# Exhibit 151

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

GAIL LUCILLE INGHAM, et al.,            )
                                         )
      *Plaintiffs*,                  )        Case No.:  1522-CC10417-01
v.                                       )
                                         )
JOHNSON & JOHNSON, et al.,              )        Division:  10
                                         )
      *Defendants*.                  )

### <u>AFFIDAVIT OF PATRICIA GRIPKA MOORMAN, M.S.P.H., PH.D.</u>

I, Patricia Moorman, do hereby declare as follows:

1.   I am over the age of 18 years of age and otherwise competent to testify to the matters contained in this affidavit.

2.   I have been retained by the Plaintiffs in this case as an expert witness. I have reviewed Defendants' Motion to Exclude Plaintiffs' Experts' General Causation Opinions. I have also reviewed the affidavit by Gregory Diette, M.D. that was attached as exhibit 12 to Defendants' Motion.

3.   The following are my responses to some of the points that Dr. Diette attempts to make in his affidavit, attached as Exhibit 12 to Defendants' Motion. My failure to address a specific point made by Dr. Diette should not be interpreted as an expression of agreement with such point. All statements of fact are true and correct, and all opinions are based on, among other things, my training and experience, research, and documents and other evidence produced to me in this case. The following are my responses to Dr. Diette's affidavit:

1

**Point 11: "it (the association between talc use and ovarian cancer) is present only in population-based case-control studies, which are incapable of proving causation"**

This opinion ignores the long history of using observational studies, both case-control and cohort studies, to assess causation between harmful exposures and cancer. In fact, the 1950 landmark epidemiologic studies describing the increased risk of lung cancer in cigarette smokers were case-control studies. (Wynder E, Graham E,1950; Doll R, Hill A. 1950). Given that it is impossible to conduct experiments on humans by intentionally exposing them to suspected carcinogens, in virtually all situations where one is trying to determine if an exposure causes cancer, scientists are relying on observational studies (both case-control and cohort studies) in humans to make a determination of causality.

It is widely-accepted that case-control studies are a valid study design for studying cancer etiology and are especially well-suited for cancers that are less common. Of all the studies of talc and ovarian cancer, the African American Cancer Epidemiology Study (AACES) is the one that was most recently initiated, with funding from the National Cancer Institute (NCI) and data collection commencing in 2010. When Dr. Schildkraut and I submitted the grant application in 2009, a reviewer expressed the opinion that a prospective cohort would be a preferred design. We successfully argued that it would be impossible to do a well-powered study of ovarian cancer in African American women in a timely manner using a prospective cohort design. In particular, we pointed out that the Black Women's Health Study, a prospective cohort with ~60,000 participants, had fewer than 100 cases of ovarian cancer within the cohort after approximately 15 years of follow-up. Therefore a case-control study was the only feasible design for studying ovarian cancer risk factors in African-American women in a reasonable time frame. The fact that our application to conduct a population-based case-control study was favorably reviewed in study section (peer-reviewed) and approved by the NCI National Cancer Advisory Board for funding is a clear indication that the case-control design is considered a reasonable and valid approach to studying cancer etiology.

It is true that the more ideal scenario would permit experimental studies in which individuals are randomly assigned to an exposure or control group and then followed to see if the disease occurs more frequently in the exposed group. It is obviously unethical as well as logistically impossible to use a randomized experimental study to determine if an exposure causes cancer.

**Point 12: "There are two types of epidemiologic studies at issue here: cohort studies and case-control studies. Cohort studies are widely regarded as more reliable than retrospective case-control studies because they are not susceptible to recall bias . . . ." "Due to the ability of the cohort studies to assess exposure at baseline instead of relying on recall, they are better suited to detect risks from exposure to an agent."**

Dr. Diette never acknowledges that cohort studies are also susceptible to bias, and in the situation of talc and ovarian cancer, the biases in the cohort studies are likely to

2

result in an attenuation of the relative risk.  Specifically, each of the cohort studies (Sister Study (Gonzalez, 2016), Nurses' Health Study (Gertig, 2000; Gates, 2008), Women's Health Initiative (Houghton, 2014) had incomplete exposure assessment.  *Talc use was assessed at one point only and there was no additional assessment of talc use during the 6 to 20+ years of follow-up of these studies.*  This likely resulted in non-differential misclassification of the exposure (i.e., the misclassification of talc use would have occurred to a similar degree in women who subsequently developed ovarian cancer and those who did not).  In general, non-differential misclassification will tend to bias results towards the null, meaning that the relative risk is not as strong as if all women were accurately classified as to their exposure.

The assessment of talc exposure was particularly weak in the Sister Study (Gonzalez, 2016).  The study participants were queried about talc use only during the previous year, so they captured neither any use prior to one year before the interview nor any use in the ~ 6 years of follow-up between the time of the interview and when the data analysis was performed.  This study reports a prevalence of use of talc of ~14%, which contrasts with the prevalence of talc use of ~40% reported in most other US studies including the Nurses' Health Study and the Women's Health Initiative.  So there is quite compelling evidence of considerable misclassification of exposure in this study.

Dr. Diette's statement that "cohort studies … assess exposure at baseline instead of relying on recall" is also somewhat misleading.  Both the Nurses' Health Study and the Women's Health Initiative asked study participants to recall their use of talc over their lifetime up to the point of the interview.  The Nurses' Health Study participants were aged 36 to 61 years when talc use was assessed in 1982 and the Women's Health Initiative participants had a mean age of 63 years at enrollment, therefore these studies also relied on women's recall of use over a long period of time, and there was likely some inaccuracy in their recall.  Inaccurate recall of past use would likely result in non-differential misclassification of the exposure, with the likely result of an attenuation of the true relative risk.

**Point 15: "Interestingly, [the Gonzales Study] separately found an association between douching and ovarian cancer, suggesting that douching (which sometimes accompanies perineal talc use) may be a confounding variable that has not sufficiently been accounted for in past studies."**

In addition to the points made above in relation to the serious concerns about inadequate exposure assessment in the Gonzalez study, it should be pointed out that despite the large size of the cohort, the study involved only 154 cases of ovarian cancer and only 17 of those had exposure to talc.  The study was not designed to study ovarian cancer and had very limited statistical power to address this outcome.

Regarding the point about douching being a potential confounder, the authors of this paper write "By contrast, talc use during the 12 months prior to study entry was associated with reduced risk after the same confounder adjustments (HR:0.73 CI: 0.44,

1.2) and there was a negligible change in the estimated effect with additional adjustment for douching (HR: 0.70 CI 0.42, 1.1)". If douching was a confounder of the association between talc use and ovarian cancer, one would have expected a substantial change in the hazard ratio once they adjusted for douching. The statement in their paper clearly indicates that their data do not show that their talc results were confounded by douching.

Furthermore, douching as a potential confounder has been addressed in at least two other studies. Hartge et al. (1983) reported "Also, we noted that cases and controls were equally likely to report douching. Since reporting of use of douches might be subject to the same recall biases as talc use, this observation suggests that little recall bias operated." The fact that cases and control were equally likely to report douching indicates that this factor would not be a confounder of the association between talc use and ovarian cancer. Harlow et al. (1992) controlled for douching as a potential confounder and still reported a statistically significant increased risk associated with talc use. As a whole, this evidence discounts the possibility that the association between talc use and ovarian cancer is due to confounding by douching.

**Point 17: Houghton study**

Another possible concern with the Houghton study is that the mean age of the participants at enrollment was 63 years, which is older than the median age of diagnosis of ovarian cancer. While it is unclear how using an cohort of older women might have affected the results, it is a point to bear in mind when considering an exposure that for many women began in their teens or 20s.

**Point 19: "none of the cohort studies – which have collectively examined more than 200,000 women"**

As described above in relation to the Gonzalez study, even a large cohort may be inadequately powered to detect an association, especially for a relatively rare cancer like ovarian cancer and for an exposure like talc where the expected relative risk is approximately 1.25 to 1.3. Despite involving >40,000 women, there were only 154 ovarian cancer cases in this study and only 17 of them reported exposure to talc, a number that clearly makes it difficult to make reliable conclusions from this study. As described in a 2016 article by Narod, et al, the lack of a significant overall association between ever use of talc and ovarian cancer in the cohort studies may be due to the fact that despite the large size of the cohorts, the studies were not adequately powered to detect a relative risk of approximately 1.2.

**Point 21: recall bias in AACES study**

Recall bias is an acknowledged possible bias in any case-control study, and it is discussed as a possible limitation in most published studies. It is worth noting that it is

4

quite standard in the epidemiologic and medical literature for authors to describe *possible* limitations of their studies in the discussion section of the paper, regardless of whether they believe those limitations had a substantial influence on the findings.

The question is whether recall bias is enough of a problem to account for the 25-30% increased risk for ovarian cancer that has been reported for talc use in multiple meta-analysis. There are studies that answer this question.

In most case-control studies of ovarian cancer, the participants complete a very extensive questionnaire –often more than 50 pages of questions addressing a wide range of factors, including some that would be expected to increase risk and some to decrease risk. Women are not told in advance of the interview what factors they will be asked about except in very general terms such as reproductive history, medical history or lifestyle characteristics. The women taking part in the case-control studies would not have known in advance of the interview that they would be asked about talc use. Since there had not been widespread publicity about talc use and ovarian cancer during the timeframe when nearly all of the studies collected data, it is difficult to imagine that the cases gave more thought to their use of talc than the controls, resulting in sufficient recall bias to account for the 25-30% increased risk.

Empirical evidence that recall bias is not likely to have a substantial effect on study findings in most circumstances comes from a study reported by Lanza, et al. (2016) in which they compared estimates from case-control studies and cohort studies in meta-analyses. The 23 meta-analyses that they examined covered a variety of interventions and outcomes and each included both case-control and cohort studies. Their overall conclusion is that estimates did not differ significantly between case-control studies and cohort studies. This study provides empirical evidence that although case-control studies theoretically have a higher risk for recall bias, in practice there are not likely to be significant differences in the estimates of the relative risks between case-control and cohort studies.

In Cramer et al.'s 2016 paper, they provide a detailed discussion of the possibility of recall bias and why it is an unlikely explanation for the association between talc and ovarian cancer. The points the authors made include: 1) the degree of misclassification that would need to exist to nullify the association is not supported by data on differences in risk factor information collected retrospectively and prospectively, 2) ORs are generally lower in studies which asked about "ever use" of talc, compared with those that specified regular use,  and 3) ORs from recent studies are lower than those from earlier studies.

As we have acknowledged, the AACES study did collect data during the timeframe when there was more publicity about talc use and ovarian cancer, and the association was stronger among the women who were interviewed more recently.  It is important to note that the association between talc use and ovarian cancer was attenuated but not

eliminated when we analyzed only the women interviewed in the earlier time frame, which indicates that the association was not due entirely to recall bias.

**Point 22:  Hospital-based case-control studies**

It is true that these studies do show a broad range of estimates in the relative risks, but there is no discussion of potential biases and limitations in the hospital-based studies. With the exception of the Wong study (Wong, 1999), the number of cases in the individual studies was small (46 to 217), so the lack of statistically significant findings even in the studies reporting ORs of 1.3 to 1.7 is not surprising.  The Wong study, with 499 cases, was better powered statistically, however it has an important limitation in its design, specifically in its choice of controls.  When conducting a case-control study (whether hospital or population-based), investigators identify individuals with the disease, ovarian cancer in this case, and select a group of individuals without the disease as a control group.  As described in the standard epidemiologic textbook, *Modern Epidemiology*, "Controls should be selected from the same population – the source population or study base – that gives rise to the cases".  In the Wong study, the controls for the ovarian cancer cases were "female patients treated for nongynecologic malignancies during the same period".  It is difficult to make the argument that other cancer patients represent the source population from which the ovarian cancer cases arose, so arguably this was a poor choice of a control group and could have led to biased findings.  Another of the hospital-based studies, the Tzonou study (Tzonou, 1993) which reported a relative risk of 1.05 also had a significant limitation.  This study was conducted in Greece and the overall prevalence of talc use in the study population was ~3.5%.  Given the small sample size and the low prevalence of exposure, this population was ill-suited to study the relation between talc use and ovarian cancer.

**Point 23:  "In summary, 11 of the 25 population-based case-control studies, including several by Dr. Moorman, do not show a statistically significant association and none of the hospital-based studies do."**

When considering the body of evidence on a topic, the statistical significance of findings from individual studies is of course something to be considered, however the overall evaluation of the association should not simply be a count of how many studies were statistically significant.  Especially when one is looking at relative risks in the range of 1.2 to 1.3 and some of the studies are relatively small (either in total sample size or total number of cases), it would be expected that some studies will not be statistically significant.  In many cases, talc use was one of many exposures examined in a particular study and the study was not specifically designed and powered to look at talc.  Part of the rationale for performing meta-analyses is to combine data from all relevant studies (statistically significant or not) to come up with an overall estimate of risk that is more statistically robust.

To illustrate this point, it is useful to compare the data from the talc and ovarian cancer studies to the data on passive smoking (also known as second-hand smoke or environmental tobacco smoke) and lung cancer. Like talc, passive smoke is a very common exposure in the population that can only be assessed retrospectively through self-report, making it difficult to quantify the precise level of exposure. Numerous epidemiologic studies have assessed the association between passive smoke exposure and many of the individual studies reported odds ratios or relative risks that were not statistically significant. Nonetheless, IARC has judged on the totality of evidence that there is a causal association between passive smoke exposure and lung cancer. The epidemiologic evidence on passive smoke exposure and lung cancer was summarized in a 2007 meta-analysis by Taylor, et al. (2007), which combined data from 55 studies and reported a statistically significant pooled relative risk of 1.27 (95% CI 1.17-1.37). The relative risks from individual studies ranged from 0.66 to 2.57, with 44 of the 55 (80%) individual studies reporting a relative risk or odds ratio greater than 1. Only 10 of the 55 (18%) studies reported statistically significant odds ratios or relative risks.

The data from the 2017 meta-analysis of talc and ovarian cancer by Berge et al. reported a pooled relative risk of 1.22 (95% CI 1.13-1.30) with values from individual studies ranging from 0.70 to 3.90. Twenty-four of the 27 (89%) studies reported a relative risk or odds ratio greater than 1, and statistically significant associations were reported in 13 of the 27 (48%) of the studies. So, as compared to the epidemiologic data on the well-accepted causal association between passive smoke exposure and lung cancer, the epidemiologic data on talc and ovarian cancer shows an overall relative risk estimate of similar magnitude, with a greater proportion of studies reporting relative risks >1 and a greater proportion reporting statistically significant associations.

Other examples of exposure-disease associations that are considered causal associations by IARC, have relative risks in the same range as talc and ovarian cancer, and meta-analyses conclude there is a statistically significant overall association even when a substantial number of the studies included in the meta-analysis did not have statistically significant findings include red or processed meat consumption and colorectal cancer, menopausal estrogen use and breast cancer, oral contraceptives and breast cancer, and residential radon exposure and lung cancer.(IARC, 2008, 2009, 2012; Chan, 2011; Shah, 2005; Collaborative Group on Hormonal Factors, 1996; Zhang, 2012).

**Point 24: Meta-analysis summary**

Dr. Diette's summary of the meta-analyses ignores results and conclusions from the most recently published meta-analysis by Penninkilampi and Eslick (2018). Specifically, statistically significant associations with serous invasive ovarian cancer (the most common histologic type of ovarian cancer) were found in both case-control and cohort studies (Table 2). Their overall conclusions include "In general, there is a consistent association between perineal talc use and ovarian cancer" and "While the results of case-control studies are prone to recall bias, especially with intense media attention following the commencement of litigation in 2014, the confirmation of an association in

7

cohort studies between perineal talc use and serous invasive ovarian cancer is suggestive of a causal association."

4.   The following are my responses to some of the points that Defendants attempt to make in their motion to strike my general causation opinions. My failure to address a specific point made by Defendants should not be interpreted as an expression of agreement with that point.

**Page 26**

Regarding my oversight in failing to disclose that I was a plaintiffs' expert to the journal for a recently published paper, this was a non-intentional oversight on my part, which I acknowledged in my deposition.  I was one of ~40 authors on a paper that examined about 20 different exposures.  I contacted the journal's editor immediately after it was brought to my attention and was told they would include a correction to the paper.  It was clear to me that the editor agreed it should be corrected but did not think it was a serious concern.

**Page 61**

The point that an increase in other gynecologic cancers . . . such as vaginal cancer, cervical cancer, uterine cancer or fallopian tube cancer would be expected if cosmetic talc is a carcinogen that travels to the ovaries via the reproductive tract is not a valid argument.  Carcinogens typically do not cause cancer across all body sites.  It is very common that associations between exposures and cancers differ across different body organs, even when considering those that might be thought to have similarities, e.g. hormone-related cancers.  To give just a few examples:

- Oral contraceptives are associated with a reduced risk for ovarian and endometrial cancer  but increased risk for breast and cervical cancer.

- Menopausal estrogen increases risk for ovarian cancer and endometrial cancer more than menopausal estrogen plus progestin, but the converse is true for breast cancer.

- Smoking increases risk for lung and oral cavity cancers but is associated with a reduced risk of endometrial cancer.

I think it's worthwhile to address comments made throughout the documents indicating that many publications, including some of my own, do not describe the repeatedly observed association between talc and ovarian cancer as "causal".  In the May 2018 issue of the American Journal of Public Health, there are three

commentaries/editorials that address how investigators who conduct observational studies often avoid the use of "causal language" in their manuscripts, often at the request of co-authors, editors or reviewers.(Galea S and Vaughn RD; Hernan MA; Begg MD and March D, 2018). The message of these papers is that "causal" has become "a dirty word, the C-word that researchers have learned to avoid". The authors argue that avoidance of causal language has been harmful to science, using the term "causal" can more accurately reflect the objectives of the research and there should be a move to reintroduce causal language into population health science research. These papers clearly articulate why very few of the papers or meta-analyses describe talc as a "cause" of ovarian cancer despite the multiple meta-analyses and individual studies indicating statistically significant associations between talc and ovarian cancer. Although the intent of these studies was to see if talc was a cause of ovarian cancer, the standards within the profession led most authors to avoid such terminology and instead use the "risk factor" or "association" terminology.

5.  The following references support this rebuttal:

> Begg MD, March D. Cause and association: missing the forest for the trees. AJPH 2018; 108: 620.

> Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. Eur J Cancer Prev. 2017.

> Chan DS, et al.  Red and processed meat and colorectal cancer incidence: meta-analysis of prospective studies.  PLoS One 2011; 6: e20456.

> Collaborative Group on Hormonal Factors in Breast C. Breast cancer and hormonal contraceptives: collaborative reanalysis of individual data on 53 297 women with breast cancer and 100 239 women without breast cancer from 54 epidemiological studies. Lancet. 1996;347(9017):1713-1727.

> Cramer DW, Vitonis AF, Terry KL, Welch WR, Titus LJ. The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States. Epidemiology. 2016;27(3):334-346.

> Doll R, Hill A. Smoking and carcinoma of the lung: preliminary report. BMJ 1950; 2: 739-48

> Galea S, Vaughan RD.  Moving beyond the cause constraint: a public health of consequence, May 2018.  AJPH 2018; 108: 602-3.

> Gates MA, Tworoger SS, Terry KL, et al. Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer. Cancer Epidemiol Biomarkers Prev. 2008;17(9):2436-2444.

> Gertig DM, Hunter DJ, Cramer DW, et al. Prospective study of talc use and ovarian cancer. J Natl Cancer Inst. 2000;92(3):249-252.

Gonzalez NL, O'Brien KM, D'Aloisio AA, Sandler DP, Weinberg CR. Douching, Talc Use, and Risk of Ovarian Cancer. Epidemiology. 2016;27(6):797-802.

Harlow BL, Cramer DW, Bell DA, Welch WR. Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol. 1992;80(1):19-26.

Hartge P, Hoover R, Lesher LP, McGowan L. Talc and ovarian cancer. JAMA. 1983;250(14):1844.

Hernan MA. The C-word: scientific euphemisms do not improve causal inference from observational data.  AJPH 2018; 108: 616-619.

Houghton SC, Reeves KW, Hankinson SE, et al. Perineal powder use and risk of ovarian cancer. J Natl Cancer Inst. 2014;106(9).

IARC A review of human carcinogens.  Part E: Personal habits and indoor combustions / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans. Lyon, France2009.

IARC A review of human carcinogens.  Part A: Pharmaceuticals / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans Lyon, France2008.

IARC A review of human carcinogens. Part D: Radiation IARC Working Group on the Evaluation of Carcinogenic Risks to Humans Lyon, France 2012.

Lanza A, et al. Comparison of estimates between cohort and case-control studies in meta-analyses of therapeutic interventions: a meta-epidemiological study.  PLoS One 2016; 11: e0154877.

Narod SA. Talc and ovarian cancer. Gynecol Oncol. 2016;141(3):410-412.

Penninkilampi R, Eslick GD. Perineal talc use and ovarian cancer.  A systematic review and meta-analysis.  Epidemiology 2018; 29: 41-49.

Schildkraut JM, Alberg AJ, Bandera EV, et al. A multi-center population-based case-control study of ovarian cancer in African-American women: the African American Cancer Epidemiology Study (AACES). BMC cancer. 2014;14:688.

Shah NR, et al. Postmenopausal hormone therapy and breast cancer: a systematic review and meta-analysis.  Menopause 2005; 12: 668-78.

Taylor R, et al.  Meta-analysis of studies of passive smoking and lung cancer: effects of study type and continent.  Int J Epidmiol 2007; 36: 1048-1059.

Tzonou A, Polychronopoulou A, Hsieh CC, Rebelakos A, Karakatsani A, Trichopoulos D. Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. *Int J Cancer*. 1993;55(3):408-410.

Wong C, Hempling RE, Piver MS, Natarajan N, Mettlin CJ. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. *Obstet Gynecol*. 1999;93(3):372-376.

Wynder E, Graham E.  Tobacco smoking as a possible etiologic factor in bronchogenic carcinoma.  JAMA 1950; 143: 329-36

Zhang ZL et al. Residential radon and lung cancer risk: an updated meta-analysis of case-control studies.  Asian Pac J Cancer Prev 2012; 13: 2459-65."

FURTHER AFFIANT SAYETH NOT.


PATRICIA MOORMAN, M.S.P.H., PH.D.


SWORN AND SUBSCRIBED TO before me this 21st day of May, 2018:


Notary

Commission expires: 9-18-22

11

Exhibit 152

*Name of Committee:* Center for Scientific Review Special Emphasis Panel, Adolescent Depression.

*Date:* October 28, 2005.

*Time:* 12 p.m. to 1 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Bethesda Marriott Suites, 6711 Democracy Boulevard, Bethesda, MD 20817.

*Contact Person:* Karen Sirocco, PhD, Scientific Review Administrator, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 3176, MSC 7848, Bethesda, MD 20892, 301–435–0676, *siroccok@csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel, Epigenetic Changes in Mouse Skin Tumor Susceptibility.

*Date:* October 28, 2005.

*Time:* 12 p.m. to 1:30 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, (Telephone Conference Call).

*Contact Person:* Elaine Sierra-Rivera, PhD, Scientific Review Administrator, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 6184, MSC 7804, Bethesda, MD 20892, 301–435–1779, *riverase@csr.nih.gov.*

*Name of Committee:* Musculoskeletal, Oral and Skin Sciences Integrated Review Group, Musculoskeletal Tissue Engineering Study Section.

*Date:* October 31–November 1, 2005.

*Time:* 8 a.m. to 5 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Hyatt Regency Bethesda, One Bethesda Metro Center, 7400 Wisconsin Avenue, Bethesda, MD 20814.

*Contact Person:* Jean Dow Sipe, PhD, Scientific Review Administrator, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 4106, MSC 7814, Bethesda, MD 20892, 301–435–1743, *sipej@csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel, Conflicts in Biological Chemistry and Macromolecular Biophysics.

*Date:* October 31, 2005.

*Time:* 8 a.m. to 5 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Holiday Inn Select Bethesda, 8120 Wisconsin Ave., Bethesda, MD 20814.

*Contact Person:* Donald L. Schneider, PhD, Scientific Review Administrator, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 4172, MSC 7806, Bethesda, MD 20892, 301–435–1727, *schneidd@csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel, F–13 Fellowship.

*Date:* October 31–November 1, 2005.

*Time:* 8 a.m. to 5 p.m.

*Agenda:* To review and evaluate grant applications. and/or proposals.

*Place:* The Watergate, 2650 Virginia Avenue, NW., Washington, DC 20037.

*Contact Person:* John C. Pugh, PHD, Scientific Review Administrator, Center for

Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 3114, MSC 7808, Bethesda, MD 20892, (301) 435–2398, *pughjohn@csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel, Cancer Diagnostic and Treatment SBIR/STTR.

*Date:* October 31–November 1, 2005.

*Time:* 8 a.m. to 5 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Hyatt Regency Bethesda, One Bethesda Metro Center, 7400 Wisconsin Avenue, Bethesda, MD 20814.

*Contact Person:* Hungyi Shau, PHD, Scientific Review Administrator, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 6214, MSC 7804, Bethesda, MD 20892, 301–435–1720, *shauhung@csr.nih.gov.*

*Name of Committee:* Oncological Sciences Integrated Review Group, Radiation Therapeutics and Biology Study Section.

*Date:* October 31–November 1, 2005.

*Time:* 8:30 a.m. to 5 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Hyatt Regency Bethesda, One Bethesda Metro Center, 7400 Wisconsin Avenue, Bethesda, MD 20814.

*Contact Person:* Bo Hong, PHD, Scientific Review Administrator, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 6194, MSC 7804, Bethesda, MD 20892, 301–435–5879, *hongb@csr.nih.gov.*

*Name of Committee:* Bioengineering Sciences & Technologies Integrated Review Group, Modeling and Analysis of Biological Systems Study Section.

*Date:* October 31–November 1, 2005.

*Time:* 8:30 a.m. to 5 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* Hyatt Regency Bethesda, One Bethesda Metro Center, 7400 Wisconsin Avenue, Bethesda, MD 20814.

*Contact Person:* Malgorzata Klosek, Scientific Review Administrator, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 4188, MSC 7849, Bethesda, MD 20892, (301) 435–2211, *klosekm@mail.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel, Drug Discovery and Development SBIR/STTR

*Date:* October 31, 2005.

*Time:* 8:30 a.m. to 6 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* One Washington Circle Hotel, One Washington Circle, Washington, DC 20037

*Contact Person:* Sergei Ruvinov, PHD, Scientific Review Administrator, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 4158, MSC 7806, Bethesda, MD 20892, 301–435–1180, *ruvinser@csr.nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel, Member Conflict: Surgery, Anesthesiology, and Trauma.

*Date:* October 31, 2005.

*Time:* 2 p.m. to 4 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, (Telephone Conference Call).

*Contact Person:* Roberto J. Matus, MD, Scientific Review Administrator, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 5108, MSC 7854, Bethesda, MD 20892, 301–435–2204, *matusr@csr.nih.gov.*

(Catalogue of Federal Domestic Assistance Program Nos. 93.306, Comparative Medicine; 93.333, Clinical Research, 93.306, 93.333, 93.337, 93.393–93.396, 93.837–93.844, 93.846–93.878, 93.892, 93.893, National Institutes of Health, HHS)

Dated: October 6, 2005.

**Anthony M. Coelho, Jr.,**

*Acting Director, Office of Federal Advisory Committee Policy.*

[FR Doc. 05–20739 Filed 10–17–05; 8:45 am]

**BILLING CODE 4140–01–M**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### Center for Scientific Review; Amended Notice of Meeting

Notice is hereby given of a change in the meeting of the Center for Scientific Review Special Emphasis Panel, October 17, 2005, 1 p.m. to October 17, 2005, 2 p.m., National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892 which was published in the **Federal Register** on September 30, 2005, 70 FR 57304–57305.

The meeting will be held on October 13, 2005. The meeting time and location remain the same. The meeting is closed to the public.

Dated: October 6, 2005.

**Anthony M. Coelho, Jr.,**

*Acting Director, Office of Federal Advisory Committee Policy.*

[FR Doc. 05–20740 Filed 10–17–05; 8:45 am]

**BILLING CODE 4140–01–M**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### National Toxicology Program (NTP); Report on Carcinogens; Status of Nominations to the 12th Report on Carcinogens (RoC): Request for Comments and Nominations of Scientific Experts

**AGENCY:** National Institute of Environmental Sciences (NIEHS), National Institutes of Health (NIH), HHS.

**ACTION:** Request for Comments and Nominations of Scientific Experts.

**SUMMARY:** The NTP invites public comments on an updated list of nominations proposed for review in the 12th RoC and the nomination of scientists who have expertise and/or knowledge relevant to the evaluation of carcinogenicity for these nominations (see **SUPPLEMENTARY INFORMATION**). Information on the nominations under consideration for the RoC can be obtained at the NTP Web site *http:// ntp.niehs.nih.gov* (select ''Report on Carcinogens'') or by contacting Dr. C.W. Jameson at the address provided below.

**DATES:** Comments and nominations will be accepted until November 17, 2005.

**ADDRESSES:** All correspondence should be directed to Dr. C. W. Jameson, National Toxicology Program, Report on Carcinogens, 79 Alexander Drive, Building 4401, Room 3118, P.O. Box 12233, Research Triangle Park, NC 27709; phone: (919) 541–4096, fax: (919) 541–0144, e-mail: *jameson@niehs.nih.gov*.

**SUPPLEMENTARY INFORMATION:**

**Background**

This notice provides an update on the current status of and/or additions to the list of nominations identified in earlier **Federal Register** notices relevant to the 12th RoC [69FR28940 (May 19, 2004) and 69FR62276 (October 25, 2004)]. All but the newly identified nomination of formaldehyde were announced in earlier **Federal Register** notices. Any additional nominations for the 12th RoC or modifications to the nominations in the attached table will be announced in future **Federal Register** notices.

**Request for Comments on Nominations to the RoC**

The following table identifies the nominations that the NTP has under consideration for review as either a new listing in the RoC or as a change in the current listing. These nominations are provided with their Chemical Abstracts Services (CAS) Registry numbers (where available) and pending review action. The NTP solicits public input on these nominations and asks for relevant information concerning their carcinogenicity as well as current data on production, patterns of use, or human exposure. The NTP also invites interested parties to identify any scientific issues related to the listing of a specific nomination in the RoC that they feel should be addressed during the reviews. Individuals who submitted comments in response to the May 19, 2004 **Federal Register** (69FR28940) and/ or the October 25, 2004 **Federal Register** notice (69FR62276) need not re-submit their comments as they are already part of the public record. Individuals submitting public comments are asked to include relevant contact information [name, affiliation (if any), address, telephone, fax, and e-mail] and sponsoring organization, if applicable. Written submissions will be made available on the NTP Web site as they are received (*http://ntp.niehs.nih.gov/* select ''Report on Carcinogens'') and added to the public record.

**Request for Nominations of Scientific Experts**

The NTP solicits nominations of scientists who have expertise and/or knowledge relevant to the evaluation of carcinogenicity for the selected nominations. These scientists should have expertise in various aspects of toxicology, epidemiology, carcinogenesis, or other relevant areas of science (*e.g.*, genetic toxicity, metabolism, etc.) and/or experience with the agent being reviewed. The experts may be used to write and/or review the background documents prepared on selected nominations. Nominations of scientists should include contact information for the nominee [name, affiliation (if any), address, telephone, fax, and e-mail], the specific nominated agent(s) (listed in the table below) for which they are being recommended as an expert, and a

curriculum vitae (if possible). Contact information for the nominator must also be provided.

**Additional Nominations Encouraged**

The NTP solicits and encourages the broadest participation from interested individuals or parties in nominating agents, substances, or mixtures for review for future RoCs. Nominations should contain a rationale for review. Appropriate background information and relevant data [e.g., journal articles, NTP Technical Reports, International Agency for Research on Cancer (IARC) listings, exposure surveys, release inventories, etc.] that support the review of a nomination should be provided or referenced when possible. Contact information for the nominator should also be included [name, affiliation (if any), address, telephone, fax, and e-mail].

**Background Information on the Report on Carcinogens**

The RoC is a congressionally mandated document [Section 301(b)(4) of the Public Health Services Act, 42 U.S.C. 241(b)(4)], published by the Secretary of Health and Human Services (HHS), that identifies agents, substances, mixtures, or exposure circumstances (collectively referred to as ''substances'') that may pose a carcinogenic hazard to human health. The Secretary, HHS, has delegated responsibility for preparing the draft report to the NTP. Substances are listed in the RoC as either known to be a human carcinogen or reasonably anticipated to be a human carcinogen. Review of nominations (substances that are under consideration for listing or removing from the RoC) involves a multi-step scientific review process with opportunity for public comment.

Dated: October 6, 2005.

**Samuel H. Wilson,**

*Deputy Director, National Institute of Environmental Health Sciences.*

STATUS OF NOMINATIONS TO BE REVIEWED FOR THE REPORT ON CARCINOGENS

| Nomination/CAS No. | Primary uses or exposures | Nominator | Basis for nomination | Status |
|---|---|---|---|---|
| [1] Herbal remedies con- taining aristolochic acid. *Note—this nomination was previously identified as ''Aristolochia-Related Herbal Remedies''. | Several *Aristolochia* spe- cies (notably *A. contorta, A. debilis, A. fangchi* and *A. manshuriensis*) have been used in tradi- tional Chinese medicine as antirheumatics, as diuretics, in the treat- ment of edema, and for other conditions such as hemorrhoids, coughs, and asthma. | NIEHS .............................. | Herbal remedies con- taining the plant genus *Aristolochia:* IARC [2] find- ing of sufficient evidence of carcinogenicity in hu- mans (IARC Monograph Vol. 82, 2002). | Review for possible listing in 12th RoC. |

STATUS OF NOMINATIONS TO BE REVIEWED FOR THE REPORT ON CARCINOGENS—Continued

| Nomination/CAS No. | Primary uses or exposures | Nominator | Basis for nomination | Status |
|---|---|---|---|---|
| Aristolochic Acid ............... | Aristolochic acid, the principle extract from Aristolochia, is a mixture of nitrophenanthrene carboxylic acids. | NIEHS ............................. | Naturally occurring mixtures of aristolochic acids: IARC [2] finding of sufficient evidence of carcinogenicity in animals and limited evidence in humans (IARC Monograph Vol. 82, 2002). | Review for possible listing in 12th RoC. |
| Asphalt fumes .................... | Asphalt is a petroleum product used in paving and roofing operations. Asphalt fumes are a cloud of small particles generated after volatilization of asphalt aggregates. | Private Individual .............. | Human epidemiological studies have reported an increased risk of lung cancer among workers exposed to asphalt fumes and asphalt fumes caused skin tumors in experimental animals. Additionally, known human carcinogens (polycyclic aromatic hydrocarbons or PAHs) have been found in asphalt fumes. | Defer review of nomination until the 13th RoC. |
| Atrazine (192–24–9) .......... | Atrazine is an herbicide used to control grass and broad-leaved weeds. Atrazine has been detected at levels that exceeded or approached the maximum contaminant level (MCL) for atrazine in 200 community surface drinking water systems. | NIEHS ............................. | IARC [2] finding of sufficient evidence of carcinogenicity in animals (IARC Monograph Vol. 73, 1999). | Defer review of nomination until the 13th RoC. |
| Benzofuran (271–89–6) ..... | Benzofuran is produced by isolation from coal-tar oils. Benzofuran is used in the manufacture of coumarone-indene resins, which harden when heated and are used to make floor tiles and other products. | NIEHS ............................. | Results of a NTP bioassay (NTP Technical Report 370, 1989) [3], which reported clear evidence of carcinogenicity in male and female mice and some evidence of carcinogenicity in female rats. | Defer review of nomination until the 13th RoC. |
| Captafol (2425–06–01) ...... | Captafol is a fungicide that has been widely used since 1961 for the control of fungal diseases in fruits, vegetables, and some other plants. Use of captafol in the United States was banned in 1999. | NIEHS ............................. | IARC [2] finding of sufficient evidence of carcinogenicity in animals (IARC Monograph Vol. 53, 1991). IARC also noted that captafol is positive in many genetic assays including the in-vivo assay for dominant lethal mutation. | Review for possible listing in 12th RoC. |
| [1] Cobalt-tungsten carbide powders and hard metals.<br>*Note—This nomination was previously identified as "Cobalt/Tungsten-Carbide Hard Metal Manufacturing". | Cobalt-tungsten carbide hard-metals are manufactured by a process of powder metallurgy from tungsten and carbon (tungsten carbide), and small amounts of other metallic compounds using cobalt as a binder. They are used to make cutting and grinding tools, dies, and wear products for a broad spectrum of industries including oil and gas drilling, and mining. | NIEHS ............................. | Recent human cancer studies on the hard metal manufacturing industry showing an association between exposure to hard metals (cobalt tungsten-carbide) and lung cancer. | Review for possible listing in 12th RoC. |

STATUS OF NOMINATIONS TO BE REVIEWED FOR THE REPORT ON CARCINOGENS—Continued

| Nomination/CAS No. | Primary uses or exposures | Nominator | Basis for nomination | Status |
|---|---|---|---|---|
| Di (2-ethylhexyl) phthalate (DEHP) (117–81–7). | DEHP is mainly used as a plasticizer in polyvinyl chloride (PVC) resins for fabricating flexible vinyl products. PVC resins have been used to manufacture toys, dolls, vinyl upholstery, tablecloths, and many other products. | Private Individual ............... | Currently listed in the RoC as reasonably anticipated to be a human carcinogen. IARC [2] reclassification as not classifiable as to its carcinogenicity to humans (Group 3) (IARC Monograph Vol. 77, 2000). IARC stated that there was sufficient evidence for the carcinogenicity in experimental animals; however, the mechanism for liver tumor involves peroxisome proliferation that is not relevant to humans. | Review for possible removal of listing in 12th RoC. |
| Etoposide in combination with cisplatin and bleomycin. | Etoposide in combination with cisplatin and bleomycin is used to treat testicular germ cell cancers. | NIEHS ............................... | IARC [2] finding of sufficient evidence of carcinogenicity in humans (IARC Monograph Vol. 76, 2000). | Review for possible listing in 12th RoC. |
| Etoposide (33419–42–0) ... | Etoposide is a DNA topoisomerase II inhibitor used in chemotherapy for non-Hodgkin's lymphoma, small-cell lung cancer, testicular cancer, lymphomas, and a variety of childhood malignancies. | NIEHS ............................... | IARC [2] finding of limited evidence of carcinogenicity in humans (IARC Monograph Vol. 76, 2000). | Review for possible listing in 12th RoC. |
| Formaldehyde (50–00–0) .. | Formaldehyde is primarily used in the production of resins that are used in the production of many different products including plastics, adhesives and binders for wood products, pulp and paper, synthetic fibers, and in textile finishing. It is also used as a disinfectant and preservative and as an intermediate for many industrial chemicals. | NIEHS ............................... | Formaldehyde (gas) is currently listed in the RoC as reasonably anticipated to be a human carcinogen. Nominated for reconsideration based on the 2004 IACR [2] review, which concluded that there was sufficient evidence for the carcinogenicity of formaldehyde in humans (IARC Monograph Vol. 88, 2004). | Review for possible reclassification of listing status in 12th RoC. |

STATUS OF NOMINATIONS TO BE REVIEWED FOR THE REPORT ON CARCINOGENS—Continued

| Nomination/CAS No. | Primary uses or exposures | Nominator | Basis for nomination | Status |
|---|---|---|---|---|
| [1] Certain Glass Wool Fibers.<br>*Note—This nomination was previously identified as "Glass wool (respirable size): Two nominations: (1) Insulation glass wool fibers, and (2) Special purpose glass fibers". | Glass wool fibers, which are a type of synthetic vitreous fibers, are an inorganic fibrous material manufactured primarily from glass and processed inorganic oxides. The composition of these fibers may vary substantially because of differences in end-use, manufacturing requirements, and biopersistence considerations. The major uses of glass wool are in thermal, electrical, and acoustical insulation, weatherproofing, and filtration media. Some glass wool fibers (special purpose fibers) are used for high-efficiency air filtration media, and acid battery separators. | North American Insulation Manufacturers Association nominated glass wool (respirable size) for delisting.<br>NIEHS recommended that the nomination be defined as "certain glass wool fibers" because of the considerable differences in the composition of glass wool fibers. | Glass wool (respirable size) is currently listed in the RoC as reasonably anticipated to be a human carcinogen.<br>Insulation glass wool: IARC[2] finding of limited evidence of carcinogenicity in animals and evaluation as not classifiable as to its carcinogenicity to humans (Group 3) (IARC Monograph Vol. 81, 2002).<br>Special-purpose glass fibers: IARC[2] finding of sufficient evidence of carcinogenicity in animals (IARC Monograph Vol. 81, 2002). | Review for possible listing in 12th RoC. |
| Metalworking Fluids | Metal working fluids are complex mixtures that may contain mixtures of oil, emulsifiers, anti-weld agents, corrosion inhibitors, extreme pressure additives, buffers biocides, and other additives. They are used to cool and lubricate tools and working surfaces in a variety of industrial machining and grinding operations. | NIEHS | Recent human cancer studies of metal working fluids that show an association between exposure to these materials and cancer at several tissue sites. | Review for possible listing in 12th RoC. |
| ortho-Nitrotoluene (88–72–2). | ortho-Nitrotoluene is used to synthesize agricultural and rubber chemicals, azo and sulfur dyes, and dyes for cotton, wool, silk, leather, and paper. | NIEHS | Results of a NTP bioassay (NTP Technical Report 504, 2002)[3], which reported clear evidence of carcinogenicity in rats and mice. | Review for possible listing in 12th RoC. |
| Oxazepam (604–75–1) | Oxazepam is a benzodiazepine used extensively since the 1960s for the treatment of anxiety and insomnia and in the control of symptoms of alcohol withdrawal. | NIEHS | Results of a NTP bioassay (NTP Technical Report 443, 1993)[3], which reported clear evidence of carcinogenicity in male and female mice. | Defer review of nomination until the 13th RoC. |
| Riddelliine (23246–96–0) | Riddelliine is found in class of plants growing in western United States. Cattle, horses, and sheep ingest these toxic plants. Residues have been found in milk and honey. | NIEHS | Results of a NTP bioassay (NTP Technical Report 508, 2003)[3], which reported clear evidence of carcinogenicity in male and female rats and mice. | Review for possible listing in 12th RoC. |
| Styrene (100–42–5) | Styrene is used in the production of polystyrene, acrylonitrile-butadiene-styrene resins, styrene-butadiene rubbers and latexes, and unsaturated polystyrene resins. | Private Individual | IARC[2] finding of limited evidence of carcinogenicity in animals and limited evidence of carcinogenicity in humans (IARC Monograph Vol. 82, 2002). | Review for possible listing in 12th RoC. |

STATUS OF NOMINATIONS TO BE REVIEWED FOR THE REPORT ON CARCINOGENS—Continued

| Nomination/CAS No. | Primary uses or exposures | Nominator | Basis for nomination | Status |
|---|---|---|---|---|
| Talc (Two nominations) ..... (1) Cosmetic talc ............... (2) Occupational exposure to talc. | Talc occurs in various geological settings around the world. Exposure to general population occurs through use of products such as cosmetics. Occupational exposure occurs during mining, milling, and processing. | NIEHS ............................. | The NTP deferred consideration of listing talc (asbestiform and non-asbestiform talc) in the 10th RoC because its 2000 review of talc found that there has been considerable confusion over the mineral nature and consequences of exposure to talc, both containing asbestiform fibers and not containing asbestiform fibers. It has become evident that the literature on both forms of talc, with a few exceptions, provides an inadequate characterization of the actual materials under study to enable one to reach definitive conclusions concerning the specific substances responsible for the range of adverse health outcomes reported. | Withdrawn from review. |
| Teniposide (29767–20–2) | Teniposide is a DNA topoisomerase II inhibitors used mainly in the treatment of adult and childhood leukemia. | NIEHS ............................. | IARC [2] finding of limited evidence of carcinogenicity in humans (IARC Monograph Vol. 76, 2000). | Review for possible listing in 12th RoC. |
| Vinyl Mono-Halides as a class. | Vinyl halides are used in the production of polymers and copolymers. Vinyl bromide is mainly used in polymers as a flame retardant and in the production of monoacrylic fibers for carpet-backing materials. Vinyl chloride is used to produce polyvinyl chloride and copolymers. Vinyl fluoride is used in the production of polyvinyl fluoride, which when laminated with aluminum, steel and other materials, is used as a protective surface for the exteriors of residential and commercial buildings. | NIEHS ............................. | Vinyl fluoride and vinyl bromide are currently listed in the RoC as reasonably anticipated to be a human carcinogen and vinyl chloride is currently listed in the RoC as a known to be a human carcinogen. Vinyl mono-halides: Structural similarities and common mechanisms of tumor formation. | Defer review of nomination until the 13th RoC. |

[1] Nomination has been redefined based on public comments received from earlier **Federal Register** notices and/or review of the literature.
[2] International Agency for Research on Cancer (IARC). IARC Monographs are available from *http://monographs.iarc.fr/*.
[3] NTP Technical Reports are available at *http://ntp.niehs.nih.gov/* see "NTP Study Reports."

[FR Doc. 05–20729 Filed 10–17–05; 8:45 am]
BILLING CODE 4140–01–P

# DEPARTMENT OF HOMELAND SECURITY

## Federal Emergency Management Agency

[FEMA–1605–DR]

### Alabama; Amendment No. 7 to Notice of a Major Disaster Declaration

**AGENCY:** Federal Emergency Management Agency, Emergency Preparedness and Response Directorate, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice amends the notice of a major disaster declaration for the State of Alabama (FEMA–1605–DR), dated August 29, 2005, and related determinations.

**EFFECTIVE DATE:** October 5, 2005.

**FOR FURTHER INFORMATION CONTACT:** Magda Ruiz, Recovery Division, Federal Emergency Management Agency, Washington, DC 20472, (202) 646–2705.

**SUPPLEMENTARY INFORMATION:** The notice of a major disaster declaration for the State of Alabama is hereby amended to include the following area among those areas determined to have been adversely affected by the catastrophe declared a major disaster by the President in his declaration of August 29, 2005: Marengo County for Individual Assistance (already designated for Public Assistance.)

(The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund Program; 97.032, Crisis Counseling; 97.033, Disaster Legal Services Program; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance; 97.048, Individuals and Households Housing; 97.049, Individuals and Households Disaster Housing Operations; 97.050 Individuals and Households Program-Other Needs, 97.036, Public Assistance Grants; 97.039, Hazard Mitigation Grant Program.)

**R. David Paulson,**
*Acting Under Secretary, Emergency Preparedness and Response, Department of Homeland Security.*
[FR Doc. 05–20770 Filed 10–17–05; 8:45 am]
BILLING CODE 9110–10–P

# DEPARTMENT OF HOMELAND SECURITY

## Federal Emergency Management Agency

[FEMA–1603–DR]

### Louisiana; Amendment No. 4 to Notice of a Major Disaster Declaration

**AGENCY:** Federal Emergency Management Agency, Emergency Preparedness and Response Directorate, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice amends the notice of a major disaster declaration for the State of Louisiana (FEMA–1603–DR), dated August 29, 2005, and related determinations.

**EFFECTIVE DATE:** October 7, 2005.

**FOR FURTHER INFORMATION CONTACT:** Magda Ruiz, Recovery Division, Federal Emergency Management Agency, Washington, DC 20472, (202) 646–2705.

**SUPPLEMENTARY INFORMATION:** The notice of a major disaster declaration for the State of Louisiana is hereby amended to include the following areas among those areas determined to have been adversely affected by the catastrophe declared a major disaster by the President in his declaration of August 29, 2005:

All parishes in the State of Louisiana are eligible to apply for assistance under the Hazard Mitigation Grant Program. (The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund Program; 97.032, Crisis Counseling; 97.033, Disaster Legal Services Program; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance; 97.048, Individuals and Households Housing; 97.049, Individuals and Households Disaster Housing Operations; 97.050 Individuals and Households Program—Other Needs, 97.036, Public Assistance Grants; 97.039, Hazard Mitigation Grant Program.)

**R. David Paulson,**
*Acting Under Secretary, Emergency Preparedness and Response, Department of Homeland Security.*
[FR Doc. 05–20769 Filed 10–17–05; 8:45 am]
BILLING CODE 9110–10–P

# DEPARTMENT OF HOMELAND SECURITY

## Federal Emergency Management Agency

[FEMA–1607–DR]

### Louisiana; Amendment No. 7 to Notice of a Major Disaster Declaration

**AGENCY:** Federal Emergency Management Agency, Emergency Preparedness and Response Directorate, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice amends the notice of a major disaster declaration for the State of Louisiana (FEMA–1607–DR), dated September 24, 2005, and related determinations.

**EFFECTIVE DATE:** October 7, 2005.

**FOR FURTHER INFORMATION CONTACT:** Magda Ruiz, Recovery Division, Federal Emergency Management Agency, Washington, DC 20472, (202) 646–2705.

**SUPPLEMENTARY INFORMATION:** The notice of a major disaster declaration for the State of Louisiana is hereby amended to include the following areas among those areas determined to have been adversely affected by the catastrophe declared a major disaster by the President in his declaration of September 24, 2005:

Evangeline, Sabine, St. Landry, and Vernon Parishes for Public Assistance [Categories C–G] (already designated for Individual Assistance and debris removal and emergency protective measures [Categories A and B] under the Public Assistance program, including direct Federal assistance.)

De Soto, Natchitoches, and Rapides Parishes for Public Assistance [Categories C–G] (already designated for debris removal and emergency protective measures [Categories A and B] under the Public Assistance program, including direct Federal assistance.)

(The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund Program; 97.032, Crisis Counseling; 97.033, Disaster Legal Services Program; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance; 97.048, Individuals and Households Housing; 97.049, Individuals and Households Disaster Housing Operations; 97.050 Individuals and Households Program—Other Needs, 97.036, Public Assistance Grants; 97.039, Hazard Mitigation Grant Program.)

**R. David Paulson,**
*Acting Under Secretary, Emergency Preparedness and Response, Department of Homeland Security.*
[FR Doc. 05–20773 Filed 10–17–05; 8:45 am]
BILLING CODE 9110–10–P

Exhibit 153

# Epidemiologic Perspectives & Innovations



BioMed Central

Methodology

Open Access

# Trend tests for the evaluation of exposure-response relationships in epidemiological exposure studies

Ludwig A Hothorn*[1], Michael Vaeth[2] and Torsten Hothorn[3]

Address: [1]Institute of Biostatistics, Leibniz University Hannover, D-30419, Hannover, Germany, [2]Department of Biostatistics, University of Aarhus, Vennelyst Boulevard 6, DK-8000, Aarhus C, Denmark and [3]Institut fuer Statistik, Ludwig Maximilians Universitaet Muenchen, Ludwigstrasse 33, D-80539, Munich, Germany

Email: Ludwig A Hothorn* - hothorn@biostat.uni-hannover.de; Michael Vaeth - vaeth@biostat.au.dk; Torsten Hothorn - Torsten.Hothorn@stat.uni-muenchen.de

* Corresponding author

Published: 6 March 2009

Epidemiologic Perspectives & Innovations 2009, 6:1   doi:10.1186/1742-5573-6-1

This article is available from: http://www.epi-perspectives.com/content/6/1/1

Received: 29 May 2006
Accepted: 6 March 2009

© 2009 Hothorn et al; licensee BioMed Central Ltd.
This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

## Abstract

One possibility for the statistical evaluation of trends in epidemiological exposure studies is the use of a trend test for data organized in a $2 \times k$ contingency table. Commonly, the exposure data are naturally grouped or continuous exposure data are appropriately categorized. The trend test should be sensitive to any shape of the exposure-response relationship. Commonly, a global trend test only determines whether there is a trend or not. Once a trend is seen it is important to identify the likely shape of the exposure-response relationship. This paper introduces a best contrast approach and an alternative approach based on order-restricted information criteria for the model selection of a particular exposure-response relationship. For the simple change point alternative $H_1 : \pi_1 = ... = \pi_q < \pi_{q+1} = ... = \pi_k$ an appropriate approach for the identification of a global trend as well as for the most likely shape of that exposure-response relationship is characterized by simulation and demonstrated for real data examples. Power and simultaneous confidence intervals can be estimated as well. If the conditions are fulfilled to transform the exposure-response data into a $2 \times k$ table, a simple approach for identification of a global trend and its elementary shape is available for epidemiologists.

## Introduction

Statistical trend analysis is an important component of epidemiological exposure studies. Here, "trend" simply means the demonstration of any monotone relationship between the response rate and the continuous exposure. For example, the association between all major types of childhood cancer and exposure to magnetic fields from high voltage installations was analyzed by Lausen et al. [1] using the data shown in Table 1, where the original continuous exposure data (Olsen et al., [2]) were categorized.

Although this example is seriously unbalanced, real epidemiological exposure studies with many unexposed or low-exposure cases but few high-exposure cases can be found. The appropriate evaluation of such epidemiological exposure studies is a statistical challenge. Many similar examples can be found in the literature, e.g. a case-control study for respiratory cancer possibly caused by long-term exposure to coke oven emissions [3].

In exposure studies, an unexposed group, $E_1$, is commonly compared with several exposure groups, $E_2, ..., E_k$. The outcome of the study is the number of cases suffering from the disease being investigated, such as a specific tumor, and the number of observations without the disease (controls), i.e. the risk of disease in each category of

*Epidemiologic Perspectives & Innovations* 2009, **6**:1                    http://www.epi-perspectives.com/content/6/1/1

**Table 1: Child cancer and magnetic fields**

| Exposure/$\mu$ Tesla | $j$ | $n_{cancer}$ | $n_{no\ cancer}$ | $n_j$ | $p_j$ | $RR_{j1}$ |
|---|---|---|---|---|---|---|
| 0–0.05 | 1 | 1698 | 4759 | 6457 | 0.263 | - |
| 0.051–0.101 | 2 | 0 | 9 | 9 | 0 | 0.000 |
| 0.101–0.15 | 3 | 2 | 3 | 5 | 0.4 | 1.525 |
| 0.151–20 | 4 | 1 | 3 | 4 | 0.25 | 0.953 |
| 0.201-0.25 | 5 | 1 | 3 | 4 | 0.25 | 0.953 |
| 0.251-0.30 | 6 | 0 | 4 | 4 | 0 | 0.000 |
| 0.301-0.35 | 7 | 0 | 2 | 2 | 0 | 0.000 |
| 0.351-0.85 | 8 | 1 | 0 | 2 | 0.5 | 1.906 |
| 0.851-1.6 | 9 | 2 | 0 | 2 | 1 | 3.812 |
| >1.61 | 10 | 2 | 0 | 2 | 1 | 3.812 |

($p_j$ ... estimated proportion, $RR_{j1}$ ... relative risk to unexposed)

exposure. One important objective in exposure epidemiology is causation; the demonstration of a global exposure-response relationship represents one of the causation criteria, according to Hill [4]. A global trend test leads to identification of a trend, whereas model selection allows inference of the likelihood of a particular elementary model.

The sampling strategy of epidemiological exposure studies is either a cohort study, in which a $2 \times k$ contingency table represents the data, or a case-control study, in which two multinomial distributions are compared. However, the likelihood ratio test of identical multinomials against the elementary odds ratios alternative, for a sufficient total number of observations, is equivalent to the comparison of the $k$ independent binomial proportions against a simple ordered alternative (Agresti and Coull, [5]; Hothorn et al., [6]). Therefore, it is appropriate to evaluate both designs by means of an asymptotic trend test for a $2 \times k$ contingency table.

Numerous methods, including model-based (e.g. Royston et al., [7]) and test-based approaches (e.g. Dosemeci and Benichou, [8]), are used to analyze exposure-response relationships. A basic problem is that the shape of the exposure-response is unknown a priori and is an outcome of the study. However, the choice of model or test greatly depends on the shape of the exposure-response. Therefore, a broad class of models or tests should be used, but that, in turn, leads to a model selection dilemma. Model selection is an intricate component of statistical problems. Model selection in this case is not the objective, but is only a tool for identifying the correct trend from several possible elementary alternatives. An alternative hypothesis can be decomposed into its underlying elementary alternatives, e.g. the simple order alternative $H_1: \pi_1 \leq \pi_2 \leq \pi_3$ can be decomposed into the three elementary hypotheses $H_1^1$ : $\pi_1 = \pi_2 < \pi_3$, $H_1^2 : \pi_1 < \pi_2 = \pi_3$, $H_1^3 : \pi_1 < \pi_2 < \pi_3$.

The *p*-value, a commonly used outcome of a trend test, is frequently insufficient for epidemiological studies. Information concerning the shape of the exposure-response and/or a measure of the magnitude of the effect, such as relative risks or odds ratios, is desirable for a significant trend. Thus, the level of the false positive decision rate ($\alpha$) should be controlled. In addition, an approach with a minimum false negative decision rate ($\beta$) (respective maximum power $\pi = 1 - \beta$) for the global test decision and a maximum correct decision rate for the selected model should be identified. The correct classification rate, the proportion of correctly identified elementary alternatives, is used as a major performance measure later on.

The exposure in case-control studies is frequently measured on a continuous scale. Categorization at pre-selected cut-off points of a small number of ordered categories is common; for example, four categories of trihalomethane exposure (Jones et al., [9]), or three categories of lifetime dose of hair dye (Benavente et al., [10]). Inappropriately chosen cut-off points dramatically reduce the power of the trend test (Greenland, [11]). Some exposures are naturally grouped, for example 2–3 cups of coffee per day, by the impreciseness of the definitions, such as "cup" and "coffee" (Ascherio et al., [12]). An example of ordinal definition of the exposure is given in a case-control study of Norwegian nickel refinery workers (Grimsrud et al., [13]). The exposure-related associations between smoking-adjusted lung cancer rates and cumulative exposure to different forms of nickel used the categories "low," "medium," and "high."

The best approach, in terms of both power and interpretation, occurs when a single cut-off point exists and is known a priori, resulting in a two-sample test "above" vs. "below" the cut-off point. This is because an odds ratio and its one-sided confidence interval can be estimated. The trend test approach discussed here is designed for naturally grouped exposure with a single change point. For continuous exposure models a continuous covariate can be used. However, the choice of an appropriate model – such as linear, logistic, or other – remains open and model selection influences the inference.

In this paper, a trend test for the comparison of $k$ ordered binomial proportions using a change point alternative is presented. Either a single change point is of interest or the change point alternative is pivotal, i.e. many other elementary monotone alternatives can be generated from it. The concept of multiple contrasts is used because of the simplicity and the availability of the distribution under the alternative. After a significant trend test, information is provided that determines which contrast was the "best," and therefore, which exposure-response shape describes the data most accurately. Alternatively, an information criterion-based approach for the likelihood ratio

*Epidemiologic Perspectives & Innovations* 2009, **6**:1          http://www.epi-perspectives.com/content/6/1/1

test under monotone order-restriction according to Anraku [14] is examined.

Therefore, the primary objective of this paper is not just describing the exposure-response relationship but also identifying the most likely elementary exposure-response model with a control of the false model classification rate.

## Analysis
### Global tests on exposure-response relationships
The number of diseased and healthy persons for each exposure group, Ej, are organized in the following 2 × k table, where Index 1 denotes the group without exposure.

The estimator for the proportions per exposure group is $p_j = n_{j1}/n_j$ $j = 1,..., k$, the total is $p = n_{.1}/n_{..}$, and the expected values for the proportions are denoted as $\pi_j$. The hypotheses system for a monotone order is:

$H_0: \pi_1 = \pi_2 = ... = \pi_k$ against

$H_1: \pi_1 \leq \pi_2 \leq ... \leq \pi_k$ with at least one strict inequality.

For simplicity, assume increasing effects with increased exposure; analogously, a directional decision for a decrease is possible.

There are an extensive number of publications concerning order-restricted tests, including the analysis of 2 × k contingency tables (e.g. Agresti and Coull, [5]; Leuraud and Benichou, [15]). However, no uniformly powerful trend test exists for all possible alternative shapes. The possible shapes can be seen as different equality-inequality patterns of $H_1$. This can be seen for an extreme convex shape $\{0, 0, 0, \pi\}$. Clearly, the "Helmert's contrast" is most powerful because of the optimal pooling of all the lower exposures and the comparison with the high exposure: $p_4 - (p_1 + p_2 + p_3)/3$. However, power for Helmert's contrast is greatly reduced for the extreme concave shape $\{0, \pi, \pi, \pi\}$. The shape of the exposure-response relationship is unknown a priori. Irrespective of numerous recent alternative proposals, the likelihood ratio test represents an appropriate solution for this situation. This test is numerically complicated, particularly concerning its distribution

**Table 2: Principle of 2 by k tables for epidemiological exposure studies**

under the alternative, which is needed for power/sample size calculations (Robertson et al., [16]). The multiple contrast test according to Bretz and Hothorn [17] approximates its power and is simpler. There are $2^{k-1}$ different shapes for $k$ exposure groups, and for each shape a contrast with a minimum false negative rate ($\beta$) can be defined. The idea is to select the best contrast, which is sensitive for a certain shape. The best contrast is simply tested by a maximum test. Because the proportions $p_j$ are asymptotically normally distributed, their linear combination (denoted as contrast) $\sum_{j=1}^{k} c_j p_j$ is also normally distributed, and therefore, the single contrast test statistic

$$t_{SingleC} = \frac{\sum_{j=1}^{k} c_j p_j}{\sqrt{p(1-p) \sum_{j=1}^{k} c_j^2 / n_{j.}}}$$

is asymptotically normally distributed, where $\sum_j c_j = 0$ guarantees a level $\alpha$ test under the null hypothesis. Different variance estimators can be used, but to keep the problem simple, the commonly used pooled estimator $p$ is used here. Asymptotic test versions are used throughout. The contrast coefficients, $c_j$, are specific for each contrast test; for example the Helmert's contrast $[c_i = -1; j = 1,..., k - 1$ and $c_k = k]$. A multiple contrast test is the maximum of $s$ pre-defined single contrast tests $t_{MultipleC} = \max_{i \in (1,...,s)} (t_{SingleC}(\mathbf{c}_i))$, $i = 1,..., s$ where $\mathbf{c}_i = (c_{i1},..., c_{ik})$ is a $k$ vector of contrasts. Under the null hypotheses, the joint distribution of the linear contrast tests $t_{SingleC}(\mathbf{c}_i)$ $i = 1,..., s$ is an $s$-variate normal distribution with a zero vector of means and a non-product-moment correlation matrix. The correlation between two arbitrary contrasts, $\mathbf{a} = (a_1,..., a_k)$ and $\mathbf{b} = (b_1,..., b_k)$, is

$$\rho_{\mathbf{a},\mathbf{b}} = \frac{\sum_{j=1}^{k} a_j b_j \frac{p_j(1-p_j)}{n_{j.}}}{\sqrt{\left(\sum_{j=1}^{k} a_j^2 \frac{p_j(1-p_j)}{n_{j.}}\right)\left(\sum_{j=1}^{k} b_j^2 \frac{p_j(1-p_j)}{n_{j.}}\right)}}.$$

This so-called isotonic contrast approach, based on s = 7 contrasts, for the balanced design with four exposure groups is demonstrated in Table 3.

However, the correct classification rates for the most likely elementary alternative (shape of the exposure-response) were found to be unsatisfactory for isotonic contrasts (Hothorn et al., [6]). Therefore, a special case of order-

|  | $E_1$ | .... | $E_k$ | Total |
|---|---|---|---|---|
| Disease | $n_{11}$ | ... | $n_{k1}$ | $n_{.1}$ |
| No disease | $n_{10}$ | ... | $n_{k0}$ | $n_{.0}$ |
| Sample size | $n_{1.}$ | ... | $n_{k.}$ | $n_{..}$ |

*Epidemiologic Perspectives & Innovations* 2009, **6**:1                    http://www.epi-perspectives.com/content/6/1/1

restricted inference is considered for step shapes only and denoted as a change point alternative (Hirotsu and Marumo, [18]). Two situations should be considered: i) threshold level studies assuming that an exposure-response reveals a single change point, which can be characterized by a lower part, an upper part, and an abrupt change between both; and ii) exposure-response studies with continuous exposure data where the change point alternative is a special and substantial component of the all-pattern alternative, which can simplify the evaluation. In some epidemiological problems this question arises. An example of a threshold level study is a diabetes study (Pastor-Barriuso et al., [19]) with the relationship between 2-hour plasma glucose and mortality, where the following questions were formulated: i) Does a certain glucose level exists that markedly increases the mortality risk? ii) Can this change point be estimated? Proposals in the literature are directed only at proof of the existence of such a change point. However, epidemiologists not only want to know that such a change exists, but also where this change is located. Here it is demonstrated that the estimation of the change point $q$ is characterized by its correct classification rate by means of multiple contrast tests, that is, in a testing framework. The hypotheses system for a change from $q$ to $q+1$ is:

$$H_0: \pi_1 = \pi_2 = ... = \pi_k$$

$$H_1: \pi_1 = ... = \pi_q < \pi_{q+1} = ... \pi_k \quad q \in (1,..., k-1)$$

The above hypotheses system can be tested by multiple step contrasts. Exactly $(k-1)$ step contrasts are appropriate for testing the above hypothesis:

$$
\begin{array}{cccc}
(-k, & 1, & 1, & ... \ 1) \\
(-(k-1), & -(k-1), & 2, & .... \ 2) \\
... & ... & ... & ... \ ... \\
(-1, & -1, & -1, & ... \ k)
\end{array}
$$

**Table 3: Contrast coefficients for the balanced design with four exposures groups**

| Type of contrasts | No. of contrasts | Alternative | Contrast $c_j$ |
|---|---|---|---|
| Isotonic | $2^k-1$ | $\pi_1 < \pi_2 = \pi_3 = \pi_4$ | {-3 1 1 1} |
| | | $\pi_1 = \pi_2 < \pi_3 = \pi_4$ | {-1 -1 1 1} |
| | | $\pi_1 = \pi_2 = \pi_3 < \pi_4$ | {-1 -1 -1 3} |
| | | $\pi_1 < \pi_2 < \pi_3 < \pi_4$ | {-3 -1 1 3} |
| | | $\pi_1 = \pi_2 < \pi_3 < \pi_4$ | {-1 -1 0 2} |
| | | $\pi_1 < \pi_2 = \pi_3 < \pi_4$ | {-1 0 0 1} |
| | | $\pi_1 < \pi_2 < \pi_3 = \pi_4$ | {-2 0 1 1} |
| Change point | $k-1$ | $\pi_1 < \pi_2 = \pi_3 = \pi_4$ | {-3 1 1 1} |
| | | $\pi_1 = \pi_2 < \pi_3 = \pi_4$ | {-1 -1 1 1} |
| | | $\pi_1 = \pi_2 = \pi_3 < \pi_4$ | {-1 -1 -1 3} |
| Up/down | 2 | $\pi_1 < \pi_2 = \pi_3 = \pi_4$ | {-3 1 1 1} |
| | | $\pi_1 = \pi_2 = \pi_3 < \pi_4$ | {-1 -1 -1 3} |
| Single (linear) | 1 | $\pi_1 < \pi_2 < \pi_3 < \pi_4$ | {-3 -1 1 3} |

Exactly three possible change points, $q$, exist for the simple design with one unexposed and three exposure groups. Exactly one contrast is power-optimal for the balanced design of each change point:

| $q$ | $c_1$ | $c_2$ | $c_3$ | $c_4$ |
|---|---|---|---|---|
| 1 | (−3 | 1 | 1 | 1) |
| 2 | (−2 | −2 | 2 | 2) |
| 3 | (−1 | −1 | −1 | 3) |

"Power-optimal" simply means the maximum test statistics because the $t^i_{SingleC}$ is normally distributed, and therefore, standardized. The $t_{MultipleC}$ is $q$-variate normally distributed. The contrast coefficients, **c**, for $q$ contrasts are defined for the general unbalanced design (Hirotsu et al., [20]):

$$
c_{qj} = \begin{cases} -n_{j.} / \sum_{l=1}^{j} n_{l.} & if \quad j = 1,...,q \\[2ex] n_{j.} / \sum_{l=j}^{k} n_{l.} & if \quad j = q+1,...,k \end{cases}
$$

These step contrasts reveal a nice ability to transform the $k$-sample problem into an unbalanced two-sample problem, which can be used later for estimation of the unadjusted relative risk (or odds ratio) "above/below" the change point. Moreover, the step contrasts belong to a broader class of multiple contrasts. Isotonic contrasts approximate the power of the likelihood ratio test for the monotone ordered hypothesis. The bivariate up/down proposals (Neuhaeuser and Hothorn, [21]; Stewart and Ruberg, [22]) only use the two extreme contrasts (Table 3). Therefore, the change point alternative represents a compromise for testing trends. It is much less dependent on the power of the shape compared with the frequently used single linear contrast test, although only $k$ instead of $2^k - 1$ isotonic contrasts were used. The multiple contrast test (above) is defined for differences of proportions, but can be re-formulated for the relative risk, commonly used in epidemiology (see Appendix A).

It seems that a multiple contrast test may be a different approach to the commonly used logistic model. However, a strong relationship between the multiple contrast test and the score test in a logistic model exists, which allows the correction for additional confounders (Hothorn et al., [6]).

### Identification of the exposure-response shape
The trend tests distinguish only globally between the null hypothesis and alternative hypotheses, based on the

*Epidemiologic Perspectives & Innovations* 2009, **6**:1
http://www.epi-perspectives.com/content/6/1/1

asymptotic distribution of the test statistics under the null hypothesis. That is, either a trend exists or it does not. However, the alternative hypothesis is not unique. For example, the following three hypotheses are possible for the change point alternative for a design with one unexposed and three exposure groups:

$$H_1^1: \pi_1 < \pi_2 = \pi_3 = \pi_4, \ H_1^2: \pi_1 = \pi_2 < \pi_3 = \pi_4, \ H_1^3: \pi_1 = \pi_2 = \pi_3 < \pi_4$$

However, the global trend tests provide no answer as to which particular alternative exists. Two different approaches can be used to answer this question: i) the best contrast approach; and ii) a model selection approach based on the information criterion for order restriction. This paper explores the identification of one of the possible $k$ - 1 elementary alternatives; that is, a classification into $H_1^1, ..., H_1^{k-1}$. Consequently, the correct classification rate, or the proportion of correctly identified elementary alternatives, is used as a performance measure later on.

The global test decision for the multiple contrast approach is based on the maximum of all included single contrasts $t_{MultipleC} = \max_{i \in (1,...,s)} (t_{SingleC}(\mathbf{c}_i))$, $i = 1,..., s$, where each single contrast is power optimal for a particular type of alternative (Table 3). Therefore, this maximum contrast approach can be used as an estimator for the exposure-response shape, where the classification is performed after a significant trend test for control $\alpha$. For example, two alternatives are possible for a design with three exposure groups: $H_1^1 \ \pi_1 = \pi_2 < \pi_3$ or $H_1^2 : \pi_1 < \pi_2 = \pi_3$. Assume that the number of diseased cases, $n_{11}, ..., n_{k1}$, is drawn from $k$ binomial random variables with parameters $\pi_j$ and $n_j$. A possible exposure-response is described by a contrast vector, $\mathbf{c} = (c_1, ..., c_k)$. The problem is to estimate the underlying exposure-response relationship when $s$ contrast vectors are given. A simple estimator is the function $\Psi$ : $(n_{11}, ..., n_{k1}) \rightarrow \{1, ..., s\}$ which can be derived from the associated contrast test, i.e. $\psi_1 = \psi(n_{11}, ..., n_{k1}) = \arg\max_{i \in (1,...,s)} |t_{SingleC}(\mathbf{c}_i)|$. Then explore variability of the simple estimator, $\Psi_1$. How likely is each of the $s$ possible values under the observed data? This question can be addressed via the parametric bootstrap. Repeated realizations from $k$ binomial distributions with sample sizes $n_j$ and the estimated success parameter $p_j = n_{j1}/n_j$ for j = 1,..., $k$ are drawn.

• Draw B bootstrap samples $n_{11}^{*b}, ..., n_{k1}^{*b}, \ n_{j1}^{*b} \sim B(n_j, p_j), \ b = 1, ..., B$

• Compute $\psi_1^b = \psi_1(n_{11}^{*b}, ..., n_{k1}^{*b})$

• Compute the relative frequency of each possible value from 1,..., s

This is a measure for the variance of the estimator. Under special circumstances, an improved estimator can be computed by a majority voting according to Breiman [23] over $\psi_1^b : \psi_2 = \arg\max_{i \in \{1,...,s\}} \sum_b I(\psi_1^b = i)$, where $I$ denotes the indicator function. This approach is designated the "parametric bootstrap best contrast" approach.

The model selection approach, based on the information criterion for order-restriction of normally distributed variables according to Anraku [14], can be modified for proportions and the change point alternative. The AIC criterion for the unrestricted maximum likelihood estimator $\hat{\theta} : AIC(\hat{\theta}) = l(\hat{\theta}) - p$ : (with $l(\hat{\theta})$ = log-likelihood, $p$ = dimension of $\theta$) was modified for order-restricted maximum likelihood estimators: $ORIC(\tilde{\theta}) = l(\tilde{\theta}) - penalty(k, n_i)$. The penalty term is calculated for each model using the level of probabilities under an order-restriction. The explicit formulas for a design with three exposure groups, such as the null-model $M_0$ and the two change point models $M_1$ and $M_2$, are given in Appendix B. The ORIC-approach represents a model estimation approach, where model $M_0\{H_0: \pi_1 = \pi_2 = \pi_3\}$, model $M_1 \ \{ H_{M_1} : \pi_1 = \pi_2 < \pi_3\}$, or model $M_2 \ \{ H_{M_2} : \pi_1 = \pi_2 < \pi_3 \}$ will be estimated as a "best fitted" model.

### Simulation study
The simulation study is structured in two parts: i) empirical comparison between the best-contrast approach and the ORIC approach for a design with three groups; and ii) investigation of the best contrast approach for more general designs. Fifty thousand pseudo-random $2 \times k$ tables ($k$ ranging from $3$ to $7$) were generated and 10,000 bootstrap samples were drawn. Two criteria are used, the correct classification rate – the empirical decision rate for the correct model – and the power.

### Part I
The correct classification rates for the ORIC approach, ORIC ($M_0$, $M_1$, $M_2$), and the parametric bootstrap best

*Epidemiologic Perspectives & Innovations* 2009, **6**:1                    http://www.epi-perspectives.com/content/6/1/1

contrast approach, Max($H^1$, $H^2$), were compared for a design with three exposure groups (in Table 4) for the change point alternatives with different unexposed rates, $\pi_1$. From the first row in Table 4, where no differences between the proportions were investigated, the main difference between both approaches becomes clear. The ORIC approach, as an estimation approach, did not control for $\alpha$. Only in 76% of the cases, not 95%, was $M_0$ selected under the null hypothesis. On the other hand, the best contrast test approach does control for $\alpha$. Both approaches reveal high correct classification rates, greater than 90%, as long as the power is sufficient: either small unexposed rates, $\pi_1$, or large non-centrality parameters $\Delta$ (Table I in Appendix C (available as additional file 1) and larger sample sizes in Table II in Appendix C). This behavior is similar to the power of trend tests of proportions (Bretz and Hothorn, [17]). Due to the fact that the correct classification rates of the best contrast approach are similar or superior to those of the ORIC approach with decreasing $\pi_1$, increasing $\Delta$, and $n_j$, the best contrast approach is recommended because of its simplicity and generalizability for use within the generalized linear model.

### Part II

For one selected change point alternative {$\pi_1$, $\pi_1$, $\pi_1$, $\pi_1$, $\pi_1$ + $\Delta$ } the best contrast approach was investigated for the different dimensions $k$, different unexposed rates $\pi_1$, and several non-centrality parameters $\Delta$, shown in Table 5. With an increasing number of exposure groups, a slight decrease of the correct classification rate occurs where the power is slightly increasing. With a decreasing sample size, a slight decrease of the correct classification rate occurs where the power is substantially decreasing. The well-known decrease of sensitivity with an increasing unexposed rate from 2 × 2 table analysis holds true for power and, less markedly, for the correct classification

rate. The effect size (non-centrality $\Delta$) has much less impact on the correct classification rate compared with its well-known impact on power.

Table 6 demonstrates the decreasing correct classification rate for change point $q << k$. More important, from an epidemiological point of view, are the asymmetrical cumulative false classification rates. False classification is primarily from an overestimation instead of an underestimation of the true change point, that is, it is very unlikely to mistake a lower change point for the true one.

### Extreme unbalanced exposure data

Particularly for environmental studies, much of the data is for unexposed and low-to-medium exposures; only rarely does data for high exposure exist. This is quite fortunate from an ethical point of view. However, this results in extremely unbalanced 2 × $k$ tables and the statistical outcome depends on the rare, high-level exposure data. In a case-control study for respiratory cancer possibly caused by long-term exposure to coke oven emissions, the sample size was 10,198 in the unexposed group, but only 487 were in the highest exposure group (Costantino et al., [3]). A more extreme example was the study investigating the connection between childhood cancer and magnetic fields from high voltage installations. The sample size was 2 in the highest exposure group, but 6,457 in the unexposed group (Table 1). The power decreases greatly for extremely unbalanced designs and accordingly the correct classification rate also decreases. If the total sample size is increased to achieve the same power, then the correct classification would be of the same magnitude as the balanced case, see Table 7. The identification of a trend in such a highly unbalanced design is complicated. A significant trend may depend on only these few cases, and the size and power of unbalanced designs differ greatly from those in balanced designs. In unbalanced designs with smaller change points, the correct classification rate increases if the resulting two-sample test is less unbalanced (as a result of the related step contrast). A change point at a high exposure that is based on rare data is very vague, however it becomes more stable when medium-to-high exposure from additional data are obtained.

Unbalanced designs, where the smallest sample size occurs in the informative groups (large change point $s$), reveal a clearly reduced classification rate. However, that decrease, compared with the balanced design, is much weaker than the related power loss. A further reduction occurs for the "in-between" change points as long as the sample size of the pooled informative groups is still smaller than the lower exposure groups. A further substantial increase of the sample size for the unexposed group had almost no influence on the classification rate.

**Table 4: Correct classification rates for several spontaneous rates $\pi_0$**

| $\pi_j$ | True Change $q$ | ORIC($M_0$, $M_1$, $M_2$) | | | Max($H^1$, $H^2$) | |
|---|---|---|---|---|---|---|
| | | $M_0$ | $M_1$ | $M_2$ | $H^1$ | $H^2$ |
| *0.3/0.3/0.3* | *0* | *.758* | *.112* | *.129* | *.514* | *.486* |
| *0.1/0.1/0.3* | *2* | *.001* | **.979** | *.021* | **.987** | *.004* |
| *0.1/0.3/0.3* | *1* | *.001* | *.020* | **.980** | *.030* | **.961** |
| *0.2/0.2/0.4* | *2* | *.002* | **.958** | *.041* | **.936** | *.023* |
| *0.2/0.4/0.4* | *1* | *.005* | *.029* | **.967** | *.040* | **.926** |
| *0.3/0.3/0.5* | *2* | *.006* | **.940** | *.054* | **.906** | *.034* |
| *0.3/0.5/0.5* | *1* | *.004* | *.053* | **.943** | *.044* | **.882** |
| *0.4/0.4/0.6* | *2* | *.009* | **.940** | *.052* | **.887** | *.036* |
| *0.4/0.6/0.6* | *1* | *.009* | *.053* | **.940** | *.039* | **.885** |

($n_j$ = 100, $H_1^1 : \pi_0 = \pi_1 < \pi_2$, $H_1^2 : \pi_0 < \pi_1 = \pi_2$) *(bold indicate correct classification)*

*Epidemiologic Perspectives & Innovations* 2009, **6**:1                http://www.epi-perspectives.com/content/6/1/1

**Table 5: Correct classification rates and power for several dimensions, sample sizes, unexposed rates, and non-centralities**

| Dimension | $k$ | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|
| | Correct classif. rate | .992 | .987 | .977 | .971 | .971 |
| | Power | .828 | .845 | .861 | .899 | .889 |
| Sample size | $n_j$ | 25 | 50 | 75 | 100 | 125 |
| | Correct classif. rate | .809 | .973 | .978 | .987 | .989 |
| | Power | .393 | .618 | .742 | .845 | .903 |
| Unexpos. rate | $\Pi_1$ | .01 | .06 | .11 | .16 | .20 |
| | Correct classif. rate | .987 | .903 | .817 | .767 | .766 |
| | Power | .845 | .488 | .373 | .312 | .266 |
| Non-centrality | $\Delta$ | 0.03 | 0.05 | 0.07 | 0.09 | 0.11 |
| | Correct classif. rate | .953 | .973 | .985 | .994 | .998 |
| | Power | .479 | .773 | .904 | .972 | .991 |

Since a sample size of $n_j = 1$ is possible, in principle, for this approach, the impact of the continuous exposure categorization can be demonstrated quantitatively with respect to power and classification rate. When a single change point exists, the best approach is the categorization below or above this change point. The true alternative is never known a priori when dealing with real data. Therefore, appropriate categorization may be helpful and inappropriate categorization can greatly reduce the sensitivity.

The asymptotic power for the change point alternative is available (Bretz and Hothorn, [17]). Based on an R-code, the power can be calculated for an arbitrary sample size pattern, which shapes the exposure response and dimensions $k$. Power estimation for unbalanced designs can be found in [6] whereas a serious power loss can be observed when the sample size in the informative high exposure groups is very small compared with the sample size in the unexposed or low exposure groups.

***Evaluation of the example***
The *p*-value for the global trend test (change point alternative) and the classification rate of the best contrast approach is determined using an implementation of the proposed procedures in R (R Development Core Team, [24]). The most likely change point, $q$, and simultaneous confidence intervals for the related change point contrasts

can be calculated for the $2 \times k$ contingency table data. A marginal confidence interval can be estimated for each elementary contrast because it represents a linear combination of the proportions $p_j$. Simultaneous confidence intervals for the maximum of several contrasts can be estimated using a multivariate normal distribution. A detailed description for the estimation of simultaneous confidence intervals for several multiple contrast tests can be found in [25] where the particular problems for binomial data were described recently [26]. The software is available as the R library *bindosres* as additional file 2. This file can be installed in the private R program via "Install packages from local zip files",

The magnet field cancer data in Table 8 revealed a change point $q = 8$ with a classification rate of 0.74 (*p*-value for a global trend = 0.002). The cumulative false classification of 0.26 is nearly concentrated on $q = 7$. The maximum simultaneous lower confidence limit is for the sub-set [10 vs. {1, 2, 3, 4, 5, 6, 7, 8, 9}] and seems to be medically relevant with 0.563, but differs only a little from that of sub-set {10, 9} vs. {1, 2, 3, 4, 5, 6, 7, 8} that is related to the change point. The analysis of the continuous data using maximally selected rank statistics gave a cut-point of 0.45 $\mu$Tesla[1]. However, above this cut-point only six cancer cases with an exposure of 0.51, 0.73, 1.0, 1.59, 1.66, and 1.72, and two cases without cancer with exposures 0.73 and 0.83 $\mu$ Tesla were available. A careful interpretation is

**Table 6: Asymmetrical cumulative false classification rates**

| Alternative | True Change | $H^1$ | $H^2$ | $H^3$ | $H^4$ | $H^5$ | Cum. over. | Cum. under. |
|---|---|---|---|---|---|---|---|---|
| .01/.01/.01/.01/.07 | 5 | .000 | .000 | .001 | .027 | **.972** | - | 0.028 |
| .01/.01/.01/.07/.07 | 4 | .000 | .002 | .012 | **.847** | .139 | 0.139 | 0.014 |
| .01/.01/.07/.07/.07 | 3 | .000 | .011 | **.819** | .119 | .051 | 0.17 | 0.011 |
| .01/.07/.07/.07/.07 | 2 | .004 | **.809** | .117 | .038 | .032 | 0.187 | 0.004 |
| .07/.07/.07/.07/.07 | 1 | **.711** | .135 | .052 | .050 | .053 | 0.29 | - |

($n_j$ = 100; **bold** indicate correct classification)

*Epidemiologic Perspectives & Innovations* 2009, **6**:1        http://www.epi-perspectives.com/content/6/1/1

**Table 7: Correct classification rates for extreme unbalanced designs**

| Sample sizes | N | Alternative | Power | Correct classif. rate |
|---|---|---|---|---|
| 200/200/200/200 | 800 | .05/.05/.05/.10 | .682 | **.935** |
| 540/200/40/20 | 800 | .05/.05/.05/.10 | .251 | **.758** |
| 200/200/200/200 | 800 | .05/.05/.10/.10 | .792 | **.831** |
| 540/200/40/20 | 800 | .05/.05/.10/.10 | .425 | **.687** |
| 200/200/200/200 | 800 | .05/.10/.10/.10 | .603 | **.783** |
| 540/200/40/20 | 800 | .05/.10/.10/.10 | .755 | **.854** |
| 400/400/400/400 | 1600 | .05/.05/.05/.10 | .915 | **.971** |
| 1340/200/40/20 | 1600 | .05/.05/.05/.10 | .266 | **.749** |
| 400/400/400/400 | 1600 | .05/.05/.10/.10 | .968 | **.916** |
| 1340/200/40/20 | 1600 | .05/.05/.10/.10 | .438 | **.667** |
| 400/400/400/400 | 1600 | .05/.10/.10/.10 | .903 | **.904** |
| 1340/200/40/20 | 1600 | .05/.10/.10/.10 | .832 | **.883** |
| 9740/200/40/20 | 10000 | .05/.05/.05/.10 | .252 | **.702** |

recommended: i) the correct classification rate is not high, ii) a high change point was identified, iii) above the change point are only 4 of 6,491 cases, and iv) the spontaneous rate of 0.263 is rather high. More examples and their interpretation can be found in Hothorn et al., [6].

## Conclusion

Trend tests for the analysis of $2 \times k$ tables using epidemiological exposure data are described to identify the change point alternatives. Not only is the identification of a trend of interest important, but also the information regarding the particular types of alternatives. The best contrast approach for the multiple contrast test is useful for identifying the type of alternative or the change point, whereas a parametric bootstrap is suitable for an assessment of the variability. Both the bootstrapped best contrast and the ORIC approach are appropriate for different dimensions, non-centralities, sample sizes, and the unexposed group rates (due to the asymmetry in binomial testing). The consequences of unbalanced designs – of a large number in the unexposed or low exposure groups and a small number in the high exposure groups – can be calculated

depending on the expected shape. Simultaneous confidence intervals for the change point alternative are also available.

Approaches that test a global trend in epidemiological exposure data and also provide information on the pattern of the exposure-response relationship are rare. The most competitive approach is the fractional polynomials model [7], which is a specific multivariable regression approach.

Most epidemiological studies are characterized not only by the primary exposure factor but also by several covariates, such as gender, age, occupational status, and competing risk characteristics. Therefore, the best contrast approach within the framework of the generalized linear model is recently available [27]. Using the related R library (multcomp), real data can be evaluated using the contrast option "Changepoint" [28].

The suitability of such a simple change point alternative in epidemiological exposure studies should be critically dis-

**Table 8: Child cancer and magnetic fields**

| Exposure/$\mu$ Tesla | j | $p_j$ | Pattern | Lower confidence limit |
|---|---|---|---|---|
| 0–0.05 | 1 | 0.263 | {10,9,8,7,6,5,4,3,2} vs.1 | -.716 |
| 0.051–0.101 | 2 | 0 | {10,9,8,7,6,5,4,3} vs.{1,2} | -.410 |
| 0.101–0.15 | 3 | 0.4 | {10,9,8,7,6,5,4} vs.{1,2,3} | -.327 |
| 0.151–.20 | 4 | 0.25 | {10,9,8,7,6,5} vs.{1,2,3,4} | -.246 |
| 0.201–0.25 | 5 | 0.25 | {10,9,8,7,6} vs.{1,2,3,4,5} | -.139 |
| 0.251–0.30 | 6 | 0 | {10,9,8,7} vs.{1,2,3,4,5,6} | .108 |
| 0.301–0.35 | 7 | 0 | {10,9,8} vs.{1,2,3,4,5,6,7} | .343 |
| 0.351–0.85 | 8 | 0.5 | {10,9} vs.{1,2,3,4,5,6,7,8} | .534 |
| 0.851–1.6 | 9 | 1 | 10 vs.{1,2,3,4,5,6,7,8,9} | .563 |
| >1.61 | 10 | 1 |  |  |

*Epidemiologic Perspectives & Innovations* 2009, **6**:1                    http://www.epi-perspectives.com/content/6/1/1

cussed and some real data examples tested. Clearly, such a change point test describes the exposure-response of the population only. Further investigations are required to demonstrate that this simple approach can be utilized to estimate the center of the individual-level change point distribution. Moreover, the above approach is not limited to change point alternatives: other trend alternatives, such as Williams-type trends [29], can be assumed as well.

## Competing interests
The authors declare that they have no competing interests.

## Authors' contributions
LAH adapted the multiple contrast tests on epidemiological case-control studies and performed part of the simulation study. MV selected, analyzed, and interpreted the epidemiological examples and designed the simulation study. TH developed the majority voting algorithm and wrote the R program.

## Appendix A
### Formulation contrast tests for the relative risk
The estimators for the relative risk (RR) of each exposure group versus unexposed $(j = 1)$ are:
$$RR_{j1} = \frac{n_{j1}/n_{j.}}{n_{11}/n_{1.}} \quad j = 2, ..., k$$
The single contrast tests can be formulated for relative risks, for example for the reverse Helmert's contrast:
$$t_{revHelmert} = \frac{-kp_1 + \sum_{j=2}^{k} p_j}{\sqrt{p(1-p)(\sum_{j=2}^{k} 1/n_{j.} + k^2/n_1)}}$$

$$t_{revHelmert}^{RR} = \frac{-k\frac{n_{11}}{n_{1.}} + \sum_{j=2}^{k}\frac{n_{j1}}{n_{j.}}}{\sqrt{p(1-p)(\sum_{j=2}^{k} 1/n_{j.} + k^2/n_1)}} = \frac{-k + \sum_{j=2}^{k}\frac{n_{j1}}{n_{j.}}\frac{n_{1.}}{n_{11}}}{\frac{n_{1.}}{n_{11}}\sqrt{p(1-p)(\sum_{j=2}^{k} 1/n_{j.} + k^2/n_1)}} = \frac{-k + \sum_{j=2}^{k} RR_{j1}}{\frac{n_{1.}}{n_{11}}\sqrt{p(1-p)(\sum_{j=2}^{k} 1/n_{j.} + k^2/n_1)}}$$

For general contrasts hold true
$$t_{SingleContrast}^{RR} = \frac{c_1 + \sum_{j=2}^{k} c_j RR_{j1}}{\frac{n_{1.}}{n_{11}}\sqrt{p(1-p)(\sum_{j=1}^{k} c_j^2/n_{j.})}}$$

## Appendix B
The ORIC approach for three binomials and the change point alternative. The three models are:

$$M_0\{H_0: \pi_1 = \pi_2 = \pi_3\}, M_1\{H_{M_1}: \pi_1 = \pi_2 < \pi_3\}, M_2\{H_{M_2}: \pi_1 < \pi_2 = \pi_3\}.$$ The likelihood is

$$L(\pi) = \frac{n_1!}{n_{11}!(n_{1.}-n_{11})!}\pi_1^{n_{11}}(1-\pi_1)^{n_{1.}-n_{11}}\frac{n_2!}{n_{21}!(n_{2.}-n_{21})!}\pi_2^{n_{21}}(1-\pi_2)^{n_{2.}-n_{21}}\frac{n_3!}{n_{31}!(n_{3.}-n_{31})!}\pi_3^{n_{31}}(1-\pi_3)^{n_{3.}-n_{31}}$$

. With the expected values $\pi_j$ and their crude estimators:
$$p_1 = {}^{n_{11}}\!/_{n_{1.}}, \quad p_2 = {}^{n_{21}}\!/_{n_{2.}}, \quad p_3 = {}^{n_{31}}\!/_{n_{3.}}$$

The $\tilde{p}_j$ are the maximum likelihood estimates under the simple order restriction: $\tilde{p}_j = \min_{t:t \geq j} \max_{s:s \leq i} \frac{\sum_{j=s}^{t} w_j p_j}{\sum_{s=j}^{t} w_j}$. The likelihood for the null-model $M_0$ is:

$$L(\tilde{p}_{H_0}) = \prod_{j=1}^{3} \frac{n_{j.}!}{n_{j1}!(n_{j.}-n_{j1})!}\tilde{p}_{H_0}^{n_{11}+n_{21}+n_{31}}(1-\tilde{p}_{H_0})^{n_{1.}+n_{2.}+n_{3.}-(n_{11}+n_{21}+n_{31})}$$

where $\tilde{p}_{H_0} = \frac{n_{11}+n_{21}+n_{31}}{n_{1.}+n_{2.}+n_{3.}} = \frac{w_1 p_1 + w_2 p_2 + w_3 p_3}{w_1 + w_2 + w_3}$ provided $w_j = n_j$

The likelihood for the model $M_1$ is:

$$L(\tilde{p}_{M_1}) = \prod_{j=1}^{3} \frac{n_{j.}!}{n_{j1}!(n_{j.}-n_{j1})!}\tilde{p}_{(12)}^{n_{11}+n_{21}}(1-\tilde{p}_{(12)})^{n_{1.}+n_{2.}-(n_{11}+n_{21})}\tilde{p}_3^{n_{31}}(1-\tilde{p}_3)^{n_{3.}-n_{31}}$$

where $\tilde{p}_{(12)} = \frac{n_{11}+n_{21}}{n_{1.}+n_{2.}}$, for $p_{(12)} < p_3 \Rightarrow \tilde{p}_{12} = p_{(12)}, \tilde{p}_3 = p_3$

and

$$p_{(12)} \geq p_3 \Rightarrow \tilde{p}_{12} = \tilde{p}_3 = \frac{w_{(12)}p_{(12)} + w_3 p_3}{w_{(12)}+w_3} = \frac{n_{11}+n_{21}+n_{31}}{n_{1.}+n_{2.}+n_{3.}}$$

The likelihood for the model $M_2$ is:

$$L(\tilde{p}_{M_2}) = \prod_{j=1}^{3} \frac{n_{j.}!}{n_{j1}!(n_{j.}-n_{j1})!}\tilde{p}_{(23)}^{n_{21}+n_{31}}(1-\tilde{p}_{(23)})^{n_{2.}+n_{3.}-(n_{21}+n_{31})}\tilde{p}_1^{n_{11}}(1-\tilde{p}_1)^{n_{1.}-n_{11}}$$

where $\tilde{p}_{(23)} = \frac{n_{21}+n_{31}}{n_{2.}+n_{3.}}$ for $p_1 < \tilde{p}_{(23)} \Rightarrow \tilde{p}_1 = p_1, \tilde{p}_{(23)} = \tilde{p}_{(23)}$

and

$$p_1 \geq \tilde{p}_{(23)} \Rightarrow \tilde{p}_1 = \tilde{p}_{(23)} = \frac{w_1 p_1 + w_{(23)}\tilde{p}(23)}{w_1 + w_{(23)}} = \frac{n_{11}+n_{21}+n_{31}}{n_{1.}+n_{2.}+n_{3.}}.$$

The model-specific ORIC are: $ORIC(M_r) = \log L(\tilde{\pi}_M) - penalty(M_r)$.

Where the penalty terms are $penalty(M_r) = \sum iP\{i, j, w(M_r)\}$

*Epidemiologic Perspectives & Innovations* 2009, **6**:1

http://www.epi-perspectives.com/content/6/1/1

With

$$w(M_0) = n_{1.} + n_{2.} + n_{3.}$$

$$w(M_1) = n_{1.} + n_{2.}, n_{3.}$$

$$w(M_2) = n_{1.}, n_{2} + n_{3.}$$

Because $\quad P\{1,1, \quad w(M_0)\} \quad = \quad 1 \quad ORIC(M_0) \quad = \quad L(P\{1,1,w(M_0)\}) = 1 \, ORIC(M_0) = L(\tilde{p}_{H_0}) - 1) - 1$

Because

$P\{1,2,w(M_1)\} = \frac{1}{2} \quad P\{2,2,w(M_1)\} = \frac{1}{2} \quad ORIC(M_1) = L(\tilde{p}_{M_1}) - \frac{3}{2}$

Because

$P\{1,2,w(M_2)\} = \frac{1}{2} \quad P\{2,2,w(M_2)\} = \frac{1}{2} \quad ORIC(M_2) = L(\tilde{p}_{M_2}) - \frac{3}{2}$

## Additional material

### Additional file 1
*Additional simulation results.* Contains three tables with simulated correct classification results
Click here for file
[http://www.biomedcentral.com/content/supplementary/1742-5573-6-1-S1.pdf]

### Additional file 2
*R package bindosres.* The R package bindosres which can be installed in R via "install packages from local zip files"
Click here for file
[http://www.biomedcentral.com/content/supplementary/1742-5573-6-1-S2.gz]

## Acknowledgements

This paper was worked out during the first author's sabbatical at the Department of Biostatistics of the University of Aarhus, under the financial support of the Volkswagen Stiftung grand no. II/78 956.

## References

1.  Lausen B, Lerche R, Schumacher M: **Maximally selected rank statistics for dose-response problems.** *Biometrical Journal* 2002, **44:**131-147.
2.  Olsen JH, Nielsen A, Schulgen G: **Residence near high voltage facilities and risk of cancer in children.** *British Medical Journal* 1993, **307:**891-895.
3.  Costantino JP, Redmond CK, Bearden A: **Occupationally related cancer risk among coke oven workers: 30 years of follow-up.** *Journal of Occupational and Environmental Medicine* 1995, **37:**597-604.
4.  Hill AB: **Principles of medical statistics.** 9th edition. Oxford University Press, New York; 1971:309-323.
5.  Agresti A, Coull BA: **The analysis of contingency tables under inequality constraints.** *Journal of Statistical Planning and Inference* 2002, **107:**45-73.
6.  Hothorn LA, Vaeth M, Hothorn T: **Trend tests for the evaluation of dose-response relationships in epidemiological exposure studies.** *Research Report 2003–3* 2003 [http://www.biostat.uni-hannover.de/report/ReportAarhus2003.pdf]. Department of Biostatistics, University of Aarhus
7.  Royston P, Ambler G, Sauerbrei W: **The use of fractional polynomials to model continuous risk variables in epidemiology.** *International Journal of Epidemiology* 1999, **28:**964-974.
8.  Dosemeci M, Benichou J: **An alternative test for trend in exposure-response analysis.** *J Expo Anal Environ Epidemiol* 1998, **8(1):**9-15.
9.  Jones AQ, Dewey CE, Dore K, Majowicz SE, McEwen SA, Waltner-Toews D: **Exposure assessment in investigations of waterborne illness: a quantitative estimate of measurement error.** *Epidemiologic Perspectives & Innovations* 2006, **3:**6.
10. Benavente Y, Garcia N, Domingo-Domenech E: **Regular use of hair dyes and risk of lymphoma in Spain.** *International Journal of Epidemiology* 2005, **34:**1118-1122.
11. Greenland S: **Avoiding power loss associated with categorization and ordinal scores in dose-response and trend analysis.** *Epidemiology* 1995, **6:**450-454.
12. Ascherio A, Weisskopf MG, O'Reilly EJ: **Coffee consumption, gender, and Parkinson's disease mortality in the Cancer Prevention Study II cohort: The modifying effects of estrogen.** *American Journal of Epidemiology* 2004, **160:**977-84.
13. Grimsrud TK, Berge SR, Haldorsen T, Andersen A: **Exposure to different forms of nickel and risk of lung cancer.** *American Journal of Epidemiology* 2002, **156:**1123-1132.
14. Anraku K: **An information criterion for parameters under a simple order restriction.** *Biometrika* 1999, **86:**141-152.
15. Leuraud K, Benichou J: **Tests for monotonic trend from case-control data: Cochran-armitage-mantel trend test, isotonic regression and single and multiple contrast tests.** *Biometrical Journal* 2004, **46:**731-749.
16. Robertson T, Wright FT, Dykstra RL: **Order restricted statistical inference.** New York; 1988.
17. Bretz F, Hothorn LA: **Detecting dose-response using contrasts: asymptotic power and sample size determination for binomial data.** *Statistics in Medicine* 2002, **21:**3325-3335.
18. Hirotsu C, Marumo K: **Changepoint analysis as a method for isotonic inference.** *Scandinavian Journal of Statistics* 2002, **29:**125-138.
19. Pastor-Barriuso R, Guallar E, Coresh J: **Transition models for change-point estimation in logistic regression.** *Statistics in Medicine* 2003, **22:**1141-1162.
20. Hirotsu C, Kuriki S, Hayter AJ: **Multiple comparison procedures based on the maximal component of the cumulative chi-square statistic.** *Biometrika* 1992, **79:**381-392.
21. Neuhaeuser M, Hothorn LA: **Trend tests for dichotomous endpoints with application in carcinogenicity studies.** *Drug Information Journal* 1997, **30:**463-469.
22. Stewart WH, Ruberg SJ: **Detecting dose response with contrasts.** *Statistics in Medicine* 2000, **19:**913-921.
23. Breiman L: **Bagging Predictors.** *Machine Learning* 1996, **24:**123-140.
24. R Development Core Team. R: *A language and environment for statistical computing* 2005 [http://www.R-project.org]. R Foundation for Statistical Computing, Vienna, Austria
25. Hothorn LA: **Multiple comparisons and multiple contrasts in randomized dose-response trials – confidence interval orient approaches.** *J Biopharm Stat* 2006, **16:**7111-731.
26. Schaarschmidt F, Sill M, Hothorn LA: **Approximate simultaneous confidence intervals for multiple contrasts of binomial proportions.** *Biometrical Journal* 2008, **50:**782-792.
27. Hothorn T, Bretz F, Westfall P: **Simultaneous inference in general parametric models.** *Biometrical Journal* 2008, **50:**346-363.
28. Bretz F, Hothorn T, Westfall P: **On multiple comparisons in R.** *R News* 2002, **3:**14-17.
29. Williams DA: **Comparison of several dose levels with a zero dose control.** *Biometrics* 1972, **28:**519-531.

# Exhibit 154

# Dose-Response and Trend Analysis in Epidemiology: Alternatives to Categorical Analysis

*Sander Greenland*

Standard categorical analysis is based on an unrealistic model for dose-response and trends and does not make efficient use of within-category information. This paper describes two classes of simple alternatives that can be implemented with any regression software: fractional polynomial regression and spline regression. These methods are illustrated in a problem of esti-mating historical trends in human immunodeficiency virus incidence. Fractional polynomial and spline regression are especially valuable when important nonlinearities are antici-pated and software for more general nonparametric regression approaches is not available. (Epidemiology 1995;6:356–365)

Keywords: biostatistics, epidemiologic methods, logistic regression, relative risk, risk assessment.

Dose-response and trend analyses in epidemiology are commonly conducted in a very simple and often naive fashion. At worst, authors may conduct a trend test such as the Mantel test, or fit a regression model with a single exposure term and test the significance of the slope (coefficient) for the exposure. Such an approach can be very misleading because, in essence, it *assumes* that the dose-response or trend curve follows a specific model form (usually logistic).[1]

More desirably, authors may break the range of the study exposure into categories and look for trends in the category-specific coefficients or relative risks.[2] Such an approach can be adequate if numbers allow the use of categories that reflect biologically homogeneous response groups or are very narrow. Too often, however, categories are chosen via a mechanical algorithm such as the percentile method, in which equal-sized categories (tertiles, quartiles, or quintiles) are chosen in the belief that such an approach will maximize accuracy and min-imize subjectivity in the analysis. The potential pitfalls of percentiles are most dramatic when most subjects are exposed in a very narrow range or when exposure effects are limited to extreme ends of the exposure scale, such as very low nutrient levels or very high occupational ex-posure levels. In such situations, individuals placed at elevated risk by exposure will be submerged among low-er-risk members of their percentile category. This hazard can sometimes be mitigated by basing percentiles on the case distribution, rather than the distribution of all sub-jects, but would be desirable to avoid altogether.

Many authors have recommended nonparametric re-gression as a means of avoiding the categorization prob-lem altogether.[1,3,4] This is a preferable approach, espe-cially when one can safely assume nothing about the form of the trend or the exposure-disease (dose-re-sponse) relation. It is mildly hindered by lack of widely available software, although this obstacle is gradually disappearing. Another occasional drawback is that the computing limits (maximum numbers of covariates and subjects) for nonparametric regression tend to be much lower than those for conventional regression. Because of these limits, and because several books on the topic are available,[3–5] I will not discuss nonparametric regression here. Instead, I will describe two alternative curve-fit-ting methods that seem under-used in epidemiologic research. The two methods, fractional polynomial re-gression and spline regression, can be performed with any regression program simply by adding some trans-formed exposure variables to the regression. Both meth-ods are intermediate between simple regression and non-parametric regression in behavior, with fractional polynomials closer to simple regression (but still a vast improvement) and spline regression falling closer to nonparametric regression (so close that it may be con-sidered an approximation to nonparametric regression). As will be discussed below, both categorical analysis and splines can be viewed as special types of category-specific regression, but splines are based on more realistic cate-gory-specific models.

In what follows, I will denote the exposure of interest by $x$. All points apply even when $x$ is only a time variable for which trends are to be plotted, or a confounder for which close control is desired. The following analysis of secular trends in human immunodeficiency virus (HIV) infection incidence will serve to illustrate all of the

From the Department of Epidemiology, UCLA School of Public Health, Los Angeles, CA 90095-1772.

This work was partially supported by the HIV Epidemiology Program of the Los Angeles County Department of Health Services.

Submitted October 14, 1994; final version accepted February 10, 1995.

© 1995 by Epidemiology Resources Inc.

Case 3:16-md-02738-MAS-RLS   Document 9895-5   Filed 05/30/19   Page 34 of 599 PageID: 72438

**TABLE 1.   New AIDS Diagnoses in Los Angeles County through 1992 Reported by 1994 among White Non-Hispanic Men Who Have Sex with Men Reporting No Injection Drug Use, 1951–1960 Birth Cohort, and Naive HIV Incidence-Rate Estimates**

| Year | Years since 1976 ($j$) | New AIDS Cases ($y$) | White Non-Hispanic Person-Years, in Thousands ($n_x$) | Naive HIV Rate Estimate* |
|---|---|---|---|---|
| 1979 | 3 | 0 | 362 | 0 |
| 1980 | 4 | 0 | 360 | 100 |
| 1981 | 5 | 4 | 355 | 519 |
| 1982 | 6 | 10 | 353 | 76 |
| 1983 | 7 | 46 | 351 | 728 |
| 1984 | 8 | 92 | 349 | 1,744 |
| 1985 | 9 | 201 | 348 | 433 |
| 1986 | 10 | 329 | 348 | 65 |
| 1987 | 11 | 456 | 348 | 1,820 |
| 1988 | 12 | 476 | 347 | 111 |
| 1989 | 13 | 606 | 347 | 2,013 |
| 1990 | 14 | 642 | 348 | 192 |
| 1991 | 15 | 791 | 344 | 57 |
| 1992 | 16 | 645 | 339 | 119 |
| Total | | 4,298 | | |

\* Number of infections per 100,000 person-years (see Appendix).

methods discussed in this paper. Throughout, the focus will be on estimation of the shape of dose-response or trend; a companion article[6] describes the advantages of splines in testing for dose-response and trends.

## General Description of Example

A major task in the study of acquired immunodeficiency syndrome (AIDS) is estimation of historical trends in HIV infection incidence.[7] Table 1 presents the 4,298 AIDS cases diagnosed in Los Angeles County through 1992 and reported by 1994 among white non-Hispanic men who have sex with men (MSM) born 1951–1960 who reported no injection drug use (IDU). Because there are no reliable data on cohort-specific prevalences of behaviors that define HIV transmission groups (such as sexual behavior), the HIV rates refer to the number of HIV MSM cases that reported no injection drug use among white non-Hispanic men born 1951–1960, rather than the number of HIV cases among non-IDU white non-Hispanic MSM born 1951–1960.

Because HIV incidence has not been directly observed, historical HIV incidence is computed from observed AIDS incidence using estimates of the distribution of incubation time from HIV infection to AIDS diagnosis.[7,8] The final column of Table 1 presents HIV rate estimates derived from a backcalculation equation, given in the Appendix, that relates AIDS to HIV incidence. These naive estimates involve no model or grouping of years. As a result, they present a noisy pattern and would fluctuate wildly in response to minor changes in the data or the estimation method.

More stable estimates require use of a model for the HIV rates. In the examples below, a series of models for these rates will be fitted via a Poisson regression method described in detail elsewhere[8,9] and summarized in the Appendix. The important elements for the present dis-

cussion are the structural forms of the models. To describe them, let $x$ be years since 1976 (1976, then, is year 0, which is commonly taken as the start of the epidemic), $n_x$ the person-years at risk in year $x$, and $r_x$ the HIV incidence rate in year $x$. The simple log-linear model

$$r_x = \exp(\alpha + \beta x) \qquad (1)$$

is out of the question, because it implies that HIV incidence rates continued to increase exponentially through the 1980s and beyond, contrary to extensive evidence of leveling and decline in the 1980s.[5] Hence $\beta x$ must be replaced by a more flexible set of trend terms. Figure 1 presents the fitted HIV incidence rates derived from Table 1 using five different choices for these terms, each with four coefficients (beyond the intercept): (1) four category indicators for five categories (*dotted line*); (2) fractional polynomial with four powers of untransformed time (*short dashes*); (3) fractional polynomial with four powers of log time (*solid curve*); (4) linear spline with four categories of log time (*long dashes*); (5) quadratic spline with three categories of log time (*solid curve* again—it almost perfectly agrees with the fractional polynomial with log time). The remainder of the paper will describe each choice in detail.

As a special caution in interpreting Figure 1, note that the very long incubation time between HIV infection and AIDS incidence (median time on the order of 10 or more years[10]) implies that the data in Table 1 contain almost no information on HIV incidence after 1989.



**FIGURE 1.   Fitted HIV infection incidence in Los Angeles County, 1979–1992: non-IDU MSM cases per 100,000 person-years among white non-Hispanic men born 1951–1960. *Short dashes:* fractional polynomial curve in untransformed time; *solid curve:* fractional polynomial curve in log time and (coinciding) quadratic spline curve; *dotted line:* step function from category indicators; *long dashes:* linear spline.**

Case 3:16-md-02738-MAS-RLS   Document 9895-5   Filed 05/30/19   Page 35 of 599 PageID: 72439

   **Epidemiology**   July 1995, Volume 6 Number 4



**FIGURE 2.** Fitted penalized spline HIV incidence curve (*solid curve*) with pointwise 95% confidence limits (*dotted curves*).

Thus, after 1989 the curves are little more than extrapolations from previous years (hence the increasing divergence beyond 1989). On the other hand, the data do provide a reasonable amount of information on HIV incidence before 1989. This point is illustrated in Figure 2, which shows the fitted curve and pointwise confidence limits obtained by using a penalized spline smoother as part of a multivariate model for HIV incidence[9] (the kinks in these three curves are artifacts of the graphing program). As a secondary caution, note that the curves in Figure 1 cannot be obtained by fitting models to the naive HIV rates in Table 1; all fitting must instead be done via backcalculation from observed AIDS incidence (Appendix Eq A1).

## Fractional Polynomial Regression

Many authors recommend that one try to examine polynomial terms (at least a quadratic term $x^2$) in addition to the basic linear term $x$ in the dose-response model.[1] There are problems with polynomial regression, however. Although in theory with enough polynomial terms one can approximate any smooth curve, in reality the number of terms required may be so large as to result in numerically unstable estimates. Polynomials greater than quadratic tend to produce artifactual turns in the fitted curve, whereas quadratics have extremely limited flexibility.

Recently, Royston and Altman[11] have emphasized that a great deal more flexibility and stability can be obtained by examining fractional and inverse powers of $x$, such as $x^{-2}$, $x^{-1}$, $x^{-1/2}$, and $x^{1/2}$ in addition to $x$ and $x^2$. (Terms of the form $x^p[\ln(x)]^j$ are also included in the family of curves considered by Royston and Altman, but these cannot be used if $x$ can be zero or negative.) Royston and Altman point out that models containing as few as three different powers of $x$ between $x^{-2}$ and $x^2$ encompass a dramatic range of shapes.

Fractional polynomials do have important limitations.[12,13] For example, $x$ cannot be negative if fractional

powers are used, and the results will be sensitive to the position of the zero-level of exposure $x$. Thus, fractional polynomials may be problematic if $x$ is not ratio scaled; that is, it is advisable that $x$ have an absolute zero level (unexposed level) and be coded so that this level is zero.[12] Nonetheless, many, if not most, epidemiologic exposures have an absolute zero, so that this limitation may be of infrequent practical importance. (If $x$ can be negative, Royston and Altman recommend adding a positive number to force it to be positive, but this approach essentially introduces a new nonlinear parameter into the model, because the optimal number to add is unknown.)

In the HIV example, $x$ does have an absolute zero: it is the time at which the epidemic started, which has not been precisely determined but is customarily taken to be 1976. A similar problem (of an absolute but imprecisely known zero) arises when using age in studies of adult noninfectious diseases: Age is often a surrogate for time since start of an unmeasured background exposure (for example, hormones) or etiologic process. In such situations, it may be advisable to replace age by a more biologically relevant time scale in which risk becomes nonzero only after time zero. For example, time since puberty could serve as such a scale in certain studies of cancers of the reproductive system.

Another problem, one which also afflicts polynomial regression, is how to decide which terms to include. Royston and Altman propose a special stepwise procedure, which (like all stepwise procedures) is questionable in concept and requires special programming. Ideally, one should specify in advance the shape of curves one would want the fitted model to encompass. To do so, however, requires a sense of what shapes are encompassed by each power of $x$. For most epidemiologic purposes, it suffices to recall that, as $x$ increases above 0, $x^2$ starts more slowly but soon increases more rapidly than $x$, and that $x^{1/2}$ starts more rapidly but soon increases more slowly than $x$. From this, a simple qualitative dose-response analysis might always include $x$ (the linear term) and then:

1. Include $x^2$ if one expects the slope of the trend or dose-response curve (that is, the steepness, or effect per unit exposure) to increase in absolute value as exposure increases (as with cigarettes per day and lung cancer[14]), or if one expects the curve to change direction.
2. Include $x^{1/2}$ if one expects the slope to decrease in absolute value as exposure increases.
3. Include both $x^{1/2}$ and $x^2$ if one wants to allow for either possibility.

One may, of course, use a higher power of $x$ in place of $x^2$ and a lower power of $x$ in place of $x^{1/2}$ if one expects more rapid changes in slope over the range of exposure, and one may include more terms if greater flexibility is desired.

If $x$ can only be positive (as with typical cardiovascular and anthropometric measurements), $\ln(x)$ can be

DOSE-RESPONSE AND TREND ANALYSIS   **359**

used in place of $x^{1/2}$ to yield a curve with a very gradually declining slope. In fact, if one uses a logistic or exponential (log-linear) model for risks or rates and $x$ can only be positive, it can be argued that $\ln(x)$ should be included in all dose-response and trend analyses. This is because the use of $x$ alone in such models implies that the rate, risk, or odds ratio for exposure level $x$ vs zero is $e^{\beta x}$, which increases exponentially with $x$ if $\beta > 0$. Use of $\ln(x)$ instead yields a rate, risk, or odds ratio of $\exp[\beta \ln(x)] = x^{\beta}$, which can increase much less rapidly than exponentially and can even increase less than linearly if $0 < \beta < 1$.

*Example*
The *short dashes* in Figure 1 trace the fitted curve obtained from Table 1 using:

$$r_x = \exp(\alpha + \beta_1 x^{1/2} + \beta_2 x + \beta_3 x^{3/2} + \beta_4 x^2).$$

A virtually identical curve was obtained using $x^3$ instead of $x^{3/2}$. The *solid line* traces the fitted curve obtained using powers of $\ln(x)$ in place of powers of $x$ as the time covariate. Both curves exhibit essentially exponential growth until 1982, followed by rapid slowing with a peak in 1984, and gradual decline thereafter.

Although fractional polynomials with only two or three exposure terms can produce quite a variety of curves, one should be aware when examining such curves that their exact shape and location can be strongly influenced by one or a few data points. In particular, the fitted values for a point can be strongly influenced by data at points far away on the graph.[13] This is also a problem with curves fit by quadratic or cubic regression, and with the single slope produced by a simple regression with only $x$ (the linear term) included. Thus, it is especially important to evaluate regressions with few exposure terms using influence analysis, which involves seeing how much results change when the most influential data points are deleted from the analysis (in the present HIV example, the basic conclusions are unchanged by single deletions). Inclusion of confidence limits in the curve graph can also help indicate what portions of the curve are poorly estimated. (Methods for constructing confidence limits are described in the Discussion.)

## Spline Regression

### CATEGORY INDICATORS REVISITED

Consider ordinary categorical dose-response analysis[2] from the following perspective: One divides the observed range of exposure $x$ into $K$ categories indexed by $k = 1, \ldots, K$ with $K - 1$ internal boundaries $c_1, \ldots, c_{K-1}$. Then, within each category, one fits a completely horizontal line as the dose-response "curve" relating exposure to the outcome within the category. For example, in categorical logistic regression, one simultaneously fits $K$ category-specific models for the logit (log odds) of risk $R$:

$$\text{logit}(R \mid x \text{ in category } k) = \alpha_k^*, \; k = 1, \ldots, K, \quad (2)$$

which says that $x$ has *no effect whatsoever within categories*, no matter how large its effect between categories!

To illustrate, suppose $x$ is daily intake of ascorbic acid, $R$ is mortality risk, and the internal boundaries for $x$ are at 20, 50, and 100 mg per day, with the boundaries included in the lower category. The categorical dose-response model then says that there is no difference in risk between 0 and 20 mg per day but allows there to be an arbitrarily large jump in risk between 20 and 21 mg per day. This is biologically absurd, given that 0 mg per day represents a relatively rapidly fatal deficiency state, 20 mg per day does not, and the difference between 20 and 21 mg per day is biologically trivial. Although a categorical model can be viewed as providing estimates of average risk within categories, one should question the value of averaging risks that are known to be as disparate as those for 0 and 20 mg per day of ascorbic acid. Furthermore, under nonlinear models, the estimates of average risk provided by category-indicator regression can produce a biased impression of the exposure-specific dose-response curve.[15]

The preceding type of model, called a step function, is precisely what one is fitting when one breaks exposure into categories and then fits a model with $K - 1$ indicator variables $i_2, \ldots, i_K$, where $i_k = 1$ if $x$ is in category $k$, 0 otherwise:

$$\text{logit}(R \mid x) = \alpha_1 + \alpha_2 i_2 + \cdots + \alpha_K i_K. \quad (3)$$

Here, $\alpha_1 = \alpha_1^*$ and $\alpha_k = \alpha_k^* - \alpha_1^*$ for $k > 1$. The results from such a model will not be misleading if risk changes little within categories. Unfortunately, selection of category boundaries based on percentiles in no way guarantees that this criterion will be met. In fact, use of percentiles virtually guarantees that the criterion will be violated if most subjects are concentrated within a narrow subrange of exposure and the exposure does have a large effect beyond that subrange.

The only way to ensure constancy of risk within categories is to use very narrow categories. This will often yield many more categories than the standard four or five—perhaps as many as 10, or even 20. If so, numbers may become so small within categories that the category-specific estimates are uselessly unstable, as in Table 1. Conventional recommendations (of four or five categories) seek to minimize variance by using few categories, but they unrealistically assume that boundaries will be set in an ideal fashion. If, however, the boundaries are not well chosen, bias will result. The variance-bias tension is especially severe in categorical dose-response modeling because of the unrealistic model that underlies the analysis.

*Example*
The *small dots* in Figure 1 trace the step function obtained by fitting the categorical model:

$$r_x = \exp(\alpha_1 + \alpha_2 i_2 + \alpha_3 i_3 + \alpha_4 i_4 + \alpha_5 i_5),$$

where $i_2, i_3, i_4, i_5$ are indicators for the categories 1981–1982, 1983–1984, 1985–1987, and $\geq$1988. The later

Epidemiology   July 1995, Volume 6 Number 4

categories are broader because of the declining stability of the estimates over time. The visual impression provided by these estimates is less accurate than that from the other curves, failing to locate well the early climb and later decline in rates. The curve produced by connecting the midpoints instead of the ends of the categories (not shown) is a little better but is still not as plausible as the smooth curves. Narrower categories (not shown) were tried but failed to help, and instead produced erratically fluctuating steps. (Note that if one used categories based on the AIDS case percentiles from Table 1, the results would be disastrous: the first quartile extends through 1987, so that the fitted step function would represent the dramatic 1980–1987 trend by one constant rate!)

## LINEAR SPLINE REGRESSION

How can one avoid the absurdity, pitfalls, and tensions of category-indicator analysis for continuous variables? One simple solution is to allow the within-category lines to have nonzero slopes, so that the model will allow risk to vary *within* as well as *between* categories. Furthermore, we can fit these lines in such a way that there is no sudden jump in risk across category boundaries, so that fitted risk changes in a continuous manner within and across categories. The simplest method for doing so is called linear spline regression, which can be performed with conventional regression programs.

For logistic regression, the objective might be to simultaneously fit the $K$ category-specific linear models:

$$\text{logit}(R \mid x \text{ in category } k) = \alpha_k^* + \beta_k^* x. \quad (4)$$

We should want these $K$ models to fit together in a biologically sensible way, meaning that we want continuity (no sudden jumps) in risk across the category boundaries. This in turn requires any adjacent pair of category-specific models to predict the same risk at their common boundary $j$. For a logistic model, this means we must have:

$$\text{logit}(R \mid x = c_k) = \alpha_k^* + \beta_k^* c_k = \alpha_{k+1}^* + \beta_{k+1}^* c_k \quad (5)$$

for all $k$ less than $K$. One way to force Eqs 4 and 5 to hold for all $k$ less than $K$ is to fit the following *linear spline model* to all of the data:

$$\text{logit}(R \mid x) = \alpha + \beta_1 x + \beta_2 s_2 + \cdots + \beta_K s_K, \quad (6)$$

where $s_k = 0$ if $x \le c_k$, $x - c_k$ if $x > c_k$. $s_k$ is sometimes called the positive part of $x - c_k$ and can also be defined as $s_k = \max(0, x - c_k)$. The parameters in Eq 6 are simple functions of the parameters in the $K$ models in Eq 4: $\alpha = \alpha_1^*$ and $\beta_1 = \beta_1^*$, whereas for $k > 1$, $\beta_k = \beta_k^* - \beta_{k-1}^*$ is the change in the slope of dose-response in going from category $k - 1$ to category $k$. The graph of Eq 6 will look like a series of connected line segments.

### Example
The *long dashes* in Figure 1 trace the linear spline obtained by fitting the model:

$$r_x = \exp(\alpha + \beta_1 \ln(x) + \beta_2 s_2 + \beta_3 s_3 + \beta_4 s_4)$$

where

$$s_2 = 0 \text{ if } x \le 6, \ \ln(x) - \ln(6) \quad \text{if } x > 6,$$

$$s_3 = 0 \text{ if } x \le 8, \ \ln(x) - \ln(8) \quad \text{if } x > 8,$$

and

$$s_4 = 0 \text{ if } x \le 11, \ \ln(x) - \ln(11) \quad \text{if } x > 11$$

($x = 6, 8, 11$ correspond to 1982, 1984, 1987). Apart from the artificially sharp peak in 1984, this model conveys essentially the same pattern as the fractional polynomial curves.

The general idea exemplified by Eqs 4–6 is to fit regression models simultaneously within each category, subject to constraints that maintain reasonable relations across the strata. These constraints also keep the analysis parsimonious. With $K$ separate category-specific linear regressions, the total number of coefficients fit would have been $2K$ ($K$ intercepts and $K$ slopes). Nevertheless, the intercepts $\alpha_2, \ldots, \alpha_K$ are eliminated because of the continuity (no-jump) constraint, leaving only one intercept. The total number of parameters in Eq 6 is thus $K + 1$, only one more than the step function model for the same categories (Eq 3). Furthermore, unlike the step function (Eq 3), the linear spline (Eq 6) does not depend on risk being constant within categories for validity and thus can be used with fewer categories than required for valid use of the step function (Eq 3).

## MORE GENERAL SPLINE REGRESSION

Although a linear spline function is a dramatic improvement over a step function, it still does not have full biological plausibility because of the sharp bends (kinks) at the boundaries where the slope of the function abruptly changes. Also, linear-spline regression can suffer from instabilities and sensitivities to choice of category boundaries, although usually not as severely as category-indicator regression. To address these problems, we can create a curve with no sharp bends and a more smooth, plausible appearance simply by adding a quadratic term to each category-specific model, for example:

$$\text{logit}(R \mid x \text{ in category } k) = \alpha_k^* + \beta_k^* x + \gamma_k^* x^2. \quad (7)$$

As before, we want no jumps, which means adjacent category-specific models must agree at their common boundary:

$$\begin{aligned}
\text{logit}(R \mid x = c_k) &= \alpha_k^* + \beta_k^* c_k + \gamma_k^* c_k^2 \\
&= \alpha_{k+1}^* + \beta_{k+1}^* c_k + \gamma_{k+1}^* c_k^2.
\end{aligned} \quad (8)$$

To obtain a smooth appearance, we also want adjacent models to have the same slope (derivative) at their common boundary, which corresponds to requiring that:

$$\beta_k^* + 2\gamma_k^* c_k = \beta_{k+1}^* + 2\gamma_{k+1}^* c_k. \quad (9)$$

Case 3:16-md-02738-MAS-RLS   Document 9895-5   Filed 05/30/19   Page 38 of 599 PageID: 72442

Simultaneously fitting the $K$ category-specific quadratic models (Eq 7) subject to the continuity constraint (Eq 8) and the smoothness (slope) constraint (Eq 9) is equivalent to fitting the single *quadratic spline model*:

$$\text{logit}(R|x) = \alpha + \beta x + \gamma_1 x^2 + \gamma_2 s_2^2 + \cdots + \gamma_K s_K^2, \quad (10)$$

where $\alpha = \alpha_1^*, \beta = \beta_1^*, \gamma_1 = \gamma_1^*$, and, for $k > 1$, $\gamma_k = \gamma_k^* - \gamma_{k-1}^*$ is the change in the quadratic term (departure from linearity) of the dose-response function in going from category $k - 1$ to category $k$. This quadratic spline model (Eq 10) has only one more parameter than the linear spline model for the same categories (Eq 6). Furthermore, it would ordinarily require fewer categories for accuracy than the linear spline model, so that in practice no more parameters are needed than for the latter model. As with the linear spline, it can easily be fit with conventional regression programs.

*Example*
In addition to tracing the log-time fractional polynomial curve, the *solid curve* in Figure 1 coincides with the quadratic spline obtained by fitting the model:

$$r_x = \exp(\alpha + \beta_1 \ln(x) + \gamma_1 \ln(x)^2 + \gamma_2 s_2^2 + \gamma_3 s_3^2),$$

where

$$s_2 = 0 \text{ if } x \le 7, \ln(x) - \ln(7) \quad \text{if } x > 7,$$

and

$$s_3 = 0 \text{ if } x \le 10, \ln(x) - \ln(10) \quad \text{if } x > 10$$

($x = 7,10$ correspond to 1983,1986).

Like higher-order polynomials, quadratic splines can suffer from odd behavior in open-ended tails of the exposure distribution. When this happens, we can further reduce the number of parameters and improve tail behavior by restricting the fitted curve to be linear in open-ended categories. To restrict the lower tail, one need only drop $x^2$ from the model. To restrict the upper tail, one drops $s_K^2$ from Model 10 and replaces the remaining $s_k^2$ by $s_k^2 - s_K^2$; one also replaces $x^2$ by $x^2 - s_K^2$ if the lower tail is not restricted. The quadratic spline with both tails restricted to be linear is:

$$\text{logit}(R|x) = \alpha + \beta x + \gamma_2(s_2^2 - s_K^2)$$
$$+ \cdots + \gamma_{K-1}(s_{K-1}^2 - s_K^2). \quad (11)$$

This model has only $K$ coefficients including the intercept. In other words, it has exactly the same number of parameters as the crude step-function model (Eq 3), given that the same number of categories are used. Yet, unlike the step function, it can reproduce a wide variety of smooth curves.

*Example*
Because of its closeness to the other curves, Figure 1 omits the curve obtained by fitting the restricted quadratic spline:

$$r_x = \exp[\alpha + \beta_1 \ln(x) + \gamma_2(s_2^2 - s_5^2)$$
$$+ \gamma_3(s_3^2 - s_5^2) + \gamma_4(s_4^2 - s_5^2)]$$

where

$$s_2 = 0 \text{ if } x \le 5, \ln(x) - \ln(5) \quad \text{if } x > 5,$$

$$s_3 = 0 \text{ if } x \le 7, \ln(x) - \ln(7) \quad \text{if } x > 7,$$

$$s_4 = 0 \text{ if } x \le 9, \ln(x) - \ln(9) \quad \text{if } x > 9,$$

$$s_5 = 0 \text{ if } x \le 12, \ln(x) - \ln(12) \quad \text{if } x > 12$$

(these spline terms are based on the same categories as the earlier category-indicator model). This curve is very similar to the linear-spline curve, but rounded at the peak and at other category boundaries.

The type of restricted spline just described should not be confused with so-called natural splines,[5] in which the fitted curve is restricted to be linear below the smallest and above the largest observed value of $x$. These natural splines have the same number of parameters as unrestricted splines. They are obtained by treating $\min(x)$ and $\max(x)$ as additional category boundaries and then fitting a restricted spline to the expanded set of $K + 2$ categories. Within the range of the data, the resulting curve is identical to that produced by the unrestricted spline.

As the reader may have surmised, one may further extend the category-specific models and constraints. The form preferred by most statisticians is the *cubic spline model*,[16] which in its unrestricted form may be written:

$$\text{logit}(R|x) = \alpha + \beta x + \gamma x^2 + \delta_1 x^3$$
$$+ \delta_2 s_2^3 + \cdots + \delta_K s_K^3, \quad (12)$$

This model may be derived by adding a cubic term $\delta_k^* x^3$ to the category-specific quadratic models (Eq 7) and then constraining the curves to be continuous and have equal slopes and second derivatives at the boundaries. The linear, quadratic, and cubic splines (Models 6 and 10–12) are all examples of *spline functions*, which are extensively used in the physical sciences and engineering but surprisingly rare in epidemiology. In the spline literature, the category boundaries $c_1, \ldots, c_{K-1}$ are called *knots* or join points, because they are the points at which the category-specific curves are tied together.[3–5,16] Natural cubic splines can be extended to produce a nonparametric smoother (called a cubic spline smoother) by placing a knot at each distinct exposure value and constraining the resulting saturated model with a penalty function.[3–5] It is also possible to constrain splines to produce only monotonic curves (that is, curves with no trend reversals).[17]

## Discussion
Some external evidence regarding the true epidemic curve in the example is available, all of it indicating that the smooth curves are better estimates than the category-indicator step function. Backcalculations based

Epidemiology   July 1995, Volume 6 Number 4

on much more extensive national data[8] indicate that a single sharp peak occurred around 1984–1985. More generally, both theoretical[5] and simulation[6] evidence indicates that smooth splines have better statistical properties than comparably parameterized step functions. Of course, one may conduct both a traditional step-function analysis and a spline analysis. The primary point of this paper is simply that some sort of smooth curve fitting is advisable when the study covariate is continuous and numbers do not permit the use of narrow categories.

All of the above methods can be applied to multiple covariates in a model. When applied to confounders, however, fractional-polynomial and spline regressions can produce more complete confounder control than step functions; this is because only the former control for confounder effects *within* strata as well as across strata. Generalized additive models[3,5] offer the same advantage, but within a given computing capacity, fractional polynomials and splines can be fit to larger datasets with more subjects and covariates, and can be fit with any regression software.

## Unexposed Subjects

An issue that often arises when $x$ is a ratio-scaled exposure (such as alcohol consumption) is whether to delete the unexposed during dose-response analysis. As explained elsewhere,[18] deletion of the unexposed (zero-exposed) is not always the best approach and is, in fact, an inadvisable waste of information if the unexposed and exposed are comparable with respect to factors that affect validity (such as uncontrolled confounders and selection factors). An advantage of highly flexible models (with more than a few exposure terms) over simpler models is that the overall curve will usually be less influenced by the unexposed than in simpler models, and hence the decision to retain or delete the unexposed will be less momentous. In nonparametric regression with ample data, smoothing neighborhoods can be made small, in which case the unexposed will exert little or no influence on the curve beyond their immediate low-exposure neighborhood. For situations in which the validity of retaining the unexposed is in question, a separate indicator variable for the unexposed category can be entered in the regression, which will eliminate direct influence of the unexposed on the curve. If this is done, the resulting fitted curve will not necessarily pass through the fitted rate at $x = 0$, reflecting the fact that the unexposed have been effectively eliminated from the curve-fitting process. See Greenland and Poole[18] for further discussion of this approach.

## Choice of Splines

The improved smoothness of quadratic splines over linear splines leads me to prefer the former. In contrast, for epidemiologic purposes, there seem to be practical disadvantages and little if any advantage to using cubic splines instead of the quadratic splines. The primary disadvantage of cubic splines is that the cubic form of the category-specific models can produce very strange shapes in broad categories and in open-ended categories. With any spline, category boundaries can be adjusted to remove anomalies, whereas end-category anomalies can be prevented or removed by further constraining the end-category models to be linear.[16] Unfortunately, for cubic splines, the latter constraint requires that more complicated covariates than the $s_k$ defined above be used in the regression. A more minor disadvantage of cubic splines is the poor interpretability of the coefficients, especially when end constraints are needed.

With enough well-chosen categories, cubic splines can closely approximate virtually any smooth curve.[4] This advantage seems of doubtful utility for epidemiologic analysis, however, because plausible trends and dose-response curves are usually very simple in form compared with many of the response functions found in engineering and the physical sciences. The primary gain from using cubic splines is that they yield very smooth curves. Nonetheless, I have not yet found epidemiologic data for which a gain from using cubic instead of quadratic splines is graphically noticeable. In the HIV example used here, a 5-parameter cubic spline model with one knot in the mid-1980s yields nearly the same curve as the fractional polynomial and quadratic spline curves in Figure 1.

There are certain advantages to using unrestricted splines (such as Models 10 and 12) over splines with end-category restrictions (such as Model 11). An unrestricted quadratic spline contains the ordinary quadratic regression model (the model with $x$ and $x^2$ only) as a special case. Hence, the ordinary quadratic model can be checked against the more general unrestricted spline model (Eq 10) by testing the hypothesis that the spline coefficients are zero ($\gamma_2 = \cdots = \gamma_K = 0$ in Model 10). The restricted spline model (Eq 11) does not contain the quadratic model as a special case and so cannot be used in this way. Another drawback of restricted splines is that, perhaps counter to intuition, an end-category restriction can strongly affect the entire shape of the curve and enhance sensitivity of the overall shape to outliers. Nonetheless, restricted splines can be useful when linear end-category behavior is considered preferable to the nonmonotone end-category behavior that unrestricted splines can exhibit.

## Choice of Categories and Terms

There are various schools of thought regarding choice of categories for splines. One school seeks automatic methods that optimize some statistical criterion, such as minimizing a goodness-of-fit statistic or the cross-validation sum of squared residuals.[3–5] Others prefer simple visual assessment of smoothness: Start with many categories, then reduce their number and adjust boundaries so that implausible blips, dips, and irregularities are eliminated. Another visual approach (suggested by a referee) is to use the curve from a smoother to suggest where cutpoints should be. All of these approaches have limitations. Automated methods (such as stepwise selection of

Case 3:16-md-02738-MAS-RLS   Document 9895-5   Filed 05/30/19   Page 40 of 599 PageID: 72444

knots) can invalidate conventional tests and confidence intervals for trends,[16,19,20] whereas visual choice runs the risk of introducing subjective biases. Visual choice does allow one to use vague prior information about curve shape. Absent such information, some authors prefer to use percentile categories[16]; the latter can perform adequately with splines even when they perform poorly when category indicators.[6]

The problems just discussed are even more acute for ordinary category-indicator regression, because the latter is so sensitive to category choice. In particular, use of percentile categories can severely harm power and precision in category-indicator regression if the exposure effect is concentrated in a tail of the exposure distribution.[6] Unlike category indicators, splines make use of within-category risk variation and so can be less sensitive to category choice,[6] although, like category indicators, they can be sensitive to choice of tail categories when those categories are open ended.

Fractional polynomial regression avoids the problem of category choice but instead faces an analogous problem in choice of terms. As with category choice, mechanical algorithms for choice of terms invalidate conventional tests and can perform badly in small to modest samples, whereas visual choice runs the risk of introducing subjective biases of the analyst. These choice issues also arise in nonparametric regression, in which the analyst must visually select a value for the smoothing parameter, or else have it chosen by an algorithm.[3,5] In sum, every dose-response or trend analysis (from conventional categorical to advanced nonparametric) must choose the degree of smoothness or complexity in the fitted curve via choice of categories, model terms, or smoothing parameter. Regardless of the approach one uses, graphical inspection of the final fitted curve will greatly aid in determining whether the choices made yielded credible or surprising results.

### Cutpoint Analysis and Thresholds

An issue of prominence in recent literature is that of choosing the proper cutpoint for dichotomous analysis of continuous exposures. Special concerns have been raised about "cutpoint bias," in which cutpoints are chosen to maximize significance or size of estimates.[21,22] Nonparametric curves and quadratic or cubic splines can largely finesse such issues by providing a single curve that simultaneously conveys rates or relative risks across the full range of exposure, without collapsing together disparate exposure levels. If there is a threshold for the exposure effect, it will be reflected by a steep portion of the smooth curve following a near-level portion. One should not, however, expect to see a single sharp (vertical) threshold point, because both exposure measurement error and individual variation in threshold will stretch out the threshold portion of the curve over some range of exposure.

### Diagnostics

As with all regression, the methods discussed here (including conventional category-indicator regression, as well as the alternatives) need to be coupled with regression diagnostics (model checking) such as tests of fit, residual analysis, and influence analysis. In nonparametric regression, the effects of influential data points tend to be visually more dramatic but more localized than in conventional parametric regression[3]; similar comments apply to the flexible alternatives discussed here. Marked influences often show up in tails of the fitted curve, which can be strongly pulled toward outlying points. Diagnostics such as influence analysis help distinguish observed patterns that are resistant to modest changes in the data from those that are "driven" by just one or two unusual data points. Sensitivity of patterns to conventional model assumptions can also be explored by comparing conventional results to the results from flexible models.

### Sample-Size Considerations

Fractional-polynomial and spline regression are *not* inherently large-sample techniques and can be applied with exact regression programs such as LogXact.[23] When applied in conjunction with large-sample (asymptotic) methods such as maximum-likelihood logistic regression, however, checks on sample size adequacy are advisable. Perhaps the easiest way of checking adequacy for maximum-likelihood logistic spline regression is to examine tabular cross-classifications based on the categories used to define the spline. By one rough criterion, if there are no product terms between exposure and other covariates, one should have at least five cases and five non-cases in each category when applying maximum-likelihood methods. I am not aware of an equally simple sample-size criterion for maximum-likelihood estimation of fractional polynomials.

### Confidence Limits

For clarity, confidence limits were omitted from Figure 1, but in practice, it can be helpful to include them, as in Figure 2. Confidence limits for points on the regression curve are an option in many software packages, and these options can be invoked when fitting fractional polynomials and splines.

When such options are not available, one may compute limits directly using large-sample analogues of standard formulas.[24] As an illustration, suppose we want 95% limits at the point $x$ under the quadratic logistic spline model (Eq 10). Define the full parameter vector $\underline{\Theta}$ as:

$$\underline{\Theta} = (\Theta_1, \ldots, \Theta_{K+2})' = (\alpha, \beta, \gamma_1, \gamma_2, \ldots, \gamma_K)'$$

and the full covariate vector $\underline{z}$ as:

$$\underline{z} = (z_1, \ldots, z_{K+2})' = (1, x, x^2, s_1^2, \ldots, s_K^2)'.$$

Also, let $\hat{c}_{ij}$ be the estimated covariance of the parameter estimates $\hat{\Theta}_i$ and $\hat{\Theta}_j$ (the $\hat{c}_{ij}$ are available by requesting the covariance matrix output option from the regression

Epidemiology   July 1995, Volume 6 Number 4

software). The fitted logit of risk $\hat{l}_x$ at $x$ is then the dot product of $\underline{\hat{\Theta}}$ and $\underline{z}$,

$$\underline{\hat{\Theta}}'\underline{z} = \sum_i \hat{\Theta}_i z_i. \qquad (13)$$

Approximate pointwise 95% limits for the risk at $x$ are then given by:

$$\text{expit}(\underline{\hat{\Theta}}'\underline{z} \pm 1.96\hat{v}_x^{1/2}) \qquad (14)$$

where $\text{expit}(u) = e^u/(1 + e^u)$ is the logistic transform, $\hat{v}_x$ is the estimated logit variance:

$$\hat{v}_x = \sum_i \sum_j \hat{c}_{ij} z_i z_j = \underline{z}'\hat{C}\underline{z}, \qquad (15)$$

and $\hat{C}$ is the estimated covariance matrix for $\underline{\hat{\Theta}}$.

To estimate the ratio of odds at two different exposure levels with full covariate vectors $\underline{z}_1$ and $\underline{z}_0$, let $\underline{d} = \underline{z}_1 - \underline{z}_0$ be the vector of differences of the $\underline{z}_1$ and $\underline{z}_0$ components. The fitted log odds ratio is then

$$\underline{\hat{\Theta}}'\underline{d} = \sum_i \hat{\Theta}_i d_i \qquad (16)$$

and approximate 95% limits for the odds ratio are given by:

$$\exp(\underline{\hat{\Theta}}'\underline{d} \pm 1.96\hat{v}_d^{1/2}) \qquad (17)$$

where

$$\hat{v}_d = \sum_i \sum_j \hat{c}_{ij} d_i d_j = \underline{d}'\hat{C}\underline{d}. \qquad (18)$$

For cohort data, approximate limits for the risk ratio can be obtained using the conditional method of Flanders and Rhodes,[25] whereas rate ratio limits can be obtained from an exponential-multiplicative rate model via Formulas 16–18.

The above formulas can be used when multiple covariates (exposure, confounders, and products among them) are present in the full covariate vector $\underline{z}$. The chief caution in their use is that they are large-sample approximations and can become inaccurate if the data are too limited. Computations are most easily performed using a matrix language such as GAUSS, MATLAB, SAS Proc Matrix, or S-Plus.

Approximate simultaneous 95% confidence limits can be constructed by replacing the normal 97.5th percentile of 1.96 by the square-root of the 97.5th percentile of a $\chi^2$ distribution with degrees of freedom equal to the number of parameters ($K + 2$ for the unrestricted quadratic spline). One should note, however, that these simultaneous limits do not provide an accurate 95% confidence band for the true regression curve; see section 3.82 of Hastie and Tibshirani[3] for a discussion of this point and of bootstrap options for construction of confidence bands for the entire curve.

## Conclusion

The present paper has argued that epidemiologic analyses of dose-response and trend, as well as methods for control of continuous confounders, should be expanded beyond simple categorical and linear (single-coefficient) approaches to include flexible curves that make use of intracategory information. Such expansion can be accomplished with little difficulty via fractional polynomial regression and spline regression. These methods can be especially valuable when important nonlinearities are anticipated, as in studies of health effects of alcohol, nutrients, and other life-style factors.

## Acknowledgments

I would like to thank Philip Kass, Jennifer Kelsey, Stephan Lanes, Malcolm Maclure, Wendy McKelvey, and the referees for their helpful comments on the initial draft of this paper.

## References

1. Maclure M, Greenland S. Tests for trend and dose response: misinterpretations and alternatives. Am J Epidemiol 1992;135:96–104.
2. Rothman KJ. Modern Epidemiology. Boston: Little, Brown, 1986.
3. Hastie T, Tibshirani R. Generalized Additive Models. New York: Chapman and Hall, 1990.
4. Härdle W. Applied Nonparametric Regression. New York: Cambridge, 1990.
5. Green PJ, Silverman BW. Generalized Linear Models and Nonparametric Regression. New York: Chapman and Hall, 1994.
6. Greenland S. Avoiding power loss associated with categorization and ordinal scores in dose-response and trend analysis. Epidemiology 1995;6:450–454.
7. Brookmeyer R, Gail MH. AIDS Epidemiology: A Quantitative Approach. New York: Oxford, 1994.
8. Bacchetti P, Segal MR, Jewell NP. Backcalculation of HIV infection rates. Stat Sci 1993;8:82–119.
9. Greenland S. Historical HIV incidence in regional subgroups: use of flexible discrete models with penalized splines based on prior curves. Stat Med 1996;15 (in press).
10. Alcabes P, Muñoz A, Vlahov D, Friedland GH. Incubation period of human immunodeficiency virus. Epidemiol Rev 1993;15:304–318.
11. Royston P, Altman DG. Regression using fractional polynomials of continuous covariates: parsimonious parametric modelling (with discussion). Appl Stat 1994;43:425–467.
12. Ross GJS. Discussion of Royston and Altman. Appl Stat 1994;43:456.
13. Hastie T, Tibshirani R. Discussion of Royston and Altman. Appl Stat 1994;43:460.
14. Doll R, Peto R. Cigarette smoking and lung cancer: reanalysis of the British doctor's data. J Epidemiol Community Health 1978;32:303–313.
15. Greenland S. Problems in the average-risk interpretation of categorical dose-response analyses. Epidemiology (in press).
16. Durrleman S, Simon R. Flexible regression models with cubic splines. Stat Med 1989;8:551–561.
17. Ramsay JO. Monotone regression splines in action (with discussion). Stat Sci 1988;3:425–461.
18. Greenland S, Poole C. Interpretation and analysis of differential exposure variability and zero-exposure categories for continuous exposures. Epidemiology 1995;6:326–328.
19. Freedman LS, Pee D. Return to a note on screening regression equations. Am Stat 1989;43:279–282.
20. Hurvich CM, Tsai C-L. The impact of model selection on inference in linear regression. Am Stat 1990;44:214–217.
21. Wartenberg D, Savitz DA. Evaluating exposure cutpoint bias in epidemiologic studies of electric and magnetic fields. Bioelectromagnetics 1993;14:237–245.
22. Schulgen G, Lausen B, Olsen JH, Schumacher M. Outcome-oriented cutpoints in analysis of quantitative exposures. Am J Epidemiol 1994;140:172–184.
23. LogXact. Release 1.0. Cambridge, MA: Cytel, 1994.

24. Graybill FA. Theory and application of the linear model. North Scituate, MA: Duxbury, 1976.
25. Flanders WD, Rhodes PH. Large sample confidence limits for regression standardized risks, risk ratios, and risk differences. J Chron Dis 1987;40:697–704.

## Appendix

Assuming that migration and AIDS case reporting are nondifferential, the expectation $\mu_j$ for the observed AIDS case count $y_j$ in epidemic year $j$ is:

$$\mu_j = q_j \sum_{x=1}^{j} p_{jx} n_x r_x \qquad (A1)$$

where $q_j$ is the probability that someone diagnosed with AIDS in year $j$ is reported by the study time (1994), $p_{jx}$ is the probability that someone contracting HIV in year $x$ is diagnosed with AIDS in year $j$, $n_x$ is the person-years at risk in year $x$, and $r_x$ is the rate of non-IDU MSM HIV infections for the population in year $x$. In the examples, $p_{jx}$ is taken from the stationary 3-parameter Weibull curve fit by Bacchetti et al[8] to the San Francisco hepatitis B cohort, with leveling of the hazard at its maximum. The denominators $n_x$ are estimated from census data, whereas the $q_j$ are estimated directly from the Los Angeles County AIDS surveillance data, which supplies both diagnosis and reporting dates.

Given the $p_{jx}$, $n_x$, $q_j$, and a model for $r_x$, the $r_x$ are estimated by maximizing the Poisson loglikelihood $\Sigma_j[y_j\ln(\mu_j) - \mu_j]$ over the unknown model parameters.[8] The naive estimates in Table 1 were obtained by treating the log HIV rates $\alpha_x = \ln(r_x)$ as independent parameters. This corresponds to using a saturated log-linear model with an indicator for each year. The backcalculation equation (Eq A1) has no unique solution under this model, but a solution can be obtained by adding a penalty function to the loglikelihood.[8] The penalty function used for Table 1 is $\Sigma_x(\hat{\alpha}_x - \bar{\alpha})^2/t^2$, where $t^2 = 1.499 \times 10^7$ is the largest value that yielded a solution for Eq A1, and $\bar{\alpha}$ is the information-weighted average of the current log HIV rate estimates $\hat{\alpha}_x$. This penalty produces very mild shrinkage of the year-specific rates toward the weighted mean rate. Note that, counter to intuition, the naive estimates do not average to produce the categorical-model results in Figure 1. This is because the HIV rate estimates for each year are highly nonlinear functions of the AIDS incidence observed in all later years, and these functions differ across models as well as across years.

# Exhibit 155

Review article   1

# Perineal talc use and ovarian cancer risk: a case study of scientific standards in environmental epidemiology

Michael Huncharek[a] and Joshua Muscat[b]

A number of observational studies (largely case–control) conducted over the last two decades suggest an association between use of talc powders on the female perineum and increased risk of ovarian cancer. A subset of these reports shows a roughly 30–60% increased risk of ovarian cancer associated with perineal talc exposure. A number of researchers partly base their conclusions of an association on the '…chemical relationship between talc and asbestos', the latter substance being a known human carcinogen. Although separating causal from noncausal explanations for an observed statistical association is a difficult process, there currently exist commonly accepted guidelines by which such inferences can be made. These scientific approaches include consideration of the strength of the association, the consistency of the finding across studies, and existence of a biological explanation of the observed phenomenon, among others. When applied to the context of a proposed talc/ovarian cancer association, we conclude that the weak statistical associations observed in a number of epidemiological studies do not support a causal association. *European Journal of Cancer Prevention* 00:000–000 © 2011 Wolters Kluwer Health | Lippincott Williams & Wilkins.

European Journal of Cancer Prevention 2011, **00**:000–000

Keywords: causation, cosmetic talc, ovarian neoplasms, risk factors

[a]Meta-Analysis Research Group, Columbia, South Carolina and [b]Department of Public Health Sciences, Pennsylvania State University College of Medicine Cancer Center, Hershey, Pennsylvania, USA.

Correspondence to Michael Huncharek MD, MPH, Meta-Analysis Research Group, 10 Sasanqua Circle, Columbia, SC 29209, USA
Tel: + 1 314 298 6324; fax: + 1 314 289 6322;
e-mail: metaresearch@hotmail.com

Received 31 March 2011 Accepted 1 April 2011

## Introduction

Ovarian cancer represents a major cause of cancer-related morbidity and mortality in the United States, with an estimated 22 000 new cases diagnosed in 2005 (Boger-Megiddo and Weiss, 2005). It is the seventh most common cancer in women and ranks fourth as a cause of cancer deaths among females from the United States, with some 16 000 succumbing to the disease this year. The lethality of ovarian tumors is in large part because of the fact that clinical symptoms tend to occur late in the natural history of the disease and the lack of screening tests allowing for early diagnosis. In fact, approximately 60% of patients are diagnosed with late-stage disease (stages III and IV), vastly diminishing the chance of long-term survival [approximately 10% at 5 years from diagnosis (Richardson *et al.*, 1985)].

Primary prevention of ovarian cancer remains elusive as a clear etiology for the vast majority of cases is unknown. In 1982, Cramer *et al.* published the first study suggesting a link between use of cosmetic talc and the risk of developing ovarian cancer. Subsequently, a number of additional reports have shown a small but increased risk among women using cosmetic talc products, although this finding is not universal (Chang and Risch, 1997). These statistical associations raise concerns that a cause–effect relationship may exist between talc exposure (particularly perineal use) and ovarian carcinogenesis.

On 13 May 2008, Samuel Epstein, MD, Chairman of the Cancer Prevention Coalition, submitted a Citizen's Petition to the Commissioner of the Food and Drug Administration seeking placement of cancer warning labels on talc products. The Petition requests the Commissioner of Food and Drugs to require that all talc products bear labels with a warning such as, 'Frequent application of talcum powder in the female genital area substantially increases the risk of ovarian cancer' (Epstein, 2008).

The claim refers to the first observational study (case–control) suggesting an association between the use of talc powders on the female perineum (by direct dusting or dusting sanitary napkins) and increased risk of ovarian cancer, published in 1982. In this document, the researchers partly base their conclusions of an association on the "…chemical relationship between talc and asbestos", the latter substance being a known human carcinogen. The claim also references a number of additional epidemiological studies conducted after 1982 that have shown a statistical link between talc dusting and ovarian cancer risk. A subset of these reports show a roughly 30–60% increased risk of ovarian cancer associated with perineal talc exposure.

The issues articulated by Epstein *et al.* in relation to the possible carcinogenicity of talc are not uncommon when dealing with interpretation of results derived from observational studies. In a study published 20 years ago, Feinstein provided an insightful and cogent explanation for the myriad problems that plague the process of causal inference as it applies to nonexperimental data (Feinstein, 1988). As he

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Protected Document – Subject to Protective Order                                                                                IMERYS 080206

2   **European Journal of Cancer Prevention**   2011, Vol 00 No 00

points out, most people learn about science by studying experimental methods. These methods largely include direct intervention by the experimenter on whatever entity is under study, whether it be an animal species such as rats or mice, specific chemical compounds, subatomic particles, etc. The scientist, in this context, directly manipulates the study subject/object using established principles of experimental science. In the context of human studies, the experimental design that has come to represent the 'gold standard' of cause–effect relationships is the randomized clinical trial. Unfortunately, in epidemiological research, issues of feasibility and ethical considerations preclude randomization of healthy human participants to receive potentially harmful exposures to various substances, including those that represent possible carcinogenic hazards. Therefore, the epidemiologist must substitute observational methods to study cause–effect relationships that preclude direct intervention with, and/or manipulation of, study participants (i.e. experiments). Owing to this fact, criteria for establishing cause–effect relationships are inherently different when using epidemiological methods versus experimental ones.

In 1965, Hill published a landmark study articulating standards for drawing causal inferences from observational data. His rationale for this stemmed from the realization that the urgency of many public health problems demands action despite the fact that existing knowledge might be imperfect (Rothman, 1986). The 'Hill Criteria' as they have become known, are not simply a 'checklist' of requirements that must be met in order to determine cause–effect relationships. Rather, they represent a theoretical framework to guide one's thinking when attempting to decide whether a body of data meets a basic threshold necessary to distinguish causal from noncausal associations. These criteria include: (i) strength of association, (ii) consistency (i.e. repeated observation of an association in different populations under different circumstances), (iii) specificity (a given cause leads to a specific effect), (iv) temporality (cause must precede effect), (v) biological gradient (dose–response), (vi) plausibility (biological plausibility), (vii) coherence (i.e. that a given cause–effect relationship for an association does not conflict with what is known of the natural history and biology of the disease in question), (viii) experimental evidence (to support the observational findings), and (ix) analogy.

Although the Hill criteria do not provide a complete solution to the dilemma of causal inference in epidemiology, their importance lies in establishing at least a general framework for the process. The proposed talc/ovarian cancer association represents an illustrative example of the utility of this framework. Below we discuss the points raised by Epstein *et al.* in this context and show that the conclusion that the proposed talc/ovarian cancer association is causal is not supported by existing data.

## Talc and ovarian cancer: overview of the scientific evidence

The possibility that perineal talc exposure could be associated with development of ovarian cancer was initially derived from a case–control study published in 1982 (Cramer *et al.*, 1982). Since that time, a number of additional reports have addressed this question, with most showing odds ratios (OR) ranging between 1.0 and 2.0 (Table 1). Although this has prompted some to suggest that these estimates of effect provide support for a cause–effect relationship between this exposure and disease outcome, several important caveats must be considered.

Effects of this magnitude are often characterized as 'weak effects' and although the exact definition of a weak effect is debatable, most epidemiologists would consider associations of less than 2.0 to fall within this general category. Hill and others argue that strong associations are more likely to be causal than weak associations as, '…if they were due to confounding or some other bias, the biasing association would have to be even stronger and would therefore presumably be evident' (Rothman, 1986). As Rothman points out, weak associations are more likely to be explained by undetected biases.

Measures of association of this magnitude are often difficult to interpret. This is based on the fact that the investigator cannot directly manipulate the levels of exposure of interest or extraneous factors that could affect study findings. Attempts to control for external factors are accomplished by statistical manipulations of collected data. However, this process depends on the accuracy and completeness of data collection. Further, the correct choice and interpretation of both statistical models and statistical findings can also be contentious.

It is important to point out that although an association is weak, this does not rule out a causal connection. Nonetheless an example of a factor that could confound the weak effect shown for perineal talc is smoking. It is now recognized that smoking is a risk factor for a number of solid tumors including lung cancer (with ORs on the order of 5.0 vs nonsmokers) and esophageal cancer. Evidence exists that smoking may also be related to at least some types of ovarian tumor, in particular those of the mucinous histology (Huncharek *et al.*, in press). The current literature contains a number of reports showing a doubling or tripling of mucinous ovarian cancer risk among smokers (Green *et al.*, 1997; Pan *et al.*, 2004). Interestingly, in a recent meta-analysis of observational studies, Huncharek *et al.* (in press) show that smoking not only increases the risk of mucinous ovarian tumors, but also the more common serous tumors (Table 2). As Rosenblatt *et al.* (1998) reported that smokers are more likely to engage in perineal talc dusting compared with nonsmokers, an imbalance in smokers across case and control groups in epidemiological studies of the talc/ovarian cancer association could contribute to a spurious positive association.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

**Table 1** Overview of observational studies examining perineal talc use/ovarian cancer risk

| Reference | Number of cases | Number of controls | Frequency of powder use | OR (95% CI) | Hospital vs. population based study |
|---|---|---|---|---|---|
| Booth et al. (1989) | 235 | 451 | Never vs. ever | 1.29 (0.92–1.80) | H |
| Chang and Risch (1997) | 450 | 564 | None vs. any | 1.42 (1.08–1.86) | P |
| Chen et al. (1992) | 112 | 224 | Never vs. ever | 3.9 (0.9–10.6) | P |
| Cook et al. (1997) | 313 | 422 | None vs. any | 1.5 (1.1–2.0) | P |
| Cramer et al. (1999) | 563 | 523 | None vs. any | 1.60 (1.18–2.15) | P |
| Cramer et al. (2005) | 215 | 215 | None vs. any | 1.92 (1.27–2.89) | P |
| Gertig et al. (2000)[a] | 307 | | Never vs. ever | 1.05 (0.84–1.32) | P |
| Godard et al. (1998) | 170 | 170 | Never vs. ever | 2.49 (0.94–6.58) | P |
| Harlow et al. (1992) | 235 | 239 | Never vs. any | 1.5 (1.0–2.1) | P |
| Harlow et al. (1992) | 116 | 158 | None vs. any | 1.1 (0.7–2.1) | P |
| Ness and Cottreau (1999) | 767 | 158 | None vs. any | 1.5 (1.1–2.0) | P |
| Purdie et al. (1995) | 824 | 860 | Never vs. ever | 1.27 (1.04–1.54) | P |
| Rosenblatt et al. (1998) | 77 | 46 | Never vs. ever | 1.0 (0.2–4.0) | H |
| Tzonou et al. (1993) | 189 | 200 | Never vs. any | 1.05 (0.28–3.98) | H |
| Whittemore et al. (1998) | 188 | 539 | Never vs. ever | 1.45 (0.81–2.60) | H |
| Wong et al. (1999) | 499 | 755 | Never vs. ever | 1.0 (0.8–1.3) | H |

CI, confidence interval; H, hospital-based study; OR, odds ratio; P, population-based study.
[a]Cohort study.

**Table 2** Summary of meta-analysis results

| Risk category | Number of studies | RRs | Statistically homogeneous? |
|---|---|---|---|
| Current/ever smoker | Three cohorts | 1.14 (0.93–1.35) | Yes |
| Current/ever smoker | 20 case–control | 1.06 (1.01–1.12) | No |
| Highest vs. lowest pk/years | 10 studies (three cohort, seven case–control) | 1.21 (1.10–1.31) | No |
| As above, excluding three studies that combined both borderline and invasive tumors | Seven studies total | 1.11 (1.00–1.22) | Yes |
| Analysis stratified by tumor histology | | | |
| Serous tumors | | | |
|     Current/ever smoker | Four studies | 1.28 (0.95–1.61) | Yes |
| Serous/nonmucinous/other histologies | | | |
|     Current/ever smoker | Six studies | 1.31 (1.15–1.47) | Yes |
| Mucinous tumors | | | |
|     Current/ever smoker | Six studies | 2.58 (2.23–2.93) | Yes |

Pk/years, packs smoked per year; RRs, summary relative risk.

Consistency of an effect could contribute to a causal claim despite a finding of a weak association. Epstein et al. characterize the talc/ovarian cancer relationship as being 'confirmed' by multiple scientific publications as well as by review of available evidence by the International Agency for Research on Cancer. They state that, '…International Agency for Research on Cancer concluded that eight publications confirmed a 30–60% increased risk of ovarian cancer following the perineal application of talc'. Despite the claims of the petitioners, a review of available evidence shows that the epidemiological evidence is not consistent across studies or across study types. For instance, Table 1 shows several inconsistencies in the database. Clearly, not all studies showed a positive, statistically significant association, even among the case–control studies that make up the bulk of the database. In addition, there was relatively wide variation in the magnitude of measures of association.

Interestingly, up to the date of filing of the petition by Epstein et al., only one cohort study had been published, that of Gertig et al. (2000) that showed no association between perineal talc use and ovarian cancer risk. Given

the conflicting findings of case–control studies, Huncharek et al. (2003) used meta-analytic techniques to explore possible sources of variability among these reports. Their rationale for doing so was that if meta-analyses showed that the patterns of low relative risks or ODs are consistent across all relevant studies in different populations, these weak associations are less likely to be due to confounding or other biases. If a statistical test for heterogeneity shows effects of different magnitudes across studies, sensitivity analyses can be employed to determine the source of observed variability and thereby identify biases due to study design, case–control selection, etc.

Huncharek et al. initially pooled data from 15 case–control and one cohort analysis, yielding a summary relative risk (RRs) of 1.33 (1.16–1.45). Although this suggests a statistically significant positive association between perineal talc use and ovarian cancer risk, sensitivity analyses demonstrated clear differences in outcome based on study design. That is, hospital-based case–control studies showed no evidence of an effect [1.19 (0.99–1.41)] in contrast to those reports using population-derived controls [1.38 (1.25–1.52)]. More frequent talc use among hospital-based

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

4   European Journal of Cancer Prevention   2011, Vol 00 No 00

control participants versus population-derived controls does not explain this finding, as the proportion of controls using talc was the same in both groups, that is, 32%. Other factors account for this difference in outcome. These findings suggest bias and bring the validity of the initial pooled RRs into question. The Huncharek report provides some possible explanation for the observed differences and indicates that study outcomes are not consistent. It is possible that the potentially spurious positive association between talc use and ovarian cancer risk is the existence of a 'treatment effect' among cases. Particularly among population-based studies, a varying proportion of cases will be prevalent rather than incident. Some patients with ovarian cancer will undergo treatment with radiation, chemotherapy, and/or surgery. Side effects from treatment may prompt talc use among some patients. Although many questionnaires used in case–control studies may specify talc use before diagnosis, patients may not always make the distinction between prediagnosis and posttreatment use. Exposure misclassification among 'prevalent' cases may cause a spurious finding of an association when none, in fact, exists.

Further supporting the findings of this meta-analysis are the more recent and updated pooled data provided by Langseth et al. (2008) cited by the Epstein petition. These researchers pooled data from 20 relevant epidemiological studies. Again, although the calculated summary RR obtained from pooling data from all 20 reports gives a statistically significant summary RRs (pooled odds ratio) of 1.35 (1.26–1.46), the statistical test for data heterogeneity yielded a P value of 0.036. A P value of this size (i.e. < 0.10) is indicative of significant heterogeneity and, as per convention (Petitti, 2000), precludes statistical pooling, that is the pooled summary estimate of effect is not valid given that the data are heterogeneous. This shows that the available data are not consistent and therefore makes a causal association less likely.

One of the more persistent findings among the epidemiological studies examining this suspected association is the lack of a dose–response relationship. Table 3, derived from data presented in the meta-analysis by Huncharek et al., displays dose–response data for those included studies providing such information. Many of the reports do not show increased risk with increasing exposure. The even more problematic finding in terms of establishing a causal association is that a number of studies suggest that risk decreases with increased exposure (Huncharek et al., 2003).

Few researchers directly address the above-noted lack of evidence of a dose–response relationship. Huncharek et al. (2003) and Huncharek and Muscat (2007), in contrast, offer a number of possible explanations for an inverse dose–response relationship. As outlined above, treatment for ovarian cancer may induce specific symptoms that could prompt short-term talc use. For instance, some early stage patients may undergo radiation therapy, which

causes skin irritation. Such side effects could result in some patients using talc products to address these side effects. Talc is often recommended to keep skin folds in the perineum dry and prevent skin breakdown secondary to radiation. In addition, symptoms of the disease process itself could cause some women to use talc to counter these symptoms. Paulsen et al. (2005) and Golf et al. (2004) document that a number of symptoms are quite common among ovarian cancer cases versus control participants. For instance, Golf et al. show that increased abdominal size is over seven times more common among cases versus controls, whereas abdominal bloating is 2.5 times more common. The combination of bloating, increased abdominal size and urinary symptoms were found in almost half of all patients with ovarian cancer, but in only 8% of controls. In addition, of interest are the findings by Green et al. (1997) that increased ovarian cancer risk was seen among patients with painful periods or excessive vaginal bleeding. Again, such symptoms could prompt talc use and lead to a spurious association with talc. Although there are no firm data in the existing literature to definitively establish that these factors lead to increased short-term use of talc, the scenarios are

**Table 3   Talc dose–response data for perineal application and ovarian cancer risk**

| Reference | Years of talc use/ OR+95% CI | Number of talc applications per month/OR+95% CI |
|---|---|---|
| Booth et al. (1989) | NG | 1 0.7 (0.3–1.8) |
|  |  | 4 2.0 (1.3–3.4) |
|  |  | 30 1.3 (0.8–1.9) |
| Chang and Risch (1997) | <30 1.7 (1.09–2.68) | <10 1.84 (1.24–2.73) |
|  | 30–40 1.44 (0.96–2.15) | 10–25 1.13 (0.74–1.72) |
|  | >40 0.96 (0.54–1.38) | >25 0.95 (0.61–1.49) |
| Cook et al. (1997) | 0–5.5 1.8 (0.9–3.5) | NG |
|  | 5.5–13.5 1.6 (0.9–2.9) | NG |
|  | 13.5–27 1.2 (0.6–3.4) | NG |
|  | >27 1.8 (0.9–3.4) | NG |
| Cramer et al. (1999) | <20 1.9 (1.2–3.0) | <30 2.2 (1.4–3.6) |
|  | 20–30 1.3 (0.8–2.3) | 30–39 1.2 (0.81.8) |
|  | >30 1.4 (0.9–2.3) | 40+ 1.6 (0.8–3.1) |
| Gertig et al. (2000) | NG | 4–24 0.99 (0.67–1.46) |
|  |  | ≥ 30 1.12 (0.82–1.55) |
| Harlow et al. (1992) | <10 1.2 (0.5–2.6) | <5 1.5 (0.8–2.7) |
|  | 10–29 1.6 (1.0–2.7) | 5–29 1.2 (0.6–2.2) |
|  | ≥ 30 1.6 (1.0–2.7) | ≥ 30 1.8 (1.1–3.0) |
| Ness and Cottreau (1999) | 1 2.0 (1.0–4.0) | NG |
| Whittemore et al. (1998) | 1–4 1.6 (1.1–2.3) | 1–20 1.27 (0.82–1.96) |
|  | 5–9 1.2 (0.8–1.9) |  |
|  | 10+ 1.2 (1.0–1.5) |  |
|  | 1–9 1.60 (1.00–2.57) |  |
| Wong et al. (1999) | 10+1 1.11 (0.74–1.65) | >20 1.45 (0.94–2.22) |
|  | 1–9 0.9 (0.6–1.5) |  |
|  | 10–19 1.11 (0.74–1.65) |  |
|  | ≥ 20 0.9 (0.6–1.2) |  |

CI, confidence interval; NG, not given; OR, odds ratio.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

plausible and could explain the inverse dose–response relationship seen in a number of epidemiological studies.

The majority of reports largely ignore the counterintuitive findings, although Cramer *et al.* (1999) attribute the dose–response inconsistencies, possibly to the 'crudeness' of the exposure measurement used. What is not acknowledged is that this same problem of imprecise exposure estimates could also explain a spurious positive association of talc and ovarian cancer, especially in light of the inconsistent outcomes across reports. In summary, the failure to show a coherent and consistent relationship between talc exposure and ovarian cancer risk argues against a causal association.

An additional limitation of the existing literature dealing with the proposed talc/ovarian cancer association is the lack of any known biological mechanism through which talc particles could induce ovarian tumors. This represents probably the most troublesome aspect of arguments in support of this proposed causal association. It is also interesting to note that biological theories put forth to explain how talc may cause neoplastic transformation have changed over time as various proposed mechanisms have met with criticism in the developing literature.

Initially, Cramer *et al.* (1982) and others sought to draw an analogy between talc and fibrous asbestos, the latter being a known and well-described carcinogen. The biological effects of asbestos have been elucidated over the last 50–60 years by a multitude of epidemiological, in-vitro and in-vivo studies (Huncharek, 1986). Specific asbestos types are recognized as both animal and human carcinogens and, because of this fact, this commodity is banned from use in the United States.

A number of investigators initially implicated talc products as possible carcinogens, as before the early 1970s some talc products contained small amounts of asbestos fibers (Rohl *et al.*, 1976). Clearly, such products could possibly represent a carcinogenic risk secondary to the asbestos contamination. It should be pointed out that this in no way implicates talc as a toxin as the problematic constituent of such products was the asbestos fibers, not talc.

Since the early 1970s, the relevant industries voluntarily eliminated asbestos contamination from talc products. On account of this, the 'antitalc' argument shifted to implicate talc itself as a carcinogenic risk based on its 'chemical similarity' to asbestos. It is interesting, and confusing, as to why talc is thought by some to be carcinogenic based on the fact that there are some common chemical constituents of talc and asbestos.

\Both commercial talc and the group of minerals known as asbestos are magnesium silicates. Beyond that fact, the two substances share no common characteristics. The work by Stanton *et al.* (1981) shows that the carcinogenic ability of fibrous asbestos is due to its structure, not its chemical composition. Although talc and asbestos are both magnesium silicates, they are structurally distinct and belong to different mineral groups and subgroups, as detailed by Muscat and Huncharek (2008). Amphibole asbestos minerals are inosilicates while talc is a member of the silicate subclass phyllosilicate and group clay or montmorillonite/smectite. Although serpentines, including serpentine asbestos (chrysotile), are also phyllosilicates, serpentine minerals belong to the kalolinite–serpentine group. The asbestos varieties of serpentine are structurally different from other members of the serpentines in that their brucite layers and silicate layers bend into tubes that produce fibers. Nonfibrous serpentine does not have carcinogenic properties and it is clear that the physical structure of serpentine asbestos (and amphibole asbestos) is responsible for its disease-causing potential, not its atomic constituents. It simply does not follow that one should assume talc is carcinogenic simply because it is a silicate. Structure, not chemical composition, dictates toxicity/carcinogenicity.

Given the dissimilarities between talc and asbestos with regard to their fibrous shapes, the weak but increased associations in the epidemiological studies could be attributed to other mechanisms, assuming that the statistical associations are unbiased and not due to confounding. Asbestos fibers in the lung initiate an inflammatory and scarring process, and it has been proposed that ground talc, as a foreign body, might initiate an inflammatory response (Ness and Cottreau, 1999). Pelvic inflammatory diseases, however, such as endometriosis, peritonitis, tuboovarian abscess formation, etc., have not been associated with an increased risk of ovarian cancer. A meta-analysis of studies of antiinflammatory drug use found no reduction in ovarian cancer risk (Bonovas *et al.*, 2005). In fact, the study by Merritt *et al.* (2008) that was cited by Epstein *et al.* also showed no relationship between inflammation and ovarian cancer risk.

Most recently, Cramer *et al.* (2005) proposed that the talc/ovarian cancer association might be explained by the induction of anti-MUC1 antibodies. This idea has been debated on statistical grounds in which talcum powder applied to the perineum was associated with increased anti-MUC1 expression but the correlation was also observed when talc powder was applied to other body parts. More importantly, the simple observation that talc elevates immunoglobulin protein levels in blood, possibly by heat shock proteins, seems to have no known direct relevance for ovarian cancer, as anti-MUC1 is associated with other cancers and because there is no known role of heat shock proteins in ovarian cancer risk.

Some of the most important biological data supporting the nontoxic nature of talc come from the clinical use of talc in treating both malignant and benign pleural effusions in humans (i.e. pleurodesis). This is a common procedure in the United States and elsewhere and talc

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

6   European Journal of Cancer Prevention   2011, Vol 00 No 00

slurry is applied directly to the pleura (through chest tube placement) to induce obliteration of the pleural space by scarring and prevent the reaccumulation of fluid secondary to tumor or benign causes. Multiple long-term clinical studies, as reviewed by Muscat and Huncharek (2008), have not shown a single case of cancer secondary to direct talc application to the human pleura (Shaw and Agarwal, 2004). There are also data showing that talc has demonstrated antitumor properties secondary to the induction of endostatin when used in pleurodesis (Najmunnisa *et al.*, 2007). In fact, patients with pleurodesis treated with talc are known to experience longer survival times than those treated with other sclerosing agents. This is likely due to the tumor-inhibitory effects of talc.

Finally, other human data, such as the demonstration that talc inhaled in mining and milling operations is not associated with increased pulmonary tumors, and the likelihood that talc could selectively induce ovarian cancer and not lung cancer at exposure concentrations orders of magnitude lower than that experienced in occupational settings, argue against its toxicity (Muscat and Huncharek, 2008).

Although the process of drawing causal inferences from scientific data is complex, application of accepted standards, as noted above, to the talc/ovarian cancer relationship clearly indicates that the available epidemiological and other evidence does not support a causal connection. The weak association shown in a subset of observational studies can potentially be explained by numerous alternative hypotheses, as detailed throughout this document. Given the lack of supporting evidence from in-vivo, in-vitro, and clinical research studies using human participants, the weak epidemiological association is unlikely to be causal.

## Summary
Although separating causal from noncausal explanations for an observed statistical association is a difficult process, there currently exist commonly accepted guidelines by which such inferences can be made. These scientific approaches include consideration of the strength of the association, the consistency of the finding across studies, and existence of a biological explanation of the observed phenomenon, among others. When applied to the context of a proposed talc/ovarian cancer association, we conclude that the weak statistical associations cited in the petition do not support a causal association.

These conclusions are based on a number of statistical, methodological, and biological issues. First, contrary to the assertions of Epstein (2008), findings from the cited studies are not consistent from study to study, and also differ by study design. Two meta-analyses by Huncharek *et al.* (2003) and Langseth *et al.* (2008) both show significant differences in summary ORs between popula-

tion-based and hospital-based case–control studies, with the latter showing generally null results. The Nurses Health Study, the one prospective study that examined this association, found no risk with talc dusting. Formal statistical tests for heterogeneity in both analyses support this finding. This fact suggests the existence of bias, and standard approaches to meta-analysis indicate that the pooled OR, in this case an OR of 1.30, is not valid in the presence of heterogeneity. Huncharek and Muscat (2007) suggest multiple possible sources of bias that could produce a spurious positive finding, including unaccounted for effects of cancer treatment and confounding by smoking.

The assembled data also fail to show a clear dose–response relationship, that is, increasing ovarian cancer risk with increasing talc exposure. Some epidemiological studies actually suggest an inverse association between perineal talc exposure and cancer risk. The reasons for this inverse association in some studies are not known, but could be due to aspects of talc usage that are not fully understood such as the possibility that disease symptoms or cancer treatment may spur temporary talc use in case patients.

There is no coherent biological explanation as to how talc could induce cancer of the ovary. The theories put forth to explain the statistical association between talc and ovarian cancer have changed over time with little underlying consistency. The long-standing claim that talc is chemically 'similar' to asbestos and is therefore a carcinogen is a misunderstanding of the chemical and physical properties of talc.

The use of therapeutic talc for pleurodesis in patients with benign and malignant pleural effusions involves the direct application of talc to the human pleura. Clinical follow-up studies of these patients have shown no increased incidence of lung or pleural malignancies despite patient follow-up extending over decades. The above-noted data are supported by the lack of positive findings among occupational cohorts exposed to talc, and negative findings from various animal studies. More recently proposed mechanisms based on other biological pathways are speculative at this point. Given the lack of supporting evidence from in-vivo and clinical research studies using human participants, the weak and inconsistent epidemiological associations, that also lack a gradient in effect, argue against a claim of causality.

## References
Boger-Megiddo I, Weiss NS (2005). Histologic subtypes and laterality of primary epithelial ovarian tumors. *Gynecol Oncol* 97:80–83.
Bonovas S, Filioussi K, Sitaras NM (2005). Do non-steroidal anti-inflammatory drugs affect the risk of developing ovarian cancer? A meta-analysis. *Br J Clin Pharmacol* 60:194–203.
Booth M, Beral V, Smith P (1989). Risk factors for ovarian cancer: a case-control study. *Br J Cancer* 60:592–598.
Chang S, Risch HA (1997). Perineal talc exposure and risk of ovarian carcinoma. *Cancer* 79:2396–2401.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Chen Y, Wu PC, Lang JH, Ge WJ, Hartge P, Brinton LA (1992). Risk factors for epithelial ovarian cancer in Beijing China. *Int J Epidemiol* 21:23–29.

Cook LS, Kamb ML, Weiss NS (1997). Perineal powder exposure and the risk of ovarian cancer. *Am J Epidemiol* 145:459–465.

Cramer DW, Welch WR, Scully RE, Wojclechowski CA (1982). Ovarian cancer and talc: a case-control study. *Cancer* 50:372–376.

Cramer DW, Liberman RF, Titus-Ernstoff L, Welch WR, Greenberg ER, Baron JA, Harlow BL (1999). Genital talc exposure and risk of ovarian cancer. *Int J Cancer* 81:351–356.

Cramer DW, Titus-Ernstoff L, McKilanis JR, Welch WR, Vitonis AF, Berkowitz RS, Finn OJ (2005). Conditions associated with antibodies against the tumor-associated antigen MUC1 and their relationship to risk for ovarian cancer. *Cancer Epidemiol Biomarkers Prev* 14:1125–1131.

Epstein S. *http://www.preventcancer.com*, May 13, 2008.

Feinstein AR (1988). Scientific standards in epidemiologic studies of the menace of daily life. *Science* 242:1257–1263.

Gertig DM, Hunter DJ, Cramer DW, Colditz GA, Speizer FE, Willett WC, Hankinson SE (2000). Prospective study of talc use and ovarian cancer. *J Natl Cancer Inst* 92:249–252.

Godard B, Foulkes WD, Provencher D, Brunet JS, Tonin PN, Mes-Mason AM, *et al.* (1998). Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Obstet Gynecol* 79:403–410.

Golf BA, Mandel LS, Melaneon CH, Munz HG (2004). Frequency of symptoms of ovarian cancer in women presenting to primary care clinics. *JAMA* 291: 2705–2712.

Green A, Purdie D, Bain C, Siskind V, Russell P, Quinn M, Ward B (1997). Tubal sterilization, hysterectomy, and decreased risk of ovarian cancer. Survey of women's health study group. *Int J Cancer* 71:948–951.

Harlow BL, Cramer DW, Bell DA, Welch WR (1992). Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol* 80:19–26.

Huncharek M (1986). The biomedical and epidemiological characteristics of asbestos-related diseases: a review. *Yale J Biol Med* 59:435–451.

Huncharek M, Muscat J (2007). Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies. *Eur J Cancer Prev* 16:422–429.

Huncharek M, Muscat J, Kupelnick B. Smoking as a risk factor for epithelial ovarian cancer: a meta-analysis of 13 330 cases from twenty-six observational studies. *Carcinogenesis* (in press).

Huncharek M, Geschwind GF, Kupelnick B (2003). Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11 933 subjects from sixteen observational studies. *Anti-Cancer Res* 23:1955–1960.

Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E (2008). Perineal use of talc and risk of ovarian cancer. *J Epidemiol Community Health* 62: 358–360.

Merritt MA, Green AC, Nagle CM, Webb PM (2008). Talcum powder, chronic pelvic inflammation and NSAIDS in relation to risk of epithelial ovarian cancer. *Int J Cancer* 122:170–176.

Muscat J, Huncharek M (2008). Perineal talc use and ovarian cancer: a critical review. *Eur J Cancer Prev* 17:139–146.

Najmunnisa N, Mohammed KA, Brown S, Su Y, Moudgil B, Loddenkemper R, Antony VB (2007). Talc mediates angiostasis in malignant pleural effusions via endostatin induction. *Eur Resp J* 29:761–769.

Ness RB, Cottreau C (1999). Possible role of ovarian epithelial inflammation in ovarian cancer. *J Natl Cancer Inst* 91:1459–1467.

Pan SY, Ugnat AM, Mao Y, Wen SW, Johnson KC (2004). A case-control study of diet and the risk of ovarian cancer. *Cancer Epidemiol Biomarkers Prev* 13:1521–1527.

Paulsen T, Kaern J, Kjaerheim K, Trope C, Tretti S (2005). Symptoms and referral of women with epithelial ovarian tumors. *Int J Gynecol Obstet* 88:31–37.

Petitti D (2000). *Meta-analysis, decision analysis and cost-effectiveness analysis: methods for quantitative synthesis in medicine.* 2nd ed. New York: Oxford University Press.

Purdie D, Green A, Bain C, Siskind V, Ward B, Hackern N, *et al.* (1995). Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. *Int J Cancer.* 62:678–684.

Richardson GS, Scully RE, Nirui N, Nelson JH (1985). Common epithelial cancer of the ovary. *N Engl J Med* 312:415–424.

Rohl AN, Langer AM, Selikoff IJ (1976). Consumer talcums and powders: mineral and chemical characteristics. *J Toxicol Environ Health* 2:255–284.

Rosenblatt KA, Mathews WA, Daling JR, Voigt LF, Malone K (1998). Characteristics of women who use perineal powders. *Obstet Gynecol* 92:753–756.

Rothman K (1986). *Modern Epidemiology.* Boston, Toronto: Little Brown and Co.; pp. 16–17.

Shaw P, Agarwal R (2004). Pleurodesis for malignant pleural effusions. *Cochrane Database Systematic Rev* 1:CD002916. DOI: 10.1002/14651858. CD009216.pub2.

Stanton MF, Layard M, Tegeris A, Miller E, May M, Morgan E, Smith A (1981). Relation of particle dimension to carcinogenicity in amphibole asbestoses and other fibrous minerals. *J Natl Cancer Inst* 67:965–975.

Tzonou A, Polychronopoulou A, Hsieh CC, Rebalakos A, Karakata A, Trichopoulos D (1993). Hair dyes, tranquilizers and perineal talc applicatin as a risk factor for ovarian cancer. *Int J Cancer* 55:408–410.

Whittemore AS, Wu ML, Paffenbarger RS, Sarles DL, Kampert JB, Grosser S, *et al.* (1998). Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol and coffee. *Am J Epidemiol* 128:1228–1246.

Wong C, Hempling RE, Pivers MS, Natarajan N, Mettlin CJ (1999). Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. *Obstet Gynecol* 93:372–376.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Exhibit 156



# Personal Care ● Products Council

Committed to Safety,
Quality & Innovation

July 21, 2009

Division of Dockets Management
Food and Drug Administration
Room 1061
5630 Fishers Lane
Rockville, MD 20852

**RE:     Comments on: Citizens Petition to the Commissioner of the Food and Drug
            Administration Seeking a Cancer Warning on Talc Products
            Docket FDA-2008-P-0309**

Dear Division of Dockets Management:

The Personal Care Products Council[1] (the Council) appreciates the opportunity to comment on
the above referenced Citizens Petition. Cosmetic talc is used within the personal care products
industry, and thus, the request for a warning is of significant interest to the Council's members.

A 1994 Citizen's Petition to FDA similarly requested that FDA (1) immediately require cosmetic
talcum powder products to bear labels with a warning such as "Talcum powder causes cancer in
laboratory animals. Frequent talc application in the female genital area increases the risk of
ovarian cancer" and (2) hold a hearing to allow the petitioner to present scientific evidence to
support their petition. FDA did not act on this petition and did not implement the requests made
by the petitioner. We believe the current request for a cancer warning also lacks scientific merit,
and that a review of all of the pertinent literature supports our confidence in the safety of
cosmetic talc.

The 2008 Petition cites twelve articles that are described as 'confirming' "the causal relation
between genital application of talc and ovarian cancer." We disagree with the petitioner's
interpretation of the data that are cited, and we believe that the available ovarian cancer
epidemiology studies do not support a causative role for talc. We note that ~half of the citations

---

[1] Based in Washington, D.C., the Personal Care Products Council (formerly CTFA) is the leading national trade
association representing the $250 billion global cosmetic and personal care products industry. Founded in 1894, the
Council's more than 600 member companies manufacture, distribute, and supply the vast majority of finished
personal care products marketed in the United States. As the makers of a diverse range of products millions of
consumers rely on everyday, from sunscreens, toothpaste and shampoo to moisturizer, lipstick and fragrance,
personal care products companies are global leaders committed to product safety, quality and innovation.



EXHIBIT 25
Muscat- 25
Date: 9-25-18
MLG, CSR, RPR, CRR

do not provide new data on talc and ovarian cancer, but rather are reviews of data on ovarian cancer incidence in general.

To address these issues further, the Council hereby submits a detailed review of the points raised in the petition, co-authored by Dr. Michael Huncharek, MD, MPH, Meta-Analysis Research Group and Associate Professor of Preventive Medicine, University of South Carolina School of Medicine, Columbia, SC; and Dr. Joshua Muscat, Ph.D., MPH, Meta-Analysis Research Group and Professor of Public Health Sciences, Pennsylvania State University College of Medicine, Hershey, PA. The review includes an assessment of each of the twelve literature references cited in the petition, with an assessment of the relevance of the study findings to support a causal association (Attachment).

This review concludes that "the weak epidemiological association is unlikely to be causal." Arguing against a causal association are lack of a clear dose-response relationship between increasing talc exposure and increasing ovarian cancer risk, with some epidemiological studies suggesting an inverse association between exposure and risk. A plausible biological mechanism is lacking to explain a causal relationship. The finding of a small increase in relative risk could be due to several potential confounding factors. A serious limitation of the epidemiology studies, many of which were not specifically designed to test the hypothesis that talc use contributes to ovarian cancer, is that the true exposure of ovarian tissue to talc is by necessity unknown, and can only be poorly estimated using proxy measures (i.e., self-reporting of talc use in the perineal area).

Given the lack of evidence of a causal role for talc in ovarian cancer, we therefore respectfully ask that the Petitioners' request for a cancer warning be denied. The basis of the request lacks scientific merit and the addition of a warning label would be inappropriate and unnecessarily alarming.

Thank you for the opportunity to comment on the Citizens Petition. Please let us know if we can provide more information.

Sincerely,

John E. Bailey, Ph.D.
Executive Vice President – Science

ATTACHMENT

Page 3 of 39

P1.0164.3



**Comments on: Citizens Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Talc Products**

Prepared by

Michael Huncharek MD, MPH

Meta-Analysis Research Group
and
Associate Professor of Preventive Medicine
University of South Carolina School of Medicine
Columbia, SC

Joshua Muscat PhD, MPH

Meta-Analysis Research Group
and
Professor of Public Health Sciences
Pennsylvania State University College of Medicine
Hershey, PA

for

Personal Care Products Council
Washington DC

**P1.0164.4**

2

**Table of contents**

I. Introduction                                              page   3

II. Executive Summary                                               3

III. Overview of citations listed in the CPC                        5
 Petition to the FDA

IV.  Talc and ovarian cancer risk:                                 21
 A critique of post-1995 data

V.  Review of Cancer Prevention Coalition website                  27

VI. Appendix                                                       28

VII. Cited literature                                              35

**P1.0164.5**

## I. Introduction

On May 13, 2008, Samuel Epstein, MD, Chairman of the Cancer Prevention Coalition, submitted a Citizen's Petition to the Commissioner of the Food and Drug Administration seeking placement of cancer warning labels on talc products. The Petition requests the Commissioner of Food and Drugs to require that all talc products bear labels with a warning such as, "Frequent application of talcum powder in the female genital area substantially increases the risk of ovarian cancer."

Given the multiple implications of such warning labels, The Personal Care Product Council sought an evaluation of the validity of the scientific facts underlying this request. The Meta-Analysis Research Group was retained to provide an independent review of the relevant data. Below are the findings of this review.

## II. Executive Summary

This document is in response to the recent Citizens Petition to the Food and Drug Administration (FDA) that seeks placement of a cancer warning on cosmetic talc products (2008). Dr. Samuel Epstein, Chairman of the Cancer Prevention Coalition, and other interested parties, filed this petition.

The claim refers to the first observational study (case-control) suggesting an association between use of talc powders on the female perineum (via direct dusting or dusting sanitary napkins) and increased risk of ovarian cancer, published in 1982. In this document, the authors partly base their conclusions of an association on the "...chemical relationship between talc and asbestos", the latter substance being a known human carcinogen. The claim also references a number of additional epidemiological studies conducted after 1982 that have shown a statistical link between talc dusting and ovarian cancer risk. A subset of these reports show a roughly 30-60% increased risk of ovarian cancer associated with perineal talc exposure.

Although separating causal from non-causal explanations for an observed statistical association is a difficult process, there currently exist commonly accepted guidelines by which such inferences can be made (see Hill, 1965). These scientific approaches include consideration of the strength of the association, the consistency of the finding across studies, and existence of a biological explanation of the observed phenomenon, among others. When applied to the context of a proposed talc/ovarian cancer association, we conclude that the weak statistical associations cited in the petition do not support a causal association.

Our conclusions are based on a number of statistical, methodological and biological issues. First, contrary to the assertions of Epstein et al., findings from the

4

cited studies are not consistent from study to study, and also differ by study design.  Two meta-analyses by Huncharek et al. (2003) and Langseth et al. (2008) both show significant differences in summary odds ratios between population-based and hospital-based case control studies, with the latter showing generally null results. The Nurses Health Study, the one prospective study that examined this association, found no risk with talc dusting. Formal statistical tests for heterogeneity in both analyses support this finding. This fact suggests the existence of bias and standard approaches to meta-analysis indicate that the pooled odds ratio, in this case an OR of 1.30, is not valid in the presence of heterogeneity. Huncharek et al. (2003, 2007) suggest multiple possible sources of bias that could produce a spurious positive finding, including unaccounted effects of cancer treatment and confounding by smoking.

The assembled data also fail to show a clear dose-response relationship, i.e. increasing ovarian cancer risk with increasing talc exposure. Some epidemiological studies actually suggest an inverse association between perineal talc exposure and cancer risk. The reason for this inverse association in some studies is not known, but could be due to aspects of talc usage that are not fully understood such as the possibility that disease symptoms or cancer treatment may spur temporary talc use in case subjects.

There is no coherent biological explanation as to how talc could induce cancer of the ovary. The theories put forth to explain the statistical association between talc and ovarian cancer have changed over time with little underlying consistency. The long-standing claim that talc is chemically "similar" to asbestos and is therefore a carcinogen is a misunderstanding of the chemical and physical properties of talc.

The use of therapeutic talc for pleurodesis in patients with benign and malignant pleural effusions involves the direct application of talc to the human pleura. Clinical follow-up studies of these patients have shown no increased incidence of lung or pleural malignancies despite patient follow-up extending over decades. The above noted data are supported by the lack of positive findings among occupational cohorts exposed to talc and negative findings from various animal studies. More recently proposed mechanisms based on other biological pathways are speculative at this point. Given the lack of supporting evidence from *in vivo* and clinical research studies using human subjects, the weak and inconsistent epidemiological associations, that also lack a gradient in effect, argues against a claim of causality.

**P1.0164.7**

## III. Overview of citations listed in the CPC Petition to the FDA

**Citation:  #1,** National Cancer Institute. SEER Cancer Statistics Review, 2005.

SUMMARY OF FINDINGS:

The age-adjusted U.S. mortality rate from ovarian cancer in elderly white and black women (ages 65+) increased from 1975-1991, and has remained stable from 1991-2005. In contrast the SEER (Surveillance Epidemiology and End Results Program) incidence rates of ovarian cancer in elderly white women increased from 1975-1991, but has decreased since that time. In elderly black women the rates have been stable throughout this period.  The age-adjusted incidence and mortality rates of younger white and black women (<65) have decreased about 30% from 1975-2005.   There is a poorer survival rate among elderly women.  (see Appendix re: SEER data)

Ovarian cancer is estimated to be the 5th most common form of cancer deaths among women in 2008.

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:

The authors make no claim with regard to talc causality. The data presented are intended to show that ovarian cancer is a relatively common cancer and has a poor prognosis, especially in older women.

MEASURE OF RELATIVE RISK/ODDS RATIO:

None.

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

None.  The data cited are intended to show that if talc has an effect, it is an important public health problem given the high case fatality rate from ovarian cancer in older women.

It should be noted that Epstein et al. cited mortality data that do not reflect updated SEER information showing that mortality for this disease has been stable for almost the last two decades. In addition, the incidence data show stable or decreasing rates since 1991 with incidence and mortality declining substantially among women under 65 years of age.

**Citation:  #2**, Purdie D. et al. Reproductive and other risk factors and risk of epithelial ovarian cancer : An Australian case-control study. Survey of Women's Health Study Group. Int J Cancer 1995; 62:678-684.

SUMMARY OF FINDINGS:

6

Purdie conducted a population-based case-control study of 824 histologically confirmed cases and 860 controls in Australia.  No response rate was given but it appears that a large number of cases could not be located or agree to be interviewed post-diagnostically. There may have been a survivor effect where the enrolled cases were more likely to have been early stage cases. This study was done to assess hormonal/reproductive factors on ovarian cancer risk. There was one question asked on talc exposure.

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:
The petition authors cite this reference as "confirming" the findings of prior work showing a positive relationship between perineal talc use and ovarian cancer risk.

MEASURE OF RELATIVE RISK/ODDS RATIO:

The "use of talc around abdomen/perineum" was associated with a nonsignificant 1.21 [1.00-1.46] risk and a significant 1.27 [1.04-1.54] risk in nulliparous women.

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

The question of statistical significance is ambiguous here. The crude odds ratio is nonsignificant or of borderline significance and not adjusted for confounders. The authors calculated an adjusted odds ratio in only a subset of women (e.g. nulliparous) women because the overall study was designed to examine hormonal factors, and the sample size was large enough to conduct a stratum-specific analysis to remove the confounding effects of parity. However, since talc was clearly not the main hypothesis, the adjusted odds ratio in only a subset of women makes it difficult to interpret and generalize the talc findings. Thus it may be argued that the nonsignificant crude odds ratio is the more appropriate measure. While the difference in the crude and the adjusted subsetted OR is quite small, such differences become important given that the overall "effect" of talc exposure in this study and the literature in general is small to begin with. The meta-analysis by Huncharek et al. included the adjusted odds ratio, but in retrospect the lower crude OR was probably the better measure when pooling the results.  There are no data on dose-exposure response effect or latency. The association with talc cannot be considered causal in this individual study as the exposure is crudely defined, the findings based on the whole dataset are marginally significant, and there are no dose-response data.

**Citation:  #3,** Kasper CS, Chandler PJ Jr. Possible morbidity in women from talc on condoms [letter]. JAMA 1995; 846-847.

SUMMARY OF FINDINGS:

7

This is an article that raises the hypothesis that talc on condoms and diaphragms may cause ovarian cancer. The original hypothesis that talc used on birth control devices may be associated with disease risk was raised in 1979 by Longo and Young (Lancet 1979;2:349-351). Kasper cites new microscopy data that supports this hypothesis, with findings demonstrating the presence of talc on condoms, with varying degrees of density/surface area depending on the brand.

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:
The petition authors cite this reference as "confirming" the findings of prior work showing a positive relationship between perineal talc use and ovarian cancer risk.

MEASURE OF RELATIVE RISK/ODDS RATIO:
None.

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

There is no new data that confirms that talc is associated with ovarian cancer. Rather, the hypothesis that talc from other sources besides perineal dusting, is alleged to possibly cause ovarian cancer. The documentation that talc is found to be concentrated on the surface of latex condoms raises the hypothesis that condom use may cause ovarian cancer.

Kasper hypothesizes that with the large increase of condom use in the U.S. from 1985-1995, that if talc were carcinogenic to the ovaries there would be a large increase in the rates of ovarian cancer in the U.S. We previously examined the rates of ovarian cancer to determine if there have been any increases in incidence during this time period. We found no evidence for an increased SEER rate (Muscat and Huncharek. Eur J Cancer Prev. 2008;17:139-46). Using the latest data from the SEER program, it can be seen that the age-adjusted incidence rates for ovarian cancer in white women have declined by about 20% since 1985, the date of the Kasper article. These data clearly do not support the Kasper hypothesis and the claim made by Dr. Epstein and others.

**Citation:  #4**, Cramer DW & Xu H. Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. Am J Epidemiol 1995; 5:310-314.

SUMMARY OF FINDINGS:

This was a hospital-based case-control study from two time periods that included a total of 450 cases and 454 controls from Boston.  The controls were randomly selected women from the population.  Controls with a history of bilateral oophorectomy were excluded.

MEASURE OF RELATIVE RISK/ODDS RATIO:

"Talc use for genital hygiene" was associated with a crude 1.6 [1.2-2.1] risk.

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:
The authors cite Cramer 'confirming' the results from Purdie.

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

It is not clear if the OR presented is the crude or adjusted odds ratio. A calculation of the crude OR from the table reveals a 1.6 odds ratio. The table (Table 1) does not indicate that the OR is adjusted despite the methods section stating that adjustments were made.  In contrast tables 2 and 4 had footnotes indicating the OR for other risk factors were adjusted ORs.  There were no dose-response data provided.

Use of body powders was assessed via personal interview. Use of powder in non-genital areas was not associated with increased ovarian cancer risk (1.08[0.77-1.50]) nor was increased risk seen among those using powder to dust the perineum (1.45(0.97-2.18]), dusting sanitary napkins (1.45[0.68-3.09]) or dusting underwear 1.21[0.40-3.64]). An elevated risk of ovarian cancer was noted for the exposure categories "multiple uses, genital area", i.e. 2.15(1.30-3.57) and "any personal genital exposure", i.e. 1.6(1.18-2.15).

Only one case and three controls reported using cornstarch powders. Dose-response analysis showed an inverse relationship for both frequency of use per month or number of applications.

The authors conclude that there is a "significant association between the use of talc in genital hygiene and risk of epithelial ovarian cancer."

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:

The authors cite Cramer et al. to document that these investigators suggested institution of "formal public health warnings" in 1999 based on their interpretation of existing data, i.e. that they "confirm" the relationship between perineal talc use and ovarian cancer is causal.

MEASURE OF RELATIVE RISK/ODDS RATIO:
Risk associated with genital exposure to talc, OR=1.60(1.18-2.15)

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

This population-based case-control study found a statistically significant association between "any personal genital exposure" to talc and risk of ovarian cancer with an odds ratio of 1.60(1.18-2.15). No clear dose-response relationship was seen. In fact, data in both tables II and III suggest an inverse dose-response.

**Citation: #5,** Chang et al. Perineal talc exposure and risk of ovarian carcinoma. Cancer 79:2396-2401, 1997.

SUMMARY OF FINDINGS:

Chang and Risch present the findings of a population based case-control study of ovarian cancer risk associated with perineal exposure to talc. The study population was derived from Ontario, Canada and consisted of 450 cases and 564 controls. Dusting or powdering behaviors considered included regular application of talc to the perineum after showering or bathing and dusting of talc on sanitary napkins. Similar information was recorded regarding use of cornstarch products.

Analyses were adjusted for age, oral contraceptive use, average duration of breastfeeding per pregnancy, tubal ligation/hysterectomy or family history of ovarian or breast cancer. No adjustment was made for smoking history.

Women with any regular talc exposure showed an increased risk of disease, i.e. OR=1.42(1.08-1.86) with no association seen with talc exposure via dusting of sanitary napkins, i.e. OR of 1.26(0.81-1.96). Use after bathing showed a borderline effect of 1.31(1.00-1.73). As noted in a number of other observational studies, no increasing risk of ovarian cancer with increasing talc exposure was noted.

The authors concluded that their data provide support that perineal talc use may increase the risk of ovarian cancer. They acknowledged that the lack of a dose-response needs clarification. In fact, an inverse dose-response is suggested by the data in Table 2 of the manuscript.

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:

Epstein et al. suggest that reference number five supports the findings of Purdie et al. (reference #2), the largest case-control analysis examining perineal talc and ovarian cancer risk as well as other reports cited in the petition.

MEASURE OF RELATIVE RISK/ODDS RATIO:
Any perineal talc exposure: OR=1.42(1.08-1.86)
Dusting of sanitary napkins: OR=1.26(0.81-1.96)
Talc use after bathing:          OR=1.31(1.00-1.73)
>25months use of after-bath talc: OR=0.95(0.61-1.49)
>40yrs after bath talc use:     OR=0.87(0.54-1.38)

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

Chang and Risch indicate that their study results "appear to support the contention that talc exposure increases risk of ovarian carcinoma." The Discussion section of the article gives an overview of the literature and addresses some of the limitations of the available database. Although there is some

discussion in the manuscript regarding the dose-response data, Chang and Risch do not provide an explanation for the lack of a dose-response (or inverse response) in their report or others in the literature. This is clearly an important criterion for drawing causal connections so the nature of the dose-response relationship is crucial to interpretation of possible biological relationships.

Chang and Risch also make reference to the fact that asbestos and talc are "chemically related". This is an often-repeated claim in many papers dealing with talc in the medical literature. In our recent publication in the European Journal of Cancer Prevention we describe how there is little mineralogical similarity between talc and asbestos other than both being magnesium silicates (Muscat, Huncharek, 2008). Commercial talc is a soft, non-fibrous entity that is structurally unlike the forms of asbestos associated with malignant disease in humans. There are new scientific findings in this area that demonstrate different carcinogenic effects between talc and asbestos. For example, talc induces apoptosis (programmed cell death) in malignant mesothelioma cells but not in normal mesothelial tissue while asbestos induces programmed cell death in normal mesothelium (see Nasreen et al., 2000 and Broaddus et al., 1996). Talc has also been found to alter the angiogenic balance (blood vessel growth promotion versus blood vessel growth inhibition) in the pleura by inducing the production of endostatin (an inhibitor of blood vessel growth) by normal pleural mesothelial cells but not in malignant mesothelial cells, thereby creating an angiostatic, and therefore, tumor inhibitory environment (see Najmunnisa et al., 2007).

**Citation: #6**, Daly M, Obrams I. Epidemiology and risk assessment for ovarian cancer. Seminar Oncology 1998; 25:

SUMMARY OF FINDINGS:

This is a review article on the epidemiology of ovarian cancer. It reviews many risk factors besides talc.

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:

The petition authors cite this reference as "confirming" the findings of prior work showing a positive relationship between perineal talc use and ovarian cancer risk. However, Daly and Obrams did not publish new data, and do not offer an opinion on the causality of the association. Rather they state, "The use of talc in dusting the perineum, in feminine hygiene sprays, or on sanitary napkins, condoms, or diaphragms has been suggested as a possible risk factor for ovarian cancer. " They cite the article by Harlow that shows a 1.5 fold risk and a higher risk in long-term users (> 10 years). The 1982 Cramer article was cited as talc being significantly contaminated with asbestos. They cite the article by Heller et al, that ovarian tissue is contaminated with asbestos and that the fiber burdens were highest in women whose fathers/husbands had a history of asbestos exposure.

MEASURE OF RELATIVE RISK/ODDS RATIO:
NA

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

Daly and Obrams did not publish new data, and state that talc has been investigated "as a possible risk factor" for ovarian cancer. This is clearly not a statement that they believe the association is causal. There is no scientific checklist for determining a causal association. The Hill postulates or variations of the Hill postulates are often used to help make assessments of causality (Hill, 1965). These postulates include strong associations, consistent associations across studies, biological plausibility, dose-response relationships and others.

**Citation:   #7,** Green A et al.  Tubal sterilization, hysterectomy and decreased risk of ovarian cancer. Int J Cancer 71:948-951, 1997.

SUMMARY OF FINDINGS:

Using a population-based case-control study design  (with 824 cases), Green et al. examined the effects of tubal sterilization and hysterectomy on ovarian cancer risk. Both procedures were shown to have a protective effect ranging from a 37% to 74% risk reduction. Data on "ever" versus "never" perineal talc use were also available. The analysis showed a "modest" (authors' terminology), but significant, association between perineal talc use and ovarian cancer risk, i.e. 1.3(1.1-1.6). No dose-response was found and the authors acknowledged this fact.

The investigators also collected information on talc exposure via condom and contraceptive diaphragm use. Duration of use for both exposures showed no association with ovarian cancer risk, consistent with others in the literature recently reviewed by Huncharek and Muscat (European Journal of Cancer Prevention, 2007). The relevant raw data were not presented in the manuscript nor were odds ratios given for these associations.

Interestingly, women with either heavy or painful periods had a marginally increased risk of ovarian cancer, i.e. 1.2(0.93-1.4), 1.1(0.86-1.4) respectively. The magnitude of effect between these two groups is similar to that seen for perineal talc use in this study. The authors provide no further discussion of this finding. This raises the question as to whether there is any relationship between heavy menstruation/painful periods and talc use. It should be noted that investigators such as Paulsen et al. show that abdominal pain is reported by 53% of women with invasive epithelial ovarian cancer prior to diagnosis (Paulsen, 2005). Among the cohort studied by Paulsen et al., fourteen percent of women with ovarian cancer also reported abnormal vaginal bleeding. It is unclear at present whether these symptoms could prompt talc use, in the short term and contribute to a spurious association with ovarian cancer e.g., detection bias may account for

12

the talc/ovarian cancer connection due to these factors. Further data are needed to clarify this issue.

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:

The petition authors cite this reference as "confirming" the findings of prior work showing a positive relationship between perineal talc use and ovarian cancer risk. In the discussion of the paper, the authors reiterate the theory of Cramer et al. that artificial closure of the fallopian tube prevents toxins from traversing the tube and depositing on the ovary, despite the fact that this view is speculative. Nonetheless, the odds ratio of 1.3 is consistent with a number of other observational studies in the literature.

As we will discuss in our report summary, this theory is also challenged by new work suggesting that the origin of serous ovarian tumors, the most common type of ovarian carcinoma, may actually be the distal fallopian tube, i.e. the fimbria (see, for instance Crum CP et al. Clinical Medicine and Research 5(1):35-44, 2007). The decrease in ovarian cancer among women with hysterectomy/tubal ligation could be due to removal of the site of origin rather than obstruction of a physical route of passage for suspected carcinogens. The Crum et al. findings are relatively recent and have not been discussed in the medical literature in the context of the talc/ovarian cancer hypothesis. It is our feeling that this pathological information could represent an important piece of evidence that challenges the biological explanation offered for these epidemiological findings.

MEASURE OF RELATIVE RISK/ODDS RATIO:
Relative risk of perineal talc use, OR=1.3(1.1-1.6).

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

The report by Green et al. was designed specifically to examine the impact of hysterectomy and tubal sterilization on ovarian cancer risk rather than the influence of perineal talc exposure. Talc data were collected although the raw data are not presented in the published manuscript. The weak effect shown for talc exposure is presented by the authors as supportive of the theory that interruption of the fallopian tube prevents the passage to carcinogens, including talc, from reaching their target organ, i.e. the ovary. Despite the fact that this theory is put forth in much of the relevant literature, it remains speculative. As noted previously, there does exist pathology literature that suggests the origin of epithelial ovarian tumors is actually the fimbria (distal fallopian tube). Should this be proven to be correct, it would present a challenge to the talc carcinogenesis theory.

The Green et al. data do not show a dose-response relationship with condom or diaphragm use. Other work supports this, as does our recent review in the European Journal of Cancer Prevention (Muscat, Huncharek, 2008). Talc exposure via this route is directly into the female reproductive tract in contrast to

13

perineal dusting. This persistent finding in the epidemiological literature also argues against the talc/ovarian cancer association being causal.

The Green et al. paper also raises another interesting point. As briefly discussed above, this study shows that women with painful or heavy menstrual periods had a marginally increased risk of ovarian cancer. There is a body of literature that documents the occurrence and nature and frequency of symptoms, including these, among patients with epithelial ovarian cancer. Compared with controls, ovarian cancer patients report a multitude of symptoms including pain, abdominal bloating and urinary frequency. In addition, some of this work provides information on the duration of these symptoms prior to diagnosis, ranging from weeks to many months. These factors could contribute to a detection bias where ovarian cancer symptoms could prompt short-term talc use. Although this suggestion is theoretically possible, it has not been addressed in the literature in the context of the talc/ovarian cancer hypothesis.

**Citation: #8,** Cramer et al. Genital talc exposure and risk of ovarian cancer. Int J Cancer 81:351-356, 1999.

SUMMARY OF FINDINGS:

Cramer et al. conducted a population-based case-control study involving 563 ovarian cancer cases. Use of body powders was assessed via personal interview. Use of powder in non-genital areas was not associated with increased ovarian cancer risk (1.08[0.77-1.50]) nor was increased risk seen among those using powder to dust the perineum (1.45(0.97-2.18]), dusting sanitary napkins (1.45[0.68-3.09]) or dusting underwear 1.21[0.40-3.64]). An elevated risk of ovarian cancer was noted for the exposure categories "multiple uses, genital area", i.e. 2.15(1.30-3.57) and "any personal genital exposure", i.e. 1.6(1.18-2.15).

Dose-response analysis showed an inverse relationship for both frequency of use per month or number of applications of talc. Only one case and three controls reported using cornstarch powders.

The authors conclude that there is a "significant association between the use of talc in genital hygiene and risk of epithelial ovarian cancer."

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:
The authors cite Cramer et al. to document that these investigators suggested institution of "formal public health warnings" in 1999 based on their interpretation of existing data at that time, i.e. that they "confirm" the causal relationship between perineal talc use and ovarian cancer risk.

MEASURE OF RELATIVE RISK/ODDS RATIO:
Risk associated with any personal genital exposure to talc, OR=1.60(1.18-2.15)

**P1.0164.16**

14

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

This population-based case-control study found a statistically significant association between "any personal genital exposure" to talc and risk of ovarian cancer with an odds ratio of 1.60(1.18-2.15). No clear dose-response relationship was seen. In fact, data in both tables II and III suggest an inverse dose-response. Again, as occurs throughout much of the relevant literature, no further explanation for the inconsistent dose-response relationship is offered. The manuscript concedes that, "...it is difficult to quantify the amount of powder actually used..." In essence, they point out the crude nature of the measure of exposure. They acknowledge that a crude exposure measure could also contribute to the finding of a spurious association.

In the discussion of the paper, the authors present a pooled summary odds ratio of fourteen case-control studies in the literature at the time the Cramer et al. report was conducted. The summary OR was 1.36(1.24-1.49). Although the authors point out that this association is statistically significant the p value associated with their assessment of statistical heterogeneity was 0.085. Cramer et al. state that this p value indicates a lack of statistical heterogeneity and therefore suggest that the data show consistency.

The above evaluation of statistical heterogeneity is incorrect in that the threshold p value used in pooled analyses of observational studies, as opposed to randomized clinical trials, is conventionally 0.10 (see Petitti, 2000). The justification for using a much more conservative p value when analyzing epidemiological studies is that they are inherently more variable than randomized trials. Therefore, a p value of 0.085 is consistent with statistical heterogeneity and suggests that the data should not be pooled since the outcome measures across studies vary by a degree greater than would be expected by chance alone. As Huncharek et al. pointed out in their later meta-analysis, clear differences exist between case-control and cohort studies examining the talc/ovarian cancer association. It is essential to seek explanations for these differences (as per Petitti, for instance) rather than ignore the heterogeneity and calculate a pooled estimate of effect. Essentially, Cramer et al. demonstrate that the database they analyzed was not suitable for calculating a pooled odds ratio although they characterize the data as "consistent."

In their Discussion, Cramer et al. also state, "Talc, as a chemical relative of asbestos, appears able to induce histologic changes that are similar to those of asbestos..." As we've pointed out throughout this document and in our recent review article (Muscat, Huncharek, 2008), this is a factual inaccuracy that is repeated in the relevant literature with great frequency. The only similarity between talc and asbestos is that they are both magnesium silicates. Beyond that, the two mineral types share no similar properties. There is a large mineralogical literature detailing the nature of the structure of both asbestos and talc that clearly outlines this fact. The medical literature also contains abundant

information on fiber carcinogenesis. It is largely the morphologic structure of asbestos and other fibers that dictates their toxicity and not their chemical composition. The 3:1 "aspect ratio" of fibers is important in induction of disease and this is independent of chemical composition (see Stanton, 1981). It should be pointed out that many non-fibrous types of asbestos are NOT carcinogenic. Therefore even within the group of asbestos minerals, only a subset of fibrous particles of specific sizes is toxic. A "real-world" example of the composition versus structure issue is the clear difference between diamond and graphite. Both are composed of carbon yet each is distinctly and profoundly different. Diamond is the hardest substance known while graphite is very soft, non-crystalline and brittle. Graphite is also a good conductor of electricity etc. Again, the primary point of importance is that similarity in chemical composition of minerals does not imply similarity in other properties, including biological activity.

**Citation:   #9,** Huncharek M et al. Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: A meta-analysis of 11,933 subjects from sixteen observational studies. Anticancer Res 23:1955-1960, 2003.

SUMMARY OF FINDINGS:

This paper presents the results of a meta-analysis designed to evaluate the relationship between perineal dusting with talc and risk of developing ovarian cancer. The rationale for this study was two-fold; (1) Although a possible association between talc use on the female perineum and increased risk of ovarian cancer was first proposed in 1982, the existing literature is inconsistent and the validity of this association is unclear, and (2) meta-analysis provides a systematic, reproducible and transparent method for analyzing large, complex data-sets and appeared well suited to exploring the scientific basis of this proposed association.

Using accepted meta-analytic techniques, data from sixteen observational studies (one cohort and 15 case-control) enrolling 11,933 subjects were statistically pooled. Nine of the sixteen reports showed non-statistically significant odds ratios or relative risks with the one cohort study demonstrating no association between talc use and ovarian cancer. Initial pooling of all 16 reports yielded a summary relative risk of 1.33(1.16-1.45) suggesting a possible positive association, although sensitivity analyses and consideration of causal criteria argued against a causal association.

The assertion by the authors that the use of the summary relative risk statistic of 1.33 is not an appropriate measure to characterize this association is based upon several important findings of the meta-analysis. First, differences in outcome were seen between hospital-based versus population-based case-control studies, i.e. 1.19(0.99-1.41) versus 1.38(1.25-1.41) respectively. This suggests the possible influence of selection bias on study results and/or a "treatment effect" due to short-term talc use by some subjects secondary to treatment induced side effects. Among subjects in population-based studies, there may exist a time

16

interval between diagnosis and study interview. In this interval some patients may have undergone treatment with modalities such as surgery, radiation and/or chemotherapy. Short-term talc use could be prompted by side effects from treatment such as skin irritation, abdominal bloating etc. The population-based reports may therefore have a larger proportion of prevalent cases versus case-control studies that are more likely to undergo surgery and radiation therapy. Since the majority of women with ovarian cancer present with advanced disease at the time of diagnosis, a larger proportion of subjects in population-based studies may have more limited disease since survival times for advanced ovarian cancer are quite poor (i.e. 5 year survivals under 10%).

Second, demonstration of a dose-response relationship is important for establishment of causal associations. The present data set does not suggest that risk increases with increased exposure and a number of the observational studies show greater disease risk among those in the lowest exposure categories.  This may be partially explained by the "treatment effect" phenomenon referred to above. Another possible explanation as discussed in prior portions of this report, is bias secondary to talc use due to disease symptoms. Nonetheless, the lack of a positive dose-response between agent and cause argues against a causal association. The authors conclude, "The available observational data do not support the existence of a causal relationship between perineal talc exposure and an increased risk of epithelial ovarian cancer. Selection bias and uncontrolled confounding may account for the positive associations seen in prior epidemiological studies."

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:

Epstein et al. note, "An analysis of 16 pooled studies **confirmed** (added) a statistically significant 33% increased risk of ovarian cancer associated with the perineal use of talc." Essentially, the petitioners erroneously indicate that the meta-analysis supports an association between perineal talc dusting and ovarian cancer risk, when, in fact, the report clearly states the contrary conclusion, i.e. "The available observational data do not support the existence of a causal relationship between perineal talc exposure and an increased risk of epithelial ovarian cancer."

MEASURE OF RELATIVE RISK/ODDS RATIO:
Summary relative risk for association OR=1.33(1.16-1.45) pooling all 16 studies
Summary relative risk for hospital based studies, OR=1.19(0.99-1.41)
Summary relative risk for population based studies, OR=1.38(1.25-1.52)

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

The petition's use of the Huncharek et al. meta-analysis as supporting evidence for a causal association between talc and ovarian cancer is inconsistent with the stated findings of the report, as outlined in both the "Abstract" and "Discussion" sections. As above, the summary relative risk initially obtained by pooling data from all sixteen observational studies (1.33[1.16-1.45]) is of questionable validity

since differences in outcomes were seen across study designs. The one cohort study by Gertig et al. showed negative results while the available case-control differed in outcome depending upon the source of study controls (hospital derived versus population).  Studies using hospital derived controls showed no increased risk while those employing population-based controls were consistent with a 38% increased risk of disease.

As discussed in the manuscript, short-term use of talc prompted by symptoms caused by treatment could also bias the population based case-control studies. The proportion of **prevalent** cases enrolled in the study, time from diagnosis and stage of disease at diagnosis, could all contribute to this "treatment effect" and explain the inverse dose-response seen in many studies.

The above discussion clearly points out the fact that the Huncharek et al. meta-analysis of existing data does not support a causal association between talc and ovarian cancer. The authors of the petition mis-interpret the pooled analysis.

**Citation:   #10**, Baan R et al. Carcinogenicity of carbon black, titanium dioxide and talc. The Lancet Oncology 7:295-296, 2006.

SUMMARY OF FINDINGS:

Citation number 10 is a summary of the recent IARC proceedings during which the carcinogenicity of talc was considered, along with carbon black and titanium dioxide. The summary notes that the one available cohort study (Gertig et al.) failed to show any association between talc use and ovarian cancer risk. Nonetheless, the summary document states that, "Although the cohort study did not lend support to an association, the case-control studies showed a high degree of consistency: the eight **more informative studies** (added) reported a 30-60% increase in risk...." The authors acknowledge that the body of available evidence does not provide evidence of a dose-response relationship.

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:

Epstein et al. cite reference 10 as further support of epidemiological findings of a 30-60% increased risk of ovarian cancer among women using perineal talc and that this report was produced under the auspices of IARC.

MEASURE OF RELATIVE RISK/ODDS RATIO:

Citation #10 is a review article and therefore does not present a measure of association derived from a statistical analysis. As above, Baan et al. cite the fact that the IARC deliberations concluded that the "more informative" epidemiological studies suggest a 30-60% increased risk of ovarian cancer among subjects using talc products on the perineum/genitals.

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

18

This citation provides a very brief summary of the recent IARC proceedings during which the carcinogenicity of talc was considered. The 2B rating suggests that talc is a possible human carcinogen, at least with regard to ovarian cancer although the IARC summary points out that inhaled talc is not classifiable as a human carcinogen (category 3).

Based on our experience as observers to the relevant IARC proceedings, there are a number of issues that appear to contradict the IARC conclusions. IARC's analysis of the human epidemiological literature is based on the "eight more-informative studies" rather than on the total available epidemiological data. The total epidemiological data do NOT show a "high degree of consistency", as characterized by IARC. For example, the one cohort study on this topic clearly showed no increased cancer risk from talc dusting. The case-control study results differ by design as pointed out by Huncharek et al. (see above) and as seen in the report by Langseth et al. (below). That is, hospital-based studies showed results different from those found via population-based analyses. Neither Epstein nor Baan acknowledge these differences but rather characterize the data as "highly consistent".

Additionally, neither Epstein et al. nor Baan et al. take into consideration the lack of a dose-response relationship in the majority of the epidemiological studies, which would be considered evidence against the suspected association being causal.  Huncharek et al., in contrast, addressed this issue and offered possible explanations for this finding based on methodological considerations. All of the above issues suggest the possible influence of bias on the various study results although these issues are not addressed in any substantive way by either set of authors. It is also problematic that neither Baan et al. nor IARC considered the meta-analysis of Huncharek et al. and it's findings.

Overall, although the Baan et al. report is held as support for a causal association, the document provides evidence of flaws not only in the pertinent epidemiological evidence itself but also in its erroneous interpretation as causal. It is our opinion that the IARC review of available data on the talc/ovarian cancer association failed to consider the flaws on the relevant database in its entirety. IARC also did not consider the observational data in the context of the criteria recognized as necessary for drawing causal inferences.

**Citation:  #11**, Langseth  et al. Perineal use of talc and risk of ovarian cancer. J Epidemiol Community Health 62(4):358-360, 2008.

SUMMARY OF FINDINGS:

Reference number 11 is a short review article outlining some of the major limitations of the data linking perineal talc use and ovarian cancer. The article also makes some methodological suggestions for future studies in this area.

19

Langseth et al. cite several aspects of the theory supporting a causal association. These include citing references that suggest talc particles applied to the perineum can migrate to the ovary, that hysterectomy and tubal ligation appear to decrease the risk of ovarian cancer by "removing the pathway by which carcinogenic substances (in this case talc) can reach the ovaries", that the possible mechanism via which talc exerts its carcinogenic effect is inflammation, and finally, that the lack of a demonstrated dose-response may be secondary to the "crudeness of the exposure metric used."

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:
Epstein et al. cite the Langseth article as supporting the findings of the IARC Monograph 93, i.e. that perineal talc exposure increases ovarian cancer risk 30-60% based upon the eight observational studies cited by IARC.

MEASURE OF RELATIVE RISK/ODDS RATIO:
As in above section.

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:
As a review, the paper provides no new data to support a causal association. Nonetheless, the authors tend to emphasize aspects of the literature that provide supporting information for the theories put forth by Cramer et al.

Figure 1 in the manuscript is instructive, though, on the difficulty the authors have in substantiating the causal claim. The Figure provides a pooled analysis of available observational studies up to the time of publication of the present review. It's important to note that the pooled OR for population-based studies shows a significant effect (1.40[1.29-1.52]) while pooling the hospital-based analyses gives a null results, i.e. OR of 1.12(0.92-1.36). These results are consistent with the prior meta-analysis published by Huncharek et al. although Langeth et al. largely ignore the above noted problems. Alternative explanations are also plausible that could account for an attenuated effect among hospital-based studies. For instance, hospital derived controls may be more likely to use talc powders over the short-term secondary to their specific hospital admission diagnoses.

The differences in outcome based on study design require explanation and none is offered. In addition, Figure 1 also provides a p value for a test for data heterogeneity, i.e. p=0.036. A p value of this magnitude indicates the presence of heterogeneity, meaning that the differences in outcome across studies are not due to chance alone. In general, such a finding precludes statistical pooling (see Petitti, 2000) since the studies are not measuring effects of similar magnitudes. The appropriate task in this context is to attempt sensitivity analyses to explain the observed heterogeneity. A pooled odds ratio in the face of heterogeneity is simply not a valid parameter.

Also, in the final portion of the manuscript, Langeth et al. point out, "The current body of experimental and epidemiological evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk." They

20

also attempt to "explain away" the lack of a dose-response by attributing it, possibly, to the use of a "crude exposure metric", i.e. years of use. Again, this feature of the data cannot be ignored and the crude nature of the exposure measure can, just as readily, account for spurious findings of a positive association in some reports.

Overall, despite the fact that this short review attempts to provide a narrative justification for a talc-ovarian cancer relationship, it serves to point out the many shortcomings of the data base and the numerous sources of flawed reasoning employed in its interpretation.

**Citation:   #12**, Merrit MA et al. Talcum powder, chronic pelvic inflammation and NSAIDS in relation to risk of epithelial ovarian cancer. Int J Cancer 122:170-176, 2008.

SUMMARY OF FINDINGS:

Citation number twelve derives from the Australian Ovarian Cancer Study Group and is a population-based case-control study of 1,576 women with both invasive and borderline ovarian malignancies. The study was designed primarily to address the question as to whether chronic pelvic inflammation is a risk factor for epithelial ovarian cancer.

Although "ever" use of talc was associated with a small increased risk of ovarian cancer, 1.17(1.01-1.36), there was no evidence of increased risk with increased exposure. Regarding inflammatory processes and disease risk, no increased risk of ovarian tumors was associated with pelvic inflammatory disease, endometriosis, human papillomavirus infection, mumps infection or genital herpes, although the latter showed an association with serous tumors, i.e. OR=1.65(1.01-2.69). Neither aspirin nor NSAID use was consistently associated with a decreased risk of ovarian cancer, providing additional evidence against inflammation as a biologically important mechanism in ovarian carcinogenesis.

Another important limitation of this study that should be noted is the relatively low response rates for cases and controls. Only 47% of eligible controls participated, as did only 65% of potential cases.

The authors conclude that, "...on balance, chronic inflammation does not play a major role in the development of ovarian cancer."

ALLEGATIONS OF PETITION'S AUTHORS re: CITATION:

The petition cites Merritt et al. as another observational study supporting a positive association between perineal talc use and ovarian cancer risk. Again, this isolated finding is not put in the context of limitations and inconsistencies regarding such issues as dose-response.

MEASURE OF RELATIVE RISK/ODDS RATIO:
For "ever use" talc/ovarian cancer risk: OR=1.17(1.01-1.36)
For talc use at other body sites: OR=1.01(0.84-1.20)

RELEVANCE OF STUDY FINDINGS TO SUPPORT CAUSAL ASSOCIATION:

As seen previously, Epstein et al. isolate the weak positive association shown between "ever" use of talc and ovarian cancer risk from the limitations of the existing data, including the lack of support Merritt et al. provides for the theory underlying talc carcinogenicity, i.e. inflammation. Merritt et al., along with two prior negative meta-analyses on anti-inflammatory medication use in this context, provides cogent evidence against the proposed biological mechanism for the talc/ovarian cancer association. This is even more convincing in that none of the other conditions associated with pelvic inflammation, such as pelvic inflammatory disease (PID) or endometriosis were related to increased risk. Since biological plausibility is a necessary component of causal inference, Epstein et al. ignore a major weakness of their argument and simply concentrate on the odds ratio of 1.17 for "ever" use of perineal talc as the basis for a causal relationship.

### IV. Talc and ovarian cancer risk: A critique of post-1995 data

#### Introduction
Above, we reviewed literature citations included in the petition to the FDA by Epstein et al. The petition cites some of the relevant literature published since 1995. We also searched electronic databases in order to determine if other citations exist that were not cited either by Epstein et al. or by Huncharek et al. in their 2003 meta-analysis. No additional observational studies relevant to the issue of ovarian cancer causation were located.

The issues articulated by Epstein et al. in relation to the possible carcinogenicity of talc are not uncommon when dealing with interpretation of results derived from observational studies. In an article published twenty years ago, Feinstein provided an insightful and cogent explanation for the myriad problems that plague the process of causal inference as it applies to non-experimental data (Feinstein, 1988). As he points out, most people learn about science by studying experimental methods. These methods largely include direct intervention by the experimenter on whatever entity is under study, whether it be an animal species such as rats or mice, specific chemical compounds, sub-atomic particles etc. The scientist, in this context, directly manipulates the study subject/object using established principles of experimental science. In the context of human studies, the experimental design that has come to represent the "gold standard" of cause-effect relationships is the randomized clinical trial. Unfortunately, in epidemiological research, issues of feasibility and ethical considerations preclude randomization of healthy human subjects to receive potentially harmful exposures to various substances, including those that represent possible carcinogenic hazards. Therefore, the epidemiologist must substitute observational methods to study cause-effect relationships that preclude direct

22

intervention with, and/or manipulation of, study subjects (i.e. experiments). Because of this fact, criteria for establishing cause-effect relationships are inherently different when utilizing epidemiological methods versus experimental ones.

In 1965, Hill published a landmark article articulating standards for drawing causal inferences from observational data. His rationale for this stemmed from the realization that the urgency of many public health problems demands action despite the fact that existing knowledge might be imperfect (Rothman, 1986). The "Hill Criteria" as they've become known, are not simply a "checklist" of requirements that must be met in order to determine cause-effect relationships.  Rather, they represent a theoretical framework to guide one's thinking when attempting to decide whether a body of data meets a basic threshold necessary to distinguish causal from non-causal associations. These criteria include, (1) strength of association, (2) consistency (i.e. repeated observation of an association in different populations under different circumstances), (3) specificity (a given cause leads to a specific effect), (4) temporality (cause must precede effect), (5) biological gradient (dose-response), (6) plausibility (biological plausibility), (7) coherence (i.e. that a given cause/effect relationship for an association does not conflict with what is known of the natural history and biology of the disease in question), (8) experimental evidence (to support the observational findings), (9) analogy.

While the Hill criteria do not provide a complete solution to the dilemma of causal inference in epidemiology, their importance lies in establishing at least a general framework for the process. The proposed talc/ovarian cancer association represents an illustrative example of the utility of this framework. Below we discuss the points raised by Epstein et al. in this context and show that the conclusion that the proposed talc/ovarian cancer association is causal is not supported by existing data.

**Overview**
The possibility that perineal talc exposure could be associated with development of ovarian cancer was initially derived from a case-control study published in 1982 (Cramer, 1982). Since that time, a number of additional reports have addressed this question with most showing odds ratios ranging between 1.0 and 2.0. Although this has prompted some to suggest that these estimates of effect provide support for a cause-effect relationship between this exposure and disease outcome, several important caveats must be considered.

Effects of this magnitude are often characterized as "weak effects" and although the exact definition of a weak effect is debatable, most epidemiologists would consider associations of less than 2.0 to fall within this general category. Hill and others argue that strong associations are more likely to be causal than weak associations since, "..if they were due to confounding or some other bias, the biasing association would have to be even stronger and would therefore presumably be evident" (Rothman, 1986). As Rothman points out, weak associations are more likely to be explained by undetected biases.

23

Measures of association of this magnitude are often difficult to interpret. This is based on the fact that the investigator cannot directly manipulate the levels of exposure of interest or extraneous factors that could affect study findings. Attempts to control for external factors are accomplished by statistical manipulations of collected data. However, this process depends on the accuracy and completeness of data collection. Further, the correct choice and interpretation of both statistical models and statistical findings can also be contentious.

It is important to point out that although an association is weak, this does not rule out a causal connection. Nonetheless an example of a factor that could confound the weak effect shown for perineal talc is smoking. It's now recognized that smoking is a risk factor for a number of solid tumors including lung (with OR's on the order of 5.0 versus non-smokers) and esophageal cancer. Evidence exists that smoking may also be related to at least some types of ovarian tumors, in particular, those of the mucinous histology. The current literature contains a number of reports showing a doubling or tripling of mucinous ovarian cancer risk among smokers (Green, 2001)(Pan, 2004). Since Rosenblatt et al. reported that smokers are more likely to engage in perineal talc dusting compared with non-smokers, an imbalance in smokers across case and control groups in epidemiological studies of the talc/ovarian cancer association could contribute to a spurious positive association (Rosenblatt, 1998).

Consistency of an effect could contribute to a causal claim despite a finding of a weak association. Epstein et al. characterize the talc/ovarian cancer relationship as being "confirmed" by multiple scientific publications as well as by review of available evidence by the International Agency for Research on Cancer (IARC). They state that, "…IARC..concluded that eight publications confirmed a 30-60% increased risk of ovarian cancer following the perineal application of talc". Despite the claims of the petitioners, a review of available evidence shows that the epidemiological evidence is NOT consistent across studies or across study types. For instance, Table 1 in Huncharek et al. (2003) shows several inconsistencies in the database. Clearly, not all studies showed a positive, statistically significant association, even among the case-control reports that make up the bulk of the database. In addition, there was relatively wide variation in the magnitude of measures of association.

Interestingly, up to the date of filing of the petition by Epstein et al., only one cohort study had been published, i.e. Gertig et al. (2000) showing no association between perineal talc use and ovarian cancer risk. Given the conflicting findings of case-control studies, Huncharek et al. employed meta-analytic techniques to explore possible sources of variability among these reports. Their rationale for doing so was that if meta-analyses showed that the patterns of low relative risks or odds ratios are consistent across all relevant studies in different populations, these weak associations are less likely to be due to confounding or other biases. If a statistical test for heterogeneity shows effects of different magnitudes across studies, sensitivity analyses can be employed to determine the source of

observed variability and thereby identify biases due to study design, case-control selection etc.

Huncharek et al. initially pooled data from fifteen case-control and one cohort analysis, yielding a summary relative risk (RRs) of 1.33 (1.16-1.45). Although this suggests a statistically significant positive association between perineal talc use and ovarian cancer, risk sensitivity analyses demonstrated clear differences in outcome based on study design. That is, hospital-based case-control studies showed no evidence of an effect (1.19[0.99-1.41]) in contrast to those reports using population-derived controls (1.38[1.25-1.52]). As discussed in the earlier portion of this report, these findings suggest bias and bring the validity of the initial pooled RRs into question. The Huncharek report provides some possible explanation for the observed differences, as was outlined previously, and indicates that study outcomes are not consistent.

Further supporting the findings of this meta-analysis is the more recent and updated pooled data provided by Langseth et al. (2008) cited by the Epstein petition. These authors pooled data from twenty relevant epidemiological studies. Again, although the calculated summary relative risk obtained from pooling data from all 20 reports gives a statistically significant RRs (pooled odds ratio) of 1.35(1.26-1.46), the statistical test for data heterogeneity yielded a p value of 0.036. A p value of this size (i.e. less than 0.10) is indicative of significant heterogeneity and, as per convention (see Petitti) precludes statistical pooling, i.e. the pooled summary estimate of effect is not valid given that the data are heterogeneous. This shows that the available data are not consistent and therefore makes a causal association less likely.

One of the more persistent findings among the epidemiological studies examining this suspected association is the lack of a dose-response relationship. Table 2 of the Huncharek et al. meta-analysis displays dose-response data for those included studies providing such information. Many of the reports do not show increased risk with increasing exposure. The even more problematic finding in terms of establishing a causal association is that a number of studies suggest that risk decreases with increased exposure, (e.g. see Chang and Risch above or Cook et al., 1997).

Few authors directly address the above noted lack of evidence of a dose –response. Huncharek et al. (2003, Petition reference #9) and Huncharek and Muscat (2007), in contrast, offer a number of possible explanations for an inverse dose response. As outlined above, treatment for ovarian cancer may induce specific symptoms that could prompt short-term talc use. For instance, some early stage patients may undergo radiation therapy, which causes skin irritation. Such side effects could result in some patients using talc products to address these side effects. Talc is often recommended to keep skin folds in the perineum dry and prevent skin breakdown secondary to radiation. In addition, symptoms of the disease process itself could cause some women to use talc to counter these symptoms. Paulsen et al. (2005) and Golf et al. (2004) document that a number of symptoms are quite common among ovarian cancer cases versus

control patients. For instance, Golf et al. (2004) show that increased abdominal size is over seven times more common among cases versus controls while abdominal bloating is 2.5 times more common. The combination of bloating, increased abdominal size and urinary symptoms were found in almost half of all ovarian cancer patients but in only 8% of controls. Also of interest are the findings of Green et al. (1997, Petition reference #8) that increased ovarian cancer risk was seen among patients with painful periods or excessive vaginal bleeding. Again, such symptoms could prompt talc use and lead to a spurious association with talc. Although there are no firm data in the existing literature to definitively establish that these factors lead to increased short-term use of talc, the scenarios are plausible and could explain the inverse dose-response seen in a number of epidemiological studies.

The majority of reports largely ignore the counter-intuitive findings although Cramer et al. (Petition reference #4) attribute the dose-response inconsistencies, possibly, to the "crudeness" of the exposure measurement used. What is not acknowledged is that this same problem of imprecise exposure estimates could also explain a spurious *positive* association of talc and ovarian cancer, especially in light of the inconsistent outcomes across reports. In summary, the failure to show a coherent and consistent relationship between talc exposure and ovarian cancer risk argues against a causal association.

An additional limitation of the existing literature dealing with the proposed talc/ovarian cancer association is the lack of any known biological mechanism via which talc particles could induce ovarian tumors. This represents probably the most troublesome aspect of arguments in support of this proposed causal association. It is also interesting to note, that biologically theories put forth to explain how talc may cause neoplastic transformation have changed over time as various proposed mechanisms have met with criticism in the developing literature.

Initially, Cramer et al. (1982) and others sought to draw an analogy between talc and fibrous asbestos, the latter being a known and well-described carcinogen. The biological effects of asbestos have been elucidated over the last 50-60 years via a multitude of epidemiological, in vitro and in vivo studies (Huncharek, 1986). Specific asbestos types are recognized as both animal and human carcinogens and, due to this fact, this commodity is banned from use in the United States. A number of investigators initially implicated talc products as possible carcinogens since prior to the early 1970's, some talc products contained small amounts of asbestos fibers (Rohl, 1976). Clearly, such products could possibly represent a carcinogenic risk secondary to the asbestos contamination. It should be pointed out that this in no way implicates talc as a toxin since the problematic constituent of such products was the asbestos fibers, not talc.

Since the early 1970's, the relevant industries voluntarily eliminated asbestos contamination from talc products. Because of this, the "anti-talc" argument shifted to implicate talc itself as a carcinogenic risk based on its "chemical similarity" to talc. It is interesting, and confusing, as to why talc is thought by

some to be carcinogenic based on the fact that there is some common chemical constituents of talc and asbestos.

Both commercial talc and the group of minerals known as asbestos are magnesium silicates. Beyond that fact, the two substances share no common characteristics. The work of Stanton (1981, referenced below) and others shows that the carcinogenic ability of fibrous asbestos is due to its structure, not its chemical composition. While talc and asbestos are both magnesium silicates, they are structurally distinct and belong to different mineral groups and subgroups, as detailed by Muscat and Huncharek (2008). Amphibole asbestos minerals are inosilicates while talc is a member of the silicate subclass phyllosilicate and group clay or montmorillonite/smectite. While serpentines, including serpentine asbestos (chrysotile), are also phyllosilicates, serpentine minerals belong to the kalolinite-serpentine group. The asbestos varieties of serpentine are structurally different from other members of the serpentines in that their brucite layers and silicate layers bend into tubes that produce fibers. Non-fibrous serpentine does not have carcinogenic properties and it is clear that the physical structure of serpentine asbestos (and amphibole asbestos) is responsible for its disease-causing potential, not its atomic constituents. It simply does not follow that one should assume talc is carcinogenic simply because it is a silicate. Structure dictates toxicity/carcinogenicity, not chemical composition.

Earlier in this report, we use the analogy of graphite and diamond as an example of two substances that are chemically identical yet are vastly different in their physical properties. The contrast between commercial talc and any of the varieties of fibrous asbestos is just as stark. Clearly, the "asbestos analogy" used to support the possible carcinogenicity of talc is not supported by existing data.

Given the dissimilarities between talc and asbestos with regard to their fibrous shapes, the weak but increased associations in the epidemiological studies could be attributed to other mechanisms, assuming that the statistical associations are unbiased and not due to confounding. Asbestos fibers in the lung initiate an inflammatory and scarring process, and it has been proposed that ground talc, as a foreign body, might initiate an inflammatory response (Ness, 1999). Pelvic inflammatory diseases, however, such as endometriosis, peritonitis, tubo-ovarian abscess formation etc., have not been associated with an increased risk of ovarian cancer. A meta-analysis of studies of anti-inflammatory drug use found no reduction in ovarian cancer risk (see Muscat, Huncharek , 2008). In fact, the Merritt et al. study (2007) cited by Epstein et al. also showed no relationship between inflammation and ovarian cancer risk.

Most recently, Cramer et al. proposed that the talc/ovarian cancer association might be explained by the induction of Anti-MUC1 antibodies (Cramer, 2005). This idea has been debated on statistical grounds where talcum powder applied to the perineum was associated with increased Anti-MUC1 expression but the correlation was also observed when talc powder was applied to other body parts. More importantly, the simple observation that talc elevates immunoglobulin protein levels in blood, possibly via heat shock proteins, seems to

have no known direct relevance for ovarian cancer since Anti-MUC1 is associated with other cancers and because there is no known role of heat shock proteins in ovarian cancer risk.

Some of the most important biological data supporting the non-toxic nature of talc comes from the clinical use of talc in treating both malignant and benign pleural effusions in humans (i.e. pleurodesis). This is a common procedure in the United States and elsewhere and talc slurry is applied directly to the pleura (via chest tube placement) to induce obliteration of the pleural space by scarring and prevent the re-accumulation of fluid secondary to tumor or benign causes. Multiple long-term clinical studies, as reviewed by Muscat and Huncharek (2008), have not shown a single case of cancer secondary to direct talc application to the human pleura. In an earlier part of this report, we also detailed recent data showing that talc has demonstrated anti-tumor properties secondary to the induction of endostatin when used in pleurodesis. In fact, pleurodesis patients treated with talc are known to experience longer survival times than those treated with other sclerosing agents. This is likely due to the tumor-inhibitory effects of talc, as suggested by a number of investigators.

Finally, other human data, such as the demonstration that inhaled talc in mining and milling operations is not associated with increased pulmonary tumors and the likelihood that talc could selectively induce ovarian cancer and not lung cancer at exposure concentrations orders of magnitude lower than that experienced in occupational settings argues against its toxicity.

Although the process of drawing causal inferences from scientific data is complex, application of accepted standards, as noted above, to the talc/ovarian cancer relationship clearly indicates that the available epidemiological and other evidence does not support a causal connection. The weak association shown in a sub-set of observational studies can potentially be explained by numerous alternative hypotheses, as detailed throughout this document. Given the lack of supporting evidence from in vivo, in vitro and clinical research studies using human subjects, the weak epidemiological association is unlikely to be causal.

**V. Review of Cancer Prevention Coalition website**

There are a number of factual errors on the CPC website. The page containing answers to specific questions begins with a description of talc. The first sentence implies that talc contains "fibers" that are "similar" to asbestos, that are not "separated" from mined talc. This implies to the lay reader that all talc preparations contain particles of "asbestos like" fibers. This could be mis-understood by the public as implying that all talc contains potentially cancer-causing particles, contrary to established fact.

Under the section explaining "Why is talc harmful", it is stated that talc has been shown to cause tumors of the ovary. It is also stated that talc shares dangerous similarities to the "potent carcinogen", asbestos, without further elaboration. In

28

their discussion of what type of talc exposures are dangerous, the site plainly states that talc is a carcinogen and that there exists a strong link between frequent use of talc in the genital area and ovarian cancer. They also go on to state that talc should not be used on children since it carcinogenic.

In the last paragraph of the "Risks of Talcum Powder" page, they urge consumers not to purchase talc products and to write to the FDA to express concerns regarding talc's toxicity.

Clearly, the CPC website contains multiple errors of fact and mis-representations. All of these are addressed in the earlier portions of this report.

# VI. Appendix

Relevant SEER data



29



**P1.0164.32**

30



**P1.0164.33**

31



Age-Adjusted SEER Incidence Rates
By Cancer Site
All Ages, White, Female
1975-2005 (SEER 9)

◆ Ovary

Cancer sites include invasive cases only unless otherwise noted.
Incidence source: SEER 9 areas (San Francisco, Connecticut, Detroit, Hawaii, Iowa, New Mexico, Seattle, Utah, and Atlanta).
Rates are per 100,000 and are age-adjusted to the 2000 US Std Population (19 age groups - Census P25-1130). Regression lines are calculated using the Joinpoint Regression Program Version 3.3, April 2008, National Cancer Institute.
Ovary excludes borderline cases or histologies 8442, 8451, 8462, 8472, and 8473.

Page 34 of 39

P1.0164.34

32



P1.0164.35

33



**P1.0164.36**

34



**P1.0164.37**

Huncharek M, Muscat J, Onitilo A et al. Use of talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies. Eur J Cancer Prev 16:422-429, 2007.

Muscat J, Huncharek M. Perineal talc use and ovarian cancer: a critical review. Eur J Cancer Prev 17:139-146, 2008.

Najmunnisa N, Mohammed KA, Brown S et al. Talc mediates angiostasis in malignant pleural effusions via endostatin induction. Eur Resp J 29:761-769, 2007.

Nasreen N, Hohammed KA, Dowling PA et al. Talc induces apoptosis in human malignant mesothelioma cells in vitro. Am J Respir Crit Care Med 161:595-600, 2000.

Ness RB, Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. J Natl Cancer Inst 91:1459-1467, 1999.

Pan SY, Ugnat AM, Mao Y,Wen SW, Johnson KC. Association of cigarette smoking with the risk of ovarian cancer. Int J Cancer 111:124-130, 2004.

Paulsen T, Kaern J, Kjaerheim K et al. Symptoms and referral of women with epithelial ovarian tumors. Int J Gynecol Obst 88:31-37, 2005.

Petitti DB. *Meta-Analysis, Decision Analysis and Cost-Effectiveness Analysis: Methods for Quantitative Synthesis in Medicine,* 2nd Edition. Oxford University Press, Oxford, UK, 2000.

Rohl AN, Langer AM, Selikoff IJ. Consumer talcums and powders: mineral and chemical characteristics. J Toxicol Environm Health 2:255-284, 1976.

Rosenblatt KA, Mathews WA, Daling JR et al. Characteristics of women who use perineal powders. Obstet Gynecol 92(5):753-756, 1998.

Rothman K. *Modern Epidemiology.* Little Brown and Co., Boston, Toronto, 1986. pp16-17.

Stanton MF, Layard M, Tegeris A, Miller E, May M et al. Relation of particle dimension to carcinogenicity in amphibole asbestos and other fibrous minerals. J Natl Cancer Inst 67(5):965-975, 1981.

# Exhibit 157

Joshua E. Muscat, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

- - -

IN RE:  JOHNSON &          :
JOHNSON TALCUM POWDER       :
PRODUCTS MARKETING,         :
SALES PRACTICES, AND        :  NO. 16-2738
PRODUCTS LIABILITY          :  (FLW) (LHG)
LITIGATION                  :
                            :
THIS DOCUMENT RELATES       :
TO ALL CASES                :

- - -

September 25, 2018

- - -

Videotaped deposition of
JOSHUA E. MUSCAT, Ph.D., taken pursuant
to notice, was held at the law offices of
Drinker Biddle & Reath, One Logan Square,
Philadelphia, Pennsylvania, beginning at
9:45 a.m., on the above date, before
Michelle L. Gray, a Registered
Professional Reporter, Certified
Shorthand Reporter, Certified Realtime
Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Joshua E. Muscat, Ph.D.

---

Page 2

```
 1   APPEARANCES:
 2
     LEVIN PAPANTONIO THOMAS
 3   MITCHELL RAFFERTY & PROCTOR, PA
     BY:  CHRISTOPHER V. TISI, ESQ.
 4        WESLEY BOWDEN, ESQ.
     316 South Baylen Street, Suite 600
 5   Pensacola, Florida 32502
     (888) 435-7001
 6   Ctisi@levinlaw.com
     Wbowden@levinlaw.com
 7
       - and -
 8
     ASHCRAFT & GEREL, LLP
 9   BY:  MICHELLE A. PARFITT, ESQ.
          JAMES F. GREEN, ESQ.
10   4900 Seminary Road, Suite 650
     Alexandria, Virginia 22311
11   (703) 931-5500
     mparfitt@ashcraftlaw.com
12   jgreen@ashcraftlaw.com
13
     LUNDY, LUNDY, SOILEAU & SOUTH, LLP
14   BY:  NICHOLAS J. KOHRS, ESQ.
     501 Broad Street
15   Lake Charles, Louisiana 70601
     (337) 439-0707
16   nkohrs@lundylawllp.com
     Representing the Plaintiffs'
17   Steering Committee
18
19
20
21
22
23
24
```

Page 3

```
 1   APPEARANCES:  (Cont'd.)
 2
     SHOOK, HARDY & BACON, LLP
 3   BY:  MARK HEGARTY, ESQ.
     2555 Grand Boulevard
 4   Kansas City, MO 64108
     (816) 474-6550
 5   Mhegarty@shb.com
 6     - and -
 7   SHOOK, HARDY & BACON, LLP
     BY:  BRITTANY N. VANEK, ESQ.
 8   600 Travis Street, Suite 3400
     Houston, Texas 77002
 9   (713) 227-9508
     Bvanek@shb.com
10
       - and -
11
     DRINKER BIDDLE & REATH LLP
12   BY:  JULIE L. TERSIGNI, ESQ.
     600 Campus Drive
13   Florham Park, NJ 07932-1047
     (973) 549.7106
14   Julie.tersigni@dbr.com
     Representing the Defendant, Johnson
15   & Johnson entities
16
     THOMPSON & KNIGHT, LLP
17   BY:  TIMOTHY E. HUDSON, ESQ.
     1722 Routh Street, Suite 1500
18   Dallas, Texas 75201
     (214) 969-1540
19   Tim.hudson@tklaw.com
     Representing the Witness
20
21
22
23
24
```

Page 4

```
 1   APPEARANCES:  (Cont'd.)
 2
     GORDON & REES, LLP
 3   BY:  MICHAEL KLATT, ESQ.
     816 Congress Avenue, Suite 1510
 4   Austin Texas 78701
     (512) 391-0197
 5   Mklatt@grsm.com
 6     - and -
 7   GORDON & REES, LLP
     BY:  SARA ANDERSON FREY, ESQ.
 8   Three Logan Square
     1717 Arch Street, Suite 610
 9   Philadelphia, Pennsylvania 19103
     (215) 717-4009
10   Sfrey@grsm.com
11     - and -
12   COUGHLIN DUFFY L.L.P.
     BY:  MARK K. SILVER, ESQ.
13   350 Mount Kemble Avenue
     Morristown, New Jersey 07962
14   (973) 267-0058
     msilver@coughlinduffy.com
15   Representing the Defendant, Imerys
     Talc America, Inc.
16
17   SEYFARTH SHAW, LLP
     BY:  THOMAS T. LOCKE, ESQ.
18   975 F Street, NW
     Washington, D.C. 20004
19   (202) 463-2400
     tlocke@seyfarth.com
20   Representing the Defendant, PCPC
21
22
23
24
```

Page 5

```
 1   TELEPHONIC APPEARANCES:
 2
 3   BEASLEY ALLEN, P.C.
     BY:  P. LEIGH O'DELL, ESQ.
 4   234 Commerce Street
     Montgomery, Alabama 36103
 5   (334) 269-2343
     leigh.odell@beasleyallen.com
 6   Representing the Plaintiffs'
     Steering Committee
 7
 8
     ALSO PRESENT:
 9
10   VIDEOTAPE TECHNICIAN:
     David Lane
11
     LITIGATION TECHNICIAN:
12   Zach Hone
13
14
15
16
17
18
19
20
21
22
23
24
```

2 (Pages 2 to 5)

Joshua E. Muscat, Ph.D.

## Page 6

- - -

I N D E X

- - -

Testimony of:   JOSHUA E. MUSCAT, Ph.D.

By Mr. Tisi        15, 613

By Mr. Hegarty        570

- - -

E X H I B I T S

- - -

NO.        DESCRIPTION        PAGE
Muscat-1   Curriculum Vitae    20
           Joshua E. Muscat, Ph.D.

Muscat-2   Letter, 5/30/18     21
           Subpoena Notice of
           Deposition

Muscat-3   Privilege Log       23
           Of Joshua Muscat
           7/20/18
           P1.0169-.52
Muscat-4   Curriculum Vitae    75
           Of Joshua E. Muscat, Ph.D.
           P1.0173-.8

## Page 7

- - -

E X H I B I T S (Cont'd.)

- - -

NO.        DESCRIPTION        PAGE
Muscat-5   Binder of 9 Tabs    91
           Reports of and
           Epidemiology
           Publications

Muscat-6   Fax Cover Sheet     110
           & Attachment
           10/7/04
           To Glenn from Huncharek
           P1.0004.1-9

Muscat-7   Letter, 10/12/00    140
           & Research Proposal
           P1.0027.1-27

Muscat-8   Perineal Talc       143
           Exposure and Ovarian
           Cancer Risk
           Huncharek
           11/2000
           P2.0003-15
Muscat-9   Letter to Jones     166
           From Muscat
           10/31/94
           P1.0136.1-2

Muscat-10  Grant Application   166
           P1.0137.1-19
Muscat-11  Memo, 6/1/94        167
           & Confidentiality
           Agreement
           P1.0134.1-3

## Page 8

- - -

E X H I B I T S (Cont'd.)

- - -

NO.        DESCRIPTION        PAGE
Muscat-12  Letter, 2/21/97     175
           To Jones from Muscat
           P1.0140.1
Muscat-13  Letter, 3/4/97      175
           To Muscat from
           Hopkins
           P1.0141.1

Muscat-14  Letter, 3/23/97     175
           To Hopkins from
           Muscat
           P1.0142.1
Muscat-15  Perineal Powder     180
           Exposure and the
           Risk of Ovarian
           Cancer
           (Cook)
           P2.0012-7

Muscat-16  PowerPoint          184
           Comments on
           Toxicology
           Special Issue:
           Talc
           P2.0016.1-33
Muscat-17  E-mail Thread       188
           10/17/00
           Subject, Talc
           P1.0146.1-2

## Page 9

- - -

E X H I B I T S (Cont'd.)

- - -

NO.        DESCRIPTION        PAGE
Muscat-18  Letter, 2/28/05     199
           From Hall to Huncharek
           And Muscat
           P1.0043.1-7

Muscat-19  E-mail Thread       237
           2/18/05
           Subject, NTP Talc
           Proceeding
           P1.0011.1

Muscat-20  E-mail, 7/27/05     245
           & Executive Summary
           Subject, Task
           Deliverables from
           Drs. Huncharek and
           Muscat
           P1.0038.1-161

Muscat-21  Privilege Log       272
           Crowell & Moring
           2000-2010

Muscat-22  Joshua Muscat       293
           Consulting - Talc
           Ovarian Cancer
           Chart
Muscat-23  Joshua Muscat       279
           Privilege Log
           Shook Hardy Bacon

Joshua E. Muscat, Ph.D.

## Page 10

```
 1              - - -
 2        E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5   NO.        DESCRIPTION        PAGE
 6   Muscat-24  Perineal Talc Use   283
              And Ovarian Cancer
 7            Risk
              (Huncharek)
 8            P2.0007-7
 9   Muscat-25  Citizen's Petition  349
              PCPC Response
10            P1.0164-.39
11   Muscat-26  Comments on Citizen's 362
              Petition
12            (Huncharek)
              JNJ 000449903-38
13
     Muscat-27  E-mail Thread       364
14            11/14/08
              Subject, Final Report
15            P1.0165
16   Muscat-28  Perineal Talc and   373
              Ovarian Cancer
17            (Muscat)
              P2.0006-8
18
     Muscat-29  Talc and Ovarian    394
19            Cancer:  A Critical
              Review
20            (Huncharek)
              P1.0174-.68
21
22
23
24
```

## Page 11

```
 1              - - -
 2        E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5   NO.        DESCRIPTION        PAGE
 6   Muscat-30  Use of Talc on      397
              Contraceptive
 7            Diaphragms and
              Risk of Ovarian
 8            Cancer
              (Huncharek)
 9            P2.0002-.8
10   Muscat-31  Deposition Topic    428
              Areas Chart
11
12   Muscat-32  Published Positions 437
              Taken Before Regulatory
13            Bodies as of 2011
14   Muscat-33  Huncharek 2011      448
              Table 3
15
     Muscat-34  Huncharek 2003      460
16            Table 2
17   Muscat-35  Huncharek 2007      549
              Table 1
18
     Muscat-36  Perineal Use of     587
19            Talc and Risk of
              Ovarian Cancer
20            (Langseth)
21   Muscat-37  Joshua E. Muscat,   629
              Ph.D., M.P.H. and
22            Meta-Analysis Research
              Group Talc Reports
23            And Epidemiology
              Publications
24
```

## Page 12

```
 1              - - -
 2        E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5   NO.        DESCRIPTION        PAGE
 6   Muscat-38  Chart on Manila     662
              Folder of
 7            Imerys, J&J and
              Crowling & Moring
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 13

```
 1              - - -
 2        DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5   Direction to Witness Not to Answer
 6   PAGE  LINE
     616   14
 7   648   15
 8
     Request for Production of Documents
 9
     PAGE  LINE
10   274   10
11
     Stipulations
12
     PAGE  LINE
13   None.
14
     Questions Marked
15
     PAGE  LINE
16   661   7
17
18
19
20
21
22
23
24
```

Joshua E. Muscat, Ph.D.

Page 14

```
 1                - - -
 2          THE VIDEOGRAPHER:  We are
 3    now on the record.  My name is
 4    David Lane, videographer for
 5    Golkow Litigation Services.
 6    Today's date is September 25,
 7    2018.  Our time is 9:45 a.m.
 8          This deposition is taking
 9    place in Philadelphia,
10    Pennsylvania, in the matter of
11    Talcum Powder Litigation MDL.
12          Our deponent today is
13    Dr. Joshua Muscat.
14          All counsel will be noted on
15    the stenographic record.
16          The court reporter is
17    Michelle Gray who will now swear
18    in our witness.
19                - - -
20          ... JOSHUA E. MUSCAT, Ph.D.,
21    having been first duly sworn, was
22    examined and testified as follows:
23                - - -
24          EXAMINATION
```

Page 15

```
 1                - - -
 2    BY MR. TISI:
 3          Q.   Good morning.
 4          A.   Good morning.
 5          Q.   Would you state your name,
 6    please?
 7          A.   Joshua Muscat.
 8          Q.   And where is your
 9    professional address?
10          A.   500 University Boulevard,
11    Hershey, Pennsylvania.
12          Q.   So you live in Pennsylvania?
13          A.   That's correct.
14          Q.   Now, you were introduced as
15    a doctor.  Are you a medical doctor?
16          A.   No.
17          Q.   You are what's called an
18    epidemiologist, is that right?
19          A.   That's correct.
20          Q.   And you are not a
21    toxicologist, are you?
22          A.   No.
23          Q.   You are not a mineralogist?
24          A.   No.
```

Page 16

```
 1          Q.   You are not a geologist?
 2          A.   No.
 3          Q.   You are not a gynecologist?
 4          A.   That's correct.
 5          Q.   Okay.  Briefly, would you
 6    tell us, and I mean briefly because we've
 7    got a lot of ground to cover.  What is an
 8    epidemiologist and what does an
 9    epidemiologist do?
10          A.   Okay.  Actually comes from
11    the word, the word epidemos.  It's
12    actually a Greek word.  It means upon
13    people.  So what it really means, it's
14    the study of the distribution causes of
15    diseases within populations.
16          Q.   Okay.  And just to kind of
17    put it in words a jury and judge might
18    understand, epidemiology just describes
19    cause and effect relationships of
20    diseases in human beings?
21          MR. SILVER:  Object to form.
22          MR. HEGARTY:  Object to
23    form.
24          THE WITNESS:  It can
```

Page 17

```
 1    ultimately be used for those
 2    purposes.  But the main purpose is
 3    to test statistical associations.
 4    BY MR. TISI:
 5          Q.   Okay.  Now, would you agree
 6    that while epidemiology is a science, the
 7    decision as to whether or not the weight
 8    of the evidence supports a causal
 9    inference is one upon which reasonable
10    epidemiologists can disagree?
11          MR. HEGARTY:  Objection to
12    form.
13          MR. HUDSON:  Object to form.
14          THE WITNESS:  I'm sorry, can
15    you repeat that, please?
16    BY MR. TISI:
17          Q.   Yes.  Would you agree that
18    while epidemiology is a science, the
19    decision as to whether the weight of
20    evidence supports a causal inference is
21    one upon which reasonable epidemiologists
22    may disagree?
23          MR. HUDSON:  Objection to
24    form.
```

5 (Pages 14 to 17)

Joshua E. Muscat, Ph.D.

Page 18

1    THE WITNESS:  It really
2  depends on the topic.  You know, I
3  think that no one would disagree
4  for example, that smoking caused
5  lung cancer.  If someone disagreed
6  with that, I would say they are
7  unreasonable.
8  BY MR. TISI:
9    Q.   But there were times in the
10  past when the science was evolving that
11  epidemiologists lined up on both sides of
12  that particular question, correct?
13    MR. HEGARTY:  Objection to
14  form.
15    THE WITNESS:  I can't recall
16  the history of it.  I would say
17  that at least the ones that I'm
18  familiar with certainly did not
19  line up on both sides.
20    MR. SILVER:  Just so we
21  don't have to all say:  An
22  objection for one is an objection
23  for all?
24    MR. TISI:  That's correct.

Page 19

1  BY MR. TISI:
2    Q.   Well, you raised the
3  question.  You know over the past
4  50 years there were epidemiologists on
5  one side of the cigarette debate that
6  thought that there was inadequate
7  evidence to support the conclusion that
8  cigarette smoking caused lung cancer.
9  And then there were epidemiologists who
10  came to that decision a lot earlier,
11  correct?
12    MR. HEGARTY:  Objection to
13  form.
14    THE WITNESS:  I don't have
15  any recollection of specific
16  epidemiologists that objected to
17  that.
18    My mentor was actually the
19  one who found, way back when in
20  1950, who found the association
21  between smoking and lung cancer.
22  BY MR. TISI:
23    Q.   That was Dr. Wynder?
24    A.   Pronounced Wynder, right.

Page 20

1    Q.   And -- and they would --
2  there were epidemiologists who strongly
3  disagreed with him, correct?
4    A.   I don't know whether they
5  were epidemiologists or not.
6    Q.   But there were people that
7  strongly disagreed with him?
8    MR. HEGARTY:  Objection to
9  form.
10    THE WITNESS:  On a priori,
11  yes.
12  BY MR. TISI:
13    Q.   Now, I'm going to show you a
14  copy of your curriculum vitae which has
15  been produced to us in this case.  I'm
16  going to mark that as Exhibit Number 1.
17    (Document marked for
18  identification as Exhibit
19  Muscat-1.)
20  BY MR. TISI:
21    Q.   Now, Doctor, we previously
22  served you with a subpoena for -- you
23  know we're here for the talc litigation,
24  correct?

Page 21

1    A.   That's correct.
2    Q.   And you know that the
3  plaintiffs in this case previously served
4  you with a subpoena asking you for
5  documents related to your involvement
6  with that issue, correct?
7    A.   That's correct.
8    Q.   And I'm going to show you a
9  copy of the subpoena that we served in
10  this case.
11    (Document marked for
12  identification as Exhibit
13  Muscat-2.)
14  BY MR. TISI:
15    Q.   I'd like to mark that as
16  Exhibit Number 2.
17    Have you seen that before,
18  sir?
19    A.   No, I don't recall seeing
20  this.
21    Q.   Okay.  All right.  Did you
22  collect documents in connection with a
23  subpoena that you were provided in this
24  case?

6 (Pages 18 to 21)

Joshua E. Muscat, Ph.D.

Page 22

1    A.   Yes, I did.
2    Q.   And did you provide them to
3  your counsel?
4    A.   Yes, I did.
5    Q.   Did you provide them -- do
6  you know if your counsel provided them to
7  the defendants in this case, Johnson &
8  Johnson, before they were produced to us
9  for review?
10   A.   My understanding is -- not
11 entirely sure what documents were
12 produced.
13   Q.   Okay.  Do you understand
14 that your documents were produced to
15 Johnson & Johnson before they were
16 produced to us?
17   A.   I'm not sure.
18   Q.   Okay.  I'd like to attach --
19 in connection with your subpoena, the
20 defendants in this case, or your counsel,
21 excuse me, produced what's called a
22 privileged log.  Do you know what that
23 is?
24   A.   I've heard the term.

Page 23

1    Q.   And do you know -- I'm going
2  to attach it as Exhibit Number 3.
3         (Document marked for
4         identification as Exhibit
5         Muscat-3.)
6  BY MR. TISI:
7    Q.   A privilege log are
8  documents that were withheld by your
9  lawyer in this case --
10   A.   Okay.
11   Q.   -- from production to us,
12 the plaintiffs, on the grounds that there
13 was some reason to believe that your
14 relationship with them and the documents
15 that you produced in the context of that
16 relationship, we don't get to see those.
17 Do you understand that?
18       MR. HUDSON:  Objection.
19       THE WITNESS:  I understand,
20   yes.
21 BY MR. TISI:
22   Q.   Okay.  And Exhibit Number 3
23 is the list of documents that were
24 withheld from the plaintiffs in this case

Page 24

1  on the grounds of alleged privilege.  Do
2  you see that?
3    A.   Yeah.  I'm not entirely sure
4  how to read this, but --
5    Q.   Yeah, I understand.  But you
6  understand that a considerable number of
7  documents were withheld from our review
8  because of your relationship with the
9  defendants in this case?
10       MR. SILVER:  Objection to
11   form.
12       THE WITNESS:  So I
13   understand that certain documents
14   were privileged, okay.
15 BY MR. TISI:
16   Q.   Right.  And they are
17 privileged because you had a relationship
18 with the defendants in this case, Johnson
19 & Johnson, Imerys, PCPC and any
20 combination of those people, correct?
21       MR. HUDSON:  And,
22   Dr. Muscat, I'm going to instruct
23   you not to answer if the answer
24   would be information that you

Page 25

1    learned in discussions with
2    counsel in this case.  If you
3    otherwise know the answer, you're
4    free to respond.
5        THE WITNESS:  Okay.
6        MR. LOCKE:  I want to note
7    an objection to form.
8        THE WITNESS:  Can you repeat
9    the question, please?
10 BY MR. TISI:
11   Q.   Let me rephrase the
12 question.
13   A.   Yeah.
14   Q.   You know that there are a
15 considerable number of documents here --
16   A.   Right.
17   Q.   -- that were withheld from
18 us -- withheld from our view, correct?
19   A.   Right.
20   Q.   And you know that those
21 documents were withheld because you have
22 a -- you have and have had a relationship
23 with every one of the defendants in this
24 talc litigation, correct?

7 (Pages 22 to 25)

Joshua E. Muscat, Ph.D.

Page 26

1    MR. HUDSON:  Objection to
2  form.
3         And same instruction,
4  Dr. Muscat, if the answer is
5  derived from information that was
6  learned from your discussions with
7  counsel, I instruct you not to
8  answer.  If you know the answer,
9  you are otherwise free to respond.
10    THE WITNESS:  Okay.  So I
11  guess I choose not to answer.
12  BY MR. TISI:
13    Q.   Okay.  So you don't want --
14  okay.
15         You do -- you have had a
16  relationship over the past decade with
17  every defendant in this litigation,
18  correct?
19    MR. HUDSON:  Objection to
20  form.
21    THE WITNESS:  So I'm not
22  sure what you mean by
23  relationship.  In terms of the
24  withholding of any documents to

Page 27

1  any of those parties, whether I
2  had a relationship or however you
3  want to define it, I wasn't part
4  of that process.
5  BY MR. TISI:
6    Q.   I'm not asking you that
7  question, sir, I moved on.
8    A.   Yeah.  Okay.
9    Q.   My question is, you have had
10  a relationship with Johnson & Johnson,
11  correct, over the years?
12    MR. HUDSON:  Objection to
13  form.
14    THE WITNESS:  I've had a
15  consulting relationship.
16  BY MR. TISI:
17    Q.   You've actually been an
18  expert for them as well, correct?
19    A.   That's correct.
20    Q.   All right.  You have worked
21  with their lawyers Shook Hardy & Bacon,
22  correct?
23    A.   That's correct.
24    Q.   And you have worked with

Page 28

1  Imerys over the course of the past
2  20 years, correct?
3    MR. SILVER:  Objection to
4  form.
5  BY MR. TISI:
6    Q.   Previously Rio Tinto or
7  Luzenac?
8    MR. HUDSON:  Objection to
9  form.
10    THE WITNESS:  Have I worked
11  with them?  No, not directly.
12  BY MR. TISI:
13    Q.   But you work with them
14  indirectly because you work with their
15  lawyers, correct?
16    A.   That's correct.
17    Q.   You worked with their
18  lawyers Crowell & Moring, correct?
19    A.   I had a meeting with them,
20  that's correct.
21    Q.   You had more than one
22  meeting, correct?
23    A.   One meeting.
24    Q.   You also met with -- you

Page 29

1  know who Bob Glenn is?
2    A.   Yes.
3    Q.   Who is Bob Glenn?
4    A.   He is a toxicologist.
5    Q.   He is more than a
6  toxicologist.  He was a consultant for
7  the lawyers for Imerys, correct?
8    MR. HUDSON:  Objection to
9  form.
10    THE WITNESS:  That I don't
11  know.
12  BY MR. TISI:
13    Q.   You know that he was working
14  with Crowell & Moring, do you not, the
15  law firm of Crowell & Moring?
16    A.   Yes.
17    Q.   Okay.  And you also worked
18  with the PCPC, the Personal Care Products
19  Council?
20    MR. HUDSON:  Objection to
21  form.
22    THE WITNESS:  Me?
23  BY MR. TISI:
24    Q.   Yes.

8 (Pages 26 to 29)

Joshua E. Muscat, Ph.D.

Page 30

1      A.   No.
2      Q.   You never worked with them,
3   you never prepared reports for them?
4      A.   That's correct.
5      Q.   Okay.  Did you prepare
6   reports for any of their consultants?
7           Do you know who The Weinberg
8   Group is?
9           MR. HUDSON:  Objection to
10      form.
11          THE WITNESS:  Yes.
12  BY MR. TISI:
13      Q.   Okay.  Do you know The
14  Weinberg Group worked for PCPC?
15          MR. LOCKE:  Objection to
16      form.
17          THE WITNESS:  The Weinberg
18      Group worked for PCPC.
19  BY MR. TISI:
20      Q.   And they were a consultant
21  group, correct?
22      A.   Weinberg Group is a
23  consulting group, that's correct.
24      Q.   And you worked with them to

Page 31

1   prepare reports for groups who were
2   involved in the regulation of talc,
3   correct?
4           MR. HEGARTY:  Objection to
5       form.
6   BY MR. TISI:
7       Q.   Like the -- let me rephrase.
8       A.   So --
9       Q.   Go ahead.
10      A.   So yes, I did work for The
11  Weinberg Group on behalf of 2000 NTP
12  submission.
13      Q.   And we're going to go over
14  some of those things.  But I'm going to
15  go back to my question here.
16          You have had a relationship
17  either directly or indirectly with every
18  defendant who is sitting around this
19  table, correct?
20          MR. HUDSON:  Objection to
21      form.
22          THE WITNESS:  Well, I don't
23      know who is here.
24  BY MR. TISI:

Page 32

1      Q.   Okay.  Well, let me help
2   you.
3      A.   Okay.
4      Q.   Let me help you.  Johnson &
5   Johnson, you've had a relationship with
6   them?
7      A.   Yes, that's correct.
8      Q.   And your relationship with
9   them on the talc-related issues goes back
10  to the 1990s when you met -- when you met
11  under a contract with American Health
12  Foundation, correct?
13          MR. HEGARTY:  Objection to
14      form.
15          THE WITNESS:  I did meet
16      with them, that's correct.
17  BY MR. TISI:
18      Q.   All right.  And you worked
19  in consultation with Imerys, directly or
20  indirectly, through their lawyers in the
21  2000s which was Crowell & Moring,
22  correct?
23      A.   That's correct.
24      Q.   And you worked with the

Page 33

1   personal -- the PCPC, the trade
2   organization for talc, from the 2000 time
3   frame related to talc issues and ovarian
4   cancer through The Weinberg Group?
5           MR. HEGARTY:  Objection to
6       form.
7           THE WITNESS:  So I think at
8       that time that was the CTFA, is
9       that correct?
10  BY MR. TISI:
11      Q.   Correct.
12      A.   Okay.  So I never worked
13  with them.
14      Q.   Right, but you worked
15  indirectly with them through their --
16  through their consultants which was The
17  Weinberg Group, correct?
18          MR. HUDSON:  Objection to
19      form.
20          THE WITNESS:  So I worked
21      with The Weinberg Group, that's
22      correct.
23  BY MR. TISI:
24      Q.   And you know The Weinberg

9 (Pages 30 to 33)

Joshua E. Muscat, Ph.D.

Page 34

1 Group submitted your report to the
2 national toxicology program relating to
3 talc, correct?
4         MR. HUDSON:  Objection to
5    form.
6         THE WITNESS:  They submitted
7    my report to the NTP, that's
8    correct.
9 BY MR. TISI:
10    Q.   Correct.  Under the name
11 CTFA.
12    A.   So I think the CTFA as I
13 recall, they are the ones who submitted
14 my report to the NTP.
15    Q.   Correct.  And they are the
16 trade organization for the defendants who
17 are sitting around this table, Johnson &
18 Johnson and the mining company, who at
19 that time was Luzenac, correct?
20         MR. HEGARTY:  Objection.
21    Objection to form.
22         THE WITNESS:  So I don't
23    have any knowledge of that.
24 BY MR. TISI:

Page 35

1    Q.   You have no knowledge of
2 that, Doctor?
3    A.   No.
4    Q.   Okay.  We'll get into that
5 in a little bit.
6    A.   Okay.
7    Q.   Now, let's get to the point
8 of why we're here today.
9         You understand that we're
10 here to discuss your involvement in the
11 evolution, conduct, and interpretation of
12 epidemiology relating to the question of
13 whether or not talcum powder products
14 caused or contributed to the development
15 of ovarian cancer?
16         MR. HEGARTY:  Objection to
17    form.
18         THE WITNESS:  I'm sorry, can
19    you repeat that?
20 BY MR. TISI:
21    Q.   Yes.  Do you understand that
22 we are here to ask you questions about
23 your involvement in the evolution,
24 conduct, and interpretation of the

Page 36

1 epidemiology relating to the question of
2 whether or not talcum powder products
3 cause ovarian cancer?
4         MR. HUDSON:  And Dr. Muscat,
5    I'll instruct you not to answer if
6    your answer is derived from
7    discussions you've had with
8    counsel in this case.
9         If you otherwise know the
10    answer to the question, you are
11    free to respond.
12         THE WITNESS:  Okay.  I don't
13    know the questions that are
14    being -- so I didn't come here
15    with a prior knowledge that I was
16    going to answer those questions.
17    But I understand now.
18 BY MR. TISI:
19    Q.   Okay.  Do you know -- I'm
20 going to ask you about public statements
21 that you made and things that you wrote
22 in the literature relating to ovarian
23 cancer and talc.
24    A.   Okay.

Page 37

1    Q.   Okay.  And, in fact, over
2 the past 20 years or so, even more, you
3 have actually written on this topic,
4 correct?
5    A.   That's correct.
6    Q.   Okay.  And by talcum powder
7 products, let's be clear as to what we
8 are talking about.  We are talking about
9 products like Johnson's Baby Powder.
10    A.   Okay.
11    Q.   Okay.  And Shower to Shower.
12    A.   Mm-hmm.
13    Q.   Okay.  You know what those
14 products are, correct?
15    A.   I'm aware of them, yes.
16    Q.   Okay.  And before we get to
17 discussing your specific contributions to
18 the science related to the question of
19 whether or not talcum powder products
20 cause ovarian cancer, I want to ask you a
21 pretty -- a series of questions which I
22 think are pretty straightforward.  Okay.
23         Number one, whether or not
24 talcum powder products can cause or

10 (Pages 34 to 37)

Joshua E. Muscat, Ph.D.

Page 38

1  contribute to the development of ovarian
2  cancer is not a new question, is it?
3          MR. HEGARTY: Objection to
4      form.
5          THE WITNESS: Can you
6      specify, is not a new question?
7  BY MR. TISI:
8      Q.   It is a question that has
9  been studied since at least the 1970s and
10 '80s.
11         MR. HEGARTY: Objection to
12     form.
13         THE WITNESS: There have
14     been epidemiologic studies
15     starting since -- I can't remember
16     the exact date, but it has gone
17     back a couple decades.
18 BY MR. TISI:
19     Q.   Okay. Second, the question
20 has been debated amongst epidemiologists
21 for decades?
22         MR. HUDSON: Objection to
23     form.
24         THE WITNESS: Has it been

Page 39

1      debated among epidemiologists for
2      decades. You have to give me like
3      specific examples.
4  BY MR. TISI:
5      Q.   Do you know who Daniel
6  Cramer is?
7      A.   Yeah, I know who he is.
8      Q.   Okay. He's taken the
9  position that he -- that talcum powder
10 products are likely a carcinogen,
11 correct?
12         MR. HEGARTY: Objection to
13     form.
14         THE WITNESS: I haven't seen
15     him make that statement.
16 BY MR. TISI:
17     Q.   You know that's his view,
18 correct?
19         MR. HEGARTY: Same
20     objection.
21         THE WITNESS: I -- I have
22     not seen a publication where he's
23     made that statement.
24 BY MR. TISI:

Page 40

1      Q.   You know that that's his
2  view, correct?
3      A.   I don't know for certain,
4  okay. I know he's been in talc
5  litigation. I haven't listened to
6  anything he said. I don't -- I don't
7  remember. I assume that's his view.
8      Q.   Okay.
9      A.   Okay.
10     Q.   Okay. So my question is,
11 and I'm not trying to -- to dance around
12 here.
13     A.   Okay.
14     Q.   This has been an issue in
15 which people, epidemiologists, have
16 differed about the quality and quantity
17 of the evidence that support or doesn't
18 support that question, correct?
19         MR. HEGARTY: Objection to
20     form.
21         MR. HUDSON: Objection to
22     form.
23         THE WITNESS: There have
24     been some published meta-analyses

Page 41

1      on the topic throughout the years,
2      that's correct.
3  BY MR. TISI:
4      Q.   Okay. And some -- well,
5  that wasn't my question.
6      A.   Okay.
7      Q.   My question was, that --
8  that within the epidemiology community,
9  epidemiologists have -- differ as to the
10 quantity and quality of the evidence that
11 supports or disputes the question about
12 whether or not ovarian cancer can be
13 caused by talcum powder products?
14         MR. HUDSON: Objection to
15     form.
16         THE WITNESS: You are
17     talking about the epidemiology
18     community, would that be referring
19     to the IARC monograph?
20 BY MR. TISI:
21     Q.   For example. I'm talking
22 about just in general, there has been a
23 debate in the epidemiology community.
24         MR. HEGARTY: Objection to

11 (Pages 38 to 41)

Joshua E. Muscat, Ph.D.

Page 42

```
 1        form.
 2            THE WITNESS:  I can't really
 3        answer that.  It seems like a
 4        general question.
 5    BY MR. TISI:
 6        Q.   It is a general question.
 7        A.   Yeah.
 8        Q.   Who -- I'm not asking about
 9    who or what.  I'm asking has there been a
10    debate in the scientific community over
11    the past 20, 30 years about the quality
12    and quantity of evidence that supports or
13    does not support the issue of whether or
14    not talcum powder products are capable of
15    causing ovarian cancer?
16            MR. HUDSON:  Objection to
17        form.
18            THE WITNESS:  There have
19        been a number of studies that have
20        been done.  And so in each of
21        those studies, the authors of
22        those studies have kind of
23        evaluated their own conclusions
24        and discussed them.
```

Page 43

```
 1            They may have discussed them
 2        with respect to how their findings
 3        differ or are the same from
 4        previous studies.  So that's
 5        just -- that's just common.  You
 6        always do that in science.  You
 7        discuss your findings in
 8        relationship to other findings.  I
 9        wouldn't necessarily call it a
10        debate.  I would call it a -- an
11        evaluation of the data.
12    BY MR. TISI:
13        Q.   Okay.  And you don't think
14    that there have been -- okay.  We'll keep
15    moving.
16            Third, have you been part of
17    that debate over the past 20, 30 years?
18            MR. SILVER:  Objection to
19        form.
20            THE WITNESS:  So I have -- I
21        have not been in a debate
22        process --
23    BY MR. TISI:
24        Q.   I'm not asking about a
```

Page 44

```
 1    debate process.
 2        A.   Okay.
 3        Q.   I'm talking about in a
 4    general sense, Doctor.
 5        A.   Okay.  I've written my --
 6        Q.   Let me just stop the
 7    question.
 8        A.   Okay.
 9        Q.   I'm not going to play word
10    games with you, okay?
11        A.   Yes, okay.
12        Q.   You understand that the
13    scientific -- when we talk about
14    scientific debate.  I'm not talking about
15    two people standing at a lectern debating
16    like we see in the presidential primary.
17        A.   Okay.
18        Q.   Okay.  I'm talking about,
19    the scientific community oftentimes
20    debates questions, correct?
21            MR. HEGARTY:  Objection to
22        form.
23            THE WITNESS:  Yes.
24    BY MR. TISI:
```

Page 45

```
 1        Q.   And they do it in several
 2    ways.  They do it through published
 3    literature, correct?
 4        A.   Yes.
 5        Q.   They do it at meetings,
 6    correct?
 7        A.   Yes.
 8        Q.   Sometimes they do it at
 9    formal meetings like IARC, for example?
10        A.   That's correct.
11        Q.   All right.  Okay.  So with
12    that in mind, does -- have you been part
13    of the general debate about whether or
14    not talcum powder products cause ovarian
15    cancer?
16            MR. HUDSON:  Objection to
17        form.
18            MR. HEGARTY:  Objection to
19        form.
20            MR. SILVER:  Objection to
21        form, asked and answered.
22            THE WITNESS:  I have written
23        on the topic, okay.  I wouldn't
24        say I've been part of a debate.
```

12 (Pages 42 to 45)

Joshua E. Muscat, Ph.D.

Page 46

1    I've never debated anyone.  I know
2    you don't want to use that term.
3    But I have written on it,
4    that's -- that's correct.  I've
5    expressed my views on it.
6  BY MR. TISI:
7        Q.   Okay.  Fourth, have you been
8    paid by the defendants and their lawyers
9    directly and indirectly to write medical
10   articles and do epidemiology studies?
11       MR. HEGARTY:  Objection to
12   form.
13       MR. SILVER:  Objection to
14   form.
15       THE WITNESS:  No.
16  BY MR. TISI:
17       Q.   You have not had any of your
18   published literature supported by any of
19   the defendants around this table?
20       MR. HEGARTY:  Objection to
21   form.
22       THE WITNESS:  That's
23   correct.
24  BY MR. TISI:

Page 47

1        Q.   Okay.  And I said directly
2    and indirectly.
3        A.   Yes.
4        Q.   And you and your colleagues,
5    you and your colleagues have not received
6    any money whatsoever for the publication
7    for example, of your meta-analysis on
8    diaphragms?
9        MR. HEGARTY:  Objection to
10   form.
11       MR. HUDSON:  Objection to
12   form.
13       THE WITNESS:  So there's two
14   questions.  Me myself or me and my
15   colleagues?
16  BY MR. TISI:
17       Q.   I'm asking you whether or
18   not you received money as from the
19   defendants, directly or indirectly, with
20   respect to your research or publications
21   on talcum powder products and ovarian
22   cancer.
23       MR. SILVER:  Objection.
24       MR. HEGARTY:  Asked and

Page 48

1    answered.
2        MR. SILVER:  You are asking
3    three different questions.
4        THE WITNESS:  So the answer
5    is no.
6  BY MR. TISI:
7        Q.   Okay.  Have the defendants
8    in this case -- let's take them one at a
9    time.
10       Has Johnson & Johnson been
11   given the opportunity to look at your
12   articles and edit them or make comments
13   to them before they were published?
14       MR. HEGARTY:  Objection to
15   form.
16  BY MR. TISI:
17       Q.   Any of your articles on
18   talc?
19       A.   No.
20       Q.   Never?
21       A.   Well, which articles are you
22   talking about?
23       Q.   I said any.  Any of your
24   articles on talc.  Have -- has Johnson &

Page 49

1    Johnson been given the opportunity,
2    either informally or pursuant to any
3    contracts, to review your article or
4    articles before they were published?
5        MR. HEGARTY:  Objection to
6    form, asked and answered.
7        THE WITNESS:  For my
8    published articles, no.
9  BY MR. TISI:
10       Q.   Okay.  How about Imerys,
11   directly or indirectly, were they able to
12   look at your medical articles and comment
13   on them before they were published?
14       MR. SILVER:  Objection to
15   form.
16       THE WITNESS:  For my
17   published articles, no.
18  BY MR. TISI:
19       Q.   Okay.  Never?
20       A.   Never.
21       Q.   Not -- their lawyers never
22   had an opportunity to redline any of your
23   articles?
24       A.   My published articles?  No.

13  (Pages 46 to 49)

Joshua E. Muscat, Ph.D.

Page 50

```
1        Q.   Okay.  What about PCPC, did
2   they ever have an opportunity, before any
3   of your articles were published, to edit
4   them?
5        A.   None of my published
6   articles in peer-reviewed journals have
7   been edited by anybody.
8        Q.   Okay.  What about -- now
9   you've done some reports, right, for the
10  FDA for example, and you mentioned the
11  National Toxicology Program.  You issued
12  reports for those organizations, correct?
13       MR. HEGARTY:  Objection to
14       form.
15       THE WITNESS:  I did a report
16       for The Weinberg Group that was
17       submitted to the NTP.
18  BY MR. TISI:
19       Q.   And you also participated in
20  drafting a response to comments for a
21  Citizen's Petition to get a warning put
22  on talc that talcum powder products may
23  cause ovarian cancer, do you remember
24  that?
```

Page 51

```
1        A.   That's correct.
2        Q.   Okay.  And so you wrote a
3   report on that with Dr. Huncharek,
4   correct?
5        A.   A report was written, right.
6        Q.   Right.  Well, a report was
7   written.  You wrote it, right?
8        A.   I actually didn't write the
9   report.
10       Q.   Did you sign your name to
11  the report?
12       A.   I did.
13       Q.   Okay.  Did you -- was that
14  report edited at all, were either of
15  those reports given to the defendants to
16  edit or review before it was submitted to
17  either the NTP or the FDA?
18       MR. HUDSON:  Objection to
19       form.
20       MR. HEGARTY:  Objection to
21       form.
22       THE WITNESS:  Was the
23       report, the FDA, the Citizen's
24       Petition report edited?
```

Page 52

```
1        It might have been, but
2   you'd have to ask Dr. Huncharek
3   that because I have no knowledge
4   of it.
5   BY MR. TISI:
6        Q.   Well, let me ask you.  Do
7   you know -- when was the last time you
8   spoke to Dr. Huncharek?
9        A.   A couple months ago.
10       Q.   Do you know where he is?
11       A.   He lives in South Carolina.
12       Q.   Okay.  We'll talk about this
13  in a moment.  But you know that he's been
14  a fugitive from -- that -- that law
15  enforcement has been looking for
16  Dr. Huncharek?
17       MR. HEGARTY:  Objection to
18       form.
19       THE WITNESS:  I have no
20       knowledge of that.
21  BY MR. TISI:
22       Q.   You don't know that at all?
23       A.   No.
24       Q.   Do you know that he claims
```

Page 53

```
1   that all his documents related to the
2   publications of your -- and the
3   Meta-Analysis Research Group which is the
4   organization that sponsored some of the
5   publications, have burned to the ground?
6        MR. HEGARTY:  Objection to
7        form.
8        MR. HUDSON:  Objection to
9        form.
10       THE WITNESS:  I'm not
11       familiar with that.
12  BY MR. TISI:
13       Q.   Do you know a Dr. Geschwind?
14       A.   That name sounds -- what's
15  the first name?
16       Q.   I don't know the name.  But
17  you published articles with a
18  Dr. Geschwind, correct, out of Johns
19  Hopkins?
20       A.   Dr. Geschwind.  I'd have to
21  see it.  I don't recall.
22       Q.   Do you know -- do you know
23  the 2003 meta-analysis from -- that
24  Dr. Huncharek published on ovarian cancer
```

14 (Pages 50 to 53)

Joshua E. Muscat, Ph.D.

Page 54

1  and talc?
2      A.  I am familiar with that,
3  yes.
4      Q.  Dr. Geschwind was a
5  co-author of that.  Have you heard that
6  Dr. Geschwind is in jail because, because
7  he stole about $500,000 from Johns
8  Hopkins University?  Have you ever heard
9  of that?
10         MR. HEGARTY:  Objection to
11      form.
12         THE WITNESS:  No, not
13      really.
14  BY MR. TISI:
15      Q.   The reports that were
16  submitted to regulators like the NTP and
17  the FDA with your name on it, they were
18  paid for by the defendants, were they
19  not?
20         MR. HEGARTY:  Objection.
21         MR. HUDSON:  Objection to
22      form.
23         THE WITNESS:  I'm sorry, can
24      you repeat that, please?

Page 55

1  BY MR. TISI:
2      Q.  Yeah.  I'm going to talk
3  about this in more detail in a moment.
4      A.  Yeah.
5      Q.   Number one, the report that
6  you submitted in 2000 to the NTP through
7  The Weinberg Group.
8      A.  Yes.
9      Q.  Was that -- do you know
10  whether that was paid for by the
11  defendants in this case?
12      A.  It was paid for by The
13  Weinberg Group.
14      Q.  Okay.  And you don't -- you
15  don't have any understanding that the --
16  you know, The Weinberg Group was hired by
17  the CTFA, the Cosmetic Toiletry and
18  Fragrance Association that represents
19  talc -- cosmetic talc manufacturers?
20      A.  Yes.
21         MR. HUDSON:  Objection to
22      form.
23  BY MR. TISI:
24      Q.  So you know that you were

Page 56

1  hired by the industry, in fact, to write
2  that report, correct?
3         MR. HUDSON:  Objection to
4      form.
5         MR. HEGARTY:  Objection to
6      form.
7         THE WITNESS:  No.  The only
8      thing I know is that I was hired
9      by The Weinberg Group.  That's
10      what I knew.
11  BY MR. TISI:
12      Q.  Okay.  That's what you knew?
13      A.  Right.
14      Q.  You know differently now,
15  right?
16         MR. HEGARTY:  Objection to
17      form.
18  BY MR. TISI:
19      Q.  You know you were hired by
20  the industry to file a report by the --
21  to the NTP, correct?
22         MR. HEGARTY:  Objection to
23      form.
24         THE WITNESS:  I don't know

Page 57

1      that for certain.  It's not
2      something that I've thought about.
3      I was hired by The Weinberg Group.
4  BY MR. TISI:
5      Q.  Oh.  You never thought about
6  it.  Doctor, you were named as an expert
7  in litigation and you don't know what
8  your involvement was with the NTP?
9         MR. HUDSON:  Objection to
10      form.
11         MR. HEGARTY:  Objection to
12      form.
13         THE WITNESS:  I can only
14      tell you what happened.  I was
15      hired by The Weinberg Group to
16      submit a document to the NTP.
17      That's what I did.
18  BY MR. TISI:
19      Q.  Okay.  Now, throughout the
20  decades you have been writing on the
21  subject of talc and ovarian cancer.  You
22  have taken a fairly consistent position,
23  as far as I can tell, that while there is
24  evidence of an epidemiologic association

15  (Pages 54 to 57)

Joshua E. Muscat, Ph.D.

Page 58

1  seen in some studies, you do not believe
2  that that evidence supports a causal
3  inference.
4       A.   That's correct.
5            MR. HEGARTY:  Objection to
6  form.
7  BY MR. TISI:
8       Q.   Have you and I ever met, by
9  the way?
10      A.   No.
11      Q.   Okay.  You are represented
12  by a lawyer today, Mr. Hudson?
13      A.   That's correct.
14      Q.   Okay.  And he's your lawyer
15  for this deposition, right?
16      A.   That's correct.
17      Q.   Okay.  But when is the first
18  time you and Mr. Hudson actually met or
19  spoke on the phone?
20      A.   It was in the early August.
21  I'm sorry, first time we met was early
22  August.  I'd spoken with him back in
23  November.
24      Q.   Right.  Are you paying for

Page 59

1  Mr. Hudson's time?
2       A.   No.
3       Q.   Do you know who is?
4       A.   Johnson & Johnson.
5       Q.   And, in fact, sitting next
6  to Johnson & Johnson is Mr. Hegarty?
7       A.   That's correct.
8       Q.   And Mr. --
9            MR. HEGARTY:  Mr. Hudson.
10  BY MR. TISI:
11      Q.   Before this past year, you
12  had met Mr. Hegarty on numerous
13  occasions, correct?
14      A.   That's correct.
15      Q.   Okay.  And you know his
16  colleague Ms. Frazier?
17      A.   Yes.
18      Q.   And you met with Ms. Frazier
19  on numerous occasions going back years,
20  correct?
21            MR. HEGARTY:  Objection to
22  form.
23            THE WITNESS:  I have met her
24  several times.

Page 60

1  BY MR. TISI:
2       Q.   And you have spoken with her
3  on the phone, correct?
4       A.   Yes.
5       Q.   Okay.  Going back 10,
6  15 years, correct?
7            MR. HEGARTY:  Objection to
8  form.
9            THE WITNESS:  Not that long
10  ago.
11  BY MR. TISI:
12      Q.   Not that long ago.
13      A.   2000 -- I think it was 2010.
14      Q.   Okay.  We'll talk about that
15  in relationship to the entries on your
16  privilege log that we just talked about.
17           Before 2018, you were
18  represented by the lawyers, by the
19  Johnson & Johnson lawyers in litigation
20  involving women like my clients who claim
21  that talc caused or contributed to their
22  ovarian cancer, correct?
23            MR. HUDSON:  Objection to
24  form.

Page 61

1            THE WITNESS:  I don't know
2  who your clients are.
3  BY MR. TISI:
4       Q.   Okay.  And when I say the
5  word talc, I just want to be clear.  For
6  the purpose of this deposition, I'm
7  talking about talcum powder products.
8  Okay.  Things like Johnson & Johnson Baby
9  Powder.  Okay?
10      A.   Mm-hmm.
11      Q.   I'm not talking about pure
12  granular talc.
13      A.   Okay.
14      Q.   Okay.  I'm talking about
15  what comes in the bottle that you can
16  walk into Walmart and pick off the
17  shelves, okay?
18      A.   Yes.
19      Q.   So unless I say otherwise,
20  if I use the word talc, I mean talcum
21  powder products, cosmetic talc.
22      A.   Okay.  Okay.
23      Q.   Okay.  Now, in those other
24  cases, you were put out as an expert

16 (Pages 58 to 61)

Joshua E. Muscat, Ph.D.

Page 62

1    hired by Johnson & Johnson, correct?
2            MR. HEGARTY:  Objection to
3    form.
4            THE WITNESS:  I'm sorry,
5    which cases?
6    BY MR. TISI:
7        Q.   Any prior cases that you
8    were involved with.  You were an expert
9    for Johnson & Johnson?
10       A.   On talc product cases.
11           MR. HEGARTY:  Objection.
12           THE WITNESS:  Yes.
13           MR. SILVER:  Chris, can we
14   take a -- stop for a second.
15           THE VIDEOGRAPHER:  Going off
16   the record, 10:17 a.m.
17           (Short break.)
18           THE VIDEOGRAPHER:  We are
19   back on record.  The time is
20   10:22 a.m.
21   BY MR. TISI:
22       Q.   So we're talking about your
23   relationship with Shook Hardy & Bacon.
24   Mr. Hegarty, some of his colleagues

Page 63

1    including Ms. Frazier.
2            For the past 20 years or
3    more have you been communicating with
4    Shook Hardy & Bacon about issues relating
5    to litigation involving talc?
6            MR. HEGARTY:  Objection to
7    form.
8            THE WITNESS:  20 years, no.
9    It's been about eight years.
10   BY MR. TISI:
11       Q.   Okay.  Eight years from --
12   that would have been 2010?
13       A.   Sounds about right.
14       Q.   And so any documents that
15   would be listed on your privilege log as
16   being related to Shook Hardy & Bacon
17   before 2010 would not be in any way
18   involved in litigation?
19           MR. HEGARTY:  Objection to
20   form.
21           MR. HUDSON:  Objection to
22   form.
23           And, Dr. Muscat, I'm going
24   to instruct you not to answer if

Page 64

1    the answer would be derived from
2    information that you learned from
3    counsel.
4            MR. TISI:  No, counsel.
5    He's entitled to answer what his
6    understanding is.  He's not
7    allowed to reveal your -- your
8    direct communications.
9    BY MR. TISI:
10       Q.   Do you understand, if you're
11   testifying here today, that your
12   relationship with Shook Hardy & Bacon
13   didn't start on litigation issues
14   after -- until after 2010, any document
15   that would be listed on your privilege
16   log as listing Shook Hardy & Bacon prior
17   to 2010 would not be involved in
18   litigation, correct?
19           MR. SILVER:  Objection to
20   form.
21           MR. HUDSON:  Objection to
22   form and the same instruction,
23   Dr. Muscat.
24           THE WITNESS:  I turned over

Page 65

1    whatever documents were asked of
2    me.
3    BY MR. TISI:
4        Q.   Well, for example, if you
5    look at the very first -- look at the
6    very first entry on this sheet here, it
7    lists Shook Hardy & Bacon, 1982,
8    materials provided by outside counsel in
9    connection with ongoing litigation.  Were
10   you working on litigation with Shook
11   Hardy & Bacon in 1982?
12       A.   No.
13       Q.   So that would be wrong,
14   correct?
15           MR. HUDSON:  Objection,
16   form.
17           MR. HEGARTY:  Objection,
18   counsel.  You know that that is
19   not referring to communication --
20   direct communication with Shook
21   Hardy & Bacon by the way that the
22   privileged is described.
23           MR. TISI:  Author from
24   materials provided by outside

17 (Pages 62 to 65)

Joshua E. Muscat, Ph.D.

Page 66

```
1    counsel in connection with ongoing
2    litigation.
3         MR. HEGARTY:  Right.
4    Materials provided by outside
5    counsel in connection with ongoing
6    litigation dated in 1982.
7         MR. TISI:  Correct.
8         MR. HUDSON:  Right.
9         MR. HEGARTY:  So it doesn't
10   mean that the communication was
11   back in 1982.
12        MR. TISI:  You mean to tell
13   me the dates here do not reflect
14   the dates of the communication?
15        MR. HEGARTY:  I didn't
16   prepare the privilege log.  But as
17   I read this, the description is
18   referring to the document itself.
19        MR. TISI:  And the date of
20   the document would be August of
21   1982.
22        MR. HEGARTY:  Would be the
23   date of the material that was
24   provided by outside counsel in
```

Page 67

```
1    connection with ongoing
2    litigation.
3         MR. TISI:  The date of the
4    document.
5         MR. HEGARTY:  Correct.
6         MR. TISI:  Right.
7    BY MR. TISI:
8         Q.   So did you receive documents
9    in contact, in 1982 on ongoing
10   litigation?
11        MR. HEGARTY:  Recognizing
12   that you can get documents back in
13   1982 in 2018.
14        MR. TISI:  That's not --
15   that's not what this column is
16   for.
17        MR. HEGARTY:  Well, I
18   disagree.
19        MR. TISI:  The column is
20   for -- is for -- okay.
21        MR. HEGARTY:  I also think
22   it's improper to ask Dr. Muscat to
23   answer legal questions.
24   BY MR. TISI:
```

Page 68

```
1         Q.   Okay.  My question is, did
2    you have -- if this column is correct,
3    that is a 1982 document, correct?
4         MR. HEGARTY:  Objection to
5    form.
6         THE WITNESS:  I didn't
7    prepare this so I can't -- but if
8    you ask me a more general
9    question, then --
10   BY MR. TISI:
11        Q.   The more general question
12   is, did you receive documents from Shook
13   Hardy & Bacon prior to 19 -- prior to
14   2010?
15        MR. HUDSON:  Objection to
16   form.
17        MR. HEGARTY:  Objection to
18   form.
19   BY MR. TISI:
20        Q.   Any documents at all?
21        A.   Not to my knowledge.
22        Q.   Did you communicate with
23   Shook Hardy & Bacon prior to 2010?
24        A.   Not to my knowledge.
```

Page 69

```
1         Q.   And if these documents on
2    the privilege log are before 2010, they
3    would have been before that relationship,
4    correct?
5         MR. HEGARTY:  Objection to
6    form.
7         MR. HUDSON:  Objection to
8    form.
9         THE WITNESS:  I assume so.
10   BY MR. TISI:
11        Q.   I'd like to show you your
12   CV.  I put it up on the screen.  But I
13   also gave you a copy.
14        Now, the data that we've
15   been provided for this document,
16   Exhibit 1, indicates that it was updated
17   in July of 2018.  The metadata that was
18   provided to us.
19        A.   Okay.
20        Q.   Did you update this CV in
21   2018?
22        A.   So this might have been
23   updated.  I update my CV regularly.
24        Q.   Okay.  When you update your
```

18 (Pages 66 to 69)

Joshua E. Muscat, Ph.D.

Page 70

1  CV, do you sometimes exclude things that
2  had previously been there?
3      A.   It depends on the nature of
4  the CV.
5          You know, the -- when
6  someone asks for a CV, it could come in
7  different formats.  So actually you do
8  include and exclude things.  It depends
9  on what people are asking for.
10     Q.   Okay.  So do you have
11 different CVs that you use for different
12 purposes?
13     A.   Yes.
14     Q.   Do you have CVs that you use
15 in connection with your consulting as an
16 expert or consultant on issues related to
17 epidemiology?
18         MR. HEGARTY:  Objection to
19     form.
20         THE WITNESS:  I usually use
21     my academic CV.  That's the CV
22     that I normally use for -- not all
23     the time, but if it's outside of
24     an academic purpose, I'll often

Page 71

1      use the academic CV.
2  BY MR. TISI:
3      Q.   Well, what other kinds of
4  CVs do you have, Doctor?
5      A.   So, it's -- well, even -- if
6  you really want to hear it.  I mean even
7  the academic CV is, it's something that
8  changes constantly.  And there are
9  reasons for that.
10         Do you want to hear it?
11     Q.   Well, what I really want to
12 know actually is -- I kind of do.  But
13 let me just get to the question.
14     A.   Okay.
15     Q.   I've got a lot of ground to
16 cover.
17     A.   Okay.
18     Q.   Are there categories of
19 information that you include in your --
20 in CVs that you use for some purposes
21 that are not in CVs that you use for
22 other purposes?
23         MR. HUDSON:  Objection to
24     form.

Page 72

1          THE WITNESS:  For me
2      personally, it's almost hard to
3      answer that question.  The CVs are
4      updated regularly.  So every time
5      you get a paper published, you
6      update that.
7          So just that in terms alone,
8      the publication list tends to
9      change.
10 BY MR. TISI:
11     Q.   That's not my question.
12     A.   Okay.
13     Q.   I understand that as time
14 goes on you may add.
15     A.   Right.
16     Q.   Right.  My question is, do
17 you have CVs that you use for different
18 purposes, and a CV, for the record, is
19 basically your professional resumé,
20 correct?
21     A.   Mm-hmm.  Mm-hmm.
22     Q.   Right?  And you might have a
23 CV that you use for obtaining a grant.  A
24 CV that you use for consulting with

Page 73

1  defendants as an expert.  A CV you may
2  use for a different purposes.
3          Okay.  Do you have CVs that
4  you use for different purposes?
5          MR. HEGARTY:  Objection to
6      form.
7          THE WITNESS:  So, yes.
8  BY MR. TISI:
9      Q.   Okay.  And so the CVs that
10 you use for consulting, does it contain
11 categories of information that are not
12 contained on the academic CV that you
13 provided to us?
14     A.   I have not been asked for a
15 consulting CV in a long time.
16     Q.   Okay.  I didn't ask that
17 question.
18     A.   Yes.
19     Q.   Okay?  You're going to have
20 to listen to my questions, okay, or else
21 we're never going to get done here.
22         My question is, are they
23 categories of information that you use on
24 your consulting CVs that do not appear on

19 (Pages 70 to 73)

Joshua E. Muscat, Ph.D.

Page 74

1  your academic CVs, like what we've had
2  marked here as Exhibit Number 1?
3       A.   Categories of information
4  that are on my consulting.  No, I don't
5  think so.
6       Q.   Okay.  So you don't include
7  for example, a section on other companies
8  that you may have worked for, or
9  consulting that you have done?
10      A.   If you're asking me whether
11 I put down my work with Shook Hardy &
12 Bacon, if that's on my CV?
13      Q.   I didn't ask you that.
14      A.   Okay.
15      Q.   Okay.  You're going to have
16 to listen to my questions.
17      A.   You said other categories.
18      Q.   Are there categories for
19 example, of consulting for example, where
20 you list consulting activities?
21      A.   Generally not.
22      Q.   Okay.
23      A.   Okay.
24      Q.   And have -- do you have a CV

Page 75

1  that actually lists your consulting
2  activities that is not Exhibit Number 1?
3       A.   A CV that lists my
4  consulting activities.  No.
5       Q.   I'm going to show you
6  Exhibit Number 4.
7            (Document marked for
8            identification as Exhibit
9            Muscat-4.)
10 BY MR. TISI:
11      Q.   Which is a CV that I pulled
12 from your work with Johnson & Johnson
13 from -- actually from Imerys, in 2005.
14 And you'll see, if you go down, it has a
15 section entitled Consulting Activities.
16           Do you see that?
17      A.   I do see that.
18      Q.   Okay.  That is your CV from
19 2005, correct?
20      A.   Yes.
21      Q.   This is a category that is
22 not listed on your academic CV that you
23 provided to us in 2018, is that right?
24      A.   That's correct.

Page 76

1       Q.   Okay.  And so I asked you
2  whether or not you have different CVs
3  that you use for different purposes that
4  have different categories.  This might be
5  one kind of category that you include in
6  your nonacademic CV, correct?
7            MR. HUDSON:  Objection to
8       form.
9            THE WITNESS:  The -- that's
10      what I listed back in 2005, that's
11      correct.
12 BY MR. TISI:
13      Q.   Right.  All right.  And so
14 at that time, you listed The Weinberg
15 Group, correct?
16      A.   That's correct.
17      Q.   And Crowell & Moring,
18 correct?
19      A.   That's correct.
20      Q.   Okay.  Weinberg Group we
21 know was hired by the PCPC, correct?
22      A.   That's correct.
23           MR. LOCKE:  Objection to
24      form.

Page 77

1  BY MR. TISI:
2       Q.   And that refers -- sorry.
3  And that refers to your work on behalf of
4  the -- providing a report to the National
5  Toxicology Program or NTP, on talc?
6            MR. HUDSON:  Objection to
7       form.
8            THE WITNESS:  That's
9       correct.
10 BY MR. TISI:
11      Q.   And Crowell & Moring is the
12 law firm for Imerys, correct?
13      A.   I don't know whether they're
14 still the law firm for Imerys or not.
15 They were in the past.
16      Q.   I'm sorry?
17      A.   I said I still don't know --
18 I don't know as of the moment.
19      Q.   You don't know whether or
20 not Crowell & Moring was the law firm --
21      A.   At the moment.  For Imerys.
22      Q.   I didn't ask you at the
23 moment.
24      A.   Okay.

20  (Pages 74 to 77)

Joshua E. Muscat, Ph.D.

| Page 78 | Page 80 |
|---|---|
| 1   Q.  I asked you -- | 1       form. |
| 2   A.  Okay. | 2           THE WITNESS:  I'd have to go |
| 3   Q.  -- you know Crowell & Moring | 3       through the whole thing and |
| 4   is a law firm that represented Imerys on | 4       compare them. |
| 5   talc-related issues. | 5   BY MR. TISI: |
| 6           MR. HEGARTY:  Objection to | 6       Q.  I'm not asking you to |
| 7       form. | 7   compare them.  Just since 2005, have you |
| 8           THE WITNESS:  That's | 8   done -- we know you've done expert work |
| 9       correct. | 9   for litigation, for Shook Hardy & Bacon, |
| 10  BY MR. TISI: | 10  representing them in talc suits, correct? |
| 11      Q.  And you did consulting | 11          MR. HEGARTY:  Objection to |
| 12  activities for them in 2005. | 12      form. |
| 13          MR. HUDSON:  Objection to | 13          MR. HUDSON:  Objection to |
| 14      form. | 14      form. |
| 15          THE WITNESS:  Okay. | 15          THE WITNESS:  I've worked |
| 16  BY MR. TISI: | 16      with Shook Hardy & Bacon, that's |
| 17      Q.  Is that true? | 17      correct. |
| 18          MR. HEGARTY:  Objection to | 18  BY MR. TISI: |
| 19      form. | 19      Q.  Other than that, have you |
| 20          THE WITNESS:  I met with | 20  had other consulting with the defendants |
| 21      Crowell & Moring, that's correct. | 21  in this case on talc-related issues? |
| 22  BY MR. TISI: | 22      A.  So, yes.  There was a |
| 23      Q.  I didn't ask you that.  I | 23  meeting I went to at Johnson & Johnson |
| 24  asked you whether you did -- you and I | 24  for the Citizen's Petition, that's |

| Page 79 | Page 81 |
|---|---|
| 1   met each other, correct? | 1   correct. |
| 2       A.  Yes. | 2       Q.  And you met with them to |
| 3       Q.  Okay.  We are not -- you are | 3   propose additional studies with |
| 4   not my consultant, are you? | 4   Dr. Huncharek? |
| 5       A.  No. | 5       A.  That's correct. |
| 6       Q.  Okay.  One of your | 6       Q.  And you had phone calls with |
| 7   consulting activities were for the | 7   them, correct? |
| 8   lawyers of -- for Imerys, correct? | 8           MR. HEGARTY:  Objection to |
| 9           MR. HEGARTY:  Objection to | 9       form. |
| 10      form. | 10          THE WITNESS:  There may have |
| 11          THE WITNESS:  Correct. | 11      been a phone call.  I don't |
| 12  BY MR. TISI: | 12      recall. |
| 13      Q.  Doctor, I didn't think I was | 13  BY MR. TISI: |
| 14  going to have to fight you on this.  It's | 14      Q.  Do you know who Ridge Hall |
| 15  on your CV, correct? | 15  is? |
| 16      A.  Yes.  Yes, that's correct. | 16      A.  Yes. |
| 17      Q.  But it's not on your current | 17      Q.  Who is he? |
| 18  CV? | 18      A.  He is with Crowell & Moring, |
| 19      A.  That's correct. | 19  he is an attorney. |
| 20      Q.  Are there any other | 20      Q.  Right.  And you met with -- |
| 21  consulting activities from 2005 that are | 21  you met with -- you spoke with him, met |
| 22  not listed on your academic CV that | 22  with him, communicated with him over the |
| 23  you've done for the talc industry? | 23  years, correct? |
| 24          MR. HEGARTY:  Objection to | 24          MR. HEGARTY:  Objection to |

21 (Pages 78 to 81)

Joshua E. Muscat, Ph.D.

Page 82

1    form.
2         THE WITNESS:  No.
3    BY MR. TISI:
4         Q.   On talc-related issues?  No?
5         A.   No.
6         Q.   Do you know how many
7    documents on your privilege log relate to
8    Mr. Hall?
9         A.   No.
10        Q.   All right.  Doctor, let's
11   get started here, and talk about some of
12   the issues I'd like to discuss with you
13   over the rest of the day today.
14        I've put together -- just so
15   you understand where I'm going to be
16   going.  Okay.  And actually, I'm going to
17   spend some time with you on four
18   different areas.  Okay.
19        The first one I'm going to
20   talk to you about your publications on
21   talc.  Okay.  And you can look at it
22   right up there.
23        And the timelines of those
24   publications.  And your relationship with

Page 83

1    the defendants, correct?
2         MR. HEGARTY:  Objection to
3    form.
4    BY MR. TISI:
5         Q.   Okay?
6         A.   Okay.
7         Q.   The second, I'm going to
8    talk to you about talc industry funding
9    of Muscat studies and regulatory reports.
10        A.   Okay.
11        MR. HEGARTY:  Objection to
12   form.
13   BY MR. TISI:
14        Q.   And you've just testified
15   before, and I want to make absolutely
16   clear, that it is your view that not a
17   single one of your published articles was
18   paid for directly or indirectly by any of
19   the defendants in this case?
20        MR. HEGARTY:  Objection to
21   form.
22        MR. HUDSON:  Objection to
23   form.
24        MR. HEGARTY:  Asked and

Page 84

1    answered.
2         THE WITNESS:  My published
3    articles, yes.
4    BY MR. TISI:
5         Q.   Okay.  Okay.  I'm going to
6    spend a brief amount of time talking
7    about scientific principles that you have
8    actually written, to see if we can agree
9    on them.  Okay?
10        MR. HEGARTY:  Objection to
11   form.
12   BY MR. TISI:
13        Q.   Okay?
14        A.   Yes.
15        Q.   And then I want to talk
16   about the reliability of the data and the
17   methods used in your literature.
18        A.   Okay.
19        Q.   Okay.  On talcum powder
20   products and ovarian cancer.  And that
21   last part I'm going to talk to you about
22   very specific pieces of data and -- and
23   your methods.  Okay?
24        A.   Okay.

Page 85

1         Q.   All right?
2         A.   Yes, mm-hmm.
3         Q.   And let me ask you this.  In
4    any article that you've ever written,
5    when you sign your name to an article,
6    you make sure that the information that
7    is in that article is correct, accurate,
8    and reflects your understanding of what
9    the data means, correct?
10        MR. HEGARTY:  Objection to
11   form.
12        THE WITNESS:  So, when I
13   sign an article, I sign it for the
14   purposes of -- I sign off on it,
15   that's correct, so...
16   BY MR. TISI:
17        Q.   Okay.  I didn't -- I don't
18   even know what that means.
19        My question is, when you
20   sign your name to an article, do you, in
21   effect, certify to the scientific and
22   medical community to the accuracy,
23   integrity of the data, and the opinions
24   and conclusions expressed in those

22 (Pages 82 to 85)

Joshua E. Muscat, Ph.D.

Page 86

1    articles?
2             MR. HEGARTY:  Objection to
3    form.
4             MR. HUDSON:  Objection to
5    form.
6             THE WITNESS:  Okay.  So
7    it -- it depends a little bit on
8    where you are in the article.  So
9    when I sign the article I'm
10   signing my name to it, that to the
11   best of my knowledge, that the
12   data is accurate.
13   BY MR. TISI:
14        Q.   Okay.  And the data and the
15   conclusions and the methods are -- are
16   yours, correct?
17        A.   If I'm the first author.
18        Q.   Okay.  But even if you're
19   second, third or last author, you are
20   signing on to the integrity of that
21   article, correct?
22        A.   That's correct.
23        Q.   Okay.  And when you list the
24   authors on the front of an article, you

Page 87

1    list the people who had primary
2    responsibility for the research of that
3    article, and the writing of that article,
4    correct?
5             MR. HEGARTY:  Objection to
6    form.
7             THE WITNESS:  The -- I mean,
8    people have different roles in the
9    production of the article.  So it
10   could either be the writing or the
11   data analysis or the obtaining of
12   the funding.  So there's
13   different -- different roles that
14   different authors play.
15   BY MR. TISI:
16        Q.   Right.  But the authors, all
17   the people who had substantive
18   involvement in the article are supposed
19   to be listed in the byline of the article
20   as authors, correct?
21             MR. HUDSON:  Objection to
22   form.
23             THE WITNESS:  Anyone who
24   makes a meaningful contribution to

Page 88

1         the paper is an author.
2    BY MR. TISI:
3         Q.   In fact, when you sign --
4    you have to actually, when you submit an
5    article for peer review, you have to
6    actually sign and verify to the
7    publication that the work is, A, yours,
8    correct?
9             Yes?
10        A.   That's correct, yes.
11        Q.   You have to identify anybody
12   else who may have contributed
13   substantively to the -- to the article,
14   correct?
15        A.   That's correct.
16        Q.   You have to identify the
17   source of funding, correct?
18        A.   That's correct.
19        Q.   You have to identify any
20   potential conflicts of interest, correct?
21        A.   Yes.
22        Q.   Because all of those things
23   can impact on whether or not a journal
24   even publishes the article in the first

Page 89

1    place, correct?
2             MR. HEGARTY:  Objection to
3    form.
4             THE WITNESS:  Yes.
5    BY MR. TISI:
6         Q.   Okay.  And it also impacts
7    on anybody, if the article is published,
8    the credibility in which the reader could
9    attribute to the article, correct?
10            MR. HUDSON:  Objection to
11   form.
12            THE WITNESS:  I'm sorry, can
13   you repeat that?
14   BY MR. TISI:
15        Q.   Yes.  It also impacts on the
16   disclosure of funding sources, of
17   conflicts of interest, to who the authors
18   are, are meaningful to the medical and
19   scientific community that actually read
20   your published work, correct?
21            MR. HEGARTY:  Objection to
22   form.
23            THE WITNESS:  Yes.
24   BY MR. TISI:

23  (Pages 86 to 89)

Joshua E. Muscat, Ph.D.

Page 90

1    Q.   Now, going through these
2  four topics, I'd like to turn to Topic
3  Number 1, and that would be publications
4  and timelines.  Okay.  And we're going to
5  come back to this slide periodically, so
6  everyone who is reading this deposition
7  or looking at it, can understand where we
8  are.
9    A.   Okay.
10   Q.   Okay.  All right.  Now I put
11 together a slide here.  I'm going to give
12 you a copy of this.  But I put together a
13 list.  I'm going to give you this.  And
14 I'll mark it -- I'll give you this as
15 well.  But you can -- Dr. Muscat.
16       I believe the other slide,
17 with all the articles and reports there
18 was one exception we're going to discuss,
19 and that's Number 4:  Articles in which
20 you are listed as an author or co-author.
21       Do you -- first of all, do
22 you recognize these -- now, some are
23 articles --
24       MR. LOCKE:  Excuse me,

Page 91

1  Chris, can you just get that
2  clearer?
3        MR. TISI:  Sure.  Can you
4  fix it please?
5        MR. LOCKE:  Thank you.
6        MR. TISI:  You're welcome.
7  BY MR. TISI:
8    Q.   Now, other than Number 4,
9  which we'll talk about in a moment, these
10 are articles and reports that have --
11 bear your name, correct?
12   A.   Yes.
13   Q.   You recognize all of these?
14   A.   Yes.
15   Q.   And for reference I have
16 pulled together a notebook that I'd like
17 to have marked as the next exhibit.
18       (Document marked for
19       identification as Exhibit
20       Muscat-5.)
21 BY MR. TISI:
22   Q.   I'm going to make this
23 Exhibit Number 5.
24       And just so, for the record,

Page 92

1  the binder contains the chart that I just
2  had, okay.  And all of the documents that
3  are referred to in them.
4    A.   Okay.
5    Q.   In the back.  To make our
6  lives easier.  We may mark separately
7  some of these documents.  But I want you
8  to have them, so it can make yours and my
9  life a little bit easier.
10   A.   Okay.
11   Q.   Okay.  Now, the first
12 article, the first three articles, the
13 1997 article is a letter to the editor,
14 correct?
15   A.   That's correct.
16   Q.   Okay.  And that's an article
17 you wrote in connection with your work at
18 the American Health Foundation, correct?
19       MR. HEGARTY:  Objection to
20       form.
21       THE WITNESS:  That's
22       correct.
23 BY MR. TISI:
24   Q.   Okay.  And that was written

Page 93

1  in 1997?
2    A.   Yes.
3    Q.   And in 1998 you wrote a book
4  chapter on the epidemiology of talc
5  exposure and ovarian cancer, correct?
6    A.   It wasn't for books.  It was
7  a journal, special issue of a journal.
8    Q.   Okay.  And in 2000 you wrote
9  a -- that's the report to the National
10 Toxicology Project that we mentioned
11 before?
12   A.   That's correct.
13   Q.   The one that you wrote for
14 The Weinberg Group?
15   A.   That's correct.
16   Q.   Okay.  These three are not
17 original research, are they, the first
18 three?
19       MR. HUDSON:  Objection to
20       form.
21 BY MR. TISI:
22   Q.   They are basically opinion
23 pieces, letters to the editor,
24 commentary, review articles?

24 (Pages 90 to 93)

Joshua E. Muscat, Ph.D.

Page 94

1           MR. SILVER: Objection.
2   BY MR. TISI:
3       Q.   Correct?
4           Doctor, I'm going to
5   recommend --
6       A.   I'm sorry, I want to clarify
7   something.
8       Q.   Well, what are you looking
9   for? I may be able to help you.
10      A.   The NTP submission.
11      Q.   The NTP submission is
12  Number 3.
13      A.   Yes, okay. So that's --
14  that's a meta-analysis that I did. I
15  would say that's original.
16      Q.   Okay.
17      A.   Okay. But the rest is
18  review.
19      Q.   Okay. Did you actually do a
20  meta-analysis in connection with the NTP
21  review?
22      A.   Yes.
23      Q.   You actually did, you
24  actually did the data crunching?

Page 95

1       A.   I did it by hand, yes.
2       Q.   You did it by hand.
3           Did Dr. Huncharek help you
4   with it?
5       A.   No.
6       Q.   No? Okay. We're going to
7   talk about that.
8           Let's go to the next section
9   which I put in red. And those are
10  articles in which a group called the
11  Meta-Analysis Research Group or MRG had
12  involvement, correct?
13      A.   Yes.
14      Q.   And you know what the
15  Meta-Analysis Research Group is, correct?
16      A.   Yes, I do.
17      Q.   What is the Meta-Analysis
18  Research Group?
19      A.   That is a, I guess you would
20  call a consulting group that was
21  established by Dr. Huncharek.
22      Q.   Now, before that -- actually
23  let me just ask one question. We talked
24  about the NTP process, the NTP review?

Page 96

1       A.   Mm-hmm.
2       Q.   Do you remember that? The
3   NTP ultimately deferred the question
4   about whether talc is a likely cause of
5   ovarian cancer, correct?
6           MR. HEGARTY: Objection to
7   form.
8           THE WITNESS: That's
9   correct.
10  BY MR. TISI:
11      Q.   If anyone were to walk into
12  court and stand up and tell the judge and
13  the jury that the NTP rejected the
14  conclusion that talc causes ovarian
15  cancer, that would be incorrect, true?
16          MR. HUDSON: Objection to
17  form.
18  BY MR. TISI:
19      Q.   They deferred the question?
20          MR. SILVER: Objection to
21  form.
22          THE WITNESS: That's all I
23  know is deferred.
24  BY MR. TISI:

Page 97

1       Q.   Okay. Now, going back to
2   the American Health Foundation. In this
3   first time frame, in the 1990s, leading
4   up to the filing of the 2000 NTP report,
5   the American Health Foundation had been
6   under a consulting agreement with J&J on
7   issues related to talc and ovarian
8   cancer, true?
9           MR. HEGARTY: Objection to
10  form.
11          MR. HUDSON: Objection to
12  form.
13          THE WITNESS: I'm not
14  familiar with that.
15  BY MR. TISI:
16      Q.   You don't know whether or
17  not Dr. Wynder had signed a consulting
18  agreement with Johnson & Johnson?
19          MR. HUDSON: Objection to
20  form.
21          THE WITNESS: No.
22  BY MR. TISI:
23      Q.   You've actually met with,
24  during that time frame, in the 1990s, you

25 (Pages 94 to 97)

Joshua E. Muscat, Ph.D.

Page 98

1  actually met with Johnson & Johnson
2  people on talc-related issues, correct?
3      A.    That's correct.
4      Q.    Okay.  In fact, you --
5  actually, we'll talk about that.  You
6  actually drafted a proposed study on that
7  issue, correct?
8      A.    That's correct.
9      Q.    A case-controlled study,
10  correct?
11      A.    That's correct.
12      Q.    A $400,000 study on the
13  issue that had been discussed in the
14  medical community for decades before,
15  correct?
16          MR. HEGARTY:  Objection to
17      form.
18          THE WITNESS:  I don't know
19      how -- whether it was discussed
20      for decades.  But we did draft a
21      proposal.
22  BY MR. TISI:
23      Q.    They never funded it, did
24  they?

Page 99

1      A.    No.
2      Q.    They never actually gave you
3  a formal answer, did they?
4          MR. SILVER:  Objection to
5      form.
6  BY MR. TISI:
7      Q.    To whether or not they would
8  fund it?
9      A.    I never received a formal
10  answer.
11      Q.    You just kind of left it
12  kind of hanging out there, right?
13          MR. HUDSON:  Objection to
14      form.
15          THE WITNESS:  It was -- I
16      mean I'm sure that information was
17      transmitted to the American Health
18      Foundation but not to me
19      personally.
20  BY MR. TISI:
21      Q.    Okay.  Well, we looked all
22  over the document.  We couldn't see any
23  place where they denied funding, that
24  they decided that they weren't -- that

Page 100

1  they informed anybody --
2      A.    Okay.
3      Q.    -- about that.
4          MR. HEGARTY:  Objection to
5      form.
6          MR. HUDSON:  Objection to
7      form.
8  BY MR. TISI:
9      Q.    But as far as you know, they
10  kind of, throughout the 1990s, they kind
11  of kept the issue of whether they would
12  fund that study out there, and it was
13  just something you never got an answer
14  to, correct?
15          MR. HUDSON:  Objection to
16      form, asked and answered.
17          THE WITNESS:  I don't
18      remember an exact date.
19          There was obviously a point
20      where we knew it was not going to
21      be funded so...
22  BY MR. TISI:
23      Q.    But you continued to speak
24  with folks at J&J on talc-related issues,

Page 101

1  correct?
2          MR. HEGARTY:  Objection to
3      form.
4  BY MR. TISI:
5      Q.    In the -- in the 1990s?
6      A.    I don't have any specific
7  recollection.
8      Q.    Do you know John Hopkins?
9      A.    Yes.
10      Q.    You met with him, correct?
11      A.    He was at the meeting in
12  Skillman, New Jersey.
13      Q.    And you communicated back
14  and forth, letters with him in the 1990s
15  on issues related to epidemiology and
16  talc?
17          MR. HEGARTY:  Objection to
18      form.
19          THE WITNESS:  I don't recall
20      specifically.
21  BY MR. TISI:
22      Q.    You don't remember him
23  e-mailing -- talk -- sending you letters
24  and you going back and forth about the

26 (Pages 98 to 101)

Joshua E. Muscat, Ph.D.

Page 102

1  Cook study?
2         MR. HEGARTY:  Objection.
3         THE WITNESS:  I can't
4     remember that.  I'd have to see
5     that.
6  BY MR. TISI:
7     Q.   Okay.  Well, we'll show you
8  that in a moment.
9     A.   Okay.
10    Q.   Do you know who Don Jones
11 is?
12    A.   Yes.
13    Q.   Who is Don Jones?
14    A.   He was an executive at
15 Johnson & Johnson.
16    Q.   You met with him, true?
17    A.   Yes.
18    Q.   Okay.  Do you know who John
19 O'Shaughnessy is?
20    A.   I'm sorry, who?
21    Q.   John O'Shaughnessy.
22    A.   No.
23    Q.   Have you ever met with any
24 lawyers at J&J in the 1990s, to your

Page 103

1  knowledge?
2     A.   No.
3     Q.   Now, at some point did
4  American Health Foundation go out of
5  business?
6     A.   Yes.
7     Q.   In fact, it went out of
8  business under -- under some questionable
9  circumstances, correct?  There had been
10 questions raised about the proprietary of
11 the American Health Association and its
12 funding by cigarette manufacturers,
13 correct?
14        MR. HUDSON:  Objection to
15    form.
16        THE WITNESS:  So it ceased
17    operations, had already changed
18    its name.  It was no longer called
19    the American Health Foundation.
20    It was called the Institute For
21    Cancer Prevention.
22 BY MR. TISI:
23    Q.   Right.  But it was -- there
24 were some real questions about whether or

Page 104

1  not the funding, their research was
2  compromised because of their funding from
3  Phillip Morris.
4         Do you remember hearing
5  that?
6         MR. HUDSON:  Objection to
7     form.
8         THE WITNESS:  No.
9  BY MR. TISI:
10    Q.   You never heard that?
11    A.   No.
12    Q.   Never heard that at all?
13        MR. HUDSON:  Objection to
14    form.
15        THE WITNESS:  No, never.
16 BY MR. TISI:
17    Q.   Okay.  Let's go back to the
18 list of publications here.  The second
19 group of papers, 4 through 9, are ones
20 that you recognized.  And we talked
21 about, those were the ones that were
22 associated with Dr. Huncharek's company
23 called Meta-Analysis Research Group?
24    A.   That's correct.

Page 105

1     Q.   And it's also called MRG?
2     A.   Yes.
3     Q.   Okay.  MRG is not in
4  business anymore, is it?
5     A.   I don't know actually.  I
6  don't know.
7     Q.   It kind of went out of
8  business to your knowledge?
9         MR. HUDSON:  Objection to
10    form.
11        THE WITNESS:  You'd have to
12    ask him.  I don't know.
13 BY MR. TISI:
14    Q.   Have you ever asked him?
15    A.   No.
16    Q.   When you spoke to him a
17 couple months ago, did you tell him that
18 you were involved in the talc litigation?
19    A.   Yes, I did.
20    Q.   Okay.  Did you ask him
21 whether he had any documents related to
22 the talc litigation?
23    A.   No.
24    Q.   Did you ask him whether he

27 (Pages 102 to 105)

Joshua E. Muscat, Ph.D.

| Page 106 | Page 108 |
|---|---|

**Page 106**

1  was going to be involved in the talc
2  litigation?
3       A.   He had mentioned that he had
4  gotten a subpoena.
5       Q.   Did he in any way -- did you
6  and he talk about the subpoena?
7       A.   No.
8       Q.   Did you talk about any
9  documents that would be collected?
10      A.   No.
11      Q.   You had a Meta-Analysis
12 Research Group e-mail account, did you
13 not?
14      A.   No.
15      Q.   Okay.  Where did you get
16 e-mails related to your work for
17 Meta-Analysis Research Group?
18      A.   I'm sorry, can you ask the
19 question again?
20      I -- I wasn't -- in terms of
21 the work at the Meta-Analysis Research
22 Group, I was on a list of consultants.
23 All the projects were generated by
24 Dr. Huncharek.

**Page 108**

1  form.
2       MR. HEGARTY:  Objection.
3       THE WITNESS:  So my name was
4  listed on papers under that
5  affiliation, that's correct.
6  BY MR. TISI:
7       Q.   Okay.  Now, Meta-Analysis
8  Research Group was a for-profit group
9  that hired itself out to pharmaceutical
10 companies to do research, correct?
11      MR. HEGARTY:  Objection to
12 form.
13      THE WITNESS:  Not to my
14 knowledge.
15 BY MR. TISI:
16      Q.   Not to your knowledge.
17      A.   Yeah.
18      Q.   Do you know what their --
19 did you ever bother -- you were
20 affiliated with them for years.  Did you
21 ever bother to ask them what their
22 affiliations were, what the scope of
23 their work was?
24      A.   The only thing that I knew

**Page 107**

1       Q.   But you were listed as a
2  senior scientist?
3       A.   That's correct.
4       Q.   Okay.  And you actually
5  signed your name for example, to the
6  Citizen's Petition in your academic
7  capacity but also as a consultant for
8  Meta-Analysis Research Group, for
9  example?
10      A.   Yes.  My name was on that.
11      Q.   Right.  For Meta-Analysis
12 Research Group?
13      A.   Yes.
14      Q.   And in the published
15 articles, when they drop the little
16 footnotes that say what your affiliations
17 are, it listed you as Meta-Analysis
18 Research Group.
19      A.   Yes.
20      Q.   Okay.  So when you were
21 writing articles, you were writing
22 articles for Meta-Analysis Research
23 Group, correct?
24      MR. HUDSON:  Objection to

**Page 109**

1  is actually it was not a for-profit
2  institution.
3       Q.   Did you -- I mean you've
4  known Dr. Huncharek, I saw your CV,
5  you've known him for years, right?
6       A.   That's correct.
7       Q.   Okay.  You published him
8  before Meta-Analysis Research Group,
9  correct?
10      A.   That's correct.
11      Q.   You haven't published with
12 him recently, have you?
13      A.   No.
14      Q.   Any reason why?
15      A.   I'm very busy at work and --
16      Q.   Has he asked you to be on
17 any publications recently, you know, in
18 the past ten years?
19      A.   No, not to my knowledge.
20      Q.   Have you talked about doing
21 any further work with him on talc?
22      A.   No.
23      Q.   I'm going to show you a
24 document which I'd like to have marked as

28 (Pages 106 to 109)

Joshua E. Muscat, Ph.D.

Page 110

1 Exhibit Number 6.
2        (Document marked for
3        identification as Exhibit
4        Muscat-6.)
5 BY MR. TISI:
6    Q.   Now, I'm actually not going
7 to ask you too much about the front pages
8 here.
9    A.   Okay.
10    Q.   But -- but bear with me a
11 moment.
12        This is a document from 2004
13 from -- to Bob Glenn from Dr. Huncharek,
14 correct?
15        Do you see that?
16    A.   Yes.
17    Q.   And Mr. Glenn, as you know,
18 was the toxicologist consultant for the
19 law firm of Crowell & Moring?
20    A.   Yes.
21    Q.   And this is an agreement,
22 attached to it is an agreement proposal
23 for talc projects, do you see that?
24        MR. HEGARTY:  Objection to

Page 111

1 form.
2 BY MR. TISI:
3    Q.   I'm not going to ask you --
4    A.   Okay.  Okay.
5    Q.   You see the agreement?
6    A.   Right, right.  Yeah, right.
7    Q.   Go to the next two pages in,
8 three pages in, and it is an
9 informational brochure for the
10 Meta-Analysis Research Group.  Do you see
11 that?  Right there.
12    A.   Yes.
13    Q.   Okay.  And it's information
14 about the organization.  Do you see that?
15    A.   Yes, I see that.
16    Q.   If you look, it said it was
17 formed in 1996 by Dr. Huncharek, correct?
18    A.   Yes.
19    Q.   Okay.  Do you know that
20 Dr. Huncharek was working with the
21 Meta-Analysis Research Group from about
22 that time?
23    A.   Sounds reasonable.
24    Q.   Then it goes on, the last

Page 112

1 sentence says, "MRG participating" -- "at
2 MRG, practicing scientists and clinicians
3 with substantial research and business
4 experience join together to produce
5 quantitative synthesis of clinical data
6 of the highest quality," correct?
7    A.   I'm sorry, which paragraph
8 is that?
9    Q.   Last -- first paragraph,
10 last sentence.
11    A.   Okay.  Okay.  Yes.
12    Q.   So he emphasized both
13 research and business experience, do you
14 see that?
15    A.   Yes.
16    Q.   Okay.  It goes on to say in
17 the last paragraph, it says, "We have
18 assisted major pharmaceutical
19 companies" -- "pharmaceutical,
20 Schering-Plough, Bayer, Warner Lambert
21 and other clients in deciphering often
22 complex, seemingly contradictory data
23 using rigorous meta-analytical methods."
24        Do you see that?

Page 113

1    A.   Mm-hmm.  Yes.
2    Q.   And deciphering is in
3 quotations, right?
4    A.   Yes.
5    Q.   Okay.  And so you
6 understand, and understood at the time,
7 that a lot of their clients of
8 Meta-Analysis Research Group were
9 pharmaceutical companies, correct?
10        MR. HUDSON:  Objection to
11 form.
12        THE WITNESS:  I'm sorry, can
13 you repeat the question?
14 BY MR. TISI:
15    Q.   Did you understand at the
16 time that Meta-Analysis Research Group
17 had worked for pharmaceutical companies?
18        MR. HUDSON:  Objection to
19 form.
20 BY MR. TISI:
21    Q.   As is listed here?
22    A.   Yes.  So I don't even recall
23 seeing this.
24    Q.   Okay.  But I'm asking you --

Joshua E. Muscat, Ph.D.

Page 114

1   I'm using this as the guideline --
2        A.   Okay.
3        Q.   -- to see whether or not
4   this helps you recall what Meta-Analysis
5   Research Group is, and what it did.
6        A.   Okay.
7        Q.   Okay?
8            Did it work for
9   pharmaceutical companies as listed here,
10  to your knowledge?
11           MR. HUDSON:  Objection to
12       form.
13           THE WITNESS:  That's what it
14       says.  We have assisted major
15       pharmaceutical and other clients,
16       that's correct.
17  BY MR. TISI:
18       Q.   And in the context of your
19  work with -- with Meta-Analysis Research
20  Group, you were writing papers in
21  connection with contracts with the
22  defendants in this case, correct?
23           MR. HEGARTY:  Objection to
24       form.

Page 115

1            THE WITNESS:  I'm sorry, can
2        you repeat the question?
3   BY MR. TISI:
4        Q.   Yes.
5        A.   Yeah.
6        Q.   In connection with your
7   affiliation with Meta-Analysis Research
8   Group, you were writing articles for
9   the -- in the medical literature, that
10  were funded in whole or in part by the
11  defendants in this case?
12           MR. HUDSON:  Objection to
13       form.
14           MR. SILVER:  Asked and
15       answered.
16  BY MR. TISI:
17       Q.   Or -- individually or
18  collectively?
19       A.   No.
20       Q.   No?
21       A.   No.
22       Q.   You don't think -- I mean
23  I've asked you this three times already.
24  I'm going to ask you one more time.

Page 116

1        A.   Yes.
2        Q.   Okay.  You are unaware of a
3   contract in which you were -- were tasked
4   with writing papers that were funded by
5   the defendant that were ultimately
6   published?
7            MR. HUDSON:  Objection to
8        form, asked and answered.
9            THE WITNESS:  There was work
10       that was done with the
11       Meta-Analysis Research Group,
12       that's correct.
13  BY MR. TISI:
14       Q.   Okay.  And that work was
15  funded by the defendants in this case,
16  correct?
17           MR. HUDSON:  Objection to
18       form.
19  BY MR. TISI:
20       Q.   J&J and Imerys?
21           MR. HEGARTY:  Same
22       objection.
23           MR. HUDSON:  Objection.
24           THE WITNESS:  There was a --

Page 117

1        a meta-analysis talking about the
2        diaphragms, right?  Is that what
3        you're referring to?
4   BY MR. TISI:
5        Q.   I'm asking you the
6   questions, Doctor.  You tell me.  I'm not
7   trying to drag you around by your nose
8   here.  Okay.
9            I'm asking you, were there
10  papers that were written on this list
11  that we have --
12       A.   I can't speak for all of the
13  clients of the Meta-Analysis Research
14  Group and what was published.  I -- I
15  wasn't -- it wasn't my group.  I don't
16  know what you expect from me.  So all
17  these things -- Plough, Schering, I -- I
18  have no knowledge of it.
19       Q.   Well, was it important to
20  you to know where your funding came from?
21       A.   Yeah, I know where my
22  funding comes from.  Right.
23       Q.   You know that for these
24  articles, for some of these articles,

Page 118

1  your funding to write these articles came
2  from defendants, correct?
3          MR. SILVER:  Objection to
4  form.  Asked and answered.
5          MR. HUDSON:  Objection to
6  form.  Asked and answered.
7          THE WITNESS:  So -- yes.
8  Okay.
9  BY MR. TISI:
10     Q.   Let's take one for example.
11  2007, the critical -- I'm sorry.  2008,
12  The Critical Review, Perineal Talc and
13  Ovarian Cancer that was published in the
14  European Journal of Cancer Prevention.
15     A.   Yes.
16     Q.   That article was actually
17  written in connection with the contract
18  with members of the talc industry,
19  correct?
20          MR. HUDSON:  Objection to
21  form.
22  BY MR. TISI:
23     Q.   Including Johnson & Johnson
24  and Imerys?

Page 119

1          MR. HUDSON:  Objection.
2          THE WITNESS:  No.
3  BY MR. TISI:
4     Q.   It was not?
5     A.   It was not.
6     Q.   Okay.  That had -- that
7  article had absolutely nothing to do
8  with -- with the contract that you
9  entered into with the -- with the
10  company?
11          MR. HEGARTY:  Objection to
12  form.
13          MR. HUDSON:  Objection to
14  form.
15          THE WITNESS:  It -- that
16  article was independent of the
17  work that was done for the
18  company.
19  BY MR. TISI:
20     Q.   You drafted that paper and
21  it was reviewed by Crowell & Moring
22  before it was published in the
23  peer-reviewed literature, correct?
24          MR. HEGARTY:  Objection to

Page 120

1  form.
2          THE WITNESS:  No.
3  BY MR. TISI:
4     Q.   No?
5     A.   No.
6     Q.   Now, another thing the
7  Meta-Analysis Research Group says it does
8  is medical/legal consulting.  If you go
9  to the next page.
10          Page 4.6.  Do you see that?
11  It says medical and legal consulting.
12     A.   Yes.
13     Q.   Did you know that the
14  Meta-Analysis Research Group did medical
15  and legal consulting?
16     A.   I don't know what they did.
17  I wasn't --
18     Q.   I didn't ask you that.
19     A.   -- actively following what
20  the Meta-Analysis Research Group did.
21     Q.   I asked you, did you know
22  that, that they did that at the time?
23     A.   Did I know that they did
24  medical and legal -- I'm unaware of any

Page 121

1  medical and legal consulting that they've
2  done.
3     Q.   Did you ever get asked by
4  Dr. Huncharek or his group to do medical
5  and legal consulting for anybody?
6     A.   So I'm not a physician so I
7  wouldn't be doing medical consulting.
8     Q.   Okay.
9     A.   Okay.
10     Q.   How about scientific
11  consulting?
12     A.   It depends.  Were you
13  referring to something specifically?
14     Q.   I'm asking you, Doctor.
15     A.   Yes.
16     Q.   Had Meta-Analysis Research
17  Group ever asked you to do any work as a
18  consultant or expert in legal matters?
19     A.   In legal matters?
20     Q.   In -- yes.  Legal
21  consulting.  Let's use that.
22     A.   Legal consulting, no.
23     Q.   No.  Never?
24     A.   Legal consulting, no.

Joshua E. Muscat, Ph.D.

Page 122

```
 1        Q.   Now, all of the articles
 2   here listed on this chart which I
 3   provided in the front of the binder that
 4   you said you recognized all of them.
 5        Other than Number 4 which is
 6   one we'll talk about in a moment, these --
 7   were written or co-written by you or the
 8   Meta-Analysis Research Group, correct?
 9        A.   That's correct.
10        Q.   And item Number 4, let's
11   talk about that for a moment.  We're
12   going to come back to that one.
13        That is entitled Perineal
14   Application of Cosmetic Talc As a Risk
15   Factor For Ovarian Cancer:  A
16   meta-analysis of 11,229 subjects from 16
17   observational studies, published in the
18   Anti-Cancer Research Journal, correct?
19        A.   Yes.
20        Q.   Okay.  The Anti-Cancer
21   Research Journal is -- is a foreign
22   journal, correct?
23        You have published in it
24   yourself.
```

Page 123

```
 1        A.   I probably have, yes.
 2        Q.   It's based in like Athens,
 3   Greece, or something like that?
 4        A.   Yeah.  Yeah, something like
 5   that, yeah.
 6        Q.   It's not an American
 7   journal, is it?
 8        A.   I think at the time, I think
 9   it was based in Greece.
10        Q.   You were aware of this study
11   before it was published, were you not?
12        A.   No.
13        Q.   You were not aware of it at
14   all?
15        A.   No.
16        Q.   You'd never been provided
17   with a -- you never were involved in the
18   design of the study or a proposal for --
19   for what ultimately became this study?
20        A.   That's correct.
21        Q.   And when this study came on
22   the scene, you had absolutely no idea
23   that he had done a meta-analysis of
24   11,229 subjects?
```

Page 124

```
 1        A.   I can't recall specifically
 2   if I had absolutely no idea.  But I was
 3   uninvolved in it.  I was unaware of it.
 4        Q.   Okay.  And you don't know
 5   whether or not a research proposal was
 6   submitted on this data in 2000 that --
 7   that included your name on it by
 8   Dr. Huncharek?
 9        A.   To who?
10        Q.   Johnson & Johnson?
11        A.   So I just became aware of
12   that within the last month.
13        Q.   Okay.  He -- so he put your
14   name, Dr. Huncharek put your name down,
15   does it refresh -- let me ask you this.
16        Does it refresh your
17   recollection as to whether or not you
18   were aware of this study proposal in
19   2000?
20        A.   So I was not aware of it.
21        Q.   So he put your name down
22   without ever having asked you?
23        A.   That's my recollection, yes.
24        Q.   Just kind of said, well, you
```

Page 125

```
 1   know, I'm just going to put Dr. Muscat
 2   down on this proposal to Johnson &
 3   Johnson?
 4        MR. HUDSON:  Objection to
 5   form.
 6        THE WITNESS:  I was unaware
 7   of it.
 8   BY MR. TISI:
 9        Q.   Now, when you updated your
10   CV in July of '18, did you list your
11   affiliation with Meta-Analysis Research
12   Group?
13        A.   No.
14        Q.   Can you tell the members of
15   the jury why you never identified
16   yourself in your -- in your CV as having
17   been a senior scientist for Meta-Analysis
18   Research Group?
19        A.   So usually what I keep now
20   is what's called an academic CV.  And
21   there are certain things that are
22   expected to be on that.  So academic CVs
23   are for purposes of submitting a -- your
24   credentials for let's say a grant
```

32 (Pages 122 to 125)

Joshua E. Muscat, Ph.D.

Page 126

1  application to NIH or some other
2  organization. So they look for certain
3  things. And there are certain things
4  that are expected and required on it.
5       So that's my -- my academic
6  CV fits those -- those requirements. It
7  doesn't mean -- they are not looking for
8  consulting work.
9       Q.  What about your other CVs
10  that you said you might have kept for
11  other reasons? Do you --
12       A.  No one -- no one has really
13  asked me for -- that's the main reason I
14  keep my CV, my academic CV, I update it
15  almost weekly. I spend a lot of time
16  doing it. It's a lot of work. That's
17  about as much work I can do on CVs as
18  possible.
19       Q.  It takes work to actually
20  omit things and take things off your CV,
21  true?
22       MR. HEGARTY: Objection to
23  form.
24  BY MR. TISI:

Page 127

1       Q.  I mean, you took -- you took
2  consulting activities off of your CV,
3  correct?
4       A.  Off the CV at that time,
5  that's correct.
6       Q.  All right. And the things
7  you took off your CV was consulting
8  with -- with organizations and lawyers
9  who were working with pharmaceutical
10  companies, correct?
11       MR. HEGARTY: Objection to
12  form.
13       THE WITNESS: So, I'll just
14  repeat myself. The work that I do
15  for -- on my CV over the last few
16  years has been --
17  BY MR. TISI:
18       Q.  I'm not asking you that
19  question, Doctor?
20       A.  Yes.
21       Q.  Okay. My question is, you
22  took off of your CV, you physically took
23  off your earlier CV, consulting
24  activities you did with law firms and

Page 128

1  other organizations that represented
2  pharmaceutical companies?
3       MR. HUDSON: Objection to
4  form.
5       THE WITNESS: I don't
6  know -- so, first of all, I don't
7  know if I took anything off. This
8  is something that I may -- it may
9  still be in there for all I know.
10  For all I know it's for --
11  BY MR. TISI:
12       Q.  It's not.
13       A.  Okay.
14       Q.  It's not in your current --
15  in your CV that you produced to us in
16  2018.
17       A.  Okay.
18       Q.  Okay?
19       A.  I may have other CVs, okay.
20  But I -- the CVs that I work on, that I
21  spend time on for probably the last at
22  least seven or eight years is my academic
23  CV. I do it to fit a specific required
24  format. I update it as -- as it is

Page 129

1  needed.
2       Q.  Okay. Let's --
3       MR. HUDSON: Counsel, when
4  you get a break, can we take a
5  short morning break? I know we've
6  been going about an hour and a
7  half. Whenever you get to a
8  stopping point --
9       MR. TISI: I don't know that
10  we've been running about an hour
11  and a half. But we'll just
12  definitely -- we can take a break.
13       MR. HUDSON: Okay. Thank
14  you. I appreciate it very much.
15       MR. TISI: Okay.
16       THE VIDEOGRAPHER: Going off
17  the record, 11:08 a.m.
18       (Short break.)
19       THE VIDEOGRAPHER: We are
20  back on the record, 11:21 a.m.
21  BY MR. TISI:
22       Q.  Doctor, I want to talk about
23  Reference Number 4 for a moment which is
24  the Huncharek 2003 meta-analysis.

33 (Pages 126 to 129)

Joshua E. Muscat, Ph.D.

Page 130

1  A.  Okay.
2  Q.  Okay.  When I talk about
3  that, you know what I'm talking about,
4  the 2003 meta-analysis involving ovarian
5  cancer and talc, correct?
6  A.  Yes.
7  Q.  And in that article, we
8  can -- we'll talk about it more later on.
9  A.  Okay.
10  Q.  But -- but the authors found
11  overall meta-analysis across all studies,
12  approximately 33 percent increased risk
13  but a difference between individual study
14  categories, correct?
15  MR. HEGARTY:  Objection to
16  form.
17  THE WITNESS:  That's
18  correct.
19  BY MR. TISI:
20  Q.  All right.  And
21  Dr. Huncharek concluded that there was --
22  there were reasons that argued against
23  causation even in the presence of
24  association, correct?

Page 131

1  MR. HEGARTY:  Objection to
2  form.
3  THE WITNESS:  So I -- I'd
4  have to read -- you don't want me
5  to read it or --
6  BY MR. TISI:
7  Q.  I don't.
8  A.  Okay.
9  Q.  But you relied heavily --
10  let me put it this way.  You relied
11  heavily in your published medical
12  literature on this 2003 article, correct?
13  MR. HUDSON:  Objection to
14  form.
15  BY MR. TISI:
16  Q.  You cite it over and over
17  and over again?
18  A.  It gets cited, that's
19  correct.
20  Q.  But you cite it often.
21  So for example, if you go to
22  your tabbed binder.  If you go to your
23  article on diaphragms which is Number 4.
24  I'm sorry, number -- I'm sorry.  I

Page 132

1  believe it's Number 6.  That's your
2  article on diaphragms, correct?
3  MR. HEGARTY:  Objection to
4  form.
5  THE WITNESS:  6 is the
6  Huncharek meta-analysis.
7  BY MR. TISI:
8  Q.  6 is the -- I'm sorry.
9  A.  In my binder.
10  Q.  6 is the Huncharek -- this
11  is the diaphragm study.
12  A.  Oh, okay.
13  Q.  This is your -- your 2007
14  diaphragm study.
15  A.  Okay.
16  Q.  And it's P2-002.
17  A.  I'm sorry.  Okay.  4?
18  Q.  I'm sorry.
19  A.  That -- is that the
20  meta-analysis you're referring to?
21  Q.  No.  Let's start all over
22  again, Doctor.
23  A.  Okay.
24  Q.  Number 6 in your binder is

Page 133

1  your 2003 study, the meta-analysis
2  involving diaphragms.
3  MR. HUDSON:  Objection to
4  form.
5  THE WITNESS:  The use of
6  contraceptive talc and
7  contraceptive diaphragms, that's
8  correct.
9  BY MR. TISI:
10  Q.  Correct.  And that's your
11  study, correct?
12  A.  I'm a co-author on it.
13  Q.  And because you are on the
14  byline as we talked about before, you --
15  you agree to all the contents in this,
16  and you wouldn't lend your name to
17  something that had wrong information in
18  it, correct?
19  A.  That's correct.
20  Q.  All right.  So if you look
21  at Page 425, there's a whole paragraph
22  about in a prior meta-analysis, we
23  demonstrated.  Do you see that?  On the
24  right-hand column, on Page 425.

34 (Pages 130 to 133)

Joshua E. Muscat, Ph.D.

Page 134

1    A.   Yes.
2    Q.   Okay.  So you're relying on
3  that -- that article here.  And then you
4  wrote -- go to the next tab.  That's The
5  Critical Review that you wrote with
6  Dr. Huncharek, correct?
7    A.   Yes.
8    Q.   Okay.  And on Page 143,
9  left-hand column, you talk about
10  Huncharek et al. 2003, correct?
11    A.   Yes.
12    Q.   And on -- you go to Tab
13  Number 8, which is the report you sent to
14  the FDA.  Go to Tab Number 8, sir.  And
15  that's 164.  If you go to Page 4.
16        This is your report to
17  the -- this is your report -- go a couple
18  pages in.
19    A.   Mm-hmm.
20    Q.   This attaches your report to
21  the FDA by Dr. Huncharek and Dr. Muscat,
22  correct?
23    A.   That's correct.
24    Q.   And if you go, there's a

Page 135

1  discussion in here about Muscat 2003,
2  correct?
3        MR. HEGARTY:  Objection to
4    form.
5        MR. HUDSON:  Objection to
6    form.
7  BY MR. TISI:
8    Q.   If you go to Page 23 -- 24,
9  excuse me.  Last paragraph.  It says,
10  Huncharek 2003 and Huncharek and Muscat
11  2007.  Do you see that?
12    A.   Yes.
13    Q.   Okay.  In fact, it refers to
14  a specific -- it talks about the
15  dose-response analysis done in the 2003
16  meta-analysis by Huncharek?
17    A.   Okay.
18    Q.   Is that correct?
19        And if you go to your final
20  article which is a 2011 article,
21  Number 9.  You actually reproduce a
22  chart, Table 3, that came from Huncharek
23  2003, correct?
24        Do you see that?

Page 136

1    A.   The Table 3, yes.
2    Q.   And it actually came from
3  Huncharek 2000 -- that came from
4  Huncharek 2003, correct?
5    A.   I'd have to go back and
6  look.  I take your word for it.
7    Q.   Right.  It says, "Table 3
8  derived from data presented in the
9  meta-analysis by Huncharek et al.
10  displays dose-response data for those
11  include studies provided that
12  information."
13        Do you see that?
14    A.   Okay.
15    Q.   Okay.  And so it's fair to
16  say throughout your published medical
17  literature, you relied heavily, or let's
18  say relied, on Huncharek 2003,
19  particularly with -- with respect to the
20  dose-response issue, correct?
21        MR. HEGARTY:  Objection to
22    form.
23        MR. HUDSON:  Objection to
24    form.

Page 137

1        THE WITNESS:  No.
2  BY MR. TISI:
3    Q.   You didn't -- I mean we just
4  looked in an article where you actually
5  republished the table that was in the
6  2003 article, correct?
7        MR. HEGARTY:  Objection to
8    form.
9        THE WITNESS:  Yeah.  So I'm
10    not sure what you mean, do I rely
11    heavily for --
12  BY MR. TISI:
13    Q.   I said did you rely on it.
14    A.   Yes, I relied it.
15    Q.   Okay.
16    A.   But you asked me if I relied
17  heavily on it.  So I'm not sure what that
18  means.  I didn't rely heavily on --
19  heavily on these tables.
20    Q.   Okay.
21    A.   Yes.
22    Q.   That -- that table is
23  inaccurate, isn't it?
24        MR. HUDSON:  Objection to

35 (Pages 134 to 137)

Joshua E. Muscat, Ph.D.

Page 138

1    form.
2         THE WITNESS:  I don't know
3    what you mean.
4    BY MR. TISI:
5         Q.   Okay.  We'll talk about
6    that.
7         A.   Okay.
8         Q.   We'll spend a little time
9    with that, sir.
10        Now, can I show you -- you
11   mentioned before that you learned for the
12   first time that Dr. Huncharek listed you
13   on the proposal for the study that
14   ultimately became the 2007 -- 2003
15   meta-analysis, correct?
16        MR. HEGARTY:  Objection to
17   form.
18        THE WITNESS:  That's
19   correct.
20   BY MR. TISI:
21        Q.   How did you learn that?
22        A.   Those were -- it was a
23   document that I looked at within the past
24   month.

Page 139

1         Q.   Okay.  Did you spoke to --
2    did you speak to Dr. Huncharek about it
3    when you spoke to him recently?
4         A.   I haven't spoken with him
5    since I learned about that information.
6         Q.   Do you know what the term
7    "gifting authorship" is, have you heard
8    of that term?
9         A.   No.
10        Q.   Have you ever seen
11   Dr. Huncharek put your name down on a
12   paper where you had no idea of knowing
13   what it -- that you had been involved?
14        MR. HUDSON:  Objection to
15   form.
16        MR. SILVER:  Objection to
17   form.
18   BY MR. TISI:
19        Q.   Ever happen before?  I'm
20   sorry.
21        A.   I don't understand the
22   question.  Can you repeat it?
23        Q.   Had you ever had that happen
24   before, where somebody put your name down

Page 140

1    on a paper or a proposal where you had
2    not been involved?
3         A.   I have to think about that
4    for a minute.  Can you give me a few
5    minutes?
6         Q.   How about we come back to
7    it, because I don't want you to take a
8    few minutes.
9         A.   Okay.
10        Q.   But can you think of any as
11   you sit here right now?
12        A.   So not off the top of my
13   head.
14        Q.   Okay.
15        MR. TISI:  What exhibit are
16   we up to?
17        (Document marked for
18        identification as Exhibit
19        Muscat-7.)
20   BY MR. TISI:
21        Q.   Now, I'm going to show you
22   what I'd like to have marked as Exhibit
23   Number 7, which I think is the document
24   you're referring to.  This is a research

Page 141

1    proposal.  Is this the document you'd
2    seen?
3         A.   I can't recall specifically.
4         Q.   Okay.  But let me ask you
5    this.  This is a letter dated October 12,
6    2000?
7         A.   Mm-hmm.
8         Q.   And it's a research proposal
9    from Dr. Huncharek.  Do you see that?
10        A.   Yes.
11        Q.   And it's entitled, Two
12   Copies of Our Proposal Regarding Cosmetic
13   Talc and Ovarian Cancer?
14        A.   Yes.
15        Q.   And it provides a timeline
16   and a budget?
17        A.   Yes.
18        Q.   Okay.  And it asks the
19   company for feedback, do you see that?
20        A.   Yes.
21        Q.   And attached to it is, in
22   fact, a research proposal?
23        A.   Yes.
24        Q.   Presented to Johnson &

36 (Pages 138 to 141)

Joshua E. Muscat, Ph.D.

Page 142

1    Johnson.  Do you see that?
2        A.   Yes.
3        Q.   And it lists Dr. Huncharek,
4    correct?
5        A.   That's correct.
6        Q.   And it lists Joshua Muscat,
7    a senior scientist, correct?
8        A.   Yes.
9        Q.   Okay.  And if you actually
10   go to the back, it actually lists a
11   budget.  Page 21.
12       A.   Okay.
13       Q.   Do you see that?
14       A.   Mm-hmm.
15       Q.   And you had never seen that
16   document before the past month?
17       A.   That's correct.
18       Q.   Never at all?
19       A.   Never.
20       Q.   You never talked about it
21   with Dr. Huncharek, never learned about
22   it from Dr. Hopkins or anybody else?
23       A.   That's correct.
24       Q.   This came as a complete

Page 143

1    surprise?
2        A.   Yes.
3        Q.   Do you know that preliminary
4    data on this study was actually sent to
5    Johnson & Johnson?
6            MR. HUDSON:  Objection to
7        form.
8            THE WITNESS:  I'm unaware of
9        the circumstances of this.
10   BY MR. TISI:
11       Q.   Okay.  Have you seen any
12   preliminary data related to this article?
13       A.   I have seen some -- another
14   piece of correspondence regarding this.
15   I don't remember.
16       Q.   Let me show you.  I'm going
17   to show you what I'd like to have marked
18   as Exhibit Number 03 -- I'm sorry.
19   Exhibit Number 8.
20           (Document marked for
21       identification as Exhibit
22       Muscat-8.)
23   BY MR. TISI:
24       Q.   And this is dated

Page 144

1    November 2000.  Do you see that?
2        A.   Yes.
3        Q.   And this says, "Perineal
4    talc exposure:  Preliminary analysis of a
5    meta-analysis."
6            Do you see that?
7        A.   Yes, I do.
8        Q.   And, in fact, is this the
9    document that you saw?
10       A.   The one you just showed me?
11       Q.   Have you seen this before?
12       A.   No.
13       Q.   You never saw this before?
14       A.   Oh, sorry.  I think I saw
15   this within the last month.
16       Q.   If you look at the very last
17   page.  There's a chart entitled
18   Dose-Response Data?
19       A.   Mm-hmm.
20       Q.   I'm going to tell you it's
21   exactly the same dose-response data that
22   was reported in the 2003 article that was
23   republished again in your 2011 article.
24           Let me ask you this

Page 145

1    question.  Had you seen this data in
2    2003?
3            MR. HEGARTY:  Objection to
4        form.
5    BY MR. TISI:
6        Q.   Or 2000 -- 2000?
7            MR. HEGARTY:  Same
8        objection.
9            THE WITNESS:  No.
10   BY MR. TISI:
11       Q.   Now, collectively, going
12   back to this list of articles, I was
13   going to go through each one.  But I
14   really want to get to some other things.
15           So you wrote an article in
16   1997, 1998, 2000, 2003, 2005, 2007, 2008,
17   2009, 2011.  Do you see all those here?
18       A.   Yes.
19       Q.   Okay.  Some of them are
20   articles, six of them are articles, and I
21   believe -- excuse me.  Seven of them are
22   articles, two of them are reports,
23   correct?
24           MR. HEGARTY:  Objection to

37 (Pages 142 to 145)

Joshua E. Muscat, Ph.D.

Page 146

1    form.
2          THE WITNESS:  I'll take your
3    word for it.
4    BY MR. TISI:
5          Q.   Okay.  The two reports are
6    the National Toxicology Report dated
7    2000, and that's Number 3?
8          A.   That's correct.
9          Q.   Okay.  And the one that you
10   did with Dr. Huncharek for the opposing a
11   warning on talc is Number 8.  That was
12   filed in 2009.
13         MR. HUDSON:  Objection to
14   form.
15         THE WITNESS:  2008, I'm
16   sorry.  2009.
17   BY MR. TISI:
18         Q.   It was actually sent -- it
19   was -- it was drafted in 2008.  It was
20   actually filed with the FDA in 2009.
21         A.   Okay.
22         Q.   Does that sound right?
23         A.   I don't know when it was
24   filed with the FDA.

Page 147

1          Q.   But you did do that report?
2          A.   I didn't write it.
3          Q.   You didn't write that report
4    at all.  Who wrote it?
5          A.   Dr. Huncharek did.
6          Q.   And you -- you -- did you
7    approve of it before it was sent?
8          A.   I looked at it.
9          Q.   You looked at it.  You
10   actually met with Johnson & Johnson.  You
11   actually went to New Jersey to talk about
12   this study --
13         A.   Yes, that's correct.
14         Q.   -- correct?
15         And actually, not only that,
16   this study was actually published as, in
17   large part, as part of the article that's
18   Number 9, in other words the 2011
19   article, correct?
20         MR. HUDSON:  Objection to
21   form.
22         THE WITNESS:  Yeah.  It's a
23   published article, yeah.
24   BY MR. TISI:

Page 148

1          Q.   But the published article is
2    derived from these comments, correct?
3          MR. HUDSON:  Objection to
4    form.
5    BY MR. TISI:
6          Q.   It's almost verbatim.
7          A.   So I haven't gone back and
8    compared it, but --
9          Q.   There are sentences --
10         A.   Okay.
11         Q.   The sentences -- there are
12   some sentences that differ, but it is --
13   essentially, we can go back and compare
14   it --
15         A.   Okay.
16         Q.   You agree that this article,
17   this, this comment that you sent to the
18   FDA was edited a little bit, but -- but
19   actually appeared in the peer-reviewed
20   literature as the 2011 article that we
21   had listed as Number 9 here?
22         MR. HUDSON:  Objection to
23   form.
24         THE WITNESS:  I haven't -- I

Page 149

1          haven't done that side-by-side
2          comparison.
3    BY MR. TISI:
4          Q.   Okay.  You know that's true,
5    right?
6          MR. HUDSON:  Objection to
7    form.
8    BY MR. TISI:
9          Q.   You can look -- you can look
10   at them and take random notes and look
11   and compare the two.  There is a
12   90 percent overlap between those --
13   between those two -- that report and that
14   article.
15         MR. HEGARTY:  Objection to
16   form.
17   BY MR. TISI:
18         Q.   I'll represent that to be
19   the case.
20         A.   Okay.
21         Q.   Okay?  Do you have any
22   reason to disbelieve me here?
23         MR. HUDSON:  Objection to
24   form.

38  (Pages 146 to 149)

Joshua E. Muscat, Ph.D.

Page 150

1      MR. HEGARTY:  Objection to
2  form.
3      THE WITNESS:  I take you as
4  an honorable man, yes.
5  BY MR. TISI:
6      Q.   Okay.  And I'm going to tell
7  you that the 2011 article is almost,
8  almost verbatim.  There are some
9  sentences here or there that are
10  different.  But almost verbatim what was
11  sent to the FDA.
12      A.   Okay.
13      Q.   Do you know why it was
14  published, the report was published?
15      MR. HEGARTY:  Objection to
16  form.
17      THE WITNESS:  Because it was
18  submitted for publication?
19  BY MR. TISI:
20      Q.   Yeah, why was it submitted
21  for publication, the report that you sent
22  to the FDA?
23      MR. HEGARTY:  Objection to
24  form.

Page 151

1      THE WITNESS:  You'd have to
2  ask Dr. Huncharek that.  I mean he
3  was the lead author.
4  BY MR. TISI:
5      Q.   Okay.  Did you communicate
6  with him about it?
7      A.   Hardly.
8      Q.   Hardly?
9      A.   Yeah.
10      Q.   So basically, he submitted
11  it for publication without your -- with
12  your -- without your knowledge?
13      A.   No, I was aware of it.
14      Q.   Okay.  Did you approve of
15  that?
16      A.   Yeah, I mean I looked at it
17  and said sure.
18      Q.   Okay.  Did you have any
19  problem with any of the data compilations
20  that were in the -- that were in that
21  article?
22      A.   I looked at it, the report
23  looked okay with me.
24      Q.   Does it surprise -- can you

Page 152

1  tell me why that 2011 article doesn't
2  appear on your CV?
3      A.   So I update my CV periodic.
4  Sometimes I miss things, okay.  So
5  when --
6      Q.   Well, you said you -- well,
7  let me stop you there --
8      A.   Yeah --
9      MR. HUDSON:  Let him finish
10  his answer, please.
11      THE WITNESS:  Let me finish.
12  Okay.
13  BY MR. TISI:
14      Q.   You said you update your CV
15  religiously every week, I think you said
16  earlier.
17      A.   I do.
18      Q.   Okay.  And when you do that,
19  and you actually updated your CV for the
20  purposes of making sure that I had a
21  complete understanding of your
22  professional activities, because you
23  updated it in July of 2008, correct?
24      A.   That's correct.

Page 153

1      Q.   Okay.  And one of the things
2  that's missing from your CV is the 2011
3  article.  Can you tell me why that is?
4      A.   That's an oversight.
5      Q.   Okay.  Now, I went through
6  the dates on this.  But you wrote fairly
7  consistently from the 1990s about issues
8  related to talc.
9      MR. HUDSON:  Objection to
10  form.
11  BY MR. TISI:
12      Q.   Correct?
13      A.   Well, you see where I have
14  publications.  So, right.
15      Q.   Right.  And the point of
16  writing these articles was to express
17  your views in the debate about talc and
18  ovarian cancer?
19      A.   That's correct.
20      Q.   And your point of view,
21  broadly speaking, was the same as
22  Dr. Huncharek's, that there was an
23  association seen in some of the studies,
24  but that there was no evidence of a

39 (Pages 150 to 153)

Joshua E. Muscat, Ph.D.

Page 154

1   causal relationship?
2       MR. HUDSON:  Objection to
3   form.
4       MR. HEGARTY:  Objection.
5       THE WITNESS:  No.
6   BY MR. TISI:
7       Q.   Okay.  Can you think of any
8   areas where you and Dr. Huncharek
9   disagreed?
10      MR. HEGARTY:  Objection to
11  form.
12      THE WITNESS:  I'm not sure
13  the case ever came up where, you
14  know, he looked at my articles and
15  I looked at his articles and we
16  entered into a discussion.
17      He did the meta-analysis on
18  ovarian cancer, and he published
19  articles.
20      And quite frankly, I was
21  surprised -- I had no knowledge of
22  it.  I had no knowledge it was
23  done.  But that wasn't my -- that
24  wasn't my field, meta-analysis.

Page 155

1   So I'm not actively looking and
2   reading his conclusions.
3       I wouldn't be surprised if
4   there were areas that we agreed
5   on.  But I didn't participate in
6   that study.
7       My initial review I did
8   independently without his
9   knowledge.
10      If we came to the same
11  conclusion, that's fine.  And if
12  we didn't, that's fine as well.
13  BY MR. TISI:
14      Q.   Well, that wasn't my
15  question, Doctor.
16      A.   Yeah.
17      Q.   Your general point of view
18  in expressing these articles was that
19  there was -- the evidence argued against
20  a causal inference for talc and ovarian
21  cancer?
22      MR. HEGARTY:  Objection to
23  form.
24      THE WITNESS:  That wasn't

Page 156

1   the overall purpose was to debate
2   the causal inference.
3       The overall purpose was to
4   review the literature.
5       Ultimately, you know, does
6   that bear into the question of
7   whether there's a causal
8   inference?  I mean of course, it's
9   a scientific review.
10  BY MR. TISI:
11      Q.   Right.  And you're --
12      A.   But I -- I didn't do a
13  review and just say well, I don't think
14  it causes cancer or it does cause cancer.
15  My purpose of my review, which I did way
16  back in 2000, which I was really happy
17  about, by the way.  I think it was a
18  really -- real good review, was to
19  critically review the literature, which
20  no one had done.  That's -- that's why I
21  had written that.  And to go over the --
22  the topical areas that I thought were
23  important in terms of interpreting
24  literature.

Page 157

1       Q.   And you concluded, back in
2   2000 and it's expressed in your writing
3   since then, that while there may be
4   evidence of an association seen in some
5   studies, that that does not, in your
6   view, establish a causal link between
7   ovarian cancer and cosmetic talc?
8       MR. HEGARTY:  Objection to
9   form.  Asked and answered.
10      THE WITNESS:  That's
11  correct.
12  BY MR. TISI:
13      Q.   And you wrote these articles
14  to express that point of view to the
15  medical and scientific community,
16  correct?
17      MR. HEGARTY:  Objection to
18  form.
19      THE WITNESS:  I wrote those
20  articles to express my viewpoint.
21  BY MR. TISI:
22      Q.   And you expressed them to
23  the FDA, correct?
24      MR. HEGARTY:  Objection to

40 (Pages 154 to 157)

Joshua E. Muscat, Ph.D.

Page 158

1   form.
2   BY MR. TISI:
3       Q.   In the content -- in the
4   context of the Citizen's Petition
5   comments, correct, in 2009?
6       A.   It was submitted to the FDA.
7       Q.   And you expressed it in the
8   NTP process, correct, which referred --
9   resulted in a deferral of the question,
10  correct?
11          MR. HEGARTY:  Objection to
12      form.
13          THE WITNESS:  It was
14      submitted to the NTP, that's
15      correct.
16  BY MR. TISI:
17      Q.   And the whole purpose was
18  to -- was to inject your point of view
19  into the debate about cosmetic talc and
20  ovarian cancer?
21          MR. HUDSON:  Objection to
22      form.
23          THE WITNESS:  I was not
24      doing this to debate anybody,

Page 159

1   okay.
2   BY MR. TISI:
3       Q.   Okay.
4       A.   It was -- I was doing this
5   to express my scientific views on the
6   topic.
7       Q.   Now, I want to move to the
8   next topic, which is -- I want to talk
9   about your connections with the
10  defendants more fulsomely.  I mentioned
11  it before.  And we're going to go through
12  it a little bit more in detail.
13      A.   Okay.
14      Q.   We talked about your
15  publications.  Now I want to talk a
16  little bit about your -- your connections
17  with the different defendants who are
18  seated around this table.  Okay?
19      A.   Okay.
20      Q.   I'll come back to your
21  articles after we're done with this.  But
22  I want the judge and jury to understand a
23  little bit about what your role was.
24          So I'm going to bring up --

Page 160

1   I'm going to put a slide here.  And we're
2   going to work on it together.
3           And it is a chart.  If I can
4   get it to fit.
5           It is entitled Joshua
6   Muscat, Ph.D., Consulting on Ovarian
7   Cancer -- Talc and Ovarian Cancer.
8           Do you see that?
9       A.   Yes, I do.
10      Q.   Okay.  And across the -- I
11  guess this is the X axis on the top,
12  correct?
13      A.   That's correct.
14      Q.   Is the different people who
15  we've talked about here.  So let's be
16  clear.
17          The manufacturer of the
18  talcum powder products that we are
19  talking about, Johnson's Baby Powder and
20  Shower to Shower, is Johnson & Johnson
21  and you know that to be the case,
22  correct?
23      A.   That's correct.
24      Q.   All right.  The talc

Page 161

1   supplier is Luzenac or Imerys as it
2   was -- Imerys as it's known but it was
3   also known as Luzenac and Rio Tinto,
4   correct?
5           MR. SILVER:  Objection to
6       form.
7           THE WITNESS:  That's
8       correct.
9   BY MR. TISI:
10      Q.   The trade organization we've
11  talked about before, is CTFA or PCPC.
12      A.   Okay.
13      Q.   They changed their names as
14  well, correct?
15      A.   Okay.  Right.
16      Q.   All right.  Then the mining
17  trade organization, we really haven't
18  talked about them at all, but you
19  understand the Industrial Minerals
20  Association or IMA, do you know those --
21      A.   Yes.
22      Q.   You've heard of those?
23      A.   Yes.
24      Q.   Okay.  They represent

41 (Pages 158 to 161)

Joshua E. Muscat, Ph.D.

Page 162

1    miners, correct?
2         MR. HEGARTY:  Objection to
3    form.
4    BY MR. TISI:
5         Q.   The mining companies?
6         MR. HEGARTY:  Objection to
7    form.
8         THE WITNESS:  I would assume
9    so.
10   BY MR. TISI:
11        Q.   Okay.  And then I'm going to
12   draw a big line here.  And then we're
13   going to have the lawyers.  Right?  The
14   lawyers who represent them, because they
15   were involved in some of these
16   discussions as well, correct?
17        A.   Yes.
18        Q.   All right.  So we are going
19   to have outside counsel.  Crowell &
20   Moring, you mentioned that company,
21   correct, that law firm, correct?
22        A.   Yes.
23        Q.   Okay.  And that's where
24   Ridge Hall was?

Page 163

1         A.   Yes.
2         Q.   I'm going to write that name
3    here.  And we are also going to have Bob
4    Glenn, right, he worked with them,
5    correct?  Consultant?
6         A.   With Crowell & Moring?
7         Q.   That's correct.
8         A.   That's correct.
9         Q.   And he was actually a former
10   president of IMA North America, you know
11   that to be the case, correct?
12        A.   I remember he had a
13   recognized title.  I don't remember what
14   it was.  But that sounds correct.
15        Q.   Okay.  And then the outside
16   lawyers, litigation lawyers, Mr. Hegarty,
17   and Ms. Frazier we talked about before,
18   are Shook Hardy & Bacon, correct?
19        A.   Yes, mm-hmm.
20        Q.   And then along the X axis
21   here is the 1990s, and I chose that time
22   frame because that's the time you worked
23   with the American Health Foundation,
24   correct?

Page 164

1         A.   Yes.
2         Q.   Okay.  And then in 2011,
3    2000 to 2011, that's the general time
4    frame that you were also a senior
5    scientist with MRG, correct?
6         MR. HUDSON:  Objection to
7    form.
8         THE WITNESS:  I wouldn't use
9    that term "senior scientist."
10   BY MR. TISI:
11        Q.   Well, you saw that -- that
12   reference?
13        A.   Right.  Right.  Right.
14   Okay.
15        Q.   Okay.  Now, let's talk about
16   Johnson & Johnson first.  From my review,
17   and we talked about this briefly, you
18   both became involved with Johnson &
19   Johnson and talcum powder products
20   through American Health Foundation,
21   correct?
22        A.   That's correct.
23        Q.   And from my reading of the
24   documents, that appears to be in the 1994

Page 165

1    time frame when the American Health
2    Foundation received a consulting
3    contract, entered into a consulting
4    contract with J&J, does that sound
5    familiar?
6         MR. HEGARTY:  Objection to
7    form.
8         THE WITNESS:  So I'm not
9    familiar with a consulting
10   contract.
11   BY MR. TISI:
12        Q.   Okay.  Well, do you
13   understand that with Dr. Wynder, you were
14   working with Dr. Wynder as his
15   subordinate or colleague with Johnson &
16   Johnson, but he was the main contact?
17        A.   So, just for the record,
18   actually his name is pronounced Wynder.
19        Q.   Okay.
20        A.   Okay.  I'm sorry.
21        It came through me -- in
22   terms of that relationship, came through
23   me through Dr. Wynder.
24        Q.   Okay.  And you know

42 (Pages 162 to 165)

Joshua E. Muscat, Ph.D.

Page 166

1   Dr. Wynder -- Wynder --
2       A.   That's okay.  Wynder, right.
3       Q.   Wynder had been in
4   communication with Johnson & Johnson,
5   correct?
6           MR. HEGARTY:  Objection to
7       form.
8           THE WITNESS:  I don't know
9       how -- who was communicating with
10      who.  So -- right.
11  BY MR. TISI:
12      Q.   1994 time frame, let's see.
13  AHF.  I'm going to show you what I'd like
14  to have marked as Exhibits Number 9 and
15  10.
16          (Document marked for
17      identification as Exhibit
18      Muscat-9.)
19          (Document marked for
20      identification as Exhibit
21      Muscat-10.)
22  BY MR. TISI:
23      Q.   And Mr. -- Dr. Wynder is
24  sadly no longer with us, is he?

Page 167

1       A.   That's correct.
2       Q.   Okay.  And this is Number 9,
3   which is a letter from Dr. Wynder in
4   1994.  And then --
5           MR. TISI:  No, no, this is
6       not it.
7   BY MR. TISI:
8       Q.   Anyway, do you understand --
9   here it says, there is a copy of a
10  proposal --
11          MR. HEGARTY:  Chris, do you
12      have copies of this?  This
13      document?
14          MR. TISI:  I'm sorry.  I'm
15      sorry.  Let me just back up a
16      second.
17          (Document marked for
18      identification as Exhibit
19      Muscat-11.)
20  BY MR. TISI:
21      Q.   I'm going to show you
22  Number 11.  This one.
23          MR. HUDSON:  Do you have
24      copies for us for 9?

Page 168

1           MR. TISI:  I apologize.
2   Just bear with me.
3           MR. HUDSON:  Okay.  No
4   problem.
5           MR. TISI:  This is
6   Number 11.  And I'll get to
7   Number 9 in a minute.
8           11, if you can -- it's 34
9   please.  34.
10          MR. HEGARTY:  He needs a
11  copy of 11.
12  BY MR. TISI:
13      Q.   This is a document dated
14  June 1st, 1994.  Returning, it says,
15  consulting agreement with Dr. Ernst
16  Wynder, correct?
17      A.   Yes.
18      Q.   And it's a consulting
19  agreement between Johnson & Johnson and
20  Dr. Wynder, do you see that?
21      A.   Yes.
22      Q.   Okay.  Does this, at least,
23  indicate to you that there was a
24  consulting agreement between American

Page 169

1   Health Foundation and Johnson & Johnson?
2           MR. HEGARTY:  Objection to
3       form.
4           MR. HUDSON:  Objection to
5       form.
6           THE WITNESS:  Yes.
7   BY MR. TISI:
8       Q.   And that consulting
9   agreement involved actually drafting a --
10  now, at this time, just on the timeline,
11  Dr. Cramer and others had published about
12  the relationship between, or alleged
13  relationship between talc and ovarian
14  cancer, correct?
15          MR. HEGARTY:  Objection to
16      form.
17  BY MR. TISI:
18      Q.   That was in the published
19  literature?
20      A.   It is in the literature.
21  And I don't remember the dates of Cramer.
22      Q.   1992.
23      A.   Okay.  Okay.
24      Q.   Is that right?  1982.

43 (Pages 166 to 169)

Joshua E. Muscat, Ph.D.

Page 170

1    Excuse me.
2        A.   Okay.
3        Q.   And so this was some
4    12 years later, correct?
5        A.   Okay.  Mm-hmm.
6        Q.   And one of the things you
7    discussed with the company was whether or
8    not to actually do a study, correct?
9            MR. HUDSON:  Objection to
10           form.
11           THE WITNESS:  That's
12           correct.
13   BY MR. TISI:
14       Q.   Okay.  And were you given
15   the task of actually designing a study?
16       A.   Yes.
17       Q.   And Exhibit Number 9 is a
18   copy of a letter dated October 31st --
19           MR. HUDSON:  He's already
20           got a copy of 9.
21           MR. TISI:  Okay.  Here is
22           your copies.
23           MR. HUDSON:  Thank you.
24   BY MR. TISI:

Page 171

1        Q.   And this is from the
2    American Health Foundation to John -- to
3    John Jones of Johnson & Johnson, correct?
4        A.   Yes.
5        Q.   And it says, "Please find
6    enclosed a copy of our proposal,"
7    correct?
8        A.   Yes.
9        Q.   And you did, in fact, send a
10   proposal, correct?
11       A.   That's correct.
12       Q.   Okay.  I'm going to hand you
13   what I'd like to have marked as
14   Number 10.
15           Here is a copy of a
16   proposal.  And this is actually a copy of
17   the grant application.  And actually if
18   you take out -- there's a document that
19   should not be in there.  It's got a Bates
20   37.4.  If you can just pull that out.
21   That shouldn't be in there, I don't
22   think.
23           I meant to do that last
24   night.

Page 172

1            And it says, "Proposal for
2    case-control study of talcum powder use
3    and ovarian cancer."
4            Do you see that?
5        A.   Yes.  Mm-hmm.
6        Q.   And that's what you drafted,
7    right?
8        A.   I think it must be.  I
9    haven't looked at this since, when it was
10   drafted, so 1994.
11       Q.   And you had a choice when
12   you did this -- actually you were meeting
13   with -- you went to Skillman and you met
14   with people and you talked about the
15   issue of ovarian cancer and talc,
16   correct?
17       A.   That's correct.
18       Q.   All right.  And you met with
19   Dr. Hopkins, and you met with Dr. Jones,
20   and you met with a bunch of people,
21   correct?
22       A.   I met with Jones and
23   Hopkins.  I don't remember, there's
24   probably other people that I don't

Page 173

1    remember.
2        Q.   And you could have designed
3    any kind of study you wanted, right?  You
4    could have proposed any kind of study,
5    right?
6            MR. HEGARTY:  Objection.
7    BY MR. TISI:
8        Q.   And there are different
9    kinds of epidemiology studies, correct?
10       A.   That's correct.
11       Q.   Okay.  You could have
12   proposed a cohort study, for example?
13       A.   Yes.
14       Q.   You could have proposed a
15   prospective study -- a prospective study
16   of some kind, correct?
17       A.   There's different study
18   designs.
19       Q.   You could have proposed a
20   hospital study, correct?
21       A.   There's different study
22   designs.
23       Q.   Right.  But you didn't
24   propose those kinds of studies.  You

44 (Pages 170 to 173)

Joshua E. Muscat, Ph.D.

Page 174

1    proposed a case-control study, correct?
2        A.   Yes.
3        Q.   And this is a study that
4    was -- if you look at this grant
5    application, it was about a -- on page --
6    third page in, it was about a $398,000
7    study that you proposed to the company?
8        A.   Okay.
9        Q.   Right?  Is that right?
10       A.   Yes.
11       Q.   That's a study that they
12   never did?
13       A.   That's correct.
14       Q.   And as the 1990s wore on,
15   we're going to say AHF.  And we're going
16   to put studies, case-control.  And that
17   was Exhibit Number 10, right?
18           Now, the next thing that
19   happened is in the 1990s, you had
20   communications with Dr. Hopkins about
21   other studies that were being published
22   in the peer-reviewed medical literature
23   that showed an increased risk as well,
24   true?

Page 175

1        A.   Not that I could recall.
2        Q.   Do you remember
3    communications about the Cook paper?
4        A.   I might have sent him a Cook
5    paper.
6        Q.   Do you remember him -- you
7    and him talking about how the best way to
8    raise questions about that paper?
9           MR. HEGARTY:  Objection to
10   form.
11          THE WITNESS:  I don't have a
12   specific recollection of that.
13          (Document marked for
14   identification as Exhibit
15   Muscat-12.)
16   BY MR. TISI:
17       Q.   Okay.  Let me show you
18   Exhibits Number 12, 13 and 14.
19          (Document marked for
20   identification as Exhibit
21   Muscat-13.)
22          (Document marked for
23   identification as Exhibit
24   Muscat-14.)

Page 176

1           MR. TISI:  This is Exhibit
2    Number 12.  We don't have to put
3    them up yet.  This is Exhibit
4    Number 12.  This is Number 13.
5    And this is Number 14.
6           We're not going to bring all
7    these up.  But I'm going to show
8    you.
9    BY MR. TISI:
10       Q.   These are a series of
11   letters that went back and forth between
12   you and Dr. Hopkins related to the Cook
13   paper, correct?
14       A.   Yes.
15       Q.   Okay.  And you see --
16   actually you can bring this up.
17          MR. TISI:  Do you have a
18   copy of the Cook paper?
19   BY MR. TISI:
20       Q.   And just for the record, the
21   Cook paper was an epidemiology study, you
22   know that to be true?
23       A.   Yes.
24       Q.   And that study reported

Page 177

1    about a 1.5 or 50 percent increased risk
2    of ovarian cancer seen in women using
3    talcum powder products?
4           MR. HEGARTY:  Objection to
5    form.
6           MR. HUDSON:  Objection to
7    form.
8           THE WITNESS:  Okay.  So I
9    don't have it in front of me.  But
10   I'll take your word for it.
11   BY MR. TISI:
12       Q.   Okay.  And we're going to
13   mark it so that the -- so the jury has
14   it.
15       A.   Okay.
16       Q.   But do you see your letter
17   dated March 23, 1997?
18          MR. TISI:  You can bring
19   this up.  It's Exhibit 42.
20   BY MR. TISI:
21       Q.   This is Exhibit 14 to our
22   deposition dated March 23, 1997.  Do you
23   see that?
24       A.   Yes.

45 (Pages 174 to 177)

Joshua E. Muscat, Ph.D.

Page 178

1      Q.   Okay.  And do you see you
2  are talking about how to respond to the
3  Cook paper?
4          MR. HEGARTY:  Objection to
5      form.
6          THE WITNESS:  Discussing the
7      Cook paper, right.
8  BY MR. TISI:
9      Q.   Right.  And one of the
10  things you say here on the first
11  paragraph, the second paragraph says,
12  "One easy way to raise questions
13  regarding these studies in general is to
14  determine the reliability of the
15  questionnaire data on powder use,"
16  correct?
17      A.   Yes.
18      Q.   So you were actually telling
19  Dr. Hopkins, you were giving him a
20  strategy here on how to raise questions
21  about the published study, correct?
22          MR. HEGARTY:  Objection to
23      form.
24          MR. HUDSON:  Objection to

Page 179

1      form.
2          THE WITNESS:  No.
3  BY MR. TISI:
4      Q.   You were not?
5      A.   No.
6      Q.   So your word, one way to
7  raise questions, you -- what was -- to
8  undermine the -- see how you can
9  undermine the integrity of the studies?
10          MR. HUDSON:  Objection to
11      form.
12          THE WITNESS:  No.  That's
13      not -- no.
14  BY MR. TISI:
15      Q.   You don't think so?
16      A.   No.
17      Q.   You don't think a jury could
18  look at that and see otherwise?
19          MR. HUDSON:  Objection to
20      form.
21          MR. SILVER:  Objection move
22      to strike.
23          THE WITNESS:  I was raising
24      a general principle, okay.

Page 180

1  BY MR. TISI:
2      Q.   Okay.  And one of the
3  questions that you -- one of the things
4  you say, let's raise questions regarding
5  these studies and the reliability of the
6  questionnaire data on powder use,
7  correct?
8          MR. HEGARTY:  Objection to
9      form.
10          THE WITNESS:  So what I say
11      is one way to raise the questions
12      on these studies is, in general,
13      is to determine the reliability of
14      questionnaire data on powder use,
15      yeah, that's correct.
16  BY MR. TISI:
17      Q.   Okay.  Just for the record,
18  Exhibit Number 15, I'm going to attach
19  the Cook study.
20          (Document marked for
21          identification as Exhibit
22          Muscat-15.)
23  BY MR. TISI:
24      Q.   That's the Cook study to

Page 181

1  which you are referring, correct?
2          Correct?
3      A.   Yes.
4      Q.   All right.  And you, in
5  fact, wrote a letter to the editor about
6  the Cook study, right?
7      A.   Yes, that's correct.
8      Q.   All right.  That was the
9  first article on our list before,
10  correct?
11      A.   Yes.
12      Q.   Okay.  And about the same
13  time, you were talking to Dr. -- you were
14  talking to Dr. Hopkins, correct?
15          MR. HEGARTY:  Objection to
16      form.
17          THE WITNESS:  So I don't
18      know the exact dates of when I
19      wrote the Cook letter.  But within
20      the year, yeah.
21  BY MR. TISI:
22      Q.   And it's about the same time
23  you were still waiting for them to spend
24  $400,000 with your -- with your company

46 (Pages 178 to 181)

Joshua E. Muscat, Ph.D.

Page 182

1    to do a study, correct?
2        MR. HEGARTY: Objection to
3    form.
4        THE WITNESS: No.
5    BY MR. TISI:
6        Q. You were -- I thought you
7    said before you still didn't know whether
8    or not they were going to fund that
9    study, right?
10       MR. HUDSON: Objection to
11   form. Asked and answered.
12       THE WITNESS: This -- this
13   was years later. I mean so, so
14   many years later that I assume
15   that -- no, I remember that we
16   were -- we were not being funded
17   for that study.
18   BY MR. TISI:
19       Q. But they never told you
20   that, did they?
21       A. I don't recall. I think I
22   got the message that it was not going to
23   be funded. I must have gotten that.
24       Q. And that's --

Page 183

1        A. Usually, usually, you know,
2    in the process of funding, you know
3    within several months.
4        Q. Now, this is about the time
5    you actually wrote in the journal, the
6    toxicology journal, The Epidemiology of
7    Talc Exposure, correct?
8        MR. HEGARTY: Objection to
9    form.
10   BY MR. TISI:
11       Q. That was Document Number 2
12   on your -- the exhibit list that we
13   talked about, the publications list
14   before.
15       Do you remember that? And
16   you actually -- you remember at that time
17   you worked with a Dr. Zazenski. Do you
18   know who Dr. Zazenski is?
19       A. I know the name.
20       MR. SILVER: Objection.
21   BY MR. TISI:
22       Q. Yeah, he worked -- he worked
23   with Imerys, correct?
24       A. Okay.

Page 184

1        Q. Do you remember that?
2        A. Not really.
3        Q. And just for the record,
4    this is the comments on toxicology that
5    you wrote.
6        (Document marked for
7        identification as Exhibit
8        Muscat-16.)
9    BY MR. TISI:
10       Q. We'll mark that as Exhibit
11   Number 16. And that corresponds with a
12   Number 2 on the -- just for the record,
13   it corresponds with Number 2 on our list
14   of publications.
15       Actually, can I have one
16   back, please?
17       And you recognize the names,
18   Dr. Weiner, Dr. Zazenski, do you remember
19   those people?
20       MR. SILVER: Objection to
21   form.
22       THE WITNESS: Okay, now I
23   remember the names. Yeah.
24   BY MR. TISI:

Page 185

1        Q. Those are people who were
2    consultants with Johnson & Johnson and
3    Imerys, correct?
4        MR. HUDSON: Objection to
5    form.
6    BY MR. TISI:
7        Q. You know -- you know
8    Mr. Zazenski worked for Imerys?
9        A. No.
10       Q. Okay. You know Dr. Weiner
11   was a -- was a consultant with Johnson &
12   Johnson?
13       MR. HEGARTY: Objection to
14   form.
15       THE WITNESS: So I didn't
16   know him at the time. But he did
17   introduce my -- himself to me when
18   he asked me to contribute to the
19   article.
20   BY MR. TISI:
21       Q. And you know he was -- he
22   was working with Johnson & Johnson as a
23   consultant?
24       MR. HEGARTY: Objection to

47 (Pages 182 to 185)

Joshua E. Muscat, Ph.D.

Page 186

1    form.
2         THE WITNESS:  No, I didn't
3    know that.
4    BY MR. TISI:
5         Q.   You didn't know that?
6         A.   No, I didn't know that.
7         Q.   Okay.  So -- and then in
8    2000, the article -- the document with
9    your name on it was submitted to Johnson
10   & Johnson, correct?
11        MR. HUDSON:  Objection to
12   form.
13   BY MR. TISI:
14        Q.   You talked -- but you didn't
15   know about that, that was the proposal
16   for the epidemiology meta-analysis from
17   Dr. Muscat, remember we looked at that?
18        A.   Yes.
19        MR. HUDSON:  Objection to
20   form.
21   BY MR. TISI:
22        Q.   Okay.  And I'm not going to
23   put that on our chart, because I'm just
24   not going to, because you said you didn't

Page 187

1    know about it.
2         A.   I didn't know about it,
3    that's correct.
4         Q.   Okay.  Well, but the next
5    thing that happened is you know you were
6    proposed to be a speaker or a contributor
7    to NTP, correct?
8         MR. HUDSON:  Objection to
9    form.
10        THE WITNESS:  No.  I was
11        approached by The Weinberg Group.
12   BY MR. TISI:
13        Q.   But do you know who proposed
14   you?
15        A.   No.
16        Q.   Do you know it was John
17   Hopkins at Johnson & Johnson?
18        MR. HEGARTY:  Objection to
19   form.
20        THE WITNESS:  No, I didn't
21   know that.
22   BY MR. TISI:
23        Q.   Had you ever heard that?
24        A.   I've never heard that

Page 188

1    before.
2         (Document marked for
3         identification as Exhibit
4         Muscat-17.)
5    BY MR. TISI:
6         Q.   I'm going to show you what
7    I'd like to have marked as Exhibit
8    Number 17.
9         MR. TISI:  16?
10        MR. HUDSON:  17.
11        MR. TISI:  17.
12   BY MR. TISI:
13        Q.   Now, you see this is an
14   e-mail, and if you look at the original
15   message.  It's from John Hopkins, right?
16   It's dated October 15, 2000.  Do you see
17   it?  Actually let me refer you to it.
18   Okay?
19        A.   Oh, I see.  The original --
20   okay.
21        Q.   Okay.  It says from John
22   Hopkins?
23        A.   I see that, okay.
24        Q.   Okay.  And it says, "Dear

Page 189

1    Neal, as you probably know, we have a
2    telecon later today with CTFA and
3    interested parties."
4         CTFA is what we know as
5    PCPC, right?
6         A.   Right.
7         Q.   Okay.  "And there is a
8    proposal to use The Weinberg Group to
9    review/present, cost to be shared I
10   guess."
11        Do you see that?
12        A.   I do.
13        Q.   Okay.  "There will be as
14   many opinions about the best way to look
15   forward.  However, my own view is that
16   this is not sufficient."
17        Do you see that?
18        A.   Yes.
19        Q.   "I would propose the
20   following additional presenters."
21        Do you see that?
22        A.   Yes.
23        Q.   Number one is Joshua Muscat?
24        A.   Okay.

48 (Pages 186 to 189)

Joshua E. Muscat, Ph.D.

Page 190

1    Q.   Do you see that?
2    A.   Yes.
3    Q.   Okay.  And that's from John
4  Hopkins, correct?
5    A.   Yes.
6    Q.   And that's the same John
7  Hopkins you were meeting with in the
8  1990s?
9         MR. HEGARTY:  Objection.
10        THE WITNESS:  I assume so.
11  BY MR. TISI:
12    Q.   And so we can put on our
13  timeline here, JH proposes JM.  Do you
14  see that?  And that would be 2000.
15  That's correct, right?
16        MR. HEGARTY:  Objection to
17  form.
18        THE WITNESS:  Okay.
19  BY MR. TISI:
20    Q.   Okay.  Now the next thing
21  that happens, is you actually do get
22  contracted by The Weinberg Group to
23  prepare that summary, correct?
24    A.   That's correct.

Page 191

1    Q.   And that document is -- oh,
2  you actually prepared the report that's
3  Number 3 in your -- in the binder that's
4  in front of you, correct?
5    A.   Okay.
6    Q.   That's the -- that's the
7  document that's sent to the National
8  Toxicology Project, correct?
9         MR. HEGARTY:  Objection to
10  form.
11        THE WITNESS:  Program.
12  BY MR. TISI:
13    Q.   Program?
14    A.   Right.
15    Q.   Now, in 2003 and 2004, the
16  issue came up again, true?
17        MR. HEGARTY:  Objection to
18  form.
19        MR. HUDSON:  Objection to
20  form.
21        THE WITNESS:  I'm sorry,
22  which?
23  BY MR. TISI:
24    Q.   2003 -- in about 2004, do

Page 192

1  you remember -- okay.
2         So 2000, let's put 2000.
3  NTP, NTP defers.
4         In 2004, NTP raised and
5  nominated talc again as a carcinogen,
6  correct?
7    A.   That's correct.
8    Q.   Okay.  2004.  And it was
9  called the 12 ROC, 12 report on
10  carcinogens, correct?
11    A.   Okay.
12    Q.   And we will put 12 next to
13  it.
14         Now before then,
15  Dr. Huncharek of MRG writes his
16  meta-analysis, correct?
17        MR. HEGARTY:  Objection to
18  form.
19        THE WITNESS:  The -- for the
20  published paper in 2003, is that
21  right?
22  BY MR. TISI:
23    Q.   Yes.
24    A.   I'm not exactly sure when it

Page 193

1  was written.  I know it was -- when it
2  was published.
3    Q.   It was published in 2003.
4    A.   Right.
5    Q.   And as a result of the NTP,
6  I'm sorry, the NTP -- the renomination,
7  you were contacted by Dr. --
8  Meta-Analysis Research Group was
9  contacted by Dr. Robert Glenn at Crowell
10  & Moring to represent and help represent
11  Imerys and Johnson & Johnson, correct?
12        MR. HUDSON:  Objection to
13  form.
14        THE WITNESS:  I don't know
15  for certain.
16  BY MR. TISI:
17    Q.   But you do -- you know  that
18  you were retained in the 2004-2005 time
19  frame to work on the 12 ROC issue?
20        MR. HUDSON:  Objection to
21  form.
22  BY MR. TISI:
23    Q.   The NTP renomination of
24  talc?

49 (Pages 190 to 193)

Joshua E. Muscat, Ph.D.

Page 194

1    A.   No.
2    Q.   You don't know that?
3    A.   Was I retained to do that,
4    no.
5    Q.   You were retained -- you
6    were retained by a law firm, right?
7    A.   Yes.
8    Q.   Do you know why it was you
9    were retained by a law firm for a
10   scientific issue?
11          MR. SILVER:  Objection to
12       form.
13          THE WITNESS:  I didn't have
14       active involvement in that.  So
15       I -- I don't really know the
16       circumstances behind what that --
17       how that occurred.
18   BY MR. TISI:
19   Q.   I didn't ask you how it
20   occurred.
21   A.   Yeah.
22   Q.   Did -- did it seem odd to
23   you that a law firm would be retaining a
24   scientist on scientific issues that were

Page 195

1    pending before a regulatory body like
2    NTP?
3           MR. SILVER:  Objection to
4       form.
5           MR. HEGARTY:  Objection to
6       form.
7           THE WITNESS:  I'm not sure
8       that I really gave it that much
9       thought.
10   BY MR. TISI:
11   Q.   You didn't give it that much
12   thought?
13   A.   No.
14   Q.   Ovarian cancer is a pretty
15   serious disease, is it not?
16   A.   It is.
17   Q.   It affects almost 20,000
18   women a year, correct?
19   A.   That's correct.
20   Q.   It's a serious public health
21   issue, correct?
22   A.   Yes, that's correct.
23   Q.   And the issue of talc and
24   ovarian cancer is something that had been

Page 196

1    debated in the medical and the scientific
2    community at that point in the mid 2000s
3    for over 20 years, or at least decades --
4           MR. SILVER:  Objection to
5       form.
6    BY MR. TISI:
7    Q.   -- correct?
8    A.   So it's a serious medical
9    problem.
10   Q.   And so you understand that
11   the issue of whether talc was the cause
12   of ovarian cancer was a serious one,
13   correct?
14   A.   Yes.
15   Q.   And it was one that was
16   raised to various regulatory bodies,
17   correct?
18          MR. HUDSON:  Objection to
19       form.
20   BY MR. TISI:
21   Q.   It was raised to NTP who
22   deferred it in 2000, correct?
23   A.   That's correct.
24   Q.   And it was deferred because

Page 197

1    the NTP didn't understand what, as you
2    understand it in the federal register, as
3    to whether or not -- what was actually
4    contained in the bottle of talc, correct?
5           MR. SILVER:  Objection.
6    BY MR. TISI:
7    Q.   There was a question
8    about -- there was a question about the
9    definition of talc, correct?
10          MR. HUDSON:  Form.
11          MR. SILVER:  Objection to
12       form.
13          THE WITNESS:  So I haven't
14       read the discussions on why it was
15       deferred.  I can't really comment
16       on it.
17   BY MR. TISI:
18   Q.   Okay.  But you know it was
19   deferred?
20   A.   Yes.
21   Q.   Okay.  And you know the
22   issue came up again in 2000 -- 2004, the
23   mid 2000s time frame?
24   A.   I was not aware of it.

50 (Pages 194 to 197)

Joshua E. Muscat, Ph.D.

Page 198

1    Q.   You didn't know that you
2 were being retained in connection with
3 the renomination of talc?
4         MR. HUDSON: Objection to
5    form.
6         THE WITNESS: That's
7    correct.
8 BY MR. TISI:
9    Q.   Okay. But you do know that
10 the law firm contacted you at this point,
11 right?
12        MR. HUDSON: Objection to
13    form.
14        MR. SILVER: Objection.
15        THE WITNESS: The law firm
16    had contacted Dr. Huncharek, or
17    Dr. Huncharek contacted the law
18    firm. I don't know the
19    arrangement.
20 BY MR. TISI:
21    Q.   Right. But ultimately you
22 were brought into the process, correct?
23    A.   That's correct.
24    Q.   Okay. And in 2004, you

Page 199

1 entered into a contract --
2        (Document marked for
3        identification as Exhibit
4        Muscat-18.)
5 BY MR. TISI:
6    Q.   Let me show you, this is the
7 copy of the contract with Crowell &
8 Moring.
9        MR. HUDSON: Is this 18 or
10    19?
11        MR. TISI: This is
12    Number 18.
13 BY MR. TISI:
14    Q.   And this is a document --
15        MR. HUDSON: Counsel, do you
16    want to change the designation on
17    that?
18        MR. TISI: I'm sorry. Thank
19    you.
20 BY MR. TISI:
21    Q.   Number 18 is a contract
22 between Michael Huncharek, Meta-Analysis
23 Research Group, Joshua Muscat, do you see
24 that?

Page 200

1    A.   Yes.
2    Q.   And Ridgway Hall. Ridgway
3 Hall is the --
4    A.   Yes, I see that, right.
5    Q.   Ridgway Hall is a senior
6 partner at the law firm of Crowell &
7 Moring.
8    A.   That's correct.
9    Q.   And I'm going to represent
10 to you, Crowell & Moring is a product
11 liability defense law firm. Do you have
12 any reason to disbelieve that?
13        MR. HUDSON: Objection to
14    form.
15        MR. SILVER: Objection to
16    form.
17        MR. HEGARTY: Objection to
18    form.
19        THE WITNESS: No.
20 BY MR. TISI:
21    Q.   You know that they were
22 representing Imerys, correct?
23    A.   Yes. It says on the form
24 their client Luzenac America.

Page 201

1    Q.   Right. And you also know
2 that J&J was paying for part of that
3 funding, correct?
4        MR. HEGARTY: Objection to
5    form.
6        MR. HUDSON: Objection to
7    form.
8 BY MR. TISI:
9    Q.   J&J admits that. So you
10 don't have any problem with that.
11        MR. HUDSON: Objection to
12    form.
13        THE WITNESS: Are you asking
14    me at the time of this?
15 BY MR. TISI:
16    Q.   Do you know right now that
17 they paid for part of your --
18    A.   I did learn that recently,
19 yes.
20    Q.   Okay. And you knew it back
21 then, right?
22    A.   No.
23    Q.   You never met with -- do you
24 know who Steve Mann was?

51 (Pages 198 to 201)

Joshua E. Muscat, Ph.D.

Page 202

1       A.   I know the name now.
2       Q.   Okay.  Did you know it then?
3    Did you ever communicate with Steve Mann?
4       A.   I discovered in one of my
5    documents that there was a communication
6    between myself and Steve Mann.
7       Q.   Okay.  You know Steve Mann
8    is actually cc'd on the bottom of this
9    contract, correct?
10      A.   Yeah, I see that.
11      Q.   Okay.  And Rich Zazenski, he
12   is with Imerys, correct, you knew that?
13      A.   No.  At that time --
14      Q.   You didn't know that?
15      A.   At these -- no.  These names
16   didn't mean anything to me.
17      Q.   Okay.  And you also were
18   told that your work with the -- with the
19   law firm was confidential, true?
20           MR. HUDSON:  Objection to
21   form.
22           THE WITNESS:  I had no
23   conversation to that.
24   BY MR. TISI:

Page 203

1       Q.   I didn't ask you that.  You
2    knew that the communications between
3    Meta-Analysis Research Group, including
4    yourself and Dr. Huncharek and anybody
5    related to this contract, was
6    confidential, correct?
7       A.   I would assume that to be
8    the case.
9       Q.   Well, you didn't assume it.
10   It was in the contract, sir.
11      A.   Yeah, okay.
12      Q.   Okay.  If you look on the
13   second page, there's a whole section on
14   confidentiality.
15      A.   Okay.
16      Q.   Right?  Do you see that?
17      A.   Yes.
18      Q.   And that all reports should
19   be initially submitted as drafts and
20   marked as privileged and confidential,
21   prepared at the request of legal counsel,
22   correct?
23           Do you see that?
24      A.   Yes.

Page 204

1       Q.   Okay.  And the two things
2    that were attached to the retainer
3    agreement were two projects?
4       A.   Yes.
5       Q.   Number one was writing a
6    paper for NTP, correct?
7       A.   Yes.
8       Q.   And the other one was
9    writing a paper -- was writing a paper on
10   the -- on -- doing a -- excuse me.
11           Doing an analysis on
12   diaphragms, correct?
13           MR. HEGARTY:  Objection to
14   form.
15           THE WITNESS:  So one is a
16       thorough review of the
17       epidemiological literature, and
18       the second one is a meta-analysis
19       of the diaphragm.
20   BY MR. TISI:
21      Q.   Okay.  And the third review
22   of the epidemiology literature is the
23   paper that ultimately became what was
24   called The Critical Review, correct?

Page 205

1           MR. SILVER:  Objection.
2           THE WITNESS:  The published
3       paper?
4    BY MR. TISI:
5       Q.   Yeah.
6       A.   No.
7       Q.   It never became -- the paper
8    that you wrote never became The Critical
9    Review?
10      A.   That's correct.
11           MR. HUDSON:  Objection to
12   form.
13   BY MR. TISI:
14      Q.   Are you absolutely sure,
15   sir?
16           MR. SILVER:  Objection.
17           THE WITNESS:  Yes.
18   BY MR. TISI:
19      Q.   100 percent?
20           MR. HUDSON:  Objection to
21   form.
22   BY MR. TISI:
23      Q.   100 percent?
24           You never submitted a paper

52 (Pages 202 to 205)

Joshua E. Muscat, Ph.D.

Page 206

1    to be edited by -- edited by -- by the
2    law firm and their -- Bob Glenn that
3    ultimately became -- The Critical Review?
4            MR. HUDSON:  Objection to
5        form.  Asked and answered.
6            MR. SILVER:  Objection to
7        form.
8    BY MR. TISI:
9        Q.   Are you -- are you saying
10   that under oath?
11       A.   Yes.
12       Q.   Okay.  The next question is
13   the -- the diaphragm study ultimately
14   became published in 2000 -- in fact, I'm
15   going to talk about this in a minute.  In
16   fact, in The Critical Review paper, you
17   actually acknowledge Crowell & Moring,
18   Inc., did you not?
19       A.   That's correct.
20       Q.   Okay.  So that was part of
21   this process, right?
22           MR. HUDSON:  Objection to
23       form.
24           MR. HEGARTY:  Objection to

Page 207

1        form.
2            MR. SILVER:  Objection to
3        form.
4            THE WITNESS:  It was part of
5        my disclosure.
6    BY MR. TISI:
7        Q.   I'm not asking you that.
8    I'm asking you the study itself.  The
9    report itself was generated as a result
10   of this contract.
11           MR. HUDSON:  Objection to
12       form.
13           THE WITNESS:  No.
14   BY MR. TISI:
15       Q.   It was not.  So why did you
16   bother acknowledging Crowell & Moring?
17   Was it a separate project?
18       A.   It was a separate project.
19       Q.   A totally separate project,
20   having nothing to do with each other?
21       A.   They were separate projects.
22       Q.   Did it have anything to do
23   with each other?
24       A.   They had the same topic.

Page 208

1        Q.   They had the same topic?
2        A.   Yes.
3        Q.   They had the same language,
4    correct?
5        A.   No.
6        Q.   The same -- a lot of the
7    language overlapped, correct?
8        A.   There might have been a
9    little overlap, but almost all of it was
10   completely separate.
11       Q.   Okay.  And then the
12   second -- the second article which was
13   the diaphragm study --
14       A.   Right.
15       Q.   -- was actually done, and
16   actually we'll talk about this, you
17   acknowledge that as a grant from -- from
18   J&J and Imerys, correct?
19           MR. HUDSON:  Objection to
20       form.
21           THE WITNESS:  That's what
22       was published, that's correct.
23   BY MR. TISI:
24       Q.   Right, that was published.

Page 209

1    It wasn't a grant, was it?  You were paid
2    for it by a law firm.
3        A    A grant is a totally
4    different process, right?
5            MR. SILVER:  Objection to
6        form.
7            MR. HEGARTY:  Objection to
8        form.
9    BY MR. TISI:
10       Q.   A grant is a process where
11   you compete to write a -- you submit a
12   grant proposal, it's vetted by a
13   committee, and a grant is -- a grant is
14   either given or not given.  That has a
15   very special meaning?
16       A.   Yes.
17           MR. HEGARTY:  Objection to
18       form.
19   BY MR. TISI:
20       Q.   Right.  The diaphragm study
21   was not that, was it?
22       A.   So, that's the way it was
23   worded.
24       Q.   But it was wrong, wasn't it?

53  (Pages 206 to 209)

Joshua E. Muscat, Ph.D.

Page 210

1          MR. HUDSON:  Objection to
2    form.
3    BY MR. TISI:
4          Q.   It was a contract with a law
5    firm, correct?
6          MR. HUDSON:  Objection to
7    form.
8          THE WITNESS:  It -- I would
9    phrase it as a -- a contract would
10    have been a better use of the word
11    than grant.
12    BY MR. TISI:
13          Q.   Okay.  Yeah.  And Crowell &
14    Moring was not a company, was it, it was
15    a law firm, correct?
16          A.   Crowell & Moring is a law
17    firm.
18          Q.   Right.  And you wrote
19    Crowell & Moring, Inc., correct?
20          A.   Yes.
21          Q.   And when you wrote this
22    contract with -- when you wrote the
23    meta-analysis from the law firm -- excuse
24    me.  The meta-analysis -- the diaphragm

Page 211

1    paper was actually a contract with a law
2    firm on behalf of Imerys and Johnson &
3    Johnson, that would have been more
4    accurate, true?
5          MR. HUDSON:  Objection to
6    form.
7          THE WITNESS:  I'm sorry.
8    I'm not sure what you're saying.
9    More accurate than what?
10    BY MR. TISI:
11          Q.   Than writing this was
12    published -- this was published with a
13    grant from J&J and Imerys.  This was not
14    a grant proposal, correct?
15          MR. HUDSON:  Objection to
16    form.
17    BY MR. TISI:
18          Q.   If I had gone to -- if I
19    took this, this contract to the National
20    Institutes of Health who do grants,
21    right?
22          A.   Yes.
23          Q.   And I presented this, would
24    they say this was a grant?

Page 212

1          MR. HUDSON:  Objection to
2    form.
3          MR. SILVER:  Objection to
4    form.
5          THE WITNESS:  I can't
6    comment on whether the word grant
7    would be used or not.
8    BY MR. TISI:
9          Q.   So and then you have -- so
10    you have -- now all during the mid '90s
11    you were having meetings with Johnson &
12    Johnson, correct?
13          MR. HEGARTY:  Objection to
14    form.
15          THE WITNESS:  No.
16    BY MR. TISI:
17          Q.   You had a meeting in 2009 at
18    Skillman to propose additional studies,
19    correct?
20          A.   I don't remember the exact
21    date.  It was --
22          Q.   January of 2008?
23          A.   Okay.  Okay.  Mm-hmm.
24          Q.   Okay.  Proposed studies.  In

Page 213

1    2009, you met with them for the Citizen's
2    Petition?
3          A.   Right.
4          Q.   2010, you wrote the -- you
5    actually worked on and published in 2011
6    the paper we talked about, the 2011 paper
7    which was the last paper?
8          A.   Right.
9          Q.   Okay.  And then you became
10    an expert for them in litigation, right?
11          A.   That's correct.
12          Q.   My handwriting is abysmal.
13          So and -- let me ask you
14    this.  Were you paid all during this
15    time?
16          MR. HEGARTY:  Objection to
17    form.
18          MR. SILVER:  Objection to
19    form.
20    BY MR. TISI:
21          Q.   Were you paid for your work
22    at American -- that you did with American
23    Health Foundation?
24          A.   I was an employee there.

54  (Pages 210 to 213)

Joshua E. Muscat, Ph.D.

Page 214

```
1        Q.   All right.  Did -- did they
2   get money from Johnson & Johnson in
3   connection with your work?
4            MR. HUDSON:  Objection to
5        form.
6            THE WITNESS:  We were not
7        funded to do that.
8   BY MR. TISI:
9        Q.   Right.  But you -- but they
10  paid you for your -- for submitting a
11  proposal and meeting with them, and your
12  expenses and all that stuff, going to
13  Skillman, all that thing?
14           MR. HUDSON:  Objection.
15           THE WITNESS:  I have no
16       knowledge of that.  I just, I was
17       an employee, I don't -- I didn't
18       do the billing.  I don't know
19       whether Johnson & Johnson paid for
20       our trip to go out there.  I have
21       no knowledge of that.
22  BY MR. TISI:
23       Q.   But you know you -- you were
24  hoping to get the contract, right?
```

Page 215

```
1        A.   Sure.
2        Q.   Okay.  So about 1994 you
3   were hoping to get funded and then you
4   became -- you were paid for your NTP
5   work.  You were paid for your working on
6   that contract with the lawyers, correct?
7            MR. HEGARTY:  Objection to
8        form.
9            MR. HUDSON:  Objection to
10       form.
11           THE WITNESS:  I'm sorry,
12       which contract were you referring
13       to?
14  BY MR. TISI:
15       Q.   The contract involving the
16  diaphragm study and The Critical Review?
17       A.   No.
18       Q.   You weren't paid for that?
19       A.   No.
20       Q.   It didn't -- you didn't get
21  paid, nobody paid you?
22       A.   No.
23       Q.   Johnson & Johnson admits
24  that they paid you.
```

Page 216

```
1            MR. HEGARTY:  Objection.
2            MR. SILVER:  Objection.
3   BY MR. TISI:
4        Q.   They paid to -- you never
5   got any money for any of the work that
6   you did with Meta-Analysis Research
7   Group?
8            If I were to have
9   Dr. Huncharek in that chair right now and
10  say did you pay Dr. Huncharek (sic) for
11  the work that he did on those papers, he
12  would say no?
13           MR. HUDSON:  Objection to
14       form.
15           THE WITNESS:  I can't answer
16       that.  I -- I never submitted any
17       time sheets to him.  I was not
18       paid for it.
19  BY MR. TISI:
20       Q.   Okay.  In this -- in this
21  document here it says you were going to
22  be paid, at one point like $6,000, et
23  cetera, for your consulting fees and all
24  that?
```

Page 217

```
1        A.   I see that.
2            MR. HEGARTY:  Objection.
3   BY MR. TISI:
4        Q.   You never got any of that
5   money?
6        A.   No.
7        Q.   Really?
8        A.   Yes.
9        Q.   And your trips back and
10  forth to Skillman, you never got paid for
11  that?
12       A.   No.  I don't have any
13  recollection of submitting a bill for my
14  trip to Skillman, no.
15       Q.   Were you paid as an expert?
16           MR. HUDSON:  Objection to
17       form.
18           MR. HEGARTY:  Objection to
19       form.
20           THE WITNESS:  No.
21  BY MR. TISI:
22       Q.   You weren't paid as an
23  expert.  You did all this for free, all
24  of it for free?
```

55 (Pages 214 to 217)

Joshua E. Muscat, Ph.D.

Page 218

1        MR. HEGARTY: Objection to
2    form.
3        THE WITNESS: I really
4    didn't do that much. I went to
5    Skillman, that is true.
6 BY MR. TISI:
7    Q.  You had meetings and
8 conversations?
9    A.  Yes.
10    Q.  You -- by the way, was -- do
11 you know whether Dr. Huncharek was paid?
12    A.  I don't know.
13    Q.  Okay. Now let's talk about
14 Imerys. My friend Mark down there is
15 perking up his head.
16        Imerys was a company that
17 mines talc for cosmetic use. We talked
18 about that, correct?
19    A.  Yes.
20    Q.  And you first came in
21 contact -- did you speak with them at any
22 time in the 1990s to your knowledge?
23    A.  No, I don't believe so.
24    Q.  So the first contact that

Page 219

1 you would have had with them to the best
2 of your knowledge was in preparation for
3 the -- the PC -- or the report on talc to
4 the NTP?
5        MR. SILVER: Objection to
6    form.
7        MR. HEGARTY: Objection to
8    form.
9        THE WITNESS: No.
10 BY MR. TISI:
11    Q.  Okay. That's -- I thought
12 you said you understood that Imerys was
13 involved with the -- retaining The
14 Weinberg Group?
15        MR. HUDSON: Objection to
16    form.
17        THE WITNESS: No, I'm sorry,
18    can you repeat? That Imerys was
19    involved in retaining -- I know
20    you just showed me a document.
21 BY MR. TISI:
22    Q.  Yes. Do you remember
23 that -- do you remember that we talked
24 about Imerys and Luzenac -- I should say

Page 220

1 Luzenac -- was involved with helping put
2 together the packet for the NTP in 2000?
3    A.  For The Weinberg Group? I
4 thought the -- the document you showed me
5 suggested my name was nominated by --
6    Q.  Johnson & Johnson.
7    A.  Johnson & Johnson.
8    Q.  But you know that -- do you
9 know that Imerys was involved in the
10 process of collecting reports for
11 presentation to the NTP in 2000?
12        MR. HUDSON: Objection to
13    form.
14        MR. SILVER: Objection to
15    form.
16        THE WITNESS: No.
17 BY MR. TISI:
18    Q.  You don't know that. Okay.
19        But -- so the first
20 knowledge you have is in 2005 and 2004
21 when the contract was entered into on
22 behalf of Imerys to do those two studies?
23    A.  That's correct.
24    Q.  The diaphragm study and The

Page 221

1 Critical Review?
2    A.  That's correct.
3        MR. SILVER: Objection to
4    form.
5 BY MR. TISI:
6    Q.  Okay. And you actually, at
7 the meetings in Skillman and, et cetera,
8 those meetings were meetings where Imerys
9 was involved, correct?
10        MR. HUDSON: Objection to
11    form.
12 BY MR. TISI:
13    Q.  Mr. Zazenski was there,
14 other people from Imerys were there. Do
15 you recall that?
16    A.  No, I don't.
17    Q.  Do you remember
18 submitting -- submitting your -- your
19 proposed additional studies to people at
20 Imerys?
21    A.  No.
22    Q.  You don't -- did you have
23 any involvement in that at all, preparing
24 those study proposals or was that all

56 (Pages 218 to 221)

Joshua E. Muscat, Ph.D.

Page 222

1  Dr. Huncharek?
2       A.   Those -- those were
3  Dr. Huncharek's proposals.
4       Q.   But your name was on it?
5       A.   Yes.
6       Q.   Why would Dr. Huncharek --
7  but were you -- did you know that they
8  were being submitted with your name on
9  it?
10      A.   I think I was aware of it.
11      Q.   You think you were aware of
12  it. You went to the meetings.
13      A.   Yes.
14      Q.   I mean he wasn't hiding it
15  from you, was he?
16      A.   No.
17           MR. HUDSON:  Objection to
18      form.
19  BY MR. TISI:
20      Q.   And you don't -- if the
21  records reflect that Imerys was at those
22  meetings, that wouldn't surprise you,
23  would it?
24           MR. HEGARTY:  Objection to

Page 223

1       form.
2            THE WITNESS:  It wouldn't
3       surprise me.  I don't remember who
4       was at those meetings.
5  BY MR. TISI:
6       Q.   Well, the record will
7  reflect, I will -- I will make a
8  representation to you that at that
9  meeting and at the Citizen's Petition
10 meeting in November of 2008, Imerys was
11 at -- was at all of those.
12           MR. HUDSON:  Objection to
13      form.
14           THE WITNESS:  Okay.
15  BY MR. TISI:
16      Q.   Do you have any reason to
17  disbelieve me?
18      A.   No.
19           MR. HUDSON:  Objection to
20      form.
21  BY MR. TISI:
22      Q.   Okay.  CTFA or PCPC, we
23  talked about that.
24           In 2000 you were retained,

Page 224

1  you were paid by The Weinberg Group, but
2  we know it was submitted, your report was
3  submitted on behalf of CTFA, correct?
4       A.   That's correct.
5       Q.   Do you know who Linda Loretz
6  is?
7       A.   I know the name has come up.
8  I -- I can't remember.  The name sounds
9  familiar.  I can't really remember who
10 she is.
11      Q.   Okay.  Do you know that they
12  were -- and -- and the Citizen's Petition
13  in 2009 was submitted under PCPC's name
14  as well, correct?
15      A.   That's correct.
16      Q.   You forgot one important
17  point.  You attended the IARC proceedings
18  in France, correct?
19      A.   That's correct.
20      Q.   And you initially were
21  proposed to represent Imerys, correct?
22           MR. HEGARTY:  Objection to
23      form.
24           MR. SILVER:  Objection to

Page 225

1       form.
2            MR. HUDSON:  Objection to
3       form.
4            THE WITNESS:  So no, my name
5       was nominated to be the --
6       initially on the expert panel.
7  BY MR. TISI:
8       Q.   From -- and who nominated
9  you?
10      A.   IMA.
11      Q.   IMA North America.  And you
12  were rejected, right?
13      A.   That's correct.
14      Q.   And then you went as an
15  observer, correct?
16      A.   I was nominated as observer,
17  that's correct.
18      Q.   Okay.  And so that would be
19  under this category IMA North America.
20  So that would be 2005, nomination for
21  panel for IARC, observer.
22           Now, the panel included some
23  scientists and epidemiologists, correct?
24      A.   Yes.

57 (Pages 222 to 225)

Joshua E. Muscat, Ph.D.

Page 226

```
1       Q.   Do you know who
2   Dr. Siemietycki?
3       A.   I believe he was the chair
4   of the panel.
5       Q.   He was the chair of the
6   panel.  Do you remember if
7   Dr. Siemietycki -- you made comments
8   about Dr. Siemietycki was the most -- I
9   think you used the word "the most
10  skeptical."  Do you remember that phrase?
11          MR. HEGARTY:  Objection to
12      form.
13          THE WITNESS:  I don't have
14      any specific recollection.  Okay.
15  BY MR. TISI:
16      Q.   Well, in your interactions
17  with Dr. Siemietycki --
18      A.   Yes.
19      Q.   -- was he -- was he -- did
20  he appear to be biased to you?
21      A.   No, I don't think so.
22      Q.   Did he appear to be -- he's
23  a well known epidemiologist, correct?
24      A.   I don't know.  I mean, I
```

Page 227

```
1   never met him before.  That was my first
2   encounter with him.
3       Q.   So you --
4       A.   I don't know if he's well
5   known or not.
6       Q.   Okay.
7       A.   Right.
8       Q.   Now, we talked about Imerys,
9   Crowell & Moring.
10          And, actually, at the IARC
11  proceedings, Bob Glenn was there, right,
12  from the law firm, correct?
13      A.   Yes.
14      Q.   So had the lawyers go -- the
15  lawyers -- the lawyers' consultant go out
16  with you, correct?
17          MR. HEGARTY:  Objection to
18      form.
19          THE WITNESS:  Bob Glenn was
20      there.
21  BY MR. TISI:
22      Q.   And people from Imerys were
23  there, correct?
24      A.   I can't remember the names.
```

Page 228

```
1   Yeah, I think so.
2       Q.   And Johnson & Johnson was
3   there?
4          MR. HUDSON:  Objection to
5      form.
6          THE WITNESS:  I don't know.
7   BY MR. TISI:
8       Q.   2005?
9       A.   No, I don't think so.
10      Q.   You don't think so?
11      A.   Johnson & Johnson?  I
12  remember Bob Glenn was there.
13      Q.   Do you remember having
14  meetings with, and making reports of the
15  proceedings to the talc industry --
16          MR. HEGARTY:  Objection to
17      form.
18  BY MR. TISI:
19      Q.   -- who were present?
20      A.   There -- there was a group
21  that was sent from the IMA that was
22  there.
23      Q.   And it included Johnson &
24  Johnson, did it not?
```

Page 229

```
1          MR. HEGARTY:  Objection to
2      form.
3          THE WITNESS:  I mean, I
4      don't remember.  I -- no.  I
5      don't -- maybe.
6   BY MR. TISI:
7       Q.   And it included Imerys,
8   correct?  Mr. Zazenski was there, was he
9   not?
10      A.   I honestly can't remember.
11  If you say so, yes.
12      Q.   And the Minerals Association
13  was there.  They actually were the people
14  that hired you, correct?
15      A.   That's correct.
16      Q.   Did you disclose to -- you
17  actually had to apply to be an observer
18  to IARC, correct?
19      A.   Yes.
20      Q.   Okay.  Did you disclose that
21  you had done work with Crowell & Moring
22  and you were actually under contract with
23  a law firm representing Imerys and J&J?
24          MR. HEGARTY:  Objection to
```

58 (Pages 226 to 229)

Joshua E. Muscat, Ph.D.

Page 230

1    form.
2         THE WITNESS:  There was a
3    disclosure form that was filled
4    out.
5    BY MR. TISI:
6         Q.  And that disclosure form
7    doesn't mention J&J or Imerys or
8    Crowell & Moring at all, does it?
9         A.  Yeah, I looked at that.
10        Q.  And it does not mention it,
11   does it?
12        A.  It mentions IMA.  And there
13   was a second disclosure about whether I
14   worked for tobacco companies.
15        Q.  Right.  But it didn't
16   mention J&J, did it?
17        A.  I didn't put that on the
18   form.
19        Q.  And it was -- and it was --
20   you were actually retained by Crowell &
21   Moring on behalf of both J&J and Imerys,
22   correct?
23        MR. HUDSON:  Objection to
24   form.

Page 231

1         THE WITNESS:  I'm sorry, can
2    you repeat that?
3    BY MR. TISI:
4         Q.  Yeah.
5         A.  Yeah.
6         Q.  You were actually -- the
7    IARC proceedings were in February of
8    2005?
9         A.  Yes.  Yes.
10        MR. HUDSON:  Objection.
11   BY MR. TISI:
12        Q.  And we looked at your
13   contract from February 28, 2005, and you
14   were actually retained by a law firm on
15   behalf of Imerys, and you also understood
16   J&J as well, correct?
17        MR. HUDSON:  Objection to
18   form.
19        THE WITNESS:  So I didn't
20   know about J&J.
21   BY MR. TISI:
22        Q.  Okay.  Let's talk about
23   Imerys?
24        A.  Okay.

Page 232

1         Q.  Did you disclose that you
2    were working for -- that you were under
3    contract for the -- for the mining
4    company?
5         A.  No.
6         Q.  Don't you think that that's
7    something that people at IARC would want
8    to know?
9         MR. HUDSON:  Objection to
10   form.
11        THE WITNESS:  That's an
12   oversight.  I disclosed my paid
13   consultant -- my paid sponsor,
14   Industrial Minerals Association.
15        It's true I didn't disclose
16   the Crowell & Moring.  But I don't
17   think it even occurred to me.
18   BY MR. TISI:
19        Q.  You didn't disclose, you
20   didn't disclose The Weinberg Group, did
21   you?
22        A.  No.
23        Q.  You didn't disclose PCPC,
24   did you?

Page 233

1         A.  No.
2         MR. LOCKE:  Objection to
3    form.
4    BY MR. TISI:
5         Q.  Let's talk about the lawyers
6    a bit.
7         MR. TISI:  Can I have 149,
8    please.  Actually, never mind.
9    BY MR. TISI:
10        Q.  We talked about Crowell &
11   Moring.  That's the law firm, right?
12        A.  Yes.
13        Q.  And you had a contract with
14   Crowell & Moring, right?
15        MR. HUDSON:  Objection to
16   form.
17        THE WITNESS:  I signed a
18   contract with them, right.
19   BY MR. TISI:
20        Q.  But you claim to have not
21   been paid directly or indirectly at all
22   for any of the work that you did under
23   the contract?
24        A.  That's correct.

59 (Pages 230 to 233)

Joshua E. Muscat, Ph.D.

Page 234

```
1        Q.   And the contract, just to be
2   clear, was for the -- so this would be
3   2005.  And you contract -- and it's for
4   The Critical Review and diaphragm, right?
5             MR. HEGARTY:  Objection to
6             form.
7             THE WITNESS:  Diaphragm
8             meta-analysis.
9   BY MR. TISI:
10       Q.   Correct.  Were you ever told
11  by the law firm to make sure that you
12  communicated any information to them to
13  preserve the attorney privileges against
14  disclosure?
15            MR. SILVER:  Objection.  I'm
16            instructing the witness's counsel
17            to instruct the witness not to
18            answer on the grounds of
19            privilege.  Communications with a
20            law firm?  Chris, come on.
21  BY MR. TISI:
22       Q.   Did you ever understand that
23  you were -- that you were supposed to
24  continue to communicate with the law firm
```

Page 235

```
1   in order to not disclose information?
2             MR. SILVER:  Same
3             instruction to the extent the
4             witness can answer.
5   BY MR. TISI:
6        Q.   You are not going to answer
7   that question?
8        A.   No.
9        Q.   Okay.  And you did note,
10  that we talked about before, in your
11  contract with the law firm, there is a
12  provision that everything that you did
13  had to be marked with a little phrase
14  that said attorney work product.  Do you
15  remember that?  Privileged?
16            MR. SILVER:  Objection to
17            form.
18            MR. HEGARTY:  Objection to
19            form.
20            MR. HUDSON:  Objection to
21            form.
22            THE WITNESS:  Yes.
23  BY MR. TISI:
24       Q.   Okay.  And that it was
```

Page 236

```
1   strictly confidential, correct?
2        A.   Yes.
3        Q.   And you abided by the
4   contract, correct?
5        A.   I personally, yes.
6        Q.   Did you ever understand from
7   your speaking with anybody involved in
8   this contract that before J&J was willing
9   to fund the studies, they wanted to know
10  whether or not the study would be
11  favorable to their position?
12            MR. HUDSON:  Objection to
13            form.
14            THE WITNESS:  I'm sorry.  I
15            don't understand the question.
16  BY MR. TISI:
17       Q.   Did they ever want to know
18  from you what you thought your studies
19  would show before you actually did the
20  studies?
21            MR. HEGARTY:  Objection to
22            form.
23            THE WITNESS:  Which studies
24            are you referring to?
```

Page 237

```
1   BY MR. TISI:
2        Q.   Either one of them.  Any of
3   the studies under the contract.
4        A.   No.
5             (Document marked for
6             identification as Exhibit
7             Muscat-19.)
8   BY MR. TISI:
9        Q.   I'm going to show you an
10  e-mail dated --
11            MR. TISI:  What number are
12            we at?
13  BY MR. TISI:
14       Q.   Here's Number 19.  I'll see
15  if I can refresh your recollection here.
16            This is an e-mail dated
17  February 18, 2005.  Do you see that?
18       A.   Yes.
19       Q.   And that was actually before
20  the contract was formally entered into on
21  the 28th of February 2005, correct?
22       A.   Yes.
23       Q.   Okay.  And there's an e-mail
24  that refers to you?
```

60 (Pages 234 to 237)

Joshua E. Muscat, Ph.D.

Page 238

1      A.   Okay.
2      Q.   It says -- and I'll kind of
3  see if I can help you set the table here
4  a little bit.
5      A.   Okay.
6      Q.   It's to Steven Mann.  And
7  You know, that he's with J&J, correct?
8      A.   Yes.
9      Q.   He is a toxicologist with
10  J&J, correct?
11          MR. HEGARTY:  Objection to
12      form.
13          THE WITNESS:  I don't know
14      if he's still there or not.  But
15      right.
16  BY MR. TISI:
17      Q.   And it's from Ridgway Hall,
18  who is the senior partner at Crowell &
19  Moring correct?
20      A.   Yes.
21      Q.   And it's an e-mail that
22  says, "In talking to my boss I think it
23  would be better that J&J not be mentioned
24  in the retainer letter."

Page 239

1          Do you see that?
2      A.   Yes.
3      Q.   Okay.  Now, this is the same
4  Steven Mann who is cc'd on the retainer
5  letter, correct?
6      A.   Yes.
7      Q.   And actually, J&J was not on
8  the retainer letter, was it?
9          MR. HEGARTY:  Objection to
10      form.
11          THE WITNESS:  That's
12      correct.
13  BY MR. TISI:
14      Q.   "I don't have a definitive
15  answer on splitting the cost study yet.
16  But that shouldn't hold you up from
17  proceeding with Mike and Josh."
18      A.   See that.
19      Q.   Mike and Josh is you and
20  Mike -- you and --
21      A.   Dr. Huncharek.
22      Q.   Huncharek.  "However, it's
23  my recommendation that Josh" -- I'm
24  sorry.  "However, it is my recommendation

Page 240

1  that Josh expects favorable results from
2  the diaphragm/ovarian comparison; thus,
3  we should be willing to support this
4  study also."
5          Do you see that?
6      A.   Yes, I do.
7      Q.   Okay.  Did you ever
8  communicate that you said in 2005, you
9  expected results that would be favorable
10  to the company?
11          MR. HEGARTY:  Objection to
12      form.
13          THE WITNESS:  No.
14  BY MR. TISI:
15      Q.   So that's a lie?
16          MR. HEGARTY:  Objection to
17      form.
18          THE WITNESS:  I don't know
19      whether it's a lie or not.  But
20      it's just not accurate.
21  BY MR. TISI:
22      Q.   It's not accurate?
23      A.   Yeah, that's correct.
24      Q.   But it does say that we

Page 241

1  would be willing to support the study,
2  correct?
3          MR. HEGARTY:  Objection to
4      form.
5  BY MR. TISI:
6      Q.   Thus, we should be willing
7  to support the study.
8      A.   Yeah, I see that.
9      Q.   And they did provide support
10  for the study, correct?
11          MR. HEGARTY:  Objection to
12      form.
13          THE WITNESS:  They provided
14      support for the study.
15  BY MR. TISI:
16      Q.   Correct.  And that was --
17  when we say support, we're talking about
18  financial support, correct?
19      A.   I would assume so.
20      Q.   And in fact, you and
21  Dr. Huncharek actually drafted two
22  papers, correct?  Two drafts of papers,
23  correct?
24          MR. HUDSON:  Objection to

61 (Pages 238 to 241)

Joshua E. Muscat, Ph.D.

Page 242

1       form.
2              THE WITNESS:  He wrote the
3       papers.
4       BY MR. TISI:
5          Q.   Boy, you're going a long way
6       to try to distance yourself from those
7       papers, Doctor?
8          A.   I'm just stating the facts.
9              MR. HEGARTY:  Objection to
10      form.
11      BY MR. TISI:
12         Q.   He wrote the papers.  But
13      you -- you looked at the papers before
14      they were submitted, correct?
15         A.   I don't have a specific
16      recollection of that, but I probably did.
17         Q.   Yeah, and they were
18      submitted according to the contract with
19      Crowell & Moring, the lawyers, on behalf
20      of Imerys, the mining company, and J&J,
21      the manufacturer of talc?  It was
22      submitted to the law firm for review and
23      comment, correct?
24             MR. HEGARTY:  Objection to

Page 243

1       form.
2              MR. HUDSON:  Objection to
3       form.
4              THE WITNESS:  I don't know.
5       BY MR. TISI:
6          Q.   You don't know?
7          A.   I -- I didn't submit
8       anything to the law firm.
9          Q.   You submitted it to
10      Dr. Huncharek with the idea that
11      Dr. Huncharek was going to submit it to
12      the law firm, correct?
13             MR. HUDSON:  Objection to
14      form.
15             THE WITNESS:  I'm sorry.
16      Could you repeat that?
17      BY MR. TISI:
18         Q.   You knew when you drafted
19      the papers that they were going to be
20      going to the law firm for review and
21      comment, didn't you?
22             MR. HUDSON:  Objection to
23      form.
24             THE WITNESS:  I didn't draft

Page 244

1       the papers.
2       BY MR. TISI:
3          Q.   I didn't -- okay.
4              You knew when you were
5       involved with the papers that they were
6       going in under your name, first of all
7       right?
8          A.   That's correct.
9          Q.   Okay.  So you knew that you
10      were going to be responsible academically
11      for the papers, correct?
12         A.   Not academically.  But for
13      the contract requirements.
14         Q.   Okay.  And you knew that
15      they were submitted to the law firm for
16      review and comment, correct?
17         A.   No, actually.
18         Q.   You didn't know that?
19         A.   I didn't have any part of
20      that process.
21         Q.   In the contract it says it
22      was to be submitted to the law firm?
23         A.   I see that.
24         Q.   You did see that?

Page 245

1          A.   Yes.
2          Q.   And you know that in fact
3       did happen, don't you?
4              MR. HUDSON:  Objection to
5       form.  Asked and answered.
6              THE WITNESS:  Okay.  So no.
7       BY MR. TISI:
8          Q.   Okay.  Let's see if we can
9       prove it to you.
10         A.   Okay.
11             (Document marked for
12         identification as Exhibit
13         Muscat-20.)
14      BY MR. TISI:
15         Q.   This is Number 20, Exhibit
16      Number 20.  Exhibit Number 20 is a
17      document dated July 27th, 2005.  Do you
18      see that?
19         A.   Yes, I see that.
20         Q.   And that is a document under
21      Crowell & Moring, do you see that?  It
22      says it's from Robert Glenn, and he has a
23      Crowell e-mail address, correct?
24         A.   Yes.

62 (Pages 242 to 245)

Joshua E. Muscat, Ph.D.

Page 246

1    Q.   To Ralph Godell, who is
2  Luzenac North America, I'll represent to
3  you, correct?
4    A.   Mm-hmm.
5    Q.   And Steve Mann, who we
6  talked about is with J&J, correct?
7    A.   That's correct.
8    Q.   Cc'd Ridgway Hall, who is
9  the lawyer for the law firm, the senior
10  partner, correct?
11    A.   Yes.
12    Q.   "Task deliverables from
13  Drs. Huncharek and Muscat."
14      Do you see that?
15    A.   Yes.
16    Q.   And did you ever consider
17  your two papers to be deliverables under
18  a contract?
19      MR. HUDSON:  Objection to
20      form.
21      THE WITNESS:  I'm sorry, I
22      don't think I understood the
23      question.
24  BY MR. TISI:

Page 247

1    Q.   I'm just looking at the
2  subject matter of the e-mail.  It says,
3  "Task deliverables from Drs. Huncharek
4  and Muscat."
5      That's you, Dr. Muscat,
6  right?
7    A.   Yes.
8    Q.   Right.  It says -- and we go
9  down below.  It says, "We recently
10  received comments from Drs. Huncharek and
11  Muscat in response to our agreement
12  providing for comments to the NTP
13  regarding talc and ovarian cancer and for
14  conducting a meta-analysis of talc usage
15  in contraceptive diaphragms and ovarian
16  cancer.  Do you see that?
17    A.   Yes.
18    Q.   And he provides five
19  documents.
20      Do you see that?
21    A.   Yes.
22    Q.   One is an executive summary,
23  two is a clean copy of -- and three is a
24  copy with Hall and Glenn's review of a

Page 248

1  document entitled "Ovarian Cancer:  A
2  Critical Review."
3      Do you see that?
4      MR. HUDSON:  Objection to
5      form.
6      THE WITNESS:  Yes.
7  BY MR. TISI:
8    Q.   And, now, that's the exact
9  title of the article that was ultimately
10  published by you in 2008, correct?
11      MR. HEGARTY:  Objection to
12      form.
13      THE WITNESS:  Is it the
14      exact title?  It could be.  I'd
15      have to look at it again.
16  BY MR. TISI:
17    Q.   Well, let's see if we can
18  look at it together.
19    A.   Okay.
20    Q.   Okay.  It says, "Perineal
21  Talc Use and Ovarian Cancer:  A Critical
22  Review."
23      Do you see that?
24    A.   Yes.

Page 249

1    Q.   Okay.  Other than the word
2  "use," it's the exact same title, is it
3  not?
4      MR. HUDSON:  Objection to
5      form.
6      MR. SILVER:  Objection to
7      form.
8  BY MR. TISI:
9    Q.   "Talc and Ovarian Cancer:  A
10  Critical Review."  The name of the
11  article is "Perineal Talc Use and Ovarian
12  Cancer:  A Critical Review."
13      Do you see that?
14    A.   Yes, I see it.
15    Q.   Okay.  And in fact, if you
16  look at it, this, what was attached to
17  this document that you drafted in 2005
18  ultimately became the article that was
19  published in the peer-reviewed
20  literature, and in fact this article
21  acknowledges Crowell & Moring, does it
22  not?
23      MR. HUDSON:  Objection to
24      form.

63 (Pages 246 to 249)

Joshua E. Muscat, Ph.D.

Page 250

1       MR. HEGARTY:  Objection to
2   form.  Asked and answered.
3       THE WITNESS:  It does not.
4   It's a different document.  It
5   does acknowledge Crowell & Moring.
6   It's a different document.
7   BY MR. TISI:
8       Q.   It's a different document
9   because the words were changed by Dr. --
10  there were red lines and edits to what
11  you submitted, correct?
12      MR. HEGARTY:  Objection to
13  form.
14      THE WITNESS:  I'm sorry.
15  BY MR. TISI:
16      Q.   Let me ask you this
17  question.  Let me rephrase the question.
18      When you submitted a
19  document to -- first of all, you and
20  Dr. Huncharek did draft a document for
21  the lawyers entitled "Talc and Ovarian
22  Cancer:  A Critical Review," correct?
23      MR. HUDSON:  Objection to
24  form.

Page 251

1   BY MR. TISI:
2       Q.   You did?
3       A.   Dr. Huncharek had submitted
4   that.
5       Q.   Right.
6       A.   Right.
7       Q.   But you knew that it was
8   going to happen, right?
9       A.   I assumed so, yes.
10      Q.   Okay.  When it came back, it
11  was different than when you wrote it,
12  correct?
13      A.   I didn't write it.  And I
14  don't have any knowledge of how it's
15  different.  I understand that there was
16  some comments made.  That's correct.
17      Q.   Right.  And the comments
18  made, when you say you didn't write it?
19      A.   Yes.
20      Q.   You didn't write this, you
21  didn't write this paper at all?
22      A.   That's correct.
23      Q.   Did you write the actual --
24  the paper that was actually published?

Page 252

1       A.   The paper that was
2   published, I wrote that.
3       Q.   You wrote that?
4       A.   Yeah.
5       Q.   Did you have the documents
6   that Dr. Huncharek wrote in front of you
7   when you wrote this article?
8       MR. HEGARTY:  Objection to
9   form.
10  BY MR. TISI:
11      Q.   That appeared in 2008?
12      A.   The documents that I used
13  were the ones that were referenced --
14      Q.   No.
15      A.   -- in the article.
16      Q.   No, when I asked you -- when
17  I asked you -- I asked you --
18      A.   Yes.
19      Q.   -- when you looked at this
20  document, did you have in front of you
21  the -- what Dr. Huncharek had submitted
22  to Crowell & Moring and what Crowell &
23  Moring had returned back that was a red
24  line?

Page 253

1       MR. HEGARTY:  Objection to
2   form.
3       THE WITNESS:  I -- I don't
4   -- I don't recall of any red line.
5       I did have -- I think I had
6   a final copy of the paper that was
7   submitted --
8   BY MR. TISI:
9       Q.   Right.
10      A.   -- to Crowell & Moring.
11      And I subsequently wrote a
12  separate document which was published.
13      Q.   In which you thanked Crowell
14  & Moring, Inc.?
15      A.   Yes, that's correct.
16      Q.   And the reason why you
17  thanked Crowell & Moring Inc. was because
18  the information that you wrote about was
19  derived from the paper that ultimately
20  came out of the contract, right?
21      MR. HUDSON:  Objection to
22  form.
23      THE WITNESS:  No.  It was a
24  separate document.

64  (Pages 250 to 253)

Joshua E. Muscat, Ph.D.

Page 254

1    BY MR. TISI:
2         Q.   Doctor, I understand that
3    this document is physically separate from
4    this document.
5         A.   Mm-hmm-hmm.
6         Q.   I'm asking you, then why did
7    you -- okay.
8              Why did you thank Crowell &
9    Moring?
10        A.   For the purposes of
11   disclosure and transparency.
12        Q.   Why were you disclosing
13   Crowell & Moring, Inc.?
14        A.   To me it was like a -- it
15   was an overdisclosure.
16        Q.   Okay.  You are
17   overdisclosing because this article came
18   out of the process that was involved in
19   the contract?
20        A.   We were -- I was
21   overdisclosing because the authors had
22   previously done work for Crowell &
23   Moring.  That's correct.
24        Q.   The next article -- the next

Page 255

1    article referenced in Exhibit Number --
2              MR. TISI:  This is 20.
3    BY MR. TISI:
4         Q.   This is 20.  Is a manuscript
5    entitled "Use of Cosmetic Talc in
6    Contraceptive Diaphragms and Risk of
7    Ovarian Cancer:  A Meta-Analysis of Nine
8    Observational Studies," correct?
9         A.   I'm sorry.  Which --
10        Q.   Look at the front of your --
11   that document right there.
12        A.   Okay.
13        Q.   Number five it says a
14   manuscript.
15        A.   Yes.
16        Q.   And you submitted the
17   manuscript of what ultimately became
18   your --
19        A.   That manuscript was
20   submitted for publication.
21        Q.   Right.  And that was also
22   subject to review by Crowell & Moring
23   correct?
24              MR. HEGARTY:  Objection to

Page 256

1    form.
2              THE WITNESS:  I believe so.
3    BY MR. TISI:
4         Q.   Yeah.  And Crowell & Moring
5    and -- but you don't know what -- you
6    don't know what edits they had to that,
7    do you?
8         A.   No.
9         Q.   Now, if you go to the second
10   page of this e-mail, Exhibit 20.  It
11   says, "Ridge and I have prepared red line
12   comments using track changes tool on the
13   comments to the NTP."
14              Do you see that?
15        A.   Yes.
16        Q.   That's The Critical Review
17   paper, correct?
18        A.   Yes.
19        Q.   "Using track changes on a
20   different font, please send us additional
21   comments or changes you wish for the
22   authors to consider in revising the NTP
23   document or the manuscript which will be
24   submitted to the medical literature."

Page 257

1    Correct?
2         A.   Yes.
3         Q.   Okay.  And that's what it
4    says?  I read that correctly?
5         A.   Yes.
6         Q.   Okay.  And so it was your
7    understanding at this time that these
8    documents would be submitted to the
9    medical literature?
10             MR. HEGARTY:  Objection to
11   form.
12             THE WITNESS:  It wasn't my
13   understanding of anything.  The --
14   the two -- we call it the white
15   papers that were submitted to
16   Crowell & Moring, was written on
17   behalf -- was written by
18   Dr. Huncharek.  And those are the
19   events that happened.
20   BY MR. TISI:
21        Q.   Right.  You understood that
22   they would be subject to publication,
23   just as it indicates here in the
24   document, correct?

65 (Pages 254 to 257)

Joshua E. Muscat, Ph.D.

Page 258

1      MR. HUDSON:  Objection to
2   form.
3      THE WITNESS:  So the
4   meta-analysis was something that
5   was intended for publication.
6   BY MR. TISI:
7      Q.   Right.  And the other one
8   was actually used by you in actually
9   drafting what was the 2008 --
10      MR. HEGARTY:  Objection to
11   form.
12   BY MR. TISI:
13      Q.   If I took the 2000 -- if I
14   looked at the manuscript here, and I
15   looked at the 2008 --
16      A.   Yes.
17      Q.   -- there would be a lot of
18   overlap in language, wouldn't there be?
19      A.   No, I don't think so.
20      Q.   You don't think so?
21      A.   No.
22      Q.   It also says that, "You will
23   note that we recommended" -- now there is
24   a section on your 2008 study on

Page 259

1   mineralogy of talc, correct?
2      A.   Yes.
3      Q.   All right.  It says, "You
4   will note that the recommended section
5   related to talc mineralogy and its
6   similarity to asbestos, needs attention
7   by Rich Zazenski or a mineralogist."
8      Do you see that in this?
9      A.   I see that.
10      Q.   Do you know whether or not a
11   mineralogist -- first of all, let's be
12   clear.  Neither you or Dr. Huncharek are
13   mineralogists, correct?
14      A.   That's correct.
15      Q.   Okay.  And there's a whole
16   section in the 2008 paper on mineralogy,
17   correct?
18      A.   Yes.
19      Q.   Do you know whether or not
20   Dr. Huncharek got a consultation from
21   anybody at Imerys about the section on
22   mineralogy related to talc?
23      MR. HUDSON:  Objection to
24   form.

Page 260

1      MR. SILVER:  Objection to
2   form.
3      THE WITNESS:  No.
4   BY MR. TISI:
5      Q.   What qualifies you or
6   Dr. Huncharek to write about the
7   mineralogy of talc?
8      MR. HUDSON:  Objection to
9   form.
10      THE WITNESS:  Well, anybody
11   can write about it, right?  I
12   mean, honestly what qualifies --
13   it's a review article.  So a
14   review article may entail review
15   of literature outside of
16   epidemiology.  I don't think you
17   necessarily have to be an expert
18   on it.  But if you want to write
19   about it, then that's your option.
20   BY MR. TISI:
21      Q.   And you were clearly not an
22   expert on mineralogy, right?
23      A.   I wouldn't call myself an
24   expert.  But if I know enough to read

Page 261

1   something about it and write about it --
2      Q.   Okay.
3      A.   -- that may be relevant to
4   an article.
5      Q.   So if I know enough about,
6   like, making spaghetti sauce, I could be
7   a chef in Rome, right?
8      MR. SILVER:  Objection to
9   form.  Move to strike.
10      THE WITNESS:  Uh --
11   BY MR. TISI:
12      Q.   My point is, Doctor --
13      A.   Let me make a point, okay,
14   because I -- so I hope this explains
15   things.
16      Is that as scientists, and
17   particularly someone like myself that
18   reviews articles for the peer-reviewed
19   literature that actually serves on NIH
20   study sections, it's very common that I
21   review things that are outside my
22   particular topic area.  I have to know
23   them.  I can't become an expert in that.
24   But it's expected that I have some

66 (Pages 258 to 261)

Joshua E. Muscat, Ph.D.

Page 262

```
 1    working knowledge of it.
 2         So a lot of scientific
 3    communication, is written by -- includes
 4    things where you're not necessarily,
 5    you're an expert on it.  But it may be
 6    included in the report, because it's
 7    relevant to the report.  You don't have
 8    to be an expert.
 9         Okay.  There's a risk to
10    that.  Maybe you wrote something that's
11    incorrect.  But that's just part of the
12    scientific process.
13         Q.   Well, did you get a consult
14    from a mineralogist?  Because one of the
15    things that you write -- and I'm going to
16    back up here.  I'm a little bit off
17    topic, but I'll do it any way.  One of
18    the things in every one of your articles
19    that you wrote on this topic, is you have
20    a section where you talk about asbestos,
21    and that asbestos was a problem in the
22    1970s, but since the 1970s, it's no
23    longer a problem.
24         MR. HUDSON:  Objection to
```

Page 263

```
 1    form.
 2    BY MR. TISI:
 3         Q.   Generally speaking?
 4         MR. HUDSON:  Objection to
 5    form.  There's no question
 6    pending.
 7    BY MR. TISI:
 8         Q.   Correct?
 9         A.   Okay.
10         Q.   That's a theme that appears
11    in all of your -- in your articles on
12    talc?
13         MR. HEGARTY:  Objection.
14         THE WITNESS:  I'd have to go
15    back and look at it.  Okay.
16    BY MR. TISI:
17         Q.   Generally, and we'll go
18    through this.
19         A.   Okay.
20         Q.   But generally speaking, your
21    position has been, and you have
22    written -- you wrote to the FDA, you
23    wrote to -- in your articles, that some
24    of the epidemiology on talc might be
```

Page 264

```
 1    explained by the fact that there was some
 2    suggestion in the medical literature that
 3    there was talc contamination in the
 4    1970s, but that was no longer the case.
 5    Does that sound familiar to you?
 6         MR. HUDSON:  Objection to
 7    form.
 8         THE WITNESS:  So that's --
 9    that's not entirely correct.
10    BY MR. TISI:
11         Q.   Okay.  Well, what is
12    correct?
13         MR. HEGARTY:  Objection to
14    form.
15         THE WITNESS:  I may have
16    written the fact in some of the
17    other articles that were
18    published, that there may be a
19    confusion between asbestos and
20    talc.
21         But I'd have to go back and
22    look at all my stuff to see
23    specifically what you're referring
24    to.
```

Page 265

```
 1    BY MR. TISI:
 2         Q.   But you actually also make a
 3    different point, which is after the
 4    1970s, asbestos was not a problem in
 5    talc.  Do you remember making that
 6    assertion?
 7         MR. HUDSON:  Objection to
 8    form.
 9         THE WITNESS:  I'd have to
10    look at the specific paper.
11    BY MR. TISI:
12         Q.   Okay.  Let me ask you this.
13    Because I'll be -- I'm going to get into
14    this a little bit later.
15         A.   Okay, okay.
16         Q.   But you have never done, if
17    that statement appears in your medical
18    literature -- and I'm going to tell you
19    that it appears over and over and over
20    again, that as of the 1970s, the company
21    has tested for talc -- has tested the
22    talc for asbestos, and there's no
23    contamination.
24         A.   Yes.
```

67 (Pages 262 to 265)

Joshua E. Muscat, Ph.D.

Page 266

1    Q.   You never cited, and I'm
2  going to tell you, you never cited a
3  single study or survey or anything like
4  that.
5         Did you ever get that from
6  anybody?
7         MR. HUDSON:  Objection to
8  form.
9         MR. SILVER:  Objection to
10 form.
11 BY MR. TISI:
12    Q.   Did anybody ever tell you
13 that?
14         MR. HUDSON:  Same objection.
15         THE WITNESS:  So I was on
16 the IARC meeting, okay.  I was on
17 the panel.  I'm sorry I wasn't on
18 the panel.  But I attended the
19 panel meetings.
20         I've read the IARC
21 monograph.  And that's something
22 that has been in the literature,
23 so that it's thought that based on
24 IARC that the talc has been

Page 267

1  asbestos-free.
2         So those are -- those are
3  the basis of -- those are one of
4  the basis.  I can't say it's all
5  of it, but --
6  BY MR. TISI:
7    Q.   You never cited in your
8  medical literature a single -- you didn't
9  cite IARC.  You cited nothing for that
10 proposition, in your articles.
11         Can you point to me one
12 survey, one article, one anything in the
13 medical literature that indicates that
14 talc was asbestos-free since the 1970s?
15         MR. HUDSON:  Objection to
16 form.
17         MR. HEGARTY:  Objection to
18 form.
19         THE WITNESS:  So I'm not
20 sure -- I'm not sure why I would
21 be -- I'd have to look at it to
22 try and understand, is there a
23 need for this citation.  Okay.
24         Because unless it's

Page 268

1  something that is specific to a
2  particular data element, I'm not
3  sure that I would cite something.
4         But I can't say why did I
5  cite this or not cite this.
6  There's always reasons for
7  citations.  So I'm not sure what
8  the point is though, to be honest.
9         MR. HUDSON:  Counsel, we've
10 been going about another hour and
11 a half or so.  I don't know what
12 your lunch plans are, but you may
13 want to consider --
14         MR. TISI:  I Want to just
15 get through this.  If you mind,
16 just give me a little leeway for
17 the next 20 minutes, I'll be done
18 with this.
19         MR. HUDSON:  That's fair.  I
20 just wanted to make that request.
21 BY MR. TISI:
22    Q.   Okay.  Can you go to the
23 privilege log.  We were talking about
24 Crowell & Moring.  Can I go back to this

Page 269

1  chart right here.
2         We were talking about, so
3  your relationship with Crowell & Moring
4  began in about 2005.  And move forward,
5  right, you continued to meet with Bob
6  Glenn or speak with Bob Glenn throughout
7  the 2000s, correct?
8    A.   No.
9    Q.   No, you have not?
10    A.   No.
11    Q.   Do you know whether
12 Dr. Huncharek did?
13    A.   No.
14    Q.   Okay.  But you continued --
15 okay.  Let's put a block here in the 2000
16 time frame.
17         2005 you were involved with
18 the IARC for the mining company, correct?
19         MR. HEGARTY:  Objection to
20 form.
21         MR. HUDSON:  Objection to
22 form.
23 BY MR. TISI:
24    Q.   IMA North America?

68 (Pages 266 to 269)

Joshua E. Muscat, Ph.D.

Page 270

1    A.   I was an industry observer.
2    Q.   Okay.  You did work in 2000
3  for the NTP for PCPC and in 2009 for the
4  Citizen's Petition, correct?
5           MR. HEGARTY:  Objection to
6  form.
7           THE WITNESS:  I did not do
8  work for the NTP.  I did work for
9  The Weinberg Group.
10  BY MR. TISI:
11    Q.   Who also and the paper was
12  submitted by --
13    A.   Submitted to NTP.
14    Q.   By PCPC?
15    A.   Yes.
16    Q.   And in 2005 going forward
17  you had various meetings with Imerys,
18  including being in a contract with them
19  through Crowell & Moring, proposing
20  studies, meeting in Skillman, being
21  involved in the Citizen's Petition,
22  correct?
23           MR. HEGARTY:  Objection to
24  form.

Page 271

1           MR. HUDSON:  Objection to
2  form.
3           MR. SILVER:  Objection to
4  form.
5           THE WITNESS:  So as I
6  mentioned with regard to the
7  meeting at J&J, I didn't know
8  there was any Imerys
9  representative there.
10  BY MR. TISI:
11    Q.   Okay.  Other than that, that
12  was correct, what I just said, right?
13           MR. HUDSON:  Objection to
14  form.
15           MR. SILVER:  Objection to
16  form.
17           THE WITNESS:  You'd have to
18  repeat it, because it was a lot of
19  stuff.
20  BY MR. TISI:
21    Q.   Let's move on.
22           The last column here is
23  Shook Hardy & Bacon?
24    A.   Yes.

Page 272

1    Q.   Now, first of all,
2  actually -- where's my -- you have in
3  front of you the privilege log.  But I
4  pulled from the privilege log
5  communications with Crowell & Moring.
6  I'm going to mark all these slides by the
7  way.  I'm going to mark this one in
8  particular.
9    A.   Okay.
10           MR. TISI:  As -- what
11  exhibit are we up to?
12           (Document marked for
13  identification as Exhibit
14  Muscat-21.)
15  BY MR. TISI:
16    Q.   This is 21.
17           MR. TISI:  And I'll give
18  copies to everybody, but these are
19  pulled from the privilege log.
20  BY MR. TISI:
21    Q.   And you see communications
22  with the lawyers, Crowell & Moring,
23  starting in 2005.
24           Do you see that?

Page 273

1           MR. HEGARTY:  Did you say
2  that you're marking this as an
3  exhibit?
4           MR. TISI:  I will.
5           MR. HEGARTY:  Okay.  Sorry.
6  BY MR. TISI:
7    Q.   Do you see that?
8    A.   I'm sorry, which one?
9    Q.   2005.  You see there's a
10  date for the documents that are being
11  withheld?
12    A.   Yes.
13    Q.   Okay.  2005.
14    A.   Yes.
15    Q.   February -- excuse me,
16  correct.
17           And then it goes through
18  2006.  Do you see that?
19    A.   Yes.
20    Q.   Were you communicating back
21  and forth with the lawyers at Crowell &
22  Moring between 2005 and 2006?
23    A.   No.
24    Q.   You were not?

69 (Pages 270 to 273)

Joshua E. Muscat, Ph.D.

Page 274

1    A.   No.
2    Q.   And --
3    A.   Not that I remember, no.
4    Q.   And there was no
5  consultation for legal advice or anything
6  like that --
7    A.   No.
8    Q.   -- in that time frame?
9    A.   No.
10        MR. TISI:  Counsel, I would
11     make -- based upon the testimony,
12     I'd like to make a request for
13     those documents that were withheld
14     on that basis.
15        MR. SILVER:  It's denied,
16     but you can go forward.
17  BY MR. TISI:
18    Q.   Next one is Shook Hardy &
19  Bacon.  Let's talk about Shook Hardy &
20  Bacon a bit.
21        MR. HEGARTY:  Are you going
22     to mark that as an exhibit?
23        MR. TISI:  I will mark that
24     as an exhibit.  This is 21.

Page 275

1  BY MR. TISI:
2    Q.   Now just to remind the jury
3  and the judge, Shook Hardy & Bacon are
4  the lawyers -- Mr. Hegarty is sitting
5  here.  Kat Frazier is a lawyer for Shook
6  Hardy & Bacon.  Did you ever meet Gene
7  Williams?  Do you know who Gene Williams
8  is?
9    A.   Yes.
10    Q.   They're the lawyers
11  representing Johnson & Johnson for claims
12  brought by women who claim that talc
13  caused ovarian cancer.
14    A.   Yes.
15    Q.   And you know that, correct?
16    A.   Yes.
17    Q.   Now, I pulled -- they're
18  not, to your knowledge, Shook Hardy &
19  Bacon in the business of doing scientific
20  research, are they?
21        MR. HUDSON:  Objection to
22     form.
23        THE WITNESS:  I'm unaware of
24     that.

Page 276

1  BY MR. TISI:
2    Q.   Now, you said you became an
3  expert consultant with them in 2010?
4    A.   Yes.
5    Q.   And in fact, you have been
6  identified as an expert in litigation on
7  behalf of Shook Hardy & Bacon, correct?
8    A.   That's correct.
9    Q.   You were paid for that?
10    A.   Yes.
11    Q.   When did that relationship
12  start?
13    A.   Well, approximately 2010.
14    Q.   So it would have started
15  before your 2011 article that wasn't
16  listed on your CV was submitted for peer
17  review?
18        MR. HEGARTY:  Objection to
19     form.
20        MR. HUDSON:  Objection to
21     form.
22        THE WITNESS:  I don't know
23     when that was submitted.
24  BY MR. TISI:

Page 277

1    Q.   It was submitted in April of
2  2011.
3    A.   Okay.
4    Q.   If that were true, you were
5  already working as a consultant, an
6  expert, for Shook Hardy & Bacon, true?
7        MR. HEGARTY:  Objection to
8     form.
9        THE WITNESS:  I don't know.
10     Perhaps.
11  BY MR. TISI:
12    Q.   That wasn't disclosed on
13  that article, was it?
14    A.   I didn't write the article.
15    Q.   It went in under your name,
16  sir, did it?
17    A.   Yes.
18    Q.   And you're also were aware
19  Dr. Huncharek was retained as an expert
20  by Shook Hardy & Bacon as well?
21    A.   That's correct.
22    Q.   And he didn't disclose --
23  you were retained at about the same time,
24  true?

70 (Pages 274 to 277)

Joshua E. Muscat, Ph.D.

Page 278

1    A.   That's right.
2        MR. HEGARTY:  Objection to
3    form.
4  BY MR. TISI:
5        Q.   And they weren't -- he
6  wasn't disclosed as an expert in
7  litigation in that article either,
8  correct?
9        MR. HUDSON:  Objection to
10   form.
11       MR. HEGARTY:  Objection to
12   form.
13       THE WITNESS:  I don't have
14   it in front of me.  I assume so.
15  BY MR. TISI:
16       Q.   Okay.  We'll talk about
17  that.
18       A.   Okay.
19       Q.   But I have pulled from the
20  privilege log as I did with the other --
21  I'll have this marked but I'll --
22       MR. TISI:  Here is a copy,
23   counsel.
24       MR. HUDSON:  Thank you.

Page 279

1        (Document marked for
2    identification as Exhibit
3    Muscat-23.)
4        MR. TISI:  This is 23.  Do
5    you have a sticker for this?  Can
6    you put 23 on there.  Thanks.
7  BY MR. TISI:
8        Q.   I sorted it by date.  The
9  privileges relating to Dr. -- to Shook
10  Hardy & Bacon.
11       MR. HUDSON:  Do you have an
12   extra copy?
13       MR. TISI:  I have what you
14   have.  I can get you at a break.
15   But it's too messy over here for
16   me to get it.
17  BY MR. TISI:
18       Q.   The date of the documents,
19  at least that's my understanding, are
20  sorted on the fourth column over.  Do you
21  see that?
22       A.   Yes, I do.
23       Q.   See a document, dated
24  October 17th, 2000.

Page 280

1        A.   Yes, I do.
2        Q.   That was about the time that
3  you were writing your report for the NTP
4  wasn't it?
5        A.   Yes.
6        Q.   12/7, 2004.  Do you see
7  that?
8        A.   Yes.
9        Q.   That's about the time that
10  you were being retained by Crowell &
11  Moring to work for -- on these two
12  articles, correct?
13       A.   Yes.
14       Q.   6/21/2007, do you see that?
15       A.   Yes.
16       Q.   Okay.  That's about the time
17  that you were submitting your diaphragm
18  study for publication, correct?
19       A.   Yes.
20       Q.   And if you look over to the
21  right, the privilege description says,
22  "Materials provided by counsel in
23  connection with ongoing litigation."
24       Do you see that?

Page 281

1        A.   Yes, I do.
2        Q.   And that's listed every --
3  all the way down, correct?
4        A.   Mm-hmm.
5        Q.   10/14/2008, do you see that?
6        A.   Yes.
7        Q.   That's about the time that
8  you were submitting your critical review
9  analysis to be published, correct?
10       A.   Mm-hmm.  That's correct.
11       Q.   10/7/2010, do you see that?
12       A.   Yes.
13       Q.   Okay.  That's about the time
14  that you were preparing Exhibit Number --
15  the 2011 paper on the epidemiology of
16  talc, correct?
17       MR. HEGARTY:  Objection to
18   form.
19       MR. HUDSON:  Objection to
20   form.
21       THE WITNESS:  I'm sorry, can
22   you repeat that, please?
23  BY MR. TISI:
24       Q.   That's about the time that

71 (Pages 278 to 281)

Joshua E. Muscat, Ph.D.

Page 282

1    you were -- that the paper that was the
2    2011 paper that's not listed on your CV,
3    was actually being drafted for
4    publication, correct?
5        A.   Yes.
6            MR. HEGARTY:  Objection to
7        form.
8    BY MR. TISI:
9        Q.   If you can continue to go
10   down, all the way through March and
11   April, that was before your 2011
12   publication, correct?
13           MR. HEGARTY:  Objection to
14       form.
15           THE WITNESS:  I don't
16       remember the dates of that, so the
17       exact date of that.  But yes.
18           MR. TISI:  Could you bring
19       up document 007, please.
20   BY MR. TISI:
21       Q.   I'm putting up --
22           MR. TISI:  I'm going to have
23       this marked as Exhibit Number 24.
24           (Document marked for

Page 283

1        identification as Exhibit
2        Muscat-24.)
3    BY MR. TISI:
4        Q.   This is 24.  This is
5    actually in your binder, sir.
6        A.   Okay.
7        Q.   This is your 2011 paper.
8            MR. SILVER:  What exhibit is
9        it?
10           MR. TISI:  24.
11   BY MR. TISI:
12       Q.   This is your 2011 paper,
13   sir?
14       A.   Yes.
15       Q.   It was received on
16   March 31st, 2011?
17       A.   Yes.
18       Q.   You had a lot of contact
19   with Shook Hardy & Bacon before 2011,
20   correct?
21           MR. HUDSON:  Objection to
22       form.
23   BY MR. TISI:
24       Q.   You were already retained as

Page 284

1    a litigation expert, true?
2        A.   I was retained in 2010.
3        Q.   Correct.  And so at the time
4    that this article was published, you were
5    already an expert in litigation being
6    paid by the lawyers for J&J, correct?
7            MR. HUDSON:  Objection to
8        form.
9            THE WITNESS:  I was a Shook
10       Hardy & Bacon -- I was working for
11       Shook Hardy & Bacon, that is
12       correct.
13   BY MR. TISI:
14       Q.   That's right?
15       A.   Right.
16       Q.   Did you disclose that by the
17   way in your acknowledgment?
18       A.   So I didn't write this
19   paper.  I wasn't responsible for the
20   acknowledgment.
21       Q.   Was -- Dr. Huncharek was
22   also -- you mentioned that he was also an
23   expert.
24       A.   Yes, that's correct.

Page 285

1        Q.   Did this acknowledgment --
2    you were aware that this was going to be
3    published.  This wasn't, like, a surprise
4    to you, was it?
5        A.   Yes.
6        Q.   Did you ever say to
7    Dr. Muscat, gee -- to Dr. Huncharek,
8    "Gee, I think, we're already litigation
9    experts now.  We've done a lot of work
10   for these companies.  We should disclose
11   that in the medical literature"?
12           MR. HUDSON:  Objection to
13       form.
14           THE WITNESS:  So it was
15       disclosed.  All right.  If you
16       look at the acknowledgment,
17       Dr. Muscat -- Huncharek and Muscat
18       were consultants at Johnson &
19       Johnson Consumer Product Worldwide
20       at the time of the initial drafts
21       of this manuscript were produced.
22   BY MR. TISI:
23       Q.   It doesn't say that you were
24   a current litigation expert defending

72 (Pages 282 to 285)

Joshua E. Muscat, Ph.D.

Page 286

1    product liability suits, does it?
2          MR. HEGARTY:  Objection to
3    form.
4          THE WITNESS:  It doesn't say
5    those words.  But it says they
6    were consultants to Johnson.
7          That's the disclosure.
8    BY MR. TISI:
9          Q.   Does it tell the reader that
10   you were actually a paid litigation
11   expert?  There's a difference between --
12   between disclosing being a consultant in
13   the normal course of business and being a
14   litigation consultant, correct?
15         MR. SILVER:  Objection.
16   Argumentative.
17         MR. HUDSON:  Objection to
18   form.
19         THE WITNESS:  I don't know.
20   All I can say is that, Huncharek
21   did the disclosure.  I think he
22   did it properly.  We were J&J
23   consultants.  That's what being a
24   litigation expert is.

Page 287

1          I think the disclosure is
2    fine.
3    BY MR. TISI:
4          Q.   You do?
5          A.   Yeah, I do.
6          Q.   And you think anybody who is
7    looking at this would know, you know,
8    gee, this guy -- this guy is working
9    being paid by the company to defend the
10   company in lawsuits?
11         MR. HUDSON:  Objection to
12   form.
13         MR. SILVER:  Objection to
14   form.
15         THE WITNESS:  I can't
16   comment to that.  This is a
17   proper -- this is a proper
18   disclosure in my mind.
19   BY MR. TISI:
20         Q.   Did you tell -- did you tell
21   the medical journal that you were an
22   expert in litigation and that you had
23   been consulting with Shook Hardy & Bacon
24   in connection with ongoing litigation

Page 288

1    prior to this article?
2          MR. HUDSON:  Objection to
3    form.
4          THE WITNESS:  So, that
5    wasn't my responsibility as first
6    author.
7    BY MR. TISI:
8          Q.   Well, but you both have to
9    sign disclosures, don't you?
10         A.   Yeah.  The disclosure was
11   signed.
12         Q.   Okay.  Did you both sign the
13   disclosure?
14         A.   I assume I signed it.  I
15   don't remember exactly.
16         Q.   Okay.  Do you have the
17   documents?  Because we haven't seen them?
18         A.   Okay.  I don't know if I
19   have the documents.
20         Q.   In fact, I've seen no
21   disclosures other than for the 2008
22   Critical Review paper.  Do you have any
23   peer review notes or disclosures for any
24   of your articles that you wrote on behalf

Page 289

1    of the talc industry?
2          MR. HUDSON:  Objection to
3    form.
4          MR. HEGARTY:  Objection to
5    form.
6          THE WITNESS:  Which -- which
7    paper are you referring to?
8    BY MR. TISI:
9          Q.   Well, how about let's start
10   with the diaphragm study that was funded
11   by J&J and Imerys.
12         MR. SILVER:  Objection.
13         THE WITNESS:  The
14   meta-analysis?
15   BY MR. TISI:
16         Q.   The meta-analysis.
17         A.   The published meta-analysis?
18         Q.   Yeah.  Do you have the peer
19   reviewed notes for that?
20         A.   The peer review notes?
21         Q.   The peer review comments by
22   the peer reviewers.
23         A.   No.
24         Q.   Do you have the disclosure

73 (Pages 286 to 289)

Joshua E. Muscat, Ph.D.

Page 290

1  forms?
2      A.  No.
3      Q.  We're going to talk about
4  this in a minute, but that's not the
5  first journal that that article was sent
6  to, was it?
7          MR. HEGARTY:  Objection to
8      form.
9          MR. HUDSON:  Objection to
10     form.
11         THE WITNESS:  The 2003
12     meta-analysis?
13 BY MR. TISI:
14     Q.  The 2007 diaphragm study.
15 It was rejected by papers before it was
16 finally published in European Journal of
17 Cancer Research?
18         MR. HEGARTY:  Objection to
19     form.
20         THE WITNESS:  I don't
21     remember the history of it.  But
22     right.
23 BY MR. TISI:
24     Q.  It was -- it was rejected,

Page 291

1  wasn't it?
2      A.  The meta-analysis.
3      Q.  Was rejected.  The diaphragm
4  was rejected before it was published?
5          MR. HEGARTY:  Objection to
6      form.
7          THE WITNESS:  No, I don't --
8      I don't have any recollection of
9      that.
10 BY MR. TISI:
11     Q.  And your Critical Review was
12 rejected by no less than four journals
13 before it was published, right?
14         MR. HEGARTY:  Objection to
15     form.
16         MR. HUDSON:  Objection to
17     form.
18         THE WITNESS:  That's
19     incorrect.  It was submitted, it
20     was rejected.  That's correct.
21 BY MR. TISI:
22     Q.  By Lancet, JAMA -- we'll go
23 through that later.
24     A.  Okay.

Page 292

1      Q.  But it was -- it was
2  rejected by several journals before it
3  was accepted for publication, correct?
4          MR. HEGARTY:  Objection to
5      form.
6          THE WITNESS:  It was -- it
7      was rejected by a couple of
8      journals.
9  BY MR. TISI:
10     Q.  Right.  And the last time it
11 was they told you to take smoking as a
12 confounder out, right?
13         MR. HEGARTY:  Objection to
14     form.
15         THE WITNESS:  I don't know
16     what you're referring to
17     specifically.
18 BY MR. TISI:
19     Q.  We'll talk about that.
20         MR. TISI:  This is probably
21     a good time to stop.
22         THE VIDEOGRAPHER:  Going off
23     the record at 1:18 p.m.
24         (Lunch break.)

Page 293

1          MR. TISI:  21 was the
2  Crowell & Moring excerpts slide.
3  I think that is identified, and
4  you have that as an exhibit
5  already as 21.
6          22 was, I think, skipped
7  over by me.  So I'm going to
8  use -- 22 is the consulting
9  ovarian cancer chart that I worked
10 on with him.
11         I'll give that to you.
12     (Document marked for
13     identification as Exhibit
14     Muscat-22.)
15     (Whereupon, a discussion is
16     held off the record.)
17         THE VIDEOGRAPHER:  We are
18     back on video record at 2:09 p.m.
19 BY MR. TISI:
20     Q.  I went through your
21 publications and your timelines before.
22     A.  Mm-hmm.
23     Q.  And the timeline of things
24 that happened.  I'm going to now talk a

74 (Pages 290 to 293)

Joshua E. Muscat, Ph.D.

Page 294

1  little bit about the funding of the
2  reports and publications that you did.
3  And I'm going to try to slow down a
4  little bit, because I know we got into a
5  pace before, and I want to slow down a
6  little bit?
7        A.   Okay.
8        Q.   Okay.  Let's talk a little
9  bit about the process.  Before we talk
10  about your actual articles, and I think
11  there were six articles and two -- seven
12  articles and two reports on the
13  publications list that we talked about.
14  Does that make sense to you?
15        A.   Yes.
16        Q.   Okay.  Let's talk about
17  articles for a moment and publishing in
18  the peer-reviewed literature.
19            When an article is submitted
20  for publication, does -- do each of the
21  authors have to identify affiliations and
22  conflicts that might be considered by the
23  journal in assessing the financial and
24  professional bias of the authors?

Page 295

1            MR. HUDSON:  Objection to
2      form.
3            THE WITNESS:  I'm sorry.
4      Can you repeat that, please?
5  BY MR. TISI:
6        Q.   Yes.  Must an author of a
7  peer-reviewed -- of an article, in order
8  to get the article accepted, have to
9  disclose potential conflicts?
10        A.   So there's -- there's a form
11  that the journal may ask you to fill out.
12  And so depending upon what the journal
13  form is requesting, then you answer it.
14        Q.   Okay.  And the form
15  typically -- typically speaking, requires
16  authors of articles to actually disclose
17  any financial or other conflicts that
18  they might have with regard to the
19  subject matter in which they seek
20  publication?
21            MR. HUDSON:  Objection to
22      form.
23            THE WITNESS:  So just be
24      clear, because I think it's

Page 296

1      important to have a background,
2      kind of the rules of disclosure
3      have changed over time.
4            So what they are today
5      certainly isn't what they are back
6      then -- or sorry, 15, 20 years
7      ago.
8            So it's changed.  There
9      usually is some type of statement,
10      and it could vary from journal to
11      journal.
12  BY MR. TISI:
13        Q.   But typically, is it
14  something that is standard that authors
15  must disclose potential conflicts that
16  they have, financial and otherwise?
17        A.   I'd say it's common.  Yes.
18        Q.   Okay.  Putting aside the
19  issue of potential bias issues, do they
20  also have to disclose anybody who makes a
21  substantive contribution to the article?
22  In other words, any contributors to the
23  paper?
24            MR. HEGARTY:  Objection to

Page 297

1      form.
2            THE WITNESS:  If someone
3      makes a substantive contribution
4      to the article, they would
5      probably be a co-author.
6  BY MR. TISI:
7        Q.   They should be?
8        A.   Most of the time, yeah.
9        Q.   I mean, you can't have
10  articles that are essentially
11  ghostwritten by one person but go under
12  another person's name?
13            MR. HEGARTY:  Objection to
14      form.
15            THE WITNESS:  I'm not aware
16      of ghostwriting, no.
17  BY MR. TISI:
18        Q.   Okay.  In other words, if
19  somebody writes a section of an
20  article -- let's say there's three
21  sections of an article, and somebody
22  writes Section 1, somebody writes Section
23  2, and somebody writes Section 3, all
24  three -- the people who wrote each of

75 (Pages 294 to 297)

Joshua E. Muscat, Ph.D.

Page 298

1  those sections should be identified as
2  authors?
3       A.   Not necessarily.  You know,
4  you may have a -- you just -- I don't
5  mean to be picky here, but, like, for
6  instance, if I have an administrative
7  assistant pull up some references, and
8  those references are added to the
9  article, she would not be identified as
10  an author.
11       Q.   Well, that's why I asked the
12  question, if somebody writes Section 1,
13  somebody writes Section 2, and somebody
14  writes Section 3, or edits Section 1,
15  edits Section 2, or edits Section 3,
16  those people -- when I say -- when I mean
17  editing, I don't mean editing a comma or
18  a period.  I mean editing.  Those people
19  should be identified as contributors to
20  the article?
21       MR. HEGARTY:  Objection to
22  form.
23       THE WITNESS:  In a
24  peer-reviewed article?

Page 299

1  BY MR. TISI:
2       Q.   Yes, correct.
3       A.   I mean, generally, right, if
4  you make a contribution, you'd be a
5  co-author.
6       Q.   You should be?
7       A.   Most of the time.  I'm sure
8  there are -- you can probably think of
9  circumstances, but in general, I think
10  that's correct.
11       Q.   Right.  Because people who
12  read the articles are entitled to know
13  who the contributors are?
14       A.   Yes.
15       Q.   When I say people who read
16  the articles, I'm talking about not only
17  the people who would actually read it as
18  it's published, but also the editors of
19  the journals?
20       MR. HEGARTY:  Objection to
21  form.
22       THE WITNESS:  The editors
23  would certainly be reading it,
24  yes.

Page 300

1  BY MR. TISI:
2       Q.   Well, in order to accept it
3  for publication, they want to know the
4  people -- who is actually writing the
5  article?
6       A.   So sometimes, just to be
7  clear, not all the time, but sometimes,
8  some journals ask to identify the author
9  contribution.  So there are authors who
10  may not necessarily be writing it.  They
11  may have done the statistical analyses.
12  So they would be acknowledged as having
13  done the statistical analyses.
14       Q.   Okay.  So -- okay.  So now
15  my question is -- to you is, you also
16  have to certify that the work that was
17  done in the article was the author's
18  work?
19       MR. HEGARTY:  Objection to
20  form.
21  BY MR. TISI:
22       Q.   I mean, it's the flip side.
23  Not only must you disclose who the
24  authors were, but you also need to

Page 301

1  disclose and certify that the work was
2  done was your original work.
3       A.   It's -- it's assumed that
4  the person who's submitting it, it's
5  their work.
6       Q.   Well, actually I've seen
7  some notations, including in the one that
8  you submitted in 2008, which is the only
9  disclosure that I have that you have to
10  certify that the work done was original
11  work.
12       MR. HEGARTY:  Objection to
13  form.
14       MR. HUDSON:  Objection to
15  form.
16  BY MR. TISI:
17       Q.   That is your work.
18       A.   So my papers that I submit
19  for my publication is my work.
20       Q.   That wasn't my question.  My
21  question was, when you submit a paper
22  generally, do you have to identify that
23  the work done was your original work?
24       MR. HEGARTY:  Objection to

76 (Pages 298 to 301)

Joshua E. Muscat, Ph.D.

Page 302

1    form.
2        THE WITNESS:  Technically
3    what happens when you do a
4    submission, you have to say, has
5    this work been submitted to
6    another journal.
7        And if the -- if that has
8    happened, then the journal has the
9    opportunity to decline to review
10   that.  So you would state that in
11   the submission process, it is not
12   being submitted to another journal
13   simultaneously.
14   BY MR. TISI:
15       Q.   Now, apart from disclosing a
16   journal.  We looked previously about --
17   articles usually have either an
18   acknowledgment section or a conflict of
19   interest section or both in which the
20   author acknowledges people who may have
21   assisted in some fashion with the
22   article, right?
23       A.   That's correct.
24       Q.   And then the conflicts of

Page 303

1    interest section, is something where they
2    say -- they ask the -- that authors
3    disclose whether or not they had any
4    potential conflicts of interest that the
5    reader might want to know when
6    considering the conclusions that the
7    authors reach?
8        A.   It wouldn't necessarily be
9    in a separate conflict of interest
10   headline.  It would be in the
11   acknowledgment section.
12       Q.   Okay.  But somehow there are
13   really two concepts that must be
14   addressed.  Number one is, any
15   contributions made by people other than
16   the named authors, and oftentimes you'll
17   get an acknowledgment like that?
18       MR. HEGARTY:  Objection to
19   form.
20       THE WITNESS:  That's
21   correct.
22   BY MR. TISI:
23       Q.   And any potential conflicts
24   of interest?

Page 304

1        A.   That's correct.
2        Q.   And why is it that in the
3    actual bodies of the article is that
4    usually done?
5        MR. HEGARTY:  Objection to
6    form.
7        THE WITNESS:  I'm sorry.  Is
8    it --
9    BY MR. TISI:
10       Q.   Why do authors have to
11   disclose or usually have to disclose
12   their funding sources, their biases, you
13   know, conflicts of interest?
14       A.   So.
15       Q.   And acknowledgments?  Why do
16   we have that?
17       A.   Okay.  Slight technicality.
18   That's not really within the body of the
19   article.  This is like a separate
20   statement.  I just want to clarify that.
21       Q.   That's fine.
22       A.   Okay.
23       Q.   We can -- that's fine.  In
24   the published article --

Page 305

1        A.   Yes.
2        Q.   -- there's usually a section
3    that identifies any potential conflicts,
4    acknowledgments of contribution, or of
5    funding?
6        A.   Yes.
7        Q.   Why do we have that?  Why is
8    that standard?
9        A.   For transparency, for the
10   reader.
11       Q.   Why is it important that
12   authors be transparent about what they
13   do?
14       A.   Well, I think they -- that's
15   a desire to do that, to acknowledge where
16   the funding came from and be transparent
17   about it.
18       Q.   Are there articles -- I
19   mean, I'm thinking of a series of
20   articles out of the New England Journal
21   of Medicine which talk about funding
22   source is often a source of bias in the
23   articles.
24       Have you ever seen that?

77 (Pages 302 to 305)

Joshua E. Muscat, Ph.D.

Page 306

1          MR. HEGARTY:  Objection to
2     form.
3          THE WITNESS:  I have not
4     seen that article.
5   BY MR. TISI:
6     Q.    Okay.  Are you aware -- I
7   mean, are you aware of studies that show
8   that funding source sometimes affects the
9   results that are -- that are -- that the
10  authors reach?
11         MR. HEGARTY:  Objection to
12    form.
13         THE WITNESS:  No, I'm not
14    aware of specific studies.
15  BY MR. TISI:
16    Q.    That doesn't surprise you?
17  That wouldn't surprise you, would it?
18    A.    Would it surprise me that
19  what?
20    Q.    That funding source
21  affects -- can affect the outcomes that
22  are reached by the authors?
23         MR. HEGARTY:  Objection to
24    form.

Page 307

1          THE WITNESS:  That's a tough
2     question.  I mean, I would have --
3     I mean, it's an interesting
4     question.  I would really have to
5     look at the literature in order to
6     evaluate that.
7   BY MR. TISI:
8     Q.    Okay.
9     A.    It's not something that I
10  can speak of.  I'm aware of the topic.
11  But I can't say that I'm aware of
12  specific studies that have done
13  statistical analyses that have proven
14  bias.
15    Q.    Sometimes one of the things
16  that you looked at when you read articles
17  is you're interested in who funded them,
18  right?
19    A.    Yes, that's correct.
20    Q.    You are also interested in
21  the relationship that the authors might
22  have to anybody who might benefit from
23  the conclusions the author reached?
24         MR. HEGARTY:  Objection to

Page 308

1     form.
2          THE WITNESS:  I'm not
3     thinking so much of benefit.  We
4     certainly do look to see the
5     funding source.
6   BY MR. TISI:
7     Q.    Right.
8     A.    Okay.
9     Q.    Because you view and
10  evaluate the conclusions in the context
11  of does the author have a financial or
12  other interest in the subject matter?
13    A.    So, yes, that's correct.
14    Q.    Okay.  So about peer review
15  for a minute, does the process of peer
16  review differ from journal to journal?
17    A.    Yes.
18    Q.    And some journals are more
19  rigorous than others, true?
20    A.    Not necessarily.  I will say
21  that the acceptance rates, number of
22  papers they accepted to a particular
23  journal, may be more competitive than for
24  others.

Page 309

1          But I can't say that the
2     peer review process is more rigorous for
3     some journals than others.
4     Q.    Well, peer reviewers
5   typically don't, for example -- let me
6   take one topic first.
7          So for example, if we had
8   The New England Journal of Medicine on
9   the one hand, which is a very competitive
10  journal, correct?
11    A.    Yes.
12    Q.    And you have another
13  journal -- let's say Anti-Cancer Research
14  which is not -- not a -- you would agree
15  that's not a big journal?
16    A.    It's not a highly cited
17  journal.
18    Q.    Correct.  The -- a study,
19  the acceptance rates are much higher for
20  the lower impact journals than the higher
21  impact journals, correct?
22    A.    The acceptance rate is much
23  lower for the high impact journals;
24  that's correct.

Joshua E. Muscat, Ph.D.

Page 310

1     Q.   Right.  So it's much harder
2  to get an article in the New England
3  Journal of Medicine than Anti-Cancer
4  Research?
5     A.   Yes, that's correct.
6     Q.   And I mentioned impact
7  factors.  Do you know what an impact
8  factor is?
9     A.   Yes.
10     Q.   An impact factor is a
11  measure -- kind of a substantive measure
12  of how often a journal is cited and
13  how -- as a measure of what influence it
14  has in the medical literature?
15     A.   That's correct.
16     Q.   So for example, using my
17  examples, The New England Journal of
18  Medicine might have an impact factor of
19  50?
20     A.   Yes.
21     Q.   And anti-cancer research
22  might have an impact factor of one?
23         MR. HEGARTY:  Objection to
24     form.

Page 311

1         THE WITNESS:  I haven't
2     looked at it recently.  But it's
3     probably lower than The New
4     England Journal of Medicine.
5  BY MR. TISI:
6     Q.   It's significantly lower
7  than The New England Journal of Medicine.
8     A.   Yes.
9     Q.   And that's a reflection
10  of -- and it's not unusual for
11  researchers to say, look, you want to get
12  your article in the highest impact
13  journal, right?  That would be the goal?
14     A.   No, not necessarily.
15     Q.   Okay.  But it is easier to
16  get -- I mean, if you've shopped around
17  an article on a -- to a couple journals
18  and it doesn't -- it is not accepted, you
19  know, you can always find a home for a
20  journal?
21         MR. HEGARTY:  Objection to
22     form.
23         THE WITNESS:  So it's --
24     these days, that's probably true.

Page 312

1  BY MR. TISI:
2     Q.   So it's important to not
3  only look at, you know, in terms of
4  weighing -- we talked about weighing the
5  authors and who they are and, you know,
6  what financial interest they have, but
7  it's also, one of the things that you
8  might want to look at is, is this journal
9  really one that is one that is a highly
10  cited, highly respected journal?
11         MR. HEGARTY:  Objection to
12     form.
13         THE WITNESS:  I'm sorry.  In
14     what context?
15  BY MR. TISI:
16     Q.   One of the things that you
17  look at as a researcher is, okay, well,
18  not only do I want to see what -- what
19  the authors' conflicts are or whatever,
20  it's important to me that, you know, I
21  see whether it's in a rigorous journal
22  out there or not.
23         MR. HEGARTY:  Objection to
24     form.

Page 313

1         THE WITNESS:  So the impact
2     factor isn't necessarily a
3     reflection of the rigor of the
4     journal and the journal review.
5  BY MR. TISI:
6     Q.   Well, it might be a
7  reflection of the number of times it's
8  cited, correct?
9     A.   That's correct.
10     Q.   And the number of times the
11  journal is cited is -- is a collective
12  understanding of the medical and
13  scientific community of, okay, an article
14  in Anti-Cancer Research, it's good
15  enough, but, you know, if I have another
16  article on the topic in JAMA, or The New
17  England Journal of Medicine, that tells
18  me something?
19         MR. HEGARTY:  Objection to
20     form.
21         THE WITNESS:  So I
22     understand the point that you're
23     trying to make.  And so let me
24     clarify that.

79 (Pages 310 to 313)

Joshua E. Muscat, Ph.D.

Page 314

1    So, for example, New England
2  Journal of Medicine and JAMA, the
3  types of articles that they prefer
4  are primarily randomized clinical
5  trials.
6    So there is a great deal of
7  research out there that's not
8  randomized clinical trials.  So
9  they wouldn't qualify for The New
10  England Journal of Medicine.  They
11  also wouldn't qualify because they
12  may be specialty topics.
13    So in most areas, most
14  people who are working in a
15  particular research area, they
16  will be publishing in journals
17  that will have a lower impact than
18  The New England Journal of
19  Medicine, because those are --
20  those are in specialty areas.
21  Those are not as widely read.
22    But for those people in
23  those areas, those journals that
24  they are publishing in are

Page 315

1    considered respected.
2  BY MR. TISI:
3    Q.   Well, but -- I don't want
4  there to be any misconception in the
5  record.  You're not suggesting in any
6  fashion that The New England Journal of
7  Medicine or Lancet or JAMA don't publish
8  epidemiology studies?
9    A.   They do on occasion.
10    Q.   Okay.  Right.  So in fact,
11  you tried to submit one of your -- we
12  talked about that before.  You tried to
13  submit one of your articles to, to the
14  Lancet, and it was rejected, true?
15    MR. HEGARTY:  Objection to
16    form.
17  BY MR. TISI:
18    Q.   Critical review?
19    A.   No.
20    Q.   Or was it JAMA?
21    A.   Neither.
22    Q.   Okay.  We'll talk about that
23  in a minute.
24    So we mentioned

Page 316

1  epidemiology.  So that we understand the
2  topics that come afterwards, there are
3  several different kind of studies.
4    We have a case-control
5  study, and that's where you have -- you
6  look backwards at cases and controls and
7  you do some statistical analysis,
8  correct?
9    A.   That's correct.
10    Q.   Kind of like the study you
11  proposed to Johnson & Johnson back in the
12  1990s?
13    A.   Yes.
14    Q.   Okay.  Then you have cohort
15  studies, where you kind of look at, you
16  kind of look forward, right?
17    A.   That's correct.
18    Q.   You basically, you know, go
19  to a hospital for example and you follow
20  people going forward, right?  That's a
21  kind of -- that's a kind of epidemiology
22  study?
23    A.   That's correct.
24    Q.   And when looking at issues,

Page 317

1  even though you have sometimes noted the
2  benefits and the comparative benefits and
3  problems -- because there's no perfect
4  study, right?
5    MR. HEGARTY:  Objection to
6    form.
7  BY MR. TISI:
8    Q.   Everything has issues to
9  consider?
10    A.   So there are often biases
11  and flaws in studies, yes.
12    Q.   We can identify them.  But
13  there's no perfect study out there,
14  right?
15    A.   So -- except for mine, of
16  course.
17    Q.   We'll talk -- we're going to
18  talk about that in a little bit.
19    A.   Okay.  Okay.
20    Q.   I think you -- I think you
21  see that coming.
22    A.   Okay, yes.  Okay.
23    Q.   So but my question, Doctor,
24  is, when given the opportunity, okay, to

80 (Pages 314 to 317)

Joshua E. Muscat, Ph.D.

Page 318

1  study talc, two kinds of studies you
2  proposed to Johnson & Johnson, a
3  case-control study, right?
4       A.   Yes.
5       Q.   And you suggested a
6  meta-analysis which you actually did?
7            MR. HEGARTY:  Objection to
8  form.
9  BY MR. TISI:
10      Q.   You did one on diaphragms,
11 but what was actually done, correct?
12           MR. HEGARTY:  Objection to
13 form.
14           THE WITNESS:  I'm sorry.
15 Are you referring to my -- when I
16 met with Dr. Wynder?  That was a
17 case-control study.
18 BY MR. TISI:
19      Q.   That was case-control.
20      A.   Right.
21      Q.   But you've also done
22 meta-analyses on the issues to talc as
23 well?
24      A.   That meta-analysis was

Page 319

1  performed, that's correct.
2       Q.   So, again, so the jury
3  understands, a meta-analysis is taking a
4  bunch of different studies, combining
5  them together to try to increase the
6  power of the study to detect what you're
7  looking for?
8            MR. HEGARTY:  Objection to
9  form.
10           THE WITNESS:  That's one of
11 its objectives.
12 BY MR. TISI:
13      Q.   Okay.  Have you ever
14 recommended that -- in 25 years, that the
15 company do a cohort study on issues
16 related to talc?
17           MR. HEGARTY:  Objection to
18 form.
19           THE WITNESS:  No.
20 BY MR. TISI:
21      Q.   Have you ever suggested that
22 they do a hospital study?
23           MR. HEGARTY:  Objection to
24 form.

Page 320

1            THE WITNESS:  So that --
2  back when I met with Don Jones and
3  John Hopkins with Dr. Wynder back
4  in 1995, that was a hospital-based
5  study.
6  BY MR. TISI:
7       Q.   But it was a case-control
8  study?
9       A.   That's correct.
10      Q.   Now, we are going to talk
11 about issues related to statistics and
12 all that, and I don't want to get too
13 bogged down.  But a statistical analysis
14 done by somebody like you, there are
15 several concepts that I want to at least
16 explore.
17           Let's say I have a relative
18 risk of let's say 1.5.  Okay.  And that
19 means to a -- somebody like you, that
20 there's a 50 percent increased
21 association between what you're looking
22 at and the null hypothesis, correct?
23           MR. HEGARTY:  Objection to
24 form.

Page 321

1            THE WITNESS:  So, that's
2  partially correct.  You know, the
3  relative risk is usually presented
4  in combination with, for example,
5  like a P-value.
6  BY MR. TISI:
7       Q.   And we'll talk about
8  P-values.
9       A.   Okay.
10      Q.   But I just want to
11 understand what the number -- if it says
12 1.5, that's a 50 percent increased risk?
13      A.   That's correct.
14      Q.   And the next thing that you
15 typically want to do is look at whether
16 it's what we call statistically
17 significant, correct?
18      A.   Yes.
19      Q.   And statistical significance
20 is a -- somebody who does a study,
21 usually expresses it to a .05 P-value?
22      A.   So that's the convention.
23      Q.   Right.  And that means that
24 if we toss a coin 95 times out of 100,

81 (Pages 318 to 321)

Joshua E. Muscat, Ph.D.

Page 322

1  that you would get the same results, and
2  five times you wouldn't?
3       A.   It means that five times the
4  result may occur by chance.
5       Q.   By chance.  And that's a
6  convention.  But we know -- we've
7  talked -- I've seen you refer to
8  Dr. Rothman oftentimes.  You recognize
9  him as an expert in the area of
10 epidemiology, correct?
11          MR. HEGARTY:  Objection to
12      form.
13          MR. HUDSON:  Objection to
14      form.
15          THE WITNESS:  He's written a
16      textbook on epidemiology.
17 BY MR. TISI:
18      Q.   And you've referred to that
19 in your articles, correct?
20      A.   Okay, right.  I'd have to
21 see it.  But...
22      Q.   That wouldn't surprise you?
23          MR. HEGARTY:  Objection to
24      form.

Page 323

1          THE WITNESS:  I'd have to
2      see what the context is.
3  BY MR. TISI:
4       Q.   Well, in one of them you
5  just cite the textbook.  So I can't know
6  the context, because you just cited it
7  generally in your article, and nobody
8  could figure out what your methods are
9  because you didn't cite to a particular
10 section.  We'll talk about that later.
11          MR. SILVER:  Objection to
12      form.
13          MR. HUDSON:  Objection to
14      form.
15          No question pending.
16 BY MR. TISI:
17      Q.   So let's talk about -- we
18 talked about P-value.  Let's talk about
19 confidence intervals.
20          Confidence intervals are
21 what?
22      A.   So it's related, it's
23 related to the P-value concept.  It just
24 basically means that given sampling

Page 324

1  error, that your, whatever your relative
2  risk is -- let's say the standard is
3  95 percent confidence, that it would be,
4  because of sampling variability, your
5  relative risk could be quite different.
6  It could fall within a range of values.
7       Q.   And typically speaking, the
8  idea is if the confidence interval falls
9  below one, it's not considered
10 statistically significant?
11      A.   If the -- if the risk is
12 elevated above one and the confidence
13 interval falls below one, that would be
14 correct.
15      Q.   Now, are you familiar, are
16 you a member of the American Statistical
17 Association?
18      A.   No.
19      Q.   Do you know what they are?
20      A.   I've heard of it.
21      Q.   Do you know that there's
22 been a significant discussion in the
23 epidemiology community about the
24 significance of P-values and confidence

Page 325

1  intervals?
2       A.   I think that that's a topic
3  that, you know, that has been discussed
4  before.
5       Q.   And Dr. Rothman has been a
6  real proponent of looking beyond
7  simply -- I think he uses the word
8  slavish adherence to P-values and
9  confidence intervals to look for risks?
10          MR. HEGARTY:  Objection to
11      form.
12          MR. HUDSON:  Objection to
13      form.
14 BY MR. TISI:
15      Q.   Have you ever seen that?
16      A.   So I don't recall reading a
17 specific article on that.
18      Q.   But you know -- you know
19 that he's been somebody who talks about
20 that a lot?
21      A.   No, not especially.
22      Q.   Okay.  So if something
23 has -- and if you have -- a point
24 estimate is the same thing as a relative

82 (Pages 322 to 325)

Joshua E. Muscat, Ph.D.

Page 326

1    risk --
2         A.   That's correct.
3         Q.   -- the number in the middle,
4    right?  So if you have a relative risk
5    of -- let's kind of use it here.  I'll
6    turn this over.  You have a 1.5 RR with a
7    confidence interval of, let's say, 99,
8    right, to 1.89, with a P-value of .05.
9    That's a lot of gobbledygook.
10             But what you're basically
11   saying is that one possible outcome is
12   that there's a very small chance that
13   this is related to chance, but most of
14   the risk estimates are between 1 and 1.9?
15             MR. HUDSON:  Objection to
16        form.
17             THE WITNESS:  It means that
18        that's the range of possible
19        values that you would expect for
20        sampling error.
21   BY MR. TISI:
22        Q.   But statistically speaking,
23   the true result is closer to the point
24   estimate than at the tail end of the

Page 327

1    confidence interval, correct?
2         A.   That's the measured result,
3    the 1.5.
4         Q.   Right.  And that's -- that's
5    considered by statisticians and people
6    who do the work that you do, that's
7    considered to be the most accurate place
8    where the real risk lies?
9              MR. HEGARTY:  Objection to
10        form.
11             MR. HUDSON:  Objection to
12        form.
13             THE WITNESS:  So I
14        wouldn't -- I wouldn't call it
15        that.  I would say that is --
16        that's the finding from the study.
17   BY MR. TISI:
18        Q.   Right.  But that's the most
19   likely event, the point estimate is the
20   most likely --
21        A.   That's what the data show.
22        Q.   That's correct.  Okay.  And
23   if you were to change the .05 to say .06
24   that would change the confidence

Page 328

1    intervals, correct?
2         A.   The confidence interval is a
3    reflection of the P-value.
4         Q.   Right.  And you don't throw
5    out a result like this -- you don't
6    ignore a result like I just put out and
7    wrote out here just because the value
8    crosses one and gets to .199.  That
9    doesn't make sense, does it?
10             MR. HEGARTY:  Objection to
11        form.
12             THE WITNESS:  So I wouldn't
13        throw it out.  I'm sorry.  I don't
14        quite understand.
15   BY MR. TISI:
16        Q.   Let's say you have -- let's
17   say you have a lot of other data out
18   there that shows an RR of 2.0.
19             And it's all statistically
20   significant.  Then you have this one
21   result over here that's .99 to .185.
22   These aren't necessarily inconsistent,
23   are they?
24             MR. HEGARTY:  Objection to

Page 329

1         form.
2    BY MR. TISI:
3         Q.   Just because this crosses
4    one doesn't mean that this -- that this
5    1.5 is inconsistent with the 2.0?
6              MR. HEGARTY:  Objection to
7         form.
8              THE WITNESS:  There are --
9         they're from two separate studies?
10        Is that the --
11   BY MR. TISI:
12        Q.   Yeah.
13        A.   Yeah, so they are from two
14   separate studies.
15        Q.   Right.  But they're not --
16   what I'm saying is --
17        A.   The one study doesn't have
18   anything to do with the other study.
19        Q.   But if you're trying to look
20   for an issue of consistency, those are
21   not inconsistent results, are they?
22             MR. HEGARTY:  Objection to
23        form.
24   BY MR. TISI:

83 (Pages 326 to 329)

Joshua E. Muscat, Ph.D.

Page 330

1    Q.   You don't throw this result
2  out because -- this 1.5 out because it is
3  statistically insignificant to a
4  confidence interval of .99 to 1.89.
5  You'd look at it in the confidence of
6  everything else, right?
7          MR. SILVER:  Objection to
8      form.
9          THE WITNESS:  It wouldn't be
10     thrown out.  It would be reported
11     as such.
12 BY MR. TISI:
13     Q.   Right.  You would look at it
14 in the context of all the other evidence
15 together, correct?
16         MR. HEGARTY:  Objection to
17     form.
18 BY MR. TISI:
19     Q.   Yes?
20     A.   So all the evidence within
21 that particular study?
22     Q.   No.  All the other evidence,
23 if there's multiple studies, you want to
24 look at -- you want to look at all the

Page 331

1  relative risks, put them together and
2  see, you know, how they kind of line up,
3  right?
4      A.   I guess it depends on what
5  your purpose is.  So usually in a single
6  study there may be multiple ways of
7  analyzing data.
8      Q.   Let's talk about
9  meta-analysis for a little bit.  Why do
10 we do meta-analyses?
11         MR. HEGARTY:  Objection to
12     form.
13         THE WITNESS:  So why do we
14     personally?
15 BY MR. TISI:
16     Q.   Yeah.  Why do you do it?
17     A.   I don't do it that often.
18 But the purpose of meta-analysis is to --
19 kind of -- is to come up with sort of a
20 way of synthesizing the literature.  If
21 there's a big topic with a lot of
22 different results on a similar topic,
23 meta-analysis is a quantitative tool to
24 summarize the results of a body of

Page 332

1  literature.
2      Q.   Okay.  And hopefully by
3  combining the results of different
4  studies, you get a better picture of what
5  the risk is, correct?
6          MR. HEGARTY:  Objection to
7      form.
8  BY MR. TISI:
9      Q.   In other words, let me --
10     A.   Can I answer?
11     Q.   Yeah.  Absolutely.
12     A.   So that's -- that's part of
13 the -- I want to make sure.  That's part
14 of the meta-analysis is that, is also --
15 right, to identify heterogeneity because
16 there wouldn't be -- like, if every
17 single study, let's say you had 100
18 studies that had 1.5, there wouldn't be
19 any point in doing it, right?
20         So meta-analysis, one of the
21 things that you do is try and come up
22 with a summary risk.  But also to
23 identify if there are differences between
24 studies, you know, what could account for

Page 333

1  that.
2      Q.   So you're not only
3  looking -- so on one hand you want to
4  look for what the overall potential risk
5  is, but you also want to be able to
6  identify, for example, biases or
7  confounding factors or those kinds of
8  things, which you might not see in any
9  individual study?
10         MR. HEGARTY:  Objection to
11     form.
12         THE WITNESS:  There could be
13     different reasons for looking at
14     way -- it could be study location,
15     for example.
16 BY MR. TISI:
17     Q.   Okay.
18     A.   Okay.
19     Q.   So do you agree that
20 researchers doing meta-analyses should
21 report their methods with sufficient
22 detail to allow for replication?
23     A.   Yes.
24     Q.   Why is replication

84 (Pages 330 to 333)

Joshua E. Muscat, Ph.D.

Page 334

1  important?
2       A.   So the purpose of
3  meta-analysis is to attempt to the best
4  extent possible to get all the relevant
5  articles within that body of literature
6  and analyze.
7            And then to list that, be
8  open about it, and so that way, if
9  anybody else wants to do their own
10  meta-analysis, they can see which ones
11  you've identified and see whether you
12  come up with a similar finding.
13       Q.   Do you agree that
14  consulting -- conducting a sound and
15  credible meta-analysis involves a
16  replicable literature search strategy?
17            MR. HEGARTY:  Objection to
18       form.
19  BY MR. TISI:
20       Q.   Go ahead.
21       A.   It does require a literature
22  search strategy.
23       Q.   Okay.
24       A.   And that strategy should be

Page 335

1  explained.
2       Q.   Do you agree that conducting
3  a sound and credible meta-analysis
4  involves a listing or graphical display
5  of individual study -- individual study
6  results or inputs?
7       A.   So that's often convention
8  these days, is to list out the individual
9  study results in a graph.
10       Q.   How about the weights that
11  are given to each study when you do --
12  because all -- when you do a study, one
13  of the things that you have to do is
14  determine -- not all studies are going to
15  be treated exactly the same.  So the
16  person conducting the meta-analysis has
17  to assign weights to each of the studies,
18  correct?
19       A.   They are weighted.
20       Q.   Okay.  And the methodology
21  for weighting the studies should be
22  disclosed, correct?  And the weight given
23  to each study should be disclosed?
24            MR. HEGARTY:  Objection to

Page 336

1       form.
2            THE WITNESS:  So I'm not
3       sure that the specific -- I mean
4       maybe the weights are disclosed.
5       I think the method of
6       meta-analysis should be described.
7  BY MR. TISI:
8       Q.   Well, without knowing the
9  weights that the authors gave to a
10  particular study, how could somebody
11  replicate a meta-analysis?  Let me
12  rephrase the question.
13       A.   Yes.
14       Q.   I want to be clear.  In
15  order -- you said before that being able
16  to replicate a meta-analysis is an
17  important thing as part of a paper.  You
18  need to know the methodology that's been
19  used.
20       A.   That's correct.
21       Q.   Okay.  In order to replicate
22  a meta-analysis, someone would need to
23  know the risk estimates in the original
24  studies, correct?

Page 337

1       A.   That's correct.
2       Q.   And you can get those from
3  the original studies.  You can find that
4  in the studies, correct?
5       A.   That's correct.
6       Q.   Okay.  Number 2, the
7  confidence interval from those original
8  studies?
9       A.   I'm sorry, what was that?
10       Q.   The confidence intervals
11  from those original studies, correct?
12       A.   That's one way of doing it
13  right.
14       Q.   And the other one, you need
15  to know the method of weighting -- the
16  individual weights given to the studies?
17       A.   That would go into
18  meta-analysis, right.
19       Q.   Okay.  And that's the only
20  one of those three things that the person
21  doing the meta-analysis -- it's not in
22  the original studies, because those are
23  not meta-analyses.  So that's the one key
24  that you need to know in order to

85 (Pages 334 to 337)

Joshua E. Muscat, Ph.D.

Page 338

1  replicate a meta-analysis; you need to
2  know how did the -- either how did the
3  author go about assigning the weights or
4  what the weights were that the author
5  assigned?
6        MR. HEGARTY:  Objection to
7     form.
8        THE WITNESS:  So can you
9     repeat the question?
10 BY MR. TISI:
11    Q.   Let me phrase it a different
12 way.
13    A.   Okay.
14    Q.   Okay.  If you don't know the
15 weights that the person doing the
16 meta-analysis assigned to the particular
17 studies that made part of that
18 meta-analysis, or if the author does not
19 disclose the methodology that they used
20 to assign those weights, is there any way
21 for the reader to replicate what the
22 author did?
23       MR. HEGARTY:  Objection to
24    form.

Page 339

1        THE WITNESS:  So I'm not
2     entirely sure.  You know, there
3     are different ways, I'm not a --
4     meta-analysis.  But there are
5     different ways of doing the
6     meta-analyses.
7        So there are reference
8     methods for it, which then
9     describes the weights.  So you'd
10    use a software package.
11 BY MR. TISI:
12    Q.   Which software package did
13 you use?
14    A.   I don't really use a
15 software package.
16    Q.   Which software package with
17 Dr. Huncharek use?
18       MR. HEGARTY:  Objection to
19    form.
20       THE WITNESS:  I don't know.
21 BY MR. TISI:
22    Q.   Do you agree with the
23 statement just because a variable has a
24 potential to confound does not mean the

Page 340

1  failure to control it leads to any
2  important bias?
3        MR. HEGARTY:  Objection to
4     form.
5        THE WITNESS:  I'm sorry.
6     Can you repeat that, please?
7  BY MR. TISI:
8     Q.   Yeah.  Do you agree with the
9  statement that just because a variable
10 has a potential to confound does not mean
11 that failure to control it leads to any
12 important bias?
13       MR. HEGARTY:  Objection to
14    form.
15       THE WITNESS:  I think it
16    depends on the circumstances.
17 BY MR. TISI:
18    Q.   Okay.  Thinking about a
19 meta-analysis methodology in general,
20 would you agree that a meta-analysis is
21 important to compare like with like?
22    A.   Can you be a little more
23 clearer on that?  I'm not sure what that
24 -- right.

Page 341

1     Q.   Yeah.  Let's say, for
2  example, you have a study on smokers.
3     A.   Mm-hmm.
4     Q.   And you have a study that
5  compares -- that looks at a risk with
6  pack-years.
7     A.   Mm-hmm.
8     Q.   Okay.  And then you have
9  another study that compare -- talks about
10 the number of cigarettes smoked a month.
11    A.   Right.
12    Q.   Those are two different
13 measurements, right?
14    A.   Right.  That's correct.
15    Q.   You can't -- if you're
16 comparing -- if you're trying to figure
17 out, for example, dose-response in the
18 context of a cigarette, you would want --
19 you can't compare pack-years, which is
20 duration of use, and number of cigarettes
21 per month, frequency of use?
22       MR. HEGARTY:  Objection to
23    form.
24       THE WITNESS:  That's

Joshua E. Muscat, Ph.D.

Page 342

1    correct.
2  BY MR. TISI:
3      Q.  Do you agree that because
4  many factors, both methodologic and
5  biologic, could affect the relative risk
6  estimates, homogeneity assumption is at
7  best at convenient fiction?
8          MR. HEGARTY:  Objection to
9      form.
10         THE WITNESS:  I don't know
11     what that means.
12 BY MR. TISI:
13     Q.  Okay.  Do you agree that an
14 important element of a meta-analysis is
15 the precise specification of the exposure
16 under study?
17     A.  That is important.
18     Q.  Do you agree with the
19 statement, meta-analysis can be reviewed
20 as the transference of good analytic
21 practice from the single study to the
22 multiple study context.  It begins
23 through critical evaluation of the
24 available data in a manner that is

Page 343

1  explicit and fully replicable by others.
2          MR. HEGARTY:  Objection to
3      form.
4          THE WITNESS:  So I think
5      what that statement is referring
6      to is how is the meta-analysis
7      done, how were the exposures
8      characterized, how was the
9      literature search was done, what
10     specific search engines are
11     doing -- what specific search
12     engines were used, which data was
13     abstracted from the studies,
14     because often it's not entirely
15     clear as to what the specific data
16     points you should be extracting.
17         So I think those things
18     are -- should be spelled out in a
19     meta-analysis.
20 BY MR. TISI:
21     Q.  What is the variances
22 estimate?
23     A.  So that I don't recall.
24     Q.  Do you always use -- do you

Page 344

1  use a variances estimator in your
2  studies?
3      A.  I haven't done a
4  meta-analysis in a long time.  I don't
5  remember what the term refers to.
6      Q.  What is a Forest plot?
7      A.  So a Forest plot is a --
8  it's a graph that lays out the risk
9  estimates for each of the individual
10 studies.
11     Q.  With the confidence
12 intervals?
13     A.  With confidence intervals.
14     Q.  Would you agree that
15 presenting Forest plots is a pretty
16 standard for meta-analysis publications?
17     A.  I think it's pretty common.
18     Q.  You don't present any
19 graphical displays in your meta-analyses,
20 do you?  Did you do it in your study on
21 diaphragms?
22         MR. HEGARTY:  Objection to
23     form.
24         THE WITNESS:  I'd have to

Page 345

1      look at that.
2  BY MR. TISI:
3      Q.  We'll talk about that in a
4  minute.
5          Did you -- do you know
6  whether you reported on the individual
7  study weights for the individual studies
8  considered?
9      A.  For which study?
10     Q.  Let's say your
11 meta-analysis, your diaphragm study?
12         MR. HEGARTY:  Objection to
13     form.
14         THE WITNESS:  You're talking
15     about the published Huncharek
16     study?
17 BY MR. TISI:
18     Q.  Yes.
19     A.  I'd have to go back and look
20 at that.
21     Q.  We'll talk about this for a
22 minute, but the 2003 Huncharek study does
23 not list the weights given by
24 Dr. Huncharek to each of the studies.  In

87 (Pages 342 to 345)

Joshua E. Muscat, Ph.D.

Page 346

1  order to replicate what he did, would you
2  need to know what weight he assigned to
3  each of the studies?
4          MR. HEGARTY:  Objection to
5      form.
6          THE WITNESS:  No, I don't
7      think it's necessary.  I think you
8      need the raw data.  You need the
9      actual raw data and either the
10     confidence interval or the
11     standard error in order to
12     replicate it.
13         There's a -- and I don't
14     know, because it's not my area,
15     but there's a methodology that
16     applies where the weights are
17     based upon the standard error.
18     But I just -- I just can't recall
19     off the top of my head what that
20     is.
21 BY MR. TISI:
22     Q.   Let's talk about homo --
23 heterogeneity in meta-analysis.  How do
24 you interpret a Q value?  Do you know

Page 347

1  what a Q value is?
2      A.   It's a test of homogeneity.
3      Q.   Did your 2003 paper measure
4  heterogeneity?
5          MR. HEGARTY:  Objection to
6      form.
7          MR. HUDSON:  Objection to
8      form.
9  BY MR. TISI:
10     Q.   I'm sorry.  Do you know
11 whether Dr. Huncharek's 2003 paper
12 measured heterogeneity?  You can take it
13 out if you want.  It's right in your
14 book.
15     A.   I'm sorry.  Which --
16     Q.   Actually, let me just move
17 forward.
18         I want to get through some
19 of those concepts.  Let's talk about some
20 of the articles that you published in the
21 context of some of the things that we
22 just talked about.
23         I'd like to you look at the
24 2011 published study.  And we talked

Page 348

1  about this a little bit before, but I
2  just want to make clear that we have it
3  all in one place.  This is Number 24.
4          Now, this article appeared
5  in the journal entitled -- I'm sorry I
6  want to get it right -- European Journal
7  of Cancer Prevention, correct?
8      A.   Yes.  No, I'm sorry -- yes,
9  that's correct.
10     Q.   And you listed your author
11 affiliation with MRG?
12         MR. HEGARTY:  Objection to
13     form.
14 BY MR. TISI:
15     Q.   Meta-Analysis Research
16 Group?
17     A.   So my affiliation's listed
18 as Penn State University.
19     Q.   Okay.  But you were also --
20 when you originally wrote this paper for
21 the FDA, you also -- well, when
22 Dr. Huncharek and you signed your name to
23 it on behalf of --
24     A.   Yes.

Page 349

1      Q.   -- it was on behalf of MRG.
2  I think we looked at that before,
3  correct?
4          MR. HEGARTY:  Objection to
5      form.
6          THE WITNESS:  So I -- did we
7      actually look at that?  Did we
8      actually review that?
9  BY MR. TISI:
10     Q.   Yeah.  Let's take a look at
11 that.
12     A.   Okay.
13     Q.   If you want to take a look
14 at that, I believe it's number eight in
15 your binder.  And I can actually give it
16 to you as well.
17         (Document marked for
18     identification as Exhibit
19     Muscat-25.)
20         MR. TISI:  This is Number
21     25.
22 BY MR. TISI:
23     Q.   Sir, if you look side by
24 side with these.  Actually, if you go to

88  (Pages 346 to 349)

Joshua E. Muscat, Ph.D.

Page 350

1  Page 4 of this document that you have up
2  here, which is Exhibit Number 25.  This
3  is the comments on the Citizen's
4  Petition, correct?
5       A.   Yes.
6       Q.   Okay.  And you participated
7  in this?
8            MR. HEGARTY:  Objection to
9  form.
10 BY MR. TISI:
11      Q.   Do you see that?
12      A.   Yes, I see that.
13      Q.   Okay.  And if you look at --
14 let's look at, for example, if you would
15 go to Page 3 of -- excuse me -- 6 of 39
16 on the Citizen's Petition and Number 1 on
17 the article here.  Do you see at the very
18 bottom left-hand corner it says, "On
19 May 3, 2008, Samuel Epstein, M.D.
20 submitted a petition to the commissioner
21 of the Food and Drug Administration."
22           Correct?  Do you see all
23 that --
24           MR. HEGARTY:  Object to

Page 351

1       form.
2            THE WITNESS:  Yes, I see
3       that.
4  BY MR. TISI:
5       Q.   -- whole paragraph?
6       A.   Yes.
7       Q.   Okay.  And you see that in
8  the same -- same paragraph as in the
9  Citizen's Petition, correct?
10      A.   Yes.
11      Q.   And if you look at -- let's
12 go to -- and I'm going to tell you this
13 is all over the place here.
14           If you go to page -- Page 24
15 of the -- do you see the paragraph that
16 begins, "The issues articulated"?
17           Do you see that paragraph?
18      A.   Yes.
19      Q.   Okay.  Do you see -- look at
20 the first -- the article first -- first
21 beginning with, "The issues articulated."
22      A.   Yes.
23      Q.   I'll represent to you that
24 it's the exact same paragraph.  And I

Page 352

1  will tell you as you go through it -- go
2  to the next page.  Go to the next page of
3  the other -- of the other article as
4  well.  It says, "In 1965, Hill published
5  a landmark study."
6            Do you see that?
7       A.   Yes.
8       Q.   It also appears in this
9  article in 2011, correct?  First column
10 next page?
11           Do you see it?
12      A.   Yeah, I see that.
13      Q.   Next paragraph.  It says,
14 "Although Hill criteria."
15           Do you see that?
16      A.   Yeah.
17      Q.   That also appears, right?
18      A.   Yes.
19      Q.   And I will tell you that as
20 you go through it, the exact same
21 language appears in both -- in both the
22 Citizen's Petition and the article?
23           MR. HEGARTY:  Objection to
24      form.

Page 353

1  BY MR. TISI:
2       Q.   Did you know that?
3       A.   So I have not sat down and
4  done a paper-by-paper comparison.
5       Q.   But you know that this
6  particular article came out of the
7  Citizen's Petition that you filed on
8  behalf of the PCPC in 2009 or was filed
9  on your behalf?
10           MR. HEGARTY:  Objection to
11      form.
12           THE WITNESS:  So no,
13      actually.
14 BY MR. TISI:
15      Q.   Okay.  We'll let the jury go
16 through this and figure it out themselves
17 if they need to.
18      A.   Okay.
19           MR. SILVER:  Objection.
20      Move to strike.
21           MR. HUDSON:  Objection to
22      form.
23 BY MR. TISI:
24      Q.   So going back to the

89 (Pages 350 to 353)

Joshua E. Muscat, Ph.D.

Page 354

1    article, it's published in the journal of
2    the European Journal of Cancer
3    Prevention.
4           The article says that it was
5    submitted by you and Dr. Huncharek in
6    March 11, 2011, and accepted on
7    April 1st, 2011, correct?
8        A.   Yes.
9        Q.   Okay.  And by that time, you
10   were litigation experts, both for Johnson
11   & Johnson.  We talked about that before.
12       A.   Yes.
13           MR. HEGARTY:  Objection to
14       form.
15   BY MR. TISI:
16       Q.   And by this time you had
17   been -- you had written not only this
18   paper for the PCPC, right, you wrote
19   it -- you had written prior reports for
20   The Weinberg Group, correct?
21           MR. HUDSON:  Objection to
22       form.
23   BY MR. TISI:
24       Q.   On this issue?

Page 355

1        A.   I wrote a prior report to
2    The Weinberg Group.
3        Q.   And of course we looked at
4    that, and it was submitted on behalf of
5    the PCPC, correct?
6           MR. HEGARTY:  Objection to
7       form.
8           THE WITNESS:  That's
9       correct.  CTFA.
10   BY MR. TISI:
11       Q.   CTFA.  Between 2009 and
12   2011, we looked at the privilege log, and
13   there were multiple communications with
14   Shook Hardy & Bacon that were withheld
15   from us.
16           I'm not asking what you
17   communicated with your lawyers.  But did
18   you submit this paper or do you know if
19   this paper was submitted to Shook Hardy &
20   Bacon for -- Shook Hardy & Bacon for
21   review?
22           MR. HEGARTY:  Objection to
23       form.
24           THE WITNESS:  No.

Page 356

1    BY MR. TISI:
2        Q.   Now, the primary person who
3    wrote this article was Dr. Huncharek,
4    correct?
5        A.   That's correct.
6        Q.   The 2011?
7        A.   That's correct.
8        Q.   What -- what part of this
9    article did you write, if any?
10       A.   So he did the majority of
11   the writing.  And probably almost -- I
12   don't know exact percent.  But mostly it
13   was written by him, that's correct.
14       Q.   Any part of it you can
15   identify that was written by you?
16       A.   I don't think I can go back
17   in time and pull out specific --
18       Q.   I'm not asking about
19   specifics.  I'm talking about any
20   section, any parts of it that you feel
21   like you had a substantive contribution
22   to?
23       A.   So he did most of the
24   writing, probably all of the writing.  We

Page 357

1    may have, and I don't remember
2    specifically, but we probably discussed
3    at some point, I probably looked at it
4    for review and that looked fine.
5        Q.   Now, the prior publication
6    or the thing that was sent to the FDA,
7    the report that was sent to the FDA, did
8    he write that as well?
9           MR. HEGARTY:  Objection to
10       form.
11           THE WITNESS:  The Citizen's
12       Petition?
13   BY MR. TISI:
14       Q.   The response to the
15   Citizen's Petition?
16       A.   That's correct.  He wrote
17   most of it.
18       Q.   Can you identify parts of
19   the Citizen's Petition that you wrote?
20       A.   So I did the graphs.  So it
21   was the analysis of SEER rates of ovarian
22   cancer.
23       Q.   Other than that, anything
24   else?

Joshua E. Muscat, Ph.D.

Page 358

1    A.   So that was -- that was
2 mostly what I did.
3    Q.   I'm sorry.  Go ahead.
4    A.   I don't have any specific
5 recollection, but I probably reviewed it
6 for its contents and it was sent off.
7    Q.   The SEER graph really shows
8 that there's been no decrease in the
9 number of ovarian cancer cases over time
10 as cornstarch was used instead of talc in
11 cosmetic products?
12    A.   It shows that the rates of
13 ovarian cancer are stable.
14    Q.   Right.  And that was your
15 major contribution to this -- to this
16 paper?
17    A.   Yes.
18    Q.   Now, going back to the 2011
19 article -- the 2011 article, do you know
20 if it was submitted to any paper, any
21 journal other than the European Journal
22 of Cancer Research?
23    A.   No.  I don't have any
24 knowledge of it.

Page 359

1    Q.   Now, we talked about the
2 financial disclosures, the
3 acknowledgments at the end.  I'm going to
4 ask you to assume for me that if you go
5 back and look at the wording of this
6 paper, it is lifted almost verbatim from
7 the Citizen's Petition, because we don't
8 have time to sit here and go paragraph by
9 paragraph, but it is almost verbatim.
10    The Citizen's Petition was a
11 collaborative effort, correct?
12    MR. HUDSON:  Objection to
13 form.  Counsel's statements.
14    THE WITNESS:  So as I said,
15 I did submit graphs for that.
16 That's correct.
17 BY MR. TISI:
18    Q.   No, but the Citizen's
19 Petition itself, moving backwards in
20 time, was a collaborative effort between
21 Johnson & Johnson, Imerys, and Huncharek
22 and Muscat.  You had meetings.  You
23 exchanged drafts.  There were edits back
24 and forth.  Do you know that to be true?

Page 360

1    MR. HUDSON:  Objection to
2 form.
3    MR. HEGARTY:  Objection to
4 form.
5    THE WITNESS:  Can you repeat
6 the question?
7 BY MR. TISI:
8    Q.   Yes.  The Citizen's Petition
9 was subject to -- it was a collaborative
10 process between yourselves --
11    A.   The response to the
12 Citizen's Petition.
13    Q.   The response to the
14 Citizen's Petition --
15    A.   Okay.
16    Q.   -- was a collaborative
17 effort between yourselves, Huncharek and
18 Muscat, and Johnson & Johnson and others
19 in the talc industry?
20    MR. HUDSON:  Objection to
21 form.
22    THE WITNESS:  No.
23 BY MR. TISI:
24    Q.   You didn't -- didn't you go

Page 361

1 to a meeting and --
2    A.   We went to a meeting.
3 That's correct.
4    Q.   And you went through the
5 paper?
6    MR. HEGARTY:  Objection to
7 form.
8    THE WITNESS:  I'm sorry.
9 Which paper?
10 BY MR. TISI:
11    Q.   You went through the report,
12 the response to the Citizen's Petition,
13 correct?
14    A.   I don't remember what went
15 on at that meeting.  I have no knowledge
16 of the content of that meeting.
17    Q.   All right.  Do you know
18 whether or not Lorena Telofski -- do you
19 know who she is?
20    A.   No.
21    Q.   Do you know whether or not
22 anybody from the -- here is a copy of the
23 Exhibit 25, which is a copy -- 26.  I'm
24 sorry.

91 (Pages 358 to 361)

Joshua E. Muscat, Ph.D.

Page 362

1      (Document marked for
2    identification as Exhibit
3    Muscat-26.)
4  BY MR. TISI:
5      Q.   This is a copy of the
6  Citizen's Petition draft that was sent to
7  you -- that was circulated with edits.
8      Do you see that?
9      MR. HEGARTY:  Objection to
10    form.
11     Do you have copies of that,
12    Counsel?
13     MR. TISI:  I'm sorry.
14  BY MR. TISI:
15     Q.   Do you see that there are
16  notes and meetings -- minute -- reviews
17  of it?
18     MR. HEGARTY:  Objection to
19    form.
20     THE WITNESS:  I'm sorry.
21    What am I supposed to be looking
22    at?
23  BY MR. TISI:
24     Q.   I'm just saying, do you see

Page 363

1  that there are notes and edits on the
2  document?
3      MR. HEGARTY:  Objection to
4    form.
5      THE WITNESS:  I don't see
6    any notes.  I see that there are
7    track changes.
8  BY MR. TISI:
9      Q.   Right.  I'm going to
10  represent to you that in the documents
11  that have been provided to us, that the
12  track changes come from Lorena Telofski
13  at J&J.
14     MR. HUDSON:  Objection to
15    form.  There's no question
16    pending.
17     MR. TISI:  I'm about ready
18    to ask it.
19  BY MR. TISI:
20     Q.   There was a meeting in
21  November of 2009 to -- 2008 to discuss
22  this report with J&J, correct?
23     MR. HEGARTY:  Objection to
24    form.

Page 364

1      MR. HUDSON:  Objection to
2    form.
3  BY MR. TISI:
4      Q.   Before it was submitted to
5  the FDA?
6      A.   There was a meeting at J&J
7  that I went to.  That is correct.
8      Q.   And while you may not
9  remember the specifics, the purpose was
10  to vet this particular report?
11     MR. HUDSON:  Objection to
12    form.
13  BY MR. TISI:
14     Q.   Do you remember that?
15     A.   No.
16     (Document marked for
17    identification as Exhibit
18    Muscat-27.)
19  BY MR. TISI:
20     Q.   I'm going to show you what
21  I'd like to have marked as Exhibit 27.
22     Let me identify it.  It's an
23  e-mail, November 14, 2008.  It says,
24  "Here is the report that Muscat and

Page 365

1  Huncharek have prepared for us to submit
2  to the docket.  We will discuss it with
3  them next Wednesday p.m."
4      Do you see that?
5      A.   Yes.
6      Q.   Okay.  So does that refresh
7  your recollection that you discussed this
8  paper with the folks at J&J?
9      MR. HEGARTY:  Objection to
10    form.
11     THE WITNESS:  Not -- I don't
12    remember any of the details of
13    that day.
14  BY MR. TISI:
15     Q.   I didn't ask you if you
16  remember the details.
17     A.   Yeah.  Okay.
18     Q.   Okay.  So --
19     A.   I remember being there.
20     Q.   And you remember the focus
21  of the meeting was to discuss the
22  contents of the paper that you had
23  prepared for responding to the Citizen's
24  Petition asking that talc contain a

92 (Pages 362 to 365)

Joshua E. Muscat, Ph.D.

Page 366

1  warning of ovarian cancer?
2          MR. HEGARTY:  Objection to
3      form.
4          MR. HUDSON:  Objection to
5      form.
6          THE WITNESS:  So I can only
7      tell you what I remember, which is
8      that I don't remember that.
9  BY MR. TISI:
10     Q.  It also says, "In addition
11 we will discuss the possibility of
12 additional work to support long-term
13 goals for talc."
14         Do you see that?
15     A.  Yes.
16     Q.  Did you remember that?
17     A.  No.
18     Q.  "Take a look and be prepared
19 to discuss your point of view of this
20 paper when they're here."
21         Correct?  Do you see that?
22     A.  Yes.
23     Q.  Okay.  Does that refresh
24 your recollection that the whole purpose

Page 367

1  of the meeting was to discuss aspects of
2  the paper that you -- that you and
3  Dr. Huncharek had drafted?
4          MR. HEGARTY:  Objection to
5      form.
6          THE WITNESS:  So, no.
7  BY MR. TISI:
8      Q.  Okay.  It also says, "We
9  have discussed having an interested party
10 support the work through the trade
11 organization and have them submit it."
12     A.  No.
13     Q.  But this was actually a J&J
14 paper, right?
15         MR. HUDSON:  Objection to
16     form.
17 BY MR. TISI:
18     Q.  This was a paper that was
19 actually drafted for J&J?
20         MR. HUDSON:  Objection to
21     form.
22         MR. HEGARTY:  Objection to
23     form.
24         THE WITNESS:  This was a

Page 368

1          paper that was drafted in response
2      to the Citizen's Petition.
3  BY MR. TISI:
4      Q.  Look at the cover page of
5  the -- of the draft that I just
6  circulated to you.  It says, "Prepared
7  for J&J," does it not?
8      A.  Yes, I see that.
9      Q.  Okay.  It was prepared for
10 J&J, was it not?
11     A.  Yes.
12         MR. HUDSON:  Objection to
13     form.
14         MR. HEGARTY:  Objection.
15 BY MR. TISI:
16     Q.  Okay.  And the authorship
17 was -- the paper was submitted not on
18 behalf of J&J, it was actually submitted
19 by PCPC, correct?
20         MR. HEGARTY:  Objection.
21 BY MR. TISI:
22     Q.  If you look at the final one
23 that I gave you, which was Exhibit 25,
24 submitted under PCPC, right?

Page 369

1      A.  That's correct.
2      Q.  So the draft was done, it
3  was a J&J report, but it was submitted on
4  behalf of the entire industry under the
5  PCPC letterhead?
6      A.  I see that, yes.
7          MR. HEGARTY:  Objection to
8      form.
9  BY MR. TISI:
10     Q.  Is the European Journal of
11 Cancer Prevention a high impact journal?
12 Would you consider it a high impact
13 journal?
14     A.  So I don't know what the
15 impact factor is.
16     Q.  It's a relatively low impact
17 journal.  It's not one that everybody
18 reads, is it?
19         MR. HUDSON:  Objection to
20     form.
21         MR. HEGARTY:  Objection to
22     form.
23 BY MR. TISI:
24     Q.  It's not a widely cited

93 (Pages 366 to 369)

Joshua E. Muscat, Ph.D.

Page 370

1  journal, is it?
2       A.   It's probably not.  It's a
3  specialty journal.
4       Q.   Now, the acknowledgment
5  says, "Dr. Muscat and Huncharek" -- the
6  acknowledgment to the 2011 article, it
7  says, "Dr. Huncharek and Muscat were
8  consultants to Johnson & Johnson and
9  Consumer Products Worldwide at the time
10 the initial drafts of this manuscript
11 were produced."
12      Correct?
13      A.   Yes.
14      Q.   But you were also
15 consultants at the time the manuscript
16 was submitted, correct?
17      MR. HEGARTY:  Objection to
18 form.
19      THE WITNESS:  That, I can't
20 answer.
21 BY MR. TISI:
22      Q.   You were consultants -- this
23 was submitted in April 2011.  You were
24 not only just consultants, you were

Page 371

1  experts.
2       MR. HEGARTY:  Objection to
3  form.
4  BY MR. TISI:
5       Q.   Fair?
6       A.   I'm sorry.  With regard to
7  what?
8       Q.   For Johnson & Johnson and --
9  you were an -- you were an expert for
10 Johnson & Johnson in 2011 when this was
11 submitted.
12      A.   So I thought we went over
13 this.  So first of all, Dr. Huncharek
14 wrote that.  So I'm not responsible for
15 the specific wording.  But it says,
16 "Dr. Huncharek and Muscat were
17 consultants to Johnson & Johnson Consumer
18 Product Worldwide."
19      Q.   Finish the sentence, please.
20      A.   "At the time the initial
21 drafts of this manuscript was produced."
22      Q.   Okay.  But you were also
23 consultants at the time that it was
24 submitted and at the time that it was

Page 372

1  published as well, right?
2       A.   It was at the time the
3  initial drafts were produced.  I assume
4  that means produced and submitted at the
5  same time.  I don't see that distinction.
6       Q.   I know you don't.
7       A.   Yeah.
8       Q.   But other people might.
9       The question is --
10      A.   That's -- I don't understand
11 what the --
12      Q.   You were also litigation
13 consultants at the time that it was
14 submitted, correct?
15      MR. HEGARTY:  Objection to
16 form.
17      THE WITNESS:  The -- I
18 started my work with Shook Hardy &
19 Bacon in 2010; that's correct.
20 BY MR. TISI:
21      Q.   When you say you started
22 your work, you mean as a litigation
23 expert?
24      A.   That's correct.

Page 373

1       Q.   And did you acknowledge any
2  contribution that anybody at Johnson &
3  Johnson made to the underlying paper?
4       MR. HEGARTY:  Objection to
5  form.
6       THE WITNESS:  To my
7  knowledge, they didn't make any
8  contribution.
9  BY MR. TISI:
10      Q.   Okay.  But that would be a
11 question for Dr. Huncharek, I guess,
12 right?
13      A.   That's correct.
14      Q.   All right.  Let's go to your
15 second journal here.  The Critical Review
16 from 19 -- 2008.
17      (Document marked for
18 identification as Exhibit
19 Muscat-28.)
20 BY MR. TISI:
21      Q.   This is Exhibit Number 28.
22 This was also published in the European
23 Journal of Cancer Prevention.
24      A.   That's correct.

94 (Pages 370 to 373)

Joshua E. Muscat, Ph.D.

Page 374

1      Q.   It was accepted for
2  publication in April of 2008, correct?
3      A.   That's correct.
4      Q.   But this wasn't the first
5  journal that it was submitted to.  We
6  talked about that before, correct?
7      A.   That's correct.
8      Q.   It was submitted to
9  Environmental Health Perspectives in
10  January of 2006.
11          Did you know that?
12      A.   I don't have the exact date.
13      Q.   That was correct, right?
14  They rejected it.
15      A.   They rejected it.
16      Q.   It was submitted to the
17  journal called Gynecology Oncology in
18  March of 2006, and they rejected it as
19  well, correct?
20          MR. HUDSON:  Objection to
21      form.
22          MR. HEGARTY:  Objection to
23      form.
24          THE WITNESS:  I don't

Page 375

1      remember if it was actually ever
2      submitted there.
3  BY MR. TISI:
4      Q.   Okay.  Do you think it was?
5      A.   I don't recall.
6      Q.   It was submitted to the
7  Journal of Clinical Epidemiology in March
8  of 2006?
9      A.   It was submitted.  I don't
10  recall the exact date.
11      Q.   It was rejected by them as
12  well?
13      A.   No, not initially.
14  Initially it was invited to be
15  resubmitted with revisions.
16      Q.   And you don't like the
17  revisions, so you withdrew it and
18  submitted elsewhere, right?
19          MR. HUDSON:  Objection to
20      form.
21          THE WITNESS:  No.  We made
22      revisions on the paper.
23  BY MR. TISI:
24      Q.   And then it was rejected?

Page 376

1      A.   It ultimately was rejected.
2      Q.   By the Clinical Epidemiology
3  journal, correct?
4      A.   I believe it was called the
5  Journal of Clinical Epidemiology.
6      Q.   And it was submitted to The
7  Lancet?
8      A.   No.
9      Q.   It was not submitted to The
10  Lancet?
11      A.   No.
12      Q.   So this journal was the
13  journal, the European Journal of --
14      A.   -- Cancer Prevention.
15      Q.   -- Cancer Prevention was not
16  your first choice, was it?
17          MR. HUDSON:  Objection to
18      form.
19          THE WITNESS:  It was not the
20      first journal that I submitted it
21      to.
22  BY MR. TISI:
23      Q.   And it was -- this again, is
24  a low impact journal, correct?

Page 377

1          MR. HEGARTY:  Objection to
2      form.
3          THE WITNESS:  I don't know
4      what the impact factor is.  When
5      you're submitting to a journal,
6      you're trying to find a journal
7      that has a topic area that would
8      have an interest in the article.
9  BY MR. TISI:
10      Q.   Now, in Section -- go to
11  Page 505 if you would of that article.
12          And there's a whole section
13  here --
14          MR. HEGARTY:  Which page?
15      I'm sorry.
16          MR. TISI:  I'm sorry.  I'm
17      looking at the wrong one.  Can you
18      give me my copy back -- a copy to
19      me back?  Thank you, Counsel.
20  BY MR. TISI:
21      Q.   There's a whole section in
22  here on asbestos contamination and
23  confounding on Page 142.
24          Do you see that?

95  (Pages 374 to 377)

Joshua E. Muscat, Ph.D.

Page 378

1       A.   Yes.
2       Q.   Do you remember I talked to
3   you before about questions relating to
4   mineralogy and structural similarities
5   between asbestos and talc.  Do you
6   remember that?
7       A.   Yes.
8           MR. HEGARTY:  Objection to
9   form.
10  BY MR. TISI:
11      Q.   And the question is, did you
12  have any mineralogist or anybody who
13  looked at this paper in order to -- to
14  your knowledge -- first of all, let me
15  ask the question before we go any
16  further.
17          Is this another article that
18  was basically written by Dr. Huncharek?
19      A.   No, it wasn't.
20      Q.   You wrote this one?
21      A.   Yes.
22      Q.   Okay.  Did you consult with
23  any mineralogist or geologist about
24  issues relating to the structure of talc?

Page 379

1       A.   No.
2       Q.   Okay.  And here, it talks
3   about -- so if you go to Page 142, it
4   says -- this is the example of what I was
5   talking about.  "Cosmetic talcum powder
6   contains greater than 99 pure" -- "95 to
7   99 percent pure talc" -- "pure talc,
8   whereas other dusting powders are
9   typically composed of talc, cornstarch,
10  and other additives."
11          Do you see that, right?
12      A.   I'm sorry.  Where is it?
13      Q.   On Page 142.  Do you see
14  that?
15      A.   Yes.
16      Q.   Now, the next sentence is
17  kind of one of the examples that I was
18  talking about before.  It says, "Cosmetic
19  grade talc is asbestos free and has been
20  for several decades, but some baby
21  powders manufactured in 1970s contained a
22  small amount of tremolite or quartz
23  silica."  And then says Rohl 1976,
24  correct?

Page 380

1       A.   Yeah, I see that.
2       Q.   Okay.  And the Rohl 1976
3   refers to the second part of that
4   sentence, meaning that some baby powders
5   manufactured in the '70s contained small
6   amounts of tremolite or quartz, right?
7           MR. HEGARTY:  Objection to
8       form.
9           THE WITNESS:  I can't say
10      without looking whether it refers
11      to the whole sentence or the
12      second part of the sentence.
13  BY MR. TISI:
14      Q.   Well, if you know the
15  article was 1976, you know that it wasn't
16  referring to recent -- talc that was
17  manufactured and distributed from 1976
18  forward, right?
19          MR. HEGARTY:  Objection to
20      form.
21          THE WITNESS:  I'm sorry.
22      What was that?
23  BY MR. TISI:
24      Q.   If the article was written

Page 381

1   in 1976 --
2       A.   Yes.
3       Q.   -- it does not refer to
4   talc --
5       A.   Yes.
6       Q.   -- manufactured between
7   1976 --
8       A.   Yes.
9       Q.   -- and the date the article
10  was written --
11      A.   Yes, that's correct.
12      Q.   -- and submitted in 2008,
13  correct?
14      A.   Yes.
15      Q.   There's nothing cited in
16  this article saying that talc was
17  asbestos free in the 1980s, 1990s and
18  2000s, is there?
19      A.   In this article, that's
20  correct.
21      Q.   Is there any place that you
22  can ever remember citing that -- for the
23  proposition that talc is -- that talcum
24  powder products are asbestos free, or did

96 (Pages 378 to 381)

Joshua E. Muscat, Ph.D.

Page 382

1    you get that from someplace?
2         A.   So that --
3              MR. HEGARTY:  Objection to
4         form.
5              THE WITNESS:  That just came
6         from sort of my general
7         understanding from the IARC
8         monograph at the -- it's been
9         asbestos free.
10   BY MR. TISI:
11        Q.   You didn't cite IARC
12   monograph here, did you?
13        A.   I didn't cite it.
14        Q.   Okay.  So I really want to
15   know other than this general idea that
16   you have -- and this is one of those
17   examples that I talked about before.
18   Other than a general idea, are there any
19   place that you can cite to me where there
20   was a survey done or some testing done of
21   talc or talcum powder products which
22   demonstrates that, and to use your words,
23   "Cosmetic grade talc is asbestos free and
24   has been for decades"?

Page 383

1              MR. HEGARTY:  Objection to
2         form.
3              THE WITNESS:  So there have
4         been studies that have been done
5         in miners where they did analyses
6         for talc and for European mines
7         and in Vermont.
8    BY MR. TISI:
9         Q.   But those aren't talcum
10   powder products, are they?
11        A.   They are mines that are --
12   where talcum powder products come from.
13        Q.   Right.  I'm talking about
14   survey -- talcum powder products, do they
15   go through a manufacturing process,
16   right?
17        A.   Yes.
18        Q.   Okay.  So certain grades of
19   talc make it, certain don't, correct?  Or
20   you don't know that?
21             MR. HEGARTY:  Objection to
22        form.
23             THE WITNESS:  The talcum
24        powder is a pure grade, yes.

Page 384

1    BY MR. TISI:
2         Q.   Okay.  So my question is,
3    the grade that is used in Johnson &
4    Johnson's Baby Powder or Shower to Shower
5    products, you really don't know whether
6    or not it is, to use your words,
7    asbestos-free and has been for several
8    decades.  You don't know that, do you?
9              MR. HEGARTY:  Objection to
10        form.
11             THE WITNESS:  So my
12        assumption based on the literature
13        is that it has been.  I've never
14        seen anything that actually says
15        that it is.
16   BY MR. TISI:
17        Q.   Right.  One way or the
18   other, right?
19             MR. HEGARTY:  Objection to
20        form.
21             THE WITNESS:  All I can say
22        is that, in general discussions
23        and being at the -- you know, with
24        the IARC monograph, I don't --

Page 385

1         I've never come across an argument
2         that there's asbestos particles in
3         cosmetic grade talc powder.
4    BY MR. TISI:
5         Q.   The discussions that you had
6    were people like John Hopkins at
7    Johnson & Johnson, correct?
8              MR. HEGARTY:  Objection to
9         form.
10             THE WITNESS:  No.
11   BY MR. TISI:
12        Q.   You have spoken to John
13   Hopkins, right?
14        A.   Many years ago.
15        Q.   Okay.  Did you submit a --
16   now this one has an acknowledgment,
17   Exhibit 28, has an acknowledgment section
18   too.  Do you see that?
19        A.   Yes.
20        Q.   It says, this was
21   supported -- this one was supported by a
22   contract from Crowell & Moring, Inc.
23        Do you see that?
24        A.   Yes.

97 (Pages 382 to 385)

Joshua E. Muscat, Ph.D.

Page 386

1    Q.   First of all, Crowell &
2  Moring is not -- it's a law firm.  It's
3  not an Inc.?
4         MR. SILVER:  Objection to
5     form.
6         MR. HEGARTY:  Objection to
7     form.
8  BY MR. TISI:
9    Q.   It's not a company, is it?
10  It's a law firm?
11        MR. SILVER:  Objection to
12     form.
13        THE WITNESS:  It's a law
14     firm.
15  BY MR. TISI:
16    Q.   Okay.  And it doesn't
17  acknowledge any involvement -- now, the
18  contract with Crowell & Moring, Inc., was
19  for the benefit of Johnson & Johnson and
20  Imerys, correct?
21        MR. HEGARTY:  Objection to
22     form.
23        THE WITNESS:  I understand
24     that -- now that was the case.

Page 387

1  BY MR. TISI:
2    Q.   They're not disclosed in
3  this article, are they?
4    A.   That's correct.
5    Q.   You wouldn't blame anybody
6  for looking at this article and not
7  understanding that Crowell & Moring was
8  the law firm representing Imerys in this
9  matter, do you?
10        MR. SILVER:  Objection to
11     form.
12        MR. HEGARTY:  Objection.
13        THE WITNESS:  I'm sorry.
14     Can you repeat that?
15  BY MR. TISI:
16    Q.   Would you blame any reader
17  of this article for not knowing that this
18  is written pursuant to a contract with a
19  law firm?
20        MR. HUDSON:  Objection to
21     form.
22        MR. SILVER:  Objection to
23     form.
24        THE WITNESS:  I still don't

Page 388

1  understand the question.  Can you
2     repeat it?
3  BY MR. TISI:
4    Q.   Yes.  Do you think anybody
5  realistically reading this article would
6  realize that this article was supported
7  by a contract with a law firm?
8         MR. SILVER:  Objection to
9     form.
10        MR. HUDSON:  Objection to
11     form.
12        THE WITNESS:  It's supported
13     by a law firm.  That's correct.  I
14     stated that.
15  BY MR. TISI:
16    Q.   Do you think anybody would
17  ever know that Crowell & Moring is a law
18  firm?
19        MR. HUDSON:  Objection to
20     form.
21        MR. SILVER:  Objection to
22     form.
23        THE WITNESS:  Maybe they
24     would, yeah.

Page 389

1         MR. TISI:  Well, let me --
2     let me --
3         THE WITNESS:  Yeah.
4         MR. TISI:  Can you just play
5     clip one, please.  This is from
6     the deposition --
7  BY MR. TISI:
8    Q.   You know who Susan Nicholson
9  is, don't you?  You spoke to
10  Dr. Nicholson.  She called you about
11  this?
12    A.   Yes, right.
13    Q.   And Susan Nicholson works
14  for Johnson & Johnson, right?
15    A.   Yes.
16    Q.   Okay.  And Susan Nicholson
17  is like the highest levels of Johnson &
18  Johnson, correct?
19        MR. SILVER:  Objection to
20     form.
21        MR. HUDSON:  Objection to
22     form.
23        THE WITNESS:  I don't know
24     her personally.

Joshua E. Muscat, Ph.D.

Page 390

1  BY MR. TISI:
2       Q.   She's a chief medical --
3  she's a chief medical officer or
4  something like that?
5            MR. HEGARTY:  Objection to
6       form.
7            THE WITNESS:  I don't know
8       her title.
9  BY MR. TISI:
10      Q.   Well, I'll tell you she was
11  produced to us as a witness representing
12  the company and speaking for Johnson &
13  Johnson?
14      A.   Okay.
15           MR. HEGARTY:  Objection to
16      form.
17  BY MR. TISI:
18      Q.   Let me show you what she
19  said about Crowell & Moring.
20           (Video playback.)
21           MR. TISI:  The contract from
22      Crowell & Moring, Inc., before you
23      came in here and you had read this
24      article, would you have any idea

Page 391

1       of knowing Crowell & Moring, Inc.,
2       was a law firm?
3            MR. NICHOLSON:  No, I would
4       not.
5            (End of video playback.)
6  BY MR. TISI:
7       Q.   Do you have any -- do you
8  have any reason to believe that any
9  person looking at this article
10  objectively would know this was written
11  under a contract with a law firm?
12           MR. SILVER:  Objection to
13      form.
14           MR. HEGARTY:  Objection to
15      form.  Asked and answered.
16           MR. HUDSON:  Objection to
17      form.
18           THE WITNESS:  If anybody had
19      a question to that, they could
20      have called me, and I would
21      explain it's a law firm.
22           But I don't see what the
23      issue is though.
24  BY MR. TISI:

Page 392

1       Q.   Okay.  And it doesn't
2  mention J&J, right?
3       A.   It mentions Crowell &
4  Moring.
5       Q.   It doesn't mention J&J?
6       A.   No, it doesn't.
7       Q.   It doesn't mention Imerys?
8       A.   No, it doesn't.
9       Q.   Does it mention -- do you
10  give any -- it gives an acknowledgment to
11  Lamar Wheeler.  Who's Lamar Wheeler?
12      A.   That's the spouse of
13  Dr. Huncharek.
14      Q.   Okay.  It doesn't give any
15  acknowledgment to Ridge Hall, right, who
16  was one of the lawyers who kind of red
17  lined a prior version of this paper,
18  right?
19           MR. SILVER:  Objection to
20      form.
21           MR. HEGARTY:  Objection to
22      form.
23           THE WITNESS:  No, he didn't
24      red line a prior version of this

Page 393

1       paper.  He had nothing to do with
2       it.
3  BY MR. TISI:
4       Q.   Nothing to do with it?
5       A.   Nothing.
6       Q.   Absolutely nothing?
7       A.   Nothing.
8       Q.   Okay.  And how about
9  Dr. McCarthy?
10      A.   With this paper?
11      Q.   Yeah.
12      A.   Nothing.
13      Q.   Dr. Glenn?
14      A.   Nothing.
15      Q.   Nothing whatsoever?
16      A.   Nothing.
17      Q.   Absolutely zero?
18      A.   Absolutely zero, nothing.
19      Q.   And if I took the drafts of
20  the article that was submitted in 2005
21  and compared it to the final paper, there
22  would be absolutely nothing in common?
23           MR. SILVER:  Objection to
24      form.

99 (Pages 390 to 393)

Joshua E. Muscat, Ph.D.

Page 394

1      MR. HUDSON:  Objection to
2  form.
3          THE WITNESS:  They are
4  almost entirely different
5  articles.
6  BY MR. TISI:
7      Q.   Okay.
8      A.   Okay.  So.
9          (Document marked for
10     identification as Exhibit
11     Muscat-29.)
12  BY MR. TISI:
13     Q.   I'm going to show you what
14  I'd like to have marked as Exhibit
15  Number -- could you please put the prior
16  article up on this one as well.
17          Now, this, Doctor, is a
18  draft of an article, this is an article,
19  "Perineal Talc Use, and Ovarian Cancer:
20  A Critical Review."
21          Do you see that?  Do you see
22  that?
23     A.   I'm sorry.  Which one are
24  you referring to?

Page 395

1      Q.   Oh, okay.
2      A.   "Talc and Ovarian Cancer."
3  Yes.
4      Q.   Do you see that this is, to
5  the left, is an article -- is a draft of
6  an article entitled "Talc and Cancer:  A
7  Critical Review."  A report to Crowell &
8  Moring by Michael Huncharek and Joshua
9  Muscat.
10         Do you see that?
11     A.   Yes.
12     Q.   And do you see the first
13  page of that is a cover sheet, and I
14  pulled it from the documents that have
15  been produced to us.  And it's
16  entitled -- it's a draft that was edited
17  by Tim McCarthy.  You know who Tim
18  McCarthy was, right?
19         MR. HEGARTY:  Objection to
20  form.
21         MR. HUDSON:  Objection to
22  form.
23         MR. SILVER:  Objection to
24  form.

Page 396

1  BY MR. TISI:
2      Q.   Do you see that?
3          MR. HEGARTY:  Objection.  No
4  question.
5  BY MR. TISI:
6      Q.   Yeah.  Do you see that says
7  Tim McCarthy?
8      A.   Oh, I'm sorry.
9          MR. HEGARTY:  Objection to
10  form.
11  BY MR. TISI:
12     Q.   Do you see that?
13     A.   Oh, okay.  On the front
14  page?
15     Q.   Mm-hmm.  And do you see that
16  this is in fact the same title or similar
17  title, "Perineal Talc Use and Ovarian
18  Cancer:  A Critical Review."  And the
19  earlier versions an edited version of
20  this by Tim McCarthy?
21         MR. HUDSON:  Objection to
22  form.
23         THE WITNESS:  It's a
24  different title.  It's not the

Page 397

1  same version.  This is a different
2  product.
3  BY MR. TISI:
4      Q.   Okay.  We'll see.  All
5  right.  Let's go to the next one, your
6  diaphragm meta-analysis.  Exhibit 30.
7  This is part of your binder, but I'm
8  going to mark it as 30.
9          (Document marked for
10     identification as Exhibit
11     Muscat-30.)
12  BY MR. TISI:
13     Q.   Diaphragm published
14  meta-analysis.
15     A.   Yes.
16     Q.   Again, this is in the very
17  same journal that we talked with the last
18  two articles, the European Journal of
19  Cancer Prevention?
20     A.   Yes.
21     Q.   It's a third article
22  produced in this journal on this issue,
23  correct?
24     A.   That's correct.

100  (Pages 394 to 397)

Joshua E. Muscat, Ph.D.

Page 398

1       MR. HUDSON:  Objection to
2   form.
3           MR. HEGARTY:  Objection to
4   form.
5   BY MR. TISI:
6       Q.   This is really your go-to
7   journal for talc, wasn't it?
8           MR. SILVER:  Objection to
9   form.
10          MR. HEGARTY:  Objection to
11  form.
12          THE WITNESS:  So this is,
13      like, cancer prevention.  So it's
14      an appropriate journal for --
15  BY MR. TISI:
16      Q.   I didn't ask you that.  I
17  asked you, was this article submitted and
18  rejected by another journal as well?
19          MR. HUDSON:  Objection to
20  form.
21          THE WITNESS:  I have -- I
22      have no knowledge of that.
23  BY MR. TISI:
24      Q.   You have no knowledge of

Page 399

1   that?
2       A.   That's correct.
3       Q.   Dr. -- would --
4   Dr. Huncharek would know that, right?
5       A.   That's correct.
6       Q.   Now, the purpose of this
7   article, as best as I understand it, is
8   to say that your assumption -- the
9   hypothesis was -- and if you go on Page
10  2, you have the -- there's a paragraph on
11  the left that says, "It appears, however,
12  that talc ovarian cancer hypothesis could
13  be tested with better precision and
14  validity if the exposure to the suspected
15  carcinogen was directed to the
16  reproductive tract."  Correct?
17      A.   I see that, yes.
18      Q.   And that was the hypothesis
19  that you thought was a good idea to test?
20      A.   Yes.
21      Q.   Okay.  In other words, if
22  talc was closer to the ovaries through
23  use of a diaphragm, and did not show an
24  increased risk; therefore, it would cast

Page 400

1   doubt on the talc that was dusted on a
2   woman more remotely from the ovaries,
3   correct?
4           MR. HEGARTY:  Objection to
5       form.
6           THE WITNESS:  I would say
7       it's a -- it's a better test to
8       the hypothesis.
9   BY MR. TISI:
10      Q.   "And therefore, the present
11  data describes a result of a
12  meta-analysis pooling data from
13  epidemiology studies examining the risk
14  of women of ovarian cancer associated
15  with the use of cosmetic talc on
16  diaphragms."
17      A.   Yeah.
18      Q.   Okay.  We're going to talk
19  about this later.  But the premise of
20  this article is to focus solely on
21  diaphragms that are dusted with talc?
22      A.   That's correct.
23      Q.   And so if this study
24  contains -- contains diaphragms that were

Page 401

1   either not dusted with talc or that did
2   not have -- that wasn't including
3   diaphragms at all, that would be -- that
4   would be inappropriate to include in this
5   study?
6       A.   I think all the data that
7   was cited were studies of talc-dusted
8   diaphragms.
9       Q.   We are going to talk about
10  that very issue.
11      A.   Okay.
12      Q.   We will.  But that was the
13  hypothesis that you were testing here,
14  right?
15      A.   Yes.
16      Q.   And this one, the
17  acknowledgment in the end, it says this
18  one was work provided by a grant from
19  Luzenac America -- American, Inc., and
20  Johnson & Johnson Consumer Products
21  Worldwide, right?
22          MR. SILVER:  Objection to
23      form.
24  BY MR. TISI:

101 (Pages 398 to 401)

Joshua E. Muscat, Ph.D.

Page 402

1    Q.   Do you see that?
2    A.   I see that.
3    Q.   Now, this one talks about a
4    grant, and we talked about before, this
5    was under a contract. This wasn't a
6    grant.
7         MR. HEGARTY: Objection to
8         form.
9         THE WITNESS: That would
10        better describe it.
11   BY MR. TISI:
12   Q.   Okay. And this one doesn't
13   acknowledge any contribution, where the
14   other one talked about Crowell & Moring
15   Inc., this one doesn't mention Crowell &
16   Moring at all?
17   A.   That's correct.
18   Q.   Okay. But this one was
19   drafted under the contract with Crowell &
20   Moring, as well?
21        MR. HEGARTY: Objection to
22        form.
23        THE WITNESS: I believe so.
24   BY MR. TISI:

Page 403

1    Q.   And there would be no way of
2    anybody reading this article knowing that
3    this article was drafted under a contract
4    with a law firm, correct?
5         MR. HEGARTY: Objection to
6         form.
7         THE WITNESS: It's not --
8         that's correct.
9    BY MR. TISI:
10   Q.   Okay. And of course, as you
11   said before, I guess somebody could have
12   called you up and said, "Was this done
13   under a contract with a law firm," and
14   they might have found that out, right?
15        MR. HEGARTY: Objection to
16        form.
17        THE WITNESS: Yes.
18   BY MR. TISI:
19   Q.   You expect -- have you done
20   that in all the years that you've been --
21   that you've a called up somebody and
22   asked what their affiliation is?
23   A.   Have I ever done that?
24   Affiliation. Not that I can recall.

Page 404

1    Q.   Okay. That's an
2    unreasonable to thing to expect somebody
3    to do, huh?
4         MR. SILVER: Objection to
5         form.
6    BY MR. TISI:
7    Q.   Right? Scientists don't do
8    that, do they?
9         MR. HUDSON: Objection to
10        form.
11   BY MR. TISI:
12   Q.   As a matter of course?
13   A.   What's that?
14   Q.   Contact and ask and probe
15   people about their conflicts of interest?
16   A.   It -- so I'm not sure what
17   the purpose of the -- what are you
18   getting at?
19   Q.   All right. Let's withdraw
20   the question.
21   A.   Okay.
22   Q.   If we wanted to ask about
23   the 2003 meta-analysis, we would have to
24   go to Dr. Huncharek?

Page 405

1    A.   That's correct.
2    Q.   Even though you were on the
3    original paper, you weren't there. You
4    didn't know anything about it.
5    A.   I didn't.
6    Q.   Okay. Let's go back to the
7    Citizen's. Now I wanted to go to the
8    next one, which is the agreed-to
9    scientific principles. We're back here.
10        We went through publication
11   timelines, talc industry funding of
12   Muscat studies and regulatory reports.
13   Now I want to go to agreed-on scientific
14   principles. This is going to be very
15   quick because I don't think it's going to
16   be really disputed. So let's just go
17   through it.
18        Can you go to the Citizen's
19   Petition in 2011 -- excuse me, 2009.
20   PCPC with your report on it. Do you see
21   that?
22        MR. HEGARTY: What exhibit
23        number?
24        MR. TISI: Exhibit

Joshua E. Muscat, Ph.D.

Page 406

```
 1        Number 25.
 2            MR. HEGARTY:  Thank you.
 3            MR. TISI:  You're welcome.
 4   BY MR. TISI:
 5        Q.   Can you go to Page 21 of the
 6   document.  Okay.  Now, this introduction
 7   is basic -- it talks about basic -- first
 8   of all, have you reviewed this prior to
 9   your deposition today?
10        A.   I briefly looked at it.
11        Q.   Okay.  So you talk about
12   some general -- this is the -- I
13   understand that your testimony, that this
14   was primarily written by Dr. Huncharek.
15        A.   That's correct.
16        Q.   But maybe we can talk about
17   it and I think you can agree to it.
18            It says here, it talks about
19   the general concepts of science and how
20   science develops and how people,
21   epidemiologists do their work.
22        A.   Okay.
23            MR. HEGARTY:  Objection.
24   BY MR. TISI:
```

Page 407

```
 1        Q.   Okay.  And at the very
 2   bottom here it says, "In the context of
 3   human studies, the experimental design
 4   has come to represent the gold standard
 5   of cause and effect relationships are
 6   randomized clinical trials."
 7            Do you see that?
 8            MR. HEGARTY:  I don't think
 9   we are on the same page.
10            THE WITNESS:  Page 21 or?
11            MR. HEGARTY:  21 or 29?
12            MR. TISI:  Right here.  21.
13            MR. HUDSON:  Oh, you mean 21
14   in the top right-hand corner.
15            MR. TISI:  Yeah, of the
16   document.
17            MR. HUDSON:  We were looking
18   at 21 on the bottom.
19            THE WITNESS:  I'm sorry,
20   okay.
21   BY MR. TISI:
22        Q.   It says here, let's start in
23   the beginning.  I have it on the screen
24   for you.  It says, "In the context of
```

Page 408

```
 1   human studies, the experimental design
 2   has come to represent the gold standard
 3   of cause and effect relationships is the
 4   randomized clinical trial."
 5            Do you see that?
 6            You can look here.  It may
 7   make your life a little easier.
 8        A.   Okay, I'm sorry.  Okay,
 9   okay.  Yes, I see that.
10        Q.   Okay.  And that's where you
11   take people prospectively, you randomize
12   them, you give them for example, a drug
13   or not and you see what the effect is,
14   and you give people placebo and you see
15   if there's an effect as well?
16        A.   That's correct.
17        Q.   Can't do that with, when
18   your hypothesis is does -- does talcum
19   powder products cause cancer, right?
20        A.   That's correct.
21        Q.   For several reasons.  Number
22   one is it would be very unethical to give
23   somebody a product that you think might
24   cause cancer?
```

Page 409

```
 1            MR. HUDSON:  Objection to
 2   form.
 3            MR. HEGARTY:  Objection to
 4   form.
 5   BY MR. TISI:
 6        Q.   And compare them to people
 7   who don't, right?
 8        A.   So I would disagree with the
 9   statement that it causes cancer.
10        Q.   I didn't --
11        A.   Okay.
12        Q.   As a -- as a general --
13        A.   Okay.
14        Q.   Let's at least talk about,
15   if your hypothesis is that this pen, this
16   pen causes cancer, okay, and you want to
17   expose somebody, you want to expose five
18   people to this pen and five people to a
19   different pen that doesn't cause -- you
20   think may not cause cancer, you can't do
21   that study because you don't want to
22   expose people to a -- to a pen that might
23   cause cancer?
24            MR. HEGARTY:  Objection to
```

Joshua E. Muscat, Ph.D.

Page 410

1      form.
2          THE WITNESS:  So can I just
3      qualify that?
4   BY MR. TISI:
5      Q.   Yeah.
6      A.   Okay.  You can do like a
7   very short-term study.  For instance,
8   you're interested in the toxicity of a
9   particular product and you know that if
10  somebody is going to be exposed to it for
11  five minutes that it's not going to cause
12  cancer.  So -- but in general you are
13  correct that one has to be careful in
14  terms of doing those type of studies that
15  involves a potentially toxic exposure.
16     Q.   So there's no surprise here
17  that there's no clinical trials where
18  people are exposed to talc and see
19  whether or not it causes cancer?
20     A.   That's correct.
21         MR. HEGARTY:  Objection.
22  BY MR. TISI:
23     Q.   All right.  So -- and that's
24  the point that's made next, which is,

Page 411

1   "Unfortunately in epidemiologic research,
2   issues of feasibility and ethical
3   considerations preclude those kinds of
4   studies."
5      A.   I see that.
6      Q.   You see that?
7      A.   Mm-hmm.
8      Q.   And that's what -- that's
9   what is meant here, right?
10         MR. HEGARTY:  Objection.
11         THE WITNESS:  Yes.
12  BY MR. TISI:
13     Q.   All right.  So, therefore,
14  the epidemiologist must substitute
15  observational methods of study to study
16  cause and effect relationships that
17  preclude direct intervention with or
18  manipulation of the study subjects.  In
19  other words, studies that don't
20  experiment on -- on individual people?
21     A.   So, you would call them
22  observational studies.
23     Q.   Right.  Epidemiology
24  studies.

Page 412

1      A.   That's correct.
2      Q.   Like the case-control
3   studies that we -- that that you
4   proposed to Johnson & Johnson and they
5   didn't do?
6          MR. HEGARTY:  Objection to
7      form.
8   BY MR. TISI:
9      Q.   Right.  Like that?
10     A.   They didn't do it.  They
11  didn't fund it.
12     Q.   But because of that fact
13  that you can't study whether talc causes
14  cancer directly, you use epidemiologic
15  methods, correct --
16         MR. HEGARTY:  Objection to
17     form.
18  BY MR. TISI:
19     Q.   -- to do that, and that's
20  what this point says here.
21         It says, "Because of that
22  fact, criteria for establishing cause and
23  effect relationships are inherently
24  different when utilizing epidemiologic

Page 413

1   methods versus experimental ones."
2      A.   Yeah, I see that.
3      Q.   Okay.  And so what's
4   postulated here is an epidemiologist may
5   go about this in a different way than if
6   you were conducting a clinical trial.
7   And the next paragraph describes that
8   methodology, correct?
9          MR. HEGARTY:  Objection to
10     form.
11  BY MR. TISI:
12     Q.   Have you ever seen this
13  before?  I mean, this is your document.
14  You are reading it.  Have you seen this
15  before?
16         MR. HEGARTY:  Objection to
17     form.
18         THE WITNESS:  So I've seen
19     it for the first time in probably
20     a long time.
21  BY MR. TISI:
22     Q.   Okay.
23     A.   Okay.  So that's why I need
24  time to look at it.

104 (Pages 410 to 413)

Joshua E. Muscat, Ph.D.

Page 414

1    Q.   No, that's fine.  But I just
2  didn't want to -- I didn't want it to be
3  like this was your first time seeing it.
4  This is -- this is your -- this is your
5  work that went in under your name.
6          MR. HUDSON:  Objection to
7      form.
8          THE WITNESS:  I've already
9      described my role in it.  So let
10     me look at the next -- the next
11     paragraph are the Hill criteria.
12 BY MR. TISI:
13     Q.   Right.  And so the
14 methodology described here is, is what's
15 called the Hill criteria and there are
16 nine, correct?
17     A.   Yes.
18     Q.   And what it basically says
19 is -- and it says here and it makes an
20 important point.  "Hill criteria as
21 they've become known is not simply a
22 checklist or requirements that must be
23 met in order to determine cause and
24 effect relationships."

Page 415

1          Do you see that?
2      A.   Yes.
3      Q.   Okay.  So if anybody were to
4  come into court and say, gee, you know,
5  here is the Hill criteria, here are the
6  nine one, and we need to go through and
7  check each one of those, that would be
8  wrong, right?
9          MR. HEGARTY:  Objection.
10         MR. SILVER:  Objection.
11 BY MR. TISI:
12     Q.   And Hill made that point.
13     A.   I'm sorry, can you repeat
14 that?
15     Q.   Yes.  Yes.  Hill made --
16 Hill made the point --
17     A.   So, okay.  So I will -- I
18 will say that the Hill criteria are --
19 are guidelines.  They are not really
20 considered criteria.
21     Q.   Right.  Correct.  And so
22 they are not like a checklist or a
23 laundry list or a recipe that has to be
24 met.

Page 416

1      A.   That's correct.
2          MR. HEGARTY:  Objection to
3      form.
4  BY MR. TISI:
5      Q.   All right.  And different --
6  and this is kind of what I talked about
7  at the very beginning of our discussion
8  today, all of these factors here, okay,
9  different epidemiologists can weigh them
10 differently, correct?
11         MR. HUDSON:  Objection to
12     form.
13 BY MR. TISI:
14     Q.   And it's not unusual that
15 they do, that's science.
16         MR. HUDSON:  Objection to
17     form.  No question pending.
18         THE WITNESS:  So --
19 BY MR. TISI:
20     Q.   Well, let me rephrase the
21 question.
22     A.   Yeah, right.
23     Q.   Okay.  You can do an
24 epidemiology study and see the results.

Page 417

1  You do the statistics.  You report them.
2  They are what they are, right?
3      A.   Yes.
4      Q.   Okay.  But the decision
5  about making the jump from that
6  Statistical Association to the causal, if
7  there's a causal inference, is one that
8  is one that scientists debate all the
9  time.
10         MR. HUDSON:  Objection to
11     form.
12         THE WITNESS:  I would say
13     that the -- well, that's the
14     purpose of the IARC proceedings,
15     is to get together experts, review
16     the literature from different
17     aspects of the field.  And not --
18     not just epidemiology.  It's
19     animal work, experimental work.
20     And come up with some -- some
21     determination.
22 BY MR. TISI:
23     Q.   That's right.  And but the
24 process is one of using scientific

105  (Pages 414 to 417)

Joshua E. Muscat, Ph.D.

Page 418

1  judgment, correct?
2       A.   That's correct.
3       Q.   There's no magic formula
4  here, right?
5            MR. HEGARTY:  Objection to
6       form.
7            THE WITNESS:  It requires
8       scientific judgment.
9  BY MR. TISI:
10      Q.   Scientific judgment.
11           And oftentimes, scientists
12  may weigh these factors differently,
13  true?
14           MR. HEGARTY:  Objection to
15      form.
16           THE WITNESS:  It's possible
17      it may happen.  But it's possible
18      that scientists may be in
19      agreement.
20  BY MR. TISI:
21      Q.   And so this is a framework,
22  this is not a -- this Hill criteria is a
23  framework.  And you used -- used the
24  word, it is at least a general framework

Page 419

1  for the process.
2            MR. HEGARTY:  Objection to
3       form.
4            THE WITNESS:  So I would --
5       I prefer my term, sort of
6       guidelines.
7  BY MR. TISI:
8       Q.   Okay.  Now the next thing
9  that's here I think we can agree to is in
10  the overview section.  It says -- and you
11  start talking about talc.
12           And it says, "The
13  possibility that perineal talc exposure
14  could be associated with the development
15  of ovarian cancer was initially derived
16  from a case-control study in 1992 (sic)
17  Dr. Cramer."
18           Do you see that?
19      A.   Yes.
20           MR. HEGARTY:  Objection,
21      form.
22  BY MR. TISI:
23      Q.   "Since that time a number of
24  additional reports have addressed the

Page 420

1  question with most showing odds ratios
2  between 1.0 and 2.0," correct?
3       A.   Yes.
4       Q.   Okay.  And when you say
5  that, you mean statistically significant,
6  correct?
7            MR. HEGARTY:  Objection to
8       form.
9            THE WITNESS:  I'm not sure
10      that's implicit.
11  BY MR. TISI:
12      Q.   Okay.  But it would show a
13  point estimate in the range that suggests
14  an association?
15           MR. HEGARTY:  Objection to
16      form.
17           THE WITNESS:  With a -- it
18      would show -- well, you've seen
19      what the meta-analyses are, right?
20  BY MR. TISI:
21      Q.   Right.
22      A.   And so the -- you know,
23  depending on the -- those ranges are
24  approximately 1.3, 1.2.

Page 421

1       Q.   Okay.  And you've
2  characterized them as weak effects,
3  right?  But you say that there is
4  actually -- effects of this magnitude are
5  often characterized as weak effects.
6  Although the definition, exact definition
7  of weak effect is debatable, and you go
8  on.
9       A.   Yes, I see that.
10      Q.   But you make the next point
11  on Page 23.  Next -- first sentence of
12  the next -- next full paragraph.  It
13  says, "It is important to point out that
14  although an association is weak," as you
15  call it, "this does not rule out a causal
16  connection," correct?
17      A.   Yes, I see that.
18      Q.   Okay.  In fact, there are
19  multiple different kinds of things that
20  we accept are causally related that have
21  weak statistical associations, correct?
22           MR. HEGARTY:  Objection to
23      form.
24           THE WITNESS:  That I don't

106 (Pages 418 to 421)

Joshua E. Muscat, Ph.D.

Page 422

1    know.  And the best way to do that
2    would be to actually go through
3    all the IARC monographs and look
4    at the statistics.  That's --
5    that's the only way I can make
6    that assessment.
7    BY MR. TISI:
8        Q.   IARC is a pretty -- is a
9    pretty -- you mentioned IARC a couple of
10   times.  Is a pretty credible
11   organization?
12       MR. HEGARTY:  Objection to
13       form.
14       THE WITNESS:  It's a
15       credible organization.
16   BY MR. TISI:
17       Q.   And it's looked at in the
18   scientific community with respect?
19       MR. HEGARTY:  Objection to
20       form.
21       THE WITNESS:  I can't answer
22       for everybody.
23   BY MR. TISI:
24       Q.   But you believe that's true?

Page 423

1        A.   Personally I -- I admire
2    IARC and what they do.
3        Q.   And when you went there for
4    talc, they actually looked at the Hill
5    criteria, true?
6        A.   So actually I can't recall
7    whether he specifically went through the
8    Hill criteria.  I think they -- I think
9    they probably did.  I don't remember
10   whether they went through it in terms of
11   each one of those items.
12       But they probably did in
13   terms of their assessment, I'm sure they
14   did that, in terms of these are the
15   things that are often considered in
16   weighing the issues.
17       Q.   Okay.  So --
18       A.   But I can't say that this is
19   the Hill criteria and they went through
20   that -- that list.
21       Q.   Well, even though -- and I
22   don't know whether it's true or not.  But
23   I -- and apparently for the purposes of
24   this, I -- it doesn't really matter to me

Page 424

1    so much.
2        But whether you agree or
3    disagree with the results that the IARC
4    panel came to, the methodology that they
5    use is one that's pretty standard in the
6    scientific and medical community, true,
7    for cause and effect?
8        MR. HEGARTY:  Objection to
9        form.
10       THE WITNESS:  No.  I would
11       say it's -- it's unusual.
12   BY MR. TISI:
13       Q.   Why is it unusual?
14       A.   They -- they have their own
15   algorithm.  It's kind of difficult to
16   describe.  But they consider different
17   bodies of evidence and then they kind of
18   give it sort of certain weights, or
19   mechanistic data versus epidemiologic
20   data versus animal studies.
21       And so there's -- sort of --
22   it's rather obscured, there's sort of a
23   weighting system.  I don't know of other
24   groups that use that specific -- the

Page 425

1    specific ways that IARC does it.
2        Q.   But it is a methodology that
3    is recognized at least in that aspect of
4    the medical community, it's not --
5        A.   It's -- in terms of a --
6    doing a comprehensive review of the
7    literature, and assessing the literature,
8    it's, you know, what they do is
9    acceptable.
10       Q.   Okay.  So you make the
11   point, it says, "Important to point out
12   that although the association is weak,
13   this does not rule out a causal
14   connection."
15       A.   I see that.
16       Q.   Okay.  And you agree with
17   that?
18       A.   That's correct.
19       Q.   Okay.  So just because
20   something is a 1.3 or a 1.2 or 1.4
21   doesn't mean that that does not -- that
22   relative risk is not causal, correct?
23   You have to look at all the other
24   evidence and weigh it?

Joshua E. Muscat, Ph.D.

Page 426

1          MR. HEGARTY:  Objection to
2     form.
3          THE WITNESS:  I'm sorry, can
4     you repeat that?
5  BY MR. TISI:
6     Q.   Yeah.  Just because a
7  relative risk seen in studies is what you
8  call weak or 1 point -- anything less
9  than a 2.0, that doesn't mean that
10 there's no cause and effect?
11         MR. HEGARTY:  Objection to
12    form.
13         THE WITNESS:  There are some
14    that would argue that's the case.
15    There's sort of a feeling on
16    some -- anything under a 2.0 is
17    due to bias.  That's not something
18    that I ascribe to.
19 BY MR. TISI:
20    Q.   Okay.
21    A.   So I would certainly
22 consider, you know, weak associations
23 within the realm of all the scientific
24 evidence that goes with it.

Page 427

1     Q.   So you employ kind of a
2  weight of the evidence methodology,
3  correct?
4          MR. HEGARTY:  Objection to
5     form.
6          THE WITNESS:  For, for?
7  BY MR. TISI:
8     Q.   Cause and effect.  You look
9  at the epidemiology studies, you look at
10 the animal studies, you look at the --
11 you look at the dose-response, you look
12 at biological plausible mechanism.  And
13 you basically take that and you apply
14 your best judgment to that and see where
15 the weight of the evidence lies?
16    A.   Yes, yes.
17    Q.   All right.  The next point I
18 want to go to is the last one.
19         MR. HUDSON:  You know,
20    Counsel, we've been going almost
21    two hours.  Do you think it may be
22    time for an afternoon break?
23         MR. TISI:  Yeah.  That's
24    fine.

Page 428

1          THE VIDEOGRAPHER:  Going off
2     the record.  3:55 p.m.
3          (Short break.)
4          THE VIDEOGRAPHER:  We are
5     back on record at 4:15 p.m.
6  BY MR. TISI:
7     Q.   Doctor, okay, so I'm in the
8  homestretch now and I'm going to focus on
9  some of the more technical issues related
10 to the studies that you did and relied on
11 in your reports that you sent to the FDA
12 and published in the peer-reviewed
13 medical literature.
14    A.   Okay.
15    Q.   So going back to our little
16 outline that I gave you in the very
17 beginning, where I am is at Number 4, the
18 reliability and data -- of data and
19 methods in Muscat literature of talcum
20 powder products and ovarian cancer.
21 Okay?
22    A.   Yep.
23    Q.   So --
24         (Document marked for

Page 429

1     identification as Exhibit
2     Muscat-31.)
3  BY MR. TISI:
4     Q.   And actually I'm going to
5  mark this as Exhibit Number 31 so we have
6  it for the record.
7          Now, Doctor, when I look at
8  your report that you sent to the FDA and
9  your 2011 article that was published in
10 the European Journal of Cancer
11 Prevention, and indeed all your other
12 articles going back in time, you appear
13 to make four points.  And I tried to be
14 fair, and we'll modify this, if I'm not
15 and put them on a slide here so we can
16 talk about each one of them.  Okay.
17         You agree that the pooled
18 analysis of epidemiologic studies shows
19 an overall 33 percent increased risk of
20 ovarian cancer, but considerations of the
21 following factors mitigate against a
22 causal inference.
23         First of all, would you
24 agree that that's generally true, that's

108 (Pages 426 to 429)

Joshua E. Muscat, Ph.D.

Page 430

1  what your -- that's what you assumed in
2  your writings based upon Dr. Huncharek's
3  2003 meta-analysis?
4        MR. SILVER:  Objection to
5  form.
6        MR. HUDSON:  Objection to
7  form.
8        THE WITNESS:  So can I
9  qualify that?
10 BY MR. TISI:
11       Q.   Sure.  And we'll change it
12 on -- on this chart.
13       A.   Okay.
14       Q.   Any way you can.
15       A.   So there have been more
16 recent meta-analyses that I think have
17 incorporated new studies.  And so --
18       Q.   In fairness, let me -- let
19 me stop you.
20       A.   Okay.
21       Q.   Because I'm taking your
22 deposition here as a fact witness and not
23 as a, quote, expert.  And I'm really
24 trying to focus on what you wrote in the

Page 431

1  peer-reviewed literature and what you
2  said.  Okay.  Now, there may have been
3  things after 2011.  But you haven't
4  really published in the area since 2007,
5  have you?
6        A.   That's correct.
7        Q.   Or 2011.
8             So I'm going to kind of keep
9  you to -- and that's a good point.
10            As of 2011, okay, you were
11 of the view that there was a
12 statistically significant increased risk
13 overall when you look at all the studies
14 together in a meta-analysis, but that
15 there were factors that considered --
16 that mitigated against a causal
17 inference?
18       MR. HEGARTY:  Objection to
19 form.
20       MR. HUDSON:  Objection to
21 form.
22       THE WITNESS:  Okay.  So I --
23 so I don't mean to be
24 obstructionist.

Page 432

1  BY MR. TISI:
2        Q.   That's fine.
3        A.   But I want to make sure that
4  I know what the data point I'm referring
5  to, that you're referring to in my
6  studies, so I can -- because one point,
7  33 percent, is that from the --
8        Q.   Well, that was -- that was
9  the number that was referred to in your
10 Citizen's Petition in your 2011 study.
11 And I think it was derived from the
12 meta-analysis that Dr. Huncharek did.
13       A.   Okay.
14       Q.   But whether the number is
15 33 percent or 1.2 or 1.4, in that range.
16       A.   In that range.  Okay.
17       Q.   Okay.  So why don't we
18 change it to say -- what numbers can we
19 use?  A 20 to 40 percent increase?
20       MR. HEGARTY:  Objection to
21 form.
22       THE WITNESS:  I'd say I
23 don't have the number off the top
24 of my head.

Page 433

1  BY MR. TISI:
2        Q.   Okay.  But the number that
3  you used was 33 percent because you
4  referred to the meta-analysis that
5  Dr. Huncharek did, so can we use that
6  number?
7        A.   Okay.
8        Q.   Knowing that it's a range.
9        MR. HUDSON:  Objection to
10 form.
11       THE WITNESS:  Okay.
12 BY MR. TISI:
13       Q.   But it's a range, it could
14 be 1.2, it could be 1.4.  But the number
15 that you had referred to in your reports
16 and publications with Dr. Huncharek was
17 33 percent.
18       MR. HEGARTY:  Objection to
19 form.
20 BY MR. TISI:
21       Q.   Okay?  I mean I can point it
22 out to you if you want.  Maybe we'll
23 confirm it when we get to that.  Okay?
24       A.   Okay.

Joshua E. Muscat, Ph.D.

Page 434

1          MR. HEGARTY:  Objection to
2     form.
3     BY MR. TISI:
4          Q.   But what I really want to
5     get to are the four points here.  Number
6     one is, your view was that there was a
7     lack of dose-response relationship,
8     correct?  And that's one of the Hill
9     factors, that there was no dose-response
10    relationship between talc and ovarian
11    cancer.
12         A.   This is kind of new to me.
13    You are summarizing my conclusions?  I
14    just don't know --
15         Q.   Let's go back.  Let's go
16    back.  Let's go back to Exhibit
17    Number 25.
18         (Brief interruption.)
19    BY MR. TISI:
20         Q.   Let's go to Page 24 of your
21    report with Dr. Huncharek in 2009.  And
22    this was in response to the Citizen's
23    Petition to add a talc warning.
24         A.   Okay.

Page 435

1          Q.   Just for context.
2          A.   Okay.
3          Q.   On Page 24 it says, first
4     paragraph.
5          A.   Yes.
6          Q.   It says, "Huncharek et al.
7     initially pooled the data from 15
8     case-control and 1 cohorts analysis
9     yielding a summary risk of 1.33 with a
10    confidence interval of 1.16 to 1.45."
11         Do you see that?
12         A.   I see that.
13         Q.   That's where the 33 percent
14    increased risk that I put on this slide
15    came from.
16         MR. HEGARTY:  Objection to
17    form.
18         THE WITNESS:  Okay.
19    BY MR. TISI:
20         Q.   But that was in your -- but
21    that was in the report that you signed
22    with Dr. Huncharek?
23         MR. HUDSON:  Objection to
24    form.

Page 436

1          THE WITNESS:  I see that.
2     Okay.
3     BY MR. TISI:
4          Q.   Okay.  But then there was
5     some -- saying, okay, well, let's accept
6     that there is a mild association, and
7     let's talk about whether or not the other
8     Hill factors support a causal inference,
9     correct, and down here it starts with,
10    two paragraphs down, it says, "One of the
11    more persistent findings among
12    epidemiological studies, examining the
13    suspected association, is the lack of
14    dose-response relationship."
15         Do you see that?
16         MR. HEGARTY:  Objection to
17    form.
18         THE WITNESS:  So I do, but
19    I'd like to make the comment on
20    the previous one.  I mean you had
21    pointed out the summary of
22    relative risk which I agreed upon,
23    all right.
24         But it also says that

Page 437

1     "although this suggests a
2     statistically significant positive
3     association between perineal talc
4     use and ovarian cancer, risk
5     sensitivity analysis demonstrate
6     clear differences in outcome based
7     on study design."
8     BY MR. TISI:
9          Q.   Understood.  I have this
10    here --
11         MR. HUDSON:  Let him finish
12    his answer, please.
13         THE WITNESS:  Yeah --
14    BY MR. TISI:
15         Q.   I have it here on the
16    chart --
17         MR. HUDSON:  Let him finish
18    his answer, please.
19         THE WITNESS:  No, but you --
20    you were summarizing the main
21    points that I was trying to make.
22    Right?  And so I -- I agreed that
23    the 1.33 by --
24         (Document marked for

110  (Pages 434 to 437)

Joshua E. Muscat, Ph.D.

Page 438

1      identification as Exhibit
2      Muscat-32.)
3  BY MR. TISI:
4      Q.   Understood.  And it says
5  here lack of consistency between study
6  designs on the chart.
7      A.   Okay.
8      Q.   Look at the -- look at the
9  chart.  And I listed at least four --
10 four arguments that made against a causal
11 inference.  One is a lack of
12 dose-response relationship.
13     A.   Okay.
14     Q.   That's here.  Number 2 is
15 lack -- I took them a little bit out of
16 order because I want to discuss them in
17 the order.
18     A.   Okay.
19     Q.   Lack of a biologically
20 plausible mechanism.  Do you see that,
21 and that's an argument you've made?
22     A.   Okay.
23     Q.   Right?  And the lack of
24 consistency between study -- different

Page 439

1  study designs which is the point you just
2  made, correct?
3      A.   Okay, yes.
4      Q.   Right?  And uncontrolled
5  confounding.
6      A.   Yes.
7      Q.   All right.  And those are
8  points that you made, not only in this
9  paper, but in the published literature
10 and in your meta-analyses and your
11 appearance before NTP and the FDA.
12 This -- these four things have been
13 consistent points of view that you have
14 raised?
15         MR. HEGARTY:  Objection to
16     form.
17         THE WITNESS:  So I -- just
18     to be clear, I did not appear
19     before the NTP had submitted
20     something.
21 BY MR. TISI:
22     Q.   Fine.
23     A.   But -- and honestly for me
24 to -- I'd have to go back and look at all

Page 440

1  that.
2      Q.   Then that's fine.  Let's --
3  let's deal with this right now.
4      A.   Okay.  But if you want to
5  talk about more general -- yeah.
6      Q.   Let's talk about more
7  general, because I don't want to -- I
8  don't want to dance around the maypole
9  with you about when -- what you said and
10 when.
11         I'm going to represent to
12 you that I've read all your literature.
13 And these four points are points that
14 you've made consistently.
15         Number one, that there does
16 not appear to be a dose-response
17 relationship and, in fact, there appears
18 to be an inverse dose-response
19 relationship in some studies.  Does that
20 sound familiar to you?
21         MR. HEGARTY:  Objection to
22     form.
23         THE WITNESS:  Yes.
24 BY MR. TISI:

Page 441

1      Q.   Okay.  You also made the
2  point that there is -- that there is, in
3  your view, a lack of biologically
4  plausible mechanism which would explain a
5  risk for -- which would raise the
6  inference of causation.
7          MR. HEGARTY:  Objection.
8          THE WITNESS:  Yeah, I have
9      talked about biological
10     plausibility.  I can't recall
11     specifically as it relates to the
12     inference.  But I mean it sounds
13     familiar, but I'd really have to
14     look at the context.
15 BY MR. TISI:
16     Q.   Okay.  We're going to talk
17 about it because it's in your paper here.
18     A.   Okay.
19     Q.   Okay.  The next thing you
20 talk about is the lack of consistency
21 between different study designs.
22     A.   Okay.
23     Q.   Right?  That's a point you
24 just mentioned.

111 (Pages 438 to 441)

Joshua E. Muscat, Ph.D.

Page 442

1    A.   Yes.
2    Q.   Okay.  And that there might
3  be uncontrolled founding -- confounding,
4  and one of the issues you raised is
5  smoking.
6    A.   Okay.
7    Q.   Does that sound familiar to
8  you?
9    A.   No.
10       MR. HEGARTY:  Objection to
11   form.
12  BY MR. TISI:
13   Q.   It doesn't?
14   A.   That I've said uncontrolled
15  confounding is smoking?
16   Q.   That -- that the studies
17  that looked at talc and ovarian cancer
18  did not control for smoking.
19   A.   I -- I can't recall.
20   Q.   Okay.  We'll talk about
21  that.
22   A.   Okay.
23   Q.   So I'm going to kind of take
24  these in order in which I listed them and

Page 443

1  talk about them.
2    A.   Okay.
3    Q.   Okay.  All right.  So let's
4  talk about lack of dose-response
5  relationship first.
6       On Page 24 of your Citizen's
7  Petition that you sent to the FDA, you
8  say, one of the -- on the last -- right
9  there.
10      "One of the more persistent
11  findings among epidemiological studies,
12  examining the suspected association, is
13  the lack of dose-response relationship."
14      Do you see that?
15   A.   I see that.
16   Q.   And it says, "Table 2 of
17  Huncharek et al. meta-analysis displays a
18  dose-response data for those including
19  studies providing such information."
20      Do you see that?
21   A.   Yes.
22   Q.   And we looked at Table 2
23  before.  Do you remember early on in the
24  deposition I showed you a dose-response

Page 444

1  table?
2    A.   I saw a table.
3    Q.   Okay.  So you're referring
4  the FDA specifically to a specific table
5  in Dr. -- Dr. Huncharek's 2003
6  meta-analysis?
7       MR. HEGARTY:  Objection to
8       form.
9       THE WITNESS:  I'm sorry, can
10  I just look at this for a second?
11  BY MR. TISI:
12   Q.   Sure.
13   A.   This would be helpful if I
14  could actually see -- if we are going to
15  talk about this, if I can see Table 2.
16   Q.   Absolutely.  You're going
17  to -- you're going to be spending a lot
18  of time with Table 2.
19   A.   Okay.
20   Q.   Okay.  But it refers the FDA
21  to Table 2 in the meta-analysis, correct?
22   A.   That's correct.
23   Q.   Okay.  And I'm going to mark
24  Table 2.

Page 445

1       I'll get it another day.
2       Let's -- let's bring it up
3  on the screen if you don't mind.
4       I'll tell you what.  Go to
5  your binder that I put in front of you.
6  Tab 4 is the meta-analysis, and there is
7  Table 2.  Do you see it?
8    A.   Yes.
9    Q.   Okay.  And you actually --
10  as I talked to you about before, you
11  actually reproduced that table.  Now that
12  table --
13      MR. TISI:  Can you bring it
14  up, please?
15  BY MR. TISI:
16   Q.   All right.  Let's just keep
17  going.
18      You actually reproduced that
19  table in your 2011 published study,
20  correct?
21      MR. HUDSON:  Objection to
22      form.
23      MR. HEGARTY:  Objection to
24      form.

112 (Pages 442 to 445)

Joshua E. Muscat, Ph.D.

Page 446

1  BY MR. TISI:
2      Q.   Go to -- go to Exhibit
3  Number 24. And here it's Table 3. And
4  it says on the first column, it says,
5  "Table 3 derived from data presented in
6  the meta-analysis by Huncharek, et al.
7  displays dose-response data for those
8  included studies providing such
9  information."
10          Do you see that?
11      A.   I'm sorry, where am I
12  supposed to be reading from?
13      Q.   Okay. Look at the first --
14  look at the first column on your 2011
15  study -- published article. It says --
16  go down.
17          Go down. It says here, "One
18  of the more persistent findings among
19  epidemiologic studies examining this
20  relationship is the lack of dose-response
21  relationship."
22          In fact, that's the exact
23  sentence that we read from the Citizen's
24  Petition report, right?

Page 447

1      A.   Okay. Okay.
2      Q.   Right? "Table 3 derived
3  from the data presented by the
4  meta-analysis of Huncharek et al.
5  displays dose-response data from those
6  included studies providing such
7  information."
8          Do you see that?
9      A.   I see that.
10      Q.   Okay. And if you look at
11  Table 3, it is exactly Table 2 from
12  your -- the meta-analysis with one
13  exception. You actually are kind enough
14  to list the actual studies along the Y
15  axis.
16          MR. HEGARTY: Objection.
17  BY MR. TISI:
18      Q.   Instead of referring by
19  numbers.
20          I will tell you that I
21  checked all the numbers. They all look
22  the same.
23      A.   Okay, okay.
24      Q.   Okay?

Page 448

1      A.   Okay.
2      Q.   So I'm going to show you and
3  this may make your life easier because
4  it's easy to read.
5          MR. TISI: What's the next
6      exhibit, please.
7          (Document marked for
8      identification as Exhibit
9      Muscat-33.)
10  BY MR. TISI:
11      Q.   Can I have Number 33. I
12  actually blew up, and maybe this will
13  help us here. Table -- this is actually
14  Huncharek 2011.
15          I'm going to give you this
16  copy. I just changed it because it
17  should be 2011. This is Table 3 from
18  your study so it's easier to read.
19      A.   Okay.
20      Q.   Okay? So you can put the
21  study down and we can actually work with
22  it.
23          Now, just for recollection,
24  this is your study from 2011 that

Page 449

1  incorporates this chart that was derived
2  from the 2003 meta-analysis that was also
3  sent to the FDA.
4      A.   Okay.
5      Q.   All right. Do you follow
6  me?
7      A.   Yes.
8      Q.   All right. Now, do you have
9  a copy of the 2003 article?
10      A.   Yes.
11      Q.   Would you please -- have you
12  ever carefully looked at this article,
13  sir?
14      A.   The 2003 meta-analysis?
15      Q.   Mm-hmm.
16      A.   Yeah, I've seen it.
17      Q.   Have you read it carefully
18  before citing it to the FDA and
19  republishing it in 2011?
20          MR. HEGARTY: Objection to
21  form.
22          THE WITNESS: I've looked at
23  it.
24  BY MR. TISI:

113 (Pages 446 to 449)

Joshua E. Muscat, Ph.D.

Page 450

1    Q.   Did you carefully look at it
2  to make sure it was accurate and
3  complete?
4    A.   So I was not an author on
5  it. So I didn't go through word by word.
6  I have looked at this.
7    Q.   It's a pretty sloppy
8  article, isn't it?
9      MR. HUDSON:  Objection to
10     form.
11  BY MR. TISI:
12    Q.   In fact, it's a really
13  sloppy article, isn't it?
14      MR. HUDSON:  Objection to
15     form.
16      THE WITNESS:  I wouldn't
17     make that comment.
18  BY MR. TISI:
19    Q.   Well, let's -- let's see if
20  we can go through it.  On Page 1958 of
21  Dr. Huncharek's 2003 article.
22    A.   Mm-hmm.
23    Q.   On the left-hand column,
24  referring to Table 2, the dose-response

Page 451

1  data that we are talking about here.
2      MR. TISI:  Could you please
3     bring that up.
4  BY MR. TISI:
5    Q.   If you go to the first
6  paragraph, second full paragraph on the
7  left-hand side.  It says, "Seven studies
8  included" -- he's talking about the
9  studies, right?
10    A.   Okay.
11    Q.   "Seven studies included
12  dose-response data stratified by the
13  number of talc applications to the
14  perineum per month Table 2."
15      Do you see that.
16    A.   Mm-hmm.
17    Q.   Could you do me a favor and
18  count the number of studies that are
19  included in Table 2?
20    A.   Nine.
21    Q.   He says there are seven,
22  correct?
23      MR. HEGARTY:  Objection to
24     form.

Page 452

1      THE WITNESS:  I see that.
2  BY MR. TISI:
3    Q.   Okay.  That's wrong,
4  correct?
5      MR. HEGARTY:  Objection to
6     form.
7      THE WITNESS:  I can't say
8     for certain.
9  BY MR. TISI:
10    Q.   It appears to be wrong,
11  correct?
12    A.   No, I can't say for certain.
13    Q.   He says seven studies were
14  included in the analysis and he displays
15  nine.
16    A.   Okay.  So without having to
17  go back and -- and compare them,
18  sometimes it's the same study and there
19  are updates.  So that may be the case.
20  Like for instance, Cramer,
21  Dr. Cramer had published multiple --
22  multiple publications so --
23    Q.   Sometimes --
24    A.   Can I finish, please?

Page 453

1    Q.   Sure.
2    A.   Okay.  So that may be the
3  same study, the New England case-control
4  study.  And there may be multiple
5  references.  I'll --
6    Q.   But let's just --
7      MR. HUDSON:  Let him finish
8     his answer.
9  BY MR. TISI:
10    Q.   Let's talk about it.
11      MR. HUDSON:  Just a minute.
12     Let him finish his answer, please.
13  BY MR. TISI:
14    Q.   Go ahead, please.
15    A.   Yeah, thank you.
16      So I can't automatically
17  make the assumption that this is
18  incorrect.
19      I -- I know for a fact in
20  meta-analyses, one of the challenges that
21  is faced is that there are sometimes
22  multiple reports from the same study.
23    Q.   Right.  Well --
24    A.   So --

114 (Pages 450 to 453)

Joshua E. Muscat, Ph.D.

Page 454

1     Q.    -- it looks like Dr. --
2  Dr. --
3     A.    Huncharek.
4     Q.    -- Huncharek tried to take
5  care of that.  Let's go back to page --
6  the page before where he talks about
7  results.
8     A.    Okay.
9     Q.    Okay.  He talks about the --
10  he talks about the literature search.
11  See the results section?  "The literature
12  search revealed 17 studies that appeared
13  to meet the protocol specification and
14  full papers were obtained for review.
15  Further review showed the paper by
16  Hankinson used the same data as the
17  subsequent paper by Gertig from the same
18  laboratory.  Therefore, only 12
19  references were included in the
20  meta-analysis.  The remaining 16 papers
21  met protocol specified include criteria."
22        So it looks like he went
23  through the process of sorting the
24  studies, didn't he?

Page 455

1        MR. HEGARTY:  Where were you
2     just reading from, counsel?
3        MR. TISI:  Page --
4        MR. HEGARTY:  1957?
5        MR. TISI:  1956 under the
6     results section.
7  BY MR. TISI:
8     Q.    He went through the sorting
9  process.
10     A.    Okay.
11     Q.    All right.  Of course this
12  is a mistake too, right?
13        MR. HUDSON:  Objection to
14     form.
15  BY MR. TISI:
16     Q.    He looked at -- well, look
17  at -- it says -- here it says that the
18  paper by Hankinson used the same data as
19  the subsequent paper by Gertig.  And he
20  says -- do you see that?
21        MR. HEGARTY:  Objection to
22     form.
23  BY MR. TISI:
24     Q.    It says, "Therefore, only

Page 456

1  Hankinson was included."  Do you see
2  that?
3     A.    Yeah, I see that.
4     Q.    Okay.  So if you look at --
5  but if you look at the next page, and it
6  says, "Overview of included studies."
7  One, two, three, four, five, six, seven,
8  eight -- eight down, he included Gertig
9  but not Hankinson.
10     A.    Yeah, I think that's
11  correct.
12     Q.    Yeah, it is.  And how about
13  this --
14     A.    Yeah, I think what he did
15  was correct.  I don't know --
16     Q.    He said he took out
17  Hankinson -- he said he took out Gertig
18  because Hankinson was repetitive, but he
19  kept Gertig in and he took Hankinson out.
20        He says, "Further review
21  showed the paper by Hankinson, reference
22  12, used the same data as the subsequent
23  paper by Gertig.  Therefore, only
24  Hankinson was included, reference 12."

Page 457

1  Right?
2     A.    I see that, yes.
3     Q.    And if you look at the next
4  page, he didn't include Hankinson, he
5  included Gertig.
6     A.    Okay.
7     Q.    So it was an error.
8        MR. HEGARTY:  Objection to
9     form.
10        THE WITNESS:  There might be
11     an error in that.
12  BY MR. TISI:
13     Q.    Okay.  And there's errors
14  throughout this paper.  Let me give you
15  another example, sir.
16        If you go to Page 86 -- I
17  mean there are just spelling errors even.
18        MR. HEGARTY:  Objection to
19     form.
20  BY MR. TISI:
21     Q.    Look at -- look at Page
22  1958.  Very top sentence.  "Given the
23  lack of statistical heterogeneity."
24  That's even spelled wrong, isn't it?

115 (Pages 454 to 457)

Joshua E. Muscat, Ph.D.

Page 458

1    A.   I'm sorry, where are we?
2    Q.   First -- first full sentence
3  on the first paragraph --
4    A.   Oh, I see.  Yeah, there's a
5  typo there.
6    Q.   Even spelling errors?
7    A.   Yes.
8    Q.   This wasn't peer reviewed
9  very carefully, was it?
10       MR. HUDSON:  Objection to
11  form.
12       THE WITNESS:  It was peer
13  reviewed.
14  BY MR. TISI:
15    Q.   Okay.  So let's talk about
16  the data.  Now going back to it, it says
17  there were seven studies that met the
18  criteria but there are nine listed in
19  Table 2, right?
20    A.   That's correct.
21    Q.   All right.  Now, let's go to
22  Table 3 that's actually reproduced in
23  your -- this -- again, for the record,
24  Table 2 was reproduced in your 2011

Page 459

1  article as Table 3, exhibit -- what is
2  that -- what is that exhibit number?  24.
3    A.   Okay.  Mm-hmm.
4    Q.   Yes, correct.
5    A.   Yes.
6    Q.   All right.  All right.  So
7  let me give you -- I created and I hope
8  this will help us here.  I'm going to
9  hand you Exhibit Number 25.
10       This is a binder with --
11       MR. HUDSON:  Is this a new
12  25?
13       MR. TISI:  Is it -- is
14  this -- I thought 24 was the last
15  one.
16       I'm sorry.  I miss -- I
17  miss -- what number are we on?
18  What number are we?
19       MR. HUDSON:  I think we are
20  on 34.  But I think we need to get
21  confirmation.
22       MR. TISI:  Okay.  34.  I
23  wanted to make -- what did I make
24  that chart over there?

Page 460

1       MR. HUDSON:  33.
2       MR. TISI:  33.
3       (Document marked for
4    identification as Exhibit
5    Muscat-34.)
6  BY MR. TISI:
7    Q.   This is Exhibit Number 34,
8  sir.
9       And this for the record
10  is --
11       MR. TISI:  Actually can I
12  have one copy?  I'll give it back
13  to you, but...
14  BY MR. TISI:
15    Q.   It has in front of it
16  Table 2 from Huncharek 2003.  Table 3,
17  and actually it should say -- it should
18  be -- why don't you write 2011 on top.
19       Do you see that?
20    A.   Okay.
21    Q.   And then behind it are the
22  studies that are referred to.
23    A.   Okay.
24    Q.   Okay.  So that we can refer

Page 461

1  to them.
2    A.   Okay.
3    Q.   All right.  So this way you
4  can make your life a little bit easier.
5  All right.  So let's go through this.
6       First, let's -- let's
7  actually -- let me actually go through
8  this.  First study is a study by Booth
9  1989.
10       First of all, you agree with
11  me as an epidemiologist, numbers matter,
12  right?  You don't want to make errors
13  with numbers?
14    A.   You always try and be
15  correct.
16    Q.   Right.  You don't try to be
17  correct, you have to be correct?
18    A.   Yes.
19    Q.   Okay.  You can't express
20  wrong confidence intervals.  You can't
21  round numbers up or down.  You can't --
22  you can't say you are doing one thing and
23  do another.  You've got to be accurate,
24  right?

116 (Pages 458 to 461)

Joshua E. Muscat, Ph.D.

Page 462

1    A.   Yes.
2    Q.   All right.  Now, what Dr. --
3  let's talk about the Booth study.  1989.
4        Turn to Booth 575.
5    A.   I'm sorry.
6    Q.   I'm sorry, I made a -- I did
7  it wrong.  I'm sorry, Page 596.
8        Now, first of all, let's
9  explain for the judge and the jury what
10 this is.  What doctor -- if you go back
11 to the original article, Dr. Huncharek
12 says, he says, the data showed a
13 comparison was made across these studies,
14 the nine studies which he said were
15 seven, but it's nine.
16        Comparing the lowest
17 recorded exposure category with the
18 highest exposure level.  Do you see that?
19    A.   I'm sorry, which -- which
20 page is that?
21    Q.   Okay.
22    A.   Sorry.
23    Q.   It's page --
24    A.   I'm sorry.  Of the Huncharek

Page 463

1  meta-analysis?
2    Q.   Yes.
3    A.   Okay.  I'm sorry.  Can you
4  point out --
5    Q.   Yes.  The second full
6  paragraph.  It says, "Seven studies
7  included dose-response data stratified by
8  talc applications to the perineum per
9  month."
10        Of course we know that there
11 are nine listed in Table 2, right?
12    A.   That's correct.
13    Q.   "A comparison was made
14 across these studies comparing the lowest
15 recorded exposure category with the
16 highest exposure level."
17        Right?
18    A.   I see that.
19    Q.   All right.  And if you look
20 at the chart, your chart on Number 33,
21 Exhibit Number 33, the first column,
22 it -- both of these display the highest
23 exposure category and the lowest exposure
24 category.  The highest on top, the lowest

Page 464

1  on the bottom.
2        For each study?
3    A.   No, it looks like the --
4    Q.   Let me -- let me see if I
5  can explain it.
6    A.   It looks like the --
7    Q.   For each study --
8    A.   Yes.
9    Q.   -- if it's expressed in
10 the -- in years of talc use, it's in the
11 first column, right?
12    A.   That's correct.
13    Q.   If it's expressed in
14 frequency applications, it's in the --
15 it's in the second column.
16    A.   That's correct.
17    Q.   All right.  And he
18 explains -- he provides all the data,
19 right, with the lowest exposure category
20 on top, to the highest.  So for example,
21 one application per month, four
22 applications per month, 30 -- 30
23 applications per month, everyday.
24    A.   I'm sorry, I just need a

Page 465

1  little time to look at this.  Okay.
2    Q.   Did you find it?  All right.
3        So now let's go to the chart
4  in Booth where that data is taken from.
5  And I believe it's Table 11 on Page 596.
6  Do you see that?
7    A.   12.
8    Q.   On page -- Table 12,
9  correct.
10    A.   Okay.
11    Q.   You see -- you follow me?
12    A.   Yes.
13    Q.   Okay.  Now, there are four
14 exposure categories:  Rarely, monthly,
15 weekly and daily, correct?
16        MR. HUDSON:  Objection to
17    form.
18        THE WITNESS:  So technically
19    five including never.
20 BY MR. TISI:
21    Q.   Right.  But let's --
22    A.   Right.
23    Q.   Never has no exposure so
24 it's not really an exposure category.  If

Joshua E. Muscat, Ph.D.

Page 466

1   you're going to include --
2        A.   It is a reference category.
3        Q.   It is a reference category.
4        A.   Right.
5        Q.   Okay.  But the -- but the
6   lowest exposure category is actually
7   rarely?
8        A.   Yes.
9        Q.   Right?  And Dr. --
10  Dr. Huncharek says he included the lowest
11  category in his chart.  But he doesn't
12  include that category, does he?
13       He actually includes
14  monthly, because you see the relative
15  risk of .07, correct?
16       A.   Yes, I see that.
17       Q.   Okay.  So that's -- he's
18  reporting something different than he
19  said he was going to do, correct?  He
20  said he was going to report the lowest
21  exposure category, but rarely -- he does
22  not report the lowest exposure category
23  in Booth, does he?
24       MR. HUDSON:  Objection to

Page 467

1   form.
2        MR. HEGARTY:  Objection to
3   form.
4        THE WITNESS:  I have to go
5   look at it carefully.  I mean it
6   could be correct, but it depends
7   on how he defined his methods.
8   BY MR. TISI:
9        Q.   Okay.
10       A.   It's like...
11       Q.   Well, his methods don't
12  explain it.  I will offer -- I will tell
13  you that his methods are very sparse.
14       A.   Okay.
15       Q.   We'll ask Dr. Huncharek,
16  but -- you can take a look at it if you
17  want.
18       A.   Okay.
19       Q.   But I'm telling you, it's
20  not there.
21       A.   Okay.
22       MR. HUDSON:  Objection to
23  form.
24  BY MR. TISI:

Page 468

1        Q.   The only -- the only place
2   he says, he says, "The comparison made
3   across these studies comparing lowest
4   reported exposure category with the
5   highest exposure level."  That's what he
6   said he did.
7        MR. HUDSON:  Objection to
8   form.  No question is pending.
9   BY MR. TISI:
10       Q.   And he doesn't appear to
11  have done that, correct?
12       MR. HEGARTY:  Objection to
13  form.
14       THE WITNESS:  Oh, I -- I
15  think I understand what he did.
16  BY MR. TISI:
17       Q.   Well, I'm asking you, did he
18  do what he said he did?  Did he use the
19  lowest exposure category?
20       A.   This is why I needed to have
21  a look.  I think for the purposes of
22  meta-analysis, he probably did, and --
23  and the reason I say that is because if
24  there are -- like for instance, it's the

Page 469

1   low -- if the lowest exposure category of
2   which is common across a different study.
3        So for example, if rarely is
4   not in the other studies, then that
5   wouldn't be included in the
6   meta-analysis.
7        Q.   Well, how do you know that?
8   He didn't describe his methods.
9        A.   He -- well, I'd have to go
10  back and look at this.  But I'm just --
11  I'm explaining as to you as to how this
12  can occur.  Okay.
13       So in a meta-analysis, maybe
14  he was not very specific with it.  But,
15  the lowest exposure category would be the
16  lowest exposure category of all the
17  studies.
18       So if there -- these other
19  studies for example, did not report
20  rarely, they wouldn't appear in the
21  meta-analysis.
22       Q.   But he didn't say that,
23  that's not what he said.  People should
24  be able to replicate and not assume,

118  (Pages 466 to 469)

Joshua E. Muscat, Ph.D.

Page 470

1  right?
2          MR. HEGARTY: Objection to
3  form.
4          MR. HUDSON: Objection to
5  form.
6  BY MR. TISI:
7      Q.   We talked about that before.
8  He -- his paper says, "A comparison was
9  made across these studies comparing the
10  lowest recorded exposure category with
11  the highest exposure category."
12          Correct? That's what he
13  said he did.
14          MR. HEGARTY: Objection to
15  form.
16          THE WITNESS: So -- I'm
17  sorry, let me go back and read
18  that, okay?
19          So I can't find it right
20  now.
21          That's what he said. And
22  perhaps the wording wasn't
23  correct. But it is -- he did it
24  correctly though.

Page 471

1  BY MR. TISI:
2      Q.   Okay.
3      A.   He did it correctly in a way
4  that is reproducible, because -- and I
5  can't speak for him, because I have to go
6  through each one of these studies that he
7  cited.
8      Q.   Okay.
9      A.   But my sense, as I
10  understand this, as I read this, and as
11  you point this out, and how I know that
12  meta-analysis is done, is that those --
13  that that particular category was
14  probably not in the other studies that
15  would have required some further
16  explanation. Perhaps he should have done
17  that to be absolutely clear.
18          But I think this was done
19  correctly.
20      Q.   That wasn't his only
21  mistake, was it?
22          MR. HUDSON: Objection to
23  form.
24  BY MR. TISI:

Page 472

1      Q.   There was more mistakes in
2  this chart.
3      A.   There was --
4      Q.   Let's go to the next one.
5  The Cook -- the Chang paper which should
6  be the next one in your list. That's the
7  second reference, right?
8      A.   Yes.
9      Q.   Let's go back. That would
10  be Chang. We talked about Booth. Let's
11  talk about Chang.
12      A.   Okay.
13      Q.   The exposure categories are
14  contained in Table 2 on Page 399, are
15  they not?
16      A.   Yes.
17      Q.   And if we look at Table 2,
18  the less than 30, do you see that?
19      A.   Yes.
20      Q.   What is the relative risk?
21      A.   1.697.
22      Q.   What is -- what is what
23  Dr. Chang -- Dr. -- Dr. Huncharek rounded
24  that number up, didn't he, to 1.7? It's

Page 473

1  not what Dr. Chang reported, was it?
2      A.   So that's correct. He
3  rounded up from 1.697 to 1.7.
4      Q.   Why didn't he use the number
5  that Dr. Chang reported?
6          MR. HUDSON: Objection to
7  form.
8          THE WITNESS: It depends on
9  the journal. Sometimes journals
10  only want you to report to one
11  significant digit. Okay.
12  That's -- I mean there's no --
13  there's no difference between
14  1.697 and 1.7. It really depends
15  on the journal. It's not exactly
16  the same, we can see that. But I
17  don't see anything wrong with it.
18  BY MR. TISI:
19      Q.   Well, he also changed the
20  confidence interval, didn't he?
21          Confidence interval is
22  different. The Chang study has a
23  confidence interval from 1.08 to 2.60 and
24  he has 1.08 to 2.59.

119 (Pages 470 to 473)

Joshua E. Muscat, Ph.D.

Page 474

```
1     A.   Yeah, I see that.
2     Q.   It's different, right?
3     A.   Yeah, it's different.
4     Q.   All right.
5     A.   But there's not a problem
6  with it.
7     Q.   Okay.
8     A.   Can I --
9     Q.   Where did he pull that
10 number from?
11    A.   Can I explain it?
12         MR. HUDSON:  Objection to
13 form.
14         THE WITNESS:  You asked --
15    you asked me if it was different
16    and I said -- but now I'm going to
17    explain to you how it's different.
18 BY MR. TISI:
19    Q.   Okay.  Tell me how it's
20 different.
21    A.   Okay.  So this is -- in the
22 Chang analysis, this is an adjusted
23 confidence interval.
24         The Huncharek analysis is an
```

Page 475

```
1  unadjusted confidence interval.  That
2  means that he would go back and
3  recalculate the confidence interval as an
4  adjusted confidence interval.
5     Q.   Well, he actually goes ahead
6  and totally changes the greater than 40
7  category, doesn't he?  He has a greater
8  than 40 -- I'm sorry, greater than 40
9  category as a .96, correct?
10    A.   Yes.
11    Q.   Okay.  And here what do they
12 say?
13    A.   Sorry, this is so small I'm
14 having a hard time reading it.  0.865.
15    Q.   Okay.  It's a different
16 number, is it not?
17    A.   It is different.  And it's
18 correct.  That's the way you do the
19 meta-analysis.
20    Q.   So he changed the numbers?
21    A.   He didn't change the
22 numbers.  He calculated his own numbers
23 based on the data.
24    Q.   Okay.  Let's go to the next
```

Page 476

```
1  one.  Let's go to Cook.
2         Now, with Cook, the exposure
3  category is on Table 3, correct?
4     A.   That's correct.
5     Q.   And you have to do a little
6  math here, but he converted days to
7  months, correct, or to years?  They use
8  lifetime -- lifetime days and he just
9  converted them to years.
10    A.   Okay.
11         MR. HEGARTY:  Objection to
12    form.
13         THE WITNESS:  Yeah, I don't
14    know how the conversion was done.
15 BY MR. TISI:
16    Q.   Okay.  Well, he uses
17 overlapping categories, right?  So his
18 categories, if you look at the categories
19 in the Cook paper, it goes less than
20 2,000, then it goes 2,001 to 5,000 and
21 5,001 to 10,000.  Do you see that,
22 there's no overlapping categories?
23    A.   Yes, I see that.
24    Q.   Do you see how Dr. Huncharek
```

Page 477

```
1  uses overlapping categories?  He goes
2  from 5 -- zero to 5.5, 5.5 to 13.5, 13.5
3  to 27.  Do you see that?
4     A.   So I don't know if they are
5  overlapping.  There is a -- I mean the
6  age -- the range is defined with the same
7  number, that's correct.
8     Q.   Well, the third category is
9  also incorrect as well.  It says a 1.2
10 relative risk with a confidence interval
11 of .5 to 2.4?
12         MR. HEGARTY:  Objection to
13    form.
14         THE WITNESS:  I'm sorry, can
15    you repeat what you're comparing,
16    which to which?
17 BY MR. TISI:
18    Q.   Yeah.  It says a confidence
19 interval -- a relative risk of 1.2.  Do
20 you see that?
21    A.   In the Cook paper?
22    Q.   Yes.
23    A.   1.2, yes.  0.5 to 2.4.  Is
24 that the one you're referring to?
```

120  (Pages 474 to 477)

Page 478

1    Q.   Correct.
2    A.   Yes.
3    Q.   Go back to Cook and the
4    confidence interval is to 3.4.
5        A.   Yes, I see that.
6        Q.   That's a mistake, is it not?
7            MR. HEGARTY:  Objection to
8    form.
9            THE WITNESS:  No, it's not.
10   BY MR. TISI:
11       Q.   It isn't a mistake?
12       A.   That's not a mistake.
13       Q.   Okay.  All right.  Why is it
14   not a mistake?
15       A.   Because, for the same
16   reasons as the previous paper.  So this
17   was based on an adjustment, okay?  The
18   meta-analysis was based on unadjusted.
19           So I'm sure you've probably
20   gone through all this, and just as we had
21   done with the first two articles, and my
22   sense is that if there are differences
23   that's probably the reason why, because
24   the meta-analysis technique is based upon

Page 479

1    the -- the unadjusted numbers, rather
2    than the adjusted published numbers.
3        Q.   Okay.  Let's look at the
4    Cramer, the Cramer paper.  And Cramer is
5    Tab 4 in your binder.  He refers his
6    frequency and month data on Table 2 on
7    Page 353.
8        A.   Okay.
9        Q.   Do you see that?
10       A.   Yes.
11       Q.   Let's see if I can help you
12   out here.  This is the Cramer paper I put
13   up.
14           And he reports years of use
15   on Table 3, correct?
16       A.   Yes.
17       Q.   Okay.  And he reports
18   frequency of use on Table 2, correct?
19       A.   That's correct.
20       Q.   And as we talked about
21   before, those are completely two
22   different measurements, frequency and
23   duration?
24       A.   That's correct.

Page 480

1        Q.   All right.  Now, let's start
2    with the -- let's start with the years of
3    use.
4        A.   So --
5        Q.   That's Table 3.  And he
6    reports a 1.9 for the lowest exposure --
7    a 1.86, right?
8        A.   That's correct.
9        Q.   And Cramer reports 1.9,
10   correct?  I mean I'm sorry, Huncharek
11   reports it as 1.9?
12       A.   Yes.
13       Q.   And he reports a confidence
14   interval, Cramer reports a confidence
15   interval of 1.16?
16       A.   Yes.
17       Q.   And Dr. Huncharek reports it
18   as a 1.2?
19       A.   Yes.
20       Q.   And those are different
21   numbers, correct?
22           MR. HEGARTY:  Objection to
23   form.
24           THE WITNESS:  They are

Page 481

1    different numbers.
2    BY MR. TISI:
3        Q.   Okay.  The next one is the
4    same.  He reports the next category, 20
5    to 30, is a 1.33 adjusted odds ratio,
6    correct?
7        A.   That's correct.
8        Q.   And Dr. Huncharek reports it
9    as a 1.3, correct?
10       A.   So, no, in fact, I'd like
11   to -- I'd like to clarify that in terms
12   of these being different numbers.  They
13   are -- they're for different calculations
14   so you expect there to be different
15   numbers.
16           One is -- one is an adjusted
17   odds ratio, the other is unadjusted odds
18   ratio.
19           So, you wouldn't expect them
20   to be the same.  Now, often when you do
21   an adjustment it may change things a
22   little bit.  So it's unsurprising that
23   the two are close.  But it's not
24   unsurprising that they are not exactly

121 (Pages 478 to 481)

Joshua E. Muscat, Ph.D.

Page 482

1   the same, because they are two different
2   calculations.
3           Okay.  So same thing with
4   the previous papers that we've gone
5   through.  Booth and Chang.  It's -- it's
6   the -- it's the same -- it's the same
7   reason why the numbers aren't exactly the
8   same.  Because they are different
9   calculations.
10      Q.   Okay.  Well, let's -- let's
11  ask -- let me talk about Gertig, the
12  fifth one.  Now, in your chart you have
13  the lowest exposure category as 4 to
14  24 days, correct?
15      A.   That's correct.
16      Q.   That's one to six times a
17  week?
18      A.   4 to 24 --
19      Q.   Once -- or one times -- I'm
20  sorry.  That's -- that's --
21      A.   Okay.  4 to 24 per month,
22  so -- I'm sorry, it's getting late in the
23  day, I can't even do my division.  So it's
24          4 to 24 per month, so it's

Page 483

1   up to -- up to daily, less than daily.
2       Q.   Okay.  And -- but that's not
3   the lowest exposure category that is
4   reported in Gertig, is it?  If you look
5   at Table 2.  The lowest category is less
6   than one time a week.
7       A.   Yes, that's correct.
8       Q.   So like in Booth, they did
9   not -- he did not use the lowest exposure
10  category, right?
11      A.   That's correct.
12      Q.   And more importantly,
13  Doctor, he compared his methodology in
14  the methods section -- well, let me --
15  you asked about the methodology he
16  employed.
17          If you go to the methodology
18  section of his paper, he really cites
19  three references.  He goes -- if you go
20  to the methodology section, if you look
21  at it, he cites three papers.
22          The first one is Note 3,
23  which if you go in the back of the paper,
24  that's the Rothman textbook.  He cites

Page 484

1   the whole textbook.
2       A.   I'm sorry, Reference 3 is
3   Cooper.
4       Q.   Are you looking at the --
5   are you looking at the 2003
6   meta-analysis?
7       A.   Yes.
8       Q.   And then he cites -- I'm
9   sorry, but I think you're right.
10          Number -- then he cites
11  Number 9 for the literature retrieved was
12  performed by previously described
13  methods.  That's Number 9.  Do you see
14  that?
15          MR. HEGARTY:  Objection to
16      form.
17          THE WITNESS:  I'm sorry, let
18      me just find it.
19  BY MR. TISI:
20      Q.   I'm sorry, but I think it
21  says Number 8?
22      A.   Oh, okay.  So --
23      Q.   I'm sorry, I can't read --
24      A.   That's all right.  Actually

Page 485

1   I'm having a hard time.
2       Q.   And it refers -- and
3   Reference Number 8 is a Cook paper which
4   is not a methodology paper at all, is it?
5   The Cook paper is a -- is the
6   case-control study we talked about
7   before.
8           MR. HEGARTY:  Objection to
9       form.
10          THE WITNESS:  That's -- so 8
11      is a misreference.
12  BY MR. TISI:
13      Q.   Okay.  And actually if you
14  look at -- if you look at the last one,
15  it says, "The statistical methods.  The
16  data analysis was performed according to
17  a procedure described by Greenland."
18          Do you see that?
19      A.   Yes.
20      Q.   Okay.  And that's Reference
21  Number 4?
22      A.   Yes.
23      Q.   Would it surprise you to
24  know that there is no 1996 Greenland

122 (Pages 482 to 485)

Joshua E. Muscat, Ph.D.

Page 486

1  article?  I looked for it, I couldn't
2  find it anywhere.
3        MR. HEGARTY:  Objection to
4  form.
5  BY MR. TISI:
6        Q.   Do you know what that
7  article is?
8        A.   I don't have it on me
9  personally.  It's published in a journal
10 called Epidemiologic Reviews.
11       Q.   Right.  There is no 1996
12 article there, if I looked at it -- if I
13 looked at it.  There is none.
14       A.   Okay.  Well, I --
15       MR. HUDSON:  Excuse me.
16 There's no question pending.
17 Sorry.
18 BY MR. TISI:
19       Q.   Do you know what article
20 he's talking about?
21       A.   I'd have to go look it up.
22       Q.   Do any of these articles
23 tell you that -- how he is going to use
24 adjusted versus unadjusted numbers for

Page 487

1  his meta-analysis?
2        MR. HUDSON:  Objection to
3  form.
4        THE WITNESS:  So Reference
5  3, the methods employed in this
6  analysis have been previously
7  described.  So that's -- that's
8  very common in the literature, in
9  fact, it's almost encouraged by
10 journals to cite previous
11 publications where you describe
12 things so you don't have to keep
13 repeating yourself in order to
14 save space.  So that's -- that's
15 quite common.
16 BY MR. TISI:
17       Q.   Number 3 is actually a
18 Handbook of Research Synthesis.  It's the
19 whole handbook.  How is somebody supposed
20 to replicate what he did if he didn't say
21 what -- what he did?
22       MR. HEGARTY:  Objection to
23 form.
24       MR. SILVER:  Objection to

Page 488

1  form.
2        THE WITNESS:  I'm sorry, can
3  you repeat the question?
4  BY MR. TISI:
5        Q.   Yes.
6        A.   Yes.
7        Q.   He doesn't -- he doesn't
8  describe what he did.  That's the
9  whole -- that's the whole handbook that
10 he described.  Do you know how big that
11 is?
12       MR. SILVER:  Objection to
13 form.
14       MR. HUDSON:  Objection to
15 form.
16       THE WITNESS:  So there
17 are -- there are books on
18 meta-analysis.
19 BY MR. TISI:
20       Q.   I understand that.
21       A.   Yes.
22       Q.   But it doesn't -- we talked
23 about the importance of replication
24 before.  How is anybody supposed to

Page 489

1  replicate what he did if he doesn't
2  describe what he did?
3        MR. SILVER:  Objection to
4  form.
5        THE WITNESS:  I just did.
6  Right in front of everybody
7  without even -- without even
8  looking at this cite.  You know,
9  anyone who knows meta-analysis, I
10 was able to see -- I understand
11 what -- I understand exactly what
12 he did.
13 BY MR. TISI:
14       Q.   Okay.  Let me ask you this.
15 Does it show the weights that he gave to
16 each study?  You talk about the
17 importance of determining what -- what
18 the weights were.
19       Remember we talked about the
20 fact that you can't -- you can't
21 replicate until you -- until you know
22 what weights he gave the studies?
23       MR. HEGARTY:  Objection to
24 form.

123 (Pages 486 to 489)

Joshua E. Muscat, Ph.D.

Page 490

1       THE WITNESS:  So the weights
2   are based on the variance.  Okay.
3   So he describes the variance
4   formula.  So that can go back and
5   be replicated.
6   BY MR. TISI:
7       Q.   Where -- where is the
8   variance formula?
9       A.   It's on Page 1956.
10      Q.   Okay.  And is it -- is it
11  that formula up at the top right-hand
12  corner?
13      A.   So I believe so.  I haven't
14  looked at meta-analyses in a long time.
15  But from my recollection is that the
16  weights are based upon the variance
17  formula and that's -- that's what's
18  provided.
19      Q.   Now, going back to the
20  dose-response issue we talked about
21  before.  He says that he looked at the
22  lowest exposure category for each study
23  group and the highest exposure category
24  for each study group, right?  It's on --

Page 491

1   it's on Page 1958, first column.  That's
2   what he says he did.  I have put it up on
3   the screen.  Right here, it says, "Seven
4   studies were included in the
5   dose-response relationship" --
6       A.   Okay.
7       Q.   -- "stratified by the number
8   of talc applications per month."
9       A.   Yes, I see that.
10      Q.   "A comparison was made
11  across studies, using the lowest recorded
12  category and the highest exposure level."
13      A.   That's correct.
14      Q.   And from that he developed a
15  relative risk of 1.83 for the lowest
16  exposure group and a 1.21 for the highest
17  talc category.
18      A.   Yes.
19      Q.   Okay.  Now, some of these
20  are measured in terms of frequency if you
21  look at the chart, right?
22      A.   That's correct.
23      Q.   Some are measured in terms
24  of duration, correct?

Page 492

1       A.   That's correct.
2       Q.   We talked about the fact
3   several times, frequency and duration are
4   the same, and we need to measure like
5   with like, right?
6       MR. HEGARTY:  Objection to
7   form.
8       THE WITNESS:  One is in
9   terms of frequency, the other's in
10  terms of duration rate.
11  BY MR. TISI:
12      Q.   So my question is, how is
13  it -- how can you on a -- do a proper
14  meta-analysis combining frequency and
15  duration and calculate a relative risk
16  from that?  You can't do that, can you?
17      MR. HEGARTY:  Objection to
18  form.
19      THE WITNESS:  So I'd have to
20  go through this and see whether
21  he's referring to one or the
22  other.
23  BY MR. TISI:
24      Q.   Well, it looks like he

Page 493

1   combined both, right?
2       MR. HEGARTY:  Objection to
3   form.
4       THE WITNESS:  I --
5   BY MR. TISI:
6       Q.   Does he indicate that he
7   looked at one or the other?
8       MR. HEGARTY:  Objection to
9   form.
10      THE WITNESS:  Okay.  May I
11  read this?
12  BY MR. TISI:
13      Q.   Sure.
14      A.   Okay.
15      MR. TISI:  We'll go off the
16  record.
17      THE WITNESS:  So --
18      MR. TISI:  Go ahead, unless
19  you --
20      THE WITNESS:  I just need
21  like 20 more seconds.
22  BY MR. TISI:
23      Q.   Okay.  Go ahead.
24      A.   Well, on the -- he's talking

124 (Pages 490 to 493)

Joshua E. Muscat, Ph.D.

Page 494

1  about number of talc applications.  So
2  my -- I would assume that's the
3  frequency.
4       Q.   It's like he used one
5  measure, but not the other.
6       A.   His reference to this is
7  with regard to frequency.
8       Q.   Okay.  And do you know if he
9  did it by duration as well, and what he
10  found?
11       A.   I'd have to read the
12  article.
13       Q.   Well, if he combined
14  exposure categories, that would be an
15  improper methodology, wouldn't you agree?
16       MR. HEGARTY:  Objection to
17  form.
18       THE WITNESS:  Frequency
19  and --
20  BY MR. TISI:
21       Q.   Duration.
22       A.   -- duration.
23       Q.   Would it be improper?
24       Q.   It's like with the pack

Page 495

1  years versus number of cigarettes
2  approach.
3       A.   So -- so -- no, not
4  necessarily.  I mean, like -- exactly,
5  right.  So some people may use pack
6  years, I don't -- I don't really like it
7  as a form of exposure.  But if you want
8  to do it, you can do it.  It wouldn't be
9  my preferred way of measuring something.
10       Q.   Actually, I was asking you a
11  slightly different question.
12       A.   Yes.
13       Q.   What I was asking you is,
14  would it be appropriate to combine pack
15  years with number of cigarettes per day
16  or per month in calculating relative
17  risk?
18       MR. HEGARTY:  Objection to
19  form.
20       THE WITNESS:  Pack years is
21  based upon both the frequency and
22  the duration.
23  BY MR. TISI:
24       Q.   And one is just frequency,

Page 496

1  right?
2       A.   That's correct.
3       Q.   All right.  So you
4  combine -- under the theory, you combine
5  like with like.  You would not want to
6  combine pack years or number of years
7  smoked versus frequency of smoking,
8  correct?
9       MR. HUDSON:  Objection to
10  form.
11  BY MR. TISI:
12       Q.   Because there's a big
13  difference between somebody who smokes a
14  cigarette a day and somebody who smokes
15  three packs a day.
16       A.   You can -- if you wanted to,
17  as an analyst, if you wanted to combine
18  frequency and duration, you can do that.
19  If that's --
20       Q.   But you've got to tell
21  people that's what you're doing, right?
22       MR. HEGARTY:  Objection to
23  form.
24       THE WITNESS:  So that's --

Page 497

1       if, for instance, the smoking app,
2       that's known.  So pack years is a
3       measurement of frequency by
4       duration.
5  BY MR. TISI:
6       Q.   All right.  What about
7  number of -- number of years smoked.
8  You've seen articles like that.  I smoked
9  30 years.
10       A.   Yes, that's right.
11       Q.   Would you ever combine "I've
12  smoked 30 years" with "I smoked eight
13  pack" -- "eight cigarettes a day per
14  month"?
15       A.   That would be pack years.
16       Q.   Right.  Could you -- is that
17  even appropriate?
18       A.   It's done.  I mean people in
19  the literature --
20       Q.   Is it appropriate?
21  Meta-analysis, under theories of
22  meta-analysis where you -- where you
23  combine like with like, is it appropriate
24  to combine frequency and duration?

125 (Pages 494 to 497)

Joshua E. Muscat, Ph.D.

Page 498

1      A.   So if the -- let's say using
2  the smoking example, if you were doing a
3  meta-analysis of pack years, if that's
4  the way exposure information was in pack
5  years, then there's nothing wrong with
6  doing the meta-analysis of pack years.
7      Q.   Pack years.  Yeah.
8      A.   That's correct.
9      Q.   But would you combine that
10  with pack years versus number of
11  cigarettes a month?
12         If you had -- if you had a
13  group of studies that looked at, I smoked
14  five cigarettes a day for a month, and
15  you had a group of studies with that, and
16  you had another group of studies that
17  looked at pack years, would you take
18  those two studies and combine them
19  together and do a meta-analysis?
20         MR. HUDSON:  Objection to
21      form.
22  BY MR. TISI:
23      Q.   With those two different
24  variables?

Page 499

1         MR. HUDSON:  Same objection.
2         THE WITNESS:  If you had the
3      data on smoking years and you had
4      the data on pack years, and you
5      wanted to do a meta-analysis that
6      looked at both smoking years and
7      pack years and the data was
8      available.
9  BY MR. TISI:
10      Q.   But you've got to tell
11  people what you've done, right?
12      A.   Yes, of course.
13      Q.   All he said was he -- by the
14  lowest exposure category and the highest
15  exposure -- exposure category, and you
16  don't know what categories he used, do
17  you?
18      A.   So yeah, I just went through
19  that, right?
20      Q.   Do you know whether he used
21  the -- in the Cramer study, do you know
22  whether he used the years or do you know
23  whether he used the number of
24  applications per month, what did he use?

Page 500

1      A.   So it -- I'd have to go
2  through -- I'd have to read the whole
3  thing.  Okay.
4      Q.   You haven't seen, when you
5  looked at this paper -- you looked at
6  this paper before you came in here today,
7  didn't you?
8      A.   I've seen this paper, right.
9      Q.   In fact, you refer to it
10  over and over and over again.  You can't
11  tell me as you sit here today what
12  exposure categories he actually used, can
13  you?
14         MR. HUDSON:  Objection to
15      form.
16         MR. HEGARTY:  Objection.
17         THE WITNESS:  So he used the
18      exposure categories that were
19      reported in the table.
20  BY MR. TISI:
21      Q.   And some of them are
22  expressed in frequency, and some of them
23  are expressed in duration, right?
24      A.   That's correct.

Page 501

1      Q.   And those -- those two
2  things are apples and oranges.  From --
3  from standard point of view of
4  meta-analysis, frequency and duration are
5  two different things?
6         MR. HEGARTY:  Objection,
7      form.
8         THE WITNESS:  The -- in
9      terms of meta-analysis, you'd want
10      to do is combine all the data with
11      frequency, right?  Combine that
12      data and then combine separately
13      all the data of duration.
14  BY MR. TISI:
15      Q.   There is no indication that
16  that was done as two separate analyses,
17  right?
18      A.   I would -- well, I'd really
19  have to look at this closely.  You know,
20  I think just --
21      Q.   Well, did you look at it
22  closely before you --
23      A.   I have --
24      Q.   Well, let me -- let me ask

126  (Pages 498 to 501)

Joshua E. Muscat, Ph.D.

Page 502

1   you this.
2       A.  Yes, yes.
3       Q.  Did you look at it closely
4   before you sent it to the FDA when they
5   were considering a -- when they were
6   considering putting a warning for talc
7   on -- on women and you were telling them
8   there was no dose-response?  Did you --
9   did you look at that?
10          MR. HEGARTY:  Objection to
11      form.
12          THE WITNESS:  It was based
13      on a published data.  And I regard
14      Dr. Huncharek as a credible
15      scientist.
16  BY MR. TISI:
17      Q.  Did you look -- did you
18  personally look at the data?
19      A.  I --
20      Q.  You knew -- let me just --
21      A.  I had not gone back.  And
22  this exercise that we're currently doing
23  right now, I have not done this.
24      Q.  Okay.  Well, let me -- let

Page 503

1   me be absolutely clear.
2           The stakes for women, if
3   there is a risk, ovarian cancer kills,
4   correct?
5           MR. SILVER:  Objection.
6           MR. HUDSON:  Objection to
7       form.
8           THE WITNESS:  That's
9       correct.
10  BY MR. TISI:
11      Q.  Ovarian cancer -- ovarian
12  cancer is the seventh cause of cancer
13  death in women overall.  And you've
14  mentioned that, correct?
15          MR. HUDSON:  Objection to
16      form.
17          THE WITNESS:  It's a -- it's
18      a very fatal disease.
19  BY MR. TISI:
20      Q.  High mortality, correct?
21      A.  That's correct.
22      Q.  And you want to get your
23  data right?
24      A.  That's correct.

Page 504

1       Q.  Okay.  And Dr. Epstein was
2   asking that all you needed to do was put
3   on a little bottle and say increasing --
4   putting a -- applying talc in your
5   underwear may -- may cause ovarian
6   cancer, right?  That's what he was asking
7   to have happen, right?
8           MR. HEGARTY:  Objection to
9       form.
10          MR. HUDSON:  Objection to
11      form.
12          MR. SILVER:  Objection to
13      form.
14          THE WITNESS:  I'd have to go
15      back and read it.
16  BY MR. TISI:
17      Q.  Okay.
18      A.  Okay.
19      Q.  But the stakes were pretty
20  high, right?  That's a big -- that's a
21  big issue.  It's a big public health
22  issue, right?
23          MR. SILVER:  Objection.
24          MR. HUDSON:  Objection to

Page 505

1       form.
2           THE WITNESS:  Is what a big
3       public health issue?
4   BY MR. TISI:
5       Q.  Whether or not talc causes
6   ovarian cancer.
7           MR. HEGARTY:  Objection to
8       form.
9   BY MR. TISI:
10      Q.  If it does, that's a big
11  deal?
12      A.  If it does.
13      Q.  Right.  And what he was
14  asking was, let's put on the bottle a
15  warning for women not to use talc in
16  their genital area, right?
17          MR. SILVER:  Objection to
18      form.
19          MR. HEGARTY:  Objection to
20      form.
21          THE WITNESS:  I guess you
22      are paraphrasing that.  So --
23  BY MR. TISI:
24      Q.  Well, let's look at exactly

127 (Pages 502 to 505)

Joshua E. Muscat, Ph.D.

Page 506

1  what he was asking to be done.  Let's go
2  back to the actual Citizen's Petition.
3        Once the -- if you look at
4  the very beginning it says, he filed a --
5  on Page 3 of the Citizen's Petition,
6  Page 6 of 9, 166.
7     A.   Right.
8     Q.   Introduction.
9        1998.  He asked the Food and
10 Drug Administration to look and say, "The
11 petition requests the Food and Drug
12 Administration require that all talc
13 products bear a label warning such as:
14 Frequent application of talcum powder in
15 the female genital area substantially
16 increases the risk of ovarian cancer."
17       Do you see that?
18    A.   Yes.
19    Q.   Okay.  Now, that's -- if
20 that is true, if the science is true,
21 okay, that would be an important thing
22 for women to know.
23       MR. SILVER:  Objection to
24 form.

Page 507

1        MR. HUDSON:  Objection to
2  form.
3  BY MR. TISI:
4     Q.   The stakes are pretty high,
5  right?
6        MR. SILVER:  Objection to
7  form.
8        MR. HEGARTY:  Same
9  objection.
10       THE WITNESS:  Can you repeat
11 the question?
12 BY MR. TISI:
13    Q.   Yeah.  We're not talking
14 about, you know, ripping a cuticle, we're
15 talking about ovarian cancer here, right?
16    A.   Yeah, that's correct.
17    Q.   And we are talking about a
18 household product that people have --
19 that people can buy in the Kmart, right?
20       MR. HEGARTY:  Objection to
21 form.
22       THE WITNESS:  It's a -- it's
23 a common product, that's correct.
24 BY MR. TISI:

Page 508

1     Q.   And if there is a risk and
2  women use it, that's a pretty serious
3  thing, correct?
4        MR. HEGARTY:  Objection to
5  form.
6        MR. HUDSON:  Objection to
7  form.
8        THE WITNESS:  If it -- if
9  talcum powder causes ovarian
10 cancer, that would be a serious
11 thing.
12 BY MR. TISI:
13    Q.   And this -- the question
14 that you were asked to address here was a
15 serious question.
16    A.   Yes.
17    Q.   And one of the things that
18 you made a big deal about pointing out to
19 the -- to the FDA was there's no
20 dose-response, right?
21       And, in fact, you referred
22 them to the Table 5 in -- Table 2 in the
23 2003 Huncharek meta-analysis, correct?
24       MR. HEGARTY:  Objection to

Page 509

1  form.
2        THE WITNESS:  It is
3  referred, that's correct.
4  BY MR. TISI:
5     Q.   And not only did you do
6  that, but then you published that chart
7  in 2011, while the petition was still
8  pending, correct?
9        MR. HEGARTY:  Objection to
10 form.
11 BY MR. TISI:
12    Q.   Because it wasn't denied
13 until 2015.
14    A.   Okay.  So I don't have
15 knowledge of when it was --
16    Q.   He published it again.  And
17 so this is an important issue, right?
18       MR. HEGARTY:  Objection to
19 form.
20       THE WITNESS:  I'm sorry,
21 which important issue?  The talcum
22 powder?  Yes.  Yes.
23 BY MR. TISI:
24    Q.   Yeah.  And whether or not

128  (Pages 506 to 509)

Joshua E. Muscat, Ph.D.

Page 510

1  there is a dose-response is an
2  important -- would be an important factor
3  to consider in the causation analysis as
4  to whether or not Dr. Epstein was right
5  or whether Dr. Huncharek was right?
6          MR. HUDSON:  Objection to
7      form.
8          THE WITNESS:  So I don't
9      know -- I don't know if it's a
10     matter of Epstein versus
11     Huncharek.  It's an issue, a
12     dose-response issue, right.
13 BY MR. TISI:
14     Q.   Right.  And you -- I mean
15 you and I are sitting here across a table
16 in 2018 looking at this data.  Did you
17 look at the data and look at how he got
18 that data knowing it was important in
19 2000 -- in 2009 when that issue was
20 pending before the FDA?
21         MR. HEGARTY:  Objection to
22     form.
23         MR. HUDSON:  Objection to
24     form.

Page 511

1          THE WITNESS:  So that data
2      was published.  It was published
3      in a peer-reviewed paper.  And so
4      I rely on it.
5  BY MR. TISI:
6      Q.   Okay.  Did you -- did you
7  look at it carefully?  Because if you
8  looked at it carefully, there are some
9  questions that we've talked about here
10 today that need to be answered, correct?
11         MR. HUDSON:  Objection to
12     form.
13         MR. HEGARTY:  Objection to
14     form.
15         THE WITNESS:  I think we did
16     answer them.
17 BY MR. TISI:
18     Q.   Do you know whether or not
19 he combined like with like, frequency and
20 duration?  Do you know that from this
21 study?
22         MR. HEGARTY:  Objection to
23     form.
24         MR. HUDSON:  Objection to

Page 512

1      form.  Asked and answered.
2          THE WITNESS:  I think you
3      should -- I'd have to go through
4      this entire thing in order to
5      answer that question.  But he
6      would best be able to answer that
7      question.
8  BY MR. TISI:
9      Q.   Well, you co-signed this
10 paper, both the one that went to the FDA
11 and the one that was published in 2011.
12 Did you ask him?
13         MR. HEGARTY:  Objection to
14     form.
15         THE WITNESS:  Did I ask him
16     what?
17 BY MR. TISI:
18     Q.   How did you come up with
19 this dose-response data?
20     A.   It's -- it's in the paper.
21     Q.   I didn't --
22     A.   Yes.
23     Q.   -- did you ask him, did you
24 discuss it with him?

Page 513

1          MR. HEGARTY:  Objection to
2      form.
3          THE WITNESS:  So, no, I
4      didn't discuss it with him.
5  BY MR. TISI:
6      Q.   Okay.  Now, you also make
7  the point that a few -- that few authors
8  mention the lack of dose-response in
9  their papers when they're looking at --
10 do you see that, in your PCPC?
11         If you go to Page 24 of what
12 you sent to the FDA.
13         MR. HEGARTY:  Objection to
14     form.
15 BY MR. TISI:
16     Q.   Exhibit 25.  You say, "Few
17 authors directly address the above noted
18 lack of evidence of dose-response."  Do
19 you see that?
20     A.   Yeah, I see that.
21     Q.   In fact, there are many of
22 the authors address that issue and say
23 that they see evidence of dose-response,
24 correct?

Joshua E. Muscat, Ph.D.

Page 514

1    MR. HEGARTY: Objection to
2  form.
3    MR. HUDSON: Objection to
4  form.
5    THE WITNESS: I'd have to go
6  through every single article to
7  look at them.
8  BY MR. TISI:
9    Q.  Well, why don't you look at
10 Harlow in your binder, fifth study in
11 your binder.
12   MR. SILVER: Which Harlow is
13 this?
14   MR. TISI: I'll find it for
15 you in a minute.
16 BY MR. TISI:
17   Q.  Can you go to Page 22.
18 Actually we need to move on because I
19 can't find my copy of the paper right
20 now.
21   Would it surprise you when
22 they looked at trends of dose-response,
23 that there was evidence that many of
24 these -- or several of these authors

Page 515

1  talked about dose-response --
2    MR. HEGARTY: Objection to
3  form.
4  BY MR. TISI:
5    Q.  -- increasing with time?
6    A.  So some did, some didn't.
7    Q.  You don't note that in the
8  FDA, did you?
9    MR. HUDSON: Objection to
10 form.
11 BY MR. TISI:
12   Q.  On Page 22 of the Harlow
13 article, the authors state, "With monthly
14 frequency was considered as a continuous
15 variable. The logistic model of Chi
16 Square linear test was 4.06, indicating
17 the risk of ovarian cancer increased
18 significantly with increasing frequency
19 of applications per month."
20   A.  Yes.
21   MR. HUDSON: Objection to
22 form. There's no question
23 pending.
24   THE WITNESS: Sorry. Okay.

Page 516

1  BY MR. TISI:
2    Q.  They did report that,
3  correct?
4    A.  I'm sorry, where was the
5  Harlow article?
6    Q.  It's in your binder. Let's
7  look at Chang. Let's see if we can do
8  that. That's a little bit easier. I
9  have that at my fingertips.
10   A.  Okay.
11   Q.  At Chang, on Page 2400.
12 Page 5 of 6, left-hand column, it says,
13 "Duration as a continuous variable
14 indicated that risk may increase with
15 increasing years by talc exposure."
16   Do you see that?
17   MR. HUDSON: Sorry. Can you
18 tell us the page again?
19   MR. TISI: Page 2400.
20 BY MR. TISI:
21   Q.  Look at the bottom left-hand
22 corner. Do you see right at the bottom,
23 second sentence, "Duration as a
24 continuous variable indicated the risk

Page 517

1  may increase with increasing years of
2  talc exposure. These results are similar
3  to the findings of Cramer, Harlow, Harlow
4  and Weiss, Cook, Whittemore, in which
5  trends of duration of frequency were not
6  significant."
7    A.  Yes.
8    Q.  So they're reporting there
9  is a trend in favor of dose-response,
10 correct?
11   MR. HEGARTY: Objection to
12 form.
13   MR. HUDSON: Objection to
14 form.
15   THE WITNESS: No. They are
16 reporting that trends were not
17 significant.
18 BY MR. TISI:
19   Q.  They said, "Duration as a
20 continuous variable indicated that risk
21 may increase with years of talc
22 exposure," correct?
23   A.  That's what it says.
24   Q.  Okay. Now, the next thing

130 (Pages 514 to 517)

Joshua E. Muscat, Ph.D.

Page 518

1    that you mention, first of all -- and in
2    your report you mention that there is
3    evidence of an inverse relationship
4    between dose and cancer, correct, that
5    the longer the dose, the longer the
6    application --
7         A.   I'm sorry.  But can we go
8    back to this article here, Chang?
9         Q.   Mm-hmm.  Yeah.
10        A.   I'm looking at this data.
11   And it looks like there's an inverse
12   trend.
13        Q.   What could explain an
14   inverse trend?  There are reasons for
15   that, right?
16        MR. HEGARTY:  Objection to
17   form.
18   BY MR. TISI:
19        Q.   Inverse trend, have you ever
20   heard of survivor bias?
21        A.   I'll tell you the most
22   probable reason would be simply recall
23   bias.
24        Q.   Did you explore survival

Page 519

1    bias?  You know what that is, right?
2         A.   So how would survival bias
3    play?  I don't see it.
4         Q.   You don't see it.  Did you
5    explore any biases that might explain a
6    dose-response relationship that was
7    inverse?
8         A.   I'm just answering --
9    answering your question.
10        Q.   No, I'm asking you --
11        A.   Okay.
12        Q.   -- did you explore it?  When
13   you observed an inverse relationship, did
14   you explore reasons why that might be?
15        A.   Did I explore -- why would
16   survival bias -- I wouldn't understand
17   how that would be.  But if it's a bias,
18   it's a bias, right?  That would --
19        Q.   Well, but -- no, a bias
20   is -- a bias is -- some biases would
21   suggest a dose-response.  Not every --
22   not every -- not every reaction is
23   linear, for example.  Some could be
24   U-shaped, right?

Page 520

1         MR. SILVER:  Objection to
2    form.
3         THE WITNESS:  You can -- you
4    can speculate on the data.  The
5    only thing I can say with regard
6    to the trend that you were
7    pointing out previously, that the
8    data show a trend, is that -- you
9    pointed specifically to this
10   article, that the trend is
11   inverse.  So there is an inverse
12   trend.
13   BY MR. TISI:
14        Q.   And the --
15        A.   It's the opposite of what
16   you were just suggesting; isn't that
17   true?
18        Q.   No.  I'm asking you the
19   questions, Doctor.  Aren't there reasons
20   why that might be the case?  Did you
21   explore what reasons might that be?
22        A.   There are so many reasons
23   why you may get the results in a study.
24   It could be bias.  It could be

Page 521

1    confounding.  I can't speak for this
2    particular study.
3         Q.   I'm asking you, when you did
4    your study, when you -- when you --
5         A.   I didn't do a study, yeah.
6         Q.   Well, when you reported
7    these to the FDA, did you say, "And we
8    explored reasons why we thought there
9    would be an inverse relationship"?
10        MR. HUDSON:  Objection to
11   form.
12   BY MR. TISI:
13        Q.   Some of them consistent with
14   causation, some of them not.
15        A.   That -- it's beyond --
16   that's like -- that would be like a
17   classroom exercise.  Simply reported what
18   the results are.  Are there trends --
19        Q.   You drew conclusions --
20        MR. HUDSON:  Excuse me.  Can
21   he finish his --
22   BY MR. TISI:
23        Q.   You drew conclusions from
24   those.  You said that there was inverse

131 (Pages 518 to 521)

Joshua E. Muscat, Ph.D.

Page 522

```
1    relationship and, therefore, no
2    dose-response, correct?
3        A.   So you're talking about this
4    particular study, is that there is an
5    inverse relationship --
6        Q.   No, I'm talking about -- I'm
7    talking about the meta-analysis that
8    Dr. -- that Dr. Huncharek did --
9        A.   Yes.
10       Q.   -- and you referred the FDA
11   to?
12       A.   That's correct.
13       Q.   Right.  And you made the
14   comment that that inverse relationship
15   suggested no dose-response, correct?
16       A.   In this particular Chang
17   article --
18       Q.   No.  In Dr. --
19   meta-analysis -- in Dr. Huncharek's
20   meta-analysis?
21       A.   That's the way he calculated
22   it.
23       Q.   All right.  And my question
24   is, did you explore reasons as to why
```

Page 523

```
1    that would be the case?
2        MR. HUDSON:  Objection to
3    form.
4        THE WITNESS:  Did I explore
5    reasons?  I still don't understand
6    the question.  What reasons am
7    I -- the meta-analysis is to
8    report on the data.
9    BY MR. TISI:
10       Q.   Let's talk about lack of
11   biologic plausibility.  Let me just stop
12   for a moment there.  Actually, let me
13   just move on.
14       Lack of biologic
15   plausibility.  One of the arguments you
16   made on page -- of your report to the FDA
17   is that there was no evidence of biologic
18   plausibility.  And if you go to Page 25.
19   You make that point.  You start out with,
20   "An additional limitation on existing
21   literature dealing with proposed ovarian
22   cancer association is the lack of any
23   known biologically plausible
24   mechanism" --
```

Page 524

```
1        A.   I see that.
2        Q.   -- "in which talc particles
3    could induce ovarian tumors."
4        Do you see that?
5        A.   Yes.
6        Q.   And you go on to say -- and
7    this is the point that I want to just
8    stop at right here.  It says, "A number
9    of investigators" -- next paragraph.  "A
10   number of investigators initially
11   implicated talc products as possible
12   carcinogens since prior to the early
13   1970s some talc products contained small
14   amounts of asbestos (Rohl 1976)."  That's
15   that same reference that we talked about
16   before, right?
17       A.   Yes.
18       MR. SILVER:  Objection.  Not
19   read correctly.
20       THE WITNESS:  Sorry.
21   BY MR. TISI:
22       Q.   "A number of investigators
23   initially implicated talc products as
24   possible carcinogens since prior to the
```

Page 525

```
1    early 1970s, some talc products contained
2    small amounts of asbestos fibers (Rohl
3    1976)."
4        Did I read that correctly?
5        A.   Yes.
6        Q.   Do you remember when I
7    talked about -- I asked you before
8    whether or not Rohl referred to the first
9    part and second part of that sentence in
10   your prior study.  This is what Rohl
11   stands for?
12       MR. HEGARTY:  Objection to
13   form.
14       THE WITNESS:  I'm sorry.
15   Can you repeat that.
16   BY MR. TISI:
17       Q.   Yes.  Well let me keep
18   going?
19       A.   Okay.
20       Q.   "Clearly such products could
21   represent a carcinogenic risk secondary
22   to asbestos contamination."
23       Correct?
24       MR. HEGARTY:  Objection to
```

132 (Pages 522 to 525)

Joshua E. Muscat, Ph.D.

Page 526

1    form.
2            THE WITNESS:  That's what it
3    says.
4    BY MR. TISI:
5        Q.   Would you agree with me that
6    if talc contains asbestos, it has --
7    there is a biologically plausible
8    mechanism by which talcum powder products
9    can cause ovarian cancer?
10           MR. HEGARTY:  Objection to
11   form.
12           MR. HUDSON:  Objection to
13   form.
14           THE WITNESS:  So it's my
15   understanding it doesn't contain
16   asbestos.
17   BY MR. TISI:
18       Q.   If it did, you're saying,
19   "Clearly, such products if they contain
20   asbestos, could possibly represent a
21   carcinogenic risk secondary to asbestos
22   contamination."
23           Correct?
24           MR. HEGARTY:  Objection to

Page 527

1    form.
2    BY MR. TISI:
3        Q.   That's what you say?
4        A.   That's what's said, right.
5        Q.   Right.  And that's what you
6    said correct?
7        A.   I think that needs to be
8    clarified.
9        Q.   No.  That's what you said?
10       A.   Yes, but let me interpret
11   it.
12       Q.   Well, let me -- let me --
13   I'm not going to interpret it because I'm
14   going to go on to the next sentence.
15       A.   Okay.
16       Q.   I'll ask you to interpret it
17   in a second because let's look at it in
18   context.
19       A.   Okay.
20       Q.   "It should be pointed out
21   that in no way implicates talc" -- "talc
22   as a toxin since the problematic
23   constituents of such products was the
24   asbestos fibers, not talc."

Page 528

1            Do you see that?
2        A.   Yes.
3        Q.   Okay.  And so you are
4    further emphasizing the point that if
5    there is asbestos in -- it is asbestos,
6    asbestos is the problem?
7            MR. HUDSON:  Objection to
8    form.
9    BY MR. TISI:
10       Q.   Right?
11       A.   So, no.
12       Q.   You are not saying that?
13       A.   It's -- it's a general
14   statement.
15       Q.   Okay.  And then it goes on
16   to say, "But since the early 1970s, the
17   relevant industries voluntarily
18   eliminated asbestos from contamination
19   from talc products."
20           Do you see that?
21       A.   Yes, I do.
22       Q.   And there is no reference
23   for that, again.  Was that an assumption
24   on your part?

Page 529

1            MR. HEGARTY:  Objection to
2    form.
3            THE WITNESS:  So this is --
4    I don't know if it's an assumption
5    on my part.  I think it's
6    something that has been well
7    accepted in the literature.
8    BY MR. TISI:
9        Q.   Do you know what -- can you
10   point to me a single reference in the
11   medical literature, one, which shows
12   there is no asbestos in talc, talcum
13   powder products, since 1976?
14       A.   I can't point to on a single
15   reference in literature that does show
16   it.
17       Q.   Okay.  I'm going to ask you
18   to -- it says here, "The relevant
19   industries voluntarily eliminated
20   asbestos."  You used the word
21   "elimination," right?
22       A.   I'm sorry.  Where are we?
23       Q.   The first sentence of that
24   paragraph, elimination.

133  (Pages 526 to 529)

Joshua E. Muscat, Ph.D.

Page 530

```
 1      A.   Yes, I see that.
 2      Q.   It was your assumption that
 3  asbestos was eliminated from talcum
 4  powder products since the 1970s?
 5      A.   I see that.
 6      Q.   If there was any talc in any
 7  of these products, would that provide a
 8  biologically plausible mechanism which
 9  would explain the increased risk seen in
10  the epidemiology studies?
11          MR. HEGARTY:  Objection to
12      form.
13          MR. SILVER:  Chris, you may
14      want to look at that question.
15          MR. TISI:  Let me rephrase
16      the question, because my learned
17      counsel at the end --
18          THE WITNESS:  Okay.
19  BY MR. TISI:
20      Q.   If there were talc in
21  asbestos, if your assumption was -- if
22  there was asbestos in talcum powder
23  products, and your assumption was wrong,
24  then there is a biologically plausible
```

Page 531

```
 1  mechanism, you would agree, by which
 2  talcum powder products can cause ovarian
 3  cancer?
 4          MR. HUDSON:  Objection to
 5      form.
 6          MR. SILVER:  Objection to
 7      form.
 8  BY MR. TISI:
 9      Q.   Your whole premise here --
10  let me rephrase the question.
11      A.   Yes.
12      Q.   Your whole premise here was
13  that talcum powder products do not
14  contain asbestos, correct?
15      A.   That's correct.
16      Q.   That had been eliminated,
17  correct?
18      A.   Yes.
19      Q.   And if that was shown to not
20  be true, there would be a biologically
21  plausible mechanism which would explain
22  the increased relative risk, true?
23          MR. SILVER:  Objection to
24      form.
```

Page 532

```
 1          THE WITNESS:  So -- so --
 2      actually not true because first
 3      I'm not sure what increased
 4      relative risk that you're
 5      referring to, because the --
 6  BY MR. TISI:
 7      Q.   Let's take that question --
 8  take that out of the question.
 9      A.   Okay.
10      Q.   That would be a biologically
11  plausible mechanism which talcum powder
12  products would cause cancer?
13          MR. SILVER:  Objection to
14      form.
15          THE WITNESS:  So can you
16      repeat it?  I'm still not sure.
17  BY MR. TISI:
18      Q.   Yes.  You do not want
19  asbestos in talcum powder products,
20  correct?
21      A.   That's correct.
22      Q.   Why?
23      A.   Because when I'm getting
24  talcum powder products, I want talcum
```

Page 533

```
 1  powder.
 2      Q.   And you don't want asbestos?
 3      A.   That's correct.
 4      Q.   Why don't you want asbestos?
 5      A.   Well, asbestos is a
 6  carcinogen, but it doesn't necessarily
 7  mean that if -- if asbestos was present
 8  in talcum powder, I'd want to set up a
 9  study to determine whether asbestos and
10  talcum powder were a cause of ovarian
11  cancer.
12      Q.   Do you know that asbestos
13  has been characterized by IARC as a cause
14  of ovarian cancer?
15          MR. HUDSON:  Objection to
16      form.
17          MR. SILVER:  Objection to
18      form.
19          THE WITNESS:  I am aware
20      that IARC has looked at it, that's
21      correct.
22  BY MR. TISI:
23      Q.   And has concluded that
24  asbestos is a carcinogen for ovarian
```

134 (Pages 530 to 533)

Joshua E. Muscat, Ph.D.

Page 534

```
1    cancer?
2           MR. HUDSON:  Objection to
3    form.
4           THE WITNESS:  In an
5    occupational setting.
6    BY MR. TISI:
7       Q.   Of ovarian cancer?
8       A.   Yes.
9       Q.   How do you get cancer -- how
10   do you get ovarian cancer in an
11   occupational setting?
12      A.   Through dealing with mining,
13   milling, paper products, secondary
14   exposures.
15      Q.   Okay.  So you can get it in
16   your -- are you suggesting that a
17   biologically plausible mechanism is
18   inhaling asbestos?
19          MR. HEGARTY:  Objection to
20   form.
21          MR. SILVER:  Objection to
22   form.
23   BY MR. TISI:
24      Q.   For ovarian cancer?
```

Page 535

```
1       A.   I'm sorry.  What was that?
2       Q.   Is it a biologically
3    plausible mechanism for ovarian cancer to
4    inhale asbestos?
5           MR. SILVER:  Same objection.
6           THE WITNESS:  I don't know.
7    BY MR. TISI:
8       Q.   Okay.  So my question is --
9    back up.  Let's back up a little bit.
10      A.   Okay.
11      Q.   A, we can agree that you
12   made an assumption that there is no
13   asbestos in talcum powder products,
14   correct?
15          MR. SILVER:  Objection to
16   form.
17          MR. HEGARTY:  Objection to
18   form.
19          THE WITNESS:  Since -- since
20   that time period, that's correct.
21   BY MR. TISI:
22      Q.   Since 1970s?
23      A.   Right.
24      Q.   B, we can agree we don't
```

Page 536

```
1    want asbestos in your talcum powder
2    products?
3       A.   That's correct.
4       Q.   C, we know asbestos is a
5    carcinogen, correct?
6       A.   It is a carcinogen for lung
7    cancer mesothelioma.
8       Q.   And you also know that it is
9    a carcinogen for ovarian cancer.  You
10   know that from IARC, correct?
11          MR. SILVER:  Objection to
12   form.
13          MR. HEGARTY:  Objection to
14   form.
15          THE WITNESS:  So I know IARC
16   has looked at it.  But that
17   doesn't necessarily mean that I
18   would come to the same conclusion.
19   BY MR. TISI:
20      Q.   Well, that would provide a
21   biologically plausible mechanism for
22   ovarian cancer in talcum powder products
23   if the talcum powder products contained
24   asbestos?
```

Page 537

```
1           MR. SILVER:  Objection to
2    form.
3           MR. HUDSON:  Objection to
4    form.
5    BY MR. TISI:
6       Q.   Correct?
7       A.   So -- what?  I'm sorry.
8       Q.   It would provide a
9    biologically plausible explanation for
10   talcum powder products causing ovarian
11   cancer.
12          MR. HUDSON:  Objection to
13   form.
14          MR. SILVER:  Objection to
15   form.
16          THE WITNESS:  So we've
17   talked about this.  It's my
18   opinion that it doesn't cause
19   ovarian cancer.
20   BY MR. TISI:
21      Q.   I'm not asking -- let's --
22   put aside -- it was your opinion that
23   talcum powder products, there is no
24   biologic plausibility because talcum
```

135 (Pages 534 to 537)

Joshua E. Muscat, Ph.D.

Page 538

1   powder products do not contain asbestos.
2   That's what that says here?
3        A.   That's one of the reasons,
4   yes.
5        Q.   Right.  Now, if you are
6   wrong and talcum powder products did
7   contain asbestos, they would in fact be a
8   biologically plausible mechanism, true?
9            MR. HEGARTY:  Objection to
10  form.
11           MR. SILVER:  Objection to
12  form.
13           MR. HEGARTY:  Asked and
14  answered.
15           THE WITNESS:  It -- no, not
16  necessarily.  I mean, it would
17  depend upon the route of exposure.
18  Asbestos is a carcinogen.  Don't
19  get me wrong.  It is a cause of
20  mesothelioma.  It's a cause of
21  lung cancer.
22       I think that's well
23  described.
24       But in order to determine

Page 539

1   whether it is a cause of ovarian
2   cancer, you'd have to look at a
3   wide variety of literature.  You'd
4   have to have epidemiological
5   studies.  You'd have to do animal
6   experiments.  You'd have to think
7   of mechanisms as how that would
8   occur.
9            So I couldn't say that if
10  asbestos was theoretically in
11  talcum powder, that it would be a
12  mechanism for causing ovarian
13  cancer, which I don't think is
14  associated with talcum powder.
15  BY MR. TISI:
16       Q.   Do you know what talcum --
17  when we look at the bottle, do you know
18  what's in that bottle?  The bottle -- if
19  you go to Kmart today, and you buy
20  Johnson's Baby Powder, talcum powder --
21       A.   Yes.
22       Q.   -- have you done any
23  research as to what is actually in that
24  bottle?

Page 540

1            MR. HEGARTY:  Objection to
2   form.
3   BY MR. TISI:
4        Q.   In any of your -- no, you
5   know, in any of your studies, over the
6   past 20 years when you've been publishing
7   in the medical literature, when you've
8   been writing these reports, did you ever
9   inquire to anybody, you know something,
10  we need to figure out whether there is
11  anything else in this bottle that could
12  be a potential carcinogen?
13           MR. HEGARTY:  Objection.
14  BY MR. TISI:
15       Q.   Do you ever ask that
16  question?
17           MR. HEGARTY:  Objection to
18  form.
19           THE WITNESS:  I'm just not
20  sure why are we asking that
21  question.
22       So my --
23  BY MR. TISI:
24       Q.   Because --

Page 541

1        A.   So my --
2        Q.   Let me provide you an
3   answer.
4            MR. HUDSON:  Let him finish
5   his answer.
6   BY MR. TISI:
7        Q.   Let me provide -- I thought
8   you asked the question, you're not sure
9   why I'm asking that question.
10           MR. HUDSON:  Let him finish
11  his answer.
12           THE WITNESS:  Okay.  You're
13  asking me whether talcum powder
14  is -- talcum powder or the
15  product, the talcum powder -- in
16  fact, that's the way IARC even
17  describes it, is talc-based
18  powders.
19       Okay.  So talc-based powders
20  includes talc.  I don't know
21  whether it has fragrance or not.
22  But it's the -- in fact, the way
23  the questions were even asked in
24  epidemiologic studies, most of

136 (Pages 538 to 541)

Joshua E. Muscat, Ph.D.

Page 542

1    them as powder.
2        So that's -- that's the
3    evidence that I look for.  Okay.
4        And so are talc-based
5    powders a cause of ovarian cancer?
6    Based upon the epidemiologic
7    studies, I would say no.
8    BY MR. TISI:
9        Q.   But you looked at -- okay.
10   Okay.  So you asked the question.  You
11   looked -- you were looking at whether or
12   not there exists a biologically plausible
13   mechanism, correct?  In this section you
14   were looking to see, we observed some
15   increased risk in some studies?
16       A.   Yes.
17       Q.   And now let's see whether or
18   not there is evidence of a biologically
19   plausible mechanism, why that might be
20   true or not true.
21       A.   It's part of the Hill
22   criteria.
23       Q.   And you wanted to look at
24   it, right?

Page 543

1        A.   That's correct.
2        Q.   Okay.  And you focused on
3    the question of whether or not pure talc
4    cause -- for the biologic plausibility,
5    you looked at whether or not talc is a
6    carcinogen, correct, talc itself, the
7    talc molecule?
8        A.   I looked at the
9    epidemiologic studies --
10       Q.   Epidemiology studies don't
11   have anything to do with what the
12   crystalline structure of talc is, does
13   it?
14       A.   That's what the studies were
15   on.
16       Q.   The studies were on talcum
17   powder products?
18       A.   That's correct.
19       Q.   All right.  Now, we also
20   know that within -- you said before
21   talcum powder products can contain
22   multiple things.  It contains talc.
23       A.   Yes.
24       Q.   Fragrance?

Page 544

1        A.   That's correct.
2        Q.   May contain --
3        A.   Cornstarch.
4        Q.   -- amounts of cornstarch.
5    It may contain asbestos.
6            MR. HUDSON:  Objection to
7        form.
8    BY MR. TISI:
9        Q.   It may contain silica.  It
10   may contain magnesium.  It may contain
11   nickel.  It may contain a lot of things
12   because it comes from the ground, true?
13           MR. HUDSON:  Objection to
14       form.
15           MR. HEGARTY:  Objection to
16       form.
17           THE WITNESS:  So I -- it may
18       contain.  It may not contain.
19   BY MR. TISI:
20       Q.   Okay.  And so my question --
21       A.   Yes.  I just don't know.
22   You need to ask --
23       Q.   So my question is if you're
24   really trying to figure out whether

Page 545

1    there's a biological mechanism as to
2    whether or not what is in the bottle,
3    causes ovarian cancer, you want to look
4    at the individual constituents in the
5    bottle to see whether or not there's a
6    biologically plausible mechanism for each
7    one of those things, correct?
8            MR. SILVER:  Objection to
9        form.
10           MR. HEGARTY:  Objection to
11       form.
12           THE WITNESS:  That's a
13       hypothetical -- not necessarily.
14   BY MR. TISI:
15       Q.   So one of the questions that
16   you might want to ask is, you know, J&J,
17   you know, Imerys, let's see if we can do
18   a survey and see what is actually in the
19   bottle.  Tell me what your talcum powder
20   products are made of.
21           That would be a reasonable
22   question to ask, correct?
23           MR. HUDSON:  Objection to
24       form.

137  (Pages 542 to 545)

Joshua E. Muscat, Ph.D.

Page 546

1           MR. SILVER:  Objection to
2       form.
3           THE WITNESS:  I believe
4       that -- I believe J&J does that.
5    BY MR. TISI:
6       Q.   Okay.  How do you know?  Did
7    you ask them?
8           MR. HEGARTY:  Objection to
9       form.
10          THE WITNESS:  So there are,
11       I mean, there are other sources
12       of -- I rely on the literature.
13    BY MR. TISI:
14       Q.   Okay.  What literature?
15    Because you -- I'm going to tell you
16    that, I went through your literature.
17    And when you make this statement like you
18    made here, "Since the early '70s, the
19    relevant industries voluntarily
20    eliminated asbestos contamination from
21    talc products."
22          Every time you say that in
23    the medical literature, it is simply a
24    statement with no citation whatsoever.

Page 547

1    And so I want to know what is the medical
2    literature upon which you relied to make
3    that statement, if you know?
4           MR. HEGARTY:  Objection to
5       form.
6           THE WITNESS:  So there's --
7       there is the Rohl's reference.
8       There are studies --
9    BY MR. TISI:
10       Q.   That was before 1970.  That
11    was the Rohl reference 1976 before.
12    Anything else?
13       A.   Okay.  So there have been
14    studies, mineralogical studies of
15    contamination in different talc mines in
16    Europe, in Vermont.  It's my
17    understanding those studies have shown
18    that talc is asbestos free.
19       Q.   And if that was not true,
20    that would -- that would be a potential
21    biologically plausible mechanism, right?
22          MR. HUDSON:  Objection to
23       form.
24          MR. HEGARTY:  Objection to

Page 548

1       form.
2           MR. SILVER:  Objection to
3       form.
4           THE WITNESS:  Biological
5       potential mechanism for -- for
6       what?
7    BY MR. TISI:
8       Q.   Okay.  I'm going to move on.
9    We're running --
10          MR. TISI:  Let's take a
11       quick break.  How much time do I
12       have?
13          THE VIDEOGRAPHER:  Going off
14       the record 5:54 p.m.
15          (Short break.)
16          THE VIDEOGRAPHER:  We are
17       back on the record at 6:13 p.m.
18    BY MR. TISI:
19       Q.   Okay.  Doctor, we're going
20    to try to wrap up pretty quickly here.
21          So I put in front of you
22    Exhibit Number 30, which is your
23    diaphragm study and Exhibit Number 35,
24    which is a document that I'm going to

Page 549

1    talk to you about in a minute.
2          (Document marked for
3          identification as Exhibit
4          Muscat-35.)
5    BY MR. TISI:
6       Q.   But in your diaphragm study,
7    and we talked before about your
8    hypothesis being identified in -- "The
9    talc cancer hypothesis could be tested
10    with better precision and validity if the
11    exposure to the suspected carcinogen was
12    directly applied to the reproductive
13    tract."
14          Do you remember that?
15       A.   Yes.
16       Q.   And your meta-analysis was
17    an attempt to do that, with the idea if
18    you use diaphragms, it's a more proximate
19    application of talc to the ovaries?
20       A.   That's correct.
21       Q.   And you included studies and
22    I remember your premise was to include
23    only studies with talc -- that had talc
24    use, correct?

138  (Pages 546 to 549)

Joshua E. Muscat, Ph.D.

Page 550

1    A.   That's correct.
2    Q.   Not cornstarch?
3    A.   That's correct.
4    Q.   So if you look at your
5  overview of studies included there,
6  there's a chart and numerous studies
7  listed.
8    A.   Yes.
9    Q.   Okay.  And I have done what
10  I did before, which is to provide a copy
11  of that chart to you as Exhibit Number
12  35.
13    A.   Okay.
14    Q.   And the studies -- some of
15  the studies that you've referred to there
16  that I'd like to talk about very briefly.
17    A.   Okay.
18    Q.   I'd like to talk about two
19  in particular.
20        The first one I'd like to
21  talk about is Booth 1989.
22    A.   Okay.
23    Q.   And the chart that I think
24  you draw that from, and you can correct

Page 551

1  me if I'm wrong is a chart, Table V,
2  Roman Numeral V; is that correct?
3    A.   Yes.
4    Q.   That's correct?
5    A.   Yes.
6    Q.   Can you tell me where in
7  that chart you indicate -- that it
8  indicates that the powder used to dust
9  the diaphragm was talc as opposed to
10  cornstarch?
11    A.   Okay.  So it's not in the
12  table.  It's actually in the methods
13  section.  Women who reported using a
14  contraceptive diaphragm were asked if
15  they stored it in talc.
16    Q.   Okay.  And presumably some
17  of them did and some of them didn't,
18  right?
19    A.   That's correct.
20    Q.   Can you tell from the
21  Table V which ones -- whether this
22  included all women, some of them included
23  talc and some that did not?  Can you read
24  the paper?

Page 552

1    A.   I'm sorry?
2    Q.   We can go off the record if
3  you're going to read the article.
4        MR. TISI:  Unless you're
5  going give me some slack on this.
6        MR. SILVER:  No and no.
7        MR. TISI:  Well, we're going
8  to -- I'm not going to let him
9  read the entire article.  I would
10  assume he would have read his own
11  study before walking in there.
12        MR. SILVER:  He didn't
13  choose these question or are in
14  the protocol.  No one knows.
15        MR. HUDSON:  It's also not
16  his study.
17        MR. TISI:  It is his study.
18        MR. HEGARTY:  The Booth
19  study?
20        MR. TISI:  He relied on the
21  Booth Study in his -- go ahead.
22        MR. HEGARTY:  Because you
23  are asking him questions about the
24  Booth study.

Page 553

1        MR. TISI:  I'll ask one more
2  time.  If you're going to cut me
3  off because he's reading a study
4  I'm going to ask for more time.
5        MR. HEGARTY:  Okay.  That's
6  your choice.
7        MR. TISI:  Okay.  And we'll
8  all come back out here.
9        MR. HEGARTY:  We'll see
10  about that, but you're the one who
11  presented it to him.  He's got an
12  opportunity --
13        MR. TISI:  I agree with you.
14  I said he can do it off the record
15  if he wants.
16        MR. HEGARTY:  How much time
17  do you need, Dr. Muscat?
18        THE WITNESS:  I need a few
19  minutes because sometimes the
20  information is -- could be buried.
21        MR. HEGARTY:  We can go off
22  the record for a few minutes.
23        THE WITNESS:  Okay.
24        THE VIDEOGRAPHER:  Going off

139 (Pages 550 to 553)

Joshua E. Muscat, Ph.D.

Page 554

1    the record at 6:19 p.m.
2        (Brief pause.)
3        THE VIDEOGRAPHER:  We are
4    back on record at 6:20 p.m.
5        THE WITNESS:  So it says
6    right above the discussion
7    section, "There's no significant
8    difference between percentage of
9    cases and controls who had used
10   and kept their diaphragm in talc."
11   BY MR. TISI:
12       Q.   Right.  But that doesn't
13   refer to the -- you don't know how many
14   of them used -- dusted with talc and how
15   many used -- dusted with cornstarch?
16   This appears, Table V appears to be
17   diaphragm studied with both talc and
18   cornstarch, right?  It's the combined
19   result?
20       A.   Yes, that's correct.  That's
21   correct.
22       Q.   So you don't know -- so you
23   don't know from -- you don't know from
24   the study.  Some of these patients would

Page 555

1    have used talc and some would have used
2    cornstarch, correct, in Table V?
3        MR. HEGARTY:  Objection to
4    form.
5        THE WITNESS:  You can
6    calculate the talc-specific
7    diaphragm used based upon these
8    numbers in the table -- in the
9    discussion.
10   BY MR. TISI:
11       Q.   Did you?
12       A.   I think that's what was
13   done.
14       Q.   You sure?
15       A.   I can't be 100 percent sure
16   because Dr. Huncharek is the lead author.
17   But that, I'm pretty confident that's
18   probably what he did because you can go
19   ahead -- once you have the percentages of
20   the cases and controls who have used talc
21   diaphragm, you can calculate the odds
22   ratio.
23       Q.   Where did the point -- where
24   did you get the .75 from?

Page 556

1        A.   It must have been
2    calculated.
3        Q.   And then the Harlow and
4    Weiss study, 1989, which I believe is Tab
5    3, the data -- it's Tab 1.  The data is
6    pulled from the chart in Table 1, right?
7    Adjusted odds ratio of .5.  You see .5
8    towards diaphragm storage only, and with
9    other methods, .5.  That is where that
10   was pulled from, right?
11       MR. HUDSON:  I think you
12   need to clarify which study.
13       MR. TISI:  It's Harlow and
14   Weiss.  Not Harlow.  Harlow and
15   Weiss.
16       THE WITNESS:  Oh, okay.
17   BY MR. TISI:
18       Q.   Go to Table 1.
19       A.   Okay.
20       Q.   That's where you got that
21   data from, right?
22       A.   It was derived from Table 1.
23       Q.   Okay.  Do you agree that the
24   Table 1 heading, "Perineal Use of

Page 557

1    Talc-Containing Powder and Cornstarch"?
2        A.   Yeah, that's correct.
3        Q.   These women used both talc
4    and cornstarch.  This wasn't pure talc,
5    was it?
6        MR. SILVER:  Objection to
7    form.
8        THE WITNESS:  I think there
9    was a separate question on
10   cornstarch.
11   BY MR. TISI:
12       Q.   It was not in this chart, is
13   it?  In fact, the odds ratio that you use
14   is exactly "diaphragm storage only and
15   with other methods"?
16       MR. HUDSON:  Objection to
17   form.
18   BY MR. TISI:
19       Q.   Do you see that?  .5 with a
20   relative risk -- I'm sorry with a
21   confidence interval of .2 to 1.3:  It's
22   exactly what was reported in your chart
23   on Table 1, right?
24       A.   Okay.

140  (Pages 554 to 557)

Joshua E. Muscat, Ph.D.

Page 558

1      Q.   The study shouldn't have
2  been included in this, should it, because
3  some women used cornstarch, right?
4          MR. SILVER:  Objection to
5  form.
6          MR. HUDSON:  Objection to
7  form.
8          THE WITNESS:  So can I have
9  a minute to go back and look at
10 this?
11         MR. TISI:  We can go off the
12 record.  You can take as much time
13 as you want.
14         THE WITNESS:  Okay.
15         THE VIDEOGRAPHER:  Off the
16 record.  6:24 p.m.
17         (Brief pause.)
18         THE VIDEOGRAPHER:  Back on
19 record.  6:28 p.m.
20 BY MR. TISI:
21     Q.   Can you tell me why Booth
22 was included?
23     A.   I'm sorry.  What was that?
24     Q.   Tell me why Booth was

Page 559

1  included in the -- because the statistic
2  you used was derived from a chart that
3  had both talc and cornstarch exposure,
4  right?
5          MR. HEGARTY:  Objection to
6  form.
7          MR. HUDSON:  Objection to
8  form.
9          THE WITNESS:  We're talking
10 about --
11 BY MR. TISI:
12     Q.   Table 1?
13     A.   -- Booth or Harlow?
14     Q.   Harlow.  I'm sorry.  I meant
15 to say Harlow.  Harlow and Weiss.
16     A.   So I think that's the case,
17 yes.
18     Q.   Okay.  And so you think
19 that -- do you think that study should
20 not have been included in your study?
21     A.   I think there was an
22 assumption here that based upon the --
23 the use of cornstarch was very low in
24 cases and controls in the study, that the

Page 560

1  vast majority of the powder was talc.
2  But yeah, I agree it's -- that is
3  probably something that was not
4  specified.
5      Q.   Okay.  And you probably
6  shouldn't have included it for that
7  reason?
8          MR. HEGARTY:  Objection to
9  form.
10         MR. SILVER:  Objection to
11 form.
12         THE WITNESS:  No.  No, I
13 wouldn't say I wouldn't have
14 included it.  But I think it
15 should be clarified as to regard
16 the exposure classification.
17 BY MR. TISI:
18     Q.   One other question, and I'm
19 going to go to the last, and I'm going to
20 mark this as a -- we talked before about
21 the consistency between different study
22 designs.
23         Do you remember we talked
24 about the 1.9 with a relative risk of .99

Page 561

1  to -- I think it was 1.6 seen in the
2  hospital studies versus the population
3  studies.
4          Do you remember we talked
5  about that?
6      A.   Yes.
7      Q.   And the only reason that
8  they were not consistent in your view was
9  because the confidence interval closed
10 went over 1 to 1 -- or 2.99 correct?
11         MR. HEGARTY:  Objection to
12 form.
13         THE WITNESS:  So I'm sorry,
14 the consistency of the studies is
15 the --
16 BY MR. TISI:
17     Q.   Is -- you felt that this was
18 an inconsistency between the
19 hospital-based studies and the
20 population-based studies, correct?
21     A.   They yielded some different
22 relative risks.
23     Q.   Right.  But they were both
24 in the recollection of the -- the point

141  (Pages 558 to 561)

Joshua E. Muscat, Ph.D.

Page 562

1    estimate was both positive for cause,
2    correct -- positive for an association?
3                MR. HEGARTY:  Objection to
4        form.
5                THE WITNESS:  So they
6        were -- I don't have the exact
7        numbers.  But they were above 1.0.
8    BY MR. TISI:
9        Q.    Now, the uncontrolled
10   confounding, which is the last one I'm
11   going to talk about that really briefly.
12           One of the issues that you
13   raised was -- on Page 23 of the report to
14   the FDA.  You said, Smokers are more
15   likely to engage in perineal talc dusting
16   compared to nonsmokers; therefore, an
17   imbalance of smokers across case-control
18   in the epi studies" -- "epidemiologic
19   studies could contribute to a spurious
20   positive association?"
21       A.    I'm sorry.  Where is this?
22       Q.    It's in your Citizen's
23   Petition, Page 23.  Number 25.  Page 23
24   of Exhibit 25.  I have it up on the

Page 563

1    screen.  The last sentence --
2        A.    Okay, thanks.  Okay.
3        Q.    It's the last sentence --
4        A.    Sorry.
5        Q.    -- of the second paragraph.
6    You talk about smoking.
7            Do you see that?
8        A.    Yes.
9        Q.    Okay.  You raise the
10   possibility that perhaps smoking could
11   account for, since there was an imbalance
12   that you suggested between people who use
13   talc and not use talc, that maybe that
14   would have confounded the results?
15       A.    I see that.
16       Q.    Okay.  I'm going to make
17   three points, and I'm going to be done.
18       A.    Okay.
19       Q.    Let me ask you Number 1.
20   You proposed a smoking study to the
21   company, and they didn't do it, correct?
22               MR. HEGARTY:  Objection to
23       form.
24               THE WITNESS:  No, I didn't.

Page 564

1    BY MR. TISI:
2        Q.    You know Meta-Analysis
3    Research Group did?
4               MR. HEGARTY:  Objection to
5        form.
6               THE WITNESS:  I don't
7        recall.  But --
8    BY MR. TISI:
9        Q.    That sounds right, right?
10              MR. HEGARTY:  Objection to
11       form.
12              THE WITNESS:  I've never
13       actually seen it.  Okay.  But a
14       proposal on smoking was done,
15       okay.
16   BY MR. TISI:
17       Q.    Let me ask you this.  Do you
18   know whether or not the company has taken
19   the position that smoking is not a
20   confounder for ovarian cancer?
21              MR. HUDSON:  Objection to
22       form.
23              THE WITNESS:  I don't know
24       that.

Page 565

1    BY MR. TISI:
2        Q.    I'm going to show you again
3    from Dr. Nicholson who spoke for the
4    company on this issue?
5        A.    Okay.
6        Q.    And see if you agree with
7    her.
8               MR. TISI:  Would you please
9        play Clip 2.
10           (Video playback.)
11           -- this particular proposal.
12           Looking at -- did you ever
13   contact" --
14           (Stop video playback.)
15           MR. TISI:  That's not it.
16           Can we go off the record for
17   one minute.  I'm having a
18   technical issue.
19              THE VIDEOGRAPHER:  Going off
20   the record 6:33 p.m.
21           (Brief pause.)
22              THE VIDEOGRAPHER:  We are
23   back on record at 6:37 p.m.
24           (Video playback.)

                    142 (Pages 562 to 565)

Joshua E. Muscat, Ph.D.

Page 566

1       MS. NICHOLSON:  Care
2   providers have to be very heavily
3   adjudicated and documented.
4   There's no way this is the
5   official record of any --
6       (Video playback paused.)
7       MR. TISI:  No, no.  Keep
8   going.
9       (Video playback.)
10      MR. TISI:  I'm going to show
11  you more evidence of this, but
12  let's just -- let's just move on
13  here.
14      Putting aside this
15  particular proposal.  Looking
16  at -- did you ever contact or see
17  any evidence that an
18  epidemiologist within the company
19  ever was contacted to see if you
20  can control for smoking?
21      MS. NICHOLSON:  No.
22      MR. TISI:  And if your
23  lawyers march into court and
24  suggest, well, a particular

Page 567

1   plaintiff had smoking, it was a
2   potential confounder, they
3   wouldn't know that because you
4   guys didn't really study it,
5   right?
6       DEFENSE COUNSEL:  Objection.
7       MS. NICHOLSON:  I would
8   agree, and I wouldn't support
9   anyone saying that smoking is a
10  confounder who didn't adjust for
11  it.
12      MR. TISI:  Thank you.
13      (Video playback ended.)
14  BY MR. TISI:
15      Q.  Let me ask you this.  Do you
16  agree with the company that smoking would
17  not be a confounder for these studies
18  that you looked at?
19      MR. HEGARTY:  Objection.
20  BY MR. TISI:
21      Q.  Do you agree with
22  Dr. Nicholson?
23      A.  So I think so.
24      Q.  Okay.

Page 568

1       A.  So, yeah, let me just
2   explain this.  I know Dr. Huncharek had
3   written that, and these are one of the
4   areas where I was less agreeable in terms
5   of my thinking.  The reason that's in
6   there is because smoking is a risk factor
7   for the mucinous form.  Okay.  So I know
8   he's very interested in that.
9       I think because it's a
10  minority of ovarian cancers, that if you
11  did not adjust for the effect of smoking,
12  it may not have a big impact on kind of
13  the overall relative risk.
14      Q.  Okay.  So anyone who would
15  come in and suggest that there was
16  uncontrolled confounding due to smoking,
17  in your view that was -- that was not an
18  explanation for what was seen in the
19  studies?
20      A.  I would -- I'd be more
21  specific and say that is a -- probably
22  cause a concern for the mucinous form of
23  ovarian cancer.
24      Q.  And most of the ovarian

Page 569

1   cancers that were looked at were of the
2   serous form, correct?
3       MR. HEGARTY:  Objection to
4   form.
5       THE WITNESS:  Well, I'm not
6   sure most of these studies
7   specified.  But he just assumed
8   the percentages most of them would
9   be serous.
10      MR. HUDSON:  Counsel, I
11  understand that we have reached
12  the seven-hour mark.
13      MR. TISI:  Yeah, no, I
14  appreciate that.  And, Doctor, I
15  appreciate your time.  And we
16  reserve the right to follow up on
17  some things.  But we're done for
18  tonight according to your counsel.
19      THE VIDEOGRAPHER:  Going off
20  the record at 6:40 p.m.
21      (Brief pause.)
22      THE VIDEOGRAPHER:  Back on
23  record 6:45 p.m.
24          - - -

143 (Pages 566 to 569)

Joshua E. Muscat, Ph.D.

Page 570

1      EXAMINATION
2          - - -
3   BY MR. HEGARTY:
4      Q.   Good afternoon, Dr. Muscat.
5      A.   It's been a long afternoon.
6      Q.   Yeah, we're almost in the
7   evening.  I promise to keep this very
8   short.  I'm not sure if we had the chance
9   today to learn your full name.  Would you
10  please tell us your full name.
11     A.   It's Joshua Muscat.
12     Q.   And I want to spend just a
13  few moments discussing your background
14  and experience.  First of all, can you
15  give us a very brief summary of your
16  educational background?
17     A.   Okay.  Received my MPH from
18  Yale University and Ph.D. in
19  environmental health sciences.
20     Q.   What is an MPH by the way?
21     A.   I'm sorry.  Master's of
22  public health.
23     Q.   You mentioned that you do
24  have a doctorate degree?

Page 571

1      A.   That's correct.
2      Q.   And what is the nature of
3   this doctorate degree?
4      A.   Some environmental health
5   science is my track.  Within that degree
6   was in environmental epidemiology.
7      Q.   Since getting your Ph.D.,
8   your doctorate, have you also had a
9   particular focus in the area of cancer
10  epidemiology?
11     A.   That's correct.
12     Q.   Can you tell us where you
13  work?
14     A.   So I work at, since 2004,
15  Penn State College of Medicine,
16  department of public health sciences.
17     Q.   And what is your current
18  title at Penn State?
19     A.   Professor.
20     Q.   Have you taught courses over
21  the years at Penn State on cancer
22  epidemiology?
23     A.   Yes, I have.
24     Q.   Have you taught such courses

Page 572

1   to medical students?
2      A.   Yes, I have.
3      Q.   Is that an area that you
4   still are involved in teaching?
5      A.   Yes.  As a matter of fact, I
6   should be teaching right now, so --
7      Q.   What class are you missing
8   right now?
9      A.   There's a substitute, right.
10  Actually it's cancer epidemiology.
11     Q.   And who is in the class
12  tonight?
13         MR. TISI:  Objection.
14         THE WITNESS:  There are five
15     graduate students.
16  BY MR. HEGARTY:
17     Q.   Graduate students in what
18  discipline?
19     A.   In epidemiology.
20     Q.   Where do you work?  In other
21  words, where is the Penn State campus
22  that you work?
23     A.   Okay.  So I'm located in the
24  College of Medicine and that is my

Page 573

1   department, department of public health
2   sciences within College of Medicine at
3   Hershey, Pennsylvania.
4      Q.   How long have you taught at
5   Penn State?
6      A.   14 years.
7      Q.   In addition to teaching
8   cancer epidemiology, do you also do
9   research in cancer epidemiology at Penn
10  State?
11     A.   Yes, I do.
12     Q.   We talked about a couple of
13  your publications today.  But you have a
14  number of publications we haven't talked
15  about.  I believe in looking at your CV,
16  it looked like you have been involved in
17  seven book chapters and some 185
18  articles.  Does that sound right?
19     A.   That's correct.
20     Q.   And have any of those book
21  chapters or articles dealt with cancer
22  epidemiology?
23     A.   Most of them.
24     Q.   And have some, as we've

144 (Pages 570 to 573)

Joshua E. Muscat, Ph.D.

Page 574

1  talked about today, dealt with talc and
2  ovarian cancer?
3      A.   That's correct.
4      Q.   Have you also served as a
5  reviewer of medical and scientific
6  literature for publications?
7      A.   Yes.
8      Q.   Is this part of what we've
9  been talking about today of the peer
10  review process?
11      A.   That's correct.
12      Q.   In other words, are you --
13  have you been and are you a peer reviewer
14  for authors who want their papers
15  published in the scientific literature?
16      A.   Yes.
17      Q.   Now, you have been asked
18  over the course of today by lawyers for
19  plaintiffs -- is it your understanding in
20  this litigation that they claim that you
21  either hid funding sources or otherwise
22  failed to make proper disclosures of
23  conflicts in the papers that you've
24  written.

Page 575

1          Is any of that true
2  Dr. Muscat?
3          MR. TISI:  Objection.
4          THE WITNESS:  No, it's not
5  true.
6  BY MR. HEGARTY:
7      Q.   You were asked about whether
8  you are aware of any funding Imerys or
9  J&J provided for the white papers that
10  were prepared as part of the work for
11  Crowell & Moring back in 2005.  Do you
12  recall those questions?
13      A.   Yes.
14      Q.   And if you had been made
15  aware of the funding sources back at that
16  time, would it have made any difference
17  in the work you did on the two white
18  papers?
19      A.   No.
20      Q.   In other words, would you
21  still have approached the work as an
22  independent scientist where your analysis
23  and results would be based solely on the
24  data and not reaching any particular

Page 576

1  conclusion?
2          MR. TISI:  Objection.
3          THE WITNESS:  Yes.
4          MR. TISI:  Form.
5  BY MR. HEGARTY:
6      Q.   We talked briefly, or in
7  some respect about the diaphragm study
8  published in 2007.  Can you tell us what
9  journal that was published in?
10      A.   That was the European
11  Journal of Cancer Prevention.
12      Q.   Did that article go through
13  peer review?
14      A.   Yes, it did.
15      Q.   We talked a little bit about
16  some of the data.  But generally have you
17  been shown anything here over the course
18  of today that establishes that any of the
19  data reported was inaccurate?
20          MR. TISI:  Objection.
21          THE WITNESS:  No.
22  BY MR. HEGARTY:
23      Q.   Are you aware of anyone in
24  the scientific community identifying any

Page 577

1  inaccuracies in the data or the
2  conclusions?
3          MR. TISI:  Objection.
4          THE WITNESS:  Not that I'm
5  aware of.
6  BY MR. HEGARTY:
7      Q.   And does the data in the
8  diaphragm study that looks at talc-dusted
9  diaphragms and ovarian cancer, does that
10  data show no causal connection between
11  the use of talc-dusted diaphragms and
12  ovarian cancer?
13          MR. TISI:  Objection.
14          THE WITNESS:  That's
15  correct.
16  BY MR. HEGARTY:
17      Q.   And have there been other
18  studies reporting no causal link between
19  the use of talc-dusted diaphragms and
20  ovarian cancer?
21          MR. TISI:  Objection.
22  BY MR. HEGARTY:
23      Q.   That you can recall?
24      A.   Other studies?

145 (Pages 574 to 577)

Joshua E. Muscat, Ph.D.

Page 578

1      Q.   If you know.  If you recall
2  other studies reporting on talc-dusted
3  diaphragms and ovarian cancer.
4           MR. TISI:  Objection.
5           THE WITNESS:  I think there
6      may have been some reports in some
7      of the cohort studies that were
8      not included in that.  I can't
9      recall the specifics.
10 BY MR. HEGARTY:
11     Q.   Is it your understanding
12 that the results reported in your
13 diaphragm study are consistent with what
14 other studies have reported?
15     A.   Yes.
16     Q.   We looked at the disclosure
17 that you provided for the 2007 diaphragm
18 study.  Do you recall doing that?
19     A.   Yes.
20     Q.   To your knowledge, did J&J
21 suggest any revisions to the diaphragm
22 paper?
23     A.   Not to my knowledge.
24     Q.   Did J&J request or require

Page 579

1  any changes be made?
2      A.   Not to my knowledge.
3      Q.   Did you have any
4  communications at all with J&J about the
5  diaphragm white paper or the diaphragm
6  published study?
7      A.   No.
8      Q.   From your standpoint did J&J
9  have any involvement in the results or
10 final wording of the published article on
11 talc-dusted diaphragms?
12     A.   No.
13          MR. TISI:  Objection.
14 BY MR. HEGARTY:
15     Q.   Now, with regard to the new
16 critical review white paper, who wrote
17 that paper, the 2008 paper?
18     A.   The published paper?
19     Q.   Yes.
20     A.   That was me.
21     Q.   And was that a paper looking
22 at the science on talc and ovarian
23 cancer?
24     A.   Yes.

Page 580

1      Q.   And to your knowledge did
2  J&J have any involvement whatsoever in
3  preparation of the published article, the
4  2008 published article?
5      A.   They did not.
6      Q.   Have you seen anywhere that
7  J&J suggested any changes to that
8  article?
9      A.   No.
10          MR. TISI:  Objection.
11 BY MR. HEGARTY:
12     Q.   Or requested or required any
13 changes?
14          MR. TISI:  Objection.
15          THE WITNESS:  No.
16 BY MR. HEGARTY:
17     Q.   Did you have any
18 communication at all with J&J about
19 preparation of The Critical Review,
20 either white paper or the paper that
21 ultimately was published in the European
22 Journal of Cancer Prevention?
23     A.   No.
24     Q.   You told us about this

Page 581

1  earlier, but over the course of writing
2  the new critical review paper, did you
3  perceive that the earlier work with
4  Crowell & Moring had ended and you were
5  now working on a separate project?
6      A.   Correct.
7      Q.   Did J&J have any involvement
8  in the writing of this new critical
9  review paper?
10          MR. TISI:  Objection.
11          THE WITNESS:  No.
12 BY MR. HEGARTY:
13     Q.   Did you have any
14 communication with J&J about writing this
15 new critical review paper?
16     A.   No.
17     Q.   Did J&J comment on or
18 suggest any revision --
19          MR. TISI:  Objection.
20 BY MR. HEGARTY:
21     Q.   -- to this critical review
22 paper?
23     A.   No.
24     Q.   Now, did you ultimately

146  (Pages 578 to 581)

Joshua E. Muscat, Ph.D.

Page 582

1  submit the new critical review paper for
2  publishing in the European Journal of
3  Cancer Prevention?
4      A.   That's correct.
5      Q.   Was J&J involved at all in
6  submitting this new critical review
7  paper?
8      A.   No.
9      Q.   Did you give J&J a copy of
10 the new critical review paper that you
11 were submitting?
12     A.   No.
13     Q.   You told us earlier that you
14 did make a reference in the disclosure
15 part of the new critical review paper to
16 Crowell & Moring.  And why did you
17 include that, the reference to Crowell &
18 Moring?
19     A.   For transparency purposes.
20     Q.   Did the funds from Crowell &
21 Moring that came from J&J and Imerys that
22 went to the white paper, The Critical
23 Review white paper, fund the work on this
24 new published study?

Page 583

1      A.   No.
2      Q.   Where did the funds come
3  from that reimbursed you for your time
4  for this new critical review paper that
5  was published in 2008?
6      A.   That came from NCI grant
7  that was awarded to me.
8      Q.   Did you disclose that
9  funding source in the 2008 paper?
10     A.   Yes, I did.
11     Q.   And did you consider the
12 disclosure at the time to be true,
13 accurate and proper in all respects?
14     A.   Yes.
15     Q.   Is that still the case?
16     A.   Yes.
17     Q.   Now, given that, as you've
18 told us, The Critical Review paper was
19 essentially a new work.  If you had been
20 made aware of the original funding for
21 the white paper for Crowell & Moring,
22 would you still have kept the disclosure
23 essentially the same as it is now?
24     A.   Yes.

Page 584

1          MR. TISI:  Objection.
2  BY MR. HEGARTY:
3      Q.   Dr. Muscat, from your
4  standpoint would it be fair for anyone to
5  claim that J&J is somehow at fault for
6  you not including the reference to the
7  company in that disclosure?
8          MR. TISI:  Objection.
9          THE WITNESS:  I'm sorry.
10 What was that?
11 BY MR. HEGARTY:
12     Q.   From your standpoint, would
13 it be fair for anyone to claim that J&J
14 is somehow at fault for you not including
15 the reference --
16     A.   No.
17     Q.   -- to the company in your
18 disclosure?
19     A.   No.
20     Q.   Have you seen anything --
21         MR. TISI:  Objection.
22 BY MR. HEGARTY:
23     Q.   -- that shows that J&J was
24 the reason that you were not made aware

Page 585

1  of the funding for the white paper in the
2  first place?
3          MR. TISI:  Objection.
4          THE WITNESS:  No.
5  BY MR. HEGARTY:
6      Q.   Have you seen anything
7  showing that J&J even knew you were
8  publishing the new critical review paper?
9      A.   No.
10     Q.   Or that J&J knew that you
11 were including in the disclosure Crowell
12 & Moring and the other grant that you
13 included?
14         MR. TISI:  Objection.
15         THE WITNESS:  That's
16 correct.
17 BY MR. HEGARTY:
18     Q.   Did J&J have any involvement
19 whatsoever in the disclosure that you
20 made for the new critical review paper?
21     A.   No.
22     Q.   So would it be proper to
23 argue that the new critical review
24 article was written by you for J&J to

147 (Pages 582 to 585)

Joshua E. Muscat, Ph.D.

Page 586

1  somehow influence scientists or
2  regulators to find talc safe?
3       MR. TISI: Objection.
4       THE WITNESS: No.
5  BY MR. HEGARTY:
6       Q.   Was that what you were doing
7  by this article?
8       MR. TISI: Objection.
9       THE WITNESS: No.
10 BY MR. HEGARTY:
11      Q.   Are you aware of anyone in
12 the scientific community identifying any
13 inaccuracies in the data in the article
14 or the conclusions?
15      A.   No.
16      Q.   Have there been any other
17 studies reporting similar conclusions
18 that the data shows that talcum powder
19 use does not cause ovarian cancer?
20      MR. TISI: Objection.
21      Beyond the scope.
22      THE WITNESS: I'm sorry, can
23 you repeat that?
24 BY MR. HEGARTY:

Page 587

1       Q.   Sure. Have there been other
2  studies reporting similar conclusions
3  that the data shows that talcum powder
4  use does not cause ovarian cancer?
5       A.   Yes.
6       MR. TISI: Objection to
7       form.
8       MR. HEGARTY: What exhibit
9       number are we on?  36?
10      (Document marked for
11      identification as Exhibit
12      Muscat-36.)
13 BY MR. HEGARTY:
14      Q.   Very quickly, Doctor, I'm
15 going to mark as Exhibit 36 a copy of a
16 2008 publication, first author Langseth,
17 called "Perineal Use of Talc and Risk of
18 Ovarian Cancer."
19      Are you familiar with this
20 article?
21      A.   Yes.
22      Q.   Was this published the same
23 year as your 2008 review paper?
24      A.   Yes.

Page 588

1       Q.   Were three of the authors on
2  the working group at IARC that you --
3  where you attended as an observer?
4       A.   That's correct.
5       Q.   And that's Jack Siemietycki,
6  Sue Hankinson, and Elizabeth Weiderpass.
7       So whoever wrote this is
8  essentially the IARC working group,
9  correct?
10      MR. TISI: Objection.
11      THE WITNESS: That's
12      correct.
13 BY MR. HEGARTY:
14      Q.   You were asked questions
15 over the course of the day about
16 dose-response. If you turn second page
17 of this study, left-hand column,
18 bottom -- end of the second paragraph.
19 You see where the line begins, "The main
20 epidemiologic evidence"?
21      A.   Oh, okay. Yes. Thank you.
22 Yes.
23      Q.   Would you read that for me?
24      A.   Okay. "The main

Page 589

1  epidemiologic evidence against the
2  association is the absence of clear
3  exposure-response associations in most
4  studies, as well as the absence of
5  overall excess risk in the cohort study."
6       Q.   And these are the IARC
7  working group authors who are saying
8  this, that they're -- that the main
9  epidemiological evidence against the
10 association is the absence of a clear
11 exposure response, and that means the
12 absence of dose-response, correct?
13      MR. TISI: Objection.
14      THE WITNESS: That's
15      correct.
16 BY MR. HEGARTY:
17      Q.   And if you look over -- and
18 backing up. Is that essentially the same
19 thing that you -- the conclusions that
20 you came to in your 2008 paper?
21      A.   That's correct.
22      Q.   Still stay with that paper.
23      A.   Sorry.
24      Q.   Look over the right-hand

Joshua E. Muscat, Ph.D.

Page 590

1    column under "Proposal to Research
2    community."
3        A.   Yes.
4        Q.   Would you read for me the
5    first sentence under that section?
6        A.   Okay.  Okay.
7            "The current body of
8    experimental and epidemiological evidence
9    is insufficient to establish a causal
10   association between" -- I'm sorry.
11   Excuse me -- "between perineal use of
12   talc and ovarian cancer risk."
13       Q.   And is that essentially the
14   same conclusion that you came to in your
15   2008 critical review paper?
16       A.   Yes, it is.
17       Q.   Again, are these the IARC
18   working group members who came to the
19   same conclusion?
20       A.   That's correct.
21       Q.   Okay.  You can put that
22   aside.  You were asked a little bit about
23   making comments to papers, to the extent
24   that anybody made comments to you, did

Page 591

1    such comments change the substance of the
2    data that you used to report on or come
3    to the conclusions about --
4        A.   No.
5            MR. TISI:  Objection.
6    BY MR. HEGARTY:
7        Q.   Would you ever allow a third
8    party to change the data, results, or
9    conclusions from one of your studies?
10           MR. TISI:  Objection.
11           THE WITNESS:  No.
12   BY MR. HEGARTY:
13       Q.   Did that happen here, what
14   we talked about here today, or ever in
15   your career?
16       A.   No, it did not.
17           MR. TISI:  Objection.
18           THE WITNESS:  Never.
19   BY MR. HEGARTY:
20       Q.   You were also asked about
21   your disclosure to IARC.  Have you seen
22   any documentation showing that J&J was in
23   any way asked -- that J&J in any way
24   asked that it not be identified in your

Page 592

1    disclosure?
2            MR. TISI:  Objection.
3            THE WITNESS:  No.
4    BY MR. HEGARTY:
5        Q.   Or knew what you were
6    disclosing in your IARC disclosure?
7        A.   No.
8        Q.   If you had been made aware
9    of any involvement in J&J, would it have
10   been made any difference in your work
11   that you did as an observer at IARC?
12           MR. TISI:  Objection.
13           THE WITNESS:  No.
14   BY MR. HEGARTY:
15       Q.   In other words, would you
16   still approach being an observer as an
17   independent scientist where your
18   contribution would be based solely on the
19   data?
20       A.   That's correct.
21           MR. TISI:  Objection.
22   BY MR. HEGARTY:
23       Q.   You were asked a number of
24   questions about the work that you did to

Page 593

1    prepare a paper that was submitted to FDA
2    in response to the Citizen's Petition.
3    Do you recall --
4        A.   Yes.
5        Q.   Do you recall a number of
6    questions on that subject area?
7        A.   Yes.
8        Q.   And again, what was the
9    extent of your involvement in that
10   submission?  Would you tell us again?
11       A.   The extent of my
12   contribution to that paper.
13       Q.   Well, let me skip over that
14   because of time.  Let me jump to
15   something else.
16       A.   Okay.
17       Q.   You were asked about that
18   paper -- that paper responding to the
19   Citizen's Petition.  You were asked about
20   your 2011 paper and other papers
21   referring to the 2003 Huncharek
22   meta-analysis.
23           Do you recall those
24   questions?

Joshua E. Muscat, Ph.D.

Page 594

1    A.   Yes.
2    Q.   First of all, do you recall
3  that in the -- the paper that was
4  submitted by you and Dr. Huncharek to FDA
5  included some 23 different pieces of
6  scientific literature?
7        A.   Was that the number of
8  references.
9    Q.   Yes.
10   A.   Yes.  Okay.
11   Q.   And also in Huncharek 2003
12 paper there were some 15 or 20-odd
13 references in that paper as well?
14       MR. TISI:  Objection.
15       THE WITNESS:  Yes.
16 BY MR. HEGARTY:
17   Q.   And all those references
18 were in the scientific and medical
19 literature available for anyone to go
20 online and pull the papers down
21 themselves?
22       MR. TISI:  Objection.
23       THE WITNESS:  Yes.
24 BY MR. HEGARTY:

Page 595

1    Q.   You were also asked about,
2  whether anyone commented on the substance
3  of the submission to FDA.  Did any
4  comments, to your knowledge, change any
5  of the substance of the paper?
6    A.   Not that I'm aware of.
7    Q.   Change the results or
8  conclusions?
9    A.   Not that I'm aware of.
10   Q.   Again, would you ever allow
11 a third party to change the data,
12 results, or conclusions in a paper like
13 that?
14   A.   No.
15   Q.   And you have reviewed the
16 submission to FDA, correct?
17   A.   Yes.
18   Q.   Is the data accurately set
19 out?
20       MR. TISI:  Objection.
21       THE WITNESS:  I think so.
22 BY MR. HEGARTY:
23   Q.   Was it an independent review
24 of the relevant data?

Page 596

1    A.   Yes.
2    Q.   And were the results and
3  conclusions proper?
4    A.   Yes.  I believe so.
5    Q.   And, Dr. Muscat, you have
6  reviewed the science, the medical and
7  scientific literature on talc and ovarian
8  cancer; is that correct?
9    A.   Yes.
10   Q.   And you would consider
11 yourself an expert in the area of talcum
12 powder use and ovarian cancer, correct?
13       MR. TISI:  Objection.
14       THE WITNESS:  Yes.
15       MR. TISI:  Objection.
16 Outside the scope.
17 BY MR. HEGARTY:
18   Q.   Do you agree that the
19 science shows that Johnson & Johnson
20 talcum powder products do not cause
21 ovarian cancer?
22       MR. TISI:  Objection.
23       THE WITNESS:  Yes.
24 BY MR. HEGARTY:

Page 597

1    Q.   Is the best evidence for
2  this the series of large prospective
3  cohort studies of talcum powder users?
4        MR. TISI:  Objection.
5        THE WITNESS:  So yes.
6        MR. TISI:  Outside the
7  scope.
8  BY MR. HEGARTY:
9    Q.   And do these studies taken
10 together show that the use of talcum
11 powder products do not cause ovarian
12 cancer?
13       MR. TISI:  Objection.
14 Outside the scope.
15       THE WITNESS:  That's
16 correct.
17 BY MR. HEGARTY:
18   Q.   And do these studies
19 evaluate talcum powder and whatever else
20 is in the powder, including asbestos as
21 alleged by the plaintiffs in this case?
22   A.   That's correct.
23   Q.   And so even if, as
24 plaintiffs alleged, talcum powder

150  (Pages 594 to 597)

Joshua E. Muscat, Ph.D.

Page 598

1    products that were studied that were used
2    had asbestos or anything else in it, do
3    those studies still show no causal link
4    between use of talcum powder products and
5    ovarian cancer?
6        A.   That's correct.
7        Q.   Dr. Muscat, is it your view
8    that cosmetic talc is safe to use?
9            MR. TISI:  Objection.
10           THE WITNESS:  Yes.
11   BY MR. HEGARTY:
12       Q.   And are talcum powder
13   products a carcinogen?
14           MR. TISI:  Objection.
15           THE WITNESS:  No.
16   BY MR. HEGARTY:
17       Q.   Just very briefly, you were
18   asked about a 2000 proposal that
19   Dr. Huncharek made to J&J.  Do you recall
20   that?  And that had your name on it?
21       A.   Yes.
22       Q.   It was represented to you
23   that that proposal was -- actually became
24   the 2003 paper.  Have you been shown that

Page 599

1    that proposal was in any way linked to
2    the 2003 paper?
3        A.   No.
4            MR. TISI:  Objection.
5    BY MR. HEGARTY:
6        Q.   Do you have Exhibit
7    Number 11?  Would you look at Exhibit
8    Number 11, Dr. Muscat?
9        A.   I'm sorry.
10       Q.   Counsel for plaintiff
11   represented to you --
12           MR. TISI:  What was the
13   number?
14           THE WITNESS:  It's Johnson &
15   Johnson consulting agreement.
16           MR. TISI:  I know what it
17   is.  Thank you.
18   BY MR. HEGARTY:
19       Q.   That was represented to you
20   by counsel for plaintiff to be a
21   consulting agreement between American
22   Health Foundation and J&J.  Do you recall
23   that representation being made?
24       A.   Yes, I do.

Page 600

1        Q.   If you look at the document
2    that was actually attached to that
3    document.  Isn't that in fact a
4    confidentiality agreement, and that
5    plaintiffs' counsels statement that it
6    was a consulting agreement is a
7    misrepresentation?
8            MR. TISI:  Objection.
9            THE WITNESS:  It does say
10           underlined "confidentiality
11           agreement."
12   BY MR. HEGARTY:
13       Q.   So the actual agreement was
14   not a consulting agreement.  It was a
15   confidentiality agreement; isn't that
16   right?
17       A.   It's a confidentiality
18   agreement.
19       Q.   You were asked earlier about
20   folks providing comments to your papers,
21   that then might be considered in
22   publishing those papers.  Do you recall
23   those questions?
24       A.   Yes.

Page 601

1        Q.   When you send out papers to
2    be -- for possible publication, do they
3    go to peer reviewers, is that correct?
4        A.   That is correct.
5        Q.   And do peer reviewers
6    provide comments?
7        A.   Yes, they do.
8        Q.   And sometimes are those
9    comments considered by the authors?
10       A.   Yes, they are.
11       Q.   And are peer reviewers ever
12   included as authors in any paper?
13       A.   No.
14       Q.   You were also asked about
15   the reason for doing meta-analysis or
16   perhaps the strength of the
17   meta-analysis.  Do you recall those
18   questions?
19       A.   Yes.
20       Q.   Does a meta-analysis in any
21   way do away with bias?
22       A.   No.
23       Q.   Does it in any way do away
24   with confounding?

151  (Pages 598 to 601)

Joshua E. Muscat, Ph.D.

Page 602

1      A.   No.
2      Q.   So it can be the classic
3  case of garbage in, garbage out?
4      A.   That's correct.
5          MR. TISI:  Objection.
6  BY MR. HEGARTY:
7      Q.   In fact, the Langseth paper
8  that we looked at was a meta-analysis,
9  correct?
10     A.   That's correct.
11     Q.   And Langseth authors
12  concluded in that meta-analysis, that
13  there was no -- to be accurate, that,
14  "The current body of experimental and
15  epidemiological evidence is insufficient
16  to establish a causal association between
17  perineal use of talc and ovarian cancer
18  risk."
19         And that's from their
20  meta-analysis, correct?
21         MR. TISI:  Objection.
22         THE WITNESS:  That's
23  correct.
24  BY MR. HEGARTY:

Page 603

1      Q.   So it's not just
2  Dr. Huncharek saying that there's no
3  causal association between talc use and
4  ovarian cancer from a meta-analysis.
5  It's members of the IARC working group,
6  correct?
7      A.   That's correct.
8      Q.   You were also asked about
9  Exhibit Number 26.  Would you pull
10  Exhibit Number 26 out, please.
11         Okay.  Exhibit 26 is
12  represented to be a proposal submitted
13  for J&J.  Do you see that?
14     A.   Yes.
15     Q.   Does that proposal
16  submitted -- who was that proposal
17  actually submitted to?
18     A.   Personal Care Products
19  Council.
20     Q.   So was that a
21  misrepresentation made that that was a
22  proposal submitted to J&J.
23         MR. TISI:  Objection.
24         THE WITNESS:  That's

Page 604

1  correct.
2          MR. HEGARTY:  Off the record
3  real quick to see if I'm done.
4          THE VIDEOGRAPHER:  Going off
5  the record.  7:09 p.m.
6          (Brief pause.)
7          THE VIDEOGRAPHER:  We are
8  back on record.  7:10 p.m.
9  BY MR. HEGARTY:
10     Q.   Dr. Muscat, just a few more
11  questions.  Do you recall being shown a
12  PowerPoint slide that indicated that the
13  pooled analysis of studies showed a
14  33 percent increased risk of ovarian
15  cancer.  Do you recall that slide?
16     A.   Yes.
17     Q.   In fact, do the cohort
18  studies that were done show no increased
19  risk between talc use and ovarian cancer?
20     A.   That's correct.
21     Q.   And do the hospital studies
22  that were done show no increased risk
23  between talc use and ovarian cancer?
24     A.   That's correct.

Page 605

1      Q.   And do approximately half of
2  the population based case-control studies
3  show no increased risk between talc use
4  and ovarian cancer?
5      A.   That's correct.
6      Q.   So is it improper to say
7  that the pooled analysis of studies show
8  a 33 percent increase in risk between
9  talc use and ovarian cancer?
10     A.   Yes.
11         MR. TISI:  I'm going to
12  object that this is way outside
13  the scope on issues related to
14  expert testimony.  It goes beyond
15  the time frame that I talked
16  about.
17  BY MR. HEGARTY:
18     Q.   You were asked about Dr. --
19         MR. TISI:  I'm not actually
20  finished, Counsel.
21         MR. HEGARTY:  Oh, I'm sorry.
22  Go ahead.
23         MR. TISI:  And the second
24  part of it is you are required, if

Joshua E. Muscat, Ph.D.

Page 606

1    you're going to do a direct
2    examination, to provide an expert
3    disclosure, and under the pretrial
4    order entered, you give us notice
5    if you do a direct examination.
6        So I object on those
7    grounds.
8        MR. HEGARTY: We did serve a
9    cross-notice prior to the
10   deposition.
11       MR. TISI: Cross-notice does
12   not -- you have an obligation to
13   provide something in connection
14   with the -- the order provides a
15   time frame that you're supposed to
16   let us know that. You served that
17   last night. And cross-notice is
18   not an intent to take a
19   preservation deposition, nor is it
20   a skirting around the rules of
21   Rule 26, which requires an expert
22   disclosure if he's going to do
23   that.
24       I specifically limited my

Page 607

1    time frame until 2011 because that
2    was his involvement with the
3    published peer-reviewed literature
4    as well as providing reports to
5    the FDA and others.
6        MR. HEGARTY: Just for the
7    record, we did not receive the
8    notice until Friday, which I think
9    also is required to be served much
10   earlier than last Friday.
11       MR. TISI: For the record,
12   this deposition has been set up
13   for at least a month. And so you
14   knew about this deposition long
15   ahead.
16       If you intended to provide
17   us with a direct examination and
18   particularly an expert direct
19   examination, you had an
20   obligation, A, to disclose it;
21   and, B, provide a Rule 26
22   statement, neither which you have
23   done.
24       MR. HEGARTY: We don't agree

Page 608

1    with that analysis and dispute
2    that this is an expert deposition
3    examination.
4        MR. TISI: You asked --
5        MR. HEGARTY: This is
6    completely consistent with the
7    scope of the deposition --
8        MR. TISI: You asked some
9    very broad questions about
10   causation which go beyond the 2011
11   time frame.
12       MR. HEGARTY: I think they
13   are consistent with what you
14   asked.
15   BY MR. HEGARTY:
16   Q.   Doctor, just a few more
17   questions. You were asked about some
18   basic points against causation, lack of
19   dose-response, lack of biologic
20   plausibility, lack of consistency between
21   the studies, and uncontrolled
22   confounding.
23       Do you recall those
24   questions?

Page 609

1    A.   Yes.
2    Q.   Are you also aware that the
3    association, to the extent there has been
4    reported one, is weak?
5    A.   That's correct.
6        MR. TISI: Objection.
7    BY MR. HEGARTY:
8    Q.   And has the cell data
9    reported to be negative showing no causal
10   link between talc use and ovarian cancer?
11       MR. TISI: Objection basis.
12       THE WITNESS: Yes.
13   BY MR. HEGARTY:
14   Q.   Have the animal studies been
15   shown to show no link between talc use
16   and ovarian cancer?
17   A.   That's correct.
18       MR. TISI: Objection.
19   Beyond the scope.
20   BY MR. HEGARTY:
21   Q.   You were also asked about
22   the 2003 Huncharek study and in
23   particular some of the other articles
24   that he cited. Would you need to have a

153 (Pages 606 to 609)

Joshua E. Muscat, Ph.D.

Page 610

1 chance to review all of the articles in
2 detail before you could properly compare
3 what he was doing or citing in that study
4 versus what he was reporting in his
5 paper?
6      A.   Yes, I think that would be
7 fair.
8      Q.   Did you have a chance to do
9 that tonight?
10      A.   No.
11      Q.   And would you also want to
12 do the same thing with regard to the
13 diaphragm study, have a chance to review
14 all the study -- articles and determine
15 whether those articles, what data was
16 pulled from those and how it was analyzed
17 and how it was put in the paper?
18      A.   Yes.
19      Q.   Have you had a chance to do
20 that tonight?
21      A.   No.
22      Q.   With regard to both those
23 papers, who was the primary author?
24      A.   Dr. Huncharek.

Page 611

1      Q.   And you were also asked at
2 the end about biologic plausibility. Do
3 you recall those questions?
4      A.   Yes, I do.
5      Q.   And talc, with whatever is
6 in it, has been -- that has been studied
7 in these -- in the various studies that
8 we talked about here today. Have those
9 studies showed any biologic plausibility
10 between talc use and ovarian cancer?
11           MR. TISI:  Objection.
12           THE WITNESS:  No.
13           MR. TISI:  Objection.
14 BY MR. HEGARTY:
15      Q.   Any reports of inflammation
16 in the ovaries following talc use?
17           MR. TISI:  Objection.
18           THE WITNESS:  Not that I'm
19 aware of.
20 BY MR. HEGARTY:
21      Q.   Finding a foreign body
22 response?
23           MR. TISI:  Objection.
24           THE WITNESS:  Not that I'm

Page 612

1 aware of.
2 BY MR. HEGARTY:
3      Q.   Any response or change to a
4 protective effect from NSAIDs or aspirin?
5      A.   No.
6      Q.   Any findings of cancer of
7 the cervix, vagina, or uterus associated
8 with those products?
9      A.   No.
10      Q.   Again, Dr. Muscat, from your
11 review of the literature, is -- are
12 talcum powder products safe to use?
13           MR. TISI:  Objection.
14           THE WITNESS:  Yes.
15           MR. TISI:  Expert testimony.
16           MR. HEGARTY:  That's all the
17 questions I have.  Thank you.
18           THE VIDEOGRAPHER:  Going off
19 the record.  7:16 p.m.
20           (Brief pause.)
21           THE VIDEOGRAPHER:  Back on
22 record 7:19 p.m.
23                - - -
24           EXAMINATION

Page 613

1                - - -
2 BY MR. TISI:
3      Q.   So, Doctor -- so, Doctor, I
4 am going to ask you some follow-up
5 questions to what J&J's counsel,
6 Mr. Hegarty -- and again, you've met
7 Mr. Hegarty before?
8      A.   Yes.
9      Q.   You've known him for years,
10 right?
11      A.   That's correct.
12      Q.   You probably met with him
13 before your deposition today, correct?
14      A.   That's correct.
15      Q.   He's paying your bills,
16 correct?
17           MR. HEGARTY:  Objection to
18 form.
19           MR. HUDSON:  Objection to
20 form.
21 BY MR. TISI:
22      Q.   He's paying for your time?
23      A.   I am compensated for my
24 time.

154 (Pages 610 to 613)

Joshua E. Muscat, Ph.D.

Page 614

1    Q.   By J&J?
2    A.   That's correct.
3    Q.   All right.  So did you spend
4  any time for him prepping for your
5  deposition today?
6    A.   Excuse me?
7    Q.   Did you spend any time
8  preparing for your deposition today with
9  Mr. Hegarty?
10    A.   Yes.
11    Q.   Okay.  How much time?
12    A.   There were I believe nine
13  sessions in Hershey.
14    Q.   Nine sessions in Hershey
15  before you showed up here today.  How
16  many hours are that?
17        MR. SILVER:  Objection.
18  Outside the scope.
19        MR. HEGARTY:  Objection.
20        THE WITNESS:  For each
21  session?
22  BY MR. TISI:
23    Q.   Yeah.
24    A.   It varied.  So anywhere from

Page 615

1  three to maybe six hours.
2    Q.   Three to six hours nine
3  times.  In what time frame?
4    A.   Over five, six weeks.
5    Q.   Five, six weeks.  Nine
6  times.  Five, six weeks.
7        And were you missing
8  classes, get your substitute to take
9  those classes as well?
10        MR. SILVER:  Objection.
11  Outside the scope.
12        MR. HEGARTY:  Same
13  objection.
14        THE WITNESS:  I was missing
15  time from work.
16  BY MR. TISI:
17    Q.   You was -- you were or were
18  not?
19    A.   I was.
20        MR. HEGARTY:  Objection to
21  form.
22  BY MR. TISI:
23    Q.   So -- and did you go over
24  documents with him?

Page 616

1    A.   Yes, I did.
2    Q.   Okay.  Was he representing
3  you at the time?
4        MR. HEGARTY:  Objection to
5  form.
6        THE WITNESS:  Mr. Hudson is
7  my --
8        MR. HUDSON:  I represent
9  Dr. Muscat.
10  BY MR. TISI:
11    Q.   Okay.  So are you going to
12  tell us what documents you reviewed with
13  Mr. Hegarty?
14        MR. HEGARTY:  I will
15  instruct Dr. Muscat not to respond
16  to the extent you are asking him
17  about -- want him to tell you what
18  documents we looked at, on the
19  grounds that they're protected by
20  the work product and the
21  consulting expert privilege.  If
22  you want to show him a document
23  and ask him whether he saw it and
24  when he saw it, you're certainly

Page 617

1  allowed to do that.
2        MR. HUDSON:  I join in the
3  instruction on the basis of
4  attorney/client privilege.
5        MR. TISI:  I'm not asking
6  for communications with you.
7  BY MR. TISI:
8    Q.   I'm asking for
9  communications with counsel for Johnson &
10  Johnson, who is not representing you,
11  correct, although they're paying your
12  bills and paying for Mr. Hudson?
13    A.   That's correct.
14        MR. HUDSON:  Objection to
15  form.
16  BY MR. TISI:
17    Q.   Nine hours, three to
18  six hours a day that's 27 hours.  A lot
19  of time over the past five or six weeks,
20  right?
21        MR. SILVER:  Objection.
22  Move to strike.
23        MR. HEGARTY:  Objection to
24  form.

155 (Pages 614 to 617)

Joshua E. Muscat, Ph.D.

Page 618

1      THE WITNESS: It has been a
2   lot of time.
3  BY MR. TISI:
4      Q.   It has been a lot of time.
5  All right.  So let me ask you this.  You
6  were asked some questions by Mr. Hegarty
7  about communications with Johnson &
8  Johnson about the white papers, correct?
9      A.   That's correct.
10      Q.   Remember he said we didn't
11  speak to Johnson & Johnson, we didn't
12  speak to any -- did you speak to any of
13  them, do you know what they did to your
14  papers, and all that, correct?
15      MR. HEGARTY:  Objection to
16   form.
17      THE WITNESS:  That is
18   correct.
19  BY MR. TISI:
20      Q.   Well, that's because the
21  confidentiality agreement required you to
22  be speaking to the lawyers, right?
23      MR. HEGARTY:  Objection to
24   form.

Page 619

1  BY MR. TISI:
2      Q.   Confidentiality agreement
3  number 31 has information you were to be
4  submitting to the lawyers, the white
5  papers, privileged and confidential,
6  prepared at the request of legal counsel,
7  right?
8      MR. HEGARTY:  Objection to
9   form.
10      THE WITNESS:  I'm sorry.
11   Can you repeat that?
12  BY MR. TISI:
13      Q.   Yeah.  Go to page -- go to
14  second page.  It has a confidentiality
15  agreement.  And you knew that all
16  communications with Johnson & Johnson and
17  Imerys were supposed to be through the
18  lawyers, correct?
19      MR. HEGARTY:  Objection to
20   form.
21  BY MR. TISI:
22      Q.   At that time.
23      A.   At that time.
24      Q.   And so all of your -- in

Page 620

1  fact, the primary point of communication
2  was Dr. Huncharek, right?
3      MR. HEGARTY:  Objection to
4   form.
5  BY MR. TISI:
6      Q.   For you?
7      A.   That's correct.
8      Q.   So you communicated to
9  Dr. Huncharek, but to the extent to which
10  you knew that you were supposed to have
11  communications with Dr. Huncharek to the
12  lawyers, who would then communicate back
13  and forth with their clients, whether it
14  be Mr. -- Imerys, if they were the
15  official client or the other contractor
16  which was J&J, correct?
17      MR. HUDSON:  Objection to
18   form.
19      MR. SILVER:  Objection to
20   form.
21      THE WITNESS:  Dr. Huncharek
22   did the communications with
23   Crowell & Moring.
24  BY MR. TISI:

Page 621

1      Q.   Right.  So you know the
2  issues of, you know, filtering things
3  through law firms.  That's exactly what
4  you were doing, correct?
5      MR. SILVER:  Objection to
6   form.
7      MR. HUDSON:  Objection to
8   form.
9  BY MR. TISI:
10      Q.   You were filtering the
11  information back and forth to these
12  defendants going through the law firm; is
13  that correct?
14      MR. SILVER:  Objection to
15   form.
16      THE WITNESS:  No.
17  BY MR. TISI:
18      Q.   Okay.  If you didn't have
19  any direct contacts with Mr. Hegarty's
20  client, you had direct contacts with the
21  lawyers representing Mr. Hegarty's
22  clients?
23      MR. HUDSON:  Objection to
24   form.

156 (Pages 618 to 621)

Joshua E. Muscat, Ph.D.

Page 622

```
1          MR. SILVER:  Objection to
2    form.
3    BY MR. TISI:
4       Q.   Correct?
5       A.   No.
6       Q.   No, that wasn't true?  So
7    most of the communications, I thought you
8    just said went through Crowell & Moring,
9    according to the contract?
10         MR. HEGARTY:  Objection to
11   form.
12         THE WITNESS:  I'm not sure
13   what communications you are
14   referring to.
15   BY MR. TISI:
16      Q.   Well, when the papers were
17   sent around, when the draft white papers
18   were sent around, they were sent to
19   Crowell & Moring, were they not?
20         MR. HEGARTY:  Objection to
21   form.
22         THE WITNESS:  I assume they
23   were.
24   BY MR. TISI:
```

Page 623

```
1       Q.   Right.  And were they sent
2    directly to J&J?
3       A.   I have no knowledge of that.
4       Q.   Okay.  You saw a document
5    where there was an e-mail from Ridge Hall
6    with a stack of documents.  Do you
7    remember with red lines and the papers
8    that you had drafted, right?
9          MR. HEGARTY:  Objection to
10   form.
11         THE WITNESS:  I'm sorry.
12   Which --
13   BY MR. TISI:
14      Q.   There was a thick document
15   in there.  I think it was Exhibit
16   Number -- Number 38.
17         Go to Exhibit 20, please.
18   It's this one here.  It's on the screen.
19      A.   Oh, sorry.
20      Q.   Okay.  This was an e-mail
21   where you saw that Dr. -- that Crowell &
22   Moring was sending your work to J&J and
23   to Imerys, correct?
24         MR. HEGARTY:  Objection to
```

Page 624

```
1    form.
2          THE WITNESS:  I see that.
3    BY MR. TISI:
4       Q.   Entitled "task deliverables
5    from Dr. Huncharek" -- excuse me --
6    "Dr. Huncharek and Muscat," correct?
7       A.   I see that.  Yes.
8       Q.   So the information was sent
9    to the law firm and then forwarded to
10   Imerys and J&J, correct?
11         MR. HEGARTY:  Objection to
12   form.
13   BY MR. TISI:
14      Q.   Or in this case Luzenac?
15      A.   Yes.
16      Q.   All right.  That's the way
17   the communication went, right?  Send the
18   papers to the law firm, the law firm then
19   sends it to the -- to the companies, and
20   anything went back, went back to the law
21   firm, went to Mr. -- to Dr. Huncharek.
22   And you don't know where it came from,
23   right?
24         MR. HEGARTY:  Objection to
```

Page 625

```
1    form.
2          MR. SILVER:  Objection to
3    form.
4    BY MR. TISI:
5       Q.   And it's on the privilege
6    log, and we can't get a copy of it.
7          MR. HUDSON:  Objection to
8    form.
9          MR. HEGARTY:  Objection to
10   form.
11         THE WITNESS:  I'm not sure
12   what the question is.
13   BY MR. TISI:
14      Q.   Well, the question is,
15   Doctor, the whole -- this whole scheme
16   that was set up of going back and forth
17   between the law firm was designed to not
18   have you have direct contact with the
19   lawyers and to preserve the
20   confidentiality of what you were doing,
21   correct?
22         MR. SILVER:  Objection.
23   Move to strike.  Beyond the scope.
24   Asked and answered.
```

157 (Pages 622 to 625)

Joshua E. Muscat, Ph.D.

Page 626

1          MR. HEGARTY:  Objection to
2     form.
3          MR. HUDSON:  Objection to
4     form.
5  BY MR. TISI:
6     Q.   It was a scheme.  You had
7  a -- you had a --
8          MR. TISI:  Turn on the --
9     can we turn this on, please.
10  BY MR. TISI:
11     Q.   You had the law firm in the
12  middle, Crowell & Moring.  You had
13  Huncharek, Muscat, Imerys, and J&J.
14          Now, you made it pretty
15  clear that you weren't communicating
16  directly with J&J and Imerys about your
17  white papers, right?
18          MR. HEGARTY:  Objection to
19     form.
20          THE WITNESS:  That's
21     correct.
22  BY MR. TISI:
23     Q.   Okay.  Most of the
24  information you had went to Dr. Huncharek

Page 627

1  correct?
2     A.   So I'm not sure what you're
3  referring to.  There was no scheming in
4  anything.  I haven't schemed in anything.
5  So I really object to whatever it is
6  you're implying.  I have not schemed in
7  anything.
8     Q.   Well, the whole purpose of
9  this -- of this --
10     A.   I really object to this.
11  But go ahead.
12     Q.   You can object all you want,
13  sir.
14     A.   Yeah, fine.
15     Q.   Okay.  So this -- you sent
16  your information --
17     A.   I don't know what you're
18  referring to, my information.
19     Q.   The white papers.  The white
20  papers that you and Dr. -- first of all,
21  who wrote the white papers, you or
22  Dr. Huncharek?
23     A.   Dr. Huncharek.
24     Q.   Okay.  They went to Crowell

Page 628

1  & Moring, correct?
2     A.   I assume so.
3     Q.   Okay.  They did not go
4  directly -- and the information, we saw
5  that there was -- there were privilege
6  logs where we don't get the
7  communications between you --
8          MR. HUDSON:  Objection to
9     form.
10  BY MR. TISI:
11     Q.   -- you and Crowell & Moring,
12  correct?
13     A.   I don't know what that
14  means.
15     Q.   Right.  Right.  So there are
16  documents that we didn't get because they
17  went to Crowell & Moring.  And you don't
18  know what Crowell & Moring was talking
19  about with Imerys and J&J, do you?
20          MR. HUDSON:  Objection to
21     form.
22          MR. SILVER:  Objection to
23     form.
24          THE WITNESS:  That's

Page 629

1     correct.
2  BY MR. TISI:
3     Q.   All right.  So now, let me
4  ask you this.  You're a tenured
5  professor, correct?
6     A.   That's correct, yes.
7     Q.   Is that correct?  Right.
8  You have an obligation to publish,
9  correct?  That's one of the requirements
10  to publish?
11     A.   Yes.
12     Q.   Did you -- you made -- and
13  you talked with Mr. Hegarty about all of
14  the articles that you published and book
15  chapters on different forms of cancer.
16  And you talked about your ovarian cancer
17  talc publications, correct?
18     A.   Yes.
19          (Document marked for
20     identification as Exhibit
21     Muscat-37.)
22  BY MR. TISI:
23     Q.   I'm going to mark as Exhibit
24  Number 37, and I'm going to give it to

158 (Pages 626 to 629)

Joshua E. Muscat, Ph.D.

Page 630

1    you.  And I'm going to ask you to show me
2    the ones that you made a large -- a lot
3    of points about I wasn't the primary
4    author here, I wasn't the primary author
5    there.
6            I want you to write next to
7    each one of them which ones Dr. Huncharek
8    was the primary author on and which one
9    you were.  And just write Hs next to --
10       A.   Okay.
11       Q.   -- Hs and Ms.
12       A.   Okay.  (Witness complies.)
13       Q.   Let me see it, please.  The
14   only one that you were the primary author
15   on is the letter to the editor in 2005
16   that we haven't talked about, about three
17   paragraphs, right?
18       A.   That's correct.
19       Q.   And the other one is 2008,
20   The Critical Review, you were the primary
21   author on that one.
22       A.   That's right.
23       Q.   Everything else was written
24   by Dr. Huncharek primarily?

Page 631

1        A.   For the red marked ones?
2        Q.   Yes.
3        A.   That's correct.
4        Q.   Okay.  Now, of the 2007
5    article on diaphragms, what percentage of
6    the work was actually done by
7    Dr. Huncharek as opposed to you?
8        A.   The majority of it.
9        Q.   When we say majority,
10   90 percent, 50 percent?
11       A.   I couldn't give you a
12   percentage.  I mean he was the primary
13   author.  He wrote -- he wrote the
14   article.
15       Q.   Okay.  Same thing with the
16   2009 article?
17       A.   That's correct.
18       Q.   The article, the white
19   paper?
20       A.   Yes.  The white paper,
21   right.
22       Q.   The 2011 article, the same
23   thing?
24       A.   Yes.

Page 632

1        Q.   Did you represent to Penn
2    State that these were your publications?
3            MR. HEGARTY:  Objection to
4        form.
5    BY MR. TISI:
6        Q.   Did you -- that you were --
7    that you were the primary authors on any
8    of these publications that you listed as
9    Dr. Huncharek's?
10       A.   Did I represent to Penn
11   State?
12       Q.   Mm-hmm, yes.  Did you tell
13   Penn State that Dr. Huncharek wrote the
14   majority of any of the papers that are
15   published?
16       A.   I haven't gotten into a
17   conversation with anyone at Penn State
18   about...
19       Q.   Okay.  All right.  Now, you
20   were asked a lot of questions about, as
21   you sit here today is talc safe, as
22   you -- you know, does the totality of the
23   evidence, animal studies, and all that.
24           I didn't ask you any of

Page 633

1    those questions, did I?  Did I ask you
2    about animal studies?
3            MR. HEGARTY:  Objection to
4        form.
5            THE WITNESS:  I don't recall
6        specifically.
7    BY MR. TISI:
8        Q.   Did I ask you your opinion
9    about, what you sit -- what you sit here
10   today, what your opinion is about talc
11   and ovarian cancer?  Did I ask you any of
12   those questions?
13       A.   You asked me about
14   causation.
15       Q.   I asked you about causation
16   as it relates to something that you wrote
17   to the FDA in 2011, correct?
18       A.   That's correct.
19       Q.   I asked you what you were
20   representing in the published literature
21   and what you were talking about to
22   doctors and the FDA, et cetera, correct?
23           MR. HEGARTY:  Objection to
24       form.

159 (Pages 630 to 633)

Joshua E. Muscat, Ph.D.

Page 634

1   BY MR. TISI:
2       Q.   I didn't ask you what your
3   opinion was as a litigation expert here
4   with Mr. Hegarty, did I?
5           MR. HEGARTY:  Objection to
6   form.
7           MR. SILVER:  Objection.
8   Misstates the testimony.
9           THE WITNESS:  I don't know
10  the differences.
11  BY MR. TISI:
12      Q.   Okay.
13      A.   Okay.
14      Q.   So, let me ask you this.
15  You were asked about the Langseth
16  article.  Can you pull that out, please,
17  sir?
18      A.   I'm sorry, which exhibit?
19      Q.   Exhibit 36.  Now,
20  Mr. Hegarty -- I'm going to point you to
21  some of the things that Mr. Hegarty
22  didn't tell -- ask you about the Langseth
23  article.  First of all, the Langseth
24  article is not an IARC paper, correct?

Page 635

1       A.   Well, I would say that it
2   does represent IARC.  There is an -- in
3   the acknowledgment section, it says, "The
4   work reported in this paper was initiated
5   while SH, JS and EW were part of an IARC
6   monograph working group."
7       Q.   Right.
8       A.   Right.
9       Q.   But this is not an official
10  IARC paper, is it?
11      A.   It's a -- it's an
12  independent paper.  That's correct.
13      Q.   Right.  And this is 2007,
14  correct?
15      A.   That's correct.
16      Q.   Have you been made aware
17  that Dr. Siemietycki has indicated from
18  2007 forward, that the association and
19  the evidence in favor of causation has
20  strengthened and that he believes that
21  talc is a likely cause of ovarian cancer?
22          MR. HEGARTY:  Objection to
23  form.
24          MR. HUDSON:  Objection to

Page 636

1       form.
2           THE WITNESS:  So I don't
3   recall coming across any
4   publications of his that says
5   that.
6   BY MR. TISI:
7       Q.   I actually didn't ask you
8   that.  I asked you, do you understand
9   that Dr. Siemietycki believes that
10  evidence since 2007 has added to the
11  strength of the evidence supporting a
12  causal inference?
13          MR. HUDSON:  Objection to
14  form.
15          MR. HEGARTY:  Objection to
16  form.
17          THE WITNESS:  Let me
18      clarify.  I haven't spoken with
19      him.  So I'm unaware of anything.
20  BY MR. TISI:
21      Q.   All right.  Now, in his
22  article in 2007, on Page 2, you were
23  asked the question.  And I'm going to put
24  it right down here.  You were asked about

Page 637

1   the sentence, "The evidence" -- let me
2   read the whole paragraph.
3           He writes, "To summarize,
4   the evidence in favor of association, a
5   very large number of studies have found
6   that women who use talc experienced
7   excess risk of ovarian cancer.  Some
8   results were statistically significant
9   and some were not."
10          So he's indicating, on
11  balance, there is epidemiologic favor,
12  favors causation, right?
13          MR. HUDSON:  Objection to
14  form.
15  BY MR. TISI:
16      Q.   Epidemiological evidence
17  favors association?
18          MR. HUDSON:  Same objection.
19  BY MR. TISI:
20      Q.   Let me rephrase the
21  question.  I apologize.  I'm trying to go
22  fast here.  Let me just read what he
23  says.
24      A.   Okay.

Joshua E. Muscat, Ph.D.

Page 638

1    Q.   "To summarize the evidence
2  in favor of an association, a very large
3  number of studies have found that women
4  who used talc experienced an excess" --
5  "an excess risk of ovarian cancer.  Some
6  results were statistically significant
7  and some were not."
8        Correct?
9    A.   I see that.
10    Q.   And he's indicating that the
11  very large number of studies are --
12  consistently show an excess risk of
13  ovarian cancer associated with talc,
14  correct?
15        MR. HUDSON:  Objection to
16    form.
17        MR. HEGARTY:  Objection to
18    form.
19        THE WITNESS:  So I think, so
20    each one of these studies there's
21    a lot of different calculations.
22    So I'd have to -- I'm not exactly
23    sure which --
24  BY MR. TISI:

Page 639

1    Q.   I'm just asking you what he
2  says?
3    A.   Yes, okay.
4    Q.   "There was some indication
5  in the cohort study of an increase in
6  serious tumors."
7        Correct?
8        MR. HEGARTY:  Objection.
9        THE WITNESS:  Yes, that's
10    correct.
11  BY MR. TISI:
12    Q.   And that's true, correct?
13        MR. HEGARTY:  Objection to
14    form.
15        THE WITNESS:  In the initial
16    report of the Nurses Health Study,
17    that is correct.
18  BY MR. TISI:
19    Q.   Now, in fact, counsel asked
20  you about cohort studies, and I just want
21  to be absolutely clear.  When you were
22  given the opportunity to actually make a
23  proposal to study talc and design the
24  best study you can think of to study that

Page 640

1  issue, you proposed a case-control study,
2  correct?
3    A.   That's correct.
4    Q.   And that was -- we marked
5  that as an exhibit.  And you proposed
6  that in the 1990s, correct?
7    A.   That's correct.
8    Q.   You didn't propose a cohort
9  study, correct?
10        MR. HEGARTY:  Objection.
11  BY MR. TISI:
12    Q.   Correct?
13    A.   That's correct.
14    Q.   In fact today, you -- up
15  until today you haven't gone to -- you
16  have worked with Mr. Hegarty for years,
17  have you gone to them and said, "Let's do
18  a cohort study.  I'll design it for you."
19        MR. HEGARTY:  Objection to
20    form.  And I'll instruct him not
21    to respond to the extent it would
22    reveal communications with him in
23    his capacity as an expert.
24  BY MR. TISI:

Page 641

1    Q.   Have you -- have you ever
2  gone to J&J and said to them, you know,
3  gee, J&J maybe you ought to do the study
4  that I proposed back in the 1990s?
5        MR. HEGARTY:  Objection to
6    form.
7        THE WITNESS:  No.
8  BY MR. TISI:
9    Q.   Did you ever go to them and
10  say, maybe we should do a different
11  study, maybe a cohort study?
12        MR. HEGARTY:  Objection to
13    form.
14        THE WITNESS:  No, I haven't
15    said that.
16  BY MR. TISI:
17    Q.   Okay.  Have you ever gone to
18  J&J and said, maybe you ought to do a
19  hospital study?
20        MR. HEGARTY:  Objection to
21    form.
22  BY MR. TISI:
23    Q.   A case-control hospital
24  study?

161 (Pages 638 to 641)

Joshua E. Muscat, Ph.D.

Page 642

1     A.   That was the first time back
2  in the 1990s, right.
3     Q.   Okay.  Now, the next
4  sentence that Mr. Hegarty didn't ask you.
5  It says, "On balance" -- the next
6  paragraph -- "the epidemiologic evidence
7  suggest the use of cosmetic talc in the
8  perineal area may be associated with an
9  ovarian cancer risk, the mechanism of
10 carcinogenicity may be related to
11 inflammation."
12        Correct?
13        MR. HEGARTY:  Objection to
14    form.
15        THE WITNESS:  That's what it
16    says, yes.
17 BY MR. TISI:
18    Q.   At this time -- well, let's
19 keep going.
20        The next page says, "What's
21 the study add?"  This is a summary of the
22 study.  Some studies have this, correct?
23    A.   That's correct.
24    Q.   Dr. Siemietycki says, "The

Page 643

1  epidemiological evidence suggests that
2  the use of cosmetic talc in the perineal
3  area may be associated with ovarian
4  cancer risk.  The IARC has classified the
5  use of talc as possibly related to" --
6  "carcinogenic to human beings."
7        Do you see that?
8        MR. HEGARTY:  Objection to
9     form.
10        THE WITNESS:  Yes.
11 BY MR. TISI:
12    Q.   It goes on to say, "The
13 mechanism of carcinogenicity may be
14 related to inflammation.  The paper
15 focuses on the high degree of consistency
16 in the studies accomplished so far and
17 what should focus" -- "should be the
18 focus in the future."
19        Correct?
20        MR. HEGARTY:  Objection to
21     form.
22        THE WITNESS:  That's what it
23    says, yes.
24 BY MR. TISI:

Page 644

1     Q.   And he focuses specifically
2  on the consistency of the studies,
3  something that you disputed?
4     A.   You have to say consistently
5  with regard to -- with regard to what?
6  So I'm not sure exactly.
7        I don't -- is he referring
8  to dose-response relationships?  I don't
9  think there's consistency in that.
10        So I can't speak for him.
11 But I -- I do acknowledge and see what he
12 says up there.
13        MR. TISI:  Can we go off the
14    record for a moment.
15        THE VIDEOGRAPHER:  Off the
16    record 7:39 p.m.
17        (Brief pause.)
18        THE VIDEOGRAPHER:  We're
19    back on record.  7:46 p.m.
20 BY MR. TISI:
21    Q.   Were you asked by
22 Mr. Hegarty some questions, overarching
23 questions about things like biologic
24 plausibility.  And I'm going to go

Page 645

1  through some of those questions.
2        You were asked whether or
3  not, as you -- whether or not studies as
4  of today showed biologic plausibility
5  between talc use and ovarian cancer.
6        Do you remember that
7  question?
8     A.   That's correct.
9     Q.   Have you -- first of all,
10 are you a toxicologist?
11    A.   No.
12    Q.   Are you a pharmacologist?
13    A.   No.
14    Q.   Are you a geneticist?
15    A.   No.
16    Q.   An oncologist?
17    A.   That's -- no.
18    Q.   Have you done any work
19 yourself on issues related to things like
20 inflammation in the ovaries?
21    A.   No, I have not.
22    Q.   Those are the kinds of
23 things that are done by people who are
24 not PhDs in public health, right?

162  (Pages 642 to 645)

Joshua E. Muscat, Ph.D.

Page 646

1    MR. SILVER: Objection.
2  BY MR. TISI:
3    Q.   Those would be done by
4  doctors typically?
5    MR. HEGARTY: Objection to
6  form.
7    THE WITNESS: So it can be
8    addressed epidemiologically.
9  BY MR. TISI:
10   Q.   Right.  But you haven't done
11 that, right?
12   A.   I haven't done those studies
13 myself, that's correct.
14   Q.   You haven't studied foreign
15 body reactions in ovaries with talc, have
16 you?
17   A.   No.
18   Q.   So you were asked that by
19 Mr. Hegarty, and he asked you the
20 question.  You didn't even study it,
21 right?
22   MR. SILVER: Objection to
23   form.
24   MR. HUDSON: Objection to

Page 647

1    form.
2    THE WITNESS: That's not
3    my -- I haven't done that in my
4    research area.  That's correct.
5  BY MR. TISI:
6    Q.   Change in response to effect
7  of NSAIDs or aspirin.  You were asked
8  that question.  Have you looked at the
9  literature as of today?
10   A.   I have looked at the
11 literature in the past.  That's correct.
12   Q.   In the past, right?
13   A.   Yeah.
14   Q.   So, I mean, you were asked
15 questions today by Mr. Hegarty, and you
16 were just saying yes, yes, yes.  You
17 haven't done -- you haven't done the
18 research, have you?
19   MR. HEGARTY: Objection to
20   form.
21   MR. HUDSON: Objection to
22   form.
23   THE WITNESS: Have I done
24   the personal research?

Page 648

1  BY MR. TISI:
2    Q.   Yes, that's correct.
3    A.   I am finished with the
4  published research.
5    Q.   And you haven't of course
6  written an expert report on that, right?
7    MR. HEGARTY: Objection to
8    form.
9  BY MR. TISI:
10   Q.   Correct?  In this federal
11 case, MDL?
12   A.   That's correct.
13   Q.   Have you been told that you
14 were going to be an expert in this MDL?
15   MR. HEGARTY: Object and
16   instruct the doctor not to respond
17   to the extent that it would reveal
18   communications with counsel
19   pursuant to --
20 BY MR. TISI:
21   Q.   Do you have any --
22   MR. HEGARTY: -- the
23   consulting privilege.
24   If you know apart from that,

Page 649

1    you can answer.
2    THE WITNESS: So, no, I
3    don't.
4  BY MR. TISI:
5    Q.   You were asked, Dr. Muscat,
6  from your review of the literature, is
7  talcum powder products safe to use?  Do
8  you remember that question?
9    A.   Yes.
10   Q.   If you were to learn that
11 talcum powder contains asbestos, would
12 you think it would be safe to use?
13   MR. SILVER: Objection to
14   form.
15   MR. HEGARTY: Objection to
16   form.
17   THE WITNESS: So that's sort
18   of a difficult question.  If it
19   contains asbestos?
20 BY MR. TISI:
21   Q.   Mm-hmm.
22   A.   I'm sorry.  What's the
23 question.
24   Q.   If talcum powder products

163 (Pages 646 to 649)

Joshua E. Muscat, Ph.D.

Page 650

1    contain asbestos today, would it be safe
2    to use?
3            MR. SILVER:  Objection to
4        form.
5            THE WITNESS:  This is a
6        hypothetical.
7    BY MR. TISI:
8        Q.   It is.  You were asked the
9    question --
10       A.   Okay.
11       Q.   -- so I'm following on it.
12   Yes.
13       A.   Okay.
14       Q.   If you were to learn that
15   talcum powder products over the past,
16   let's say, couple decades, despite what
17   was in the published literature,
18   contained asbestos, if you would have
19   learned that, would they be safe to use?
20           MR. SILVER:  Objection to
21       form.
22           MR. HUDSON:  Objection to
23       form.
24           THE WITNESS:  I would say

Page 651

1        that if I -- if I learned that and
2        the concentration was the same in
3        historical studies that looked at
4        the risk of talcum powder and
5        ovarian cancer, I would conclude
6        that -- that the -- there is not a
7        causal association.
8    BY MR. TISI:
9        Q.   Right.  That wasn't my
10   question though.
11       A.   But that's the only way I
12   can answer it.
13       Q.   Well, if you were to -- if
14   you were to learn -- I mean, apart from
15   being an expert and being paid by them
16   and all that stuff.  Okay.  If you were
17   to learn as a doctor -- as a consumer, if
18   you were to learn that the talcum powder
19   products that sit in Kmart right now
20   contain asbestos, would you recommend
21   that they -- would you feel comfortable
22   saying that they were safe?
23           MR. SILVER:  Objection to
24       form.

Page 652

1            MR. HUDSON:  Objection to
2        form.
3            MR. HEGARTY:  Objection to
4        form.  Asked and answered.
5            THE WITNESS:  I would agree
6        that I would not talcum -- I would
7        not want asbestos in talcum
8        products.
9    BY MR. TISI:
10       Q.   Right.  Especially if you
11   were going to apply them -- if women were
12   going to apply them to the perineal area,
13   correct?
14           MR. HEGARTY:  Objection to
15       form.
16           THE WITNESS:  That's correct
17       I would want not talcum powder in
18       asbestos -- sorry.  I would not
19       want asbestos in talcum powder.
20   BY MR. TISI:
21       Q.   Especially -- especially
22   since we do know that whatever else is
23   out there, there has been shown to be an
24   increased risk in different studies of

Page 653

1    ovarian cancer associated with talcum
2    powder products?
3            MR. SILVER:  Objection to
4        form.
5            MR. HUDSON:  Objection to
6        form.
7    BY MR. TISI:
8        Q.   If you knew those two
9    things, Number 1, that there was asbestos
10   in talcum powder products, and Number 2,
11   there were multiple studies that showed
12   an increased risk, that would at least
13   raise for you an index of suspicion,
14   would it not?
15           MR. HUDSON:  Objection to
16       form.
17           MR. SILVER:  Objection.
18           THE WITNESS:  I'd have to
19       look at the studies again and go
20       through all the things that kind
21       of we just talked about.  You
22       know, strength of the association,
23       confounding, bias, dose-response
24       relationships.  I'd want to look

164 (Pages 650 to 653)

Joshua E. Muscat, Ph.D.

Page 654

1   at it using the methodological
2   tools that we use to assess
3   causality.
4   BY MR. TISI:
5       Q.   But as you sit here today,
6   you would not, if those two things are
7   true, you would not be totally
8   comfortable putting your reputation on
9   the line saying that talcum powder
10  products containing asbestos would be
11  safe?
12          MR. HUDSON:  Objection to
13      form.
14          MR. HEGARTY:  Objection to
15      form.
16          MR. SILVER:  Objection to
17      the form.
18          THE WITNESS:  Sorry.  Can
19      you repeat the question?
20  BY MR. TISI:
21      Q.   Yes.  You were asked the
22  question by Mr. Hegarty.
23      A.   Yes.
24      Q.   As to whether or not talcum

Page 655

1   products were safe based upon what you
2   know.
3       A.   Yes.
4       Q.   If you were to add to the
5   mix of what you know, that talcum powder
6   products had asbestos in it, add that
7   fact --
8       A.   Yes.
9       Q.   -- would you feel
10  comfortable saying that talcum powder
11  products were safe or would you have to
12  do additional research?
13          MR. HUDSON:  Objection to
14      form.
15          MR. SILVER:  Objection to
16      form.
17          THE WITNESS:  So, again, I
18      wouldn't want asbestos in talcum
19      powder, okay.
20          The question of safety as it
21      relates to, for example, ovarian
22      cancer, I think would have to be
23      studied.  I would rely on
24      epidemiologic studies.

Page 656

1   BY MR. TISI:
2       Q.   And you haven't done that
3   work, have you?
4           MR. HEGARTY:  Objection to
5       form.
6   BY MR. TISI:
7       Q.   As you sit here today?  You
8   haven't looked at the studies linking
9   ovarian cancer and asbestos, have you?
10          MR. HEGARTY:  Objection to
11      form.
12          THE WITNESS:  I'm sorry.
13      Which studies are you referring to
14      specifically?
15  BY MR. TISI:
16      Q.   Have you looked at studies,
17  epidemiologic studies involving ovarian
18  cancer and asbestos?
19      A.   I am aware of occupational
20  studies.
21      Q.   Okay.  Have you done a
22  systematic review of that work?
23      A.   No.
24          MR. HEGARTY:  Objection to

Page 657

1       form.
2   BY MR. TISI:
3       Q.   Okay.  And so my question
4   is, in absence of having done that work,
5   if you were to learn that talcum powder
6   products have and have had asbestos in
7   them, you could not sit here today and
8   say that talcum products were safe, if
9   that was shown to you to be true?
10          MR. HUDSON:  Objection to
11      form.
12          MR. HEGARTY:  Objection to
13      form.
14          MR. SILVER:  Objection to
15      form.
16          THE WITNESS:  So the only
17      thing that I can rely on is the
18      epidemiologic evidence, okay.  So
19      there have been epidemiologic
20      studies of powders.  Okay.  If
21      hypothetically, and I don't know
22      this, but if hypothetically those
23      powders contain some amount --
24      trace amount of asbestos, and was

165 (Pages 654 to 657)

Joshua E. Muscat, Ph.D.

Page 658

```
 1    not shown to increase ovarian
 2    cancer, that's -- that's what I
 3    would rely on.
 4        I think IARC did the same
 5    thing in terms of their
 6    classification that they
 7    specifically refer to talc-based
 8    powders.
 9        So that's -- that's the
10    exposure by which these -- these
11    studies were measured by.
12    BY MR. TISI:
13    Q.   Right.  But let me be clear.
14    You didn't look at the IARC -- I think it
15    was 2012 or 2015 monograph on asbestos
16    and ovarian cancer, did you?
17    A.   I have cursory looked at it.
18    I have not studied it.
19    Q.   Right.
20        MR. HUDSON:  Counsel, I
21    believe we've run up on the
22    30-minute time frame.
23        MR. TISI:  I understand.  I
24    understand.
```

Page 659

```
 1        THE WITNESS:  Okay.
 2    BY MR. TISI:
 3    Q.   But in order to render your
 4    opinion -- render an opinion, because you
 5    were asked general opinions about the
 6    safety of talc, you would need to know
 7    more about, A, whether talcum powder
 8    products have asbestos in it; and, B,
 9    what the evidence was that would support
10    an association, correct?
11        MR. HUDSON:  Objection to
12    form.  Asked and answered.  And
13    we're past the time frame.
14        MR. HEGARTY:  Yeah, the
15    question has been asked three
16    times.
17    BY MR. TISI:
18    Q.   You can answer the question,
19    sir?
20        MR. HEGARTY:  Okay.  Answer
21    it the same way that you did
22    before.
23        MR. TISI:  No, you can
24    answer -- I want to know what his
```

Page 660

```
 1    answer is.
 2        MS. PARFITT:  He can answer
 3    the question.
 4        MR. HEGARTY:  It's already
 5    past the time.
 6        MR. TISI:  I want an answer
 7    to the question.  You -- Counsel,
 8    you opened the door so wide.  You
 9    can't come marching in here and
10    ask him expert questions without
11    an expert report based upon as he
12    sits here today and then expect
13    this not to happen.
14        MR. HEGARTY:  You're not
15    supposed to ask the same question
16    and get answer the question three
17    times, and not like it, so then
18    ask another question, which is
19    what you're doing.
20        MR. TISI:  That is not true.
21    He's --
22        MR. HEGARTY:  You're getting
23    --
24        MR. TISI:  He's asking the
```

Page 661

```
 1    opposite question.
 2        MR. HUDSON:  We're past the
 3    time frame.  So let's just agree
 4    to go off the record because the
 5    examination at this point needs to
 6    conclude.
 7        MR. TISI:  The
 8    examination -- I'm going to keep
 9    the examination open, and we're
10    going to ask -- we are going to
11    ask to come back, because you
12    opened the door for additional
13    time.
14        MR. SILVER:  And note
15    Imerys' objection, and we will
16    strenuously object.
17        MR. TISI:  You can
18    strenuously object.  You can paint
19    your hair green if you would like
20    to.
21        MR. HUDSON:  Let the record
22    reflect we don't agree.
23        MR. SILVER:  Off the record.
24        THE VIDEOGRAPHER:  Going off
```

166 (Pages 658 to 661)

Joshua E. Muscat, Ph.D.

Page 662

1    the record this ends today's
2    deposition.  We are going off the
3    record at 7:56 p.m.
4        (Document marked for
5    identification as Exhibit
6    Muscat-38.)
7        (Excused.)
8        (Deposition concluded at
9    approximately 7:56 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 664

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8        After doing so, please sign
9    the errata sheet and date it.
10        You are signing same subject
11    to the changes you have noted on the
12    errata sheet, which will be attached to
13    your deposition.
14        It is imperative that you
15    return the original errata sheet to the
16    deposing attorney within thirty (30) days
17    of receipt of the deposition transcript
18    by you.  If you fail to do so, the
19    deposition transcript may be deemed to be
20    accurate and may be used in court.
21
22
23
24

Page 663

1
2        CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.
7
         It was requested before
8    completion of the deposition that the
     witness, JOSHUA E. MUSCAT, Ph.D., have
9    the opportunity to read and sign the
     deposition transcript.
10
11
12    _____
     MICHELLE L. GRAY,
13    A Registered Professional
     Reporter, Certified Shorthand
14    Reporter, Certified Realtime
     Reporter and Notary Public
15    Dated:  September 27, 2018
16
17
18        (The foregoing certification
19    of this transcript does not apply to any
20    reproduction of the same by any means,
21    unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24

Page 665

1        - - - - - -
         E R R A T A
2        - - - - - -
3
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6        REASON: _____
7    ____  ____  _____
8        REASON: _____
9    ____  ____  _____
10        REASON: _____
11    ____  ____  _____
12        REASON: _____
13    ____  ____  _____
14        REASON: _____
15    ____  ____  _____
16        REASON: _____
17    ____  ____  _____
18        REASON: _____
19    ____  ____  _____
20        REASON: _____
21    ____  ____  _____
22        REASON: _____
23    ____  ____  _____
24        REASON: _____

167 (Pages 662 to 665)

Joshua E. Muscat, Ph.D.

Page 666

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4        I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, 1 - 667, and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16    JOSHUA E. MUSCAT, Ph.D.        DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
23   _____
     Notary Public
24
```

Page 667

```
 1          LAWYER'S NOTES
 2   PAGE  LINE
 3   _____ _____ _____
 4   _____ _____ _____
 5   _____ _____ _____
 6   _____ _____ _____
 7   _____ _____ _____
 8   _____ _____ _____
 9   _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____
```

168 (Pages 666 to 667)

**A**
**abided** 236:3
**able** 49:11 94:9
  333:5 336:15
  469:24 489:10
  512:6
**absence** 589:2,4
  589:10,12
  657:4
**absolutely** 83:15
  119:7 123:22
  124:2 205:14
  332:11 393:6
  393:17,18,22
  444:16 471:17
  503:1 639:21
**abstracted**
  343:13
**abysmal** 213:12
**academic** 70:21
  70:24 71:1,7
  73:12 74:1
  75:22 79:22
  107:6 125:20
  125:22 126:5
  126:14 128:22
**academically**
  244:10,12
**accept** 300:2
  421:20 436:5
**acceptable**
  425:9
**acceptance**
  308:21 309:19
  309:22
**accepted** 292:3
  295:8 308:22
  311:18 354:6
  374:1 529:7
**accomplished**
  643:16
**account** 106:12
  332:24 563:11
**accuracy** 85:22
**accurate** 85:7
  86:12 211:4,9

240:20,22
327:7 450:2
461:23 583:13
602:13 664:20
**accurately**
  595:18
**acknowledge**
  206:17 208:17
  250:5 305:15
  373:1 386:17
  402:13 644:11
**acknowledged**
  300:12
**acknowledges**
  249:21 302:20
**acknowledging**
  207:16
**acknowledgm...**
  284:17,20
  285:1,16
  302:18 303:11
  303:17 370:4,6
  385:16,17
  392:10,15
  401:17 635:3
  666:2
**acknowledgm...**
  304:15 305:4
  359:3
**active** 194:14
**actively** 120:19
  155:1
**activities** 74:20
  75:2,4,15
  78:12 79:7,21
  127:2,24
  152:22
**actual** 251:23
  294:10 304:3
  346:9 447:14
  506:2 600:13
**add** 72:14
  434:23 642:21
  655:4,6
**added** 298:8
  636:10

**addition** 366:10
  573:7
**additional** 81:3
  189:20 212:18
  221:19 256:20
  366:12 419:24
  523:20 655:12
  661:12
**additives** 379:10
**address** 15:9
  245:23 508:14
  513:17,22
**addressed**
  303:14 419:24
  646:8
**adherence** 325:8
**adjudicated**
  566:3
**adjust** 567:10
  568:11
**adjusted** 474:22
  475:4 479:2
  481:5,16
  486:24 556:7
**adjustment**
  478:17 481:21
**Administration**
  350:21 506:10
  506:12
**administrative**
  298:6
**admire** 423:1
**admits** 201:9
  215:23
**advice** 274:5
**affect** 306:21
  342:5
**affiliated** 108:20
**affiliation** 108:5
  115:7 125:11
  348:11 403:22
  403:24
**affiliations**
  107:16 108:22
  294:21
**affiliation's**

348:17
**afternoon**
  427:22 570:4,5
**age** 477:6
**ago** 52:9 60:10
  60:12 105:17
  296:7 385:14
**agree** 17:5,17
  84:8 133:15
  148:16 309:14
  333:19 334:13
  335:2 339:22
  340:8,20 342:3
  342:13,18
  344:14 406:17
  419:9 424:2
  425:16 429:17
  429:24 461:10
  494:15 526:5
  531:1 535:11
  535:24 553:13
  556:23 560:2
  565:6 567:8,16
  567:21 596:18
  607:24 652:5
  661:3,22
**agreeable** 568:4
**agreed** 155:4
  436:22 437:22
**agreed-on**
  405:13
**agreed-to** 405:8
**agreement** 7:22
  97:6,18 110:21
  110:22 111:5
  168:15,19,24
  169:9 204:3
  247:11 418:19
  599:15,21
  600:4,6,11,13
  600:14,15,18
  618:21 619:2
  619:15
**ahead** 31:9
  334:20 358:3
  453:14 475:5

493:18,23
552:21 555:19
605:22 607:15
627:11
**AHF** 166:13
  174:15
**al** 134:10 136:9
  435:6 443:17
  446:6 447:4
**Alabama** 5:4
**Alexandria** 2:10
**algorithm**
  424:15
**alleged** 24:1
  169:12 597:21
  597:24
**ALLEN** 5:3
**allow** 333:22
  591:7 595:10
**allowed** 64:7
  617:1
**America** 4:15
  163:10 200:24
  225:11,19
  246:2 269:24
  401:19
**American** 32:11
  92:18 97:2,5
  99:17 103:4,11
  103:19 123:6
  163:23 164:20
  165:1 168:24
  171:2 213:22
  213:22 324:16
  401:19 599:21
**amount** 84:6
  379:22 657:23
  657:24
**amounts** 380:6
  524:14 525:2
  544:4
**analyses** 300:11
  300:13 307:13
  383:5 501:16
**analysis** 87:11
  135:15 144:4

204:11 281:9
316:7 320:13
357:21 429:18
435:8 437:5
452:14 474:22
474:24 485:16
487:6 510:3
575:22 604:13
605:7 608:1
**analyst** 496:17
**analytic** 342:20
**analyze** 334:6
**analyzed** 610:16
**analyzing** 331:7
**ANDERSON**
4:7
**and/or** 663:21
**animal** 417:19
424:20 427:10
539:5 609:14
632:23 633:2
**answer** 13:5
24:23,23 25:3
26:4,8,8,11
36:5,6,10,16
42:3 48:4
63:24 64:1,5
67:23 72:3
99:3,10 100:13
152:10 216:15
234:18 235:4,6
239:15 295:13
332:10 370:20
422:21 437:12
437:18 453:8
453:12 511:16
512:5,6 541:3
541:5,11 649:1
651:12 659:18
659:20,24
660:1,2,6,16
**answered** 45:21
48:1 49:6 84:1
100:16 115:15
116:8 118:4,6
157:9 182:11

206:5 245:5
250:2 391:15
511:10 512:1
538:14 625:24
652:4 659:12
**answering** 519:8
519:9
**answers** 666:8
**anti-cancer**
122:18,20
309:13 310:3
310:21 313:14
**anybody** 50:7
88:11 89:7
100:1 121:5
142:22 158:24
203:4 236:7
259:21 260:10
266:6,12 287:6
296:20 307:22
334:9 361:22
373:2 378:12
387:5 388:4,16
391:18 403:2
415:3 488:24
540:9 590:24
**anymore** 105:4
**Anyway** 167:8
**apart** 302:15
648:24 651:14
**apologize** 168:1
637:21
**app** 497:1
**apparently**
423:23
**appear** 73:24
152:2 226:20
226:22 429:12
439:18 440:16
468:10 469:20
**appearance**
439:11
**APPEARAN...**
2:1 3:1 4:1 5:1
**appeared**
148:19 252:11

348:4 454:12
**appears** 164:24
263:10 265:17
265:19 352:8
352:17,21
399:11 440:17
452:10 554:16
554:16
**apples** 501:2
**application** 7:19
122:14 126:1
171:17 174:5
464:21 506:14
518:6 549:19
**applications**
451:13 463:8
464:14,22,23
491:8 494:1
499:24 515:19
**applied** 549:12
**applies** 346:16
**apply** 229:17
427:13 652:11
652:12 663:19
**applying** 504:4
**appreciate**
129:14 569:14
569:15
**approach** 495:2
592:16
**approached**
187:11 575:21
**appropriate**
398:14 495:14
497:17,20,23
664:6
**approve** 147:7
151:14
**approximately**
130:12 276:13
420:24 605:1
662:9
**April** 277:1
282:11 354:7
370:23 374:2
**Arch** 4:8

**area** 261:22
314:15 322:9
346:14 377:7
431:4 505:16
506:15 571:9
572:3 593:6
596:11 642:8
643:3 647:4
652:12
**areas** 11:10
82:18 154:8
155:4 156:22
314:13,20,23
568:4
**argue** 426:14
585:23
**argued** 130:22
155:19
**argument** 385:1
438:21
**Argumentive**
286:16
**arguments**
438:10 523:15
**arrangement**
198:19
**article** 49:3 85:4
85:5,7,13,20
86:8,9,21,24
87:3,3,9,18,19
88:5,13,24
89:7,9 92:12
92:13,16
118:16 119:7
119:16 130:7
131:12,23
132:2 134:3
135:20,20
137:4,6 143:12
144:22,23
145:15 147:17
147:19,23
148:1,16,20
149:14 150:7
151:21 152:1
153:3 181:9

185:19 186:8
208:12 248:9
249:11,18,20
252:7,15
254:17,24
255:1 260:13
260:14 261:4
267:12 276:15
277:13,14
278:7 284:4
288:1 290:5
294:19 295:7,8
296:21 297:4
297:20,21
298:9,20,24
300:5,17
302:22 304:3
304:19,24
306:4 310:2
311:12,17
313:13,16
323:7 325:17
348:4 350:17
351:20 352:3,9
352:22 353:6
354:1,4 356:3
356:9 358:19
358:19 370:6
377:8,11
378:17 380:15
380:24 381:9
381:16,19
387:3,6,17
388:5,6 390:24
391:9 393:20
394:16,18,18
395:5,6 397:21
398:17 399:7
400:20 403:2,3
429:9 446:15
449:9,12 450:8
450:13,21
459:1 462:11
486:1,7,12,19
494:12 514:6
515:13 516:5

518:8 520:10
522:17 552:3,9
576:12 579:10
580:3,4,8
585:24 586:7
586:13 587:20
631:5,14,16,18
631:22 634:16
634:23,24
636:22
**articles** 46:10
48:12,17,21,24
49:4,8,12,17
49:23,24 50:3
50:6 53:17
83:17 84:3
86:1 90:17,19
90:23 91:10
92:12 93:24
95:10 107:15
107:21,22
115:8 117:24
117:24 118:1
122:1 145:12
145:20,20,22
153:16 154:14
154:15,19
155:18 157:13
157:20 159:21
261:18 262:18
263:11,23
264:17 267:10
280:12 288:24
294:10,11,12
294:17 295:16
297:10 299:12
299:16 302:17
305:18,20,23
307:16 314:3
315:13 322:19
334:5 347:20
394:5 397:18
429:12 478:21
486:22 497:8
573:18,21
609:23 610:1

610:14,15
629:14
**articulated**
351:16,21
**asbestos** 259:6
262:20,21
264:19 265:4
265:22 377:22
378:5 379:19
381:17,24
382:9,23 385:2
524:14 525:2
525:22 526:6
526:16,20,21
527:24 528:5,5
528:6,18
529:12,20
530:3,21,22
531:14 532:19
533:2,4,5,7,9
533:12,24
534:18 535:4
535:13 536:1,4
536:24 538:1,7
538:18 539:10
544:5 546:20
547:18 597:20
598:2 649:11
649:19 650:1
650:18 651:20
652:7,18,19
653:9 654:10
655:6,18 656:9
656:18 657:6
657:24 658:15
659:8
**asbestos-free**
267:1,14 384:7
**ascribe** 426:18
**ASHCRAFT**
2:8
**aside** 296:18
537:22 566:14
590:22
**asked** 45:21
47:24 49:6

65:1 73:14
76:1 78:1,24
83:24 100:16
105:14 109:16
115:14,23
116:8 118:4,6
120:21 121:3
121:17 124:22
126:13 137:16
157:9 182:11
185:18 206:5
245:5 250:2
252:16,17,17
298:11 391:15
398:17 403:22
474:14,15
483:15 506:9
508:14 512:1
525:7 538:13
541:8,23
542:10 551:14
574:17 575:7
588:14 590:22
591:20,23,24
592:23 593:17
593:19 595:1
598:18 600:19
601:14 603:8
605:18 608:4,8
608:14,17
609:21 611:1
618:6 625:24
632:20 633:13
633:15,19
634:15 636:8
636:23,24
639:19 644:21
645:2 646:18
646:19 647:7
647:14 649:5
650:8 652:4
654:21 659:5
659:12,15
**asking** 21:4 27:6
42:8,9 43:24
47:17 48:2

70:9 74:10
80:6 113:24
117:5,9 121:14
127:18 201:13
207:7,8 254:6
355:16 356:18
365:24 468:17
495:10,13
504:2,6 505:14
506:1 519:10
520:18 521:3
537:21 540:20
541:9,13
552:23 616:16
617:5,8 639:1
660:24
**asks** 70:6 141:18
**aspect** 425:3
**aspects** 367:1
417:17
**aspirin** 612:4
647:7
**assertion** 265:6
**assess** 654:2
**assessing** 294:23
425:7
**assessment**
422:6 423:13
**assign** 335:17
338:20
**assigned** 338:5
338:16 346:2
**assigning** 338:3
**assistant** 298:7
**assisted** 112:18
114:14 302:21
**associated**
104:22 400:14
419:14 539:14
612:7 638:13
642:8 643:3
653:1
**association**
19:20 55:18
57:24 103:11
130:24 153:23

157:4 161:20
229:12 232:14
320:21 324:17
417:6 420:14
421:14 425:12
436:6,13 437:3
443:12 523:22
562:2,20 589:2
589:10 590:10
602:16 603:3
609:3 635:18
637:4,17 638:2
651:7 653:22
659:10
**associations**
17:3 421:21
426:22 589:3
**assume** 40:7
69:9 162:8
182:14 190:10
203:7,9 241:19
278:14 288:14
359:4 372:3
469:24 494:2
552:10 622:22
628:2
**assumed** 251:9
301:3 430:1
569:7
**assumption**
342:6 384:12
399:8 453:17
528:23 529:4
530:2,21,23
535:12 559:22
**Athens** 123:2
**attach** 22:18
23:2 180:18
**attached** 110:22
141:21 204:2
249:16 600:2
664:12 666:11
**attaches** 134:20
**Attachment** 7:9
**attempt** 334:3
549:17

Joshua E. Muscat, Ph.D.

**attended** 224:17
266:18 588:3
**attention** 259:6
**attorney** 81:19
234:13 235:14
664:16
**attorney/client**
617:4
**attribute** 89:9
**August** 58:20,22
66:20
**Austin** 4:4
**author** 65:23
86:17,19 88:1
90:20 151:3
288:6 295:6
298:10 300:8
302:20 307:23
308:11 338:3,4
338:18,22
348:10 450:4
555:16 587:16
610:23 630:4,4
630:8,14,21
631:13
**authors** 42:21
86:24 87:14,16
87:20 89:17
130:10 254:21
256:22 294:21
294:24 295:16
296:14 298:2
300:9,24 303:2
303:7,16
304:10 305:12
306:10,22
307:21 312:5
312:19 336:9
513:7,17,22
514:24 515:13
574:14 588:1
589:7 601:9,12
602:11 632:7
**authorship**
139:7 368:16
**author's** 300:17

**automatically**
453:16
**available** 342:24
499:8 594:19
**Avenue** 4:3,13
**awarded** 583:7
**aware** 37:15
123:10,13
124:11,18,20
151:13 197:24
222:10,11
277:18 285:2
297:15 306:6,7
306:14 307:10
307:11 533:19
575:8,15
576:23 577:5
583:20 584:24
586:11 592:8
595:6,9 609:2
611:19 612:1
635:16 656:19
**axis** 160:11
163:20 447:15
**a.m** 1:16 14:7
62:16,20
129:17,20

———————
**B**
**B** 6:11 7:2 8:2
9:2 10:2 11:2
12:2 535:24
607:21 659:8
**baby** 37:9 61:8
160:19 379:20
380:4 384:4
539:20
**back** 19:19
31:15 32:9
38:17 58:22
59:19 60:5
62:19 66:11
67:12 76:10
90:5 92:5 97:1
101:13,24
104:17 122:12

129:20 136:5
140:6 142:10
145:12 148:7
148:13 156:16
157:1 159:20
167:15 176:11
184:16 201:20
217:9 251:10
252:23 262:16
263:15 264:21
268:24 273:20
293:18 296:5
316:11 320:2,3
345:19 353:24
356:16 358:18
359:5,23
377:18,19
405:6,9 428:5
428:15 429:12
434:15,16,16
439:24 452:17
454:5 458:16
460:12 462:10
469:10 470:17
472:9 475:2
478:3 483:23
490:4,19
502:21 504:15
506:2 518:8
535:9,9 548:17
553:8 554:4
558:9,18
565:23 569:22
575:11,15
604:8 612:21
620:12 621:11
624:20,20
625:16 641:4
642:1 644:19
661:11
**background**
296:1 570:13
570:16
**backing** 589:18
**backwards**
316:6 359:19

**Bacon** 3:2,7 9:21
27:21 62:23
63:4,16 64:12
64:16 65:7,11
65:21 68:13,23
74:12 80:9,16
163:18 271:23
274:19,20
275:3,6,19
276:7 277:6,20
279:10 283:19
284:10,11
287:23 355:14
355:20,20
372:19
**balance** 637:11
642:5
**based** 123:2,9
266:23 274:11
346:17 384:12
430:2 437:6
475:23 478:17
478:18,24
490:2,16
495:21 502:12
542:6 555:7
559:22 575:23
592:18 605:2
655:1 660:11
**basic** 406:7,7
608:18
**basically** 72:19
93:22 151:10
316:18 323:24
326:10 378:18
414:18 427:13
**basis** 267:3,4
274:14 609:11
617:3
**Bates** 171:19
**Bayer** 112:20
**Baylen** 2:4
**bear** 91:11
110:10 156:6
168:2 506:13
**BEASLEY** 5:3

**began** 269:4
**beginning** 1:16
351:21 407:23
416:7 428:17
506:4
**begins** 342:22
351:16 588:19
**behalf** 31:11
77:3 211:2
220:22 224:3
230:21 231:15
242:19 257:17
276:7 288:24
348:23 349:1
353:8,9 355:4
368:18 369:4
**beings** 16:20
643:6
**believe** 23:13
58:1 90:16
132:1 145:21
218:23 226:3
256:2 349:14
376:4 391:8
402:23 422:24
465:5 490:13
546:3,4 556:4
573:15 596:4
614:12 658:21
**believes** 635:20
636:9
**benefit** 307:22
308:3 386:19
**benefits** 317:2,2
326:10 378:18
414:18 427:13
**best** 86:11 175:7
189:14 219:1
334:3 342:7
399:7 422:1
427:14 512:6
597:1 639:24
**better** 210:10
238:23 332:4
399:13 400:7
402:10 549:10
**beyond** 325:6
521:15 586:21

Joshua E. Muscat, Ph.D.

605:14 608:10
609:19 625:23
**bias** 294:24
296:19 305:22
307:14 340:2
340:12 426:17
518:20,23
519:1,2,16,17
519:18,19,20
520:24 601:21
653:23
**biased** 226:20
**biases** 304:12
317:10 333:6
519:5,20
**Biddle** 1:15 3:11
**big** 162:12
309:15 331:21
488:10 496:12
504:20,21,21
505:2,10
508:18 568:12
**bill** 217:13
**billing** 214:18
**bills** 613:15
617:12
**binder** 7:6 92:1
122:3 131:22
132:9,24 191:3
283:5 349:15
397:7 445:5
459:10 479:5
514:10,11
516:6
**biologic** 342:5
523:11,14,17
537:24 543:4
608:19 611:2,9
644:23 645:4
**biological**
427:12 441:9
545:1 548:4
**biologically**
438:19 441:3
523:23 526:7
530:8,24

531:20 532:10
534:17 535:2
536:21 537:9
538:8 542:12
542:18 545:6
547:21
**bit** 35:5 86:7
92:9 148:18
159:12,16,23
233:6 238:4
262:16 265:14
274:20 294:1,4
294:6,9 317:18
331:9 348:1
438:15 461:4
481:22 516:8
535:9 576:15
590:22
**blame** 387:5,16
**blew** 448:12
**block** 269:15
**Bob** 29:1,3
110:13 163:3
206:2 227:11
227:19 228:12
269:5,6
**bodies** 11:13
196:16 304:3
424:17
**body** 195:1
304:18 331:24
334:5 590:7
602:14 611:21
646:15
**bogged** 320:13
**book** 93:3
347:14 573:17
573:20 629:14
**books** 93:6
488:17
**Booth** 461:8
462:3,4 465:4
466:23 472:10
482:5 483:8
550:21 552:18
552:21,24

558:21,24
559:13
**boss** 238:22
**bother** 108:19
108:21 207:16
**bottle** 61:15
197:4 504:3
505:14 539:17
539:18,18,24
540:11 545:2,5
545:19
**bottom** 202:8
350:18 407:2
407:18 464:1
516:21,22
588:18
**Boulevard** 3:3
15:10
**BOWDEN** 2:4
**Boy** 242:5
**break** 62:17
129:4,5,12,18
279:14 292:24
427:22 428:3
548:11,15
**brief** 84:6
434:18 554:2
558:17 565:21
569:21 570:15
604:6 612:20
644:17
**briefly** 16:5,6
164:17 406:10
550:16 562:11
576:6 598:17
**bring** 159:24
176:6,16
177:18 282:18
445:2,13 451:3
**BRITTANY** 3:7
**broad** 2:14
608:9
**broadly** 153:21
**brochure** 111:9
**brought** 198:22
275:12

**budget** 141:16
142:11
**bunch** 172:20
319:4
**buried** 553:20
**burned** 53:5
**business** 103:5,8
105:4,8 112:3
112:13 275:19
286:13
**busy** 109:15
**buy** 507:19
539:19
**Bvanek@shb....**
3:9
**byline** 87:19
133:14

---

**C**

**C** 536:4
**calculate** 492:15
555:6,21
**calculated**
475:22 522:21
556:2
**calculating**
495:16
**calculations**
481:13 482:2,9
638:21
**call** 43:9,10
81:11 95:20
257:14 260:23
321:16 327:14
411:21 421:15
426:8
**called** 15:17
22:21 95:10
103:18,20
104:23 105:1
125:20 192:9
204:24 374:17
376:4 389:10
391:20 403:12
403:21 414:15
486:10 587:17

**calls** 81:6
**campus** 3:12
572:21
**cancer** 7:14 8:14
9:18 10:6,16
10:19 11:8,19
18:5 19:8,21
33:4 35:15
36:3,23 37:20
38:2 41:12
42:15 45:15
47:22 50:23
53:24 57:21
60:22 84:20
93:5 96:5,15
97:8 103:21
118:13,14
122:15 130:5
141:13 153:18
154:18 155:21
156:14,14
157:7 158:20
160:7,7 169:14
172:3,15 177:2
195:14,24
196:12 247:13
247:16 248:1
248:21 249:9
249:12 250:22
255:7 275:13
290:17 293:9
348:7 354:2
357:22 358:9
358:13,22
366:1 369:11
373:23 376:14
376:15 394:19
395:2,6 396:18
397:19 398:13
399:12 400:14
408:19,24
409:9,16,20,23
410:12,19
412:14 419:15
428:20 429:10
429:20 434:11

Joshua E. Muscat, Ph.D.

437:4 442:17
503:3,11,12,12
504:6 505:6
506:16 507:15
508:10 515:17
518:4 523:22
526:9 531:3
532:12 533:11
533:14 534:1,7
534:9,10,24
535:3 536:7,9
536:22 537:11
537:19 538:21
539:2,13 542:5
545:3 549:9
564:20 568:23
571:9,21
572:10 573:8,9
573:21 574:2
576:11 577:9
577:12,20
578:3 579:23
580:22 582:3
586:19 587:4
587:18 590:12
596:8,12,21
597:12 598:5
602:17 603:4
604:15,19,23
605:4,9 609:10
609:16 611:10
612:6 629:15
629:16 633:11
635:21 637:7
638:5,13 642:9
643:4 645:5
651:5 653:1
655:22 656:9
656:18 658:2
658:16
**cancers** 568:10
569:1
**capable** 42:14
**capacity** 107:7
640:23
**carcinogen**

39:10 192:5
399:15 533:6
533:24 536:5,6
536:9 538:18
540:12 543:6
549:11 598:13
**carcinogenic**
525:21 526:21
643:6
**carcinogenicity**
642:10 643:13
**carcinogens**
192:10 524:12
524:24
**care** 29:18 454:5
566:1 603:18
**career** 591:15
**careful** 410:13
**carefully** 449:12
449:17 450:1
458:9 467:5
511:7,8 664:4
**Carolina** 52:11
**case** 20:15 21:3
21:10,24 22:7
22:20 23:9,24
24:9,18 25:2
36:8 48:8
55:11 80:21
83:19 114:22
115:11 116:15
149:19 154:13
160:21 163:11
203:8 264:4
386:24 426:14
452:19 520:20
523:1 559:16
583:15 597:21
602:3 624:14
648:11
**cases** 1:8 61:24
62:5,7,10
316:6 358:9
554:9 555:20
559:24
**case-control**

172:2 174:1,16
316:4 318:3,17
318:19 320:7
412:2 419:16
435:8 453:3
485:6 562:17
605:2 640:1
641:23
**case-controlled**
98:9
**cast** 399:24
**categories** 71:18
73:11,23 74:3
74:17,18 76:4
130:14 465:14
472:13 476:17
476:18,18,22
477:1 494:14
499:16 500:12
500:18
**category** 75:21
76:5 225:19
462:17 463:15
463:23,24
464:19 465:24
466:2,3,6,11
466:12,21,22
468:4,19 469:1
469:15,16
470:10,11
471:13 475:7,9
476:3 477:8
481:4 482:13
483:3,5,10
490:22,23
491:12,17
499:14,15
**causal** 17:8,20
58:2 154:1
155:20 156:2,7
157:6 417:6,7
421:15 425:13
425:22 429:22
431:16 436:8
438:10 577:10
577:18 590:9

598:3 602:16
603:3 609:9
636:12 651:7
**causality** 654:3
**causally** 421:20
**causation**
130:23 441:6
510:3 521:14
608:10,18
633:14,15
635:19 637:12
**cause** 16:19 36:3
37:20,24 45:14
50:23 96:4
156:14 196:11
407:5 408:3,19
408:24 409:19
409:20,23
410:11 411:16
412:22 414:23
424:7 426:10
427:8 503:12
504:5 526:9
531:2 532:12
533:10,13
537:18 538:19
538:20 539:1
542:5 543:4
562:1 568:22
586:19 587:4
596:20 597:11
635:21
**caused** 18:4 19:8
35:14 41:13
60:21 275:13
**causes** 16:14
96:14 156:14
409:9,16
410:19 412:13
505:5 508:9
545:3
**causing** 42:15
537:10 539:12
**cc'd** 202:8 239:4
246:8
**ceased** 103:16

**cell** 609:8
**certain** 24:13
40:3 57:1
125:21 126:2,3
193:15 383:18
383:19 424:18
452:8,12
**certainly** 18:18
296:5 299:23
308:4 426:21
616:24
**CERTIFICA...**
663:2
**certification**
663:18
**Certified** 1:17
1:18 663:13,14
**certify** 85:21
300:16 301:1
301:10 663:5
666:5
**certifying**
663:22
**cervix** 612:7
**cetera** 216:23
221:7 633:22
**chair** 216:9
226:3,5
**challenges**
453:20
**chance** 322:4,5
326:12,13
570:8 610:1,8
610:13,19
**Chang** 472:5,10
472:11,23
473:1,5,22
474:22 482:5
516:7,11 518:8
522:16
**change** 72:9
199:16 327:23
327:24 430:11
432:18 475:21
481:21 591:1,8
595:4,7,11

612:3 647:6
665:4
**changed** 103:17
161:13 250:9
296:3,8 448:16
473:19 475:20
**changes** 71:8
256:12,19,21
363:7,12 475:6
579:1 580:7,13
664:11 666:10
**chapter** 93:4
**chapters** 573:17
573:21 629:15
**characterized**
343:8 421:2,5
533:13
**Charles** 2:15
**chart** 9:19 11:10
12:6 92:1
122:2 135:22
144:17 160:3
186:23 269:1
293:9 430:12
437:16 438:6,9
449:1 459:24
463:20,20
465:3 466:11
472:2 482:12
491:21 509:6
550:6,11,23
551:1,7 556:6
557:12,22
559:2
**check** 415:7
**checked** 447:21
**checklist** 414:22
415:22
**chef** 261:7
**Chi** 515:15
**chief** 390:2,3
**choice** 172:11
376:16 553:6
**choose** 26:11
552:13
**chose** 163:21

**Chris** 62:13 91:1
167:11 234:20
530:13
**CHRISTOPH...**
2:3
**cigarette** 19:5,8
103:12 341:18
496:14
**cigarettes**
341:10,20
495:1,15
497:13 498:11
498:14
**circulated** 362:7
368:6
**circumstances**
103:9 143:9
194:16 299:9
340:16
**citation** 267:23
546:24
**citations** 268:7
**cite** 131:16,20
267:9 268:3,5
268:5 323:5,9
382:11,13,19
487:10 489:8
**cited** 131:18
266:1,2 267:7
267:9 309:16
310:12 312:10
313:8,11 323:6
369:24 381:15
401:7 471:7
609:24
**cites** 483:18,21
483:24 484:8
484:10
**citing** 381:22
449:18 610:3
**Citizen's** 10:9
10:11 50:21
51:23 80:24
107:6 158:4
213:1 223:9
224:12 270:4

270:21 350:3
350:16 351:9
352:22 353:7
357:11,15,19
359:7,10,18
360:8,12,14
361:12 362:6
365:23 368:2
405:7,18
432:10 434:22
443:6 446:23
506:2,5 562:22
593:2,19
**City** 3:4
**claim** 60:20
233:20 275:12
574:20 584:5
584:13
**claims** 52:24
275:11
**clarified** 527:8
560:15
**clarify** 94:6
304:20 313:24
481:11 556:12
636:18
**class** 572:7,11
**classes** 615:8,9
**classic** 602:2
**classification**
560:16 658:6
**classified** 643:4
**classroom**
521:17
**clean** 247:23
**clear** 37:7 61:5
83:16 160:16
234:2 259:12
295:24 300:7
336:14 343:15
348:2 437:6
439:18 471:17
503:1 589:2,10
626:15 639:21
658:13
**clearer** 91:2

340:23
**clearly** 260:21
525:20 526:19
**client** 200:24
620:15 621:20
**clients** 60:20
61:2 112:21
113:7 114:15
117:13 620:13
621:22
**clinical** 112:5
314:4,8 375:7
376:2,5 407:6
408:4 410:17
413:6
**clinicians** 112:2
**clip** 389:5 565:9
**close** 481:23
**closed** 561:9
**closely** 501:19
501:22 502:3
**closer** 326:23
399:22
**cohort** 173:12
316:14 319:15
578:7 589:5
597:3 604:17
639:5,20 640:8
640:18 641:11
**cohorts** 435:8
**coin** 321:24
**collaborative**
359:11,20
360:9,16
**colleague** 59:16
165:15
**colleagues** 47:4
47:5,15 62:24
**collect** 21:22
**collected** 106:9
**collecting**
220:10
**collective** 313:11
**collectively**
115:18 145:11
**College** 571:15

572:24 573:2
**column** 67:15,19
68:2 133:24
134:9 271:22
279:20 352:9
446:4,14
450:23 463:21
464:11,15
491:1 516:12
588:17 590:1
**combination**
24:20 321:4
**combine** 495:14
496:4,4,6,17
497:11,23,24
498:9,18
501:10,11,12
**combined** 493:1
494:13 511:19
554:18
**combining**
319:4 332:3
492:14
**come** 36:14 70:6
90:5 122:12
140:6 159:20
224:7 234:20
316:2 331:19
332:21 334:12
363:12 383:12
385:1 407:4
408:2 415:4
417:20 512:18
536:18 553:8
568:15 583:2
591:2 660:9
661:11
**comes** 16:10
61:15 117:22
544:12
**comfortable**
651:21 654:8
655:10
**coming** 317:21
636:3
**comma** 298:17

Joshua E. Muscat, Ph.D.

comment 49:12
148:17 197:15
212:6 242:23
243:21 244:16
287:16 436:19
450:17 522:14
581:17
commentary
93:24
commented
595:2
comments 8:17
10:11 48:12
50:20 148:2
158:5 184:4
226:7 247:10
247:12 251:16
251:17 256:12
256:13,21
289:21 350:3
590:23,24
591:1 595:4
600:20 601:6,9
Commerce 5:4
commission
666:21
commissioner
350:20
committee 2:17
5:6 209:13
common 43:5
261:20 296:17
344:17 393:22
469:2 487:8,15
507:23
communicate
68:22 151:5
202:3 234:24
240:8 620:12
communicated
81:22 101:13
234:12 355:17
620:8
communicating
63:3 166:9
273:20 626:15

communication
65:19,20 66:10
66:14 166:4
202:5 262:3
580:18 581:14
620:1 624:17
communicatio...
64:8 174:20
175:3 203:2
234:19 272:5
272:21 355:13
579:4 617:6,9
618:7 619:16
620:11,22
622:7,13 628:7
640:22 648:18
community 41:8
41:18,23 42:10
44:19 85:22
89:19 98:14
157:15 196:2
313:13 324:23
422:18 424:6
425:4 576:24
586:12 590:2
companies 74:7
108:10 112:19
113:9,17 114:9
127:10 128:2
162:5 230:14
285:10 624:19
company 34:18
104:22 119:10
119:18 141:19
162:20 170:7
174:7 181:24
210:14 218:16
232:4 240:10
242:20 265:20
269:18 287:9
287:10 319:15
386:9 390:12
563:21 564:18
565:4 566:18
567:16 584:7
584:17

comparative
317:2
compare 80:4,7
148:13 149:11
340:21 341:9
341:19 409:6
452:17 610:2
compared 148:8
393:21 483:13
562:16
compares 341:5
comparing
341:16 462:16
463:14 468:3
470:9 477:15
comparison
149:2 240:2
353:4 462:13
463:13 468:2
470:8 491:10
compensated
613:23
compete 209:11
competitive
308:23 309:9
compilations
151:19
complete 142:24
152:21 450:3
completely
208:10 479:21
608:6
completion
663:8
complex 112:22
complies 630:12
composed 379:9
comprehensive
425:6
compromised
104:2
concentration
651:2
concept 323:23
concepts 303:13
320:15 347:19

406:19
concern 568:22
conclude 651:5
661:6
concluded
130:21 157:1
533:23 602:12
662:8
conclusion 19:7
96:14 155:11
536:18 576:1
590:14,19
conclusions
42:23 85:24
86:15 155:2
303:6 307:23
308:10 434:13
521:19,23
577:2 586:14
586:17 587:2
589:19 591:3,9
595:8,12 596:3
conduct 35:11
35:24
conducting
247:14 334:14
335:2,16 413:6
confidence
323:19,20
324:3,8,12,24
325:9 326:7
327:1,24 328:2
330:4,5 337:7
337:10 344:11
344:13 346:10
435:10 461:20
473:20,21,23
474:23 475:1,3
475:4 477:10
477:18 478:4
480:13,14
557:21 561:9
confident
555:17
confidential
202:19 203:6

203:20 236:1
619:5
confidentiality
7:21 203:14
600:4,10,15,17
618:21 619:2
619:14 625:20
confirm 433:23
confirmation
459:21
conflict 302:18
303:9
conflicts 88:20
89:17 294:22
295:9,17
296:15 302:24
303:4,23
304:13 305:3
312:19 404:15
574:23
confound
339:24 340:10
confounded
563:14
confounder
292:12 564:20
567:2,10,17
confounding
333:7 377:23
439:5 442:3,15
521:1 562:10
568:16 601:24
608:22 653:23
confusion
264:19
Congress 4:3
connection
21:22 22:19
65:9 66:1,5
67:1 70:15
92:17 94:20
114:21 115:6
118:17 198:2
214:3 280:23
287:24 421:16
425:14 577:10

606:13
connections
159:9,16
consider 246:16
256:22 268:13
317:9 369:12
424:16 426:22
510:3 583:11
596:10
considerable
24:6 25:15
considerations
411:3 429:20
considered
294:22 315:1
324:9 327:5,7
345:8 415:20
423:15 431:15
515:14 600:21
601:9
considering
303:6 502:5,6
consistency
329:20 438:5
438:24 441:20
560:21 561:14
608:20 643:15
644:2,9
consistent 57:22
439:13 521:13
561:8 578:13
608:6,13
consistently
153:7 440:14
638:12 644:4
constantly 71:8
constituents
527:23 545:4
consult 262:13
378:22
consultant 29:6
30:20 70:16
79:4 107:7
110:18 121:18
163:5 185:11
185:23 227:15

232:13 276:3
277:5 286:12
286:14
consultants 30:6
33:16 106:22
185:2 285:18
286:6,23 370:8
370:15,22,24
371:17,23
372:13
consultation
32:19 259:20
274:5
consulting 9:18
27:15 30:23
70:15 72:24
73:10,15,24
74:4,9,19,20
75:1,4,15
78:11 79:7,21
80:20 95:20
97:6,17 120:8
120:11,15
121:1,5,7,11
121:21,22,24
126:8 127:2,7
127:23 160:6
165:2,3,9
168:15,18,24
169:8 216:23
287:23 293:8
334:14 599:15
599:21 600:6
600:14 616:21
648:23
consumer
285:19 370:9
371:17 401:20
651:17
contact 67:9
165:16 218:21
218:24 283:18
404:14 565:13
566:16 625:18
contacted 193:7
193:9 198:10

198:16,17
566:19
contacts 621:19
621:20
contain 73:10
365:24 526:15
526:19 531:14
538:1,7 543:21
544:2,5,9,10
544:10,11,18
544:18 650:1
651:20 657:23
contained 73:12
197:4 379:21
380:5 472:14
524:13 525:1
536:23 650:18
containing
654:10
contains 92:1
379:6 400:24
400:24 526:6
543:22 649:11
649:19
contamination
264:3 265:23
377:22 525:22
526:22 528:18
546:20 547:15
content 158:3
361:16
contents 133:15
358:6 365:22
context 23:15
114:18 158:4
308:10 312:14
323:2,6 330:14
341:18 342:22
347:21 407:2
407:24 435:1
441:14 527:18
continue 234:24
282:9
continued
100:23 269:5
269:14

continuous
515:14 516:13
516:24 517:20
contraceptive
11:6 133:6,7
247:15 255:6
551:14
contract 32:11
116:3 118:17
119:8 165:3,4
165:10 199:1,7
199:21 202:9
203:5,10
207:10 210:4,9
210:22 211:1
211:19 214:24
215:6,12,15
220:21 229:22
231:13 232:3
233:13,18,23
234:1,3 235:11
236:4,8 237:3
237:20 242:18
244:13,21
246:18 253:20
254:19 270:18
385:22 386:18
387:18 388:7
390:21 391:11
402:5,19 403:3
403:13 622:9
contracted
190:22
contractor
620:15
contracts 49:3
114:21
contradictory
112:22
contribute 38:1
185:18 562:19
contributed
35:14 60:21
88:12
contribution
87:24 296:21

297:3 299:4
300:9 305:4
356:21 358:15
373:2,8 402:13
592:18 593:12
contributions
37:17 303:15
contributor
187:6
contributors
296:22 298:19
299:13
control 340:1,11
442:18 566:20
663:21
controls 316:6
554:9 555:20
559:24
Cont'd 3:1 4:1
7:2 8:2 9:2
10:2 11:2 12:2
convenient
342:7
convention
321:22 322:6
335:7
conversation
202:23 632:17
conversations
218:8
conversion
476:14
converted 476:6
476:9
Cook 8:15 102:1
175:3,4 176:12
176:18,21
178:3,7 180:19
180:24 181:6
181:19 472:5
476:1,2,19
477:21 478:3
485:3,5 517:4
Cooper 484:3
copies 141:12
167:12,24

Joshua E. Muscat, Ph.D.

170:22 272:18
362:11
**copy** 20:14 21:9
69:13 90:12
167:9 168:11
170:18,20
171:6,15,16
176:18 199:7
247:23,24
253:6 278:22
279:12 361:22
361:23 362:5
377:18,18
448:16 449:9
460:12 514:19
550:10 582:9
587:15 625:6
**corner** 350:18
407:14 490:12
516:22
**cornstarch**
358:10 379:9
544:3,4 550:2
551:10 554:15
554:18 555:2
557:1,4,10
558:3 559:3,23
**correct** 15:13,19
16:4 18:12,24
19:11 20:3,24
21:1,6,7 24:20
25:18,24 26:18
27:11,18,19,22
27:23 28:2,15
28:16,18,20,22
29:7 30:4,21
30:23 31:3,19
32:7,12,16,22
32:23 33:9,11
33:17,22 34:3
34:8,10,15,19
37:4,5,14
39:11,18 40:2
40:18 41:2
44:20 45:3,6
45:10 46:4,23

50:12 51:1,4
53:18 56:2,21
58:4,13,16
59:7,13,14,20
60:3,6,22 62:1
64:18 65:14
66:7 67:5 68:2
68:3 69:4
72:20 75:19,24
76:6,11,15,16
76:18,19,21,22
77:9,12 78:9
78:21 79:1,8
79:11,15,16,19
80:10,17 81:1
81:5,7,23 83:1
85:7,9,15
86:16,21,22
87:4,20 88:8
88:10,14,15,17
88:18,20 89:1
89:9,20 91:11
92:14,15,18,22
93:5,12,15
94:3 95:12,15
96:5,9 98:2,3,7
98:8,10,11,15
100:14 101:1
101:10 103:9
103:13 104:24
107:3,23 108:5
108:10 109:6,9
109:10 110:14
111:17 112:6
113:9 114:16
114:22 116:12
116:16 118:2
118:19 119:23
122:8,9,18,22
123:20 127:3,5
127:10 130:5
130:14,18,24
131:12,19
132:2 133:8,10
133:11,18,19
134:6,10,22,23

135:2,18,23
136:4,20 137:6
138:15,19
142:4,5,7,17
142:23 145:23
146:8 147:13
147:14,19
148:2 152:23
152:24 153:12
153:19 157:11
157:16,23
158:5,8,10,15
160:12,13,22
160:23 161:4,8
161:14 162:1
162:16,21,21
163:5,7,8,11
163:14,18,24
164:5,21,22
166:5 167:1
168:16 169:14
170:4,8,12
171:3,7,10,11
172:16,17,21
173:9,10,16,20
174:1,13
176:13 178:16
178:21 180:7
180:15 181:1,2
181:7,10,14
182:1 183:7,23
185:3 186:10
187:3,7 190:4
190:15,23,24
191:4,8 192:6
192:7,10,16
193:11 195:18
195:19,21,22
196:7,13,17,22
196:23 197:4,9
198:7,22,23
200:8,22 201:3
202:9,12 203:6
203:22 204:6
204:12,24
205:10 206:19

208:4,7,18,22
210:5,15,19
211:14 212:12
212:19 213:11
215:6 218:18
220:23 221:2,9
224:3,4,14,15
224:18,19,21
225:13,15,17
225:23 226:23
227:12,16,23
229:8,14,15,18
230:22 231:16
233:24 234:10
236:1,4 237:21
238:7,10,19
239:5,12
240:23 241:2
241:10,16,18
241:22,23
242:14,23
243:12 244:8
244:11,16
245:23 246:3,6
246:7,10
248:10 250:11
250:22 251:12
251:16,22
253:15 254:23
255:8,23
256:17 257:1
257:24 259:1
259:13,14,17
263:8 264:9,12
269:7,18 270:4
270:22 271:12
273:16 275:15
276:7,8 277:21
278:8 280:12
280:18 281:3,9
281:10,16
282:4,12
283:20 284:3,6
284:12,24
286:14 291:20
292:3 299:2,10

302:23 303:21
304:1 307:19
308:13 309:10
309:18,21,24
310:5,15 313:8
313:9 316:8,9
316:17,23
318:11 319:1
320:9,22 321:2
321:13,17
322:10,19
324:14 326:2
327:1,22 328:1
330:15 332:5
335:18,22
336:20,24
337:1,4,5,11
341:14 342:1
348:7,9 349:3
350:4,22 351:9
352:9 354:7,20
355:5,9 356:4
356:5,7,13
357:16 359:11
359:16 361:3
361:13 363:22
364:7 366:21
368:19 369:1
370:12,16
372:14,19,24
373:13,24
374:2,3,6,7,13
374:19 376:3
376:24 379:24
381:11,13,20
383:19 385:7
386:20 387:4
388:13 389:18
397:23,24
399:2,5,16
400:3,22
402:17 403:4,8
405:1 406:15
408:16,20
410:13,20
412:1,15 413:8

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 414:16 415:21 | 536:3,5,10 | 640:2,3,6,7,9 | 455:2 530:17 | **credentials** |
| 416:1,10 418:1 | 537:6 542:13 | 640:12,13 | 567:6 569:10 | 125:24 |
| 418:2 420:2,6 | 543:1,6,18 | 642:12,22,23 | 569:18 599:10 | **credibility** 89:8 |
| 421:16,21 | 544:1 545:7,22 | 643:19 645:8 | 599:20 605:20 | **credible** 334:15 |
| 425:18,22 | 549:20,24 | 646:13 647:4 | 613:5 617:9 | 335:3 422:10 |
| 427:3 431:6 | 550:1,3,24 | 647:11 648:2 | 619:6 639:19 | 422:15 502:14 |
| 434:8 436:9 | 551:2,4,19 | 648:10,12 | 648:18 658:20 | **criteria** 352:14 |
| 439:2 444:21 | 554:20,21 | 652:13,16 | 660:7 | 412:22 414:11 |
| 444:22 445:20 | 555:2 557:2 | 659:10 666:7 | **counsels** 600:5 | 414:15,20 |
| 451:22 452:4 | 561:10,20 | **corrections** | **Counsel's** | 415:5,18,20 |
| 452:11 456:11 | 562:2 563:21 | 664:5,7 666:10 | 359:13 | 418:22 423:5,8 |
| 456:15 458:20 | 569:2 571:1,11 | **correctly** 257:4 | **count** 451:18 | 423:19 454:21 |
| 459:4 461:15 | 573:19 574:3 | 470:24 471:3 | **couple** 38:17 | 458:18 542:22 |
| 461:17,17 | 574:11 577:15 | 471:19 524:19 | 52:9 105:17 | **critical** 10:19 |
| 463:12 464:12 | 581:6 582:4 | 525:4 | 134:17 292:7 | 118:11,12 |
| 464:16 465:9 | 585:16 588:4,9 | **correspondence** | 311:17 422:9 | 134:5 204:24 |
| 465:15 466:15 | 588:12 589:12 | 143:14 | 573:12 650:16 | 205:8 206:3,16 |
| 466:19 467:6 | 589:15,21 | **corresponds** | **course** 28:1 | 215:16 221:1 |
| 468:11 470:12 | 590:20 592:20 | 184:11,13 | 156:8 286:13 | 234:4 248:2,21 |
| 470:23 473:2 | 595:16 596:8 | **cosmetic** 55:17 | 317:16 355:3 | 249:10,12 |
| 475:9,18 476:3 | 596:12 597:16 | 55:19 61:21 | 403:10 404:12 | 250:22 256:16 |
| 476:4,7 477:7 | 597:22 598:6 | 122:14 141:12 | 455:11 463:10 | 281:8 288:22 |
| 478:1 479:15 | 601:3,4 602:4 | 157:7 158:19 | 499:12 574:18 | 291:11 315:18 |
| 479:18,19,24 | 602:9,10,20,23 | 218:17 255:5 | 576:17 581:1 | 342:23 373:15 |
| 480:8,10,21 | 603:6,7 604:1 | 358:11 379:5 | 588:15 648:5 | 394:20 395:7 |
| 481:6,7,9 | 604:20,24 | 379:18 382:23 | **courses** 571:20 | 396:18 579:16 |
| 482:14,15 | 605:5 609:5,17 | 385:3 400:15 | 571:24 | 580:19 581:2,8 |
| 483:7,11 | 613:11,13,14 | 598:8 642:7 | **court** 1:1 14:16 | 581:15,21 |
| 491:13,22,24 | 613:16 614:2 | 643:2 | 96:12 415:4 | 582:1,6,10,15 |
| 492:1 496:2,8 | 617:11,13 | **cost** 189:9 | 566:23 664:20 | 582:22 583:4 |
| 498:8 500:24 | 618:8,9,14,18 | 239:15 | **cover** 7:8 16:7 | 583:18 585:8 |
| 503:4,9,14,20 | 619:18 620:7 | **COUGHLIN** | 71:16 368:4 | 585:20,23 |
| 503:21,24 | 620:16 621:4 | 4:12 | 395:13 | 590:15 630:20 |
| 507:16,23 | 621:13 622:4 | **Council** 29:19 | **co-author** 54:5 | **critically** 156:19 |
| 508:3,23 509:3 | 623:23 624:6 | 603:19 | 90:20 133:12 | **crosses** 328:8 |
| 509:8 511:10 | 624:10 625:21 | **counsel** 14:14 | 297:5 299:5 | 329:3 |
| 513:24 516:3 | 626:21 627:1 | 22:3,6,20 25:2 | **co-signed** 512:9 | **cross-notice** |
| 517:10,22 | 628:1,12 629:1 | 26:7 36:8 64:3 | **co-written** 122:7 | 606:9,11,17 |
| 518:4 522:2,12 | 629:5,6,7,9,17 | 64:4 65:8,18 | **Cramer** 39:6 | **Crowell** 9:16 |
| 522:15 525:11 | 630:18 631:3 | 66:1,5,24 | 169:11,21 | 28:18 29:14,15 |
| 525:23 526:23 | 631:17 633:17 | 129:3 162:19 | 419:17 452:20 | 32:21 76:17 |
| 527:6 531:14 | 633:18,22 | 199:15 203:21 | 452:21 479:4,4 | 77:11,20 78:3 |
| 531:15,17 | 634:24 635:12 | 234:16 268:9 | 479:4,12 480:9 | 78:21 81:18 |
| 532:20,21 | 635:14,15 | 274:10 278:23 | 480:14 499:21 | 110:19 119:21 |
| 533:3,21 | 638:8,14 639:7 | 280:22 362:12 | 517:3 | 162:19 163:6 |
| 535:14,20 | 639:10,12,17 | 377:19 427:20 | **created** 459:7 | 193:9 199:7 |

200:6,10
206:17 207:16
210:13,16,19
227:9 229:21
230:8,20
232:16 233:10
233:14 238:18
242:19 245:21
245:23 249:21
250:5 252:22
252:22 253:10
253:13,17
254:8,13,22
255:22 256:4
257:16 268:24
269:3 270:19
272:5,22
273:21 280:10
293:2 385:22
386:1,18 387:7
388:17 390:19
390:22 391:1
392:3 395:7
402:14,15,19
575:11 581:4
582:16,17,20
583:21 585:11
620:23 622:8
622:19 623:21
626:12 627:24
628:11,17,18
**Crowling** 12:7
**crunching** 94:24
**crystalline**
543:12
**CTFA** 33:8
34:11,12 55:17
161:11 189:2,4
223:22 224:3
355:9,11
**Ctisi@levinla...**
2:6
**current** 79:17
128:14 285:24
571:17 590:7
602:14

**currently**
502:22
**curriculum** 6:15
6:21 20:14
**cursory** 658:17
**cut** 553:2
**cuticle** 507:14
**CV** 69:12,20,23
70:1,4,6,21,21
71:1,7 72:18
72:23,24 73:1
73:12,15 74:12
74:24 75:3,11
75:18,22 76:6
79:15,18,22
109:4 125:10
125:16,20
126:6,14,14,20
127:2,4,7,15
127:22,23
128:15,23
152:2,3,14,19
153:2 276:16
282:2 573:15
**CVs** 70:11,14
71:4,20,21
72:3,17 73:3,9
73:24 74:1
76:2 125:22
126:9,17
128:19,20

_____
**D**

**D** 6:2
**daily** 465:15
483:1,1
**Dallas** 3:18
**dance** 40:11
440:8
**Daniel** 39:5
**data** 43:11 69:14
84:16,22 85:9
85:23 86:12,14
87:11 94:24
112:5,22 124:6
136:8,10 143:4

143:12 144:18
144:21 145:1
151:19 178:15
180:6,14 268:2
327:21 328:17
331:7 342:24
343:12,15
346:8,9 400:11
400:12 401:6
424:19,20
428:18,18
432:4 435:7
443:18 446:5,7
447:3,5 451:1
451:12 454:16
455:18 456:22
458:16 462:12
463:7 464:18
465:4 475:23
479:6 485:16
499:3,4,7
501:10,12,13
502:13,18
503:23 510:16
510:17,18
511:1 512:19
518:10 520:4,8
523:8 556:5,5
556:21 575:24
576:16,19
577:1,7,10
586:13,18
587:3 591:2,8
592:19 595:11
595:18,24
609:8 610:15
**date** 1:16 14:6
38:16 66:19,23
67:3 100:18
212:21 273:10
279:8,18
282:17 374:12
375:10 381:9
664:9 666:16
**dated** 66:6 141:5
143:24 146:6

168:13 170:18
177:17,22
188:16 237:10
237:16 245:17
279:23 663:15
**dates** 66:13,14
153:6 169:21
181:18 282:16
**David** 5:10 14:4
**day** 82:13
365:13 445:1
482:23 495:15
496:14,15
497:13 498:14
588:15 617:18
666:20
**days** 311:24
335:8 476:6,8
482:14 664:16
**deal** 314:6 440:3
505:11 508:18
**dealing** 523:21
534:12
**dealt** 573:21
574:1
**Dear** 188:24
**death** 503:13
**debatable** 421:7
**debate** 19:5
41:23 42:10
43:10,17,21
44:1,14 45:13
45:24 153:17
156:1 158:19
158:24 417:8
**debated** 38:20
39:1 46:1
196:1
**debates** 44:20
**debating** 44:15
**decade** 26:16
**decades** 38:17
38:21 39:2
57:20 98:14,20
196:3 379:20
382:24 384:8

650:16
**decided** 99:24
**deciphering**
112:21 113:2
**decision** 17:7,19
19:10 417:4
**decline** 302:9
**decrease** 358:8
**deemed** 664:19
**defend** 287:9
**defendant** 3:14
4:15,20 26:17
31:18 116:5
**defendants** 22:7
22:20 24:9,18
25:23 34:16
46:8,19 47:19
48:7 51:15
54:18 55:11
73:1 80:20
83:1,19 114:22
115:11 116:15
118:2 159:10
159:17 621:12
**defending**
285:24
**defense** 200:11
567:6
**deferral** 158:9
**deferred** 96:3,19
96:23 196:22
196:24 197:15
197:19
**defers** 192:3
**define** 27:3
**defined** 467:7
477:6
**definitely**
129:12
**definition** 197:9
421:6,6
**definitive**
239:14
**degree** 570:24
571:3,5 643:15
**deliverables**

9:13 246:12,17
247:3 624:4
**demonstrate**
437:5
**demonstrated**
133:23
**demonstrates**
382:22
**denied** 99:23
274:15 509:12
**department**
571:16 573:1,1
**depend** 538:17
**depending**
295:12 420:23
**depends** 18:2
70:3,8 86:7
121:12 331:4
340:16 467:6
473:8,14
**deponent** 14:12
666:2
**deposing** 664:16
**deposition** 1:14
6:17 11:10
13:2 14:8
58:15 61:6
90:6 177:22
389:6 406:9
430:22 443:24
606:10,19
607:12,14
608:2,7 613:13
614:5,8 662:2
662:8 663:6,8
663:9 664:3,13
664:17,19
**deps@golkow...**
1:22
**derived** 26:5
36:6 64:1
136:8 148:2
253:19 419:15
432:11 446:5
447:2 449:1
556:22 559:2

**describe** 402:10
424:16 469:8
487:11 488:8
489:2
**described** 65:22
336:6 414:9,14
484:12 485:17
487:7 488:10
538:23
**describes** 16:18
339:9 400:11
413:7 490:3
541:17
**description** 6:14
7:5 8:5 9:5
10:5 11:5 12:5
66:17 280:21
**design** 123:18
407:3 408:1
437:7 639:23
640:18
**designation**
199:16
**designed** 173:2
625:17
**designing**
170:15
**designs** 173:18
173:22 438:6
439:1 441:21
560:22
**desire** 305:15
**despite** 650:16
**detail** 55:3
159:12 333:22
610:2
**details** 365:12
365:16
**detect** 319:6
**determination**
417:21
**determine**
178:14 180:13
335:14 414:23
533:9 538:24
610:14

**determining**
489:17
**developed**
491:14
**development**
35:14 38:1
419:14
**develops** 406:20
**diaphragm**
132:11,14
204:19 206:13
208:13 209:20
210:24 215:16
220:24 234:4,7
280:17 289:10
290:14 291:3
345:11 397:6
397:13 399:23
548:23 549:6
551:9,14
554:10,17
555:7,21 556:8
557:14 576:7
577:8 578:13
578:17,21
579:5,5 610:13
**diaphragms**
11:7 47:8
117:2 131:23
132:2 133:2,7
204:12 247:15
255:6 318:10
344:21 400:16
400:21,24
401:3,8 549:18
577:9,11,19
578:3 579:11
631:5
**diaphragm/ov...**
240:2
**differ** 41:9 43:3
148:12 308:16
**differed** 40:16
**difference**
130:13 286:11
473:13 496:13

554:8 575:16
592:10
**differences**
332:23 437:6
478:22 634:10
**different** 48:3
70:7,11,11
72:17 73:2,4
76:2,3,4 82:18
87:8,13,13,14
150:10 159:17
160:14 173:8
173:17,21
209:4 250:4,6
250:8 251:11
251:15 256:20
265:3 316:3
319:4 324:5
331:22 332:3
333:13 338:11
339:3,5 341:12
394:4 396:24
397:1 409:19
412:24 413:5
416:5,9 417:16
421:19 424:16
438:24 441:21
466:18 469:2
473:22 474:2,3
474:15,17,20
475:15,17
479:22 480:20
481:1,12,13,14
482:1,8 495:11
498:23 501:5
547:15 560:21
561:21 594:5
629:15 638:21
641:10 652:24
**differently**
56:14 416:10
418:12
**difficult** 424:15
649:18
**digit** 473:11
**direct** 64:8

65:20 411:17
606:1,5 607:17
607:18 621:19
621:20 625:18
663:21
**directed** 399:15
**Direction** 13:5
**directly** 28:11
31:17 32:19
46:9 47:1,19
49:11 83:18
233:21 412:14
513:17 549:12
623:2 626:16
628:4
**disagree** 17:10
17:22 18:3
67:18 409:8
424:3
**disagreed** 18:5
20:3,7 154:9
**disbelieve**
149:22 200:12
223:17
**discipline**
572:18
**disclose** 229:16
229:20 232:1
232:15,19,20
232:23 235:1
277:22 284:16
285:10 295:9
295:16 296:15
296:20 300:23
301:1 303:3
304:11,11
338:19 583:8
607:20
**disclosed** 232:12
277:12 278:6
285:15 335:22
335:23 336:4
387:2
**disclosing**
254:12 286:12
302:15 592:6

Joshua E. Muscat, Ph.D.

207:5 230:3,6
230:13 234:14
254:11 286:7
286:21 287:1
287:18 288:10
288:13 289:24
296:2 301:9
578:16 582:14
583:12,22
584:7,18
585:11,19
591:21 592:1,6
606:3,22
**disclosures**
288:9,21,23
359:2 574:22
**discovered**
202:4
**discuss** 35:10
43:7 82:12
90:18 363:21
365:2,21
366:11,19
367:1 438:16
512:24 513:4
**discussed** 42:24
43:1 98:13,19
170:7 325:3
357:2 365:7
367:9
**discussing** 37:17
178:6 570:13
**discussion** 135:1
154:16 293:15
324:22 416:7
554:6 555:9
**discussions** 25:1
26:6 36:7
162:16 197:14
384:22 385:5
**disease** 195:15
503:18
**diseases** 16:15
16:20
**display** 335:4
463:22

**displays** 136:10
344:19 443:17
446:7 447:5
452:14
**dispute** 608:1
**disputed** 405:16
644:3
**disputes** 41:11
**distance** 242:6
**distinction**
372:5
**distributed**
380:17
**distribution**
16:14
**DISTRICT** 1:1
1:2
**division** 482:23
**docket** 365:2
**doctor** 15:15,15
20:21 35:2
44:4 57:6 71:4
79:13 82:10
94:4 117:6
121:14 127:19
129:22 132:22
155:15 242:7
254:2 261:12
317:23 394:17
428:7 429:7
462:10 483:13
520:19 548:19
569:14 587:14
608:16 613:3,3
625:15 648:16
651:17
**doctorate**
570:24 571:3,8
**doctors** 633:22
646:4
**document** 1:8
20:17 21:11
23:3 57:16
64:14 66:18,20
67:4 68:3
69:15 75:7

91:18 99:22
109:24 110:2
110:12 138:23
140:17,23
141:1 142:16
143:20 144:9
166:16,19
167:13,17
168:13 171:18
175:13,19,22
180:20 183:11
184:6 186:8
188:2 191:1,7
199:2,14
216:21 219:20
220:4 237:5
245:11,17,20
248:1 249:17
250:4,6,8,19
250:20 252:20
253:12,24
254:3,4 255:11
256:23 257:24
272:12 279:1
279:23 282:19
282:24 293:12
349:17 350:1
362:1 363:2
364:16 373:17
394:9 397:9
406:6 407:16
413:13 428:24
437:24 448:7
460:3 548:24
549:2 587:10
600:1,3 616:22
623:4,14
629:19 662:4
**documentation**
591:22
**documented**
566:3
**documents** 13:8
21:5,22 22:11
22:14 23:8,14
23:23 24:7,13

25:15,21 26:24
53:1 63:14
65:1 67:8,12
68:12,20 69:1
82:7 92:2,7
105:21 106:9
164:24 202:5
247:19 252:5
252:12 257:8
273:10 274:13
279:18 288:17
288:19 363:10
395:14 615:24
616:12,18
623:6 628:16
**doing** 109:20
121:7 126:16
158:24 159:4
204:10,11
275:19 332:19
333:20 337:12
337:21 338:15
339:5 343:11
410:14 425:6
461:22 496:21
498:2,6 502:22
578:18 586:6
601:15 610:3
621:4 625:20
660:19 664:8
**Don** 102:10,13
320:2
**door** 660:8
661:12
**dose** 518:4,5
**dose-response**
135:15 136:10
136:20 144:18
144:21 341:17
427:11 434:7,9
436:14 438:12
440:16,18
443:4,13,18,24
446:7,20 447:5
450:24 451:12
463:7 490:20

491:5 502:8
508:20 510:1
510:12 512:19
513:8,18,23
514:22 515:1
517:9 519:6,21
522:2,15
588:16 589:12
608:19 644:8
653:23
**doubt** 400:1
**Dr** 14:13 19:23
24:22 26:4
36:4 51:3 52:2
52:8,16 53:13
53:18,20,24
54:4,6 63:23
64:23 67:22
81:4 90:15
95:3,21 97:17
104:22 106:24
109:4 110:13
111:17,20
121:4 124:8,14
125:1 130:21
134:6,21,21
138:12 139:2
139:11 141:9
142:3,21,22
146:10 147:5
151:2 153:22
154:8 165:13
165:14,23
166:1,23 167:3
168:15,20
169:11 172:19
172:19 174:20
176:12 178:19
181:13,14
183:17,18
184:18,18
185:10 186:17
192:15 193:7,9
198:16,17
203:4 216:9,10
218:11 222:1,3

222:6 226:2,7
226:8,17
239:21 241:21
243:10,11
247:5 250:9,20
251:3 252:6,21
257:18 259:12
259:20 260:6
269:12 277:19
279:9 284:21
285:7,7,17
318:16 320:3
322:8 325:5
339:17 345:24
347:11 348:22
354:5 356:3
367:3 370:5,7
371:13,16
373:11 378:18
389:10 392:13
393:9,13 399:3
399:4 404:24
406:14 419:17
430:2 432:12
433:5,16
434:21 435:22
444:5,5 450:21
452:21 454:1,2
462:2,11 466:9
466:10 467:15
472:23,23,23
473:1,5 476:24
480:17 481:8
502:14 504:1
510:4,5 522:8
522:8,18,19
553:17 555:16
565:3 567:22
568:2 570:4
575:2 584:3
594:4 596:5
598:7,19 599:8
603:2 604:10
605:18 610:24
612:10 616:9
616:15 620:2,9

620:11,21
623:21 624:5,6
624:21 626:24
627:20,22,23
630:7,24 631:7
632:9,13
635:17 636:9
642:24 649:5
**draft** 98:20
243:24 250:20
362:6 368:5
369:2 394:18
395:5,16
622:17
**drafted** 98:6
119:20 146:19
172:6,10
241:21 243:18
249:17 282:3
367:3,19 368:1
402:19 403:3
623:8
**drafting** 50:20
169:9 258:9
**drafts** 203:19
241:22 285:20
359:23 370:10
371:21 372:3
393:19
**drag** 117:7
**draw** 162:12
550:24
**drew** 521:19,23
**Drinker** 1:15
3:11
**Drive** 3:12
**drop** 107:15
**Drs** 9:13 246:13
247:3,10
**drug** 350:21
408:12 506:10
506:11
**due** 426:17
568:16
**DUFFY** 4:12
**duly** 14:21 663:5

**duration** 341:20
479:23 491:24
492:3,10,15
494:9,21,22
495:22 496:18
497:4,24
500:23 501:4
501:13 511:20
516:13,23
517:5,19
**dust** 551:8
**dusted** 400:1,21
401:1 554:14
554:15
**dusting** 379:8
562:15
**D.C** 4:18

## E

**E** 1:14 3:17 6:2
6:4,11,15,21
7:2 8:2 9:2
10:2 11:2,21
12:2 14:20
663:8 665:1
666:16
**earlier** 19:10
127:23 152:16
396:19 581:1,3
582:13 600:19
607:10
**early** 58:20,21
443:23 524:12
525:1 528:16
546:18
**easier** 92:6,9
311:15 408:7
448:3,18 461:4
516:8
**EASTERN** 1:2
**easy** 178:12
448:4
**edit** 48:12 50:3
51:16
**edited** 50:7
51:14,24

148:18 206:1,1
395:16 396:19
**editing** 298:17
298:17,18
**editor** 92:13
93:23 181:5
630:15
**editors** 299:18
299:22
**edits** 250:10
256:6 298:14
298:15,15
359:23 362:7
363:1
**educational**
570:16
**effect** 16:19
85:21 407:5
408:3,13,15
411:16 412:23
414:24 421:7
424:7 426:10
427:8 568:11
612:4 647:6
**effects** 421:2,4,5
**effort** 359:11,20
360:17
**eight** 63:9,11
128:22 349:14
456:8,8 497:12
497:13
**either** 31:17
49:2 51:14,17
87:10 209:14
237:2 278:7
302:17 338:2
346:9 401:1
574:21 580:20
**element** 268:2
342:14
**elevated** 324:12
**eliminated**
528:18 529:19
530:3 531:16
546:20
**elimination**

529:21,24
**Elizabeth** 588:6
**emphasized**
112:12
**emphasizing**
528:4
**employ** 427:1
**employed**
483:16 487:5
**employee**
213:24 214:17
**enclosed** 171:6
**encounter** 227:2
**encouraged**
487:9
**ended** 567:13
581:4
**ends** 662:1
**enforcement**
52:15
**engage** 562:15
**engines** 343:10
343:12
**England** 305:20
309:8 310:2,17
311:4,7 313:17
314:1,10,18
315:6 453:3
**entail** 260:14
**entered** 119:9
154:16 165:3
199:1 220:21
237:20 606:4
**entire** 369:4
512:4 552:9
**entirely** 22:11
24:3 264:9
339:2 343:14
394:4
**entities** 3:15
**entitled** 64:5
75:15 122:13
141:11 144:17
160:5 248:1
250:21 255:5
299:12 348:5

Joshua E. Muscat, Ph.D.

395:6,16 624:4
**entries** 60:15
**entry** 65:6
**environmental**
374:9 570:19
571:4,6
**epi** 562:18
**epidemiologic**
38:14 57:24
411:1 412:14
412:24 424:19
429:18 446:19
486:10 541:24
542:6 543:9
562:18 588:20
589:1 637:11
642:6 655:24
656:17 657:18
657:19
**epidemiological**
204:17 436:12
443:11 539:4
589:9 590:8
602:15 637:16
643:1
**epidemiologic...**
646:8
**epidemiologist**
15:16 16:8,9
226:23 411:14
413:4 461:11
566:18
**epidemiologists**
17:10,21 18:11
19:4,9,16 20:2
20:5 38:20
39:1 40:15
41:9 225:23
406:21 416:9
**epidemiology**
7:7 11:23
16:18 17:6,18
35:12 36:1
41:8,17,23
46:10 70:17
93:4 101:15

173:9 176:21
183:6 186:16
204:22 260:16
263:24 281:15
315:8 316:1,21
322:10,16
324:23 375:7
376:2,5 400:13
411:23 416:24
417:18 427:9
530:10 543:10
571:6,10,22
572:10,19
573:8,9,22
**epidemos** 16:11
**Epstein** 350:19
504:1 510:4,10
**Ernst** 168:15
**errata** 664:6,9
664:12,15
666:12
**error** 324:1
326:20 346:11
346:17 457:7
457:11
**errors** 457:13,17
458:6 461:12
**especially**
325:21 652:10
652:21,21
**ESQ** 2:3,4,9,9
2:14 3:3,7,12
3:17 4:3,7,12
4:17 5:3
**essentially**
148:13 297:10
583:19,23
588:8 589:18
590:13
**establish** 157:6
590:9 602:16
**established**
95:21
**establishes**
576:18
**establishing**

412:22
**estimate** 325:24
326:24 327:19
343:22 420:13
562:1
**estimates** 326:14
336:23 342:6
344:9
**estimator** 344:1
**et** 134:10 136:9
216:22 221:7
435:6 443:17
446:6 447:4
633:22
**ethical** 411:2
**Europe** 547:16
**European**
118:14 290:16
348:6 354:2
358:21 369:10
373:22 376:13
383:6 397:18
429:10 576:10
580:21 582:2
**evaluate** 307:6
308:10 597:19
**evaluated** 42:23
**evaluation** 43:11
342:23
**evening** 570:7
**event** 327:19
**events** 257:19
**everybody**
272:18 369:17
422:22 489:6
**everyday** 464:23
**evidence** 17:8,20
19:7 40:17
41:10 42:12
57:24 58:2
153:24 155:19
157:4 330:14
330:20,22
424:17 425:24
426:24 427:2
427:15 513:18

513:23 514:23
518:3 523:17
542:3,18
566:11,17
588:20 589:1,9
590:8 597:1
602:15 632:23
635:19 636:10
636:11 637:1,4
637:16 638:1
642:6 643:1
657:18 659:9
**evolution** 35:11
35:23
**evolving** 18:10
**EW** 635:5
**exact** 38:16
100:18 181:18
212:20 248:8
248:14 249:2
282:17 351:24
352:20 356:12
374:12 375:10
421:6 446:22
562:6
**exactly** 144:21
192:24 288:15
335:15 447:11
473:15 481:24
482:7 489:11
495:4 505:24
557:14,22
621:3 638:22
644:6
**examination**
14:24 570:1
606:2,5 607:17
607:19 608:3
612:24 661:5,8
661:9
**examined** 14:22
**examining**
400:13 436:12
443:12 446:19
**example** 18:4
41:21 45:9

47:7 50:10
65:4 74:7,19
74:19 107:5,9
118:10 131:21
173:12 309:5,7
310:16 314:1
316:19 321:4
333:6,15 341:2
341:17 350:14
379:4 408:12
457:15 464:20
469:3,19 498:2
519:23 655:21
**examples** 39:3
310:17 379:17
382:17
**exception** 90:18
447:13
**excerpts** 293:2
**excess** 589:5
637:7 638:4,5
638:12
**exchanged**
359:23
**exclude** 70:1,8
**excuse** 22:21
90:24 135:9
145:21 170:1
204:10 210:23
273:15 350:15
405:19 486:15
521:20 590:11
614:6 624:5
**Excused** 662:7
**executive** 9:12
102:14 247:22
**exercise** 502:22
521:17
**exhibit** 20:16,18
21:12,16 23:2
23:4,22 69:16
74:2 75:2,6,8
91:17,19,23
110:1,3 140:15
140:18,22
143:18,19,21

166:17,20
167:18 170:17
174:17 175:14
175:20,23
176:1,3 177:19
177:21 180:18
180:21 183:12
184:7,10 188:3
188:7 199:3
237:6 245:12
245:15,16
255:1 256:10
272:11,13
273:3 274:22
274:24 279:2
281:14 282:23
283:1,8 293:4
293:13 349:18
350:2 361:23
362:2 364:17
364:21 368:23
373:18,21
385:17 394:10
394:14 397:6
397:10 405:22
405:24 429:1,5
434:16 438:1
446:2 448:6,8
459:1,2,9
460:4,7 463:21
513:16 548:22
548:23 549:3
550:11 562:24
587:8,11,15
599:6,7 603:9
603:10,11
623:15,17
629:20,23
634:18,19
640:5 662:5
**Exhibits** 166:14
175:18
**existing** 523:20
**exists** 542:12
**expect** 117:16
326:19 403:19

404:2 481:14
481:19 660:12
**expected** 125:22
126:4 240:9
261:24
**expects** 240:1
**expenses** 214:12
**experience**
112:4,13
570:14
**experienced**
637:6 638:4
**experiment**
411:20
**experimental**
407:3 408:1
413:1 417:19
590:8 602:14
**experiments**
539:6
**expert** 27:18
57:6 61:24
62:8 70:16
73:1 80:8
121:18 213:10
217:15,23
225:6 260:17
260:22,24
261:23 262:5,8
276:3,6 277:6
277:19 278:6
284:1,5,23
285:24 286:11
286:24 287:22
322:9 371:9
372:23 430:23
596:11 605:14
606:2,21
607:18 608:2
612:15 616:21
634:3 640:23
648:6,14
651:15 660:10
660:11
**experts** 285:9
354:10 371:1

417:15
**expires** 666:21
**explain** 391:21
441:4 462:9
464:5 467:12
474:11,17
518:13 519:5
530:9 531:21
568:2
**explained** 264:1
335:1
**explaining**
469:11
**explains** 261:14
464:18
**explanation**
471:16 537:9
568:18
**explicit** 343:1
**explore** 320:16
518:24 519:5
519:12,14,15
520:21 522:24
523:4
**explored** 521:8
**expose** 409:17
409:17,22
**exposed** 410:10
410:18
**exposure** 7:14
8:13 93:5
144:4 183:7
342:15 399:14
410:15 419:13
462:17,18
463:15,16,23
463:23 464:19
465:14,23,24
466:6,21,22
468:4,5,19
469:1,15,16
470:10,11
472:13 476:2
480:6 482:13
483:3,9 490:22
490:23 491:12

491:16 494:14
495:7 498:4
499:14,15,15
500:12,18
516:15 517:2
517:22 538:17
549:11 559:3
560:16 589:11
658:10
**exposures** 343:7
534:14
**exposure-resp...**
589:3
**express** 153:16
157:14,20
159:5 461:19
**expressed** 46:5
85:24 157:2,22
158:7 464:9,13
500:22,23
**expresses**
321:21
**expressing**
155:18
**extent** 235:3
334:4 590:23
593:9,11 609:3
616:16 620:9
640:21 648:17
**extra** 279:12
**extracting**
343:16
**e-mail** 8:20 9:8
9:11 10:13
106:12 188:14
237:10,16,23
238:21 245:23
247:2 256:10
364:23 623:5
623:20
**e-mailing**
101:23
**e-mails** 106:16

———————
**F**
———————
**F** 2:9 4:18

**faced** 453:21
**fact** 37:1 56:1
59:5 88:3 98:4
103:7 135:13
141:22 144:8
171:9 181:5
206:14,16
241:20 245:2
249:15,20
264:1,16 276:5
288:20 315:10
396:16 412:12
412:22 421:18
430:22 440:17
446:22 450:12
453:19 481:10
487:9 489:20
492:2 500:9
508:21 513:21
538:7 541:16
541:22 557:13
572:5 600:3
602:7 604:17
620:1 639:19
640:14 655:7
**factor** 122:15
310:8,10,18,22
313:2 369:15
377:4 510:2
568:6
**factors** 310:7
333:7 342:4
416:8 418:12
429:21 431:15
434:9 436:8
**facts** 242:8
**fail** 664:18
**failed** 574:22
**failure** 340:1,11
**fair** 136:15
268:19 371:5
429:14 584:4
584:13 610:7
**fairly** 57:22
153:6
**fairness** 430:18

Joshua E. Muscat, Ph.D.

**fall** 324:6
**falls** 324:8,13
**familiar** 18:18
  53:11 54:2
  97:14 165:5,9
  224:9 264:5
  324:15 440:20
  441:13 442:7
  587:19
**far** 57:23 100:9
  643:16
**fashion** 302:21
  315:6
**fast** 637:22
**fatal** 503:18
**fault** 584:5,14
**favor** 451:17
  517:9 635:19
  637:4,11 638:2
**favorable**
  236:11 240:1,9
**favors** 637:12,17
**fax** 1:22 7:8
**FDA** 50:10
  51:17,23 54:17
  134:14,21
  146:20,24
  148:18 150:11
  150:22 157:23
  158:6 263:22
  348:21 357:6,7
  364:5 428:11
  429:8 439:11
  443:7 444:4,20
  449:3,18 502:4
  508:19 510:20
  512:10 513:12
  515:8 521:7
  522:10 523:16
  562:14 593:1
  594:4 595:3,16
  607:5 633:17
  633:22
**feasibility** 411:2
**February** 231:7
  231:13 237:17

237:21 273:15
**federal** 197:2
  648:10
**feedback** 141:19
**feel** 356:20
  651:21 655:9
**feeling** 426:15
**fees** 216:23
**felt** 561:17
**female** 506:15
**fibers** 525:2
  527:24
**fiction** 342:7
**field** 154:24
  417:17
**fifth** 482:12
  514:10
**fight** 79:14
**figure** 323:8
  341:16 353:16
  540:10 544:24
**file** 56:20
**filed** 146:12,20
  146:24 353:7,8
  506:4
**filing** 97:4
**fill** 295:11
**filled** 230:3
**filtering** 621:2
  621:10
**final** 10:14
  135:19 253:6
  368:22 393:21
  579:10
**finally** 290:16
**financial** 241:18
  294:23 295:17
  296:16 308:11
  312:6 359:2
**find** 171:5
  311:19 337:3
  377:6 465:2
  470:19 484:18
  486:2 514:14
  514:19 586:2
**finding** 327:16

**findings** 43:2,7
  43:8 436:11
  443:11 446:18
  517:3 612:6
**fine** 155:11,12
  287:2 304:21
  304:23 357:4
  414:1 427:24
  432:2 439:22
  440:2 627:14
**fingertips** 516:9
**finish** 152:9,11
  371:19 437:11
  437:17 452:24
  453:7,12
  521:21 541:4
  541:10
**finished** 605:20
  648:3
**firm** 29:15 77:12
  77:14,20 78:4
  110:19 162:21
  194:6,9,23
  198:10,15,18
  200:6,11
  202:19 206:2
  209:2 210:5,15
  210:17,23
  211:2 227:12
  229:23 231:14
  233:11 234:11
  234:20,24
  235:11 242:22
  243:8,12,20
  244:15,22
  246:9 386:2,10
  386:14 387:8
  387:19 388:7
  388:13,18
  391:2,11,21
  403:4,13
  621:12 624:9
  624:18,18,21
  625:17 626:11
**firms** 127:24

621:3
**first** 14:21 53:15
  58:17,21 65:5
  65:6 82:19
  86:17 88:24
  90:21 92:11,12
  93:17 97:3
  112:9 128:6
  138:12 164:16
  178:10 181:9
  218:20,24
  220:19 227:1
  244:6 250:19
  259:11 272:1
  288:5 290:5
  309:6 351:20
  351:20,20
  352:9 371:13
  374:4 376:16
  376:20 378:14
  386:1 395:12
  406:7 413:19
  414:3 421:11
  429:23 435:3
  443:5 446:4,13
  446:14 451:5
  458:2,2,3
  461:6,8,10
  462:8 463:21
  464:11 478:21
  483:22 491:1
  518:1 525:8
  529:23 532:2
  550:20 570:14
  585:2 587:16
  590:5 594:2
  627:20 634:23
  642:1 645:9
**fit** 128:23 160:4
**fits** 126:6
**five** 247:18
  255:13 322:2,3
  409:17,18
  410:11 456:7
  465:19 498:14
  572:14 615:4,5

615:6 617:19
**fix** 91:4
**flaws** 317:11
**flip** 300:22
**Florham** 3:13
**Florida** 2:5
**FLW** 1:6
**focus** 365:20
  400:20 428:8
  430:24 571:9
  643:17,18
**focused** 543:2
**focuses** 643:15
  644:1
**Folder** 12:6
**folks** 100:24
  365:8 600:20
**follow** 316:19
  449:5 465:11
  569:16
**following**
  120:19 189:20
  429:21 611:16
  650:11
**follows** 14:22
**follow-up** 613:4
**font** 256:20
**Food** 350:21
  506:9,11
**footnotes** 107:16
**foregoing**
  663:18 666:6
**foreign** 122:21
  611:21 646:14
**Forest** 344:6,7
  344:15
**forgot** 224:16
**form** 16:21,23
  17:12,13,24
  18:14 19:13
  20:9 24:11
  25:7 26:2,20
  27:13 28:4,9
  29:9,21 30:10
  30:16 31:5,21
  32:14 33:6,19

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 34:5,21 35:17 | 130:16 131:2 | 212:4,14 | 286:18 287:12 | 365:10 366:3,5 |
| 38:4,12,23 | 131:14 132:4 | 213:17,19 | 287:14 288:3 | 367:5,16,21,23 |
| 39:13 40:20,22 | 133:4 135:4,6 | 214:5 215:8,10 | 289:3,5 290:8 | 368:13 369:8 |
| 41:15 42:1,17 | 136:22,24 | 216:14 217:17 | 290:10,19 | 369:20,22 |
| 43:19 44:22 | 137:8 138:1,17 | 217:19 218:2 | 291:6,15,17 | 370:18 371:3 |
| 45:17,19,21 | 139:15,17 | 219:6,8,16 | 292:5,14 295:2 | 372:16 373:5 |
| 46:12,14,21 | 143:7 145:4 | 220:13,15 | 295:10,13,14 | 374:21,23 |
| 47:10,12 48:15 | 146:1,14 | 221:4,11 | 295:22 297:1 | 375:20 376:18 |
| 49:6,15 50:14 | 147:21 148:4 | 222:18 223:1 | 297:14 298:22 | 377:2 378:9 |
| 51:19,21 52:18 | 148:23 149:7 | 223:13,20 | 299:21 300:20 | 380:8,20 382:4 |
| 53:7,9 54:11 | 149:16,24 | 224:23 225:1,3 | 301:13,15 | 383:2,22 |
| 54:22 55:22 | 150:2,16,24 | 226:12 227:18 | 302:1 303:19 | 384:10,20 |
| 56:4,6,17,23 | 153:10 154:3 | 228:5,17 229:2 | 304:6 306:2,12 | 385:9 386:5,7 |
| 57:10,12 58:6 | 154:11 155:23 | 230:1,3,6,18 | 306:24 308:1 | 386:12,22 |
| 59:22 60:8,24 | 157:9,18 158:1 | 230:24 231:18 | 310:24 311:22 | 387:11,21,23 |
| 62:3 63:7,20 | 158:12,22 | 232:10 233:3 | 312:12,24 | 388:9,11,20,22 |
| 63:22 64:20,22 | 161:6 162:3,7 | 233:16 234:6 | 313:20 315:16 | 389:20,22 |
| 65:16 68:5,16 | 164:7 165:7 | 235:17,19,21 | 317:6 318:8,13 | 390:6,16 |
| 68:18 69:6,8 | 166:7 169:3,5 | 236:13,22 | 319:9,18,24 | 391:13,15,17 |
| 70:19 71:24 | 169:16 170:10 | 238:12 239:10 | 320:24 322:12 | 392:20,22 |
| 73:6 76:8,24 | 175:10 177:5,7 | 240:12,17 | 322:14,24 | 393:24 394:2 |
| 77:7 78:7,14 | 178:5,23 179:1 | 241:4,12 242:1 | 323:12,14 | 395:20,22,24 |
| 78:19 79:10 | 179:11,20 | 242:10 243:1,3 | 325:11,13 | 396:10,22 |
| 80:1,12,14 | 180:9 181:16 | 243:14,23 | 326:16 327:10 | 398:2,4,9,11 |
| 81:9 82:1 83:3 | 182:3,11 183:9 | 245:5 246:20 | 327:12 328:11 | 398:20 400:5 |
| 83:12,21,23 | 184:21 185:5 | 248:5,12 249:5 | 329:1,7,23 | 401:23 402:8 |
| 84:11 85:11 | 185:14 186:1 | 249:7,24 250:2 | 330:8,17 | 402:22 403:6 |
| 86:3,5 87:6,22 | 186:12,20 | 250:13,24 | 331:12 332:7 | 403:16 404:5 |
| 89:3,11,22 | 187:9,19 | 252:9 253:2,22 | 333:11 334:18 | 404:10 409:2,4 |
| 92:20 93:20 | 190:17 191:10 | 256:1 257:11 | 336:1 338:7,24 | 410:1 412:7,17 |
| 96:7,17,21 | 191:18,20 | 258:2,11 | 339:19 340:4 | 413:10,17 |
| 97:10,12,20 | 192:18 193:13 | 259:24 260:2,9 | 340:14 341:23 | 414:7 416:3,12 |
| 98:17 99:5,14 | 193:21 194:12 | 261:9 263:1,5 | 342:9 343:3 | 416:17 417:11 |
| 100:5,7,16 | 195:4,6 196:5 | 264:7,14 265:8 | 344:23 345:13 | 418:6,15 419:3 |
| 101:3,18 | 196:19 197:10 | 266:8,10 | 346:5 347:6,8 | 419:21 420:8 |
| 103:15 104:7 | 197:12 198:5 | 267:16,18 | 348:13 349:5 | 420:16 421:23 |
| 104:14 105:10 | 198:13 200:14 | 269:20,22 | 350:9 351:1 | 422:13,20 |
| 108:1,12 111:1 | 200:16,18,23 | 270:6,24 271:2 | 352:24 353:11 | 424:9 426:2,12 |
| 113:11,19 | 201:5,7,12 | 271:4,14,16 | 353:22 354:14 | 427:5 430:5,7 |
| 114:12,24 | 202:21 204:14 | 275:22 276:19 | 354:22 355:7 | 431:19,21 |
| 115:13 116:8 | 205:12,21 | 276:21 277:8 | 355:23 357:10 | 432:21 433:10 |
| 116:18 118:4,6 | 206:5,7,23 | 278:3,10,12 | 359:13 360:2,4 | 433:19 434:2 |
| 118:21 119:12 | 207:1,3,12 | 281:18,20 | 360:21 361:7 | 435:17,24 |
| 119:14 120:1 | 208:20 209:6,8 | 282:7,14 | 362:10,19 | 436:17 439:16 |
| 125:5 126:23 | 209:18 210:2,7 | 283:22 284:8 | 363:4,15,24 | 440:22 442:11 |
| 127:12 128:4 | 211:6,16 212:2 | 285:13 286:3 | 364:2,12 | 444:8 445:22 |

Joshua E. Muscat, Ph.D.

445:24 449:21
450:10,15
451:24 452:6
455:14,22
457:9,19
458:11 465:17
467:1,3,23
468:8,13 470:3
470:5,15
471:23 473:7
474:13 476:12
477:13 478:8
480:23 484:16
485:9 486:4
487:3,23 488:1
488:13,15
489:4,24 492:7
492:18 493:3,9
494:17 495:7
495:19 496:10
496:23 498:21
500:15 501:7
502:11 503:7
503:16 504:9
504:11,13
505:1,8,18,20
506:24 507:2,7
507:21 508:5,7
509:1,10,19
510:7,22,24
511:12,14,23
512:1,14 513:2
513:14 514:2,4
515:3,10,22
517:12,14
518:17 520:2
521:11 523:3
525:13 526:1
526:11,13
527:1 528:8
529:2 530:12
531:5,7,24
532:14 533:16
533:18 534:3
534:20,22
535:16,18

536:12,14
537:2,4,13,15
538:10,12
540:2,18 544:7
544:14,16
545:9,11,24
546:2,9 547:5
547:23 548:1,3
555:4 557:7,17
558:5,7 559:6
559:8 560:9,11
561:12 562:4
563:23 564:5
564:11,22
568:7,22 569:2
569:4 576:4
587:7 613:18
613:20 615:21
616:5 617:15
617:24 618:16
618:24 619:9
619:20 620:4
620:18,20
621:6,8,15,24
622:2,11,21
623:10 624:1
624:12 625:1,3
625:8,10 626:2
626:4,19 628:9
628:21,23
632:4 633:4,24
634:6 635:23
636:1,14,16
637:14 638:16
638:18 639:14
640:20 641:6
641:13,21
642:14 643:9
643:21 646:6
646:23 647:1
647:20,22
648:8 649:14
649:16 650:4
650:21,23
651:24 652:2,4
652:15 653:4,6

653:16 654:13
654:15,17
655:14,16
656:5,11 657:1
657:11,13,15
659:12 666:10
**formal** 45:9 99:3
99:9
**formally** 237:20
**format** 128:24
**formats** 70:7
**formed** 111:17
**former** 163:9
**forms** 290:1
629:15
**formula** 418:3
490:4,8,11,17
**forth** 101:14,24
176:11 217:10
273:21 359:24
620:13 621:11
625:16
**forward** 189:15
269:4 270:16
274:16 316:16
316:20 347:17
380:18 635:18
**forwarded**
624:9
**for-profit** 108:8
109:1
**found** 19:19,20
130:10 403:14
494:10 637:5
638:3
**Foundation**
32:12 92:18
97:2,5 99:18
103:4,19
163:23 164:20
165:2 169:1
171:2 213:23
599:22
**founding** 442:3
**four** 82:17 90:2
291:12 429:13

434:5 438:9,10
439:12 440:13
456:7 464:21
465:13
**fourth** 46:7
279:20
**fragrance** 55:18
541:21 543:24
**frame** 33:3 97:3
97:24 163:22
164:4 165:1
166:12 193:19
197:23 269:16
274:8 605:15
606:15 607:1
608:11 615:3
658:22 659:13
661:3
**framework**
418:21,23,24
**France** 224:18
**frankly** 154:20
**Frazier** 59:16,18
63:1 163:17
275:5
**free** 25:4 26:9
36:11 217:23
217:24 379:19
381:17,24
382:9,23
547:18
**frequency**
341:21 464:14
479:6,18,22
491:20 492:3,9
492:14 494:3,7
494:18 495:21
495:24 496:7
496:18 497:3
497:24 500:22
501:4,11
511:19 515:14
515:18 517:5
**Frequent** 506:14
**FREY** 4:7
**Friday** 607:8,10

**friend** 218:14
**front** 86:24
110:7 122:3
177:9 191:4
252:6,20
255:10 272:3
278:14 396:13
445:5 460:15
489:6 548:21
**fugitive** 52:14
**full** 421:12
451:6 454:14
458:2 463:5
570:9,10
**fully** 343:1
**fulsomely**
159:10
**fund** 99:8
100:12 182:8
236:9 412:11
582:23
**funded** 98:23
100:21 115:10
116:4,15
182:16,23
214:7 215:3
289:10 307:17
**funding** 83:8
87:12 88:17
89:16 99:23
103:12 104:1,2
117:20,22
118:1 183:2
201:3 294:1
304:12 305:5
305:16,21
306:8,20 308:5
405:11 574:21
575:8,15 583:9
583:20 585:1
**funds** 582:20
583:2
**further** 109:21
378:16 454:15
456:20 471:15
528:4

Joshua E. Muscat, Ph.D.

**future** 643:18

**G**

**games** 44:10
**garbage** 602:3,3
**gee** 285:7,8
  287:8 415:4
  641:3
**Gene** 275:6,7
**general** 41:22
  42:4,6 44:4
  45:13 68:8,11
  155:17 164:3
  178:13 179:24
  180:12 299:9
  340:19 382:6
  382:15,18
  384:22 406:12
  406:19 409:12
  410:12 418:24
  440:5,7 528:13
  659:5
**generally** 74:21
  263:3,17,20
  299:3 301:22
  323:7 429:24
  576:16
**generated**
  106:23 207:9
**geneticist**
  645:14
**genital** 505:16
  506:15
**geologist** 16:1
  378:23
**GEREL** 2:8
**Gertig** 454:17
  455:19 456:8
  456:17,19,23
  457:5 482:11
  483:4
**Geschwind**
  53:13,18,20
  54:4,6
**getting** 404:18
  482:22 532:23

571:7 660:22
**ghostwriting**
  297:16
**ghostwritten**
  297:11
**gifting** 139:7
**give** 39:2 90:11
  90:13,14 140:4
  195:11 268:16
  272:17 293:11
  349:15 377:18
  392:10,14
  408:12,14,22
  424:18 448:15
  457:14 459:7
  460:12 552:5
  570:15 582:9
  606:4 629:24
  631:11
**given** 48:11 49:1
  51:15 170:14
  209:14,14
  317:24 323:24
  335:11,22
  337:16 345:23
  457:22 583:17
  639:22 663:6
  666:8
**gives** 392:10
**giving** 178:19
**Glenn** 7:10 29:1
  29:3 110:13,17
  163:4 193:9
  206:2 227:11
  227:19 228:12
  245:22 269:6,6
  393:13
**Glenn's** 247:24
**go** 31:9,13,15
  75:14 80:2
  95:8 103:4
  104:17 111:7
  120:8 131:21
  131:22 134:4
  134:12,14,15
  134:17,24

135:8,19 136:5
  142:10 145:13
  148:13 156:21
  159:11 214:20
  227:14,15
  247:8 256:9
  263:14,17
  264:21 268:22
  268:24 274:16
  282:9 291:22
  297:11 316:18
  334:20 337:17
  338:3 345:19
  349:24 350:15
  351:12,14
  352:1,1,2,20
  353:15 356:16
  358:3 359:4,8
  360:24 373:14
  377:10 378:15
  379:3 383:15
  397:5 399:9
  404:24 405:6,7
  405:13,16,18
  406:5 413:5
  415:6 421:7
  422:2 427:18
  434:15,15,16
  434:20 439:24
  445:4 446:2,2
  446:16,17
  450:5,20 451:5
  452:17 453:14
  454:5 457:16
  458:21 461:5,7
  462:10 465:3
  467:4 469:9
  470:17 471:5
  472:4,9 475:2
  475:24 476:1
  478:3 483:17
  483:19,23
  486:21 490:4
  492:20 493:15
  493:18,23
  500:1 504:14

506:1 512:3
  513:11 514:5
  514:17 518:7
  523:18 524:6
  527:14 539:19
  552:2,21
  553:21 555:18
  556:18 558:9
  558:11 560:19
  565:16 576:12
  594:19 601:3
  605:22 608:10
  615:23 619:13
  619:13 623:17
  627:11 628:3
  637:21 641:9
  644:13,24
  653:19 661:4
**goal** 311:13
**goals** 366:13
**gobbledygook**
  326:9
**Godell** 246:1
**goes** 32:9 72:14
  111:24 112:16
  273:17 426:24
  475:5 476:19
  476:20 477:1
  483:19 528:15
  605:14 643:12
**going** 20:13,16
  21:8 23:1
  24:22 31:13,14
  36:16,20 44:9
  55:2 59:19
  60:5 62:15
  63:23 73:19,21
  74:15 75:5
  79:14 82:15,16
  82:16,19 83:7
  84:5,21 90:1,4
  90:11,13,18
  91:22 94:4
  95:6 97:1
  100:20 101:24
  106:1 109:23

110:6 111:3
  115:24 122:12
  125:1 129:6,16
  140:21 143:16
  144:20 145:11
  145:13 150:6
  159:11,24
  160:1,2 162:11
  162:13,18
  163:2,3 166:13
  167:21 171:12
  174:15,15
  176:6,7 177:12
  180:18 182:8
  182:22 186:22
  186:24 188:6
  200:9 206:15
  214:12 216:21
  235:6 237:9
  242:5 243:11
  243:19,20
  244:6,10 251:8
  262:15 265:13
  265:18 266:2
  268:10 270:16
  272:6,7 274:21
  282:22 285:2
  290:3 292:22
  293:7,24 294:3
  316:20 317:17
  320:10 335:14
  351:12 353:24
  358:18 359:3
  363:9 364:20
  394:13 397:8
  400:18 401:9
  405:14,15
  410:10,11
  427:20 428:1,8
  428:15 429:4
  429:12 431:8
  440:11 441:16
  442:23 444:14
  444:16,17,23
  445:17 448:2
  448:15 458:16

459:8 466:1,19
466:20 474:16
486:23 490:19
525:18 527:13
527:14 529:17
546:15 548:8
548:13,19,24
552:3,5,7,8
553:2,4,24
560:19,19
562:11 563:16
563:17 565:2
565:19 566:8
566:10 569:19
587:15 604:4
605:11 606:1
606:22 612:18
613:4 616:11
621:12 625:16
629:23,24
630:1 634:20
636:23 642:19
644:24 648:14
652:11,12
661:8,10,10,24
662:2
**gold** 407:4 408:2
**Golkow** 1:21
  14:5
**good** 15:3,4
  156:18 292:21
  313:14 342:20
  399:19 431:9
  570:4
**GORDON** 4:2,7
**gotten** 106:4
  182:23 632:16
**go-to** 398:6
**grade** 379:19
  382:23 383:24
  384:3 385:3
**grades** 383:18
**graduate** 572:15
  572:17
**Grand** 3:3
**grant** 7:19 72:23

125:24 171:17
174:4 208:17
209:1,3,10,12
209:13,13
210:11 211:13
211:14,24
212:6 401:18
402:4,6 583:6
585:12
**grants** 211:20
**granular** 61:12
**graph** 335:9
  344:8 358:7
**graphical** 335:4
  344:19
**graphs** 357:20
  359:15
**Gray** 1:17 14:17
  663:12
**great** 314:6
**greater** 379:6
  475:6,7,8
**Greece** 123:3,9
**Greek** 16:12
**green** 2:9 661:19
**Greenland**
  485:17,24
**ground** 16:7
  53:5 71:15
  544:12
**grounds** 23:12
  24:1 234:18
  606:7 616:19
**group** 11:22
  30:8,14,18,21
  30:22,23 31:11
  33:4,17,21
  34:1 50:16
  53:3 55:7,13
  55:16 56:9
  57:3,15 76:15
  76:20 93:14
  95:10,11,15,18
  95:20 104:19
  104:23 106:12
  106:17,22

107:8,12,18,23
108:8,8 109:8
111:10,21
113:8,16 114:5
114:20 115:8
116:11 117:14
117:15 120:7
120:14,20
121:4,17 122:8
125:12,18
187:11 189:8
190:22 193:8
199:23 203:3
216:7 219:14
220:3 224:1
228:20 232:20
270:9 348:16
354:20 355:2
490:23,24
491:16 498:13
498:15,16
564:3 588:2,8
589:7 590:18
603:5 635:6
**groups** 31:1
  424:24
**guess** 26:11
  95:19 160:11
  189:10 331:4
  373:11 403:11
  505:21
**guideline** 114:1
**guidelines**
  415:19 419:6
**guy** 287:8,8
**guys** 567:4
**gynecologist**
  16:3
**Gynecology**
  374:17

———— **H** ————
**H** 6:11 7:2 8:2
  9:2 10:2 11:2
  12:2
**hair** 661:19

**half** 129:7,11
  268:11 605:1
**Hall** 9:6 81:14
  82:8 162:24
  200:2,3,5
  238:17 246:8
  247:24 392:15
  623:5
**hand** 95:1,2
  171:12 309:9
  333:3 459:9
**handbook**
  487:18,19
  488:9
**handwriting**
  213:12
**hanging** 99:12
**Hankinson**
  454:16 455:18
  456:1,9,17,18
  456:19,21,24
  457:4 588:6
**happen** 139:19
  139:23 245:3
  251:8 418:17
  504:7 591:13
  660:13
**happened** 57:14
  174:19 187:5
  257:19 293:24
  302:8
**happens** 190:21
  302:3
**happy** 156:16
**hard** 72:2
  475:14 485:1
**harder** 310:1
**Hardy** 3:2,7
  9:21 27:21
  62:23 63:4,16
  64:12,16 65:7
  65:11,21 68:13
  68:23 74:11
  80:9,16 163:18
  271:23 274:18
  274:19 275:3,6

275:18 276:7
277:6,20
279:10 283:19
284:10,11
287:23 355:14
355:19,20
372:18
**Harlow** 514:10
  514:12 515:12
  516:5 517:3,3
  556:3,13,14,14
  559:13,14,15
  559:15
**head** 140:13
  218:15 346:19
  432:24
**heading** 556:24
**headline** 303:10
**health** 32:11
  92:18 97:2,5
  99:17 103:4,11
  103:19 163:23
  164:20 165:1
  169:1 171:2
  195:20 211:20
  213:23 374:9
  504:21 505:3
  570:19,22
  571:4,16 573:1
  599:22 639:16
  645:24
**hear** 71:6,10
**heard** 22:24
  54:5,8 104:10
  104:12 139:7
  161:22 187:23
  187:24 324:20
  518:20
**hearing** 104:4
**heavily** 131:9,11
  136:17 137:11
  137:17,18,19
  566:2
**Hegarty** 3:3 6:6
  16:22 17:11
  18:13 19:12

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 20:8 31:4 | 163:16 165:6 | 307:24 310:23 | 407:11 409:3 | 540:13,17 |
| 32:13 33:5 | 166:6 167:11 | 311:21 312:11 | 409:24 410:21 | 544:15 545:10 |
| 34:20 35:16 | 168:10 169:2 | 312:23 313:19 | 411:10 412:6 | 546:8 547:4,24 |
| 38:3,11 39:12 | 169:15 173:6 | 315:15 317:5 | 412:16 413:9 | 552:18,22 |
| 39:19 40:19 | 175:9 177:4 | 318:7,12 319:8 | 413:16 415:9 | 553:5,9,16,21 |
| 41:24 44:21 | 178:4,22 180:8 | 319:17,23 | 416:2 418:5,14 | 555:3 559:5 |
| 45:18 46:11,20 | 181:15 182:2 | 320:23 322:11 | 419:2,20 420:7 | 560:8 561:11 |
| 47:9,24 48:14 | 183:8 185:13 | 322:23 325:10 | 420:15 421:22 | 562:3 563:22 |
| 49:5 50:13 | 185:24 187:18 | 327:9 328:10 | 422:12,19 | 564:4,10 |
| 51:20 52:17 | 190:9,16 191:9 | 328:24 329:6 | 424:8 426:1,11 | 567:19 569:3 |
| 53:6 54:10,20 | 191:17 192:17 | 329:22 330:16 | 427:4 431:18 | 570:3 572:16 |
| 56:5,16,22 | 195:5 200:17 | 331:11 332:6 | 432:20 433:18 | 575:6 576:5,22 |
| 57:11 58:5 | 201:4 204:13 | 333:10 334:17 | 434:1 435:16 | 577:6,16,22 |
| 59:6,9,12,21 | 206:24 209:7 | 335:24 338:6 | 436:16 439:15 | 578:10 579:14 |
| 60:7 62:2,11 | 209:17 212:13 | 338:23 339:18 | 440:21 441:7 | 580:11,16 |
| 62:24 63:6,19 | 213:16 215:7 | 340:3,13 | 442:10 444:7 | 581:12,20 |
| 65:17 66:3,9 | 216:1 217:2,18 | 341:22 342:8 | 445:23 447:16 | 584:2,11,22 |
| 66:15,22 67:5 | 218:1 219:7 | 343:2 344:22 | 449:20 451:23 | 585:5,17 586:5 |
| 67:11,17,21 | 222:24 224:22 | 345:12 346:4 | 452:5 455:1,4 | 586:10,24 |
| 68:4,17 69:5 | 226:11 227:17 | 347:5 348:12 | 455:21 457:8 | 587:8,13 |
| 70:18 73:5 | 228:16 229:1 | 349:4 350:8,24 | 457:18 467:2 | 588:13 589:16 |
| 78:6,18 79:9 | 229:24 234:5 | 352:23 353:10 | 468:12 470:2 | 591:6,12,19 |
| 79:24 80:11 | 235:18 236:21 | 354:13 355:6 | 470:14 476:11 | 592:4,14,22 |
| 81:8,24 83:2 | 238:11 239:9 | 355:22 357:9 | 477:12 478:7 | 594:16,24 |
| 83:11,20,24 | 240:11,16 | 360:3 361:6 | 480:22 484:15 | 595:22 596:17 |
| 84:10 85:10 | 241:3,11 242:9 | 362:9,18 363:3 | 485:8 486:3 | 596:24 597:8 |
| 86:2 87:5 89:2 | 242:24 248:11 | 363:23 365:9 | 487:22 489:23 | 597:17 598:11 |
| 89:21 92:19 | 250:1,12 252:8 | 366:2 367:4,22 | 492:6,17 493:2 | 598:16 599:5 |
| 96:6 97:9 | 253:1 255:24 | 368:14,20 | 493:8 494:16 | 599:18 600:12 |
| 98:16 100:4 | 257:10 258:10 | 369:7,21 | 495:18 496:22 | 602:6,24 604:2 |
| 101:2,17 102:2 | 263:13 264:13 | 370:17 371:2 | 500:16 501:6 | 604:9 605:17 |
| 108:2,11 | 267:17 269:19 | 372:15 373:4 | 502:10 504:8 | 605:21 606:8 |
| 110:24 114:23 | 270:5,23 273:1 | 374:22 377:1 | 505:7,19 507:8 | 607:6,24 608:5 |
| 116:21 119:11 | 273:5 274:21 | 377:14 378:8 | 507:20 508:4 | 608:12,15 |
| 119:24 126:22 | 275:4 276:18 | 380:7,19 382:3 | 508:24 509:9 | 609:7,13,20 |
| 127:11 130:15 | 277:7 278:2,11 | 383:1,21 384:9 | 509:18 510:21 | 611:14,20 |
| 131:1 132:3 | 281:17 282:6 | 384:19 385:8 | 511:13,22 | 612:2,16 613:6 |
| 135:3 136:21 | 282:13 286:2 | 386:6,21 | 512:13 513:1 | 613:7,17 614:9 |
| 137:7 138:16 | 289:4 290:7,18 | 387:12 390:5 | 513:13 514:1 | 614:19 615:12 |
| 145:3,7,24 | 291:5,14 292:4 | 390:15 391:14 | 515:2 517:11 | 615:20 616:4 |
| 149:15 150:1 | 292:13 296:24 | 392:21 395:19 | 518:16 525:12 | 616:13,14 |
| 150:15,23 | 297:13 298:21 | 396:3,9 398:3 | 525:24 526:10 | 617:23 618:6 |
| 154:4,10 | 299:20 300:19 | 398:10 400:4 | 526:24 529:1 | 618:15,23 |
| 155:22 157:8 | 301:12,24 | 402:7,21 403:5 | 530:11 534:19 | 619:8,19 620:3 |
| 157:17,24 | 303:18 304:5 | 403:15 405:22 | 535:17 536:13 | 622:10,20 |
| 158:11 162:2,6 | 306:1,11,23 | 406:2,23 407:8 | 538:9,13 540:1 | 623:9,24 |

Joshua E. Muscat, Ph.D.

624:11,24
625:9 626:1,18
629:13 632:3
633:3,23 634:4
634:5,20,21
635:22 636:15
638:17 639:8
639:13 640:10
640:16,19
641:5,12,20
642:4,13 643:8
643:20 644:22
646:5,19
647:15,19
648:7,15,22
649:15 652:3
652:14 654:14
654:22 656:4
656:10,24
657:12 659:14
659:20 660:4
660:14,22
**Hegarty's**
621:19,21
**held** 1:15 293:16
**help** 32:1,4 94:9
95:3 193:10
238:3 448:13
459:8 479:11
**helpful** 444:13
**helping** 220:1
**helps** 114:4
**Hershey** 15:11
573:3 614:13
614:14
**heterogeneity**
332:15 346:23
347:4,12
457:23
**hid** 574:21
**hiding** 222:14
**high** 309:23
369:11,12
503:20 504:20
507:4 643:15
**higher** 309:19

309:20
**highest** 112:6
311:12 389:17
462:18 463:16
463:22,24
464:20 468:5
470:11 490:23
491:12,16
499:14
**highly** 309:16
312:9,10
**Hill** 352:4,14
414:11,15,20
415:5,12,15,16
415:18 418:22
423:4,8,19
434:8 436:8
542:21
**hired** 55:16 56:1
56:8,19 57:3
57:15 62:1
76:21 108:9
229:14
**historical** 651:3
**history** 18:16
290:21
**hold** 239:16
**home** 311:19
**homestretch**
428:8
**homo** 346:22
**homogeneity**
342:6 347:2
**Hone** 5:12
**honest** 268:8
**honestly** 229:10
260:12 439:23
**honorable** 150:4
**hope** 261:14
459:7
**hopefully** 332:2
**hoping** 214:24
215:3
**Hopkins** 8:9,11
53:19 54:8
101:8 142:22

172:19,23
174:20 176:12
178:19 181:14
187:17 188:15
188:22 190:4,7
320:3 385:6,13
**hospital** 173:20
316:19 319:22
561:2 604:21
641:19,23
**hospital-based**
320:4 561:19
**hour** 129:6,10
268:10
**hours** 427:21
614:16 615:1,2
617:17,18,18
**household**
507:18
**Houston** 3:8
**Hs** 630:9,11
**Hudson** 3:17
17:13,23 23:18
24:21 26:1,19
27:12 28:8
29:8,20 30:9
31:20 33:18
34:4 36:4
38:22 40:21
41:14 42:16
45:16 47:11
51:18 53:8
54:21 55:21
56:3 57:9
58:12,18 59:9
60:23 63:21
64:21 65:15
66:8 68:15
69:7 71:23
76:7 77:6
78:13 80:13
83:22 86:4
87:21 89:10
93:19 96:16
97:11,19 99:13
100:6,15

103:14 104:6
104:13 105:9
107:24 113:10
113:18 114:11
115:12 116:7
116:17,23
118:5,20 119:1
119:13 125:4
128:3 129:3,13
131:13 133:3
135:5 136:23
137:24 139:14
143:6 146:13
147:20 148:3
148:22 149:6
149:23 152:9
153:9 154:2
158:21 164:6
167:23 168:3
169:4 170:9,19
170:23 177:6
178:24 179:10
179:19 182:10
185:4 186:11
186:19 187:8
188:10 191:19
193:12,20
196:18 197:10
198:4,12 199:9
199:15 200:13
201:6,11
202:20 205:11
205:20 206:4
206:22 207:11
208:19 210:1,6
211:5,15 212:1
214:4,14 215:9
216:13 217:16
219:15 220:12
221:10 222:17
223:12,19
225:2 228:4
230:23 231:10
231:17 232:9
233:15 235:20
236:12 241:24

243:2,13,22
245:4 246:19
248:4 249:4,23
250:23 253:21
258:1 259:23
260:8 262:24
263:4 264:6
265:7 266:7,14
267:15 268:9
268:19 269:21
271:1,13
275:21 276:20
278:9,24
279:11 281:19
283:21 284:7
285:12 286:17
287:11 288:2
289:2 290:9
291:16 295:1
295:21 301:14
322:13 323:13
325:12 326:15
327:11 347:7
353:21 354:21
359:12 360:1
360:20 363:14
364:1,11 366:4
367:15,20
368:12 369:19
374:20 375:19
376:17 387:20
388:10,19
389:21 391:16
394:1 395:21
396:21 398:1
398:19 404:9
407:13,17
409:1 414:6
416:11,16
417:10 427:19
430:6 431:20
433:9 435:23
437:11,17
445:21 450:9
450:14 453:7
453:11 455:13

Joshua E. Muscat, Ph.D.

458:10 459:11
459:19 460:1
465:16 466:24
467:22 468:7
470:4 471:22
473:6 474:12
486:15 487:2
488:14 496:9
498:20 499:1
500:14 503:6
503:15 504:10
504:24 507:1
508:6 510:6,23
511:11,24
514:3 515:9,21
516:17 517:13
521:10,20
523:2 526:12
528:7 531:4
533:15 534:2
537:3,12 541:4
541:10 544:6
544:13 545:23
547:22 552:15
556:11 557:16
558:6 559:7
564:21 569:10
613:19 616:6,8
617:2,12,14
620:17 621:7
621:23 625:7
626:3 628:8,20
635:24 636:13
637:13,18
638:15 646:24
647:21 650:22
652:1 653:5,15
654:12 655:13
657:10 658:20
659:11 661:2
661:21
**Hudson's** 59:1
**huh** 404:3
**human** 16:20
407:3 408:1
643:6

**Huncharek** 7:10
7:15 9:6,13
10:7,12,20
11:8,14,15,17
51:3 52:2,8,16
53:24 81:4
95:3,21 106:24
109:4 110:13
111:17,20
121:4 124:8,14
129:24 130:21
132:6,10 134:6
134:10,21
135:10,10,16
135:22 136:3,4
136:9,18
138:12 139:2
139:11 141:9
142:3,21
146:10 147:5
151:2 154:8
192:15 198:16
198:17 199:22
203:4 216:9,10
218:11 222:1,6
239:21,22
241:21 243:10
243:11 246:13
247:3,10
250:20 251:3
252:6,21
257:18 259:12
259:20 260:6
269:12 277:19
284:21 285:7
285:17 286:20
339:17 345:15
345:22,24
348:22 354:5
356:3 359:21
360:17 365:1
367:3 370:5,7
371:13,16
373:11 378:18
392:13 395:8
399:4 404:24

406:14 432:12
433:5,16
434:21 435:6
435:22 443:17
446:6 447:4
448:14 454:3,4
460:16 462:11
462:24 466:10
467:15 472:23
474:24 476:24
480:10,17
481:8 502:14
508:23 510:5
510:11 522:8
555:16 568:2
593:21 594:4
594:11 598:19
603:2 609:22
610:24 620:2,9
620:11,21
624:5,6,21
626:13,24
627:22,23
630:7,24 631:7
632:13
**Huncharek's**
104:22 153:22
222:3 347:11
430:2 444:5
450:21 522:19
632:9
**hypothesis**
320:22 399:9
399:12,18
400:8 401:13
408:18 409:15
549:8,9
**hypothetical**
545:13 650:6
**hypothetically**
657:21,22

---

**I**

**IARC** 41:19
45:9 224:17
225:21 227:10

229:18 231:7
232:7 266:16
266:20,24
267:9 269:18
382:7,11
384:24 417:14
422:3,8,9
423:2 424:3
425:1 533:13
533:20 536:10
536:15 541:16
588:2,8 589:6
590:17 591:21
592:6,11 603:5
634:24 635:2,5
635:10 643:4
658:4,14
**idea** 123:22
124:2 139:12
243:10 324:8
382:15,18
390:24 399:19
549:17
**identification**
20:18 21:12
23:4 75:8
91:19 110:3
140:18 143:21
166:17,20
167:18 175:14
175:20,23
180:21 184:7
188:3 199:3
237:6 245:12
272:13 279:2
283:1 293:13
349:18 362:2
364:17 373:18
394:10 397:10
429:1 438:1
448:8 460:4
549:3 587:11
629:20 662:5
**identified**
125:15 276:6
293:3 298:1,9

298:19 334:11
549:8 591:24
**identifies** 305:3
**identify** 88:11
88:16,19
294:21 300:8
301:22 317:12
332:15,23
333:6 356:15
357:18 364:22
**identifying**
576:24 586:12
**ignore** 328:6
**IMA** 161:20
163:10 225:10
225:11,19
228:21 230:12
269:24
**imbalance**
562:17 563:11
**Imerys** 4:15
12:7 24:19
28:1 29:7
32:19 49:10
75:13 77:12,14
77:21 78:4
79:8 116:20
118:24 161:1,2
183:23 185:3,8
193:11 200:22
202:12 208:18
211:2,13
218:14,16
219:12,18,24
220:9,22 221:8
221:14,20
222:21 223:10
224:21 227:8
227:22 229:7
229:23 230:7
230:21 231:15
231:23 242:20
259:21 270:17
271:8 289:11
359:21 386:20
387:8 392:7

Case 3:16-md-02738-MAS-RLS   Document 9895-5   Filed 05/30/19   Page 284 of 599 PageID: 72688
Joshua E. Muscat, Ph.D.

Page 693

545:17 575:8
582:21 619:17
620:14 623:23
624:10 626:13
626:16 628:19
661:15
**impact** 88:23
309:20,21,23
310:6,7,10,18
310:22 311:12
313:1 314:17
369:11,12,15
369:16 376:24
377:4 568:12
**impacts** 89:6,15
**imperative**
664:14
**implicated**
524:11,23
**implicates**
527:21
**implicit** 420:10
**implying** 627:6
**importance**
488:23 489:17
**important**
117:19 156:23
224:16 296:1
305:11 312:2
312:20 334:1
336:17 340:2
340:12,21
342:14,17
414:20 421:13
425:11 506:21
509:17,21
510:2,2,18
**importantly**
483:12
**improper** 67:22
494:15,23
605:6
**inaccuracies**
577:1 586:13
**inaccurate**
137:23 576:19

**inadequate** 19:6
**inappropriate**
401:4
**include** 70:8
71:19 74:6
76:5 136:11
401:4 454:21
457:4 466:1,12
549:22 582:17
**included** 124:7
225:22 228:23
229:7 262:6
446:8 447:6
451:8,11,19
452:14 454:19
456:1,6,8,24
457:5 463:7
466:10 469:5
491:4 549:21
550:5 551:22
551:22 558:2
558:22 559:1
559:20 560:6
560:14 578:8
585:13 594:5
601:12
**includes** 262:3
466:13 541:20
**including** 63:1
118:23 203:3
270:18 301:7
401:2 443:18
465:19 584:6
584:14 585:11
597:20
**inconsistency**
561:18
**inconsistent**
328:22 329:5
329:21
**incorporated**
430:17
**incorporates**
449:1
**incorrect** 96:15
262:11 291:19

453:18 477:9
**increase** 319:5
432:19 516:14
517:1,21 605:8
639:5 658:1
**increased**
130:12 174:23
177:1 320:20
321:12 399:24
429:19 431:12
435:14 515:17
530:9 531:22
532:3 542:15
604:14,18,22
605:3 652:24
653:12
**increases** 506:16
**increasing** 504:3
515:5,18
516:15 517:1
**independent**
119:16 575:22
592:17 595:23
635:12
**independently**
155:8
**index** 13:2
653:13
**indicate** 168:23
493:6 551:7
**indicated** 516:14
516:24 517:20
604:12 635:17
**indicates** 69:16
257:23 267:13
551:8
**indicating**
515:16 637:10
638:10
**indication**
501:15 639:4
**indirectly** 28:14
31:17 32:20
33:15 46:9
47:2,19 49:11
83:18 233:21

**individual**
130:13 333:9
335:5,5,8
337:16 344:9
345:6,7 411:20
545:4
**individually**
115:17
**induce** 524:3
**Industrial**
161:19 232:14
**industries**
528:17 529:19
546:19
**industry** 56:1,20
79:23 83:8
118:18 228:15
270:1 289:1
360:19 369:4
405:11
**inference** 17:9
17:20 58:3
155:20 156:2,8
417:7 429:22
431:17 436:8
438:11 441:6
441:12 636:12
**inflammation**
611:15 642:11
643:14 645:20
**influence** 310:13
586:1
**informally** 49:2
**information**
24:24 26:5
64:2 71:19
73:11,23 74:3
85:6 99:16
111:13 133:17
136:12 139:5
234:12 235:1
253:18 443:19
446:9 447:7
498:4 553:20
619:3 621:11
624:8 626:24

627:16,18
628:4
**informational**
111:9
**informed** 100:1
**inhale** 535:4
**inhaling** 534:18
**inherently**
412:23
**initial** 155:7
285:20 370:10
371:20 372:3
639:15
**initially** 203:19
224:20 225:6
375:13,14
419:15 435:7
524:10,23
**initiated** 635:4
**inject** 158:18
**inputs** 335:6
**inquire** 540:9
**insignificant**
330:3
**instance** 298:6
410:7 452:20
468:24 497:1
**Institute** 103:20
**Institutes**
211:20
**institution** 109:2
**instruct** 24:22
26:7 36:5
63:24 234:17
616:15 640:20
648:16
**instructing**
234:16
**instruction** 26:3
64:22 235:3
617:3
**INSTRUCTI...**
664:1
**insufficient**
590:9 602:15
**integrity** 85:23

86:20 179:9
**intended** 258:5
607:16
**intent** 606:18
**interactions**
226:16
**interest** 88:20
89:17 302:19
303:1,4,9,24
304:13 308:12
312:6 377:8
404:15
**interested** 189:3
307:17,20
367:9 410:8
568:8
**interesting**
307:3
**interpret** 346:24
527:10,13,16
**interpretation**
35:11,24
**interpreting**
156:23
**interruption**
434:18
**interval** 324:8
324:13 326:7
327:1 328:2
330:4 337:7
346:10 435:10
473:20,21,23
474:23 475:1,3
475:4 477:10
477:19 478:4
480:14,15
557:21 561:9
**intervals** 323:19
323:20 325:1,9
328:1 337:10
344:12,13
461:20
**intervention**
411:17
**introduce**
185:17

**introduced**
15:14
**introduction**
406:6 506:8
**inverse** 440:18
518:3,11,14,19
519:7,13
520:11,11
521:9,24 522:5
522:14
**investigators**
524:9,10,22
**invited** 375:14
**involved** 31:2
62:8 63:18
64:17 105:18
106:1 123:17
139:13 140:2
162:15 164:18
169:9 219:13
219:19 220:1,9
221:9 236:7
244:5 254:18
269:17 270:21
572:4 573:16
582:5
**involvement**
21:5 35:10,23
57:8 87:18
95:12 194:14
221:23 386:17
579:9 580:2
581:7 585:18
592:9 593:9
607:2
**involves** 334:15
335:4 410:15
**involving** 60:20
63:5 130:4
133:2 215:15
656:17
**issue** 8:18 21:6
40:14 42:13
93:7 98:7,13
100:11 136:20
172:15 191:16

193:19 194:10
195:21,23
196:11 197:22
296:19 329:20
354:24 391:23
397:22 401:10
490:20 504:21
504:22 505:3
509:17,21
510:11,12,19
513:22 565:4
565:18 640:1
**issued** 50:11
**issues** 32:9 33:3
63:4 64:13
70:16 78:5
80:21 82:4,12
97:7 98:2
100:24 101:15
153:7 194:24
296:19 316:24
317:8 318:22
319:15 320:11
351:16,21
378:24 411:2
423:16 428:9
442:4 562:12
605:13 621:2
645:19
**item** 122:10
**items** 423:11

_____
### J
_____
**J** 2:14
**Jack** 588:5
**jail** 54:6
**JAMA** 291:22
313:16 314:2
315:7,20
**JAMES** 2:9
**January** 212:22
374:10
**Jersey** 1:2 4:13
101:12 147:11
**jgreen@ashcr...**
2:12

**JH** 190:13
**JM** 190:13
**JNJ** 10:12
**John** 101:8
102:18,21
171:2,3 187:16
188:15,21
190:3,6 320:3
385:6,12
**Johns** 53:18
54:7
**Johnson** 1:4,5
3:14,15 22:7,8
22:15,15 24:18
24:19 27:10,10
32:4,5 34:17
34:18 48:10,10
48:24 49:1
59:4,4,6,6
60:19,19 61:8
61:8 62:1,1,9,9
75:12,12 80:23
80:23 97:18,18
98:1,1 102:15
102:15 118:23
118:23 124:10
124:10 125:2,3
141:24 142:1
143:5,5 147:10
147:10 160:20
160:20 164:16
164:16,18,19
165:15,16
166:4,4 168:19
168:19 169:1,1
171:3,3 185:2
185:2,11,12,22
185:22 186:9
186:10 187:17
187:17 193:11
193:11 211:2,3
212:11,12
214:2,2,19,19
215:23,23
220:6,6,7,7
228:2,2,11,11

228:23,24
275:11,11
285:18,19
286:6 316:11
316:11 318:2,2
354:10,11
359:21,21
360:18,18
370:8,8 371:8
371:8,10,10,17
371:17 373:2,3
384:3 385:7,7
386:19,19
389:14,14,17
389:18 390:12
390:13 401:20
401:20 412:4,4
596:19,19
599:14,15
617:9,10 618:7
618:8,11,11
619:16,16
**Johnson's** 37:9
160:19 384:4
539:20
**join** 112:4 617:2
**Jones** 7:17 8:6
102:10,13
171:3 172:19
172:22 320:2
**Josh** 239:17,19
239:23 240:1
**Joshua** 1:14 6:4
6:15,19,21
9:17,20 11:21
14:13,20 15:7
142:6 160:5
189:23 199:23
395:8 570:11
663:8 666:16
**journal** 88:23
93:7,7 118:14
122:18,21,22
123:7 183:5,6
287:21 290:5
290:16 294:23

Joshua E. Muscat, Ph.D.

295:11,12
296:10,11
302:6,8,12,16
305:20 308:16
308:16,23
309:8,10,13,15
309:17 310:3
310:12,17
311:4,7,13,20
312:8,10,21
313:4,4,11,17
314:2,10,18
315:6 348:5,6
354:1,2 358:21
358:21 369:10
369:11,13,17
370:1,3 373:15
373:23 374:5
374:17 375:7
376:3,5,12,13
376:13,20,24
377:5,6 397:17
397:18,22
398:7,14,18
429:10 473:9
473:15 486:9
576:9,11
580:22 582:2
**journals** 50:6
291:12 292:2,8
299:19 300:8
308:18 309:3
309:20,21,23
311:17 314:16
314:23 473:9
487:10
**JS** 635:5
**judge** 16:17
96:12 159:22
275:3 462:9
**judgment** 418:1
418:8,10
427:14
**JULIE** 3:12
**Julie.tersigni...**
3:14

**July** 69:17
125:10 152:23
245:17
**jump** 417:5
593:14
**June** 168:14
**jury** 16:17 96:13
125:15 159:22
177:13 179:17
275:2 319:2
353:15 462:9
**J&J** 12:7 97:6
100:24 102:24
116:20 165:4
201:2,9 208:18
211:13 229:23
230:7,16,21
231:16,20
236:8 238:7,10
238:23 239:7
242:20 246:6
271:7 284:6
286:22 289:11
363:13,22
364:6 365:8
367:13,19
368:7,10,18
369:3 392:2,5
545:16 546:4
575:9 578:20
578:24 579:4,8
580:2,7,18
581:7,14,17
582:5,9,21
584:5,13,23
585:7,10,18,24
591:22,23
592:9 598:19
599:22 603:13
603:22 614:1
620:16 623:2
623:22 624:10
626:13,16
628:19 641:2,3
641:18
**J&J's** 613:5

## K

**K** 4:12
**Kansas** 3:4
**Kat** 275:5
**keep** 43:14
125:19 126:14
431:8 445:16
487:12 525:17
566:7 570:7
642:19 661:8
**Kemble** 4:13
**kept** 100:11
126:10 456:19
554:10 583:22
**key** 337:23
**kills** 503:3
**kind** 16:16
42:22 71:12
76:5 99:11,12
100:10,10
105:7 124:24
173:3,4,16
238:2 296:2
310:11 316:3
316:10,15,16
316:21,21
326:5 331:2,19
379:17 392:16
416:6 424:15
424:17 427:1
431:8 434:12
442:23 447:13
568:12 653:20
**kinds** 71:3 173:9
173:24 318:1
333:7 411:3
421:19 645:22
**KLATT** 4:3
**Kmart** 507:19
539:19 651:19
**knew** 56:10,12
100:20 108:24
201:20 202:12
203:2 243:18
244:4,9,14
251:7 502:20

585:7,10 592:5
607:14 619:15
620:10 653:8
**KNIGHT** 3:16
**know** 18:2 19:3
20:4,23 21:2
22:6,22 23:1
25:3,14,20
26:8 29:1,11
29:13 30:7,13
31:23 33:24
36:9,13,19
37:13 39:5,7
39:17 40:1,3,4
46:1 52:7,10
52:13,22,24
53:13,16,22,22
55:9,16,24
56:8,14,19,24
57:7 59:3,15
61:1 65:18
70:5 71:12
76:21 77:13,17
77:18,19 78:3
80:8 81:14
82:6 85:18
95:14 96:23
97:16 98:18
100:9 101:8
102:10,18
105:5,6,12
108:18 109:17
110:17 111:19
117:16,20,21
117:23 120:13
120:16,21,23
124:4 125:1
128:6,7,9,10
129:5,9 130:3
138:2 139:6
143:3 146:23
149:4 150:13
154:14 156:5
160:21 161:20
163:10 165:24
166:8 176:22

181:18 182:7
183:1,2,18,19
185:7,7,10,16
185:21 186:3,5
186:6,15 187:1
187:2,5,13,16
187:21 189:1,4
193:1,14,17
194:2,8,15
197:18,21
198:1,9,18
200:21 201:1
201:16,24
202:1,2,7,14
214:18,23
218:11,12
219:19 220:8,9
220:18 222:7
224:2,5,7,11
226:1,24 227:4
228:6 231:20
232:8 236:9,17
238:7,13
240:18 243:4,6
244:18 245:2
256:5,6 259:10
259:19 260:24
261:5,22
268:11 269:11
271:7 275:7,15
276:22 277:9
286:19 287:7,7
288:18 292:15
294:4 298:3
299:12 300:3
303:5 304:13
310:7 311:19
312:3,5,20
313:15 316:18
321:2 322:6
323:5 324:19
324:21 325:3
325:18,18
331:2 332:24
336:18,23
337:15,24

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 338:2,14 339:2 | 578:1 599:16 | **label** 506:13 | 229:23 231:14 | 649:10 650:14 |
| 339:20 342:10 | 606:16 618:13 | **laboratory** | 233:11 234:11 | 651:14,17,18 |
| 345:5 346:2,14 | 621:1,2 624:22 | 454:18 | 234:20,24 | 657:5 |
| 346:24 347:10 | 627:17 628:13 | **lack** 434:7 | 235:11 242:22 | **learned** 25:1 |
| 353:2,5 355:18 | 628:18 632:22 | 436:13 438:5 | 243:8,12,20 | 26:6 64:2 |
| 356:12 358:19 | 634:9 641:2 | 438:11,15,19 | 244:15,22 | 138:11 139:5 |
| 359:24 361:17 | 648:24 652:22 | 438:23 441:3 | 246:9 386:2,10 | 142:21 530:16 |
| 361:19,21 | 653:22 655:2,5 | 441:20 443:4 | 386:13 387:8 | 650:19 651:1 |
| 369:14 372:6 | 657:21 659:6 | 443:13 446:20 | 387:19 388:7 | **lectern** 44:15 |
| 374:11 377:3 | 659:24 | 457:23 513:8 | 388:13,17 | **leeway** 268:16 |
| 380:14,15 | **knowing** 139:12 | 513:18 523:10 | 391:2,11,21 | **left** 99:11 395:5 |
| 382:15 383:20 | 336:8 387:17 | 523:14,22 | 403:4,13 621:3 | 399:11 |
| 384:5,8,23 | 391:1 403:2 | 608:18,19,20 | 621:12 624:9 | **left-hand** 134:9 |
| 388:17 389:8 | 433:8 510:18 | **Lake** 2:15 | 624:18,20 | 350:18 450:23 |
| 389:23 390:7 | **knowledge** | **Lamar** 392:11 | 625:17 626:11 | 451:7 516:12 |
| 391:10 395:17 | 34:23 35:1 | 392:11 | **lawsuits** 287:10 | 516:21 588:17 |
| 399:4 405:4 | 36:15 52:3,20 | **Lambert** 112:20 | **lawyer** 23:9 | **legal** 67:23 |
| 410:9 415:4 | 68:21,24 86:11 | **Lancet** 291:22 | 58:12,14 246:9 | 120:11,15,24 |
| 420:22 422:1 | 103:1 105:8 | 315:7,14 376:7 | 275:5 | 121:1,5,18,19 |
| 423:22 424:23 | 108:14,16 | 376:10 | **lawyers** 27:21 | 121:20,22,24 |
| 425:8 426:22 | 109:19 114:10 | **landmark** 352:5 | 28:15,18 29:7 | 203:21 274:5 |
| 427:19 432:4 | 117:18 151:12 | **Lane** 5:10 14:4 | 32:20 46:8 | 619:6 |
| 434:14 453:19 | 154:21,22 | **Langseth** 11:20 | 49:21 60:18,19 | **LEIGH** 5:3 |
| 456:15 463:10 | 155:9 214:16 | 587:16 602:7 | 79:8 102:24 | **leigh.odell@b...** |
| 469:7 471:11 | 214:21 218:22 | 602:11 634:15 | 127:8 162:13 | 5:5 |
| 476:14 477:4 | 219:2 220:20 | 634:22,23 | 162:14 163:16 | **lend** 133:16 |
| 485:24 486:6 | 251:14 262:1 | **language** 208:3 | 163:16 215:6 | **letter** 6:16 7:11 |
| 486:19 488:10 | 275:18 358:24 | 208:7 258:18 | 227:14,15,15 | 7:17 8:6,8,10 |
| 489:8,21 494:8 | 361:15 373:7 | 352:21 | 233:5 242:19 | 9:6 92:13 |
| 499:16,20,21 | 378:14 398:22 | **large** 147:17 | 250:21 272:22 | 141:5 167:3 |
| 499:22 501:19 | 398:24 509:15 | 597:2 630:2 | 273:21 275:4 | 170:18 177:16 |
| 506:22 507:14 | 578:20,23 | 637:5 638:2,11 | 275:10 284:6 | 181:5,19 |
| 510:9,9 511:18 | 579:2 580:1 | **late** 482:22 | 355:17 392:16 | 238:24 239:5,8 |
| 511:20 519:1 | 595:4 623:3 | **laundry** 415:23 | 566:23 574:18 | 630:15 |
| 529:4,9 533:12 | **known** 109:4,5 | **law** 1:15 29:15 | 618:22 619:4 | **letterhead** 369:5 |
| 535:6 536:4,8 | 161:2,3 226:23 | 52:14 77:12,14 | 619:18 620:12 | **letters** 93:23 |
| 536:10,15 | 227:5 414:21 | 77:20 78:4 | 621:21 625:19 | 101:14,23 |
| 539:16,17 | 497:2 523:23 | 110:19 127:24 | **LAWYER'S** | 176:11 |
| 540:5,9 541:20 | 613:9 | 162:21 194:6,9 | 667:1 | **let's** 35:7 37:7 |
| 543:20 544:21 | **knows** 489:9 | 194:23 198:10 | **lays** 344:8 | 48:8 82:10 |
| 545:16,17 | 552:14 | 198:15,17 | **lead** 151:3 | 95:8 104:17 |
| 546:6 547:1,3 | **KOHRS** 2:14 | 200:6,11 | 555:16 | 118:10 121:21 |
| 554:13,22,23 | | 202:19 206:2 | **leading** 97:3 | 122:10 125:24 |
| 554:23 564:2 | **L** | 209:2 210:4,15 | **leads** 340:1,11 | 129:2 132:21 |
| 564:18,23 | **L** 1:17 3:12 | 210:16,23 | **learn** 138:21 | 136:17 160:15 |
| 567:3 568:2,7 | 663:12 | 211:1 227:12 | 201:18 570:9 | 164:15 166:12 |

Joshua E. Muscat, Ph.D.

180:4 192:2
218:13 231:22
233:5 245:8
248:17 259:11
269:15 271:21
274:19 289:9
294:8,16
297:20 309:13
320:17,18
323:17,18
324:2 326:5,7
328:16,16
331:8 332:17
341:1 345:10
346:22 347:19
349:10 350:14
351:11 373:14
397:5 404:19
405:6,16
407:22 409:14
434:15,15,16
434:20 436:5,7
440:2,3,6
443:3 445:2,2
445:16 450:19
450:19 453:6
453:10 454:5
458:15,21
461:5,6,6
462:3,8 465:3
465:21 472:4,9
472:10 475:24
476:1 479:3,11
480:1,2 482:10
482:10 498:1
505:14,24
506:1 516:6,7
523:10 527:17
532:7 535:9
537:21 542:17
545:17 548:10
566:12,12
640:17 642:18
650:16 661:3
**level** 462:18
463:16 468:5

491:12
**levels** 389:17
**LEVIN** 2:2
**LHG** 1:6
**liability** 1:6
200:11 286:1
**lie** 240:15,19
**lies** 327:8 427:15
**life** 92:9 408:7
448:3 461:4
**lifetime** 476:8,8
**lifted** 359:6
**limitation**
523:20
**limited** 606:24
**Linda** 224:5
**line** 13:6,9,12,15
18:19 162:12
252:24 253:4
256:11 331:2
392:24 588:19
654:9 665:4
667:2
**linear** 515:16
519:23
**lined** 18:11
392:17
**lines** 250:10
623:7
**link** 157:6
577:18 598:3
609:10,15
**linked** 599:1
**linking** 656:8
**list** 23:23 72:8
74:20 86:23
87:1 90:13
104:18 106:22
117:10 125:10
145:12 181:9
183:12,13
184:13 294:13
334:7 335:8
345:23 415:23
423:20 447:14
472:6

**listed** 63:15
64:15 75:22
76:10,14 79:22
87:19 90:20
107:1,17 108:4
113:21 114:9
122:2 138:12
148:21 276:16
281:2 282:2
348:10,17
438:9 442:24
458:18 463:11
550:7 632:8
**listen** 73:20
74:16
**listened** 40:5
**listing** 64:16
335:4
**lists** 65:7 75:1,3
142:3,6,10
**literature** 36:22
45:3 46:18
84:17 115:9
119:23 131:12
136:17 148:20
156:4,19,24
169:19,20
174:22 204:17
204:22 249:20
256:24 257:9
260:15 261:19
264:2 265:18
266:22 267:8
267:13 285:11
294:18 307:5
310:14 331:20
332:1 334:5,16
334:21 343:9
384:12 417:16
425:7,7 428:13
428:19 431:1
439:9 440:12
454:10,11
484:11 487:8
497:19 523:21
529:7,11,15

539:3 540:7
546:12,14,16
546:23 547:2
574:6,15 594:6
594:19 596:7
607:3 612:11
633:20 647:9
647:11 649:6
650:17
**litigation** 1:7,21
5:11 14:5,11
20:23 25:24
26:17 40:5
57:7 60:19
63:5,18 64:13
64:18 65:9,10
66:2,6 67:2,10
80:9 105:18,22
106:2 163:16
213:10 276:6
278:7 280:23
284:1,5 285:8
285:24 286:10
286:14,24
287:22,24
354:10 372:12
372:22 574:20
634:3
**little** 35:5 86:7
92:9 107:15
138:8 148:18
159:12,16,23
208:9 235:13
238:4 262:16
265:14 268:16
294:1,4,6,8
317:18 331:9
340:22 348:1
408:7 428:15
438:15 461:4
465:1 476:5
481:22 504:3
516:8 535:9
576:15 590:22
**live** 15:12
**lives** 52:11 92:6

**LLP** 2:8,13 3:2
3:7,11,16 4:2,7
4:17
**located** 572:23
**location** 333:14
**LOCKE** 4:17
25:6 30:15
76:23 90:24
91:5 233:2
**log** 6:18 9:15,20
22:22 23:7
60:16 63:15
64:16 66:16
69:2 82:7
268:23 272:3,4
272:19 278:20
355:12 625:6
**Logan** 1:15 4:8
**logistic** 515:15
**logs** 628:6
**long** 60:9,12
73:15 242:5
344:4 413:20
490:14 570:5
573:4 607:14
**longer** 103:18
166:24 262:23
264:4 518:5,5
**long-term**
366:12
**look** 48:11 49:12
65:5,5 82:21
111:16 126:2
133:20 136:6
144:16 149:9,9
149:10 174:4
179:18 188:14
189:14 203:12
248:15,18
249:16 255:10
263:15 264:22
265:10 267:21
280:20 285:16
307:5 308:4
311:11 312:3,8
312:17 316:6

Joshua E. Muscat, Ph.D.

316:15,16
321:15 325:9
329:19 330:5
330:13,24,24
333:4 345:1,19
347:23 349:7
349:10,13,23
350:13,14
351:11,19
359:5 366:18
368:4,22 408:6
413:24 414:10
422:3 425:23
427:8,9,10,11
427:11 429:7
431:13 438:8,8
439:24 441:14
444:10 446:13
446:14 447:10
447:21 450:1
455:16 456:4,5
457:3,21,21
463:19 465:1
467:5,16
468:21 469:10
472:17 476:18
479:3 483:4,20
485:14,14
486:21 491:21
501:19,21
502:3,9,17,18
505:24 506:3
506:10 510:17
510:17 511:7
514:7,9 516:7
516:21 527:17
530:14 539:2
539:17 542:3
542:23 545:3
550:4 558:9
589:17,24
599:7 600:1
653:19,24
658:14
**looked** 99:21
137:4 138:23

147:8,9 151:16
151:22,23
154:14,15
172:9 186:17
230:9 231:12
242:13 252:19
258:14,15
302:16 307:16
311:2 349:2
355:3,12 357:3
357:4 378:13
406:10 422:17
423:4 442:17
443:22 449:12
449:22 450:6
455:16 486:1
486:12,13
490:14,21
493:7 498:13
498:17 499:6
500:5,5 511:8
514:22 533:20
536:16 542:9
542:11 543:5,8
567:18 569:1
573:16 578:16
602:8 616:18
647:8,10 651:3
656:8,16
658:17
**looking** 52:15
90:7 94:8
126:7 155:1
247:1 287:7
316:24 319:7
320:21 325:6
333:3,13
362:21 377:17
380:10 387:6
391:9 407:17
484:4,5 489:8
510:16 513:9
518:10 542:11
542:14 565:12
566:15 573:15
579:21

**looks** 341:5
454:1,22 464:3
464:6 492:24
518:11 577:8
**Lorena** 361:18
363:12
**Loretz** 224:5
**lot** 16:7 19:10
71:15 113:7
126:15,16
208:6 258:17
262:2 271:18
283:18 285:9
325:20 326:9
328:17 331:21
444:17 544:11
617:18 618:2,4
630:2 632:20
638:21
**Louisiana** 2:15
**low** 369:16
376:24 469:1
559:23
**lower** 309:20,23
311:3,6 314:17
**lowest** 462:16
463:14,23,24
464:19 466:6
466:10,20,22
468:3,19 469:1
469:15,16
470:10 480:6
482:13 483:3,5
483:9 490:22
491:11,15
499:14
**lunch** 268:12
292:24
**LUNDY** 2:13,13
**lung** 18:5 19:8
19:21 536:6
538:21
**Luzenac** 28:7
34:19 161:1,3
200:24 219:24
220:1 246:2

401:19 624:14
**L.L.P** 4:12
_____

**M**
**magic** 418:3
**magnesium**
544:10
**magnitude**
421:4
**main** 17:2
126:13 165:16
437:20 588:19
588:24 589:8
**major** 112:18
114:14 358:15
**majority** 356:10
560:1 631:8,9
632:14
**making** 152:20
228:14 261:6
265:5 417:5
590:23
**man** 150:4
**Manila** 12:6
**manipulation**
411:18
**Mann** 201:24
202:3,6,7
238:6 239:4
246:5
**manner** 342:24
**manufactured**
379:21 380:5
380:17 381:6
**manufacturer**
160:17 242:21
**manufacturers**
55:19 103:12
**manufacturing**
383:15
**manuscript**
255:4,14,17,19
256:23 258:14
285:21 370:10
370:15 371:21
**march** 177:17

177:22 282:10
283:16 354:6
374:18 375:7
566:23
**marching** 660:9
**mark** 3:3 4:12
20:16 21:15
90:14 92:6
177:13 184:10
218:14 272:6,7
274:22,23
397:8 429:5
444:23 560:20
569:12 587:15
629:23
**marked** 13:14
20:17 21:11
23:3 74:2 75:7
91:17,18
109:24 110:2
140:17,22
143:17,20
166:14,16,19
167:17 171:13
175:13,19,20
180:20 184:6
188:2,7 199:2
203:20 235:13
237:5 245:11
272:12 278:21
279:1 282:23
282:24 293:12
349:17 362:1
364:16,21
373:17 394:9
394:14 397:9
428:24 437:24
448:7 460:3
549:2 587:10
629:19 631:1
640:4 662:4
**MARKETING**
1:5
**marking** 273:2
**Master's** 570:21
**material** 66:23

materials 65:8
65:24 66:4
280:22
math 476:6
matter 14:10
247:2 295:19
308:12 387:9
404:12 423:24
461:11 510:10
572:5
matters 121:18
121:19
maypole 440:8
McCarthy 393:9
395:17,18
396:7,20
MDL 14:11
648:11,14
mean 16:6 26:22
61:20 66:10,12
71:6 87:7
99:16 109:3
115:22 126:7
127:1 137:3,10
138:3 151:2,16
156:8 182:13
202:16 222:14
226:24 229:3
260:12 297:9
298:5,16,17,18
299:3 300:22
305:19 306:7
307:2,3 311:16
329:4 336:3
339:24 340:10
372:22 407:13
413:13 420:5
425:21 426:9
431:23 433:21
436:20 441:12
457:17 467:5
473:12 477:5
480:10 495:4
497:18 510:14
533:7 536:17
538:16 546:11

631:12 647:14
651:14
meaning 209:15
380:4
meaningful
87:24 89:18
means 16:12,13
85:9,18 137:18
320:19 321:23
322:3 323:24
326:17 342:11
372:4 475:2
589:11 628:14
663:20
meant 171:23
411:9 559:14
measure 310:11
310:11,13
347:3 492:4
494:5
measured 327:2
347:12 491:20
491:23 658:11
measurement
497:3
measurements
341:13 479:22
measuring
495:9
mechanism
427:12 438:20
441:4 523:24
526:8 530:8
531:1,21
532:11 534:17
535:3 536:21
538:8 539:12
542:13,19
545:1,6 547:21
548:5 642:9
643:13
mechanisms
539:7
mechanistic
424:19
medical 15:15

46:9 49:12
85:22 89:18
98:14 115:9
120:11,14,24
121:1,4,7
131:11 136:16
157:15 174:22
196:1,8 256:24
257:9 264:2
265:17 267:8
267:13 285:11
287:21 310:14
313:12 390:2,3
424:6 425:4
428:13 529:11
540:7 546:23
547:1 572:1
574:5 594:18
596:6
medical/legal
120:8
Medicine 305:21
309:8 310:3,18
311:4,7 313:17
314:2,10,19
315:7 571:15
572:24 573:2
meet 32:15
269:5 275:6
454:13
meeting 28:19
28:22,23 80:23
101:11 172:12
190:7 212:17
214:11 223:9
223:10 266:16
270:20 271:7
361:1,2,15,16
363:20 364:6
365:21 367:1
meetings 45:5,9
212:11 218:7
221:7,8,8
222:12,22
223:4 228:14
266:19 270:17

359:22 362:16
member 324:16
members 118:18
125:14 590:18
603:5
Memo 7:21
mention 230:7
230:10,16
392:2,5,7,9
402:15 513:8
518:1,2
mentioned
50:10 93:10
106:3 138:11
159:10 162:20
238:23 271:6
284:22 310:6
315:24 422:9
441:24 503:14
570:23
mentions 230:12
392:3
mentor 19:18
mesothelioma
536:7 538:20
message 182:22
188:15
messy 279:15
met 28:24 32:10
32:10 58:8,18
58:21 59:12,18
59:23 78:20
79:1 81:2,20
81:21,21 97:23
98:1 101:10
102:16,23
147:10 172:13
172:18,19,20
172:22 201:23
213:1 227:1
318:16 320:2
414:23 415:24
454:21 458:17
613:6,12
metadata 69:17
meta-analyses

40:24 318:22
331:10 333:20
337:23 339:6
344:19 420:19
430:16 439:10
453:20 490:14
meta-analysis
11:22 47:7
53:3,23 94:14
94:20 95:11,15
95:17 104:23
106:11,17,21
107:8,11,17,22
108:7 109:8
111:10,21
113:8,16 114:4
114:19 115:7
116:11 117:1
117:13 120:7
120:14,20
121:16 122:8
122:16 123:23
125:11,17
129:24 130:4
130:11 132:6
132:20 133:1
133:22 135:16
136:9 138:15
144:5 154:17
154:24 186:16
192:16 193:8
199:22 203:3
204:18 210:23
210:24 216:6
234:8 247:14
255:7 258:4
289:14,16,17
290:12 291:2
318:6,24 319:3
331:9,18,23
332:14,20
334:3,10,15
335:3,16 336:6
336:11,16,22
337:18,21
338:1,16,18

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 339:4 340:19 | 483:20 485:4 | 383:5 | 144:19 163:19 | 499:24 515:19 |
| 340:20 342:14 | 494:15 | **mines** 218:17 | 170:5 172:5 | 607:13 |
| 342:19 343:6 | **methods** 84:17 | 383:6,11 | 212:23 246:4 | **monthly** 465:14 |
| 343:19 344:4 | 84:23 86:15 | 547:15 | 281:4,10 | 466:14 515:13 |
| 344:16 345:11 | 112:23 323:8 | **mining** 34:18 | 293:22 341:3,7 | **months** 52:9 |
| 346:23 348:15 | 333:21 339:8 | 161:16 162:5 | 396:15 411:7 | 105:17 183:3 |
| 397:6,14 | 411:15 412:15 | 232:3 242:20 | 449:15 450:22 | 476:7 |
| 400:12 404:23 | 413:1 428:19 | 269:18 534:12 | 451:16 459:3 | **Moring** 9:16 |
| 430:3 431:14 | 467:7,11,13 | **minority** 568:10 | 518:9 632:12 | 12:7 28:18 |
| 432:12 433:4 | 469:8 483:14 | **minute** 140:4 | 649:21 | 29:14,15 32:21 |
| 443:17 444:6 | 484:13 485:15 | 168:7 206:15 | **Mm-hmm-hmm** | 76:17 77:11,20 |
| 444:21 445:6 | 487:5 551:12 | 290:4 308:15 | 254:5 | 78:3,21 81:18 |
| 446:6 447:4,12 | 556:9 557:15 | 315:23 345:4 | **MO** 3:4 | 110:19 119:21 |
| 449:2,14 | **Mhegarty@sh...** | 345:22 362:16 | **model** 515:15 | 162:20 163:6 |
| 454:20 463:1 | 3:5 | 453:11 514:15 | **modify** 429:14 | 193:10 199:8 |
| 468:22 469:6 | **Michael** 4:3 | 549:1 558:9 | **molecule** 543:7 | 200:7,10 |
| 469:13,21 | 199:22 395:8 | 565:17 | **moment** 52:13 | 206:17 207:16 |
| 471:12 475:19 | **Michelle** 1:17 | **minutes** 140:5,8 | 55:3 77:18,21 | 210:14,16,19 |
| 478:18,24 | 2:9 14:17 | 268:17 410:11 | 77:23 91:9 | 227:9 229:21 |
| 484:6 487:1 | 663:12 | 553:19,22 | 102:8 110:11 | 230:8,21 |
| 488:18 489:9 | **mid** 196:2 | **misconception** | 122:6,11 | 232:16 233:11 |
| 492:14 497:21 | 197:23 212:10 | 315:4 | 129:23 294:17 | 233:14 238:19 |
| 497:22 498:3,6 | **middle** 326:3 | **misreference** | 523:12 644:14 | 242:19 245:21 |
| 498:19 499:5 | 626:12 | 485:11 | **moments** 570:13 | 249:21 250:5 |
| 501:4,9 508:23 | **Mike** 239:17,19 | **misrepresenta-** | **money** 47:6,18 | 252:22,23 |
| 522:7,19,20 | 239:20 | 600:7 603:21 | 214:2 216:5 | 253:10,14,17 |
| 523:7 549:16 | **mild** 436:6 | **missing** 153:2 | 217:5 | 254:9,13,23 |
| 564:2 593:22 | **milling** 534:13 | 572:7 615:7,14 | **monograph** | 255:22 256:4 |
| 601:15,17,20 | **mind** 45:12 | **Misstates** 634:8 | 41:19 266:21 | 257:16 268:24 |
| 602:8,12,20 | 233:8 268:15 | **mistake** 455:12 | 382:8,12 | 269:3 270:19 |
| 603:4 | 287:18 445:3 | 471:21 478:6 | 384:24 635:6 | 272:5,22 |
| **meta-analytical** | **mine** 317:15 | 478:11,12,14 | 658:15 | 273:22 280:11 |
| 112:23 | **mineralogical** | **mistakes** 472:1 | **monographs** | 293:2 385:22 |
| **method** 336:5 | 547:14 | **MITCHELL** | 422:3 | 386:2,18 387:7 |
| 337:15 | **mineralogist** | 2:3 | **Montgomery** | 388:17 390:19 |
| **methodologic** | 15:23 259:7,11 | **mitigate** 429:21 | 5:4 | 390:22 391:1 |
| 342:4 | 262:14 378:12 | **mitigated** | **month** 124:12 | 392:4 395:8 |
| **methodological** | 378:23 | 431:16 | 138:24 142:16 | 402:14,16,20 |
| 654:1 | **mineralogists** | **mix** 655:5 | 144:15 341:10 | 575:11 581:4 |
| **methodology** | 259:13 | **Mklatt@grsm...** | 341:21 451:14 | 582:16,18,21 |
| 335:20 336:18 | **mineralogy** | 4:5 | 463:9 464:21 | 583:21 585:12 |
| 338:19 340:19 | 259:1,5,16,22 | **mm-hmm** 37:12 | 464:22,23 | 620:23 622:8 |
| 346:15 413:8 | 260:7,22 378:4 | 61:10 72:21,21 | 479:6 482:21 | 622:19 623:22 |
| 414:14 424:4 | **Minerals** 161:19 | 85:2 96:1 | 482:24 491:8 | 626:12 628:1 |
| 425:2 427:2 | 229:12 232:14 | 113:1 134:19 | 495:16 497:14 | 628:11,17,18 |
| 483:13,15,17 | **miners** 162:1 | 141:7 142:14 | 498:11,14 | **morning** 15:3,4 |

Joshua E. Muscat, Ph.D.

129:5
**Morris** 104:3
**Morristown**
4:13
**mortality**
503:20
**Mount** 4:13
**move** 159:7
179:21 261:9
269:4 271:21
347:16 353:20
514:18 523:13
548:8 566:12
617:22 625:23
**moved** 27:7
**moving** 43:15
359:19
mparfitt@ash...
2:11
**MPH** 570:17,20
**MRG** 95:11
105:1,3 112:1
112:2 164:5
192:15 348:11
349:1
msilver@coug...
4:14
**mucinous** 568:7
568:22
**multiple** 330:23
331:6 342:22
355:13 421:19
452:21,22
453:4,22
543:22 653:11
**Muscat** 1:14 6:4
6:15,19,21
7:17 8:6,8,11
9:7,14,17,20
10:17 11:21
14:13,20 15:7
24:22 26:4
36:4 63:23
64:23 67:22
83:9 90:15
125:1 134:21

135:1,10 142:6
160:6 186:17
189:23 199:23
246:13 247:4,5
247:11 285:7
285:17,17
359:22 360:18
364:24 370:5,7
371:16 395:9
405:12 428:19
553:17 570:4
570:11 575:2
584:3 596:5
598:7 599:8
604:10 612:10
616:9,15 624:6
626:13 649:5
663:8 666:16
**Muscat-1** 6:15
20:19
**Muscat-10** 7:19
166:21
**Muscat-11** 7:21
167:19
**Muscat-12** 8:6
175:15
**Muscat-13** 8:8
175:21
**Muscat-14** 8:10
175:24
**Muscat-15** 8:13
180:22
**Muscat-16** 8:16
184:8
**Muscat-17** 8:20
188:4
**Muscat-18** 9:6
199:4
**Muscat-19** 9:8
237:7
**Muscat-2** 6:16
21:13
**Muscat-20** 9:11
245:13
**Muscat-21** 9:15
272:14

**Muscat-22** 9:17
293:14
**Muscat-23** 9:20
279:3
**Muscat-24** 10:6
283:2
**Muscat-25** 10:9
349:19
**Muscat-26**
10:11 362:3
**Muscat-27**
10:13 364:18
**Muscat-28**
10:16 373:19
**Muscat-29**
10:18 394:11
**Muscat-3** 6:18
23:5
**Muscat-30** 11:6
397:11
**Muscat-31**
11:10 429:2
**Muscat-32**
11:12 438:2
**Muscat-33**
11:14 448:9
**Muscat-34**
11:15 460:5
**Muscat-35**
11:17 549:4
**Muscat-36**
11:18 587:12
**Muscat-37**
11:21 629:21
**Muscat-38** 12:6
662:6
**Muscat-4** 6:21
75:9
**Muscat-5** 7:6
91:20
**Muscat-6** 7:8
110:4
**Muscat-7** 7:11
140:19
**Muscat-8** 7:13
143:22

**Muscat-9** 7:17
166:18
**M.D** 350:19
**M.P.H** 11:21

**N**

**N** 3:7 6:2
**name** 14:3 15:5
34:10 51:10
53:14,15,16
54:17 85:5,20
86:10 91:11
103:18 107:5
107:10 108:3
124:7,14,14,21
133:16 139:11
139:24 163:2
165:18 183:19
186:9 202:1
220:5 222:4,8
224:7,8,13
225:4 244:6
249:10 277:15
297:12 348:22
414:5 570:9,10
598:20
**named** 57:6
303:16
**names** 161:13
184:17,23
202:15 227:24
**national** 34:2
50:11 77:4
93:9 146:6
191:7 211:19
**nature** 70:3
571:2
**NCI** 583:6
**Neal** 189:1
**necessarily** 43:9
260:17 262:4
298:3 300:10
303:8 308:20
311:14 313:2
328:22 495:4
533:6 536:17

538:16 545:13
**necessary** 346:7
664:4
**need** 267:23
300:24 336:18
336:22 337:14
337:24 338:1
346:2,8,8
353:17 413:23
415:6 459:20
464:24 492:4
493:20 511:10
514:18 540:10
544:22 553:17
553:18 556:12
609:24 659:6
**needed** 129:1
468:20 504:2
**needs** 168:10
259:6 527:7
661:5
**negative** 609:9
**neither** 259:12
315:21 607:22
**never** 30:2,3
33:12 46:1
48:20 49:19,20
49:21 57:5
73:21 98:23
99:2,9 100:13
104:10,12,15
121:23 123:16
123:17 125:15
142:15,18,19
142:20,21
144:13 174:12
182:19 187:24
201:23 205:7,8
205:24 216:4
216:16 217:4
217:10 227:1
233:8 265:16
266:1,2 267:7
384:13 385:1
465:19,23
564:12 591:18

Case 3:16-md-02738-MAS-RLS   Document 9895-5   Filed 05/30/19   Page 293 of 599 PageID: 72697
Joshua E. Muscat, Ph.D.

Page 702

| | | | | |
|---|---|---|---|---|
| new 1:2 4:13 | normally 70:22 | null 320:22 | 446:3 448:11 | 648:15 661:16 |
| 38:2,6 101:12 | North 163:10 | number 20:16 | 451:13,18 | 661:18 |
| 147:11 305:20 | 225:11,19 | 21:16 23:2,22 | 459:2,9,17,18 | objected 19:16 |
| 309:8 310:2,17 | 246:2 269:24 | 24:6 25:15 | 460:7 463:20 | objection 17:11 |
| 311:3,7 313:16 | nose 117:7 | 37:23 42:19 | 463:21 472:24 | 17:23 18:13,22 |
| 314:1,9,18 | Notary 1:18 | 55:5 74:2 75:2 | 473:4 474:10 | 18:22 19:12 |
| 315:6 430:17 | 663:14 666:23 | 75:6 90:3,19 | 475:16 477:7 | 20:8 23:18 |
| 434:12 453:3 | notations 301:7 | 91:8,23 94:12 | 484:10,11,13 | 24:10 25:7 |
| 459:11 579:15 | note 25:6 235:9 | 110:1 122:5,10 | 484:21 485:3 | 26:1,19 27:12 |
| 581:2,8,15 | 258:23 259:4 | 129:23 131:23 | 485:21 487:17 | 28:3,8 29:8,20 |
| 582:1,6,10,15 | 483:22 515:7 | 131:24 132:1 | 491:7 494:1 | 30:9,15 31:4 |
| 582:24 583:4 | 661:14 | 132:24 134:13 | 495:1,15 496:6 | 31:20 32:13 |
| 583:19 585:8 | notebook 91:16 | 134:14 135:21 | 497:7,7 498:10 | 33:5,18 34:4 |
| 585:20,23 | noted 14:14 | 140:23 143:18 | 499:23 524:8 | 34:20,21 35:16 |
| NICHOLAS | 317:1 513:17 | 143:19 146:7 | 524:10,22 | 38:3,11,22 |
| 2:14 | 664:11 666:11 | 146:11 147:18 | 548:22,23 | 39:12,20 40:19 |
| Nicholson 389:8 | notes 119:10 | 148:21 166:14 | 550:11 562:23 | 40:21 41:14,24 |
| 389:10,13,16 | 288:23 289:19 | 167:2,22 168:6 | 563:19 573:14 | 42:16 43:18 |
| 391:3 565:3 | 289:20 362:16 | 168:7 170:17 | 587:9 592:23 | 44:21 45:16,18 |
| 566:1,21 567:7 | 363:1,6 667:1 | 171:14 174:17 | 593:5 594:7 | 45:20 46:11,13 |
| 567:22 | notice 1:15 6:17 | 175:18 176:2,4 | 599:7,8,13 | 46:20 47:9,11 |
| nickel 544:11 | 606:4 607:8 | 176:4,5 180:18 | 603:9,10 619:3 | 47:23 48:14 |
| night 171:24 | November 58:23 | 183:11 184:11 | 623:16,16 | 49:5,14 50:13 |
| 606:17 | 144:1 223:10 | 184:12,13 | 629:24 637:5 | 51:18,20 52:17 |
| NIH 126:1 | 363:21 364:23 | 188:8 189:23 | 638:3,11 653:9 | 53:6,8 54:10 |
| 261:19 | NSAIDs 612:4 | 191:3 199:12 | 653:10 | 54:20,21 55:21 |
| nine 255:7 | 647:7 | 199:21 204:5 | numbers 432:18 | 56:3,5,16,22 |
| 414:16 415:6 | NTP 9:9 31:11 | 237:11,14 | 447:19,21 | 57:9,11 58:5 |
| 451:20 452:15 | 34:7,14 50:17 | 245:15,16,16 | 461:11,13,21 | 59:21 60:7,23 |
| 458:18 462:14 | 51:17 54:16 | 255:1,13 | 475:20,22,22 | 62:2,11 63:6 |
| 462:15 463:11 | 55:6 56:21 | 281:14 282:23 | 479:1,2 480:21 | 63:19,21 64:19 |
| 614:12,14 | 57:8,16 77:5 | 303:14 308:21 | 481:1,12,15 | 64:21 65:15,17 |
| 615:2,5 617:17 | 94:10,11,20 | 313:7,10 | 482:7 486:24 | 68:4,15,17 |
| NJ 3:13 | 95:24,24 96:3 | 321:11 326:3 | 555:8 562:7 | 69:5,7 70:18 |
| nkohrs@lund... | 96:13 97:4 | 337:6 341:10 | Numeral 551:2 | 71:23 73:5 |
| 2:16 | 158:8,14 187:7 | 341:20 348:3 | numerous 59:12 | 76:7,23 77:6 |
| nominated | 192:3,3,4 | 349:14,20 | 59:19 550:6 | 78:6,13,18 |
| 192:5 220:5 | 193:5,6,23 | 350:2,16 358:9 | Nurses 639:16 | 79:9,24 80:11 |
| 225:5,8,16 | 195:2 196:21 | 373:21 394:15 | NW 4:18 | 80:13 81:8,24 |
| nomination | 197:1 204:6 | 405:23 406:1 | | 83:2,11,20,22 |
| 225:20 | 215:4 219:4 | 408:21 419:23 | **O** | 84:10 85:10 |
| nonacademic | 220:2,11 | 428:17 429:5 | oath 206:10 | 86:2,4 87:5,21 |
| 76:6 | 247:12 256:13 | 432:9,14,23 | object 16:21,22 | 89:2,10,21 |
| nonsmokers | 256:22 270:3,8 | 433:2,6,14 | 17:13 350:24 | 92:19 93:19 |
| 562:16 | 270:13 280:3 | 434:5,17 | 605:12 606:6 | 94:1 96:6,16 |
| normal 286:13 | 439:11,19 | 438:14 440:15 | 627:5,10,12 | 96:20 97:9,11 |

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 97:19 98:16 | 190:16 191:9 | 250:12,23 | 329:22 330:7 | 402:21 403:5 |
| 99:4,13 100:4 | 191:17,19 | 252:8 253:1,21 | 330:16 331:11 | 403:15 404:4,9 |
| 100:6,15 101:2 | 192:17 193:12 | 255:24 257:10 | 332:6 333:10 | 406:23 409:1,3 |
| 101:17 102:2 | 193:20 194:11 | 258:1,10 | 334:17 335:24 | 409:24 410:21 |
| 103:14 104:6 | 195:3,5 196:4 | 259:23 260:1,8 | 338:6,23 | 411:10 412:6 |
| 104:13 105:9 | 196:18 197:5 | 261:8 262:24 | 339:18 340:3 | 412:16 413:9 |
| 107:24 108:2 | 197:11 198:4 | 263:4,13 264:6 | 340:13 341:22 | 413:16 414:6 |
| 108:11 110:24 | 198:12,14 | 264:13 265:7 | 342:8 343:2 | 415:9,10 416:2 |
| 113:10,18 | 200:13,15,17 | 266:7,9,14 | 344:22 345:12 | 416:11,16 |
| 114:11,23 | 201:4,6,11 | 267:15,17 | 346:4 347:5,7 | 417:10 418:5 |
| 115:12 116:7 | 202:20 204:13 | 269:19,21 | 348:12 349:4 | 418:14 419:2 |
| 116:17,22,23 | 205:1,11,16,20 | 270:5,23 271:1 | 350:8 352:23 | 419:20 420:7 |
| 118:3,5,20 | 206:4,6,22,24 | 271:3,13,15 | 353:10,19,21 | 420:15 421:22 |
| 119:1,11,13,24 | 207:2,11 | 275:21 276:18 | 354:13,21 | 422:12,19 |
| 125:4 126:22 | 208:19 209:5,7 | 276:20 277:7 | 355:6,22 357:9 | 424:8 426:1,11 |
| 127:11 128:3 | 209:17 210:1,6 | 278:2,9,11 | 359:12 360:1,3 | 427:4 430:4,6 |
| 130:15 131:1 | 211:5,15 212:1 | 281:17,19 | 360:20 361:6 | 431:18,20 |
| 131:13 132:3 | 212:3,13 | 282:6,13 | 362:9,18 363:3 | 432:20 433:9 |
| 133:3 135:3,5 | 213:16,18 | 283:21 284:7 | 363:14,23 | 433:18 434:1 |
| 136:21,23 | 214:4,14 215:7 | 285:12 286:2 | 364:1,11 365:9 | 435:16,23 |
| 137:7,24 | 215:9 216:1,2 | 286:15,17 | 366:2,4 367:4 | 436:16 439:15 |
| 138:16 139:14 | 216:13 217:2 | 287:11,13 | 367:15,20,22 | 440:21 441:7 |
| 139:16 143:6 | 217:16,18 | 288:2 289:2,4 | 368:12,14,20 | 442:10 444:7 |
| 145:3,8,24 | 218:1 219:5,7 | 289:12 290:7,9 | 369:7,19,21 | 445:21,23 |
| 146:13 147:20 | 219:15 220:12 | 290:18 291:5 | 370:17 371:2 | 447:16 449:20 |
| 148:3,22 149:6 | 220:14 221:3 | 291:14,16 | 372:15 373:4 | 450:9,14 |
| 149:15,23 | 221:10 222:17 | 292:4,13 295:1 | 374:20,22 | 451:23 452:5 |
| 150:1,15,23 | 222:24 223:12 | 295:21 296:24 | 375:19 376:17 | 455:13,21 |
| 153:9 154:2,4 | 223:19 224:22 | 297:13 298:21 | 377:1 378:8 | 457:8,18 |
| 154:10 155:22 | 224:24 225:2 | 299:20 300:19 | 380:7,19 382:3 | 458:10 465:16 |
| 157:8,17,24 | 226:11 227:17 | 301:12,14,24 | 383:1,21 384:9 | 466:24 467:2 |
| 158:11,21 | 228:4,16 229:1 | 303:18 304:5 | 384:19 385:8 | 467:22 468:7 |
| 161:5 162:2,6 | 229:24 230:23 | 306:1,11,23 | 386:4,6,11,21 | 468:12 470:2,4 |
| 164:6 165:6 | 231:10,17 | 307:24 310:23 | 387:10,12,20 | 470:14 471:22 |
| 166:6 169:2,4 | 232:9 233:2,15 | 311:21 312:11 | 387:22 388:8 | 473:6 474:12 |
| 169:15 170:9 | 234:5,15 | 312:23 313:19 | 388:10,19,21 | 476:11 477:12 |
| 173:6 175:9 | 235:16,18,20 | 315:15 317:5 | 389:19,21 | 478:7 480:22 |
| 177:4,6 178:4 | 236:12,21 | 318:7,12 319:8 | 390:5,15 | 484:15 485:8 |
| 178:22,24 | 238:11 239:9 | 319:17,23 | 391:12,14,16 | 486:3 487:2,22 |
| 179:10,19,21 | 240:11,16 | 320:23 322:11 | 392:19,21 | 487:24 488:12 |
| 180:8 181:15 | 241:3,11,24 | 322:13,23 | 393:23 394:1 | 488:14 489:3 |
| 182:2,10 183:8 | 242:9,24 243:2 | 323:11,13 | 395:19,21,23 | 489:23 492:6 |
| 183:20 184:20 | 243:13,22 | 325:10,12 | 396:3,9,21 | 492:17 493:2,8 |
| 185:4,13,24 | 245:4 246:19 | 326:15 327:9 | 398:1,3,8,10 | 494:16 495:18 |
| 186:11,19 | 248:4,11 249:4 | 327:11 328:10 | 398:19 400:4 | 496:9,22 |
| 187:8,18 190:9 | 249:6,23 250:1 | 328:24 329:6 | 401:22 402:7 | 498:20 499:1 |

500:14,16
501:6 502:10
503:5,6,15
504:8,10,12,23
504:24 505:7
505:17,19
506:23 507:1,6
507:9,20 508:4
508:6,24 509:9
509:18 510:6
510:21,23
511:11,13,22
511:24 512:13
513:1,13 514:1
514:3 515:2,9
515:21 517:11
517:13 518:16
520:1 521:10
523:2 524:18
525:12,24
526:10,12,24
528:7 529:1
530:11 531:4,6
531:23 532:13
533:15,17
534:2,19,21
535:5,15,17
536:11,13
537:1,3,12,14
538:9,11 540:1
540:13,17
544:6,13,15
545:8,10,23
546:1,8 547:4
547:22,24
548:2 555:3
557:6,16 558:4
558:6 559:5,7
560:8,10
561:11 562:3
563:22 564:4
564:10,21
567:6,19 569:3
572:13 575:3
576:2,20 577:3
577:13,21

578:4 579:13
580:10,14
581:10,19
584:1,8,21
585:3,14 586:3
586:8,20 587:6
588:10 589:13
591:5,10,17
592:2,12,21
594:14,22
595:20 596:13
596:15,22
597:4,13 598:9
598:14 599:4
600:8 602:5,21
603:23 609:6
609:11,18
611:11,13,17
611:23 612:13
613:17,19
614:17,19
615:10,13,20
616:4 617:14
617:21,23
618:15,23
619:8,19 620:3
620:17,19
621:5,7,14,23
622:1,10,20
623:9,24
624:11,24
625:2,7,9,22
626:1,3,18
628:8,20,22
632:3 633:3,23
634:5,7 635:22
635:24 636:13
636:15 637:13
637:18 638:15
638:17 639:8
639:13 640:10
640:19 641:5
641:12,20
642:13 643:8
643:20 646:1,5
646:22,24

647:19,21
648:7 649:13
649:15 650:3
650:20,22
651:23 652:1,3
652:14 653:3,5
653:15,17
654:12,14,16
655:13,15
656:4,10,24
657:10,12,14
659:11 661:15
**objectively**
391:10
**objectives**
319:11
**obligation**
606:12 607:20
629:8
**obscured** 424:22
**observational**
122:17 255:8
411:15,22
**observed** 519:13
542:14
**observer** 225:15
225:16,21
229:17 270:1
588:3 592:11
592:16
**obstructionist**
431:24
**obtained** 454:14
**obtaining** 72:23
87:11
**obviously**
100:19
**occasion** 315:9
**occasions** 59:13
59:19
**occupational**
534:5,11
656:19
**occur** 322:4
469:12 539:8
**occurred** 194:17

194:20 232:17
**October** 141:5
170:18 188:16
279:24
**odd** 194:22
**odds** 420:1
481:5,17,17
555:21 556:7
557:13
**offer** 467:12
**officer** 390:3
**offices** 1:15
**official** 566:5
620:15 635:9
**oftentimes** 44:19
303:16 322:8
418:11
**oh** 57:5 132:12
144:14 188:19
191:1 395:1
396:8,13
407:13 458:4
468:14 484:22
556:16 588:21
605:21 623:19
**okay** 16:5,10,16
17:5 21:21
22:13,18 23:10
23:22 24:14
25:5 26:10,13
26:14 27:8
29:17 30:5,13
32:1,3 33:12
35:4,6 36:12
36:19,24 37:1
37:6,10,11,13
37:16,22 38:19
39:8 40:4,8,9
40:10,13 41:4
41:6 43:13,14
44:2,5,8,10,11
44:17,18 45:11
45:23 46:7
47:1 48:7
49:10,19 50:1
50:8 51:2,13

52:12 55:14
56:12 57:19
58:11,14,17
59:15 60:5,14
61:4,8,9,13,14
61:17,22,22,23
63:11 67:20
68:1 69:19,24
70:10 71:14,17
72:12 73:3,9
73:16,19,20
74:6,14,15,22
74:23 75:18
76:1,20 77:24
78:2,15 79:3,6
82:16,18,21
83:5,6,10 84:5
84:5,9,13,18
84:19,23,24
85:17 86:6,14
86:18,23 89:6
90:4,9,10 92:2
92:4,10,11,16
92:24 93:8,16
94:13,16,17,19
95:6 97:1 98:4
99:21 100:2
102:7,9,18
104:17 105:3
105:20 106:15
107:4,20 108:7
109:7 110:9
111:4,4,13,19
112:11,11,16
113:5,24 114:2
114:6,7 116:2
116:14 117:8
118:8 119:6
121:8,9 122:20
124:4,13
127:21 128:13
128:17,18,19
129:2,13,15
130:1,2,9
131:8 132:12
132:15,17,23

| | | | | |
|---|---|---|---|---|
| 134:2,8 135:13 | 204:1,21 | 317:19,22,22 | 428:14,21 | 490:10 491:6 |
| 135:17 136:14 | 206:12,20 | 317:24 319:13 | 429:16 430:13 | 491:19 493:10 |
| 136:15 137:15 | 208:11 210:13 | 320:18 321:9 | 430:20 431:2 | 493:14,23 |
| 137:20,21 | 212:23,23,24 | 322:20 325:22 | 431:10,22 | 494:8 500:3 |
| 138:5,7 139:1 | 213:9 215:2 | 327:22 332:2 | 432:13,16,17 | 502:24 504:1 |
| 140:9,14 141:4 | 216:20 218:13 | 333:17,18 | 433:2,7,11,21 | 504:17,18 |
| 141:18 142:9 | 219:11 220:18 | 334:23 335:20 | 433:23,24 | 506:19,21 |
| 142:12 143:11 | 221:6 223:14 | 336:21 337:6 | 434:24 435:2 | 509:14 511:6 |
| 145:19 146:5,9 | 223:22 224:11 | 337:19 338:13 | 435:18 436:2,4 | 513:6 515:24 |
| 146:21 148:10 | 225:18 226:14 | 338:14 340:18 | 436:5 438:7,13 | 516:10 517:24 |
| 148:15 149:4 | 227:6 229:20 | 341:8 342:13 | 438:18,22 | 519:11 525:19 |
| 149:20,21 | 231:22,24 | 348:19 349:12 | 439:3 440:4 | 527:15,19 |
| 150:6,12 151:5 | 235:9,24 | 350:6,13 351:7 | 441:1,16,18,19 | 528:3,15 |
| 151:14,18,23 | 237:23 238:1,5 | 351:19 353:15 | 441:22 442:2,6 | 529:17 530:18 |
| 152:4,12,18 | 239:3 240:7 | 353:18 354:9 | 442:20,22 | 532:9 534:15 |
| 153:1,5 154:7 | 244:3,9,14 | 360:15 365:6 | 443:2,3 444:3 | 535:8,10 |
| 159:1,3,13,18 | 245:6,8,10 | 365:17,18 | 444:19,20,23 | 541:12,19 |
| 159:19 160:10 | 248:19,20 | 366:23 367:8 | 445:9 446:13 | 542:3,9,10 |
| 161:12,15,24 | 249:1,15 | 368:9,16 | 447:1,1,10,23 | 543:2 544:20 |
| 162:11,23 | 251:10 254:7 | 371:22 373:10 | 447:23,24 | 546:6,14 |
| 163:15 164:2 | 254:16 255:12 | 375:4 378:22 | 448:1,19,20 | 547:13 548:8 |
| 164:14,15 | 257:3,6 259:15 | 379:2 380:2 | 449:4 451:10 | 548:19 550:9 |
| 165:12,19,20 | 261:2,13 262:9 | 382:14 383:18 | 452:3,16 453:2 | 550:13,17,22 |
| 165:24 166:2 | 263:9,15,19 | 384:2 385:15 | 454:8,9 455:10 | 551:11,16 |
| 167:2 168:3,22 | 264:11 265:12 | 386:16 389:16 | 456:4 457:6,13 | 553:5,7,23 |
| 169:23,23 | 265:15,15 | 390:14 392:1 | 458:15 459:3 | 556:16,19,23 |
| 170:2,5,14,21 | 266:16 267:23 | 392:14 393:8 | 459:22 460:20 | 557:24 558:14 |
| 171:12 173:11 | 268:22 269:14 | 394:7,8 395:1 | 460:23,24 | 559:18 560:5 |
| 174:8 175:17 | 269:15 270:2 | 396:13 397:4 | 461:2,19 | 563:2,2,9,16 |
| 176:15 177:8 | 271:11 272:9 | 399:21 400:18 | 462:21 463:3 | 563:18 564:13 |
| 177:12,15 | 273:5,13 277:3 | 401:11 402:12 | 465:1,10,13 | 564:15 565:5 |
| 178:1 179:24 | 278:16,18 | 402:18 403:10 | 466:5,17 467:9 | 567:24 568:7 |
| 180:2,17 | 280:16 281:13 | 404:1,21 405:6 | 467:14,18,21 | 568:14 570:17 |
| 181:12 183:24 | 283:6 288:12 | 406:6,11,22 | 469:12 470:18 | 572:23 588:21 |
| 184:22 185:10 | 288:16,18 | 407:1,20 408:8 | 471:2,8 472:12 | 588:24 590:6,6 |
| 186:7,22 187:4 | 291:24 294:7,8 | 408:8,9,10 | 473:11 474:7 | 590:21 593:16 |
| 188:18,20,21 | 294:16 295:14 | 409:11,13,16 | 474:19,21 | 594:10 603:11 |
| 188:23,24 | 296:18 297:18 | 410:6 413:3,22 | 475:11,15,24 | 614:11 616:2 |
| 189:7,13,24 | 300:14,14 | 413:23 415:3 | 476:10,16 | 616:11 621:18 |
| 190:3,18,20 | 303:12 304:17 | 415:17 416:8 | 478:13,17 | 623:4,20 |
| 191:5 192:1,8 | 304:22 306:6 | 416:23 417:4 | 479:3,8,17 | 626:23 627:15 |
| 192:11 197:18 | 307:8 308:8,14 | 419:8 420:4,12 | 481:3 482:3,10 | 627:24 628:3 |
| 197:21 198:9 | 311:15 312:17 | 421:1,18 | 482:21 483:2 | 630:10,12 |
| 198:24 201:20 | 313:13,14 | 423:17 425:10 | 484:22 485:13 | 631:4,15 |
| 202:2,7,11,17 | 315:10,22 | 425:16,19 | 485:20 486:14 | 632:19 634:12 |
| 203:11,12,15 | 316:14 317:19 | 426:20 428:7 | 489:14 490:2 | 634:13 637:24 |

Joshua E. Muscat, Ph.D.

639:3 641:17
642:3 650:10
650:13 651:16
655:19 656:21
657:3,18,20
659:1,20
**omit** 126:20
**once** 482:19
506:3 555:19
**oncologist**
645:16
**Oncology**
374:17
**ones** 18:17 34:13
104:19,21
252:13 334:10
413:1 551:21
630:2,7 631:1
**ongoing** 65:9
66:1,5 67:1,9
280:23 287:24
**online** 594:20
**open** 334:8
661:9
**opened** 660:8
661:12
**operations**
103:17
**opinion** 93:22
537:18,22
633:8,10 634:3
659:4,4
**opinions** 85:23
189:14 659:5
**opportunity**
48:11 49:1,22
50:2 302:9
317:24 553:12
639:22 663:9
**opposed** 551:9
631:7
**opposing** 146:10
**opposite** 520:15
661:1
**option** 260:19
**oranges** 501:2

**order** 235:1
295:7 300:2
307:5 336:15
336:21 337:24
346:1,11
378:13 414:23
438:16,17
442:24 487:13
512:4 538:24
606:4,14 659:3
**organization**
33:2 34:16
53:4 111:14
126:2 161:10
161:17 367:11
422:11,15
**organizations**
50:12 127:8
128:1
**original** 93:17
94:15 188:14
188:19 301:2
301:10,23
336:23 337:3,7
337:11,22
405:3 462:11
583:20 664:15
**originally**
348:20
**other's** 492:9
**ought** 641:3,18
**outcome** 326:11
437:6
**outcomes**
306:21
**outline** 428:16
**outside** 65:8,24
66:4,24 70:23
162:19 163:15
260:15 261:21
596:16 597:6
597:14 605:12
614:18 615:11
**ovarian** 7:14
8:14 9:18 10:6
10:16,18 11:7

11:19 33:3
35:15 36:3,22
37:20 38:1
41:12 42:15
45:14 47:21
50:23 53:24
57:21 60:22
84:20 93:5
96:5,14 97:7
118:13 122:15
130:4 141:13
153:18 154:18
155:20 157:7
158:20 160:6,7
169:13 172:3
172:15 177:2
195:14,24
196:12 247:13
247:15 248:1
248:21 249:9
249:11 250:21
255:7 275:13
293:9 357:21
358:9,13 366:1
394:19 395:2
396:17 399:12
400:14 419:15
428:20 429:20
434:10 437:4
442:17 503:3
503:11,11
504:5 505:6
506:16 507:15
508:9 515:17
523:21 524:3
526:9 531:2
533:10,14,24
534:7,10,24
535:3 536:9,22
537:10,19
539:1,12 542:5
545:3 564:20
568:10,23,24
574:2 577:9,12
577:20 578:3
579:22 586:19

587:4,18
590:12 596:7
596:12,21
597:11 598:5
602:17 603:4
604:14,19,23
605:4,9 609:10
609:16 611:10
629:16 633:11
635:21 637:7
638:5,13 642:9
643:3 645:5
651:5 653:1
655:21 656:9
656:17 658:1
658:16
**ovaries** 399:22
400:2 549:19
611:16 645:20
646:15
**overall** 130:11
156:1,3 333:4
429:19 431:13
503:13 568:13
589:5
**overarching**
644:22
**overdisclosing**
254:17,21
**overdisclosure**
254:15
**overlap** 149:12
208:9 258:18
**overlapped**
208:7
**overlapping**
476:17,22
477:1,5
**oversight** 153:4
232:12
**overview** 419:10
456:6 550:5
**O'DELL** 5:3
**O'Shaughnessy**
102:19,21

| **P** |
| --- |

**P** 5:3
**PA** 2:3
**pace** 294:5
**pack** 494:24
495:5,14,20
496:6 497:2,13
497:15 498:3,4
498:6,7,10,17
499:4,7
**package** 339:10
339:12,15,16
**packet** 220:2
**packs** 496:15
**pack-years**
341:6,19
**page** 6:14 7:5
8:5 9:5 10:5
11:5 12:5 13:6
13:9,12,15
120:9,10
133:21,24
134:8,15 135:8
142:11 144:17
174:5,6 203:13
256:10 350:1
350:15 351:14
351:14 352:2,2
352:10 368:4
377:11,14,23
379:3,13
395:13 396:14
399:9 406:5
407:9,10
421:11 434:20
435:3 443:6
450:20 454:5,6
455:3 456:5
457:4,16,21
462:7,20,23
465:5,8 472:14
479:7 490:9
491:1 506:5,6
513:11 514:17
515:12 516:11
516:12,18,19

Joshua E. Muscat, Ph.D.

523:16,18
562:13,23,23
588:16 619:13
619:14 636:22
642:20 665:4
667:2
**pages** 110:7
111:7,8 134:18
666:6
**paid** 46:8 54:18
55:10,12 83:18
201:17 209:1
213:14,21
214:10,19
215:4,5,18,21
215:21,24
216:4,18,22
217:10,15,22
218:11 224:1
232:12,13
233:21 276:9
284:6 286:10
287:9 651:15
**paint** 661:18
**panel** 225:6,21
225:22 226:4,6
266:17,18,19
424:4
**PAPANTONIO**
2:2
**paper** 72:5 88:1
119:20 139:12
140:1 175:3,5
175:8 176:13
176:18,21
178:3,7 192:20
204:6,9,9,23
205:3,7,24
206:16 211:1
213:6,6,7
251:21,24
252:1 253:6,19
256:17 259:16
265:10 270:11
281:15 282:1,2
283:7,12

284:19 288:22
289:7 296:23
301:21 336:17
347:3,11
348:20 354:18
355:18,19
358:16,20
359:6 361:5,9
365:8,22
366:20 367:2
367:14,18
368:1,17 373:3
375:22 378:13
392:17 393:1
393:10,21
405:3 439:9
441:17 454:15
454:17 455:18
455:19 456:21
456:23 457:14
470:8 472:5
476:19 477:21
478:16 479:4
479:12 483:18
483:23 485:3,4
485:5 500:5,6
500:8 511:3
512:10,20
514:19 534:13
551:24 578:22
579:5,16,17,17
579:18,21
580:20,20
581:2,9,15,22
582:1,7,10,15
582:22,23
583:4,9,18,21
585:1,8,20
587:23 589:20
589:22 590:15
593:1,12,18,18
593:20 594:3
594:12,13
595:5,12
598:24 599:2
601:12 602:7

610:5,17
631:19,20
634:24 635:4
635:10,12
643:14
**papers** 104:19
108:4 114:20
116:4 117:10
216:11 241:22
241:22 242:3,7
242:12,13
243:19 244:1,5
244:11 246:17
257:15 290:15
301:18 308:22
454:14,20
482:4 483:21
513:9 574:14
574:23 575:9
575:18 590:23
593:20 594:20
600:20,22
601:1 610:23
618:8,14 619:5
622:16,17
623:7 624:18
626:17 627:19
627:20,21
632:14
**paper-by-paper**
353:4
**paragraph**
112:7,9,17
133:21 135:9
178:11,11
351:5,8,15,17
351:24 352:13
359:8,9 399:10
413:7 414:11
421:12 435:4
451:6,6 458:3
463:6 524:9
529:24 563:5
588:18 637:2
642:6
**paragraphs**

436:10 630:17
**paraphrasing**
505:22
**PARFITT** 2:9
660:2
**Park** 3:13
**part** 27:3 43:16
45:12,24 84:21
115:10 147:17
147:17 201:2
201:17 206:20
207:4 244:19
262:11 332:12
332:13 336:17
338:17 356:8
356:14 380:3
380:12 397:7
525:9,9 528:24
529:5 542:21
574:8 575:10
582:15 605:24
635:5
**partially** 321:2
**participate**
155:5
**participated**
50:19 350:6
**participating**
112:1
**particles** 385:2
524:2
**particular** 18:12
261:22 268:2
272:8 308:22
314:15 323:9
330:21 336:10
338:16 353:6
364:10 410:9
471:13 521:2
522:4,16
550:19 565:11
566:15,24
571:9 575:24
609:23
**particularly**
136:19 261:17

607:18
**parties** 27:1
189:3
**partner** 200:6
238:18 246:10
**parts** 356:20
357:18
**party** 367:9
591:8 595:11
**patients** 554:24
**pause** 554:2
558:17 565:21
569:21 604:6
612:20 644:17
**paused** 566:6
**pay** 216:10
**paying** 58:24
201:2 613:15
613:22 617:11
617:12
**PC** 219:3
**PCPC** 4:20 10:9
24:19 29:18
30:14,18 33:1
50:1 76:21
161:11 189:5
223:22 232:23
270:3,14 353:8
354:18 355:5
368:19,24
369:5 405:20
513:10
**PCPC's** 224:13
**peer** 88:5 276:16
288:23 289:18
289:20,21,22
308:14,15
309:2,4 458:8
458:12 574:9
574:13 576:13
601:3,5,11
**peer-reviewed**
50:6 119:23
148:19 174:22
249:19 261:18
294:18 295:7

298:24 428:12
431:1 511:3
607:3
**pen** 409:15,16
409:18,19,22
**pending** 195:1
263:6 323:15
363:16 416:17
468:8 486:16
509:8 510:20
515:23
**Penn** 348:18
571:15,18,21
572:21 573:5,9
632:1,10,13,17
**Pennsylvania**
1:16 4:9 14:10
15:11,12 573:3
**Pensacola** 2:5
**people** 16:13
20:6 24:20
40:15 44:15
70:9 87:1,8,17
98:2 160:14
172:14,20,24
184:19 185:1
221:14,19
227:22 229:13
232:7 297:24
298:16,18
299:11,15,17
300:4 302:20
303:15 314:14
314:22 316:20
327:5 372:8
385:6 404:15
406:20 408:11
408:14 409:6
409:18,18,22
410:18 411:20
469:23 495:5
496:21 497:18
499:11 507:18
507:19 563:12
645:23
**perceive** 581:3

**percent** 130:12
149:12 177:1
205:19,23
320:20 321:12
324:3 356:12
379:7 429:19
432:7,15,19
433:3,17
435:13 555:15
604:14 605:8
631:10,10
**percentage**
554:8 631:5,12
**percentages**
555:19 569:8
**perfect** 317:3,13
**performed**
319:1 484:12
485:16
**perineal** 7:13
8:13 10:6,16
11:18 118:12
122:13 144:3
248:20 249:11
394:19 396:17
419:13 437:3
556:24 562:15
587:17 590:11
602:17 642:8
643:2 652:12
**perineum**
451:14 463:8
**period** 298:18
535:20
**periodic** 152:3
**periodically**
90:5
**perking** 218:15
**persistent**
436:11 443:10
446:18
**person** 297:11
301:4 335:16
337:20 338:15
356:2 391:9
**personal** 29:18

33:1 603:18
647:24
**personally** 72:2
99:19 236:5
331:14 389:24
423:1 486:9
502:18
**person's** 297:12
**Perspectives**
374:9
**petition** 10:9,11
50:21 51:24
80:24 107:6
158:4 213:2
223:9 224:12
270:4,21 350:4
350:16,20
351:9 352:22
353:7 357:12
357:15,19
359:7,10,19
360:8,12,14
361:12 362:6
365:24 368:2
405:19 432:10
434:23 443:7
446:24 506:2,5
506:11 509:7
562:23 593:2
593:19
**ph** 1:22
**pharmaceutical**
108:9 112:18
112:19 113:9
113:17 114:9
114:15 127:9
128:2
**pharmacologist**
645:12
**PhDs** 645:24
**Philadelphia**
1:16 4:9 14:9
**Phillip** 104:3
**phone** 58:19
60:3 81:6,11
**phrase** 210:9

226:10 235:13
338:11
**physically**
127:22 254:3
**physician** 121:6
**Ph.D** 1:14 6:4,15
6:21 11:21
14:20 160:6
570:18 571:7
663:8 666:16
**pick** 61:16
**picky** 298:5
**picture** 332:4
**piece** 143:14
**pieces** 84:22
93:23 594:5
**place** 14:9 89:1
99:23 327:7
348:3 351:13
381:21 382:19
468:1 585:2
**placebo** 408:14
**plaintiff** 567:1
599:10,20
**plaintiffs** 2:16
5:6 21:3 23:12
23:24 574:19
597:21,24
600:5
**plans** 268:12
**plausibility**
441:10 523:11
523:15,18
537:24 543:4
608:20 611:2,9
644:24 645:4
**plausible** 427:12
438:20 441:4
523:23 526:7
530:8,24
531:21 532:11
534:17 535:3
536:21 537:9
538:8 542:12
542:19 545:6
547:21

**play** 44:9 87:14
389:4 519:3
565:9
**playback** 390:20
391:5 565:10
565:14,24
566:6,9 567:13
**please** 15:6
17:15 25:9
54:24 91:4
152:10 168:9
171:5 184:16
233:8 256:20
281:22 282:19
295:4 340:6
371:19 389:5
394:15 437:12
437:18 445:14
448:6 449:11
451:2 452:24
453:12,14
565:8 570:10
603:10 623:17
626:9 630:13
634:16 664:3,8
**plot** 344:6,7
**plots** 344:15
**Plough** 117:17
**point** 35:7
100:19 103:3
129:8 153:15
153:20 155:17
157:14 158:18
196:2 198:10
216:22 224:17
261:12,13
265:3 267:11
268:8 313:22
325:23 326:23
327:19 332:19
357:3 366:19
410:24 412:20
414:20 415:12
415:16 420:13
421:10,13
425:11,11

426:8 427:17
431:9 432:4,6
433:21 439:1
441:2,23 463:4
471:11 501:3
513:7 523:19
524:7 528:4
529:10,14
555:23 561:24
620:1 634:20
661:5
**pointed** 436:21
520:9 527:20
**pointing** 508:18
520:7
**points** 343:16
429:13 434:5
437:21 439:8
439:13 440:13
440:13 563:17
608:18 630:3
**pooled** 429:17
435:7 604:13
605:7
**pooling** 400:12
**population**
561:2 605:2
**populations**
16:15
**population-ba...**
561:20
**position** 39:9
57:22 236:11
263:21 564:19
**Positions** 11:12
**positive** 437:2
562:1,2,20
**possibility**
366:11 419:13
563:10
**possible** 126:18
326:11,18
334:4 418:16
418:17 524:11
524:24 601:2
**possibly** 526:20

643:5
**postulated** 413:4
**potential** 88:20
295:9 296:15
296:19 303:4
303:23 305:3
333:4 339:24
340:10 540:12
547:20 548:5
567:2
**potentially**
410:15
**powder** 1:5 8:13
14:11 35:13
36:2 37:6,9,19
37:24 39:9
41:13 42:14
45:14 47:21
50:22 61:7,9
61:21 84:19
160:18,19
164:19 172:2
177:3 178:15
180:6,14 379:5
381:24 382:21
383:10,12,14
383:24 384:4
385:3 408:19
428:20 506:14
508:9 509:22
526:8 529:13
530:4,22 531:2
531:13 532:11
532:19,24
533:1,8,10
535:13 536:1
536:22,23
537:10,23
538:1,6 539:11
539:14,20,20
541:13,14,15
542:1 543:17
543:21 545:19
551:8 557:1
560:1 586:18
587:3 596:12

596:20 597:3
597:11,19,20
597:24 598:4
598:12 612:12
649:7,11,24
650:15 651:4
651:18 652:17
652:19 653:2
653:10 654:9
655:5,10,19
657:5 659:7
**powders** 379:8
379:21 380:4
541:18,19
542:5 657:20
657:23 658:8
**power** 319:6
**PowerPoint**
8:16 604:12
**practice** 342:21
**PRACTICES**
1:6
**practicing** 112:2
**precise** 342:15
**precision** 399:13
549:10
**preclude** 411:3
411:17
**prefer** 314:3
419:5
**preferred** 495:9
**preliminary**
143:3,12 144:4
**premise** 400:19
531:9,12
549:22
**preparation**
219:2 580:3,19
**prepare** 30:5
31:1 66:16
68:7 190:23
593:1
**prepared** 30:3
191:2 203:21
256:11 365:1
365:23 366:18

368:6,9 575:10
619:6
**preparing**
221:23 281:14
614:8
**prepping** 614:4
**presence** 130:23
**present** 5:8
228:19 344:18
400:10 533:7
**presentation**
220:11
**presented** 136:8
141:24 211:23
321:3 446:5
447:3 553:11
**presenters**
189:20
**presenting**
344:15
**preservation**
606:19
**preserve** 234:13
625:19
**president**
163:10
**presidential**
44:16
**presumably**
551:16
**pretrial** 606:3
**pretty** 37:21,22
195:14 344:15
344:17 422:8,9
422:10 424:5
450:7 504:19
507:4 508:2
548:20 555:17
626:14
**prevention**
103:21 118:14
348:7 354:3
369:11 373:23
376:14,15
397:19 398:13
429:11 576:11

580:22 582:3
**previous** 43:4
436:20 478:16
482:4 487:10
**previously** 20:21
21:3 28:6 70:2
254:22 302:16
484:12 487:6
520:7
**primarily** 314:4
406:14 630:24
**primary** 44:16
87:1 356:2
610:23 620:1
630:3,4,8,14
630:20 631:12
632:7
**principle** 179:24
**principles** 84:7
405:9,14
**prior** 36:15 62:7
64:16 68:13,13
68:23 133:22
288:1 354:19
355:1 357:5
392:17,24
394:15 406:8
524:12,24
525:10 606:9
**priori** 20:10
**privilege** 6:18
9:15,20 23:7
24:1 60:16
63:15 64:15
66:16 69:2
82:7 234:19
268:23 272:3,4
272:19 278:20
280:21 355:12
616:21 617:4
625:5 628:5
648:23
**privileged** 22:22
24:14,17 65:22
203:20 235:15
619:5

Joshua E. Muscat, Ph.D.

privileges
234:13 279:9
probable 518:22
probably 123:1
128:21 172:24
189:1 242:16
292:20 297:5
299:8 311:3,24
356:11,24
357:2,3 358:5
370:2 413:19
423:9,12
468:22 471:14
478:19,23
555:18 560:3,5
568:21 613:12
probe 404:14
problem 151:19
168:4 196:9
201:10 262:21
262:23 265:4
474:5 528:6
problematic
527:22
problems 317:3
procedure
485:17
proceeding 9:10
239:17
proceedings
224:17 227:11
228:15 231:7
417:14
process 27:4
43:22 44:1
95:24 158:8
183:2 198:22
206:21 209:4
209:10 220:10
244:20 254:18
262:12 294:9
302:11 308:15
309:2 360:10
383:15 417:24
419:1 454:23
455:9 574:10

PROCTOR 2:3
produce 112:4
produced 20:15
22:8,12,14,16
22:21 23:15
128:15 285:21
370:11 371:21
372:3,4 390:11
395:15 397:22
product 62:10
200:10 235:14
285:19 286:1
371:18 397:2
408:23 410:9
507:18,23
541:15 616:20
production 13:8
23:11 87:9
products 1:5,6
29:18 35:13
36:2 37:7,9,14
37:19,24 39:10
41:13 42:14
45:14 47:21
50:22 61:7,21
84:20 160:18
164:19 177:3
358:11 370:9
381:24 382:21
383:10,12,14
384:5 401:20
408:19 428:20
506:13 524:11
524:13,23
525:1,20 526:8
526:19 527:23
528:19 529:13
530:4,7,23
531:2,13
532:12,19,24
534:13 535:13
536:2,22,23
537:10,23
538:1,6 543:17
543:21 545:20
546:21 596:20

597:11 598:1,4
598:13 603:18
612:8,12 649:7
649:24 650:15
651:19 652:8
653:2,10
654:10 655:1,6
655:11 657:6,8
659:8
professional
1:17 15:9
72:19 152:22
294:24 663:13
professor
571:19 629:5
program 34:2
50:11 77:5
191:11,13
project 93:10
191:8 207:17
207:18,19
581:5
projects 106:23
110:23 204:3
207:21
promise 570:7
pronounced
19:24 165:18
proper 287:17
287:17 492:13
574:22 583:13
585:22 596:3
properly 286:22
610:2
proponent 325:6
proposal 7:12
98:21 110:22
123:18 124:5
124:18 125:2
138:13 140:1
141:1,8,12,22
167:10 171:6
171:10,16
172:1 186:15
189:8 209:12
211:14 214:11

564:14 565:11
566:15 590:1
598:18,23
599:1 603:12
603:15,16,22
639:23
proposals
221:24 222:3
propose 81:3
173:24 189:19
212:18 640:8
proposed 98:6
173:4,12,14,19
174:1,7 187:6
187:13 212:24
221:19 224:21
316:11 318:2
412:4 523:21
563:20 640:1,5
641:4
proposes 190:13
proposing
270:19
proposition
267:10 381:23
propounded
666:9
proprietary
103:10
prospective
173:15,15
597:2
prospectively
408:11
protected
616:19
protective 612:4
protocol 454:13
454:21 552:14
prove 245:9
proven 307:13
provide 22:2,5
241:9 530:7
536:20 537:8
541:2,7 550:10
601:6 606:2,13

607:16,21
provided 21:23
22:6 65:8,24
66:4,24 69:15
69:18 73:13
75:23 122:3
123:16 136:11
241:13 280:22
363:11 401:18
490:18 575:9
578:17
providers 566:2
provides 141:15
247:18 464:18
606:14
providing 77:4
247:12 443:19
446:8 447:6
600:20 607:4
provision
235:12
proximate
549:18
public 1:18
36:20 195:20
504:21 505:3
570:22 571:16
573:1 645:24
663:14 666:23
publication
39:22 47:6
72:8 88:7
150:18,21
151:11 255:20
257:22 258:5
280:18 282:4
282:12 292:3
294:20 295:20
300:3 301:19
357:5 374:2
405:10 587:16
601:2
publications 7:7
11:23 47:20
53:2,5 82:20
82:24 90:3

Joshua E. Muscat, Ph.D.

104:18 109:17
153:14 159:15
183:13 184:14
293:21 294:2
294:13 344:16
433:16 452:22
487:11 573:13
573:14 574:6
629:17 632:2,8
636:4
**publish** 315:7
629:8,10
**published** 11:12
40:24 45:2
46:18 48:13
49:4,8,13,17
49:24 50:3,5
53:17,24 72:5
83:17 84:2
89:7,20 107:14
109:7,11 116:6
117:14 118:13
119:22 122:17
122:23 123:11
131:11 136:16
147:16,23
148:1 150:14
150:14 154:18
169:11,18
174:21 178:21
192:20 193:2,3
205:2 206:14
208:22,24
211:12,12
213:5 248:10
249:19 251:24
252:2 253:12
264:18 281:9
284:4 285:3
289:17 290:16
291:4,13
299:18 304:24
345:15 347:20
347:24 352:4
354:1 372:1
373:22 397:13

428:12 429:9
431:4 439:9
445:19 446:15
452:21 479:2
486:9 502:13
509:6,16 511:2
511:2 512:11
574:15 576:8,9
579:6,10,18
580:3,4,21
582:24 583:5
587:22 607:3
629:14 632:15
633:20 648:4
650:17
**publishes** 88:24
**publishing**
294:17 314:16
314:24 540:6
582:2 585:8
600:22
**pull** 171:20
298:7 356:17
474:9 594:20
603:9 634:16
**pulled** 75:11
91:16 272:4,19
275:17 278:19
395:14 556:6
556:10 610:16
**pure** 61:11
379:6,7,7
383:24 543:3
557:4
**purpose** 17:2
61:6 70:24
156:1,3,15
158:17 331:5
331:18 334:2
364:9 366:24
399:6 404:17
417:14 627:8
**purposes** 17:2
70:12 71:20,22
72:18 73:2,4
76:3 85:14

125:23 152:20
254:10 423:23
468:21 582:19
**pursuant** 1:14
49:2 387:18
648:19
**put** 16:17 50:21
61:24 69:12
74:11 82:14
90:10,12 95:9
124:13,14,21
125:1 131:10
139:11,24
160:1 174:16
176:2 186:23
190:12 192:2
192:12 220:1
230:17 269:15
279:6 328:6
331:1 394:15
429:15 435:14
445:5 448:20
479:12 491:2
504:2 505:14
537:22 548:21
590:21 610:17
636:23
**putting** 282:21
296:18 502:6
504:4 566:14
654:8
**P-value** 321:5
321:21 323:18
323:23 326:8
328:3
**P-values** 321:8
324:24 325:8
**P.C** 5:3
**p.m** 292:23
293:18 365:3
428:2,5 548:14
548:17 554:1,4
558:16,19
565:20,23
569:20,23
604:5,8 612:19

612:22 644:16
644:19 662:3,9
**P1.0004.1-9** 7:10
**P1.0011.1** 9:10
**P1.0027.1-27**
7:12
**P1.0038.1-161**
9:14
**P1.0043.1-7** 9:7
**P1.0134.1-3** 7:22
**P1.0136.1-2** 7:18
**P1.0137.1-19**
7:20
**P1.0140.1** 8:7
**P1.0141.1** 8:9
**P1.0142.1** 8:12
**P1.0146.1-2** 8:21
**P1.0164** 10:10
**P1.0165** 10:15
**P1.0169** 6:20
**P1.0173** 6:22
**P1.0174** 10:20
**P2-002** 132:16
**P2.0002** 11:9
**P2.0003-15** 7:16
**P2.0006-8** 10:17
**P2.0007-7** 10:8
**P2.0012-7** 8:15
**P2.0016.1-33**
8:19

---

**Q**

**qualifies** 260:5
260:12
**qualify** 314:9,11
410:3 430:9
**quality** 40:16
41:10 42:11
112:6
**quantitative**
112:5 331:23
**quantity** 40:16
41:10 42:12
**quartz** 379:22
380:6
**question** 18:12

19:3 25:9,12
27:7,9 31:15
35:12 36:1,10
37:18 38:2,6,8
38:19 40:10,18
41:5,7,11 42:4
42:6 44:7 68:1
68:9,11 71:13
72:3,11,16
73:17,22 85:19
95:23 96:3,19
106:19 113:13
115:2 127:19
127:21 139:22
145:1 155:15
156:6 158:9
197:7,8 206:12
235:7 236:15
246:23 250:17
250:17 263:5
298:12 300:15
301:20,21
307:2,4 317:23
323:15 336:12
338:9 360:6
363:15 372:9
373:11 378:11
378:15 384:2
388:1 391:19
396:4 404:20
416:17,21
420:1 468:8
486:16 488:3
492:12 495:11
507:11 508:13
508:15 512:5,7
515:22 519:9
522:23 523:6
530:14,16
531:10 532:7,8
535:8 540:16
540:21 541:8,9
542:16 543:3
544:20,23
545:22 552:13
557:9 560:18

Joshua E. Muscat, Ph.D.

625:12,14
636:23 637:21
645:7 646:20
647:8 649:8,18
649:23 650:9
651:10 654:19
654:22 655:20
657:3 659:15
659:18 660:3,7
660:15,16,18
661:1
**questionable**
103:8
**questionnaire**
178:15 180:6
180:14
**questions** 13:14
35:22 36:13,16
37:21 44:20
47:14 48:3
67:23 73:20
74:16 103:10
103:24 117:6
175:8 178:12
178:20 179:7
180:3,4,11
378:3 511:9
520:19 541:23
545:15 552:23
575:12 588:14
592:24 593:6
593:24 600:23
601:18 604:11
608:9,17,24
611:3 612:17
613:5 618:6
632:20 633:1
633:12 644:22
644:23 645:1
647:15 660:10
666:8
**quick** 405:15
548:11 604:3
**quickly** 548:20
587:14
**quite** 154:20

324:5 328:14
487:15
**quotations**
113:3
**quote** 430:23

**R**
**R** 665:1,1
**RAFFERTY** 2:3
**raise** 175:8
178:12,20
179:7 180:4,11
441:5 563:9
653:13
**raised** 19:2
103:10 192:4
196:16,21
439:14 442:4
562:13
**raising** 179:23
**Ralph** 246:1
**random** 149:10
**randomize**
408:11
**randomized**
314:4,8 407:6
408:4
**range** 324:6
326:18 420:13
432:15,16
433:8,13 477:6
**ranges** 420:23
**rarely** 465:14
466:7,21 469:3
469:20
**rate** 309:22
492:10
**rates** 308:21
309:19 357:21
358:12
**ratio** 481:5,17
481:18 555:22
556:7 557:13
**ratios** 420:1
**raw** 346:8,9
**reach** 303:7

306:10
**reached** 306:22
307:23 569:11
**reaching** 575:24
**reaction** 519:22
**reactions** 646:15
**read** 24:4 66:17
89:19 131:4,5
197:14 257:4
260:24 266:20
299:12,15,17
307:16 314:21
390:23 440:12
446:23 448:4
448:18 449:17
470:17 471:10
484:23 493:11
494:11 500:2
504:15 524:19
525:4 551:23
552:3,9,10
588:23 590:4
637:2,22 663:9
664:3 666:5
**reader** 89:8
286:9 303:5
305:10 338:21
387:16
**reading** 90:6
155:2 164:23
299:23 325:16
388:5 403:2
413:14 446:12
455:2 475:14
553:3
**reads** 369:18
**ready** 363:17
**real** 103:24
156:18 325:6
327:8 604:3
**realistically**
388:5
**realize** 388:6
**really** 16:13
18:1 42:2
54:13 71:6,11

126:12 145:14
156:16,18
161:17 184:2
194:15 195:8
197:15 217:7
218:3 224:9
303:13 304:18
307:4 312:9
339:14 358:7
382:14 384:5
398:6 405:16
415:19 423:24
430:23 431:4
434:4 441:13
450:12 465:24
473:14 483:18
495:6 501:18
544:24 562:11
567:4 627:5,10
**realm** 426:23
**Realtime** 1:18
663:14
**reason** 23:13
109:14 126:13
149:22 200:12
223:16 253:16
391:8 468:23
478:23 482:7
518:22 560:7
561:7 568:5
584:24 601:15
664:5 665:6,8
665:10,12,14
665:16,18,20
665:22,24
**reasonable** 17:9
17:21 111:23
545:21
**reasons** 71:9
126:11 130:22
268:6 333:13
408:21 478:16
518:14 519:14
520:19,21,22
521:8 522:24
523:5,6 538:3

**Reath** 1:15 3:11
**recalculate**
475:3
**recall** 18:15
21:19 34:13
53:21 81:12
101:19 113:22
114:4 124:1
141:3 175:1
182:21 221:15
253:4 325:16
343:23 346:18
375:5,10
403:24 423:6
441:10 442:19
518:22 564:7
575:12 577:23
578:1,9,18
593:3,5,23
594:2 598:19
599:22 600:22
601:17 604:11
604:15 608:23
611:3 633:5
636:3
**receipt** 664:17
**receive** 67:8
68:12 607:7
**received** 47:5,18
99:9 165:2
247:10 283:15
570:17
**recipe** 415:23
**recognize** 90:22
91:13 184:17
322:8
**recognized**
104:20 122:4
163:13 425:3
**Recognizing**
67:11
**recollection**
19:15 101:7
124:17,23
175:12 217:13
226:14 237:15

Golkow Litigation Services - 877.370.DEPS

242:16 291:8
358:5 365:7
366:24 448:23
490:15 561:24
**recommend**
94:5 651:20
**recommendati...**
239:23,24
**recommended**
258:23 259:4
319:14
**record** 14:3,15
62:16,19 72:18
91:24 129:17
129:20 165:17
176:20 180:17
184:3,12 223:6
292:23 293:16
293:18 315:5
428:2,5 429:6
458:23 460:9
493:16 548:14
548:17 552:2
553:14,22
554:1,4 558:12
558:16,19
565:16,20,23
566:5 569:20
569:23 604:2,5
604:8 607:7,11
612:19,22
644:14,16,19
661:4,21,23
662:1,3 663:6
**recorded** 462:17
463:15 470:10
491:11
**records** 222:21
**red** 95:9 250:10
252:23 253:4
256:11 392:16
392:24 623:7
631:1
**redline** 49:22
**REES** 4:2,7
**refer** 188:17

322:7 381:3
460:24 500:9
554:13 658:7
**reference** 91:15
129:23 164:12
339:7 456:21
456:24 466:2,3
472:7 484:2
485:3,20 487:4
494:6 524:15
528:22 529:10
529:15 547:7
547:11 582:14
582:17 584:6
584:15
**referenced**
252:13 255:1
**references** 298:7
298:8 453:5
454:19 483:19
594:8,13,17
**referred** 92:3
158:8 322:18
432:9 433:4,15
460:22 508:21
509:3 522:10
525:8 550:15
**referring** 41:18
65:19 66:18
117:3 121:13
132:20 140:24
181:1 215:12
236:24 264:23
289:7 292:16
318:15 343:5
380:16 394:24
432:4,5 444:3
447:18 450:24
477:24 492:21
532:5 593:21
622:14 627:3
627:18 644:7
656:13
**refers** 77:2,3
135:13 237:24
344:5 380:3,10

444:20 479:5
485:2
**reflect** 66:13
222:21 223:7
661:22
**reflection** 311:9
313:3,7 328:3
**reflects** 85:8
**refresh** 124:15
124:16 237:15
365:6 366:23
**regard** 271:6
295:18 371:6
494:7 502:13
520:5 560:15
579:15 610:12
610:22 644:5,5
**regarding**
141:12 143:14
178:13 180:4
247:13
**register** 197:2
**Registered** 1:17
663:13
**regularly** 69:23
72:4
**regulation** 31:2
**regulators** 54:16
586:2
**regulatory**
11:12 83:9
195:1 196:16
405:12
**reimbursed**
583:3
**rejected** 96:13
225:12 290:15
290:24 291:3,4
291:12,20
292:2,7 315:14
374:14,15,18
375:11,24
376:1 398:18
**relate** 82:7
**related** 21:5
33:3 37:18

53:1 63:16
70:16 97:7
101:15 105:21
106:16 143:12
153:8 176:12
203:5 259:5,22
319:16 320:11
323:22,23
326:13 421:20
428:9 605:13
642:10 643:5
643:14 645:19
**relates** 1:8
441:11 633:16
655:21
**relating** 34:2
35:12 36:1,22
63:4 279:9
378:3,24
**relationship**
23:14,16 24:8
24:17 25:22
26:16,23 27:2
27:10,15 31:16
32:5,8 43:8
60:15 62:23
64:12 69:3
82:24 154:1
165:22 169:12
169:13 269:3
276:11 307:21
434:7,10
436:14 438:12
440:17,19
443:5,13
446:20,21
491:5 518:3
519:6,13 521:9
522:1,5,14
**relationships**
16:19 407:5
408:3 411:16
412:23 414:24
644:8 653:24
**relative** 320:17
321:3 324:1,5

325:24 326:4
331:1 342:5
425:22 426:7
436:22 466:14
472:20 477:10
477:19 491:15
492:15 495:16
531:22 532:4
557:20 560:24
561:22 568:13
**relatively**
369:16
**relevant** 261:3
262:7 334:4
528:17 529:18
546:19 595:24
**reliability** 84:16
178:14 180:5
180:13 428:18
**relied** 131:9,10
136:17,18
137:14,16
428:10 547:2
552:20
**religiously**
152:15
**rely** 137:10,13
137:18 511:4
546:12 655:23
657:17 658:3
**relying** 134:2
**remaining**
454:20
**remember** 38:15
40:7 50:23
96:2 100:18
101:22 102:4
104:4 143:15
163:12,13
169:21 172:23
173:1 175:2,6
182:15 183:15
183:16 184:1
184:18,23
186:17 192:1
212:20 219:22

Joshua E. Muscat, Ph.D.

219:23 221:17
223:3 224:8,9
226:6,10
227:24 228:12
228:13 229:4
229:10 235:15
265:5 274:3
282:16 288:15
290:21 344:5
357:1 361:14
364:9,14
365:12,16,19
365:20 366:7,8
366:16 375:1
378:2,6 381:22
423:9 443:23
489:19 525:6
549:14,22
560:23 561:4
618:10 623:7
645:6 649:8
**remind** 275:2
**remotely** 400:2
**render** 659:3,4
**renomination**
193:6,23 198:3
**repeat** 17:15
25:8 35:19
54:24 89:13
113:13 115:2
127:14 139:22
219:18 231:2
243:16 271:18
281:22 295:4
338:9 340:6
360:5 387:14
388:2 415:13
426:4 477:15
488:3 507:10
525:15 532:16
586:23 619:11
654:19
**repeating**
487:13
**repetitive**
456:18

**rephrase** 25:11
31:7 250:17
336:12 416:20
530:15 531:10
637:20
**replicable**
334:16 343:1
**replicate** 336:11
336:16,21
338:1,21 346:1
346:12 469:24
487:20 489:1
489:21
**replicated** 490:5
**replication**
333:22,24
488:23
**report** 10:14
34:1,7,14
50:15 51:3,5,6
51:9,11,14,23
51:24 55:5
56:2,20 77:4
93:9 97:4
134:13,16,17
134:20 146:6
147:1,3 149:13
150:14,21
151:22 191:2
192:9 207:9
219:3 224:2
262:6,7 280:3
333:21 355:1
357:7 361:11
363:22 364:10
364:24 369:3
395:7 405:20
417:1 429:8
434:21 435:21
446:24 466:20
466:22 469:19
473:10 516:2
518:2 523:8,16
562:13 591:2
639:16 648:6
660:11

**reported** 144:22
176:24 330:10
345:6 468:4
473:1,5 483:4
500:19 521:6
521:17 551:13
557:22 576:19
578:12,14
609:4,9 635:4
**reporter** 1:17,18
1:18 14:16
663:13,14,14
663:22
**reporting**
466:18 517:8
517:16 577:18
578:2 586:17
587:2 610:4
**reports** 7:6
11:22 30:3,6
31:1 50:9,12
51:15 54:15
83:9 90:17
91:10 145:22
146:5 203:18
220:10 228:14
294:2,12
354:19 405:12
419:24 428:11
433:15 453:22
479:14,17
480:6,9,11,13
480:14,17
481:4,8 540:8
578:6 607:4
611:15
**represent**
149:18 161:24
162:14 193:10
193:10 200:9
224:21 246:2
351:23 363:10
407:4 408:2
440:11 525:21
526:20 616:8
632:1,10 635:2

**representation**
223:8 599:23
**representative**
271:9
**represented**
58:11 60:18
78:4 128:1
598:22 599:11
599:19 603:12
**representing**
2:16 3:14,19
4:15,20 5:6
80:10 200:22
229:23 275:11
387:8 390:11
616:2 617:10
621:21 633:20
**represents** 55:18
**reproduce**
135:21
**reproduced**
445:11,18
458:22,24
**reproducible**
471:4
**reproduction**
663:20
**reproductive**
399:16 549:12
**republished**
137:5 144:23
**republishing**
449:19
**reputation**
654:8
**request** 13:8
203:21 268:20
274:12 578:24
619:6
**requested**
580:12 663:7
**requesting**
295:13
**requests** 506:11
**require** 334:21
506:12 578:24

**required** 126:4
128:23 471:15
580:12 605:24
607:9 618:21
**requirements**
126:6 244:13
414:22 629:9
**requires** 295:15
418:7 606:21
**research** 7:12
11:22 47:20
53:3 87:2
93:17 95:11,15
95:18 104:1,23
106:12,17,21
107:8,12,18,22
108:8,10 109:8
111:10,21
112:3,13 113:8
113:16 114:5
114:19 115:7
116:11 117:13
120:7,14,20
121:16 122:8
122:18,21
124:5 125:11
125:18 140:24
141:8,22 193:8
199:23 203:3
216:6 275:20
290:17 309:13
310:4,21
313:14 314:7
314:15 348:15
358:22 411:1
487:18 539:23
564:3 573:9
590:1 647:4,18
647:24 648:4
655:12
**researcher**
312:17
**researchers**
311:11 333:20
**reserve** 569:16
**respect** 43:2

| | | | | |
|---|---|---|---|---|
| 47:20 136:19 | 638:6 | 313:4 315:18 | 246:8 | 216:9 225:12 |
| 422:18 576:7 | **resumé** 72:19 | 349:8 355:21 | **right** 15:18 | 227:7,11 |
| **respected** | **retained** 193:18 | 357:4 373:15 | 19:24 21:21 | 230:15 233:11 |
| 312:10 315:1 | 194:3,5,6,9 | 394:20 395:7 | 24:16 25:16,19 | 233:14,18 |
| **respects** 583:13 | 198:2 223:24 | 396:18 417:15 | 27:20 32:18 | 234:4 238:15 |
| **respond** 25:4 | 230:20 231:14 | 425:6 454:14 | 33:14 45:11 | 244:7 247:6,8 |
| 26:9 36:11 | 277:19,23 | 454:15 456:20 | 50:9 51:5,6,7 | 251:5,6,8,17 |
| 178:2 616:15 | 280:10 283:24 | 574:10 576:13 | 56:13,15 58:15 | 253:9,20 |
| 640:21 648:16 | 284:2 | 579:16 580:19 | 58:24 63:13 | 255:11,21 |
| **responding** | **retainer** 204:2 | 581:2,9,15,21 | 66:3,8 67:6 | 257:21 258:7 |
| 365:23 593:18 | 238:24 239:4,8 | 582:1,6,10,15 | 72:15,16,22 | 259:3 260:11 |
| **response** 10:9 | **retaining** 194:23 | 582:23 583:4 | 75:23 76:13,13 | 260:22 261:7 |
| 50:20 247:11 | 219:13,19 | 583:18 585:8 | 81:20 82:10,22 | 269:1,5 271:12 |
| 357:14 360:11 | **retrieved** 484:11 | 585:20,23 | 85:1 87:16 | 278:1 280:21 |
| 360:13 361:12 | **return** 664:15 | 587:23 590:15 | 90:10 99:12 | 284:14,15 |
| 368:1 434:22 | **returned** 252:23 | 595:23 610:1 | 103:23 107:11 | 285:15 290:22 |
| 589:11 593:2 | **Returning** | 610:13 612:11 | 109:5 111:6,6 | 291:13 292:10 |
| 611:22 612:3 | 168:14 | 630:20 649:6 | 111:6,11 113:3 | 292:12 299:3 |
| 647:6 | **reveal** 64:7 | 656:22 | 117:2,22 127:6 | 299:11 302:22 |
| **responsibility** | 640:22 648:17 | **reviewed** 119:21 | 130:20 133:20 | 307:18 308:7 |
| 87:2 288:5 | **revealed** 454:12 | 289:19 342:19 | 136:7 140:11 | 310:1 311:13 |
| **responsible** | **review** 10:19 | 358:5 406:8 | 146:22 149:5 | 315:10 316:16 |
| 244:10 284:19 | 22:9 24:7 49:3 | 458:8,13 | 153:14,15 | 316:20 317:4 |
| 371:14 | 51:16 88:5 | 595:15 596:6 | 156:11 160:24 | 317:14 318:3 |
| **rest** 82:13 94:17 | 93:24 94:18,21 | 616:12 | 161:15,16 | 318:20 321:23 |
| **resubmitted** | 95:24 118:12 | **reviewer** 574:5 | 162:13,18 | 322:20 326:4,8 |
| 375:15 | 134:5 155:7 | 574:13 | 163:4 164:13 | 327:4,18 328:4 |
| **result** 193:5 | 156:4,9,13,15 | **reviewers** | 164:13,13 | 329:15 330:6 |
| 207:9 322:4 | 156:18,19 | 289:22 309:4 | 166:2,10 | 330:13 331:3 |
| 326:23 327:2 | 164:16 204:16 | 601:3,5,11 | 169:24 172:7 | 332:15,19 |
| 328:5,6,21 | 204:21,24 | **reviews** 261:18 | 172:18 173:3,5 | 337:13,18 |
| 330:1 400:11 | 205:9 206:3,16 | 362:16 486:10 | 173:23 174:9,9 | 340:24 341:11 |
| 554:19 | 215:16 221:1 | **review/present** | 174:17 178:7,9 | 341:13,14 |
| **resulted** 158:9 | 234:4 242:22 | 189:9 | 181:4,6,8 | 347:13 348:6 |
| **results** 240:1,9 | 243:20 244:16 | **revising** 256:22 | 182:9 188:15 | 352:17 354:18 |
| 306:9 322:1 | 247:24 248:2 | **revision** 581:18 | 189:5,6 190:15 | 358:14 361:17 |
| 329:21 331:22 | 248:22 249:10 | **revisions** 375:15 | 191:14 192:21 | 363:9 367:14 |
| 331:24 332:3 | 249:12 250:22 | 375:17,22 | 193:4 194:6 | 368:24 372:1 |
| 335:6,9 416:24 | 255:22 256:16 | 578:21 | 198:11,21 | 373:12,14 |
| 424:3 454:7,11 | 260:13,14,14 | **Rich** 202:11 | 200:4 201:1,16 | 374:13 375:18 |
| 455:6 517:2 | 261:21 276:17 | 259:7 | 201:21 203:16 | 379:11 380:6 |
| 520:23 521:18 | 281:8 288:22 | **Ridge** 81:14 | 206:21 208:24 | 380:18 383:13 |
| 563:14 575:23 | 288:23 289:20 | 162:24 256:11 | 209:4,20 | 383:16 384:17 |
| 578:12 579:9 | 289:21 291:11 | 392:15 623:5 | 210:18 211:21 | 384:18 385:13 |
| 591:8 595:7,12 | 302:9 308:14 | **Ridgway** 200:2 | 213:3,8,10 | 389:12,14 |
| 596:2 637:8 | 308:16 309:2 | 200:2,5 238:17 | 214:1,9,24 | 392:2,15,18 |

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 395:18 397:5 | 507:19 508:20 | **Rio** 28:6 161:3 | **Rohl** 379:23 | **sat** 353:3 |
| 399:4 401:14 | 509:17 510:4,5 | **ripping** 507:14 | 380:2 524:14 | **sauce** 261:6 |
| 401:21 403:14 | 510:12,14 | **risk** 7:14 8:14 | 525:2,8,10 | **save** 487:14 |
| 404:7,19 | 514:19 516:22 | 10:7 11:7,19 | 547:11 | **saw** 109:4 144:9 |
| 407:12 408:19 | 518:15 519:1 | 122:14 130:12 | **Rohl's** 547:7 | 144:13,14 |
| 409:7 410:23 | 519:18,24 | 174:23 177:1 | **role** 159:23 | 164:11 444:2 |
| 411:9,13,23 | 522:13,23 | 255:6 262:9 | 414:9 | 616:23,24 |
| 412:9 414:13 | 524:8,16 527:4 | 320:18 321:3 | **roles** 87:8,13 | 623:4,21 628:4 |
| 415:8,21 416:5 | 527:5 528:10 | 321:12 324:2,5 | **Roman** 551:2 | **saying** 206:9 |
| 416:22 417:2 | 529:21 535:23 | 324:11 326:1,4 | **Rome** 261:7 | 211:8 326:11 |
| 417:23 418:4 | 538:5 542:24 | 326:14 327:8 | **Rothman** 322:8 | 329:16 362:24 |
| 420:19,21 | 543:19 547:21 | 332:5,22 333:4 | 325:5 483:24 | 381:16 436:5 |
| 421:3 427:17 | 551:18 554:6 | 336:23 341:5 | **round** 461:21 | 526:18 528:12 |
| 436:23 437:22 | 554:12,18 | 342:5 344:8 | **rounded** 472:23 | 567:9 589:7 |
| 438:23 439:4,7 | 556:6,10,21 | 399:24 400:13 | 473:3 | 603:2 647:16 |
| 440:3 441:23 | 557:23 558:3 | 425:22 426:7 | **route** 538:17 | 651:22 654:9 |
| 443:3,8 445:16 | 559:4 561:23 | 429:19 431:12 | **Routh** 3:17 | 655:10 |
| 446:24 447:2 | 564:9,9 567:5 | 435:9,14 | **RR** 326:6 | **says** 112:1,17 |
| 449:5,8 451:9 | 569:16 572:6,8 | 436:22 437:4 | 328:18 | 114:14 120:7 |
| 453:23 455:11 | 572:9 573:18 | 441:5 466:15 | **rule** 421:15 | 120:11 135:9 |
| 455:12 457:1 | 600:16 613:10 | 472:20 477:10 | 425:13 606:21 | 136:7 144:3 |
| 458:19,21 | 614:3 617:20 | 477:19 491:15 | 607:21 | 167:9 168:14 |
| 459:6,6 461:3 | 618:5,22 619:7 | 492:15 495:17 | **rules** 296:2 | 171:5 172:1 |
| 461:5,12,16,24 | 620:2 621:1 | 503:3 506:16 | 606:20 | 178:11 188:21 |
| 462:2 463:11 | 623:1,8 624:16 | 508:1 515:17 | **run** 658:21 | 188:24 200:23 |
| 463:17,19 | 624:17,23 | 516:14,24 | **running** 129:10 | 216:21 238:2 |
| 464:11,17,19 | 626:17 628:15 | 517:20 525:21 | 548:9 | 238:22 244:21 |
| 465:2,21,22 | 628:15 629:3,7 | 526:21 530:9 | | 245:22 247:2,8 |
| 466:4,9 470:1 | 630:17,22 | 531:22 532:4 | **S** | 247:9 248:20 |
| 470:19 472:7 | 631:21 632:19 | 542:15 557:20 | **S** 6:11 7:2 8:2 | 255:13 256:11 |
| 474:2,4 476:17 | 635:7,8,13 | 560:24 568:6 | 9:2 10:2 11:2 | 257:4 258:22 |
| 478:13 480:1,7 | 636:21,24 | 568:13 587:17 | 12:2 | 259:3 280:21 |
| 483:10 484:9 | 637:12 642:2 | 589:5 590:12 | **sadly** 166:24 | 286:5 321:11 |
| 484:24 486:11 | 645:24 646:10 | 602:18 604:14 | **safe** 586:2 598:8 | 350:18 352:4 |
| 489:6 490:24 | 646:11,21 | 604:19,22 | 612:12 632:21 | 352:13 354:4 |
| 491:3,21 492:5 | 647:12 648:6 | 605:3,8 637:7 | 649:7,12 650:1 | 364:23 366:10 |
| 493:1 495:5 | 651:9,19 | 638:5,12 642:9 | 650:19 651:22 | 367:8 368:6 |
| 496:1,3,21 | 652:10 658:13 | 643:4 651:4 | 654:11 655:1 | 370:5,7 371:15 |
| 497:6,10,16 | 658:19 | 652:24 653:12 | 655:11 657:8 | 379:4,18,23 |
| 499:11,19 | **right-hand** | **risks** 325:9 | **safety** 655:20 | 384:14 385:20 |
| 500:8,23 | 133:24 407:14 | 331:1 561:22 | 659:6 | 396:6 399:11 |
| 501:11,17 | 490:11 589:24 | **Road** 2:10 | **SALES** 1:6 | 401:17 406:18 |
| 502:23 503:23 | **rigor** 313:3 | **Robert** 193:9 | **sampling** 323:24 | 407:2,22,24 |
| 504:6,7,20,22 | **rigorous** 112:23 | 245:22 | 324:4 326:20 | 412:20,21 |
| 505:13,16 | 308:19 309:2 | **ROC** 192:9 | **Samuel** 350:19 | 414:18,19 |
| 506:7 507:5,15 | 312:21 | 193:19 | **SARA** 4:7 | 419:10,12 |

421:13 425:11
435:3,6 436:10
436:24 438:4
443:16 446:4,4
446:15,17
451:7,21
452:13 455:17
455:17,20,24
456:6,20
458:16 462:12
462:12 463:6
466:10 468:2,2
470:8 477:9,18
484:21 485:15
490:21 491:2,3
506:4 516:12
517:23 524:8
526:3 529:18
538:2 554:5
635:3 636:4
637:23 639:2
642:5,16,20,24
643:23 644:12
**scene** 123:22
**scheme** 625:15
626:6
**schemed** 627:4,6
**scheming** 627:3
**Schering** 117:17
**Schering-Plou...**
112:20
**science** 17:6,18
18:10 37:18
43:6 406:19,20
416:15 506:20
571:5 579:22
596:6,19
**sciences** 570:19
571:16 573:2
**scientific** 42:10
44:13,14,19
84:7 85:21
89:19 121:10
156:9 157:15
159:5 194:10
194:24 196:1

262:2,12
275:19 313:13
405:9,13
417:24 418:8
418:10 422:18
424:6 426:23
574:5,15
576:24 586:12
594:6,18 596:7
**scientist** 107:2
125:17 142:7
164:5,9 194:24
502:15 575:22
592:17
**scientists** 112:2
225:23 261:16
404:7 417:8
418:11,18
586:1
**scope** 108:22
586:21 596:16
597:7,14
605:13 608:7
609:19 614:18
615:11 625:23
**screen** 69:12
407:23 445:3
491:3 563:1
623:18
**search** 334:16
334:22 343:9
343:10,11
454:10,12
**seated** 159:18
**second** 38:19
62:14 83:7
86:19 104:18
167:16 178:11
203:13 204:18
208:12,12
230:13 256:9
373:15 380:3
380:12 444:10
451:6 463:5
464:15 472:7
516:23 525:9

527:17 563:5
588:16,18
605:23 619:14
**secondary**
525:21 526:21
534:13
**seconds** 493:21
**section** 74:7
75:15 95:8
203:13 258:24
259:4,16,21
262:20 297:19
297:22,22,23
298:12,13,14
298:14,15,15
302:18,19
303:1,11 305:2
323:10 356:20
377:10,12,21
385:17 419:10
454:11 455:6
483:14,18,20
542:13 551:13
554:7 590:5
635:3
**sections** 261:20
297:21 298:1
**see** 23:16 24:2
44:16 53:21
75:14,16,17
84:8 99:22
102:4 110:15
110:23 111:5
111:10,14,15
112:14,24
114:3 120:10
133:23 135:11
135:24 136:13
141:9,19 142:1
142:13 144:1,6
145:17 153:13
160:8 166:12
168:20 172:4
176:15 177:16
177:23 178:1
179:8,18

188:13,16,19
188:23 189:11
189:17,21
190:1,14
199:23 200:4
202:10 203:16
203:23 217:1
237:14,17
238:3 239:1,18
240:5 241:8
244:23,24
245:8,18,19,21
246:14 247:16
247:20 248:3
248:17,23
249:13,14
256:14 259:8,9
264:22 272:21
272:24 273:7,9
273:18 279:21
279:23 280:6
280:14,24
281:5,11 308:4
312:18,21
317:21 322:21
323:2 331:2
333:8 334:10
334:11 350:11
350:12,17,22
351:2,7,15,17
351:19 352:6
352:11,12,15
362:8,15,24
363:5,6 365:4
366:14,21
368:8 369:6
372:5 377:24
379:11,13
380:1 385:18
385:23 391:22
394:21,21
395:4,10,12
396:2,6,12,15
397:4 399:17
402:1,2 405:20
407:7 408:5,9

408:13,14
410:18 411:5,6
413:2 415:1
416:24 419:18
421:9,17
425:15 427:14
435:11,12
436:1,15
438:20 443:14
443:15,20
444:14,15
445:7 446:10
447:8,9 450:19
451:15 452:1
454:11 455:20
456:1,3 457:2
458:4 460:19
462:18 463:18
464:4 465:6,11
466:14,16
472:18 473:16
473:17 474:1
476:21,23,24
477:3,20 478:5
479:9,11
484:13 485:18
489:10 491:9
492:20 506:17
513:10,19,20
513:23 516:7
516:22
519:3,4 524:1
524:4 528:1,20
530:1,5 542:14
542:17 545:5
545:17,18
553:9 556:7
557:19 563:7
563:15 565:6
566:16,19
588:19 603:13
604:3 624:2,7
630:13 638:9
643:7 644:11
**seeing** 21:19
113:23 414:3

Case 3:16-md-02738-MAS-RLS   Document 9895-5   Filed 05/30/19   Page 309 of 599 PageID: 72713
Joshua E. Muscat, Ph.D.

Page 718

seek 295:19
seemingly 112:22
seen 21:17 39:14 39:22 58:1 139:10 141:2 142:15 143:11 143:13 144:11 145:1 153:23 157:4 177:2 288:17,20 301:6 305:24 306:4 322:7 325:15 384:14 413:12,14,18 420:18 426:7 449:16 497:8 500:4,8 530:9 561:1 564:13 568:18 580:6 584:20 585:6 591:21
SEER 357:21 358:7
Seminary 2:10
send 171:9 256:20 601:1 624:17
sending 101:23 623:22
sends 624:19
senior 107:2 125:17 142:7 164:4,9 200:5 238:18 246:9
sense 44:4 294:14 328:9 471:9 478:22
sensitivity 437:5
sent 134:13 143:4 146:18 147:7 148:17 150:11,21 175:4 191:7 228:21 290:5 357:6,7 358:6

362:6 428:11 429:8 443:7 449:3 502:4 513:12 622:17 622:18,18 623:1 624:8 627:15
sentence 112:1 112:10 371:19 379:16 380:4 380:11,12 421:11 446:23 457:22 458:2 516:23 525:9 527:14 529:23 563:1,3 590:5 637:1 642:4
sentences 148:9 148:11,12 150:9
separate 207:17 207:18,19,21 208:10 253:12 253:24 254:3 303:9 304:19 329:9,14 501:16 557:9 581:5
separately 92:6 501:12
September 1:11 14:6 663:15
series 37:21 176:10 305:19 597:2
serious 195:15 195:20 196:8 196:12 508:2 508:10,15 639:6
serous 569:2,9
serve 606:8
served 20:22 21:3,9 574:4 606:16 607:9
serves 261:19

Services 1:21 14:5
session 614:21
sessions 614:13 614:14
set 238:3 533:8 595:18 607:12 625:16
setting 534:5,11
seven 128:22 145:21 294:11 451:7,11,21 452:13 456:7 458:17 462:15 463:6 491:3 573:17
seventh 503:12
seven-hour 569:12
SEYFARTH 4:17
Sfrey@grsm.c... 4:10
SH 635:5
shared 189:9
SHAW 4:17
sheet 7:8 65:6 395:13 664:7,9 664:12,15 666:12
sheets 216:17
shelves 61:17
Shook 3:2,7 9:21 27:21 62:23 63:4,16 64:12,16 65:7 65:10,20 68:12 68:23 74:11 80:9,16 163:18 271:23 274:18 274:19 275:3,5 275:18 276:7 277:6,20 279:9 283:19 284:9 284:11 287:23 355:14,19,20

372:18
shopped 311:16
short 62:17 129:5,18 428:3 548:15 570:8
Shorthand 1:18 663:13
short-term 410:7
show 20:13 21:8 69:11 75:5 102:7 109:23 138:10 140:21 143:16,17 166:13 167:21 175:17 176:7 188:6 199:6 236:19 237:9 306:7 327:21 364:20 390:18 394:13 399:23 420:12,18 448:2 489:15 520:8 529:15 565:2 566:10 577:10 597:10 598:3 604:18 604:22 605:3,7 609:15 616:22 630:1 638:12
showed 144:10 174:23 219:20 220:4 443:24 454:15 456:21 462:12 604:13 611:9 614:15 645:4 653:11
Shower 37:11 37:11 160:20 160:20 384:4,4
showing 420:1 585:7 591:22 609:9
shown 531:19 547:17 576:17 598:24 604:11

609:15 652:23 657:9 658:1
shows 328:18 358:7,12 429:18 529:11 584:23 586:18 587:3 596:19
sic 216:10 419:16
side 19:5 300:22 349:23,24 451:7
sides 18:11,19
side-by-side 149:1
Siemietycki 226:2,7,8,17 588:5 635:17 636:9 642:24
sign 51:10 85:5 85:13,13,14,20 86:9 88:3,6 288:9,12 663:9 664:8
signed 97:17 107:5 233:17 288:11,14 348:22 435:21
significance 321:19 324:24
significant 321:17 324:10 324:22 328:20 420:5 431:12 437:2 473:11 517:6,17 554:7 637:8 638:6
significantly 311:6 515:18
signing 86:10,20 664:10
silica 379:23 544:9
SILVER 4:12 16:21 18:20 24:10 28:3

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 43:18 45:20 | 548:2 552:6,12 | **sitting** 31:18 | 564:14,19 | 340:5 347:10 |
| 46:13 47:23 | 557:6 558:4 | 34:17 59:5 | 566:20 567:1,9 | 347:15 348:5,8 |
| 48:2 49:14 | 560:10 614:17 | 275:4 510:15 | 567:16 568:6 | 358:3 361:8,24 |
| 62:13 64:19 | 615:10 617:21 | **six** 145:20 | 568:11,16 | 362:13,20 |
| 94:1 96:20 | 620:19 621:5 | 294:11 456:7 | **software** 339:10 | 371:6 377:15 |
| 99:4 115:14 | 621:14 622:1 | 482:16 615:1,2 | 339:12,15,16 | 377:16 379:12 |
| 118:3 139:16 | 625:2,22 | 615:4,5,6 | **SOILEAU** 2:13 | 380:21 387:13 |
| 161:5 179:21 | 628:22 634:7 | 617:18,19 | **solely** 400:20 | 394:23 396:8 |
| 183:20 184:20 | 646:1,22 | **skeptical** 226:10 | 575:23 592:18 | 407:19 408:8 |
| 194:11 195:3 | 649:13 650:3 | **Skillman** 101:12 | **somebody** | 415:13 426:3 |
| 196:4 197:5,11 | 650:20 651:23 | 172:13 212:18 | 139:24 297:19 | 444:9 446:11 |
| 198:14 200:15 | 653:3,17 | 214:13 217:10 | 297:21,22,23 | 458:1 459:16 |
| 205:1,16 206:6 | 654:16 655:15 | 217:14 218:5 | 298:12,13,13 | 462:5,6,7,19 |
| 207:2 209:5 | 657:14 661:14 | 221:7 270:20 | 320:14,19 | 462:22,24 |
| 212:3 213:18 | 661:23 | **skip** 593:13 | 321:20 325:19 | 463:3 464:24 |
| 216:2 219:5 | **similar** 331:22 | **skipped** 293:6 | 336:10 403:11 | 470:17 475:8 |
| 220:14 221:3 | 334:12 396:16 | **skirting** 606:20 | 403:21 404:2 | 475:13 477:14 |
| 224:24 234:15 | 517:2 586:17 | **slack** 552:5 | 408:23 409:17 | 480:10 482:20 |
| 235:2,16 249:6 | 587:2 | **slavish** 325:8 | 410:10 487:19 | 482:22 484:2,9 |
| 260:1 261:8 | **similarities** | **slide** 90:5,11,16 | 496:13,14 | 484:17,20,23 |
| 266:9 271:3,15 | 378:4 | 160:1 293:2 | **someplace** 382:1 | 486:17 488:2 |
| 274:15 283:8 | **similarity** 259:6 | 429:15 435:14 | **sorry** 17:14 | 509:20 515:24 |
| 286:15 287:13 | **simply** 325:7 | 604:12,15 | 35:18 54:23 | 516:4,17 518:7 |
| 289:12 323:11 | 414:21 518:22 | **slides** 272:6 | 58:21 62:4 | 524:20 525:14 |
| 330:7 353:19 | 521:17 546:23 | **Slight** 304:17 | 77:2,16 89:12 | 529:22 535:1 |
| 386:4,11 | **simultaneously** | **slightly** 495:11 | 94:6 102:20 | 537:7 552:1 |
| 387:10,22 | 302:13 | **sloppy** 450:7,13 | 106:18 112:7 | 557:20 558:23 |
| 388:8,21 | **single** 83:17 | **slow** 294:3,5 | 113:12 115:1 | 559:14 561:13 |
| 389:19 391:12 | 266:3 267:8 | **small** 326:12 | 118:11 131:24 | 562:21 563:4 |
| 392:19 393:23 | 331:5 332:17 | 379:22 380:5 | 131:24 132:8 | 570:21 584:9 |
| 395:23 398:8 | 342:21 514:6 | 475:13 524:13 | 132:17,18 | 586:22 589:23 |
| 401:22 404:4 | 529:10,14 | 525:2 | 139:20 143:18 | 590:10 599:9 |
| 415:10 430:4 | **sir** 21:18 27:7 | **smoked** 341:10 | 144:14 146:16 | 605:21 619:10 |
| 487:24 488:12 | 134:14 138:9 | 496:7 497:7,8 | 165:20 167:14 | 623:11,19 |
| 489:3 503:5 | 203:10 205:15 | 497:12,12 | 167:15 191:21 | 634:18 649:22 |
| 504:12,23 | 277:16 283:5 | 498:13 | 193:6 199:18 | 652:18 654:18 |
| 505:17 506:23 | 283:13 349:23 | **smokers** 341:2 | 211:7 215:11 | 656:12 |
| 507:6 514:12 | 449:13 457:15 | 562:14,17 | 219:17 231:1 | **sort** 331:19 |
| 520:1 524:18 | 460:8 627:13 | **smokes** 496:13 | 236:14 239:24 | 382:6 419:5 |
| 530:13 531:6 | 634:17 659:19 | 496:14 | 243:15 246:21 | 424:18,21,22 |
| 531:23 532:13 | **sit** 140:11 359:8 | **smoking** 18:4 | 250:14 255:9 | 426:15 649:17 |
| 533:17 534:21 | 500:11 632:21 | 19:8,21 292:11 | 266:17 273:5,8 | **sorted** 279:8,20 |
| 535:5,15 | 633:9,9 651:19 | 442:5,15,18 | 281:21 295:3 | **sorting** 454:23 |
| 536:11 537:1 | 654:5 656:7 | 496:7 497:1 | 296:6 304:7 | 455:8 |
| 537:14 538:11 | 657:7 | 498:2 499:3,6 | 312:13 318:14 | **sound** 146:22 |
| 545:8 546:1 | **sits** 660:12 | 563:6,10,20 | 328:13 337:9 | 165:4 264:5 |

334:14 335:3
440:20 442:7
573:18
**sounds** 53:14
63:13 111:23
163:14 224:8
441:12 564:9
**source** 88:17
305:22,22
306:8,20 308:5
583:9
**sources** 89:16
304:12 546:11
574:21 575:15
**South** 2:4,13
52:11
**space** 487:14
664:6
**spaghetti** 261:6
**sparse** 467:13
**speak** 100:23
117:12 139:2
218:21 269:6
307:10 471:5
521:1 618:11
618:12,12
644:10
**speaker** 187:6
**speaking** 153:21
236:7 263:3,20
295:15 324:7
326:22 390:12
618:22
**special** 8:18 93:7
209:15
**specialty** 314:12
314:20 370:3
**specific** 19:15
37:17 39:3
84:22 101:6
128:23 135:14
175:12 226:14
242:15 265:10
268:1 306:14
307:12 325:17
336:3 343:10

343:11,15
356:17 358:4
371:15 424:24
425:1 444:4
469:14 568:21
**specifically**
101:20 121:13
124:1 141:3
264:23 292:17
357:2 423:7
441:11 444:4
520:9 606:24
633:6 644:1
656:14 658:7
**specification**
342:15 454:13
**specifics** 356:19
364:9 578:9
**specified** 454:21
560:4 569:7
**specify** 38:6
**speculate** 520:4
**spelled** 343:18
457:24
**spelling** 457:17
458:6
**spend** 82:17
84:6 126:15
128:21 138:8
181:23 570:12
614:3,7
**spending** 444:17
**splitting** 239:15
**spoke** 52:8
58:19 81:21
105:16 139:1,3
389:9 565:3
**spoken** 58:22
60:2 139:4
385:12 636:18
**sponsor** 232:13
**sponsored** 53:4
**spouse** 392:12
**spurious** 562:19
**Square** 1:15 4:8
515:16

**stable** 358:13
**stack** 623:6
**stakes** 503:2
504:19 507:4
**stand** 96:12
**standard** 296:14
305:8 324:2
344:16 346:11
346:17 407:4
408:2 424:5
501:3
**standing** 44:15
**standpoint**
579:8 584:4,12
**stands** 525:11
**start** 64:13
132:21 276:12
289:9 407:22
419:11 480:1,2
523:19
**started** 82:11
276:14 372:18
372:21
**starting** 38:15
272:23
**starts** 436:9
**state** 15:5
302:10 348:18
515:13 571:15
571:18,21
572:21 573:5
573:10 632:2
632:11,13,17
664:5
**stated** 388:14
**statement** 39:15
39:23 265:17
296:9 304:20
339:23 340:9
342:19 343:5
409:9 528:14
546:17,24
547:3 600:5
607:22
**statements**
36:20 359:13

**STATES** 1:1
**stating** 242:8
**statistic** 559:1
**statistical** 17:3
300:11,13
307:13 316:7
320:13 321:19
324:16 417:6
421:21 457:23
485:15
**statistically**
321:16 324:10
326:22 328:19
330:3 420:5
431:12 437:2
637:8 638:6
**statisticians**
327:5
**statistics** 320:11
417:1 422:4
**stay** 589:22
**Steering** 2:17
5:6
**stenographic**
14:15
**Steve** 201:24
202:3,6,7
246:5
**Steven** 238:6
239:4
**sticker** 279:5
**Stipulations**
13:11
**stole** 54:7
**stop** 44:6 62:14
152:7 292:21
430:19 523:11
524:8 565:14
**stopping** 129:8
**storage** 556:8
557:14
**stored** 551:15
**straightforward**
37:22
**strategy** 178:20
334:16,22,24

**stratified** 451:12
463:7 491:7
**Street** 2:4,14 3:8
3:17 4:8,18 5:4
**strength** 601:16
636:11 653:22
**strengthened**
635:20
**strenuously**
661:16,18
**strictly** 236:1
**strike** 179:22
261:9 353:20
617:22 625:23
**strongly** 20:2,7
**structural** 378:4
**structure** 378:24
543:12
**students** 572:1
572:15,17
**studied** 38:9
554:17 598:1
611:6 646:14
655:23 658:18
**studies** 38:14
42:19,21,22
43:4 46:10
58:1 81:3 83:9
122:17 130:11
136:11 153:23
157:5 173:9,24
174:16,21
178:13 179:9
180:5,12
212:18,24
220:22 221:19
236:9,18,20,23
237:3 255:8
270:20 306:7
306:14 307:12
315:8 316:3,15
317:11 318:1
319:4 329:9,14
330:23 332:4
332:18,24
335:14,17,21

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 336:24 337:3,4 | 598:3 604:13 | 319:15,22 | 639:5,16,23,24 | 255:16,20 |
| 337:8,11,16,22 | 604:18,21 | 320:5,8 321:20 | 639:24 640:1,9 | 256:24 257:8 |
| 338:17 343:13 | 605:2,7 608:21 | 327:16 329:17 | 640:18 641:3 | 257:15 270:12 |
| 344:2,10 345:7 | 609:14 611:7,9 | 329:18 330:21 | 641:11,11,19 | 270:13 276:16 |
| 345:24 346:3 | 632:23 633:2 | 331:6 332:17 | 641:24 642:21 | 276:23 277:1 |
| 383:4 400:13 | 637:5 638:3,11 | 333:9,14 335:5 | 642:22 646:20 | 291:19 294:19 |
| 401:7 405:12 | 638:20 639:20 | 335:5,9,11,12 | **stuff** 214:12 | 301:8 302:5,12 |
| 407:13 408:1 | 642:22 643:16 | 335:23 336:10 | 264:22 271:19 | 350:20 354:5 |
| 410:14 411:4 | 644:2 645:3 | 341:2,4,9 | 651:16 | 355:4,19 |
| 411:19,22,24 | 646:12 651:3 | 342:16,21,22 | **subject** 8:21 9:9 | 358:20 364:4 |
| 412:3 424:20 | 652:24 653:11 | 344:20 345:7,9 | 9:12 10:14 | 368:17,18,24 |
| 426:7 427:9,10 | 653:19 655:24 | 345:11,16,22 | 57:21 247:2 | 369:3 370:16 |
| 428:10 429:18 | 656:8,13,16,17 | 347:24 352:5 | 255:22 257:22 | 370:23 371:11 |
| 430:17 431:13 | 656:20 657:20 | 400:23 401:5 | 295:19 308:12 | 371:24 372:4 |
| 432:6 436:12 | 658:11 | 409:21 410:7 | 360:9 593:6 | 372:14 374:5,8 |
| 440:19 442:16 | **study** 16:14 98:6 | 411:15,15,18 | 664:10 | 374:16 375:2,6 |
| 443:11,19 | 98:9,12 100:12 | 412:13 416:24 | **subjects** 122:16 | 375:9,18 376:6 |
| 446:8,19 447:6 | 102:1 123:10 | 419:16 432:10 | 123:24 411:18 | 376:9,20 |
| 447:14 451:7,9 | 123:18,19,21 | 437:7 438:5,24 | **submission** | 381:12 393:20 |
| 451:11,18 | 124:18 130:13 | 439:1 441:21 | 31:12 94:10,11 | 398:17 439:19 |
| 452:13 454:12 | 132:11,14 | 445:19 446:15 | 302:4,11 | 593:1 594:4 |
| 454:24 456:6 | 133:1,11 | 448:18,21,24 | 593:10 595:3 | 603:12,16,17 |
| 458:17 460:22 | 138:13 143:4 | 452:18 453:3,4 | 595:16 | 603:22 |
| 462:13,14 | 147:12,16 | 453:22 461:8,8 | **submit** 57:16 | **submitting** |
| 463:6,14 468:3 | 155:6 170:8,15 | 462:3 464:2,7 | 88:4 209:11 | 125:23 214:10 |
| 469:4,17,19 | 172:2 173:3,4 | 469:2 473:22 | 243:7,11 | 217:13 221:18 |
| 470:9 471:6,14 | 173:12,15,15 | 485:6 489:16 | 301:18,21 | 221:18 280:17 |
| 489:22 491:4 | 173:17,20,21 | 490:22,24 | 315:11,13 | 281:8 301:4 |
| 491:11 498:13 | 174:1,3,7,11 | 499:21 511:21 | 355:18 359:15 | 377:5 582:6,11 |
| 498:15,16,18 | 176:21,24 | 514:10 520:23 | 365:1 367:11 | 619:4 |
| 530:10 539:5 | 178:21 180:19 | 521:2,4,5 | 385:15 582:1 | **subordinate** |
| 540:5 541:24 | 180:24 181:6 | 522:4 525:10 | **submitted** 34:1 | 165:15 |
| 542:7,15 543:9 | 182:1,9,17 | 533:9 548:23 | 34:6,13 50:17 | **subpoena** 6:17 |
| 543:10,14,16 | 206:13 207:8 | 549:6 552:11 | 51:16 54:16 | 20:22 21:4,9 |
| 547:8,14,14,17 | 208:13 209:20 | 552:16,17,19 | 55:6 124:6 | 21:23 22:19 |
| 549:21,23 | 215:16 220:24 | 552:21,24 | 150:18,20 | 106:4,6 |
| 550:5,6,14,15 | 221:24 236:10 | 553:3 554:24 | 151:10 158:6 | **Subscribed** |
| 561:2,3,14,19 | 239:15 240:4 | 556:4,12 558:1 | 158:14 186:9 | 666:19 |
| 561:20 562:18 | 241:1,7,10,14 | 559:19,20,24 | 203:19 205:24 | **subsequent** |
| 562:19 567:17 | 258:24 261:20 | 560:21 563:20 | 216:16 222:8 | 454:17 455:19 |
| 568:19 569:6 | 266:3 280:18 | 567:4 576:7 | 224:2,3,13 | 456:22 |
| 577:18,24 | 289:10 290:14 | 577:8 578:13 | 242:14,18,22 | **subsequently** |
| 578:2,7,14 | 309:18 316:5 | 578:18 579:6 | 243:9 244:15 | 253:11 |
| 586:17 587:2 | 316:10,22 | 582:24 588:17 | 244:22 250:11 | **substance** 591:1 |
| 589:4 591:9 | 317:4,13 318:1 | 589:5 609:22 | 250:18 251:3 | 595:2,5 666:11 |
| 597:3,9,18 | 318:3,17 319:6 | 610:3,13,14 | 252:21 253:7 | **substantial** |

Joshua E. Muscat, Ph.D.

112:3
**substantially**
506:15
**substantive**
87:17 296:21
297:3 310:11
356:21
**substantively**
88:13
**substitute**
411:14 572:9
615:8
**Sue** 588:6
**sufficient**
189:16 333:21
**suggest** 519:21
566:24 568:15
578:21 581:18
642:7
**suggested** 220:5
318:5 319:21
522:15 563:12
580:7
**suggesting** 315:5
520:16 534:16
**suggestion** 264:2
**suggests** 420:13
437:1 643:1
**Suite** 2:4,10 3:8
3:17 4:3,8
**suits** 80:10
286:1
**summarize**
331:24 637:3
638:1
**summarizing**
434:13 437:20
**summary** 9:12
190:23 247:22
332:22 435:9
436:21 570:15
642:21
**supervision**
663:22
**supplier** 161:1
**support** 13:2

19:7 40:17,18
42:13 240:3
241:1,7,9,14
241:17,18
366:12 367:10
436:8 567:8
659:9
**supported** 46:18
385:21,21
388:6,12
**supporting**
636:11
**supports** 17:8
17:20 41:11
42:12 58:2
**supposed** 87:18
234:23 362:21
446:12 487:19
488:24 606:15
619:17 620:10
660:15
**sure** 22:11,17
24:3 26:22
85:6 91:3
99:16 137:10
137:17 151:17
152:20 154:12
192:24 195:7
205:14 211:8
215:1 234:11
267:20,20
268:3,7 299:7
332:13 336:3
339:2 340:23
404:16 420:9
423:13 430:11
432:3 444:12
450:2 453:1
478:19 493:13
532:3,16
540:20 541:8
555:14,15
569:6 570:8
587:1 622:12
625:11 627:2
638:23 644:6

**surprise** 143:1
151:24 222:22
223:3 285:3
306:16,17,18
322:22 410:16
485:23 514:21
**surprised**
154:21 155:3
**survey** 266:3
267:12 382:20
383:14 545:18
**survival** 518:24
519:2,16
**survivor** 518:20
**Susan** 389:8,13
389:16
**suspected**
399:14 436:13
443:12 549:11
**suspicion**
653:13
**swear** 14:17
**sworn** 14:21
663:5 666:19
**synthesis** 112:5
487:18
**synthesizing**
331:20
**system** 424:23
**systematic**
656:22

_____

**T**

**T** 4:17 6:11 7:2
8:2 9:2 10:2
11:2 12:2
665:1
**tab** 134:4,12,14
445:6 479:5
556:4,5
**tabbed** 131:22
**table** 11:14,16
11:17 31:19
34:17 46:19
135:22 136:1,7
137:5,22

159:18 238:3
443:16,22
444:1,2,4,15
444:18,21,24
445:7,11,12,19
446:3,5 447:2
447:11,11
448:13,17
450:24 451:14
451:19 458:19
458:22,24
459:1 460:16
460:16 463:11
465:5,8 472:14
472:17 476:3
479:6,15,18
480:5 483:5
500:19 508:22
508:22 510:15
551:1,12,21
554:16 555:2,8
556:6,18,22,24
557:23 559:12
**tables** 137:19
**Tabs** 7:6
**tail** 326:24
**take** 48:8 62:14
118:10 126:20
129:4,12 136:6
140:7 146:2
149:10 150:3
171:18 177:10
292:11 309:6
347:12 349:10
349:13 366:18
408:11 427:13
442:23 454:4
467:16 498:17
532:7,8 548:10
558:12 606:18
615:8
**taken** 1:14 11:12
39:8 57:22
465:4 564:18
597:9
**takes** 126:19

**talc** 4:15 7:13
8:18,21 9:9,18
10:6,16,18
11:6,19,22
20:23 25:24
31:2 33:2,3
34:3 36:23
40:4 48:18,24
50:22 54:1
55:19,19 57:21
60:21 61:5,12
61:20,21 62:10
63:5 77:5
79:23 80:10
82:21 83:8
93:4 96:4,14
97:7 101:16
105:18,22
106:1 109:21
110:23 118:12
118:18 122:14
130:5 133:6
141:13 144:4
146:11 153:8
153:17 155:20
157:7 158:19
160:7,24
169:13 172:15
183:7 192:5
193:24 195:23
196:11 197:4,9
198:3 218:17
219:3 228:15
242:21 247:13
247:14 248:21
249:9,11
250:21 255:5
259:1,5,22
260:7 263:12
263:24 264:3
264:20 265:5
265:21,22
266:24 267:14
275:12 281:16
289:1 318:1,22
319:16 358:10

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 366:13 378:5 | 611:5,10,16 | 655:10,18 | 442:20 443:1,4 | 44:14,18 48:22 |
| 378:24 379:7,7 | 629:17 632:21 | 657:5,8 659:7 | 444:15 453:10 | 61:7,11,14 |
| 379:9,19 | 633:10 635:21 | **talc-based** | 458:15 462:3 | 62:22 84:6 |
| 380:16 381:4 | 637:6 638:4,13 | 541:17,19 | 472:11 482:11 | 117:1 130:3 |
| 381:16,23 | 639:23 642:7 | 542:4 658:7 | 489:16 523:10 | 160:19 175:7 |
| 382:21,23 | 643:2,5 645:5 | **Talc-Containi...** | 549:1 550:16 | 178:2 181:13 |
| 383:6,19 385:3 | 646:15 659:6 | 557:1 | 550:18,21 | 181:14 238:22 |
| 394:19 395:2,6 | **talcum** 1:5 | **talc-dusted** | 562:11 563:6 | 241:17 268:23 |
| 396:17 398:7 | 14:11 35:13 | 401:7 577:8,11 | **talked** 60:16 | 269:2 299:16 |
| 399:12,22 | 36:2 37:6,19 | 577:19 578:2 | 95:23 104:20 | 345:14 356:19 |
| 400:1,15,21 | 37:24 39:9 | 579:11 | 109:20 133:14 | 379:5,18 |
| 401:1 405:11 | 41:13 42:14 | **talc-related** 32:9 | 142:20 159:14 | 383:13 419:11 |
| 410:18 412:13 | 45:14 47:21 | 78:5 80:21 | 160:15 161:11 | 451:1,8 486:20 |
| 419:11,13 | 50:22 61:7,20 | 82:4 98:2 | 161:18 163:17 | 493:24 507:13 |
| 423:4 434:10 | 84:19 160:18 | 100:24 | 164:17 172:14 | 507:15,17 |
| 434:23 437:3 | 164:19 172:2 | **talc-specific** | 183:13 186:14 | 522:3,6,7 |
| 442:17 451:13 | 177:3 379:5 | 555:6 | 213:6 218:17 | 559:9 574:9 |
| 463:8 464:10 | 381:23 382:21 | **talk** 44:13 52:12 | 219:23 223:23 | 628:18 633:21 |
| 491:8,17 494:1 | 383:9,12,14,23 | 55:2 60:14 | 227:8 233:10 | **talks** 135:14 |
| 502:6 504:4 | 408:18 428:19 | 82:11,20 83:8 | 235:10 246:6 | 325:19 341:9 |
| 505:5,15 | 506:14 508:9 | 84:15,21 91:9 | 294:13 312:4 | 379:2 402:3 |
| 506:12 516:15 | 509:21 526:8 | 95:7 98:5 | 315:12 322:7 | 406:7,18 454:6 |
| 517:2,21 524:2 | 529:12 530:3 | 101:23 106:6,8 | 323:18 347:22 | 454:9,10 |
| 524:11,13,23 | 530:22 531:2 | 122:6,11 | 347:24 354:11 | **task** 9:12 170:15 |
| 525:1 526:6 | 531:13 532:11 | 129:22 130:2,8 | 359:1 374:6 | 246:12 247:3 |
| 527:21,21,24 | 532:19,24,24 | 134:9 138:5 | 378:2 382:17 | 624:4 |
| 528:19 529:12 | 533:8,10 | 147:11 159:8 | 397:17 402:4 | **tasked** 116:3 |
| 530:6,20 | 535:13 536:1 | 159:15 164:15 | 402:14 416:6 | **taught** 571:20 |
| 541:20 543:3,5 | 536:22,23 | 206:15 208:16 | 441:9 445:10 | 571:24 573:4 |
| 543:6,7,12,22 | 537:10,23,24 | 218:13 231:22 | 470:7 472:10 | **teaching** 572:4,6 |
| 546:21 547:15 | 538:6 539:11 | 233:5 262:20 | 479:20 485:6 | 573:7 |
| 547:18 549:9 | 539:14,16,20 | 274:19 278:16 | 488:22 489:19 | **technical** 428:9 |
| 549:19,23,23 | 541:13,14,15 | 290:3 292:19 | 490:20 492:2 | 565:18 |
| 551:9,15,23 | 543:16,21 | 293:24 294:8,9 | 511:9 515:1 | **technicality** |
| 554:10,14,17 | 545:19 586:18 | 294:16 305:21 | 524:15 525:7 | 304:17 |
| 555:1,20 557:3 | 587:3 596:11 | 315:22 317:17 | 537:17 549:7 | **technically** |
| 557:4 559:3 | 596:20 597:3 | 317:18 320:10 | 560:20,23 | 302:2 465:18 |
| 560:1 562:15 | 597:10,19,24 | 321:7 323:10 | 561:4 573:12 | **TECHNICIAN** |
| 563:13,13 | 598:4,12 | 323:17,18 | 573:14 574:1 | 5:10,11 |
| 574:1 579:22 | 612:12 649:7 | 331:8 345:3,21 | 576:6,15 | **technique** |
| 586:2 587:17 | 649:11,24 | 346:22 347:19 | 591:14 605:15 | 478:24 |
| 590:12 596:7 | 650:15 651:4 | 400:18 401:9 | 611:8 629:13 | **telecon** 189:2 |
| 598:8 602:17 | 651:18 652:6,7 | 406:11,16 | 629:16 630:16 | **TELEPHONIC** |
| 603:3 604:19 | 652:17,19 | 409:14 429:16 | 653:21 | 5:1 |
| 604:23 605:3,9 | 653:1,10 654:9 | 436:7 440:5,6 | **talking** 37:8,8 | **tell** 16:6 57:14 |
| 609:10,15 | 654:24 655:5 | 441:16,20 | 41:17,21 44:3 | 57:23 66:12 |

96:12 105:17
117:6 125:14
144:20 150:6
152:1 153:3
265:18 266:2
266:12 286:9
287:20,20
351:12 352:1
352:19 366:7
390:10 445:4
447:20 467:12
474:19 486:23
496:20 499:10
500:11 516:18
518:21 545:19
546:15 551:6
551:20 558:21
558:24 570:10
571:12 576:8
593:10 616:12
616:17 632:12
634:22
**telling** 178:18
467:19 502:7
**tells** 313:17
**Telofski** 361:18
363:12
**ten** 109:18
**tends** 72:8
**tenured** 629:4
**term** 22:24 46:2
139:6,8 164:9
344:5 419:5
**terms** 26:23 72:7
106:20 156:23
165:22 312:3
410:14 423:10
423:13,14
425:5 481:11
491:20,23
492:9,10 501:9
568:4 658:5
**TERSIGNI** 3:12
**test** 17:3 347:2
399:19 400:7
515:16

**tested** 265:21,21
399:13 549:9
**testified** 14:22
83:14
**testifying** 64:11
**testimony** 6:4
274:11 406:13
605:14 612:15
634:8 663:6
**testing** 382:20
401:13
**Texas** 3:8,18 4:4
**textbook** 322:16
323:5 483:24
484:1
**thank** 91:5
129:13 170:23
199:18 254:8
278:24 377:19
406:2 453:15
567:12 588:21
599:17 612:17
**thanked** 253:13
253:17
**thanks** 279:6
563:2
**theme** 263:10
**theoretically**
539:10
**theories** 497:21
**theory** 496:4
**thick** 623:14
**thing** 56:8 80:3
108:24 120:6
174:18 187:5
190:20 214:13
321:14 325:24
336:17 357:6
404:2 419:8
441:19 461:22
482:3 500:3
506:21 508:3
508:11 512:4
517:24 520:5
589:19 610:12
631:15,23

657:17 658:5
**things** 31:14
36:21 61:8
70:1,8 88:22
117:17 125:21
126:3,3,20,20
127:6 145:14
152:4 153:1
170:6 178:10
180:3 204:1
261:15,21
262:4,15,18
293:23 307:15
312:7,16
332:21 333:8
335:13 337:20
343:17 347:21
421:19 423:15
431:3 439:12
481:21 487:12
501:2,5 508:17
543:22 544:11
545:7 569:17
621:2 634:21
644:23 645:19
645:23 653:9
653:20 654:6
**think** 18:3 33:7
34:12 37:22
43:13 60:13
67:21 74:5
79:13 115:22
123:8,8 140:3
140:10,23
144:14 152:15
154:7 156:13
156:17 171:22
172:8 179:15
179:17 182:21
222:10,11
226:9,21 228:1
228:9,10 232:6
232:17 238:22
246:22 253:5
258:19,20
260:16 285:8

286:21 287:1,6
293:3,6 294:10
295:24 299:8,9
305:14 317:20
317:20 325:2,7
336:5 340:15
343:4,17
344:17 346:7,7
349:2 356:16
375:4 388:4,16
401:6 405:15
406:17 407:8
408:23 409:20
419:9 423:8,8
427:21 430:16
432:11 456:10
456:14 459:19
459:20 468:15
468:21 471:18
484:9,20
501:20 511:15
512:2 527:7
529:5 538:22
539:6,13
550:23 555:12
556:11 557:8
559:16,18,19
559:21 560:14
561:1 567:23
568:9 578:5
595:21 607:8
608:12 610:6
623:15 638:19
639:24 644:9
649:12 655:22
658:4,14
**thinking** 305:19
308:3 340:18
568:5
**third** 43:16
86:19 174:6
204:21 397:21
477:8 591:7
595:11
**thirty** 664:16
**THOMAS** 2:2

4:17
**THOMPSON**
3:16
**thorough** 204:16
**thought** 19:6
57:2,5 156:22
182:6 195:9,12
219:11 220:4
236:18 266:23
371:12 399:19
459:14 521:8
541:7 622:7
**Thread** 8:20 9:8
10:13
**three** 4:8 48:3
92:12 93:16,18
111:8 115:23
247:23 297:20
297:24 337:20
456:7 483:19
483:21 496:15
563:17 588:1
615:1,2 617:17
630:16 659:15
660:16
**throw** 328:4,13
330:1
**thrown** 330:10
**Tim** 395:17,17
396:7,20
**time** 14:7 33:2,8
34:19 48:9
52:7 58:18,21
59:1 62:19
70:23 72:4,13
73:15 76:14
82:17 84:6
97:3,24 111:22
113:6,16
115:24 120:22
123:8 126:15
127:4 128:21
138:8,12
163:21,22
164:3 165:1
166:12 169:10

181:13,22
183:4,16
185:16 193:18
197:23 201:14
202:13 213:15
216:17 218:22
257:7 269:16
274:8 277:23
280:2,9,16
281:7,13,24
284:3 285:20
292:10,21
296:3 297:8
299:7 300:7
344:4 354:9,16
356:17 358:9
359:8,20 370:9
370:15 371:20
371:23,24
372:2,5,13
413:19,20,24
414:3 417:9
419:23 427:22
429:12 444:18
465:1 475:14
483:6 485:1
490:14 515:5
535:20 546:22
548:11 553:2,4
553:16 558:12
569:15 575:16
583:3,12
593:14 605:15
606:15 607:1
608:11 613:22
613:24 614:4,7
614:11 615:3
615:15 616:3
617:19 618:2,4
619:22,23
642:1,18
658:22 659:13
660:5 661:3,13
**timeline** 141:15
169:10 190:13
293:23

**timelines** 82:23
90:4 293:21
405:11
**times** 18:9 59:24
115:23 313:7
313:10 321:24
322:2,3 422:10
482:16,19
492:3 615:3,6
659:16 660:17
**TIMOTHY** 3:17
**Tim.hudson@...**
3:19
**Tinto** 28:6 161:3
**Tisi** 2:3 6:5 15:2
17:4,16 18:8
18:24 19:1,22
20:12,20 21:14
23:6,21 24:15
25:10 26:12
27:5,16 28:5
28:12 29:12,23
30:12,19 31:6
31:24 32:17
33:10,23 34:9
34:24 35:20
36:18 38:7,18
39:4,16,24
41:3,20 42:5
43:12,23 44:24
46:6,16,24
47:16 48:6,16
49:9,18 50:18
52:5,21 53:12
54:14 55:1,23
56:11,18 57:4
57:18 58:7
59:10 60:1,11
61:3 62:6,21
63:10 64:4,9
65:3,23 66:7
66:12,19 67:3
67:6,7,14,19
67:24 68:10,19
69:10 71:2
72:10 73:8

75:10 76:12
77:1,10 78:10
78:16,22 79:12
80:5,18 81:13
82:3 83:4,13
84:4,12 85:16
86:13 87:15
88:2 89:5,14
89:24 91:3,6,7
91:21 92:23
93:21 94:2
96:10,18,24
97:15,22 98:22
99:6,20 100:8
100:22 101:4
101:21 102:6
103:22 104:9
104:16 105:13
108:6,15 110:5
111:2 113:14
113:20 114:17
115:3,16
116:13,19
117:4 118:9,22
119:3,19 120:3
125:8 126:24
127:17 128:11
129:9,15,21
130:19 131:6
131:15 132:7
133:9 135:7
137:2,12 138:4
138:20 139:18
140:15,20
143:10,23
145:5,10 146:4
146:17 147:24
148:5 149:3,8
149:17 150:5
150:19 151:4
152:13 153:11
154:6 155:13
156:10 157:12
157:21 158:2
158:16 159:2
161:9 162:4,10

164:10 165:11
166:11,22
167:5,7,14,20
168:1,5,12
169:7,17
170:13,21,24
173:7 175:16
176:1,9,17,19
177:11,18,20
178:8 179:3,14
180:1,16,23
181:21 182:5
182:18 183:10
183:21 184:9
184:24 185:6
185:20 186:4
186:13,21
187:12,22
188:5,9,11,12
190:11,19
191:12,23
192:22 193:16
193:22 194:18
195:10 196:6
196:20 197:6
197:17 198:8
198:20 199:5
199:11,13,18
199:20 200:20
201:8,15
202:24 204:20
205:4,13,18,22
206:8 207:6,14
208:23 209:9
209:19 210:3
210:12 211:10
211:17 212:8
212:16 213:20
214:8,22
215:14 216:3
216:19 217:3
217:21 218:6
219:10,21
220:17 221:5
221:12 222:19
223:5,15,21

225:7 226:15
227:21 228:7
228:18 229:6
230:5 231:3,11
231:21 232:18
233:4,7,9,19
234:9,21 235:5
235:23 236:16
237:1,8,11,13
238:16 239:13
240:14,21
241:5,15 242:4
242:11 243:5
243:17 244:2
245:7,14
246:24 248:7
248:16 249:8
250:7,15 251:1
252:10 253:8
254:1 255:2,3
256:3 257:20
258:6,12 260:4
260:20 261:11
263:2,7,16
264:10 265:1
265:11 266:11
267:6 268:14
268:21 269:23
270:10 271:10
271:20 272:10
272:15,17,20
273:4,6 274:10
274:17,23
275:1 276:1,24
277:11 278:4
278:15,22
279:4,7,13,17
281:23 282:8
282:18,20,22
283:3,10,11,23
284:13 285:22
286:8 287:3,19
288:7 289:8,15
290:13,23
291:10,21
292:9,18,20

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 293:1,19 295:5 | 375:23 376:22 | 448:5,10 | 526:4,17 527:2 | 599:12,16 |
| 296:12 297:6 | 377:9,16,20 | 449:24 450:11 | 528:9 529:8 | 600:8 602:5,21 |
| 297:17 299:1 | 378:10 380:13 | 450:18 451:2,4 | 530:15,19 | 603:23 605:11 |
| 300:1,21 | 380:23 382:10 | 452:2,9 453:9 | 531:8 532:6,17 | 605:19,23 |
| 301:16 302:14 | 383:8 384:1,16 | 453:13 455:3,5 | 533:22 534:6 | 606:11 607:11 |
| 303:22 304:9 | 385:4,11 386:8 | 455:7,15,23 | 534:23 535:7 | 608:4,8 609:6 |
| 306:5,15 307:7 | 386:15 387:1 | 457:12,20 | 535:21 536:19 | 609:11,18 |
| 308:6 311:5 | 387:15 388:3 | 458:14 459:13 | 537:5,20 | 611:11,13,17 |
| 312:1,15 313:5 | 388:15 389:1,4 | 459:22 460:2,6 | 539:15 540:3 | 611:23 612:13 |
| 315:2,17 317:7 | 389:7 390:1,9 | 460:11,14 | 540:14,23 | 612:15 613:2 |
| 318:9,18 | 390:17,21 | 465:20 467:8 | 541:6 542:8 | 613:21 614:22 |
| 319:12,20 | 391:6,24 393:3 | 467:24 468:9 | 544:8,19 | 615:16,22 |
| 320:6 321:6 | 394:6,12 396:1 | 468:16 470:6 | 545:14 546:5 | 616:10 617:5,7 |
| 322:17 323:3 | 396:5,11 397:3 | 471:1,24 | 546:13 547:9 | 617:16 618:3 |
| 323:16 325:14 | 397:12 398:5 | 473:18 474:18 | 548:7,10,18 | 618:19 619:1 |
| 326:21 327:17 | 398:15,23 | 476:15 477:17 | 549:5 552:4,7 | 619:12,21 |
| 328:15 329:2 | 400:9 401:24 | 478:10 481:2 | 552:17,20 | 620:5,24 621:9 |
| 329:11,24 | 402:11,24 | 484:19 485:12 | 553:1,7,13 | 621:17 622:3 |
| 330:12,18 | 403:9,18 404:6 | 486:5,18 | 554:11 555:10 | 622:15,24 |
| 331:15 332:8 | 404:11 405:24 | 487:16 488:4 | 556:13,17 | 623:13 624:3 |
| 333:16 334:19 | 406:3,4,24 | 488:19 489:13 | 557:11,18 | 624:13 625:4 |
| 336:7 338:10 | 407:12,15,21 | 490:6 492:11 | 558:11,20 | 625:13 626:5,8 |
| 339:11,21 | 409:5 410:4,22 | 492:23 493:5 | 559:11 560:17 | 626:10,22 |
| 340:7,17 342:2 | 411:12 412:8 | 493:12,15,18 | 561:16 562:8 | 628:10 629:2 |
| 342:12 343:20 | 412:18 413:11 | 493:22 494:20 | 564:1,8,16 | 629:22 632:5 |
| 345:2,17 | 413:21 414:12 | 495:23 496:11 | 565:1,8,15 | 633:7 634:1,11 |
| 346:21 347:9 | 415:11 416:4 | 497:5 498:22 | 566:7,10,22 | 636:6,20 |
| 348:14 349:9 | 416:13,19 | 499:9 500:20 | 567:12,14,20 | 637:15,19 |
| 349:20,22 | 417:22 418:9 | 501:14 502:16 | 569:13 572:13 | 638:24 639:11 |
| 350:10 351:4 | 418:20 419:7 | 503:10,19 | 575:3 576:2,4 | 639:18 640:11 |
| 353:1,14,23 | 419:22 420:11 | 504:16 505:4,9 | 576:20 577:3 | 640:24 641:8 |
| 354:15,23 | 420:20 422:7 | 505:23 507:3 | 577:13,21 | 641:16,22 |
| 355:10 356:1 | 422:16,23 | 507:12,24 | 578:4 579:13 | 642:17 643:11 |
| 357:13 359:17 | 424:12 426:5 | 508:12 509:4 | 580:10,14 | 643:24 644:13 |
| 360:7,23 | 426:19 427:7 | 509:11,23 | 581:10,19 | 644:20 646:2,9 |
| 361:10 362:4 | 427:23 428:6 | 510:13 511:5 | 584:1,8,21 | 647:5 648:1,9 |
| 362:13,14,23 | 429:3 430:10 | 511:17 512:8 | 585:3,14 586:3 | 648:20 649:4 |
| 363:8,17,19 | 432:1 433:1,12 | 512:17 513:5 | 586:8,20 587:6 | 649:20 650:7 |
| 364:3,13,19 | 433:20 434:3 | 513:15 514:8 | 588:10 589:13 | 651:8 652:9,20 |
| 365:14 366:9 | 434:19 435:19 | 514:14,16 | 591:5,10,17 | 653:7 654:4,20 |
| 367:7,17 368:3 | 436:3 437:8,14 | 515:4,11 516:1 | 592:2,12,21 | 656:1,6,15 |
| 368:15,21 | 438:3 439:21 | 516:19,20 | 594:14,22 | 657:2 658:12 |
| 369:9,23 | 440:24 441:15 | 517:18 518:18 | 595:20 596:13 | 658:23 659:2 |
| 370:21 371:4 | 442:12 444:11 | 520:13 521:12 | 596:15,22 | 659:17,23 |
| 372:20 373:9 | 445:13,15 | 521:22 523:9 | 597:4,6,13 | 660:6,20,24 |
| 373:20 375:3 | 446:1 447:17 | 524:21 525:16 | 598:9,14 599:4 | 661:7,17 |

**title** 163:13
 248:9,14 249:2
 390:8 396:16
 396:17,24
 571:18
**tlocke@seyfar...**
 4:19
**tobacco** 230:14
**today** 14:12 35:8
 58:12 64:11
 82:13 189:2
 296:4 406:9
 416:8 500:6,11
 511:10 539:19
 570:9 573:13
 574:1,9,18
 576:18 591:14
 611:8 613:13
 614:5,8,15
 632:21 633:10
 640:14,15
 645:4 647:9,15
 650:1 654:5
 656:7 657:7
 660:12
**today's** 14:6
 662:1
**Toiletry** 55:17
**told** 182:19
 202:18 234:10
 292:11 580:24
 582:13 583:18
 648:13
**tonight** 569:18
 572:12 610:9
 610:20
**tool** 256:12
 331:23
**tools** 654:2
**top** 140:12
 160:11 346:19
 407:14 432:23
 457:22 460:18
 463:24 464:20
 490:11
**topic** 11:10 18:2

 37:3 41:1
 45:23 90:2
 159:6,8 207:24
 208:1 261:22
 262:17,19
 307:10 309:6
 313:16 325:2
 331:21,22
 337:7
**topical** 156:22
**topics** 90:2
 314:12 316:2
**toss** 321:24
**totality** 632:22
**totally** 207:19
 209:3 475:6
 654:7
**tough** 307:1
**toxic** 410:15
**toxicity** 410:8
**toxicologist**
 15:21 29:4,6
 110:18 238:9
 645:10
**toxicology** 8:17
 34:2 50:11
 77:5 93:10
 146:6 183:6
 184:4 191:8
**toxin** 527:22
**trace** 657:24
**track** 256:12,19
 363:7,12 571:5
**tract** 399:16
 549:13
**trade** 33:1 34:16
 161:10,17
 367:10
**transcript** 663:9
 663:19 664:17
 664:19
**transcription**
 666:7
**transference**
 342:20
**transmitted**

 99:17
**transparency**
 254:11 305:9
 582:19
**transparent**
 305:12,16
**Travis** 3:8
**treated** 335:15
**tremolite** 379:22
 380:6
**trend** 517:9
 518:12,14,19
 520:6,8,10,12
**trends** 514:22
 517:5,16
 521:18
**trial** 408:4 413:6
**trials** 314:5,8
 407:6 410:17
**tried** 315:11,12
 429:13 454:4
**trip** 214:20
 217:14
**trips** 217:9
**true** 78:17 96:15
 97:8 102:16
 126:21 149:4
 174:24 176:22
 191:16 202:19
 211:4 218:5
 232:15 277:4,6
 277:24 284:1
 308:19 311:24
 315:14 326:23
 359:24 418:13
 422:24 423:5
 423:22 424:6
 429:24 506:20
 506:20 520:17
 531:20,22
 532:2 538:8
 542:20,20
 544:12 547:19
 575:1,5 583:12
 622:6 639:12
 654:7 657:9

 660:20 663:6
**try** 242:6 267:22
 294:3 319:5
 332:21 461:14
 461:16 548:20
**trying** 40:11
 117:7 313:23
 329:19 341:16
 377:6 430:24
 437:21 544:24
 637:21
**tumors** 524:3
 639:6
**turn** 90:2 326:6
 462:4 588:16
 626:8,9
**turned** 64:24
**two** 44:15 47:13
 111:7 141:11
 145:22 146:5
 149:11,13
 204:1,3 220:22
 241:21,22
 246:17 247:23
 257:14 280:11
 294:11,12
 303:13 318:1
 329:9,13
 341:12 397:18
 427:21 436:10
 456:7 478:21
 479:21 481:23
 482:1 498:18
 498:23 501:1,5
 501:16 550:18
 575:17 653:8
 654:6
**type** 296:9
 410:14
**types** 314:3
**typically** 295:15
 295:15 296:13
 309:5 321:15
 324:7 379:9
 646:4
**typo** 458:5

| U |
|---|

**Uh** 261:10
**ultimately** 17:1
 96:3 116:5
 123:19 138:14
 156:5 198:21
 204:23 206:3
 206:13 248:9
 249:18 253:19
 255:17 376:1
 580:21 581:24
**unadjusted**
 475:1 478:18
 479:1 481:17
 486:24
**unaware** 116:2
 120:24 124:3
 125:6 143:8
 275:23 636:19
**uncontrolled**
 439:4 442:3,14
 562:9 568:16
 608:21
**underlined**
 600:10
**underlying**
 373:3
**undermine**
 179:8,9
**understand**
 16:18 22:13
 23:17,19 24:5
 24:6,13 35:9
 35:21 36:17
 44:12 64:10
 72:13 82:15
 90:7 113:6,15
 139:21 159:22
 161:19 165:13
 167:8 196:10
 197:1,2 234:22
 236:6,15
 251:15 254:2
 267:22 313:22
 316:1 321:11
 328:14 372:10

386:23 388:1
399:7 406:13
468:15 471:10
488:20 489:10
489:11 519:16
523:5 569:11
636:8 658:23
658:24
**understanding**
22:10 55:15
64:6 85:8
152:21 257:7
257:13 279:19
313:12 382:7
387:7 526:15
547:17 574:19
578:11
**understands**
319:3
**understood**
113:6 219:12
231:15 246:22
257:21 437:9
438:4
**underwear**
504:5
**unethical** 408:22
**Unfortunately**
411:1
**uninvolved**
124:3
**UNITED** 1:1
**University** 15:10
54:8 348:18
570:18
**unreasonable**
18:7 404:2
**unsurprising**
481:22,24
**unusual** 311:10
416:14 424:11
424:13
**update** 69:20,23
69:24 72:6
126:14 128:24
152:3,14

**updated** 69:16
69:23 72:4
125:9 152:19
152:23
**updates** 452:19
**usage** 247:14
**use** 10:6 11:6,18
46:2 61:20
70:11,14,20,22
71:1,20,21
72:17,23,24
73:2,4,10,23
76:3 121:21
133:5 164:8
172:2 178:15
180:6,14 189:8
210:10 218:17
248:21 249:2
249:11 255:5
293:8 326:5
339:10,13,14
339:17 341:20
341:21 343:24
344:1 382:22
384:6 394:19
396:17 399:23
400:15 412:14
424:5,24
432:19 433:5
437:4 464:10
468:18 473:4
476:7 479:14
479:18 480:3
483:9 486:23
495:5 499:24
505:15 508:2
549:18,24
556:24 557:13
559:23 563:12
563:13 577:11
577:19 586:19
587:4,17
590:11 596:12
597:10 598:4,8
602:17 603:3
604:19,23

605:3,9 609:10
609:15 611:10
611:16 612:12
637:6 642:7
643:2,5 645:5
649:7,12 650:2
650:19 654:2
**users** 597:3
**uses** 325:7
476:16 477:1
**usually** 70:20
125:19 183:1,1
296:9 302:17
304:4,11 305:2
321:3,21 331:5
**uterus** 612:7
**utilizing** 412:24
**U-shaped**
519:24

---

**V**

**V** 2:3 551:1,2,21
554:16 555:2
**vagina** 612:7
**validity** 399:14
549:10
**value** 328:7
346:24 347:1
**values** 324:6
326:19
**VANEK** 3:7
**variability** 324:4
**variable** 339:23
340:9 515:15
516:13,24
517:20
**variables** 498:24
**variance** 490:2,3
490:8,16
**variances**
343:21 344:1
**varied** 614:24
**variety** 539:3
**various** 196:16
270:17 611:7
**vary** 296:10

**vast** 560:1
**verbatim** 148:6
150:8,10 359:6
359:9
**verify** 88:6
**Vermont** 383:7
547:16
**version** 392:17
392:24 396:19
397:1
**versions** 396:19
**versus** 413:1
424:19,20
486:24 495:1
496:7 498:10
510:10 561:2
610:4
**vet** 364:10
**vetted** 209:12
**video** 293:18
390:20 391:5
565:10,14,24
566:6,9 567:13
**videographer**
14:2,4 62:15
62:18 129:16
129:19 292:22
293:17 428:1,4
548:13,16
553:24 554:3
558:15,18
565:19,22
569:19,22
604:4,7 612:18
612:21 644:15
644:18 661:24
**VIDEOTAPE**
5:10
**Videotaped** 1:14
**view** 25:18
39:17 40:2,7
83:16 153:20
155:17 157:6
157:14 158:18
189:15 308:9
366:19 431:11

434:6 439:13
441:3 501:3
561:8 568:17
598:7
**viewpoint**
157:20
**views** 46:5
153:17 159:5
**Virginia** 2:10
**vitae** 6:15,21
20:14
**voluntarily**
528:17 529:19
546:19

---

**W**

**waiting** 181:23
**walk** 61:16
96:11
**walking** 552:11
**Walmart** 61:16
**want** 25:6 26:13
27:3 37:20
46:2 61:5 71:6
71:10,11 83:15
84:15 92:7
94:6 129:22
131:4 140:7
145:14 159:7,8
159:15,22
199:16 232:7
236:17 260:18
268:13,14
294:5 300:3
303:5 304:20
311:11 312:8
312:18 315:3
320:12,15
321:10,15
330:23,24
332:13 333:3,5
336:14 341:18
347:13,18
348:2,6 349:13
382:14 405:13
409:16,17,21

Joshua E. Muscat, Ph.D.

414:2,2 427:18
432:3 433:22
434:4 438:16
440:4,7,8
461:12 467:17
473:10 495:7
496:5 501:9
503:22 524:7
530:14 532:18
532:24 533:2,4
533:8 536:1
545:3,16 547:1
558:13 570:12
574:14 610:11
616:17,22
627:12 630:6
639:20 652:7
652:17,19
653:24 655:18
659:24 660:6
**wanted** 173:3
236:9 268:20
404:22 405:7
459:23 496:16
496:17 499:5
542:23
**wants** 334:9
553:15
**Warner** 112:20
**warning** 50:21
146:11 366:1
434:23 502:6
505:15 506:13
**Washington**
4:18
**wasn't** 27:3 41:5
93:6 106:20
117:15,15
120:17 154:23
154:24 155:14
155:24 209:1
209:24 222:14
257:12 266:17
276:15 277:12
278:6 280:4
284:19 285:3

288:5 291:1
301:20 374:4
378:19 380:15
398:7 401:2
402:5 458:8
470:22 471:20
509:12 557:4
622:6 630:3,4
651:9
**way** 19:19 58:9
63:17 65:21
106:5 131:10
156:15,17
175:7 178:12
179:6 180:11
189:14 209:22
218:10 242:5
262:17 272:7
281:3 282:10
284:17 331:20
333:14 334:8
337:12 338:12
338:20 384:17
403:1 413:5
422:1,5 430:14
461:3 471:3
475:18 495:9
498:4 522:21
527:21 541:16
541:22 566:4
570:20 591:23
591:23 599:1
601:21,23
605:12 624:16
651:11 659:21
**ways** 45:2 331:6
339:3,5 425:1
Wbowden@le...
2:6
**weak** 421:2,5,7
421:14,21
425:12 426:8
426:22 609:4
**Wednesday**
365:3
**week** 152:15

482:17 483:6
**weekly** 126:15
465:15
**weeks** 615:4,5,6
617:19
**Weiderpass**
588:6
**weigh** 416:9
418:12 425:24
**weighing** 312:4
312:4 423:16
**weight** 17:7,19
335:22 346:2
427:2,15
**weighted** 335:19
**weighting**
335:21 337:15
424:23
**weights** 335:10
335:17 336:4,9
337:16 338:3,4
338:15,20
339:9 345:7,23
346:16 424:18
489:15,18,22
490:1,16
**Weinberg** 30:7
30:14,17,22
31:11 33:4,17
33:21,24 50:16
55:7,13,16
56:9 57:3,15
76:14,20 93:14
187:11 189:8
190:22 219:14
220:3 224:1
232:20 270:9
354:20 355:2
**Weiner** 184:18
185:10
**Weiss** 517:4
556:4,14,15
559:15
**welcome** 91:6
406:3
**went** 80:23

103:7 105:7
147:11 153:5
172:13 176:11
218:4 222:12
225:14 277:15
293:20 361:2,4
361:11,14
364:7 371:12
405:10 414:5
423:3,7,10,19
454:22 455:8
499:18 512:10
546:16 561:10
582:22 622:8
624:17,20,20
624:21 626:24
627:24 628:17
**weren't** 99:24
215:18 217:22
278:5 405:3
626:15
**WESLEY** 2:4
**we'll** 35:4 43:14
52:12 60:14
91:9 98:5
102:7 122:6
129:11 130:8
138:5,8 184:10
208:16 263:17
278:16 291:22
292:19 315:22
317:17 321:7
323:10 345:3
345:21 353:15
397:4 429:14
430:11 433:22
442:20 467:15
493:15 553:7,9
**we're** 20:23
31:13 35:8,9
62:22 73:21
90:4,18 95:6
122:11 159:11
159:21 160:1
162:12 174:15
174:15 176:6

177:12 241:17
285:8 290:3
317:17 400:18
405:9 441:16
502:22 507:13
507:14 548:9
548:19 552:7
559:9 569:17
570:6 644:18
659:13 661:2,9
**we've** 16:6 69:14
74:1 129:5,10
160:15 161:10
268:9 285:9
322:6 427:20
482:4 511:9
537:16 573:24
574:8 658:21
**whatsoever** 47:6
393:15 546:24
580:2 585:19
**Wheeler** 392:11
392:11
**white** 257:14
575:9,17 579:5
579:16 580:20
582:22,23
583:21 585:1
618:8 619:4
622:17 626:17
627:19,19,21
631:18,20
**Whittemore**
517:4
**wide** 539:3
660:8
**widely** 314:21
369:24
**Williams** 275:7
275:7
**willing** 236:8
240:3 241:1,6
**wish** 256:21
**withdraw**
404:19
**withdrew**

Joshua E. Muscat, Ph.D.

| | | | | |
|---|---|---|---|---|
| 375:17 | 103:16 104:8 | 226:13 227:19 | 338:8 339:1,20 | 449:22 450:16 |
| **withheld** 23:8 | 104:15 105:11 | 228:6 229:3 | 340:5,15 | 452:1,7 457:10 |
| 23:24 24:7 | 108:3,13 | 230:2 231:1,19 | 341:24 342:10 | 458:12 465:18 |
| 25:17,18,21 | 113:12 114:13 | 232:11 233:17 | 343:4 344:24 | 467:4 468:14 |
| 273:11 274:13 | 115:1 116:9,24 | 234:7,17 235:4 | 345:14 346:6 | 470:16 473:8 |
| 355:14 | 118:7 119:2,15 | 235:22 236:14 | 349:6 351:2 | 474:14 476:13 |
| **withholding** | 120:2 125:6 | 236:23 238:13 | 353:12 355:8 | 477:14 478:9 |
| 26:24 | 127:13 128:5 | 239:11 240:13 | 355:24 357:11 | 480:24 484:17 |
| **witness** 3:19 | 130:17 131:3 | 240:18 241:13 | 359:14 360:5 | 485:10 487:4 |
| 13:5 14:18 | 132:5 133:5 | 242:2 243:4,15 | 360:22 361:8 | 488:2,16 489:5 |
| 16:24 17:14 | 137:1,9 138:2 | 243:24 245:6 | 362:20 363:5 | 490:1 492:8,19 |
| 18:1,15 19:14 | 138:18 143:8 | 246:21 248:6 | 365:11 366:6 | 493:4,10,17,20 |
| 20:10 23:19 | 145:9 146:2,15 | 248:13 250:3 | 367:6,24 | 494:18 495:20 |
| 24:12 25:5,8 | 147:22 148:24 | 250:14 253:3 | 370:19 372:17 | 496:24 499:2 |
| 26:10,21 27:14 | 150:3,17 151:1 | 253:23 256:2 | 373:6 374:24 | 500:17 501:8 |
| 28:10 29:10,22 | 152:11 154:5 | 257:12 258:3 | 375:21 376:19 | 502:12 503:8 |
| 30:11,17 31:22 | 154:12 155:24 | 260:3,10 | 377:3 380:9,21 | 503:17 504:14 |
| 32:15 33:7,20 | 157:10,19 | 261:10 263:14 | 382:5 383:3,23 | 505:2,21 |
| 34:6,22 35:18 | 158:13,23 | 264:8,15 265:9 | 384:11,21 | 507:10,22 |
| 36:12 38:5,13 | 161:7 162:8 | 266:15 267:19 | 385:10 386:13 | 508:8 509:2,20 |
| 38:24 39:14,21 | 164:8 165:8 | 270:7 271:5,17 | 386:23 387:13 | 510:8 511:1,15 |
| 40:23 41:16 | 166:8 169:6 | 275:23 276:22 | 387:24 388:12 | 512:2,15 513:3 |
| 42:2,18 43:20 | 170:11 175:11 | 277:9 278:13 | 388:23 389:3 | 514:5 515:24 |
| 44:23 45:22 | 177:8 178:6 | 281:21 282:15 | 389:23 390:7 | 517:15 520:3 |
| 46:15,22 47:13 | 179:2,12,23 | 284:9 285:14 | 390:11 391:18 | 523:4 524:20 |
| 48:4 49:7,16 | 180:10 181:17 | 286:4,19 | 392:23 394:3 | 525:14 526:2 |
| 50:15 51:22 | 182:4,12 | 287:15 288:4 | 396:23 398:12 | 526:14 529:3 |
| 52:19 53:10 | 184:22 185:15 | 289:6,13 | 398:21 400:6 | 530:18 532:1 |
| 54:12,23 56:7 | 186:2 187:10 | 290:11,20 | 402:9,23 403:7 | 532:15 533:19 |
| 56:24 57:13 | 187:20 190:10 | 291:7,18 292:6 | 403:17 407:10 | 534:4 535:6,19 |
| 59:23 60:9 | 190:18 191:11 | 292:15 295:3 | 407:19 410:2 | 536:15 537:16 |
| 61:1 62:4,12 | 191:21 192:19 | 295:23 297:2 | 411:11 413:18 | 538:15 540:19 |
| 63:8 64:24 | 193:14 194:13 | 297:15 298:23 | 414:8 416:18 | 541:12 544:17 |
| 68:6 69:9 | 195:7 197:13 | 299:22 302:2 | 417:12 418:7 | 545:12 546:3 |
| 70:20 72:1 | 198:6,15 | 303:20 304:7 | 418:16 419:4 | 546:10 547:6 |
| 73:7 76:9 77:8 | 200:19 201:13 | 306:3,13 307:1 | 420:9,17 | 548:4 553:18 |
| 78:8,15,20 | 202:22 204:15 | 308:2 311:1,23 | 421:24 422:14 | 553:23 554:5 |
| 79:11 80:2,15 | 205:2,17 207:4 | 312:13 313:1 | 422:21 424:10 | 555:5 556:16 |
| 81:10 82:2 | 207:13 208:21 | 313:21 318:14 | 426:3,13 427:6 | 557:8 558:8,14 |
| 84:2 85:12 | 210:8 211:7 | 319:10,19 | 430:8,22 | 559:9 560:12 |
| 86:6 87:7,23 | 212:5,15 214:6 | 320:1 321:1 | 431:22 432:22 | 561:13 562:5 |
| 89:4,12,23 | 214:15 215:11 | 322:15 323:1 | 433:11 435:18 | 563:24 564:6 |
| 92:21 96:8,22 | 216:15 217:20 | 326:17 327:13 | 436:1,18 | 564:12,23 |
| 97:13,21 98:18 | 218:3 219:9,17 | 328:12 329:8 | 437:13,19 | 569:5 572:14 |
| 99:15 100:17 | 220:16 223:2 | 330:9 331:13 | 439:17 440:23 | 575:4 576:3,21 |
| 101:19 102:3 | 223:14 225:4 | 333:12 336:2 | 441:8 444:9 | 577:4,14 578:5 |

584:9 585:4,15
586:4,9,22
588:11 589:14
591:11,18
592:3,13
594:15,23
595:21 596:14
596:23 597:5
597:15 598:10
598:15 599:14
600:9 602:22
603:24 609:12
611:12,18,24
612:14 614:20
615:14 616:6
618:1,17
619:10 620:21
621:16 622:12
622:22 623:11
624:2 625:11
626:20 628:24
630:12 633:5
634:9 636:2,17
638:19 639:9
639:15 641:7
641:14 642:15
643:10,22
646:7 647:2,23
649:2,17 650:5
650:24 652:5
652:16 653:18
654:18 655:17
656:12 657:16
659:1 663:5,6
663:8 664:1
**witness's** 234:16
**woman** 400:2
**women** 60:20
177:2 195:18
275:12 400:14
502:7 503:2,13
505:15 506:22
508:2 551:13
551:22 557:3
558:3 637:6
638:3 652:11

**word** 16:11,11
16:12 44:9
61:5,20 136:6
146:3 177:10
179:6 210:10
212:6 226:9
249:1 325:7
418:24 450:5,5
529:20
**worded** 209:23
**wording** 359:5
371:15 470:22
579:10
**words** 16:17
147:18 250:9
286:5 296:22
297:18 332:9
382:22 384:6
399:21 411:19
572:21 574:12
575:20 592:15
**wore** 174:14
**work** 28:13,14
31:10 74:11
75:12 77:3
80:8 88:7
89:20 92:17
106:16,21
108:23 109:15
109:21 114:8
114:19 116:9
116:14 119:17
121:17 126:8
126:16,17,19
127:14 128:20
160:2 193:19
202:18 213:21
214:3 215:5
216:5,11
229:21 233:22
235:14 254:22
270:2,8,8
280:11 285:9
300:16,18
301:1,2,5,10
301:11,17,19

301:23,23
302:5 327:6
366:12 367:10
372:18,22
401:18 406:21
414:5 417:19
417:19 448:21
571:13,14
572:20,22
575:10,17,21
581:3 582:23
583:19 592:10
592:24 615:15
616:20 623:22
631:6 635:4
645:18 656:3
656:22 657:4
**worked** 27:20
27:24 28:10,17
29:17 30:2,14
30:18,24 32:18
32:24 33:12,14
33:20 74:8
80:15 113:17
163:4,22
183:17,22,22
185:8 213:5
230:14 293:9
640:16
**working** 29:13
65:10 111:20
127:9 165:14
185:22 215:5
232:2 262:1
277:5 284:10
287:8 314:14
581:5 588:2,8
589:7 590:18
603:5 635:6
**works** 389:13
**Worldwide**
285:19 370:9
371:18 401:21
**wouldn't** 43:9
45:23 121:7
133:16 155:3

164:8 222:22
223:2 258:18
260:23 303:8
306:17 314:9
314:11 322:2
322:22 327:14
327:14 328:12
330:9 332:16
332:18 387:5
450:16 469:5
469:20 481:19
494:15 495:8
519:16 560:13
560:13 567:3,8
655:18
**wrap** 548:20
**write** 46:9 51:8
56:1 118:1
147:2,3 163:2
209:11 251:13
251:18,20,21
251:23 260:6
260:11,18
261:1 262:15
277:14 284:18
356:9 357:8
460:18 630:6,9
**writes** 192:15
297:19,22,22
297:23 298:12
298:13,14
637:3
**writing** 57:20
87:3,10 107:21
107:21 114:20
115:8 116:4
153:16 157:2
204:5,9,9
211:11 280:3
300:4,10
356:11,24,24
540:8 581:1,8
581:14
**writings** 430:2
**written** 37:3
44:5 45:22

46:3 51:5,7
84:8 85:4
92:24 117:10
118:17 122:7
156:21 193:1
257:16,17
262:3 263:22
264:16 322:15
354:17,19
356:13,15
378:18 380:24
381:10 387:18
391:10 406:14
568:3 574:24
585:24 630:23
648:6
**wrong** 65:13
133:17 209:24
377:17 415:8
452:3,10
457:24 461:20
462:7 473:17
498:5 530:23
538:6,19 551:1
**wrote** 36:21
51:2,7 92:17
93:3,8,13
134:4,5 145:15
147:4 153:6
157:13,19
181:5,19 183:5
184:5 205:8
210:18,21,22
213:4 242:2,12
251:11 252:2,3
252:6,7 253:11
253:18 262:10
262:19 263:22
263:23 288:24
297:24 328:7
348:20 354:18
355:1 356:3
357:16,19
371:14 378:20
430:24 579:16
588:7 627:21

631:13,13
632:13 633:16
**Wynder** 19:23
19:24 97:17
165:13,14,18
165:23 166:1,1
166:2,3,23
167:3 168:16
168:20 318:16
320:3

---
**X**
**X** 6:2,11 7:2 8:2
9:2 10:2 11:2
12:2 160:11
163:20

---
**Y**
**Y** 447:14
**Yale** 570:18
**yeah** 24:3,5
25:13 27:8
39:7 42:7 55:2
55:4 108:17
111:6 115:5
117:21 123:4,4
123:5 137:9
147:22,23
150:20 151:9
151:16 152:8
155:16 180:15
181:20 183:22
184:23 194:21
202:10 203:11
205:5 210:13
228:1 230:9
231:4,5 240:23
241:8 242:17
252:4 256:4
287:5 288:10
289:18 297:8
329:12,13
331:16 332:11
340:8 341:1
349:10 352:12
352:16 365:17

372:7 380:1
388:24 389:3
393:11 396:6
400:17 407:15
410:5 413:2
416:22 426:6
427:23 437:13
440:5 441:8
449:16 453:15
456:3,10,12,14
458:4 474:1,3
476:13 477:18
498:7 499:18
507:13,16
509:24 513:20
518:9 521:5
557:2 560:2
568:1 569:13
570:6 614:23
619:13 627:14
647:13 659:14
**year** 59:11
181:20 195:18
587:23
**years** 19:4 27:11
28:2 37:2 41:1
42:11 43:17
59:19 60:6
63:2,8,9,11
81:23 108:20
109:5,18
127:16 128:22
170:4 182:13
182:14 196:3
296:6 319:14
385:14 403:20
464:10 476:7,9
479:14 480:2
495:1,6,15,20
496:6,6 497:2
497:7,9,12,15
498:3,5,6,7,10
498:17 499:3,4
499:6,7,22
516:15 517:1
517:21 540:6

571:21 573:6
613:9 640:16
**Yep** 428:22
**yielded** 561:21
**yielding** 435:9

---
**Z**
**Zach** 5:12
**Zazenski** 183:17
183:18 184:18
185:8 202:11
221:13 229:8
259:7
**zero** 393:17,18
477:2

---
**$**
**$398,000** 174:6
**$400,000** 98:12
181:24
**$500,000** 54:7
**$6,000** 216:22

---
**0**
**0.5** 477:23
**0.865** 475:14
**000449903-38**
10:12
**007** 282:19
**03** 143:18
**05** 321:21 326:8
327:23
**06** 327:23
**07** 466:15
**07932-1047** 3:13
**07962** 4:13

---
**1**
**1** 11:17 20:16
69:16 74:2
75:2 90:3
297:22 298:12
298:14 326:14
350:16 426:8
435:8 556:5,6
556:18,22,24
557:23 559:12

561:10,10
563:19 653:9
666:6
**1st** 168:14 354:7
**1.0** 420:2 562:7
**1.08** 473:23,24
**1.16** 435:10
480:15
**1.2** 420:24
425:20 432:15
433:14 477:9
477:19,23
480:18
**1.21** 491:16
**1.3** 420:24
425:20 481:9
557:21
**1.33** 435:9
437:23 481:5
**1.4** 425:20
432:15 433:14
**1.45** 435:10
**1.5** 177:1 320:18
321:12 326:6
327:3 329:5
330:2 332:18
**1.6** 561:1
**1.697** 472:21
473:3,14
**1.7** 472:24 473:3
473:14
**1.83** 491:15
**1.86** 480:7
**1.89** 326:8 330:4
**1.9** 326:14 480:6
480:9,11
560:24
**1:18** 292:23
**10** 13:10 60:5
166:15 171:14
174:17
**10,000** 476:21
**10/12/00** 7:11
**10/14/2008**
281:5
**10/17/00** 8:20

**10/31/94** 7:18
**10/7/04** 7:9
**10/7/2010**
281:11
**10:17** 62:16
**10:22** 62:20
**100** 205:19,23
321:24 332:17
555:15
**11** 167:22 168:6
168:8,11 354:6
465:5 599:7,8
**11,229** 122:16
123:24
**11/14/08** 10:14
**11/2000** 7:15
**11:08** 129:17
**11:21** 129:20
**110** 7:8
**12** 141:5 170:4
175:18 176:2,4
192:9,9,12
193:19 454:18
456:22,24
465:7,8
**12/7** 280:6
**13** 175:18 176:4
**13.5** 477:2,2
**14** 13:6 175:18
176:5 177:21
364:23 573:6
**140** 7:11
**142** 377:23
379:3,13
**143** 7:13 134:8
**149** 233:7
**15** 6:5 13:7 60:6
180:18 188:16
296:6 435:7
594:12
**1500** 3:17
**1510** 4:3
**16** 122:16
184:11 188:9
454:20
**16-2738** 1:6

Joshua E. Muscat, Ph.D.

**164** 134:15
**166** 7:17,19
506:6
**167** 7:21
**17** 188:8,10,11
454:12
**17th** 279:24
**1717** 4:8
**1722** 3:17
**175** 8:6,8,10
**18** 125:10 199:9
199:12,21
237:17
**180** 8:13
**184** 8:16
**185** 328:21
573:17
**188** 8:20
**19** 68:13 199:10
237:14 373:16
**19103** 4:9
**1950** 19:20
**1956** 455:5
490:9
**1957** 455:4
**1958** 450:20
457:22 491:1
**1965** 352:4
**1970** 547:10
**1970s** 38:9
262:22,22
264:4 265:4,20
267:14 379:21
524:13 525:1
528:16 530:4
535:22
**1976** 379:23
380:2,15,17
381:1,7 524:14
525:3 529:13
547:11
**1980s** 381:17
**1982** 65:7,11
66:6,11,21
67:9,13 68:3
169:24

**1989** 461:9
462:3 550:21
556:4
**199** 9:6 328:8
**1990s** 32:10 97:3
97:24 100:10
101:5,14
102:24 153:7
163:21 174:14
174:19 190:8
218:22 316:12
381:17 640:6
641:4 642:2
**1992** 169:22
419:16
**1994** 164:24
166:12 167:4
168:14 172:10
215:2
**1995** 320:4
**1996** 111:17
485:24 486:11
**1997** 92:13 93:1
145:16 177:17
177:22
**1998** 93:3
145:16 506:9

―――――――――
**2**

**2** 11:16 21:16
183:11 184:12
184:13 297:23
298:13,15
337:6 399:10
438:14 443:16
443:22 444:15
444:18,21,24
445:7 447:11
450:24 451:14
451:19 458:19
458:24 460:16
463:11 472:14
472:17 479:6
479:18 483:5
508:22 557:21
565:9 636:22

653:10
**2,000** 476:20
**2,001** 476:20
**2.0** 328:18 329:5
420:2 426:9,16
**2.4** 477:11,23
**2.59** 473:24
**2.60** 473:23
**2.99** 561:10
**2/18/05** 9:9
**2/21/97** 8:6
**2/28/05** 9:6
**2:09** 293:18
**20** 6:15 28:2
37:2 42:11
43:17 63:2,8
196:3 245:15
245:16,16
255:2,4 256:10
268:17 296:6
432:19 481:4
493:21 540:6
623:17 666:20
**20,000** 195:17
**20-odd** 594:12
**2000** 31:11 33:2
55:6 60:13
93:8 97:4
124:6,19 136:3
141:6 144:1
145:6,6,16
146:7 156:16
157:2 164:3
186:8 188:16
190:14 192:2,2
196:22 197:22
206:14 220:2
220:11 223:24
258:13 269:15
270:2 279:24
510:19 598:18
**2000s** 32:21
196:2 197:23
269:7 381:18
**2000-2010** 9:16
**20004** 4:18

**2003** 11:15
53:23 129:24
130:4 131:12
133:1 134:10
135:1,10,15,23
136:4,18 137:6
138:14 144:22
145:2,16
191:15,24
192:20 193:3
290:11 345:22
347:3,11
404:23 430:3
444:5 449:2,9
449:14 450:21
460:16 484:5
508:23 593:21
594:11 598:24
599:2 609:22
**2004** 110:12
191:15,24
192:4,8 197:22
198:24 220:20
280:6 571:14
**2004-2005**
193:18
**2005** 75:13,19
76:10 78:12
79:21 80:7
145:16 220:20
225:20 228:8
231:8,13 234:3
237:17,21
240:8 245:17
249:17 269:4
269:17 270:16
272:23 273:9
273:13,22
393:20 575:11
630:15
**2006** 273:18,22
374:10,18
375:8
**2007** 11:17
118:11 132:13
135:11 138:14

145:16 290:14
431:4 576:8
578:17 631:4
635:13,18
636:10,22
**2008** 118:11
145:16 146:15
146:19 152:23
212:22 223:10
248:10 252:11
258:9,15,24
259:16 288:21
301:8 350:19
363:21 364:23
373:16 374:2
381:12 579:17
580:4 583:5,9
587:16,23
589:20 590:15
630:19
**2009** 145:17
146:12,16,20
158:5 212:17
213:1 224:13
270:3 353:8
355:11 363:21
405:19 434:21
510:19 631:16
**2010** 60:13
63:12,17 64:14
64:17 68:14,23
69:2 213:4
276:3,13 284:2
372:19
**2011** 11:13,14
135:20 144:23
145:17 147:18
148:20 150:7
152:1 153:2
164:2,3 213:5
213:6 276:15
277:2 281:15
282:2,11 283:7
283:12,16,19
347:24 352:9
354:6,7 355:12

356:6 358:18
358:19 370:6
370:23 371:10
405:19 429:9
431:3,7,10
432:10 445:19
446:14 448:14
448:17,24
449:19 458:24
460:18 509:7
512:11 593:20
607:1 608:10
631:22 633:17
**2012** 658:15
**2015** 509:13
658:15
**2018** 1:11 14:7
60:17 67:13
69:17,21 75:23
128:16 510:16
663:15
**202** 4:19
**21** 6:16 142:11
272:16 274:24
293:1,5 406:5
407:10,11,12
407:13,18
**214** 3:18
**215** 4:9
**22** 293:6,8
514:17 515:12
**22311** 2:10
**227-9508** 3:9
**23** 6:18 135:8
177:17,22
279:4,6 421:11
562:13,23,23
594:5
**234** 5:4
**237** 9:8
**24** 135:8 282:23
283:4,10 348:3
351:14 434:20
435:3 443:6
446:3 459:2,14
482:14,18,21

482:24 513:11
**2400** 516:11,19
**245** 9:11
**25** 1:11 14:6
319:14 349:21
350:2 361:23
368:23 406:1
434:17 459:9
459:12 513:16
523:18 562:23
562:24
**2555** 3:3
**26** 361:23 603:9
603:10,11
606:21 607:21
**267-0058** 4:14
**269-2343** 5:5
**27** 364:21 477:3
617:18 663:15
**27th** 245:17
**272** 9:15
**274** 13:10
**279** 9:20
**28** 231:13
373:21 385:17
**28th** 237:21
**283** 10:6
**29** 407:11
**293** 9:17

_____

**3**
**3** 11:14 23:2,22
94:12 135:22
136:1,7 146:7
191:3 297:23
298:14,15
350:15,19
446:3,5 447:2
447:11 448:17
458:22 459:1
460:16 476:3
479:15 480:5
483:22 484:2
487:5,17 506:5
556:5
**3.4** 478:4

**3/23/97** 8:10
**3/4/97** 8:8
**3:55** 428:2
**30** 42:11 43:17
397:6,8 464:22
464:22 472:18
481:5 497:9,12
548:22 664:16
**30-minute**
658:22
**31** 429:5 619:3
**31st** 170:18
283:16
**316** 2:4
**32502** 2:5
**33** 130:12
429:19 432:7
432:15 433:3
433:17 435:13
448:11 460:1,2
463:20,21
604:14 605:8
**334** 5:5
**337** 2:15
**34** 168:8,9
459:20,22
460:7
**3400** 3:8
**349** 10:9
**35** 548:23
550:12
**350** 4:13
**353** 479:7
**36** 587:9,15
634:19
**36103** 5:4
**362** 10:11
**364** 10:13
**37** 629:24
**37.4** 171:20
**373** 10:16
**38** 623:16
**39** 10:10 350:15
**391-0197** 4:4
**394** 10:18
**397** 11:6

**399** 472:14

_____

**4**
**4** 75:6 90:19
91:8 104:19
122:5,10
129:23 131:23
132:17 134:15
350:1 428:17
445:6 479:5
482:13,18,21
482:24 485:21
**4.06** 515:16
**4.6** 120:10
**4:15** 428:5
**40** 432:19 475:6
475:8,8
**42** 177:19
**425** 133:21,24
**428** 11:10
**435-7001** 2:5
**437** 11:12
**439-0707** 2:15
**448** 11:14
**460** 11:15
**463-2400** 4:19
**474-6550** 3:4
**4900** 2:10

_____

**5**
**5** 91:23 477:2,11
508:22 516:12
556:7,7,9
557:19
**5,000** 476:20
**5,001** 476:21
**5.5** 477:2,2
**5/30/18** 6:16
**5:54** 548:14
**50** 19:4 177:1
310:19 320:20
321:12 631:10
**500** 15:10
**501** 2:14
**505** 377:11
**512** 4:4

**52** 6:20
**549** 11:17
**549.7106** 3:13
**570** 6:6
**575** 462:4
**587** 11:18
**596** 462:7 465:5

_____

**6**
**6** 110:1 132:1,5
132:8,10,24
350:15 506:6
516:12
**6/1/94** 7:21
**6/21/2007**
280:14
**6:13** 548:17
**6:19** 554:1
**6:20** 554:4
**6:24** 558:16
**6:28** 558:19
**6:33** 565:20
**6:37** 565:23
**6:40** 569:20
**6:45** 569:23
**600** 2:4 3:8,12
**610** 4:8
**613** 6:5
**616** 13:6
**629** 11:21
**64108** 3:4
**648** 13:7
**650** 2:10
**661** 13:16
**662** 12:6
**667** 666:6
**68** 10:20

_____

**7**
**7** 13:16 140:23
**7/20/18** 6:19
**7/27/05** 9:11
**7:09** 604:5
**7:10** 604:8
**7:16** 612:19
**7:19** 612:22

Joshua E. Muscat, Ph.D.

**7:39** 644:16
**7:46** 644:19
**7:56** 662:3,9
**70s** 380:5 546:18
**703** 2:11
**70601** 2:15
**713** 3:9
**717-4009** 4:9
**75** 6:21 555:24
**75201** 3:18
**77002** 3:8
**78701** 4:4

---
**8**

**8** 6:22 11:9
  134:13,14
  143:19 146:11
  484:21 485:3
  485:10
**80s** 38:10
**816** 3:4 4:3
**86** 457:16
**877.370.3377**
  1:22
**888** 2:5

---
**9**

**9** 7:6 104:19
  135:21 147:18
  148:21 166:14
  167:2,24 168:7
  170:17,20
  484:11,13
  506:6
**9:45** 1:16 14:7
**90** 149:12
  631:10
**90s** 212:10
**91** 7:6
**917.591.5672**
  1:22
**931-5500** 2:11
**95** 321:24 324:3
  379:6
**96** 475:9
**969-1540** 3:18

**973** 3:13 4:14
**975** 4:18
**99** 326:7 328:21
  330:4 379:6,7
  560:24

Exhibit 158

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN RE: JOHNSON &               )
JOHNSON TALCUM POWDER  )
PRODUCTS MARKETING        )
SALES PRACTICES AND       )   MDL 16-2738
PRODUCT LIABILITY           )   (FLW)(LHG)
LITIGATION                      )
_____  )
THIS DOCUMENT              )
RELATES TO ALL CASES    )


THURSDAY, OCTOBER 18, 2018

- - -


Videotaped deposition of Robert Glenn, held at the offices of Grimes Teich Anderson LLP, 535 College Street, Asheville, North Carolina, commencing at 8:44 a.m., on the above date, before Carrie A. Campbell, Registered Diplomate Reporter and Certified Realtime Reporter.


- - -


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Robert Glenn

Page 2

APPEARANCES:

LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY & PROCTOR, P.A.
BY:  CHRISTOPHER V. TISI, ESQUIRE
   ctisi@levinlaw.com
   WESLEY BOWDEN, ESQUIRE
   wbowden@levinlaw.com
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
(850) 435-7000

LUNDY, LUNDY, SOILEAU & SOUTH, LLP
BY:  NICHOLAS J. KOHRS, ESQUIRE
   (VIA TELECONFERENCE)
501 Broad Street
Lake Charles, Louisiana 70601
(337) 439-0707
Counsel for Plaintiffs

SHOOK, HARDY & BACON L.L.P.
BY:  MARK C. HEGARTY, ESQUIRE
   mhegarty@shb.com
2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550
Counsel for Defendant Johnson & Johnson

Page 3

APPEARANCES (continued):

GORDON REES SCULLY MANSUKHANI, LLP
BY:  KENNETH J. FERGUSON, ESQUIRE
   kferguson@grsm.com
816 Congress Avenue, Suite 5150
Austin, Texas 78701
(512) 391-0197

and

BY:  SARA ANDERSON FREY, ESQUIRE
   sfrey@grsm.com
1717 Arch Street, Suite 610
Philadelphia, Pennsylvania 19103
(215) 561-2300

and

COUGHLIN DUFFY LLP
BY:  JONATHAN DONATH, ESQUIRE
   jdonath@coughlinduffy.com
350 Mount Kemble Avenue, Suite 3
Morristown, New Jersey 07962
(973) 267-0058
Counsel for the Defendant Imerys Talc America

SEYFARTH SHAW LLP
BY:  JAMES R. BILLINGS-KANG, ESQUIRE
   jbillingskang@seyfarth.com
975 F Street, N.W.
Washington, DC 20004
(202) 463-2400
Counsel for Defendant Personal Care Products Council

Page 4

APPEARANCES (continued):

WILLIAMS & CONNOLLY LLP
BY:  CHARLES DAVANT, IV, ESQUIRE
   cdavant@wc.com
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000
Counsel for the Witness

VIDEOGRAPHER:
DARNELL BROWN,
   Golkow Litigation Services
Corey Smith, Trial Technician
   Golkow Litigation Services

   ---

Page 5

INDEX

PAGE
APPEARANCES............................  2
EXAMINATIONS
   BY MR. BOWDEN............................  11
   BY MR. FERGUSON............................ 453
   BY MR. HEGARTY............................ 471
   BY MR. BILLINGS-KANG...................... 521
   BY MR. BOWDEN............................ 527

EXHIBITS
No.  Description                      Page
1   Notice to Take Videotaped Deposition    21
     of Robert Glenn

2   August 2, 2108 letter from Davant to    22
     Dassow

3   NIOSH Testimony on Occupational         39
     Exposure to Asbestos, Tremolite,
     Anthophyllite, and Actinolite by JD
     Miller, July 17, 1986

4   NISA Position on Crystalline Silica     44
     Rulemaking

5   Purpose and Description - Industrial    50
     Minerals Association - North America

6   Producer Members - Industrial          59
     Minerals Association - North America
7   Associate Members - Industrial         63
     Minerals Association - North America

8   E-mail(s),                             87
     JNJ 000000935 - JNJ 000000936

2  (Pages 2 to 5)

Robert Glenn

Page 6

1   9   August 18, 2004 facsimile from Ralph   102
2       Godell to Ridgway Hall,
        IMERYS 236821 - IMERYS 236831
3   10   Meta-Analysis Research Group   111
        proposal,
4       JNJ 000389800 - JNJ 000389804
5   11   Fax from Dr. M. Harrison to Mr. Bob   126
        Glenn,
6       JNJ 000389796 - JNJ 000389804
7   12   Cosmetic Talc Conference Call   133
        Minutes,
8       JNJ 000003399 - JNJ 000003400
9   13   E-mail(s),   148
        JNJ 000391641
10
11  14   E-mail(s),   154
        JNJ 000369203
12  15   E-mail(s),   162
        IMERYS 287089 - IMERYS 287131
13
14  16   E-mail(s),   177
        JNJ 000389751 - JUN000389793
15  17   E-mail(s),   187
        IMERYS 324762 - IMERYS 324922
16
17  18   "Perineal talc use and ovarian   199
        cancer:  A critical review,"
18       Muscat & Huncharek
19  19   E-mail(s),   231
        JNJ 000369542
20  20   IARC Monographs on the Evaluation of   240
        Carcinogenic Risks to Humans, Volume
21       93, Carbon Black, Titanium Dioxide,
        and Talc, Lyon, France, 2010
22
23  21   Minutes of Talc Section,   246
        JNJ 000004749 - JNJ 000004750
24
25

Page 7

1   22   Non-Asbestiform Talc Overview, IARC   255
        Monograph 93 Observers Meeting, San
2       Juan, PR, January 12, 2006,
        Crowell & Moring
3
4   23   E-mail(s),   291
        IMERYS 309615 - IMERYS 309623
5   24   E-mail(s),   313
        JNJ 000004461 - JNJ 000004463
6
7   25   E-mail(s),   319
        IMERYS 001719 - IMERYS 001720
8   26   February 25, 2006 letter from Eric   325
        Turner to Robert A. Baan, Ph.D.,
9       C&M-LUZ 00001562 - C&M-LUZ 00001563
10  27   February 23, 1978 letter to Roger   337
        Miller,
11       JNJ 000246710 - JNJ 000246717
12  28   Minutes Talc Section Teleconference   342
        Meeting, IMA-NA - IMA-Europe,
13       February 24, 2006,
        JNJ 000004466 - JNJ 000004468
14
15  29   Rio Tinto Minerals Memorandum -   347
        February 15, 2006,
        IMERYS 241536 - IMERYS 241544
16
17  30   E-mail(s),   362
        IMERYS 005117
18  31   Rio Tinto Minerals July 20, 2006   369
        letter to John Worgan,
19       LUZ001441 - LUZ001444
20  32   Overview of Potential New Projects   377
        Examining the Talc/Ovarian Cancer
21       Relationship, Huncharek and Muscat,
        IMERYS 272247 - IMERYS 2722450
22
23  33   Perineal talcum use and ovarian   379
        cancer risk: A meta-analytic
24       evaluation of the dose-response
        relationship, Muscat and Huncharek,
25       IMERYS 242353 - IMERYS 242362

Page 8

1   34   E-mail(s),   383
        IMERYS 248642 - IMERYS 248649
2
3   35   Memo to IMA-NA Talc Section from   398
        Mark Ellis,
        IMERYS 288001 -  IMERYS 288004
4
5   36   E-mail(s),   405
        IMERYS 280507 - IMERYS 280511
6   37   E-mail(s),   409
        IMERYS 270648
7
8   38   "Alterations in Gene Expression in   415
        Human Mesothelial Cells Correlate
        with Mineral Pathogenicity," Shukla
9
10  39   E-mail(s)   425
        IMERYS 444052 - IMERYS 444054
11  40   February 28, 2005 letter to Dr.   483
        Huncharek and Dr. Muscat from
12       Ridgway Hall,
        Bates numbering cut off document
13
14   (Exhibits attached to the deposition.)
15
16
17
18
19
20
21
22
23
24
25

Page 9

1        VIDEOGRAPHER:  Good morning.
2   We are now on the record.
3        My name is Darnell Brown, and
4   I'm the videographer with Golkow
5   Litigation Services.
6        Today's date is October 18,
7   2018, and the time is 8:44 a.m.
8        This video deposition is being
9   held in Asheville, North Carolina, in
10  the matter of In Re: Talc for the
11  United States District Court for the
12  Northern District of New Jersey.
13       The deponent is Robert Glenn.
14       Counsel will be noted on the
15  stenographic record.
16       The court reporter is Carrie
17  Campbell, who will now swear in the
18  witness.
19
20       ROBERT GLENN,
21  of lawful age, having been first duly sworn
22  to tell the truth, the whole truth and
23  nothing but the truth, deposes and says on
24  behalf of the Plaintiffs, as follows:
25

3  (Pages 6 to 9)

Robert Glenn

Page 10

1         VIDEOGRAPHER:  Counsel on the
2    phone, could you state your
3    appearances, please?
4         MR. KOHRS:  Nicholas Kohrs with
5    Lundy, Lundy, Soileau & South.
6         VIDEOGRAPHER:  Anyone else?
7         MR. BOWDEN:  Wes Bowden for the
8    plaintiffs.
9         MR. TISI:  Chris Tisi for the
10   plaintiffs.
11        MR. FERGUSON:  Ken Ferguson for
12   Imerys.
13        MR. HEGARTY:  Mark Hegarty for
14   the Johnson & Johnson defendants.
15        MS. FREY:  Sara Frey for
16   Imerys.
17        MR. DONATH:  Jonathan Donath
18   for Imerys.
19        MR. BILLINGS-KANG:  James
20   Billings-Kang for Personal Care
21   Products Council.
22        MR. DAVANT:  Oh, Charles Davant
23   for the witness.
24        THE WITNESS:  Robert Glenn,
25   deponent.

Page 11

1         DIRECT EXAMINATION
2    QUESTIONS BY MR. BOWDEN:
3         Q.    All right.  Good morning, sir.
4         A.    Good morning.
5         Q.    Please state your name for the
6    record.
7         A.    Robert Glenn.
8         Q.    Mr. Glenn, it's good to see you
9    again.  It's been a couple of years since we
10   last met, hasn't it?
11        A.    I don't recall the last time,
12   but...
13        Q.    Okay.  This is your first depo
14   in the talcum powder litigation; is that
15   right?
16        A.    That's correct.
17        Q.    All right.  And you understand
18   that you're here today in a litigation
19   involving women who have alleged that they've
20   developed ovarian cancer as a result of their
21   use of talcum powder products.
22             You understand that?
23        A.    I understand that.
24        Q.    All right.  And before we jump
25   into who you are and the different topics, I

Page 12

1    just want to step back and tell you some of
2    the ground we're going to be covering today.
3         A.    All right.
4         Q.    So you see that there's cameras
5    here, right?
6         A.    Yes.
7         Q.    And you understand that today
8    you're under oath, right?
9         A.    Yes.
10        Q.    And this is not your first time
11   being under oath?
12        A.    No.
13        Q.    Not your first time giving a
14   deposition?
15        A.    No, it's not.
16        Q.    So you understand that your
17   testimony today might be used in evidentiary
18   hearings, might be given to other experts to
19   consider your testimony.
20             Do you understand that?
21        A.    Yes, I understand that.
22        Q.    You understand that your
23   testimony today may be played before the
24   judge?
25        A.    I understand that.

Page 13

1         Q.    And ultimately, your testimony
2    today may be played in front of juries.
3              You understand that?
4         A.    I understand that.
5         Q.    Okay.  So I want to make
6    something very clear right off the bat.  When
7    I say "talc" today, when I say "talc" during
8    your deposition, I want you to have an
9    understanding that I mean talcum powder
10   products.  Everything that's in the bottle
11   that a woman buys at a store, Kmart, Sears,
12   wherever it might be, when I say "talc," I'm
13   talking about talcum powder products,
14   cosmetic talc, and everything that's in the
15   bottle.
16             Do you understand that?
17        A.    Yes.
18             MR. BILLINGS-KANG:  Objection,
19   form.
20   QUESTIONS BY MR. BOWDEN:
21        Q.    Now, let me just reiterate some
22   basic ground rules here.
23             From time to time you may hear
24   an objection from the numerous defense
25   attorneys who are in this room with you

4 (Pages 10 to 13)

Robert Glenn

Page 14

1    today.  Just let them state their objection
2    fully, and unless your attorney tells you not
3    to answer a question, give a full answer.
4           And of course if I ask a
5    question, do me the courtesy of letting me
6    ask the full question.  And I'll extend the
7    same courtesy to you, let you give your full
8    answer.  Fair?
9        A.    That's fair.
10       Q.    Okay.
11              MR. BILLINGS-KANG:  And,
12       Counsel, may we have an stipulation
13       that an objection by one is an
14       objection by all?
15              MR. BOWDEN:  Absolutely.
16   QUESTIONS BY MR. BOWDEN:
17       Q.    So today we're going to be
18   talking about a number of issues, primarily
19   dealing with your involvement with the law
20   firm of Crowell & Moring.
21              And you began working there in
22   2004; is that correct?
23       A.    That's correct, 2004.
24       Q.    And then your employment, your
25   direct employment with Crowell & Moring, that

Page 15

1    ended in 2010?
2        A.    I left the firm in 2010.  They
3    still had me doing work for the firm for
4    another four or five years, and then we
5    severed our relationship as far as a business
6    transaction.
7        Q.    Okay.  And so if my
8    recollection is correct, you left in 2010 to
9    form Glenn Consulting Group; is that right?
10       A.    That's correct, I did.
11       Q.    In 2010 through the 2015 time
12   period when you said they severed all ties
13   with you, were you working on talcum powder
14   product litigation again?
15       A.    No, I was not working on talcum
16   powder for Crowell or for anyone else to my
17   recollection.
18       Q.    Okay.  So we're going to talk a
19   little bit about the 2004 time period
20   through 2010, but to give the jury an idea of
21   the type of material we're going to cover,
22   that was an important time period in talc and
23   the scientific debate that was going on in
24   the medical and public arena; is that fair to
25   say?

Page 16

1              MR. HEGARTY:  Object to form.
2              THE WITNESS:  Well, the
3        scientific debate goes further back
4        than 2010, of course.
5    QUESTIONS BY MR. BOWDEN:
6        Q.    Sure.
7              And I think you might even say
8    2004, it went back before then as well?
9        A.    Yes, it did.
10       Q.    Okay.  And I understand that.
11   We're going to touch on some of those issues,
12   but we're going to focus a lot of your
13   testimony on that 2004 to 2010 time period.
14              And that time period, that
15   encompasses the second NTP nomination of
16   talc, right?
17       A.    Yes.
18       Q.    It encompasses your direct
19   involvement with the publication of
20   scientific literature?
21       A.    It was not my direct
22   involvement with publication of scientific
23   literature.
24       Q.    Okay.  We're going to get to
25   that.

Page 17

1        A.    Okay.
2        Q.    In 2006, there was an IARC
3    proceeding as well, right?
4        A.    That's correct.  IARC working
5    group met in Lyon, France.
6        Q.    Uh-huh.  And after 2006, up and
7    through 2010 and '11, there were numerous
8    scientific articles that had been submitted
9    for peer review which you had involvement in,
10   correct?
11       A.    I commissioned some of those.
12   The sponsor was our client --
13       Q.    Okay.
14       A.    -- Luzenac.  But -- and I had
15   review of those papers, but I was not an
16   author or did not have significant input to
17   those papers.
18       Q.    You did not have significant
19   input into those papers?
20       A.    Into the published papers,
21   the --
22       Q.    Okay.
23       A.    -- manuscripts, submitted for
24   publication.
25       Q.    Okay.  So we're going to talk

5  (Pages 14 to 17)

Robert Glenn

Page 18

1    about some of those issues in greater detail.
2        A.    Uh-huh.
3        Q.    But I just wanted to give the
4    jury an idea of where we're headed in today's
5    testimony.
6            All right?
7        A.    Sure.
8        Q.    Now, you have a master's in
9    public health, right?
10       A.    That's correct.
11       Q.    What track, if any, did you
12   take in school?
13       A.    My master's degree is in
14   industrial hygiene and occupational health
15   from the University of Minnesota School of
16   Public Health.
17       Q.    Okay.  And so industrial
18   hygiene.  Anything else that you had a minor
19   or anything else in terms of science?
20       A.    No, not at the University of
21   Minnesota, no.  It was strictly a public
22   health degree.
23       Q.    Industrial -- okay.  Industrial
24   hygiene.
25           You're not a geologist, right?

Page 19

1        A.    No, I'm not a geologist.
2        Q.    You're not a mineralogist?
3        A.    No, I have a working knowledge
4    of geology and mineralogy, but I'm not a --
5    trained in those fields.
6        Q.    Okay.  And that was
7    self-taught, basically, right?
8        A.    Self-taught, attendance at
9    meetings, meeting and discussing subjects
10   with mineralogists and geologists, yes.
11       Q.    Okay.  But not through
12   experience, correct?
13       A.    Well, I'm not sure I -- I would
14   consider it was experience.  While at NIOSH,
15   I took on the role as the liaison to the
16   mining industry to organize labor into
17   government agencies involved in mine safety
18   and health, and I met fairly frequently with
19   some of the geologists, leading
20   mineralogists, related to the topic.
21       Q.    Sure.  And we'll get into some
22   more of those details.
23           But I think maybe you used the
24   term there you were a liaison, you were
25   coordinating communication between these

Page 20

1    various groups, and that's how you picked
2    some of this up, right?
3        A.    Between NIOSH -- that was one
4    of the ways.  And then of course after I left
5    NIOSH, I continued to have interest in the
6    topic.
7        Q.    Sure.
8            Not a gynecologist?
9        A.    No.
10       Q.    Not an oncologist?
11       A.    No.
12       Q.    Not an epidemiologist?
13       A.    No.
14       Q.    And while you worked for a law
15   firm --
16       A.    My training did include
17   epidemiology at the University of Minnesota.
18       Q.    Sure.  At course level?
19       A.    Yes, but my -- yes, but my
20   track was not epidemiology.
21       Q.    You don't hold yourself out as
22   an epidemiologist?
23       A.    No, I don't.
24       Q.    Okay.  And you're not an
25   attorney, right?

Page 21

1        A.    No, I'm not.
2        Q.    You worked at a law firm as a
3    consulting scientist?
4        A.    That's correct.
5        Q.    You were a liaison in that
6    capacity as well, correct?
7        A.    Well, I wasn't a liaison.  I
8    interacted with the attorneys in litigation,
9    more or less, in litigation support.
10       Q.    Now, we're in a fairly small
11   room here today, so bear with me if it takes
12   me a minute to get these documents out to
13   you, but --
14       A.    I could step out if you want me
15   to.
16       Q.    No, no, we'll be fine.
17           Just as a side note, it is
18   fairly small in here, it's fairly cramped.
19   If you get to the point where you need to
20   take a break, just let me know.
21       A.    I will do that.  Thank you.
22           (Glenn Exhibit 1 marked for
23   identification.)
24   QUESTIONS BY MR. BOWDEN:
25       Q.    So I'm going to mark for this

6  (Pages 18 to 21)

Robert Glenn

Page 22

1 deposition -- excuse me, Exhibit 1 to this
2 deposition the notice of deposition.
3          Have you had an opportunity to
4 review that?
5    A.   Yes, I did review that.
6    Q.   Okay.  And did you have an
7 opportunity to review that notice of
8 deposition with your attorneys?
9    A.   Yes, I did review it with
10 counsel.
11         (Glenn Exhibit 2 marked for
12         identification.)
13 QUESTIONS BY MR. BOWDEN:
14   Q.   Now, I'm going to mark as
15 Exhibit Number 2 the response from your
16 attorney to the notice of deposition.
17         Have you read the response?
18   A.   Yes, I have.
19   Q.   Did you have input into its
20 content?
21   A.   We discussed it.
22   Q.   And stop right there and just
23 ask you:  What law firm are you represented
24 by here today?
25   A.   I'm represented by Williams &

Page 23

1 Connolly.
2    Q.   Are they your personal
3 attorneys?
4    A.   They're my personal attorney.
5    Q.   Who's paying for them?
6    A.   Crowell & Moring is paying for
7 them.
8    Q.   Are you being paid for your
9 time today by Crowell & Moring as well?
10   A.   No, I'm not being paid at all
11 for my appearance here.
12   Q.   Transportation costs?
13   A.   Nothing.
14   Q.   Okay.  So I want you to turn to
15 page 4 --
16         MR. DONATH:  Counsel, do you
17     have any other copies of Exhibit 2?
18         MR. BOWDEN:  I thought I handed
19     them out.  If I didn't...
20 QUESTIONS BY MR. BOWDEN:
21   Q.   So page 4.  And, sir, we've got
22 on the screen here, too, if it might be
23 easier to follow along, the document's
24 displayed for you.  Okay.  That's fine.
25   A.   My eyes are not that good.

Page 24

1    Q.   Okay.  So page 4 at the very
2 bottom of the screen, you see a footnote
3 there?  And it says, "Mr. Glenn has never
4 been retained by or on behalf of the other
5 defendants in MDL number 2738."
6          Do you see that?
7    A.   That's what it says.
8    Q.   And let's just be very clear
9 for the jury.  The only client that you
10 worked for through the law firm of Crowell &
11 Moring was Imerys?
12   A.   It was Luzenac America at that
13 time.
14   Q.   Sure.
15         And I think it's important --
16 because we're going to be talking about a
17 couple of different names here.
18         When I say "Imerys" today, I'm
19 talking about the client that exists today,
20 right?  Crowell & Moring still represents
21 them, true?
22   A.   Not to my knowledge.  Crowell &
23 Moring, I don't think, represents Imerys in
24 any way.
25   Q.   Okay.  They don't represent

Page 25

1 them anymore, anyway?
2    A.   Again, I'm not with the firm
3 anymore.  I don't have access to that
4 information.
5    Q.   Okay.
6    A.   It's my understanding that they
7 do not represent Imerys.
8    Q.   Well, let me restate this.
9          While you were employed at
10 Crowell & Moring, Imerys was the client that
11 you were engaged in providing consulting
12 services to, true?
13   A.   Yes.
14   Q.   Okay.  And now for clarity,
15 Imerys is the current iteration of that
16 company, but it's been known by other names,
17 right?
18   A.   Yes.
19         MR. DONATH:  Objection to form.
20         THE WITNESS:  And when working
21     for it, as I mentioned, it was Luzenac
22     America.
23 QUESTIONS BY MR. BOWDEN:
24   Q.   Right.
25         It was Luzenac America, and

7 (Pages 22 to 25)

Robert Glenn

Page 26

1   then it became Rio Tinto?
2        A.    Well, yes, Rio Tinto owned --
3   was --
4             MR. DONATH:  Objection to form.
5             THE WITNESS:  Rio Tinto was a
6   major company over Luzenac America as
7   well.
8   QUESTIONS BY MR. BOWDEN:
9        Q.    Okay.
10       A.    It was one of its mining
11  entities.
12       Q.    And now it's Imerys?
13       A.    Now it's Imerys.
14       Q.    And in that Exhibit Number 2,
15  your CV is attached, right?
16       A.    Yes.  Yes, it is.
17       Q.    Glenn Consulting Group, where
18  is that based out of?
19       A.    It's based out of Seabrook
20  Island, South Carolina.
21       Q.    All right.  And is that -- are
22  you a sole proprietor?
23       A.    I'm a sole proprietor.  I carry
24  my dog to work, but she doesn't do anything
25  useful.

Page 27

1        Q.    And it was formed in 2010,
2   right?
3        A.    Yes.
4        Q.    And that was formed upon you
5   being -- leaving Crowell & Moring, correct?
6        A.    Correct.
7        Q.    And prior to 2010, the 2004 to
8   2010 time period, your sole employer, would
9   that have been Crowell & Moring?
10       A.    Yes, it was.
11       Q.    Okay.  You didn't work for
12  anybody else during that time period?
13       A.    No.
14       Q.    Between 2010 and 2015, where
15  did Glenn consulting derive the majority of
16  its income?
17       A.    Mainly from research in
18  silicosis studies.  There were three major
19  studies I was working on with colleagues from
20  academia.
21       Q.    You were actually an author on
22  one of those studies, weren't you?
23       A.    I was author on -- yes, on one
24  of those studies.  The other two are still in
25  progress.

Page 28

1        Q.    Those on behalf of industrial
2   clients?
3        A.    They were on behalf of
4   industrial clients, yes.
5        Q.    Has Crowell -- or excuse me.
6   Has Glenn Consulting ever represented an
7   individual or provided consulting services to
8   an individual?
9             MR. DAVANT:  Objection to form.
10            THE WITNESS:  In what manner
11       are you speaking?
12  QUESTIONS BY MR. BOWDEN:
13       Q.    Well, the people who have hired
14  you, the entities --
15       A.    Yeah.
16       Q.    -- have they exclusively been
17  corporations?
18       A.    Yes, they have.
19       Q.    Exclusively been corporations
20  in the mining industry?
21       A.    Not necessarily.  No, not --
22  not all of them have been in the mining
23  industry.
24       Q.    Right.
25            Some of them have been in other

Page 29

1   industrial settings, true?
2        A.    Uh-huh.
3        Q.    Companies like DuPont?
4        A.    Yes.  Yes.
5        Q.    How do you advertise your
6   services, or how did you in that 2010 to 2015
7   time period?
8        A.    I haven't advertised my
9   services.  My work has come by knowing people
10  that know of my background and my experience.
11       Q.    Just word of mouth?
12       A.    Yes.  I had a LinkedIn page,
13  but I don't have a website.  I have a domain
14  name, but I never put up a website.
15       Q.    How many -- sorry.
16            Between 2010 and 2015, aside
17  from DuPont, what other companies did you
18  consult with?
19            MR. DAVANT:  Just to caution
20       the witness, if you would have to
21       reveal information that's protected by
22       client confidentiality, you shouldn't
23       do that.
24            THE WITNESS:  Would the company
25       names be that or...

8 (Pages 26 to 29)

Robert Glenn

<table>
<tr><td>

Page 30

1         MR. DAVANT: Yeah, it could be.
2         THE WITNESS: Okay. I have
3    a -- probably in that period have had
4    18 to 20 clients.
5    QUESTIONS BY MR. BOWDEN:
6         Q.    Different clients?
7         A.    On -- yes, probably that many.
8              On the research end, I was -- I
9    did some work for the National Industrial
10   Sand Association, National Stone, Sand and
11   Gravel Association and Vulcan Materials.
12        Q.    What companies did you provide
13   consulting work for that you aren't
14   underneath a confidentiality agreement in
15   terms of the name?
16        A.    That goes back. Pfizer.
17        Q.    And Pfizer is a drug company,
18   right?
19        A.    Yes, a pharmaceutical
20   manufacturer.
21        Q.    They create pharmaceutical
22   products, right?
23        A.    Correct.
24        Q.    Do they own some liability for
25   asbestos manufacturers?

</td><td>

Page 32

1         Q.    Okay. And DuPont, that was
2    also in regards to cancer, correct?
3         A.    It was involved related to a
4    lot of potential disease outcomes, cancer
5    being one.
6         Q.    One of which was cancer?
7         A.    Yes.
8         Q.    All right. And then you said
9    Lafarge?
10        A.    Yes.
11        Q.    Can you describe that company
12   for us?
13        A.    Describe the company?
14        Q.    Yeah.
15              What was the nature of your
16   consulting services?
17        A.    It was litigation related to
18   asbestos.
19        Q.    Okay. What other companies?
20        A.    There was Southern Talc.
21        Q.    I'm assuming the name implies
22   that it was a talc company, correct?
23        A.    Yes.
24        Q.    Was it also in regards to
25   cancer?

</td></tr>
<tr><td>

Page 31

1         A.    Not asbestos that I'm aware of.
2         Q.    Silica?
3         A.    I don't think they're in any
4    litigation related to silica either.
5         Q.    Okay. What was the nature of
6    the consulting work that you did for them,
7    what topics?
8         A.    Talc.
9         Q.    What other manufacturers?
10        A.    Of course, you mentioned
11   DuPont.
12        Q.    And DuPont, that was dealing
13   with a water contamination issue, correct?
14        A.    Yes. Yes. I did work for
15   Lafarge.
16        Q.    Now, I want to pause real quick
17   and go back.
18              Pfizer talc, was that in
19   regards to ovarian cancer as well?
20        A.    No, it was not.
21        MR. HEGARTY: Objection, form.
22   QUESTIONS BY MR. BOWDEN:
23        Q.    Was it involved in cancer
24   research?
25        A.    Yes.

</td><td>

Page 33

1         MR. HEGARTY: Objection, form.
2         MR. DONATH: Form.
3         THE WITNESS: Yes.
4    QUESTIONS BY MR. BOWDEN:
5         Q.    What other companies?
6         A.    You're stretching my memory.
7    Those are the ones that stand out right away,
8    but there are others.
9         Q.    Would it be fair to say that
10   your consulting services between 2010 and
11   2015 were largely dealing with talc and with
12   asbestos matters?
13        MR. DONATH: Objection. Form.
14        THE WITNESS: On that side of
15   consulting, yes. On the research it
16   was silica.
17   QUESTIONS BY MR. BOWDEN:
18        Q.    Sure.
19        A.    And the research studies were
20   quite large studies. They were all near
21   million dollars in cost. Significant
22   studies.
23        Q.    Why do you point out the
24   expense of the...
25        A.    Just to give you an

</td></tr>
</table>

9 (Pages 30 to 33)

Robert Glenn

Page 34

1    appreciation for how much involvement I had
2    in those.  It took quite a bit of my time.
3        Q.    Okay.  So when you say a
4    million dollars, is that a million dollars to
5    you?
6        A.    No, but that -- not quite that,
7    no.
8        Q.    So you're talking about the
9    studies themselves, right?
10       A.    Yes.  Yes.
11       Q.    And the funding that went into
12   those?
13       A.    The investigators, the research
14   cost, the data collection, data analysis, the
15   whole kit and caboodle.
16       Q.    Sure, because research can be
17   expensive, especially the more detailed of
18   analysis that goes into it, right?
19       A.    It can be, yes.
20       Q.    Did you discuss today's
21   deposition with anyone other than your
22   counsel?
23       A.    No.
24       Q.    How much time did you spend
25   preparing for today's deposition?

Page 35

1        A.    Maybe three days.
2        Q.    Were you paid for that time?
3        A.    No.
4        Q.    What materials did you review
5    during those three days?
6        A.    Counsel provided a list of
7    documents, a couple of volumes of documents,
8    that had been -- been in discovery, have been
9    obtained, and I went through many -- most of
10   those, all of those.
11       Q.    Which attorney provided them?
12       A.    Counsel to -- Williams
13   Connolly.
14       Q.    The attorneys hired by
15   Crowell & Moring to represent you?
16       A.    That's correct.
17       Q.    Okay.
18       A.    Mr. Davant.
19       Q.    And in reading those documents,
20   did you ask for any additional documents?
21       A.    No, I did not.
22       Q.    So you only read for
23   preparation -- excuse me -- strike that.
24           In preparing for today's
25   deposition, you reviewed the documents that

Page 36

1    the attorney selected for you?
2        A.    That the attorney provided me,
3    yes.
4        Q.    Are there any documents you
5    didn't see that you wanted to see?
6        A.    No.
7        Q.    Now, you've mentioned NIOSH a
8    few times.
9            Explain to the jury what NIOSH
10   is.
11       A.    NIOSH is the National Institute
12   for Occupational Safety and Health.  It
13   was -- came about in 1970 legislation which
14   formed the Occupational Safety and Health
15   Administration and the National Institute for
16   Occupational Safety and Health.
17           OSHA is in the Department of
18   Labor.  It's an enforcement agency that
19   enforces health and safety regulations in
20   general industry and in industry outside of
21   mining.
22           NIOSH is a research arm.  At
23   the time, it was in the Department of Health
24   and Education and Welfare.  It's now in the
25   Department of Health and Human Services.  And

Page 37

1    they were essentially formed to do research
2    in occupational health and safety and provide
3    recommendations to Department of Labor.
4            There's another organization in
5    the Department of Labor, the Mine Safety and
6    Health Administration, which regulates --
7    regulates the mining industry in safety and
8    health.  It came about in 1977.
9        Q.    One of their overall missions
10   is to look out for workers and protect human
11   health; fair to say?
12       A.    Yes, it's to develop research
13   to protect the health of workers, health and
14   safety of workers.
15       Q.    And you would agree with me
16   that research develops over time, right?
17       A.    Yes, it does.
18       Q.    Science progresses as more and
19   more data is collected, true?
20       A.    Certainly.
21       Q.    Okay.  And at some point you
22   actually rise to the director level in NIOSH?
23       A.    Yes, I was director.
24       Q.    And as director, did you oppose
25   NIOSH's expansion of the definition of

10  (Pages 34 to 37)

Robert Glenn

Page 38

1  asbestos?
2      A.   I didn't -- I never published a
3  policy -- anything opposing the NIOSH policy.
4  I was not in agreement with their definition
5  of asbestos, as well as other scientists in
6  my division, the scientists in academia. We
7  all felt that they had an improper definition
8  of asbestos.
9      Q.   We can agree today that
10 asbestos is a carcinogen, right?
11         MR. DAVANT:  Objection to form.
12         THE WITNESS:  Asbestos in
13     asbestiform minerals is a carcinogen.
14 QUESTIONS BY MR. BOWDEN:
15     Q.   So we can agree that asbestos
16 is a carcinogen?
17     A.   When you say as --
18         MR. DAVANT:  Same objection.
19         THE WITNESS:  When you say
20     asbestos, I like to use a qualifier,
21     and that is, it's asbestiform -- it's
22     from an asbestiform habit.
23 QUESTIONS BY MR. BOWDEN:
24     Q.   Is it fair to say that asbestos
25 fiber is a carcinogen?

Page 39

1         MR. HEGARTY:  Objection to
2     form.
3         THE WITNESS:  Not necessarily
4     fiber.  An asbestiform fiber is a
5     carcinogen.
6  QUESTIONS BY MR. BOWDEN:
7      Q.   Okay.
8      A.   Fiber -- not all fibrous
9  minerals are asbestos, and not all...
10         (Glenn Exhibit 3 marked for
11     identification.)
12 QUESTIONS BY MR. BOWDEN:
13     Q.   I'm going to mark as Exhibit
14 Number 3, it's a web page printout from the
15 CDC.
16         I want you to read along with
17 me where it says "abstract."
18     A.   Let me just look at it and
19 get -- for a second.
20     Q.   Sure.  And I'm going to show
21 you the whole document.
22     A.   Okay.
23     Q.   Go ahead and read it, if you'd
24 like.
25     A.   Okay.  I've -- all right.  It's

Page 40

1  good.
2      Q.   It says, "The testimony
3  restated the definition currently in place at
4  NIOSH for asbestos.  Concern had arisen
5  following the issuance of an internal
6  memorandum by Mr. Robert Glenn, who was the
7  director of the division of respiratory
8  disease studies at NIOSH.  This memorandum
9  did not change the position of NIOSH
10 concerning the definition of asbestos as it
11 concerns regulatory purposes."
12         Do you see where it says that?
13     A.   Yes.  Yes.
14     Q.   And so you were actually
15 criticized for your internal memorandum
16 opposing the definition of asbestos, correct?
17         MR. DONATH:  Objection to form.
18         MR. HEGARTY:  Objection.
19         THE WITNESS:  You're correct,
20     that was an internal memorandum.  It
21     was NIOSH that released it under the
22     Freedom of Information Act.
23 QUESTIONS BY MR. BOWDEN:
24     Q.   Right.  It was internal, wasn't
25 meant for the public eyes.

Page 41

1      A.   It didn't have to be released
2  under the Freedom of Information Act.
3      Q.   Okay.
4      A.   This was predecisional to the
5  standard.
6      Q.   Does that disturb you, that it
7  became public knowledge?
8          MR. DONATH:  Objection to form.
9          THE WITNESS:  Yes.  I was
10     trying to keep it internal.
11         If you read the memo, it goes
12     to the point that my communication
13     was --
14 QUESTIONS BY MR. BOWDEN:
15     Q.   Sir, my question was simply --
16     A.   I'm sorry, you said you
17 wouldn't interrupt me.
18         MR. DONATH:  Let him get his
19     whole answer out.
20 QUESTIONS BY MR. BOWDEN:
21     Q.   I want you to answer the
22 question that I asked.
23     A.   I am.  I am.
24     Q.   I'm going to move to strike it.
25     A.   All right.

11 (Pages 38 to 41)

Robert Glenn

Page 42

1   My memo is to Dr. Lemon, who
2 was director of DSDTT.  He was aware of my
3 concerns about the definition, and I was
4 recommending to him that we have a
5 scientific -- convene scientific --
6 scientific meeting of NIOSH scientists to
7 discuss this issue and go forward.
8   Q.   And, Corey, will you show --
9 this was fiscal year 1986, right?
10   A.   That's correct.
11   Q.   Okay.  And after that, you left
12 NIOSH and you went to work for something
13 called the National Industrial Sand
14 Association?
15   A.   That's right.
16   Q.   And that's an industry front
17 group, right?
18   MR. DONATH:  Objection to form.
19   MR. HEGARTY:  Objection to
20 form.
21   THE WITNESS:  It's not a front
22 group.  It's a trade association
23 that --
24 QUESTIONS BY MR. BOWDEN:
25   Q.   Okay.

Page 43

1   A.   -- represents companies that
2 mine and process industrial sand.
3   Q.   I see.
4   So it's -- it's an industry
5 group, a trade organization?
6   A.   It's a trade organization.
7   Q.   That represents the interests
8 of silica sand manufacturers?
9   A.   Yes, it does.
10   Q.   Gravel manufacturers?
11   A.   No, not gravel.
12   Q.   Okay.  You're dealing with
13 silicates, though, in that, true?
14   A.   We're dealing with crystalline
15 silica in a near pure form.
16   Q.   And you were vice president
17 there, and then you became the CEO from '92
18 to 2004, right?
19   A.   That's correct.
20   Q.   And the number one advocacy
21 points for NISA, do you know what it is?
22   A.   The number one?
23   Q.   Advocacy point, yes, sir.
24   A.   Yeah, it's -- it's protecting
25 workers' health in the industrial sand

Page 44

1 industry through development of a model,
2 silicosis prevention program that was
3 essentially lifted and put into the current
4 OSHA standard for silica.
5   (Glenn Exhibit 4 marked for
6 identification.)
7 QUESTIONS BY MR. BOWDEN:
8   Q.   I'll mark as Exhibit Number 4
9 the National Industrial Sand Association web
10 page.
11   Have you visited it recently?
12   A.   No, I have not.
13   Q.   I'm going to turn to page 2 of
14 3.
15   A.   Okay.
16   MR. DONATH:  Objection.
17 Counsel, the document you've handed
18 out as Exhibit 4 is dated 2018.
19   Is that the correct date that
20 you meant for this printout?
21 QUESTIONS BY MR. BOWDEN:
22   Q.   Are you on page 2, sir?
23   A.   Yeah.
24   Q.   Okay.  I want you to look down
25 where it says "the .1-milligram-per-meter-

Page 45

1 cubed PEL is protective."
2   Do you see that?
3   MR. DONATH:  Objection.  Beyond
4 the scope.
5   THE WITNESS:  Yes, I do see
6 that.
7 QUESTIONS BY MR. BOWDEN:
8   Q.   And it has always been this
9 organization's purpose to oppose regulations
10 which would make it more restrictive in terms
11 of silica dust, correct?
12   MR. DONATH:  Objection.  Beyond
13 the scope.
14   THE WITNESS:  No.  No it was
15 not.
16 QUESTIONS BY MR. BOWDEN:
17   Q.   Okay.  And --
18   A.   This -- I mentioned the funding
19 of research --
20   Q.   Sir, there's no question
21 pending right now.
22   MR. DAVANT:  You keep
23 interrupting the witness.
24   MR. BOWDEN:  No, I don't.  I'm
25 asking an examination.  If you want to

12 (Pages 42 to 45)

Robert Glenn

Page 46

1    have questions for him on follow-up,
2    I'll give you the opportunity.
3        THE WITNESS:  I want to tell
4    you about --
5        MR. BOWDEN:  No, sir, you're
6    not.  You're going to answer --
7        THE WITNESS:  All right.  This
8    organization funded --
9        MR. BOWDEN:  There's no
10   question pending.
11       THE WITNESS:  -- a major
12   research study that cost over $750,000
13   to look at the relationship between
14   crystalline silica exposure and lung
15   cancer and other disease end points as
16   well.
17       I was the one that wanted to --
18   I was the one that wanted to sponsor
19   that study.  I have my bias.  I
20   thought it would be a negative study.
21       Everyone has bias.  When you do
22   a study, you put aside that bias.
23       As it turned out, that study
24   conducted by Drs. Corb and McDonald --
25   Allison McDonald, Dr. Hans Weil, Janet

Page 47

1    Hughes and Roy Rando came out to be a
2    positive study.  It showed the
3    relationship between crystalline
4    silica and lung cancer, so it
5    supported OSHA's reduction of the
6    standard.
7        Furthermore, we just completed
8    another study and submitted two
9    papers, and this is on silica and
10   silicosis, radiographic silicosis.
11   Those studies as well I thought would
12   be negative; they were positive.  And
13   they then, too, add support to OSHA's
14   reduction in the crystalline silica
15   PEL.
16       So I'm a public health
17   professional, and that's my job, to
18   protect workers.  And that's what I
19   was doing, and that's what this
20   organization was doing.
21   QUESTIONS BY MR. BOWDEN:
22       Q.    So if you look underneath where
23   it -- we got it pulled up here on the screen
24   for you.
25       "We support reasonable

Page 48

1    regulations that recognize silicosis is
2    preventable through a series of simple and
3    effective occupational health measures;
4    however, we oppose the lowering of the PEL
5    because it has been proven protective."
6        MR. DONATH:  Objection.  Beyond
7    the scope.
8        THE WITNESS:  For silicosis,
9    that was the understanding.  That's
10   what NISA put forward at that time.  I
11   was no longer with NISA, but I agree
12   with that.
13       You didn't call attention to
14   page 1 --
15   QUESTIONS BY MR. BOWDEN:
16       Q.    Sir, I'm --
17       A.    -- where there's a paragraph on
18   silicosis --
19       Q.    I'm sorry, sir, there is no
20   question pending.
21       A.    -- and how to prevent
22   silicosis.
23       Q.    This is not an opportunity for
24   you to just go on a soapbox.  You have an
25   opportunity when your counsel asks you

Page 49

1    questions to answer their questions.
2        MR. DONATH:  Objection.  Move
3    to strike the comment by --
4        THE WITNESS:  You're not my
5    counsel.
6        MR. DONATH:  And frankly,
7    Counsel, you can't predict the future,
8    and you don't know where the witness
9    is going with his answer.  So if he
10   keeps talking, I would assume that's
11   part of his answer as well.
12       THE WITNESS:  And I plan to put
13   my --
14       MR. BOWDEN:  You need to limit
15   your objections to form.
16       THE WITNESS:  I plan to answer
17   with my context.
18   QUESTIONS BY MR. BOWDEN:
19       Q.    From this trade organization,
20   you moved on to the industrial mining
21   association of North America, right?
22       A.    No, we formed the industrial
23   mining association North America in 2002, and
24   NISA was a part of that organization.
25       Q.    Right.

13  (Pages 46 to 49)

Robert Glenn

Page 50

1    And you credit yourself on your
2  LinkedIn page with being one of the founders,
3  or the founder, of that organization, right?
4    A.   No. I've said, "along with
5  industry leaders, I was a founder of this
6  organization."
7    Q.   So let me make sure I
8  understand then.
9    It was Bob Glenn, you
10  individually, along with industry leaders.
11  Would that be the industry itself?
12    A.   That would be the industry
13  leaders of the mineral commodities that this
14  organization formed to represent.
15    Q.   I see.
16    (Glenn Exhibit 5 marked for
17    identification.)
18  QUESTIONS BY MR. BOWDEN:
19    Q.   I'm going to mark as Exhibit
20  Number 5 the IMA web page listing their
21  purpose and description.
22    MR. BOWDEN:  Corey, if you'll
23    bring up the whole body there.  Yes,
24    sir.
25  QUESTIONS BY MR. BOWDEN:

Page 51

1    Q.   Can you read long with me at
2  the top here?  "The Industrial Minerals
3  Association - North America is a trade
4  organization created to advance the interests
5  of North American companies that mine or
6  process minerals used throughout the
7  manufacturing and agricultural industries."
8    Have I read that correctly?
9    A.   Yes.
10    MR. DONATH: Objection. Same
11    objection.  Beyond the scope.  It's a
12    2018 document.
13  QUESTIONS BY MR. BOWDEN:
14    Q.   Was that the same purpose that
15  it had when you formed it in 2002?
16    A.   It may have been, yes.  You
17  know, I didn't prepare this or the website,
18  but that might have been in a document
19  somewhere.
20    Q.   Do you disagree with that
21  mission statement, sir?
22    A.   No, we weren't advancing
23  interests in mineral companies.
24    Q.   Examples of minerals
25  represented by the IMA-North America include

Page 52

1  ball clay, bentonite, borates, calcium
2  carbonate, feldspar, industrial sand --
3    That would include silica sand,
4  right?
5    A.   Yes.
6    Q.   -- mica, soda ash, talc --
7    A.   Yes.
8    Q.   -- and wollastonite, right?
9    A.   Yes.
10    Q.   In talc, you actually have
11  several members that -- of the IMA-North
12  America when you were there that were talc
13  producers, right, miners?
14    A.   Yes, I'm not sure -- they may
15  have added companies and probably have added
16  talc companies since I left in 2004.
17    Q.   Right.  And I'm going to ask
18  you some questions about that.
19    A.   Okay.  Good.
20    Q.   When you formed this
21  organization in 2002, was Imerys a cofounder?
22    A.   I don't -- I think they were.
23  I'm not sure.  I would have to see documents
24  related to that.
25    Q.   Were other talc manufacturers

Page 53

1  cofounders as well?
2    A.   Well, I'm not sure --
3    MR. DONATH:  Objection to form.
4    THE WITNESS:  I'm not sure
5    Imerys was, but I would have to, you
6    know, see something.
7    I do remember IMI Fabi and
8    RT Vanderbilt were members.
9  QUESTIONS BY MR. BOWDEN:
10    Q.   Okay.  Did they help provide --
11    A.   It may have been more.
12    Q.   Sorry, I didn't mean to
13  interrupt you.
14    A.   That's all right.
15    Talc manufacturers provided the
16  funding to get this organization off the
17  ground.
18    MR. DONATH:  Objection to form.
19    THE WITNESS:  They were one
20    that -- actually, NISA --
21    MR. HEGARTY:  Objection to
22    form.
23    THE WITNESS:  -- was a big
24    underwriter of this whole adventure,
25    or venture, for the first few years,

14 (Pages 50 to 53)

Robert Glenn

Page 54

1    and NISA was paying the lion's share
2    of the expenses for the IMA-NA.
3    QUESTIONS BY MR. BOWDEN:
4        Q.    Did NISA have talc
5    manufacturers as members?
6        A.    No.
7        Q.    Interesting.
8            So NISA was a big proponent of
9    this, to bring talc manufacturers into the
10   trade organization?
11           MR. DONATH:  Objection.  Form.
12           THE WITNESS:  Some of the --
13       some of the NISA companies were
14       horizontally integrated into other
15       minerals, so that was their interest
16       in getting a group together.
17           This organization was modeled
18       after the Industrial Minerals
19       Association - Europe.
20   QUESTIONS BY MR. BOWDEN:
21       Q.    Right.
22       A.    And so we kind of took their --
23   their game plan and introduced it here in the
24   United States and North America since we have
25   Canadian members.

Page 55

1        Q.    And I'm sorry, you trailed off
2    a little bit there.  And Canadian members?
3    Was that what you said?
4        A.    Yes, we have Canadian members.
5        Q.    Okay.
6        A.    Or had Canadian.  And they
7    still have Canadian members.  It's probably
8    added some.  It's grown since I left there,
9    of course.
10       Q.    Sure.
11           And it grew while you were
12   there as well, right?
13       A.    Well, we -- actually, from the
14   time we formed, I don't know if we added any
15   members in the two years that I was still
16   with the organization.
17       Q.    Okay.  So let me ask you:
18   IMA-Europe, did you have involvement with
19   IMA-Europe before 2002?
20       A.    Before 2002, I may have.
21       Q.    In what capacity?
22       A.    I believe I attended one of
23   their meetings to discuss the silicosis
24   prevention program, the model program, that
25   we had put together for their industry and

Page 56

1    especially for their EUROSIL industry.
2        Q.    So now you were the president
3    of NISA at the time, right?
4        A.    That's correct.
5        Q.    And you said that it was NISA
6    who provided the funding to get IMA-North
7    America off the ground --
8        A.    The bulk --
9        Q.    The lion's share, I think is
10   what you said.
11       A.    The bulk, yeah, that's correct.
12       Q.    Let me restate that.
13           When you were president of
14   NISA, you had a meeting with IMA-Europe,
15   true?
16       A.    Uh-huh, yes.
17       Q.    When you were president of
18   NISA, was it your decision and direction that
19   funds be used to help get IMA-North America
20   off the ground?
21           MR. DONATH:  Objection to form.
22           THE WITNESS:  No, the board,
23       the NISA board, made that decision.
24   QUESTIONS BY MR. BOWDEN:
25       Q.    Was it your recommendation?

Page 57

1        A.    No, it was not.
2            Well, yes, in a way it was my
3    recommendation, but they had the final
4    decision, of course.
5        Q.    Sure.
6        A.    It was their funds.
7        Q.    And at that time, NISA did not
8    represent the interests of talc
9    manufacturers, true?
10       A.    They did not.  I might --
11       Q.    But the formation of IMA-North
12   America from day one, as it was founded,
13   would have multiple talc manufacturers
14   involved?
15       A.    I'm not sure how many.  There
16   were some, yes.
17       Q.    More than one, right?
18       A.    Yes.
19       Q.    Okay.
20           MR. BOWDEN:  Corey, can we go
21       back to that page?
22           Pull up the second paragraph.
23       You can make that bigger.
24           I can read it the way it is.
25       Just go back to the full.

15  (Pages 54 to 57)

Robert Glenn

Page 58

1    QUESTIONS BY MR. BOWDEN:
2        Q.    "The IMA-North America is open
3    to membership of industrial mineral producers
4    and companies that provide equipment and
5    services to the industry."
6            Do you see where that's
7    written, sir?
8        A.    Yes.
9            MR. DONATH:  Objection.  Form.
10        Excuse me, withdrawn.
11    QUESTIONS BY MR. BOWDEN:
12        Q.    "IMA-North America operates
13    through a board of directors augmented by
14    standing committees and task force."
15            Do you see that there?
16        A.    Yes.
17        Q.    "Through its committee
18    structure, IMA addresses such issues as
19    safety and health, government affairs, the
20    environment, industry operations, engineering
21    and technology, research and transportation."
22            MR. DONATH:  Objection.  Beyond
23        the scope.
24    QUESTIONS BY MR. BOWDEN:
25        Q.    Correct.

Page 59

1        A.    And I would note that the
2    issues of safety and health are number one in
3    that list.
4        Q.    Did I read it correctly?
5        A.    Yes.
6        Q.    And in there is research,
7    right?
8        A.    Yes.
9        Q.    And IMA-North America actually
10    sponsors research on behalf of its members,
11    true?
12        A.    I'm not -- IMA did not -- well,
13    they sponsor some research on technology for
14    the industry.  I'm not sure they sponsored
15    any safety and health research at the time I
16    was there.  I don't think IMA-NA did.
17        Q.    Okay.  As a general point,
18    though, the IMA-North America does found
19    research?
20        A.    Yes.
21            MR. DONATH:  Objection.  Form.
22            (Glenn Exhibit 6 marked for
23        identification.)
24            MR. BOWDEN:  Corey, can you
25        pull up producer members for me,

Page 60

1    please?
2    QUESTIONS BY MR. BOWDEN:
3        Q.    I'm going to mark as Exhibit
4    Number 6 another web page from the IMA
5    website called Producer Members.
6        A.    Yes.
7        Q.    And I apologize, the font's
8    kind of small to read.  We're trying to make
9    it larger.
10            Now, I want to turn to page 2,
11    the top of page 2.
12        A.    Yes.
13            MR. DONATH:  Counsel, do you
14        have another copy of your Exhibit 6?
15            MR. BOWDEN:  Yes, sir, I've got
16        an extra copy.
17            MR. DONATH:  Thank you.
18    QUESTIONS BY MR. BOWDEN:
19        Q.    Do you see Imerys is listed at
20    the top there, right?
21            MR. DONATH:  Objection.  Beyond
22        the scope.  It's another 2018
23        document.
24            THE WITNESS:  Yes.
25

Page 61

1    QUESTIONS BY MR. BOWDEN:
2        Q.    And while you were at IMA-North
3    America, Imerys was a member, true?
4            MR. DONATH:  Objection.  Form.
5            THE WITNESS:  I'm not sure.  I
6        know we -- we paid a visit to calcium
7        carbonate company in Georgia, and I
8        don't know whether at that time it was
9        a separate company and Imerys acquired
10        it later.  I'm just vague on that.
11        But in the period when we were trying
12        to build membership, we did visit a
13        corporation, a calcium carbonate
14        corporation, to try to and get them to
15        join.
16    QUESTIONS BY MR. BOWDEN:
17        Q.    What about Luzenac when you
18    were there?
19            MR. DONATH:  Objection.  Form.
20            THE WITNESS:  I'm not sure when
21        the Luzenac came, but they may have
22        been an initial member.  But it's
23        stated, this is a 2018 document.
24    QUESTIONS BY MR. BOWDEN:
25        Q.    Right, I'm not saying that this

16  (Pages 58 to 61)

Robert Glenn

Page 62

1   says the day that they joined.
2          I'm asking you as the president
3   and founder of this whether you recall them
4   being members at the time you were there.
5          A.    I did not recall them.  Let me
6   take a look, and I might can tell you.
7          Q.    I'll represent to you that it
8   doesn't have on here their join date.
9          A.    Okay.  Right.  Okay.
10         Q.    And I wasn't able to find that
11  information, but I'm interested in knowing as
12  you, Bob Glenn, the person who founded this
13  and was the president and CEO of IMA-North
14  America, whether in that capacity you had
15  dealings with Imerys or Luzenac while you
16  were the president and CEO of IMA-North
17  America.
18         MR. DONATH:  Objection, form.
19         THE WITNESS:  I may have.
20  Again, this was some years ago.  Yeah,
21  I remember IMI Fabi and Specialty
22  Minerals.
23         I don't know when exactly
24  Luzenac became a member -- or Imerys
25  became a member of the talc section.

Page 63

1          I'm now looking at the talc
2   section, and Specialty Minerals was a
3   original member, Vanderbilt, IMI Fabi,
4   which I mentioned before.  I just -- I
5   can't really recall about Imerys.
6   QUESTIONS BY MR. BOWDEN:
7          Q.    Okay.  Fair enough.  We're
8   going to put that one aside.
9          A.    But Mr. Ellis, the current
10  president, could probably find that out from
11  his files.
12         Q.    Right.  He's the current
13  president of NISA and IMA, true?
14         A.    Yes.
15         (Glenn Exhibit 7 marked for
16  identification.)
17  QUESTIONS BY MR. BOWDEN:
18         Q.    Okay.  I'm going to hand you
19  what I'm marking as Exhibit Number 7.  This
20  is also going to be a web page from IMA-North
21  America entitled "Associate Members."
22         A.    Yes.
23         Q.    All right.  So now, associate
24  members -- the producer members, those are
25  people that actually are producing minerals,

Page 64

1   right?
2          A.    Yeah.
3          Q.    They're the mining company?
4          A.    The mining process minerals,
5   correct.
6          Q.    Okay.  And associate members
7   are people who are also members of the
8   organization, right?
9          A.    They are vendors and service
10  companies, consultants and such, that belong
11  to the association.  I don't believe
12  associate members have a right to vote.
13         Q.    Okay.  But they have a right to
14  participate in meetings?
15         A.    Yes.
16         Q.    They have a right to
17  participate in presentations?
18         A.    Yes.
19         Q.    They have a right to
20  participate when there are meetings between
21  different trade organizations involving
22  IMA-North America, true?
23         A.    I don't know if -- well, they
24  can sit in on some meetings, yes.
25  Essentially if they wanted to sit in the

Page 65

1   industrial sand section or the talc section,
2   they certainly can sit in on those meetings.
3          Q.    Well, we're going to explore
4   some of that later on in your deposition.
5          A.    All right.  Okay.
6          MR. BOWDEN:  So Mr. Smith, if
7   you'll go down about halfway down the
8   page, you'll see Crowell & Moring,
9   LLP.
10         Will you please pull that out,
11  highlight the whole thing for us?
12  QUESTIONS BY MR. BOWDEN:
13         Q.    You see as an associate member,
14  Crowell & Moring, LLP, is listed, right?
15         A.    Yes.
16         Q.    And that's a law firm?
17         A.    Yes, that's the firm I worked
18  for.
19         MR. DONATH:  Note --
20  QUESTIONS BY MR. BOWDEN:
21         Q.    That's a defense law firm,
22  right?
23         MR. DONATH:  Note the same
24  objection.  Beyond the scope.  It's a
25  2018 document.

17 (Pages 62 to 65)

Robert Glenn

Page 66

1    MR. DAVANT:  Object to form.
2    THE WITNESS:  Well, they're
3    principally a defense.  They certainly
4    do pro bono work for individuals.
5    QUESTIONS BY MR. BOWDEN:
6    Q.    Okay.
7    A.    Plaintiffs.
8    Q.    That's the firm that you ended
9    up working for after you left IMA-North
10   America?
11   A.    I just mentioned that, yes.
12   Q.    Okay.  And then underneath
13   there it Glenn Consulting Group, two more
14   spaces down, right?
15   MR. DONATH:  Same objection.
16   THE WITNESS:  Yes, that's
17   correct.
18   QUESTIONS BY MR. BOWDEN:
19   Q.    And of course, you wouldn't
20   have joined until Glenn Consulting existed in
21   2010, correct?
22   A.    That's right.  That was a
23   business decision on my part.  I was getting
24   a three-quarter million dollars to do a
25   research study, and I thought the $2500

Page 67

1    membership fee would be in my interest.
2    Q.    Sure.
3    Crowell & Moring, LLP, do you
4    recall when they first joined?
5    A.    No.
6    There's a mining group -- a
7    small group in Crowell & Moring that does
8    mining work, represents mining companies,
9    coal mining and other companies, and they
10   joined.  I believe one of the counsel in that
11   litigation group was responsible for that.
12   Q.    Okay.  When you were the
13   president in 2002 through 2004, was Crowell &
14   Moring a memory -- or excuse me.  Strike
15   that.  I misspoke.
16   When you were the president of
17   IMA-North America between 2002 and 2004, was
18   Crowell & Moring a member, based on your
19   recollection?
20   A.    I don't -- I don't recall if
21   they were or not.  This -- the associate
22   member group was a kind of afterthought, if
23   you will.  They were people we wanted to
24   join, but we didn't go out and try and
25   recruit them as the we way did the producer

Page 68

1    members.  So it usually came by the word of
2    mouth.
3    And I knew attorneys in
4    Crowell & Moring while I was at IMA-NA, and
5    they may have been one of the founding
6    members, I'm not sure, founding associate
7    members.
8    Q.    Which attorneys did you know at
9    Crowell & Moring?
10   A.    That were responsible for
11   working in this area, principally Edward
12   Green, Ed Green.
13   Q.    What about Ridgway Hall?
14   A.    I don't think -- he never
15   participated in any of the IMA-NA activities.
16   Q.    Okay.
17   A.    He was more of an environmental
18   lawyer.
19   Q.    How did you meet Mr. Green?
20   A.    I had been working in mining
21   for a long time, and I met him at MSHA
22   meetings.
23   Q.    At what?
24   A.    Mine Safety and Health
25   Administration meetings.

Page 69

1    Q.    When is the earliest --
2    A.    Yeah, sorry.
3    Q.    When was the earliest date that
4    you recall having a meetings with any lawyer
5    from Crowell & Moring?
6    A.    I probably -- well, I met
7    Mr. Green when I was in NIOSH.  He was
8    general counsel at that time to the America
9    Mining Congress.  And in my role as liaison
10   to industry, labor and government agencies, I
11   would meet with those groups, and I knew Ed
12   from that period.
13   Q.    Did they represent Luzenac at
14   the time?
15   A.    The American Mining Congress?
16   Q.    No, no, what you just talked
17   about when you were at NIOSH.
18   You were the director head,
19   right?
20   A.    Oh, yes.  Yes.
21   Q.    Crowell & Moring, you were
22   speaking to some attorneys through your
23   position at NIOSH, right?
24   A.    Right.
25   Q.    As a liaison?

18 (Pages 66 to 69)

Robert Glenn

Page 70

1    A.    Yeah.
2    Q.    At that time when you're
3    speaking to Crowell & Moring attorneys, whose
4    interests did they represent?  Was it
5    Luzenac?
6    A.    No.
7    Q.    It wasn't --
8    A.    Ed Green -- Ed Green was
9    principally in coal mining -- worked in coal
10   mining and represented coal companies.  And
11   again, going back -- this is going back to
12   the -- to the 1980s.
13   Q.    Go ahead, sir.
14   A.    The American Mining Congress
15   was one of the -- well, one of the largest,
16   along with the national -- or the coal --
17   coal mining had another association.  Those
18   two finally merged after Mr. Green left the
19   firm.
20   Q.    Okay.
21   A.    Left the association and went
22   to Crowell & Moring.
23   Q.    Did you have interaction with
24   Crowell & Moring when you were the -- one of
25   the officers of NISA?

Page 71

1    A.    Yes.
2    Q.    Okay.  And did they represent
3    the interests of some of the members in the
4    NISA trade organization?
5    A.    I don't -- well, when you say
6    "interests," it's broad.  They represented
7    NISA.
8    Q.    Oh, they represented NISA?
9    A.    Crowell & Moring did.
10   Q.    I see.
11         So when you were there at NISA,
12   did you hire them?
13   A.    I hired them for one matter,
14   yes.
15   Q.    What matter was that?
16   A.    That matter had to do with the
17   litigation, silicosis litigation, in which
18   the NISA was involved.
19   Q.    Okay.  Did you have any
20   discussion with Crowell & Moring about talc
21   while you were at NISA?
22   A.    No.
23   Q.    That discussion didn't come up
24   until you were at IMA-North America, right?
25   A.    Well, when you say --

Page 72

1         MR. DAVANT:  Object to form.
2         THE WITNESS:  -- discussion, I
3    mean, they -- Crowell & Moring, with
4    Ed Green, would attend the meetings.
5    He was aware we had talc companies,
6    yes, as members.
7    QUESTIONS BY MR. BOWDEN:
8    Q.    When was the first time that
9    Crowell & Moring spoke to you about coming to
10   work for them?
11   A.    In 1988.
12   Q.    Did they want you to come
13   in-house as a consulting scientist then?
14   A.    They wanted me to come in-house
15   as vice president of industrial hygiene.
16   Q.    Okay.  So did you maintain --
17   from 1988 until 2004 when you ultimately went
18   and joined their firm, did you maintain ties
19   with them?
20   A.    We did for -- we had close ties
21   for several years, and then it was just
22   through running into maybe an attorney from
23   Crowell & Moring I knew at a meeting.
24   Q.    Okay.  When was the first time
25   you met Ridgway Hall?

Page 73

1    A.    When I -- 2000 -- 2000 and --
2    probably 2004, no doubt, when I went over to
3    Crowell & Moring.
4    Q.    Who extended to you the offer
5    in 1988 to come and work for Crowell &
6    Moring, the defense law firm?
7         MR. DAVANT:  Object to form.
8         THE WITNESS:  David Siegel.
9    QUESTIONS BY MR. BOWDEN:
10   Q.    Okay.  Who contacted you about
11   coming to work for them again in 2004?  Was
12   that Mr. Hall?
13   A.    No, that was David Siegel.
14   Q.    Again?
15   A.    I worked in the litigation
16   group, and David was there.  The mining group
17   was separate.
18   Q.    I see.
19         So when you left, went to
20   NIOSH, the National -- NISA, you went to
21   IMA-North America, and then when you went
22   in-house with Crowell & Moring --
23   A.    Right.
24   Q.    -- the defense attorneys --
25   A.    Yeah.

19 (Pages 70 to 73)

Robert Glenn

Page 74

```
 1        Q.    -- you went into the litigation
 2   department?
 3             MR. DAVANT: Object to form.
 4             THE WITNESS: Yes.
 5   QUESTIONS BY MR. BOWDEN:
 6        Q.    You okay to keep going?
 7        A.    Sure.
 8        Q.    Okay. Great.
 9        A.    Sorry for getting -- losing my
10   voice.
11        Q.    That's okay.
12        A.    I'm on a medication, diuretic,
13   so I have to drink a lot of water.
14        Q.    Now, I want to talk about
15   the -- after you left IMA-North America, did
16   you continue to interact with them, "them"
17   being IMA?
18        A.    Yes.
19        Q.    Okay. You never broke that
20   tie. You left from being president of
21   IMA-North America, you went into Crowell &
22   Moring as a litigation department, and you
23   maintain that contact with IMA-North America,
24   right?
25        A.    Yes.
```

Page 75

```
 1             MR. DONATH: Objection to form.
 2   QUESTIONS BY MR. BOWDEN:
 3        Q.    And when you went to work for
 4   Crowell & Moring law firm, was Luzenac
 5   already a client?
 6        A.    No. Not to my knowledge, they
 7   were not.
 8        Q.    Okay. What was the first
 9   project you worked on when you went to
10   Crowell & Moring?
11        A.    It was --
12             MR. DAVANT: Yeah, just caution
13   not to --
14             THE WITNESS: Yeah.
15             MR. DAVANT: -- reveal any
16   client confidences.
17             THE WITNESS: Thank you.
18             It was asbestos litigation.
19   QUESTIONS BY MR. BOWDEN:
20        Q.    Okay. Was that your sole
21   focus?
22        A.    No.
23        Q.    Was that your primary focus?
24        A.    I'd say primary, yes.
25        Q.    And then shortly after joining
```

Page 76

```
 1   them in the asbestos litigation department,
 2   you then went and started interacting with
 3   Imerys, correct?
 4             MR. DONATH: Objection. Form.
 5             MR. HEGARTY: Objection to
 6   form.
 7             THE WITNESS: Yeah, asbestos
 8   litigation was not a department. It
 9   was broadly litigation, product
10   liability, mass toxic tort.
11             But I worked with other groups
12   and provided them scientific support
13   as well outside of the litigation
14   support.
15             MR. BOWDEN: Okay. We're going
16   to switch gears. Now might be a good
17   time to take a break.
18             THE WITNESS: That's fine.
19   Yeah.
20             VIDEOGRAPHER: Okay. The time
21   is now 9:41. Going off the record.
22             (Off the record at 9:42 a.m.)
23             VIDEOGRAPHER: The time is now
24   9:55. Back on the record.
25
```

Page 77

```
 1   QUESTIONS BY MR. BOWDEN:
 2        Q.    Just one more question on
 3   that -- what we were just discussing.
 4             Your involvement at IMA before
 5   you left and went over to Crowell & Moring,
 6   at the time that you were at IMA-North
 7   America, was anyone there dealing with the
 8   issue of talc and ovarian cancer?
 9             MR. DONATH: Objection to form.
10             THE WITNESS: Not that I
11   recall. The talc section -- I just
12   don't remember. It was just a short
13   two years. But, you know, now, given
14   the time you've mentioned, it's likely
15   they were discussing that during their
16   meetings.
17   QUESTIONS BY MR. BOWDEN:
18        Q.    Is it fair to say that your
19   awareness or at least involvement with talc
20   and ovarian cancer did not start until you
21   went in-house at Crowell & Moring?
22        A.    That's when it --
23             MR. HEGARTY: Objection. Form.
24             THE WITNESS: Yeah, when Imerys
25   came to us through Ridgway Hall,
```

20 (Pages 74 to 77)

Robert Glenn

Page 78

1    that's when I really started reading
2    more about the ovarian cancer issue,
3    as I recall.
4    QUESTIONS BY MR. BOWDEN:
5        Q.    Okay.  What month in 2004 did
6    you start at Crowell & Moring?
7        A.    It would have probably been
8    June, possibly May, of 2004.
9        Q.    Okay.
10       A.    Around that time frame.
11       Q.    So -- all right.  Now, I want
12   to ask you:  Prior to joining Crowell &
13   Moring in May of -- or excuse me, June
14   of 2004 -- let me strike that.
15            May, June 2004 --
16       A.    Yeah.
17       Q.    -- prior to joining Crowell &
18   Moring then, were you aware of Drs. Huncharek
19   and Muscat?
20       A.    No, I didn't -- I wasn't aware
21   of them until I got to Crowell & Moring.
22       Q.    Prior to getting to Crowell &
23   Moring -- it's a poorly worded question.  Let
24   me strike it.
25            Prior to joining Crowell &

Page 79

1    Moring, had you ever contacted the
2    Meta-Analysis Research Group?
3        A.    No.
4        Q.    Did you even know what the
5    Meta-Analysis Research Group was prior to
6    joining Crowell & Moring?
7        A.    No.
8        Q.    Now, I want to take you just a
9    step back and just talk generally about the
10   NTP report on carcinogens process.
11            Are you familiar with that
12   process?
13       A.    I'm -- yes, I'm familiar with
14   it.
15       Q.    Okay.  Was that something that
16   you closely followed while you were at
17   IMA-North America?
18            MR. DONATH:  Objection.  Form.
19            THE WITNESS:  I think at that
20       time they were -- they did have a
21       silica -- possibly were looking at
22       silica through -- to put it through
23       the NTP review process, so I may
24       have -- I may have been.
25

Page 80

1    QUESTIONS BY MR. BOWDEN:
2        Q.    Sure.
3             And they review a number of
4    different things that they suspect might be
5    carcinogens, right?
6             MR. HEGARTY:  Objection.  Form.
7             THE WITNESS:  Yeah, they come
8        under -- their role comes under an act
9        that was passed by Congress to put out
10       what used to be called an annual
11       report on carcinogens.
12   QUESTIONS BY MR. BOWDEN:
13       Q.    Right.
14       A.    They weren't meeting the
15   annual, but they still are doing that --
16       Q.    Well, and you --
17       A.    -- to my knowledge.
18       Q.    I'm sorry.
19       A.    Yeah.
20       Q.    And you know that in 2000, talc
21   was nominated for review, right?
22       A.    I -- I know -- yes, now.
23             When I was reviewing some of
24   these documents, I did not recall that they
25   had had an original review of talc.

Page 81

1        Q.    And I think that's fair.  And I
2    want to make very clear for the record and
3    whoever else might be watching this, you
4    didn't have a recollection prior to reading
5    the documents in preparation for this
6    deposition as to that first NTP process,
7    correct?
8        A.    Yeah, I wasn't really involved
9    in -- or to my recall, I don't remember being
10   tuned in to that first review.
11       Q.    Right.
12             And the NTP process that I'm
13   speaking of is specifically dealing with the
14   nomination of talc.
15       A.    That's correct, yeah.
16       Q.    That didn't -- wasn't something
17   you were focused on, wasn't something that
18   you were devoting your time or services to
19   prior to joining Crowell & Moring in May,
20   June 2004, right?
21       A.    Yeah, that's right.  And it
22   wasn't immediately May, June, when I got
23   focused on it at Crowell & Moring.  It was
24   sometime later --
25       Q.    Okay.

21 (Pages 78 to 81)

Robert Glenn

Page 82

```
1        A.    -- that Imerys came to our
2    firm.
3        Q.    And we're going to explore that
4    in a minute, but I'm just trying to flesh out
5    your knowledge and understanding of the NTP
6    process.
7        A.    Yeah.
8        Q.    And we're going to build from
9    there, all right?
10       A.    Yeah.
11       Q.    So let me ask you the next
12   question. Okay?
13             So that 2000 NTP process, that
14   was known as the tenth report on carcinogens,
15   right?
16       A.    If you say so, yes, I'll accept
17   that.
18       Q.    Okay. And did you know -- or
19   do you know that the NTP ultimately deferred
20   the issue of whether talc is a carcinogen
21   during the 10 ROC process?
22             MR. DONATH: Objection. Form.
23             MR. HEGARTY: Objection. Form.
24             THE WITNESS: I learned that
25   when I was reviewing some of the
```

Page 83

```
1        materials through this deposition.
2    QUESTIONS BY MR. BOWDEN:
3        Q.    So that wasn't a fact that you
4    already knew when you joined Crowell &
5    Moring?
6        A.    No.
7              One thing on the talc --
8        Q.    I'm sorry, sir, I'm going to
9    continue with my questions, and your counsel
10   will have an opportunity to ask questions as
11   well.
12       A.    Okay. All right. Fine.
13       Q.    So they deferred the issue.
14   They didn't vote that it was not a carcinogen
15   during the 10th Report on Carcinogens,
16   correct?
17             MR. HEGARTY: Objection. Form.
18             THE WITNESS: That's my
19   understanding, yes, sir.
20   QUESTIONS BY MR. BOWDEN:
21       Q.    So it would be -- if someone
22   were to walk into court in this proceeding
23   and say that in 2000, the NTP found that talc
24   was not a carcinogen, that would not be
25   accurate, correct?
```

Page 84

```
1             MR. DONATH: Objection to form.
2             MR. HEGARTY: Objection to
3    form.
4             THE WITNESS: I have not read
5    that review. I'm accepting what
6    you're saying, but I haven't read the
7    action they took at the tenth
8    report --
9    QUESTIONS BY MR. BOWDEN:
10       Q.    Sure.
11       A.    -- for talc.
12       Q.    When you started at Crowell &
13   Moring, you did not believe at that time that
14   the NTP had ruled that talc was not a
15   carcinogen, correct?
16             MR. DAVANT: Objection. Form.
17             THE WITNESS: I was not aware
18   of that at all.
19             MR. DONATH: Join.
20   QUESTIONS BY MR. BOWDEN:
21       Q.    Okay. And in fact what
22   happened was, the 10th Report on Carcinogens
23   deferred the issue for a later date, right?
24             MR. HEGARTY: Objection to
25   form.
```

Page 85

```
1             THE WITNESS: That's what I --
2    I saw some documents related to that,
3    but it did not include the tenth
4    report.
5    QUESTIONS BY MR. BOWDEN:
6        Q.    Okay. And when you're saying
7    "some documents," you're talking about in
8    preparation for today?
9        A.    Yes.
10       Q.    Okay. That wasn't vital
11   information for you to understand during your
12   employment at Crowell & Moring, right?
13             MR. DONATH: Objection to form.
14             MR. DAVANT: Objection to form.
15             THE WITNESS: The tenth report?
16   QUESTIONS BY MR. BOWDEN:
17       Q.    Yeah.
18       A.    No.
19       Q.    No one printed it out for you
20   and put it on your desk to make you familiar
21   with it, right?
22             MR. DONATH: Objection to form.
23             THE WITNESS: The tenth report?
24   QUESTIONS BY MR. BOWDEN:
25       Q.    Yes, sir.
```

22 (Pages 82 to 85)

Robert Glenn

Page 86

1     A.    No, I --
2     Q.    Okay.  Now, when -- at some
3   point talc was renominated for inclusion on
4   the report of carcinogens, right?
5     A.    Yes.
6     Q.    That was for the 12th report,
7   correct?
8     A.    I'm not sure what the date of
9   that was.  I'll accept that it was the 12th.
10     Q.    Well, I'll represent to you
11   that it was renominated in May of 2004.
12         Does that sound correct to you?
13     A.    I don't know of that date.  If
14   you -- if you are representing that, I will
15   accept that.
16     Q.    Okay.  And when you started at
17   Crowell & Moring and you were put on the
18   issue of talc and ovarian cancer in the
19   litigation department, did you go back and
20   look at what had been published since the
21   10th ROC and the 12th ROC nomination?
22         MR. HEGARTY:  Objection to
23     form.
24         THE WITNESS:  I started
25     reviewing the medical literature

Page 87

1     related to talc, but I don't think
2     that I ever went back and reviewed the
3     transactions from the tenth report.
4   QUESTIONS BY MR. BOWDEN:
5     Q.    Okay.
6     A.    But that's when I started to
7   hone in on talc and ovarian cancer, to my
8   knowledge.
9         (Glenn Exhibit 8 marked for
10     identification.)
11   QUESTIONS BY MR. BOWDEN:
12     Q.    Okay.  I'm going to mark for
13   you what's going to be Exhibit Number 8.
14         MR. BOWDEN:  Corey, if you
15     would, highlight the date at the top
16     for us along with who the sender is.
17   QUESTIONS BY MR. BOWDEN:
18     Q.    Now, Mr. Glenn, you know who
19   Steven Mann is, don't you?
20     A.    I know of Steven Mann.  I have
21   been on telephone conversations with him.  I
22   don't know if I ever met Steven Mann.
23     Q.    Okay.  But you've had a number
24   of conversations with him over your course of
25   your employment with Crowell & Moring and

Page 88

1   then even afterwards as Glenn Consulting,
2   right?
3         MR. HEGARTY:  Objection.  Form.
4         THE WITNESS:  I don't think
5     I've ever had any contact with him
6     after leaving Crowell & Moring.
7   QUESTIONS BY MR. BOWDEN:
8     Q.    Okay.  So only while you were
9   at Crowell & Moring did you have contact
10   directly with Steven Mann?
11         MR. HEGARTY:  Objection.  Form.
12         THE WITNESS:  That's my recall,
13     yes.
14   QUESTIONS BY MR. BOWDEN:
15     Q.    And you can see that he's the
16   director of toxicology at Johnson & Johnson
17   Consumer Personal Care Products Worldwide.
18         Do you see that there?
19     A.    Yeah, correct.
20     Q.    Okay.  And this is a June 4,
21   2004 e-mail.
22         Do you see where I'm reading
23   from?
24     A.    Date, date, date...
25     Q.    It's at the very top, sir.

Page 89

1   I've got it highlighted for you on the
2   screen.
3     A.    Yeah, that's --
4     Q.    Do you see that?
5     A.    Yes.
6     Q.    So this would have been, to
7   your knowledge, about the time that you were
8   joining the Crowell & Moring law firm, right?
9     A.    Yes.
10         MR. BOWDEN:  And, Corey, if we
11     can go down to the body of the e-mail
12     where it says "the Talc Task Force
13     conference call" in the middle.
14         Okay.  And we'll expand that
15     down to show who the participants
16     were.
17   QUESTIONS BY MR. BOWDEN:
18     Q.    And I should point out, too,
19   the subject of this e-mail was the CTFA talc
20   conference call minutes.
21         You know what the CTFA is?
22     A.    Yes, it was the cosmetic
23   toiletries fragrance association.
24     Q.    Right.  And that's another
25   trade organization, right?

23  (Pages 86 to 89)

Robert Glenn

Page 90

1      A.    That's correct.
2      Q.    And it represents the interests
3  or has members that include talc
4  manufacturers and producers of consumer
5  products such as Johnson & Johnson, right?
6           MR. BILLINGS-KANG:  Object to
7      form.
8      A.    Yes, it does.
9  QUESTIONS BY MR. BOWDEN:
10     Q.    Okay.  And this talc force, you
11 can see that Steven Mann was on the call for
12 Johnson & Johnson.
13           You see that?
14     A.    Yes.
15     Q.    And you also see that Rich
16 Zazenski with Luzenac was on that call as
17 well, right?
18     A.    Yes.
19           MR. DONATH:  Going to assert an
20     objection to the line of questioning
21     just insofar as Mr. Glenn isn't a
22     recipient or a sender on this e-mail.
23 QUESTIONS BY MR. BOWDEN:
24     Q.    And then if you go down to the
25 bottom, it says, "since the first review was

Page 91

1  complete."
2           Do you see that there?
3      A.    Yes.
4      Q.    It says, "Since the first
5  review was completed, a meta-analysis has
6  been published, Huncharek, et al.  The
7  authors found a weak association,
8  statistically significant, between talc and
9  ovarian cancer but did not conclude there was
10 a causal association."
11           Do you see that there?
12     A.    Yes.
13     Q.    "CTFA will contact the authors
14 to get more insight into their position and
15 the study."
16           Do you see that?
17     A.    Yes.
18     Q.    Now, prior to this date, to the
19 best of your knowledge, you had not had any
20 direct correspondence with Dr. Huncharek,
21 Dr. Muscat or the MRG Group, right?
22     A.    No, I had not.
23     Q.    Okay.  Turn to the second page,
24 please.  It's the middle paragraph there.
25     A.    Okay.

Page 92

1      Q.    And do you understand that in
2  the context of our timeline here, talc has
3  now been renominated for the NTP process?
4  You understand that, right?
5      A.    Yes.
6      Q.    And that's consistent with your
7  understanding of some of the things you were
8  going to be working on very shortly at
9  Crowell & Moring law firm, right?
10     A.    I'm sorry, would you repeat
11     that?
12     Q.    It was a little bit of a long
13 question.
14     A.    Well, I was trying to read the
15 paragraph.
16     Q.    Okay.  So you understand that
17 at this time, in June of 2004 --
18     A.    Yeah.
19     Q.    -- as you're beginning your
20 employment at Crowell & Moring, talc has been
21 renominated for the 12th Report on
22 Carcinogens, right?
23           MR. HEGARTY:  Objection.  Form.
24           THE WITNESS:  I don't know if I
25     knew it at this time or not.

Page 93

1  QUESTIONS BY MR. BOWDEN:
2      Q.    Okay.
3      A.    It's likely I did not -- I
4  didn't know it until Luzenac came to us.
5      Q.    Okay.  And we can see on this
6  e-mail that Johnson & Johnson, Luzenac and
7  others are participating in a CTFA conference
8  call, right?
9      A.    Correct.
10           MR. DONATH:  Same objection.
11           MR. BILLINGS-KANG:  Objection.
12     He doesn't have any personal knowledge
13     as to the e-mail.
14 QUESTIONS BY MR. BOWDEN:
15     Q.    And then we go to the second
16 page.  It says, "For the first comment
17 period, it was suggested that the previous
18 submissions related to ovarian cancer be
19 resubmitted."
20           You weren't involved in any way
21 with the first submissions, right, for the 10
22 ROC?
23     A.    No.  To my knowledge, I didn't
24 have anything to do with that.
25     Q.    "And updated with the addition

24 (Pages 90 to 93)

Robert Glenn

Page 94

1    of the limited new information, i.e., the
2    Huncharek paper."
3          Do you see that there?
4    A.    Yes.
5          MR. DONATH:  Same objection.
6    The witness did not send or receive
7    this e-mail, hasn't said he has
8    personal knowledge of it.
9    QUESTIONS BY MR. BOWDEN:
10   Q.    "It was suggested that the CTFA
11   express surprise over the renomination of
12   talc."
13         Do you see where that's
14   written?
15   A.    Yes.
16   Q.    "Given the outcome of the board
17   meeting in 2000 and the fact there is no new
18   cause for concern."
19         Do you see that?
20   A.    I see that.
21   Q.    And your client, Luzenac, was a
22   member -- or a participant of this
23   conference, right?
24         MR. DONATH:  Objection to form.
25         THE WITNESS:  Yes, there was a

Page 95

1    Luzenac employee at the meeting -- at
2    the conference call.
3    QUESTIONS BY MR. BOWDEN:
4    Q.    And it's fair to say that this
5    was an important issue, talc and ovarian
6    cancer, right?
7          MR. HEGARTY:  Objection.
8          MR. DONATH:  Objection to form.
9          MR. BILLINGS-KANG:  Objection
10   to form.
11         THE WITNESS:  I don't know.  At
12   this time I don't know what CTFA
13   considered it.
14   QUESTIONS BY MR. BOWDEN:
15   Q.    Well, I'm not asking you what
16   they considered it.  I'm asking whether
17   ovarian cancer, is that a serious condition?
18   A.    It's a very serious condition.
19   Q.    It causes death, right?
20   A.    It does have a high mortality
21   rate because of lateness of diagnosis.
22   Q.    It's an exceptionally high
23   mortality rate in terms of gynecological
24   cancers, right?
25   A.    Yes, it is.

Page 96

1    Q.    And it can also have -- if talc
2    were to be considered a carcinogen, that
3    would have important business ramifications
4    too, right?
5          MR. DONATH:  Objection to form.
6          MR. HEGARTY:  Objection to
7    form.
8          THE WITNESS:  I would think it
9    would.
10   QUESTIONS BY MR. BOWDEN:
11   Q.    Okay.  In what way would it
12   have business ramifications?
13         MR. DONATH:  Objection to form.
14         MR. BILLINGS-KANG:  Objection
15   to form.
16         THE WITNESS:  Possibly the
17   reason we're here today:  litigation.
18   QUESTIONS BY MR. BOWDEN:
19   Q.    Was that a consideration back
20   in 2004?
21         MR. DONATH:  Same objection.
22         THE WITNESS:  I don't know.  I
23   wasn't involved in this.
24   QUESTIONS BY MR. BOWDEN:
25   Q.    Okay.  We're --

Page 97

1    A.    I don't know --
2    Q.    -- going to see about that.
3    A.    -- what these people were
4    talking about, what they were discussing.
5    All I have are these minutes you've given me.
6    Q.    Sure.
7          If talc were to be considered a
8    carcinogen, that might require labeling to be
9    added to talcum products, right?
10         MR. HEGARTY:  Objection.
11         MR. BILLINGS-KANG:  Objection.
12   Form.
13         THE WITNESS:  Yes.  I'm sorry,
14   I don't know what the FDA regulations
15   are for labeling.
16         At the time I made my first
17   answer, I was thinking of OSHA
18   regulations.  And if it's going into
19   the industry, it would have to be
20   labeled.
21   QUESTIONS BY MR. BOWDEN:
22   Q.    Yeah.  Things like MSDSs would
23   need to be updated?
24         MR. HEGARTY:  Objection.  Form.
25         MR. BILLINGS-KANG:  Objection.

25  (Pages 94 to 97)

Robert Glenn

| Page 98 | Page 100 |
|---|---|
| 1    Form.<br>2        THE WITNESS:  I'm not sure.<br>3    MSDSs are for workers in industry.<br>4    QUESTIONS BY MR. BOWDEN:<br>5    Q.   Uh-huh.<br>6    A.   They're not for the general<br>7    public.<br>8    Q.   Right.<br>9    A.   Again, I'm not an FDA<br>10   specialist at all, so I don't know what their<br>11   regulations would require concerning any type<br>12   of a decision by the NTP.<br>13   Q.   Haven't you issued expert<br>14   reports in the past regarding MSDSs and<br>15   whether they need to be updated for<br>16   carcinogen warnings?<br>17   A.   I have related to OSHA in<br>18   industry, general industry, maritime,<br>19   agriculture.<br>20   Q.   Right.<br>21   A.   Not for the consumers.<br>22   Q.   Right.<br>23        Well, consumers aren't given<br>24   MSDSs, right?<br>25   A.   I'm sorry, I didn't finish. | 1    Q.   Okay.  And it's important those<br>2   be accurate?<br>3   A.   Oh, yes.<br>4   Q.   And it's important they be<br>5   updated?<br>6   A.   Yes.<br>7   Q.   And it's important that the<br>8   information that's contained in there gets to<br>9   the end user, right?<br>10       MR. DAVANT:  Objection.  Form.<br>11   QUESTIONS BY MR. BOWDEN:<br>12   Q.   When I say "end user," I mean<br>13   the person who's going to be reprocessing<br>14   this into something else.<br>15       MR. HEGARTY:  Objection.  Form.<br>16       THE WITNESS:  When you say "end<br>17   user," I'm thinking about the person<br>18   on the factory floor.<br>19   QUESTIONS BY MR. BOWDEN:<br>20   Q.   Right.  That's what I'm asking<br>21   you.<br>22   A.   Not the consumer, not someone<br>23   in their home --<br>24   Q.   Right.<br>25   A.   -- but on the factory floor. |

| Page 99 | Page 101 |
|---|---|
| 1        MSDSs are not intended for<br>2   consumers or for the public.<br>3   Q.   Right.<br>4   A.   Right.<br>5   Q.   Those are considered to be<br>6   industry internal to the -- to -- say a<br>7   manufacturer produces a mineral, and that<br>8   mineral has an MSDS that goes to the end<br>9   user, which might be a company that<br>10   reprocesses it for the general public, right?<br>11       MR. DONATH:  Objection to form.<br>12       THE WITNESS:  Well, it goes to<br>13   a company, and then from there it<br>14   goes -- is to go downstream to the<br>15   individual workers --<br>16   QUESTIONS BY MR. BOWDEN:<br>17   Q.   Right.<br>18   A.   -- so they're informed of the<br>19   hazards of the products they're working with.<br>20   Q.   Right.<br>21       And it's the company that<br>22   creates the MSDS, right?<br>23   A.   Yes.<br>24   Q.   The manufacturer?<br>25   A.   Yes. | 1   It's very important it get there because --<br>2   in my opinion, MSDSs don't quite get done<br>3   what needs to be done.  But they're to inform<br>4   the employee of the hazards so they can<br>5   modify their behavior and reduce their risk.<br>6   Q.   I think that's a very succinct<br>7   way of saying it.<br>8   A.   Yeah.<br>9   Q.   And that information is given<br>10   to employees on the factory floor, in your<br>11   example --<br>12   A.   Yes.<br>13   Q.   -- so that they can modify<br>14   their behavior and reduce their risk --<br>15   A.   Yes.<br>16   Q.   -- correct?<br>17       And that's --<br>18   A.   First of all, the industry has<br>19   obligation to reduce that risk through<br>20   engineering controls and such.<br>21   Q.   No question.  No question.<br>22       But the MSDSs aren't given to<br>23   consumers, to people like young women who are<br>24   going and buying talcum products off the<br>25   shelf, right? |

26  (Pages 98 to 101)

Robert Glenn

Page 102

1     A.    No, they're not.
2     Q.    The designation of talc as a
3  carcinogen might also cause increased
4  regulations to be imposed, correct?
5          MR. DONATH: Objection. Form.
6          MR. HEGARTY: Objection. Form.
7          THE WITNESS: It could, yes.
8  QUESTIONS BY MR. BOWDEN:
9     Q.    And you already mentioned that
10  it might open up manufacturers and producers
11  like Imerys and J&J up to lawsuits, correct?
12          MR. DONATH: Objection. Form.
13          MR. HEGARTY: Objection. Form.
14          THE WITNESS: Yes, that would
15     be a possible outcome.
16          (Glenn Exhibit 9 marked for
17     identification.)
18  QUESTIONS BY MR. BOWDEN:
19     Q.    I'm going to hand you what I'm
20  going to mark as Exhibit Number 9. Bear with
21  me a second. I think we're going to cut
22  through some of this.
23          And those factors that we've
24  just gone over, those are factors that you
25  understood the whole time you were working at

Page 103

1  Crowell & Moring, right?
2          MR. DAVANT: Object to form.
3          MR. DONATH: Form.
4          THE WITNESS: The factors
5     related to MSDS sheets?
6  QUESTIONS BY MR. BOWDEN:
7     Q.    All the factors we just talked
8  about. If ovarian cancer -- if talc was
9  related to ovarian cancer, that would cause
10  this cascade of factors --
11          MR. DONATH: Objection. Form.
12          MR. BILLINGS-KANG: Objection.
13     Form.
14  QUESTIONS BY MR. BOWDEN:
15     Q.    -- to taken into consideration?
16          MR. BILLINGS-KANG: Objection.
17     Form.
18          THE WITNESS: Yes.
19  QUESTIONS BY MR. BOWDEN:
20     Q.    So now I'm going to hand you
21  Exhibit 9.
22          All right. I want to turn to
23  the cover page of this. This is actually a
24  fax from Luzenac to Crowell & Moring.
25          Do you see that there?

Page 104

1     A.    Yes.
2     Q.    And this is dated August 18,
3  2004. It's to Ridgway Hall.
4          Was he the partner you were
5  working with most closely at that point?
6     A.    He was. He was responsible for
7  this matter, the attorney responsible for
8  this matter.
9     Q.    All right. Now, I want to turn
10  to the second page here.
11     A.    Okay.
12     Q.    And you can see that he's
13  attaching a study.
14          Have you seen the study before?
15     A.    Some time ago I did read this
16  study, yes.
17     Q.    And this is the Mills study,
18  right?
19     A.    Yes.
20     Q.    The author is Mills?
21     A.    The major -- the principal
22  author, yes.
23     Q.    And the title of the article
24  here -- and this is a peer-reviewed article,
25  right?

Page 105

1     A.    It is.
2     Q.    And you're familiar with the
3  peer-review process. You've actually gone
4  through it yourself, right?
5     A.    Yes.
6     Q.    And let me just ask you some
7  general questions about peer review
8  generally.
9          The byline, who goes on a
10  byline?
11     A.    A byline. You mean --
12     Q.    Who gets credited with
13  authorship?
14     A.    The author?
15     Q.    Yes, sir.
16     A.    You have to have contributed a
17  major part to the study.
18     Q.    And you can contribute in a
19  number of different ways. It doesn't
20  necessarily mean actually typing out the
21  words, right?
22          MR. HEGARTY: Objection.
23          THE WITNESS: It means you have
24     to have a significant input to the
25     study.

27 (Pages 102 to 105)

Robert Glenn

Page 106

1    QUESTIONS BY MR. BOWDEN:
2        Q.    Uh-huh.
3        A.    Merely reviewing the study and
4    the edit and commenting is not sufficient.
5        Q.    Okay.
6        A.    It may have been done in the
7    past; it's not done today.
8        Q.    It's considered inappropriate
9    today?
10       A.    Yes.
11       Q.    Okay.  And when did that
12   transition occur?
13       A.    I think it's taken place since
14   maybe starting with 2000.  It depends on the
15   journal.
16       Q.    Okay.
17       A.    But it used to be that, you
18   know, a research group would list a whole
19   number of coauthors who maybe were in the
20   team and maybe reviewed it, maybe offered
21   comments, maybe went through a discussion,
22   but they did not contribute to the research
23   and the writing of the manuscript.
24       Q.    And, sir, I apologize, I
25   coughed right in the middle of your answer.

Page 107

1        A.    That's all right.
2        Q.    Did I hear you correctly that
3    they wouldn't be considered authors because
4    they did not contribute to the research or
5    the writing of the paper?  Correct?
6        A.    Yes.
7        Q.    All right.  So let's look here
8    under the abstract.  It says, "Perineal talc
9    use has been suggested as a possible risk
10   factor for ovarian cancer based on the
11   structural similarity to asbestos, a known
12   human carcinogen."
13             Do you see where that's
14   written?
15       A.    Yes, and that's a poor
16   sentence.
17       Q.    I'm just asking, do you see
18   where it's written, sir?
19       A.    I see where it's written.
20       Q.    At the bottom of the abstract
21   it says, "This study provides some support
22   for the hypothesis that perineal talc use is
23   associated with an increased risk of EOC."
24             And you understand that to mean
25   epithelial ovarian cancer, right?

Page 108

1        A.    Yes, that's what it says.
2        Q.    And just underneath that it
3    says, "Received January 14th; accepted May 3,
4    2004."
5             Do you see where that's
6    written?
7        A.    Yes.
8        Q.    And so this was one of the
9    papers that had come out, too, since the 10th
10   Report on Carcinogen, right?
11       A.    Yes.
12       Q.    And this actually came out and
13   was published in May of 2004, correct?
14       A.    Yes.
15       Q.    The same month that Crowell &
16   Moring asked you to come over to work for
17   them at their law firm, right?
18       A.    Same month I -- I recall
19   joining Crowell & Moring, yes.
20       Q.    And the takeaway from this
21   paper -- I'm not asking whether you agree
22   with it or not.  But takeaway the authors
23   say, they suggest that there is an increased
24   risk between perineal talc use and ovarian
25   cancer, correct?

Page 109

1             MR. DONATH:  Objection.  Form.
2             MR. BILLINGS-KANG:  Objection
3        to form.
4             THE WITNESS:  I haven't read
5        this document in a long time,
6        carefully, but I remember being
7        critical of this document.  That's
8        what they say.
9    QUESTIONS BY MR. BOWDEN:
10       Q.    Sure.
11             And I understand you've been
12   critical all along of the concept of talc and
13   its ability to cause ovarian cancer, correct?
14             MR. DONATH:  Objection to form.
15             THE WITNESS:  I haven't been
16        critical all along.  I've read the
17        literature and formed my scientific
18        opinion after carefully considering
19        the literature.
20   QUESTIONS BY MR. BOWDEN:
21       Q.    Once you started at Crowell &
22   Moring?
23       A.    Once I started at Crowell &
24   Moring is my recollection of when I got
25   involved in talc and ovarian cancer.

28 (Pages 106 to 109)

Robert Glenn

Page 110

1      Q.    And you're aware that other
2  people have looked at the same studies and
3  information and disagree with you on that
4  topic?
5            MR. HEGARTY:  Objection to
6  form.
7            MR. DONATH:  Objection to form.
8            THE WITNESS:  Well, let's look
9       at IARC.
10  QUESTIONS BY MR. BOWDEN:
11      Q.    I'm just asking you --
12      A.    Yeah.
13      Q.    -- are you aware that other
14  people looking at the same data disagree with
15  you?
16      A.    And there are a number that
17  agree, but, yes.
18      Q.    So this gets issued in May
19  of 2004, right?
20      A.    Yes.
21      Q.    And in May of 2004, talc is
22  renominated for consideration on the Report
23  on Carcinogens, right?
24      A.    I believe so, yes.
25      Q.    And at that same time, you are

Page 111

1  now being pulled away from the industry trade
2  organization and going to work for a law firm
3  that ends up defending and advancing the
4  interests of one of the talc manufacturers,
5  correct?
6            MR. DONATH:  Objection to form.
7            THE WITNESS:  I wasn't pulled
8       away.
9  QUESTIONS BY MR. BOWDEN:
10      Q.    That's right, you weren't -- it
11  was a voluntary decision, right?
12      A.    Yes, it was a voluntary
13  decision to accept employment.  And I wasn't
14  pulled away because of talc.  As I said
15  earlier, I was mainly involved in asbestos
16  litigation.
17            (Glenn Exhibit 10 marked for
18       identification.)
19  QUESTIONS BY MR. BOWDEN:
20      Q.    Okay.  We're going to get to
21  that in a minute.
22            All right.  I'm going to hand
23  you what I'm marking as Exhibit Number 10.
24  And because of the way this document's
25  written, we're going to start from the back,

Page 112

1  okay?  So I want you to go ahead and turn to
2  the last page here.
3      A.    Let me just thumb through it so
4  I get a -- somewhat of a context.  Okay.
5      Q.    Now, let me ask you --
6      A.    When you say "the back," do you
7  mean the e-mail?
8      Q.    Yes, sir, the very last page of
9  the exhibit.
10      A.    Right.
11      Q.    And so I use a coding system at
12  the bottom.  You see where it says P1-0187.5?
13      A.    I do.
14      Q.    Now you're on .5?
15      A.    Yes.
16      Q.    Great.
17            So let me just ask you a couple
18  of just general questions before we get into
19  this document here.
20            Who was it that first put you
21  in contact with Meta-Analysis Research Group?
22            MR. DONATH:  I want to give a
23       direction to the witness as well that
24       we're probably going to be wading into
25       some areas here, and I'm going to

Page 113

1       remind you and ask you not to divulge
2       any discussions or information that
3       might have been within the purview of
4       the privilege of Imerys while you were
5       at Crowell & Moring.
6  QUESTIONS BY MR. BOWDEN:
7      Q.    You understood my question.  My
8  question was, who first introduced you to
9  Meta-Analysis Research Group?
10            You can answer that question.
11  Go ahead.
12      A.    I found -- well, I found
13  Dr. Huncharek when I was looking for an
14  asbestos researcher for asbestos litigation.
15      Q.    When was that?
16      A.    That was in -- earlier in this
17  year.
18      Q.    Earlier in 2004 --
19      A.    As I recall.
20      Q.    -- right?
21      A.    Yeah.
22      Q.    You say "this year."  I want to
23  make clear for the record that's 2004.
24      A.    Yeah.
25      Q.    Okay.

29 (Pages 110 to 113)

Robert Glenn

Page 114

1   A. As I recall, he was a
2 pathologist -- he is a pathologist, and I was
3 looking for a pathologist on asbestos. He
4 had published on that subject, and his name
5 is the one that I pulled up in searching for
6 pathologists to work on asbestos. We did not
7 use him for that.
8   Q. Why not?
9   A. We found others that we thought
10 more acceptable pathologists.
11   Q. When you say "more acceptable,"
12 you mean more qualified?
13   MR. HEGARTY: Objection. Form.
14   THE WITNESS: No, I mean they
15  had somewhat of a larger background in
16  the area we were interested in.
17 QUESTIONS BY MR. BOWDEN:
18   Q. Right. So they were more
19 qualified for the task at hand?
20   MR. HEGARTY: Objection. Form.
21   MR. DONATH: Objection to form.
22   THE WITNESS: No, they could
23  represent -- they could opine better
24  as to the subject matter of the
25  litigation.

Page 115

1 QUESTIONS BY MR. BOWDEN:
2   Q. Given the option of
3 Dr. Huncharek and someone else when it came
4 to asbestos, you chose someone else?
5   A. We chose the person that could
6 best represent our client.
7   Q. Oh, I see.
8   And that's separate and
9 distinct from qualifications?
10   MR. DAVANT: Objection. Form.
11   THE WITNESS: We -- I had a
12  role in accepting and in recommending
13  scientists to serve as expert witness.
14  I have a broad group of expert --
15  of -- not expert, broad group of
16  scientists that I've known through my
17  days at NIOSH and afterwards, and I'm
18  always looking for the best.
19  I did not know Dr. Huncharek
20  personally when I brought his name up.
21 QUESTIONS BY MR. BOWDEN:
22   Q. I think our jury will
23 understand.
24   All right. Let's go --
25   MR. BILLINGS-KANG: Move to

Page 116

1  strike the narrative.
2 QUESTIONS BY MR. BOWDEN:
3   Q. Go into this document now.
4   And you're with me on .5,
5 right?
6   A. Are you back to the front?
7   Q. No, sir, I'm still on the last
8 page.
9   A. Okay.
10   Q. All right. So at the top
11 there, you see that it's from Robert Glenn.
12  That's you, right?
13   A. Yes.
14   Q. And this is to Michael S.,
15 right?
16   A. Yes.
17   Q. And that's actually going to be
18 Dr. Huncharek, right?
19   A. Yes.
20   Q. And he's got
21 metaresearch@hotmail.com, right?
22   A. Yes.
23   Q. Okay. He wasn't asking you to
24 e-mail him at the school. This was part of
25 Meta-Analysis Research Group, right?

Page 117

1   A. He was doing this, as I recall,
2 for his group that he had formed, this
3 Meta-Analysis Research Group.
4   Q. All right. And it says,
5 "Subject, Projects-Huncharek," and then the
6 body reads, "Dr. Huncharek, we would like for
7 you to join us tomorrow after, September 7th,
8 at 1:30 p.m. Eastern, for a telephone
9 conference to discuss the NTP talc listing.
10 We will use Luzenac conference telephone
11 system for this call."
12   Do you see where that's
13 written?
14   A. Yes.
15   Q. Okay. And the rest of this
16 document -- or excuse me, let's go back to
17 the reply, which will be right above that.
18   Dr. Huncharek says, "I look
19 forward to speaking with you," right?
20   A. Yes.
21   Q. And it appears that this
22 document, at least the way it was produced to
23 us, this is a brochure from Meta-Analysis
24 Research Group, right?
25   You can go to the first page

30 (Pages 114 to 117)

Robert Glenn

Page 118

1    to -- and we'll go through it together.
2        A.    Yeah, that appears to be what
3    it is.
4        Q.    And this was sent in advance of
5    that call, I take it?
6        A.    I gather it was, yes.
7        Q.    And it was part of the
8    discussion as to who they are --
9        A.    Yeah.
10       Q.    -- what they do, right?
11       A.    Right.
12       Q.    Now, this was after you decided
13   not to use them in that asbestos litigation?
14       A.    Yes.
15       Q.    Okay.  So it says here at the
16   very first, "this group was formed in 1996 by
17   Michael Huncharek."
18           Do you see that?
19       A.    Yes.
20       Q.    And then halfway down that
21   paragraph it says, "The MRG is unique in that
22   it transcends the traditional boundaries
23   between the academic world and the
24   marketplace."
25           Do you see that?

Page 119

1        A.    I see that.
2        Q.    And that was one of the unique
3    things they did, was they didn't just look at
4    the academic side of it, they also looked at
5    the marketplace, the business side of issues,
6    correct?
7           MR. HEGARTY:  Objection.  Form.
8           MR. DONATH:  Objection.  Form.
9           THE WITNESS:  That's his words.
10   QUESTIONS BY MR. BOWDEN:
11       Q.    Okay.  Did you ever ask him
12   what that meant?
13       A.    No.
14       Q.    Okay.  Well, let's continue on
15   and see what it means.
16       A.    I didn't focus on that at all.
17       Q.    Okay.  The bottom of this first
18   page, the last paragraph:  "We have assisted
19   major pharmaceutical companies and other
20   clients in, quote, deciphering often complex,
21   seemingly contradictory data using rigorous
22   meta-analytical methods."
23           Do you see where that's
24   written?
25       A.    Yes.

Page 120

1        Q.    And so they're going to help,
2    quote, decipher complex issues, right?  That
3    was one of the things that you hired them to
4    do?
5        A.    No, that's what he wrote in
6    this.
7        Q.    Okay.
8        A.    This was not -- did not affect
9    my hiring him.  This is boilerplate, and I
10   doubt if he even read it, but...
11       Q.    Who are you talking about?
12       A.    This document.
13       Q.    Who was the -- who was the "I
14   doubt he even read it"?  You think
15   Mr. Huncharek didn't read this?
16       A.    I doubt I read it.
17       Q.    Okay.  Let's turn to the third
18   page -- or, excuse me, the second page.
19       A.    Yes.
20       Q.    We're going to go to the bottom
21   paragraph first.  "Medical/scientific
22   writing, scientific editing.  Report and
23   manuscript preparation for internal and
24   external applications.  Our ability to
25   generate manuscripts of publishable quality

Page 121

1    is unparalleled in the private sector.  MRG
2    will guide manuscripts through the entire
3    editorial process from submission of the
4    manuscript to final publication."
5           Do you see that where that's
6    written?
7        A.    Yes.
8        Q.    In fact, that's one of the
9    things that you ultimately hired them to do,
10   right?
11          MR. DONATH:  Objection.  I'm
12      going to direct the witness again
13      to -- not to give any answer with
14      respect to your work for Imerys at
15      Crowell & Moring.
16          MR. BOWDEN:  That's what you
17      hired him to do.
18          MR. DONATH:  Objection.  Same
19      direction.
20          MR. BOWDEN:  Are you telling
21      him not to answer this question?
22          MR. DONATH:  If it'll waive the
23      privilege, I am.
24   QUESTIONS BY MR. BOWDEN:
25       Q.    Did you hire them?  That's not

31 (Pages 118 to 121)

Robert Glenn

Page 122

1  a privilege question. Did you hire them; yes
2  or no?
3       A.   No, I did not.
4       Q.   Did Crowell & Moring hire them?
5  That's not a privilege question. Yes or no?
6       A.   Yes.
7       Q.   Okay. And you hired them after
8  this was sent to you, correct?
9       A.   We hired them after we
10  obtained, I believe, a proposal.
11      Q.   Right. We're going to get to
12  the proposal next.
13           And that proposal wasn't just
14  to Luzenac, right? You shared it with other
15  people.
16      A.   I may have, yes.
17      Q.   You shared it with Johnson &
18  Johnson, right?
19           MR. HEGARTY: Objection. Form.
20           THE WITNESS: I don't know if I
21  did. Let's see.
22  QUESTIONS BY MR. BOWDEN:
23      Q.   Well, let's just make clear
24  because your counsel keeps pointing out for
25  everyone to hear that they think this is

Page 123

1  privileged.
2           So were you sharing the
3  information you got from Meta-Analysis
4  Research Group with Johnson & Johnson as you
5  were getting it?
6       A.   You're asking me about
7  something 14 years ago. If you show me where
8  I did, I will accept that, but I don't --
9  that was not -- I don't recall doing that. I
10  may have.
11      Q.   Okay. We're going to go into
12  that.
13      A.   Good.
14      Q.   Let's go into the next section
15  first, the one right above that, please.
16      A.   Okay.
17      Q.   Medical and legal consulting.
18  "High quality consulting services for medical
19  malpractice, toxic tort" --
20           Toxic tort's a thing like talc,
21  right?
22           MR. DONATH: Objection. Form.
23           MR. HEGARTY: Objection to
24  form.
25           THE WITNESS: It's product

Page 124

1  liability.
2  QUESTIONS BY MR. BOWDEN:
3       Q.   Right.
4           That's what Crowell & Moring
5  does, too, right?
6           MR. DONATH: Objection to form.
7           THE WITNESS: That's one of the
8  things they do.
9  QUESTIONS BY MR. BOWDEN:
10      Q.   Okay.
11      A.   They're a full-service firm.
12      Q.   "Environment and other
13  medically oriented litigation."
14      A.   Yes, that's what it says.
15      Q.   "Expert witness"?
16      A.   Yes.
17      Q.   "Cause for action"?
18      A.   Yes.
19      Q.   "Medical record review"?
20      A.   Yes.
21      Q.   In 2004, was it your intent to
22  hire them and groom them as expert witnesses?
23           MR. BILLINGS-KANG: Objection
24  to form.
25           MR. DONATH: Objection to form.

Page 125

1           THE WITNESS: It was -- we
2           hired them to get reports on the
3           relationship between talc and ovarian
4           cancer, scientific reports.
5  QUESTIONS BY MR. BOWDEN:
6       Q.   That doesn't answer my
7  question, though.
8           Was one of the considerations
9  at the time that you hired them the idea that
10  they could ultimately become expert
11  witnesses?
12      A.   No, not expert witnesses in
13  litigation.
14      Q.   Expert witnesses in what?
15      A.   In regulatory affairs.
16      Q.   Oh, things like communicating
17  with the NTP or the IARC, right?
18      A.   Yes.
19      Q.   I see.
20           So you were grooming them for
21  that purpose?
22           MR. DONATH: Objection to form.
23           MR. BILLINGS-KANG: Objection
24  to form.
25           THE WITNESS: We weren't

32 (Pages 122 to 125)

Robert Glenn

Page 126

1    grooming them.
2    QUESTIONS BY MR. BOWDEN:
3        Q.   Okay.  We're going to talk
4    about that a little bit later, too.
5            All right.
6            MR. HEGARTY:  Move to strike
7    the commentary.  No question pending.
8            (Glenn Exhibit 11 marked for
9    identification.)
10   QUESTIONS BY MR. BOWDEN:
11       Q.   I'm going to hand you what I
12   will mark as Exhibit Number 11.  There you
13   go, sir.
14       A.   Uh-huh.
15           MR. BOWDEN:  Counsel, I got
16   copies for you.
17   QUESTIONS BY MR. BOWDEN:
18       Q.   You can see this is a facsimile
19   back from you.  Now we're back in October
20   of 2004.
21       A.   It's to me, yes.
22       Q.   Oh, I'm sorry, correct.
23           It's to you, right?  And this
24   is from Dr. Huncharek.
25           You see it's handwritten --

Page 127

1        A.   Yes.
2        Q.   -- in the "from" line, right?
3        A.   Yes.
4        Q.   And then the message says,
5    "Agreement."  Right?
6        A.   Yes.
7        Q.   "Look forward to speaking" -- I
8    can't read that.  Maybe it means tomorrow or
9    something.
10       A.   Yeah.
11       Q.   All right.  So let's turn to
12   the second page.
13       A.   All right.
14       Q.   And at the very top it says,
15   "To Robert Glenn, Crowell & Moring," and this
16   is "regarding talc project's letter of
17   agreement."
18       A.   Yes.
19       Q.   Do you see where that's
20   written?
21       A.   Yes.
22       Q.   First paragraph reads, "It's
23   been a pleasure speaking with you and your
24   colleagues regarding projects related to
25   epidemiology of talc and its relationship to

Page 128

1    ovarian cancer," right?
2        A.   Yes.
3        Q.   And that was the purpose of
4    speaking with them, at least in this series
5    of communications that we're looking at, is
6    to discuss talc and ovarian cancer, right?
7        A.   It was.
8            MR. DONATH:  Objection to form.
9            MR. HEGARTY:  Objection to
10   form.
11   QUESTIONS BY MR. BOWDEN:
12       Q.   Let's go to the next paragraph.
13           "As previously discussed, this
14   work would take the form of two projects.
15   The first of these consists of a thorough
16   narrative review of the existing
17   epidemiological literature, examine the
18   possible relationship, if any, between use of
19   cosmetic talc and ovarian cancer.  We would
20   employ our usual methods as outlined in the
21   attached budget summary, including thorough
22   electronic database researches, supplemented
23   by manual searches of existing scientific
24   literature.  The work product for this
25   project will take the form of a narrative

Page 129

1    summary of our interpretation of the existing
2    scientific literature on this topic that will
3    be submitted to your firm for review prior to
4    possible submission to the NTP."
5            Do you see where that's
6    written?
7        A.   Yes.
8        Q.   So one of the things that
9    Crowell & Moring was doing, or you were doing
10   on Crowell & Moring's behalf on Luzenac's
11   behalf, was contacting them in anticipation
12   that a report might need to be submitted to
13   the NTP?
14       A.   Yes.
15           MR. DONATH:  Objection to form.
16           THE WITNESS:  Yes, to possibly
17   make a submission to the NTP.
18   QUESTIONS BY MR. BOWDEN:
19       Q.   Right.  And we're going to talk
20   about what actually happened with that in
21   just a second.
22           Go down two more paragraphs,
23   "an additional goal."  "An additional goal of
24   this project is to create an academic review
25   article suitable for submission to a

33 (Pages 126 to 129)

Robert Glenn

Page 130

1  recognized medical, scientific journal.
2  Prior to submission to an outside journal,
3  our firm and clients are entitled to comment
4  on its content, suggest changes and possible
5  avenues for publication."
6        I'm sorry, "your firm." Let
7  me -- strike that. Let me reread it.
8        "Prior to submission to an
9  outside journal, your firm and clients are
10  entitled to comment on its content, suggest
11  changes and possible avenues for
12  publication."
13        Do you see where that's
14  written?
15    A.    Yes, I do.
16    Q.    And the next paragraph says,
17  "The second project included in the terms of
18  our agreement is a meta-analysis examining
19  the possible association of cosmetic talc use
20  with contraceptive diaphragms and the risk of
21  cancer of the ovary."
22        Do you see where that is?
23    A.    Yes.
24    Q.    And in regards to that project,
25  Crowell & Moring actually retained the right

Page 131

1  to make comments and edits to it prior to
2  submission for publication as well, right?
3        MR. DONATH: Objection.
4        THE WITNESS: That's what he
5  placed in this agreement, yes.
6  QUESTIONS BY MR. BOWDEN:
7    Q.    Okay.
8    A.    And we accepted the agreement,
9  as I recall.
10    Q.    Was that a requirement by you?
11    A.    No.
12    Q.    That was just what they
13  proposed in the brochure what they could do
14  for you, right?
15    A.    Yes.
16    Q.    Okay. And ultimately you
17  agreed to hire their services for those two
18  specific tasks that we just covered, right?
19        MR. HEGARTY: Objection. Form.
20        THE WITNESS: Yes.
21  QUESTIONS BY MR. BOWDEN:
22    Q.    And the expectation at the time
23  was that their review of the epidemiology
24  data was going to show that there was no
25  causal relationship between talc and ovarian

Page 132

1  cancer?
2        MR. BILLINGS-KANG: Objection
3  to form.
4        MR. DONATH: Objection to form.
5        THE WITNESS: No, that was not
6  our interest. We wanted them to
7  review critically the literature
8  related to talc exposure and ovarian
9  cancer.
10  QUESTIONS BY MR. BOWDEN:
11    Q.    Right.
12        And to prepare a report --
13    A.    Prepare a report --
14    Q.    -- with their findings, their
15  conclusions from their review, right?
16    A.    Yes, prepare a report --
17    Q.    And --
18    A.    -- that might be submitted to
19  the medical literature.
20    Q.    That might be submitted, right?
21    A.    Yes. That was secondary.
22    Q.    But it would be secondary
23  subject to Crowell & Moring's approval?
24        MR. HEGARTY: Objection to
25  form.

Page 133

1        MR. DONATH: Objection to form.
2        MR. BILLINGS-KANG: Objection
3  to form.
4        THE WITNESS: No. The
5  manuscript we had nothing to do with.
6  QUESTIONS BY MR. BOWDEN:
7    Q.    You had nothing to do with the
8  manuscript for the critical review?
9    A.    To my knowledge, we did not
10  have anything to do, other than review it for
11  technical accuracy and such.
12        We did review the reports and
13  make some comments on the reports, but I
14  don't recall making any comments on the
15  manuscript that went to the journals.
16        (Glenn Exhibit 12 marked for
17  identification.)
18  QUESTIONS BY MR. BOWDEN:
19    Q.    Okay. I'm going to hand you
20  what I'm marking as Exhibit Number 12.
21        Did you review this document
22  when you were prepping for deposition?
23    A.    I -- yeah, may have. I don't
24  recall exactly whether this is one I reviewed
25  or not.

34 (Pages 130 to 133)

Robert Glenn

Page 134

1  Q.   Okay.  Well, I think we can go
2  through it pretty quickly.  Maybe we should
3  talk about it on a high level, all right?
4  A.   Okay.
5  Q.   This, for the record, is going
6  to be P1.0039.  That's our internal coding.
7  This is cosmetic talc conference call
8  minutes.
9  Do you see that?
10  A.   Yes.
11  Q.   It says, "A J&J Luzenac
12  teleconference was conducted October 13,
13  2004, to review issues regarding the NTP
14  cosmetic talc nomination for the 12th Report
15  on Carcinogens," what I've been calling the
16  12 ROC, right?
17  A.   Yes.
18  Q.   "Participants:  J&J list, Eric
19  Turner" --
20  He's with Luzenac, right?
21  A.   Yes.
22  Q.   -- "and Rich Zazenski," right?
23  A.   Yes.
24  Q.   Okay.  And so as you're talking
25  to Meta-Analysis Research Group, looking at

Page 135

1  their proposals, signing the agreement,
2  Johnson & Johnson is involved, true?
3  MR. HEGARTY:  Objection.  Form.
4  THE WITNESS:  Yes, they appear
5  to be involved.  I had little contact
6  with J&J, in fact.
7  QUESTIONS BY MR. BOWDEN:
8  Q.   So if you go down to the
9  epidemiological studies section, please.
10  We're looking at the very top
11  of this.  You'll recall that this was review
12  of issues regarding NTP in the 12th report,
13  right?
14  A.   Yes.
15  Q.   And we've already looked at the
16  CTFA minutes, right, that were talking about
17  what new science has come out, right?
18  A.   Yes.
19  Q.   And during those minutes, all
20  they mentioned was Huncharek's paper, right,
21  the 2003 Huncharek paper?
22  A.   I suppose.  I'd have to go back
23  on that.
24  Q.   But when the internal
25  discussion is taking place between Imerys and

Page 136

1  Johnson & Johnson and you, they're looking at
2  two studies, right?  The studies that we went
3  over, the Mills paper as well.
4  Do you see that there?
5  MR. DONATH:  Objection.  Form.
6  MR. HEGARTY:  Objection to
7  form.
8  MR. BOWDEN:  It's misspelled.
9  It's M-o-l-l-s, but it's M-i.
10  THE WITNESS:  Yeah, they have
11  two papers listed.
12  QUESTIONS BY MR. BOWDEN:
13  Q.   Okay.
14  A.   The 2003 publication is what
15  drawed my attention to Dr. Huncharek.
16  Q.   Right.
17  And it says, "Dr. Huncharek had
18  previously been contacted by the CTFA and
19  tentatively agreed to present comments at the
20  12th ROC committee sub meeting regarding the
21  lack of observational data to support a
22  causal relationship between perineal talc use
23  and an increased risk of ovarian cancer."
24  Do you see that?
25  A.   Yes, I see that.

Page 137

1  Q.   So you understand that's
2  different than what we had just discussed.
3  Do you see the distinction?
4  A.   Yes.
5  MR. HEGARTY:  Objection to
6  form.
7  QUESTIONS BY MR. BOWDEN:
8  Q.   You just told our jury --
9  A.   Yes.
10  Q.   -- that they were contacted to
11  conduct a review and that you weren't
12  expecting an outcome one way or another.
13  Am I saying that correctly?
14  A.   That's what we --
15  Q.   But the CTFA, in these internal
16  minutes here, they're saying they were
17  tentatively agreed to support -- to support a
18  report regarding the lack of data with a
19  causal relationship between perineal talc use
20  and increased risk of ovarian cancer.
21  Do you see where that's
22  written?
23  A.   That's right.
24  MR. HEGARTY:  Objection.
25  MR. DONATH:  Objection.

35 (Pages 134 to 137)

Robert Glenn

Page 138

1    Mischaracterizes the testimony because
2    this documents doesn't reflect
3    anything that Mr. Glenn says in this
4    document.
5        MR. TISI:  Yeah, we can -- we
6    can really -- I mean, I'm going to
7    stay away, but you're violating the
8    rules all over the place.  "It's
9    objection form," or "objection, don't
10   answer."
11       If you're going to keep doing
12   that kind of objection, we're going to
13   call Judge Pisano.
14       MR. DONATH:  That's fine,
15   Counsel.  I understand the rules.
16       MR. TISI:  Okay.  Well, you're
17   not obeying them, so let's obey them.
18   It's "objection, form," or "objection,
19   I instruct the witness not to answer,"
20   period.
21   QUESTIONS BY MR. BOWDEN:
22   Q.   All right.
23   A.   I was -- I was not --
24   Q.   There's no question pending,
25   sir.  We're going to set that down.

Page 139

1    A.   There has been one about this.
2    Q.   No, sir, there's not, actually.
3    A.   I'm not on this --
4    Q.   Sir, this is not an opportunity
5    for you to speak.  You have to answer the
6    questions I ask.  I know it's not fair, but
7    that's how these things work.  Okay?
8        Hold on to that.
9    A.   Crowell & Moring didn't ask for
10   this --
11   Q.   Sir, we're not going to go
12   through this right now.  There's no question
13   pending.  You can set that aside.  Thank you.
14       Rich Zazenski.  Do you know
15   what his function was at Imerys?
16   A.   I believe he was responsible
17   for the safety and health program at Imerys.
18   Q.   Is he a mineralogist?
19   A.   No, he has knowledge of
20   mineralogy.
21   Q.   Okay.  Was he the primary
22   contact point for Imerys on the issue of talc
23   and ovarian cancer?
24   A.   I believe he would be
25   considered that, yes.

Page 140

1    Q.   Okay.  If anyone was to suggest
2    that he was a loose cannon and didn't speak
3    for Imerys, would that be true?
4        MR. DONATH:  Objection to form.
5        THE WITNESS:  No.  He was at
6    the time employed by Luzenac, so I
7    don't know whether he could be
8    speaking for Imerys when he was
9    employed by Luzenac.
10   QUESTIONS BY MR. BOWDEN:
11   Q.   I'm not going to play word
12   games with you, sir.  We've already talked
13   about at the beginning of this, Luzenac,
14   Rio Tinto, Imerys, I'm referring all to the
15   same entity.
16       You understand that, right?
17   A.   The client I worked with was
18   Luzenac.
19       MR. DONATH:  Objection.
20   QUESTIONS BY MR. BOWDEN:
21   Q.   Okay.  Was that your experience
22   with Mr. Zazenski?
23   A.   That he was a loose cannon?
24   Q.   Right.
25   A.   I don't know if I'd consider

Page 141

1    him a loose cannon.
2    Q.   You would not, would you?
3    A.   No.
4    Q.   I assure you I'm trying to keep
5    it shorter, so I'm cutting through some
6    documents.  Just bear with me here.
7    A.   That's fine.
8    Q.   Now, you told me a little bit
9    about Dr. Huncharek and how you first came
10   into contact with him.
11       Now I want to ask you:  His
12   partner, his colleague at MRG that you dealt
13   with on this talc and ovarian cancer issue,
14   that was Dr. Joshua Muscat, correct?
15       MR. HEGARTY:  Objection to
16   form.
17       THE WITNESS:  I'm not sure,
18   Dr. Muscat, what his relationship with
19   Dr. Huncharek's group was or whether
20   he was just acting on his own through
21   Dr. Huncharek, but -- I don't know
22   whether he was considered a group
23   member, but Dr. Huncharek brought
24   Dr. Muscat to my attention.
25

36 (Pages 138 to 141)

Robert Glenn

|  | Page 142 |
|---|---|
| 1 | QUESTIONS BY MR. BOWDEN: |
| 2 | Q.    And when he brought it to your |
| 3 | attention, you made sure that Dr. Muscat was |
| 4 | on the retainer agreement that Crowell & |
| 5 | Moring ultimately signed, right? |
| 6 | MR. DAVANT:  Objection. Form. |
| 7 | THE WITNESS:  I think -- I |
| 8 | think there was a discussion of |
| 9 | whether Crowell & Moring would pay |
| 10 | Dr. Muscat or whether it would go |
| 11 | through the -- Dr. Huncharek's group. |
| 12 | And I think in the end it went through |
| 13 | Dr. Huncharek's group. |
| 14 | QUESTIONS BY MR. BOWDEN: |
| 15 | Q.    And I appreciate that, sir, I |
| 16 | do, but my question is whether or not you |
| 17 | made sure that he was on the retainer |
| 18 | agreement with Crowell & Moring and MRG. |
| 19 | MR. HEGARTY:  Objection. Form. |
| 20 | MR. DONATH:  Objection to form. |
| 21 | THE WITNESS:  That was the |
| 22 | question of Dr. Huncharek, and we went |
| 23 | along with it. |
| 24 | QUESTIONS BY MR. BOWDEN: |
| 25 | Q.    You went along with it to make |

|  | Page 144 |
|---|---|
| 1 | THE WITNESS:  Okay. |
| 2 | QUESTIONS BY MR. BOWDEN: |
| 3 | Q.    Who added that term? |
| 4 | A.    Who what? |
| 5 | Q.    Who added the confidentiality |
| 6 | term? |
| 7 | A.    It's in a communication from |
| 8 | Mr. Hall. |
| 9 | Q.    Mr. Hall added the term? |
| 10 | MR. DAVANT:  Object to form. |
| 11 | THE WITNESS:  He is the one |
| 12 | that's -- in his communication put |
| 13 | that in, so I suppose. |
| 14 | QUESTIONS BY MR. BOWDEN: |
| 15 | Q.    So I'd asked you a little bit |
| 16 | before about some of the involvement of |
| 17 | Johnson & Johnson, whether they were involved |
| 18 | from the get-go with MRG. |
| 19 | You understood at the time that |
| 20 | these proposals were being sent back and |
| 21 | forth -- |
| 22 | A.    I did. |
| 23 | MR. HEGARTY:  Objection. Form. |
| 24 | MR. DONATH:  Objection to form. |
| 25 |  |

|  | Page 143 |
|---|---|
| 1 | sure he was a retained member of MRG and |
| 2 | consulting for these two top -- these two |
| 3 | tasks, the NTP report and the diaphragm -- |
| 4 | A.    Study. |
| 5 | Q.    -- study. |
| 6 | MR. DONATH:  Objection to form. |
| 7 | MR. HEGARTY:  Objection. Form. |
| 8 | THE WITNESS:  Yeah, consultant. |
| 9 | Yes. |
| 10 | QUESTIONS BY MR. BOWDEN: |
| 11 | Q.    And part of that was that you |
| 12 | wanted to make sure that he was subject to a |
| 13 | confidentiality agreement, true? |
| 14 | MR. HEGARTY:  Objection. Form. |
| 15 | THE WITNESS:  That wasn't my |
| 16 | role, but there was language related |
| 17 | to that in communications from |
| 18 | Mr. Hall. |
| 19 | QUESTIONS BY MR. BOWDEN: |
| 20 | Q.    Mr. Hall made sure that you had |
| 21 | him underneath the confidentiality, right? |
| 22 | A.    No, he -- |
| 23 | MR. DONATH:  Objection. Direct |
| 24 | the witness not to answer with respect |
| 25 | to anything Mr. Hall told you. |

|  | Page 145 |
|---|---|
| 1 | QUESTIONS BY MR. BOWDEN: |
| 2 | Q.    -- that Johnson & Johnson was |
| 3 | going to be paying for half the cost, right? |
| 4 | MR. HEGARTY:  Objection to |
| 5 | form. |
| 6 | THE WITNESS:  That later came |
| 7 | up, yes. |
| 8 | QUESTIONS BY MR. BOWDEN: |
| 9 | Q.    And Johnson & Johnson at that |
| 10 | time or afterwards, from the time that you |
| 11 | were at Crowell & Moring, never were they a |
| 12 | client of yours, of Crowell & Moring law |
| 13 | firm? |
| 14 | A.    I don't think they had any |
| 15 | matters being litigated or being -- |
| 16 | Q.    Well, we saw in your response |
| 17 | to the notice of deposition that the only |
| 18 | client was Luzenac, right? |
| 19 | A.    Yes, they were the client on |
| 20 | this matter. |
| 21 | Q.    Not Johnson & Johnson? |
| 22 | A.    No. |
| 23 | Q.    Okay. But they were involved |
| 24 | in it and they were paying for it, right? |
| 25 | MR. HEGARTY:  Objection. Form. |

37 (Pages 142 to 145)

Robert Glenn

Page 146

1        THE WITNESS: Yes.
2    QUESTIONS BY MR. BOWDEN:
3        Q.    They were on the conference
4    calls?
5        A.    Yes.
6        MR. HEGARTY: Objection. Form.
7    QUESTIONS BY MR. BOWDEN:
8        Q.    They were participants in the
9    formation of the agreements?
10        MR. HEGARTY: Objection. Form.
11        THE WITNESS: I don't know if
12        they came in late or after the
13        agreements were being discussed, but I
14        think they did have -- they did look
15        at the agreements before we engaged
16        Dr. Huncharek and his firm.
17    QUESTIONS BY MR. BOWDEN:
18        Q.    Does Meta-Analysis Research
19    Group only work for law firms?
20        A.    I do not know.
21        Q.    Did you ever ask?
22        A.    I didn't have any reason to
23    ask.
24        Q.    Didn't matter to your analysis?
25        MR. BILLINGS-KANG: Objection.

Page 147

1    Form.
2        THE WITNESS: I didn't have any
3        reason to ask. I was hiring them to
4        do a scientific -- that's what I was
5        concerned with, is the scientific
6        conventions.
7    QUESTIONS BY MR. BOWDEN:
8        Q.    At some point Johnson & Johnson
9    expressed concern over being included on the
10    agreement, right?
11        MR. BILLINGS-KANG: Objection.
12    Form.
13        THE WITNESS: Yes, they did.
14    QUESTIONS BY MR. BOWDEN:
15        Q.    They understood, based on your
16    discussions with Mr. Mann and others, that
17    the science was going to run through
18    Crowell & Moring and through MRG, right?
19        MR. HEGARTY: Objection. Form.
20        MR. DONATH: Objection to form.
21        MR. BILLINGS-KANG: Objection
22    to form.
23        THE WITNESS: It wasn't
24    discussions I had with Mr. Mann
25    related to that. It took place with

Page 148

1        Mr. Hall.
2    QUESTIONS BY MR. BOWDEN:
3        Q.    Is that your understanding?
4        A.    That's my understanding.
5        (Glenn Exhibit 13 marked for
6    identification.)
7    QUESTIONS BY MR. BOWDEN:
8        Q.    I'm going to hand you what I am
9    marking as Exhibit Number 13.
10        A.    If we could take a break in
11    about ten minutes?
12        Q.    I tell you what, why don't we
13    go through this document and then we'll take
14    a break. That'd be just fine.
15        A.    That's fine. Nature calls.
16        Q.    Are you okay with waiting?
17        A.    Yeah. Yeah.
18        Q.    Let's start off at the bottom
19    of this e-mail.
20        A.    Okay.
21        Q.    This is an e-mail from Ridgway
22    Hall, the attorney at Crowell & Moring,
23    right?
24        A.    Yes.
25        Q.    It's to Steven Mann at Johnson

Page 149

1    & Johnson?
2        A.    Right.
3        Q.    And it copies Mr. Zazenski?
4        A.    Yes.
5        Q.    Ralph Godell? Is that how you
6    say his name?
7        A.    Godell.
8        Q.    Godell.
9        He's also with Luzenac, right?
10        A.    Yes.
11        Q.    And you?
12        A.    Yes.
13        Q.    Okay. And that e-mail says,
14    "Dear Steve, we'd like to get Drs. Huncharek
15    and Muscat started as soon as possible on the
16    studies we have been discussing."
17        And that Steve would be --
18    that's Steve Mann at Johnson & Johnson,
19    right?
20        A.    Yes.
21        Q.    "Please let me know at your
22    earliest convenience whether J&J would like
23    its name on the retainer letter or not and
24    whether J&J would like to share with Luzenac
25    the cost of the second task."

38 (Pages 146 to 149)

Robert Glenn

Page 150

1        The second task was the
2   diaphragm study, right?
3        A.   Yes.
4        Q.   "We understand that you are on
5   board to split evenly the cost of the first.
6   Many thanks. Regards, Ridge," right?
7        A.   Right.
8        Q.   And the response back, we go
9   back up to the top. "Ridge, in talking to my
10  boss, I think it would be better if J&J were
11  not mentioned in the retainer letter. I
12  don't have a definitive answer on
13  splitting the cost of the second study yet,
14  but that shouldn't hold you up from
15  proceeding with Mike and Josh."
16       That's Huncharek and Muscat,
17  right?
18       MR. HEGARTY:  Objection to
19     form.
20       THE WITNESS:  Yes.
21  QUESTIONS BY MR. BOWDEN:
22       Q.   "However, it will be my
23  recommendation that Josh" --
24       Josh Muscat, right?
25       A.   Yes.

Page 151

1        Q.   -- "expects favorable results
2   from the diaphragm/ovarian comparison; thus,
3   we should be willing to support that study
4   also."
5        Do you see where that's
6   written?
7        A.   Yes.
8        Q.   Okay. So during the conference
9   calls that you were part of with Johnson &
10  Johnson and Luzenac and the MRG research
11  group, the expected conclusions were
12  discussed as well, right?
13       MR. DONATH: Objection. Direct
14     the witness not to answer with respect
15     to any discussions with Imerys that
16     are not reflected in this document.
17       MR. BOWDEN: That Johnson &
18     Johnson is a party to? Is that what
19     you're telling him?
20       MR. DONATH: With Imerys.
21  QUESTIONS BY MR. BOWDEN:
22       Q.   Okay. Let me rephrase it.
23       On the conference calls that
24  you're involved with at the time with members
25  from Luzenac, Johnson & Johnson and the MRG

Page 152

1   Group, the outcome of the diaphragm study was
2   discussed prior to funding, true?
3        MR. HEGARTY:  Objection to
4     form.
5        THE WITNESS:  I don't recall
6     that I was ever involved in those
7     conversations.  In this document I
8     have not seen -- I don't know if it
9     was in the documents I looked at to
10    prepare for the deposition, but I
11    don't recall seeing this.  Maybe I
12    did, but I wasn't involved in this
13    discussion.
14  QUESTIONS BY MR. BOWDEN:
15       Q.   Okay. I understand that you
16  weren't involved in this e-mail here, but the
17  conversations with Muscat and with you and
18  with Zazenski and Hall, was it ever discussed
19  what the expected outcome of the diaphragm
20  study would be?
21       MR. DONATH: Objection. Direct
22     the witness not to answer.
23  QUESTIONS BY MR. BOWDEN:
24       Q.   And Johnson & Johnson.
25       A.   Yeah. I don't recall being

Page 153

1   involved in that, but -- I just don't
2   remember being involved in those discussions
3   myself. I think it's --
4        Q.   Let me ask you a different way.
5   I'm sorry, go ahead.
6        A.   Yeah. I'd read the literature
7   pretty completely, reviews -- review papers
8   and such, and I had formed my opinion about
9   the scientific evidence relating to talc
10  exposure through perineal dusting and ovarian
11  cancer, and my conclusion was the evidence
12  was weak. On balance, the scientific
13  evidence was weak.
14       Q.   Okay.
15       A.   And as I -- as I said earlier
16  about studies I've been involved in, I
17  sometimes go in with them with a scientific
18  opinion of more or less -- more or less an
19  opinion I've had. And I've been wrong
20  once -- once I've been involved in research
21  of that nature.
22       Q.   Would it be appropriate -- as a
23  published author yourself, would it be
24  appropriate to approach a party to fund a
25  scientific study and say that you expect an

                              39 (Pages 150 to 153)

Robert Glenn

Page 154

1   outcome?
2         MR. DONATH: Objection to form.
3         MR. BILLINGS-KANG: Objection
4   to form.
5         THE WITNESS: No, I wouldn't --
6   I don't think I've ever done that.
7   QUESTIONS BY MR. BOWDEN:
8      Q.   That would be inappropriate?
9      A.   Yes.
10        MR. DONATH: Objection. Form.
11        MR. BOWDEN: I'm sorry, you
12   asked for a break. Let's take a
13   break.
14        THE WITNESS: Yes, if you don't
15   mind.
16        VIDEOGRAPHER: The time is now
17   10:54. Going off the record.
18      (Off the record at 10:54 a.m.)
19        VIDEOGRAPHER: The time is now
20   11:09 -- I'm sorry, 11:10. Back on
21   the record.
22        (Glenn Exhibit 14 marked for
23   identification.)
24   QUESTIONS BY MR. BOWDEN:
25      Q.   All right. Mr. Glenn, I'm

Page 155

1   going to hand you Exhibit Number 14.
2         All right. Mr. Glenn, I'm
3   handing you what I'm marking as Exhibit 14.
4         MR. BOWDEN: And Mr. Smith,
5   that'll be P1.0042.
6         MR. SMITH: Yeah. Great.
7   QUESTIONS BY MR. BOWDEN:
8      Q.   This is an e-mail from Ridgway
9   Hall to Rich Zazenski, Steven Mann, and also
10   copies you.
11        Do you see where that is?
12     A.   Yes.
13     Q.   And this is now February 28,
14   2005.
15        Do you see that?
16     A.   Yes.
17     Q.   And Ridgway Hall writes -- the
18   lawyer, Ridgway Hall, writes, "Dear
19   colleagues, the retainer letter is going out
20   today in final form for execution by
21   Drs. Huncharek and Muscat. Attached for your
22   info are the transmittal letter and the
23   retainer letter."
24        Do you see where that's
25   written?

Page 156

1      A.   Yes.
2      Q.   "Signed copies along with
3   Attachment A are on the way to each of you by
4   snail mail. When I receive the executed
5   letters back, we'll owe Dr. Huncharek's
6   group, Meta-Analysis Research Group, the
7   first installment of 13,950, one-third of the
8   total. To maximize the effectiveness of our
9   use of the attorney product privilege for
10   their work, I will plan to send them a
11   Crowell & Moring check in that amount to be
12   reimbursed to us by Luzenac and Johnson &
13   Johnson in whatever proportions you agree
14   on."
15        Do you see where that's
16   written?
17     A.   Yes.
18     Q.   And just again, to clarify now,
19   at this point in time Johnson & Johnson is
20   still not a client of Crowell & Moring,
21   correct?
22        MR. HEGARTY: Objection to
23   form.
24        THE WITNESS: Correct.
25

Page 157

1   QUESTIONS BY MR. BOWDEN:
2      Q.   Now, at this time period, aside
3   from the agreement itself, was the majority
4   of the communication going through you to
5   Meta-Analysis Research Group?
6      A.   No, I think mainly what I would
7   communicate with was related to the science.
8   This business aspect was handled by Mr. Hall.
9      Q.   Okay. So Mr. Hall was the
10   business side of the law firm's interactions
11   and you were the science side?
12     A.   That's pretty much --
13     Q.   Is that a fair way of saying
14   it?
15     A.   That's a pretty fair way of
16   saying it.
17     Q.   Okay. And the purpose being
18   expressed here of the payment going through
19   Crowell & Moring is to try to protect -- to
20   keep a privilege on the work, right?
21        MR. HEGARTY: Objection to
22   form.
23        THE WITNESS: I think it's
24   practice in firms that generally when
25   you're working with a client, that

40 (Pages 154 to 157)

Robert Glenn

| Page 158 | Page 160 |
|---|---|
| 1      information is considered privileged,<br>2      yes.<br>3  QUESTIONS BY MR. BOWDEN:<br>4      Q.    Okay.  Information about who is<br>5  funding the study?<br>6          MR. HEGARTY:  Objection.  Form.<br>7  QUESTIONS BY MR. BOWDEN:<br>8      Q.    Is that a common practice?<br>9      A.    I'm not an attorney.  I thought<br>10  most all communications were -- there was a<br>11  protection to them.<br>12      Q.    No, no, no, that's not my<br>13  question.<br>14          We just established that you're<br>15  on the science side of it --<br>16      A.    Yeah.<br>17      Q.    -- and you yourself are a<br>18  published author, and we've already talked a<br>19  little bit about funding generally.<br>20          My question to you is, should<br>21  the source of funding be kept confidential<br>22  and private for a paper that's ultimately<br>23  published?<br>24          MR. HEGARTY:  Objection.  Form.<br>25          THE WITNESS:  Not -- no, it | 1  QUESTIONS BY MR. BOWDEN:<br>2      Q.    And that's an important<br>3  consideration, right?<br>4      A.    It can be.<br>5      Q.    And it could be an important<br>6  consideration in weighing the veracity of the<br>7  conclusions, right?<br>8          MR. HEGARTY:  Objection.  Form.<br>9          MR. DONATH:  Objection to form.<br>10          THE WITNESS:  Not in my opinion<br>11  as a scientist.<br>12  QUESTIONS BY MR. BOWDEN:<br>13      Q.    Okay.  But you do feel that it<br>14  would be inappropriate to hide the source of<br>15  fundings, correct?<br>16      A.    Yes.  Certainly from the -- I<br>17  mean, from the journal, that's when usually<br>18  the acknowledgement is -- comes related to<br>19  the source of funding.<br>20      Q.    And beyond just journal<br>21  publications, interacting with regulatory<br>22  bodies, many, if not all of those, require<br>23  financial disclosures, right --<br>24          MR. HEGARTY:  Objection.  Form.<br>25 |

| Page 159 | Page 161 |
|---|---|
| 1      shouldn't at the end of the work,<br>2      certainly.<br>3  QUESTIONS BY MR. BOWDEN:<br>4      Q.    Right.<br>5          Because that would be<br>6  inappropriate, right?<br>7      A.    Yes.<br>8          MR. DONATH:  Objection to form.<br>9  QUESTIONS BY MR. BOWDEN:<br>10      Q.    That would mask biases<br>11  potentially in the paper, right?<br>12          MR. HEGARTY:  Objection to<br>13  form.<br>14          THE WITNESS:  No, I don't think<br>15  it masked biases necessarily.<br>16  QUESTIONS BY MR. BOWDEN:<br>17      Q.    Okay.  Well, you would agree<br>18  with me that it would deprive the reader of<br>19  an article from assessing whether the author<br>20  had a bias, right?<br>21          MR. DONATH:  Objection.  Form.<br>22          THE WITNESS:  Well, I don't<br>23  know about assessing bias.  It<br>24  wouldn't inform the reader of who paid<br>25  for the work. | 1  QUESTIONS BY MR. BOWDEN:<br>2      Q.    -- if you're going to be<br>3  speaking before a regulatory body?<br>4          MR. HEGARTY:  Objection.  Form.<br>5          THE WITNESS:  I don't -- I<br>6  don't know if -- that may have taken<br>7  place at the OSHA hearing, and that<br>8  might be the first place I saw that<br>9  take place, and that was just four<br>10  years ago or so, three, four.<br>11  QUESTIONS BY MR. BOWDEN:<br>12      Q.    Four years ago.  Okay.<br>13          Does NTP require disclosure of<br>14  financial interest?<br>15      A.    I don't know if they do now.<br>16  They didn't -- I don't think it was ever that<br>17  during the period they were handling the NTP<br>18  process.<br>19          Certainly in NIOSH, when I was<br>20  in NIOSH, people appeared before NIOSH to<br>21  state opinion, provide information.  That was<br>22  not required.<br>23      Q.    How about IARC proceedings?<br>24      A.    I don't know what IARC requires<br>25  for their working group members. |

41 (Pages 158 to 161)

Robert Glenn

Page 162

1    Q.   I'm not talking about working
2  group members.  I mean people who are going
3  to appear to either observe or give
4  testimony.
5        MR. HEGARTY:  Objection to
6  form.
7        THE WITNESS:  Well, observers
8  are nominated by industry groups, so,
9  yes, they know that.  Excuse me.
10       (Glenn Exhibit 15 marked for
11  identification.)
12 QUESTIONS BY MR. BOWDEN:
13   Q.   I'm going to hand you what I'm
14 marking now as Exhibit Number 15, P1.37.
15       Actually, let's go back to
16 P149, please.  I'm trying to save myself
17 time, and it ended up costing me.
18       This is going to be Exhibit
19 Number 15.  P1.0035.
20       Now we're going forward in
21 time.  You see we're up to now May of 2005.
22       Do you see that?
23   A.   Yes.
24   Q.   And this is a call between --
25 actually, it's an e-mail from you to the

Page 163

1  Meta-Analysis Research Group, Muscat,
2  Zazenski, and Steven Mann.
3        Do you see that?
4    A.   Yes.
5    Q.   And it says, "Attachments, talc
6  is a sclerosing" -- I think that's
7  misspelled, agent, but that's what it's
8  supposed to be, right?
9    A.   Yes.  Okay.
10   Q.   -- "and sclerosing strategy
11 attachments."
12       Do you see that there?
13   A.   Yes.
14   Q.   Now, we had seen a little bit
15 ago, at the beginning of your deposition,
16 where one of the terms of the agreement was
17 that Crowell & Moring as well as the clients,
18 Luzenac -- and we've seen Johnson & Johnson
19 played a role, too -- had a right to comment,
20 to edit and propose their suggestions to the
21 authors, right?
22       MR. HEGARTY:  Objection to
23  form.
24       THE WITNESS:  To the authors.
25       And as I recall, that was for reports.

Page 164

1        It didn't specify reports, but that's
2   the way it worked out, as I recall.
3  QUESTIONS BY MR. BOWDEN:
4    Q.   Yeah, and there was only tasks
5  they were being asked to deliver.
6    A.   They were at that time.
7    Q.   One was the diaphragm study.
8    A.   Yes.
9    Q.   The other was an NTP report,
10 right?
11   A.   Right.
12       MR. HEGARTY:  Objection.  Form.
13 QUESTIONS BY MR. BOWDEN:
14   Q.   And on this e-mail --
15       MR. BOWDEN:  I want to go down,
16  Mr. Smith, down to primary purpose.
17 QUESTIONS BY MR. BOWDEN:
18   Q.   The primary purpose of the call
19 that you're setting up in this e-mail was to
20 have Dr. Huncharek and Muscat update you on
21 the progress related to the literature review
22 regarding the use of talc as a perineal
23 dusting agent and its relationship with
24 ovarian cancer, and to update us on the
25 progress of the meta-analysis study of talc

Page 165

1  and ovarian cancer.
2        That would be the diaphragm
3  study, right?
4    A.   Yes.
5    Q.   Okay.  So again, we're just
6  talking about the two deliverables that we've
7  gone through the agreements on, right?
8    A.   Those were the primary
9  purposes, yes.
10   Q.   And then there's a secondary
11 purpose of the call.
12       Do you see the next paragraph
13 down there?
14   A.   Yes.
15   Q.   Would be to discuss the
16 experience with talc use as a sclerosing
17 agent, the likelihood talc use and perineal
18 dusting migration to the ovary, and three,
19 the study of perineal talc exposure and
20 ovarian cancer in the Central Valley of
21 California.
22   A.   Yes.
23   Q.   And that Central Valley
24 California, that's the Mills paper, right?
25   A.   Yes.

42 (Pages 162 to 165)

Robert Glenn

Page 166

1    Q.    Okay.  "Firstly, you will find
2  attached a strategy that discusses how the
3  experience of talc being used as a sclerosing
4  agent could possibly be used to discount its
5  role as a factor in ovarian cancer."
6        Right?
7    A.    That's correct.
8    Q.    And that actual strategy came
9  from you?
10   A.    Yes, it did.
11   Q.    Were you the author of the
12 strategy?
13   A.    Yes.
14   Q.    Okay.  Let's look at the
15 strategy itself.
16   A.    All right.
17       MR. BOWDEN:  Corey, let's go
18 ahead and turn to page 7, 35.7,
19 please.
20       THE WITNESS:  Okay.
21 QUESTIONS BY MR. BOWDEN:
22   Q.    You with me on this, sir, the
23 hypothesis section?
24   A.    Yes.
25   Q.    Okay.  "Hypothesis of why talc

Page 167

1  would not be expected to be carcinogenic to
2  the ovary."
3        Do you see that?
4    A.    Yes.
5    Q.    And then if you go down five
6  bullet points, it says, "No evidence of
7  increased mesotheliomas from pleurodesis for
8  spontaneous pneumothorax."
9        Do you see that there?
10   A.    Yes.  Yes.
11   Q.    Is that what we were talking
12 about from the first page?
13   A.    Yes.
14   Q.    That's a sclerosing agent,
15 right?
16   A.    Yeah.  That came about from the
17 experience my son had with a collapsed lung.
18       MR. BOWDEN:  I'm going to move
19 to strike, sir.
20       THE WITNESS:  And this --
21 this -- well --
22 QUESTIONS BY MR. BOWDEN:
23   Q.    Go ahead.
24   A.    I think it's somewhat important
25 to --

Page 168

1    Q.    Go ahead, I'll let you.
2    A.    -- understand what -- this is
3  something that formed my opinion --
4    Q.    Okay.
5    A.    -- about talc not being an
6  ovarian carcinogen, the experience with using
7  5 grams and above on the pleural tissue to
8  cause adhesions to prevent spontaneous
9  pneumothorax from occurring in the future.
10 And that would be a massive dose of talc to a
11 tissue that is known to respond with
12 mesotheliomas and tumors when it's -- when
13 it's treated with asbestos.
14   Q.    I'm sorry to hear that.
15       The pleural space, you're using
16 medical terms --
17   A.    But back then, you know, they
18 did it as open thoracotomy, so he had an open
19 chest.  And --
20   Q.    Use the talc slurring?
21   A.    Yes.
22   Q.    Okay.
23   A.    5 grams of it.  Sterile talc.
24   Q.    What do you mean "sterile
25 talc"?

Page 169

1    A.    The talc used for pleurodesis
2  is considered sterile talc because it's going
3  to be used for medical purposes.
4    Q.    So that would be pharmaceutical
5  grade?
6    A.    Yeah.
7    Q.    That'd be 99 percent talc or
8  better?
9    A.    Yeah.
10       MR. HEGARTY:  Objection to
11 form.
12 QUESTIONS BY MR. BOWDEN:
13   Q.    By definition.
14   A.    Yeah.  And those same talcs
15 have been -- animals have been treated with
16 them and they have not responded with tumors.
17       And we know that that pleural
18 tissue is prime to respond with tumors in
19 humans and rats to a point where the Stanton
20 study, a hallmark study, found that these
21 very same talcs, these cosmetic -- these
22 talcs used pleurodesis did not cause tumors
23 in rats.
24       Very important in my -- the
25 opinion I came to regarding talc and ovarian

Robert Glenn

| Page 170 | Page 172 |
|---|---|

**Page 170**

1   cancer.
2         I can't imagine if ovarian
3   tissue were hit with a load like that -- if
4   lung tissue is and it doesn't respond, I
5   don't think epithelial tissue in the -- in
6   the ovary will respond.
7         So, sorry to get off on that.
8         Q.    No, and I -- I'm sorry to hear
9   that.
10        A.    Yeah.  Well, he never had
11  another spontaneous pneumothorax either from
12  his treatment.
13        Q.    Oh, good.
14        A.    And he never developed
15  mesothelioma.
16        Q.    Okay.  So you had used quite a
17  few medical terms.  I just want to make sure
18  that I understand them.
19        A.    All right.
20        Q.    So the spontaneous
21  pneumothorax, that's a collapsed lung, right?
22        A.    That's a collapsed lung, yes.
23        Q.    And the pleura, that's the
24  actual tissue surrounding the outside of the
25  lung?

**Page 171**

1         A.    There're two pleural surfaces.
2         Q.    Okay.  Go ahead.
3         A.    The visceral pleura and the
4   parietal pleura.
5         Q.    Right.
6         A.    The visceral surrounds the
7   lung --
8         Q.    Is above the diaphragm.
9         A.    -- and the abdomen -- abdominal
10  organs, and the parietal is on the chest
11  wall.
12        Q.    Okay.  Okay.
13              MR. BOWDEN:  I want to go back
14  to page 4, Corey.  It's just on the
15  other side.
16              THE WITNESS:  I'm sorry.  Got
17  too many pages.  Okay.
18              With the table?  Oh.
19  QUESTIONS BY MR. BOWDEN:
20        Q.    It's 35.4.  It's actually
21  page 2 of the document.
22        A.    Yeah, I have it now.
23        Q.    Are you okay to keep going,
24  sir?
25        A.    Sure.

**Page 172**

1         Q.    Okay.  What we just saw as the
2   bullet point we just referenced on the other
3   page, this is the actual section that
4   supports that hypothesis, right?
5         A.    That's correct.
6         Q.    And you quote here a study by
7   Lange and Mortensen and Groth, "Lung function
8   22 to 35 years after treatment of idiopathic
9   spontaneous pneumothorax."
10              That's like what you just
11  described, correct?
12        A.    Correct.
13        Q.    "With talc poudrage" -- I don't
14  know how to say that.
15        A.    Poudrage.
16        Q.    Poudrage.
17              -- "or simple drainage thorax,"
18  right?
19        A.    Uhm.
20        Q.    I'm not asking you to describe
21  it, but --
22        A.    Yes.
23        Q.    -- that's what you quoted in
24  here, correct?
25        A.    I was just saying in low

**Page 173**

1   country, South Carolina, they probably
2   wouldn't say poudrage, but --
3         Q.    Well, then I said it right.
4         A.    Yeah, right.
5         Q.    All right.  "So the long-term
6   effects of lung function of treatment of
7   idiopathic spontaneous pneumothorax by talc
8   poudrage or simple chest drainage was
9   assessed in 114 consecutive patients treated
10  at two chest sites in Copenhagen for
11  idiopathic spontaneous pneumothorax" --
12              Lung collapses, right?
13        A.    Uh-huh.
14        Q.    -- "without known origin."
15              Right?
16        A.    Yeah.
17        Q.    Okay.  And you go on there to
18  discuss at the very end of it:  "None of the
19  subjects had developed a mesothelioma."
20        A.    Yes.
21        Q.    Right?
22              And mesothelioma is a cancer,
23  right?
24        A.    It's a very serious cancer.
25        Q.    It's an incurable cancer?

44 (Pages 170 to 173)

Robert Glenn

| Page 174 | Page 176 |
|---|---|
| 1   A.   It is incurable, yes. | 1   Q.   Epithelial ovarian cells? |
| 2   Q.   Always a lethal cancer, right? | 2   A.   -- and epithelial ovarian |
| 3   A.   To my knowledge, yes. | 3  cells, genetic microarrays. |
| 4   Q.   Okay. | 4   Q.   Right. |
| 5   A.   It might be some peritoneals | 5   A.   Right. |
| 6  survive, but certainly the pleural do not. | 6   Q.   And we're going to actually |
| 7   Q.   Okay.  And I do have to ask | 7  talk about that later on. |
| 8  you:  You are not an oncologist, correct? | 8   A.   Okay.  Good. |
| 9   A.   No, I'm not. | 9   Q.   That's the -- you're referring |
| 10   Q.   Okay.  And you're not an | 10  to Mossman and -- |
| 11  oncologist dealing with ovarian tumors, | 11   A.   Dr. Mossman, yes. |
| 12  correct? | 12   Q.   Yeah.  Okay. |
| 13   A.   No. | 13      We're going to get to that. |
| 14   Q.   In writing this strategy, did | 14   A.   Okay. |
| 15  you consult with a gynecological oncologist? | 15   Q.   I promise we'll come back to |
| 16   A.   I did not.  I did consult with | 16  it. |
| 17  a pulmonary specialist that had considerable | 17      So one of the comments you just |
| 18  experience with pleurodesis.  I don't know | 18  made in that last paper we were talking about |
| 19  whether that was before this time or after, | 19  was pharmaceutical grade talc.  I think you |
| 20  but Dr. Veena Antony at the University of | 20  said medical grade talc. |
| 21  Florida. | 21   A.   The Lange study, yes. |
| 22   Q.   Okay. | 22   Q.   Okay.  So I think it's |
| 23   A.   And she essentially was in | 23  important to understand that there are |
| 24  agreement with the hypothesis based upon her | 24  different types of talc, right? |
| 25  experience with pleurodesis for malignant | 25   A.   Yeah, the -- these talcs that |

| Page 175 | Page 177 |
|---|---|
| 1  pleural mesotheliomas and other causes. | 1  they use for pleurodesis, they come from the |
| 2   Q.   Okay.  And pleural cells are | 2  same deposits that body powder talcs come |
| 3  different than ovarian cells, correct? | 3  from. |
| 4   A.   Yeah, they are.  Ovarian cells | 4   Q.   Right. |
| 5  or epithelium cells, pleuras from the | 5      But they have different |
| 6  mesoderm. | 6  compositions? |
| 7   Q.   Right. | 7   A.   Not necessarily.  Not to my |
| 8      Mesoderm being the membrane | 8  knowledge. |
| 9  lining. | 9   Q.   Pharmaceutical grade talc is |
| 10   A.   That's correct. | 10  defined as having 99 percent talcum in it, |
| 11   Q.   And in this case what you're | 11  right? |
| 12  talking about is the pleural space, right? | 12      MR. BILLINGS-KANG:  Object to |
| 13   A.   That's for the embryologic | 13  form. |
| 14  origin of it, yes. | 14      THE WITNESS:  I would have to |
| 15   Q.   Okay.  Okay.  All right.  We're | 15  go back and read this FDA |
| 16  going to come back -- | 16  specification.  I cannot recall right |
| 17   A.   However, there are epithelial | 17  now, having it been 10, 14 years ago |
| 18  cell linings in the lung. | 18  when I read that, but I would say it |
| 19   Q.   Right.  But I'm talking about | 19  is 99 percent talc, yes. |
| 20  ovarian cells.  Epithelial ovarian cells are | 20      (Glenn Exhibit 16 marked for |
| 21  different? | 21  identification.) |
| 22   A.   Yeah, but those epithelial | 22  QUESTIONS BY MR. BOWDEN: |
| 23  cells in the lung would be very similar. | 23   Q.   Okay.  I want to hand you what |
| 24      And some experiments have been | 24  I'm going to mark as Exhibit 16. |
| 25  done using human mesothelial cells and -- | 25   A.   Okay. |

45 (Pages 174 to 177)

Robert Glenn

Page 178

```
 1        Q.   I marked my copy.  Bear with me
 2   one moment.
 3            The last document we were
 4   looking at was dated May 3, 2005.  This
 5   document is dated May 9, 2005.
 6            Do you see that?
 7        A.   Yeah.
 8        Q.   And this is a follow-up from
 9   the NTP talc telephone conference that you
10   had with Luzenac, Meta-Analysis Research
11   Group and Johnson & Johnson, right?
12        A.   It appears to be, yes.
13        Q.   And this is Steven Mann writing
14   internally at Johnson & Johnson that "we
15   discussed another issue related to the
16   historical use of talc and the treatment of
17   spontaneous lung collapse and how the lack of
18   tumors might help our case," right?
19        A.   Yes.
20        Q.   And that was a suggestion that
21   you raised, right?
22        A.   Yes, it is.
23        Q.   Okay.  Prior to this suggestion
24   in that phone call of May of 2005, there
25   wasn't a section in their potential report on
```

Page 179

```
 1   that issue, right?  That was something that
 2   you brought and added to the conversation?
 3            MR. HEGARTY:  Objection.  Form.
 4            THE WITNESS:  I'm sorry, could
 5       you repeat that one?
 6   QUESTIONS BY MR. BOWDEN:
 7        Q.   Prior to this telephone
 8   conference in May of 2005 --
 9        A.   Telephone conference, yeah,
10   right.
11        Q.   Yes, sir.
12            -- that was a strategy that you
13   developed to include --
14        A.   I introduced, yes.
15        Q.   Okay.  Before then, it was not
16   something that was in the review paper that
17   they were writing, correct?
18            MR. HEGARTY:  Objection.  Form.
19            MR. DONATH:  Objection.
20            THE WITNESS:  No, not to my
21       knowledge.
22   QUESTIONS BY MR. BOWDEN:
23        Q.   Okay.
24        A.   I wasn't -- I don't know
25   whether Dr. Huncharek and Dr. Muscat were
```

Page 180

```
 1   aware of this hypothesis of this pleurodesis
 2   issue.  It's certain IARC wasn't aware of it
 3   because when it was brought to their
 4   attention, someone had to explain what
 5   pleurodesis was.
 6        Q.   Oh, okay.
 7            Now, ultimately -- and this is
 8   May of 2005 --
 9        A.   Yes.
10        Q.   -- right?
11            And some of this discussion
12   beyond the diaphragm study is regarding the
13   process for creating a report for submission
14   to the NTP, the 12 ROC.
15            That's what we've been
16   discussed, right?
17        A.   Yes.
18        Q.   And ultimately what happened
19   was later that year, the NTP withdrew their
20   nomination of talc, right?
21        A.   They drew -- withdrew the 10th.
22        Q.   Withdrew the nomination of the
23   talc from the 12th Report on Carcinogens.
24        A.   Oh, the 12th.  I didn't catch
25   that in reviewing my documents, but you may
```

Page 181

```
 1   be correct.
 2        Q.   Well, you know ultimately that
 3   the NTP paper that you had had Meta-Analysis
 4   Research Group begin drafting was never
 5   submitted to the NTP?
 6        A.   I do, yes.
 7        Q.   Because the NTP, that issue
 8   just went by the wayside.  They withdrew it.
 9        A.   Yeah, I -- you're recalling
10   some things that now are coming back to me,
11   but I wasn't really aware --
12        Q.   And I understand.
13        A.   -- the 12th had been withdrawn.
14        Q.   Sure.  Right.  I just want
15   to --
16        A.   Yeah.
17        Q.   -- to show the timeline --
18        A.   Sure.
19        Q.   -- for the jury of what's
20   happening here.
21        A.   Sure.
22        Q.   Before the NTP withdrew their
23   nomination of talc, IARC picked up the issue,
24   right?
25        A.   Yes, and I think there was some
```

Robert Glenn

Page 182

1   communication between NTP and IARC on that.
2        Q.   Right.
3             And so while NTP was
4   withdrawing the nomination, there was
5   knowledge at that point in time that IARC was
6   going to take the issue up and have a working
7   group on it, right?
8             MR. DONATH:  Objection to form.
9             THE WITNESS:  Yes, now that you
10       mention that, that would probably be
11       the -- the order that would take
12       place.  It seems like in this case
13       they did have the 10th.
14            But IARC generally reviews
15       these substances, and then the NTP,
16       they essentially endorse them, they
17       rubber-stamp.
18  QUESTIONS BY MR. BOWDEN:
19       Q.   Okay.  So if anyone were to
20  walk into court in this case and say that the
21  NTP withdrew their nomination of talc from
22  the 12th Report on Carcinogens because they
23  concluded that talc was not a carcinogen,
24  that would not be accurate?
25            MR. DONATH:  Objection to form.

Page 183

1             THE WITNESS:  That wouldn't --
2        to my knowledge, no, that would not be
3        accurate.  I don't think that was the
4        cause.
5             There was some discussion
6        between Dr. Jameson and an individual
7        with the IARC that you're getting into
8        a ball of wax by reviewing talc.
9   QUESTIONS BY MR. BOWDEN:
10       Q.   Okay.
11       A.   Or words to that effect.
12       Q.   Well -- and we're switching
13  gears, but there's a lot of overlap as you've
14  described.
15            NTP was withdrawing from the
16  issue at the same time they know that IARC is
17  picking it up, and that had implications to
18  Crowell & Moring and their interactions with
19  Meta-Analysis Research Group, right?
20            MR. DONATH:  Objection to form.
21            MR. HEGARTY:  Objection to
22       form.
23            MR. BOWDEN:  And I can be more
24       specific.
25            THE WITNESS:  There was a

Page 184

1        shift, yeah, yeah.
2   QUESTIONS BY MR. BOWDEN:
3        Q.   Sure.
4             And so what happened was that
5   the -- the review, the report that was
6   created or was in the draft stages --
7        A.   Uh-huh.
8        Q.   -- that was shelved for the
9   time being, right?
10            MR. HEGARTY:  Objection.  Form.
11            THE WITNESS:  I'm not -- I
12       don't recall it being shelved.  It may
13       have been.
14  QUESTIONS BY MR. BOWDEN:
15       Q.   Well, I guess --
16       A.   As you say, we were developing
17  those reports for NTP.
18       Q.   So the contract said?
19       A.   Yeah.
20       Q.   Right.
21       A.   They were for NTP submission.
22       Q.   Right.  So the idea of
23  submitting it to the NTP, that idea had been
24  shelved, but the idea of continuing on with
25  the report and reaching conclusions, that

Page 185

1   work continued?
2             MR. DONATH:  Objection to form.
3             MR. HEGARTY:  Objection to
4        form.
5             THE WITNESS:  Yes.  I think I
6        did, yes.
7   QUESTIONS BY MR. BOWDEN:
8        Q.   So there were some objections
9   and I think your answer overlapped it, so I'm
10  going to reask the question to you again.
11            The intent to submit that
12  report to the NTP, that intent went away when
13  the NTP withdrew its nomination?
14       A.   Yes.
15       Q.   However, the intent for
16  Crowell & Moring to continue with the report
17  itself, that continued on --
18            MR. HEGARTY:  Objection.
19  QUESTIONS BY MR. BOWDEN:
20       Q.   -- exclusive of the NTP
21  process?
22            MR. DONATH:  Objection.  Form.
23            MR. HEGARTY:  Objection.  Form.
24            THE WITNESS:  Yes, I think our
25       client was still interested in the

47 (Pages 182 to 185)

Robert Glenn

Page 186

```
 1      reviews and -- to find out if what was
 2      the relationship, if any, between
 3      perineal dusting and ovarian cancer.
 4      So that continued.
 5  QUESTIONS BY MR. BOWDEN:
 6      Q.    And at the same time, the
 7  diaphragm study was still being developed,
 8  right?
 9      A.    Yes.
10      Q.    There wasn't as much input on
11  the diaphragm study, was there?
12          MR. HEGARTY:  Objection to
13  form.
14          MR. DONATH:  Objection.  Form.
15          THE WITNESS:  That was proposed
16  by Dr. Huncharek, and it was
17  meta-analysis, and we didn't -- I
18  didn't have a lot of input on that.
19  QUESTIONS BY MR. BOWDEN:
20      Q.    But the NTP proposal was
21  proposed by Crowell & Moring?
22      A.    They --
23      Q.    On behalf of Luzenac?
24      A.    Yeah.  Yeah.
25      Q.    Okay.
```

Page 187

```
 1          THE WITNESS:  I hate to do this
 2  to you, but let's do one more.  I'm
 3  sorry.
 4          MR. BOWDEN:  It's completely
 5  okay.  I'm going to sit tight.  We can
 6  take a shorter break that way.
 7          THE WITNESS:  If y'all can just
 8  sit by, I'll be right back.
 9          VIDEOGRAPHER:  The time is now
10  11:37.  Going off the record.
11          (Off the record at 11:37 a.m.)
12          VIDEOGRAPHER:  Okay.  The time
13  is now 11:40.  Back on the record.
14          (Glenn Exhibit 17 marked for
15  identification.)
16  QUESTIONS BY MR. BOWDEN:
17      Q.    All right.  I'm going to hand
18  you what's marked as Exhibit 17, sir.
19      A.    All right.  Okay.
20      Q.    Do you recognize this document
21  in your review for this deposition?
22      A.    Yes, I do.
23      Q.    Did you spend some time on it?
24      A.    I looked through it, yes.
25      Q.    And this is a pretty good-sized
```

Page 188

```
 1  document.  It's 100 and, what, 61 pages by my
 2  count.
 3          Is that about right to you?
 4  It's numbered at the bottom.
 5      A.    Yeah, right, with the -- the
 6  actual text, it's maybe 47, 48 pages.
 7      Q.    Right.
 8      A.    Approximately.
 9      Q.    Right.
10          So -- and you can see on the
11  first page here, this is an e-mail from you
12  dated July 27, 2005, to Luzenac, Johnson &
13  Johnson, copying Ridgway Hall, right?
14      A.    Yes.
15      Q.    And it says, "Subject,
16  deliverables from Huncharek and Muscat,"
17  right?
18      A.    Yes.
19      Q.    And we go down to the body of
20  this on the first page, it says, "We recently
21  received documents from Dr. Huncharek and
22  Muscat in response to our agreement providing
23  for comments to the NTP and for conducting a
24  meta-analysis."
25          And then you list out a total
```

Page 189

```
 1  of eight -- there's five on the first page --
 2  the following documents:  Executive summary,
 3  talc and ovarian cancer, a critical review.
 4          Now, that number 2 there, talc
 5  and ovarian cancer, a critical review, that
 6  would be the report for the NTP --
 7      A.    Yes.
 8      Q.    -- that's ultimately scratched,
 9  right?
10      A.    That would be the report, yes.
11      Q.    I said "scratched."
12  "Ultimately not submitted" is the right way
13  of saying that, right?
14      A.    Yes.
15      Q.    Okay.  And you see on the end
16  of number 2 it says, "clean copy," right?
17      A.    Yes.
18      Q.    And then 3 it says, "red line
19  version," right?
20      A.    Yeah.  Correct.
21      Q.    Then you've got some SEER
22  information, and then 5 is the draft
23  manuscript of use of cosmetic talc on
24  contraceptive diaphragms and risk of ovarian
25  cancer.
```

48 (Pages 186 to 189)

Robert Glenn

Page 190

1    A.    Right.
2    Q.    That's the meta-analysis -- the
3  diaphragm meta-analysis, right?
4    A.    Right.
5    Q.    If you'll turn with me to the
6  second page, I got a couple of tables and two
7  figures that are listed out as 6, 7 and 8,
8  right?
9    A.    Correct.
10    Q.    And those were submitted to --
11  those are drafts of forest plots and a couple
12  of tables that were summarizing data within
13  the article itself?
14    A.    Right.
15    Q.    And those were given to you,
16  Johnson & Johnson and Luzenac, as well as
17  Crowell & Moring, to provide your edits and
18  comments on, true?
19        MR. HEGARTY:  Objection to
20  form.
21        MR. DONATH:  Objection to form.
22        THE WITNESS:  Yeah, we were
23  asked to review this.
24  QUESTIONS BY MR. BOWDEN:
25    Q.    Okay.

Page 191

1    A.    Or we did review it, yes.
2    Q.    Right.
3        The meta-analysis document,
4  Item Number 5:  "Seems well written, and
5  conclusions are supported by the data."
6    A.    Yeah.
7    Q.    "However, the critical
8  review" -- again, that's the NTP report,
9  right?
10    A.    Uh-huh.
11    Q.    -- "Items 2 and 3 is not as
12  well done and will require some revisions by
13  the authors after receiving our collective
14  comments."
15        And now this sequence, this is
16  after -- after the strategy document you sent
17  around, right?
18        MR. HEGARTY:  Objection. Form.
19        THE WITNESS:  The strategy
20  document on pleurodesis?
21  QUESTIONS BY MR. BOWDEN:
22    Q.    Yes, sir.
23    A.    Yeah.
24    Q.    Well, it's actually -- it was a
25  strategy document that was more than just

Page 192

1  pleurodesis.  It outlined 11 different
2  hypotheses, I think, of talc and ovarian
3  cancers and why there might not be a
4  correlation.
5    A.    Yeah, okay.
6    Q.    Is that correct?
7    A.    I think that -- I think you're
8  right about that, yes.
9    Q.    Okay.  And then it says, if we
10  continue on here, "You will see we question
11  inclusion of sections 3 and 4 and are
12  undecided whether they belong in scientific
13  comments to the NTP or add any value to the
14  thrust of the comments.  Your opinions on
15  whether to recommend deleting these sections
16  or placing them in the appendix will be
17  welcomed.  You will note that we recommended
18  the section related to talc mineralogy and
19  its similarity/dissimilarity to asbestos
20  needs attention by Rich Zazenski or a
21  mineralogist."
22    A.    Yes.
23    Q.    Did you ever consult with a
24  mineralogist in preparing that report?
25    A.    I did not.

Page 193

1        MR. DONATH:  Objection to form.
2  QUESTIONS BY MR. BOWDEN:
3    Q.    Do you know whether the authors
4  ever consulted with one?
5    A.    I think they may have.
6    Q.    But you don't recall?
7    A.    I don't know who it was.  But
8  Dr. Muscat, who's principal on this, he's not
9  a mineralogist and had poor understanding of
10  mineralogy, and we felt that it, you know, it
11  shouldn't go out without those corrections
12  being made.
13    Q.    I see.  Okay.
14        "We are in hopes of getting our
15  collective comments back to Huncharek and
16  Muscat by August 12 and would appreciate your
17  comments by August 9th," right?
18        So you were establishing a
19  timeline to get these comments in --
20    A.    Yes.
21    Q.    -- correct?
22        So now let's turn to some of
23  the actual pages in this -- this report.
24    A.    Yeah.
25    Q.    If you'll turn to -- I'm going

49 (Pages 190 to 193)

Robert Glenn

Page 194

1    to use, because it's easier to see, is P138.5
2    at the bottom.  It's in bold.
3        A.   Okay.
4        Q.   And this is going to be
5    called -- strike that.
6            This is the cover page --
7        A.   Oh, I've got 4.
8        Q.   -- to the draft report.
9        A.   Wait a minute.  I've got 5.
10   Yeah, this is the cover.
11       Q.   Oh, I'm sorry.  You with me
12   now?
13       A.   Yeah.
14       Q.   Okay.  Great.
15       A.   This is the cover page.
16       Q.   Right.  Right.
17            "Talc and Ovarian Cancer:  A
18   Critical Review."
19            You see where that's written?
20       A.   Yes.
21       Q.   "A report provided to Crowell &
22   Moring by Michael Huncharek and Josh Muscat."
23            Do you see that there?
24       A.   Yes.
25       Q.   All right.  And if you turn to

Page 195

1    page 22, .22.
2        A.   Okay.
3        Q.   You with me?
4        A.   Yeah.
5        Q.   The bolded section is called 5,
6    testing the talc hypothesis, right?
7        A.   Right.
8        Q.   And this is the introductory
9    section, right, of what -- of what hypotheses
10   are going to be discussed within this
11   article, right?
12       A.   Yes, this is his initial
13   introduction, yes.
14       Q.   And you can see on page 19 that
15   it starts listing them out, and it's 1
16   through 8 --
17       A.   Page?
18       Q.   I'm sorry, page 23.
19       A.   Okay.  Yes.
20       Q.   And number 8 is the talc
21   pleurodesis section, right, or the
22   introductory language?
23       A.   Yes.
24       Q.   And then on page 24, the next
25   page, you've got 9 through 11 listed as

Page 196

1    well --
2        A.   Yes.  Yes.
3        Q.   -- right?
4            So what I want to draw your
5    attention to is page .35, if you can go to
6    page .35 for me.
7        A.   Okay.  Okay.
8        Q.   Now, you see Section 8 there?
9        A.   Yeah.
10       Q.   Which is talc pleurodesis?
11       A.   Right.
12       Q.   That entire section was added
13   as a result of your strategy paper, right?
14       A.   It appears to be, yes.
15       Q.   And it continues on to
16   page .36, page .37, right?
17       A.   Yes.
18       Q.   So it appears to be just over
19   two pages worth of information, right?
20       A.   Yes.
21       Q.   And but for your involvement --
22   strike that.
23            Without you recommending this
24   to be in there, this would not have been in
25   there, true?

Page 197

1            MR. HEGARTY:  Objection.  Form.
2            MR. DONATH:  Objection.  Form.
3            THE WITNESS:  I brought this to
4        the attention of the authors.  They
5        decided to include it.
6    QUESTIONS BY MR. BOWDEN:
7        Q.   I see.
8            Was this paper ultimately
9    published?
10           MR. HEGARTY:  Objection.  Form.
11           THE WITNESS:  Yes.  Yes, it
12       was.  I think.
13   QUESTIONS BY MR. BOWDEN:
14       Q.   It was published, right?
15       A.   Yeah.
16       Q.   And it took a while to get
17   published, didn't it?
18           MR. BILLINGS-KANG:  Objection.
19       Form.
20           THE WITNESS:  It may have, yes.
21   QUESTIONS BY MR. BOWDEN:
22       Q.   And the reason it took a while
23   to get published is that it had been rejected
24   by four separate journals prior to being
25   accepted, right?

50 (Pages 194 to 197)

Robert Glenn

Page 198

1         MR. HEGARTY: Objection. Form.
2         MR. DONATH: Objection. Form.
3         MR. BILLINGS-KANG: Objection.
4    Form.
5         THE WITNESS: It may have been,
6    yes.
7    QUESTIONS BY MR. BOWDEN:
8         Q.    Well, I don't know about may
9    have been. It actually was rejected --
10        A.    Okay.
11        Q.    -- by numerous articles,
12   right -- or journals?
13        A.    By some journals, yes.
14        Q.    Okay. Do you know that we took
15   the deposition of Dr. Muscat in this
16   litigation?
17        A.    I was aware of that, yes.
18        Q.    Did you review his testimony?
19        A.    No, I did not.
20        Q.    Were you provided with any sort
21   of summary of what his testimony is?
22        A.    No, I was not.
23        Q.    Okay. Would it surprise you to
24   learn that Dr. Muscat says that this paper
25   was never published?

Page 199

1         MR. HEGARTY: Objection. Form.
2         THE WITNESS: I think it was
3    published.
4    QUESTIONS BY MR. BOWDEN:
5         Q.    You think he's wrong?
6         MR. HEGARTY: Objection. Form.
7         THE WITNESS: I think it was
8    published in a European journal.
9    QUESTIONS BY MR. BOWDEN:
10        Q.    Journal of Cancer Prevention?
11        A.    Yeah. Yeah. Right.
12        Q.    Ultimately what started off as
13   a proposal from Crowell & Moring to conduct a
14   summary review for the NTP winds up being
15   published in the European Journal of Cancer
16   Prevention, right?
17        MR. HEGARTY: Objection. Form.
18        THE WITNESS: Yeah, it was
19        mentioned in their agreement that they
20        put forward their proposal that they
21        would submit articles for publication,
22        so I don't know that's so surprising.
23        (Glenn Exhibit 18 marked for
24        identification.)
25

Page 200

1    QUESTIONS BY MR. BOWDEN:
2         Q.    I hand you what I'm labeling as
3    Exhibit Number 18. There you go, sir.
4         A.    Okay.
5         Q.    Did you review this article in
6    preparing for your deposition?
7         A.    I looked -- yes, I saw it in
8    the documents that were provided.
9         Q.    And this is the document that
10   you recall -- this publication was originally
11   the NTP report, right --
12        A.    That's --
13        Q.    -- that you commissioned?
14        A.    That was the basis of this
15   paper, yes.
16        Q.    Okay. And you can see at the
17   top, the title changes just slightly to
18   "Perineal talc use and ovarian cancer: A
19   critical review"?
20        MR. HEGARTY: Objection. Form.
21        THE WITNESS: Yes.
22   QUESTIONS BY MR. BOWDEN:
23        Q.    And that's not uncommon to have
24   minor edits, right, like that?
25        MR. HEGARTY: Objection. Form.

Page 201

1         THE WITNESS: Well, yeah,
2         oftentimes the subject of the study,
3         the manuscript that's submitted for
4         publication will differ.
5    QUESTIONS BY MR. BOWDEN:
6         Q.    Sure.
7         A.    Sure.
8         Q.    And that's based on reviewer
9    comments?
10        MR. HEGARTY: Objection. Form.
11        THE WITNESS: No, it's based
12        upon the author. The last paper we
13        submitted --
14   QUESTIONS BY MR. BOWDEN:
15        Q.    Okay. Yeah.
16        A.    The last paper me and my
17   colleagues submitted, the -- we didn't use
18   the report name on it. We couched it in
19   different terms.
20        Q.    Right.
21        And this doesn't indicate, at
22   least on its title, that it was a report
23   prepared for Crowell & Moring, right?
24        A.    No, it does not.
25        Q.    Okay. And you can see that on

51 (Pages 198 to 201)

Robert Glenn

Page 202

1  the --
2      A.    That would -- that wouldn't be
3  normal for a journal to publish that upfront.
4      Q.    That's right.
5            It says in the bottom -- or
6  excuse me.  The received date was October 31,
7  2006, accepted February 13th of 2007.
8            Do you see that?
9      A.    Yes.
10     Q.    Now, let's turn to -- it'll be
11 point -- excuse me .7 for you.
12     A.    Okay.  Yes.
13     Q.    And you see down there where it
14 says "acknowledgement"?
15     A.    Yes.
16     Q.    And it says, "Supported by a
17 contract from Crowell & Moring, Inc., and
18 Public Health Service Grant," and then it
19 lists the number?
20     A.    Yeah.
21     Q.    Okay.  And the contract from
22 Crowell & Moring, that's the original
23 contract we've been discussing today --
24     A.    That's our agreement.
25     Q.    -- that Johnson & Johnson paid

Page 203

1  half of?
2      A.    Yes.
3      Q.    Imerys paid half of?
4      A.    Yes.
5      Q.    Or excuse me, Luzenac paid half
6  of?
7      A.    Yes.
8      Q.    And the funds went through
9  Crowell & Moring?
10     A.    Yes, they -- Luzenac was our
11 client, yes.
12     Q.    Right.  It wasn't Crowell &
13 Moring's money.  It was the client's money,
14 right?
15           MR. HEGARTY:  Objection.  Form.
16           MR. DONATH:  Objection to form.
17           THE WITNESS:  Yes.
18 QUESTIONS BY MR. BOWDEN:
19     Q.    Okay.  And do you see anywhere
20 in this paper where Johnson & Johnson or
21 Luzenac are credited with funding?
22     A.    I don't.  Doctor --
23     Q.    In fact, do you see --
24     A.    Dr. Muscat, I guess he was the
25 primary author, and he's the one that put

Page 204

1  that in, the acknowledgement.
2      Q.    They should be acknowledged,
3  right?
4            MR. HEGARTY:  Objection.  Form.
5            MR. DONATH:  Objection to form.
6            THE WITNESS:  He was being paid
7  by Crowell & Moring.  I don't know why
8  he couched it this way.  Dr. Huncharek
9  differed in his acknowledgment.
10 QUESTIONS BY MR. BOWDEN:
11     Q.    So there's nowhere in this
12 paper that says "supported by funds received
13 from Johnson & Johnson," correct?
14     A.    No, not to my knowledge.  No.
15     Q.    There's nowhere in this paper
16 that acknowledges that funds supporting this
17 paper were received by Luzenac?
18     A.    No.
19           MR. DONATH:  Objection to form.
20 QUESTIONS BY MR. BOWDEN:
21     Q.    The only thing that's listed
22 here is Crowell Moring and a Public Health
23 Service Grant, correct?
24     A.    Yes.
25     Q.    And it says "Crowell & Moring,

Page 205

1  Inc."
2            Do you see that?
3      A.    Yes.
4      Q.    Crowell & Moring, LLP, is who
5  you worked for, right?
6      A.    That's right.
7      Q.    What is Crowell & Moring, Inc.?
8      A.    This was evidently a mistake by
9  Dr. Muscat.
10     Q.    It doesn't say Crowell & Moring
11 law firm, does it?
12     A.    No.  We didn't ask -- he didn't
13 ask us about our title.  I'm surprised he
14 didn't pick it up from correspondence.
15     Q.    You saw drafts of this document
16 before it was submitted, right?
17           MR. HEGARTY:  Objection.  Form.
18           THE WITNESS:  I did see -- I
19 did see a draft of this.
20 QUESTIONS BY MR. BOWDEN:
21     Q.    Crowell & Moring never asked to
22 be identified as a defense law firm, correct?
23           MR. BILLINGS-KANG:  Object to
24 form.
25           MR. DONATH:  Objection.  Form.

52 (Pages 202 to 205)

Robert Glenn

| Page 206 |
|---|

1    THE WITNESS: The journals
2 require the author to disclose this
3 information. We, as the sponsor of
4 it, we didn't have anything to do with
5 it.
6    He chose to put that on there,
7 and you'd best ask him why he chose
8 that way.
9 QUESTIONS BY MR. BOWDEN:
10   Q.   When you received the draft
11 manuscript -- all right.
12    You're not cited as an author
13 in here?
14   A.   No, I'm not. I was not an
15 author.
16   Q.   Johnson & Johnson isn't cited
17 as an author?
18    MR. HEGARTY: Objection. Form.
19    THE WITNESS: They had -- they
20 didn't have significant contribution
21 to it either.
22 QUESTIONS BY MR. BOWDEN:
23   Q.   Luzenac didn't get cited as an
24 author either?
25    MR. DONATH: Objection to form.

| Page 207 |
|---|

1    THE WITNESS: No, they did not
2 have contribution to the paper.
3 QUESTIONS BY MR. BOWDEN:
4   Q.   Okay. If you turn to page .6
5 for me.
6   A.   Okay.
7   Q.   Here it says "therapeutic uses
8 of talc"?
9   A.   Yes.
10   Q.   It says, "Cosmetic grade talc
11 is used therapeutically to treat nonmalignant
12 and malignant pulmonary disease."
13   A.   Yes.
14   Q.   Do you see where I'm reading
15 from?
16   A.   Yes.
17   Q.   "The insufflation causes
18 adhesions between the parietal and visceral
19 pleura and is used in the treatment of
20 bronchopleural fistulas, malignant pleural
21 effusions and pneumothorax," right?
22   A.   Yes.
23   Q.   A collapse of the lung from
24 changes in the intrapleural pressure in the
25 chest cavity, right?

| Page 208 |
|---|

1   A.   Yes.
2   Q.   And this is -- this is actually
3 the section that you proposed in your
4 strategy, right?
5    MR. HEGARTY: Objection. Form.
6    THE WITNESS: This is the
7 section that I brought to their
8 attention, the hypothesis of
9 pleurodesis and how that might relate
10 to ovarian cancer.
11    They prepared this.
12 QUESTIONS BY MR. BOWDEN:
13   Q.   I see.
14   A.   They drafted this, prepared
15 this. This is their language.
16   Q.   Let's go on down to the second
17 paragraph underneath there. It should say,
18 "The safety of talc pleurodesis."
19   A.   Yes.
20   Q.   "The safety of talc pleurodesis
21 has been clinically recognized anecdotally
22 for many decades but also supported by
23 clinical studies," right?
24   A.   Yes.
25   Q.   "In a group of 70 patients

| Page 209 |
|---|

1 medically treated with talc pleurodesis, none
2 developed subsequent malignancies after
3 follow-up for outcomes."
4    Do you see that?
5   A.   Yes.
6   Q.   "In 99 patients undergoing
7 fluoroscopy in asbestos-free talc pleurodesis
8 from spontaneous pneumothorax between 1954
9 and 1964, Lange, et al., none developed
10 malignant mesothelioma as of 1985."
11   A.   That's correct.
12    MR. BOWDEN: Corey, can we do a
13 split screen? Can you pull up
14 P1.0035.4?
15    Can you pull up that whole
16 section there, the Lange section,
17 please?
18 QUESTIONS BY MR. BOWDEN:
19   Q.   You would agree with me that
20 the Lange article is quoted in the ultimately
21 published -- strike that.
22    The Lange study is quoted in
23 this article which was published, correct?
24    MR. DONATH: Objection. Form.
25    THE WITNESS: Yes, it is.

53 (Pages 206 to 209)

Robert Glenn

| Page 210 | Page 212 |
|---|---|
| 1　QUESTIONS BY MR. BOWDEN: | 1　section on mineralogy as well, right? |
| 2　　Q.　And the Lange study was exactly | 2　　A.　Yes, we recommended that also. |
| 3　what you brought to their attention, correct? | 3　　Q.　And that's another thing that |
| 4　　A.　Yes. | 4　was added in there -- |
| 5　　　MR. DAVANT:  Object to form. | 5　　　MR. HEGARTY:  Objection.  Form. |
| 6　QUESTIONS BY MR. BOWDEN: | 6　QUESTIONS BY MR. BOWDEN: |
| 7　　Q.　And the takeaway that the | 7　　Q.　-- at your recommendation, |
| 8　authors have from the Lange study in their | 8　true? |
| 9　published review, none developed malignant | 9　　A.　Yes. |
| 10　mesothelioma, right? | 10　　Q.　And, in fact, when you |
| 11　　　MR. DONATH:  Objection.  Form. | 11　recommended this to them, you didn't just say |
| 12　　　THE WITNESS:  Yes. | 12　that they needed to have a mineralogy section |
| 13　QUESTIONS BY MR. BOWDEN: | 13　added, you said you need to get a consult |
| 14　　Q.　Last line of your summary of | 14　with a mineralogist. |
| 15　strategies to them is "none of the subjects | 15　　A.　I suggested that, yes. |
| 16　had developed a mesothelioma." | 16　　Q.　Okay.  You don't know whether |
| 17　　　Do you see that there? | 17　that ever happened? |
| 18　　A.　Yes, that's correct. | 18　　A.　No, I don't. |
| 19　　Q.　And they've built out this | 19　　Q.　You'd agree with me that |
| 20　section that you gave them, right? | 20　there's no mineralogist cited in here as a |
| 21　　　MR. DONATH:  Objection.  Form. | 21　consulting -- |
| 22　　　MR. HEGARTY:  Objection.  Form. | 22　　A.　There is not. |
| 23　　　THE WITNESS:  You mean build | 23　　Q.　-- person? |
| 24　out? | 24　　　No mineralogist listed as an |
| 25　 | 25　author? |

| Page 211 | Page 213 |
|---|---|
| 1　QUESTIONS BY MR. BOWDEN: | 1　　A.　There is none, which would |
| 2　　Q.　Meta-Analysis Research Group | 2　imply they reworded it on their own, |
| 3　took what you gave them and devoted almost a | 3　possibly. |
| 4　column and a half and their article to it, | 4　　Q.　You said Dr. Muscat was a poor |
| 5　right? | 5　mineralogist, right? |
| 6　　　MR. DONATH:  Objection to form. | 6　　　MR. HEGARTY:  Objection.  Form. |
| 7　　　MR. HEGARTY:  Objection.  Form. | 7　　　THE WITNESS:  I said he did not |
| 8　　　THE WITNESS:  Yes, they | 8　　have an understanding.  Anyone can |
| 9　　discussed this subject which I brought | 9　　read the literature and form the |
| 10　　to their attention, and they used some | 10　　opinions and couch them in text -- or |
| 11　　of my text. | 11　　in words.  And maybe he did that, I |
| 12　QUESTIONS BY MR. BOWDEN: | 12　　don't know. |
| 13　　Q.　I'm sorry, I didn't hear the | 13　QUESTIONS BY MR. BOWDEN: |
| 14　last part.  They used some of your text? | 14　　Q.　You said that Dr. Muscat was a |
| 15　　A.　They used some of my text from | 15　poor mineralogist. |
| 16　my hypothesis. | 16　　A.　I didn't say he was a |
| 17　　Q.　I want to go back to -- still | 17　mineralogist at all.  I think I said he did |
| 18　using this article, that's going to be -- | 18　not have knowledge of mineralogy and there |
| 19　　A.　Okay. | 19　were problems with his initial work. |
| 20　　Q.　-- Exhibit 18. | 20　　Q.　I see. |
| 21　　　MR. BOWDEN:  If you go to | 21　　A.　And recommended that a |
| 22　P2006.2, Corey. | 22　mineralogist be consulted in revising it. |
| 23　　　THE WITNESS:  6.2.  Okay. | 23　　Q.　There's also a section in here |
| 24　QUESTIONS BY MR. BOWDEN: | 24　on exposure via diaphragms, right? |
| 25　　Q.　You see there's an entire | 25　　A.　What page is that? |

54 (Pages 210 to 213)

Robert Glenn

Page 214

1    Q.    .4.
2    A.    Yes.
3    Q.    And so the diaphragm study uses
4    some of this same data, right?
5            MR. HEGARTY:  Objection.  Form.
6            THE WITNESS:  It uses the data
7    that Dr. Huncharek did in his
8    research, in his earlier research,
9    yes.
10   QUESTIONS BY MR. BOWDEN:
11   Q.    Right.
12           And that was the data that was
13   sponsored and paid for by Johnson & Johnson
14   as well as Imerys -- or Luzenac; is that
15   correct?
16           MR. HEGARTY:  Objection.  Form.
17           MR. DONATH:  Objection to form.
18           THE WITNESS:  Yeah, the one
19   paper was, yes.
20   QUESTIONS BY MR. BOWDEN:
21   Q.    Okay.  Prior to publication,
22   you mentioned that IARC -- the issue was
23   raised in IARC about pleurodesis?
24   A.    Yes.
25   Q.    And that was raised at your

Page 215

1    suggestion, right?
2            MR. HEGARTY:  Objection.  Form.
3            THE WITNESS:  It was raised
4    through comments I made, not to IARC
5    but Dr. Antony, who had experience
6    with pleurodesis and who I met with at
7    an American Thoracic Society meeting
8    and we discussed it.
9            After that, it came out that
10   IARC was going to review talc, and I
11   contacted her and said, you know, this
12   is taking place by IARC, and I think
13   you have something to provide.
14   QUESTIONS BY MR. BOWDEN:
15   Q.    Dr. Antony, what role did he
16   play in the IARC working group?
17   A.    It's not a he.  A she.
18   Q.    I'm sorry.  Dr. Antony, what
19   role did she play at the IARC working group
20   proceedings?
21   A.    She was a working group member.
22   Q.    Right.
23           And that issue wasn't raised to
24   Dr. Antony directly, was it?
25   A.    What issue?

Page 216

1    Q.    The issue of pleurodesis at
2    IARC.
3            MR. HEGARTY:  Objection.  Form.
4            THE WITNESS:  She -- that was
5    raised at IARC.
6    QUESTIONS BY MR. BOWDEN:
7    Q.    I understand.
8            But you didn't reach out to her
9    directly, right?
10   A.    No.  I informed her that the
11   meeting was taking place.  We had discussed
12   the pleurodesis issue.  I said this is
13   something that needs to be a part of the IARC
14   review.
15   Q.    So --
16   A.    And that's when we found out
17   later, I suppose, that IARC didn't even
18   understand pleurodesis and that talc was used
19   in 5 to 20 grams on lung tissue.
20   Q.    Okay.  When you had this
21   discussion with Dr. Antony, had IARC already
22   announced that it was going to consider talc?
23   A.    Yes.
24   Q.    When you had this discussion
25   with Dr. Antony, had IARC already identified

Page 217

1    the working group participants?
2    A.    I don't think so.  I'm not
3    sure, but I don't think so.
4    Q.    What time did you have this
5    conversation with Dr. Antony?
6    A.    I don't recall the exact date.
7    Q.    Was it in 2006?
8    A.    I don't recall the date.  It
9    may have been earlier.  I don't -- it would
10   have been after I learned that IARC was going
11   to review talc.  And after my conversation
12   with her, I did not have any other
13   conversation with her about the subject.
14   Q.    Has she been on prior IARC
15   working groups, to your knowledge?
16   A.    I don't think so.
17           That's part of the problem I
18   have with IARC working groups.
19   Q.    What do you mean?
20   A.    They have their little cadre
21   that they call in for most of them.
22   Q.    It's a low turnover rate?
23   A.    You see the same names over and
24   over.
25   Q.    Right.

55 (Pages 214 to 217)

Robert Glenn

Page 218

1    A.    Yeah.
2    Q.    And we're going to explore some
3  of that.
4    A.    Good.
5    Q.    I think now --
6         MR. BOWDEN:  Go off the record
7  just for a second.
8         VIDEOGRAPHER:  The time is now
9  12:06.  Going off the record.
10   (Off the record at 12:06 p.m.)
11        VIDEOGRAPHER:  Okay.  The time
12  is now 12:16.  Back on the record.
13  QUESTIONS BY MR. BOWDEN:
14   Q.    So I wanted to ask you a couple
15  of questions in follow-up to the article we
16  were just looking at.  That was Exhibit
17  Number 18.
18   A.    Yes.
19   Q.    You know, we had seen earlier
20  when you were attaching your strategies to be
21  taken into consideration by the authors that
22  you recommended that they consult with
23  Mr. Zazenski or with a mineralogist, right?
24   A.    Yes.  Yes.
25   Q.    And you don't know that they

Page 219

1  didn't consult with a mineralogist, right?
2    A.    I don't.
3    Q.    And you don't know that they
4  didn't consult with Mr. Zazenski, do you?
5    A.    I don't.
6    Q.    Okay.  If they did, that
7  person's not cited or acknowledged in any way
8  in this paper, correct?
9         MR. DONATH:  Objection.  Form.
10        THE WITNESS:  Well, just that
11        they talked to him about it and he
12        pointed out some papers they should
13        read and such, he shouldn't be cited
14        as an author.
15  QUESTIONS BY MR. BOWDEN:
16   Q.    I see.
17   A.    Journals have gotten very
18  strict about that now.  We had a recent
19  paper, and we had justified some radiologists
20  that read the X-rays, so -- and we did it in
21  one paper, which was on the medical effect,
22  and we didn't do it in the paper on dust
23  characterization of exposure because they
24  didn't contribute to it.
25   Q.    But in your 2013 paper that you

Page 220

1  recently published, you actually gave
2  acknowledgements to people who helped you out
3  with editing the manuscript.
4    A.    Acknowledgement, yes.
5    Q.    You cited them in there --
6    A.    Acknowledging them.
7    Q.    -- at the end of -- right.
8    A.    Yeah.
9    Q.    And at the end of the paper,
10  you also gave acknowledgements to people who
11  helped you out with simple things like
12  editing the tables, didn't you?
13   A.    I may have.  I don't recall.
14  But that was acknowledgement, not listed as
15  an author.
16   Q.    Okay.  In this, is there any
17  mineralogist listed as acknowledged?
18   A.    I don't know if they used one.
19   Q.    You're not acknowledged in this
20  paper either, are you?
21   A.    No.  It would have been
22  improper for me to be acknowledged in this
23  article.
24        MR. BOWDEN:  Move to strike the
25        last answer.

Page 221

1  QUESTIONS BY MR. BOWDEN:
2    Q.    All right.  Let's talk about
3  IARC now.
4    A.    All right.
5    Q.    So IARC is the International
6  Agency for Research on Cancer, right?
7    A.    That's correct.
8    Q.    And that's part of the World
9  Health Organization?
10   A.    Of WHO, yes.
11   Q.    Right.
12        And you're familiar with both
13  those organizations, right?
14   A.    Yes.
15   Q.    And unlike NTP, where people
16  can be invited to come and comment directly,
17  IARC process requires nomination of
18  observers, right?
19   A.    Yes.
20   Q.    And observers, that's a
21  different process, isn't it?
22   A.    Yes.
23   Q.    I'm sorry, I'm moving around.
24        That's a different process,
25  right?

56  (Pages 218 to 221)

Robert Glenn

| Page 222 | Page 224 |
|---|---|
| 1    A.   Yes.  Yes. | 1   would be the CTFA, right?  They had input? |
| 2    Q.   And you were involved on behalf | 2    A.   I don't recall.  They may have. |
| 3   of a number of talc manufacturers in | 3    Q.   IMA-North America? |
| 4   coordinating the message from industry at | 4    A.   IMA-North America did.  In |
| 5   IARC, right? | 5   fact, they sponsored Dr. Muscat.  A Euro talc |
| 6       MR. HEGARTY:  Objection.  Form. | 6   sponsored Dr. Oberdörster. |
| 7       THE WITNESS:  I wouldn't say we | 7    Q.   IMA-North America sponsored |
| 8    coordinated the message.  We had input | 8   Dr. Muscat, right? |
| 9    to our industry observers -- | 9    A.   They underwrote his expenses to |
| 10  QUESTIONS BY MR. BOWDEN: | 10  IARC. |
| 11   Q.   Right. | 11   Q.   Right. |
| 12   A.   -- which were Dr. Muscat and | 12       And they underwrote it, they |
| 13  Dr. Gunter Oberdörster. | 13  estimated the combined total for both |
| 14   Q.   Right. | 14  observers to be about $100,000 to the group. |
| 15   A.   We brought things to their | 15  And the question was, how were they going to |
| 16  attention that we would be important to the | 16  pay for it, right? |
| 17  deliberations of the working group. | 17       MR. HEGARTY:  Objection.  Form. |
| 18   Q.   Was the intention there to | 18       THE WITNESS:  I don't recall |
| 19  influence the proceedings? | 19    that, that discussion or that |
| 20   A.   The intention was to provide | 20    documentation.  I didn't see it in |
| 21  them information from which they could make a | 21    preparing for here today. |
| 22  reasoned, scientific decision. | 22  QUESTIONS BY MR. BOWDEN: |
| 23   Q.   Do you agree with my statement | 23   Q.   Sure.  And I understand that. |
| 24  that the intention was to influence the | 24       But that's -- that's -- your |
| 25  proceedings? | 25  expectation is that -- the industry's |

| Page 223 | Page 225 |
|---|---|
| 1       MR. HEGARTY:  Objection.  Form. | 1   expectation, it costs about $50,000 to have |
| 2       MR. DONATH:  Objection.  Form. | 2   an observer go over there and participate in |
| 3       THE WITNESS:  We had opinions | 3   the proceedings? |
| 4    on -- scientific opinions on that, and | 4       MR. DAVANT:  Objection to form. |
| 5    certainly we wanted to put those | 5       MR. BILLINGS-KANG:  Objection |
| 6    forward to the working group. | 6    to form. |
| 7   QUESTIONS BY MR. BOWDEN: | 7       THE WITNESS:  Yes, to prepare |
| 8    Q.   With the intent to influence | 8    and participate. |
| 9   the working group's thought process and | 9   QUESTIONS BY MR. BOWDEN: |
| 10  discussion? | 10   Q.   Is that a yes? |
| 11       MR. HEGARTY:  Objection.  Form. | 11       MR. BILLINGS-KANG:  Objection |
| 12       MR. DONATH:  Same objection. | 12    to form. |
| 13       THE WITNESS:  We wanted -- they | 13       THE WITNESS:  Yes, to prepare |
| 14    were going to vote on their own, but | 14    and participate. |
| 15    we wanted to make them aware of | 15   QUESTIONS BY MR. BOWDEN: |
| 16    certain things that they should take | 16   Q.   Did Dr. Muscat ever complain to |
| 17    into consideration and that certainly | 17  you about not being paid? |
| 18    were our opinions on the science. | 18   A.   I don't recall that he did. |
| 19  QUESTIONS BY MR. BOWDEN: | 19   Q.   That he complained?  You don't |
| 20   Q.   Right. | 20  recall that he complained? |
| 21   A.   They were our opinions, and we | 21   A.   I don't recall that he did. |
| 22  wanted to get those in front of IARC and have | 22   Q.   Okay.  Did Dr. Muscat ever |
| 23  them treat them as any scientific input. | 23  complain to you about not being paid by |
| 24   Q.   So in the industry, the trade | 24  Meta-Analysis Research Group? |
| 25  groups that we're talking about here, that | 25   A.   I don't recall that either. |

57 (Pages 222 to 225)

Robert Glenn

| Page 226 |
| --- |

```
 1        Q.    Did he ever complain about not
 2   being paid as the carve-out retainer pursuant
 3   to the original agreement of $3,000 and
 4   $3,000?
 5            MR. HEGARTY: Objection. Form.
 6            THE WITNESS: I don't recall
 7        that. I don't recall him contacting
 8        me at all about nonpayment for his
 9        work.
10   QUESTIONS BY MR. BOWDEN:
11        Q.    Was he paid?
12        A.    I don't know.
13            MR. HEGARTY: Objection. Form.
14   QUESTIONS BY MR. BOWDEN:
15        Q.    Was he paid at the IARC
16   proceedings?
17        A.    I don't know. He was paid from
18   Crowell & Moring for what he did and what he
19   proposed to do. I was not involved in the
20   IMA-NA.
21        Q.    He was paid by Crowell & Moring
22   for the work he did at IARC?
23            MR. HEGARTY: Objection. Form.
24            THE WITNESS: No, for the work
25        he did in preparing the report and
```

| Page 227 |
| --- |

```
 1        also in assisting Dr. Muscat on the
 2        meta-analysis paper.
 3   QUESTIONS BY MR. BOWDEN:
 4        Q.    I see.
 5            So the report that you're
 6   referencing is, of course, the NTP report
 7   that now is being used, the data from that is
 8   being used, at the IARC proceedings, right?
 9        A.    Yes.
10            MR. HEGARTY: Objection. Form.
11            THE WITNESS: It was, yes.
12   QUESTIONS BY MR. BOWDEN:
13        Q.    IARC work group met in February
14   of 2006, right?
15        A.    Yes.
16        Q.    And when you went over there,
17   you went over there with a number of people
18   to have a support team on the ground --
19        A.    That's correct.
20        Q.    -- true?
21        A.    Yes.
22        Q.    And those support team members
23   consisted of yourself?
24        A.    Yes.
25        Q.    A representative from Johnson &
```

| Page 228 |
| --- |

```
 1   Johnson?
 2        A.    I don't recall anyone from
 3   Johnson & Johnson being there.
 4        Q.    I'm asking.
 5        A.    No.
 6        Q.    I'm asking. You don't recall?
 7        A.    No.
 8        Q.    Luzenac was there?
 9        A.    Yes, Eric Turner, yes.
10        Q.    Right.
11            Dr. Huncharek and Muscat were
12   there?
13        A.    Dr. Muscat was. Dr. Huncharek
14   was not.
15        Q.    So Dr. Huncharek just assisted
16   via e-mail and collaboration by telephone?
17        A.    That's correct.
18            MR. HEGARTY: Objection. Form.
19   QUESTIONS BY MR. BOWDEN:
20        Q.    Okay. And IMA-Europe was there
21   as well?
22        A.    IMA-Europe I don't -- they
23   didn't have a staff member there.
24        Q.    Okay. But the president of
25   IMA-Europe at the time, Michele --
```

| Page 229 |
| --- |

```
 1        A.    Wyart-Remy.
 2        Q.    Uh-huh.
 3            She was involved on a daily
 4   basis, right?
 5        A.    Through e-mails and such, yes.
 6        Q.    Were there any oncologists
 7   involved on the industry's behalf?
 8        A.    No.
 9        Q.    Any gynecologists involved on
10   the industry's behalf?
11        A.    No.
12        Q.    What about the CTFA?
13        A.    They were not at the meeting.
14        Q.    But Linda Loretz, she
15   participated, right?
16        A.    She likely did through e-mails.
17        Q.    Okay. And just to make sure
18   that the jury understands what we're
19   describing here, the industry knew that the
20   issue was going to be taken up at the IARC
21   proceedings, fair?
22        A.    Yes. Yes, the industry knew.
23        Q.    Months and months of
24   preparation went into those proceedings on
25   behalf of the industry, right?
```

58 (Pages 226 to 229)

Robert Glenn

Page 230

1          MR. HEGARTY: Objection. Form.
2          MR. DONATH: Objection to form.
3          MR. BILLINGS-KANG: Objection.
4    Form.
5          THE WITNESS: I don't know
6    about months and months, but, yeah, it
7    was over a long period of time, but it
8    wasn't constant.
9    QUESTIONS BY MR. BOWDEN:
10        Q.    Okay. And -- well, let's talk
11   about that.
12         I want to talk to you first
13   about the observer nomination process.
14        A.    Yes.
15        Q.    Are you familiar with the
16   observer nomination process?
17        A.    Not terribly familiar, no.
18        Q.    Okay. Well, you know as a
19   general sequence of events --
20        A.    Oh, for observers?
21        Q.    Yes, sir. I'm sorry.
22        A.    Oh, I thought you meant working
23   group.
24        Q.    No, sir, I'm talking about
25   observers.

Page 231

1        A.    Yes, I am aware.
2        Q.    And observers serve a role
3    of -- back up.
4          Industry is not allowed to
5    participate directly in the proceedings,
6    right?
7        A.    They are not allowed to vote.
8    They aren't involved in the voting. At times
9    they are allowed to speak during the working
10   group sessions.
11        Q.    Uh-huh.
12        A.    They play a limited role.
13        (Glenn Exhibit 19 marked for
14   identification.)
15   QUESTIONS BY MR. BOWDEN:
16        Q.    I believe I'm on Exhibit
17   Number 19.
18          Here you go, sir.
19          Yours is marked as 19?
20        A.    Yes. Thank you.
21        Q.    You had mentioned Mark Ellis
22   previously. He was actually the president of
23   IMA-North America at the time of the IARC
24   proceedings, right?
25        A.    Yes.

Page 232

1        Q.    And in fact, because of the way
2    the organizations worked out, he also ended
3    up being the president of the National
4    Industrial Sand Association as well, right?
5        A.    Yes. National Industrial Sand
6    Association continued to exist after the
7    formation of IMA-NA.
8        Q.    Right.
9          And so Mark Ellis, in this
10   January 13th e-mail, he is forwarding to a
11   number of people -- you see Mike Larson,
12   Minerals Tech?
13        A.    Yes.
14        Q.    And Minerals Tech is what type
15   of company?
16        A.    They're a talc company with
17   deposits in Montana.
18        Q.    Uh-huh. And you see R. Price
19   from RT Vanderbilt?
20        A.    This is in the "to"?
21        Q.    Yes, sir.
22        A.    Yeah, Price.
23        Q.    RT Vanderbilt.
24        A.    Yeah. Or is he a cc?
25        Q.    He's in the "to" line. I've

Page 233

1    got it highlighted on the screen here for
2    you.
3        A.    Oh, okay.
4        Q.    RT Vanderbilt. That's another
5    talc manufacturer, right?
6        A.    Yes, an industrial talc.
7        Q.    And you see V. Sadowski right
8    after him, the next line down, from Zemex?
9        A.    Yes.
10        Q.    And that's another talc
11   manufacturer?
12        A.    Yes.
13        Q.    And you see Luzenac listed
14   there as well, right?
15        A.    Yes.
16        Q.    And you are listed as the last
17   person on that e-mail chain, right?
18        A.    Yes.
19        Q.    Copied on this is Steven Mann,
20   Johnson & Johnson?
21        A.    Yes.
22        Q.    You've got Linda Loretz from
23   CTFA?
24        A.    Yes.
25        Q.    And you've got Ed deBeus from

Robert Glenn

Page 234

1    Mondo Minerals, right?
2         A.   Yes.
3         Q.   And that's another talc
4    interested party?
5         A.   I don't know him, but that's a
6    European talc company.
7         Q.   Uh-huh.  And you've also got
8    Josh Muscat on there, right?
9         A.   Yes, I guess.  Yeah.
10        Q.   And in this e-mail chain, do
11   you see any consumer groups represented?
12        A.   What do you mean by "consumer
13   groups"?  Is the CTFA on there?
14        Q.   Well, that's an industry group,
15   right?
16        A.   Well, they -- they provide
17   downstream products to consumers.
18        Q.   Well, I'm not talking about the
19   companies that make something that they sell
20   to consumers.
21        A.   Okay.
22        Q.   I'm talking about consumers --
23        A.   Yeah, they're -- they are a
24   trade organization.
25        Q.   Right.

Page 235

1             So consumer groups, they're not
2    on this e-mail chain.  Consumers, I'm sorry,
3    consumers are not --
4         A.   Consumers are not, yeah.
5         Q.   Right.  Right.
6             What about medical societies?
7         A.   No, there are no medical
8    societies.
9         Q.   Okay.  Attached to this are the
10   observer guidelines.
11            Do you see that, the
12   attachments?
13        A.   Yes.
14        Q.   We're going to go to page 61.4.
15        A.   All right.
16        Q.   You with me, sir?
17        A.   Yes.
18        Q.   And this says, "Guidelines for
19   observers at IARC monograph meetings."
20        A.   Yes.
21        Q.   These are the -- you can see
22   the bottom left corner says "February 2004."
23            These were the guidelines in
24   place at the time of the meeting?
25        A.   Yes.

Page 236

1         Q.   Yeah.
2             "IARC appreciates the interest
3    of all parties have" -- excuse me, strike
4    that.
5             "IARC appreciates the interest
6    all parties have in seeing that monographs
7    are the outcome of a rigorous scientific
8    assessment free of any attempt at
9    interference."
10            Do you see that, the first --
11        A.   Yes.
12        Q.   "These guidelines are meant to
13   convey a common understanding of conduct
14   expected from observers at IARC monograph
15   meetings."
16        A.   Yes.
17        Q.   This was shared with
18   Dr. Muscat, right?  He's one of the e-mail
19   recipients?
20        A.   Yes.  Yes.
21        Q.   As well as Dr. Oberdörster,
22   correct?
23        A.   Yes.
24        Q.   Those are the two IARC -- or
25   excuse me, industry observers that were being

Page 237

1    put forth, right?
2         A.   Yes.
3         Q.   Okay.  "In the spirit of
4    transparency, observers are welcome to attend
5    IARC monograph meetings.  The main role of
6    observers is serve as sources of firsthand
7    information from the meeting to their
8    sponsoring organizations."
9             Have I read that correctly?
10        A.   Yes.
11        Q.   The next paragraph down:
12   "Implicit in the term 'observer' is the
13   responsibility to observe," in italics.
14            Do you see that?
15        A.   You've jumped down somewhere?
16        Q.   No, no, next paragraph, sir,
17   the next --
18        A.   Oh.
19        Q.   Let me read it to you again.
20        A.   Yeah.
21        Q.   "Implicit in the term
22   'observer' is the responsibility to observe
23   the meeting and not to attempt to influence
24   its outcome."
25        A.   Yeah, let's see.  You left out

Robert Glenn

Page 238

```
 1   a sentence that says --
 2       Q.    Yeah, I'm not reading the whole
 3   document.
 4       A.    "Also can play a valuable role
 5   in ensuring that all published information
 6   and scientific perspectives are considered."
 7       Q.    Yeah, no question.  They're
 8   able to walk in information, right?
 9       A.    Yeah.  I just wanted to bring
10   that out.
11       Q.    Right.  Well, I'm actually
12   going to show you some documents where that's
13   exactly what you guys did, right?
14       A.    Yes, we did.
15       Q.    Right.  And that's part of the
16   role of the observers, is to --
17       A.    To bring scientific information
18   forward, correct.
19       Q.    Not to lobby the meeting
20   participants, right?
21       A.    That's right.
22       Q.    And you're not supposed to be
23   trying to influence its outcome, and that
24   includes both before and during the meeting,
25   right?
```

Page 239

```
 1       A.    Oh, okay.  Not to lobby
 2   participants.  Yeah.
 3       Q.    Okay.
 4       A.    Yes.
 5       Q.    Okay.  And at the bottom it
 6   says, "Observers will complete a
 7   declaration."
 8             Do you see that?
 9       A.    Yes.
10       Q.    "Observers will complete a
11   declaration of interests that covers
12   financial interest" -- that's payments?
13       A.    Yes.
14       Q.    "Employment interests,
15   including consulting or other affiliations"?
16       A.    Correct.
17       Q.    "And research support, whether
18   granted to the individual or an affiliated
19   organization."
20             Right?
21       A.    Yes.
22       Q.    "Interests pertinent to the
23   subject matter of the meeting will be
24   disclosed to the meeting participants and
25   published in the monograph."
```

Page 240

```
 1             Do you see that?
 2       A.    Yeah.
 3       Q.    And you're aware that
 4   Dr. Muscat is cited in the monograph as an
 5   observer, right?
 6       A.    Yes.
 7       Q.    Have you read the 93 monograph?
 8       A.    It's been some time.  I think
 9   it's 400 pages or something.
10       Q.    496, yeah.
11       A.    That's close.
12       Q.    I didn't print them all out for
13   us, but I want to show you this page.
14             Okay?
15       A.    Okay.
16             (Glenn Exhibit 20 marked for
17   identification.)
18   QUESTIONS BY MR. BOWDEN:
19       Q.    This is Exhibit Number 20.
20             Now, following this 2006
21   working group, 2006 working group, the
22   monograph itself was actually published in
23   2010 --
24       A.    Correct.
25       Q.    -- correct?
```

Page 241

```
 1       A.    Yes.
 2       Q.    But the time that the industry
 3   observers were participating was February
 4   of 2006 --
 5       A.    Yes.
 6       Q.    -- correct?
 7             So I want you to turn to the
 8   second page of this document.
 9       A.    Yes.
10       Q.    And do you see where it has
11   participants and it lists observers, right?
12       A.    Yes.
13       Q.    Just like we saw was going to
14   happen on the declaration of -- or excuse me,
15   the observer guidelines, right?
16       A.    Yes.
17       Q.    And they're required to
18   disclose financial interests, including
19   funding, at the time, right?
20       A.    That is likely through a form
21   they submit to IARC.
22       Q.    I've got the form.
23       A.    Okay.  I haven't seen it.
24       Q.    Okay.
25       A.    All right.  Yes.
```

61 (Pages 238 to 241)

Robert Glenn

Page 242

1       Q.    "Observers sponsored by the
2   Industrial Minerals Association of Europe and
3   of North America," right?
4       A.    Yes.
5       Q.    And it lists Josh Muscat?
6       A.    Yes.
7       Q.    And so Josh Muscat, I think
8   before you said that he was only sponsored by
9   IMA-North America, but here he's saying that
10  he's sponsored by IMA-Europe and of North
11  America, right?
12      A.    Let me see.  They paid his
13  freight, yes.  IMA, they paid for him to go
14  over.
15      Q.    IMA-Europe and of North
16  America, right?
17      A.    No, IMA-North America --
18      Q.    Okay.
19      A.    -- is my understanding of what
20  I believed happened.
21      Q.    Sure.
22            It says, Josh E. Muscat --
23  "Joshua E. Muscat, Department of Health
24  Evaluation Sciences, Pennsylvania State of
25  College of Medicine, Hershey, Pennsylvania,

Page 243

1   USA," right?
2       A.    Right.
3       Q.    It doesn't say Meta-Analysis
4   Research Group?
5       A.    No.
6       Q.    But during that time, he was
7   underneath a contract with Crowell & Moring
8   as a part of Meta-Analysis Research Group,
9   correct?
10      A.    I think he was paid --
11            MR. HEGARTY:  Objection.  Form.
12            THE WITNESS:  He was paid
13      partly for his work, $3,000 or
14      something.
15  QUESTIONS BY MR. BOWDEN:
16      Q.    My question to you is that at
17  this time, he was underneath a contract with
18  Meta-Analysis Research Group to perform
19  services for Crowell & Moring on behalf of
20  their talc client, correct?
21            MR. HEGARTY:  Objection.  Form.
22            MR. DONATH:  Objection.  Form.
23            THE WITNESS:  Yes, he listed
24      his primary employer here, which was
25      the university.

Page 244

1   QUESTIONS BY MR. BOWDEN:
2       Q.    Doesn't list Meta-Analysis
3   Research Group, right?
4            MR. BILLINGS-KANG:  Objection.
5      Asked and answered.
6            THE WITNESS:  No, he does not.
7   QUESTIONS BY MR. BOWDEN:
8       Q.    Doesn't list Crowell & Moring?
9       A.    No.
10      Q.    Doesn't list Imerys?
11      A.    No.
12      Q.    During that time, Imerys was
13  directly funding the diaphragm study, true?
14            MR. DONATH:  Objection.  Form.
15            MR. HEGARTY:  Objection.  Form.
16            THE WITNESS:  We funded that
17      study, and it was probably running
18      through this period as well.
19  QUESTIONS BY MR. BOWDEN:
20      Q.    J&J was also supporting that
21  study at the time that the IARC working group
22  meeting went on, true?
23            MR. DONATH:  Objection to form.
24            MR. HEGARTY:  Objection.  Form.
25            THE WITNESS:  He's serving as

Page 245

1       an industry observer, not an observer
2       for Crowell & Moring or J&J or anyone
3       else.  He's acting as observant to the
4       larger industrial minerals talc
5       industry.
6   QUESTIONS BY MR. BOWDEN:
7       Q.    So now what we're doing here is
8   we've got a split screen.  One is from the
9   monograph 93, right?
10      A.    Okay.
11      Q.    And you can see the top is what
12  we just covered.  That's the one that
13  discloses the industry observers and who
14  they're participating on behalf of, right?
15      A.    Yes.  Yeah.
16      Q.    And the bottom is what we
17  covered with the industry observer
18  guidelines, true?
19      A.    Yes.
20      Q.    That's from 61.4?
21      A.    Right.
22      Q.    Let's read this again.
23  "Observer will complete a declaration of
24  interest that covers financial interest,
25  employment interest, including consulting and

62 (Pages 242 to 245)

Robert Glenn

Page 246

1    other affiliations," right?
2        A.   Yes.
3        Q.   Do you see anywhere in that
4    above block quote where Dr. Muscat discloses
5    the consulting work that he is doing with
6    MRG, Johnson & Johnson, Luzenac or Crowell &
7    Moring, the law firm?
8        A.   He did not.
9            MR. DAVANT:  Object to form.
10           THE WITNESS:  According to what
11   the others did, he should have listed
12   that.
13           MR. BOWDEN:  Take that down,
14   please.
15       (Glenn Exhibit 21 marked for
16       identification.)
17   QUESTIONS BY MR. BOWDEN:
18       Q.   I want to go back to --
19   actually, it's going to be a new document.
20           I'm going to tell you right now
21   that we're going backwards, back to October
22   of 2005.
23       A.   Okay.
24       Q.   Okay?
25       A.   All right.

Page 247

1        Q.   So we're kind of covering
2    things a little bit linearly, but now we're
3    doing it by topic.
4        A.   Okay.
5        Q.   You see here that this is the
6    minutes of the talc section at IMA-North
7    America.
8            Do you see that?
9        A.   Yes.
10       Q.   And it appears that there was a
11   meeting that took place at the Plaza Hotel,
12   or the Avance Plaza Hotel in Washington, DC.
13       A.   Yes.
14       Q.   Have you ever been there
15   before?
16       A.   Yes.
17       Q.   Were you at this meeting?
18       A.   Pardon?
19       Q.   Were you at this meeting?
20       A.   No.  No, I don't think so.
21   This was after I left.
22       Q.   Is it a nice hotel?
23       A.   It's fairly nice.
24       Q.   Meeting participants:
25   Specialty Minerals, chairman; RT Vanderbilt;

Page 248

1    Luzenac America; IMA -- that's Michele Wyart.
2    That's going to be IMA-Europe, right?
3        A.   Yes, yes, it would be.
4        Q.   And then Ms. Abrams, who's an
5    attorney, right?
6        A.   Yes.  Yes.
7        Q.   And so if we turn to the second
8    page here, 68.2, it's going to be bullet
9    point number 10, it says, "The group
10   discussed the IARC talc project and
11   recommendations for an industry observer."
12           Do you see where that's
13   happening?
14       A.   Yes.
15       Q.   And this group, again, we just
16   kind of run through them, those are some of
17   the talc manufacturers, right?
18       A.   Yes.
19       Q.   Including Luzenac, your client?
20       A.   Yes.
21       Q.   Okay.  "Potential observers are
22   Joshua Muscat of Penn State and Michael
23   Huncharek of St. Michaels Hospital, Stevens
24   Point, Wisconsin.
25           Do you see that?

Page 249

1        A.   Yes.
2        Q.   And ultimately they rejected
3    Dr. Muscat as an observer, didn't they, or
4    did you decide not to nominate him?
5        A.   I don't recall that.
6        Q.   So it wasn't IARC that rejected
7    him; the group said not to put him up?
8            MR. HEGARTY:  Objection.  Form.
9            THE WITNESS:  I'm not sure
10   where you're going.
11   QUESTIONS BY MR. BOWDEN:
12       Q.   I'm asking you, was
13   Dr. Huncharek ever proposed --
14           MR. DONATH:  You said Muscat.
15           THE WITNESS:  Oh, Huncharek.  I
16   thought you -- I was thinking of
17   Muscat.
18           MR. BOWDEN:  Oh, I apologize.
19   Everyone is telling me I'm wrong.
20   I'll go with -- I'm sorry, let me
21   reword that.
22   QUESTIONS BY MR. BOWDEN:
23       Q.   Dr. Huncharek did not become an
24   industry observer?
25       A.   Yes, he did not.

63 (Pages 246 to 249)

Robert Glenn

Page 250

1    Q.   Okay.  Why not?
2    A.   Because they -- IARC only
3  allowed two.
4    Q.   Right.
5    A.   So IMA-Europe got one and
6  IMA-North America got one.
7    Q.   Right.  And Dr. Hun -- or
8  Muscat was the one that was proposed for --
9  was it the epi subgroup?
10   A.   I believe so, yes.
11   Q.   Right.
12        And it continues on: "The
13  group agreed to contact Michael Huncharek on
14  a motion by Michele Wyart."
15        That's the IMA-Europe
16  president, right?
17   A.   Yeah.
18   Q.   "Bob Glenn and Mark Ellis will
19  be asked to make the contact."
20        Do you see that there?
21   A.   Yes.
22   Q.   And Mark Ellis being the
23  president of IMA-North America, and Bob
24  Glenn, of course, is you, the former
25  president, right?

Page 251

1    A.   Yes.  Yes.
2    Q.   Okay.  And you did that, right?
3    A.   I assume we did, yes.
4    Q.   And at this point in time in
5  2005, your only employer is the Crowell &
6  Moring law firm, right?
7    A.   Right.
8    Q.   Okay.  Were you paid by
9  Crowell & Moring to make that contact?
10   A.   To --
11   Q.   To Dr. Muscat?
12   A.   I doubt it.  It was probably a
13  telephone call.  And I'm not sure I did it or
14  Mark did it.
15   Q.   Okay.  Do you know where
16  Dr. Huncharek is right now?
17   A.   The last I knew of him, and I
18  haven't had contact with him, he was at the
19  University of South Carolina School of Public
20  Health.
21   Q.   Okay.  And when was the last
22  time you spoke with him?
23   A.   It's been a long time ago.
24   Q.   Are you talking about years?
25   A.   Yeah.

Page 252

1    Q.   Okay.
2    A.   Probably -- probably when I was
3  still at Crowell & Moring.  So I don't think
4  I've had contact with him since 2010.
5    Q.   Do you know that he's a
6  fugitive right now?
7        MR. DONATH:  Objection.  Form.
8        MR. HEGARTY:  Objection.  Form.
9        THE WITNESS:  No, I did not
10   know that.
11  QUESTIONS BY MR. BOWDEN:
12   Q.   Does that surprise you?
13   A.   Well, I don't know the details,
14  but it wouldn't surprise me.
15   Q.   All right.  Now, after you
16  reached out to Dr. Muscat to propose -- to
17  have himself-nominate, right?
18   A.   Yes.
19        MR. DONATH:  Objection.
20        THE WITNESS:  No, the industry
21   sent his name in.
22  QUESTIONS BY MR. BOWDEN:
23   Q.   The industry sent his name in;
24  you just had the contact with him?
25   A.   Pardon?

Page 253

1        MR. DONATH:  Objection.
2  QUESTIONS BY MR. BOWDEN:
3    Q.   You had the contact with him?
4        MR. DONATH:  Objection.  Form.
5        THE WITNESS:  I don't know
6    whether I did or Mark.  It was
7    probably Mark because he was
8    representing IMA-North America.
9  QUESTIONS BY MR. BOWDEN:
10   Q.   I see.
11        Okay.  And you remained
12  involved in helping the industry observers
13  prepare for their participation at IARC,
14  right?
15   A.   Yes, I did.
16   Q.   In fact, you actually had
17  conducted presentations, right?
18   A.   Yes, I have.  I did.
19   Q.   And those preparations -- how
20  many days did that take place over?
21   A.   One day.  The one day, and
22  probably half a day.
23   Q.   Half a day?
24   A.   Yeah.
25   Q.   Was it just you presenting?

64 (Pages 250 to 253)

Robert Glenn

| Page 254 | Page 256 |
|---|---|
| 1    A.   I presented on talc.  It was a | 1  meeting took place. |
| 2  group re -- it was a group that was involved | 2      Q.   Right.  And so now we've been |
| 3  with the carbon black industry, titanium | 3  talking about how long the industry has been |
| 4  dioxide industry, and talc, and we were | 4  preparing for the IARC meeting.  We've seen |
| 5  sharing kind of the basic knowledge of our | 5  documents that went back to October? |
| 6  agent, our substance. | 6      A.   Yes. |
| 7      Q.   I apologize for coughing during | 7      Q.   And efforts took place before |
| 8  your statement there. | 8  then, too, right? |
| 9          But I understand that the IARC | 9      A.   Yes. |
| 10  proceeding, it wasn't just on talc, it was | 10      Q.   Because by August, you knew |
| 11  also on carbon black? | 11  that they were going to be taking a look at |
| 12      A.   Correct. | 12  the issue, right? |
| 13      Q.   And titanium dioxide? | 13      A.   No.  Once we knew that they |
| 14      A.   Yes. | 14  were going to review talc, we started our -- |
| 15      Q.   Okay.  And the proceeding | 15  developing our message, if you will. |
| 16  you're talking about, the half-day | 16      Q.   Okay.  And one of the things |
| 17  presentation that you gave, that actually | 17  that you were doing in Puerto Rico was you |
| 18  took place down at Puerto Rico, right? | 18  were giving this presentation to the |
| 19      A.   That's right. | 19  observers? |
| 20      Q.   Why did it take place in Puerto | 20      A.   Yes, to the industry observers |
| 21  Rico? | 21  from all groups, although Dr. -- I don't |
| 22      A.   There was a meeting of | 22  believe Dr. Muscat or Dr. Huncharek were |
| 23  occupational physicians that was held the | 23  there. |
| 24  previous two days or so, and we took one | 24      Q.   You don't think they were |
| 25  afternoon, as I recall, for these groups to | 25  there? |

| Page 255 | Page 257 |
|---|---|
| 1  get together and talk about their substance. | 1      A.   I don't think they were. |
| 2          (Glenn Exhibit 22 marked for | 2      Q.   Is there anything in this |
| 3  identification.) | 3  document -- have you reviewed this |
| 4  QUESTIONS BY MR. BOWDEN: | 4  document -- |
| 5      Q.   Okay.  Can we go ahead and put | 5      A.   Yes, I looked over it. |
| 6  up his -- this is Exhibit 22. | 6      Q.   -- in preparing for your |
| 7          You recognize this, right? | 7  deposition? |
| 8      A.   Yes, I do. | 8      A.   Yes. |
| 9          MR. DONATH:  Do you have | 9      Q.   Was there anything in this |
| 10  another copy? | 10  document that was inconsistent with the |
| 11          MR. BOWDEN:  I apologize.  I | 11  messages that you gave to Dr. Muscat prior to |
| 12  thought I handed them -- I might have | 12  him participating as an industry observer? |
| 13  one more. | 13          MR. HEGARTY:  Objection.  Form. |
| 14  QUESTIONS BY MR. BOWDEN: | 14          THE WITNESS:  I mean, we went |
| 15      Q.   All right.  You recognize this | 15      through more than just this, possibly, |
| 16  PowerPoint.  This is the one that you put | 16      and gave him more papers and things to |
| 17  together, right? | 17      read, but essentially this was the |
| 18      A.   Yes. | 18      thrust -- |
| 19      Q.   Okay.  And it's entitled | 19  QUESTIONS BY MR. BOWDEN: |
| 20  "Non-Asbestiform Talc Overview," right? | 20      Q.   Right. |
| 21      A.   Yes. | 21      A.   -- of the comment, yeah. |
| 22      Q.   IARC monograph 93 observers | 22      Q.   All right.  So this was the |
| 23  meetings, San Juan, Puerto Rico, January 12, | 23  thrust of the comment, to bring people like |
| 24  2006.  Right? | 24  Dr. Ober -- |
| 25      A.   Correct.  That's the date the | 25      A.   Oberdörster. |

65 (Pages 254 to 257)

Robert Glenn

Page 258

```
 1        Q.    -- Oberdörster up to speed on
 2   the talc issue that might not necessarily be
 3   directly related to talc?
 4        A.    Yeah, and actually for
 5   Dr. Morfeld, who was an observer for, I
 6   believe, titanium dioxide.
 7             So we were trying to get the
 8   whole group attuned to these things so as
 9   they sat through meetings, they could come up
10   with something as well that we might want to
11   look further into.
12        Q.    Right.
13        A.    It wasn't just talc group.
14        Q.    I'm sorry?
15        A.    Just wasn't talc observers.
16   All observers.
17        Q.    And I -- I'm not trying to give
18   you the impression that it was only to --
19        A.    Okay.  All right.
20        Q.    -- educate the talc observers.
21        A.    Sure.
22        Q.    What this does, though, and if
23   we flip to the first page -- the second page,
24   excuse me, at the top you're going to find
25   that on every single one of these pages it
```

Page 259

```
 1   says "Crowell & Moring," right?
 2        A.    Yes.
 3        Q.    Did the attorneys help prepare
 4   this?
 5        A.    No.
 6        Q.    This was all you?
 7        A.    This is all me.
 8        Q.    On behalf of Crowell & Moring?
 9        A.    I don't think there's any
10   attorney input into this.
11        Q.    Okay.  This was part of the
12   message that you expected the industry to put
13   forth --
14        A.    This is the scientific opinions
15   of Bob Glenn and how he formed those
16   opinions.
17        Q.    Right.
18        A.    Pretty much.  There was more
19   than that, but this is distilling it down
20   into 15 or 20 minutes that I might have had
21   for a presentation.
22        Q.    Sure.
23             And this message that you
24   delivered, this was at the request of the
25   IMA-North America?
```

Page 260

```
 1             MR. HEGARTY:  Objection.  Form.
 2             THE WITNESS:  It was a request
 3   of all agents that were being
 4   reviewed, titanium dioxide and carbon
 5   black.
 6             Someone came up with the idea
 7   that this meeting was taking place in
 8   Puerto Rico, some of these other
 9   observers were going to be there, and
10   it made sense to do it in that place.
11   So I went to the meeting for that
12   purpose.
13   QUESTIONS BY MR. BOWDEN:
14        Q.    And you were appearing on
15   behalf of Imerys?
16             MR. DONATH:  Objection.  Form.
17             THE WITNESS:  I was -- yes,
18   I -- Imerys would have been paying me
19   for this.
20   QUESTIONS BY MR. BOWDEN:
21        Q.    All right.  Let's go to --
22             MR. BOWDEN:  Mr. Smith, these
23   pages are not numbered, but it would
24   be the third page.  The title is
25   "Asbestos and Talc."
```

Page 261

```
 1   QUESTIONS BY MR. BOWDEN:
 2        Q.    "The notion that asbestos is
 3   commonly found in talc ore deposits is not
 4   correct."
 5             Do you see where that's
 6   written?
 7        A.    Yes.
 8        Q.    And you don't list a citation
 9   for that, correct?
10        A.    I didn't list them for any of
11   them.  I've opined on that subject in another
12   paper, though.
13        Q.    Right.
14             And we're not here today to ask
15   you about your opinions.  That's not what
16   you're here for, right?
17        A.    Oh, okay.
18        Q.    And you're not being disclosed
19   as an expert, to your knowledge, correct?
20        A.    Okay.
21        Q.    True?
22        A.    Yes.  I'm being -- I'm being
23   put up because of my work for Imerys at
24   Crowell & Moring.
25        Q.    Have you been retained as a
```

66 (Pages 258 to 261)

Robert Glenn

| Page 262 |
| --- |

1  litigation expert in this --
2       A.   In talc litigation?
3       Q.   Yes, sir.
4       A.   Yes.
5       Q.   By who?
6       A.   By a company, Southern Talc.
7       Q.   Okay.  Reads --
8       A.   And cosmetic talc by Southern
9  Talc.
10      Q.   Uh-huh.
11      A.   I've also been retained by
12  Pfizer, which I mentioned earlier --
13      Q.   Okay.
14      A.   -- in industrial talc.
15      Q.   Didn't mention it earlier in
16  the context of 2010 to 2015.
17           Are you currently working for
18  Pfizer?
19           MR. DONATH:  Objection.
20           THE WITNESS:  Yes.  The last
21  thing I did was last year.
22  QUESTIONS BY MR. BOWDEN:
23      Q.   On talc?
24      A.   Yes.
25           It may have been this year.

| Page 263 |
| --- |

1  I'm pretty sure it was the last year, last
2  work I did for Pfizer.
3       Q.   "The occurrence of asbestos in
4  talc ore bodies is rare to nonexistent."
5           Do you see where that's
6  written?
7       A.   Yes.
8       Q.   Do you ever recall making these
9  statements to Dr. Muscat?
10           MR. HEGARTY:  Objection.  Form.
11           THE WITNESS:  No, I don't think
12  I did.
13  QUESTIONS BY MR. BOWDEN:
14      Q.   Okay.  Fair to say that as you
15  sit here today you don't recall all the
16  conversations that you've had with
17  Dr. Muscat?
18      A.   Of course not.
19      Q.   Okay.  And we've mentioned
20  before that Dr. Muscat has already had his
21  deposition testimony taken in this
22  litigation?
23      A.   Yeah.
24      Q.   Would it surprise you to learn
25  that Dr. Muscat has made these same

| Page 264 |
| --- |

1  statements in his papers, his published
2  articles?
3           MR. HEGARTY:  Objection.  Form.
4           THE WITNESS:  Yeah, I think it
5  would.
6  QUESTIONS BY MR. BOWDEN:
7       Q.   Would it surprise you to learn
8  that Dr. Muscat doesn't know where he got the
9  citation from?
10           MR. HEGARTY:  Objection.  Form.
11           THE WITNESS:  It would, and I
12  don't know.  I -- yeah.
13  QUESTIONS BY MR. BOWDEN:
14      Q.   Okay.  All right.  We'll move
15  on.
16      A.   Is there something incorrect
17  with the science here?
18      Q.   Let's go on to -- I'm going to
19  try to pull it up on the screen for you
20  because it didn't print with numbers.
21      A.   Yeah.  That would be good.
22  Yeah.
23      Q.   Now, the message that you were
24  giving to all industry observers was "overall
25  strength that statistical associations

| Page 265 |
| --- |

1  observed have been weak."
2           And again, we're talking
3  specifically about ovarian cancer
4  epidemiology, right?
5       A.   I wasn't -- I was informing
6  them that this is my scientific opinion and
7  why I feel this way.
8           You said a message.  I wasn't
9  conveying a message.  I was saying that my
10  interpretation, my evaluation, of the
11  science, this is what I see.
12      Q.   Okay.  As you're speaking,
13  though, you're conveying ideas to the people
14  who are hearing it, correct?
15           MR. DONATH:  Objection.  Form.
16           THE WITNESS:  Yes.
17  QUESTIONS BY MR. BOWDEN:
18      Q.   And that's what we call
19  communication, right?
20      A.   Well, I think -- has a
21  different term that I would like to use.
22      Q.   Okay.  I'm not going to quibble
23  with you over the wording.
24      A.   Okay.  Good.
25      Q.   But this was the message you

67 (Pages 262 to 265)

Robert Glenn

Page 266

```
 1   were giving to the industry observers that
 2   were there, true?
 3        A.   This is what I was informing
 4   them about.
 5        Q.   Okay.
 6        A.   And I think they understood as
 7   scientists that this is my scientific
 8   opinions that I developed after carefully
 9   reviewing the medical literature.
10        MR. BOWDEN:  I move to strike
11        the second portion of the answer which
12        calls for speculation.
13   QUESTIONS BY MR. BOWDEN:
14        Q.   What you write down here is
15   "the overall strength of statistical
16   associations observed have been weak."
17        Have I read that correctly?
18        A.   They are.
19        Q.   Generally under 2.0?
20        A.   Yes.
21        Q.   Mean is average of 1.3?
22        A.   That's correct.
23        Q.   The majority lacking
24   statistical significance?
25        A.   Many did, yeah.
```

Page 267

```
 1        Q.   Okay.  Drs. Huncharek and
 2   Dr. Muscat, they found 1.3 with statistical
 3   significance.
 4        You're aware of that, aren't
 5   you?
 6        MR. HEGARTY:  Objection.  Form.
 7   QUESTIONS BY MR. BOWDEN:
 8        Q.   It's a yes or no question.
 9        A.   I said majority lacking.
10        Q.   I'm asking whether the authors
11   who were under contracts with Crowell &
12   Moring --
13        A.   The meta-analysis 1.3, and I
14   think it was statistically significant.
15        Q.   Okay.  That's not mentioned in
16   here, though?
17        A.   Yeah.  But -- yeah.
18        Q.   So let me ask you:  When you
19   say --
20        MR. DAVANT:  He's not done with
21        his answer.
22   QUESTIONS BY MR. BOWDEN:
23        Q.   When you say "we" --
24        MR. DAVANT:  Were you finished
25        with your answer?
```

Page 268

```
 1        THE WITNESS:  I wasn't, but --
 2   you know, essentially IARC agreed with
 3   that, much of that.  They considered
 4   eight papers to be informative as to
 5   whether talc is an ovarian carcinogen.
 6   QUESTIONS BY MR. BOWDEN:
 7        Q.   Eight papers to be informative?
 8        A.   Yeah.
 9        Q.   In one of the papers they
10   rejected --
11        MR. DAVANT:  He's still not
12   done with his answer.
13        THE WITNESS:  I'm talking about
14   informative in their summary.  They
15   said, these are the eight papers -- I
16   think there's eight.  It might have
17   been nine -- from which we can draw
18   our conclusions regarding our
19   classification of talc.
20        There were eight -- seven
21   case-control studies, and they said
22   two of them showed a relationship.
23   They said two of them are somewhat
24   uninterpretable.  They said three do
25   not show a relationship.
```

Page 269

```
 1        Further, they said that the
 2   best paper was a Gertig paper, which
 3   was a prospective paper and didn't
 4   call for recall bias of talc.  They
 5   asked these nurses before they ever
 6   started studying talc.
 7        And that was the best paper,
 8   and it failed to show an
 9   exposure/response relationship.  In
10   fact, it was a negative -- it was a
11   negative slope.
12        So I think while I was ahead of
13   that, that kind of supports what I was
14   saying at this meeting.
15   QUESTIONS BY MR. BOWDEN:
16        Q.   Okay.  So my question to you
17   was:  The fact that Muscat and Huncharek
18   found statistical significance at 1.3, that's
19   not mentioned here.  That was my question to
20   you.
21        MR. DONATH:  Objection.  Form.
22        MR. HEGARTY:  Objection.  Form.
23        THE WITNESS:  No, and it's not
24   mentioned -- I think in litigation it
25   used to be an SMR had to be over 3
```

68 (Pages 266 to 269)

Robert Glenn

| Page 270 | Page 272 |
|---|---|

**Page 270**

1    before it was considered to be
2    somewhat causal.  2 to 3, something
3    might be going on, and under 2, you
4    couldn't say anything about it.
5    QUESTIONS BY MR. BOWDEN:
6        Q.    You're not an attorney, are
7    you?
8        A.    No.
9        Q.    Then I move to strike your
10   answers.
11       A.    I'm not an epidemiologist
12   either.
13       Q.    Okay.  Let me ask you -- and I
14   think that -- we're going to cover all this.
15       A.    Okay.
16       Q.    We are.
17       A.    Okay.  All right.
18       Q.    I'm trying to move through
19   these documents because I recognize that we
20   still have material to get through, right?
21       A.    Yeah.
22       Q.    So my question to you -- and
23   I'm accepting that you say it is a weak
24   statistical association, right?
25       A.    Yeah.  The studies that are

**Page 271**

1    informative, yes.
2        Q.    And IARC says that it's a 2B
3    carcinogen.  At the end of all of this --
4        A.    Right.
5        Q.    -- we're going to see a
6    document that says this is a 2B carcinogen --
7        A.    That's right.
8             MR. HEGARTY:  Objection. Form.
9    QUESTIONS BY MR. BOWDEN:
10       Q.    -- right?
11            Which means limited evidence --
12       A.    Yeah.
13       Q.    -- right?
14            I'm not quibbling with you over
15   that.
16       A.    Yeah.
17       Q.    My question to you is that when
18   you say "weak risk associated" --
19       A.    Yeah.
20       Q.    -- that is still a risk?
21            MR. HEGARTY:  Objection. Form.
22            MR. DONATH:  Objection to form.
23            THE WITNESS:  It's a risk.  It
24   might not be significant.
25

**Page 272**

1    QUESTIONS BY MR. BOWDEN:
2        Q.    I'm asking you:  When you see a
3    weak risk, that is still a risk?
4             MR. HEGARTY:  Objection. Form.
5             THE WITNESS:  It's -- yes, it's
6    a risk based upon the odds ratio or
7    the standard mortality ratio.
8    QUESTIONS BY MR. BOWDEN:
9        Q.    Doesn't mean zero risk?
10       A.    No.
11       Q.    Doesn't mean no risk?
12            MR. HEGARTY:  Objection to
13   form.
14            THE WITNESS:  No.
15   QUESTIONS BY MR. BOWDEN:
16       Q.    Would you agree with me as just
17   a general principle -- I'm not talking about
18   talc and ovarian cancer.  But you would agree
19   with me that there is no acceptable risk for
20   a carcinogen?
21            MR. HEGARTY:  Objection. Form.
22            MR. DONATH:  Objection to form.
23            THE WITNESS:  I'm not sure I
24   would agree with you on that.
25

**Page 273**

1    QUESTIONS BY MR. BOWDEN:
2        Q.    Okay.
3        A.    I think we -- we accept risk to
4    carcinogens every day.
5        Q.    Sure.
6        A.    Sitting here right now, we're
7    probably breathing asbestos fibers.  You have
8    millions in your lung.
9             MR. BOWDEN:  I'm going to move
10   to strike your answer.
11   QUESTIONS BY MR. BOWDEN:
12       Q.    Do you feel that there's any
13   amounts of carcinogen -- risk of carcinogen
14   that's acceptable in cosmetic products?
15       A.    I don't think all carcinogens
16   are based upon alteration of DNA.  I think
17   there are other processes that can take
18   place.  So there can be thresholds for
19   carcinogens, in my opinion.
20       Q.    Uh-huh.  My question to you was
21   whether you feel that there is any level of
22   acceptable carcinogens --
23       A.    Yes.
24       Q.    -- that should be present in
25   cosmetic products.

69 (Pages 270 to 273)

Robert Glenn

| Page 274 | Page 276 |
|---|---|
| 1       A.    In cosmetic products?  I think<br>2  that talc is one of those.  It's -- that if<br>3  it plays a role, it's through an inflammatory<br>4  process.  And I'm not sure -- I don't think<br>5  it plays a role, but if it does, it's through<br>6  an inflammatory process.  So there would be a<br>7  threshold.<br>8       Q.    Would that be acceptable?<br>9            MR. HEGARTY:  Objection.  Form.<br>10           MR. DONATH:  Objection to form.<br>11  QUESTIONS BY MR. BOWDEN:<br>12      Q.    If true, would it be<br>13  acceptable?<br>14      A.    If we knew the level.  If we<br>15  knew the level, yes.  If we knew the level,<br>16  that threshold level, yes, then levels below<br>17  that would be acceptable.<br>18      Q.    And if you don't know the<br>19  level --<br>20      A.    Again --<br>21      Q.    -- do you feel it's<br>22  appropriate?<br>23      A.    If you know there's DNA<br>24  alteration, that's a different question.  I<br>25  don't think the genetic studies of talc have | 1       And the other arm of the study<br>2  was going to be to look at human epithelial<br>3  ovarian cells --<br>4       A.    That's right.<br>5       Q.    -- right?<br>6       A.    That's right.<br>7       Q.    You didn't fund the human<br>8  epithelial ovarian cell portion of it, did<br>9  you?<br>10      A.    Yes, I think we did.<br>11      Q.    You started it, right?<br>12           MR. HEGARTY:  Objection.  Form.<br>13           THE WITNESS:  The epithelial<br>14      ovarian?  It's in her report, in her<br>15      paper.<br>16  QUESTIONS BY MR. BOWDEN:<br>17      Q.    You stopped paying it, right?<br>18           MR. HEGARTY:  Objection.  Form.<br>19           MR. DONATH:  Objection.  Form.<br>20           THE WITNESS:  Stopped paying<br>21      it.  She wouldn't have -- she wouldn't<br>22      have done the research.<br>23  QUESTIONS BY MR. BOWDEN:<br>24      Q.    Oh, I'm sorry.  I said<br>25  epithelial.  Strike that.  Let me get back to |
| **Page 275** | **Page 277** |
| 1  shown that the DNA adducts are formed from<br>2  exposure to talc.<br>3       Q.    We're going to get -- we're<br>4  going to go into that.<br>5            You're aware that Brooke<br>6  Mossman and Dr. Shukla looked at this very<br>7  issue, right?<br>8       A.    Yes.<br>9       Q.    They actually brought a<br>10  proposal to you while you were at Crowell &<br>11  Moring to look into this issue, right?<br>12      A.    I asked for the proposal.<br>13           MR. HEGARTY:  Objection to<br>14      form.<br>15  QUESTIONS BY MR. BOWDEN:<br>16      Q.    Right.<br>17           And one of them was for looking<br>18  at what the effect of talcum particles was on<br>19  human mesothelial cells?<br>20      A.    Yes.<br>21      Q.    They were going to test<br>22  asbestos as well?<br>23      A.    Yes, as a positive control, if<br>24  you will.<br>25      Q.    Right. | 1  it.<br>2       A.    As I recall, we paid for the<br>3  entire study by Brooke -- well, wait a<br>4  minute.  IMA-North America may have paid for<br>5  that study.  That's right.  It wasn't Luzenac<br>6  or Imerys.  That study was -- I won't say any<br>7  more.<br>8       Q.    If you don't know the risk, if<br>9  you don't know the threshold level at which<br>10  an agent causes cancer --<br>11      A.    Yes.<br>12      Q.    -- is there any amount that's<br>13  acceptable in a cosmetic product?<br>14           MR. DAVANT:  Objection to form.<br>15           MR. DONATH:  Objection.  Form.<br>16           THE WITNESS:  In risk<br>17      management, we certainly accept those<br>18      risks.<br>19  QUESTIONS BY MR. BOWDEN:<br>20      Q.    You don't know what the<br>21  threshold level is, how can you accept the<br>22  risk?<br>23      A.    Well, do you eat --<br>24      Q.    It's not an opportunity for you<br>25  to ask me questions. |

70 (Pages 274 to 277)

Robert Glenn

Page 278

```
1      A.    All right. Well --
2      Q.    My question to you is: If you
3  don't know what the threshold level is at
4  which an agent can cause cancer, should you
5  warn about it?
6          MR. DONATH: Objection to form.
7          THE WITNESS: As Dr. Bruce Ames
8      pointed out, many of the things in our
9      diet are carcinogens, and we do accept
10      and consume those things.
11  QUESTIONS BY MR. BOWDEN:
12      Q.    We have to eat, right?
13      A.    Yes.
14      Q.    Or we die?
15      A.    Yeah.
16      Q.    Do you have to use talcum
17  powder?
18          MR. DONATH: Objection. Form.
19          THE WITNESS: You don't have
20      to.
21  QUESTIONS BY MR. BOWDEN:
22      Q.    So there's a different
23  risk/benefit analysis there, right?
24      A.    Somewhat.
25          MR. HEGARTY: Objection.
```

Page 279

```
1  QUESTIONS BY MR. BOWDEN:
2      Q.    Okay. So for a product which
3  has -- personal consumer products, baby
4  powder --
5      A.    Yeah.
6      Q.    -- has no medical necessity,
7  right?
8          MR. DONATH: Objection to form.
9          THE WITNESS: Well, it's the
10      same mineral issues in pleurodesis, so
11      it does have medical --
12  QUESTIONS BY MR. BOWDEN:
13      Q.    That's not my question.
14      My question is whether
15  talcum-based baby powders, whether they serve
16  a medical purpose, a necessary medical
17  purpose; yes or no?
18          MR. DONATH: Objection to form.
19          MR. BILLINGS-KANG: Objection.
20      Form.
21          THE WITNESS: Perineal
22      application?
23  QUESTIONS BY MR. BOWDEN:
24      Q.    Right.
25      A.    Yeah, if it's used for moisture
```

Page 280

```
1  control or irritation, that's a medical usage
2  of it.
3      Q.    People die from moisture
4  control?
5      A.    Well, you say they might since
6  perineal exposure leads to ovarian cancer.
7      Q.    No, people definitely do die
8  from ovarian cancer. That's not in dispute,
9  right?
10      A.    Yeah, they do. I agree.
11      Q.    And if something causes ovarian
12  cancer, you want to make sure that you're,
13  one, aware of it, right?
14      A.    Yeah.
15          MR. DONATH: Objection. Form.
16  QUESTIONS BY MR. BOWDEN:
17      Q.    So you can make an informed
18  decision, true?
19          MR. HEGARTY: Objection. Form.
20          THE WITNESS: Yeah, the -- the
21      American Cancer Society --
22          MR. BOWDEN: No, focus on my
23      question.
24          THE WITNESS: -- does not list
25      talc as a risk factor for ovarian
```

Page 281

```
1      cancer.
2  QUESTIONS BY MR. BOWDEN:
3      Q.    Right.
4      Where does Dr. Mossman work,
5  Brooke Mossman?
6      A.    University of Vermont.
7      Q.    Right.
8      Have you been on their website
9  recently?
10      A.    No, I have not.
11      Q.    Did you know that their website
12  lists talc as a cause of ovarian cancer?
13          MR. HEGARTY: Objection. Form.
14          THE WITNESS: At the medical
15      school?
16  QUESTIONS BY MR. BOWDEN:
17      Q.    I'm sorry, as a risk -- did you
18  know that University of Vermont --
19      A.    Yes.
20      Q.    -- lists talc as a risk factor
21  for ovarian cancer?
22          MR. DONATH: Objection to form.
23          THE WITNESS: You're talking
24      about the medical school at the
25      University of Vermont, I presume?
```

71 (Pages 278 to 281)

Robert Glenn

| Page 282 | Page 284 |
|---|---|
| 1  QUESTIONS BY MR. BOWDEN:<br>2    Q.   Either one.<br>3       Are you aware of either one?<br>4    A.   Well, I doubt if the<br>5  University --<br>6    MR. DAVANT:  Objection to form.<br>7    THE WITNESS:  -- of Vermont<br>8  website, which is about education,<br>9  would list something medical, but<br>10  maybe they do.  But I wasn't aware of<br>11  that.<br>12  QUESTIONS BY MR. BOWDEN:<br>13    Q.   Okay.  You weren't aware that<br>14  the medical university listed it as a<br>15  possible risk of ovarian cancer?<br>16    A.   No, I was not.<br>17    MR. DAVANT:  Same objection.<br>18  QUESTIONS BY MR. BOWDEN:<br>19    Q.   Is there any risk of cancer,<br>20  ovarian cancer, that is acceptable in a<br>21  cosmetic product?<br>22    MR. DONATH:  Objection. Form.<br>23    MR. BILLINGS-KANG:  Objection.<br>24  Asked and answered.<br>25    THE WITNESS:  No. | 1  period.<br>2    MR. TISI:  He said no, period.<br>3    MR. DAVANT:  I'm looking at<br>4  this right here:  "State your answer<br>5  again."<br>6    Answer: --<br>7    MR. TISI:  No, that's the<br>8  question before.<br>9    MR. DAVANT:  Had you finished<br>10  your answer --<br>11    THE WITNESS:  No.<br>12    MR. DAVANT:  -- before you were<br>13  interrupted?<br>14    MR. BOWDEN:  There's no<br>15  question pending.<br>16    THE WITNESS:  No, I was going<br>17  to add to it.<br>18    MR. DAVANT:  All right.  Move<br>19  to strike.<br>20  QUESTIONS BY MR. BOWDEN:<br>21    Q.   Are you familiar with the<br>22  precautionary principle?<br>23    A.   Yes.<br>24    Q.   State for us what the<br>25  precautionary principle is. |

| Page 283 | Page 285 |
|---|---|
| 1  QUESTIONS BY MR. BOWDEN:<br>2    Q.   State your answer again.<br>3    A.   Any risk of -- state that<br>4  again?  I'm sorry, could you state that again<br>5  or read it back?<br>6    MR. DAVANT:  "Is there any risk<br>7  of cancer, ovarian cancer, that is<br>8  acceptable in a cosmetic product?"<br>9    MR. BOWDEN:  Hold on.  You can<br>10  ask him during your deposition.<br>11    MR. DAVANT:  He's asked to read<br>12  your question back.<br>13    MR. BOWDEN:  There's a question<br>14  and an answer.  We're moving on.<br>15    MR. DAVANT:  I don't think his<br>16  answer matched the question because<br>17  everybody was objecting at the time.<br>18    MR. TISI:  Actually, she got it<br>19  down just right, Counsel.<br>20    MR. DAVANT:  No, I don't<br>21  think -- I don't think he -- he did<br>22  finish his answer.  I'm not trying to<br>23  be obstructive.  Unless I'm looking at<br>24  the wrong thing.  I might be --<br>25    MR. BOWDEN:  He said no, | 1    A.   Essentially says if -- in loose<br>2  words it says that if a substance is a<br>3  carcinogen or has toxic properties and it's<br>4  known, it should be avoided -- or it should<br>5  be controlled to the lowest possible level.<br>6    Q.   It doesn't say "known," doesn't<br>7  it?<br>8    A.   That's not it.<br>9    Q.   Okay.  Let me ask you this:  Is<br>10  there any level of a carcinogen that's<br>11  acceptable in a consumer product?<br>12    MR. DONATH:  Objection to form.<br>13    THE WITNESS:  There are --<br>14  there are some in consumer products,<br>15  yes.<br>16  QUESTIONS BY MR. BOWDEN:<br>17    Q.   I'm not asking you whether they<br>18  exist.  I'm asking you whether they're<br>19  acceptable.<br>20    MR. DONATH:  Objection to form.<br>21    THE WITNESS:  I would have to<br>22  look at the literature.  I would have<br>23  to do a search.  I would suspect there<br>24  are some.<br>25 |

Robert Glenn

| Page 286 | Page 288 |
|---|---|
| 1  QUESTIONS BY MR. BOWDEN:<br>2      Q.   Should they be warned of?<br>3          MR. DONATH:  Objection to form.<br>4          MR. BILLINGS-KANG:  Objection.<br>5          THE WITNESS:  If the risk rises<br>6      to a certain level, yes, there should<br>7      be warning.<br>8  QUESTIONS BY MR. BOWDEN:<br>9      Q.   And when you're talking about<br>10  rising to a certain level, that's in<br>11  comparison to a benefit, true?<br>12          MR. DONATH:  Objection to form.<br>13          THE WITNESS:  Yes.<br>14  QUESTIONS BY MR. BOWDEN:<br>15      Q.   It's a balancing act, right?<br>16      A.   Yes.<br>17      Q.   And so if you don't know what<br>18  the threshold risk is and there's no medical<br>19  or therapeutic benefit to a product, that<br>20  risk would not be acceptable, true?<br>21          MR. DONATH:  Objection to form.<br>22          MR. HEGARTY:  Objection.  Form.<br>23          THE WITNESS:  I haven't really<br>24      studied that subject closely. | 1      there's sufficient evidence that<br>2      there's a relationship with cancer and<br>3      there's not a threshold, then I would<br>4      say it should be -- there should be<br>5      warnings about it.<br>6          MR. BOWDEN:  All right.  Take a<br>7      break?<br>8          MR. DONATH:  Sure.<br>9          VIDEOGRAPHER:  The time is now<br>10  1:08.  Going off the record.<br>11      (Off the record at 1:08 p.m.)<br>12          VIDEOGRAPHER:  Okay.  The time<br>13  is now 1:58.  Back on the record.<br>14  QUESTIONS BY MR. BOWDEN:<br>15      Q.   All right.  When we left off<br>16  for our break, we were discussing the IARC<br>17  proceedings and the efforts that were being<br>18  made leading up to it.<br>19      A.   Yes.<br>20      Q.   And we had discussed briefly<br>21  the presentation that you had made to some of<br>22  the industry observers --<br>23      A.   Yes.<br>24      Q.   -- and now I want to move<br>25  forward into the actual IARC proceedings |

| Page 287 | Page 289 |
|---|---|
| 1  QUESTIONS BY MR. BOWDEN:<br>2      Q.   It's not a subject; it's a<br>3  question.<br>4      A.   Well, I don't want to answer it<br>5  without -- you know, top of my head without<br>6  some knowledge of the subject.<br>7      Q.   I'm asking you as a<br>8  hypothetical, as a person who is out there<br>9  giving presentations to industry observers,<br>10  as a person who is giving scientific opinions<br>11  to others:  What is it -- strike that.<br>12          If you don't know what the<br>13  threshold level of a causative agent --<br>14  strike that.<br>15          If you don't know what the<br>16  threshold level is that raised the risk of<br>17  causing cancer, there is no amount of that<br>18  agent that's acceptable in a personal care<br>19  product?<br>20          MR. DONATH:  Objection to form.<br>21          MR. BILLINGS-KANG:  Objection.<br>22      Asked and answered.  Beyond the scope.<br>23          THE WITNESS:  We have to be<br>24      careful, certainly, with -- with what<br>25      are in personal care products.  If | 1  themselves.<br>2          Okay?<br>3      A.   Okay.<br>4      Q.   And so we discussed a little<br>5  bit that -- strike that.<br>6          We discussed before our break<br>7  that there's a support team on the ground in<br>8  Lyon, France, correct?<br>9      A.   Yes.<br>10      Q.   And the IARC proceedings took<br>11  place over about a week?<br>12      A.   I think it might have stretched<br>13  into the second week.  It may have gone<br>14  from --<br>15      Q.   For the voting process.<br>16      A.   -- Monday to Friday, and then<br>17  Monday and they voted Tuesday, something like<br>18  that.  I can't recall.<br>19      Q.   Right.<br>20          And so you were there the<br>21  entire time, right?<br>22      A.   Yes.  Yes.<br>23      Q.   Dr. Muscat was there the entire<br>24  time?<br>25      A.   Yes.  Yes. |

73 (Pages 286 to 289)

Robert Glenn

Page 290

```
 1       Q.    And part of your role at the
 2   IARC proceedings was to coordinate, right, to
 3   coordinate what information and feedback was
 4   going to and from the industry observers,
 5   right?
 6             MR. BILLINGS-KANG:  Objection.
 7   Asked and answered.
 8             MR. DONATH:  Objection.
 9             THE WITNESS:  Yeah, we would
10   find out from Dr. Muscat what was
11   taking place during the meeting and if
12   there was anything that we could get
13   to augment the information at the
14   meeting.
15   QUESTIONS BY MR. BOWDEN:
16       Q.    Okay.  And so as part of that
17   process, Dr. Muscat would come out in the
18   evenings and he would provide a daily report
19   to the trade organization being -- well, it
20   wasn't a trade organization, it was a group
21   of people that was involved, that list of
22   people we went through earlier, right?
23       A.    Yes.
24       Q.    I'm going to mark for you
25   Exhibit Number 23.
```

Page 291

```
 1             MR. BOWDEN:  And Mr. Smith,
 2   this will be P1.059.
 3             (Glenn Exhibit 23 marked for
 4   identification.)
 5   QUESTIONS BY MR. BOWDEN:
 6       Q.    Now, did you review this
 7   document in preparation for today?
 8       A.    I did see this, yes.
 9       Q.    And you're very familiar with
10   the IARC process, right?
11       A.    Somewhat, yes.
12       Q.    Okay.  I want to start off
13   on -- I'm going to start off on page 5, so
14   that would be 59.5.
15       A.    Okay.
16       Q.    Do you see this e-mail from
17   Mark Ellis?
18       A.    Yes.
19       Q.    And he's sending it out to a
20   group of folks, right?
21       A.    Yes.
22       Q.    And at the bottom it says, "The
23   Lyon-based supported team has determined it
24   is critical that the larger overall support
25   team provides scientific reasoning to address
```

Page 292

```
 1   the limitations of the Cramer, et al., study.
 2   Please direct any insights you may have to
 3   the talc industry observers, the Lyon-based
 4   team and the trade association points of
 5   contact" -- I'll re-read it.
 6             "Please direct any insights you
 7   may have to the talc industry observers, the
 8   Lyon-based team and the trade association
 9   points of contact using the following
10   hyperlink."
11             Do you see where that's listed
12   down there?
13       A.    Yes.  Yes.
14       Q.    And there's a couple of names.
15   One is Eric Turner, right?
16       A.    In the "from"?
17       Q.    In the support team
18   distribution list.
19       A.    Oh.
20       Q.    These are the people that are
21   running support on the ground, right?
22       A.    Yeah.
23             Not all these people are in
24   Lyon.
25       Q.    Right.  Right.  Poor choice of
```

Page 293

```
 1   words on my part.
 2             But these are the people who
 3   were going to be helping disseminate the
 4   information from the observers and helping
 5   coordinate information going back to the
 6   observers, right?
 7             MR. HEGARTY:  Objection.  Form.
 8             THE WITNESS:  Yes, to
 9   Dr. Muscat, yes.
10   QUESTIONS BY MR. BOWDEN:
11       Q.    Right.
12             And you're one of the people
13   that's listed there, right?
14             RGlenn@Crowell.com?
15       A.    Yes.
16       Q.    Now, on February 8th, if you go
17   to 59.6...
18       A.    What was the date of this?
19   February?
20       Q.    It's just the next page over.
21       A.    Yeah.
22       Q.    You see there's an e-mail at
23   the bottom from you?
24       A.    Yes.
25       Q.    And that's February 8th?
```

Robert Glenn

Page 294

1    A.   Yes.
2    Q.   And you're sending it to the
3  same group of people, or some of the same
4  members, right?
5    A.   Yeah.
6    Q.   And it says, "Privileged and
7  confidential, attorney-client communication."
8         Was that just a signature page,
9  something that automatically appeared on your
10  e-mails?
11    A.   It didn't automatically.  I
12  think that's how I put it in.
13    Q.   Who asked you to put it there?
14    A.   No one.
15    Q.   You just felt that it would be
16  appropriate to do?
17    A.   I did.
18    Q.   Okay.
19    A.   I put it in for some reason I
20  don't know.
21    Q.   Okay.  Turn to the next page,
22  and you list key points, right?
23    A.   Yes.
24    Q.   And these are key points from
25  the epidemiology session at which Dr. Muscat

Page 295

1  was serving as the industry observer, right?
2    A.   Yes.
3    Q.   Okay.  And if you look halfway
4  down that page, there's one that starts
5  "Dr. Muscat."
6    A.   Yes.
7    Q.   "Dr. Muscat introduced into the
8  discussion the fact that talc diaphragm
9  studies did not show a relationship with the
10  scientific premise that talc-coated
11  diaphragms would be a more plausible and
12  direct route of exposure than perineal
13  dusting."
14         Do you see that?
15    A.   Yes.
16    Q.   And what he's doing there, he's
17  making sure that the working group is aware
18  of the -- of the premise -- the hypothesis of
19  the paper that he was working for Crowell &
20  Moring on, right?
21         MR. DONATH:  Objection to form.
22         MR. HEGARTY:  Objection.  Form.
23         THE WITNESS:  In making the
24    point that as far as a route of entry,
25    the diaphragm would probably be

Page 296

1  more -- a more realistic or
2  scientifically reliable introduction
3  of talc to the ovary than perineal
4  dusting.
5  QUESTIONS BY MR. BOWDEN:
6    Q.   Sure.
7         And I'm not -- I'm not trying
8  to quibble with you --
9    A.   Okay.
10    Q.   -- about what it was he was
11  trying to say to them.
12    A.   Right.
13    Q.   What I'm asking is whether what
14  he was saying, the substance of what he was
15  saying, was the same substance or the same
16  issue that he was being paid for to write a
17  report on behalf of Crowell & Moring --
18    A.   Yeah.
19    Q.   -- Johnson & Johnson and
20  Luzenac; is that correct?
21         MR. DONATH:  Objection.  Form.
22         MR. HEGARTY:  Objection.  Form.
23  QUESTIONS BY MR. BOWDEN:
24    Q.   Is that correct?
25    A.   Yes.  Yes.

Page 297

1    Q.   Okay.
2    A.   Actually --
3    Q.   And then at the bottom --
4    A.   -- the talc-diaphragm study was
5  more under Dr. Huncharek.  Dr. Muscat was
6  acting as a --
7    Q.   Dr. Muscat is listed as one of
8  the authors of that paper, right?
9    A.   Yes.  Yes.
10    Q.   Okay.  And that means that he
11  had significant input into it, correct?
12         MR. HEGARTY:  Objection.  Form.
13         THE WITNESS:  Yes.
14  QUESTIONS BY MR. BOWDEN:
15    Q.   At the bottom of that page it
16  says, "Dr. Muscat is waiting."
17         Do you see the bottom?
18    A.   Yes.
19    Q.   And I'm pulling it up here on
20  the screen here, too, if that's easier.
21         "Dr. Muscat is waiting to
22  introduce the use of talc as a sclerosing
23  agent in pleurodesis and its lack of
24  mesotheliogenic potential on the pleura and
25  how that observation relates to a lack of

75 (Pages 294 to 297)

Robert Glenn

Page 298

1    potential as an ovarian carcinogen."
2         Do you see that?
3    A.   Yes.
4    Q.   And that was actually the
5    hypothesis that you came up with during that
6    strategy session that we reviewed back in
7    2005, right?
8         MR. DONATH: Objection. Form.
9         THE WITNESS: That's right.
10   QUESTIONS BY MR. BOWDEN:
11   Q.   Okay. And that was the idea
12   that you put forth that they ultimately
13   adopted and put into the paper, correct?
14   A.   Yes.
15   Q.   Okay. And then at the bottom
16   there -- or excuse me, it says, "It is our
17   intention to discuss this with
18   Dr. Oberdörster and Muscat tomorrow evening."
19        Do you see that?
20   A.   Wait a minute. Is that on 7?
21   Q.   It's on 8. I continued over.
22        Let me strike that question.
23   A.   Oh, I'm sorry.
24   Q.   That's okay.
25        MR. BOWDEN: So, Corey, let's

Page 299

1    actually bring out the bullet point in
2    front of it as well.
3    QUESTIONS BY MR. BOWDEN:
4    Q.   And now we're talking about the
5    pleurodesis information, correct?
6    A.   Correct. Yes.
7    Q.   It says, "It is likely that
8    this issue would be introduced at the plenary
9    session where it could receive support from
10   Drs. Oberdörster and Antony," right?
11   A.   Yes.
12        MR. DONATH: Objection to form.
13   QUESTIONS BY MR. BOWDEN:
14   Q.   And Antony, that's the
15   Dr. Antony you were referring to earlier?
16   A.   It's Dr. Vena Antony, yes.
17   Q.   Okay. And then the next bullet
18   point is, "It is our intention to discuss
19   this with Dr. Oberdörster and Muscat tomorrow
20   evening," right?
21   A.   Correct.
22   Q.   And the work assignment --
23   A.   Let me just add, the reason to
24   bring it out in the plenary session is that
25   Dr. Antony was not in the epidemiology

Page 300

1    section.
2    Q.   Okay. The work assignment, "It
3    is critical that the support team provide
4    scientific reasoning to knock the
5    underpinnings from the Cramer, et al.,
6    studies."
7         Do you see that there?
8    A.   Yes. Yes, I do.
9    Q.   Now, one of the issues that --
10   as viewed by the group that was there and the
11   group -- the larger group on this e-mail was
12   that the epidemiology session was giving
13   greater weight to the Cramer studies, right?
14        MR. HEGARTY: Objection. Form.
15        THE WITNESS: They did give
16   considerable weight to the Cramer
17   studies, yes.
18   QUESTIONS BY MR. BOWDEN:
19   Q.   Right. And they actually
20   said -- they made the comment that they felt
21   that that was the most robust study on the
22   issue?
23        MR. HEGARTY: Objection. Form.
24        THE WITNESS: I think if they
25   made that comment, it was made about

Page 301

1    the Gertig study, who was -- who
2    Dr. Cramer was a coauthor on.
3    QUESTIONS BY MR. BOWDEN:
4    Q.   Right.
5    A.   Dr. Gertig.
6    Q.   That was Dr. Hankinson as well,
7    right?
8    A.   Yes. I think Dr. Gertig was
9    from Australia. She evidently was doing a
10   fellowship or something there.
11   Q.   Fair to say, though, that they
12   gave that study greater weight, correct?
13   A.   If it was the Gertig study,
14   yes, they should have.
15   Q.   So I want to go 59.2 now.
16   A.   Okay.
17   Q.   And at the top it says, "Bob,
18   please forward this e-mail to the list. I
19   will be back at the Hilton at about ten
20   o'clock."
21   A.   Yeah.
22   Q.   And that's from Dr. Muscat,
23   right?
24   A.   Yes.
25   Q.   And that was his -- this is

76 (Pages 298 to 301)

Robert Glenn

Page 302

1    actually -- if you flip to the front page at
2    the bottom, it shows this is the daily report
3    from February 8, 2006, right?
4         A.    Right.
5              And when was that last one that
6    I wrote?  February 8th also.
7         Q.    Right.
8         A.    Okay.
9         Q.    A lot of communication going
10   back and forth on these days, right?
11        A.    Yeah.  Right.  And to the group
12   outside as well.
13        Q.    Sure.  Sure.
14             Anyway, on the second page, if
15   you look down at the second paragraph where
16   it says "I introduced"?
17        A.    Yes.
18        Q.    This is Dr. Huncharek -- or
19   excuse me, Dr. Muscat giving a report to you
20   to forward on to the group about what he did,
21   right?
22        A.    Yes.
23        Q.    And he says, "I introduced the
24   pleurodesis data and reasoning.  The group
25   agreed to take this into consideration."

Page 303

1              Do you see that?
2         A.    Yes.
3         Q.    And if you go down to -- if you
4    continue reading, it says, "Dr. Demers was
5    charged with writing a summary of this data
6    for the volume.  I am unsure that this will
7    be persuasive in the next vote.  Dr. Demers
8    indicated to me that he thought this
9    information was anecdotal because it is
10   limited in scope compared to the ovarian
11   studies and that the information consisted of
12   case series."
13             Do you see that?
14        A.    I do.
15        Q.    And I'm not asking you whether
16   you agree with it; I'm just asking if that's
17   what the report was back from the group.
18   Correct?
19        A.    It was, but it's --
20        Q.    Okay.
21        A.    -- kind of odd that Dr. Demers
22   had already formed his opinion when he just
23   heard of the subject.
24        Q.    So if we continue on down, it
25   says, "Dr. Hankinson was cautious."

Page 304

1              Do you see that?
2         A.    Yes.
3         Q.    Down there it says, in the
4    middle of that paragraph, "Dr. Demers stated
5    that diaphragms are often coated with a
6    spermicide jelly and that this may prevent
7    the release of particles."
8              Right?
9              Do you see where that's
10   written?
11        A.    Yes.
12        Q.    "This is a valid point."
13             Do you see where that's
14   written?
15        A.    Yes.
16        Q.    That's Dr. Muscat's words,
17   correct?
18        A.    Yes.
19        Q.    Now, Dr. Muscat ultimately
20   published the diaphragm study along with
21   Dr. Huncharek, correct?
22        A.    Correct.
23        Q.    And that valid point that he
24   took away from the IARC work group, you know
25   that that does not appear anywhere in the

Page 305

1    diaphragm study, correct?
2              MR. HEGARTY:  Objection.
3    Correct.
4              THE WITNESS:  I don't know
5         whether Dr. Demers was a gynecologist
6         and whether he was familiar with
7         spermicidal jellies being used either.
8         And it says "often used"; it doesn't
9         say "always used."
10   QUESTIONS BY MR. BOWDEN:
11        Q.    My question to you is, when the
12   diaphragm study was ultimately published, was
13   that point mentioned in there?
14        A.    I don't recall it being
15   mentioned.  I don't recall it being
16   mentioned.
17        Q.    Okay.  Let's continue on.  Two
18   more paragraphs down, "Dr. Hankinson
19   indicated"?
20        A.    Yes.
21        Q.    "Dr. Hankinson indicated that
22   she did not believe confounding was an
23   issue."
24             And she's talking about the epi
25   studies; is that right?

Robert Glenn

Page 306

1    A.   She's probably talking about
2  her own work with Dr. Cramer.
3    Q.   "She noted little change
4  between age-adjusted risk estimates and
5  models that incorporated other variables.
6  She stated that since known confounders did
7  not change the estimates, she could not make
8  the assumption that there were other unknown
9  potential factors that could be confounders."
10    Do you see where that's
11  written?
12    A.   "She made the assumption there
13  were other..."  There were other on the -- on
14  the potential confounders, yes, there were.
15    Q.   Did I read that correctly?
16    A.   Yes.
17    Q.   "Michael Huncharek pointed out
18  that none of these studies controlled for
19  smoking, and new data indicate that smoking
20  is related to ovarian cancer."
21    Do you see where that's
22  written?
23    A.   Yes, and many of them --
24    Q.   And this is February of 2006?
25    A.   Many of them didn't control for

Page 307

1  BRCA1 or BRCA2 gene deficiencies.  They
2  didn't control --
3    Q.   Sir, my question is
4  specifically about what's written here.
5    A.   They did not control --
6    Q.   They didn't control smoking --
7    A.   -- for the most common causes
8  of ovarian cancer.
9    Q.   Dr. Huncharek pointed out -- he
10  was not there on the ground, right?
11    A.   That's right.
12    Q.   Dr. Huncharek pointed out that
13  none of these studies controlled for smoking,
14  right?
15    A.   Yes.
16    Q.   The very next sentence from
17  Dr. Muscat is, "I brought this up in
18  session."
19    Have I read that correctly?
20    A.   Let me find it again.
21    Q.   It's on the screen in front of
22  you, sir.
23    A.   Oh, okay.  Yes.  Yes.
24    MR. BOWDEN:  Can we play the
25  clip from Dr. Nicholson, please?

Page 308

1  QUESTIONS BY MR. BOWDEN:
2    Q.   Let me ask you before we play
3  this:  Are you familiar with Dr. Nicholson?
4    A.   Of Mount Sinai?
5    Q.   No, sir, of Johnson & Johnson.
6    A.   I thought you meant the
7  asbestos researcher.
8    No, I do not know a
9  Dr. Nicholson.
10    Q.   Do you know that we took her
11  deposition in this case and that she speaks
12  for J&J?
13    MR. HEGARTY:  Objection.  Form.
14    MR. DONATH:  Objection.  Form.
15    THE WITNESS:  I did not know
16  that.
17    MR. BOWDEN:  Okay.  I want you
18  to watch this clip from her
19  deposition, please.
20    (Video played.)
21  QUESTIONS BY MR. BOWDEN:
22    Q.   Go back to 59.2, please.
23    "Dr. Muscat, as the IARC
24  industry observer, on behalf of" --
25    A.   Where are you now?

Page 309

1    Q.   I'm sorry, do you -- let me
2  just back up and strike that.
3    Do you agree with what you just
4  saw from Dr. Nicholson?
5    A.   I have not read the literature
6  related to smoking and ovarian cancer, so I
7  wouldn't agree with either one of them.
8    Q.   You don't know one way or an
9  other?
10    A.   I don't know one way or the
11  other.
12    Q.   But that's exactly what message
13  was being brought up at the IARC proceedings
14  by Dr. Muscat, correct?
15    A.   I don't know whether Dr. Muscat
16  had information of that or not.
17    Q.   Let's go back and read this.
18    A.   He -- I thought it was --
19    Q.   "Dr. Huncharek pointed out that
20  none of these studies controlled for smoking,
21  and new data indicate that smoking is related
22  to ovarian cancer."
23    You see where that's written?
24    A.   Yes, I've not read --
25    Q.   "I brought this up in session."

78  (Pages 306 to 309)

Robert Glenn

Page 310

1  The "I" in that sentence is Dr. Muscat,
2  correct?
3      A.   Muscat, right.  Right.
4      Q.   Dr. Muscat, the industry
5  observer, brought that up to the IARC --
6      A.   That Dr. Huncharek considered
7  to be new studies of confounding from smoking
8  with ovarian cancer, yes.
9      I have not read that -- that
10  work, so I can't comment whether the good
11  doctor on the screen was right or whether
12  Dr. Huncharek was right.
13      Q.   Well, you're aware that the
14  original paper -- oh, yeah.
15      Are you aware that Dr. Muscat
16  has testified that he didn't believe that
17  either?
18          MR. HEGARTY:  Objection to
19      form.
20          MR. DONATH:  Objection to form.
21          THE WITNESS:  No, I have not
22      read that.
23  QUESTIONS BY MR. BOWDEN:
24      Q.   Okay.  In fact, you know that
25  the Critical Review paper, which we took a

Page 311

1  look at a little bit earlier, that originally
2  when they submitted to the Europe Journal of
3  Cancer Prevention, they had a statement in
4  there about smoking as a confounder, right?
5          MR. HEGARTY:  Objection.  Form.
6          THE WITNESS:  I did not know
7      that.
8  QUESTIONS BY MR. BOWDEN:
9      Q.   You did not know that?
10      A.   I don't recall reading that
11  manuscript that carefully.
12      Q.   Okay.  Would it surprise you if
13  Dr. Huncharek had put it in there?
14          MR. HEGARTY:  Objection.  Form.
15          MR. DONATH:  Objection.  Form.
16          THE WITNESS:  If that was his
17      opinion and he had a basis for it, it
18      wouldn't surprise me.
19  QUESTIONS BY MR. BOWDEN:
20      Q.   Would it surprise you that the
21  reviewers said that there's no support for
22  this and you should take it out?
23          MR. HEGARTY:  Objection.  Form.
24          THE WITNESS:  Again, I just
25      told you, I have not read the

Page 312

1  literature myself.  If the reviewers
2  would determine that there was not
3  support, scientific support, for it,
4  no, it wouldn't surprise me that they
5  suggested taking it out.
6  QUESTIONS BY MR. BOWDEN:
7      Q.   And it doesn't exist in the
8  paper as published, true?
9          MR. HEGARTY:  Objection.  Form.
10          THE WITNESS:  I'd have to read
11      the paper, which I'm taking at your
12      word.
13  QUESTIONS BY MR. BOWDEN:
14      Q.   Okay.  All right.  So I said
15  the review -- well, strike that.
16      Let me go to P1.0073.  I'm
17  going to mark this for you as Exhibit
18  Number 24.
19      I'm sorry, this is -- you can
20  take that back.  That's the same.  It's just
21  a different number.
22      A.   Yeah, I thought --
23      Q.   Yeah, it's a different Bates
24  production of the...
25          MR. BOWDEN:  Are you okay with

Page 313

1  that, Counsel, if I take that and just
2  put it on the next one?
3          (Glenn Exhibit 24 marked for
4      identification.)
5  QUESTIONS BY MR. BOWDEN:
6      Q.   All right.  Go to P1.65 next.
7      All right.  We'll make this one
8  number 24 for you.
9      So now we've gone a couple days
10  forward here.  You see this is an e-mail from
11  Michele Wyart on February 11th.
12      Do you see that down in the
13  middle of the first paragraph -- the first
14  page?
15      A.   It's to Michele Wyart.
16          MR. BOWDEN:  Yeah.  Can you
17      pull up this original message here in
18      the middle?
19  QUESTIONS BY MR. BOWDEN:
20      Q.   Mr. Glenn, I'm looking at the
21  middle of the page.  I think you might be
22  looking at the top of it.
23      A.   Oh.
24      Q.   So I pulled it up on the screen
25  here for you.

79 (Pages 310 to 313)

Robert Glenn

| Page 314 | Page 316 |
|---|---|

Page 314

1     A.   Okay.
2     Q.   All right.
3     A.   Yeah.
4     Q.   So this is the message from
5 Michele, IMA-Europe --
6     A.   Yes.
7     Q.   -- on February 11th.
8          Are you with me now?
9     A.   Right. Yes.
10    Q.   Okay.
11         And this is talking to you,
12 Eric and John; again, some of the contact
13 people, Eric Turner, yourself, John Muscat?
14    A.   Actually, John is John Parks.
15    Q.   I'm sorry, that's right. And
16 he's with Minerals Tech, right?
17    A.   Yes.
18    Q.   All right. And she's thanking
19 you for the reports, and she's offering some
20 comments, right?
21    A.   Yes.
22    Q.   And what she's asking in this
23 case is at this point was there concern that
24 the IARC work group was going to recommend
25 that talc be listed as a possible carcinogen?

Page 315

1          MR. DONATH: Objection. Form.
2          THE WITNESS: I'm not sure.
3 QUESTIONS BY MR. BOWDEN:
4     Q.   Okay.
5     A.   I don't recall that.
6     Q.   All right. Well, let's read
7 through this. "Thank you for the report,
8 although late in the night so complete and
9 structured. The market-base people should
10 rapidly give an opinion on a possible
11 separate and more stringent evaluation of
12 cosmetic talc. The first remarks which come
13 to me are the following: Although cosmetic
14 application is limited to 4 percent of the
15 market, cosmetic talc is a leading product
16 for industry which grade is also used in a
17 series of applications with human contact and
18 large added value. If cosmetic talc is
19 classified, why not food grade talc and
20 pharmaceutical talc."
21         Do you see that there?
22    A.   Yes.
23    Q.   It continues on to the next
24 page: "What does it mean to conclude limited
25 evidence for cosmetic talc and insufficient

Page 316

1 evidence for industrial talc?"
2          Right?
3     A.   Yes.
4     Q.   And "Cosmetic talc is one of
5 the purest talc product. The regulatory
6 bodies will have difficulties to digest and
7 evaluate. There is a risk that they
8 understand, and the market and public, too,
9 that the evidence is there, but the studies
10 in the industrial settings were not of
11 sufficient quality."
12         Do you see that there?
13    A.   Yes. I do. I do.
14    Q.   Do you agree with that
15 statement?
16    A.   Pardon?
17    Q.   Do you agree with that
18 statement?
19         "There is a risk that they
20 understand" --
21    A.   Yeah.
22    Q.   -- "they" being the regulatory
23 bodies -- and she puts in parentheses, "and
24 the market and public, too."
25    A.   Yeah.

Page 317

1     Q.   The public are the consumers,
2 right?
3     A.   Right.
4     Q.   -- "that the evidence is there,
5 but the studies in the industrial settings
6 were not of sufficient quality."
7          MR. DONATH: Objection. Form.
8          THE WITNESS: I'm not sure what
9     Michele is really meaning there,
10    especially when she says the studies
11    in the industrial settings were not of
12    sufficient quality. The suggestions
13    of talc workers were pretty clearly --
14 QUESTIONS BY MR. BOWDEN:
15    Q.   But the cosmetic talc did come
16 out with a 2B rating, right?
17    A.   It did, 2B, possible, yeah.
18         MR. DONATH: Objection. Form.
19 QUESTIONS BY MR. BOWDEN:
20    Q.   At the bottom of that she says,
21 "Sorry to mix science and market, but that is
22 the reality of the Lyon outcome," right?
23         MR. HEGARTY: Objection. Form.
24         THE WITNESS: That was her
25    opinion. It was never mine.

80 (Pages 314 to 317)

Robert Glenn

| Page 318 | Page 320 |
|---|---|
| 1  QUESTIONS BY MR. BOWDEN:<br>2      Q.   Well, you know that if the IARC<br>3  proceedings were to consider talc, cosmetic<br>4  talc, to be a possible carcinogen, that that<br>5  could have an impact on the market, right?<br>6      MR. HEGARTY:  Objection.  Form.<br>7      MR. DONATH:  Objection.  Form.<br>8      THE WITNESS:  I suppose it<br>9  could, but that was not of my interest<br>10  at all, and those things had never<br>11  been.<br>12      When silica was considered a<br>13  carcinogen, the chairman of my<br>14  association said, "We need to know the<br>15  truth so that we can do the right<br>16  thing for our employees and our<br>17  customers," and that was one of the<br>18  great public health lessons I got, and<br>19  it came from a CEO.<br>20      MR. BOWDEN:  I move to strike.<br>21  Nonresponsive.<br>22      THE WITNESS:  Good.  I would<br>23  never --<br>24      MR. BOWDEN:  There's no<br>25  question pending, sir. | 1      talc company we represented, yes.<br>2  QUESTIONS BY MR. BOWDEN:<br>3      Q.   Don't you feel that as a --<br>4  well, strike that.<br>5      They have a responsibility to<br>6  act in the public interests, right?<br>7      MR. DONATH:  Objection.  Form.<br>8      THE WITNESS:  Are you talking<br>9  about --<br>10  QUESTIONS BY MR. BOWDEN:<br>11      Q.   Oh, I'm sorry.  I meant to say<br>12  the -- Crowell & Moring's -- Luzenac's<br>13  message, that's Crowell & Moring's<br>14  responsibility to get that out, correct?<br>15      MR. DONATH:  Objection.  Form.<br>16      MR. DAVANT:  Objection.  Form.<br>17      MR. DONATH:  Beyond the scope.<br>18      THE WITNESS:  Luzenac's message<br>19  is Crowell's responsibility?<br>20      MR. BOWDEN:  I'll strike that.<br>21      THE WITNESS:  Never.<br>22  QUESTIONS BY MR. BOWDEN:<br>23      Q.   Crowell & Moring's client at<br>24  that time was Luzenac, right?<br>25      A.   Correct.  Luzenac America. |

| Page 319 | Page 321 |
|---|---|
| 1      I'm going to go to P1.056.<br>2      (Glenn Exhibit 25 marked for<br>3  identification.)<br>4  QUESTIONS BY MR. BOWDEN:<br>5      Q.   I'm going to mark this as<br>6  Exhibit Number 25.<br>7      Now, Tuesday, February 14th,<br>8  that's the date of the final vote, right?<br>9      A.   It may have been.<br>10      Q.   Okay.  And perineal talc, what<br>11  the final vote is, was unanimous Group 2B,<br>12  right?<br>13      A.   Yes.<br>14      MR. HEGARTY:  Objection.  Form.<br>15  QUESTIONS BY MR. BOWDEN:<br>16      Q.   And throughout this time<br>17  period, as to this time period, the IARC<br>18  working group proceedings, your employer was<br>19  the Crowell & Moring law firm, right?<br>20      A.   Correct.<br>21      Q.   And the only corporation they<br>22  represented at that point, the talc<br>23  manufacturer, was Luzenac, right?<br>24      MR. DONATH:  Objection.  Form.<br>25      THE WITNESS:  That was the only | 1      Q.   And they were ethically bound<br>2  to act in their client's best interests,<br>3  correct?<br>4      MR. BILLINGS-KANG:  Objection.<br>5  Form.<br>6      MR. DONATH:  Objection to form.<br>7      MR. DAVANT:  Objection.  Form.<br>8      THE WITNESS:  Crowell &<br>9  Moring --<br>10  QUESTIONS BY MR. BOWDEN:<br>11      Q.   Crowell & Moring was ethically<br>12  bound to act in Imerys, Luzenac's, best<br>13  interest, correct?<br>14      MR. DONATH:  Same objection.<br>15      THE WITNESS:  Not necessarily,<br>16  I don't think.<br>17  QUESTIONS BY MR. BOWDEN:<br>18      Q.   Well, they weren't bound to act<br>19  on behalf of the public, right?<br>20      A.   I'm not an attorney.  I think<br>21  you need to direct that question to an<br>22  attorney.<br>23      Q.   I understand.<br>24      But you're working for<br>25  Crowell & Moring at the time, and you're the |

81 (Pages 318 to 321)

Robert Glenn

Page 322

1    only employee of Crowell & Moring at the IARC
2    proceedings, right?
3         A.    Yes, uh-huh.
4         Q.    And you're one of the
5    designated points of contact for feeding
6    information into the industry observers and
7    taking reports out, right?
8              MR. DONATH: Objection. Form.
9              MR. BILLINGS-KANG: Objection
10   to form.
11             THE WITNESS: We were -- we
12        were giving information to the
13        observer, yes.
14   QUESTIONS BY MR. BOWDEN:
15        Q.    Right.
16             And we've seen now through
17   these documents where specifically your
18   strategies, including pleurodesis, those were
19   offered specifically at the working group
20   proceedings, right?
21        A.    They were.
22        Q.    And that was strategies that
23   were developed during the course of
24   employment with Crowell & Moring, your course
25   of employment with Crowell & Moring, right?

Page 323

1         A.    Yes. Yes.
2         Q.    And that was on behalf of
3    Luzenac, correct?
4              MR. DONATH: Objection to form.
5              THE WITNESS: Yes, Luzenac was
6         a client.
7    QUESTIONS BY MR. BOWDEN:
8         Q.    Uh-huh. And that strategy was
9    on their behalf, true?
10             MR. DONATH: Objection. Form.
11             THE WITNESS: It was on their
12        behalf, out of my brain.
13   QUESTIONS BY MR. BOWDEN:
14        Q.    And that strategy was in the
15   defense of talc, correct?
16             MR. DONATH: Objection to form.
17             THE WITNESS: That strategy was
18        trying to explain what is the real
19        scientific understanding of talc and
20        ovarian cancer.
21   QUESTIONS BY MR. BOWDEN:
22        Q.    And so -- but the talc
23   industry, in the trade group's view, was
24   under attack, right?
25             MR. HEGARTY: Objection to

Page 324

1    form.
2              MR. DONATH: Objection to form.
3              THE WITNESS: I don't think
4         we're under attack. I didn't see any
5         publications about the trade group or
6         talc itself being a problem.
7    QUESTIONS BY MR. BOWDEN:
8         Q.    Okay.
9         A.    In fact, I'm not sure that
10   anything came out of the IARC meeting related
11   to publicity about talc being a carcinogen.
12        Q.    A rating of 2B came out of it,
13   right?
14        A.    Yes, and it was published in
15   Lancet Oncology.
16        Q.    Right.
17        A.    But I didn't read about it in
18   the New York Times.
19        Q.    Okay. Let's move on. Let's
20   put that document aside.
21             Next document is going to be
22   P1.4.
23             VIDEOGRAPHER: The time is now
24        2:30. Going off the record.
25             (Off the record at 2:30 p.m.)

Page 325

1              VIDEOGRAPHER: Okay. The time
2         is now 2:31. Back on the record.
3              (Glenn Exhibit 26 marked for
4         identification.)
5    QUESTIONS BY MR. BOWDEN:
6         Q.    Mr. Glenn, I'm going to hand
7    you what's marked as Exhibit 26.
8         A.    Okay.
9         Q.    Did you read this in
10   preparation of today's deposition?
11        A.    I don't recall that I did. I
12   don't recall seeing this one.
13        Q.    And you see here that this is a
14   letter written from Luzenac, right?
15        A.    Yes.
16        Q.    And February 25, 2006, they
17   were still a client of Crowell & Moring,
18   right?
19        A.    Yes.
20        Q.    Okay. And they're writing to
21   Dr. Baan?
22        A.    Yes.
23        Q.    And Dr. Baan is an officer at
24   IARC, right?
25        A.    Yes.

82 (Pages 322 to 325)

Robert Glenn

Page 326

1    Q.    And he was one of the people
2  who received comments on monograph 93, right?
3    A.    Yes.
4    Q.    Okay.  And it says here from
5  Luzenac, "Dear Dr. Baan, we wish to express
6  our disappointment with the recent IARC
7  monograph evaluation process that was used to
8  review non-asbestiform talc and ovarian
9  cancer evidence in -- in addition to the lung
10  cancer evidence."
11        Do you see where that's
12  written?
13    A.    Yes.
14    Q.    The third paragraph down says,
15  "First, the working group did not contain the
16  necessary expertise to properly evaluate the
17  evidence regarding ovarian cancer."
18        Do you agree with that
19  statement?
20    A.    I would have to look back at
21  the members working group, but I think there
22  may -- they may could have had better working
23  group members on that -- on that group.
24    Q.    Well, you had mentioned earlier
25  that you felt that they didn't have high

Page 327

1  turnover, right?
2    A.    They -- you often see the same
3  people back on the working group --
4    Q.    And one of the --
5    A.    -- Straif being one.
6    Q.    One of the criticisms that your
7  client had at the time, Luzenac, and they're
8  writing to IARC, is that "the working group
9  did not contain the necessary expertise to
10  properly evaluate the evidence."
11    A.    That's what he said.
12    Q.    Do you agree with that
13  statement?
14    A.    I would have had probably some
15  other scientists on the group.
16    Q.    I don't understand your
17  response.
18        Do you agree with that
19  statement; yes or no?
20    A.    I would have composed a
21  different group, possibly.  Some of the
22  people would have been on, some not.
23        I did not write this.  It's not
24  my opinion.
25    Q.    I understand you did not write

Page 328

1  this, and I'm not asking you to take
2  authorship of it.
3    A.    Yeah.
4    Q.    What I'm asking you is whether
5  you agree that the IARC working group did not
6  contain the necessary expertise to properly
7  evaluate the evidence regarding ovarian
8  cancer.
9    A.    I want to be kind, but, yes.
10    Q.    Okay.  The next paragraph down
11  says, "Evaluation of the ovarian cancer human
12  evidence in this case required expertise in a
13  number of areas of gynecologic oncology that
14  should have been addressed by other
15  subgroups, parentheses, exposure and
16  mechanism, and that the single working group
17  member familiar with the ovarian cancer human
18  studies did not have such expertise."
19        Do you see where that's
20  written?
21    A.    I don't know who he's referring
22  to as the single group member, but, yes, I
23  see it.  I read -- you read that correctly.
24    Q.    And so we're going to go down
25  to the final paragraph here.  Halfway through

Page 329

1  it says, "In addition."
2    A.    Yes.
3    Q.    Okay.  "In addition, the
4  preamble states that consideration in
5  selecting working group members is also given
6  to balance of scientific findings and views.
7  In this evaluation, there could be no such
8  balance because 15 of the 16 working group
9  members had no expertise in gynecologic
10  oncology or the ovarian cancer literature."
11        Do you see where that's
12  written?
13    A.    Yes.
14    Q.    Now, gynecologic oncology -- in
15  fact, she mentioned that now twice in this
16  letter by my count.  All right?
17        Do you agree that a
18  gynecological oncologist -- or, excuse me, a
19  gynecologic oncologist is best suited to
20  evaluate and opine on the studies looking at
21  talc and ovarian cancer?
22        MR. DONATH:  Objection to form.
23        MR. HEGARTY:  Objection to
24  form.
25        THE WITNESS:  I think a

83 (Pages 326 to 329)

Robert Glenn

| Page 330 | Page 332 |
|---|---|
| 1     gynecologist -- a gynecological | 1     When you were working with |
| 2     oncologist would have been a welcomed | 2  Johnson & Johnson -- |
| 3     addition to the group, yes. | 3     A.   Yeah, we did not -- |
| 4  QUESTIONS BY MR. BOWDEN: | 4     Q.   -- Luzenac and MRG Group |
| 5     Q.   In the preparation and | 5  together -- |
| 6  publishing of the two papers we've talked | 6     A.   Yeah. |
| 7  about today, the critical review and the | 7     Q.   -- collectively -- |
| 8  diaphragm study -- | 8     A.   Yes. |
| 9     A.   Yes. | 9     Q.   -- and producing, funding, |
| 10     Q.   -- did you, Crowell & Moring, | 10  editing and ultimately publishing those |
| 11  Johnson & Johnson or Luzenac ever consult | 11  papers, did that group working together ever |
| 12  with an expert on gynecologic oncology? | 12  consult with an ovarian cancer expert? |
| 13     A.   No. | 13     MR. HEGARTY:  Objection.  Form. |
| 14     MR. DONATH:  Objection to form. | 14     THE WITNESS:  No, we did not. |
| 15     MR. HEGARTY:  Objection.  Form. | 15     And those papers weren't strongly |
| 16     THE WITNESS:  We were -- | 16     related to ovarian cancer, other than |
| 17  QUESTIONS BY MR. BOWDEN: | 17     the epidemiology of ovarian cancer. |
| 18     Q.   So my second question to | 18  QUESTIONS BY MR. BOWDEN: |
| 19  that -- | 19     Q.   To your knowledge, did they |
| 20     A.   We were not -- | 20  ever consult with a gynecologic oncologist or |
| 21     Q.   I'm sorry? | 21  an ovarian cancer expert? |
| 22     A.   We were not broadly looking at | 22     MR. DONATH:  Objection.  Form. |
| 23  the entire field. | 23     MR. HEGARTY:  Objection.  Form. |
| 24     Q.   Uh-huh. | 24     THE WITNESS:  No. |
| 25     A.   The reason the gynecological | 25   |

| Page 331 | Page 333 |
|---|---|
| 1  oncologist would be useful is because of the | 1  QUESTIONS BY MR. BOWDEN: |
| 2  nature of ovarian cancer and the clinical | 2     Q.   And you didn't bring one over |
| 3  aspects of ovarian cancer and what are real | 3  to IARC either, correct? |
| 4  risk factors for ovarian cancer. | 4     A.   No, we did not. |
| 5     MR. BOWDEN:  I'm going to move | 5     Q.   I want you to turn to the |
| 6     to strike as not responsive. | 6  second page of exhibit -- well, this is |
| 7     THE WITNESS:  Okay. | 7  Exhibit 26.  It's P1.54.2. |
| 8  QUESTIONS BY MR. BOWDEN: | 8     A.   First paragraph? |
| 9     Q.   In your experience with | 9     Q.   No, sir, I'm going to actually |
| 10  Crowell & Moring, Johnson & Johnson, Luzenac, | 10  be going to the third paragraph. |
| 11  Meta-Analysis Research Group, in the drafting | 11     A.   Oh, I thought that was the one |
| 12  and publication of the Critical Review and | 12  you wanted to direct me to. |
| 13  diaphragm study, did they ever consult with | 13     Q.   I'm sorry, it'll be the last |
| 14  an expert on ovarian cancer? | 14  paragraph. |
| 15     MR. DONATH:  Wait.  I'm going | 15     A.   Okay. |
| 16     to direct the witness not to answer | 16     Q.   "Due to the above deficiencies |
| 17     simply with respect to communications | 17  and irregularities, we believe IARC should |
| 18     with respect to Luzenac, Imerys and | 18  consider carefully whether it should proceed |
| 19     Crowell & Moring. | 19  with the publication of the ovarian cancer |
| 20     MR. HEGARTY:  Objection. | 20  portion of the evaluation for non-asbestiform |
| 21  QUESTIONS BY MR. BOWDEN: | 21  talc.  We believe it should not, and we |
| 22     Q.   Go ahead and answer. | 22  formally object to the conduct of the |
| 23     A.   Read the -- give me the | 23  evaluation in a manner that was not |
| 24  question again. | 24  consistent with IARC's reputation and its |
| 25     Q.   Sure. | 25  policies and procedures." |

84 (Pages 330 to 333)

Robert Glenn

| Page 334 |
|---|

```
1              Do you see that?
2        A.    Yes, I do.
3        Q.    To this day, has IARC changed
4    its position as regards non-asbestiform talc?
5        A.    They haven't bothered to
6    consider talc again, so, no, it -- this is
7    still their position.
8        Q.    And now I wanted to ask you --
9        A.    I do find the first paragraph
10   to be very interesting.
11       Q.    I'm going to ask you a separate
12   question right now.  You can set that aside.
13             We have -- during the IARC
14   proceedings, you actually had runners go over
15   to Dr. Muscat and bring him newspaper
16   articles from the 1970s.
17             Do you recall doing that?
18             MR. DONATH:  Objection to form.
19             THE WITNESS:  I don't recall
20        doing that.
21   QUESTIONS BY MR. BOWDEN:
22       Q.    You also informed him that
23   talc, after 1975, did not contain asbestos.
24       A.    That was the position from the
25   Cosmetic Toiletry Fragrances Association,
```

| Page 335 |
|---|

```
1    yes.
2        Q.    Was that your position?
3        A.    They set up a standard.  I'm
4    not -- I never tested talc prior to that, and
5    I did read a lot of tests related to talc
6    before that.
7        Q.    So you didn't test the accuracy
8    of that statement before relaying it to
9    Dr. Muscat?
10       A.    This was a group effort.
11       Q.    My question is:  You did not --
12       A.    I did not.
13       Q.    Crowell & Moring did not?
14       A.    No.
15       Q.    And the question of whether
16   talc contains asbestos, that's an important
17   question, right?
18             MR. HEGARTY:  Objection to
19        form.
20             MR. DONATH:  Objection.  Form.
21             THE WITNESS:  Well, talc
22        contains asbestos.  Whether it
23        contains asbestiform asbestos is a
24        critical question, yes.
25
```

| Page 336 |
|---|

```
1    QUESTIONS BY MR. BOWDEN:
2        Q.    Right.
3              And I'm not going to parse
4    words with you here on this, and when I'm
5    talking about asbestos, I'm talking about a
6    single fiber of asbestos in talc, in any
7    talcum product that's being used for -- in
8    baby talc, for example.
9              MR. DONATH:  Objection to form.
10             THE WITNESS:  I can't speak
11        broadly about that.
12   QUESTIONS BY MR. BOWDEN:
13       Q.    Why not?
14       A.    Because it's much more complex
15   than that.
16             To be -- as OSHA decided in
17   their regulation, to be considered an
18   asbestos mineral that would cause disease, it
19   had to be in an asbestiform habit.  And they
20   also decided that the asbestiform habit and
21   the non-asbestiform habit were easily
22   distinguishable and that the non-asbestiform
23   habit had little consequence.  They could --
24   they'd regulate it as a particulate not
25   otherwise regulated with a TOV of
```

| Page 337 |
|---|

```
1    5 milligrams per cubic meter.
2              (Glenn Exhibit 27 marked for
3        identification.)
4    QUESTIONS BY MR. BOWDEN:
5        Q.    So I'm going to hand you
6    Exhibit 27.  Take a look at that.
7        A.    Uh-huh.
8        Q.    Are you familiar with Johnson &
9    Johnson's definition of asbestos?
10             MR. HEGARTY:  Objection.  Form.
11             THE WITNESS:  I am not.
12   QUESTIONS BY MR. BOWDEN:
13       Q.    I want to go -- this will be --
14   I want to go down to this second to the last
15   paragraph.
16       A.    I have not seen this, and it
17   might --
18       Q.    I'm not suggesting that you
19   have.
20       A.    Yeah.
21       Q.    What I'm asking about here
22   is --
23       A.    Well, what I'm suggesting is to
24   have context --
25       Q.    No, sir, there is no question
```

85 (Pages 334 to 337)

Robert Glenn

| Page 338 |
|---|
| 1  pending. |
| 2      A.    -- to your answers, I may have |
| 3  to read it. |
| 4      Q.    If you want to read -- I'm |
| 5  sorry, if you want to read the document, go |
| 6  ahead.  Take your time. |
| 7      A.    Okay.  Okay.  I think I've read |
| 8  enough now to have the context. |
| 9          I wouldn't agree with their |
| 10  definition of asbestos. |
| 11      Q.    Okay.  I'm not asking you to |
| 12  agree with it. |
| 13      A.    Yeah. |
| 14      Q.    But in the context of this |
| 15  discussion -- |
| 16      A.    Right. |
| 17      Q.    -- this is how I'm defining it, |
| 18  is Johnson & Johnson's definition. |
| 19      A.    This is their definition, |
| 20  correct. |
| 21          MR. HEGARTY:  Objection. |
| 22  QUESTIONS BY MR. BOWDEN: |
| 23      Q.    "Asbestos is defined to be the |
| 24  fibrous serpentine chrysotile and the fibrous |
| 25  forms of the amphibole group as represented |

| Page 339 |
|---|
| 1  by amosite, anthophyllite, crocidolite, |
| 2  tremolite asbestos and actinolite." |
| 3          Do you see that there? |
| 4      A.    Yeah, I read that in here, yes. |
| 5  I'm not sure -- oh, there's the paragraph, |
| 6  okay.  I got it, yeah. |
| 7      Q.    Okay.  My question to you is: |
| 8  When you were discussing with Dr. Muscat that |
| 9  talcum powder products were free of asbestos |
| 10  as of 1975, you were meaning that there was |
| 11  no asbestos whatsoever in there, correct? |
| 12          MR. DONATH:  Objection to form. |
| 13          THE WITNESS:  I meant -- |
| 14          MR. BILLINGS-KANG:  Objection. |
| 15          THE WITNESS:  -- there was no |
| 16  asbestiform asbestos in it. |
| 17  QUESTIONS BY MR. BOWDEN: |
| 18      Q.    Right. |
| 19      A.    Yeah. |
| 20      Q.    And that's an important |
| 21  distinction, correct? |
| 22      A.    Yes. |
| 23          MR. DONATH:  Objection. |
| 24  QUESTIONS BY MR. BOWDEN: |
| 25      Q.    Because prior to 1975 -- and |

| Page 340 |
|---|
| 1  the date I'm not committed to because I think |
| 2  even in your correspondence with them you say |
| 3  may have been 1975 or choose whatever date |
| 4  you want in the 1970s. |
| 5          Prior to that, some of the |
| 6  studies that were done may have included |
| 7  women who were exposed to talcum-based |
| 8  products which contained asbestos? |
| 9      A.    I don't know that to be a fact |
| 10  at all. |
| 11          MR. DONATH:  Objection.  Form. |
| 12          MR. HEGARTY:  Objection. |
| 13          THE WITNESS:  I believe the |
| 14  Stanton paper was published before |
| 15  that, his hallmark paper on |
| 16  implantation at the pleura of asbestos |
| 17  and other products, and none of the |
| 18  talcs produced a significant number of |
| 19  tumors in experimental animals. |
| 20  QUESTIONS BY MR. BOWDEN: |
| 21      Q.    Well, I'm asking you a broader |
| 22  question, and maybe it's a -- it's the way |
| 23  that I'm phrasing it that's confusing. |
| 24      A.    Uh-huh. |
| 25      Q.    It would be unacceptable to |

| Page 341 |
|---|
| 1  have even one fiber of asbestos in talcum |
| 2  products, correct? |
| 3          MR. DONATH:  Objection. |
| 4          THE WITNESS:  One asbestiform |
| 5  fiber, yes.  It would not be a good |
| 6  business, right. |
| 7  QUESTIONS BY MR. BOWDEN: |
| 8      Q.    It would not be acceptable? |
| 9          MR. DONATH:  Objection. |
| 10          THE WITNESS:  It would -- it |
| 11  would not be acceptable, yes, if |
| 12  you -- if you have a protocol that |
| 13  would determine that, yes. |
| 14  QUESTIONS BY MR. BOWDEN: |
| 15      Q.    Okay.  And if there were a |
| 16  fiber of asbestos in talcum-based products, |
| 17  that would provide a biologically plausible |
| 18  mechanism for the observance of the increased |
| 19  risk in these studies, correct? |
| 20          MR. DONATH:  Objection to form. |
| 21          MR. HEGARTY:  Objection.  Form. |
| 22          THE WITNESS:  I know it |
| 23  certainly would in lung disease.  I |
| 24  would suspect it biologically |
| 25  plausible that it would also do |

Robert Glenn

Page 342

1    similar mechanism of disease in other
2    tissues and organs, so I would expect
3    it would.
4    QUESTIONS BY MR. BOWDEN:
5        Q.    And when you say "expect it
6    would," we're talking about ovarian cells?
7        A.    Ovarian cancer, yes.
8            In fact, Brooke Mossman's study
9    showed that, that asbestos, true asbestos,
10   was the only mineral she -- the only particle
11   she tested that showed a positive response to
12   genetic microarray.
13       Q.    So now we've talked a little
14   bit about -- and I'm still on IARC, but we're
15   changing gears a little bit from our asbestos
16   discussion.
17           Okay?
18       A.    Yes.
19           MR. BOWDEN:  I want to go to
20   P1.66, Mr. Smith.
21           (Glenn Exhibit 28 marked for
22   identification.)
23   QUESTIONS BY MR. BOWDEN:
24       Q.    Mark this as Exhibit 28 for
25   you.

Page 343

1        A.    Thank you.
2        Q.    You can see at the top here
3    these are meeting minutes from the talc
4    section teleconference, IMA-North America in
5    conjunction with IMA-Europe.
6            Do you see that?
7        A.    Yes.
8        Q.    And they're holding a joint
9    meeting, Tuesday, February 14th, and this is
10   the day that the vote came down, right?
11       A.    Yes.
12       Q.    Okay.  And let's look at the
13   participants there.  You have the operations
14   room.
15           Do you see yourself as listed?
16       A.    Yes.
17       Q.    Crowell & Moring, LLP.
18           Eric Turner, Luzenac, is
19   listed?
20       A.    Yes.
21       Q.    Linda Loretz, CTFA, is listed?
22       A.    Yes.
23       Q.    Michele Wyart, IMA-Europe?
24       A.    Yes.
25       Q.    And you're telling me that

Page 344

1    those people weren't actually there, though.
2    These were --
3        A.    No.  They were on the phone
4    call.
5        Q.    And there's a little bit of a
6    space there, and you can see it looks like
7    the people that are actually on the ground
8    were --
9        A.    Right.
10       Q.    -- yourself, Mr. Parks and
11   Mr. Turner?
12           MR. DONATH:  Objection to form.
13           THE WITNESS:  That's correct.
14   That's correct.
15   QUESTIONS BY MR. BOWDEN:
16       Q.    And Dr. Huncharek was on the
17   phone for MRG, right?
18       A.    Yes.
19       Q.    Steven Mann for Johnson &
20   Johnson?
21       A.    He was actually -- he says he
22   was representing himself from the Marshfield
23   Clinic, the hospital he worked at.
24       Q.    Okay.  Well, I mean, at the
25   time he was under a contract with guys --

Page 345

1    with Crowell & Moring through Meta-Analysis
2    Research Group, right?
3            MR. HEGARTY:  Objection to
4    form.
5            MR. DONATH:  Objection.  Form.
6    QUESTIONS BY MR. BOWDEN:
7        Q.    But you're right, it does say
8    Marshfield Clinic.
9        A.    Yeah.
10       Q.    Then if we go down where --
11   it's the first -- second paragraph that says
12   "Eric Turner."
13       A.    Yes.
14       Q.    "Eric Turner expressed his
15   warmest thanks to Drs. Gunter Oberdörster and
16   Joshua Muscat, who both played a key role in
17   the defense of the talc dossier," right?
18       A.    Yes.
19       Q.    "And their respective
20   subgroups, as well as to the whole supportive
21   group who assisted during the week and even
22   months and years," right?
23       A.    Yes.
24       Q.    So this is the culmination of
25   effort that had been going on for weeks,

Robert Glenn

| Page 346 | Page 348 |
|---|---|
| 1  months, and supporting IMA-North America | 1  written? |
| 2  meeting minutes, years, right? | 2      A.    Yes. |
| 3          MR. DONATH:  Objection to form. | 3      Q.    And then underneath Situation |
| 4          MR. HEGARTY:  Objection.  Form. | 4  Analysis -- |
| 5          THE WITNESS:  Well, looking at | 5      A.    Yes. |
| 6      the talc ovarian cancer on the whole, | 6      Q.    -- about halfway through that |
| 7      yes, it's been that long. | 7  paragraph where it starts "IARC"? |
| 8  QUESTIONS BY MR. BOWDEN: | 8      A.    Yeah. |
| 9      Q.    And if we go to the last page, | 9      Q.    "IARC has not set or enforce |
| 10  66.3. | 10  policy or legislation aimed at controlling |
| 11      A.    Yes. | 11  carcinogens, but it is a highly influential |
| 12      Q.    "The participants discussed the | 12  agency.  For example, in the United States, |
| 13  need for further developing research to | 13  many agencies automatically recalibrate their |
| 14  address gaps, and Eric Turner emphasized that | 14  regulations based on IARC findings." |
| 15  RTM" -- | 15      Do you see that? |
| 16      That's Rio Tinto? | 16          MR. DONATH:  Objection to form. |
| 17      A.    Yes. | 17          THE WITNESS:  Yes, I do see |
| 18      Q.    Is that Luzenac, right? | 18      that, and it remind -- reminds me that |
| 19      A.    Yes. | 19      IARC -- there were -- their process is |
| 20          MR. DONATH:  Objection to form. | 20      looked at -- at identification of |
| 21  QUESTIONS BY MR. BOWDEN: | 21      carcinogens, the first step in risk |
| 22      Q.    "Eric Turner emphasized that | 22      assessment. |
| 23  RTM will challenge the issue to demonstrate | 23  QUESTIONS BY MR. BOWDEN: |
| 24  that talc is a very safe material through | 24      Q.    If you go to page 3, there's a |
| 25  research projects confided to independent | 25  section entitled "Stakeholders." |

| Page 347 | Page 349 |
|---|---|
| 1  scientists." | 1      Do you see that? |
| 2      Do you see that there? | 2      A.    Yes.  Yes. |
| 3      A.    Yes. | 3      Q.    "A critical aspect of this |
| 4      Q.    And if we go back again to the | 4  mitigation plan involves creating alliances |
| 5  first page, what we're talking about is the | 5  with and communicating clearly and |
| 6  defense of talc, right? | 6  consistently to key stakeholders, |
| 7          MR. DONATH:  Objection to form. | 7  including -- " |
| 8          THE WITNESS:  That was her | 8      Do you see where that's listed? |
| 9      terminology, yes. | 9      A.    Yes. |
| 10      (Glenn Exhibit 29 marked for | 10      Q.    -- "Rio Tinto Minerals |
| 11      identification.) | 11  employees, Rio Tinto Minerals customers" -- |
| 12  QUESTIONS BY MR. BOWDEN: | 12      Those would be people like |
| 13      Q.    Okay.  Let's go to P1.0188. | 13  Johnson & Johnson, right? |
| 14  I'm going to mark this for you as Exhibit | 14          MR. DONATH:  Objection to form. |
| 15  Number 29.  This is P1.0188. | 15          THE WITNESS:  Uh-huh, yes. |
| 16      Now, you can see this is | 16  QUESTIONS BY MR. BOWDEN: |
| 17  Rio Tinto Minerals, right? | 17      Q.    Okay.  -- "government officials |
| 18      A.    Yes. | 18  and regulators"? |
| 19      Q.    And this is a memorandum | 19      A.    Johnson & Johnson and others, |
| 20  revised February 15, 2006. | 20  yes. |
| 21      Do you see that? | 21      Q.    Sure, I didn't mean for it to |
| 22      A.    Yes. | 22  be an exclusive group, but that's one of |
| 23      Q.    And it's regarding IARC | 23  them, right? |
| 24  strategy and initial communications. | 24      A.    Yes. |
| 25      Do you see where that's | 25      Q.    "Government officials and |

88 (Pages 346 to 349)

Robert Glenn

Page 350

1    regulators"?
2        A.   Yes.
3        Q.   "Industrial minerals, chemical
4    and other trade organizations"?
5        A.   Yes.
6        Q.   And that's things like IMA,
7    CTFA, NISA, right?
8        A.   Right.
9        Q.   "News media"?
10       A.   You skipped the medical
11   community, including leading academics.
12       Q.   I didn't mean to.  I'm going to
13   do that, too.
14       A.   Well, I think that's an
15   important --
16       Q.   "The medical community,
17   including leading academics," right?
18       A.   Correct.
19       Q.   And those are what they've
20   identified as the stakeholders, right?
21       A.   That was in this document, yes.
22       Q.   And then the objectives --
23   "immediate objectives are to," do you see
24   where that's written?
25       A.   Yes.

Page 351

1        Q.   Number one objective is
2    "understand the impact of potential
3    categorization on the business in order to
4    assess risk and create mitigation plans."
5            MR. DONATH:  Objection to form.
6            THE WITNESS:  Yes.
7    QUESTIONS BY MR. BOWDEN:
8        Q.   They're talking about a
9    business strategy, right?
10           MR. DONATH:  Objection to form.
11           THE WITNESS:  It sounds like
12       that.  I wasn't a party to this
13       discussion.
14   QUESTIONS BY MR. BOWDEN:
15       Q.   I'm not saying that you were,
16   sir.
17       A.   It might have helped if I'd
18   seen this document before now, but --
19       Q.   Well, we're going to go through
20   it together.
21       A.   Okay.
22       Q.   The second bullet point says,
23   "Establish a plan for influencing regulators
24   on how they apply the IARC findings."
25           Do you see that?

Page 352

1        A.   Yes.
2        Q.   And so we've discussed that
3    IARC is a difficult agency to influence,
4    right?
5            MR. DONATH:  Objection.
6            THE WITNESS:  It can be.
7    QUESTIONS BY MR. BOWDEN:
8        Q.   And so when IARC recategorized
9    talc as a 2B, non-asbestiform talc as a 2B,
10   carcinogen your client the next day issues
11   immediate objectives to establish a plan for
12   influencing regulators on how they apply the
13   IARC findings, correct?
14           MR. DONATH:  Objection to form.
15           MR. BILLINGS-KANG:  Objection
16       to form.
17           MR. HEGARTY:  Objection to
18       form.
19           THE WITNESS:  There's some
20       other bullet points that seem equally
21       important, like demonstrate the
22       employees --
23   QUESTIONS BY MR. BOWDEN:
24       Q.   Well, they come afterwards,
25   right?

Page 353

1            MR. DONATH:  Objection to form.
2            THE WITNESS:  Yeah, they do,
3        but they seem important to the context
4        of what we're talking about.
5    QUESTIONS BY MR. BOWDEN:
6        Q.   But the number one objective on
7    here, the first listed objective, is to
8    understand the impact to the business, right?
9            MR. DONATH:  Objection to form.
10           THE WITNESS:  Correct.
11           MR. BILLINGS-KANG:  Objection.
12   QUESTIONS BY MR. BOWDEN:
13       Q.   The second objective listed
14   underneath here is to "establish a plan for
15   influencing regulators and how they apply the
16   IARC findings," correct?
17           MR. DAVANT:  Same objection.
18           THE WITNESS:  And these bullet
19       points, they may not list any
20       priority.
21   QUESTIONS BY MR. BOWDEN:
22       Q.   Okay.
23           You don't know that, do you?
24       A.   No, I don't.  I'm just saying
25   it could be.

89 (Pages 350 to 353)

Robert Glenn

Page 354

1      Q.   Let's turn to page -- and
2  underneath the stakeholders, you don't see
3  anywhere where it's listed as consumers,
4  right?
5      A.    Well, news media certainly
6  would get out to consumers, wouldn't it?
7      Q.    Not directly, though, right?
8          MR. DONATH:  Objection to form.
9          THE WITNESS:  Well --
10  QUESTIONS BY MR. BOWDEN:
11      Q.    I mean, that's -- that's --
12      A.    I think it would.  It would get
13  out directly to consumers by reading
14  newspaper articles.
15      Q.    Wouldn't it be easier to just
16  put it on the bottle?
17          MR. DONATH:  Objection to form.
18          THE WITNESS:  I don't know what
19      they put on the bottle.
20  QUESTIONS BY MR. BOWDEN:
21      Q.    Wouldn't that be the most
22  direct form --
23      A.    I'm just saying the news media,
24  that would be one way of --
25          MR. BILLINGS-KANG:  Objection

Page 355

1      the form.
2          THE WITNESS:  Distributing it
3      to the consumer.  I would think that
4      if some lady was using talc for
5      perineal application and she sees a
6      headline "body talc may cause cancer,"
7      she would certainly read it.
8  QUESTIONS BY MR. BOWDEN:
9      Q.    What about putting it on the
10  bottle directly so that the consumers know?
11          MR. BILLINGS-KANG:  Objection
12      to form.
13          MR. DONATH:  Objection to form.
14          THE WITNESS:  I don't know if
15      there's a requirement to do that.
16  QUESTIONS BY MR. BOWDEN:
17      Q.    I'm not asking if there's a
18  requirement.
19          Would that accomplish it?
20          MR. BILLINGS-KANG:  Objection
21      to form.
22          MR. DONATH:  Same objection.
23          THE WITNESS:  I don't think the
24      decision of IARC was sufficient to do
25      that.

Page 356

1          The hazard communication
2      standard, which is a workplace
3      standard, does not require that 2Bs, I
4      don't believe requires 2Bs, to be put
5      on the label.
6  QUESTIONS BY MR. BOWDEN:
7      Q.    Am I understanding you
8  correctly to say that it wasn't done, and
9  you're not required to do it?
10          MR. DONATH:  Objection.
11          THE WITNESS:  It was not done.
12      I'm not sure what the requirement of
13      FDA was.
14  QUESTIONS BY MR. BOWDEN:
15      Q.    You do agree with me, though,
16  that that would be an effective way of
17  relaying to consumers that talc was now a
18  potential human carcinogen, by putting it
19  directly on the bottle?
20          MR. DONATH:  Objection to form.
21          THE WITNESS:  Product labeling
22      can be important in passing that type
23      of information downstream, yes.
24  QUESTIONS BY MR. BOWDEN:
25      Q.    Let's go to page 5.

Page 357

1      A.    Okay.
2      Q.    You with me?
3      A.    Yes.
4      Q.    Underneath the large redacted
5  section --
6      A.    Yes.
7      Q.    Underneath it says "legal" and
8  then it's redacted.
9          Do you see that?
10      A.    Yes.
11      Q.    And then it says, "Science, Sue
12  Hubbard, team lead," right?
13      A.    Yes.
14      Q.    And it says underneath that,
15  "Contest the IARC process as using the 93
16  monograph as deeply flawed and skewed by
17  academic bias."
18          Do you see that?
19      A.    That's what is written, yes.
20      Q.    "Actions:  Develop a group of
21  academics who can publish and otherwise
22  communicate on this issue," right?
23      A.    Yes.
24      Q.    "2, develop long-term science
25  strategy to enhance the body of research

90  (Pages 354 to 357)

Robert Glenn

|  | Page 358 |  | Page 360 |
|---|---|---|---|

**Page 358**

1  examining the supposed association between
2  talc use and carcinogenicity."
3      Do you see where that's
4  written?
5      A.   Yes.
6      Q.   "Sue Hubbard, Rich Zazenski,
7  plus internal/external legal counsel, date,
8  question mark."
9      Do you see that?
10     A.   Yes.
11     Q.   Last bullet point there --
12     A.   I might add, it doesn't say
13 Crowell & Moring.
14     Q.   Oh, okay.  Let's go to the very
15 bottom.
16     Oh, okay.
17     Q.   "Team to be set up compromising
18 {sic} Sue Hubbard, Rich Zazenski, Michelle
19 Frigjier, using outside help, Bob Glenn,
20 Crowell & Moring."
21     Do you see that there?
22     A.   I see that.
23     Q.   Okay.  So it is talking about
24 you?
25     A.   Yeah.  And if I'd have seen

**Page 359**

1  this before, I would have known that.  If I
2  had seen this before today.
3      Q.   You know that as in the course
4  of your employment through Crowell & Moring?
5      A.   I never saw this document until
6  today.
7      Q.   Oh, okay.
8      A.   They didn't share it with me.
9      Where did it come from in
10 discovery?  Imerys?
11     Q.   Your client.
12     A.   Imerys?
13     Q.   Yes, sir.  You see on the
14 bottom right there --
15     A.   Yes.
16     Q.   -- it says "Imerys"?
17     A.   Right.  Right.  But they
18 didn't -- they didn't give me everything in
19 their files, Counsel, I'm sure.
20     Q.   I understand, but we've also
21 just covered that you didn't ask for
22 everything either, right?
23     A.   No, I didn't ask for everything
24 they had in their files.
25     Q.   Okay.  I just get the

**Page 360**

1  impression that you feel like that's my
2  fault, that they didn't share it with you.
3      A.   I mean, if you'd have given it
4  to me before I came in here today, I wouldn't
5  have made that mistake of saying I wasn't
6  part of, included, involved in their
7  strategy.
8      By the way, they never followed
9  up with me on this.
10     Q.   They never followed up with
11 you?
12     A.   I don't recall them ever
13 following up regarding to this.
14     Q.   Okay.
15     A.   The -- we went ahead with the
16 publications of the articles, and we went
17 ahead with Brooke Mossman's work, which IMA
18 funded.
19     We had a proposal for Luzenac
20 to do that genetic microarray, and they did
21 not fund it.
22     Q.   I tell you what, let's talk
23 about that next.
24     A.   All right.  We also had a
25 proposal from Dr. -- I'm drawing a blank on

**Page 361**

1  his name now.  A well-known epidemiologist to
2  do some work.  They did not fund that.
3  Ken -- Ken Rothman.
4      Q.   Do you feel that Imerys didn't
5  do studies that they ought to have done?
6      MR. DONATH:  Objection to form.
7      THE WITNESS:  No, I didn't say
8  that.  They -- for some reason they
9  decided not to fund some studies.
10     VIDEOGRAPHER:  The time is now
11 3:01.  Going off the record.
12     (Off the record at 3:01 p.m.)
13     VIDEOGRAPHER:  Okay.  The time
14 is now 3:10.  Back on the record.
15 QUESTIONS BY MR. BOWDEN:
16     Q.   Left off talking about Sue
17 Hubbard, and then we were talking about how
18 one her tasks as a team lead was to develop
19 long-term science to enhance the body of
20 research, examining the association between
21 talc use and ovarian cancer, right?
22     A.   Yeah.
23     Q.   And you had said that for some
24 reason there were some studies they decided
25 not to fund, correct?

91 (Pages 358 to 361)

Robert Glenn

Page 362

```
 1        A.   Yes.
 2        Q.   All right.  So let's switch
 3  gears and start talking about some of those
 4  studies.
 5        A.   Okay.
 6            (Glenn Exhibit 30 marked for
 7      identification.)
 8  QUESTIONS BY MR. BOWDEN:
 9        Q.   And I'm going to show you
10  another document produced by Imerys.  This
11  will be Exhibit Number 30.
12            Let's go ahead and pull out the
13  top, who this is from.
14        A.   Yes.
15        Q.   You see this is Ms. Hubbard,
16  right?
17        A.   Yes.  Yes.
18        Q.   And this is to Mr. Zazenski,
19  right, and this is June 9, 2006.
20            Do you see that?
21        A.   Yes.
22        Q.   It says, "Rich, we are meeting
23  with Bob Glenn on Tuesday to discuss the talc
24  research, et cetera.  What is our contractual
25  relationship with him, and is he under a
```

Page 363

```
 1  confidentiality agreement?  I need to know
 2  what we can and can't tell him about the
 3  future of research."
 4            Do you see where that's
 5  written?
 6        A.   Yes.
 7        Q.   "Also, who pays him, and does
 8  he have a role with Johnson & Johnson?"
 9            Do you see that?
10        A.   Yes.
11        Q.   "Since we are re-review" -- I'm
12  sorry, there's an omission there.  Let me try
13  that again.
14            "Since we're reviewing the RTM
15  portfolio, I'm going to put some brakes on
16  the process related to ovarian cancer until
17  we have made an internal decision as to
18  whether we support the ovarian use or not and
19  we have established what Johnson & Johnson
20  are actually going to do.  I want to steer
21  the conversation around what research would
22  still be valuable in this area and look at
23  the other non-ovarian work to see what we can
24  get going and evaluate that."
25            Do you see that?
```

Page 364

```
 1        A.   Yes, I do.
 2        Q.   They're talking about value.
 3  And we've seen in those meeting minutes from
 4  February, the one where she was tasked with
 5  being the team lead for developing science,
 6  that some of the considerations were for
 7  business considerations, right?
 8            MR. DONATH:  Objection to form.
 9  QUESTIONS BY MR. BOWDEN:
10        Q.   Are you having difficulty
11  hearing?
12        A.   Well, just repeat that.  The
13  truck was a little loud and the other things,
14  but --
15            MR. BOWDEN:  Counsel, would you
16      mind -- I'm sorry.
17            THE WITNESS:  I'm sorry.  Could
18      you repeat that?
19  QUESTIONS BY MR. BOWDEN:
20        Q.   I will.
21            All right.  The question I had
22  to you was that they were talking about
23  value, whether the research, the scientific
24  research, on ovarian cancer and talc use
25  would have any value to Imerys, correct?
```

Page 365

```
 1  Rio Tinto?
 2            MR. DONATH:  Objection to form.
 3            THE WITNESS:  You got to tell
 4      me about future research.  I'm sorry,
 5      it's so hot I can't remember what I've
 6      read.  Yeah.
 7  QUESTIONS BY MR. BOWDEN:
 8        Q.   Okay.  And you're not on this
 9  e-mail, right?
10        A.   No, and I don't know -- I don't
11  ever recall having a follow-up meeting.  I'm
12  sorry.
13        Q.   That's okay.
14        A.   Go ahead.
15        Q.   Do you agree as of the date of
16  that e-mail that there was still -- do you
17  agree with me that as of the date of that
18  e-mail that there was valuable scientific
19  research that could still be done?
20        A.   Yes.  Being a researcher, I'd
21  probably always answer that in the
22  affirmative.
23        Q.   What research did you think
24  would be useful at that time?
25        A.   I was still interested in -- I
```

92 (Pages 362 to 365)

Robert Glenn

Page 366

```
 1   still would liked to have done a follow-up of
 2   the pleurodesis.  I would have liked to have
 3   done the genetic microarray, which we did
 4   later.  I could have -- I don't have them top
 5   of my tongue now, but there are others.
 6       I think the whole thing is --
 7   Sue suggested in this meeting, one thing that
 8   would have been nice is to have a group --
 9   she suggests we have a group convene,
10   possibly under the auspices of the National
11   Academy of Science.  And I think that would
12   have been worthwhile, to look at what are the
13   critical knowledge gaps that need to be
14   filled.
15       Q.   And they never did it, right?
16           MR. DONATH:  Objection to form.
17           MR. DAVANT:  Objection.
18           THE WITNESS:  I don't think
19       they did any of the things in this --
20       I'm not sure.
21   QUESTIONS BY MR. BOWDEN:
22       Q.   And J&J didn't do it either, to
23   your knowledge, right?
24           MR. HEGARTY:  Objection to
25       form.
```

Page 367

```
 1           MR. DONATH:  Objection.
 2           THE WITNESS:  As I say, I don't
 3       recall anything coming out of the --
 4       this, and I don't recall anything
 5       coming out of this.  In fact, I don't
 6       even know if we ever met.  I can't
 7       remember.
 8           I know Sue Hubbard, I met her
 9       once or so, but I don't think -- she
10       says we're meeting with Bob Glenn, but
11       I don't recall the meeting.
12   QUESTIONS BY MR. BOWDEN:
13       Q.   Okay.  And this was an
14   important issue that had been going on for
15   40 years, right, since the -- at least 1970s?
16           MR. DONATH:  Objection to form.
17           MR. HEGARTY:  Objection to
18       form.
19           THE WITNESS:  Yeah, it -- it
20       really -- probably more fair to say it
21       gathered momentum in the early '80s.
22   QUESTIONS BY MR. BOWDEN:
23       Q.   Okay.
24       A.   It was first recognized in '72,
25   I believe, by Griffith.
```

Page 368

```
 1           MR. DONATH:  Foundation.
 2   QUESTIONS BY MR. BOWDEN:
 3       Q.   All right.  It's an important
 4   public health issue back in the 1970s, right?
 5           MR. DONATH:  Objection to form.
 6           MR. DAVANT:  Objection to form.
 7   QUESTIONS BY MR. BOWDEN:
 8       Q.   Well, ovarian cancer has always
 9   been an important --
10       A.   Ovarian cancer certainly is an
11   important public health issue.
12       Q.   Right.
13           And it's still an important
14   health issue, right?
15       A.   I don't know whether talc was
16   an important risk factor for it, and I think
17   that's what we should have found out.
18       Q.   You think they should have
19   found it out then?
20           MR. HEGARTY:  Objection to
21       form.
22           MR. DONATH:  Objection to form.
23           THE WITNESS:  Again, I'm a
24       researcher, and I won't -- I want the
25       best research applied to these
```

Page 369

```
 1   questions to say that we can answer
 2   them.  And often if you do get groups
 3   together and you concentrate on what
 4   are the critical knowledge gaps in the
 5   literature, and which ones need to be
 6   filled and which -- what's the
 7   priority, you can make some progress.
 8   But that didn't happen.
 9       (Glenn Exhibit 31 marked for
10   identification.)
11   QUESTIONS BY MR. BOWDEN:
12       Q.   Okay.  I'm going to mark for
13   you Exhibit Number 31.
14       A.   All right.
15       Q.   Do you have a copy in front of
16   you, sir?
17       A.   Yes, I do now.
18       Q.   This is a little difficult to
19   read, especially with the red lining.
20       A.   Yeah.
21       Q.   I'm going to put it up on the
22   screen for you.
23       A.   Okay.
24       Q.   All right.  So this will be a
25   little bit tricky because I'm left-handed and
```

93 (Pages 366 to 369)

Robert Glenn

Page 370

1    reaching over, so...
2         A.    I can work from this.
3         Q.    I know, but I want it to be
4    picked up, too, for the camera, so I'll walk
5    through it here with you?
6         A.    Yeah.  Oh, okay.  I understand.
7         Q.    You see at the top there it
8    says July 20, 2006?
9         A.    Yes.
10        Q.    And this was a letter on
11   Rio Tinto Minerals' letterhead.
12             Do you see that?
13        A.    Correct.
14        Q.    And you can see that this
15   document is signed -- or is prepared for Eric
16   Turner.
17             Do you see that there?
18             MR. DONATH:  Objection to form.
19             THE WITNESS:  Prepared by Eric
20   Turner?  Okay.  I don't see that
21   paragraph.
22   QUESTIONS BY MR. BOWDEN:
23        Q.    Actually, I'm sorry, I'm on the
24   wrong page.  Let's go back.
25        A.    Okay.  I was thinking that.

Page 371

1         Q.    Showing you the wrong cover
2    page there.
3         A.    All right.
4         Q.    It looks like two documents
5    together.
6         A.    Yeah.
7         Q.    So go with me to page 3 is
8    where I meant to be at.
9         A.    The Mark -- the Mark Ellis?
10        Q.    Right.  Mark Ellis.
11             And he is the president
12   IMA-North America, right?
13        A.    Yes.
14        Q.    And down here where it says,
15   "When IARC concluded and reclassified" --
16   "concluded their review and classified
17   perineal use of talc-based powders as a 2B
18   carcinogen, we began to question the value of
19   proceeding any further with the Mossman
20   study."
21             Do you see that there?
22        A.    Yes.
23        Q.    "To put it in the vernacular,
24   the horse had already left the barn."
25             Do you see where that's

Page 372

1    written?
2         A.    Yes.
3         Q.    "Due to the considerable costs
4    involved and deadlines no longer a factor,
5    Luzenac, Rio Tinto Minerals, made the
6    decision that the potential value of this
7    study was greatly diminished and did not
8    warrant any further pursuit at this time."
9             Do you see that?
10        A.    Yes, I do.
11        Q.    "Considerable costs and the
12   deadline no longer being a factor."
13             The deadline that they're
14   talking about is the publication date prior
15   to having it be published prior to the IARC
16   proceeding?
17        A.    It was the IARC, yes.
18        Q.    And it was going to cost money,
19   right?
20        A.    Yes.
21             MR. DONATH:  Objection to form.
22   QUESTIONS BY MR. BOWDEN:
23        Q.    And there's no consideration
24   out there in that for the ones that you've
25   just talked about, advancing the scientific

Page 373

1    knowledge, right?
2             MR. DONATH:  Objection to form.
3             MR. HEGARTY:  Objection.  Form.
4             THE WITNESS:  I'm sorry, say
5    that again?
6    QUESTIONS BY MR. BOWDEN:
7         Q.    There's no mention in here as
8    one of the considerations --
9         A.    They didn't --
10        Q.    -- is not consumers, right?
11        A.    No.  They didn't mention that,
12   no.
13        Q.    It was purely based on
14   business, true?
15             MR. DONATH:  Objection to form.
16             MR. DAVANT:  Objection to form.
17             THE WITNESS:  It was a business
18   decision, yes, evidently.  It says so.
19   QUESTIONS BY MR. BOWDEN:
20        Q.    And during this time, J&J,
21   Imerys, which was Luzenac, they're all
22   coordinating these together, correct?
23             MR. HEGARTY:  Objection to
24   form.
25             THE WITNESS:  You know, I don't

94 (Pages 370 to 373)

Robert Glenn

Page 374

1  think I was in the loop here, so I
2  don't know who else they were
3  coordinating with.
4  QUESTIONS BY MR. BOWDEN:
5      Q.  Uh-huh.  And they're talking
6  about in this particular document not
7  funding, or discontinuing funding, of a study
8  which you felt had scientific merit, right?
9          MR. DONATH:  Object to form.
10         THE WITNESS:  I thought the
11     study did have scientific merit.  They
12     decided not to fund it.
13 QUESTIONS BY MR. BOWDEN:
14     Q.  I'm sorry.  Bear with me,
15 Mr. Glenn.
16     A.  Sure.
17         MR. BOWDEN:  Let's go off the
18     record just for one second.
19         VIDEOGRAPHER:  The time is now
20     3:24.  Going off the record.
21     (Off the record at 3:24 p.m.)
22         VIDEOGRAPHER:  Okay.  The time
23     is now 3:28.  Back on the record.
24 QUESTIONS BY MR. BOWDEN:
25     Q.  Going back to this exhibit

Page 375

1  marked Exhibit 31, one of the things that
2  they're talking about not funding in this --
3  that's the Mossman study, correct?
4      A.  I believe so, yes.
5      Q.  Okay.  I want to go to the last
6  page of this document.  It's bullet 3 or
7  paragraph number 3?
8      A.  Yeah.  Yeah.  Right.
9      Q.  It says, "Over the last nine
10 months, Luzenac has transformed into a new
11 company, Rio Tinto Minerals.  As a result,
12 we're undergoing major changes in our product
13 portfolios and business strategies.  Our
14 limited R&D resources will be applied to
15 those products which are essential to our
16 stability and growth.  Supplying talc for the
17 body powder market is rather insignificant --
18 is a rather insignificant element in our
19 overall product portfolio and does not
20 warrant any further sponsorship for research
21 projects to support the business."
22         Do you see that?
23     A.  Yes.
24     Q.  And that's purely a business
25 consideration, correct?

Page 376

1          MR. DAVANT:  Object to form.
2          MR. DONATH:  Object to form.
3          MR. HEGARTY:  Object to form.
4          THE WITNESS:  They were
5      undergoing -- I was aware they were
6      undergoing some changes during that
7      period, and in fact I think -- or
8      some -- some layoffs.
9  QUESTIONS BY MR. BOWDEN:
10     Q.  Okay.  My question to you:  Is
11 that the only consideration listed in this is
12 a business consideration, correct?
13         MR. DONATH:  Object to form.
14         THE WITNESS:  A business, yes.
15 QUESTIONS BY MR. BOWDEN:
16     Q.  Correct?
17         Do you know if Johnson &
18 Johnson picked up the Mossman study?
19         MR. HEGARTY:  Objection to
20     form.
21         MR. DAVANT:  Objection to form.
22         THE WITNESS:  I did not
23     approach them, but they -- they
24     weren't ever asked to fund that study.
25

Page 377

1  QUESTIONS BY MR. BOWDEN:
2      Q.  They didn't, to your knowledge,
3  right?
4      A.  No.
5          MR. BOWDEN:  Now I want to
6      bring up P1.001, Corey.
7      (Glenn Exhibit 32 marked for
8      identification.)
9  QUESTIONS BY MR. BOWDEN:
10     Q.  I'm going to mark this as
11 Exhibit Number 32.
12     A.  Yes.
13     Q.  And you're aware that MRG had
14 proposed to do 11 different studies, right,
15 the Meta-Analysis Research Group?
16         MR. HEGARTY:  Objection to
17     form.
18         THE WITNESS:  Yes, I -- this
19     document doesn't ring bells, but it
20     looks like it was something that
21     Michael and his group proposed.
22 QUESTIONS BY MR. BOWDEN:
23     Q.  Okay.  Were you aware of that
24 at the time?
25     A.  As I say, I don't recall seeing

Robert Glenn

| Page 378 | Page 380 |
|---|---|

Page 378

1  it, but it obviously -- not obviously, but
2  it's very likely they submitted this to me,
3  looking for research.
4      Q.   And was it Luzenac and Johnson
5  & Johnson that asked Meta-Analysis Research
6  Group to revisit their original 11 proposed
7  studies from 2006?
8      MR. HEGARTY:  Objection to
9  form.
10      MR. DONATH:  Objection to form.
11      THE WITNESS:  These studies, I
12  don't know.
13  QUESTIONS BY MR. BOWDEN:
14      Q.   Okay.  I want to read through
15  these with you.  On page 2 --
16      A.   There's no date on this.
17      Q.   On page 2 --
18      A.   I don't see a date on this.  Is
19  there one?
20      Q.   Oh, I'm sorry.  I'll represent
21  to you the metadata shows it's from 2008.
22      MR. DAVANT:  I'm sorry, what
23  year?
24      MR. BOWDEN:  2008.
25      THE WITNESS:  And what

Page 379

1  data showed it?  Oh, the metadata on
2  the document.  Okay.
3      MR. BOWDEN:  Give me just one
4  second.  I might have a different
5  document that would clarify this for
6  you.
7      I'm sorry, can we go off the
8  record for a few minutes, please?
9      VIDEOGRAPHER:  The time is now
10  3:33.  Going off the record.
11      (Off the record at 3:33 p.m.)
12      VIDEOGRAPHER:  Okay.  The time
13  is now 3:41.  Back on the record.
14      (Glenn Exhibit 33 marked for
15  identification.)
16  QUESTIONS BY MR. BOWDEN:
17      Q.   All right.  Mr. Glenn, when we
18  left the record we were talking about some of
19  the studies that had not been conducted,
20  right?
21      A.   Yes.
22      Q.   And so I want to ask you -- I'm
23  going to hand you exhibit number -- what I'm
24  marking as Exhibit Number 33.  Okay?
25      And you see that the title of

Page 380

1  this is -- it's a Meta-Analysis Research
2  Group proposal, right?
3      A.   Yes.
4      Q.   And it's "Perineal talcum use
5  and ovarian cancer risk:  A meta-analytic
6  evaluation of the dose-response
7  relationship."
8      Do you see that there?
9      A.   Yes.
10      Q.   And it says it's prepared for
11  Crowell & Moring --
12      A.   Yes.
13      Q.   -- Luzenac, Rio Tinto and J&J
14  Consumer Products Division.
15      Do you see that?
16      A.   Yes.
17      Q.   And you guys were all still
18  working together at the time of this
19  proposal, right?
20      MR. HEGARTY:  Objection to
21  form.
22  QUESTIONS BY MR. BOWDEN:
23      Q.   It was sent to all three of you
24  or all four of you?
25      A.   Well, I don't recall seeing

Page 381

1  this at the time, but it evidently came to
2  Crowell & Moring.
3      Q.   Okay.  And if you flip with me
4  to page 109.8?
5      A.   Yes.
6      Q.   Here it says, "Commercial and
7  scientific significance of the research"?
8      A.   Yes.
9      Q.   And "significance to the talc
10  industry."
11      Do you see that?
12      A.   Yes.
13      Q.   "The Hill criteria continue to
14  be the benchmark criteria by which disease
15  causality is based, and a dose-response
16  relationship is almost universally considered
17  a necessary component.  If our analysis can
18  show that the risk of ovarian cancer is not
19  related to cumulative perineal talc exposure,
20  it would reduce the likelihood that
21  authoritative bodies would consider talc a
22  human carcinogen or provide evidence to
23  reconsider its designation as an IARC 2B
24  carcinogen."
25      Do you see that?

Robert Glenn

| Page 382 | Page 384 |
|---|---|

**Page 382**

1    A.    Yes.
2    Q.    Go to the next page, 109.9.
3    A.    Okay.
4    Q.    Middle of the first paragraph
5    where it says "further"?
6    A.    Yes.
7    Q.    "Further, if it is shown that
8    there is no consistent overall trend in risk,
9    this would provide a background for future
10    claims for a biological mechanism for talc
11    carcinogenesis."
12          Do you see that there?
13    A.    Yes.
14    Q.    Do you agree that this would
15    have been an important study to conduct?
16          MR. HEGARTY:  Objection to
17    form.
18          MR. DONATH:  Objection to form.
19          THE WITNESS:  I don't know
20    enough about this with his proposal,
21    but a dose-response study, if it could
22    be conducted properly, would have been
23    important.
24          I'm not sure you would be able
25    to put -- put together a sufficient

**Page 383**

1    exposure matrix to a perineal
2    application of talc.
3    QUESTIONS BY MR. BOWDEN:
4    Q.    To your knowledge, did they
5    ever fund this?
6    A.    No.
7          MR. DAVANT:  Object to form.
8    QUESTIONS BY MR. BOWDEN:
9    Q.    Neither Crowell & Moring,
10    Luzenac, Rio Tinto or Johnson & Johnson?
11          MR. DONATH:  Objection to form.
12          MR. HEGARTY:  Objection to
13    form.
14          THE WITNESS:  Not to my
15    knowledge.
16          (Glenn Exhibit 34 marked for
17    identification.)
18    QUESTIONS BY MR. BOWDEN:
19    Q.    Okay.  In fact, let's show you
20    what I will mark as Exhibit Number 34,
21    P1.076.  You see this is an internal e-mail
22    at Rio Tinto regarding talc studies.
23          Do you see that?
24    A.    Yes.
25    Q.    And it talks about the talc

**Page 384**

1    feasibility study, talc China feasibility
2    study, Huncharek and Muscat scientific
3    standards in epi, Mossman follow-up study,
4    Huncharek and Muscat meta-analysis
5    dose-response.
6          That's the one we just talked
7    about, right?
8    A.    Yes.
9    Q.    Huncharek and Muscat
10    meta-analysis smoking and BMI.
11          Do you see that there?
12    A.    Yes.
13    Q.    If you turn to page 7 of this
14    document, regulatory science project
15    proposal?
16    A.    Just a second.  I haven't seen
17    this, so I was kind of trying to get a flavor
18    for it.
19    Q.    Okay.
20    A.    Yes.  Okay.
21    Q.    "Topic, perineal talcum use and
22    ovarian cancer risk:  A meta-analytic
23    evaluation of the dose-response
24    relationship."
25          Do you see that?

**Page 385**

1    A.    Yes.
2    Q.    And it goes down, it says at
3    the bottom -- or excuse me, in the middle,
4    "likelihood of success"?
5    A.    Yes.
6    Q.    You see where it says, "High"?
7    A.    Yes.
8    Q.    "High since these
9    researchers -- researches have extensive
10    experience in meta-analysis."
11          Do you see that there?
12    A.    Yes.
13    Q.    And then if you look down
14    underneath "Urgency" --
15    A.    Yes.
16    Q.    -- it says, "High due to
17    upcoming release of IARC report and Prop 65."
18          Do you see that?
19    A.    Yes.
20    Q.    But then there's a grid, and
21    the grid says, "Business impact:  High,
22    medium low.  Urgency:  Low, media, high."
23          Do you see that there?
24    A.    Yes.
25    Q.    So it's high urgency, medium

97 (Pages 382 to 385)

Robert Glenn

Page 386

1    business impact, correct?
2         A.   That's what they have, yes.
3         Q.   And the reason it's a high
4    urgency is that the 93 monograph is going to
5    be published in 2010, right?
6              MR. DAVANT:  Object to form.
7              THE WITNESS:  I don't think we
8         knew when it would come out.  We knew
9         it would come out.  And I -- 2010 was
10        this --
11   QUESTIONS BY MR. BOWDEN:
12        Q.   "High due to upcoming release
13   of IARC report."
14             Do you see where that's
15   written?
16        A.   I don't think we knew it would
17   come out.  You said 2010.  It was published,
18   but I don't think we had any advanced notice.
19             I'm sorry.  Repeat your
20   question now?
21        Q.   If it went to Crowell & Moring,
22   who else would it have gone through aside
23   from you?
24             MR. DAVANT:  Object to form.
25             MR. DONATH:  Object to form.

Page 387

1              THE WITNESS:  I don't see it
2         went to Crowell & Moring.  I don't --
3         does it?
4    QUESTIONS BY MR. BOWDEN:
5         Q.   The MRG research proposal that
6    we just looked at, that was --
7         A.   This one?
8         Q.   Yes, sir.
9         A.   Yeah.
10        Q.   That last exhibit.
11        A.   Right.
12        Q.   It says, "This proposal was
13   prepared for Crowell & Moring," right?
14        A.   Yes.  I'm sorry, I was looking
15   at --
16        Q.   No, that's --
17        A.   -- 34.
18        Q.   Right.
19             So it's the same study, though,
20   right?  What we're looking at in Exhibit 34
21   is the same study as the proposal to
22   Crowell & Moring in Exhibit Number 33?
23        A.   What are the costs?  It's
24   certainly formatted different, so --
25        Q.   Sure.  Well -- and this is a

Page 388

1    summary internally.
2              The Exhibit Number 34 is a
3    summary that Imerys has put together, right?
4              MR. DONATH:  Objection to form.
5              MR. BILLINGS-KANG:  Objection
6         to form.
7    QUESTIONS BY MR. BOWDEN:
8         Q.   And they put the cost at 35,000
9    there, right?
10        A.   Yeah, at 30,000.
11             MR. DONATH:  Objection to form.
12   QUESTIONS BY MR. BOWDEN:
13        Q.   35,000?
14        A.   I'm sorry, what page is that
15   on?  Page 2?
16        Q.   Page 7, sir.
17        A.   7.  Okay.
18             MR. BOWDEN:  Corey, why don't
19        we do a split screen.  That might
20        help.
21   QUESTIONS BY MR. BOWDEN:
22        Q.   Go to page 7 of 7 of --
23        A.   Yeah, 35,000 on page 7.
24             MR. BOWDEN:  Pull up the topic.
25        And let's pull out the highlighted

Page 389

1    title up here.
2    QUESTIONS BY MR. BOWDEN:
3         Q.   You see those are the same
4    topics, right?
5         A.   Yes.
6         Q.   Okay.
7              MR. BOWDEN:  And then, Corey,
8         if you'll pull up the middle of
9         page 7.  How much, 35,000.  And then
10        page 10 of P1.09, subtotal.
11   QUESTIONS BY MR. BOWDEN:
12        Q.   You see on the screen, sir?
13        A.   Yeah.
14        Q.   Those are the same study,
15   right?
16             MR. DONATH:  Object to form.
17             THE WITNESS:  Same study, yes.
18   QUESTIONS BY MR. BOWDEN:
19        Q.   Right.
20             And so this did go to Crowell &
21   Moring?
22             MR. DAVANT:  Object to form.
23             THE WITNESS:  This one went to
24        Crowell & Moring, yes.
25

98 (Pages 386 to 389)

Robert Glenn

Page 390

1    QUESTIONS BY MR. BOWDEN:
2        Q.   Right.
3        A.   Exhibit 33.
4        Q.   Right.
5             And the same study is what's
6    being summarized in Exhibit Number 34, right?
7        A.   It appears to be, and that
8    appears to be an abstract of someone from
9    Imerys.
10       Q.   Okay.  So did it go to you at
11   Crowell & Moring?
12       A.   This?  34?
13       Q.   33, the one that says it was to
14   Crowell & Moring.
15       A.   I said earlier I don't recall
16   seeing this, but it's -- I liked what he did,
17   see this.
18       Q.   And if it didn't go to you,
19   whom else would it have gone to?
20            MR. DAVANT:  Object to form.
21            MR. DONATH:  I'm going to
22       direct the witness not to answer to
23       the extent it would lead to privileged
24       information.
25

Page 391

1    QUESTIONS BY MR. BOWDEN:
2        Q.   Do you know?
3        A.   No, I don't, unless Ridge Hall.
4        Q.   Okay.
5        A.   We were the two that were
6    working for Luzenac, Imerys.
7        Q.   Going back to Exhibit
8    Number 34, if you'll go to page 6, which is
9    the preceding page.
10       A.   Yeah, one thing.  These
11   proposals don't match up with Sue Hubbard's
12   points that she was bringing out that needed
13   to be moved forward.  So I don't know why
14   these came out like they did.
15       Q.   Are you with me on page 6?
16       A.   Of 34.
17       Q.   Yes, sir, Exhibit 34.
18       A.   I am now, yes.
19       Q.   Okay.  And do you see where at
20   the top it says, "Topic, a study of gene
21   expressing changes in human ovarian
22   epithelial cells" --
23       A.   Yes.
24       Q.   -- "exposed to talc of
25   different sources and mineralogy"?

Page 392

1             Do you see that there?
2        A.   Yes.
3        Q.   Okay.  And the objective --
4    says, "The objective of the study is to
5    evaluate gene expressions in human ovarian
6    epithelial cells upon exposure to several
7    commercial-type talcs used in the paper
8    industry and in cosmetic products, and to
9    positive and negative control materials."
10            Do you see that there?
11       A.   Yes.
12       Q.   "Benefits:  This study will
13   show that various talcs have low surface
14   reactivity and are nonreactive in the human
15   ovarian epithelial cells," right?
16       A.   Yes.
17       Q.   That's what Rio Tinto is saying
18   that the benefit of the study would be,
19   correct?
20       A.   Yes.
21            MR. DONATH:  Objection.  Form.
22            THE WITNESS:  It's saying it
23       would have a low surface reactivity,
24       yes, and be nonreactive.
25

Page 393

1    QUESTIONS BY MR. BOWDEN:
2        Q.   That's their expectation of the
3    study?
4            MR. DONATH:  Objection to form.
5            THE WITNESS:  Yes.
6    QUESTIONS BY MR. BOWDEN:
7        Q.   And at the end of the benefit
8    section it says, "The results will also
9    provide supportive evidence to IARC to
10   reconsider its designation as a 2B carcinogen
11   should this issue be revisited by IARC."
12            Do you see that there?
13       A.   That's what it says, yes.
14       Q.   "How much, 97,000"?
15       A.   Yes.
16       Q.   "Likelihood of success, high,
17   since this is an extension of previous study
18   by Mossman that demonstrated no significant
19   gene expression changes with talc and human
20   ovarian epithelial cells."
21            Do you see where that's
22   written?
23       A.   Yes.
24       Q.   Is that supposed to be
25   mesothelial cells?

Robert Glenn

Page 394

1        MR. DONATH: Objection. Form.
2        THE WITNESS: I think it is.
3   QUESTIONS BY MR. BOWDEN:
4        Q.   I think that's a typo, too.
5        A.   Yeah, I do, too.
6        Q.   There was no prior study on --
7        A.   She did not work with -- to my
8   knowledge, Brooke did not work with ovarian
9   cells until she did the gene expression work.
10       Q.   Right.
11            Before then it was with human
12  mesothelial cells?
13       A.   Correct.
14       Q.   Which are what you were
15  describing earlier is from the lung area,
16  right?
17       A.   Correct. Yes.
18       Q.   And so potential challenges, do
19  you see where that's written there?
20       A.   Yes.
21       Q.   "There is a possibility of
22  equivocal results that could suggest adverse
23  effects of talc and ovarian cells, such as a
24  change in one or two genes in epithelial
25  cells exposed -- ovarian epithelial cells

Page 395

1   exposed to one of the talc products
2   evaluated. Prior written approval by RTM
3   would be required before publication of the
4   results by Dr. Mossman and Fabini."
5            Do you see that there?
6        A.   Yes.
7        Q.   And so in this study, if they
8   fund it, what they're saying is that the
9   results would have to receive written
10  approval by RTM, Luzenac, before they would
11  be allowed to publish, correct?
12            MR. DONATH: Objection to form.
13            THE WITNESS: That's what it
14       says. I wasn't aware of the
15       consideration of this.
16  QUESTIONS BY MR. BOWDEN:
17       Q.   Right.
18            This was -- this was a company
19  internal document, right?
20       A.   That's correct.
21       Q.   This analysis was not shared
22  with you?
23       A.   No, it was not.
24       Q.   Correct?
25            And you feel in 2009, and in

Page 396

1   today, that that study would have value to
2   do, correct?
3        MR. DONATH: Objection.
4        THE WITNESS: Yes. Yes.
5   QUESTIONS BY MR. BOWDEN:
6        Q.   All right. And you can see at
7   the bottom it's prepared by Wayne Ball, 2009?
8        A.   I don't -- I don't know him.
9        Q.   I'm not saying you do.
10       A.   Yeah.
11       Q.   But he's with Luzenac -- or
12  Rio Tinto Materials {sic}, right?
13            MR. DONATH: Objection to form.
14            THE WITNESS: I don't know. I
15       don't know him, and I don't know Keith
16       Spearing or Michael -- I may have -- I
17       may remember Michael Haraas. I think
18       he may have been a toxicologist. But
19       the others I don't.
20  QUESTIONS BY MR. BOWDEN:
21       Q.   What about Shripal Sharma?
22       A.   I've heard that name, but I
23  don't remember him being involved -- I wasn't
24  involved with him when he -- when I was at
25  Crowell & Moring.

Page 397

1        Q.   Okay. You know that he
2   actually was the authors for Luzenac of the
3   MSDS sheets at the time, right?
4        MR. DONATH: Objection to form.
5        MR. BILLINGS-KANG: Objection
6       to form.
7        THE WITNESS: Sharma?
8   QUESTIONS BY MR. BOWDEN:
9        Q.   Mr. Sharma?
10       A.   I did not know that.
11       Q.   You did not know that?
12       A.   No.
13       Q.   Did you know that he included a
14  carcinogen warning on the MSDSs?
15            MR. DONATH: Object to form.
16            THE WITNESS: I did not know
17       that.
18  QUESTIONS BY MR. BOWDEN:
19       Q.   Did you know that he included
20  information about talc, cosmetic talc, being
21  considered a possible human carcinogen on the
22  MSDSs?
23            MR. DONATH: Objection to form.
24            THE WITNESS: I did not know
25       that.

Robert Glenn

| Page 398 |
|---|
| 1  QUESTIONS BY MR. BOWDEN: |
| 2      Q.    That information was never |
| 3  shared with you? |
| 4          MR. DONATH:  Objection.  Form. |
| 5          THE WITNESS:  No. |
| 6  QUESTIONS BY MR. BOWDEN: |
| 7      Q.    You weren't asked to weigh in |
| 8  on the content of the MSDS at the time it was |
| 9  being written? |
| 10         MR. DONATH:  Objection.  Form. |
| 11         THE WITNESS:  I don't recall |
| 12     ever being asked to look at a MSDS |
| 13     from Rio Tinto, Luzenac. |
| 14  QUESTIONS BY MR. BOWDEN: |
| 15     Q.    And to your knowledge, the MSDS |
| 16  that I'm referring to, that was never shared |
| 17  with consumers, to your knowledge, correct? |
| 18         MR. DONATH:  Objection.  Form. |
| 19         THE WITNESS:  I don't know what |
| 20     they distributed. |
| 21         (Glenn Exhibit 35 marked for |
| 22     identification.) |
| 23  QUESTIONS BY MR. BOWDEN: |
| 24     Q.    All right.  We're going to set |
| 25  that one aside. |

| Page 399 |
|---|
| 1          I'm going to hand you what I'm |
| 2  marking as Exhibit 35.  The title of this is |
| 3  called -- it's to the IMA talc section, |
| 4  right? |
| 5      A.    Yes. |
| 6      Q.    This is from August 15, 2005? |
| 7      A.    Correct. |
| 8      Q.    Do you recall receiving this? |
| 9      A.    Sitting here right now, I |
| 10  don't.  I possibly did. |
| 11     Q.    And this is talking about |
| 12  "marshalling talc industry resources for IARC |
| 13  monograph 93." |
| 14         Do you see where that's |
| 15  written? |
| 16     A.    Yes. |
| 17     Q.    So I want to turn to page 3 of |
| 18  this document. |
| 19     A.    Okay.  Yes. |
| 20     Q.    And do you see this last full |
| 21  paragraph of the page starting "Dr. Brooke |
| 22  Mossman"? |
| 23     A.    Yes. |
| 24     Q.    And again, this is from 2005, |
| 25  right? |

| Page 400 |
|---|
| 1      A.    Yes. |
| 2      Q.    "Dr. Brooke Mossman, affiliated |
| 3  with the University of Vermont College of |
| 4  Medicine, proposes to compare gene profiling |
| 5  by non-asbestiform talc to that of |
| 6  crocidolite asbestos in human mesothelial and |
| 7  ovarian epithelial cells." |
| 8      A.    Correct. |
| 9      Q.    Those are two different cell |
| 10  lines, right? |
| 11     A.    Yes. |
| 12     Q.    Okay.  "Little is known about |
| 13  the cellular and molecular effects of talc on |
| 14  cells." |
| 15         Do you see that? |
| 16     A.    Yes. |
| 17     Q.    "Gene profiling studies have |
| 18  been done on chrysotile asbestos.  In |
| 19  contrast to titanium dioxide, chrysotile |
| 20  induces a number of genes linked to |
| 21  inflammation, fibrogenesis and loss of cell |
| 22  control." |
| 23     A.    Yes. |
| 24     Q.    "Gene profiling increasingly is |
| 25  being used in evaluating the carcinogenic |

| Page 401 |
|---|
| 1  potential of substances." |
| 2          Do you see that? |
| 3      A.    Yes. |
| 4      Q.    You agree with that statement, |
| 5  right? |
| 6      A.    Yes. |
| 7      Q.    Gene profiling was being used |
| 8  increasingly, right? |
| 9      A.    Yes, I do. |
| 10     Q.    And it had value in 2005, |
| 11  right? |
| 12         MR. DONATH:  Objection to form. |
| 13         THE WITNESS:  Yes. |
| 14  QUESTIONS BY MR. BOWDEN: |
| 15     Q.    You still agree that has value |
| 16  today? |
| 17     A.    I do. |
| 18     Q.    Okay.  "While human |
| 19  epidemiology is likely to be determinative in |
| 20  the working group evaluation of talc, studies |
| 21  that demonstrate the absence of a plausible |
| 22  mechanism of action will cast doubt on causal |
| 23  associations between exposure to talc and |
| 24  cancer." |
| 25         Do you see that? |

101 (Pages 398 to 401)

Robert Glenn

Page 402

1    A.    Yes.
2    Q.    And that's because one of the
3  things that you had talked about earlier was
4  this Bradford Hill criteria about plausible
5  mechanisms.
6        Do you remember that?
7    A.    Biological plausibility.
8    Q.    Right.
9        And that's commonly referred to
10  as biological plausibility?
11    A.    Yes.
12    Q.    And this study specifically
13  would be looking at whether talc bodies and
14  asbestos bodies are -- provide a plausible
15  mechanism of ovarian cancer formation,
16  correct?
17    A.    Not asbestos bodies.
18  Asbestos -- asbestos bodies is a --
19  ferruginous, yeah.
20    Q.    I'm sorry.  That's a fair
21  point.  Let me rephrase it.
22    A.    Okay.
23    Q.    Talc particles --
24    A.    Yeah.
25    Q.    -- in asbestiform asbestos,

Page 403

1  right?
2    A.    Yes.
3    Q.    And I appreciate that
4  clarification.
5    A.    No, I --
6    Q.    And the project costs here in
7  2005 was estimated at $75,000.
8        Do you see that there?
9    A.    Yes.
10    Q.    And so where it's -- if you
11  continue on reading here, "While human
12  epidemiology is likely to be determinative,
13  studies that demonstrate the absence of a
14  plausible mechanism will cast doubts on the
15  causal associations between exposure to talc
16  and cancer."
17        Do you see where I'm reading
18  from there?
19    A.    That's what Mark wrote, yes.
20    Q.    And the inverse of that is also
21  true, correct?
22        MR. DONATH:  Objection to form.
23  QUESTIONS BY MR. BOWDEN:
24    Q.    That studies which demonstrate
25  inflammation when provided -- when exposed to

Page 404

1  talc, those provide a plausible mechanism as
2  well?
3        MR. DONATH:  Objection to form.
4        MR. HEGARTY:  Objection to
5  form.
6        THE WITNESS:  If inflammation
7  is of a certain degree, yes.
8  QUESTIONS BY MR. BOWDEN:
9    Q.    And this goes on to attach the
10  proposal from Dr. Mossman, right?
11    A.    It says so, but it's not
12  attached here, of course.
13    Q.    In 2005, the arm of that study
14  that actually went through and became
15  published was just the mesothelial side of
16  it, correct?
17    A.    Yes, I believe so.  Yes.
18    Q.    And that's because Luzenac,
19  2005 and 2006, decided not to fund the study
20  in its entirety, right?
21        MR. DONATH:  Objection to form.
22        THE WITNESS:  You know --
23  QUESTIONS BY MR. BOWDEN:
24    Q.    And that may not be information
25  that you know.  I'm just asking you.

Page 405

1    A.    Yeah, I'm not sure I do.  And
2  I'm getting a little confused why this is
3  coming to the talc section, unless Luzenac
4  was wanting them to take over the funding of
5  it.
6    Q.    Well, it's a talc study, right?
7    A.    Yes.
8    Q.    I'm going to hand you Exhibit
9  Number 36.  This is from Linda Loretz to
10  undisclosed recipients.
11        Do you see that?
12    A.    Yes.
13        MR. BOWDEN:  Hold on a second.
14  I'm sorry, this is the wrong document.
15  I apologize.
16        Tell you what, why don't we
17  take a break, and I'll get this
18  organized, and we'll finish up.
19        VIDEOGRAPHER:  The time is now
20  4:05.  Going off the record.
21    (Off the record at 4:05 p.m.)
22        VIDEOGRAPHER:  All right.  The
23  time is now 4:22.  Back on the record.
24        (Glenn Exhibit 36 marked for
25  identification.)

Robert Glenn

| Page 406 | Page 408 |
|---|---|

Page 406

```
1    QUESTIONS BY MR. BOWDEN:
2        Q.    All right.  When we left off,
3    we just discussed that in 2005, 2006, Luzenac
4    had decided not to fund the epithelial side
5    of the Mossman study, right?
6        A.    Yes.
7        Q.    Okay.  I'm going to hand you
8    what I'll mark as Exhibit Number 37.  This
9    will be P1.85.
10       A.    6.  6 is next.
11       Q.    All right.  So now in 2007, I
12   want you to turn to page -- page 2 of this
13   document.  This is April 13, 2007.
14           Do you see where Dr. Mossman is
15   sending Mark Ellis at IMA-North America an
16   e-mail?
17       A.    Yes.
18       Q.    And it's talking about the talc
19   microarray study in progress, right?
20       A.    Correct.
21       Q.    It says, "Dear Mark, please
22   find below our progress and suggested
23   protocol for the, quote, mega experiment
24   based on the duplicate surface area
25   measurements on the talc samples which are
```

Page 407

```
1    remarkably almost identical to crocidolite
2    asbestos."
3            Do you see that?
4        A.    Yes.
5        Q.    "Please send it to all our
6    collaborators and sponsors and ask them to
7    get back to Max and me with any concerns,
8    questions or changes.  Have a nice weekend."
9        A.    Yes.
10       Q.    Right?
11           And if you go to the first
12   page --
13       A.    Yes.
14       Q.    -- that same day, Mr. Ellis
15   forwards this e-mail on, Dr. Mossman,
16   attaching some of her preliminary results --
17       A.    Yeah.
18       Q.    -- with -- he copies -- he
19   sends it to you?
20       A.    Yes.
21       Q.    Steven Mann, that's Johnson &
22   Johnson, right?
23       A.    Yes.
24       Q.    Linda Loretz, that's CTFA?
25       A.    Right.
```

Page 408

```
1        Q.    Right?
2            Rich Zazenski is right above
3    her, right?
4        A.    Yes.
5        Q.    And that's Luzenac, correct?
6        A.    Yes.
7        Q.    And in the body of it, it says,
8    "Ladies and gentlemen, please find attached
9    for your consideration a concise experimental
10   plan for the UVM talc research study," right?
11       A.    Yes.
12       Q.    All of these people on this
13   e-mail are still working together, right?
14           MR. HEGARTY:  Objection.  Form.
15           THE WITNESS:  The ones that you
16   pointed out, yes.
17   QUESTIONS BY MR. BOWDEN:
18       Q.    Now, let's go to --
19       A.    When Mr. Ellis makes a
20   transmission like this, he simply sends it to
21   everyone in his talc section, so to speak,
22   the members.
23       Q.    Go to page 3 of that document.
24       A.    Yes.
25       Q.    And so in April of 2007, what
```

Page 409

```
1    she's forwarding on to IMA, which is then
2    disseminated to the industry --
3        A.    Yes.
4        Q.    -- being Johnson & Johnson --
5    including Johnson & Johnson and Luzenac --
6        A.    Right.
7        Q.    -- is her talc and crocidolite
8    asbestos studies on LP9 mesothelial and IOSE
9    ovarian epithelial cells, right?
10       A.    Yes.
11       Q.    That's the lung mesothelial and
12   the ovarian cell, right?
13       A.    Yes.
14       Q.    And it was the mesothelial ones
15   that ultimately were published, correct?
16   That line, correct?
17           MR. HEGARTY:  Objection.  Form.
18           THE WITNESS:  I think -- I
19   guess so, but I need to look at the
20   publication again.
21           (Glenn Exhibit 37 marked for
22   identification.)
23   QUESTIONS BY MR. BOWDEN:
24       Q.    Okay.  So let's move on to
25   P1.084.  Now I'm on Exhibit 37.
```

Robert Glenn

Page 410

```
1        A.    85.4? Oh, 37.  Okay.
2        Q.    I'm sorry, sir, it's a little
3  confusing.
4        A.    Okay.
5        Q.    You see now this is -- starting
6  at the second e-mail entry there, this is
7  from Dr. Mossman, right?
8        A.    Uh-huh, yes.
9        Q.    Sent August --
10       A.    Yes.
11       Q.    -- 9, 2007?
12       A.    Yes.
13       Q.    Again, she's sending it to Mark
14  Ellis, and this time she's copying you --
15       A.    Yes.
16       Q.    -- directly on it, right?
17       A.    Yes, I'm copied.
18       Q.    Along with Steven Mann?
19       A.    Yes.
20       Q.    Linda Loretz?
21       A.    Right.
22       Q.    And I think Mr. Zazenski is on
23  there as well?
24       A.    He probably is.
25       Q.    And it says, "Dear group, I am
```

Page 411

```
1  attaching the closed table summarizing the
2  significant gene changes observed in our
3  experience with the LP9 human mesothelial
4  cells."
5             The significant gene change
6  she's talking about are the lungs cells,
7  right?
8        A.    Yes.
9        Q.    "Note that there were no
10  significant changes from no dust control
11  groups with either titanium dioxide or glass
12  beads and minimal changes with talc."
13            Do you see that?
14       A.    Yes.
15       Q.    "For the paper, gene profiling
16  reveals mineral-specific patterns of MRNA
17  expression in human mesothelial and human
18  ovarian epithelial cells," right?
19       A.    Yes.
20       Q.    And then at the bottom -- so
21  what's she's talking about there is that she
22  has some findings for the lung cells, right?
23       A.    Uh-huh.
24       Q.    And she's getting ready to
25  publish that paper, at least submit it,
```

Page 412

```
1  correct?
2        A.    It appears.
3        Q.    Okay.  And at the bottom where
4  it says "lastly," do you see the bottom
5  there?
6        A.    Yes.
7        Q.    It says, "Lastly, we are ready
8  to run the ovarian epithelial microarrays,"
9  right?
10       A.    Right.
11       Q.    They haven't even started at
12  this point yet.  They're just ready to run
13  them now --
14       A.    Yeah.
15       Q.    -- in August of 2007?
16       A.    It's what it appears, yes.
17       Q.    "These cells were less
18  sensitive to asbestos by both viability and
19  the preliminary microarray experiment, namely
20  showing only 54 genes altered after exposure
21  to crocidolite asbestos, parentheses, 75, at
22  8 hours and only 14 genes changing after
23  exposure to crocidolite asbestos, paren, 15,
24  at 24 hours."
25            What she's talking about is the
```

Page 413

```
1  number within each of those groups, right?
2  That's what the parentheses mean --
3        A.    Yes.
4        Q.    -- right?
5             And then she goes on and she
6  says, "Here is our proposal.  Thus we propose
7  to have four groups:  Control group, zero;
8  crocidolite, 75; talc, 75; and titanium
9  dioxide, 75," right?
10       A.    Yes.
11       Q.    And those control groups are
12  going to be tested at both 8 hours and
13  24 hours in those experiments, right?
14       A.    Yes.
15       Q.    "Any feedback?  Sincerely,
16  Brooke," right?
17       A.    Right.
18       Q.    So her indication at this point
19  is that this is what she's going to be doing
20  going forward, right?
21       A.    Uh-huh, yes.
22       Q.    And so again, this is -- this
23  is an update that she's giving not only to
24  the IMA-North America, but when she sends
25  this out, she's sending it to you, which is
```

104 (Pages 410 to 413)

Robert Glenn

Page 414

1    Crowell & Moring, right?
2        A.    Yes.
3        Q.    Steven Mann, which is Johnson &
4    Johnson?
5              MR. HEGARTY:  Objection to
6    form.
7    QUESTIONS BY MR. BOWDEN:
8        Q.    Correct?
9        A.    Yes.
10       Q.    And also to Rich Zazenski, who
11   is the person you've been dealing with at
12   Rio Tinto, right?
13       A.    This distribution --
14             MR. DONATH:  Object to form.
15             THE WITNESS:  -- would have
16       been dictated by Mark Ellis more
17       likely than not.
18   QUESTIONS BY MR. BOWDEN:
19       Q.    But this is her e-mail back to
20   the entire group, right?
21       A.    Yes.  But I'm saying the
22   addressees on the "to" were probably sent to
23   her by Mark Ellis.  In other words, you know,
24   send the e-mail to all of these people.
25       Q.    Fair enough.

Page 415

1              At the top you're going to see
2    there's a response from Rich Zazenski.
3              Do you see that?
4        A.    Yes.
5        Q.    And it's a private response,
6    Rich Zazenski straight to Dr. Mossman.
7              Do you see that there?
8        A.    Right.  Yes.
9        Q.    And he writes, "Dr. Mossman,
10   excellent.  You can count on us to provide
11   any and all assistance you need."
12             Do you see that written?
13       A.    Yes.  Yes.
14             (Glenn Exhibit 38 marked for
15       identification.)
16   QUESTIONS BY MR. BOWDEN:
17       Q.    Okay.  I'm going to show you --
18   you had mentioned you wanted to see the
19   paper.  I'll go ahead and mark that as an
20   exhibit, number 38.
21             So the paper that she was
22   referring to, does this appear to be that
23   paper?
24       A.    What's the date on this?
25       Q.    It's a little bit hard to see.

Page 416

1    It's down in the bottom.  It was originally
2    published December 2008.
3        A.    Right.  Yeah.
4        Q.    And it looks like it appeared
5    in a volume in 2009.
6        A.    Yeah.
7        Q.    At the end of 2008, 2009.
8        A.    Right.  And this is on
9    mesothelial cells.
10       Q.    Right.
11             It doesn't have the lung cell
12   data?
13       A.    No, the -- it doesn't have the
14   ovarian --
15       Q.    Ovarian cell data, right.
16   Right?
17       A.    The epidermal cells.  That came
18   later.
19       Q.    Okay.  Go back to Exhibit
20   Number 34.
21       A.    Yes.
22       Q.    You go to page 6 in that
23   proposal -- or excuse me, in that exhibit,
24   you see this is -- she's proposing completing
25   that study, the ones we've just been looking

Page 417

1    at?
2        A.    Yeah, this -- yes, and this was
3    a proposal for the human ovarian epithelial
4    cells.
5        Q.    Right.
6        A.    Right.
7        Q.    This is the one that was given
8    high urgency and high business impact --
9        A.    Yes.
10       Q.    -- categorization, right?
11       A.    Yes.
12             MR. DONATH:  Objection to form.
13   QUESTIONS BY MR. BOWDEN:
14       Q.    Now -- so go back to the -- to
15   the study that we were just looking at.  It's
16   Exhibit 38.
17       A.    Yeah, I was just wondering.
18   Were these people on this Exhibit 34, they
19   addressees on the 37 e-mail?  I don't see
20   them.
21       Q.    I'm not following you, sir, but
22   I'm trying to -- I just have a couple of
23   questions left here.
24       A.    Well, if this was the -- you
25   know, critical from -- from some strategy

105 (Pages 414 to 417)

Robert Glenn

Page 418

1   point or priority point --
2       Q.    That's internal to Luzenac.
3       A.    Yeah, I realize that, but I
4   don't see that Wayne Ball and this other guy
5   are on this e-mail.
6       Q.    But Luzenac's on that e-mail,
7   right?
8       A.    Yes.
9       Q.    Rich Zazenski?
10      A.    But, I mean, these people are
11  saying this is a high priority, but I'm
12  surprised if they were that interested.  It
13  was high priority.  They wouldn't be on this
14  e-mail about the results.
15          But anyway, just a point.
16      Q.    Okay.  So if you go back to --
17      A.    37, did you say?
18      Q.    Yes, sir, the -- 38.  38.
19          The study itself, you've got it
20  in your right hand, sir.
21      A.    Oh, this, yeah.
22      Q.    Yes, sir.
23      A.    Okay.
24      Q.    If you turn to the back, you're
25  going to see a second to last page of

Page 419

1   acknowledgements and conflicts of interest.
2       A.    Yes.
3       Q.    Do you see that?
4       A.    Yes.
5          MR. BOWDEN:  Pull out both for
6   me, please, Corey.
7   QUESTIONS BY MR. BOWDEN:
8       Q.    Do you see the conflict of
9   interest statement?
10      A.    Yes.
11      Q.    And it says that they received
12  support from EUROTALC?
13      A.    Yes.
14      Q.    What is EUROTALC?
15      A.    That's the IMA-Europe talc
16  section or talc organization.
17      Q.    And the Industrial Minerals
18  Association for $90,000 for research?
19      A.    Yes.
20      Q.    "None of the authors has a
21  financial relationship with a commercial
22  entity that has an interest in the subject of
23  this manuscript."
24          Do you see that there?
25      A.    Yes.

Page 420

1       Q.    And then they also even give
2   acknowledgements to people for performing the
3   microarray and realtime quantitative plenary
4   chain reaction.
5          Do you see that there?
6       A.    Yes.
7       Q.    And also for people in helping
8   out with the talc characterization.
9          Do you see that there?
10      A.    Yeah, and obtaining of the talc
11  samples.
12      Q.    And this is 2009, right?
13      A.    That is correct.
14      Q.    Okay.  And in 2009 it was
15  appropriate to disclose these conflict of
16  interest and the acknowledgements in the way
17  they were done.
18          Do you feel that?
19          MR. DONATH:  Objection to form.
20          THE WITNESS:  She did, yes.
21  QUESTIONS BY MR. BOWDEN:
22      Q.    You feel she did it in an
23  appropriate manner?
24      A.    I think so, yes.
25      Q.    None of this, these conflict of

Page 421

1   interests or acknowledgements, none of those
2   were done by Huncharek and Muscat in the
3   Critical Review paper that we covered earlier
4   today?
5          MR. HEGARTY:  Objection.
6          MR. DONATH:  Objection to form.
7          THE WITNESS:  I don't think
8   they mentioned the amount of money.
9   QUESTIONS BY MR. BOWDEN:
10      Q.    Right.  And they didn't --
11      A.    Huncharek noted the -- noted
12  the funding sponsorship by Crowell & Moring.
13      Q.    Right.
14      A.    And Huncharek noted
15  contribution by -- I forget now, but it might
16  have been the talc companies.
17      Q.    But they didn't notice in the
18  Critical Review paper that the funding --
19  they said Crowell & Moring.
20      A.    Yeah.
21      Q.    They did not note that it came
22  from Imerys and Johnson & Johnson, correct?
23          MR. HEGARTY:  Objection.
24          MR. DONATH:  Objection to form.
25          THE WITNESS:  That -- that's --

106 (Pages 418 to 421)

Robert Glenn

Page 422

1    no, that's correct.
2    QUESTIONS BY MR. BOWDEN:
3        Q.    And it would have been
4    appropriate to include that and list it under
5    a subheading called Conflict of Interest
6    Statement?
7            MR. HEGARTY:  Objection.  Form.
8            MR. DONATH:  Objection to form.
9            THE WITNESS:  I don't know what
10            that journal required that they
11            publish that paper in.
12    QUESTIONS BY MR. BOWDEN:
13        Q.    Okay.  So that was the fifth
14    journal they had submitted that paper for
15    publication.
16            You're aware of that, right?
17            MR. HEGARTY:  Objection to
18            form.
19            MR. DONATH:  Objection to form.
20            THE WITNESS:  After you said --
21            yes, and that often happens when --
22    QUESTIONS BY MR. BOWDEN:
23        Q.    And I'll represent to you --
24        A.    -- journals, you know, don't
25    accept the paper and it goes to another

Page 423

1    journal.
2        Q.    Right.
3        A.    There's various reasons why
4    they're not -- don't accept them.
5        Q.    Okay.  And ultimately it was
6    published in the European Journal of Cancer
7    Prevention, right?
8        A.    Yes.
9        Q.    And you know, do you not, that
10    that's a low impact journal?
11            MR. HEGARTY:  Objection to
12            form.
13            MR. DONATH:  Objection.
14            THE WITNESS:  I'm not sure what
15            the impact factor of that journal is.
16    QUESTIONS BY MR. BOWDEN:
17        Q.    You understand that it's about
18    a 1 at the time that they were -- actually
19    had their paper published?
20            MR. HEGARTY:  Objection to
21            form.
22            MR. DONATH:  Objection to form.
23            THE WITNESS:  I didn't know --
24            I didn't know that, and I question
25            whether it really was a 1.  If you

Page 424

1    showed me some dates of the impact
2    factor from their publications at that
3    period --
4    QUESTIONS BY MR. BOWDEN:
5        Q.    Sure.
6        A.    -- I would have to believe, but
7    I think it was more on the order of a 3,
8    possibly.
9        Q.    Could --
10        A.    Occupational safety and health
11    journals and such generally have low impact
12    factors.
13        Q.    Right.
14        A.    They aren't New England Journal
15    of Medicine or Lancet, so...
16        Q.    Do you know whether the
17    journals that rejected that article were
18    higher impact journals?
19        A.    I don't know if -- I don't
20    know.
21        Q.    So the -- excuse me.  If you'll
22    bring back out Exhibit Number 34.  P1.76.
23        A.    Okay.
24        Q.    Go to page 6.
25        A.    Yes.

Page 425

1        Q.    "The likelihood of success for
2    this study," which is the ovarian epithelial
3    cell arm of the Mossman study, "is high since
4    this is an extension of the previous Mossman
5    study that demonstrated significant gene
6    changes with talc in human" -- and that
7    should read mesothelial cells --
8        A.    Yes.
9        Q.    -- right?
10            MR. DAVANT:  Object to form.
11            (Glenn Exhibit 39 marked for
12            identification.)
13    QUESTIONS BY MR. BOWDEN:
14        Q.    All right.  So then let's move
15    on to what I'm going to mark as Exhibit
16    Number 39.
17            So between 2009 and 2011, are
18    you aware of when the first lawsuit was filed
19    against Luzenac, or what's now Imerys?
20            MR. DONATH:  Objection to form.
21            THE WITNESS:  I am not.
22    QUESTIONS BY MR. BOWDEN:
23        Q.    Okay.  Would it surprise you to
24    learn that it was filed in December of 2009?
25            MR. HEGARTY:  Objection.  Form.

107 (Pages 422 to 425)

Robert Glenn

| Page 426 | Page 428 |
|---|---|

**Page 426**

1    THE WITNESS:  It would, yes.
2  QUESTIONS BY MR. BOWDEN:
3    Q.  Okay.  You hadn't heard that in
4  the 2009, '10, '11 time period that Luzenac,
5  the client that was represented by Crowell &
6  Moring, was beginning to get sued --
7    MR. DONATH:  Objection to form.
8    MR. HEGARTY:  Objection to
9  form.
10  QUESTIONS BY MR. BOWDEN:
11    Q.   -- by women alleging that
12  exposure to talcum powder had resulted in
13  their ovarian cancer?
14    A.   I don't recall that --
15    MR. DONATH:  Objection.
16    THE WITNESS:  -- coming from
17  Luzenac.  I only recall it vaguely
18  that when I was in my own business,
19  that that's when it started.  So I
20  wasn't aware of that.
21  QUESTIONS BY MR. BOWDEN:
22    Q.   Okay.  And you'd actually gone
23  out from Crowell & Moring in 2010?
24    A.   Yes.
25    Q.   So what time in 2010 did you

**Page 427**

1  leave Crowell & Moring?
2    A.   It would have been March.
3    Q.   March 2010?
4    A.   Yes.
5    Q.   Okay.  So we were looking just
6  a minute ago at a study proposal that was
7  being summarized internally by Luzenac in
8  September of 2009.  That's the one we were
9  just looking at, and you said you didn't
10  recognize some of the names in the paper,
11  right?
12    A.   Right.  Yes.
13    Q.   And then later in 2009, the
14  Byrd complaint is filed?
15    A.   The what complaint?
16    MR. DONATH:  Objection to form.
17  QUESTIONS BY MR. BOWDEN:
18    Q.   The Byrd complaint.  It's a --
19  it was a lawsuit filed against Luzenac.
20    A.   Oh, I --
21    MR. DONATH:  Objection.  Form.
22  QUESTIONS BY MR. BOWDEN:
23    Q.   You weren't aware of that?
24    A.   No.
25    Q.   Okay.  And in March of the

**Page 428**

1  following year, your position as a scientific
2  consultant at Crowell & Moring ceases,
3  correct?
4    A.   Yes.
5    Q.   All right.  Do you have
6  Exhibit 39 in front of you now?
7    A.   Yes.
8    Q.   Okay.  Now, I want you to turn
9  to page 3 of that paper, of that exhibit.
10    A.   Okay.
11    Q.   And you still maintain an
12  e-mail address at Crowell & Moring?
13    A.   No, I do not.
14    Q.   So --
15    A.   I didn't check e-mail there
16  probably since 2011.
17    Q.   Okay.  It says, "From Brooke
18  Mossman."  It's to John Kelse and to you as
19  well.
20    Do you see that?
21    A.   Yes.
22    Q.   "Summary of proposed
23  experiments and budget figures.  Dear John
24  and Bob, please look this over and see if it
25  makes sense to circulate to your colleagues.

**Page 429**

1  Sincerely" --
2    A.   Oh, wait a minute.  I was
3  looking at the one above.
4    Q.   I've got it up on the screen
5  for you, sir.
6    A.   Oh, okay.  Yeah.
7    Q.   Do you see where it's written?
8    A.   Yeah.
9    Q.   She's sending it to you in May
10  of 2011, and then -- that was on -- excuse
11  me.  That was on May 5th.
12    Do you see where that's
13  written?
14    A.   I see May -- yes, May 5th,
15  sent.
16    Q.   Okay.  Now, go back to page 2,
17  the page before that.
18    A.   Okay.
19    Q.   You see where John actually
20  responds, right?  The bottom of the page?
21    A.   Yes.
22    Q.   And he's with RT Vanderbilt,
23  right?
24    A.   Correct.
25    Q.   And he's with IMA-North America

108  (Pages 426 to 429)

Robert Glenn

| Page 430 |
| --- |

1   as well?
2       A.    He's a member of the talc
3   section. His company was.
4       Q.    And he's responding back, and
5   he copies you as well, or actually sends it
6   to you, right?
7       A.    Yes.
8       Q.    And he says, "Sorry for the
9   delayed response. I do wish to thank you for
10  the revised product description. I
11  distributed the revision for further
12  discussion and hopefully -- and will
13  hopefully have an answer for you shortly."
14          Do you see that?
15      A.    Yes.
16      Q.    "As earlier mentioned, the
17  primary concern now is a legal-oriented worry
18  that comparable cellular responses for the
19  various assays, greater, lesser, the same, et
20  cetera, may be misrepresented by plaintiffs'
21  attorneys."
22          Right?
23      A.    Yes.
24      Q.    People like me?
25      A.    Yes.

| Page 431 |
| --- |

1       Q.    All right. "Basically our
2   attorneys believe that demonstrating that a
3   test material is not as biologically reactive
4   as asbestos can still inappropriately be used
5   to argue harm, just to a lesser degree."
6       A.    Yes, that's what he says.
7       Q.    "The lesser biological effect,
8   if that's what is projected, might be
9   described as still a risk for the highly
10  susceptible, like the plaintiff, of course."
11          Right?
12      A.    Yes.
13      Q.    "Obviously risk is not black or
14  white. When in the courtroom, any ambiguity
15  is sadly used to indict you. That's
16  certainly been my take on our legal
17  adventures thus far."
18          Have I read that correctly?
19      A.    That's his -- yes.
20      Q.    Okay. And we've already
21  discussed earlier that some of the studies
22  were finding statistically significant risk.
23          MR. DONATH: Objection to form.
24          MR. DAVANT: Objection to form.
25          MR. HEGARTY: Objection to

| Page 432 |
| --- |

1   form.
2           THE WITNESS: Some what
3   studies?
4   QUESTIONS BY MR. BOWDEN:
5       Q.    Some of the studies that we've
6   talked about. One of the --
7       A.    The epidemiology studies.
8       Q.    Yes, sir.
9           One of the epidemiology
10  studies, right?
11      A.    Yes.
12      Q.    "Even though as you state in
13  the proposal, dose response studies will be
14  employed to determine a dose of crocidolite
15  that test positively and a dose of the talcs
16  that does not to aid in the control of such a
17  like asbestos scenario, this type of like
18  asbestos misrepresentation may still remain a
19  threat in the legal arena. That's the
20  concern at the moment, but we also recognize
21  that this concern may be misplaced. We don't
22  fully appreciate, understand, the meaning of
23  variations likely to be observed. Prior to
24  being in the crosshairs of litigation,
25  there's little question that by now we would

| Page 433 |
| --- |

1   have moved ahead with the project."
2           Do you see that?
3       A.    Yes.
4       Q.    So the only reason they didn't
5   move forward with the project to get the
6   answer was because they were concerned about
7   litigation?
8           MR. DONATH: Objection to form.
9   QUESTIONS BY MR. BOWDEN:
10      Q.    That's what this e-mail is
11  saying?
12          MR. DONATH: Same objection.
13          THE WITNESS: That's what it's
14  saying from John Kelse, yes.
15  QUESTIONS BY MR. BOWDEN:
16      Q.    When you're talking about women
17  who are dying of ovarian cancer, is that a
18  reason not to fund the study?
19      A.    This was --
20          MR. DONATH: Objection to form.
21          MR. BILLINGS-KANG: Objection
22  to form.
23          THE WITNESS: I don't believe
24  this was a cosmetic talc. I believe
25  this was RT Vanderbilt industrial

109 (Pages 430 to 433)

Robert Glenn

| Page 434 |
|---|
| 1   talc, which really is a misnomer to |
| 2   call it a talc.  It is 60 percent |
| 3   non-asbestiform tremolite, 30 percent |
| 4   talc. |
| 5   QUESTIONS BY MR. BOWDEN: |
| 6      Q.   And her study was to look at |
| 7   all forms of talc, right? |
| 8      A.   I think -- no, I think -- |
| 9      Q.   Cosmetic talc, I'm sorry. |
| 10     A.   I don't think this study |
| 11  relates to that.  I think this study, because |
| 12  John is involved, evidently was of the RT |
| 13  Vanderbilt talc. |
| 14     Q.   There's no question that -- |
| 15     A.   And he's talking about |
| 16  litigation of RT Vanderbilt. |
| 17     Q.   "There's no question this work |
| 18  is meaningful with regard to the broader |
| 19  issue of mechanism." |
| 20        Do you agree with that? |
| 21        MR. HEGARTY:  Objection to |
| 22  form. |
| 23        MR. DONATH:  Objection to form. |
| 24        THE WITNESS:  You know, again, |
| 25  I want to make it clear that I do not |

| Page 435 |
|---|
| 1   think this is a cosmetic talc that is |
| 2   being -- is looked at it being used in |
| 3   this experiment. |
| 4   QUESTIONS BY MR. BOWDEN: |
| 5      Q.   Would doing a study with |
| 6   cosmetic talc provide a meaningful answer to |
| 7   you? |
| 8        MR. DONATH:  Objection. |
| 9   Objection to form, sorry. |
| 10       THE WITNESS:  I think it would |
| 11  turn out that way, yes. |
| 12  QUESTIONS BY MR. BOWDEN: |
| 13     Q.   And I'm not asking whether -- |
| 14  how you think it would turn out, but would |
| 15  the evidence or the conclusions reached by |
| 16  such a study, would that be important in |
| 17  furthering scientific knowledge? |
| 18       MR. DONATH:  Object to form. |
| 19       THE WITNESS:  If this is |
| 20  genetic microarray, it would further |
| 21  the knowledge of cosmetic talc. |
| 22  QUESTIONS BY MR. BOWDEN: |
| 23     Q.   And it would also -- do you |
| 24  agree if there was such a study done with |
| 25  talc, cosmetic talc, that it would provide |

| Page 436 |
|---|
| 1   meaningful information with regard to the |
| 2   broader issue of mechanism or |
| 3   bioplausibility? |
| 4        MR. HEGARTY:  Objection to |
| 5   form. |
| 6        MR. DONATH:  Objection to form. |
| 7        THE WITNESS:  Cosmetic talc, |
| 8   yes. |
| 9   QUESTIONS BY MR. BOWDEN: |
| 10     Q.   Okay. |
| 11     A.   I'd proposed such previously. |
| 12     Q.   And no one -- no one took you |
| 13  up on that offer, right? |
| 14       MR. HEGARTY:  Objection. Form. |
| 15       MR. DONATH:  Objection. Form. |
| 16       THE WITNESS:  Not until much |
| 17  later. |
| 18  QUESTIONS BY MR. BOWDEN: |
| 19     Q.   Okay.  "I believe there is |
| 20  still reasonable likelihood that I will |
| 21  receive approval for this work.  I did, |
| 22  however, want you to understand why we're |
| 23  experiencing this delay.  From your prior |
| 24  comments, I know you understand and |
| 25  appreciate the concerns expressed by our |

| Page 437 |
|---|
| 1   legal team.  If there are any further |
| 2   insights, advice, that you might share from |
| 3   your experience with regard to these |
| 4   concerns, it would be very much appreciated." |
| 5        Do you see where that's |
| 6   written? |
| 7      A.   Yes. |
| 8      Q.   So what's essentially happened |
| 9   here is the lawyers shut it down, right? |
| 10       MR. DONATH:  Objection to form. |
| 11       MR. HEGARTY:  Objection.  Form. |
| 12       THE WITNESS:  It looks like |
| 13  internally legal counsel decided not |
| 14  to go forward with this. |
| 15  QUESTIONS BY MR. BOWDEN: |
| 16     Q.   And you're the only person |
| 17  affiliated with the law firm on this e-mail, |
| 18  right? |
| 19       MR. DAVANT:  Objection to form. |
| 20       MR. DONATH:  Objection to form. |
| 21       THE WITNESS:  Yes. |
| 22  QUESTIONS BY MR. BOWDEN: |
| 23     Q.   Now, let's go to the first |
| 24  page. |
| 25     A.   All right. |

110  (Pages 434 to 437)

Robert Glenn

| Page 438 | Page 440 |
|---|---|
| 1    Q.    Actually, I'm sorry, go back to<br>2 the second page.<br>3    A.    Okay.<br>4    Q.    See Dr. Mossman's response on<br>5 Friday, May 27th?<br>6    A.    Yes.<br>7    Q.    And she writes back that she<br>8 hopes that she can answer some of the<br>9 questions, right?<br>10    A.    Right.<br>11    Q.    One of the things that would be<br>12 important to understand --<br>13    A.    She --<br>14    Q.    -- is whether talc just<br>15 generally causes inflammation, right?<br>16    A.    I think it's --<br>17        MR. DONATH: Objection. Form.<br>18        THE WITNESS: What I was<br>19    stating before is evidenced in the<br>20    first sentence, effects of mechanism<br>21    of action of RTV talc --<br>22 QUESTIONS BY MR. BOWDEN:<br>23    Q.    Uh-huh.<br>24    A.    -- which is not a cosmetic<br>25 talc. | 1 ceramics, things like that.<br>2    Q.    Right.<br>3        The study that would include<br>4 talc as you describe it, you proposed that<br>5 study?<br>6    A.    Pardon?<br>7    Q.    A similar study to this --<br>8    A.    Yes.<br>9    Q.    -- utilizing talc as you define<br>10 it --<br>11    A.    Talc, pure talc. Yeah,<br>12 cosmetic talc --<br>13    Q.    Fine. Cosmetic talc?<br>14    A.    -- I proposed that, yes.<br>15    Q.    You proposed that while you<br>16 were an employee at Crowell & Moring,<br>17 correct?<br>18    A.    Yes, I did.<br>19    Q.    And when you proposed that,<br>20 Luzenac was one of your clients, or was your<br>21 client?<br>22    A.    Yes, they were.<br>23    Q.    And ultimately when you made<br>24 that proposal, that was shot down. They<br>25 showed no interest, correct? |

| Page 439 | Page 441 |
|---|---|
| 1    Q.    Okay.<br>2    A.    So this study has no relevance<br>3 to cosmetic talc.<br>4    Q.    Industrial talc and cosmetic<br>5 talc, how do they differ?<br>6    A.    Well, this talc, as I said,<br>7 it's not a talc. It should -- it's a<br>8 misnomer. Sometimes it's called an<br>9 industrial talc, but it doesn't even compare<br>10 to some of the industrial talcs that are<br>11 used.<br>12        This is a very complex<br>13 mineralogy in this deposit, and it is<br>14 composed of only 30 percent talc, magnesium<br>15 silicate. It has about 60 percent<br>16 non-asbestiform tremolite, and it then has<br>17 some chlorite and some other minerals. But<br>18 it is by no way a pure talc or even what you<br>19 would consider -- what I would consider a<br>20 talc.<br>21    Q.    Okay. The study, though --<br>22    A.    It's sold as a talc, industrial<br>23 talc, but it has uses in industrial use only.<br>24    Q.    The study that would --<br>25    A.    Paints -- paints, rubber, some | 1    A.    I wouldn't say no interest --<br>2        MR. DONATH: Objection to form.<br>3    Direct the witness not to answer to<br>4    the extent it wades into<br>5    communications from Luzenac directly<br>6    to you, or even through Crowell &<br>7    Moring.<br>8 QUESTIONS BY MR. BOWDEN:<br>9    Q.    Okay. So that was an idea of<br>10 yours that you had when you were still in<br>11 discussions not only with Luzenac and<br>12 Crowell & Moring but also with Johnson &<br>13 Johnson, correct?<br>14        MR. HEGARTY: Objection to<br>15    form.<br>16        THE WITNESS: I really didn't<br>17    have direct communications with<br>18    Johnson & Johnson.<br>19 QUESTIONS BY MR. BOWDEN:<br>20    Q.    Okay. Well, we've -- go ahead.<br>21    A.    Luzenac personnel would<br>22 communicate with Johnson & Johnson. I did<br>23 not advise them on any science that they<br>24 should be doing or anything. Luzenac would<br>25 take those proposals to them. |

Robert Glenn

Page 442

1    Q.    Okay.  Okay.  And we've seen in
2  these documents, we were just looking at one
3  a moment ago, where Luzenac internally, in
4  2009, was considering a study, correct?  A
5  study, this study, right?
6         MR. DONATH:  Objection to form.
7         THE WITNESS:  No, not this
8    study.  Not this -- not this study
9    that John Kelse is talking about.
10   This is an RT Vanderbilt talc.
11 QUESTIONS BY MR. BOWDEN:
12   Q.    I'm not saying -- I'm saying a
13 study --
14   A.    Well, you said "this study,"
15 and this is the paper in front of me.
16   Q.    Okay.
17   A.    All right.
18   Q.    Let me rephrase then.
19   A.    Good.
20   Q.    Luzenac had considered doing a
21 similar study with talc?
22        MR. DONATH:  Objection to form.
23        THE WITNESS:  With cosmetic
24   talc or pure talc.
25

Page 443

1  QUESTIONS BY MR. BOWDEN:
2    Q.    Yes?
3    A.    Yes, pure talc.
4    Q.    And they chose not to do that?
5    A.    They did not fund it.
6    Q.    Right.
7          And that proposal was a
8  proposal that Crowell & Moring was aware of
9  as well --
10        MR. DONATH:  Objection to form.
11 QUESTIONS BY MR. BOWDEN:
12   Q.    -- through you?
13   A.    Yes.
14   Q.    And it was your opinion at the
15 time, and as you sit here today, that such a
16 study would provide meaningful evidence that
17 would contribute to the scientific knowledge
18 surrounding talc and ovarian cancer?
19        MR. DONATH:  Objection to form.
20        THE WITNESS:  I expected it
21   would based upon my knowledge of the
22   effect of that talc mineral in other
23   cellular systems and in humans.
24 QUESTIONS BY MR. BOWDEN:
25   Q.    I want to -- I want to go to

Page 444

1  the front of this e-mail.
2    A.    Okay.
3    Q.    You see at the very top,
4  there's a response from Sharma -- from
5  Mr. Sharma.
6          Do you see that?
7    A.    Yes.
8    Q.    And it's internal.  RTM, that's
9  Luzenac, right?
10   A.    Yes.
11        MR. DONATH:  Objection to form.
12 QUESTIONS BY MR. BOWDEN:
13   Q.    And it says, "John Kelse gave
14 me a copy of the Mossman proposal in DC in
15 late April."
16        Right?
17   A.    Yes.
18   Q.    "I sent the proposals to" --
19 I'm going to butcher --
20   A.    Coggiola.
21   Q.    -- "Coggiola, Wayne Ball and
22 Jocelyn for their comments," right?
23   A.    Yes.
24   Q.    And Wayne Ball, that's the same
25 gentleman we saw that in 2009 was summarizing

Page 445

1  that study, right?
2         MR. DONATH:  Objection to form.
3         THE WITNESS:  And that's a
4    person I never met.
5  QUESTIONS BY MR. BOWDEN:
6    Q.    I'm not asking if you ever met
7  him.  I'm asking if that's the same name that
8  we saw on that prior document.
9    A.    No, I just wanted to let you
10 know I didn't have any communication with
11 that person.
12        But, yes, that's the same.
13   Q.    Okay.  "Given the history of
14 the Vanderbilt talc and their decision to
15 exit the market, we jointly decided not to
16 participate in this study."
17        Do you see where that's
18 written?
19   A.    Yes.
20   Q.    "We do not want our name to be
21 associated with their product, particularly
22 if the results turn out to not be as
23 expected," right?
24   A.    Yes.
25   Q.    And not only did they not want

Robert Glenn

---

Page 446

1    their name associated with RT Vanderbilt's
2    product, they also chose not to run the study
3    themselves, correct?
4             MR. DAVANT: Object to form.
5             MR. DONATH: Object to form.
6             THE WITNESS: Again, this is
7        two studies she's speaking about. One
8        evidently is the industrial talc, and
9        the other was the cosmetic talc.
10   QUESTIONS BY MR. BOWDEN:
11       Q.    They never ran one with
12   cosmetic talc?
13            MR. DAVANT: Objection to form.
14            MR. DONATH: Objection to form.
15            THE WITNESS: No, they did not
16        fund it.
17   QUESTIONS BY MR. BOWDEN:
18       Q.    Okay. Still haven't funded it
19   to this day, to your knowledge?
20            MR. DONATH: Objection to form.
21            THE WITNESS: No, I'm no longer
22        associated with Imerys. I'm not sure
23        what they're doing.
24   QUESTIONS BY MR. BOWDEN:
25       Q.    To your knowledge, has anyone

---

Page 447

1    conducted that study?
2        A.    Yes. Yes. IMA-North America
3    and possibly EUROTALC was -- as we looked at
4    earlier, funded the study.
5        Q.    Was it published?
6        A.    Yes -- yes, I think it was.
7        Q.    What journal was it published
8    in?
9        A.    I think it was in a cell
10   biology study. We looked at it earlier, I
11   believe.
12            No, there's another one. You
13   didn't show me that one. That one was only
14   of the mesothelial cells.
15            She published her paper of the
16   mesothelial cells and the ovarian cells.
17   I'll send you a copy.
18       Q.    What did it show?
19       A.    It showed that pure talc did
20   not respond with a genetic microarray. It
21   would trigger -- it was evidence of
22   triggering cancer.
23       Q.    Did it have any genetic
24   mutations at all?
25       A.    Yes, the positive control

---

Page 448

1    asbestos.
2        Q.    Okay. And what about for the
3    talc arm of it, the talc group?
4        A.    The talc did not show an
5    increase, significant increase, in genetic
6    microarray.
7        Q.    So let me be very precise in my
8    questions here because I think that the
9    intention of my question is different than
10   what I think you're understanding it to be.
11            My question to you is: In that
12   study that you're referencing right now --
13       A.    Yes.
14       Q.    -- in the talc control -- in
15   the talc group --
16       A.    Yes.
17       Q.    -- were there any molecular
18   changes, genetic changes?
19            MR. DONATH: Objection to form.
20            THE WITNESS: I would have to
21        look at the paper again. There's two
22        tables at the back of the paper, and
23        they showed the results at -- she did
24        it using surface area, too.
25            And there are two tables at the

---

Page 449

1        back that are very illustrative, and I
2        can't tell you what they were right
3        now, but that's what I would direct
4        you to.
5    QUESTIONS BY MR. BOWDEN:
6        Q.    Okay. And you're saying
7    that -- was there any risk associated with
8    talc at all?
9        A.    It -- no, not -- not with
10   the -- with the ovarian epithelial cells or
11   the mesothelial cells.
12       Q.    None whatsoever?
13       A.    There may have been a response,
14   but it wasn't significant.
15       Q.    Okay. And when you say
16   "significant," you're talking about
17   statistical significance?
18       A.    No, I'm talking about compared
19   to what Brooke and genetic microarray
20   analysis would consider significant.
21       Q.    Okay.
22       A.    I wish I had the paper with me.
23   It would enlighten us greatly.
24       Q.    Okay.
25       A.    But it turned out, as I thought

---

113 (Pages 446 to 449)

Robert Glenn

Page 450

1    it might, when I proposed this research way
2    back as earlier as, what, 2005?
3         Q.    You proposed this study back in
4    2005?
5         A.    It was in that area, yes.
6         Q.    Okay.
7         A.    It's a talc study looking at
8    mesothelial cells.  Brooke actually -- I
9    think Brooke brought it to my attention, but
10   it was -- it was earlier.
11        Q.    I want to ask you about the
12   diaphragm study that was published as a
13   result of the contract between Crowell &
14   Moring and the Meta-Analysis Research Group.
15        A.    Yes.
16        Q.    Okay.  The two arms in that
17   are -- tell us about the comparative group
18   and the control group in that.
19        A.    I'm sorry, which study was
20   that?
21        Q.    The diaphragm study.
22        A.    I'm getting -- okay.
23             It wasn't -- that was an
24   observational epidemiology study.
25        Q.    The meta-analysis?

Page 451

1         A.    Yes.
2         Q.    Okay.
3         A.    So it just looked at the risk
4    related to females who were using diaphragms
5    for birth control.
6         Q.    Okay.
7         A.    It wasn't an animal study, so
8    you don't have a control population.
9         Q.    Right.
10             And so in the diaphragm study,
11   do you know if there was asbestos
12   contamination in the talc?
13             MR. HEGARTY:  Objection to
14        form.
15             MR. DONATH:  Object to form.
16             THE WITNESS:  No.  I mean, the
17        talc was never analyzed from that.  It
18        was -- it was talc, talcum powder,
19        that females would -- would dust or
20        use in storage of their diaphragm.
21   QUESTIONS BY MR. BOWDEN:
22        Q.    Okay.  And in looking at
23   that -- if it turned out that the talc did
24   contain asbestos, would that be problematic?
25        A.    If.

Page 452

1             MR. DONATH:  Objection.  Form.
2             MR. HEGARTY:  Objection.  Form.
3             THE WITNESS:  Yeah.  If.
4    QUESTIONS BY MR. BOWDEN:
5         Q.    That's not something that you
6    personally looked at or know of?
7         A.    I have not looked at the
8    analyses of -- well, I'm somewhat aware of
9    the analyses of these talcs, and I don't
10   think they've ever been shown -- show -- they
11   may have fibers, they may have talc fibers,
12   but not asbestiform fibers.
13        Q.    But you don't know that for a
14   fact, correct?
15             MR. HEGARTY:  Objection.  Form.
16             THE WITNESS:  It comes from
17        geology I've read and geologists I've
18        talked with.
19             MR. BOWDEN:  Okay.  We'll
20        tender the witness to you guys.
21             VIDEOGRAPHER:  The time is now
22        4:59.  Going off the record.
23        (Off the record at 4:59 p.m.)
24             VIDEOGRAPHER:  Okay.  The time
25        is now 5:05.  Back on the record.

Page 453

1             CROSS-EXAMINATION
2    QUESTIONS BY MR. FERGUSON:
3         Q.    Mr. Glenn, good afternoon.
4         A.    Good afternoon.
5         Q.    My name is Ken Ferguson.  I
6    represent Imerys in this matter, along with
7    my colleagues, and I have relatively few
8    questions for you.
9         A.    Okay.
10        Q.    Let me -- let me go through a
11   couple of things first that I think we may
12   have covered early on but it's been a while.
13             Why don't you go ahead and
14   state your name for the record, please.
15        A.    Yes, it's Robert Glenn.
16        Q.    And where do you live,
17   Mr. Glenn?
18        A.    I live on Seabrook Island,
19   South Carolina.
20        Q.    Okay.  And how far is that from
21   here?  I don't even know.
22        A.    It's about -- well, from our
23   mountain house, it's about six hours' drive,
24   but most of it's the last 50 miles.
25        Q.    And I think maybe when we were

114 (Pages 450 to 453)

Robert Glenn

Page 454

1  talking off the record, did you go to
2  Clemson?  Is that what you said?
3      A.   Yes, I did.
4      Q.   All right.  And what degrees
5  did you get at Clemson?
6      A.   I got a degree in entomology,
7  and I left that behind.
8      Q.   All right.  I've got some
9  questions for you about some exhibits, so if
10 you --
11     A.   All right.
12     Q.   -- would, I'll let you go
13 through and pull up the -- the exhibits.
14 Look for number -- I'm seeing it as 31 and as
15 32, so that's a little tricky.
16          It's 31?  All right.
17     A.   Yeah.  This?
18     Q.   Correct.
19     A.   Okay.
20     Q.   And if you turn over to page --
21 what's listed 3 of 4.
22     A.   Okay.
23     Q.   And then looks like a letter to
24 Mark Ellis, president of Industrial Minerals
25 Association of North America, correct?

Page 455

1      A.   It does.
2      Q.   Okay.  And counsel asked you
3  about this and asked you about a couple of
4  paragraphs, particularly the paragraph about
5  two-thirds of the way down the page when
6  there was talk about somebody putting it in
7  the vernacular, horse has already left the
8  barn.
9          Do you recall that discussion?
10     A.   Yes.
11     Q.   Now, looking at this document,
12 this page particularly, do you see where it
13 says the lead in, and it has somebody else's
14 name and has a time in there?
15     A.   Yes.
16     Q.   That's not normally how you
17 send a letter out, is it?
18     A.   No.
19          MR. BOWDEN:  Objection.  Form.
20 Leading.
21          THE WITNESS:  This looks like a
22 draft.
23 QUESTIONS BY MR. FERGUSON:
24     Q.   I was going to ask you:  Does
25 this appear to be a redline draft?

Page 456

1      A.   Yes, it does.
2      Q.   So do you -- have you ever seen
3  a final version of this particular letter to
4  Mr. Ellis?
5      A.   I have not.  I don't recall
6  ever seeing this letter.
7      Q.   So as far as this letter
8  itself, is this the only version you've ever
9  seen?
10     A.   This is.
11     Q.   And based on your experience in
12 the world for a number of years, do people
13 typically send out draft letters or are
14 they -- typically continue to working on
15 them?
16     A.   That would certainly not be
17 customary in business.
18          MR. BOWDEN:  Form.
19 QUESTIONS BY MR. FERGUSON:
20     Q.   Now, as was discussed with you,
21 this particular letter has to do with
22 Mr. Turner indicating that his company was
23 going to -- to cease funding certain -- a
24 certain study that was being conducted at the
25 University of Vermont, correct?

Page 457

1      A.   That was to be conducted there,
2  yes.
3      Q.   Correct.
4          And that was called the Mossman
5  study, at least in the first paragraph of
6  this draft letter, right?
7      A.   Yes.
8      Q.   Okay.  Do you know, in fact,
9  whether or not that study was ever completed
10 by Dr. Mossman and her colleagues at the
11 University of Vermont?
12     A.   Yes, it was -- to my knowledge,
13 it was completed and funded by IMA-NA and
14 possibly EUROTALC.  I might be wrong about
15 that.
16     Q.   Let's take a look at
17 Exhibit 38, please, sir.
18     A.   Okay.
19     Q.   And Exhibit 38 was also
20 discussed with you, and this appears to be a
21 study that -- with Dr. Mossman as the last
22 author listed, correct?
23     A.   Yes.  Dr. Mossman probably has
24 300 publications, and she has a very
25 productive group, and she oftentimes lists

115  (Pages 454 to 457)

Robert Glenn

Page 458

1  herself last.
2      Q.    And there are a number of her
3  colleagues at the University of Vermont in
4  different departments and in her department
5  that are also listed as coauthors here,
6  correct?
7      A.    Yes.
8      Q.    Okay.  So is this considered to
9  be the University of Vermont talc study?
10     A.    It was a talc study by the
11 University of Vermont, but they also have
12 done other talc studies.
13     Q.    Certainly -- and looking at the
14 timing of it, the exhibit we just talked
15 about, Exhibit 31, was dated July 12 of 2006,
16 correct?
17     A.    Yes.
18     Q.    And this particular study,
19 Exhibit 38, indicates that it was received in
20 original form, April 11, 2008 --
21     A.    Right.
22     Q.    -- and in final form,
23 November 24, 2008, correct?
24     A.    Yes.
25     Q.    So the Exhibit 31 that was

Page 459

1  talking about the ceasing of funding for a
2  particular study was a year and a half,
3  couple years before this one, correct?
4      A.    Yes.
5      Q.    And in fact, I think as you-all
6  discussed earlier, if you look on the bottom
7  left of the first page of Exhibit 38, it
8  says, "This work was supported by NIEHS
9  training grant," and then there's a long
10 number.
11     A.    Yes.
12     Q.    "And a contract from EUROTALC
13 and the Industrial Minerals Association of
14 North America," correct?
15     A.    That's correct.
16     Q.    "And NCI," the National Cancer
17 Institute, correct?
18     A.    Yes.  Yes.
19     Q.    So Imerys, to your knowledge,
20 has been a member, was a member at this time,
21 of the Industrial Minerals Association,
22 correct?
23          MR. BOWDEN:  Form.
24          THE WITNESS:  Yes, they were.
25

Page 460

1  QUESTIONS BY MR. FERGUSON:
2      Q.    Okay.  And --
3      A.    I was no longer with IMA-NA
4  myself, but Imerys -- I do know that Imerys
5  was a member.
6      Q.    So a study that's being
7  supported by the IMA is also being supported
8  financially, at least indirectly, through the
9  member -- members of the organization,
10 correct?
11     A.    That's correct.
12     Q.    Let me visit with you a little
13 bit about IARC.  There was a lot of
14 discussion about IARC.  And let's talk first
15 about the categories.
16          There was discussion about 2B?
17     A.    Uh-huh.
18     Q.    There are a number of other
19 categories that IARC, in its procedure --
20     A.    Yeah.
21     Q.    -- can classify agents,
22 correct?
23     A.    That's correct.
24     Q.    And there are about five.
25 There are exactly five of those groups,

Page 461

1  correct?
2      A.    Yes.  Yes.
3      Q.    1, Group 1, is carcinogenic to
4  humans, correct?
5      A.    Yes.
6          And as I mentioned earlier,
7  this is just the first step of risk
8  identification, of -- is -- is of risk
9  assessment, the identification step.  There
10 are four or five other steps that were
11 contained in the National Academy of Sciences
12 Red Book on the risk assessment.
13     Q.    But the Group 1, carcinogenic
14 to humans --
15     A.    Yes.
16     Q.    -- that's IARC saying this is
17 carcinogenic, correct?
18     A.    It's saying it's been
19 identified as a human carcinogen.
20     Q.    And then the next group down is
21 Group 2A --
22     A.    Yes.
23     Q.    -- which is probably
24 carcinogenic, correct?
25     A.    Yes, correct.  And that has

116 (Pages 458 to 461)

Robert Glenn

Page 462

1    sufficient evidence in -- as -- I can't
2    recall now.  It's limited evidence in humans,
3    insufficient evidence in animals.
4        Q.    Okay.  I might be able to help
5    with you that in just a minute.
6        A.    Okay.
7        Q.    Okay.  Then we got 1, we got
8    2A, then we have Group 2B, correct?
9        A.    Group 2B.
10       Q.    And Group 2B is possibly
11   carcinogenic to humans, correct?
12       A.    That's right.  That's right.
13           MR. BOWDEN:  Object to form.
14   QUESTIONS BY MR. FERGUSON:
15       Q.    Group 3 is called not
16   classifiable as to its carcinogenicity to
17   humans, correct?
18       A.    That's right.
19       Q.    And then finally Group 4 is
20   probably not carcinogenic to humans?
21       A.    Right.
22       Q.    And in the monograph that was
23   published in 2010 that was being discussed
24   early -- earlier today, perineal use of talc
25   was classified as a Group 2B --

Page 463

1        A.    Yes.
2        Q.    -- meaning possibly
3    carcinogenic to humans, correct?
4        A.    Yes.
5        Q.    Not carcinogenic, Group 1?
6        A.    No.
7        Q.    Not probably carcinogenic,
8    Group 2A?
9        A.    Right.
10       Q.    And could you pull out for me
11   Exhibit 28, which are minutes of a talc
12   section teleconference meeting?
13       A.    Okay.  I have it.
14       Q.    I just bracketed the areas I
15   was going to talk about.
16       A.    All right.  Page 2 then.
17       Q.    Yes, sir, I'm on page 2 of this
18   document.
19       A.    All right.  Yeah.
20       Q.    And you see there's a
21   discussion here in this first full paragraph
22   on this page that talks about you, in fact --
23       A.    Yes.
24       Q.    -- and says, "Answering to
25   questions, Bob Glenn recalled that the

Page 464

1    distinction between carcinogens 2A and 2B
2    lies on the fact that the experimental
3    evidence is sufficient for 2A and less than
4    sufficient for 2B carcinogens" --
5        A.    Yes.
6        Q.    -- "while for both, human
7    evidence is limited," correct?
8        A.    Yes.
9        Q.    So for a 2B classification, as
10   you were -- as is attributed to you here,
11   experimental evidence is less than sufficient
12   for 2B, and human evidence is limited,
13   correct?
14       A.    Yes.  Yes.
15       Q.    And it goes on to discuss,
16   again attributed to you, what the limited
17   human evidence means.  And what it says is,
18   "A positive association has been observed
19   between exposure to the agent and cancer for
20   which a causal interpretation is considered
21   by the working group to be credible, but
22   chance, bias or confounding could not be
23   ruled out with reasonable confidence,"
24   correct?
25       A.    Right.  Yes.  And that also

Page 465

1    speaks to the point I made about this is the
2    first step in risk assessment.  It's
3    essentially saying, you know, we -- this
4    appears to be or is a carcinogen, this is a
5    probable carcinogen, but it doesn't say
6    anything about the magnitude of the risk or
7    anything like that.
8        Q.    And here, a 2B agent, possibly
9    carcinogenic, has limited human evidence and
10   a positive association, but chance, bias or
11   confounding could not be ruled out with
12   reasonable confidence?
13       A.    That's right.
14           MR. BOWDEN:  Objection to form.
15   QUESTIONS BY MR. FERGUSON:
16       Q.    And certainly in classifying an
17   agent as carcinogenic, you would have to rule
18   out chance, bias or confounding?
19       A.    You would need to.
20           MR. BOWDEN:  Objection to form.
21           THE WITNESS:  I mean, those
22   would all be essentially some type of
23   flaws in the published literature that
24   was being considered.
25

117 (Pages 462 to 465)

Robert Glenn

| Page 466 | Page 468 |
|---|---|
| 1   QUESTIONS BY MR. FERGUSON:<br>2     Q.  Let's look at Exhibit 29, if we<br>3  could.<br>4     A.  Okay. Yes.<br>5     Q.  Now, counsel talked to you<br>6  about some of the -- well, we'd better go to<br>7  the first part of that. I apologize.<br>8     This is a Rio Tinto memorandum<br>9  from a number of people -- to a number of<br>10  people, excuse me, from a couple of people<br>11  that discusses IARC strategy and initial<br>12  communications, correct?<br>13     A.  Yes.<br>14     Q.  And counsel discussed with you<br>15  some of the objectives and some of the<br>16  stakeholders, as I recall, and indicated that<br>17  there was -- well, he didn't read any that<br>18  had anything to do with consumers, correct?<br>19     MR. BOWDEN: Form.<br>20     THE WITNESS: I believe so,<br>21  yes.<br>22  QUESTIONS BY MR. FERGUSON:<br>23     Q.  Okay. And let's look under the<br>24  objectives here, if we can. And it says --<br>25  and I believe counsel read some of these, but | 1     MR. BOWDEN: Objection to form.<br>2  QUESTIONS BY MR. FERGUSON:<br>3     Q.  And in these bullet points --<br>4  bullet points number 4, did they indicate<br>5  that they were -- wanted to provide<br>6  information to customers and consumers?<br>7     A.  They did.<br>8     Q.  And in bullet point 5, did they<br>9  note that they wanted to work closely with<br>10  body powder customers to ensure a coordinated<br>11  approach?<br>12     A.  They did.<br>13     Q.  Let's go, if we may, to<br>14  Exhibit 22, which was also discussed with<br>15  you.<br>16     A.  Hold on.<br>17     Q.  Sure. Take your time.<br>18     A.  Okay. Yeah.<br>19     Q.  Now, this was a PowerPoint, and<br>20  as I recall, you prepared this; is that<br>21  right?<br>22     A.  Yes, I did.<br>23     Q.  And you prepared this based on<br>24  your review of the scientific literature,<br>25  correct? |

| Page 467 | Page 469 |
|---|---|
| 1  let me get down to the fourth and fifth<br>2  bullet points --<br>3     A.  Yeah, I think he --<br>4     Q.  -- under objectives.<br>5     A.  I think he went over the second<br>6  bullet.<br>7     Q.  The fourth bullet point there<br>8  says, "Provide information to customers and<br>9  their employees and consumers to ensure the<br>10  safe handling and use of talc," correct?<br>11     A.  Yes.<br>12     Q.  Okay. And that in this<br>13  memorandum was one of the immediate<br>14  objectives. They had immediate objectives<br>15  and at least one long-term objective, right?<br>16     A.  Yes.<br>17     Q.  Then the next item, the fifth<br>18  bullet point, says, "Work closely with body<br>19  powder customers to ensure a coordinated<br>20  approach," correct?<br>21     A.  Yes.<br>22     Q.  So --<br>23     A.  Very, very responsible in that<br>24  they're looking to notify their customers and<br>25  have interaction with their customers. | 1     A.  That's correct, on talc, yes.<br>2     Q.  And this was dated back in<br>3  2006 --<br>4     A.  Correct.<br>5     Q.  -- at a San Juan, Puerto Rico,<br>6  meeting, right?<br>7     A.  Yes.<br>8     Q.  Let's go ahead and look at --<br>9  there's where I run into trouble with the<br>10  old -- there's the zoom. Okay. Gotcha. Let<br>11  me try to zoom out.<br>12     I pulled out one I put some<br>13  handwriting on, so that's probably not<br>14  appropriate, but let's just -- you have this?<br>15     A.  Yeah.<br>16     Q.  In this PowerPoint, you<br>17  stated -- and this is on page --<br>18     A.  It's not numbered,<br>19  unfortunately.<br>20     Q.  It's not numbered?<br>21     A.  Yes.<br>22     Q.  But it's the page that<br>23  starts -- it is titled "Conclusion, ovarian<br>24  cancer."<br>25     A.  Okay. Is this it, overall |

118 (Pages 466 to 469)

Robert Glenn

Page 470

1  strength and association?
2        MR. DONATH:  Conclusion.
3        THE WITNESS:  Yeah.
4  QUESTIONS BY MR. FERGUSON:
5        Q.    The first bullet point says,
6  "Only evidence to support a causal
7  interpretation is the overall modest,
8  positive association, approximately 1.31."
9        A.    Let me find this -- that's at
10  the very end?  Yeah, I've got it.
11       Q.    You got it?
12       A.    Yes.
13       Q.    Okay.  Now, on this page there
14  are four bullet points, correct?
15       A.    Yes.
16       Q.    And the last of these bullet
17  points says -- again, you prepared this --
18  "Evidence does not indicate that talc is a
19  risk factor for ovarian cancer in humans."
20       Is that correct?
21       A.    Yes, that's my conclusion.
22       Q.    Okay.  And based upon your
23  comment here and your scientific research,
24  does talc cause ovarian cancer?
25       A.    Not to my opinion, it does not.

Page 471

1        Q.    In your opinion, are talc-based
2  body powders safe for consumers to use in the
3  perineal area?
4        MR. BOWDEN:  Objection to form.
5  Calls for an expert opinion.
6        THE WITNESS:  Yes, they are.
7        MR. FERGUSON:  I think those
8  are all the questions I have.  Thank
9  you for your time, sir.
10       THE WITNESS:  Thank you.
11       MR. FERGUSON:  Why don't we go
12  off the record.
13       VIDEOGRAPHER:  The time is
14  now --
15       CROSS-EXAMINATION
16  QUESTIONS BY MR. HEGARTY:
17       Q.    Mr. Glenn, good afternoon.
18       A.    Good afternoon.
19       Q.    My name is Mark Hegarty.  I
20  represent Johnson & Johnson.
21       Have we ever met before today?
22       A.    No, we've not.
23       Q.    You told counsel for Imerys
24  where you currently live.  And I think in
25  talking to him, you mentioned you also have a

Page 472

1  place somewhere where we are today, in
2  Asheville, North Carolina.
3        Where else do you have a place?
4        A.    That's it.  I have a lot, if
5  you want to buy it.
6        Q.    I thought you said you had a
7  mountain home somewhere.
8        A.    Yeah, I have a mountain home.
9        Q.    Where is that located?
10       A.    That's in Tuckasegee, North
11  Carolina.
12       Q.    Where is that?
13       A.    It's a garden spot.  It's near
14  Cashiers, North Carolina, in the high
15  mountains west of here.
16       Q.    I think everyone listening to
17  this might need a better reference point.
18       A.    Okay.
19       Q.    How far is it from where we are
20  today in Asheville, North Carolina?
21       A.    It's 52 miles, and an hour and
22  45 minutes by car.
23       Q.    Mr. Glenn, you gave us some
24  information about your educational
25  background.

Page 473

1        You mentioned that you got a
2  degree from Clemson in entomology?
3        A.    Yes.
4        Q.    What is that?
5        A.    I was doing medical entomology,
6  bugs, and my first job outside of Clemson was
7  I went in the US Army and was in Vietnam
8  working on infectious diseases transported by
9  vectors such as mosquitos, fleas, in the case
10  of plague, things like that.
11       Q.    Well, thank you for your
12  service.
13       You also mentioned that you
14  attended the University of Minnesota?
15       A.    Yes, I did.
16       Q.    And what degree did you get
17  from the University of Minnesota?
18       A.    I got a master of public health
19  with concentration in industrial hygiene and
20  occupational health.
21       Q.    With regard to what your
22  discipline would be, would you consider
23  yourself to be a toxicologist?
24       A.    No.
25       Q.    What would you consider

Robert Glenn

Page 474

1  yourself to be?
2       A.    Industrial hygiene is a science
3  that deals with -- excuse me -- recognizing
4  hazards in industry, evaluating those
5  hazards.  So taking measurements and such,
6  maybe comparing to the recognized standards
7  and implementing controls, recommending
8  control measures to protect the worker.
9       Q.    You mentioned that you're still
10 working in that field; is that correct?
11      A.    I don't do much field work
12 anymore of that nature.  I'm more involved in
13 just research and some expert witnessing.
14      Q.    I should have asked it in a
15 different way.
16            You're not retired; you still
17 work?
18      A.    I still work, yes.
19      Q.    Approximately how many hours a
20 week do you work?
21      A.    Probably 40 to 50.
22      Q.    Okay.  So still almost full
23 time?
24      A.    Yeah, almost.
25      Q.    You mentioned earlier in the

Page 475

1  deposition about a study you're involved with
2  that was going to cost in the neighborhood of
3  $750,000; is that right?
4       A.    Yes.
5       Q.    Can you tell us a little bit
6  about that study, but more importantly what
7  the 750,000 is for and what -- and just
8  confirm that that's money -- that money is
9  not going to you, is it?
10      A.    No.  Let's say the personnel
11 cost is a minor part of that.  I work with
12 some colleagues at the University of Vermont,
13 Dr. Pamela Vacek; at West Virginia
14 University, Dr. Jack Parker, who is a
15 pulmonologist; and at Tulane University,
16 Dr. Roy Rando, who is an industrial
17 hygienist.  So there's personnel costs
18 related to that.
19            But the major costs come in, if
20 you want to know the truth, from a radiology
21 study we recently conducted.  It comes from
22 the radiologist.  They read X-rays at 35 to
23 $50 each, and in one study we had them read
24 4,000-X-rays, three radiologists.  They made
25 more than any of the other scientists

Page 476

1  involved in the research.
2       Q.    Fair enough.
3             You told us about a number of
4  the places you've worked.  We talked about
5  NIOSH.  You also mentioned working at
6  Crowell & Moring for a time and now having
7  your own consulting business.
8             Regardless of where you worked,
9  did you always approach any scientific issue
10 as letting the data provide the answer as
11 opposed to advocating or working towards some
12 result?
13      A.    Most certainly.  I think I
14 pointed out this morning that some studies
15 that I expected that were going to be
16 negative turned out to be positive.
17      Q.    And put another way, as a
18 scientist -- would you consider yourself a
19 scientist?
20      A.    Yes.
21      Q.    As a scientist, did you always
22 commit yourself to reporting what the science
23 showed regardless of the outcome?
24            MR. BOWDEN: Objection to form.
25            THE WITNESS:  Yes.  Yes.

Page 477

1  QUESTIONS BY MR. HEGARTY:
2       Q.    Did you always do that while
3  working at Crowell & Moring?
4             MR. BOWDEN:  Form.
5             THE WITNESS:  Yes.
6  QUESTIONS BY MR. HEGARTY:
7       Q.    Did you always do that in
8  analyzing any issue relating to the safety of
9  talcum powder products?
10            MR. BOWDEN: Form.  Leading.
11            THE WITNESS:  Yes, my -- my
12       first goal is to represent -- is to do
13       work on science that would help
14       benefit the worker.
15 QUESTIONS BY MR. HEGARTY:
16      Q.    And also as part of that work,
17 you were working on science to make sure that
18 consumers were safe --
19      A.    That's correct.
20      Q.    -- in their use of talcum
21 powder products, correct?
22            MR. BOWDEN: Objection to form.
23            THE WITNESS:  That's correct.
24 QUESTIONS BY MR. HEGARTY:
25      Q.    Now, as to your work on ovarian

120  (Pages 474 to 477)

Robert Glenn

Page 478

1  cancer and talcum powder products, did you
2  always let the data provide the answer?
3      A.   It always did.
4          MR. BOWDEN:  Form.
5          THE WITNESS:  Yes.
6  QUESTIONS BY MR. HEGARTY:
7      Q.    And has that data always
8  showed, as you just told us, that talcum
9  powder products are safe?
10         MR. BOWDEN:  Form.  Leading.
11         THE WITNESS:  In the case of
12  talcum powder, yes.
13  QUESTIONS BY MR. HEGARTY:
14     Q.    And has that data always shown
15  that talcum powder products do not cause
16  ovarian cancer?
17         MR. BOWDEN:  Objection.
18  Leading.  Calls for opinion testimony.
19         THE WITNESS:  Yes.
20  QUESTIONS BY MR. HEGARTY:
21     Q.    Has that data included
22  epidemiologic data, including several large
23  cohort or forward-looking studies that showed
24  no association between talcum powder use and
25  ovarian cancer?

Page 479

1          MR. BOWDEN:  Form.
2          THE WITNESS:  There were --
3  there was one prospective study that
4  was mentioned this morning, that's the
5  Gertig study, and that's the one that
6  has less methodological problems for
7  many reasons.  One is because it did
8  not -- you did not have to rely on a
9  recall bias of when you -- how much or
10 when you used talcum.  That was
11 answered up front by the nurses in the
12 study.
13         Secondly, it showed -- it
14 failed to show an exposure/response
15 relationship between the use of talcum
16 powder and ovarian cancer.
17         MR. BOWDEN:  Counsel, I just
18 want to interject real quickly.  I'm
19 stating some objections.  I know I'm
20 not sitting right across from you
21 right now.  If you'll let me state my
22 objection cleanly for the record and
23 then give your response, I would
24 appreciate it.
25         THE WITNESS:  I will.  I

Page 480

1  thought I was doing that, but I'm
2  sorry.
3          MR. BOWDEN:  I might have
4  misheard you.  Thank you.
5  QUESTIONS BY MR. HEGARTY:
6      Q.    You just mentioned, Mr. Glenn,
7  recall bias.  In a document we just looked at
8  a moment ago commenting on IARC's finding as
9  it relates to talc and its finding of
10 category 2B, it mentioned that with regard to
11 that finding that bias could not be ruled
12 out.
13         Was that referring to what you
14 just mentioned, recall bias?
15     A.    Yes, it was.  You know, in most
16 studies -- and also there's an exposure part
17 that has some methodological issues, and that
18 is how you quantity exposure from perineal
19 application of talc.
20     Q.    We talked about the
21 epidemiologic data and how the cohort studies
22 and even the -- many of the case-control
23 studies do not show a link or causation
24 between talcum powder use and ovarian cancer?
25     A.    Yeah.

Page 481

1          MR. BOWDEN:  Objection.  Form.
2  QUESTIONS BY MR. HEGARTY:
3      Q.    But as also the animal studies
4  that were done show that talcum powder does
5  not cause ovarian cancer?
6          MR. BOWDEN:  Form.
7          THE WITNESS:  As I mentioned
8  this morning, the studies that IARC
9  considered to be most informative in
10 answering that question of is talc --
11 talcum powder increase risk of ovarian
12 cancers, two did, two were more or
13 less, and then uninterpretable, if you
14 will, three were negative, and then
15 the cohort study of Gertig, which I
16 consider to be the strongest, did not
17 find a positive relationship to dose.
18         MR. BOWDEN:  Objection.  Form.
19 Opinion.
20 QUESTIONS BY MR. HEGARTY:
21     Q.    Has the data showing that
22 talcum powder products do not cause ovarian
23 cancer also include cell studies?
24     A.    Yes, they have.  There are
25 some.

Robert Glenn

Page 482

1    Q.    And have the studies that have
2  been done shown that talcum powder is not
3  genotoxic, meaning that it doesn't damage the
4  genes?
5         MR. BOWDEN: Objection. Form.
6         THE WITNESS: It is -- it has
7    shown that it does not respond with
8    genetic changes that would indicate
9    that it's triggering a mechanism of
10   cancer, yes.
11 QUESTIONS BY MR. HEGARTY:
12   Q.    Has the data also showed that
13 talcum powder is not cytotoxic, meaning it
14 doesn't damage cells?
15        MR. BOWDEN: Objection. Form.
16        THE WITNESS: Yes.
17 QUESTIONS BY MR. HEGARTY:
18   Q.    And has the data also showed
19 that talcum powder is not mutagenic, meaning
20 it doesn't mutate genes?
21   A.    Yes.
22   Q.    And when you talk about the
23 studies on talcum powder, what has been
24 studied are the powders that women use on
25 their bodies in the perineal area.

Page 483

1    A.    Right.
2    Q.    Regardless of what's in them,
3  whether it includes asbestiform fibers, as
4  the plaintiffs have contended, or not, that's
5  the product that's been studied that has not
6  been shown to be cytotoxic, genotoxic,
7  mutagenic, and shown to be safe, correct?
8    A.    Yes.
9         MR. BOWDEN: Objection to form.
10 QUESTIONS BY MR. HEGARTY:
11   Q.    You were asked a number of
12 questions by counsel for plaintiffs regarding
13 your work with Crowell & Moring and the
14 studies authored by Drs. Muscat and Huncharek
15 that were published in 2007 and 2008.
16        Do you recall those questions?
17   A.    Yes.
18   Q.    I want to talk about those
19 studies. In particular, I want to make sure
20 of the chronology and facts of those studies.
21        I first want to show you a
22 document that was not provided to you by
23 plaintiff's counsel.
24        MR. BOWDEN: Objection. Form.
25        (Glenn Exhibit 40 marked for

Page 484

1    identification.)
2  QUESTIONS BY MR. HEGARTY:
3    Q.    And I'm going to mark as
4  Exhibit 40 -- I think that's the exhibit
5  we're on.
6    A.    Yeah.
7    Q.    Exhibit 40 is a February 28,
8  2005 document signed by Ridgway Hall going to
9  Drs. Huncharek and Muscat.
10        First of all, are you familiar
11 with this document?
12   A.    I have seen this document, yes.
13   Q.    Is this a document that counsel
14 for plaintiffs showed you?
15   A.    No, I didn't see this from
16 plaintiffs.
17   Q.    Would you turn over to about
18 page 4 of the -- of Exhibit 40, which refers
19 to attachment A at the top?
20   A.    Oh, yes.  Yeah.
21   Q.    Is this an attachment you're
22 familiar with, Mr. Glenn?  In other words,
23 have you seen it before right now?
24   A.    I've seen this before, yes.
25   Q.    This, in the end, was the

Page 485

1  retainer agreement that was entered into
2  between Drs. Huncharek and Muscat and
3  Crowell & Moring, correct?
4    A.    Yes, it was.
5    Q.    If we look at the retainer
6  agreement, the work that was being requested
7  by Crowell & Moring were two papers that
8  could be called white papers --
9    A.    Yes.
10   Q.    -- that were to be potentially,
11 in the end, submitted to NTP as part of the
12 2004 ROC process, correct?
13   A.    Yes.
14   Q.    Those two papers were to be a
15 review of the existing literature looking at
16 talc use and ovarian cancer, and an analysis
17 of the risk of ovarian cancer in users of
18 talc-dusted diaphragms, correct?
19   A.    Yes.
20   Q.    And would it be a correct
21 statement that you and Crowell & Moring
22 expected Drs. Huncharek and Muscat to
23 approach this work as independent scientists,
24 where their analysis and results be based
25 solely on the data and not on what you

122 (Pages 482 to 485)

Robert Glenn

| Page 486 | Page 488 |
|---|---|

**Page 486**

1  thought anyone wanted to hear?
2       MR. BOWDEN: Objection to form.
3       THE WITNESS: It was. It was
4   their independent research we were
5   looking for.
6  QUESTIONS BY MR. HEGARTY:
7       Q.   And from your standpoint, did
8  Drs. Huncharek and Muscat do just that with
9  regard to the work they did on the diaphragm
10  and Critical Review paper?
11       MR. BOWDEN: Objection. Form.
12       THE WITNESS: Yes, they did.
13  QUESTIONS BY MR. HEGARTY:
14       Q.   And as to any work you did in
15  connection with preparing these white papers,
16  any involvement that you had, did you
17  approach this work as you have always
18  approached scientific issues? You would
19  analyze the data as it is and draw
20  conclusions from the data without regard to
21  the final results?
22       MR. BOWDEN: Objection to form.
23       THE WITNESS: Yes.
24  QUESTIONS BY MR. HEGARTY:
25       Q.   And under the contract, did it

**Page 487**

1  specify that the review paper, as mentioned,
2  and the diaphragm paper was potentially going
3  to be submitted to the NTP, but did you
4  understand, though, that they were never
5  submitted?
6       A.   Yes, I do.
7       Q.   Now, you were also asked about
8  the funding provided to support the
9  preparation of the two white papers that may
10  be going potentially to the NTP.
11       Do you recall those questions?
12       A.   Yes.
13       Q.   Do you know whether J&J or
14  Imerys knew back then that -- of whether the
15  payment information was passed along to
16  Drs. Huncharek and Muscat?
17       MR. BOWDEN: Objection.
18       THE WITNESS: That was in
19   Ridge, Ridge Hall's, involvement, and
20   so I'm not sure I did on that.
21  QUESTIONS BY MR. HEGARTY:
22       Q.   Do you know whether there was
23  an effort to keep Drs. Huncharek and Muscat
24  in the dark about the funding sources for
25  those white papers?

**Page 488**

1       A.   No, there was not.
2           Now that you mention that, I
3  think there was some communication that J&J
4  was shown -- was on the paperwork, so
5  obviously they knew that J&J and Imerys were
6  involved in the funding.
7       Q.   In fact, I think you mentioned
8  this earlier. The 2000 -- did the authors,
9  Drs. Huncharek and Muscat, acknowledge the
10  finding of Johnson & Johnson and Imerys in
11  the 2007 paper on diaphragm use?
12       A.   Yes, they did.
13       Q.   If we look at the agreement
14  that we marked as Exhibit Number 40, at the
15  bottom, do you see where it talks about the
16  second project included a meta-analysis
17  examining the possible association of
18  cosmetic talc with contraceptive diaphragms
19  and the risk of cancer of the ovary?
20           Do you see that?
21       A.   Yes. Yes.
22       Q.   And then if we look at the last
23  paragraph, it refers to potential work to
24  reformat that paper to make it suitable for
25  publication.

**Page 489**

1       A.   Yes.
2       Q.   But if we look above, we see
3  where it talks about the first project being
4  the Critical Review paper, correct?
5       A.   Yes.
6       Q.   Do you see in the middle, the
7  paragraph that talks about publishing the
8  Critical Review paper was actually crossed
9  out?
10       A.   Yes.
11       Q.   So from this contract, there
12  was no plans to publish the Critical Review
13  white paper, correct?
14       A.   Not here, no.
15       Q.   So anyone reading this
16  contract, including J&J, would see that it
17  specified that there would be an effort to
18  publish the diaphragm study but not the
19  Critical Review paper, correct?
20       A.   That's what it, yes, appears
21  to --
22       MR. BOWDEN: Objection.
23  QUESTIONS BY MR. HEGARTY:
24       Q.   Indeed was the diaphragm study
25  published in 2007?

123 (Pages 486 to 489)

Robert Glenn

Page 490

1    A.    Yes, it was.
2    Q.    Would that study have gone
3 through the peer-review process?
4    A.    It would have gone through the
5 journal's process, yes.
6    Q.    And have you had a chance to
7 review that article?
8    A.    I've reviewed the article, yes.
9    Q.    Okay. From your standpoint,
10 was the data reported accurate?
11    A.    Yes, it was.
12    Q.    Are you aware of anyone in the
13 scientific community identifying any
14 inaccuracies in the data or their
15 conclusions?
16        MR. BOWDEN: Objection.
17        THE WITNESS: I don't recall
18    any letters to the editor objecting to
19    anything in that paper.
20 QUESTIONS BY MR. HEGARTY:
21    Q.    Did that data show that there
22 was no causal connection between use of
23 talc-dusted diaphragms and ovarian cancer?
24    A.    Yes.
25        MR. BOWDEN: Objection.

Page 491

1 QUESTIONS BY MR. HEGARTY:
2    Q.    And has there been other
3 studies that have been -- that have looked at
4 and rated talc-dusted diaphragms users and
5 ovarian cancer came to the same conclusion?
6    A.    I don't recall any, but
7 Dr. Huncharek was interested in following
8 that up in a study.
9    Q.    With regard to the diaphragm
10 study, to your knowledge -- or do you have
11 any knowledge of J&J, or Johnson & Johnson,
12 making any suggested revisions to that paper?
13    A.    No.
14    Q.    Are you aware of Johnson &
15 Johnson requesting or requiring any changes
16 be made?
17    A.    No.
18        MR. BOWDEN: Objection. Form.
19 QUESTIONS BY MR. HEGARTY:
20    Q.    Did you have any communications
21 at all with Johnson & Johnson about the
22 diaphragm white paper or the diaphragm study?
23    A.    As I mentioned, I really had
24 limited communications with J&J, most of
25 those things where I was copied on or they

Page 492

1 were copied on, but I had very little contact
2 with Dr. Mann or anyone at J&J.
3    Q.    From your standpoint, did
4 Johnson & Johnson have any involvement in the
5 results or final wording of the published
6 diaphragm study?
7        MR. BOWDEN: Objection. Form.
8        THE WITNESS: No, they did not.
9 QUESTIONS BY MR. HEGARTY:
10    Q.    I want to next talk about the
11 white paper for the Critical Review.
12        Just focusing on the white
13 paper first --
14    A.    Yes.
15    Q.    -- to your knowledge, did J&J
16 have any involvement in the preparation of
17 the Critical Review white paper?
18        MR. BOWDEN: Objection. Form.
19        THE WITNESS: No.
20 QUESTIONS BY MR. HEGARTY:
21    Q.    Have you been shown anything
22 showing that Johnson & Johnson suggested any
23 changes to the Critical Review white paper?
24        MR. BOWDEN: Form.
25        THE WITNESS: No.

Page 493

1 QUESTIONS BY MR. HEGARTY:
2    Q.    Have you seen anywhere that
3 Johnson & Johnson requested, requiring --
4 required any changes to the white paper on
5 the critical review?
6        MR. BOWDEN: Form.
7        THE WITNESS: No.
8 QUESTIONS BY MR. HEGARTY:
9    Q.    Now, after that white paper was
10 finished -- and by the way, do you
11 remember -- do you recall when the two white
12 papers were completed, what time frame?
13    A.    Sitting here right now, no.
14 I'd have to look back through some of the
15 papers.
16    Q.    Do you recall that the drafts
17 were actually completed in 2005?
18        MR. BOWDEN: Form.
19        THE WITNESS: That may have
20    been, yes.
21 QUESTIONS BY MR. HEGARTY:
22    Q.    Do you recall in particular
23 that the drafts were completed before the
24 IARC proceedings in 2006?
25        MR. BOWDEN: Form.

124  (Pages 490 to 493)

Robert Glenn

Page 494

1      THE WITNESS: Yes, I remember
2   now, in one of Ridge's letters I
3   looked at earlier, he stated dates,
4   target dates, that we would like to
5   see the papers, yes.
6   QUESTIONS BY MR. HEGARTY:
7      Q.   Those target dates were in
8   2005?
9      A.   Yes.
10      Q.   Now, after the white paper was
11   finished, do you understand that
12   Drs. Huncharek and Muscat, without any
13   involvement from Imerys and J&J, created a
14   new Critical Review white paper that they --
15   ultimately was published in the European
16   Journal of Cancer Epidemiology?
17      MR. BOWDEN: Objection to form.
18      THE WITNESS: Yes.
19   QUESTIONS BY MR. HEGARTY:
20      Q.   To your knowledge, was Johnson
21   & Johnson even aware that Drs. Muscat and
22   Huncharek were trying to publish the Critical
23   Review white paper in the European Journal of
24   Cancer Epidemiology?
25      MR. BOWDEN: Objection to form.

Page 495

1      THE WITNESS: I don't think
2   they were aware of it.
3   QUESTIONS BY MR. HEGARTY:
4      Q.   So would it be correct to say
5   that you're not aware of Johnson & Johnson
6   having any involvement whatsoever in the
7   content of the Critical Review article that
8   was published?
9      MR. BOWDEN: Form.
10      THE WITNESS: That's correct.
11   QUESTIONS BY MR. HEGARTY:
12      Q.   Now, are you aware of any
13   communications by Drs. Huncharek and Muscat
14   with Johnson & Johnson about the published
15   Critical Review paper?
16      A.   I am not.
17      Q.   You were shown the published
18   Critical Review paper. Do you happen to have
19   that paper in front of you, Doctor? I think
20   it was marked as an exhibit.
21      MR. DONATH: 18.
22      MR. HEGARTY: Exhibit 18.
23      THE WITNESS: Boy, you're good.
24   QUESTIONS BY MR. HEGARTY:
25      Q.   Do you recall prior to looking

Page 496

1   at Exhibit Number 18, the published Critical
2   Review white paper, being shown Exhibit
3   Number 17, which was the white paper that had
4   comments included in the white paper?
5      Do you recall that larger
6   document?
7      A.   Yes, I do.
8      Q.   And have you had a chance to do
9   a side-by-side comparison between the white
10   paper that was generated under the contract
11   with Crowell & Moring and the published
12   paper, Exhibit Number 18, that eventually
13   made its way into the public domain?
14      A.   I have not done a side-by-side.
15   I've read the paper. I think the paper is a
16   good paper.
17      Q.   Plaintiff's counsel showed you
18   the disclosure that Drs. Muscat and Huncharek
19   made as part of this paper.
20      First of all, is it correct
21   that the lead author is responsible for doing
22   the acknowledgements or the disclosure in a
23   paper?
24      A.   It's -- it could be a combined,
25   but usually the lead author is certainly the

Page 497

1   one that has correspondence back and forth
2   with the journal editor and is the one
3   responsible that they follow the guidelines
4   for a manuscript.
5      Q.   I think you mentioned earlier
6   you did not have a chance to read
7   Dr. Muscat's testimony about why he worded
8   the acknowledgement section as he did; is
9   that correct?
10      A.   I have not seen that.
11      Q.   And counsel for plaintiffs did
12   not show you Dr. Muscat's testimony about why
13   he worded the acknowledgement the way he did,
14   correct?
15      MR. BOWDEN: Objection. Form.
16      THE WITNESS: No counsel didn't
17   show me his testimony.
18   QUESTIONS BY MR. HEGARTY:
19      Q.   As far as the best source of
20   why the acknowledgement was worded as it was,
21   would that be either Dr. Muscat or
22   Dr. Huncharek?
23      MR. BOWDEN: Objection. Form.
24      THE WITNESS: Yes, they would
25   have been responsible for that.

125 (Pages 494 to 497)

Robert Glenn

Page 498

1  QUESTIONS BY MR. HEGARTY:
2      Q.   Did you have any communication
3  with them at all about the preparation of the
4  acknowledgement section in this published
5  paper?
6      A.   No.
7      Q.   And have you -- did plaintiff's
8  counsel show you Dr. Muscat's testimony from
9  his deposition where he said that he wrote
10  this article, Exhibit 18, as a new article,
11  independent of the Critical Review white
12  paper?  Have you seen that testimony?
13         MR. BOWDEN:  Objection to form.
14         THE WITNESS:  I have not seen
15     that.
16  QUESTIONS BY MR. HEGARTY:
17      Q.   And did plaintiff's counsel
18  show you Dr. Muscat's testimony where he said
19  that the funds for the article that was
20  published did not come from the original
21  Crowell & Moring contract but from the NIH
22  grant that he references in this
23  acknowledgement?  Did they show you that
24  testimony?
25         MR. BOWDEN:  Objection to form.

Page 499

1         THE WITNESS:  They did not show
2     me that.
3  QUESTIONS BY MR. HEGARTY:
4      Q.   Are you aware that Dr. Muscat
5  still considers this disclosure to be a
6  proper disclosure for this review paper?
7         MR. BOWDEN:  Form.
8         THE WITNESS:  I've not had any
9     communication with Dr. Muscat
10     regarding that question.
11  QUESTIONS BY MR. BOWDEN:
12      Q.   In your dealings with
13  Dr. Muscat, did you find him to be a highly
14  qualified scientist?
15         MR. BOWDEN:  Form.
16         THE WITNESS:  Yes, I did.
17  QUESTIONS BY MR. HEGARTY:
18      Q.   Did you respect him as a
19  scientist?
20      A.   Yes, I did.
21         He had worked at the American
22  Health Foundation with Dr. Ernst Wynder, who
23  was responsible mainly for linking cigarette
24  smoking to lung cancer.  And they had
25  impeccable credentials, the American Health

Page 500

1  Foundation and Dr. Wynder, and he published a
2  lot about cigarette smoking with Dr. Wynder.
3         MR. BOWDEN:  Form.
4         THE WITNESS:  Surely that would
5     give me confidence that he was a
6     credible researcher.
7  QUESTIONS BY MR. HEGARTY:
8      Q.   And with regard to the
9  preparation of the Critical Review white
10  paper and its relationship to the -- I'm
11  sorry, let me start over again.
12         With regard to the preparation
13  of the Critical Review paper that was
14  published in relationship to the Critical
15  Review white paper, would you defer to
16  Dr. Muscat as far as what was done between
17  the two papers?
18      A.   Yes.  Certainly.  I don't think
19  we commented at all on any of the manuscripts
20  they submitted.  It was only on the reports.
21      Q.   So would it be a correct
22  statement that you never provided comments on
23  the actual manuscripts that were being
24  submitted to the journals for their
25  consideration?

Page 501

1      A.   That's correct.
2         MR. BOWDEN:  Objection to form.
3  QUESTIONS BY MR. HEGARTY:
4      Q.   You mentioned even earlier
5  that -- in response to plaintiff's counsel
6  question, and I think you were cut off --
7  that it would be improper to reference you in
8  the published Critical Review paper.
9         Do you recall wanting to make
10  that statement?
11      A.   Yes.
12      Q.   Can you tell us why it would be
13  improper for you to have been listed there?
14      A.   Journals have gotten much more
15  stringent in the last ten years or so about
16  who is an author and who is not an author,
17  and you pretty much have to assert and
18  essentially have to have some strong support that the
19  person contributed in a meaningful way.
20         Example, the two papers that
21  we've just published on industrial sand.  On
22  the medical portion of the paper, the medical
23  paper, the epidemiology, because the
24  radiologist read the X-rays, we included him.
25         On the dust exposure part --

126  (Pages 498 to 501)

Robert Glenn

Page 502

1    paper that was submitted, they were not
2    included because they didn't have anything to
3    do with dust exposure.
4            So you -- now they're wanting
5    you to be -- they want to be assured that the
6    authors really had something to do with the
7    paper.
8            Sometimes in the past it was a
9    research group, would list a lot of names,
10   just -- that's changed.
11       Q.    So would it be improper for
12   Drs. Huncharek and Muscat to have listed you
13   on either of the papers, the diaphragm study
14   or the Critical Review study?
15           MR. BOWDEN:  Objection.  Form.
16           THE WITNESS:  If I had known
17   about it, I wouldn't have let them
18   list me on the paper.
19   QUESTIONS BY MR. HEGARTY:
20       Q.    Would it be proper for anyone
21   to argue that the diaphragm study and the
22   Critical Review study were written so that
23   Johnson & Johnson or Imerys could try to
24   influence scientists or regulators as to the
25   safety of talcum powder products?

Page 503

1            MR. BOWDEN:  Objection to form.
2            THE WITNESS:  No, it wouldn't.
3    No, it was not that way.
4    QUESTIONS BY MR. HEGARTY:
5        Q.    Would that be an improper
6    argument to make?
7        A.    Yeah.
8            MR. BOWDEN:  Objection.
9    QUESTIONS BY MR. HEGARTY:
10       Q.    Are you aware of anyone in the
11   scientific community identifying any
12   inaccuracies in the Critical Review paper
13   that was published with -- by Drs. Huncharek
14   and Muscat?
15       A.    I think I mentioned it.  I
16   don't recall any letter to the editor being
17   submitted that took exception with anything
18   they said in that paper.
19       Q.    And as to the Critical Review
20   paper, have there been other papers published
21   that have reached the same conclusions?
22           MR. BOWDEN:  Objection.  Form.
23           THE WITNESS:  I can't think of
24   any now, but I'm totally --
25   essentially -- you know, in a way the

Page 504

1    IARC did that in what they said about
2    those most informative studies.
3            The weight of the evidence
4    seemed to be that it was not a
5    relationship.
6    QUESTIONS BY MR. HEGARTY:
7        Q.    You were also asked a little
8    bit about providing comments on the white
9    papers.
10           Is there anything wrong with --
11   in the context of an author working on a
12   white paper and showing it to others, and
13   others providing comments with regard to
14   grammar, wording, making sure that the -- the
15   paper was easily understandable?  Is there
16   anything wrong with that?
17       A.    No, and I'd go a little further
18   than that.  If something is left out that
19   would add to the paper and the author knew --
20   and it was brought to the author's attention,
21   they may want to put that in.
22       Q.    In your experience, has such a
23   process been helpful in making sure the paper
24   properly communicates the information and to
25   identify any unforeseen problems in the way

Page 505

1    the data is presented?
2            MR. BOWDEN:  Objection to form.
3            THE WITNESS:  Yes.
4    QUESTIONS BY MR. HEGARTY:
5        Q.    And when articles are reviewed
6    for peer review, do reviewing scientists
7    provide comments on the articles?
8        A.    In peer review?
9        Q.    Yes.
10       A.    It's usually someone from the
11   editorial board, and sometimes the editorial
12   board will go outside if they don't have
13   expertise themselves to review the
14   manuscript.
15       Q.    Is that a proper thing to do
16   and standard practice?
17       A.    Of course, yes.
18           MR. BOWDEN:  Object to form.
19   QUESTIONS BY MR. HEGARTY:
20       Q.    And does providing comments in
21   the course of peer review make the reviewers
22   authors, where they need to be included on
23   the author line or in the acknowledgement
24   section?
25           MR. BOWDEN:  Objection.  Form.

127 (Pages 502 to 505)

Robert Glenn

Page 506

1    THE WITNESS:  Not at all.
2    QUESTIONS BY MR. HEGARTY:
3        Q.    In your experience, when you
4    make comments on a white paper or otherwise,
5    does that make you an author?
6        MR. BOWDEN:  Objection.  Form.
7        THE WITNESS:  No, it does not.
8    QUESTIONS BY MR. HEGARTY:
9        Q.    In the end, is it up to the
10   authors to consider the comments and decide
11   whether to include any suggestions and make
12   them their own?
13       A.    That is up to them, yes.
14       MR. BOWDEN:  Objection.  Form.
15   QUESTIONS BY MR. HEGARTY:
16       Q.    And to your knowledge, did any
17   comments that were made to the white papers
18   change the substance of the papers?
19       A.    Not the substance.  I think, as
20   I mentioned earlier, Dr. Muscat was not very
21   familiar with the mineralogical literature,
22   and that was pointed out to him and it got
23   straightened out.
24       Q.    Did any of the comments
25   provided actually change the results or

Page 507

1    conclusions of the papers?
2        A.    No, it did not.
3        Q.    Would you ever advocate to
4    change data, results or conclusions from a
5    study to benefit anyone?
6        MR. BOWDEN:  Objection.  Form.
7        THE WITNESS:  No, I would not.
8    QUESTIONS BY MR. HEGARTY:
9        Q.    And did that happen here?
10       MR. BOWDEN:  Objection.  Form.
11       THE WITNESS:  No, it did not.
12   QUESTIONS BY MR. HEGARTY:
13       Q.    You were also asked about your
14   involvement in the IARC meeting back in 2006.
15       Do you recall those questions?
16       A.    Yes.
17       Q.    And from your standpoint as to
18   Dr. Muscat's work, did he approach being an
19   observer as an independent scientist where
20   his -- where his contributions were based
21   solely on the data and not being an advocate
22   of any position?
23       MR. BOWDEN:  Objection to form.
24       THE WITNESS:  Yes.
25

Page 508

1    QUESTIONS BY MR. HEGARTY:
2        Q.    And you mentioned earlier that
3    Dr. Muscat was there and supported by an
4    industry group, the Industrial Minerals
5    Association?
6        A.    Yes.
7        Q.    And was that allowed under
8    IARC's rules?
9        A.    Yes.
10       And there were some Luzenac
11   people in that group, too.
12       Q.    Why does IARC want industry
13   observers or sponsor scientists there?
14       A.    They're a stakeholder,
15   essentially, and they -- industry supports
16   research and has researchers as well and
17   scientists that can contribute, and I would
18   think they'd welcome that.
19       Q.    That was going to be my next
20   question.
21       Do they actually welcome the
22   expertise that the observers can bring to the
23   process?
24       MR. BOWDEN:  Objection to form.
25       THE WITNESS:  I think they do.

Page 509

1    QUESTIONS BY MR. HEGARTY:
2        Q.    We asked -- strike that.
3        You were asked about Dr. Muscat
4    making comments as an observer as to the data
5    regarding talc pleurodesis.
6        Do you recall those questions?
7        A.    I'm sorry, I was drifting off.
8        Q.    That's all right.  I'll try to
9    finish very quickly.
10       A.    That's all right.
11       Q.    Do you recall Dr. Muscat --
12   strike that.
13       Do you recall questions being
14   asked about Dr. Muscat making comments as an
15   observer as to use of talc and pleurodesis?
16       A.    Yes.
17       Q.    I believe you described a
18   little bit what talc pleurodesis is, but
19   that's actually injection of talc in a slurry
20   into the lung cavity?
21       A.    It's into the pleural space.
22       MR. BOWDEN:  Objection to form.
23   QUESTIONS BY MR. HEGARTY:
24       Q.    Into the pleural space?
25       A.    Yeah, the -- the two membranes

128  (Pages 506 to 509)

Robert Glenn

Page 510

1  which surround the lung, and there's a small
2  amount of fluid.  And if you've ever had
3  pleurisy, you know what the pleura can be.
4      Q.    And why was it important for
5  the working group to consider the data on
6  talc used in pleurodesis?
7          MR. BOWDEN:  Form.
8          THE WITNESS:  I think it has
9      strong relevance to discount the
10     relationship between -- proposed
11     relationship between talc exposure,
12     perineal talc exposure, and ovarian
13     cancer.
14 QUESTIONS BY MR. HEGARTY:
15     Q.    In fact, if talc was a
16 carcinogen, what would you expect to see from
17 that data?
18         MR. BOWDEN:  Objection.  Form.
19     Calls for an opinion.
20         THE WITNESS:  You would -- you
21     would expect to see anyone that had a
22     longevity of probably ten years, after
23     undergoing pleurodesis, dead.
24 QUESTIONS BY MR. HEGARTY:
25     Q.    But what did the data show

Page 511

1  instead?
2      A.    It showed that it does not have
3  an effect.
4      Q.    What did that say about the
5  association between talc use and ovarian
6  cancer?
7          MR. BOWDEN:  Objection to form.
8      Calls for expert testimony.
9          THE WITNESS:  I think that -- I
10     think it is -- you can relate that.
11     You can transfer that knowledge to the
12     epithelial ovarian cells as well.
13 QUESTIONS BY MR. HEGARTY:
14     Q.    Did the panel working group
15 accept the data on talc use as pleurodesis?
16     A.    I think they were enlightened
17 by it.  I believe it's possible that
18 Dr. Antony, who was on another panel, was
19 asked by the epidemiology group to come give
20 them a pleurodesis 101.
21         And in fact, IARC brought in a
22 researcher who wasn't on a working group who
23 had done research in that area, too.  I think
24 her name was Dr. Dressler.
25     Q.    And in providing that data, did

Page 512

1  Dr. Muscat do what observers are expected to
2  do:  provide information that might be
3  helpful to the working group as part of
4  evaluating the issue?
5      A.    Yes.
6          MR. BOWDEN:  Form.
7  QUESTIONS BY MR. HEGARTY:
8      Q.    Counsel for plaintiffs kept
9  referring to the talc pleurodesis data as
10 your strategy.  But just to make clear, the
11 data that we've been talking about is data
12 that was generated by scientists who were
13 looking at this issue before you ever looked
14 at the issue, correct?
15     A.    Yeah, I --
16         MR. BOWDEN:  Objection to form.
17         THE WITNESS:  I thought of it
18     because of my experience with my son
19     undergoing an open thoracotomy and
20     talc installation.  And so I started
21     researching the literature, and that's
22     where I found the British study, the
23     Lange study, and one other study, and
24     I thought those could be buttressed by
25     a more sound -- by a stronger study.

Page 513

1  QUESTIONS BY MR. HEGARTY:
2      Q.    In essence, you found that you
3  weren't the first one to think about that?
4          MR. BOWDEN:  Objection to form.
5          THE WITNESS:  Yeah, I can't
6      take credit totally for it.
7  QUESTIONS BY MR. HEGARTY:
8      Q.    In fact, you found a number of
9  studies where the authors thought that the
10 results of that data was relevant to show
11 that talc doesn't cause cancer?
12         MR. BOWDEN:  Form.
13         THE WITNESS:  Yes.  And then
14     when I -- when I found Dr. Antony and
15     met with her at the American Thoracic
16     Society, I was more reinforced by her
17     that there's not a relationship.
18 QUESTIONS BY MR. HEGARTY:
19     Q.    You were not the source,
20 though, of any that data.
21     A.    No.
22     Q.    That data was in the public
23 domain?
24     A.    Yes.
25     Q.    And was that data available to

129 (Pages 510 to 513)

Robert Glenn

Page 514

1    anyone who wanted to review it?
2        A.    Yes.
3            MR. BOWDEN:  Objection.  Form.
4    QUESTIONS BY MR. HEGARTY:
5        Q.    Now, we talked a moment ago
6    about IARC's conclusions from the
7    proceedings, and that was that they
8    categorized talc as 2B, possibly
9    carcinogenic, correct?
10       A.    Yes.
11       Q.    IARC did not conclude that talc
12   is a carcinogen, correct?
13           MR. BOWDEN:  Objection to form.
14           THE WITNESS:  No.
15   QUESTIONS BY MR. HEGARTY:
16       Q.    Did IARC conclude that talc is
17   a probable carcinogen?
18       A.    No.
19       Q.    In terms of classifying talc as
20   category B, has IARC classified a number of
21   substances that we as a public consume or use
22   every day?  In particular, did it classify
23   coffee as 2B?
24           MR. BOWDEN:  Objection.  Form.
25           THE WITNESS:  I believe it did.

Page 515

1        There were a number of dietary things
2        that they've looked at and...
3    QUESTIONS BY MR. HEGARTY:
4        Q.    And have they classified
5    pickled vegetables as 2B?
6            MR. BOWDEN:  Form.
7            THE WITNESS:  I'm taking your
8        representation.
9    QUESTIONS BY MR. HEGARTY:
10       Q.    Do you recall they classified
11   whole leaf aloe vera as 2B?
12           MR. BOWDEN:  Objection.
13           THE WITNESS:  And probably if
14       they looked at smoked meat they would
15       do that.  I don't know if they have.
16   QUESTIONS BY MR. HEGARTY:
17       Q.    I believe they may have
18   classified red meat as probably carcinogenic.
19       Are you familiar with that?
20       A.    Yes, I think they did.
21       Q.    But in the end, did they
22   classify talc as a carcinogen or even a
23   probable carcinogen?
24           MR. BOWDEN:  Objection to form.
25           THE WITNESS:  No, they did not.

Page 516

1    QUESTIONS BY MR. HEGARTY:
2        Q.    You were asked a few questions
3    about Dr. Muscat's disclosure of his
4    interests as part of the IARC process where
5    he acted as an observer.
6            Do you recall those questions?
7        A.    I'm sorry.
8        Q.    That's okay.
9            You were asked a couple of
10   questions about Dr. Muscat's disclosure of
11   his interests as being an observer in the
12   IARC proceedings.
13           Do you recall that?
14       A.    Yes.
15       Q.    Have you had a chance to talk
16   to Dr. Muscat about why he made his
17   disclosures as an observer as he did?
18       A.    I have not.  I haven't had any
19   communication with Joshua in years, probably
20   not since I left Crowell & Moring.
21       Q.    Do you know whether at the time
22   of his disclosure if he still considered
23   himself to be working under the Crowell &
24   Moring contracts?
25           MR. BOWDEN:  Objection to form.

Page 517

1            THE WITNESS:  I don't know.  As
2        I say, he was -- his freight was paid
3        by IMA.
4    QUESTIONS BY MR. HEGARTY:
5        Q.    Was -- would Dr. Muscat be the
6    best source of information to answer
7    questions as to why he made the disclosure
8    that he did the way he did?
9            MR. BOWDEN:  Objection.  Form.
10           THE WITNESS:  Yes, he
11       absolutely would.
12   QUESTIONS BY MR. HEGARTY:
13       Q.    So would you defer to him as
14   far as the reason he included in his
15   disclosure the Industrial Minerals
16   Association?
17       A.    Most certainly.
18           MR. HEGARTY:  Go off the record
19       for a minute.
20           VIDEOGRAPHER:  Going off the
21       record at 6:02.  Going off the record.
22       (Off the record at 6:02 p.m.)
23           VIDEOGRAPHER:  Okay.  The time
24   is now 6:04.  Back on record.
25

130  (Pages 514 to 517)

Robert Glenn

| Page 518 | Page 520 |
|---|---|
| 1   QUESTIONS BY MR. HEGARTY:<br>2      Q.    Mr. Glenn, just a few more<br>3   questions, then I'll be finished.<br>4            You were asked a number of<br>5   questions about J&J and its activities and<br>6   shown a number of documents that made<br>7   reference to J&J, in particular Steven Mann.<br>8            Do you recall those questions<br>9   and those documents?<br>10     A.    Yes, I do.<br>11     Q.    Mr. Glenn, have you ever worked<br>12   for Johnson & Johnson?<br>13     A.    No, I have not.<br>14     Q.    And again, you were shown a<br>15   number of documents by plaintiff's counsel,<br>16   but have you had a chance to review the<br>17   hundreds and thousands of other documents<br>18   that have been provided by Johnson & Johnson<br>19   to plaintiff's counsel concerning studies,<br>20   funding, the science and other issues we<br>21   discussed today?<br>22         MR. BOWDEN:  Objection.  Form.<br>23         THE WITNESS:  No, I have not.<br>24   QUESTIONS BY MR. HEGARTY:<br>25     Q.    And were you ever involved in | 1         MR. BOWDEN:  Objection.<br>2         THE WITNESS:  Yes, they were.<br>3   QUESTIONS BY MR. HEGARTY:<br>4      Q.    And was that important because<br>5   of concerns that the science was being<br>6   misunderstood and/or not being properly<br>7   characterized?<br>8         MR. BOWDEN:  Objection.  Form.<br>9         THE WITNESS:  Yes, that's<br>10     correct.<br>11   QUESTIONS BY MR. HEGARTY:<br>12     Q.    And from your standpoint, when<br>13   the science was properly understood and<br>14   characterized, did it show unequivocally that<br>15   talcum powder is safe to use?<br>16         MR. BOWDEN:  Objection.  Form.<br>17         THE WITNESS:  In my opinion it<br>18     did, as well as many other scientists<br>19     hold the same opinion.<br>20   QUESTIONS BY MR. HEGARTY:<br>21     Q.    Did that science, when properly<br>22   understood and characterized, show that<br>23   talcum powder products do not cause ovarian<br>24   cancer?<br>25         MR. BOWDEN:  Objection.  Form. |

| Page 519 | Page 521 |
|---|---|
| 1   any decision-making process at Johnson &<br>2   Johnson concerning the funding of studies?<br>3      A.    No, I was not.<br>4      Q.    As to the communication that<br>5   you were shown involving Steven Mann, did you<br>6   ever speak to Mr. Mann about those<br>7   communications or any internal discussions or<br>8   decision-making processes at Johnson &<br>9   Johnson as they relate to the funding of<br>10   studies?<br>11     A.    No, I did not, and I don't<br>12   think I ever person -- in person met Steven<br>13   Mann.<br>14     Q.    In fact, can you speak for<br>15   Mr. Mann as to the words he chose or what he<br>16   meant by any of the documents you looked at<br>17   today?<br>18         MR. BOWDEN:  Objection.  Form.<br>19         THE WITNESS:  No way.<br>20   QUESTIONS BY MR. HEGARTY:<br>21     Q.    And from your standpoint, were<br>22   both Johnson & Johnson and Imerys properly<br>23   focused on evaluating the science and getting<br>24   the science out there so that everyone can<br>25   make a well-informed decision? | 1         THE WITNESS:  Yes.  Yes.<br>2   QUESTIONS BY MR. HEGARTY:<br>3      Q.    And would any decision by NTP<br>4   or IARC concluding otherwise, in your view,<br>5   have been wrong and actually provided a<br>6   disservice to the public?<br>7         MR. BOWDEN:  Objection to form.<br>8         THE WITNESS:  Yes, it would.<br>9         MR. HEGARTY:  Okay.  That's all<br>10     the questions I have.  Thank you.<br>11         VIDEOGRAPHER:  The time is now<br>12     6:07.  Going off the record.<br>13     (Off the record at 6:07 p.m.)<br>14         VIDEOGRAPHER:  All right.  Time<br>15     is now 6:10.  Back on the record.<br>16         CROSS-EXAMINATION<br>17   QUESTIONS BY MR. BILLINGS-KANG:<br>18     Q.    Hello, Mr. Glenn.  How are you<br>19   today?<br>20     A.    Just fine.<br>21     Q.    My name is James Billings-Kang.<br>22   I represent Personal Care Products Council.<br>23         Now, you and I have never met<br>24   before today; is that correct?<br>25     A.    We have not. |

131 (Pages 518 to 521)

Robert Glenn

Page 522

1    Q.    In fact, during the break off
2  the record, you asked me who I represented.
3        Do you recall that I mentioned
4  that I represent Personal Care Products
5  Council?
6    A.    I do.
7    Q.    And do you recall that you
8  mentioned -- you didn't know who that was?
9        MR. BOWDEN:  Objection to form.
10       THE WITNESS:  It went by
11    another name, mostly, when I was
12    involved with the Cosmetic Toiletries
13    Fragrance Association.
14  QUESTIONS BY MR. BILLINGS-KANG:
15    Q.    And it was I who represented
16  that to you --
17    A.    Yes.
18    Q.    -- that it was formerly called
19  the CTFA; is that correct?
20    A.    Right.  Right.
21    Q.    Do you know when the CTFA
22  changed its name?
23    A.    I do not.
24    Q.    Well, I'll represent to you
25  that it changed its name in 2007.

Page 523

1    A.    Oh.
2    Q.    So based on that name change,
3  is it -- is it right to infer that you had no
4  communication with CTFA or PCPC after 2007?
5        MR. BOWDEN:  Objection to form.
6        THE WITNESS:  It would have
7    been around that time.
8  QUESTIONS BY MR. BILLINGS-KANG:
9    Q.    Okay.  So the last time -- when
10  was the last time you think, if you can
11  approximate?
12    A.    It would have been near that
13  time.  You know, the correspondence we saw, I
14  would have to go back through and find a
15  date.
16        But Dr. Loretz, I believe,
17  and -- was involved in some of that, but I
18  haven't had any contact lately.
19    Q.    Aside from Dr. Loretz, do you
20  know anyone else who was ever employed or
21  represented PCPC or CTFA?
22    A.    I might, but I think there was
23  a Kathleen Willy that was involved in some of
24  the phone calls, possibly.
25    Q.    And had you ever met either of

Page 524

1  them in person?
2    A.    I may have met Dr. Loretz, but
3  I don't really recall that I did.
4    Q.    Was it a private meeting?
5    A.    It would have been a business
6  meeting on the science issue, but not
7  private, no.  It would have been a group.
8    Q.    Who else would have been in
9  that meeting?
10    A.    Probably others that have
11  appeared in some of these documents today and
12  the e-mails and such.
13    Q.    Would it have been other people
14  besides PCPC representatives and employees?
15    A.    Yes, it could be.
16    Q.    Now, have you ever directly,
17  privately, corresponded with Dr. Loretz or
18  anyone from CTFA or PCPC?
19    A.    You say privately?
20    Q.    Correct, one --
21    A.    No.
22    Q.    For instance --
23    A.    No.  One communication, no.
24    Q.    Just to clarify --
25    A.    Yeah.

Page 525

1    Q.    -- no one else beyond PCPC or
2  CTFA in these communications have you ever
3  had a direct correspondence?
4    A.    No.
5    Q.    Now, have you ever been
6  employed by CTFA or PCPC?
7    A.    No, I have not.
8    Q.    Have you ever entered into any
9  agreement with PCPC?
10    A.    No, I have not.
11    Q.    Have you ever had any
12  communication concerning PCPC's funding of
13  studies?
14        MR. BOWDEN:  Objection.  Form.
15        THE WITNESS:  I have not had
16    any internal communications with them
17    about their funding of studies, no.
18  QUESTIONS BY MR. BILLINGS-KANG:
19    Q.    And have you ever received a
20  payment from PCPC or CTFA?
21    A.    I have not in any capacity, no.
22    Q.    Mr. Glenn, do you know where
23  PCPC's office is at?
24    A.    I do not.  I know it's in
25  Washington, DC.

133 (Pages 522 to 525)

Robert Glenn

| Page 526 | Page 528 |
|---|---|
| 1    Q.    Have you ever been to any | 1  questions asking about consumers, right? |
| 2  former office location at all? | 2  Customers? |
| 3    A.    No, I have not. | 3    A.    Yes. |
| 4    Q.    And have you ever been directed | 4    Q.    All right.  And I believe your |
| 5  by PCPC in any way? | 5  testimony was along the lines of that one of |
| 6    A.    No. | 6  objectives of Luzenac at the time was to work |
| 7    Q.    Now, of course there were lots | 7  closely with body powder customers to ensure |
| 8  of discussions about -- I'm going to talk | 8  a coordinated approach, right? |
| 9  about the two white papers by Huncharek and | 9    A.    That was in their strategy, |
| 10  Muscat. | 10  yes. |
| 11    A.    Yeah. | 11    Q.    Right. |
| 12    Q.    Are you aware of any | 12          And so the coordinated approach |
| 13  involvement by CTFA or PCPC with those two | 13  was the industry's position on whether talc |
| 14  white papers? | 14  causes ovarian cancer, correct? |
| 15    A.    I don't recall any -- receiving | 15          MR. HEGARTY:  Objection to |
| 16  any comments from them on those papers at | 16      form. |
| 17  all. | 17          MR. DONATH:  Objection.  Form. |
| 18    Q.    Okay.  So from your standpoint, | 18          THE WITNESS:  No, I don't think |
| 19  PCPC or CTFA did not provide any comments or | 19      that was what they meant in this |
| 20  edits to any of those two white papers? | 20      document. |
| 21    A.    No, I don't believe they did. | 21  QUESTIONS BY MR. BOWDEN: |
| 22          MR. BILLINGS-KANG:  I think | 22    Q.    What do you think they meant in |
| 23      that's all I have, and good luck | 23  this document? |
| 24      against the Wolfpack. | 24    A.    I don't have any idea what they |
| 25          THE WITNESS:  Oh, thank you. | 25  meant, but I don't think that was it based |

| Page 527 | Page 529 |
|---|---|
| 1          MR. BOWDEN:  Take a brief break | 1  upon the content of the other documents, some |
| 2      if that's all right. | 2  which are very laudable. |
| 3          VIDEOGRAPHER:  The time is now | 3    Q.    Have you ever heard the company |
| 4      6:15.  Going off the record. | 4  say anything other than their position being |
| 5      (Off the record at 6:15 p.m.) | 5  that ovarian cancer is not caused by talc? |
| 6          VIDEOGRAPHER:  Okay.  The time | 6          MR. DONATH:  Objection.  Form. |
| 7      is now 6:22.  Back on the record. | 7          MR. HEGARTY:  Objection.  Form. |
| 8          REDIRECT EXAMINATION | 8          THE WITNESS:  The Rio Tinto or |
| 9  QUESTIONS BY MR. BOWDEN: | 9      Luzenac saying that? |
| 10    Q.    All right, Mr. Glenn, we're in | 10  QUESTIONS BY MR. BOWDEN: |
| 11  the homestretch here. | 11    Q.    Yes, sir. |
| 12    A.    Okay. | 12    A.    I'm sorry, state the question. |
| 13    Q.    I'm going to ask you to turn to | 13  I'm just -- it's been a long day. |
| 14  Exhibit 29. | 14    Q.    I know.  And I promise you I'm |
| 15    A.    All right. | 15  going to keep this brief for you. |
| 16    Q.    That's P1.0188. | 16    A.    All right.  Okay. |
| 17    A.    Yeah, I have it. | 17    Q.    My question though is -- strike |
| 18    Q.    And you recall that counsel | 18  that. |
| 19  just a moment ago showed you this document? | 19          When you were having a |
| 20  Remember just discussing this with him? | 20  discussion with counsel about these |
| 21    A.    Yes. | 21  objectives -- |
| 22    Q.    I want you to go to page 3 | 22    A.    Yes. |
| 23  and -- where it says "Objectives"? | 23    Q.    -- you pointed out that we went |
| 24    A.    Yes. | 24  through a couple of bullet points but not all |
| 25    Q.    Counsel and you had a series of | 25  of them, right? |

Robert Glenn

| Page 530 |
| --- |

1    A.   Yes.
2    Q.   You made that point?
3    A.   Yes.
4    Q.   And then he went through and
5  said, "The other objectives are to provide
6  information to customers and their employees
7  and consumers to ensure the safe handling and
8  use of talc."
9    A.   Yes.
10   Q.   All right.  What, if anything,
11  after the IARC proceedings did you see Imerys
12  do differently as it relates to information
13  being given to employees and consumers?
14         MR. DONATH:  Objection to form.
15         THE WITNESS:  Yeah, I was not
16    involved with them much after that.  I
17    don't know what they did.  I don't
18    know if they carried out this strategy
19    or not.
20  QUESTIONS BY MR. BOWDEN:
21   Q.   The answer is that as you sit
22  here today nothing, right?
23         MR. DONATH:  Objection to form.
24         MR. DAVANT:  Objection.
25         MR. BILLINGS-KANG:  Objection.

| Page 531 |
| --- |

1         THE WITNESS:  I don't know.
2  QUESTIONS BY MR. BOWDEN:
3    Q.   You can't give me one single
4  item, one list -- if we were to make a list
5  of what did they do following the IARC
6  proceedings to inform consumers that the IARC
7  had considered talc to be a 2B carcinogen,
8  you can't name a single thing, can you?
9         MR. BILLINGS-KANG:  Objection.
10    Form.
11         MR. DONATH:  Objection.  Form.
12    Asked and answered.
13         THE WITNESS:  I can't answer
14    that.  I don't know what they did.  I
15    just know that this was their
16    strategy.
17  QUESTIONS BY MR. BOWDEN:
18   Q.   Right.
19         But you don't know if they ever
20  implemented the strategy?
21    A.   Of course not.
22   Q.   Okay.
23         MR. DONATH:  Objection to form.
24         THE WITNESS:  I don't.
25

| Page 532 |
| --- |

1  QUESTIONS BY MR. BOWDEN:
2    Q.   Okay.  I just want to be clear.
3    A.   That's not to say they didn't
4  implement parts of it.  I just don't know.
5    Q.   "Develop credible messages and
6  identify third-party spokespeople to present
7  Rio Tinto Minerals' and other agencies' view
8  that there is insufficient evidence that talc
9  is unsafe."
10         Do you know if they implemented
11  that strategy?
12    A.   I do not know.
13   Q.   What are the consequences if
14  their view is wrong?
15         MR. DONATH:  Objection to form.
16  QUESTIONS BY MR. BOWDEN:
17   Q.   What are the consequences if
18  their view is wrong?
19         MR. DONATH:  Same objection.
20  QUESTIONS BY MR. BOWDEN:
21   Q.   Their view being the talc does
22  not increase the risk of ovarian cancer?
23         MR. HEGARTY:  Objection.  Form.
24         THE WITNESS:  I don't think it
25    does.

| Page 533 |
| --- |

1  QUESTIONS BY MR. BOWDEN:
2    Q.   I'm not asking you if it does.
3  I'm asking you if they're wrong, what are the
4  consequences?
5    A.   I'm not going to speculate on
6  what the consequence would be.
7    Q.   Well, one of the consequences
8  might be that women continue to use their
9  product and get ovarian cancer, right?
10         MR. DONATH:  Objection to form.
11         THE WITNESS:  That's your
12    opinion, yes.
13  QUESTIONS BY MR. BOWDEN:
14   Q.   If talc increases the risk of
15  ovarian cancer and the industry's view on
16  this is wrong, that it doesn't, the
17  consequence of being wrong is that women
18  continue to apply a carcinogen to their
19  bodies, correct?
20         MR. HEGARTY:  Objection.  Asked
21    and answered.
22         MR. DONATH:  Objection to form.
23         MR. BILLINGS-KANG:  Objection
24    to form.
25         THE WITNESS:  They might choose

Robert Glenn

Page 534

1    to do that, yes.
2    QUESTIONS BY MR. BOWDEN:
3        Q.   And let's just be, I mean, very
4    candid here. Baby powder, body powder, you
5    don't have to use talc to make it.
6            MR. HEGARTY: Objection. Form.
7            MR. DONATH: Objection to form.
8    QUESTIONS BY MR. BOWDEN:
9        Q.   You understand that cornstarch
10   is offered by some other companies, right?
11       A.   I don't know about cornstarch.
12   I know about talc.
13       Q.   But you don't know about --
14       A.   You brought up a good point.
15   You call that baby powder.
16       Q.   I'm talking about talcum
17   powder.
18       A.   I'm sorry.
19       Q.   No, sir, this is not your
20   opportunity --
21       A.   You said baby -- you said baby
22   powder.
23       Q.   Yeah, products like Johnson &
24   Johnson baby powder.
25       A.   It brought up a question that I

Page 535

1    have --
2        Q.   Sir, you don't get to ask
3    questions.
4        A.   -- and that is -- no, all
5    right, I won't ask a question. I'll
6    formulate something.
7        Q.   Sir, you don't get to --
8        A.   All -- where are all the --
9    where are all the mesotheliomas from babies
10   that were powdered -- had their butts
11   powdered for two or three years with baby
12   powder, talcum powder? Where are they?
13       Q.   Are you done?
14       A.   Yes.
15           MR. BOWDEN: I move to strike
16   your nonresponsive answer.
17   QUESTIONS BY MR. BOWDEN:
18       Q.   All right. The consequence is
19   that if they're wrong, you would be
20   subjecting people --
21       A.   I don't think it's a risk.
22       Q.   We understand that that's your
23   opinion.
24       A.   Sir, I don't think they are
25   subjected to any risk.

Page 536

1        Q.   Okay.
2        A.   From perineal application of
3    powder, body powder.
4        Q.   And do you feel that the
5    industry has voiced that view as strongly as
6    you have just now?
7            MR. HEGARTY: Objection. Form.
8            MR. DONATH: Objection.
9            THE WITNESS: The industry
10   might not be as emotional as I am.
11   You've tried to...
12   QUESTIONS BY MR. BOWDEN:
13       Q.   All right. So --
14       A.   You've tried to impugn my
15   integrity throughout this thing, and I'm
16   tired of it.
17           MR. BOWDEN: Move to strike the
18   comments.
19   QUESTIONS BY MR. BOWDEN:
20       Q.   Now, you had asked -- you had
21   had some questions asked by counsel about
22   there being studies that showed an increased
23   risk of ovarian cancer and studies that
24   didn't show an increased risk of ovarian
25   cancer, right?

Page 537

1        A.   Yes.
2            MR. HEGARTY: Objection. Form.
3    QUESTIONS BY MR. BOWDEN:
4        Q.   And you would agree with me
5    that there are studies on both sides of the
6    issue?
7        A.   And I think there are more on
8    the negative side. So weight of the evidence
9    is it does not.
10       Q.   I understand that's your
11   opinion today. I'm not asking your opinion.
12       A.   That's the opinion of other
13   scientists as well. Many.
14       Q.   Okay. And there are -- there
15   are scientists that have opinions that differ
16   from yours, correct?
17           MR. HEGARTY: Objection.
18           MR. DONATH: Objection. Form.
19           THE WITNESS: Yes, and many of
20   them are getting paid lots of money by
21   plaintiffs' firms.
22   QUESTIONS BY MR. BOWDEN:
23       Q.   IARC's being paid by
24   plaintiffs' firms?
25       A.   No, not IARC.

135 (Pages 534 to 537)

Robert Glenn

| Page 538 | Page 540 |
|---|---|

**Page 538**

1    Q.    Okay.
2    A.    I said expert.
3    Q.    So --
4    A.    Hankinson may be.  I don't know
5  for sure.
6    Q.    You don't know; you're just
7  guessing?
8    A.    Yeah, I'm just guessing.
9    Q.    Okay.  And why would you
10  believe that to be a guess?
11    A.    Well, she was on the IARC
12  working group.
13    Q.    Okay.
14    A.    And she was strong in her
15  conviction that studies of her group and
16  Dr. Cramer were solid, and I don't think they
17  are.  I think there are methodological
18  problems with it.
19    Q.    And so because she -- her
20  opinion differs from yours, you suspect that
21  she might be being paid by someone else?
22          MR. DONATH:  Objection.  Form.
23          THE WITNESS:  The way it is
24    now, I'm not sure why she's been on
25    the working group.

**Page 539**

1  QUESTIONS BY MR. BOWDEN:
2    Q.    Well, that's an interesting
3  point that you bring up.  Payment from
4  somebody else, undisclosed payment, that's a
5  consideration that you take into account when
6  weighing their opinions?
7          MR. HEGARTY:  Objection.  Form.
8  QUESTIONS BY MR. BOWDEN:
9    Q.    Is that what you're telling our
10  jury?
11    A.    I've said it enough.
12    Q.    No, no, no.  You're going to
13  answer that question.
14    A.    No.
15    Q.    When someone has payments to
16  them, you want to know who those payments are
17  from when they're forming their opinions so
18  you can weigh the veracity of the opinions
19  and their conclusions?
20          MR. HEGARTY:  Objection.  Form.
21    Asked and answered.
22          MR. DONATH:  Objection.
23          THE WITNESS:  I want to know
24    the veracity of their opinions, is
25    most important.

**Page 540**

1  QUESTIONS BY MR. BOWDEN:
2    Q.    So why is funding important to
3  you?  You just brought this up on your own.
4  Why is it important to you?
5    A.    It can be important.
6    Q.    It can be a source of bias,
7  right?
8          MR. DONATH:  Objection.  Form.
9          THE WITNESS:  It may be in some
10    cases.
11  QUESTIONS BY MR. BOWDEN:
12    Q.    Okay.  And you were actually
13  paid, weren't you?
14    A.    Pardon?
15    Q.    From 2004 to 2010, during those
16  IARC proceedings, you were actually being
17  paid?
18    A.    Yes, I was.
19    Q.    And your paycheck was coming
20  from Crowell & Moring, correct?
21    A.    Yes.
22    Q.    From funds given to Crowell &
23  Moring for your services by Luzenac, true?
24          MR. DONATH:  Objection to form.
25          THE WITNESS:  Yes.

**Page 541**

1  QUESTIONS BY MR. BOWDEN:
2    Q.    And during that time period you
3  voiced an opinion about talc and ovarian
4  cancer risk, correct?
5    A.    Yes.
6    Q.    All right.  So it's not unusual
7  for a scientist to interpret data
8  differently, correct?
9          MR. HEGARTY:  Objection.  Form.
10          MR. DONATH:  Objection.
11          THE WITNESS:  That's correct.
12  QUESTIONS BY MR. BOWDEN:
13    Q.    That's part of the scientific
14  debate?
15    A.    Debate, that's correct.
16    Q.    And in fact, for years --
17  actually, you mentioned Dr. Wynder earlier,
18  right?
19    A.    Dr. Ernst Wynder.
20    Q.    Wynder?
21    A.    Yes.
22    Q.    And you would agree with me
23  that there were consultants, for example, for
24  the tobacco industry that for years stated
25  there was no connection between cigarette

136 (Pages 538 to 541)

Robert Glenn

| Page 542 | Page 544 |
|---|---|
| 1  smoke and lung cancer. | 1  industry's view that tobacco smoking did not |
| 2          You would agree with me on | 2  increase the risk of lung cancer. |
| 3  that? | 3          You're aware of that as a fact |
| 4          MR. HEGARTY: Objection. Form. | 4  as you sit here? |
| 5          THE WITNESS: There were some, | 5          MR. DONATH: Objection. Form. |
| 6  yes. | 6          MR. HEGARTY: Objection. Form. |
| 7  QUESTIONS BY MR. BOWDEN: | 7          THE WITNESS: Yes, and it was |
| 8      Q.   Right. | 8  criminal. |
| 9          And in fact, there weren't just | 9  QUESTIONS BY MR. BOWDEN: |
| 10  some; there was a lot? | 10      Q.   It was criminal. |
| 11          MR. DONATH: Objection. Form. | 11          The consequences for their view |
| 12          THE WITNESS: There were a | 12  being wrong was the death of hundreds of |
| 13  number, yes. | 13  thousands of individuals, correct? |
| 14  QUESTIONS BY MR. BOWDEN: | 14          MR. DONATH: Objection. Form. |
| 15      Q.   Right. | 15          MR. HEGARTY: Objection. Form. |
| 16          And it was something that was | 16  QUESTIONS BY MR. BOWDEN: |
| 17  used to create doubt -- | 17      Q.   It led to the death and disease |
| 18          MR. DONATH: Objection. Form. | 18  of human beings? |
| 19          MR. HEGARTY: Objection. Form. | 19      A.   Yes, it did.  Yes. |
| 20  QUESTIONS BY MR. BOWDEN: | 20          MR. DONATH: Objection to form. |
| 21      Q.   -- over decades and decades and | 21  QUESTIONS BY MR. BOWDEN: |
| 22  decades, right? | 22      Q.   Okay.  And so in that specific |
| 23      A.   It was misleading, yes. | 23  example, there were people on both sides of |
| 24      Q.   Right. | 24  that issue as well, true? |
| 25          And when they turned out to be | 25          MR. HEGARTY: Objection. Form. |

| Page 543 | Page 545 |
|---|---|
| 1  wrong -- you're not going to sit here today | 1          THE WITNESS: There were. |
| 2  and tell us that smoking doesn't increase the | 2  QUESTIONS BY MR. BOWDEN: |
| 3  risk of lung cancer, right? | 3      Q.   Scientists -- |
| 4          MR. HEGARTY: Objection. Form. | 4      A.   Yes. |
| 5          THE WITNESS: No, but I would | 5      Q.   -- who looked at the same data? |
| 6  say that breast implants don't produce | 6      A.   Yes. |
| 7  any -- any breast disease or breast | 7      Q.   You would agree with me that a |
| 8  cancer.  That was -- | 8  product that may cause cancer, particularly |
| 9  QUESTIONS BY MR. BOWDEN: | 9  cosmetic products, that consumers should be |
| 10      Q.   I don't remember -- | 10  informed of that possibility? |
| 11      A.   That went through a number of | 11          MR. DONATH: Objection. Form. |
| 12  litigation.  Of course in the end it was | 12          MR. HEGARTY: Objection. Form. |
| 13  proved it was not true, not a scientific | 13          THE WITNESS: I don't know what |
| 14  fact. | 14  the FDA rules are regarding labeling |
| 15      Q.   That's your response to my | 15  and warnings to consumers. |
| 16  question of whether -- | 16  QUESTIONS BY MR. BOWDEN: |
| 17      A.   I'm just saying that -- | 17      Q.   I'm not asking you about what |
| 18      Q.   -- cigarette smoke -- | 18  the regulations are or what the FDA requires. |
| 19      A.   -- both sides -- | 19          I'm asking you as you sit here |
| 20      Q.   Please, sir, don't interrupt | 20  today, you would agree with me that if a |
| 21  me. | 21  product contains something that can cause |
| 22          My question to you is that as | 22  cancer, particularly if it's in a cosmetic |
| 23  you sit here today, you are aware that there | 23  product, that consumers should be informed of |
| 24  were consultants paid for by the tobacco | 24  that possibility? |
| 25  industry which for years espoused the | 25          MR. DONATH: Objection. Form. |

Robert Glenn

Page 546

1    Beyond the scope.
2         MR. HEGARTY:  Objection.  Form.
3         THE WITNESS:  If it presents an
4    unacceptable risk, they should be
5    informed.
6         MR. DAVANT:  Counsel, you --
7    QUESTIONS BY MR. BOWDEN:
8         Q.   If there's no benefit of the
9    product, is there any amount of risk that's
10   acceptable?
11        MR. HEGARTY:  Objection.  Asked
12   and answered.
13        THE WITNESS:  I'm sorry, what?
14   QUESTIONS BY MR. BOWDEN:
15        Q.   If the product itself provides
16   no benefit, is there any amount of risk
17   that's acceptable?
18        MR. BILLINGS-KANG:  Asked and
19   answered.
20        MR. DONATH:  Objection.  Form.
21   Beyond the scope.  Asked and answered.
22        THE WITNESS:  There's no such
23   thing as, you know, safety.  I mean,
24   we all accept risk.
25

Page 547

1    QUESTIONS BY MR. BOWDEN:
2         Q.   Risk that they have to know
3    about, right?
4         MR. DAVANT:  Counsel.
5         MR. HEGARTY:  Objection.  Form.
6    QUESTIONS BY MR. BOWDEN:
7         Q.   Risks that they should know
8    about, right?
9         MR. DONATH:  Objection to form.
10        MR. HEGARTY:  Objection.  Form.
11        THE WITNESS:  If it's an
12   unacceptable risk, they should be
13   informed.
14   QUESTIONS BY MR. BOWDEN:
15        Q.   Okay.  Unacceptable by whose
16   view?
17        MR. DONATH:  Objection.
18        THE WITNESS:  Unacceptable
19   by -- it becomes a policy decision.
20   QUESTIONS BY MR. BOWDEN:
21        Q.   I see.
22        MR. DAVANT:  Counsel, how much
23   more do you have?
24        MR. BOWDEN:  Just a little bit.
25        MR. DAVANT:  Like how many more

Page 548

1    minutes do you think?  Because it's
2    already --
3         MR. BOWDEN:  Well, I don't need
4    to give you a time frame.  We have
5    seven hours, and we'll take minute for
6    minute from you've guys have done.
7         Am I bumping up against what
8    you've done?
9         MR. DAVANT:  The witness didn't
10   take a minute.  And under your
11   protocol, you were supposed to be
12   limited to 15-minute breaks, and you
13   took a lot of breaks today.  You took
14   a lot of long breaks.
15        MR. BOWDEN:  Are you serious?
16   You want to put on the record the
17   reason for that?
18        MR. DAVANT:  Sure.  It's you.
19        MR. TISI:  All right.  Let's
20   just get done.
21        MR. BOWDEN:  Whatever.  All
22   right.
23        MR. DAVANT:  And now you're
24   asking the same questions you've
25   already spent seven hours asking.  You

Page 549

1    spent two hours asking about things
2    that he wasn't involved in.  Please
3    try to focus.
4         MR. BOWDEN:  Oh, thanks.  I
5    appreciate you chiming in now at the
6    end of the deposition.  I appreciate
7    it.
8    QUESTIONS BY MR. BOWDEN:
9         Q.   Where scientists disagree on
10   the issues such as carcinogens, things that
11   can cause cancer, should companies err on the
12   side of patient safety or business interest?
13        MR. HEGARTY:  Objection.  Form.
14        MR. DONATH:  Objection.  Form.
15        THE WITNESS:  It's been a long
16   day.  Give me that one again.
17   QUESTIONS BY MR. BOWDEN:
18        Q.   Where scientists disagree on
19   issues such as the cause of cancer in a
20   product, should companies err on the side of
21   patient safety or business interests?
22        MR. HEGARTY:  Objection.  Form.
23        MR. DONATH:  Objection.  Form.
24   Beyond the scope.
25        THE WITNESS:  Patients should

138  (Pages 546 to 549)

Robert Glenn

## Page 550

1  side on whether there's an
2  unacceptable risk by their product and
3  its use.
4      MR. BOWDEN:  Thank you.  Those
5  are my questions.
6      Want some follow-up?
7      VIDEOGRAPHER:  The time is now
8  6:35.  This concludes the deposition.
9  Going off the record.
10  (Deposition concluded at 6:35 p.m.)
11      – – – – – – –
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 551

CERTIFICATE

1
2
3      I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
5  of the examination, Robert Glenn was duly
   sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7      I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
       I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
   employee of such attorney or counsel, and
13  that I am not financially interested in the
   action.
14
15
16
       _____
17      CARRIE A. CAMPBELL,
       NCRA Registered Diplomate Reporter
18      Certified Realtime Reporter
       California Certified Shorthand
19      Notary Public
       Dated:  October 22, 2018
20
21
22
23
24
25

## Page 552

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8      After doing so, please sign the
9  errata sheet and date it.  You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13      It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you.  If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25

## Page 553

1      ACKNOWLEDGMENT OF DEPONENT
2
3
4      I,_____, do
5  hereby certify that I have read the foregoing
   pages and that the same is a correct
6  transcription of the answers given by me to
   the questions therein propounded, except for
7  the corrections or changes in form or
   substance, if any, noted in the attached
8  Errata Sheet.
9
10
11
12  _____
   Robert Glenn            DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  Notary Public
20
21
22
23
24
25

Robert Glenn

Page 554

```
 1          - - - - - - -
                ERRATA
 2          - - - - - - -
 3   PAGE  LINE  CHANGE/REASON
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25
```

Page 555

```
 1          - - - - - - -
              LAWYER'S NOTES
 2          - - - - - - -
 3   PAGE  LINE
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25
```

140 (Pages 554 to 555)

**A**

**abdomen** 171:9
**abdominal**
  171:9
**ability** 109:13
  120:24 551:9
**able** 62:10 238:8
  382:24 462:4
**Abrams** 248:4
**absence** 401:21
  403:13
**absolutely** 14:15
  517:11
**abstract** 39:17
  107:8,20 390:8
**academia** 27:20
  38:6
**academic**
  118:23 119:4
  129:24 357:17
**academics**
  350:11,17
  357:21
**Academy**
  366:11 461:11
**accept** 82:16
  86:9,15 111:13
  123:8 273:3
  277:17,21
  278:9 422:25
  423:4 511:15
  546:24
**acceptable**
  114:10,11
  272:19 273:14
  273:22 274:8
  274:13,17
  277:13 282:20
  283:8 285:11
  285:19 286:20
  287:18 341:8
  341:11 546:10
  546:17
**accepted** 108:3
  131:8 197:25
  202:7

**accepting** 84:5
  115:12 270:23
**access** 25:3
**accomplish**
  355:19
**account** 539:5
**accuracy** 133:11
  335:7
**accurate** 83:25
  100:2 182:24
  183:3 490:10
  552:18
**acknowledge**
  488:9
**acknowledged**
  204:2 219:7
  220:17,19,22
**acknowledge...**
  160:18 202:14
  204:1,9 220:4
  220:14 497:8
  497:13,20
  498:4,23
  505:23
**acknowledge...**
  220:2,10 419:1
  420:2,16 421:1
  496:22
**acknowledges**
  204:16
**Acknowledging**
  220:6
**ACKNOWLE...**
  553:1
**acquired** 61:9
**act** 40:22 41:2
  80:8 286:15
  320:6 321:2,12
  321:18
**acted** 516:5
**acting** 141:20
  245:3 297:6
**actinolite** 5:17
  339:2
**action** 84:7
  124:17 401:22

438:21 551:12
  551:13
**Actions** 357:20
**activities** 68:15
  518:5
**actual** 166:8
  170:24 172:3
  188:6 193:23
  288:25 500:23
**add** 47:13
  192:13 284:17
  299:23 358:12
  504:19
**added** 52:15,15
  55:8,14 97:9
  144:3,5,9
  179:2 196:12
  212:4,13
  315:18
**addition** 93:25
  326:9 329:1,3
  330:3
**additional** 35:20
  129:23,23
**address** 291:25
  346:14 428:12
**addressed**
  328:14
**addressees**
  414:22 417:19
**addresses** 58:18
**adducts** 275:1
**adhesions** 168:8
  207:18
**Administration**
  36:15 37:6
  68:25
**adopted** 298:13
**advance** 51:4
  118:4
**advanced**
  386:18
**advancing** 51:22
  111:3 372:25
**adventure** 53:24
**adventures**

431:17
**adverse** 394:22
**advertise** 29:5
**advertised** 29:8
**advice** 437:2
**advise** 441:23
**advocacy** 43:20
  43:23
**advocate** 507:3
  507:21
**advocating**
  476:11
**affairs** 58:19
  125:15
**affect** 120:8
**affiliated** 239:18
  400:2 437:17
**affiliations**
  239:15 246:1
**affirmative**
  365:22
**afternoon**
  254:25 453:3,4
  471:17,18
**afterthought**
  67:22
**age** 9:21
**agencies** 19:17
  69:10 348:13
  532:7
**agency** 36:18
  221:6 348:12
  352:3
**agent** 163:7
  164:23 165:17
  166:4 167:14
  254:6 277:10
  278:4 287:13
  287:18 297:23
  464:19 465:8
  465:17
**agents** 260:3
  460:21
**age-adjusted**
  306:4
**ago** 62:20

104:15 123:7
  161:10,12
  163:15 177:17
  251:23 427:6
  442:3 480:8
  514:5 527:19
**agree** 37:15 38:9
  38:15 48:11
  108:21 110:17
  156:13 159:17
  209:19 212:19
  222:23 272:16
  272:18,24
  280:10 303:16
  309:3,7 316:14
  316:17 326:18
  327:12,18
  328:5 329:17
  338:9,12
  356:15 365:15
  365:17 382:14
  401:4,15
  434:20 435:24
  537:4 541:22
  542:2 545:7,20
**agreed** 131:17
  136:19 137:17
  250:13 268:2
  302:25
**agreement**
  30:14 38:4
  127:5,17
  130:18 131:5,8
  135:1 142:4,18
  143:13 147:10
  157:3 163:16
  174:24 188:22
  199:19 202:24
  226:3 363:1
  485:1,6 488:13
  525:9
**agreements**
  146:9,13,15
  165:7
**agricultural**
  51:7

agriculture 98:19
ahead 39:23
70:13 112:1
113:11 153:5
166:18 167:23
168:1 171:2
255:5 269:12
331:22 338:6
360:15,17
362:12 365:14
415:19 433:1
441:20 453:13
469:8
aid 432:16
aimed 348:10
al 91:6 209:9
292:1 300:5
alleged 11:19
alleging 426:11
alliances 349:4
Allison 46:25
allowed 231:4,7
231:9 250:3
395:11 508:7
aloe 515:11
alteration
273:16 274:24
Alterations 8:7
altered 412:20
ambiguity
431:14
America 3:17
5:20,22,23
24:12 25:22,25
26:6 49:21,23
51:3,25 52:12
54:24 56:7,19
57:12 58:2,12
59:9,18 61:3
62:14,17 63:21
64:22 66:10
67:17 69:8
71:24 73:21
74:15,21,23
77:7 79:17

224:3,4,7
231:23 242:3,9
242:11,16,17
247:7 248:1
250:6,23 253:8
259:25 277:4
320:25 343:4
346:1 371:12
406:15 413:24
429:25 447:2
454:25 459:14
American 51:5
69:15 70:14
215:7 280:21
499:21,25
513:15
Ames 278:7
amosite 339:1
amount 156:11
277:12 287:17
421:8 510:2
546:9,16
amounts 273:13
amphibole
338:25
analyses 452:8,9
analysis 34:14
34:18 146:24
278:23 348:4
381:17 395:21
449:20 485:16
485:24
analyze 486:19
analyzed 451:17
analyzing 477:8
Anderson 1:13
3:8
and/or 520:6
anecdotal 303:9
anecdotally
208:21
animal 451:7
481:3
animals 169:15
340:19 462:3
announced

216:22
annual 80:10,15
answer 14:3,3,8
41:19,21 46:6
49:1,9,11,16
97:17 106:25
113:10 121:13
121:21 125:6
138:10,19
139:5 143:24
150:12 151:14
152:22 185:9
220:25 266:11
267:21,25
268:12 273:10
283:2,14,16,22
284:4,6,10
287:4 331:16
331:22 365:21
369:1 390:22
430:13 433:6
435:6 438:8
441:3 476:10
478:2 517:6
530:21 531:13
535:16 539:13
answered 244:5
282:24 287:22
290:7 479:11
531:12 533:21
539:21 546:12
546:19,21
answering
463:24 481:10
answers 270:10
338:2 553:5
anthophyllite
5:17 339:1
anticipation
129:11
Antony 174:20
215:5,15,18,24
216:21,25
217:5 299:10
299:14,15,16
299:25 511:18

513:14
anybody 27:12
anymore 25:1,3
474:12
anyway 25:1
302:14 418:15
apologize 60:7
106:24 249:18
254:7 255:11
405:15 466:7
appear 135:4
162:3 304:25
415:22 455:25
appearance
23:11
appearances 5:3
10:3
appeared
161:20 294:9
416:4 524:11
appearing
260:14
appears 117:21
118:2 178:12
196:14,18
247:10 390:7,8
412:2,16
457:20 465:4
489:20
appendix
192:16
application
279:22 315:14
355:5 383:2
480:19 536:2
applications
120:24 315:17
applied 368:25
375:14
apply 351:24
352:12 353:15
533:18
appreciate
142:15 193:16
403:3 432:22
436:25 479:24

549:5,6
appreciated
437:4
appreciates
236:2,5
appreciation
34:1
approach
153:24 376:23
467:20 468:11
476:9 485:23
486:17 507:18
528:8,12
approached
486:18
appropriate
153:22,24
274:22 294:16
420:15,23
422:4 469:14
552:6
approval 132:23
395:2,10
436:21
approximate
523:11
approximately
188:8 470:8
474:19
April 406:13
408:25 444:15
458:20
Arch 3:9
area 68:11
114:16 363:22
394:15 406:24
448:24 450:5
471:3 482:25
511:23
areas 112:25
328:13 463:14
arena 15:24
432:19
argue 431:5
502:21
argument 503:6

Robert Glenn

arisen 40:4
arm 36:22 276:1
    404:13 425:3
    448:3
arms 450:16
Army 473:7
article 104:23
    104:24 129:25
    159:19 190:13
    195:11 200:5
    209:20,23
    211:4,18
    218:15 220:23
    424:17 490:7,8
    495:7 498:10
    498:10,19
articles 17:8
    198:11 199:21
    264:2 334:16
    354:14 360:16
    505:5,7
asbestiform
    38:13,21,22
    39:4 335:23
    336:19,20
    339:16 341:4
    402:25 452:12
    483:3
asbestos 5:16
    30:25 31:1
    32:18 33:12
    38:1,5,8,10,12
    38:15,20,24
    39:9 40:4,10
    40:16 75:18
    76:1,7 107:11
    111:15 113:14
    113:14 114:3,6
    115:4 118:13
    168:13 192:19
    260:25 261:2
    263:3 273:7
    275:22 308:7
    334:23 335:16
    335:22,23
    336:5,6,18

337:9 338:10
338:23 339:2,9
339:11,16
340:8,16 341:1
341:16 342:9,9
342:15 400:6
400:18 402:14
402:17,18,18
402:25 407:2
409:8 412:18
412:21,23
431:4 432:17
432:18 448:1
451:11,24
asbestos-free
    209:7
ash 52:6
Asheville 1:13
    9:9 472:2,20
aside 29:16
    46:22 63:8
    139:13 157:2
    324:20 334:12
    386:22 398:25
    523:19
asked 41:22
    108:16 144:15
    154:12 164:5
    190:23 205:21
    244:5 250:19
    269:5 275:12
    282:24 283:11
    287:22 290:7
    294:13 376:24
    378:5 398:7,12
    455:2,3 474:14
    483:11 487:7
    504:7 507:13
    509:2,3,14
    511:19 516:2,9
    518:4 522:2
    531:12 533:20
    536:20,21
    539:21 546:11
    546:18,21
asking 45:25

62:2 95:15,16
100:20 107:17
108:21 110:11
116:23 123:6
172:20 228:4,6
249:12 267:10
272:2 285:17
285:18 287:7
296:13 303:15
303:16 314:22
328:1,4 337:21
338:11 340:21
355:17 404:25
435:13 445:6,7
528:1 533:2,3
537:11 545:17
545:19 548:24
548:25 549:1
asks 48:25
aspect 157:8
    349:3
aspects 331:3
assays 430:19
assert 90:19
    501:17
assess 351:4
assessed 173:9
assessing 159:19
    159:23
assessment
    236:8 348:22
    461:9,12 465:2
assignment
    299:22 300:2
assistance
    415:11
assisted 119:18
    228:15 345:21
assisting 227:1
associate 5:23
    63:21,23 64:6
    64:12 65:13
    67:21 68:6
associated
    107:23 271:18
    445:21 446:1

446:22 449:7
association 5:20
    5:22,23 30:10
    30:11 42:14,22
    44:9 49:21,23
    51:3 54:19
    64:11 70:17,21
    89:23 91:7,10
    130:19 232:4,6
    242:2 270:24
    292:4,8 318:14
    334:25 358:1
    361:20 419:18
    454:25 459:13
    459:21 464:18
    465:10 470:1,8
    478:24 488:17
    508:5 511:5
    517:16 522:13
associations
    264:25 266:16
    401:23 403:15
assume 49:10
    251:3
assuming 32:21
assumption
    306:8,12
assure 141:4
assured 502:5
attach 404:9
attached 8:13
    26:15 128:21
    155:21 166:2
    235:9 404:12
    408:8 552:11
    553:7
attaching
    104:13 218:20
    407:16 411:1
attachment
    156:3 484:19
    484:21
attachments
    163:5,11
    235:12
attack 323:24

324:4
attempt 236:8
    237:23
attend 72:4
    237:4
attendance 19:8
attended 55:22
    473:14
attention 48:13
    136:15 141:24
    142:3 180:4
    192:20 196:5
    197:4 208:8
    210:3 211:10
    222:16 450:9
    504:20
attorney 14:2
    20:25 22:16
    23:4 35:11
    36:1,2 72:22
    104:7 148:22
    156:9 158:9
    248:5 259:10
    270:6 321:20
    321:22 551:11
    551:12 552:15
attorneys 13:25
    21:8 22:8 23:3
    35:14 68:3,8
    69:22 70:3
    73:24 259:3
    430:21 431:2
attorney-client
    294:7
attributed
    464:10,16
attuned 258:8
augment 290:13
augmented
    58:13
August 5:14 6:1
    104:2 193:16
    193:17 256:10
    399:6 410:9
    412:15
auspices 366:10

Robert Glenn

**Austin** 3:5
**Australia** 301:9
**author** 17:16
  27:21,23
  104:20,22
  105:14 153:23
  158:18 159:19
  166:11 201:12
  203:25 206:2
  206:12,15,17
  206:24 212:25
  219:14 220:15
  457:22 496:21
  496:25 501:16
  501:16 504:11
  504:19 505:23
  506:5
**authored** 483:14
**authoritative**
  381:21
**authors** 91:7,13
  107:3 108:22
  163:21,24
  191:13 193:3
  197:4 210:8
  218:21 267:10
  297:8 397:2
  419:20 488:8
  502:6 505:22
  506:10 513:9
**authorship**
  105:13 328:2
**author's** 504:20
**automatically**
  294:9,11
  348:13
**available** 513:25
**Avance** 247:12
**Avenue** 3:4,15
**avenues** 130:5
  130:11
**average** 266:21
**avoided** 285:4
**aware** 31:1 42:2
  72:5 78:18,20
  84:17 110:1,13

180:1,2 181:11
198:17 223:15
231:1 240:3
267:4 275:5
280:13 282:3
282:10,13
295:17 310:13
310:15 376:5
377:13,23
395:14 422:16
425:18 426:20
427:23 443:8
452:8 490:12
491:14 494:21
495:2,5,12
499:4 503:10
526:12 543:23
544:3
**awareness** 77:19
**a.m** 1:14 9:7
  154:18 187:11

_____

**B**

**B** 514:20
**Baan** 7:8 325:21
  325:23 326:5
**babies** 535:9
**baby** 279:3,15
  336:8 534:4,15
  534:21,21,24
  535:11
**back** 12:1 16:3,8
  30:16 31:17
  57:21,25 70:11
  70:11 76:24
  79:9 86:19
  87:2 96:19
  111:25 112:6
  116:6 117:16
  126:19,19
  135:22 144:20
  150:8,9 154:20
  156:5 162:15
  168:17 171:13
  175:16 176:15
  177:15 181:10

187:8,13
193:15 211:17
218:12 231:3
246:18,21
256:5 276:25
283:5,12
288:13 293:5
298:6 301:19
302:10 303:17
308:22 309:2
309:17 312:20
325:2 326:20
327:3 347:4
361:14 368:4
370:24 374:23
374:25 379:13
391:7 405:23
407:7 414:19
416:19 417:14
418:16,24
424:22 429:16
430:4 438:1,7
448:22 449:1
450:2,3 452:25
469:2 487:14
493:14 497:1
507:14 517:24
521:15 523:14
527:7
**background**
  29:10 114:15
  382:9 472:25
**backwards**
  246:21
**BACON** 2:14
**balance** 153:12
  329:6,8
**balancing**
  286:15
**ball** 52:1 183:8
  396:7 418:4
  444:21,24
**barn** 371:24
  455:8
**based** 26:18,19
  67:18 107:10

147:15 174:24
201:8,11 272:6
273:16 348:14
373:13 381:15
406:24 443:21
456:11 468:23
470:22 485:24
507:20 523:2
528:25
**basic** 13:22
  254:5
**basically** 19:7
  431:1
**basis** 200:14
  229:4 311:17
**bat** 13:6
**Bates** 8:12
  312:23
**Baylen** 2:6
**beads** 411:12
**bear** 21:11
  102:20 141:6
  178:1 374:14
**began** 14:21
  371:18
**beginning** 92:19
  140:13 163:15
  426:6
**behalf** 9:24 24:4
  28:1,3 59:10
  129:10,11
  186:23 222:2
  229:7,10,25
  243:19 245:14
  259:8 260:15
  296:17 308:24
  321:19 323:2,9
  323:12
**behavior** 101:5
  101:14
**beings** 544:18
**believe** 55:22
  64:11 67:10
  84:13 110:24
  122:10 139:16
  139:24 231:16

250:10 256:22
258:6 305:22
310:16 333:17
333:21 340:13
356:4 367:25
375:4 404:17
424:6 431:2
433:23,24
436:19 447:11
466:20,25
509:17 511:17
514:25 515:17
523:16 526:21
528:4 538:10
**believed** 242:20
**bells** 377:19
**belong** 64:10
  192:12
**benchmark**
  381:14
**benefit** 286:11
  286:19 392:18
  393:7 477:14
  507:5 546:8,16
**Benefits** 392:12
**bentonite** 52:1
**best** 91:19 115:6
  115:18 206:7
  269:2,7 321:2
  321:12 329:19
  368:25 497:19
  517:6 551:9
**better** 114:23
  150:10 169:8
  326:22 466:6
  472:17
**beyond** 45:3,12
  48:6 51:11
  58:22 60:21
  65:24 160:20
  180:12 287:22
  320:17 525:1
  546:1,21
  549:24
**bias** 46:19,21,22
  159:20,23

Robert Glenn

269:4 357:17
464:22 465:10
465:18 479:9
480:7,11,14
540:6
**biases** 159:10,15
**big** 53:23 54:8
**bigger** 57:23
**Billings-Kang**
3:19 5:8 10:19
10:20 13:18
14:11 90:6
93:11 95:9
96:14 97:11,25
103:12,16
109:2 115:25
124:23 125:23
132:2 133:2
146:25 147:11
147:21 154:3
177:12 197:18
198:3 205:23
225:5,11 230:3
244:4 279:19
282:23 286:4
287:21 290:6
321:4 322:9
339:14 352:15
353:11 354:25
355:11,20
388:5 397:5
433:21 521:17
521:21 522:14
523:8 525:18
526:22 530:25
531:9 533:23
546:18
**biological**
382:10 402:7
402:10 431:7
**biologically**
341:17,24
431:3
**biology** 447:10
**bioplausibility**
436:3

**birth** 451:5
**bit** 15:19 34:2
55:2 92:12
126:4 141:8
144:15 158:19
163:14 247:2
289:5 311:1
342:14,15
344:5 369:25
415:25 460:13
475:5 504:8
509:18 547:24
**black** 6:21 254:3
254:11 260:5
431:13
**blank** 360:25
**block** 246:4
**BMI** 384:10
**board** 56:22,23
58:13 94:16
150:5 505:11
505:12
**Bob** 6:5 50:9
62:12 250:18
250:23 259:15
301:17 358:19
362:23 367:10
428:24 463:25
**bodies** 160:22
263:4 316:6,23
381:21 402:13
402:14,17,18
482:25 533:19
**body** 50:23
89:11 117:6
161:3 177:2
188:19 355:6
357:25 361:19
375:17 408:7
467:18 468:10
471:2 528:7
534:4 536:3
**boilerplate**
120:9
**bold** 194:2
**bolded** 195:5

**bono** 66:4
**Book** 461:12
**borates** 52:1
**boss** 150:10
**bothered** 334:5
**bottle** 13:10,15
354:16,19
355:10 356:19
**bottom** 24:2
90:25 107:20
112:12 119:17
120:20 148:18
188:4 194:2
202:5 235:22
239:5 245:16
291:22 293:23
297:3,15,17
298:15 302:2
317:20 358:15
359:14 385:3
396:7 411:20
412:3,4 416:1
429:20 459:6
488:15
**Boulevard** 2:15
**bound** 321:1,12
321:18
**boundaries**
118:22
**Bowden** 2:5 5:5
5:9 10:7,7 11:2
13:20 14:15,16
16:5 21:24
22:13 23:18,20
25:23 26:8
28:12 30:5
31:22 33:4,17
38:14,23 39:6
39:12 40:23
41:14,20 42:24
44:7,21 45:7
45:16,24 46:5
46:9 47:21
48:15 49:14,18
50:18,22,25
51:13 53:9

54:3,20 56:24
57:20 58:1,11
58:24 59:24
60:2,15,18
61:1,16,24
63:6,17 65:6
65:12,20 66:5
66:18 72:7
73:9 74:5 75:2
75:19 76:15
77:1,17 78:4
80:1,12 83:2
83:20 84:9,20
85:5,16,24
87:4,11,14,17
88:7,14 89:10
89:17 90:9,23
93:1,14 94:9
95:3,14 96:10
96:18,24 97:21
98:4 99:16
100:11,19
102:8,18 103:6
103:14,19
106:1 109:9,20
110:10 111:9
111:19 113:6
114:17 115:1
115:21 116:2
119:10 121:16
121:20,24
122:22 124:2,9
125:5 126:2,10
126:15,17
128:11 129:18
131:6,21
132:10 133:6
133:18 135:7
136:8,12 137:7
138:21 140:10
140:20 142:1
142:14,24
143:10,19
144:2,14 145:1
145:8 146:2,7
146:17 147:7

147:14 148:2,7
150:21 151:17
151:21 152:14
152:23 154:7
154:11,24
155:4,7 157:1
158:3,7 159:3
159:9,16 160:1
160:12 161:1
161:11 162:12
164:3,13,15,17
166:17,21
167:18,22
169:12 171:13
171:19 177:22
179:6,22
182:18 183:9
183:23 184:2
184:14 185:7
185:19 186:5
186:19 187:4
187:16 190:24
191:21 193:2
197:6,13,21
198:7 199:4,9
200:1,22 201:5
201:14 203:18
204:10,20
205:20 206:9
206:22 207:3
208:12 209:12
209:18 210:1,6
210:13 211:1
211:12,21,24
212:6 213:13
214:10,20
215:14 216:6
218:6,13
219:15 220:24
221:1 222:10
223:7,19
224:22 225:9
225:15 226:10
226:14 227:3
227:12 228:19
230:9 231:15

Robert Glenn

240:18 243:15
244:1,7,19
245:6 246:13
246:17 249:11
249:18,22
252:11,22
253:2,9 255:4
255:11,14
257:19 260:13
260:20,22
261:1 262:22
263:13 264:6
264:13 265:17
266:10,13
267:7,22 268:6
269:15 270:5
271:9 272:1,8
272:15 273:1,9
273:11 274:11
275:15 276:16
276:23 277:19
278:11,21
279:1,12,23
280:16,22
281:2,16 282:1
282:12,18
283:1,9,13,25
284:14,20
285:16 286:1,8
286:14 287:1
288:6,14
290:15 291:1,5
293:10 296:5
296:23 297:14
298:10,25
299:3,13
300:18 301:3
305:10 307:24
308:1,17,21
310:23 311:8
311:19 312:6
312:13,25
313:5,16,19
315:3 317:14
317:19 318:1
318:20,24

319:4,15 320:2
320:10,20,22
321:10,17
322:14 323:7
323:13,21
324:7 325:5
330:4,17 331:5
331:8,21
332:18 333:1
334:21 336:1
336:12 337:4
337:12 338:22
339:17,24
340:20 341:7
341:14 342:4
342:19,23
344:15 345:6
346:8,21
347:12 348:23
349:16 351:7
351:14 352:7
352:23 353:5
353:12,21
354:10,20
355:8,16 356:6
356:14,24
361:15 362:8
364:9,15,19
365:7 366:21
367:12,22
368:2,7 369:11
370:22 372:22
373:6,19 374:4
374:13,17,24
376:9,15 377:1
377:5,9,22
378:13,24
379:3,16
380:22 383:3,8
383:18 386:11
387:4 388:7,12
388:18,21,24
389:2,7,11,18
390:1 391:1
393:1,6 394:3
395:16 396:5

396:20 397:8
397:18 398:1,6
398:14,23
401:14 403:23
404:8,23
405:13 406:1
408:17 409:23
414:7,18
415:16 417:13
419:5,7 420:21
421:9 422:2,12
422:22 423:16
424:4 425:13
425:22 426:2
426:10,21
427:17,22
432:4 433:9,15
434:5 435:4,12
435:22 436:9
436:18 437:15
437:22 438:22
441:8,19
442:11 443:1
443:11,24
444:12 445:5
446:10,17,24
449:5 451:21
452:4,19
455:19 456:18
459:23 462:13
465:14,20
466:19 468:1
471:4 476:24
477:4,10,22
478:4,10,17
479:1,17 480:3
481:1,6,18
482:5,15 483:9
483:24 486:2
486:11,22
487:17 489:22
490:16,25
491:18 492:7
492:18,24
493:6,18,25
494:17,25

495:9 497:15
497:23 498:13
498:25 499:7
499:11,15
500:3 501:2
502:15 503:1,8
503:22 505:2
505:18,25
506:6,14 507:6
507:10,23
508:24 509:22
510:7,18 511:7
512:6,16 513:4
513:12 514:3
514:13,24
515:6,12,24
516:25 517:9
518:22 519:18
520:1,8,16,25
521:7 522:9
523:5 525:14
527:1,9 528:21
529:10 530:20
531:2,17 532:1
532:16,20
533:1,13 534:2
534:8 535:15
535:17 536:12
536:17,19
537:3,22 539:1
539:8 540:1,11
541:1,12 542:7
542:14,20
543:9 544:9,16
544:21 545:2
545:16 546:7
546:14 547:1,6
547:14,20,24
548:3,15,21
549:4,8,17
550:4
**Boy** 495:23
**bracketed**
463:14
**Bradford** 402:4
**brain** 323:12

**brakes** 363:15
**BRCA1** 307:1
**BRCA2** 307:1
**break** 21:20
76:17 148:10
148:14 154:12
154:13 187:6
288:7,16 289:6
405:17 522:1
527:1
**breaks** 548:12
548:13,14
**breast** 543:6,7,7
**breathing** 273:7
**brief** 527:1
529:15
**briefly** 288:20
**bring** 50:23 54:9
238:9,17
257:23 299:1
299:24 333:2
334:15 377:6
424:22 508:22
539:3
**bringing** 391:12
**British** 512:22
**broad** 2:10 71:6
115:14,15
**broader** 340:21
434:18 436:2
**broadly** 76:9
330:22 336:11
**brochure** 117:23
131:13
**broke** 74:19
**bronchopleural**
207:20
**Brooke** 275:5
277:3 281:5
342:8 360:17
394:8 399:21
400:2 413:16
428:17 449:19
450:8,9
**brought** 115:20
141:23 142:2

Robert Glenn

179:2 180:3
197:3 208:7
210:3 211:9
222:15 275:9
307:17 309:13
309:25 310:5
450:9 504:20
511:21 534:14
534:25 540:3
**Brown** 4:8 9:3
**Bruce** 278:7
**budget** 128:21
428:23
**bugs** 473:6
**build** 61:12 82:8
210:23
**built** 210:19
**bulk** 56:8,11
**bullet** 167:6
172:2 248:8
299:1,17
351:22 352:20
353:18 358:11
375:6 467:2,6
467:7,18 468:3
468:4,8 470:5
470:14,16
529:24
**bumping** 548:7
**business** 15:5
66:23 96:3,12
119:5 157:8,10
341:6 351:3,9
353:8 364:7
373:14,17
375:13,21,24
376:12,14
385:21 386:1
417:8 426:18
456:17 476:7
524:5 549:12
549:21
**butcher** 444:19
**buttressed**
512:24
**butts** 535:10

**buy** 472:5
**buying** 101:24
**buys** 13:11
**byline** 105:9,10
105:11
**Byrd** 427:14,18

---

**C**

**C** 2:1,14 3:1 4:1
**caboodle** 34:15
**cadre** 217:20
**calcium** 52:1
61:6,13
**California**
165:21,24
551:18
**call** 6:7 48:13
89:13,20 90:11
90:16 93:8
95:2 117:11
118:5 134:7
138:13 162:24
164:18 165:11
178:24 217:21
251:13 265:18
269:4 344:4
434:2 534:15
**called** 42:13
60:5 80:10
194:5 195:5
399:3 422:5
439:8 457:4
462:15 485:8
522:18
**calling** 134:15
**calls** 146:4
148:15 151:9
151:23 266:12
471:5 478:18
510:19 511:8
523:24
**camera** 370:4
**cameras** 12:4
**Campbell** 1:15
9:17 551:3,17
**Canadian** 54:25

55:2,4,6,7
**cancer** 6:17 7:20
7:23 11:20
31:19,23 32:2
32:4,6,25
46:15 47:4
77:8,20 78:2
86:18 87:7
91:9 93:18
95:6,17 103:8
103:9 107:10
107:25 108:25
109:13,25
125:4 128:1,6
128:19 130:21
132:1,9 136:23
137:20 139:23
141:13 153:11
164:24 165:1
165:20 166:5
170:1 173:22
173:24,25
174:2 186:3
189:3,5,25
194:17 199:10
199:15 200:18
208:10 221:6
265:3 272:18
277:10 278:4
280:6,8,12,21
281:1,12,21
282:15,19,20
283:7,7 287:17
288:2 306:20
307:8 309:6,22
310:8 311:3
323:20 326:9
326:10,17
328:8,11,17
329:10,21
331:2,3,4,14
332:12,16,17
332:21 333:19
342:7 346:6
355:6 361:21
363:16 364:24

368:8,10 380:5
381:18 384:22
401:24 402:15
403:16 423:6
426:13 433:17
443:18 447:22
459:16 464:19
469:24 470:19
470:24 478:1
478:16,25
479:16 480:24
481:5,23
482:10 485:16
485:17 488:19
490:23 491:5
494:16,24
499:24 510:13
511:6 513:11
520:24 528:14
529:5 532:22
533:9,15
536:23,25
541:4 542:1
543:3,8 544:2
545:8,22
549:11,19
**cancers** 95:24
192:3 481:12
**candid** 534:4
**cannon** 140:2,23
141:1
**capacity** 21:6
55:21 62:14
525:21
**car** 472:22
**carbon** 6:21
254:3,11 260:4
**carbonate** 52:2
61:7,13
**carcinogen**
38:10,13,16,25
39:5 82:20
83:14,24 84:15
96:2 97:8
98:16 102:3
107:12 108:10

168:6 182:23
268:5 271:3,6
272:20 273:13
273:13 285:3
285:10 298:1
314:25 318:4
318:13 324:11
352:10 356:18
371:18 381:22
381:24 393:10
397:14,21
461:19 465:4,5
510:16 514:12
514:17 515:22
515:23 531:7
533:18
**carcinogenesis**
382:11
**carcinogenic**
6:20 167:1
400:25 461:3
461:13,17,24
462:11,20
463:3,5,7
465:9,17 514:9
515:18
**carcinogenicity**
358:2 462:16
**carcinogens**
79:10 80:5,11
82:14 83:15
84:22 86:4
92:22 110:23
134:15 180:23
182:22 273:4
273:15,19,22
278:9 348:11
348:21 464:1,4
549:10
**care** 3:22 10:20
88:17 287:18
287:25 521:22
522:4
**careful** 287:24
**carefully** 109:6
109:18 266:8

311:11 333:18
552:4
**Carolina** 1:14
9:9 26:20
173:1 251:19
453:19 472:2
472:11,14,20
**Carrie** 1:15 9:16
551:3,17
**carried** 530:18
**carry** 26:23
**carve-out** 226:2
**cascade** 103:10
**case** 175:11
178:18 182:12
182:20 303:12
308:11 314:23
328:12 473:9
478:11
**cases** 1:7 540:10
**case-control**
268:21 480:22
**Cashiers** 472:14
**cast** 401:22
403:14
**catch** 180:24
**categories**
460:15,19
**categorization**
351:3 417:10
**categorized**
514:8
**category** 480:10
514:20
**causal** 91:10
131:25 136:22
137:19 270:2
401:22 403:15
464:20 470:6
490:22
**causality** 381:15
**causation**
480:23
**causative** 287:13
**cause** 94:18
102:3 103:9

109:13 124:17
168:8 169:22
183:4 278:4
281:12 336:18
355:6 470:24
478:15 481:5
481:22 513:11
520:23 545:8
545:21 549:11
549:19
**caused** 529:5
**causes** 95:19
175:1 207:17
277:10 280:11
307:7 438:15
528:14
**causing** 287:17
**caution** 29:19
75:12
**cautious** 303:25
**cavity** 207:25
509:20
**cc** 232:24
**cdavant@wc....**
4:4
**CDC** 39:15
**cease** 456:23
**ceases** 428:2
**ceasing** 459:1
**cell** 175:18
276:8 400:9,21
409:12 416:11
416:15 425:3
447:9 481:23
**cells** 8:8 175:2,3
175:4,5,20,20
175:23,25
176:1,3 275:19
276:3 342:6
391:22 392:6
392:15 393:20
393:25 394:9
394:12,23,25
394:25 400:7
400:14 409:9
411:4,6,18,22

412:17 416:9
416:17 417:4
425:7 447:14
447:16,16
449:10,11
450:8 482:14
511:12
**cellular** 400:13
430:18 443:23
**Central** 165:20
165:23
**CEO** 43:17
62:13,16
318:19
**ceramics** 440:1
**certain** 180:2
223:16 286:6
286:10 404:7
456:23,24
**certainly** 37:20
65:2 66:3
159:2 160:16
161:19 174:6
223:5,17
277:17 287:24
341:23 354:5
355:7 368:10
387:24 431:16
456:16 458:13
465:16 476:13
496:25 500:18
517:17
**CERTIFICA...**
551:1
**Certified** 1:16
551:3,4,18,18
**certify** 551:4,7
551:10 553:4
**cetera** 362:24
430:20
**chain** 233:17
234:10 235:2
420:4
**chairman**
247:25 318:13
**challenge**

346:23
**challenges**
394:18
**chance** 464:22
465:10,18
490:6 496:8
497:6 516:15
518:16
**change** 40:9
306:3,7 394:24
411:5 506:18
506:25 507:4
523:2
**changed** 334:3
502:10 522:22
522:25
**changes** 130:4
130:11 200:17
207:24 375:12
376:6 391:21
393:19 407:8
411:2,10,12
425:6 448:18
448:18 482:8
491:15 492:23
493:4 552:10
553:6
**CHANGE/RE...**
554:3
**changing** 342:15
412:22
**characterizati...**
219:23 420:8
**characterized**
520:7,14,22
**charged** 303:5
**Charles** 2:11 4:3
10:22
**check** 156:11
428:15
**chemical** 350:3
**chest** 168:19
171:10 173:8
173:10 207:25
**chiming** 549:5
**China** 384:1

**chlorite** 439:17
**choice** 292:25
**choose** 340:3
533:25
**chose** 115:4,5
206:6,7 443:4
446:2 519:15
**Chris** 10:9
**CHRISTOPH...**
2:4
**chronology**
483:20
**chrysotile**
338:24 400:18
400:19
**cigarette** 499:23
500:2 541:25
543:18
**circulate** 428:25
**citation** 261:8
264:9
**cited** 206:12,16
206:23 212:20
219:7,13 220:5
240:4
**City** 2:16
**claims** 382:10
**clarification**
403:4
**clarify** 156:18
379:5 524:24
**clarity** 25:14
**classifiable**
462:16
**classification**
268:19 464:9
**classified** 315:19
371:16 462:25
514:20 515:4
515:10,18
**classify** 460:21
514:22 515:22
**classifying**
465:16 514:19
**clay** 52:1
**clean** 189:16

cleanly 479:22
clear 13:6 24:8
  81:2 113:23
  122:23 434:25
  512:10 532:2
clearly 317:13
  349:5
Clemson 454:2
  454:5 473:2,6
client 17:12 24:9
  24:19 25:10
  29:22 75:5,16
  94:21 115:6
  140:17 145:12
  145:18,19
  156:20 157:25
  185:25 203:11
  243:20 248:19
  320:23 323:6
  325:17 327:7
  352:10 359:11
  426:5 440:21
clients 28:2,4
  30:4,6 119:20
  130:3,9 163:17
  440:20
client's 203:13
  321:2
Clinic 344:23
  345:8
clinical 208:23
  331:2
clinically 208:21
clip 307:25
  308:18
close 72:20
  240:11
closed 411:1
closely 79:16
  104:5 286:24
  467:18 468:9
  528:7
coal 67:9 70:9,9
  70:10,16,17
coated 304:5
coauthor 301:2

coauthors
  106:19 458:5
coding 112:11
  134:6
coffee 514:23
cofounder 52:21
cofounders 53:1
Coggiola 444:20
  444:21
cohort 478:23
  480:21 481:15
collaboration
  228:16
collaborators
  407:6
collapse 178:17
  207:23
collapsed 167:17
  170:21,22
collapses 173:12
colleague 141:12
colleagues 27:19
  127:24 155:19
  201:17 428:25
  453:7 457:10
  458:3 475:12
collected 37:19
collection 34:14
collective 191:13
  193:15
collectively
  332:7
College 1:13
  242:25 400:3
column 211:4
combined
  224:13 496:24
come 29:9 71:23
  72:12,14 73:5
  80:7 108:9,16
  135:17 175:16
  176:15 177:1,2
  221:16 258:9
  290:17 315:12
  317:15 352:24
  359:9 386:8,9

386:17 475:19
  498:20 511:19
comes 80:8
  160:18 452:16
  475:21
coming 72:9
  73:11 181:10
  367:3,5 405:3
  426:16 540:19
commencement
  551:4
commencing
  1:14
comment 49:3
  93:16 130:3,10
  163:19 221:16
  257:21,23
  300:20,25
  310:10 470:23
commentary
  126:7
commented
  500:19
commenting
  106:4 480:8
comments
  106:21 131:1
  133:13,14
  136:19 176:17
  188:23 190:18
  191:14 192:13
  192:14 193:15
  193:17,19
  201:9 215:4
  314:20 326:2
  436:24 444:22
  496:4 500:22
  504:8,13 505:7
  505:20 506:4
  506:10,17,24
  509:4,14
  526:16,19
  536:18
commercial
  381:6 419:21
commercial-ty...

392:7
commission
  553:17
commissioned
  17:11 200:13
commit 476:22
committed
  340:1
committee 58:17
  136:20
committees
  58:14
commodities
  50:13
common 158:8
  236:13 307:7
commonly 261:3
  402:9
communicate
  157:7 357:22
  441:22
communicates
  504:24
communicating
  125:16 349:5
communication
  19:25 41:12
  144:7,12 157:4
  182:1 265:19
  294:7 302:9
  356:1 445:10
  488:3 498:2
  499:9 516:19
  519:4 523:4
  524:23 525:12
communicatio...
  128:5 143:17
  158:10 331:17
  347:24 441:5
  441:17 466:12
  491:20,24
  495:13 519:7
  525:2,16
community
  350:11,16
  490:13 503:11

companies 29:3
  29:17 30:12
  32:19 33:5
  43:1 51:5,23
  52:15,16 54:13
  58:4 64:10
  67:8,9 70:10
  72:5 119:19
  234:19 421:16
  534:10 549:11
  549:20
company 25:16
  26:6 29:24
  30:17 32:11,13
  32:22 61:7,9
  64:3 99:9,13
  99:21 232:15
  232:16 234:6
  262:6 320:1
  375:11 395:18
  430:3 456:22
  529:3
comparable
  430:18
comparative
  450:17
compare 400:4
  439:9
compared
  303:10 449:18
comparing
  474:6
comparison
  151:2 286:11
  496:9
complain 225:16
  225:23 226:1
complained
  225:19,20
complaint
  427:14,15,18
complete 91:1
  239:6,10
  245:23 315:8
completed 47:7
  91:5 457:9,13

Robert Glenn

493:12,17,23
**completely**
153:7 187:4
**completing**
416:24
**complex** 119:20
120:2 336:14
439:12
**component**
381:17
**composed**
327:20 439:14
**compositions**
177:6
**compromising**
358:17
**concentrate**
369:3
**concentration**
473:19
**concept** 109:12
**concern** 40:4
94:18 147:9
314:23 430:17
432:20,21
**concerned** 147:5
433:6
**concerning**
40:10 98:11
518:19 519:2
525:12
**concerns** 40:11
42:3 407:7
436:25 437:4
520:5
**concise** 408:9
**conclude** 91:9
315:24 514:11
514:16
**concluded**
182:23 371:15
371:16 550:10
**concludes** 550:8
**concluding**
521:4
**conclusion**

153:11 469:23
470:2,21 491:5
**conclusions**
132:15 151:11
160:7 184:25
191:5 268:18
435:15 486:20
490:15 503:21
507:1,4 514:6
539:19
**condition** 95:17
95:18
**conduct** 137:11
199:13 236:13
333:22 382:15
**conducted** 46:24
134:12 253:17
379:19 382:22
447:1 456:24
457:1 475:21
**conducting**
188:23
**conference** 6:7
89:13,20 93:7
94:23 95:2
117:9,10 134:7
146:3 151:8,23
178:9 179:8,9
**confided** 346:25
**confidence**
464:23 465:12
500:5
**confidences**
75:16
**confidential**
158:21 294:7
**confidentiality**
29:22 30:14
143:13,21
144:5 363:1
**confirm** 475:8
**conflict** 419:8
420:15,25
422:5
**conflicts** 419:1
**confounder**

311:4
**confounders**
306:6,9,14
**confounding**
305:22 310:7
464:22 465:11
465:18
**confused** 405:2
**confusing**
340:23 410:3
**Congress** 3:4
69:9,15 70:14
80:9
**conjunction**
343:5
**connection**
486:15 490:22
541:25
**Connolly** 4:3
23:1 35:13
**consecutive**
173:9
**consequence**
336:23 533:6
533:17 535:18
**consequences**
532:13,17
533:4,7 544:11
**consider** 12:19
19:14 140:25
216:22 318:3
333:18 334:6
381:21 439:19
439:19 449:20
473:22,25
476:18 481:16
506:10 510:5
**considerable**
174:17 300:16
372:3,11
**consideration**
96:19 103:15
110:22 160:3,6
218:21 223:17
302:25 329:4
372:23 375:25

376:11,12
395:15 408:9
500:25 539:5
**considerations**
125:8 364:6,7
373:8
**considered**
95:13,16 96:2
97:7 99:5
106:8 107:3
139:25 141:22
158:1 169:2
238:6 268:3
270:1 310:6
318:12 336:17
381:16 397:21
442:20 458:8
464:20 465:24
481:9 516:22
531:7
**considering**
109:18 442:4
**considers** 499:5
**consisted** 227:23
303:11
**consistent** 92:6
333:24 382:8
**consistently**
349:6
**consists** 128:15
**constant** 230:8
**consult** 29:18
174:15,16
192:23 212:13
218:22 219:1,4
330:11 331:13
332:12,20
**consultant** 143:8
428:2
**consultants**
64:10 541:23
543:24
**consulted** 193:4
213:22
**consulting** 15:9
21:3 25:11

26:17 27:15
28:6,7 30:13
31:6 32:16
33:10,15 66:13
66:20 72:13
88:1 123:17,18
143:2 212:21
239:15 245:25
246:5 476:7
**consume** 278:10
514:21
**consumer** 88:17
90:4 100:22
234:11,12
235:1 279:3
285:11,14
355:3 380:14
**consumers**
98:21,23 99:2
101:23 234:17
234:20,22
235:2,3,4
317:1 354:3,6
354:13 355:10
356:17 373:10
398:17 466:18
467:9 468:6
471:2 477:18
528:1 530:7,13
531:6 545:9,15
545:23
**contact** 74:23
88:5,9 91:13
112:21 135:5
139:22 141:10
250:13,19
251:9,18 252:4
252:24 253:3
292:5,9 314:12
315:17 322:5
492:1 523:18
**contacted** 73:10
79:1 136:18
137:10 215:11
**contacting**
129:11 226:7

**contain** 326:15
 327:9 328:6
 334:23 451:24
**contained** 100:8
 340:8 461:11
**contains** 335:16
 335:22,23
 545:21
**contamination**
 31:13 451:12
**contended** 483:4
**content** 22:20
 130:4,10 398:8
 495:7 529:1
**Contest** 357:15
**context** 49:17
 92:2 112:4
 262:16 337:24
 338:8,14 353:3
 504:11
**continue** 74:16
 83:9 119:14
 185:16 192:10
 303:4,24
 305:17 381:13
 403:11 456:14
 533:8,18
**continued** 3:1
 4:1 20:5 185:1
 185:17 186:4
 232:6 298:21
**continues**
 196:15 250:12
 315:23
**continuing**
 184:24
**contraceptive**
 130:20 189:24
 488:18
**contract** 184:18
 202:17,21,23
 243:7,17
 344:25 450:13
 459:12 486:25
 489:11,16
 496:10 498:21

**contracts** 267:11
 516:24
**contractual**
 362:24
**contradictory**
 119:21
**contrast** 400:19
**contribute**
 105:18 106:22
 107:4 219:24
 443:17 508:17
**contributed**
 105:18 501:19
**contribution**
 206:20 207:2
 421:15
**contributions**
 507:20
**control** 275:23
 280:1,4 306:25
 307:2,5,6
 392:9 400:22
 411:10 413:7
 413:11 432:16
 447:25 448:14
 450:18 451:5,8
 474:8
**controlled** 285:5
 306:18 307:13
 309:20
**controlling**
 348:10
**controls** 101:20
 474:7
**convene** 42:5
 366:9
**convenience**
 149:22
**conventions**
 147:6
**conversation**
 179:2 217:5,11
 217:13 363:21
**conversations**
 87:21,24 152:7
 152:17 263:16

**convey** 236:13
**conveying** 265:9
 265:13
**conviction**
 538:15
**coordinate**
 290:2,3 293:5
**coordinated**
 222:8 467:19
 468:10 528:8
 528:12
**coordinating**
 19:25 222:4
 373:22 374:3
**Copenhagen**
 173:10
**copied** 233:19
 410:17 491:25
 492:1
**copies** 23:17
 126:16 149:3
 155:10 156:2
 407:18 430:5
**copy** 60:14,16
 178:1 189:16
 255:10 369:15
 444:14 447:17
**copying** 188:13
 410:14
**Corb** 46:24
**Corey** 4:10 42:8
 50:22 57:20
 59:24 87:14
 89:10 166:17
 171:14 209:12
 211:22 298:25
 377:6 388:18
 389:7 419:6
**corner** 235:22
**cornstarch**
 534:9,11
**corporation**
 61:13,14
 319:21
**corporations**
 28:17,19

**correct** 11:16
 14:22,23 15:8
 15:10 17:4,10
 18:10 19:12
 21:4,6 27:5,6
 30:23 31:13
 32:2,22 35:16
 40:16,19 42:10
 43:19 44:19
 45:11 56:4,11
 58:25 64:5
 66:17,21 76:3
 81:7,15 83:16
 83:25 84:15
 86:7,12 88:19
 90:1 93:9
 101:16 102:4
 102:11 107:5
 108:13,25
 109:13 111:5
 119:6 122:8
 126:22 141:14
 156:21,24
 160:15 166:7
 172:5,11,12,24
 174:8,12 175:3
 175:10 179:17
 181:1 189:20
 190:9 192:6
 193:21 204:13
 204:23 205:22
 209:11,23
 210:3,18
 214:15 219:8
 221:7 227:19
 228:17 236:22
 238:18 239:16
 240:24,25
 241:6 243:9,20
 254:12 255:25
 261:4,9,19
 265:14 266:22
 289:8 296:20
 296:24 297:11
 298:13 299:5,6
 299:21 301:12

 303:18 304:17
 304:21,22
 305:1,3 309:14
 310:2 319:20
 320:14,25
 321:3,13 323:3
 323:15 333:3
 338:20 339:11
 339:21 341:2
 341:19 344:13
 344:14 350:18
 352:13 353:10
 353:16 361:25
 364:25 370:13
 373:22 375:3
 375:25 376:12
 376:16 386:1
 392:19 394:13
 394:17 395:11
 395:20,24
 396:2 398:17
 399:7 400:8
 402:16 403:21
 404:16 406:20
 408:5 409:15
 409:16 412:1
 414:8 420:13
 421:22 422:1
 428:3 429:24
 440:17,25
 441:13 442:4
 446:3 452:14
 454:18,25
 456:25 457:3
 457:22 458:6
 458:16,23
 459:3,14,15,17
 459:22 460:10
 460:11,22,23
 461:1,4,17,24
 461:25 462:8
 462:11,17
 463:3 464:7,13
 464:24 466:12
 466:18 467:10
 467:20 468:25

469:1,4 470:14
470:20 474:10
477:19,21,23
483:7 485:3,12
485:18,20
489:4,13,19
495:4,10
496:20 497:9
497:14 500:21
501:1 512:14
514:9,12
520:10 521:24
522:19 524:20
528:14 533:19
537:16 540:20
541:4,8,11,15
544:13 553:5
**corrections**
193:11 552:4,7
553:6
**correctly** 51:8
59:4 107:2
137:13 237:9
266:17 306:15
307:19 328:23
356:8 431:18
**Correlate** 8:8
**correlation**
192:4
**corresponded**
524:17
**correspondence**
91:20 205:14
340:2 497:1
523:13 525:3
**cosmetic** 6:7
13:14 89:22
128:19 130:19
134:7,14
169:21 189:23
207:10 262:8
273:14,25
274:1 277:13
282:21 283:8
315:12,13,15
315:18,25

316:4 317:15
318:3 334:25
392:8 397:20
433:24 434:9
435:1,6,21,25
436:7 438:24
439:3,4 440:12
440:13 442:23
446:9,12
488:18 522:12
545:9,22
**cost** 33:21 34:14
46:12 145:3
149:25 150:5
150:13 372:18
388:8 475:2,11
**costing** 162:17
**costs** 23:12
225:1 372:3,11
387:23 403:6
475:17,19
**couch** 213:10
**couched** 201:18
204:8
**coughed** 106:25
**coughing** 254:7
**COUGHLIN**
3:13
**Council** 3:22
10:21 521:22
522:5
**counsel** 2:12,17
3:16,22 4:6
9:14 10:1
14:12 22:10
23:16 34:22
35:6,12 44:17
48:25 49:5,7
60:13 67:10
69:8 83:9
122:24 126:15
138:15 283:19
313:1 358:7
359:19 364:15
437:13 455:2
466:5,14,25

471:23 479:17
483:12,23
484:13 496:17
497:11,16
498:8,17 501:5
512:8 518:15
518:19 527:18
527:25 529:20
536:21 546:6
547:4,22
551:11,12
**count** 188:2
329:16 415:10
**country** 173:1
**couple** 11:9
24:17 35:7
112:17 190:6
190:11 218:14
292:14 313:9
417:22 453:11
455:3 459:3
466:10 516:9
529:24
**course** 14:4 16:4
20:4,18 31:10
55:9 57:4
66:19 87:24
227:6 250:24
263:18 322:23
322:24 359:3
404:12 431:10
505:17,21
526:7 531:21
543:12
**court** 1:1 9:11
9:16 83:22
182:20 552:19
**courtesy** 14:5,7
**courtroom**
431:14
**cover** 15:21
103:23 194:6
194:10,15
270:14 371:1
**covered** 131:18
245:12,17

359:21 421:3
453:12
**covering** 12:2
247:1
**covers** 239:11
245:24
**Cramer** 292:1
300:5,13,16
301:2 306:2
538:16
**cramped** 21:18
**create** 30:21
129:24 351:4
542:17
**created** 51:4
184:6 494:13
**creates** 99:22
**creating** 180:13
349:4
**credentials**
499:25
**credible** 464:21
500:6 532:5
**credit** 50:1
513:6
**credited** 105:12
203:21
**criminal** 544:8
544:10
**criteria** 381:13
381:14 402:4
**critical** 6:17
109:7,12,16
133:8 189:3,5
191:7 194:18
200:19 291:24
300:3 310:25
330:7 331:12
335:24 349:3
366:13 369:4
417:25 421:3
421:18 486:10
489:4,8,12,19
492:11,17,23
493:5 494:14
494:22 495:7

495:15,18
496:1 498:11
500:9,13,14
501:8 502:14
502:22 503:12
503:19
**critically** 132:7
**criticisms** 327:6
**criticized** 40:15
**crocidolite**
339:1 400:6
407:1 409:7
412:21,23
413:8 432:14
**crossed** 489:8
**crosshairs**
432:24
**CROSS-EXA...**
453:1 471:15
521:16
**Crowell** 7:2
14:20,25 15:16
23:6,9 24:10
24:20,22 25:10
27:5,9 28:5
35:15 65:8,14
67:3,7,13,18
68:4,9 69:5,21
70:3,22,24
71:9,20 72:3,9
72:23 73:3,5
73:22 74:21
75:4,10 77:5
77:21 78:6,12
78:17,21,22,25
79:6 81:19,23
83:4 84:12
85:12 86:17
87:25 88:6,9
89:8 92:9,20
103:1,24
108:15,19
109:21,23
113:5 121:15
122:4 124:4
127:15 129:9

129:10 130:25
132:23 139:9
142:4,9,18
145:11,12
147:18 148:22
156:11,20
157:19 163:17
183:18 185:16
186:21 190:17
194:21 199:13
201:23 202:17
202:22 203:9
203:12 204:7
204:22,25
205:4,7,10,21
226:18,21
243:7,19 244:8
245:2 246:6
251:5,9 252:3
259:1,8 261:24
267:11 275:10
295:19 296:17
319:19 320:12
320:13,23
321:8,11,25
322:1,24,25
325:17 330:10
331:10,19
335:13 343:17
345:1 358:13
358:20 359:4
380:11 381:2
383:9 386:21
387:2,13,22
389:20,24
390:11,14
396:25 414:1
421:12,19
426:5,23 427:1
428:2,12
440:16 441:6
441:12 443:8
450:13 476:6
477:3 483:13
485:3,7,21
496:11 498:21

516:20,23
540:20,22
**Crowell's**
320:19
**crystalline** 5:18
43:14 46:14
47:3,14
**CTFA** 89:19,21
91:13 93:7
94:10 95:12
135:16 136:18
137:15 224:1
229:12 233:23
234:13 343:21
350:7 407:24
522:19,21
523:4,21
524:18 525:2,6
525:20 526:13
526:19
ctisi@levinla...
2:4
**cubed** 45:1
**cubic** 337:1
**culmination**
345:24
**cumulative**
381:19
**current** 25:15
44:3 63:9,12
**currently** 40:3
262:17 471:24
**customary**
456:17
**customers**
318:17 349:11
467:8,19,24,25
468:6,10 528:2
528:7 530:6
**cut** 8:12 102:21
501:6
**cutting** 141:5
**CV** 26:15
**cytotoxic** 482:13
483:6
**C&M-LUZ** 7:9

7:9

---
## D
**D** 4:8
**daily** 229:3
290:18 302:2
**damage** 482:3
482:14
**dark** 487:24
**Darnell** 4:8 9:3
**Dassow** 5:15
**data** 34:14,14
37:19 110:14
119:21 131:24
136:21 137:18
190:12 191:5
214:4,6,12
227:7 302:24
303:5 306:19
309:21 379:1
416:12,15
476:10 478:2,7
478:14,21,22
480:21 481:21
482:12,18
485:25 486:19
486:20 490:10
490:14,21
505:1 507:4,21
509:4 510:5,17
510:25 511:15
511:25 512:9
512:11,11
513:10,20,22
513:25 541:7
545:5
**database** 128:22
**date** 1:15 9:6
44:19 62:8
69:3 84:23
86:8,13 87:15
88:24,24,24
91:18 202:6
217:6,8 255:25
293:18 319:8
340:1,3 358:7

365:15,17
372:14 378:16
378:18 415:24
523:15 551:8
552:9 553:12
**dated** 44:18
104:2 178:4,5
188:12 458:15
469:2 551:19
**dates** 424:1
494:3,4,7
**Davant** 4:3 5:14
10:22,22 28:9
29:19 30:1
35:18 38:11,18
45:22 66:1
72:1 73:7 74:3
75:12,15 84:16
85:14 100:10
103:2 115:10
142:6 144:10
210:5 225:4
246:9 267:20
267:24 268:11
277:14 282:6
282:17 283:6
283:11,15,20
284:3,9,12,18
320:16 321:7
353:17 366:17
368:6 373:16
376:1,21
378:22 383:7
386:6,24
389:22 390:20
425:10 431:24
437:19 446:4
446:13 530:24
546:6 547:4,22
547:25 548:9
548:18,23
**David** 73:8,13
73:16
**day** 57:12 62:1
253:21,21,22
253:23 273:4

334:3 343:10
352:10 407:14
446:19 514:22
529:13 549:16
553:16
**days** 35:1,5
115:17 253:20
254:24 302:10
313:9 552:15
**DC** 3:21 4:5
247:12 444:14
525:25
**dead** 510:23
**deadline** 372:12
372:13
**deadlines** 372:4
**dealing** 14:19
31:12 33:11
43:12,14 77:7
81:13 174:11
414:11
**dealings** 62:15
499:12
**deals** 474:3
**dealt** 141:12
**Dear** 149:14
155:18 326:5
406:21 410:25
428:23
**death** 95:19
544:12,17
**debate** 15:23
16:3 541:14,15
**deBeus** 233:25
**decades** 208:22
542:21,21,22
**December** 416:2
425:24
**decide** 249:4
506:10
**decided** 118:12
197:5 336:16
336:20 361:9
361:24 374:12
404:19 406:4
437:13 445:15

Robert Glenn

decipher 120:2
deciphering
119:20
decision 56:18
56:23 57:4
66:23 98:12
111:11,13
222:22 280:18
355:24 363:17
372:6 373:18
445:14 519:25
521:3 547:19
decision-maki...
519:1,8
declaration
239:7,11
241:14 245:23
deemed 552:18
deeply 357:16
Defendant 2:17
3:16,22
defendants
10:14 24:5
defending 111:3
defense 13:24
65:21 66:3
73:6,24 205:22
323:15 345:17
347:6
defer 500:15
517:13
deferred 82:19
83:13 84:23
deficiencies
307:1 333:16
define 440:9
defined 177:10
338:23
defining 338:17
definitely 280:7
definition 37:25
38:4,7 40:3,10
40:16 42:3
169:13 337:9
338:10,18,19
definitive

150:12
degree 18:13,22
404:7 431:5
454:6 473:2,16
degrees 454:4
delay 436:23
delayed 430:9
deleting 192:15
deliberations
222:17
deliver 164:5
deliverables
165:6 188:16
delivered 259:24
Demers 303:4,7
303:21 304:4
305:5
demonstrate
346:23 352:21
401:21 403:13
403:24
demonstrated
393:18 425:5
demonstrating
431:2
department
36:17,23,25
37:3,5 74:2,22
76:1,8 86:19
242:23 458:4
departments
458:4
depends 106:14
depo 11:13
deponent 9:13
10:25 553:1
deposes 9:23
deposing 552:14
deposit 439:13
deposition 1:11
5:13 8:13 9:8
12:14 13:8
22:1,2,2,8,16
34:21,25 35:25
65:4 81:6 83:1
133:22 145:17

152:10 163:15
187:21 198:15
200:6 257:7
263:21 283:10
308:11,19
325:10 475:1
498:9 549:6
550:8,10 552:3
552:12,16,17
deposits 177:2
232:17 261:3
deprive 159:18
deps@golkow...
1:22
derive 27:15
describe 32:11
32:13 172:20
440:4
described
172:11 183:14
431:9 509:17
describing
229:19 394:15
description 5:12
5:20 50:21
430:10
designated
322:5
designation
102:2 381:23
393:10
desk 85:20
detail 18:1
detailed 34:17
details 19:22
252:13
determinative
401:19 403:12
determine 312:2
341:13 432:14
determined
291:23
develop 37:12
357:20,24
361:18 532:5
developed 11:20

170:14 173:19
179:13 186:7
209:2,9 210:9
210:16 266:8
322:23
developing
184:16 256:15
346:13 364:5
development
44:1
develops 37:16
devoted 211:3
devoting 81:18
diagnosis 95:21
diaphragm
143:3 150:2
152:1,19 164:7
165:2 171:8
180:12 186:7
186:11 190:3
214:3 244:13
295:8,25
304:20 305:1
305:12 330:8
331:13 450:12
450:21 451:10
451:20 486:9
487:2 488:11
489:18,24
491:9,22,22
492:6 502:13
502:21
diaphragms
130:20 189:24
213:24 295:11
304:5 451:4
485:18 488:18
490:23 491:4
diaphragm/ov...
151:2
dictated 414:16
die 278:14 280:3
280:7
diet 278:9
dietary 515:1
differ 201:4

439:5 537:15
differed 204:9
different 11:25
24:17 30:6
64:21 80:4
105:19 137:2
153:4 175:3,21
176:24 177:5
192:1 201:19
221:21,24
265:21 274:24
278:22 312:21
312:23 327:21
377:14 379:4
387:24 391:25
400:9 448:9
458:4 474:15
differently
530:12 541:8
differs 538:20
difficult 352:3
369:18
difficulties
316:6
difficulty 364:10
digest 316:6
diminished
372:7
dioxide 6:21
254:4,13 258:6
260:4 400:19
411:11 413:9
Diplomate 1:16
551:3,17
direct 11:1
14:25 16:18,21
91:20 121:12
143:23 151:13
152:21 292:2,6
295:12 321:21
331:16 333:12
354:22 390:22
441:3,17 449:3
525:3
directed 526:4
direction 56:18

112:23 121:19
**directly** 88:10
  215:24 216:9
  221:16 231:5
  244:13 258:3
  354:7,13
  355:10 356:19
  410:16 441:5
  524:16
**director** 37:22
  37:23,24 40:7
  42:2 69:18
  88:16
**directors** 58:13
**disagree** 51:20
  110:3,14 549:9
  549:18
**disappointment**
  326:6
**discipline**
  473:22
**disclose** 206:2
  241:18 420:15
**disclosed** 239:24
  261:18
**discloses** 245:13
  246:4
**disclosure**
  161:13 496:18
  496:22 499:5,6
  516:3,10,22
  517:7,15
**disclosures**
  160:23 516:17
**discontinuing**
  374:7
**discount** 166:4
  510:9
**discovery** 35:8
  359:10
**discuss** 34:20
  42:7 55:23
  117:9 128:6
  165:15 173:18
  298:17 299:18
  362:23 464:15

**discussed** 22:21
  128:13 137:2
  146:13 151:12
  152:2,18
  178:15 180:16
  195:10 211:9
  215:8 216:11
  248:10 288:20
  289:4,6 346:12
  352:2 406:3
  431:21 456:20
  457:20 459:6
  462:23 466:14
  468:14 518:21
**discusses** 166:2
  466:11
**discussing** 19:9
  77:3,15 97:4
  149:16 202:23
  288:16 339:8
  527:20
**discussion** 71:20
  71:23 72:2
  106:21 118:8
  135:25 142:8
  152:13 180:11
  183:5 216:21
  216:24 223:10
  224:19 295:8
  338:15 342:16
  351:13 430:12
  455:9 460:14
  460:16 463:21
  529:20
**discussions**
  113:2 147:16
  147:24 151:15
  153:2 441:11
  519:7 526:8
**disease** 32:4
  40:8 46:15
  207:12 336:18
  341:23 342:1
  381:14 543:7
  544:17
**diseases** 473:8

**displayed** 23:24
**dispute** 280:8
**disseminate**
  293:3
**disseminated**
  409:2
**disservice** 521:6
**distilling** 259:19
**distinct** 115:9
**distinction**
  137:3 339:21
  464:1
**distinguishable**
  336:22
**distributed**
  398:20 430:11
**Distributing**
  355:2
**distribution**
  292:18 414:13
**District** 1:1,1
  9:11,12
**disturb** 41:6
**diuretic** 74:12
**division** 38:6
  40:7 380:14
**divulge** 113:1
**DNA** 273:16
  274:23 275:1
**doctor** 203:22
  310:11 495:19
**document** 1:6
  8:12 39:21
  44:17 51:12,18
  60:23 61:23
  65:25 109:5,7
  112:19 116:3
  117:16,22
  120:12 133:21
  138:4 148:13
  151:16 152:7
  171:21 178:3,5
  187:20 188:1
  191:3,16,20,25
  200:9 205:15
  238:3 241:8

246:19 257:3,4
  257:10 271:6
  291:7 324:20
  324:21 338:5
  350:21 351:18
  359:5 362:10
  370:15 374:6
  375:6 377:19
  379:2,5 384:14
  395:19 399:18
  405:14 406:13
  408:23 445:8
  455:11 463:18
  480:7 483:22
  484:8,11,12,13
  496:6 527:19
  528:20,23
**documentation**
  224:20
**documents**
  21:12 35:7,7
  35:19,20,25
  36:4 52:23
  80:24 81:5
  85:2,7 138:2
  141:6 152:9
  180:25 188:21
  189:2 200:8
  238:12 256:5
  270:19 322:17
  371:4 442:2
  518:6,9,15,17
  519:16 524:11
  529:1
**document's**
  23:23 111:24
**dog** 26:24
**doing** 15:3 47:19
  47:20 80:15
  117:1 123:9
  129:9,9 138:11
  245:7 246:5
  247:3 256:17
  295:16 301:9
  334:17,20
  413:19 435:5

441:24 442:20
  446:23 473:5
  480:1 496:21
  552:8
**dollars** 33:21
  34:4,4 66:24
**domain** 29:13
  496:13 513:23
**Donath** 3:14
  10:17,17 23:16
  25:19 26:4
  33:2,13 40:17
  41:8,18 42:18
  44:16 45:3,12
  48:6 49:2,6
  51:10 53:3,18
  54:11 56:21
  58:9,22 59:21
  60:13,17,21
  61:4,19 62:18
  65:19,23 66:15
  75:1 76:4 77:9
  79:18 82:22
  84:1,19 85:13
  85:22 90:19
  93:10 94:5,24
  95:8 96:5,13
  96:21 99:11
  102:5,12 103:3
  103:11 109:1
  109:14 110:7
  111:6 112:22
  114:21 119:8
  121:11,18,22
  123:22 124:6
  124:25 125:22
  128:8 129:15
  131:3 132:4
  133:1 136:5
  137:25 138:14
  140:4,19
  142:20 143:6
  143:23 144:24
  147:20 151:13
  151:20 152:21
  154:2,10 159:8

Robert Glenn

| | | | | |
|---|---|---|---|---|
| 159:21 160:9 | 349:14 351:5 | 531:23 532:15 | 198:15,24 | 400:2 404:10 |
| 179:19 182:8 | 351:10 352:5 | 532:19 533:10 | 203:24 204:8 | 406:14 407:15 |
| 182:25 183:20 | 352:14 353:1,9 | 533:22 534:7 | 205:9 213:4,14 | 410:7 415:6,9 |
| 185:2,22 | 354:8,17 | 536:8 537:18 | 214:7 215:5,15 | 438:4 457:10 |
| 186:14 190:21 | 355:13,22 | 538:22 539:22 | 215:18,24 | 457:21,23 |
| 193:1 197:2 | 356:10,20 | 540:8,24 | 216:21,25 | 475:13,14,16 |
| 198:2 203:16 | 361:6 364:8 | 541:10 542:11 | 217:5 222:12 | 491:7 492:2 |
| 204:5,19 | 365:2 366:16 | 542:18 544:5 | 222:13 224:5,6 | 497:7,12,21,22 |
| 205:25 206:25 | 367:1,16 368:1 | 544:14,20 | 224:8 225:16 | 498:8,18 499:4 |
| 209:24 210:11 | 368:5,22 | 545:11,25 | 225:22 227:1 | 499:9,13,22 |
| 210:21 211:6 | 370:18 372:21 | 546:20 547:9 | 228:11,13,13 | 500:1,2,16 |
| 214:17 219:9 | 373:2,15 374:9 | 547:17 549:14 | 228:15 236:18 | 506:20 507:18 |
| 223:2,12 230:2 | 376:2,13 | 549:23 | 236:21 240:4 | 508:3 509:3,11 |
| 243:22 244:14 | 378:10 382:18 | **dose** 168:10 | 246:4 249:3,13 | 509:14 511:18 |
| 244:23 249:14 | 383:11 386:25 | 432:13,14,15 | 249:23 250:7 | 511:24 512:1 |
| 252:7,19 253:1 | 388:4,11 | 481:17 | 251:11,16 | 513:14 516:3 |
| 253:4 255:9 | 389:16 390:21 | **dose-response** | 252:16 256:21 | 516:10,16 |
| 260:16 262:19 | 392:21 393:4 | 7:23 380:6 | 256:22,22 | 517:5 523:16 |
| 265:15 269:21 | 394:1 395:12 | 381:15 382:21 | 257:11,24 | 523:19 524:2 |
| 271:22 272:22 | 396:3,13 397:4 | 384:5,23 | 258:5 263:9,17 | 524:17 538:16 |
| 274:10 276:19 | 397:15,23 | **dossier** 345:17 | 263:20,25 | 541:17,19 |
| 277:15 278:6 | 398:4,10,18 | **doubt** 73:2 | 264:8 267:2 | **draft** 184:6 |
| 278:18 279:8 | 401:12 403:22 | 120:10,14,16 | 275:6 278:7 | 189:22 194:8 |
| 279:18 280:15 | 404:3,21 | 251:12 282:4 | 281:4 289:23 | 205:19 206:10 |
| 281:22 282:22 | 414:14 417:12 | 401:22 542:17 | 290:10,17 | 455:22,25 |
| 285:12,20 | 420:19 421:6 | **doubts** 403:14 | 293:9 294:25 | 456:13 457:6 |
| 286:3,12,21 | 421:24 422:8 | **downstream** | 295:5,7 297:5 | **drafted** 208:14 |
| 287:20 288:8 | 422:19 423:13 | 99:14 234:17 | 297:5,7,16,21 | **drafting** 181:4 |
| 290:8 295:21 | 423:22 425:20 | 356:23 | 298:18 299:15 | 331:11 |
| 296:21 298:8 | 426:7,15 | **Dr** 6:5 8:11,11 | 299:16,19,25 | **drafts** 190:11 |
| 299:12 308:14 | 427:16,21 | 42:1 46:25 | 301:2,5,6,8,22 | 205:15 493:16 |
| 310:20 311:15 | 431:23 433:8 | 91:20,21 | 302:18,19 | 493:23 |
| 315:1 317:7,18 | 433:12,20 | 113:13 115:3 | 303:4,7,21,25 | **drainage** 172:17 |
| 318:7 319:24 | 434:23 435:8 | 115:19 116:18 | 304:4,16,19,21 | 173:8 |
| 320:7,15,17 | 435:18 436:6 | 117:6,18 | 305:5,18,21 | **draw** 196:4 |
| 321:6,14 322:8 | 436:15 437:10 | 126:24 136:15 | 306:2 307:9,12 | 268:17 486:19 |
| 323:4,10,16 | 437:20 438:17 | 136:17 141:9 | 307:17,25 | **drawed** 136:15 |
| 324:2 329:22 | 441:2 442:6,22 | 141:14,18,19 | 308:3,9,23 | **drawing** 360:25 |
| 330:14 331:15 | 443:10,19 | 141:21,23,24 | 309:4,14,15,19 | **Dressler** 511:24 |
| 332:22 334:18 | 444:11 445:2 | 142:3,10,11,13 | 310:1,4,6,12 | **drew** 180:21 |
| 335:20 336:9 | 446:5,14,20 | 142:22 146:16 | 310:15 311:13 | **drifting** 509:7 |
| 339:12,23 | 448:19 451:15 | 156:5 164:20 | 325:21,23 | **drink** 74:13 |
| 340:11 341:3,9 | 452:1 470:2 | 174:20 176:11 | 326:5 334:15 | **drive** 453:23 |
| 341:20 344:12 | 495:21 528:17 | 179:25,25 | 335:9 339:8 | **Drs** 46:24 78:18 |
| 345:5 346:3,20 | 529:6 530:14 | 183:6 186:16 | 344:16 360:25 | 149:14 155:21 |
| 347:7 348:16 | 530:23 531:11 | 188:21 193:8 | 395:4 399:21 | 267:1 299:10 |

345:15 483:14 484:9 485:2,22 486:8 487:16 487:23 488:9 494:12,21 495:13 496:18 502:12 503:13
**drug** 30:17
**DSDTT** 42:2
**due** 333:16 372:3 385:16 386:12
**DUFFY** 3:13
**duly** 9:21 551:5
**duplicate** 406:24
**DuPont** 29:3,17 31:11,12 32:1
**dust** 45:11 219:22 411:10 451:19 501:25 502:3
**dusting** 153:10 164:23 165:18 186:3 295:13 296:4
**dying** 433:17

**E**
**E** 2:1,1 3:1,1 4:1 4:1,8,8 242:22 242:23
**earlier** 111:15 113:16,18 153:15 214:8 217:9 218:19 262:12,15 290:22 299:15 311:1 326:24 390:15 394:15 402:3 421:3 430:16 431:21 447:4,10 450:2 450:10 459:6 461:6 462:24 474:25 488:8 494:3 497:5

501:4 506:20 508:2 541:17
**earliest** 69:1,3 149:22
**early** 367:21 453:12 462:24
**easier** 23:23 194:1 297:20 354:15
**easily** 336:21 504:15
**Eastern** 117:8
**eat** 277:23 278:12
**Ed** 68:12 69:11 70:8,8 72:4 233:25
**edit** 106:4 163:20
**editing** 120:22 220:3,12 332:10
**editor** 490:18 497:2 503:16
**editorial** 121:3 505:11,11
**edits** 131:1 190:17 200:24 526:20
**educate** 258:20
**education** 36:24 282:8
**educational** 472:24
**Edward** 68:11
**effect** 183:11 219:21 275:18 431:7 443:22 511:3
**effective** 48:3 356:16
**effectiveness** 156:8
**effects** 173:6 394:23 400:13 438:20

**effort** 335:10 345:25 487:23 489:17
**efforts** 256:7 288:17
**effusions** 207:21
**eight** 189:1 268:4,7,15,16 268:20
**either** 31:4 162:3 170:11 206:21,24 220:20 225:25 270:12 282:2,3 305:7 309:7 310:17 333:3 359:22 366:22 411:11 497:21 502:13 523:25
**electronic** 128:22
**element** 375:18
**Ellis** 8:3 63:9 231:21 232:9 250:18,22 291:17 371:9 371:10 406:15 407:14 408:19 410:14 414:16 414:23 454:24 456:4
**else's** 455:13
**embryologic** 175:13
**emotional** 536:10
**emphasized** 346:14,22
**employ** 128:20
**employed** 25:9 140:6,9 432:14 523:20 525:6
**employee** 95:1 101:4 322:1 440:16 551:11 551:12

**employees** 101:10 318:16 349:11 352:22 467:9 524:14 530:6,13
**employer** 27:8 243:24 251:5 319:18
**employment** 14:24,25 85:12 87:25 92:20 111:13 239:14 245:25 322:24 322:25 359:4
**encompasses** 16:15,18
**ended** 15:1 66:8 162:17 232:2
**endorse** 182:16
**ends** 111:3
**enforce** 348:9
**enforcement** 36:18
**enforces** 36:19
**engaged** 25:11 146:15
**engineering** 58:20 101:20
**England** 424:14
**enhance** 357:25 361:19
**enlighten** 449:23
**enlightened** 511:16
**ensure** 467:9,19 468:10 528:7 530:7
**ensuring** 238:5
**entered** 485:1 525:8
**entire** 121:2 196:12 211:25 277:3 289:21 289:23 330:23 414:20
**entirety** 404:20

**entities** 26:11 28:14
**entitled** 63:21 130:3,10 255:19 348:25
**entity** 140:15 419:22
**entomology** 454:6 473:2,5
**entry** 295:24 410:6
**environment** 58:20 124:12
**environmental** 68:17
**EOC** 107:23
**epi** 250:9 305:24 384:3
**epidemiologic** 478:22 480:21
**epidemiological** 128:17 135:9
**epidemiologist** 20:12,22 270:11 361:1
**epidemiology** 20:17,20 127:25 131:23 265:4 294:25 299:25 300:12 332:17 401:19 403:12 432:7,9 450:24 494:16 494:24 501:23 511:19
**epidermal** 416:17
**epithelial** 107:25 170:5 175:17 175:20,22 176:1,2 276:2 276:8,13,25 391:22 392:6 392:15 393:20 394:24,25 400:7 406:4

409:9 411:18
412:8 417:3
425:2 449:10
511:12
**epithelium**
175:5
**equally** 352:20
**equipment** 58:4
**equivocal**
394:22
**Eric** 7:8 134:18
228:9 292:15
314:12,13
343:18 345:12
345:14 346:14
346:22 370:15
370:19
**Ernst** 499:22
541:19
**err** 549:11,20
**errata** 552:6,9
552:11,14
553:7 554:1
**especially** 34:17
56:1 317:10
369:19
**espoused** 543:25
**ESQUIRE** 2:4,5
2:9,14 3:3,8,14
3:19 4:3
**essence** 513:2
**essential** 375:15
**essentially** 37:1
44:3 64:25
174:23 182:16
257:17 268:2
285:1 437:8
465:3,22
501:18 503:25
508:15
**establish** 351:23
352:11 353:14
**established**
158:14 363:19
**establishing**
193:18

**estimated**
224:13 403:7
**estimates** 306:4
306:7
**et** 91:6 209:9
292:1 300:5
362:24 430:19
**ethically** 321:1
321:11
**Euro** 224:5
**Europe** 54:19
242:2 311:2
**European** 199:8
199:15 234:6
423:6 494:15
494:23
**EUROSIL** 56:1
**EUROTALC**
419:12,14
447:3 457:14
459:12
**evaluate** 316:7
326:16 327:10
328:7 329:20
363:24 392:5
**evaluated** 395:2
**evaluating**
400:25 474:4
512:4 519:23
**evaluation** 6:20
7:23 242:24
265:10 315:11
326:7 328:11
329:7 333:20
333:23 380:6
384:23 401:20
**evening** 298:18
299:20
**evenings** 290:18
**evenly** 150:5
**events** 230:19
**eventually**
496:12
**everybody**
283:17
**evidence** 153:9

153:11,13
167:6 271:11
288:1 315:25
316:1,9 317:4
326:9,10,17
327:10 328:7
328:12 381:22
393:9 435:15
443:16 447:21
462:1,2,3
464:3,7,11,12
464:17 465:9
470:6,18 504:3
532:8 537:8
**evidenced**
438:19
**evidentiary**
12:17
**evidently** 205:8
301:9 373:18
381:1 434:12
446:8
**exact** 217:6
**exactly** 62:23
133:24 210:2
238:13 309:12
460:25
**examination**
11:1 45:25
527:8 551:5
**EXAMINATI...**
5:4
**examine** 128:17
**examining** 7:20
130:18 358:1
361:20 488:17
**example** 101:11
336:8 348:12
501:20 541:23
544:23
**Examples** 51:24
**excellent** 415:10
**exception**
503:17
**exceptionally**
95:22

**exclusive** 185:20
349:22
**exclusively**
28:16,19
**excuse** 22:1 28:5
35:23 58:10
67:14 78:13
117:16 120:18
162:9 202:6,11
203:5 236:3,25
241:14 258:24
298:16 302:19
329:18 385:3
416:23 424:21
429:10 466:10
474:3
**executed** 156:4
**execution**
155:20
**Executive** 189:2
**exhibit** 21:22
22:1,11,15
23:17 26:14
39:10,13 44:5
44:8,18 50:16
50:19 59:22
60:3,14 63:15
63:19 87:9,13
102:16,20
103:21 111:17
111:23 112:9
126:8,12
133:16,20
148:5,9 154:22
155:1,3 162:10
162:14,18
177:20,24
187:14,18
199:23 200:3
211:20 218:16
231:13,16
240:16,19
246:15 255:2,6
290:25 291:3
312:17 313:3
319:2,6 325:3

325:7 333:6,7
337:2,6 342:21
342:24 347:10
347:14 362:6
362:11 369:9
369:13 374:25
375:1 377:7,11
379:14,23,24
383:16,20
387:10,20,22
388:2 390:3,6
391:7,17
398:21 399:2
405:8,24 406:8
409:21,25
415:14,20
416:19,23
417:16,18
424:22 425:11
425:15 428:6,9
457:17,19
458:14,15,19
458:25 459:7
463:11 466:2
468:14 483:25
484:4,4,7,18
488:14 495:20
495:22 496:1,2
496:12 498:10
527:14
**exhibits** 5:11
8:13 454:9,13
**exist** 232:6
285:18 312:7
**existed** 66:20
**existing** 128:16
128:23 129:1
485:15
**exists** 24:19
**exit** 445:15
**expand** 89:14
**expansion** 37:25
**expect** 153:25
342:2,5 510:16
510:21
**expectation**

131:22 224:25
225:1 393:2
**expected** 151:11
152:19 167:1
236:14 259:12
443:20 445:23
476:15 485:22
512:1
**expecting**
137:12
**expects** 151:1
**expense** 33:24
**expenses** 54:2
224:9
**expensive** 34:17
**experience**
19:12,14 29:10
140:21 165:16
166:3 167:17
168:6 174:18
174:25 215:5
331:9 385:10
411:3 437:3
456:11 504:22
506:3 512:18
**experiencing**
436:23
**experiment**
406:23 412:19
435:3
**experimental**
340:19 408:9
464:2,11
**experiments**
175:24 413:13
428:23
**expert** 98:13
115:13,14,15
124:15,22
125:10,12,14
261:19 262:1
330:12 331:14
332:12,21
471:5 474:13
511:8 538:2
**expertise** 326:16

327:9 328:6,12
328:18 329:9
505:13 508:22
**experts** 12:18
**expires** 553:17
**explain** 36:9
180:4 323:18
**explore** 65:3
82:3 218:2
**exposed** 340:7
391:24 394:25
395:1 403:25
**exposure** 5:16
46:14 132:8
153:10 165:19
213:24 219:23
275:2 280:6
295:12 328:15
381:19 383:1
392:6 401:23
403:15 412:20
412:23 426:12
464:19 480:16
480:18 501:25
502:3 510:11
510:12
**exposure/resp...**
269:9 479:14
**express** 94:11
326:5
**expressed** 147:9
157:18 345:14
436:25
**expressing**
391:21
**expression** 8:7
393:19 394:9
411:17
**expressions**
392:5
**extend** 14:6
**extended** 73:4
**extension**
393:17 425:4
**extensive** 385:9
**extent** 390:23

441:4
**external** 120:24
**extra** 60:16
**eyes** 23:25 40:25
**e-mail** 88:21
89:11,19 90:22
93:6,13 94:7
112:7 116:24
148:19,21
149:13 152:16
155:8 162:25
164:14,19
188:11 228:16
232:10 233:17
234:10 235:2
236:18 291:16
293:22 300:11
301:18 313:10
365:9,16,18
383:21 406:16
407:15 408:13
410:6 414:19
414:24 417:19
418:5,6,14
428:12,15
433:10 437:17
444:1
**e-mails** 229:5,16
294:10 524:12
**E-mail(s)** 5:24
6:9,10,12,13
6:15,18 7:3,5,6
7:16 8:1,4,6,9

————————
**F**
**F** 3:20
**Fabi** 53:7 62:21
63:3
**Fabini** 395:4
**facsimile** 6:1
126:18
**fact** 83:3 84:21
94:17 121:8
135:6 203:23
212:10 224:5
232:1 253:16

269:10,17
295:8 310:24
324:9 329:15
340:9 342:8
367:5 376:7
383:19 452:14
457:8 459:5
463:22 464:2
488:7 510:15
511:21 513:8
519:14 522:1
541:16 542:9
543:14 544:3
**factor** 107:10
166:5 280:25
281:20 368:16
372:4,12
423:15 424:2
470:19
**factors** 102:23
102:24 103:4,7
103:10 306:9
331:4 424:12
**factory** 100:18
100:25 101:10
**facts** 483:20
**fail** 552:17
**failed** 269:8
479:14
**fair** 14:8,9 15:24
33:9 37:11
38:24 63:7
77:18 81:1
95:4 139:6
157:13,15
229:21 263:14
301:11 367:20
402:20 414:25
476:2
**fairly** 19:18
21:10,18,18
247:23
**familiar** 79:11
79:13 85:20
105:2 221:12
230:15,17

284:21 291:9
305:6 308:3
328:17 337:8
484:10,22
506:21 515:19
**far** 15:5 295:24
431:17 453:20
456:7 472:19
497:19 500:16
517:14
**fault** 360:2
**favorable** 151:1
**fax** 1:22 6:5
103:24
**FDA** 97:14 98:9
177:15 356:13
545:14,18
**feasibility** 384:1
384:1
**February** 7:8,10
7:13,15 8:11
155:13 202:7
227:13 235:22
241:3 293:16
293:19,25
302:3,6 306:24
313:11 314:7
319:7 325:16
343:9 347:20
364:4 484:7
**fee** 67:1
**feedback** 290:3
413:15
**feeding** 322:5
**feel** 160:13
265:7 273:12
273:21 274:21
320:3 360:1
361:4 395:25
420:18,22
536:4
**feldspar** 52:2
**fellowship**
301:10
**felt** 38:7 193:10
294:15 300:20

Robert Glenn

**females** 451:4
  451:19
**Ferguson** 3:3
  5:6 10:11,11
  453:2,5 455:23
  456:19 460:1
  462:14 465:15
  466:1,22 468:2
  470:4 471:7,11
**ferruginous**
  402:19
**fiber** 38:25 39:4
  39:4,8 336:6
  341:1,5,16
**fibers** 273:7
  452:11,11,12
  483:3
**fibrogenesis**
  400:21
**fibrous** 39:8
  338:24,24
**field** 330:23
  474:10,11
**fields** 19:5
**fifth** 422:13
  467:1,17
**figures** 190:7
  428:23
**filed** 425:18,24
  427:14,19
**files** 63:11
  359:19,24
**filled** 366:14
  369:6
**final** 57:3 121:4
  155:20 319:8
  319:11 328:25
  456:3 458:22
  486:21 492:5
**finally** 70:18
  462:19
**financial** 160:23
  161:14 239:12
  241:18 245:24
  419:21
**financially**

460:8 551:13
**find** 62:10 63:10
  166:1 186:1
  258:24 290:10
  307:20 334:9
  406:22 408:8
  470:9 481:17
  499:13 523:14
**finding** 431:22
  480:8,9,11
  488:10
**findings** 132:14
  329:6 348:14
  351:24 352:13
  353:16 411:22
**fine** 21:16 23:24
  76:18 83:12
  138:14 141:7
  148:14,15
  440:13 521:20
**finish** 98:25
  283:22 405:18
  509:9
**finished** 267:24
  284:9 493:10
  494:11 518:3
**firm** 14:20 15:2
  15:3 20:15
  21:2 22:23
  24:10 25:2
  65:16,17,21
  66:8 70:19
  72:18 73:6
  75:4 82:2 89:8
  92:9 108:17
  111:2 124:11
  129:3 130:3,6
  130:9 145:13
  146:16 205:11
  205:22 246:7
  251:6 319:19
  437:17
**firms** 146:19
  157:24 537:21
  537:24
**firm's** 157:10

**first** 9:21 11:13
  12:10,13 53:25
  67:4 72:8,24
  75:8 81:6,10
  90:25 91:4
  93:16,21 97:16
  101:18 112:20
  113:8 117:25
  118:16 119:17
  120:21 123:15
  127:22 128:15
  141:9 150:5
  156:7 161:8
  167:12 188:11
  188:20 189:1
  230:12 236:10
  258:23 313:13
  313:13 315:12
  326:15 333:8
  334:9 345:11
  347:5 348:21
  353:7 367:24
  382:4 407:11
  425:18 437:23
  438:20 453:11
  457:5 459:7
  460:14 461:7
  463:21 465:2
  466:7 470:5
  473:6 477:12
  483:21 484:10
  489:3 492:13
  496:20 513:3
**firsthand** 237:6
**Firstly** 166:1
**fiscal** 42:9
**fistulas** 207:20
**five** 15:4 167:5
  189:1 460:24
  460:25 461:10
**flavor** 384:17
**flawed** 357:16
**flaws** 465:23
**fleas** 473:9
**flesh** 82:4
**flip** 258:23

302:1 381:3
**floor** 100:18,25
  101:10
**Florida** 2:6
  174:21
**fluid** 510:2
**fluoroscopy**
  209:7
**FLW** 1:5
**focus** 16:12
  75:21,23
  119:16 280:22
  549:3
**focused** 81:17
  81:23 519:23
**focusing** 492:12
**folks** 291:20
**follow** 23:23
  497:3
**followed** 79:16
  360:8,10
**following** 40:5
  189:2 240:20
  292:9 315:13
  360:13 417:21
  428:1 491:7
  531:5
**follows** 9:24
**follow-up** 46:1
  178:8 209:3
  218:15 365:11
  366:1 384:3
  550:6
**font's** 60:7
**food** 315:19
**footnote** 24:2
**force** 58:14
  89:12 90:10
**foregoing** 551:7
  553:4
**forest** 190:11
**forget** 421:15
**form** 13:19 15:9
  16:1 25:19
  26:4 28:9
  31:21 33:1,2

33:13 38:11
  39:2 40:17
  41:8 42:18,20
  43:15 49:15
  53:3,18,22
  54:11 56:21
  58:9 59:21
  61:4,19 62:18
  66:1 72:1 73:7
  74:3 75:1 76:4
  76:6 77:9,23
  79:18 80:6
  82:22,23 83:17
  84:1,3,16,25
  85:13,14,22
  86:23 88:3,11
  90:7 92:23
  94:24 95:8,10
  96:5,7,13,15
  97:12,24 98:1
  99:11 100:10
  100:15 102:5,6
  102:12,13
  103:2,3,11,13
  103:17 109:1,3
  109:14 110:6,7
  111:6 114:13
  114:20,21
  115:10 119:7,8
  122:19 123:22
  123:24 124:6
  124:24,25
  125:22,24
  128:8,10,14,25
  129:15 131:19
  132:3,4,25
  133:1,3 135:3
  136:5,7 137:6
  138:9,18 140:4
  141:16 142:6
  142:19,20
  143:6,7,14
  144:10,23,24
  145:5,25 146:6
  146:10 147:1
  147:12,19,20

| | | | | |
|---|---|---|---|---|
| 147:22 150:19 | 263:10 264:3 | 351:5,10 | 442:22 443:10 | 531:11,23 |
| 152:4 154:2,4 | 264:10 265:15 | 352:14,16,18 | 443:19 444:11 | 532:15,23 |
| 154:10 155:20 | 267:6 269:21 | 353:1,9 354:8 | 445:2 446:4,5 | 533:10,22,24 |
| 156:23 157:22 | 269:22 271:8 | 354:17,22 | 446:13,14,20 | 534:6,7 536:7 |
| 158:6,24 159:8 | 271:21,22 | 355:1,12,13,21 | 448:19 451:14 | 537:2,18 |
| 159:13,21 | 272:4,13,21,22 | 356:20 361:6 | 451:15 452:1,2 | 538:22 539:7 |
| 160:8,9,24 | 274:9,10 | 364:8 365:2 | 452:15 455:19 | 539:20 540:8 |
| 161:4 162:6 | 275:14 276:12 | 366:16,25 | 456:18 458:20 | 540:24 541:9 |
| 163:23 164:12 | 276:18,19 | 367:16,18 | 458:22 459:23 | 542:4,11,18,19 |
| 169:11 177:13 | 277:14,15 | 368:5,6,21,22 | 462:13 465:14 | 543:4 544:5,6 |
| 179:3,18 182:8 | 278:6,18 279:8 | 370:18 372:21 | 465:20 466:19 | 544:14,15,20 |
| 182:25 183:20 | 279:18,20 | 373:2,3,15,16 | 468:1 471:4 | 544:25 545:11 |
| 183:22 184:10 | 280:15,19 | 373:24 374:9 | 476:24 477:4 | 545:12,25 |
| 185:2,4,22,23 | 281:13,22 | 376:1,2,3,13 | 477:10,22 | 546:2,20 547:5 |
| 186:13,14 | 282:6,22 | 376:20,21 | 478:4,10 479:1 | 547:9,10 |
| 190:20,21 | 285:12,20 | 377:17 378:9 | 481:1,6,18 | 549:13,14,22 |
| 191:18 193:1 | 286:3,12,21,22 | 378:10 380:21 | 482:5,15 483:9 | 549:23 553:6 |
| 197:1,2,10,19 | 287:20 293:7 | 382:17,18 | 483:24 486:2 | **formally** 333:22 |
| 198:1,2,4 | 295:21,22 | 383:7,11,13 | 486:11,22 | **formation** 57:11 |
| 199:1,6,17 | 296:21,22 | 386:6,24,25 | 491:18 492:7 | 146:9 232:7 |
| 200:20,25 | 297:12 298:8 | 388:4,6,11 | 492:18,24 | 402:15 |
| 201:10 203:15 | 299:12 300:14 | 389:16,22 | 493:6,18,25 | **formatted** |
| 203:16 204:4,5 | 300:23 308:13 | 390:20 392:21 | 494:17,25 | 387:24 |
| 204:19 205:17 | 308:14 310:19 | 393:4 394:1 | 495:9 497:15 | **formed** 27:1,4 |
| 205:24,25 | 310:20 311:5 | 395:12 396:13 | 497:23 498:13 | 36:14 37:1 |
| 206:18,25 | 311:14,15,23 | 397:4,6,15,23 | 498:25 499:7 | 49:22 50:14 |
| 208:5 209:24 | 312:9 315:1 | 398:4,10,18 | 499:15 500:3 | 51:15 52:20 |
| 210:5,11,21,22 | 317:7,18,23 | 401:12 403:22 | 501:2 502:15 | 55:14 109:17 |
| 211:6,7 212:5 | 318:6,7 319:14 | 404:3,5,21 | 503:1,22 505:2 | 117:2 118:16 |
| 213:6,9 214:5 | 319:24 320:7 | 408:14 409:17 | 505:18,25 | 153:8 168:3 |
| 214:16,17 | 320:15,16 | 414:6,14 | 506:6,14 507:6 | 259:15 275:1 |
| 215:2 216:3 | 321:5,6,7 | 417:12 420:19 | 507:10,23 | 303:22 |
| 219:9 222:6 | 322:8,10 323:4 | 421:6,24 422:7 | 508:24 509:22 | **former** 250:24 |
| 223:1,2,11 | 323:10,16 | 422:8,18,19 | 510:7,18 511:7 | 526:2 |
| 224:17 225:4,6 | 324:1,2 329:22 | 423:12,21,22 | 512:6,16 513:4 | **formerly** 522:18 |
| 225:12 226:5 | 329:24 330:14 | 425:10,20,25 | 513:12 514:3 | **forming** 539:17 |
| 226:13,23 | 330:15 332:13 | 426:7,9 427:16 | 514:13,24 | **forms** 338:25 |
| 227:10 228:18 | 332:22,23 | 427:21 431:23 | 515:6,24 | 434:7 |
| 230:1,2,4 | 334:18 335:19 | 431:24 432:1 | 516:25 517:9 | **formulate** 535:6 |
| 241:20,22 | 335:20 336:9 | 433:8,20,22 | 518:22 519:18 | **forth** 144:21 |
| 243:11,21,22 | 337:10 339:12 | 434:22,23 | 520:8,16,25 | 237:1 259:13 |
| 244:14,15,23 | 340:11 341:20 | 435:9,18 436:5 | 521:7 522:9 | 298:12 302:10 |
| 244:24 246:9 | 341:21 344:12 | 436:6,14,15 | 523:5 525:14 | 497:1 551:9 |
| 249:8 252:7,8 | 345:4,5 346:3 | 437:10,11,19 | 528:16,17 | **forward** 42:7 |
| 253:4 257:13 | 346:4,20 347:7 | 437:20 438:17 | 529:6,7 530:14 | 48:10 117:19 |
| 260:1,16 | 348:16 349:14 | 441:2,15 442:6 | 530:23 531:10 | 127:7 162:20 |

199:20 223:6
238:18 288:25
301:18 302:20
313:10 391:13
413:20 433:5
437:14
**forwarding**
232:10 409:1
**forwards** 407:15
**forward-looki...**
478:23
**found** 59:18
83:23 91:7
113:12,12
114:9 169:20
216:16 261:3
267:2 269:18
368:17,19
512:22 513:2,8
513:14
**Foundation**
368:1 499:22
500:1
**founded** 57:12
62:12
**founder** 50:3,5
62:3
**founders** 50:2
**founding** 68:5,6
**four** 15:4 161:9
161:10,12
197:24 380:24
413:7 461:10
470:14
**fourth** 467:1,7
**fragrance** 89:23
522:13
**Fragrances**
334:25
**frame** 78:10
493:12 548:4
**France** 6:21
17:5 289:8
**frankly** 49:6
**free** 236:8 339:9
**Freedom** 40:22

41:2
**freight** 242:13
517:2
**frequently** 19:18
**Frey** 3:8 10:15
10:15
**Friday** 289:16
438:5
**Frigjier** 358:19
**front** 13:2 42:16
42:21 116:6
223:22 299:2
302:1 307:21
369:15 428:6
442:15 444:1
479:11 495:19
**fugitive** 252:6
**full** 14:3,6,7
57:25 399:20
463:21 474:22
**fully** 14:2
432:22
**full-service**
124:11
**function** 139:15
172:7 173:6
**fund** 153:24
276:7 360:21
361:2,9,25
374:12 376:24
383:5 395:8
404:19 406:4
433:18 443:5
446:16
**funded** 46:8
244:16 360:18
446:18 447:4
457:13
**funding** 34:11
45:18 53:16
56:6 152:2
158:5,19,21
160:19 203:21
241:19 244:13
332:9 374:7,7
375:2 405:4

421:12,18
456:23 459:1
487:8,24 488:6
518:20 519:2,9
525:12,17
540:2
**fundings** 160:15
**funds** 56:19 57:6
203:8 204:12
204:16 498:19
540:22
**further** 16:3
258:11 269:1
346:13 371:19
372:8 375:20
382:5,7 430:11
435:20 437:1
504:17 551:7
551:10
**furthering**
435:17
**Furthermore**
47:7
**future** 49:7
168:9 363:3
365:4 382:9

**G**

**G** 4:8
**game** 54:23
**games** 140:12
**gaps** 346:14
366:13 369:4
**garden** 472:13
**gather** 118:6
**gathered** 367:21
**gears** 76:16
183:13 342:15
362:3
**gene** 8:7 307:1
391:20 392:5
393:19 394:9
400:4,17,24
401:7 411:2,5
411:15 425:5
**general** 36:20

59:17 69:8
98:6,18 99:10
105:7 112:18
230:19 272:17
**generally** 79:9
105:8 157:24
158:19 182:14
266:19 424:11
438:15
**generate** 120:25
**generated**
496:10 512:12
**genes** 394:24
400:20 412:20
412:22 482:4
482:20
**genetic** 176:3
274:25 342:12
360:20 366:3
435:20 447:20
447:23 448:5
448:18 449:19
482:8
**genotoxic** 482:3
483:6
**gentleman**
444:25
**gentlemen** 408:8
**geologist** 18:25
19:1
**geologists** 19:10
19:19 452:17
**geology** 19:4
452:17
**Georgia** 61:7
**Gertig** 269:2
301:1,5,8,13
479:5 481:15
**getting** 54:16
66:23 74:9
78:22 123:5
183:7 193:14
405:2 411:24
450:22 519:23
537:20
**get-go** 144:18

**give** 14:3,7
15:20 18:3
33:25 46:2
112:22 121:13
162:3 258:17
300:15 315:10
331:23 359:18
379:3 420:1
479:23 500:5
511:19 531:3
548:4 549:16
**given** 12:18
77:13 94:16
97:5 98:23
101:9,22 115:2
190:15 329:5
360:3 417:7
445:13 530:13
540:22 553:5
**giving** 12:13
256:18 264:24
266:1 287:9,10
300:12 302:19
322:12 413:23
**glass** 411:11
**Glenn** 1:12 5:13
6:5 9:13,20
10:24 11:7,8
15:9 21:22
22:11 24:3
26:17 27:15
28:6 39:10
40:6 44:5 50:9
50:16 59:22
62:12 63:15
66:13,20 87:9
87:18 88:1
90:21 102:16
111:17 116:11
126:8 127:15
133:16 138:3
148:5 154:22
154:25 155:2
162:10 177:20
187:14 199:23
231:13 240:16

Robert Glenn

| | | | | |
|---|---|---|---|---|
| 246:15 250:18 | 208:16 211:17 | 404:9 413:5 | 229:20 235:14 | **Golkow** 1:21 4:9 |
| 250:24 255:2 | 211:21 218:6 | 422:25 464:15 | 238:12 241:13 | 4:10 9:4 |
| 259:15 291:3 | 225:2 231:18 | **going** 12:2 14:17 | 246:19,20,21 | **good** 9:1 11:3,4 |
| 313:3,20 319:2 | 235:14 242:13 | 15:18,21,23 | 248:2,8 249:10 | 11:8 23:25 |
| 325:3,6 337:2 | 246:18 249:20 | 16:11,12,24 | 256:11,14 | 40:1 52:19 |
| 342:21 347:10 | 255:5 260:21 | 17:25 21:25 | 258:24 260:9 | 76:16 123:13 |
| 358:19 362:6 | 264:18 275:4 | 22:14 24:16 | 264:18 265:22 | 170:13 176:8 |
| 362:23 367:10 | 293:16 301:15 | 39:13,20 41:24 | 270:3,14 271:5 | 218:4 264:21 |
| 369:9 374:15 | 303:3 308:22 | 44:13 46:6 | 273:9 275:3,4 | 265:24 310:10 |
| 377:7 379:14 | 309:17 312:16 | 49:9 50:19 | 275:21 276:2 | 318:22 341:5 |
| 379:17 383:16 | 313:6 319:1 | 52:17 60:3 | 284:16 288:10 | 442:19 453:3,4 |
| 398:21 405:24 | 328:24 331:22 | 63:8,18,20 | 290:4,24 | 471:17,18 |
| 409:21 415:14 | 334:14 337:13 | 65:3 70:11,11 | 291:13 293:3,5 | 495:23 496:16 |
| 425:11 453:3 | 337:14 338:5 | 74:6 76:15,21 | 302:9 312:17 | 526:23 534:14 |
| 453:15,17 | 342:19 345:10 | 82:3,8 83:8 | 314:24 319:1,5 | **good-sized** |
| 463:25 471:17 | 346:9 347:4,13 | 87:12,13 90:19 | 324:21,24 | 187:25 |
| 472:23 480:6 | 348:24 351:19 | 92:8 97:2,18 | 325:6 328:24 | **GORDON** 3:3 |
| 483:25 484:22 | 356:25 358:14 | 100:13 101:24 | 331:5,15 333:9 | **Gotcha** 469:10 |
| 518:2,11 | 362:12 365:14 | 102:19,20,21 | 333:10 334:11 | **gotten** 219:17 |
| 521:18 525:22 | 370:24 371:7 | 103:20 111:2 | 336:3 337:5 | 501:14 |
| 527:10 551:5 | 374:17 375:5 | 111:20,22,25 | 345:25 347:14 | **government** |
| 553:12 | 379:7 382:2 | 112:24,25 | 350:12 351:19 | 19:17 58:10 |
| **go** 31:17 39:23 | 388:22 389:20 | 116:17 120:1 | 361:11 362:9 | 69:10 349:17 |
| 42:7 48:24 | 390:10,18 | 120:20 121:12 | 363:15,20,24 | 349:25 |
| 57:20,25 65:7 | 391:8 407:11 | 122:11 123:11 | 367:14 369:12 | **grade** 169:5 |
| 67:24 70:13 | 408:18,23 | 126:3,11 | 369:21 372:18 | 176:19,20 |
| 86:19 89:11 | 415:19 416:19 | 129:19 131:24 | 374:20,25 | 177:9 207:10 |
| 90:24 93:15 | 416:22 417:14 | 133:19 134:5 | 377:10 379:10 | 315:16,19 |
| 99:14 112:1 | 418:16 424:24 | 138:6,11,12,25 | 379:23 386:4 | **grammar** |
| 113:11 115:24 | 429:16 437:14 | 139:11 140:11 | 390:21 391:7 | 504:14 |
| 116:3 117:16 | 437:23 438:1 | 145:3 147:17 | 398:24 399:1 | **grams** 168:7,23 |
| 117:25 118:1 | 441:20 443:25 | 148:8 154:17 | 405:8,20 406:7 | 216:19 |
| 120:20 123:11 | 453:10,13 | 155:1,19 157:4 | 413:12,19,20 | **Grand** 2:15 |
| 123:14 126:13 | 454:1,12 466:6 | 157:18 161:2 | 415:1,17 | **grant** 202:18 |
| 128:12 129:22 | 468:13 469:8 | 162:2,13,18,20 | 418:25 425:15 | 204:23 459:9 |
| 134:1 135:8,22 | 471:11 504:17 | 167:18 169:2 | 444:19 452:22 | 498:22 |
| 139:11 142:10 | 505:12 517:18 | 171:23 175:16 | 455:24 456:23 | **granted** 239:18 |
| 148:13 150:8 | 523:14 527:22 | 176:6,13 | 463:15 475:2,9 | **gravel** 30:11 |
| 153:5,17 | **goal** 129:23,23 | 177:24 182:6 | 476:15 484:3,8 | 43:10,11 |
| 162:15 164:15 | 477:12 | 185:10 187:5 | 487:2,10 | **great** 74:8 |
| 166:17 167:5 | **Godell** 6:1 149:5 | 187:10,17 | 508:19 517:20 | 112:16 155:6 |
| 167:23 168:1 | 149:7,8 | 193:25 194:4 | 517:21 521:12 | 194:14 318:18 |
| 171:2,13 | **goes** 16:3 30:16 | 195:10 211:18 | 526:8 527:4,13 | **greater** 18:1 |
| 173:17 177:15 | 34:18 41:11 | 215:10 216:22 | 529:15 533:5 | 300:13 301:12 |
| 188:19 193:11 | 99:8,12,14 | 217:10 218:2,9 | 539:12 543:1 | 430:19 |
| 196:5 200:3 | 105:9 385:2 | 223:14 224:15 | 550:9 | **greatly** 372:7 |

449:23
**Green** 68:12,12
68:19 69:7
70:8,8,18 72:4
**grew** 55:11
**grid** 385:20,21
**Griffith** 367:25
**Grimes** 1:12
**groom** 124:22
**grooming**
125:20 126:1
**Groth** 172:7
**ground** 12:2
13:22 53:17
56:7,20 227:18
289:7 292:21
307:10 344:7
**group** 6:3 15:9
17:5 26:17
42:17,22 43:5
54:16 66:13
67:6,7,11,22
73:16,16 79:2
79:5 91:21
106:18 112:21
113:9 115:14
115:15 116:25
117:2,3,24
118:16 123:4
134:25 141:19
141:22 142:11
142:13 146:19
151:11 152:1
156:6,6 157:5
161:25 162:2
163:1 178:11
181:4 182:7
183:19 208:25
211:2 215:16
215:19,21
217:1 222:17
223:6 224:14
225:24 227:13
230:23 231:10
234:14 240:21
240:21 243:4,8

243:18 244:3
244:21 248:9
248:15 249:7
250:13 254:2,2
258:8,13
290:20 291:20
294:3 295:17
300:10,11,11
302:11,20,24
303:17 304:24
314:24 319:11
319:18 322:19
324:5 326:15
326:21,23,23
327:3,8,15,21
328:5,16,22
329:5,8 330:3
331:11 332:4
332:11 335:10
338:25 345:2
345:21 349:22
357:20 366:8,9
377:15,21
378:6 380:2
401:20 410:25
413:7 414:20
448:3,15
450:14,17,18
457:25 461:3
461:13,20,21
462:8,9,10,15
462:19,25
463:5,8 464:21
502:9 508:4,11
510:5 511:14
511:19,22
512:3 524:7
538:12,15,25
**groups** 20:1
69:11 76:11
162:8 217:15
217:18 223:25
234:11,13
235:1 254:25
256:21 369:2
411:11 413:1,7

413:11 460:25
**group's** 223:9
323:23
**grown** 55:8
**growth** 375:16
**guess** 184:15
203:24 234:9
409:19 538:10
**guessing** 538:7,8
**guide** 121:2
**guidelines**
235:10,18,23
236:12 241:15
245:18 497:3
**Gunter** 222:13
345:15
**guy** 418:4
**guys** 238:13
344:25 380:17
452:20 548:6
**gynecologic**
328:13 329:9
329:14,19
330:12 332:20
**gynecological**
95:23 174:15
329:18 330:1
330:25
**gynecologist**
20:8 305:5
330:1
**gynecologists**
229:9

_____

**H**

**H** 4:8
**habit** 38:22
336:19,20,21
336:23
**half** 145:3 203:1
203:3,5 211:4
253:22,23
459:2
**halfway** 65:7
118:20 295:3
328:25 348:6

**half-day** 254:16
**Hall** 6:1 8:12
68:13 72:25
73:12 77:25
104:3 143:18
143:20,25
144:8,9 148:1
148:22 152:18
155:9,17,18
157:8,9 188:13
391:3 484:8
**hallmark** 169:20
340:15
**Hall's** 487:19
**hand** 63:18
102:19 103:20
111:22 114:19
126:11 133:19
148:8 155:1
162:13 177:23
187:17 200:2
325:6 337:5
379:23 399:1
405:8 406:7
418:20
**handed** 23:18
44:17 255:12
**handing** 155:3
**handled** 157:8
**handling** 161:17
467:10 530:7
**handwriting**
469:13
**handwritten**
126:25
**Hankinson**
301:6 303:25
305:18,21
538:4
**Hans** 46:25
**happen** 241:14
369:8 495:18
507:9
**happened** 84:22
129:20 180:18
184:4 212:17

242:20 437:8
**happening**
181:20 248:13
**happens** 422:21
**Haraas** 396:17
**hard** 415:25
**HARDY** 2:14
**harm** 431:5
**hate** 187:1
**hazard** 356:1
**hazards** 99:19
101:4 474:4,5
**head** 69:18
287:5
**headed** 18:4
**headline** 355:6
**health** 18:9,14
18:16,22 19:18
36:12,14,16,19
36:23,25 37:2
37:6,8,11,13
37:13 43:25
47:16 48:3
58:19 59:2,15
68:24 139:17
202:18 204:22
221:9 242:23
251:20 318:18
368:4,11,14
424:10 473:18
473:20 499:22
499:25
**hear** 13:23
107:2 122:25
168:14 170:8
211:13 486:1
**heard** 303:23
396:22 426:3
529:3
**hearing** 161:7
265:14 364:11
**hearings** 12:18
**Hegarty** 2:14
5:7 10:13,13
16:1 31:21
33:1 39:1

| | | | | |
|---|---|---|---|---|
| 40:18 42:19 | 226:13,23 | 471:16,19 | **help** 53:10 56:19 | **historical** |
| 53:21 76:5 | 227:10 228:18 | 477:1,6,15,24 | 120:1 178:18 | 178:16 |
| 77:23 80:6 | 230:1 243:11 | 478:6,13,20 | 259:3 358:19 | **history** 445:13 |
| 82:23 83:17 | 243:21 244:15 | 480:5 481:2,20 | 388:20 462:4 | **hit** 170:3 |
| 84:2,24 86:22 | 244:24 249:8 | 482:11,17 | 477:13 | **hold** 20:21 139:8 |
| 88:3,11 92:23 | 252:8 257:13 | 483:10 484:2 | **helped** 220:2,11 | 150:14 283:9 |
| 95:7 96:6 | 260:1 263:10 | 486:6,13,24 | 351:17 | 405:13 468:16 |
| 97:10,24 | 264:3,10 267:6 | 487:21 489:23 | **helpful** 504:23 | 520:19 |
| 100:15 102:6 | 269:22 271:8 | 490:20 491:1 | 512:3 | **holding** 343:8 |
| 102:13 105:22 | 271:21 272:4 | 491:19 492:9 | **helping** 253:12 | **home** 100:23 |
| 110:5 114:13 | 272:12,21 | 492:20 493:1,8 | 293:3,4 420:7 | 472:7,8 |
| 114:20 119:7 | 274:9 275:13 | 493:21 494:6 | **hereinbefore** | **homestretch** |
| 122:19 123:23 | 276:12,18 | 494:19 495:3 | 551:9 | 527:11 |
| 126:6 128:9 | 278:25 280:19 | 495:11,22,24 | **Hershey** 242:25 | **hone** 87:7 |
| 131:19 132:24 | 281:13 286:22 | 497:18 498:1 | **hide** 160:14 | **hopefully** |
| 135:3 136:6 | 293:7 295:22 | 498:16 499:3 | **high** 95:20,22 | 430:12,13 |
| 137:5,24 | 296:22 297:12 | 499:17 500:7 | 123:18 134:3 | **hopes** 193:14 |
| 141:15 142:19 | 300:14,23 | 501:3 502:19 | 326:25 385:6,8 | 438:8 |
| 143:7,14 | 305:2 308:13 | 503:4,9 504:6 | 385:16,21,22 | **horizontally** |
| 144:23 145:4 | 310:18 311:5 | 505:4,19 506:2 | 385:25 386:3 | 54:14 |
| 145:25 146:6 | 311:14,23 | 506:8,15 507:8 | 386:12 393:16 | **horse** 371:24 |
| 146:10 147:19 | 312:9 317:23 | 507:12 508:1 | 417:8,8 418:11 | 455:7 |
| 150:18 152:3 | 318:6 319:14 | 509:1,23 | 418:13 425:3 | **hospital** 248:23 |
| 156:22 157:21 | 323:25 329:23 | 510:14,24 | 472:14 | 344:23 |
| 158:6,24 | 330:15 331:20 | 511:13 512:7 | **higher** 424:18 | **hot** 365:5 |
| 159:12 160:8 | 332:13,23 | 513:1,7,18 | **highlight** 65:11 | **hotel** 247:11,12 |
| 160:24 161:4 | 335:18 337:10 | 514:4,15 515:3 | 87:15 | 247:22 |
| 162:5 163:22 | 338:21 340:12 | 515:9,16 516:1 | **highlighted** 89:1 | **hour** 472:21 |
| 164:12 169:10 | 341:21 345:3 | 517:4,12,18 | 233:1 388:25 | **hours** 412:22,24 |
| 179:3,18 | 346:4 352:17 | 518:1,24 | **highly** 348:11 | 413:12,13 |
| 183:21 184:10 | 366:24 367:17 | 519:20 520:3 | 431:9 499:13 | 453:23 474:19 |
| 185:3,18,23 | 368:20 373:3 | 520:11,20 | **Hill** 381:13 | 548:5,25 549:1 |
| 186:12 190:19 | 373:23 376:3 | 521:2,9 528:15 | 402:4 | **house** 453:23 |
| 191:18 197:1 | 376:19 377:16 | 529:7 532:23 | **Hilton** 301:19 | **Hubbard** |
| 197:10 198:1 | 378:8 380:20 | 533:20 534:6 | **himself-nomin...** | 357:12 358:6 |
| 199:1,6,17 | 382:16 383:12 | 536:7 537:2,17 | 252:17 | 358:18 361:17 |
| 200:20,25 | 404:4 408:14 | 539:7,20 541:9 | **hire** 71:12 | 362:15 367:8 |
| 201:10 203:15 | 409:17 414:5 | 542:4,19 543:4 | 121:25 122:1,4 | **Hubbard's** |
| 204:4 205:17 | 421:5,23 422:7 | 544:6,15,25 | 124:22 131:17 | 391:11 |
| 206:18 208:5 | 422:17 423:11 | 545:12 546:2 | **hired** 28:13 | **Hughes** 47:1 |
| 210:22 211:7 | 423:20 425:25 | 546:11 547:5 | 35:14 71:13 | **human** 8:8 |
| 212:5 213:6 | 426:8 431:25 | 547:10 549:13 | 120:3 121:9,17 | 36:25 37:10 |
| 214:5,16 215:2 | 434:21 436:4 | 549:22 | 122:7,9 125:2 | 107:12 175:25 |
| 216:3 222:6 | 436:14 437:11 | **held** 1:12 9:9 | 125:9 | 275:19 276:2,7 |
| 223:1,11 | 441:14 451:13 | 254:23 | **hiring** 120:9 | 315:17 328:11 |
| 224:17 226:5 | 452:2,15 | **Hello** 521:18 | 147:3 | 328:17 356:18 |

381:22 391:21
392:5,14
393:19 394:11
397:21 400:6
401:18 403:11
411:3,17,17
417:3 425:6
461:19 464:6
464:12,17
465:9 544:18
**humans** 6:20
169:19 443:23
461:4,14 462:2
462:11,17,20
463:3 470:19
**Hun** 250:7
**Huncharek** 6:5
6:17 7:21,24
8:11 78:18
91:6,20 94:2
113:13 115:3
115:19 116:18
117:6,18
118:17 120:15
126:24 135:21
136:15,17
141:9,21,23
142:22 146:16
149:14 150:16
155:21 164:20
179:25 186:16
188:16,21
193:15 194:22
204:8 214:7
228:11,13,15
248:23 249:13
249:15,23
250:13 251:16
256:22 267:1
269:17 297:5
302:18 304:21
306:17 307:9
307:12 309:19
310:6,12
311:13 344:16
384:2,4,9

421:2,11,14
483:14 484:9
485:2,22 486:8
487:16,23
488:9 491:7
494:12,22
495:13 496:18
497:22 502:12
503:13 526:9
**Huncharek's**
135:20 141:19
142:11,13
156:5
**hundreds**
518:17 544:12
**hygiene** 18:14
18:18,24 72:15
473:19 474:2
**hygienist** 475:17
**hyperlink**
292:10
**hypotheses**
192:2 195:9
**hypothesis**
107:22 166:23
166:25 172:4
174:24 180:1
195:6 208:8
211:16 295:18
298:5
**hypothetical**
287:8

---

**I**

**IARC** 6:20 7:1
17:2,4 110:9
125:17 161:23
161:24 180:2
181:23 182:1,5
182:14 183:7
183:16 214:22
214:23 215:4
215:10,12,16
215:19 216:2,5
216:13,17,21
216:25 217:10

217:14,18
221:3,5,17
222:5 223:22
224:10 226:15
226:22 227:8
227:13 229:20
231:23 235:19
236:2,5,14,24
237:5 241:21
244:21 248:10
249:6 250:2
253:13 254:9
255:22 256:4
268:2 271:2
288:16,25
289:10 290:2
291:10 304:24
308:23 309:13
310:5 314:24
318:2 319:17
322:1 324:10
325:24 326:6
327:8 328:5
333:3,17 334:3
334:13 342:14
347:23 348:7,9
348:14,19
351:24 352:3,8
352:13 353:16
355:24 357:15
371:15 372:15
372:17 381:23
385:17 386:13
393:9,11
399:12 460:13
460:14,19
461:16 466:11
481:8 493:24
504:1 507:14
508:12 511:21
514:11,16,20
516:4,12 521:4
530:11 531:5,6
537:25 538:11
540:16
**IARC's** 333:24

480:8 508:8
514:6 537:23
**idea** 15:20 18:4
125:9 184:22
184:23,24
260:6 298:11
441:9 528:24
**ideas** 265:13
**identical** 407:1
**identification**
21:23 22:12
39:11 44:6
50:17 59:23
63:16 87:10
102:17 111:18
126:9 133:17
148:6 154:23
162:11 177:21
187:15 199:24
231:14 240:17
246:16 255:3
291:4 313:4
319:3 325:4
337:3 342:22
347:11 348:20
362:7 369:10
377:8 379:15
383:17 398:22
405:25 409:22
415:15 425:12
461:8,9 484:1
**identified**
205:22 216:25
350:20 461:19
**identify** 504:25
532:6
**identifying**
490:13 503:11
**idiopathic** 172:8
173:7,11
**illustrative**
449:1
**IMA** 50:20
58:18 59:12
60:4 63:13
74:17 77:4

242:13 248:1
350:6 360:17
399:3 409:1
460:7 517:3
**imagine** 170:2
**IMA-Europe**
7:12 55:18,19
56:14 228:20
228:22,25
242:10,15
248:2 250:5,15
314:5 343:5,23
419:15
**IMA-NA** 7:12
8:2 54:2 59:16
68:4,15 226:20
232:7 457:13
460:3
**IMA-North**
51:25 52:11
56:6,19 57:11
58:2,12 59:9
59:18 61:2
62:13,16 63:20
64:22 66:9
67:17 71:24
73:21 74:15,21
74:23 77:6
79:17 224:3,4
224:7 231:23
242:9,17 247:6
250:6,23 253:8
259:25 277:4
343:4 346:1
371:12 406:15
413:24 429:25
447:2
**Imerys** 3:16 6:2
6:2,12,12,15
6:15 7:4,4,7,7
7:15,15,17,21
7:21,24,24 8:1
8:1,3,3,5,5,6
8:10,10 10:12
10:16,18 24:11
24:18,23 25:7

25:10,15 26:12
26:13 52:21
53:5 60:19
61:3,9 62:15
62:24 63:5
76:3 77:24
82:1 102:11
113:14 121:14
135:25 139:15
139:17,22
140:3,8,14
151:15,20
203:3 214:14
244:10,12
260:15,18
261:23 277:6
321:12 331:18
359:10,12,16
361:4 362:10
364:25 373:21
388:3 390:9
391:6 421:22
425:19 446:22
453:6 459:19
460:4,4 471:23
487:14 488:5
488:10 494:13
502:23 519:22
530:11
**IMI** 53:7 62:21
63:3
**immediate**
350:23 352:11
467:13,14
**immediately**
81:22
**impact** 318:5
351:2 353:8
385:21 386:1
417:8 423:10
423:15 424:1
424:11,18
**impeccable**
499:25
**imperative**
552:13

**implantation**
340:16
**implants** 543:6
**implement**
532:4
**implemented**
531:20 532:10
**implementing**
474:7
**implications**
183:17
**Implicit** 237:12
237:21
**implies** 32:21
**imply** 213:2
**important** 15:22
24:15 95:5
96:3 100:1,4,7
101:1 160:2,5
167:24 169:24
176:23 222:16
335:16 339:20
350:15 352:21
353:3 356:22
367:14 368:3,9
368:11,13,16
382:15,23
435:16 438:12
510:4 520:4
539:25 540:2,4
540:5
**importantly**
475:6
**imposed** 102:4
**impression**
258:18 360:1
**improper** 38:7
220:22 501:7
501:13 502:11
503:5
**impugn** 536:14
**inaccuracies**
490:14 503:12
**inappropriate**
106:8 154:8,9
159:6 160:14

**inappropriately**
431:4
**include** 20:16
51:25 52:3
85:3 90:3
179:13 197:5
422:4 440:3
481:23 506:11
**included** 130:17
147:9 340:6
360:6 397:13
397:19 478:21
488:16 496:4
501:24 502:2
505:22 517:14
**includes** 238:24
483:3
**including**
128:21 239:15
241:18 245:25
248:19 322:18
349:7 350:11
350:17 409:5
478:22 489:16
**inclusion** 86:3
192:11
**income** 27:16
**inconsistent**
257:10
**incorporated**
306:5
**incorrect** 264:16
**increase** 448:5,5
481:11 532:22
543:2 544:2
**increased** 102:3
107:23 108:23
136:23 137:20
167:7 341:18
536:22,24
**increases** 533:14
**increasingly**
400:24 401:8
**incurable**
173:25 174:1
**independent**

346:25 485:23
486:4 498:11
507:19
**INDEX** 5:1
**indicate** 201:21
306:19 309:21
468:4 470:18
482:8
**indicated** 303:8
305:19,21
466:16
**indicates** 458:19
**indicating**
456:22
**indication**
413:18
**indict** 431:15
**indirectly** 460:8
**individual** 28:7
28:8 99:15
183:6 239:18
**individually**
50:10
**individuals** 66:4
544:13
**induces** 400:20
**industrial** 5:20
5:21,23 18:14
18:17,23,23
28:1,4 29:1
30:9 42:13
43:2,25 44:9
49:20,22 51:2
52:2 54:18
58:3 65:1
72:15 232:4,5
233:6 242:2
245:4 262:14
316:1,10 317:5
317:11 350:3
419:17 433:25
439:4,9,10,22
439:23 446:8
454:24 459:13
459:21 473:19
474:2 475:16

501:21 508:4
517:15
**industries** 51:7
**industry** 19:16
28:20,23 36:20
36:20 37:7
42:16 43:4
44:1 50:5,10
50:11,12 55:25
56:1 58:5,20
59:14 69:10
97:19 98:3,18
98:18 99:6
101:18 111:1
162:8 222:4,9
223:24 229:19
229:22,25
231:4 234:14
236:25 241:2
245:1,5,13,17
248:11 249:24
252:20,23
253:12 254:3,4
256:3,20
257:12 259:12
264:24 266:1
287:9 288:22
290:4 292:3,7
295:1 308:24
310:4 315:16
322:6 323:23
381:10 392:8
399:12 409:2
474:4 508:4,12
508:15 536:5,9
541:24 543:25
**industry's**
224:25 229:7
229:10 528:13
533:15 544:1
**infectious** 473:8
**infer** 523:3
**inflammation**
400:21 403:25
404:6 438:15
**inflammatory**

274:3,6
**influence** 222:19
222:24 223:8
237:23 238:23
352:3 502:24
**influencing**
351:23 352:12
353:15
**influential**
348:11
**info** 155:22
**inform** 101:3
159:24 531:6
**information**
25:4 29:21
40:22 41:2
62:11 85:11
94:1 100:8
101:9 110:3
113:2 123:3
158:1,4 161:21
189:22 196:19
206:3 222:21
237:7 238:5,8
238:17 290:3
290:13 293:4,5
299:5 303:9,11
309:16 322:6
322:12 356:23
390:24 397:20
398:2 404:24
436:1 467:8
468:6 472:24
487:15 504:24
512:2 517:6
530:6,12
**informative**
268:4,7,14
271:1 481:9
504:2
**informed** 99:18
216:10 280:17
334:22 545:10
545:23 546:5
547:13
**informing** 265:5

266:3
**initial** 61:22
195:12 213:19
347:24 466:11
**injection** 509:19
**input** 17:16,19
22:19 105:24
186:10,18
222:8 223:23
224:1 259:10
297:11
**insight** 91:14
**insights** 292:2,6
437:2
**insignificant**
375:17,18
**insofar** 90:21
**installation**
512:20
**installment**
156:7
**instance** 524:22
**Institute** 36:11
36:15 459:17
**instruct** 138:19
**INSTRUCTI...**
552:1
**insufficient**
315:25 462:3
532:8
**insufflation**
207:17
**integrated** 54:14
**integrity** 536:15
**intended** 99:1
**intent** 124:21
185:11,12,15
223:8
**intention** 222:18
222:20,24
298:17 299:18
448:9
**interact** 74:16
**interacted** 21:8
**interacting** 76:2
160:21

**interaction**
70:23 467:25
**interactions**
157:10 183:18
**interest** 20:5
54:15 67:1
132:6 161:14
236:2,5 239:12
245:24,24,25
318:9 321:13
419:1,9,22
420:16 422:5
440:25 441:1
549:12
**interested** 62:11
114:16 185:25
234:4 365:25
418:12 491:7
551:13
**interesting** 54:7
334:10 539:2
**interests** 43:7
51:4,23 57:8
70:4 71:3,6
90:2 111:4
239:11,14,22
241:18 320:6
321:2 421:1
516:4,11
549:21
**interference**
236:9
**interject** 479:18
**internal** 40:5,15
40:20,24 41:10
99:6 120:23
134:6 135:24
137:15 363:17
383:21 395:19
418:2 444:8
519:7 525:16
**internally**
178:14 388:1
427:7 437:13
442:3
**internal/exter...**

358:7
**International**
221:5
**interpret** 541:7
**interpretation**
129:1 265:10
464:20 470:7
**interrupt** 41:17
53:13 543:20
**interrupted**
284:13
**interrupting**
45:23
**intrapleural**
207:24
**introduce**
297:22
**introduced**
54:23 113:8
179:14 295:7
299:8 302:16
302:23
**introduction**
195:13 296:2
**introductory**
195:8,22
**inverse** 403:20
**investigators**
34:13
**invited** 221:16
**involved** 19:17
31:23 32:3
57:14 71:18
81:8 93:20
96:23 109:25
111:15 135:2,5
144:17 145:23
151:24 152:6
152:12,16
153:1,2,16,20
222:2 226:19
229:3,7,9
231:8 253:12
254:2 290:21
360:6 372:4
396:23,24

434:12 474:12
475:1 476:1
488:6 518:25
522:12 523:17
523:23 530:16
549:2
**involvement**
14:19 16:19,22
17:9 34:1
55:18 77:4,19
144:16 196:21
486:16 487:19
492:4,16
494:13 495:6
507:14 526:13
**involves** 349:4
**involving** 11:19
64:21 519:5
**in-house** 72:13
72:14 73:22
77:21
**IOSE** 409:8
**irregularities**
333:17
**irritation** 280:1
**Island** 26:20
453:18
**issuance** 40:5
**issue** 31:13 42:7
77:8 78:2
82:20 83:13
84:23 86:18
95:5 139:22
141:13 178:15
179:1 180:2
181:7,23 182:6
183:16 214:22
215:23,25
216:1,12
229:20 256:12
258:2 275:7,11
296:16 299:8
300:22 305:23
346:23 357:22
367:14 368:4
368:11,14

393:11 434:19
436:2 476:9
477:8 512:4,13
512:14 524:6
537:6 544:24
**issued** 98:13
110:18
**issues** 14:18
16:11 18:1
58:18 59:2
119:5 120:2
134:13 135:12
279:10 300:9
352:10 480:17
486:18 518:20
549:10,19
**italics** 237:13
**item** 191:4
467:17 531:4
**Items** 191:11
**iteration** 25:15
**it'll** 121:22
202:10 333:13
**IV** 4:3
**i.e** 94:1

## J

**J** 2:9 3:3
**Jack** 475:14
**James** 3:19
10:19 521:21
**Jameson** 183:6
**Janet** 46:25
**January** 7:2
108:3 232:10
255:23
**jbillingskang...**
3:20
**JD** 5:17
**jdonath@cou...**
3:14
**jellies** 305:7
**jelly** 304:6
**Jersey** 1:1 3:15
9:12
**JNJ** 5:25,25 6:4

6:4,6,6,8,8,9
6:11,14,19,23
6:23 7:5,5,11
7:11,13,13
**job** 47:17 473:6
**Jocelyn** 444:22
**John** 7:18
314:12,13,14
314:14 428:18
428:23 429:19
433:14 434:12
442:9 444:13
**Johnson** 1:3,3
2:17,17 10:14
10:14 88:16,16
90:5,5,12,12
93:6,6 122:17
122:18 123:4,4
135:2,2 136:1
136:1 144:17
144:17 145:2,2
145:9,9,21,21
147:8,8 148:25
149:1,18,18
151:9,10,17,18
151:25,25
152:24,24
156:12,13,19
156:19 163:18
163:18 178:11
178:11,14,14
188:12,13
190:16,16
202:25,25
203:20,20
204:13,13
206:16,16
214:13,13
227:25 228:1,3
228:3 233:20
233:20 246:6,6
296:19,19
308:5,5 330:11
330:11 331:10
331:10 332:2,2
337:8 338:18

344:19,20
349:13,13,19
349:19 363:8,8
363:19,19
376:17,18
378:4,5 383:10
383:10 407:21
407:22 409:4,4
409:5,5 414:3
414:4 421:22
421:22 441:12
441:13,18,18
441:22,22
471:20,20
488:10,10
491:11,11,14
491:15,21,21
492:4,4,22,22
493:3,3 494:20
494:21 495:5,5
495:14,14
502:23,23
518:12,12,18
518:18 519:1,2
519:8,9,22,22
534:23,24
**Johnson's** 337:9
338:18
**join** 61:15 62:8
67:24 84:19
117:7
**joined** 62:1
66:20 67:4,10
72:18 83:4
**joining** 75:25
78:12,17,25
79:6 81:19
89:8 108:19
**joint** 343:8
**jointly** 445:15
**Jonathan** 3:14
10:17
**Josh** 150:15,23
150:24 194:22
234:8 242:5,7
242:22

**Joshua** 141:14
242:23 248:22
345:16 516:19
**journal** 106:15
130:1,2,9
160:17,20
199:8,10,15
202:3 311:2
422:10,14
423:1,6,10,15
424:14 447:7
494:16,23
497:2
**journals** 133:15
197:24 198:12
198:13 206:1
219:17 422:24
424:11,17,18
500:24 501:14
**journal's** 490:5
**Juan** 7:2 255:23
469:5
**judge** 12:24
138:13
**July** 5:17 7:18
188:12 370:8
458:15
**jump** 11:24
**jumped** 237:15
**June** 78:8,13,15
81:20,22 88:20
92:17 362:19
**JUN000389793**
6:14
**juries** 13:2
**jury** 15:20 18:4
24:9 36:9
115:22 137:8
181:19 229:18
539:10
**justified** 219:19
**J&J** 102:11
134:11,18
135:6 149:22
149:24 150:10
244:20 245:2

308:12 366:22
373:20 380:13
487:13 488:3,5
489:16 491:11
491:24 492:2
492:15 494:13
518:5,7

## K

**Kansas** 2:16
**Kathleen** 523:23
**keep** 41:10
45:22 74:6
138:11 141:4
157:20 171:23
487:23 529:15
**keeps** 49:10
122:24
**Keith** 396:15
**Kelse** 428:18
433:14 442:9
444:13
**Kemble** 3:15
**Ken** 10:11 361:3
361:3 453:5
**KENNETH** 3:3
**kept** 158:21
512:8
**key** 294:22,24
345:16 349:6
**kferguson@gr...**
3:4
**kind** 54:22 60:8
67:22 138:12
247:1 248:16
254:5 269:13
303:21 328:9
384:17
**kit** 34:15
**Kmart** 13:11
**knew** 68:3 69:11
72:23 83:4
92:25 229:19
229:22 251:17
256:10,13
274:14,15,15

Robert Glenn

386:8,8,16
487:14 488:5
504:19
**knock** 300:4
**know** 21:20
29:10 43:21
49:8 51:17
53:6 55:14
61:6,8 62:23
64:23 68:8
77:13 79:4
80:20,22 82:18
82:19 86:13
87:18,20,22
89:21 92:24
93:4 95:11,12
96:22 97:1,14
98:10 106:18
115:19 122:20
139:6,14 140:7
140:25 141:21
146:11,20
149:21 152:8
159:23 161:6
161:15,24
162:9 168:17
169:17 172:14
174:18 179:24
181:2 183:16
193:3,7,10
198:8,14
199:22 204:7
212:16 213:12
215:11 218:19
218:25 219:3
220:18 226:12
226:17 230:5
230:18 234:5
251:15 252:5
252:10,13
253:5 264:8,12
268:2 274:18
274:23 277:8,9
277:20 278:3
281:11,18
286:17 287:5

287:12,15
294:20 304:24
305:4 308:8,10
308:15 309:8
309:10,15
310:24 311:6,9
318:2,14
328:21 340:9
341:22 353:23
354:18 355:10
355:14 359:3
363:1 365:10
367:6,8 368:15
370:3 373:25
374:2 376:17
378:12 382:19
391:2,13 396:8
396:14,15,15
397:1,10,11,13
397:16,19,24
398:19 404:22
404:25 414:23
417:25 422:9
422:24 423:9
423:23,24
424:16,19,20
434:24 436:24
445:10 451:11
452:6,13
453:21 457:8
460:4 465:3
475:20 479:19
480:15 487:13
487:22 503:25
510:3 515:15
516:21 517:1
522:8,21
523:13,20
525:22,24
529:14 530:17
530:18 531:1
531:14,15,19
532:4,10,12
534:11,12,13
538:4,6 539:16
539:23 545:13

546:23 547:2,7
**knowing** 29:9
62:11
**knowledge** 19:3
24:22 41:7
75:6 80:17
82:5 87:8 89:7
91:19 93:12,23
94:8 133:9
139:19 174:3
177:8 179:21
182:5 183:2
204:14 213:18
217:15 254:5
261:19 287:6
332:19 366:13
366:23 369:4
373:1 377:2
383:4,15 394:8
398:15,17
435:17,21
443:17,21
446:19,25
457:12 459:19
491:10,11
492:15 494:20
506:16 511:11
**known** 25:16
82:14 107:11
115:16 168:11
173:14 285:4,6
306:6 359:1
400:12 502:16
**Kohrs** 2:9 10:4,4

**L**

**label** 356:5
**labeled** 97:20
**labeling** 97:8,15
200:2 356:21
545:14
**labor** 19:16
36:18 37:3,5
69:10
**lack** 136:21
137:18 178:17

297:23,25
**lacking** 266:23
267:9
**Ladies** 408:8
**lady** 355:4
**Lafarge** 31:15
32:9
**Lake** 2:11
**Lancet** 324:15
424:15
**Lange** 172:7
176:21 209:9
209:16,20,22
210:2,8 512:23
**language** 143:16
195:22 208:15
**large** 33:20
315:18 357:4
478:22
**largely** 33:11
**larger** 60:9
114:15 245:4
291:24 300:11
496:5
**largest** 70:15
**Larson** 232:11
**lastly** 412:4,7
**late** 146:12
315:8 444:15
**lately** 523:18
**lateness** 95:21
**laudable** 529:2
**law** 14:19 20:14
21:2 22:23
24:10 65:16,21
73:6 75:4 89:8
92:9 108:17
111:2 145:12
146:19 157:10
205:11,22
246:7 251:6
319:19 437:17
**lawful** 9:21
**lawsuit** 425:18
427:19
**lawsuits** 102:11

**lawyer** 68:18
69:4 155:18
**lawyers** 437:9
**LAWYER'S**
555:1
**layoffs** 376:8
**lead** 357:12
361:18 364:5
390:23 455:13
496:21,25
**leaders** 50:5,10
50:13
**leading** 19:19
288:18 315:15
350:11,17
455:20 477:10
478:10,18
**leads** 280:6
**leaf** 515:11
**learn** 198:24
263:24 264:7
425:24
**learned** 82:24
217:10
**leave** 427:1
**leaving** 27:5
88:6
**led** 544:17
**left** 15:2,8 20:4
42:11 52:16
55:8 66:9
70:18,21 73:19
74:15,20 77:5
235:22 237:25
247:21 288:15
361:16 371:24
379:18 406:2
417:23 454:7
455:7 459:7
504:18 516:20
**left-handed**
369:25
**legal** 123:17
357:7 358:7
431:16 432:19
437:1,13

legal-oriented
430:17
legislation 36:13
348:10
Lemon 42:1
lesser 430:19
431:5,7
lessons 318:18
lethal 174:2
letter 5:14 7:8
7:10,18 8:11
127:16 149:23
150:11 155:19
155:22,23
325:14 329:16
370:10 454:23
455:17 456:3,6
456:7,21 457:6
503:16
letterhead
370:11
letters 156:5
456:13 490:18
494:2
letting 14:5
476:10
let's 24:8 107:7
110:8 115:24
117:16 119:14
120:17 122:21
122:23 123:14
127:11 128:12
138:17 148:18
154:12 162:15
166:14,17
187:2 193:22
202:10 208:16
221:2 230:10
237:25 245:22
260:21 264:18
298:25 305:17
309:17 315:6
324:19,19
343:12 347:13
354:1 356:25
358:14 360:22

362:2,12
370:24 374:17
383:19 388:25
408:18 409:24
425:14 437:23
457:16 460:14
466:2,23
468:13 469:8
469:14 475:10
534:3 548:19
level 20:18
37:22 134:3
273:21 274:14
274:15,15,16
274:19 277:9
277:21 278:3
285:5,10 286:6
286:10 287:13
287:16
levels 274:16
LEVIN 2:3
LHG 1:5
liability 1:5
30:24 76:10
124:1
liaison 19:15,24
21:5,7 69:9,25
lies 464:2
lifted 44:3
liked 366:1,2
390:16
likelihood
165:17 381:20
385:4 393:16
425:1 436:20
limit 49:14
limitations
292:1
limited 94:1
231:12 271:11
303:10 315:14
315:24 375:14
462:2 464:7,12
464:16 465:9
491:24 548:12
Linda 229:14

233:22 343:21
405:9 407:24
410:20
line 90:20 127:2
189:18 210:14
232:25 233:8
409:16 505:23
554:3 555:3
linearly 247:2
lines 400:10
528:5
lining 175:9
369:19
linings 175:18
link 480:23
linked 400:20
LinkedIn 29:12
50:2
linking 499:23
lion's 54:1 56:9
list 35:6 59:3
106:18 134:18
188:25 244:2,8
244:10 261:8
261:10 280:24
282:9 290:21
292:18 294:22
301:18 353:19
422:4 502:9,18
531:4,4
listed 60:19
65:14 136:11
190:7 195:25
204:21 212:24
220:14,17
233:13,16
243:23 246:11
282:14 292:11
293:13 297:7
314:25 343:15
343:19,21
349:8 353:7,13
354:3 376:11
454:21 457:22
458:5 501:13
502:12

listening 472:16
listing 50:20
117:9 195:15
lists 202:19
241:11 242:5
281:12,20
457:25
literature 16:20
16:23 86:25
109:17,19
128:17,24
129:2 132:7,19
153:6 164:21
213:9 266:9
285:22 309:5
312:1 329:10
369:5 465:23
468:24 485:15
506:21 512:21
litigated 145:15
litigation 1:5,21
4:9,10 9:5
11:14,18 15:14
21:8,9 31:4
32:17 67:11
71:17,17 73:15
74:1,22 75:18
76:1,8,9,13
86:19 96:17
111:16 113:14
114:25 118:13
124:13 125:13
198:16 262:1,2
263:22 269:24
432:24 433:7
434:16 543:12
little 15:19 55:2
92:12 126:4
135:5 141:8
144:15 158:19
163:14 217:20
247:2 289:4
306:3 311:1
336:23 342:13
342:15 344:5
364:13 369:18

369:25 400:12
405:2 410:2
415:25 432:25
454:15 460:12
475:5 492:1
504:7,17
509:18 547:24
live 453:16,18
471:24
LLP 1:13 2:9
3:3,13,19 4:3
65:9,14 67:3
205:4 343:17
load 170:3
lobby 238:19
239:1
located 472:9
location 526:2
long 51:1 68:21
92:12 109:5
230:7 251:23
256:3 346:7
459:9 529:13
548:14 549:15
longer 48:11
372:4,12
446:21 460:3
longevity 510:22
long-term 173:5
357:24 361:19
467:15
look 37:10 39:18
44:24 46:13
47:22 62:6
86:20 107:7
110:8 117:18
119:3 127:7
146:14 166:14
256:11 258:11
275:11 276:2
285:22 295:3
302:15 311:1
326:20 337:6
343:12 363:22
366:12 385:13
398:12 409:19

428:24 434:6
448:21 454:14
457:16 459:6
466:2,23 469:8
485:5 488:13
488:22 489:2
493:14
**looked** 110:2
119:4 135:15
152:9 187:24
200:7 257:5
275:6 348:20
387:6 435:2
447:3,10 451:3
452:6,7 480:7
491:3 494:3
512:13 515:2
515:14 519:16
545:5
**looking** 63:1
79:21 110:14
113:13 114:3
115:18 128:5
134:25 135:10
136:1 178:4
218:16 275:17
283:23 284:3
313:20,22
329:20 330:22
346:5 378:3
387:14,20
402:13 416:25
417:15 427:5,9
429:3 442:2
450:7 451:22
455:11 458:13
467:24 485:15
486:5 495:25
512:13
**looks** 344:6
371:4 377:20
416:4 437:12
454:23 455:21
**loop** 374:1
**loose** 140:2,23
141:1 285:1

**Loretz** 229:14
233:22 343:21
405:9 407:24
410:20 523:16
523:19 524:2
524:17
**losing** 74:9
**loss** 400:21
**lot** 16:12 32:4
74:13 183:13
186:18 302:9
335:5 460:13
472:4 500:2
502:9 542:10
548:13,14
**lots** 526:7
537:20
**loud** 364:13
**Louisiana** 2:11
**low** 172:25
217:22 385:22
385:22 392:13
392:23 423:10
424:11
**lowering** 48:4
**lowest** 285:5
**LP9** 409:8 411:3
**luck** 526:23
**Lundy** 2:9,9
10:5,5
**lung** 46:14 47:4
167:17 170:4
170:21,22,25
171:7 172:7
173:6,12
175:18,23
178:17 207:23
216:19 273:8
326:9 341:23
394:15 409:11
411:22 416:11
499:24 509:20
510:1 542:1
543:3 544:2
**lungs** 411:6
**Luzenac** 17:14

24:12 25:21,25
26:6 61:17,21
62:15,24 69:13
70:5 75:4
90:16 93:4,6
94:21 95:1
103:24 117:10
122:14 134:11
134:20 140:6,9
140:13,18
145:18 149:9
149:24 151:10
151:25 156:12
163:18 178:10
186:23 188:12
190:16 203:5
203:10,21
204:17 206:23
214:14 228:8
233:13 246:6
248:1,19 277:5
296:20 319:23
320:24,25
323:3,5 325:14
326:5 327:7
330:11 331:10
331:18 332:4
343:18 346:18
360:19 372:5
373:21 375:10
378:4 380:13
383:10 391:6
395:10 396:11
397:2 398:13
404:18 405:3
406:3 408:5
409:5 418:2
425:19 426:4
426:17 427:7
427:19 440:20
441:5,11,21,24
442:3,20 444:9
508:10 528:6
529:9 540:23
**Luzenac's**
129:10 320:12

320:18 321:12
418:6
**LUZ001441**
7:19
**LUZ001444**
7:19
**Lyon** 6:21 17:5
289:8 292:24
317:22
**Lyon-based**
291:23 292:3,8
**L.L.P** 2:14

_____

**M**

**M** 6:5
**magnesium**
439:14
**magnitude**
465:6
**mail** 156:4
**main** 237:5
**maintain** 72:16
72:18 74:23
428:11
**major** 26:6
27:18 46:11
104:21 105:17
119:19 375:12
475:19
**majority** 27:15
157:3 266:23
267:9
**making** 133:14
263:8 295:17
295:23 491:12
504:14,23
509:4,14
**malignancies**
209:2
**malignant**
174:25 207:12
207:20 209:10
210:9
**malpractice**
123:19
**management**

277:17
**Mann** 87:19,20
87:22 88:10
90:11 147:16
147:24 148:25
149:18 155:9
163:2 178:13
233:19 344:19
407:21 410:18
414:3 492:2
518:7 519:5,6
519:13,15
**manner** 28:10
333:23 420:23
**MANSUKHA...**
3:3
**manual** 128:23
**manufacturer**
30:20 99:7,24
233:5,11
319:23
**manufacturers**
30:25 31:9
43:8,10 52:25
53:15 54:5,9
57:9,13 90:4
102:10 111:4
222:3 248:17
**manufacturing**
51:7
**manuscript**
106:23 120:23
121:4 133:5,8
133:15 189:23
201:3 206:11
220:3 311:11
419:23 497:4
505:14
**manuscripts**
17:23 120:25
121:2 500:19
500:23
**March** 427:2,3
427:25
**maritime** 98:18
**mark** 2:14 8:3

10:13 21:25
22:14 39:13
44:8 50:19
60:3 87:12
102:20 126:12
177:24 231:21
232:9 250:18
250:22 251:14
253:6,7 290:24
291:17 312:17
319:5 342:24
347:14 358:8
369:12 371:9,9
371:10 377:10
383:20 403:19
406:8,15,21
410:13 414:16
414:23 415:19
425:15 454:24
471:19 484:3
**marked** 21:22
22:11 39:10
44:5 50:16
59:22 63:15
87:9 102:16
111:17 126:8
133:16 148:5
154:22 162:10
177:20 178:1
187:14,18
199:23 231:13
231:19 240:16
246:15 255:2
291:3 313:3
319:2 325:3,7
337:2 342:21
347:10 362:6
369:9 375:1
377:7 379:14
383:16 398:21
405:24 409:21
415:14 425:11
483:25 488:14
495:20
**market** 315:15
316:8,24

317:21 318:5
375:17 445:15
**MARKETING**
1:4
**marketplace**
118:24 119:5
**market-base**
315:9
**marking** 63:19
111:23 133:20
148:9 155:3
162:14 379:24
399:2
**marshalling**
399:12
**Marshfield**
344:22 345:8
**mask** 159:10
**masked** 159:15
**mass** 76:10
**massive** 168:10
**master** 473:18
**master's** 18:8,13
**match** 391:11
**matched** 283:16
**material** 15:21
270:20 346:24
431:3
**materials** 30:11
35:4 83:1
392:9 396:12
**matrix** 383:1
**matter** 9:10
71:13,15,16
104:7,8 114:24
145:20 146:24
239:23 453:6
**matters** 33:12
145:15
**Max** 407:7
**maximize** 156:8
**McDonald**
46:24,25
**MDL** 1:4 24:5
**mean** 13:9 53:12
72:3 100:12

105:11,20
107:24 112:7
114:12,14
138:6 160:17
162:2 168:24
210:23 217:19
234:12 257:14
266:21 272:9
272:11 315:24
344:24 349:21
350:12 354:11
360:3 413:2
418:10 451:16
465:21 534:3
546:23
**meaning** 317:9
339:10 432:22
463:2 482:3,13
482:19
**meaningful**
434:18 435:6
436:1 443:16
501:19
**means** 105:23
119:15 127:8
271:11 297:10
464:17
**meant** 40:25
44:20 119:12
230:22 236:12
308:6 320:11
339:13 371:8
519:16 528:19
528:22,25
**measurements**
406:25 474:5
**measures** 48:3
474:8
**meat** 515:14,18
**mechanism**
328:16 341:18
342:1 382:10
401:22 402:15
403:14 404:1
434:19 436:2
438:20 482:9

**mechanisms**
402:5
**media** 350:9
354:5,23
385:22
**medical** 15:24
86:25 123:17
123:18 124:19
130:1 132:19
168:16 169:3
170:17 176:20
219:21 235:6,7
266:9 279:6,11
279:16,16
280:1 281:14
281:24 282:9
282:14 286:18
350:10,16
473:5 501:22
501:22
**medically**
124:13 209:1
**Medical/scient...**
120:21
**medication**
74:12
**Medicine** 242:25
400:4 424:15
**medium** 385:22
385:25
**meet** 68:19
69:11
**meeting** 7:1,12
19:9 42:6
56:14 72:23
80:14 94:17
95:1 136:20
215:7 216:11
229:13 235:24
237:7,23
238:19,24
239:23,24
244:22 247:11
247:17,19,24
254:22 256:1,4
260:7,11

269:14 290:11
290:14 324:10
343:3,9 346:2
362:22 364:3
365:11 366:7
367:10,11
463:12 469:6
507:14 524:4,6
524:9
**meetings** 19:9
55:23 64:14,20
64:24 65:2
68:22,25 69:4
72:4 77:16
235:19 236:15
237:5 255:23
258:9
**mega** 406:23
**member** 61:3,22
62:24,25 63:3
65:13 67:18,22
94:22 141:23
143:1 215:21
228:23 328:17
328:22 430:2
459:20,20
460:5,9
**members** 5:21
5:23 52:11
53:8 54:5,25
55:2,4,7,15
59:10,25 60:5
62:4 63:21,24
63:24 64:6,7
64:12 68:1,6,7
71:3 72:6 90:3
151:24 161:25
162:2 227:22
294:4 326:21
326:23 329:5,9
408:22 460:9
**membership**
58:3 61:12
67:1
**membrane**
175:8

Robert Glenn

membranes
  509:25
memo 8:2 41:11
  42:1
memorandum
  7:14 40:6,8,15
  40:20 347:19
  466:8 467:13
memory 33:6
  67:14
mention 182:10
  262:15 373:7
  373:11 488:2
mentioned
  25:21 31:10
  36:7 45:18
  63:4 66:11
  77:14 102:9
  135:20 150:11
  199:19 214:22
  231:21 262:12
  263:19 267:15
  269:19,24
  305:13,15,16
  326:24 329:15
  415:18 421:8
  430:16 461:6
  471:25 473:1
  473:13 474:9
  474:25 476:5
  479:4 480:6,10
  480:14 481:7
  487:1 488:7
  491:23 497:5
  501:4 503:15
  506:20 508:2
  522:3,8 541:17
Merely 106:3
merged 70:18
merit 374:8,11
mesoderm 175:6
  175:8
mesothelial 8:8
  175:25 275:19
  393:25 394:12
  400:6 404:15

409:8,11,14
411:3,17 416:9
425:7 447:14
447:16 449:11
450:8
mesotheliogenic
  297:24
mesothelioma
  170:15 173:19
  173:22 209:10
  210:10,16
mesotheliomas
  167:7 168:12
  175:1 535:9
message 127:4
  222:4,8 256:15
  259:12,23
  264:23 265:8,9
  265:25 309:12
  313:17 314:4
  320:13,18
messages 257:11
  532:5
met 11:10 17:5
  19:18 68:21
  69:6 72:25
  87:22 215:6
  227:13 367:6,8
  445:4,6 471:21
  513:15 519:12
  521:23 523:25
  524:2
metadata
  378:21 379:1
metaresearch...
  116:21
meta-analysis
  6:3 79:2,5 91:5
  112:21 113:9
  116:25 117:3
  117:23 123:3
  130:18 134:25
  146:18 156:6
  157:5 163:1
  164:25 178:10
  181:3 183:19

186:17 188:24
190:2,3 191:3
211:2 225:24
227:2 243:3,8
243:18 244:2
267:13 331:11
345:1 377:15
378:5 380:1
384:4,10
385:10 450:14
450:25 488:16
meta-analytic
  7:23 380:5
  384:22
meta-analytical
  119:22
meter 337:1
methodological
  479:6 480:17
  538:17
methods 119:22
  128:20
mhegarty@sh...
  2:15
mica 52:6
Michael 116:14
  118:17 194:22
  248:22 250:13
  306:17 377:21
  396:16,17
Michaels 248:23
Michele 228:25
  248:1 250:14
  313:11,15
  314:5 317:9
  343:23
Michelle 358:18
microarray
  342:12 360:20
  366:3 406:19
  412:19 420:3
  435:20 447:20
  448:6 449:19
microarrays
  176:3 412:8
middle 89:13

91:24 106:25
304:4 313:13
313:18,21
382:4 385:3
389:8 489:6
migration
  165:18
Mike 150:15
  232:11
miles 453:24
  472:21
Miller 5:17 7:10
milligrams
  337:1
million 33:21
  34:4,4 66:24
millions 273:8
Mills 104:17,20
  136:3 165:24
mind 154:15
  364:16
mine 19:17 37:5
  43:2 51:5
  68:24 317:25
mineral 8:8
  50:13 51:23
  58:3 99:7,8
  279:10 336:18
  342:10 443:22
mineralogical
  506:21
mineralogist
  19:2 139:18
  192:21,24
  193:9 212:14
  212:20,24
  213:5,15,17,22
  218:23 219:1
  220:17
mineralogists
  19:10,20
mineralogy 19:4
  139:20 192:18
  193:10 212:1
  212:12 213:18
  391:25 439:13

minerals 5:20
  5:22,23 7:14
  7:18 38:13
  39:9 51:2,6,24
  54:15,18 62:22
  63:2,25 64:4
  232:12,14
  234:1 242:2
  245:4 247:25
  314:16 347:17
  349:10,11
  350:3 370:11
  372:5 375:11
  419:17 439:17
  454:24 459:13
  459:21 508:4
  517:15 532:7
mineral-specific
  411:16
miners 52:13
minimal 411:12
mining 19:16
  26:10 28:20,22
  36:21 37:7
  49:20,23 64:3
  64:4 67:6,8,8,9
  68:20 69:9,15
  70:9,10,14,17
  73:16
Minnesota
  18:15,21 20:17
  473:14,17
minor 18:18
  200:24 475:11
minute 21:12
  82:4 111:21
  194:9 277:4
  298:20 427:6
  429:2 462:5
  517:19 548:5,6
  548:10
minutes 6:7,22
  7:12 89:20
  97:5 134:8
  135:16,19
  137:16 148:11

247:6 259:20
343:3 346:2
364:3 379:8
463:11 472:22
548:1
**Mischaracteri...**
138:1
**misheard** 480:4
**misleading**
542:23
**misnomer** 434:1
439:8
**misplaced**
432:21
**misrepresenta...**
432:18
**misrepresented**
430:20
**mission** 51:21
**missions** 37:9
**Missouri** 2:16
**misspelled** 136:8
163:7
**misspoke** 67:15
**mistake** 205:8
360:5
**misunderstood**
520:6
**MITCHELL**
2:3
**mitigation** 349:4
351:4
**mix** 317:21
**model** 44:1
55:24
**modeled** 54:17
**models** 306:5
**modest** 470:7
**modify** 101:5,13
**moisture** 279:25
280:3
**molecular**
400:13 448:17
**moment** 178:2
432:20 442:3
480:8 514:5

527:19
**momentum**
367:21
**Monday** 289:16
289:17
**Mondo** 234:1
**money** 203:13
203:13 372:18
421:8 475:8,8
537:20
**monograph** 7:1
235:19 236:14
237:5 239:25
240:4,7,22
245:9 255:22
326:2,7 357:16
386:4 399:13
462:22
**monographs**
6:20 236:6
**Montana** 232:17
**month** 78:5
108:15,18
**months** 229:23
229:23 230:6,6
345:22 346:1
375:10
**Morfeld** 258:5
**Moring** 7:2
14:20,25 23:6
23:9 24:11,20
24:23 25:10
27:5,9 35:15
65:8,14 67:3,7
67:14,18 68:4
68:9 69:5,21
70:3,22,24
71:9,20 72:3,9
72:23 73:3,6
73:22 74:22
75:4,10 77:5
77:21 78:6,13
78:18,21,23
79:1,6 81:19
81:23 83:5
84:13 85:12

86:17 87:25
88:6,9 89:8
92:9,20 103:1
103:24 108:16
108:19 109:22
109:24 113:5
121:15 122:4
124:4 127:15
129:9 130:25
139:9 142:5,9
142:18 145:11
145:12 147:18
148:22 156:11
156:20 157:19
163:17 183:18
185:16 186:21
190:17 194:22
199:13 201:23
202:17,22
203:9 204:7,22
204:25 205:4,7
205:10,21
226:18,21
243:7,19 244:8
245:2 246:7
251:6,9 252:3
259:1,8 261:24
267:12 275:11
295:20 296:17
319:19 321:9
321:11,25
322:1,24,25
325:17 330:10
331:10,19
335:13 343:17
345:1 358:13
358:20 359:4
380:11 381:2
383:9 386:21
387:2,13,22
389:21,24
390:11,14
396:25 414:1
421:12,19
426:6,23 427:1
428:2,12

440:16 441:7
441:12 443:8
450:14 476:6
477:3 483:13
485:3,7,21
496:11 498:21
516:20,24
540:20,23
**Moring's** 129:10
132:23 203:13
320:12,13,23
**morning** 9:1
11:3,4 476:14
479:4 481:8
**Morristown**
3:15
**mortality** 95:20
95:23 272:7
**Mortensen**
172:7
**mosquitos** 473:9
**Mossman**
176:10,11
275:6 281:4,5
371:19 375:3
376:18 384:3
393:18 395:4
399:22 400:2
404:10 406:5
406:14 407:15
410:7 415:6,9
425:3,4 428:18
444:14 457:4
457:10,21,23
**Mossman's**
342:8 360:17
438:4
**motion** 250:14
**Mount** 3:15
308:4
**mountain**
453:23 472:7,8
**mountains**
472:15
**mouth** 29:11
68:2

**move** 41:24 49:2
115:25 126:6
167:18 220:24
264:14 266:10
270:9,18 273:9
284:18 288:24
318:20 324:19
331:5 409:24
425:14 433:5
535:15 536:17
**moved** 49:20
391:13 433:1
**moving** 221:23
283:14
**MRG** 91:21
118:21 121:1
141:12 142:18
143:1 144:18
147:18 151:10
151:25 246:6
332:4 344:17
377:13 387:5
**MRNA** 411:16
**MSDS** 99:8,22
103:5 397:3
398:8,12,15
**MSDSs** 97:22
98:3,14,24
99:1 101:2,22
397:14,22
**MSHA** 68:21
**multiple** 57:13
**Muscat** 6:17
7:21,24 8:11
78:19 91:21
141:14,18,24
142:3,10
149:15 150:16
150:24 152:17
155:21 163:1
164:20 179:25
188:16,22
193:8,16
194:22 198:15
198:24 203:24
205:9 213:4,14

222:12 224:5,8
225:16,22
227:1 228:11
228:13 234:8
236:18 240:4
242:5,7,22,23
246:4 248:22
249:3,14,17
250:8 251:11
252:16 256:22
257:11 263:9
263:17,20,25
264:8 267:2
269:17 289:23
290:10,17
293:9 294:25
295:5,7 297:5
297:7,16,21
298:18 299:19
301:22 302:19
304:19 307:17
308:23 309:14
309:15 310:1,3
310:4,15
314:13 334:15
335:9 339:8
345:16 384:2,4
384:9 421:2
483:14 484:9
485:2,22 486:8
487:16,23
488:9 494:12
494:21 495:13
496:18 497:21
499:4,9,13
500:16 502:12
503:14 506:20
508:3 509:3,11
509:14 512:1
516:16 517:5
526:10
**Muscat's** 304:16
497:7,12 498:8
498:18 507:18
516:3,10
**mutagenic**

482:19 483:7
**mutate** 482:20
**mutations**
447:24
**M-i** 136:9
**M-o-l-l-s** 136:9

_____
**N**

**N** 2:1 3:1 4:1
**name** 9:3 11:5
29:14 30:15
32:21 114:4
115:20 149:6
149:23 201:18
252:21,23
361:1 396:22
445:7,20 446:1
453:5,14
455:14 471:19
511:24 521:21
522:11,22,25
523:2 531:8
**names** 24:17
25:16 29:25
217:23 292:14
427:10 502:9
**narrative** 116:1
128:16,25
**national** 30:9,10
36:11,15 42:13
44:9 70:16
73:20 232:3,5
366:10 459:16
461:11
**nature** 31:5
32:15 148:15
153:21 331:2
474:12
**NCI** 459:16
**NCRA** 551:17
**near** 33:20
43:15 472:13
523:12
**necessarily**
28:21 39:3
105:20 159:15

177:7 258:2
321:15
**necessary**
279:16 326:16
327:9 328:6
381:17 552:4
**necessity** 279:6
**need** 21:19
49:14 97:23
98:15 129:12
212:13 318:14
321:21 346:13
363:1 366:13
369:5 409:19
415:11 465:19
472:17 505:22
548:3
**needed** 212:12
391:12
**needs** 101:3
192:20 216:13
**negative** 46:20
47:12 269:10
269:11 392:9
476:16 481:14
537:8
**neighborhood**
475:2
**neither** 383:9
551:11,12
**never** 24:3 29:14
38:2 68:14
74:19 145:11
170:10,14
181:4 198:25
205:21 317:25
318:10,23
320:21 335:4
359:5 360:8,10
366:15 398:2
398:16 445:4
446:11 451:17
487:4 500:22
521:23
**new** 1:1 3:15
7:20 9:12 94:1

94:17 135:17
246:19 306:19
309:21 310:7
324:18 375:10
424:14 494:14
498:10
**news** 350:9
354:5,23
**newspaper**
334:15 354:14
**nice** 247:22,23
366:8 407:8
**Nicholas** 2:9
10:4
**Nicholson**
307:25 308:3,9
309:4
**NIEHS** 459:8
**night** 315:8
**NIH** 498:21
**nine** 268:17
375:9
**NIOSH** 5:16
19:14 20:3,5
36:7,9,11,22
37:22 38:3
40:4,8,9,21
42:6,12 69:7
69:17,23 73:20
115:17 161:19
161:20,22
476:5
**NIOSH's** 37:25
**NISA** 5:18 43:21
48:10,11 49:24
53:20 54:1,4,8
54:13 56:3,5
56:14,18,23
57:7 63:13
70:25 71:4,7,8
71:11,18,21
73:20 350:7
**nominate** 249:4
**nominated**
80:21 162:8
**nomination**

16:15 81:14
86:21 134:14
180:20,22
181:23 182:4
182:21 185:13
221:17 230:13
230:16
**nonexistent**
263:4
**nonmalignant**
207:11
**nonpayment**
226:8
**nonreactive**
392:14,24
**nonresponsive**
318:21 535:16
**non-asbestifor...**
7:1 255:20
326:8 333:20
334:4 336:21
336:22 352:9
400:5 434:3
439:16
**non-ovarian**
363:23
**normal** 202:3
**normally** 455:16
**North** 1:14 5:20
5:22,23 9:9
49:21,23 51:3
51:5 54:24
242:3,10,15
454:25 459:14
472:2,10,14,20
**Northern** 9:12
**Notary** 551:19
553:19
**note** 21:17 59:1
65:19,23
192:17 411:9
421:21 468:9
**noted** 9:14 306:3
421:11,11,14
552:10 553:7
**NOTES** 555:1

Robert Glenn

**notice** 5:13 22:2
22:7,16 145:17
386:18 421:17
**notify** 467:24
**notion** 261:2
**November**
458:23
**NTP** 16:15
79:10,23 81:6
81:12 82:5,13
82:19 83:23
84:14 92:3
98:12 117:9
125:17 129:4
129:13,17
134:13 135:12
143:3 161:13
161:17 164:9
178:9 180:14
180:19 181:3,5
181:7,22 182:1
182:3,15,21
183:15 184:17
184:21,23
185:12,13,20
186:20 188:23
189:6 191:8
192:13 199:14
200:11 221:15
227:6 485:11
487:3,10 521:3
**number** 14:18
22:15 24:5
26:14 39:14
43:20,22 44:8
50:20 59:2
60:4 63:19
80:3 87:13,23
102:20 105:19
106:19 110:16
111:23 126:12
133:20 148:9
155:1 162:14
162:19 189:4
189:16 191:4
195:20 200:3

202:19 218:17
222:3 227:17
231:17 232:11
240:19 248:9
290:25 312:18
312:21 313:8
319:6 328:13
340:18 347:15
351:1 353:6
362:11 369:13
375:7 377:11
379:23,24
383:20 387:22
388:2 390:6
391:8 400:20
405:9 406:8
413:1 415:20
416:20 424:22
425:16 454:14
456:12 458:2
459:10 460:18
466:9,9 468:4
476:3 483:11
488:14 496:1,3
496:12 513:8
514:20 515:1
518:4,6,15
542:13 543:11
**numbered** 188:4
260:23 469:18
469:20
**numbering** 8:12
**numbers** 264:20
**numerous** 13:24
17:7 198:11
**nurses** 269:5
479:11
**NW** 4:4
**N.W** 3:20

———————
**O**

**O** 4:8
**oath** 12:8,11
**Ober** 257:24
**Oberdörster**
222:13 224:6

236:21 257:25
258:1 298:18
299:10,19
345:15
**obey** 138:17
**obeying** 138:17
**object** 16:1 66:1
72:1 73:7 74:3
90:6 103:2
144:10 177:12
205:23 210:5
246:9 333:22
374:9 376:1,2
376:3,13 383:7
386:6,24,25
389:16,22
390:20 397:15
414:14 425:10
435:18 446:4,5
451:15 462:13
505:18
**objecting** 283:17
490:18
**objection** 13:18
13:24 14:1,13
14:14 25:19
26:4 28:9
31:21 33:1,13
38:11,18 39:1
40:17,18 41:8
42:18,19 44:16
45:3,12 48:6
49:2 51:10,11
53:3,18,21
54:11 56:21
58:9,22 59:21
60:21 61:4,19
62:18 65:24
66:15 75:1
76:4,5 77:9,23
79:18 80:6
82:22,23 83:17
84:1,2,16,24
85:13,14,22
86:22 88:3,11
90:20 92:23

93:10,11 94:5
94:24 95:7,8,9
96:5,6,13,14
96:21 97:10,11
97:24,25 99:11
100:10,15
102:5,6,12,13
103:11,12,16
105:22 109:1,2
109:14 110:5,7
111:6 114:13
114:20,21
115:10 119:7,8
121:11,18
122:19 123:22
123:23 124:6
124:23,25
125:22,23
128:8,9 129:15
131:3,19 132:2
132:4,24 133:1
133:2 135:3
136:5,6 137:5
137:24,25
138:9,9,12,18
138:18 140:4
140:19 141:15
142:6,19,20
143:6,7,14,23
144:23,24
145:4,25 146:6
146:10,25
147:11,19,20
147:21 150:18
151:13 152:3
152:21 154:2,3
154:10 156:22
157:21 158:6
158:24 159:8
159:12,21
160:8,9,24
161:4 162:5
163:22 164:12
169:10 179:3
179:18,19
182:8,25

183:20,21
184:10 185:2,3
185:18,22,23
186:12,14
190:19,21
191:18 193:1
197:1,2,10,18
198:1,2,3
199:1,6,17
200:20,25
201:10 203:15
203:16 204:4,5
204:19 205:17
205:25 206:18
206:25 208:5
209:24 210:11
210:21,22
211:6,7 212:5
213:6 214:5,16
214:17 215:2
216:3 219:9
222:6 223:1,2
223:11,12
224:17 225:4,5
225:11 226:5
226:13,23
227:10 228:18
230:1,2,3
243:11,21,22
244:4,14,15,23
244:24 249:8
252:7,8,19
253:1,4 257:13
260:1,16
262:19 263:10
264:3,10
265:15 267:6
269:21,22
271:8,21,22
272:4,12,21,22
274:9,10
275:13 276:12
276:18,19
277:14,15
278:6,18,25
279:8,18,19

Robert Glenn

| | | | | |
|---|---|---|---|---|
| 280:15,19 | 366:16,17,24 | 477:22 478:17 | 546:2,11,20 | 224:14 230:20 |
| 281:13,22 | 367:1,16,17 | 479:22 481:1 | 547:5,9,10,17 | 230:25 231:2 |
| 282:6,17,22,23 | 368:5,6,20,22 | 481:18 482:5 | 549:13,14,22 | 235:19 236:14 |
| 285:12,20 | 370:18 372:21 | 482:15 483:9 | 549:23 | 236:25 237:4,6 |
| 286:3,4,12,21 | 373:2,3,15,16 | 483:24 486:2 | **objections** 49:15 | 238:16 239:6 |
| 286:22 287:20 | 373:23 376:19 | 486:11,22 | 185:8 479:19 | 239:10 241:3 |
| 287:21 290:6,8 | 376:21 377:16 | 487:17 489:22 | **objective** 351:1 | 241:11 242:1 |
| 293:7 295:21 | 378:8,10 | 490:16,25 | 353:6,7,13 | 245:13 248:21 |
| 295:22 296:21 | 380:20 382:16 | 491:18 492:7 | 392:3,4 467:15 | 253:12 255:22 |
| 296:22 297:12 | 382:18 383:11 | 492:18 494:17 | **objectives** | 256:19,20 |
| 298:8 299:12 | 383:12 388:4,5 | 494:25 497:15 | 350:22,23 | 258:15,16,20 |
| 300:14,23 | 388:11 392:21 | 497:23 498:13 | 352:11 466:15 | 260:9 264:24 |
| 305:2 308:13 | 393:4 394:1 | 498:25 501:2 | 466:24 467:4 | 266:1 287:9 |
| 308:14 310:18 | 395:12 396:3 | 502:15 503:1,8 | 467:14,14 | 288:22 290:4 |
| 310:20 311:5 | 396:13 397:4,5 | 503:22 505:2 | 527:23 528:6 | 292:3,7 293:4 |
| 311:14,15,23 | 397:23 398:4 | 505:25 506:6 | 529:21 530:5 | 293:6 322:6 |
| 312:9 315:1 | 398:10,18 | 506:14 507:6 | **obligation** | 508:13,22 |
| 317:7,18,23 | 401:12 403:22 | 507:10,23 | 101:19 | 512:1 |
| 318:6,7 319:14 | 404:3,4,21 | 508:24 509:22 | **observance** | **obstructive** |
| 319:24 320:7 | 408:14 409:17 | 510:18 511:7 | 341:18 | 283:23 |
| 320:15,16 | 414:5 417:12 | 512:16 513:4 | **observant** 245:3 | **obtained** 35:9 |
| 321:4,6,7,14 | 420:19 421:5,6 | 514:3,13,24 | **observation** | 122:10 |
| 322:8,9 323:4 | 421:23,24 | 515:12,24 | 297:25 | **obtaining** |
| 323:10,16,25 | 422:7,8,17,19 | 516:25 517:9 | **observational** | 420:10 |
| 324:2 329:22 | 423:11,13,20 | 518:22 519:18 | 136:21 450:24 | **obviously** 378:1 |
| 329:23 330:14 | 423:22 425:20 | 520:1,8,16,25 | **observe** 162:3 | 378:1 431:13 |
| 330:15 331:20 | 425:25 426:7,8 | 521:7 522:9 | 237:13,22 | 488:5 |
| 332:13,22,23 | 426:15 427:16 | 523:5 525:14 | **observed** 265:1 | **occupational** |
| 334:18 335:18 | 427:21 431:23 | 528:15,17 | 266:16 411:2 | 5:16 18:14 |
| 335:20 336:9 | 431:24,25 | 529:6,7 530:14 | 432:23 464:18 | 36:12,14,16 |
| 337:10 338:21 | 433:8,12,20,21 | 530:23,24,25 | **observer** 225:2 | 37:2 48:3 |
| 339:12,14,23 | 434:21,23 | 531:9,11,23 | 230:13,16 | 254:23 424:10 |
| 340:11,12 | 435:8,9 436:4 | 532:15,19,23 | 235:10 237:12 | 473:20 |
| 341:3,9,20,21 | 436:6,14,15 | 533:10,20,22 | 237:22 240:5 | **occur** 106:12 |
| 344:12 345:3,5 | 437:10,11,19 | 533:23 534:6,7 | 241:15 245:1,1 | **occurrence** |
| 346:3,4,20 | 437:20 438:17 | 536:7,8 537:2 | 245:17,23 | 263:3 |
| 347:7 348:16 | 441:2,14 442:6 | 537:17,18 | 248:11 249:3 | **occurring** 168:9 |
| 349:14 351:5 | 442:22 443:10 | 538:22 539:7 | 249:24 257:12 | **October** 1:8 9:6 |
| 351:10 352:5 | 443:19 444:11 | 539:20,22 | 258:5 295:1 | 126:19 134:12 |
| 352:14,15,17 | 445:2 446:13 | 540:8,24 541:9 | 308:24 310:5 | 202:6 246:21 |
| 353:1,9,11,17 | 446:14,20 | 541:10 542:4 | 322:13 507:19 | 256:5 551:19 |
| 354:8,17,25 | 448:19 451:13 | 542:11,18,19 | 509:4,15 516:5 | **odd** 303:21 |
| 355:11,13,20 | 452:1,2,15 | 543:4 544:5,6 | 516:11,17 | **odds** 272:6 |
| 355:22 356:10 | 455:19 465:14 | 544:14,15,20 | **observers** 7:1 | **offer** 73:4 |
| 356:20 361:6 | 465:20 468:1 | 544:25 545:11 | 162:7 221:18 | 436:13 |
| 364:8 365:2 | 471:4 476:24 | 545:12,25 | 221:20 222:9 | **offered** 106:20 |

| | | | | |
|---|---|---|---|---|
| 322:19 534:10 | 39:25 41:3 | 161:12 163:9 | 258:19 259:11 | 381:3 382:3 |
| **offering** 314:19 | 42:11,25 43:12 | 165:5 166:1,14 | 261:17,20 | 383:19 384:19 |
| **office** 525:23 | 44:15,24 45:17 | 166:20,25 | 262:7,13 | 384:20 388:17 |
| 526:2 | 52:19 53:10 | 168:4,22 | 263:14,19 | 389:6 390:10 |
| **officer** 325:23 | 55:5,17 57:19 | 170:16 171:2 | 264:14 265:12 | 391:4,19 392:3 |
| **officers** 70:25 | 59:17 62:9,9 | 171:12,12,17 | 265:22,24 | 397:1 399:19 |
| **offices** 1:12 | 63:7,18 64:6 | 171:23 172:1 | 266:5 267:1,15 | 400:12 401:18 |
| **officials** 349:17 | 64:13 65:5 | 173:17 174:4,7 | 269:16 270:13 | 402:22 406:7 |
| 349:25 | 66:6,12 67:12 | 174:10,22 | 270:15,17 | 409:24 410:1,4 |
| **oftentimes** 201:2 | 68:16 70:20 | 175:2,15,15 | 273:2 279:2 | 412:3 415:17 |
| 457:25 | 71:2,19 72:16 | 176:8,12,14,22 | 282:13 285:9 | 416:19 418:16 |
| **oh** 10:22 69:20 | 72:24 73:10 | 177:23,25 | 288:12 289:2,3 | 418:23 420:14 |
| 71:8 100:3 | 74:6,8,11,19 | 178:23 179:15 | 290:16 291:12 | 422:13 423:5 |
| 115:7 125:16 | 75:8,20 76:15 | 179:23 180:6 | 291:15 294:18 | 424:23 425:23 |
| 126:22 170:13 | 76:20 78:5,9 | 182:19 183:10 | 294:21 295:3 | 426:3,22 427:5 |
| 171:18 180:6 | 79:15 81:25 | 186:25 187:5 | 296:9 297:1,10 | 427:25 428:8 |
| 180:24 194:7 | 82:12,18 83:12 | 187:12,19 | 298:11,15,24 | 428:10,17 |
| 194:11 230:20 | 84:21 85:6,10 | 189:15 190:25 | 299:17 300:2 | 429:6,16,18 |
| 230:22 233:3 | 86:2,16 87:5 | 192:5,9 193:13 | 301:16 302:8 | 431:20 436:10 |
| 237:18 239:1 | 87:12,23 88:8 | 194:3,14 195:2 | 303:20 305:17 | 436:19 438:3 |
| 249:15,18 | 88:20 89:14 | 195:19 196:7,7 | 307:23 308:17 | 439:1,21 441:9 |
| 261:17 276:24 | 90:10 91:23,25 | 198:10,14,23 | 310:24 311:12 | 441:20 442:1,1 |
| 292:19 298:23 | 92:16 93:2,5 | 200:4,16 | 312:14,25 | 442:16 444:2 |
| 307:23 310:14 | 96:11,25 100:1 | 201:15,25 | 314:1,10 315:4 | 445:13 446:18 |
| 313:23 320:11 | 104:11 106:5 | 202:12,21 | 319:10 324:8 | 448:2 449:6,15 |
| 333:11 339:5 | 106:11,16 | 203:19 207:4,6 | 324:19 325:1,8 | 449:21,24 |
| 358:14,16 | 111:20 112:1,4 | 211:19,23 | 325:20 326:4 | 450:6,16,22 |
| 359:7 370:6 | 113:25 116:9 | 212:16 214:21 | 328:10 329:3 | 451:2,6,22 |
| 378:20 379:1 | 116:23 117:15 | 216:20 218:11 | 331:7 333:15 | 452:19,24 |
| 410:1 418:21 | 118:15 119:11 | 219:6 220:16 | 338:7,7,11 | 453:9,20 |
| 427:20 429:2,6 | 119:14,17 | 225:22 228:20 | 339:6,7 341:15 | 454:19,22 |
| 484:20 523:1 | 120:7,17 122:7 | 228:24 229:17 | 342:17 343:12 | 455:2 457:8,18 |
| 526:25 549:4 | 123:11,16 | 230:10,18 | 344:24 347:13 | 458:8 460:2 |
| **okay** 11:13 13:5 | 124:10 126:3 | 233:3 234:21 | 349:17 351:21 | 462:4,6,7 |
| 14:10 15:7,18 | 131:7,16 | 235:9 237:3 | 353:22 357:1 | 463:13 466:4 |
| 16:10,24 17:1 | 133:19 134:1,4 | 239:1,3,5 | 358:14,16,23 | 466:23 467:12 |
| 17:13,22,25 | 134:24 136:13 | 240:14,15 | 359:7,25 | 468:18 469:10 |
| 18:17,23 19:6 | 138:16 139:7 | 241:23,24 | 360:14 361:13 | 469:25 470:13 |
| 19:11 20:24 | 139:21 140:1 | 242:18 245:10 | 362:5 365:8,13 | 470:22 472:18 |
| 22:6 23:14,24 | 140:21 144:1 | 246:23,24 | 367:13,23 | 474:22 490:9 |
| 24:1,25 25:5 | 145:23 148:16 | 247:4 248:21 | 369:12,23 | 516:8 517:23 |
| 25:14 26:9 | 148:20 149:13 | 250:1 251:2,8 | 370:6,20,25 | 521:9 523:9 |
| 27:11 30:2 | 151:8,22 | 251:15,21 | 374:22 375:5 | 526:18 527:6 |
| 31:5 32:1,19 | 152:15 153:14 | 252:1 253:11 | 376:10 377:23 | 527:12 529:16 |
| 34:3 35:17 | 157:9,17 158:4 | 254:15 255:5 | 378:14 379:2 | 531:22 532:2 |
| 37:21 39:7,22 | 159:17 160:13 | 255:19 256:16 | 379:12,24 | 536:1 537:14 |

538:1,9,13
540:12 544:22
547:15
**old** 469:10
**omission** 363:12
**once** 109:21,23
153:20,20
256:13 367:9
**oncologist** 20:10
174:8,11,15
329:18,19
330:2 331:1
332:20
**oncologists**
229:6
**oncology** 324:15
328:13 329:10
329:14 330:12
**ones** 33:7 369:5
372:24 408:15
409:14 416:25
**one-third** 156:7
**open** 58:2
102:10 168:18
168:18 512:19
**operates** 58:12
**operations**
58:20 343:13
**opine** 114:23
329:20
**opined** 261:11
**opinion** 101:2
109:18 153:8
153:18,19
160:10 161:21
168:3 169:25
265:6 273:19
303:22 311:17
315:10 317:25
327:24 443:14
470:25 471:1,5
478:18 481:19
510:19 520:17
520:19 533:12
535:23 537:11
537:11,12

538:20 541:3
**opinions** 192:14
213:10 223:3,4
223:18,21
259:14,16
261:15 266:8
287:10 537:15
539:6,17,18,24
**opportunity**
22:3,7 46:2
48:23,25 83:10
139:4 277:24
534:20
**oppose** 37:24
45:9 48:4
**opposed** 476:11
**opposing** 38:3
40:16
**option** 115:2
**order** 182:11
351:3 424:7
**ore** 261:3 263:4
**organization**
37:4 43:5,6
46:8 47:20
49:19,24 50:3
50:6,14 51:4
52:21 53:16
54:10,17 55:16
64:8 71:4
89:25 111:2
221:9 234:24
239:19 290:19
290:20 419:16
460:9
**organizations**
64:21 221:13
232:2 237:8
350:4
**organization's**
45:9
**organize** 19:16
**organized**
405:18
**organs** 171:10
342:2

**oriented** 124:13
**origin** 173:14
175:14
**original** 63:3
80:25 202:22
226:3 310:14
313:17 378:6
458:20 498:20
552:14
**originally**
200:10 311:1
416:1
**OSHA** 36:17
44:4 97:17
98:17 161:7
336:16
**OSHA's** 47:5,13
**ought** 361:5
**outcome** 94:16
102:15 137:12
152:1,19 154:1
236:7 237:24
238:23 317:22
476:23
**outcomes** 32:4
209:3
**outlined** 128:20
192:1
**outside** 36:20
76:13 130:2,9
170:24 302:12
358:19 473:6
505:12
**ovarian** 6:16
7:22 11:20
31:19 77:8,20
78:2 86:18
87:7 91:9
93:18 95:5,17
103:8,9 107:10
107:25 108:24
109:13,25
125:3 128:1,6
128:19 131:25
132:8 136:23
137:20 139:23

141:13 153:10
164:24 165:1
165:20 166:5
168:6 169:25
170:2 174:11
175:3,4,20,20
176:1,2 186:3
189:3,5,24
192:2 194:17
200:18 208:10
265:3 268:5
272:18 276:3,8
276:14 280:6,8
280:11,25
281:12,21
282:15,20
283:7 298:1
303:10 306:20
307:8 309:6,22
310:8 323:20
326:8,17 328:7
328:11,17
329:10,21
331:2,3,4,14
332:12,16,17
332:21 333:19
342:6,7 346:6
361:21 363:16
363:18 364:24
368:8,10 380:5
381:18 384:22
391:21 392:5
392:15 393:20
394:8,23,25
400:7 402:15
409:9,12
411:18 412:8
416:14,15
417:3 425:2
426:13 433:17
443:18 447:16
449:10 469:23
470:19,24
477:25 478:16
478:25 479:16
480:24 481:5

481:11,22
485:16,17
490:23 491:5
510:12 511:5
511:12 520:23
528:14 529:5
532:22 533:9
533:15 536:23
536:24 541:3
**ovary** 130:21
165:18 167:2
170:6 296:3
488:19
**overall** 37:9
264:24 266:15
291:24 375:19
382:8 469:25
470:7
**overlap** 183:13
**overlapped**
185:9
**Overview** 7:1,20
255:20
**owe** 156:5
**owned** 26:2
**o'clock** 301:20

**P**
**P** 2:1,1 3:1,1 4:1
4:1,8
**page** 5:2,12
23:15,21 24:1
29:12 39:14
44:10,13,22
48:14 50:2,20
57:21 60:4,10
60:11 63:20
65:8 91:23
93:16 103:23
104:10 112:2,8
116:8 117:25
119:18 120:18
120:18 127:12
166:18 167:12
171:14,21
172:3 188:11

| | | | | |
|---|---|---|---|---|
| 188:20 189:1 | 35:2 61:6 | 428:9 442:15 | 128:12 130:16 | 94:22 |
| 190:6 194:6,15 | 159:24 202:25 | 447:15 448:21 | 165:12 208:17 | **participants** |
| 195:1,14,17,18 | 203:3,5 204:6 | 448:22 449:22 | 237:11,16 | 89:15 134:18 |
| 195:24,25 | 214:13 225:17 | 486:10 487:1,2 | 302:15 304:4 | 146:8 217:1 |
| 196:5,6,16,16 | 225:23 226:2 | 488:11,24 | 313:13 326:14 | 238:20 239:2 |
| 207:4 213:25 | 226:11,15,17 | 489:4,8,13,19 | 328:10,25 | 239:24 241:11 |
| 235:14 240:13 | 226:21 242:12 | 490:19 491:12 | 333:8,10,14 | 247:24 343:13 |
| 241:8 248:8 | 242:13 243:10 | 491:22 492:11 | 334:9 337:15 | 346:12 |
| 258:23,23 | 243:12 251:8 | 492:13,17,23 | 339:5 345:11 | **participate** |
| 260:24 291:13 | 277:2,4 296:16 | 493:4,9 494:10 | 348:7 370:21 | 64:14,17,20 |
| 293:20 294:8 | 517:2 537:20 | 494:14,23 | 375:7 382:4 | 225:2,8,14 |
| 294:21 295:4 | 537:23 538:21 | 495:15,18,19 | 399:21 455:4 | 231:5 445:16 |
| 297:15 302:1 | 540:13,17 | 496:2,3,4,10 | 457:5 463:21 | **participated** |
| 302:14 313:14 | 543:24 | 496:12,15,15 | 488:23 489:7 | 68:15 229:15 |
| 313:21 315:24 | **paints** 439:25,25 | 496:16,19,23 | **paragraphs** | **participating** |
| 333:6 346:9 | **Pamela** 475:13 | 498:5,12 499:6 | 129:22 305:18 | 93:7 241:3 |
| 347:5 348:24 | **panel** 511:14,18 | 500:10,13,15 | 455:4 | 245:14 257:12 |
| 354:1 356:25 | **PAPANTONIO** | 501:8,22,23 | **Pardon** 247:18 | **participation** |
| 370:24 371:2,7 | 2:3 | 502:1,7,18 | 252:25 316:16 | 253:13 |
| 375:6 378:15 | **paper** 94:2 | 503:12,18,20 | 440:6 540:14 | **particle** 342:10 |
| 378:17 381:4 | 107:5 108:21 | 504:12,15,19 | **paren** 412:23 | **particles** 275:18 |
| 382:2 384:13 | 135:20,21 | 504:23 506:4 | **parentheses** | 304:7 402:23 |
| 388:14,15,16 | 136:3 158:22 | **papers** 17:15,17 | 316:23 328:15 | **particular** 374:6 |
| 388:22,23 | 159:11 165:24 | 17:19,20 47:9 | 412:21 413:2 | 456:3,21 |
| 389:9,10 391:8 | 176:18 179:16 | 108:9 136:11 | **parietal** 171:4 | 458:18 459:2 |
| 391:9,15 | 181:3 196:13 | 153:7 219:12 | 171:10 207:18 | 483:19 493:22 |
| 399:17,21 | 197:8 198:24 | 257:16 264:1 | **Parker** 475:14 | 514:22 518:7 |
| 406:12,12 | 200:15 201:12 | 268:4,7,9,15 | **Parks** 314:14 | **particularly** |
| 407:12 408:23 | 201:16 203:20 | 330:6 332:11 | 344:10 | 445:21 455:4 |
| 416:22 418:25 | 204:12,15,17 | 332:15 485:7,8 | **parse** 336:3 | 455:12 545:8 |
| 424:24 428:9 | 207:2 214:19 | 485:14 486:15 | **part** 49:11,24 | 545:22 |
| 429:16,17,20 | 219:8,19,21,22 | 487:9,25 | 66:23 105:17 | **particulate** |
| 437:24 438:2 | 219:25 220:9 | 493:12,15 | 116:24 118:7 | 336:24 |
| 454:20 455:5 | 220:20 227:2 | 494:5 500:17 | 143:11 151:9 | **parties** 236:3,6 |
| 455:12 459:7 | 261:12 269:2,2 | 501:20 502:13 | 211:14 216:13 | 551:11 |
| 463:16,17,22 | 269:3,7 276:15 | 503:20 504:9 | 217:17 221:8 | **partly** 243:13 |
| 469:17,22 | 295:19 297:8 | 506:17,18 | 238:15 243:8 | **partner** 104:4 |
| 470:13 484:18 | 298:13 310:14 | 507:1 526:9,14 | 259:11 290:1 | 141:12 |
| 527:22 554:3 | 310:25 312:8 | 526:16,20 | 290:16 293:1 | **parts** 532:4 |
| 555:3 | 312:11 340:14 | **paperwork** | 360:6 466:7 | **party** 151:18 |
| **pages** 171:17 | 340:15 392:7 | 488:4 | 475:11 477:16 | 153:24 234:4 |
| 188:1,6 193:23 | 411:15,25 | **paragraph** | 480:16 485:11 | 351:12 |
| 196:19 240:9 | 415:19,21,23 | 48:17 57:22 | 496:19 501:25 | **passed** 80:9 |
| 258:25 260:23 | 421:3,18 | 91:24 92:15 | 512:3 516:4 | 487:15 |
| 553:5 | 422:11,14,25 | 118:21 119:18 | 541:13 | **passing** 356:22 |
| **paid** 23:8,10 | 423:19 427:10 | 120:21 127:22 | **participant** | **Pathogenicity** |

8:8
**pathologist** 114:2,2,3
**pathologists** 114:6,10
**patient** 549:12
549:21
**patients** 173:9
208:25 209:6
549:25
**patterns** 411:16
**pause** 31:16
**pay** 142:9
224:16
**paycheck** 540:19
**paying** 23:5,6
54:1 145:3,24
260:18 276:17
276:20
**payment** 157:18
487:15 525:20
539:3,4
**payments** 239:12 539:15
539:16
**pays** 363:7
**PCPC** 523:4,21
524:14,18
525:1,6,9,20
526:5,13,19
**PCPC's** 525:12
525:23
**peer** 17:9 105:7
505:6,8,21
**peer-review** 105:3 490:3
**peer-reviewed** 104:24
**PEL** 45:1 47:15
48:4
**pending** 45:21
46:10 48:20
126:7 138:24
139:13 284:15
318:25 338:1

**Penn** 248:22
**Pennsylvania** 3:10 242:24,25
**Pensacola** 2:6
**people** 28:13
29:9 63:25
64:7 67:23
97:3 101:23
110:2,14
122:15 161:20
162:2 220:2,10
221:15 227:17
232:11 257:23
265:13 280:3,7
290:21,22
292:20,23
293:2,12 294:3
314:13 315:9
326:1 327:3,22
344:1,7 349:12
408:12 414:24
417:18 418:10
420:2,7 430:24
456:12 466:9
466:10,10
508:11 524:13
535:20 544:23
**percent** 169:7
177:10,19
315:14 434:2,3
439:14,15
**perform** 243:18
**performing** 420:2
**perineal** 6:16
7:22 107:8,22
108:24 136:22
137:19 153:10
164:22 165:17
165:19 186:3
200:18 279:21
280:6 295:12
296:3 319:10
355:5 371:17
380:4 381:19
383:1 384:21

462:24 471:3
480:18 482:25
510:12 536:2
**period** 15:12,19
15:22 16:13,14
27:8,12 29:7
30:3 61:11
69:12 93:17
138:20 157:2
161:17 230:7
244:18 284:1,2
319:17,17
376:7 424:3
426:4 541:2
**peritoneals** 174:5
**person** 62:12
100:13,17
115:5 212:23
233:17 287:8
287:10 414:11
437:16 445:4
445:11 501:19
519:12,12
524:1
**personal** 3:22
10:20 23:2,4
88:17 93:12
94:8 279:3
287:18,25
521:22 522:4
**personally** 115:20 452:6
**personnel** 441:21 475:10
475:17
**person's** 219:7
**perspectives** 238:6
**persuasive** 303:7
**pertinent** 239:22
**Pfizer** 30:16,17
31:18 262:12
262:18 263:2
**ph** 1:22

**pharmaceutical** 30:19,21
119:19 169:4
176:19 177:9
315:20
**Philadelphia** 3:10
**phone** 10:2
178:24 344:3
344:17 523:24
**phrasing** 340:23
**physicians** 254:23
**Ph.D** 7:8
**pick** 205:14
**picked** 20:1
181:23 370:4
376:18
**picking** 183:17
**pickled** 515:5
**Pisano** 138:13
**place** 40:3
106:13 135:25
138:8 147:25
161:7,8,9
182:12 215:12
216:11 235:24
247:11 253:20
254:18,20
256:1,7 260:7
260:10 273:18
289:11 290:11
472:1,3 551:8
**placed** 131:5
**places** 476:4
**placing** 192:16
**plague** 473:10
**plaintiff** 431:10
**plaintiffs** 2:12
9:24 10:8,10
66:7 430:20
483:4,12
484:14,16
497:11 512:8
537:21,24
**plaintiff's**

483:23 496:17
498:7,17 501:5
518:15,19
**plan** 49:12,16
54:23 156:10
349:4 351:23
352:11 353:14
408:10
**plans** 351:4
489:12
**plausibility** 402:7,10
**plausible** 295:11
341:17,25
401:21 402:4
402:14 403:14
404:1
**play** 140:11
215:16,19
231:12 238:4
307:24 308:2
**played** 12:23
13:2 163:19
308:20 345:16
**plays** 274:3,5
**Plaza** 247:11,12
**please** 10:3 11:5
60:1 65:10
91:24 123:15
135:9 149:21
162:16 166:19
209:17 246:14
292:2,6 301:18
307:25 308:19
308:22 379:8
406:21 407:5
408:8 419:6
428:24 453:14
457:17 543:20
549:2 552:3,8
**pleasure** 127:23
**plenary** 299:8
299:24 420:3
**pleura** 170:23
171:3,4 207:19
297:24 340:16

**pleural** 168:7,15
169:17 171:1
174:6 175:1,2
175:12 207:20
509:21,24
**pleuras** 175:5
**pleurisy** 510:3
**pleurodesis**
167:7 169:1,22
174:18,25
177:1 180:1,5
191:20 192:1
195:21 196:10
208:9,18,20
209:1,7 214:23
215:6 216:1,12
216:18 279:10
297:23 299:5
302:24 322:18
366:2 509:5,15
509:18 510:6
510:23 511:15
511:20 512:9
**plots** 190:11
**plus** 358:7
**pneumothorax**
167:8 168:9
170:11,21
172:9 173:7,11
207:21 209:8
**point** 21:19
33:23 37:21
41:12 43:23
59:17 86:3
89:18 104:5
139:22 147:8
156:19 169:19
172:2 182:5
202:11 248:9
248:24 251:4
295:24 299:1
299:18 304:12
304:23 305:13
314:23 319:22
351:22 358:11
402:21 412:12

413:18 418:1,1
418:15 465:1
467:7,18 468:8
470:5 472:17
530:2 534:14
539:3
**pointed** 219:12
278:8 306:17
307:9,12
309:19 408:16
476:14 506:22
529:23
**pointing** 122:24
**points** 43:21
46:15 167:6
292:4,9 294:22
294:24 322:5
352:20 353:19
391:12 467:2
468:3,4 470:14
470:17 529:24
**policies** 333:25
**policy** 38:3,3
348:10 547:19
**poor** 107:15
193:9 213:4,15
292:25
**poorly** 78:23
**population**
451:8
**portfolio** 363:15
375:19
**portfolios**
375:13
**portion** 266:11
276:8 333:20
501:22
**position** 5:18
40:9 69:23
91:14 334:4,7
334:24 335:2
428:1 507:22
528:13 529:4
**positive** 47:2,12
275:23 342:11
392:9 447:25

464:18 465:10
470:8 476:16
481:17
**positively**
432:15
**possibility**
394:21 545:10
545:24
**possible** 102:15
107:9 128:18
129:4 130:4,11
130:19 149:15
282:15 285:5
314:25 315:10
317:17 318:4
397:21 488:17
511:17
**possibly** 78:8
79:21 96:16
129:16 166:4
213:3 257:15
327:21 366:10
399:10 424:8
447:3 457:14
462:10 463:2
465:8 514:8
523:24
**potential** 7:20
32:4 178:25
248:21 297:24
298:1 306:9,14
351:2 356:18
372:6 394:18
401:1 488:23
**potentially**
159:11 485:10
487:2,10
**poudrage**
172:13,15,16
173:2,8
**powder** 1:3
11:14,21 13:9
13:13 15:13,16
177:2 278:17
279:4 339:9
375:17 426:12

451:18 467:19
468:10 477:9
477:21 478:1,9
478:12,15,24
479:16 480:24
481:4,11,22
482:2,13,19,23
502:25 520:15
520:23 528:7
534:4,4,15,17
534:22,24
535:12,12
536:3,3
**powdered**
535:10,11
**powders** 279:15
371:17 471:2
482:24
**PowerPoint**
255:16 468:19
469:16
**PR** 7:2
**practice** 157:24
158:8 505:16
**PRACTICES**
1:4
**preamble** 329:4
**precautionary**
284:22,25
**preceding** 391:9
**precise** 448:7
**predecisional**
41:4
**predict** 49:7
**preliminary**
407:16 412:19
**premise** 295:10
295:18
**preparation**
35:23 81:5
85:8 120:23
229:24 291:7
325:10 330:5
487:9 492:16
498:3 500:9,12
**preparations**

253:19
**prepare** 51:17
132:12,13,16
152:10 225:7
225:13 253:13
259:3
**prepared** 201:23
208:11,14
370:15,19
380:10 387:13
396:7 468:20
468:23 470:17
**preparing** 34:25
35:24 192:24
200:6 224:21
226:25 256:4
257:6 486:15
**prepping** 133:22
**present** 136:19
273:24 532:6
**presentation**
254:17 256:18
259:21 288:21
**presentations**
64:17 253:17
287:9
**presented** 254:1
505:1
**presenting**
253:25
**presents** 546:3
**president** 43:16
56:2,13,17
62:2,13,16
63:10,13 67:13
67:16 72:15
74:20 228:24
231:22 232:3
250:16,23,25
371:11 454:24
**pressure** 207:24
**presume** 281:25
**pretty** 134:2
153:7 157:12
157:15 187:25
259:18 263:1

317:13 501:17
**prevent** 48:21
168:8 304:6
**preventable**
48:2
**prevention** 44:2
55:24 199:10
199:16 311:3
423:7
**previous** 93:17
254:24 393:17
425:4
**previously**
128:13 136:18
231:22 436:11
**Price** 232:18,22
**primarily** 14:18
**primary** 75:23
75:24 139:21
164:16,18
165:8 203:25
243:24 430:17
**prime** 169:18
**principal** 104:21
193:8
**principally** 66:3
68:11 70:9
**principle** 272:17
284:22,25
**print** 240:12
264:20
**printed** 85:19
**printout** 39:14
44:20
**prior** 27:7 78:12
78:17,22,25
79:5 81:4,19
91:18 129:3
130:2,8 131:1
152:2 178:23
179:7 197:24
214:21 217:14
257:11 335:4
339:25 340:5
372:14,15
394:6 395:2

432:23 436:23
445:8 495:25
551:4
**priority** 353:20
369:7 418:1,11
418:13
**private** 121:1
158:22 415:5
524:4,7
**privately** 524:17
524:19
**privilege** 113:4
121:23 122:1,5
156:9 157:20
**privileged** 123:1
158:1 294:6
309:23
**pro** 66:4
**probable** 465:5
514:17 515:23
**probably** 30:3,7
52:15 55:7
63:10 69:6
73:2 78:7
112:24 173:1
182:10 244:17
251:12 252:2,2
253:7,22 273:7
295:25 306:1
327:14 365:21
367:20 410:24
414:22 428:16
457:23 461:23
462:20 463:7
469:13 474:21
510:22 515:13
515:18 516:19
524:10
**problem** 217:17
324:6
**problematic**
451:24
**problems**
213:19 479:6
504:25 538:18
**procedure**

460:19
**procedures**
333:25
**proceed** 333:18
**proceeding** 17:3
83:22 150:15
254:10,15
371:19 372:16
**proceedings**
161:23 215:20
222:19,25
225:3 226:16
227:8 229:21
229:24 231:5
231:24 288:17
288:25 289:10
290:2 309:13
318:3 319:18
322:2,20
334:14 493:24
514:7 516:12
530:11 531:6
540:16
**process** 43:2
51:6 64:4
79:10,12,23
81:6,12 82:6
82:13,21 92:3
105:3 121:3
161:18 180:13
185:21 221:17
221:21,24
223:9 230:13
230:16 274:4,6
289:15 290:17
291:10 326:7
348:19 357:15
363:16 485:12
490:3,5 504:23
508:23 516:4
519:1
**processes**
273:17 519:8
**PROCTOR** 2:3
**produce** 543:6
**produced**

117:22 340:18
362:10
**producer** 5:21
59:25 60:5
63:24 67:25
**producers** 52:13
58:3 90:4
102:10
**produces** 99:7
**producing** 63:25
332:9
**product** 1:5
15:14 76:9
123:25 128:24
156:9 277:13
279:2 282:21
283:8 285:11
286:19 287:19
315:15 316:5
336:7 356:21
375:12,19
430:10 445:21
446:2 483:5
533:9 545:8,21
545:23 546:9
546:15 549:20
550:2
**production**
312:24
**productive**
457:25
**products** 1:4
3:22 10:21
11:21 13:10,13
30:22 88:17
90:5 97:9
99:19 101:24
234:17 273:14
273:25 274:1
279:3 285:14
287:25 339:9
340:8,17 341:2
341:16 375:15
380:14 392:8
395:1 477:9,21
478:1,9,15

481:22 502:25
520:23 521:22
522:4 534:23
545:9
**professional**
47:17
**profiling** 400:4
400:17,24
401:7 411:15
**program** 44:2
55:24,24
139:17
**progress** 27:25
164:21,25
369:7 406:19
406:22
**progresses**
37:18
**project** 75:9
128:25 129:24
130:17,24
248:10 384:14
403:6 433:1,5
488:16 489:3
**projected** 431:8
**projects** 7:20
127:24 128:14
346:25 375:21
**Projects-Hunc...**
117:5
**project's** 127:16
**promise** 176:15
529:14
**Prop** 385:17
**proper** 499:6
502:20 505:15
**properly** 326:16
327:10 328:6
382:22 504:24
519:22 520:6
520:13,21
**properties** 285:3
**proponent** 54:8
**proportions**
156:13
**proposal** 6:3

| | | | | |
|---|---|---|---|---|
| 122:10,12,13 | 406:23 548:11 | **publication** | 496:1,11 498:4 | **purview** 113:3 |
| 186:20 199:13 | **proved** 543:13 | 16:19,22 17:24 | 498:20 500:1 | **put** 29:14 44:3 |
| 199:20 275:10 | **proven** 48:5 | 121:4 130:5,12 | 500:14 501:8 | 46:22 48:10 |
| 275:12 360:19 | **provide** 30:12 | 131:2 136:14 | 501:21 503:13 | 49:12 55:25 |
| 360:25 380:2 | 37:2 53:10 | 199:21 200:10 | 503:20 | 63:8 79:22 |
| 380:19 382:20 | 58:4 161:21 | 201:4 214:21 | **publishing** | 80:9 85:20 |
| 384:15 387:5 | 190:17 215:13 | 331:12 333:19 | 330:6 332:10 | 86:17 112:20 |
| 387:12,21 | 222:20 234:16 | 372:14 395:3 | 489:7 | 144:12 199:20 |
| 404:10 413:6 | 290:18 300:3 | 409:20 422:15 | **Puerto** 254:18 | 203:25 206:6 |
| 416:23 417:3 | 341:17 381:22 | 488:25 | 254:20 255:23 | 223:5 237:1 |
| 427:6 432:13 | 382:9 393:9 | **publications** | 256:17 260:8 | 249:7 255:5,16 |
| 440:24 443:7,8 | 402:14 404:1 | 160:21 324:5 | 469:5 | 259:12 261:23 |
| 444:14 | 415:10 435:6 | 360:16 424:2 | **pull** 57:22 59:25 | 294:12,13,19 |
| **proposals** 135:1 | 435:25 443:16 | 457:24 | 65:10 209:13 | 298:12,13 |
| 144:20 391:11 | 467:8 468:5 | **publicity** 324:11 | 209:15 264:19 | 311:13 313:2 |
| 441:25 444:18 | 476:10 478:2 | **publish** 202:3 | 313:17 362:12 | 324:20 354:16 |
| **propose** 163:20 | 505:7 512:2 | 357:21 395:11 | 388:24,25 | 354:19 356:4 |
| 252:16 413:6 | 526:19 530:5 | 411:25 422:11 | 389:8 419:5 | 363:15 369:21 |
| **proposed** 131:13 | **provided** 28:7 | 489:12,18 | 454:13 463:10 | 371:23 382:25 |
| 186:15,21 | 35:6,11 36:2 | 494:22 | **pulled** 47:23 | 382:25 388:3,8 |
| 208:3 226:19 | 53:15 56:6 | **publishable** | 111:1,7,14 | 469:12 476:17 |
| 249:13 250:8 | 76:12 194:21 | 120:25 | 114:5 313:24 | 504:21 548:16 |
| 377:14,21 | 198:20 200:8 | **published** 17:20 | 469:12 | **puts** 316:23 |
| 378:6 428:22 | 403:25 483:22 | 38:2 86:20 | **pulling** 297:19 | **putting** 355:9 |
| 436:11 440:4 | 487:8 500:22 | 91:6 108:13 | **pulmonary** | 356:18 455:6 |
| 440:14,15,19 | 506:25 518:18 | 114:4 153:23 | 174:17 207:12 | **P.A** 2:3 |
| 450:1,3 510:10 | 521:5 | 158:18,23 | **pulmonologist** | **p.m** 117:8 |
| **proposes** 400:4 | **provides** 107:21 | 197:9,14,17,23 | 475:15 | 218:10 288:11 |
| **proposing** | 291:25 546:15 | 198:25 199:3,8 | **pure** 43:15 | 324:25 361:12 |
| 416:24 | **providing** 25:11 | 199:15 209:21 | 439:18 440:11 | 374:21 379:11 |
| **propounded** | 188:22 504:8 | 209:23 210:9 | 442:24 443:3 | 405:21 452:23 |
| 553:6 | 504:13 505:20 | 220:1 238:5 | 447:19 | 517:22 521:13 |
| **proprietor** | 511:25 | 239:25 240:22 | **purely** 373:13 | 527:5 550:10 |
| 26:22,23 | **public** 15:24 | 264:1 304:20 | 375:24 | **P1-0187.5** |
| **prospective** | 18:9,16,21 | 305:12 312:8 | **purest** 316:5 | 112:12 |
| 269:3 479:3 | 40:25 41:7 | 324:14 340:14 | **purpose** 5:20 | **P1.001** 377:6 |
| **protect** 37:10,13 | 47:16 98:7 | 372:15 386:5 | 45:9 50:21 | **P1.0035** 162:19 |
| 47:18 157:19 | 99:2,10 202:18 | 386:17 404:15 | 51:14 125:21 | **P1.0035.4** |
| 474:8 | 204:22 251:19 | 409:15 416:2 | 128:3 157:17 | 209:14 |
| **protected** 29:21 | 316:8,24 317:1 | 423:6,19 447:5 | 164:16,18 | **P1.0039** 134:6 |
| **protecting** 43:24 | 318:18 320:6 | 447:7,15 | 165:11 260:12 | **P1.0042** 155:5 |
| **protection** | 321:19 368:4 | 450:12 462:23 | 279:16,17 | **P1.0073** 312:16 |
| 158:11 | 368:11 473:18 | 465:23 483:15 | **purposes** 40:11 | **P1.0188** 347:13 |
| **protective** 45:1 | 496:13 513:22 | 489:25 492:5 | 165:9 169:3 | 347:15 527:16 |
| 48:5 | 514:21 521:6 | 494:15 495:8 | **pursuant** 226:2 | **P1.056** 319:1 |
| **protocol** 341:12 | 551:19 553:19 | 495:14,17 | **pursuit** 372:8 | **P1.059** 291:2 |

| | | | | |
|---|---|---|---|---|
| **P1.076** 383:21 | 280:23 283:12 | 75:19 77:1,17 | 169:12 171:19 | 275:15 276:16 |
| **P1.084** 409:25 | 283:13,16 | 78:4 80:1,12 | 177:22 179:6 | 276:23 277:19 |
| **P1.09** 389:10 | 284:8,15 287:3 | 83:2,9,10,20 | 179:22 182:18 | 277:25 278:11 |
| **P1.37** 162:14 | 298:22 305:11 | 84:9,20 85:5 | 183:9 184:2,14 | 278:21 279:1 |
| **P1.4** 324:22 | 307:3 318:25 | 85:16,24 87:4 | 185:7,19 186:5 | 279:12,23 |
| **P1.54.2** 333:7 | 321:21 330:18 | 87:11,17 88:7 | 186:19 187:16 | 280:16 281:2 |
| **P1.65** 313:6 | 331:24 334:12 | 88:14 89:17 | 190:24 191:21 | 281:16 282:1 |
| **P1.66** 342:20 | 335:11,15,17 | 90:9,23 93:1 | 193:2 197:6,13 | 282:12,18 |
| **P1.76** 424:22 | 335:24 337:25 | 93:14 94:9 | 197:21 198:7 | 283:1 284:20 |
| **P1.85** 406:9 | 339:7 340:22 | 95:3,14 96:10 | 199:4,9 200:1 | 285:16 286:1,8 |
| **P138.5** 194:1 | 358:8 364:21 | 96:18,24 97:21 | 200:22 201:5 | 286:14 287:1 |
| **P149** 162:16 | 371:18 376:10 | 98:4 99:16 | 201:14 203:18 | 288:14 290:15 |
| **P2006.2** 211:22 | 386:20 423:24 | 100:11,19 | 204:10,20 | 291:5 293:10 |
| | 432:25 434:14 | 102:8,18 103:6 | 205:20 206:9 | 296:5,23 |
| **Q** | 434:17 448:9 | 103:14,19 | 206:22 207:3 | 297:14 298:10 |
| **qualifications** | 448:11 481:10 | 105:7 106:1 | 208:12 209:18 | 299:3,13 |
| 115:9 | 499:10 501:6 | 109:9,20 | 210:1,6,13 | 300:18 301:3 |
| **qualified** 114:12 | 508:20 529:12 | 110:10 111:9 | 211:1,12,24 | 305:10 308:1 |
| 114:19 499:14 | 529:17 534:25 | 111:19 112:18 | 212:6 213:13 | 308:21 310:23 |
| **qualifier** 38:20 | 535:5 539:13 | 113:6 114:17 | 214:10,20 | 311:8,19 312:6 |
| **quality** 120:25 | 543:16,22 | 115:1,21 116:2 | 215:14 216:6 | 312:13 313:5 |
| 123:18 316:11 | **questioning** | 119:10 121:24 | 218:13,15 | 313:19 315:3 |
| 317:6,12 | 90:20 | 122:22 124:2,9 | 219:15 221:1 | 317:14,19 |
| **quantitative** | **questions** 11:2 | 125:5 126:2,10 | 222:10 223:7 | 318:1 319:4,15 |
| 420:3 | 13:20 14:16 | 126:17 128:11 | 223:19 224:22 | 320:2,10,22 |
| **quantity** 480:18 | 16:5 21:24 | 129:18 131:6 | 225:9,15 | 321:10,17 |
| **question** 14:3,5 | 22:13 23:20 | 131:21 132:10 | 226:10,14 | 322:14 323:7 |
| 14:6 41:15,22 | 25:23 26:8 | 133:6,18 135:7 | 227:3,12 | 323:13,21 |
| 45:20 46:10 | 28:12 30:5 | 136:12 137:7 | 228:19 230:9 | 324:7 325:5 |
| 48:20 77:2 | 31:22 33:4,17 | 138:21 139:6 | 231:15 240:18 | 330:4,17 331:8 |
| 78:23 82:12 | 38:14,23 39:6 | 140:10,20 | 243:15 244:1,7 | 331:21 332:18 |
| 92:13 101:21 | 39:12 40:23 | 142:1,14,24 | 244:19 245:6 | 333:1 334:21 |
| 101:21 113:7,8 | 41:14,20 42:24 | 143:10,19 | 246:17 249:11 | 336:1,12 337:4 |
| 113:10 121:21 | 44:7,21 45:7 | 144:2,14 145:1 | 249:22 252:11 | 337:12 338:22 |
| 122:1,5 125:7 | 45:16 46:1 | 145:8 146:2,7 | 252:22 253:2,9 | 339:17,24 |
| 126:7 138:24 | 47:21 48:15 | 146:17 147:7 | 255:4,14 | 340:20 341:7 |
| 139:12 142:16 | 49:1,1,18 | 147:14 148:2,7 | 257:19 260:13 | 341:14 342:4 |
| 142:22 158:13 | 50:18,25 51:13 | 150:21 151:21 | 260:20 261:1 | 342:23 344:15 |
| 158:20 185:10 | 52:18 53:9 | 152:14,23 | 262:22 263:13 | 345:6 346:8,21 |
| 192:10 224:15 | 54:3,20 56:24 | 154:7,24 155:7 | 264:6,13 | 347:12 348:23 |
| 238:7 243:16 | 58:1,11,24 | 157:1 158:3,7 | 265:17 266:13 | 349:16 351:7 |
| 267:8 269:16 | 60:2,18 61:1 | 159:3,9,16 | 267:7,22 268:6 | 351:14 352:7 |
| 269:19 270:22 | 61:16,24 63:6 | 160:1,12 161:1 | 269:15 270:5 | 352:23 353:5 |
| 271:17 273:20 | 63:17 65:12,20 | 161:11 162:12 | 271:9 272:1,8 | 353:12,21 |
| 274:24 278:2 | 66:5,18 72:7 | 164:3,13,17 | 272:15 273:1 | 354:10,20 |
| 279:13,14 | 73:9 74:5 75:2 | 166:21 167:22 | 273:11 274:11 | 355:8,16 356:6 |

Robert Glenn

| | | | | |
|---|---|---|---|---|
| 356:14,24 | 448:8 449:5 | 529:10 530:20 | **raised** 178:21 | 310:9,22 |
| 361:15 362:8 | 451:21 452:4 | 531:2,17 532:1 | 214:23,25 | 311:25 312:10 |
| 364:9,19 365:7 | 453:2,8 454:9 | 532:16,20 | 215:3,23 216:5 | 315:6 324:17 |
| 366:21 367:12 | 455:23 456:19 | 533:1,13 534:2 | 287:16 | 325:9 328:23 |
| 367:22 368:2,7 | 460:1 462:14 | 534:8 535:3,17 | **Ralph** 6:1 149:5 | 328:23 331:23 |
| 369:1,11 | 463:25 465:15 | 536:12,19,21 | **ramifications** | 335:5 338:3,4 |
| 370:22 372:22 | 466:1,22 468:2 | 537:3,22 539:1 | 96:3,12 | 338:5,7 339:4 |
| 373:6,19 374:4 | 470:4 471:8,16 | 539:8 540:1,11 | **ran** 446:11 | 355:7 365:6 |
| 374:13,24 | 477:1,6,15,24 | 541:1,12 542:7 | **Rando** 47:1 | 369:19 378:14 |
| 376:9,15 377:1 | 478:6,13,20 | 542:14,20 | 475:16 | 425:7 431:18 |
| 377:9,22 | 480:5 481:2,20 | 543:9 544:9,16 | **rapidly** 315:10 | 452:17 466:17 |
| 378:13 379:16 | 482:11,17 | 544:21 545:2 | **rare** 263:4 | 466:25 475:22 |
| 380:22 383:3,8 | 483:10,12,16 | 545:16 546:7 | **rate** 95:21,23 | 475:23 496:15 |
| 383:18 386:11 | 484:2 486:6,13 | 546:14 547:1,6 | 217:22 | 497:6 501:24 |
| 387:4 388:7,12 | 486:24 487:11 | 547:14,20 | **rated** 491:4 | 552:3 553:4 |
| 388:21 389:2 | 487:21 489:23 | 548:24 549:8 | **rating** 317:16 | **reader** 159:18 |
| 389:11,18 | 490:20 491:1 | 549:17 550:5 | 324:12 | 159:24 |
| 390:1 391:1 | 491:19 492:9 | 553:6 | **ratio** 272:6,7 | **reading** 35:19 |
| 393:1,6 394:3 | 492:20 493:1,8 | **quibble** 265:22 | **rats** 169:19,23 | 78:1 81:4 |
| 395:16 396:5 | 493:21 494:6 | 296:8 | **reach** 216:8 | 88:22 207:14 |
| 396:20 397:8 | 494:19 495:3 | **quibbling** | **reached** 252:16 | 238:2 303:4 |
| 397:18 398:1,6 | 495:11,24 | 271:14 | 435:15 503:21 | 311:10 354:13 |
| 398:14,23 | 497:18 498:1 | **quick** 31:16 | **reaching** 184:25 | 403:11,17 |
| 401:14 403:23 | 498:16 499:3 | **quickly** 134:2 | 370:1 | 489:15 |
| 404:8,23 406:1 | 499:11,17 | 479:18 509:9 | **reaction** 420:4 | **reads** 117:6 |
| 407:8 408:17 | 500:7 501:3 | **quite** 33:20 34:2 | **reactive** 431:3 | 127:22 262:7 |
| 409:23 414:7 | 502:19 503:4,9 | 34:6 101:2 | **reactivity** | **ready** 411:24 |
| 414:18 415:16 | 504:6 505:4,19 | 170:16 | 392:14,23 | 412:7,12 |
| 417:13,23 | 506:2,8,15 | **quote** 119:20 | **read** 22:17 | **real** 31:16 |
| 419:7 420:21 | 507:8,12,15 | 120:2 172:6 | 35:22 39:16,23 | 323:18 331:3 |
| 421:9 422:2,12 | 508:1 509:1,6 | 246:4 406:23 | 41:11 51:1,8 | 479:18 |
| 422:22 423:16 | 509:13,23 | **quoted** 172:23 | 57:24 59:4 | **realistic** 296:1 |
| 424:4 425:13 | 510:14,24 | 209:20,22 | 60:8 84:4,6 | **reality** 317:22 |
| 425:22 426:2 | 511:13 512:7 | | 92:14 104:15 | **realize** 418:3 |
| 426:10,21 | 513:1,7,18 | **R** | 109:4,16 | **really** 63:5 78:1 |
| 427:17,22 | 514:4,15 515:3 | **R** 2:1 3:1,19 4:1 | 120:10,14,15 | 81:8 138:6 |
| 432:4 433:9,15 | 515:9,16 516:1 | 4:8,8 232:18 | 120:16 127:8 | 181:11 286:23 |
| 434:5 435:4,12 | 516:2,6,10 | **radiographic** | 153:6 177:15 | 317:9 367:20 |
| 435:22 436:9 | 517:4,7,12 | 47:10 | 177:18 213:9 | 423:25 434:1 |
| 436:18 437:15 | 518:1,3,5,8,24 | **radiologist** | 219:13,20 | 441:16 491:23 |
| 437:22 438:9 | 519:20 520:3 | 475:22 501:24 | 237:9,19 240:7 | 502:6 524:3 |
| 438:22 441:8 | 520:11,20 | **radiologists** | 245:22 257:17 | **realtime** 1:17 |
| 441:19 442:11 | 521:2,10,17 | 219:19 475:24 | 266:17 283:5 | 420:3 551:3,18 |
| 443:1,11,24 | 522:14 523:8 | **radiology** | 283:11 306:15 | **reask** 185:10 |
| 444:12 445:5 | 525:18 527:9 | 475:20 | 307:19 309:5 | **reason** 96:17 |
| 446:10,17,24 | 528:1,21 | **RAFFERTY** 2:3 | 309:17,24 | 146:22 147:3 |

197:22 294:19
299:23 330:25
361:8,24 386:3
433:4,18
517:14 548:17
552:5
**reasonable**
47:25 436:20
464:23 465:12
**reasoned** 222:22
**reasoning**
291:25 300:4
302:24
**reasons** 423:3
479:7
**recalibrate**
348:13
**recall** 11:11 62:3
62:5 63:5 67:4
67:20 69:4
77:11 78:3
80:24 81:9
88:12 108:18
113:19 114:1
117:1 123:9
131:9 133:14
133:24 135:11
152:5,11,25
163:25 164:2
177:16 184:12
193:6 200:10
217:6,8 220:13
224:2,18
225:18,20,21
225:25 226:6,7
228:2,6 249:5
254:25 263:8
263:15 269:4
277:2 289:18
305:14,15
311:10 315:5
325:11,12
334:17,19
360:12 365:11
367:3,4,11
377:25 380:25

390:15 398:11
399:8 426:14
426:17 455:9
456:5 462:2
466:16 468:20
479:9 480:7,14
483:16 487:11
490:17 491:6
493:11,16,22
495:25 496:5
501:9 503:16
507:15 509:6
509:11,13
515:10 516:6
516:13 518:8
522:3,7 524:3
526:15 527:18
**recalled** 463:25
**recalling** 181:9
**recategorized**
352:8
**receipt** 552:15
**receive** 94:6
156:4 299:9
395:9 436:21
**received** 108:3
188:21 202:6
204:12,17
206:10 326:2
419:11 458:19
525:19
**receiving** 191:13
399:8 526:15
**recipient** 90:22
**recipients**
236:19 405:10
**reclassified**
371:15
**recognize** 48:1
187:20 255:7
255:15 270:19
427:10 432:20
**recognized**
130:1 208:21
367:24 474:6
**recognizing**

474:3
**recollection** 15:8
15:17 67:19
81:4 109:24
**recommend**
192:15 314:24
**recommendati...**
56:25 57:3
150:23 212:7
**recommendati...**
37:3 248:11
**recommended**
192:17 212:2
212:11 213:21
218:22
**recommending**
42:4 115:12
196:23 474:7
**reconsider**
381:23 393:10
**record** 9:2,15
11:6 76:21,22
76:24 81:2
113:23 124:19
134:5 154:17
154:18,21
187:10,11,13
218:6,9,10,12
288:10,11,13
324:24,25
325:2 361:11
361:12,14
374:18,20,21
374:23 379:8
379:10,11,13
379:18 405:20
405:21,23
452:22,23,25
453:14 454:1
471:12 479:22
517:18,21,21
517:22,24
521:12,13,15
522:2 527:4,5
527:7 548:16
550:9

**recruit** 67:25
**red** 189:18
369:19 461:12
515:18
**redacted** 357:4
357:8
**REDIRECT**
527:8
**redline** 455:25
**reduce** 101:5,14
101:19 381:20
**reduction** 47:5
47:14
**REES** 3:3
**reference**
472:17 501:7
518:7
**referenced**
172:2
**references**
498:22
**referencing**
227:6 448:12
**referred** 402:9
**referring** 140:14
176:9 299:15
328:21 398:16
415:22 480:13
512:9
**refers** 484:18
488:23
**reflect** 138:2
**reflected** 151:16
**reformat** 488:24
**regard** 434:18
436:1 437:3
473:21 480:10
486:9,20 491:9
500:8,12
504:13
**regarding** 98:14
127:16,24
134:13 135:12
136:20 137:18
164:22 169:25
180:12 268:18

326:17 328:7
347:23 360:13
383:22 483:12
499:10 509:5
545:14
**regardless** 476:8
476:23 483:2
**regards** 31:19
32:2,24 130:24
150:6 334:4
**Registered** 1:16
551:3,17
**regulate** 336:24
**regulated**
336:25
**regulates** 37:6,7
**regulation**
336:17
**regulations**
36:19 45:9
48:1 97:14,18
98:11 102:4
348:14 545:18
**regulators**
349:18 350:1
351:23 352:12
353:15 502:24
**regulatory**
40:11 125:15
160:21 161:3
316:5,22
384:14
**reimbursed**
156:12
**reinforced**
513:16
**reiterate** 13:21
**rejected** 197:23
198:9 249:2,6
268:10 424:17
**relate** 208:9
511:10 519:9
**related** 19:20
31:4 32:3,17
52:24 85:2
87:1 93:18

98:17 103:5,9
127:24 132:8
143:16 147:25
157:7 160:18
164:21 178:15
192:18 258:3
306:20 309:6
309:21 324:10
332:16 335:5
363:16 381:19
451:4 475:18
**relates** 1:7
297:25 434:11
480:9 530:12
**relating** 153:9
477:8
**relationship**
7:21,24 15:5
46:13 47:3
125:3 127:25
128:18 131:25
136:22 137:19
141:18 164:23
186:2 268:22
268:25 269:9
288:2 295:9
362:25 380:7
381:16 384:24
419:21 479:15
481:17 500:10
500:14 504:5
510:10,11
513:17
**relative** 551:11
551:12
**relatively** 453:7
**relaying** 335:8
356:17
**release** 304:7
385:17 386:12
**released** 40:21
41:1
**relevance** 439:2
510:9
**relevant** 513:10
**reliable** 296:2

**rely** 479:8
**remain** 432:18
**remained**
253:11
**remarkably**
407:1
**remarks** 315:12
**remember** 53:7
62:21 77:12
81:9 109:6
153:2 365:5
367:7 396:17
396:23 402:6
493:11 494:1
527:20 543:10
**remind** 113:1
348:18
**reminds** 348:18
**renominated**
86:3,11 92:3
92:21 110:22
**renomination**
94:11
**repeat** 92:10
179:5 364:12
364:18 386:19
**rephrase** 151:22
402:21 442:18
**reply** 117:17
**report** 79:10
80:11 82:14
83:15 84:8,22
85:4,15,23
86:4,6 87:3
92:21 108:10
110:22 120:22
129:12 132:12
132:13,16
134:14 135:12
137:18 143:3
164:9 178:25
180:13,23
182:22 184:5
184:25 185:12
185:16 189:6
189:10 191:8

192:24 193:23
194:8,21
200:11 201:18
201:22 226:25
227:5,6 276:14
290:18 296:17
302:2,19
303:17 315:7
385:17 386:13
**reported** 490:10
**reporter** 1:16,17
9:16 551:3,4,4
551:17,18
**reporting**
476:22
**reports** 98:14
125:2,4 133:12
133:13 163:25
164:1 184:17
314:19 322:7
500:20
**represent** 24:25
25:7 35:15
50:14 57:8
62:7 69:13
70:4 71:2
86:10 114:23
115:6 378:20
422:23 453:6
471:20 477:12
521:22 522:4
522:24
**representation**
515:8
**representative**
227:25
**representatives**
524:14
**represented**
22:23,25 28:6
51:25 70:10
71:6,8 234:11
319:22 320:1
338:25 426:5
522:2,15
523:21

**representing**
86:14 253:8
344:22
**represents** 24:20
24:23 43:1,7
67:8 90:2
**reprocesses**
99:10
**reprocessing**
100:13
**reputation**
333:24
**request** 259:24
260:2
**requested** 485:6
493:3
**requesting**
491:15
**require** 97:8
98:11 160:22
161:13 191:12
206:2 356:3
**required** 161:22
241:17 328:12
356:9 395:3
422:10 493:4
**requirement**
131:10 355:15
355:18 356:12
**requires** 161:24
221:17 356:4
545:18
**requiring**
491:15 493:3
**reread** 130:7
**research** 6:3
27:17 30:8
31:24 33:15,19
34:13,16 36:22
37:1,12,16
45:19 46:12
58:21 59:6,10
59:13,15,19
66:25 79:2,5
106:18,22
107:4 112:21

113:9 116:25
117:3,24 123:4
134:25 146:18
151:10 153:20
156:6 157:5
163:1 178:10
181:4 183:19
211:2 214:8,8
221:6 225:24
239:17 243:4,8
243:18 244:3
276:22 331:11
345:2 346:13
346:25 357:25
361:20 362:24
363:3,21
364:23,24
365:4,19,23
368:25 375:20
377:15 378:3,5
380:1 381:7
387:5 408:10
419:18 450:1
450:14 470:23
474:13 476:1
486:4 502:9
508:16 511:23
**researcher**
113:14 308:7
365:20 368:24
500:6 511:22
**researchers**
385:9 508:16
**researches**
128:22 385:9
**researching**
512:21
**resources**
375:14 399:12
**respect** 121:14
143:24 151:14
331:17,18
499:18
**respective**
345:19
**respiratory** 40:7

| | | | | |
|---|---|---|---|---|
| **respond** 168:11 | 486:21 492:5 | 490:7 492:11 | 358:6,18 | 80:5,13,21 |
| 169:18 170:4,6 | 506:25 507:4 | 492:17,23 | 362:22 408:2 | 81:11,20,21 |
| 447:20 482:7 | 513:10 | 493:5 494:14 | 414:10 415:2,6 | 82:9,15 83:12 |
| **responded** | **retained** 24:4 | 494:23 495:7 | 418:9 | 84:23 85:12,21 |
| 169:16 | 130:25 143:1 | 495:15,18 | **Rico** 254:18,21 | 86:4 88:2 89:8 |
| **responding** | 261:25 262:11 | 496:2 498:11 | 255:23 256:17 | 89:24,25 90:5 |
| 430:4 | **retainer** 142:4 | 499:6 500:9,13 | 260:8 469:5 | 90:17 91:21 |
| **responds** 429:20 | 142:17 149:23 | 500:15 501:8 | **Ridge** 150:6,9 | 92:4,9,22 93:8 |
| **response** 22:15 | 150:11 155:19 | 502:14,22 | 391:3 487:19 | 93:21 94:23 |
| 22:17 145:16 | 155:23 226:2 | 503:12,19 | 487:19 | 95:6,19,24 |
| 150:8 188:22 | 485:1,5 | 505:6,8,13,21 | **Ridge's** 494:2 | 96:4 97:9 98:8 |
| 327:17 342:11 | **retired** 474:16 | 514:1 518:16 | **Ridgway** 6:1 | 98:20,22,24 |
| 415:2,5 430:9 | **return** 552:13 | **reviewed** 35:25 | 8:12 68:13 | 99:3,4,10,17 |
| 432:13 438:4 | **reveal** 29:21 | 87:2 106:20 | 72:25 77:25 | 99:20,22 100:9 |
| 444:4 449:13 | 75:15 | 133:24 257:3 | 104:3 148:21 | 100:20,24 |
| 479:23 501:5 | **reveals** 411:16 | 260:4 298:6 | 155:8,17,18 | 101:25 103:1 |
| 543:15 | **review** 6:17 17:9 | 490:8 505:5 | 188:13 484:8 | 103:22 104:9 |
| **responses** | 17:15 22:4,5,7 | **reviewer** 201:8 | **right** 11:3,15,17 | 104:18,25 |
| 430:18 | 22:9 35:4 | **reviewers** | 11:24 12:3,5,8 | 105:4,21 |
| **responsibility** | 79:23 80:3,21 | 311:21 312:1 | 13:6 15:9 | 106:25 107:1,7 |
| 237:13,22 | 80:25 81:10 | 505:21 | 16:16 17:3 | 107:25 108:10 |
| 320:5,14,19 | 84:5 90:25 | **reviewing** 80:23 | 18:6,9,25 19:7 | 108:17 110:19 |
| **responsible** | 91:5 105:7 | 82:25 86:25 | 20:2,25 22:22 | 110:23 111:10 |
| 67:11 68:10 | 124:19 128:16 | 106:3 180:25 | 24:20 25:17,24 | 111:11,22 |
| 104:6,7 139:16 | 129:3,24 | 183:8 266:9 | 26:15,21 27:2 | 112:10 113:20 |
| 467:23 496:21 | 131:23 132:7 | 363:14 505:6 | 28:24 30:18,22 | 114:18 115:24 |
| 497:3,25 | 132:15 133:8 | **reviews** 153:7 | 32:8 33:7 34:9 | 116:5,10,12,15 |
| 499:23 | 133:10,12,21 | 182:14 186:1 | 34:18 37:16 | 116:18,21,25 |
| **responsive** | 134:13 135:11 | **revised** 347:20 | 38:10 39:25 | 117:4,17,19,24 |
| 331:6 | 137:11 153:7 | 430:10 | 40:24 41:25 | 118:10,11 |
| **rest** 117:15 | 164:21 179:16 | **revising** 213:22 | 42:9,15,17 | 120:2 121:10 |
| **restate** 25:8 | 184:5 187:21 | **revision** 430:11 | 43:18 45:21 | 122:11,14,18 |
| 56:12 | 189:3,5 190:23 | **revisions** 191:12 | 46:7 49:21,25 | 123:15,21 |
| **restated** 40:3 | 191:1,8 194:18 | 491:12 | 50:3 52:4,8,13 | 124:3,5 125:17 |
| **restrictive** 45:10 | 198:18 199:14 | **revisit** 378:6 | 52:17 53:14 | 126:5,23 127:2 |
| **resubmitted** | 200:5,19 210:9 | **revisited** 393:11 | 54:21 55:12 | 127:5,11,13 |
| 93:19 | 215:10 216:14 | **reword** 249:21 | 56:3 57:17 | 128:1,6 129:19 |
| **result** 11:20 | 217:11 256:14 | **reworded** 213:2 | 59:7 60:20 | 130:25 131:2 |
| 196:13 375:11 | 291:6 310:25 | **re-read** 292:5 | 61:25 62:9 | 131:14,18 |
| 450:13 476:12 | 312:15 326:8 | **re-review** | 63:12,23 64:1 | 132:11,15,20 |
| **resulted** 426:12 | 330:7 331:12 | 363:11 | 64:8,12,13,16 | 134:3,16,20,22 |
| **results** 151:1 | 371:16 421:3 | **RGlenn@Cro...** | 64:19 65:5,14 | 135:13,16,17 |
| 393:8 394:22 | 421:18 468:24 | 293:14 | 65:22 66:14,22 | 135:20 136:2 |
| 395:4,9 407:16 | 485:15 486:10 | **Rich** 90:15 | 69:19,23,24 | 136:16 137:23 |
| 418:14 445:22 | 487:1 489:4,8 | 134:22 139:14 | 71:24 73:23 | 138:22 139:12 |
| 448:23 485:24 | 489:12,19 | 155:9 192:20 | 74:24 78:11 | 140:16,24 |

142:5 143:21
145:3,18,24
147:10,18
148:23 149:2,9
149:19 150:2,6
150:7,17,24
151:12 154:25
155:2 157:20
159:4,6,11,20
160:3,7,23
163:8,19,21
164:10,11
165:3,7,24
166:6,16
167:15 170:19
170:21 171:5
172:4,18 173:3
173:4,5,12,15
173:21,23
174:2 175:7,12
175:15,19
176:4,5,24
177:4,11,16
178:11,18,21
179:1,10
180:10,16,20
181:14,24
182:2,7 183:19
184:9,20,22
186:8 187:8,17
187:19 188:3,5
188:7,9,13,17
189:9,12,13,16
189:19 190:1,3
190:4,8,14
191:2,9,17
192:8 193:17
194:16,16,25
195:6,7,9,11
195:21 196:3
196:11,13,16
196:19 197:14
197:25 198:12
199:11,16
200:11,24
201:20,23

202:4 203:12
203:14 204:3
205:5,6,16
206:11 207:21
207:25 208:4
208:23 210:10
210:20 211:5
212:1 213:5,24
214:4,11 215:1
215:22 216:9
217:25 218:23
219:1 220:7
221:2,4,6,11
221:13,18,25
222:5,11,14
223:20 224:1,8
224:11,16
227:8,14
228:10 229:4
229:15,25
231:6,24 232:4
232:8 233:5,7
233:14,17
234:1,8,15,25
235:5,5,15
236:18 237:1
238:8,11,13,15
238:20,21,25
239:20 240:5
241:11,15,19
241:25 242:3
242:11,16
243:1,2 244:3
245:9,14,21
246:1,20,25
248:2,5,17
250:4,7,11,16
250:25 251:2,6
251:7,16 252:6
252:15,17
253:14,17
254:18,19
255:7,15,17,20
255:24 256:2,8
256:12 257:20
257:22 258:12

258:19 259:1
259:17 260:21
261:13,16
264:14 265:4
265:19 270:17
270:20,24
271:4,7,10,13
273:6 275:7,11
275:16,25
276:4,5,6,11
276:17 277:5
278:1,12,23
279:7,24 280:9
280:13 281:3,7
283:19 284:4
284:18 286:15
288:6,15
289:19,21
290:2,5,22
291:10,20
292:15,21,25
292:25 293:6
293:11,13
294:4,22 295:1
295:20 296:12
297:8 298:7,9
299:10,20
300:13,19
301:4,7,23
302:3,4,7,10
302:11,21
304:8 305:25
307:10,11,14
310:3,3,11,12
311:4 312:14
313:6,7 314:2
314:9,15,16,18
314:20 315:6
316:2 317:2,3
317:16,22
318:5,15 319:8
319:12,19,23
320:6,24
321:19 322:2,7
322:15,20,25
323:24 324:13

324:16 325:14
325:18,24
326:2 327:1
329:16 334:12
335:17 336:2
338:16 339:18
341:6 343:10
344:9,17 345:2
345:7,17,22
346:2,18 347:6
347:17 349:13
349:23 350:7,8
350:17,20
351:9 352:4,25
353:8 354:4,7
357:12,22
359:14,17,17
359:22 360:24
361:21 362:2
362:16,19
364:7,21 365:9
366:15,23
367:15 368:3,4
368:12,14
369:14,24
371:3,10,12
372:19 373:1
373:10 374:8
375:8 377:3,14
379:17,20
380:2,19 384:7
386:5 387:11
387:13,18,20
388:3,9 389:4
389:15,19
390:2,4,6
392:15 394:10
394:16 395:17
395:19 396:6
396:12 397:3
398:24 399:4,9
399:25 400:10
401:5,8,11
402:8 403:1
404:10,20
405:6,22 406:2

406:5,11,19
407:10,22,25
408:1,2,3,10
408:13 409:6,9
409:12 410:7
410:16,21
411:7,18,22
412:9,10 413:1
413:4,9,13,16
413:17,20
414:1,12,20
415:8 416:3,8
416:10,15,16
417:5,6,10
418:7,20
420:12 421:10
421:13 422:16
423:2,7 424:13
425:9,14
427:11,12
428:5 429:20
429:23 430:6
430:22 431:1
431:11 432:10
434:7 436:13
437:9,18,25
438:9,10,15
440:2 442:5,17
443:6 444:9,16
444:22 445:1
445:23 448:12
449:2 451:9
454:4,8,11,16
457:6 458:21
462:12,12,18
462:21 463:9
463:16,19
464:25 465:13
467:15 468:21
469:6 475:3
479:20,21
483:1 484:23
493:13 509:8
509:10 521:14
522:20,20
523:3 527:2,10

527:15 528:1,4
528:8,11
529:16,25
530:10,22
531:18 533:9
534:10 535:5
535:18 536:13
536:25 540:7
541:6,18 542:8
542:15,22,24
543:3 547:3,8
548:19,22
**rigorous** 119:21
236:7
**ring** 377:19
**Rio** 7:14,18 26:1
26:2,5 140:14
346:16 347:17
349:10,11
365:1 370:11
372:5 375:11
380:13 383:10
383:22 392:17
396:12 398:13
414:12 466:8
529:8 532:7
**rise** 37:22
**rises** 286:5
**rising** 286:10
**risk** 7:23 101:5
101:14,19
107:9,23
108:24 130:20
136:23 137:20
189:24 271:18
271:20,23
272:3,3,6,9,11
272:19 273:3
273:13 277:8
277:16,22
280:25 281:17
281:20 282:15
282:19 283:3,6
286:5,18,20
287:16 306:4
316:7,19 331:4

341:19 348:21
351:4 368:16
380:5 381:18
382:8 384:22
431:9,13,22
449:7 451:3
461:7,8,12
465:2,6 470:19
481:11 485:17
488:19 532:22
533:14 535:21
535:25 536:23
536:24 541:4
543:3 544:2
546:4,9,16,24
547:2,12 550:2
**risks** 6:20
277:18 547:7
**risk/benefit**
278:23
**Robert** 1:11
5:13 7:8 9:13
9:20 10:24
11:7 40:6
116:11 127:15
453:15 551:5
553:12
**robust** 300:21
**ROC** 82:21
86:21,21 93:22
134:16 136:20
180:14 485:12
**Roger** 7:10
**role** 19:15 69:9
80:8 115:12
143:16 163:19
166:5 215:15
215:19 231:2
231:12 237:5
238:4,16 274:3
274:5 290:1
345:16 363:8
**room** 13:25
21:11 343:14
**Rothman** 361:3
**route** 295:12,24

**Roy** 47:1 475:16
**RT** 53:8 232:19
232:23 233:4
247:25 429:22
433:25 434:12
434:16 442:10
446:1
**RTM** 346:15,23
363:14 395:2
395:10 444:8
**RTV** 438:21
**rubber** 439:25
**rubber-stamp**
182:17
**rule** 465:17
**ruled** 84:14
464:23 465:11
480:11
**Rulemaking**
5:19
**rules** 13:22
138:8,15 508:8
545:14
**run** 147:17
248:16 412:8
412:12 446:2
469:9
**runners** 334:14
**running** 72:22
244:17 292:21
**R&D** 375:14

——————
**S**
——————
**S** 2:1 3:1 4:1
116:14
**sadly** 431:15
**Sadowski** 233:7
**safe** 346:24
467:10 471:2
477:18 478:9
483:7 520:15
530:7
**safety** 19:17
36:12,14,16,19
37:2,5,7,14
58:19 59:2,15

68:24 139:17
208:18,20
424:10 477:8
502:25 546:23
549:12,21
**SALES** 1:4
**samples** 406:25
420:11
**San** 7:1 255:23
469:5
**sand** 30:10,10
42:13 43:2,8
43:25 44:9
52:2,3 65:1
232:4,5 501:21
**Sara** 3:8 10:15
**sat** 258:9
**save** 162:16
**saw** 85:2 145:16
161:8 172:1
200:7 205:15
241:13 309:4
359:5 444:25
445:8 523:13
**saying** 61:25
84:6 85:6
101:7 137:13
137:16 157:13
157:16 172:25
189:13 242:9
265:9 269:14
296:14,15
351:15 353:24
354:23 360:5
392:17,22
395:8 396:9
414:21 418:11
433:11,14
442:12,12
449:6 461:16
461:18 465:3
529:9 543:17
**says** 9:23 24:3,7
39:17 40:2,12
44:25 62:1
89:12 90:25

91:4 93:16
107:8,21 108:1
108:3 112:12
117:4,18
118:15,21
124:14 127:4
127:14 130:16
134:11 136:17
138:3 149:13
163:5 167:6
188:15,20
189:16,18
192:9 198:24
202:5,14,16
204:12,25
207:7,10
235:18,22
238:1 239:6
242:22 248:9
259:1 271:2,6
285:1,2 291:22
294:6 297:16
298:16 299:7
301:17 302:16
302:23 303:4
303:25 304:3
305:8 317:10
317:20 326:4
326:14 328:11
329:1 344:21
345:11 351:22
357:7,11,14
359:16 362:22
367:10 370:8
371:14 373:18
375:9 380:10
381:6 382:5
385:2,6,16,21
387:12 390:13
391:20 392:4
393:8,13
395:14 404:11
406:21 408:7
410:25 412:4,7
413:6 419:11
428:17 430:8

431:6 444:13
455:13 459:8
463:24 464:17
466:24 467:8
467:18 470:5
470:17 527:23
**scenario** 432:17
**school** 18:12,15
116:24 251:19
281:15,24
**science** 18:19
37:18 135:17
147:17 157:7
157:11 158:15
223:18 264:17
265:11 317:21
357:11,24
361:19 364:5
366:11 384:14
441:23 474:2
476:22 477:13
477:17 518:20
519:23,24
520:5,13,21
524:6
**Sciences** 242:24
461:11
**scientific** 15:23
16:3,20,22
17:8 42:5,5,6
76:12 109:17
120:22 125:4
128:23 129:2
130:1 147:4,5
153:9,12,17,25
192:12 222:22
223:4,23 236:7
238:6,17
259:14 265:6
266:7 287:10
291:25 295:10
300:4 312:3
323:19 329:6
364:23 365:18
372:25 374:8
374:11 381:7

384:2 428:1
435:17 443:17
468:24 470:23
476:9 486:18
490:13 503:11
541:13 543:13
**scientifically**
296:2
**scientist** 21:3
72:13 160:11
476:18,19,21
499:14,19
507:19 541:7
**scientists** 38:5,6
42:6 115:13,16
266:7 327:15
347:1 475:25
485:23 502:24
505:6 508:13
508:17 512:12
520:18 537:13
537:15 545:3
549:9,18
**sclerosing** 163:6
163:10 165:16
166:3 167:14
297:22
**scope** 45:4,13
48:7 51:11
58:23 60:22
65:24 287:22
303:10 320:17
546:1,21
549:24
**scratched** 189:8
189:11
**screen** 23:22
24:2 47:23
89:2 209:13
233:1 245:8
264:19 297:20
307:21 310:11
313:24 369:22
388:19 389:12
429:4
**SCULLY** 3:3

**Seabrook** 26:19
453:18
**search** 285:23
**searches** 128:23
**searching** 114:5
**Sears** 13:11
**second** 16:15
39:19 57:22
91:23 93:15
102:21 104:10
120:18 127:12
129:21 130:17
149:25 150:1
150:13 190:6
208:16 218:7
241:8 248:7
258:23 266:11
289:13 302:14
302:15 330:18
333:6 337:14
345:11 351:22
353:13 374:18
379:4 384:16
405:13 410:6
418:25 438:2
467:5 488:16
**secondary**
132:21,22
165:10
**Secondly** 479:13
**section** 6:22
7:12 8:2 62:25
63:2 65:1,1
77:11 123:14
135:9 166:23
172:3 178:25
192:18 195:5,9
195:21 196:8
196:12 208:3,7
209:16,16
210:20 212:1
212:12 213:23
247:6 300:1
343:4 348:25
357:5 393:8
399:3 405:3

408:21 419:16
430:3 463:12
497:8 498:4
505:24
**sections** 192:11
192:15
**sector** 121:1
**see** 11:8 12:4
24:2,6 36:5,5
40:12 43:3
45:2,5 50:15
52:23 53:6
58:6,15 60:19
65:8,13 71:10
73:18 88:15,18
88:22 89:4
90:11,13,15
91:2,11,16
93:5 94:3,13
94:19,20 97:2
103:25 104:12
107:13,17,19
108:5 112:12
115:7 116:11
117:12 118:18
118:25 119:1
119:15,23
121:5 122:21
125:19 126:18
126:25 127:19
129:5 130:13
130:22 134:9
136:4,24,25
137:3,21 151:5
155:11,15,24
156:15 162:21
162:22 163:3
163:12 165:12
167:3,9 178:6
188:10 189:15
192:10 193:13
194:1,19,23
195:14 196:8
197:7 200:16
201:25 202:8
202:13 203:19

203:23 205:2
205:18,19
207:14 208:13
209:4 210:17
211:25 213:20
217:23 219:16
224:20 227:4
232:11,18
233:7,13
234:11 235:11
235:21 236:10
237:14,25
239:8 240:1
241:10 242:12
245:11 246:3
247:5,8 248:12
248:25 250:20
253:10 261:5
263:5 265:11
271:5 272:2
291:8,16
292:11 293:22
295:14 297:17
298:2,19 300:7
303:1,13 304:1
304:9,13
306:10,21
309:23 313:10
313:12 315:21
316:12 324:4
325:13 326:11
327:2 328:19
328:23 329:11
334:1 339:3
343:2,6,15
344:6 347:2,16
347:21,25
348:15,17
349:1,8 350:23
351:25 354:2
357:9,18 358:3
358:9,21,22
359:13 362:15
362:20 363:4,9
363:23,25
370:7,12,14,17

370:20 371:21
371:25 372:9
375:22 378:18
379:25 380:8
380:15 381:11
381:25 382:12
383:21,23
384:11,25
385:6,11,18,23
386:14 387:1
389:3,12
390:17 391:19
392:1,10
393:12,21
394:19 395:5
396:6 399:14
399:20 400:15
401:2,25 403:8
403:17 405:11
406:14 407:3
410:5 411:13
412:4 415:1,3
415:7,12,18,25
416:24 417:19
418:4,25 419:3
419:8,24 420:5
420:9 428:20
428:24 429:7
429:12,14,19
430:14 433:2
437:5 438:4
444:3,6 445:17
455:12 463:20
484:15 488:15
488:20 489:2,6
489:16 494:5
510:16,21
530:11 547:21
**seeing** 152:11
236:6 325:12
377:25 380:25
390:16 454:14
456:6
**seemingly**
119:21
**seen** 104:14

152:8 163:14
163:18 218:19
241:23 256:4
322:16 337:16
351:18 358:25
359:2 364:3
384:16 442:1
456:2,9 484:12
484:23,24
493:2 497:10
498:12,14
**SEER** 189:21
**sees** 355:5
**selected** 36:1
**selecting** 329:5
**self-taught** 19:7
19:8
**sell** 234:19
**send** 94:6
156:10 407:5
414:24 447:17
455:17 456:13
**sender** 87:16
90:22
**sending** 291:19
294:2 406:15
410:13 413:25
429:9
**sends** 407:19
408:20 413:24
430:5
**sense** 260:10
428:25
**sensitive** 412:18
**sent** 118:4 122:8
144:20 191:16
252:21,23
380:23 410:9
414:22 429:15
444:18
**sentence** 107:16
238:1 307:16
310:1 438:20
**separate** 61:9
73:17 115:8
197:24 315:11

334:11
**September**
117:7 427:8
**sequence** 191:15
230:19
**series** 48:2 128:4
303:12 315:17
527:25
**serious** 95:17,18
173:24 548:15
**serpentine**
338:24
**serve** 115:13
231:2 237:6
279:15
**service** 64:9
202:18 204:23
473:12
**services** 1:21 4:9
4:10 9:5 25:12
28:7 29:6,9
32:16 33:10
36:25 58:5
81:18 123:18
131:17 243:19
540:23
**serving** 244:25
295:1
**session** 294:25
298:6 299:9,24
300:12 307:18
309:25
**sessions** 231:10
**set** 138:25
139:13 334:12
335:3 348:9
358:17 398:24
551:9
**setting** 164:19
**settings** 29:1
316:10 317:5
317:11
**seven** 268:20
548:5,25
**severed** 15:5,12
**SEYFARTH**

3:19
sfrey@grsm.c...
3:9
**share** 54:1 56:9
149:24 359:8
360:2 437:2
**shared** 122:14
122:17 236:17
395:21 398:3
398:16
**sharing** 123:2
254:5
**Sharma** 396:21
397:7,9 444:4
444:5
**SHAW** 3:19
**sheet** 552:6,9,11
552:14 553:7
**sheets** 103:5
397:3
**shelf** 101:25
**shelved** 184:8,12
184:24
**shift** 184:1
**SHOOK** 2:14
**short** 77:12
**shorter** 141:5
187:6
**Shorthand**
551:4,18
**shortly** 75:25
92:8 430:13
**shot** 440:24
**show** 39:20 42:8
89:15 123:7
131:24 181:17
238:12 240:13
268:25 269:8
295:9 362:9
381:18 383:19
392:13 415:17
447:13,18
448:4 452:10
479:14 480:23
481:4 483:21
490:21 497:12

497:17 498:8
498:18,23
499:1 510:25
513:10 520:14
520:22 536:24
**showed** 47:2
268:22 342:9
342:11 379:1
424:1 440:25
447:19 448:23
476:23 478:8
478:23 479:13
482:12,18
484:14 496:17
511:2 527:19
536:22
**showing** 371:1
412:20 481:21
492:22 504:12
**shown** 275:1
382:7 452:10
478:14 482:2,7
483:6,7 488:4
492:21 495:17
496:2 518:6,14
519:5
**shows** 302:2
378:21
**Shripal** 396:21
**Shukla** 8:8
275:6
**shut** 437:9
**sic** 358:18
396:12
**side** 21:17 33:14
119:4,5 157:10
157:11 158:15
171:15 404:15
406:4 537:8
549:12,20
550:1
**sides** 537:5
543:19 544:23
**side-by-side**
496:9,14
**Siegel** 73:8,13

**sign** 552:8
**signature** 294:8
**signed** 142:5
  156:2 370:15
  484:8
**significance**
  266:24 267:3
  269:18 381:7,9
  449:17
**significant**
  17:16,18 33:21
  91:8 105:24
  206:20 267:14
  271:24 297:11
  340:18 393:18
  411:2,5,10
  425:5 431:22
  448:5 449:14
  449:16,20
**signing** 135:1
  552:9
**silica** 5:18 31:2,4
  33:16 43:8,15
  44:4 45:11
  46:14 47:4,9
  47:14 52:3
  79:21,22
  318:12
**silicate** 439:15
**silicates** 43:13
**silicosis** 27:18
  44:2 47:10,10
  48:1,8,18,22
  55:23 71:17
**similar** 175:23
  342:1 440:7
  442:21
**similarity**
  107:11
**similarity/diss...**
  192:19
**simple** 48:2
  172:17 173:8
  220:11
**simply** 41:15
  331:17 408:20

**Sinai** 308:4
**Sincerely** 413:15
  429:1
**single** 258:25
  328:16,22
  336:6 531:3,8
**sir** 11:3 23:21
  41:15 43:23
  44:22 45:20
  46:5 48:16,19
  50:24 51:21
  58:7 60:15
  70:13 83:8,19
  85:25 88:25
  105:15 106:24
  107:18 112:8
  116:7 126:13
  138:25 139:2,4
  139:11 140:12
  142:15 166:22
  167:19 171:24
  179:11 187:18
  191:22 200:3
  230:21,24
  231:18 232:21
  235:16 237:16
  262:3 307:3,22
  308:5 318:25
  333:9 337:25
  351:16 359:13
  369:16 387:8
  388:16 389:12
  391:17 410:2
  417:21 418:18
  418:20,22
  429:5 432:8
  457:17 463:17
  471:9 529:11
  534:19 535:2,7
  535:24 543:20
**sit** 64:24,25 65:2
  187:5,8 263:15
  443:15 530:21
  543:1,23 544:4
  545:19
**sites** 173:10

**sitting** 273:6
  399:9 479:20
  493:13
**Situation** 348:3
**six** 453:23
**skewed** 357:16
**skipped** 350:10
**slightly** 200:17
**slope** 442:25
**slurring** 168:20
**slurry** 509:19
**small** 21:10,18
  60:8 67:7
  510:1
**Smith** 4:10 65:6
  155:4,6 164:16
  260:22 291:1
  342:20
**smoke** 542:1
  543:18
**smoked** 515:14
**smoking** 306:19
  306:19 307:6
  307:13 309:6
  309:20,21
  310:7 311:4
  384:10 499:24
  500:2 543:2
  544:1
**SMR** 269:25
**snail** 156:4
**soapbox** 48:24
**societies** 235:6,8
**Society** 215:7
  280:21 513:16
**soda** 52:6
**Soileau** 2:9 10:5
**sold** 439:22
**sole** 26:22,23
  27:8 75:20
**solely** 485:25
  507:21
**solid** 538:16
**somebody** 455:6
  455:13 539:4
**somewhat** 112:4

114:15 167:24
  268:23 270:2
  278:24 291:11
  452:8
**son** 167:17
  512:18
**soon** 149:15
**sorry** 29:15
  41:16 48:19
  53:12 55:1
  69:2 74:9
  80:18 83:8
  92:10 97:13
  98:25 126:22
  130:6 153:5
  154:11,20
  168:14 170:7,8
  171:16 179:4
  187:3 194:11
  195:18 211:13
  215:18 221:23
  230:21 235:2
  249:20 258:14
  276:24 281:17
  283:4 298:23
  309:1 312:19
  314:15 317:21
  320:11 330:21
  333:13 338:5
  363:12 364:16
  364:17 365:4
  365:12 370:23
  373:4 374:14
  378:20,22
  379:7 386:19
  387:14 388:14
  402:20 405:14
  410:2 430:8
  434:9 435:9
  438:1 450:19
  480:2 500:11
  509:7 516:7
  529:12 534:18
  546:13
**sort** 198:20
**sound** 86:12

512:25
**sounds** 351:11
**source** 158:21
  160:14,19
  497:19 513:19
  517:6 540:6
**sources** 237:6
  391:25 487:24
**South** 2:6,9 10:5
  26:20 173:1
  251:19 453:19
**Southern** 32:20
  262:6,8
**space** 168:15
  175:12 344:6
  509:21,24
  552:6
**spaces** 66:14
**speak** 139:5
  140:2 231:9
  336:10 408:21
  519:6,14
**speaking** 28:11
  69:22 70:3
  81:13 117:19
  127:7,23 128:4
  140:8 161:3
  265:12 446:7
**speaks** 308:11
  465:1
**Spearing** 396:16
**specialist** 98:10
  174:17
**Specialty** 62:21
  63:2 247:25
**specific** 131:18
  183:24 544:22
**specifically**
  81:13 265:3
  307:4 322:17
  322:19 402:12
**specification**
  177:16
**specified** 489:17
**specify** 164:1
  487:1

speculate 533:5
speculation
  266:12
speed 258:1
spend 34:24
  187:23
spent 548:25
  549:1
spermicidal
  305:7
spermicide
  304:6
spirit 237:3
split 150:5
  209:13 245:8
  388:19
splitting 150:13
spoke 72:9
  251:22
spokespeople
  532:6
sponsor 17:12
  46:18 59:13
  206:3 508:13
sponsored 59:14
  214:13 224:5,6
  224:7 242:1,8
  242:10
sponsoring
  237:8
sponsors 59:10
  407:6
sponsorship
  375:20 421:12
spontaneous
  167:8 168:8
  170:11,20
  172:9 173:7,11
  178:17 209:8
spot 472:13
St 248:23
stability 375:16
staff 228:23
stages 184:6
stakeholder
  508:14

stakeholders
  348:25 349:6
  350:20 354:2
  466:16
stand 33:7
standard 41:5
  44:4 47:6
  272:7 335:3
  356:2,3 505:16
standards 384:3
  474:6
standing 58:14
standpoint
  486:7 490:9
  492:3 507:17
  519:21 520:12
  526:18
Stanton 169:19
  340:14
start 77:20 78:6
  111:25 148:18
  291:12,13
  362:3 500:11
started 76:2
  78:1 84:12
  86:16,24 87:6
  109:21,23
  149:15 199:12
  256:14 269:6
  276:11 412:11
  426:19 512:20
starting 106:14
  399:21 410:5
starts 195:15
  295:4 348:7
  469:23
state 10:2 11:5
  14:1 161:21
  242:24 248:22
  283:2,3,4
  284:4,24
  432:12 453:14
  479:21 529:12
  552:5
stated 61:23
  304:4 306:6

469:17 494:3
  541:24
statement 51:21
  222:23 254:8
  311:3 316:15
  316:18 326:19
  327:13,19
  335:8 401:4
  419:9 422:6
  485:21 500:22
  501:10
statements
  263:9 264:1
states 1:1 9:11
  54:24 329:4
  348:12
stating 438:19
  479:19
statistical
  264:25 266:15
  266:24 267:2
  269:18 270:24
  449:17
statistically 91:8
  267:14 431:22
stay 138:7
steer 363:20
stenographic
  9:15
stenographica...
  551:8
step 12:1 21:14
  79:9 348:21
  461:7,9 465:2
steps 461:10
sterile 168:23,24
  169:2
Steve 149:14,17
  149:18
Steven 87:19,20
  87:22 88:10
  90:11 148:25
  155:9 163:2
  178:13 233:19
  344:19 407:21
  410:18 414:3

518:7 519:5,12
Stevens 248:23
stipulation
  14:12
Stone 30:10
stop 22:22
stopped 276:17
  276:20
storage 451:20
store 13:11
Straif 327:5
straight 415:6
straightened
  506:23
strategies
  210:15 218:20
  322:18,22
  375:13
strategy 163:10
  166:2,8,12,15
  174:14 179:12
  191:16,19,25
  196:13 208:4
  298:6 323:8,14
  323:17 347:24
  351:9 357:25
  360:7 417:25
  466:11 512:10
  528:9 530:18
  531:16,20
  532:11
Street 1:13 2:6
  2:10 3:9,20 4:4
strength 264:25
  266:15 470:1
stretched 289:12
stretching 33:6
strict 219:18
strictly 18:21
strike 35:23
  41:24 49:3
  67:14 78:14,24
  116:1 126:6
  130:7 167:19
  194:5 196:22
  209:21 220:24

236:3 266:10
  270:9 273:10
  276:25 284:19
  287:11,14
  289:5 298:22
  309:2 312:15
  318:20 320:4
  320:20 331:6
  509:2,12
  529:17 535:15
  536:17
stringent 315:11
  501:15
strong 501:18
  510:9 538:14
stronger 512:25
strongest 481:16
strongly 332:15
  536:5
structural
  107:11
structure 58:18
structured
  315:9
studied 286:24
  482:24 483:5
studies 27:18,19
  27:22,24 33:19
  33:20,22 34:9
  40:8 47:11
  110:2 135:9
  136:2,2 149:16
  153:16 208:23
  268:21 270:25
  274:25 295:9
  300:6,13,17
  303:11 305:25
  306:18 307:13
  309:20 310:7
  316:9 317:5,10
  328:18 329:20
  340:6 341:19
  361:5,9,24
  362:4 377:14
  378:7,11
  379:19 383:22

400:17 401:20
403:13,24
409:8 431:21
432:3,5,7,10
432:13 446:7
458:12 476:14
478:23 480:16
480:21,23
481:3,8,23
482:1,23
483:14,19,20
491:3 504:2
513:9 518:19
519:2,10
525:13,17
536:22,23
537:5 538:15
**study** 46:12,19
46:20,22,23
47:2,8 66:25
91:15 104:13
104:14,16,17
105:17,25
106:3 107:21
143:4,5 150:2
150:13 151:3
152:1,20
153:25 158:5
164:7,25 165:3
165:19 169:20
169:20 172:6
176:21 180:12
186:7,11 201:2
209:22 210:2,8
214:3 244:13
244:17,21
276:1 277:3,5
277:6 292:1
297:4 300:21
301:1,12,13
304:20 305:1
305:12 330:8
331:13 342:8
371:20 372:7
374:7,11 375:3
376:18,24

382:15,21
384:1,2,3
387:19,21
389:14,17
390:5 391:20
392:4,12,18
393:3,17 394:6
395:7 396:1
402:12 404:13
404:19 405:6
406:5,19
408:10 416:25
417:15 418:19
425:2,3,5
427:6 433:18
434:6,10,11
435:5,16,24
439:2,21,24
440:3,5,7
442:4,5,5,8,8
442:13,14,21
443:16 445:1
445:16 446:2
447:1,4,10
448:12 450:3,7
450:12,19,21
450:24 451:7
451:10 456:24
457:5,9,21
458:9,10,18
459:2 460:6
475:1,6,21,23
479:3,5,12
481:15 489:18
489:24 490:2
491:8,10,22
492:6 502:13
502:14,21,22
507:5 512:22
512:23,23,25
**studying** 269:6
**sub** 136:20
**subgroup** 250:9
**subgroups**
328:15 345:20
**subheading**

422:5
**subject** 89:19
114:4,24 117:5
132:23 143:12
188:15 201:2
211:9 217:13
239:23 261:11
286:24 287:2,6
303:23 419:22
552:10
**subjected**
535:25
**subjecting**
535:20
**subjects** 19:9
173:19 210:15
**submission**
121:3 129:4,17
129:25 130:2,8
131:2 180:13
184:21
**submissions**
93:18,21
**submit** 185:11
199:21 241:21
411:25
**submitted** 17:8
17:23 47:8
129:3,12
132:18,20
181:5 189:12
190:10 201:3
201:13,17
205:16 311:2
378:2 422:14
485:11 487:3,5
500:20,24
502:1 503:17
**submitting**
184:23
**Subscribed**
553:15
**subsequent**
209:2
**substance** 254:6
255:1 285:2

296:14,15
506:18,19
553:7
**substances**
182:15 401:1
514:21
**subtotal** 389:10
**success** 385:4
393:16 425:1
**succinct** 101:6
**Sue** 357:11
358:6,18
361:16 366:7
367:8 391:11
**sued** 426:6
**sufficient** 106:4
288:1 316:11
317:6,12
355:24 382:25
462:1 464:3,4
464:11
**suggest** 108:23
130:4,10 140:1
394:22
**suggested** 93:17
94:10 107:9
212:15 312:5
366:7 406:22
491:12 492:22
**suggesting**
337:18,23
**suggestion**
178:20,23
215:1
**suggestions**
163:20 317:12
506:11
**suggests** 366:9
**suitable** 129:25
488:24
**Suite** 2:6 3:4,9
3:15
**suited** 329:19
**summarized**
390:6 427:7
**summarizing**

190:12 411:1
444:25
**summary**
128:21 129:1
189:2 198:21
199:14 210:14
268:14 303:5
388:1,3 428:22
**supplemented**
128:22
**Supplying**
375:16
**support** 21:9
47:13,25 76:12
76:14 107:21
136:21 137:17
137:17 151:3
227:18,22
239:17 289:7
291:24 292:17
292:21 299:9
300:3 311:21
312:3,3 363:18
375:21 419:12
470:6 487:8
501:18
**supported** 47:5
191:5 202:16
204:12 208:22
291:23 459:8
460:7,7 508:3
**supporting**
204:16 244:20
346:1
**supportive**
345:20 393:9
**supports** 172:4
269:13 508:15
**suppose** 135:22
144:13 216:17
318:8
**supposed** 163:8
238:22 358:1
393:24 548:11
**sure** 16:6 18:7
19:13,21 20:7

20:18 24:14
33:18 34:16
39:20 50:7
52:14,23 53:2
53:4 55:10
57:5,15 59:14
61:5,20 67:2
68:6 74:7 80:2
84:10 86:8
97:6 98:2
109:10 141:17
142:3,17 143:1
143:12,20
170:17 171:25
181:14,18,21
184:3 201:6,7
217:3 224:23
229:17 242:21
249:9 251:13
258:21 259:22
263:1 272:23
273:5 274:4
280:12 288:8
295:17 296:6
302:13,13
315:2 317:8
324:9 331:25
339:5 349:21
356:12 359:19
366:20 374:16
382:24 387:25
405:1 423:14
424:5 446:22
468:17 477:17
483:19 487:20
504:14,23
538:5,24
548:18
**Surely** 500:4
**surface** 392:13
392:23 406:24
448:24
**surfaces** 171:1
**surprise** 94:11
198:23 252:12
252:14 263:24

264:7 311:12
311:18,20
312:4 425:23
**surprised**
205:13 418:12
**surprising**
199:22
**surround** 510:1
**surrounding**
170:24 443:18
**surrounds** 171:6
**survive** 174:6
**susceptible**
431:10
**suspect** 80:4
285:23 341:24
538:20
**swear** 9:17
**switch** 76:16
362:2
**switching**
183:12
**sworn** 9:21
551:5 553:15
**system** 112:11
117:11
**systems** 443:23

———————
**T**
**table** 171:18
411:1
**tables** 190:6,12
220:12 448:22
448:25
**take** 5:13 18:12
21:20 62:6
76:17 79:8
118:5 128:14
128:25 148:10
148:13 154:12
161:9 182:6,11
187:6 223:16
246:13 253:20
254:20 273:17
288:6 302:25
311:22 312:20

313:1 328:1
337:6 338:6
405:4,17
431:16 441:25
457:16 468:17
513:6 527:1
539:5 548:5,10
**takeaway**
108:20,22
210:7
**taken** 103:15
106:13 161:6
218:21 229:20
263:21 551:8
**takes** 21:11
**talc** 3:17 6:7,16
6:21,22 7:1,12
8:2 9:10 13:7,7
13:12,14 15:22
16:16 31:8,18
32:20,22 33:11
52:6,10,12,16
52:25 53:15
54:4,9 57:8,13
62:25 63:1
65:1 71:20
72:5 77:8,11
77:19 80:20,25
81:14 82:20
83:7,23 84:11
84:14 86:3,18
87:1,7 89:12
89:19 90:3,10
91:8 92:2,20
94:12 95:5
96:1 97:7
102:2 103:8
107:8,22
108:24 109:12
109:25 110:21
111:4,14 117:9
123:20 125:3
127:16,25
128:6,19
130:19 131:25
132:8 134:7,14

136:22 137:19
139:22 141:13
153:9 163:5
164:22,25
165:16,17,19
166:3,25 168:5
168:10,20,23
168:25 169:1,2
169:7,25
172:13 173:7
176:19,20,24
177:9,19 178:9
178:16 180:20
180:23 181:23
182:21,23
183:8 189:3,4
189:23 192:2
192:18 194:17
195:6,20
196:10 200:18
207:8,10
208:18,20
209:1,7 215:10
216:18,22
217:11 222:3
224:5 232:16
233:5,6,10
234:3,6 243:20
245:4 247:6
248:10,17
254:1,4,10
255:20 256:14
258:2,3,13,15
258:20 260:25
261:3 262:2,6
262:8,9,14,23
263:4 268:5,19
269:4,6 272:18
274:2,25 275:2
280:25 281:12
281:20 292:3,7
295:8 296:3
297:22 314:25
315:12,15,18
315:19,20,25
316:1,4,5

317:13,15
318:3,4 319:10
319:22 320:1
323:15,19,22
324:6,11 326:8
329:21 333:21
334:4,6,23
335:4,5,16,21
336:6,8 343:3
345:17 346:6
346:24 347:6
352:9,9 355:4
355:6 356:17
358:2 361:21
362:23 364:24
368:15 375:16
381:9,19,21
382:10 383:2
383:22,25
384:1 391:24
393:19 394:23
395:1 397:20
397:20 399:3
399:12 400:5
400:13 401:20
401:23 402:13
402:23 403:15
404:1 405:3,6
406:18,25
408:10,21
409:7 411:12
413:8 419:15
419:16 420:8
420:10 421:16
425:6 430:2
433:24 434:1,2
434:4,7,9,13
435:1,6,21,25
435:25 436:7
438:14,21,25
439:3,4,5,6,7,9
439:14,18,20
439:22,23
440:4,9,11,11
440:12,13
442:10,21,24

| | | | | |
|---|---|---|---|---|
| 442:24 443:3 | 482:2,13,19,23 | 175:19 176:18 | **technical** 133:11 | **terribly** 230:17 |
| 443:18,22 | 502:25 520:15 | 223:25 230:24 | **Technician** 4:10 | **test** 275:21 |
| 445:14 446:8,9 | 520:23 534:16 | 234:18,22 | **technology** | 335:7 431:3 |
| 446:12 447:19 | 535:12 | 251:24 254:16 | 58:21 59:13 | 432:15 |
| 448:3,3,4,14 | **talcum-based** | 256:3 265:2 | **Teich** 1:12 | **tested** 335:4 |
| 448:15 449:8 | 279:15 340:7 | 268:13 272:17 | **teleconference** | 342:11 413:12 |
| 450:7 451:12 | 341:16 | 281:23 286:9 | 2:10 7:12 | **testified** 310:16 |
| 451:17,18,23 | **talc-based** | 299:4 305:24 | 134:12 343:4 | **testify** 551:5 |
| 452:11 458:9 | 371:17 471:1 | 306:1 314:11 | 463:12 | **testimony** 5:16 |
| 458:10,12 | **talc-coated** | 320:8 336:5,5 | **telephone** 87:21 | 12:17,19,23 |
| 462:24 463:11 | 295:10 | 342:6 347:5 | 117:8,10 178:9 | 13:1 16:13 |
| 467:10 469:1 | **talc-diaphragm** | 351:8 353:4 | 179:7,9 228:16 | 18:5 40:2 |
| 470:18,24 | 297:4 | 358:23 361:16 | 251:13 | 138:1 162:4 |
| 480:9,19 | **talc-dusted** | 361:17 362:3 | **tell** 9:22 12:1 | 198:18,21 |
| 481:10 485:16 | 485:18 490:23 | 364:2,22 | 46:3 62:6 | 263:21 478:18 |
| 488:18 509:5 | 491:4 | 372:14 374:5 | 148:12 246:20 | 497:7,12,17 |
| 509:15,18,19 | **Talc/Ovarian** | 375:2 379:18 | 360:22 363:2 | 498:8,12,18,24 |
| 510:6,11,12,15 | 7:20 | 399:11 406:18 | 365:3 405:16 | 511:8 528:5 |
| 511:5,15 512:9 | **talk** 15:18 17:25 | 411:6,21 | 449:2 450:17 | 551:8 |
| 512:20 513:11 | 74:14 79:9 | 412:25 433:16 | 475:5 501:12 | **testing** 195:6 |
| 514:8,11,16,19 | 126:3 129:19 | 434:15 442:9 | 543:2 | **tests** 335:5 |
| 515:22 528:13 | 134:3 176:7 | 449:16,18 | **telling** 121:20 | **Texas** 3:5 |
| 529:5 530:8 | 221:2 230:10 | 454:1 459:1 | 151:19 249:19 | **text** 188:6 |
| 531:7 532:8,21 | 230:12 255:1 | 471:25 512:11 | 343:25 539:9 | 211:11,14,15 |
| 533:14 534:5 | 360:22 455:6 | 534:16 | **tells** 14:2 | 213:10 |
| 534:12 541:3 | 460:14 463:15 | **talks** 383:25 | **ten** 148:11 | **thank** 21:21 |
| **talcs** 169:14,21 | 482:22 483:18 | 463:22 488:15 | 301:19 501:15 | 60:17 75:17 |
| 169:22 176:25 | 492:10 516:15 | 489:3,7 | 510:22 | 139:13 231:20 |
| 177:2 340:18 | 526:8 | **target** 494:4,7 | **tender** 452:20 | 315:7 343:1 |
| 392:7,13 | **talked** 69:16 | **task** 58:14 89:12 | **tentatively** | 430:9 471:8,10 |
| 432:15 439:10 | 103:7 140:12 | 114:19 149:25 | 136:19 137:17 | 473:11 480:4 |
| 452:9 | 158:18 219:11 | 150:1 | **tenth** 82:14 84:7 | 521:10 526:25 |
| **talcum** 1:3 7:22 | 330:6 342:13 | **tasked** 364:4 | 85:3,15,23 | 550:4 |
| 11:14,21 13:9 | 372:25 384:6 | **tasks** 131:18 | 87:3 | **thanking** 314:18 |
| 13:13 15:13,15 | 402:3 432:6 | 143:3 164:4 | **term** 19:24 | **thanks** 150:6 |
| 97:9 101:24 | 452:18 458:14 | 361:18 | 144:3,6,9 | 345:15 549:4 |
| 177:10 275:18 | 466:5 476:4 | **team** 106:20 | 237:12,21 | **That'd** 148:14 |
| 278:16 336:7 | 480:20 514:5 | 227:18,22 | 265:21 | 169:7 |
| 339:9 341:1 | **talking** 13:13 | 289:7 291:23 | **terminology** | **therapeutic** |
| 380:4 384:21 | 14:18 24:16,19 | 291:25 292:4,8 | 347:9 | 207:7 286:19 |
| 426:12 451:18 | 34:8 49:10 | 292:17 300:3 | **terms** 18:19 | **therapeutically** |
| 477:9,20 478:1 | 85:7 97:4 | 357:12 358:17 | 30:15 45:10 | 207:11 |
| 478:8,12,15,24 | 120:11 134:24 | 361:18 364:5 | 95:23 130:17 | **they'd** 336:24 |
| 479:10,15 | 135:16 150:9 | 437:1 | 163:16 168:16 | 508:18 |
| 480:24 481:4 | 162:1 165:6 | **Tech** 232:12,14 | 170:17 201:19 | **thing** 65:11 83:7 |
| 481:11,22 | 167:11 175:12 | 314:16 | 514:19 | 123:20 204:21 |

212:3 262:21
283:24 318:16
366:6,7 391:10
505:15 531:8
536:15 546:23
**things** 80:4 92:7
97:22 119:3
120:3 121:9
124:8 125:16
129:8 139:7
181:10 220:11
222:15 223:16
247:2 256:16
257:16 258:8
278:8,10
318:10 350:6
364:13 366:19
375:1 402:3
438:11 440:1
453:11 473:10
491:25 515:1
549:1,10
**think** 16:7 19:23
24:15,23 31:3
52:22 56:9
59:16 68:14
79:19 81:1
87:1 88:4 96:8
101:6 102:21
106:13 115:22
120:14 122:25
134:1 142:7,8
142:12 145:14
146:14 150:10
153:3 154:6
157:6,23
159:14 161:16
163:6 167:24
170:5 176:19
176:22 181:25
183:3 185:5,9
185:24 192:2,7
192:7 193:5
197:12 199:2,5
199:7 213:17
215:12 217:2,3

217:16 218:5
240:8 242:7
243:10 247:20
252:3 256:24
257:1 259:9
263:11 264:4
265:20 266:6
267:14 268:16
269:12,24
270:14 273:3
273:15,16
274:1,4,25
276:10 283:15
283:21,21
289:12 294:12
300:24 301:8
313:21 321:16
321:20 324:3
326:21 329:25
338:7 340:1
350:14 354:12
355:3,23
365:23 366:6
366:11,18
367:9 368:16
368:18 374:1
376:7 386:7,16
386:18 394:2,4
396:17 409:18
410:22 420:24
421:7 424:7
434:8,8,10,11
435:1,10,14
438:16 447:6,9
448:8,10 450:9
452:10 453:11
453:25 459:5
467:3,5 471:7
471:24 472:16
476:13 484:4
488:3,7 495:1
495:19 496:15
497:5 500:18
501:6 503:15
503:23 506:19
508:18,25

510:8 511:9,10
511:16,23
513:3 515:20
519:12 523:10
523:22 526:22
528:18,22,25
532:24 535:21
535:24 537:7
538:16,17
548:1
**thinking** 97:17
100:17 249:16
370:25
**third** 120:17
260:24 326:14
333:10
**third-party**
532:6
**thirty** 552:15
**THOMAS** 2:3
**Thoracic** 215:7
513:15
**thoracotomy**
168:18 512:19
**thorax** 172:17
**thorough** 128:15
128:21
**thought** 23:18
46:20 47:11
66:25 114:9
158:9 223:9
230:22 249:16
255:12 303:8
308:6 309:18
312:22 333:11
374:10 449:25
472:6 480:1
486:1 512:17
512:24 513:9
**thousands**
518:17 544:13
**threat** 432:19
**three** 27:18 35:1
35:5 161:10
165:18 268:24
380:23 475:24

481:14 535:11
**three-quarter**
66:24
**threshold** 274:7
274:16 277:9
277:21 278:3
286:18 287:13
287:16 288:3
**thresholds**
273:18
**thrust** 192:14
257:18,23
**thumb** 112:3
**THURSDAY**
1:8
**tie** 74:20
**ties** 15:12 72:18
72:20
**tight** 187:5
**time** 9:7 11:11
12:10,13 13:23
13:23 15:11,19
15:22 16:13,14
23:9 24:13
27:8,12 29:7
34:2,24 35:2
36:23 37:16
48:10 55:14
56:3 57:7
59:15 61:8
62:4 68:21
69:8,14 70:2
72:8,24 76:17
76:20,23 77:6
77:14 78:10
79:20 81:18
84:13 89:7
92:17,25 95:12
97:16 102:25
104:15 109:5
110:25 125:9
131:22 140:6
144:19 145:10
145:10 151:24
154:16,19
156:19 157:2

162:17,21
164:6 174:19
182:5 183:16
184:9 186:6
187:9,12,23
217:4 218:8,11
228:25 230:7
231:23 235:24
240:8 241:2,19
243:6,17
244:12,21
251:4,22,23
283:17 288:9
288:12 289:21
289:24 319:16
319:17 320:24
321:25 324:23
325:1 327:7
338:6 344:25
361:10,13
365:24 372:8
373:20 374:19
374:22 377:24
379:9,12
380:18 381:1
397:3 398:8
405:19,23
410:14 423:18
426:4,25
443:15 452:21
452:24 455:14
459:20 468:17
471:9,13
474:23 476:6
493:12 516:21
517:23 521:11
521:14 523:7,9
523:10,13
527:3,6 528:6
541:2 548:4
550:7 551:8
**timeline** 92:2
181:17 193:19
**times** 36:8 231:8
324:18
**timing** 458:14

**Tinto** 7:14,18
  26:1,2,5
  140:14 346:16
  347:17 349:10
  349:11 365:1
  370:11 372:5
  375:11 380:13
  383:10,22
  392:17 396:12
  398:13 414:12
  466:8 529:8
  532:7
**tired** 536:16
**Tisi** 2:4 10:9,9
  138:5,16
  283:18 284:2,7
  548:19
**tissue** 168:7,11
  169:18 170:3,4
  170:5,24
  216:19
**tissues** 342:2
**titanium** 6:21
  254:3,13 258:6
  260:4 400:19
  411:11 413:8
**title** 104:23
  200:17 201:22
  205:13 260:24
  379:25 389:1
  399:2
**titled** 469:23
**tobacco** 541:24
  543:24 544:1
**today** 11:18 12:2
  12:7,17,23
  13:2,7 14:1,17
  21:11 22:24
  23:9 24:18,19
  38:9 85:8
  96:17 106:7,9
  155:20 202:23
  224:21 261:14
  263:15 291:7
  330:7 359:2,6
  360:4 396:1

401:16 421:4
  443:15 462:24
  471:21 472:1
  472:20 518:21
  519:17 521:19
  521:24 524:11
  530:22 537:11
  543:1,23
  545:20 548:13
**today's** 9:6 18:4
  34:20,25 35:24
  325:10
**toiletries** 89:23
  522:12
**Toiletry** 334:25
**told** 137:8 141:8
  143:25 311:25
  471:23 476:3
  478:8
**tomorrow** 117:7
  127:8 298:18
  299:19
**tongue** 366:5
**top** 51:2 60:11
  60:20 87:15
  88:25 116:10
  127:14 135:10
  143:2 150:9
  200:17 245:11
  258:24 287:5
  301:17 313:22
  343:2 362:13
  366:4 370:7
  391:20 415:1
  444:3 484:19
**topic** 19:20 20:6
  110:4 129:2
  247:3 384:21
  388:24 391:20
**topics** 11:25
  31:7 389:4
**tort** 76:10
  123:19
**tort's** 123:20
**total** 156:8
  188:25 224:13

**totally** 503:24
  513:6
**touch** 16:11
**TOV** 336:25
**toxic** 76:10
  123:19,20
  285:3
**toxicologist**
  396:18 473:23
**toxicology** 88:16
**track** 18:11
  20:20
**trade** 42:22 43:5
  43:6 49:19
  51:3 54:10
  64:21 71:4
  89:25 111:1
  223:24 234:24
  290:19,20
  292:4,8 323:23
  324:5 350:4
**traditional**
  118:22
**trailed** 55:1
**trained** 19:5
**training** 20:16
  459:9
**transaction** 15:6
**transactions**
  87:3
**transcends**
  118:22
**transcript** 551:7
  552:16,17
**transcription**
  553:5
**transfer** 511:11
**transformed**
  375:10
**transition**
  106:12
**transmission**
  408:20
**transmittal**
  155:22
**transparency**

237:4
**transportation**
  23:12 58:21
**transported**
  473:8
**treat** 207:11
  223:23
**treated** 168:13
  169:15 173:9
  209:1
**treatment**
  170:12 172:8
  173:6 178:16
  207:19
**tremolite** 5:16
  339:2 434:3
  439:16
**trend** 382:8
**Trial** 4:10
**tricky** 369:25
  454:15
**tried** 536:11,14
**trigger** 447:21
**triggering**
  447:22 482:9
**trouble** 469:9
**truck** 364:13
**true** 24:21 25:12
  29:1 37:19
  43:13 56:15
  57:9 59:11
  61:3 63:13
  64:22 135:2
  140:3 143:13
  152:2 190:18
  196:25 212:8
  227:20 244:13
  244:22 245:18
  261:21 266:2
  274:12 280:18
  286:11,20
  312:8 323:9
  342:9 373:14
  403:21 540:23
  543:13 544:24
**truth** 9:22,22,23

318:15 475:20
  551:5,6,6
**try** 61:14 67:24
  157:19 264:19
  363:12 469:11
  502:23 509:8
  549:3
**trying** 41:10
  60:8 61:11
  82:4 92:14
  141:4 162:16
  238:23 258:7
  258:17 270:18
  283:22 296:7
  296:11 323:18
  384:17 417:22
  494:22
**Tuckasegee**
  472:10
**Tuesday** 289:17
  319:7 343:9
  362:23
**Tulane** 475:15
**tumors** 168:12
  169:16,18,22
  174:11 178:18
  340:19
**tuned** 81:10
**turn** 23:14 44:13
  60:10 91:23
  103:22 104:9
  112:1 120:17
  127:11 166:18
  190:5 193:22
  193:25 194:25
  202:10 207:4
  241:7 248:7
  294:21 333:5
  354:1 384:13
  399:17 406:12
  418:24 428:8
  435:11,14
  445:22 454:20
  484:17 527:13
**turned** 46:23
  449:25 451:23

476:16 542:25
**Turner** 7:8
134:19 228:9
292:15 314:13
343:18 344:11
345:12,14
346:14,22
370:16,20
456:22
**turnover** 217:22
327:1
**Twelfth** 4:4
**twice** 329:15
**two** 27:24 47:8
55:15 66:13
70:18 77:13
128:14 129:22
131:17 136:2
136:11 143:2,2
165:6 171:1
173:10 190:6
196:19 236:24
250:3 254:24
268:22,23
305:17 330:6
371:4 391:5
394:24 400:9
446:7 448:21
448:25 450:16
481:12,12
485:7,14 487:9
493:11 500:17
501:20 509:25
526:9,13,20
535:11 549:1
**two-thirds** 455:5
**type** 15:21 98:11
232:14 356:22
432:17 465:22
**types** 176:24
**typically** 456:13
456:14
**typing** 105:20
**typo** 394:4

—————
**U**
—————

**Uhm** 172:19
**uh-huh** 17:6
18:2 29:2
56:16 98:5
106:2 126:14
173:13 184:7
191:10 229:2
231:11 232:18
234:7 262:10
273:20 322:3
323:8 330:24
337:7 340:24
349:15 374:5
410:8 411:23
413:21 438:23
460:17
**ultimately** 13:1
72:17 82:19
121:9 125:10
131:16 142:5
158:22 180:7
180:18 181:2
189:8,12 197:8
199:12 209:20
249:2 298:12
304:19 305:12
332:10 409:15
423:5 440:23
494:15
**unacceptable**
340:25 546:4
547:12,15,18
550:2
**unanimous**
319:11
**uncommon**
200:23
**undecided**
192:12
**undergoing**
209:6 375:12
376:5,6 510:23
512:19
**underneath**
30:14 47:22
66:12 108:2

143:21 208:17
243:7,17 348:3
353:14 354:2
357:4,7,14
385:14
**underpinnings**
300:5
**understand**
11:17,22,23
12:7,16,20,21
12:22,25 13:3
13:4,16 16:10
50:8 85:11
92:1,4,16
107:24 109:11
115:23 137:1
138:15 140:16
150:4 152:15
168:2 170:18
176:23 181:12
216:7,18
224:23 254:9
316:8,20
321:23 327:16
327:25 351:2
353:8 359:20
370:6 423:17
432:22 436:22
436:24 438:12
487:4 494:11
534:9 535:22
537:10
**understandable**
504:15
**understanding**
13:9 25:6 48:9
82:5 83:19
92:7 148:3,4
193:9 213:8
236:13 242:19
323:19 356:7
448:10
**understands**
229:18
**understood**
102:25 113:7

144:19 147:15
266:6 520:13
520:22
**underwriter**
53:24
**underwrote**
224:9,12
**undisclosed**
405:10 539:4
**unequivocally**
520:14
**unforeseen**
504:25
**unfortunately**
469:19
**uninterpretable**
268:24 481:13
**unique** 118:21
119:2
**United** 1:1 9:11
54:24 348:12
**universally**
381:16
**university** 18:15
18:20 20:17
174:20 243:25
251:19 281:6
281:18,25
282:5,14 400:3
456:25 457:11
458:3,9,11
473:14,17
475:12,14,15
**unknown** 306:8
**unparalleled**
121:1
**unsafe** 532:9
**unsure** 303:6
**unusual** 541:6
**upcoming**
385:17 386:12
**update** 164:20
164:24 413:23
**updated** 93:25
97:23 98:15
100:5

**upfront** 202:3
**urgency** 385:14
385:22,25
386:4 417:8
**USA** 243:1
**usage** 280:1
**use** 6:16 7:22
11:21 38:20
107:9,22
108:24 112:11
114:7 117:10
118:13 128:18
130:19 136:22
137:19 156:9
164:22 165:16
165:17 168:20
177:1 178:16
189:23 194:1
200:18 201:17
265:21 278:16
297:22 358:2
361:21 363:18
364:24 371:17
380:4 384:21
439:23 451:20
462:24 467:10
471:2 477:20
478:24 479:15
480:24 482:24
485:16 488:11
490:22 509:15
511:5,15
514:21 520:15
530:8 533:8
534:5 550:3
**useful** 26:25
331:1 365:24
**user** 99:9 100:9
100:12,17
**users** 485:17
491:4
**uses** 207:7 214:3
214:6 439:23
**usual** 128:20
**usually** 68:1
160:17 496:25

Robert Glenn

505:10
**utilizing** 440:9
**UVM** 408:10

---

**V**

**V** 2:4 4:8 233:7
**Vacek** 475:13
**vague** 61:10
**vaguely** 426:17
**valid** 304:12,23
**Valley** 165:20
165:23
**valuable** 238:4
363:22 365:18
**value** 192:13
315:18 364:2
364:23,25
371:18 372:6
396:1 401:10
401:15
**Vanderbilt** 53:8
63:3 232:19,23
233:4 247:25
429:22 433:25
434:13,16
442:10 445:14
**Vanderbilt's**
446:1
**variables** 306:5
**variations**
432:23
**various** 20:1
392:13 423:3
430:19
**vectors** 473:9
**Veena** 174:20
**vegetables** 515:5
**Vena** 299:16
**vendors** 64:9
**venture** 53:25
**vera** 515:11
**veracity** 160:6
539:18,24
**verbatim** 551:7
**Vermont** 281:6
281:18,25

282:7 400:3
456:25 457:11
458:3,9,11
475:12
**vernacular**
371:23 455:7
**version** 189:19
456:3,8
**viability** 412:18
**vice** 43:16 72:15
**video** 9:8 308:20
**videographer**
9:1,4 10:1,6
76:20,23
154:16,19
187:9,12 218:8
218:11 288:9
288:12 324:23
325:1 361:10
361:13 374:19
374:22 379:9
379:12 405:19
405:22 452:21
452:24 471:13
517:20,23
521:11,14
527:3,6 550:7
**Videotaped** 1:11
5:13
**Vietnam** 473:7
**view** 323:23
521:4 532:7,14
532:18,21
533:15 536:5
544:1,11
547:16
**viewed** 300:10
**views** 329:6
**violating** 138:7
**Virginia** 475:13
**visceral** 171:3,6
207:18
**visit** 61:6,12
460:12
**visited** 44:11
**vital** 85:10

**voice** 74:10
**voiced** 536:5
541:3
**volume** 6:20
303:6 416:5
**volumes** 35:7
**voluntary**
111:11,12
**vote** 64:12 83:14
223:14 231:7
303:7 319:8,11
343:10
**voted** 289:17
**voting** 231:8
289:15
**Vulcan** 30:11

---

**W**

**wades** 441:4
**wading** 112:24
**wait** 194:9 277:3
298:20 331:15
429:2
**waiting** 148:16
297:16,21
**waive** 121:22
**walk** 83:22
182:20 238:8
370:4
**wall** 171:11
**want** 12:1 13:5,8
21:14 23:14
31:16 39:16
41:21 44:24
45:25 46:3
60:10 72:12
74:14 78:11
79:8 81:2
103:22 104:9
112:1,22
113:22 141:11
164:15 170:17
171:13 177:23
181:14 196:4
211:17 230:12
240:13 241:7

246:18 258:10
280:12 287:4
288:24 291:12
301:15 308:17
328:9 333:5
337:13,14
338:4,5 340:4
342:19 363:20
368:24 370:3
375:5 377:5
378:14 379:22
399:17 406:12
428:8 434:25
436:22 443:25
443:25 445:20
445:25 450:11
472:5 475:20
479:18 483:18
483:19,21
492:10 502:5
504:21 508:12
527:22 532:2
539:16,23
548:16 550:6
**wanted** 18:3
36:5 46:17,18
64:25 67:23
72:14 132:6
143:12 218:14
223:5,13,15,22
238:9 333:12
334:8 415:18
445:9 468:5,9
486:1 514:1
**wanting** 405:4
501:9 502:4
**warmest** 345:15
**warn** 278:5
**warned** 286:2
**warning** 286:7
397:14
**warnings** 98:16
288:5 545:15
**warrant** 372:8
375:20
**Washington**

3:21 4:5
247:12 525:25
**wasn't** 21:7
40:24 62:10
70:7 78:20
81:8,16,17,22
83:3 85:10
96:23 111:7,13
116:23 122:13
143:15 147:23
152:12 178:25
179:24 180:2
181:11 186:10
203:12 215:23
230:8 249:6
254:10 258:13
258:15 265:5,8
268:1 277:5
282:10 290:20
351:12 356:8
360:5 395:14
396:23 426:20
449:14 450:23
451:7 511:22
549:2
**watch** 308:18
**watching** 81:3
**water** 31:13
74:13
**wax** 183:8
**way** 24:24 57:2
57:24 67:25
93:20 96:11
101:7 111:24
117:22 137:12
153:4 156:3
157:13,15
164:2 187:6
189:12 204:8
206:8 219:7
232:1 265:7
309:8,10
340:22 354:24
356:16 360:8
420:16 435:11
439:18 450:1

Robert Glenn

455:5 474:15
476:17 493:10
496:13 497:13
501:19 503:3
503:25 504:25
517:8 519:19
526:5 538:23
**Wayne** 396:7
418:4 444:21
444:24
**ways** 20:4
105:19
**wayside** 181:8
**wbowden@le...**
2:5
**weak** 91:7
153:12,13
265:1 266:16
270:23 271:18
272:3
**web** 39:14 44:9
50:20 60:4
63:20
**website** 29:13,14
51:17 60:5
281:8,11 282:8
**week** 289:11,13
345:21 474:20
**weekend** 407:8
**weeks** 345:25
**weigh** 398:7
539:18
**weighing** 160:6
539:6
**weight** 300:13
300:16 301:12
504:3 537:8
**Weil** 46:25
**welcome** 237:4
508:18,21
**welcomed**
192:17 330:2
**Welfare** 36:24
**well-informed**
519:25
**well-known**

361:1
**went** 16:8 34:11
35:9 42:12
70:21 72:17
73:2,19,20,21
74:1,21 75:3,9
76:2 77:5,21
87:2 106:21
133:15 136:2
142:12,22,25
181:8 185:12
203:8 227:16
227:17 229:24
244:22 256:5
257:14 260:11
290:22 360:15
360:16 386:21
387:2 389:23
404:14 467:5
473:7 522:10
529:23 530:4
543:11
**weren't** 27:22
51:22 80:14
93:20 111:10
125:25 137:11
152:16 282:13
321:18 332:15
344:1 376:24
398:7 427:23
513:3 540:13
542:9
**Wes** 10:7
**WESLEY** 2:5
**west** 472:15
475:13
**we'll** 19:21
21:16 89:14
118:1 148:13
156:5 176:15
264:14 313:7
405:18 452:19
548:5
**we're** 12:2 14:17
15:18,21 16:11
16:12,24 17:25

18:4 21:10
24:16 43:14
60:8 63:7 65:3
76:15 82:3,8
96:17,25
102:21 111:20
111:25 112:24
120:20 122:11
123:11 126:3
126:19 128:5
129:19 135:10
138:12,25
139:11 162:20
162:21 165:5
175:15 176:6
176:13 183:12
218:2 223:25
229:18 235:14
245:7 246:21
247:1,2 261:14
265:2 270:14
271:5 273:6
275:3,3 283:14
299:4 324:4
328:24 342:6
342:14 347:5
351:19 353:4
363:14 367:10
375:12 387:20
398:24 436:22
484:5 527:10
**we've** 23:21
102:23 135:15
140:12 158:18
163:18 165:6
180:15 202:23
245:8 256:2,4
263:19 313:9
322:16 330:6
342:13 352:2
359:20 364:3
416:25 431:20
432:5 441:20
442:1 471:22
501:21 512:11
**whatsoever**

339:11 449:12
495:6
**white** 431:14
485:8 486:15
487:9,25
489:13 491:22
492:11,12,17
492:23 493:4,9
493:11 494:10
494:14,23
496:2,3,4,9
498:11 500:9
500:15 504:8
504:12 506:4
506:17 526:9
526:14,20
**Williams** 4:3
22:25 35:12
**willing** 151:3
**Willy** 523:23
**winds** 199:14
**Wisconsin**
248:24
**wish** 326:5
430:9 449:22
**withdrawing**
182:4 183:15
**withdrawn**
58:10 181:13
**withdrew**
180:19,21,22
181:8,22
182:21 185:13
**witness** 4:6 9:18
10:23,24 16:2
25:20 26:5
28:10 29:20,24
30:2 33:1,4
38:12,19 39:3
40:19 41:9
42:21 45:5,14
45:23 46:3,7
46:11 48:8
49:4,8,12,16
53:4,19,23
54:12 56:22

60:24 61:5,20
62:19 66:2,16
72:2 73:8 74:4
75:14,17 76:7
76:18 77:10,24
79:19 80:7
82:24 83:18
84:4,17 85:1
85:15,23 86:24
88:4,12 92:24
94:6,25 95:11
96:8,16,22
97:13 98:2
99:12 100:16
102:7,14 103:4
103:18 105:23
109:4,15 110:8
111:7 112:23
114:14,22
115:11,13
119:9 121:12
122:20 123:25
124:7,15 125:1
125:25 129:16
131:4,20 132:5
133:4 135:4
136:10 138:19
140:5 141:17
142:7,21 143:8
143:15,24
144:1,11 145:6
146:1,11 147:2
147:13,23
150:20 151:14
152:5,22 154:5
154:14 156:24
157:23 158:25
159:14,22
160:10 161:5
162:7 163:24
166:20 167:20
171:16 177:14
179:4,20 182:9
183:1,25
184:11 185:5
185:24 186:15

Robert Glenn

| | | | | |
|---|---|---|---|---|
| 187:1,7 190:22 | 310:21 311:6 | 420:20 421:7 | 521:1,8 522:10 | 27:11 29:9 |
| 191:19 197:3 | 311:16,24 | 421:25 422:9 | 523:6 525:15 | 30:9,13 31:6 |
| 197:11,20 | 312:10 315:2 | 422:20 423:14 | 526:25 528:18 | 31:14 42:12 |
| 198:5 199:2,7 | 317:8,24 318:8 | 423:23 425:21 | 529:8 530:15 | 66:4 67:8 |
| 199:18 200:21 | 318:22 319:25 | 426:1,16 432:2 | 531:1,13,24 | 72:10 73:5,11 |
| 201:1,11 | 320:8,18,21 | 433:13,23 | 532:24 533:11 | 75:3 108:16 |
| 203:17 204:6 | 321:8,15 | 434:24 435:10 | 533:25 536:9 | 111:2 114:6 |
| 205:18 206:1 | 322:11 323:5 | 435:19 436:7 | 537:19 538:23 | 121:14 128:14 |
| 206:19 207:1 | 323:11,17 | 436:16 437:12 | 539:23 540:9 | 128:24 139:7 |
| 208:6 209:25 | 324:3 329:25 | 437:21 438:18 | 540:25 541:11 | 146:19 156:10 |
| 210:12,23 | 330:16 331:7 | 441:3,16 442:7 | 542:5,12 543:5 | 157:20 159:1 |
| 211:8,23 213:7 | 331:16 332:14 | 442:23 443:20 | 544:7 545:1,13 | 159:25 185:1 |
| 214:6,18 215:3 | 332:24 334:19 | 445:3 446:6,15 | 546:3,13,22 | 213:19 226:9 |
| 216:4 219:10 | 335:21 336:10 | 446:21 448:20 | 547:11,18 | 226:22,24 |
| 222:7 223:3,13 | 337:11 339:13 | 451:16 452:3 | 548:9 549:15 | 227:13 243:13 |
| 224:18 225:7 | 339:15 340:13 | 452:16,20 | 549:25 552:1 | 246:5 261:23 |
| 225:13 226:6 | 341:4,10,22 | 455:21 459:24 | **witnesses** 124:22 | 263:2 281:4 |
| 226:24 227:11 | 344:13 346:5 | 465:21 466:20 | 125:11,12,14 | 299:22 300:2 |
| 230:5 243:12 | 347:8 348:17 | 470:3 471:6,10 | **witnessing** | 304:24 306:2 |
| 243:23 244:6 | 349:15 351:6 | 476:25 477:5 | 474:13 | 310:10 314:24 |
| 244:16,25 | 351:11 352:6 | 477:11,23 | **Wolfpack** | 360:17 361:2 |
| 246:10 249:9 | 352:19 353:2 | 478:5,11,19 | 526:24 | 363:23 370:2 |
| 249:15 252:9 | 353:10,18 | 479:2,25 481:7 | **wollastonite** | 394:7,8,9 |
| 252:20 253:5 | 354:9,18 355:2 | 482:6,16 486:3 | 52:8 | 434:17 436:21 |
| 257:14 260:2 | 355:14,23 | 486:12,23 | **woman** 13:11 | 459:8 467:18 |
| 260:17 262:20 | 356:11,21 | 487:18 490:17 | **women** 11:19 | 468:9 474:11 |
| 263:11 264:4 | 361:7 364:17 | 492:8,19,25 | 101:23 340:7 | 474:17,18,20 |
| 264:11 265:16 | 365:3 366:18 | 493:7,19 494:1 | 426:11 433:16 | 475:11 477:13 |
| 268:1,13 | 367:2,19 | 494:18 495:1 | 482:24 533:8 | 477:16,25 |
| 269:23 271:23 | 368:23 370:19 | 495:10,23 | 533:17 | 483:13 485:6 |
| 272:5,14,23 | 373:4,17,25 | 497:16,24 | **wondering** | 485:23 486:9 |
| 276:13,20 | 374:10 376:4 | 498:14 499:1,8 | 417:17 | 486:14,17 |
| 277:16 278:7 | 376:14,22 | 499:16 500:4 | **word** 29:11 68:1 | 488:23 507:18 |
| 278:19 279:9 | 377:18 378:11 | 502:16 503:2 | 140:11 312:12 | 528:6 |
| 279:21 280:20 | 378:25 382:19 | 503:23 505:3 | **worded** 78:23 | **worked** 20:14 |
| 280:24 281:14 | 383:14 386:7 | 506:1,7 507:7 | 497:7,13,20 | 21:2 24:10 |
| 281:23 282:7 | 387:1 389:17 | 507:11,24 | **wording** 265:23 | 65:17 70:9 |
| 282:25 284:11 | 389:23 390:22 | 508:25 510:8 | 492:5 504:14 | 73:15 75:9 |
| 284:16 285:13 | 392:22 393:5 | 510:20 511:9 | **words** 105:21 | 76:11 140:17 |
| 285:21 286:5 | 394:2 395:13 | 512:17 513:5 | 119:9 183:11 | 164:2 205:5 |
| 286:13,23 | 396:4,14 397:7 | 513:13 514:14 | 213:11 285:2 | 232:2 344:23 |
| 287:23 290:9 | 397:16,24 | 514:25 515:7 | 293:1 304:16 | 476:4,8 499:21 |
| 293:8 295:23 | 398:5,11,19 | 515:13,25 | 336:4 414:23 | 518:11 |
| 297:13 298:9 | 401:13 404:6 | 517:1,10 | 484:22 519:15 | **worker** 474:8 |
| 300:15,24 | 404:22 408:15 | 518:23 519:19 | **Worgan** 7:18 | 477:14 |
| 305:4 308:15 | 409:18 414:15 | 520:2,9,17 | **work** 15:3 26:24 | **workers** 37:10 |

| | | | | |
|---|---|---|---|---|
| 37:13,14 43:25 | 154:5 159:24 | 199:5 249:19 | 164:4 167:16 | 332:3,6 337:20 |
| 47:18 98:3 | 173:2 183:1 | 283:24 370:24 | 169:6,9,14 | 338:13 339:4,6 |
| 99:15 317:13 | 202:2 222:7 | 371:1 405:14 | 170:10 171:22 | 339:19 345:9 |
| **working** 14:21 | 252:14 276:21 | 457:14 504:10 | 173:4,16 175:4 | 348:8 353:2 |
| 15:13,15 17:4 | 276:21 309:7 | 504:16 521:5 | 175:22 176:12 | 358:25 361:22 |
| 19:3 25:20 | 311:18 312:4 | 532:14,18 | 176:25 178:7 | 365:6 367:19 |
| 27:19 66:9 | 338:9 354:6,15 | 533:3,16,17 | 179:9 181:9,16 | 369:20 370:6 |
| 68:11,20 92:8 | 354:21 360:4 | 535:19 543:1 | 184:1,1,19 | 371:6 375:8,8 |
| 99:19 102:25 | 418:13 441:1 | 544:12 | 186:24,24 | 387:9 388:10 |
| 104:5 157:25 | 502:17 503:2 | **wrote** 120:5 | 188:5 189:20 | 388:23 389:13 |
| 161:25 162:1 | **write** 266:14 | 302:6 403:19 | 190:22 191:6 | 391:10 394:5 |
| 182:6 215:16 | 296:16 327:23 | 498:9 | 191:23 192:5 | 396:10 402:19 |
| 215:19,21 | 327:25 | **Wyart** 248:1 | 193:24 194:10 | 402:24 405:1 |
| 217:1,15,18 | **writes** 155:17,18 | 250:14 313:11 | 194:13 195:4 | 407:17 412:14 |
| 222:17 223:6,9 | 415:9 438:7 | 313:15 343:23 | 196:9 197:15 | 416:3,6 417:2 |
| 230:22 231:9 | **writing** 106:23 | **Wyart-Remy** | 199:11,11,18 | 417:17 418:3 |
| 240:21,21 | 107:5 120:22 | 229:1 | 201:1,15 | 418:21 420:10 |
| 244:21 262:17 | 174:14 178:13 | **Wynder** 499:22 | 202:20 214:18 | 421:20 429:6,8 |
| 295:17,19 | 179:17 303:5 | 500:1,2 541:17 | 218:1 220:8 | 440:11 452:3 |
| 319:18 321:24 | 325:20 327:8 | 541:19,20 | 230:6 232:22 | 454:17 460:20 |
| 322:19 326:15 | **written** 58:7 | | 232:24 234:9 | 463:19 467:3 |
| 326:21,22 | 94:14 107:14 | **X** | 234:23 235:4 | 468:18 469:15 |
| 327:3,8 328:5 | 107:18,19 | **X-rays** 219:20 | 236:1 237:20 | 470:3,10 472:8 |
| 328:16 329:5,8 | 108:6 111:25 | 475:22 501:24 | 237:25 238:2,7 | 474:24 480:25 |
| 332:1,11 | 117:13 119:24 | | 238:9 239:2 | 484:6,20 503:7 |
| 380:18 391:6 | 121:6 127:20 | **Y** | 240:2,10 | 509:25 512:15 |
| 401:20 408:13 | 129:6 130:14 | **yeah** 28:15 30:1 | 245:15 250:17 | 513:5 524:25 |
| 456:14 464:21 | 137:22 151:6 | 32:14 43:24 | 251:25 253:24 | 526:11 527:17 |
| 473:8 474:10 | 155:25 156:16 | 44:23 56:11 | 257:21 258:4 | 530:15 534:23 |
| 476:5,11 477:3 | 191:4 194:19 | 62:20 64:2 | 263:23 264:4 | 538:8 |
| 477:17 504:11 | 261:6 263:6 | 69:2 70:1 | 264:12,21,22 | **year** 42:9 113:17 |
| 510:5 511:14 | 304:10,14 | 73:25 75:12,14 | 266:25 267:17 | 113:22 180:19 |
| 511:22 512:3 | 306:11,22 | 76:7,19 77:24 | 267:17 268:8 | 262:21,25 |
| 516:23 538:12 | 307:4 309:23 | 78:16 80:7,19 | 270:21,25 | 263:1 378:23 |
| 538:25 | 325:14 326:12 | 81:8,15,21 | 271:12,16,19 | 428:1 459:2 |
| **workplace** 356:2 | 328:20 329:12 | 82:7,10 85:17 | 278:15 279:5 | **years** 11:9 15:4 |
| **world** 118:23 | 348:1 350:24 | 88:19 89:3 | 279:25 280:10 | 53:25 55:15 |
| 221:8 456:12 | 357:19 358:4 | 92:18 97:22 | 280:14,20 | 62:20 72:21 |
| **Worldwide** | 363:5 372:1 | 101:8 110:12 | 290:9 292:22 | 77:13 123:7 |
| 88:17 | 386:15 393:22 | 113:21,24 | 293:21 294:5 | 161:10,12 |
| **worry** 430:17 | 394:19 395:2,9 | 118:2,9 127:10 | 296:18 301:21 | 172:8 177:17 |
| **worth** 196:19 | 398:9 399:15 | 133:23 136:10 | 302:11 310:14 | 251:24 345:22 |
| **worthwhile** | 415:12 429:7 | 138:5 143:8 | 312:22,23 | 346:2 367:15 |
| 366:12 | 429:13 437:6 | 148:17,17 | 313:16 314:3 | 456:12 459:3 |
| **wouldn't** 41:17 | 445:18 502:22 | 152:25 153:6 | 316:21,25 | 501:15 510:22 |
| 66:19 107:3 | **wrong** 153:19 | 155:6 158:16 | 317:17 328:3 | 516:19 535:11 |

541:16,24
543:25
**York** 324:18
**young** 101:23
**you-all** 459:5
**y'all** 187:7

___

**Z**

**Zazenski** 90:16
134:22 139:14
140:22 149:3
152:18 155:9
163:2 192:20
218:23 219:4
358:6,18
362:18 408:2
410:22 414:10
415:2,6 418:9
**Zemex** 233:8
**zero** 272:9 413:7
**zoom** 469:10,11

___

**$**

**$100,000** 224:14
**$2500** 66:25
**$3,000** 226:3,4
243:13
**$50** 475:23
**$50,000** 225:1
**$75,000** 403:7
**$750,000** 46:12
475:3
**$90,000** 419:18

___

**0**

**000000935** 5:25
**000000936** 5:25
**000003399** 6:8
**000003400** 6:8
**000004461** 7:5
**000004463** 7:5
**000004466** 7:13
**000004468** 7:13
**000004749** 6:23
**000004750** 6:23
**00001562** 7:9
**00001563** 7:9

**000246710** 7:11
**000246717** 7:11
**000369203** 6:11
**000369542** 6:19
**000389751** 6:14
**000389796** 6:6
**000389800** 6:4
**000389804** 6:4,6
**000391641** 6:9
**001719** 7:7
**001720** 7:7
**005117** 7:17
**07962** 3:15

___

**1**

**1** 5:13 21:22
22:1 48:14
195:15 423:18
423:25 461:3,3
461:13 462:7
463:5
**1-milligram-p...**
44:25
**1.3** 266:21 267:2
267:13 269:18
**1.31** 470:8
**1:08** 288:10,11
**1:30** 117:8
**1:58** 288:13
**10** 6:3 82:21
93:21 111:17
111:23 177:17
248:9 389:10
426:4
**10th** 83:15 84:22
86:21 108:9
180:21 182:13
**10:54** 154:17,18
**100** 188:1
**101** 511:20
**102** 6:1
**109.8** 381:4
**109.9** 382:2
**11** 5:5 6:5 17:7
126:8,12 192:1
195:25 377:14

378:6 426:4
458:20
**11th** 313:11
314:7
**11:09** 154:20
**11:10** 154:20
**11:37** 187:10,11
**11:40** 187:13
**111** 6:3
**114** 173:9
**12** 6:7 7:2
133:16,20
134:16 180:14
193:16 255:23
458:15
**12th** 86:6,9,21
92:21 134:14
135:12 136:20
180:23,24
181:13 182:22
**12:06** 218:9,10
**12:16** 218:12
**126** 6:5
**13** 6:9 134:12
148:5,9 406:13
**13th** 202:7
232:10
**13,950** 156:7
**133** 6:7
**14** 6:10 123:7
154:22 155:1,3
177:17 412:22
**14th** 108:3 319:7
343:9
**148** 6:9
**15** 6:12 7:15
162:10,14,19
259:20 329:8
347:20 399:6
412:23
**15-minute**
548:12
**154** 6:10
**16** 6:13 177:20
177:24 329:8
**16-2738** 1:4

**162** 6:12
**17** 5:17 6:15
187:14,18
496:3
**1717** 3:9
**177** 6:13
**18** 1:8 6:1,16 9:6
30:4 104:2
199:23 200:3
211:20 218:17
495:21,22
496:1,12
498:10
**187** 6:15
**19** 6:18 195:14
231:13,17,19
**19103** 3:10
**1954** 209:8
**1964** 209:9
**1970** 36:13
**1970s** 334:16
340:4 367:15
368:4
**1975** 334:23
339:10,25
340:3
**1977** 37:8
**1978** 7:10
**1980s** 70:12
**1985** 209:10
**1986** 5:17 42:9
**1988** 72:11,17
73:5
**199** 6:16
**1996** 118:16

___

**2**

**2** 5:3,14,14
22:11,15 23:17
26:14 44:13,22
60:10,11
171:21 189:4
189:16 191:11
270:2,3 357:24
378:15,17
388:15 406:12

**429:16** 463:16
463:17
**2A** 461:21 462:8
463:8 464:1,3
**2B** 271:2,6
317:16,17
319:11 324:12
352:9,9 371:17
381:23 393:10
460:16 462:8,9
462:10,25
464:1,4,9,12
465:8 480:10
514:8,23 515:5
515:11 531:7
**2Bs** 356:3,4
**2.0** 266:19
**2:30** 324:24,25
**2:31** 325:2
**20** 6:20 7:18
30:4 216:19
240:16,19
259:20 370:8
553:16
**2000** 73:1,1
80:20 82:13
83:23 94:17
106:14 488:8
**20004** 3:21
**20005** 4:5
**2002** 49:23
51:15 52:21
55:19,20 67:13
67:17
**2003** 135:21
136:14
**2004** 6:1 14:22
14:23 15:19
16:8,13 27:7
43:18 52:16
67:13,17 72:17
73:2,11 78:5,8
78:14,15 81:20
86:11 88:21
92:17 96:20
104:3 108:4,13

110:19,21
113:18,23
124:21 126:20
134:13 235:22
485:12 540:15
**2005** 8:11
155:14 162:21
178:4,5,24
179:8 180:8
188:12 246:22
251:5 298:7
399:6,24
401:10 403:7
404:13,19
406:3 450:2,4
484:8 493:17
494:8
**2006** 7:2,8,13,15
7:18 17:2,6
202:7 217:7
227:14 240:20
240:21 241:4
255:24 302:3
306:24 325:16
347:20 362:19
370:8 378:7
404:19 406:3
458:15 469:3
493:24 507:14
**2007** 202:7
406:11,13
408:25 410:11
412:15 483:15
488:11 489:25
522:25 523:4
**2008** 378:21,24
416:2,7 458:20
458:23 483:15
**2009** 395:25
396:7 416:5,7
420:12,14
425:17,24
426:4 427:8,13
442:4 444:25
**2010** 6:21 15:1,2
15:8,11,20

16:4,13 17:7
27:1,7,8,14
29:6,16 33:10
66:21 240:23
252:4 262:16
386:5,9,17
426:23,25
427:3 462:23
540:15
**2011** 425:17
428:16 429:10
**2013** 219:25
**2015** 15:11
27:14 29:6,16
33:11 262:16
**2018** 1:8 9:7
44:18 51:12
60:22 61:23
65:25 551:19
**202** 3:21 4:5
**21** 5:13 6:22
246:15
**2108** 5:14
**215** 3:10
**22** 5:14 7:1
172:8 195:1,1
255:2,6 468:14
551:19
**23** 7:3,10 195:18
290:25 291:3
**231** 6:18
**236821** 6:2
**236831** 6:2
**24** 7:5,13 195:24
312:18 313:3,8
412:24 413:13
458:23
**240** 6:20
**241536** 7:15
**241544** 7:15
**242353** 7:24
**242362** 7:24
**246** 6:22
**248642** 8:1
**248649** 8:1
**25** 7:6,8 319:2,6

325:16
**255** 7:1
**2555** 2:15
**26** 7:8 325:3,7
333:7
**267-0058** 3:16
**27** 7:10 188:12
337:2,6
**27th** 438:5
**270648** 8:6
**2722450** 7:21
**272247** 7:21
**2738** 24:5
**28** 7:12 8:11
155:13 342:21
342:24 463:11
484:7
**280507** 8:5
**280511** 8:5
**287089** 6:12
**287131** 6:12
**288001** 8:3
**288004** 8:3
**29** 7:14 347:10
347:15 466:2
527:14
**291** 7:3

———————————
**3**
**3** 3:15 5:16
39:10,14 44:14
108:3 178:4
189:18 191:11
192:11 269:25
270:2 348:24
371:7 375:6,7
399:17 408:23
424:7 428:9
454:21 462:15
527:22
**3:01** 361:11,12
**3:10** 361:14
**3:24** 374:20,21
**3:28** 374:23
**3:33** 379:10,11
**3:41** 379:13

**30** 7:16 362:6,11
434:3 439:14
552:15
**30,000** 388:10
**300** 457:24
**309615** 7:4
**309623** 7:4
**31** 7:18 202:6
369:9,13 375:1
454:14,16
458:15,25
**313** 7:5
**316** 2:6
**319** 7:6
**32** 7:20 377:7,11
454:15
**324762** 6:15
**324922** 6:15
**325** 7:8
**32502** 2:6
**33** 7:22 379:14
379:24 387:22
390:3,13
**337** 2:11 7:10
**34** 8:1 383:16,20
387:17,20
388:2 390:6,12
391:8,16,17
416:20 417:18
424:22
**342** 7:12
**347** 7:14
**35** 8:2 172:8
196:5,6 398:21
399:2 475:22
**35,000** 388:8,13
388:23 389:9
**35.4** 171:20
**35.7** 166:18
**350** 3:15
**36** 8:4 196:16
405:9,24
**362** 7:16
**369** 7:18
**37** 8:6 196:16
406:8 409:21

409:25 410:1
417:19 418:17
**377** 7:20
**379** 7:22
**38** 8:7 415:14,20
417:16 418:18
418:18 457:17
457:19 458:19
459:7
**383** 8:1
**39** 5:16 8:9
425:11,16
428:6
**391-0197** 3:5
**398** 8:2

———————————
**4**
**4** 5:18 23:15,21
24:1 44:5,8,18
88:20 171:14
192:11 194:7
214:1 315:14
454:21 462:19
468:4 484:18
**4,000-X-rays**
475:24
**4:05** 405:20,21
**4:22** 405:23
**4:59** 452:22,23
**40** 8:11 367:15
474:21 483:25
484:4,7,18
488:14
**400** 240:9
**405** 8:4
**409** 8:6
**415** 8:7
**425** 8:9
**434-5000** 4:5
**435-7000** 2:7
**439-0707** 2:11
**44** 5:18
**444052** 8:10
**444054** 8:10
**45** 472:22
**453** 5:6

Robert Glenn

**463-2400** 3:21
**47** 188:6
**471** 5:7
**474-6550** 2:16
**48** 188:6
**483** 8:11
**496** 240:10

_____
**5**

**5** 5:20 50:16,20
   112:14 116:4
   168:7,23
   189:22 191:4
   194:9 195:5
   216:19 291:13
   337:1 356:25
   468:8
**5th** 429:11,14
**5:05** 452:25
**50** 5:20 453:24
   474:21
**501** 2:10
**512** 3:5
**5150** 3:4
**52** 472:21
**521** 5:8
**527** 5:9
**535** 1:13
**54** 412:20
**561-2300** 3:10
**59** 5:21
**59.2** 301:15
   308:22
**59.5** 291:14
**59.6** 293:17

_____
**6**

**6** 5:21 59:22
   60:4,14 190:7
   207:4 391:8,15
   406:10,10
   416:22 424:24
**6.2** 211:23
**6:02** 517:21,22
**6:04** 517:24
**6:07** 521:12,13

**6:10** 521:15
**6:15** 527:4,5
**6:22** 527:7
**6:35** 550:8,10
**60** 434:2 439:15
**600** 2:6
**61** 188:1
**61.4** 235:14
   245:20
**610** 3:9
**63** 5:23
**64108** 2:16
**65** 385:17
**66.3** 346:10
**68.2** 248:8

_____
**7**

**7** 5:23 63:15,19
   166:18 190:7
   202:11 298:20
   384:13 388:16
   388:17,22,22
   388:23 389:9
**7th** 117:7
**70** 208:25
**70601** 2:11
**72** 367:24
**725** 4:4
**75** 412:21 413:8
   413:8,9
**750,000** 475:7
**78701** 3:5

_____
**8**

**8** 5:24 87:9,13
   190:7 195:16
   195:20 196:8
   298:21 302:3
   412:22 413:12
**8th** 293:16,25
   302:6
**8:44** 1:14 9:7
**80s** 367:21
**816** 2:16 3:4
**85.4** 410:1
**850** 2:7

**87** 5:24
**877.370.3377**
   1:22

_____
**9**

**9** 6:1 102:16,20
   103:21 178:5
   195:25 362:19
   410:11
**9th** 193:17
**9:41** 76:21
**9:42 a.m** 76:22
**9:55** 76:24
**917.591.5672**
   1:22
**92** 43:17
**93** 6:21 7:1
   240:7 245:9
   255:22 326:2
   357:15 386:4
   399:13
**97,000** 393:14
**973** 3:16
**975** 3:20
**99** 169:7 177:10
   177:19 209:6

Exhibit 159

Case 3:16-md-02738-MAS-RLS Document 9895-5 Filed 05/30/19 Page 538 of 599 PageID: 72942

# Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies

Michael Huncharek[a,b], Joshua Muscat[c], Adedayo Onitilo[b] and Bruce Kupelnick[a]

Prior work suggests an association between perineal use of cosmetic talc and increased ovarian cancer risk. A meta-analysis was performed to examine this hypothesis by evaluating ovarian cancer risk associated with direct exposure of the female genital tract to talc via dusting of contraceptive diaphragms. Data were pooled from epidemiological studies using a general variance-based meta-analytic method that employs confidence intervals. The outcome of interest was a summary relative risk reflecting the risk of ovarian cancer development associated with the use of cosmetic talc on contraceptive diaphragms. Sensitivity analyses were performed to explain any observed statistical heterogeneity and to explore the influence of specific study characteristics on the summary estimate of effect. Initially, combining homogeneous data from nine case–control studies yielded a non-statistically significant summary relative risk of 1.03 (0.80–1.37), suggesting no association between talc-dusted diaphragms and ovarian cancer development. Sensitivity analyses were performed to evaluate the robustness of this finding. All resultant summary relative risks were not statistically significant. The available epidemiological data do not support a causal association between the use of cosmetic talc-dusted diaphragms and ovarian cancer development. *European Journal of Cancer Prevention* 16:422–429 © 2007 Lippincott Williams & Wilkins.

European Journal of Cancer Prevention 2007, 16:422–429

Keywords: diaphragms, ovarian neoplasms, systematic review, talcum powder

[a]Meta-Analysis Research Group, Stevens Point, [b]Department of Clinical Oncology, Marshfield Clinic, Marshfield, Wisconsin and [c]Department of Health Evaluation Sciences, Pennsylvania State College of Medicine, Hershey, Pennsylvania, USA

Correspondence to Dr Michael Huncharek, MD, MPH, Meta-Analysis Research Group, 2740 Sunset Blvd, Stevens Point, WI 54481, USA
Tel: +1 715 343 3035; fax: +1 715 343 3080;
e-mail: info@metaresearchgroup.org

Received 20 April 2006 Accepted 18 May 2006

## Introduction

Ovarian cancer represents a major cause of cancer-related morbidity and mortality in the United States with an estimated 22 000 new cases diagnosed in 2005 (Boger-Meigiddo and Weiss, 2005). It is the seventh most common cancer in women and ranks fourth as a cause of cancer deaths among female individuals from the United States, with some 16 000 succumbing to the disease this year. The lethality of ovarian tumors is in large part due to the fact that clinical symptoms tend to occur late in the natural history of the disease and the lack of screening tests allowing for early diagnosis. In fact, approximately 60% of patients are diagnosed with late-stage disease (stage III and IV) vastly diminishing the chance of long-term survival (approximately 10% at 5 years from diagnosis) (Richardson *et al.*, 1985).

Primary prevention of ovarian cancer remains elusive as a clear etiology for the vast majority of cases is unknown. Nonetheless, prior epidemiological research suggests a number of risk factors, including age (older versus younger), nulliparity, first pregnancy after the age of 35 years, diet high in saturated fats, positive family history of ovarian/breast cancer and race (white versus African American) (Baker and Piver, 1994; Tortolero-Luna and Mitchell, 1995; Daly and Obrams, 1998). Clear geographic differences in incidence exist. The highest rates are found in industrialized countries versus underdeveloped nations (Ioka *et al.*, 2003), implicating environmental factors in ovarian cancer etiology. The one exception is highly industrialized Japan (Ioka *et al.*, 2003) with a low annual incidence of approximately 3/100 000. Interestingly, Japanese woman who migrate to the United States experience an increased occurrence of this disease, further suggesting environmental factors in its cause.

In 1982, Cramer *et al.* (1982) published the first study suggesting a link between use of cosmetic talc and the risk of developing ovarian cancer. Subsequently, a number of additional reports have shown a small but increased risk among women using cosmetic talc products, although this finding is not universal (Chang and Risch, 1997). These statistical associations raise concerns that a cause–effect relationship may exist between talc exposure (particularly perineal use) and ovarian carcinogenesis.

Further fueling concerns about this association is the mistaken, but often repeated, assertion that asbestos and talc are biologically similar; that is, they may exhibit similar disease-causing potential (Wong *et al.*, 1999). While talc and asbestos are both silicates, they bear little resemblance structurally or in their biological properties. Asbestos fibers are well recognized human and animal carcinogens with substantial supporting epidemiological and in-vivo evidence available in the published literature (Huncharek, 1986; Mossman and Gee, 1989). Asbestos is known to induce peritoneal (and pleural) mesotheliomas among occupationally and environmentally exposed cohorts and some evidence exists suggesting that asbestos can also cause ovarian neoplasms in humans (Acheson *et al.*, 1982).

Although in the experimental setting translocation of talc particles to the human ovary can occur with deliberate or inadvertent manipulations of patients in the supine position (Wehner, 1998), it is unknown whether cosmetic use of talc in the perineal area can routinely penetrate the female reproductive tract and reach the ovary against physiological forces working in the opposite direction. The existing epidemiological literature focuses primarily on external perineal exposure. It appears, however, that the talc–ovarian cancer hypothesis could be tested with better precision and validity if the exposure to the suspected carcinogen was directly to the reproductive tract. A common route for such an exposure is via talc dusting of contraceptive diaphragms, a well documented practice in the relevant epidemiological literature. Intuitively, the possible association of ovarian cancer with talc-dusted diaphragms appears to provide a more rational test of this cause–effect hypothesis. Therefore, the present report describes the results of a meta-analysis pooling data from nine epidemiological studies examining the risk of ovarian cancer associated with the use of cosmetic talc on diaphragms.

## Methods

The methods employed in the design and execution of this analysis have been previously described (Greenland, 1986; Cooper and Hedges, 1994). A study protocol was prospectively developed outlining the purpose and methods; that is, a meta-analysis examining the risk of developing ovarian cancer associated with use of talc-dusted contraceptive diaphragms. Eligibility criteria for study inclusion were determined prospectively as were the specific data elements to be extracted from each published report. The study protocol included details of the planned statistical analysis.

We used a data extraction form designed for recording relevant information from each selected report. Two researchers performed data extraction with differences in extraction forms resolved by consensus. Other data collected but not included in the eligibility criteria were the number of patients in each study, study odds ratios or relative risks, 95% confidence intervals and type of statistical adjustments made, if any, by individual study authors.

### Literature search

Information retrieval was performed by previously described methods (Cooper and Hedges, 1994). We conducted a MEDLARS search of the literature published between January 1966 and March 2005, as well as a review of Cancer Lit and the CD-ROM version of Current Contents. The search criteria included all languages. The search terms used were talc exposure and ovarian neoplasms. If a series of articles was published, all data were retrieved from the most recent article. The literature search also included hand searches of bibliographies of published reports, review articles and textbooks.

The initial citations (in the form of abstracts) from this literature search were screened by a physician investigator to exclude those that did not meet inclusion criteria. Reasons for rejection included study designs other than case–control, cohort or randomized controlled trials; animal or in-vivo studies; abstracts; review articles and non-peer reviewed articles. Eligibility criteria included, observational studies or clinical trials enrolling patients with histologically proven ovarian tumors of all histologies, studies enrolling only adult patients (i.e. 18 years or older), availability of data documenting type of talc exposure, in this instance, dusting of diaphragms, and availability of odds ratios or relative risks with 95% confidence intervals for each report or availability of raw data to calculate these parameters.

### Statistical analysis

We performed data analysis according to meta-analytic procedures described by Greenland (1986). This method of meta-analysis is a general variance-based method employing confidence intervals. As the variance estimates are based on the adjusted measures of effect, the confidence interval methods do not ignore confounding and are the preferred methodology for pooling observational studies.

For each included study, we derived odds ratios reflecting the risk of developing ovarian cancer associated with the practice of dusting contraceptive diaphragms with cosmetic talc and determined the natural logarithm of the estimated relative risk for each data set followed by calculation of an estimate of the variance. We used the estimate of the 95% confidence interval from each study to calculate the variance of each study's measure of effect.

We calculated a weight for each included analysis as 1/variance followed by a summation of the weights. We then determined the product of the study weight and the natural logarithm of the estimated relative risk and performed a summation of these products. Finally, a summary relative risk and 95% confidence interval were determined.

Before the estimation of a summary relative risk, a statistical test for homogeneity was performed ($Q$). This procedure tests the hypothesis that the effect sizes are equal in all of the included studies (Greenland, 1986). If $Q$ exceeds the upper tail critical value of $\chi^2$ ($P < 0.10$) at $k - 1$ d.f. (where $k$ equals the number of studies analyzed or the number of comparisons made), the observed variance in study effect sizes is significantly greater than what would be expected by chance if all studies shared a common population effect size. If the hypothesis that the studies are homogeneous is rejected, the studies do not measure an effect of the same size. In this instance, calculation of a pooled estimate of effect (i.e. relative risks) may be of questionable validity. Possible explanations for the observed heterogeneity must be sought to provide the most rational interpretation of the summary relative risk. Sensitivity analyses and or further stratified analyses are then performed based on the magnitude of $Q$.

## Results

The literature search yielded 17 studies that appeared to meet protocol specifications and full papers were obtained for review (Hartge et al., 1983; Richardson et al., 1985; Whittemore et al., 1988; Booth et al., 1989; Harlow and Weiss, 1989; Chen et al., 1992; Harlow et al., 1992; Rosenblatt et al., 1992; Tzonou et al., 1993; Purdie et al., 1995; Cook et al., 1997; Goddard et al., 1998; Cramer et al., 1999; Gertig et al., 2000; Ness et al., 2000). Upon further review, nine of these met the specified inclusion criteria. Table 1 provides an overview of the nine reports included in the meta-analysis (Hartge et al., 1983; Richardson et al., 1985; Whittemore et al., 1988; Booth et al., 1989; Harlow and Weiss, 1989; Harlow et al., 1992; Rosenblatt et al., 1992; Cook et al., 1997; Ness et al., 2000). A total of 2281 ovarian cancer cases and 3608 controls were enrolled in nine case–control studies. Table 1 also specifies which reports were hospital based versus those that were population based. Only Cook et al. (1997) and Harlow and Weiss (1989) used both population-derived cases and controls. All of the other studies listed as 'population based' used hospital-derived cases. The individual study odds ratios listed in Table 1 reflect the odds of exposure in cases versus controls, with an odds ratio greater than one suggesting a positive association, that is, an increased risk of ovarian cancer among women using talc-dusted diaphragms.

Before combining all studies to derive a summary estimate of effect (i.e. a summary relative risk) a statistical test for heterogeneity was performed ($Q$). This gave a value of $Q$ equal to 10.75. With eight degrees of freedom, the $P$ value associated with a $Q$ of this size is 0.22. This indicates that the studies are homogeneous; that is, the studies are measuring an effect of similar

**Table 1  Overview of included studies**

| Study (year) | Number of cases/controls | Percentage eligible cases included | Adjusted OR | 95% CI | Adjustments to OR | Epithelial tumors only | Borderline tumors incl. | Stratification by histology | H/P |
|---|---|---|---|---|---|---|---|---|---|
| Booth et al. (1989) | 235/451 | 84 | 0.75 | 0.85–2.02 | Age, SES | Y | Y | N | H |
| Cook et al. (1997) | 313/422 | 64 | 0.80 | 0.40–1.40 | Age | Y | N+ | Y | P |
| Cramer et al. (1982) | 215/215 | 72 | 1.56 | 0.62–3.88 | Parity, menstrual status | Y | Y | Y | P |
| Harlow et al. (1992) | 235/239 | 59 | 1.20 | 0.60–2.40 | Parity, education, marital status, religion, use of sanitary napkins, douching, age, weight | Y | Y | Y | P |
| Harlow and Weiss, 1989 | 116/158 | 68 | 0.50 | 0.20–1.30 | Age, parity, use of oral contraceptives | N/A | All | N/A | P |
| Hartge et al. (1983) | 135/171 | 69 | 0.80 | 0.40–1.40 | Age, race, hospital | Y | Unknown | N | H |
| Ness et al. (2000) | 767/1367 | 61 | 0.60 | 0.30–1.20 | Age, gravity, race family HX ovarian cancer, oral contraceptive use, tubal ligation, hysterectomy, breast feeding | Y | Y | N | P |
| Rosenblatt et al. (1992) | 77/46 | 55 | 3.0 | 0.80–10.8 | Obesity, SES, religion, number of live births, OC use | Y | Unknown | N | H |
| Whittemore et al. (1988) | 188/539 | NG | 1.5 | 0.63–3.58 | Parity, use of oral contraceptives | Y | Unknown | N | H |

SES, socio-economic status; OR, odds ratio; CI, confidence interval; H/P, hospital based/population based; N+, separate analyses done for borderline versus invasive tumors.

magnitudes. Given the lack of statistical heterogeneity, the data were pooled for calculation of a summary relative risk.

Table 1 shows that adjusted odds ratios ranged from 0.60 (Booth *et al.*, 1989) to 3.0 (Rosenblatt *et al.*, 1992), with adjustment parameters specified along with 95% confidence intervals. Of note, none of the reports showed a statistically significant odds ratio. Initial pooling of data from all nine reports yielded a summary relative risk of 1.03 with a 95% confidence interval of 0.80–1.33, a non-statistically significant result suggesting no association between talc/diaphragm use and ovarian cancer risk (see Fig. 1).

Upon closer scrutiny of the available data, further sensitivity analyses were performed as described below. The data provided by Booth *et al.* (1989) did not explicitly provide data on talc use via contraceptive diaphragms and such use could only be assumed. As the data were questionable in this respect they were dropped from the analysis and a summary relative risk was recalculated. The resultant relative risks was 1.12 with a 95% confidence interval of 0.84–1.48. Therefore, the results remained statistically non-significant despite removal of these data from the summary estimate of effect.

The report by Harlow *et al.* (1992) also represents a potential problem for statistical pooling as the cases in this instance were all patients with 'borderline ovarian tumors'. The exact nature of borderline ovarian tumors in terms of a relationship with their invasive counterparts remains unclear, with some data suggesting differences in epidemiology and etiology (Riman *et al.*, 2001). Whether borderline tumors are precursors of invasive cancers or a separate disease entity is a matter of debate. We therefore recalculated a summary relative risk without inclusion of data from the study by Ness *et al.* (2000). This gave a

relative risk of 1.09 with a 95% confidence interval of (0.84–1.41), a non-statistically significant result.

All studies except that of Hartge *et al.* (1983) are full research reports with the study by Ness *et al.* (2000) published as a 'Letter to the editor'. Publication in this format is potentially problematic owing to issues related to the 'quality' of the presented data. Letters to the editor normally do not undergo the same type of editorial scrutiny as full research papers. In addition, by their nature, letters are brief notes with limited details presented, precluding rigorous evaluation of methods, results and associated conclusions. In order to address these issues, we dropped the study by Hartge *et al.* from the pooled analysis and, again, recalculated a summary relative risk. This gave a relative risk of 1.07 with a 95% confidence interval of 0.82–1.40. Again, this represents a non-significant finding.

In a prior meta-analysis (Huncharek *et al.*, 2003), we demonstrated a possible bias among studies examining the perineal talc use/ovarian cancer association based on the source of cases. That is, our study suggested that population-based studies may spuriously show a causal association secondary to exposure misclassification to a 'treatment effect' among population-derived cases. Some patients with ovarian cancer will undergo treatment with radiation, chemotherapy and/or surgery. Side effects from treatment may prompt talc use among some of these individuals. Patients may not always make the distinction between pre-diagnosis and post-treatment use. Exposure misclassification among 'prevalent' cases may cause a spurious finding of an association when none, in fact, exists. We therefore recalculated the summary relative risk excluding the studies by Cook *et al.* (1997) and Harlow and Weiss (1989) as these were the only two reports that utilized population-derived cases and controls. The resultant relative risk was 1.15 with a non-statistically significant odds ratio of 0.87–1.53.

Furthermore, this suggests no association between talc use and increased ovarian cancer risk. In fact, if data from the studies by Cook *et al.* (1997) and Harlow and Weiss (1989) are statistically pooled, the summary relative risk is 0.67 with a non-significant confidence interval (i.e. 0.34–1.35). The fact that the population-based relative risk is in the opposite direction (i.e. favoring a protective effect for talc) to that shown in the other case–control studies, further supports the existence of bias in these analyses.

Another methodological consideration is the fact that the definitions of the control groups used across all nine studies are not completely comparable. Some reports defined controls as 'never having used talc' (e.g. Ness *et al.*, 2000), while others used controls defined as not

**Fig. 1**



Forest plot of summary relative risk derived by pooling all available studies using adjusted odds ratios (OR).

having used talc on diaphragms (e.g. Cook *et al.*, 1997). We therefore calculated crude odds ratios and 95% confidence intervals using data supplied in the available studies and recalculated a summary relative risk to ensure that the analysis using adjusted odds ratio was not spurious (Table 2). The resultant relative risk was 0.86 (0.59–1.40) (see Fig. 2), a non-statistically significant result suggesting no association between talc use on diaphragms and increased ovarian cancer risk (see Fig. 2). Of note, the test for heterogeneity for this latter analysis gave a value for $Q$ of 7.20 with a $P$ value of 0.52.

## Discussion

Talc is an important industrial mineral for a number of reasons including its resistance to heat, electricity and acids and its relatively low price. It is used in many commercial applications because of its lamellar platy nature, softness, whiteness, chemical inertness, high melting point and hydrophobic features, among others. For instance, talc is used in the plastic industry owing to its inertness, superior electrical and thermal resistance and its ability to improve the quality of plastic surfaces. It also finds application in the paint industry to increase the smoothness of paint products and in paper manufacturing to reduce the usage of expensive whitening agents because of its high brightness.

Mineral talc is a magnesium silicate hydroxide belonging to the mineral class, silicate and subclass phyllosilicate. It belongs to the clay mineral group, an important subgroup within the phyllosilicates that contain large percentages of water trapped between the silicate sheets. Clay minerals are divided into four major groups: the kaolinite group, the montmorillonite/smectite group, the illite group and the chlorite group. Talc is a member of the montmorillon/smectite group along with pyrophyllite, vermiculite, sauconite, saponite and nontronite.

Talc also forms pseudomorphs, that is false shapes, of other minerals, replacing them on an atom by atom basis. For instance, talc forms pseudomorphs of quartz, pyroxene, olivine and amphiboles. In nature, it can also be found in association with a number of other minerals, such as serpentine, quartz, olivine and biotite.

In 1982, Cramer *et al.* (1982) published a case–control study suggesting an association between cosmetic talc use on the perineum and increased ovarian cancer risk. Women dusting the perineum with talc or dusting sanitary napkins showed a near doubling of ovarian cancer risk. Unfortunately, in addition to a number of methodological limitations plaguing this report (e.g. only 45% of eligible controls participating), it is important to point out the flawed premise on which it is based. Cramer *et al.* (1982) cite the 'chemical relationship between talc and asbestos' as a major reason for assuming that talc may also be a human carcinogen and that '…the mineral talc is a specific hydrous magnesium silicate chemically related to several asbestos group minerals and occurring in nature with them'.

The above-cited justification for the Cramer *et al.* (1982) study and subsequent work examining a possible cosmetic talc/ovarian cancer link is misguided for a number of reasons. Despite the fact that talc and various forms of asbestos are silicates, they are structurally distinct and belong to different mineral groups and subgroups. That is, amphibole minerals (e.g. tremolite) are inosilicates while talc is a member of the silicate subclass phyllosilicate and the group, clay or montmorillonite/smectite. While serpentines, including serpentine asbestos, are also phyllosilicates, serpentine minerals belong to the kalolinite–serpentine group. The asbestos varieties of serpentine are structurally different from other members of the serpentines in that their brucite layers and silicate layers bend into tubes that produce fibers. Non-fibrous serpentine does not have carcinogenic properties and it is clear that the physical structure of serpentine asbestos is responsible for its disease-causing

**Table 2   Crude odds ratios and 95% confidence intervals for included studies**

| Study (year) | Crude OR | 95% CI | Variance | Weight |
|---|---|---|---|---|
| Booth *et al.* (1989) | 0.75 | 0.33–2.02 | 0.175 | 5.70 |
| Cook *et al.* (1997) | 0.96 | 0.52–1.76 | 0.097 | 10.2 |
| Cramer *et al.* (1982) | 1.18 | 0.59–2.35 | 0.125 | 7.99 |
| Harlow *et al.* (1992) | 0.97 | 0.49–1.92 | 0.121 | 8.24 |
| Harlow and Weiss, 1989 | 0.51 | 0.22–1.13 | 0.184 | 5.43 |
| Hartge *et al.* (1983) | 0.72 | 0.40–1.30 | 0.090 | 11.1 |
| Ness *et al.* (2000) | 0.53 | 0.25–1.13 | 0.147 | 6.80 |
| Rosenblatt *et al.* (1992) | 1.82 | 0.55–6.34 | 0.373 | 2.68 |
| Whittemore *et al.* (1988) | 1.38 | 0.57–3.28 | 0.204 | 4.91 |

OR, odds ratio; CI, confidence interval.

**Fig. 2**



Forest plot of summary relative risk derived by pooling all available studies using crude odds ratios (OR).

potential, not its atomic constituents. It simply does not follow, therefore, that one should assume that talc is carcinogenic simply because it is a silicate and a member of the phyllosilicate subgroup. Structure dictates toxicity/carcinogenicity, not chemical composition.

It is true that in nature, mineral talc can be found in association with both serpentine and amphibole minerals, including the asbestos varieties. It is crucial to understand that the carcinogenic potential of asbestos is well known and abundantly documented in the medical and epidemiological literature (Huncharek, 1986; Mossman and Gee, 1989). Cramer *et al.*'s argument suggesting that pure talc is carcinogenic is based solely on 'guilt by association' rather than on scientific fact. If one is exposed to a mixture of talc and asbestos, it is reasonable to expect a carcinogenic effect as it contains a known carcinogen. To then suggest that talc is also carcinogenic simply owing to the fact that it is sometimes found in association with various asbestos minerals in nature is not logical. This reasoning ignores a large body of data regarding the mineralogy of silicates and fails to acknowledge the lack of supporting biological or in-vitro data documenting any carcinogenic potential of pure talc (i.e. uncontaminated by asbestos). A commercial product containing asbestos-contaminated talc could certainly pose a health risk and although prior to the mid-1970s some consumer talc products did, in fact, contain such contamination, the carcinogenic entity is asbestos, not talc (Rohl *et al.*, 1976). It is important to note that since that time, talc product manufacturers voluntarily ensured that such products are asbestos free. Despite this fact, even some recent studies looking at the perineal talc dusting/ovarian cancer risk connection show a weak association (e.g. Mills *et al.*, 2004), further suggesting a spurious finding.

Other evidence that indicates that talc and asbestos have dissimilar biological properties is the fact that talc has been used for decades as a sclerosing agent for both benign and malignant pleural effusions (Viskum *et al.*, 1989). Long-term follow-up studies of these patients have not shown even a single case of lung cancer or mesothelioma resulting from introduction of talc to the pleural cavity (Viskum *et al.*, 1989; Shaw and Agarwal, 2004). Epidemiological studies of talc miners and millers also fail to demonstrate an increased cancer risk (Rubino *et al.*, 1976; Gamble, 1993). In-vivo implantation and injection using asbestos of various types, in contrast, unequivocally induce tumors in experimental animals (Huncharek, 1986).

Despite the above-noted problems, the idea that cosmetic talc poses a possible ovarian cancer risk persists. As reviewed in the present paper and elsewhere (Richardson *et al.*, 1985; Tortolero-Luna and Mitchell,

1995) numerous investigators have examined this possible relationship in a variety of case–control studies and at least one cohort study (e.g. Gertig *et al.*, 2000). Most of these categorized talc use as 'ever versus never' used while others further stratified by particular types of use, for example, perineal dusting, sanitary napkin dusting, condoms, etc. Results differ across studies, with some showing no association (Rosenblatt *et al.*, 1992) while others suggests a 'weak effect' (Purdie *et al.*, 1995), that is odds ratios below 1.5.

In addition to the obvious problems with the premise put forth by Cramer *et al.* (1982) and others, validity of the weak effect shown in a number of other epidemiological studies also remains questionable. The major weaknesses of the existing database include (Boger-Meigiddo and Weiss, 2005) the relatively small sample size of most reports, which limits the statistical power to detect an effect (Richardson *et al.*, 1985), the lack of consistent positive association across studies (Baker and Piver, 1994), the absence of a demonstrable dose–response relationship (Daly and Obrams, 1998), the lack of supporting evidence of talc carcinogenicity from animal or in-vitro analyses (Tortolero-Luna and Mitchell, 1995) and the possible presence of uncontrolled confounding producing a spurious positive association. In fact, some of the available observational studies show an inverse dose–response (Ness *et al.*, 2000) that weighs against a causal association. In addition, no plausible biological mechanism capable of explaining how talc could induce ovarian malignancies exists.

In a study, Heller *et al.* (1996) examined talc particle counts in ovarian specimens from 24 women undergoing incidental oophorectomy and compared these counts with reported frequency and duration of talc use. The study sought to examine the hypothesis of a dose-related risk of epithelial ovarian cancer with perineal talc exposure. Women were considered 'exposed' if they reported talc application to undergarments or directly to the perineum. Talc was detected in all ovaries by either polarized light or electron microscopy. No relationship was found between cosmetic talc burden in healthy ovarian tissue and lifelong perineal talc dusting determined by either microscopic methods. This study raises further questions regarding whether reported associations between perineal talc exposure and ovarian tumors in observational studies reflects a carcinogenic action of talc. The validity of these epidemiologic associations has also been questioned because it is unknown whether talc dust in the perineal area can actually penetrate the female reproductive tract and then translocate to the ovaries against physiological forces working in the opposite direction. The work of Heller *et al.* clearly brings this into question.

Although the epidemiological literature focuses primarily on external perineal exposure to talc, a more valid

assessment of the 'talc hypothesis' would appear to be provided by examining the ovarian cancer risk associated with talc dusting of diaphragms. This particular use of talc results in direct female reproductive tract exposure. Although data on the use of talc-dusted diaphragms have been reported in some epidemiological studies, this literature fails to garner the attention devoted to perineal dusting and no systematic evaluation of this particular literature is available. This probably reflects the fact that perineal dusting is a more common practice than dusting contraceptive diaphragms. Nonetheless, exposure via this latter route is, intuitively, a better 'model' for testing whether talc represents a risk factor for ovarian cancer as the exposure is directly to the female genital tract. Consequently, we performed the above-detailed meta-analysis pooling all available published data on this topic.

Using accepted meta-analytic techniques our analysis was unable to demonstrate any increased risk of ovarian cancer associated with use of talc-dusted diaphragms. Despite performing a number of sensitivity analyses to test the robustness of our findings, the pooled data from over 5000 cases and controls failed to show a positive association. In some studies, the odds ratio was calculated based on an inappropriate control group; for example, individuals who reported no exposure to any talc. For these studies, the crude odds ratio was recalculated based on women who never used talc-dusted diaphragms as the reference group. This summary relative risk was also statistically non-significant.

In summary, our present report, along with our prior meta-analysis pooling data from studies examining the possible ovarian cancer risk associated with perineal talc dusting (Huncharek et al., 2003), does not provide evidence of a causal relationship. In the context of 'weak associations', many sources of bias and uncontrolled confounding can contribute to the finding of a spurious association. Recall bias in case–control studies, lack of a demonstrated dose–response in many published analyses, lack of a coherent biological mechanism for possible talc carcinogenicity and lack of supporting animal or in-vitro data demonstrating the carcinogenic potential of talc all argue against a causal relationship. These limitations and inconsistencies have also been discussed in detail elsewhere (Wehner, 1994; Muscat and Barish, 1998). As ovarian cancer remains a major cause of cancer-related morbidity and mortality in the United States, further work is needed to clearly define modifiable risk factors in an attempt to improve disease prevention.

## Acknowledgements
Funding for this work was provided by a grant from Luzenac American Inc., and Johnson and Johnson Consumer and Personal Products Worldwide.

## References
Acheson ED, Gardner MJ, Pippard EC, Grime LP (1982). Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40 year follow-up. Br J Ind Med 39:344–348.
Baker TR, Piver MS (1994). Etiology, biology and epidemiology of ovarian cancer. Semin Surg Oncol 10:242–248.
Boger-Meigiddo I, Weiss NS (2005). Histologic subtypes and laterality of primary epithelial ovarian tumors. Gynecol Oncol 97:80–83.
Booth M, Beral V, Smith P (1989). Risk factors for ovarian cancer: a case–control study. Br J Cancer 60:592–598.
Chang S, Risch HA (1997). Perineal talc exposure and risk of ovarian carcinoma. Cancer 79:2396–2401.
Chen Y, Wu PC, Lang JH, Ge WJ, Hartge P, Brinton LA (1992). Risk factors for epithelial ovarian cancer in Beijing, China. Int J Epidemiol 21:23–29.
Cook LS, Kamb ML, Weiss NS (1997). Perineal powder exposure and the risk of ovarian cancer. Am J Epidemiol 145:459–465.
Cooper H, Hedges LV (1994). The handbook of research synthesis. New York: Russell Sage Foundation. pp. 286–298.
Cramer DW, Welch WR, Scully RE, Wojciechowski CA (1982). Ovarian cancer and talc: a case–control study. Cancer 50:372–376.
Cramer DW, Liberman RF, Titus-Ernstoff L, Welch WR, Greenberg ER, Baron JA, Harlow BL (1999). Genital talc exposure and risk of ovarian cancer. Int J Cancer 81:351–356.
Daly M, Obrams GI (1998). Epidemiology and risk assessment for ovarian cancer. Semin Oncol 25:255–264.
Gamble JF (1993). A nested case–control study of lung cancer among New York talc workers. Int Arch Occup Environ Health 64:449–456.
Gertig DM, Hunter DJ, Cramer DW, Colditz GA, Speizer FE, Willett WC, Hankinson SE (2000). Prospective study of talc use and ovarian cancer. J Natl Cancer Inst 92:249–252.
Goddard B, Foulkes WD, Provencher D, Brunet JS, Tonin PN, Mes-Masson AM, et al. (1998). Risk factors for familial and sporadic ovarian cancer among French Canadians: a case–control study. Am J Obstet Gynecol 179:403–410.
Greenland S (1986). Quantitative methods in the review of epidemiological literature. Epidemiol Rev 9:1–30.
Harlow BL, Weiss NL (1989). A case–control study of borderline ovarian tumors: the influence of perineal exposure to talc. Am J Epid 130:390–394.
Harlow BL, Cramer DW, Bell DA, Welch WR (1992). Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol 80:19–26.
Hartge P, Hoover R, Lesher LP, McGowan L (1983). Talc and ovarian cancer (letter). JAMA 250:1844.
Heller DS, Westhoff C, Gordon RE, Norman K (1996). The relationship between perineal cosmetic talc usage and ovarian talc particle burden. Am J Obstet Gynecol 174:1507–1510.
Huncharek M (1986). The biomedical and epidemiological characteristics of asbestos related diseases: a review. Yale J Biol Med 59:435–451.
Huncharek M, Geschwind JF, Kupelnick B (2003). Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies. Anticancer Res 23:1955–1960.
Ioka A, Tsukuma H, Ajiki W, Oshima A (2003). Ovarian cancer incidence and survival by histologic type in Osaka, Japan. Cancer Sci 94:292–296.
Mills PK, Riordan DG, Cress RD, Young HA (2004). Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. Int J Cancer 112:458–464.
Mossman BT, Gee JBL (1989). Asbestos related diseases. N Engl J Med 320:1721–1730.
Muscat J, Barish M (1998). Epidemiology of talc exposure and ovarian cancer: a critical assessment. Comments Toxicol 6:327–335.
Ness RB, Grisso JA, Cottreau C, Klapper J, Vergona R, Wheeler JE, et al. (2000). Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. Epidemiology 11:111–117.
Purdie P, Green A, Bain C, Siskind V, Ward B, Hacker N, et al. (1995). Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case–control study. Int J Cancer 62:678–684.
Richardson GS, Scully RE, Nirui N, Nelson JH (1985). Common epithelial cancer of the ovary. N Engl J Med 312:415–424.
Riman T, Dickman PW, Nilsson S, Correia N, Nordlinder H, Magnusson CM, Persson IR (2001). Risk factors for epithelial borderline ovarian tumors: results of a Swedish case–control study. Gynecol Oncol 83:575–585.
Rohl AN, Langer AM, Selikoff IJ (1976). Consumer talcums and powders: mineral and chemical characteristics. J Toxicol Environ Health 2:255–284.
Rosenblatt KA, Szklo M, Rosenshein NB (1992). Mineral fiber exposure and the development of ovarian cancer. Gynecol Oncol 45:20–25.
Rubino GF, Scansetti G, Piolatto G, Romano CA (1976). Mortality study of talc miners and millers. J Occup Med 18:187–193.

Shaw P, Agarwal R (2004). Pleurodesis for malignant pleural effusions. *Cochrane Database Syst Rev* CD002916.

Tortolero-Luna G, Mitchell MF (1995). The epidemiology of ovarian cancer. *J Cell Biochem (Suppl)* **23**:200–207.

Tzonou A, Polychronopoulou A, Hsieh CC, Rebalakos A, Karakatsani A, Trichopoulos D (1993). Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. *Int J Cancer* **55**:408–410.

Viskum K, Lange P, Mortensen J (1989). Long term sequelae after talc pleurodesis for spontaneous pneumothorax. *Pneumologie* **43**:105–106.

Wehner AP (1994). Biological effects of cosmetic talc. *Food Chem Toxicol* **32**:1173–1184.

Wehner A (1998). Is cosmetic talc safe? *Comments Toxicol* **6**:337–366.

Whittemore AS, Wu ML, Paffenbarger RS, Sarles DL, Kampert JB, Grosser S, *et al.* (1988). Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol and coffee. *Am J Epidemiol* **128**:1228–1240.

Wong C, Hempling RE, Piver MS, Natarajan N, Mettlin CJ (1999). Perineal talc exposure and subsequent epithelial ovarian cancer: a case–control study. *Obstet Gynecol* **93**:372–376.

# Exhibit 160

WORLD HEALTH ORGANIZATION

INTERNATIONAL AGENCY FOR RESEARCH ON CANCER

# IARC MONOGRAPHS

## ON THE

# EVALUATION OF THE CARCINOGENIC RISKS TO HUMANS

## Overall Evaluations of Carcinogenicity: An Updating of *IARC Monographs* Volumes 1 to 42

*SUPPLEMENT 7*

LYON, FRANCE

1987

[50]Katsnelson, B.A., Neizvestnova, Y.M. & Blokhin, V.A. (1986) Stomach carcinogenesis induction by chronic treatment with arsenic (Russ.). *Vopr. Onkol.*, *32*, 68-73

[51]Pershagen, G. & Björklund, N.-E. (1985) On the pulmonary tumorigenicity of arsenic trisulfide and calcium arsenate in hamsters. *Cancer Lett.*, *27*, 99-104

[52]Shirachi, D.Y., Johansen, M.G., McGowan, J.P. & Tu, S.-H. (1983) Tumorigenic effect of sodium arsenite in rat kidney. *Proc. West. pharmacol. Soc.*, *26*, 413-415

[53]*IARC Monographs, Suppl. 6*, 71-76, 1987

# ASBESTOS* (Group 1)

## A. Evidence for carcinogenicity to humans (*sufficient*)

Numerous reports from several countries have described cases or series of pleural and peritoneal mesotheliomas in relation to occupational exposure to various types and mixtures of asbestos (including talc containing asbestos), although occupational exposures have not been identified in all cases[1-21]. Mesotheliomas of the tunica vaginalis testis and of the pericardium have been reported in persons occupationally exposed to asbestos[22-24].

Environmental exposure either in the houses of asbestos workers or in the neighbourhood of asbestos mines or factories has been noted in some of the cases[1,2,4-6,9,11,25,26]. It has been estimated that a third of the mesotheliomas occurring in the USA may be due to nonoccupational exposure[27]. In a study from Israel, the incidence of mesothelioma was found to be higher among those born in the USA or in Europe relative to those born in Israel[9].

In some of these case reports and in other studies, asbestos fibres were identified in the lung[5,6,11,28-32]. Amphibole fibres usually predominated, but in a few cases mainly or only chrysotile fibres were found[6,28].

The long latency required for mesothelioma to develop after asbestos exposure has been documented in a number of publications[11,13,26,28,33-37]. An increasing proportion of cases has been seen with increasing duration of exposure[36].

A number of epidemiological studies of respiratory cancer and mesothelioma have been reported in relation to exposure to unspecified or complex mixtures of asbestos in shipyard work[38-45]. The risk ratio for lung cancer has usually been moderately increased, both in these studies and in studies on various other occupational groups with similarly job-related but unspecified or complex asbestos exposures[35,46-54]. Risk ratios of about 2-5 have been reported in some studies, but the ratio was considerably higher in one rather small study[55] and did not exceed unity in another[42]. In one study, individuals suffering from asbestosis had a considerably greater risk for lung cancer, with a risk ratio of 9.0[56]. In some of the studies referred to, a number of mesotheliomas were also observed[41,42,44,47,51,53,55]. Abdominal mesotheliomas have sometimes been mistaken for pancreatic cancer[57]. Mesothelioma cases have been observed to have a relatively lower fibre content in the lungs than lung cancer cases[32].

---

*Actinolite, amosite, anthophyllite, chrysotile, crocidolite, tremolite

Laryngeal cancer has been considered in two case-control studies, resulting in risk ratios of 2.4 and 2.3 that relate to shipyard work and unspecified exposure, respectively[40,58]. A cohort study of insulation workers showed a relative risk of 1.9, based on nine cases[57]. A case series indicated a high frequency of exposure to asbestos, especially in low-grade smokers[59]. A risk ratio of 3.2 for laryngeal cancer was reported among chrysotile miners in an area with generally high incidence[60], but no increased risk was seen in a cohort of workers with exposure to crocidolite[61]. Two correlation studies have also indicated a relationship between laryngeal cancer and exposure to asbestos[39,62].

Mesotheliomas related to shipyard work and other exposures, including household contact with asbestos workers, have also been subject to epidemiological studies[36,63-67], resulting in risk ratios of about 3-15 in comparison with background rates not clearly referable to asbestos exposure.

Some studies have specifically considered environmental exposures with reference to mesotheliomas[66,67]. Three correlation studies and one case-control study considering exposure to piped drinking-water[68-71] did not show consistently increased risks for any type of cancer, whereas another study[72] considering chrysotile contamination mainly from natural sources gave some indication of an increase in the incidence of peritoneal and stomach cancers in persons of each sex, although no other cancer site was consistent in this respect.

Exposure to crocidolite has been studied with regard to risk of lung cancer[61,73-76], and risk ratios of about 2-3 have been reported. Three lung cancers and two mesotheliomas occurred in 20 individuals after one year of high exposure to crocidolite; at least 17 of the cases had asbestos-induced lung changes on X-ray films[77].

One study[78] of histological types of lung cancers showed that among persons exposed to crocidolite 45.7% of cases were squamous-cell carcinomas, as compared to 35.2% among unexposed persons. In the context of unspecified and complex exposures, small-cell carcinoma was found to be relatively more prevalent than other forms[50].

Exposure to chrysotile was found in some studies to result in virtually no increase in risk ratio[60,79-81], or a slightly elevated relative risk of lung cancer[82-86]. Somewhat higher risk ratios, up to 2.5, 3.5 and 2, respectively, were obtained in one study of chrysotile miners[87] and in two independent studies from one asbestos [chrysotile] textile plant[88,89], the latter being the more comprehensive. With regard to mesotheliomas, one study suggested a particularly high risk of combined exposure to chrysotile and amphiboles (risk ratio, 61), thus almost multiplying the risk ratios (6 and 12, respectively) of exposures to chrysotile and to amphiboles alone[90]. Another study showed no mesothelioma among a large worker population with exposure to chrysotile only[91].

A slight excess of lung cancer and some mesotheliomas appeared in some groups with mixed exposures involving amosite, chrysotile and crocidolite[92-94]. Exposure predominantly to amosite, but also to chrysotile, was reported to be the probable cause of at least four of five mesotheliomas (one peritoneal) observed in a UK insulation-board factory[95]. One cohort with exposure to cummingtonite-grunerite, which is closely related to amosite, had no clear excess of lung cancer, although one case of mesothelioma was observed[96].

Exposure to tremolite and actinolite has been the subject of a few studies in investigations of vermiculite mining and milling[97,98] and environmental exposure[99]. The studies of miners indicated a risk ratio for lung cancer of up to approximately six fold. Deaths from mesothelioma were found in the occupational studies, whereas the study of environmental exposure showed no increased risk, although pleural plaques were reported. Publication of one case report of a mesothelioma after environmental exposure suggests that tremolite was of etiological importance[31].

Cancers other than of the lung or mesothelioma have been considered in many studies[1,17,35,39,41-44,48,51,55,60-62,68-70,72-74,76,83,87,89,92,93,96,97,99-108]. Some indicated an approximately two-fold risk with regard to gastrointestinal cancer in connection with shipyard work[41,43], and some increased risk was also seen in association with exposure to both chrysotile and crocidolite[103], to crocidolite[61,74] or to chrysotile[87]. Cancer of the colon and rectum was associated with asbestos exposure during chrysotile production, with an approximately two-fold risk[87]; a similar excess was found for unspecified asbestos exposure[104]. Some excess of ovarian cancer has been reported in two studies[73,76] but not in another[92]; exposure to crocidolite was probably more predominant in the studies that showed excesses. Bile-duct cancer appeared in excess in one study based on record-linking[105], and large-cell lymphomas of the gastrointestinal tract and oral cavity appeared to be strongly related to asbestos exposure in one small study covering 28 cases and 28 controls, giving a risk ratio of 8; however, ten cases and one control also had a history of malaria[106]. An excess of lymphopoietic and haematopoietic malignancies has been reported in plumbers, pipe-fitters, sheet-metal workers and others with asbestos exposure[17,54,107,108].

The relationship between asbestos exposure and smoking indicates a synergistic effect of smoking with regard to lung cancer[1]. Further evaluations indicate that this synergistic effect is close to a multiplicative model[52,109]. As noted previously[1], the risk of mesothelioma appears to be independent of smoking[47,66], and a significantly decreasing trend in risk was observed with the amount smoked in one study[65].

The studies of the carcinogenic effect of asbestos exposure, including evidence reviewed earlier[1], show that occupational exposure to chrysotile, amosite and anthophyllite asbestos and to mixtures containing crocidolite results in an increased risk of lung cancer, as does exposure to minerals containing tremolite and actinolite and to tremolitic material mixed with anthophyllite and small amounts of chrysotile. Mesotheliomas have been observed after occupational exposure to crocidolite, amosite, tremolitic material and chrysotile asbestos. Gastrointestinal cancers occurred at an increased incidence in groups occupationally exposed to crocidolite, amosite, chrysotile or mixed fibres containing crocidolite, although not all studies are consistent in this respect. An excess of laryngeal cancer has also been observed in some groups of exposed workers. No clear excess of cancer has been associated with the presence of asbestos fibres in drinking-water. Mesotheliomas have occurred in individuals living in the neighbourhood of asbestos factories and mines and in people living with asbestos workers.

## B. Evidence for carcinogenicity to animals (*sufficient*)

Asbestos has been tested for carcinogenicity by inhalation in rats, by intrapleural administration in rats and hamsters, by intraperitoneal injection in mice, rats and hamsters and by oral administration in rats and hamsters. Chrysotile, crocidolite, amosite, anthophyllite and tremolite produced mesotheliomas and lung carcinomas in rats after inhalation[1,110,111] and mesotheliomas following intrapleural administration[1,112]. Chrysotile, crocidolite, amosite and anthophyllite induced mesotheliomas in hamsters following intrapleural administration[1]. Intraperitoneal administration of chrysotile, crocidolite and amosite induced peritoneal tumours, including mesotheliomas, in mice[1,113] and rats[1,111,114]. Given by the same route, crocidolite produced abdominal tumours in hamsters[115], and tremolite and actinolite produced abdominal tumours in rats[110,116-118]. A statistically significant increase in the incidence of malignant tumours was observed in rats given filter material containing chrysotile orally[1]. In more recent studies, tumour incidence was not increased by oral administration of amosite or tremolite in rats[119], of amosite in hamsters[120,121] or of chrysotile in hamsters[121]. In two studies in rats, oral administration of chrysotile produced a low incidence of benign adenomatous polyps of the large intestine in males (9/250 *versus* 3/254 pooled controls)[122] and of mesenteric haemangiomas (4/22 *versus* 0/47 controls)[123]. Synergistic effects were observed following intratracheal administration of chrysotile and benzo[*a*]pyrene to rats and hamsters[1] and of intratracheal administration of chrysotile and subcutaneous or oral administration of *N*-nitroso-diethylamine to hamsters[124].

## C. Other relevant data

Insulation workers exposed to asbestos 'displayed a marginal increase' in the incidence of sister chromatid exchanges in lymphocytes in one study[125].

Chrysotile did not induce micronuclei in bone-marrow cells of mice or chromosomal aberrations in bone-marrow cells of rhesus monkeys treated *in vivo*. In cultured human cells, conflicting results were reported for the induction of chromosomal aberrations and negative results for the induction of sister chromatid exchanges by chrysotile and crocidolite; amosite and crocidolite did not induce DNA strand breaks, and crocidolite was not mutagenic. Amosite, anthophyllite, chrysotile and crocidolite induced transformation of Syrian hamster embryo cells, chrysotile and crocidolite transformed BALB/c 3T3 mouse cells, and chrysotile transformed rat mesothelial cells. Neither amosite nor crocidolite transformed CH3 10T1/2 cells. In cultured rodent cells, amosite, anthophyllite, chrysotile and crocidolite induced chromosomal aberrations, and amosite, chrysotile and crocidolite induced sister chromatid exchanges; chrysotile and crocidolite induced aneuploidy and micronuclei. Chrysotile induced unscheduled DNA synthesis in rat hepatocytes. Amosite, chrysotile and crocidolite were inactive or weakly active in inducing mutation in rodent cells *in vitro*; none was mutagenic to bacteria[125].

# References

[1] *IARC Monographs, 14*, 1977

[2] Armstrong, B.K., Musk, A.W., Baker, J.E., Hunt, J.M., Newall, C.C., Henzell, H.R., Blunsdon, B.S., Clarke-Hundley, M.D., Woodward, S.D. & Hobbs, M.S.T. (1984) Epidemiology of malignant mesothelioma in Western Australia. *Med. J. Aust.*, *141*, 86-88

[3] Beck, B. & Irmscher, G. (1979) Extrathoracic mesotheliomas after inhalation of asbestos dust (Ger.). *Z. Erkrank. Atm.-Org.*, *152*, 282-293

[4] Biava, P.M., Fiorito, A., Canciani, L. & Bovenzi, M. (1983) Epidemiology of mesothelioma of the pleura in the province of Trieste: role of occupational exposure to asbestos (Ital.). *Med. Lav.*, *74*, 260-265

[5] Edge, J.R. & Choudhury, S.L. (1978) Malignant mesothelioma of the pleura in Barrow-in-Furness. *Thorax*, *33*, 26-30

[6] Emonot, A., Marquet, M., Baril, A., Berardj & Braillon (1979) Epidemiology of asbestos mesotheliomas in the region of St Etienne (Fr.). *Ann. Med. intern.*, *130*, 71-74

[7] Griffiths, M.H., Riddell, R.J. & Xipell, J.M. (1980) Malignant mesothelioma: a review of 35 cases with diagnosis and prognosis. *Pathology*, *12*, 591-603

[8] Kovarik, J.L. (1976) Primary pleural mesothelioma. *Cancer*, *38*, 1816-1825

[9] Lemesch, C., Steinitz, R. & Wassermann, M. (1976) Epidemiology of mesothelioma in Israel. *Environ. Res.*, *12*, 255-261

[10] McDonald, A.D. (1980) *Malignant mesothelioma in Quebec*. In: Wagner, J.C., ed., *Biological Effects of Mineral Fibres* (*IARC Scientific Publications No. 30*), Lyon, International Agency for Research on Cancer, pp. 673-680

[11] Mowé, G. & Gylseth, B. (1986) Occupational exposure and regional variation of malignant mesothelioma in Norway, 1970-79. *Am. J. ind. Med.*, *9*, 323-332

[12] Paur, R., Woitowitz, H.-J., Rödelsperger, K. & Jahn, H. (1985) Pleural mesothelioma after asbestos exposure in brake repair work in automobile repair workshop: case observations (Ger.). *Prax. klin. Pneumol.*, *39*, 362-366

[13] Sheers, G. & Coles, R.M. (1980) Mesothelioma risks in a naval dockyard. *Arch. environ. Health*, *35*, 276-282

[14] Vande Weyer, R., Groetenbriel, C., Lauwers, D. & Yernault, J.C. (1982) Evolution of deaths by bronchial carcinoma and pleural mesothelioma among two groups of Belgian workers who died between 1973 and 1981: the role of asbestosis and coalworkers' pneumoconiosis (Abstract No. 5). *Eur. J. respir. Dis.*, *63* (*Suppl. 125*), 10

[15] Xu, Z., Armstrong, B.K., Blundson, B.J., Rogers, J.M., Musk, A.W. & Shilkin, K.B. (1985) Trends in mortality from malignant mesothelioma of the pleura, and production and use of asbestos in Australia. *Med. J. Aust.*, *143*, 185-187

[16] Ben-Dror, G., Suprun, H. & Shkolnik, T. (1985) Peritoneal mesotheliomas and exposure to asbestos (Arabic). *Harefuah*, *108*, 435-437

[17] Cantor, K.P., Sontag, J.M. & Heid, M.F. (1986) Patterns of mortality among plumbers and pipefitters. *Am. J. ind. Med.*, *10*, 73-89

[18] Gardner, M.J., Jones, R.D., Pippard, E.C. & Saitoh, N. (1985) Mesothelioma of the peritoneum during 1967-82 in England and Wales. *Br. J. Cancer*, *51*, 121-126

[19] Mancuso, T.F. (1983) Mesothelioma among machinists in railroad and other industries. *Am. J. ind. Med., 4*, 501-513

[20] Newhouse, M.L., Oakes, D. & Woolley, A.J. (1985) Mortality of welders and other craftsmen at a shipyard in NE England. *Br. J. ind. Med., 42*, 406-410

[21] Sera, Y. & Kang, K.-Y. (1981) Asbestos and cancer in the Sennan district of Osaka. *Tohoku J. exp. Med., 133*, 313-320

[22] Fligiel, Z. & Kaneko, M. (1976) Malignant mesothelioma of the tunica vaginalis propria testis in a patient with asbestos exposure. *Cancer, 37*, 1478-1484

[23] Beck, B., Konetzke, G., Ludwig, V., Röthig, W. & Sturm, W. (1982) Malignant pericardial mesotheliomas and asbestos exposure: a case report. *Am. J. ind. Med., 3*, 149-159

[24] Kahn, E.I., Rohl, A., Barrett, E.W. & Suzuki, Y. (1980) Primary pericardial mesothelioma following exposure to asbestos. *Environ. Res., 23*, 270-281

[25] Arul, K.J. & Holt, P.F. (1977) Mesothelioma possibly due to environmental exposure to asbestos in childhood. *Int. Arch. occup. environ. Health, 40*, 141-143

[26] Bignon, J., Sébastien, P., di Menza, L., Nebut, M. & Payan, H. (1979) French registry of mesotheliomas 1965-1978 (Fr.). *Rev. fr. Mal. respir., 7*, 223-242

[27] Enterline, P.E. (1983) Cancer produced by nonoccupational asbestos exposure in the United States. *J. Air Pollut. Control Assoc., 33*, 318-322

[28] Greenberg, M. & Davies, T.A.L. (1974) Mesothelioma register 1967-68. *Br. J. ind. Med., 31*, 91-104

[29] Chen, W.-J. & Mottet, N.K. (1978) Malignant mesothelioma with minimal asbestos exposure. *Hum. Pathol., 9*, 253-258

[30] Gylseth, B., Mowé, G. & Wannag, A. (1983) Fibre type and concentration in the lungs of workers in an asbestos cement factory. *Br. J. ind. Med., 40*, 375-379

[31] Magee, F., Wright, J.L., Chan, N., Lawson, L. & Churg, A. (1986) Malignant mesothelioma caused by childhood exposure to long-fiber low aspect ratio tremolite. *Am. J. ind. Med., 9*, 529-533

[32] Wagner, J.C., Moncrieff, C.B., Coles, R., Griffiths, D.M. & Munday, D.E. (1986) Correlation between fibre content of the lungs and disease in naval dockyard workers. *Br. J. ind. Med., 43*, 391-395

[33] Browne, K. (1983) Asbestos-related mesothelioma: epidemiological evidence for asbestos as a promoter. *Arch. environ. Health, 38*, 261-266

[34] Churg, A., Warnock, M.L. & Bensch, K.G. (1978) Malignant mesothelioma arising after direct application of asbestos and fiber glass to the pericardium. *Am. Rev. respir. Dis., 118*, 419-424

[35] Beck, E.G. & Schmidt, P. (1985) Epidemiological investigations of deceased employees of the asbestos cement industry in the Federal Republic of Germany. *Zbl. Bakt. Hyg., I. Abt. Orig. B, 181*, 207-215

[36] Hughes, J.M., Hammad, Y.Y. & Weill, H. (1986) Mesothelioma risk in relation to duration and type of asbestos fiber exposure (Abstract). *Am. Rev. respir. Dis., 133 (Suppl. 4)*, A33

[37] Selikoff, I.J., Hammond, E.C. & Seidman, H. (1980) Latency of asbestos disease among insulation workers in the United States and Canada. *Cancer, 46*, 2736-2740

[38] Blot, W.J., Harrington, J.M., Toledo, A., Hoover, R., Heath, C.W., Jr & Fraumeni, J.F., Jr (1978) Lung cancer after employment in shipyards during World War II. *New Engl. J. Med., 299*, 620-624

[39]Blot, W.J., Stone, B.J., Fraumeni, J.F., Jr & Morris, L.E. (1979) Cancer mortality in US counties with shipyard industries during World War II. *Environ. Res., 18*, 281-290

[40]Blot, W.J., Morris, L.E., Stroube, R., Tagnon, I. & Fraumeni, J.F., Jr (1980) Lung and laryngeal cancers in relation to shipyard employment in coastal Virginia. *J. natl Cancer Inst., 65*, 571-575

[41]Kolonel, L.N., Yoshizawa, C.N., Hirohata, T. & Myers, B.C. (1985) Cancer occurrence in shipyard workers exposed to asbestos in Hawaii. *Cancer Res., 45*, 3924-3928

[42]Rossiter, C.E. & Coles, R.M. (1980) *HM Dockyard, Devonport: 1947 mortality study.* In: Wagner, J.C., ed., *Biological Effects of Mineral Fibres (IARC Scientific Publications No. 30)*, Lyon, International Agency for Research on Cancer, pp. 713-721

[43]Sandén, Å., Näslund, P.-E. & Järvholm, B. (1985) Mortality in lung and gastrointestinal cancer among shipyard workers. *Int. Arch. occup. environ. Health, 55*, 277-283

[44]Lumley, K.P.S. (1976) A proportional study of cancer registrations of dockyard workers. *Br. J. ind. Med., 33*, 108-114

[45]Nicholson, W.J., Lilis, R., Frank, A.L. & Selikoff, I.J. (1980) Lung cancer prevalence among shipyard workers. *Am. J. ind. Med., 1*, 191-203

[46]Alies-Patin, A.M. & Valleron, A.J. (1985) Mortality of workers in a French asbestos cement factory 1940-82. *Br. J. ind. Med., 42*, 219-225

[47]Berry, G., Newhouse, M.L. & Antonis, P. (1985) Combined effect of asbestos and smoking on mortality from lung cancer and mesothelioma in factory workers. *Br. J. ind. Med., 42*, 12-18

[48]Hodgson, J.T. & Jones, R.D. (1986) Mortality of asbestos workers in England and Wales. *Br. J. ind. Med., 43*, 158-164

[49]Coggon, D., Pannett, B. & Acheson, E.D. (1984) Use of job-exposure matrix in an occupational analysis of lung and bladder cancers on the basis of death certificates. *J. natl Cancer Inst., 72*, 61-65

[50]Kjuus, H., Skjaerven, R., Langård, S., Lien, J.T. & Aamodt, T. (1986) A case-referent study of lung cancer, occupational exposures and smoking. II. Role of asbestos exposure. *Scand. J. Work Environ. Health, 12*, 203-209

[51]Newhouse, M.L., Berry, G. & Wagner, J.C. (1985) Mortality of factory workers in East London 1933-80. *Br. J. ind. Med., 42*, 4-11

[52]Hilt, B., Langård, S., Andersen, A. & Rosenberg, J. (1985) Asbestos exposure, smoking habits, and cancer incidence among production and maintenance workers in an electrochemical plant. *Am. J. ind. Med., 8*, 565-577

[53]Woitowitz, H.-J., Lange, H.-J., Beierl, L., Rathgeb, M., Schmidt, K., Ulm, K., Giesen, T., Woitowitz, R.H., Pache, L. & Rödelsperger, K. (1986) Mortality rates in the Federal Republic of Germany following previous occupational exposure to asbestos dust. *Int. Arch. occup. environ. Health, 57*, 161-171

[54]Zoloth, S. & Michaels, D. (1985) Asbestos disease in sheet metal workers: the results of a proportional mortality analysis. *Am. J. ind. Med., 7*, 315-321

[55]Elmes, P.C. & Simpson, M.J.C. (1977) Insulation workers in Belfast. A further study of mortality due to asbestos exosure (1940-75). *Br. J. ind. Med., 34*, 174-180

[56]Huuskonen, M.S. (1980) Asbestos and cancer in Finland. *J. Toxicol. environ. Health, 6*, 1261-1265

[57]Selikoff, I.J. & Seidman, H. (1981) Cancer of the pancreas among asbestos insulation workers. *Cancer, 47 (Suppl.)*, 1469-1473

[58]Burch, J.D., Howe, G.R., Miller, A.B. & Semenciw, R. (1981) Tobacco, alcohol, asbestos, and nickel in the etiology of cancer of the larynx: a case-control study. *J. natl Cancer Inst.*, *67*, 1219-1224

[59]von Bittersohl, G. (1977) On the problem of asbestos-induced carcinoma of the larynx (Ger.). *Z. ges. Hyg.*, *23*, 27-30

[60]Rubino, G.F., Piolatto, G., Newhouse, M.L., Scansetti, G., Aresini, G.A. & Murray, R. (1979) Mortality of chrysotile asbestos workers at the Balangero mine, Northern Italy. *Br. J. ind. Med.*, *36*, 187-194

[61]Musk, A.W., de Klerk, N., Hobbs, M.S.T. & Armstrong, B.K. (1986) Mortality in crocidolite miners and millers from Wittenoom, Western Australia (Abstract). *Am. Rev. respir. Dis.*, *133* (*Suppl. 4*), A34

[62]Graham, S., Blanchet, M. & Rohrer, T. (1977) Cancer in asbestos-mining and other areas of Quebec. *J. natl Cancer Inst.*, *59*, 1139-1145

[63]Chiappino, G., Riboldi, L., Todaro, A. & Schulz, L. (1985) Survey of mesotheliomas in Lombardy in the period 1978-1982 (Ital.). *Med. Lav.*, *76*, 454-465

[64]Mowé, G., Gylseth, B., Hartveit, F. & Skaug, V. (1984) Occupational asbestos exposure, lung-fiber concentration and latency time in malignant mesothelioma. *Scand. J. Work Environ. Health*, *10*, 293-298

[65]Tagnon, I., Blot, W.J., Stroube, R.B., Day, N.E., Morris, L.E., Peace, B.B. & Fraumeni, J.F., Jr (1980) Mesothelioma associated with the shipbuilding industry in coastal Virginia. *Cancer Res.*, *40*, 3875-3879

[66]Thériault, G.P. & Grand-Bois, L. (1978) Mesothelioma and asbestos in the province of Quebec, 1969-1972. *Arch. environ. Health*, *33*, 15-19

[67]Vianna, N.J. & Polan, A.K. (1978) Non-occupational exposure to asbestos and malignant mesothelioma in females. *Lancet*, *i*, 1061-1063

[68]Meigs, J.W., Walter, S.D., Heston, J.F., Millette, J.R., Craun, G.F., Woodhull, R.S. & Flannery, J.T. (1980) Asbestos cement pipe and cancer in Connecticut 1955-1974. *J. environ. Health*, *42*, 187-191

[69]Wigle, D.T. (1977) Cancer mortality in relation to asbestos in municipal water supplies. *Arch. environ. Health*, *32*, 185-190

[70]Harrington, J.M., Craun, G.F., Meigs, J.W., Landrigan, P.J., Flannery, J.T. & Woodhull, R.S. (1978) An investigation of the use of asbestos cement pipe for public water supply and the incidence of gastrointestinal cancer in Connecticut, 1935-1973. *Am. J. Epidemiol.*, *107*, 96-103

[71]Polissar, L., Severson, R.K. & Boatman, E.S. (1984) A case-control study of asbestos in drinking water and cancer risk. *Am. J. Epidemiol.*, *119*, 456-471

[72]Kanarek, M.S., Conforti, P.M., Jackson, L.A., Cooper, R.C. & Murchio, J.C. (1980) Asbestos in drinking water and cancer incidence in the San Francisco Bay area. *Am. J. Epidemiol.*, *112*, 54-72

[73]Acheson, E.D., Gardner, M.J., Pippard, E.C. & Grime, L.P. (1982) Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40-year follow-up. *Br. J. ind. Med.*, *39*, 344-348

[74]Botha, J.L., Irwig, L.M. & Strebel, P.M. (1986) Excess mortality from stomach cancer, lung cancer, and asbestosis and/or mesothelioma in crocidolite mining districts in South Africa. *Am. J. Epidemiol.*, *123*, 30-40

[75] Hobbs, M.S.T., Woodward, S.D., Murphy, B., Musk, A.W. & Elder, J.E. (1980) *The incidence of pneumoconiosis, mesothelioma and other respiratory cancer in men engaged in mining and milling crocidolite in Western Australia.* In: Wagner, J.C., ed., *Biological Effects of Mineral Fibres (IARC Scientific Publications No. 30)*, Lyon, International Agency for Research on Cancer, pp. 615-625

[76] Wignall, B.K. & Fox, A.J. (1982) Mortality of female gas mask assemblers. *Br. J. ind. Med., 39*, 34-38

[77] Hilt, B., Rosenberg, J. & Langård, S. (1981) Occurrence of cancer in a small cohort of asbestos-exposed workers. *Scand. J. Work Environ. Health, 7*, 185-189

[78] Baker, J.E., Reutens, D.C., Graham, D.F., Sterrett, G.F., Musk, A.W., Hobbs, M.S.T., Armstrong, B.K. & de Klerk, N.H. (1986) Morphology of bronchogenic carcinoma in workers formerly exposed to crocidolite at Wittenoom Gorge in Western Australia. *Int. J. Cancer, 37*, 547-550

[79] Berry, G. & Newhouse, M.L. (1983) Mortality of workers manufacturing friction materials using asbestos. *Br. J. ind. Med., 40*, 1-7

[80] Gardner, M.J., Winter, P.D., Pannett, B. & Powell, C.A. (1986) Follow up study of workers manufacturing chrysotile asbestos cement products. *Br. J. ind. Med., 43*, 726-732

[81] Weiss, W. (1977) Mortality of a cohort exposed to chrysotile asbestos. *J. occup. Med., 19*, 737-740

[82] Haider, M. & Neuberger, M. (1980) *Comparison of lung cancer risks for dust workers, asbestos-cement workers and control groups.* In: Wagner, J.C., ed., *Biological Effects of Mineral Fibres (IARC Scientific Publications No. 30)*, Lyon, International Agency for Research on Cancer, pp. 973-977

[83] McDonald, A.D., Fry, J.S., Woolley, A.J. & McDonald, J.C. (1984) Dust exposure and mortality in an American chrysotile asbestos friction products plant. *Br. J. ind. Med., 41*, 151-157

[84] Peto, J. (1980) *Lung cancer mortality in relation to measured dust levels in an asbestos textile factory.* In: Wagner, J.C., ed., *Biological Effects of Mineral Fibres (IARC Scientific Publications No. 30)*, Lyon, International Agency for Research on Cancer, pp. 829-836

[85] Peto, J., Doll, R., Howard, S.V., Kinlen, L.J. & Lewinsohn, H.C. (1977) A mortality study among workers in an English asbestos factory. *Br. J. ind. Med., 34*, 169-173

[86] Peto, J., Doll, R., Hermon, C., Binns, W., Clayton, R. & Goffe, T. (1985) Relationship of mortality to measures of environmental asbestos pollution in an asbestos textile factory. *Ann. occup. Hyg., 29*, 305-355

[87] Liddell, F.D.K., Thomas, D.C., Gibbs, G.W. & McDonald, J.C. (1984) Fibre exposure and mortality from pneumoconiosis, respiratory and abdominal malignancies in chrysotile production in Quebec, 1926-75. *Ann. Acad. Med., 13*, 340-344

[88] Dement, J.M., Harris, R.L., Jr, Symons, M.J. & Shy, C. (1982) Estimates of dose-response for respiratory cancer among chrysotile asbestos textile workers. *Ann. occup. Hyg., 26*, 869-887

[89] McDonald, A.D., Fry, J.S., Woolley, A.J. & McDonald, J. (1983) Dust exposure and mortality in an American chrysotile textile plant. *Br. J. ind. Med., 40*, 361-367

[90] Acheson, E.D. & Gardner, M.J. (1979) Mesothelioma and exposure to mixtures of chrysotile and amphibole asbestos. *Arch. environ. Health, 34*, 240-242

[91] Browne, K. & Smither, W.J. (1983) Asbestos-related mesothelioma: factors discriminating between pleural and peritoneal sites. *Br. J. ind. Med., 40*, 145-152

[92] Newhouse, M.L., Berry, G. & Skidmore, J.W. (1982) A mortality study of workers manufacturing friction materials with chrysotile asbestos. *Ann. occup. Hyg., 26*, 899-909

[93]Ohlson, C.-G., Klaesson, B. & Hogstedt, C. (1984) Mortality among asbestos-exposed workers in a railroad workshop. *Scand. J. Work Environ. Health*, *10*, 283-291

[94]McDonald, A.D. & Fry, J.S. (1982) Mesothelioma and fiber type in three American asbestos factories — preliminary report. *Scand. J. Work Environ. Health*, *8 (Suppl. 1)*, 53-58

[95]Acheson, E.D., Gardner, M.J., Bennett, C. & Winter, P.D. (1981) Mesothelioma in a factory using amosite and chrysotile asbestos. *Lancet*, *ii*, 1403-1405

[96]McDonald, J.C., Gibbs, G.W., Liddell, F.D.K. & McDonald, A.D. (1978) Mortality after long exposure to cummingtonite-grunerite. *Am. Rev. respir. Dis.*, *118*, 271-277

[97]McDonald, J.C., McDonald, A.D., Armstrong, B. & Sébastien, P. (1986) Cohort study of mortality in vermiculite miners exposed to tremolite. *Br. J. ind. Med.*, *43*, 436-444

[98]Amandus, H.E. & Wheeler, R. (1987) The morbidity and mortality of vermiculite miners and millers exposed to tremolite-actinolite: Part II. Mortality. *Am. J. ind. Med.*, *11*, 15-26

[99]Neuberger, M., Kundi, M. & Friedl, H.P. (1984) Environmental asbestos exposure and cancer mortality. *Arch. environ. Health*, *39*, 261-265

[100]Ohlson, C.-G. & Hogstedt, C. (1985) Lung cancer among asbestos cement workers. A Swedish cohort study and a review. *Br. J. ind. Med.*, *42*, 397-402

[101]Thomas, H.F., Benjamin, I.T., Elwood, P.C. & Sweetnam, P.M. (1982) Further follow-up study of workers from an asbestos cement factory. *Br. J. ind. Med.*, *39*, 273-276

[102]Weill, H., Hughes, J. & Waggenspack, C. (1979) Influence of dose and fiber type on respiratory malignancy risk in asbestos cement manufacturing. *Am. Rev. respir. Dis.*, *120*, 345-354

[103]Finkelstein, M.M. (1984) Mortality among employees of an Ontario asbestos-cement factory. *Am. Rev. respir. Dis.*, *129*, 754-761

[104]Hardell, L. (1981) Relation of soft-tissue sarcoma, malignant lymphoma and colon cancer to phenoxy acids, chlorophenols and other agents. *Scand. J. Work Environ. Health*, *7*, 119-130

[105]Malker, H.S.R., McLaughlin, J.K., Malker, B.K., Stone, B.J., Weiner, J.A., Ericsson, J.L.E. & Blot, W.J. (1986) Biliary tract cancer and occupation in Sweden. *Br. J. ind. Med.*, *43*, 257-262

[106]Ross, R., Nichols, P., Wright, W., Lukes, R., Dworsky, R., Paganini-Hill, A., Koss, M. & Henderson, B. (1982) Asbestos exposure and lymphomas of the gastrointestinal tract and oral cavity. *Lancet*, *ii*, 1118-1120

[107]Waxweiler, R.J. & Robinson, C. (1983) Asbestos and non-Hodgkin's lymphoma. *Lancet*, *i*, 189-190

[108]Spanedda, R., Barbieri, D. & La Corte, R. (1983) Asbestos and non-Hodgkin's lymphoma. *Lancet*, *i*, 190

[109]Saracci, R. (1977) Asbestos and lung cancer: an analysis of the epidemiological evidence on the asbestos-smoking interaction. *Int. J. Cancer*, *20*, 323-331

[110]Davis, J.M.G., Addison, J., Bolton, R.E., Donaldson, K., Jones, A.D. & Miller, B.G. (1985) Inhalation studies on the effects of tremolite and brucite dust in rats. *Carcinogenesis*, *6*, 667-674

[111] Davis, J.M.G., Addison, J., Bolton, R.E., Donaldson, K. & Jones, A.D. (1986) Inhalation and injection studies in rats using dust samples from chrysotile asbestos prepared by a wet dispersion process. *Br. J. exp. Pathol.*, *67*, 113-129

[112] Stanton, M.F., Layard, M., Tegeris, A., Miller, E., May, M., Morgan, E. & Smith, A. (1981) Relation of particle dimension to carcinogenicity in amphibole asbestoses and other fibrous minerals. *J. natl Cancer Inst.*, *67*, 965-975

[113] Suzuki, Y, & Kohyama, N. (1984) Malignant mesothelioma induced by asbestos and zeolite in the mouse peritoneal cavity. *Environ. Res.*, *35*, 277-292

[114] Bolton, R.E., Davis, J.M.G., Donaldson, K. & Wright, A. (1982) Variations in the carcinogenicity of mineral fibres. *Ann. occup. Hyg.*, *26*, 569-582

[115] Pott, F., Huth, F. & Spurny, K. (1980) *Tumour induction after intraperitoneal injection of fibrous dusts.* In: Wagner, J.C., ed., *Biological Effects of Mineral Fibres (IARC Scientific Publications No. 30)*, Lyon, International Agency for Research on Cancer, pp. 337-342

[116] Spurny, K., Pott, F., Huth, F., Weiss, G. & Opiela, H. (1979) Identification and carcinogenic action of fibrous actinolite from a diabase rock (Ger.). *Staub-Reinhalt. Luft*, *39*, 386-389

[117] Pott, F., Schlipköter, H.W., Ziem, U., Spurny, K. & Huth, F. (1982) *New results from implantation experiments with mineral fibres.* In: *Biological Effects of Man-made Fibres*, Vol. 2, Copenhagen, WHO Regional Office for Europe, pp. 286-302

[118] Pott, F., Matscheck, A., Ziem, U., Muhle, H. & Huth, F. (1987) Animal experiments with chemically treated fibres. *Ann. occup. Hyg.* (in press)

[119] McConnell, E.E., Rutter, H.A., Ulland, B.M. & Moore, J.A. (1983) Chronic effects of dietary exposure to amosite asbestos and tremolite in F344 rats. *Environ. Health Perspect.*, *53*, 27-44

[120] National Toxicology Program (1983) *Lifetime Carcinogenesis Studies of Amosite Asbestos (CAS No. 121-72-73-5) in Syrian Golden Hamsters (Feed Studies) (NIH Publ. No. 84-2505; NTP TR 249)*, Research Triangle Park, NC

[121] McConnell, E.E., Shefner, A.M., Rust, J.H. & Moore, J.A. (1983) Chronic effects of dietary exposure to amosite and chrysotile asbestos in Syrian golden hamsters. *Environ. Health Perspect.*, *53*, 11-25

[122] National Toxicology Program (1985) *Toxicology and Carcinogenesis Studies of Chrysotile Asbestos (CAS No. 12001-29-5) in F344/N Rats (Feed Studies) (NIH Publ. No. 86-2551; NTP TR 295)*, Research Triangle Park, NC

[123] Bolton, R.E., Davis, J.M.G. & Lamb, D. (1982) The pathological effects of prolonged asbestos ingestion in rats. *Environ. Res.*, *29*, 134-150

[124] Küng-Vösamäe, A. & Vinkmann, F. (1980) *Combined carcinogenic action of chrysotile asbestos dust and N-nitrosodiethylamine on the respiratory tract of Syrian golden hamsters.* In: Wagner, J.C., ed., *Biological Effects of Mineral Fibres (IARC Scientific Publications No. 30)*, Lyon, International Agency for Research on Cancer, pp. 305-310

[125] *IARC Monographs, Suppl. 6*, 77-80, 1987

Exhibit 161

Fedak et al. Emerg Themes Epidemiol (2015) 12:14
DOI 10.1186/s12982-015-0037-4



# EMERGING THEMES IN EPIDEMIOLOGY

---

**ANALYTIC PERSPECTIVE**                                    **Open Access**

CrossMark

# Applying the Bradford Hill criteria in the 21st century: how data integration has changed causal inference in molecular epidemiology

Kristen M. Fedak[1,3*], Autumn Bernal[2], Zachary A. Capshaw[3] and Sherilyn Gross[3]

## Abstract

In 1965, Sir Austin Bradford Hill published nine "viewpoints" to help determine if observed epidemiologic associations are causal. Since then, the "Bradford Hill Criteria" have become the most frequently cited framework for causal inference in epidemiologic studies. However, when Hill published his causal guidelines—just 12 years after the double-helix model for DNA was first suggested and 25 years before the Human Genome Project began—disease causation was understood on a more elementary level than it is today. Advancements in genetics, molecular biology, toxicology, exposure science, and statistics have increased our analytical capabilities for exploring potential cause-and-effect relationships, and have resulted in a greater understanding of the complexity behind human disease onset and progression. These additional tools for causal inference necessitate a re-evaluation of how each Bradford Hill criterion should be interpreted when considering a variety of data types beyond classic epidemiology studies. Herein, we explore the implications of data integration on the interpretation and application of the criteria. Using examples of recently discovered exposure–response associations in human disease, we discuss novel ways by which researchers can apply and interpret the Bradford Hill criteria when considering data gathered using modern molecular techniques, such as epigenetics, biomarkers, mechanistic toxicology, and genotoxicology.

**Keywords:** Causation, Causal inference, Data integration, Bradford Hill, Molecular epidemiology

## Background

In 1965, Sir Austin Bradford Hill gave the first President's Address to the newly formed Section on Occupational Medicine, which was published within the Proceedings of the Royal Society of Medicine [1]. Hill began his address by pointing out a fundamental problem facing the Section members: how could they effectively practice preventative occupational medicine without a basis for determining which occupational hazards ultimately cause sickness and injury? Namely, Hill asked, "In what circumstances can [one] pass from [an] observed *association* to a verdict of *causation*?" [1]. He proceeded to propose nine "aspects of association" for evaluating traditional epidemiologic data. These aspects, which have since become fundamental

tenets of causal inference in epidemiology, are often referred to as the Bradford Hill Criteria.

The nine "aspects of association" that Hill discussed in his address (strength of association, consistency, specificity, temporality, biological gradient, plausibility, coherence, experiment, and analogy) have been used to evaluate countless hypothesized relationships between occupational and environmental exposures and disease outcomes. Yet, when Hill conceived these nine aspects (hereafter referred to as criteria), the mechanistic connections between exposure and disease were not well understood. Consider that Hill published his criteria just 12 years after Watson and Crick first suggested the double-helix model for DNA. Traditional epidemiologic study designs that were developed and used around the time of Hill's speech treated the connection between exposure and disease as a 'black box'—meaning that the biological mechanisms that occur between exposure and disease onset were unknown and therefore omitted in

---

*Correspondence: Kristen.Fedak@colostate.edu
[1] Department of Environmental and Radiological Health Sciences, Colorado State University, 350 West Lake Street, Fort Collins, CO 80521, USA
Full list of author information is available at the end of the article



© 2015 Fedak et al. This article is distributed under the terms of the Creative Commons Attribution 4.0 International License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons license, and indicate if changes were made. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated.

Fedak *et al. Emerg Themes Epidemiol (2015) 12:14*

study design [2]. Over the past 50 years, advances in scientific fields (e.g., molecular genetics, genomics, molecular toxicology) and technology (e.g., computers, software, statistics, analytical methods) have provided researchers with a much deeper and more complex understanding of how diseases initiate and progress, effectively allowing researchers to glimpse into the 'black box' of the exposure-to-disease paradigm. As a result, researchers considering causal inference have new and more diverse types of information to consider when establishing causality beyond the traditional epidemiologic study designs that were available when Hill wrote his causal criteria.

Data integration refers to the incorporation of data, knowledge, or reasoning from across multiple disciplines or approaches, with the goal of generating a level of understanding or knowledge that no discipline achieved alone [3, 4]. Data integration, while not always referred to by that term, has been discussed in light of causal inference of disease for over a decade, and the epidemiologic community has generally welcomed these interdisciplinary collaborations [5–7]. For example, the preface of the 5th edition of the *Dictionary of Epidemiology* directly acknowledges the "positive blurring of the boundaries of epidemiological research methods" into other scientific disciplines. The preface welcomes non-epidemiologists to contribute to and use the *Dictionary* and inversely invites trained epidemiologists to utilize the concepts within the *Dictionary* in non-epidemiological initiatives [4]. Furthermore, numerous agencies, organizations, and academics have recently attempted to establish frameworks or guidelines for data integration in the field of human health and ecological risk assessment. These frameworks consider how researchers should address, compare, and contrast the value and contributions of data that come from different evidence streams or scientific disciplines [8–11].

Hill aptly stated at the end of his speech that "[a]ll scientific work is incomplete... [and] liable to be upset or modified by advancing knowledge" [1]. Today, researchers considering causal inference must integrate data from a variety of scientific disciplines. Herein, we discuss how data integration in the field of causal inference of diseases affects the application and interpretation of each of Hill's criteria.

## Criteria 1: strength of association

Hill's first criterion for causation is *strength of the association*. As he explained, the larger an association between exposure and disease, the more likely it is to be causal. To illustrate this point, Hill provided the classic example of Percival Pott's examination of scrotal cancer incidence in chimney sweeps. The tremendous strength of association between that occupation and disease—nearly 200 times

greater than seen in other occupations—led to a determination that the chimney soot was likely a causal factor. Contrarily, Hill suggested that small associations could more conceivably be attributed to other underlying contributors (i.e. bias or confounding) and, therefore, are less indicative of causation.

Defining what constitutes a "strong" association is critical to the assessment of potentially causal relationships. Advances in statistical theory and the computational processing power have allowed scientists to delineate strong versus weak associations using more defensible mathematical criteria than Hill had in mind. Strength is no longer interpreted as simply the magnitude of an association. Furthermore, researchers have gained a greater appreciation for multi-factoral diseases and the existence of determinant risk factors that are small in magnitude yet statistically strong. Today, statistical significance—not the magnitude of association—is the accepted benchmark for judging the strength of an observed association, and thus its potential causality.

Yet, these same statistical and computational advances necessitate an added degree of scrutiny when interpreting study results. Modern tools have enabled researchers to collect much larger datasets, access wide ranges of metadata, employ complex algorithms, and choose from a multitude of statistical approaches. As such, statistically significant results presented within a study are not always biologically meaningful or methodologically appropriate for contributing to causal inference. Conversely, failure to mathematically demonstrate statistical significance in a single study does not preclude the possibility of a meaningful exposure–response relationship in reality. Thus, assessing *strength of association* in causal inference requires examination of underlying methods, comparison to the weight of evidence in the literature, and consideration of other contextual factors including the other criteria discussed herein.

An example can be seen in the analysis and subsequent re-analysis of pulmonary function in a cohort of 106 workers at a flavorings manufacturing facility that used a variety of chemicals, including acetaldehyde, acetoin, benzaldehyde, butyric acid, and diacetyl [12, 13]. In the original study conducted by the National Institute for Occupational Safety and Health (NIOSH), researchers retrospectively analyzed spirometry reports and job title records collected by the cohort's employer [13]. The authors presented statistically significant effect estimates showing that employees in jobs with higher potential for flavoring chemical exposures had 2.8 times greater annual declines in forced expiratory volume (FEV) than employees in lower-exposure jobs. This led authors to conclude that there was a statistically strong association between occupational exposure to flavorings and

Fedak *et al. Emerg Themes Epidemiol (2015) 12:14*

restrictive pulmonary disease [13]. However, as Ronk et al. [12] pointed out, the NIOSH researchers did not account for the inherently correlated nature of the longitudinal spirometry test data in their choice of regression analysis, which would affect the data variability and therefore standard error estimates and subsequent statistical inference [14, 15]. Ronk and colleagues reanalyzed the same data set using generalized estimating equations (GEE) that account for these correlations and did not find any statistically significant associations [12]. The varied outcomes and author interpretations associated with these two studies underscores how the use of different statistical methods can lead to statistically different results, thus impacting the application of *strength of association*.

## Criteria 2: consistency

Traditionally, Hill's *consistency* criterion is upheld when multiple epidemiologic studies using a variety of locations, populations, and methods show a consistent association between two variables with respect to the null hypothesis. Hill stressed the importance of repetitive findings because a single study, no matter how statistically sound, cannot be relied upon to prove causation due to ever-present threats to internal validity. This criterion is still very appropriate for determining causal relationships; however, data integration practices have led to an evolution in thought on what constitutes consistency. The concept of data integration is inherently influential in the interpretation of the *consistency* criterion as it speaks to understanding a consistent story across multiple disciplines or practices. For example, through the lens of data integration, molecular experimentation can bolster epidemiologic findings by providing supportive evidence for a mechanistic hypothesis, thereby lessening the need for repetition among numerous observational studies. In vitro toxicology studies that suggest a mode of action such as genotoxicity or altered gene expression can support an association found in an epidemiologic study. By integrating results from multiple types of studies, researchers can show consistency in the causal story by illuminating various mechanistic points along the exposure-to-effects paradigm. This is a much broader interpretation of *consistency* than Hill's original concept of repetitive epidemiologic findings.

The story of benzene-associated Acute Myeloid Leukemia (AML) illustrates the application of the *consistency* criterion in light of modern data integration. Both animal models and in vitro human cell cultures demonstrated that hydroquinone and para-benzoquinone are the active metabolites of benzene [15, 16]. Additionally, it was shown that hydroquinone induces cell changes that are consistent with various cellular changes known to mark the early progression of AML in humans [16, 17]. These molecular-level studies supported available human in vivo data (i.e., standard epidemiological studies), thereby lessening the need for additional observational studies to support a causal relationship.

Similarly, data integration played a role in the demonstration of consistency to support a causal relationship between polychlorinated biphenyl (PCB) exposure and melanoma. Consistency among epidemiologic studies of PCB exposure and melanoma, and in vitro mechanistic studies with human melanocytes support a plausible mechanism by which PCBs disrupt melanogenesis [18, 19]. Collectively, these data contributed to the decision by the International Agency for Research on Cancer Monograph Working Group to upgrade PCBs to a Group 1 carcinogen [18, 20]. Consistency between rodent and human bioassays also demonstrates support for a mechanism of carcinogenicity via initial binding to the aryl-hydrocarbon receptor (AhR) by PCB 126 and 2,3,7,8-tetrachlorodibenzo-para-dioxin, (TCDD) in other cancers [18, 20]. These examples illustrate how advanced molecular analyses can be integrated with the results of observational studies to demonstrate consistent research findings supporting a potentially causal relationship.

## Criteria 3: specificity

Hill suggested that associations are more likely to be causal when they are specific, meaning the exposure causes only one disease. While Hill understood that some diseases had multiple causes or risk factors, he suggested that "if we knew all the answers we might get back to a single factor" responsible for causation. This view is indicative of the fact that, in Hill's era, exposure was often defined in terms of proxies for true exposures, such as an occupational setting or a residential location. Today, we attempt to specifically define exposures not in terms of a person's surroundings or conditions, but rather an actual dose of a chemical, physical, or biological agent. While some examples of highly specific agent-outcome associations exist, most exposure and health concerns at the forefront of research today center around complex chemical mixtures and low-dose environmental and occupational exposures complicated by a variety of risk factors.

The original criterion of *specificity* is widely considered weak or irrelevant from an epidemiologic standpoint. However, *specificity* may have new and interesting implications in the broader context of data integration. For example, researchers can demonstrate a molecular mechanism of action with precisely defined (i.e., specific) relationships between the agent and the effects using a variety of research methodologies. Asbestos exposure and the development of asbestosis is one example. In

addition to the common use of occupational history as a surrogate for asbestos exposure in an epidemiological framework, advances such as refined standardized criteria for clinical diagnosis of asbestosis, microscopic lung fiber burden analyses and identification of asbestos bodies, as well as increased understanding of the relative potency of different fiber types have further clarified how asbestosis may be specifically caused by asbestos exposures [21–24]. With data integration, *specificity* evolves into a more powerful criterion, and the lack of specificity can help to narrow down specific agents associated with disease. For example, complex mixtures of chemicals (e.g., tobacco smoke) typically lack specificity when studied using classic epidemiology designs, since multiple diseases can result from the exposures. However, it is possible that data integration may elucidate some mechanistic specificity among the varied disease endpoints associated with these complex carcinogenic mixtures.

## Criteria 4: temporality

*Temporality* is perhaps the only criterion which epidemiologists universally agree is essential to causal inference. Consider that Rothman and Greenland, despite finding a lack of utility or practicality in any of the other criteria, referred to *temporality* as "inarguable" [25]. Hill explained that for an exposure-disease relationship to be causal, exposure must precede the onset of disease. Thus, epidemiologic study designs which ensure a temporal progression between the two measures are more persuasive in causal inference.

When ensuring temporality in the context of modern-day environmental exposures, it is important to consider that many of these involve low levels of exposure over extended time frames, and low incidence, micro-scale outcomes that occur following long latency periods. These factors make the prospect of designing a traditional epidemiologic study in which temporality is firmly established a costly, time consuming, and potentially unfeasible task. However, improved chemical exposure monitoring and analytical capabilities, molecular epidemiology techniques, and advances in understanding disease progression allow for new and expanded ways to meet this criterion across a variety of study designs. The use of biomarkers, state-of-the-art analytical testing at low limits of detection, and understanding of windows of toxicity and chromosome abnormalities in disease progression have increased our confidence in *temporality* as a useful criterion.

A modern example of expanded temporal analysis using data integration is illustrated by studies of low-dose exposures to arsenic through drinking water and food. Arsenic levels in hair and nails serves as a biomarker of past exposure [26, 27], and drinking water analytical

records from an individual's past and present residences can be used to create an estimate of historic environmental exposure [28]. Limited windows of exposure can be evaluated to determine effects of exposure during sensitive stages [29, 30]. By integrating new data and knowledge from these tools, temporal relationships can be considered even within cross-sectional or ecological studies that do not implicitly establish temporality within the study design.

Today, our understanding of temporality now includes a wider range of precisely defined wider exposure windows, some of which are more relevant to disease outcomes than previously thought. Through epigenetic mechanisms (i.e., DNA methylation, histone modifications), exposures that occur during specific periods of development or even in previous generations can result in phenotypic differences in offspring [31]. Such changes could be responsible for generational effects of synthetic estrogen diethylstilbestrol (DES) exposure which can lead to increased risk of breast cancer multiple generations removed from the initial exposure [32]. Analytical techniques are improving to detect these changes and to determine which epigenetic alterations may serve as indicators of disease potential and persistent biomarkers of a previous exposure [33]. Understanding the molecular-level changes that precede an observable outcome can help establish the temporal progression in a multigenerational causal story [34].

## Criteria 5: biological gradient

Hill wrote that "if a dose response is seen, it is more likely that the association is causal." According to the traditional interpretation of *biological gradient*, the presence of a dose–response relationship supports the causal association between an exposure and an effect [25, 35]. In traditional epidemiology, a monotonic biological gradient, wherein increased exposure resulted in increased incidence of disease, provides the clearest evidence of a causal relationship. However, Hill acknowledged that more complex dose–response relationships may exist, and modern studies have confirmed that a monotonic dose–response curve is an overly simplistic representation of most causal relationships. In fact, most dose–response curves are non-linear and can even vary in shape from one study to the next depending on unique characteristics of the given population, exposure routes, and molecular endpoints assessed [36]. Furthermore, individual susceptibility and synergistic or antagonistic effects of cumulative exposures can make some biological gradients even more difficult to characterize. An example of this effect can be seen in aryl hydrocarbon receptor (AhR)-based mechanisms: many exogenous and endogenous agents can act as partial agonists/antagonists

Fedak *et al. Emerg Themes Epidemiol* (2015) 12:14

of AhR, and thus modulate the dose–response effect of 2,3,7,8-tetrachlorodibenzodioxin (TCDD) which affects gene expression via AhR [9]. Integration of advanced statistical capabilities, data modeling techniques, and knowledge from increased understanding of biomolecular interactions have resulted in the descriptions of more defined dose–response curves, capable of showing molecular effects at very low levels of exposure. Additionally, growing knowledge of genetic polymorphisms has illuminated the reasons behind individual variations in biological response to toxic insult and the dose–response relationships [8].

It is now possible to observe threshold responses in the low-dose range, rather than assuming linearity for all substances. Furthermore, experimental support for a dose–response phenomenon referred to as hormesis has increased with improved molecular techniques. Hormesis is characterized by low dose stimulation and a high dose inhibition [37]. The dose–response curve associated with this phenomenon is biphasic and, depending on the endpoint measured, is either J or U shaped [38]. Hormesis has been observed in both toxicology and pharmacology, and the features of the observed dose–response are consistent and independent of the biological model, endpoint measured, chemical or physical stressor, and mechanism [37]. The most distinctive feature of hormesis is that it is repeatedly observed below the typical threshold dose [37].

*Biological gradient* is an example of how data integration can complicate causal inference. New tools and technical capabilities have allowed researchers to characterize a variety of low-level molecular endpoints that may not lead to disease or observable adverse outcomes on a larger scale. For example, innate responses can repair, eliminate, or reverse molecular changes caused by low levels of exposure. Thus, molecular changes within the no-observable-adverse-effect level (NOAEL) may not contribute to disease and are more indicative of a threshold dose response. Understanding the mechanisms at low level exposures allows us to elucidate a dose–response curve. For example, the in vitro endpoints for asbestos toxicity include generation of oxidative stress which results in genotoxicity and chromosome damage via DNA adduct formation [39]. However, damage at low levels, while measurable in vitro, is removed via cellular apoptosis which represents adaptive response and a threshold effect. Thus, responses at these low levels may not be indicative of disease, but rather adaptive responses that indicate a threshold must be overcome prior to disease initiation.

Additionally, modern analytics have shown that epigenetic endpoints can occur in the low-dose range of environmental chemical exposures, though these measured changes may not lead to observable disease. For example, Kim et al. [40] observed non-monotonic dose-dependent alterations in DNA methylation among mouse liver samples from offspring exposed perinatally to multiple doses of BPA through the maternal diet. These changes may provide insight regarding a mechanism of action for BPA during developmental exposure; however, further information regarding phenotypic changes is necessary to determine whether epigenetic changes at low level exposures are significant indicators of a dose-disease response relationship. Thus, *biological gradient* can be broadened to include molecular dose–response relationships, if the actual response occurs at a dose that is also associated with disease onset or progression.

## Criteria 6: plausibility

Even at the time it was introduced, *biological plausibility* represented fundamental concepts of data integration—the criterion implies that epidemiology and biology must interact [5]. Plausibility has historically been judged based on the presence of existing biological or social models that explain the association of interest. Hill's criterion of plausibility is satisfied if the relationship is consistent with the current body of knowledge regarding the etiology and mechanism of disease; though, Hill admitted that this interpretation of *biological plausibility* was dependent on the current state of knowledge. Today, tools such as high-throughput screening assays can be used to study a specific biologically plausible pathway and identify toxic agents that interfere with that pathway in defined ways. Indeed, opening the 'black box' through integrating molecular epidemiological advancements has allowed researchers to illuminate more steps in the exposure-to-effect paradigm, contributing to an understanding of biological plausibility for suggested causal relationships.

The elucidation of biological pathways leading to liver toxicity have played a large role in advancing the interpretation of *biological plausibility*, and the integration of knowledge from various evidence streams has aided in those interpretations. The liver is typically the first organ with appreciable capacity for oxidative metabolism that an agent encounters after ingestion, and is therefore a key organ for studying potential toxicity [16]. Liver effects demonstrated using techniques such as high-throughput in vitro and in silico cell manipulation, can be seen as a harbinger for further toxic endpoints that might occur with more refined, realistic exposures [41, 42]. However, as demonstrated by the newly-developed "virtual liver" [43], the future of testing biological plausibility likely lies with in silico experimentation. Researchers can now predict plausible relationships using in vitro and in silico screening tools targeting defined disease mechanisms,

Fedak *et al. Emerg Themes Epidemiol* (2015) 12:14

which represents a potential paradigm shift in how scientists frame causal research questions and design studies.

Historically, causal inference was approached with the assumption of a single-factor direct relationship (i.e. A causes B). However, researchers now understand that many disease outcomes are a result of the interplay and balance between multiple contributing and intermediary factors. As such, demonstrating the biological plausibility of a causal relationship can be complex. However, improved statistical techniques can help researchers to understand complex disease progression from a molecular standpoint, where multiple risk factors, confounders, adaptive responses, and mediating mechanisms intersect [44–46]. For example, the biostatistical approach of mediation analysis allows for the disentanglement and decomposition of the various biological pathways of direct and indirect effects that play a role in filling the "black box" between exposures and observable outcomes [47].

## Criteria 7: coherence

*Coherence* has been viewed as being similar to *biological plausibility*, in that the cause-and-effect story should make sense with all knowledge available to the researcher, and this criterion has not changed greatly since its inception. Indeed, Hill identified histopathological evidence of bronchial epithelium changes and animal-based toxicity tests for the carcinogenicity of cigarette smoke as an example of a coherent story among several avenues of study design. Today, *coherence* is another area in which molecular-based studies have been used to demonstrate a comprehensible story regarding various aspects of the exposure-to-disease paradigm. For example, lung tissue fiber analysis by scanning transmission electron microscopy (STEM) has expanded our knowledge of internal biologically effective amphibole dose relating to altered structure and function of lung tissue, supporting the conclusion that amphibole asbestos fibers induce mesothelioma [48].

Alternatively, advanced mechanistic studies can elucidate an incoherent body of epidemiologic literature, thereby strengthening the causal inference in one direction or another. Consider for example the carcinogenicity of hexavalent chromium [Cr(VI)]. The body of epidemiologic literature regarding the carcinogenicity of Cr(VI) is limited and conflicting, particularly regarding ingestion exposures (e.g., drinking water) and cancers outside the respiratory system (e.g., cancers of the GI tract). However, a recent array of genomic, pharmacokinetic, and mechanistic research—including metabolism, bioavailability and kinetic studies, mutagenic mode of action studies, and gene expression profiling—demonstrate that ingested Cr(VI) does indeed have a carcinogenic profile [49, 50].

## Criteria 8: experiment

Hill explained that evidence drawn from experimental manipulation—particularly epidemiologic studies in disease risk declines following an intervention or cessation of exposure—may lead to the strongest support for causal inference. Yet in modern contexts, experimentation must consider that many diseases result from multifaceted exposures and follow complex progression pathways. Cessation of exposure as Hill described may not reverse or appreciably slow the progression of disease. In some cases, multiple risk factors, including diet, exercise, smoking, chemical exposures, and genetic predisposition can contribute to disease onset and progression. Thus, while the combination of these factors may culminate in disease, experimental manipulation of a single contributory factor may or may not result in observable decreases in disease incidence.

Researchers using a data integration framework can now draw from toxicological findings for experimental insight into causality. In vitro studies that test mechanistic pathways and demonstrate the biological role of an agent in disease progression may result in knowledge that can be used to predict potential human health outcomes in a much more time-efficient manner than human studies, particularly for adverse outcomes with a long latency period.

The expanded understanding of *temporality* in light of data from varied evidence streams can also affect interpretation of the *experiment* criterion. Individual exposures can cause epigenetic modifications to parental DNA that result in an observed effect in future offspring, even though there is no direct exposure to the offspring. Experimental studies in animal models are often necessary to provide mechanistic support for an epidemiologic observation that involves complex temporality. For example, multiple animal studies provide support for the hypothesis that epigenetic changes induced by DES exposure in utero may be causative of transgenerational effects of DES exposure in females [32, 51–54]. Because epigenetic analyses in transgenerational human studies take decades and are riddled with potential confounders, reliance on animal models and advanced analytical techniques can help to support determination of a causal relationship.

## Criteria 9: analogy

Hill implied that when there is strong evidence of a causal relationship between a particular agent and a specific disease, researchers should be more accepting of weaker evidence that a similar agent may cause a similar disease. *Analogy* has been interpreted to mean that when one causal agent is known, the standards of evidence are lowered for a second causal agent that is similar in some

Case 3:16-md-02738-MAS-RLS    Document 9895-5    Filed 05/30/19    Page 566 of 599 PageID: 72970

Fedak *et al. Emerg Themes Epidemiol (2015) 12:14*                                                                Page 7 of 9

way [55]. Some modern epidemiologists have argued that a lack of analogy does not preclude causation, but simply implies a lack of creativity on the researcher's part [56]. Indeed, some might argue that enough knowledge exists and is accessible today to identify an analogy for every situation, especially if the researcher pulls that knowledge from multiple disciplines and across evidence streams. Today, researchers have a wider range of tools by which to seek an analogy, including disease progression pattern, common risk factors and confounders, and biological mechanisms of action. Therefore, the modern value of *analogy* is not gained from confirming a causal inference, but rather from proposing and testing mechanistic hypotheses.

As an example, analogous mechanistic hypothesis testing has been conducted on carbon nanotubes (CNTs) using the extensive literature on the mechanistic toxicity of asbestos fibers. Models based on molecular structure and physical–chemical characteristics such as aspect ratio predict a mechanism of action similar to that of asbestos [57]. The physical morphology of CNTs appears similar to that of asbestos fibers; thus, respirable-sized fibers are expected to behave similarly in occupational settings and lead to similar lung translocation and deposition. Additionally, asbestos fibers are known to cause inflammation and fibrosis of the lung pleura as a precursor to mesothelioma; these same outcomes have been demonstrated following CNT exposure [58, 59]. Further, CNTs have been found to stimulate the release of acute phase cytokines from human macrophages and mesothelial cells exposed to CNTs of varying lengths, demonstrating that CNT exposure results in a length-dependent pro-inflammatory response, similar to that of asbestos [60]. These findings enhance the asbestos analogy by confirming that CNTs may be capable of causing disease that begins with pleural inflammation—the same mechanism responsible for asbestos-related mesothelioma. However, the results also demonstrate that not all CNTs have the same potential for carcinogenicity, implying that proactive design of engineered CNTs can limit the risks and allow for safe use of the compounds in a variety of applications—and that the analogy to asbestos should not be viewed in a way that limits continued research.

## Conclusion

Hill's nine aspects of association were never intended to be viewed as rigid criteria or as a checklist for causation, yet have been popularized as such over the past 50 years. Instead, the so called "Bradford Hill Criteria" were written as flexible guidelines or considerations meant to guide epidemiologic investigations and aid in causal inference. As the world of epidemiologic research has changed and expanded, our criteria for determining causal inference must similarly evolve. As Chen and Hunter explained, researchers today are "much more of a participant in the assessment of the biologic basis for an association, by using biologic measurements to assess exposure, internal dose, biologically effective dose, early biologic effect, altered structure/function, invasive cancer diagnosis, tumor metastasis and prognosis"—essentially, the 'black box' between exposure and disease can now be peered into and explored [2]. Epidemiologic investigation of causation conducted today must also evolve to reflect the concepts of data integration. This involves incorporating not just traditional epidemiological evidence but also evidence gathered by opening the 'black box' and incorporating data from molecular biology, toxicology, genotoxicology, and other disciplines into evaluations of causation. The advanced tools and techniques that have developed in recent decades across all scientific disciplines have affected the application and interpretation of the Bradford Hill criteria, which were originally written to fit the concepts of data integration. This involves incorporating the 'black box' model of epidemiologic studies.

The Bradford Hill Criteria remain one of the most cited concepts in health research and are still upheld as valid tools for aiding causal inference [61]. However, the way each criterion should be applied, interpreted, and weighted in a data integration framework must be carefully measured against the varied and often novel types of data available in each unique situation. In some ways, data integration degrades the value and importance of certain criteria, as it offers alternative interpretations for each criterion that give way for inductivism. In other words, in a data integration framework, researchers can interpret the criterion whichever way fits the available data as opposed to determining whether the data meets the criterion. This type of application is dangerous as it bypasses the ultimate purpose of causal inference—determining whether the observed association is directionally causal or not.

Nonetheless, data integration represents an opportunity to expand our abilities as researchers to think about causation. Herein, we have discussed how the data integration framework requires the compilation of more lines of evidence and more scrutiny for each of the criteria. The examples above have demonstrated that data integration can enhance the application of the Bradford Hill Criteria in a causal analysis by: allowing for more scrutiny in study designs; providing new tools to demonstrate consistency, specificity, and plausibility of associations; integrating molecular evaluation to determine temporality and dose–response; clarifying conflicting epidemiologic findings to determine coherence; and promoting the proposal and testing of new mechanistic hypotheses.

The Bradford Hill Criteria are far from outdated in a data integration framework. Causal inference in the field

Fedak *et al. Emerg Themes Epidemiol* (2015) 12:14

Page 8 of 9

of epidemiology is no longer informed solely by traditional epidemiologic studies, but rather by a complementary host of evolving research tools and scientific disciplines. Although specific interpretations of each criterion have evolved over time, the concepts that underlie each criterion can be applied to a variety of methodologies to answer questions about causation. The Bradford Hill Criteria can aid researchers in connecting the dots within a body of literature, either to lead to suggestions of causal relationships or identification of what more research is needed to understand potential causality. As ever, the criteria should not be used as a heuristic for assessing causation in a vacuum; rather they should be viewed as a list of possible considerations meant to generate thoughtful discourse among researchers from diverse scientific fields. The interpretive concepts we have introduce into each Bradford Hill criterion in light of data integration support the Bradford Hill Criteria's function as a valid and useful tool when establishing causation.

**Authors' contributions**
All four authors contributed to thematic development, literature-based research, and writing. All authors read and approved the final manuscript.

**Author details**
[1] Department of Environmental and Radiological Health Sciences, Colorado State University, 350 West Lake Street, Fort Collins, CO 80521, USA. [2] Cardno ChemRisk, 130 Vantis Suite 170, Aliso Viejo, CA 92656, USA. [3] Cardno ChemRisk, 4840 Pearl East Circle, Suite 300 West, Boulder, CO 80301, USA.

**Acknowledgements**
The authors would like to acknowledge Peter Ruestow and Brent Kerger for their contributions towards manuscript revisions. We would also like to thank the anonymous peer reviewers for their critical feedback. No outside funding was received for this project.

**Compliance with ethical guidelines**

**Competing interests**
The authors declare that they have no competing interests.

Received: 4 November 2014   Accepted: 23 September 2015
Published online: 30 September 2015

**References**
1.  Hill AB. The environment and disease: association or causation? Proc R Soc Med. 1965;58:295–300.
2.  Chen YC, Hunter DJ. Molecular epidemiology of cancer. CA Cancer J Clin. 2005;55(1):45–54.
3.  Geneletti S, Gallo V, Porta M, Khoury MJ, Vineis P. Assessing causal relationships in genomics: from Bradford-Hill criteria to complex gene-environment interactions and directed acyclic graphs. Emerg Themes Epidemiol. 2011;8(1):5.
4.  Porta M, editor. A dictionary of epidemiology. 5th ed. New York: Oxford University Press; 2008.
5.  Re Porta M. Biologic plausibility in causal inference: current method and practice. Am J Epidemiol. 1999;150(2):217–9.
6.  Real FX, Bertranpetit J, Estrivill X. Genes as causes: scientific fact or simplistic thinking? J Epidemiol Commun Health. 2000;54(7):559.
7.  Porta M, Alvarez-Dardet C. Authors' reply: how is causal inference practised in the biological sciences? J Epidemiol Commun Health. 2000;54:559–60.
8.  Rooney AA, Boyles AL, Wolfe MS, Bucher JR, Thayer KA. Systematic review and evidence integration for literature-based environmental health sciences assessments. Environ Health Perspect. 2014;122(7):711–8.
9.  Doerrer NG. Integration of human biomonitoring exposure data into risk assessment: HESI initiatives and perspectives. Int J Hyg Environ Health. 2007;210(3–4):247–51.
10. Adami H-O, Berry SCL, Breckenridge CB, Smith LL, Swenberg JA, Trichopoulos D, et al. Toxicology and epidemiology: improving the science with a framework for combining toxicological and epidemiological evidence to establish causal inference. Toxicol Sci. 2011;122(2):223–34.
11. ECETOC. Technical Report No. 104: Framework for the integration of human and animal data in chemical risk assessment. European Centre for Ecotoxicology and Toxicology of Chemicals; 2009.
12. Ronk CJ, Hollins DM, Jacobsen MJ, Galbraith DA, Paustenbach DJ. Evaluation of pulmonary function within a cohort of flavorings workers. Inhal Toxicol. 2013;25(2):107–17.
13. NIOSH. Lung function (Spirometry) testing in employees at a flavorings manufacturing plant—Indiana. Centers for Disease Control and Prevention; National Institute for Occupational Safety and Health. Atlanta, GA 2011.
14. Fitzmamice G, Laird NM, Ware JH. Applied longitudinal analysis. Hoboken: Wiley-Interscience; 2004.
15. Ware JH. Linear models for the analysis of longitudinal studies. Am Stat. 1985;39(2):95–101.
16. Klaassen CD, Casarett LJ. Casarett and Doull's toxicology: the basic science of poisons. Blacklick: McGraw-Hill Professional Publishing; 2007.
17. Gross SA, Zheng JH, Le AT, Kerzic PJ, Irons RD. PU.1 phosphorylation correlates with hydroquinone-induced alterations in myeloid differentiation and cytokine-dependent clonogenic response in human CD34(+) hematopoietic progenitor cells. Cell Biol Toxicol. 2006;22(4):229–41.
18. Lauby-Secretan B, Loomis D, Grosse Y, El Ghissassi F, Bouvard V, Benbrahim-Tallaa L, et al. Carcinogenicity of polychlorinated biphenyls and polybrominated biphenyls. Lancet Oncol. 2013;14(4):287–8.
19. Luecke S, Backlund M, Jux B, Esser C, Krutmann J, Rannug A. The aryl hydrocarbon receptor (AHR), a novel regulator of human melanogenesis. Pigment Cell Melanoma Res. 2010;23(6):828–33.
20. IARC. IARC monographs on the evaluation of carcinogenic risks to humans. Polychlorinated and polybrominated biphenyls, vol 107. Lyon: International Agency for Research on Cancer (in press).
21. Roggli VL, Gibbs AR, Attanoos R, Churg A, Popper H, Cagle P, et al. Pathology of asbestosis- an update of the diagnostic criteria: report of the asbestosis committee of the college of american pathologists and pulmonary pathology society. Arch Pathol Lab Med. 2010;134(3):462–80.
22. Hesterberg TW, Chase G, Axten C, Miller WC, Musselman RP, Kamstrup O, et al. Biopersistence of synthetic vitreous fibers and amosite asbestos in the rat lung following inhalation. Toxicol Appl Pharmacol. 1998;151(2):262–75.
23. Churg A, Wright JL, Vedal S. Fiber burden and patterns of asbestos-related disease in chrysotile miners and millers. Am Rev Respir Dis. 1993;148(1):25–31.
24. Churg A, Vedal S. Fiber burden and patterns of asbestos-related disease in workers with heavy mixed amosite and chrysotile exposure. Am J Respir Crit Care Med. 1994;150(3):663–9.
25. Rothman KJ, Greenland S. Causation and causal inference in epidemiology. Am J Public Health. 2005;95(Suppl 1):S144–50.
26. Gruber JF, Karagas MR, Gilbert-Diamond D, Bagley PJ, Zens MS, Sayarath V, et al. Associations between toenail arsenic concentration and dietary factors in a New Hampshire population. Nutr J. 2012;11:45.
27. Wright RO, Amarasiriwardena C, Woolf AD, Jim R, Bellinger DC. Neuropsychological correlates of hair arsenic, manganese, and cadmium levels in school-age children residing near a hazardous waste site. Neurotoxicology. 2006;27(2):210–6.
28. Cleland B, Tsuchiya A, Kalman DA, Dills R, Burbacher TM, White JW, et al. Arsenic exposure within the Korean community (United States) based on dietary behavior and arsenic levels in hair, urine, air, and water. Environ Health Perspect. 2009;117(4):632–8.
29. Steinmaus C, Ferreccio C, Acevedo J, Yuan Y, Liaw J, Duran V, et al. Increased lung and bladder cancer incidence in adults after in utero and early-life arsenic exposure. Cancer Epidemiol Biomarkers Prev. 2014;23:1529–38.
30. Melak D, Ferreccio C, Kalman D, Parra R, Acevedo J, Perez L, et al. Arsenic methylation and lung and bladder cancer in a case-control study in northern Chile. Toxicol Appl Pharmacol. 2014;274(2):225–31.

Fedak *et al. Emerg Themes Epidemiol* (2015) 12:14

31. Dolinoy DC, Weidman JR, Jirtle RL. Epigenetic gene regulation: linking early developmental environment to adult disease. Reprod Toxicol. 2007;23(3):297–307.
32. Hilakivi-Clarke L. Maternal exposure to diethylstilbestrol during pregnancy and increased breast cancer risk in daughters. Breast Cancer Res. 2014;16(2):208.
33. Hoyo C, Murphy SK, Jirtle RL. Imprint regulatory elements as epigenetic biosensors of exposure in epidemiological studies. J Epidemiol Community Health. 2009;63(9):683–4.
34. Skaar DA, Li Y, Bernal AJ, Hoyo C, Murphy SK, Jirtle RL. The human imprintome: regulatory mechanisms, methods of ascertainment, and roles in disease susceptibility. ILAR J. 2012;53(3–4):341–58.
35. Swaen G, van Amelsvoort L. A weight of evidence approach to causal inference. J Clin Epidemiol. 2009;62(3):270–7.
36. Calabrese EJ, Blain RB. The hormesis database: the occurrence of hormetic dose responses in the toxicological literature. Regul Toxicol Pharmacol. 2011;61(1):73–81.
37. Calabrese EJ. Hormetic mechanisms. Crit Rev Toxicol. 2013;43(7):580–606.
38. Szabadi E. A model of two functionally antagonistic receptor populations activated by the same agonist. J Theor Biol. 1977;69(1):101–12.
39. Barlow CA, Lievense L, Gross S, Ronk CJ, Paustenbach DJ. The role of genotoxicity in asbestos-induced mesothelioma: an explanation for the differences in carcinogenic potential among fiber types. Inhal Toxicol. 2013;25(9):553–67.
40. Kim JH, Sartor MA, Rozek LS, Faulk C, Anderson OS, Jones TR, et al. Perinatal bisphenol A exposure promotes dose-dependent alterations of the mouse methylome. BMC Genom. 2014;15:30.
41. Alfirevic A, Gonzalez-Galarza F, Bell C, Martinsson K, Platt V, Bretland G, et al. In silico analysis of HLA associations with drug-induced liver injury: use of a HLA-genotyped DNA archive from healthy volunteers. Genome Med. 2012;4(6):51.
42. Kavlock R, Dix D. Computational toxicology as implemented by the US EPA: providing high throughput decision support tools for screening and assessing chemical exposure, hazard and risk. J Toxicol Environ Health B Crit Rev. 2010;13(2–4):197–217.
43. U.S. EPA. The Virtual Liver Project. 2014. http://www.epa.gov/ncct/virtual_liver/. Accessed 24 Jun 2014.
44. Albert JM, Nelson S. Generalized causal mediation analysis. Biometrics. 2011;67(3):1028–38.
45. Pearl J. On the consistency rule in causal inference: axiom, definition, assumption, or theorem? Epidemiology. 2010;21(6):872–5.
46. Vanderweele TJ. Mediation analysis with multiple versions of the mediator. Epidemiology. 2012;23(3):454–63.
47. Richiardi L, Bellocco R, Zugna D. Mediation analysis in epidemiology: methods, interpretation and bias. Int J Epidemiol. 2013;42(5):1511–9.

48. Rodelsperger K, Woitowitz HJ, Bruckel B, Arhelger R, Pohlabeln H, Jockel KH. Dose-response relationship between amphibole fiber lung burden and mesothelioma. Cancer Detect Prev. 1999;23(3):183–93.
49. Zhitkovich A. Chromium in drinking water: sources, metabolism, and cancer risks. Chem Res Toxicol. 2011;24(10):1617–29.
50. Antonova L, Aronson K, Mueller CR. Stress and breast cancer: from epidemiology to molecular biology. Breast Cancer Res. 2011;13(2):208.
51. Skinner MK, Manikkam M, Tracey R, Guerrero-Bosagna C, Haque M, Nilsson EE. Ancestral dichlorodiphenyltrichloroethane (DDT) exposure promotes epigenetic transgenerational inheritance of obesity. BMC Med. 2013;11:228.
52. Doherty LF, Bromer JG, Zhou Y, Aldad TS, Taylor HS. In utero exposure to diethylstilbestrol (DES) or bisphenol-A (BPA) increases EZH2 expression in the mammary gland: an epigenetic mechanism linking endocrine disruptors to breast cancer. Horm Cancer. 2010;1(3):146–55.
53. Jefferson WN, Chevalier DM, Phelps JY, Cantor AM, Padilla-Banks E, Newbold RR, et al. Persistently altered epigenetic marks in the mouse uterus after neonatal estrogen exposure. Mol Endocrinol. 2013;27(10):1666–77.
54. Kaati G, Bygren LO, Edvinsson S. Cardiovascular and diabetes mortality determined by nutrition during parents' and grandparents' slow growth period. Eur J Hum Genet. 2002;10(11):682–8.
55. Susser M. What is a cause and how do we know one? A grammar for pragmatic epidemiology. Am J Epidemiol. 1991;133(7):635–48.
56. Hofler M. The Bradford Hill considerations on causality: a counterfactual perspective. Emerg Themes Epidemiol. 2005;2:11.
57. Donaldson K, Murphy FA, Duffin R, Poland CA. Asbestos, carbon nanotubes and the pleural mesothelium: a review of the hypothesis regarding the role of long fibre retention in the parietal pleura, inflammation and mesothelioma. Part Fibre Toxicol. 2010;7:5.
58. Schinwald A, Murphy FA, Prina-Mello A, Poland CA, Byrne F, Movia D, et al. The threshold length for fiber-induced acute pleural inflammation: shedding light on the early events in asbestos-induced mesothelioma. Toxicol Sci. 2012;128(2):461–70.
59. Murphy FA, Poland CA, Duffin R, Al-Jamal KT, Ali-Boucetta H, Nunes A, et al. Length-dependent retention of carbon nanotubes in the pleural space of mice initiates sustained inflammation and progressive fibrosis on the parietal pleura. Am J Pathol. 2011;178(6):2587–600.
60. Murphy FA, Schinwald A, Poland CA, Donaldson K. The mechanism of pleural inflammation by long carbon nanotubes: interaction of long fibres with macrophages stimulates them to amplify pro-inflammatory responses in mesothelial cells. Part Fibre Toxicol. 2012;9:8.
61. Phillips CV, Goodman KJ. The missed lessons of Sir Austin Bradford Hill. Epidemiol Perspect Innov. 2004;1(1):3.

**Submit your next manuscript to BioMed Central and take full advantage of:**

• Convenient online submission
• Thorough peer review
• No space constraints or color figure charges
• Immediate publication on acceptance
• Inclusion in PubMed, CAS, Scopus and Google Scholar
• Research which is freely available for redistribution

Submit your manuscript at
www.biomedcentral.com/submit



# Exhibit 162



Health Canada  Santé Canada

*Your health and safety... our priority.*  *Votre santé et votre sécurité... notre priorité.*

# Weight of Evidence:
## General Principles and Current Applications at Health Canada

**PREPARED FOR:** Task Force on Scientific Risk Assessment
**PREPARED BY:** Weight of Evidence Working Group



**Health Canada is the federal department responsible for helping the people of Canada maintain and improve their health.** Health Canada is committed to improving the lives of all of Canada's people and to making this country's population among the healthiest in the world as measured by longevity, lifestyle and effective use of the public health care system.

Également disponible en français sous le titre :
*Poids de la preuve : Principes généraux et applications actuelles à Santé Canada*

To obtain additional information, please contact:

Health Canada
Address Locator 0900C2
Ottawa, ON  K1A 0K9
Tel.: 613-957-2991
Toll free: 1-866-225-0709
Fax: 613-941-5366
TTY: 1-800-465-7735
E-mail: hc.publications-publications.sc@canada.ca

© Her Majesty the Queen in Right of Canada, as represented by the Minister of Health, 2018

Publication date: August 2018

This publication may be reproduced for personal or internal use only without permission provided the source is fully acknowledged.

Cat.: H129-69/2018E-PDF
ISBN: 978-0-660-27301-3
Pub.: 180202

*Prepared by the Task Force on Scientific Risk Assessment's Weight of Evidence Working Group*

*T. Tao,[1] Y. Bhuller,[2] Y. Bonvalot,[3] M. Hill,[4] A. Klein,[5] G. Kozak,[6] I. Plante,[7] and N. Robert[8]*

## Document Revision History

| VERSION | DATE | SECTION/PARAGRAPH CHANGED | CHANGE(S) MADE |
|---|---|---|---|
| 1 | November 2011 | | Initial issuance of final document. |
| 2 | May 2018 | Document Revision History | Section added to track revisions. |
| | | Annex 2 | Program areas, interpretations and applications updated. |
| | | 8.0 References | Section 8.0 added; Reference list updated throughout document. |

[1]   Bioethics and Policy Integration Division, Science Policy Directorate, SPB, Ottawa, ON

[2]   Health Evaluation Directorate, PMRA, Ottawa, ON

[3]   Environmental Health Program, Quebec Region, Longueuil, QC

[4]   New Substances Assessment and Control Bureau, Safe Environments Directorate, HECSB, Ottawa, ON

[5]   Centre for Evaluation of Radiopharmaceuticals and Biotherapeutics, Biologics and Genetic Therapies Directorate, HPFB, Ottawa, ON

[6]   Bureau of Microbial Hazards, Food Directorate, HPFB, Ottawa, ON

[7]   Office of Risk Management and Science, Marketed Health Products Directorate, HPFB, Ottawa, ON

[8]   Existing Substances Risk Assessment Bureau, Safe Environments Directorate, HECSB, Ottawa, ON

**Weight of Evidence:** General Principles and Current Applications at Health Canada

# Table of Contents

1.  Introduction ...................................................................................................................... 1

2.  Purpose and Scope ........................................................................................................ 1

3.  Role in Risk Assessments ............................................................................................. 2

4.  General Principles .......................................................................................................... 3

    4.1   Gathering *"All"* Available Evidence ........................................................................3

    4.2   Assessing Individual Studies ..................................................................................3

    4.3   Assembling Lines of Evidence .................................................................................4

    4.4   Assessing Lines of Evidence ...................................................................................4

    4.5   Integrating Multiple Lines of Evidence.....................................................................5

5.  Application at Health Canada........................................................................................ 5

6.  International Context ...................................................................................................... 8

7.  Conclusions .................................................................................................................. 11

8.  References .................................................................................................................... 12

Annex 1 ................................................................................................................................. 15

Annex 2 ................................................................................................................................. 16

Annex 3 ................................................................................................................................. 18

# 1.   Introduction

Weight of Evidence (WoE) is frequently cited as the basis on which risk assessment conclusions are made. However, multiple interpretations and a lack of consensus about its meaning could potentially compromise communication between diverse stakeholders in the decision-making process. In response to this issue, an analysis of the WoE approach was initiated by Health Canada's Science Policy Directorate in 2010, as a project under the Task Force on Scientific Risk Assessment. By examining current interpretations and identifying potential best practices, this analysis aims to enhance the consistency and coherence of risk assessments across the Department.

# 2.   Purpose and scope

The current document aims to inform senior management about WoE in Health Canada risk assessments by providing an overview of the approach in terms of its:

- role in scientific risk assessments;

- main guiding principles; and

- application by various risk assessment programs at Health Canada.

In addition, this explanatory document serves as a value-added Departmental resource of high level contextual information and guiding principles to supplement program specific guidelines, procedures and/or tools.

While this document acknowledges that WoE could also be applied in the risk management decision making context, where scientific evidence is weighed against other policy considerations, it will not expand on this information as it is considered **not** within the scope of this document.[9]

---

[9]   The terms evidence, information and data are used interchangeably in this document, and refer to general scientific usage, not specific legal definitions of what constitutes evidence, or "admissible" evidence, in a court of law.

# 3.   Role in risk assessments

In general, scientific risk assessments encompass the following steps: identifying and characterizing the hazard, assessing the exposure, and characterizing the risk; risk assessments also play an integrated role in an evidence- informed decision making process which also involves managing and communicating the risk.

WoE in the risk assessment context is defined in *Health Canada Decision-Making Framework for Identifying, Assessing, and Managing Health Risks* (Health Canada, 2000) as:

> *"A qualitative measure that takes into account the nature and quality of scientific studies intended to examine the risk of an agent. Uncertainties that result from the incompleteness and unavailability of scientific data frequently require scientists to make inferences, assumptions, and judgements in order to characterize a risk. Making judgements about risk based on scientific information is called "evaluating the weight of evidence".*

The above description can be interpreted to implicitly include two separate concepts frequently associated with WoE terminology:

1. **Totality of Evidence:** what types and sources of information are to be gathered and considered for subsequent assessment; and

2. **Weighing Evidence:** how such individual sources of evidence are assessed and integrated into an overall conclusion or recommendation.

Totality of evidence can be influenced by varying interpretations of *"all"* available or relevant evidence to date. This concept provides the opportunity to make use of information/studies that may be regarded insufficient individually, but which contribute to a total "weight of evidence" case in support of conclusions during risk assessment when they are considered alongside other studies/sources of evidence. Moreover, an evaluation of evidence and of any subsequent decision can be reassessed, at a later date, based on the availability of data that may not have been readily available at the time of the original assessment.

The latter, methodological concept of weighing evidence is applicable to most risk assessments. While specific methodologies and tools used for assessing and integrating evidence (e.g.*,* quantitative or qualitative) may vary and are context dependent, the general principles for the assessment and integration process remain the same.

# 4.   General principles

The inter-relationship of the above two concepts, and the general principles of the WoE approach outlined below, is presented in Annex 1, for illustrative purposes only. The Totality of Evidence concept includes the general principles 4.1, 4.2, and 4.3, while the methodological concept of Weighing Evidence can be subdivided into the general principles of 4.4 and 4.5. Regardless of specific interpretations of terminology, the following steps are applicable to building a "weight of evidence" case for a given risk assessment conclusion or recommendation.

## 4.1   GATHERING *"ALL"* AVAILABLE EVIDENCE

Multiple sources and types of evidence may be gathered or submitted and considered in context of *"all"* available evidence to date. Depending on the regulatory data requirements, the full spectrum of sources and types of evidence may include: randomized controlled clinical trials, company and/or third party generated studies of a proprietary nature, peer-reviewed, published scientific literature, expert opinion reports, decisions and analysis reports from regulatory authorities, incident reports, adverse reactions submitted to regulatory authorities, and unpublished data.

## 4.2   ASSESSXIVIDUAL STUDIES

General criteria for inclusion/exclusion are useful when screening *"all"* evidence gathered for further consideration. While specific terminology and scope for inter-related screening criteria such as "quality", "reliability", "relevance", etc. could differ across various regulatory programs and agencies, the underlying principles are common. Assessment could involve use of specific scoring tools and/or best professional judgement. Acceptable studies that meet standards for inclusion are assessed further in subsequent steps of the WoE approach, while unacceptable studies may be excluded from further consideration. For example, unpublished data, or data irrelevant to the risk assessment endpoint in question, may be excluded from further consideration or may be given a lower weight when assembling the lines of evidence. When necessary, the rationale for including (or excluding) studies could be documented in the relevant report.

## 4.3    ASSEMBLING LINES OF EVIDENCE

The types and sources of evidence considered are diverse and vary considerably in level of detail. Depending on the context of the risk assessment in question, individual studies or data sources are often assessed as distinct lines of evidence on their own, or considered in concert with other similar studies that together constitute a particular "line of evidence". Such lines can be organized according to unifying characteristics, such as source or type of data (e.g., animal data, human data, clinical trials, and literature data). Separate lines of evidence can also be drawn along sub-components of risk, such as hazard, exposure, human health, environmental safety, or other characteristics such as studies which support or counter a particular conclusion. These lines can be further subdivided into more specific lines. For example, "hazard" can be divided into specific organ systems (hazard to the liver, kidneys, brain, etc.).

## 4.4    ASSESSING LINES OF EVIDENCE

Lines of evidence are assessed against various criteria that are dependent on the context of the particular endpoint in question. Risk assessments can be hypothesis driven, and designed to answer yes/no questions (e.g., is substance *x* a carcinogen?). In such instances, several lines of evidence (e.g., carcinogenicity studies, genotoxicity studies, or mechanistic data) can each be assessed based on criteria such as the strength/robustness of evidence in support of, or against, a given conclusion for each particular line.

Other risk assessments can address more general questions (e.g., what product/source is the likely cause of illness outbreak *y*?). In such instances, some lines of evidence, such as epidemiological data, can be assessed based on specific criteria such as strength of association, consistency, specificity, temporality, biological gradient/ dose-response, plausibility, coherence, experimental evidence, and analogy (e.g., the Bradford Hill (1965) criteria for causal inference). Depending on the context of the particular line of evidence involved, other criteria not described here could also be applicable. The assessment can be quantitative, by assigning a weight or value to each line of evidence assessed, in the form of probabilities, alphanumeric values, or qualitative by descriptions such as "weak" or "strong", or implicit, in the form of logic models and decision trees that by default emphasize the importance of certain lines of evidence over others.

Assigned values or descriptions reflect the relative "strength" of a particular line of evidence, which is negatively impacted by the uncertainty and variability in datasets contributing to each line of evidence. Departmental documents elaborating on uncertainty and/or variability include, but are not limited to: *A Framework for the Application of Precaution in Science-based Decision Making about Risk* (Privy Council Office, 2003) and the *Health Products and Food Branch's Guide for Conducting Health Risk Assessments in Humans* (Health Canada, 2011).

## 4.5   INTEGRATING MULTIPLE LINES OF EVIDENCE

The determination of the relative contributions of various lines of evidence to the overall conclusion can be performed in a single step, qualitative process, using best professional judgment. More systematic methods of quantitative integration can also be employed, where scores for individual lines of evidence may be adjusted by weighting factors that reflect the relative importance of a line within the overall body of evidence, and then mathematically integrated into a final value. However, scoring is not easily applicable in a context such as risk assessment, due to the large complexity of the different sources of information available.

The integration of values/weights is an iterative process that is repeated at many levels: within individual studies, across similar studies into a collective value for a particular line of evidence, and across multiple lines of evidence into an overall risk assessment conclusion or recommendation. For example, to determine whether a compound affects the liver, one collectively examines and integrates clinical chemistry findings along with organ weight and histopathology data within a single study, or across multiple similar studies (e.g., to assess dose-response). For integration across collection of studies for a given assessment endpoint (e.g., whether a compound is carcinogenic) one can collectively examine and integrate carcinogenicity studies, genotoxicity studies and mechanistic data. For conclusions regarding overall risk, it is necessary to integrate lines of evidence related to hazard and exposure. Further integration of human health risk and environmental risk may contribute to an overall risk profile.

# 5.   Application at Health Canada

Assessment of scientific evidence is a crucial component of risk assessment and decision making at Health Canada. Moreover, for many of the regulatory programs in the Department, risk assessment conclusions (referred to as risk characterization) are often made based on the likelihood of association between a particular substance/activity and associated health effects. In this context, a WoE approach is frequently cited as the basis on which conclusions are made using the best available information to date that can be gathered, assessed, and integrated using various qualitative and quantitative methods.

The mandate and scope of risk assessment and/or risk management activities of the various programs vary significantly across the Department (see *A Primer on Scientific Risk Assessment at Health Canada,* Saner, 2010). Each program operates within the constraints of program-specific legislation. Differences in legislation and program goals impact time available for assessment of each particular product or activity, the amount and quality of information that is available to date for assessment, and

the degree of flexibility in interpretation and application of WoE as a risk assessment approach. Each program is also impacted by international guidelines for specific subject areas and the sector-specific context in which regulations may be often harmonized globally. The varying issues and the context under which regulatory decisions are made, and the scope of potential risk management options and recommendations that can be explored also differ across and within programs.

A survey was conducted to determine how WoE was applied across the department. All branches surveyed responded, including the Health Products and Food Branch (HPFB), the Healthy Environments and Consumer Safety Branch (HECSB), and the Pesticide Management Regulatory Agency (PMRA). The general principles of the WoE approach are applied by most programs surveyed. Specifically, most risk assessments follow the steps of gathering and assessing individual studies and sources of evidence, assembling studies into context specific lines of evidence, and assessing and integrating multiple lines of evidence into an overall conclusion or recommendation. Most programs interpret WoE to include concepts such as the totality of evidence (i.e., the evidence to be gathered and considered), as well as the weighing of evidence (i.e., how such evidence is assessed and integrated into a final conclusion) (see Annex 2).

The application of specific criteria and tools are context specific, and are outlined in various program specific guidelines, standard operating procedures, working documents, etc. Program documents outlining application of the WoE approach have been specifically developed for such purposes when considered necessary. For example:

- *Weight of Evidence: Factors to Consider for Appropriate and Timely Action in a Foodborne Illness Outbreak Investigation* (Health Canada, Public Health Agency of Canada, and Canadian Food Inspection Agency, 2011);

- *Framework for Initiating and Conducting Risk Analysis Activities on Microbial Hazards in Food* (Health Canada, 2017);

- *Food Investigation Response Manual* (Canadian Food Inspection Agency, 2017);

- *Science Policy Note: General Exposure Factor Inputs for Dietary, Occupational, and Residential Exposure Assessments* (Health Canada, 2014)

- *Federal Contaminated Site Risk Assessment in Canada: Supplemental Guidance on Human Health Risk Assessment for Country Foods (HHRAFoods)* (Health Canada, 2010);

- *Notice to Product License Applicants—Traditional Claim Submissions: Evidence Criteria and Evidence Assessment Template* (Natural and Non-prescription Health Products Directorate, 2010);

- *Pathway for Licensing Natural Health Products used as Traditional Medicines* (Natural and Non-prescription Health Products Directorate, 2012a)

- *Pathway for Licensing Natural Health Products Making Modern Health Claims* (Natural and Non-prescription Health Products Directorate, 2012b)

Program documents of a more general nature include:

- *Health Products and Food Branch's Guide for Conducting Health Risk Assessments in Humans* (Health Canada, 2011);

- *Framework for Science-Based Risk Assessment of Micro-Organisms Regulated under the Canadian Environmental Protection Act, 1999* (Environment Canada, Health Canada, 2013);

- *All Hazards Risk Assessment Methodology Guidelines 2012–2013* (Public Safety Canada 2018)

As mentioned above, documentation on how the risk assessment is conducted and the rationale for either including or excluding certain sources of evidence is a critical component of the decision making process. Similarly, while the WoE approach is consistently applied in most risk assessments across the Department, explicit use of WoE terminology is not always documented. In some instances, WoE terminology is used, but the specific application of the WoE approach is not elaborated.

On occasion, WoE terminology is used when actually referring to levels of evidence or standards of quality of individual studies. In some instances, WoE terminology is also used in place of actual descriptions of the strength/robustness of overall conclusions/recommendations, or in place of legal terms such as preponderance of evidence, which simply means more likely than not.

The majority of risk assessment reports, however, provide a logical narrative description of the relative strengths or weaknesses of various lines of evidence considered. For most risk assessments, individual lines of evidence are pooled and integrated into a final conclusion based on best professional judgment, and not mathematical formula. Narrative descriptions of the rationale for such judgments are usually provided, including explanations of how certain lines of evidence are more important than others in determining the overall risk assessment conclusion/recommendation. Some reports, however, simply list lines of evidence assessed and proceed directly to the overall risk assessment conclusion, without explicit documentation of how the multiple lines of evidence relate to one another, or the rationale behind the integration process.

# 6.   International context

The WoE approach is routinely applied by most scientific risk assessment agencies internationally and while several definitions for WoE exist, there is no single, universal standardized/commonly agreed upon definition or specific guidance on how to implement a WoE approach. For example, recent guidance on the use of the WoE approach and "totality of evidence" has been published by the European Food Safety Authority's Scientific Committee (EFSA, 2017a), which stated that "*weight of evidence assessment is a process in which evidence is integrated to determine the relative support for possible answers to a scientific question. The term 'weight of evidence' on its own is the extent to which evidence supports possible answers to a scientific question.*"

The United States Environmental Protection Agency (EPA, 2003) outlines WoE in various guidelines, in both the totality of evidence context, and the methodological context of the weighing of multiple lines of evidence, e.g.:

> *"The weight-of-evidence approach considers all relevant information in an integrative assessment that takes into account the kinds of evidence available, the quality and quantity of the evidence, the strengths and limitations associated with each type of evidence and explains how the various types of evidence fit together."*

However, in a review of the EPA's Integrated Risk Information System (IRIS) process, the National Research Council (2014) found that:

> *"systematic review and weight-of-evidence analysis have historically been described in various ways, and the terms are sometimes used interchangeably; this vagueness in use of terminology results in some confusion as to what the terms mean in practice… The committee views weight-of-evidence analysis as a judgment-based process for evaluating the strength of evidence to infer causation. However, it found that the phrase as used in practice has become too vague and is of little scientific use. An IRIS assessment must come to a judgment about whether a chemical is hazardous to human health and must do so by integrating a variety of lines of evidence. Therefore, the committee found the term evidence integration to be more useful and more descriptive of the process that occurs after completion of systematic reviews."*

Similarly, the U.S. Environmental Protection Agency's National Center for Environmental Assessment (2015) takes an integrated approach to science assessments for reviews of national ambient air quality standards:

*"The U.S. EPA integrates the evidence from across scientific disciplines or study types and characterizes the weight of evidence for relationships… drawing upon the results of all studies judged of adequate quality and relevance per the criteria… consider aspects, such as strength, consistency, coherence, and biological plausibility of the evidence, and develop causality determinations on the nature of the relationships… includes evaluating strengths and weaknesses in the overall collection of studies across disciplines."*

The European Chemicals Agency (ECHA, 2011 and 2016) outlines interpretations regarding the methodological context of weighing evidence as follows:

*"The weight of evidence approach commonly refers to combining evidence from multiple sources to assess a property under consideration. It can therefore be a useful technique where, for example, each piece of information or test alone is not sufficient to address a standard information requirement but where it may be possible to combine the strengths and weaknesses of the individual studies to reach a conclusion for a particular property.*

*The term weight of evidence (WoE) is neither a scientifically well-defined term nor an agreed formalised concept characterised by defined tools and procedures. It can, however, be regarded as an evidence-based approach involving an assessment of the relative weights (values) of different pieces of the available information that have been gathered. Application of this concept can be achieved either in an objective way by using a formalised procedure or by using expert judgement. Factors such as the quality of the data, consistency of results, nature and severity of effects, relevance of the information will have an influence on the weight given to the available evidence."*

This concept of weighing evidence is supplemented by the totality of evidence concept within the Regulation on Registration, Evaluation, Authorisation and Restriction of Chemicals (ECHA, 2017):

*"There may be sufficient weight of evidence from several independent sources of information leading to the assumption/conclusion that a substance has or has not a particular dangerous property, while the information from each single source alone is regarded insufficient to support this notion.*

*There may be sufficient weight of evidence from the use of newly developed test methods, not yet included in the test methods referred to in Article 13(3) or from an international test method recognised by the Commission or the Agency as being equivalent, leading to the conclusion that a substance has or has not a particular dangerous property.*

*Where sufficient weight of evidence for the presence or absence of a particular dangerous property is available:*
*— further testing on vertebrate animals for that property shall be omitted,*
*— further testing not involving vertebrate animals may be omitted.*

*In all cases adequate and reliable documentation shall be provided."*

The World Health Organization's International Programme on Chemical Safety has published two guidance documents regarding uncertainty in risk assessment: *Uncertainty and Data Quality in Exposure Assessment* (WHO, 2008), which explicitly addresses WoE: *"to the extent possible, the combined effect of different sources of uncertainty on the exposure or risk predictions, perhaps based on a weight-of-evidence methodology in the absence of quantitative data, should also be considered"*, and a *Guidance Document on Evaluating and Expressing Uncertainty in Hazard Characterization* (WHO, 2017).

The Food and Agriculture Organization of the United Nations and the World Health Organization (FAO/ WHO, 2009) discussed using a WoE approach to the risk characterization of microbiological hazards in food: *"the weight of evidence should be evaluated according to clearly specified, scientific criteria. As more criteria are satisfied, the weight of evidence indicates a more credible risk."* FAO/WHO anticipated that *"weight-of-evidence determinations will become increasingly prominent in risk assessments of microbiological pathogens in food."*

The Organisation for Economic Co-operation and Development (OECD, 2015, 2017, 2018) defines WoE as *"a comprehensive, integrated, often qualitative judgment of the extent and quality of information supporting an hypothesis for which the approaches and tools vary, depending on the context."* WoE methodology is used in their "Adverse Outcome Pathway (AOP)/Mode Of Action (MOA)" framework for the development and use of "Integrated Approaches to Testing and Assessment" (IATA):

> *"Evaluation of existing information or generation of additional data within an IATA can be performed on the basis of a non-formalised Weight of Evidence (WoE) approach or by using predefined, structured approaches such as Sequential Testing Strategies (STS), Integrated Testing Strategies (ITS) or their combination."*

In considering the use of a WoE approach, Codex Alimentarius (2014) cautions that *"The weight of evidence integrating quantitative and qualitative data may permit only a qualitative estimate of risk."*

Taken together, the above definitions from key international partners are consistent with current Health Canada interpretations of the WoE approach.

# 7.   Conclusions

While specific tools and methodologies are often context-specific to particular program areas, the underlying principles of the WoE approach, in which multiple sources of information are gathered, assessed, and integrated into an overall conclusion, are commonly applied across the Department, and are judged to be consistent with international practice.

Presently, inconsistencies occur not in the high level applications of the overall WoE approach. Rather, they result when WoE terminology is applied when actually dealing with standards of quality of individual studies or strength of overall conclusions/recommendations.

Given the context specific nature of each risk assessment and the diversity of tools and criteria applicable, transparent documentation of the specific application of the WoE approach is especially important. There are opportunities for harmonization, and adherence to a simple checklist is a step towards this goal (see Annex 3). Program areas are encouraged to take the relevant steps (e.g., updating internal guidelines) to further improve the documentation aspect in reports that provide the risk assessment in support of subsequent risk management options/regulatory decision, which includes elaborating on what is meant by WoE, when necessary. Additionally, graphically based evidence maps, profiles, or tables may be helpful as supplementary tools for communication from risk assessors to risk managers.

# 8.   References

Bradford Hill A. 1965. The environment and disease: association or causation? *Proc R Soc Med.* 58(5): 295–300.

Canadian Food Inspection Agency. 2017. *Food Investigation Response Manual.* Available at: www.inspection.gc.ca/food/safe-food-production-systems/food-recall-and-emergency-response/food-manual/eng/1378402475724/1378403080658?chap=0 (accessed 2018-03-16)

Canada Privy Council Office. 2003. *A Framework for the Application of Precaution in Science-based Decision Making about Risk*. Available at: http://publications.gc.ca/collections/Collection/CP22-70-2003E.pdf (accessed 2018-03-15)

Codex Alimentarius. 2014. *Principles and Guidelines for the Conduct of Microbiological Risk Assessment (CAC/GL 30-1999)*. Available at: www.fao.org/fao-who-codexalimentarius/codex-texts/guidelines/en/ (accessed 2018-03-20)

ECHA: European Chemicals Agency. 2011. *Guidance on information requirements and chemical safety assessment—Chapter R.4: Evaluation of available information*. Available at: https://echa.europa.eu/documents/10162/13643/information_requirements_r4_en.pdf/d6395ad2-1596-4708-ba86-0136686d205e (accessed 2018-03-19).

ECHA. 2016. *Practical guide: How to use alternatives to animal testing to fulfil your information requirements for REACH registration.* Available at: https://echa.europa.eu/documents/10162/13655/practical_guide_how_to_use_alternatives_en.pdf/148b30c7-c186-463c-a898-522a888a4404 (accessed 2018-03-19)

ECHA. 2017. *Consolidated version of the REACH Regulation: Regulation (EC) No 1907/2006 of the European Parliament and of the Council of 18 December 2006 concerning the Registration, Evaluation, Authorisation and Restriction of Chemicals (REACH)*. Available at: https://echa.europa.eu/regulations/reach/legislation (accessed 2018-03-19)

Environment Canada, Health Canada. 2013. *Framework for Science-Based Risk Assessment of Micro-Organisms Regulated under the* Canadian Environmental Protection Act, 1999. Available at: www.ec.gc.ca/subsnouvelles-newsubs/default.asp?lang=En&n=120842D5-1 (accessed 2018-03-16))

EFSA: European Food Safety Authority. 2017a. *Guidance on the use of the weight of evidence approach in scientific assessments*. EFSA Journal 2017;15(8):4971. Available at: http://onlinelibrary.wiley.com/doi/10.2903/j.efsa.2017.4971/epdf (accessed 2018-03-15)

EFSA. 2017b. *Revised Draft for Internal Testing: Guidance on Uncertainty in EFSA Scientific Assessment*. Available at: www.efsa.europa.eu/sites/default/files/160321DraftGDUncertaintyInScientificAssessment.pdf (accessed 2018-03-15)

EPA: United States Environmental Protection Agency. 2003. *A Summary of General Assessment Factors for Evaluating the Quality of Scientific and Technical Information*. Available at: www.epa.gov/sites/production/files/2015-01/documents/assess2.pdf (accessed 2018-03-19)

EPA: United States Environmental Protection Agency. 2015. Preamble to the Integrated Science Assessments (ISA). Available at: https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=310244 (accessed 2018-03-29)

FAO/WHO: Food and Agriculture Organization of the United Nations and the World Health Organization. 2009. *Risk characterization of microbiological hazards in food: Guidelines. Microbiological Risk Assessment Series 17.* Available at: www.fao.org/docrep/012/i1134e/i1134e.pdf (accessed 2018-03-20)

Health Canada. 2000. *Health Canada Decision-Making Framework for Identifying, Assessing, and Managing Health Risks*. Available at: www.canada.ca/content/dam/hc-sc/migration/hc-sc/ahc-asc/alt_formats/hpfb-dgpsa/pdf/pubs/risk-risques-eng.pdf (accessed 2018-03-15)

Health Canada. 2010. *Federal Contaminated Site Risk Assessment in Canada: Supplemental Guidance on Human Health Risk Assessment for Country Foods (HHRAFoods)*. Available at: http://publications.gc.ca/collections/collection_2012/sc-hc/H128-1-11-641-eng.pdf (accessed 2018-03-16)

Health Canada. 2011. *Health Products and Food Branch's Guide for Conducting Health Risk Assessments in Humans*. Available at: http://mysource.hc-sc.gc.ca/sites/default/files/hpfbs_guide_for_conducting_hras_in_humans_e_final.pdf (accessed 2018-03-15)

Health Canada. 2014. *Science Policy Note: General Exposure Factor Inputs for Dietary, Occupational, and Residential Exposure Assessments*. Available at: www.canada.ca/content/dam/hc-sc/migration/hc-sc/cps-spc/alt_formats/pdf/pubs/pest/pol-guide/spn2014-01/spn2014-01-eng.pdf (accessed 2018-03-16)

Health Canada. 2017. *Framework for Initiating and Conducting Risk Analysis Activities on Microbial Hazards in Food*. Cat.: H164-198/2017E-PDF, ISBN: 978-0-660-06811-4, Pub.: 160231. Available from publications@hc-sc.gc.ca

Health Canada, Public Health Agency of Canada, Canadian Food Inspection Agency. 2011. *Weight of Evidence: Factors to Consider for Appropriate and Timely Action in a Foodborne Illness Outbreak Investigation*. Available at: www.canada.ca/content/dam/hc-sc/migration/hc-sc/fn-an/alt_formats/pdf/pubs/securit/2011-food-illness-outbreak-eclosion-malad-ailments-eng.pdf (accessed 2018-03-16)

National Research Council. 2014. *Review of EPA's Integrated Risk Information System (IRIS) Process*. Committee to Review the IRIS Process; Board on Environmental Studies and Toxicology; Division on Earth and Life Studies. National Academies of Sciences, Engineering, Medicine – National Academies Press. Available at: http://nap.edu/18764 (accessed 2018-03-19)

Natural and Non-prescription Health Products Directorate, Health Canada. 2010. *Notice to Product License Applicants – Traditional Claim Submissions: Evidence Criteria and Evidence Assessment Template.* Available at: www.canada.ca/en/health-canada/services/drugs-health-products/natural-non-prescription/legislation-guidelines/guidance-documents/traditional-claim-submissions-evidence-criteria-evidence-assessment-template.html (accessed 2018-03-16)

Natural and Non-prescription Health Products Directorate, Health Canada. 2012a. *Pathway for Licensing Natural Health Products used as Traditional Medicines.* Available at: www.canada.ca/en/health-canada/services/drugs-health-products/natural-non-prescription/legislation-guidelines/guidance-documents/pathway-licensing-traditional-medicines.html (accessed 2018-03-16)

Natural and Non-prescription Health Products Directorate, Health Canada. 2012b. *Pathway for Licensing Natural Health Products Making Modern Health Claims*. Available at: www.canada.ca/en/health-canada/services/drugs-health-products/natural-non-prescription/legislation-guidelines/guidance-documents/pathway-licensing-making-modern-health-claims.html (accessed 2018-03-16)

OECD: Organisation for Economic Co-operation and Development. 2015. *Report of the Workshop on a Framework for the Development and Use of Integrated Approaches to Testing and Assessment. Series on Testing and Assessment No. 215, ENV/JM/MONO(2015)22*. Available at: www.oecd.org/officialdocuments/publicdisplaydocumentpdf/?cote=ENV/JM/MONO(2015)22&doclanguage=en (accessed 2018-03-20)

OECD. 2017. *Revised Guidance Document on Developing and Assessing Adverse Outcome Pathways. Series on Testing & Assessment No. 184, ENV/JM/MONO(2013)6.* Available at: www.oecd.org/officialdocuments/publicdisplaydocumentpdf/?cote=env/jm/mono(2013)6&doclanguage=en (accessed 2018-03-20)

OECD. 2018. *Users' Handbook Supplement to the Guidance Document for Developing and Assessing AOPs. Series on Testing & Assessment No. 233, Series on Adverse Outcome Pathways No. 1, ENV/JM/MONO(2016)12.* Available at: https://one.oecd.org/document/ENV/JM/MONO(2016)12/en/pdf (accessed 2018-03-20)

Public Safety Canada. 2018. *All Hazards Risk Assessment Methodology Guidelines 2012-2013.* Available at: www.publicsafety.gc.ca/cnt/rsrcs/pblctns/ll-hzrds-ssssmnt/index-en.aspx (accessed 2018-03-16)

Saner M. 2010. *A Primer on Scientific Risk Assessment at Health Canada.* HC Pub.: 100140; Cat.: H22-4/3-2010; ISBN: 978-1-100-15377-3. Available at: www.canada.ca/content/dam/hc-sc/migration/hc-sc/sr-sr/alt_formats/pdf/pubs/about-apropos/2010-scientif-ris-eng.pdf (accessed 2018-03-16)

WHO (World Health Organization). 2008. *International Programme on Chemical Safety: Uncertainty and Data Quality in Exposure Assessment.* Available at: www.who.int/ipcs/publications/methods/harmonization/exposure_assessment.pdf?ua=1 (accessed 2018-03-15)

WHO. 2017. *International Programme on Chemical Safety: Guidance Document on Evaluating and Expressing Uncertainty in Hazard Characterization.* Available at: http://apps.who.int/iris/bitstream/10665/259858/1/9789241513548-eng.pdf?ua=1 (accessed 2018-03-15)

# Annex 1



**Graphical Representation of the Weight of Evidence Approach in the Context of Scientific Risk Assessments**

**Totality of Evidence:** *conceptual interpretations of scope and nature of evidence for consideration*

**1** GATHERING "ALL" EVIDENCE

**2** ASSESSING INDIVIDUAL STUDIES (for 'quality', 'relevance', etc…)

*(Note: Individual studies may not meet standards for all criteria, but still could be considered if contributing to a weight of evidence case when pooled with other studies.)*

Inclusion                    Exclusion

**3** ASSEMBLING LINES OF EVIDENCE (context specific)

Line 1:                    Line 2:                    Line 3:

**Weighing Evidence:** *methodological approaches for assessing and integrating evidence into an overall conclusion*

**4** ASSESSING LINES OF EVIDENCE (for causality, hazard, exposure, etc…)

**5** INTEGRATING MULTIPLE LINES OF EVIDENCE

**Example 1:** Weight of Evidence Summary for Foodborne Illness Outbreak[1]

| Lines of Evidence | Criteria assessed | Qualitative Description |
|---|---|---|
| **Line 1** (Laboratory Investigation: Strength of Microbiological Evidence: Determining the Relevance of Food and Clinical Isolates that Match by Pulsed-Field Gel Electrophoresis (PFGE)*) | A. Does the organism show suitable diversity by PFGE? B. Are clinical and food isolate PFGE patterns indistinguishable by enzymes? C. What is the historic frequency of the PFGE pattern combination? D. Are other subtyping results available; are they consistent with PFGE? | (Weak….Strong) |
| **Line 2** (Food Safety Investigation: Traceback and Trace Forward) | • Does the product identity allow direct tracing to the manufacturer? • Can the point of purchase be identified? • Can the product identity lead to manufacturer? • Distribution Channel • Can the product be traced back to the wholesaler? | (Weak….Strong) |
| **Line 3** (Epidemiological Investigation) | • Plausibility, • Consistency, • Specificity, • Strength of the association, • Temporal(ity), • Dose-Response, • etc… | (Weak….Strong) |
| **Overall conclusion** | The WoE case for product Y as source of contamination for Foodborne Illness Outbreak X is (Weak….Strong) | |

**Example 2:** Weight of Evidence Summary for neurobehavioural effects of bisphenol-A at low doses in rodents (below reproductive/ developmental NOAEL)[2]

| Criteria Assessed | Qualitative Description |
|---|---|
| Rigour of overall dataset | limited |
| Power of overall dataset | limited |
| Corroboration/consistency | limited |
| Biological Plausibility/coherence | limited |
| Overall weight of evidence for neurodevelopmental effects in rodents at low level exposures (exposure below the NOAEL for reproductive/developmental toxicity) | limited |

1  Weight of Evidence: Factors to Consider for Appropriate and Timely Action in a Foodborne Illness Outbreak Investigation. Health Canada, Public Health Agency of Canada, and Canadian Food Inspection Agency. January 2011
2  Final Screening Assessment for the Phenol, 4,4'-(1-methylethylidene)bis-(Bisphenol A). Chemical Abstracts Service Registry Number 80-05-7. Environment Canada and Health Canada. October 2008.

# Annex 2

## Working level interpretation(s)/application(s) of Weight of Evidence

| PROGRAM | TOTALITY OF EVIDENCE [*]: Conceptual interpretations of the nature and scope of evidence sources for consideration | | WEIGHING EVIDENCE [**]: Methodological approaches for the assessment and integration of multiple lines of evidence to derive at a final conclusion | | |
|---|---|---|---|---|---|
| | Consideration of all available lines of evidence to date, as opposed to a subset of data | Consideration of studies that individually may not meet standards for all criteria, but contributing to a weight of evidence case when pooled with other studies | Qualitative (e.g., listing, best professional judgment) | Semi-quantitative (e.g., causal criteria, logic models, alphanumeric scoring or indexing) | Quantitative (e.g., probabilistic tools or Multi-Criteria Decision Analysis [MCDA]) |
| **Healthy Environments and Consumer Safety Branch (HECSB)** | | | | | |
| WAQB[1] / Water | ✓ | ✓ | ✓ | ✓ | |
| WAQB / Air | ✓ | ✓ | ✓ | ✓ | |
| New Substances – NSACB[2] | ✓ | ✓ | ✓ | | |
| Existing Substances – ESRAB[3] | ✓ | ✓ | ✓ | ✓ | |
| ERHSD[4] | | | ✓ | ✓ | |
| CPSD[5] | ✓ | ✓ | ✓ | | ✓ |
| **Health Products and Food Branch (HPFB)** | | | | | |
| TPD[6] | ✓ | ✓ | ✓ | ✓ | ✓ |
| BGTD[7] / Biologics | ✓ | ✓ | ✓ | ✓ | ✓ |
| MHPD[8] | ✓ | ✓ | ✓ | ✓ | ✓ |
| NNHPD[9] | ✓ | ✓ | ✓ | ✓ | |
| VDD[10] | ✓ | ✓ | ✓ | ✓ | ✓ |
| FD[11] / Novel Foods | ✓ | ✓ | ✓ | | |
| FD / Nutrition Labelling and Claims | | ✓ | | | |
| FD / Microbial Hazards | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Pesticide Management Regulatory Agency (PMRA)** | | | | | |
| HED[12] | ✓ | ✓ | ✓ | ✓ | ✓ |

[1]  Water and Air Quality Bureau, Safe Environments Directorate (SED)
[2]  New Substances Assessment and Control Bureau, SED

3  Existing Substances Risk Assessment Bureau, SED

4  Environmental and Radiation Health Sciences Directorate

5  Consumer Product Safety Directorate

6  Therapeutic Products Directorate

7  Biologics and Genetic Therapies Directorate

8  Marketed Health Products Directorate

9  Natural and Non-prescription Health Products Directorate

10  Veterinary Drugs Directorate

11  Food Directorate

12  Health Evaluation Directorate

\*   In general, the totality of evidence concept does not involve any actual "weighing" of multiple lines of evidence relative to each other, and is thus not interpreted as part of the WoE concept by certain programs. Nevertheless, this concept is commonly recognized as part of the scope of the WoE approach in the risk assessment context by most programs across the Department. Some differences are also observed regarding the sub-concept of considering "all" available evidence and such apparent differences may be the result of more literal interpretations of "all" available evidence by these programs compared to others, rather than a true reflection of actual differences of risk assessment practices. Moreover, a precise interpretation of "all" is also dependent on the program area/regulatory requirements in terms of the type of evidence that are required in order to support a submission. For example, for programs conducting risk assessments on therapeutic products such as drugs and biologics, the requirements come from guidelines of the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH). On the other hand, pesticide evaluations utilize guidance lists of required and conditionally required data, which differ depending on how and where the product is used.

\*\*  Qualitative methods of assessing and integrating multiple lines of scientific evidence in Departmental risk assessment programs seem to be the dominant application of the WoE approach for risk assessments across the Department. Specific qualitative methods can range from simple listing of the evidence assessed, to more detailed narrative descriptions that explain the rationale behind the application of best professional judgment, in which some lines of evidence are considered more important, and are given more weight, compared to others. Semi-quantitative methods include systematic assignment of alphanumeric scores for each line of evidence, as well as logic models, decision trees and causality analysis that implicitly give more weight to certain lines of evidence over others, even if actual numeric scores are not assigned. Frequently referred to as "levels of evidence", scoring tools are more often applied by programs involved in the regulation of therapeutic products, for which such standards and scoring systems exist, and are practiced, by international counterparts. Semi-quantitative methods employing hierarchal descriptors instead of alphanumeric scores are frequently employed in the context of assigning value to causality criteria used in foodborne illness outbreaks. Similarly, semi-quantitative descriptors for key events could be used for Mode of Action (MoA) assessment of chemicals for carcinogenicity/mutagenicity. Quantitative methods are not widely used across the Department, often due to limitations in availability of appropriate data.

# Annex 3

## Checklist for Transparent Documentation of Weight of Evidence Approach

When weight of evidence terminology is used, specify intended meaning in relation to the following concepts:

☐ ***Totality of Evidence:*** conceptual interpretations of the nature and scope of evidence sources for consideration

☐ ***Weighing Evidence:*** methodology for assessment and integration of multiple lines of evidence

## For the risk assessment process, are the following documented?

☐ evidence gathered: all available to date, individual sources and types

☐ evidence included for further consideration, and why (i.e., inclusion criteria)

☐ evidence excluded from further consideration, and why (i.e., exclusion criteria)

☐ lines of evidence assembled (list individual studies under each line)

☐ assessment criteria applied to lines of evidence, and scoring tools used (if any)

☐ values/weighting assigned to each line of evidence (e.g., descriptions, alphanumeric)

☐ integration scheme (e.g., best professional judgment, mathematical formula, criteria framework)

☐ overall conclusion/recommendation(s)

# Exhibit 163

*Int. J. Cancer:* **104,** 228–232 (2003)
© 2003 Wiley-Liss, Inc.



Publication of the International Union Against Cancer

# OVULATION AND RISK OF EPITHELIAL OVARIAN CANCER

David M. Purdie[1]*, Christopher J. Bain[2], Victor Siskind[1], Penelope M. Webb[1] and Adèle C. Green[1]

[1]*Queensland Institute of Medical Research, Royal Brisbane Hospital, Herston, Queensland, Australia*
[2]*School of Population Health, The University of Queensland Medical School, Herston, Queensland, Australia.*

Incessant ovulation is thought to be one of the primary causes of epithelial ovarian cancer. However, the effects of ovulation at different ages and of the various exposures or events that suppress ovulation have not been established. We used data from an Australian case-control study of 791 ovarian cancer cases and 853 controls to examine the effect of ovulation on ovarian cancer risk. The total number of lifetime ovulations was calculated using information provided in a monthly contraceptive/reproductive calendar, as well as incorporating other information such as average menstrual cycle length. An increase of 1 year's worth of ovulation was associated with a 6% increase in risk of ovarian cancer (95% confidence interval [CI] = 4–8%). Ovulations in the 20–29-year age group were associated with the greatest risk, with a 20% increase in risk associated with each year of ovulation during this age period (95% CI = 13–26%). When the effects of different exposures that suppress ovulation were compared, there was an indication that some factors may have a greater effect than others. These findings support the theory that incessant ovulation is a major contributor to the occurrence of ovarian cancer and suggest that ovulations during the 20s may be those most associated with disease risk.
© 2003 Wiley-Liss, Inc.

**Key words:** *ovarian cancer; case-control study; ovulation; pregnancy; oral contraceptive pill*

In 1971, Fathalla was the first to suggest a possible relation between the frequency of ovulation and the development of malignant neoplasms from the ovarian epithelium.[1] He noted that societal developments had rendered most ovulations purposeless and proposed that repeated minor trauma to the epithelial surface of the ovary, caused by incessant ovulation, is a major risk factor for ovarian cancer.[1]

Various biologic findings support the "incessant ovulation" hypothesis. The ovarian epithelial cells proliferate following ovulation, which may propagate mutations or promote carcinogenesis,[2] and ovulation itself has been implicated in malignant transformation of the epithelium.[3] In support of this hypothesis is epidemiologic evidence that exposures that suppress ovulation, such as the oral contraceptive pill (OCP) and pregnancy, reduce occurrence of ovarian cancer.[4] In addition, a number of investigators have reported a significant association between increasing number of calculated lifetime ovulations and risk of ovarian cancer.[4–12] In general, however, the number of accumulated lifetime ovulations has only been crudely estimated by subtracting duration of pregnancies, lactation and OCP use from the total years between menarche and menopause.

Using data from a large Australian population-based case-control study, we have explored the relationship between ovulation and risk of ovarian cancer in greater depth. In addition to comparing the separate effects of the most common exposures/events that suppress ovulation, we have considered the effects of age-specific ovulations on risk of ovarian cancer.

## MATERIAL AND METHODS

Histologically confirmed incident cases of primary epithelial ovarian cancer registered in major gynecologic-oncology treatment centres in 3 Australian states were ascertained. Notification of cancer cases is obligatory in Australia; however, only in Queensland could the cancer registry be accessed to ensure complete case ascertainment. In the other 2 states, approximately half of eligible cases notified to the registry were enrolled. Cases diagnosed in 1991 and 1992 in New South Wales and Victoria and from August 1990 to the end of 1993 in Queensland were recruited. Histologic diagnosis was confirmed by an independent gynecologic pathologist in each state. Details have been published elsewhere.[13] Briefly, ovarian cancer patients who were aged 18–79 years at diagnosis and capable of completing the questionnaire were eligible to participate. A control series was selected at random from the electoral roll (enrollment to vote is compulsory in Australia), frequency-matched to cases on broad geographic region and weighted so that the age distribution would match that of the cases. Women with previous ovarian cancer or bilateral oophorectomy or those incapable of completing the questionnaire were not eligible; cases found not to be on the electoral roll were also excluded from the analysis.

Identically trained interviewers administered a standard questionnaire to each woman in a face-to-face interview to obtain personal details including marital status, level of education, height and weight, smoking history, history of abdominal surgery, talc use, menstrual cycle details and family history of ovarian or other cancers. Details of each woman's reproductive and contraceptive histories were obtained by means of pregnancy and contraceptive calendars that elicited, month by month, events in the woman's reproductive life from age 15–50 years. In a small number of calendars, some missing data were filled in by parallel information gathered in the questionnaire.

### Estimating lifetime ovulations

The length of time a woman had ovulated up to the age of diagnosis (or interview for controls) was calculated using age at menopause for postmenopausal women or current age for premenopausal women, age at menarche, total duration of pregnancies (births and abortions), duration of OCP use, postpregnancy amenorrhoea, other periods of amenorrhoea, menstrual cycle length and average ovulatory intensity across reproductive life as reported by Metcalf *et al.*[14] Women were classified as premenopausal if they were still menstruating and were not on hormone replacement therapy (HRT) and as postmenopausal if their periods had ended naturally. If they reported a surgical menopause via hysterectomy, age at natural menopause was estimated as the age they began HRT or first had menopausal symptoms or at age 50 (the mean age of natural menopause for both cases and controls).

Pregnancies of <20 weeks gestation were classified as abortions (spontaneous or induced) and those ≥20 weeks as births (still or live).[15] After each pregnancy, the reported number of weeks before

Grant sponsor: Australian National Health and Medical Research Council; Grant sponsor: Queensland Cancer Fund.

*Correspondence to: Queensland Institute of Medical Research, Post Office, Royal Brisbane Hospital, Queensland 4029, Australia.
Fax: +61-7-3845-3502. E-mail: davidP@qimr.edu.au

Received 3 July 2002; Revised 12 November 2002; Accepted 13 November 2002

DOI 10.1002/ijc.10927

periods returned was cumulated to estimate duration of "postpregnancy amenorrhoea." If women could not recall this, it was estimated using duration of breastfeeding (without supplementation), up to a maximum of 12 months,[16] or for those who did not breastfeed, it was taken to be 6 weeks after births or 3 weeks after abortions (including ectopic pregnancies).[17] Women were also asked the length of time their periods had ever stopped due to chronic illness, psychological stress, excessive leanness, obesity or post-OCP use, all referred to as "other amenorrhoea."

For each woman, the total potential ovulatory time in months was multiplied by the average number of menstrual cycles per month (calculated from her reported menstrual cycle length) to estimate the cumulative number of ovulations that occurred during her lifetime up to the time of diagnosis/interview. Months of pregnancy, OCP use, postpregnancy amenorrhoea and other amenorrhoea were similarly weighted to estimate the cumulative number of ovulations suppressed. Results are presented as equivalent year's worth of ovulation (ovulatory years) by dividing total ovulations by 13 (since a normal 28-day cycle constitutes 13 ovulations per year).

The number of ovulations occurring at various ages during a woman's reproductive life was also considered. Specifically, ovulations accumulated from ages 10–19, 20–29, 30–39 and 40–49 years were analysed separately, and the risks associated with increasing number of ovulations in each age band were compared. Since the incidence of ovulation varies by age,[14] estimates of the age-specific incidence of ovulation per menstrual cycle were used to weight the number of cycles at different ages and allow valid comparison of the risk estimates across various ages. The exact weights used to adjust menstrual cycles, based on the average incidence of ovulation reported by Metcalf et al.,[14] were 56.5%, 84%, 98%, 90.5% and 66% for the age periods 10–19, 20–29, 30–39, 40–49 and ≥50 years, respectively.

*Statistical analysis*

Crude odds ratios (OR) with 95% confidence intervals (CI) were used as unadjusted measures of association between levels of exposures and disease status. Unconditional logistic regression was carried out to estimate the effect of ovulation and of exposures that suppress ovulation after adjusting for age and age squared (in years), level of education, residential location (state; urban *vs.* rural), talc use in the perineal region, body mass index (BMI), smoking status (current, past, never), family history of breast or ovarian cancer and a previous hysterectomy or tubal sterilization.[13] For the investigation of ovulations at different ages, ORs were also adjusted for the number of ovulations at other ages, since ovulations in each age band were correlated. Wald $\chi^2$ statistics were calculated to test for homogeneity of regression coefficients to assess whether greater risk was associated with a particular form of anovulation or ovulations occurring within a particular age period. All analyses were conducted using SAS for Windows release 8.2 (SAS Institute, Cary, NC).

## RESULTS

Of 1,116 cases of epithelial ovarian cancer identified, 191 (17%) were ineligible on grounds of age, language problems, mental incapacity or histology; 50 (4%) died prior to interview; 12 (1%) were unable to be contacted; 41 (4%) either refused or their doctor did not consent; and 29 (3%) were excluded because they were not on the electoral roll. Among 1,527 potential controls selected from the electoral roll, 192 women (13%) could not be traced; 162 (11%) were ineligible or physically unable to participate; and 318 (21%) refused. A further 2 cases and 2 controls were excluded from the analysis because of insufficient information in their pregnancy and contraceptive calendars. After exclusions as described above, there were 791 eligible cases and 853 eligible controls who provided adequate data for calculation of total ovulations.

*Total number of lifetime ovulations*

The cumulative number of ovulatory years ranged from 0–42; for cases the mean number was 22.1 (SD = 8.2) and for controls 19.5 (SD = 8.8), a difference that was statistically significant (t = 6.3; df = 1,644; $p < 0.001$). Thus, on average, cases had 2–3 more ovulatory years than did controls.

Ovulatory years were grouped into 10-year bands, and the resulting distributions for cases and controls compared (Table I). There was a significant trend of increasing risk of epithelial ovarian cancer with increasing number of years of ovulations ($p < 0.001$), particularly after adjusting for confounding factors such as age. Women with ≥30 years of ovulations had more than 5 times the adjusted risk of ovarian cancer of women with fewer than 10 years of ovulations (OR = 5.01, 95% CI = 2.86–8.76). Using years of ovulations in the model as a continuous variable resulted in an OR of 1.06 per ovulatory year (95% CI = 1.04–1.08), indicating a 6% increase in risk of ovarian cancer associated with each full ovulation year a woman experienced.

The effect of ovulation was similar for women with both borderline (n = 138) and frankly malignant ovarian tumours (n = 653). There also was a nonsignificant 4% increase in the risk of primary peritoneal tumours associated with each year of ovulation, although there were only 22 cases with these tumours (all malignant), so the confidence interval for this effect was wide (OR = 1.04, 95% CI = 0.96–1.13). Among histologic subtypes of epithelial ovarian cancer, adjusted ORs for each ovulatory year were 1.06 for serous tumours (95% CI = 1.04–1.08), 1.10 for endometrioid tumours (95% CI = 1.06–1.14), 1.08 for clear cell tumours (95% CI = 1.03–1.13), 1.01 for mucinous tumours (95% CI = 0.98–1.04), 1.03 for undifferentiated tumours (95% CI = 0.97–1.07) and 1.11 for mixed epithelial/mixed mesodermal tumours (95% CI = 1.06–1.17). As reported previously from our data,[18] the risk associated with ovulation appears to be restricted to nonmucinous tumours.

*Timing of ovulations*

Crudely, for each age period, a greater number of ovulations was associated with an increasing risk of ovarian cancer (Table

TABLE I – NUMBER OF LIFETIME OVULATIONS FOR CASES (INVASIVE AND BORDERLINE) AND CONTROLS

| Years of ovulation | Cases (n = 791) | Controls (n = 853) | Crude OR (95% CI) | Adjusted OR[1] (95% CI) |
|---|---|---|---|---|
| 0–9 years | 10.0% | 16.3% | 1.0 | 1.0 |
| 10–14 years | 10.9% | 15.9% | 1.11 (0.76–1.64) | 1.53 (0.96–2.44) |
| 15–19 years | 13.7% | 14.7% | 1.51 (1.03–2.20) | 2.34 (1.44–3.78) |
| 20–24 years | 20.1% | 19.9% | 1.64 (1.15–2.32) | 2.52 (1.57–4.07) |
| 25–29 years | 33.6% | 26.4% | 2.07 (1.49–2.88) | 3.29 (2.03–5.31) |
| 30–42 years | 11.9% | 6.8% | 2.85 (1.86–4.38) | 5.01 (2.86–8.76) |
| OR per ovulatory year | | | | 1.06 (1.04–1.08) |

[1]OR, odds ratio; CI, confidence interval.–ORs adjusted for age, age squared, education, area of residence, body mass index (BMI), talc use in perineal region, smoking status, tubal sterilization, hysterectomy and a family history of breast or ovarian cancer.

230                                                                                                 PURDIE ET AL.

II). After controlling for ovulations in other age periods how-ever, the 20–29-year age period had the most distinct trend of increasing risk with increasing number of ovulations, there being a 20% increase in risk associated with each ovulatory year accumulated in this age period (OR = 1.20, 95% CI = 1.13–1.27). There was a 6% increase in risk associated with each ovulatory year during the 30–49-year age period, after controlling for ovulations in the younger age periods. An increased number of ovulations in the 10–19-year age band had a nonsignificant inverse association with risk of disease after controlling for ovulations in other age periods ($p = 0.21$). A test for homogeneity of regression coefficients revealed significantly different effects of ovulations in the various age periods ($p < 0.001$).

### Comparison of different anovulation mechanisms

Risk estimates were obtained for each type of event associated with ovulation suppression, mutually adjusted for each other, as well as for other potential confounders. Use of the OCP was associated with an 8% decrease in risk of ovarian cancer with each year of ovulation suppressed (OR = 0.92, 95% CI = 0.89–0.94); births a 12% decrease in risk (OR = 0.88, 95% CI = 0.78–0.98); postpregnancy amenorrhoea a 13% decrease in risk (OR = 0.87, 95% CI = 0.72–1.05); other amenorrhoea a 4% reduction in risk (OR = 0.96, 95% CI = 0.70–1.30); and abortions showed a 35% increase in risk with each year of associated anovulation (OR = 1.35, 95% CI = 0.73–2.48). All of the events/exposures, except for abortion, showed trends of decreasing risk with increasing years of ovulation suppression (although even the effect of abortions was not inconsistent with the other effects, taking into consideration the width of the confidence interval). The test for homogeneity of regression coefficients did not indicate any significant difference in effects ($p = 0.53$). The OCP, based on sufficient exposure, was the only one to show a clear trend with long-term suppression of ovulation. The effect associated with the OCP was very similar in nulligravid women (OR per year = 0.91, 95% CI = 0.85–0.98) to that seen in gravid women (OR per year = 0.92, 95% CI = 0.89–0.94).

### DISCUSSION

A number of prior epidemiologic studies have attempted to estimate women's total duration of ovulatory life based on their reproductive and contraceptive histories. All have shown that the relative risk of ovarian cancer increases significantly by 2–4.5-fold with >35 years of ovulation compared to <25 years.[4–12] A linear relationship between increasing years of ovulation and risk of disease has also been noted by some.[8,9,11] The approach to investigating the role of ovulation in the development of ovarian cancer taken here was similar in principle to the approaches of previous studies, but we attempted to refine calculations further by taking into account underlying biologic influences on ovulation. To this end, a more precise definition of age at menopause was used, especially post hysterectomy, using information on menopausal symptoms and treatment to estimate age at cessation of ovulation. In addition, anovulation due to amenorrhoea caused by factors such as psychologic stress or chronic illness was considered, and the calculation of total potential number of ovulations was tailored to the actual length of each woman's menstrual cycle. Finally, since information was collected by means of a lifetime calendar, the timing of ovulation could be examined and adjustments made for variations in frequency of ovulation at various ages. However, any approach to calculating number of ovulations will be imprecise because not all seemingly normal cycles are ovulatory and this varies from woman to woman. In addition, the various mechanisms for suppression of ovulation are not likely to be recalled with equal accuracy. Number of births, for instance, is likely to be recalled more accurately than periods of amenorrhoea. The accuracy of recall is unlikely to differ between cases and controls, leading to a greater attenuation of the effect of some mechanisms than others. A recent article comparing various methods for calculating numbers of lifetime ovulations concluded that it is important to assess the various mechanisms separately because their effects are not homogenous.[19]

Risk of ovarian cancer in this Australian population appeared to be related to the number of lifetime ovulations in a linear fashion (Table I), with an average 6% increase in risk associated with each ovulatory year. This finding supports a model proposed by Pike,[20] which relates incidence of ovarian cancer to duration of exposure

TABLE II – YEARS OF OVULATION WITHIN AGE BANDS FOR CASES AND CONTROLS

| Years of ovulations within age bands | Cases ($n = 791$) | Controls ($n = 853$) | Adjusted OR[1] (95% CI) | Adjusted OR[2] (95% CI) |
|---|---|---|---|---|
| **Age 10–19 years** | | | | |
| < 4 years | 70.2% | 71.9% | 1.0 | 1.0 |
| 4–5 years | 27.7% | 26.1% | 1.05 (0.84–1.33) | 0.95 (0.75–1.20) |
| 6–8 years | 2.0% | 2.0% | 1.16 (0.56–2.41) | 0.73 (0.34–1.56) |
| OR per ovulatory year | | | 1.05 (0.96–1.15) | 0.94 (0.85–1.04) |
| **Age 20–29 years** | | | | |
| < 4 years | 21.8% | 34.8% | 1.0 | 1.0 |
| 4–5 years | 20.0% | 20.6% | 1.75 (1.27–2.41) | 1.65 (1.19–2.29) |
| 6–7 years | 37.7% | 31.6% | 2.20 (1.62–3.00) | 1.98 (1.42–2.77) |
| 8–11[3] years | 20.4% | 13.0% | 3.04 (2.11–4.37) | 2.79 (1.87–4.15) |
| OR per ovulatory year | | | 1.20 (1.14–1.27) | 1.20 (1.13–1.26) |
| **Age 30–39 years** | | | | |
| < 4 years | 18.0% | 26.8% | 1.0 | 1.0 |
| 4–5 years | 9.7% | 12.5% | 1.29 (0.86–1.93) | 1.35 (0.90–2.04) |
| 6–7 years | 15.5% | 13.3% | 1.96 (1.34–2.86) | 1.60 (1.08–2.37) |
| 8–13[3] years | 56.8% | 47.4% | 1.96 (1.44–2.67) | 1.44 (1.03–2.01) |
| OR per ovulatory year | | | 1.10 (1.06–1.14) | 1.06 (1.02–1.10) |
| **Age 40–49 years** | | | | |
| < 4 years | 33.8% | 41.9% | 1.0 | 1.0 |
| 4–5 years | 14.4% | 14.6% | 1.22 (0.87–1.71) | 1.25 (0.88–1.77) |
| 6–7 years | 13.1% | 11.3% | 1.57 (1.09–2.24) | 1.34 (0.92–1.95) |
| 8–11[3] years | 38.7% | 32.2% | 1.59 (1.19–2.13) | 1.31 (0.96–1.78) |
| OR per ovulatory year | | | 1.07 (1.04–1.11) | 1.04 (1.00–1.09) |

[1]ORs adjusted for age, age squared, education, area of residence, body mass index (BMI), talc use in perineal region, smoking status, tubal sterilization, hysterectomy and a family history of breast or ovarian cancer.–[2]ORs also adjusted for number of ovulatory years in other age periods.–[3]Due to short cycle lengths, some women had the equivalent of more than one ovulatory year in a calendar year.

of the ovarian epithelium to ovulation. Support for a direct role of ovulation on ovarian tumour development also comes from animal studies that have shown that, when continuously hyperovulated, domestic laying hens develop high rates of ovarian tumours,[21] and mice ovarian epithelium undergoes neoplastic changes.[22]

Within all decades of reproductive life after 20 years of age, cases had a significantly higher number of age-specific ovulations than did controls, with ovulations occurring from 20–29 years of age incurring a markedly greater risk of ovarian cancer than those occurring at any other time. The 20–29-year age period is the time when ovulations are most commonly interrupted by contraceptive and reproductive exposures and so is likely to show the most variation between cases and controls with respect to number of ovulations. This association could also suggest, however, that ovulations in the 20–29 year age group are the most influential in terms of development of ovarian cancer, reflecting the "induction time" between disease initiation and detection.[23] It is likely that ovarian cancer has a reasonably long latency period between initiation and manifestation of established disease, and this is exacerbated by the usually late clinical detection of the disease. The peak incidence of ovarian cancer is in the 60–70-year age period,[24] which was also seen in the series of cases in our study. If ovulation has the greatest effect during a woman's 20s, it would suggest that an increased number of ovulations during this age period may increase the risk of disease initiation. Thus, the latency period of more advanced, malignant epithelial ovarian cancer could be estimated to be approximately 30–40 years. This time frame is consistent with data from the Hiroshima cohort, which estimated a minimum radiation-induced latency period of 15–20 years for ovarian cancer development.[25] The increase in risk associated with ovulations during the 30–49-year age period may indicate that either ovulation itself or the repeated exposure to gonadotrophins associated with ovulation could promote disease development during this period. If the role of ovulation was primarily promotion of already initiated disease, risk would be highest at ages closer to the time of usual disease detection.

The corollary to the hypothesis that ovulation initiates mutagenesis of ovarian epithelial cells is that the amount of protection afforded by exposures that suppress ovulation should be independent of the particular cause of anovulation and depend only upon the total period of anovulation. In a previous analysis of these data, Siskind et al.[26] concluded that the protective effect of the OCP was greater than what would be predicted by suppression of ovulation alone. Similarly, Risch et al.,[10] La Vecchia et al.[9] and Whittemore et al.[4] have also concluded from their data that the relationship between ovulation-suppressive events/exposures and development of disease is more complex than could be explained by duration of anovulation. In our analysis, we found a 12% reduction in risk associated with each year of ovulation suppressed through full-term pregnancies, with corresponding risk reductions of 8% for the OCP, 13% for postpregnancy amenorrhoea and 4% for other amenorrhoea. Although there was no significant difference in the size of these effect estimates ($p = 0.53$), the effects of OCP and pregnancy were larger than other forms of amenorrhoea, consistent with the previous findings and with recent evidence of a direct hormonal effect on ovarian epithelium.[27] Different formulations of the OCP also have recently been shown to have different effects on ovarian cancer risk;[28] unfortunately attempts to collect information on the type of OCP used in this study were unsuccessful. Further research is necessary into the mechanisms underlying the protective effects of pregnancy and the OCP in ovarian cancer development, other than suppression of ovulation.

Pregnancy resulting in abortions (spontaneous or induced) appeared to be associated with an increased risk of ovarian cancer, which was due to a positive association seen with induced abortions, suggesting that some other factors associated with induced abortions may increase risk over and above any protection afforded by the few suppressed ovulations. Also, because the number of ovulations suppressed by abortions was much fewer than for other factors, it was difficult to assess the magnitude of its effect to the same degree, thus uncertainty remains for this association.

Some support for a direct role of ovulation is also found among the subgroup of infertile women who suffer from anovulatory infertility. In a pooled analysis of 8 population-based case-control studies (including the one presented here), it was found that anovulatory infertility was negatively associated with ovarian cancer risk (albeit not significantly), whereas unsuccessful attempts to become pregnant were associated with an increased risk of ovarian cancer.[29]

In summary, our results would be consistent with initiation of ovarian epithelial carcinogenesis due to ovulation from 20–30 years of age and tumour promotion occurring after about age 30, either through the mechanism of ovulation itself or due to the high levels of hormones associated with it. These events may then culminate to result in a tumour becoming clinically apparent from the ages of 55–75 years. Clearly insights at the molecular level would help evaluate the actual role of ovulation in ovarian cancer development. Mutations of the p53 tumour suppressor gene were associated with an increased number of lifetime ovulations in one study,[30] but this finding was not replicated in a subset of our data.[31] Perhaps other gene mutations may be responsible or some other role of ovulation such as epithelial inflammation.[32] The exact mechanism is yet to be determined.

## ACKNOWLEDGEMENTS

The contribution made by other members of the Survey of Women's Health Study Group has been acknowledged previously.[13]

## REFERENCES

1. Fathalla MF. Incessant ovulation—a factor in ovarian neoplasia? Lancet 1971;2:163.
2. Preston Martin S, Pike MC, Ross RK, Henderson BE. Epidemiologic evidence for the increased cell proliferation model of carcinogenesis. Prog Clin Biol Res 1991;369:21–34.
3. Hamilton TC. Ovarian cancer, part I: biology. Curr Probl Cancer 1992;16:1–57.
4. Whittemore AS, Harris R, Itnyre J. Characteristics relating to ovarian cancer risk: collaborative analysis of 12 US case-control studies. IV. The pathogenesis of epithelial ovarian cancer. Collaborative Ovarian Cancer Group. Am J Epidemiol 1992;136:1212–20.
5. Chen Y, Wu PC, Lang JH, Ge WJ, Hartge P, Brinton LA. Risk factors for epithelial ovarian cancer in Beijing, China. Int J Epidemiol 1992; 21:23–9.
6. Shu XO, Brinton LA, Gao YT, Yuan JM. Population-based case-control study of ovarian cancer in Shanghai. Cancer Res 1989;49: 3670–4.
7. Mori M, Harabuchi I, Miyake H, Casagrande JT, Henderson BE, Ross RK. Reproductive, genetic, and dietary risk factors for ovarian cancer. Am J Epidemiol 1988;128:771–7.
8. Wu ML, Whittemore AS, Paffenbarger RS Jr, Sarles DL, Kampert JB,

Grosser S, Jung DL, Ballon S, Hendrickson M, Mohle Boetani J. Personal and environmental characteristics related to epithelial ovarian cancer. I. Reproductive and menstrual events and oral contraceptive use. Am J Epidemiol 1988;128:1216–27.
9. La Vecchia C, Franceschi S, Gallus G, Decarli A, Liberati A, Tognoni G. Incessant ovulation and ovarian cancer: a critical approach. Int J Epidemiol 1983;12:161–4.
10. Risch HA, Weiss NS, Lyon JL, Daling JR, Liff JM. Events of reproductive life and the incidence of epithelial ovarian cancer. Am J Epidemiol 1983;117:128–39.
11. Hildreth NG, Kelsey JL, LiVolsi VA, Fischer DB, Holford TR, Mostow ED, Schwartz PE, White C. An epidemiologic study of epithelial carcinoma of the ovary. Am J Epidemiol 1981;114:398–405.
12. Casagrande JT, Louie EW, Pike MC, Roy S, Ross RK, Henderson BE. "Incessant ovulation" and ovarian cancer. Lancet 1979;2:170–3.
13. Purdie D, Green A, Bain C, Siskind V, Ward B, Hacker N, Quinn M, Wright G, Russell P, Susil B. Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Int J Cancer 1995;62:678–84.
14. Metcalf MG. Incidence of ovulation from the menarche to the meno-

pause: observations of 622 New Zealand women. N Z Med J 1983; 96:645–8.

15. Australian Government. Registration of Births, Deaths and Marriages Act. Sydney: Govt. Printer, 1996.

16. Lewis PR, Brown JB, Renfee MB, Short RV. The resumption of ovulation and mestruation in a well-nourished population of women breastfeeding for an extended period of time. Fertil Steril 1991;55: 529–36.

17. McNeilly AS. Breastfeeding and fertility. In: Gray R, Leridon H, Spira A, eds. Biomedical and demographic determinants of reproduction. Oxford: Clarendon Press, 1993. 391–412.

18. Purdie DM, Siskind V, Bain CJ, Webb PM, Green AC. Reproduction-related risk factors for mucinous and nonmucinous epithelial ovarian cancer. Am J Epidemiol 2001;153:860–4.

19. Moorman PG, Schildkraut JM, Calingaert B, Halabi S, Vine MF, Berchuck A. Ovulation and ovarian cancer: a comparison of two methods for calculating lifetime ovulatory cycles (United States). Cancer Causes Control 2002;13:807–11.

20. Pike MC. Age-related factors in cancers of the breast, ovary, and endometrium. J Chronic Dis 1987;40 (Suppl 2):59s–69s.

21. Wilson JE. Adeno-carcinomata in hens kept in a constant environment. Poult Sci 1958;37:1253.

22. Clow OL, Hurst PR, Fleming JS. Changes in the mouse ovarian epithelium with age and ovulation number. Mol Cell Endocrinol 2002;191:105–11.

23. Rothman KJ. Induction and latent periods. Am J Epidemiol 1981;114: 253–9.

24. Parkin DM, Muir CD, Whelan SL, Gao Y-T, Ferlay J, Powell J. Cancer incidence in five continents, vol. VI, no. 120. Lyon: IARC Scientific Publications, 1992.

25. Tokuoka S, Kawai K, Shimizu Y, Inai K, Ohe K, Fujikura T, Kato H. Malignant and benign ovarian neoplasms among atomic bomb survivors, Hiroshima and Nagasaki, 1950–80. J Natl Cancer Inst 1987;79: 47–57.

26. Siskind V, Green A, Bain C, Purdie D. Beyond ovulation: oral contraceptives and epithelial ovarian cancer. Epidemiology 2000;11: 106–10.

27. Rodriguez GC, Walmer DK, Cline M, Krigman H, Lessey BA, Whitaker RS, Dodge R, Hughes CL. Effect of progestin on the ovarian epithelium of macaques: cancer prevention through apoptosis? J Soc Gynecol Investig 1998;5:271–6.

28. Schildkraut JM, Calingaert B, Marchbanks PA, Moorman PG, Rodriguez GC. Impact of progestin and estrogen potency in oral contraceptives on ovarian cancer risk. J Natl Cancer Inst 2002;94:32–8.

29. Ness RB, Cramer DW, Goodman MT, Kjaer SK, Mallin K, Mosgaard BJ, Purdie DM, Risch HA, Vergona R, Wu AH. Infertility, fertility drugs, and ovarian cancer: a pooled analysis of case-control studies. Am J Epidemiol 2002;155:217–24.

30. Schildkraut JM, Bastos E, Berchuck A. Relationship between lifetime ovulatory cycles and overexpression of mutant p53 in epithelial ovarian cancer. J Natl Cancer Inst 1997;89:932–8.

31. Webb PM, Green A, Cummings MC, Purdie DM, Walsh MD, Chenevix Trench G. Relationship between number of ovulatory cycles and accumulation of mutant p53 in epithelial ovarian cancer. J Natl Cancer Inst 1998;90:1729–34.

32. Ness RB, Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. J Natl Cancer Inst 1999;91:1459–67.