# Exhibit 41

| No. | STATEMENT | AGREE | DISAGREE | DON'T KNOW/ NO OPINION |
|---|---|---|---|---|
| 1 | Given the number of hazard ratios reported in the literature between 1.1 of 1.4 in both case-control and cohort studies, it is disingenuous to state that there is no evidence that talc is associated with ovarian cancer. | | X | |
| 2 | If 40% of women use talc and the relative risk is 1.2, then 7% of ovarian cancer cases would be attributable to talc use or 1577 cases a year in the USA. This is not a trivial number and should not be dismissed. | | X | |
| 3 | Genital powder use is a modifiable exposure associated with small-to-moderate increases in risk of most histologic subtypes of epithelial ovarian cancer. | | X | |
| 4 | Perineal use of talc-based (non-asbestiform) body powder is possibly carcinogenic to humans (Group 2B). | | X | |
| 5 | The use of perineal talcum powder has been associated with a 20 to 30 percent increased risk of ovarian cancer, although it also has been show to vary by histologic subtype. | | X | |
| 6 | A lot of work has been done to clarify the risk reduction of various lifestyle approaches, such as alcohol, obesity, cigarette smoking, and talc use. Some of these are subtype specific, such as endometriosis, cigarette smoking, and obesity, while others are general risk factors. Use of talc in the genital area has consistently been shown to increase the risk of OC and therefore is not recommended. | | X | |
| 7 | Inflammatory risk factors for EOC are perineal talc exposure, endometriosis, and pelvic inflammatory disease. | | X | |
| 8 | ~~...~~ risk factors to be considered: parity, oral contraceptive use, breastfeeding, tubal ligation, painful periods or endometriosis, obesity or polycystic ovarian syndrome, and talc use. These risk factors are concordant with published epidemiologic data related to reproductive factors, use of talc, tubal ligation, endometriosis, and polycystic ovarian syndrome or obesity. | | X | |

EXHIBIT

9

Berens 3/29/18

PENGAD 800-631-6989

| No. | STATEMENT | AGREE | DISAGREE | DON'T KNOW/ NO OPINION |
|---|---|---|---|---|
| 9 | ~~...~~ talc powder use is highly prevalent in the African-American community and has been found to be associated with increased risk of ovarian cancer in this and other studies. | | X | |
| 10 | Most women report using Johnson's Baby Powder or Shower to Shower. | | | X |
| 11 | The average age women begin using talc is 20. | | | X |
| 12 | In the interests of public health, I believe we should caution women against using genital talcum powder. | | X | |
| 13 | Genital powder use is a lifestyle risk factor for all serous, endometrioid, and clear cell histologic subtypes of ovarian cancer. | | X | |
| 14 | Overall, there is an association between genital talc use and EOC and a significant trend with increasing "talc years" of use. | | X | |
| 15 | Talc-containing powders are hypothesized to promote cancer development by ascending the female genital tract and interacting directly with the ovarian surface epithelium, leading to local inflammation characterized by increased rates of cell division, DNA repair, oxidative stress, and elevated inflammatory cytokines. | X | | |
| 16 | Following perineal application, talc particles can migrate from the vagina to the peritoneal cavity and ovaries. | | X | |
| 17 | A majority of women experience retrograde menstruation; this suggests a mechanism by which talc particles can travel through the female reproductive tract to the peritoneal cavity and ovaries. | | X | |
| 18 | It is possible that the passage of talc is aided by retrograde menses and that talc use during menses poses a special risk. | | X | |

| No. | STATEMENT | AGREE | DISAGREE | DON'T KNOW/ NO OPINION |
|---|---|---|---|---|
| 19 | Biologic credibility of the talc/EOC association is enhanced by persuasive evidence that inert particles the size of talc, present in the vagina, can migrate to the upper genital tract. | | X | |
| 20 | The vagina serves as a portal to the internal reproductive tract. | X | | |
| 21 | The vagina is a musculoepithelial tube extending from the level of the external genitals to the cervical portion of the uterus. It is a reproductive conduit in all respects, connecting the external environment to the internal genitalia. ( nru | X | | |
| 22 | A review of the literature suggests that it is biologically plausible for talc particles to migrate from the vagina to the peritoneal cavity and ovaries following perineal application. | | X | |
| 23 | Talc placed on the perineum may enter the vagina and ascend to the upper genital tract. | | X | |
| 24 | The potential for particulates to migrate from the perineum and vagina to the peritoneal cavity is indisputable. | | X | |
| 25 | The Sjosten study offers compelling evidence in support of the migration hypothesis. | | X | |
| 26 | Talc particulates from perineal application have been shown to migrate to the ovaries... | | X | |
| 27 | Talc is able to migrate through the genital tract and gain access to the ovaries because talc fibers have been detected in benign and malignant ovarian tissue. | | X | |
| 28 | There are inherent limitations quantifying a dose–response due to a lack of metrics for how much talc is in an "application," how much enters the vagina, and how much reaches the upper genital tract where, presumably, any deleterious effect is mediated. This may account for the failure to identify a dose–response in many papers on talc and ovarian cancer. | | X | |

| No. | STATEMENT | AGREE | DISAGREE | DON'T KNOW/ NO OPINION |
|---|---|---|---|---|
| 29 | Tubal ligation is a strong protective factor. One possibility for the mechanism is blocking the transience of potential materials could impact the health of the fimbria | | X | |
| 30 | Any material – whether it be talc, heavy metals, asbestos, whatever – can migrate from the perineum to the ovaries through the reproductive tract. There's an anatomical conduit. So it's not like it's blocked. Theoretically, it could happen. | | X | |
| 31 | There is an anatomic conduit from the perineum through to the ovary, vagina, cervical os, endometrium, and the fallopian tube. That is, in most women, an open conduit. On a theoretic level, things can transit. | X | | |
| 32 | Genital powder use was associated with ovarian cancer risk in AA women and are consistent with localized chronic inflammation in the ovary due to particulates that travel through a direct transvaginal route. | | X | |
| 33 | Biologic credibility for an association would be strengthened by an animal model, but an experiment capturing all of the potential factors in the human "model" would be very difficult. These elements include chronicity of the exposure, anatomic and physiologic uniqueness of women, effects of pregnancy and potential spread through coitus. | X | X | |
| 34 | It is plausible that perineal talc (and other particulate) that reaches the endometrial cavity, Fallopian tubes, ovaries and peritoneum may elicit a foreign body type reaction and inflammatory response that, in some exposed women, may progress to epithelial cancers. | | X | |
| 35 | Epidemiologic evidence implicates chronic inflammation as a central mechanism in the pathogenesis of ovarian cancer, the most lethal gynecologic cancer among women in the United States. | | X | |
| 36 | Findings on talc and endometriosis are consistent with previous findings and are compatible with the hypothesis that these factors increase the risk of ovarian cancer and that inflammation may be a common pathway. | | X | |

| No. | STATEMENT | AGREE | DISAGREE | DON'T KNOW/ NO OPINION |
|---|---|---|---|---|
| 37 | Chronic inflammation has been proposed as the possible causal mechanism that explains the observed association between certain risk factors, such as use of talcum powder (talc) in the pelvic region and epithelial ovarian cancer. | X | | |
| 38 | Talc particles can induce an inflammatory response *in vivo*, which may be important in ovarian cancer risk. Normal ovarian cells treated with talc are more likely to undergo cell proliferation and neoplastic transformation, and cellular generation of reactive oxygen species increases with increasing exposure to talc. | | X | |
| 39 | [A] growing body of epidemiologic evidence suggests that factors causing epithelial inflammation are involved in ovarian carcinogenesis.  Such factors include asbestos and talc exposures, endometriosis and pelvic inflammatory disease (PID). | | X | |
| 40 | Direct induction of inflammation as a result of endometriosis, talc and asbestos exposure, and PID, as well as ovulation itself, may act to promote ovarian tumorigenesis. | | X | |
| 41 | **Inflammation:** Studies of the inflammatory marker C-reactive protein suggest a possible association between inflammation and an increased risk of ovarian cancer. Other specific inflammatory factors have also been associated with ovarian cancer. | X | | |
| 42 | The patency of the female tract and the nature of ovarian cancer as a surface epithelial (mesothelial) lesion make the ovary a target for foreign body carcinogenesis. | | X | |
| 43 | Inflammation has been suggested to be a major factor leading to epithelial ovarian cancer. For example, epidemiologic data have shown that asbestos and talc exposure increased ovarian cancer risk. | | X | |

| No. | STATEMENT | AGREE | DISAGREE | DON'T KNOW/ NO OPINION |
|---|---|---|---|---|
| 44 | Studies have also found that endometriosis, pelvic inflammatory disease, and mumps viral infection are positively associated with ovarian cancer risk. In contrast, tubal ligations and hysterectomies, which are thought to reduce the exposure of the OSE to environmental inflammation initiators have been shown to reduce the risk of ovarian cancer. | X | | |
| 45 | It has been noted that the ovulatory process itself resembles an inflammatory reaction, with leukocytic infiltration, the release of nitric oxide and inflammatory cytokines, vasodilatation, DNA repair, and tissue remodeling. | X | | |
| 46 | The latency period of more advanced, malignant epithelial ovarian cancer could be estimated to be approximately 30–40 years. | | | X |
| 47 | If the magnitude of the association is to be estimated with precision, it is important that consortia are developed and expanded in order to generate the appropriate sample size. | | | X |
| 48 | Neither prospective study [Gertig, Houghton] confirmed the association of talc use and ovarian cancer raised by the case-control studies, but neither study was powered to detect a risk of 1.2 and therefore we cannot exclude the possibility. | | X | |
| 49 | An odds ratio of 1.2 or 1.3 has no meaningful clinical impact on a patient. | | | X |
| 50 | There are design issues with every study, both case-controls and cohort studies. | X | | |
| 51 | For baby powder users, it is habit that developed at one point and stays regularly. | | | X |
| 52 | In order to achieve statistical significance in a prospective study, we need a much larger cohort, e.g., we will need to study upwards of 200,000 women for ten years. | | X | |

| No. | STATEMENT | AGREE | DISAGREE | DON'T KNOW/ NO OPINION |
|---|---|---|---|---|
| 53 | Given the inherent limitation of cohort studies, it is not surprising that we have not been able to confirm the case-control studies with prospective studies, but this does not mean that the case-control studies were wrong. | | X | |
| 54 | It is unlikely that the association between talc and ovarian cancer is due to confounding and so it is fair to say that if there is a statistically robust relationship between talc use and ovarian cancer, it is likely to be causal (albeit with intermediate factors such as inflammation). | | X | |
| 55 | Among many epidemiologic variables, no confounders for the association were identified. | | | X |
| 56 | There is a consistent association between talc and ovarian cancer that appears unlikely to be explained by recall or confounding. | | X | |
| 57 | The meta-analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. | | X | X |
| 58 | In studies where the exposure is simple (e.g. never versus ever use), recall bias is unlikely to be an important source of bias. | | | X |
| 59 | Available data are indicative of a causal effect. | | X | |
| 60 | The data supporting the association of talc to the development of ovarian cancer is completely inconclusive. | X | | |
| 61 | The gold standard for translating epidemiologic case controlled or cohort observational studies into a clinical meaningful data relies on laboratory derived experiments in vitro or in vivo. | | X | |
| 62 | Mineral talc occurs naturally in a platy (flat) form, but may also occur as asbestiform fibres, which describes its physical form and does not imply the presence of asbestos. The purer forms (approximately 90% mineral talc) are used for cosmetic and hygiene products including baby powders and feminine hygiene products. (Langseth 2008) | | | X |

Exhibit 42

Michael Birrer, M.D., Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

_____

IN RE:  JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY
LITIGATION
                              Case No. 16-2738
THIS DOCUMENT RELATES TO       (FLW)  (LHG)
ALL CASES

MDL Docket No. 2738
_____

Friday, March 29, 2019

- - - - -

              The video deposition of MICHAEL BIRRER, M.D.,

         Ph.D., taken pursuant to notice, was held at

         the law offices of Butler Snow, LLP, One Federal

         Place, Suite 1000, 1819 Fifth Avenue North,

         Birmingham, Alabama, commencing at approximately

         9:03 a.m., on the above date, before Lois Anne

         Robinson, Registered Diplomate Reporter,

         Certified Realtime Reporter, and

         Notary Public for the State of Alabama.

Michael Birrer, M.D., Ph.D.

## Page 2

1                A P P E A R A N C E S
2    COUNSEL FOR PLAINTIFFS' STEERING COMMITTEE:
3       BEASLEY ALLEN LAW FIRM
        218 Commerce Street
4       Montgomery, Alabama  36104
        BY:  Margaret M  Thompson,
5           M D , J D , MPAFF
           Margaret thompson@beasleyallen.com
6           Sydney Everett, Esquire
           Sydney everett@beasleyallen com
7
8       ROBINSON CALCAGNIE, INC
        19 Corporate Plaza Drive
9       Newport Beach, California  92660
        BY:  Cynthia L  Garber, Esquire
10          Cgarber@robinsonfirm com
11
        RESTAINO LAW, LLC
12      130 Forest Street
        Denver, Colorado 80220
13      BY: John M  Restaino, JR , DPM, ESQ
           Jrestaino@restainollc.com
14
15      NAPOLI SHKOLNIK PLLC
        400 Broadway Road, Suite 305
16      Melville, New York  11747
        BY:  ALASTAIR J M  FINDEIS, ESQUIRE
17          Afindeis@napolilaw.com
18
     FOR THE DEFENDANT, JOHNSON & JOHNSON:
19
        NUTTER, McCLENNEN & FISH, LLP
20      155 Seaport Boulevard
        Boston, Massachusetts 02210
21      BY:  Dawn M  Curry, ESQUIRE
           Dawn@nutter com
22      SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
        4 Times Square
23      New York, New York  10036
        BY:  Benjamin Halperin, Esquire
24          Benjamin halperin@skadden com

## Page 4

1                  I N D E X
2    EXAMINATION                              PAGE
3    By Ms. Thompson                          10
4    By Ms. Curry                     424
5
6                * * * * * *
7    EXHIBITS
8    1  Expert report of Michael Birrer, M.D., Ph D.    20
9
10   2  Curriculum vitae of Michael Birrer, M.D., Ph.D.   21
11
12   3  Defendants' Response to Plaintiff's Document     21
13     Requests contained in Notice
14
15   4  Health Canada - Draft Screening Assessment - Talc  48
16
17   5  FDA letter to Samuel Epstein regarding Citizen   49
18     Petitions
19
20   6  IARC Monographs on the Evaluation of Carcinogenic  50
21     Risks to Humans
22
23   7  "Weight of Evidence: General Principles and    53
24     Current Applications at Health Canada"

## Page 3

1           A P P E A R A N C E S - (continued)
2
     COUNSEL FOR PERSONAL CARE PRODUCTS COUNCIL:
3
        SEYFARTH SHAW LLP
4       1075 Peachtree Street, N.E.
        Atlanta, Georgia  30309
5       BY:  Eric Barton, ESQUIRE
           Ebarton@seyfarth.com
6
7    COUNSEL FOR PTI:
8       TUCKER ELLIS, LLP
        233 S. Wacker Drive, Suite 6950
9       Chicago, Illinois  60606-9997
        BY:  JAMES W. MIZGALA, ESQUIRE
10         James.mizgala@tuckerellis.com
11
12   VIDEOGRAPHER:
13      Devyn Mulholland
14
15
16
17
18
19
20      LOIS ANNE ROBINSON, RPR, RDR, CRR
        COURT REPORTER
21
22
23
24

## Page 5

1            I N D E X - (continued)
2
3    8  List of Co-Authors                     81
4
5    9  List of 62 statements               113
6
7    10  "Hallmarks of Cancer: The Next Generation"     149
8
9    11  "Inflammation and cancer:  Back to Virchow?"    153
10      (Fran Balkwill, Alberto Mantovani)
11
12   12  Free Radical Biology & Medicine, Review Article  162
13      "Oxidative stress, inflammation, and cancer:  How are
14      they linked?"  (Simone Reuter, Gupta, et al.)
15
16   13  "Epithelial ovarian cancer" (Stephanie Lheureux,  166
17      C. Gourley, et al.)
18
19   14  Federal Register/ Vol. 81, No. 243/ Monday,     199
20      December 19, 2016
21
22   15  "The relationship between perineal cosmetic talc  205
23      usage and ovarian talc particle burden"  (Debra Heller,
24      et al.)

Michael Birrer, M.D., Ph.D.

Page 6

I N D E X - (Continued)

16  Ultrastructural Pathology - "Correlative        209
    polarizing light and scanning electron microscopy for
    the assessment of talc in pelvic region lymph nodes"
    (Sandra McDonald, et al.)

17  American Cancer Society - "Talcum Powder and     234
    Cancer What is talcum powder?

18  "Ovarian Cancers: Evolving Paradigms in Research 246
    and Care"  (The National Academies of
    Sciences-Engineering-Medicine)

19  Practice Issues - "What is New in Ovarian        253
    Cancer?" (Jason D. Wright, M.D.)

20  "Asbestos (Chrysotile, Amosite, Crocidolite,     264
    Tremolite, Actinolite, and Anthophyllite)"

21  American Journal of Industrial Medicine -        268
    "Asbestos Exposure and Ovarian Fiber Burden"  (Heller, et
    al.)

Page 7

I N D E X - (continued)

22  "The Analysis of Johnson & Johnson's Historical  281
    Baby Powder & Shower to Shower Products from the
    1960's for Amphibole Asbestos"   (Longo, Rigler)
    November 14, 2018

23  "The Analysis of Johnson & Johnson's Historical  282
    Product Containers and Imerys' Historical Railroad
    Car Samples from the 1960's to the Early 2000's for
    Amphibole Asbestos" (Longo, Rigler) January 15, 2019

24  BMJ: "Johnson & Johnson knew for decades talcum  287
    powder contained asbestos, reports allege" (Owen Dyer)

25  "Correspondence - Erratum: Smooth reference      294
    equations for slow vital capacity and flow-volume
    curve indexes"

26  Toxicology and Applied Pharmacology - "Mechanistic 301
    in vitro studies:  What they have told us about
    carcinogenic properties of elongated mineral particles
    (EMPs)"  (Brooke Mossman)

Page 8

I N D E X - (Continued)

27  Curriculum vitae of Ghassan M. Saed, Ph.D.       311

28  "Molecular Basis Supporting the Association of    320
    Talcum Powder Use With Increased Risk of Ovarian Cancer"
    (Fletcher, et al.)

29  GYN-188-1020: Final Decision - 9/19/18 - To      328
    Ghassan Saed from Robert Bristow, Editor, Gynecologic
    Oncology

30  "FWD:  Reproductive Sciences - Decision of       329
    Manuscript ID RSCI-18-671"

31  Tables from Saed manuscript with handwritten     366
    chart

32  Gynecologic Oncology - Review Article - "Updates 393
    of the role of oxidative stress in the pathogenesis
    of ovarian cancer"  (Saed, et al)

33  "Alterations in Gene Expression in Human Mesothelial 400
    Cells Correlate with Mineral Pathogenicity"  (Shukla)

Page 9

I N D E X - (Continued)

34  "Pycnogenol reduces Talc-induced Neoplastic      406
    Transformation in Human Ovarian Cell Cultures"
    (Buz'Zard)

35  Toxicology in Vitro - "The primary role of       409
    iron-mediated lipid peroxidation in the differential
    cytotoxicity caused by two varieties of talc nanoparticles
    on A549 cells and lipid peroxidation inhibitory effect
    exerted by ascorbic acid"  (Akhtar, et al.)

36  "Cytotoxicity and Apoptosis Induction by         415
    Nanoscale Talc Particles from Two Different Geographical
    Regions in Human Lung Epithelial Cells"  (Akhtar, et al.)

Michael Birrer, M.D., Ph.D.

| Page 10 |
| --- |

1  VIDEOGRAPHER:
2      We are now on the record. My name is
3  Devyn Mulholland. I'm a videographer for Golkow
4  Litigation Services. Today's date is March 29th,
5  2019. The time is 9:03 a.m.
6      This video deposition is being held in
7  Birmingham, Alabama, in the matter of Talcum
8  Powder Litigation, MDL Number 2738. The deponent
9  is Michael Birrer, M.D., Ph.D.
10      Counsel will be noted on the
11  stenographic record. The court reporter is Lois
12  Robinson and will now swear in the witness.
13      MICHAEL BIRRER, M.D., PH.D.,
14      the witness, after having first been
15  duly sworn to tell the truth, the whole truth,
16  and nothing but the truth, was examined and
17  testified as follows:
18      EXAMINATION
19  BY MS. THOMPSON:
20  Q      Dr. Birrer, I'm Margaret Thompson, and
21  I'll be taking your deposition today.
22      You've had your deposition taken
23  before; right?
24  A      Correct.

| Page 11 |
| --- |

1  Q      Including in the talcum powder
2  litigation; correct?
3  A      Yes.
4  Q      Have you had your deposition taken in
5  any other situation?
6  A      I gave testimony in a case, but that
7  wasn't a deposition, I don't think. No.
8  Q      And when was that?
9  A      That was prior to the talc. It's --
10  probably goes back, I want to say, 2015, 2012,
11  somewhere --
12  Q      And what -- sorry.
13  A      Yeah.
14  Q      What was the nature of that matter?
15  A      I was in Massachusetts at the time. It
16  was a delayed diagnosis case.
17  Q      A medical malpractice case?
18  A      Medical malpractice, yes.
19  Q      Were you testifying for the plaintiff
20  or for the defendant?
21  A      Defendant.
22  Q      Was it a physician or a doc- -- a
23  hospital?
24  A      It was both. And it was in Maine.

| Page 12 |
| --- |

1  It -- it eventually went to -- to court. They
2  have a panel up there of three judges, which sort
3  of prescreens it.
4  Q      And you've also submitted a previous
5  report in this case; correct?
6  MS. CURRY:
7      Object to the form.
8  A      Correct.
9  MS. THOMPSON:
10  Q      That was in the Swan case? Does that
11  sound familiar?
12  A      Yes.
13  Q      Have any of your opinions -- and that
14  was in May 2017. Does that sound right?
15  A      That sounds right.
16  Q      Have any of your opinions in this case
17  changed since May 2017?
18  A      No.
19  Q      Have any of your opinions changed since
20  you were deposed in September of 2018?
21  A      No.
22  Q      I guess that would be a "no" if they
23  hadn't changed since 2017.
24  A      It's consistent.

| Page 13 |
| --- |

1  Q      And you're aware that the purpose of
2  today is for me to gain a thorough understanding
3  of what opinions you plan to give at a hearing or
4  trial?
5  A      Yes.
6  Q      And the basis for those opinions;
7  right?
8  A      Yes.
9  Q      And your report states that your
10  opinions are given to a reasonable degree of
11  scientific and medical certainty.
12      What does that mean to you?
13  A      It means that, basically, more often
14  than not, they're correct.
15  Q      And you are a medical doctor as well as
16  a Ph.D. researcher; correct?
17  A      Correct.
18  Q      Do you currently see patients?
19  A      I do.
20  Q      Do you currently diagnose ovarian
21  cancer in women?
22  A      Yes.
23  Q      How -- do you treat women with ovarian
24  cancer?

4 (Pages 10 to 13)

Michael Birrer, M.D., Ph.D.

Page 14

1    A    Yes.
2    Q    And would that primarily involve the
3    medical aspects, including chemotherapy
4    administration?
5    A    Yes.
6    Q    Do you perform any surgical procedures?
7    A    No.
8    Q    What --
9    A    I'm a medical oncologist.
10    Q    What --
11    A    I could perform it, but it wouldn't
12    come out very well.
13    Q    I understand.
14        What percentage of your time involves
15    patient care versus research?
16    A    So --
17    MS. CURRY:
18        Object to the form.
19    A    -- right now I have a half-a-day clinic
20    a week, and then the research component, I have a
21    fully funded lab, probably two days a week. I'm
22    the director of the cancer center, which also
23    takes a fair amount of administrative
24    responsibility.

Page 15

1    MS. THOMPSON:
2    Q    So administrative time --
3    A    Yeah.
4    Q    -- as well included in that?
5        And how would you describe the focus of
6    your laboratory search -- research currently?
7    A    Almost entirely on ovarian cancer and
8    exploring detailing the genomics, the molecular
9    basis for ovarian cancer and trying to translate
10    that into better early detection, diagnosis and
11    treatment.
12    Q    Are you doing in vitro as well as in
13    vivo research?
14    A    Correct.
15    Q    And have published in both animal
16    studies as well as cellular studies?
17    A    Yes.
18    Q    Have you published with immortalized
19    cells?
20    A    Yes.
21    Q    Have you published research with human
22    tissue?
23    A    Yes.
24    Q    Have you published human trials?

Page 16

1    A    Yes.
2    Q    And does that pretty much cover the
3    types of research that you would be doing in your
4    lab --
5    MS. CURRY:
6        Object to the form.
7    MS. THOMPSON:
8    Q    -- or in a general sense?
9    A    I'm just trying to think if there was
10    anything else. We obviously do a lot of
11    review-type papers and articles. You know, I
12    think that's pretty broad. I think it does,
13    actually.
14    Q    When you do a review article, is that
15    usually invited by the journal, or is that a
16    topic that you have interest in that you submit
17    as a publication?
18    A    Could be both. A lot of them are
19    invited. But we have occasionally thought of
20    areas that we thought were interesting and
21    important and suggested it.
22    Q    And are authors or review articles
23    generally intended to be experts in the field?
24    MS. CURRY:

Page 17

1        Object to the form.
2    A    More often than not, yes. But
3    frequently on my reviews, I'll have some junior
4    people.
5    MS. THOMPSON:
6    Q    With -- with a senior author
7    usually --
8    A    (Nods affirmatively.)
9    Q    -- correct?
10    A    Correct.
11    Q    And that would be, I would think,
12    because readers of a journal want to know that
13    it's an expert in the field that's providing the
14    information in a review article; right?
15    MS. CURRY:
16        Object to the form.
17    A    I think so, yeah.
18    MS. THOMPSON:
19    Q    Would you agree with me that it would
20    be unethical at this point in time to design a
21    prospective study in which women were exposed to
22    talcum powder in the genital area and follow over
23    time?
24    MS. CURRY:

5 (Pages 14 to 17)

Michael Birrer, M.D., Ph.D.

Page 18

1           Object to the form.
2      A      Prospectively and randomized and --
3  could you just --
4  MS. THOMPSON:
5      Q      Let's start with just prospectively.
6      A      I -- I think it would be a --
7  interesting question.  I don't think it would be
8  valuable.
9      Q      How about a randomized trial?  Would it
10 be ethical?
11     A      No.  I don't think it would be valuable
12 at all.
13     Q      But I didn't ask about valuable.
14           What about ethical?
15     A      Well, val- -- if it's not valuable, it
16 should -- it wouldn't be of great concern to do
17 that.  I'm not sure what you're asking.
18     Q      Well, I'm asking if you -- if you have
19 a carcinogen, even a possible carcinogen, you
20 could not design and get a trial through IRB
21 using that product and a control group; correct?
22 MR. MIZGALA:
23           Object to form.
24     A      I guess -- I -- I see what -- now I see

Page 19

1  what you're asking.
2           So my position on that is that talc
3  is -- I don't believe talc is a carcinogen.
4  MS. THOMPSON:
5      Q      I understand.  But there are others
6  that do.
7           And, so, is it your opinion that an IRB
8  would let a study through using what has been
9  designated as a possible carcinogen, say, for
10 example, IARC?
11 MS. CURRY:
12           Object to the form.
13     A      I have no idea.
14 MS. THOMPSON:
15     Q      All right.  So the ground rules are
16 we'll try not to interrupt each other.  Let me
17 know if I ask a bad question or one that you
18 don't understand, and I'll expect you to answer
19 honestly.  Fair enough?
20     A      Yes.
21     Q      If you need a break, let me know.
22           What did you bring with you today?
23     A      I have my expert report right here.
24     Q      And is that all you brought with you?

Page 20

1      A      And this is -- this is a -- let me get
2  my glasses -- supplemental materials received by
3  me after this was done.
4      Q      Okay.
5      A      Okay?
6      Q      And, so, "received by" you meant the
7  lawyers for Johnson & Johnson provided those
8  supplemental materials to you?
9      A      It was a little bit of both.  I mean,
10 some of this I wasn't privy to, so I got it
11 provided to me, and some of these were additional
12 articles that I was -- I pulled out.
13     Q      Okay.  And I've marked as Exhibit 1
14 your expert report.
15           (DEPOSITION EXHIBIT NUMBER 1
16           WAS MARKED FOR IDENTIFICATION.)
17 MS. THOMPSON:
18     Q      Do you --
19           Do you have a copy?  You're good on
20 that?
21     A      And mine's -- mine's thicker than
22 yours, so -- it's got my CV in there.
23     Q      I separated out your CV.  So -- well,
24 good.  But that's a good observation.

Page 21

1           And -- and I marked as Exhibit 2 your
2  CV.
3      A      Okay.
4           (DEPOSITION EXHIBIT NUMBER 2
5           WAS MARKED FOR IDENTIFICATION.)
6  MS. THOMPSON:
7      Q      And that should --
8           And you're good on that, too?
9  MS. CURRY:
10           Thank you.
11 MS. THOMPSON:
12     Q      That should -- those combined should be
13 the same thickness of what you've brought.
14           And I also brought the Notice of
15 Deposition, which I'm going to hand you.
16           (DEPOSITION EXHIBIT NUMBER 3
17           WAS MARKED FOR IDENTIFICATION.)
18 MS. THOMPSON:
19     Q      And this is the one with objections.
20           Have you seen this before, Dr. Birrer?
21     A      Yes.
22     Q      And did you look at the request on
23 the -- on this document?
24     A      Yes.

6 (Pages 18 to 21)

Michael Birrer, M.D., Ph.D.

| Page 22 |
|---|

1    Q      Is there -- and there's nothing that
2    was responsive to any of these requests?
3    MS. CURRY:
4          Objection.  Subject to the objections
5    that were made by counsel.
6    MS. THOMPSON:
7    Q      Subject --
8    MS. THOMPSON:
9          Sorry.
10   Q      Subject to the objections.
11   A      Yeah.
12   Q      So where would you keep your file for
13   the litigation?
14   MS. CURRY:
15         And I'm sorry.  Just to clarify for the
16   record, there is a small production at the back
17   that incorporates the --
18   MS. THOMPSON:
19         Yes.
20   MS. CURRY:
21         -- invoice as well as the supplemental
22   fee schedule and the supplemental list of
23   materials.
24   MS. THOMPSON:

| Page 24 |
|---|

1    Q      -- this litigation?
2          And be careful not to interrupt just
3    because it makes our court reporter's job a
4    little more difficult.
5          How much money have you been paid total
6    by Johnson & Johnson in talcum powder litigation?
7    A      To date, nothing.
8    Q      You haven't been paid for any of the
9    other cases that you've testified in?
10   A      Correct.
11   Q      Why is that?
12   A      I'm a lousy businessman.  I haven't
13   invoiced for Swan yet and I haven't invoiced for
14   Brower.  But I can -- I can estimate the hours.
15   Q      Go ahead and estimate.
16   A      Swan I think is around 80 hours --
17   Q      Okay.
18   A      -- because it was the initial case.  It
19   was a bundled -- bundled five cases, so involved
20   a lot of review.  And the deposition alone was
21   quite long.  I remember like it was yesterday.
22         And, then, Brower was probably about 40
23   hours.
24   Q      Okay.

| Page 23 |
|---|

1          Right.
2    Q      So the supplemental material list that
3    you brought with you today, Dr. Birrer, is
4    attached to the back of this notice with
5    objections; correct?
6    A      That's the same as this.  Yes.
7    Q      Yes.
8    A      Yeah.  Uh-huh.
9    Q      And also attached to this -- this
10   notice with objections are your fees; correct?
11   A      Correct.
12   Q      And are -- are those all the invoices
13   that you have submitted thus far?
14   A      Yes.
15   Q      And how much -- and from -- this
16   invoice that's attached to Exhibit 3 goes through
17   March 17th.
18         How much time would you say you have
19   spent since March 17th preparing for the case?
20   A      I'd say probably put another 15 hours,
21   And I haven't invoiced that yet.
22   Q      Okay.  And you have testified in other
23   cases for the defendants in --
24   A      Correct.

| Page 25 |
|---|

1    A      And those invoices are being
2    constructed.
3    Q      And you're charging those at the same
4    rate as in your fee schedule --
5    A      That's right.
6    Q      -- attached to this document?
7    A      That's right.
8    Q      Okay.  When were you first approached
9    by Johnson & Johnson as -- about serving as an
10   expert in talcum powder litigation?
11   A      So that was before the -- that was the
12   Blaes or Swan case.  I believe it was in
13   December, around November, December of 2016.
14   Q      '16?
15   A      Thank you.  Time flies.
16   Q      Only because I know that the report was
17   submitted in May, so --
18   A      (Nods affirmatively.)
19   Q      -- I'm assuming that you didn't work 18
20   months on that --
21   A      No.
22   Q      -- case.
23         And you were asked in -- for this
24   report that you just submitted, to address the

7 (Pages 22 to 25)

Michael Birrer, M.D., Ph.D.

Page 26

```
 1    biological plausibility of the plaintiffs' theory
 2    that cosmetic talcum powder can cause ovarian
 3    cancer.  Right?
 4    A       Correct.
 5    Q       And that would be the stand- -- from
 6    the standpoint of the genomics and molecular
 7    biology that is your expertise; correct?
 8    MS. CURRY:
 9           Object to the form.
10    A       So I think they were asking me in the
11    big picture the biologic plausibility of talc
12    being involved in the -- causing ovarian cancer
13    and then my scientific experience, even clinical
14    experience, would factor into -- to -- to that
15    expert opinion.
16    MS. THOMPSON:
17    Q       Was that a different opinion than what
18    you were asked to provide in the previous cases
19    that you testified in?
20    MS. CURRY:
21           Object to the form.
22    A       Previously -- the answer, I believe, is
23    no.  But I was asked for general causation
24    before.  This was a more -- somewhat more narrow
```

Page 27

```
 1    expert opinion.
 2    MS. THOMPSON:
 3    Q       So in this case, you're not providing
 4    general causation opinions.  You're providing the
 5    biological mechanism, plausibility opinions;
 6    correct?
 7    A       Well, the title --
 8    MS. CURRY:
 9           Object to the form.
10    A       The title on the expert report is for
11    General Causation For the Daubert Hearing.  But
12    my understanding was -- was to focus extensively,
13    if you will, on the biologic plausibility.
14    MS. THOMPSON:
15    Q       And because biological plausibility is
16    part of general causation; correct?
17    A       Correct.
18    Q       But it's not the whole of general
19    causation.  Is that your understanding?
20    A       Correct.
21    Q       So I want to make sure that I
22    understand your opinions.
23           Is it your opinion that the perineal
24    use of talcum powder products is not associated
```

Page 28

```
 1    with an increased risk of epithelial ovarian
 2    cancer?
 3    A       Correct.
 4    Q       Is it your opinion that the genital use
 5    of talcum powder is not a risk factor for
 6    epithelial ovarian cancer?
 7    A       Correct.
 8    Q       Is it your opinion that genital use of
 9    talcum powder products does not cause ovarian
10    cancer?
11    A       Correct.
12    Q       Is it your opinion that the genital use
13    of talcum powder products does not cause ovarian
14    cancer in some women?
15    MS. CURRY:
16           Object to the form.
17    A       Correct.
18    MS. THOMPSON:
19    Q       And that would be ever.
20    MS. CURRY:
21           Object -- object to the form.
22    A       No data to support that.
23    MS. THOMPSON:
24    Q       Is it your opinion that the genital use
```

Page 29

```
 1    of talcum powder does not contribute to the
 2    development of epithelial ovarian cancer?
 3    A       Yes.
 4    Q       And do you say that there's no data to
 5    support that as well?
 6    A       Correct.
 7    Q       Is it your opinion that genital use of
 8    talcum powder does not contribute to the
 9    development of ovarian cancer in some women?
10    MS. CURRY:
11           Object to the form.
12    A       There's no data to support that either.
13    MS. THOMPSON:
14    Q       So the answer is yes?
15    A       Yes.
16    Q       Is it your opinion that any proposed
17    biologic mechanism for how the genital use of
18    talcum powder products could cause epithelial
19    ovarian cancer is not plausible?
20    MS. CURRY:
21           Object to the form.
22    A       I would agree with that statement.
23    It's not biologically plausible.
24    MS. THOMPSON:
```

Michael Birrer, M.D., Ph.D.

| | Page 30 |
|---|---|

1    Q      Is it your opinion that any proposed
2  biologic mechanism for how the genital use of
3  talcum powder products might contribute to the
4  development of ovarian cancer is not plausible?
5    MS. CURRY:
6         Object to the form.
7    A    There's no data for that either.
8    MS. THOMPSON:
9    Q    So the answer would be yes?
10   A    Yes.
11   Q    Do you intend to give opinions on
12 whether talc particles can reach the ovaries?
13   A    I believe on my expert report and in --
14 and I'm more than happy to talk about it --
15 reviews the migration theories.
16   Q    Do you consider yourself to be an
17 expert in that area?
18   A    I think that those studies are
19 relatively straightforward and, based upon my
20 experience that, I would be relatively easy to
21 interpret those.
22   Q    Do you feel like you would be in a
23 better position than a gynecologist or
24 gynecologic oncologist?

| | Page 31 |
|---|---|

1    A      Yes.
2    Q      Have you found any new expertise in the
3  migration or transport of particles in the female
4  reproductive system since 2017?
5    MS. CURRY:
6         Object to the form.
7    A    I'm not sure what you mean by "found
8  any new expertise." In the literature or my own
9  experience?
10   MS. THOMPSON:
11   Q    Do you believe that you have more
12 expertise in that subject than you did in 2017?
13   A    I think that it's comparable.
14   Q    So that would be no additional
15 expertise since 2017, when you testified
16 previously?
17   MS. CURRY:
18        Object to the form.
19   A    Not that I can identify as -- as we're
20 discussing this.
21   MS. THOMPSON:
22   Q    And same for 2018, when you gave a
23 deposition in -- in a talcum powder case?
24   MS. CURRY:

| | Page 32 |
|---|---|

1         Object to the form.
2    A    Correct.
3    MS. THOMPSON:
4    Q    Are all the opinions contained in your
5  report that you will be providing in this case?
6    A    That's a tough question to ask because
7  I don't know what you're gonna ask me.
8    Q    Fair enough.
9         Can you think of any areas, sitting
10 here today, that you intend to testify in other
11 than the migration and transport of particles and
12 the molecular and genomics of cellular tissue
13 response to talc?
14   MS. CURRY:
15        Object to the form.
16   A    Well, that's the bulk of my expert
17 report. I'm -- again, it depends on what you ask
18 me within the construct of general causation.
19 I'm willing to talk about some of that.
20   MS. THOMPSON:
21   Q    Okay. I understand.
22   A    Uh-huh.
23   Q    And you are not an epidemiologist;
24 correct?

| | Page 33 |
|---|---|

1    A    I don't have a degree in epidemiology.
2  But I have training.
3    Q    So would you agree that your
4  understanding of epidemiology is general in
5  nature?
6    MS. CURRY:
7         Object to the form.
8    A    So in order to be a, you know,
9  laboratory-based scientist in this field and a
10 clinician to treat patients, you certainly need
11 to have an understanding of epidemiologic
12 studies, so I have that understanding. And I
13 think that it gives me the ability to assess
14 epidemiologic studies and to draw conclusions
15 from them.
16   MS. THOMPSON:
17   Q    But if you're looking for more nuanced
18 or more comprehensive epidemiological experience,
19 you would look to an actual epidemiologist;
20 correct?
21   MS. CURRY:
22        Object to the form.
23   A    Well, I think it would depend on the
24 question that's being asked.

9 (Pages 30 to 33)

Michael Birrer, M.D., Ph.D.

Page 34

1    MS. THOMPSON:
2    Q      Well, for example, in the consortium
3    that you publish with, there are specific
4    epidemiologists that publish with the group;
5    correct?
6    A      Which consortium are you referring to?
7    Q      There are several?
8    A      Yes.
9    Q      Take -- take the Ovarian Cancer
10   Association Consortium.
11   A      The GOS?
12   Q      No.  OCAC or --
13   A      Okay.
14   Q      There are specific epidemiologists that
15   I assume are recruited to -- to provide the
16   epidemiology experience in that consortium;
17   correct?
18   A      There are epidemiologists in that
19   consortium.  I will point out there are lots of
20   other people and scientists.
21   Q      And -- and -- and you would be sought
22   out for that type of consortium because of your
23   molecular experience; correct?
24   MS. CURRY:

Page 35

1          Object to the form.
2    A      Well, I would add to that that I think
3    from a -- sort of a clinical standpoint we
4    provide some reality testing in terms of
5    whether -- what they're observing is actually
6    meaningful.
7    MS. THOMPSON:
8    Q      Yes.  So it would be for your
9    experience as a clinician in genomics and
10   molecular researcher; right?
11   A      Yes.
12   Q      That makes sense.
13          You're not a gynecologist or
14   gynecologic oncologist; correct?
15   A      Correct.
16   Q      Were you asked to offer criticism of
17   plaintiff experts and their opinions?
18   MS. CURRY:
19          Object to the form.
20   A      So in my expert report, I really
21   reviewed the primary literature, and with -- with
22   then integrating that into the arguments made by
23   plaintiffs' expert witnesses.  So you see in a
24   section there I began to look at individuals'

Page 36

1    comments, and they're all listed in terms of
2    biologic plausibility.  And then, of course, I
3    spent a lot of time on Dr. Saed.
4    MS. THOMPSON:
5    Q      My question, though, is which of the
6    plaintiff experts were you asked to offer
7    criticism of?
8    MS. CURRY:
9          Object to the form.
10   A      So I reviewed the entire list, and
11   that's listed in the materials.  I think it's on
12   page --
13   MS. THOMPSON:
14   Q      28?
15   A      -- 28 and 29.
16   Q      Okay.  Let's go ahead and go -- do --
17   did you read all of these experts -- expert
18   reports?
19   A      I looked through them, yes.
20   Q      And each one?
21   A      Correct.
22   Q      All right.  Let's go through each one
23   and have you tell me what you gleaned from each
24   expert report.

Page 37

1    MS. CURRY:
2          Object to the form.
3    MS. THOMPSON:
4    Q      Ann McTiernan, do you know Ann
5    McTiernan?
6    A      I don't know her personally.
7    Q      What's her field of expertise?
8    A      I would have to check that.
9    Q      So you don't remember here today
10   what --
11   A      Well, you're reviewing, I think --
12   let's be honest, 300 pages.  I'm not going to be
13   able to go through those systematically.
14   Q      Well --
15   A      But if you look at my report, it very
16   specifically addressed some of the flaws in the
17   experts' opinions regarding migration of talc.
18   Q      I -- I understand.  But my question is
19   do you know what Dr. McTiernan's area of
20   expertise is?  And it's fine if you don't.
21   A      I'd have to look it up.
22   Q      Okay.  Do you know Dr. Carson's area of
23   expertise?
24   A      I have never met him, and I don't know

10 (Pages 34 to 37)

Michael Birrer, M.D., Ph.D.

Page 38

1   him.
2   Q       Have you met Dr. McTiernan?
3   A       No.
4   Q       What is Dr. Clarke-Pearson's area of
5   expertise?
6   A       Clarke-Pearson is a gynecological
7   oncologist, former department chair at UNC.  Now
8   he's stepped down.
9   Q       And do you know Dr. Clarke-Pearson?
10  A       I've met him.
11  Q       And what about Dr. Kessler?
12  A       I've never met Dr. Kessler.
13  Q       What's his area of expertise?
14  A       I can't quote you that.
15  Q       What's Dr. Smith's area of expertise?
16  A       I think Dr. Smith's pretty -- actually,
17  I can't tell you.
18  Q       And Dr. Saed, I think we know.
19          What about Dr. Siemiatycki?
20  A       Uh-uh.  No.
21  Q       Dr. Wolf?
22  A       I've met Judith.  She's a gynecologic
23  oncologist.
24  Q       And do you know Dr. Zelikoff's area of

Page 39

1   expertise?
2   A       I don't know her.
3   Q       Nor her area of expertise?
4   A       Correct.
5   Q       What about Dr. Plunkett?  Do you know
6   her area of expertise?
7   A       I don't.
8   Q       Dr. Moorman, do you know her area of
9   expertise?
10  A       Don't know her.  No.
11  Q       Dr. Smith-Bindman, do you know her area
12  of expertise?
13  A       No.
14  Q       Do you know the area of expertise of
15  Dr. Kane?
16  A       Nope.
17  Q       Dr. Levy?
18  A       No.
19  Q       Dr. Singh?
20  A       No.
21  Q       Were you asked by Johnson & Johnson to
22  perform any experiments?
23  A       No.
24  Q       Did you offer to perform any

Page 40

1   experiments?
2   A       No.  Laboratory-based?
3   Q       Laboratory, yes.
4   A       No.
5   Q       What did you know about talcum powder
6   and a possible link to ovarian cancer before you
7   were approached to serve as an expert in 2017?
8   A       So it was not something that we dealt
9   with clinically.  We never counseled patients.
10  Scientifically, it never really was part of my
11  laboratory effort.  I didn't know really -- I
12  didn't know anybody working with it in the lab.
13  And -- and, you know, to be fair, I would say
14  that I was aware of the sort of concept that some
15  people -- some epidemiologic studies were being
16  done trying to determine relationship of talc
17  exposure to ovarian cancer.  And that's about it.
18  Q       Were you -- were you aware of the
19  issues raised by Dr. Woodruff and others in the
20  '70s about possible contamination with asbestos?
21  MS. CURRY:
22          Object to the form.
23  A       No.
24  MS. THOMPSON:

Page 41

1   Q       Did you have any opinions about whether
2   talcum powder could cause ovarian cancer before
3   you were approached to serve as an expert?
4   A       Well, my sense was that it wasn't a
5   factor.
6   Q       And what was --
7   A       Because we -- again, we weren't -- we
8   weren't using it in the clinic.  We weren't
9   talking about it.  There were essentially no
10  presentations in the biologic plausibility within
11  any of the scientific meetings that I would go
12  to.
13  Q       And at that time, that's what your
14  impression, at least, would have been based on?
15  MS. CURRY:
16          Object to the form.
17  A       Yeah.
18  MS. THOMPSON:
19  Q       Did you write your report?
20  A       Yes.
21  Q       Every word?
22  A       Yes.
23  Q       Did you choose the literature to cite?
24  A       So I pulled out most of that myself,

11 (Pages 38 to 41)

Michael Birrer, M.D., Ph.D.

Page 42

1  went back and did a reference list and then
2  pulled more.  As I said before, the expert
3  reports would have been provided from counsel.
4         There may have been some papers that I
5  said, hey, I don't have this.  Can you pull this
6  out?  And then they would -- they would provide
7  it to me.
8  Q      And there are -- just so I understand
9  the literature --
10  A      Uh-huh.
11  Q      -- there's literature that you actually
12  cite in the report in footnotes; right?
13  A      Correct.
14  Q      And then there's another list at the
15  end of the report that's considered -- that's
16  titled "Materials Reviewed and Considered by Dr.
17  Birrer"; right?
18  A      That's right.
19  Q      And can I assume that the literature
20  that are actually cited in the footnotes is
21  literature that you felt was particularly
22  significant?
23  MS. CURRY:
24        Object to the form.

Page 43

1  A      Yeah.  So the idea here was to try to
2  provide some guidance as to where that reference
3  was relevant within the document.  That's why
4  it's on each page.  At the end is a sort of sum
5  total.
6  MS. THOMPSON:
7  Q      Okay.
8  A      Yeah.
9  Q      Did you choose any quotes that are
10  included in your expert report yourself?
11  MS. CURRY:
12        Object to the form.
13  MS. THOMPSON:
14  Q      It was a bad question.
15         Did you choose the quotes that are
16  included in your expert report?
17  A      Correct.
18  Q      Did you choose the language that you
19  used to criticize the plaintiffs' experts?
20  A      Correct.
21  Q      Did you perform any searches?
22  MS. CURRY:
23        Object to the form.
24  A      In order to generate the original body

Page 44

1  of information, I did that by searching.
2  MS. THOMPSON:
3  Q      And what search engines did you use?
4  A      It was mostly PubMed, which is
5  something we use all the time.
6  Q      And did you -- what search terms did
7  you use?
8  A      Ovary, ovarian cancer, talc.  So the
9  ones you -- you'd predict.  And that doesn't
10  necessarily generate the entire list.  Right?  I
11  mean, you get the list and then you look at the
12  papers, go back to the references in those
13  papers, and then you see if you -- you're missing
14  out.  Then you pull out more.  And as you go
15  through this iteration, you begin to find out
16  that you're identifying the same patient -- the
17  same papers.  So then you begin to get an idea
18  that you have the sum total of what you need.
19  Q      And have you saved those papers
20  anywhere?
21  A      So those were -- the way that worked
22  was they came in, mostly computer-based, and then
23  I would look at those, extract what I wanted, and
24  then construct the report.  And that was all done

Page 45

1  in the computer.
2  Q      But what happened to the articles?
3  MS. CURRY:
4        Object to the form.
5  A      Well, they'd be computer-based, or
6  there's backup, I believe, some backup copies
7  here on everything.
8  MS. THOMPSON:
9  Q      So -- so everything that you looked at
10  would be in your materials considered list and
11  the supplemental materials considered list?
12  A      Correct.  Yep.
13  Q      Did you look at plaintiff expert
14  depositions?
15  A      Correct.
16  Q      Which ones?
17  A      So I looked at the deposition of
18  Dr. Saenz.  I think that's listed on supplemental
19  deposition.
20  MS. CURRY:
21        I believe she asked about plaintiff
22  expert deposition.
23  MS. THOMPSON:
24  Q      Plaintiff.

Michael Birrer, M.D., Ph.D.

Page 46

1     A      I'm sorry. I'm on the wrong one. So
2  that would be Dr. Saed.
3     Q      Uh-huh.
4     A      And I think -- let's go back and look.
5  I think -- yeah. It was 23 and 24 are -- were
6  both the Saed depositions. I think that's it.
7     Q      In the file -- the backup file that you
8  mentioned that's here, is that on a thumb drive
9  or what's --
10  MS. CURRY:
11        Object to the form. They're actually
12  my -- the lawyer's files. I just brought a copy
13  of the references in case we needed to refer to
14  everything. But it's not -- actually not
15  Dr. Birrer's file.
16  MS. THOMPSON:
17     Q      So there's no electronic file that you
18  possess?
19     A      Yeah.
20     Q      Did you make any notes or highlights on
21  any of the articles that --
22     A      (Shakes head negatively.)
23     Q      And in addition to Dr. Saed's
24  deposition, you have listed two drafts of his

Page 47

1  manuscript that was recently published; correct?
2     A      I believe I saw the pre-print and then
3  the copy of the actual published paper. And, of
4  course, his expert report.
5     Q      When did you first see Dr. Saed's
6  manuscript?
7  MS. CURRY:
8        Object to the form.
9     A      Preprint or published?
10  MS. THOMPSON:
11     Q      Either.
12     A      So I think the preprint came first,
13  obviously. The expert report was available
14  first, and then the preprint, and then just
15  within, I think, a month and a half I got the
16  paper. It was pretty recent.
17     Q      Is Dr. Saenz's published manuscript on
18  your supplemental materials list?
19  MS. CURRY:
20        It's attached to the objections, which
21  is Exhibit 3.
22  MS. THOMPSON:
23        Yeah. I -- I couldn't find my notice
24  with objections.

Page 48

1  MS. CURRY:
2        Here you go.
3     A      This supplemental list with objections
4  or the extra paper?
5  MS. THOMPSON:
6     Q      And you reviewed some reports from
7  governmental and regulatory agencies; correct?
8     A      Correct.
9     Q      I'll go ahead and mark those. We're
10  gonna discuss them more later.
11        (DEPOSITION EXHIBIT NUMBER 4
12           WAS MARKED FOR IDENTIFICATION.)
13  MS. THOMPSON:
14     Q      You've looked at the Health Canada's
15  recent draft assessment; correct?
16     A      Yes.
17     Q      When did you first see that?
18     A      It was in a deposition of Dr. Saenz's.
19     Q      And do you know when that was first
20  published?
21     A      The Health Canada?
22     Q      Yes.
23     A      Fairly recently. Can't quote you the
24  date.

Page 49

1     Q      If it was December, would that surprise
2  you?
3  MS. CURRY:
4        Object to the form.
5     A      December of --
6  MS. THOMPSON:
7     Q      Of '18?
8     A      That's pretty recent.
9     Q      Were you not aware that this had been
10  put online by Health Canada prior to Dr. Saenz's
11  deposition?
12     A      I was not.
13     Q      Did you review that 2014 letter from
14  FDA in response to a public citizen complaint?
15     A      I am familiar with that.
16        (DEPOSITION EXHIBIT NUMBER 5
17           WAS MARKED FOR IDENTIFICATION.)
18  MS. THOMPSON:
19     Q      And I'll mark that 2014 public citizen
20  response letter from the FDA as Exhibit Number 5.
21        Does that look like the letter that you
22  reviewed, Dr. Birrer?
23     A      (Nods affirmatively.) I've seen that,
24  yeah.

13 (Pages 46 to 49)

Michael Birrer, M.D., Ph.D.

| Page 50 | Page 52 |

**Page 50**

1    Q      And did you review the IARC Monograph
2    on Nonasbestiform Talc from 2010?
3    A      I did.
4    Q      And that will be Exhibit Number 6.
5            (DEPOSITION EXHIBIT NUMBER 6
6                WAS MARKED IDENTIFICATION.)
7    MS. THOMPSON:
8    Q      Does that look like the document that
9    you reviewed?
10   A      Yes.  Yeah.  I've seen that.  Yep.
11   MS. THOMPSON:
12         Dawn, if you want more copies, I'm
13   happy to give --
14   MS. CURRY:
15         I'm okay.  I don't know if other
16   counsel need a copy to review.
17   MR. MIZGALA:
18         No.
19   MS. THOMPSON:
20         I think for most everything I have
21   another copy, so if there's anything you'd like
22   to see and not have to take home with you, I'm
23   happy to provide it.
24   MS. THOMPSON:

**Page 52**

1    Q      Okay.  That's my question.
2    A      Yes.
3    Q      But it was published in December, and
4    you didn't look at it until you saw it in
5    Dr. Saenz's deposition as an exhibit; right?
6    A      Correct.
7    Q      Did you deem it important?
8    MS. CURRY:
9         Object to the form.
10   A      Well, since it was quoted and my
11   impression was that there were people who thought
12   this was important, that necessitated me to take
13   a look at it.
14   MS. THOMPSON:
15   Q      Did you think it was important?
16   MS. CURRY:
17         Object to the form.
18   A      Well, after I read it, again, my sense
19   was it doesn't really sway me one more -- one way
20   or the other because they're -- they're
21   essentially re-reviewing all the data that we
22   know and coming to a different conclusion.  I
23   just think they got it wrong, unfortunately.
24   MS. THOMPSON:

**Page 51**

1    Q      Did you know that the Health Canada
2    assessment was made pub- -- made available to the
3    public?
4    A      Yes.
5    MS. CURRY:
6         Object to the form.
7    MS. THOMPSON:
8    Q      Do you believe that the Health Canada
9    risk assessment is relevant to the topic today?
10   MS. CURRY:
11         Object to the form.
12   A      It doesn't change my opinion about
13   biologic plausibility.  It's a -- obviously, an
14   opinion that's based upon a lot of data that I
15   believe is reviewed by Taher, which is
16   information data that I already was aware of, so
17   it doesn't really sway me one way or the other.
18   MS. THOMPSON:
19   Q      But my question was, did you deem it
20   relevant?
21   MS. CURRY:
22         Object to the form.
23   A      Relevant to review.
24   MS. THOMPSON:

**Page 53**

1    Q      But you will agree that it did provide
2    an extensive review on the subject?
3    MS. CURRY:
4         Object to the form.
5    A      It was, I thought, would be described
6    as extensive.
7    MS. THOMPSON:
8    Q      Did you review the statement of the
9    methodology that accompanied the risk assessment?
10   A      I went -- I looked through it.
11   Q      I'll mark that as Exhibit 7.
12         (DEPOSITION EXHIBIT NUMBER 7
13             WAS MARKED IDENTIFICATION.)
14   MS. THOMPSON:
15   Q      Is that what you saw?
16   A      I didn't see it printed like this with
17   the color on it.  Yeah.
18   Q      And let's just look at page 2 of the
19   document titled "Weight of Evidence, General
20   Principles and Current Applications in Health
21   Canada."
22         Does number 3, Role in Risk
23   Assessments, generally outline the methodology
24   that Health Canada applied to this risk

Michael Birrer, M.D., Ph.D.

1    assessment?
2    MS. CURRY:
3        Object to the form.
4    A    Yeah. I think it's a summary of
5    what -- of how they approached it. That's my
6    sense. Yep.
7    MS. THOMPSON:
8    Q    And for the risk assessment, Health
9    Canada assumed talc or talcum products to be
10   nonasbestiform.
11       Is that your understanding?
12   A    Yeah. I believe that's what they
13   focused on.
14   Q    What does nonasbestiform mean?
15   A    I'm not going to go down the line of
16   being an expert in asbestos.
17   Q    So do you not know what it means when
18   the talc is considered nonasbestiform?
19   MS. CURRY:
20       Object to the form.
21   A    I'm assuming they're addressing sort of
22   mineral characterization of these substances.
23   But again, I -- that's not my area of expertise.
24   I'm not a geologist and it -- it in many ways is

1    sort of irrelevant to looking at many of the
2    studies which are just looking at talcum powder.
3    MS. THOMPSON:
4    Q    Does it not matter to you whether that
5    talc is in a particle or fiber -- fiber form?
6    MS. CURRY:
7        Object to the form.
8    A    Well, I looked at, again, extensively
9    all the data that was addressing whether talcum
10   powder is a risk factor or plays a role in
11   developing ovarian cancer. It is irrelevant in
12   that setting whether there are components in
13   there that go from asbestiform to heavy metals to
14   fragrance. That data would be clear from those
15   experiments, and they're not.
16   MS. THOMPSON:
17   Q    So is the answer that -- is it
18   irrelevant whether the particles are in a
19   particulate form or in a fiber form?
20   MS. CURRY:
21       Object to the form.
22   A    Again, I -- that -- that experiment has
23   not been done in the -- the -- in the -- in the
24   data that I looked at.

1    MS. THOMPSON:
2    Q    So you're agreeing it's irrelevant what
3    form the particles are in when --
4    A    I'm saying we don't have any data.
5    MS. CURRY:
6        Object to the form.
7        You have to let her get her --
8    THE WITNESS:
9        Okay.
10   MS. CURRY:
11       -- entire question out before you
12   answer so that the court reporter can get
13   everything down.
14   MS. THOMPSON:
15   Q    No data isn't the same as irrelevant,
16   and that's my question.
17   MS. CURRY:
18       Object to the form.
19   A    You know, again, I don't think I can
20   answer that "yes" or "no."
21   MS. THOMPSON:
22   Q    Is it important whether the substance
23   in Johnson's baby powder and Shower to Shower is
24   in a particulate form or in a fiber form?

1    MS. CURRY:
2        Object to the form.
3    A    I don't know.
4    MS. THOMPSON:
5    Q    You don't know if it's important?
6    A    I don't know if it's important.
7    Q    Okay. And is part of the reason is
8    because you're not an expert in asbestos?
9    MS. CURRY:
10       Object to the form.
11   A    Again, I wasn't asked to evaluate the
12   role of asbestos in ovarian cancer. I have an
13   opinion on that based upon some of the
14   epidemiologic studies.
15       But in terms of the compositional
16   analysis of talcum powder, that is not within the
17   area of my expertise, and the various forms of
18   asbestos in talc in terms of mineralogy is not
19   something that I've spent time on.
20       But, as I pointed out before, the
21   experiments that have been conducted address that
22   issue, which is they're using talcum powder. If
23   it's got a variety of substances in it, any one
24   of which match and play a role in ovarian cancer,

Michael Birrer, M.D., Ph.D.

Page 58

1   it would have been obvious from the data and it's
2   not.
3   MS. THOMPSON:
4       Q     Is it your opinion that baby powder and
5   Shower to Shower -- and you understand those are
6   the two products that we're here to talk about
7   today; right?
8       A     Yes.  J & J products?
9       Q     Yes.
10          Is it your opinion that those products
11  have been proven safe?
12  MS. CURRY:
13          Object to the form.
14      A     So there's no data that I know of that
15  says they're not safe.
16  MS. THOMPSON:
17      Q     That's different.  Have they been
18  proven safe?
19  MS. CURRY:
20          Object to the form.
21      A     Yes.
22  MS. THOMPSON:
23      Q     And what data do you have as the basis
24  for that, that they have been proven safe?

Page 59

1       A     Again, years and years of usage with
2   these experiments and biologic systems,
3   epidemiologic data is basically not exposing or
4   uncovering any definitive data that that they're
5   unsafe.
6       Q     So you believe the epidemiological data
7   proves the product safe?
8       A     I don't think it -- it proves that it's
9   a risk factor.
10      Q     Is that --
11      A     You're asking -- you're asking me to
12  prove a negative.  I can't do that.
13      Q     So you're not -- you're unable to prove
14  that it's safe because you can't prove a
15  negative?
16  MS. CURRY:
17          Object to the form.
18  MS. THOMPSON:
19      Q     Is that what you're saying?
20      A     I get -- yeah.  I think -- I think the
21  issue in front of us is:  Is it unsafe?  And the
22  answer to that is there's no data for it.
23      Q     Well, the issue is what I asked you.
24  And my question was has it been proven safe, not

Page 60

1   has it been proven unsafe, so --
2   MR. MIZGALA:
3           Object to the form.
4   MS. THOMPSON:
5       Q     -- I'll ask the question again.
6           Have these products been proven safe in
7   your mind?
8   MS. CURRY:
9           Object to the form.
10      A     Again, it is -- it is an issue about
11  trying to prove a negative.  The data is there
12  are decades of use of this, this material,
13  perineal dusting, with no evidence, no convincing
14  evidence that it's unsafe.  I conclude that it's
15  a safe product.
16  MS. THOMPSON:
17      Q     Do you believe that the molecular data
18  proves the product safe?
19  MS. CURRY:
20          Object to the form.
21      A     Can you define "molecular data"?
22  MS. THOMPSON:
23      Q     The -- the studies that have been
24  performed on talcum powder, do you believe they

Page 61

1   prove that the products are safe?
2   MS. CURRY:
3           Object to the form.
4       A     Just repeat that once more, please.
5   MS. THOMPSON:
6       Q     The molecular studies that have been
7   done on talcum powder, is it your opinion that
8   they prove that the products are safe?
9   MS. CURRY:
10          Object to the form.
11      A     So I refine that a bit because I don't
12  really consider them molecular studies.  They're
13  biologic studies, and there's a difference.
14          The biologic studies which I reviewed,
15  which I think is the sum total that's out there,
16  are completely unconvincing, unconvincing that
17  talcum powder is a a -- plays a role in the
18  development of ovarian cancer.
19  MS. THOMPSON:
20      Q     But my question was is it your belief
21  that the biologic studies confirm that the
22  product is safe?
23  MS. CURRY:
24          Object to the form.

16 (Pages 58 to 61)

Michael Birrer, M.D., Ph.D.

Page 62

1    A    Again, we're back sort of to that
2    negative. I -- I think if -- I don't think they
3    convince me at all that it's -- it's a risk or
4    that it has any biologic activity on the target
5    organ, which is the ovary. And then in the
6    context of decades of use, then I would conclude
7    that it's a safe product.
8    MS. THOMPSON:
9    Q    And it's fine to say you can't
10   answer -- you can't answer the question. But I
11   need -- but I want to have an answer.
12        And that is: Is it your opinion that
13   the biologic studies show that the products are
14   safe?
15   MS. CURRY:
16        Object to the form.
17   A    Yeah. I -- I think -- I think
18   certainly that -- I think we can say that the
19   biologic studies do not reveal any untoward
20   effects. It's not reliable. The experiments are
21   not reliable. And so in that context, it's a
22   safe product.
23        I mean, again, you're asking me for a
24   biologic experiment that proves something is

Page 63

1    safe. I don't even know how to conduct an
2    experiment like that.
3    MS. THOMPSON:
4    Q    Okay. And again, you know, I can't
5    answer that -- your question --
6    A    It's okay?
7    Q    -- is a fine answer. Yeah.
8    MS. CURRY:
9        Object to the form.
10   MS. THOMPSON:
11   Q    Back to the weight of the evidence
12   document, it's your understanding that this is
13   the evaluation that Health Canada applied to --
14   A    That's this one?
15   Q    Yeah.
16        -- to answering the -- the question of
17   whether talcum powder was a risk for the public
18   in Canada; correct?
19   MS. CURRY:
20        Object to the form.
21   A    Correct.
22   MS. THOMPSON:
23   Q    And they also applied a Bradford Hill
24   analysis? Is that your understanding from

Page 64

1    reviewing the assessment?
2    A    I believe so, but let me just --
3    MS. CURRY:
4        Do you have the marked Exhibit 4 there?
5        I don't think the witness actually has
6    the --
7        Oh, I think it's in front of you here.
8        I'm just gonna grab these marked
9    exhibits for him. Thank you.
10   MS. THOMPSON:
11       I think his is the marked exhibit,
12   unless I --
13   MS. CURRY:
14       Right. It was just in front of you.
15   MS. THOMPSON:
16       Oh, I -- yeah.
17   MS. CURRY:
18       He didn't have it. That's all.
19   MS. THOMPSON:
20       Sorry.
21   A    Yeah, this -- okay.
22       Yeah. So they -- they essentially went
23   through it in that kind of algorithm.
24   MS. THOMPSON:

Page 65

1    Q    I did not see any discussion in your
2    report of a methodology similar to this. Is that
3    right?
4    A    Correct.
5    Q    Did you perform a weight of the
6    evidence of the data in this case?
7    A    So I approached the expert report based
8    upon my experience, both scientifically and
9    clinical. We do this -- we do this a lot,
10   actually, where we'll do a complete review of the
11   literature and then extract the information,
12   dissect it in terms of paper by paper.
13       As a scientist, we don't really weigh
14   studies in a quantitative way. We don't -- it's
15   really not like a meta-analysis where we're
16   saying, okay, this is -- this is this weight
17   versus that weight.
18       But -- but the gestalt is, if you will,
19   at the end of the day, we look at these studies
20   and say do we believe -- do we think that the
21   data and results are believable; do they -- do
22   they support the conclusions. And we do that
23   individually through all the studies.
24       And my expert report, I think, outlines

17 (Pages 62 to 65)

Michael Birrer, M.D., Ph.D.

Page 66

1    that very clearly.
2         So I guess the answer to your question
3    is at the end of the day, the conclusion is that
4    we don't think -- I don't think the data supports
5    a biologic plausibility for talc versus -- talc
6    and the -- as a role in the development of
7    ovarian cancer.  That's the sum total of all that
8    analysis.
9    Q      Did you perform a Bradford Hill
10   analysis, per se?
11   A      Not in the expert report.  It's really
12   focused on biologic plausibility.  I'm aware of
13   Bradford Hill.  Prior depositions, we talked
14   about the elements, and I feel like I -- I
15   certainly understand those criteria.
16   Q      But at least in this report, you didn't
17   apply the criteria to this subject?
18   MS. CURRY:
19         Object to the form.
20   A      It's really focused on biologic
21   plausibility, which, as you know, is one
22   component of it.
23   MS. THOMPSON:
24   Q      Correct.

Page 67

1         And you reviewed that IARC 2010
2    document that we've marked as an exhibit; right.
3    A      This is when it was labeled as 2B;
4    right?
5    Q      Yes.
6         And -- and this -- well, this monograph
7    was published in 2010; right?
8    A      Correct.
9    Q      Is it your understanding that it
10   considered literature up to 2006?  Correct?
11   A      Sounds about right, yes.
12   Q      What is IARC?
13   A      Well, it's an international agency for
14   research on cancer.  Part of what they -- their
15   responsibility is is to look at environmental
16   risks for -- and -- and to sort of attempt to
17   quantify them, identify them and quantify them
18   for the development of cancer.
19   Q      Is it generally thought to be a
20   reputable scientific organization?
21   MS. CURRY:
22         Object to the form.
23   A      How do you define "reputable"?
24   MS. THOMPSON

Page 68

1    Q      Is it a credible scientific
2    organization?
3    MS. CURRY:
4         Object to the form.
5    A      I -- I think, to be fair, they -- they
6    recognize this as a group that is careful and is
7    invested in this.  I would say, though, that
8    they're not, as an organization, completely free
9    of -- because of the way they're structured with
10   WHO, completely free of outside influence or
11   politics.  That's my sense.
12   MS. THOMPSON:
13   Q      And by outside influence and politics,
14   where would that be coming from?
15   A      From World Health Organization, which
16   is their sort of supervising body.
17   Q      And is it your belief that the World
18   Health Organization is politically biased or
19   subject to influence from outside?
20   A      Well, I think it's an organization
21   that, by its nature, is, you know, a compendium
22   of countries and societies.  And, so, it's --
23   let's just say it's not necessarily as sort of
24   independent as the Academy, National Academy.

Page 69

1    Q      And by that you mean the National
2    Academy of Science and Medicine Engineering, now
3    titled?
4    A      Yes.
5    Q      Okay.  And I believe we talked about
6    before this --
7    A      Uh-huh.
8    Q      -- this monograph applies to talc not
9    containing asbestiform fibers, but that is not
10   your area of expertise; correct?
11   MS. CURRY:
12         Object to the form.
13   A      Correct.
14   MS. THOMPSON:
15   Q      And you are aware that there's a
16   different IARC monograph published in 2012 that
17   would cover talc containing asbestos or talc
18   containing asbestiform fibers; correct?
19   A      I don't think I've seen that.
20   Q      That would be 2012, the 100C.  I
21   believe it's on your --
22   A      Is it?
23   Q      -- reliance list.
24   A      Do you have a copy?

18 (Pages 66 to 69)

Michael Birrer, M.D., Ph.D.

Page 70

1    Q      Yeah.  It's number 77.
2    A      77.
3    Q      Arsenic, Metals, Fibers and Dust?
4    A      Oh, I think I -- I'm sorry.  That's
5    coming back to me.  It was a small -- yeah.
6    Q      And did you -- did you review that IARC
7    monograph?
8    A      Yeah.  There was a -- what -- what
9    I looked at was a subset of the entire document.
10   Yeah.
11   Q      Did you look at the section with
12   asbestos?
13   MS. CURRY:
14          Object to the form.
15   A      I believe so, yeah.
16   MS. THOMPSON:
17   Q      Did you look at the section with heavy
18   metals?
19   A      No.
20   Q      Are you aware that that document, 2012,
21   100C, includes all forms of asbestos and talc
22   containing asbestiform fibers?
23   A      That sounds correct.
24   Q      But you're not sure about that today?

Page 71

1    MS. CURRY:
2          Object to the form.
3    A      Well, as I said, I'm not a asbestos
4    expert.  But that -- that IARC volume is focused
5    on fibers, so that makes sense.
6    MS. THOMPSON:
7    Q      And have you reviewed the preamble to
8    the IARC monographs?  It's included in --
9    A      Yeah.
10   Q      -- in exhibit --
11   A      I looked through it.
12   Q      Okay.
13   A      It's voluminous.
14   Q      And does that describe the -- the
15   methodology that IARC applies when it's looking
16   to determine whether a substance is carcinogenic
17   or not?
18   A      Yes.  It's a list of all the
19   participants, the general principles, the
20   methodology.
21   Q      And you would agree, similar to Health
22   Canada, that that methodology is extensive as
23   well?
24   MS. CURRY:

Page 72

1          Object to the form.
2    A      It's detailed.
3    MS. THOMPSON:
4    Q      Going to the FDA response letter, at
5    least by volume, would you agree that this FDA
6    letter is a less extensive review?
7    MS. CURRY:
8          Object to the form.
9    A      Less pages.
10   MS. THOMPSON:
11   Q      That's kind of what I was getting at.
12          How about references?
13   A      Yeah.
14   Q      So, essentially, the FDA response
15   letter in 2014 does not include a description of
16   the methodology or an extensive reference list.
17   Is a that fair --
18   MS. CURRY:
19          Object to the form.
20   MS. THOMPSON:
21   Q      -- statement?
22   A      Well, I -- again, I think a little bit
23   you're comparing apples and oranges in the sense
24   that the purpose for these documents is somewhat

Page 73

1    different in that this is a letter from the FDA
2    in response to a -- I think it was a citizen's
3    petition.  They're not gonna give -- they're not
4    gonna send this back to a citizen's petition
5    because I think the citizen's petition would be
6    insulted because they're not going to be able to
7    read it.  It's more of a letter than the -- what
8    their opinion is.
9          Oh.  Sorry.
10   Q      And you're referring to that IARC --
11   A      Yeah.
12   Q      -- 2010 monograph.  Yeah.
13   A      Yeah.
14   Q      Fair enough.
15          However, you would consider the FDA a
16   credible source?
17   A      Yes.
18   Q      Let's look at your CV.  And you have
19   been a prolific researcher.  Would you agree?
20   A      I survive.
21   Q      I -- I think there are approximately
22   400 published papers.  Is that close?
23   A      Correct.
24   Q      You have a lot of coauthors on these

Michael Birrer, M.D., Ph.D.

Page 74

```
1    papers.  Am I right?
2    A      Correct.
3    Q      On some, you're the lead author;
4    correct?
5    A      Correct.
6    Q      What does the role of lead author
7    usually entail?
8    MS. CURRY:
9         Object to the form.
10   A      So let me -- let me step back and
11   define that.  I would say anchor positions.
12   MS. THOMPSON:
13   Q      Okay.
14   A      So first author is usually the person
15   who has done most of the work.  And, it
16   actually -- my first authorship positions have
17   sort of faded with time because I take the other
18   anchor position, which is the senior author,
19   where you're providing guidance, mentorship, and
20   then you -- you ultimately are responsible for
21   the quality of the paper.
22   Q      And -- and that --
23   A      Yeah.
24   Q      -- that person is -- is often listed
```

Page 75

```
1    last.  Is that right?
2    A      That's right.
3    Q      Okay.  And can I assume that the
4    authors in the middle have varying roles but all
5    participate in the preparation of the manuscript
6    in some sense?
7    A      Right.  I mean, it becomes -- you
8    probably can guess -- somewhat problematic when
9    you look at GY studies when there are almost more
10   authors than specimens.  So the idea there is
11   that the individuals in -- in between are still
12   contributing to the paper.  They're -- they may
13   be providing specimens.
14   Q      And I believe in GWAS, the -- the
15   recruitment for GWAS are researchers that can
16   provide tissue specimens for the group that's
17   analyzing them.  Is that a fair --
18   A      It's a big point.  It's -- it's a big
19   part of it.  Yeah.
20   Q      And you'd agree that that's different
21   from the consortium that we discussed earlier,
22   that OCAC consortium; right?
23   MS. CURRY:
24        Object to the form.
```

Page 76

```
1    A      No.  I think OCAC is a lot like that.
2    MS. THOMPSON:
3    Q      They're providing tissue samples or are
4    they providing expertise?
5    A      Well, OCAC is the consortium, so
6    it's -- it's composed of all of those
7    institutions.  And those institutions are
8    providing specimens.  And then the authors from
9    those institutions end up on the paper.
10   Q      How are the authors of the consortium's
11   publications selected?
12   MS. CURRY:
13        Object to the form.
14   A      Specific in GWAS or in general?
15   MS. THOMPSON:
16   Q      In OCAC.
17   A      OCAC.  Well, I'm not sure I can quote
18   you OCAC rules, but the general guidelines would
19   be that from every institution that participated,
20   there'd be a primary author.  If -- if there was
21   somebody else at the institution who specifically
22   did something important for that paper, they
23   might take two authors.  But usually there's a
24   limit because you just -- OCAC, I believe, has --
```

Page 77

```
1    I'm guessing -- 50 to maybe even 100
2    institutions.  So if you were to allow unlimited
3    authors, it would be unmanageable.
4    Q      Would the authors typically be
5    considered to have expertise in the particular
6    area that they're publishing in?
7    A      Yes.
8    Q      Would they typically have previous
9    scholarly work or publications?
10   MS. CURRY:
11        Object to the form.
12   A      Usually.
13   MS. THOMPSON:
14   Q      Would they typically have a -- good
15   reputation in the scientific or medical
16   community?
17   MS. CURRY:
18        Object to the form.
19   A      I hope so.
20   MS. THOMPSON:
21   Q      Would they typically be knowledgeable
22   in that respective field that they're called upon
23   to contribute to the --
24   MS. CURRY:
```

20  (Pages 74 to 77)

Michael Birrer, M.D., Ph.D.

Page 78

1      Object to the form.
2      A    Yeah. I mean, I think it would be
3  very -- again, these GWAS studies -- I'm sorry --
4  the GWAS studies are in some ways really unique
5  in that there's so many authors. There may be
6  individuals in that list who -- who while they're
7  ovarian cancer researchers, they could be fairly
8  junior, and they may have just provided some
9  specimens. Yeah.
10 MS. THOMPSON:
11     Q    Yeah. And I'm not as interested in the
12 GWAS because they do have, you know, a whole
13 number.
14     A    Yeah.
15     Q    But I'm thinking more of the Australian
16 consortium, the OCAC, the -- other ones where
17 it looks, at least by appearance, that you're --
18 the authors are chosen because they're experts
19 in -- in a particular area. For example,
20 epidemiology. Would you agree with that
21 statement?
22 MS. CURRY:
23     Object to the form.
24     A    I think that's true -- I think that's

Page 79

1  true as a -- as general guideline, yeah.
2  MS. THOMPSON:
3      Q    And would the same be true for a paper
4  that you're publishing? Would you look for
5  coauthors -- either as an anchor or a senior,
6  would you look for coauthors that are credible?
7      A    Well, you know, when you do these
8  experiments, you're not really out looking for
9  authors. You're doing the experiments, and the
10 people who do them, help you design a project,
11 deserve authorship. Those are the guidelines.
12     And if you're asking would I put
13 somebody who I thought was not credible on an
14 author list, I'd be very bothered by that. But
15 you'd have to define what "credible" means.
16     Q    Yeah. So I guess rather than choosing
17 someone as a coauthor, I should have rephrased
18 that. Choosing someone to work on a project that
19 would later be published, you can assume that
20 person would be credible; correct?
21 MS. CURRY:
22     Object to the form.
23     A    Yeah. I choose my collaborators, like
24 others, other scientists, with a certain amount

Page 80

1  of careful thought.
2  MS. THOMPSON:
3      Q    And -- and I'd assume they'd be
4  qualified in their area of expertise for the same
5  reason, or else you wouldn't choose them. Right?
6      A    It would be hard for them to contribute
7  in a meaningful way if they don't know what
8  they're doing.
9      Q    Okay. Looking at your CV, are there
10 any coauthors that you can identify that you
11 would not regard as qualified in their respective
12 fields?
13     A    I'm not gonna be able to answer that.
14 I've got 400 publications and probably several
15 thousand authors.
16     Q    So do you think there would be some
17 that you could identify as not being credible?
18     A    Not that I know of.
19 MS. CURRY:
20     Object to the form.
21     A    Again, this is realtime, so if we go
22 back to my Ph.D., which was on the measles virus
23 back when I was a young lad, I don't know that
24 field anymore, and I don't know what those

Page 81

1  individuals have done.
2      It's a realtime process. Sometimes
3  individuals who seem to be very, very good
4  scientists later on in life will get involved in
5  scientific misconduct. That may not have been at
6  all relevant for when you put that person on your
7  paper.
8      (DEPOSITION EXHIBIT NUMBER 8
9      WAS MARKED IDENTIFICATION.)
10 MS. THOMPSON:
11     Q    I'm gonna just give you a list of some
12 coauthors that I pulled off your CV. And would
13 you look at that list?
14     A    Uh-huh.
15     Q    I narrowed it down from a couple
16 thousand to a more manageable number. Are there
17 any names on that list that you could identify as
18 not being credible?
19 MS. CURRY:
20     Object to the form.
21 MS. THOMPSON:
22     Q    And that list is marked as Exhibit --
23 Dr. Birrer, can you --
24     A    8.

21 (Pages 78 to 81)

Michael Birrer, M.D., Ph.D.

Page 82

```
 1    Q      -- 8.
 2    A      So I would say of this list,
 3  probably -- I'm estimating -- about 20 percent of
 4  these people, I'm -- I'm not sure I quite
 5  remember what paper they're on.  But the rest of
 6  them I know because they're high profile.  I
 7  don't see anybody here that I would say is not a
 8  good scientist.
 9    Q      And qualified in their respective
10  areas?
11    A      Yes.
12  MS. CURRY:
13          Object to the form.
14  MS. THOMPSON:
15    Q      And some -- at least some on the list
16  you published with multiple times.  Is that fair
17  to say?
18    A      Yeah.
19    Q      Dr. Birrer, throughout your report you,
20  at least at times, used the term "talc."  What
21  are you referring to when you say talc?
22    A      So there's two levels of relevance
23  here.  One is for epidemiologic studies or
24  studies that were -- that were conducted.  A
```

Page 83

```
 1  subset of the -- of the studies that were
 2  conducted in the lab were actually dealing with
 3  talcum powder.
 4          But there are experiments in particular
 5  where individuals are using sigma-produced talc.
 6  So it's -- it's -- it's a bit of a mixture.  But
 7  I think, in particular in the epi studies, a lot
 8  of them are just okay to use powder.
 9    Q      So to -- to the extent both of us can,
10  we can try to say whether we're referring to
11  talcum powder or talc, as you described, so
12  let's -- let's both try to do that, to the extent
13  possible, because it can get confusing.
14    A      I completely concur.
15    Q      Okay.  Okay.  I'm glad we agree on
16  that.
17          Do you know what Johnson & Johnson's
18  market share of the talcum powder product has
19  been over the years?
20    A      I don't.
21    Q      If I told you it was 60 to 70 percent,
22  would you have any basis to disagree with that
23  number?
24    A      I actually wouldn't, because I -- my
```

Page 84

```
 1  sense is they command the market.  But I'm not --
 2  I'm not in the supermarket a lot.
 3    Q      And not in the baby powder section?
 4    A      No.
 5    Q      And what is contained in the
 6  Johnson's -- in Johnson's baby powder, to your
 7  understanding?
 8  MS. CURRY:
 9          Object to the form.
10    A      Talc.  And I know that's an issue
11  that's come up in terms of are there other
12  things.  I mean, clearly there are other things
13  that -- the product smells nice, so there must be
14  some fragrance.
15  MS. THOMPSON:
16    Q      Okay.
17    A      But I don't know of any -- first of
18  all, I don't -- that's not my area of expertise.
19  I've certainly never conducted any experiments
20  and tried to figure out what's in it and -- and
21  wouldn't consider myself an expert in the whole
22  mineralogy issue.
23    Q      So that would be talc, the mineral.  Do
24  you have an opinion as to whether there is a such
```

Page 85

```
 1  thing as pure talc?
 2  MS. CURRY:
 3          Object to the form.
 4    A      You know, my -- you know, my sense is
 5  in that some of the experiments where this
 6  product is actually bought not cosmetically, but
 7  I've seen references to sigma-produced talc, that
 8  that's a -- that's a purified form of it.
 9  MS. THOMPSON:
10    Q      And, so, by pure -- purified form, you
11  would mean that it does not con- -- contain
12  impurities; correct?
13    A      It would not contain something else.
14    Q      Would you consider it pure if it
15  contained talc fibers?
16  MS. CURRY:
17          Object to the form.
18    A      I don't -- I don't think I can answer
19  that.
20  MS. THOMPSON:
21    Q      So no opinion on -- on that issue.
22    A      Yeah.
23    Q      Are you familiar with the various
24  grades of talc?
```

22 (Pages 82 to 85)

Michael Birrer, M.D., Ph.D.

Page 86

1    A    No.
2    Q    Do you have any knowledge regarding the
3    particle size of Johnson's baby powder or Shower
4    to Shower?
5    A    Again, that's a little bit outside my
6    area of expertise.  My understanding is, you
7    know, talc ranges from 10 microns to larger
8    sizes.  But it's not something I systematically
9    explored.  Even the expert reports here that
10   focused on the mineralogy, I looked at it but not
11   in any great detail.
12   Q    And if you were told that there are
13   also smaller particles than 10 microns, that
14   wouldn't surprise you?
15   A    I think there's a range.
16   Q    Fair enough.
17   A    I don't know how -- you know, again, I
18   know there's references to ultrafine, et cetera,
19   et cetera.  I don't have definitive knowledge or
20   data that that is true.
21   Q    Okay.  But, as far as you know, the
22   particle size is -- is mixed?
23   A    Uh-huh.
24   Q    It's not a standard size like you might

Page 87

1    see, for example, in a pleurodesis talc?
2    MS. CURRY:
3         Object to the form.
4    A    I don't -- I can't say that.
5    MS. THOMPSON:
6    Q    Okay.
7    A    But based on my rudimentary
8    understanding of mineralogy here, that there's a
9    range.
10   Q    Have you ever looked at the label on a
11   bottle of baby powder?
12   A    I don't recall that.
13   Q    So you don't know what would be listed
14   on the label?
15   A    No.
16   Q    But you're assuming it has some kind of
17   fragrances in it?
18   A    I think that's a safe assumption.  I
19   have smelled it.
20   Q    Haven't we all.
21        Did you read Dr. Crowley's report?
22        Do you remember Dr. Crowley's report?
23   A    That's not coming to mind.  Can -- do
24   you have it?

Page 88

1    Q    It was the -- it was a report that
2    addressed the fragrance chemicals in talcum
3    powder.  Do you remember seeing that?  I don't
4    remember whether it's on your list.  Oh.
5    A    Is that plaintiff?
6    Q    You don't have Dr. Crowley's report.
7    A    Yeah.
8    Q    Did you know if there was a -- an
9    expert report that specifically addressed the
10   fragrance -- fragrance chemical presence in baby
11   powder?
12   A    Not that I know of.
13   Q    So I -- I can assume that you don't
14   know why you weren't provided Dr. Crowley's
15   report?
16   MS. CURRY:
17        Object to the form.
18   A    It's not on my list.
19   MS. THOMPSON:
20   Q    Did you ask if anyone had looked at the
21   actual chemicals in baby powder?
22   A    I didn't specifically go through that,
23   no.
24   Q    It -- is it important for you to know

Page 89

1    the quality of talcum powder?
2    MS. CURRY:
3         Object to the form.
4    A    And how do you define "quality"?
5    MS. THOMPSON:
6    Q    I -- I define "quality" as the absence
7    of the amount and types of impurities.
8    MS. CURRY:
9         Object to the form.
10   A    How do you define "impurities"?
11   MS. THOMPSON:
12   Q    Something that's not pure talc.
13   A    Okay.  Again, I -- I'll come back to
14   this theme.  I think -- I didn't go down that
15   road.  It's not my area of expertise.  But, more
16   importantly, I was asked to sort of review the
17   total data that suggested there might be a role
18   for talc in ovarian cancer, regard- -- talcum
19   powder, regardless of what's in it.
20        So in that context, impurities,
21   fragrance, heavy metals, it doesn't matter.  We
22   would see the data.  So I felt pretty comfortable
23   that that's the -- that's the important theme for
24   my job.

23 (Pages 86 to 89)

Michael Birrer, M.D., Ph.D.

1   Q      Is it important for you to know the
2   min- -- mineral content of a talcum powder
3   product if you are intending to assess its
4   potential health effects?
5   MS. CURRY:
6         Object to the form.
7   A      Would you just repeat that, please?
8   MS. THOMPSON:
9   Q      Is it important to know the mineral
10  content of a talcum powder product if you are
11  intending to assess its potential health effects?
12  MS. CURRY:
13        Object to the form.
14  A      You know, again, I think in terms of
15  reviewing the literature, no.  I mean, it's
16  talcum and it's talcum powder.  It's a
17  representative of what's on the market.
18        So regardless of what's there or not,
19  even from a mineral standpoint, we can make a
20  judgment as to whether that's providing data that
21  supports whether it's a risk factor or biologic
22  plausibility for a role in development of ovarian
23  cancer.
24  MS. THOMPSON:

1   MS. THOMPSON:
2   Q      For a potential health effect.
3   MS. CURRY:
4         Object to the form.
5   A      There's no data for that.  I can't
6   develop a mechanism when, in fact, there's no
7   biologic plausibility for talcum powder in a role
8   of ovarian cancer.
9   MS. THOMPSON:
10  Q      Well, it sounds like what you're saying
11  is if you decide that talcum powder doesn't cause
12  ovarian cancer, then there's no reason to even
13  look at whether there's a plausible mechanism or
14  not.
15  MS. CURRY:
16        Object to the form.
17  MS. THOMPSON:
18  Q      Is that --
19  A      Well, I'm not sure what mechanism we're
20  looking at.  We're looking at a mechanism that an
21  agent doesn't cause cancer?  That does -- makes
22  no sense to me.
23  Q      We're looking at what a mechanism could
24  be if it could cause cancer, as a hypothetical.

1   Q      So even in your determination of
2   whether a biologic mechanism is plausible or not,
3   it doesn't matter what the mineral content of the
4   baby powder is?
5   MS. CURRY:
6         Object to the form.
7   A      As long as that baby powder's been
8   tested in that experiment, it doesn't matter.
9   MS. THOMPSON:
10  Q      And that goes for whether the baby
11  powder contains asbestos?
12  A      Well, again, I -- I think if it
13  contained asbestos, that would show a signal in
14  those experiments.  Now, we would see it.  We may
15  not know it's related to asbestos, fragrance or
16  whatever, but the experiments would be
17  reproducible and dispositive.  And in my
18  experience, they're not.
19  Q      But the question is, does that -- would
20  that explain a mechanism if there's asbestos in
21  the baby powder?
22  MS. CURRY:
23        Object to the form.
24  A      Mechanism for what?

1   MS. CURRY:
2         Object to the form.
3   A      No.  I -- a mechanism for a
4   hypothetical.  I -- you know, again, that -- we
5   don't need the hypothetical.  We've tested talcum
6   in those experiments.  There's no data to support
7   biologic plausibility.  So why are -- why would
8   we be trying to think about a hypothetical
9   component to produce a mechanism for a biologic
10  activity that we haven't seen?
11  MS. THOMPSON:
12  Q      What experiments are you referring to?
13  A      I would say primarily the ones that are
14  in my expert report.  That really is a sum- --
15  Q      Which experiments in your report?  We
16  can go through your report if you want.
17  A      I'm -- yeah.
18  Q      I'm looking for the experiments that
19  show that there's no biologic effect.
20  A      So Buz'Zard is one that frequently --
21  Q      And is it your opinion that Buz'Zard
22  shows no biologic effect?
23  A      There's nothing in that paper that's
24  reliable in terms of showing biologic

Golkow Litigation Services - 877.370.DEPS

Michael Birrer, M.D., Ph.D.

Page 94

1  plausibility.
2  Q      And we'll get to the others.
3         So you're referring to --
4  A      Yes.
5  Q      -- Buz'Zard, Shukla?
6  A      Shukla.  Just hang on.  Yeah.
7  Buz'Zard, Shukla and Hamilton.
8  Q      And I'm going to assume you include
9  Dr. Saed in that?
10  A      Correct.
11  Q      Although we're going to get into more
12  detail in that later.
13  A      Exactly.
14  Q      And you're aware of the other animal
15  studies that show inflammatory effects; right?
16  MS. CURRY:
17         Object to the form.
18  A      You have to go through those and define
19  that.
20  MS. THOMPSON:
21  Q      Okay.
22  A      Because it's pretty broad literature.
23         You're assuming -- you're referring to
24  Keskin?

Page 95

1  Q      There are studies going back to the
2  '40s and '50s with intraperitoneal inflammatory
3  effects with -- in the presence of talc.
4         You're aware of those?
5  MS. CURRY:
6         Object to the form.
7  A      There is a big literature.
8  MS. THOMPSON:
9  Q      And understanding that there are
10  different histologic subtypes of epithelial
11  ovarian cancer, can we agree that if one of us
12  refers to ovarian cancer in a general sense, that
13  we're referring to epithelial ovarian cancer?
14  A      I would not include germ -- you know,
15  germ cell tumors in this.
16  Q      Stromal -- we're excluding stromal --
17  A      And stromal, yeah.  It's epithelial,
18  correct.
19  Q      Okay.  So we're on the same page there?
20  A      With -- with the caveat being, and we
21  do discuss this in the report about -- even
22  within the epithelial component, we now realize
23  there are different types of tumors.
24  Q      Understood.

Page 96

1         What is your understanding of how these
2  products are used by women?
3  MS. CURRY:
4         Object to the form.
5  A      Baby powder?
6  MS. THOMPSON:
7  Q      And -- and we're talking about, at
8  least for these cases, in the perineal area.
9  A      Yeah.
10  Q      Do you have any knowledge from
11  conversations with women or literature or any
12  other source as to how it's applied, whether it's
13  standing, lying down, in the underwear, on a
14  sanitary napkin, shaken into hands?  Did you have
15  any understanding of -- of those issues?
16  MS. CURRY:
17         Object to the form.
18  A      I would say not a systematic, shall we
19  say, meta-analysis of baby powder use.  I
20  certainly, over years in the clinic, am familiar
21  with women who use baby powder.  You know, my
22  sense is that most dust the perineum usually
23  standing up.  I -- but again, I can't say that's
24  a scientific evaluation.  I have some experience

Page 97

1  with my wife.  So I -- I -- it's a certain --
2  some general concept of how it's done, yeah.
3  MS. THOMPSON:
4  Q      Would you agree, at least, that, for
5  most women, it would be applied in a -- in a
6  habitual manner?
7  MS. CURRY:
8         Object to the form.
9  A      Yeah, I think it's important to define
10  that.  It would certainly be repetitive.  Is it
11  something -- you know, habitual sounds to me
12  like -- almost like an addict.  And I don't -- I
13  don't think that's the case.
14  MS. THOMPSON:
15  Q      No.  I didn't mean it -- mean in that
16  term.
17         I meant that it's -- and this has been
18  reported in the literature, I believe you're
19  aware --
20  A      Uh-huh.
21  Q      -- that most women do it the same way
22  every day or whatever schedule they're on.
23  MS. CURRY:
24         Object to the form.

25 (Pages 94 to 97)

Michael Birrer, M.D., Ph.D.

Page 98

1    A    I would think that there'd be some
2    consistency on that.  I -- I will say this
3    parenthetically, you may get to it later on, but
4    I do think, based on what we're just discussing,
5    it's very hard to -- it's very hard to quantify
6    amount of use.  I really do.
7    MS. THOMPSON:
8    Q    And I think we will get to that.
9    A    Okay.
10   Q    But -- but -- so it's hard to quantify
11   how much a woman is using on any given
12   application; correct?
13   A    (Nods affirmatively.)
14   Q    And it's hard --
15   MS. CURRY:
16        You have to say "yes" or "no" versus
17   head shakes because the court reporter will not
18   be able to get that down.
19   A    It says "nods affirmatively."
20        Yes.
21   MS. CURRY:
22        She was able to in that instance.  I
23   stand corrected, but for --
24   THE WITNESS:

Page 99

1        She's very good.
2    MS. THOMPSON:
3    Q    And -- and if there were talc that
4    reached the vagina or the upper genital tract, it
5    would be hard to quantify how much that would be;
6    right?
7    A    Yes.
8    Q    But you'll have to agree, but -- that
9    not being able to quantify it isn't a reason not
10   to study the issue.  Right?
11   MS. CURRY:
12        Object to the form.
13   A    I think that's a fair statement in
14   that, you know, if it's important, you need to do
15   it.  I just think that, for the reasons you just
16   said, quantifying it is -- is difficult, not only
17   in individual applications, how much actually
18   would get where, but this longitudinal issue.
19   While I think there's some consistency, do women
20   use it for a while and then stop using it and how
21   often do they change?  I think there's a whole
22   issue on that, too.
23   MS. THOMPSON:
24   Q    And wouldn't you agree that that would

Page 100

1    be true for a number of environmental
2    exposures --
3    MS. CURRY:
4        Object to the form.
5    MS. THOMPSON:
6    Q    -- that difficulty in quantifying how
7    much a particular individual is exposed to?
8    A    Well, you'd have to give me some
9    examples on that.  I mean, I think for cigarette
10   smoke, it actually is quite quantifiable.
11   Q    Cigarette smoke, I agree.
12        How about a household or domestic
13   exposure to asbestos, for example?
14   A    I guess you could quantify the amount
15   of asbestos-containing material in the house,
16   but --
17   Q    How about a spouse coming home from
18   occupational exposure?
19   A    Yeah.  It would be a challenge.
20   Q    How about chemicals in water source?
21   A    That should be measurable.
22   Q    Over time?
23   A    Multiple samples.
24   Q    How about --

Page 101

1    A    And -- and potentially even the
2    patient.
3    Q    How about exposure to a pesticide?
4    A    Yeah.  That would be more of a
5    challenge.  Yeah.
6    Q    So there's certainly other --
7    A    Some variability.
8    Q    -- other situations where it's
9    challenging to quantify the exposure to an
10   individual over time.
11   MS. CURRY:
12        Object to the form.
13   A    Yes.
14   MS. THOMPSON:
15   Q    Other than a literature or document
16   review, you -- I think I asked you this before
17   but I'm gonna just ask it again since it's in my
18   outline here.
19        Other than a literature and document
20   review, have you done any research on talcum
21   powder and ovarian cancer?
22   A    No.
23   Q    And that would include in vitro
24   research and in vivo; correct?

26  (Pages 98 to 101)

Michael Birrer, M.D., Ph.D.

Page 102

1    A     Correct.
2    Q     And you've never published an article
3  on talcum powder and ovarian cancer.  Is that
4  correct?
5    A     No.
6    Q     Have you ever given a talk on talcum
7  powder and ovarian cancer?
8    A     No.
9    Q     Have you discussed your opinions in
10 this case with anyone?
11   A     No, other than counsel.
12   Q     No colleagues?
13   A     No.
14   Q     Did you attend the recent SGO
15 conference in Hawaii?
16   A     Hawaii's a nice place.  I did.
17   Q     Did you discuss talcum powder with any
18 of your colleagues at the meeting?
19   A     I'd never been there before.
20        I did not.
21   Q     Do you know Liz Swisher?
22   A     I do know Liz, yes.
23   Q     Do you know her from professional
24 meetings and other interactions?

Page 103

1    A     I know her professionally and we're on
2  several papers together.
3    Q     Yes, you are.
4    A     Yeah.
5    Q     Have you discussed the case with
6  Dr. Swisher?
7    A     Not that I can recall.
8    Q     Were you aware that she was originally
9  disclosed as an expert for the defendants?
10 MS. CURRY:
11        Object to the form.
12   A     I think her name did -- was sort of
13 mentioned to me, but --
14 MS. CURRY:
15        And please don't reveal any discussions
16 or --
17 THE WITNESS:
18        Okay.
19 MS. CURRY:
20        -- communications that you've had with
21 lawyers.
22 THE WITNESS:
23        Yes, counsel.
24 MS. THOMPSON:

Page 104

1    Q     Do you know why she's no longer an
2  expert?
3    A     I don't.
4    Q     Do you know Dr. Huh?
5    A     I do know Dr. Huh.  Warner.  Uh-huh.
6    Q     Do you know why Dr. Huh is not serving
7  as an expert for the defendants in the MDL?
8    A     No.
9    Q     Does University of Alabama know that
10 you are serving as a paid expert for
11 Johnson & Johnson --
12   A     Yes.
13   Q     -- in this case?
14        Do you know how much money
15 Johnson & Johnson has contributed to the
16 University of Alabama and your lab?
17 MS. CURRY:
18        Object to the form.
19   A     I --
20 MS. THOMPSON:
21   Q     Let me rephrase that question because I
22 don't like being "contributed."
23        Do you know how much money
24 Johnson & Johnson has paid to University of

Page 105

1  Alabama?
2    A     No.
3    Q     Do you know how much money
4  Johnson & Johnson has paid to support your lab?
5  MS. CURRY:
6        Object to the form.
7    A     None.
8  MS. CURRY:
9        We've been going over an hour and a
10 half.  Whenever it's a good breaking point for
11 you.
12 MS. THOMPSON:
13        I think maybe less than five minutes --
14 MS. CURRY:
15        No problem.
16 MS. THOMPSON:
17        -- and it's a great break time.
18   A     I may be in kidney failure soon.
19 MS. THOMPSON:
20   Q     Can you make five minutes?
21   A     Yeah, I can.  Yeah.
22   Q     We'll -- we'll --
23   A     Sure.
24   Q     -- be in the same boat there, so we

27 (Pages 102 to 105)

Michael Birrer, M.D., Ph.D.

---

Page 106

1  can --
2  A     Boat's not a good choice.
3  Q     Yeah.  I should have used a different
4  word there.
5        We talked about the methodology that
6  you applied, but -- but it's not included, per
7  se, in the report.
8        Can you refer to me -- me to any
9  published article, textbook chapter, anything
10 that actually describes Dr. Birrer's methodology?
11 MS. CURRY:
12       Object to the form.
13 A     No.  Again, I -- I think this relates
14 to what a lot of us in the field on my level do
15 routinely, and so it's not really defined.  But
16 when we review literature, a topic, I wouldn't
17 want to -- I don't want to call it a
18 meta-analysis because that's a formal process.
19 But we -- we -- we do the right -- we do the same
20 thing.  If we do it right, then it's
21 comprehensive and then we make opinions on those
22 papers.  That's the methodology.
23 MS. THOMPSON:
24 Q     Okay.

---

Page 107

1  A     It's more of a scientific lab-based
2  approach.
3  Q     Okay.  And did you apply the same
4  standards for this report that you would use if
5  you were publishing a paper, for example, a
6  review article like we discussed before?
7  A     I think so, yes.
8  Q     Would you be willing to have the
9  opinions that you've provided in this report
10 peer-reviewed if that were appropriate?
11 A     Essentially, yes.  Yeah.  Yeah.
12 Q     And I think we've discussed this, but
13 does -- in your opinion, you performed a
14 comprehensive literature review on the subject of
15 talc and ovarian cancer; correct?
16 A     Correct.
17 Q     But am I correct to say that you did
18 not perform the same comprehensive literature
19 review for asbestos and ovarian cancer?
20 A     Correct.
21 Q     Fibrous talc in ovarian cancer?
22 MS. CURRY:
23       Object to the form.
24 A     Didn't use that term.

---

Page 108

1  MS. THOMPSON:
2  Q     How about what is sometimes used in the
3  literature, elongated mineral fibers?  Does that
4  sound familiar?
5  A     It sounds consistent with some of the
6  things I read, but I certainly did not pursue
7  that sort of mineralogy review.
8  Q     So no comprehensive review on what's
9  called EMP sometimes.
10 MS. CURRY:
11       Object to the form.
12 A     No.
13 MS. THOMPSON:
14 Q     And I can assume that you didn't do a
15 comprehensive review on heavy metals --
16 A     Correct.
17 Q     -- and ovarian cancer?
18 A     Yes.
19 Q     Or fragrance chemicals and ovarian
20 cancer?
21 A     Correct.
22 Q     Do you agree that scientists can look
23 at the same body of literature and reach
24 different conclusions, in a general sense?

---

Page 109

1  A     You know, again, I think if the body
2  of -- of data and literature is substantive and
3  clear, I think that a reasonable scientist, a
4  competent scientist will come to the same
5  conclusion.
6  Q     So is it your opinion that a scientist
7  who looks at the baby powder literature or talcum
8  powder literature and concludes something
9  different from you is unreasonable and
10 incompetent?
11 MS. CURRY:
12       Object to the form.
13 A     I -- I would say they got it wrong.
14 MS. THOMPSON:
15 Q     They got it wrong.  But what about
16 unreasonable?
17 MS. CURRY:
18       Object to the form.
19 A     I don't -- I wouldn't use that term.  I
20 would say that they looked at the data and
21 misinterpreted it.
22 MS. THOMPSON:
23 Q     And would you say the same about their
24 competence?

---

28  (Pages 106 to 109)

Michael Birrer, M.D., Ph.D.

Page 110

1  MS. CURRY:
2      Object to the form.
3  A      I think -- you know, labeling that as
4  incompetent is not appropriate.
5  MS. THOMPSON:
6  Q      Well, you said, I think that a
7  reasonable scientist, competent scientist will
8  come to the same conclusion.  Wouldn't that imply
9  that if they come to a different inclusion --
10  conclusion, that they're unreasonable or
11  incompetent?
12  A      Well, I think I prefaced that with if
13  the body of science we're looking at is -- is --
14  it's convincing and strong and reproducible, that
15  reasonable scientists will come to the same
16  conclusion.
17      When the data is really unconvincing,
18  which is what we're dealing with here -- this
19  data is not convincing -- there's no data for
20  talc being involved in ovarian cancer, then you
21  get this disparate opinions.  And -- and they've
22  got it wrong.  And I made the --
23  Q      They've got it -- sorry.
24  A      And I've made the argument why I got it

Page 111

1  right.
2  Q      Okay.  They've got it wrong?
3  A      Uh-huh.
4  Q      You have it right.
5  A      Uh-huh.
6  Q      But I'm trying to find -- figure out
7  how you think they got it wrong.  Were they
8  misinformed?
9  MS. CURRY:
10      Object to the form.
11  A      They misinterpreted the data.
12  MS. THOMPSON:
13  Q      They misinterpreted the data.
14  A      Yeah.
15  Q      And you would say they misinterpreted
16  the data even though they interpreted the data in
17  the same way that the authors presenting the data
18  pre- -- interpreted it?
19  MS. CURRY:
20      Object to the form.
21  A      We'd have to go through the actual
22  paper you're referring to.
23  MS. THOMPSON:
24  Q      Okay.  We may go through some of those.

Page 112

1  A      Okay.
2  MS. CURRY:
3      Can we take a break?
4  A      It looks like you're coming to an end.
5  MS. THOMPSON:
6  Q      We are.  Well, not the end of the day.
7  The end of the section.
8  A      Hope springs eternal.
9  Q      Wishful thinking.
10      One -- one more question, then we're
11  done.
12  A      Sure.
13  Q      What does "proof" mean to you?
14  MS. CURRY:
15      Object to the form.
16  MS. THOMPSON:
17  Q      In a scientific sense.
18  A      That would be evidence to support the
19  conclusion.
20  Q      To convincingly support the conclusion?
21  MS. CURRY:
22      Object to the form.
23  A      I'm not sure I need that adjective
24  there.

Page 113

1  MS. THOMPSON:
2  Q      Well, support -- support equals proof?
3  A      Support couldn't equal proof.  Proof is
4  a general term.  So it's gonna be a spectrum.
5  Q      100 percent?
6  A      Are you -- you know, definitive proof
7  would be definitive.
8  Q      Okay.  Let's take a break.
9  VIDEOGRAPHER:
10      Off the record at 10:44 a.m.
11      (OFF THE RECORD.)
12  VIDEOGRAPHER:
13      We're back on the record at 11 a.m.
14  MS. THOMPSON:
15  Q      Dr. Birrer, I want to give you a series
16  of statements and have you agree or disagree or,
17  if you don't know or don't have an opinion,
18  that's fine, too.  And -- and if you do have a
19  comment or explanation, you're welcome to provide
20  that, too, after you -- do you have a pen?  You
21  can mark on this exhibit as we go through.  This
22  is Exhibit 9.
23      (DEPOSITION EXHIBIT NUMBER 9
24      WAS MARKED FOR IDENTIFICATION.)

29 (Pages 110 to 113)

Michael Birrer, M.D., Ph.D.

Page 114

1    MS. CURRY:
2         Can I just state an objection on the
3    record to the creation of this exhibit without
4    knowing the background of where the statements
5    are coming from.
6    MS. GARBER:
7         I don't think we're going to have
8    speaking objections here today, Miss Curry.  The
9    proper objection is "Objection.  Form."  Do not
10   coach the witness, please.
11   MS. CURRY:
12        Miss Garber, I'm not coaching the
13   witness.
14   MS. GARBER:
15        You are coaching the witness.  You know
16   you're coaching the witness.
17   MS. THOMPSON:
18        I'm asking a statement.  It doesn't
19   matter where it's coming from.  It's from my
20   head.
21   MR. MIZGALA:
22        Do you have extra copies of this?
23   MS. THOMPSON:
24        I did bring extra copies.

Page 115

1    MR. MIZGALA:
2         Thank you.
3    MS. THOMPSON:
4    Q    So, Dr. Birrer, statement number 1,
5    "Given the number of hazard ratios reported in
6    the literature between 1.1 and" -- that should be
7    an -- "1.4 in both case-control and cohort
8    studies, it is disingenuous to state that there
9    is no evidence that talc is associated with
10   ovarian cancer."
11        Do you agree or disagree with that
12   statement?
13   MS. CURRY:
14        Object to the form.
15   A    Now, you want me to write an answer
16   here?
17   MS. THOMPSON:
18   Q    Yes, please.  And then -- and when you
19   tell me, I'm going to put it on here, too.
20   A    Yeah.  Okay.  In these -- the hazard
21   ratios, these are in a case-controlled cohort
22   studies.
23   Q    It says in both case-controlled and
24   cohort studies.

Page 116

1    A    Yeah.  I would disagree with that
2    statement.
3    Q    Number 2, "If 40 percent of women use
4    talc and the relative risk is 1.2, then 7 percent
5    of ovarian cancer cases would be attributable to
6    talc use or 1,577 cases a year in the USA.  This
7    is not a trivial number and should not be
8    dismissed."
9         Would you agree or disagree?
10   MS. CURRY:
11        Object to the form.
12   A    Disagree.
13   MS. THOMPSON:
14   Q    Number 3, "Genital powder use is a
15   modifiable exposure associated with small to
16   moderate increases in risk of most histologic
17   subtypes of epithelial ovarian cancer."
18        Would you agree or disagree?
19   MS. CURRY:
20        Object to the form.
21   A    Disagree.
22        I'm sorry.  Go ahead.  Got it?
23        Disagree.
24   MS. THOMPSON:

Page 117

1    Q    Number 4, "Perineal use of talc-based,
2    not asbestiform, body powder is possibly
3    carcinogenic to humans, group 2B."
4    A    Disagree.
5    MS. CURRY:
6         Object to the form.
7    MS. THOMPSON:
8    Q    Number 5, "The use of perineal talcum
9    powder has been associated with a 20 to 30
10   percent increased risk of ovarian cancer,
11   although it also has been shown to vary by
12   histologic subtype."
13   MS. CURRY:
14        Object to the form.
15   MS. THOMPSON:
16   Q    Agree or disagree?
17   A    And this is -- like, histologic --
18   clear cell and endometrioid?  Is that what's
19   being implied here?
20   Q    Yes.
21   A    Disagree.
22   Q    Number 6, "A lot of work has been done
23   to clarify the risk reduction of various
24   lifestyle approaches, such as alcohol, obesity,

Michael Birrer, M.D., Ph.D.

Page 118

1    cigarette smoking and talc use.  Some of these
2    are subtype specific, such as endometriosis,
3    cigarette smoking, while others are general risk
4    factors.  Use of talc in the genital area has
5    consistently been shown to increase the risk of
6    OC and therefore is not recommended."
7    MS. CURRY:
8            Object to the form.
9    A    Disagree.
10   MS. THOMPSON:
11   Q    Number 7, "Inflammatory risk factors
12   for EOC are perineal talc exposure, endometriosis
13   and pelvic inflammatory disease."
14           Agree or disagree?
15   MS. CURRY:
16           Object to the form.
17   A    So this is inclusive of all three;
18   right?  Endometriosis and --
19   MS. THOMPSON:
20   Q    Yes.
21   A    Okay.
22   Q    But if you want to disagree and
23   explain, that -- that's fine.
24   A    I would -- that's a tough one to

Page 119

1    answer.  I think endometriosis is a -- I don't
2    call it inflammatory.  So, yeah, I would -- I
3    don't call it inflammatory, so, yeah, I would
4    disagree on this.  It's too general.
5    MS. THOMPSON:
6    Q    "Risk factors to be considered:
7    Parity, oral contraceptive use, breastfeeding,
8    tubal ligation, painful periods or endometriosis,
9    obesity or polycystic ovarian syndrome, and talc
10   use.  These risk factors are concordant with
11   published epidemiologic data related to
12   reproductive factors, use of talc, tubal
13   ligation, endometriosis and polycystic ovarian
14   syndrome or obesity."
15   MS. CURRY:
16           Object to the form.
17   A    So parity, oral contraceptive,
18   breastfeeding, tubal ligation, endometriosis but
19   not painful periods or obesity or talc use.  Is
20   that a --
21   MS. THOMPSON:
22   Q    Okay.
23   A    -- no or --
24   Q    So -- so you would disagree with the

Page 120

1    statement as a whole --
2    A    Yeah.
3    Q    -- but would --
4    A    Caveat.
5    Q    -- and that will be on the record that
6    you --
7    A    Okay.  Parsed it.
8    Q    The ones that -- yeah.
9            Number 9, "Talc powder use is highly
10   prevalent in the African-American community and
11   has been found to be associated with increased
12   risk of ovarian cancer, period."
13   MS. CURRY:
14           Object to the form.
15   A    So I do believe the first part, that
16   it's prevalent in the African-American community.
17   The second part is not convincing to me.
18           Is that -- can we put that on the
19   record?  Disagree with the caveat, yeah.
20   MS. THOMPSON:
21   Q    Yeah.  "Most women report using
22   Johnson's baby powder or Shower to Shower."
23   A    I don't know.
24   Q    "The average age women begin using talc

Page 121

1    is 20."
2    A    Don't know that.
3    Q    "In the interest of public health, I
4    believe we should caution women against using
5    genital talcum powder," number 12.
6    MS. CURRY:
7            Object to the form.
8    MS. THOMPSON:
9    Q    Agree or disagree?
10   A    I disagree.
11   Q    Number 13, "Genital powder use is a
12   lifestyle risk factor for all serous,
13   endometrioid, and clear cell histologic subtypes
14   of ovarian cancer."
15   MS. CURRY:
16           Object to the form.
17   A    I disagree.
18   MS. THOMPSON:
19   Q    Number 14, "Overall, there is an
20   association between genital talc use and EOC and
21   a significant trend with increasing" -- in
22   quotations -- "'talc years of use.'"
23   MS. CURRY:
24           Object to the form.

31 (Pages 118 to 121)

Michael Birrer, M.D., Ph.D.

Page 122

1    MS. THOMPSON:
2    Q      Agree or disagree?
3    A      I'm thinking.  Disagree.
4    Q      Number 15, "Talc-containing powders are
5    hypothesized to promote cancer development by
6    ascending the female genital tract and
7    interacting directly with the ovarian surface
8    epithelium, leading to local inflammation
9    characterized by increased rates of cell
10   division, DNA repair, oxidative stress, and
11   elevated inflammatory cytokines."
12   MS. CURRY:
13       Object to the form.
14   A      This is a hypothesis; right?
15   MS. THOMPSON:
16   Q      Yes.
17   A      I agree.
18   Q      "Following" -- number 16.
19   A      Uh-huh.
20   Q      "Following perineal application, talc
21   particles can migrate from the vagina to the
22   peritoneal cavity and ovaries."
23   MS. CURRY:
24       Object to the form.

Page 123

1    A      Disagree on that.
2    MS. THOMPSON:
3    Q      Number 17, "A majority of women
4    experience retrograde menstruation.  This
5    suggests a mechanism by which talc particles can
6    travel through the female reproductive tract to
7    the peritoneal cavity and ovaries."
8    MS. CURRY:
9        Object to the form.
10   MS. THOMPSON:
11   Q      Agree or disagree?
12   A      Disagree.
13   Q      Number 18, "It is possible that the
14   passage of talc is aided by retrograde menses and
15   that talc use during menses poses a special
16   risk."
17       Agree or disagree?
18   MS. CURRY:
19       Object to the form.
20   A      Disagree.
21   MS. THOMPSON:
22   Q      19, "Biologic credibility of the
23   Talc/EOC association is enhanced by persuasive
24   evidence that inert particles the size of talc,

Page 124

1    present in the vagina, can migrate to the upper
2    genital tract."
3    MS. CURRY:
4        Object to the form.
5    MS. THOMPSON:
6    Q      Agree or disagree?
7    MS. THOMPSON:
8    A      You want to -- do you want to define
9    "biologic credibility"?
10   THE COURT REPORTER:
11       Say again?
12   THE WITNESS:
13       Define "biologic credibility."
14       Sorry.  I'm mumbling.
15   THE COURT REPORTER:
16       Uh-huh.
17   MS. THOMPSON:
18   Q      Let's define it as evidence of a
19   credible biologic mechanism.
20   A      I would disagree.
21   MS. CURRY:
22       Object to the form.
23   MS. THOMPSON:
24   Q      Number 20, "The vagina serves as a

Page 125

1    portal to the internal reproductive tract.
2    MS. CURRY:
3        Object to the form.
4    A      Agree.
5    MS. THOMPSON:
6    Q      21, "The vagina is a musculoepithelial
7    tube extending from the level of the external
8    genitals to the cervical portion of the uterus.
9    It is a reproductive conduit in all respects,
10   connecting the external environment to the
11   internal genitalia."
12   MS. CURRY:
13       Object to the form.
14   A      I'm not sure I understand that
15   statement.
16       What's the internal genitalia?
17   MS. THOMPSON:
18   Q      The ovaries.
19   A      The ovaries.  I'm putting that in here.
20   Q      And tubes.  Let's say tubes and
21   ovaries.
22   A      Okay.  External.
23       Yeah, I would agree on that.
24   Q      And, actually, I think the --

32 (Pages 122 to 125)

Michael Birrer, M.D., Ph.D.

Page 126

1    A       Cervix.
2    Q       I think the uterus is an internal
3    genitalia, too.
4    A       Okay.
5    Q       But I agree that's somewhat --
6    A       Yeah.  It's a little -- I mean, yeah.
7    Genitalia is usually external.
8    Q       Yeah.
9            22, "A review of the literature
10   suggests that it is biologically plausible for
11   talc particles to migrate from the vagina to the
12   peritoneal cavity and ovaries following perineal
13   application."
14   MS. CURRY:
15           Object to the form.
16   MS. THOMPSON:
17   Q       Agree or disagree?
18   A       Disagree.
19   Q       "Talc" -- 23.  "Talc placed on the
20   perineum may enter the vagina and ascend to the
21   upper genital tract."
22           Agree or disagree?
23   MS. CURRY:
24           Object to the form.

Page 127

1    A       Disagree.
2    MS. THOMPSON:
3    Q       24, "The potential for particulates to
4    migrate from the perineum and vagina to the
5    peritoneal cavity is indisputable."
6    MS. CURRY:
7            Object to the form.
8    A       Disagree.
9    MS. THOMPSON:
10   Q       "The Sjösten study" --
11           Do you know the Sjösten study?
12   A       I do.
13   Q       -- "offers compelling evidence in
14   support of the migration hypothesis."
15   MS. CURRY:
16           Object to the form.
17   A       Disagree.
18   MS. THOMPSON:
19   Q       26, "Talc particulates from perineal
20   application have been shown to migrate to the
21   ovaries."
22           Agree or disagree?
23   MS. CURRY:
24           Object to the form.

Page 128

1    A       Disagree.
2    MS. THOMPSON:
3    Q       27, "Talc is able to migrate through
4    the genital tract and gain access to the ovaries
5    because talc fibers have been detected in benign
6    and malignant ovarian tissues."
7            Agree or disagree?
8    MS. CURRY:
9            Object to the form.
10   A       Disagree.
11   MS. THOMPSON:
12   Q       28, "There are inherent limitations
13   quantifying a dose-response due to a lack of
14   metrics for how much talc is in an application,
15   how much enters the vagina, and how much reaches
16   the upper genital tract where, presumably, any
17   deleterious effect is mediated.  This may account
18   for the failure to identify a dose-response in
19   many papers on talc and ovarian cancer."
20   MS. CURRY:
21           Object to the form.
22   A       It's a big statement.  Give me a
23   second.  I disagree with that.
24   MS. THOMPSON:

Page 129

1    Q       29, "Tubal ligation is a strong
2    protective factor.  One possibility for the
3    mechanism is blocking the transience of potential
4    materials that could impact the health of the
5    fimbria."
6    MS. CURRY:
7            Object to the form.
8    A       Disagree.
9    MS. THOMPSON:
10   Q       Number 30, "Any material -- whether it
11   be talc, heavy metals, asbestos, whatever -- can
12   migrate from the perineum to the ovaries through
13   the reproductive tract.  There's an anatomical
14   conduit, so it's not blocked.  Theoretically, it
15   could happen."
16           Agree or disagree?
17   MS. CURRY:
18           Object to the form.
19   A       Disagree.
20   MS. THOMPSON:
21   Q       31, "There is an anatomic conduit from
22   the perineum through to the ovary, vagina,
23   cervical os, endometrium, and the fallopian tube
24   that is, in most women, an open conduit -- that

33 (Pages 126 to 129)

Michael Birrer, M.D., Ph.D.

Page 130

1   is in most women an open conduit. On a theoretic
2   level, things can transit."
3   A      I would agree with that.
4   MS. CURRY:
5          Object to the form. Sorry.
6   THE WITNESS:
7          I'm sorry.
8   MS. THOMPSON:
9   Q      32, "Genital powder use was associated
10  with ovarian cancer risk in African-American
11  women and are consistent with localized chronic
12  inflammation in the ovary due to particulates
13  that travel through a direct transvaginal route."
14  MS. CURRY:
15         Object to the form.
16  A      Disagree.
17  MS. THOMPSON:
18  Q      33, "Biologic credibility for an
19  association would be strengthened by an animal
20  model, but an experiment capturing all of the
21  potential factors in the 'human' model would be
22  very difficult. These elements include
23  chronicity of the exposure, anatomic and
24  physiologic uniqueness of women, effects of

Page 131

1   pregnancy and potential spread through coitus."
2          Agree or disagree?
3   MS. CURRY:
4          Object to the form.
5   A      This is in relationship to talc?
6   MS. THOMPSON:
7   Q      Yes.
8   A      Okay.
9   Q      Talc and ovarian cancer.
10  A      Yeah, yeah. Okay.
11         It's a two-part issue, unfortunately.
12  I mean, I think it would be strengthened by an
13  animal model.
14  Q      And if you -- if you'd -- if you'd like
15  to divide that up into two sections, that would
16  be -- that's fine.
17  A      Okay. Well, I -- okay. That's --
18  yeah. I think -- I think it would be
19  strengthened by an animal model.
20  Q      Okay. So --
21  A      "Experiment capturing all the potential
22  would be difficult."
23         I don't agree with that, the second
24  part. Can I do that and split it a little bit?

Page 132

1   Oh, sorry.
2          So the animal model, yes. The rest of
3   it, no.
4   Q      Animal model --
5   A      Would be strengthened.
6   Q      Okay. We've got in the human model --
7   A      Yeah.
8   Q      -- agree.
9   A      Okay.
10  Q      Okay. And the rest, disagree.
11  A      Yeah.
12  Q      Okay. I think that's clear, especially
13  with explanation.
14         34, "It is plausible that perineal
15  talc, and other particulate, in parens, that
16  reaches the endometrial cavity, fallopian tubes,
17  ovaries and peritoneum, may elicit a foreign
18  body-type reaction and inflammatory response
19  that, in some exposed women, may progress to
20  epithelial cancers."
21  MS. CURRY:
22         Object to the form.
23  A      I disagree with that.
24  MS. THOMPSON:

Page 133

1   Q      35, "Epidemiologic evidence implicates
2   chronic inflammation as a central mechanism in
3   the pathogenesis of ovarian cancer, the most
4   lethal gynecologic cancer among women in the
5   United States."
6   MS. CURRY:
7          Object to the form.
8   MS. THOMPSON:
9   Q      And I'll assume that you don't agree
10  with the last --
11  A      Right. Most lethal?
12  Q      -- part of that? But the first part?
13  A      I would disagree with this. Yeah.
14  Q      36, "Findings on talc and endometriosis
15  are consistent with previous findings and are
16  compatible with a hypothesis that these factors
17  increase the risk of ovarian cancer and that
18  inflammation -- and that inflammation may be a
19  common pathway."
20  MS. CURRY:
21         Object to the form.
22  A      Disagree.
23  MS. THOMPSON:
24  Q      37, "Chron-" --

34 (Pages 130 to 133)

Michael Birrer, M.D., Ph.D.

Page 134

1    A    37.  Right.
2    Q    "Chronic inflammation has been proposed
3    as the possible causal mechanism that explains
4    the observed association between certain risk
5    factors, such as use of talcum powder (talc) in
6    the pelvic region and epithelial ovarian cancer."
7    MS. CURRY:
8         Object to the form.
9    A    That's been proposed; right?  I would
10   agree.
11   MS. THOMPSON:
12   Q    And you would disagree that that is a
13   possible cause of mechanism, I assume.
14   A    Correct.
15   Q    38, "Talc particles can induce an
16   inflammatory response in vivo, which may be
17   important in ovarian cancer risk.  Normal ovarian
18   cells treated with talc are more likely to
19   undergo cell proliferation and neoplastic
20   transformation, and cellular generation of
21   reactive oxygen species increases with increasing
22   exposure to talc."
23   MS. CURRY:
24        Object to the form.

Page 135

1    A    I disagree with that.
2    MS. THOMPSON:
3    Q    39, "A growing body of epidemiologic
4    evidence suggests that factors causing epithelial
5    inflammation are involved in ovarian
6    carcinogenesis.  Such factors include asbestos
7    and talc exposures, endometriosis and pelvic
8    inflammatory disease (PID)."
9    MS. CURRY:
10        Object to the form.
11   A    Disagree with that.
12   MS. THOMPSON:
13   Q    40, "Direct induction of inflammation
14   as a result of endometriosis, talc, and asbestos
15   exposure, and PID, as well as ovulation itself,
16   may act to promote ovarian tumorigenesis."
17        Agree or disagree?
18   MS. CURRY:
19        Object to the form.
20   A    Disagree.
21   MS. THOMPSON:
22   Q    41, regarding Inflammation.  "Studies
23   of the inflammatory marker C-reactive protein
24   suggests a possible association between

Page 136

1    inflammation and an increased risk of ovarian
2    cancer.  Other specific inflammatory factors have
3    also been associated with ovarian cancer."
4    MS. CURRY:
5         Object to the form.
6    A    I agree on that.
7    MS. THOMPSON:
8    Q    42, "The patency of the female tract
9    and the nature of ovarian cancer as a surface
10   epithelial (mesothelial lesion) make the ovary a
11   target for foreign body carcinogenesis."
12   MS. CURRY:
13        Object to the form.
14   MS. THOMPSON:
15   Q    Agree or disagree?
16   A    Disagree.
17   Q    43, "Inflammation has been suggested to
18   be a major factor leading to epithelial ovarian
19   cancer.  For example, epidemiologic data have
20   shown that asbestos and talc exposure increased
21   ovarian cancer risk."
22   MS. CURRY:
23        Object to the form.
24   A    Disagree.

Page 137

1    MS. THOMPSON:
2    Q    44, "Studies have found" -- "also found
3    that endometrio-" --
4         Let's leave out the "also," since I
5    don't know what that refers to.
6         "Studies have found that endometriosis,
7    pelvic inflammatory disease, and mumps viral
8    infection are positively associated with ovarian
9    cancer risk.  In contrast, tubal ligations and
10   hysterectomies, which are thought to reduce the
11   exposure of the OSE to environmental inflammation
12   initiators have been shown to reduce the risk of
13   ovarian cancer."
14   MS. CURRY:
15        Object to the form.
16   A    I agree on that.
17   MS. THOMPSON:
18   Q    45, "It has been noted that the
19   ovulatory process itself resembles an
20   inflammatory reaction, with leukocytic
21   infiltration, the release of nitric oxide and
22   inflammatory cytokines, basal dilation, DNA
23   repair and tissue remodeling."
24   MS. CURRY:

35  (Pages 134 to 137)

Michael Birrer, M.D., Ph.D.

Page 138

1      Object to the form.
2    MS THOMPSON:
3    Q      Agree or disagree?
4    A      I would agree on that.
5    Q      46, "The latency period of more
6  advanced, malignant epithelial ovarian cancer
7  could be estimated to be approximately 30 to 40
8  years."
9    MS. CURRY:
10      Form.
11    A      I don't know that.  Sorry.  I don't
12  know.
13    MS. THOMPSON:
14    Q      "If the magnitude of the association is
15  to be estimated with precision, it is important
16  that consortia are developed and expanded in
17  order to generate the appropriate sample size."
18      And this is in regard to talcum powder
19  in association with ovarian cancer.
20    MS. CURRY:
21      Object to the form.
22    A      Don't know.
23    MS. THOMPSON:
24    Q      48, "Neither prospective study" --

Page 139

1  meaning Gertig or Houghton -- "confirmed the
2  association of talc use and ovarian cancer raised
3  by the case-control studies, but neither study
4  was powered to detect a risk of 1.2 and
5  therefore, we cannot exclude the possibility."
6      Agree or disagree?
7    MS. CURRY:
8      Object to the form.
9    A      Disagree.
10    MS. THOMPSON:
11    Q      49, "An odds ratio of 1.2 or 1.3 has no
12  meaningful clinical impact on a patient."
13    MS. CURRY:
14      Object to the form.
15    A      Don't know.
16    MS. THOMPSON:
17    Q      "There are design studies with" --
18  sorry.
19      50, "There are design issues with every
20  study, both case-controls and cohort studies."
21    MS. CURRY:
22      Object to the form.
23    A      I would agree with that.
24    MS. THOMPSON:

Page 140

1    Q      51, "For baby powder users, it is habit
2  that developed at one point and stays regularly."
3    MS. CURRY:
4      Object to the form.
5    A      Don't know.
6    MS. THOMPSON:
7    Q      52, "In order to achieve statistical
8  significance in a prospective study, we need a
9  much larger cohort.  For example, we will need to
10  study upwards of 200,000 women for ten years."
11    MS. CURRY:
12      Object to the form.
13    A      I disagree.
14    MS. THOMPSON:
15    Q      You disagree.
16      53, "Given inherent limitation of
17  cohort studies, it is not surprising that we have
18  not been able to confirm the case-control studies
19  with prospective studies, but this does not mean
20  that the case-control studies were wrong."
21    MS. CURRY:
22      Object to the form.
23    A      Disagree.
24    MS. THOMPSON:

Page 141

1    Q      Agree or disagree?
2    A      Disagree.
3    Q      54, "It is unlikely that the
4  association between talc and ovarian cancer is
5  due to confounding, and so it is fair to say that
6  if there is a statistically robust relationship
7  between talc use and ovarian cancer" -- sorry.
8  I'm gonna start all over.
9      "It is unlikely that the association
10  between talc and ovarian cancer is due to
11  confounding, and so it is fair to say that if
12  there is a statistically robust relationship
13  between talc use and ovarian cancer, it is likely
14  to be causal (albeit with intermediate factors
15  such as inflammation)."
16      Agree or disagree?
17    MS. CURRY:
18      Object to the form.
19    A      Disagree.
20    MS. THOMPSON:
21    Q      55, "Among many epidemiologic
22  variables, no confounders for the association --
23  for the association were identified."
24    MS. CURRY:

36  (Pages 138 to 141)

Michael Birrer, M.D., Ph.D.

Page 142

```
1              Object to the form.
2    A     No opinion.
3    MS. THOMPSON:
4    Q     56, "There is a consistent association
5    between talc and ovarian cancer that appears
6    unlikely to be explained by recall or
7    confounding."
8              Agree or disagree?
9    MS. CURRY:
10             Object to the form.
11   A     Disagree.
12   MS. THOMPSON:
13   Q     57, "The meta-analyses of the available
14   human studies in the peer-reviewed literature
15   indicate a consistent and statistically
16   significant positive association between perineal
17   exposure to talc and ovarian cancer."
18   MS. CURRY:
19             Object to the form.
20   A     Disagree.
21   MS. THOMPSON:
22   Q     You disagree.
23             58, "In studies where the exposure is
24   simple (e.g., never versus ever use), recall bias
```

Page 143

```
1    is unlikely to be an important source of bias."
2              Agree or disagree?
3    MS. CURRY:
4              Object to the form.
5    A     No opinion.
6    MS. THOMPSON:
7    Q     Is that an issue that you would be
8    inclined to -- to ask an epidemiologist?
9    MS. CURRY:
10             Object to the form.
11   A     I'd like to see the -- I'd like to see
12   the study that it's based on.
13   MS. THOMPSON:
14   Q     Okay. 59, "Available data are
15   indicative of a causal effect." And again,
16   referring to talc and ovarian cancer.
17   MS. CURRY:
18             Object to the form.
19   A     Disagree.
20   MS. THOMPSON:
21   Q     60, "The data supporting the
22   association of talc to the development of ovarian
23   cancer is completely inconclusive."
24   MS. CURRY:
```

Page 144

```
1              Object to the form.
2    A     I agree on that.
3    MS. THOMPSON:
4    Q     61, "The gold standard for translating
5    epidemiologic case-controlled or cohort
6    observational studies into a clinical meaningful
7    data relies on laboratory-derived experiments in
8    vitro or in vivo."
9    MS. CURRY:
10             Object to the form.
11   A     I disagree with that.
12   MS. THOMPSON:
13   Q     On what basis?
14   A     The -- it depends upon the
15   epidemiologic date that that we're talking about.
16   Q     In other words, if the epidemiologic
17   data isn't strong enough, in your opinion, then
18   doing in vitro or in vivo studies don't provide
19   clinically meaningful data? Is that --
20   MS. CURRY:
21             Object to the form.
22   A     It's actually -- it's actually the
23   other way around. So I think if it's a weak
24   association, then the laboratory data becomes
```

Page 145

```
1    that much more important for biologic
2    plausibility.
3              If it has -- you know, if it's chimney
4    sweeps or lung cancer with smoking, then that's
5    clinically meaningful. Those effects are huge.
6    That's what I'm -- I'm not associating this just
7    with the talc statement. Is it a talc statement?
8    MS. THOMPSON:
9    Q     Uh-huh. I just want to make -- just
10   want to make sure that I understand the -- the
11   reason for your disagreement. But if you feel
12   like it's explained, I'm good.
13   A     And again, I -- it's sort of the broad
14   view that if -- if the -- if the epidemiologic
15   case control and cohort studies are so powerful
16   with a huge effect, then the biologic experiments
17   and lab become less important.
18             The other way around, which is really
19   what we're dealing with with talc where the
20   epidemiologic data I think is not compelling, the
21   biologic plausibility becomes more important.
22   And it sort of gets back into the Bradford Hill.
23   Q     Okay. So it's sort of inversely
24   proportional in terms of the --
```

37 (Pages 142 to 145)

Michael Birrer, M.D., Ph.D.

Page 146

1    A      In terms of value.
2    Q      -- the importance of it?
3    A      Yeah.
4    Q      Okay.  Got it.
5          62, "Mineral talc occurs naturally in a
6    platy, flat form, but may also occur as
7    asbestiform fibers, which describes its physical
8    form and does not imply the presence of asbestos.
9    The purer forms, approximately 90 percent mineral
10   talc, are used for" -- oops -- "are used for
11   cosmetic and hygiene products, including baby
12   powders and feminine hygiene products."
13   MS. CURRY:
14          Object to the form.
15   MS. THOMPSON:
16   Q      Agree or disagree or no opinion?
17   A      No opinion.
18   Q      That's it.  I'll think of some new
19   questions.
20   A      I feel like I just took my boards.
21   Q      Dr. Birrer, how do you define a
22   carcinogen?
23   A      That's an agent or substance which
24   causes or induces cancer.

Page 147

1    Q      Do you include effect on the promotion
2    and progression of cancer as well in a -- when
3    you're considering carcinogenicity?
4    MS. CURRY:
5          Object to the form.
6    A      So historically -- and there's been a
7    lot of work on this for decades -- carcinogens
8    have been -- usually been associated with
9    initiation.  So this is a substance -- just to
10   you an example.  Paint it on to a mouse skin, and
11   you develop tumors above -- statistically
12   significantly above background.
13          Tumor promoters don't do that.  But
14   when you combine the tumor promoter with the
15   carcinogen, instead of getting the 10 tumors, now
16   you get a hundred.  So promotion is a little bit
17   different.  That's the historic perspective.
18          You know, we've come a long way since
19   then, and I think it's gotten even more complex,
20   that there are tumor promoters that work by
21   transcriptional factors.  So that's not genetic
22   changes in the tumor, in the cells.  Carcinogens
23   usually work that way, where you're getting a
24   permanent genetic change.

Page 148

1    Q      Are you familiar with the term -- and I
2    believe this is more in the toxicological
3    literature -- of a complete carcinogen?
4    A      I would --
5    Q      Does that have a meaning to you?
6    A      Yeah.  I've seen that described.
7    Frankly, I can only -- I can only sort of guess
8    what they mean by that.  My guess is a complete
9    carcinogen, putting out there for the discussion
10   between you and me is what I'm describing as the
11   classic initiation molecule.
12   Q      IARC describes -- do I have it?  Would
13   you look at Exhibit 6, which is the IARC?  I just
14   wanted to look at their definition of
15   carcinogenesis and see whether you would agree
16   with it or not.
17   A      Is it in the preamble?
18   Q      It's in the preamble.  And if I can't
19   find it, we may come back to that later.
20          Because I can't remember where it is.
21   Let's come back to that.
22   A      It's a big preamble.
23   Q      Lots of methodology.
24          Are you familiar with the Hanahan paper

Page 149

1    from 2011 "Hallmarks of Cancer"?
2    A      It's a global sort of review.  Yes.
3    Q      A big review --
4    A      Big.
5    Q      -- article?
6    A      Is it --
7    Q      Do you know -- do you know Dr. Hanahan
8    or know of Dr. Hanahan?
9    A      I know of him.
10   Q      And it's Hanahan and Weinberg?
11   A      Weinberg, yeah.  Yeah.
12   Q      Let me go ahead and mark that.
13   A      Okay.
14          (DEPOSITION EXHIBIT NUMBER 10
15          WAS MARKED FOR IDENTIFICATION.)
16   MS. THOMPSON:
17          Make sure those don't have my markings
18   on it.
19   A      It would be easier for me if the
20   markings were there.
21   MS. THOMPSON:
22   Q      Exhibit 10.  And you agree that this
23   article describes the hallmarks of cancer in a
24   general sense; right?

38 (Pages 146 to 149)

Michael Birrer, M.D., Ph.D.

Page 150

1    A     Correct.
2    Q     And it's a review article in Cell.  Are
3  you familiar with that journal?
4    A     I am.
5    Q     Have you published in that journal?
6  Probably.
7    A     I wished I had published more in that
8  journal.  Yeah.
9    Q     And it's -- the title of the article is
10  "The Hallmarks of Cancer: The Next Generation."
11  But in the top right hand, it says, "Leading edge
12  review."  So that would be a review article for a
13  general audience.  Would you agree?
14    A     Yes.  General audience of scientists,
15  yeah.  Because it's pretty sophisticated.
16    Q     Agree.
17         And it describes the hallmarks of
18  cancer generally.  These do not specifically
19  apply to ovarian cancer in -- in the
20  introduction.  I'm starting on the third
21  sentence.  "They include sustaining proliferative
22  signaling, evading growth suppressors, resisting
23  cell death, enabling replicative" --
24    A     Third line of -- you're in the abstract

Page 151

1  or in the introduction?
2    Q     I'm in the -- sorry.  I'm in the
3  abstract.
4    A     Okay.
5    Q     It sort of seemed more like an
6  introduction than an abstract to me.  So starting
7  again.  Talking about the hallmarks described in
8  this paper, "They include sustaining
9  proliferative signalling, evading growth
10  suppressors, resisting cell death, enabling
11  replicative immortality, enduing angiogenesis,
12  and activating invasin and metathesis.
13         "Underlining these hallmarks are genome
14  instability which generates the genetic diversity
15  that expedites their acquisition and
16  inflammation, which fosters multiple hallmark
17  functions."
18         Would you agree with that statement
19  from this article?
20    A     I think as a general statement, yes.
21    Q     And the article, as you described, is
22  quite technical and -- and goes on for a while.
23  I'm looking at the Figure 3 on page 658.  And the
24  heading is "Emerging Hallmarks and Enabling

Page 152

1  Characteristics."
2         And it says, the first sentence, "An
3  increasing body of research suggests that two
4  additional hallmarks of cancer are involved in
5  the pathogenesis of some and perhaps all
6  cancers."
7         I'm gonna skip down to the -- to the
8  last sentence in that description.
9  "Inflammation" --
10    A     You're in the figure legend?
11    Q     In the figure legend.
12         "Inflammation by innate immune cells
13  designed to fight infections and heal wounds can
14  instead result in their inadvertent support of
15  multiple hallmark capabilities, thereby
16  manifesting the now widely appreciated tumor
17  promoting consequences of inflammatory
18  responses."
19         Would you agree with that statement, in
20  a general sense?
21    A     Yes.
22  MS. CURRY:
23         Object to the form.
24    A     Sorry.

Page 153

1  MS. THOMPSON:
2    Q     Are you familiar with Dr. Balkwill?
3    A     We're done with this?
4    Q     We're done with that.
5    A     Fran?  Fran Balkwill?  Yes.
6    Q     And I believe you published with
7  Dr. Balkwill?
8    A     I believe we're on two.  I can't
9  remember.
10    Q     And she is a well-renowned cancer
11  biologist.  Would you agree?
12    A     I would agree.
13  MS. CURRY:
14         Object to the form.
15         (DEPOSITION EXHIBIT NUMBER 11
16         WAS MARKED FOR IDENTIFICATION.)
17  MS. THOMPSON:
18    Q     I'm gonna mark as Exhibit 11 an article
19  written by Dr. Balkwill.
20         Have you seen this article, Dr. Birrer?
21    A     I'm actually not familiar with this.
22  But I know Fran's work pretty well.
23    Q     Okay.  Well, let's just --
24    A     Yeah.

39 (Pages 150 to 153)

Michael Birrer, M.D., Ph.D.

Page 154

1    Q      -- look through it.  And this is also a
2    review article.
3    A      Uh-huh.
4    Q      And -- and this article is in -- is in
5    The Lancet.  Correct?
6    A      Correct.
7    Q      And is -- we've already mentioned that
8    Dr. Balkwill is well regarded.
9         Is The Lancet a well-regarded journal?
10   A      Yes.
11   MS. CURRY:
12        Object to the form.
13   MS. THOMPSON:
14   Q      Is it one of the most respected
15   journals, would you say?
16   MS. CURRY:
17        Object to the form.
18   A      It's not as good as Cell.
19   MS. THOMPSON:
20   Q      Oh.  I won't tell them you said that.
21        But, generally -- generally speaking --
22   A      Yes.
23   Q      -- physicians and scientists would
24   recognize The Lancet?

Page 155

1    A      It's well read -- it's well read and
2    it's -- it has a substantial impact factor.
3    Q      And we don't know in this situation
4    whether Dr. Balkwill -- do you know
5    Dr. Mantovani, the second author on this paper?
6    A      No.  I don't recognize him.
7    Q      We don't know whether this article was
8    invited or submitted, but, regardless, certainly
9    the readers of Lancet would look to Dr. Balkwill
10   as being an expert to discuss inflammation in
11   cancer; correct?
12   MS. CURRY:
13        Object to the form.
14   A      Correct.
15   MS. THOMPSON:
16   Q      So reading in -- in the abstract, which
17   looks like an introduction to me again, but
18   reading the abstract, "This article reviews" --
19   second line -- "This article reviews the links
20   between cancer and inflammation and discusses the
21   implications of these links for cancer prevention
22   and treatment.  We suggest that the inflammatory
23   cells and cytokines found in tumors are more
24   likely to contribute to tumor growth,

Page 156

1    progression, and immunosuppression than they are
2    to mount an effective host antitumor response.
3    Moreover cancer suscep- -- susceptibility and
4    severity may be associated with functional
5    polymorphisms of inflammatory cytokine genes, and
6    deletion or inhibition of inflammatory cytokines,
7    inhibits development of experimental cancer.
8         "If genetic damage is the 'match that
9    lights the fire' of cancer, some types of
10   inflammation may provide the 'fuel that feeds the
11   flames.'"
12        That was a long passage, but do you
13   generally agree with the statement by
14   Dr. Balkwill?
15   MS. CURRY:
16        Object to the form.
17   A      I do.
18   MS. THOMPSON:
19   Q      And then look down on that same page to
20   panel 1.
21   A      Uh-huh.
22   Q      And the title of that panel, for lack
23   of better word, is "Some Associations Between
24   Inflammation and Cancer Risk."  Right?

Page 157

1    A      901.  Got it.
2    Q      And under "Malignancy," it lists
3    various types of cancer in which there's
4    association between inflammation and cancer risk.
5    Correct?
6    A      Correct.
7    Q      And one of them -- one of them is
8    ovarian; right?
9    A      I see it.
10   Q      And in the -- under the inflammatory
11   stimulus/condition, it lists pelvic inflammatory
12   disease, talc, tissue remodeling.
13        Do you agree that Dr. Balkwill, at
14   least in 2001, believed that talc was an
15   inflammatory stimulus and condition for the
16   association with ovarian cancer?
17   MS. CURRY:
18        Object to the form.
19   A      Yeah.  So, again, this is a -- bit of
20   a recurring theme in the sense that I don't know
21   if Fran -- I haven't talked to her about this
22   review.  I don't know if Fran wrote that and
23   got it wrong or, more likely, this is a review
24   article.  So you include everything, even though

40  (Pages 154 to 157)

Michael Birrer, M.D., Ph.D.

Page 158

1  she may not feel really strongly about that. So
2  it's a little hard to tell.
3  MS. THOMPSON:
4      Q      But you would agree that both -- both
5  Dr. Balkwill and The Lancet would not include
6  something in a review article for which there was
7  no evidence?
8  MS. CURRY:
9          Object to the form.
10     A      Again, it depends on how they're
11  proposing it; that there has been -- there has --
12  there have been reports associating PID, talc --
13  I don't know what tissue remodeling is, although
14  that is probably the most reasonable -- but PID
15  and talc as associated with a risk for ovarian
16  cancer. That's a true statement. I don't -- and
17  the reason we're here today is because I reviewed
18  that literature and I don't believe the
19  conclusion.
20          But you could put it into review.
21  That's -- that's the nature of a review article.
22  We all put things in that we feel the reader
23  needs to see to get a full understanding of
24  science, but we don't necessarily -- we're not

Page 159

1  convinced.
2  MS. THOMPSON:
3      Q      Well, but -- but back to my question,
4  which I think was Dr. Balkwill and The Lancet
5  would not have put this in with no evidence.
6  MS. CURRY:
7          Object to the form.
8      A      I don't agree with that.
9  MS. THOMPSON:
10     Q      You think they would put something in
11  that they did not believe there was any evidence
12  to support?
13  MS. CURRY:
14          Object to the form.
15     A      Again, it depends on how you define
16  that. So when you say "no evidence," you mean no
17  epidemiologic studies that have ever shown an
18  association. We know that's not true. There
19  have been some. So there is some evidence. It's
20  the totality of the evidence that I don't
21  believe.
22  MS. THOMPSON:
23     Q      Okay.
24     A      But it would not be unreasonable for

Page 160

1  them to say, okay, this has been studied
2  epidemiologically and in other situations. So I
3  think -- I think that's what you're grappling
4  with. It's a review article. So these things
5  show up.
6      Q      Okay. So -- so there are two
7  possibilities --
8      A      Uh-huh.
9      Q      -- it sounds like. Either Dr. Balkwill
10  got it wrong --
11     A      Uh-huh.
12     Q      -- or because this was a review
13  article, she was reporting evidence that was in
14  the literature that she felt that readers of this
15  article should be aware of.
16     A      Correct. Don't tell her I said the
17  former.
18  MS. CURRY:
19          Object to the form of the question.
20  MS. THOMPSON:
21     Q      Okay. I -- I -- I will do that for
22  you, Dr. Birrer.
23     A      Uh-huh.
24     Q      And -- and this paper is not recent,

Page 161

1  you will agree?
2      A      2010?
3      Q      2001.
4      A      2001. Uh-huh. Yeah. Okay.
5      Q      Are you aware of anything that
6  Johnson & Johnson did in 2001 to address this
7  idea of Dr. Balkwill and others, including
8  Dr. Ness, that talc may be causing ovarian cancer
9  through an inflammatory process?
10  MS. CURRY:
11          Object to the form.
12     A      In 2000 -- in 2001?
13  MS. THOMPSON:
14     Q      Right.
15          Did Johnson & Johnson respond to what
16  at least is reported as being in the literature
17  in Lancet?
18  MS. CURRY:
19          Object to the form.
20     A      I'm not aware of that.
21  MS. THOMPSON:
22     Q      I'm gonna mark as Exhibit 13 --
23  MS. EVERETT:
24          12.

41 (Pages 158 to 161)

Michael Birrer, M.D., Ph.D.

Page 162

```
 1    MS. THOMPSON:
 2    Q     Oh, there it is.
 3          (DEPOSITION EXHIBIT NUMBER 12
 4          WAS MARKED FOR IDENTIFICATION.)
 5    MS. THOMPSON:
 6    Q     Exhibit 12 is going to be another
 7    article -- another review article by Dr. Reuter
 8    and authors.  Oh, we need to -- sorry.  Make sure
 9    that's not my copy.
10    A     This is mine?
11    Q     That's yours, yeah.
12          Are you familiar with the journal of
13    Free Radical Biology in Medicine?
14    A     I am familiar.  Not something I publish
15    in much.
16    Q     And probably doesn't have quite the
17    reputation of The Lancet or Cell?
18    A     I don't think so.
19    Q     But regardless, it's peer-reviewed.
20    A     Uh-huh.
21    Q     Are you familiar with any of these
22    authors?
23    A     Not firsthand.  Aggarwal I may have
24    heard about, but not, firsthand, no.
```

Page 163

```
 1    Q     And reading -- and the title of this
 2    review article is "Oxidative stress,
 3    inflammation, and cancer.  How are they linked?"
 4          Right?
 5    A     Correct.
 6    Q     Reading in the abstract, the last
 7    couple of sentences starting with "How oxidative
 8    stress activates inflammatory pathways leading to
 9    a transformation of a normal cell to tumor cell,
10    tumor cell survival, proliferation,
11    chemoresistance, radioresistance, invasion,
12    angiogenesis, and stem cell survival is the focus
13    of this review.  Overall, observations to date
14    suggest that oxidative stress, chronic
15    inflammation, and cancer are closely linked."
16          Would you agree with that statement?
17    MS. CURRY:
18          Object to the form.
19    A     Yes.
20    MS. THOMPSON:
21    Q     In a general sense, in a review
22    article?
23    A     Correct.
24    Q     And --
```

Page 164

```
 1    A     Where are you now?
 2    Q     I'm turning to page 2, 1604 in the
 3    introduction section.
 4    A     Uh-huh.
 5    Q     The second paragraph reads "Under a
 6    sustained environmental stress, ROS -- R-O-S --
 7    are produced over a long time, and thus
 8    significant damage may occur to cell structure
 9    and functions and may induce somatic mutations
10    and neoplastic transformation.
11          "Indeed, cancer initiation and
12    progression have been linked to oxidative stress
13    by increasing DNA mutations or inducing DNA
14    damage, genome instability, and cell
15    proliferation."
16          Would you agree with that sentence in a
17    general sense?
18    MS. CURRY:
19          Object to the form.
20    A     I'm just looking at the references.
21    MS. THOMPSON:
22    Q     And take a moment if you need to do
23    that.
24    A     Sure.
```

Page 165

```
 1          I think as a general statement, I
 2    wouldn't -- I would not disagree with that.  I
 3    think that's -- yeah.
 4    Q     Sorry.
 5    A     Go ahead.
 6    Q     And this article was published in 2010;
 7    correct?
 8    A     Correct.
 9    Q     And looking at Table 2, a partial list
10    of cancers that have been linked to reactive
11    oxygen species, and under that list is ovarian
12    cancer.
13          Would you agree that in 2010 ovarian
14    cancer had been linked to reactive oxygen
15    species?
16    MS. CURRY:
17          Object to the form.
18    A     Yeah.  This was a little more
19    complicated in the sense I'm not sure why every
20    case was not listed because reactive oxygen
21    species are present in essentially every cell in
22    the body.  So it's a -- it's an odd table in that
23    it's a subset and then -- it's sort of implying
24    reactive oxygen species are not important in
```

42 (Pages 162 to 165)

Michael Birrer, M.D., Ph.D.

Page 166

1    other cancers.
2         And, then, too, what they reference is
3    51, which is a really odd reference.  "Loss of
4    Mkp3 mediated by oxidative stress enhances tumor
5    genicity and chemoresistance of ovarian cancer
6    cells."
7         Hardly a paper -- I mean, I'm
8    extrapolating the title.  Hardly a paper that
9    would say that reactive oxygen species is
10   critical to the development of ovarian cancer.
11   That's chemoresistance.  That's -- that's at the
12   end of natural history, so...
13   MS. THOMPSON:
14   Q    But at least the authors in this
15   peer-reviewed review article thought appropriate
16   to list ovarian cancer under one of the cancers
17   that have been linked to reactive oxygen species;
18   right?
19   A    It's there.
20        (DEPOSITION EXHIBIT NUMBER 13
21           WAS MARKED FOR IDENTIFICATION.)
22   MS. THOMPSON:
23   Q    I'm marking as Exhibit 13 another
24   review article from Lancet.  This one, a little

Page 167

1    more current.
2         Have you seen this article, Dr. Birrer?
3    A    I know the -- I know the authors, but I
4    haven't actually --
5    Q    Oh.  Did I give you a highlighted --
6    A    I -- I don't think so.
7    Q    Okay.
8    A    It would be helpful if it was
9    highlighted.
10   Q    It would be helpful to me also.
11        That's okay.
12        And, in fact, these -- I think three of
13   the four authors you have published with.  Does
14   that sound right?
15   A    Ignace, Charlie, Amit, I know all of
16   them.  I don't know Stephanie.
17   Q    I think that was the one that I did not
18   see on -- on your CV as one of your coauthors.
19        And this review article -- and you
20   would assume that -- well, we don't have to
21   assume -- are Dr. Gourley, Dr. Vergote and
22   Dr. Oza considered experts in the field of
23   epithelial ovarian cancer?
24   MS. CURRY:

Page 168

1         Object to the form.
2    A    Oza and Vergote are -- Vergote is a
3    surgeon and very much clinical.  I don't think he
4    does any work in the lab.  Oza is developmental
5    therapeutics clinical.  Charlie is the scientist
6    here.
7    MS. THOMPSON:
8    Q    Okay.  And I think --
9    A    Yeah.
10   Q    -- at least with this review article,
11   it was meant to address --
12   A    Everything.
13   Q    -- all -- all aspects --
14   A    Right.
15   Q    -- from my reading of it.
16   A    And I think Stephanie works for Amit, I
17   think.
18   Q    So these are well-regarded --
19   A    Uh-huh.
20   Q    -- scientists and experts in ovarian
21   cancer.  You would agree?
22   MS. CURRY:
23        Object to the form.
24   A    Yes.

Page 169

1    MS. THOMPSON:
2    Q    And this is a review article, as we
3    said, just published in Lancet within -- March
4    23rd, so within the last week.
5         Have you seen this article?
6    A    This one?
7    Q    Yes.
8    A    No.  Just the last week.
9    Q    Let's look in the first section,
10   Epidemiology and Risk Factors.  And the last
11   sentence, "Risk factors for EOC include the
12   number of lifetime of ovulations (absence of
13   pregnancy), early age of menarche and late age at
14   menopause, family history of EOC, smoking, benign
15   gynecological conditions, including
16   endometriosis -- endometriosis, polycystic ovary
17   disease and pelvic inflammatory disease, and
18   potentially use of talcum powder."
19        Would you agree that at least the
20   authors thought that the use of talcum powder is
21   potentially a risk factor for EOC?
22   MS. CURRY:
23        Object to the form.
24   A    And, again, this is a review.  So I

43 (Pages 166 to 169)

Michael Birrer, M.D., Ph.D.

Page 170

1    think they're trying to be inclusive.  And I
2    don't actually know that any of them believe
3    that.
4    MS. THOMPSON:
5         Q      So would -- would they -- would they
6    have -- would it be the two options again, either
7    they're wrong --
8         A      (Nods affirmatively.)
9         Q      -- or that they're just reporting on
10   what the literature states?
11        A      (Nods affirmatively.)
12   MS. CURRY:
13             Object to the form.
14        A      Yeah.  I think it extends beyond
15   talcum, too, to be honest with you.  I don't -- I
16   don't consider smoking to be a strong risk for
17   ovarian cancer.  And PID, I don't either.
18             So -- and I don't know of many of my --
19   I mean, we don't -- we don't want our patients
20   smoking.  But I don't know of many of the
21   gynecologic oncologists I work with who -- that's
22   on their -- that's on their risk list.
23   MS. THOMPSON:
24        Q      Even for mucinous?

Page 171

1         A      Well, now you're gonna get complicated
2    on me because, you know, there are people that
3    don't think -- there are mucinous tumors of the
4    ovary.  Bob Kirkman is one of them, and that is
5    all GI.
6             So I think -- I don't think it's all
7    that relevant because it's such a rare tumor.
8         Q      And the citation for the reference
9    that --
10        A      8?
11        Q      -- a risk factor potentially would --
12   could be the use of talcum powder is the
13   Penninkilampi meta-analysis; right?
14        A      That's referenced in 8, yes.
15        Q      So at least the authors, the reviewers,
16   the editors of the journal felt that the most
17   authoritative source would be that Penninkilampi
18   meta-analysis.  Would you agree?
19   MS. CURRY:
20             Object to the form.
21        A      Say that again.  I'm sorry.
22   MS. THOMPSON:
23        Q      Yeah.
24        A      I could read it.

Page 172

1         Q      So the authors, if they were reporting
2    on the potential risk of talcum powder use in
3    ovarian cancer chose to cite Penninkilampi as a
4    source -- as the source for that information;
5    correct?
6         A      They reference it.
7         Q      And you would assume they would choose
8    the most authoritative article that was available
9    in the literature?
10   MS. CURRY:
11             Object to the form.
12   MS. THOMPSON:
13        Q      Wouldn't you?
14        A      I would not assume that.
15        Q      You would assume they'd pick something
16   that wasn't as authoritative?  There's something
17   else they could have picked?
18   MS. CURRY:
19             Object to the form.
20        A      They may have -- they may have picked
21   that because it was one of the more recent
22   meta-analyses, and so it was convenient.  And
23   it's flawed.  We can go over if you'd like.
24   MS. THOMPSON:

Page 173

1         Q      Well, I'm just saying these authors
2    picked that to -- to support the statement in
3    their review article in The Lancet that the use
4    of talcum powder is potentially a risk factor for
5    ovarian cancer.
6         A      Well, I would agree that they picked
7    that reference.  I disagree that that's because
8    they thought it was the most authoritative
9    article.  It is one of the more recent, and, so,
10   therefore, a lot of the other papers would be
11   included in it.  So it's a convenient place to
12   steer a reader.
13        Q      Do you think they'd pick it if they
14   thought it was flawed?
15   MS. CURRY:
16             Object to the form.
17        A      Probably if -- if it was seriously
18   flawed, I don't think they would have picked it.
19   Yeah.
20   MS. THOMPSON:
21        Q      And would you agree, also, that the
22   reviewers would not have included an article that
23   the reviewers felt was seriously flawed?
24   MS. CURRY:

44 (Pages 170 to 173)

Michael Birrer, M.D., Ph.D.

Page 174

1        Object to the form.
2     A     Again, it's a little bit -- having been
3  involved in these processes, to be perfectly
4  frank, you get a review article with a review of
5  147 references, you're not gonna go through them
6  all. So I don't know I can say with any
7  authority that the reviewers looked at this and
8  said, gee, they picked the one talc paper that is
9  really spectacular.
10  MS. THOMPSON:
11     Q     Okay. So there were -- but there --
12  there were no --
13     A     The review, and -- and it's true for
14  the editor too.
15     Q     Okay. So at least there were no red
16  flags in front of the reviewers and the editor
17  when they saw the Penninkilampi article cited for
18  that reference?
19  MS. CURRY:
20        Object to the form.
21     A     I --
22  MS. THOMPSON:
23     Q     That would cause them to --
24     A     I don't know they noticed it.

Page 175

1     Q     Okay. But the editors selected that
2  article; correct?
3  MS. CURRY:
4        Object to the form.
5  MS. THOMPSON:
6     Q     For whatever reason?
7     A     The --
8     Q     The authors.
9     A     The authors selected it.
10     Q     Sorry.
11     A     Not -- not the editors. Correct.
12     Q     Thank you. I meant to say authors.
13     A     And, again, I would just emphasize it
14  says "potentially use of talcum powder."
15     Q     That's right.
16     A     Okay.
17     Q     And at least in this statement, the
18  reference to talcum powder as potentially a risk
19  factor did not separate out the subtypes. It's
20  referring to EOC; correct?
21     A     I -- that's the way I would read it,
22  right.
23  MS. THOMPSON:
24        Dawn, what are you thinking about

Page 176

1  lunch?
2  MS. CURRY:
3        We actually did order in lunch. I'm
4  not sure if we -- if you want to take a quick
5  break, I can check on the estimated time of
6  arrival.
7  MS. THOMPSON:
8        Sure. Or we can just keep going until
9  we get word. Whatever --
10     A     Or we could just finish.
11  MR. MIZGALA:
12        I second that.
13  MS. GARBER:
14        You guys keep going. I'll check.
15  MS. THOMPSON:
16        Are you telling me you're not having
17  fun? I think he liked the test.
18  THE WITNESS:
19        Yeah. It would have been nice to have
20  the little box -- the little circles you could
21  fill in. You know.
22  MS. THOMPSON:
23        And then I could just put it in the
24  computer.

Page 177

1  THE WITNESS:
2        No mumbling? Sorry.
3  MS. CURRY:
4        Okay. So the lunch, I was just told,
5  is actually here. So it's up to you when you're
6  in a good breaking point.
7  MS. THOMPSON:
8        Dr. Birrer, do you want to take a break
9  for lunch or do you want to go another 15 or 20
10  minutes?
11  THE WITNESS:
12        Going would be fine.
13  MS. THOMPSON:
14     Q     Okay.
15     A     Yeah.
16     Q     Let's -- let's look at the IARC 93, the
17  one that --
18     A     Uh-huh.
19     Q     -- addresses the nonasbestiform talc.
20  And turning to page 277 in the exposure data
21  introduction --
22     A     Uh-huh. Do you want to use mine?
23     Q     Let's have a blank one to follow along.
24        Does this section define the

45 (Pages 174 to 177)

Michael Birrer, M.D., Ph.D.

Page 178

1    nonasbestiform talc?
2    MS. CURRY:
3         Object to the form.
4    MS. THOMPSON:
5    Q    Oh, there it is.  And let's just read
6    along in that third paragraph.
7    A    Okay.
8    Q    "Asbestiform talc fibers are very long
9    and thin and occur in parallel bundles that are
10   easily separated from one another by hand
11   pressure."  And asbestos -- no.  Just strike
12   that.
13        You're -- you're not an expert in the
14   different types of asbestos or talc in its
15   different --
16   A    I'm learning --
17   Q    Are you?
18   A    I'm learning a lot.
19   Q    I -- well, I don't want to ask those
20   questions to you later because then you'll be an
21   expert.
22        Let's -- let's go to the conclusions of
23   IARC.  We've already established that IARC used a
24   pretty extensive methodology in reaching their

Page 179

1    conclusions; right?
2    MS. CURRY:
3         Object to the form.
4    A    Yes.
5    MS. THOMPSON:
6    Q    And in your -- in your opinion, IARC
7    got -- got it wrong; right?
8    MS. CURRY:
9         Object to the form.
10   A    I think the net -- and I -- let me just
11   summarize.  I agree that they did a thorough sort
12   of process here.  In the end, what they
13   concluded, I think, was -- was wrong.  If I
14   recall correctly, it's 2B.
15   MS. THOMPSON:
16   Q    That's right.
17   A    Was the classification.
18   Q    But 2B does not mean that it's not
19   carcinogenic, does it?
20   A    Means it's possible carcinogenic.  I
21   think that's by definition.
22   Q    Right.
23        And -- and in this situation, the
24   reason for the classification was that there

Page 180

1    was -- well, that there was limited evidence in
2    humans for the carcinogenicity in peroneal use of
3    talcum powder body product.  Is that what IARC
4    concluded?
5    A    That's in 6.1, the second one.  Yes.
6    Q    Right.
7         And there is limited evidence in
8    experimental animals; right?
9    A    6.2.  Yes.
10   Q    And in the rationale, the authors
11   state, third paragraph, "For peroneal use of
12   talcum-based body power, many case-control
13   studies of ovarian cancer found a modest but an
14   unusually consistent excessive risk, although the
15   impact of bias and potential confounding could
16   not be ruled out."
17        Is -- is that your understanding of the
18   conclusions?
19   A    That's what they concluded.
20   Q    And --
21   A    We're done with IARC?
22   Q    We're done with IARC.
23        And you also looked at the Health
24   Canada Assessment; right?

Page 181

1    A    Yes.
2    Q    And we agreed that the methodology that
3    Health Canada applied for -- for their
4    determination was also extensive; right?
5    MS. CURRY:
6         Object to the form.
7    A    They were systematic and thorough.  I
8    think it was pretty complicated, yeah.
9    MS. THOMPSON:
10   Q    And what's your understanding of the
11   conclusions reached by the -- Health Canada?
12   MS. CURRY:
13        Object to the form.
14   MS. THOMPSON:
15   Q    Scientists.
16   A    Well, they concluded that there was a
17   low risk of harm to the environment from talc.
18   Q    Is that what you came away with?
19   A    Well, it was in the third paragraph.
20   So it was important to note that.  But they did
21   conclude that talc meets one of the criteria.
22   That was Section 64.  And so they concluded that
23   it potentially presented a health risk to
24   Canadians, if I got that right.

46 (Pages 178 to 181)

Michael Birrer, M.D., Ph.D.

Page 182

1    Q      And do you think it was just to
2  Canadians?
3    A      Well, that's the way they quoted it.
4    Q      And --
5    A      In fact, the statement is "may
6  constitute a danger in Canada to health" --
7  "human health" -- "human life or health."
8    Q      And they also made the -- well, let's
9  read beginning on page little -- little 3, i --
10  iii?
11    A      I'm sorry.  Where are you?
12    Q      Little -- little roman numeral 3.
13    A      Three?  Yeah.
14    Q      Is your understanding that the -- that
15  Health Canada found that the available data were
16  indicative of a causal effect?
17    A      Where are you reading?
18    Q      I was just asking you what your
19  understanding was.
20  MS. CURRY:
21        Object to the form.
22    A      I'm not sure that they actually found
23  causal effects.
24  MS. THOMPSON:

Page 183

1    Q      Okay.  Well, let's -- let's read
2  beginning -- the paragraph with "The
3  meta-analyses."
4    A      Where are you?  Oh, the -- yeah.
5    Q      "The meta-analyses of the available
6  human studies in the peer-reviewed literature" --
7    A      Yep.
8    Q      -- "indicate a statistically
9  significant positive association between perineal
10  exposure to talc and ovarian cancer.  Further,
11  available data are indicative of a causal
12  effect."
13    A      Uh-huh.
14    Q      So they did --
15    A      (Nods affirmatively.)
16    Q      -- determine that it was indicative of
17  a causal effect; right?
18  MS. CURRY:
19        Object to the form.
20    A      That's what they said, yes.  It's not
21  referenced, but --
22  MS. THOMPSON:
23    Q      Well, this is the --
24    A      Yeah.

Page 184

1    Q      -- executive summary.
2    A      Yeah.  Uh-huh.
3    Q      "Given that there is potential for
4  peroneal exposure to talc from the use of various
5  self-care products, for example, body powder,
6  baby powder, diaper and rash creams, gentle
7  antiperspirants and deodorants, body wipes, bath
8  bombs, a potential concern for human health has
9  been identified."
10        Correct?
11    A      I agree with that.
12    Q      And is it your opinion that Health
13  Canada got it wrong also?
14  MS. CURRY:
15        Object to the form.
16    A      So it's interesting.  When I reviewed
17  this was -- again, this is a very recent -- looks
18  like December 2018 -- decision by Health Canada
19  based upon a huge body of literature, which I had
20  reviewed and come to a different conclusion.
21        So there really was not very much new
22  data to draw this conclusion.  So, you know,
23  again, I think very much like IARC, I think they
24  got it wrong.

Page 185

1  MS. THOMPSON:
2    Q      And you don't think that this is a
3  situation where scientists can look at the same
4  data and -- and make different conclusions?
5    A      No.
6  MS. CURRY:
7        Object to the form.
8  MS. THOMPSON:
9    Q      Do you have any reason to believe that
10  the scientists who worked on this project were
11  unreasonable?
12  MS. CURRY:
13        Object to the form.
14    A      Other than the fact they drew the wrong
15  conclusion here, I know nothing else about them,
16  so...
17  MS. THOMPSON:
18    Q      You don't have any reason to believe
19  they were incompetent?
20  MS. CURRY:
21        Object to the form.
22    A      No.
23  MS. THOMPSON:
24    Q      Do you have any reason to believe that

47 (Pages 182 to 185)

Michael Birrer, M.D., Ph.D.

1   they weren't good scientists?
2   MS. CURRY:
3        Object to the form.
4   A    I don't really have a lot of knowledge
5   of them. If I could actually find the list of
6   individuals who made this decision -- I don't
7   think it's published.
8   MS. THOMPSON:
9   Q    And did you -- this was done under the
10  auspices, I believe, of the Minister of Health.
11  A    Uh-huh.
12  Q    You don't know the Minister of Health
13  in Canada, do you?
14  A    I don't.
15  Q    Or know that he would -- or she would
16  not be competent?
17  MS. CURRY:
18       Object to the form.
19  A    I have no direct evidence for that.
20  MS. THOMPSON:
21  Q    Do you take any issue with the weight
22  of the evidence methodology that Health Canada
23  applied?
24  A    No.

1   Q    Only that they came up with the wrong
2   conclusion; right?
3   A    Correct.
4   Q    And this assessment, like IARC, was
5   based on talc -- cosmetic-grade talc and not on
6   potential impurities such as asbestos. Is that
7   also your understanding?
8   MS. CURRY:
9        Object to the form.
10  A    That is my understanding. So, you
11  know, again, it's -- it's the same epi data. The
12  epi data is focused on talcum powder. So that --
13  that applies here, too.
14  MS. THOMPSON:
15  Q    And is it your understanding that the
16  human health portion of the Health Canada
17  assessment went through a peer-review process?
18  MS. CURRY:
19       Object to the form.
20  MS. THOMPSON:
21  Q    With external reviewers.
22  A    I didn't see that described.
23  Q    So you don't know one way or the other
24  whether it went through a review process?

1   A    In terms of peer review, scientific
2   peer review?
3   Q    Correct.
4   A    I can't say that definitively.
5   Q    If you'll look at the -- and the copy
6   that I'm looking at doesn't have page numbers, so
7   that's why it's -- I'm --
8   A    Roughly.
9   Q    -- making it difficult.
10       But if you look at the big bold
11  introduction that comes right after the synopsis,
12  it should be about the -- it may be the little
13  numbers.
14  A    Introduction?
15  Q    Yeah.
16       And the very bottom of that page, I'm
17  reading "The human health portion of this
18  assessment has undergone external peer review
19  and/or consultation?"
20       Doesn't -- does the assessment, at
21  least, state that it underwent peer review and
22  consultation?
23  A    It states that. I don't quite -- I
24  don't honestly know what that means.

1   Q    Okay.
2   A    And the public comment period, of
3   course, is just a governmental response.
4   Q    Do you know if Johnson & Johnson has
5   submitted comments to Health Canada?
6   MS. CURRY:
7        Object to the form.
8   A    Not that I know of.
9   MS. THOMPSON:
10  Q    Have you submitted comments to Health
11  Canada --
12  A    No.
13  Q    -- with your opinions?
14  A    No.
15  Q    Do you intend to submit any opinions to
16  Health Canada?
17  A    I doubt it.
18  Q    You are -- are you aware that talc used
19  as a dry powder lubricant on condoms was
20  substituted with cornstarch in the 1990s?
21  A    I believe I am familiar with that.
22  Q    Do you know why?
23  A    No.
24  Q    Do you know that dusting diaphragms,

Golkow Litigation Services - 877.370.DEPS

Michael Birrer, M.D., Ph.D.

Page 190

1    the practice of dusting diaphragms with talcum
2    powder was abandoned approximately the same time?
3    MS. CURRY:
4         Object to the form.
5    A    Yes.
6    MS. THOMPSON:
7    Q    Do you know why?
8    A    No.
9    Q    Was it for concerns about inflammatory
10   and cancer effects?
11   MS. CURRY:
12        Object to the form.
13   A    Could have been.  I don't -- can't
14   quote that.
15   MS. THOMPSON:
16   Q    Were you aware that FDA banned -- has
17   banned powder examination and surgical gloves?
18   A    Yes.
19   Q    Do you know why?
20   A    That was based upon the concern about
21   the generation of fibrosis.
22   Q    And other inflammatory processes in
23   the -- in the peritoneal cavity?
24   MS. CURRY:

Page 191

1         Object to the form.
2    A    I would define -- I would define that
3    as fibrosis, if not inflammatory.
4    MS. THOMPSON:
5    Q    Do you consider granulomas an
6    inflammatory response?
7    A    It's in the characterization of chronic
8    inflammation, yes.
9    Q    Are adhesions an inflammatory response?
10   A    Not necessarily.
11   Q    And they would be an acute response
12   if -- if they were caused by an inflammatory
13   reaction?
14   MS. CURRY:
15        Object to the form.
16   A    So adhesions are, you know, essentially
17   scar tissue and fibrosis.  The etiology of it is
18   pretty broad.  Some of it could be chronic
19   inflammation.  Some of it could be acute
20   inflammation.  And I would not even rule out the
21   possibility that general wound healing would give
22   rise to scar tissue.  And that may not
23   necessarily fit the criteria of inflammation.
24   MS. THOMPSON:

Page 192

1    Q    Are you aware of the differences
2    between cornstarch and talc?
3    MS. CURRY:
4         Object to the form.
5    A    In terms of biochemical and physical
6    differences?
7    MS. THOMPSON:
8    Q    Sure.  Let's start there.
9    A    Yeah.  I don't think I can list them
10   all.  But certainly cornstarch is a biologic
11   agent, it's a carbohydrate, and talc is a
12   mineral.
13        We've already talked a little bit about
14   the size of particles in talcum powder and it's
15   exceedingly variable.  So it's a little hard to
16   compare those two particles.  But I would think
17   that starch would be more homogeneous and of a
18   different size.
19        And then, you know, biochemical
20   differences are substantial.  I mean, this is a
21   carbohydrate, which can be broken down by certain
22   enzymes, has, you know, a firm structure to it.
23        Talc, as a mineral, forms suspensions.
24   It is not soluble.  Starch is more soluble.  So

Page 193

1    there's differences.
2    Q    So, in general terms, cornstarch would
3    typically be absorbed or metabolized by the body?
4    MS. CURRY:
5         Object to the form.
6    MS. THOMPSON:
7    Q    Would you agree?
8    A    Absorbed or -- there's -- it would
9    certainly be more likely, I think, than a
10   mineral, yeah.
11   Q    Whereas the mineral, once it's there,
12   is expected to remain there; correct?
13   MS. CURRY:
14        Object to the form.
15   A    It's a little hard to tell because then
16   there are other mechanisms remove particulate
17   matters; right?  So macrophages come along and
18   they phagocytize them.  That macrophage then may
19   travel somewhere else and then essentially
20   deposit it in a way that the mineral -- the
21   mineral particle could be removed.  So -- so it's
22   a little bit complex.
23   MS. THOMPSON:
24   Q    Can inhaled talc particles appear in

49 (Pages 190 to 193)

Michael Birrer, M.D., Ph.D.

Page 194

1    distant organs?
2    A     So there is some data, I believe, in
3    animal studies that high concentrations of talc,
4    either in the pleural cavity or in intratracheal
5    injections can end up in what --
6         And I think I put them in the expert
7    report; for instance, the spleen.
8    Q     And ovaries?  Can they occur in the
9    ovaries?
10   A     So if you look at the literature -- you
11   know, and I went through in pretty big detail --
12   nobody's looked.  So there's no reproductive
13   organs in any of those studies.  At least the
14   ones that I have looked at.  So I don't think we
15   know, and I don't think we could assume that.
16   Q     Can talc fibers enter the peritoneal
17   cavity?
18   MS. CURRY:
19        Object to the form.
20   A     Again, we're back to this mineral
21   structure, and I'm not going to be able to
22   comment on that.
23   MS. THOMPSON:
24   Q     And how about asbestos fibers?

Page 195

1    A     Well, asbestos exposure can, of course,
2    give rise to mesothelioma and can give rise to
3    peritoneal mesotheliomas.  So it's got to get
4    there from somewhere.
5    Q     Do you have an opinion as to whether
6    asbestos fibers can get to the peritoneal cavity
7    through peritoneal exposure and migration through
8    the genital tract?
9    MS. CURRY:
10        Object to the form.
11   A     I don't have any data on that.
12   MS. THOMPSON:
13   Q     So you have no opinion.
14   A     I would say analogous with the
15   migration data that there's not a lot of evidence
16   things are migrating retrograde.  So -- and I
17   think -- although I don't think those experiments
18   have been done with asbestos in mind -- and we
19   know that asbestos can travel with high
20   insulation [sic] -- you know, inhalation of
21   asbestos can get in the pleural cavity.  It gets
22   there from somewhere.  It's got to be inside the
23   lung.  It has to get out in the pleural cavity,
24   and then again, the peritoneal cavity.  So we

Page 196

1    know that.
2    Q     So you know -- you -- we know that
3    asbestos fibers can reach the peritoneal cavity;
4    correct?
5    A     Yes.
6    Q     And -- and let me just understand
7    you -- what you're opining today is that we just
8    don't know how they get there?
9    MS. CURRY:
10        Object to the form.
11   A     I don't know.  So -- so I think one of
12   the hypotheses that -- after asbestos -- again,
13   I'm not -- I wasn't asked to explore asbestos in
14   great detail.  This is more my medical training
15   speaking.
16        But as people inhaled asbestos, these
17   particles would work their way out into the
18   pleural cavity --
19   MS. THOMPSON:
20   Q     So --
21   A     -- which is where they would do their
22   badness.  And then, there is a hypothesis
23   connection between the pleural cavity and the
24   peritoneal cavity.

Page 197

1    Q     So direct penetration of the fiber
2    through the pleura?
3    A     The diaphragm's are pretty secure
4    structures, so it's a little bit -- I can't say,
5    hey, here's the pathway.  But that's the
6    supposition.
7    Q     Okay.
8    A     Okay.
9    Q     Do you -- are you aware of any
10   epidemiologic or other studies that have linked
11   the use of perineal cornstarch with ovarian
12   cancer?
13   MS. CURRY:
14        Object to the form.
15   A     Perineal cornstarch with ovarian
16   cancer?
17   MS. THOMPSON:
18   Q     Correct.  Let me phrase that
19   differently just so it's clear.
20   A     Okay.
21   Q     Are you aware of any studies that link
22   the perineal use of cornstarch products with
23   ovarian cancer?
24   MS. CURRY:

50 (Pages 194 to 197)

Michael Birrer, M.D., Ph.D.

Page 198

1       Object to the form.
2    A    Therapeutically or just accidentally?
3    MS. THOMPSON:
4    Q    Um -- as a substitute for talcum
5    powder.  If a woman is using corn -- a
6    cornstarch-based perineal dusting powder, are you
7    aware of any studies that have linked that usage
8    to ovarian cancer?
9    A    Not that I -- no.
10   Q    Do you agree that -- I might go ahead
11   and go back to that -- that -- the FDA, mark it
12   as --
13   A    The letter?
14   Q    The letter.
15       I know.  But I don't have my stickers.
16   MS. THOMPSON:
17       My fault; not yours.
18   THE COURT REPORTER:
19       Okay.
20   MS. THOMPSON:
21       Shall we do another few just to get us
22   to lunch?
23   THE COURT REPORTER:
24       I forget what number we're on.

Page 199

1    MS. THOMPSON:
2        We're on --
3    MS. EVERETT:
4        14.
5    MS. THOMPSON:
6        14.
7        (DEPOSITION NUMBER 14 WAS
8        MARKED FOR IDENTIFICATION.)
9    MS. THOMPSON:
10   Q    I'm going to go ahead and mark the FDA
11   announcement on the banning of -- of talcum
12   powder just so we can see what they actually did
13   say about the reasons.
14       And --
15   A    This is for gloves.  For gloves.
16   Surgical gloves.
17   Q    Examination and surgical gloves.
18   A    Yeah.
19   Q    And just in the bottom part of the
20   right-hand side of the first page, "Banned
21   Devices; Powdered Surgeon's Gloves, Powdered
22   Patient Examination Gloves, and Absorbable Powder
23   For Lubricating on a Surgeon's Glove."
24       And if you'll turn to the executive

Page 200

1    summary on the following page, one, purpose and
2    coverage of the final rule, and the last
3    paragraph -- or the last sentence of the first
4    paragraph says, "However, the use of powder on
5    medical gloves presents numerous risks to
6    patients and healthcare workers, including
7    inflammation, granulomas and respiratory allergic
8    reaction."
9        Does that at least state what the FDA
10   considers the reasons for the removal of talcum
11   powder from surgical gloves?
12   A    Yes, it does.
13   Q    Are you aware that Health Canada
14   determined that the migration of talc particles
15   to the ovaries from perineal use was a plausible
16   or is a plausible mechanism for the detection of
17   talc in the ovaries?
18   MS. CURRY:
19       Object to the form.
20   A    I believe they did.  You're --
21   MS. THOMPSON:
22   Q    And you -- do you disagree with the
23   determination that Health Canada reached
24   regarding the -- the migration of talc particles

Page 201

1    to the ovaries being a plausible mechanism for
2    the detection of talc in ovaries?
3    A    Yes, I do.
4    Q    In your report, you state that the
5    migration is contrary to basic anatomy and common
6    sense, I believe.
7        Do you still hold that opinion?
8    A    Where are you reading?  Back to my
9    report?
10   Q    I have to get your report out.
11   A    Yeah.  That's get that out there.
12   Q    His expert report.
13       And in the -- under "Migration" on page
14   5, "Supposed Presence of Talc in Ovaries."
15   A    Ah.  Okay.  Yep.
16   Q    And Health Canada's conclusion was that
17   the migration of talc particles to the ovaries
18   from perineal use is a plausible mechanism for
19   the detection of talc to the ovaries.
20       But at least your opinion is that the
21   presence of talc in the ovaries cannot be
22   explained by migration.  Is that right?
23   A    Well, the studies that I looked at here
24   mostly are the presence of talc in cancer of the

51 (Pages 198 to 201)

Michael Birrer, M.D., Ph.D.

Page 202

1    ovary, and there were some control patients, I
2    believe, with breast cancer where they looked at
3    the ovary.
4           And these -- these studies have been
5    around for a while. I've reviewed them multiple
6    times, and they're just seriously flawed, from my
7    perspective. So I don't know that you can
8    conclude that. But these are -- these are just
9    the studies that show the presence of talc in
10   specimens. It's not the next line of evidence,
11   which is actual variety of human -- human
12   experiments, if you will, which are also
13   seriously flawed.
14          So, you know, I essentially reviewed
15   all of that and came to the conclusion you can't
16   conclude anything. There's no convincing data.
17   Health Canada came to a different conclusion.
18   Q       And is that because Health Canada got
19   it wrong again, or is that because scientists can
20   come to different conclusions when reviewing the
21   same data?
22   MS. CURRY:
23          Object to the form.
24   A       Based on my review on this, they got it

Page 203

1    wrong.
2    MS. THOMPSON:
3    Q       Regarding the Heller paper --
4    A       Uh-huh.
5    Q       -- let's just go back to your report.
6           Do you know what the Heller authors
7    concluded from their study?
8    MS. CURRY:
9           Object to the form.
10   A       Do you --
11   MS. THOMPSON:
12   Q       This is the paper regarding the talc
13   presence in --
14   A       Right.
15   Q       -- ovaries from the Heller paper.
16   MS. CURRY:
17          Object to the form.
18   A       So just to summarize real quick --
19   MS. THOMPSON:
20   Q       No. Not asking that question.
21          Do you know what the Heller authors
22   concluded on the basis of their study?
23   MS. CURRY:
24          Object to the form.

Page 204

1    A       I think they were mystified and they
2    tried to argue that the reason why they found
3    talc in everybody --
4    MS. THOMPSON:
5    Q       Dr. Birrer, sorry.
6           My question was: Do you know what the
7    authors concluded?
8    A       I'm saying it.
9    Q       That's "yes" or "no."
10   A       Oh.
11   Q       Do you know what the authors concluded?
12   MS. CURRY:
13          Object to the form.
14   A       Yes.
15   MS. THOMPSON:
16   Q       What did the authors conclude?
17   A       So I think they were mystified. And
18   so --
19   Q       No. Did the authors -- where do you
20   see in the paper that the authors were mystified?
21   A       Because --
22   MS. CURRY:
23          Let him finish and don't cut him off.
24   MS. THOMPSON:

Page 205

1           Not when he's not answering my
2    question.
3    THE WITNESS:
4           Well, I --
5    MS. CURRY:
6           He's trying to answer it. You keep
7    cutting him off at every word.
8    MS. THOMPSON:
9           I asked where in the paper did the
10   authors say they were mystified, and he needs to
11   explain that.
12   MS. CURRY:
13          You haven't even marked the paper. You
14   are asking him based on his expert report, and
15   he's --
16   MS. THOMPSON:
17          I didn't ask him on the basis of his
18   expert report. I asked him on the basis of his
19   knowledge.
20          I'll mark the Heller paper 15.
21          (DEPOSITION EXHIBIT NUMBER 15 WAS
22          MARKED FOR IDENTIFICATION.)
23   MS. THOMPSON:
24   Q       Do you see anywhere in the paper that

52 (Pages 202 to 205)

Michael Birrer, M.D., Ph.D.

1    the authors were mystified?  Yes or no?
2    A      I think they were confused by the lack
3    of association.
4    Q      Do you see where the authors were
5    mystified?
6    MS. CURRY:
7          Object to the form.
8    MS. THOMPSON:
9    Q      There's nowhere where the authors say
10   they were mystified, is there, Dr. Birrer?
11   MS. CURRY:
12         Object to the form.
13   MS. THOMPSON:
14   Q      I'll withdraw the question.
15   A      Okay.
16   Q      Let's just go to the conclusions.
17         "Conclusions:  The detection of talc in
18   all ovaries demonstrates that it can reach the
19   upper genital tract."
20         Is that what the authors of the Heller
21   paper conclude?
22   A      Yes.
23   Q      And yet you're critical of the
24   plaintiffs' experts because they conclude the

1    same thing that the authors of the paper
2    conclude; right?
3    MS. CURRY:
4          Object to the form.
5    MS. THOMPSON:
6    Q      In fact, I -- well, go ahead and
7    answer.
8    A      Well, I'm critical of the paper and the
9    experts who agreed with it.
10   Q      And I -- I think there were no fewer
11   than 12 experts that you think were wrong on
12   this; right?
13   MS. CURRY:
14         Object to the form.
15   A      If that's the number of experts that
16   agreed to it, then, yeah.  I agree on that.
17   MS. THOMPSON:
18   Q      And it's not that scientists can come
19   to different conclusions.  It's that 12 experts
20   who state the same conclusions as the authors of
21   the paper are wrong and you're right?
22   MS. CURRY:
23         Object to the form.
24   MS. THOMPSON:

1    Q      Is that your opinion?
2    A      Say that again.
3    Q      It's not that scientists can come to
4    different conclusions.  It's that the 12 experts
5    who state the same conclusions as the authors of
6    the paper are wrong and you're right?
7    MS. CURRY:
8          Object to the form.
9    MS. THOMPSON:
10   Q      Is that a correct statement?
11   A      Correct.
12   Q      One of your criticisms of the Cramer
13   paper from 2007 that detected talc in lymph nodes
14   was that it was a case report; correct?
15   A      Correct.
16   Q      And you've published with Dr. Cramer;
17   correct?
18   A      I don't think I'm on papers with
19   Dr. Cramer.
20   Q      And have you seen the paper that was
21   published recently of a series of cases in which
22   talc was detected in the lymph nodes?
23   MS. CURRY:
24         Object to the form.

1    A      Do you have an author?
2    MS. THOMPSON:
3    Q      Same authors.
4    A      So Dr. Cramer --
5    Q      The lead author is McDonald, but from
6    Cramer's lab --
7    A      I have seen it.
8    Q      -- and Welch.  You've seen it?
9    A      Uh-huh.
10   Q      And is it your understanding that the
11   authors -- I'll mark the McDonald paper Exhibit
12   16.
13         (DEPOSITION EXHIBIT NUMBER 16 WAS
14         MARKED FOR IDENTIFICATION.)
15   MS. THOMPSON:
16   Q      Is it your understanding that the
17   authors specifically controlled for any
18   possibility of contamination?
19   MS. CURRY:
20         Object to the form.
21   A      No.  That's not my understanding.
22   MS. THOMPSON:
23   Q      Well, it's in the abstract, if we can
24   get -- delve deeper if we need to.  The authors

Michael Birrer, M.D., Ph.D.

Page 210

1  said that since talc can be a surface contaminant
2  from tissue collection preparation, digestion
3  measurements may be influenced by contamination.
4  Instead, because they preserve anatomic landmarks
5  and permit identification of particles in cells
6  and tissues polarized light microscopy and in
7  situ SEM-EDX are recommended to assess talc in
8  lymph nodes.
9        And that's the methodology that the
10 authors, the researchers, performed to assure
11 themselves that this finding was not due to
12 contamination; right?
13 MS. CURRY:
14        Object to the form.
15 A    You are reading correctly.
16 MS. THOMPSON:
17 Q    I didn't even read that.
18 A    Oh.
19 Q    I came up with that --
20 A    Oh.  I thought you were looking at the
21 paper.
22 Q    Well, I must be right, then.
23 A    I mean, they -- they observe -- I read
24 this -- I'll read it.  "In conclusion, talc

Page 211

1  contamination in the surface of surgical
2  pathology specimens of is common."
3  Q        Except -- and I didn't have a question
4  on the table.
5  A        Okay.
6  Q        So I'll object to that as being
7  nonresponsive to a question.
8          Except the whole purpose of this study
9  was to, number one, expand on the case report
10 that was published earlier; right?
11 MS. CURRY:
12        Object to the form.
13 A    I don't see that.  It's another study.
14 MS. THOMPSON:
15 Q    Okay.
16 A    Yeah.
17 Q    But this had a series of 22 cases;
18 right?
19 A    Twenty-two cases, correct.
20 Q    And -- and the authors concluded that
21 by -- by using the techniques that they used in
22 this pap-- in this paper, they could confirm
23 that the -- talc in the lymph nodes was not
24 surface contamination.  Right?

Page 212

1  MS. CURRY:
2        Object to the form.
3  A    So they -- they observe -- they observe
4  large amounts of contamination.  They argue that
5  with their technology, they can tell whether some
6  is surface and some is internal, in lymph nodes.
7  MS. THOMPSON:
8  Q    And they determined that some was
9  internal; right?
10 A    I believe so.
11 Q    Probably have another, what, five
12 minutes and then lunch, or I can do it after we
13 come back.
14 MS. CURRY:
15        Is that okay with you?
16 A    That's okay.
17 MS. CURRY:
18        Is that okay with the court reporter?
19 THE COURT REPORTER:
20        That's fine.  Yes.
21 THE WITNESS:
22        You all right?  I'll stop mumbling.
23 MS. THOMPSON:
24 Q    Okay.  I want to go over just a few of

Page 213

1  your criticisms of plaintiffs' experts.  And
2  let's start with Dr. Clarke-Pearson.  I believe
3  that you have met Dr. Clarke-Pearson and know him
4  by reputation, at least; correct?
5  A    I have.
6  Q    He's a past president, I believe, of
7  SGO; correct?
8  A    Correct.
9  Q    And department chair at University of
10 North Carolina, recently retired; correct?
11 A    Correct.
12 Q    And -- and you actually wrote the
13 criticism here of Dr. Clarke-Pearson?
14 A    Correct.
15 Q    And that's your language?
16 A    Uh-huh.
17 Q    Okay.  Let's just read through that.
18 "Dr. Clarke-Pearson analogizes to the migration
19 of sperm" -- and this is considering the
20 migration of talc particles -- "into tubes after
21 coitus.  It is rather surprising to hear this
22 from a gynecological oncologist."
23        Did you look at Dr. Clarke-Pearson's
24 references?

54 (Pages 210 to 213)

Michael Birrer, M.D., Ph.D.

Page 214

1    A      I looked at his expert report.
2    Q      Including his references?
3    A      I probably would have paged through it,
4    yeah.  Yep.
5    Q      "The obvious difficulty with this line
6    of reasoning is the fact that spermatozoa are
7    motile and have evolved under millions of years
8    to be able to migrate under their own control to
9    increase the potential to fertilize the egg.
10   This mode of transport is not consistent with a
11   talc particle."
12          Did you look at Dr. Pearson's citation
13   that describes the movement of dead sperm and
14   talc particles through that upper genital tract?
15   MS. CURRY:
16          Object to the form.
17   A      Yeah.  I didn't see the -- I didn't see
18   the reference on dead sperm.  But --
19   MS. THOMPSON:
20   Q      If -- if there was a reference that
21   dead sperm moved through and moved through quite
22   easily, then your statement that it's not
23   analogous because spermatozoa are motile is
24   incorrect, isn't it?

Page 215

1    MS. CURRY:
2          Object to the form.
3    A      Well, I have to see the paper, and I
4    don't know the details.
5    MS. THOMPSON:
6    Q      Assume with me that there is evidence
7    published in the peer-reviewed literature that
8    dead sperm and sperm particles move through the
9    upper genital tract, then your statement that
10   it's not analogous because spermatozoa are motile
11   would be incorrect; right?
12   MS. CURRY:
13          Object to the form.
14   A      So these sperm would be put on the
15   perineum like a dusting?
16   MS. THOMPSON:
17   Q      No.
18   A      Okay.
19   Q      I'm just saying it's -- your statement
20   that that is the reason would be incorrect.
21   A      I -- so --
22   Q      Are -- are dead sperm motile?
23   A      I don't actually know.  They --
24   Q      You're --

Page 216

1    A      Are they dead dead or --
2    Q      Do you think dead sperm may be motile?
3    Do you know any -- too much about reproductive
4    physiology?
5    MS. CURRY:
6          Object to the form.
7    A      A fair amount, yeah.
8    MS. THOMPSON:
9    Q      And you don't know whether dead sperm
10   would be motile or not?
11   A      So how are you defining that?
12   They're -- they're -- they've decayed?  They're
13   broken down --
14   Q      Yes.
15   A      -- or the flagella is not moving?
16   Q      The flagella is not moving in a dead
17   sperm.
18   A      Okay.
19   Q      Is it?
20   A      I guess as you are specifically
21   defining --
22   Q      Are you arguing me -- with me?
23   A      Can I answer?
24   MS. CURRY:

Page 217

1          I'm sorry.  You can each just take
2    turns.  Just please let her get her question out.
3    MS. THOMPSON:
4    Q      Do you not know whether dead sperm
5    would be motile or not?
6    A      I would think most of the time they
7    would not be motile.
8    Q      Okay.  And would you agree that a sperm
9    particle -- for example, if the flagellum is
10   broken off, would you agree that would not be
11   motile, a sperm particle?
12   MS. CURRY:
13          Object to the form.
14   A      Motile, moving under its own --
15   MS. THOMPSON:
16   Q      Moving on its own.
17   A      Yeah.  I think it's unlikely.
18   Q      Do you know the size of the head of a
19   sperm?
20   A      No.
21   Q      If the reason that Dr. Clarke-Pearson
22   was incorrect referencing dead and -- dead sperm
23   and sperm particles moving through the upper
24   genital tract could be relevant to a talc

Michael Birrer, M.D., Ph.D.

Page 218

1    particle.  If your reason for saying that opinion
2    is incorrect is that sperm are motile, then that
3    reasoning is incorrect, isn't it?
4    MS. CURRY:
5         Object to the form.
6    A    Well, I think in the way it's expressed
7    here, that, obviously, it doesn't mean -- I mean,
8    it makes no sense to apply to spermatozoa, which
9    are mobile.  But if you're telling me there's a
10   reference for dead sperm, then the question
11   becomes what's in that reference?  So these --
12   MS. THOMPSON:
13   Q    Okay.
14   A    -- dead sperm were deposited into the
15   uterus after coitus and --
16   Q    We're just talking -- we're not talking
17   about coitus.
18        Is it plausible to you --
19   A    Okay.
20   Q    -- that a woman who has talcum on her
21   perineum --
22   A    Uh-huh.
23   Q    -- could have coitus and the talcum
24   powder on the perineum could be placed in the

Page 219

1    vagina forcefully?  Is that plausible?
2    A    I don't have any data on that.
3    Q    Do you have to have data to say whether
4    or not that's plausible?
5    A    I am a scientist.
6    Q    Well, maybe take off your scientist
7    hat.  Is it plausible that a woman who has talcum
8    powder on her perineum and has sex, that the
9    talcum powder could be forced into the vagina?
10   MS. CURRY:
11        Object to the form.
12   MS. THOMPSON:
13   Q    Is it plausible?
14   A    Sexual intercourse?
15   Q    Sexual intercourse, yes.
16   A    Yes.  Just getting specifics.
17        Yeah.  I mean, I -- I think the way
18   you're hypothesizing it, I suppose there's a
19   possibility.
20   Q    So if those things are possible and
21   plausible, then you really don't think
22   Dr. Clarke-Pearson's opinions are unreasonable
23   and -- and are contrary to basic anatomy, do you?
24   MS. CURRY:

Page 220

1         Object to the form.
2    A    Yeah, I don't know what --
3    MS. THOMPSON:
4    Q    Those are your words.  Are
5    Dr. Clarke-Pearson's opinions contrary to
6    knowledge of basic anatomy?
7    MS. CURRY:
8         Object to the form.
9    A    Where are you reading?
10   MS. THOMPSON:
11   Q    Well, for right now I was just in the
12   first paragraph of "Hypothesized migration of
13   talc to ovaries."
14   A    What page?  Is it on my report?
15   Q    Page 7.
16   A    Okay.
17        Oh.  So you're relating that statement
18   to Clarke-Pearson?
19   Q    Well, I believe you say that all the
20   experts have -- have a theory that's contrary to
21   basic anatomy and common sense.
22   A    No.  What that refers to, I think, is
23   the fact that you're putting -- you're dusting
24   the perineum many times, most of the times, in a

Page 221

1    woman who's vertical, and this concept is that
2    somehow that talc and dust essentially ascends
3    into the ovary.  And I think that more often than
4    not lacks common sense and basic anatomy because
5    of what I just said.
6         Now, if you want to go through each
7    individual study, I'm happy to do that because
8    there are methodologic flaws in them.  But that
9    statement does not relate directly to
10   Dr. Clarke-Pearson.  If it did, it would be under
11   his name.
12   Q    But you talk generally about
13   plaintiffs' experts, too.  And do you think that
14   you have a better understanding of female anatomy
15   than Dr. Clarke-Pearson?
16   MS. CURRY:
17        Object to the form.
18   A    Dr. Clarke-Pearson's pretty good with
19   female anatomy.
20   MS. THOMPSON:
21   Q    Do you think you have a better
22   understanding than Dr. Clarke-Pearson of female
23   reproductive physiology?
24   MS. CURRY:

Michael Birrer, M.D., Ph.D.

Page 222

1         Object to the form.
2    A    No.  I think he would be more versed in
3    that.
4    MS. THOMPSON:
5    Q     And -- and you've just testified that
6    we're not just talking about a woman standing up
7    and putting dusting powder and the ascension.  We
8    are talking about the possibility, in your words,
9    that powder could be on the perineum and
10   introduced in the vagina forcefully with sexual
11   intercourse; right?
12   A    Well, yes --
13   MS. CURRY:
14        Object to the form.
15   A    We just had that conversation.  I mean,
16   again, it's hypothetical.  Yeah.
17   MS. THOMPSON:
18   Q    Okay.  Agreed.  I mean, I agree that's
19   your opinion.
20        And how about a woman who applies
21   talcum powder to a sanitary napkin?  Is it
22   possible that the talcum powder would be
23   introduced in the vagina through menstrual flow?
24   A    Through menstrual --

Page 223

1    MS. CURRY:
2         Object to the form.
3    A    Not that I know of.  I don't have any
4    data for that.
5    MS. THOMPSON:
6    Q    Is that -- you don't think it's
7    possible?
8    A    Again, from -- from -- it's
9    interesting.  So if menstrual flow coming out of
10   the vagina with a sanitary napkin, the talc then
11   gets into the vagina up to the ovaries.  It
12   doesn't make a lot of sense to me.
13   Q    What percentage of women have
14   retrograde menstruation on a -- on a given
15   period?
16   A    I don't understand what you mean by
17   that.
18   Q    Do you think Dr. Clarke-Pearson
19   probably knows that percentage?
20   MS. CURRY:
21        Object to the form.
22   A    I'm sure he'd probably have an opinion
23   on it.
24   MS. THOMPSON:

Page 224

1    Q    Do you think he would know it, what's
2    published in literature?
3    MS. CURRY:
4         Object to the form.
5    A    He might.
6    MS. THOMPSON:
7    Q    So you're certainly not opining today
8    that you have a better understanding than
9    Dr. Clarke-Pearson of materials that can travel
10   retrograde through the upper genital tract, do
11   you?
12   MS. CURRY:
13        Object to the form.
14   A    Oh, I disagree with that.
15   MS. THOMPSON:
16   Q    You think you do have a better
17   understanding than Dr. Clarke-Pearson regarding
18   whether or not particles can travel through the
19   upper genital tract?
20   MS. CURRY:
21        Object to the form.
22   A    Based upon my analysis of these papers,
23   yes.
24   MS. THOMPSON:

Page 225

1    Q    Well, you certainly didn't know about
2    dead sperm and sperm particles, did you?
3    MS. CURRY:
4         Object to the form.
5    A    Well, it's one paper.
6    MS. THOMPSON:
7    Q    And you don't know about -- you don't
8    know how many -- what percentage of women have
9    retrograde menstruation, which is a classic paper
10   in gynecology -- gynecology?  You don't know that
11   percentage, do you?
12   MS. CURRY:
13        Object to the form.
14   A    I can't quote you that percentage.
15   MS. THOMPSON:
16   Q    Do you know that women oftentimes use
17   baby powder at bedtime?
18   MS. CURRY:
19        Object to the form.
20   A    I guess that's possible.
21   MS. THOMPSON:
22   Q    And that would not be in an upright
23   position, would it?
24   MS. CURRY:

57 (Pages 222 to 225)

Michael Birrer, M.D., Ph.D.

Page 226

1    Object to the form.
2    A    They may have put it on in an upright
3    position.
4    MS. THOMPSON:
5    Q    And do you agree that women could have
6    powder on the perineum and use a tampon?
7    MS. CURRY:
8    Object to the form.
9    A    I assume that's possible, yes.
10   MS. THOMPSON:
11   Q    And wouldn't it be possible that powder
12   on a tampon could be introduced into the vagina?
13   MS. CURRY:
14   Object to the form.
15   A    It's possible.
16   MS. THOMPSON:
17   Q    And what -- what did Dr. Kunz, K-U-N-Z,
18   describe in an article regarding how particles
19   and substances are transported to the upper
20   genital tract?
21   A    So that's the peristaltic pump.
22   Q    And describe that for me.
23   A    Yeah.  So they went and looked at the
24   contractions -- they, first of all, tried to

Page 227

1    measure the pressure in the uterus based on this
2    contraction, and they used actually ultrasound to
3    do it, which is an indirect measure, of course.
4    Don't know really what the pressure is.
5    Based upon finding that, then they went
6    on to, if I recall correctly, use micro- --
7    radiolabeled microspheres to do -- a word I can't
8    pronounce -- hysterosalpingoscintigraphy,
9    whatever.
10   Q    I can't either.
11   A    Yeah.  And the idea was -- if I recall
12   correctly, the idea of that whole study was
13   actually for -- I think fertility and pregnancy.
14   And the idea was that they then saw this
15   radioactivity up in the areas and drew the
16   conclusion that there is contraction to the
17   uterus and that they were hypothesizing that the
18   particles then were going up the tubes of the
19   ovaries.
20   Q    So it facilitates movement through
21   the --
22   A    Yeah.
23   Q    -- genital tract?
24   MS. CURRY:

Page 228

1    Object to the form.
2    A    Yeah.
3    The problem I have with that is I'm not
4    sure what direction the pressure is in, because
5    obviously if you give oxytocin at the time of
6    pregnancy after the delivery, expels the
7    placenta, so some of that pressure's going to
8    come down.
9    And, then, too, the radioactive studies
10   are really problematic because a lot of times the
11   label will come off of the microsphere.  So you
12   don't quite know where it's going.
13   MS. THOMPSON:
14   Q    At what points in a female's -- in a
15   woman's cycle are oxytocin levels the highest?
16   A    I can't quote you that.
17   Q    Would that be a question for
18   Dr. Clarke-Pearson?
19   MS. CURRY:
20   Object to the form.
21   A    He probably would know.
22   MS. THOMPSON:
23   Q    And are you aware of the studies
24   showing that not only sperm particles and dead

Page 229

1    sperm move through the upper genital tract but
2    even motile sperm move at a much faster rate than
3    would be predicted strictly based on their
4    self-generated motility?
5    MS. CURRY:
6    Object to the form.
7    A    Yeah.  I actually recall seeing that in
8    a study.
9    MS. THOMPSON:
10   Q    Are you aware that motile sperm
11   preferentially go to the side where ovulation has
12   occurred?
13   A    That, I'm not -- I can't quote you
14   that.  I don't know.
15   Q    So that would probably be another
16   question for one of the gynecologists or --
17   MS. CURRY:
18   Object to the form.
19   MS. THOMPSON:
20   Q    -- gynecologic oncologists?  Would you
21   agree?
22   A    They -- they would have that, and their
23   OB training would provide them with that
24   information.  Yeah.

58 (Pages 226 to 229)

Michael Birrer, M.D., Ph.D.

Page 230

1   Q     Let's break for lunch.
2   VIDEOGRAPHER:
3        Off the record at 12:55 p.m.
4         (Lunch recess.)
5   VIDEOGRAPHER:
6        We're back on the record at 2:02 p.m.
7   MS. THOMPSON:
8   Q     Dr. Birrer, I think we established this
9   morning that it is your opinion that the genital
10  use of talcum powder is not a risk factor for
11  ovarian cancer; right?
12  A     I'm sorry.  Say that -- say that again.
13  Q     It's your opinion that talcum powder is
14  not a risk factor for ovarian cancer; right?
15  A     The use of talcum powder?
16  Q     Yes.
17  A     Correct.
18  Q     Can you point me to any article -- can
19  you point me to an article that specifically
20  states genital talcum powder use is not a risk
21  factor for -- for ovarian cancer?
22  MS. CURRY:
23        Object to the form.
24  A     That genital talcum powder use is not a

Page 231

1   risk factor?  I mean, if you look at the -- a lot
2   of the case-control studies, about 40 percent of
3   them are negative and --
4   MS. THOMPSON:
5   Q     Well -- and by negative, you mean not
6   statistically significant; right?
7   A     (Nods affirmatively.)  Negative.  And
8   cohort studies aren't either.  And -- and,
9   actually, that -- and the cohort studies have
10  been sort of analyzed, reanalyzed in multiple
11  meta-analysis, and so they're all negative.
12  Q     But my question was:  Did any of those
13  studies conclude talcum powder is not a risk
14  factor for ovarian cancer?
15  MS. CURRY:
16        Object to the form.
17  A     So there are studies that don't show a
18  significant association between talcum use and --
19  MS. THOMPSON:
20  Q     But I'm looking for --
21  A     -- and ovarian cancer.
22  Q     -- the statement that genital use of
23  talcum is not a risk factor for ovarian cancer.
24        Do you remember seeing that in any

Page 232

1   study?
2   MS. CURRY:
3        Object to the form.
4   A     No.  I'd have to go through them.  Do
5   you have them?
6   MS. THOMPSON:
7   Q     We're not gonna go through the 40
8   studies, but --
9        At least sitting here today, you can't
10  think of one right offhand, can you?
11  A     I'm happy to go through the studies.
12  Q     Okay.  Is it your opinion that genital
13  talcum powder use has been proven to be a safe
14  practice?
15  MS. CURRY:
16        Object to the form.
17  A     We discussed that this morning.  There
18  is no data I know that it's an unsafe practice.
19  That's a review of the literature.  And, so,
20  it's -- I think in that context it's safe.
21  MS. THOMPSON:
22  Q     In your previous -- or did you look at
23  websites when you prepared your report this time
24  regarding talcum powder exposure and the risk for

Page 233

1   ovarian cancer?
2   MS. CURRY:
3        Object to the form.
4   A     Other than PubMed?
5   MS. THOMPSON:
6   Q     Right.
7        Like the American Cancer Society or NCI
8   or any websites.
9   A     Not for this one.
10  Q     Had you looked at them before?
11  MS. CURRY:
12        Object to the form.
13  A     I think in the previous depositions, I
14  reported looking at one or two of them.  I'd have
15  to go back and look at that.
16  MS. THOMPSON:
17  Q     Okay.
18  A     Yeah.
19  Q     And I think the American Cancer Society
20  website was one of those that you looked at.
21  Correct?
22  A     Could be.
23  Q     I'll mark 17, American Cancer Society,
24  Talcum Powder and Cancer.

Michael Birrer, M.D., Ph.D.

Page 234

1          (DEPOSITION EXHIBIT NUMBER 17
2          WAS MARKED FOR IDENTIFICATION.)
3   MS. THOMPSON:
4   Q      Does that look familiar?
5   A      That looks like American Cancer
6   Society's website.  Because I see the logo.
7   Q      And -- and would you use this statement
8   on the American Cancer Society website to be
9   support for your opinion that talcum powder use
10  is not a risk factor for ovarian cancer?
11  A      Is not a risk factor?  Is not?
12  Q      Is not.
13  A      I wouldn't refer to this, no.
14  Q      Do you think that's what this document
15  states?
16  A      I don't think this -- it doesn't seem
17  to me, based on what the ACS is saying -- they
18  report that their findings are mixed, with some
19  studies reporting a slightly increased risk and
20  some reporting no increase.
21  Q      So the American Cancer Society, on
22  their website, states that IARC has classified
23  talc that contains asbestos as carcinogenic to
24  humans; right?

Page 235

1   A      You're on page 3?
2   Q      Yeah.  30 -- yeah, 3 of 6.
3   A      Yeah.
4   Q      And then based on the lack of data from
5   human studies and unlimited data in lab animal
6   studies, IARC classified inhaled talc not
7   containing asbestos as not classifiable; right?
8   A      The second bullet?
9   Q      The second bullet.
10         And then the third bullet is the IARC
11  that states that the perineal genital use of talc
12  powder -- talc-based body powder is possibly
13  carcinic- -- carcinogenic to humans.  That's the
14  2B classification; right?
15  A      2B.
16  Q      And then it states that the US National
17  Toxicology Program, NTB, has not fully reviewed
18  talc with or without asbestos as a possible
19  carcinogen; right?  That's what it says.
20  A      Correct.
21  Q      And, then, as -- as you said, the ACS
22  states it's not clear if consumer products
23  containing talcum powder increase cancer risk.
24         They're certainly not saying that

Page 236

1   talcum powder does not increase risk, are they?
2   MS. CURRY:
3          Object to the form.
4   A      Say again.
5   MS. THOMPSON:
6   Q      They're not saying that talcum powder
7   use does not increase cancer risk, do they?
8   A      I don't see that stated.
9   Q      And -- and they say there is some
10  suggestion of a possible increase in ovarian
11  cancer risk; right?
12  A      Well, the statement I see is "It's not
13  clear if consumer products containing talcum
14  increase cancer risks."  That's pretty specific.
15  Q      They're saying it's not clear.  It's
16  not saying it's not a risk, is it?
17  MS. CURRY:
18         Object to the form.
19  A      They're saying they don't know.
20  MS. THOMPSON:
21  Q      Right.  And then the recommendation, by
22  the American Cancer Society, would be "Until more
23  information is available, people concerned about
24  using talcum powder may want to avoid or limit

Page 237

1   their use of consumer products that contain it."
2          But you think any recommendation of
3   that kind is not indicated; correct?
4   MS. CURRY:
5          Object to the form.
6   A      Well, it depends on how you read that.
7   I mean, I think what they're suggesting is that
8   people concerned about using talcum powder, for
9   whatever reason, may want to avoid or limit their
10  use of consumer products that contain it and
11  implies that it's the stress of knowing they're
12  using it because of what they've interpreted.  It
13  doesn't really make any conclusions about talcum
14  powder.
15  MS. THOMPSON:
16  Q      Are there any medical benefits that
17  you're aware of from the genital use of talcum
18  powder?
19  A      Well, I think it's generally used to
20  absorb -- absorb fluid.  It's -- a lot of women
21  like it.  It's a body image issue.  You know, so
22  I think those issues -- and again, I treat a lot
23  of women with ovarian cancer -- are important.
24  Q      That wasn't my question.

60 (Pages 234 to 237)

Michael Birrer, M.D., Ph.D.

Page 238

1        Are there any medical benefits to the
2   genital use of talcum powder?
3   MS. CURRY:
4        Object to the form.
5   A        That is a medical use?
6   MS. THOMPSON:
7   Q        Are there any benefits, is the
8   question.
9   A        Yeah.
10  MS. CURRY:
11       Object to the form.
12  MS. THOMPSON:
13  Q        Where are -- where are those benefits
14  reported?
15  A        That's quality of life.
16  Q        Where in the medical literature can you
17  show a report that describes medical benefits
18  from the genital use of talcum powder?
19  A        Well, it's not in -- and again, I
20  didn't review that for this expert report, so --
21  but you're asking me.
22  Q        When you -- if you're trying to make a
23  risk assessment, wouldn't you know if you're
24  weighing the benefits versus the potential risks?

Page 239

1   A        Well, I evaluated the risks, and there
2   are none.
3   Q        So you just evaluated the risk and
4   it -- it wouldn't matter to you whether there
5   were benefits or not.
6   A        Well, my benefit --
7   MS. CURRY:
8        Object to the form.
9   A        I'm sorry.  Go ahead.  I'm sorry.
10       Yeah.  My benefit would be based upon
11  my own experience.  It's not necessarily
12  published in medical literature.
13  MS. THOMPSON:
14  Q        Okay.  Well, that would certainly be
15  anecdotal, wouldn't it?
16  MS. CURRY:
17       Object to the form.
18  A        Well, you know, I've got a lot of
19  experience.
20  MS. THOMPSON:
21  Q        It's still anecdotal, isn't it,
22  Dr. Birrer?
23  MS. CURRY:
24       Object to the form.

Page 240

1   A        Again, you asked me the question about
2   do I think there's some medical benefit.  I --
3   the answer is yes.  I mean --
4   MS. THOMPSON:
5   Q        But that's never been published
6   anywhere that you're aware of, has it?
7   MS. CURRY:
8        Object to the form.
9   A        As I said before, I -- I can't quote
10  you that.
11  MS. THOMPSON:
12  Q        Is it -- have you seen in the medical
13  literature that there are no benefits, medical
14  benefits from the use of talcum powder in the
15  genital area?
16  MS. CURRY:
17       Object to the form.
18  A        I don't think I've actually seen that.
19  MS. THOMPSON:
20  Q        Would you be surprised if there are
21  references in numerous articles that say because
22  there are no medical benefits of talcum powder
23  use, it's not recommended?
24  MS. CURRY:

Page 241

1        Object to the form.
2   A        I'd be happy to -- I'd be happy to
3   review them.
4   MS. THOMPSON:
5   Q        Have you seen in the medical literature
6   that cornstarch products are recommended if women
7   choose to use a dusting powder over talcum
8   powder?
9   A        Can you repeat that?  I -- the cough.
10  Q        Have you seen in the medical literature
11  that -- where cornstarch products are recommended
12  if women choose to use a dusting powder over
13  talcum powder?
14  A        You know, I haven't seen the -- I
15  haven't seen the medical literature recommending
16  cornstarch over talcum.  But I have seen -- I've
17  seen discussions about women who use cornstarch.
18  Q        And again, there have never been any
19  risks that you're aware of into -- related to the
20  genital use of cornstarch products and the link
21  with ovarian cancer; right?
22  A        I don't know of any.
23  Q        You mentioned earlier this morning the
24  National Academy of Science, Engineering and

61 (Pages 238 to 241)

Michael Birrer, M.D., Ph.D.

Page 242

1   Medicine as a -- as a -- possibly the most
2   reputable source of credible information.
3        Would -- did I describe that sort of
4   correctly?
5   MS. CURRY:
6        Object to the form.
7   A    I don't recall saying it's the most,
8   but I used it in context of comparing IARC, if I
9   recall correctly, versus some other sort of pure
10  scientific professional organization, which I
11  would include the National Academy to be that.
12  MS. THOMPSON:
13  Q    Okay. Fair enough.
14       And I'm sure you're familiar with the
15  treatise -- it's actually -- came out in book
16  form -- of the study by the Institute of
17  Medicine, I believe, at that time, on ovarian
18  cancer?
19  A    Yes.
20  Q    Did you participate at all in that
21  study?
22  A    They asked me to review it.
23  Q    You were one of the reviewers?
24  A    They asked me to review it.

Page 243

1   Q    Oh.
2   A    I declined.
3   Q    They asked you to review it and you did
4   not review it. That explains it, because I
5   didn't see your name on the list.
6        And that was published in 2016?
7   A    Uh-huh.
8   Q    And what was your understanding of the
9   purpose of that study?
10  MS. CURRY:
11       Object to the form.
12  A    It -- I -- you know, I think it was --
13  this is -- it's just medicine undertakes this
14  periodically for large topics, and that was one
15  of them, to sort of summarize the state of the
16  science.
17  MS. THOMPSON:
18  Q    And the -- in fact, the committee that
19  did the study was a committee on the state of the
20  science in ovarian cancer research; is that
21  correct? So you called --
22  A    This is the one by Beth Karlan?
23  Q    Yeah.
24  A    Yeah.

Page 244

1   Q    I'll give it to you in a minute.
2   A    Okay.
3   Q    I just want to ask you a few questions
4   first.
5        Why did you decline to review?
6   A    I was too busy.
7   Q    Okay. Because it was a big book?
8   A    It's monstrous.
9   Q    However, several of the authors have
10  been coauthors with you on -- on papers. Is one
11  of them Dr. Karlan?
12  A    I believe I've been on papers with
13  Beth. And I think Anil Sood was on there, too.
14  THE COURT REPORTER:
15       Excuse me?
16  THE WITNESS:
17       Anil Sood, S-O-O-D.
18  MS. THOMPSON:
19  Q    And Ronald Alvarez -- Alvarez published
20  with you, I think.
21  A    I believe so.
22  Q    Dr. Karlan's published with you.
23  A    (Nods affirmatively.)
24  Q    Dr. Levine has published with you?

Page 245

1   A    Doug and I are on a couple of papers,
2   yeah.
3   Q    Doug Levine?
4   A    Yeah.
5   Q    Dr. Odunsi, Kunle Odunsi --
6   A    Kunle. Kunle.
7   Q    -- has published with you. And
8   Dr. Sood you mentioned; right?
9        And Dr. -- is it Tworoger or --
10  A    Two- -- Twergger?
11  Q    -- Two- -- Twoauger?
12  A    T-W-O-G-G-E-R [sic].
13  Q    Has published with you?
14  A    I think so, yes. I'd have to check
15  that.
16  Q    So you were, I would say, well
17  represented on the --
18  MS. CURRY:
19       Object to the form.
20  A    Well, I know them.
21  MS. THOMPSON:
22  Q    -- on the author list?
23  MS. CURRY:
24       Object to the form.

Michael Birrer, M.D., Ph.D.

Page 246

1    MS. THOMPSON:
2    Q     And -- and I assume you would agree
3  with me that the committee to report on the state
4  of the science of ovarian cancer research was
5  selected because of their expertise in the area;
6  correct?
7    A     Yes.
8    MS. CURRY:
9        Object to the form.
10    MS. THOMPSON:
11    Q     And, as we mentioned, this study was
12  under the auspices of the National Academy of
13  Science, Medicine and Engineering, Institute of
14  Medicine, I believe, originally; correct?
15    A     Correct.
16    Q     And is it your understanding that this
17  study was also supported by the CDC?
18    A     That, I don't know.
19    Q     All right.  Let me just go ahead and
20  give it to you.
21    A     Yeah.
22        (DEPOSITION EXHIBIT NUMBER 18 WAS
23        MARKED FOR IDENTIFICATION.)
24    MS. THOMPSON:

Page 247

1    Q     Exhibit 18 I'm marking as Ovarian
2  Cancers, Evolving Paradigms in Research and Care.
3  And this is not the entire book, but it is the
4  entire chapter that we're going to look at, which
5  is "Prevention and Early Detection," Chapter 3.
6        And if you look on page little ix, page
7  9, preface --
8    A     9?  9?
9    Q     Little nine.
10    A     Yeah.
11    Q     Yeah.  The -- first sentence, "This
12  congressionally mandated report sponsored by the
13  Centers For Disease Control and Prevention
14  assesses the state of research on ovarian cancers
15  from multiple perspectives and by multiple
16  disciplines."
17        So do you agree that the Center For
18  Disease Control sponsored the study?
19    A     Correct.
20    Q     If you'll turn to page -- I don't have
21  pages on my copy.  Page 110.  Under the section
22  heading "Inflammation."  And this is in a larger
23  section titled "Behavioral and Inflammatory Risk
24  Factors"; correct?

Page 248

1    A     Correct.
2    Q     The State of the Science authors state,
3  under "Inflammation," "Studies of the
4  inflammatory marker C-reactive protein suggest a
5  possible association between inflammation and
6  increased risk of ovarian cancer," citing OC and
7  Poole.
8        "Other specific inflammatory factors
9  have also been associated with ovarian cancer."
10        Do you agree that the authors of this
11  treatise reported that there's a possible
12  association between inflammation and increased
13  risk for ovarian cancer?
14    A     Well, on these -- on these two
15  sentences, I think they accurately stated,
16  "suggests association."  And then they refer -- I
17  don't -- these two papers, I can't directly quote
18  you.  I mean --
19    Q     And I -- and I'm not --
20    A     Yeah.
21    Q     -- suggesting that they do anything
22  other than suggest the possible association.
23    A     Right.
24    Q     I'm not trying to read more into it.

Page 249

1    A     Okay.
2    Q     And then they describe "A meta-analysis
3  reported that exposure to asbestos was associated
4  with a 77 percent increased risk of ovarian
5  cancer mortality," citing Carmargo.
6        Are you familiar with that paper?
7    A     I am familiar with that.  That's the
8  occasional exposure, if I recall correctly.
9    Q     And "The International Agency For
10  Research on Cancer determined that there was
11  sufficient evidence to support a causal
12  relationship between asbestos exposure and
13  ovarian cancer."
14        So the authors of this treatise include
15  exposure to asbestos and its association with
16  ovarian cancer in the Inflammation section of --
17  of risk factors; right?
18    A     Say that again?  Sorry.  For asbestos?
19    Q     The authors of this treatise include
20  exposure to asbestos and its association with
21  ovarian cancer in the Inflammation section of
22  risk factors; right?
23    A     Correct.
24    Q     They go on to say, "This has led to

63 (Pages 246 to 249)

Michael Birrer, M.D., Ph.D.

Page 250

1    studies of talc use which is chemically similar
2    to asbestos and can cause an inflammatory
3    response."
4        Do you agree with that statement?
5    A    I -- I actually hesitate a little on
6    that because I'm not so sure that that's a
7    temporal relationship, that it was the asbestos
8    association that then led to the investigation of
9    talc. I don't know, when Dan Cramer published
10   his first paper, that's what was driving him.
11   Q    Do you have any other disagreement with
12   the -- the statement other than whether it led to
13   the studies of talc use?
14   MS. CURRY:
15       Object to the form.
16   A    I don't know. Again, we've covered
17   this. I'm not a mineralogist, so I don't know
18   the similarity issues. And inflammatory response
19   is not defined. So other than that, it's fine.
20   MS. THOMPSON:
21   Q    Well, the authors -- let's take out the
22   asbestos and say "Talc can cause inflammatory
23   response." Do you agree or disagree with that?
24   A    Well, inflammation is a broad issue and

Page 251

1    it's very relevant to this debate, which is are
2    we talking granulomas, acute, chronic but
3    nongranuloma? I think that's a big issue.
4    Q    Well, these were the authors that were
5    selected because of their expertise to do a State
6    of the Science treatise at the behest of the
7    National Academy of Science and CDC.
8        I'm just asking you do you agree with
9    the statement "Talc can cause an inflammatory
10   response"?
11   MS. CURRY:
12       Object to the form.
13   A    And -- and I'm -- I'm answering it.
14   MS. THOMPSON:
15   Q    And you say you don't know? You can't
16   agree or disagree? Is that what you're saying?
17   MS. CURRY:
18       Object to the form.
19   A    The inflammation is not defined. I
20   don't know if the similarity between asbestos and
21   talc. So other than that, I think it's fine.
22   But the -- the -- the implication that all of the
23   ovarian cancer experts are on this -- on this --
24   on this report and there are no one -- there's no

Page 252

1    one else anywhere in the literature to question
2    even this, I don't agree with.
3    MS. THOMPSON:
4    Q    Okay. So you -- so you disagree with
5    the authors including that statement in -- in
6    this treatise?
7    A    I just think it's not defined. They
8    defined it, then I would have felt a lot better.
9    Can cause granulomas inflammatory response. That
10   would have been more accurate.
11   Q    I can understand that you think it
12   should have been defined better.
13   A    Yeah.
14   Q    But do you agree with the statement
15   that's in this treatise, or disagree?
16   MS. CURRY:
17       Object to the form.
18   A    No opinion.
19   MS. THOMPSON:
20   Q    But you'll agree that at least these
21   experts thought it was worthwhile putting the
22   statement in this State of the Science treatise
23   on ovarian cancer published in 2016; right?
24   MS. CURRY:

Page 253

1        Object to the form.
2    A    Yeah. Apparently.
3    MS. THOMPSON:
4    Q    Do you know Jason Wright?
5    A    Division head at Columbia?
6    Q    Yes.
7    A    I do know Jason. Not -- I know him by
8    reputation. I don't think I've ever actually met
9    him.
10   Q    And what is his reputation?
11   A    I think he's got a good reputation
12   running his division, and he's a good surgeon.
13   Q    Have you ever published with Jason
14   Wright?
15   A    I don't believe so.
16   Q    You're right. That was a trick
17   question.
18       I'm gonna mark --
19   MS. CURRY:
20       I should have objected.
21       (DEPOSITION EXHIBIT NUMBER 19
22       WAS MARKED FOR IDENTIFICATION.)
23   MS. THOMPSON:
24       I'm gonna mark just a short article of