# Exhibit 108

## In the Matter Of:

TERESA ELIZABETH LEAVITT vs JOHNSON & JOHNSON, et al.,

## BROOKE T. MOSSMAN, MS, PHD

*November 15, 2018*

Court Reporters, Videography, Trial Preparation

Videoconference Center

Oakland ◆ San Francisco ◆ San Jose

Sacramento ◆ Irvine ◆ Los Angeles

877.451.1580

www.aikenwelch.com



Aiken Welch COURT REPORTERS

**EXHIBIT J**

```
 1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2              IN AND FOR THE COUNTY OF ALAMEDA

 3                         ---oOo---

 4
    TERESA ELIZABETH LEAVITT
 5  and DEAN J. McELROY,

 6          Plaintiffs,

 7  vs.                                    No. RG17882401

 8  JOHNSON & JOHNSON, et al.,

 9          Defendants.
    _____/
10

11

12        DEPOSITION OF BROOKE T. MOSSMAN, MS, Ph.D.

13

14

15

16       Taken before DARLENE L. FALLS, RMR, CRR

17                  November 15, 2018

18

19

20

21

22
               Aiken Welch Court Reporting
23             One Kaiser Plaza, Suite 250
                Oakland, California  94612
24             (510) 451-1580/(877) 451-1580
                    Fax (510) 451-3797
25                  www.aikenwelch.com
```

Page 2

```
 1                I N D E X
 2
 3  BROOKE T. MOSSMAN, MS, Ph.D.                PAGE
 4  EXAMINATION BY MR. LITTLE                      5
 5  EXAMINATION BY MR. SEA                        51
 6
 7
 8              E X H I B I T S
 9
10  EXHIBIT NO.                                 PAGE
11  Exhibit 1     Notice of Expert Deposition of
                  Brooke Mossman                   5
12
    Exhibit 2     Mossman CV                       5
13
    Exhibit 3     Mossman Reliance List            5
14
    Exhibit 4     Mossman Prior Testimony          5
15
    Exhibit 5     Defense Expert Disclosure
16                Imerys et al.
17  Exhibit 6     Defense Expert Disclosure J&J    5
18  Exhibit 7     Prior Mossman Report             5
19
20
21
22
23
24
25
```

Page 3

```
 1      DEPOSITION OF BROOKE T. MOSSMAN, MS, Ph.D.
 2
 3          BE IT REMEMBERED, that pursuant to Notice, and
 4  on the 15th day of November, 2018, commencing at the
 5  hour of 1:05 p.m., at the Hilton Garden Inn, 101 Main
 6  Street, Burlington, Vermont 05401, before me, DARLENE
 7  L. FALLS, a Certified Shorthand Reporter, personally
 8  appeared BROOKE T. MOSSMAN, MS, Ph.D., produced as a
 9  witness in said action, and being by me first duly
10  sworn, was thereupon examined as a witness in said
11  cause.
12                      ---oOo---
13
14
15  APPEARANCES:
16  For the Plaintiffs:
    (via conference call)
17      BRENDAN E. LITTLE
        Levy Konigsberg LLP
18      800 Third Avenue, 11th Fl.
        New York, New York 10022
19      212-605-6282
        blittle@levylaw.com
20
21
22
23
24
25
```

Page 4

```
 1  For the Defendants Imerys Talc America, Inc.; Imerys
    Talc Vermont, Inc.; Cyprus Mines Corporation:
 2  (via conference call)
        RICK NORRIS
 3      Dentons US LLP
        601 S. Figueroa Street
 4      Suite 2500
        Los Angeles, California 90017-5704
 5      213-243-6234
        rick.norris@dentons.com
 6
        PATRICIA BALL ALBERTS
 7      Dentons US LLP
        601 S. Figueroa Street
 8      Suite 2500
        Los Angeles, California 90017-5704
 9      213-243-6032
        patricia.alberts@dentons.com
10
11  For the Defendants Johnson & Johnson; Johnson & Johnson
    Consumer, Inc.:
12      NEXUS U. SEA
        Orrick, Herrington & Sutcliffe LLP
13      51 West 52nd Street
        New York, New York 10019-6142
14      212-506-3516
        nsea@orrick.com
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              (Deposition Exhibits Nos. 1 through 7
 2      were marked for identification preceding
 3      commencement of the deposition.)
 4                      ---oOo---
 5  THEREUPON,
 6          BROOKE T. MOSSMAN, MS, Ph.D.
 7  called as a witness, having been first duly sworn, was
 8  examined and testified as follows:
 9          MR. NORRIS:  Plaintiff's counsel,
10      before -- before we get going, can we just get a
11      stipulation on the record that an objection by one
12      defense counsel will stand for all?
13          MR. LITTLE:  Yes.  That would be great.
14          MR. NORRIS:  Thank you.
15                  EXAMINATION
16  BY MR. LITTLE:
17      Q.  Okay.  Good afternoon, Dr. Mossman.
18      A.  Hello.  How are you?
19      Q.  Could you please identify yourself, for the
20  record?
21      A.  My name is Brooke Taylor Mossman.
22      Q.  Okay.  And where are you today, Dr. Mossman?
23      A.  I'm in a conference room at the Hilton Garden
24  Inn in Burlington, Vermont.
25      Q.  And can you tell me who else is in the room
```

Page 22

1  2010 document on talc that's cited on my Key References
2  and Reliance Materials.
3      Q.  Okay.  And what IARC document specifically is
4  that?  I think there are multiple documents identified
5  in your Reliance Materials.
6      A.  Um-hum.  It's the -- it will be under World
7  Health Organization IARC Monograph No. 93 in 2010,
8  Carbon Black, Titanium Dioxide, and Talc.
9      Q.  Okay.  And can you tell me in your own words
10 what your understanding of a cleavage fragment is?
11         MR. SEA:  Objection to form.  Dr. Mossman
12    has already noted that she relies on the
13    definition in the IARC monograph.
14     Q.  BY MR. LITTLE:  Dr. Mossman, could you
15 specify where in that document it defines what a
16 cleavage fragment is?
17     A.  Yes.  It is on the first page of the document
18 that describes talc, that section, and the definition
19 is supplied on that first page.
20     Q.  So essentially when you use the term
21 "cleavage fragments," you are referring to mineral
22 fragments that are not asbestiform; is that correct?
23     A.  That's correct.
24     Q.  Dr. Mossman, are you familiar with the term
25 "elongated mineral fragment"?

Page 23

1      A.  EMF?
2      Q.  Sorry, elongated mineral particle?
3      A.  Yes.
4      Q.  And how would you define an elongated mineral
5  particle?
6      A.  Let me emphasize that that term is a very
7  broad term that has been used, depending upon authors
8  of scientific articles, loosely and is not a geological
9  term that's recognized by most geologists, and so I
10 would define it as something being extremely broad that
11 may reflect a number of minerals that may or may not be
12 asbestos or asbestiform.
13     Q.  Would you agree that all nonasbestiform
14 elongated mineral particles are cleavage fragments as
15 used in your opinion?
16     A.  Would you say that again?
17     Q.  Sure.  Would you agree that all
18 nonasbestiform elongated mineral particles are subsumed
19 within the definition of cleavage fragments, as you use
20 it in your opinion?
21         MR. SEA:  Objection to form.
22     A.  Yeah, I'm not -- I'm not sure what you're
23 getting at here.
24         MR. NORRIS:  Well, objection, vague,
25    ambiguous.

Page 24

1      A.  Yeah, I --
2      Q.  So your definition of cleavage fragment, that
3  includes elongated mineral particles that are
4  nonasbestiform, correct?
5      A.  No, let me --
6         MR. SEA:  The same objection.
7      A.  Let me emphasize that I would not use the
8  term "elongated mineral particles" for cleavage
9  fragments or any materials knowing the discrepancies in
10 which it has been used in the scientific literature and
11 being cognizant of the fact that geologists do not
12 recognize that term mineralogically.
13         MR. SEA:  Counsel, if we can just take a
14    one-minute off the record?  They're -- they're
15    vacuuming right outside this conference room, and
16    it's hard for Dr. Mossman to hear.  I'm just going
17    to ask them to stop vacuuming, please, so that
18    it's a little bit easier to hear.
19         MR. LITTLE:  Sure.  Why don't we go off
20    the record for a five-minute break.
21         MR. SEA:  Yeah, let's do that.
22         (A brief break was taken from 1:44 p.m.
23    to 1:48 p.m.)
24         MR. LITTLE:  Great.  Back on the record,
25    please.

Page 25

1      Q.  BY MR. LITTLE:  Dr. Mossman, before we took a
2  break, I believe the question that had been posed was
3  whether your definition of a cleavage fragment includes
4  elongated mineral particles that are nonasbestiform.
5  Is it your opinion that elongated mineral particles
6  that are nonasbestiform are not capable of causing
7  cancer?
8         MR. SEA:  The same objection.
9      A.  Yes.
10     Q.  Are there any epidemiological studies that
11 you're aware of that examine whether elongated mineral
12 particles that have the same chemical composition of
13 the amphibole asbestos types do not cause cancer?
14     A.  There are experimental studies.
15     Q.  When you refer to "experimental studies," can
16 you describe what studies you're referring to?
17     A.  Yes, if we go to my Key Reliance Material
18 List.
19     Q.  Okay.  And for the record, this is Exhibit 3
20 that we're referring to?  I'm sorry, Exhibit 4?
21     A.  Let me --
22     Q.  Okay, go ahead.
23     A.  It's Exhibit 3.
24     Q.  Sorry, Exhibit 3.  Go ahead.
25     A.  So I can just list for you the key references

Page 34

1  measuring to document adverse pathogenic effects.
2      Q.   Okay.  And just to clarify, "species" as you
3  use it is not referring to different types of asbestos,
4  correct?
5      A.   Not here, no, it's not.
6      Q.   Thank you.  With regard to elongated mineral
7  particles that are nonasbestiform, would you agree that
8  there's a hazard gradient that depends upon the length
9  and the diameter of those particles regardless of
10 whether they're asbestiform or not?
11     A.   No, again, when you use the term "elongated
12 mineral particles," it reviews -- it has been used
13 correctly and incorrectly for a number of different
14 types of materials, asbestiform versus nonasbestiform,
15 and a variety of different sizes of materials, so I
16 couldn't comment on the statement that you just gave
17 me.  I think we'd have to focus in a little bit.
18     Q.   Okay.  What -- what do you consider to be the
19 correct usage of "elongated mineral particle" versus
20 the incorrect usage?
21     A.   Elongated mineral particles, in my speaking
22 to geologists, incorrectly refers to a number of
23 different mineral types, sizes, durability, chemical
24 composition, and so it's difficult to make a statement
25 using this definition that relates to biological

Page 35

1  effects or geological effects, because it's not a
2  recognized term.
3      Q.   So to rephrase, there are different types of
4  elongated mineral particles, and the hazard the
5  different types pose is individual to the physical
6  characteristics of that particular particle?
7      A.   No.
8      Q.   Would you agree?
9      A.   What I would say is that if you're talking
10 about a broad group of materials, the effects could be
11 due to many properties of those materials, including
12 their dose, dimensions, crystal structure, flexibility,
13 surface chemistry and availability, surface area and
14 durability.  It's impossible using that term to hone in
15 on the different properties that may be important or
16 the specific mineral types that may be important in the
17 biological effects.
18     Q.   Okay.  But elongated mineral particles that
19 are nonasbestiform, I mean those are a type of cleavage
20 fragment, correct?
21     A.   No.
22     Q.   Okay.  So some of the other parameters
23 besides the dimensional criteria of a particle that
24 might affect toxicity would include biopersistence and
25 surface reactivity; would you agree?

Page 36

1      A.   Those are two of many properties.
2      Q.   And those properties differ between different
3  mineral types; is that correct?
4      A.   Correct.
5      Q.   Dr. Mossman, are you familiar with the term
6  "ferruginous body"?
7      A.   I am.
8      Q.   Okay.  Can you tell me what that term means
9  to you?
10     A.   Yes.  It's an iron deposit; hence, the term
11 ferruginous, that's formed on an inhaled particle or
12 fiber in the lung and rarely in other organs.
13     Q.   And could you explain briefly how a
14 ferruginous body is formed?
15     A.   We don't know all the details, but the
16 hypothesis is that a ferruginous body is formed
17 consisting of beads of material along fibers that are
18 beyond a certain size and that the deposit is due to
19 dying macrophages that unsuccessfully try to digest and
20 remove these materials.
21     Q.   Okay.  And would you consider the presence of
22 ferruginous bodies to be a marker of an adverse
23 pathogenic response in human tissue?
24     A.   No.
25     Q.   Are cleavage fragments, as you define them,

Page 37

1  capable of producing ferruginous bodies in the human
2  body?
3      A.   I don't believe that the analysis of what's
4  inside of a ferruginous body has been classified as
5  cleavage fragments versus asbestos fibers in any paper
6  I've ever read, so I couldn't comment on that.
7      Q.   Based on your understanding of how a
8  ferruginous body is formed or at least the theory
9  behind their formation, does that indicate to you that
10 the particle around which they form is biopersistent?
11     A.   I don't believe that is a true statement.  We
12 don't know that.  We do know that something such as
13 chrysotile asbestos is rarely found in ferruginous
14 bodies, and that's because it's very toxic and --
15 initially to cells, but it also dissolves, so we don't
16 know whether ferruginous bodies are a protective
17 response to an agent or whether it's a general response
18 to any material that may digest within a ferruginous
19 body over time.
20     Q.   Dr. Mossman, are you familiar with the IARC
21 monograph issued in 1997 titled Supplement 7 - Talc not
22 containing asbestiform fibers and talc containing
23 asbestiform fibers?
24     A.   No, I didn't go back that far.  I am aware of
25 the more recent documents in 2010 and 2012, which

Page 38

1  supersede the earlier documents.
2      Q.   Are you familiar with the discussion in the
3  2010 IARC monograph regarding what it describes as
4  Supplement 7, which is the 1997 monograph regarding
5  talc containing asbestiform fibers and talc not
6  containing asbestiform fibers?
7      A.   No, I can't recall that without the document
8  in front of me.
9      Q.   Okay.  Would you agree that talc containing
10  asbestiform fibers is capable of causing mesothelioma?
11      A.   I haven't seen any experimental evidence
12  supporting that.
13      Q.   Okay.  Would you agree that there's evidence
14  that talc containing asbestiform fibers is carcinogenic
15  to humans?
16      A.   No, I can't recall studies on talc miners
17  with asbestiform fiber exposures.
18      Q.   And if a conclusion of the IARC Supplement 7
19  from 1997 is that there's sufficient evidence to
20  conclude that talc containing asbestiform fibers is
21  carcinogenic to humans, do you have any -- do you have
22  any information to dispute that statement?
23      A.   I don't, not knowing the references that
24  they're -- that may support that.  I'm -- again, I
25  previously stated, I'm unaware of any references that

Page 39

1  support that in humans, and this has not been discussed
2  in the more recent IARC monographs.
3      Q.   With regard to elongated mineral particles
4  that have the same chemical composition as the five
5  regulated amphibole asbestos types, do you believe it's
6  possible to rule out a risk of cancer linked to
7  exposure to these particles?
8           MR. SEA:  Objection; vague.
9      A.   Yeah, could you focus your question a little
10  bit, please?
11      Q.   Sure.  With regard to elongated mineral
12  particles that have the same chemistry as the five
13  regulated amphibole asbestos types, do you believe it's
14  possible, based on the scientific evidence, to rule out
15  the risk of cancer linked to exposure to those
16  particles?
17           MR. SEA:  The same objection.
18           MR. NORRIS:  Objection; overbroad as to
19       "cancer."
20      A.   Yeah, I don't think that that hypothetical
21  situation exists with regard to nonasbestos analogs
22  being chemically identical to the asbestiform
23  derivatives.  I know that this is not true for things
24  such as riebeckite versus crocidolite, and for that
25  reason I -- I couldn't endorse that opinion.

Page 40

1      Q.   So putting aside crocidolite and its
2  nonasbestiform analog riebeckite, that leaves four
3  remaining regulated amphibole asbestos types.  Is it
4  possible to rule out a health risk linked to exposure
5  to elongated mineral particles that are nonasbestiform
6  and have the same chemical composition as the other
7  four regulated asbestos amphiboles?
8           MR. SEA:  Objection; vague, foundation.
9      A.   Yeah, I couldn't comment on that.  It's just
10  too highly speculative.  As I said previously, it's not
11  just chemistry, but it's a variety of other properties
12  of materials that have to be considered in
13  carcinogenicity.
14      Q.   Would you agree that there is evidence of
15  occurrence of cancer as a result of exposure to
16  particle populations that have mixed nonasbestiform and
17  asbestiform properties of the minerals fluoro-edenite,
18  winchite or richterite?
19           MR. SEA:  The same objection.
20           MR. NORRIS:  Vague.
21      A.   No, I wouldn't agree.
22      Q.   So you would not agree that there is
23  a -- that there's a relationship between exposure to
24  those particles I listed in my prior question and
25  occurrence of cancer?

Page 41

1           MR. SEA:  The same objection.
2      A.   Could you be specific in the particles you
3  listed?
4      Q.   Yes.  And please correct me if I'm
5  mispronouncing these, but fluoro-edenite -- are you
6  familiar with that mineral?
7      A.   Yes.  Fluoro-edenite in Italy, yes.
8      Q.   Okay.  And are you familiar with the mineral
9  winchite or winchite?
10      A.   I'm assuming you're talking about the Libby
11  amphibole like material?
12      Q.   That's correct.  Are you familiar with that
13  mineral spelled w-i-n-c-h-i-t-e?
14      A.   Yes.
15      Q.   Okay.  And are you familiar with the mineral
16  richterite?
17      A.   Yes.
18      Q.   Okay.  Regarding these three mineral types,
19  do you agree that there has been a relationship
20  established between occurrence of cancer and exposure
21  to these particulates?
22      A.   Yes.  They're quite different materials, but
23  fluoro-edenite has been associated with cancers, and I
24  believe that's been listed as a carcinogen by IARC.
25  That's distinctive from the Libby amphibole which

Page 42

1  contains winchite and richterite, and there have been
2  mesotheliomas associated with this material in
3  individuals in Libby, Montana.
4      Q.   And the Libby amphibole that caused those
5  these mesotheliomas, would you consider that to be an
6  elongated mineral particle?
7      A.   Like every dust material, there would be
8  elongated mineral particles as well as nonelongated
9  mineral particles that would have been inhaled by these
10 individuals.
11     Q.   And is it your opinion that it is the
12 nonelongated mineral particles or the elongated mineral
13 particles that would be carcinogenic in those particle
14 populations?
15     A.   It's difficult to say in this population,
16 because these individuals were exposed to vermiculite
17 that would have different populations proportionally of
18 elongated mineral particles versus nonelongated mineral
19 particles, and so it really is hard to parcel out what
20 fraction or population is important in cancer in these
21 mixed exposures.
22     Q.   Would you agree that a cleavage fragment with
23 the dimensional criteria as set forth by the World
24 Health Organization for a fiber --
25          MR. SEA:  Objection; vague.

Page 43

1      Q.   -- is toxic -- is toxic from a carcinogenic
2  perspective?
3           MR. SEA:  Counsel, can you reask the
4      question?  I'm sorry, there was a pause there, and
5      I wasn't sure if that was the question or not.  Do
6      you want to just reask that so it's a little
7      clearer?
8           MR. LITTLE:  Yeah, that's fair.  Let me
9      reask it.
10     Q.   BY MR. LITTLE:  Would you agree that cleavage
11 fragments with the dimensional criteria as set forth by
12 the World Health Organization for a fiber are
13 carcinogenic?
14     A.   No.
15          MR. SEA:  I'm just going to object as to
16     foundation.
17     Q.   Okay.  Would you agree that there is
18 sufficient scientific evidence to conclude that
19 cleavage fragments with a dimensional criteria as set
20 forth by the World Health Organization for a fiber,
21 which is length greater than 5 microns, diameter less
22 than 3 microns, and an aspect ratio greater than 3 to
23 1, are less carcinogenic than their asbestiform
24 counterparts?
25          MR. SEA:  The same objection.

Page 44

1      A.   No, I wouldn't agree with it.
2      Q.   Dr. Mossman, do you know an individual by the
3  name of Richard Zazenski?
4      A.   Could you spell the last name?  I -- it's not
5  ringing a bell.
6      Q.   Sure.  Zazenski is --
7      A.   Oh.
8      Q.   -- Z-a-z-e-n-s-k-i.
9      A.   I don't know him personally.
10     Q.   Do you know who that individual is, even if
11 you don't know him personally?
12     A.   I have a reference by Zazenski in 1995 which
13 talks about talc occurrence characterization in
14 consumer applications.
15     Q.   Okay.  Do you know anything further about
16 Richard Zazenski aside from him being listed as an
17 author on that publication?
18     A.   No, I don't.
19     Q.   Have you ever communicated or exchanged
20 e-mails with a Mr. Zazenski?
21     A.   Not that I can remember.  It's possible.
22          MR. LITTLE:  All right.  I only have a
23     few more questions.  Does anyone mind if we take a
24     short break, five minutes?
25          MR. SEA:  That's fine with me.

Page 45

1           MR. LITTLE:  All right.  Let's go off the
2      record.
3           (A brief break was taken from 2:39 p.m.
4      to 2:48 p.m.)
5           MR. LITTLE:  Back on the record?
6      Q.   BY MR. LITTLE:  Dr. Mossman, you described
7  one of the areas that you may offer testimony on to be
8  the ability of durable fibers in a human body to
9  translocate to the pleura and peritoneum; is that
10 correct?
11     A.   Could you say that again, please?
12     Q.   You've identified one of the areas that you
13 may testify in to be the ability of durable fibers to
14 enter the human body and translocate to the pleura and
15 peritoneum; is that right?
16     A.   Yes.
17     Q.   Is it your opinion that the ability to
18 asbestiform versus nonasbestiform fibers of the same
19 dimension have different ability to translocate to the
20 pleura and peritoneum?
21     A.   No, what I'm saying is that asbestos fibers
22 that are long and thin may -- and fibers of a certain
23 dimension, may be translocated to sites of mesothelioma
24 development, but they would be unlikely to be retained
25 there for sufficient periods of times unless they were

Page 46

1  durable fibers.
2      Q.  And so in terms of translocation and
3  remaining in those sites where mesothelioma develops,
4  it's the durability of the fiber that differentiates
5  between asbestiform and nonasbestiform, in your
6  opinion?
7      A.  Yes, that's one of the features.
8      Q.  Okay.  What other features differentiate
9  between the ability of long, thin particles that are
10 asbestiform versus nonasbestiform to translocate and
11 remain at the sites where mesothelioma develops?
12     A.  Okay.  So the other properties that become
13 important are what are called the dissolution kinetics
14 at the site, and at the site of development the
15 durability is an important phenomena, but there also
16 has to be considered the interaction of fibers with
17 mesothelial cells and their ability to drive reactions
18 that are important in carcinogenesis, and this is a
19 function of not only their dose and dimension, but
20 their surface chemistry, chemical composition, surface
21 charge, and surface area.
22     Q.  And would you agree that those physical
23 characteristics that you just listed differ between the
24 six regulated asbestos types?
25     A.  The properties that I listed aren't

Page 47

1  dimensional or physical.  The point I want to make is
2  that the physical nature may drive what gets to the
3  pleura, but there are other features that are important
4  that -- in determining whether fibers will be retained
5  or interact with pleural or peritoneal mesothelial
6  cells, and those are some of the many properties that
7  may be important, in additional to just dimensions.
8          MR. LITTLE:  I'm going to object to the
9      nonresponsive portions of that response.
10     Q.  BY MR. LITTLE:  Again, the physical
11 properties that you located, would you agree that they
12 differ between the six different types of regulated
13 asbestos, being chrysotile, crocidolite, amosite,
14 anthophyllite, tremolite; would you agree -- would you
15 agree that those physical properties that you
16 identified differ between those asbestos types?
17         MR. SEA:  Objection; asked and answered.
18     A.  The physical and chemical properties of the
19 different types of asbestos as well as their
20 composition and surface chemistry differs between each
21 type of asbestos.
22     Q.  And it also differs then between the
23 different types of the nonasbestiform mineral analogs
24 of the six regulated asbestos types?
25     A.  From what we know, yes, there are different

Page 48

1  properties of nonasbestos versus asbestos fibers.
2      Q.  Would you agree that each mineralogically
3  distinct particulate elicits its own unique biologic
4  response?
5      A.  I don't think I would -- I could agree with
6  that.  We just don't have information on all types of
7  asbestos and their biological responses.
8      Q.  Are you currently performing any research,
9  Dr. Mossman, personally?
10     A.  No.
11     Q.  When was the last time that you personally
12 performed any original research?
13     A.  I would guess three to four years ago.
14     Q.  Who is the scientist that's now in charge of
15 your laboratory or what was formerly your laboratory?
16     A.  Dr. Arti, spelled A-r-t-i, Shukla, spelled
17 S-h-u-k-l-a.
18     Q.  And has your laboratory, that you know of,
19 received any grants or other compensation from
20 companies that either sell, manufacture, or mine talcum
21 powder or sell talcum powder products?
22         MR. SEA:  Objection; vague, compound.
23     A.  Are you talking about historically or within
24 a certain period of time to the present?
25     Q.  Sure, let me narrow that question to the last

Page 49

1  five years.
2      A.  No.
3      Q.  Okay.  Has your laboratory that you know of
4  received any compensation or grants from industry
5  groups that are -- that include or have as members
6  companies that sell talc or talcum powder products?
7      A.  In the last five years, again?
8          MR. SEA:  Objection; vague.
9      Q.  Yes, in the last five years.
10     A.  No.
11     Q.  Okay.  How about in the last ten years?
12     A.  No.  No new grants in the last ten years
13 supported by industry.
14         MR. SEA:  Objection; vague.
15     Q.  Okay.  How would you characterize the level
16 of certainty with which you opine that cleavage
17 fragments are not carcinogenic?
18         MR. SEA:  Objection; vague,
19     mischaracterizes.
20     A.  Yeah, I'm not sure what you mean by "level of
21 certainty."
22     Q.  Okay.  When you opine that cleavage fragments
23 are not carcinogenic, I mean how certain are you of
24 that opinion?
25     A.  Quite certain based on my review of the

Page 50

1  scientific literature and my own studies.
2     Q.  Okay.  Dr. Mossman, could you estimate the
3  number of hours that you've spent on this matter thus
4  far?
5     A.  Only the time in this deposition and perhaps
6  an hour total prior to this deposition.
7     Q.  Okay.  And what did the hour prior to the
8  deposition include?
9     A.  It included reading the original complaint,
10 setting up the file, and talking with attorneys about
11 the logistics of the deposition.
12    Q.  Okay.  So to clarify, you have reviewed the
13 complaint that the Plaintiff filed in this matter?
14    A.  I did when it was first filed, yes.
15    Q.  Okay.  And who were the attorneys with whom
16 which you spoke in preparation for this deposition?
17    A.  Mr. Sea, Mr. Norris, and I believe Patricia
18 Alberts was on the line as well.
19    Q.  And did any of these three attorneys provide
20 you with any documents or show you any documents as
21 part of your preparation?
22    A.  No.
23        MR. LITTLE:  Okay.  That's all the
24    questions I have for today.  Are there any other
25    questions from the Defendants?

Page 51

1        MR. SEA:  Yeah, I just want to clear a
2    few things up with respect to an earlier question
3    that you asked.
4             EXAMINATION
5  BY MR. SEA:
6     Q.  Dr. Mossman -- Dr. Mossman, you were asked
7  earlier about the -- well, strike that.  Let me start
8  over.
9        Counsel for Plaintiffs asked you about
10 cleavage fragments and compared them to the definition
11 of a fiber from the World Health Organization; do you
12 remember that?
13    A.  I do.
14    Q.  And he was asking whether you agreed that a
15 cleavage fragment with the same dimensions of a fiber
16 as defined by the World Health Organization was less
17 carcinogenic; do you remember that?
18    A.  Correct.
19    Q.  And you noted that you did not agree with
20 that, correct?
21    A.  Correct.
22    Q.  Can you explain why?
23    A.  Yes, because cleavage fragments, by
24 definition, are not of the same dimensions as asbestos
25 fibers as they are -- the ones as long as, let's say,

Page 52

1  and comparable asbestos fibers are not only thicker,
2  and it's rarely that cleavage fragments of greater than
3  5 or 10 microns have a narrow diameter.  They don't by
4  definition.  So I couldn't agree with that statement.
5        MR. SEA:  Thank you, Dr. Mossman.  That's
6    all I have.
7        MR. LITTLE:  Nothing further from me.
8    Any other questions from any of the folks on the
9    phone or in person?
10       MR. NORRIS:  No, nothing from Imerys.
11       THE REPORTER:  Could you just please put
12   your transcript order on the record?
13       MR. SEA:  This is Nexus for Johnson &
14   Johnson and Johnson & Johnson Consumer, Inc.  We
15   would like an expedited transcript, please, and a
16   scan of all the exhibits used for this deposition.
17   We would like a PDF and PTX form, condensed, and
18   noncondensed.
19       MR. NORRIS:  We just want an e-transcript
20   with exhibits, however they normally do it.  This
21   is Imerys.
22       MR. LITTLE:  Yeah, and Plaintiffs would
23   like an e-transcript with exhibits as well.  I
24   assume that comes in PDF format?
25       THE REPORTER:  PDF or PTX, whichever you

Page 53

1  prefer.
2        MR. LITTLE:  PDF, please.
3        (Whereupon, the deposition was concluded
4  at 3:06 p.m.)