# Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF NEW JERSEY
 3
 4      _____
                                       :
 5      IN RE:  JOHNSON & JOHNSON       :    MDL NO. 2592
        TALCUM POWDER PRODUCTS          :    16-2738 (FLW) (LGH)
 6      MARKETING, SALES PRACTICES      :
        AND PRODUCTS LIABILITY          :
 7      LITIGATION                      :
                                        :
 8      THIS DOCUMENT RELATES TO:       :
        ALL CASES                       :
 9                                      :
        _____
10
11                        Videotaped Deposition of
12                        MARK KREKELER, Ph.D.
13            Taken:      By the Defendants
                          Pursuant to Notice
14
              Date:       January 25, 2019
15
              Time:       Commencing at 9:16 a.m.
16
              Place:      Hampton Inn
17                        375 South College Avenue
                          Oxford, Ohio  45056
18
              Before:     Susan M. Gee, RMR, CRR
19                        Notary Public - State of Ohio
                                 and
20                        Melinda Sindiong, CLVS
21
22
23
24
25
```

Mark Krekeler, Ph.D.

---

## Page 2

1  APPEARANCES:
2
    On behalf of the Plaintiffs:
3
    BEASLEY ALLEN LAW FIRM
4   BY: P. LEIGH O'DELL, ESQ.
    BY: JENNIFER K. EMMEL, ESQ.
5   218 Commerce Street
    Montgomery, Alabama  36103
6   (334) 269-2343
    leigh.odell@beasleyallen.com
7   jennifer.emmel@beasleyallen.com
8   MOTLEY RICE LLC
    BY: CARMEN SESSIONS SCOTT, ESQ.
9   28 Bridgeside Boulevard
    Mt. Pleasant, South Carolina  29464
10  (843) 216-9160
    cscott@motleyrice.com
11
    WILENTZ, GOLDMAN & SPITZER, P.A.
12  BY: DANIEL R. LAPINSKI, ESQ.
    90 Woodbridge Cener Drive
13  Suite 900
    Woodbridge, New Jersey  07095
14  (732) 865-6066
    dlapinski@wilentz.com
15
16  On behalf of Defendant Johnson & Johnson:
17  DRINKER BIDDLE & REATH LLP
    BY: JACK N. FROST, JR., ESQ.
18  600 Campus Drive
    Florham Park, New Jersey  07932
19  (873) 549-7338
    jack.frost@dbr.com
20
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM
21  BY: NINA R. ROSE, ESQ.
    1440 New York Avenue, N.W.
22  Washington, D.C.  20005
    (202) 371-7105
23  nina.rose@skadden.com
24
25

## Page 3

1  APPEARANCES:
2
    On behalf of Defendant Pharmatech:
3
    TUCKER ELLIS LLP
4   TARIQ M. NAEEM, ESQ.
    950 Main Avenue, Suite 1100
5   Cleveland, Ohio  44113
    (216) 696-3675
6   tariq.naeem@tuckerellis.com
7
    On behalf of Defendant Imerys Talc America,
8   Inc.:
9   GORDON & REES SCULLY MANSUKHANI, LLP
    BY: KENNETH J. FERGUSON, ESQ.
10  816 Congress Avenue
    Suite 1510
11  Austin, Texas  78701
    (512) 391-0197
12  kferguson@gordonrees.com
13  GORDON & REES SCULLY MANSUKHANI, LLP
    BY: ANDREW W. CARY, ESQ.
14  275 Battery Street
    Suite 2000
15  San Francisco, California  94111
    (415) 875-3163
16  acary@grsm.com
17
    On behalf of Personal Care Products Council:
18
    SEYFARTH SHAW LLP
19  BY: JAMES R. BILLINGS-KANG, ESQ.
    975 F Street, N.W.
20  Washington, D.C.  20004
    (202) 463-2400
21  jbillingskang@seyfarth.com
22      - - -
23
24
25

## Page 4

1            I N D E X
2
3  WITNESS:  MARK KREKELER, Ph.D.
4                         PAGE
5  CROSS-EXAMINATION
6     By Mr. Frost                8
7  CROSS-EXAMINATION
8     By Mr. Ferguson            283
9  EXAMINATION
10    By Ms. O'Dell              309
11 FURTHER CROSS-EXAMINATION
12    By Mr. Frost               327
13
14          E X H I B I T S
15 NUMBER      DESCRIPTION      PAGE
16   1   11/16/18 Rule 26 Expert Report of    13
         Mark Krekeler, Ph.D.
17   2   1/17/19 Rule 26 Addendum to the      13
         Expert Report of Mark Krekeler, Ph.D.
18
19   3   IRSST report R-755        82
20   4   IC 8757 Bureau of Mines Information  86
         Circular/1977
21   5   IARC Monographs on the Evaluation of 91
         Carcinogenic Risks to Humans, Vol. 93
22
23   6   U.S. Department of Health and Human  109
         Services Toxicological Profile for
         Asbestos 9/2001
24
25

## Page 5

1          E X H I B I T S
2  NUMBER      DESCRIPTION      PAGE
3   7   NIOSH Current Intelligence Bulletin 62  116
        Asbestos fibers and Other Elongate
4       Mineral Particles:  State of the Science
        and Roadmap for Research, Revised Edition
5   8   State of Montana, Bureau of Mines and   120
        Geology, Reconnaissance Geology of
6       Southernmost Ravalli County, Montana,
        by Richard B. Berg
7
8   9   International Geology Review, The       140
        Serpentine Multisystem Revisited:
9       Chrysotile is Metastable
10  10  Windsor Minerals, Inc.                  144
        Geology of the Talc Mine at East
11      Johnson, Vermont
        Bates JNJ000272469 - 668
12
13  11  Using the geologic setting              160
        of talc deposits as an indicator
14      of amphibole asbestos content by
        Bradley S. Van Gosen, et al.
15
16  12  Geology, Asbestos and Health by         160
        Malcolm Ross, December 1974
17  13  Letter from RJ Lee Group dated 5/16/16  161
        Bates JNJ 000521616 - 638
18
19  14  Krekeler Deposition Italian Documents   164
        Various Bates numbers
20  15  Department of the Interior Geological    174
        Survey Circular 95 - Talc
21      Investigations Vermont Preliminary
        Report
22
23  16  Talc Resources of the United States     177
        Geological Survey Bulletin 1167
24  17  Occupational Exposures to               182
        Non-Asbestiform Talc in Vermont
25

Page 6

```
          E X H I B I T S
NUMBER          DESCRIPTION          PAGE
 18    Preliminary Investigation of Cosmetic  188
       Talc Potential, Lungsheng Operations,
       Kwangsi, China
       Bates JNJNL61_000002060 - 89

 19    Sampling of Run-of-mine mill feed -    209
       A practical approach
       by Afewu and Lewis

 20    Email dated 10/31/13                   218
       Bates JNJ14T5_000005157 - 48
 21    Zuffar Days Symposium Held in Cagliari 236
       October 10 - 15, 1988
       Geology of the Italian high quality
       cosmetic talc from the Pinerolo district
       (Western Alps) by Sandrone and Zucchetti
 22    Krekeler Deposition Asbestos Documents 240
       Various Bates numbers

 23    An Introduction to the Rock-Forming     285
       Materials by Deer, Howie & Zussman
 24    The Mineral Industry of Italy by        288
       by Harold R. Newman

 25    Analysis of an Authentic Historical     289
       Italian Cosmetic Talc Sample - Further
       Evidence for he Lack of Cancer Risk

 26    Excerpt from the Deposition of Patrick  291
       Downey taken 11/8/17
 27    FDA Action Related to Talc              297
 28    USB Jump Drive                          331
 29    Color Photograph                        331
 30    Color Photograph                        331
                   - - -
```

Page 7

1    VIDEOGRAPHER:  We are now on the record.
2  My name is Melinda Sindiong, CLVS.  I'm
3  videographer for Golkow Litigation Services.
4  Today is January 25th, 2019.  The time is 9:16.
5  The video deposition is being held in Oxford,
6  Ohio, in the matter of Johnson & Johnson Talcum
7  Powder Products Marketing Sales Liability
8  Litigation.  This is for the United States
9  District Court of the District of New Jersey.
10  The deponent is Mark Krekeler, M.D.
11       Will counsel please identify yourselves
12  and the parties you represent?
13       MS. SCOTT:  My name is Carmen Scott.  I'm
14  with Motley Rice, for the plaintiffs.
15       MS. O'DELL:  Leigh O'Dell, Beasley Allen,
16  for the plaintiffs.
17       MS. EMMEL:  Jennifer Emmel, Beasley
18  Allen, for the plaintiffs.
19       MR. LAPINSKI:  Daniel Lapinski, Wilentz
20  law firm, for the plaintiffs.
21       MR. FROST:  Jack Frost, Drinker Biddle &
22  Reath, on behalf of Johnson & Johnson.
23       MS. ROSE:  Nina Rose, Skadden, Arps, on
24  behalf of Johnson & Johnson.
25       MR. FERGUSON:  Ken Ferguson, Gordon &

Page 8

1  Rees, for Imerys.
2       MR. CARY:  Andrew Cary, Gordon & Rees,
3  for Imerys.
4       MR. NAEEM:  Tariq Naeem, Tucker Ellis,
5  for the Pharmatech defendants.
6       MR. BILLINGS-KANG:  James Billings-Kang
7  for Personal Care Products Council.
8       VIDEOGRAPHER:  The court reporter is
9  Susan Gee, RMR and CRR, and will now swear in
10  the witness, and we can proceed.
11       MARK KREKELER, Ph.D.
12  of lawful age, a witness herein, being first duly sworn
13  as hereinafter certified, was examined and deposed as
14  follows:
15       CROSS-EXAMINATION
16  BY MR. FROST:
17    Q.   Good morning, Dr. Krekeler.  My name is
18  Jack Frost.  I'll be asking you probably the majority of
19  the questions today.
20    A.   Okay.
21    Q.   But before we get started, could you
22  please state your full name for the record?
23    A.   Mark Paul Spigg Krekeler.
24    Q.   And where do you currently work?
25    A.   I am an associate professor at Miami

Page 9

1  University.  I hold an appointment where my tenure is
2  held on the Oxford campus in the department of geology,
3  and my teaching the -- I work at the Hamilton campus as
4  well.
5    Q.   And just so the record is clear, Miami
6  University, there are two.  We're at the one in Ohio,
7  right?
8    A.   To my knowledge, there's only one Miami
9  University.
10    Q.   The other one's University of?
11    A.   Yes.
12    Q.   Okay.  All right.
13    A.   Miami was founded in 1809.
14    Q.   And have you ever been deposed before?
15    A.   No, I have not been deposed before.
16    Q.   Okay.  Have you ever testified before?
17    A.   No, I have not testified before.
18    Q.   All right.  Real quick, I'll go over some
19  ground rules.  I'm sure your counsel has told you this,
20  but the number one most important thing is everything
21  we're saying today is being written down by the court
22  reporter who's to my left.  So because of that, we have
23  to make sure we verbalize everything.  Uh-huh, huh-uh,
24  nods of the head, pointing, things like that don't show
25  up very well in written word.

**Page 10**

1    A.    Very good.
2    Q.    So we just need to make sure that, you
3  know, we're verbalizing everything.
4         Second thing is, and I guarantee we'll
5  get in trouble for this at some point.  It's very hard
6  for the court reporter to write down when both of us are
7  talking at the same time.  I'm not saying we're doing it
8  in a rude way but just normal human conversation.
9  Eventually, you'll pick up what the end of my question
10  is.  I'll pick up the end of your answer, and we'll just
11  start naturally talking over each other.  We've got to
12  be really careful about that, you know, make sure she
13  can write it down.
14         At some points during the deposition,
15  your counsel may object or other people in the room may
16  object.  Allow time to give counsel, you know, to put
17  their objections on.  Once they're done, unless you're
18  instructed otherwise by your counsel, you have to answer
19  my question.
20         The other thing is, if you answer my
21  question, I'm going to understand you assumed it or
22  understood it.  So if you don't understand what I'm
23  asking, you need clarification, let me know.  If there
24  is, you know, something you need for me to work out, I'd
25  rather work it out than have you answer something that,

**Page 11**

1  you know, you and I are talking at different places.
2         The only other thing, too, I don't want
3  you to guess here today, and if you're guessing or
4  making an estimate, just let us know.  And, you know,
5  but if it's a wild guess, I don't know, I don't
6  remember, those are perfectly fine answers.
7         And other than that, if you need a break
8  at any time, let us know.  If there's a question
9  pending, you've got to answer the question first, but
10  we're here on your schedule, so -- and we'll try to
11  break every hour, hour and a half or so, but if you need
12  to break in between, you know, just let us know, and
13  we'll stop.
14    A.    Can I ask a question?
15    Q.    Sure.
16    A.    So I've never done this before.  I've
17  never been deposed, and I noticed early on, when the
18  videographer was making some statements, that the
19  statements that I heard were not recorded accurately on
20  this.  So the word was "demotion."
21         MS. SCOTT:  You don't need to worry about
22  that.
23    A.    So but my question is, is if I go -- if I
24  use this to read your question, how do I know a word's
25  not -- how do we make sure that word is right?  Do we

**Page 12**

1  just say it again and agree on it or -- I'm unclear.
2  I've never done this before.
3  BY MR. FROST:
4    Q.    Sure.  So to the extent we can, just
5  listen to my question and answer the question, yeah, as
6  I've asked it.  What shows up on the screen is called
7  phonetic, so sometimes the words converted over by the
8  computer will be incorrect, and ultimately, when they
9  come and transfer it for the final transcript, it will
10  change.
11         So these are sort of there as a guide, if
12  we can't remember what we're talking about a couple
13  minutes ago, to look back.  But this is not the official
14  record.  The official record will be what's on the
15  video, and then, ultimately, what's in the transcript,
16  which might end up being a little different than what's
17  on the screen.
18    A.    Okay.  And because -- so a third party
19  would go and transcribe what's on the video?
20    Q.    So I'm not sure at the end, yeah.
21    A.    So if there's something garbled on here,
22  someone else does that?
23    Q.    Yes.  That's correct.
24    A.    So they don't come back to me or --
25    Q.    No.  You don't need to worry about that.

**Page 13**

1  That's done somewhere else.
2    A.    Okay.  Yeah.  I don't -- I don't know.
3    Q.    No.  That's okay.  It's a fair question.
4  But --
5         VIDEOGRAPHER:  Sorry.  If I can interject
6  as well, you're talking with your hands, and it
7  does get in the shot.
8         MR. FROST:  Oh, mine does?
9         VIDEOGRAPHER:  Yes.
10         THE WITNESS:  Okay.  Sorry.
11         VIDEOGRAPHER:  Thank you.
12         MR. FROST:  All right.  So if I can mark
13  a couple exhibits to begin.  I'll mark this as
14  Exhibit 1.
15         (Exhibit 1 was marked for
16         identification.)
17         MR. FROST:  I'll mark this as Exhibit 2.
18         THE WITNESS:  Does it matter which copy?
19         MS. SCOTT:  You can take a look at
20  whichever you're more comfortable with.  They're
21  the same.
22         MR. FROST:  I imagine they're the same,
23  right?
24         (Exhibit 2 was marked for
25         identification.)

Mark Krekeler, Ph.D.

Page 14

BY MR. FROST:

1 BY MR. FROST:
2     Q.   All right.  In front of you marked as
3 Exhibits 1 and 2 are your expert report that's dated
4 November 16th, 2018, and then Exhibit 2 is your
5 supplemental report dated January 17th, 2019; is that
6 correct?
7     A.   Yes.
8     Q.   Are these the only two reports that
9 you've written in this case?
10     A.   Yes.
11     Q.   Now, you understand you've been
12 designated by the plaintiffs in this case in the Johnson
13 & Johnson talc MDL?
14     A.   Yes.
15     Q.   Okay.  Can you explain to me what, or
16 define what your area of expertise is?
17     A.   Yes.  So my undergraduate degree was in
18 geology, and since my freshman year, I've been working
19 with clay materials and clay intervals.  My degree is
20 in -- my undergraduate degree is a bachelor's of science
21 in geology, and so that entailed field work.  And,
22 actually, I think since my freshman year, I've been
23 doing powder x-ray diffraction.  My master's was on,
24 also, a clay rich rock, bentonite, so -- and then in --
25 I finished that degree in '98.

Page 15

1     Then my Ph.D. was in mineralogy and
2 specifically phyllosilicate mineralogy and looking at
3 the impurities and materials associated with
4 phyllosilicates.  My dissertation was on
5 palygorskite-sepiolite minerals and smectite minerals.
6 My Ph.D. advisor was Steve Guggenheim, who essentially
7 is the North American expert in crystallography for
8 phyllosilicates.
9     And, then, so I finished that degree in
10 2003.  Throughout my degrees, I think my first
11 consulting job was a project with Amoco when I was an
12 undergrad doing x-ray diffraction, looking at clays from
13 Trinidad through my advisor, Warren Huff.  But through
14 that period of time, I did occasional consulting
15 projects, largely with powder x-ray diffraction and
16 sometimes electron microscopy.
17     Then I did not do a postdoc.  There were
18 two mineralogy positions available nationwide when I
19 graduated.  My graduation year was 2003.  I then got one
20 of those positions at George Mason University, and I was
21 hired in a department of environmental science and
22 policy.  And my research there, I was specifically
23 teaching mineralogy.  Then my research was centered
24 around mineralogy.
25     I produced a few patents relating to

Page 16

1 phyllosilicates as well.  And, basically, I worked with
2 industrial mineral materials, mine materials, and then
3 my time at Miami University, I've also worked with
4 synthetic minerals and natural minerals.
5     So my training as a Ph.D. student was to
6 look at the phyllosilicate minerals as a whole.  So
7 mineralogy has evolved significantly in that we think of
8 minerals as sort of a system, and we look at things at
9 how they're interrelated.  And that's -- so, basically,
10 I've had some -- my degree is in geotechnical
11 engineering and environmental earth science, so I have a
12 few engineering classes.  And then I've collaborated and
13 worked with several mineral companies.  My Ph.D. was
14 sponsored by a mineral company, in part.
15     Q.   So long story short, would you define
16 your area of expertise as mineralogy?
17     A.   Yes.
18     Q.   Okay.  And the two reports in front of
19 you, do those reflect all the opinions you plan to give
20 in this case or intend to give in this case?
21     A.   Well, again, I'm legally not familiar
22 with the process, but I think I -- currently, this is my
23 opinions.  If something new comes up and I'm asked, I
24 would...
25     Q.   Okay.  I guess a better way to ask that

Page 17

1 question --
2     A.   Sorry.  I'm unclear.  I'm not familiar.
3     Q.   Yeah.  That's okay.  As we sit here
4 today, do you intend to offer any opinions in this case
5 that aren't reflected in either of these two reports?
6     A.   No.  The reports are what I am using.
7     Q.   And were you asked to render any reports
8 by your counsel that you did not or are not included in
9 those reports?
10     MS. SCOTT:  Objection.  You can answer.
11 BY MR. FROST:
12     Q.   You can answer.
13     A.   Oh, I can answer?  So, if I remember
14 correctly, with the deposition notice, it was requested
15 that reports or documents I prepared relating to, I
16 think, all talc cases were requested.  So there's one
17 report that I gave to them from another case that I'm
18 involved in.
19     Q.   Okay.  So you're currently involved in
20 another talc case or is this an older case?
21     A.   This is a current case.
22     Q.   And it's a talc case?
23     A.   It is a talc-related case, yes.
24     Q.   Is it a case against Johnson & Johnson?
25     A.   I believe it's a case against Imerys.

Mark Krekeler, Ph.D.

Page 18

```
1      Q.    Against Imerys?  Do you know what the
2  case is called or where it's venued?
3      A.    I don't remember offhand.  The law firm
4  is Waters & Kraus.
5      Q.    That's who retained you?
6      A.    Yes.
7      Q.    Do you know what state it's in?
8      A.    The law firm is in Texas.  I think the
9  case is in Texas.
10     Q.    And what have you been asked to do in
11 that case?
12           MS. SCOTT:  I'm going to object to the
13     extent that I'm not aware of what his role is in
14     that case.
15           MR. FROST:  Sure.
16           MS. SCOTT:  And I'm not sure he knows
17     what's going on and, you know, the extent of
18     the -- whether he's been disclosed in that case
19     or not.
20           MR. FROST:  Okay.
21           MS. SCOTT:  So I'm going to object to any
22     questions on that.
23           MR. FROST:  All right.  We'll reserve our
24     right to come back.
25           MS. SCOTT:  Sure.
```

Page 19

```
1  BY MR. FROST:
2      Q.    Have you brought that report that you
3  drafted in that case with you today?
4      A.    I don't know.
5      Q.    Okay.  Did you bring anything with you --
6  I'll start.  So there seems to be a table of stuff next
7  to you.  Is that a fair way to describe that?
8      A.    Yes.
9      Q.    And what, generally, is that stuff?  Like
10 what's in the binders and things like that?
11     A.    So, generally, those are documents that
12 were provided when I requested them, and those documents
13 are from the companies.
14     Q.    Are those all the documents that are
15 listed in your materials-relied-upon list at the end of
16 your report?
17     A.    Yes.
18     Q.    Is there anything in those binders that
19 isn't otherwise reflected on the list in your reports?
20     A.    I'm sorry?
21     Q.    I can reask it if it's easier.
22     A.    Is there anything in those binders that
23 isn't otherwise reflected on the list?  I have books
24 that are also included in the report.
25     Q.    Okay.  Those are the various books you
```

Page 20

```
1  cite throughout the report?
2      A.    Yes.
3      Q.    The piece of literature, things like
4  that?
5      A.    Yes.
6      Q.    Okay.  Other than documents, books,
7  literature, et cetera, that are already included in your
8  report, have you brought anything else with you today?
9      A.    No.  I believe just what is in the
10 report.
11     Q.    Okay.  We're also going to probably send
12 a request for, you know, a copy of the report written on
13 the other case as well.  It seems like it was turned
14 over to counsel.
15           MS. O'DELL:  No.  You misunderstood.
16     It's not been turned over to counsel.
17           MR. FROST:  It hasn't been turned over to
18     you guys.
19           MS. O'DELL:  We don't have any
20     information about that case.
21           MR. FROST:  Oh, okay.
22           MS. O'DELL:  Yeah.  So if you have any
23     questions about that, you need to talk to Waters
24     & Kraus or whoever else is involved.
25
```

Page 21

```
1  BY MR. FROST:
2      Q.    So before, when you said you'd given the
3  report to counsel, you're talking about Waters & Kraus,
4  not --
5      A.    I don't recall specifics.
6      Q.    All right.  Have you turned that report
7  at all over to any of your attorneys who are here today
8  or anybody who works for them, their law firms, if you
9  can recall?
10     A.    I don't remember specifics.
11     Q.    Okay.  Do you recall when you were
12 retained in that case?
13     A.    In the other case?
14     Q.    Yes.
15     A.    It was about the same time as this case.
16     Q.    Do you recall when that was?
17     A.    Basically, I want to say it was towards
18 the end of December of 2017, but -- so that's when we
19 talked, and then I think it was like late January, maybe
20 February, when I actually started reviewing documents
21 for that case.
22     Q.    Have you generated any invoices for your
23 work in this case yet?
24     A.    I'm sorry.  Are you referring to --
25     Q.    For this, what we're here for today, the
```

Mark Krekeler, Ph.D.

Page 22

1  Johnson & Johnson MDL case.
2      A.    Yes. I'm up to date with invoices.
3      Q.    And did you bring any of those invoices
4  with you?
5          MS. SCOTT:  Counsel, those were provided
6      previously about a week ago by email.
7          MR. FROST:  All right.
8  BY MR. FROST:
9      Q.    But other than that, there's nothing, no
10 additional documents or invoices?
11     A.    Right.  There's no outstanding billing or
12 anything --
13     Q.    Yeah.
14     A.    -- like that.
15     Q.    Okay.
16     A.    Yeah.  We're all caught up.
17     Q.    All right.  Turning back to the reports
18 that are in front of you as Exhibits 1 or 2, are these
19 reports complete, as far as you're concerned?
20     A.    To the best of my knowledge, they're
21 complete, based on what I was provided to review.
22     Q.    And do you believe what's reflected in
23 those reports is accurate?
24     A.    I believe that my opinions are accurate.
25 The data as presented as findings are as they are

Page 23

1  interpreted by the company.  So when you say -- again,
2  I'm unexperienced.
3      Q.    Sure.
4      A.    So when you say "accurate," I don't think
5  some of the report, some of the findings are
6  scientifically accurate, based on the analytical
7  methods.  So...
8      Q.    Are you talking about some of your
9  findings?  I'm asking sort of what your ultimate
10 opinions and your findings in this case.  Do you believe
11 that what you've opined to in this case is accurate in
12 these reports?
13     A.    So is my opinion --
14     Q.    Yes.
15     A.    -- accurate?
16     Q.    Yes.
17     A.    Yes, I believe my opinion is accurate.
18     Q.    Is there anything, before we get started
19 going through those opinions, that you want to change or
20 amend?
21     A.    No.
22     Q.    And is it fair to say that, effectively,
23 the opinions you're rendering here are limited to review
24 of the geologic deposits utilized by Johnson & Johnson
25 and Imerys to create talcum powder?

Page 24

1      A.    Is it fair to say that, effectively, the
2  opinions you're rendering here are limited to review of
3  the geologic deposits utilized by Johnson & Johnson
4  and -- it's kind of garbled.
5      Q.    Yeah.  And Imerys.
6      A.    And to create talcum powder.  So, yes, I
7  reviewed those materials.
8      Q.    Okay.  And you're not here to opine about
9  anything outside of those geological deposits and the
10 mining practices, et cetera, that were going on at those
11 areas?
12         MS. SCOTT:  Objection.
13     A.    So the nature of mineralogy, as I alluded
14 to earlier, is very systematic, right?  So it's not the
15 same deposit.  It's not the same deposit, but there's
16 Caledonia.  New Caledonia is a terrain that has a lot of
17 talc in it, that has a lot of nickel in it, and so,
18 essentially, the geologic knowledge as a whole,
19 essentially, I'm relying on my educational base, my
20 research base, things like that.  So being aware of the
21 geology of talc and the mineralogy of talc, geochemistry
22 of talc through global settings is critical to evaluate
23 any subset of data relating to talc and associated
24 rocks.
25

Page 25

1  BY MR. FROST:
2      Q.    I'll ask it a sort of different way.
3  I'll break it down.  You didn't do any testing here of
4  any product, right?
5      A.    I was not asked to do any testing.
6      Q.    Okay.  And you're not going to render any
7  opinions about what causes disease, anything of that
8  nature?
9      A.    Correct.  I am not a medical expert.  I
10 am not an environmental health expert.
11     Q.    And you're not going to render any
12 opinions about what level of exposure to any particular
13 metal or contaminate can cause disease?
14     A.    Again, I would defer for details to
15 environmental health experts and medical experts.
16     Q.    You're not going to render any opinion
17 that use of Johnson & Johnson talcum powder causes
18 ovarian cancer, right?
19     A.    So I'm sorry.  I am not an expert in the
20 molecular mechanisms of carcinogenicity, if I said that
21 correct.  I don't know.  I'm not a medical person.  So,
22 no.
23     Q.    All right.  Looking at Exhibit 2, which
24 is the addendum report, why did you draft this addendum?
25     A.    New materials became available.

Mark Krekeler, Ph.D.

Page 26

1    Q.    When were you asked to draft the
2 addendum?
3    A.    I think when Longo had his supplemental,
4 and then I can't remember exactly when, but what really
5 caught my eye was this testing where they used
6 .1 milligrams of a sample, and that's not representative
7 in any way, and then they use a silver membrane.
8    Q.    I'll stop you here, because we'll be here
9 for a very long time.
10   A.    Okay.
11   Q.    So the question was:  When were you asked
12 to draft the report?
13   A.    I'm sorry.  I'm sorry.  You're right.  I
14 got distracted.  It was in January sometime.
15   Q.    And if you look at the second paragraph
16 of the report, it states, "After I submitted my
17 preliminary report on November 16, 2018, I reviewed
18 additional documents provided by Johnson & Johnson and
19 Imerys through the course of this litigation as well as
20 documents produced after submitting my report."  Is that
21 correct?
22   A.    Yes.
23   Q.    If you turn to pages 4 -- I'm sorry, page
24 5 of the report.  You list the supplemental materials
25 and data considered?

Page 27

1    A.    Yes.
2    Q.    Am I also correct, you only list Imerys
3 documents as the additional materials reviewed?
4    A.    Yes.
5    Q.    Okay.  So you, in fact, did not actually
6 review any additional Johnson & Johnson documents to
7 create this addendum; is that correct?
8        MS. SCOTT:  Objection.
9    A.    I don't remember specifically.  That may
10 be a typo.  I think I -- I think it's likely that I
11 looked at some Johnson & Johnson documents but only
12 ended up focusing on these others.
13 BY MR. FROST:
14   Q.    Do you know what additional Johnson &
15 Johnson documents --
16   A.    I don't.  I don't remember.
17   Q.    Okay.  And I take it because they didn't
18 make it into the report, it's not something you're
19 relying on?
20        MS. SCOTT:  Objection.
21   A.    I don't know.
22 BY MR. FROST:
23   Q.    Are there any other typos --
24   A.    So I think --
25   Q.    Go ahead.

Page 28

1    A.    I might have been confused with the Longo
2 title.  It says, "Analysis of Johnson & Johnson's
3 historical product," so that might be the source of
4 the...
5    Q.    Do you know if there are anything else or
6 any other changes that you'd like to make to either the
7 supplemental or the original report?
8        MS. SCOTT:  Objection.  Asked and
9 answered.
10 BY MR. FROST:
11   Q.    You can answer.
12   A.    Do I --
13   Q.    Yeah.  Do you know if there are any other
14 typos or anything else you'd want to correct in either
15 of the two reports?
16   A.    I think there are a few typos in the
17 report, or I'm, you know, I'm not perfect so...
18   Q.    We talked about, sort of, what's in the
19 binders over there and in the tubs.  We'll start with
20 the binders, which are the documents.  Did plaintiffs'
21 counsel provide all of the documents you relied on from
22 both Imerys and Johnson & Johnson in this case?
23        MS. SCOTT:  Objection.
24   A.    I requested documents from the lawyers to
25 review.

Page 29

1 BY MR. FROST:
2    Q.    What did you request from the lawyers?
3    A.    I requested any documents relating to the
4 mineralogy, the geology, things such as coring, x-ray
5 diffraction, bulk chemical tests, electron microscopy,
6 anything relating to, essentially, problems in
7 manufacturing or things that are related to how well
8 audits, for example -- audits would be a good example of
9 something that would be a third-party objective thing,
10 and I think there's, you know, there's an audit in here,
11 and any, any materials that would give sort of a big,
12 big picture of the situation at hand.
13   Q.    Did you ever ask to have access to all
14 the documents so you could perform searches yourself?
15   A.    I don't remember.  I remember I reviewed
16 a lot of, a lot of documents, but I don't remember if I
17 specifically asked that.  I asked for things relating to
18 what I just said.
19   Q.    Did you ever run any searches against any
20 documents to see if there's anything additional to what
21 was provided to you?
22        MS. SCOTT:  Object to form.  You can
23 answer.
24   A.    What do you mean by "search"?  So I
25 don't -- it was my understanding that -- so this is sort

Mark Krekeler, Ph.D.

Page 30

1  of a closed system that, essentially, there's the
2  documents that the company produces.  If I were to
3  search for something else, I don't necessarily know if
4  that's from the company, right, or that's my thought.
5  So I did not -- I didn't do any additional searches.
6  BY MR. FROST:
7      Q.    So you just relied on the documents as
8  provided to you by plaintiffs' counsel?
9      A.    Yes.
10         MS. SCOTT:  Objection.
11     A.    For these, for the documents that were
12  used.
13  BY MR. FROST:
14     Q.    And you have no way of knowing whether or
15  not they've given you a complete set of every document,
16  correct, that hits the categories you asked for?
17         MS. SCOTT:  Objection.
18     A.    I think it's very representative of a
19  set.  But, I mean, as I understand, there's, you know,
20  an enormous amount of data, as there should be, and that
21  is -- that would be expected, but, you know, I've
22  reviewed what was requested.
23  BY MR. FROST:
24     Q.    You reviewed what was provided, not what
25  was requested, correct?

Page 31

1      A.    What was provided that I requested from
2  them.
3      Q.    And you don't know whether or not -- you
4  have no way of telling, sitting here, whether or not
5  you've been given the complete record, correct?
6         MS. SCOTT:  Objection.  Asked and
7      answered.  You can answer if you can.
8      A.    I think it's, I think it's very
9  representative.  So I found examples where asbestos and
10  contaminate -- essentially where asbestos was
11  undetected.  You know, I looked at a wide variety of
12  things.
13  BY MR. FROST:
14     Q.    But you would agree with me it's a
15  representative set as chosen to be given to you by your
16  counsel?
17         MS. SCOTT:  Objection.
18     A.    I think it's representative.
19  BY MR. FROST:
20     Q.    You have no way of knowing what else
21  might exist, correct?
22         MS. SCOTT:  Objection.  Asked and
23      answered.  You can answer.
24     A.    So, yeah, there could be more bad reports
25  out there.  There could be more good reports out there.

Page 32

1  There's a lot of data, as I understand it.  I don't
2  think it's reasonable to review every document.
3  Unfortunately, I'm one person, and if there's hundreds
4  of thousands of pages of documents, yeah, I don't think
5  any single person can review those in a reasonable
6  manner.
7  BY MR. FROST:
8      Q.    So you don't think it's important, as an
9  expert giving opinions about the overall mining and
10  sampling and testing practices of Johnson & Johnson, to
11  have looked at or at least had access to the complete
12  set of documents?
13         MS. SCOTT:  Objection.
14     A.    I think it's important to have a
15  representative set, and that representative -- you know,
16  so -- you know, I didn't look at one document.  I didn't
17  look at a few documents.  You know, here's Hopkins'
18  deposition, for example.  There's all kinds of documents
19  in that.  There's a lot.  There is a lot, but it's my
20  expert opinion that the amount of documents that I
21  reviewed were adequate to arrive at my conclusions.
22  BY MR. FROST:
23     Q.    And, again, that's solely based on the
24  set of documents that was compiled for you by
25  plaintiffs' counsel in this case given to you, which you

Page 33

1  don't know is complete or not, correct?
2         MS. SCOTT:  Objection.
3      A.    I believe it is a representative set of
4  documents, but I did rely on what they provided as
5  that's what I requested.  I requested the documents, as
6  I previously indicated in the answer.
7  BY MR. FROST:
8      Q.    So you keep calling this a representative
9  set, but how can you make a determination if a set is
10  representative if you hadn't actually looked at or had
11  access to the full set of documents?
12         MS. SCOTT:  Objection.
13     A.    It's my expert opinion that's a -- it's a
14  reasonable amount of documents.  There's, you know --
15  BY MR. FROST:
16     Q.    So you're basing the representativeness
17  off of the sheer size of the pile of documents on the
18  table?
19         MS. SCOTT:  Objection.
20     A.    It's what I think is a representative
21  population of documents.  I mean, there's -- there are a
22  lot of documents, but I've -- and I've looked at a lot
23  of documents, and I've arrived at my professional
24  opinion based on the review of those documents.
25

Mark Krekeler, Ph.D.

Page 34

1  BY MR. FROST:
2       Q.    Would it change your opinion --
3       A.    I can't ask a question, right?
4       Q.    No.
5       A.    Okay.  All right.  Yeah.
6       Q.    Would it change your opinion if you knew
7  that the set of documents provided to you by plaintiffs'
8  counsel only represents a portion of the story and there
9  are hundreds and possibly thousands of additional
10  documents that weren't provided to you by counsel?
11           MS. SCOTT:  Objection.
12       A.    So those documents would not negate the
13  findings of the report.  So, for example, if there was
14  an additional document that said talc was undetected, it
15  wouldn't negate the findings of the materials starting
16  on page 14.
17  BY MR. FROST:
18       Q.    Well, that's -- I'm glad you brought that
19  up, because we'll get to those at the end of the
20  deposition, because I think you were actually not
21  provided some very important documents regarding that
22  chart, but we'll turn back to that later when we start
23  going through the report.
24       A.    Okay.
25       Q.    But it wouldn't change your opinion at

Page 35

1  all to know that you were only given a selection of
2  documents that supported plaintiffs' theories in this
3  case?
4           MS. SCOTT:  Objection.  Asked and
5       answered.
6       A.    No.  My opinion remains unchanged.
7  BY MR. FROST:
8       Q.    And, again, it wouldn't change your
9  opinion if you knew that there are documents that
10  specifically refute some of the findings that you've
11  relied on in these reports?
12           MS. SCOTT:  Objection.
13       A.    Again, my opinion remains unchanged.  The
14  data present demonstrates that there was asbestos
15  materials and metals materials.
16  BY MR. FROST:
17       Q.    Have you reviewed any reports from other
18  experts in this case?
19       A.    Yes.
20       Q.    We know you reviewed Longo.  You
21  mentioned that in the report.  Anybody else other than
22  Dr. Longo?
23       A.    Not -- let me look here.  So the expert
24  reports are listed on page 97, and there are four of
25  those.  And then the expert report, there's one listed

Page 36

1  on page 5 of the shorter document.
2       Q.    Okay.  And these are all Longo expert
3  reports, correct, Longo testing reports?
4       A.    Yes.
5       Q.    Did you ever see any draft reports from
6  any other experts in these cases before you finished
7  yours?
8       A.    No, I did not.
9       Q.    Have you reviewed any other expert
10  reports given in any talcum powder cases other than this
11  one?  You know, for example, were you provided any
12  expert reports from other cases against Johnson &
13  Johnson?
14       A.    I'm trying to think about the other case
15  for a moment.  I don't remember.
16       Q.    And have you reviewed any deposition or
17  trial transcripts in either preparation of your report
18  or to prepare for today's deposition?
19       A.    Yes.
20       Q.    What depositions have you reviewed?
21       A.    Hopkins.
22       Q.    I guess I'll ask it a different way.
23  Other than the ones that are already reflected in your
24  report, have you reviewed any depositions of any other
25  experts in talcum powder cases, any other, you know,

Page 37

1  other than --
2       A.    Not that I remember.
3       Q.    -- Dr. Downey, Dr. Hopkins?
4       A.    I don't remember.
5           THE WITNESS:  Can we take a little break?
6           MR. FROST:  Sure.
7           VIDEOGRAPHER:  We're now going off
8  record.  The time is 9:53.
9           (A recess was taken from 9:53 to 10:04.)
10           VIDEOGRAPHER:  We are now back on record
11  and the time is 10:04.
12  BY MR. FROST:
13       Q.    All right.  Before going on the break, we
14  talked about whether or not you'd read any depositions
15  of any other experts in these cases.  Has plaintiffs'
16  counsel ever discussed with you the testimony of any
17  other experts in these cases?
18           MS. SCOTT:  Objection.
19           MS. O'DELL:  I would instruct the
20  witness -- I'm sorry.  Instruct the witness not
21  to discuss anything that's been discussed or
22  communicated with plaintiffs' counsel.
23           MR. FROST:  Let's mark the record.  I
24  disagree with that assumption because, you know,
25  I believe any discussion of depositions in these

Page 38

1    cases is discoverable under the federal rules,
2    but I'll move on.  All right.
3 BY MR. FROST:
4    Q.    Was there anything you asked plaintiffs'
5 counsel to provide for you in this case to help prepare
6 your reports that you were not given?
7    A.    I'm sorry.  Can you just say that again?
8    Q.    Sure.  Was there anything you asked
9 plaintiffs' counsel to provide you in preparation of
10 your report that you were not given or you didn't
11 receive?
12    A.    No.  I believe they gave me
13 representative materials of what I requested.  I'm not
14 sure, but I also have the materials that I rely on.  So
15 like the, you know, reviews in mineralogy books and
16 things like that are in the reliance list, but I
17 acquired those.  They did not produce those.
18    Q.    Okay.  That was actually my next question
19 is that the stuff that's under your reliance material
20 list, is that things that you independently found
21 yourself or that were provided to you by counsel?
22    A.    Yeah, yeah.  Those are things I found.
23    Q.    Were any of the articles --
24    A.    Those --
25    Q.    I'm sorry?

Page 39

1    A.    Those are things I found on my own.  You
2 know, many of the books I -- some I just had on my
3 shelf, you know.  I've actually gone through three
4 versions of some of them.
5    Q.    So were any of the reports, treatises,
6 books, et cetera, you relied on provided to you by
7 plaintiffs' counsel?
8    A.    No, I don't think so.
9    Q.    Did anybody help you prepare the report?
10    A.    I asked counsel to create the charts that
11 are in the report, and this was my first time doing such
12 an extensive report.  So I asked about organizational
13 issues, things like that.
14    Q.    What about other than the charts that
15 appear in the report?  Did counsel assist you with any
16 of the other -- the word just escaped my mind.  I
17 apologize.
18    A.    Text?
19    Q.    Any of the other, sort of principle of
20 research or any of the other opinions that are in the
21 paper?
22          MS. SCOTT:  Objection.
23    A.    No.
24 BY MR. FROST:
25    Q.    And did you have any hand at editing the

Page 40

1 reports or were they just provided to you and then you
2 included them in your final opinion paper?
3    A.    The chart?
4          MS. SCOTT:  Objection.
5 BY MR. FROST:
6    Q.    That was a bad question.  Did you do any
7 editing of the charts that were included in the final
8 report or did you just put them in as provided by
9 counsel?
10    A.    I directed them to put them in.
11    Q.    So plaintiffs' counsel ultimately put it
12 into the report the way it's structured?
13          MS. SCOTT:  Objection.
14    A.    I indicated the documents to be included
15 in the table, and they put it in the table.
16 BY MR. FROST:
17    Q.    Is that true for all of the tables or did
18 they produce -- did they provide some of the content of
19 the tables as well?
20          MS. SCOTT:  Objection.
21    A.    I'd have to look to refresh.
22 BY MR. FROST:
23    Q.    That's okay.  Take your time.
24    A.    I'm already a little tired.  That table,
25 I requested them to do.  And that table.  Sorry.  I'm

Page 41

1 new at this, a little bit nervous.  So I directed them
2 to put those tables in.
3    Q.    Okay.  Did you direct them to -- I'll
4 strike that.
5          So the actual documents that are
6 reflected in the tables, was that your work that you --
7    A.    Those are documents I reviewed, yes.
8    Q.    Okay.  And you're the one who put
9 together the list of documents for them ultimately to
10 put in table form to include in the report?
11          MS. SCOTT:  Objection.  Asked and
12 answered.
13    A.    Ultimately, I selected the documents,
14 told them to put them in.
15 BY MR. FROST:
16    Q.    In forming your opinions to this report,
17 did you have to come to any -- did you have to make any
18 assumptions that you relied on, then, for your ultimate
19 opinions?
20          MS. SCOTT:  Objection.
21    A.    That's kind of a tricky question.  I
22 assumed that the documents provided by the company were
23 genuine.
24 BY MR. FROST:
25    Q.    Okay.  Any other assumptions you had to

Mark Krekeler, Ph.D.

Page 42

1 make to reach your opinions?
2      A.    I'm just thinking.  I -- I don't think
3 so.  I -- I assume that documents that I reviewed were
4 genuine, I guess, is maybe the best way to express that.
5      Q.    And by "genuine," do you mean, you know,
6 part of the actual documents accompanied?
7      A.    They weren't altered in some way or --
8      Q.    Okay.  Yep.
9      A.    Sometimes it was, you know, there were --
10 so, for example, the SEM document in this report and,
11 actually, other things, the images were extremely
12 degraded.  It appeared that several documents had been
13 photocopied, so one could supplant things.  You know,
14 again, I don't know, so that's why I say that I assume
15 things are genuine.
16     Q.    Okay.  I think we're on the same page
17 about what "genuine" means.  I just wanted to make sure.
18     A.    Yeah.
19     Q.    All right.  And do you agree with me that
20 in forming your opinions, it's important for you to keep
21 a fair and open mind and look at the data in an
22 impartial way?
23           MS. SCOTT:  Objection.
24     A.    I believe it's important to look at data,
25 yes.

Page 43

1 BY MR. FROST:
2      Q.    Do you believe it's important to look at
3 it in an impartial way?
4           MS. SCOTT:  Objection.
5      A.    I did look at things impartially, yes.
6 BY MR. FROST:
7      Q.    Coming in to your review of the
8 documents, were you told what plaintiffs' liability
9 theories were in this case?
10          MS. SCOTT:  Objection.
11     A.    I don't know what that word means.
12 BY MR. FROST:
13     Q.    Sure.
14     A.    What's plaintiff liability theory?
15     Q.    Yeah.  I'll ask it a different way.
16     A.    Okay.
17     Q.    Before you were coming in to review the
18 documents, were you told by plaintiffs, ultimately, what
19 an opinion or what type of opinion they were looking
20 for?
21          MS. SCOTT:  Objection.
22     A.    No, not really.  I mean, in our early
23 discussions, my job was to evaluate the data, so -- and
24 I feel I've done that objectively.  I knew it was
25 connected to a case involving ovarian cancer, but my

Page 44

1 role was to be objective.  And I reviewed several
2 documents, you know, numerous, numerous, numerous
3 documents objectively.
4 BY MR. FROST:
5      Q.    And did you know what role the counsel
6 who engaged you had?  Did you know that you were
7 representing the plaintiffs versus the company?
8      A.    I'm sorry.  I missed a word.
9      Q.    Did you know what role you were hired to
10 do?
11     A.    I knew they were on the side of the
12 plaintiffs, yes.
13     Q.    And you knew that, ultimately, they were
14 looking for evidence of bad mining practices and
15 opinions regarding inadequate sampling, things of that
16 nature?
17          MS. SCOTT:  Objection.
18     A.    I think they -- it's my opinion that they
19 were looking for data to support their case in some way
20 and also evaluate, potentially, if there was not a case.
21 BY MR. FROST:
22     Q.    Do you believe there's any additional
23 data you need to see in order to fully evaluate the
24 mining practices and the sampling practices by the two
25 companies in this case?

Page 45

1           MS. SCOTT:  Objection.  Asked and
2     answered multiple times.
3      A.    I would consider looking at other data,
4 of course, but looking at that other data would not
5 change the opinions expressed in this report.  Other
6 data doesn't negate the fact that we have all these
7 occurrences of materials.  I mean, so there's over 90
8 occurrences documented or there's about 90 or so in the
9 one table of asbestos.  You know, it doesn't negate --
10 for me, fundamentally, it's using the powder x-ray
11 diffraction as the screening method that's fundamentally
12 flawed.  The reasons, you know, I don't want to -- do
13 you want me to --
14 BY MR. FROST:
15     Q.    We'll get to that.
16     A.    I can stop.
17     Q.    We'll turn to that later.
18     A.    Okay.  All right.  Good.
19     Q.    You said before you're not a medical
20 doctor, right?
21     A.    I'm sorry?  Medical doctor, no.
22     Q.    And you're not a toxicologist, right?
23     A.    Correct.
24     Q.    And do you consider yourself a regulatory
25 expert?

Mark Krekeler, Ph.D.

Page 46

1    A.   No.
2    Q.   And you're not an expert in regulatory
3  processes or mine regulations?
4    A.   No, I'm not an expert.
5    Q.   Before working on this report, have you
6  ever worked with talc before?
7    A.   In my class work, my advisor was Steve
8  Guggenheim, and, of course, Warren Huff was my master's
9  advisor.  So I had several clay mineralogy classes, and
10  we analyzed talc.  And my Ph.D. advisor specifically,
11  you know, he would tell me, go look at this mineral with
12  the TEM and x-ray, so I would know and be familiar with
13  things, so but I don't have a specific thing on talc.
14    Q.   So other than, you know, your use of it
15  in undergraduate and graduate and Ph.D. work, you know,
16  you've never studied talc, you've never published on
17  talc, anything like that?
18    A.   No.
19    Q.   Other than, you know, looking at it so
20  you'd be able to identify minerals, have you ever done
21  any examination or testing of talc?
22    A.   Other than just looking at it for -- as
23  far as learning the details of the mineral, no.
24    Q.   Have you ever been to a talc mine?
25    A.   Yes, in California.  There's this mine in

Page 47

1  Darwin.  So Darwin was this area in California on the
2  south side of Joshua Tree, and there's asbestos all over
3  the place, and the mine closed -- if I remember
4  correctly, the mine closed, like, in the '50s.  So it
5  might have been, you know, the mine that was -- where
6  things were sourced from when the Italian mines were not
7  around or, you know, the World War II era.
8         But, yeah, I went there with Brian
9  Currie, and we do a field trip to Death Valley and the
10  surrounding areas all the time.  So, yes, I've been to
11  at least that talc mine, and I've been on several --
12  I've been on field trips to, like, metamorphic terrains
13  in New England states, but I can't remember if I saw
14  talc there or not.  I have not physically been to the
15  Vermont mines, but, yes, I've been to a talc mine.
16    Q.   So you just made the statement that this
17  mine in Darwin, you know, may have been during World War
18  II, where they -- I'm looking at the thing -- where they
19  source talc from.  That's just a guess by you, correct?
20    A.   Correct.  As I said, it may have been.
21  But the region, as I understand thinking about that
22  field trip, you know, I may be foggy, but there's other
23  talc mines in the area.  But, yeah, there was asbestos
24  in that.
25    Q.   Okay.  But, again, I just want to clarify

Page 48

1  for the record, you don't know one way or the other
2  whether this mine --
3    A.   I don't know the exact source.
4    MS. SCOTT:  Be careful you don't talk
5  over one another.
6    THE WITNESS:  I'm sorry.
7    MS. SCOTT:  That's okay.
8    THE WITNESS:  I apologize.
9  BY MR. FROST:
10    Q.   And when you were at this mine in Darwin,
11  I take it there were no mine operations continuing at
12  the time you were visiting?
13    A.   I believe it would just be alum land.
14  But dealings and things were -- you know, I mean, things
15  were there.
16    Q.   And you can't tell me what type of talc
17  that was produced, whether it was industrial talc,
18  cosmetic talc or something else, right?
19    A.   Correct.  I don't know.  There's no
20  record.  We found it in a guidebook, thought it'd be a
21  good experience for the students.
22    Q.   And other than that visit, you've
23  certainly never been to a talc mine that is currently
24  undergoing operation, correct?
25    A.   Correct.

Page 49

1    Q.   Have you ever published anything
2  regarding amphiboles?
3    A.   I'm trying to think.  My master's thesis
4  had -- there were amphiboles in those bentonites.  Aside
5  from that, I don't think so, or if I did, it was not a
6  major component.  Not memorable.
7    Q.   And other than what you recall in your
8  thesis, you've never done any testing of amphiboles or
9  anything of that nature?
10    A.   I'm trying to -- well, I have nothing
11  published, but I have ran across -- so I've done -- you
12  know, I have several.  I have many projects with
13  students, and some of those projects, for example, I
14  think I -- there were minerals that I would identify in
15  the TEM as amphibole for the coke formation, which was
16  kind of unusual.  So the coke formation is a local
17  bedrock.
18    Q.   Okay.
19    A.   So but nothing -- nothing in the
20  peer-review literature, and I don't even know if it was
21  mentioned in the abstract.  I do remember occasionally
22  running across amphiboles.  It's amazing what you'll
23  find in the TEM.  There's all kind of crazy stuff if you
24  look for it.  Yeah.
25    Q.   And I think we covered this before, but

Mark Krekeler, Ph.D.

Page 50

1 you've never done any testing of talcum powder or
2 over-the-counter cosmetic products, right?
3      A.   No.
4      Q.   Before you were contacted by plaintiffs'
5 attorneys in -- it sounds like about December, give or
6 take, of 2017, had you ever done any research regarding
7 talc, talcum powder, anything of that nature?
8      A.   No.
9      Q.   And had you ever done any research prior
10 to being contacted about the mining practices at talc
11 mines or looking at the geological mine deposits?
12      A.   I'm sorry.  A research on, on talc
13 mining?
14      Q.   Exactly.  Talc-mining practices.
15      A.   Specifically?  No.
16      Q.   Okay.  Well, what about the geology of
17 the specific -- you know, did you ever look at the
18 specific geology of any talc mines prior to being
19 engaged in this case?
20      A.   I took a metamorphic course, and during
21 my master's, under Craig Dietsch, I remember we talked
22 about talc in that class.  So Craig is a metamorphic
23 petrologist.  So -- and then, you know, my -- I've read
24 papers.  I mean, all through my Ph.D., my advisor
25 hammered that I should read everything around the topic.

Page 51

1 So -- but I've not -- I haven't mapped a talc deposit,
2 for example.
3      Q.   So I guess the best way to put it, and
4 you can correct me if I'm wrong, but it sounds like
5 you've read papers about talc deposits and all other
6 types of deposits.
7      A.   That's in my training.
8      Q.   But you never did any specific research
9 narrowing down on talc deposits, specifically?
10      A.   Correct.  I have no peer-review
11 literature on talc.
12      Q.   Have you ever attended any conferences
13 that talk about talc mining or specific, you know, talc
14 mine geology?
15      A.   I've attended several clay minerals
16 society meetings periodically throughout my career.  I
17 haven't attended any in a few years.  I don't remember
18 their names, but, you know, I remember seeing some stuff
19 on talc, nothing specific.  I was always focused on
20 either the bentonites or palygorskite/sepiolite.
21      Q.   Okay.  So there might -- you know, these
22 various conferences, talc might have been a topic, but
23 it wasn't something you were there to concentrate on or
24 to talk about?
25      A.   Correct.

Page 52

1      Q.   And you certainly have never written any
2 opinions regarding talc, talc mining practices, you
3 know, et cetera, before getting engaged in this case and
4 the other case from Waters & Kraus, right?
5      A.   Correct.
6           MS. SCOTT:  Objection.
7 BY MR. FROST:
8      Q.   On your CV, I know you notice you have a
9 patent for something called asbestos containment
10 composition.
11      A.   Yes.
12      Q.   What is that?
13      A.   It's a mixture of clay minerals.
14      Q.   And what's the patent?
15      A.   Basically, it's a mixture of kaolinite
16 and montmorillonite, if I recall.  Essentially, it's one
17 we produced but didn't really pursue.  It was actually
18 my brother-in-law thought it would be a good idea.  So
19 but, yeah.
20      Q.   So it's patented but not in production or
21 use?
22      A.   Right.  And I don't regard patents as
23 peer-review literature.  Those are -- that's a
24 different.
25      Q.   Yeah.  I actually agree with you on that

Page 53

1 one.
2      A.   Yeah.
3      Q.   I was just -- I couldn't find the
4 patents, so I was wondering what it was.
5      A.   Oh, surprise.
6      Q.   All right.  If you want to open your
7 report to page -- it's Exhibit 1 in front of you.
8      A.   Okay.
9      Q.   To page 45.  Do you have a summary of the
10 opinions you're rendering in this case?
11      A.   Okay.
12      Q.   And in looking at one through five there,
13 are those the five opinions that you believe are
14 supported by the report?
15           MS. SCOTT:  Objection.
16      A.   Yeah, I believe these are, these are my
17 opinions.  That's the -- essentially, these are the
18 summary of those opinions.
19 BY MR. FROST:
20      Q.   Okay.  And these fairly reflect the
21 opinions you intend to offer in this case?  There's
22 nothing else that you can think of that you're going to
23 opine about?
24      A.   With respect to this report, correct.
25      Q.   And then I note in the addendum report,

## Page 54

1 there's not an additional opinion given.  I think the
2 report states that it supports the opinions given in the
3 preliminary report; is that correct?
4     A.    Let me look.
5     Q.    That's Exhibit 2.  I believe the quote is
6 that "it supports and further enhances my opinions
7 outlined in the original report"?
8     A.    Correct, yeah.
9     Q.    So you agree with me there are no new
10 opinions in the addendum report.  It's just additional
11 support for the five opinions you plan to render in this
12 case?
13     A.    There's no new opinions.  The silver --
14 there's new data, but, yeah, there's no new opinions.
15 It's the addendum supports the first.
16     Q.    And I take it you haven't published this
17 report or published these opinions anywhere, have you?
18     A.    Absolutely not.
19     Q.    Do you intend to publish them?
20     A.    No.
21     Q.    Do you intend to publish any of the
22 research you've done with relation to this report?
23     A.    No.
24     Q.    Did anybody help you do any of the, the
25 research underlying the report?

## Page 55

1     A.    No.
2     Q.    So all the opinions and all the analysis
3 in the original report and the addendum report, you
4 know, are all things that you've researched yourself and
5 are solely your opinion and your --
6     A.    Yep.
7     Q.    -- based on your work.  Okay.
8         So you have, I believe it's a couple
9 boxes, right, of stuff on the ground that are articles
10 and textbooks?  How did you actually go about selecting
11 the literature you were going to review in this case?
12     A.    The stuff outside?
13     Q.    Yes, the stuff outside the documents.
14     A.    So I was informed by, you know, really,
15 the core of my Ph.D.  So I had a class on crystal
16 chemistry and phyllosilicates, and basically, I was
17 expected to read and learn things.  And so my collection
18 of books is, in part, from that effort.  And then, also,
19 I teach classes regularly, so I'm familiar with the
20 books that I use in those classes and then, also, citing
21 things for research.
22         So I had a master's student who did a
23 thesis on New Caledonia, which has talc and asbestos and
24 other things.  So, essentially, you know, the Brinley
25 papers were an example of, you know, those came back up,

## Page 56

1 but I had read those during my dissertation time as
2 well.
3     Q.    Did you go --
4     A.    So I was -- I'm sorry.
5     Q.    I'm sorry.  I didn't mean to cut you off.
6 I thought you were done.
7     A.    So I'm familiar with a broad range of
8 literature.
9     Q.    Did you have to go out and do any
10 searches for new literature that you didn't already have
11 in your possession?
12     A.    We got some materials from -- or I got
13 some materials from the library, and there were some
14 things like Gy were things I knew of and Finkelstein
15 were things I knew of that had been discussed either in
16 my classes or I ran across it previously that I had to
17 go re-get.
18     Q.    Did you spend any time doing any, what
19 I'll call sort of new or independent research in
20 addition to things you've already done in the past to
21 prepare your report?
22     A.    I don't understand the question.  In the
23 sense that?
24     Q.    For example, did you spend any time in a
25 research library trying to find all the articles about

## Page 57

1 the different geological deposits at issue in this case?
2     A.    No.  My opinion, the knowledge set I had
3 generated over decades was appropriate reference point.
4 So I didn't, I didn't look at, you know, French
5 literature, Chinese or Russian literature, for example.
6     Q.    Do you agree with me that the standard
7 for rendering your opinions in peer-reviewed literature
8 is different than the standard for rendering opinions in
9 litigation cases?
10         MS. SCOTT:  Objection.
11     A.    That's a -- sort of a complex question.
12 Can I talk about?
13 BY MS. SCOTT:
14     Q.    Sure.
15     A.    So industrial mineral companies, margins
16 are not great.  So, basically, the profits are not
17 great.  So, you know, there's not -- well, I should back
18 up.  Industrial mineral companies, other mineral
19 companies, they rely on peer-review literature for their
20 analytical standards and practices.  So, essentially,
21 peer-review literature is kind of part of that.  They
22 don't -- mineral companies don't necessarily talk to
23 each other.  There are, like, societies, so there's a
24 clay mineral society.  I think there's a zeolite
25 society.  But the sort of industrial secrets or the

Mark Krekeler, Ph.D.

Page 58

1  details and methods, you know, everyone's afraid that
2  they're going to get ripped off from someone else.  So
3  peer-review literature is a sort of common ground that
4  everyone uses.
5      Q.    I guess I'll ask the question a different
6  way.
7      A.    Okay.
8      Q.    Because it was about, sort of, the
9  standard for opinions.  Do you believe that the standard
10 of review for an opinion, you know, such as in the
11 expert report you've given in this case, is the same or
12 different than the standard review if you were trying to
13 publish a peer-reviewed article on the same subject?
14         MS. SCOTT:  I'm going to object and ask
15     him not to speculate on your initial question in
16     any legal standards.
17     A.    Yeah.  I am -- as I -- I'm not familiar
18 with legal review.
19 BY MS. SCOTT:
20     Q.    Do you believe the -- when you were
21 writing the report, do you believe that the opinions in
22 this report, you know, would meet or be sufficient for
23 peer-review publication?
24         MS. SCOTT:  Objection.
25     A.    I don't want -- I'm not an editor.  I

Page 59

1  don't want to speculate.
2  BY MS. SCOTT:
3      Q.    That's fine.  Turning in to your report.
4  Start at page 2.  So you state that "Talc is a mineral
5  derived almost exclusively from metamorphic deposits,"
6  right?
7      A.    Correct.
8      Q.    You also agree with me that not all talc
9  forms through a metamorphic process, right?
10     A.    You can have soils developed on talc
11 deposits, so, yes.
12     Q.    Yes, you can have talc form --
13     A.    Developed on.  And then you can also have
14 potential hydrothermal alteration at mid-ocean ridges,
15 which is also a metamorphic.  It's hydrothermal
16 alteration.
17     Q.    You also state further down that the
18 process of metamorphism occurs over several tens of
19 millions of years.  Is that always the case?
20     A.    Generally, that's the case, you know, in
21 rocks where you have talc occurring, yes.
22     Q.    Do you think that's true for all talc
23 deposits that have formed?
24     A.    For, you know, the instances of mid-ocean
25 ridge, perhaps not, but, essentially, it's generally

Page 60

1  regarded that metamorphic rock, metamorphic terrains
2  take a long time to form.  So pressure temperature
3  loops, and this is well documented in the geologic
4  literature.  You know, it's in the classwork that I've
5  had.
6      Q.    Would you agree with me that some talc
7  deposits form -- you know, the formation of talc
8  deposits, some take a lot longer, some take a lot
9  shorter, depending upon the characteristics of the
10 formation?
11         MS. SCOTT:  Objection.
12     A.    I'm not gonna speculate without data.
13 But, you know, generally it's accepted that talc
14 deposits take several millions of years to form.
15 BY MR. FROST:
16     Q.    What's your basis of that opinion?
17     A.    My classwork.
18     Q.    Can you tell me what factors affect the
19 formation of talc, what the controlling factors of
20 metamorphism would be?
21     A.    Heat and pressure and fluids.
22     Q.    Would you agree with me that not all talc
23 is formed with the exact same amount of heat, pressure
24 and fluids in the mix?
25     A.    There is variability.

Page 61

1      Q.    Would you agree with me that not all talc
2  deposits are geologically the same?
3          MS. SCOTT:  Objection.
4      A.    I don't think any -- every rock and every
5  geologic deposit has its own history, so one of the big
6  things that's come out in mineralogy is mineralogical
7  evolution.  And Bob Hazen's paper talks about this, and
8  there's been several successive papers.  So based on
9  that, you know, every deposit has individual
10 characteristics, but there's general sort of groups or
11 classes.
12 BY MR. FROST:
13     Q.    And you'd agree with me that not every
14 mined deposit of talc is the same either, correct?
15     A.    It all depends on what you mean by "the
16 same."  You know, you can have things that are not the
17 same but very similar.
18     Q.    Sure.  But not every mined deposit is
19 going to be exactly the same chemically, geologically.
20 They're all going to form in different ways at different
21 times.  Would you agree with that?
22     A.    Unless they are geologically related.  So
23 you can have two parts.  You can have multiple deposits
24 in the same geologic terrain that form at approximately
25 the same time.  Other issues, I mean there's issues with

Mark Krekeler, Ph.D.

Page 62

1  geochronology, right?  So, you know, age range errors
2  can be plus or minus 10 million years.  So if you have a
3  age of a metamorphic deposit that is talc and the age is
4  plus or minus 20 million years, you know, based on the
5  available data, that's a reasonable, you know,
6  chronometric value.
7      Q.    Sure.  And based upon when it formed, how
8  it formed, the pressures, the temperatures, whether or
9  not there's variability of that would effect what other
10 minerals might be with the talc, right?
11     A.    Correct.
12     Q.    And also depending what surrounding rock
13 there is to the rock that changed to talc would also,
14 you know, affect what might be on the margins of a talc
15 deposit, for example?
16     A.    I'm sorry.  The last part of your
17 question?
18     Q.    Sure.  So depending what the surrounding
19 rock was to the rock that metamorphosed to talc would
20 also affect what you would see in the black wall, for
21 example, what you see at the boundaries for the talc,
22 right?
23     A.    It can, if there's a reaction or not, so
24 it's dependent upon the situation.
25     Q.    That's what I was going to stay.  It's

Page 63

1  variable, and it changes from deposit to deposit?  You
2  have to look specifically?
3      A.    That's why every deposit should be
4  evaluated with an appropriate core density and high
5  sampling density.
6      Q.    So in order to fully understand what's in
7  a particular talc deposit, you really do need to know
8  how it formed, what was with it when it formed, what's
9  around it, things like that, right?
10     A.    I'm sorry.  To understand a talc deposit?
11     Q.    Yes.
12     A.    At what level or what understanding, what
13 context?
14     Q.    To understand what specifically, you
15 know, is associated with that talc, what other minerals
16 might be associated with the talc, you really have to
17 look at the specific deposit, how it was formed, what
18 other constituent minerals were around it, things of
19 that nature, correct?
20     A.    Yes.  One should evaluate what is in the
21 deposit and what is adjacent to the deposit.
22     Q.    You also state on page 2, on the next
23 paragraph down, that "Talc can have, and commonly does
24 have, natural impurities."  And that's effectively what
25 we're talking about?

Page 64

1      A.    Yes, it does.
2      Q.    And that's effectively what we're talking
3  about here, is that it's the other minerals that were
4  around during the formation of the talc.  They may be in
5  the deposit, they may not, and they may be different
6  depending on deposits, right?
7          MS. SCOTT:  Objection.
8      A.    I'm sorry.  Can you --
9  BY MS. SCOTT:
10     Q.    Sure.  So you agree with me that not
11 every talc deposit is going to have the same exact
12 associated other minerals with talc, right?
13         MS. SCOTT:  Objection.
14     A.    It depends, because, I mean, you have --
15 so, in mineralogy, we have a term called "perigenesis."
16 So essentially, there are -- these common minerals are
17 associated with each other.  So out of context, for
18 example, galena and sphalerite are very commonly
19 associated with each other.
20         So, essentially, I think a more correct
21 way of saying things is that chrysotile asbestos and
22 talc are commonly associated with each other.  So
23 perhaps not all talc deposits have the same mineral
24 assemblage, but many of them do have very similar
25 mineral assemblages, and that's even when the chemistry

Page 65

1  varies.
2  BY MS. SCOTT:
3      Q.    And that's what I'm getting to, is just
4  because some minerals are associated with talc doesn't
5  mean that other mineral is going to be in every single
6  talc deposit in the world, right?
7          MS. SCOTT:  Objection.
8      A.    Correct, but that doesn't mean that's not
9  very common, either.
10 BY MR. FROST:
11     Q.    Sure.  But we're talking about -- you
12 agree with my statement that not every single talc
13 deposit in the world will have all of the same exact
14 accessory minerals associated with it, right?
15         MS. SCOTT:  Objection.  Calls for
16 speculation.
17     A.    Yeah.  I don't want to speculate on that.
18 BY MR. FROST:
19     Q.    It's not speculation.
20     A.    Because, you know, there's --
21     Q.    Isn't it science?
22     A.    You know, I go back to the New Caledonia
23 example.  It has talc, but not every talc deposit has
24 New Caledonia assemblages.
25     Q.    Okay.  So the answer to my question would

Mark Krekeler, Ph.D.

Page 66

1  be yes, right, that not every single talc deposit has
2  the exact same accessory minerals associated with it?
3          MS. SCOTT: Objection.
4      A.   Correct.
5  BY MR. FROST:
6      Q.   And you also agree with me that -- I'm
7  going to use the word, you know, "pure," to mean more
8  talc, but there are some talc deposits that are more
9  pure than other talc deposits. There's some talc
10  deposits that are comprised of more talc than others,
11  correct?
12          MS. SCOTT: Objection.
13      A.   It's -- so it's speculative. I don't
14  know exactly what you mean by "pure." So it's been
15  known, for example, that at the atomic level, you can
16  have intergrowths with chrysotile with talc. So, yeah.
17  I'm really not quite sure how to answer that question.
18  BY MR. FROST:
19      Q.   So you have no opinion that if I were to
20  go find a talc deposit over here and find one over here,
21  that one might have -- be comprised of more talc or have
22  a more pure metamorphism of the talc than another?
23          MS. SCOTT: Objection.
24      A.   Without any priority knowledge -- yeah.
25  I would want to -- to answer that question correctly,

Page 67

1  you need to analyze each individual deposit.
2  BY MR. FROST:
3      Q.   As an expert in geology, you can't tell
4  me that there are some deposits of talc in the world
5  that are more pure than others, that are more comprised
6  of talc than others?
7          MS. SCOTT: Objection.
8      A.   One would expect -- you know, so
9  materials are variable in percentages, but I don't think
10  it's reasonable just to declare -- I mean, it seems like
11  a -- perhaps I'm misinterpreting it, but it seems like
12  arbitrary setup or question. So the -- one cannot --
13  what I'm trying to say is one cannot predict the exact
14  impurities in any given deposit.
15          There are general -- using the
16  peer-reviewed literature and well documented, you know,
17  work of archives going back, for example, Hess, 1933,
18  you know, it is common and reasonable to know that
19  there's some, or very, very likely, asbestos materials
20  are associated with talc.
21          And so it is reasonable that -- it's a
22  reasonable, scientifically reasonable interpretation
23  that one would expect impurities of many types, but they
24  may not be the same. So we have examples where there's
25  tremolite, and there's examples where there's

Page 68

1  chrysotile.
2  BY MR. FROST:
3      Q.   So as an expert in geology, you can't
4  tell me as a fact, sitting here today, that there are
5  some talc deposits that are exist in the world that are
6  comprised of more talc than others?
7          MS. SCOTT: Objection. Asked and
8          answered.
9      A.   I think I answered that, yeah. There's
10  some that have a higher percentage of talc, but there's
11  impurities that also occur. So, you know, if you have
12  10 percent asbestos in one mine and 2 percent asbestos
13  in one and 30 percent in another, so, yes, that's,
14  that's possible.
15  BY MR. FROST:
16      Q.   I don't think you're understanding my
17  question. More fundamentally, don't you agree with me
18  some talc deposits are only made up of 20 percent talc
19  and are predominantly other minerals, as were other talc
20  deposits are made up of, for example, 50 or 60 percent
21  talc?
22      A.   So I'm unclear. Are you talking about
23  talc deposits or talc ores?
24      Q.   I'm talking about talc deposits,
25  generally, geological formations of talc.

Page 69

1      A.   So, yeah. Talc can occur at a variable
2  concentration in metamorphic rocks.
3      Q.   You will also agree with me that some
4  talc deposits can be larger than others, right,
5  geologically?
6      A.   Yes.
7      Q.   You'll agree with me that talc is sort of
8  all over the place and what are the mine deposits are
9  sort of unique?
10      A.   No. Talc is not all over the place.
11  Metamorphic rocks comprise approximately 10 percent or
12  so of rocks exposed at the surface of the earth, and so
13  talc, by that definition alone, talc is not all over the
14  place.
15      Q.   You'd agree with me talc can be found
16  from Quebec to Georgia, for example?
17      A.   I think that's a very general in, perhaps
18  in consumers' homes, in baby powder bottles. The --
19      Q.   You don't think there are talc formations
20  found in the Appalachian Mountains from Quebec through
21  Georgia?
22      A.   There --
23          MS. SCOTT: Objection.
24      A.   There are other talc deposits in North
25  America, yes. They're not restricted to Vermont, but

Mark Krekeler, Ph.D.

Page 70

1  talc deposits do occur.
2  BY MR. FROST:
3      Q.   And talc deposits occur in places like
4  Alabama, Texas, Minnesota, California?  You'll agree
5  with me on that as well, right?
6      A.   I remember some of the specifics in the
7  Southern states.  I know they occur in California.
8      Q.   Will you agree with me that some talc
9  deposits are larger than others?
10         MS. SCOTT:  Objection.
11     A.   Yes.  You can have small talc deposits.
12  You can have big talc deposits.  You can have -- they're
13  just like granites.  You can have small granites and
14  large granites.  You can have -- you know, a variation
15  in size and scale and complexity is a very common trait
16  in geologic terrains.
17  BY MR. FROST:
18     Q.   You'd agree with me because of variations
19  in size, scale, complexity, accessory minerals, et
20  cetera, you can't make general statements about talc
21  deposits.  Not every talc deposit's the same, right?
22         MS. SCOTT:  Objection.
23     A.   To some level, I think one can.  You can
24  make general statements about rock types, what is common
25  or likely to occur.  If we were able to precisely

Page 71

1  predict just by thought the distribution of ore, we
2  would have no problem finding platinum and gold and
3  those kinds of things, right?  So does that answer the
4  question?
5      Q.   Sure.
6          THE WITNESS:  Can we take a break?
7          MR. FROST:  Sure.
8          VIDEOGRAPHER:  We are now going off
9      record, and the time is 10:48.
10         (A recess was taken from 10:48 to 11:03.)
11         VIDEOGRAPHER:  We are now back on record,
12     and the time is 11:03.
13  BY MR. FROST:
14     Q.   Would you describe for me what a "fibrous
15  habit" means?
16     A.   In general, it is an elongated particle
17  that -- and the -- so on page 4, I indicate there's
18  length or width ratios for fibers which have fibrous
19  habit of three to one, and then NIOSH is five to one.
20  BY MR. FROST:
21     Q.   Okay.  Can you define for me what a
22  "fibrous habit" means?  Does it purely mean dimensions
23  of three to one to five to one?
24     A.   So in the general context of mineralogy,
25  fiber can -- it's actually a little bit of a loose term,

Page 72

1  but you can have minerals that have fibrous habits that
2  are not microscopic.
3          So an example would be millerite, which
4  is a nickel sulfide that, essentially, you have these
5  very long black fibers, and it's very commonly -- that's
6  what it occurs as.  And the fiber -- fibrous textures,
7  you know, essentially, all morphologies are driven by
8  the unit cell and, essentially, bonding strengths and
9  defect densities and things like that.  So fibers are
10  common in asbestiform materials.
11     Q.   Is a fibrous habit different than the
12  asbestiform habit?
13     A.   So a fiber would be more of a subset of
14  asbestiform.  So if I had a chunk of chrysotile, that
15  would be asbestiform, and it would be composed of
16  fibers.
17     Q.   So fibers are a smaller subset of
18  asbestiform?
19     A.   Generally.
20     Q.   Can you define for me what "asbestiform
21  habit" means?  Are you able to define what "asbestiform
22  habit" means without referencing your report?
23     A.   Asbestiform basically is --
24     Q.   Here, could we do it this way?  Without
25  looking at your report, can you define for me what

Page 73

1  "asbestiform" means?
2          MS. SCOTT:  Objection.  If he needs to
3      look at his report, he can look at his report.
4          MR. FROST:  Well, I just want to see if
5      he can do it without looking at the report.
6  BY MR. FROST:
7      Q.   But if you need to look at your report,
8  just let me know that you have to look at your report to
9  define it.
10         MS. SCOTT:  Objection.
11     A.   Asbestiform essentially is a texture that
12  is -- the particles are elongated.  They have a high
13  general aspect ratio.
14  BY MR. FROST:
15     Q.   So asbestiform is purely a texture?
16         MS. O'DELL:  Object to the form.
17     A.   A texture with respect to what?
18  BY MR. FROST:
19     Q.   Well, that's what you just said.  That's
20  what I'm trying to figure out.  You used the word
21  "texture."  You defined asbestiform as a texture?
22     A.   So texture is a general term that means
23  the size, shape and distribution of mineral particles.
24     Q.   Is that different than the morphology?
25     A.   Morphology generally refers to a crystal

Mark Krekeler, Ph.D.

Page 74

1 or single phase.
2   Q.   What do you mean by that, the "single
3 phase"?
4   A.   Single phase, phase is like a -- phase is
5 a thermodynamic term.  So, in theory, it is something
6 that is separable from a system.  So you can have
7 something like chrysocolla that is grown around and fill
8 some other mineral, where you can have glass.  Glass is
9 a separate phase.  Or it can also be a mineral, so it's
10 more of just a thermodynamic term.
11   Q.   Do you agree with me that in order for a
12 mineral to be asbestiform, it has to grow in an
13 asbestiform habit?
14       MS. SCOTT:  Objection.
15   A.   No.  So talc is mechanically soft, and I
16 can certainly imagine scenarios where you have
17 tremolite, large tremolite crystals that exist in a talc
18 schist, and that talc schist then experiences continued
19 dynamic metamorphism, so things move, and that talc
20 crystal can be -- other talc -- or, I'm sorry, the
21 tremolite crystal in the talc can then hit other talc or
22 other tremolite crystals and essentially abrade and
23 grind and be broken down into smaller elongate, elongate
24 mineral particles which would be fibrous, and that would
25 be one way of producing that texture.

Page 75

1 BY MR. FROST:
2   Q.   Is that different than growing in an
3 asbestiform habit?  In order to be asbestiform, do you
4 have to grow in the asbestiform habit?
5       MS. SCOTT:  Objection.
6   A.   There's not necessarily -- mineral growth
7 would not necessarily be a part of that.
8 BY MR. FROST:
9   Q.   So mineral growth has nothing to do with
10 whether or not a mineral is asbestiform?
11       MS. SCOTT:  Objection.
12   A.   I think there's a false dilemma.  You
13 know, as I described, so you can have that, you know, a
14 nice, happy actinolite or tremolite crystal.  Stress is
15 applied during metamorphism and that then breaks apart
16 and you can end up with material that is -- that meets
17 the definition of a fiber.
18 BY MR. FROST:
19   Q.   So as far as you're concerned, all fibers
20 are asbestiform?
21       MS. SCOTT:  Objection.
22   A.   No.  My mineral, one of the minerals I'm
23 an expert in, palygorskite/sepiolite, often the
24 individual crystals are referred to as fibers.
25

Page 76

1 BY MR. FROST:
2   Q.   If you look at page 4 of your report,
3 second paragraph, under "Asbestos," you write that
4 "Asbestiform refers to a mineral that has grown into a
5 fibrous aggregate of long, thin flexible crystals that
6 readily separate into smaller crystals of a" smaller
7 "length-to-width aspect ratio."  You agree with me
8 that's very different than what you just told me, right?
9       MS. SCOTT:  Objection.  You just misread
10     something.  It says, "smaller crystals of a
11     similar length."
12       MR. FROST:  Oh, I apologize.
13       MS. SCOTT:  No problem.
14   A.   So I think that's a correct statement.
15 BY MR. FROST:
16   Q.   Which one, the one in your report or the
17 one you just gave me?
18       MS. SCOTT:  Objection.
19   A.   Both.
20 BY MR. FROST:
21   Q.   You think you can, a mineral can both
22 grow as you have here in a fibrous aggregate of long or
23 you can create it?
24   A.   It can -- it can result from the process.
25 So in the broad context, if you are crushing or milling

Page 77

1 a talc ore and there's tremolite in it, basically, you
2 can process that, it's my expert opinion, that you can
3 process that and result in producing asbestiform
4 materials or fibers, elongated mineral particles.
5   Q.   So are all elongated mineral particles
6 asbestiform?
7   A.   I'm sorry.  I misspoke.  Not necessarily,
8 no.
9   Q.   Okay.  Why don't we look at -- well,
10 first off, do you have any studies or research that you
11 rely on to support your opinion that you can change
12 something that grew prismatic into something that's now
13 asbestiform?
14   A.   So I think it's reasonable, based on my
15 knowledge of crystal chemistry.
16   Q.   You can't point me to a single
17 peer-reviewed study or NIOSH or anything else that has
18 ever supported this opinion?
19       MS. SCOTT:  Objection.
20   A.   So I was taught by Steve Guggenheim that
21 you can reduce particle size, and when you reduce
22 particle size in minerals, essentially, that is driven
23 by cleavage.  So basically every mineral has a unit
24 cell, and that is definition of the elements that are
25 unique to that mineral and a specific arrangement.

Page 78

1    And, essentially, the nature of bonds in
2 that mineral will be weaker along certain planes for
3 certain minerals such as amphiboles.  So basically what
4 happens is when you apply stress, it doesn't matter if
5 that is a five-foot piece of tremolite or if it is a
6 micron piece of tremolite.  Essentially, it's absolutely
7 reasonable that if you apply stress and you break that,
8 it will break into smaller pieces, and you can end up
9 with -- essentially, the hat or the shape is the same.
10 Or, essentially, hat or shape is driven by those
11 crystallographic parameters.
12 BY MR. FROST:
13    Q.   All right.  Do you know what a cleavage
14 fragment is?
15    A.   Yeah.  It's essentially a fragment that
16 has broken off.
17    Q.   And you're telling me that cleavage
18 fragments can be asbestiform that have broken off as
19 prismatic crystals?
20    A.   I think they can, so they can.  They can
21 meet the crystallographic requirements.
22    Q.   Is your opinion generally accepted by the
23 scientific community?
24    A.   I have not presented or published on
25 that, but I think, based on my experience and what I

Page 79

1 know about crystal chemistry of minerals, that is a
2 reasonable interpretation.
3    Q.   Okay.  So your interpretation is that a
4 particle can become asbestiform, even if it didn't form
5 naturally in an asbestiform habit by this cleaving down
6 to a particular particle size?  Is that a fair summary?
7    MS. O'DELL:  Object to the form.
8    A.   You, through processing, you can modify
9 many things.
10 BY MR. FROST:
11    Q.   So can you tell me what particular
12 properties will determine whether or not a particle was
13 a cleavage fragment versus an asbestiform fragment?
14    MS. SCOTT:  Objection.
15    A.   Cleavage fragment implies that it has,
16 through some mechanical process, it's been developed.
17 BY MR. FROST:
18    Q.   So a cleavage fragment purely refers to
19 some outside mechanical process?
20    MS. SCOTT:  Objection.
21    A.   What do you mean by "purely"?
22 BY MR. FROST:
23    Q.   That's what I'm trying to figure out,
24 what your definition is.  So I asked you, you know, what
25 the properties are that will determine whether or not a

Page 80

1 particular particle is asbestiform or a cleavage
2 fragment, and your answer to that was cleavage fragments
3 implies that through some mechanism process, it's been
4 developed.  That's what I'm asking.  What is this
5 mechanism process?  Is this an outside force?  Are you
6 talking about processing --
7    A.   Mechanical.
8    Q.   You're talking about mechanics.  So if a
9 fragment cleaves off because a mechanical force is
10 applied to it, it's a cleavage fragment?  If it occurs,
11 if it naturally cleaves, then it's asbestiform?
12    MS. SCOTT:  Objection.
13    A.   You can have, as I mentioned before, you
14 can have the situations totally reasonable, both in the
15 processing and then the natural geologic process, where
16 you can have a tremolite crystal, for example, that
17 essentially is deformed through metamorphic processes.
18 You can have multiple directions of force, and so,
19 basically, you can end up with particles that are
20 asbestiform as a result of that, and then you can grind,
21 crush, process things that also have an asbestiform
22 texture.
23 BY MR. FROST:
24    Q.   Are there any standards you're relying on
25 to make this determination of asbestiform versus

Page 81

1 cleavage fragment?
2    MS. SCOTT:  Objection.
3    A.   I'm using the terminology as described in
4 my mineralogy class that I took from Dr. John Grover in
5 1991, and he -- he grew some of the artificial,
6 synthetic fibers for the rat tests in the '70s.
7 BY MR. FROST:
8    Q.   Okay.  Other than this class you had with
9 Dr. John Grover, you can't name me another source,
10 another peer-reviewed literature, a scientific paper
11 that supports your theory?
12    MS. SCOTT:  Objection to form.
13    MR. LAPINSKI:  I was going to say, make
14 sure you let him ask the full question before
15 you start to answer.
16    THE WITNESS:  Okay.  I'm sorry.
17 BY MR. FROST:
18    Q.   Do you want me to reask it?
19    A.   The terms were used in my graduate school
20 classes as well.  I think that -- yeah.
21    Q.   And your opinion is whether or not this
22 fragment that breaks off, whether or not it's
23 asbestiform or cleavage doesn't have anything to do with
24 the way in which the particle originally formed?
25    MS. SCOTT:  Objection.

Mark Krekeler, Ph.D.

<table>
<tr><td colspan="2">

**Page 82**

1    A.    So crystallographically, in a way, the
2  term's not necessarily extremely relevant.  It is the
3  physicality of a particle is such that, you know, it's
4  driven by, essentially, the science.  So you can crush,
5  you can grind something, and you can end up with an
6  asbestiform particle.
7          MR. FROST:  Let me look at some articles.
8  I'm going to mark this as -- I believe, we're at
9  Exhibit 3.
10          (Exhibit 3 was marked for
11          identification.)
12  BY MR. FROST:
13    Q.    Do you recognize this paper?
14    A.    No, I do not.  I have not seen this
15  report.
16    Q.    This is not the IRSST 2010 Montreal paper
17  you reference in your report?
18    A.    I don't remember.
19    Q.    Look at your -- let me see.  I want to
20  find a place that you reference this.  If you look at
21  Footnote 5 on page 4.
22    A.    I don't see a Footnote 5 on page 4.
23    Q.    Of your report.
24          MS. SCOTT:  Of your report.
25    A.    Oh, I'm sorry.  Okay.  Yeah.

**Page 83**

1  BY MR. FROST:
2    Q.    Do you agree that this is the same report
3  that you have referenced in Footnote 5 on your paper?
4    A.    Yeah.
5    Q.    Have you ever read this report before?
6    A.    I think so.
7    Q.    And this is something --
8    A.    I'm tired.
9    Q.    And this is something you rely on
10  otherwise in your paper, correct?
11    A.    I forget the specifics of where I've
12  cited it.
13    Q.    If you turn to page 10, please.
14          MS. SCOTT:  Of the report or of the --
15          MR. FROST:  Of the paper, the IRSST
16  paper.
17    A.    Page 10.
18  BY MR. FROST:
19    Q.    So it's Section 5.1.2, "Asbestiform."
20    A.    Okay.
21    Q.    It states, "The term 'asbestiform; refers
22  to a morphology originating from the natural
23  crystallization of a mineral into small crystals, into
24  hair-like fibers (unidimensional).  This morphology
25  gives the mineral-specific characteristics, including a

</td><td>

**Page 84**

1  high aspect ratio, (length/diameter ratio), increased
2  mechanical properties, flexibility and durability.
3          "In the asbestiform morphology, the
4  crystals grew by forming long and filiform fibers.
5  These fibers are found in bundles that can easily
6  separate into smaller fibers (fibrals), which, during
7  processes, retain their surface and activity properties.
8          "OSHA (1992) specifies that the
9  asbestiform criterion does not depend on the crystalline
10  structure but on how the crystal grows or its
11  crystalline formation.  When pressure is applied to" an
12  asbestiform "fiber, it will bend rather than break."
13  Did I read that correctly?
14          MS. SCOTT:  With one correction.
15          MR. FROST:  I did miss one?
16          MS. SCOTT:  Asbestos fiber, not
17  asbestiform fiber.
18          MR. FROST:  Oh, I apologize.
19  BY MR. FROST:
20    Q.    Did I read that -- other than that, did I
21  read this correctly?
22    A.    Okay.  Yeah.
23    Q.    Do you agree with me this definition is
24  very different than the definition you've given me?
25          MS. SCOTT:  Objection.

**Page 85**

1    A.    Not necessarily.  It is more specific,
2  but it's, you know, generally in line.
3  BY MR. FROST:
4    Q.    Generally in line.  Doesn't the IRSST
5  paper specifically state that an asbestiform crystal has
6  to grow into that structure to be asbestiform?
7    A.    It says that, but again --
8    Q.    You disagree with that?
9          MS. SCOTT:  Objection.
10    A.    It --
11  BY MR. FROST:
12    Q.    It's okay.  You can disagree with it.
13    A.    In my -- it's permissive, not exclusive.
14  So I - I --
15    Q.    I don't -- where does it say it's
16  permissive, not exclusive?  Is that in this paper?
17    A.    No.  My class terminology might not be
18  consistent with this.
19    Q.    Okay.  Let's look at another one.  What
20  exhibit are we on?  Four?  I would like to mark this as
21  Exhibit 4.  I'll give you a copy.
22          MR. FROST:  Are we not on four?
23          MS. SCOTT:  I think it's five.
24          MR. FROST:  Are we on five?  I thought we
25  were on five, too.

</td></tr>
</table>

Mark Krekeler, Ph.D.

Page 86

1    MS. SCOTT:  I think we're on five.
2    MR. FROST:  Okay.  Yeah.  I was going to
3  say maybe we can keep track.
4    VIDEOGRAPHER:  I'm keeping track, but the
5  last one you just gave him, you said three.
6    MR. FROST:  Oh, okay.  So I guess we are
7  on 4.  We'll mark this whatever the next exhibit
8  is.
9    (Exhibit 4 was marked for
10    identification.)
11 BY MR. FROST:
12    Q.    Take a look at it.  Have you ever seen
13 this paper before?
14    A.    I'm not sure.  I immediately don't see it
15 in the reference list.
16    Q.    I can tell you, it's not on your
17 reference list.
18    A.    Okay.  Yeah.  I have not seen this
19 before.
20    Q.    Have you ever heard of Dr. William J.
21 Campbell?
22    A.    No, I have not.
23    Q.    You'd agree with me that this is a report
24 from the United States Department of the Interior,
25 Bureau of Mines?

Page 87

1    A.    Yes.
2    Q.    You'd agree with me that they are a
3  reliable source --
4    A.    So this is from 1977?
5    Q.    Yes.  You'd agree with me that the Bureau
6  of Mines is a reliable source of information for
7  geological term -- geological --
8    A.    I am somewhat hesitant's to make a
9  generalization of any organization being extremely
10 reliable or not.  It depends on the individual.  But,
11 generally, many things that have been produced are
12 reliable.  This document is from 1977, which is sort of
13 the end of the heyday of asbestos production.  So right
14 around this time, essentially, it was coming to light
15 that asbestos really did have a lot of hazards
16 associated with it.
17    Q.    Can you please turn to page 30 of this
18 report?  Specifically, there's a paragraph, it's
19 called "Cleavage Fragment."  Do you see where I'm
20 talking about?
21    A.    Yes.
22    Q.    Okay.  If you go down to the second -- I
23 can read the first few on, but -- I'll read all of it
24 for clarity.  "Cleavage fragment:  A fragment produced
25 by the breaking of crystals in" direct -- in "directions

Page 88

1  that are related to the crystal structure and are always
2  parallel to crystal faces."  That's in line with what
3  you've described, right, for cleaving?
4    A.    That statement is not correct.
5    Q.    It's not correct?
6    A.    You can have cleavage that is, has a
7  variety of degree as a perfection to it.
8    Q.    And, again, do you have -- can you cite
9  me a study that you're relying on for that opinion?
10    A.    I can probably point to a book, but it's
11 something that is -- I mean, it's taught in mineralogy,
12 introduction to mineralogy.  You have different levels
13 of perfection of cleavage.  So, for example, micas are
14 said to be perfect in cleavage, and a lot of the
15 amphiboles are said to be good but not necessarily
16 perfect.
17    And, actually, you can see in this SEM
18 image, there's all kinds of irregularities on the
19 surface.  And on this particular SEM image, it's
20 extremely bright.  The contrast is wrong.  It's not --
21 you know, you can't tell what is on that right end of
22 the image that is the tremolite particle there.
23    Q.    I'll stop you here.  I'm confused because
24 your problem with the definition appears to be the word
25 "perfect," which doesn't actually appear in the

Page 89

1  definition.  But you generally agree that a cleavage
2  fragment is a cleave along a generally parallel plane of
3  a crystalline structure, right?
4    A.    Yes.
5    Q.    Okay.  If you continue along, it says,
6  "Minerals" --
7    A.    It says "with perfect cleavage."
8    Q.    That's in the next, you know, paragraph.
9    A.    I'm sorry.  I got confused.
10    Q.    So it talks a little bit, you know, about
11 it.  It talks about amphiboles, et cetera.  What I'm
12 concerned is the next paragraph down.  It starts,
13 "However, because they did not grow as fibers, they
14 cannot have characteristics of fibers.  Consequently,
15 cleavage fragments cannot be called fibers."
16    Do you see where the Bureau of Mines has
17 said that?
18    MS. SCOTT:  Object to form.
19    A.    So it's my professional opinion that
20 that's inaccurate.  I mean, the crystallographic -- you
21 know, from the materials aspect of things, whether
22 something has grown or not, you know, doesn't -- it
23 really doesn't matter too much as far as what it is.  So
24 and -- and so, "However, because they did not grow as
25 fibers, they cannot have characteristics of fibers."

Mark Krekeler, Ph.D.

Page 90

1 Well, you know, if you can cleave or process something,
2 roll it such that, you know, you get particle size
3 reduction, and that particle size is then, matches,
4 although perhaps there is disagreement on what
5 asbestiform is, but it matches what a fiber is, then
6 that's --
7 BY MR. FROST:
8    Q.   But, again, you can't point me to a
9 single study or peer-reviewed piece of literature that
10 supports your opinion, correct?
11       MS. SCOTT:  Objection.
12    A.   I think it's -- I think it's a very much
13 a reasonable interpretation.  It's almost too basic, in
14 a way.  I mean, if we know -- we're taught, actually, at
15 the introductory level, that minerals cleavage is the
16 first things we teach, and essentially cleavage is an
17 interval property of a given mineral, and then you can
18 reduce it, and that's why minerals, when you crush a
19 mineral, you actually, you have sort of the same general
20 kind of particle shape.  So you take mica, for example,
21 and you crush it and you get a particle size reduction,
22 and a lot of that is happening along the cleavage
23 planes.  So I think --
24 BY MR. FROST:
25    Q.   So that's what I established.  So you

Page 91

1 think IRSST is wrong.  You think the Bureau of Mines is
2 wrong, right?
3       MS. SCOTT:  Objection.
4 BY MR. FROST:
5    Q.   Why don't we look at the World Health
6 Organization?
7       MR. FROST:  This is -- I'll mark this as
8 Exhibit 5.
9       MS. O'DELL:  Monograph 93.
10      MR. FROST:  Yes, it's Monograph 93.
11 Sorry.
12      (Exhibit 5 was marked for
13       identification.)
14    A.   So this would be IARC 2010.
15      MR. FROST:  Does anyone need a copy or
16 pull it up on your computer?
17      MS. SCOTT:  Yeah.
18      MR. FROST:  That's a better way to look
19 at it.
20      MR. FERGUSON:  I'll take one, Jack, if
21 you've got an extra one.
22      MR. FROST:  I do.
23      MR. FERGUSON:  Lighten your load.
24 BY MR. FROST:
25    Q.   Are you familiar with this publication?

Page 92

1    A.   Yes, I believe this is what's cited in
2 the report.  This is the 2010 IARC.
3    Q.   Can you please turn to page 277?  If you
4 look at the bottom paragraph, it says, "Asbestos is a
5 commercial term that describes six minerals that occur
6 in the asbestiform habit:  Actinolite, anthophyllite,
7 chrysotile, grunerite, riebeckite and tremolite (IARC,
8 1977).  Similarly to talc, these six minerals occur more
9 commonly in a non-asbestiform habit and may also be
10 elongated without being asbestiform."  And then if you
11 follow down, it says, "when asbestiform, they constitute
12 asbestos and, when not asbestiform, they are referred to
13 as mineral fragments or cleavage fragments."
14       So, again, here, IARC is talking about
15 how the crystal forms or how it grows to distinguish
16 asbestiform versus cleavage fragment, correct?
17       MS. SCOTT:  Objection.
18    A.   So you're saying as it forms?
19 BY MR. FROST:
20    Q.   Yes.
21    A.   So mechanical processes can be how a
22 mineral is formed or how a texture is developed.
23    Q.   So you're saying the cleave of a
24 prismatic crystal can considered the morphology of how
25 that crystal forms?

Page 93

1    A.   No.  You said how a mineral -- what did
2 you say?
3    Q.   Yes, that's what I said is how a mineral
4 forms.  This is what they're saying:  A mineral can
5 form --
6    A.   So --
7    Q.   -- an asbestiform habit or not.
8    A.   -- form is not growth.  Form is not
9 growth.
10    Q.   Okay.  Fine.  It's saying here that how a
11 crystal grows or develops determines whether or not it's
12 is a mineral fragment or asbestiform, correct?
13       MS. SCOTT:  Objection.
14       MS. O'DELL:  Object to the form.
15    A.   "When asbestiform, they constitute
16 asbestos, and when not asbestiform, they are referred to
17 as mineral fragments or cleavage fragments."  That's how
18 they are referred to.  But I don't see anything in here
19 about growth.  There's nothing about precipitating out
20 of a solution.  There's nothing precipitating out of a
21 melt.  There's nothing precipitating from some
22 mineralogical transformation.  So -- and, again, you
23 know --
24 BY MR. FROST:
25    Q.   But, again, I just want to go back.

Mark Krekeler, Ph.D.

Page 94

1    A.    -- cleavage --
2          MR. LAPINSKI:  Let him finish his answer.
3          MR. FROST:  Sure.
4    A.    Whether something is a cleavage or
5    fragment or not, it can be -- it can match the
6    dimensions of something that is defined by NIOSH or
7    other things.  It can be 1 micron by 3 microns or it can
8    be 1 micron by 5 microns.  So I don't -- the -- you
9    know.  But this, this doesn't seem to -- you keep
10   implying that there has to be growth for the mineral to
11   occur, but it's not -- apparently, in here, it doesn't,
12   it doesn't make that stipulation.
13         Grinding, grinding can be one method, and
14   then deformation.  We have other examples where,
15   essentially, textures are developed from deformation,
16   meteorite impacts.  We have metamorphic rocks.  We can
17   have, essentially, high temperature or high pressure
18   metamorphic rocks that have one form of quartz in them.
19   Then when they get exhumed, essentially, they shatter
20   the granite around them and create a different texture.
21         So I don't, I don't think that growth is
22   necessarily related to -- I think, in my professional
23   opinion, it's not related to the generation of cleavage
24   fragments, and it's my professional opinion that
25   cleavage fragments can have asbestiform materials.

Page 95

1          The other thing that confuses things is
2    you can have a cleavage fragment that's a meter, right?
3    You can -- you can have large crystals.  You can go out
4    to the South Dakota mines and pick up a spodumene, hit
5    it with a hammer.  That's a cleavage fragment.  Because
6    we have these same atomic laws, essentially, you get the
7    same type of effects into the small particle ranges.
8    Q.    So now I'll go back to the same question
9    I asked before you couldn't answer, and that was, other
10   than size, other than this whole idea of aspect ratio,
11   what other differences can you tell me there is between
12   an asbestiform fiber and a cleavage fragment?  Is it
13   truly just size, in your opinion, that makes something
14   asbestiform?
15         MS. SCOTT:  Object to the form of the
16         question.  You can answer.
17   BY MR. FROST:
18   Q.    It's an easy enough question.  I'll ask
19   it a different way if you want.
20   A.    I'm a slow reader.  Sorry.  What
21   differences can you tell me there is between asbestiform
22   fiber around achieve advantage fragment -- a cleavage
23   fragment.  So if you're talking about just differences
24   in general --
25   Q.    Well, no.  That's why.  Let me ask you a

Page 96

1    question.
2    A.    -- activity --
3    Q.    Let me ask you a question.  Let me ask
4    you the question without reading from the thing, because
5    you're reading the phonetics, which aren't actually the
6    question I'm asking.
7    A.    Okay.  I'm sorry.
8    Q.    What properties, other than size, will
9    tell you whether or not a particle is a cleavage
10   fragment versus an asbestiform fiber?
11   A.    What properties other than size?
12   Q.    I guess size truly -- is that what
13   determines whether or not a particle is asbestiform
14   versus a cleavage fragment, in your opinion?
15         MS. SCOTT:  Objection.
16   A.    It's a major, a major factor in it.  But,
17   you know, you can have things that are large that are
18   asbestiform as well.  So hand samples, images in --
19   Q.    Okay.  Can you answer my question?  Is it
20   a major component or is that the difference?  And if
21   there's more than just size, what are the other things
22   you look at to determine whether or not a particle is a
23   cleavage fragment versus an asbestiform fiber?
24         MS. SCOTT:  Objection.  He is answering
25         your question.  Go ahead, Doctor.

Page 97

1    BY MR. FROST:
2    Q.    I don't understand how telling me the
3    size of giant pattern, giant rocks that are grabbed from
4    somewhere else.  What I want to know are what properties
5    do you look at when you're trying to determine if it's
6    an asbestiform fiber versus a cleavage fragment?  Is it
7    just the size of the mineral with -- you know, the
8    aspect ratio of the mineral?  Is that purely what
9    determines, in your opinion, whether a particle is
10   asbestiform versus cleavage?
11   A.    That and the texture.
12   Q.    What do you mean by "texture"?  What
13   properties are you looking at in the texture?
14   A.    The texture is how -- is the size, shape
15   and distribution of materials.
16   Q.    So, again, we're talking about size,
17   shape and distribution.  These are the only -- these are
18   the aspects --
19   A.    I get that from -- I'm sorry.
20   Q.    I was going to say, size, shape and
21   distribution are the attributes you look at to determine
22   whether or not a particle is asbestiform versus
23   cleavage?
24   A.    A spatial distribution is not necessarily
25   size and shape.

Mark Krekeler, Ph.D.

Page 98

1     Q.   What do you mean by "spatial
2 distribution," then?
3     A.   The occurrence of it in a sample or
4 substrate.
5     Q.   What do you mean by "occurrence of it in
6 a sample or substrate"?
7     A.   The placement of it. So, essentially, we
8 can have a lithology onto which, relative to that, an
9 asbestiform material occurs.
10     Q.   What do you mean by lithology upon which
11 an asbestiform material occurs?
12     A.   Lithology is a general term for a type of
13 rock. It's a very general term for a type of rock.
14     Q.   Okay. So, effectively, you're saying the
15 type of rock it is and the size and shape of the
16 particle determine whether or not it's asbestiform?
17 Those are the three considerations you look at?
18     A.   Well, so, not necessarily, but, you know,
19 I'm talking about hand sample size.
20     Q.   Okay. And this is -- and what about --
21 and what about micron size, when you're looking at a
22 particle that's micron size?
23     A.   Aspect ratio is important. I think that
24 and -- so to identify a fiber or a cleavage fragment, to
25 thoroughly identify things, one should generally do,

Page 99

1 should do TEM work. And in order for that data to be
2 interpreted, to identify the aspect ratio and also what
3 the material is, you need to do imaging electron
4 diffraction and electron microscopy.
5     Q.   Okay. I fear you're not understanding my
6 question. I'm not -- I want to know what the difference
7 is between an asbestiform particle and a cleavage
8 fragment. Is it purely the aspect ratio and the type of
9 rock it's generated from, in your opinion?
10     MS. SCOTT: Objection.
11     A.   I'm sorry. I'm having difficulty
12 describing it. I thought I described it. I thought I
13 answered.
14 BY MR. FROST:
15     Q.   What you keep saying is you keep telling
16 me is that aspect ratio is a major component. Is it the
17 only component? Are there others? We've heard the type
18 of rock. Are there any other things you would look at
19 to tell me these are the properties of an asbestiform
20 fiber versus these are the properties of a cleavage
21 fragment? I'm just asking for simple mineralogic
22 definition here of what's the difference between a
23 cleavage fragment and an asbestiform fiber. If it's
24 rock type and aspect ratio, that's fine.
25     A.   So, okay. So what's the difference

Page 100

1 between a cleavage fragment and an asbestiform fiber?
2     Q.   Yes.
3     A.   A cleavage fragment can be a subset of
4 asbestiform fibers.
5     Q.   So you're telling me there's no
6 difference between a cleavage fragment and asbestiform
7 fiber if it's --
8     A.   No.
9     Q.   -- if they're the same size?
10     A.   If it's --
11     MS. SCOTT: Let him finish.
12 BY MR. FROST:
13     Q.   If they meet whatever aspect ratio
14 definition you want to put on it, as far as you're
15 concerned, any cleavage fragment that meets that
16 definition is an asbestiform fiber?
17     MS. SCOTT: Objection.
18     A.   Speculative in that I don't -- you know,
19 I don't --
20 BY MR. FROST:
21     Q.   It's not speculative. I'm asking for
22 your definition.
23     A.   I'm sorry. I have an incomplete thought.
24 A cleavage fragment can be a subset of -- it can be a
25 subset of an asbestiform fiber.

Page 101

1     Q.   How? Like how do you -- so what -- okay.
2     A.   Based on the size and the dimensions that
3 are provided in the paragraph in page 4.
4     Q.   Okay. So it's purely size and dimension
5 is what determines whether or not a cleavage fragment is
6 a subset of asbestiform?
7     A.   Correct.
8     Q.   That's your opinion?
9     MS. SCOTT: Objection.
10     A.   With respect to only my -- so I think
11 some of our confusion is is I'm talking about minerals
12 in general, so things, you know, you would see in a
13 museum. And then there's, essentially, the microscopic
14 scale.
15 BY MR. FROST:
16     Q.   Okay. So there's a -- how you define
17 asbestiform is different depending on whether or not
18 it's a hand sample versus something you look at in a
19 microscope?
20     A.   Potentially, and things can, you know,
21 appear to be asbestiform, but they are pseudomorphs.
22     Q.   Okay. So other than size, which we've
23 now determined is aspect ratio, you can't tell me any
24 other properties that you would look at to determine
25 whether or not a particle, an elongated mineral

Mark Krekeler, Ph.D.

Page 102

1  particle, is a cleavage fragment versus an asbestiform
2  fragment. Is that -- is that a fair summary of your
3  opinion?
4       A.    I'm unsure. I'm sorry. I'm tired.
5  The -- if it -- so the -- so in your question, mineral
6  type doesn't matter, correct?
7       Q.    I don't know. I'm asking you how you
8  define. Does mineral type matter for asbestiform versus
9  non-asbestiform?
10      A.    Well, there are minerals that tend to be
11 asbestiform or can be asbestiform and not. So, but
12 that's not necessarily related to the -- asbestiform is
13 a descriptor of the minerals, not necessarily -- so I
14 would use what, what I have in the report, basically. I
15 would say that a cleavage fragment can be an asbestiform
16 particle and size. The aspect ratio is a major
17 contributor.
18           Also, the -- you know, if it is a -- so,
19 for example, if the chemistry and the electron
20 diffraction data and the images also indicate that it is
21 a mineral that is known to be asbestos, I think that
22 that would be -- that would support that.
23           I think that, you know, if you had --
24 it's like kyanite, for example, might -- kyanite might
25 have -- meet those dimension, fiber-dimension

Page 103

1  requirements, but because it is kyanite, it wouldn't
2  necessarily be described as asbestiform, but it would be
3  a fiber. So there's complexities.
4       Q.    Okay. So I think we have -- I'll change
5  my summary of your opinion. So in determining whether
6  or not an elongated mineral particle, and we can agree
7  an elongated mineral particle is a particle that, you
8  know, broke off of something that's long, right? Can we
9  agree on that?
10      A.    Yes.
11      Q.    Okay. So in order to determine if an
12 elongated mineral particle is a cleavage fragment or
13 asbestiform fiber, the two things you look at are,
14 first, whether or not it's a rock that can be
15 asbestiform, and then, second, which is the major
16 component, is its size, meaning aspect ratio. Is that a
17 fair summary of your opinion?
18      A.    Well, so that's a different question. So
19 elongated mineral particle --
20      Q.    Then if elongated mineral particle's
21 confusing you, I'll take that out.
22           So if we're trying to figure out if a
23 particle -- I don't care what size, I don't care if it's
24 elongated or not. If we're trying to figure out if a
25 particle is a cleavage fragment or an asbestiform fiber,

Page 104

1  first, it has to be of a rock that could be asbestiform,
2  and then the major component is the size, meaning aspect
3  ratio. Is that a fair summary of the definition you're
4  giving me?
5       A.    I'm not sure. I'm sorry. I'm spacing
6  out a little bit. A cleavage fragment can be
7  asbestiform.
8       Q.    Okay. But what I keep asking you is --
9       A.    The criteria?
10      Q.    The criteria you're using to define
11 something as asbestiform, is it purely rock type, that
12 is, a type of rock that can be asbestiform?
13      A.    I --
14      Q.    Hold on. That's one.
15      A.    Okay.
16      Q.    And then the other, which is the major
17 component, is the size, meaning the aspect ratio of the
18 particle. Are those the two things you look at when
19 you're determining whether or not a particle is an
20 asbestiform fiber?
21      A.    I would sort of correct myself in saying
22 the particle size and the mineralogy.
23      Q.    Okay. Particle size and mineralogy. And
24 mineralogy, meaning the type of mineral it is, correct?
25      A.    Yes.

Page 105

1       Q.    Okay. And, again, the basis of your
2  opinion that that's the definition of asbestiform comes
3  from your coursework and undergraduate and graduate,
4  correct?
5       A.    Yes.
6       Q.    And sitting here today, you can't cite me
7  a single study in the peer-reviewed literature or from
8  any government organization that supports that theory,
9  correct?
10           MS. SCOTT: Objection.
11           MS. O'DELL: Objection. Form.
12      A.    So --
13 BY MR. FROST:
14      Q.    I'm just asking for citations.
15           MR. LAPINSKI: Let him finish.
16      A.    I cannot -- I cannot -- let me think how
17 to phrase this. Peer review, I have had discussions,
18 actually, with my -- a former committee member, Bill
19 Mull. He was on my Ph.D. committee, and we had several
20 discussions about impurities and things like that and
21 industrial minerals. He was an industry guy.
22           And, basically, we talked about small
23 particles breaking off and how that could be of concern
24 in different ways. And then I've had discussions in
25 industry about, essentially, fine particles getting

Mark Krekeler, Ph.D.

Page 106

1  entrained in things with another company, one based here
2  in Cincinnati, not basically asbestiform, not basically
3  asbestos, but there's graphite and biotite.
4       So no peer-review literature, but I've
5  had discussions in a general sense, but not specific to
6  talc, but with contaminants, small particles breaking.
7       Q.   So the basis --
8       A.   So I think companies sometimes use
9  different -- it's actually common for companies to use
10 different words.  They have internal vocabularies, even,
11 you know, so that might be the issue.
12 BY MR. FROST:
13      Q.   So it's based off your coursework and
14 discussions with industry individuals but not any
15 peer-reviewed literature?
16      MS. SCOTT:  Objection.
17      A.   Yes.  Correct.
18 BY MR. FROST:
19      Q.   All right.  We're going to move to
20 another definition.  Okay?
21      A.   Okay.
22      Q.   I note in your report -- let me find
23 where it is.  At the top, under the section that says
24 "Asbestos" on page 4.  Second sentence, you say,
25 "Asbestos is a naturally occurring mineral that can be

Page 107

1  in close proximity to talc in mines around the world."
2  Is asbestos a mineral?
3       A.   I'm sorry.  It should be mineral group.
4       Q.   Okay.  That was going to be my next
5  question.  Asbestos is a defined group of minerals,
6  correct?
7       A.   Yeah.  It can be referred to that.
8       Q.   Okay.  Without looking at your report,
9  can you tell me what minerals fit the definition of
10 asbestos?
11      MS. SCOTT:  Objection.
12      A.   Tremolite, crocidolite, anthophyllite,
13 chrysotile, amosite.
14 BY MR. FROST:
15      Q.   And in your report, you know, you list
16 them.  I believe it's here on page 4.  You list the
17 amphibole class includes, you know, amosite,
18 crocidolite, actinolite, anthophyllite and tremolite,
19 correct?
20      A.   I'm sorry.  Where?
21      MS. SCOTT:  Here.
22 BY MR. FROST:
23      Q.   Page 4.
24      A.   Yeah.  So, yeah, end of the second line.
25      Q.   And you're relying on the ATSDR for this

Page 108

1  definition, according to the paragraph?
2       A.   I'm just saying that's what they define
3  those as.
4       Q.   Do you believe you've included the whole
5  definition that ATSDR has of asbestos in your paper?
6       MS. SCOTT:  Objection.
7       A.   I believe it's consistent with a document
8  I've done.  I was gonna say, there are other academic
9  classifications.  Sometimes I know, in my classwork, it
10 was discussed like antigorite sometimes comes up.
11 Antigorite is actually something that's detected in some
12 of the documents as well.  So antigorite can be, look
13 like it's asbestos, but it's not officially classified.
14      So there's some con -- if you look in the
15 older literature, there's some confusion.  People will
16 also refer to other minerals, perhaps incorrectly, as
17 being asbestos.  So it's -- historically, I think it can
18 be a term that is applied either too loosely or things
19 just haven't worked out, so...
20 BY MR. FROST:
21      Q.   And the definition of asbestos in the
22 ATSDR, is that something you found yourself or was that
23 given to you by plaintiffs' counsel?
24      MS. SCOTT:  Objection.
25      A.   I looked at -- ATSDR is something that

Page 109

1  I've used in the past for my publications in general, so
2  I'm familiar with them.  So we use that in a variety of
3  ways to help frame our discussions in peer-review
4  articles and things like that.
5  BY MR. FROST:
6       Q.   All right.  I'm going to mark this next
7  exhibit.  I think we're on six.
8       MS. SCOTT:  Yes.
9       MR. FROST:  Yep.
10      (Exhibit 6 was marked for
11      identification.)
12      MR. FROST:  Do you need a copy?
13      MR. FERGUSON:  I'll take it unless
14  anybody else wants one.
15      MS. O'DELL:  Have you directed us to a
16  page?
17      MR. FROST:  He was looking at his
18  references to make sure.  I think he's
19  identifying that it's the same article.
20      A.   I'm not -- I'm not sure if this is Item
21 Number 6.
22 BY MR. FROST:
23      Q.   Well, here.  I can speed this up.  You
24 agree with me that this is an ATSD article, correct?
25      A.   Yes.

Mark Krekeler, Ph.D.

Page 110

1    Q.   Okay.  Turn to -- actually, it's page 1.
2  It's a misnomer.  It's decently into it, probably about
3  10 or 15 pages into it.  As I said, the one is a
4  misnomer.  Okay.
5         MS. SCOTT:  I have a --
6         MR. FROST:  Yeah.  I was going to say, I
7      apologize for it being highlighted, but I'm
8      going to read the highlighted parts anyway, so
9      it will help guide us there.  That was a
10     printing issue.
11 BY MR. FROST:
12     Q.   Do you see where it defines, under
13 Section 1.1, "What is Asbestos"?
14     A.   Yes, I do.
15     Q.   Do you notice that its definition of
16 asbestos are "the fibrous varieties of tremolite,
17 actinolite and anthophyllite that occur naturally in the
18 environment"?
19         MS. SCOTT:  Objection.
20     A.   I see that, yeah.
21 BY MR. FROST:
22     Q.   That's slightly different than what you
23 attribute the definition of asbestos from the ATSDR in
24 your report, right?  You don't note that it's the
25 fibrous varieties of the amosite, crocidolite,

Page 111

1  actinolite, anthophyllite and tremolite, correct?
2     A.   Let me just double-check.
3     Q.   It's page 4.
4     A.   In two general classes.  I omitted the
5  word "fibrous," but it seems that the minerals are
6  consistent.
7     Q.   Yeah, the minerals are consistent, but
8  isn't the omission of "fibrous" an important distinction
9  in the definition of what's asbestos and what isn't?
10         MS. SCOTT:  Objection.
11     A.   In the context of this situation, I
12 don't -- I don't think it exclusively applies because
13 you can mechanically produce particles that are -- meet
14 the criteria on the bottom of the last paragraph on page
15 4.  So tremolite -- and actually, you know, on one hand,
16 IARC 2012 lists tremolite as a carcinogen in general.
17 So IARC is not -- I was consistent, but you're correct.
18 I did not use the word "fibrous."
19 BY MR. FROST:
20     Q.   So you're not consistent, because you're
21 saying ATSDR defines asbestos, and then you need to put
22 them out.  But you fail to leave out that these are
23 fibrous.  I'll tell you why it's important.  Do you see
24 the second highlighted portion?
25         MS. SCOTT:  Let me just object to the

Page 112

1  statement.
2         MR. FROST:  Sure.
3         MS. SCOTT:  Go ahead.
4  BY MR. FROST:
5     Q.   Do you see the second highlighted portion
6  on that page?  It starts at the bottom.  "Asbestos
7  minerals consist of thin, separable fibers that have a
8  parallel arrangement.  Nonfibrous forms of tremolite,
9  actinolite and anthophyllite are found naturally.
10 However, because they are not fibrous, they are not
11 classified as an asbestos mineral."  That's different
12 than what you're telling us here, correct?
13     A.   Let me compare.
14     Q.   Well, that's what you just told us, that
15 you could have nonfibrous tremolite and it would still
16 be asbestos.
17     A.   I'm sorry.  What was the question again?
18 This is not consistent with what I have written?
19     Q.   I'm saying it's not consistent with what
20 you just told me.  You just told me the fibers doesn't
21 really matter because you can have --
22     A.   Fibers --
23     Q.   So my question is:  You're relying on --
24 say you rely on the ATSDR as the definition for
25 asbestos, but your definition of asbestos, sitting here

Page 113

1  today, is actually different than that of the ATSDR.  So
2  it doesn't really support what you're saying today,
3  correct?
4         MS. SCOTT:  Objection.  Misrepresents.
5     A.   No.  I think that is a misrepresentation.
6  So I cited this, and the minerals are listed here are
7  the same minerals there.
8  BY MR. FROST:
9     Q.   Okay.
10     A.   And then, based on my academic
11 experience, knowledge, these minerals are also, you
12 know, what I would list as well.
13     Q.   But that's not -- you didn't say they say
14 that certain types of these minerals can be asbestos.
15 The definition that you attribute, and you're talking
16 today about asbestos, is different than the -- you say
17 the ATSDR supports your definition of asbestos, but
18 yours is actually slightly different than theirs, right?
19         MS. SCOTT:  Objection.  Misrepresents.
20     A.   I left out a word.
21 BY MR. FROST:
22     Q.   And according to them, it's an important
23 word, because as the ATSDR says, "Because they are not
24 fibrous, they are not classified as asbestos minerals."
25 Do you agree?

Page 114

1    MS. SCOTT: Objection.
2    A.    That's what's stated in the document.
3 BY MR. FROST:
4    Q.    Okay. Let's move down to the third
5 paragraph under "Asbestos" in your report. Do you see
6 the -- I don't know. What sentence is it? Third
7 sentence starts, "However, non-asbestiform cleavage
8 particles can correspond to the definition of respirable
9 fiber as defined by WHO and, due to its morphology, can
10 have potentially dangerous health effects." Do you see
11 that?
12   A.    Yes.
13   Q.    Now, you don't have an opinion yourself
14 as to whether or not asbestiform can cause any disease.
15 You're not a doctor, right?
16   A.    Correct.
17   Q.    And you're relying on, you know, other
18 documents and things you've read for that statement?
19 That's correct?
20   A.    Correct.
21   Q.    Do you have any opinion on whether or not
22 the surface chemistries of cleavage fragments versus
23 asbestiform fibers are the same?
24   A.    I'm not a surface geochemist.
25   Q.    Okay. Do you agree with me that IARC has

Page 115

1 ultimately determined that non-asbestiform cleavage
2 fragments actually are not or do not -- sorry. Let me
3 reform that.
4    Could we also agree that IARC has
5 determined that non-asbestiform minerals are not
6 carcinogenic?
7    MS. SCOTT: Objection.
8    A.    I believe IARC 2012 lists tremolite as a
9 carcinogen.
10 BY MR. FROST:
11   Q.    And do you know what level of carcinogen?
12 Do you know what category?
13   MS. O'DELL: Objection to form.
14   A.    I don't specifically remember. I know
15 there are three categories that are relevant. There's
16 Group 1, and then Group 2-A and 2-B. Group 1 are known
17 carcinogens. 2-A is probable, and I think 2-B is
18 possible. But, again, I'm kind of --
19 BY MR. FROST:
20   Q.    That's not your -- that's not your field
21 of expertise?
22   A.    That's not my area.
23   Q.    And you also -- so you cite the NIOSH
24 2010. You also cite the IRSST 2012, correct, for your
25 proposition that these, the fragments of the same

Page 116

1 morphology can have potentially dangerous health
2 effects?
3    A.    Yes, I say those documents.
4    Q.    Okay. Let's look at the NIOSH road map.
5    MR. FROST: Did you mark that yet?
6    (Exhibit 7 was marked for
7    identification.)
8 BY MR. FROST:
9    Q.    Do you recognize this as the NIOSH
10 document that you were relying on for your statement?
11   MS. SCOTT: Jack, can you, just for my
12 ease, can you direct me to the citation within
13 the report?
14   MR. FROST: That I'm going to go to?
15   MS. SCOTT: Yeah.
16   MR. FROST: I'm going to page 5, or V,
17 which is the Executive Summary.
18   MS. O'DELL: Thank you. You're talking
19 about in the NIOSH document?
20   MR. FROST: Oh, in his?
21   MS. O'DELL: Yes.
22   MR. FROST: It's on page 4, third
23 paragraph down from Asbestos. It's NIOSH 2010,
24 IRSST 2012.
25   MS. SCOTT: Thank you.

Page 117

1    A.    I'm not seeing it in my list.
2 BY MR. FROST:
3    Q.    Well, yeah. But if you look at page 4 of
4 your report, you cite to NIOSH 2012 for the proposition
5 that --
6    A.    Wait. Okay.
7    Q.    -- non-asbestiform cleavage fragments can
8 have the same potentially dangerous health effects. If
9 you turn to page V, "Executive Summary."
10   A.    Page V. Okay. "Executive Summary."
11   Q.    The second paragraph, about halfway down,
12 there's a sentence that starts, "Asbestos fibers are
13 clearly a substantial health concern."
14   A.    Let me find it. Okay. I found it.
15   Q.    After that, it reads, "Further research
16 is needed to better understand health risks associated
17 with exposure to other thoracic-size EMPs, including
18 those with mineralogical compositions identical or
19 similar to the asbestos minerals in those that have
20 already been documented to cause asbestos-like disease
21 as well as the physiochemical characteristics that
22 determine their toxicity." Did I read that correctly or
23 close enough, anyway, I'm sure?
24   A.    Yes, yes. Yep.
25   Q.    Okay. So, again, NIOSH here isn't saying

## Page 118

1 that -- NIOSH is not supporting the position you have in
2 your paper here, correct?  NIOSH's determination is that
3 they can't make one.  More research is necessary, right?
4         MS. SCOTT:  Objection.
5     A.    That is what's stated here.
6 BY MR. FROST:
7     Q.    Let's turn back to the IRSST document.  I
8 forget what we marked that as.  I think it's 4.  There
9 it is.  If you can turn to page 37.
10    A.    Okay.
11    Q.    And, again, at the top nine
12 recommendations, it states, Since a conclusion cannot be
13 reached about the biological effects from the
14 distinction between a cleavage fragment and asbestos
15 fibers -- actually, I did not read that correctly.  Let
16 me try again.
17        "Since a conclusion cannot be reached
18 about the biological effects from the distinction
19 between cleavage fragments and asbestos fibers," and
20 then it continues to say precautionary things.  So,
21 again, they also haven't determined, as you state in
22 your report, that it has the same dangerous health
23 effects, correct?
24        MS. SCOTT:  Objection.  Scope.
25    A.    It says what it says.

## Page 119

1 BY MR. FROST:
2     Q.    Yes.  They come to the same conclusion as
3 NIOSH, and that's, we don't know one way or the other.
4 More research needs to be done, right?
5     A.    Correct.
6     Q.    Other than these two, can you point me
7 right now to any other studies that actually support the
8 sentence you have here in your report that cleavage
9 fragments are the same, have the same dangerous health
10 effects as asbestiform fibers?
11    A.    No.
12    Q.    All right.  If we move down, further down
13 to page 4 of your report, the section called "Formation
14 of Talc deposits and inherent asbestos impurities."
15    A.    Okay.
16    Q.    The first sentence, "Talc forms in the
17 earth in metamorphic terranes, and the difference is
18 metamorphosed" -- I apologize.  Can tell me how to
19 pronounce that word?
20    A.    Metamorphosed.
21    Q.    Metamorphosed.  Okay.  "And the
22 difference in metamorphosed mafic and ultramafic rock
23 deposits show the complexity of talc ores at different
24 levels."
25    A.    I'm sorry.  That's a typo.  As I

## Page 120

1 indicated, I thought there might be typos in the report.
2     Q.    Okay.  What's the typo?
3     A.    So, essentially, the difference should be
4 diversity.  Talc forms in the earth in metamorphic
5 terranes, and the diversity is metamorphosed mafic and
6 ultramafic rock deposits show the complexity of talc
7 ores at different levels.
8     Q.    Okay.  And --
9     A.    Sorry about that.
10    Q.    That's okay.  Typos happens.
11        Your support for that is Berg 1977?
12    A.    Yes.
13    Q.    I'll mark Berg.
14    A.    It's e.g., Berg, so that's an example.
15    Q.    Yes.  Well, look at the one example you
16 pointed to.
17        MR. FROST:  Let me see if I can find a
18 copy.  Let me see if I can find a copy where the
19 staple hasn't come out.  We'll mark that one.
20 Do you all need one?
21        MS. SCOTT:  Sure.
22        MR. FROST:  Be careful of the staple.
23 It's pokey.
24        MS. SCOTT:  I appreciate that.
25        (Exhibit 8 was marked for

## Page 121

1        identification.)
2 BY MR. FROST:
3     Q.    Do we agree this is the Berg '77 you
4 reference in your report?
5     A.    I'm not a hundred percent sure.
6     Q.    It also appears, if you look at 18 --
7        MS. O'DELL:  Excuse me, Doctor.  Are you
8 finished?  Did you finish with your answer?
9     A.    I'm not sure.  So either I might have
10 misquoted something.  Let's see.  I don't think I -- I
11 don't think I have it.  Let me --
12 BY MR. FROST:
13    Q.    We can look at it during a break.  We can
14 come back.
15    A.    I'll check.  Berg had several.
16    Q.    I believe it's number 18.
17    A.    So I am not a hundred percent sure.  I
18 might have misquoted --
19    Q.    Okay.
20    A.    -- this.  Because, as I remember the
21 book, it was -- I honestly don't think I --
22    Q.    Looked different?
23    A.    Yeah.  It was -- yeah.  I think I've
24 looked at some of this before.  It looks familiar, but
25 the thing that I'm thinking, I think I misquoted.  I'm

Mark Krekeler, Ph.D.

Page 122

1 sorry.

2    Q.   If I were to tell you that talc isn't
3 even mentioned in this paper --

4    A.   Yeah. I mean, there's like -- the book I
5 had, there's images of mines that talks about, I think,
6 the Yellowstone mines, specifically. So I'm sorry about
7 that. I totally, totally missed that.

8    Q.   Okay. If we move down to the next
9 sentence, you state that "Italian mines, which Johnson &
10 Johnson and Imerys obtained talc for cosmetic
11 production, were ultramafic origin."

12    A.   Okay.

13    Q.   Is that true?

14    A.   I believe so.

15    Q.   Can we turn back to the IARC 2010? It's
16 the one with the orange cover. Go to page 283 to 84.

17    A.   Okay.

18    Q.   If you look at B, towards the bottom, it
19 says, "Talc derived from magnesium carbonites."

20    A.   Okay.

21    Q.   "Talc deposits formed from the alteration
22 of carbonite and sandy carbonite, such as dolomite and
23 limestone, are the most important in terms of world
24 production. Two types are recognized." And if you skip
25 down to two, it says, "Those derived from hydrothermal

Page 123

1 alteration (including retrograde metamorphism) of
2 regionally *metamorphosed siliceous dolomites and other
3 magnesium-rich rocks." And then if you turn the page
4 over one, two, three, it says "Italy vouches own after
5 that."

6    A.   So this is information produced by
7 Luzenac?

8    Q.   Well, this is from IARC.

9    A.   It's in IARC, but they're citing Luzenac
10 as part of this, and each -- the occurrences of each
11 individual mine are -- location are not shown. IARC is
12 more of a health thing. I would not necessarily expect
13 a detailed analysis of a geology from an IARC monograph.
14 So...

15    Q.   Can you point to me to any geological
16 study that shows --

17        MR. LAPINSKI: Counsel, let him finish
18     his answer first.

19    A.   So, I don't think that -- I don't know
20 what they are specifically relying on.

21 BY MR. FROST:

22    Q.   Can you cite me any geological study that
23 shows that the Italian mines of Val Chisone were of
24 ultramafic origin?

25    A.   I forget the citations specifically. I

Page 124

1 think --

2    Q.   You certainly didn't include it in the
3 report, right?

4        MS. SCOTT: Objection.

5    A.   I don't know. I forget.

6        THE WITNESS: Can we take a break?

7        MR. FROST: Sure.

8        VIDEOGRAPHER: We're now going off
9     record. The time is 12:21.

10        (A recess was taken from 12:21 to 1:25.)

11        VIDEOGRAPHER: We're now back on record.
12     The time is 1:25.

13 BY MR. FROST:

14    Q.   All right. Welcome back from lunch. We
15 were on page 4 of your report under "Formations of
16 Talc." And we talked about Italy. Let's move on to
17 Vermont. You say, "Vermont mines relevant to this
18 litigation are mafic and ultramafic origins." What's
19 your support for that statement?

20    A.   I'm sorry. Oh, bottom of 4?

21    Q.   Yeah, bottom of 4, moving on to 5.

22    A.   It's the geology of the area.

23    Q.   Do you believe there are mafic formations
24 of talc relevant to the Vermont mines used by Johnson &
25 Johnson and Imerys in this case?

Page 125

1    A.   Yes.

2    Q.   And do you have a geological survey or
3 something else you're relying on for that?

4    A.   There are USGS reports and things like
5 that.

6    Q.   And they say mafic? They don't just say
7 it's an ultramafic belt?

8    A.   I believe so.

9    Q.   On page 5, kick down to the next
10 paragraph, the one that starts, "Asbestos minerals,
11 including chrysotile, tremolite and actinolite" -- I'm
12 sorry, "tremolite, actinolite and anthophyllite are
13 common in talc ores." What's your basis for the
14 statement, because it's uncited?

15    A.   It's common knowledge --

16    Q.   Can you point me to a --

17    A.   -- mineralogy.

18    Q.   Can you point me to a peer-reviewed
19 source that states that?

20    A.   Let see here.

21        MR. LAPINSKI: Jack, while he's looking,
22     what was the statement from the report?

23        MR. FROST: It's page 5, the first
24     sentence of the first full paragraph. The
25     "Asbestos minerals, including chrysotile,

Mark Krekeler, Ph.D.

Page 126

1 tremolite," et cetera.  The first full
2 paragraph.
3     A.    So reference 40, figure 3, is a
4 comparison I computed with silica activities.  So,
5 essentially, it showed boundaries between talc and
6 chrysotile.  And figure 2 shows temperature pressure
7 diagrams for chrysotile and talc.  Figure 4 shows
8 comparison of computer phase equillibrium, experimental
9 data of Johannes, 1969.  It shows chrysotile and talc
10 fields.  So the significance of those fields is that
11 because of -- so those are fields where things, when, in
12 absolute equillibrium, those discrete phases are set or,
13 essentially, those are the phases that are stable.
14         The minerals are stable.  But you can go
15 back, you know, because of geologic conditions are
16 variable, you have metamorphism that heats up an
17 area or then cools down.  You can then -- the geologic
18 conditions then can cross those phase boundaries, and
19 you essentially can have minerals that are stable for a
20 while and then revert.  But, often, those reversions are
21 not necessarily complete.  And to substantiate that --
22 BY MR. FROST:
23     Q.    Can I stop you right there?
24     A.    Yes.
25     Q.    Where does Chernoskey say that asbestos

Page 127

1 minerals are common in talc ores?  You just told me
2 about how, chemically, things form --
3     A.    The thermodynamic diagram.  I'm sorry.
4 Go ahead.
5     Q.    Yes.  You just told me about how
6 chemically talc forms, but where does Chernoskey talk
7 about talc ores and relate that asbestos minerals are
8 common in talc ores?
9     A.    So this is a mineralogical volume, so
10 this is a review volume, and basically, talc is a
11 mineral that is in talc ores and, therefore, is
12 relevant.
13     Q.    So you're telling me how talc forms, and
14 where on the pressure and temperature scale, you know,
15 it can go back and forth to, you know, tremolite.  But,
16 again, does that, just because something can form in
17 nature, where does it say that asbestos minerals are
18 common in talc ores?  What you're telling me --
19     A.    Well, these are --
20     Q.    -- is scientifically how talc forms.
21     A.    They're commonly associated
22 thermodynamically.
23     Q.    And that says that in that book?
24     A.    The diagrams indicate that.
25     Q.    Okay.  But this is you interpreting

Page 128

1 something.  That's not actually stated in this book,
2 correct?
3         MS. SCOTT:  Object to the form.
4     A.    The diagrams are -- that's how one can
5 interpret these diagrams.
6 BY MR. FROST:
7     Q.    Okay.  So --
8     A.    The field --
9     Q.    Does it say it's common?
10         MR. LAPINSKI:  Counsel, let him finish
11     his answer, please.
12         MR. FROST:  Sure.
13     A.    So, you know, phase diagrams and the
14 interpretation of phase diagrams is something that
15 mineralogists and petrologists do all the time, and
16 basically, we often will refer to a given phase diagram.
17 People spend their entire lives perfecting phase
18 diagrams.  That was typically in the '50s, '60, '70s and
19 '80s.
20         So people will actually refer to specific
21 phase diagrams by people.  So one of my committee
22 members, when I was on my Ph.D., he had the best phase
23 diagram for quartz for some period of time.  So we use
24 those phase diagrams.  They're commonly used to
25 interpret mineral associations and assemblages.

Page 129

1         To further answer the question, the -- I
2 believe it's the Veblen '79.  Veblen and Buseck is the
3 science paper that shows the TEM associations, you know,
4 essentially, these intergrowths of talc and chrysotile.
5 And, essentially, that literature proves the --
6 essentially, the interpretation of the assertion I said,
7 that you go between these regions that are of one
8 condition and another.  You don't necessarily get the
9 full conversion because of the kinetics.  Essentially,
10 either the reaction goes too fast or things basically
11 sort of get frozen in the rock, depending upon the
12 various conditions.
13 BY MR. FROST:
14     Q.    Okay.  So let's be careful with the
15 language we're using here.  What you're giving me is a
16 generalization about how talc, the mineral, forms, and
17 what other minerals that might be associated with that
18 formation.  Is that -- is that fair?
19     A.    I would be hesitant about the word
20 "generalization."  I mean, these are experiments.  They
21 take years.
22     Q.    Okay.  But --
23     A.    And the data, you know, these boundaries,
24 people in the '50s, '60s and '70s, I mean, they put a
25 great deal of effort into establishing the boundaries.

Page 130

1 These are relevant for understanding larger processes of
2 metamorphism and understanding, you know, what --
3 essentially what the history of the earth is. So the
4 diagrams aren't generalized. They're very, very
5 specific --
6       Q.   That's why I want you to listen very
7 carefully to what I'm asking you. We'll really step
8 back.
9            All right. You agree with me, talc ore
10 is different than talc, right? Ore means it's the
11 deposit that is being mined, right?
12           MS. O'DELL: Objection.
13      A.   The mineral talc is a primary --
14      Q.   But listen to the "ore."
15      A.   -- constituent --
16           MR. LAPINSKI: Let him answer the
17 question, Counsel.
18      A.   So the mineral talc is a primary
19 constituent of ore, and you can't --
20 BY MR. FROST:
21      Q.   And that's why I want you to listen to
22 me. I'm talking about ore. Ore means it's a talc
23 deposit that's being mined, right? You wouldn't find a
24 piece of talc you found in somebody's backyard and call
25 it ore, would you? Ore is a definition of a mineral

Page 131

1 that's being mined. Do you agree with me there?
2           MS. SCOTT: Objection.
3      A.   Yeah. Ore is not necessarily a mineral.
4 Ore can be multiple minerals.
5 BY MR. FROST:
6      Q.   Sure. But ore is something that's being
7 mined, right?
8      A.   Yes. It's something of economic
9 interest --
10      Q.   Sure. So in order --
11      A.   -- as opposed to a primary material of
12 interest.
13      Q.   Okay. So in order to be an ore, it has
14 to be something that's being mined, right?
15           MS. SCOTT: Objection.
16      A.   No. You can have ores that are not being
17 mined. They're just recognized as ore deposits. I have
18 a book of ore deposits.
19 BY MR. FROST:
20      Q.   Okay. It's not this complicated, sir.
21 Just listen to what I'm saying. Talc ore means
22 something different than just a talc, you know, deposit,
23 a talc formation somewhere. A talc ore is something
24 that has been identified as a mineable source of talc.
25 Are we fair on that?

Page 132

1           MS. SCOTT: Objection.
2      A.   You can have an ore of talc. The two are
3 not -- so go ahead. Proceed.
4 BY MR. FROST:
5      Q.   So where in this book is it specifically
6 saying that talc ores, which are ores that have been,
7 you know, talc deposits that have been determined, as
8 you said, to be economically viable, will commonly be
9 associated with chrysotile, tremolite, actinolite,
10 anthophyllite?
11           MS. SCOTT: Objection.
12      A.   The mineral constituency --
13 BY MR. FROST:
14      Q.   So, again, you're --
15      A.   -- is -- minerals make up the talc ore.
16 So you can't separate -- you can't separate the ore from
17 the mineral when you're talking about how it's formed.
18 It's integral. I mean, it's absolutely integral to the
19 ore. You know, it would not be an ore if it didn't have
20 talc in it, right? It wouldn't -- you have to have the
21 required constituent in order for it to be an ore.
22           So, therefore, you know, every
23 petrologist in the world, every, you know, mineralogist,
24 you know, we refer to these thermodynamic diagrams that
25 have been worked out for, you know, now, some of them,

Page 133

1 you know, decades. One was '69 or whatever. So I don't
2 think it's -- it's my professional opinion that these
3 thermodynamic diagrams adequately relate and describe to
4 the mineral phases that occur in talc ore.
5 BY MR. FROST:
6      Q.   Okay. So you are making a
7 generalization, based upon the mineral phases, that all
8 talc ores --
9      A.   I would be hesitant to call it a
10 generalization. I mean, it's --
11      Q.   Can I finish my question, sir?
12      A.   Yeah. I'm sorry. Sorry. Go ahead.
13      Q.   So, again, can you give me a -- can you
14 give me a cite that shows that anthophyllite is common
15 in every talc ore mined across the world?
16           MS. SCOTT: Objection.
17      A.   Where does it say that in the report?
18      Q.   "Asbestos minerals, including chrysotile,
19 tremolite and actinolite and anthophyllite are common in
20 talc ores."
21      A.   Are common, yes. You said every talc
22 deposit in the world.
23      Q.   Well, no. Show me where -- show me in
24 there where it says that anthophyllite is common in
25 every talc ore across the world.

Mark Krekeler, Ph.D.

Page 134

1     A.   I think the interpretations of these
2   thermodynamic diagrams indicate that it's --
3     Q.   So it's purely theoretical?
4     A.   No.  It's experimental.
5     Q.   Okay.
6     A.   Is how the diagrams are designed.  And
7   then, essentially, these are peer-reviewed articles that
8   are long-standing.  So let me just check that to be
9   sure.  Yeah, so there's, you know, these different -- so
10  Berman '88 is kind of one of these benchmark
11  thermodynamic databases, and we use these all the time
12  to understand and predict mineral stabilities and
13  understand and interpret the environments.
14         So, essentially, through the use of these
15  diagrams over time, we can interpret, you know, the
16  condition.  So whether it's an ore or talc, you know, is
17  immaterial, the thermodynamics don't, don't really care.
18    Q.   Well, don't you agree with me that
19  depending on the temperature, time and pressure, the
20  constituent rock of any particular deposit is going to
21  be different?  I mean, that's what those phrase diagrams
22  say, right?
23         MS. SCOTT:  Objection.
24    A.   No.  The phase diagrams indicate that
25  things will be stable under different fields.

Page 135

1   BY MR. FROST:
2     Q.   That's what I'm talking about.  So you'll
3   have -- different minerals are stable under different
4   pressures and temperatures, right?
5         MS. SCOTT:  Objection.
6     A.   Not -- because of the kinetics,
7   essentially, this lag effect.  You know, things are --
8   that's not necessarily the case.  So diamonds, you know,
9   the classic example that we use in courses, diamonds are
10  thermodynamically stable deep in the earth.  They get
11  brought up and then they -- thermodynamically, they
12  should persist.  But because of the kinetics in that
13  particular situation, the bonds of the carbon are
14  really, really strong.  That diamond doesn't revert to
15  graphite.
16         So, essentially, the thermodynamics gives
17  us a guide.  It is a very, very good guide.  But when
18  things cross these boundaries, it takes time to
19  essentially equilibrate to the new conditions.  And if
20  not enough time evolves geologically, things occur such
21  that you get these relic phases.  And in the case of
22  talc ores or talc deposits or whatever you want to call
23  that, you can have essentially these relics or asbestos
24  minerals, chrysotile, for example, that co-occur.  So
25  the thermodynamics basically is -- and people know that.

Page 136

1   I mean, this is long recognized.
2   BY MR. FROST:
3     Q.   See, that's why -- I fear you're not
4   listening to my questions.  My question is:  Depending
5   upon the thermodynamics that were in play in creating
6   any particular deposit, it will be different.  And
7   depending on the differences, you will get different
8   mineral crystallization within the phases, correct?
9         MS. SCOTT:  Object to the form.
10    A.   Each situation may be slightly different.
11  But the -- to the blunt of the major phases, the
12  thermodynamics is relevant, and actually, you can
13  tweak -- you know, there's other programs that exist.
14         So, for example, on the igneous field,
15  there's a program called MELTS where you can fine tune
16  your models.  And I think things were being in
17  development for these.  You know, essentially, similar
18  types of things exist.  There's like geochemist
19  workbench and other modeling programs that exist.
20         So, yes, you can -- things will change,
21  but these diagrams are generalizable in the sense that
22  they can be applied to multiple regions throughout
23  the -- throughout the world.
24  BY MR. FROST:
25    Q.   And that's exactly what I asked you at

Page 137

1   the very beginning is these are generalizable tables
2   that you can use to predict what's in a particular
3   deposit?
4     A.   They're not tables.  They're phase
5   diagrams.
6     Q.   Or figures or phase diagrams.
7     A.   Yeah.
8     Q.   But so we're right back to where I
9   started, but that's these are generalization of how
10  phases work that you can use to predict what's in
11  something, but it's not necessarily saying there is this
12  constituent in this particular deposit, correct?
13         MS. SCOTT:  Objection.
14  BY MR. FROST:
15    Q.   How the phase operated will affect what's
16  in a particular deposit, right?
17    A.   So it's really the combination of the
18  phase diagram.  Plus, you know, I keep referring to
19  Veblen.
20    Q.   Yeah.
21    A.   So basically, yeah.  So the phase diagram
22  is relevant when things are -- assumed to be absolutely
23  perfect when everything is in thermodynamic equilibrium.
24    Q.   Yes.
25    A.   And it is relevant when it's not.  When

Mark Krekeler, Ph.D.

| Page 138 | Page 140 |
|---|---|

**Page 138**

1  things are not or when they're moving, things
2  essentially react and progress slowly.  But you can have
3  incomplete or imperfect reactions as, you know,
4  illustrated by the one Buseck paper, the '79 paper.
5      Q.   So if you want to predict what's in a
6  particular deposit, you have to sort of know what the
7  time pressure, the metamorphic history of it, when it
8  formed, how stable it was, what it started from, what
9  the constituent beginning minerals were, you know.  Then
10  you can apply that to a phase model?
11      A.   If you want to predict -- I'm sorry.
12      Q.   Yeah.  And then you can apply it to the
13  phase model, right?
14      A.   No.
15          MS. SCOTT:  Objection.
16      A.   Well, There's multiple ways of predicting
17  what a deposit would be, and it's scale dependent, phase
18  dependent.  It's dependent on the geology, and it's
19  dependent upon tectonics, as well.  So there's many
20  things.  So as a mineralogist, you know, one thing that
21  I would heavily rely on are the phase diagrams.
22  BY MR. FROST:
23      Q.   Sure.  But you have to know the specific
24  history of a formation if you want to do an accurate
25  prediction of what's in that particular thing.  The

**Page 139**

1  phase diagrams are one of the things you'd look at,
2  right?
3          MS. SCOTT:  Objection.
4      A.   You would use phase diagrams to predict
5  potential, potentially what would be in text, because
6  you have this kinetic issue, right.
7  BY MR. FROST:
8      Q.   Yeah, and that's based upon the geologic
9  formation, all the other factors that come into how that
10  formation was formed, temperature, pressure, time, you
11  know, all the things that we've talked about, right?
12      A.   You can use the phase diagrams.  Also if
13  you have bulk chemistry data -- if you have bulk
14  chemistry data, you can use that bulk chemistry data,
15  sort of figure out and do models to see where things
16  are.  So you don't necessarily have to know -- so you
17  can, you an model things, and that model would give you
18  some prediction.
19      Q.   If you look at the next sentence, it
20  says, "Talc and chrysotile are associated with each in
21  talc deposits at the micrometer and nanometer scale
22  making the separation impossible during the mining and
23  manufacturing process."  Do you see that?
24      A.   Yes.
25

**Page 140**

2  BY MR. FROST:
2      Q.   Then you cite Evans 2004 as the basis for
3  that statement?
4      A.   Yes.
5          MR. FROST:  Let's mark this.
6          MR. LAPINSKI:  What number is this?
7          VIDEOGRAPHER:  Nine.
8          MR. FROST:  I told you I'd forget.
9          (Exhibit 9 was marked for
10          identification.)
11  BY MR. FROST:
12      Q.   Do you recognize this article?
13      A.   Yes, I do.
14      Q.   Can you point to me where this article
15  shows that talc and chrysotile are associated with each
16  other in deposits?
17      A.   The thing I was referring to is
18  concluding remarks.  "Despite an up temperature
19  transition from lizardite to chrysotile at these
20  temperatures, the latter remains metastable."
21          So basically in giving these diagrams,
22  the thermodynamic diagrams, because that metastability,
23  that's the kinetic thing, that's what, essentially, the
24  chrysotile would potentially persist.
25      Q.   Okay.  So he's not saying that.  You're

**Page 141**

1  just interpreting that from this article?  That's not
2  his conclusion?  That's yours?
3      A.   That is the interpretation of the
4  thermodynamic, you know, this article.  And I think that
5  data supports it as does other, you know, these
6  diagrams.
7      Q.   What I'm saying is that's not his.
8  That's not Evans' conclusion.  That's you interpreting
9  data within the Evans report, correct?
10          MS. SCOTT:  Objection.
11      A.   Yes, but I'm citing that.
12  BY MR. FROST:
13      Q.   Okay.  Let's move on.  The next
14  paragraph, the one that starts "Metamorphic systems." I
15  believe it's the last sentence.  It says, "Reactions can
16  also progress for some period and then revert to
17  asbestiform mineral chrysotile," and it continues
18  because it changes.
19          So, hopefully, you'll agree with me on
20  this one.  For it to revert back to chrysotile, it would
21  have to have started as chrysotile, correct?
22      A.   So that is a possibility.  You can go
23  from -- that's what the stability fields are all about.
24  So you can start off as chrysotile.  You can cross that
25  phase boundary, and then it can revert back if the

Page 142

1  conditions change back.  And, actually, we know this in
2  metamorphic rocks, that, essentially, the phase
3  assemblage can basically go back and forth, back and --
4  it can revert.  So I'm specifically -- I'm talking about
5  reverting on that phase boundary.
6       Q.    Yes, but it can only revert back to
7  chrysotile if it started at chrysotile, right?
8       A.    So that might be a poor phrasing of the
9  word, but essentially it's not an inaccurate phrasing.
10 So when I wrote this, I was thinking of these phase
11 diagrams.
12      Q.    What I'm getting at is, let's say it
13 started as, you know, a serpentinite or an anthophyllite
14 converted to talc.  It's not going to then revert back
15 to a different crystal, right?  It's not going to --
16 it's not going to go from anthophyllite to talc to
17 chrysotile?
18      A.    Based on the geologic history, there's
19 multiple pathways.  So it won't revert to the same magic
20 crystal, if that's what you're implying.
21      Q.    So the way -- and I agree with you.  It's
22 very inartfully written here.  So you say, "Reactions
23 can progress for some period of time and then revert to
24 the mineral chrysotile."  So the reactions of talc can
25 only revert back to chrysotile if that's where they

Page 143

1  started from, correct?
2            MS. O'DELL:  Objection to form.
3       A.    So let me just read the sentence before
4  here, because I think -- "Reactions may also be
5  incomplete, meaning there may not be enough geologic
6  time or other chemical component to drive the reaction
7  to completion as discussed in Deer, Howie and Zussman.
8  Reactions can also progress for some period of time,
9  then revert to asbestiform mineral chrysotile because of
10 changes in geologic conditions."
11           So, in part, I think I'm referring to
12 Deer, Howie and Zussman.  I don't think I've said
13 anything inaccurate there.  It's not exclusive to --
14 BY MR. FROST:
15      Q.    I'm trying to clarify --
16      A.    You know, you can have reactions, you
17 know, that's not complete.
18      Q.    So what I'm getting at, it's a really
19 simple question.  The reversion won't always be from
20 talc to chrysotile, right?  It will only revert back to
21 chrysotile if that's where it started.  Do you agree
22 with me there?  So while it may be correct that if it
23 starts as chrysotile, partially transforms to talc and
24 reverts back to chrysotile, that makes sense.  But if it
25 starts as something else, it's not going to revert to a

Page 144

1  completely new chemical structure of chrysotile,
2  correct?
3       A.    Correct.  Not all the time, yeah.
4       Q.    Okay.  Thank you.  Bear with me a second
5  here.  Okay.  Next paragraph down after you cite the
6  various Imerys documents, you said, "A 1977 thesis by
7  Barry Seymour (JNJ 272469) describes the complex
8  mineralogical development of the specific ore."  So are
9  you talking about the specific ore in the Seymour paper
10 or are you talking about the specific ore at issue in
11 this case?
12      A.    I forget.  Can we bring that document up?
13      Q.    Yeah, I can get you Seymour.
14           MR. FROST:  Would you like a copy?
15           MS. SCOTT:  Yes, please.  Thank you.
16           (Exhibit 10 was marked for
17           identification.)
18           MS. SCOTT:  Are you marking this?
19           MR. FROST:  Yes, I forget what number it
20 is.
21           MS. SCOTT:  Ten.
22           MR. FROST:  Ten.
23      A.    I think "specific" is -- I think it might
24 be a typo.
25

Page 145

1  BY MR. FROST:
2       Q.    Okay.
3       A.    So as I look at this document, I
4  basically remember looking at the introductory material
5  in it.  So --
6       Q.    You'd agree with me it's a thesis about
7  the East Johnson mine?
8       A.    I would have to reread the document.
9       Q.    If I would represent to you it's about
10 the East Johnson mine and if you actually look at the
11 abstract --
12      A.    Foley and Johnson.
13      Q.    And you'd also agree with me the East
14 Johnson mine was never one that was used for cosmetic
15 talcum powder by Johnson & Johnson, correct?
16           MS. O'DELL:  Objection to form.
17      A.    It may not have been used, but it is in
18 the same general geology.  And, certainly, in geology,
19 it is part of the same general terrane, so therefore,
20 it's not exactly like the hammer, the Rainbow mine, but
21 it is relevant because it's geologically connected in
22 the sense of the terranes.
23 BY MR. FROST:
24      Q.    So you're telling me that it has the same
25 formation as the deposits in the Hammondsville and

Page 146

1 Rainbow mines or are you just saying --
2     A.    I don't remember specifically, but
3 essentially the geology, so...
4     Q.    The second half of my question, or is it
5 more that you're basing it on they're all part of the
6 ultramafic belt, the Appalachian ultramafic belt that
7 runs from Quebec through Georgia?
8     A.    It is more the general geologic
9 association.
10     Q.    Okay.  That's all I was going to ask
11 about that.
12     A.    Page 15 is geologic map of Vermont.  It
13 shows things being connected.
14     Q.    Well, it shows the Appalachian ultramafic
15 belt running through Vermont, correct?
16     A.    Yes.
17     Q.    Turn to page 6 of your report, the
18 "Common toxic metals of interest."  So before we start
19 looking at any specific documents, will you agree with
20 me that seeing metals at certain levels in deposit
21 samples is different than seeing metals in certain
22 levels in a finished talcum powder product?
23         MS. SCOTT:  Objection.
24     A.    It can be metals in processing.  It could
25 be reduced or they could also be increased depending

Page 147

1 upon the details of the processing.  I don't think I saw
2 any documents, although I requested documents, any
3 documents about the detail, you know, before -- before
4 and after, kind of full throughput, you know, as far as
5 watching a specific sample go through, but, yeah.
6 BY MR. FROST:
7     Q.    You'd also agree with me, too, that
8 sometimes mine samples aren't necessarily from the ore
9 that is used in the final product.  It might be from a
10 boundary.  It might be from a surrounding rock, a black
11 wall.  Just because you see something in a sample
12 doesn't necessarily mean that that's the ore that is
13 then converted over into the final powder as well,
14 correct?
15         MS. SCOTT:  Objection.
16         MS. O'DELL:  Object to form.
17     A.    I am confused by the question.  As I
18 think I understand you, can contaminants or other
19 material that is not the primary ore be included in the
20 ore processing?
21 BY MR. FROST:
22     Q.    Other way around.  When you sample a
23 mine, when you drill sample holes, they're not just
24 drilling the mineable ore body, correct?
25     A.    Generally correct.  They're looking to

Page 148

1 define the geology as a whole, you know.  So they want
2 to know where ore is and where ore is not, if there is
3 problematic areas.  So, for example, the mine I work
4 with in Nevada, they have a formation, Stebbins Hill
5 unit that they avoid, because it's got all kinds of
6 problematic stuff in it.
7     Q.    And that's probably a pretty good
8 example.  I take it they -- every now and again, they
9 take samples from the problematic portion of that mine,
10 correct?
11     A.    They sample everything as they go.  So
12 I've seen datasets of 20,000 from a single -- single
13 level.
14     Q.    So what I'm getting to is just because
15 you have a test of -- you know, a test coming back from
16 a mine doesn't necessarily mean that the rock associated
17 with that test makes it into the final product, right?
18         MS. SCOTT:  Objection.
19     A.    I don't -- there's no -- I didn't see any
20 specific chain of custody, so I can't, you know.
21 BY MR. FROST:
22     Q.    I'm talking from a general perspective.
23 They're sampling a lot more of the rock than that
24 ultimately ends up in a final product in a mine,
25 correct?

Page 149

1         MS. SCOTT:  Objection.
2     A.    So there's a difference between coring to
3 define your geology and then mining --
4 BY MR. FROST:
5     Q.    Uh-huh.  That's what I'm saying.
6     A.    -- to get your product.
7     Q.    So just because you find something here
8 doesn't necessarily mean that that ends up, that
9 particular test sample ends up in the final ore that
10 makes it to the grinding process for final talc,
11 correct?
12         MS. SCOTT:  Objection.  Speculation.
13     A.    Yeah.  You don't -- that would be
14 speculative or you -- it doesn't mean it doesn't.
15 BY MR. FROST:
16     Q.    But, again, that's why --
17     A.    So --
18     Q.    Okay.  I'll ask you this way.  Does every
19 single sample that's ever tested in a mine --
20         MS. O'DELL:  Excuse me.  You guys just --
21         MR. FROST:  Sure.
22         MS. O'DELL:  If you'd give him a chance
23 to finish.
24         MR. FROST:  I thought he did finish his
25 question.

Mark Krekeler, Ph.D.

Page 150

1    MS. O'DELL: I don't think he did. I'm
2 sure he needs to give you an opportunity to
3 finish as well --
4    MR. FROST: I'm sorry. I thought you had
5 finished your question.
6    MS. O'DELL: But you're talking over each
7 other. In fact, you just interrupted me.
8    A.    That's why I was distracted. Can you
9 restate your question again, please?
10 BY MR. FROST:
11   Q.    Sure. So my question is: Every sample
12 that comes out of a mine doesn't -- you know, everywhere
13 they're sampling, they're doing core outside of the talc
14 body. They're coring through. They're trying to find
15 areas of ore they don't use. Do you agree with all
16 these as just general mining concepts?
17   A.    Generally.
18   Q.    Okay.
19   A.    But it -- go ahead.
20   Q.    And you also agree with me that,
21 generally, mines aren't just sampling from the ore they
22 are using to put into a final product, correct?
23    MS. SCOTT: Objection.
24   A.    Correct. But that doesn't mean that --
25 that doesn't mean that you're not, when you sample and

Page 151

1 find things like asbestos, it doesn't negate that they
2 exist.
3 BY MR. FROST:
4    Q.    Okay. Here's my next question: Based on
5 that, just because a sample comes back with a particular
6 level of some, say, heavy metal, you know, just because
7 some sample in a mine somewhere came up with a level of
8 chromium, for example, based on that sample, you can't
9 say, without knowing more, that that particular area
10 where the sample came from ultimately ended up in talcum
11 powder that consumers used, right?
12    MS. SCOTT: Objection. Calls for
13    speculation.
14   A.    So, yeah, I think it is speculative,
15 because you're talking about one powder. There's many,
16 many analyses of things. So you're not -- you're not
17 gonna spend a huge amount of time on things that are not
18 directly related to your work, because, you know, you do
19 have to keep costs in mind. So, you know, if -- you
20 know, there were numerous, numerous, numerous analyses
21 of arsenic, for example, in some of the Vermont
22 material. So, you know, some of those were related to
23 ores. And let's look to --
24 BY MR. FROST:
25   Q.    We don't need to. I'm asking very just

Page 152

1 hypothetical questions here. I'm trying to get down to,
2 and again, as part of the mining process, you sample to
3 determine which parts of the ore you avoid and which
4 parts of the ore you mine, right?
5    A.    Yes. That is a common procedure.
6    Q.    So just because a sample comes up and has
7 a hit of a particular chemical in it doesn't necessarily
8 mean that they then use that as a final product, because
9 part of sampling is to tell you what parts of the mine
10 to avoid, right?
11    MS. SCOTT: Objection.
12   A.    Potentially. But there's reasonable
13 risk. If you find it in one spot, it might be near
14 another spot. When you have high concentrations, such
15 as those observed, it's a natural. Essentially, you
16 have gradients that occur over some degree of space. So
17 you, you know, so arsenic might have, you know, a
18 thousand parts per million in one spot and be zero in
19 another, but without, you don't know where to mine,
20 where that's cut -- cut off.
21 BY MR. FROST:
22   Q.    But, again, but my question's very easy,
23 and it's just because you see something here doesn't
24 mean it's there, right? You'd have to know more?
25    MS. SCOTT: Objection.

Page 153

1 BY MR. FROST:
2    Q.    Right?
3    A.    Correct.
4    Q.    Okay. And just because something shows
5 up here doesn't necessarily mean it's going to end up in
6 what becomes the mill feed, right?
7    MS. SCOTT: Objection.
8    A.    Correct. But there's always the
9 potential for it to do so.
10 BY MR. FROST:
11   Q.    Okay. And you also agree with me that
12 beneficiation is one way that mines specifically for
13 talc can clean out some of the accessory minerals and
14 some of the heavy metals, right?
15    MS. O'DELL: Object to the form.
16   A.    Beneficiation works when applied
17 properly. I'm not a mineral engineer, so I don't fully
18 think I can comment on details of that.
19 BY MR. FROST:
20   Q.    Okay. But you agree with me that
21 beneficiation is one way in which you can reduce the
22 amount of, say, a heavy metal that ends up in a final
23 product, correct?
24    MS. SCOTT: Objection.
25   A.    I would rather not comment, so the --

Mark Krekeler, Ph.D.

Page 154

1  BY MR. FROST:
2      Q.    You comment in your report specifically
3  about the beneficiation going on at the Vermont mines.
4  So is that not something you're going to opine on here?
5          MS. SCOTT:  Do you want to point him to
6      the place in his report?
7      A.    Yeah.  Sorry.  Is this the Colorado mines
8  study?
9  BY MR. FROST:
10     Q.    Yeah, it might be.  I don't have it right
11 in front of me.  It's something that I think we can get
12 back to later.  But you agree with me as a general
13 mining concept --
14     A.    I'd like to see the document.
15     Q.    Yeah.  Well, I'm asking you general
16 concepts, because you are giving opinions about the
17 mining that was going on at these mines, correct?
18     A.    Yes.
19     Q.    And beneficiation is one thing that mines
20 use, correct?
21     A.    Yes.
22     Q.    And beneficiation can be used to reduce
23 the amount of contaminants that are in an ore, correct?
24         MS. SCOTT:  Objection.
25         MS. O'DELL:  Objection to form.

Page 155

1      A.    Reduce, but not purify.
2  BY MR. FROST:
3      Q.    It can be used to reduce, correct?
4          MS. SCOTT:  Objection.
5      A.    Potentially, if executed well.
6  BY MR. FROST:
7      Q.    Okay.  And selective mining is another
8  tactic that can be used in an ore to try to reduce
9  contaminates, correct?
10         MS. SCOTT:  Objection.
11     A.    No.  There's -- the selective mining was
12 an issue, significant issue that I found.  And the
13 reason --
14 BY MR. FROST:
15     Q.    I'm asking in general, sir.  Can
16 selective mining --
17     A.    In general, I don't -- you know, I think
18 it really depends on what you mean by "selective
19 mining."  So I think a good effective example of
20 selective mining would be gemstones.  So you find a
21 pegmatite.  You go -- actually, there was a group that
22 did this a couple years ago.  They went to a site in
23 Colorado.  They basically looked at the geology.  They
24 selectively looked at specific lithologies.  They were
25 able to narrow it down.  They did a lot of research

Page 156

1  beforehand, and basically, they walked away with $50,000
2  worth of aquamarines.  So gem mining certainly is
3  something that you could selectively mine.
4          Gold is another example where there are
5  deposits in Nigeria where, essentially, groups of women
6  go out and they selectively, you know, go through,
7  basically pan and find gold nuggets.  I think it's --
8  you know, it really depends on how you say selective
9  mining, and so the thing that, you know -- did I answer
10 that?
11     Q.    I'm listening to your explanation, yeah.
12     A.    Okay.  So selective mining, I think in
13 the context of talc deposits, is -- I really don't think
14 you can effectively do it.  So with respect to Chinese
15 ore that is supposedly hand sorted -- let me find where
16 that section is.  So if you're -- yeah, as I understand
17 it, they basically look at the rock and say it's okay.
18 There's nothing wrong.
19         Well, there's several issues with that.
20 So, one, the human eye cannot detect either metals or
21 small asbestos fibers by simply looking at, at the rock,
22 at the surface of the rock, right?  So, essentially, you
23 can do it.  You can visually inspect the outside of the
24 material, and you would not be able to visibly see if
25 there's a thousand parts per million of nickel or

Page 157

1  chromium or some other element.
2          And then, in addition, you can have
3  inclusions of stuff in the rock that you could not --
4  you just physically can't see.  So there's a
5  hypothetical risk that you can have inclusion of, let's
6  say, sulfides, a lot of sulfides, a nodule that has a
7  lot of sulfides in it, that, in this chunk, you would
8  not be able to visually discern what was there.  So and
9  then, you know, so you basically -- and so that's the
10 sorting, as I understand it, with China.
11     Q.    Do you agree with me that -- so, is it
12 your opinion that selective mining for talc can never
13 work or do you agree with me that selective mining is
14 one of the tools that a mine can use to help to purify
15 its ore?
16     A.    I would say in the context of -- in the
17 context of talc, selective mining is not very effective,
18 because the scale of the issue is with the ore.
19     Q.    Okay.  Other than your personal opinion,
20 can you cite to me any peer-reviewed or scientific
21 source that supports that?
22         MS. SCOTT:  Objection.
23     A.    I don't think there's any peer-reviewed
24 literature that I can think of.  I think it's just
25 common sense.  You know, everyone knows that you can

Mark Krekeler, Ph.D.

Page 158

1   hide -- you can have inclusions and impurities in an
2   ore. And if you're only using your eyes and you're only
3   hand sorting things -- plus there's human error.
4   There's just simply human error. If someone, you know,
5   is, you know -- they'll just make mistakes.
6           And then the other issue I think is
7   unclear, I didn't find any degree of training, you know,
8   or no description of the training methods that were used
9   for hand sorting. So an ore-controlled geologist is a
10  common, common position in mines.
11          One of my former students, he's an
12  ore-controlled geologist in Stillwater, and it takes
13  three months of training for them to delineate the ore.
14  So that is an example of selective mining, but there's a
15  high level of effort that goes into it, and the goal is
16  platinum. And, basically, the way that particular mine
17  is set up is to extract the platinum. They're not
18  really -- they don't have to worry about other
19  contaminants that might be present.
20  BY MR. FROST:
21      Q.   Okay. I'm going to stop you because we
22  keep getting off on a lot of these tangents. My
23  question was: Can you point me to any mining studies or
24  anything else that say that selective mining does not
25  work for talc?

Page 159

1       A.   I know of no peer-review publications.
2       Q.   Okay. Thank you. Turn to page 7 of your
3   report. It's 7 into 8, actually. You know, we start
4   talking about the various regions that talc is sourced
5   from, correct?
6       A.   Yes.
7       Q.   Okay. On page 7 to 8, you list various
8   time frames and various mines, you know, from which you
9   believe. I take it this came from your review of the
10  documents, the timeline that you put forth here?
11      A.   Just give me a moment to review.
12      Q.   The easier way to ask is: Is this
13  something that was provided to you or is this something
14  that you came up with yourself?
15      A.   I came up with it.
16      Q.   Okay. So at the very end of it, so we
17  talked about all the various mines, and afterwards, you
18  have a sentence that reads, "These mines are known to
19  have impurities associated with talc, including toxic
20  metals, chrysotile, and amphibole asbestos." Do you see
21  that?
22          MS. O'DELL: Objection to form.
23      A.   Yes.
24  BY MR. FROST:
25      Q.   Okay. So the first thing you note as the

Page 160

1   basis of this is Van Gosen 2004. I'm going to mark
2   that.
3       A.   Okay. It's the environmental earth
4   science paper?
5       Q.   What's that?
6       A.   It's the environmental earth science
7   paper? It's the journal?
8       Q.   Yes. Environmental Geology, 2004.
9       A.   Oh, yeah. That's currently -- the
10  journal name changed. I had a few papers in it. Is
11  there a copy of it?
12      Q.   The court reporter's marking it.
13          (Exhibit 11 was marked for
14          identification.)
15  BY MR. FROST:
16      Q.   Since we've already established we're
17  talking about the same paper, can you show me anywhere
18  in this paper that Van Gosen specifically speaks about
19  any of the mines that you've listed here in your report?
20      A.   Correct. No specific mine is listed. It
21  talks about Vermont talc, in general.
22          (Exhibit 12 was marked for
23          identification.)
24  BY MR. FROST:
25      Q.   I've now marked the Ross article. It's

Page 161

1   Ross 74. "Environmental Health Perspectives." She's
2   already marked it for you.
3       A.   Oh.
4       Q.   Same question. Can you show me where in
5   this article it details any mine actually used by
6   Johnson & Johnson?
7           MS. SCOTT: Objection.
8       A.   I don't see mention of a specific mine.
9   BY MR. FROST:
10      Q.   Next, I'm going to mark -- I'm sorry.
11      A.   Go ahead.
12      Q.   I didn't mean to cut you off if you
13  weren't done. Next I'm going to mark Document
14  JNJ 000521616, the first page of it, anyway.
15          (Exhibit 13 was marked for
16          identification.)
17  BY MR. FROST:
18      Q.   Do you remember looking at this document?
19      A.   Actually, I'm unsure.
20      Q.   Okay.
21      A.   I might have used the wrong number.
22      Q.   Okay. But you agree with me this doesn't
23  talk about any of the mines, certainly, right?
24      A.   Right. Yeah.
25          MS. SCOTT: Object to form.

Page 162

1      MS. O'DELL: Object to form.
2      A.   Correct.  I -- I haven't -- I don't think
3  I've seen this.  I think I used -- there's a typo or
4  something in there.  Sorry.
5  BY MR. FROST:
6      Q.   No.  That's okay.  That's why we're --
7  that's why we're doing this.
8      All right.  If you turn to page 14 of
9  your report under, "Evidence that Asbestos Occurred in
10  Defendants' Mines."  The first sentence reads, "The
11  documents I reviewed provided strong evidence that the
12  talc used by Imerys and Johnson & Johnson to produce
13  Johnson's Baby Powder and Shower to Shower came from
14  mines that contained asbestos minerals or fibrous talcum
15  in an asbestiform habit."  Did I read that right?
16      A.   Yes.
17      Q.   And looking back, you cite the same exact
18  documents as we just -- as the last sentence, correct?
19      MS. SCOTT: Objection.
20      A.   It's in the report.
21  BY MR. FROST:
22      Q.   Yeah.  Okay.  And you'd agree with me,
23  you know, that these materials don't actually relate
24  directly to the mines used by Johnson & Johnson as
25  identified on pages -- I believe it's 7 and 8 of your

Page 163

1  report, right?
2      MS. SCOTT: Objection.
3      MS. O'DELL: Objection to form.
4      A.   I would have to read -- double -- I would
5  want to double-check each individual document.
6  BY MR. FROST:
7      Q.   But, certainly, the ones we just looked
8  at --
9      A.   The one we just looked at.
10      Q.   -- certainly don't support that, right?
11      A.   Correct.
12      Q.   Okay.  All right.  Move on to the next
13  section of the report.  It's "Mines in Italy," pages 8
14  to 9, I believe, of your report.
15      A.   Oh, 8 to 9.
16      Q.   Then on page 9, it's the third paragraph.
17  You have, "Based on what I have reviewed, I have
18  sufficient basis to conclude that Italian ore was of
19  poor quality," correct?
20      A.   Yes.
21      Q.   What are you talking about there when you
22  say "poor quality"?
23      A.   That I'm referring to the findings of the
24  items listed below.
25      Q.   These items are talking about things such

Page 164

1  as amphibole and grit and stuff like that, correct?
2      A.   So, for example, the one ending in 87231,
3  "Battelle Memorial Institute document dated 1958,
4  indicated the presence of tremolite in the talc,
5  commonly at levels ranging from 1-3 percent.  That
6  document also studied the abrasiveness and grit of
7  Italian talc."  So that's something, that the grit is in
8  addition to the finding of tremolite.
9      Q.   Do you agree with me that none of these
10  documents actually find asbestos or define that they
11  have found asbestos in any of the ore from Italy?
12      MS. O'DELL: Object to the form.
13      A.   I would want to double-check all of
14  these, but they do two things.  The last one, presence
15  of tremolite and actinolite and, also, tremolite and one
16  that I just mentioned.  And tremolite is a -- recognized
17  as a carcinogen by IARC 2012.
18      Q.   Can you show me anywhere in your report
19  that you note that tremolite is found by IARC to be a
20  potentially dangerous mineral, you know, a human
21  carcinogen?
22      (Exhibit 14 was marked for
23      identification.)
24      A.   I can't find a specific example.
25

Page 165

1  BY MR. FROST:
2      Q.   And you're not qualified to say whether
3  or not a particular mineral would be harmful, you know,
4  as a human carcinogen.  You have no basis by which to
5  say that's correct or not correct, right?
6      MS. SCOTT: Objection.
7      A.   Correct.  I'm not a medical.
8  BY MR. FROST:
9      Q.   Okay.  All right.  What number was that?
10  Fourteen.  So I've just marked -- I've given you a
11  binder marked 14.  It has tabs 1 through 5.  I'm sorry.
12  I have yours.  I apologize.
13      So these are the various documents you
14  cite in your report.  So let's look through each of
15  them.  We'll start with 1.
16      MS. O'DELL: Let's get this one back
17      together.
18      MR. FROST: Oh, did it come apart?
19      MS. O'DELL: Yes.  Is there a particular
20      part of his report that these came from or are
21      you jumping around?
22      MR. FROST: Yes.  No, we're talking about
23      the report now.  They're page 9 to 10.  These
24      are the documents that support the
25      ore-is-of-poor-quality statement.

Mark Krekeler, Ph.D.

Page 166

BY MR. FROST:

1  BY MR. FROST:
2      Q.   So this first one, can you tell me
3  anywhere in the Battelle report that starts JNJ 87868,
4  that they note the trace amounts of amphibole are
5  asbestiform in any way?
6          MS. O'DELL:  Object to the form.
7      A.   No, I don't.
8  BY MR. FROST:
9      Q.   Okay.  Turn to tab 2, which is -- the
10  document starts JNJ 87231.  Same question.  Can you tell
11  me anywhere in here where, I believe it's Battelle
12  again, identifies finding any asbestiform mineral?
13          MS. SCOTT:  Objection.
14      A.   So tremolite is noted as trace on page 4
15  here.
16  BY MR. FROST:
17      Q.   Does it note the trace tremolite has
18  asbestiform?
19      A.   No, it does not.
20      Q.   So you'd have no way to tell whether or
21  not it's asbestiform or non-asbestiform based on this
22  document?
23          MS. O'DELL:  Object to form.
24          MS. SCOTT:  Objection.
25      A.   The -- it has been so, "The amphibole

Page 167

1  component has been established to be the variety of
2  tremolite."  Yeah.  It does not say that it is asbestos
3  form, but it is tremolite.
4  BY MR. FROST:
5      Q.   Okay.  Turn to tab 17 -- or sorry, tab 3.
6  It's the document Bates numbered JNJAZ55_213.
7          And, again, I think it mentions tremolite
8  and actinolite as things that may be in the ore, but it
9  doesn't talk about whether or not anything's asbestiform
10  or any levels, correct?
11      A.   True.  It does say tremolite and
12  actinolite.
13      Q.   Turn to tab 4.  Somebody's conveniently
14  put an arrow, I think, to the paragraph that you're
15  relying on.  It states -- sorry, this is the document
16  that starts JNJAZ --
17          MS. O'DELL:  Just to make clear --
18          MR. FROST:  It's on the document.
19          MS. O'DELL:  It's the original.
20          MR. FROST:  Yeah.  I was going to say,
21  it's not something we've done.
22          MS. SCOTT:  Or anyone else?
23          MR. FROST:  Yes.  It's part of the
24  original document as produced.
25

Page 168

1  BY MR. FROST:
2      Q.   But it's JNJAZ55_6104.  I think it starts
3  at 6103, but 6104 is the letter.  The one, two, three --
4  fourth paragraph down says, "I have also checked into
5  the mineralization of that part of the territory, and
6  the minerals which show in the valley are:  Talc,
7  pyrite," magnesite -- sorry, "magnetite, calcite,
8  dolomite, apatite, clinochlore," sorry, "chrysotile,"
9  and then, you know, talks about others, including
10  tremolite, actinolite, correct?
11      A.   Yes.
12      Q.   And this is talking about the valley.
13  There is nothing in here that indicates that this is
14  talking specifically about the Fontaine mine, correct?
15          MS. SCOTT:  Objection.
16          MS. O'DELL:  Objection.
17      A.   It's unclear.
18  BY MR. FROST:
19      Q.   Dr. Ashton also isn't saying that any of
20  these minerals have been found in the ore coming from
21  the Fontaine mine, correct?
22          MS. O'DELL:  Objection to form.
23          MS. SCOTT:  Objection.
24      A.   Correct, but mineralization of that part
25  of the territory.  So...

Page 169

1  BY MR. FROST:
2      Q.   But there can be different mineral
3  profiles throughout the valley depending on when it
4  formed, what it formed from?
5      A.   Yes, and it could be present because of
6  the association observed.
7      Q.   Unfortunately, there's just no way to
8  tell from this document, correct?
9          MS. SCOTT:  Objection.
10          MS. O'DELL:  Object to form.
11      A.   Correct.
12  BY MR. FROST:
13      Q.   All right.  Turn to tab 5.  It's the
14  document that starts JNJAZ_87.  This is the Pooley
15  report from 1972.  It's very long, so I'll help you out.
16  If you turn to the very end of it --
17          MS. O'DELL:  Doctor, feel free to --
18  BY MR. FROST:
19      Q.   Yeah.  I was going to say, you can review
20  the whole thing if you want, but I'm going to
21  concentrate on the "Conclusions" section.
22          If you look at -- it's on page 121 of the
23  report.
24      A.   Oh, this one.
25      Q.   Do you recognize that you've seen this

Page 170

1 one?
2    A.   Yeah.
3    Q.   The quality's bad.
4    A.   Oh, there's -- you can see chrysotile.
5 "Examples of commercial amphibole and chrysotile
6 asbestos particles together with typical selected area
7 electron diffraction patterns." Yeah. So the images
8 are here, but, yeah. So, yeah. That's right. That
9 page you can't tell.
10        MS. O'DELL: What page are you on?
11        THE WITNESS: I'm on Page 56. I'm sorry.
12        MS. O'DELL: Yeah. No, no. I'm just
13    trying to follow along. You go where you need
14    to go.
15    A.   Amosite asbestos particles there.
16 BY MR. FROST:
17    Q.   Again, the chrysotile you pointed out on
18 56, he's showing you an example of what a commercial
19 chrysotile looks like, right, not a picture of what came
20 from the talc. Do you agree?
21        MS. O'DELL: Object to the form.
22    A.   What's your question?
23 BY MR. FROST:
24    Q.   When you just talked about 56, the
25 picture of chrysotile you're talking about is a

Page 171

1 reference to --
2    A.   I just recognized it.
3    Q.   Okay.
4        MS. O'DELL: Object to the form.
5 BY MR. FROST:
6    Q.   So if you look at the fourth paragraph
7 down on page 121, Pooley's page 121, it's page 210 of
8 the Bates number. The conclusion is "The only
9 asbestos-type mineral to be detected in the hand samples
10 was tremolite, which was found in three specimens." If
11 you go down to the next sentence, it says, "no tremolite
12 was detected in the talc-type specimens." Is that
13 right?
14        MS. O'DELL: Object to the form.
15    A.   That's what it says, yes.
16 BY MR. FROST:
17    Q.   Okay. So, again, Pooley did not find any
18 tremolite in the actual ore or the talc, correct?
19        MS. O'DELL: Object to the form.
20        MS. SCOTT: Objection.
21    A.   As it reads, yes.
22 BY MR. FROST:
23    Q.   And if you go to the next page, page 122,
24 it's the first full paragraph, the second paragraph on
25 the page. About halfway down, it reads, "Particles

Page 172

1 formed from the amphibole mineral found at the mine were
2 hardly fibrous in character, the majority of the
3 tremolite breaking to give compact particles," correct?
4    A.   It also said, "Those fibres formed were
5 short and had a very large diameter." So fibers were
6 formed. But, yeah, you're correct.
7    Q.   So, again, it's his opinion that there
8 was no asbestos in that test, correct?
9        MS. O'DELL: Object to the form.
10        MS. SCOTT: Objection.
11 BY MR. FROST:
12    Q.   But that the tremolite was not
13 asbestiform. I think they were just called the
14 amphibole, but the amphibole that he found was not
15 asbestos, correct?
16    A.   Correct.
17    Q.   Turning back to your report, page 10, the
18 "Mines in Vermont." So I think we talked about it a
19 little bit, but I think you and I will agree the
20 Appalachian ultramafic belt is where the talc is found
21 in Vermont, correct? I think it's your second sentence.
22    A.   Yes. Yeah.
23    Q.   Now, do you have the opinion that all the
24 ultramafic rocks within the Appalachian belt had the
25 same general metamorphic histories and formation

Page 173

1 histories and profiles?
2    A.   No. There would be some variability.
3    Q.   Okay. I agree with you. So have you
4 ever looked at the local geology for the formation
5 associated with the Hammondsville mine?
6    A.   I've never been on site. I've never been
7 to the mine.
8    Q.   Have you ever looked at any geological
9 survey specific to the Hammondsville mine deposit?
10    A.   The Hammondsville?
11    Q.   Yes.
12    A.   Yeah. Yeah. I see its geological
13 survey.
14    Q.   I see the one you've typed here. That's
15 really just geological survey showing you where it is,
16 correct? That doesn't tell you about the morphology and
17 the geological deposit formation?
18    A.   I think there's some geologic data that's
19 associated with it. I don't remember specifics.
20    Q.   Okay. So and this is true for -- it's
21 27, 28, 29 and 30, your footnotes, correct? These are
22 all, you know, USGS website hits for Hamm, et cetera?
23    A.   Yeah.
24    Q.   Have you ever looked at any of the USGS
25 actual reports or surveys that were done examining the

Mark Krekeler, Ph.D.

Page 174

1 talc in these particular mines?
2      A.    I believe I have.
3      Q.    Do you recall which ones they are?
4      A.    Not specifically at the moment.
5            MS. SCOTT: Before you get into this
6 next --
7            MR. FROST: Do you want to take a break?
8            MS. SCOTT: Yeah, let's do that. We've
9 been going about an hour and a half, I think, is
10 that right, or about an hour?
11           MS. O'DELL: Hour and 13 minutes.
12           VIDEOGRAPHER: We're now going off the
13 record. The time is 2:39.
14           (A recess was taken from 2:39 to 2:58.)
15           VIDEOGRAPHER: We're now back on record,
16 and the time is 2:58.
17           (Exhibit 15 was marked for
18           identification.)
19 BY MR. FROST:
20     Q.    All right. I'm going to start -- can you
21 grab, I think, number 15? It's the 1951 geological
22 survey from Chidester. Have you ever seen this article
23 before?
24     A.    I don't remember. Let me look at my
25 references, the author or the agency. It doesn't appear

Page 175

1 to be on my reference list.
2      Q.    Okay. Turn to page 28 of the report.
3            MS. SCOTT: And, Doctor, feel free to
4 take a look at the entirety of the report if you
5 need to.
6      A.    Okay. I'm not sure.
7            MS. SCOTT: Do you have one?
8            MR. FROST: Do you need a copy?
9            MS. SCOTT: Yes.
10           MR. FROST: I apologize.
11           MS. SCOTT: That's okay. Thanks.
12           MR. FROST: You're welcome. Sorry about
13 that.
14           MS. SCOTT: No problem.
15 BY MR. FROST:
16     Q.    And my question about this paper is: You
17 agree with me, turning to page 28, that this geological
18 survey specifically talks about the Hammondsville talc
19 mine, correct?
20     A.    Turn to page 28. Let's see here.
21     Q.    About halfway down the first column,
22 "Hammondsville talc quarry, Locality 117."
23     A.    28, Locality 117. Okay. I see that.
24     Q.    So you agree with me this paper talks
25 about the Hammondsville talc mine, correct, this

Page 176

1 geological survey?
2      A.    As stated, yeah.
3      Q.    Any reason this would not have come up in
4 your search?
5            MS. SCOTT: Objection.
6      A.    I didn't search for this particular
7 document. When I was doing my search for the
8 peer-review literature, you know, I use, like, Web of
9 Science. So Web of Science has, essentially, this
10 higher level of peer-review material. So this isn't
11 necessarily -- these types of reports aren't included in
12 that, but I did use Google to search things, and that's
13 how I found some of the other things. So -- but, no, I
14 don't believe that I've seen this report.
15 BY MR. FROST:
16     Q.    Okay. Given your rendering opinions
17 about the geology specifically at the Vermont talc
18 deposits, any particular reason you didn't search the
19 geological surveys, the USGS surveys regarding the
20 areas?
21           MS. SCOTT: Objection.
22     A.    I looked at the literature that I thought
23 was relevant, based on my professional opinion.
24 BY MR. FROST:
25     Q.    The next one marked. Take a look at --

Page 177

1 yep, the next one.
2            MS. O'DELL: What's the exhibit number on
3      this one?
4            MR. FROST: Sixteen.
5            (Exhibit 16 was marked for
6            identification.)
7 BY MR. FROST:
8      Q.    And, again, this is Chidester 1964.
9      A.    It's the geological survey. Let me check
10 and see if I have that. It doesn't look like I have
11 that in the reference list.
12     Q.    Turn to pages --
13     A.    So let me look. Can I look at the report
14 and --
15     Q.    Yes.
16     A.    -- just see what the nature is?
17     Q.    Sure. And, specifically, I'm going to
18 turn your attention to 48 and 49.
19     A.    48 and 49, okay. Let me look at the
20 report in general here.
21     Q.    The question, then, is going to be: You
22 agree with me that in this USGS survey, they
23 specifically ran chemical analysis of ore coming out of
24 the Hammondsville mine? I guess it's typed ore mill
25 product.

Mark Krekeler, Ph.D.

Page 178

1    A.   Yes.  It says, "Chemical analyses of a
2  variety of talc in Vermont," and the year on this is --
3  well, I'm sorry.
4    Q.   I believe it's 19 --
5    A.   So 40a, 40b and 40c.  The source is from
6  Spence, so let's see what Spence 1940 is.  So at that
7  period of time, most things were done by wet chemistry,
8  and so the -- there were limitations as far as the
9  detection limits.  So I'm sorry.  1940.
10   Q.   Well, again, my question --
11   A.   Yeah.  Go ahead with your question.
12   Q.   Despite the fact that there is specific
13 testing of ore in this document as well as Spence,
14 neither of those two documents ever came up in your
15 searches, correct?
16       MS. SCOTT:  Objection.
17 BY MR. FROST:
18   Q.   And this is testing specific to the ore
19 from the Hammondsville mine.  Do you agree with me that
20 neither Spence nor this paper came up in your searches?
21   A.   Correct.  I mean, you know, so one of the
22 things is that it depends --
23   Q.   Well, answer my question.
24   A.   Yep.  I'm seeing if it -- it's not --
25 actually, Spence is not cited in this document.

Page 179

1    Q.   It appears to be.  Spence?
2    A.   Pearre, Pearre, Pearre, Pearre, Perry,
3  Pratt, Quinn.
4    Q.   If you at page 61, Spence, HS 1940.
5    A.   It's not listed in the --
6    Q.   Page 61, selected bibliography?
7    A.   61.  I'm sorry.  I don't see it.  Oh,
8  Spence.  I was thinking Pence.  Okay.  Right.  Very
9  good.
10   Q.   Okay.
11   A.   So, essentially, the -- I don't think the
12 company was mining Hammondsville at that time, was it?
13   Q.   My question becomes, did these come up --
14 despite the fact that there's testing specifically of
15 ore from Hammondsville in both Spence and this, this
16 report did not come up or the Spence report come up in
17 your searches; is that correct?
18       MS. SCOTT:  Objection.
19   A.   Correct, because the analytical
20 techniques at the time, certainly for electron
21 microscopy, was in its infancy.  Power diffraction
22 was --
23 BY MR. FROST:
24   Q.   So you're saying it didn't come up in
25 your computer search because of --

Page 180

1       MS. O'DELL:  Let him finish.
2    A.   Power diffraction was beginning to be
3  common and then chemical analyses.  So I didn't
4  necessarily exclude it based on -- or I didn't really --
5  I just -- I didn't find it, but I didn't -- you know,
6  these are older references and I would not --
7  BY MR. FROST:
8    Q.   That was question is you didn't find
9  this, right?
10       MS. SCOTT:  Objection.
11   A.   I did not search for a lot of the older
12 literature because the analytical methods dated,
13 predated what appear to be the operational -- operation
14 timelines or --
15 BY MR. FROST:
16   Q.   But it doesn't sound like you searched
17 for any USGS surveys regarding these specific mines; is
18 that fair?  That wouldn't have come up in your search?
19       MS. SCOTT:  Objection.
20   A.   So specific mines may not -- they're not
21 necessarily in USGS reports.  Mines tend to show up in
22 USGS reports if there's permission or --
23 BY MR. FROST:
24   Q.   Sir, I have a limited amount of time, and
25 I really need you to just answer my questions.  So my

Page 181

1  question is --
2    A.   I'm trying to give a thorough answer.
3    Q.   No, no.  The question is -- it's a very
4  simple question.  Did you search USGS reports for the
5  specific mines that Johnson & Johnson used in Vermont?
6       MS. SCOTT:  Objection.
7    A.   I don't remember.
8  BY MR. FROST:
9    Q.   Okay.  And you certainly didn't cite
10 them.
11   A.   I did not cite these.  I did not cite
12 these.
13   Q.   Do you know what NIOSH is?
14   A.   Yes.
15   Q.   Okay.  Are you aware that NIOSH has
16 funded an epidemiological study based out of the workers
17 of the Vermont mines?
18       MS. SCOTT:  Objection.
19   A.   I'm not a medical expert.  I only know
20 NIOSH really exists.  I use it for the basic definition.
21 BY MR. FROST:
22   Q.   So is that a no?
23   A.   I'm sorry.  Repeat the question, please.
24   Q.   I said, are you aware that NIOSH has run
25 an epidemiological study of the workers at the Vermont

Mark Krekeler, Ph.D.

Page 182

1  mines?
2      A.    No I am not.  I don't remember.
3          MR. FROST:  We'll mark this as -- I
4  believe this is new 17.
5          (Exhibit 17 was marked for
6          identification.)
7  BY MR. FROST:
8      Q.    Have you ever seen this paper?  Do you
9  know who Dr. Boundy is?
10     A.    So what is the journal?  I don't have it
11  cited as Boundy.  The journal -- is this a National
12  Institutes of Health paper, just so I can be sure?
13     Q.    I believe it is a journal called Dust and
14  Disease.
15     A.    Oh, I don't think I cited anything from
16  Dust and Disease.
17     Q.    Okay.
18     A.    So in occupational exposures,
19  non-asbestiform talc in Vermont.  Okay?
20     Q.    Is this not something that came up in
21  your search?
22          MS. SCOTT:  Objection.
23     A.    No.  I'm not -- I'm sorry.  Dust and
24  Disease?
25

Page 183

1  BY MR. FROST:
2      Q.    That's correct.
3      A.    Yeah.  I'm not a medical --
4      Q.    So you wouldn't have --
5      A.    -- expert.
6      Q.    Sorry.
7      A.    So I'm not a medical expert, so I didn't.
8      Q.    So you wouldn't have looked at any
9  journals outside of your specific field, because I will
10  relate to you that they tested talc from the various
11  mines and found that there was no asbestos in it based
12  on the NIOSH study.  It's not something you relied on?
13     A.    So there's --
14          MS. O'DELL:  Object to the form.  Excuse
15     me, Doctor.  Object to the form.  You may
16     answer.
17     A.    In all these questions are still -- I did
18  not look at this paper, but this paper does not negate
19  the findings of the rest of the report.  I've tried to
20  take a broad net.
21  BY MR. FROST:
22     Q.    Sir, again --
23     A.    I have a broad net.
24     Q.    I'm asking very simply yes or no
25  questions about whether he searched for things,

Page 184

1  explanations about other parts of the report that don't
2  have to do with question are just taking up my time on
3  the record.  So I'm not trying to be rude, but I'm
4  running out of time, so I'm trying to move it along.
5          MS. SCOTT:  But to be fair, you're also
6      asking him about an epidemiological study.  He's
7      not an epidemiologist.
8  BY MR. FROST:
9      Q.    And my question was whether or not this
10  was something he would have searched for, and the answer
11  is no, right?
12     A.    No.  I would not go to a journal called
13  Dust and Disease.  Are you okay on time?
14     Q.    You don't need to worry about that.
15  That's a lawyer thing.
16          MS. O'DELL:  Yes.
17  BY MR. FROST:
18     Q.    Turning back to your report, looking at
19  the bottom of page 10, we then move on to the mines in
20  China.
21     A.    I requested documents on -- I requested
22  documents on China, mines in China.  There were --
23  apparently, there was not a whole lot of information.  I
24  know Dr. Longo tested materials from China, but I don't
25  think -- I mean, I made a request for cores.  I made

Page 185

1  requests for testing results, including TEM, XRD, bulk
2  chemistry.  But the data that I was able to have was, as
3  far as I did actually, I tried to search on Web of
4  Science and other things about talc deposits in China,
5  and I could not discernibly find anything.  I think
6  there's Chinese references, but I don't speak Chinese
7  and --
8      Q.    Sure.
9      A.    -- I couldn't really translate those.
10     Q.    And by saying you asked, you asked
11  plaintiffs' counsel, and they provided you what they
12  provided you, correct?
13          MS. SCOTT:  Objection.
14     A.    Yeah.  So I want to use company
15  documents, so give the company, essentially, as I
16  believe I was supposed to do, so the company documents
17  are -- I mean.
18  BY MR. FROST:
19     Q.    Okay.  And like we established before,
20  you have no way of knowing if there are any other
21  documents that just weren't given to you by plaintiffs'
22  counsel, right?
23          MS. SCOTT:  Objection.
24     A.    Well, I did.  I did search -- I did
25  search the Internet to try to find --

Mark Krekeler, Ph.D.

## Page 186

1  BY MR. FROST:
2      Q.   I'm talking about documents.
3      A.   The documents?
4      Q.   Yes. You have no way of knowing if what
5  plaintiffs gave you is the complete set of documents
6  that relate to the mine, right?
7      A.   I expected --
8      MS. SCOTT: Objection.
9      A.   Yeah. Of all the documents that exist, I
10  expect that it's not each and every single document.
11  BY MR. FROST:
12      Q.   So you've made your review and your
13  opinions on the China based on what is admittedly an
14  incomplete set of documents provided to you by
15  plaintiffs' counsel, right?
16      MS. SCOTT: Object to the form.
17      A.   I don't know if it's fully -- I made
18  requests for the China for as much -- all the
19  information on China that there was and to, my
20  knowledge, what was provided, and then what I looked at,
21  I tried to search things on my own. There just is
22  apparently not a lot I would consider. I would
23  certainly consider reviewing documents on China. I
24  would certainly consider translated documents, so
25  someone who's got an expertise but --

## Page 187

1  BY MR. FROST:
2      Q.   Again, I'm trying to rein in your answers
3  here --
4      A.   Okay.
5      Q.   -- to what we're talking about. But I
6  want to be clear. The requests you made weren't to
7  either Imerys or Johnson & Johnson. You made those
8  requests to plaintiffs' counsel?
9      A.   Yes.
10      Q.   And then plaintiffs' counsel provided
11  back to you a set of documents?
12      A.   Yes.
13      Q.   And you can't tell me whether or not that
14  set consists of all documents that you requested related
15  to the Chinese mines, right?
16      MS. SCOTT: Objection.
17      A.   I cannot without certainty.
18  BY MR. FROST:
19      Q.   All right. So let's look at what you
20  opine. Page 11, the second paragraph, you state, as far
21  back as 1983, you state, again, we know in 1983, Johnson &
22  Johnson was not sourcing talc from China, right?
23      A.   Correct.
24      Q.   Defendants had information indicating
25  that Chinese talc contains higher than normal heavy

## Page 188

1  metal contents like lead, cobalt, chromium, iron, nickel
2  and titanium, correct?
3      A.   Correct.
4      Q.   And then you cite to JNJ 59273, right?
5      A.   Right.
6      Q.   Okay. Let's look at that document.
7      A.   It's got 750 parts per million of
8  titanium in it. It's actually low. It's like .2.
9      (Exhibit 18 was marked for
10      identification.)
11  BY MR. FROST:
12      Q.   I'll divert your attention to page 2086.
13  I take it the comment at the bottom of 2086 is where
14  you're getting this information from, right?
15      MS. SCOTT: Objection.
16      A.   I looked at the data. Actually, I'm
17  looking for the data table that I saw the other day.
18  Yeah, so 2078, titanium 750. The lead there is 12.7 on
19  the previous table. Let's look and see what the
20  concentrations are.
21  BY MR. FROST:
22      Q.   You're on 2078?
23      A.   I am on 2078.
24      Q.   Okay.
25      A.   And so --

## Page 189

1      Q.   Do you see the top of 2078 that that
2  chart relates to something called "Kwangsi No. 1 talc"?
3      A.   Yes.
4      Q.   Do you believe that Kwangsi No. 1 talc
5  was the talc ever used by Johnson & Johnson?
6      A.   It's unclear. I don't.
7      Q.   Well, in your report, I think you note
8  that they use Kwangsi No. 1 and Kwangsi No. 2, correct?
9      A.   Correct.
10      MS. O'DELL: Objection.
11      A.   I think -- again, I'm not an expert in
12  Chinese language.
13  BY MR. FROST:
14      Q.   But you'd agree with me that Kwangsi No.
15  1 is not Kwangsi talc, correct? It's a different ore?
16      A.   I don't really know. Names of mines
17  change and things, but, potentially, they seem
18  different. That's reasonable. But in my sentence, I
19  say defense information indicating that Chinese talc
20  contains higher than normal levels and, you know, the
21  metals are there. So I think that statement is
22  consistent with the chart on page 2078 and 2086, and
23  let's look at -- it's been a while since I looked at the
24  document.
25      Q.   Hold on. Let me walk you through it.

Mark Krekeler, Ph.D.

Page 190

1    A.   I'd like to review --
2    Q.   Well, I want to talk about your
3 statement, then.  When you're saying Chinese talc is
4 higher than normal --
5    A.   Can I?
6    Q.   No.
7         MS. SCOTT:  Let him ask the question.
8 BY MR. FROST:
9    Q.   Can you answer my question, please?
10    A.   Okay.  Good.
11    Q.   When you say Chinese talc contains higher
12 than normal heavy metal contents, you're talking about
13 all talc from China, not necessarily the Chinese talc
14 that Johnson & Johnson was using?  Is that what you're
15 telling me?
16         MS. SCOTT:  Objection.
17    A.   I'm sorry.
18 BY MR. FROST:
19    Q.   I'll ask you the question again, so you
20 don't have to read it.
21    A.   Yeah.
22    Q.   So in your report, when you're talking
23 about Chinese talc, you're talking about talc from the
24 country of China, not the Chinese talc ore that Johnson
25 & Johnson was using?  Is that what you're telling us?

Page 191

1         MS. SCOTT:  Objection.
2    A.   I meant, essentially, both more Chinese,
3 Chinese talc, meaning talc within the boundaries of
4 China has more or has contaminants and would be of
5 potential concern.
6 BY MR. FROST:
7    Q.   That's a general statement as to all
8 talcs coming out of all talc regions of China?
9         MS. O'DELL:  Object to the form.
10 BY MR. FROST:
11    A.   Well, it's specific to this example, and
12 as an example, I think there's, there's a lot of concern
13 in the general environmental literature about materials
14 in China in general so --
15    Q.   And by concerns over materials in
16 general, you're talking about now everything coming out
17 of China as a generalization?
18         MS. SCOTT:  Objection.
19    A.   Not everything.
20 BY MR. FROST:
21    Q.   But you're talking about, like, the lead
22 concerns out of manufactured products like toys, and
23 we're including this now in your statement, right?
24         MS. SCOTT:  Objection.
25    A.   No.  I'm sorry.  Let me just be clear.  I

Page 192

1 refer to this as an indication that there are
2 problematic materials in Chinese ore.  Obviously, it was
3 investigated for a reason, so they were interested in it
4 at some level.
5 BY MR. FROST:
6    Q.   Okay.  But you agree with me you have no
7 way to tell us one way or the other that any of the
8 tests of any of the ore in this document actually relate
9 to the talcum powder that 20 years, 30 years later made
10 it into Johnson & Johnson talcum powder products?
11         MS. O'DELL:  Objection.
12    A.   The -- the documentation provided to me
13 is -- there's many gaps.
14 BY MR. FROST:
15    Q.   Sir, I'm talking about this document.
16 Focus on this document.  So my question is:  This
17 document, is there anywhere in this document that says
18 the talc that Johnson & Johnson uses 20 years later for
19 talcum powder has constituents?  I understand we're
20 talking --
21    A.   Has constituents?
22    Q.   Has the constituents we're talking about
23 here.  You know, that "Defendant had information
24 indicating that Chinese talc contains higher than normal
25 heavy metal contents like lead, cobalt, chromium, nickel

Page 193

1 and titanium."  Is there anything in here --
2    A.   They simply knew that this is how I --
3 they simply know that this report existed, right?
4    Q.   You have to listen to my question.  You
5 can't tell me one way or the other that this report in
6 any way relates to any talc ever used by Johnson &
7 Johnson for its talcum powder, right?
8         MS. SCOTT:  Objection.
9    A.   I do not have a chain of custody, so,
10 yes.
11    Q.   Okay.
12    A.   But the way the sentence is phrased, the
13 sentence is general.
14    Q.   Yes.  We've established that now.
15         MS. O'DELL:  Excuse me.
16 BY MR. FROST:
17    Q.   No, no.  I'm saying --
18         MS. O'DELL:  You interrupted him -- let
19 him finish.
20         MR. FROST:  Sure.
21 BY MR. FROST:
22    Q.   In general --
23         MS. O'DELL:  Stop talking.  Let him talk.
24 Thank you.
25    A.   So the sentence is general.  Defendants

Mark Krekeler, Ph.D.

Page 194

1  have information indicating that Chinese talc contains
2  higher than normal levels of lead, cobalt, chromium.  So
3  I feel that this document supports that statement.  It
4  doesn't say all talc, but they had knowledge that
5  some --
6  BY MR. FROST:
7       Q.    Some talc?
8       A.    -- talc had issues.
9       Q.    Okay.
10            THE WITNESS:  My thing is -- I think it
11      stopped.  What time?  It says 1520.
12            MS. SCOTT:  Did you hit "follow"?
13            THE WITNESS:  Yeah, I have hit "follow"
14      several times.
15  BY MR. FROST:
16      Q.    All right.  While they're sorting that
17  out, I'll continue to ask my questions.
18      A.    Okay.
19      Q.    All right.  Page 11 of your report,
20  second full paragraph starts, "In the Guangxi Province."
21      A.    Yes.
22      Q.    If you look down the citation, you say,
23  after it, it says, "In 'Talc Geology, Resources,
24  Production and Market Study, Guangxi Autonomous Region,'
25  asbestos was discovered in fractures of the talc ore

Page 195

1  body of the Maanshan talc deposit located in the
2  Shanglin region."
3            Did I read that right, or close enough,
4  anyway, on the pronunciations?
5       A.    Yes.
6       Q.    Did Johnson & Johnson ever use talc from
7  the Maanshan deposit?
8       A.    I'm not sure.  I'm confused by that, the
9  Chinese words, so I'm not sure.  But, again, there
10  was -- so I don't know for sure, but there was a paucity
11  of data relating to Chinese, I think.
12      Q.    You specifically state, if you look back
13  at page 8 --
14      A.    I forget.
15      Q.    -- of your report, you state, "2002 to
16  present: Zhizhua Mine, Guigang Province, China.
17  Product Name:  Guangxi No. 2 and Guangxi No. 2A"
18      A.    Yeah.  Those are two.
19      Q.    Maanshan is not the Guangxi mine that's
20  mentioned there, correct?
21      A.    Correct.
22      Q.    And you have no evidence that Johnson &
23  Johnson ever sourced talc from the Maanshan deposit?
24            MS. SCOTT:  Objection.
25      A.    Correct.  But as I understand it, the

Page 196

1  deposits are geologically related, to the best of my
2  ability.  Again, there is some paucity of data, but it
3  seemed, from what I could gather, that these are
4  geologically related.
5  BY MR. FROST:
6       Q.    So sitting here today, you can tell me
7  that you've specifically looked at the Maanshan deposit
8  and the -- I apologize to the court reporter on these
9  names -- and Zhizhua Mine, and you're confident and you
10  can tell me that you have seen sources that shows those
11  two exact deposits are similar and come from the same
12  areas?  And if that's true, what's your source?
13      A.    Let me -- so...
14            MS. O'DELL:  Objection.
15      A.    So asbestos was discovered and fractures
16  of the talc ore body of the Maanshan deposit looking in
17  the Shanglin region.  And the question is am I certain
18  that talc --
19  BY MR. FROST:
20      Q.    You just told me that you've seen
21  something that says Maanshan is the same geological
22  formation?
23      A.    Can we look at 413792?
24      Q.    I don't have it.  Is that the one we just
25  looked at, though?

Page 197

1            MS. SCOTT:  No.
2            MR. FROST:  A different one.  I don't
3      have it, so, no.  I mean, you guys can do it
4      during your time.
5            MS. O'DELL:  If he wants to see the
6      document and it's available to him --
7            All right.  If he has it.
8       A.    Can we?  So it's Imerys 413792, Imerys.
9            VIDEOGRAPHER:  Watch your mic.  Doctor,
10      watch your mic.
11      A.    That's 413792.  413792.  It is a JNJ.
12  BY MR. FROST:
13      Q.    No.  It is an Imerys.
14            VIDEOGRAPHER:  Do you want to go off the
15      record?
16            MR. FROST:  Let's go off the record,
17      please.
18            VIDEOGRAPHER:  We're now going off
19      record.  The time is 3:32.
20            (Recess taken from 3:32 to 3:39.)
21            VIDEOGRAPHER:  We're now back on record.
22      The time is 3:39.
23  BY MR. FROST:
24      Q.    Okay.  So do you believe this document
25  supports that the geology of Zhizhua and Maanshan are

Mark Krekeler, Ph.D.

| Page 198 | Page 200 |
|---|---|

**Page 198**

1  the same?

2      A.   So Guangxi is an autonomous region.

3      Q.   Okay.

4      A.   And there are different mines within that

5  autonomous region.

6      Q.   So, again, do you have anything that

7  shows me that the formation at the Zhizhua Mine are the

8  same as the Maanshan mine?

9      A.   No.  I don't think so, or I'm unclear.

10  I'm confused by the names.

11      Q.   All right.  That's fine.  Moving on

12  page 11, the paragraph that starts about halfway down

13  the page, "Beginning in July of 2004."

14      A.   Uh-huh.

15      Q.   And then the next two paragraphs sort of

16  preceding that, do you agree with me that these all

17  relate to a mine visit in the Liboshikuang Mine of the

18  Shandong Province?

19      A.   I'm confused by the names.  I would need

20  to look at the document.

21      Q.   Yeah.  And Hubei and Shandong.  Well,

22  here.  We'll start with the first paragraph.  "Beginning

23  in ... 2004, Rio Tinto began investigating talc

24  operations and talc potential in the provinces of Hubei

25  and Shandong."  Did I read that correctly?

**Page 199**

1      A.   Yeah.  So, to my knowledge, that

2  paragraph is correct.

3      Q.   But I didn't ask if it was correct.

4      A.   Okay.

5      Q.   My question is:  Do you agree with me

6  that Hubei and Shandong are different areas of China

7  than Guangxi?

8          MS. SCOTT:  Objection.

9      A.   I don't know.

10  BY MR. FROST:

11      Q.   Okay.  Did you ever look up Hubei and

12  Shandong and compare them to where Guangxi sits?

13      A.   I don't remember.  If I did, I -- you

14  know, I got -- the nomenclature, the names were

15  confusing.  So I did -- I try to look at Google Earth

16  and figure things out.  But, again, I don't think there

17  was, like, a location map that was provided.  The data

18  from China was very limited.  There's no -- I don't

19  think there's any GPS coordinates, which is another

20  thing that's kind of odd.  Okay.  Go ahead.

21      Q.   If I were to represent to you that

22  they're about 2,000 kilometers away from each other, the

23  Hubei and Shandong are coastal by Shanghai and Guangxi

24  is southern and internal and they're about

25  2,000 kilometers away from each other, would you have

**Page 200**

1  anything to refute that statement?

2          MS. SCOTT:  Objection.

3      A.   I have nothing to refute or endorse.  I

4  do know the geology of China is very chopped up.  It's

5  extremely complex.  So you can have areas that are

6  geologically connected that are distant from each other.

7  So Tianchen is a basin area in north central China.  I

8  have colleagues that work there, and, essentially, there

9  are major displacements that occur.

10          So, again, I didn't have details of

11  China, but, essentially, China is very complex, and you

12  can have parts of the geology disperse.  Yes, I was not

13  aware that they were separated by geographic distance.

14  That doesn't preclude that.

15  BY MR. FROST:

16      Q.   Well, I was going to say without

17  speculating, your can't tell me whether or not the talc

18  districts of Hubei and Shandong are the same as the talc

19  district in Guangxi, for example, correct?

20          MS. SCOTT:  Objection.

21  BY MR. FROST:

22      Q.   Sitting here today --

23      A.   Correct.  But the statement as "Rio Tinto

24  began investigating talc operations and talc potential

25  in the provinces of Hubei and Shandong."

**Page 201**

1      Q.   Yes.  Just answer my questions, okay?

2  And, again, there's no evidence that talc ever came from

3  Hubei and Shandong that was used in Johnson & Johnson

4  talcum powder.  You, sitting here today, without

5  speculating, can't tell me that Johnson & Johnson ever

6  used talc that came from Hubei and Shandong, correct?

7      A.   Correct.

8      Q.   And then it continues on, and it starts

9  talking about the detailed visit to the Liboshikuang

10  Mine in the Shandong province, correct?  It's two

11  paragraphs down.  It talks about the field report and

12  "the report detailed a visit?"

13      A.   The second paragraph on the bottom?

14      Q.   Yes.

15      A.   In Shandong?  Okay.

16      Q.   Okay.  And, again, it talks about a mine

17  that you have no evidence whatsoever whether or not this

18  has any geological similarity to the Shandong province

19  or the Guangxi province, correct?

20          MS. SCOTT:  Objection.

21      A.   Specifically, no.  There is no data that

22  was --

23  BY MR. FROST:

24      Q.   So what I'm getting at here is I'm a

25  little confused why we're talking about talc districts

Mark Krekeler, Ph.D.

Page 202

1  upon which you have no data that are thousands of
2  kilometers away from the mine actually being used by
3  Johnson & Johnson.
4       MS. SCOTT:  Form.
5       A.   Because just like in, as you pointed out
6  for the Appalachians, we have this very large district
7  that extends hundreds of kilometers.  Based on the
8  limited data that was available to me, it's likely that,
9  essentially, talc deposits are genetically related in
10 some way.
11 BY MR. FROST:
12      Q.   Except that didn't you just tell me
13 without speculating --
14      MS. O'DELL:  Excuse me.
15      MR. FROST:  Old on.
16      MS. O'DELL:  He was not finished.
17      A.   So, basically, it's reasonable, you know,
18 so if you have -- you know, you have a deposit of
19 something, and you have similar deposits of that same
20 something, that it's reasonable that you would expect
21 there to be some connection or relationship.  That's
22 something that we do in geology all the time,
23 essentially develop hypotheses as far as spatial
24 relationships of things.
25      So, basically, the fact that there's

Page 203

1  60 percent white talc and 40 percent black talc with the
2  latter having obvious tremolite association, so that's,
3  okay, one thing.  And then, notably, it was associated
4  with amphibolite-grade metamorphism.  Therefore,
5  Johnson & Johnson and Imerys had information regarding
6  tremolite's presence in the region.
7       And if you had indication of the presence
8  of something in the region, you know, you might exclude
9  that or you would want to do further exploration to sort
10 of constrain, as we mentioned earlier, with mining, we
11 want to define what's not there and what is there.
12 BY MR. FROST:
13      Q.   But here's where I'm going stop you.  All
14 of this concerns a region that's thousands of kilometers
15 away from the region that's actually being mined, right?
16      MS. SCOTT:  Objection.
17 BY MR. FROST:
18      Q.   So what does any of this actually have
19 anything to do, without speculating, about the talc
20 coming from the Zhizhua Mine in the Guangxi Province?
21      MS. SCOTT:  Objection.
22      A.   The geology can be potentially related.
23 BY MR. FROST:
24      Q.   See, we're talking about can be here, but
25 you're speculating, right?

Page 204

1       MS. SCOTT:  Objection.
2  BY MR. FROST:
3       Q.   You don't know one way or the other; is
4  that correct?
5       MS. SCOTT:  Objection.
6       MS. O'DELL:  Objection.
7       A.   With a hundred percent degree of
8  certainty, sure.  But, geologically, it makes sense that
9  things would be related.
10 BY MR. FROST:
11      Q.   Okay.  And that's based on what studies
12 have you looked at in China that show you can make the
13 leap to say that these regions that you don't --
14      A.   That's --
15      Q.   Hold on -- that you don't know anything
16 about are related?
17      MS. SCOTT:  Objection.
18      A.   I base that on, essentially, just the
19 nature of tectonics on the planet.  Essentially, there's
20 no peer review literature.
21 BY MR. FROST:
22      Q.   Turn to page 12.  It's the first full
23 paragraph.  "I have reviewed multiple documents."  It is
24 the paragraph that starts there.  Do you see where I am?
25      A.   Yes.

Page 205

1       Q.   Where is it?  The third sentence.  You
2  know that "The practices and procedures defendants' talc
3  fall short of satisfying international standards of
4  quality and purity."  What international standards of
5  quality and purity are you talking about here that you
6  didn't cite?
7       A.   So industrial mineral companies,
8  basically, we used the peer-review literature, and
9  essentially, things are developed internally to assure
10 that you have variability or control, and so it's
11 commonly done that you run multiple x-ray diffraction
12 analyses on materials, for example.  So a company I work
13 closely with in Virginia, or have historically, they
14 analyze 200 samples a day, essentially, and they do that
15 with powder diffraction and, also, XRF.
16      There's analytical technologies that
17 exist that you can do rapid XRF analyses with a handheld
18 device, and that's been around since the early 2000s.
19 So, basically, the peer-review literature is one general
20 way of doing things.
21      Q.   And then -- well, hold on.  We'll start
22 there.  What studies?  Can you point me a single study
23 that talks about the international standards of quality
24 and purity that weren't met here?
25      MS. SCOTT:  Objection.

Page 206

1    A.    So methods are communicated verbally in
2  industrial mineral companies.  So, basically, by
3  interacting with companies, I know, basically, that you
4  analyze things repeatedly, repeatedly trying to
5  constrain the variability.  Things aren't necessarily,
6  as far as what individual companies do, they look to the
7  peer-review literature to use or learn what analyses are
8  done and how they are executed.
9        As far as the numbers of things, that's
10  something that's decided by companies, and basically,
11  using general statistical approaches, they want to know
12  what the variation is.  So companies that I work with,
13  they commonly will analyze hundreds of, a couple hundred
14  samples a day or a week.
15        Other companies I know, they have
16  dedicated labs that basically analyze hundreds of
17  thousands of samples a week, and it's expected that they
18  maintain that level because, eventually, they can get
19  sold or bought, so they want to be able to prove the
20  reserves and the historical thing.  So that's -- that's
21  kind of the international standard is sort of multiple
22  things.  It's by experience.
23    Q.    Here's what I want to get at.  If I want
24  to know what the international standards of quality and
25  purity are, you're telling me there's not any document I

Page 207

1  can go to, any regulation or anything out there.  I'm
2  trying to get the basis for your opinion here, and the
3  basis for your opinion here is Dr. Krekeler had told me
4  it's wrong and here's why, and you can't point to any
5  study --
6    A.    So --
7        MS. O'DELL:  Let him finish.
8        THE WITNESS:  Okay.
9  BY MR. FROST:
10    Q.    -- regulation, mine document, anything
11  out there to support your basis.  It's just I, Mark
12  Krekeler, am telling you this.  You should believe me.
13        MS. SCOTT:  Objection.
14    A.    So Gy and the reference.  Gy 79 is
15  something that's used sampling of particulate materials
16  there in practice.
17  BY MR. FROST:
18    Q.    Let's talk about Gy.  Gy is about gold
19  mining, right?
20    A.    Gy is about sampling of particulate
21  materials.
22    Q.    Related to gold mining, right?
23    A.    I don't recall specifically.  Was it
24  Afewu?  I believe the Afewu.
25    Q.    If you look at Afewu, I can mark that for

Page 208

1  you if you want.
2    A.    Yeah.  I need to look at it, but I think
3  that might be related to gold mining, but Gy is
4  something that's used in general.
5    Q.    Is Gy a universally adopted standard for
6  mining practices around the world?
7    A.    I think it's commonly used.  Again, every
8  company has their own.
9    Q.    Why don't we look at Afewu but, again,
10  you agree with me that Gy is one.  There are probably
11  hundreds, if not thousands, of competing theories and
12  methodologies, right?
13        MS. SCOTT:  Objection.
14        MS. O'DELL:  Objection.
15    A.    I don't think that's an accurate
16  statement.
17  BY MR. FROST:
18    Q.    But it's certainly not the only one,
19  right?
20    A.    Others exist.
21    Q.    So you can't tell me that Gy is the
22  universal standard for talc mining, right, and that
23  that's the standard that companies have to follow?
24  That's the, quote, international standard of quality and
25  purity?

Page 209

1        MS. SCOTT:  Objection.
2    A.    I think it's relevant.
3  BY MR. FROST:
4    Q.    We'll mark Afewu.  We talked about Afewu.
5    A.    So if you're mining --
6    Q.    There's not a question pending, sir.
7    A.    Okay.  Sorry.
8        MS. O'DELL:  This is 20?
9        MR. FROST:  18.
10        COURT REPORTER:  19.
11        MR. FROST:  19?
12        COURT REPORTER:  Yes.
13        (Exhibit 19 was marked for
14        identification.)
15  BY MR. FROST:
16    Q.    On the first page, it's page 299 on the
17  first column.  It's the paragraph that starts, "An
18  essential condition of any sample."
19    A.    Okay.  I found the paragraph.
20    Q.    Okay.  About halfway through, it starts
21  talking about the Gy paper.  "A number of approaches
22  have been proposed to address these problems.  The most
23  notable one is the work of Gy."  Do you see where I am?
24    A.    Yes.
25    Q.    After that, it says, "Most practitioners

Page 210

1  have used this model for gold ores, though, without much
2  fulfillment in the results."  Am I reading that
3  correctly?
4      A.    You're reading what they've said.
5      Q.    Okay.
6      A.    But, yeah.
7      Q.    And you agree with me that there are laws
8  and regulations that relate to mining standards, how
9  mining has to be done, things of that nature, correct?
10      A.    There are -- there's a code of mining
11  regulations.  To my knowledge, there's not a specific
12  code as far as what's required for mining.  It's my
13  experience that, essentially, it's based on indications
14  from peer-reviewed literature, the concerns the company
15  has had as far as maintaining quality of their product,
16  so these are the standards that are set.  Some companies
17  will have, essentially, internal protocols and standards
18  that are applied, and they're international companies,
19  so this is applied by international.
20      Q.    So you don't believe there are any
21  regulations that relate to any miners that talk about
22  requirements of sampling?
23           MS. SCOTT:  Objection.
24      A.    At this point, I don't remember.  I
25  don't --

Page 211

1  BY MR. FROST:
2      Q.    "I don't know" is a fine answer, sir.
3      A.    Yeah.  I don't know with certainty.
4      Q.    Okay.  And I think we established this
5  morning, you're not a regulatory expert?  You're not a
6  mine regulations expert?
7      A.    Yeah.
8      Q.    Okay.  So at this point, you just don't
9  know.  Have you ever heard of the organization JORC,
10  J-O-R-C?
11      A.    What's that?
12      Q.    JORC, J-O-R-C.  I think it's the Joint
13  Regulatory Commission, something like that.
14      A.    No, I have not.
15      Q.    Do you recall seeing, in several of the
16  Imerys documents, that they were doing sampling to
17  various JORAC regulatory specifications?
18      A.    No, I do not remember seeing that.
19      Q.    And you have no idea what any of the
20  sampling regulations that they're applying for would be?
21  That's correct?
22           MS. O'DELL:  Object to the form.
23      A.    Yeah.  I'm not familiar with that.
24  BY MR. FROST:
25      Q.    While we're talking about Gy, I read the

Page 212

1  Gy paper, and he talks about running Gy analysis of the
2  samples to determine whether or not they're
3  representative.  Is that a fair sort of, really high
4  level synopsis of what he's talking about?
5      A.    Yes.
6      Q.    And in forming your opinions, I take it
7  you rely -- I mean, we've talked about Gy.  You're
8  relying on the Gy theory, right?  Is it a theory?  I
9  don't know what the right word to call it is.  Is it
10  mine theory?
11      A.    It is an approach.
12      Q.    Mine approach?
13      A.    Yeah.  It's very dense mathematically.
14      Q.    I will agree with you there.  And you're
15  effectively relying on the Gy approach in forming your
16  opinions about the mining sampling practices, correct?
17      A.    It is one of them.  It is one approach,
18  yes.
19      Q.    And Afewu and Lewis is another one you
20  cite, too?
21      A.    It's another example.
22      Q.    And Afewu and Lewis also is another
23  mathematical geostatistical computation to determine
24  whether or not sampling is adequate and representative,
25  correct?

Page 213

1      A.    Yes.  That's another approach.
2      Q.    Have you actually run any of the
3  geostatistical calculations in this case to determine
4  whether or not the sampling that was being done by
5  Imerys and Johnson & Johnson is adequate?
6           MS. SCOTT:  Objection.
7      A.    No, I have not.  But I do note that I did
8  not see evidence of it either.
9           MR. FROST:  Move to strike.  No question
10  was pending.
11  BY MR. FROST:
12      Q.    While we're on mining, let's talk about
13  it a little bit.  Do you agree with me that mining
14  companies do not mill -- sorry.  Let me try again.  I
15  used the wrong word.  Do you agree with me that mining
16  companies do not drill the entire deposit all at once?
17           MS. O'DELL:  Object to the form.  Do you
18  mean --
19  BY MR. FROST:
20      Q.    When they're doing core sampling?
21      A.    They will -- it depends.  So if there's
22  field indications that things are looking good and they
23  want to establish things, then there would be a reason
24  to drill the entire deposit if it's small.  But, yeah,
25  if you have a large deposit, you would drill that in

Mark Kockler, Ph.D.

Page 214

1 phases.
2    Q.    And you'd sort of do it as the mine
3 develops, right, as the -- as you're following the
4 deposit? You -- a really untechnical way of saying it
5 is, effectively, you're drilling ahead of where you are
6 so you know where you can keep going, right?
7         MS. SCOTT: Objection.
8    A.    It -- sometimes it's more complex than
9 that. So, basically, people gain investment for
10 exploration and it's -- you know, the investors are set
11 on doing things one particular way because of what they
12 believe. So there's variation in that.
13    Q.    Okay. And you agree that additional --
14 you know, one of the reasons you do additional coring,
15 additional drilling, is to further refine the mine plan,
16 the mine schedule, things like that?
17    A.    Yes. So, often, coring will be done
18 every day in certain situations. So that's the case in
19 some palygorskite deposits in Georgia, and that's also
20 the case in Brown Mountain Mine and other, other
21 situations, yes. They'll drill daily and produce lots
22 of core.
23    Q.    And, ultimately, mine operators are
24 drilling a mine site in order to determine what the ore
25 body itself actually looks like, right?

Page 215

1    A.    As well as other areas of concern. So I
2 gave the example on the Stebbins Hill for Brown
3 Mountain. And they, you know, they have extensive
4 amounts of core. They filled an entire high school,
5 abandoned high school, with core.
6    Q.    Where you mine -- or sorry. Where you
7 drill, when you drill, what angle you're drilling at, et
8 cetera, all these are very complicated. You know, in a
9 complicated ore body, where you drill, when you drill,
10 the angles you drill at, these are all dictated by lots
11 of factors, including topography, access to certain
12 areas, things of that nature. Do you agree with that
13 statement?
14         MS. O'DELL: Objection.
15    A.    Not necessarily. You may -- people want
16 to essentially have a good, even distribution so they
17 try to drill on a grid, you know, if possible.
18 BY MR. FROST:
19    Q.    Okay. As you said, not necessarily. It
20 all depends, sort of, what you're seeing and what you're
21 looking for, correct? There's no one way to drill core
22 and ore body, right?
23    A.    There's multiple ways, but, you know,
24 using -- essentially having something that is
25 representative is reasonable. And one determining

Page 216

1 factor is the scale of the geologic features that are
2 involved in the deposit. So, generally, you want to
3 have a core density such that you can capture those
4 scales of features.
5    Q.    And that's ore deposit -- by "ore
6 deposit," depending, right, what you have to do to
7 capture those features? Effectively, every mine is
8 different; is that a fair synopsis?
9         MS. SCOTT: Objection.
10    A.    The -- it depends on the local geology,
11 but it still must be representative based on the
12 features you're trying to capture.
13 BY MR. FROST:
14    Q.    Okay. I think we're saying the same
15 thing. You're just adding a lot more words, right?
16    A.    Okay.
17    Q.    But it depends on the local geology what
18 the deposit looks like because every deposit is
19 different, right?
20         MS. SCOTT: Objection.
21    A.    You can have similar deposits, but, yeah,
22 every deposit is in a different location.
23 BY MR. FROST:
24    Q.    Sure. And there are different shapes and
25 sizes, right?

Page 217

1    A.    Yes.
2    Q.    So because of that, you have to drill
3 appropriate to the deposit that you're coring, correct?
4    A.    Yes.
5    Q.    And that's a determination that's usually
6 made by the on-site geologist or by the company that's
7 mining. You know, hopefully, they're consulting with
8 somebody who understands the geology to determine where
9 to drill. Is that also a fair statement?
10         MS. SCOTT: Objection.
11    A.    Ultimately, the company is responsible
12 for how it drills, yes.
13 BY MR. FROST:
14    Q.    Okay. Turn back to page 12 of your
15 report. It's the third paragraph. You note that, "The
16 practice of hand sorting is not acceptable in the United
17 States." Do you have any law or regulation that you're
18 pointing to that says that's inappropriate?
19         MS. SCOTT: Objection.
20    A.    No. But, you know, the companies I work
21 with wouldn't do that with something of this complexity.
22 BY MR. FROST:
23    Q.    And you've never worked with talc before,
24 right? You've never worked with a company that mines
25 talc?

Mark Krekeler, Ph.D.

Page 218

1     A.    Correct.
2     Q.    Okay.  The next paragraph down, the -- I
3  believe this is an email.  Maybe I'll just mark the
4  document.  It might be easier.
5          MR. FROST:  We'll mark this one.  I think
6  we're on 20.
7          COURT REPORTER:  20.
8          (Exhibit 20 was marked for
9          identification.)
10 BY MR. FROST:
11    Q.    Do you see where you are in your report
12 on page 12?
13    A.    I'm checking to see.  I'll go back.
14    Q.    Sorry.
15    A.    Go back to 12.  So 517.  Okay.
16    Q.    And this is -- you're quoting here from
17 an email --
18    A     Okay.
19    Q     -- from Mr. Cutler?  Do you see where we
20 are?
21    A.    Yes.
22    Q.    Okay.  So you quote a portion of this
23 email from Mr. Cutler, right?  And then the next
24 paragraph down, you go, "Cutler goes on to say, 'In
25 principle, the inspection is enough to guarantee the

Page 219

1  requested specs to insure no fibers.'"  And then, after
2  that, you make the opinion, "That practice falls below
3  the standards of quality control in mining operations in
4  the United States, and it does not guarantee the absence
5  of fibers, such as asbestos or fibrous talc."  Did I
6  read that correctly?
7     A.    Yes.
8     Q.    Okay.  If you look up at the quote from
9  Mr. Cutler's email and if you turn to the email itself,
10 it's the bottom of page 5147.  This is not a complete
11 quote from Mr. Cutler's email, correct?
12         MS. SCOTT:  Objection.
13    A.    Let me find -- so where is it on 5147?
14 BY MR. FROST:
15    Q.    It's at the bottom.
16         MS. SCOTT:  It's in B.
17 BY MR. FROST:
18    Q.    Yeah, it's in B.
19    A.    So "In principle, this inspection is
20 enough to guarantee the requested specs and insure no
21 fibers."
22    Q.    Okay.  But do you see above that your
23 block quote?  So what I find interesting is the part you
24 left out of Mr. Cutler's email is actually the part that
25 talks about the testing for fibers.  If you look at the

Page 220

1  bottom of 5147 -- I'll go two lines up.  I'll start
2  there.  There's some stuff above it, but it starts,
3  "During unloading, a representative industrial sample
4  (at least 25mt) is processed in the plant at various
5  meshes and sent to our central Denver lab to be analyzed
6  for main specs (whiteness, mineralogy, chemical
7  composition, major elements and traces).  Fibers
8  investigation is carried out systematically.  The lot is
9  quarantined, waiting the lab results."  Don't you agree
10 with me that's the most important piece of what Cutler
11 is saying there --
12         MS. SCOTT:  Objection.
13 BY MR. FROST:
14    Q.    -- for purposes of your opinion that it
15 does not guarantee the absence of fibers or asbestos and
16 fibrous talc?
17         MS. SCOTT:  Objection.
18    A.    So when the cargo arrives at destination,
19 so that's after it's been hand picked, right?
20 BY MR. FROST:
21    Q.    Sure.  What I'm saying here is:  You use
22 the quote you have above as a basis for your --
23    A.    So they're not -- I'm stating --
24    Q.    Let me finish, sir.
25    A.    Okay.  I'm sorry.  Sorry.

Page 221

1     Q.    So you use the quote above here as the
2  basis for your statement that the practice falls below
3  the standards of quality in mine operations in the
4  United States and does not guarantee the absence of
5  fibers such as asbestos and fibrous talc, but left out
6  of the quote you're taking from the email is the
7  specific part of the testing that talks about the
8  testing for fibers in the talc.  Am I correct or
9  incorrect?
10    A.    I did not include that portion in the
11 quote.
12    Q.    Okay.  Let's move on.
13    A.    I --
14    Q.    All right.  Moving on.
15    A     Okay.
16         MS. SCOTT:  If he's not done with his
17 answer, let him finish his answer.
18    A.    But, yeah, I'm not.  So it is -- you
19 know, if you're mining material and then you have a
20 point of shipment, you would want to test that at that
21 point of shipment in case you find something later.  You
22 would be able to identify where in the supply chain an
23 issue occurred.  So is this -- you know, is this shipped
24 by a ship, correct?  Right?  So multiple things can be
25 put into a ship cargo.  You can have a whole crate of

Mark Krekeler, Ph.D.

Page 222

1  asbestos, you know, from Indiana or Russia or some other
2  place or some other material that is mixed in. So, to
3  me, it really does make sense that at the stage of when
4  it leaves the port, you would want to have some quality
5  control so --
6  BY MR. FROST:
7      Q.    Here's my question. Isn't that exactly
8  the part that you left out of the quote? Isn't it
9  disingenuous that you left out the fibrous talc?
10      A.    As I read it, as I read it --
11      MS. O'DELL: Dr. Krekeler, he's not done.
12      A.    Oh, I'm sorry. Sorry.
13  BY MR. FROST:
14      Q.    Don't you agree with me that it's
15  disingenuous to leave out the specific portion of the
16  quote that talks about the testing that's done once the
17  talc arrives at port in Houston when you're making,
18  based on that quote, the opinion that it does not
19  guarantee the absence of fibers and falls short?
20      MS. SCOTT: Objection. Misrepresents.
21      A.    Yeah. I say it's in the report for the
22  reasons I provided.
23  BY MR. FROST:
24      Q.    Okay. All right. Let's move on.
25      MR. FROST: Actually, if you want, I

Page 223

1      don't know how long we've been going. This is
2      probably a good time for a break. I'm changing
3      subjects.
4      MS. SCOTT: Sure. Great.
5      VIDEOGRAPHER: We are now going off
6  record. The time is 4:12.
7      (A recess was taken from 4:12 to 4:38.)
8      VIDEOGRAPHER: We're now back on record,
9  and the time is 4:38.
10  BY MR. FROST:
11      Q.    I'm going to move back to page 12 --
12      A.    Okay.
13      Q.    -- of your report. The last full
14  paragraph on page 12, sir, it's a document entitled
15  "Quality Control."
16      A.    Okay.
17      Q.    Okay. And you note, "This document
18  includes procedures related to Guangxi Number 1 and
19  Number 2A, the talc ore purchased by Defendants for use
20  in Johnson's Baby Powder and Shower to Shower products.
21  Again, the procedure calls for samples to be ground
22  prior to testing a protocol that will disrupt the
23  physical properties of the talc ore, making detection of
24  harmful contaminants, including asbestos, much more
25  difficult." Did I read that right?

Page 224

1      A.    Yes.
2      Q.    Okay. What is the basis that grinding
3  the sample before testing will make it much more
4  difficult to --
5      A.    So talc is a phyllosilicate mineral.
6  It's a two-to-one layer clay. Essentially, the
7  structure is held together by long hydrogen bonds and it
8  is mechanically very soft. So, basically,
9  phyllosilicates have essentially delicate structures and
10  they need to be prepared in specific ways so grinding is
11  a rotary motion and what that does is -- the crystal
12  structure is shown here for talc.
13      So what that does is it takes these
14  two-to-one layers. When you grind, you displace, you
15  know, essentially, a rotation of the crystal structure,
16  and that rotation of the crystal structure basically
17  destroys the crystallographic coherency through the clay
18  particle. So if you are -- essentially, for x-ray
19  analysis, you're supposed to crush materials. So crush
20  is specifically an up-and-down motion. And, basically,
21  it's easy to do with talc. You crush it in this
22  up-and-down motion, typically in an agate mortar and
23  pestle.
24      And then so, basically, what happens is
25  you also have other potential contaminants such as

Page 225

1  chrysotile. Chrysotile is a one-to-one layer
2  serpentine. It is coiled because the octahedral sheet
3  and the tetrahedral sheet don't match up. So there's
4  other serpentines such as antigorite, lizardite,
5  crocidolites, other things like that.
6      So what needs to happen is, again, that
7  needs to be prepared in a crush method, not a rotary,
8  not ground. So grinding -- ground, grinding -- those
9  words have specific meanings in the context of
10  phyllosilicates. It's been well, recognized, and I
11  provide several references elsewhere in the report.
12      So essentially what happens is x-ray
13  diffraction has detection limits, and for many
14  materials, such as quartz, that are very crystalline,
15  your detection limit is approximately about a tenth of a
16  weight percent, and that's generally understood. That's
17  a long-standing detection limit.
18      Clay minerals, in general, the
19  phyllosilicates, in general, those materials typically
20  have a detection limit that is at least a few weight
21  percent, in part because they start off as essentially
22  poorly crystalline material. So if you take a talc or a
23  chlorite and you compare that to another, you know, a
24  mineral such as a pyroxene, the overall crystallinity of
25  the pyroxene is much, much more than the talc or the

Mark Krekeler, Ph.D.

Page 226

1  chlorite. So and then there's also many issues with --
2  the minerals are just very sensitive, and they naturally
3  have disorder.
4      For example, chlorite theoretically can
5  have 1,024 different arrangements of the layers of atoms
6  in the structure, two-layer structure. So, basically,
7  the crushing and grinding, you can grind -- if you have,
8  let's say you have 4 percent chrysotile and 96 percent
9  talc and you have that sample and you grind it, and
10 essentially, you are destroying the crystal structures
11 of both, and you only have, essentially, a 1 percent or
12 so that is still crystalline or maybe none of it is
13 crystalline.
14     You can grind, actually do experiments
15 and grind things to be amorphous. We did this when I
16 was a Ph.D. student. He had us hammer home the point.
17 But, basically, so the net effect is when you grind
18 stuff, you deflate the detection limit of materials that
19 are there.
20     It's already a problem -- you know,
21 chrysotile is already problematic because, essentially,
22 the shape of it. So it's a difficult material to work
23 with. When you grind those materials, you will end up
24 with, essentially, stuff that won't diffract. So,
25 therefore, with powder x-ray diffraction, you cannot be

Page 227

1  assured that what you're measuring that you detect. So
2  that's the issue with grounding.
3      Q.  Okay. So let me start here. Amphibiles
4  aren't phyllosilicates, correct, amphibile minerals?
5         MS. O'DELL: Amphiboles.
6  BY MR. FROST:
7      Q.  Or amphiboles.
8      A.  They're part of the biopyriboles.
9      Q   Okay.
10     A   So but they are not a --
11     Q.  It's not phyllosilicate, correct?
12     A.  Correct.
13     Q.  And, again, the point of XRD, the
14 testing, is to determine whether or not there are
15 amphibole particles in the talc. Is that also correct?
16        MS. SCOTT: Objection.
17     A.  Yes.
18 BY MR. FROST:
19     Q.  Okay. So what you're talking about here
20 is we'd ruin the talc and it would be hard, but we don't
21 care because we know talc is in there. What we're
22 looking for are amphiboles, right? So crushing isn't
23 going to be a problem with identifying the amphiboles,
24 because they aren't subject to smear and amorphousness,
25 if that's the right word, but becoming amorphous through

Page 228

1  crush and smear, correct?
2         MS. O'DELL: Objection.
3      A    They would be far less -- I think the
4  proper thing to say is they would be far less
5  susceptible to reduction and crystallinity, but, yeah,
6  the chrysotile would be.
7  BY MR. FROST:
8      Q    Okay. But, again, chrysotile is not --
9  because of the closeness to talc, XRD is not the primary
10 way of identifying chrysotile, correct?
11     A.   Oh, no.
12     Q.   I'm talking about specific to talc here.
13     A.   Were -- I'm sorry, was the question can
14 you -- the difference --
15     Q.   Not can you, no.
16     A.   -- between talc and chrysotile?
17     Q.   Okay. Let me ask it another way. In the
18 testing that is done of talc to determine whether or not
19 there is asbestos, the way -- the test for chrysotile,
20 you'll agree with me, is PLM, correct?
21     A.   I understand that powder x-ray
22 diffraction is the primary screen.
23     Q.   That's the first screen, correct?
24     A.   Yes.
25     Q.   Okay.

Page 229

1      A.   And then if -- then if there's something
2  that's detected, it then goes to PLM. And then if is
3  something is detected, it goes to TEM. So if you
4  don't -- if you're not -- if you're having, essentially,
5  a false negative because you've ground away the
6  chrysotile, you would not -- you know, as things were
7  described, you wouldn't go on to the other techniques,
8  but you would potentially have tremolite.
9      Q.   Yes. And you're actually going -- again,
10 you've looked at Longo's testing, right?
11     A.   Yes.
12     Q.   So would you invalidate Longo's testing
13 because he crushes and grinds the samples before putting
14 them through his various tests, including XRD?
15        MS. O'DELL: Objection.
16     A.   I -- there might be some differences, but
17 overall, my review of Longo's report, I think it's fine.
18 BY MR. FROST:
19     Q.   Okay. And, again, in looking through
20 Longo's report, despite that he crushed and smeared, did
21 he come up with any amorphous -- you know, did he
22 identify any amorphous figures within the talc?
23        MS. SCOTT: Objection.
24        MS. O'DELL: Object to form.
25     A.   I don't remember specific. I remember

Mark Krekeler, Ph.D.

Page 230

1  seeing lots and lots of TEM images by -- there's a lot
2  of TEM images.  I don't remember specifically.
3  BY MR. FROST:
4       Q.    You also agree with me that the amphibole
5  content that you're looking for in baby powder is
6  actually very small.  We're talking about the micron
7  level, correct?
8            MS. O'DELL:  Object to the form.
9       A.    I'm sorry.  What?
10  BY MR. FROST:
11      Q.    We're talking about particles that are
12  measured by microns, not --
13      A.    For?
14      Q.    -- inches or centimeters for the --
15      A.    For what context?
16      Q.    The amphiboles --
17      A.    The amphiboles?
18      Q.    -- that would be located in ground talcum
19  powder.
20      A.    I'm sorry.  I'm unclear on the question.
21  Can I --
22      Q.    I'll just ask it again.
23      A.    Well, I would prefer to read, if that's
24  okay.
25      Q.    Well, I'd prefer to reask you the, ask

Page 231

1  you a different question, sir.
2       A.    Okay.  All right.  Good.
3            MS. O'DELL:  He can ask a different
4       question.
5  BY MR. FROST:
6       Q.    So, again, my question is:  The
7  amphiboles that we care about here, the ones we're
8  finding in the testing of talcum powder, are in microns
9  of size.  They're tiny, correct?
10      A.    They can be, yes.
11      Q.    Okay.  And because they're so small and
12  small by volume, grinding and crushing really isn't a
13  problem because you're not going to affect the
14  crystalline structure of something that small when you
15  grind it.  Do you also agree with that?
16           MS. SCOTT:  Objection.
17      A.    Not necessarily.  It depends on the
18  specific methods of grinding.
19  BY MR. FROST:
20      Q.    And have you seen any evidence in any of
21  the testing that you've looked at in this case that
22  grinding and crushing has caused a problem with smear or
23  amorphous -- I guess it would become an amorphous
24  particle.  I don't know what the right second term would
25  be.  But in any of the testing you've seen done by Longo

Page 232

1  or done by anybody else, have you ever seen any problem
2  with either smear or amorphous?
3            MS. SCOTT:  Object to the form.
4       A.    Yeah.  By the nature of the test, as it's
5  been described, you know, you can't, you can't see -- I
6  want to say you can't see something that is not, that
7  you can't detect.  So amorphous material doesn't
8  diffract x-rays.  So x-rays arise when we have coherent
9  crystallinity that occurs.  And then I'm trying to --
10  BY MR. FROST:
11      Q.    I understand, but let me stop you there.
12  You would see amphiboles on TEM or SEM, wouldn't you,
13  when you were looking at images of the talc after it's
14  been prepared for a sample?
15           MS. O'DELL:  Objection.
16      A.    The -- only if you're, only if you're
17  looking for it.  So you need to have electron
18  diffraction data that -- you said if you're only looking
19  for the asbestos materials so you're looking for
20  crystalline materials.  You would not necessarily be
21  looking for amorphous.  So I don't think Longo was
22  tasked with finding amorphous, amorphous
23  phyllosilicates.  I think he --
24  BY MR. FROST:
25      Q.    But I'm confused.  Doesn't Longo

Page 233

1  categorize every particle that was on the TEM grids?
2            MS. O'DELL:  Objection.  In what way?
3            MR. FROST:  He accounts for them on his
4       count sheets.
5  BY MR. FROST:
6       Q.    If you don't know, sir, that's fine, too.
7       A.    I don't remember.
8       Q.    Okay.  That's fine.  We'll move on.
9            Now, sir, are you aware that talcum
10  powder, cosmetic talcum powder specifically is regulated
11  by the FDA?
12           MS. SCOTT:  Objection.
13      A.    I know they have looked at it.  I don't
14  know if they've -- I'm not a regulatory expert.  So I
15  just know that they've looked at it.  I don't know that
16  there's a study on talc.
17  BY MR. FROST:
18      Q.    I'm not talking about regulations,
19  regulations and testings --
20      A.    Oh, okay.  I'm sorry.  Yeah.  No.
21      Q.    Okay.  All right.  Are you aware that
22  there is an FDA sanction testing model called J4-1?
23      A.    No, I'm not.
24      Q.    Okay.  And you don't know whether or not
25  the companies are using J4-1 to test their product

Mark Krekeler, Ph.D.

Page 234

1 because that's what's required of them?
2          MS. O'DELL:  Object to form.
3          MS. SCOTT:  Object to the form.
4     A.   No.
5 BY MR. FROST:
6     Q.   Okay.  Sir, do you agree with me that
7 compliance with legal standards is an important
8 consideration in determining if a mine is being operated
9 correctly?
10         MS. SCOTT:  Objection.
11    A.   Yes, in general.
12 BY MR. FROST:
13    Q.   And as we said before, you just don't
14 know one way or the other whether or not -- well, I
15 guess, what regulations govern these talc mines and
16 whether or not the companies were abiding by those
17 regulations.  Is that fair?
18         MS. SCOTT:  Object to the form.
19 BY MR. FROST:
20    Q    That's not your area of expertise?
21    A.   Yeah.  I'm not a regulatory expert.
22    Q.   Turn to page 39, I believe, of your
23 report.  One, two, third paragraph down, it says,
24 "Examination of data from several mines."
25    A.   On page 39.  "Examination of data from

Page 235

1 several mines," that paragraph?
2    Q.   Yes, that paragraph.  Let me just orient
3 myself.  I apologize.
4         All right.  You note here, "Examination
5 of data from several mines shows that ore bodies are
6 very complex, with mixtures of several rock types,
7 including those likely to have the presence of asbestos
8 and heavy metals.  These rock types are intimately mixed
9 with talc ore.  The variation of the bodies of rock
10 differs and significant features may be only one foot
11 thick or less."  Correct?
12    A.   Yes.  That is what it says.
13    Q.   Are you talking about the features there
14 of the talc ore itself or are you talking about the
15 other minerals that might be in the geological
16 formation?
17    A.   So I'm talking about the ore as a whole,
18 including, you know, lithologies that are rich in talc
19 and not as well as the minerals and all the constituents
20 of ore.
21    Q.   So you're talking about the ore body?  I
22 just want to clarify what we're talking about there.
23 All right.
24    A.   Yes.
25    Q.   And that's Footnote 36, is the support

Page 236

1 for that statement, correct?
2    A.   Yes.
3    Q.   So we'll start at the first cite, which
4 is Furtron or Furcron, F-u-r-c-r-o-n, and others, 1947,
5 deposits of Murray -- talc deposits in Murray County,
6 Georgia, Georgia State Division of Conservation
7 Department of Mines, Mineralogy, Mining and Geology?
8    A.   Uh-huh.
9    Q.   Okay.  You agree with me that they're
10 looking at Georgia mine formations, correct?
11    A.   Yes.
12    Q.   And that would -- they'd have nothing --
13 no opinions or no specifics of what the actual ore body
14 in Vermont looks like or Italy or China, correct?
15         MS. SCOTT:  Objection.
16    A.   Correct.
17 BY MR. FROST:
18    Q.   Okay.  The second citation here is Berg
19 1977, and I think that was the one we identified earlier
20 that was a mis-cite?
21    A.   Yes.  I think it relates to Montana.
22    Q.   All right.  Tab -- the next one is
23 Mark -- where is it?  Sandrone and Zucchetti?
24    A.   So --
25         (Exhibit 21 was marked for

Page 237

1          identification.)
2 BY MR. FROST:
3    Q.   So it seems like this is talking about
4 the Italian deposit.
5    A    Yes.  So, yeah.
6    Q    You go one, two, three, four.
7         MR. FROST:  Oh, I apologize I thought he
8 had the paper in front of him.
9         COURT REPORTER:  No.
10         MR. FROST:  Oh, I'm sorry.
11 BY MR. FROST:
12    Q    I'll reask the question.  She didn't get
13 it.
14         So the question was:  This paper appears
15 to be dealing with the Italian mines, correct, the
16 Italian deposit?
17    A.   Yes.  Can I state a clarification?
18    Q.   Sure.
19    A.   So this is actually meant as an
20 introduction paragraph.  So several mines, meaning
21 several mines of talc, in general.
22    Q.   Okay.
23    A.   So that sentence does not specifically
24 relate to -- as written doesn't necessarily relate to
25 mines in Vermont but just in general.

Mark Krekeler, Ph.D.

| Page 238 | Page 240 |
|---|---|

**Page 238**

1    Q.   Okay.

2    A.   So --

3    Q.   So it's not a statement --

4    A.   The thing that's gone, the Berg paper

5 shows really intimate associations of, you know,

6 small-scale features.  So it's meant to be general.

7 Sorry.

8    Q.   Okay.  So these aren't talking about any

9 of the mines that we're specifically talking about here:

10 The Vermont mines, the Italian mine and the Chinese

11 mines, the ones at issue on page 7 and 8 --

12    A.   That sentence does --

13    Q   -- of your report?

14    A   -- not refer to those, yes.

15    Q   Turn to page 41 of your report, please.

16 The very -- the sentence that goes from 41 to 42.

17 "Composite sampling is a flawed methodology to

18 adequately" monitor -- sorry.  It's a typo, but --

19 "adequately monitoring for asbestos and toxic metals and

20 should be reserved for products not intended for human

21 consumption or cosmetic use."  And then you cite to the

22 Afewu paper?

23    A.   That is an editorial error.  The Afewu

24 reference is there as its own parenthetical sentence.

25    Q.   So you agree with me --

**Page 239**

1    A.   I don't -- it's a typo.

2    Q.   Okay.  So you agree with me that Afewu

3 and Lewis don't talk about testing for heavy metals or

4 whether or not ores are meant for human consumption?

5    A.   Correct, yeah.  That's a streaming, a

6 streaming reference.  It's cited where -- it's just

7 stand alone.  There's a period before it and a period

8 after it.  Sorry about that.

9    Q.   That's okay.  All right.  I'm going to

10 turn to the various charts now that are in your report.

11 So as a preliminary question, did you review each of the

12 documents that are listed in the various documents?

13    A.   I looked at all these documents, yes.

14    Q.   Have you ever seen the expert report done

15 by Dr. Cook in this case?

16    A.   Yeah.  I have seen it recently, yes.

17    Q.   It was after you were done drafting your

18 initial and supplemental reports?  Do you know?

19    A.   I believe so.

20    Q.   Okay.  I'll note that Dr. Cook seems to

21 have the exact same lists that you do.  Did you provide

22 these to him?

23    A.   We looked at the same data.  I'm sorry.

24    Q.   Okay.  I was going to say, did you

25 provide the charts that you created to him?

**Page 240**

1    A.   No, I did not.

2    Q.   Do you know if your counsel provided the

3 charts that you created to Dr. Cook?

4    MS. SCOTT:  Objection.

5    A.   I don't know if they did or not.  I

6 presume not.  He looked at the same -- I think he looked

7 at the same sets of documents.  It doesn't surprise me

8 that --

9 BY MR. FROST:

10    Q.   That they look exactly the same?

11    A   -- they're similar.  I don't know if

12 they're exactly the same.  I didn't --

13    Q   Yeah.  You didn't look at it in detail?

14    A   -- look at Cook's.  I didn't look at

15 Cook's documents in detail.

16    Q.   Bear with me a second.  I have to go to

17 the third box.  It's far away.

18    (Exhibit 22 was marked for

19    identification.)

20    VIDEOGRAPHER:  I'm going to make a

21    general housekeeping announcement.  If you've

22    got a laptop in front of you and you've got a

23    mic on, push it back a little bit and make sure

24    your phones stay away from the mic wires.

25    Thanks.

**Page 241**

1    MR. FROST:  Can we go off the record for

2    a second?

3    VIDEOGRAPHER:  We're now going off

4    record.  The time is 5:02.

5    (Off the record.)

6    VIDEOGRAPHER:  We are now back on record,

7    and the time is 5:10.

8 BY MR. FROST:

9    Q.   All right, sir.  If you look at page 21

10 of your report, do you see the sample with the date

11 8/22/1985?

12    VIDEOGRAPHER:  I'm sorry, Counsel.  Can

13    you put that notebook lid down?

14    MR. FROST:  Oh.

15    VIDEOGRAPHER:  Thanks.

16    MS. O'DELL:  21.

17    A.   21, and what was the line on the table?

18 BY MR. FROST:

19    Q.   8/22/1985.

20    A.   Yes.

21    Q.   I'll move this binder, so it's out of the

22 way.

23    And that relates to sample WMI 85-28 and

24 WMI 85-30?

25    A.   Yeah, as indicated on the chart.

## Page 242

1    Q.    Do you know where Samples 85-28 and 85-30
2  were mined?
3    A.    I'm looking at the document.
4    Q.    Yes.  If you look for the actual
5  document, if you turn to Tab 1 in the book you have
6  there.
7    A.    I have Tab 1.
8    Q.    All right.  Great.
9    A.    All right.  Let me just read.  Yes.  As
10 is common, there's not -- it doesn't say the exact
11 location.
12   Q.    Would it surprise you to learn that these
13 samples came from a mine in San Andreas, California?
14       MS. SCOTT:  Objection.
15   A.    I did not know that.
16 BY MR. FROST:
17   Q.    Turn to Tab 2.  It's a document Bates
18 stamped JNJ 65646.
19   A.    I'm sorry.  Tab 2?
20   Q.    Yeah.  Turn to the second page.
21   A.    Okay.  The second page.
22   Q.    Okay.  And if you look at sample WMI
23 85-28, it notes that it's grade TC-700.  Do you see
24 that?
25   A.    85-28.  Oh, okay.  Yes.

## Page 243

1        MS. O'DELL:  What sample are you on in
2  the chart, Jack?  I'm sorry.
3        MR. FROST:  It's WMI 85-28.  It's on page
4  2.
5        MS. O'DELL:  I've got you.  All right.
6  BY MR. FROST:
7    Q.    And then looking down at 85-30, which is
8  the second sample, that is also grade TC-700, correct?
9    A.    Correct.
10   Q.    Okay.  And those are the two samples we
11 saw from the Tab 1 document that appear in the chart,
12 right?
13   A.    Yes.
14   Q.    Okay.  You now can turn to Tab 3, which
15 is a document that starts IMERYS 013723.  If you turn to
16 the third page of it.  The very bottom of the product
17 certification protocol on page 3.  Yeah, I know.  It's
18 tiny.  I apologize.  Do you see where it says, "San
19 Andreas, California, Red Hill Grade," and then it has
20 "TC-700, light" and "dark"?
21   A.    Yes.
22   Q.    Okay.  This clearly indicates that these
23 two samples did not come from one of the Vermont mines
24 or the Italian or the Chinese mines, correct?
25       MS. SCOTT:  Object to the form.

## Page 244

1    A.    Presumably, yeah.
2  BY MR. FROST:
3    Q.    On page 12, if you go down to the next
4  sample listed, it's the 4/29/1986 sample.
5    A.    I'm sorry.  Page 12?
6    Q.    I'm sorry.  I meant page 21.  I got it
7  backwards.
8    A.    Page 21.  Okay.  And I'm sorry.  And what
9  was the line?
10   Q.    It's the next one down, 4/29/1986.
11   A.    4/29/1986.  So J&J 182.  So is that --
12   Q.    That's Tab 4.
13   A.    Tab 4.
14   Q.    And do you see in the middle of page
15 we're talking here, it's sample number WMI 85-53, WMI
16 85-55 and WMI 85-57?
17   A.    Yes.
18   Q.    Okay.  And those are the ones that
19 they're talking about in the letter about the chrysotile
20 detection?
21   A.    Yes.
22   Q.    Okay.  Do you know where these samples
23 were mined?
24   A.    We can just check.  No.
25   Q.    Turn to Tab 5, sir.  And that's the

## Page 245

1  document with Bates number JNJ 578888.  You can turn to
2  the third page.
3    A.    Where is that on the --
4    Q.    It's on the --
5    A.    Chart?
6    Q.    No.  It's the -- I was just identifying
7  for the record the document.  It's Tab 5 of the binder.
8    A.    Tab 5, yes.
9    Q.    If you turn to the third page --
10       MS. SCOTT:  8890.
11 BY MR. FROST:
12   Q.    Yeah, 8890.
13   A.    Yes.
14   Q.    Okay.  Do you see here on here the WMI
15 85-53 is identified as the grade TC-700?
16   A.    Yes.
17   Q.    And that's the one we just saw that comes
18 from the San Andreas, California, mine, correct?
19   A.    Okay.  Yes.
20   Q.    If you look down at WMI 85-56 and 85-57,
21 which are the other two samples, do you see that one is
22 grade 76 and the other is also grade TC-700?
23   A.    Yes.
24   Q.    Okay.  So for the TC-700, we know that's
25 San Andreas.  If you turn back to Tab --

Mark Krekeler, Ph.D.

Page 246

1    MS. O'DELL: Object to the form.
2    BY MR. FROST:
3    Q.    Turn back to Tab 3.
4        MS. O'DELL: Is that a question?
5        MR. FROST: Sure.
6    BY MR. FROST:
7    Q.    Do you agree with me that we know from
8    looking at the document before that the TC-700 is
9    identified as San Andreas, California?
10       MS. O'DELL: Object to the form.
11   A.    I don't remember.
12   BY MR. FROST:
13   Q.    We're going to turn back there. It's Tab
14   3, please, in the binder. It's the last page of that
15   document.
16   A.    Right. Oh, okay. Yeah.
17   Q.    And do you also see the grade 76?
18   A.    76 is listed there as well.
19   Q.    Okay.
20   A.    Okay. Yes.
21   Q.    So the samples in this, from this testing
22   also did not come from any of the mines utilized by
23   Johnson & Johnson for talcum powder, correct?
24       MS. O'DELL: Object to the form.
25   A.    Okay. As far as -- yeah.

Page 247

1    BY MR. FROST:
2    Q.    Turn to page 19 of your report.
3    A.    Page 19 of the report?
4    Q.    Yes. The very bottom, the
5    10/10/1974 sample.
6    A.    Okay.
7    Q.    And if you look at Tab 7, that's the
8    corresponding document. I'm sorry. Tab 6. I
9    apologize. Tab 6 is the corresponding document.
10   A.    J&J-74. Okay.
11   Q.    Do you see here where it states that the
12   sample that came back, the fibrous asbestiform material
13   is D-GI? It's in the semi-highlighted section, the gray
14   box.
15   A.    "Only one sample was found to contain
16   fibrous asbestiform material."
17   Q.    And that's D-GI?
18   A.    D -- okay. If you say -- all right.
19   Okay. "7/15 to 7/29. Chrysotile fibers were found to
20   be present at an estimated level (good at approximately
21   to an order of magnitude) of .006 percent."
22   Q.    And do you know where this sample was
23   mined?
24   A.    Not specifically, no. I mean it's --
25   Q.    That -- yeah, I think it's the short --

Page 248

1    A.    No, not specifically.
2    Q.    Okay. If you turn to Tab 7, that's the
3    document, it's identified as JNJMX68_2659.
4    A.    JNJMX68_2659. Okay. Where is it in
5    the --
6    Q.    If you look at the third paragraph.
7    A.    Okay.
8    Q.    So it's the third and the fifth
9    paragraph.
10   A.    "The samples represented both the
11   industrial materials produced at the Gassetts and West
12   Windsor."
13   Q.    Okay. If you look down at the fifth
14   paragraph, it says, "In one instance, asbestos was
15   identified, this being associated with sample D-GI
16   produced at the Gassetts Mill."
17   A.    Okay.
18   Q.    And do you agree with me that the
19   Gassetts Mill and industrial talc are different than the
20   cosmetic talcum powder used in Johnson & Johnson Baby
21   Powder -- or Johnson's Baby Powder and Shower to Shower
22   products?
23   A.    The geology is related.
24   Q.    Okay. But specifically the -- this is
25   not talcum powder that ever made it into a bottle of

Page 249

1    Johnson's Baby Powder or Shower to Shower; is that
2    correct?
3        MS. SCOTT: Objection.
4    A.    Presumably, that is correct.
5    BY MR. FROST:
6    Q.    Turn to page 15 of your report.
7    A.    Page 15?
8    Q.    Yep.
9    A.    Of the report? Okay.
10   Q.    It's the sample 7/7/1971.
11   A.    7/7/1971, J&J-15, Colorado School of
12   Mines, the Vermont talc.
13   Q.    And if you turn to Tab 8. This is the
14   corresponding document related to processed talc sample
15   344-L?
16       MS. O'DELL: I'm sorry, Jack. Did you
17   say Tab 8?
18       MR. FROST: Tab 8 of the binder, yes.
19   It's JNJAZ55_6089.
20       MS. O'DELL: Great. Thanks.
21   A.    It says, "only minor amounts (below
22   1 percent) of tremolite and actinolite were detected."
23   BY MR. FROST:
24   Q.    Okay. And you agree that this is sample
25   344-L that they're talking about?

Mark Krekeler, Ph.D.

Page 250

1    A.    Yeah. It says, "Following are results of
2    the x-ray analyses on the 344-L Vermont talc product and
3    the six monthly Vermont talc product samples."  Yes.
4        MS. O'DELL:  Jack, are you going to
5    mark -- I think what made it to the chart was
6    J&J-15.
7        MR. FROST:  I didn't have a copy with the
8    J&J-15 sticker on it.  It's the same document,
9    though.  This is just from our production.
10       MS. O'DELL:  I see.  Do you mind giving
11   me just a minute to pull that up --
12       MR. FROST:  Sure.
13       MS. O'DELL:  -- so we can correlate it?
14   It will take me two seconds.
15       Thanks very much.
16   BY MR. FROST:
17   Q.    If you turn, sir, to page -- or, sorry,
18   to Tab Number 9.  Well, before I get there, this report
19   was done by the Colorado School of Mines, correct?
20   A.    Colorado School of Mines Research
21   Institute it what it says, yes.
22   Q.    Are you aware that the Colorado School of
23   Mines issued a subsequent report regarding these
24   samples?
25   A.    I don't know.  I believe I've seen other

Page 251

1    things from the Colorado School of Mines.
2    Q.    Okay.  If you turn to Tab 9.  It's a
3    document identified as JNJAZ55_3828.
4    A.    Okay.
5    Q.    Do you see it where it says -- it's Point
6    Number 1.  "In the report of July 7, 1971."  Do you
7    agree with me that's the report you just looked at in
8    Tab 8?
9    A.    Okay.
10   Q.    Continues down, it says, "Subsequent
11   x-ray work on the six monthly product samples and the
12   344-L product sample shows no definite indications of
13   asbestos-type minerals within our limits of
14   detectability.  The trace amounts I saw were evidently
15   contamination from the standard asbestos samples."  Did
16   I read that correctly?
17   A.    You read it correctly.  But it's also, in
18   my mind, it's unclear, you know -- you know, again,
19   like, there's no detail as far as, like, the methods and
20   such.  So if they're doing this as powders and then
21   they're reanalyzing, so they're repacking the powder at
22   a sample volume can be several cubic centimeters.  So
23   it's not necessarily surprising that we would have a
24   positive result and then, if you repack it, you might
25   get a negative result.  And their interpretation is

Page 252

1    permissible, but, again, you know, it also indicates
2    that they're sloppy with their materials and they --
3    Q.    I'll stop you here.  Without speculating,
4    you can't tell me that the talc in 344-L contained
5    asbestos, correct?
6        MS. SCOTT:  Object to the form.
7    A.    I would say that based on these
8    documents, that, objectively, the analysis might be
9    suspect or based on what I saw previously.
10   BY MR. FROST:
11   Q.    Yeah.  But you can't tell me one way or
12   the other based on this, considering it's a retraction?
13   A.    Well, it was measured once.  We don't
14   know -- they didn't -- I don't see any data that backs
15   up --
16   Q.    Well, there's no data in this report.
17   A.    It says, I saw where evidently
18   contamination.  "Evidently" is a word up to
19   interpretation.  Prove it.  I don't see, you know,
20   essentially, some sort of chemical analysis or whatever
21   that would prove the exact same thing.
22   Q.    So with the guy who did the testing
23   saying my testing is wrong, you're still comfortable in
24   saying 100 percent that there was asbestos in that
25   talcum powder sample?

Page 253

1        MS. SCOTT:  Objection.
2    A.    Well, I would say it's probable --
3    BY MR. FROST:
4    Q    And what's that based on?
5    A    -- or possible.
6    Q.    What's your basis?
7    A.    The first finding.
8    Q.    And the fact that it was negated and
9    specifically retracted by the person who does the
10   testing has absolutely no sway in your mind as to
11   whether or not?  You're just now basing your opinion on
12   speculation?
13       MS. SCOTT:  Objection.
14   BY MR. FROST:
15   Q.    Don't you think the guy who did the test
16   is in a better position than you are today, 40, 50 years
17   later, to say what was in that particular sample that he
18   tested?
19       MS. O'DELL:  Objection.
20   A.    I've stated my opinion.
21   BY MR. FROST:
22   Q    Okay.  Interesting one.  Let's turn to
23   1972.  It's page 16.
24   A.    There's many from '72 here.  Which one?
25   Q.    It's the very -- it's 8/3/1972.

Mark Krekeler, Ph.D.

1    A.    "8/3/1972, J&J-28, NYU, Shower to Shower
2  ... 5 percent chrysotile."
3    Q.    Turn to Tab 8. I'm sorry. Tab 10.
4    A.    Tab 10.
5    Q.    Do you agree this is a corresponding
6  document to that entry?
7    A.    J&J-28. Yes.
8    Q.    Okay. Real quick, before I get there,
9  turning back to Tab 9, you were never provided with this
10 document, right?
11          MS. SCOTT: Objection.
12   A.    Tab 9. I think I was.
13 BY MR. FROST:
14   Q.    And then why didn't you consider this
15 document in creating your chart?
16          MS. SCOTT: Objection.
17   A.    I potentially missed it in the
18 compilation.
19 BY MR. FROST:
20   Q.    And you also didn't include it under
21 materials considered?
22   A.    I missed it.
23   Q.    Okay. So back to Tab 10. So we agree
24 this is the source of the entry on page 16 of your
25 report, correct? The Shower to Shower sample 84.

1    A.    Yeah. J&J-28?
2    Q.    Yes.
3    A.    Yes.
4    Q.    Okay. And this was testing that was done
5  by Dr. Lewin?
6    A.    Yes.
7    Q.    Are you aware that Dr. Lewin retested
8  this sample and was unable to replicate his results?
9    A.    No.
10   Q.    Okay. Turn to Tab 11. If you look at
11 page 4, it's the testing of Number 29. I think it's
12 four -- three down.
13   A.    It is one, two, three, four. And I'm
14 sorry. This is --
15   Q.    Yes. That's the chart.
16   A.    Where? I don't see a number on this.
17   Q.    Yeah. It appears to have gotten cut off,
18 so I don't know what the number of this document is. We
19 can sort that out at the back end.
20   A.    Where is it at on the chart?
21   Q.    It's D-7113. As I said, it got cut off.
22          MS. O'DELL: Yeah. Was it marked in a
23 deposition?
24          MR. FROST: I believe it is. It's marked
25 somewhere, but I have it in my notes as D-7113.

1          MS. O'DELL: Give us just a minute.
2    A.    Here's one by Doctor -- I'm sorry. I'm
3  getting Dr. Lewin-- okay. D. You said D-1?
4          MS. O'DELL: Is it DX?
5          MR. FROST: I have it as D. It's
6  possible it's DX.
7    A.    So let's see what the date is. We have a
8  date. We're looking for January 7th, '76. January 7th,
9  '76. I think there's only -- I have one. I have only
10 one.
11 BY MR. FROST:
12   Q.    Sir, we're trying to pull up the
13 documents, but this relates -- and I'll get back -- but
14 this relates to your testing of 8/3/72 by Dr. Lewin.
15 The Shower to Shower sample 84, you note on the 8/3/72.
16 If you look back at Tab 10, that's the corresponding
17 document for that. It's on the one, two, three, four,
18 five, sixth page.
19          MS. SCOTT: Is subsection B on the
20          tabulation of Dr. Lewin's original findings
21          smudged?
22          MR. FROST: Yeah, it's smudged, too.
23          MS. SCOTT: Okay.
24          MR. FROST: Yeah. Mine looks the same.
25          MS. SCOTT: Got it. And that's the

1  original?
2          MR. FROST: Yes. My understanding is
3          that's the original.
4  BY MR. FROST:
5    Q.    Okay. So you see we're talking about
6  Sample 84 on Tab 10?
7    A.    Right. So I'm at Tab 10. Tab 10.
8    Q.    One, two, three, four -- it's the fifth
9  page.
10   A.    One, two, three, four, five.
11   Q.    Do you see a Product 84?
12   A.    Product 84? Yes.
13   Q.    And if you follow across, there's --
14   A.    5 percent chrysotile.
15   Q.    -- 5 percent chrysotile. Okay. So if
16 you turn to the document at Tab 11.
17          MS. O'DELL: I'm not able to find that
18 DX.
19          MR. FROST: Okay. Well, I'll provide it
20 to you after the deposition. We'll figure it
21 out.
22 BY MR. FROST:
23   Q.    So if you look at this, this document,
24 you go to the fourth page. Sorry. One, two, three,
25 fourth page.

Mark Krekeler, Ph.D.

Page 258

1    A    Okay.  One, two, three, four.

2    Q    Do you see here under Sample 84 with the

3  retest that there's a no detect and there's no finding

4  of chrysotile?

5        MS. SCOTT:  Objection.

6    A    In the -- oh, there's a question mark for

7  chrysotile, right?

8  BY MR. FROST:

9    Q    Yeah.  It certainly doesn't find that

10  there's chrysotile in the retest, correct?

11        MS. SCOTT:  Objection.

12    A    It doesn't say "no detect," also.

13  BY MR. FROST:

14    Q    Again, without speculating, can you tell

15  me whether or not that that means there's chrysotile in

16  that product?

17    A    No.  But it means there's some question.

18  Yeah, I don't know why they would use question marks.

19  If it was no detect, I would expect it to be an ND.

20    Q    But, again, you can't tell me one way or

21  the other without speculating that there's chrysotile in

22  that product, correct?

23        MS. O'DELL:  Object to the form.

24    A    So with all these, you know, re-analyses,

25  you know, essentially, one aspect of variability is that

Page 259

1  perhaps the samples were either ground more or not

2  prepared, you know, in the same way.

3  BY MR. FROST:

4    Q    Let's stop you here.  You're speculating

5  about all of this, correct?  Based on these documents,

6  can you tell me one way or the other that there was any

7  problems with the retest or that they've actually found

8  chrysotile in any of these samples?  I don't want you to

9  speculate.

10        MS. SCOTT:  Object to the form.

11    A    The -- this has a question mark listed

12  for chrysotile.

13  BY MR. FROST:

14    Q    And based on that, you can't tell me one

15  way or the other whether there was chrysotile in the

16  final sample that was tested, according to this

17  document, correct?

18    A    Correct.  According to that document.

19    Q    Okay.  Go to your chart.  Still on page

20  16, I believe.  It's 9/26/72.

21    A    9/26/72.

22    Q    If you turn to Tab 12.  Do you agree that

23  that's the corresponding document, J&J-31?

24    A    JNJ-31.  I believe so, yes.  Johnson's

25  Baby Powder, 2 percent chrysotile; Johnson's Baby

Page 260

1  Powder, 3 percent chrysotile.

2    Q    You're looking at page 4 of 7?

3    A    4 of 7.

4    Q    Samples 183 and 184?

5    A    Yes.

6    Q    If you look back at Tab 11.  If you look

7  at Samples 133 and 134 here.  Again, on the retest, this

8  time there's no question mark.  It says nondetect for

9  chrysotile, tremolite.  Do you agree?

10    A    133 and 134, ND.  Yes, ND is listed.

11    Q    And if you look back at your chart on

12  16 -- strike that.

13        So, again, looking at this, you can't

14  tell me whether or not there's actually asbestos that

15  made it into the sample that's listed as 9/26/72 in your

16  chart, correct, without speculating?

17    A    Correct.  It was detected once in a

18  sample, and it was not detected again in what is

19  supposedly the same sample.  So I'm unclear.  Is it the

20  exact -- is it the same exact sample or same lot?

21    Q    It's the same sample, sir.  It was

22  retesting of the same sample.

23    A    Resting.

24        MS. O'DELL:  Object to the form.

25    A    Is the exact --

Page 261

1        MS. O'DELL:  Excuse me.  Object to the

2    form.

3  BY MR. FROST:

4    Q    You can read the document yourself, sir.

5        All right.  So I think we've gone

6  through, like, six of these, correct?  And we've come up

7  with six of them either are samples that have absolutely

8  nothing to do with Johnson's Baby Powder or Shower to

9  Shower or any other cosmetic talcum problem.  Do you

10  agree?  Talcum powder product.

11        MS. O'DELL:  Objection.

12  BY MR. FROST:

13    Q    Do you agree?

14    A    We've gone through six examples as

15  you've -- yeah.

16    Q    And others we've come up with, we

17  basically determined without speculating you can't say

18  one way or the other that there is asbestos in that

19  product that made it onto the market, correct?

20        MS. SCOTT:  Object to the form.

21    A    Based on those documents, yes.

22  BY MR. FROST:

23    Q    So I think it would take us days to go

24  through all of these, but can you definitively sit here

25  now and tell me that every single hit or every single

Mark Krekeler, Ph.D.

Page 262

1  reference you have on this list showing asbestos and
2  talcum powder is actually talcum powder that was, one,
3  either use or ended up in an bottle of Johnson's Baby
4  Powder or Shower to Shower or other talcum powder
5  products or, two, that you can say without speculating
6  contains asbestos?
7          MS. O'DELL:  Objection.
8      A.    To the best of my knowledge, I stand by
9  the report.
10 BY MR. FROST:
11     Q.    But sitting here today, you can't tell me
12 one way or the other that absolutely every -- well, we
13 know not every single entry is correct?
14         MS. O'DELL:  Objection.
15     A.    Yeah.  So there -- there are some
16 misidentifications or later corrections, later
17 corrections that I was unaware of, but it's also
18 concerning that you can -- it's not exactly -- you know,
19 so what is a sample?  It's not exactly clear if the
20 sample is like a kilogram sample, so you could have
21 portions in that sample that have asbestos that you
22 cannot detect, and then you can have regions of the
23 sample that have a lot.  So that, that's my opinion.
24     Q.    So what you're telling me is you can't
25 actually speculate as to any of the testing results in

Page 263

1  here because of the various sample sizes retesting, and
2  again, not everything we found is a retest, right?  Some
3  aren't even products of cosmetic talc, correct?
4          MS. O'DELL:  Object to the form.
5          MS. SCOTT:  Objection.
6      A.    I don't remember.
7  BY MR. FROST:
8      Q.    You don't remember that we found talcum
9  powder that came from a mine in San Andreas, California?
10     A.    I'm sorry.  Yeah, that's correct.
11     Q.    Okay.  So it's not just retesting that
12 came back.  I've also identified some product that has
13 nothing to do with cosmetic talcum powder, correct?
14         MS. SCOTT:  Objection.
15     A.    Correct.
16 BY MR. FROST:
17     Q.    Okay.  Now, you also reference in your
18 report Dr. Longo's reports; is that correct?
19     A.    Yes.
20     Q.    And I take it you were provided those
21 reports by plaintiffs' counsel?
22     A.    Yes.
23     Q.    Did you ever ask plaintiffs' counsel if
24 anybody else has done testing of Johnson & Johnson
25 talcum powder other than Dr. Longo and the records that

Page 264

1  they provided to you?
2          MS. SCOTT:  Objection.
3      A.    No.  But I -- well, I remember there's a
4  deposition by Blount who indicated, I think, on page 10
5  that work from 1991 was Johnson & Johnson talcum powder,
6  if I remember correctly.  I've seen that somewhere.
7  BY MR. FROST:
8      Q.    Okay.  So Blount, Longo.  And, again,
9  Blount was provided to you by plaintiffs' counsel,
10 correct?
11     A.    Yes.
12     Q.    Now, you've done no additional testing
13 yourself of talcum powder?  I think you said that
14 before.
15     A.    Correct.  Yeah.  That was not requested
16 of me.
17     Q.    And have you done any testing or cusing
18 of the testing done by Dr. Longo?
19         MS. SCOTT:  Objection.  Asked and
20 answered.
21     A.    No.  I was not asked to retest on any of
22 his samples or anything like that.
23 BY MR. FROST:
24     Q.    So you're merely relying on the results
25 of his testing for purposes of your opinions here,

Page 265

1  correct?
2      A.    Yes.
3      Q.    You have no opinions about his sample
4  preparation, his underlying testing methods, anything of
5  that nature?
6      A.    I'm fine with what he's done.
7      Q.    Okay.  But you're not rendering any
8  opinions that it's correct or incorrect or the
9  methodology about it?  You're not going to sit here
10 today and walk me through the methodology that Longo
11 used to give me opinions that that's the proper way or
12 not the proper way?
13         MS. SCOTT:  Objection.
14     A.    I think what he did was fine for the
15 purpose of the report.
16 BY MR. FROST:
17     Q.    You have no problems with any of the
18 methodology he employed in his testing?
19         MS. O'DELL:  Objection.  Asked and
20 answered.
21     A.    No.  I'm fine with what he's done in the
22 report.
23 BY MR. FROST:
24     Q.    This is despite the fact that you've done
25 nothing to verify the results of his report?

Page 266

1        MS. SCOTT: Objection.
2        A.    You know, I looked at a lot of TEM data.
3  You know, just looking at the quality of the data,
4  electron diffraction is, requires a certain level of
5  skill, and he produced several, you know, really good
6  nets, so he was obviously able to get good orientations
7  of crystals. So, you know, he didn't have anything that
8  was extremely off axis or anything like that. So at
9  that level, I mean, I am fine with his data.
10 BY MR. FROST:
11       Q.    You didn't go through and actually run
12 any calculations to determine whether or not his
13 accessees were correct or whether or not any of his
14 underlying calculations or determinations are correct?
15       MS. SCOTT: Objection. Asked and
16 answered.
17       A.    I did not index things, but the
18 diffraction patterns looked suitable and consistent as
19 to the EDS, suitable and consistent with the materials
20 that he identified.
21 BY MR. FROST:
22       Q.    And is suitable and consistent the
23 scientific requirement for testing?
24       MS. SCOTT: Objection.
25       A.    So with TEM work, essentially, one should

Page 267

1  have an image, an EDS pattern and a diffraction pattern.
2  So I find what he has done is in agreement with what I
3  would do and what others have done.
4  BY MR. FROST:
5        Q.    This is despite the fact that you didn't
6  do any retesting of the work calculations. You didn't
7  do any cusing of it. You're just taking it a face value
8  based on your review?
9        MS. SCOTT: Objection.
10       A.    I was not tasked with retesting samples.
11 BY MR. FROST:
12       Q.    You agree with me that there are samples
13 where Dr. Longo detected no asbestos, correct?
14       A.    I'm not sure. There may have been some,
15 but I don't remember the exact details.
16       Q.    So you're relying on Dr. Longo's report
17 and testing as a basis for your opinions here, but you
18 can't even tell me whether or not what percentage or if
19 he finds no asbestos in some of the bottles he tested?
20       MS. SCOTT: Objection.
21       A.    There were, you know, hundreds and
22 hundreds of images diffraction patterns in EDS, so I
23 don't remember specifics.
24 BY MR. FROST:
25       Q.    So you can't tell me whether or not he

Page 268

1  found asbestos in every sample he tested?
2        A.    I would not be comfortable saying that.
3  I don't know.
4        Q.    Okay.
5        A.    I know he found asbestos in many samples.
6        Q.    Okay. Turning to -- where I did put your
7  report?
8        THE WITNESS: Can we take a little break?
9        MR. FROST: Sure.
10       VIDEOGRAPHER: We're now going off
11 record. The time is 5:47.
12       (A recess was taken from 5:47 to 6:00.)
13       VIDEOGRAPHER: We are back on record, and
14 the time is 6:00.
15 BY MR. FROST:
16       Q.    We're going to change gears a little bit
17 and talk about fibrous talc. Of course, I'm not finding
18 it. That's all right. It doesn't matter.
19       So, in general, you're relying on the
20 IARC statement from 2012, correct, that fibrous talc is
21 carcinogenic?
22       A.    I'm just trying to find it.
23 BY MR. FROST:
24       Q.    If you find it, tell me the page. Okay.
25 Page 23 is where it starts.

Page 269

1        A.    Twenty-three.
2        Q.    In general, I think a couple different
3  places in your report, you note that, according to IARC,
4  it's actually -- I see it on page 3. Yeah, that rely on
5  IARC 2012 to state that fibrous talc can be a human
6  carcinogen?
7        A.    I'm sorry. You said page 3?
8        Q.    Yes.
9        A.    Page 3.
10       MS. SCOTT: I'll just object.
11       A.    "Talc can occur in a fibrous habit"?
12       Q.    Yep.
13       A.    "These fibers can be inhaled into the
14 lower lungs based on their length and diameter,
15 producing effects linked to significant health risks in
16 humans. IARC 2012."
17 BY MR. FROST:
18       Q.    Okay. Would you agree with me that
19 you're not an expert in reading the literature of what
20 causes cancer?
21       MS. SCOTT: Objection.
22       A.    I am not an oncologist. I am not a
23 medical expert.
24 BY MR. FROST:
25       Q.    Do you agree with me that an IARC

Mark Krekeler, Ph.D.

Page 270

1 monograph does not represent independent lab work but,
2 instead, it's a summary of work that's already been done
3 by others?
4         MS. SCOTT: Objection.
5     A.    And that's normal. There are many
6 monographs. I mean, we have, you know, the CRC
7 chemistry book.
8 BY MR. FROST:
9     Q.    That's what I'm saying.
10    A.    It is a cumulative document, as I
11 understand it, based on peer-review literature, and it's
12 also an international document, so it's global
13 peer-review literature, as I understand it.
14    Q.    Do you agree with me that if there are --
15 IARC does not draw conclusions on its own, so if there's
16 not peer-reviewed literature that says one way or the
17 other, IARC isn't going to jump out and say this is or
18 this isn't, correct? IARC relies on the work of others
19 in order to reach its conclusions?
20        MS. O'DELL: Object to form.
21    A.    I think it's speculation because I'm not
22 an expert in health and medical things.
23 BY MR. FROST:
24    Q.    Okay. Are you aware whether or not there
25 are any peer-reviewed studies that actually link

Page 271

1 exposure to talc to ovarian cancer?
2        MS. SCOTT: Objection.
3        MS. O'DELL: Object to form.
4     A.    I'm sorry. Any studies or any
5 information?
6 BY MR. FROST:
7     Q.    I said any peer-reviewed studies linking
8 exposure to talc to ovarian cancer.
9     A.    I'm not a medical expert.
10    Q.    Again, can you tell me whether or not
11 IARC specifically links exposure to talc to ovarian
12 cancer?
13        MS. SCOTT: Objection. Asked and
14    answered.
15        MS. O'DELL: Objection.
16    A.    I'm not a medical expert.
17 BY MR. FROST:
18    Q.    Have you ever done any work identifying
19 talc as either platy or fibrous?
20    A.    No. I have no peer-reviewed articles.
21    Q.    Are you aware if you ever heard of the
22 common misreporting of platy talc as fibrous?
23        MS. SCOTT: Objection.
24        MS. O'DELL: Objection.
25

Page 272

1 BY MR. FROST:
2     Q.    If you want me to explain it --
3     A.    I don't -- I don't remember.
4     Q.    And that, specifically, the theory is
5 that -- you know, the explanation is that if you look at
6 talc edge on, it can appear in a 2-D image as fibrous.
7 Would you agree with that?
8        MS. SCOTT: Objection.
9     A.    Can I make a statement?
10 BY MR. FROST:
11    Q.    Sure.
12    A.    So the miopyroboles are this mineral
13 group that actually were discovered in the ultramafic,
14 these talc-rich zones in Vermont. So Dave Devlin, I
15 worked with Thompson at Harvard, and basically, what
16 they showed is that you can have these structural
17 intermediates where, essentially, you can have a region
18 of a crystal.
19    Q.    Okay. I am going to stop you because we
20 are talking about something completely different. My
21 question was --
22    A.    I was explaining how one might get
23 fibrous talc.
24    Q.    No, no. I'm talking about -- that's why
25 I stopped you, because that's not what we're talking

Page 273

1 about.
2        So do you agree that if you're looking at
3 a plate of talc on edge, it can appear as a fiber in a
4 2-D SEM or TEM image? And have you read any literature
5 about the problems with misidentifying talc?
6        MS. O'DELL: Objection.
7        MS. SCOTT: Objection.
8     A.    It can look -- so a fibrous -- a fiber
9 can look like a two-dimensional plate or a
10 two-dimensional plate can look like a fiber.
11 BY MR. FROST:
12    Q.    So the problem is when you're looking --
13 because, usually, a platy talc, you know, if it's
14 sitting oriented this way, you can see the large
15 platiness of it, but if it's oriented that you're
16 looking at the flat plane, have you ever read anything
17 that talks about the fact that you can misidentify platy
18 talc as fiber based on the orientation of the image?
19        MS. SCOTT: Objection.
20    A.    I don't remember.
21        MR. FROST: Can we get IARC 2010? I
22    forget what it was marked as. It's the big
23    orange one, I believe. Yeah, there it is.
24        MS. O'DELL: Five.
25        MR. FROST: It looks like that. It's

Mark Krekeler, Ph.D.

Page 274

1    five.
2 BY MR. FROST:
3        Q.    I'll skip this.  You said you haven't
4 read anything.  You don't know about that, so it's not
5 something that comes up in your work?
6        A.    I don't remember.
7        Q.    That's fine.  I'll move on for sake of
8 time.  All right.
9             Now, you've also noted in your report
10 various opinions about findings of nickel, chromium and
11 cobalt, correct?
12       A.    Yes.
13       Q.    And you're not qualified to opine as to
14 whether or not a particular level of nickel is
15 sufficient to cause human disease, correct?
16            MS. SCOTT:  Objection.
17       A.    I am not a toxicologist.
18 BY MR. FROST:
19       Q.    You're also not qualified to opine what,
20 if any, disease may be associated with nickel
21 contaminated or with nickel exposure, correct?
22            MS. SCOTT:  Objection.
23       A.    I'm not a toxicologist or oncologist.
24 BY MR. FROST:
25       Q.    I'm looking at your report, starting on

Page 275

1 page 34.
2        A.    I'm right there.
3        Q.    Some of these tests, you'll agree with
4 me, you know, not that they're from ore.  Several of
5 them actually note that they're from grade 66.
6 Windsor 66, you agree, is an ore, correct?
7            MS. O'DELL:  Object to the form.
8        A.    I'm sorry?
9 BY MR. FROST:
10       Q.    You'd agree with me, looking at these,
11 that the marks that say "ore in concentrate, grade 66,
12 Windsor 66," et cetera, these are all ore samples,
13 correct?
14            MS. SCOTT:  Objection.
15       A.    I think so.  I'd like to look at the
16 document to be sure.
17 BY MR. FROST:
18       Q.    I mean, you can go on them, such as the
19 example of Imerys 045182.  It says three ore samples?
20       A.    Yeah.  So that's what it's listed as,
21 yes.
22       Q.    So you'd agree with me without
23 speculating, you can't say one way or the other that
24 levels, as detected in the ore samples, are actually the
25 levels that may have ever made it into a bottle of

Page 276

1 finished talcum powder, correct?
2            MS. SCOTT:  Objection.
3            MS. O'DELL:  Objection.
4        A.    I'm sorry.  Repeat the question.
5 BY MR. FROST:
6        Q.    Sure.  You can't tell me without
7 speculating that levels of -- we're looking at nickel,
8 for example, here, found in ore samples are the same
9 levels that would be located in finished talcum powder,
10 correct?
11            MS. SCOTT:  Objection.
12       A.    Correct.  The levels of metals may be the
13 same, may be less or may be more depending upon the
14 process.
15 BY MR. FROST:
16       Q.    And things like beneficiation, blending,
17 things of this nature would ultimately affect what ends
18 up in the final product, right?
19       A.    If it's executed correctly, but I think
20 it's also reasonable to say that some -- it is
21 scientifically likely -- it's my opinion that some of
22 this would, from the ore samples, would make it into
23 product if it is used for that purpose.
24       Q.    But you can't tell me, of these ore
25 samples, what sample may or may not have made --

Page 277

1        A.    I can't tell you where, what bottle that
2 might have ended up in, yes.
3        Q.    Or if it even could have ended up in the
4 bottle, correct?
5            MS. SCOTT:  Objection.
6 BY MR. FROST:
7        Q.    At that --
8        A.    Specifically, no.
9        Q.    Okay.
10       A.    If you process it, you may modify it one
11 way or the other.
12       Q.    The same thing would also be true with
13 respect to the chromium, cobalt, and I think this is the
14 only other ones, right, chromium, cobalt that are listed
15 in the charts?  Yes.
16            MS. SCOTT:  Objection.
17 BY MR. FROST:
18       Q.    The same would be true with chromium and
19 cobalt, right?
20       A.    Chromium, cobalt, nickel.  Chromium
21 cobalt, nickel -- I'm just checking and double checking.
22 Chromium, cobalt, and then it's not in chart form, but I
23 do talk about arsenic on page 33.
24       Q.    And it would be the same for the
25 chromium, cobalt, nickel and arsenic based on ore sample

Page 278

1  testing? You couldn't say one way or the other what
2  level ultimately made it into, if at all, talcum powder,
3  finished talcum powder, correct?
4        MS. SCOTT: Objection.
5     A.  Yes.
6  BY MR. FROST:
7     Q.  With respect to chromium, which is page
8  36 of your report, sir?
9     A.  Uh-huh.
10    Q.  You know that chromium can occur in two
11  different forms, Chromium III and Chromium VI?
12    A.  It's a slight typo. What I mean to say
13  there is chromium can occur in two common forms and
14  minerals, Chromium III and Chromium IV. So chromium can
15  actually have several different valent states to it --
16    Q.  And it's Chromium VI --
17    A.  -- including the zero valent metal, which
18  we don't really see in nature.
19    Q.  And it's chromium 6, correct, that is the
20  known carcinogen?
21    A.  Yeah. That is one of high concern, as I
22  understand it.
23    Q.  Are you generally aware that Chromium III
24  is actually an essential element in the human body?
25    A.  I'm a diabetic. Yes.

Page 279

1     Q.  Okay. And are you also aware that
2  chromium 3 is commonly found in rocks and minerals?
3     A.  Yes.
4     Q.  And, again, in looking at the chart, you
5  don't list here whether or not it is Chromium III,
6  Chromium VI or some other variant of the mineral -- or
7  the metal, correct?
8     A.  Correct. But I think it's reasonable
9  that -- yes. There's no specific determination of
10  valent state, which would have been a nice step if you
11  could definitively show that there is no chromium or
12  active valent chromium that would have been a good
13  thing. But, yes, there's no specific EELS, electron
14  energy loss spectroscopy, or what comes through
15  techniques to determine that.
16    Q.  And with respect to the arsenic, the
17  cobalt and the chromium, just like the nickel, you can't
18  tell me what level of exposure is required to cause
19  disease of those heavy metals, correct?
20    A.  I am not a medical or oncologist, sir,
21  yes.
22    Q.  And it's the same thing. You couldn't
23  tell me what diseases they're known to cause if you have
24  exposure, correct?
25    A.  Correct.

Page 280

1     Q.  It you turn to, I believe, Exhibit 2,
2  your supplemental report.
3     A.  Okay.
4     Q.  Okay. The second page.
5     A.  Okay.
6     Q.  Under sampling and techniques, do you see
7  it's one, two, three, four down?
8     A.  Under "Sampling and Testing"?
9     Q.  Under "Sampling and Testing Results,"
10  yes. You know that it failed to provide data
11  supporting -- no. I'm in the wrong place.
12    A.  I'm sorry. Where were you?
13    Q.  Sorry. I was in the wrong place. Bear
14  with me a second here. Okay. It's the one, two, third
15  paragraph down. It starts with "Another issue."
16    A.  Yeah.
17    Q.  So "Another issue was the vague
18  description of the preparation technique. The method
19  fails to identify whether the material was ground,
20  crushed or made into a powder by another method." Do
21  you see that there?
22    A.  Yes.
23    Q.  If you look up to the testing, it says,
24  "XRD methodology states." Do you see where I am there?
25    A.  Yes.

Page 281

1     Q.  It's the part that's indented.
2  Underneath, it says, "Monthly talc composite, February
3  1990."
4     A.  Yeah.
5     Q.  Do you agree with me that the monthly
6  talc composite is a composite of the ground finished
7  talc that's being tested?
8        MS. SCOTT: Objection.
9     A.  I'm unsure. I'm unsure. The -- you --
10  one would essentially prepare the -- I'm sorry. Go
11  ahead.
12  BY MR. FROST:
13    Q.  Yes.
14    A.  I'm unsure.
15    Q.  You can't tell me whether or not this was
16  the composite sample of the already ground and prepared
17  talc?
18    A.  I don't -- I don't remember specifically.
19    Q.  And if the talc was already ground as a
20  finished product, there wouldn't be further grinding of
21  it. Do you agree with that?
22        MS. SCOTT: Objection.
23    A.  So as I understand, the final talc
24  particle size is approximately 15, 25 microns or so, so
25  that's essentially fine salt size. So, typically, in

Mark Krekeler, Ph.D.

| Page 282 | Page 284 |
|---|---|

**Page 282**

1  power diffraction, you would want to reduce that
2  particle size further.
3  BY MR. FROST:
4      Q.    Did you see anywhere in reviewing this
5  testing that they state that they reduce the particle
6  size further?
7          MS. O'DELL:  If you need to review the
8  document, Doctor, we can pull it.
9      A.    Yeah.  Why don't we pull it up?
10 BY MR. FROST:
11     Q.    Sure.  I don't have it.  That's fine.  We
12 can move on.  I don't want to waste my time.
13         MS. O'DELL:  To ask him questions,
14     specific questions about the document not having
15     this.
16         MR. FROST:  I'm just asking -- I'm just
17     asking if he knows and what he remembers in
18     drafting his report.
19         All right, sir.  I think that's all the
20     questions I have for now.  I reserve the right
21     to look at my notes and come back, but I'm going
22     to yield my time to some of the other
23     defendants.  We can go off the record.
24         VIDEOGRAPHER:  We're now going off
25     record.  The time is 6:19.

**Page 283**

1          (A recess was taken from 6:19 to 6:33.)
2          VIDEOGRAPHER:  We are now back on record,
3      and the time is 6:33.
4              CROSS-EXAMINATION
5  BY MR. FERGUSON:
6      Q.    Good evening, Dr. Krekeler.  How are you?
7      A.    Good.
8      Q.    Okay.  We met briefly before.  My name is
9  Ken Ferguson, and I represent Imerys.  Do you understand
10 that?
11     A.    Yes.
12     Q.    Okay.  And I've got, along with Mr. Cary,
13 who's down, three people down from me.
14     A.    Okay.
15     Q.    I've got some questions for you.  I'm not
16 going to spend a lot of time, because there's not a lot
17 of time left, so I may skip around a little, just
18 depending on which questions I feel like I need to get
19 asked before I run out of time.  So I'm not trying to
20 confuse you by that, but if I do, then you let me know,
21 and I'll restate the question, okay?
22     A.    Okay.
23     Q.    Okay.  Fair enough.
24         So in your career as an academic, you've
25 written scientific papers before, correct?

**Page 284**

1      A.    Yes.
2      Q.    And you've published a hundred and
3  something; is that right?
4      A.    Over 40 peer-review papers.  I have over
5  a hundred presentations at meetings and a couple
6  patents, yes.
7      Q.    In your peer-review papers, when you're
8  citing authorities in your peer-review papers, you tend
9  to or customarily cite peer-reviewed papers, don't you?
10     A.    Generally, yes.
11     Q.    Because you know that they have the
12 likelihood to be more accurate and have been, obviously,
13 reviewed by peers, correct?
14         MS. O'DELL:  Object to form.
15     A.    Correct, yes.
16 BY MR. FERGUSON:
17     Q.    Now, in your report that you did in this
18 case, and I know it's been marked as an exhibit.  I
19 forget which number.  In your report in this case, you
20 have, among other authorities, cited Dr. Longo and
21 Dr. Rigler's report, correct?
22     A.    I've cited expert witness reports, yes.
23     Q.    And you understand that Dr. Longo and
24 Rigler's report, that's not peer reviewed, correct?  You
25 understand that?

**Page 285**

1      A.    Yes, I do.
2      Q.    So while your custom is to cite
3  peer-reviewed articles in your scientific papers that
4  you're writing, you've varied from that in doing your
5  report here in this matter, correct?
6          MS. O'DELL:  Object to the form.
7      A.    Yes.  So I have not in my previous work
8  cited an expert witness report.
9  BY MR. FERGUSON:
10     Q.    And you understand that Dr. Longo and his
11 colleague, Dr. Rigler, and I think they wrote these
12 reports together, that they are being paid as experts by
13 counsel for plaintiffs just as you are, correct?
14         MS. SCOTT:  Objection.
15     A.    I believe that is the case, yes.
16 BY MR. FERGUSON:
17     Q.    I want to talk to you a little bit about
18 a book that I see you've got your copy out.  I've got my
19 copy out, and we have some copies we've made that I'm
20 going to mark as Exhibit 23, I believe.
21         (Exhibit 23 was marked for
22             identification.)
23 BY MR. FERGUSON:
24     Q.    Now what I've marked, Dr. Krekeler, are
25 some pages from a book called "An Introduction to the

Mark Krekeler, Ph.D.

Page 286

1  Rock-Forming Minerals" by Deer, Howie and Zussman,
2  correct?
3      A.   Is this the same edition?
4      Q.   I believe -- I believe it's the third
5  edition.
6      A.   Oh, I'm sorry.
7      Q.   And yours is?
8      A.   Third.  Yeah, we're good.
9      Q.   This is a book that is often relied upon
10 by mineralogists, correct, material scientists?
11     A.   This is a book that is used as a textbook
12 for mineralogy courses, yes.
13     Q.   So let's go back to your report, and if
14 you would, just keep the Deer, Howie and Zussman by your
15 side.  Go to your report at page 5.  Are you with me?
16     A.   Page 5.
17     Q.   And in the first paragraph on page 5 of
18 your report, there's a sentence in the middle that says,
19 "As a result, natural talc formation is commonly
20 accompanied by veins of other minerals, including
21 asbestiform minerals like tremolite and serpentine,"
22 correct?
23     A.   Yes.
24     Q.   And you cite for that Deer, Howie &
25 Zussman 2013, correct?

Page 287

1      A.   Yep.
2      Q.   And the citation down below cites, for
3  that assertion, pages 145, 149, 151 and 164 to 165,
4  correct?
5      A.   Yes.  That's what it reads.
6      Q.   And it's your contention in your expert
7  report that those pages stand for the proposition that
8  we just read the "natural talc formation is commonly
9  accompanied by veins of other minerals, including
10 asbestiform minerals like tremolite and serpentine,"
11 correct?
12     A.   Yes.
13     Q.   Let's move on because I'm not sure I have
14 it time to sit and read them all now.  Let's move on to
15 another topic.  Let's look at page 9 of your report,
16 please.
17     A.   Page 9?
18     Q.   Page 9, sir, yes.  And do you see on page
19 9 that you have said in the -- I think it's the second
20 full paragraph.  "Based on what I have reviewed, I have
21 sufficient basis to conclude that Italian ore was of
22 poor quality," correct?
23     A.   Yes.
24     Q.   And let me show you, first of all, an
25 exhibit that we'll mark as Exhibit 24.

Page 288

1           (Exhibit 24 was marked for
2           identification.)
3  BY MR. FERGUSON:
4      Q.   And this is a paper by a Harold R.
5  Newman, correct?
6      A.   That's what it says.
7      Q.   And it says, "The Mineral Industry of
8  Italy," correct?
9      A.   Yes.  What journal did this come from?
10 Is this peer review?
11     Q.   I don't know.  I believe it is, but I
12 don't know the answer, so I'm not going to answer it.
13     A.   You believe or it is?
14     Q.   I get to ask the questions.
15     A.   All right.
16     Q.   We have Harold Newman's paper here, okay?
17     A.   Okay.
18     Q.   From The Mineral Institute of Italy,
19 right?
20     A.   Mineral Industry of Italy, one.
21     Q.   So look at page --
22     A.   I'm sorry?
23     Q.   Look at page 428, please.
24     A.   428?
25     Q.   Yes.  And you see on the right-hand

Page 289

1  column, this is a paragraph that has "Talc" in bold at
2  the beginning of the paragraph, correct?
3      A.   Correct.
4      Q.   And it says -- and I won't try to
5  pronounce the Italian names.  We had enough trouble with
6  Chinese names earlier on, but "Talco" -- I'll try -- "e
7  Grafite Val Chisone S.p.A. operated two underground
8  mines at Pinerolo near Turin," correct?
9      A.   That is what it says.  I didn't know.
10     Q.   And next sentence says, "The white talc,
11 mined from metamorphic rocks, has been of very high
12 quality," correct?
13     A.   That is what it says.  It doesn't say
14 what high quality for.  Is it -- the table in the back,
15 does it say what the talc is used for?  Talc and related
16 materials.  It just lists tonnages.
17          MR. FERGUSON:  And I'd like the next
18     list, Exhibit 24 -- 25.  My bad.
19          (Exhibit 25 was marked for
20          identification.)
21 BY MR. FERGUSON:
22     Q.   The first author is Edward B. Ilgren,
23 I-l-g-r-e-n, correct?
24     A.   Ilgren, yes.
25     Q.   And the title is "Analysis of an

Mark Krekeler, Ph.D.

Page 290

1  Authentic Historical Italian Cosmetic Talc Sample
2  Further Evidence for the Lack of Cancer Risk," correct?
3      A.    And analysis of an, implying one,
4  authentic historical Italian.  Yes, that's what the
5  title is.
6      Q.    Exactly.  It does say "an," a-n?
7      A.    A single or it's implied that's a single
8  sample.  I have not seen this paper before.
9      Q.    Can you look with me at the first line of
10 the abstract, where it says, "Italian talc from the
11 Pinerolo Mines in northwest Italy is known for its
12 extreme purity," correct?
13     A.    That is what it says.  It doesn't say
14 with respect to what, so and then -- so it's an
15 abstract.  It should be a summary from introductory
16 materials, so let's see if they discuss that in the
17 introduction.  "It is known for its extreme purity.
18 More than 60 years of epidemiological studies have
19 failed to demonstrate any attendant cancer risk."  So --
20     Q.    I don't need you to read it out loud.  I
21 apologize for interrupting.  Obviously, time is limited.
22 You've answered my question, so what we know is that
23 Mr. Newman and Dr. Ilgren disagree with your comment
24 that the Italian talc is not good quality, correct?
25         MS. O'DELL:  Object to the form.

Page 291

1      A.    They can disagree, correct.
2  BY MS. ROSE:
3      Q.    At one point in your report on page 13,
4  you say that, "Usually, companies have a dedicated
5  in-house laboratory for these analyses."
6      A.    Yes.  Oil Dry as an example.  There's
7  other companies that have, you know, extensive labs, and
8  also, people rely on third-party labs to check their
9  internal labs.
10     Q.    And you're aware that Imerys has had and
11 has a dedicated in-house laboratory as well, correct?
12     A.    I believe so, yes.
13     Q.    And, in addition, Imerys has had occasion
14 to send samples to third-party laboratories as well,
15 correct?
16     A.    Correct.
17     Q.    Let me mark for you Exhibit 26 to your
18 deposition, please.
19         (Exhibit 26 was marked for
20         identification.)
21         MS. O'DELL:  Let me get that out here.
22         MR. FERGUSON:  Sure.  No problem.  Let me
23 know when you're ready.
24         MS. O'DELL:  Yeah.  Okay.
25         MR. FERGUSON:  Can I ask him a question

Page 292

1  about his report while you're pulling that up,
2  if you wouldn't mind?
3         MS. O'DELL:  Yeah, sure.  I've got it
4  right here.
5  BY MR. FERGUSON:
6      Q.    Could look at page 31 of your report,
7  Dr. Krekeler?
8      A.    I'm at page 31.
9      Q.    Are you with me, sir?  Okay.  Just above
10 the heading of "Toxic Metal Contamination," is a
11 paragraph that starts "In summary."  And do you see a
12 sentence there that says, "Defendants admit that the
13 beneficiation process does not remove asbestos"?  Do you
14 see that sentence?
15     A.    I do see that sentence.
16     Q.    And for that proposition, you cite the
17 deposition of Patrick Downey at page 407, pages -- line.
18 Excuse me.  Lines 13 through 16, correct?  That's what
19 you cited?
20     A.    Correct.
21     Q.    All right.  Let's look, if we may, look
22 at Exhibit 26, and the second -- the first page of that
23 is just the cover page to Mr. Downey's deposition.
24 Could you turn to the second page, and let's look at
25 page 407, lines 13 to 16, which you cited.

Page 293

1      A.    So 407?
2      Q.    Yes, sir.
3      A.    13 to 16.  Can I have a moment to read
4  the context above it and stuff?
5      Q.    Certainly, sir.
6      A.    To refresh my memory.
7      Q.    Certainly, sir.  Ready to go?  Got the
8  context?
9      A.    Yes.
10     Q.    All right.  So if we look at lines 13
11 through 16, that is an answer by Mr. Downey where he
12 says, "I don't know if -- I'm not familiar, and I don't
13 know if flotation was intended to remove asbestos, but
14 to my knowledge, our products don't contain asbestos
15 so."  Did I read that correctly?
16     A.    Yes, you did read that correctly.
17     Q.    So, in fact, Mr. Downey is not, as you
18 say, admitting that the beneficiation process does not
19 remove asbestos.  Instead, what he says is I don't know
20 if flotation was intended to remove asbestos, correct?
21     A.    That's what it says.  I took it as -- he
22 said "I don't know" twice, "I'm not familiar."  And it
23 says, "I don't know if flotation was intended to remove
24 asbestos."  So the text is correct, yes.
25     Q.    But you would agree he did not admit that

Mark Krekeler, Ph.D.

Page 294

1 the beneficiation process does not remove asbestos,
2 correct?
3          MS. SCOTT:  Objection.
4      A.    He doesn't know if it was intended or not
5 is how -- that's how I interpret it.  Others can
6 interpret it in other ways.
7 BY MR. FERGUSON:
8      Q.    Would you look at the bottom of page 31,
9 please, of your report?
10     A.    Okay.  On page 31.  I see it, yes.
11     Q.    And you see it says, at the bottom, it
12 starts a sentence, "In fact, these chemical elements are
13 inherent properties of talc ore, a fact acknowledged by
14 Julie Pier in her deposition."  And then you cite Julie
15 Pier Deposition, page 211, lines six through 13 from the
16 September 12, 2018, session of her deposition.  Do you
17 see that?
18     A.    Yes, I do.
19     Q.    And could you go to your left and pick up
20 Miss Pier's deposition?  And both sessions are there.
21 If you could, look at the -- they're in reverse order, I
22 noticed before, so would you look at the deposition that
23 is the second one in that notebook?  It's the second
24 one.  It's not the first one because they're in reverse
25 order.  That's the September 13 session, I notice, and

Page 295

1 you can go all the way past those.  There you go.
2      A.    I'll try not to break the stuff.
3      Q.    Can we look at page --
4      A.    You said -- is it 211?
5      Q.    Yes, sir.  Page 211, please, sir.
6      A.    I turned right to it.  211.
7      Q.    Okay.
8      A.    And you're interested in lines 6 through
9 13?  Is that your question?
10     Q.    Right.  And what you've asserted is
11 that -- you cite that for the proposition, "In fact,
12 these chemical elements are inherit properties of talc
13 ore, a fact acknowledged by Julie Pier."
14          Can you read for me page 211, Lines 6
15 through 13 of the September 12 deposition.
16     A.    Well, this has to do -- can I first read
17 the context a little bit to refresh myself?
18     Q.    Right now, I'd like you to read what --
19     A.    Okay.  I can just read the text.
20     Q.    Yeah, what you cited.
21     A.    "Well, this has to do with sampling
22 that's done at the operation.  I'm thinking that Pat is
23 in -- If you don't know, you can tell me that."
24 Question.  "I'm" -- dash dash dash or -- ". . ."
25     Q.    Are you past line --

Page 296

1      A.    I have -- "I have just a general broad
2 understanding that as it's crushed, an automatic sampler
3 takes a sample at specific time intervals."  That's
4 through line 13.
5      Q.    All right.  So would you agree with me
6 that in that portion of the deposition, Ms. Pier does
7 not acknowledge the fact that chemical elements are
8 inherent properties of talc ore, correct?
9      A.    Correct.
10     Q.    It doesn't say that at all, does it?
11     A.    Yeah.  I must have made a mistake with
12 the numbering.
13     Q.    You also state in your report that Imerys
14 admitted in depositions that -- well, let me skip back
15 because I don't have my citation.  So let's -- let's
16 move on to another topic.  I may come back to that if I
17 have time, okay?
18     A.    Right.  Do you want me to put the Pier
19 deposition away?
20     Q.    Yeah, for now.
21     A.    I'll set it aside.
22     Q.    Yeah.  Keep it handy in case we have time
23 to get back to that.
24     A.    Okay.
25     Q.    Now, you have taken, as you -- as we

Page 297

1 discussed earlier, you have taken the report of
2 Drs. Longo and Rigler and relied upon it for your
3 report, correct?
4      A.    Correct.
5      Q.    And that has to do with whether there are
6 contaminants in talc that is sold by Imerys and by
7 Johnson & Johnson, correct?  That's what they addressed?
8      A.    Correct.
9      Q.    Now, are you aware, Dr. Krekeler, that
10 the United States Food & Drug Administration actually
11 performed a survey of talc and body powders and cosmetic
12 raw material talc?
13     A.    I believe so.  I looked at an FDA
14 document on the Internet, and if I remember correctly --
15 I would want to check -- there was four suppliers that
16 provided talc products, and they did not find any
17 indications or it was nondetects for those many samples.
18 But I also remember that the FDA also said that -- I'd
19 have to look at it for the exact language, but,
20 essentially, the FDA couldn't fully assure that talc is
21 free of asbestos, I think.  Do you have that?
22          MR. FERGUSON:  Yeah.  Let's go ahead and
23     mark as Exhibit 27 the FDA survey.
24          (Exhibit 27 was marked for
25          identification.)

Mark Krekeler, Ph.D.

| Page 298 |
| --- |

1      A.   I don't know if it's exactly the same one
2  that I looked at.
3            MR. BILLINGS-KANG:  Ken, was the Pier
4      deposition marked at all?
5            MR. FERGUSON:  No.  I didn't mark it.  I
6      can mark it.
7            MS. SCOTT:  27?
8            MR. FERGUSON:  Yes.
9      A.   It's a printed, so it looks like a
10 different format than maybe the one I looked at.  The
11 tables look familiar.
12 BY MR. FERGUSON:
13     Q.   So since our time is growing short, if
14 you would, it looks familiar?
15     A.   Okay.  Yeah.  I -- I do think it's the
16 one I looked at, I think.
17     Q.   Go to the second page of the exhibit, and
18 you see that it has a heading and a little chart saying
19 "Cosmetic-grade raw material talc," correct?
20     A.   The second page, the heading is "How FDA
21 followed up on the latest"?
22     Q.   Yeah.  If you go to the bottom, there's a
23 little chart with a heading that says, "Cosmetic-grade
24 raw material talc," correct?
25     A.   Yes.

| Page 299 |
| --- |

1      Q.   And you see under "Supplier," it says,
2  "Rio Tinto Minerals/Luzenac America," correct?
3      A.   Correct.
4      Q.   And if you look at that and the next
5  page, there are seven lots that were tested from Rio
6  Tinto Minerals/Luzenac America, correct?
7      A.   One, two, three, four.  Yes.  Seven?
8      Q.   Yes, sir.
9      A.   From Rio Tinto.
10     Q.   Okay.  And there's a column for
11 "Percentage Asbestos by PLM."  That's polarized light
12 microscopy, correct?
13     A.   Yes.  There's a column for that.
14     Q.   And a percentage asbestos by TEM
15 or transmission electron microscope, correct?
16     A.   Yes.  There's a column for that.
17     Q.   Okay.  And in all 14 columns, it notes no
18 asbestos detected, correct?
19           MS. O'DELL:  Objection.
20     A.   Fourteen columns?
21 BY MS. ROSE:
22     Q.   Well, there's seven for PLM, seven for
23 TEM?
24     A.   Oh, you mean rows or 14 columns?  One,
25 two, three, four, five columns.

| Page 300 |
| --- |

1      Q.   Let's call it rows.
2      A.   Oh, rows.  Okay.  All right.
3      Q.   Okay.
4      A.   So for these seven rows, yes.
5      Q.   Okay.
6      A.   There's no asbestos detected for those
7  seven samples.
8      Q.   Okay.  And if we go to the
9  second-to-the-last page of that exhibit -- in fact, it's
10 the last page that has typing on it.
11     A.   The second-to-the-last page.
12     Q.   Are you there?
13     A.   Okay.
14     Q.   Do you see there's a column that is or a
15 chart that is entitled "Body Powder," correct?
16     A.   Correct.
17     Q.   And there's a line, a row for Johnson's
18 Baby Powder, correct?
19     A.   Correct.
20     Q.   That says no asbestos detected by PLM or
21 by TEM, correct?
22     A.   Correct.
23     Q.   And a row for Shower or Shower, Morning
24 Fresh Absorbent Body Powder that likewise says no
25 asbestos detected by PLM and TEM, correct?

| Page 301 |
| --- |

1      A.   At the very bottom, yes.
2      Q.   So in this Food & Drug Administration
3  survey that was done, the results were different than
4  the ones that Drs. Longo and Rigler came up with,
5  correct?
6            MS. O'DELL:  Object to the form.
7      A.   Well, it's not the same sample size.
8  And. yeah, this is the same report.  As it says, "For
9  these reasons, while FDA finds these results
10 informative, they do not prove that most or all talc or
11 talc-containing cosmetic products currently marketed in
12 the United States are likely to be free of asbestos
13 contamination.  As always, when potential" -- yeah.
14 This is, yeah.  This is the, yeah.
15 BY MS. ROSE:
16     Q.   But we know that they tested Luzenac, raw
17 material talc and Johnson & Johnson body powder,
18 correct?
19     A.   Correct.  Yes.
20           MR. FERGUSON:  What are we doing on time,
21 if you wouldn't mind letting me know?
22           VIDEOGRAPHER:  You've been on record six
23 hours and 51 minutes.
24           MR. FERGUSON:  I've got a few minutes.
25           MR. BILLINGS-KANG:  Plenty of time.

Page 302

1     MR. FERGUSON:  Plenty of time.
2     THE WITNESS:  Are we done with this one?
3     MR. FERGUSON:  Yes, sir.  We're done with
4  that one.
5  BY MS. ROSE:
6     Q.    Let me ask you one more area, one more
7  area, and then I'll quit.
8     MR. BILLINGS-KANG:  I'm going to give him
9  my time.
10     MR. FERGUSON:  Okay.
11     MR. CARY:  Time for the gentleman from
12  Texas.
13     MS. O'DELL:  It's like we're in the
14  Senate or House.
15     MR. FERGUSON:  The House.  I hope not.
16     MR. FROST:  Won't do too well for that.
17     MS. SCOTT:  I was just going to say the
18  same thing.
19  BY MR. FERGUSON:
20     Q.    Could you get the IARC 93 monograph,
21  which I believe is Exhibit 5?
22     A.    IARC 93.  IARC 93.  Yep.  Exhibit 5, yes.
23     Q.    All right.
24     MR. FERGUSON:  And I'm sorry, Leigh and
25  Carmen, do you guys have?  Okay.

Page 303

1     MS. O'DELL:  What page?
2     MR. FERGUSON:  I am going to be looking
3  at page 286.
4  BY MR. FERGUSON:
5     Q.    Can you find page 286?
6     A.    286.  285, 286.  I found it.
7     Q.    At the top of page 286, the section --
8  and, again, this is from the IARC monograph, correct?
9     A.    Correct.
10     Q.    That you discussed earlier and you've
11  cited in your report, correct?
12     MS. O'DELL:  Objection.  Cites the
13  monograph, but you're saying he cites this.
14  It's a little confusing.
15     MR. FERGUSON:  I apologize.
16  BY MR. FERGUSON:
17     Q.    You've cited this monograph, not
18  necessarily this portion of it?
19     A.    Correct.  Yeah.  I've cited the
20  monograph.
21     Q.    So let's look at the first paragraph
22  there on page 286.  You see it says, "Talc ores may be
23  processed by a variety of techniques that include
24  selective mining, hand sorting and milling by roller
25  mills, hammer mills, ball mills, fluid energy mills and

Page 304

1  jet mills and are classified and separated from other
2  minerals by froth flotation or magnetic separation,"
3  correct?
4     A.    Yes.  And there's no citation for that.
5     Q.    And the IARC working group does note that
6  the techniques by which top ores may be processed
7  include hand sorting, correct?
8     A.    Correct, yes.  That's in the second line
9  on the paragraph.  That's what they say.  Again, it's
10  not cited, so I'm not sure where they get the
11  information from, but they say that.
12     MR. FERGUSON:  Can we go off for one
13  second?  I know we're almost done, please.
14     VIDEOGRAPHER:  We're now going off
15  record.  The time is 7:05.
16     (Off the record.)
17     VIDEOGRAPHER:  We are now back on record.
18  The time is 7:07.
19  BY MR. FERGUSON:
20     Q.    Dr. Krekeler, could you turn to page 42
21  of your report?
22     A.    42 of my report?
23     Q.    Yes, sir.
24     A.    42.
25     Q.    Not of the IARC.

Page 305

1     A.    Oh, I thought we were still talking about
2  that.  I'm sorry.
3     Q.    No.  I apologize.  Of your report?
4     A.    Okay.
5     Q.    Okay?
6     A.    Yep.
7     Q.    Are you there?
8     A.    Yes.
9     Q.    Okay.  So if you look at the last
10  paragraph on page 42 about --
11     A.    Grinding?
12     Q.    That paragraph.
13     A.    Yep.
14     Q.    But if you look at the fifth line of
15  that, you see where it starts, "Imerys admitted," and it
16  goes on to say, "Imerys admitted, in deposition, that a
17  phyllosilicate sample could be ground to a near
18  amorphous state, damaging the sample, even with minimal
19  grinding."  Correct?  Did I read that correctly?
20     A.    Yes.  That is correct.
21     Q.    And then you cite the Julie Pier
22  deposition, page 25, 23 to 25, and page 26, 1 through
23  23, September 23rd, 2018?  Correct?
24     A.    Correct.
25     Q.    And so would you pick up again the Julie

Mark Krekeler, Ph.D.

Page 306

1  Pier notebook to your left?  And this time, we're
2  looking at the first deposition in the notebook because
3  they're reversed, and that's the September 13th, 2018,
4  date.  So would you turn to page 25 in that
5  deposition --
6      A.    This starts at page 340.
7      Q.    Yes, it does.
8      Q.    So page --
9      Q.    Would you with agree with me there is no
10  page 25 and no page 26 in the Julie Pier deposition
11  transcript from September 13th, 2018?
12      A.    I don't know.
13      Q.    Well --
14      A.    Let's look and see.
15      Q.    You have the deposition transcript in
16  front of you, sir.
17      A.    Is that -- I don't remember if it's a one
18  or two volume.  Some of these, I think, were two volume.
19      Q.    Well, sir --
20      A.    So I think if -- yeah, I don't remember
21  specifically, but if this is --
22      Q.    Why don't you look at the very first
23  page.
24      A.    The first page says 340.  This is the
25  page number.

Page 307

1      Q.    Look at the very first page there that
2  you're looking at there, and does that say Julie Pier's
3  deposition from September 13th of 2018?
4      A.    Actually, on this page, there is not --
5  oh, September 13th, 2018.
6      Q.    And just as you told us, there is no page
7  25 or page 26 for the September 13, 2018, deposition of
8  Julie Pier, is there?
9      A.    In this printed copy, there appears not
10  to be.  I don't --
11      Q.    So --
12      A.    Can I check to see if it's confused by --
13  just double-check?  I might have.
14      Q.    Do you want to check the September 12th
15  version and see?
16      A.    Yeah.  I don't know if I've confused
17  things or not.  So we're looking at --
18      Q.    Page 25 and page 26.
19      A.    25 and 26.
20      Q.    She is not talking about phyllosilicates
21  on pages 25 or 26 of the September 12th, is she?
22      A.    Correct.  I currently don't have an
23  explanation for the apparent discrepancy.
24      Q.    Do you think since --
25      A.    I don't know if pages are missing or...

Page 308

1      Q.    Well, those pages weren't missing.  The
2  words that you quoted were not just not on them,
3  correct?
4          MS. SCOTT:  Objection.
5      A.    It's unclear.
6  BY MR. FERGUSON:
7      Q.    Do you think maybe this is another
8  mistake or typo?
9      A.    I don't know.
10          MR. FERGUSON:  That's all I have,
11  Dr. Krekeler.  Thank you for your time, sir.
12          VIDEOGRAPHER:  Do you want to go off?
13          MS. O'DELL:  James, are you okay?
14          MR. BILLINGS-KANG:  I'm fine.  Thank you.
15          MS. O'DELL:  How much time on the record?
16          VIDEOGRAPHER:  Seven hours even.
17          MS. O'DELL:  Let's go take a break.
18          MR. FROST:  Look at that.
19          VIDEOGRAPHER:  We are going off record.
20  The time is 7:13.
21          (A recess was taken from 7:13 to 7:47.)
22          VIDEOGRAPHER:  We are now back on record.
23  The time is 7:47.
24          EXAMINATION
25

Page 309

1  BY MS. O'DELL:
2      Q.    Dr. Krekeler, good evening.  I've got a
3  few questions for you to follow up.
4      A.    Okay.
5      Q.    First, you were asked a number of
6  questions about Italian talc and the talc ore deposits
7  in Italy.  Do you recall those questions?
8      A.    Generally, yes.
9      Q.    And, in fact, you were handed a binder of
10  documents that I think are in front of you now that --
11  they were marked as Exhibit 14.
12      A.    Exhibit -- yes.
13      Q.    And they related to certain documents
14  regarding talc formations in Italy.  Do you recall those
15  documents?
16      A.    Correct.
17      Q.    And specifically in terms of the Italian
18  ore bodies, were there positive tests of asbestos in
19  Italian talc that you reviewed in reaching your opinions
20  in this case?
21          MR. FROST:  Objection to form.
22      A.    Yes.
23  BY MS. O'DELL:
24      Q.    And, in fact, if you'll turn to page -- I
25  think it was 14 of your report.  Do you see that?

Mark Krekeler, Ph.D.

| Page 310 |
|---|
| 1   A.   Yes. |
| 2   Q.   And are the test results depicted on page |
| 3  14 -- well, let me just ask you this way.  Where did the |
| 4  test results depicted in the table on page 14 of your |
| 5  expert report, where did they originate from? |
| 6   A.   There are five examples from 1957 to '58 |
| 7  from Italy. |
| 8   Q.   And you were also handed by Mr. Ferguson |
| 9  what's been marked as Exhibit 25.  I don't recall if you |
| 10  recall a document entitled, "Analysis of an Authentic |
| 11  Historical -- |
| 12   A.   Yes. |
| 13   Q.   -- "Italian Cosmetic Talc Sample."  Do |
| 14  you recall that? |
| 15   A.   Yep. |
| 16   Q.   Do you have it in front of you? |
| 17   A.   Yes. |
| 18   Q.   And Mr. Ferguson asked you to read the |
| 19  first sentence of the abstract which addressed "the |
| 20  extreme purity" of Italian talc.  Do you recall that? |
| 21   A.   Correct.  Yes, I do. |
| 22   Q.   Did this report that's been marked as |
| 23  Exhibit 5 actually report the presence of tremolite |
| 24  fibers in Italian talc? |
| 25   A.   Yes.  There's -- it reports the numerical |

| Page 311 |
|---|
| 1  concentration of tremolite fibers in the talc sample was |
| 2  3.67 -- 3.687 times 10 to the negative 6 fibers per |
| 3  gram, so that is over 3 million fibers per gram |
| 4  corresponding to a mass concentration of .722 parts per |
| 5  million. |
| 6   Q.   And if you'll turn to page 3 of this |
| 7  exhibit -- |
| 8   MR. FROST:  Leigh, what exhibit is this? |
| 9   MS. O'DELL:  25. |
| 10   MR. FROST:  25.  Okay. |
| 11   MS. O'DELL:  It's what Ken marked. |
| 12   MR. FROST:  Oh, I thought you said five. |
| 13  I apologize. |
| 14   MS. O'DELL:  Did I?  Sorry.  Thank you. |
| 15   MR. BILLINGS-KANG:  You said five. |
| 16   MS. O'DELL:  I don't think you heard the |
| 17  two, but 25 is what I'm referring to. |
| 18   MR. FROST:  Thank you. |
| 19  BY MS. O'DELL: |
| 20   Q.   On page 3 of the exhibit, Dr. Krekeler, |
| 21  did the authors of this report also report the presence |
| 22  of fibrous talc in this particular sample? |
| 23   MR. BILLINGS-KANG:  Object to form. |
| 24   A.   Yes.  I believe I saw it in here. |
| 25 |

| Page 312 |
|---|
| 1  BY MS. O'DELL: |
| 2   Q.   In fact, at the top, in the first full |
| 3  paragraph, it says, "The TEM micrograph in Figure B1 |
| 4  shows a number of platy talc particles.  Figure B-2 |
| 5  shows platy talc particles and an elongated fragment of |
| 6  talc." |
| 7   A.   Of talc.  Two -- yeah.  "Two other |
| 8  tremolite fibers were detected," and then it restates |
| 9  that numerical concentration of tremolite fibers in talc |
| 10  was the number that I mentioned previously. |
| 11  BY MS. O'DELL: |
| 12   Q.   And so does, in fact, Exhibit 25 support |
| 13  your opinion that Italian talc is contaminated with |
| 14  asbestos? |
| 15   MR. BILLINGS-KANG:  Objection to form. |
| 16   MR. FROST:  Objection to form. |
| 17  BY MS. O'DELL: |
| 18   Q.   Now, let me ask you to turn to your |
| 19  report specifically.  Oh, one question.  You were asked |
| 20  a few questions today about the beneficiation process, |
| 21  and if there is asbestos fibers present in talc ore, is |
| 22  there anything in the beneficiation process that you |
| 23  would expect to remove the asbestos fibers from the |
| 24  talc? |
| 25   A.   Not efficiently. |

| Page 313 |
|---|
| 1   Q.   Let me ask you to turn to page 35 of your |
| 2  report.  Actually, 36. |
| 3   A.   Okay.  I'm on page 36. |
| 4   Q.   And, actually, you can look at, actually, |
| 5  either 35 or 36, but are the test results and the |
| 6  samples that are of the samples reported in the table on |
| 7  page 35, and do many of them include the results of |
| 8  annual composite samples? |
| 9   A.   Yes. |
| 10   Q.   And are -- what are annual composite |
| 11  samples? |
| 12   A.   They are, essentially, talcum powder |
| 13  that's ready to go as a consumer product, essentially a |
| 14  consumer product. |
| 15   Q.   And annual samples would be composed of |
| 16  processed talc? |
| 17   A.   Yes. |
| 18   Q.   And let me ask you to look at page 36, |
| 19  where you report some of the findings regarding |
| 20  chromium.  Did Johnson & Johnson conduct testing of its |
| 21  talc powder that was specific enough to identify whether |
| 22  the type of chromium contained was either hexavalent |
| 23  chromium or trivalent chromium? |
| 24   MR. BILLINGS-KANG:  Objection to form. |
| 25   MR. FROST:  Objection to form. |

Mark Krekeler, Ph.D.

Page 314

1      A.   No.  I saw no evidence of any testing to
2  determine whether chromium was in the three-plus state
3  or the six-plus state.
4           MR. FROST:  Move to strike the response
5      as speculative.
6  BY MS. O'DELL:
7      Q.   Is that also true -- is that also true of
8  the testing that was conducted by Imerys?
9           MR. FROST:  Objection to form.
10     A.   I'm sorry.  Can you repeat the question?
11 BY MS. O'DELL:
12     Q.   Is that -- is that also true of the
13 testing that was conducted by Imerys regarding chromium?
14          MR. FROST:  Same objection.
15     A.   Yes.
16 BY MS. O'DELL:
17     Q.   You were asked a number of questions
18 regarding the ore deposits in Vermont.  Do you recall
19 those questions?
20     A.   Yes.
21     Q.   And you -- one of the exhibits that was
22 marked in regard to Vermont was the Ross commentary that
23 you cited, and I believe it's in front of you.  What's
24 the exhibit number, please?
25     A.   Twelve, I think.

Page 315

1      Q.   Okay.
2      A.   That's correct.
3      Q.   And Exhibit 12 was a reference that you
4  cited in your report?
5      A.   Correct.
6      Q.   And is the Ross commentary supportive of
7  your opinions?
8      A.   Yes.
9      Q.   Why?
10     A.   So, essentially, end of second column,
11 "Ultramafic talc deposits of Vermont offer a third
12 example of the complexities of rock formations
13 containing asbestos minerals.  The core of the
14 ultramafic bodies is off a serpentine rock derived from
15 a hydrothermal alteration of a pre-existing pyroxene and
16 olivine-rich ultramafic rock.  The serpentine core often
17 grades outward into talc-serpentine-carbonate rock, then
18 steatite (massive talc ore containing often small
19 amounts of serpentine), then 'blackwall' rock (contains
20 amphiboles, chlorite, quartz, albite, et cetera), and
21 finally the country rock.  Equivalent ultramafic bodies
22 in Quebec, Canada, form some of the world's largest
23 chrysotile deposits."
24          So, essentially, this is all the talc
25 mines are all part of this one essentially extensive

Page 316

1  geologic terrain.
2      Q.   And in the comments that are included in
3  the Ross paper would cover the geologic formations that
4  were used to source Johnson & Johnson's talcum powder in
5  Vermont?
6      A.   Yes.
7           MR. FROST:  Objection to form.  Calls for
8      speculation.
9  BY MS. O'DELL:
10     Q.   Let me ask you to turn to Exhibit 11,
11 which should be right --
12     A.   Eleven.
13     Q.   -- in front of you there.
14     A.   Yes.
15     Q.   And if you'll turn to page 2 of --
16     A.   Page 921 in the article?
17     Q.   Yes.  Let me ask you, with the
18 constituents of the geology, geologic formation that is
19 described in Ross, and we'll get to it, but, also, in
20 Van Gosen, would those constituents, as described in
21 those publications, be the same or similar to the mines
22 in Vermont that were used to source Johnson & Johnson's
23 talcum powder?
24          MR. FROST:  Objection to form.
25     A.   Yes.

Page 317

1  BY MS. O'DELL:
2      Q.   Let me ask you to turn specifically to
3  Van Gosen, which we've marked as Exhibit 11 and
4  specifically ask you to turn to page 933.
5      A.   Okay.  Yes.
6      Q.   Does page 933 begin a description of
7  Vermont talc?
8      A.   Yes, it does.
9      Q.   Does this description by Van Gosen apply
10 to the, or is it relevant to the geology of the talc
11 mines that were used to source J&J talc?
12     A.   Yes, it is.
13          MR. FROST:  Objection.  Calls for
14     speculation.
15 BY MS. O'DELL:
16     Q.   And if you'll turn to page 934, what is
17 the description of the Vermont talc geology that Van
18 Gosen includes in his article?
19     A.   So, sorry.  On the previous page, the
20 alteration of zones are typically compromised by
21 sequence, provides details --
22     Q.   Doctor, read more clearly for the court
23 reporter, please.
24     A.   "Ultramafic rocks, grading to a
25 talc-carbonate-dominant zone, grading to a nearly

Mark Krekeler, Ph.D.

Page 318

1  mono-mineralogical ... zone," all these other rich
2  zones, Items 1 through 7.  And then "Black-wall talc
3  deposits are associated spatially with serpentinite
4  masses that, in some areas, host well-developed
5  chrysotile asbestos."  And there's citations from 1942
6  and '63.
7  BY MS. O'DELL:
8      Q.    Okay.  And did it also say that some of
9  the alteration zones contain actinolite, tremolite and
10  anthophyllite?
11     A.    Yes.
12     Q.    And does the Van Gosen article support
13  your opinions in this case?
14         MR. FROST:  Objection.  Calls for
15     speculation.
16     A.    Yes.
17  BY MS. O'DELL:
18     Q.    Let me ask you now to turn to Exhibit 15,
19  which also should be in front of you.
20     A.    Fifteen.
21     Q.    It's the Chidester --
22     A.    Fourteen.
23     Q.    Fifteen.
24     A.    Okay.
25     Q.    So the Chidester article that was

Page 319

1  referenced earlier, and I'll ask you to turn to page 28.
2  If you'll turn --
3      A.    I am on page 28.
4      Q.    Right.  And does page 28 relate to the
5  Hammondsville talc mine?
6      A.    Yes, it does.
7      Q.    And was the Hammondsville talc mine one
8  of the mines that was used to source Johnson & Johnson's
9  talc?
10     A.    Yes.
11     Q.    And if you'll look on the right-hand
12  side, on the second paragraph, do you see that?
13     A.    Yeah.  "The deposit consists entirely of
14  coarse, flakey grit and of steatite.  No serpentine
15  has been found.  In the southwestern face of the quarry,
16  there is a large mass of actinolite rock."
17     Q.    Does that support your opinions in this
18  case?
19     A.    Yes.
20         MR. FROST:  Objection.  Form.
21  BY MS. O'DELL:
22     Q.    Let me ask you to set that aside and turn
23  to Exhibit 18.  It's the document, the "Preliminary
24  Investigation of Cosmetic Talc Potential" in China,
25  Kwangsi, China.  I think you had it in front of you.

Page 320

1      A.    I had it somewhere.  Yeah, 18.  Yes.
2      Q.    And if you'll turn in Exhibit 18 to page
3  11, is this a document that you relied on in reaching
4  your opinions?
5      A.    Yes.  I'll get to page --
6      Q.    Page 11.
7      A.    Page 11, "Elemental Scan" at the top.
8      Q.    And does this page address the presence
9  of certain heavy metals in Chinese talc deposits?
10     A.    Yes.
11     Q.    And what metals specifically were
12  elevated?
13     A.    Titanium.
14     Q.    And based on this document, does the
15  writer include a comment below regarding the need to --
16  well, let me just say for the writer's comments below
17  regarding the presence?
18     A.    "This very sophisticated analysis shows a
19  relatively wide array of elements in subtrace levels.
20  Other high grade talcs can show a similar array.  The
21  analysis represents research information, which should
22  be conducted on a periodic basis to anticipate any
23  mineral contamination in future assessments of other
24  exposures of talc in the district."
25     Q.    Let me ask you to put that aside, please,

Page 321

1  sir.  Thank you.
2          If you'll turn now to the IARC monograph,
3  which I think is on the '93 monograph, which is right
4  there.  Yes.
5      A.    This?  Five?
6      Q.    That's right, Exhibit 5.
7      A.    Okay.
8      Q.    You were asked a number of questions
9  about a statement that you made in your report about, I
10  think along the lines of it was common to find minerals
11  such as tremolite, anthophyllite, asbestos in talc
12  deposits.  Do you recall those lines of questions?
13     A.    Yes.
14     Q.    And if you'll turn to page 284 of the
15  IARC monograph, 284, and this is the '93 monograph that
16  relates to talc not containing asbestiform fibers.  If
17  you look at the bottom of 284, what does it say in the
18  IARC monograph regarding the presence of these minerals
19  in talc deposits?
20     A.    It discusses minerals associated with
21  talc.  "The most common minerals found in talc products
22  include chlorite, magnesite, dolomite, tremolite
23  anthophyllite, serpentine and quartz."
24     Q.    And if you'll turn over to page 285, that
25  statement is further supported in Table 1.4?

Mark Krekeler, Ph.D.

Page 322

1     A.    Yes.
2           MR. FROST:  Object to form.
3     A.    Tremolite is listed, anthophyllite is
4 listed, actinolite is listed.
5 BY MS. O'DELL:
6     Q.    And is that supportive of your opinion
7 that those asbestos minerals are common in talc
8 deposits?
9     A.    Yes.
10          MR. FROST:  Objection to form.
11 BY MS. O'DELL:
12    Q.    Let me ask you just a general question
13 first.  How would you define fibrous talc?
14    A.    Fibrous talc is a talc particle that has
15 a morphology consistent with the definition of a fiber.
16    Q.    And would it be fair to say that fibrous
17 talc could be defined as talc formed in an asbestiform
18 habit?
19          MR. BILLINGS-KANG:  Objection to form.
20          MR. FROST:  Objection to form.
21    A.    Yes.
22 BY MS. O'DELL:
23    Q.    Let me ask you to look at Exhibit 22,
24 Dr. Krekeler, which I think I had in front of you.  It
25 may be.

Page 323

1     A.    Twenty-two?
2     Q.    Yes.
3     A.    Okay.
4     Q.    And I would like for you -- you recall
5 there was a number of documents that Mr. Frost showed
6 you regarding six asbestos test results that were
7 contained in the asbestos chart in your report beginning
8 at page 14.  Do you recall those questions?
9     A.    Yes.
10    Q.    And if I marked them correctly, Mr. Frost
11 pointed out one, two, three, four, five, six test
12 results that he took issue with.  Do you recall that?
13    A.    Yes.
14    Q.    How many positive tests results, just
15 estimate if you don't know --
16    A.    Approximately 125.
17    Q.    So let me -- and so let me ask you this
18 question.  Is there anything that you heard today that,
19 in your mind, would call into question the veracity of
20 the test results that, the other 125 test results that
21 you reported in the chart, which begins in your report
22 on page 14?
23          MR. FROST:  Objection to form.
24    A.    No.
25

Page 324

1 BY MS. O'DELL:
2     Q.    Dr. Krekeler, describe for us the
3 methodology that you've used in reaching your opinions
4 in this case.
5     A.    I evaluated data, I evaluated x-ray
6 diffraction data, I evaluated core data, I evaluated
7 electron microscopy data, I evaluated bulk chemistry
8 data, I evaluated descriptions, I used peer-review
9 literature, and these are essentially methods that would
10 be expected if I was working as a consultant in a
11 company.
12    Q.    Did you rely on published books regarding
13 the geology of Vermont, Italy and China?
14    A.    Yes.
15    Q.    To the degree they were available?
16    A.    To the degree, yes.  I would agree with
17 that.
18    Q.    Is another common source that geologists
19 rely on publications such as the U.S. Geological Survey?
20    A.    Yes.
21    Q.    And are there also publications from the
22 U.S. Bureau of Mines?
23    A.    Yes.
24    Q.    And did you rely on those types of
25 materials in reaching your opinions in this case?

Page 325

1     A.    Yes.
2     Q.    Is the methodology that you used
3 methodology that would be generally acceptable in the
4 field of geology?
5     A.    Yes.
6           MR. FROST:  Objection to form.
7 BY MS. O'DELL:
8     Q.    Did you rely on peer-reviewed literature
9 to support your opinions?
10    A.    Yes.
11    Q.    Is peer-reviewed literature always
12 available for specific mineral formations or deposits in
13 geology?
14    A.    Not necessarily.
15    Q.    You were asked about the documents that
16 you had received, internal documents that you had
17 received in formulating your opinions in this case.
18 Obviously, corporate documents were not available to you
19 other than lawyers giving them to you, fair?
20    A.    Yes.  Correct.
21    Q.    You didn't have an independent way to get
22 the documents from Johnson & Johnson or Imerys in order
23 to reach your opinions, right?
24    A.    Correct.
25    Q.    And did you feel that you had adequate

Page 326

1 materials to support the opinions contained in your
2 report?
3           MR. FROST:  Objection to form.
4           MR. BILLINGS-KANG:  Objection to form.
5      A.    Yes.
6 BY MS. O'DELL:
7      Q.    In terms of the testing documents that
8 are mentioned and reported in your expert report, are
9 testing documents something that you rely on in the
10 normal course of your role as a geologist?
11      A.    Yes.
12      Q.    Would that also be true of core logs?
13      A.    Yes.
14      Q.    And those are some of the documents that
15 you cited in your report?
16      A.    Yes.
17      Q.    Let me ask you just to talk just briefly
18 about your qualifications as a geologist.  As a
19 geologist, are you -- do you teach the process of
20 evaluating mineral deposits?
21      A.    Yes.  I teach a course on ore deposits,
22 and I've taught courses on industrial minerology and
23 I've taught --
24      Q.    Excuse me.
25      A.    When I was at George Mason, I would

Page 327

1 regularly teach minerology.
2      Q.    And would those courses have included
3 teaching students how to conduct expiration such as
4 drilling, core drilling and other ways to define an ore
5 deposit?
6      A.    Yes.
7           MR. FROST:  Object to form.
8 BY MS. O'DELL:
9      Q.    Have you given presentations on those
10 types of activities?
11      A.    Yes.
12           MS. O'DELL:  Okay.  I don't have anything
13 further.  Thank you.
14           THE WITNESS:  Okay.
15           MR. FROST:  Could we go off the record?
16           VIDEOGRAPHER:  Sure.  We are now going
17 off record, and the time is 8:13.
18           (A recess was taken from 8:13 to 8:20.)
19           VIDEOGRAPHER:  We are now back on record,
20 and the time is 8:20.
21           FURTHER CROSS-EXAMINATION
22 BY MR. FROST:
23      Q.    All right, Doctor.  A couple quick
24 follow-ups, and unfortunately, I'm going to run them in
25 the order they're in my binder, which probably is no

Page 328

1 particular order, but if we can first turn to the IARC
2 monograph.  It's the one right in front of you there.
3 Which exhibit number is that?
4      A.    I'm sorry.  What?
5      Q.    Which exhibit number is that?
6      A.    Five.
7      Q.    Okay.  If you can turn to page 284.
8      A.    Okay.
9      Q.    So if you look at the bottom of the page,
10 Miss O'Dell had you read from the line starting, "The
11 most common minerals found in talc products," but before
12 that, it reads, "Because talc deposits are formed from
13 different protoliths under many different geological
14 conditions, each talc deposit has a combination of
15 mineralogy and mineral habit that is distinctive and, in
16 many cases, unique."  Did I read that correctly?
17      A.    There's no citation for that and, yes,
18 you did.
19      Q.    Sir, my question is:  Did I read that
20 correctly?
21      A.    Yes.
22      Q.    And that's what the IARC monograph says,
23 correct?
24      A.    Correct.
25      Q.    If you can turn to the Van Gosen article,

Page 329

1 which is Exhibit 11.
2      A.    Okay.
3      Q.    Page 934.
4      A.    All right.  I'm on that page.
5      Q.    Before, when you were reading this, you
6 skipped over most of Number 3.  Number 3 reads, "a
7 nearly mono-mineralogical talc zone (often of high
8 purity) several centimeters to meters thick."  Did I
9 read that correctly?
10      A.    Yes.
11      Q.    Do you agree with me that that would be
12 the talc ore zone, correct?
13           MS. O'DELL:  Object to the form.
14      A.    Presumably.  A nearly -- a nearly
15 monomineralic -- mineralogical talc zone.
16 BY MR. FROST:
17      Q.    Now, if we can turn to Exhibit 15, which
18 is the Chidst article -- Chidester.
19      A.    215.
20      Q.    And specifically page 28.  Okay.  Counsel
21 had pointed you to the second paragraph, the second
22 column down, and you read the, "In the southwest face of
23 the quarry, there is large mass of actinolite rock,"
24 correct?
25      A.    Correct.

| Page 330 | Page 332 |
|---|---|

**Page 330**

1  Q.   It doesn't say here that it's asbestos
2  actinolite, correct?
3      A.   It does not specifically say that it's
4  asbestos.
5      Q.   And you couldn't, without speculating,
6  based on this document, say whether or not it's
7  asbestos, correct?
8      MS. O'DELL:  Object to the form.
9      A.   I would agree.
10  BY MR. FROST:
11      Q.   And then the sentence before that, the
12  end of it reads, No serpentine has been found; is that
13  correct?
14      A.   No.  It says, "No serpentinite."
15      Q.   "No serpentinite," sorry, "has been
16  found"?
17      A.   "Has been found."
18      Q.   Okay.  Sorry.  I did read it incorrectly.
19  You are right.  So "No serpentinite has been found"?
20  That's correct?
21      A.   Correct.
22      MR. FROST:  That's all questions I have,
23  sir.
24      VIDEOGRAPHER:  Is that it?
25      MR. FERGUSON:  I don't have any

**Page 331**

1  questions.
2      MS. O'DELL:  I have nothing further.
3      MR. FROST:  All right.
4      VIDEOGRAPHER:  This adjourns the
5  deposition of Dr. Mark Krekeler.  We are now
6  going off record, and the time is 8:24.
7      COURT REPORTER:  What about signature?
8      MS. O'DELL:  Yes.
9      (Exhibit 28 through 30 were marked for
10      identification.)
11      - - -
12      DEPOSITION CONCLUDED AT 8:34 P.M.
13      - - -

**Page 332**

1      C E R T I F I C A T E
2  State of Ohio   :
                :  SS
3  County of Hamilton :
4      I, Susan M. Gee, RMR, CRR, the undersigned, a
5  duly commissioned notary public within and for the State
6  of Ohio, do hereby certify that before the giving of his
7  aforesaid deposition, MARK KREKELER, Ph.D., was by me
8  first duly sworn to depose the truth, the whole truth
9  and nothing but the truth; that the foregoing is the
10  deposition given at said time and place by MARK
11  KREKELER, Ph.D.; that said deposition was taken in all
12  respects pursuant to stipulations of counsel; that I am
13  neither a relative of nor employee of any of their
14  parties or their counsel, and have no interest whatever
15  in the result of the action; that I am not, nor is the
16  court reporting firm with which I am affiliated, under a
17  contract as defined in Civil Rule 28(D).
18      IN WITNESS WHEREOF, I have hereunto set my
19  hand and official seal of office at Cincinnati, Ohio, on
20  this 29th day of January, 2019.
21
22
      _____
23  My commission expires: S/ Susan M. Gee, RMR, CRR
      September 20, 2020.   Notary Public - State of Ohio
24
25

**Page 333**

3      DECLARATION UNDER PENALTY OF PERJURY
5  Case Name:  Talcum Powder Litigation
      Name of Witness:  Mark Krekeler, Ph.D.
6  Date of Deposition:  January 25, 2019
9      I, MARK KREKELER, Ph.D., hereby certify under
10  penalty of perjury under the laws of the State of
11  _____ that the foregoing is true and correct.
12      Executed this _____ day of
13  _____, 2019, at _____.
16
      _____
      MARK KREKELER, Ph.D.

Mark Krekeler, Ph.D.

Page 334

1   DEPOSITION ERRATA SHEET
2   Case Name:  Talcum Powder Litigation
    Name of Witness:  Mark Krekeler, Ph.D.
3   Date of Deposition:  January 25, 2019
    Reason Codes:  1. To clarify the record.
4              2. To conform to the facts.
               3. To correct transcription errors.
5
6   Page _____ Line _____ Reason _____
7   From _____ to _____
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  _____ Subject to the above changes, I certify that
         the transcript is true and correct.
21  _____ No changes have been made.  I certify that the
         transcript is true and correct.
22
23         _____
               MARK KREKELER, Ph.D.
24
25