Exhibit 5

Environmental Protection Agency

§ 763.80

(c) Record all testing parameters and experimental conditions from the successful validation study into a standard operating procedure (SOP) for reference whenever the decontamination procedure is used. Include in the SOP the identity of the soaking solvent, the length of time of the soak, and the ratio of the soak solvent to contaminated surface area during the soaking process. Also include in the SOP the maximum concentration of PCBs in the spilled material and the identity of the spilled material, and/or the measured maximum surface concentration of the contaminated surface used in the validation study. Record and keep the results of the validation study as an appendix to the SOP. Include in this appendix, the solvent used to make the spiking solution, the PCB concentration of the spiking solution used to contaminate the surfaces in the validation study, and all of the validation study testing parameters and experimental conditions.

[63 FR 35473, June 29, 1998, as amended at 72 FR 57241, Oct. 9, 2007; 74 FR 30235, June 25, 2009]

## PART 763—ASBESTOS

### Subparts A–D [Reserved]

### Subpart E—Asbestos-Containing Materials in Schools

Sec.
763.80  Scope and purpose.
763.83  Definitions.
763.84  General local education agency responsibilities.
763.85  Inspection and reinspections.
763.86  Sampling.
763.87  Analysis.
763.88  Assessment.
763.90  Response actions.
763.91  Operations and maintenance.
763.92  Training and periodic surveillance.
763.93  Management plans.
763.94  Recordkeeping.
763.95  Warning labels.
763.97  Compliance and enforcement.
763.98  Waiver; delegation to State.
763.99  Exclusions.
APPENDIX A TO SUBPART E—INTERIM TRANSMISSION ELECTRON MICROSCOPY ANALYTICAL METHODS—MANDATORY AND NONMANDATORY—AND MANDATORY SECTION TO DETERMINE COMPLETION OF RESPONSE ACTIONS
APPENDIX B TO SUBPART E [RESERVED]
APPENDIX C TO SUBPART E—ASBESTOS MODEL ACCREDITATION PLAN
APPENDIX D TO SUBPART E—TRANSPORT AND DISPOSAL OF ASBESTOS WASTE
APPENDIX E TO SUBPART E—INTERIM METHOD OF THE DETERMINATION OF ASBESTOS IN BULK INSULATION SAMPLES

### Subpart F [Reserved]

### Subpart G—Asbestos Worker Protection

763.120  What is the purpose of this subpart?
763.121  Does this subpart apply to me?
763.122  What does this subpart require me to do?
763.123  May a State implement its own asbestos worker protection plan?

### Subpart H [Reserved]

### Subpart I—Prohibition of the Manufacture, Importation, Processing, and Distribution in Commerce of Certain Asbestos-Containing Products; Labeling Requirements

763.160  Scope.
763.163  Definitions.
763.165  Manufacture and importation prohibitions.
763.167  Processing prohibitions.
763.169  Distribution in commerce prohibitions.
763.171  Labeling requirements.
763.173  Exemptions.
763.175  Enforcement.
763.176  Inspections.
763.178  Recordkeeping.
763.179  Confidential business information claims.

AUTHORITY: 15 U.S.C. 2605, 2607(c), 2643, and 2646.

## Subparts A–D [Reserved]

## Subpart E—Asbestos-Containing Materials in Schools

SOURCE: 52 FR 41846, Oct. 30, 1987, unless otherwise noted.

### § 763.80  Scope and purpose.

(a) This rule requires local education agencies to identify friable and nonfriable asbestos-containing material (ACM) in public and private elementary and secondary schools by visually inspecting school buildings for such materials, sampling such materials if they are not assumed to be ACM, and having samples analyzed by appropriate techniques referred to in this rule. The rule requires local education

**§ 763.83**

agencies to submit management plans to the Governor of their State by October 12, 1988, begin to implement the plans by July 9, 1989, and complete implementation of the plans in a timely fashion. In addition, local education agencies are required to use persons who have been accredited to conduct inspections, reinspections, develop management plans, or perform response actions. The rule also includes recordkeeping requirements. Local education agencies may contractually delegate their duties under this rule, but they remain responsible for the proper performance of those duties. Local education agencies are encouraged to consult with EPA Regional Asbestos Coordinators, or if applicable, a State's lead agency designated by the State Governor, for assistance in complying with this rule.

(b) Local education agencies must provide for the transportation and disposal of asbestos in accordance with EPA's "Asbestos Waste Management Guidance." For convenience, applicable sections of this guidance are reprinted as Appendix D of this subpart. There are regulations in place, however, that affect transportation and disposal of asbestos waste generated by this rule. The transportation of asbestos waste is covered by the Department of Transportation (49 CFR part 173, subpart J) and disposal is covered by the National Emissions Standards for Hazardous Air Pollutants (NESHAP) (40 CFR part 61, subpart M).

**§ 763.83   Definitions.**

For purposes of this subpart:

*Act* means the Toxic Substances Control Act (TSCA), 15 U.S.C. 2601, *et seq.*

*Accessible* when referring to ACM means that the material is subject to disturbance by school building occupants or custodial or maintenance personnel in the course of their normal activities.

*Accredited* or *accreditation* when referring to a person or laboratory means that such person or laboratory is accredited in accordance with section 206 of Title II of the Act.

*Air erosion* means the passage of air over friable ACBM which may result in the release of asbestos fibers.

*Asbestos* means the asbestiform varieties of: Chrysotile (serpentine); crocidolite (riebeckite); amosite (cummingtonitegrunerite); anthophyllite; tremolite; and actinolite.

*Asbestos-containing material* (ACM) when referring to school buildings means any material or product which contains more than 1 percent asbestos.

*Asbestos-containing building material* (ACBM) means surfacing ACM, thermal system insulation ACM, or miscellaneous ACM that is found in or on interior structural members or other parts of a school building.

*Asbestos debris* means pieces of ACBM that can be identified by color, texture, or composition, or means dust, if the dust is determined by an accredited inspector to be ACM.

*Damaged friable miscellaneous ACM* means friable miscellaneous ACM which has deteriorated or sustained physical injury such that the internal structure (cohesion) of the material is inadequate or, if applicable, which has delaminated such that its bond to the substrate (adhesion) is inadequate or which for any other reason lacks fiber cohesion or adhesion qualities. Such damage or deterioration may be illustrated by the separation of ACM into layers; separation of ACM from the substrate; flaking, blistering, or crumbling of the ACM surface; water damage; significant or repeated water stains, scrapes, gouges, mars or other signs of physical injury on the ACM. Asbestos debris originating from the ACBM in question may also indicate damage.

*Damaged friable surfacing ACM* means friable surfacing ACM which has deteriorated or sustained physical injury such that the internal structure (cohesion) of the material is inadequate or which has delaminated such that its bond to the substrate (adhesion) is inadequate, or which, for any other reason, lacks fiber cohesion or adhesion qualities. Such damage or deterioration may be illustrated by the separation of ACM into layers; separation of ACM from the substrate; flaking, blistering, or crumbling of the ACM surface; water damage; significant or repeated water stains, scrapes, gouges, mars or other signs of physical injury

**Environmental Protection Agency**                    **§ 763.83**

on the ACM. Asbestos debris originating from the ACBM in question may also indicate damage.

*Damaged or significantly damaged thermal system insulation ACM* means thermal system insulation ACM on pipes, boilers, tanks, ducts, and other thermal system insulation equipment where the insulation has lost its structural integrity, or its covering, in whole or in part, is crushed, water-stained, gouged, punctured, missing, or not intact such that it is not able to contain fibers. Damage may be further illustrated by occasional punctures, gouges or other signs of physical injury to ACM; occasional water damage on the protective coverings/jackets; or exposed ACM ends or joints. Asbestos debris originating from the ACBM in question may also indicate damage.

*Encapsulation* means the treatment of ACBM with a material that surrounds or embeds asbestos fibers in an adhesive matrix to prevent the release of fibers, as the encapsulant creates a membrane over the surface (bridging encapsulant) or penetrates the material and binds its components together (penetrating encapsulant).

*Enclosure* means an airtight, impermeable, permanent barrier around ACBM to prevent the release of asbestos fibers into the air.

*Fiber release episode* means any uncontrolled or unintentional disturbance of ACBM resulting in visible emission.

*Friable* when referring to material in a school building means that the material, when dry, may be crumbled, pulverized, or reduced to powder by hand pressure, and includes previously nonfriable material after such previously nonfriable material becomes damaged to the extent that when dry it may be crumbled, pulverized, or reduced to powder by hand pressure.

*Functional space* means a room, group of rooms, or homogeneous area (including crawl spaces or the space between a dropped ceiling and the floor or roof deck above), such as classroom(s), a cafeteria, gymnasium, hallway(s), designated by a person accredited to prepare management plans, design abatement projects, or conduct response actions.

*High-efficiency particulate air* (HEPA) refers to a filtering system capable of trapping and retaining at least 99.97 percent of all monodispersed particles 0.3 μm in diameter or larger.

*Homogeneous area* means an area of surfacing material, thermal system insulation material, or miscellaneous material that is uniform in color and texture.

*Local education agency* means:

(1) Any local educational agency as defined in section 198 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 3381).

(2) The owner of any nonpublic, nonprofit elementary, or secondary school building.

(3) The governing authority of any school operated under the defense dependent's education system provided for under the Defense Dependents' Education Act of 1978 (20 U.S.C. 921, et seq.).

*Miscellaneous ACM* means miscellaneous material that is ACM in a school building.

*Miscellaneous material* means interior building material on structural components, structural members or fixtures, such as floor and ceiling tiles, and does not include surfacing material or thermal system insulation.

*Nonfriable* means material in a school building which when dry may not be crumbled, pulverized, or reduced to powder by hand pressure.

*Operations and maintenance program* means a program of work practices to maintain friable ACBM in good condition, ensure clean up of asbestos fibers previously released, and prevent further release by minimizing and controlling friable ACBM disturbance or damage.

*Potential damage* means circumstances in which:

(1) Friable ACBM is in an area regularly used by building occupants, including maintenance personnel, in the course of their normal activities.

(2) There are indications that there is a reasonable likelihood that the material or its covering will become damaged, deteriorated, or delaminated due to factors such as changes in building use, changes in operations and maintenance practices, changes in occupancy, or recurrent damage.

*Potential significant damage* means circumstances in which:

(1) Friable ACBM is in an area regularly used by building occupants, including maintenance personnel, in the course of their normal activities.

(2) There are indications that there is a reasonable likelihood that the material or its covering will become significantly damaged, deteriorated, or delaminated due to factors such as changes in building use, changes in operations and maintenance practices, changes in occupancy, or recurrent damage.

(3) The material is subject to major or continuing disturbance, due to factors including, but not limited to, accessibility or, under certain circumstances, vibration or air erosion.

*Preventive measures* means actions taken to reduce disturbance of ACBM or otherwise eliminate the reasonable likelihood of the material's becoming damaged or significantly damaged.

*Removal* means the taking out or the stripping of substantially all ACBM from a damaged area, a functional space, or a homogeneous area in a school building.

*Repair* means returning damaged ACBM to an undamaged condition or to an intact state so as to prevent fiber release.

*Response action* means a method, including removal, encapsulation, enclosure, repair, operations and maintenance, that protects human health and the environment from friable ACBM.

*Routine maintenance area* means an area, such as a boiler room or mechanical room, that is not normally frequented by students and in which maintenance employees or contract workers regularly conduct maintenance activities.

*School* means any elementary or secondary school as defined in section 198 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 2854).

*School building* means:

(1) Any structure suitable for use as a classroom, including a school facility such as a laboratory, library, school eating facility, or facility used for the preparation of food.

(2) Any gymnasium or other facility which is specially designed for athletic or recreational activities for an academic course in physical education.

(3) Any other facility used for the instruction or housing of students or for the administration of educational or research programs.

(4) Any maintenance, storage, or utility facility, including any hallway, essential to the operation of any facility described in this definition of ''school building'' under paragraphs (1), (2), or (3).

(5) Any portico or covered exterior hallway or walkway.

(6) Any exterior portion of a mechanical system used to condition interior space.

*Significantly damaged friable miscellaneous ACM* means damaged friable miscellaneous ACM where the damage is extensive and severe.

*Significantly damaged friable surfacing ACM* means damaged friable surfacing ACM in a functional space where the damage is extensive and severe.

*State* means a State, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Northern Marianas, the Trust Territory of the Pacific Islands, and the Virgin Islands.

*Surfacing ACM* means surfacing material that is ACM.

*Surfacing material* means material in a school building that is sprayed-on, troweled-on, or otherwise applied to surfaces, such as acoustical plaster on ceilings and fireproofing materials on structural members, or other materials on surfaces for acoustical, fireproofing, or other purposes.

*Thermal system insulation* means material in a school building applied to pipes, fittings, boilers, breeching, tanks, ducts, or other interior structural components to prevent heat loss or gain, or water condensation, or for other purposes.

*Thermal system insulation ACM* means thermal system insulation that is ACM.

*Vibration* means the periodic motion of friable ACBM which may result in the release of asbestos fibers.

## § 763.84  General local education agency responsibilities.

Each local education agency shall:

**Environmental Protection Agency**                          **§ 763.85**

(a) Ensure that the activities of any persons who perform inspections, reinspections, and periodic surveillance, develop and update management plans, and develop and implement response actions, including operations and maintenance, are carried out in accordance with subpart E of this part.

(b) Ensure that all custodial and maintenance employees are properly trained as required by this subpart E and other applicable Federal and/or State regulations (e.g., the Occupational Safety and Health Administration asbestos standard for construction, the EPA worker protection rule, or applicable State regulations).

(c) Ensure that workers and building occupants, or their legal guardians, are informed at least once each school year about inspections, response actions, and post-response action activities, including periodic reinspection and surveillance activities that are planned or in progress.

(d) Ensure that short-term workers (e.g., telephone repair workers, utility workers, or exterminators) who may come in contact with asbestos in a school are provided information regarding the locations of ACBM and suspected ACBM assumed to be ACM.

(e) Ensure that warning labels are posted in accordance with § 763.95.

(f) Ensure that management plans are available for inspection and notification of such availability has been provided as specified in the management plan under § 763.93(g).

(g)(1) Designate a person to ensure that requirements under this section are properly implemented.

(2) Ensure that the designated person receives adequate training to perform duties assigned under this section. Such training shall provide, as necessary, basic knowledge of:

(i) Health effects of asbestos.

(ii) Detection, identification, and assessment of ACM.

(iii) Options for controlling ACBM.

(iv) Asbestos management programs.

(v) Relevant Federal and State regulations concerning asbestos, including those in this subpart E and those of the Occupational Safety and Health Administration, U.S. Department of Labor, the U.S. Department of Trans-portation and the U.S. Environmental Protection Agency.

(h) Consider whether any conflict of interest may arise from the interrelationship among accredited personnel and whether that should influence the selection of accredited personnel to perform activities under this subpart.

**§ 763.85   Inspection and reinspections.**

(a) *Inspection.* (1) Except as provided in paragraph (a)(2) of this section, before October 12, 1988, local education agencies shall inspect each school building that they lease, own, or otherwise use as a school building to identify all locations of friable and nonfriable ACBM.

(2) Any building leased or acquired on or after October 12, 1988, that is to be used as a school building shall be inspected as described under paragraphs (a) (3) and (4) of this section prior to use as a school building. In the event that emergency use of an uninspected building as a school building is necessitated, such buildings shall be inspected within 30 days after commencement of such use.

(3) Each inspection shall be made by an accredited inspector.

(4) For each area of a school building, except as excluded under § 763.99, each person performing an inspection shall:

(i) Visually inspect the area to identify the locations of all suspected ACBM.

(ii) Touch all suspected ACBM to determine whether they are friable.

(iii) Identify all homogeneous areas of friable suspected ACBM and all homogeneous areas of nonfriable suspected ACBM.

(iv) Assume that some or all of the homogeneous areas are ACM, and, for each homogeneous area that is not assumed to be ACM, collect and submit for analysis bulk samples under §§ 763.86 and 763.87.

(v) Assess, under § 763.88, friable material in areas where samples are collected, friable material in areas that are assumed to be ACBM, and friable ACBM identified during a previous inspection.

(vi) Record the following and submit to the person designated under § 763.84 a copy of such record for inclusion in

the management plan within 30 days of the inspection:

(A) An inspection report with the date of the inspection signed by each accredited person making the inspection, State of accreditation, and if applicable, his or her accreditation number.

(B) An inventory of the locations of the homogeneous areas where samples are collected, exact location where each bulk sample is collected, dates that samples are collected, homogeneous areas where friable suspected ACBM is assumed to be ACM, and homogeneous areas where nonfriable suspected ACBM is assumed to be ACM.

(C) A description of the manner used to determine sampling locations, the name and signature of each accredited inspector who collected the samples, State of accreditation, and, if applicable, his or her accreditation number.

(D) A list of whether the homogeneous areas identified under paragraph (a)(4)(vi)(B) of this section, are surfacing material, thermal system insulation, or miscellaneous material.

(E) Assessments made of friable material, the name and signature of each accredited inspector making the assessment, State of accreditation, and if applicable, his or her accreditation number.

(b) *Reinspection.* (1) At least once every 3 years after a management plan is in effect, each local education agency shall conduct a reinspection of all friable and nonfriable known or assumed ACBM in each school building that they lease, own, or otherwise use as a school building.

(2) Each inspection shall be made by an accredited inspector.

(3) For each area of a school building, each person performing a reinspection shall:

(i) Visually reinspect, and reassess, under §763.88, the condition of all friable known or assumed ACBM.

(ii) Visually inspect material that was previously considered nonfriable ACBM and touch the material to determine whether it has become friable since the last inspection or reinspection.

(iii) Identify any homogeneous areas with material that has become friable

since the last inspection or reinspection.

(iv) For each homogeneous area of newly friable material that is already assumed to be ACBM, bulk samples may be collected and submitted for analysis in accordance with §§763.86 and 763.87.

(v) Assess, under §763.88, the condition of the newly friable material in areas where samples are collected, and newly friable materials in areas that are assumed to be ACBM.

(vi) Reassess, under §763.88, the condition of friable known or assumed ACBM previously identified.

(vii) Record the following and submit to the person designated under §763.84 a copy of such record for inclusion in the management plan within 30 days of the reinspection:

(A) The date of the reinspection, the name and signature of the person making the reinspection, State of accreditation, and if applicable, his or her accreditation number, and any changes in the condition of known or assumed ACBM.

(B) The exact locations where samples are collected during the reinspection, a description of the manner used to determine sampling locations, the name and signature of each accredited inspector who collected the samples, State of accreditation, and, if applicable, his or her accreditation number.

(C) Any assessments or reassessments made of friable material, the name and signature of the accredited inspector making the assessments, State of accreditation, and if applicable, his or her accreditation number.

(c) *General.* Thermal system insulation that has retained its structural integrity and that has an undamaged protective jacket or wrap that prevents fiber release shall be treated as nonfriable and therefore is subject only to periodic surveillance and preventive measures as necessary.

**§ 763.86  Sampling.**

(a) *Surfacing material.* An accredited inspector shall collect, in a statistically random manner that is representative of the homogeneous area, bulk samples from each homogeneous area of friable surfacing material that

**Environmental Protection Agency**                    **§ 763.88**

is not assumed to be ACM, and shall collect the samples as follows:

(1) At least three bulk samples shall be collected from each homogeneous area that is 1,000 ft² or less, except as provided in §763.87(c)(2).

(2) At least five bulk samples shall be collected from each homogeneous area that is greater than 1,000 ft² but less than or equal to 5,000 ft², except as provided in §763.87(c)(2).

(3) At least seven bulk samples shall be collected from each homogeneous area that is greater than 5,000 ft², except as provided in §763.87(c)(2).

(b) *Thermal system insulation.* (1) Except as provided in paragraphs (b) (2) through (4) of this section and §763.87(c), an accredited inspector shall collect, in a randomly distributed manner, at least three bulk samples from each homogeneous area of thermal system insulation that is not assumed to be ACM.

(2) Collect at least one bulk sample from each homogeneous area of patched thermal system insulation that is not assumed to be ACM if the patched section is less than 6 linear or square feet.

(3) In a manner sufficient to determine whether the material is ACM or not ACM, collect bulk samples from each insulated mechanical system that is not assumed to be ACM where cement or plaster is used on fittings such as tees, elbows, or valves, except as provided under §763.87(c)(2).

(4) Bulk samples are not required to be collected from any homogeneous area where the accredited inspector has determined that the thermal system insulation is fiberglass, foam glass, rubber, or other non-ACBM.

(c) *Miscellaneous material.* In a manner sufficient to determine whether material is ACM or not ACM, an accredited inspector shall collect bulk samples from each homogeneous area of friable miscellaneous material that is not assumed to be ACM.

(d) *Nonfriable suspected ACBM.* If any homogeneous area of nonfriable suspected ACBM is not assumed to be ACM, then an accredited inspector shall collect, in a manner sufficient to determine whether the material is ACM or not ACM, bulk samples from the homogeneous area of nonfriable

suspected ACBM that is not assumed to be ACM.

**§ 763.87  Analysis.**

(a) Local education agencies shall have bulk samples, collected under §763.86 and submitted for analysis, analyzed for asbestos using laboratories accredited by the National Bureau of Standards (NBS). Local education agencies shall use laboratories which have received interim accreditation for polarized light microscopy (PLM) analysis under the EPA Interim Asbestos Bulk Sample Analysis Quality Assurance Program until the NBS PLM laboratory accreditation program for PLM is operational.

(b) Bulk samples shall not be composited for analysis and shall be analyzed for asbestos content by PLM, using the ''Interim Method for the Determination of Asbestos in Bulk Insulation Samples'' found at appendix E to subpart E of this part.

(c)(1) A homogeneous area is considered not to contain ACM only if the results of all samples required to be collected from the area show asbestos in amounts of 1 percent or less.

(2) A homogeneous area shall be determined to contain ACM based on a finding that the results of at least one sample collected from that area shows that asbestos is present in an amount greater than 1 percent.

(d) The name and address of each laboratory performing an analysis, the date of analysis, and the name and signature of the person performing the analysis shall be submitted to the person designated under §763.84 for inclusion into the management plan within 30 days of the analysis.

[52 FR 41846, Oct. 30, 1987, as amended at 60 FR 31922, June 19, 1995]

**§ 763.88  Assessment.**

(a)(1) For each inspection and reinspection conducted under §763.85 (a) and (c) and previous inspections specified under §763.99, the local education agency shall have an accredited inspector provide a written assessment of all friable known or assumed ACBM in the school building.

(2) Each accredited inspector providing a written assessment shall sign and date the assessment, provide his or

851

her State of accreditation, and if applicable, accreditation number, and submit a copy of the assessment to the person designated under §763.84 for inclusion in the management plan within 30 days of the assessment.

(b) The inspector shall classify and give reasons in the written assessment for classifying the ACBM and suspected ACBM assumed to be ACM in the school building into one of the following categories:

(1) Damaged or significantly damaged thermal system insulation ACM.

(2) Damaged friable surfacing ACM.

(3) Significantly damaged friable surfacing ACM.

(4) Damaged or significantly damaged friable miscellaneous ACM.

(5) ACBM with potential for damage.

(6) ACBM with potential for significant damage.

(7) Any remaining friable ACBM or friable suspected ACBM.

(c) Assessment may include the following considerations:

(1) Location and the amount of the material, both in total quantity and as a percentage of the functional space.

(2) Condition of the material, specifying:

(i) Type of damage or significant damage (e.g., flaking, blistering, water damage, or other signs of physical damage).

(ii) Severity of damage (e.g., major flaking, severely torn jackets, as opposed to occasional flaking, minor tears to jackets).

(iii) Extent or spread of damage over large areas or large percentages of the homogeneous area.

(3) Whether the material is accessible.

(4) The material's potential for disturbance.

(5) Known or suspected causes of damage or significant damage (e.g., air erosion, vandalism, vibration, water).

(6) Preventive measures which might eliminate the reasonable likelihood of undamaged ACM from becoming significantly damaged.

(d) The local education agency shall select a person accredited to develop management plans to review the results of each inspection, reinspection, and assessment for the school building and to conduct any other necessary ac-

tivities in order to recommend in writing to the local education agency appropriate response actions. The accredited person shall sign and date the recommendation, provide his or her State of accreditation, and, if applicable, provide his or her accreditation number, and submit a copy of the recommendation to the person designated under §763.84 for inclusion in the management plan.

§ 763.90  Response actions.

(a) The local education agency shall select and implement in a timely manner the appropriate response actions in this section consistent with the assessment conducted in §763.88. The response actions selected shall be sufficient to protect human health and the environment. The local education agency may then select, from the response actions which protect human health and the environment, that action which is the least burdensome method. Nothing in this section shall be construed to prohibit removal of ACBM from a school building at any time, should removal be the preferred response action of the local education agency.

(b) If damaged or significantly damaged thermal system insulation ACM is present in a building, the local education agency shall:

(1) At least repair the damaged area.

(2) Remove the damaged material if it is not feasible, due to technological factors, to repair the damage.

(3) Maintain all thermal system insulation ACM and its covering in an intact state and undamaged condition.

(c)(1) If damaged friable surfacing ACM or damaged friable miscellaneous ACM is present in a building, the local education agency shall select from among the following response actions: encapsulation, enclosure, removal, or repair of the damaged material.

(2) In selecting the response action from among those which meet the definitional standards in §763.83, the local education agency shall determine which of these response actions protects human health and the environment. For purposes of determining which of these response actions are the least burdensome, the local education

**Environmental Protection Agency**                                    **§ 763.90**

agency may then consider local circumstances, including occupancy and use patterns within the school building, and its economic concerns, including short- and long-term costs.

(d) If significantly damaged friable surfacing ACM or significantly damaged friable miscellaneous ACM is present in a building the local education agency shall:

(1) Immediately isolate the functional space and restrict access, unless isolation is not necessary to protect human health and the environment.

(2) Remove the material in the functional space or, depending upon whether enclosure or encapsulation would be sufficient to protect human health and the environment, enclose or encapsulate.

(e) If any friable surfacing ACM, thermal system insulation ACM, or friable miscellaneous ACM that has potential for damage is present in a building, the local education agency shall at least implement an operations and maintenance (O&M) program, as described under § 763.91.

(f) If any friable surfacing ACM, thermal system insulation ACM, or friable miscellaneous ACM that has potential for significant damage is present in a building, the local education agency shall:

(1) Implement an O&M program, as described under § 763.91.

(2) Institute preventive measures appropriate to eliminate the reasonable likelihood that the ACM or its covering will become significantly damaged, deteriorated, or delaminated.

(3) Remove the material as soon as possible if appropriate preventive measures cannot be effectively implemented, or unless other response actions are determined to protect human health and the environment. Immediately isolate the area and restrict access if necessary to avoid an imminent and substantial endangerment to human health or the environment.

(g) Response actions including removal, encapsulation, enclosure, or repair, other than small-scale, short-duration repairs, shall be designed and conducted by persons accredited to design and conduct response actions.

(h) The requirements of this subpart E in no way supersede the worker pro-

tection and work practice requirements under 29 CFR 1926.58 (Occupational Safety and Health Administration (OSHA) asbestos worker protection standards for construction), 40 CFR part 763, subpart G (EPA asbestos worker protection standards for public employees), and 40 CFR part 61, subpart M (National Emission Standards for Hazardous Air Pollutants—Asbestos).

(i) Completion of response actions. (1) At the conclusion of any action to remove, encapsulate, or enclose ACBM or material assumed to be ACBM, a person designated by the local education agency shall visually inspect each functional space where such action was conducted to determine whether the action has been properly completed.

(2)(i) A person designated by the local education agency shall collect air samples using aggressive sampling as described in appendix A to this subpart E to monitor air for clearance after each removal, encapsulation, and enclosure project involving ACBM, except for projects that are of small-scale, short-duration.

(ii) Local education agencies shall have air samples collected under this section analyzed for asbestos using laboratories accredited by the National Bureau of Standards to conduct such analysis using transmission electron microscopy (TEM) or, under circumstances permitted in this section, laboratories enrolled in the American Industrial Hygiene Association Proficiency Analytical Testing Program for phase contrast microscopy (PCM).

(iii) Until the National Bureau of Standards TEM laboratory accreditation program is operational, local educational agencies shall use laboratories that use the protocol described in appendix A to subpart E of this part.

(3) Except as provided in paragraphs (i)(4), and (i)(5), of this section, an action to remove, encapsulate, or enclose ACBM shall be considered complete when the average concentration of asbestos of five air samples collected within the affected functional space and analyzed by the TEM method in appendix A of this subpart E, is not statistically significantly different, as determined by the Z-test calculation found in appendix A of this subpart E,

853

from the average asbestos concentration of five air samples collected at the same time outside the affected functional space and analyzed in the same manner, and the average asbestos concentration of the three field blanks described in appendix A of this subpart E is below the filter background level, as defined in appendix A of this subpart E, of 70 structures per square millimeter (70 s/mm²).

(4) An action may also be considered complete if the volume of air drawn for each of the five samples collected within the affected functional space is equal to or greater than 1,199 L of air for a 25 mm filter or equal to or greater than 2,799 L of air for a 37 mm filter, and the average concentration of asbestos as analyzed by the TEM method in appendix A of this subpart E, for the five air samples does not exceed the filter background level, as defined in appendix A, of 70 structures per square millimeter (70 s/mm²). If the average concentration of asbestos of the five air samples within the affected functional space exceeds 70 s/mm², or if the volume of air in each of the samples is less than 1,199 L of air for a 25 mm filter or less than 2,799 L of air for a 37 mm filter, the action shall be considered complete only when the requirements of paragraph (i)(3) or (i)(5), of this section are met.

(5) At any time, a local education agency may analyze air monitoring samples collected for clearance purposes by phase contrast microscopy (PCM) to confirm completion of removal, encapsulation, or enclosure of ACBM that is greater than small-scale, short-duration and less than or equal to 160 square feet or 260 linear feet. The action shall be considered complete when the results of samples collected in the affected functional space and analyzed by phase contrast microscopy using the National Institute for Occupational Safety and Health (NIOSH) Method 7400 entitled "Fibers" published in the NIOSH Manual of Analytical Methods, 3rd Edition, Second Supplement, August 1987, show that the concentration of fibers for each of the five samples is less than or equal to a limit of quantitation for PCM (0.01 fibers per cubic centimeter (0.01 f/cm³) of air). The method is available for public

inspection at the Non-Confidential Information Center (NCIC) (7407), Office of Pollution Prevention and Toxics, U.S. Environmental Protection Agency, Room B–607 NEM, 401 M St., SW., Washington, DC 20460, between the hours of 12 p.m. and 4 p.m. weekdays excluding legal holidays or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http:// www.archives.gov/federal__register/ code__of__federal__regulations/ ibr__locations.html*. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. The method is incorporated as it exists on the effective date of this rule, and a notice of any change to the method will be published in the FEDERAL REGISTER.

(6) To determine the amount of ACBM affected under paragraph (i)(5) of this section, the local education agency shall add the total square or linear footage of ACBM within the containment barriers used to isolate the functional space for the action to remove, encapsulate, or enclose the ACBM. Contiguous portions of material subject to such action conducted concurrently or at approximately the same time within the same school building shall not be separated to qualify under paragraph (i)(5), of this section.

[52 FR 41846, Oct. 30, 1987, as amended at 53 FR 12525, Apr. 15, 1988; 60 FR 31922, June 19, 1995; 60 FR 34465, July 3, 1995; 69 FR 18803, Apr. 9, 2004]

## § 763.91  Operations and maintenance.

(a) *Applicability.* The local education agency shall implement an operations, maintenance, and repair (O&M) program under this section whenever any friable ACBM is present or assumed to be present in a building that it leases, owns, or otherwise uses as a school building. Any material identified as nonfriable ACBM or nonfriable assumed ACBM must be treated as friable ACBM for purposes of this section when the material is about to become friable as a result of activities performed in the school building.

**Environmental Protection Agency**                    **§ 763.91**

(b) *Worker protection.* Local education agencies must comply with either the OSHA Asbestos Construction Standard at 29 CFR 1926.1101, or the Asbestos Worker Protection Rule at 40 CFR 763.120, whichever is applicable.

(c) *Cleaning*—(1) *Initial cleaning.* Unless the building has been cleaned using equivalent methods within the previous 6 months, all areas of a school building where friable ACBM, damaged or significantly damaged thermal system insulation ACM, or friable suspected ACBM assumed to be ACM are present shall be cleaned at least once after the completion of the inspection required by § 763.85(a) and before the initiation of any response action, other than O&M activities or repair, according to the following procedures:

(i) HEPA-vacuum or steam-clean all carpets.

(ii) HEPA-vacuum or wet-clean all other floors and all other horizontal surfaces.

(iii) Dispose of all debris, filters, mopheads, and cloths in sealed, leak-tight containers.

(2) *Additional cleaning.* The accredited management planner shall make a written recommendation to the local education agency whether additional cleaning is needed, and if so, the methods and frequency of such cleaning.

(d) *Operations and maintenance activities.* The local education agency shall ensure that the procedures described below shall be followed for any operations and maintenance activities disturbing friable ACBM:

(1) Restrict entry into the area by persons other than those necessary to perform the maintenance project, either by physically isolating the area or by scheduling.

(2) Post signs to prevent entry by unauthorized persons.

(3) Shut off or temporarily modify the air-handling system and restrict other sources of air movement.

(4) Use work practices or other controls, such as, wet methods, protective clothing, HEPA-vacuums, mini-enclosures, glove bags, as necessary to inhibit the spread of any released fibers.

(5) Clean all fixtures or other components in the immediate work area.

(6) Place the asbestos debris and other cleaning materials in a sealed, leak-tight container.

(e) *Maintenance activities other than small-scale, short-duration.* The response action for any maintenance activities disturbing friable ACBM, other than small-scale, short-duration maintenance activities, shall be designed by persons accredited to design response actions and conducted by persons accredited to conduct response actions.

(f) *Fiber release episodes*—(1) *Minor fiber release episode.* The local education agency shall ensure that the procedures described below are followed in the event of a minor fiber release episode (i.e., the falling or dislodging of 3 square or linear feet or less of friable ACBM): 5

(i) Thoroughly saturate the debris using wet methods.

(ii) Clean the area, as described in paragraph (e) of this section.

(iii) Place the asbestos debris in a sealed, leak-tight container.

(iv) Repair the area of damaged ACM with materials such as asbestos-free spackling, plaster, cement, or insulation, or seal with latex paint or an encapsulant, or immediately have the appropriate response action implemented as required by § 763.90.

(2) *Major fiber release episode.* The local education agency shall ensure that the procedures described below are followed in the event of a major fiber release episode (i.e., the falling or dislodging of more than 3 square or linear feet of friable ACBM):

(i) Restrict entry into the area and post signs to prevent entry into the area by persons other than those necessary to perform the response action.

(ii) Shut off or temporarily modify the air-handling system to prevent the distribution of fibers to other areas in the building.

(iii) The response action for any major fiber release episode must be designed by persons accredited to design response actions and conducted by persons accredited to conduct response actions.

[52 FR 41846, Oct. 30, 1987, as amended at 65 FR 69216, Nov. 15, 2000]

## § 763.92  Training and periodic surveillance.

(a) *Training.* (1) The local education agency shall ensure, prior to the implementation of the O&M provisions of the management plan, that all members of its maintenance and custodial staff (custodians, electricians, heating/air conditioning engineers, plumbers, etc.) who may work in a building that contains ACBM receive awareness training of at least 2 hours, whether or not they are required to work with ACBM. New custodial and maintenance employees shall be trained within 60 days after commencement of employment. Training shall include, but not be limited to:

(i) Information regarding asbestos and its various uses and forms.

(ii) Information on the health effects associated with asbestos exposure.

(iii) Locations of ACBM identified throughout each school building in which they work.

(iv) Recognition of damage, deterioration, and delamination of ACBM.

(v) Name and telephone number of the person designated to carry out general local education agency responsibilities under §763.84 and the availability and location of the management plan.

(2) The local education agency shall ensure that all members of its maintenance and custodial staff who conduct any activities that will result in the disturbance of ACBM shall receive training described in paragraph (a)(1) of this section and 14 hours of additional training. Additional training shall include, but not be limited to:

(i) Descriptions of the proper methods of handling ACBM.

(ii) Information on the use of respiratory protection as contained in the EPA/NIOSH *Guide to Respiratory Protection for the Asbestos Abatement Industry*, September 1986 (EPA 560/OPPTS–86–001), available from the Director, Environmental Assistance Division (7408), Office of Pollution Prevention and Toxics, U.S. Environmental Protection Agency, Room E–543B, 1200 Pennsylvania Ave., NW., Washington, DC 20460, Telephone: (202) 554–1404, TDD: (202) 544–0551 and other personal protection measures.

(iii) The provisions of this section and §763.91, Appendices A, C, and D of this subpart E of this part, EPA regulations contained in 40 CFR part 763, subpart G, and in 40 CFR part 61, subpart M, and OSHA regulations contained in 29 CFR 1926.58.

(iv) Hands-on training in the use of respiratory protection, other personal protection measures, and good work practices.

(3) Local education agency maintenance and custodial staff who have attended EPA-approved asbestos training or received equivalent training for O&M and periodic surveillance activities involving asbestos shall be considered trained for the purposes of this section.

(b) *Periodic surveillance.* (1) At least once every 6 months after a management plan is in effect, each local education agency shall conduct periodic surveillance in each building that it leases, owns, or otherwise uses as a school building that contains ACBM or is assumed to contain ACBM.

(2) Each person performing periodic surveillance shall:

(i) Visually inspect all areas that are identified in the management plan as ACBM or assumed ACBM.

(ii) Record the date of the surveillance, his or her name, and any changes in the condition of the materials.

(iii) Submit to the person designated to carry out general local education agency responsibilities under §763.84 a copy of such record for inclusion in the management plan.

[52 FR 41846, Oct. 30, 1987, as amended at 60 FR 34465, July 3, 1995; 65 FR 69216, Nov. 15, 2000]

## § 763.93  Management plans.

(a)(1) On or before October 12, 1988, each local education agency shall develop an asbestos management plan for each school, including all buildings that they lease, own, or otherwise use as school buildings, and submit the plan to an Agency designated by the Governor of the State in which the local education agency is located. The plan may be submitted in stages that cover a portion of the school buildings under the authority of the local education agency.

(2) If a building to be used as part of a school is leased or otherwise acquired after October 12, 1988, the local education agency shall include the new building in the management plan for the school prior to its use as a school building. The revised portions of the management plan shall be submitted to the Agency designated by the Governor.

(3) If a local education agency begins to use a building as a school after October 12, 1988, the local education agency shall submit a management plan for the school to the Agency designated by the Governor prior to its use as a school.

(b) On or before October 17, 1987, the Governor of each State shall notify local education agencies in the State regarding where to submit their management plans. States may establish administrative procedures for reviewing management plans. If the Governor does not disapprove a management plan within 90 days after receipt of the plan, the local education agency shall implement the plan.

(c) Each local education agency must begin implementation of its management plan on or before July 9, 1989, and complete implementation in a timely fashion.

(d) Each local education agency shall maintain and update its management plan to keep it current with ongoing operations and maintenance, periodic surveillance, inspection, reinspection, and response action activities. All provisions required to be included in the management plan under this section shall be retained as part of the management plan, as well as any information that has been revised to bring the plan up-to-date.

(e) The management plan shall be developed by an accredited management planner and shall include:

(1) A list of the name and address of each school building and whether the school building contains friable ACBM, nonfriable ACBM, and friable and nonfriable suspected ACBM assumed to be ACM.

(2) For each inspection conducted before the December 14, 1987:

(i) The date of the inspection.

(ii) A blueprint, diagram, or written description of each school building that identifies clearly each location and approximate square or linear footage of any homogeneous or sampling area where material was sampled for ACM, and, if possible, the exact locations where bulk samples were collected, and the dates of collection.

(iii) A copy of the analyses of any bulk samples, dates of analyses, and a copy of any other laboratory reports pertaining to the analyses.

(iv) A description of any response actions or preventive measures taken to reduce asbestos exposure, including if possible, the names and addresses of all contractors involved, start and completion dates of the work, and results of any air samples analyzed during and upon completion of the work.

(v) A description of assessments, required to be made under §763.88, of material that was identified before December 14, 1987, as friable ACBM or friable suspected ACBM assumed to be ACM, and the name and signature, State of accreditation, and if applicable, accreditation number of each accredited person making the assessments.

(3) For each inspection and reinspection conducted under §763.85:

(i) The date of the inspection or reinspection and the name and signature, State of accreditation and, if applicable, the accreditation number of each accredited inspector performing the inspection or reinspection.

(ii) A blueprint, diagram, or written description of each school building that identifies clearly each location and approximate square or linear footage of homogeneous areas where material was sampled for ACM, the exact location where each bulk sample was collected, date of collection, homogeneous areas where friable suspected ACBM is assumed to be ACM, and where nonfriable suspected ACBM is assumed to be ACM.

(iii) A description of the manner used to determine sampling locations, and the name and signature of each accredited inspector collecting samples, the State of accreditation, and if applicable, his or her accreditation number.

(iv) A copy of the analyses of any bulk samples collected and analyzed, the name and address of any laboratory

that analyzed bulk samples, a statement that the laboratory meets the applicable requirements of § 763.87(a) the date of analysis, and the name and signature of the person performing the analysis.

(v) A description of assessments, required to be made under § 763.88, of all ACBM and suspected ACBM assumed to be ACM, and the name, signature, State of accreditation, and if applicable, accreditation number of each accredited person making the assessments.

(4) The name, address, and telephone number of the person designated under § 763.84 to ensure that the duties of the local education agency are carried out, and the course name, and dates and hours of training taken by that person to carry out the duties.

(5) The recommendations made to the local education agency regarding response actions, under § 763.88(d), the name, signature, State of accreditation of each person making the recommendations, and if applicable, his or her accreditation number.

(6) A detailed description of preventive measures and response actions to be taken, including methods to be used, for any friable ACBM, the locations where such measures and action will be taken, reasons for selecting the response action or preventive measure, and a schedule for beginning and completing each preventive measure and response action.

(7) With respect to the person or persons who inspected for ACBM and who will design or carry out response actions, except for operations and maintenance, with respect to the ACBM, one of the following statements:

(i) If the State has adopted a contractor accreditation program under section 206(b) of Title II of the Act, a statement that the person(s) is accredited under such plan.

(ii) A statement that the local education agency used (or will use) persons who have been accredited by another State which has adopted a contractor accreditation plan under section 206(b) of Title II of the Act or is accredited by an EPA-approved course under section 206(c) of Title II of the Act.

(8) A detailed description in the form of a blueprint, diagram, or in writing of any ACBM or suspected ACBM assumed to be ACM which remains in the school once response actions are undertaken pursuant to § 763.90. This description shall be updated as response actions are completed.

(9) A plan for reinspection under § 763.85, a plan for operations and maintenance activities under § 763.91, and a plan for periodic surveillance under § 763.92, a description of the recommendation made by the management planner regarding additional cleaning under § 763.91(c)(2) as part of an operations and maintenance program, and the response of the local education agency to that recommendation.

(10) A description of steps taken to inform workers and building occupants, or their legal guardians, about inspections, reinspections, response actions, and post-response action activities, including periodic reinspection and surveillance activities that are planned or in progress.

(11) An evaluation of the resources needed to complete response actions successfully and carry out reinspection, operations and maintenance activities, periodic surveillance and training.

(12) With respect to each consultant who contributed to the management plan, the name of the consultant and one of the following statements:

(i) If the State has adopted a contractor accreditation plan under section 206(b) of Title II of the Act, a statement that the consultant is accredited under such plan.

(ii) A statement that the contractor is accredited by another State which has adopted a contractor accreditation plan under section 206(b) of Title II of the Act, or is accredited by an EPA-approved course developed under section 206(c) of Title II of the Act.

(f) A local education agency may require each management plan to contain a statement signed by an accredited management plan developer that such person has prepared or assisted in the preparation of such plan or has reviewed such plan, and that such plan is in compliance with this subpart E. Such statement may not be signed by a person who, in addition to preparing or assisting in preparing the management

858

**Environmental Protection Agency**                                   **§ 763.94**

plan, also implements (or will implement) the management plan.

(g)(1) Upon submission of a management plan to the Governor for review, a local education agency shall keep a copy of the plan in its administrative office. The management plans shall be available, without cost or restriction, for inspection by representatives of EPA and the State, the public, including teachers, other school personnel and their representatives, and parents. The local education agency may charge a reasonable cost to make copies of management plans.

(2) Each local education agency shall maintain in its administrative office a complete, updated copy of a management plan for each school under its administrative control or direction. The management plans shall be available, during normal business hours, without cost or restriction, for inspection by representatives of EPA and the State, the public, including teachers, other school personnel and their representatives, and parents. The local education agency may charge a reasonable cost to make copies of management plans.

(3) Each school shall maintain in its administrative office a complete, updated copy of the management plan for that school. Management plans shall be available for inspection, without cost or restriction, to workers before work begins in any area of a school building. The school shall make management plans available for inspection to representatives of EPA and the State, the public, including parents, teachers, and other school personnel and their representatives within 5 working days after receiving a request for inspection. The school may charge a reasonable cost to make copies of the management plan.

(4) Upon submission of its management plan to the Governor and at least once each school year, the local education agency shall notify in writing parent, teacher, and employee organizations of the availability of management plans and shall include in the management plan a description of the steps taken to notify such organizations, and a dated copy of the notification. In the absence of any such organizations for parents, teachers, or employees, the local education agency

shall provide written notice to that relevant group of the availability of management plans and shall include in the management plan a description of the steps taken to notify such groups, and a dated copy of the notification.

(h) Records required under § 763.94 shall be made by local education agencies and maintained as part of the management plan.

(i) Each management plan must contain a true and correct statement, signed by the individual designated by the local education agency under § 763.84, which certifies that the general, local education agency responsibilities, as stipulated by § 763.84, have been met or will be met.

**§ 763.94   Recordkeeping.**

(a) Records required under this section shall be maintained in a centralized location in the administrative office of both the school and the local education agency as part of the management plan. For each homogeneous area where all ACBM has been removed, the local education agency shall ensure that such records are retained for 3 years after the next reinspection required under § 763.85(b)(1), or for an equivalent period.

(b) For each preventive measure and response action taken for friable and nonfriable ACBM and friable and nonfriable suspected ACBM assumed to be ACM, the local education agency shall provide:

(1) A detailed written description of the measure or action, including methods used, the location where the measure or action was taken, reasons for selecting the measure or action, start and completion dates of the work, names and addresses of all contractors involved, and if applicable, their State of accreditation, and accreditation numbers, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(2) The name and signature of any person collecting any air sample required to be collected at the completion of certain response actions specified by § 763.90(i), the locations where samples were collected, date of collection, the name and address of the laboratory analyzing the samples, the date of analysis, the results of the

859

analysis, the method of analysis, the name and signature of the person performing the analysis, and a statement that the laboratory meets the applicable requirements of § 763.90(i)(2)(ii).

(c) For each person required to be trained under § 763.92(a) (1) and (2), the local education agency shall provide the person's name and job title, the date that training was completed by that person, the location of the training, and the number of hours completed in such training.

(d) For each time that periodic surveillance under § 763.92(b) is performed, the local education agency shall record the name of each person performing the surveillance, the date of the surveillance, and any changes in the conditions of the materials.

(e) For each time that cleaning under § 763.91(c) is performed, the local education agency shall record the name of each person performing the cleaning, the date of such cleaning, the locations cleaned, and the methods used to perform such cleaning.

(f) For each time that operations and maintenance activities under § 763.91(d) are performed, the local education agency shall record the name of each person performing the activity, the start and completion dates of the activity, the locations where such activity occurred, a description of the activity including preventive measures used, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(g) For each time that major asbestos activity under § 763.91(e) is performed, the local education agency shall provide the name and signature, State of accreditation, and if applicable, the accreditation number of each person performing the activity, the start and completion dates of the activity, the locations where such activity occurred, a description of the activity including preventive measures used, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(h) For each fiber release episode under § 763.91(f), the local education agency shall provide the date and location of the episode, the method of repair, preventive measures or response action taken, the name of each person performing the work, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(Approved by the Office of Management and Budget under control number 2070–0091)

§ 763.95 **Warning labels.**

(a) The local education agency shall attach a warning label immediately adjacent to any friable and nonfriable ACBM and suspected ACBM assumed to be ACM located in routine maintenance areas (such as boiler rooms) at each school building. This shall include:

(1) Friable ACBM that was responded to by a means other than removal.

(2) ACBM for which no response action was carried out.

(b) All labels shall be prominently displayed in readily visible locations and shall remain posted until the ACBM that is labeled is removed.

(c) The warning label shall read, in print which is readily visible because of large size or bright color, as follows: CAUTION: ASBESTOS. HAZARDOUS. DO NOT DISTURB WITHOUT PROPER TRAINING AND EQUIPMENT.

§ 763.97 **Compliance and enforcement.**

(a) *Compliance with Title II of the Act.* (1) Section 207(a) of Title II of the Act (15 U.S.C. 2647) makes it unlawful for any local education agency to:

(i) Fail to conduct inspections pursuant to section 203(b) of Title II of the Act, including failure to follow procedures and failure to use accredited personnel and laboratories.

(ii) Knowingly submit false information to the Governor regarding any inspection pursuant to regulations under section 203(i) of Title II of the Act.

(iii) Fail to develop a management plan pursuant to regulations under section 203(i) of Title II of the Act.

(2) Section 207(a) of Title II of the Act (15 U.S.C. 2647) also provides that any local education agency which violates any provision of section 207 shall be liable for a civil penalty of not more than $5,000 for each day during which the violation continues. For the purposes of this subpart, a "violation" means a failure to comply with respect to a single school building.

(b) *Compliance with Title I of the Act.* (1) Section 15(1)(D) of Title I of the Act (15 U.S.C. 2614) makes it unlawful for

**Environmental Protection Agency** §763.98

any person to fail or refuse to comply
with any requirement of Title II or any
rule promulgated or order issued under
Title II. Therefore, any person who vio-
lates any requirement of this subpart
is in violation of section 15 of Title I of
the Act.

(2) Section 15(3) of Title I of the Act
(15 U.S.C. 2614) makes it unlawful for
any person to fail or refuse to establish
or maintain records, submit reports,
notices or other information, or permit
access to or copying of records, as re-
quired by this Act or a rule thereunder.

(3) Section 15(4) (15 U.S.C. 2614) of
Title I of the Act makes it unlawful for
any person to fail or refuse to permit
entry or inspection as required by sec-
tion 11 of Title I of the Act.

(4) Section 16(a) of Title I of the Act
(15 U.S.C. 2615) provides that any per-
son who violates any provision of sec-
tion 15 of Title I of the Act shall be lia-
ble to the United States for a civil pen-
alty in an amount not to exceed $25,000
for each such violation. Each day such
a violation continues shall, for pur-
poses of this paragraph, constitute a
separate violation of section 15. A local
education agency is not liable for any
civil penalty under Title I of the Act
for failing or refusing to comply with
any rule promulgated or order issued
under Title II of the Act.

(c) *Criminal penalties.* If any violation
committed by any person (including a
local education agency) is knowing or
willful, criminal penalties may be as-
sessed under section 16(b) of Title I of
the Act.

(d) *Injunctive relief.* The Agency may
obtain injunctive relief under section
208(b) of Title II of the Act to respond
to a hazard which poses an imminent
and substantial endangerment to
human health or the environment or
section 17 (15 U.S.C. 2616) of Title I of
the Act to restrain any violation of
section 15 of Title I of the Act or to
compel the taking of any action re-
quired by or under Title I of the Act.

(e) *Citizen complaints.* Any citizen who
wishes to file a complaint pursuant to
section 207(d) of Title II of the Act
should direct the complaint to the Gov-
ernor of the State or the EPA Asbestos
Ombudsman, 1200 Pennsylvania Ave.,
NW., Washington, DC 20460. The citizen
complaint should be in writing and

identified as a citizen complaint pursu-
ant to section 207(d) of Title II of
TSCA. The EPA Asbestos Ombudsman
or the Governor shall investigate and
respond to the complaint within a rea-
sonable period of time if the allega-
tions provide a reasonable basis to be-
lieve that a violation of the Act has oc-
curred.

(f) *Inspections.* EPA may conduct in-
spections and review management
plans under section 11 of Title I of the
Act (15 U.S.C. 2610) to ensure compli-
ance.

**§763.98  Waiver; delegation to State.**

(a) *General.* (1) Upon request from a
state Governor and after notice and
comment and an opportunity for a pub-
lic hearing in accordance with para-
graphs (b) and (c) of this section, EPA
may waive some or all of the require-
ments of this subpart E if the state has
established and is implementing or in-
tends to implement a program of asbes-
tos inspection and management that
contains requirements that are at least
as stringent as the requirements of this
subpart. In addition, if the state choos-
es to receive electronic documents, the
state program must include, at a min-
imum, the requirements of 40 CFR part
3—(Electronic reporting).

(2) A waiver from any requirement of
this subpart E shall apply only to the
specific provision for which a waiver
has been granted under this section.
All requirements of this subpart E
shall apply until a waiver is granted
under this section.

(b) *Request.* Each request by a Gov-
ernor to waive any requirement of this
subpart E shall be sent with three com-
plete copies of the request to the Re-
gional Administrator for the EPA Re-
gion in which the State is located and
shall include:

(1) A copy of the State provisions or
proposed provisions relating to its pro-
gram of asbestos inspection and man-
agement in schools for which the re-
quest is made.

(2)(i) The name of the State agency
that is or will be responsible for admin-
istering and enforcing the require-
ments for which a waiver is requested,
the names and job titles of responsible
officials in that agency, and phone

861

numbers where the officials can be contacted.

(ii) In the event that more than one agency is or will be responsible for administering and enforcing the requirements for which a waiver is requested, a description of the functions to be performed by each agency, how the program will be coordinated by the lead agency to ensure consistency and effective administration in the asbestos inspection and management program within the State, the names and job titles of responsible officials in the agencies, and phone numbers where the officials can be contacted. The lead agency will serve as the central contact point for the EPA.

(3) Detailed reasons, supporting papers, and the rationale for concluding that the state's asbestos inspection and management program provisions for which the request is made are at least as stringent as the requirements of Subpart E of this part, and that, if the state chooses to receive electronic documents, the state program includes, at a minimum, the requirements of 40 CFR part 3—(Electronic reporting).

(4) A discussion of any special situations, problems, and needs pertaining to the waiver request accompanied by an explanation of how the State intends to handle them.

(5) A statement of the resources that the State intends to devote to the administration and enforcement of the provisions relating to the waiver request.

(6) Copies of any specific or enabling State laws (enacted and pending enactment) and regulations (promulgated and pending promulgation) relating to the request, including provisions for assessing criminal and/or civil penalties.

(7) Assurance from the Governor, the Attorney General, or the legal counsel of the lead agency that the lead agency or other cooperating agencies have the legal authority necessary to carry out the requirements relating to the request.

(c) *General notice—hearing.* (1) Within 30 days after receipt of a request for a waiver, EPA will determine the completeness of the request. If EPA does not request further information within

the 30-day period, the request will be deemed complete.

(2) Within 30 days after EPA determines that a request is complete, EPA will issue for publication in the FEDERAL REGISTER a notice that announces receipt of the request, describes the information submitted under paragraph (b) of this section, and solicits written comment from interested members of the public. Comments must be submitted within 60 days.

(3) If, during the comment period, EPA receives a written objection to a Governor's request and a request for a public hearing detailing specific objections to the granting of a waiver, EPA will schedule a public hearing to be held in the affected State after the close of the comment period and will announce the public hearing date in the FEDERAL REGISTER before the date of the hearing. Each comment shall include the name and address of the person submitting the comment.

(d) *Criteria.* EPA may waive some or all of the requirements of subpart E of this part if:

(1) The State's lead agency and other cooperating agencies have the legal authority necessary to carry out the provisions of asbestos inspection and management in schools relating to the waiver request.

(2) The State's program of asbestos inspection and management in schools relating to the waiver request and implementation of the program are or will be at least as stringent as the requirements of this subpart E.

(3) The state has an enforcement mechanism to allow it to implement the program described in the waiver request and any electronic reporting requirements are at least as stringent as 40 CFR part 3—(Electronic reporting).

(4) The lead agency and any cooperating agencies have or will have qualified personnel to carry out the provisions relating to the waiver request.

(5) The State will devote adequate resources to the administration and enforcement of the asbestos inspection and management provisions relating to the waiver request.

(6) When specified by EPA, the State gives satisfactory assurances that necessary steps, including specific actions it proposes to take and a time schedule

**Environmental Protection Agency**                                §763.99

for their accomplishment, will be taken within a reasonable time to conform with applicable criteria under paragraphs (d)(2) through (4) of this section.

(e) *Decision*. EPA will issue for publication in the FEDERAL REGISTER a notice announcing its decision to grant or deny, in whole or in part, a Governor's request for a waiver from some or all of the requirements of this subpart E within 30 days after the close of the comment period or within 30 days following a public hearing, whichever is applicable. The notice will include the Agency's reasons and rationale for granting or denying the Governor's request. The 30-day period may be extended if mutually agreed upon by EPA and the State.

(f) *Modifications*. When any substantial change is made in the administration or enforcement of a State program for which a waiver was granted under this section, a responsible official in the lead agency shall submit such changes to EPA.

(g) *Reports*. The lead agency in each State that has been granted a waiver by EPA from any requirement of subpart E of this part shall submit a report to the Regional Administrator for the Region in which the State is located at least once every 12 months to include the following information:

(1) A summary of the State's implementation and enforcement activities during the last reporting period relating to provisions waived under this section, including enforcement actions taken.

(2) Any changes in the administration or enforcement of the State program implemented during the last reporting period.

(3) Other reports as may be required by EPA to carry out effective oversight of any requirement of this subpart E that was waived under this section.

(h) *Oversight*. EPA may periodically evaluate the adequacy of a State's implementation and enforcement of and resources devoted to carrying out requirements relating to the waiver. This evaluation may include, but is not limited to, site visits to local education agencies without prior notice to the State.

(i) *Informal conference*. (1) EPA may request that an informal conference be held between appropriate State and EPA officials when EPA has reason to believe that a State has failed to:

(i) Substantially comply with the terms of any provision that was waived under this section.

(ii) Meet the criteria under paragraph (d) of this section, including the failure to carry out enforcement activities or act on violations of the State program.

(2) EPA will:

(i) Specify to the State those aspects of the State's program believed to be inadequate.

(ii) Specify to the State the facts that underlie the belief of inadequacy.

(3) If EPA finds, on the basis of information submitted by the State at the conference, that deficiencies did not exist or were corrected by the State, no further action is required.

(4) Where EPA finds that deficiencies in the State program exist, a plan to correct the deficiencies shall be negotiated between the State and EPA. The plan shall detail the deficiencies found in the State program, specify the steps the State has taken or will take to remedy the deficiencies, and establish a schedule for each remedial action to be initiated.

(j) *Rescission*. (1) If the State fails to meet with EPA or fails to correct deficiencies raised at the informal conference, EPA will deliver to the Governor of the State and a responsible official in the lead agency a written notice of its intent to rescind, in whole or part, the waiver.

(2) EPA will issue for publication in the FEDERAL REGISTER a notice that announces the rescission of the waiver, describes those aspects of the State's program determined to be inadequate, and specifies the facts that underlie the findings of inadequacy.

[52 FR 41846, Oct. 30, 1987, as amended at 70 FR 59889, Oct. 13, 2005]

**§763.99   Exclusions.**

(a) A local education agency shall not be required to perform an inspection under §763.85(a) in any sampling area as defined in 40 CFR 763.103 or homogeneous area of a school building where:

(1) An accredited inspector has determined that, based on sampling records, friable ACBM was identified in that homogeneous or sampling area during an inspection conducted before December 14, 1987. The inspector shall sign and date a statement to that effect with his or her State of accreditation and if applicable, accreditation number and, within 30 days after such determination, submit a copy of the statement to the person designated under § 763.84 for inclusion in the management plan. However, an accredited inspector shall assess the friable ACBM under § 763.88.

(2) An accredited inspector has determined that, based on sampling records, nonfriable ACBM was identified in that homogeneous or sampling area during an inspection conducted before December 14, 1987. The inspector shall sign and date a statement to that effect with his or her State of accreditation and if applicable, accreditation number and, within 30 days after such determination, submit a copy of the statement to the person designated under § 763.84 for inclusion in the management plan. However, an accredited inspector shall identify whether material that was nonfriable has become friable since that previous inspection and shall assess the newly-friable ACBM under § 763.88.

(3) Based on sampling records and inspection records, an accredited inspector has determined that no ACBM is present in the homogeneous or sampling area and the records show that the area was sampled, before December 14, 1987 in substantial compliance with § 763.85(a), which for purposes of this section means in a random manner and with a sufficient number of samples to reasonably ensure that the area is not ACBM.

(i) The accredited inspector shall sign and date a statement, with his or her State of accreditation and if applicable, accreditation number that the homogeneous or sampling area determined not to be ACBM was sampled in substantial compliance with § 763.85(a).

(ii) Within 30 days after the inspector's determination, the local education agency shall submit a copy of the inspector's statement to the EPA Regional Office and shall include the statement in the management plan for that school.

(4) The lead agency responsible for asbestos inspection in a State that has been granted a waiver from § 763.85(a) has determined that, based on sampling records and inspection records, no ACBM is present in the homogeneous or sampling area and the records show that the area was sampled before December 14, 1987, in substantial compliance with § 763.85(a). Such determination shall be included in the management plan for that school.

(5) An accredited inspector has determined that, based on records of an inspection conducted before December 14, 1987, suspected ACBM identified in that homogeneous or sampling area is assumed to be ACM. The inspector shall sign and date a statement to that effect, with his or her State of accreditation and if applicable, accreditation number and, within 30 days of such determination, submit a copy of the statement to the person designated under § 763.84 for inclusion in the management plan. However, an accredited inspector shall identify whether material that was nonfriable suspected ACBM assumed to be ACM has become friable since the previous inspection and shall assess the newly friable material and previously identified friable suspected ACBM assumed to be ACM under § 763.88.

(6) Based on inspection records and contractor and clearance records, an accredited inspector has determined that no ACBM is present in the homogeneous or sampling area where asbestos removal operations have been conducted before December 14, 1987, and shall sign and date a statement to that effect and include his or her State of accreditation and, if applicable, accreditation number. The local education agency shall submit a copy of the statement to the EPA Regional Office and shall include the statement in the management plan for that school.

(7) An architect or project engineer responsible for the construction of a new school building built after October 12, 1988, or an accredited inspector signs a statement that no ACBM was specified as a building material in any

construction document for the building, or, to the best of his or her knowledge, no ACBM was used as a building material in the building. The local education agency shall submit a copy of the signed statement of the architect, project engineer, or accredited inspector to the EPA Regional Office and shall include the statement in the management plan for that school.

(b) The exclusion, under paragraphs (a) (1) through (4) of this section, from conducting the inspection under §763.85(a) shall apply only to homogeneous or sampling areas of a school building that were inspected and sampled before October 17, 1987. The local education agency shall conduct an inspection under §763.85(a) of all areas inspected before October 17, 1987, that were not sampled or were not assumed to be ACM.

(c) If ACBM is subsequently found in a homogeneous or sampling area of a local education agency that had been identified as receiving an exclusion by an accredited inspector under paragraphs (a) (3), (4), (5) of this section, or an architect, project engineer or accredited inspector under paragraph (a)(7) of this section, the local education agency shall have 180 days following the date of identification of ACBM to comply with this subpart E.

APPENDIX A TO SUBPART E OF PART 763—INTERIM TRANSMISSION ELECTRON MICROSCOPY ANALYTICAL METHODS—MANDATORY AND NONMANDATORY—AND MANDATORY SECTION TO DETERMINE COMPLETION OF RESPONSE ACTIONS

*I. Introduction*

The following appendix contains three units. The first unit is the mandatory transmission electron microscopy (TEM) method which all laboratories must follow; it is the minimum requirement for analysis of air samples for asbestos by TEM. The mandatory method contains the essential elements of the TEM method. The second unit contains the complete non-mandatory method. The non-mandatory method supplements the mandatory method by including additional steps to improve the analysis. EPA recommends that the non-mandatory method be employed for analyzing air filters; however, the laboratory may choose to employ the mandatory method. The non-mandatory method contains the same minimum require-

ments as are outlined in the mandatory method. Hence, laboratories may choose either of the two methods for analyzing air samples by TEM.

The final unit of this Appendix A to subpart E defines the steps which must be taken to determine completion of response actions. This unit is mandatory.

*II. Mandatory Transmission Electron Microscopy Method*

A. Definitions of Terms

1. *Analytical sensitivity*—Airborne asbestos concentration represented by each fiber counted under the electron microscope. It is determined by the air volume collected and the proportion of the filter examined. This method requires that the analytical sensitivity be no greater than 0.005 structures/$cm^3$.

2. *Asbestiform*—A specific type of mineral fibrosity in which the fibers and fibrils possess high tensile strength and flexibility.

3. *Aspect ratio*—A ratio of the length to the width of a particle. Minimum aspect ratio as defined by this method is equal to or greater than 5:1.

4. *Bundle*—A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

5. *Clean area*—A controlled environment which is maintained and monitored to assure a low probability of asbestos contamination to materials in that space. Clean areas used in this method have HEPA filtered air under positive pressure and are capable of sustained operation with an open laboratory blank which on subsequent analysis has an average of less than 18 structures/$mm^2$ in an area of 0.057 $mm^2$ (nominally 10 200-mesh grid openings) and a maximum of 53 structures/$mm^2$ for any single preparation for that same area.

6. *Cluster*—A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

7. *ED*—Electron diffraction.

8. *EDXA*—Energy dispersive X-ray analysis.

9. *Fiber*—A structure greater than or equal to 0.5 µm in length with an aspect ratio (length to width) of 5:1 or greater and having substantially parallel sides.

10. *Grid*—An open structure for mounting on the sample to aid in its examination in the TEM. The term is used here to denote a 200-mesh copper lattice approximately 3 mm in diameter.

11. *Intersection*—Nonparallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater.

12. *Laboratory sample coordinator*—That person responsible for the conduct of sample

**Pt. 763, Subpt. E, App. A**                    **40 CFR Ch. I (7–1–11 Edition)**

handling and the certification of the testing procedures.

13. *Filter background level*—The concentration of structures per square millimeter of filter that is considered indistinguishable from the concentration measured on a blank (filters through which no air has been drawn). For this method the filter background level is defined as 70 structures/mm².

14. *Matrix*—Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

15. *NSD*—No structure detected.

16. *Operator*—A person responsible for the TEM instrumental analysis of the sample.

17. *PCM*—Phase contrast microscopy.

18. *SAED*—Selected area electron diffraction.

19. *SEM*—Scanning electron microscope.

20. *STEM*—Scanning transmission electron microscope.

21. *Structure*—a microscopic bundle, cluster, fiber, or matrix which may contain asbestos.

22. *S/cm³*—Structures per cubic centimeter.

23. *S/mm²*—Structures per square millimeter.

24. *TEM*—Transmission electron microscope.

B. Sampling

1. The sampling agency must have written quality control procedures and documents which verify compliance.

2. Sampling operations must be performed by qualified individuals completely independent of the abatement contractor to avoid possible conflict of interest (References 1, 2, 3, and 5 of Unit II.J.).

3. Sampling for airborne asbestos following an abatement action must use commercially available cassettes.

4. Prescreen the loaded cassette collection filters to assure that they do not contain concentrations of asbestos which may interfere with the analysis of the sample. A filter blank average of less than 18 s/mm² in an area of 0.057 mm² (nominally 10 200-mesh grid openings) and a single preparation with a maximum of 53 s/mm² for that same area is acceptable for this method.

5. Use sample collection filters which are either polycarbonate having a pore size less than or equal to 0.4 μm or mixed cellulose ester having a pore size less than or equal to 0.45 μm.

6. Place these filters in series with a 5.0 μm backup filter (to serve as a diffuser) and a support pad. See the following Figure 1:

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

FIGURE I--SAMPLING CASSETTE CONFIGURATION



7. Reloading of used cassettes is not permitted.

8. Orient the cassette downward at approximately 45 degrees from the horizontal.

9. Maintain a log of all pertinent sampling information.

867

10. Calibrate sampling pumps and their flow indicators over the range of their intended use with a recognized standard. Assemble the sampling system with a representative filter (not the filter which will be used in sampling) before and after the sampling operation.

11. Record all calibration information.

12. Ensure that the mechanical vibrations from the pump will be minimized to prevent transferral of vibration to the cassette.

13. Ensure that a continuous smooth flow of negative pressure is delivered by the pump by damping out any pump action fluctuations if necessary.

14. The final plastic barrier around the abatement area remains in place for the sampling period.

15. After the area has passed a thorough visual inspection, use aggressive sampling conditions to dislodge any remaining dust. (See suggested protocol in Unit III.B.7.d.)

16. Select an appropriate flow rate equal to or greater than 1 liter per minute (L/min) or less than 10 L/min for 25 mm cassettes. Larger filters may be operated at proportionally higher flow rates.

17. A minimum of 13 samples are to be collected for each testing site consisting of the following:

a. A minimum of five samples per abatement area.

b. A minimum of five samples per ambient area positioned at locations representative of the air entering the abatement site.

c. Two field blanks are to be taken by removing the cap for not more than 30 seconds and replacing it at the time of sampling before sampling is initiated at the following places:

i. Near the entrance to each abatement area.

ii. At one of the ambient sites. (DO NOT leave the field blanks open during the sampling period.)

d. A sealed blank is to be carried with each sample set. This representative cassette is not to be opened in the field.

18. Perform a leak check of the sampling system at each indoor and outdoor sampling site by activating the pump with the closed sampling cassette in line. Any flow indicates a leak which must be eliminated before initiating the sampling operation.

19. The following Table I specifies volume ranges to be used:

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**



TABLE 1--NUMBER OF 200 MESH EM GRID OPENINGS (0.0057 MM$^2$) THAT NEED TO BE ANALYZED TO MAINTAIN SENSITIVITY OF 0.005 STRUCTURES/CC BASED ON VOLUME AND EFFECTIVE FILTER AREA

| Volume (liters) | # of grid openings | | Volume (liters) | # of grid openings |
|---|---|---|---|---|
| 560 | 24 | | 1,250 | 24 |
| 600 | 23 | | 1,300 | 23 |
| 700 | 19 | | 1,400 | 21 |
| 800 | 17 | | 1,600 | 19 |
| 900 | 15 | | 1,800 | 17 |
| 1,000 | 14 | | 2,000 | 15 |
| 1,100 | 12 | | 2,200 | 14 |
| 1,200 | 11 | | 2,400 | 13 |
| 1,300 | 10 | | 2,600 | 12 |
| 1,400 | 10 | | 2,800 | 11 |
| 1,500 | 9 | | 3,000 | 10 |
| 1,600 | 8 | | 3,200 | 9 |
| 1,700 | 8 | | 3,400 | 9 |
| 1,800 | 8 | | 3,600 | 8 |
| 1,900 | 7 | | 3,800 | 8 |
| 2,000 | 7 | | 4,000 | 8 |
| 2,100 | 6 | | 4,200 | 7 |
| 2,200 | 6 | | 4,400 | 7 |
| 2,300 | 6 | | 4,600 | 7 |
| 2,400 | 6 | | 4,800 | 6 |
| 2,500 | 5 | | 5,000 | 6 |
| 2,600 | 5 | | 5,200 | 6 |
| 2,700 | 5 | | 5,400 | 6 |
| 2,800 | 5 | | 5,600 | 5 |
| 2,900 | 5 | | 5,800 | 5 |
| 3,000 | 5 | | 6,000 | 5 |
| 3,100 | 4 | | 6,200 | 5 |
| 3,200 | 4 | | 6,400 | 5 |
| 3,300 | 4 | | 6,600 | 5 |
| 3,400 | 4 | | 6,800 | 4 |
| 3,500 | 4 | | 7,000 | 4 |
| 3,600 | 4 | | 7,200 | 4 |
| 3,700 | 4 | | 7,400 | 4 |
| 3,800 | 4 | | 7,600 | 4 |

Effective Filter Area 385 sq mm (left table); Effective Filter Area 855 sq mm (right table). Recommended Volume Range indicated for 1,200–1,800 liters (left) and 2,800–4,000 liters (right).

Note minimum volumes required:
25 mm : 560 liters
37 mm : 1250 liters

Filter diameter of 25 mm = effective area of 385 sq mm
Filter diameter of 37 mm = effective area of 855 sq mm

20. Ensure that the sampler is turned upright before interrupting the pump flow.

21. Check that all samples are clearly labeled and that all pertinent information has been enclosed before transfer of the samples to the laboratory.

22. Ensure that the samples are stored in a secure and representative location.

23. Do not change containers if portions of these filters are taken for other purposes.

24. A summary of Sample Data Quality Objectives is shown in the following Table II:

TABLE II--SUMMARY OF SAMPLING AGENCY DATA QUALITY OBJECTIVES

This table summarizes the data quality objectives from the performance of this method in terms of precision, accuracy, completeness, representativeness, and comparability. These objectives are assured by the periodic control checks and reference checks listed here and described in the text of the method.

| Unit Operation | QC Check | Frequency | Conformance Expectation |
|---|---|---|---|
| Sampling materials | Sealed blank | 1 per I/O site | 95% |
| Sample procedures | Field blanks | 2 per I/O site | 95% |
| | Pump calibration | Before and after each field series | 90% |
| Sample custody | Review of chain-of-custody record | Each sample | 95% complete |
| Sample shipment | Review of sending report | Each sample | 95% complete |

#### C. Sample Shipment

Ship bulk samples to the analytical laboratory in a separate container from air samples.

#### D. Sample Receiving

1. Designate one individual as sample coordinator at the laboratory. While that individual will normally be available to receive samples, the coordinator may train and supervise others in receiving procedures for those times when he/she is not available.

2. Bulk samples and air samples delivered to the analytical laboratory in the same container shall be rejected.

#### E. Sample Preparation

1. All sample preparation and analysis shall be performed by a laboratory independent of the abatement contractor.

2. Wet-wipe the exterior of the cassettes to minimize contamination possibilities before taking them into the clean room facility.

3. Perform sample preparation in a well-equipped clean facility.

NOTE: The clean area is required to have the following minimum characteristics. The area or hood must be capable of maintaining a positive pressure with make-up air being HEPA-filtered. The cumulative analytical blank concentration must average less than 18 s/mm² in an area of 0.057 mm² (nominally 10 200-mesh grid openings) and a single preparation with a maximum of 53 s/mm² for that same area.

4. Preparation areas for air samples must not only be separated from preparation areas for bulk samples, but they must be prepared in separate rooms.

5. Direct preparation techniques are required. The object is to produce an intact film containing the particulates of the filter surface which is sufficiently clear for TEM analysis.

a. TEM Grid Opening Area measurement must be done as follows:

i. The filter portion being used for sample preparation must have the surface collapsed using an acetone vapor technique.

ii. Measure 20 grid openings on each of 20 random 200-mesh copper grids by placing a grid on a glass and examining it under the PCM. Use a calibrated graticule to measure the average field diameters. From the data, calculate the field area for an average grid opening.

iii. Measurements can also be made on the TEM at a properly calibrated low magnification or on an optical microscope at a magnification of approximately 400X by using an eyepiece fitted with a scale that has been calibrated against a stage micrometer. Optical microscopy utilizing manual or automated procedures may be used providing instrument calibration can be verified.

b. TEM specimen preparation from polycarbonate (PC) filters. Procedures as described in Unit III.G. or other equivalent methods may be used.

c. TEM specimen preparation from mixed cellulose ester (MCE) filters.

i. Filter portion being used for sample preparation must have the surface collapsed using an acetone vapor technique or the Burdette procedure (Ref. 7 of Unit II.J.)

ii. Plasma etching of the collapsed filter is required. The microscope slide to which the collapsed filter pieces are attached is placed in a plasma asher. Because plasma ashers vary greatly in their performance, both from unit to unit and between different positions in the asher chamber, it is difficult to specify the conditions that should be used. Insufficient etching will result in a failure to expose embedded filters, and too much etching may result in loss of particulate from the surface. As an interim measure, it is recommended that the time for ashing of a

**Environmental Protection Agency**                                                    **Pt. 763, Subpt. E, App. A**

known weight of a collapsed filter be established and that the etching rate be calculated in terms of micrometers per second. The actual etching time used for the particulate asher and operating conditions will then be set such that a 1–2 μm (10 percent) layer of collapsed surface will be removed.

iii. Procedures as described in Unit III. or other equivalent methods may be used to prepare samples.

### F. TEM Method

1. An 80–120 kV TEM capable of performing electron diffraction with a fluorescent screen inscribed with calibrated gradations is required. If the TEM is equipped with EDXA it must either have a STEM attachment or be capable of producing a spot less than 250 nm in diameter at crossover. The microscope shall be calibrated routinely for magnification and camera constant.

2. *Determination of Camera Constant and ED Pattern Analysis.* The camera length of the TEM in ED operating mode must be calibrated before ED patterns on unknown samples are observed. This can be achieved by using a carbon-coated grid on which a thin film of gold has been sputtered or evaporated. A thin film of gold is evaporated on the specimen TEM grid to obtain zone-axis ED patterns superimposed with a ring pattern from the polycrystalline gold film. In practice, it is desirable to optimize the thickness of the gold film so that only one or two sharp rings are obtained on the superimposed ED pattern. Thicker gold film would normally give multiple gold rings, but it will tend to mask weaker diffraction spots from the unknown fibrous particulate. Since the unknown d-spacings of most interest in asbestos analysis are those which lie closest to the transmitted beam, multiple gold rings are unnecessary on zone-axis ED patterns. An average camera constant using multiple gold rings can be determined. The camera constant is one-half the diameter of the rings times the interplanar spacing of the ring being measured.

3. *Magnification Calibration.* The magnification calibration must be done at the fluorescent screen. The TEM must be calibrated at the grid opening magnification (if used) and also at the magnification used for fiber counting. This is performed with a cross grating replica (e.g., one containing 2,160 lines/mm). Define a field of view on the fluorescent screen either by markings or physical boundaries. The field of view must be measurable or previously inscribed with a scale or concentric circles (all scales should

be metric). A logbook must be maintained, and the dates of calibration and the values obtained must be recorded. The frequency of calibration depends on the past history of the particular microscope. After any maintenance of the microscope that involved adjustment of the power supplied to the lenses or the high-voltage system or the mechanical disassembly of the electron optical column apart from filament exchange, the magnification must be recalibrated. Before the TEM calibration is performed, the analyst must ensure that the cross grating replica is placed at the same distance from the objective lens as the specimens are. For instruments that incorporate a eucentric tilting specimen stage, all specimens and the cross grating replica must be placed at the eucentric position.

4. While not required on every microscope in the laboratory, the laboratory must have either one microscope equipped with energy dispersive X-ray analysis or access to an equivalent system on a TEM in another laboratory.

5. Microscope settings: 80–120 kV, grid assessment 250–1,000X, then 15,000–20,000X screen magnification for analysis.

6. Approximately one-half (0.5) of the predetermined sample area to be analyzed shall be performed on one sample grid preparation and the remaining half on a second sample grid preparation.

7. Individual grid openings with greater than 5 percent openings (holes) or covered with greater than 25 percent particulate matter or obviously having nonuniform loading must not be analyzed.

8. Reject the grid if:

a. Less than 50 percent of the grid openings covered by the replica are intact.

b. The replica is doubled or folded.

c. The replica is too dark because of incomplete dissolution of the filter.

9. *Recording Rules.*

a. Any continuous grouping of particles in which an asbestos fiber with an aspect ratio greater than or equal to 5:1 and a length greater than or equal to 0.5 μm is detected shall be recorded on the count sheet. These will be designated asbestos structures and will be classified as fibers, bundles, clusters, or matrices. Record as individual fibers any contiguous grouping having 0, 1, or 2 definable intersections. Groupings having more than 2 intersections are to be described as cluster or matrix. An intersection is a non-parallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater. See the following Figure 2:

FIGURE 2--COUNTING GUIDELINES USED IN
DETERMINING ASBESTOS STRUCTURES

Count as 1 fiber; 1 Structure; no intersections.



Count as 2 fibers if space between fibers is greater than width of 1 fiber
diameter or number of intersections is equal to or less than 1.



Count as 3 structures if space between fibers is greater than width of 1 fiber
diameter or if the number of intersections is equal to or less than 2.



Count bundles as 1 structure; 3 or more parallel fibrils less
than 1 fiber diameter separation.



**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**



i. *Fiber.* A structure having a minimum length greater than or equal to 0.5 μm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed.

ii. *Bundle.* A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

iii. *Cluster.* A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

iv. *Matrix.* Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

b. Separate categories will be maintained for fibers less than 5 μm and for fibers equal to or greater than 5 μm in length.

c. Record NSD when no structures are detected in the field.

d. Visual identification of electron diffraction (ED) patterns is required for each asbestos structure counted which would cause the

873

**Pt. 763, Subpt. E, App. A**

**40 CFR Ch. I (7–1–11 Edition)**

analysis to exceed the 70 s/mm² concentration. (Generally this means the first four fibers identified as asbestos must exhibit an identifiable diffraction pattern for chrysotile or amphibole.)

e. The micrograph number of the recorded diffraction patterns must be reported to the client and maintained in the laboratory's quality assurance records. In the event that examination of the pattern by a qualified individual indicates that the pattern has been misidentified visually, the client shall be contacted.

f. Energy Dispersive X-ray Analysis (EDXA) is required of all amphiboles which would cause the analysis results to exceed the 70 s/mm² concentration. (Generally speaking, the first 4 amphiboles would require EDXA.)

g. If the number of fibers in the non-asbestos class would cause the analysis to exceed the 70 s/mm² concentration, the fact that they are not asbestos must be confirmed by EDXA or measurement of a zone axis diffraction pattern.

h. Fibers classified as chrysotile must be identified by diffraction or X-ray analysis and recorded on a count sheet. X-ray analysis alone can be used only after 70 s/mm² have been exceeded for a particular sample.

i. Fibers classified as amphiboles must be identified by X-ray analysis and electron diffraction and recorded on the count sheet. (X-ray analysis alone can be used only after 70 s/mm² have been exceeded for a particular sample.)

j. If a diffraction pattern was recorded on film, record the micrograph number on the count sheet.

k. If an electron diffraction was attempted but no pattern was observed, record N on the count sheet.

l. If an EDXA spectrum was attempted but not observed, record N on the count sheet.

m. If an X-ray analysis spectrum is stored, record the file and disk number on the count sheet.

10. Classification Rules.

a. *Fiber.* A structure having a minimum length greater than or equal to 0.5 μm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed.

b. *Bundle.* A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

c. *Cluster.* A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

d. *Matrix.* Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

11. After finishing with a grid, remove it from the microscope, and replace it in the appropriate grid holder. Sample grids must be stored for a minimum of 1 year from the date of the analysis; the sample cassette must be retained for a minimum of 30 days by the laboratory or returned at the client's request.

G. Sample Analytical Sequence

1. Under the present sampling requirements a minimum of 13 samples is to be collected for the clearance testing of an abatement site. These include five abatement area samples, five ambient samples, two field blanks, and one sealed blank.

2. Carry out visual inspection of work site prior to air monitoring.

3. Collect a minimum of 5 air samples inside the work site and 5 samples outside the work site. The indoor and outdoor samples shall be taken during the same time period.

4. Remaining steps in the analytical sequence are contained in Unit IV of this Appendix.

H. Reporting

1. The following information must be reported to the client for each sample analyzed:

a. Concentration in structures per square millimeter and structures per cubic centimeter.

b. Analytical sensitivity used for the analysis.

c. Number of asbestos structures.

d. Area analyzed.

e. Volume of air sampled (which must be initially supplied to lab by client).

f. Copy of the count sheet must be included with the report.

g. Signature of laboratory official to indicate that the laboratory met specifications of the method.

h. Report form must contain official laboratory identification (e.g., letterhead).

i. Type of asbestos.

I. Quality Control/Quality Assurance Procedures (Data Quality Indicators)

Monitoring the environment for airborne asbestos requires the use of sensitive sampling and analysis procedures. Because the test is sensitive, it may be influenced by a variety of factors. These include the supplies used in the sampling operation, the performance of the sampling, the preparation of the grid from the filter and the actual examination of this grid in the microscope. Each of these unit operations must produce a product of defined quality if the analytical result is to be a reliable and meaningful test result. Accordingly, a series of control checks and reference standards are to be performed along with the sample analysis as indicators that the materials used are adequate and the

874

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

operations are within acceptable limits. In this way, the quality of the data is defined and the results are of known value. These checks and tests also provide timely and specific warning of any problems which might develop within the sampling and analysis operations. A description of these quality control/quality assurance procedures is summarized in the following Table III:

TABLE III--SUMMARY OF LABORATORY DATA QUALITY OBJECTIVES

| Unit Operation | QC Check | Frequency | Conformance Expectation |
|---|---|---|---|
| Sample receiving | Review of receiving report | Each sample | 95% complete |
| Sample custody | Review of chain-of-custody record | Each sample | 95% complete |
| Sample preparation | Supplies and reagents | On receipt | Meet specs. or reject |
| | Grid opening size | 20 openings/20 grids/lot of 1000 or 1 opening/sample | 100% |
| | Special clean area monitoring | After cleaning or service | Meet specs or reclean |
| | Laboratory blank | 1 per prep series or 10% | Meet specs. or reanalyze series |
| | Plasma etch blank | 1 per 20 samples | 75% |
| | Multiple preps (3 per sample) | Each sample | One with cover of 15 complete grid sqs. |
| Sample analysis | System check | Each day | Each day |
| | Alignment check | Each day | Each day |
| | Magnification calibration with low and high standards | Each month or after service | 95% |
| | ED calibration by gold standard | Weekly | 95% |
| | EDS calibration by copper line | Daily | 95% |
| Performance check | Laboratory blank (measure of cleanliness) | Prep 1 per series or 10% read 1 per 25 samples | Meet specs or reanalyze series |
| | Replicate counting (measure of precision) | 1 per 100 samples | 1.5 x Poisson Std. Dev. |
| | Duplicate analysis (measure of reproducibility) | 1 per 100 samples | 2 x Poisson Std. Dev. |
| | Known samples of typical materials (working standards) | Training and for comparison with unknowns | 100% |
| | Analysis of NBS SRM 1876 and/or RM 8410 (measure of accuracy and comparability) | 1 per analyst per year | 1.5 x Poisson Std. Dev. |
| | Data entry review (data validation and measure of completeness) | Each sample | 95% |
| | Record and verify ID electron diffraction pattern of structure | 1 per 5 samples | 80% accuracy |
| Calculations and data reduction | Hand calculation of automated data reduction procedure or independent recalculation of hand-calculated data | 1 per 100 samples | 85% |

1. When the samples arrive at the laboratory, check the samples and documentation for completeness and requirements before initiating the analysis.
2. Check all laboratory reagents and supplies for acceptable asbestos background levels.
3. Conduct all sample preparation in a clean room environment monitored by laboratory blanks. Testing with blanks must also be done after cleaning or servicing the room.
4. Prepare multiple grids of each sample.

875

5. Provide laboratory blanks with each sample batch. Maintain a cumulative average of these results. If there are more than 53 fibers/mm² per 10 200-mesh grid openings, the system must be checked for possible sources of contamination.

6. Perform a system check on the transmission electron microscope daily.

7. Make periodic performance checks of magnification, electron diffraction and energy dispersive X-ray systems as set forth in Table III under Unit II.I.

8. Ensure qualified operator performance by evaluation of replicate analysis and standard sample comparisons as set forth in Table III under Unit II.I.

9. Validate all data entries.

10. Recalculate a percentage of all computations and automatic data reduction steps as set forth in Table III under Unit II.I.

11. Record an electron diffraction pattern of one asbestos structure from every five samples that contain asbestos. Verify the identification of the pattern by measurement or comparison of the pattern with patterns collected from standards under the same conditions. The records must also demonstrate that the identification of the pattern has been verified by a qualified individual and that the operator who made the identification is maintaining at least an 80 percent correct visual identification based on his measured patterns.

12. Appropriate logs or records must be maintained by the analytical laboratory verifying that it is in compliance with the mandatory quality assurance procedures.

J. References

For additional background information on this method, the following references should be consulted.

1. "Guidance for Controlling Asbestos-Containing Materials in Buildings," EPA 560/5–85–024, June 1985.

2. "Measuring Airborne Asbestos Following an Abatement Action," USEPA, Office of Pollution Prevention and Toxics, EPA 600/4–85–049, 1985.

3. Small, John and E. Steel. Asbestos Standards: Materials and Analytical Methods. N.B.S. Special Publication 619, 1982.

4. Campbell, W.J., R.L. Blake, L.L. Brown, E.E. Cather, and J.J. Sjoberg. Selected Silicate Minerals and Their Asbestiform Varieties. Information Circular 8751, U.S. Bureau of Mines, 1977.

5. Quality Assurance Handbook for Air Pollution Measurement System. Ambient Air Methods, EPA 600/4–77–027a, USEPA, Office of Research and Development, 1977.

6. Method 2A: Direct Measurement of Gas Volume through Pipes and Small Ducts. 40 CFR Part 60 Appendix A.

7. Burdette, G.J., Health & Safety Exec. Research & Lab. Services Div., London,

"Proposed Analytical Method for Determination of Asbestos in Air."

8. Chatfield, E.J., Chatfield Tech. Cons., Ltd., Clark, T., PEI Assoc., "Standard Operating Procedure for Determination of Airborne Asbestos Fibers by Transmission Electron Microscopy Using Polycarbonate Membrane Filters," WERL SOP 87–1, March 5, 1987.

9. NIOSH Method 7402 for Asbestos Fibers, 12–11–86 Draft.

10. Yamate, G., Agarwall, S.C., Gibbons, R.D., IIT Research Institute, "Methodology for the Measurement of Airborne Asbestos by Electron Microscopy," Draft report, USEPA Contract 68–02–3266, July 1984.

11. "Guidance to the Preparation of Quality Assurance Project Plans," USEPA, Office of Pollution Prevention and Toxics, 1984.

*III. Nonmandatory Transmission Electron Microscopy Method*

A. Definitions of Terms

1. *Analytical sensitivity*—Airborne asbestos concentration represented by each fiber counted under the electron microscope. It is determined by the air volume collected and the proportion of the filter examined. This method requires that the analytical sensitivity be no greater than 0.005 s/cm³.

2. *Asbestiform*—A specific type of mineral fibrosity in which the fibers and fibrils possess high tensile strength and flexibility.

3. *Aspect ratio*—A ratio of the length to the width of a particle. Minimum aspect ratio as defined by this method is equal to or greater than 5:1.

4. *Bundle*—A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

5. *Clean area*—A controlled environment which is maintained and monitored to assure a low probability of asbestos contamination to materials in that space. Clean areas used in this method have HEPA filtered air under positive pressure and are capable of sustained operation with an open laboratory blank which on subsequent analysis has an average of less than 18 structures/mm² in an area of 0.057 mm² (nominally 10 200 mesh grid openings) and a maximum of 53 structures/mm² for no more than one single preparation for that same area.

6. *Cluster*—A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

7. *ED*—Electron diffraction.

8. *EDXA*—Energy dispersive X-ray analysis.

9. *Fiber*—A structure greater than or equal to 0.5 µm in length with an aspect ratio (length to width) of 5:1 or greater and having substantially parallel sides.

10. *Grid*—An open structure for mounting on the sample to aid in its examination in the TEM. The term is used here to denote a 200-mesh copper lattice approximately 3 mm in diameter.

11. *Intersection*—Nonparallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater.

12. *Laboratory sample coordinator*—That person responsible for the conduct of sample handling and the certification of the testing procedures.

13. *Filter background level*—The concentration of structures per square millimeter of filter that is considered indistinguishable from the concentration measured on blanks (filters through which no air has been drawn). For this method the filter background level is defined as 70 structures/mm².

14. *Matrix*—Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

15. *NSD*—No structure detected.

16. *Operator*—A person responsible for the TEM instrumental analysis of the sample.

17. *PCM*—Phase contrast microscopy.

18. *SAED*—Selected area electron diffraction.

19. *SEM*—Scanning electron microscope.

20. *STEM*—Scanning transmission electron microscope.

21. *Structure*—a microscopic bundle, cluster, fiber, or matrix which may contain asbestos.

22. *S/cm³*—Structures per cubic centimeter.

23. *S/mm²*—Structures per square millimeter.

24. *TEM*—Transmission electron microscope.

### B. Sampling

1. Sampling operations must be performed by qualified individuals completely independent of the abatement contractor to avoid possible conflict of interest (See References 1, 2, and 5 of Unit III.L.) Special precautions should be taken to avoid contamination of the sample. For example, materials that have not been prescreened for their asbestos background content should not be used; also, sample handling procedures which do not take cross contamination possibilities into account should not be used.

2. Material and supply checks for asbestos contamination should be made on all critical supplies, reagents, and procedures before their use in a monitoring study.

3. Quality control and quality assurance steps are needed to identify problem areas and isolate the cause of the contamination (see Reference 5 of Unit III.L.). Control checks shall be permanently recorded to document the quality of the information produced. The sampling firm must have written quality control procedures and documents which verify compliance. Independent audits by a qualified consultant or firm should be performed once a year. All documentation of compliance should be retained indefinitely to provide a guarantee of quality. A summary of Sample Data Quality Objectives is shown in Table II of Unit II.B.

4. Sampling materials.

a. Sample for airborne asbestos following an abatement action using commercially available cassettes.

b. Use either a cowling or a filter-retaining middle piece. Conductive material may reduce the potential for particulates to adhere to the walls of the cowl.

c. Cassettes must be verified as ''clean'' prior to use in the field. If packaged filters are used for loading or preloaded cassettes are purchased from the manufacturer or a distributor, the manufacturer's name and lot number should be entered on all field data sheets provided to the laboratory, and are required to be listed on all reports from the laboratory.

d. Assemble the cassettes in a clean facility (See definition of clean area under Unit III.A.).

e. Reloading of used cassettes is not permitted.

f. Use sample collection filters which are either polycarbonate having a pore size of less than or equal to 0.4 µm or mixed cellulose ester having a pore size of less than or equal to 0.45 µm.

g. Place these filters in series with a backup filter with a pore size of 5.0 µm (to serve as a diffuser) and a support pad. See the following Figure 1:

**Pt. 763, Subpt. E, App. A**                              **40 CFR Ch. I (7–1–11 Edition)**



FIGURE I--SAMPLING CASSETTE CONFIGURATION

h. When polycarbonate filters are used, position the highly reflective face such that the incoming particulate is received on this surface.

i. Seal the cassettes to prevent leakage around the filter edges or between cassette part joints. A mechanical press may be useful to achieve a reproducible leak-free seal.

878

**Environmental Protection Agency**                          **Pt. 763, Subpt. E, App. A**

Shrink fit gel-bands may be used for this purpose and are available from filter manufacturers and their authorized distributors.

j. Use wrinkle-free loaded cassettes in the sampling operation.

5. Pump setup.

a. Calibrate the sampling pump over the range of flow rates and loads anticipated for the monitoring period with this flow measuring device in series. Perform this calibration using guidance from EPA Method 2A each time the unit is sent to the field (See Reference 6 of Unit III.L.).

b. Configure the sampling system to preclude pump vibrations from being transmitted to the cassette by using a sampling stand separate from the pump station and making connections with flexible tubing.

c. Maintain continuous smooth flow conditions by damping out any pump action fluctuations if necessary.

d. Check the sampling system for leaks with the end cap still in place and the pump operating before initiating sample collection. Trace and stop the source of any flow indicated by the flowmeter under these conditions.

e. Select an appropriate flow rate equal to or greater than 1 L/min or less than 10 L/min for 25 mm cassettes. Larger filters may be operated at proportionally higher flow rates.

f. Orient the cassette downward at approximately 45 degrees from the horizontal.

g. Maintain a log of all pertinent sampling information, such as pump identification number, calibration data, sample location, date, sample identification number, flow rates at the beginning, middle, and end, start and stop times, and other useful information or comments. Use of a sampling log form is recommended. See the following Figure 2:

**Pt. 763, Subpt. E, App. A**                                   **40 CFR Ch. I (7–1–11 Edition)**

FIGURE 2--SAMPLING LOG FORM

| Sample Number | Location of Sample | Pump I.D. | Start Time | Middle Time | End Time | Flow Rate |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Inspector: _____        Date: _____

h. Initiate a chain of custody procedure at the start of each sampling, if this is requested by the client.

i. Maintain a close check of all aspects of the sampling operation on a regular basis.

j. Continue sampling until at least the minimum volume is collected, as specified in the following Table I:

880

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

TABLE 1—NUMBER OF 200 MESH EM GRID OPENINGS (0.0057 MM$^2$) THAT NEED TO BE ANALYZED TO MAINTAIN SENSITIVITY OF 0.005 STRUCTURES/CC BASED ON VOLUME AND EFFECTIVE FILTER AREA



Effective Filter Area 385 sq mm

| Volume (liters) | # of grid openings |
|---|---|
| 560 | 24 |
| 600 | 23 |
| 700 | 19 |
| 800 | 17 |
| 900 | 15 |
| 1,000 | 14 |
| 1,100 | 12 |
| 1,200 | 11 |
| 1,300 | 10 |
| 1,400 | 10 |
| 1,500 | 9 |
| 1,600 | 8 |
| 1,700 | 8 |
| 1,800 | 8 |
| 1,900 | 7 |
| 2,000 | 7 |
| 2,100 | 6 |
| 2,200 | 6 |
| 2,300 | 6 |
| 2,400 | 6 |
| 2,500 | 5 |
| 2,600 | 5 |
| 2,700 | 5 |
| 2,800 | 5 |
| 2,900 | 5 |
| 3,000 | 5 |
| 3,100 | 4 |
| 3,200 | 4 |
| 3,300 | 4 |
| 3,400 | 4 |
| 3,500 | 4 |
| 3,600 | 4 |
| 3,700 | 4 |
| 3,800 | 4 |

Effective Filter Area 855 sq mm

| Volume (liters) | # of grid openings |
|---|---|
| 1,250 | 24 |
| 1,300 | 23 |
| 1,400 | 21 |
| 1,600 | 19 |
| 1,800 | 17 |
| 2,000 | 15 |
| 2,200 | 14 |
| 2,400 | 13 |
| 2,600 | 12 |
| 2,800 | 11 |
| 3,000 | 10 |
| 3,200 | 9 |
| 3,400 | 9 |
| 3,600 | 8 |
| 3,800 | 8 |
| 4,000 | 8 |
| 4,200 | 7 |
| 4,400 | 7 |
| 4,600 | 7 |
| 4,800 | 6 |
| 5,000 | 6 |
| 5,200 | 6 |
| 5,400 | 6 |
| 5,600 | 5 |
| 5,800 | 5 |
| 6,000 | 5 |
| 6,200 | 5 |
| 6,400 | 5 |
| 6,600 | 5 |
| 6,800 | 4 |
| 7,000 | 4 |
| 7,200 | 4 |
| 7,400 | 4 |
| 7,600 | 4 |

(Recommended Volume Range indicated on both sides of the table.)

Note minimum volumes required:
25 mm : 560 liters
37 mm : 1250 liters

Filter diameter of 25 mm = effective area of 385 sq mm
Filter diameter of 37 mm = effective area of 855 sq mm

k. At the conclusion of sampling, turn the cassette upward before stopping the flow to minimize possible particle loss. If the sampling is resumed, restart the flow before reorienting the cassette downward. Note the condition of the filter at the conclusion of sampling.

l. Double check to see that all information has been recorded on the data collection forms and that the cassette is securely closed and appropriately identified using a waterproof label. Protect cassettes in individual clean resealed polyethylene bags. Bags are to be used for storing cassette caps when they are removed for sampling purposes. Caps and plugs should only be removed or replaced using clean hands or clean disposable plastic gloves.

m. Do not change containers if portions of these filters are taken for other purposes.

881

6. Minimum sample number per site. A minimum of 13 samples are to be collected for each testing consisting of the following:

a. A minimum of five samples per abatement area.

b. A minimum of five samples per ambient area positioned at locations representative of the air entering the abatement site.

c. Two field blanks are to be taken by removing the cap for not more than 30 sec and replacing it at the time of sampling before sampling is initiated at the following places:

i. Near the entrance to each ambient area.

ii. At one of the ambient sites.

(NOTE: Do not leave the blank open during the sampling period.)

d. A sealed blank is to be carried with each sample set. This representative cassette is not to be opened in the field.

7. Abatement area sampling.

a. Conduct final clearance sampling only after the primary containment barriers have been removed; the abatement area has been thoroughly dried; and, it has passed visual inspection tests by qualified personnel. (See Reference 1 of Unit III.L.)

b. Containment barriers over windows, doors, and air passageways must remain in place until the TEM clearance sampling and analysis is completed and results meet clearance test criteria. The final plastic barrier remains in place for the sampling period.

c. Select sampling sites in the abatement area on a random basis to provide unbiased and representative samples.

d. After the area has passed a thorough visual inspection, use aggressive sampling conditions to dislodge any remaining dust.

i. Equipment used in aggressive sampling such as a leaf blower and/or fan should be properly cleaned and decontaminated before use.

ii. Air filtration units shall remain on during the air monitoring period.

iii. Prior to air monitoring, floors, ceiling and walls shall be swept with the exhaust of a minimum one (1) horsepower leaf blower.

iv. Stationary fans are placed in locations which will not interfere with air monitoring equipment. Fan air is directed toward the ceiling. One fan shall be used for each 10,000 ft$^3$ of worksite.

v. Monitoring of an abatement work area with high-volume pumps and the use of circulating fans will require electrical power. Electrical outlets in the abatement area may be used if available. If no such outlets are available, the equipment must be supplied with electricity by the use of extension cords and strip plug units. All electrical power supply equipment of this type must be approved Underwriter Laboratory equipment that has not been modified. All wiring must be grounded. Ground fault interrupters should be used. Extreme care must be taken to clean up any residual water and ensure that electrical equipment does not become wet while operational.

vi. Low volume pumps may be carefully wrapped in 6-mil polyethylene to insulate the pump from the air. High volume pumps cannot be sealed in this manner since the heat of the motor may melt the plastic. The pump exhausts should be kept free.

vii. If recleaning is necessary, removal of this equipment from the work area must be handled with care. It is not possible to completely decontaminate the pump motor and parts since these areas cannot be wetted. To minimize any problems in this area, all equipment such as fans and pumps should be carefully wet wiped prior to removal from the abatement area. Wrapping and sealing low volume pumps in 6-mil polyethylene will provide easier decontamination of this equipment. Use of clean water and disposable wipes should be available for this purpose.

e. Pump flow rate equal to or greater than 1 L/min or less than 10 L/min may be used for 25 mm cassettes. The larger cassette diameters may have comparably increased flow.

f. Sample a volume of air sufficient to ensure the minimum quantitation limits. (See Table I of Unit III.B.5.j.)

8. Ambient sampling.

a. Position ambient samplers at locations representative of the air entering the abatement site. If makeup air entering the abatement site is drawn from another area of the building which is outside of the abatement area, place the pumps in the building, pumps should be placed out of doors located near the building and away from any obstructions that may influence wind patterns. If construction is in progress immediately outside the enclosure, it may be necessary to select another ambient site. Samples should be representative of any air entering the work site.

b. Locate the ambient samplers at least 3 ft apart and protect them from adverse weather conditions.

c. Sample same volume of air as samples taken inside the abatement site.

### C. Sample Shipment

1. Ship bulk samples in a separate container from air samples. Bulk samples and air samples delivered to the analytical laboratory in the same container shall be rejected.

2. Select a rigid shipping container and pack the cassettes upright in a noncontaminating nonfibrous medium such as a bubble pack. The use of resealable polyethylene bags may help to prevent jostling of individual cassettes.

3. Avoid using expanded polystyrene because of its static charge potential. Also avoid using particle-based packaging materials because of possible contamination.

4. Include a shipping bill and a detailed listing of samples shipped, their descriptions

and all identifying numbers or marks, sampling data, shipper's name, and contact information. For each sample set, designate which are the ambient samples, which are the abatement area samples, which are the field blanks, and which is the sealed blank if sequential analysis is to be performed.

5. Hand-carry samples to the laboratory in an upright position if possible; otherwise choose that mode of transportation least likely to jar the samples in transit.

6. Address the package to the laboratory sample coordinator by name when known and alert him or her of the package description, shipment mode, and anticipated arrival as part of the chain of custody and sample tracking procedures. This will also help the laboratory schedule timely analysis for the samples when they are received.

D. Quality Control/Quality Assurance Procedures (Data Quality Indicators)

Monitoring the environment for airborne asbestos requires the use of sensitive sampling and analysis procedures. Because the test is sensitive, it may be influenced by a variety of factors. These include the supplies used in the sampling operation, the performance of the sampling, the preparation of the grid from the filter and the actual examination of this grid in the microscope. Each of these unit operations must produce a product of defined quality if the analytical result is to be a reliable and meaningful test result. Accordingly, a series of control checks and reference standards is performed along with the sample analysis as indicators that the materials used are adequate and the operations are within acceptable limits. In this way, the quality of the data is defined, and the results are of known value. These checks and tests also provide timely and specific warning of any problems which might develop within the sampling and analysis operations. A description of these quality control/quality assurance procedures is summarized in the text below.

1. Prescreen the loaded cassette collection filters to assure that they do not contain concentrations of asbestos which may interfere with the analysis of the sample. A filter blank average of less than 18 s/mm² in an area of 0.057 mm² (nominally 10 200-mesh grid openings) and a maximum of 53 s/mm² for that same area for any single preparation is acceptable for this method.

2. Calibrate sampling pumps and their flow indicators over the range of their intended use with a recognized standard. Assemble the sampling system with a representative filter—not the filter which will be used in sampling—before and after the sampling operation.

3. Record all calibration information with the data to be used on a standard sampling form.

4. Ensure that the samples are stored in a secure and representative location.

5. Ensure that mechanical calibrations from the pump will be minimized to prevent transferral of vibration to the cassette.

6. Ensure that a continuous smooth flow of negative pressure is delivered by the pump by installing a damping chamber if necessary.

7. Open a loaded cassette momentarily at one of the indoor sampling sites when sampling is initiated. This sample will serve as an indoor field blank.

8. Open a loaded cassette momentarily at one of the outdoor sampling sites when sampling is initiated. This sample will serve as an outdoor field blank.

9. Carry a sealed blank into the field with each sample series. Do not open this cassette in the field.

10. Perform a leak check of the sampling system at each indoor and outdoor sampling site by activating the pump with the closed sampling cassette in line. Any flow indicates a leak which must be eliminated before initiating the sampling operation.

11. Ensure that the sampler is turned upright before interrupting the pump flow.

12. Check that all samples are clearly labeled and that all pertinent information has been enclosed before transfer of the samples to the laboratory.

E. Sample Receiving

1. Designate one individual as sample coordinator at the laboratory. While that individual will normally be available to receive samples, the coordinator may train and supervise others in receiving procedures for those times when he/she is not available.

2. Adhere to the following procedures to ensure both the continued chain-of-custody and the accountability of all samples passing through the laboratory:

a. Note the condition of the shipping package and data written on it upon receipt.

b. Retain all bills of lading or shipping slips to document the shipper and delivery time.

c. Examine the chain-of-custody seal, if any, and the package for its integrity.

d. If there has been a break in the seal or substantive damage to the package, the sample coordinator shall immediately notify the shipper and a responsible laboratory manager before any action is taken to unpack the shipment.

e. Packages with significant damage shall be accepted only by the responsible laboratory manager after discussions with the client.

3. Unwrap the shipment in a clean, uncluttered facility. The sample coordinator or his or her designee will record the contents, including a description of each item and all identifying numbers or marks. A

**Pt. 763, Subpt. E, App. A**                         **40 CFR Ch. I (7–1–11 Edition)**

Sample Receiving Form to document this information is attached for use when necessary. (See the following Figure 3.)

FIGURE 3--SAMPLE RECEIVING FORM

Date of package delivery _____        Package shipped from _____

Carrier _____        Shipping bill retained _____

*Condition of package on receipt_____

*Condition of custody seal _____

Number of samples received _____        Shipping manifest attached _____

Purchase Order No. _____        Project I.D. _____

Comments _____

| No. | Description | Sampling Medium | | Sampled Volume Liters | Receiving ID # | Assigned # |
|---|---|---|---|---|---|---|
| | | PC | MCE | | | |
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |

(Use as many additional sheets as needed.)

Comments _____

Date of acceptance into sample bank _____

Signature of chain-of-custody recipient _____

Disposition of samples_____

*Note:   If the package has sustained substantial damage or the custody seal is broken, stop and contact the project manager and the shipper.

884

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

NOTE: The person breaking the chain-of-custody seal and itemizing the contents assumes responsibility for the shipment and signs documents accordingly.

4. Assign a laboratory number and schedule an analysis sequence.

5. Manage all chain-of-custody samples within the laboratory such that their integrity can be ensured and documented.

F. Sample Preparation

1. Personnel not affiliated with the Abatement Contractor shall be used to prepare samples and conduct TEM analysis. Wet-wipe the exterior of the cassettes to minimize contamination possibilities before taking them to the clean sample preparation facility.

2. Perform sample preparation in a well-equipped clean facility.

NOTE: The clean area is required to have the following minimum characteristics. The area or hood must be capable of maintaining a positive pressure with make-up air being HEPA filtered. The cumulative analytical blank concentration must average less than 18 s/mm² in an area of 0.057 s/mm² (nominally 10 200-mesh grid openings) with no more than one single preparation to exceed 53 s/mm² for that same area.

3. Preparation areas for air samples must be separated from preparation areas for bulk samples. Personnel must not prepare air samples if they have previously been preparing bulk samples without performing appropriate personal hygiene procedures, i.e., clothing change, showering, etc.

4. *Preparation*. Direct preparation techniques are required. The objective is to produce an intact carbon film containing the particulates from the filter surface which is sufficiently clear for TEM analysis. Currently recommended direct preparation procedures for polycarbonate (PC) and mixed cellulose ester (MCE) filters are described in Unit III F.7. and 8. Sample preparation is a subject requiring additional research. Variation on those steps which do not substantively change the procedure, which improve filter clearing or which reduce contamination problems in a laboratory are permitted.

a. Use only TEM grids that had grid opening areas measured according to directions in Unit III.J.

b. Remove the inlet and outlet plugs prior to opening the cassette to minimize any pressure differential that may be present.

c. Examples of techniques used to prepare polycarbonate filters are described in Unit III.F.7.

d. Examples of techniques used to prepare mixed cellulose ester filters are described in Unit III.F.8.

e. Prepare multiple grids for each sample.

f. Store the three grids to be measured in appropriately labeled grid holders or polyethylene capsules.

5. Equipment.

a. Clean area.

b. Tweezers. Fine-point tweezers for handling of filters and TEM grids.

c. Scalpel Holder and Curved No. 10 Surgical Blades.

d. Microscope slides.

e. Double-coated adhesive tape.

f. Gummed page reinforcements.

g. Micro-pipet with disposal tips 10 to 100 μL variable volume.

h. Vacuum coating unit with facilities for evaporation of carbon. Use of a liquid nitrogen cold trap above the diffusion pump will minimize the possibility of contamination of the filter surface by oil from the pumping system. The vacuum-coating unit can also be used for deposition of a thin film of gold.

i. *Carbon rod electrodes*. Spectrochemically pure carbon rods are required for use in the vacuum evaporator for carbon coating of filters.

j. *Carbon rod sharpener*. This is used to sharpen carbon rods to a neck. The use of necked carbon rods (or equivalent) allows the carbon to be applied to the filters with a minimum of heating.

k. *Low-temperature plasma asher*. This is used to etch the surface of collapsed mixed cellulose ester (MCE) filters. The asher should be supplied with oxygen, and should be modified as necessary to provide a throttle or bleed valve to control the speed of the vacuum to minimize disturbance of the filter. Some early models of ashers admit air too rapidly, which may disturb particulates on the surface of the filter during the etching step.

l. *Glass petri dishes, 10 cm in diameter, 1 cm high*. For prevention of excessive evaporation of solvent when these are in use, a good seal must be provided between the base and the lid. The seal can be improved by grinding the base and lid together with an abrasive grinding material.

m. Stainless steel mesh.

n. Lens tissue.

o. Copper 200-mesh TEM grids, 3 mm in diameter, or equivalent.

p. Gold 200-mesh TEM grids, 3 mm in diameter, or equivalent.

q. Condensation washer.

r. Carbon-coated, 200-mesh TEM grids, or equivalent.

s. Analytical balance, 0.1 mg sensitivity.

t. Filter paper, 9 cm in diameter.

u. Oven or slide warmer. Must be capable of maintaining a temperature of 65–70 °C.

v. Polyurethane foam, 6 mm thickness.

w. Gold wire for evaporation.

6. Reagents.

a. *General*. A supply of ultra-clean, fiber-free water must be available for washing of all components used in the analysis. Water

885

that has been distilled in glass or filtered or deionized water is satisfactory for this purpose. Reagents must be fiber-free.

b. Polycarbonate preparation method—chloroform.

c. Mixed Cellulose Ester (MCE) preparation method—acetone or the Burdette procedure (Ref. 7 of Unit III.L.).

7. TEM specimen preparation from polycarbonate filters.

a. *Specimen preparation laboratory*. It is most important to ensure that contamination of TEM specimens by extraneous asbestos fibers is minimized during preparation.

b. Cleaning of sample cassettes. Upon receipt at the analytical laboratory and before they are taken into the clean facility or laminar flow hood, the sample cassettes must be cleaned of any contamination adhering to the outside surfaces.

c. Preparation of the carbon evaporator. If the polycarbonate filter has already been carbon-coated prior to receipt, the carbon coating step will be omitted, unless the analyst believes the carbon film is too thin. If there is a need to apply more carbon, the filter will be treated in the same way as an uncoated filter. Carbon coating must be performed with a high-vacuum coating unit. Units that are based on evaporation of carbon filaments in a vacuum generated only by an oil rotary pump have not been evaluated for this application, and must not be used. The carbon rods should be sharpened by a carbon rod sharpener to necks of about 4 mm long and 1 mm in diameter. The rods are installed in the evaporator in such a manner that the points are approximately 10 to 12 cm from the surface of a microscope slide held in the rotating and tilting device.

d. Selection of filter area for carbon coating. Before preparation of the filters, a 75 mm×50 mm microscope slide is washed and dried. This slide is used to support strips of filter during the carbon evaporation. Two parallel strips of double-sided adhesive tape are applied along the length of the slide. Polycarbonate filters are easily stretched during handling, and cutting of areas for further preparation must be performed with great care. The filter and the MCE backing filter are removed together from the cassette and placed on a cleaned glass microscope slide. The filter can be cut with a curved scalpel blade by rocking the blade from the point placed in contact with the filter. The process can be repeated to cut a strip approximately 3 mm wide across the diameter of the filter. The strip of polycarbonate filter is separated from the corresponding strip of backing filter and carefully placed so that it bridges the gap between the adhesive tape strips on the microscope slide. The filter strip can be held with fine-point tweezers and supported underneath by the scalpel blade during placement on the microscope slide. The analyst can place several such

strips on the same microscope slide, taking care to rinse and wet-wipe the scalpel blade and tweezers before handling a new sample. The filter strips should be identified by etching the glass slide or marking the slide using a marker insoluble in water and solvents. After the filter strip has been cut from each filter, the residual parts of the filter must be returned to the cassette and held in position by reassembly of the cassette. The cassette will then be archived for a period of 30 days or returned to the client upon request.

e. Carbon coating of filter strips. The glass slide holding the filter strips is placed on the rotation-tilting device, and the evaporator chamber is evacuated. The evaporation must be performed in very short bursts, separated by some seconds to allow the electrodes to cool. If evaporation is too rapid, the strips of polycarbonate filter will begin to curl, which will lead to cross-linking of the surface material and make it relatively insoluble in chloroform. An experienced analyst can judge the thickness of carbon film to be applied, and some test should be made first on unused filters. If the film is too thin, large particles will be lost from the TEM specimen, and there will be few complete and undamaged grid openings on the specimen. If the coating is too thick, the filter will tend to curl when exposed to chloroform vapor and the carbon film may not adhere to the support mesh. Too thick a carbon film will also lead to a TEM image that is lacking in contrast, and the ability to obtain ED patterns will be compromised. The carbon film should be as thin as possible and remain intact on most of the grid openings of the TEM specimen intact.

f. Preparation of the Jaffe washer. The precise design of the Jaffe washer is not considered important, so any one of the published designs may be used. A washer consisting of a simple stainless steel bridge is recommended. Several pieces of lens tissue approximately 1.0 cm×0.5 cm are placed on the stainless steel bridge, and the washer is filled with chloroform to a level where the meniscus contacts the underside of the mesh, which results in saturation of the lens tissue. See References 8 and 10 of Unit III.L.

g. Placing of specimens into the Jaffe washer. The TEM grids are first placed on a piece of lens tissue so that individual grids can be picked up with tweezers. Using a curved scalpel blade, the analyst excises three 3 mm square pieces of the carbon-coated polycarbonate filter from the filter strip. The three squares are selected from the center of the strip and from two points between the outer periphery of the active surface and the center. The piece of filter is placed on a TEM specimen grid with the shiny side of the TEM grid facing upwards, and the whole assembly is placed boldly onto the saturated lens tissue in the Jaffe washer. If carbon-coated grids are used, the filter should be

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

placed carbon-coated side down. The three excised squares of filters are placed on the same piece of lens tissue. Any number of separate pieces of lens tissue may be placed in the same Jaffe washer. The lid is then placed on the Jaffe washer, and the system is allowed to stand for several hours, preferably overnight.

h. *Condensation washing.* It has been found that many polycarbonate filters will not dissolve completely in the Jaffe washer, even after being exposed to chloroform for as long as 3 days. This problem becomes more serious if the surface of the filter was overheated during the carbon evaporation. The presence of undissolved filter medium on the TEM preparation leads to partial or complete obscuration of areas of the sample, and fibers that may be present in these areas of the specimen will be overlooked; this will lead to a low result. Undissolved filter medium also compromises the ability to obtain ED patterns. Before they are counted, TEM grids must be examined critically to determine whether they are adequately cleared of residual filter medium. It has been found that condensation washing of the grids after the initial Jaffe washer treatment, with chloroform as the solvent, clears all residual filter medium in a period of approximately 1 hour. In practice, the piece of lens tissue supporting the specimen grids is transferred to the cold finger of the condensation washer, and the washer is operated for about 1 hour. If the specimens are cleared satisfactorily by the Jaffe washer alone, the condensation washer step may be unnecessary.

8. TEM specimen preparation from MCE filters.

a. This method of preparing TEM specimens from MCE filters is similar to that specified in NIOSH Method 7402. See References 7, 8, and 9 of Unit III.L.

b. Upon receipt at the analytical laboratory, the sample cassettes must be cleaned of any contamination adhering to the outside surfaces before entering the clean sample preparation area.

c. Remove a section from any quadrant of the sample and blank filters.

d. Place the section on a clean microscope slide. Affix the filter section to the slide with a gummed paged reinforcement or other suitable means. Label the slide with a water and solvent-proof marking pen.

e. Place the slide in a petri dish which contains several paper filters soaked with 2 to 3 mL acetone. Cover the dish. Wait 2 to 4 minutes for the sample filter to fuse and clear.

f. Plasma etching of the collapsed filter is required.

i. The microscope slide to which the collapsed filter pieces are attached is placed in a plasma asher. Because plasma ashers vary greatly in their performance, both from unit to unit and between different positions in the asher chamber, it is difficult to specify

the conditions that should be used. This is one area of the method that requires further evaluation. Insufficient etching will result in a failure to expose embedded filters, and too much etching may result in loss of particulate from the surface. As an interim measure, it is recommended that the time for ashing of a known weight of a collapsed filter be established and that the etching rate be calculated in terms of micrometers per second. The actual etching time used for a particular asher and operating conditions will then be set such that a 1–2 μm (10 percent) layer of collapsed surface will be removed.

ii. Place the slide containing the collapsed filters into a low-temperature plasma asher, and etch the filter.

g. Transfer the slide to a rotating stage inside the bell jar of a vacuum evaporator. Evaporate a 1 mm×5 mm section of graphite rod onto the cleared filter. Remove the slide to a clean, dry, covered petri dish.

h. Prepare a second petri dish as a Jaffe washer with the wicking substrate prepared from filter or lens paper placed on top of a 6 mm thick disk of clean spongy polyurethane foam. Cut a V-notch on the edge of the foam and filter paper. Use the V-notch as a reservoir for adding solvent. The wicking substrate should be thin enough to fit into the petri dish without touching the lid.

i. Place carbon-coated TEM grids face up on the filter or lens paper. Label the grids by marking with a pencil on the filter paper or by putting registration marks on the petri dish lid and marking with a waterproof marker on the dish lid. In a fume hood, fill the dish with acetone until the wicking substrate is saturated. The level of acetone should be just high enough to saturate the filter paper without creating puddles.

j. Remove about a quarter section of the carbon-coated filter samples from the glass slides using a surgical knife and tweezers. Carefully place the section of the filter, carbon side down, on the appropriately labeled grid in the acetone-saturated petri dish. When all filter sections have been transferred, slowly add more solvent to the wedge-shaped trough to bring the acetone level up to the highest possible level without disturbing the sample preparations. Cover the petri dish. Elevate one side of the petri dish by placing a slide under it. This allows drops of condensed solvent vapors to form near the edge rather than in the center where they would drip onto the grid preparation.

### G. TEM Method

1. *Instrumentation.*

a. Use an 80–120 kV TEM capable of performing electron diffraction with a fluorescent screen inscribed with calibrated gradations. If the TEM is equipped with EDXA it must either have a STEM attachment or be capable of producing a spot less than 250 nm

**Pt. 763, Subpt. E, App. A**                    **40 CFR Ch. I (7–1–11 Edition)**

in diameter at crossover. The microscope shall be calibrated routinely (see Unit III.J.) for magnification and camera constant.

b. While not required on every microscope in the laboratory, the laboratory must have either one microscope equipped with energy dispersive X-ray analysis or access to an equivalent system on a TEM in another laboratory. This must be an Energy Dispersive X-ray Detector mounted on TEM column and associated hardware/software to collect, save, and read out spectral information. Calibration of Multi-Channel Analyzer shall be checked regularly for A1 at 1.48 KeV and Cu at 8.04 KeV, as well as the manufacturer's procedures.

i. Standard replica grating may be used to determine magnification (e.g., 2160 lines/mm).

ii. Gold standard may be used to determine camera constant.

c. Use a specimen holder with single tilt and/or double tilt capabilities.

2. Procedure.

a. Start a new Count Sheet for each sample to be analyzed. Record on count sheet: analyst's initials and date; lab sample number; client sample number microscope identification; magnification for analysis; number of predetermined grid openings to be analyzed; and grid identification. See the following Figure 4:

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

FIGURE 4--COUNT SHEET

Lab Sample No. _____    Filter Type _____    Operator _____
Client Sample No. _____    Filter Area _____    Date _____
Instrument I.D. _____    Grid I.D. _____    Comments _____
Magnification _____    Grid Opening (GO) Area _____
Acc. Voltage _____    No. GO to be Analyzed _____

| GO | Structure No. | Structure Type* | Length | | ED Observation | | | | EDAX |
|---|---|---|---|---|---|---|---|---|---|
| | | | < 5 µm | ≥ 5 µm | Chrys. | Amph. | Nonasb. | Neg. ID | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| GO | Structure No. | Structure Type* | Length | | ED Observation | | | | EDAX |
|---|---|---|---|---|---|---|---|---|---|
| | | | < 5 µm | ≥ 5 µm | Chrys. | Amph. | Nonasb. | Neg. ID | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

*B = Bundle          NFD = No fibers detected
 C = Cluster         N = No diffraction obtained
 F = Fiber
 M = Matrix

b. Check that the microscope is properly aligned and calibrated according to the manufacturer's specifications and instructions.

c. Microscope settings: 80–120 kV, grid assessment 250–1000X, then 15,000–20,000X screen magnification for analysis.

d. Approximately one-half (0.5) of the predetermined sample area to be analyzed shall be performed on one sample grid preparation and the remaining half on a second sample grid preparation.

e. Determine the suitability of the grid.

889

i. Individual grid openings with greater than 5 percent openings (holes) or covered with greater than 25 percent particulate matter or obviously having nonuniform loading shall not be analyzed.

ii. Examine the grid at low magnification (<1000X) to determine its suitability for detailed study at higher magnifications.

iii. Reject the grid if:

(1) Less than 50 percent of the grid openings covered by the replica are intact.

(2) It is doubled or folded.

(3) It is too dark because of incomplete dissolution of the filter.

iv. If the grid is rejected, load the next sample grid.

v. If the grid is acceptable, continue on to Step 6 if mapping is to be used; otherwise proceed to Step 7.

f. Grid Map (Optional).

i. Set the TEM to the low magnification mode.

ii. Use flat edge or finder grids for mapping.

iii. Index the grid openings (fields) to be counted by marking the acceptable fields for one-half (0.5) of the area needed for analysis on each of the two grids to be analyzed. These may be marked just before examining each grid opening (field), if desired.

iv. Draw in any details which will allow the grid to be properly oriented if it is re-

loaded into the microscope and a particular field is to be reliably identified.

g. Scan the grid.

i. Select a field to start the examination.

ii. Choose the appropriate magnification (15,000 to 20,000X screen magnification).

iii. Scan the grid as follows.

(1) At the selected magnification, make a series of parallel traverses across the field. On reaching the end of one traverse, move the image one window and reverse the traverse.

NOTE: A slight overlap should be used so as not to miss any part of the grid opening (field).

(2) Make parallel traverses until the entire grid opening (field) has been scanned.

h. Identify each structure for appearance and size.

i. Appearance and size: Any continuous grouping of particles in which an asbestos fiber within aspect ratio greater than or equal to 5:1 and a length greater than or equal to 0.5 $\mu$m is detected shall be recorded on the count sheet. These will be designated asbestos structures and will be classified as fibers, bundles, clusters, or matrices. Record as individual fibers any contiguous grouping having 0, 1, or 2 definable intersections. Groupings having more than 2 intersections are to be described as cluster or matrix. See the following Figure 5:

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

FIGURE 5--COUNTING GUIDELINES USED IN
DETERMINING ASBESTOS STRUCTURES

Count as 1 fiber; 1 Structure; no intersections.



Count as 2 fibers if space between fibers is greater than width of 1 fiber
diameter or number of intersections is equal to or less than 1.



Count as 3 structures if space between fibers is greater than width of 1 fiber
diameter or if the number of intersections is equal to or less than 2.



Count bundles as 1 structure; 3 or more parallel fibrils less
than 1 fiber diameter separation.





Count clusters as 1 structure; fibers having greater than or equal to 3 intersections.

Count matrix as 1 structure.

DO NOT COUNT AS STRUCTURES:

Fiber protrusion <5:1 Aspect Ratio

No fiber protusion

Fiber protrusion <0.5 micrometer

<0.5 micrometer in length
<5:1 Aspect Ratio

An intersection is a non-parallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater. Combinations such as a matrix and cluster, matrix and bundle, or bundle and cluster are categorized by the dominant fiber quality—cluster, bundle, and matrix, respectively. Separate categories will be maintained for fibers less than 5 μm and for fibers greater than or equal to 5 μm in length. Not required, but useful, may be to record the fiber length in 1 μm intervals. (Identify each structure morphologically and analyze it as it enters the "window".)

(1) *Fiber*. A structure having a minimum length greater than 0.5 μm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed, no intersections.

(2) *Bundle*. A structure composed of 3 or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

(3) *Cluster*. A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group; groupings must have more than 2 intersections.

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

(4) *Matrix.* Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

(5) *NSD.* Record NSD when no structures are detected in the field.

(6) *Intersection.* Non-parallel touching or crossing of fibers, with the projection having an aspect ratio 5:1 or greater.

ii. Structure Measurement.

(1) Recognize the structure that is to be sized.

(2) Memorize its location in the "window" relative to the sides, inscribed square and to other particulates in the field so this exact location can be found again when scanning is resumed.

(3) Measure the structure using the scale on the screen.

(4) Record the length category and structure type classification on the count sheet after the field number and fiber number.

(5) Return the fiber to its original location in the window and scan the rest of the field for other fibers; if the direction of travel is not remembered, return to the right side of the field and begin the traverse again.

i. Visual identification of Electron Diffraction (ED) patterns is required for each asbestos structure counted which would cause the analysis to exceed the 70 s/mm² concentration. (Generally this means the first four fibers identified as asbestos must exhibit an identifiable diffraction pattern for chrysotile or amphibole.)

i. Center the structure, focus, and obtain an ED pattern. (See Microscope Instruction Manual for more detailed instructions.)

ii. From a visual examination of the ED pattern, obtained with a short camera length, classify the observed structure as belonging to one of the following classifications: chrysotile, amphibole, or nonasbestos.

(1) Chrysotile: The chrysotile asbestos pattern has characteristic streaks on the layer lines other than the central line and some streaking also on the central line. There will be spots of normal sharpness on the central layer line and on alternate lines (2nd, 4th, etc.). The repeat distance between layer lines is 0.53 nm and the center doublet is at 0.73 nm. The pattern should display (002), (110), (130) diffraction maxima; distances and geometry should match a chrysotile pattern and be measured semiquantitatively.

(2) Amphibole Group [includes grunerite (amosite), crocidolite, anthophyllite, tremolite, and actinolite]: Amphibole asbestos fiber patterns show layer lines formed by very closely spaced dots, and the repeat distance between layer lines is also about 0.53 nm. Streaking in layer lines is occasionally present due to crystal structure defects.

(3) Nonasbestos: Incomplete or unobtainable ED patterns, a nonasbestos EDXA, or a nonasbestos morphology.

iii. The micrograph number of the recorded diffraction patterns must be reported to the client and maintained in the laboratory's quality assurance records. The records must also demonstrate that the identification of the pattern has been verified by a qualified individual and that the operator who made the identification is maintaining at least an 80 percent correct visual identification based on his measured patterns. In the event that examination of the pattern by the qualified individual indicates that the pattern had been misidentified, the client shall be contacted. If the pattern is a suspected chrysotile, take a photograph of the diffraction pattern at 0 degrees tilt. If the structure is suspected to be amphibole, the sample may have to be tilted to obtain a simple geometric array of spots.

j. Energy Dispersive X-Ray Analysis (EDXA).

i. Required of all amphiboles which would cause the analysis results to exceed the 70 s/mm² concentration. (Generally speaking, the first 4 amphiboles would require EDXA.)

ii. Can be used alone to confirm chrysotile after the 70 s/mm² concentration has been exceeded.

iii. Can be used alone to confirm all nonasbestos.

iv. Compare spectrum profiles with profiles obtained from asbestos standards. The closest match identifies and categorizes the structure.

v. If the EDXA is used for confirmation, record the properly labeled spectrum on a computer disk, or if a hard copy, file with analysis data.

vi. If the number of fibers in the nonasbestos class would cause the analysis to exceed the 70 s/mm² concentration, their identities must be confirmed by EDXA or measurement of a zone axis diffraction pattern to establish that the particles are nonasbestos.

k. Stopping Rules.

i. If more than 50 asbestiform structures are counted in a particular grid opening, the analysis may be terminated.

ii. After having counted 50 asbestiform structures in a minimum of 4 grid openings, the analysis may be terminated. The grid opening in which the 50th fiber was counted must be completed.

iii. For blank samples, the analysis is always continued until 10 grid openings have been analyzed.

iv. In all other samples the analysis shall be continued until an analytical sensitivity of 0.005 s/cm³ is reached.

l. Recording Rules. The count sheet should contain the following information:

i. Field (grid opening): List field number.

ii. Record "NSD" if no structures are detected.

iii. Structure information.

893

**Pt. 763, Subpt. E, App. A**

**40 CFR Ch. I (7–1–11 Edition)**

(1) If fibers, bundles, clusters, and/or matrices are found, list them in consecutive numerical order, starting over with each field.

(2) Length. Record length category of asbestos fibers examined. Indicate if less than 5 μm or greater than or equal to 5 μm.

(3) Structure Type. Positive identification of asbestos fibers is required by the method. At least one diffraction pattern of each fiber type from every five samples must be recorded and compared with a standard diffraction pattern. For each asbestos fiber reported, both a morphological descriptor and an identification descriptor shall be specified on the count sheet.

(4) Fibers classified as chrysotile must be identified by diffraction and/or X-ray analysis and recorded on the count sheet. X-ray analysis alone can be used as sole identification only after 70s/mm² have been exceeded for a particular sample.

(5) Fibers classified as amphiboles must be identified by X-ray analysis and electron diffraction and recorded on the count sheet. (X-ray analysis alone can be used as sole identification only after 70s/mm² have been exceeded for a particular sample.)

(6) If a diffraction pattern was recorded on film, the micrograph number must be indicated on the count sheet.

(7) If an electron diffraction was attempted and an appropriate spectra is not observed, N should be recorded on the count sheet.

(8) If an X-ray analysis is attempted but not observed, N should be recorded on the count sheet.

(9) If an X-ray analysis spectrum is stored, the file and disk number must be recorded on the count sheet.

m. Classification Rules.

i. *Fiber.* A structure having a minimum length greater than or equal to 0.5 μm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed.

ii. *Bundle.* A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

iii. *Cluster.* A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

iv. *Matrix.* Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

v. *NSD.* Record NSD when no structures are detected in the field.

n. After all necessary analyses of a particle structure have been completed, return the goniometer stage to 0 degrees, and return the structure to its original location by recall of the original location.

o. Continue scanning until all the structures are identified, classified and sized in the field.

p. Select additional fields (grid openings) at low magnification; scan at a chosen magnification (15,000 to 20,000X screen magnification); and analyze until the stopping rule becomes applicable.

q. Carefully record all data as they are being collected, and check for accuracy.

r. After finishing with a grid, remove it from the microscope, and replace it in the appropriate grid hold. Sample grids must be stored for a minimum of 1 year from the date of the analysis; the sample cassette must be retained for a minimum of 30 days by the laboratory or returned at the client's request.

H. Sample Analytical Sequence

1. Carry out visual inspection of work site prior to air monitoring.

2. Collect a minimum of five air samples inside the work site and five samples outside the work site. The indoor and outdoor samples shall be taken during the same time period.

3. Analyze the abatement area samples according to this protocol. The analysis must meet the 0.005 s/cm³ analytical sensitivity.

4. Remaining steps in the analytical sequence are contained in Unit IV. of this Appendix.

I. Reporting

The following information must be reported to the client. See the following Table II:

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

TABLE II--EXAMPLE LABORATORY LETTERHEAD

| Laboratory I.D. | Client I.D. | FILTER MEDIA DATA | | | | Analyzed Area, $mm^2$ | Sample Volume, cc |
|---|---|---|---|---|---|---|---|
| | | Type | Diameter, mm | Effective Area, $mm^2$ | Pore Size, μm | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

INDIVIDUAL ANALYTICAL RESULTS

| Laboratory I.D. | Client I.D. | # Asbestos Structures | Analytical Sensitivity, s/cc | CONCENTRATION | |
|---|---|---|---|---|---|
| | | | | Structures/$mm^2$ | Structures/cc |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

The analysis was carried out to the approved TEM method.  This laboratory is in compliance with the quality specified by the method. _____

Authorized Signature

1. Concentration in structures per square millimeter and structures per cubic centimeter.

2. Analytical sensitivity used for the analysis.

3. Number of asbestos structures.

4. Area analyzed.

5. Volume of air samples (which was initially provided by client).

6. Average grid size opening.

7. Number of grids analyzed.

8. Copy of the count sheet must be included with the report.

895

9. Signature of laboratory official to indicate that the laboratory met specifications of the AHERA method.

10. Report form must contain official laboratory identification (e.g., letterhead).

11. Type of asbestos.

### J. Calibration Methodology

NOTE: Appropriate implementation of the method requires a person knowledgeable in electron diffraction and mineral identification by ED and EDXA. Those inexperienced laboratories wishing to develop capabilities may acquire necessary knowledge through analysis of appropriate standards and by following detailed methods as described in References 8 and 10 of Unit III.L.

1. *Equipment Calibration*. In this method, calibration is required for the air-sampling equipment and the transmission electron microscope (TEM).

a. *TEM Magnification*. The magnification at the fluorescent screen of the TEM must be calibrated at the grid opening magnification (if used) and also at the magnification used for fiber counting. This is performed with a cross grating replica. A logbook must be maintained, and the dates of calibration depend on the past history of the particular microscope; no frequency is specified. After any maintenance of the microscope that involved adjustment of the power supplied to the lenses or the high-voltage system or the mechanical disassembly of the electron optical column apart from filament exchange, the magnification must be recalibrated. Before the TEM calibration is performed, the analyst must ensure that the cross grating replica is placed at the same distance from the objective lens as the specimens are. For instruments that incorporate an eucentric tilting specimen stage, all specimens and the cross grating replica must be placed at the eucentric position.

b. Determination of the TEM magnification on the fluorescent screen.

i. Define a field of view on the fluorescent screen either by markings or physical boundaries. The field of view must be measurable or previously inscribed with a scale or concentric circles (all scales should be metric).

ii. Insert a diffraction grating replica (for example a grating containing 2,160 lines/mm) into the specimen holder and place into the microscope. Orient the replica so that the grating lines fall perpendicular to the scale on the TEM fluorescent screen. Ensure that the goniometer stage tilt is 0 degrees.

iii. Adjust microscope magnification to 10,000X or 20,000X. Measure the distance (mm) between two widely separated lines on the grating replica. Note the number of spaces between the lines. Take care to measure between the same relative positions on the lines (e.g., between left edges of lines).

NOTE: The more spaces included in the measurement, the more accurate the final

calculation. On most microscopes, however, the magnification is substantially constant only within the central 8–10 cm diameter region of the fluorescent screen.

iv. Calculate the true magnification (M) on the fluorescent screen:

M=XG/Y

where:

X=total distance (mm) between the designated grating lines;
G=calibration constant of the grating replica (lines/mm);
Y=number of grating replica spaces counted along X.

c. Calibration of the EDXA System. Initially, the EDXA system must be calibrated by using two reference elements to calibrate the energy scale of the instrument. When this has been completed in accordance with the manufacturer's instructions, calibration in terms of the different types of asbestos can proceed. The EDXA detectors vary in both solid angle of detection and in window thickness. Therefore, at a particular accelerating voltage in use on the TEM, the count rate obtained from specific dimensions of fiber will vary both in absolute X-ray count rate and in the relative X-ray peak heights for different elements. Only a few minerals are relevant for asbestos abatement work, and in this procedure the calibration is specified in terms of a "fingerprint" technique. The EDXA spectra must be recorded from individual fibers of the relevant minerals, and identifications are made on the basis of semiquantitative comparisons with these reference spectra.

d. Calibration of Grid Openings.

i. Measure 20 grid openings on each of 20 random 200-mesh copper grids by placing a grid on a glass slide and examining it under the PCM. Use a calibrated graticule to measure the average field diameter and use this number to calculate the field area for an average grid opening. Grids are to be randomly selected from batches up to 1,000.

NOTE: A grid opening is considered as one field.

ii. The mean grid opening area must be measured for the type of specimen grids in use. This can be accomplished on the TEM at a properly calibrated low magnification or on an optical microscope at a magnification of approximately 400X by using an eyepiece fitted with a scale that has been calibrated against a stage micrometer. Optical microscopy utilizing manual or automated procedures may be used providing instrument calibration can be verified.

e. Determination of Camera Constant and ED Pattern Analysis.

i. The camera length of the TEM in ED operating mode must be calibrated before ED patterns on unknown samples are observed. This can be achieved by using a carbon-coated grid on which a thin film of gold has been

**Environmental Protection Agency**                          **Pt. 763, Subpt. E, App. A**

sputtered or evaporated. A thin film of gold is evaporated on the specimen TEM grid to obtain zone-axis ED patterns superimposed with a ring pattern from the polycrystalline gold film.

ii. In practice, it is desirable to optimize the thickness of the gold film so that only one or two sharp rings are obtained on the superimposed ED pattern. Thicker gold film would normally give multiple gold rings, but it will tend to mask weaker diffraction spots from the unknown fibrous particulates. Since the unknown d-spacings of most interest in asbestos analysis are those which lie closest to the transmitted beam, multiple gold rings are unnecessary on zone-axis ED patterns. An average camera constant using multiple gold rings can be determined. The camera constant is one-half the diameter, D, of the rings times the interplanar spacing, d, of the ring being measured.

K. Quality Control/Quality Assurance Procedures (Data Quality Indicators)

Monitoring the environment for airborne asbestos requires the use of sensitive sam-

pling and analysis procedures. Because the test is sensitive, it may be influenced by a variety of factors. These include the supplies used in the sampling operation, the performance of the sampling, the preparation of the grid from the filter and the actual examination of this grid in the microscope. Each of these unit operations must produce a product of defined quality if the analytical result is to be a reliable and meaningful test result. Accordingly, a series of control checks and reference standards is performed along with the sample analysis as indicators that the materials used are adequate and the operations are within acceptable limits. In this way, the quality of the data is defined and the results are of known value. These checks and tests also provide timely and specific warning of any problems which might develop within the sampling and analysis operations. A description of these quality control/quality assurance procedures is summarized in the following Table III:

TABLE III--SUMMARY OF LABORATORY DATA QUALITY OBJECTIVES

| Unit Operation | QC Check | Frequency | Conformance Expectation |
|---|---|---|---|
| Sample receiving | Review of receiving report | Each sample | 95% complete |
| Sample custody | Review of chain-of-custody record | Each sample | 95% complete |
| Sample preparation | Supplies and reagents | On receipt | Meet specs. or reject |
| | Grid opening size | 20 openings/20 grids/lot of 1000 or 1 opening/sample | 100% |
| | Special clean area monitoring | After cleaning or service | Meet specs or reclean |
| | Laboratory blank | 1 per prep series or 10% | Meet specs. or reanalyze series |
| | Plasma etch blank | 1 per 20 samples | 75% |
| | Multiple preps (3 per sample) | Each sample | One with cover of 15 complete grid sqs. |
| Sample analysis | System check | Each day | Each day |
| | Alignment check | Each day | Each day |
| | Magnification calibration with low and high standards | Each month or after service | 95% |
| | ED calibration by gold standard | Weekly | 95% |
| | EDS calibration by copper line | Daily | 95% |
| Performance check | Laboratory blank (measure of cleanliness) | Prep 1 per series or 10% read 1 per 25 samples | Meet specs or reanalyze series |
| | Replicate counting (measure of precision) | 1 per 100 samples | 1.5 x Poisson Std. Dev. |
| | Duplicate analysis (measure of reproducibility) | 1 per 100 samples | 2 x Poisson Std. Dev. |
| | Known samples of typical materials (working standards) | Training and for comparison with unknowns | 100% |
| | Analysis of NBS SRM 1876 and/or RM 8410 (measure of accuracy and comparability) | 1 per analyst per year | 1.5 x Poisson Std. Dev. |
| | Data entry review (data validation and measure of completeness) | Each sample | 95% |
| | Record and verify ID electron diffraction pattern of structure | 1 per 5 samples | 80% accuracy |
| Calculations and data reduction | Hand calculation of automated data reduction procedure or independent recalculation of hand-calculated data | 1 per 100 samples | 85% |

1. When the samples arrive at the laboratory, check the samples and documentation for completeness and requirements before initiating the analysis.

2. Check all laboratory reagents and supplies for acceptable asbestos background levels.

3. Conduct all sample preparation in a clean room environment monitored by laboratory blanks and special testing after cleaning or servicing the room.

4. Prepare multiple grids of each sample.

5. Provide laboratory blanks with each sample batch. Maintain a cumulative average of these results. If this average is greater than 53 f/mm² per 10 200-mesh grid openings, check the system for possible sources of contamination.

6. Check for recovery of asbestos from cellulose ester filters submitted to plasma asher.

7. Check for asbestos carryover in the plasma asher by including a blank alongside the positive control sample.

**Environmental Protection Agency**

**Pt. 763, Subpt. E, App. A**

8. Perform a systems check on the transmission electron microscope daily.

9. Make periodic performance checks of magnification, electron diffraction and energy dispersive X-ray systems as set forth in Table III of Unit III.K.

10. Ensure qualified operator performance by evaluation of replicate counting, duplicate analysis, and standard sample comparisons as set forth in Table III of Unit III.K.

11. Validate all data entries.

12. Recalculate a percentage of all computations and automatic data reduction steps as specified in Table III.

13. Record an electron diffraction pattern of one asbestos structure from every five samples that contain asbestos. Verify the identification of the pattern by measurement or comparison of the pattern with patterns collected from standards under the same conditions.

The outline of quality control procedures presented above is viewed as the minimum required to assure that quality data is produced for clearance testing of an asbestos abated area. Additional information may be gained by other control tests. Specifics on those control procedures and options available for environmental testing can be obtained by consulting References 6, 7, and 11 of Unit III.L.

L. References

For additional background information on this method the following references should be consulted.

1. "Guidelines for Controlling Asbestos-Containing Materials in Buildings," EPA 560/5–85–024, June 1985.

2. "Measuring Airborne Asbestos Following an Abatement Action," USEP/Office of Pollution Prevention and Toxics, EPA 600/4–85–049, 1985.

3. Small, John and E. Steel. Asbestos Standards: Materials and Analytical Methods. N.B.S. Special Publication 619, 1982.

4. Campbell, W.J., R.L. Blake, L.L. Brown, E.E. Cather, and J.J. Sjoberg. Selected Silicate Minerals and Their Asbestiform Varieties. Information Circular 8751, U.S. Bureau of Mines, 1977.

5. Quality Assurance Handbook for Air Pollution Measurement System. Ambient Air Methods, EPA 600/4–77–027a, USEPA, Office of Research and Development, 1977.

6. Method 2A: Direct Measurement of Gas Volume Through Pipes and Small Ducts. 40 CFR Part 60 Appendix A.

7. Burdette, G.J. Health & Safety Exec., Research & Lab. Services Div., London, "Proposed Analytical Method for Determination of Asbestos in Air."

8. Chatfield, E.J., Chatfield Tech. Cons., Ltd., Clark, T., PEI Assoc. "Standard Operating Procedure for Determination of Airborne Asbestos Fibers by Transmission Electron Microscopy Using Polycarbonate Membrane Filters." WERL SOP 87–1, March 5, 1987.

9. NIOSH. Method 7402 for Asbestos Fibers, December 11, 1986 Draft.

10. Yamate, G., S.C. Agarwall, R.D. Gibbons, IIT Research Institute, "Methodology for the Measurement of Airborne Asbestos by Electron Microscopy." Draft report, USEPA Contract 68–02–3266, July 1984.

11. Guidance to the Preparation of Quality Assurance Project Plans. USEPA, Office of Pollution Prevention and Toxics, 1984.

*IV. Mandatory Interpretation of Transmission Electron Microscopy Results To Determine Completion of Response Actions*

A. Introduction

A response action is determined to be completed by TEM when the abatement area has been cleaned and the airborne asbestos concentration inside the abatement area is no higher than concentrations at locations outside the abatement area. "Outside" means outside the abatement area, but not necessarily outside the building. EPA reasons that an asbestos removal contractor cannot be expected to clean an abatement area to an airborne asbestos concentration that is lower than the concentration of air entering the abatement area from outdoors or from other parts of the building. After the abatement area has passed a thorough visual inspection, and before the outer containment barrier is removed, a minimum of five air samples inside the abatement area and a minimum of five air samples outside the abatement area must be collected. Hence, the response action is determined to be completed when the average airborne asbestos concentration measured inside the abatement area is not statistically different from the average airborne asbestos concentration measured outside the abatement area.

The inside and outside concentrations are compared by the Z-test, a statistical test that takes into account the variability in the measurement process. A minimum of five samples inside the abatement area and five samples outside the abatement area are required to control the false negative error rate, i.e., the probability of declaring the removal complete when, in fact, the air concentration inside the abatement area is significantly higher than outside the abatement area. Additional quality control is provided by requiring three blanks (filters through which no air has been drawn) to be analyzed to check for unusually high filter contamination that would distort the test results.

When volumes greater than or equal to 1,199 L for a 25 mm filter and 2,799 L for a 37 mm filter have been collected and the average number of asbestos structures on samples inside the abatement area is no greater than 70 s/mm² of filter, the response action

899

may be considered complete without comparing the inside samples to the outside samples. EPA is permitting this initial screening test to save analysis costs in situations where the airborne asbestos concentration is sufficiently low so that it cannot be distinguished from the filter contamination/background level (fibers deposited on the filter that are unrelated to the air being sampled). The screening test cannot be used when volumes of less than 1,199 L for 25 mm filter or 2,799 L for a 37 mm filter are collected because the ability to distinguish levels significantly different from filter background is reduced at low volumes.

The initial screening test is expressed in structures per square millimeter of filter because filter background levels come from sources other than the air being sampled and cannot be meaningfully expressed as a concentration per cubic centimeter of air. The value of 70 s/mm² is based on the experience of the panel of microscopists who consider one structure in 10 grid openings (each grid opening with an area of 0.0057 mm²) to be comparable with contamination/background levels of blank filters. The decision is based, in part, on Poisson statistics which indicate that four structures must be counted on a filter before the fiber count is statistically distinguishable from the count for one structure. As more information on the performance of the method is collected, this criterion may be modified. Since different combinations of the number and size of grid openings are permitted under the TEM protocol, the criterion is expressed in structures per square millimeter of filter to be consistent across all combinations. Four structures per 10 grid openings corresponds to approximately 70 s/mm².

B. Sample Collection and Analysis

1. A minimum of 13 samples is required: five samples collected inside the abatement area, five samples collected outside the abatement area, two field blanks, and one sealed blank.
2. Sampling and TEM analysis must be done according to either the mandatory or nonmandatory protocols in Appendix A. At least 0.057 mm² of filter must be examined on blank filters.

C. Interpretation of Results

1. The response action shall be considered complete if either:
a. Each sample collected inside the abatement area consists of at least 1,199 L of air for a 25 mm filter, or 2,799 L of air for a 37 mm filter, and the arithmetic mean of their asbestos structure concentrations per square millimeter of filter is less than or equal to 70 s/mm²; or
b. The three blank samples have an arithmetic mean of the asbestos structure con-

centration on the blank filters that is less than or equal to 70 s/mm² and the average airborne asbestos concentration measured inside the abatement area is not statistically higher than the average airborne asbestos concentration measured outside the abatement area as determined by the Z-test. The Z-test is carried out by calculating

$$Z = \frac{\bar{Y}_I - \bar{Y}_O}{0.8(1/n_I + 1/n_O)^{1/2}}$$

where $Y_I$ is the average of the natural logarithms of the inside samples and $Y_O$ is the average of the natural logarithms of the outside samples, $n_I$ is the number of inside samples and $n_O$ is the number of outside samples. The response action is considered complete if Z is less than or equal to 1.65.

NOTE: When no fibers are counted, the calculated detection limit for that analysis is inserted for the concentration.

2. If the abatement site does not satisfy either (1) or (2) of this Section C, the site must be recleaned and a new set of samples collected.

D. Sequence for Analyzing Samples

It is possible to determine completion of the response action without analyzing all samples. Also, at any point in the process, a decision may be made to terminate the analysis of existing samples, reclean the abatement site, and collect a new set of samples. The following sequence is outlined to minimize the number of analyses needed to reach a decision.

1. Analyze the inside samples.
2. If at least 1,199 L of air for a 25 mm filter or 2,799 L of air for a 37 mm filter is collected for each inside sample and the arithmetic mean concentration of structures per square millimeter of filter is less than or equal to 70 s/mm², the response action is complete and no further analysis is begun.
3. If less than 1,199 L of air for a 25 mm filter or 2,799 L of air for a 37 mm filter is collected for any of the inside samples, or the arithmetic mean concentration of structures per square millimeter of filter is greater than 70 s/mm², analyze the three blanks.
4. If the arithmetic mean concentration of structures per square millimeter on the blank filters is greater than 70 s/mm², terminate the analysis, identify and correct the source of blank contamination, and collect a new set of samples.
5. If the arithmetic mean concentration of structures per square millimeter on the blank filters is less than or equal to 70 s/mm², analyze the outside samples and perform the Z-test.

900

6. If the Z-statistic is less than or equal to 1.65, the response action is complete. If the Z-statistic is greater than 1.65, reclean the abatement site and collect a new set of samples.

[52 FR 41857, Oct. 30, 1987]

APPENDIX B TO SUBPART E OF PART 763 [RESERVED]

APPENDIX C TO SUBPART E OF PART 763—ASBESTOS MODEL ACCREDITATION PLAN

*I. Asbestos Model Accreditation Plan for States*

The Asbestos Model Accreditation Plan (MAP) for States has eight components:
(A) Definitions
(B) Initial Training
(C) Examinations
(D) Continuing Education
(E) Qualifications
(F) Recordkeeping Requirements for Training Providers
(G) Deaccreditation
(H) Reciprocity
(I) Electronic reporting

A. Definitions

For purposes of Appendix C:

1. "Friable asbestos-containing material (ACM)" means any material containing more than one percent asbestos which has been applied on ceilings, walls, structural members, piping, duct work, or any other part of a building, which when dry, may be crumbled, pulverized, or reduced to powder by hand pressure. The term includes non-friable asbestos-containing material after such previously non-friable material becomes damaged to the extent that when dry it may be crumbled, pulverized, or reduced to powder by hand pressure.

2. "Friable asbestos-containing building material (ACBM)" means any friable ACM that is in or on interior structural members or other parts of a school or public and commercial building.

3. "Inspection" means an activity undertaken in a school building, or a public and commercial building, to determine the presence or location, or to assess the condition of, friable or non-friable asbestos-containing building material (ACBM) or suspected ACBM, whether by visual or physical examination, or by collecting samples of such material. This term includes reinspections of friable and non-friable known or assumed ACBM which has been previously identified. The term does not include the following:

a. Periodic surveillance of the type described in 40 CFR 763.92(b) solely for the purpose of recording or reporting a change in the condition of known or assumed ACBM;

b. Inspections performed by employees or agents of Federal, State, or local government solely for the purpose of determining

compliance with applicable statutes or regulations; or

c. visual inspections of the type described in 40 CFR 763.90(i) solely for the purpose of determining completion of response actions.

4. "Major fiber release episode" means any uncontrolled or unintentional disturbance of ACBM, resulting in a visible emission, which involves the falling or dislodging of more than 3 square or linear feet of friable ACBM.

5. "Minor fiber release episode" means any uncontrolled or unintentional disturbance of ACBM, resulting in a visible emission, which involves the falling or dislodging of 3 square or linear feet or less of friable ACBM.

6. "Public and commercial building" means the interior space of any building which is not a school building, except that the term does not include any residential apartment building of fewer than 10 units or detached single-family homes. The term includes, but is not limited to: industrial and office buildings, residential apartment buildings and condominiums of 10 or more dwelling units, government-owned buildings, colleges, museums, airports, hospitals, churches, preschools, stores, warehouses and factories. Interior space includes exterior hallways connecting buildings, porticos, and mechanical systems used to condition interior space.

7. "Response action" means a method, including removal, encapsulation, enclosure, repair, and operation and maintenance, that protects human health and the environment from friable ACBM.

8. "Small-scale, short-duration activities (SSSD)" are tasks such as, but not limited to:

a. Removal of asbestos-containing insulation on pipes.

b. Removal of small quantities of asbestos-containing insulation on beams or above ceilings.

c. Replacement of an asbestos-containing gasket on a valve.

d. Installation or removal of a small section of drywall.

e. Installation of electrical conduits through or proximate to asbestos-containing materials.

SSSD can be further defined by the following considerations:

f. Removal of small quantities of ACM only if required in the performance of another maintenance activity not intended as asbestos abatement.

g. Removal of asbestos-containing thermal system insulation not to exceed amounts greater than those which can be contained in a single glove bag.

h. Minor repairs to damaged thermal system insulation which do not require removal.

i. Repairs to a piece of asbestos-containing wallboard.

j. Repairs, involving encapsulation, enclosure, or removal, to small amounts of friable ACM only if required in the performance of emergency or routine maintenance activity and not intended solely as asbestos abatement. Such work may not exceed amounts greater than those which can be contained in a single prefabricated mini-enclosure. Such an enclosure shall conform spatially and geometrically to the localized work area, in order to perform its intended containment function.

### B. Initial Training

Training requirements for purposes of accreditation are specified both in terms of required subjects of instruction and in terms of length of training. Each initial training course has a prescribed curriculum and number of days of training. One day of training equals 8 hours, including breaks and lunch. Course instruction must be provided by EPA or State-approved instructors. EPA or State instructor approval shall be based upon a review of the instructor's academic credentials and/or field experience in asbestos abatement.

Beyond the initial training requirements, individual States may wish to consider requiring additional days of training for purposes of supplementing hands-on activities or for reviewing relevant state regulations. States also may wish to consider the relative merits of a worker apprenticeship program. Further, they might consider more stringent minimum qualification standards for the approval of training instructors. EPA recommends that the enrollment in any given course be limited to 25 students so that adequate opportunities exist for individual hands-on experience.

States have the option to provide initial training directly or approve other entities to offer training. The following requirements are for the initial training of persons required to have accreditation under TSCA Title II.

Training requirements for each of the five accredited disciplines are outlined below. Persons in each discipline perform a different job function and distinct role. Inspectors identify and assess the condition of ACBM, or suspect ACBM. Management planners use data gathered by inspectors to assess the degree of hazard posed by ACBM in schools to determine the scope and timing of appropriate response actions needed for schools. Project designers determine how asbestos abatement work should be conducted. Lastly, workers and contractor/supervisors carry out and oversee abatement work. In addition, a recommended training curriculum is also presented for a sixth discipline, which is not federally-accredited, that of "Project Monitor." Each accredited discipline and training curriculum is separate and distinct from the others. A person

seeking accreditation in any of the five accredited MAP disciplines cannot attend two or more courses concurrently, but may attend such courses sequentially.

In several instances, initial training courses for a specific discipline (e.g., workers, inspectors) require hands-on training. For asbestos abatement contractor/supervisors and workers, hands-on training should include working with asbestos-substitute materials, fitting and using respirators, use of glovebags, donning protective clothing, and constructing a decontamination unit as well as other abatement work activities.

### 1. WORKERS

A person must be accredited as a worker to carry out any of the following activities with respect to friable ACBM in a school or public and commercial building: (1) A response action other than a SSSD activity, (2) a maintenance activity that disturbs friable ACBM other than a SSSD activity, or (3) a response action for a major fiber release episode. All persons seeking accreditation as asbestos abatement workers shall complete at least a 4-day training course as outlined below. The 4-day worker training course shall include lectures, demonstrations, at least 14 hours of hands-on training, individual respirator fit testing, course review, and an examination. Hands-on training must permit workers to have actual experience performing tasks associated with asbestos abatement. A person who is otherwise accredited as a contractor/supervisor may perform in the role of a worker without possessing separate accreditation as a worker.

Because of cultural diversity associated with the asbestos workforce, EPA recommends that States adopt specific standards for the approval of foreign language courses for abatement workers. EPA further recommends the use of audio-visual materials to complement lectures, where appropriate.

The training course shall adequately address the following topics:

(a) *Physical characteristics of asbestos.* Identification of asbestos, aerodynamic characteristics, typical uses, and physical appearance, and a summary of abatement control options.

(b) *Potential health effects related to asbestos exposure.* The nature of asbestos-related diseases; routes of exposure; dose-response relationships and the lack of a safe exposure level; the synergistic effect between cigarette smoking and asbestos exposure; the latency periods for asbestos-related diseases; a discussion of the relationship of asbestos exposure to asbestosis, lung cancer, mesothelioma, and cancers of other organs.

(c) *Employee personal protective equipment.* Classes and characteristics of respirator

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. C**

types; limitations of respirators; proper selection, inspection; donning, use, maintenance, and storage procedures for respirators; methods for field testing of the facepiece-to-face seal (positive and negative-pressure fit checks); qualitative and quantitative fit testing procedures; variability between field and laboratory protection factors that alter respiratory fit (e.g., facial hair); the components of a proper respiratory protection program; selection and use of personal protective clothing; use, storage, and handling of non-disposable clothing; and regulations covering personal protective equipment.

(d) *State-of-the-art work practices.* Proper work practices for asbestos abatement activities, including descriptions of proper construction; maintenance of barriers and decontamination enclosure systems; positioning of warning signs; lock-out of electrical and ventilation systems; proper working techniques for minimizing fiber release; use of wet methods; use of negative pressure exhaust ventilation equipment; use of high-efficiency particulate air (HEPA) vacuums; proper clean-up and disposal procedures; work practices for removal, encapsulation, enclosure, and repair of ACM; emergency procedures for sudden releases; potential exposure situations; transport and disposal procedures; and recommended and prohibited work practices.

(e) *Personal hygiene.* Entry and exit procedures for the work area; use of showers; avoidance of eating, drinking, smoking, and chewing (gum or tobacco) in the work area; and potential exposures, such as family exposure.

(f) *Additional safety hazards.* Hazards encountered during abatement activities and how to deal with them, including electrical hazards, heat stress, air contaminants other than asbestos, fire and explosion hazards, scaffold and ladder hazards, slips, trips, and falls, and confined spaces.

(g) *Medical monitoring.* OSHA and EPA Worker Protection Rule requirements for physical examinations, including a pulmonary function test, chest X-rays, and a medical history for each employee.

(h) *Air monitoring.* Procedures to determine airborne concentrations of asbestos fibers, focusing on how personal air sampling is performed and the reasons for it.

(i) *Relevant Federal, State, and local regulatory requirements, procedures, and standards.* With particular attention directed at relevant EPA, OSHA, and State regulations concerning asbestos abatement workers.

(j) *Establishment of respiratory protection programs.*

(k) *Course review.* A review of key aspects of the training course.

2. CONTRACTOR/SUPERVISORS

A person must be accredited as a contractor/supervisor to supervise any of the following activities with respect to friable ACBM in a school or public and commercial building: (1) A response action other than a SSSD activity, (2) a maintenance activity that disturbs friable ACBM other than a SSSD activity, or (3) a response action for a major fiber release episode. All persons seeking accreditation as asbestos abatement contractor/supervisors shall complete at least a 5-day training course as outlined below. The training course must include lectures, demonstrations, at least 14 hours of hands-on training, individual respirator fit testing, course review, and a written examination. Hands-on training must permit supervisors to have actual experience performing tasks associated with asbestos abatement.

EPA recommends the use of audiovisual materials to complement lectures, where appropriate.

Asbestos abatement supervisors include those persons who provide supervision and direction to workers performing response actions. Supervisors may include those individuals with the position title of foreman, working foreman, or leadman pursuant to collective bargaining agreements. At least one supervisor is required to be at the worksite at all times while response actions are being conducted. Asbestos workers must have access to accredited supervisors throughout the duration of the project.

The contractor/supervisor training course shall adequately address the following topics:

(a) *The physical characteristics of asbestos and asbestos-containing materials.* Identification of asbestos, aerodynamic characteristics, typical uses, physical appearance, a review of hazard assessment considerations, and a summary of abatement control options.

(b) *Potential health effects related to asbestos exposure.* The nature of asbestos-related diseases; routes of exposure; dose-response relationships and the lack of a safe exposure level; synergism between cigarette smoking and asbestos exposure; and latency period for diseases.

(c) *Employee personal protective equipment.* Classes and characteristics of respirator types; limitations of respirators; proper selection, inspection, donning, use, maintenance, and storage procedures for respirators; methods for field testing of the facepiece-to-face seal (positive and negative-pressure fit checks); qualitative and quantitative fit testing procedures; variability between field and laboratory protection factors that alter respiratory fit (e.g., facial hair); the components of a proper respiratory protection program; selection and use of personal protective clothing; and use, storage,

and handling of non-disposable clothing; and regulations covering personal protective equipment.

(d) *State-of-the-art work practices.* Proper work practices for asbestos abatement activities, including descriptions of proper construction and maintenance of barriers and decontamination enclosure systems; positioning of warning signs; lock-out of electrical and ventilation systems; proper working techniques for minimizing fiber release; use of wet methods; use of negative pressure exhaust ventilation equipment; use of HEPA vacuums; and proper clean-up and disposal procedures. Work practices for removal, encapsulation, enclosure, and repair of ACM; emergency procedures for unplanned releases; potential exposure situations; transport and disposal procedures; and recommended and prohibited work practices. New abatement-related techniques and methodologies may be discussed.

(e) *Personal hygiene.* Entry and exit procedures for the work area; use of showers; and avoidance of eating, drinking, smoking, and chewing (gum or tobacco) in the work area. Potential exposures, such as family exposure, shall be included.

(f) *Additional safety hazards.* Hazards encountered during abatement activities and how to deal with them, including electrical hazards, heat stress, air contaminants other than asbestos, fire and explosion hazards, scaffold and ladder hazards, slips, trips, and falls, and confined spaces.

(g) *Medical monitoring.* OSHA and EPA Worker Protection Rule requirements for physical examinations, including a pulmonary function test, chest X-rays and a medical history for each employee.

(h) *Air monitoring.* Procedures to determine airborne concentrations of asbestos fibers, including descriptions of aggressive air sampling, sampling equipment and methods, reasons for air monitoring, types of samples and interpretation of results.

EPA recommends that transmission electron microscopy (TEM) be used for analysis of final air clearance samples, and that sample analyses be performed by laboratories accredited by the National Institute of Standards and Technology's (NIST) National Voluntary Laboratory Accreditation Program (NVLAP).

(i) *Relevant Federal, State, and local regulatory requirements, procedures, and standards,* including:

(i) Requirements of TSCA Title II.

(ii) National Emission Standards for Hazardous Air Pollutants (40 CFR part 61), Subparts A (General Provisions) and M (National Emission Standard for Asbestos).

(iii) OSHA standards for permissible exposure to airborne concentrations of asbestos fibers and respiratory protection (29 CFR 1910.134).

(iv) OSHA Asbestos Construction Standard (29 CFR 1926.58). (v)EPA Worker Protection Rule, (40 CFR part 763, Subpart G).

(j) *Respiratory Protection Programs and Medical Monitoring Programs.*

(k) *Insurance and liability issues.* Contractor issues; worker's compensation coverage and exclusions; third-party liabilities and defenses; insurance coverage and exclusions.

(l) *Recordkeeping for asbestos abatement projects.* Records required by Federal, State, and local regulations; records recommended for legal and insurance purposes.

(m) *Supervisory techniques for asbestos abatement activities.* Supervisory practices to enforce and reinforce the required work practices and discourage unsafe work practices.

(n) *Contract specifications.* Discussions of key elements that are included in contract specifications.

(o) *Course review.* A review of key aspects of the training course.

### 3. INSPECTOR

All persons who inspect for ACBM in schools or public and commercial buildings must be accredited. All persons seeking accreditation as an inspector shall complete at least a 3-day training course as outlined below. The course shall include lectures, demonstrations, 4 hours of hands-on training, individual respirator fit-testing, course review, and a written examination.

EPA recommends the use of audiovisual materials to complement lectures, where appropriate. Hands-on training should include conducting a simulated building walk-through inspection and respirator fit testing. The inspector training course shall adequately address the following topics:

(a) *Background information on asbestos.* Identification of asbestos, and examples and discussion of the uses and locations of asbestos in buildings; physical appearance of asbestos.

(b) *Potential health effects related to asbestos exposure.* The nature of asbestos-related diseases; routes of exposure; dose-response relationships and the lack of a safe exposure level; the synergistic effect between cigarette smoking and asbestos exposure; the latency periods for asbestos-related diseases; a discussion of the relationship of asbestos exposure to asbestosis, lung cancer, mesothelioma, and cancers of other organs.

(c) *Functions/qualifications and role of inspectors.* Discussions of prior experience and qualifications for inspectors and management planners; discussions of the functions of an accredited inspector as compared to those of an accredited management planner; discussion of inspection process including inventory of ACM and physical assessment.

(d) *Legal liabilities and defenses.* Responsibilities of the inspector and management

planner; a discussion of comprehensive general liability policies, claims-made, and occurrence policies, environmental and pollution liability policy clauses; state liability insurance requirements; bonding and the relationship of insurance availability to bond availability.

(e) *Understanding building systems.* The interrelationship between building systems, including: an overview of common building physical plan layout; heat, ventilation, and air conditioning (HVAC) system types, physical organization, and where asbestos is found on HVAC components; building mechanical systems, their types and organization, and where to look for asbestos on such systems; inspecting electrical systems, including appropriate safety precautions; reading blueprints and as-built drawings.

(f) *Public/employee/building occupant relations.* Notifying employee organizations about the inspection; signs to warn building occupants; tact in dealing with occupants and the press; scheduling of inspections to minimize disruptions; and education of building occupants about actions being taken.

(g) *Pre-inspection planning and review of previous inspection records.* Scheduling the inspection and obtaining access; building record review; identification of probable homogeneous areas from blueprints or as-built drawings; consultation with maintenance or building personnel; review of previous inspection, sampling, and abatement records of a building; the role of the inspector in exclusions for previously performed inspections.

(h) *Inspecting for friable and non-friable ACM and assessing the condition of friable ACM.* Procedures to follow in conducting visual inspections for friable and non-friable ACM; types of building materials that may contain asbestos; touching materials to determine friability; open return air plenums and their importance in HVAC systems; assessing damage, significant damage, potential damage, and potential significant damage; amount of suspected ACM, both in total quantity and as a percentage of the total area; type of damage; accessibility; material's potential for disturbance; known or suspected causes of damage or significant damage; and deterioration as assessment factors.

(i) *Bulk sampling/documentation of asbestos.* Detailed discussion of the ''Simplified Sampling Scheme for Friable Surfacing Materials (EPA 560/5-85-030a October 1985)''; techniques to ensure sampling in a randomly distributed manner for other than friable surfacing materials; sampling of non-friable materials; techniques for bulk sampling; inspector's sampling and repair equipment; patching or repair of damage from sampling; discussion of polarized light microscopy; choosing an accredited laboratory to analyze bulk samples; quality control and quality assurance procedures. EPA's recommendation that all bulk samples collected from school or public and commercial buildings be analyzed by a laboratory accredited under the NVLAP administered by NIST.

(j) *Inspector respiratory protection and personal protective equipment.* Classes and characteristics of respirator types; limitations of respirators; proper selection, inspection; donning, use, maintenance, and storage procedures for respirators; methods for field testing of the facepiece-to-face seal (positive and negative-pressure fit checks); qualitative and quantitative fit testing procedures; variability between field and laboratory protection factors that alter respiratory fit (e.g., facial hair); the components of a proper respiratory protection program; selection and use of personal protective clothing; use, storage, and handling of non-disposable clothing.

(k) *Recordkeeping and writing the inspection report.* Labeling of samples and keying sample identification to sampling location; recommendations on sample labeling; detailing of ACM inventory; photographs of selected sampling areas and examples of ACM condition; information required for inclusion in the management plan required for school buildings under TSCA Title II, section 203 (i)(1). EPA recommends that States develop and require the use of standardized forms for recording the results of inspections in schools or public or commercial buildings, and that the use of these forms be incorporated into the curriculum of training conducted for accreditation.

(l) *Regulatory review.* The following topics should be covered: National Emission Standards for Hazardous Air Pollutants (NESHAP; 40 CFR part 61, Subparts A and M); EPA Worker Protection Rule (40 CFR part 763, Subpart G); OSHA Asbestos Construction Standard (29 CFR 1926.58); OSHA respirator requirements (29 CFR 1910.134); the Asbestos-Containing Materials in School Rule (40 CFR part 763, Subpart E; applicable State and local regulations, and differences between Federal and State requirements where they apply, and the effects, if any, on public and nonpublic schools or commercial or public buildings.

(m) *Field trip.* This includes a field exercise, including a walk-through inspection; on-site discussion about information gathering and the determination of sampling locations; on-site practice in physical assessment; classroom discussion of field exercise.

(n) *Course review.* A review of key aspects of the training course.

### 4. MANAGEMENT PLANNER

All persons who prepare management plans for schools must be accredited. All persons seeking accreditation as management planners shall complete a 3-day inspector training course as outlined above and a 2-day

management planner training course. Possession of current and valid inspector accreditation shall be a prerequisite for admission to the management planner training course. The management planner course shall include lectures, demonstrations, course review, and a written examination.

EPA recommends the use of audiovisual materials to complement lectures, where appropriate.

TSCA Title II does not require accreditation for persons performing the management planner role in public and commercial buildings. Nevertheless, such persons may find this training and accreditation helpful in preparing them to design or administer asbestos operations and maintenance programs for public and commercial buildings.

The management planner training course shall adequately address the following topics:

(a) *Course overview.* The role and responsibilities of the management planner; operations and maintenance programs; setting work priorities; protection of building occupants.

(b) *Evaluation/interpretation of survey results.* Review of TSCA Title II requirements for inspection and management plans for school buildings as given in section 203(i)(1) of TSCA Title II; interpretation of field data and laboratory results; comparison of field inspector's data sheet with laboratory results and site survey.

(c) *Hazard assessment.* Amplification of the difference between physical assessment and hazard assessment; the role of the management planner in hazard assessment; explanation of significant damage, damage, potential damage, and potential significant damage; use of a description (or decision tree) code for assessment of ACM; assessment of friable ACM; relationship of accessibility, vibration sources, use of adjoining space, and air plenums and other factors to hazard assessment.

(d) *Legal implications.* Liability; insurance issues specific to planners; liabilities associated with interim control measures, in-house maintenance, repair, and removal; use of results from previously performed inspections.

(e) *Evaluation and selection of control options.* Overview of encapsulation, enclosure, interim operations and maintenance, and removal; advantages and disadvantages of each method; response actions described via a decision tree or other appropriate method; work practices for each response action; staging and prioritizing of work in both vacant and occupied buildings; the need for containment barriers and decontamination in response actions.

(f) *Role of other professionals.* Use of industrial hygienists, engineers, and architects in developing technical specifications for response actions; any requirements that may exist for architect sign-off of plans; team ap-

proach to design of high-quality job specifications.

(g) *Developing an operations and maintenance (O&M) plan.* Purpose of the plan; discussion of applicable EPA guidance documents; what actions should be taken by custodial staff; proper cleaning procedures; steam cleaning and HEPA vacuuming; reducing disturbance of ACM; scheduling O&M for off-hours; rescheduling or canceling renovation in areas with ACM; boiler room maintenance; disposal of ACM; in-house procedures for ACM—bridging and penetrating encapsulants; pipe fittings; metal sleeves; polyvinyl chloride (PVC), canvas, and wet wraps; muslin with straps, fiber mesh cloth; mineral wool, and insulating cement; discussion of employee protection programs and staff training; case study in developing an O&M plan (development, implementation process, and problems that have been experienced).

(h) *Regulatory review.* Focusing on the OSHA Asbestos Construction Standard found at 29 CFR 1926.58; the National Emission Standard for Hazardous Air Pollutants (NESHAP) found at 40 CFR part 61, Subparts A (General Provisions) and M (National Emission Standard for Asbestos); EPA Worker Protection Rule found at 40 CFR part 763, Subpart G; TSCA Title II; applicable State regulations.

(i) *Recordkeeping for the management planner.* Use of field inspector's data sheet along with laboratory results; on-going recordkeeping as a means to track asbestos disturbance; procedures for recordkeeping. EPA recommends that States require the use of standardized forms for purposes of management plans and incorporate the use of such forms into the initial training course for management planners.

(j) *Assembling and submitting the management plan.* Plan requirements for schools in TSCA Title II section 203(i)(1); the management plan as a planning tool.

(k) *Financing abatement actions.* Economic analysis and cost estimates; development of cost estimates; present costs of abatement versus future operation and maintenance costs; Asbestos School Hazard Abatement Act grants and loans.

(l) *Course review.* A review of key aspects of the training course.

5. PROJECT DESIGNER

A person must be accredited as a project designer to design any of the following activities with respect to friable ACBM in a school or public and commercial building: (1) A response action other than a SSSD maintenance activity, (2) a maintenance activity that disturbs friable ACBM other than a SSSD maintenance activity, or (3) a response action for a major fiber release episode. All persons seeking accreditation as a project designer shall complete at least a minimum

**Environmental Protection Agency**                                    **Pt. 763, Subpt. E, App. C**

3–day training course as outlined below. The project designer course shall include lectures, demonstrations, a field trip, course review and a written examination.

EPA recommends the use of audiovisual materials to complement lectures, where appropriate.

The abatement project designer training course shall adequately address the following topics:

(a) *Background information on asbestos.* Identification of asbestos; examples and discussion of the uses and locations of asbestos in buildings; physical appearance of asbestos.

(b) *Potential health effects related to asbestos exposure.* Nature of asbestos-related diseases; routes of exposure; dose-response relationships and the lack of a safe exposure level; the synergistic effect between cigarette smoking and asbestos exposure; the latency period of asbestos-related diseases; a discussion of the relationship between asbestos exposure and asbestosis, lung cancer, mesothelioma, and cancers of other organs.

(c) *Overview of abatement construction projects.* Abatement as a portion of a renovation project; OSHA requirements for notification of other contractors on a multi-employer site (29 CFR 1926.58).

(d) *Safety system design specifications.* Design, construction, and maintenance of containment barriers and decontamination enclosure systems; positioning of warning signs; electrical and ventilation system lockout; proper working techniques for minimizing fiber release; entry and exit procedures for the work area; use of wet methods; proper techniques for initial cleaning; use of negative-pressure exhaust ventilation equipment; use of HEPA vacuums; proper clean-up and disposal of asbestos; work practices as they apply to encapsulation, enclosure, and repair; use of glove bags and a demonstration of glove bag use.

(e) *Field trip.* A visit to an abatement site or other suitable building site, including on-site discussions of abatement design and building walk-through inspection. Include discussion of rationale for the concept of functional spaces during the walk-through.

(f) *Employee personal protective equipment.* Classes and characteristics of respirator types; limitations of respirators; proper selection, inspection; donning, use, maintenance, and storage procedures for respirators; methods for field testing of the facepiece-to-face seal (positive and negative-pressure fit checks); qualitative and quantitative fit testing procedures; variability between field and laboratory protection factors that alter respiratory fit (e.g., facial hair); the components of a proper respiratory protection program; selection and use of personal protective clothing; use, storage, and handling of non-disposable clothing.

(g) *Additional safety hazards.* Hazards encountered during abatement activities and how to deal with them, including electrical hazards, heat stress, air contaminants other than asbestos, fire, and explosion hazards.

(h) *Fiber aerodynamics and control.* Aerodynamic characteristics of asbestos fibers; importance of proper containment barriers; settling time for asbestos fibers; wet methods in abatement; aggressive air monitoring following abatement; aggressive air movement and negative-pressure exhaust ventilation as a clean-up method.

(i) *Designing abatement solutions.* Discussions of removal, enclosure, and encapsulation methods; asbestos waste disposal.

(j) *Final clearance process.* Discussion of the need for a written sampling rationale for aggressive final air clearance; requirements of a complete visual inspection; and the relationship of the visual inspection to final air clearance.

EPA recommends the use of TEM for analysis of final air clearance samples. These samples should be analyzed by laboratories accredited under the NIST NVLAP.

(k) *Budgeting/cost estimating.* Development of cost estimates; present costs of abatement versus future operation and maintenance costs; setting priorities for abatement jobs to reduce costs.

(l) *Writing abatement specifications.* Preparation of and need for a written project design; means and methods specifications versus performance specifications; design of abatement in occupied buildings; modification of guide specifications for a particular building; worker and building occupant health/medical considerations; replacement of ACM with non-asbestos substitutes.

(m) *Preparing abatement drawings.* Significance and need for drawings, use of as-built drawings as base drawings; use of inspection photographs and on-site reports; methods of preparing abatement drawings; diagramming containment barriers; relationship of drawings to design specifications; particular problems related to abatement drawings.

(n) *Contract preparation and administration.*

(o) *Legal/liabilities/defenses.* Insurance considerations; bonding; hold-harmless clauses; use of abatement contractor's liability insurance; claims made versus occurrence policies.

(p) *Replacement.* Replacement of asbestos with asbestos-free substitutes.

(q) *Role of other consultants.* Development of technical specification sections by industrial hygienists or engineers; the multi-disciplinary team approach to abatement design.

(r) *Occupied buildings.* Special design procedures required in occupied buildings; education of occupants; extra monitoring recommendations; staging of work to minimize occupant exposure; scheduling of renovation to minimize exposure.

(s) *Relevant Federal, State, and local regulatory requirements, procedures and standards, including, but not limited to:*

(i) Requirements of TSCA Title II.

(ii) National Emission Standards for Hazardous Air Pollutants, (40 CFR part 61) subparts A (General Provisions) and M (National Emission Standard for Asbestos).

(iii) OSHA Respirator Standard found at 29 CFR 1910.134.

(iv) EPA Worker Protection Rule found at 40 CFR part 763, subpart G.

(v) OSHA Asbestos Construction Standard found at 29 CFR 1926.58.

(vi) OSHA Hazard Communication Standard found at 29 CFR 1926.59.

(t) *Course review.* A review of key aspects of the training course.

6. PROJECT MONITOR

EPA recommends that States adopt training and accreditation requirements for persons seeking to perform work as project monitors. Project monitors observe abatement activities performed by contractors and generally serve as a building owner's representative to ensure that abatement work is completed according to specification and in compliance with all relevant statutes and regulations. They may also perform the vital role of air monitoring for purposes of determining final clearance. EPA recommends that a State seeking to accredit individuals as project monitors consider adopting a minimum 5-day training course covering the topics outlined below. The course outlined below consists of lectures and demonstrations, at least 6 hours of hands-on training, course review, and a written examination. The hands-on training component might be satisfied by having the student simulate participation in or performance of any of the relevant job functions or activities (or by incorporation of the workshop component described in item "n" below of this unit).

EPA recommends that the project monitor training course adequately address the following topics:

(a) *Roles and responsibilities of the project monitor.* Definition and responsibilities of the project monitor, including regulatory/specification compliance monitoring, air monitoring, conducting visual inspections, and final clearance monitoring.

(b) *Characteristics of asbestos and asbestos-containing materials.* Typical uses of asbestos; physical appearance of asbestos; review of asbestos abatement and control techniques; presentation of the health effects of asbestos exposure, including routes of exposure, dose-response relationships, and latency periods for asbestos-related diseases.

(c) *Federal asbestos regulations.* Overview of pertinent EPA regulations, including: NESHAP, 40 CFR part 61, subparts A and M; AHERA, 40 CFR part 763, subpart E; and the EPA Worker Protection Rule, 40 CFR part 763, subpart G. Overview of pertinent OSHA regulations, including: Construction Industry Standard for Asbestos, 29 CFR 1926.58; Respirator Standard, 29 CFR 1910.134; and the Hazard Communication Standard, 29 CFR 1926.59. Applicable State and local asbestos regulations; regulatory interrelationships.

(d) *Understanding building construction and building systems.* Building construction basics, building physical plan layout; understanding building systems (HVAC, electrical, etc.); layout and organization, where asbestos is likely to be found on building systems; renovations and the effect of asbestos abatement on building systems.

(e) *Asbestos abatement contracts, specifications, and drawings.* Basic provisions of the contract; relationships between principle parties, establishing chain of command; types of specifications, including means and methods, performance, and proprietary and nonproprietary; reading and interpreting records and abatement drawings; discussion of change orders; common enforcement responsibilities and authority of project monitor.

(f) *Response actions and abatement practices.* Pre-work inspections; pre-work considerations, precleaning of the work area, removal of furniture, fixtures, and equipment; shutdown/modification of building systems; construction and maintenance of containment barriers, proper demarcation of work areas; work area entry/exit, hygiene practices; determining the effectiveness of air filtration equipment; techniques for minimizing fiber release, wet methods, continuous cleaning; abatement methods other than removal; abatement area clean-up procedures; waste transport and disposal procedures; contingency planning for emergency response.

(g) *Asbestos abatement equipment.* Typical equipment found on an abatement project; air filtration devices, vacuum systems, negative pressure differential monitoring; HEPA filtration units, theory of filtration, design/construction of HEPA filtration units, qualitative and quantitative performance of HEPA filtration units, sizing the ventilation requirements, location of HEPA filtration units, qualitative and quantitative tests of containment barrier integrity; best available technology.

(h) *Personal protective equipment.* Proper selection of respiratory protection; classes and characteristics of respirator types, limitations of respirators; proper use of other safety equipment, protective clothing selection, use, and proper handling, hard/bump hats, safety shoes; breathing air systems, high pressure v. low pressure, testing for Grade D air, determining proper backup air volumes.

(i) *Air monitoring strategies.* Sampling equipment, sampling pumps (low v. high volume), flow regulating devices (critical and

908

**Environmental Protection Agency**

limiting orifices), use of fibrous aerosol monitors on abatement projects; sampling media, types of filters, types of cassettes, filter orientation, storage and shipment of filters; calibration techniques, primary calibration standards, secondary calibration standards, temperature/pressure effects, frequency of calibration, recordkeeping and field work documentation, calculations; air sample analysis, techniques available and limitations of AHERA on their use, transmission electron microscopy (background to sample preparation and analysis, air sample conditions which prohibit analysis, EPA's recommended technique for analysis of final air clearance samples), phase contrast microscopy (background to sample preparation, and AHERA's limits on the use of phase contrast microscopy), what each technique measures; analytical methodologies, AHERA TEM protocol, NIOSH 7400, OSHA reference method (non clearance), EPA recommendation for clearance (TEM); sampling strategies for clearance monitoring, types of air samples (personal breathing zone v. fixed-station area) sampling location and objectives (pre-abatement, during abatement, and clearance monitoring), number of samples to be collected, minimum and maximum air volumes, clearance monitoring (post-visual-inspection) (number of samples required, selection of sampling locations, period of sampling, aggressive sampling, interpretations of sampling results, calculations), quality assurance; special sampling problems, crawl spaces, acceptable samples for laboratory analysis, sampling in occupied buildings (barrier monitoring).

(j) *Safety and health issues other than asbestos.* Confined-space entry, electrical hazards, fire and explosion concerns, ladders and scaffolding, heat stress, air contaminants other than asbestos, fall hazards, hazardous materials on abatement projects.

(k) *Conducting visual inspections.* Inspections during abatement, visual inspections using the ASTM E1368 document; conducting inspections for completeness of removal; discussion of ''how clean is clean?''

(l) *Legal responsibilities and liabilities of project monitors.* Specification enforcement capabilities; regulatory enforcement; licensing; powers delegated to project monitors through contract documents.

(m) *Recordkeeping and report writing.* Developing project logs/daily logs (what should be included, who sees them); final report preparation; recordkeeping under Federal regulations.

(n) *Workshops (6 hours spread over 3 days).* Contracts, specifications, and drawings: This workshop could consist of each participant being issued a set of contracts, specifications, and drawings and then being asked to answer questions and make recommendations to a project architect, engineer or to

the building owner based on given conditions and these documents.

Air monitoring strategies/asbestos abatement equipment: This workshop could consist of simulated abatement sites for which sampling strategies would have to be developed (i.e., occupied buildings, industrial situations). Through demonstrations and exhibition, the project monitor may also be able to gain a better understanding of the function of various pieces of equipment used on abatement projects (air filtration units, water filtration units, negative pressure monitoring devices, sampling pump calibration devices, etc.).

Conducting visual inspections: This workshop could consist, ideally, of an interactive video in which a participant is ''taken through'' a work area and asked to make notes of what is seen. A series of questions will be asked which are designed to stimulate a person's recall of the area. This workshop could consist of a series of two or three videos with different site conditions and different degrees of cleanliness.

C. Examinations

1. Each State shall administer a closed book examination or designate other entities such as State-approved providers of training courses to administer the closed-book examination to persons seeking accreditation who have completed an initial training course. Demonstration testing may also be included as part of the examination. A person seeking initial accreditation in a specific discipline must pass the examination for that discipline in order to receive accreditation. For example, a person seeking accreditation as an abatement project designer must pass the State's examination for abatement project designer.

States may develop their own examinations, have providers of training courses develop examinations, or use standardized examinations developed for purposes of accreditation under TSCA Title II. In addition, States may supplement standardized examinations with questions about State regulations. States may obtain commercially developed standardized examinations, develop standardized examinations independently, or do so in cooperation with other States, or with commercial or non-profit providers on a regional or national basis. EPA recommends the use of standardized, scientifically-validated testing instruments, which may be beneficial in terms of both promoting competency and in fostering accreditation reciprocity between States.

Each examination shall adequately cover the topics included in the training course for that discipline. Each person who completes a

training course, passes the required examination, and fulfills whatever other requirements the State imposes must receive an accreditation certificate in a specific discipline. Whether a State directly issues accreditation certificates, or authorizes training providers to issue accreditation certificates, each certificate issued to an accredited person must contain the following minimum information:

a. A unique certificate number

b. Name of accredited person

c. Discipline of the training course completed.

d. Dates of training course.

e. Date of the examination.

f. An expiration date of 1 year after the date upon which the person successfully completed the course and examination.

g. The name, address, and telephone number of the training provider that issued the certificate.

h. A statement that the person receiving the certificate has completed the requisite training for asbestos accreditation under TSCA Title II.

States or training providers who reaccredit persons based upon completion of required refresher training must also provide accreditation certificates with all of the above information, except the examination date may be omitted if a State does not require a refresher examination for reaccreditation.

Where a State licenses accredited persons but has authorized training providers to issue accreditation certificates, the State may issue licenses in the form of photo-identification cards. Where this applies, EPA recommends that the State licenses should include all of the same information required for the accreditation certificates. A State may also choose to issue photo-identification cards in addition to the required accreditation certificates.

Accredited persons must have their initial and current accreditation certificates at the location where they are conducting work.

2. The following are the requirements for examination in each discipline:

a. Worker:

i. 50 multiple-choice questions

ii. Passing score: 70 percent correct

b. Contractor/Supervisor:

i. 100 multiple-choice questions

ii. Passing score: 70 percent correct

c. Inspector:

i. 50 Multiple-choice questions

ii. Passing score: 70 percent correct

d. Management Planner:

i. 50 Multiple-choice questions

ii. Passing score: 70 percent correct

e. Project Designer:

i. 100 multiple-choice questions

ii. Passing score: 70 percent correct

D. Continuing Education

For all disciplines, a State's accreditation program shall include annual refresher training as a requirement for reaccreditation as indicated below:

1. Workers: One full day of refresher training.

2. Contractor/Supervisors: One full day of refresher training.

3. Inspectors: One half-day of refresher training.

4. Management Planners: One half-day of inspector refresher training and one half-day of refresher training for management planners.

5. Project Designers: One full day of refresher training.

The refresher courses shall be specific to each discipline. Refresher courses shall be conducted as separate and distinct courses and not combined with any other training during the period of the refresher course. For each discipline, the refresher course shall review and discuss changes in Federal, State, and local regulations, developments in state-of-the-art procedures, and a review of key aspects of the initial training course as determined by the State. After completing the annual refresher course, persons shall have their accreditation extended for an additional year from the date of the refresher course. A State may consider requiring persons to pass reaccreditation examinations at specific intervals (for example, every 3 years).

EPA recommends that States formally establish a 12-month grace period to enable formerly accredited persons with expired certificates to complete refresher training and have their accreditation status reinstated without having to re-take the initial training course.

E. Qualifications

In addition to requiring training and an examination, a State may require candidates for accreditation to meet other qualification and/or experience standards that the State considers appropriate for some or all disciplines. States may choose to consider requiring qualifications similar to the examples outlined below for inspectors, management planners and project designers. States may modify these examples as appropriate. In addition, States may want to include some requirements based on experience in performing a task directly as a part of a job or in an apprenticeship role. They may also wish to consider additional criteria for the approval of training course instructors beyond those prescribed by EPA.

1. Inspectors: Qualifications - possess a high school diploma. States may want to require an Associate's Degree in specific fields (e.g., environmental or physical sciences).

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. C**

2. Management Planners: Qualifications - Registered architect, engineer, or certified industrial hygienist or related scientific field.

3. Project Designers: Qualifications - registered architect, engineer, or certified industrial hygienist.

4. Asbestos Training Course Instructor: Qualifications - academic credentials and/or field experience in asbestos abatement.

EPA recommends that States prescribe minimum qualification standards for training instructors employed by training providers.

F. Recordkeeping Requirements for Training Providers

All approved providers of accredited asbestos training courses must comply with the following minimum recordkeeping requirements.

1. Training course materials. A training provider must retain copies of all instructional materials used in the delivery of the classroom training such as student manuals, instructor notebooks and handouts.

2. Instructor qualifications. A training provider must retain copies of all instructors' resumes, and the documents approving each instructor issued by either EPA or a State. Instructors must be approved by either EPA or a State before teaching courses for accreditation purposes. A training provider must notify EPA or the State, as appropriate, in advance whenever it changes course instructors. Records must accurately identify the instructors that taught each particular course for each date that a course is offered.

3. Examinations. A training provider must document that each person who receives an accreditation certificate for an initial training course has achieved a passing score on the examination. These records must clearly indicate the date upon which the exam was administered, the training course and discipline for which the exam was given, the name of the person who proctored the exam, a copy of the exam, and the name and test score of each person taking the exam. The topic and dates of the training course must correspond to those listed on that person's accreditation certificate. States may choose to apply these same requirements to examinations for refresher training courses.

4. Accreditation certificates. The training providers or States, whichever issues the accreditation certificate, shall maintain records that document the names of all persons who have been awarded certificates, their certificate numbers, the disciplines for which accreditation was conferred, training and expiration dates, and the training location. The training provider or State shall maintain the records in a manner that allows verification by telephone of the required information.

5. Verification of certificate information. EPA recommends that training providers of refresher training courses confirm that their students possess valid accreditation before granting course admission. EPA further recommends that training providers offering the initial management planner training course verify that students have met the prerequisite of possessing valid inspector accreditation at the time of course admission.

6. Records retention and access. (a) The training provider shall maintain all required records for a minimum of 3 years. The training provider, however, may find it advantageous to retain these records for a longer period of time.

(b) The training provider must allow reasonable access to all of the records required by the MAP, and to any other records which may be required by States for the approval of asbestos training providers or the accreditation of asbestos training courses, to both EPA and to State Agencies, on request. EPA encourages training providers to make this information equally accessible to the general public.

(c) If a training provider ceases to conduct training, the training provider shall notify the approving government body (EPA or the State) and give it the opportunity to take possession of that providers asbestos training records.

G. Deaccreditation

1. States must establish criteria and procedures for deaccrediting persons accredited as workers, contractor/supervisors, inspectors, management planners, and project designers. States must follow their own administrative procedures in pursuing deaccreditation actions. At a minimum, the criteria shall include:

(a) Performing work requiring accreditation at a job site without being in physical possession of initial and current accreditation certificates;

(b) Permitting the duplication or use of one's own accreditation certificate by another;

(c) Performing work for which accreditation has not been received; or

(d) Obtaining accreditation from a training provider that does not have approval to offer training for the particular discipline from either EPA or from a State that has a contractor accreditation plan at least as stringent as the EPA MAP.

EPA may directly pursue deaccreditation actions without reliance on State deaccreditation or enforcement authority or actions. In addition to the above-listed situations, the Administrator may suspend or revoke the accreditation of persons who have been subject to a final order imposing a civil penalty or convicted under section 16 of TSCA, 15 U.S.C. 2615 or 2647, for violations of 40 CFR part 763, or section 113 of the Clean

911

Air Act, 42 U.S.C. 7413, for violations of 40 CFR part 61, subpart M.

2. Any person who performs asbestos work requiring accreditation under section 206(a) of TSCA, 15 U.S.C. 2646(a), without such accreditation is in violation of TSCA. The following persons are not accredited for purposes of section 206 of TSCA:

(a) Any person who obtains accreditation through fraudulent representation of training or examination documents;

(b) Any person who obtains training documentation through fraudulent means;

(c) Any person who gains admission to and completes refresher training through fraudulent representation of initial or previous refresher training documentation; or

(d) Any person who obtains accreditation through fraudulent representation of accreditation requirements such as education, training, professional registration, or experience.

## H. Reciprocity

EPA recommends that each State establish reciprocal arrangements with other States that have established accreditation programs that meet or exceed the requirements of the MAP. Such arrangements might address cooperation in licensing determinations, the review and approval of training programs and/or instructors, candidate testing and exam administration, curriculum development, policy formulation, compliance monitoring, and the exchange of information and data. The benefits to be derived from these arrangements include a potential cost-savings from the reduction of duplicative activity and the attainment of a more professional accredited workforce as States are able to refine and improve the effectiveness of their programs based upon the experience and methods of other States.

## I. Electronic Reporting

States that choose to receive electronic documents must include, at a minimum, the requirements of 40 CFR Part 3—(Electronic reporting) in their programs.

## II. EPA Approval Process for State Accreditation Programs

A. States may seek approval for a single discipline or all disciplines as specified in the MAP. For example, a State that currently only requires worker accreditation may receive EPA approval for that discipline alone. EPA encourages States that currently do not have accreditation requirements for all disciplines required under section 206(b)(2) of TSCA, 15 U.S.C. 2646(b)(2), to seek EPA approval for those disciplines the State does accredit. As States establish accreditation requirements for the remaining disciplines, the requested information outlined below should be submitted to EPA as soon as possible. Any State that had an accreditation program approved by EPA under an earlier version of the MAP may follow the same procedures to obtain EPA approval of their accreditation program under this MAP.

B. Partial approval of a State Program for the accreditation of one or more disciplines does not mean that the State is in full compliance with TSCA where the deadline for that State to have adopted a State Plan no less stringent than the MAP has already passed. State Programs which are at least as stringent as the MAP for one or more of the accredited disciplines may, however, accredit persons in those disciplines only.

C. States seeking EPA approval or reapproval of accreditation programs shall submit the following information to the Regional Asbestos Coordinator at their EPA Regional office:

1. A copy of the legislation establishing or upgrading the State's accreditation program (if applicable).

2. A copy of the State's accreditation regulations or revised regulations.

3. A letter to the Regional Asbestos Coordinator that clearly indicates how the State meets the program requirements of this MAP. Addresses for each of the Regional Asbestos Coordinators are shown below:

EPA, Region I, (ATC-111) Asbestos Coordinator, JFK Federal Bldg., Boston, MA 02203-2211, (617) 565-3836.

EPA, Region II, (MS-500), Asbestos Coordinator, 2890 Woodbridge Ave., Edison, NJ 08837-3679, (908) 321-6671.

EPA, Region III, (3AT-33), Asbestos Coordinator, 841 Chestnut Bldg., Philadelphia, PA 19107, (215) 597-3160.

EPA, Region IV, Asbestos Coordinator, 345 Courtland St., N.E., Atlanta, GA 30365, (404) 347-5014.

EPA, Region V, (SP-14J), Asbestos Coordinator, 77 W. Jackson Blvd., Chicago, IL 60604-3590, (312) 886-6003.

EPA, Region VI, (6T-PT), Asbestos Coordinator, 1445 Ross Ave. Dallas, TX 75202-2744, (214) 655-7244.

EPA, Region VII, (ARTX/ASBS), Asbestos Coordinator, 726 Minnesota Ave., Kansas City, KS 66101, (913) 551-7020.

EPA, Region VIII, (8AT-TS), Asbestos Coordinator, 1 Denver Place, Suite 500 999 - 18th St., Denver, CO 80202-2405, (303) 293-1442.

EPA, Region IX, Asbestos NESHAPs Contact, Air Division (A–5), 75 Hawthorne Street, San Francisco, CA 94105, (415) 972-3989.

EPA, Region X, (AT-083), Asbestos Coordinator, 1200 Sixth Ave., Seattle, WA 98101, (206) 553-4762.

EPA maintains a listing of all those States that have applied for and received EPA approval for having accreditation requirements that are at least as stringent as the MAP for one or more disciplines. Any training courses

**Environmental Protection Agency**                          **Pt. 763, Subpt. E, App. C**

approved by an EPA-approved State Program are considered to be EPA-approved for purposes of accreditation.

*III. Approval of Training Courses*

Individuals or groups wishing to sponsor training courses for disciplines required to be accredited under section 206(b)(1)(A) of TSCA, 15 U.S.C. 2646(b)(1)(A), may apply for approval from States that have accreditation program requirements that are at least as stringent as this MAP. For a course to receive approval, it must meet the requirements for the course as outlined in this MAP, and any other requirements imposed by the State from which approval is being sought. Courses that have been approved by a State with an accreditation program at least as stringent as this MAP are approved under section 206(a) of TSCA, 15 U.S.C. 2646(a), for that particular State, and also for any other State that does not have an accreditation program as stringent as this MAP.

A. Initial Training Course Approval

A training provider must submit the following minimum information to a State as part of its application for the approval of each training course:

1. The course provider's name, address, and telephone number.
2. A list of any other States that currently approve the training course.
3. The course curriculum.
4. A letter from the provider of the training course that clearly indicates how the course meets the MAP requirements for:
   a. Length of training in days.
   b. Amount and type of hands-on training.
   c. Examination (length, format, and passing score).
   d. Topics covered in the course.
5. A copy of all course materials (student manuals, instructor notebooks, handouts, etc.).
6. A detailed statement about the development of the examination used in the course.
7. Names and qualifications of all course instructors. Instructors must have academic and/or field experience in asbestos abatement.
8. A description of and an example of the numbered certificates issued to students who attend the course and pass the examination.

B. Refresher Training Course Approval

The following minimum information is required for approval of refresher training courses by States:

1. The length of training in half-days or days.
2. The topics covered in the course.
3. A copy of all course materials (student manuals, instructor notebooks, handouts, etc.).

4. The names and qualifications of all course instructors. Instructors must have academic and/or field experience in asbestos abatement.
5. A description of and an example of the numbered certificates issued to students who complete the refresher course and pass the examination, if required.

C. Withdrawal of Training Course Approval

States must establish criteria and procedures for suspending or withdrawing approval from accredited training programs. States should follow their own administrative procedures in pursuing actions for suspension or withdrawal of approval of training programs. At a minimum, the criteria shall include:

(1) Misrepresentation of the extent of a training course's approval by a State or EPA;
(2) Failure to submit required information or notifications in a timely manner;
(3) Failure to maintain requisite records;
(4) Falsification of accreditation records, instructor qualifications, or other accreditation information; or
(5) Failure to adhere to the training standards and requirements of the EPA MAP or State Accreditation Program, as appropriate.

In addition to the criteria listed above, EPA may also suspend or withdraw a training course's approval where an approved training course instructor, or other person with supervisory authority over the delivery of training has been found in violation of other asbestos regulations administered by EPA. An administrative or judicial finding of violation, or execution of a consent agreement and order under 40 CFR 22.18, constitutes evidence of a failure to comply with relevant statutes or regulations. States may wish to adopt this criterion modified to include their own asbestos statutes or regulations. EPA may also suspend or withdraw approval of training programs where a training provider has submitted false information as a part of the self-certification required under Unit V.B. of the revised MAP.

Training course providers shall permit representatives of EPA or the State which approved their training courses to attend, evaluate, and monitor any training course without charge. EPA or State compliance inspection staff are not required to give advance notice of their inspections. EPA may suspend or withdraw State or EPA approval of a training course based upon the criteria specified in this Unit III.C.

*IV. EPA Procedures for Suspension or Revocation of Accreditation or Training Course Approval.*

A. If the Administrator decides to suspend or revoke the accreditation of any person or

913

suspend or withdraw the approval of a training course, the Administrator will notify the affected entity of the following:

1. The grounds upon which the suspension, revocation, or withdrawal is based.

2. The time period during which the suspension, revocation, or withdrawal is effective, whether permanent or otherwise.

3. The conditions, if any, under which the affected entity may receive accreditation or approval in the future.

4. Any additional conditions which the Administrator may impose.

5. The opportunity to request a hearing prior to final Agency action to suspend or revoke accreditation or suspend or withdraw approval.

B. If a hearing is requested by the accredited person or training course provider pursuant to the preceding paragraph, the Administrator will:

1. Notify the affected entity of those assertions of law and fact upon which the action to suspend, revoke, or withdraw is based.

2. Provide the affected entity an opportunity to offer written statements of facts, explanations, comments, and arguments relevant to the proposed action.

3. Provide the affected entity such other procedural opportunities as the Administrator may deem appropriate to ensure a fair and impartial hearing.

4. Appoint an EPA attorney as Presiding Officer to conduct the hearing. No person shall serve as Presiding Officer if he or she has had any prior connection with the specific case.

C. The Presiding Officer appointed pursuant to the preceding paragraph shall:

1. Conduct a fair, orderly, and impartial hearing, without unnecessary delay.

2. Consider all relevant evidence, explanation, comment, and argument submitted pursuant to the preceding paragraph.

3. Promptly notify the affected entity of his or her decision and order. Such an order is a final Agency action.

D. If the Administrator determines that the public health, interest, or welfare warrants immediate action to suspend the accreditation of any person or the approval of any training course provider, the Administrator will:

1. Notify the affected entity of the grounds upon which the emergency suspension is based;

2. Notify the affected entity of the time period during which the emergency suspension is effective.

3. Notify the affected entity of the Administrator's intent to suspend or revoke accreditation or suspend or withdraw training course approval, as appropriate, in accordance with Unit IV.A. above. If such suspension, revocation, or withdrawal notice has not previously been issued, it will be issued

at the same time the emergency suspension notice is issued.

E. Any notice, decision, or order issued by the Administrator under this section, and any documents filed by an accredited person or approved training course provider in a hearing under this section, shall be available to the public except as otherwise provided by section 14 of TSCA or by 40 CFR part 2. Any such hearing at which oral testimony is presented shall be open to the public, except that the Presiding Officer may exclude the public to the extent necessary to allow presentation of information which may be entitled to confidential treatment under section 14 of TSCA or 40 CFR part 2.

*V. Implementation Schedule*

The various requirements of this MAP become effective in accordance with the following schedules:

A. Requirements applicable to State Programs

1. Each State shall adopt an accreditation plan that is at least as stringent as this MAP within 180 days after the commencement of the first regular session of the legislature of the State that is convened on or after April 4, 1994.

2. If a State has adopted an accreditation plan at least as stringent as this MAP as of April 4, 1994, the State may continue to:

a. Conduct TSCA training pursuant to this MAP.

b. Approve training course providers to conduct training and to issue accreditation that satisfies the requirements for TSCA accreditation under this MAP.

c. Issue accreditation that satisfies the requirements for TSCA accreditation under this MAP.

3. A State that had complied with an earlier version of the MAP, but has not adopted an accreditation plan at least as stringent as this MAP by April 4, 1994, may:

a. Conduct TSCA training which remains in compliance with the requirements of Unit V.B. of this MAP. After such training has been self-certified in accordance with Unit V.B. of this MAP, the State may issue accreditation that satisfies the requirement for TSCA accreditation under this MAP.

b. Sustain its approval for any training course providers to conduct training and issue TSCA accreditation that the State had approved before April 4, 1994, and that remain in compliance with Unit V.B. of this MAP.

c. Issue accreditation pursuant to an earlier version of the MAP that provisionally satisfies the requirement for TSCA accreditation until October 4, 1994.

Such a State may not approve new TSCA training course providers to conduct training or to issue TSCA accreditation that satisfies

**Environmental Protection Agency**    **Pt. 763, Subpt. E, App. C**

the requirements of this MAP until the State adopts an accreditation plan that is at least as stringent as this MAP.

4. A State that had complied with an earlier version of the MAP, but fails to adopt a plan as stringent as this MAP by the deadline established in Unit V.A.1., is subject to the following after that deadline date:

a. The State loses any status it may have held as an EPA-approved State for accreditation purposes under section 206 of TSCA, 15 U.S.C. 2646.

b. All training course providers approved by the State lose State approval to conduct training and issue accreditation that satisfies the requirements for TSCA accreditation under this MAP.

c. The State may not:

i. Conduct training for accreditation purposes under section 206 of TSCA, 15 U.S.C. 2646.

ii. Approve training course providers to conduct training or issue accreditation that satisfies the requirements for TSCA accreditation; or

iii. Issue accreditation that satisfies the requirement for TSCA accreditation.

EPA will extend EPA-approval to any training course provider that loses State approval because the State does not comply with the deadline, so long as the provider is in compliance with Unit V.B. of this MAP, and the provider is approved by a State that had complied with an earlier version of the MAP as of the day before the State loses its EPA approval.

5. A State that does not have an accreditation program that satisfies the requirements for TSCA accreditation under either an earlier version of the MAP or this MAP, may not:

a. Conduct training for accreditation purposes under section 206 of TSCA, 15 U.S.C. 2646;

b. Approve training course providers to conduct training or issue accreditation that satisfies the requirements for TSCA accreditation; or

c. Issue accreditation that satisfies the requirement for TSCA accreditation.

### B. Requirements applicable to Training Courses and Providers

As of October 4, 1994, an approved training provider must certify to EPA and to any State that has approved the provider for TSCA accreditation, that each of the provider's training courses complies with the requirements of this MAP. The written submission must document in specific detail the changes made to each training course in order to comply with the requirements of this MAP and clearly state that the provider is also in compliance with all other requirements of this MAP, including the new recordkeeping and certificate provisions. Each submission must include the following state-

ment signed by an authorized representative of the training provider: ''Under civil and criminal penalties of law for the making or submission of false or fraudulent statements or representations (18 U.S.C. 1001 and 15 U.S.C. 2615), I certify that the training described in this submission complies with all applicable requirements of Title II of TSCA, 40 CFR part 763, Appendix C to Subpart E, as revised, and any other applicable Federal, state, or local requirements.'' A consolidated self-certification submission from each training provider that addresses all of its approved training courses is permissible and encouraged.

The self-certification must be sent via registered mail, to EPA Headquarters at the following address: Attn. Self-Certification Program, Field Programs Branch, Chemical Management Division (7404), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460. A duplicate copy of the complete submission must also be sent to any States from which approval had been obtained.

The timely receipt of a complete self-certification by EPA and all approving States shall have the effect of extending approval under this MAP to the training courses offered by the submitting provider. If a self-certification is not received by the approving government bodies on or before the due date, the affected training course is not approved under this MAP. Such training providers must then reapply for approval of these training courses pursuant to the procedures outlined in Unit III.

### C. Requirements applicable to Accredited Persons.

Persons accredited by a State with an accreditation program no less stringent than an earlier version of the MAP or by an EPA-approved training provider as of April 3, 1994, are accredited in accordance with the requirements of this MAP, and are not required to retake initial training. They must continue to comply with the requirements for annual refresher training in Unit I.D. of the revised MAP.

### D. Requirements applicable to Non-Accredited Persons.

In order to perform work requiring accreditation under TSCA Title II, persons who are not accredited by a State with an accreditation program no less stringent than an earlier version of the MAP or by an EPA-approved training provider as of April 3, 1994, must comply with the upgraded training requirements of this MAP by no later than October 4, 1994. Non-accredited persons may obtain initial accreditation on a provisional basis by successfully completing any of the training programs approved under an earlier

915

version of the MAP, and thereby perform work during the first 6 months after this MAP takes effect. However, by October 4, 1994, these persons must have successfully completed an upgraded training program that fully complies with the requirements of this MAP in order to continue to perform work requiring accreditation under section 206 of TSCA, 15 U.S.C. 2646.

[59 FR 5251, Feb. 3, 1994, as amended at 60 FR 31922, June 19, 1995; 70 FR 59889, Oct. 13, 2005; 75 FR 69353, Nov. 12, 2010]

APPENDIX D TO SUBPART E OF PART 763—TRANSPORT AND DISPOSAL OF ASBESTOS WASTE

For the purposes of this appendix, transport is defined as all activities from receipt of the containerized asbestos waste at the generation site until it has been unloaded at the disposal site. Current EPA regulations state that there must be no visible emissions to the outside air during waste transport. However, recognizing the potential hazards and subsequent liabilities associated with exposure, the following additional precautions are recommended.

*Recordkeeping.* Before accepting wastes, a transporter should determine if the waste is properly wetted and containerized. The transporter should then require a chain-of-custody form signed by the generator. A chain-of-custody form may include the name and address of the generator, the name and address of the pickup site, the estimated quantity of asbestos waste, types of containers used, and the destination of the waste. The chain-of-custody form should then be signed over to a disposal site operator to transfer responsibility for the asbestos waste. A copy of the form signed by the disposal site operator should be maintained by the transporter as evidence of receipt at the disposal site.

*Waste handling.* A transporter should ensure that the asbestos waste is properly contained in leak-tight containers with appropriate labels, and that the outside surfaces of the containers are not contaminated with asbestos debris adhering to the containers. If there is reason to believe that the condition of the asbestos waste may allow significant fiber release, the transporter should not accept the waste. Improper containerization of wastes is a violation of the NESHAPs regulation and should be reported to the appropriate EPA Regional Asbestos NESHAPs contact below:

*Region I*

Asbestos NESHAPs Contact, Air Management Division, USEPA, Region I, JFK Federal Building, Boston, MA 02203, (617) 223–3266.

*Region II*

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region II, 26 Federal Plaza, New York, NY 10007, (212) 264–6770.

*Region III*

Asbestos NESHAPs Contact, Air Management Division, USEPA, Region III, 841 Chestnut Street, Philadelphia, PA 19107, (215) 597–9325.

*Region IV*

Asbestos NESHAPs Contact, Air, Pesticide & Toxic Management, USEPA, Region IV, 345 Courtland Street, NE., Atlanta, GA 30365, (404) 347–4298.

*Region V*

Asbestos NESHAPs Contact, Air Management Division, USEPA, Region V, 77 West Jackson Boulevard, Chicago, IL 60604, (312) 353–6793.

*Region VI*

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region VI, 1445 Ross Avenue, Dallas, TX 75202, (214) 655–7229.

*Region VII*

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region VII, 726 Minnesota Avenue, Kansas City, KS 66101, (913) 236–2896.

*Region VIII*

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region VIII, 999 18th Street, Suite 500, Denver, CO 80202, (303) 293–1814.

*Region IX*

Asbestos NESHAPs Contact, Air Division, USEPA, Region IX, 75 Hawthorne Street, San Francisco, CA 94105, (415) 972–3989.

*Region X*

Asbestos NESHAPs Contact, Air & Toxics Management Division, USEPA, Region X, 1200 Sixth Avenue, Seattle, WA 98101, (206) 442–2724.

Once the transporter is satisfied with the condition of the asbestos waste and agrees to handle it, the containers should be loaded into the transport vehicle in a careful manner to prevent breaking of the containers. Similarly, at the disposal site, the asbestos waste containers should be transferred carefully to avoid fiber release.

*Waste transport.* Although there are no regulatory specifications regarding the transport vehicle, it is recommended that vehicles used for transport of containerized asbestos

**Environmental Protection Agency**                              **Pt. 763, Subpt. E, App. D**

waste have an enclosed carrying compartment or utilize a canvas covering sufficient to contain the transported waste, prevent damage to containers, and prevent fiber release. Transport of large quantities of asbestos waste is commonly conducted in a 20-cubic-yard ''roll off'' box, which should also be covered. Vehicles that use compactors to reduce waste volume should not be used because these will cause the waste containers to rupture. Vacuum trucks used to transport waste slurry must be inspected to ensure that water is not leaking from the truck.

Disposal involves the isolation of asbestos waste material in order to prevent fiber release to air or water. Landfilling is recommended as an environmentally sound isolation method because asbestos fibers are virtually immobile in soil. Other disposal techniques such as incineration or chemical treatment are not feasible due to the unique properties of asbestos. EPA has established asbestos disposal requirements for active and inactive disposal sites under NESHAPs (40 CFR Part 61, subpart M) and specifies general requirements for solid waste disposal under RCRA (40 CFR Part 257). Advance EPA notification of the intended disposal site is required by NESHAPs.

*Selecting a disposal facility.* An acceptable disposal facility for asbestos wastes must adhere to EPA's requirements of no visible emissions to the air during disposal, or minimizing emissions by covering the waste within 24 hours. The minimum required cover is 6 inches of nonasbestos material, normally soil, or a dust-suppressing chemical. In addition to these Federal requirements, many state or local government agencies require more stringent handling procedures. These agencies usually supply a list of ''approved'' or licensed asbestos disposal sites upon request. Solid waste control agencies are listed in local telephone directories under state, county, or city headings. A list of state solid waste agencies may be obtained by calling the RCRA hotline: 1–800–424–9346 (382–3000 in Washington, DC). Some landfill owners or operators place special requirements on asbestos waste, such as placing all bagged waste into 55-gallon metal drums. Therefore, asbestos removal contractors should contact the intended landfill before arriving with the waste.

*Receiving asbestos waste.* A landfill approved for receipt of asbestos waste should require notification by the waste hauler that the load contains asbestos. The landfill operator should inspect the loads to verify that asbestos waste is properly contained in leak-tight containers and labeled appropriately. The appropriate EPA Regional Asbestos NESHAPs Contact should be notified if the landfill operator believes that the asbestos waste is in a condition that may cause significant fiber release during disposal. In situations when the wastes are not properly con-

tainerized, the landfill operator should thoroughly soak the asbestos with a water spray prior to unloading, rinse out the truck, and immediately cover the wastes with non-asbestos material prior to compacting the waste in the landfill.

*Waste deposition and covering.* Recognizing the health dangers associated with asbestos exposure, the following procedures are recommended to augment current federal requirements:

• Designate a separate area for asbestos waste disposal. Provide a record for future landowners that asbestos waste has been buried there and that it would be hazardous to attempt to excavate that area. (Future regulations may require property deeds to identify the location of any asbestos wastes and warn against excavation.)

• Prepare a separate trench to receive asbestos wastes. The size of the trench will depend upon the quantity and frequency of asbestos waste delivered to the disposal site. The trenching technique allows application of soil cover without disturbing the asbestos waste containers. The trench should be ramped to allow the transport vehicle to back into it, and the trench should be as narrow as possible to reduce the amount of cover required. If possible, the trench should be aligned perpendicular to prevailing winds.

• Place the asbestos waste containers into the trench carefully to avoid breaking them. Be particularly careful with plastic bags because when they break under pressure asbestos particles can be emitted.

• Completely cover the containerized waste within 24 hours with a minimum of 6 inches of nonasbestos material. Improperly containerized waste is a violation of the NESHAPs and EPA should be notified.

However, if improperly containerized waste is received at the disposal site, it should be covered immediately after unloading. Only after the wastes, including properly containerized wastes, are completely covered, can the wastes be compacted or other heavy equipment run over it. During compacting, avoid exposing wastes to the air or tracking asbestos material away from the trench.

• For final closure of an area containing asbestos waste, cover with at least an additional 30 inches of compacted nonasbestos material to provide a 36-inch final cover. To control erosion of the final cover, it should be properly graded and vegetated. In areas of the United States where excessive soil erosion may occur or the frost line exceeds 3 feet, additional final cover is recommended. In desert areas where vegetation would be difficult to maintain, 3–6 inches of well graded crushed rock is recommended for placement on top of the final cover.

*Controlling public access.* Under the current NESHAPs regulation, EPA does not require that a landfill used for asbestos disposal use

917

warning signs or fencing if it meets the requirement to cover asbestos wastes. However, under RCRA, EPA requires that access be controlled to prevent exposure of the public to potential health and safety hazards at the disposal site. Therefore, for liability protection of operators of landfills that handle asbestos, fencing and warning signs are recommended to control public access when natural barriers do not exist. Access to a landfill should be limited to one or two entrances with gates that can be locked when left unattended. Fencing should be installed around the perimeter of the disposal site in a manner adequate to deter access by the general public. Chain-link fencing, 6-ft high and topped with a barbed wire guard, should be used. More specific fencing requirements may be specified by local regulations. Warning signs should be displayed at all entrances and at intervals of 330 feet or less along the property line of the landfill or perimeter of the sections where asbestos waste is deposited. The sign should read as follows:

ASBESTOS WASTE DISPOSAL SITE
BREATHING ASBESTOS DUST MAY
CAUSE LUNG DISEASE AND CANCER

*Recordkeeping.* For protection from liability, and considering possible future requirements for notification on disposal site deeds, a landfill owner should maintain documentation of the specific location and quantity of the buried asbestos wastes. In addition, the estimated depth of the waste below the surface should be recorded whenever a landfill section is closed. As mentioned previously, such information should be recorded in the land deed or other record along with a notice warning against excavation of the area.

[52 FR 41897, Oct. 30, 1987, as amended at 62 FR 1834, Jan. 14, 1997; 75 FR 69353, Nov. 12, 2010]

APPENDIX E TO SUBPART E OF PART 763—INTERIM METHOD OF THE DETERMINATION OF ASBESTOS IN BULK INSULATION SAMPLES

SECTION 1. POLARIZED LIGHT MICROSCOPY

### 1.1 Principle and Applicability

Bulk samples of building materials taken for asbestos identification are first examined for homogeneity and preliminary fiber identification at low magnification. Positive identification of suspect fibers is made by analysis of subsamples with the polarized light microscope.

The principles of optical mineralogy are well established.[1,2] A light microscope equipped with two polarizing filters is used to observe specific optical characteristics of a sample. The use of plane polarized light allows the determination of refractive indices along specific crystallographic axes. Mor-

phology and color are also observed. A retardation plate is placed in the polarized light path for determination of the sign of elongation using orthoscopic illumination. Orientation of the two filters such that their vibration planes are perpendicular (crossed polars) allows observation of the birefringence and extinction characteristics of anisotropic particles.

Quantitative analysis involves the use of point counting. Point counting is a standard technique in petrography for determining the relative areas occupied by separate minerals in thin sections of rock. Background information on the use of point counting[2] and the interpretation of point count data[3] is available.

This method is applicable to all bulk samples of friable insulation materials submitted for identification and quantitation of asbestos components.

### 1.2 Range

The point counting method may be used for analysis of samples containing from 0 to 100 percent asbestos. The upper detection limit is 100 percent. The lower detection limit is less than 1 percent.

### 1.3 Interferences

Fibrous organic and inorganic constituents of bulk samples may interfere with the identification and quantitation of the asbestos mineral content. Spray-on binder materials may coat fibers and affect color or obscure optical characteristics to the extent of masking fiber identity. Fine particles of other materials may also adhere to fibers to an extent sufficient to cause confusion in identification. Procedures that may be used for the removal of interferences are presented in Section 1.7.2.2.

### 1.4 Precision and Accuracy

Adequate data for measuring the accuracy and precision of the method for samples with various matrices are not currently available. Data obtained for samples containing a single asbestos type in a simple matrix are available in the EPA report *Bulk Sample Analysis for Asbestos Content: Evaluation of the Tentative Method.*[4]

### 1.5 Apparatus

#### 1.5.1 Sample Analysis

A low-power binocular microscope, preferably stereoscopic, is used to examine the bulk insulation sample as received.

- *Microscope:* binocular, 10–45X (approximate).
- *Light Source:* incandescent or fluorescent.
- *Forceps, Dissecting Needles, and Probes*
- *Glassine Paper or Clean Glass Plate*

**Environmental Protection Agency**

Compound microscope requirements: A polarized light microscope complete with polarizer, analyzer, port for wave retardation plate, 360° graduated rotating stage, substage condenser, lamp, and lamp iris.

- *Polarized Light Microscope:* described above.
- *Objective Lenses:* 10X, 20X, and 40X or near equivalent.
- *Dispersion Staining Objective Lens* (optional)
- *Ocular Lens:* 10X minimum.
- *Eyepiece Reticle:* cross hair or 25 point Chalkley Point Array.
- *Compensator Plate:* 550 millimicron retardation.

### 1.5.2  Sample Preparation

Sample preparation apparatus requirements will depend upon the type of insulation sample under consideration. Various physical and/or chemical means may be employed for an adequate sample assessment.

- *Ventilated Hood* or negative pressure glove box.
- *Microscope Slides*
- *Coverslips*
- *Mortar and Pestle:* agate or porcelain. (optional)
- *Wylie Mill* (optional)
- *Beakers and Assorted Glassware* (optional)
- *Centrifuge* (optional)
- *Filtration apparatus* (optional)
- *Low temperature asher* (optional)

### 1.6  Reagents

#### 1.6.1  Sample Preparation

- *Distilled Water (optional)*
- *Dilute CH₃COOH:* ACS reagent grade (optional)
- *Dilute HCl:* ACS reagent grade (optional)
- *Sodium metaphosphate* $(NaPO_3)_b$ (optional)

#### 1.6.2  Analytical Reagents

*Refractive Index Liquids:* 1.490–1.570, 1.590–1.720 in increments of 0.002 or 0.004.
- *Refractive Index Liquids for Dispersion Staining:* high-dispersion series, 1.550, 1.605, 1.630 (optional).
- *UICC Asbestos Reference Sample Set:* Available from: UICC MRC Pneumoconiosis Unit, Llandough Hospital, Penarth, Glamorgan CF6 1XW, UK, and commercial distributors.
- *Tremolite-asbestos* (source to be determined)
- *Actinolite-asbestos* (source to be determined)

### 1.7  Procedures

NOTE: Exposure to airborne asbestos fibers is a health hazard. Bulk samples submitted for analysis are usually friable and may release fibers during handling or matrix reduction steps. All sample and slide preparations should be carried out in a ventilated hood or glove box with continuous airflow (negative pressure). Handling of samples without these precautions may result in exposure of the

**Pt. 763, Subpt. E, App. E**

analyst and contamination of samples by airborne fibers.

#### 1.7.1  Sampling

Samples for analysis of asbestos content shall be taken in the manner prescribed in Reference 5 and information on design of sampling and analysis programs may be found in Reference 6. If there are any questions about the representative nature of the sample, another sample should be requested before proceeding with the analysis.

#### 1.7.2  Analysis

##### 1.7.2.1  Gross Examination

Bulk samples of building materials taken for the identification and quantitation of asbestos are first examined for homogeneity at low magnification with the aid of a stereomicroscope. The core sample may be examined in its container or carefully removed from the container onto a glassine transfer paper or clean glass plate. If possible, note is made of the top and bottom orientation. When discrete strata are identified, each is treated as a separate material so that fibers are first identified and quantified in that layer only, and then the results for each layer are combined to yield an estimate of asbestos content for the whole sample.

##### 1.7.2.2  Sample Preparation

Bulk materials submitted for asbestos analysis involve a wide variety of matrix materials. Representative subsamples may not be readily obtainable by simple means in heterogeneous materials, and various steps may be required to alleviate the difficulties encountered. In most cases, however, the best preparation is made by using forceps to sample at several places from the bulk material. Forcep samples are immersed in a refractive index liquid on a microscope slide, teased apart, covered with a cover glass, and observed with the polarized light microscope.

Alternatively, attempts may be made to homogenize the sample or eliminate interferences before further characterization. The selection of appropriate procedures is dependent upon the samples encountered and personal preference. The following are presented as possible sample preparation steps.

A mortar and pestle can sometimes be used in the size reduction of soft or loosely bound materials though this may cause matting of some samples. Such samples may be reduced in a Wylie mill. Apparatus should be clean and extreme care exercised to avoid cross-contamination of samples. Periodic checks of the particle sizes should be made during the grinding operation so as to preserve any fiber bundles present in an identifiable form. These procedures are not recommended for samples that contain amphibole minerals or

919

**Pt. 763, Subpt. E, App. E**

vermiculite. Grinding of amphiboles may result in the separation of fiber bundles or the production of cleavage fragments with aspect ratios greater than 3:1. Grinding of vermiculite may also produce fragments with aspect ratios greater than 3:1.

Acid treatment may occasionally be required to eliminate interferences. Calcium carbonate, gypsum, and bassanite (plaster) are frequently present in sprayed or trowelled insulations. These materials may be removed by treatment with warm dilute acetic acid. Warm dilute hydrochloric acid may also be used to remove the above materials. If acid treatment is required, wash the sample at least twice with distilled water, being careful not to lose the particulates during decanting steps. Centrifugation or filtration of the suspension will prevent significant fiber loss. The pore size of the filter should be 0.45 micron or less. Caution: prolonged acid contact with the sample may alter the optical characteristics of chrysotile fibers and should be avoided.

Coatings and binding materials adhering to fiber surfaces may also be removed by treatment with sodium metaphosphate.[7] Add 10 mL of 10g/L sodium metaphosphate solution to a small (0.1 to 0.5 mL) sample of bulk material in a 15-mL glass centrifuge tube. For approximately 15 seconds each, stir the mixture on a vortex mixer, place in an ultrasonic bath and then shake by hand. Repeat the series. Collect the dispersed solids by centrifugation at 1000 rpm for 5 minutes. Wash the sample three times by suspending in 10 mL distilled water and recentrifuging. After washing, resuspend the pellet in 5 mL distilled water, place a drop of the suspension on a microscope slide, and dry the slide at 110 °C.

In samples with a large portion of cellulosic or other organic fibers, it may be useful to ash part of the sample and view the residue. Ashing should be performed in a low temperature asher. Ashing may also be performed in a muffle furnace at temperatures

**40 CFR Ch. I (7–1–11 Edition)**

of 500 °C or lower. Temperatures of 550 °C or higher will cause dehydroxylation of the asbestos minerals, resulting in changes of the refractive index and other key parameters. If a muffle furnace is to be used, the furnace thermostat should be checked and calibrated to ensure that samples will not be heated at temperatures greater than 550 °C.

Ashing and acid treatment of samples should not be used as standard procedures. In order to monitor possible changes in fiber characteristics, the material should be viewed microscopically before and after any sample preparation procedure. Use of these procedures on samples to be used for quantitation requires a correction for percent weight loss.

### 1.7.2.3  Fiber Identification

Positive identification of asbestos requires the determination of the following optical properties.
• Morphology
• Color and pleochroism
• Refractive indices
• Birefringence
• Extinction characteristics
• Sign of elongation

Table 1–1 lists the above properties for commercial asbestos fibers. Figure 1–1 presents a flow diagram of the examination procedure. Natural variations in the conditions under which deposits of asbestiform minerals are formed will occasionally produce exceptions to the published values and differences from the UICC standards. The sign of elongation is determined by use of the compensator plate and crossed polars. Refractive indices may be determined by the Becke line test. Alternatively, dispersion staining may be used. Inexperienced operators may find that the dispersion staining technique is more easily learned, and should consult Reference 9 for guidance. Central stop dispersion staining colors are presented in Table 1–2. Available high-dispersion (HD) liquids should be used.

TABLE 1–1—OPTICAL PROPERTIES OF ASBESTOC FIBERS

| Mineral | Morphology, color[a] | Refrac-tive indices[b] | | Birefring-ence | Extinction | Sign of elonation |
|---------|----------------------|---------|---------|----------------|------------|-------------------|
| | | α | γ | | | |
| Chrysotile (asbestiform serpentine). | Wavy fibers. Fiber bundles have splayed ends and "kinks". Aspect ratio typically >10:1. Colorless[3], nonpleochroic. | 1.493–1.560 | 1.517–1.562[f] (normally 1.556). | .008 | ‖ to fiber length. | + (length slow) |
| Amosite (asbestiform grunerite). | Straight, rigid fibers. Aspect ratio typically >10:1. Colorless to brown, nonpleochroic or weakly so. Opaque inclusions may be present. | 1.635–1.696 | 1.655–1.729[f] (normally 1.696–1.710. | .020–.033 | ‖ to fiber length. | + (length slow) |

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. E**

TABLE 1–1—OPTICAL PROPERTIES OF ASBESTOC FIBERS—Continued

| Mineral | Morphology, color [a] | Refrac- tive indices [b] | | Birefring- ence | Extinction | Sign of elonation |
|---------|----------------------|------|------|------|------|------|
| | | α | γ | | | |
| Crocidolite (asbestiform Riebeckite). | Straight, rigid fibers. Thick fibers and bundles common, blue to purple-blue in color. Pleochroic. Birefringence is generally masked by blue color. | 1.654–1.701 | 1.668–1.717[3e] (normally close to 1.700). | .014–.016 | ‖ to fiber length. | (length fast) |
| Anthophyllite-asbestos. | Straight fibers and acicular cleavage fragments.[d] Some composite fibers. Aspect ratio <10:1. Colorless to light brown. | 1.596–1.652 | 1.615–1.676[f]. | .019–.024 | ‖ to fiber length. | + (length slow) |
| Tremolite-actin-olite-asbes-tos. | Normally present as acicular or prismatic cleavage fragments.[d] Single crystals predominate, aspect ratio <10:1. Colorless to pale green. | 1.599–1.668 | 1.622–1.688[f]. | .023–.020 | Oblique extinction, 10–20° for fragments. Composite fibers show ‖ extinction. | + (length slow) |

[a] From reference 5; colors cited are seen by observation with plane polarized light.
[b] From references 5 and 8.
[c] Fibers subjected to heating may be brownish.
[d] Fibers defined as having aspect ratio >3:1.
[e] to fiber length.
[f] ‖To fiber length.

921

Pt. 763, Subpt. E, App. E                                        40 CFR Ch. I (7–1–11 Edition)



Figure 1-1.  Flow chart for analysis of bulk samples by polarized light microscopy.

**Environmental Protection Agency**

TABLE 1–2—CENTRAL STOP DISPERSION STAINING COLORS[A]

| Mineral | RI Liquid | η | η‖ |
|---|---|---|---|
| Chrysotile ....... | 1.550[HD] | Blue ............. | Blue-magenta |
| Amosite ........ | 1.680 | Blue-magenta to pale blue. | Golden-yellow |
| | 1.550[HD] | Yellow to white. | Yellow to white |
| Crocidolite[b] .. | 1.700 | Red magenta | Blue-magenta |
| | 1.550[HD] | Yellow to white. | Yellow to white |
| Anthophyllite | 1.605[HD] | Blue ............. | Gold to gold-magenta |
| Tremolite ...... | 1.605[HD c] | Pale blue ..... | Gold |
| Actinolite ...... | 1.605[HD] | Gold-magenta to blue. | Gold |
| | 1.630[HD c] | Magenta ...... | Golden-yellow |

[a] From reference 9.
[b] Blue absorption color.
[c] Oblique extinction view.

### 1.7.2.4  Quantitation of Asbestos Content

Asbestos quantitation is performed by a point-counting procedure or an equivalent estimation method. An ocular reticle (cross-hair or point array) is used to visually superimpose a point or points on the microscope field of view. Record the number of points positioned directly above each kind of particle or fiber of interest. Score only points directly over asbestos fibers or nonasbestos matrix material. Do not score empty points for the closest particle. If an asbestos fiber and a matrix particle overlap so that a point is superimposed on their visual intersection, a point is scored for both categories. Point counting provides a determination of the area percent asbestos. Reliable conversion of area percent to percent of dry weight is not currently feasible unless the specific gravities and relative volumes of the materials are known.

For the purpose of this method, "asbestos fibers" are defined as having an aspect ratio greater than 3:1 and being positively identified as one of the minerals in Table 1–1.

A total of 400 points superimposed on either asbestos fibers or nonasbestos matrix material must be counted over at least eight different preparations of representative subsamples. Take eight forcep samples and mount each separately with the appropriate refractive index liquid. The preparation should not be heavily loaded. The sample should be uniformly dispersed to avoid overlapping particles and allow 25–50 percent empty area within the fields of view. Count 50 nonempty points on each preparation, using either

• A cross-hair reticle and mechanical stage; or

• A reticle with 25 points (Chalkley Point Array) and counting at least 2 randomly selected fields.

For samples with mixtures of isotropic and anisotropic materials present, viewing the sample with slightly uncrossed polars or the addition of the compensator plate to the polarized light path will allow simultaneous discrimination of both particle types. Quantitation should be performed at 100X or at the lowest magnification of the polarized light microscope that can effectively distinguish the sample components. Confirmation of the quantitation result by a second analyst on some percentage of analyzed samples should be used as standard quality control procedure.

The percent asbestos is calculated as follows:

% asbestos=(a/n) 100%

where

a=number of asbestos counts,
n=number of nonempty points counted (400).

If a=0, report "No asbestos detected." If 0< a≤3, report "<1% asbestos".

The value reported should be rounded to the nearest percent.

### 1.8  References

1. Paul F. Kerr, *Optical Mineralogy*, 4th ed., New York, McGraw-Hill, 1977.

2. E. M. Chamot and C. W. Mason, *Handbook of Chemical Microscopy, Volume One*, 3rd ed., New York: John Wiley & Sons, 1958.

3. F. Chayes, *Petrographic Modal Analysis: An Elementary Statistical Appraisal*, New York: John Wiley & Sons, 1956.

4. E. P. Brantly, Jr., K. W. Gold, L. E. Myers, and D. E. Lentzen, *Bulk Sample Analysis for Asbestos Content: Evaluation of the Tentative Method*, U.S. Environmental Protection Agency, October 1981.

5. U.S. Environmental Protection Agency, *Asbestos-Containing Materials in School Buildings: A Guidance Document*, Parts 1 and 2, EPA/OPPT No. C00090, March 1979.

6. D. Lucas, T. Hartwell, and A. V. Rao, *Asbestos-Containing Materials in School Buildings: Guidance for Asbestos Analytical Programs*, EPA 560/13–80–017A, U.S. Environmental Protection Agency, December 1980, 96 pp.

7. D. H. Taylor and J. S. Bloom, Hexametaphosphate pretreatment of insulation samples for identification of fibrous constituents, *Microscope, 28*, 1980.

8. W. J. Campbell, R. L. Blake, L. L. Brown, E. E. Cather, and J. J. Sjoberg, *Selected Silicate Minerals and Their Asbestiform Varieties: Mineralogical Definitions and Identification-Characterization*, U.S. Bureau of Mines Information Circular 8751, 1977.

9. Walter C. McCrone, *Asbestos Particle Atlas*, Ann Arbor: Ann Arbor Science Publishers, June 1980.

**Pt. 763, Subpt. E, App. E**

**40 CFR Ch. I (7–1–11 Edition)**

SECTION 2. X-RAY POWDER DIFFRACTION

*2.1 Principle and Applicability*

The principle of X-ray powder diffraction (XRD) analysis is well established.[1,2] Any solid, crystalline material will diffract an impingent beam of parallel, monochromatic X-rays whenever Bragg's Law,

$$\lambda = 2d \sin \theta,$$

is satisfied for a particular set of planes in the crystal lattice, where

$\lambda$ = the X-ray wavelength, Å;
d = the interplanar spacing of the set of reflecting lattice planes, Å; and
$\theta$ = the angle of incidence between the X-ray beam and the reflecting lattice planes.

By appropriate orientation of a sample relative to the incident X-ray beam, a diffraction pattern can be generated that, in most cases, will be uniquely characteristic of both the chemical composition and structure of the crystalline phases present.

Unlike optical methods of analysis, however, XRD cannot determine crystal morphology. Therefore, in asbestos analysis, XRD does not distinguish between fibrous and nonfibrous forms of the serpentine and amphibole minerals (Table 2–1). However, when used in conjunction with optical methods such as polarized light microscopy (PLM), XRD techniques can provide a reliable analytical method for the identification and characterization of asbestiform minerals in bulk materials.

For *qualitative analysis* by XRD methods, samples are initially scanned over limited diagnostic peak regions for the serpentine (~7.4 Å) and amphibole (8.2–8.5 Å) minerals (Table 2–2). Standard slow-scanning methods for bulk sample analysis may be used for materials shown by PLM to contain significant amounts of asbestos (>5–10 percent). Detection of minor or trace amounts of asbestos may require special sample preparation and step-scanning analysis. All samples that exhibit diffraction peaks in the diagnostic regions for asbestiform minerals are submitted to a full (5°–60° 2θ; 1° 2θ/min) qualitative XRD scan, and their diffraction patterns are compared with standard reference powder diffraction patterns[3] to verify initial peak assignments and to identify possible matrix interferences when subsequent quantitative analysis will be performed.

TABLE 2–1—THE ASBESTOS MINERALS AND THEIR NONASBESTIFORM ANALOGS

| Asbestiform | Nonasbestiform |
| --- | --- |
| SERPENTINE | |
| Chrysotile | Antigorite, lizardite |
| AMPHIBOLE | |
| Anthophyllite asbestos | Anthophyllite |
| Cummingtonite-grunerite asbestos ("Amosite") | Cummingtonite-grunerite |
| Crocidolite | Riebeckite |
| Tremolite asbestos | Tremolite |
| Actinolite asbestos | Actinolite |

TABLE 2–2—PRINCIPAL LATTICE SPACINGS OF ASBESTIFORM MINERALS [a]

| Minerals | Principal d-spacings (Å) and relative intensities | | | JCPDS Powder diffraction file[3] number |
| --- | --- | --- | --- | --- |
| Chrysotile .................. | $7.37_{100}$ | $3.65_{70}$ | $4.57_{50}$ | 21–543[b] |
| | $7.36_{100}$ .. | $3.66_{80}$ | $2.45_{65}$ | 25–645 |
| | $7.10_{100}$ .. | $2.33_{80}$ | $3.55_{70}$ | 22–1162 (theoretical) |
| "Amosite" ................ | $8.33_{100}$ | $3.06_{70}$ | $2.756_{70}$ | 17–745 (nonfibrous) |
| | $8.22_{100}$ .. | $3.060_{45}$ | $3.25_{70}$ | 27–1170 (UICC) |
| Anthophyllite ............ | $3.05_{100}$ | $3.24_{40}$ | $8.26_{55}$ | 9–455 |
| | $3.06_{100}$ .. | $8.33_{70}$ | $3.23_{50}$ | 16–401 (synthetic) |
| Anthophyllite ............ | $2.72_{100}$ | $2.54_{100}$ | $3.480_{40}$ | 25–157 |
| Crocidolite ............... | $8.35_{100}$ | $3.10_{55}$ | $2.720_{15}$ | 27–1415 (UICC) |
| Tremolite .................. | $8.38_{100}$ | $3.12_{100}$ | $2.705_{90}$ | 13–437[b] |
| | $2.706_{100}$ | $3.14_{65}$ | $8.43_{40}$ | 20–1310[b] (synthetic) |
| | $3.13_{100}$ .. | $2.706_{60}$ | $8.44_{40}$ | 23–666 (synthetic mixture with richterite) |

[a] This information is intended as a guide, only. Complete powder diffraction data, including mineral type and source, should be referred to, to ensure comparability of sample and reference materials where possible. Additional precision XRD data on amosite, crocidolite, tremolite, and chrysotile are available from the U.S. Bureaus of Mines.[4]
[b] Fibrosity questionable.

Accurate *quantitative analysis* of asbestos in bulk samples by XRD is critically dependent on particle size distribution, crystallite size, preferred orientation and matrix absorption effects, and comparability of standard reference and sample materials. The most intense diffraction peak that has been shown to be free from interference by prior qualitative XRD analysis is selected for quantitation of each asbestiform mineral. A "thin-layer" method of analysis[5,6] is recommended in which, subsequent to comminution of the bulk material to ~10 μm by suitable cryogenic milling techniques, an accurately known amount of the sample is deposited on a silver membrane filter. The

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. E**

mass of asbestiform material is determined by measuring the integrated area of the selected diffraction peak using a step-scanning mode, correcting for matrix absorption effects, and comparing with suitable calibration standards. Alternative "thick-layer" or bulk methods,[7,8] may be used for *semiquantitative analysis*.

This XRD method is applicable as a confirmatory method for identification and quantitation of asbestos in bulk material samples that have undergone prior analysis by PLM or other optical methods.

*2.2   Range and Sensitivity*

The range of the method has not been determined.

The sensitivity of the method has not been determined. It will be variable and dependent upon many factors, including matrix effects (absorption and interferences), diagnostic reflections selected, and their relative intensities.

*2.3   Limitations*

2.3.1   Interferences

Since the fibrous and nonfibrous forms of the serpentine and amphibole minerals (Table 2–1) are indistinguishable by XRD techniques unless special sample preparation techniques and instrumentation are used,[9] the presence of nonasbestiform serpentines and amphiboles in a sample will pose severe interference problems in the identification and quantitative analysis of their asbestiform analogs.

The use of XRD for identification and quantitation of asbestiform minerals in bulk samples may also be limited by the presence of other interfering materials in the sample. For naturally occurring materials the commonly associated asbestos-related mineral interferences can usually be anticipated. However, for fabricated materials the nature of the interferences may vary greatly (Table 2–3) and present more serious problems in identification and quantitation.[10] Potential interferences are summarized in Table 2–4 and include the following:

- *Chlorite* has major peaks at 7.19 Å and 3.58 Å That interfere with both the primary (7.36 Å) and secondary (3.66 Å) peaks for chrysotile. Resolution of the primary peak to give good quantitative results may be possible when a step-scanning mode of operation is employed.

- *Halloysite* has a peak at 3.63 Å that interferes with the secondary (3.66 Å) peak for chrysotile.

- *Kaolinite* has a major peak at 7.15 Å that may interfere with the primary peak of chrysotile at 7.36 Å when present at concentrations of >10 percent. However, the secondary chrysotile peak at 3.66 Å may be used for quantitation.

- *Gypsum* has a major peak at 7.5 Å that overlaps the 7.36 Å peak of chrysotile when present as a major sample constituent. This may be removed by careful washing with distilled water, or be heating to 300 °C to convert gypsum to plaster of paris.

- *Cellulose* has a broad peak that partially overlaps the secondary (3.66 Å) chrysotile peak.[8]

- Overlap of major diagnostic peaks of the amphibole asbestos minerals, amosite, anthophyllite, crocidolite, and tremolite, at approximately 8.3 Å and 3.1 Å causes mutual interference when these minerals occur in the presence of one another. In some instances, adequate resolution may be attained by using step-scanning methods and/or by decreasing the collimator slit width at the X-ray port.

TABLE 2–3—COMMON CONSTITUENTS IN INSULATION AND WALL MATERIALS

A. Insulation materials

Chrysotile
"Amosite"
Crocidolite
*Rock wool
*Slag wool
*Fiber glass
Gypsum (CaSO$_4$ · 2H$_2$O)
Vermiculite (micas)
*Perlite
Clays (kaolin)
*Wood pulp
*Paper fibers (talc, clay, carbonate fillers)
Calcium silicates (synthetic)
Opaques (chromite, magnetite inclusions in serpentine)
Hematite (inclusions in "amosite")
Magnesite
*Diatomaceous earth

B. Spray finishes or paints

Bassanite
Carbonate minerals (calcite, dolomite, vaterite)
Talc
Tremolite
Anthophyllite
Serpentine (including chrysotile)
Amosite
Crocidolite
*Mineral wool
*Rock wool
*Slag wool
*Fiber glass
Clays (kaolin)
Micas
Chlorite
Gypsum (CaSO$_4$ · 2H$_2$O)
Quartz
*Organic binders and thickeners
Hyrdomagnesite
Wollastonite
Opaques (chromite, magnetite inclusions in serpentine)
Hematite (inclusions in "amosite")

925

*Amorphous materials contribute only to overall scattered radiation and increased background radiation.

TABLE 2–4—INTERFERENCES IN XRD ANALYSIS ASBESTIFORM MINERALS

| Asbestiform mineral | Primary diagnostic peaks (approximate d-spacings, in Å) | Interference |
|---|---|---|
| Serpentine Chrysotile | 7.4 | Nonasbestiform serpentines (antigorite, lizardite) Chlorite Kaolinite Gypsum |
| | 3.7 | Chlorite Halloysite Cellulose |
| Amphibole "Amosite" Anthophyllite Crocidolite Tremolite | 3.1 | Nonasbestiform amphiboles (cummingtonite-grunerite, anthophyllite, riebeckite, tremolite) Mutual interferences Carbonates Talc |
| | 8.3 | Mutual interferences |

• *Carbonates* may also interfere with quantitative analysis of the amphibole asbestos minerals, amosite, anthophyllite, crocidolite, and tremolite. Calcium carbonate ($CaCO_3$) has a peak at 3.035 Å that overlaps major amphibole peaks at approximately 3.1 Å when present in concentrations of >5 percent. Removal of carbonates with a dilute acid wash is possible; however, if present, chrysotile may be partially dissolved by this treatment.[11]

• A major *talc* peak at 3.12 Å interferes with the primary tremolite peak at this same position and with secondary peaks of crocidolite (3.10 Å), amosite (3.06 Å), and anthophyllite (3.05 Å). In the presence of talc, the major diagnostic peak at approximately 8.3 Å should be used for quantitation of these asbestiform minerals.

The problem of intraspecies and matrix interferences is further aggravated by the variability of the silicate mineral powder diffraction patterns themselves, which often makes definitive identification of the asbestos minerals by comparison with standard reference diffraction patterns difficult. This variability results from alterations in the crystal lattice associated with differences in isomorphous substitution and degree of crystallinity. This is especially true for the amphiboles. These minerals exhibit a wide variety of very similar chemical compositions, with the result being that their diffraction patterns are characterized by having major (110) reflections of the monoclinic amphiboles and (210) reflections of the

orthorhombic anthophyllite separated by less than 0.2 Å.[12]

2.3.2   Matrix Effects

If a copper X-ray source is used, the presence of iron at high concentrations in a sample will result in significant X-ray fluorescence, leading to loss of peak intensity along with increased background intensity and an overall decrease in sensitivity. This situation may be corrected by choosing an X-ray source other than copper; however, this is often accompanied both by loss of intensity and by decreased resolution of closely spaced reflections. Alternatively, use of a diffracted beam monochromator will reduce background fluorescent radiation, enabling weaker diffraction peaks to be detected.

X-ray absorption by the sample matrix will result in overall attenuation of the diffracted beam and may seriously interfere with quantitative analysis. Absorption effects may be minimized by using sufficiently "thin" samples for analysis.[5,13,14] However, unless absorption effects are known to be the same for both samples and standards, appropriate corrections should be made by referencing diagnostic peak areas to an internal standard[7,8] or filter substrate (Ag) peak.[5,6]

2.3.3   Particle Size Dependence

Because the intensity of diffracted X-radiation is particle-size dependent, it is essential for accurate quantitative analysis that both sample and standard reference materials have similar particle size distributions. The optimum particle size range for quantitative analysis of asbestos by XRD has been reported to be 1 to 10 μm.[15] Comparability of sample and standard reference material particle size distributions should be verified by optical microscopy (or another suitable method) prior to analysis.

2.3.4   Preferred Orientation Effects

Preferred orientation of asbestiform minerals during sample preparation often poses a serious problem in quantitative analysis by XRD. A number of techniques have been developed for reducing preferred orientation effects in "thick layer" samples.[7,8,15] However, for "thin" samples on membrane filters, the preferred orientation effects seem to be both reproducible and favorable to enhancement of the principal diagnostic reflections of asbestos minerals, actually increasing the overall sensitivity of the method.[12,14] (Further investigation into preferred orientation effects in both thin layer and bulk samples is required.)

2.3.5   Lack of Suitably Characterized Standard Materials

The problem of obtaining and characterizing suitable reference materials for asbestos analysis is clearly recognized. NIOSH has

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. E**

recently directed a major research effort toward the preparation and characterization of analytical reference materials, including asbestos standards.[16,17] however, these are not available in large quantities for routine analysis.

In addition, the problem of ensuring the comparability of standard reference and sample materials, particularly regarding crystallite size, particle size distribution, and degree of crystallinity, has yet to be adequately addressed. For example, Langer et al.[18] have observed that in insulating matrices, chrysotile tends to break open into bundles more frequently than amphiboles. This results in a line-broadening effect with a resultant decrease in sensitivity. Unless this effect is the same for both standard and sample materials, the amount of chrysotile in the sample will be underestimated by XRD analysis. To minimize this problem, it is recommended that standardized matrix reduction procedures be used for both sample and standard materials.

### 2.4  Precision and Accuracy

Precision of the method has not been determined.

Accuracy of the method has not been determined.

### 2.5  Apparatus

#### 2.5.1  Sample Preparation

Sample preparation apparatus requirements will depend upon the sample type under consideration and the kind of XRD analysis to be performed.

* *Mortar and Pestle:* Agate or porcelain.
* *Razor Blades*
* *Sample Mill:* SPEX, Inc., freezer mill or equivalent.
* *Bulk Sample Holders*
* *Silver Membrane Filters:* 25-mm diameter, 0.45-µm pore size. Selas Corp. of America, Flotronics Div., 1957 Pioneer Road, Huntington Valley, PA 19006.
* *Microscope Slides*
* *Vacuum Filtration Apparatus:* Gelman No. 1107 or equivalent, and side-arm vacuum flask.
* *Microbalance*
* *Ultrasonic Bath or Probe:* Model W140, Ultrasonics, Inc., operated at a power density of approximately 0.1 W/mL, or equivalent.
* *Volumetric Flasks:* 1–L volume.
* *Assorted Pipettes*
* *Pipette Bulb*
* *Nonserrated Forceps*
* *Polyethylene Wash Bottle*
* *Pyrex Beakers:* 50-mL volume.
* *Desiccator*
* *Filter Storage Cassettes*
* *Magnetic Stirring Plate and Bars*
* *Porcelain Crucibles*
* *Muffle Furnace or Low Temperature Asher*

#### 2.5.2  Sample Analysis

Sample analysis requirements include an X-ray diffraction unit, equipped with:

* *Constant Potential Generator; Voltage and mA Stabilizers*
* *Automated Diffractometer with Step-Scanning Mode*
* *Copper Target X-Ray Tube:* High intensity, fine focus, preferably.
* *X-Ray Pulse Height Selector*
* *X-Ray Detector* (with high voltage power supply): Scintillation or proportional counter.
* *Focusing Graphite Crystal Monochromator;* or *Nickel Filter* (if copper source is used, and iron fluorescence is not a serious problem).
* *Data Output Accessories:*
  * *Strip Chart Recorder*
  * *Decade Scaler/Timer*
  * *Digital Printer*
* *Sample Spinner* (optional).
* *Instrument Calibration Reference Specimen:* α-quartz reference crystal (Arkansas quartz standard, #180–147–00, Philips Electronics Instruments, Inc., 85 McKee Drive, Mahwah, NJ 07430) or equivalent.

### 2.6  Reagents

#### 2.6.1  Standard Reference Materials

The reference materials listed below are intended to serve as a guide. Every attempt should be made to acquire pure reference materials that are comparable to sample materials being analyzed.

* *Chrysotile:* UICC Canadian, or NIEHS Plastibest. (UICC reference materials available from: UICC, MRC Pneumoconiosis Unit, Llandough Hospital, Penarth, Glamorgan, CF61XW, UK).
* *Crocidolite:* UICC
* *Amosite:* UICC
* *Anthophyllite:* UICC
* *Tremolite Asbestos:* Wards Natural Science Establishment, Rochester, N.Y.; Cyprus Research Standard, Cyprus Research, 2435 Military Ave., Los Angeles, CA 90064 (washed with dilute HCl to remove small amount of calcite impurity); India tremolite, Rajasthan State, India.
* *Actinolite Asbestos*

#### 2.6.2  Adhesive

Tape, petroleum jelly, etc. (for attaching silver membrane filters to sample holders).

#### 2.6.3  Surfactant

1 percent aerosol OT aqueous solution or equivalent.

#### 2.6.4  Isopropanol

ACS Reagent Grade.

### 2.7  Procedure

#### 2.7.1  Sampling

Samples for analysis of asbestos content shall be collected as specified in EPA Guidance Document #C0090, *Asbestos-Containing Materials in School Buildings.*[10]

#### 2.7.2  Analysis

All samples must be analyzed initially for asbestos content by PLM. XRD should be used as an auxiliary method when a second, independent analysis is requested.

NOTE: Asbestos is a toxic substance. All handling of dry materials should be performed in an operating fume hood.

##### 2.7.2.1  Sample Preparation

The method of sample preparation required for XRD analysis will depend on: (1) The condition of the sample received (sample size, homogeneity, particle size distribution, and overall composition as determined by PLM); and (2) the type of XRD analysis to be performed (qualitative, quantitative, thin layer or bulk).

Bulk materials are usually received as inhomogeneous mixtures of complex composition with very wide particle size distributions. Preparation of a homogeneous, representative sample from asbestos-containing materials is particularly difficult because the fibrous nature of the asbestos minerals inhibits mechanical mixing and stirring, and because milling procedures may cause adverse lattice alterations.

A discussion of specific matrix reduction procedures is given below. Complete methods of sample preparation are detailed in Sections 2.7.2.2 and 2.7.2.3.

NOTE: All samples should be examined microscopically before and after each matrix reduction step to monitor changes in sample particle size, composition, and crystallinity, and to ensure sample representativeness and homogeneity for analysis.

2.7.2.1.1  *Milling*— Mechanical milling of asbestos materials has been shown to decrease fiber crystallinity, with a resultant decrease in diffraction intensity of the specimen; the degree of lattice alteration is related to the duration and type of milling process.[19,22] Therefore, all milling times should be kept to a minimum.

For *qualitative analysis*, particle size is not usually of critical importance and initial characterization of the material with a minimum of matrix reduction is often desirable to document the composition of the sample as received. Bulk samples of very large particle size (>2-3 mm) should be comminuted to ~100 μm. A mortar and pestle can sometimes be used in size reduction of soft or loosely bound materials though this may cause matting of some samples. Such samples may be reduced by cutting with a razor blade in a mortar, or by grinding in a suitable mill (e.g., a microhammer mill or equivalent). When using a mortar for grinding or cutting, the sample should be moistened with ethanol, or some other suitable wetting agent, to minimize exposures.

For accurate, reproducible *quantitative analysis*, the particle size of both sample and standard materials should be reduced to ~10 μm (see Section 2.3.3). Dry ball milling at liquid nitrogen temperatures (e.g., Spex Freezer Mill, or equivalent) for a maximum time of 10 min. is recommended to obtain satisfactory particle size distributions while protecting the integrity of the crystal lattice.[5] Bulk samples of very large particle size may require grinding in two stages for full matrix reduction to <10 μm.[8,16]

Final particle size distributions should always be verified by optical microscopy or another suitable method.

2.7.2.1.2  *Low temperature ashing*—For materials shown by PLM to contain large amounts of gypsum, cellulosic, or other organic materials, it may be desirable to ash the samples prior to analysis to reduce background radiation or matrix interference. Since chrysotile undergoes dehydroxylation at temperatures between 550 °C and 650 °C, with subsequent transformation to forsterite,[23,24] ashing temperatures should be kept below 500 °C. Use of a low temperature asher is recommended. In all cases, calibration of the oven is essential to ensure that a maximum ashing temperature of 500 °C is not exceeded.

2.7.2.1.3  *Acid leaching*—Because of the interference caused by gypsum and some carbonates in the detection of asbestiform minerals by XRD (see Section 2.3.1), it may be necessary to remove these interferents by a simple acid leaching procedure prior to analysis (see Section 1.7.2.2).

##### 2.7.2.2  Qualitative Analysis

2.7.2.2.1  *Initial screening of bulk material*— Qualitative analysis should be performed on a representative, homogeneous portion of the sample with a minimum of sample treatment.

1. Grind and mix the sample with a mortar and pestle (or equivalent method, see Section 2.7.2.1.1.) to a final particle size sufficiently small (~100 μm) to allow adequate packing into the sample holder.

2. Pack the sample into a standard bulk sample holder. Care should be taken to ensure that a representative portion of the milled sample is selected for analysis. Particular care should be taken to avoid possible size segregation of the sample. (Note: Use of a back-packing method[25] of bulk sample preparation may reduce preferred orientation effects.)

3. Mount the sample on the diffractometer and scan over the diagnostic peak regions for

**Environmental Protection Agency**

**Pt. 763, Subpt. E, App. E**

the serpentine (−67.4 Å) and amphibole (8.2–8.5 Å) minerals (see Table 2–2). The X-ray diffraction equipment should be optimized for intensity. A slow scanning speed of 1° 2θ/min is recommended for adequate resolution. Use of a sample spinner is recommended.

4. Submit all samples that exhibit diffraction peaks in the diagnostic regions for asbestiform minerals to a full qualitative XRD scan (5°–60° 2θ; 1°2θ/min) to verify initial peak assignments and to identify potential matrix interferences when subsequent quantitative analysis is to be performed.

5. Compare the sample XRD pattern with standard reference powder diffraction patterns (i.e., JCPDS powder diffraction data[3] or those of other well-characterized reference materials). Principal lattice spacings of asbestiform minerals are given in Table 2–2; common constituents of bulk insulation and wall materials are listed in Table 2–3.

2.7.2.2.2 *Detection of minor or trace constituents*— Routine screening of bulk materials by XRD may fail to detect small concentrations (<5 percent) of asbestos. The limits of detection will, in general, be improved if matrix absorption effects are minimized, and if the sample particle size is reduced to the optimal 1 to 10 μm range, provided that the crystal lattice is not degraded in the milling process. Therefore, in those instances where confirmation of the presence of an asbestiform mineral at very low levels is required, or where a negative result from initial screening of the bulk material by XRD (see Section 2.7.2.2.1) is in conflict with previous PLM results, it may be desirable to prepare the sample as described for quantitative analysis (see Section 2.7.2.3) and step-scan over appropriate 2θ ranges of selected diagnostic peaks (Table 2–2). Accurate transfer of the sample to the silver membrane filter is not necessary unless subsequent quantitative analysis is to be performed.

2.7.2.3   Quantitative Analysis

The proposed method for quantitation of asbestos in bulk samples is a modification of the NIOSH-recommended thin-layer method for chrysotile in air.[5] A thick-layer or bulk method involving pelletizing the sample may be used for semiquantitative analysis;[7,8] however, this method requires the addition of an internal standard, use of a specially fabricated sample press, and relatively large amounts of standard reference materials. Additional research is required to evaluate the comparability of thin- and thick-layer methods for quantitative asbestos analysis.

For quantitative analysis by thin-layer methods, the following procedure is recommended:

1. Mill and size all or a substantial representative portion of the sample as outlined in Section 2.7.2.1.1.

2. Dry at 100 °C for 2 hr; cool in a desiccator.

3. Weigh accurately to the nearest 0.01 mg.

4. Samples shown by PLM to contain large amounts of cellulosic or other organic materials, gypsum, or carbonates, should be submitted to appropriate matrix reduction procedures described in Sections 2.7.2.1.2 and 2.7.2.1.3. After ashing and/or acid treatment, repeat the drying and weighing procedures described above, and determine the percent weight loss; L.

5. Quantitatively transfer an accurately weighed amount (50–100 mg) of the sample to a 1–L volumetric flask with approximately 200 mL isopropanol to which 3 to 4 drops of surfactant have been added.

6. Ultrasonicate for 10 min at a power density of approximately 0.1 W/mL, to disperse the sample material.

7. Dilute to volume with isopropanol.

8. Place flask on a magnetic stirring plate. Stir.

9. Place a silver membrane filter on the filtration apparatus, apply a vacuum, and attach the reservoir. Release the vacuum and add several milliliters of isopropanol to the reservoir. Vigorously hand shake the asbestos suspension and immediately withdraw an aliquot from the center of the suspension so that total sample weight, $W_T$, on the filter will be approximately 1 mg. Do not adjust the volume in the pipet by expelling part of the suspension; if more than the desired aliquot is withdrawn, discard the aliquot and resume the procedure with a clean pipet. Transfer the aliquot to the reservoir. Filter rapidly under vacuum. Do not wash the reservoir walls. Leave the filter apparatus under vacuum until dry. Remove the reservoir, release the vacuum, and remove the filter with forceps. (Note: Water-soluble matrix interferences such as gypsum may be removed at this time by careful washing of the filtrate with distilled water. Extreme care should be taken not to disturb the sample.)

10. Attach the filter to a flat holder with a suitable adhesive and place on the diffractometer. Use of a sample spinner is recommended.

11. For each asbestos mineral to be quantitated select a reflection (or reflections) that has been shown to be free from interferences by prior PLM or qualitative XRD analysis and that can be used unambiguously as an index of the amount of material present in the sample (see Table 2–2).

12. Analyze the selected diagnostic reflection(s) by step scanning in increments of 0.02° 2θ for an appropriate fixed time and integrating the counts. (A fixed count scan may be used alternatively; however, the method chosen should be used consistently for all samples and standards.) An appropriate scanning interval should be selected for each peak, and background corrections made. For a fixed time scan, measure the

929

background on each side of the peak for one-half the peak-scanning time. The net intensity, $I_a$, is the difference between the peak integrated count and the total background count.

13. Determine the net count, $I_{Ag}$, of the filter 2.36 Å silver peak following the procedure in step 12. Remove the filter from the holder, reverse it, and reattach it to the holder. Determine the net count for the unattenuated silver peak, $I_{Ag}^°$. Scan times may be *less* for measurement of silver peaks than for sample peaks; however, they should be *constant* throughout the analysis.

14. Normalize all raw, net intensities (to correct for instrument instabilities) by referencing them to an external standard (e.g., the 3.34 Å peak of an α-quartz reference crystal). After each unknown is scanned, determine the net count, $I_r$, of the reference specimen following the procedure in step 12. Determine the normalized intensities by dividing the peak intensities by $I_r$:

$$\hat{I}_a = \frac{I_a}{I_r^°}, \quad \hat{I}_{Ag} = \frac{I_{Ag}}{I_r^°}, \quad \text{and} \quad \hat{I}_{Ag}^° = \frac{I_{Ag}^°}{I_r^°}$$

### 2.8  Calibration

#### 2.8.1  Preparation of Calibration Standards

1. Mill and size standard asbestos materials according to the procedure outlined in Section 2.7.2.1.1. *Equivalent, standardized matrix reduction and sizing techniques should be used for both standard and sample materials.*

2. Dry at 100 °C for 2 hr; cool in a desiccator.

3. Prepare two suspensions of each standard in isopropanol by weighing approximately 10 and 50 mg of the dry material to the nearest 0.01 mg. Quantitatively transfer each to a 1–L volumetric flask with approximately 200 mL isopropanol to which a few drops of surfactant have been added.

4. Ultrasonicate for 10 min at a power density of approximately 0.1 W/mL, to disperse the asbestos material.

5. Dilute to volume with isopropanol.

6. Place the flask on a magnetic stirring plate. Stir.

7. Prepare, in triplicate, a series of at least five standard filters to cover the desired analytical range, using appropriate aliquots of the 10 and 50 mg/L suspensions and the following procedure.

Mount a silver membrane filter on the filtration apparatus. Place a few milliliters of isopropanol in the reservoir. Vigorously hand shake the asbestos suspension and immediately withdraw an aliquot from the center of the suspension. Do not adjust the volume in the pipet by expelling part of the suspension; if more than the desired aliquot is withdrawn, discard the aliquot and resume the procedure with a clean pipet. Transfer

the aliquot to the reservoir. Keep the tip of the pipet near the surface of the isopropanol. Filter rapidly under vacuum. Do not wash the sides of the reservoir. Leave the vacuum on for a time sufficient to dry the filter. Release the vacuum and remove the filter with forceps.

#### 2.8.2  Analysis of Calibration Standards

1. Mount each filter on a flat holder. Perform step scans on selected diagnostic reflections of the standards and reference specimen using the procedure outlined in Section 2.7.2.3, step 12, and the same conditions as those used for the samples.

2. Determine the normalized intensity for each peak measured, $I_{std}$, as outlined in Section 2.7.2.3, step 14.

### 2.9  Calculations

For each asbestos reference material, calculate the exact weight deposited on each standard filter from the concentrations of the standard suspensions and aliquot volumes. Record the weight, w, of each standard. Prepare a calibration curve by regressing $\hat{I}^2_{std}$ on w. Poor reproducibility (±15 percent RSD) at any given level indicates problems in the sample preparation technique, and a need for new standards. The data should fit a straight line equation.

Determine the slope, m, of the calibration curve in counts/microgram. The intercept, b, of the line with the $\hat{I}_{std}$ axis should be approximately zero. A large negative intercept indicates an error in determining the background. This may arise from incorrectly measuring the baseline or from interference by another phase at the angle of background measurement. A large positive intercept indicates an error in determining the baseline or that an impurity is included in the measured peak.

Using the normalized intensity, $\hat{I}_{Ag}$, for the attenuated silver peak of a sample, and the corresponding normalized intensity from the unattenuated silver peak, $I_{Ag}^°$, of the sample filter, calculate the transmittance, T, for each sample as follows:[26,27]

$$T = \frac{\hat{I}_{Ag}}{I_{Ag}^°}$$

Determine the correction factor, f(T), for each sample according to the formula:

$$f(T) = \frac{-R \,(\ln T)}{1 - T^R}$$

where

$$R = \frac{\sin \Theta_{Ag}}{\sin \Theta_a}$$

$\theta_{Ag}$=angular position of the measured silver peak (from Bragg's Law), and

$\theta_a$=angular position of the diagnostic asbestos peak.

Calculate the weight, $W_a$, in micrograms, of the asbestos material analyzed for in each sample, using the appropriate calibration data and absorption corrections:

$$W_a = \frac{\hat{I}_a f(t) - b}{m}$$

Calculate the percent composition, $P_a$, of each asbestos mineral analyzed for in the parent material, from the total sample weight, $W_T$, on the filter:

$$P_a = \frac{W_a(1-.01L)}{W_T} \times 100$$

where

$P_a$=percent asbestos mineral in parent material;

$W_a$=mass of asbestos mineral on filter, in μg;

$W_T$=total sample weight on filter, in μg;

$L$=percent weight loss of parent material on ashing and/or acid treatment (see Section 2.7.2.3).

### 2.10 References

1. H. P. Klug and L. E. Alexander, *X-ray Diffraction Procedures for Polycrystalline and Amorphous Materials*, 2nd ed., New York: John Wiley and Sons, 1979.

2. L. V. Azaroff and M. J. Buerger, *The Powder Method of X-ray Crystallography*, New York: McGraw-Hill, 1958.

3. *JCPDS-International Center for Diffraction Data Powder Diffraction File*, U.S. Department of Commerce, National Bureau of Standards, and Joint Committee on Powder Diffraction Studies, Swarthmore, PA.

4. W. J. Campbell, C. W. Huggins, and A. G. Wylie, *Chemical and Physical Characterization of Amosite, Chrysotile, Crocidolite, and Nonfibrous Tremolite for National Institute of Environmental Health Sciences Oral Ingestion Studies*, U.S. Bureau of Mines Report of Investigation RI8452, 1980.

5. B. A. Lange and J. C. Haartz, Determination of microgram quantities of asbestos by X-ray diffraction: Chrysotile in thin dust layers of matrix material, *Anal. Chem.*, *51*(4):520–525, 1979.

6. *NIOSH Manual of Analytical Methods*, Volume 5, U.S. Dept. HEW, August 1979, pp. 309–1 to 309–9.

7. H. Dunn and J. H. Stewart, Jr., Quantitative determination of chrysotile in building materials, *The Microscope*, *29*(1), 1981.

8. M. Taylor, Methods for the quantitative determination of asbestos and quartz in bulk samples using X-ray diffraction, *The Analyst*, *103*(1231):1009–1020, 1978.

9. L. Birks, M. Fatemi, J. V. Gilfrich, and E. T. Johnson, *Quantitative Analysis of Airborne Asbestos by X-ray Diffraction*, Naval Research Laboratory Report 7879, Naval Research Laboratory, Washington, DC, 1975.

10. U.S. Environmental Protection Agency, *Asbestos-Containing Materials in School Buildings: A Guidance Document*, Parts 1 and 2, EPA/OPPT No. C00090, March 1979.

11. J. B. Krause and W. H. Ashton, Misidentification of asbestos in talc, pp. 339–353, in: *Proceedings of Workshop on Asbestos: Definitions and Measurement Methods* (NBS Special Publication 506), C. C. Gravatt, P. D. LaFleur, and K. F. Heinrich (eds.), Washington, DC: National Measurement Laboratory, National Bureau of Standards, 1977 (issued 1978).

12. H. D. Stanley, The detection and identification of asbestos and asbesti-form minerals in talc, pp. 325–337, in *Proceedings of Workshop on Asbestos: Definitions and Measurement Methods* (NBS Special Publication 506), C. C. Gravatt, P. D. LaFleur, and K. F. Heinrich (eds.), Washington, DC, National Measurement Laboratory, National Bureau of Standards, 1977 (issued 1978).

13. A. L. Rickards, Estimation of trace amounts of chrysotile asbestos by X-ray diffraction, *Anal. Chem.*, *44*(11):1872–3, 1972.

14. P. M. Cook, P. L. Smith, and D. G. Wilson, Amphibole fiber concentration and determination for a series of community air samples: use of X-ray diffraction to supplement electron microscope analysis, in: *Electron Microscopy and X-ray Applications to Environmental and Occupation Health Analysis*, P. A. Russell and A. E. Hutchings (eds.), Ann Arbor: Ann Arbor Science Publications, 1978.

15. A. N. Rohl and A. M. Langer, Identification and quantitation of asbestos in talc, *Environ. Health Perspectives*, *9*:95–109, 1974.

16. J. L. Graf, P. K. Ase, and R. G. Draftz, *Preparation and Characterization of Analytical Reference Minerals*, DHEW (NIOSH) Publication No. 79–139, June 1979.

17. J. C. Haartz, B. A. Lange, R. G. Draftz, and R. F. Scholl, Selection and characterization of fibrous and nonfibrous amphiboles for analytical methods development, pp. 295–312, in: *Proceedings of Workshop on Asbestos: Definitions and Measurement Methods* (NBS Special Publication 506), C. C. Gravatt, P. D. LaFleur, and K. F. Heinrich (eds.), Washington, DC: National Measurement Laboratory, National Bureau of Standards, 1977 (issued 1978).

18. Personal communication, A. M. Langer, Environmental Sciences Laboratory, Mount

§ 763.120                                                40 CFR Ch. I (7–1–11 Edition)

Sinai School of Medicine of the City University of New York, New York, New York.

19. A. M. Langer, M. S. Wolff, A. N. Rohl, and I. J. Selikoff, Variation of properties of chrysotile asbestos subjected to milling, *J. Toxicol. and Environ. Health, 4*:173–188, 1978.

20. A. M. Langer, A. D. Mackler, and F. D. Pooley, Electron microscopical investigation of asbestos fibers, *Environ. Health Perspect., 9*:63–80, 1974.

21. E. Occella and G. Maddalon, X-ray diffraction characteristics of some types of asbestos in relation to different techniques of comminution, *Med. Lavoro, 54*(10):628–636, 1963.

22. K. R. Spurny, W. Stöber, H. Opiela, and G. Weiss, On the problem of milling and ultrasonic treatment of asbestos and glass fibers in biological and analytical applications, *Am. Ind. Hyg. Assoc. J., 41*:198–203, 1980.

23. L. G. Berry and B. Mason, *Mineralogy,* San Francisco: W. H. Greeman & Co., 1959.

24. J. P. Schelz, The detection of chrysotile asbestos at low levels in talc by differential thermal analysis, *Thermochimica Acta, 8*:197–204, 1974.

25. Reference 1, pp. 372–374.

26. J. Leroux, *Staub-Reinhalt Luft, 29*:26 (English), 1969.

27. J. A. Leroux, B. C. Davey, and A. Paillard, *Am. Ind. Hyg. Assoc. J., 34*:409, 1973.

[47 FR 23369, May 27, 1982; 47 FR 38535, Sept. 1, 1982; Redesignated at 60 FR 31922, June 19, 1995]

## Subpart F [Reserved]

## Subpart G—Asbestos Worker Protection

SOURCE: 65 FR 69216, Nov. 15, 2000, unless otherwise noted.

### § 763.120   What is the purpose of this subpart?

This subpart protects certain State and local government employees who are not protected by the Asbestos Standards of the Occupational Safety and Health Administration (OSHA). This subpart applies the OSHA Asbestos Standards in 29 CFR 1910.1001 and 29 CFR 1926.1101 to these employees.

### § 763.121   Does this subpart apply to me?

If you are a State or local government employer and you are not subject to a State asbestos standard that OSHA has approved under section 18 of the Occupational Safety and Health Act or a State asbestos plan that EPA

has exempted from the requirements of this subpart under §763.123, you must follow the requirements of this subpart to protect your employees from occupational exposure to asbestos.

### § 763.122   What does this subpart require me to do?

If you are a State or local government employer whose employees perform:

(a) Construction activities identified in 29 CFR 1926.1101(a), you must:

(1) Comply with the OSHA standards in 29 CFR 1926.1101.

(2) Submit notifications required for alternative control methods to the Director, National Program Chemicals Division (7404), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460.

(b) Custodial activities not associated with the construction activities identified in 29 CFR 1926.1101(a), you must comply with the OSHA standards in 29 CFR 1910.1001.

(c) Repair, cleaning, or replacement of asbestos-containing clutch plates and brake pads, shoes, and linings, or removal of asbestos-containing residue from brake drums or clutch housings, you must comply with the OSHA standards in 29 CFR 1910.1001.

### § 763.123   May a State implement its own asbestos worker protection plan?

This section describes the process under which a State may be exempted from the requirements of this subpart.

(a) *States seeking an exemption.* If your State wishes to implement its own asbestos worker protection plan, rather than complying with the requirements of this subpart, your State must apply for and receive an exemption from EPA.

(1) *What must my State do to apply for an exemption?* To apply for an exemption from the requirements of this subpart, your State must send to the Director of EPA's Office of Pollution Prevention and Toxics (OPPT) a copy of its asbestos worker protection regulations and a detailed explanation of how your State's asbestos worker protection plan meets the requirements of TSCA section 18 (15 U.S.C. 2617).