# Exhibit 43

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

- - -

IN RE:  JOHNSON &          :
JOHNSON TALCUM POWDER       :
PRODUCTS MARKETING,         :  MDL
SALES PRACTICES, AND        :  NO. 16-2738
PRODUCTS LIABILITY          :  (FLW) (LHG)
LITIGATION                  :
                            :
THIS DOCUMENT RELATES       :
TO ALL CASES                :

Volume I

- - -

June 28, 2018

- - -


        Videotaped deposition of
DONALD HICKS, taken pursuant to notice,
was held at the law offices of Drinker
Biddle & Reath, 105 College Road East,
Princeton, New Jersey, beginning at 9:31
a.m., on the above date, before Michelle
L. Gray, a Registered Professional
Reporter, Certified Shorthand Reporter,
Certified Realtime Reporter, and Notary
Public.


- - -


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Donald Hicks

---

**Page 2**

```
 1   APPEARANCES:
 2
     BEASLEY ALLEN, P.C.
 3   BY:  LEIGH O'DELL, ESQUIRE
          JENNIFER K. EMMEL, ESQUIRE
 4   218 Commerce Street
     Montgomery, Alabama 36104
 5   (334) 269-2343
     leigh.odell@beasleyallen.com
 6   jennifer.emmel@beasleyallen.com
 7      - and -
 8   ASHCRAFT & GEREL, LLP
     BY:  MICHELLE A. PARFITT, ESQUIRE
 9   4900 Seminary Road, Suite 650
     Alexandria, VA 22311
10   (703) 931-5500
     mparf@aol.com
11
        - and -
12
     COHEN, PLACITELLA & ROTH PC
13   BY:  CHRISTOPHER M. PLACITELLA, ESQUIRE
     127 Maple Avenue
14   Red Bank, New Jersey 07701
     (732) 747-9003
15   cplacitella@cprlaw.com
16      - and -
17   WILENTZ GOLDMAN & SPITZER, P.A.
     BY:  DANIEL R. LAPINSKI, ESQUIRE
18   90 Woodbridge Center Drive
     Suite 900 Box 10
19   Woodbridge, New Jersey 07095
     (732) 855-6066
20   dlapinski@wilentz.com
     Representing the Plaintiffs'
21   Steering Committee
22
23
24
```

**Page 3**

```
 1   APPEARANCES:  (Cont'd.)
 2
     ORRICK, HERRINGTON & SUTCLIFFE, LLP
 3   BY:  ELYSE ECHTMAN, ESQUIRE
          LOGAN DWYER, ESQUIRE
 4   51 West 52nd street
     New York, New York 10019
 5   (212) 506-3767
     eechtman@orrick.com
 6   Ldwyer@orrick.com
 7      - and -
 8   DRINKER, BIDDLE & REATH, LLP
     BY:  SUSAN M. SHARKO, ESQUIRE
 9   600 Campus Drive
     Florham Park, New Jersey 07932
10   (973) 549-7000
     susan.sharko@dbr.com
11   Representing the Defendants, Johnson
     & Johnson entities
12
13   GORDON & REES, LLP
     BY:  KENNETH J. FERGUSON, ESQUIRE
14   816 Congress Avenue, Suite 1510
     Austin, Texas 78701
15   512.391.0183
     kferguson@gordonrees.com
16
        - and -
17
     COUGHLIN DUFFY L.L.P.
18   BY:  MARK K. SILVER, ESQUIRE
     350 Mount Kemble Avenue
19   Morristown, NJ 07962
     973-267-0058
20   Msilver@coughlinduffy.com
     Representing the Defendant, Imerys
21   Talc America, Inc.
22
23
24
```

**Page 4**

```
 1   APPEARANCES:  (Cont'd.)
 2
     BARRY, McTIERNAN & WEDINGER, PC
 3   BY:  JENNIFER N. CHEONG, ESQUIRE
     10 Franklin Avenue
 4   Edison, New Jersey 08837
     (732) 738-5600
 5   Jcheong@bmctwlaw.com
     Representing the Defendant, PCPC
 6
 7
     VIDEOTAPE TECHNICIAN:
 8     Darnell Brown
 9
10        - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 5**

```
 1        - - -
 2      I N D E X
 3        - - -
 4
     Testimony of:       DONALD HICKS
 5
        By Ms. O'Dell        15
 6
 7
 8
 9        - - -
10      E X H I B I T S
11
12
13   NO.      DESCRIPTION          PAGE
14   Hicks-1    Second Amended       15
               Notice of Deposition
15
     Hicks-2    Second Amended       15
16             Notice of Deposition
17   Hicks-3    Curriculum Vitae of  30
               Donald L. Hicks
18
     Hicks-4    J&J Consumer         54
19             Companies Worldwide
               Specification
20             Talc Grade 25, USP
               JNJ 000357471-88
21
22
23
24
```

Page 6

```
 1              - - -
 2         E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5     NO.      DESCRIPTION       PAGE
 6   Hicks-5    Raw Material       76
             Specification
 7           Talc Powder
             3/24/10
 8           RM 008967
             IMERYS 049938-50
 9
           Hicks-6    Raw Material       96
10             Specification
             Talc Powder
11           3/24/11
             RM 008967
12           IMERYS 033839-50
13   Hicks-7    Binder of Raw      109
             Material Specifications
14           JNJTALC000205528-753
15   Hicks-8    Asbestiform        138
             Amphibole Minerals
16           In Cosmetic Talc
             PCPC_MDL00007392-01
17
18   Hicks-9    Global Overview    141
             Talc Sourcing &
18           Asbestos Requirements
19           For Body Powders
             6/16/11
20           JNJ 000525310
21   Hicks-10   Test Method TM7024 156
             IMERYS 140471-76
22
23
24
```

Page 8

```
 1              - - -
 2         E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5     NO.      DESCRIPTION       PAGE
 6   Hicks-18   E-mail Thread,     238
             6/9/09
 7           Subject, Skillman Talc
             Technical Team Week 1
 8           Summary
             JNJTALC000149467-68
 9
           Hicks-19   JB Talcum Powder   255
10           China Asia Pacific
             Technical Team
11           Update May 26th
             JNJTALC000121177
12
13   Hicks-20   Development of a    259
             New ASTM Method for the
             Analysis of Cosmetic and
14           Pharmaceutical Talc
             For Asbestos
15           Johnson Conference
             July 2011
16           IMERYS 44413
17   Hicks-21   E-mail Thread      266
             11/17/11
18           Subject, Project
             HEAT Alternate Talc
19           Supply Chain
             JNJTALC000186914-15
20
21   Hicks-22   E-mail Thread      274
             11/28/11
22           Subject, About Talc
             Test Method
22           JNJ 000132148
23
24
```

Page 7

```
 1              - - -
 2         E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5     NO.      DESCRIPTION       PAGE
 6   Hicks-11   Memo, 12/5/96      161
             RE: Explanation of
 7           Detection Limit on
             J&J TEM Analysis of
 8           Grade 66
             IMERYS 253366
 9
10   Hicks-12   Test Method TM7169 177
             IMERYS 140505-09
11   Hicks-13   Test Method TM003845 180
             JNJ 000634054-61
12
           Hicks-14   Guilin Guiguang Talc 194
13           Mine and Grinding
             EMQA Trip Review
14           4/15/11
             JNJ 000415546-80
15
           Hicks-15   Supplier Audit     202
16           Report, 4/23/09
             IMERYS 031712-20
17
           Hicks-16   J&J WW Talc Supplier 214
18           Assessment
             Questionnaire
19           IMERYS 037018-26
20   Hicks-17   China JB Talc      228
             Technical Update as of
21           5/15/09
             JNJTALC000117964
22
23
24
```

Page 9

```
 1              - - -
 2         E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5     NO.      DESCRIPTION       PAGE
 6   Hicks-23   E-mail Thread      276
             11/8/11
 7           Subject CoA Requirements
             JNJTALC000186909-13
 8
           Hicks-24   Contract           281
 9           Manufacturing Audit Report
             4/13/12
10           JNJ000133644-50
11
           Hicks-25   E-mail Thread      288
12           4/16/12
             Subject, Lee Audit
13           Report
             JNJNL61_000005495
14
           Hicks-26   R&D Supplier/      293
15           Contractor Audit Report
             3/21-22/16
16           JNJ000521602-15
17   Hicks-27   Attestation Regarding 312
             Use of Talc in J&J
18           Body Powders
             12/19/14
19           JNJTALC000148813
20   Hicks-28   C of A, Glacier 200  313
             FCC (Talc)
21           IMERYS 411895
22   Hicks-29   C of A, Grade 25     314
             NS (Talc)
23           IMERYS 411701
24
```

Donald Hicks

| | Page 10 |
|---|---|
| 1 | - - - |
| 2 | E X H I B I T S (Cont'd.) |
| 3 | - - - |
| 4 | |
| 5 | NO.      DESCRIPTION      PAGE |
| 6 | Hicks-30   C of A Grade 25 NS   316 |
| | (Talc) |
| 7 | JNJ 000629320 |
| 8 | Hicks-31   Guilin Guiguang Talc 322 |
| | Development C of A |
| 9 | For Talc Powder |
| | JNJ 000631364-80 |
| 10 | |
| | Hicks-32   E-mail Thread      326 |
| 11 | 6/24/14 |
| | Subject, Escalation |
| 12 | JBaby Baby Powder |
| | Unspecified |
| 13 | JNJTALC000369999 |
| 14 | |
| 15 | |
| | - - - |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 11 |
|---|---|
| 1 | - - - |
| 2 | DEPOSITION SUPPORT INDEX |
| 3 | - - - |
| 4 | |
| 5 | Direction to Witness Not to Answer |
| 6 | PAGE  LINE |
| | None. |
| 7 | |
| 8 | Request for Production of Documents |
| 9 | PAGE  LINE |
| | 217   2 |
| 10 | |
| 11 | Stipulations |
| 12 | PAGE  LINE |
| | None. |
| 13 | |
| 14 | Questions Marked |
| 15 | PAGE  LINE |
| | 262   1 |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 12 |
|---|---|
| 1 | - - - |
| 2 | THE VIDEOGRAPHER:  Good |
| 3 | morning.  We are now on the |
| 4 | record.  My name is Darnell Brown |
| 5 | and I'm the videographer with |
| 6 | Golkow Litigation Services. |
| 7 | Today's date is June 28, |
| 8 | 2018, and the time is 9:31 a.m. |
| 9 | This video deposition is |
| 10 | being held in Princeton, New |
| 11 | Jersey in the matter of In Re Talc |
| 12 | for the United States District |
| 13 | Court for the District of New |
| 14 | Jersey. |
| 15 | The deponent is Donald |
| 16 | Hicks. |
| 17 | Counsel will be noted on the |
| 18 | stenographic record. |
| 19 | The court reporter is |
| 20 | Michelle Gray who will now swear |
| 21 | in the witness. |
| 22 | - - - |
| 23 | ... DONALD HICKS, having |
| 24 | been first duly sworn, was |

| | Page 13 |
|---|---|
| 1 | examined and testified as follows: |
| 2 | - - - |
| 3 | MS. SHARKO:  Just for the |
| 4 | record, Mr. Hicks is being |
| 5 | produced here pursuant to the |
| 6 | March notices served by the |
| 7 | plaintiffs as modified by Judge |
| 8 | Pisano and agreement of counsel to |
| 9 | testify to topics 1.4 (post 2006); |
| 10 | 6 (post 2006); 8; 9 as to quality |
| 11 | assurance; 1.628 (post 2006), 9 |
| 12 | and 11 (post 2006); and III (1) to |
| 13 | (2), all to U.S. products. |
| 14 | The defendants object to the |
| 15 | definitions in the notice and |
| 16 | preserve all their other |
| 17 | objections, and specifically |
| 18 | object to the definition of |
| 19 | asbestos. |
| 20 | The depositions are being |
| 21 | taken pursuant to the MDL |
| 22 | protective order, and I'll note |
| 23 | for the record that we notified |
| 24 | plaintiff's counsel in the Brower |

4 (Pages 10 to 13)

Donald Hicks

Page 14

1    case in Georgia who are the same
2    law firm of Ms. O'Dell that the
3    depositions are moving forward.
4         The topics here overlap and
5    the deposition may be used in both
6    cases.
7         With that, proceed.
8         MS. O'DELL:  I'll just for
9    the record note a couple of things
10   for the plaintiffs' steering
11   committee.
12        One, is this deposition
13   here today is being taken, as you
14   mentioned, pursuant to Judge
15   Pisano's February 6th order and to
16   the degree it's been modified
17   since, regarding topics permitted
18   to be discovered at this point,
19   composition, testing, samples and
20   bias, the PSC reserves the right
21   to follow up -- to have follow-up
22   depositions, including an
23   individual deposition of this
24   witness and others regarding the

Page 15

1    topics in the 30(b)(6) deposition
2    notices.
3         Further, I understand
4    Mr. Hicks is being offered both
5    for Johnson & Johnson Inc., and
6    Johnson & Johnson Consumer
7    Companies.  So his testimony will
8    bind both companies.
9         MS. SHARKO:  Yes, correct, I
10   should have said that.
11             - - -
12        EXAMINATION
13             - - -
14        (Document marked for
15   identification as Exhibit
16   Hicks-1.)
17        (Document marked for
18   identification as Exhibit
19   Hicks-2.)
20   BY MS. O'DELL:
21        Q.   Mr. Hicks, good morning.
22   I'm Leigh O'Dell.  We met just a few
23   minutes before we went on the record.
24   Let me show you what I've marked as

Page 16

1    exhibit Number one which is one of the
2    deposition notices that you're appearing
3    here today to speak to.
4         Also I'm going to hand you
5    Exhibit Number 2 which is the deposition
6    notice for Johnson & Johnson.  Exhibit 1
7    is for Johnson & Johnson Consumer, Inc.
8         Have you seen those before
9    today?
10        A.   I have, yes.
11        Q.   I've had an opportunity to
12   read some prior testimony from you.  I
13   understand that you previously appeared
14   at four depositions -- is that correct --
15   in your career?
16        A.   Regarding what topic?  In
17   general?
18        Q.   In general.
19        A.   Approximately four
20   depositions.  Yes.
21        Q.   Do you have a memory of
22   another deposition?  Let me ask you this
23   way.  Have you been deposed since January
24   of this year?

Page 17

1    A.   I have.
2    Q.   In what case?
3    A.   In a case entitled the
4    Ratcliff case.
5    Q.   What was that case
6    involving?
7    A.   That case was involving, I
8    believe, a mesothelioma issue.
9    Q.   And when was that
10   deposition?
11   A.   It was in January.  I don't
12   remember the exact date.
13   Q.   That may be the area of
14   confusion.  I had asked you if you had
15   been deposed since January of this year.
16   Have you sat for another deposition since
17   January of 2018?
18   A.   I have not.
19   Q.   Okay.  Great.  And that will
20   be a good spring board into the next
21   thing I want to go over.  I know you've
22   been deposed before.  I know you know the
23   drill, so to speak.  But if I ask you a
24   question that you're not clear on, or if

Donald Hicks

Page 18

1    you want me to repeat the question, I'm
2    happy to do that.  I'm not going to say I
3    ask the best questions sometimes.  So if
4    you have a question, I'm happy to
5    rephrase it.
6          Second, if you'll just
7    remember to say "yes" or "no" in response
8    to the questions, I would appreciate
9    that.
10       A.   Yes, I will.
11       Q.   We talked about the topics
12   to which you are testifying today.
13   Ms. Sharko put that on the record.  But
14   to make it more clear rather than to
15   refer to Roman numerals and numbers of
16   paragraphs, you are here today to testify
17   regarding the entities responsible for
18   the composition and testing of Johnson &
19   Johnson's Baby Powder and Shower to
20   Shower products since 2006, correct?
21       A.   That's correct, yes.
22       Q.   And you're here today to testify
23   regarding the standards and protocols
24   that Johnson & Johnson specified for the

Page 19

1    production of its Baby Powder and Shower
2    to Shower products since 2006, correct?
3        A.   Correct.
4        Q.   And you're also here today
5    to discuss the types of testing that was
6    required by Johnson & Johnson in relation
7    to its Baby Powder and Shower to Shower
8    products since 2006?
9        A.   Correct.
10       Q.   You're here today to testify
11   regarding the quality assurance
12   procedures that Johnson & Johnson and
13   JJCI employed in relation to its Baby
14   Powder and Shower to Shower products?
15       A.   That is correct.
16       Q.   Now, as I understand it, in
17   relation to that particular topic, there
18   is no time limit, that that is for all
19   time.  You are here to testify regarding
20   Johnson & Johnson's quality assurance
21   procedures relating to Baby Powder and
22   Shower to Shower; is that correct?
23       A.   That is not my
24   understanding.  My understanding was that

Page 20

1    it was from 2006 through 2017 when I
2    retired.
3          MS. O'DELL:  Susan, are you
4    offering Mr. Hicks for -- you did
5    not put a time limit on that
6    particular topic.  So are you
7    offering Mr. Hicks for that
8    purpose to testify -- excuse me --
9    testify to all quality assurance
10   procedures employed by J&J?
11          MS. ECHTMAN:  Mr. Hicks
12   today, as he said, is going to be
13   prepared to testify from 2006
14   forward on quality assurance.
15          MS. O'DELL:  If that's the
16   case, then I don't think we have
17   that topic covered for the time
18   frame -- excuse me -- time frame
19   prior to 2006, and we would ask
20   that Johnson & Johnson designate a
21   witness for that purpose.
22   BY MS. O'DELL:
23       Q.   I'll ask questions today,
24   Mr. Hicks.  And I'll refer to Johnson &

Page 21

1    Johnson.  When I do that, if we can just
2    have an understanding I'm referring to
3    both Johnson & Johnson and Johnson &
4    Johnson Consumer, Inc.
5          Can we agree to that?
6        A.   I think we can agree if
7    you're referring to the U.S. entities
8    that are called by those names.
9        Q.   If you have any confusion as
10   you're responding to my question when I
11   say Johnson & Johnson, I would ask you to
12   bring that to my attention, but I'm going
13   to be asking you questions to bind
14   Johnson & Johnson, Inc., and Johnson &
15   Johnson consumer, Inc.
16          Is that understood, sir?
17       A.   Yes, it is.
18       Q.   Okay.  Thank you.
19          Also today we'll be looking
20   at documents that refer to Imerys and
21   also Imerys' predecessor corporation, Rio
22   Tinto.  When I refer to Imerys, can we
23   have an agreement that I'm also referring
24   to Rio Tinto so it's not so messy on the

Donald Hicks

Page 22

1  record, if you will?
2       A.   I think that's fair.  Yes.
3            MR. FERGUSON:  Can I object
4  to the form of that question,
5  please.
6            MS. O'DELL:  You may.  And
7  feel free to object.  If there's
8  an issue I will try to clarify it
9  at that time.  Thank you.
10 BY MS. O'DELL:
11      Q.   Also, today I'll refer to
12 talcum powder products.  And, Mr. Hicks,
13 I would just like an agreement, when I
14 say talcum powder products I mean Baby
15 Powder and Shower to Shower; is that --
16 is that fair?
17      A.   That is fair, yes.
18      Q.   Okay, great.  Now, in the
19 notice itself, if you'll have it in front
20 of you, sir, it doesn't matter which one
21 you look at, Exhibit 1 or Exhibit 2.  If
22 you'll turn to Page 11 of the notice,
23 there were some instructions provided.
24           Have you seen these

Page 23

1  instructions?
2       A.   Yes, I have.  I have read
3  this document.
4       Q.   Great.  Counsel provided me
5  a copy of your curriculum vitae.  So I
6  have that.
7            Did you bring with you
8  copies of the documents you reviewed or
9  read in preparation for your deposition?
10      A.   I did not personally bring
11 them.
12      Q.   Okay.  What doc -- did you
13 review documents in preparation for your
14 deposition?
15      A.   Yes, I did.
16      Q.   Let me just back up and ask
17 you a broader question.  What did you do
18 to prepare for your deposition here
19 today?
20      A.   I met with the Orrick legal
21 team.  We did review a number of
22 documents and we talked about --
23           MS. ECHTMAN:  I'm just going
24 to caution the witness not to

Page 24

1  disclose the substance of the
2  discussions, but you can talk
3  generally about what it is that
4  you did.
5            THE WITNESS:  Understood.
6  BY MS. O'DELL:
7       Q.   You may continue, sir.
8       A.   So -- so we did meet.  We
9  reviewed various documents that are
10 germane to this particular case.  And had
11 some discussion about how the deposition
12 would go.
13           MS. ECHTMAN:  Okay.  Thank
14 you.
15 BY MS. O'DELL:
16      Q.   How many times did you meet
17 with counsel?
18      A.   I don't recall the exact
19 number.  There was multiple -- multiple
20 days.  I would have to look at my records
21 to have an exact number of meetings that
22 we had in this topic.
23      Q.   Was it more than five or
24 less than five meetings to prepare for

Page 25

1  your deposition?
2       A.   I think it was approximately
3  five.  Again, I can't indicate the exact
4  number of days that we met without
5  looking at some --
6       Q.   Over --
7       A.   -- calendar history.
8       Q.   Excuse me.  Over what time
9  period did these meetings occur?
10      A.   These meetings occurred in
11 the June time period.
12      Q.   How long on average were
13 these five meetings that you had with
14 counsel?
15      A.   Typically a meeting day
16 would last approximately six hours of
17 discussion time.
18      Q.   And did I understand that
19 these meetings occurred in June of this
20 year?
21      A.   To the best of my
22 recollection yes.
23      Q.   How many times have you met
24 with Johnson & Johnson counsel since

7 (Pages 22 to 25)

Donald Hicks

Page 26

1    January of this year?  So since January
2    of 2018 into the present time, how many
3    times have you met with plaintiffs -- I
4    mean defense counsel?
5         A.   I don't really recall the
6    number of days that we met.
7         Q.   Can you give me an estimate.
8         A.   I would say the total number
9    of days is in the area of about eight to
10   nine days.
11        Q.   As I understand it, you met
12   with counsel for Johnson & Johnson
13   approximately five times in preparation
14   for your deposition here today, and those
15   meetings occurred in June.  And you met
16   with Johnson & Johnson somewhere in the
17   neighborhood of four times, other than
18   then the specific meetings in June.  When
19   did those meetings occur?
20        A.   Those meetings would have
21   occurred in January.  And I believe that
22   there may have been some meetings in late
23   May.
24        Q.   Are you being paid for your

Page 27

1    testimony here today?
2         MS. ECHTMAN:  Objection to
3    the characterization.
4         MS. O'DELL:  Well, let me
5    say -- I'll just rephrase it.
6    BY MS. O'DELL:
7         Q.   I mean, are you being paid
8    for your time to be here today to testify
9    on behalf of Johnson & Johnson?
10        A.   Yes, I am.
11        Q.   And what's the rate of your
12   compensation?
13        A.   It is discussed to be
14   approximately $200 per hour.
15        Q.   And do you have a contract
16   documenting your compensation arrangement
17   with either Johnson & Johnson or counsel
18   for Johnson & Johnson?
19        A.   I do not.  It was a verbal
20   agreement.
21        Q.   Okay.  Have you been paid?
22        A.   I have not.
23        Q.   Approximately how many hours
24   have you spent in either meetings or in

Page 28

1    other preparation in relation to relation
2    to the talcum powder litigation?
3         A.   As indicated it would be the
4    approximately five days for talc
5    litigation -- talc litigation in this
6    case.
7         There were a number of
8    meetings in January, as I indicated
9    previously where we met for a -- for
10   another case.
11        Q.   A case that also involved
12   talcum powder products?
13        A.   Yes, it did.
14        Q.   Are there any other terms to
15   your arrangement with Johnson & Johnson
16   to provide testimony besides the amount
17   that you're being paid per hour?
18        MS. ECHTMAN:  Objection.
19   BY MS. O'DELL:
20        Q.   You may answer.
21        A.   Can you provide more
22   information?  I'm not exactly sure what
23   you're referring to.
24        Q.   Well, you're certainly

Page 29

1    familiar with contracts, aren't you,
2    Mr. Hicks?
3         A.   Yes, I am.
4         Q.   And they have multiple terms
5    typically, true?
6         A.   That is true.
7         Q.   Yes.  And so we talked about
8    the amount that you're being paid per
9    hour.  And you've testified that you are
10   being paid $200 per hour.  And my
11   question is, are there any other terms
12   related to your agreement with Johnson &
13   Johnson besides the amount that you're
14   being paid per hour?
15        MS. ECHTMAN:  Objection.
16        THE WITNESS:  No, there is
17   not.  May I just, from a record
18   point of view, indicate that for
19   the Ratcliff case, which the
20   deposition was taken in January, I
21   was not paid at that time for that
22   particular testimony.
23   BY MS. O'DELL:
24        Q.   But you've been paid for

8 (Pages 26 to 29)

Donald Hicks

Page 30

1    other meetings in January and for your
2    meetings since that time, and you are
3    being paid for your testimony here today?
4         MS. ECHTMAN:  Objection to
5         the characterization of being paid
6         for testimony.
7         THE WITNESS:  For --
8         beginning with this particular
9         case, yes, there's a verbal
10        agreement that there would be
11        compensation.  For the January
12        work, there was no agreement at
13        that point.
14        (Document marked for
15        identification as Exhibit
16        Hicks-3.)
17   BY MS. O'DELL:
18        Q.   Let me pass to you what I'm
19   marking as Exhibit Number 3, Mr. Hicks --
20   thank you -- which is a copy of your --
21        A.   Are you finished with these?
22        Q.   Yes, sir.  You may put that
23   aside.
24        A.   Thank you.

Page 31

1         Q.   I've handed to you a copy of
2    the curriculum vitae that was provided to
3    us.
4              Is this an up-to-date
5    curriculum vitae?
6         A.   It is up-to-date.  Yes.
7         Q.   Mr. Hicks, a couple more
8    questions before I ask you about your CV.
9              Did you speak with anyone at
10   either Johnson & Johnson or Johnson &
11   Johnson Consumer, Inc. about your
12   testimony here today?
13        A.   Discussions relative to
14   testimony were through the Orrick legal
15   team.
16        Q.   Did you speak privately with
17   any employee of Johnson & Johnson or its
18   subsidiaries?
19        MS. ECHTMAN:  Objection.
20        THE WITNESS:  In terms of?
21   BY MS. O'DELL:
22        Q.   In relation to your
23   preparation or participation in your
24   deposition today?

Page 32

1         A.   I have had phone
2    conversations with members of Johnson &
3    Johnson, yes.
4         Q.   And who have you spoken
5    with?
6         A.   Susan Nicholson.  Dr. Susan
7    Nicholson.
8         Q.   When did you speak with
9    Dr. Nicholson?
10        A.   It was the end of May,
11   beginning of June.
12        Q.   How many times have you
13   spoken with Dr. Nicholson about your
14   participation in this case?
15        A.   Just a brief conversation,
16   once.
17        Q.   What did you discuss?
18        MS. ECHTMAN:  Objection.
19        Just caution the witness not to
20        disclose any privileged
21        information with those
22        discussions.  But factual
23        information is fine.
24        MS. O'DELL:  Well, the

Page 33

1    discussions are not protected by
2    the attorney/client privilege.  So
3    I'm entitled to ask him about what
4    they discussed.
5         MS. ECHTMAN:  As long as he
6         did not communicate
7         attorney/client privileged
8         information.
9         MS. O'DELL:  I'm entitled to
10        know what you discussed.
11   BY MS. O'DELL:
12        Q.   I'm assuming you discussed
13   the facts of this case, true?
14        A.   Depends what you mean by
15   relative to facts, of course.  She was
16   looking for some background information
17   relative to how talc was generally
18   managed.
19        Q.   And what do you mean by
20   managed?
21        A.   Managed from a -- where it
22   came from, how it was processed, the
23   types of testing that was performed.
24        Q.   Was Dr. Nicholson at your

9 (Pages 30 to 33)

Donald Hicks

Page 34

1  meetings with counsel for Johnson &
2  Johnson?
3      A.   No.
4      Q.   Did you speak with any other
5  employees regarding the topics that
6  you're here to testify about today?
7      A.   Relative to this case, no.
8      Q.   Did you speak with them
9  about any other talcum powder related
10 cases?
11     A.   I have not.
12     Q.   Were there any other
13 employees -- excuse me -- strike that.
14         Were there any employees of
15 Johnson & Johnson present at your
16 meetings with counsel in preparation for
17 your deposition?
18     A.   No.
19     Q.   Did you ask for any
20 documentation or information from Johnson
21 & Johnson to prepare for your testimony
22 here today?
23     A.   I did not ask for any
24 documentation.

Page 35

1      Q.   Now, you are a former
2  long-time employee of Johnson & Johnson?
3      A.   That's correct.  42 years.
4      Q.   You began your career at
5  Johnson & Johnson in 1974?
6      A.   That is correct.
7      Q.   And as I understand it, you
8  retired last year?
9      A.   In March of 2017, correct.
10     Q.   Did you maintain in your
11 personal files documents pertinent to the
12 testimony you're providing here today?
13     A.   No, I did not.
14     Q.   I'm going to ask you about
15 telephone conversations and meetings, but
16 let me broaden the communications just
17 for a moment.
18         Did you have any e-mail
19 communications or texting communications
20 with any employee of Johnson & Johnson
21 pertaining to your participation in this
22 case?
23     A.   I did not.
24     Q.   Did you e-mail with

Page 36

1  Dr. Nicholson about your involvement in
2  this case?
3      A.   I did not.  The conversation
4  we had was a live phone call
5  conversation.
6      Q.   Now, when you retired from
7  Johnson & Johnson, what was your
8  position?
9      A.   I was senior director of
10 quality assurance for the consumer
11 division of Johnson & Johnson.
12     Q.   And did your
13 responsibilities include North America
14 plus global responsibilities?
15     A.   I had responsibility
16 primarily for the North America and U.S.
17 operation relative to the quality of baby
18 products in general.
19         However, I was also assigned
20 responsibility for handling questions
21 regarding baby products around the globe
22 and would interact with my peers on a
23 global basis if needed.
24     Q.   And just so the record is

Page 37

1  clear, when you refer to baby products,
2  are you also referring to Shower to
3  Shower in addition to Baby Powder?
4      A.   That's correct, although
5  Shower to Shower, of course, you're
6  probably aware that it was sold to
7  another company.  So for most of my time
8  and involvement with the baby line it was
9  focused on Baby Powder and other baby
10 products and not Shower to Shower.  I am
11 aware of Shower to Shower, but it was not
12 directly under my responsibility for very
13 long.
14     Q.   What period of time -- so
15 I'm understanding your testimony, what
16 period of time were you responsible for
17 Shower to Shower?
18     A.   So if we look at the time
19 period beginning in 2006 through the
20 point at which it was sold and I don't
21 have that date in front of me -- yeah, I
22 don't recall the actual date that it was
23 sold.
24     Q.   Mr. Hicks, let me talk to

10 (Pages 34 to 37)

Donald Hicks

Page 38

1    you about your educational background and
2    training. Don't mean to spend time, but
3    I need to understand what you're trained
4    for and what your education was focused
5    on and what you've not had training in.
6         You have a BS in chemistry?
7    A.   I do, yes.
8    Q.   You do not have a
9    postgraduate degree?
10   A.   I do not.
11   Q.   You're not a medical doctor?
12   A.   That is correct.
13   Q.   You are not a geologist?
14   A.   That is correct.
15   Q.   Nor are you a mineralogist?
16   A.   That is correct.
17   Q.   You are not an industrial
18   hygienist?
19   A.   That is correct.
20   Q.   In regard to testing, you
21   have never analyzed a talcum powder
22   sample by x-ray diffraction?
23   A.   That's correct.
24   Q.   You have never analyzed a

Page 39

1    talcum powder sample by polarized light
2    microscopy?
3    A.   Correct.
4    Q.   You have never analyzed a
5    talcum powder sample using what's called
6    TEM?
7    A.   That is correct.
8    Q.   You are not qualified to
9    analyze a sample using TEM, correct?
10   A.   That is correct.
11   Q.   You have not analyzed a
12   sample of talcum powder by selected area
13   electron diffraction?
14   A.   That is correct.
15   Q.   That's often referred to as
16   SAED, correct?
17   A.   Yes, it is.
18   Q.   That's not something that
19   you have expertise in?
20   A.   It is not.
21   Q.   By the same token you have
22   not analyzed a talcum powder sample by
23   SEM?
24   A.   That's correct.

Page 40

1    Q.   And that's scanning electron
2    microscopy?
3    A.   Correct.
4    Q.   And that's not a discipline
5    that you have expertise in?
6    A.   It's not a discipline that I
7    have expertise in in terms of actually
8    conducting the test, yes.
9    Q.   You're not qualified to
10   conduct that test, correct?
11   A.   That is correct.
12   Q.   You have not published
13   papers in any scientific literature
14   regarding the testing of talcum powder?
15   A.   I have not.
16   Q.   Other than the meetings that
17   we've discussed with counsel for J&J and
18   the telephone conversation with
19   Dr. Nicholson, have you done anything
20   else to prepare yourself for your
21   testimony here today?
22   A.   I have not.
23   Q.   Mr. Hicks, I understand that
24   you have formed a consulting firm called

Page 41

1    DLH; is that correct?
2    A.   It's DLH Quality and
3    Compliance Consulting. That is correct.
4    Q.   Sorry. I didn't mean to cut
5    off the name of the company.
6         Are you actively consulting
7    with individuals now on quality control
8    and quality assurance?
9    A.   I have done some very
10   limited consulting work for some
11   companies who are not Johnson & Johnson.
12   Q.   Are they in the cosmetic
13   industry?
14   A.   They are in the cosmetic
15   industry, yes.
16   Q.   And what are the names of
17   those companies?
18   A.   It was Cosmetic Essence
19   Innovations, and a company called OceanX
20   which is a fulfillment sector business.
21   Q.   And what type of products
22   does Cosmetic Essence manufacture or
23   market?
24   A.   Primarily it's cosmetic

11 (Pages 38 to 41)

Donald Hicks

Page 42

1    products, creams, lotions typically.
2        Q.   Are you actively consulting
3    for them?
4        A.   I am not actively consulting
5    for them at this point.  Our contract has
6    been completed and there's no further
7    work planned at this point.
8        Q.   You said Ocean -- Ocean
9    company?
10       A.   OceanX.  Ocean with an X at
11   the end.
12       Q.   Okay.  And what type of
13   company are they?
14       A.   They are a fulfillment
15   center where a consumer would call, place
16   an order, and they would get filled.
17   That order would then get filled, shipped
18   to the consumer.
19       Q.   Is your work with ocean X
20   ongoing?
21       A.   No.  It is also complete at
22   this point.
23       Q.   Mr. Hicks, would you agree
24   with me that Johnson & Johnson is

Page 43

1    responsible for ensuring that its talcum
2    powder products are safe?
3        A.   Yes, I do agree with that.
4        Q.   Do you agree with me that
5    Johnson & Johnson, from 2006 to the
6    present day, has a zero tolerance for
7    asbestos in its Baby Powder products?
8        A.   I would agree with that,
9    yes.
10       Q.   I'll say it a little
11   differently.  Johnson & Johnson has a
12   zero tolerance policy for asbestos in its
13   talcum powder products?
14       A.   That is correct.
15       Q.   I spent some time on the
16   Johnson & Johnson website in looking at
17   various principles that Johnson & Johnson
18   espouses.  And would you agree with me
19   that Johnson & Johnson is committed to
20   good manufacturing practices in its
21   talcum powder products?
22       A.   Yes, I do.
23       Q.   Would you agree that
24   Johnson & Johnson is responsible for

Page 44

1    ensuring that the processes are in place
2    within the companies to ensure that its
3    talcum powder products are safe?
4        A.   I would agree with that,
5    yes.
6        Q.   Would you agree, Mr. Hicks,
7    that asbestos can cause cancer in humans?
8        MS. ECHTMAN:  Objection.
9    Outside the scope.  And if he can
10   answer, he can do it in his
11   personal capacity.
12       THE WITNESS:  It is really
13   outside of my scope in terms of
14   being able to answer that.
15   BY MS. O'DELL:
16       Q.   As a quality assurance
17   witness here today to speak on behalf of
18   Johnson & Johnson and Johnson & Johnson
19   Consumer, Inc., who had 40-some-odd years
20   with J&J, you are not willing to say that
21   asbestos is capable of causing cancer?
22   That's outside of your expertise?
23       MS. ECHTMAN:  Objection.
24   It's outside of the scope of the

Page 45

1    topics that Mr. Hicks has been
2    designated on.  And I think we
3    already established that he is not
4    a medical doctor or toxicologist.
5    But I'll allow him to answer the
6    question in his personal capacity.
7        MS. O'DELL:  Well, Mr. --
8    let me just speak to the
9    objection.
10       Mr. Hicks is here today to
11   talk about the testing protocols
12   that were employed for the talcum
13   powder products which included
14   asbestos.  So it's well within the
15   scope of his testimony to ask him,
16   is asbestos a dangerous compound
17   that causes cancer.
18       MS. ECHTMAN:  So objection.
19   It is outside the scope.  What
20   asbestos can and cannot cause and
21   under what circumstances, is
22   outside the scope.  He can talk
23   about the testing within the scope
24   for asbestos.  But what asbestos

Donald Hicks

Page 46

1    can and cannot do, he's not a
2    medical doctor or toxicologist.
3    But I'll allow him to answer the
4    question in his personal capacity.
5        THE WITNESS:  I am aware
6    that asbestos can cause
7    mesothelioma.
8 BY MS. O'DELL:
9      Q.   Is mesothelioma a type of
10 cancer?
11       MS. ECHTMAN: Objection. He
12    can answer in his personal
13    capacity.
14       THE WITNESS:  As I said, I'm
15    not a medical professional.  And I
16    would leave that discussion to
17    them.
18 BY MS. O'DELL:
19      Q.   As a quality assurance
20 professional person at Johnson & Johnson
21 who served as the senior director of
22 quality assurance, was your job to ensure
23 that there were procedures in place to
24 prevent dangerous contaminants from being

Page 47

1 in talcum powder products?
2       A.   It was my responsibility to
3 have oversight of the individuals working
4 on those -- in those areas.
5      Q.   So the answer to my question
6 is yes?
7       A.   Yes.
8      Q.   Mr. Hicks, would you agree
9 with me that arsenic has been evaluated
10 by the World Health Organization and
11 determined to be a compound that
12 causes -- can cause cancer in humans?
13       MS. ECHTMAN:  Objection.
14    Outside the scope.  I'll allow
15    Mr. Hicks to answer in his
16    personal capacity if he can.
17       THE WITNESS:  That's not an
18    area of my expertise, sorry.
19 BY MS. O'DELL:
20      Q.   Are you aware that nickel
21 has been determined by the World Health
22 Organization to cause cancer in humans?
23       MS. ECHTMAN:  Same
24    objection.  It's outside the

Page 48

1    scope.  I'll allow Mr. Hicks to
2    answer in his personal capacity if
3    he can.
4       THE WITNESS:  Also the same
5    response, I'm not able to answer
6    the question.
7 BY MS. O'DELL:
8      Q.   You don't know one way or
9 the other?
10       MS. ECHTMAN:  Same
11    objection.
12       THE WITNESS:  I don't know
13    enough about the details to be
14    able to provide a meaningful
15    answer.
16 BY MS. O'DELL:
17      Q.   Are you aware, Mr. Hicks --
18 and I'm asking you this in your capacity
19 as a corporate representative here for
20 Johnson & Johnson that chromium has been
21 determined to cause cancer in humans?
22       MS. ECHTMAN:  Objection as
23    outside the scope, and I will
24    allow Mr. Hicks to answer in his

Page 49

1    personal capacity.
2       THE WITNESS:  Again, its
3    ability to cause cancer is outside
4    the scope of what I'm able to
5    testify about.
6 BY MS. O'DELL:
7      Q.   You do not know whether the
8 World Health Organization has analyzed
9 chromium and exposure of chromium to
10 humans and determined that it can cause
11 cancer?
12       MS. ECHTMAN:  Objection.
13    I'll allow Mr. Hicks to answer
14    only in his personal capacity.
15       THE WITNESS:  It is not
16    within the area of my expertise.
17    We have toxicologists and medical
18    doctors who work with those
19    topics.
20 BY MS. O'DELL:
21      Q.   Have you ever written in a
22 document that nickel can cause cancer?
23       MS. ECHTMAN:  Objection.
24    Outside the scope.  He can answer

13 (Pages 46 to 49)

Donald Hicks

Page 50

```
 1        in his personal capacity.
 2            THE WITNESS:  To the best of
 3        my recollection, no.
 4   BY MS. O'DELL:
 5        Q.   Have you seen documents from
 6   J&J, or J&J employee, or during your time
 7   as an employee of J&J that discuss the
 8   dangers of nickel in talcum powder
 9   products?
10            MS. ECHTMAN:  Objection.  He
11        can answer in his personal
12        capacity.
13            THE WITNESS:  I have not
14        specifically.  Again, the
15        toxicologists and the medical
16        professionals would be focused on
17        those kinds of issues.
18   BY MS. O'DELL:
19        Q.   Have you seen documents that
20   discuss the determination of IARC
21   regarding the cancer causing propensities
22   of asbestos, nickel, arsenic, or
23   chromium?
24            MS. ECHTMAN:  Objection.  He
```

Page 51

```
 1        can answer in his personal
 2        capacity.
 3            THE WITNESS:  Relative to
 4        IARC, that information is really
 5        communicated to our medical folks,
 6        to our toxicologists for review.
 7            I've seen documents that --
 8        where they may have published or
 9        had sent around.  It's not really
10        within my area of expertise, and I
11        don't really recall any specifics.
12   BY MS. O'DELL:
13        Q.   You certainly remember
14   documents from your time at J&J that
15   discuss the danger of asbestos being in
16   talcum powder products?
17            MS. ECHTMAN:  Objection to
18        form.
19            THE WITNESS:  I certainly
20        recall having discussions about
21        asbestos and its hazard, and, yes,
22        I do recall those.
23   BY MS. O'DELL:
24        Q.   Mr. Hicks, beginning in
```

Page 52

```
 1   2006, at the time, as I understand it,
 2   you became responsible for talcum powder
 3   products.  What specifications controlled
 4   talc?
 5            MS. ECHTMAN:  Objection to
 6        form.
 7            THE WITNESS:  There were raw
 8        material specifications for talc.
 9        And those raw materials
10        specifications, which were J&J
11        documents, defined the
12        requirements for talc.
13   BY MS. O'DELL:
14        Q.   Well, what raw material
15   specification was controlling, if you
16   will, when you became responsible for
17   Baby Powder and Shower to Shower?
18            MS. ECHTMAN:  Objection.  If
19        you'd like to show the witness a
20        document.
21            MS. O'DELL:  He's here to
22        testify to specifications.  That's
23        a clear part of the notice.  And
24        so I'm asking what specification
```

Page 53

```
 1        was controlling.  It's a very good
 2        question.  It's very well within
 3        the scope.  So I'd like an answer.
 4            MS. ECHTMAN:  Well, I just
 5        have an objection.
 6   BY MS. O'DELL:
 7        Q.   What specification was
 8   controlling when you became responsible
 9   for talcum powder products?
10            MS. ECHTMAN:  Objection.
11        Overly broad and vague, and this
12        is also not a memory test.  If
13        you'd like to show the witness a
14        document, that would probably be
15        more helpful.
16            MS. O'DELL:  The witness
17        spent five days all day preparing
18        for his deposition on a very
19        limited number of topics.  And I'm
20        sure you discussed specifications.
21   BY MS. O'DELL:
22        Q.   I'm asking you if you
23   remember.
24            Do you know what
```

14 (Pages 50 to 53)

Donald Hicks

Page 54

1    specification was controlling in 2006?
2        A.    There is a raw materials
3    specification for talc, which was in
4    effect in 2006.
5        Q.    Do you know what it was?
6        A.    The specific number and
7    version history, I don't recall that
8    offhand.  I would have to look at the
9    document.
10           (Document marked for
11           identification as Exhibit
12           Hicks-4.)
13   BY MS. O'DELL:
14       Q.    Let me show you what I'm
15   marking as Exhibit 4.  Do you recognize
16   this document?
17       A.    Yes, I do.
18       Q.    Is this a document that was
19   produced by Johnson & Johnson?
20       A.    It is.
21       Q.    The title is "RM 08031 talc
22   Grade 25 USP."  Is that correct?
23       A.    That's correct.  However, I
24   would add in that it's Revision 7, just

Page 55

1    so we're clear with this document.
2        Q.    Was this document produced
3    and maintained in the regular course of
4    business?
5        A.    It was, yes.
6        Q.    The -- is this the
7    specification that was in effect when you
8    became responsible for talcum powder
9    products?
10       A.    I cannot say for sure that
11   this exact revision was the one that was
12   in effect in 2006.  The issue date on
13   this is 2005.  So it's not clear, was
14   there a change between April of 2005 and
15   2006.
16       Q.    You don't know?
17       A.    I do not recall.
18       Q.    Was there a point in time
19   when Raw Material 8031 was made obsolete?
20   Do you know?
21          Let me ask you this
22   question, sorry.
23          Was Raw Material 8031 in
24   effect in one version or another from

Page 56

1    2006 until your retirement?
2        A.    It was not.
3        Q.    At some point was the raw
4    material specification changed?
5        A.    It was changed, and that's
6    in the time frame of 2009.
7        Q.    Do you have any reason to
8    believe that Raw Material 8031 was not in
9    effect until -- from 2005 until it was --
10   the change you've mentioned in 2009?
11       A.    It may have been.  These
12   documents often get revised.  I'm not
13   sure whether there are any subsequent
14   revisions between 2005 and 2009.  There
15   may have been.
16       Q.    And as you're sitting here
17   today, you do not know what the
18   specifications were that were controlling
19   from 2006 until 2009?
20       A.    Well, I can say that it was
21   RM 08031.  I just can't say that this is
22   the latest version that covered that time
23   period.
24       Q.    Do you have any reason to

Page 57

1    believe that it was materially changed --
2    excuse me, that RM 08031 was materially
3    changed from 2005 till 2009?
4        A.    It's very possible.  The
5    names of companies change.  The inventory
6    identification numbers change.  There are
7    many reasons why you might update this
8    particular spec in that time period.
9        Q.    Let me ask you a question
10   about talc grade 25.  In -- where was
11   talc grade 25 sourced?  Where did it come
12   from?
13       A.    So our supplier was Imerys,
14   and they milled the talc in Houston,
15   Texas.
16       Q.    Where was the talc mined?
17       A.    The talc mine is in southern
18   China.
19       Q.    Let me ask you to look at
20   Page 10 of 18 of Exhibit Number 4.  Do
21   you see under Paragraph 6, acceptance?
22       A.    Yes, I do.
23       Q.    And the paragraph, Paragraph
24   Number 2, it says, "The following Chinese

Donald Hicks

Page 58

1    mines and deposits are currently
2    considered approved to provide ore for
3    processing in grade 25/Guangxi Number 2a
4    talc." How would you pronounce the next
5    word?  Guiguang?
6        A.   That's correct.  It's very
7    close.
8        Q.    And there's a Zhizhuo quarry
9    and Longguang Guping quarry, and a Huamei
10   underground mine, Shang Lang quarry,
11   Tongzi quarry, all in the Longsheng
12   County, Guangxi Province of China.
13          Do you see that?
14       A.   Yes, I do.
15       Q.   Was Baby Powder and Shower
16   to Shower sourced from all of those
17   mines?
18       A.   During that specific time
19   period from 2006 to 2017, my knowledge is
20   that all of these mines were not used,
21   and that there were primary mines, being
22   the Guangxi mine.
23       Q.   So it's your understanding
24   throughout the time period 2006 to 2017

Page 59

1    that Guangxi was the mine from which talc
2    was extracted for purposes of supplying
3    Johnson & Johnson with talc for its Baby
4    Powder and Shower to Shower products?
5        A.   That's my understanding,
6    yes.
7        Q.    I'm going to ask you about
8    the testing that was part of the
9    specification, Mr. Hicks.  But I think
10   one of the things you have to consider
11   when you are testing is the amount of
12   product that you're dealing with.
13          One of my colleagues is
14   going to talk with you about sampling at
15   some point over the next two days.  I'm
16   not going to speak to that topic.  But I
17   do think it's helpful to understand sort
18   of the amount of material that's being
19   dealt with.
20          So if you look at Page 6 of
21   this document, it appears that -- well,
22   let me say 3.2 discusses bulk density.
23          Do you see that on Page 6?
24       A.   Yes, I do.

Page 60

1        MS. ECHTMAN:  I'm sorry.
2    Can I ask for a clarification?
3    When you're talking about Page 6,
4    there's two sets of numbers on the
5    page.
6        MS. O'DELL:  I'm using the
7    lower one.
8        MS. ECHTMAN:  Page 6 of 18?
9        MS. O'DELL:  Yes.
10       MS. ECHTMAN:  Thanks.
11   BY MS. O'DELL:
12       Q.   Mr. Hicks, you --
13   approximately how much talc was shipped
14   to Houston from China on a monthly basis
15   for use in talcum powder products?
16       MS. ECHTMAN:  Objection.
17   You can answer.
18       THE WITNESS:  From my
19   perspective it was in multiple
20   tons.  The exact tonnage, I don't
21   recall.
22   BY MS. O'DELL:
23       Q.   And we are talking thousands
24   of tons on a monthly basis, correct?

Page 61

1        MS. ECHTMAN:  Objection.
2        THE WITNESS:  I could only
3    speculate on that.
4    BY MS. O'DELL:
5        Q.   During the 2006 to 2017 time
6    frame, multiple rail cars per month were
7    shipped from Houston to PTI Royston, the
8    bottling company, correct?
9        A.   That is correct.
10       Q.   And those rail cars had the
11   capacity for 60-plus tons of material,
12   true?
13       A.   I don't recall the tonnage
14   that a rail car can hold at this
15   juncture.
16       Q.   But that -- but would it be
17   fair to say, looking at this, that if the
18   average bag of material in a rail car,
19   according to this document, was
20   25 pounds -- do you see that, per cubic
21   foot?
22       A.   Yes.
23       Q.   And I'm no expert on rail
24   cars.  But I -- Google is a terrific

16  (Pages 58 to 61)

Donald Hicks

Page 62

1  thing.  And I looked up CSX.  And a
2  50-foot rail car has 100 -- excuse me --
3  5,238 cubic feet.  Does that sound fair?
4      MS. ECHTMAN:  Objection.
5      THE WITNESS:  I would have
6      to defer to you on the --
7  BY MS. O'DELL:
8      Q.  But you wouldn't disagree
9  with me on that -- that point, would you?
10     A.  I'm not disagreeing or
11 agreeing.
12     Q.  Okay.  And if I did the math
13 correct, which is always a question mark,
14 if a bag weighs 25 pounds per cubic feet
15 and you've got over 5,000 cubic feet in a
16 rail car that's more than, let's see,
17 125,000 pounds per rail car, true?
18     MS. ECHTMAN:  Objection.
19     I'll let Mr. Hicks answer in his
20     personal capacity if he can do the
21     math.
22     THE WITNESS:  I can't do the
23     math in my head.  I'll let you do
24     the math.

Page 63

1  BY MS. O'DELL:
2      Q.  All right.  So 5,000 by 25,
3  125,000?
4      MS. ECHTMAN:  Objection.
5  BY MS. O'DELL:
6      Q.  Does that sound fair?
7      A.  In the neighborhood, yes.
8      Q.  Okay.  So 125,000 pounds
9  roughly per rail car, and multiple rail
10 cars per month were being transported of
11 talc from Houston to Royston on a monthly
12 basis?
13     MS. ECHTMAN:  Objection.
14     Foundation.
15 BY MS. O'DELL:
16     Q.  True?
17     A.  Multiple rail cars were
18 being delivered to the Royston, Georgia
19 facility.
20     Q.  Let me ask you to back up
21 one page in this document to Page 5 of
22 18.  You'll see 3.0 is entitled
23 certificate of analysis.  Do you see
24 that, sir?

Page 64

1      A.  I do.
2      Q.  And what's the purpose of a
3  certificate of analysis?
4      A.  It provides a summary of the
5  testing that was performed by -- usually
6  in this case it would be by the supplier.
7      Q.  And the certificate of
8  analysis is a document that records the
9  testing that is required by Johnson &
10 Johnson, true?
11     A.  That's correct.
12     Q.  And according to this
13 specification, RM 08031, Johnson &
14 Johnson required testing for particle
15 size?
16     A.  Correct.
17     Q.  Testing for density?
18     A.  Yes.
19     Q.  Color, of course?
20     A.  Yes.
21     Q.  Johnson & Johnson required a
22 certain whiteness of the talc in order
23 for it to be acceptable?
24     A.  Yes.

Page 65

1      Q.  There was a requirement that
2  talc be tested for arsenic levels?
3      A.  Yes.
4      Q.  The reason that arsenic was
5  tested was to ensure that the levels were
6  below three parts per million?
7      A.  Yes, it was.
8      Q.  And the reason there was a
9  concern about the level of arsenic is
10 because arsenic is known to be a danger
11 to humans, correct?
12     MS. ECHTMAN:  Objection.
13     Outside the scope.  I'll allow him
14     to answer in his personal
15     capacity.
16     THE WITNESS:  There
17     certainly is a safety concern for
18     arsenic.  But I would also point
19     out that arsenic is required to be
20     tested by the United States
21     Pharmacopeia.
22 BY MS. O'DELL:
23     Q.  Because it's a danger to
24 humans, correct?

17 (Pages 62 to 65)

Donald Hicks

Page 66

1          MS. ECHTMAN:  Objection.
2     Outside the scope.  I'll let him
3     answer in his personal capacity.
4          THE WITNESS:  I would agree
5     that high levels of arsenic could
6     be an issue.
7  BY MS. O'DELL:
8     Q.   And when you mean issue,
9  it's a danger to humans, correct?
10    A.   Correct.
11         MS. ECHTMAN:  Objection to
12    form.
13  BY MS. O'DELL:
14    Q.   Because heavy metals at high
15  levels also are a danger to humans, there
16  was a requirement that the talc be tested
17  for heavy metals, correct?
18         MS. ECHTMAN:  Objection.
19         You can answer in your
20         personal capacity.
21         THE WITNESS:  Yes, that's
22         correct.  Talc is a natural
23         material, and so it was agreed
24         that we would do that.  We would

Page 67

1     do a heavy metals testing in
2     addition to those tests that were
3     defined by the United States
4     Pharmacopeia.
5  BY MS. O'DELL:
6     Q.   There was testing for lead
7  because high levels of lead in a product
8  can be a danger to humans, correct?
9          MS. ECHTMAN:  Objection.
10         Mr. Hicks can answer in his
11         personal capacity.
12         THE WITNESS:  Yes.
13  BY MS. O'DELL:
14    Q.   Let me ask you to turn to
15  Page 7.  What was the purpose of the
16  certificate of analysis for initial ore
17  results?
18    A.   So that testing -- that C of
19  A reflected the testing that was
20  performed on a composite sample across
21  the ore lot that was received by Imerys.
22    Q.   What's -- what's meant by a
23  unique ore lot?
24    A.   My understanding is that a

Page 68

1  unique ore lot would be an ore lot that
2  was pulled from the mines, set aside for
3  Johnson & Johnson and Imerys, and was
4  then an ore lot that was put on a ship
5  and sent over.  That became a unique ore
6  lot.
7     Q.   How large is a unique ore
8  lot as it's used in this context?
9     A.   Again, it's in tons.  I
10  don't recall the exact number.
11    Q.   It says, "A certificate of
12  analysis labeled initial ore results
13  after grinding will be" -- "will provide
14  numerical analytical results."
15         When was this certificate of
16  analysis provided to J&J in the
17  manufacturing process?
18         MS. ECHTMAN:  Objection to
19         form.
20         THE WITNESS:  So it would be
21         provided in advance typically of a
22         rail car coming into the Royston,
23         Georgia facility.
24  BY MS. O'DELL:

Page 69

1     Q.   In this specification, 3.14
2  and 3.15, do those contain the testing
3  methods for asbestos that were
4  controlling in 2006 to 2009?
5     A.   Yes.  Here it defines the
6  testing methods that are to be used.
7     Q.   And those are the methods
8  that were dictated and required by J&J,
9  correct?
10    A.   It was methods that were
11  agreed upon between Imerys and Johnson &
12  Johnson, yes.
13    Q.   And J&J required them; that
14  was part of the specification, true?
15    A.   Yes, they did.
16    Q.   I'm going to ask you about
17  those processes in more detail, but
18  looking down at the bottom of Page 7 of
19  18 of Exhibit 4, there was another
20  certificate of analysis labeled, "Yearly
21  composite results by atomic absorption or
22  equivalent method."
23         Do you see that?
24    A.   Yes, I do.

18 (Pages 66 to 69)

Donald Hicks

Page 70

1    Q.   What was the purpose of that
2  testing?
3    A.   So that testing, the atomic
4  absorption testing typically would be
5  used for a metal determination, for
6  example.
7    Q.   And that testing was only
8  required yearly, true?
9    A.   For the items listed below
10  that paragraph, yes.
11    Q.   Which would be for aluminum,
12  cadmium, and calcium?
13    A.   That's correct.
14    Q.   Would it also be true
15  that -- if you'll turn over to Page 9,
16  that for chromium, cobalt, copper,
17  manganese -- excuse me -- magnesium,
18  mercury, nickel, arsenic, and lead were
19  only required to be tested on a yearly
20  basis, true?
21        MS. ECHTMAN:  Objection to
22  form.
23        THE WITNESS:  That was the
24  requirement of this document.

Page 71

1    Yes.
2  BY MS. O'DELL:
3    Q.   Mr. Hicks, from beginning in
4  2006 forward, did Johnson & Johnson
5  employ outside labs to conduct testing?
6        MS. ECHTMAN:  Objection to
7  form.
8        THE WITNESS:  The time
9  ranges were?  Sorry.
10  BY MS. O'DELL:
11    Q.   2006 forward.
12    A.   2006 forward there were --
13  there was a point at which an independent
14  laboratory was used, yes.
15    Q.   Okay.  I want to ask you to
16  list for me all the independent labs that
17  Johnson & Johnson employed to conduct
18  tests on its talcum powder products.
19        MS. ECHTMAN:  Objection to
20  form.
21        THE WITNESS:  The
22  independent lab that was used by
23  Johnson & Johnson was the RJ Lee
24  Group located in Pennsylvania.

Page 72

1  BY MS. O'DELL:
2    Q.   And that's the only lab that
3  Johnson & Johnson ever engaged to conduct
4  testing on its talcum powder products?
5        MS. ECHTMAN:  Objection.
6        THE WITNESS:  It's the
7      only -- it's the only lab that I'm
8      aware of, yes.  I might just
9      clarify, in a production capacity.
10  BY MS. O'DELL:
11    Q.   What do you mean by a
12  production capacity?
13    A.   There may have been research
14  and development studies going on for
15  various types of projects prior to that.
16  I would have no knowledge of that.
17    Q.   From a quality assurance
18  standpoint, testing talc that had been
19  mined in China and for purposes of use in
20  J&J talcum powder products, the only lab
21  that J&J employed was RJ Lee Group?
22        MS. ECHTMAN:  Objection.
23  2006 forward.
24        THE WITNESS:  From 2006

Page 73

1      forward, my understanding is that
2      is correct.
3  BY MS. O'DELL:
4    Q.   Okay.  You can put that
5  aside.
6        MS. ECHTMAN:  Ms. O'Dell, if
7      we're going to move on to another
8      document, can we take a quick
9      hygiene break?
10        MS. O'DELL:  Of course.
11        THE VIDEOGRAPHER:  The time
12      is now 10:48.  Going off the
13      record.
14      (Short break.)
15        THE VIDEOGRAPHER:  The time
16      is now 11:00 a.m. back on the
17      record.
18  BY MS. O'DELL:
19    Q.   Before the break, Mr. Hicks,
20  we were talking about a raw materials
21  specification for Talc 25.  RM 08031, I
22  think, was the specification.
23        And was there a point --
24  I'll ask it a different way.  You told us

19  (Pages 70 to 73)

Donald Hicks

Page 74

1  that RM 08031 was in effect till some
2  time in 2009, to the best of your
3  knowledge; is that -- is that accurate?
4       MS. ECHTMAN:  Objection.
5       THE WITNESS:  So that
6       particular document number was in
7       effect.  There were multiple
8       revisions of this document
9       ongoing.  As situations change,
10      information needs to be updated.
11 BY MS. O'DELL:
12      Q.   And was that specification
13 rendered obsolete and a new specification
14 adopted in 2009 time period?
15      A.   That is correct.
16      Q.   And what was the number of
17 that new raw materials specification?
18      MS. ECHTMAN:  Objection.  Do
19      you want to show the witness a
20      document?  Or do you want him to
21      give you the number off the top of
22      his head?
23      MS. O'DELL:  I want him to
24      tell me what specification.  He

Page 75

1  obviously has it in his memory
2  because he's referred to it.  I
3  want to know what number it is.
4  This is my chance to ask him
5  questions on behalf of Johnson &
6  Johnson, and he's here to talk
7  about the specifications.
8  BY MS. O'DELL:
9       Q.   And so Mr. Hicks, the
10 question for you is, do you know what the
11 number of the specification was?
12      A.   I don't recall the exact
13 number of that specification.
14      Q.   Does the number 8967 ring a
15 bell?
16      MS. ECHTMAN:  Objection.
17      THE WITNESS:  That may be
18      the correct number.  I would have
19      to verify it with the actual
20      document.
21      THE VIDEOGRAPHER:  Excuse me
22      one second, Counsel.
23      Can you raise your mic,
24      Mr. Hicks.  Thank you.

Page 76

1       (Document marked for
2       identification as Exhibit
3       Hicks-5.)
4  BY MS. O'DELL:
5       Q.   Let me show you what I'm
6  marking as Exhibit Number 5.
7       Do you recognize this
8  document?
9       A.   Yes, I do.
10      Q.   Is this the specification
11 that replaced specification RM 08031?
12      A.   It is the specification, and
13 we are talking about RM 008967.  This
14 happens to be the first revision so there
15 would have been a document prior to this
16 one, a version prior to this one.
17      Q.   And this first revision
18 became effective March 24, 2010?
19      A.   That is correct.
20      Q.   And just to make sure I'm
21 clear, this would have been the
22 controlling raw materials specification
23 for talc to be used in Baby Powder and
24 Shower to Shower products at that time?

Page 77

1       A.   That is correct.
2       Q.   Okay.  So there's not
3  another raw materials specification
4  related to talc that would also have had
5  implications for Baby Powder and Shower
6  to Shower?
7       A.   None that I'm aware of, no.
8       Q.   Let me ask you to turn to
9  Page 4 of 15.  Take a look at 2.0,
10 "Properties and requirements."  There's a
11 table.
12      Do you see that, sir?
13      A.   Yes, I do.
14      Q.   And this table is intended
15 to outline the required test method that
16 should be used for a particular
17 component, true?
18      A.   That is correct.
19      Q.   And to provide the upper
20 limit of normal for the individual
21 property that's being tested, correct?
22      MS. ECHTMAN:  Objection to
23      form.
24      THE WITNESS:  That is

20  (Pages 74 to 77)

Donald Hicks

Page 78

1    correct.
2    BY MS. O'DELL:
3        Q.    And if you'll turn to the
4    next page.  The acceptable limit for
5    lead, for example, was ten parts per
6    million.  Am I reading that correctly?
7        A.    Yes, you are.
8        Q.    And what does NMT stand for?
9        A.    Not more than.
10       Q.    Not more than.  And so
11   Johnson & Johnson specified that it's
12   talc would not have more than ten parts
13   per million of lead, correct?
14       A.    That is correct.
15       Q.    And similarly Johnson &
16   Johnson dictated that its talc should not
17   have more than two parts per million of
18   aluminum?
19       A.    That is correct.
20       Q.    And the maximum amount of
21   arsenic that was allowed in its talc,
22   according to the specification, was two
23   parts per million, correct?
24       A.    Yes.

Page 79

1        Q.    The limit of chromium was .5
2    part per million, correct?
3        A.    Yes.
4        Q.    And the limit of nickel was
5    ten parts per million?
6        A.    Yes.
7        Q.    Then you'll see 2.33
8    addresses asbestos, correct?
9        A.    Yes.
10       Q.    And Johnson & Johnson
11   required that talc be tested using CTFA
12   J4-1, correct?
13       A.    You had the option of using
14   the either current USP method or CTFA
15   Method J4-1.
16       Q.    And in terms of asbestos
17   being tested by transmission electron
18   microscope, the specific method to be
19   employed -- and this was required by J&J,
20   was TM, meaning test method, 7024,
21   correct?
22       A.    Yes.
23       Q.    I'll ask you to turn to Page
24   8 of 15.  Mr. Hicks, who was responsible

Page 80

1    for -- at Johnson & Johnson for the
2    drafting of this raw materials
3    specification?
4        A.    Primary responsibility was
5    with the research and development team.
6        Q.    Did the -- strike that.
7             Who in the research and
8    development team was primarily
9    responsible for raw material
10   specifications for talc?
11       A.    Individual?
12       Q.    Yes.
13       A.    At this point in time there
14   was a scientist.  His name was Curtis
15   Lee.
16       Q.    And so Mr. Lee would have
17   had responsibility for developing this
18   raw materials specification, true?
19       A.    In collaboration with both
20   Imerys and other members within Johnson &
21   Johnson, yes.  He was the primary owner
22   of the document.
23       Q.    Were you involved in the
24   drafting of these specifications?

Page 81

1        A.    Yes.  I was part of the
2    team.
3        Q.    And what input did you have
4    in the specification?  What was your
5    responsibility?
6        A.    Alignment.  Indicating
7    that -- reviewing all the information to
8    make sure that it was correct from a
9    quality and compliance perspective,
10   looking at the sampling process, names of
11   the companies that were being used, and,
12   you know, other related information, such
13   as the approved independent testing
14   laboratory name, those kinds of topics.
15       Q.    Looking at Page 8 of 15,
16   you'll see the testing frequencies and
17   requirements.
18            Do you see that?
19       A.    Yes.
20       Q.    Let's go through this table.
21   You see Stage I is ore.  I'm assuming
22   that means that's ore that's being taken
23   from the mine in China, correct?
24       A.    That's correct.

21 (Pages 78 to 81)

Donald Hicks

Page 82

1        Q.    And who was responsible for
2   the testing of the ore while it was at
3   the mine in China?
4        A.    That would be Imerys.
5        Q.    What responsibility did the
6   Chinese mining company have for testing
7   the ore while it was at the mine?
8        A.    They -- they were certainly
9   responsible to do testing of their own
10  mine.  Those records were not sent to us.
11  Imerys was doing the testing for
12  Johnson & Johnson.
13       Q.    Did J&J receive certificates
14  of analyses from the Chinese mining
15  company?
16       A.    No, they did not.
17       Q.    So J&J was not copied on
18  testing that was performed in China?
19       A.    That's correct.
20       Q.    Did J&J dictate the specific
21  test that should be done by the mining
22  company in China?
23       A.    No.  Imerys dictated those
24  requirements based upon the specification

Page 83

1   that we provided to Imerys to evaluate
2   talc.
3        Q.    Let me ask you, in this
4   chart, just to make it more clear on the
5   record.  The supplier, who's the supplier
6   that's being referred to in the title on
7   Column Number 3?
8        A.    So the supplier would be the
9   supplier who is responsible for procuring
10  the ore.
11       Q.    So who in this -- in the
12  context of 2010 when this specification
13  was in effect, who was the supplier that
14  would have been referred to?  Is that
15  Imerys or China -- the Chinese mining
16  company?
17       A.    That would -- that would be
18  Imerys.
19       Q.    There is reference here to
20  the J&J plant or TPM.  What does TPM
21  stand for?
22       A.    Third-party manufacturer.
23       Q.    Who was the third-party
24  manufacturer in 2010?

Page 84

1        A.    In 2010, the third party
2   manufacturer was Pharmaceutical
3   Technologies Incorporated, located in
4   Royston, Georgia.
5        Q.    And in 2010, talc was being
6   used for Baby Powder, correct?
7        A.    That's correct, yes.
8        Q.    And talc was also being
9   purchased by Johnson & Johnson for use in
10  Shower to Shower in 2010, correct?
11       A.    That is correct, yes.
12       Q.    And the Shower to Shower
13  product was not manufactured in Royston,
14  Georgia, was it?
15       A.    It -- some manufacturing was
16  occurring in Royston, Georgia to the best
17  of my knowledge.
18       Q.    Was there also manufacturing
19  in Union City, Missouri?
20       A.    There was a very limited
21  time frame where a specialized product
22  was manufactured in St. Louis.  I should
23  say specialized Shower to Shower, just to
24  be clear.

Page 85

1        Q.    Working through this
2   timeline for the ore itself.  It says
3   under the J&J plant or TPM, third-party
4   manufacturing, column, "Ore lot C of A,"
5   which is certificate of analysis,
6   correct?
7        A.    Yes.
8        Q.    "Received and reviewed for
9   compliance versus specification."
10            Who was the person
11  responsible for or the entity responsible
12  for receiving the certificate of
13  analysis?
14       A.    It would be the quality unit
15  at the manufacturing location for Baby
16  Powder and Shower to Shower.
17       Q.    And that would have been
18  Pharma Tech or PTI in Georgia?
19       A.    That's correct.
20       Q.    And to the degree that talc
21  was being sourced for Shower to Shower
22  and manufactured in Missouri, it would
23  have been Pharma Tech -- Pharma Tech's
24  location in Missouri, correct?

Donald Hicks

| | |
|---|---|
| Page 86 | Page 88 |

Page 86

1    MS. ECHTMAN:  Objection.
2         THE WITNESS:  That is
3    correct.
4    BY MS. O'DELL:
5         Q.    The certificate of analysis
6    was conveyed to the Pharma Tech separate
7    and apart from the shipment, correct?
8         MS. ECHTMAN:  Objection.
9         THE WITNESS:  It would have
10        been sent -- it might have been
11        sent electronically.  It might
12        have been sent via mail directly
13        to the site.  It usually did not
14        accompany the rail car itself.
15   BY MS. O'DELL:
16        Q.    Who was responsible for
17   reviewing certificates of analysis?
18        A.    At the receiving point it
19   would have been the quality assurance
20   unit.
21        Q.    At Pharma Tech?
22        A.    At Pharma Tech.
23        Q.    Was Johnson & Johnson
24   provided copies of certificates of

Page 88

1         A.    Inter -- yes.  An
2    independent lab was used by them and
3    reported on their C of A whenever they
4    used an independent lab.
5         Q.    What was the name of that
6    independent lab?
7         A.    It was a laboratory called
8    Intertek.
9         Q.    And what type of testing did
10   Intertek perform for Imerys?
11        A.    Without looking at the C of
12   A, I believe that it was the analysis
13   of -- both the chemical analysis as well
14   as evaluating for asbestos.
15        Q.    So when you said a chemical
16   analysis, would it be all of the tests
17   that are listed in the properties and
18   requirements section of this
19   specification, the ones we've talked
20   about previously on Page 5 and -- 4 and 5
21   of this document?
22        MS. ECHTMAN:  Objection to
23        form, and this is not a memory
24        test.  Go ahead.

Page 87

1    analysis as a sort of normal operating
2    practice?
3         A.    Not on a routine basis, no.
4         Q.    If you look down to the
5    second line of this chart, it talks about
6    post milling.  What is intended -- what
7    is meant by post milling?
8         A.    The ore that is received at
9    the Imerys Houston facility would be in
10   lump form approximately the size of a
11   baseball or softball.  And it would be
12   milled down to a fine powder.  So this
13   refers to the process or the material
14   after it has been milled to a fine
15   powder.
16        Q.    Are you -- I understand that
17   Imerys performed testing of milled ore,
18   correct?
19        A.    Yes, I am.
20        Q.    Did Imerys use, from 2010 --
21   and I'll just put it in the time frame of
22   the specification, forward to 2018, did
23   they use independent labs to test the
24   talc?

Page 89

1         THE WITNESS:  That is my
2         understanding.  It -- the location
3         of the testing varied over
4         those -- that period in terms of
5         where it was done.
6    BY MS. O'DELL:
7         Q.    Are you aware of any other
8    third-party labs that Imerys employed to
9    perform testing on talc?
10        A.    I am not.
11        Q.    Did J&J audit Intertek to
12   ensure that the proper tests were being
13   done?
14        A.    This was a laboratory that
15   was qualified and utilized by Imerys so
16   Imerys had that responsibility to audit
17   that laboratory.
18        Q.    So the answer to my question
19   was no?
20        A.    That's correct.
21        Q.    So let me ask you again.
22   Johnson & Johnson, during -- from 2006
23   forward did not audit Intertek to ensure
24   that the testing and specifications were

23  (Pages 86 to 89)

Donald Hicks

Page 90

1   being done appropriately, correct?
2           MS. ECHTMAN:  Objection to
3       form.
4           THE WITNESS:  Johnson &
5       Johnson did not audit that
6       particular laboratory.
7   BY MS. O'DELL:
8       Q.   Did Johnson & Johnson
9   receive copies of the results of testing
10  performed by Imerys on post milling
11  product?
12      A.   Yes.
13      Q.   Was that a requirement that
14  all post milling testing results be
15  provided to Johnson & Johnson?
16      A.   Yes, it was.
17      Q.   Were all testing results
18  from tests conducted by Intertek required
19  to be provided to Johnson & Johnson?
20      A.   I'm not sure I can answer
21  all.  What I can answer is that testing
22  that Intertek performed, which was
23  required by our specification, would have
24  been then reported for production of

Page 91

1   product -- or production of material to
2   Johnson & Johnson.
3       Q.   Who within Johnson & Johnson
4   would have been the person to receive
5   those test results?
6       A.   The certificates of
7   analysis, I misspoke.  The certificates
8   of analysis, as previously indicated, go
9   to the PTI facility in Royston, Georgia.
10  They would be looking at those results.
11      Q.   So just like the test or
12  certificate of analysis for the ore,
13  certificates of analysis for post milling
14  material were also to be directed to
15  Pharma Tech?
16      A.   That's correct.
17      Q.   Those certificates of
18  analysis were not copied to Johnson &
19  Johnson?
20      A.   On a routine basis, no, they
21  were not.
22      Q.   After the post-milling
23  product was shipped from Houston to
24  Pharma Tech in either Georgia or

Page 92

1   Missouri, what testing, if any, did
2   Pharma Tech perform on the talcum powder?
3           MS. ECHTMAN:  Objection.
4           THE WITNESS:  So the testing
5       performed would have been
6       appearance, density, particle
7       size, and microbiological content.
8   BY MS. O'DELL:
9       Q.   So in other words, testing
10  for arsenic, testing for -- would not
11  have occurred at Pharma Tech?
12      A.   That is correct.
13      Q.   Testing for asbestos did not
14  occur at Pharma Tech?
15      A.   That is correct.
16      Q.   Testing for nickel was not
17  performed at Pharma Tech at the time the
18  talcum powder was being placed in the
19  bottles and finished, if you will?
20      A.   That's correct.
21      Q.   Testing for, in the same way
22  for chromium, lead, heavy metals was not
23  performed at Pharma Tech?
24      A.   That's correct.

Page 93

1       Q.   For the limited testing of
2   appearance, particle size, and, did you
3   say, sort of microbiology at Pharma Tech,
4   was that performed within a lab at Pharma
5   Tech or was that also done by third
6   party?
7           MS. ECHTMAN:  Objection to
8       form.
9           THE WITNESS:  My
10      recollection is that it was being
11      performed directly at the Pharma
12      Tech lab, although some testing
13      could have been shifted outside,
14      depending on capacity, I suppose.
15  BY MS. O'DELL:
16      Q.   Now, in the lower right
17  corner of this document -- we're still on
18  Exhibit 5, which is RM 008967 that was in
19  effect in March of 2010.  It says at the
20  bottom, "J&J independent audit.
21  Quarterly samples from finished talc lots
22  are sent to J&J authorized independent
23  lab for full testing."
24          Who was the lab that J&J

24 (Pages 90 to 93)

Donald Hicks

Page 94

1    sent those quarterly samples to?
2         A.   That is the RJ Lee Group.
3         Q.   And RJ Lee was the only lab
4    that Johnson & Johnson employed to test
5    samples from 2006 until the present date?
6         A.   That is correct.  Yes.
7         Q.   And the data that was
8    gleaned from the testing, the quarterly
9    testing by RJ Lee, it was generated for
10   informational purposes only, correct?
11        MS. ECHTMAN:  Objection to
12        form.
13        THE WITNESS:  It was
14        generated for review, not for
15        release.
16   BY MS. O'DELL:
17        Q.   And by virtue of the fact
18   that it was not generated for release
19   purposes, that means that the Baby Powder
20   product continued forward through the
21   manufacturing process at Pharma Tech and
22   then onto the shelves of grocery stores
23   and Target and Walmart around the country
24   without the testing from RJ Lee having

Page 95

1    any impact on that process, true?
2         MS. ECHTMAN:  Objection to
3         form.
4         THE WITNESS: Yes, that is
5         true.
6    BY MS. O'DELL:
7         Q.   Would it be fair to say,
8    Mr. Hicks, RM 08967 was the controlling
9    specification, in one version or
10   another -- I understand it was amended,
11   you know, periodically.  But that
12   particular raw material number was the
13   controlling specification for talc from
14   2009 until you retired in 2017?
15        A.   Yes, it was.
16        Q.   Do you have any information
17   to suggest that RM 008967 is not in
18   effect today?
19        A.   I have no information that
20   it has been replaced or superseded.
21        Q.   And as a part of your
22   preparation for testifying on behalf of
23   Johnson & Johnson and JJCI, did you
24   investigate to determine who had the

Page 96

1    latest information about the raw
2    materials specifications that is
3    currently in effect?
4         A.   I did not personally
5    investigate.
6         Q.   But you have no reason to
7    believe it's changed?
8         A.   That's correct.
9         (Document marked for
10        identification as Exhibit
11        Hicks-6.)
12   BY MS. O'DELL:
13        Q.   Let me show you what I'm
14   going to mark as Exhibit 6 and ask you to
15   identify that for the record, please.
16        A.   So this is a raw materials
17   specification for talcum powder.  It is
18   numbered RM 008967.  It's revision
19   three.  It was issued in March 24th of
20   2011.
21        Q.   And as your -- in your
22   capacity as senior director of quality
23   assurance, you would have contributed to
24   the creation of this document, true?

Page 97

1         A.   Yes.
2         Q.   And this was created in the
3    normal course of business?
4         A.   Yes, it was.
5         Q.   And from your review, it
6    appears to be a true and accurate copy of
7    that raw materials specification?
8         A.   It does.
9         Q.   And this raw material
10   specification would have been the
11   controlling specification for North
12   America and Baby Powder and Shower to
13   Shower?
14        MS. ECHTMAN:  Objection to
15        form.  You can answer.
16        THE WITNESS:  Yes.
17   BY MS. O'DELL:
18        Q.   Mr. Hicks, looking at, I
19   want to make sure that you've got in
20   front of you Exhibit 6.
21        A.   Yes.
22        Q.   Okay.  Just to make sure.
23   If you'll look on Page 9 of 12 of
24   Exhibit 6.

25  (Pages 94 to 97)

Donald Hicks

Page 98

1           The testing frequency at
2   this time in 2011 is still yearly samples
3   are tested for chromium, arsenic, nickel,
4   and lead, correct?
5           MS. ECHTMAN:  Objection to
6   form.
7           THE WITNESS:  My
8       understanding at this point is
9       that testing for those items were
10      being done per ore lot.
11  BY MS. O'DELL:
12      Q.   When did that change?
13          MS. ECHTMAN:  Objection to
14      form.
15  BY MS. O'DELL:
16      Q.   You testified earlier that
17  those tests were being done on a yearly
18  composite?
19      A.   Yes, that's what the 2005
20  specification that we reviewed indicated.
21      Q.   When did it change that
22  those tests for those components were
23  performed on a unique lot basis?
24      A.   Certainly by 2009 when this

Page 99

1   original specification was first issued.
2   I would have to look back through the
3   older documents to confirm the exact time
4   period that that changed.
5       Q.   In this version of RM 08967
6   that we're looking at, Exhibit 6.  There
7   is an added element under the receipt at
8   Pharma Tech, the third-party
9   manufacturing plant.
10          And if you'll look on the
11  far right column at the bottom, it says
12  under each shipment -- do you see that
13  section, sir?
14      A.   Actually I don't.  Sorry.
15      Q.   Okay.  It says each shipment
16  on the far -- the lower right box?  Do
17  you see that?
18      A.   Yes, okay.  I see it now.
19      Q.   There is an added
20  requirement that each shipment confirmed
21  linkage of certificate of analysis to
22  quarterly ore lot testing.
23          Do you see that?
24          MS. ECHTMAN:  Objection to

Page 100

1   form.
2           THE WITNESS:  Yes, I do.
3   BY MS. O'DELL:
4       Q.   And that was a new
5   requirement as of this revision of the
6   raw material specification in 2011?
7           MS. ECHTMAN:  Objection.
8       Lack of foundation.
9           MS. O'DELL:  Let me finish
10      my question, please.
11  BY MS. O'DELL:
12      Q.   That was a new requirement
13  of the testing frequencies and
14  requirements section of the
15  specification, true?
16          MS. ECHTMAN:  Objection.
17      Lack of foundation.
18          THE WITNESS:  In -- I can't
19      say whether it's only -- whether
20      this was the first revision that
21      it appeared, without looking back
22      further at the prior documents.
23  BY MS. O'DELL:
24      Q.   Would it be safe to say that

Page 101

1   there was no requirement that the
2   certificate of analyses be linked to an
3   ore lot prior to the change being made in
4   the specifications in the 2010, 2011 time
5   period?
6           MS. ECHTMAN:  Objection
7       foundation.
8           THE WITNESS:  I would have
9       to look at those to verify that
10      that was not there.
11  BY MS. O'DELL:
12      Q.   Let's go back then.  We
13  looked at 8031 previously.  That was the
14  first specification we looked at.  And
15  can we agree that -- and that was
16  Exhibit 4.
17      A.   Yes.
18      Q.   And there was no requirement
19  in that specification to confirm linkage
20  of a certificate of analysis to a
21  quarterly ore lot testing, true?
22      A.   That is true, yes.
23      Q.   And you testified that raw
24  materials specification 08967 was

26  (Pages 98 to 101)

Donald Hicks

Page 102

1  instituted in the 2009-2010 time frame,
2  true?
3      A.   That is correct.
4      Q.   And there was no requirement
5  that there be a confirmation of linkage
6  to a certificate of analysis to a
7  quarterly ore lot until that time frame,
8  true?
9          MS. ECHTMAN:  Objection.
10         THE WITNESS:  I would have
11     to look through the specifications
12     between 2006 and 2009 to confirm
13     that.
14  BY MS. O'DELL:
15     Q.   Well, you testified
16  previously that the specifications for
17  talcum powder did not change until Raw
18  Material 008967 was instituted in the
19  2009 and 2010 time frame.
20         MS. ECHTMAN:  Objection.
21     Misstates the testimony.
22         THE WITNESS:  I'm not sure
23     how that question is applicable to
24     your prior question.  I'm sorry.

Page 103

1  BY MS. O'DELL:
2      Q.   Well, I'll be happy to
3  restate it.
4          The 8031, you just told me
5  this a few minutes ago.  Raw material
6  specification 8031 did not require a
7  confirmation of linkage from a
8  certificate of analysis, which was the
9  testing of an ore to a particular ore
10  lot, true?
11         MS. ECHTMAN:  Objection.
12         THE WITNESS:  The 2005
13     document, raw material
14     specification that we looked at,
15     requires that testing to be done
16     on an annual basis.  The testing
17     of every single ore lot is not
18     required by that specification,
19     although that specification is
20     technically out of our -- out of
21     my 2006 to my 2017 area of
22     expertise.
23  BY MS. O'DELL:
24     Q.   And that particular

Page 104

1  specification that I walked you through,
2  Exhibit Number 4, was -- became effective
3  in April of 2005 shortly before the 2006
4  time frame, true?
5      A.   Yes, that is true.
6      Q.   And you have no reason to
7  believe that it was not in effect in 2006
8  when you became responsible for the
9  talcum powder products and for the time
10  period that you're here to speak to
11  today, correct?
12         MS. ECHTMAN:  Objection.
13         THE WITNESS:  Well,
14     actually, I have reason to believe
15     that it probably was updated.
16     These documents were updated
17     pretty frequently.  It was very
18     likely that it was updated in
19     2006-2007 time period.
20  BY MS. O'DELL:
21     Q.   But the new specification,
22  sort of the major overhaul, if you will,
23  of the raw materials specification
24  occurred when Raw Material 008967 was --

Page 105

1  became effective in 2009-2010 time frame,
2  true?
3      A.   That is true, yes.
4      Q.   And it wasn't until the raw
5  material 8967 was instituted that there
6  was a specific requirement to confirm the
7  linkage of the certificate of analysis to
8  a quarterly -- quarterly ore lot, true?
9          MS. ECHTMAN:  Objection.
10     Foundation.
11         THE WITNESS:  I cannot
12     confirm or deny.  I have -- I
13     would need to look at the
14     specifications from 2006 to 2009
15     and confirm that that particular
16     statement is not in there.
17  BY MS. O'DELL:
18     Q.   You're here to testify about
19  the specifications that were in effect
20  from 2006 forward.  I thought we had an
21  agreement that 8031 was in effect in 2006
22  until 2009.  I think the testimony
23  will -- your prior testimony today will
24  support that.

27 (Pages 102 to 105)

Donald Hicks

Page 106

```
1           Are you saying that there
2    was another specification that was
3    controlling during that time period?
4           MS. ECHTMAN:  Objection.
5       Misstates the testimony.
6           MS. O'DELL:  I'm asking --
7       I'm asking him a clear question.
8       It doesn't misstate his testimony.
9    BY MS. O'DELL:
10      Q.   Are you saying that there
11   was another specification, Mr. Hicks?
12          MS. ECHTMAN:  Objection.
13      Misstates the testimony.
14          THE WITNESS:  The
15      specification -- you are correct
16      that the base specification number
17      is in fact the same during that
18      period.  However, there were
19      multiple revisions to that
20      document between 2005 and 2009.
21   BY MS. O'DELL:
22      Q.   Do you have any knowledge
23   that the requirement prior -- that there
24   was a requirement prior to 2009 that
```

Page 107

```
1    there be confirmation of a linkage
2    between a certificate of analysis for a
3    quarterly ore lot?
4           MS. ECHTMAN:  I'm going to
5       object that this is not a memory
6       test, and we actually have a
7       binder of specifications right
8       here.  So if you'll allow the
9       witness to look at the applicable
10      documents to make sure he's
11      answering the questions correctly,
12      we appreciate that.
13   BY MS. O'DELL:
14      Q.   Have you reviewed this
15   binder?
16      A.   I briefly looked at that
17   binder, yes.
18      Q.   When did you review it?
19      A.   It would be at least a week
20   or so ago.
21      Q.   What other documents besides
22   this binder did you review to refresh
23   your memory on the specifications that
24   applied to talc during the 2006 to 2018
```

Page 108

```
1    time period?
2           MS. ECHTMAN:  And I'm just
3       going to clarify.  It would be
4       specifically which documents
5       refreshed his recollection,
6       because beyond that it's subject
7       to privilege what documents
8       counsel chose to show the witness.
9    BY MS. O'DELL:
10      Q.   Do you recall all the
11   documents that you reviewed in
12   preparation for your testimony regarding
13   the specifications?
14          MS. ECHTMAN:  Objection.
15      Specifically you asked that
16      refreshed his recollection.
17   BY MS. O'DELL:
18      Q.   You may answer the question,
19   Mr. Hicks.
20      A.   Specifications during the
21   time period 2006 to 2017 were made
22   available to me.  I looked at some of
23   them.
24      Q.   Okay.
```

Page 109

```
1           MS. O'DELL:  I'm going to
2       mark the notebook.  I think we are
3       at Exhibit 7.
4           (Document marked for
5       identification as Exhibit
6       Hicks-7.)
7    BY MS. O'DELL:
8       Q.   Let me have you turn -- I'm
9    assuming counsel has a copy of the
10   notebook for you, Mr. Hicks?
11          MS. ECHTMAN:  I'll give
12      Mr. Hicks that one.
13   BY MS. O'DELL:
14      Q.   Now, we've marked the
15   notebook as Exhibit 7.  And if you'll
16   look at -- it's Tab 1 Mr. Hicks.  You'll
17   see that there is a copy of the RM 08031
18   specification we discussed earlier,
19   revision 8.
20          Do you see that?
21      A.   Yes, I do.
22      Q.   And it was in effect or
23   issued May 30th, 2006.
24          Do you see that?
```

Donald Hicks

Page 110

1    A.   Yes, I do.
2    Q.   Is that correct?
3    A.   It is correct.  Yes.
4    Q.   And if you will turn, I'm
5  assuming you're familiar with this,
6  having been provided it by counsel, but
7  if you turn to the back there's no
8  requirement that there be a linkage
9  between the certificate of analysis and
10  an ore lot, correct?
11       MS. ECHTMAN:  I'd ask the
12  witness to please look at the
13  entirety of the document.
14       MS. O'DELL:  Don't
15  counsel -- don't coach the witness
16  please, Counsel.  It's object to
17  the form, and let him answer the
18  question.
19       MS. ECHTMAN:  Okay.  He has
20  the right to understand that he's
21  got the right to look at the
22  entirety of the document.
23       MS. O'DELL:  It's sitting
24  before him.  I'm sure he

Page 111

1  understands, being a qualified
2  person he is, that he can look at
3  the document if he wants to.
4       THE WITNESS:  So if you --
5  if I could refer you to Page 6,
6  the bottom paragraph.  It says, "A
7  certificate of analysis was
8  labeled initial ore result after
9  grinding."
10       So -- and it indicates that
11  there is a composite sample for
12  each unique ore shipment that's
13  evaluated.  So in this case it
14  does clearly indicate that all
15  test results would be connected --
16  directly connected to an ore
17  shipment.
18  BY MS. O'DELL:
19    Q.   It does not say that there
20  would be a particular linkage to a
21  certificate of analysis to the particular
22  ore lot, does it, sir?
23    A.   Well, it --
24       MS. ECHTMAN:  Objection to

Page 112

1  form.
2       You can answer.
3       THE WITNESS:  It does say,
4  "The certificate shall include the
5  ore shipment identification
6  number," so that infers that in
7  fact there is a hard linkage
8  between the milled talc and the
9  ore lot and the C of A.
10  BY MS. O'DELL:
11    Q.   There's no -- there is no
12  requirement that there be a linkage
13  of the linkage of the certificate of
14  analysis to the quarterly lot testing
15  that is included in specifications in
16  later years, true?
17       MS. ECHTMAN:  Objection to
18  form.  Foundation.
19       THE WITNESS:  If I
20  understand your question
21  correctly, I believe that there is
22  a direct correlation on the C of
23  A's between the testing results
24  and the ore lot that was tested

Page 113

1  which also then connects to the
2  milled lot that is being shipped.
3  BY MS. O'DELL:
4    Q.   Let me ask you to look at --
5  looking at Tab Number 1.  You referred me
6  to Page 6.  Nowhere in that paragraph
7  does it say, "Confirm linkage of a
8  certificate of analysis to a quarterly
9  ore lot," true?
10       MS. ECHTMAN:  Objection to
11  form.
12  BY MS. O'DELL:
13    Q.   It does not contain that
14  language, does it, sir?
15       MS. ECHTMAN:  Objection to
16  form.
17       THE WITNESS:  It contains
18  different language which in
19  essence says the same thing.
20  BY MS. O'DELL:
21    Q.   So it does not -- my
22  question was very clear, sir.  That
23  paragraph and that specification does not
24  contain the requirement that there be a

29 (Pages 110 to 113)

Donald Hicks

Page 114

1  confirmation of -- excuse me -- that
2  there be -- let me start again.
3      That paragraph does not
4  contain the language, "Confirm linkage of
5  certificate of analysis to quarterly ore
6  lot testing," true?
7      MS. ECHTMAN:  Objection to
8  form.
9      THE WITNESS:  I think that
10 exact language is not included in
11 this document.  However, the
12 intent of what is in the document
13 is equivalent to the meaning of
14 that particular statement, which
15 is in the new specification for
16 talc.
17     MS. O'DELL:  Move to strike
18 after "the intent."
19 BY MS. O'DELL:
20     Q.  Did you write that
21 paragraph, Mr. Hicks?
22     A.  It depends which document
23 we're talking about.  If we are talking
24 about the RM 08031 Revision 8, I did not

Page 115

1  write the document.  I have read the
2  document many times, and I've reviewed
3  the actual practice that was being --
4  that was in place.
5      MS. O'DELL:  Move to strike
6  as nonresponsive.
7      MS. SHARKO:  Comments like
8  that are specifically prohibited
9  by the order.  It's unnecessary
10 objections to questions by either
11 counsel.
12     MS. O'DELL:  I think I'm
13 entitled to move to strike.
14 There's nothing in the protocol
15 that prevents me from doing so.
16 I'm going to exercise that right
17 when the response to the question
18 is nonresponsive.
19     MS. SHARKO:  So I absolutely
20 disagree.  Look at the letter
21 order that your colleague
22 Ms. Parfitt and I crafted, and I
23 think you'll see that it covers
24 it.  Let's move on.  I don't want

Page 116

1  to --
2      MS. O'DELL:  The letter does
3  not dictate that you cannot object
4  for a nonresponsive answer.  It
5  says you won't be argumentative.
6  And I'm certainly not being
7  argumentative -- argumentative in my
8  comments to Mr. Hicks.
9      MS. SHARKO:  Well, I
10 disagree with that.  I disagree
11 with your interpretation of the
12 order.  But you're burning up your
13 own time with unnecessary
14 objections.  To the extent that
15 they become even more harassing or
16 onerous, then we can call the
17 judge.
18     MS. O'DELL:  Well, I think
19 the record will be clear, Susan.
20 I've not been harassing Mr. Hicks.
21 I've been very courteous and
22 cordial.  And to suggest otherwise
23 is completely incorrect.
24     Why don't we take -- it's

Page 117

1  noon.  Let's take a break for
2  lunch, and then we'll come back
3  and pick it up from there.
4      THE VIDEOGRAPHER:  The time
5  is 12:01:  Going off the record.
6           - - -
7      (Lunch break.)
8           - - -
9  A F T E R N O O N   S E S S I O N
10          - - -
11     THE VIDEOGRAPHER:  The time
12 is now 12:43.  Back on the record.
13 BY MS. O'DELL:
14     Q.  Mr. Hicks, before we took a
15 break for lunch, we were looking at
16 Exhibit 8, the notebook --
17     MS. ECHTMAN:  Seven.
18     MS. O'DELL:  Exhibit 7?
19     MS. ECHTMAN:  It's
20 Exhibit 7, the notebook.
21 BY MS. O'DELL:
22     Q.  Okay.  Thank you.
23 Exhibit 7.
24     A notebook that was prepared

30 (Pages 114 to 117)

Donald Hicks

Page 118

1    for you by counsel, correct?
2        A.   Yes.
3        Q.   And does this notebook
4    contain all of the controlling raw
5    materials specifications that were in
6    effect from 2006 to the present?
7        A.   Yes, it does.
8        Q.   I'd like for you to turn to
9    Tab 6 of the notebook.  It's the
10   specification that was issued on March
11   the 24th, 2011.
12           Do you see that?
13       A.   Yes, I do.
14           MR. SILVER:  Leigh, is there
15       a Bates number at the bottom?
16           MS. O'DELL:  Yes, that's
17       fair.  It's JNJMC 00122446.
18   BY MS. O'DELL:
19       Q.   This specification applied
20   to a talc that was used in Baby Powder as
21   well as talc that was used in Shower to
22   Shower, correct?
23       A.   Yes.
24       Q.   And I'm sure during your

Page 119

1    meetings with counsel, you reviewed this
2    document to refresh your memory, so
3    hopefully we can move through this
4    quickly.
5            If you'll turn to Page 9 of
6    12.  It's Subsection 10, the testing
7    frequencies and requirements table.
8            Do you see that?
9        A.   Yes, I do.
10       Q.   And in that particular table
11   for post milling, there is not a
12   requirement to quarantine the product
13   until the tests have been completed on
14   the product, correct?
15       A.   Actually, product is
16   quarantined prior to it being used in the
17   post milling stage upon receipt.
18       Q.   In the specification that
19   was in effect in 2011, there's no
20   requirement for quarantining of the
21   product listed in the testing and
22   frequencies table, true?
23       A.   Not in that table.
24       Q.   Okay.

Page 120

1        A.   One would normally not find
2    it there.  So this is the quarantining of
3    all raw materials coming in to a
4    manufacturing site but -- from a GMP
5    point of view would be required to be
6    quarantined.
7        Q.   That's not my question
8    though.  We are not talking about general
9    GMP, Mr. Hicks, as you know.  We're
10   talking about specific specifications for
11   Baby Powder as instituted by J&J.  And
12   there's no requirement in the
13   specification that was issued on
14   March 24, 2011, to quarantine material
15   until testing is complete, correct?
16           MS. ECHTMAN:  Objection to
17       form.
18           THE WITNESS:  That is
19       correct.  That would be covered
20       under a standard operating
21       procedure for the site.
22   BY MS. O'DELL:
23       Q.   What standard operating
24   procedure are you referring to?

Page 121

1        A.   During this time period it
2    would have been a PTI standard operating
3    procedure, which would govern the receipt
4    of what are called chemical raw
5    materials, talc being one.
6        Q.   What I'm asking you, you
7    said a PTI standard operating procedure.
8    Do you know the number of the operating
9    procedure?
10       A.   I do not, no.
11       Q.   There was no Johnson &
12   Johnson specification that required
13   quarantining of product at this time in
14   March 2011, correct?
15           MS. ECHTMAN:  Objection.
16           THE WITNESS:  The facility
17       is operating under PTI SOPs, not
18       necessarily J&J SOPs.
19   BY MS. O'DELL:
20       Q.   The specification was
21   instituted by Johnson & Johnson, correct?
22       A.   That's correct.
23       Q.   And in the specification,
24   there is no requirement that talc ore be

31 (Pages 118 to 121)

Donald Hicks

Page 122

1    quarantined until testing is complete as
2    of the date of this specification on
3    March 24, 2011?
4         MS. ECHTMAN:  Objection to
5    form.
6         THE WITNESS:  Well, it -- it
7    normally would not be in such a
8    document.  It would normally be in
9    an SOP.  There is a statement
10   here, if I could read that.
11   BY MS. O'DELL:
12       Q.   The answer to my question is
13   no, isn't it, Mr. Hicks?
14       MS. ECHTMAN:  Objection.
15   Let the witness finish his answer,
16   please.
17       THE WITNESS:  Actually, I
18   believe that it is very clear in
19   here that you need to complete the
20   requirements prior to release.
21   BY MS. O'DELL:
22       Q.   Where are you reading?
23       A.   Under Section 5.0,
24   acceptance.  There's a statement which

Page 123

1    says that properties and requirements,
2    packaging and marketing shall be cause
3    for rejection, which suggests that they
4    need to be reviewed prior to release.
5         Q.   There's no specific
6    requirement listed for a product to be
7    quarantined?
8         A.   No.  And we would not put
9    them in these raw materials
10   specifications.  That's not where they
11   would be housed.
12        Q.   That's not.  You're saying
13   that would be an inappropriate thing to
14   put in a requirement to quarantine in a
15   specification like this?
16        A.   In a specification like
17   this, it would be inappropriate to put it
18   here because it is captured in the SOP
19   for how one receives, evaluates and
20   finally releases raw materials.
21        Q.   And that's not a Johnson &
22   Johnson standard operating procedure
23   you're referring to; that's a Pharma
24   Tech?

Page 124

1         A.   In this case, yes, it would
2    be.
3         Q.   Does Johnson & Johnson have
4    copies of Pharma Tech standard operating
5    procedures for use in the manufacture of
6    its Baby Powder and Shower to Shower
7    products?
8         MS. ECHTMAN:  Objection.
9         THE WITNESS:  In general,
10   the PTI SOPs would remain at the
11   PTI site.
12   BY MS. O'DELL:
13        Q.   So the answer to my question
14   is no, Johnson & Johnson does not have
15   copies of standard operating procedures
16   for Pharma Tech?
17        MS. ECHTMAN:  Objection.
18        THE WITNESS:  They're not
19   kept in our control document
20   system.
21   BY MS. O'DELL:
22        Q.   As a part of your duties as
23   senior quality assurance, did you ever
24   have occasion to review all of the

Page 125

1    operating -- standard operating
2    procedures of Pharma Tech?
3         A.   That was -- excuse me.  That
4    was not my role to really review at that
5    level.
6         My team was working on that.
7    I do -- the team does audits of
8    facilities, and they look for that as
9    part of their GMP auditing process.  We
10   also have a written agreement with all
11   third-party manufacturers.  And one of
12   the things that it would talk about is
13   the receipt of raw materials.
14        Q.   Did J&J audit PTI?
15        A.   Yes, they did.
16        Q.   When?
17        A.   I don't have those dates.
18        Q.   During the time period 2006
19   to 2017, was Pharma Tech audited?
20        A.   Yes, it was.
21        Q.   Approximately what time
22   period?
23        A.   At this point, I wouldn't
24   recall the exact dates of those -- when

32 (Pages 122 to 125)

Donald Hicks

Page 126

1  those audits were actually performed.
2      Q.   Excuse me, sir.  How many
3  times was PTI audited during that time
4  period?
5      A.   I don't have the exact
6  number, sorry.
7      Q.   Was it one time?
8          MS. ECHTMAN:  Objection.
9      Asked and answered.
10         THE WITNESS:  Were they
11     audited?  Yes.  If that's your
12     question.
13 BY MS. O'DELL:
14     Q.   I'm trying to get a sense of
15 were they audited once or more than once?
16     A.   I don't remember the exact
17 time.  I can tell you that the policy in
18 general was every two to three years.
19 Depending on the outcome of the prior
20 audit.
21     Q.   Did you participate in an
22 audit or order an audit of PTI?
23     A.   No, nor would I.
24     Q.   It would be the standard

Page 127

1  operating procedure to produce an audit
2  report after each audit of a supplier; is
3  that correct?
4          MS. ECHTMAN:  Objection.
5  BY MS. O'DELL:
6      Q.   Yeah, let me ask it --
7      A.   Yeah, please.
8      Q.   If there's an objection,
9  I'll ask it a different way.
10         Would it be standard
11 procedure to produce a report following
12 an audit of a supplier or --
13     A.   Yes, it would.
14     Q.   And if there was an audit of
15 PTI, you would expect that to be within
16 the files of the quality assurance
17 department?
18     A.   I would.
19     Q.   And it would be the quality
20 assurance department, the division you
21 were senior director of, to conduct the
22 audit, true?
23     A.   It depends on the time
24 period from 2009 on.  There was a

Page 128

1  separation between being the quality head
2  of baby products and there was another
3  group.  There was a quality head of third
4  parties, third-party manufacturing.
5          So they're doing the process
6  of auditing, taking care of issues.  You
7  know, my role was oversight of the baby
8  products business and its products.
9      Q.   And because PTI was bottling
10 Baby Powder, by virtue of what you just
11 described, you would have been ultimately
12 responsible for that audit, correct?
13         MS. ECHTMAN:  Objection.
14         THE WITNESS:  Well, I think
15     it is a shared responsibility with
16     my peer who was in charge of the
17     external manufacturing quality
18     group.
19 BY MS. O'DELL:
20     Q.   Well, let me ask it sort of
21 differently to make sure.
22         You would have had -- you
23 would have responsibility for any audit
24 of PTI, at least in some part from 2006

Page 129

1  to 2017?
2      A.   I could say that I would be
3  aware of an audit that would occur.
4      Q.   In terms of the requirement
5  that was imposed by Johnson & Johnson, I
6  think we've established that your
7  specification did not have a requirement
8  for quarantining milled ore until the
9  testing was complete according to your
10 March 24, 2011 specification?
11     A.   I don't think that we're
12 aligned to that.  I think there's
13 different language that was used.  But
14 the intent was the same, that material
15 was not being released.
16     Q.   But we're in agreement on
17 this point.  Specific language in terms
18 of directing the supplier to quarantine a
19 product was not included?
20         MS. ECHTMAN:  Objection to
21     form.
22 BY MS. O'DELL:
23     Q.   The word "quarantine" was
24 not included in the March 24, 2011 spec?

33 (Pages 126 to 129)

Donald Hicks

Page 130

1          A.   That I can agree to, yes,
2    because it was captured in the SOP and
3    also the quality agreement that we had
4    with that particular external
5    manufacturer.
6          Q.   And you don't have --
7    Johnson & Johnson -- you're here to speak
8    for Johnson & Johnson today -- does not
9    have a copy of the standard operating
10   procedures for Pharma Tech in its filing
11   cabinets.  You told us that, right?
12         MS. ECHTMAN:  Objection.
13         THE WITNESS:  There may be
14         some.  But it was not routine
15         practice to take all their SOPs
16         and put them in our filing
17         cabinet.
18   BY MS. O'DELL:
19         Q.   And you've not seen them?
20         A.   I personally have not seen
21   them, no.
22         Q.   And so to the degree you're
23   talking about a standard operating
24   procedure for Pharma Tech, that would be

Page 131

1    a speculation on your part in terms of
2    what was operational in March 24, 2011,
3    but we can agree that the term
4    "quarantine" was not used in the J&J
5    specification?
6          MS. ECHTMAN:  Objection.
7          THE WITNESS:  I think we can
8          agree that that word is not used.
9    BY MS. O'DELL:
10         Q.   Now, when you turn to Tab 7
11   of the notebook in front of you,
12   Mr. Hicks.
13         MS. O'DELL:  And for others,
14         the Bates is JNJMC 000008597.
15   BY MS. O'DELL:
16         Q.   This is the raw materials
17   specification that was issued July 3rd,
18   2012?
19         A.   You said that's Tab 7?
20   Because I have a different document here.
21         MS. ECHTMAN:  Can you read
22         the Bates number again just to
23         make sure we're on --
24         MS. O'DELL:  Yeah.  It's --

Page 132

1    the first few letters are JNJMC
2    the last numbers are 8597.
3          MS. ECHTMAN:  If you look at
4          the very bottom, just to make see
5          if you have the document that has
6          these Bates numbers, 8597 at the
7          very bottom.
8          THE WITNESS:  Well, 8597,
9          yes.  Okay.  I thought you were
10         referring to the specification
11         number.  Sorry.
12   BY MS. O'DELL:
13         Q.   And this is the raw material
14   specification 008967 that was issued on
15   July 3, 2012, correct?
16         A.   That's correct.
17         Q.   Okay.  That's all I was
18   asking.
19         A.   Yeah, I just wanted to make
20   sure we were on the same page.
21         Q.   The -- if you'll turn, sir,
22   to Page 9 of 9.  You see the table
23   "Testing Frequencies and Requirements"?
24         A.   Yes, I do.

Page 133

1          Q.   Under post milling, do you
2    see that?
3          A.   Yes, I do.
4          Q.   And in fact, a requirement
5    was added for the first time in this
6    specification that, "While awaiting
7    results of ore lot testing, milled lots
8    associated with the one" -- excuse me --
9    "with the ore lot will be quarantined
10   until ore tests have been satisfactorily
11   completed."
12         Do you see that?
13         A.   Yes, I do.
14         Q.   And that's a new requirement
15   for testing and frequencies as of
16   July 3rd, 2012?
17         MS. ECHTMAN:  Objection.
18   BY MS. O'DELL:
19         Q.   Correct?
20         A.   It is a new statement that's
21   been added.  It's not a new requirement.
22   And it's clarifying standard practice.
23         Q.   It's not something that was
24   included in prior specifications.  We've

Donald Hicks

Page 134

1    agreed to that, correct?
2        A.   Yes.  I say yes, but I have
3    not looked.
4            Yes.
5        Q.   Let me ask you to set the
6    notebook aside, Mr. Hicks.  I want to ask
7    a few follow-up questions from our
8    discussion this morning.  You mentioned
9    that the documents that counsel had
10   provided to you in the notebook in
11   Exhibit 7 were documents that you'd used
12   to refresh your recollection for your
13   testimony here today; is that true?
14       A.   That is true that I've
15   looked at those documents, yes.
16       Q.   Were there any other
17   documents that you reviewed for purposes
18   of refreshing your recollection for your
19   testimony?
20           MS. ECHTMAN:  Let me just
21       clarify that unless it actually
22       refreshed his recollection, the
23       collection of documents that
24       counsel chose to show the witness

Page 135

1        are privileged.  So I'll let the
2        witness answer to the extent that
3        a document did refresh his
4        recollection.
5    BY MS. O'DELL:
6        Q.   You reviewed documents in
7    preparation for your deposition, didn't
8    you, Mr. Hicks?
9        A.   I did.
10       Q.   And in terms of those
11   documents, were there documents there
12   that refreshed your recollection in
13   preparation for your testimony today?
14       A.   I think that these documents
15   were reviewed, and you know, looking at,
16   you know, some of the specifics clearly
17   helped my recollection over the basic
18   information contained in those documents.
19       Q.   Did you review testing
20   procedures to refresh your recollection
21   prior to your testimony?
22           MS. ECHTMAN:  Objection.
23       Again, to the extent that a
24       document actually did refresh his

Page 136

1        recollection, I'll allow him to
2        answer.
3            THE WITNESS:  I did review
4        documents that were associated
5        with the testing, yes.
6    BY MS. O'DELL:
7        Q.   And what were those
8    documents?
9        A.   So that was -- it was
10   referenced in here.
11           TM 7024, "Asbestos by
12   transmission electron."
13       Q.   Any others?
14           MS. ECHTMAN:  I'm going to
15       object to the extent that they
16       refreshed his recollection or
17       incorporated in the
18       specifications.
19           THE WITNESS:  Yeah.
20           MS. O'DELL:  Please don't
21       coach the witness.
22           MS. ECHTMAN:  I'm not.
23           MS. O'DELL:  Yes, you were.
24           MS. ECHTMAN:  No, I --

Page 137

1            MS. O'DELL:  Let him answer
2        the question, please.
3            MS. ECHTMAN:  No, I'm just
4        saying the parameters of where I
5        think the privilege is, that if he
6        can disclose to the extent that
7        it's in the specifications or if
8        it refreshed his recollection.
9        I'm not coaching.  I'm delineating
10       the extent of the privilege that
11       we're asserting.
12   BY MS. O'DELL:
13       Q.   All I asked of you is -- I
14   didn't ask you about specifications,
15   other than the notebook previously.  The
16   question that I'm asking now, did you
17   review documents regarding testing that
18   refreshed your recollection?  You told us
19   about TM 7024.  Were there any others?
20       A.   Also the CTFA, Cosmetic
21   Toiletry Fragrance Association methods.
22   I'm not sure I'm in alignment with
23   refreshing my memory.  Certainly reviewed
24   them.

Donald Hicks

Page 138

1    Q.   CTFA method J4-1 is a method
2  for testing for the presence of asbestos,
3  correct?
4    A.   Yes, it is.
5    Q.   CTFA J4-1 was the method
6  that J&J specified for the testing of
7  asbestos for the time period 2006 to
8  2017, true?
9    A.   It's one of the methods,
10  yes.
11    Q.   Let me ask you take a look
12  at what I'm marking as Exhibit 8.
13       (Document marked for
14       identification as Exhibit
15       Hicks-8.)
16  BY MS. O'DELL:
17    Q.   Is that the document that
18  you reviewed to refresh your recollection
19  about CTFA J4-1?
20    A.   It's a document that I
21  reviewed to ensure that my memory was in
22  fact accurate, yes.
23    Q.   What's your understanding of
24  the CTFA J4-1 method for testing for

Page 139

1  asbestos, Mr. Hicks?
2    A.   Could you clarify the
3  statement?  In terms of what aspect?
4    Q.   In general.  What's your --
5  what's your understanding of the
6  procedure or methodology dictated by CTFA
7  Method J4-1 for identifying asbestos in
8  talc?
9    A.   It just seems to be a very
10  general question.  I'm trying to narrow
11  it down to something more tangible that I
12  can respond to.
13    Q.   Okay.  How was the -- what
14  were the steps for -- and the types of
15  instruments that were used in CTFA J4-1
16  to examine talc to determine if there was
17  asbestos?
18    A.   So in this CTFA method,
19  there are two types of techniques that
20  are used.  One is a x-ray diffraction.
21  The other one is -- it's actually -- in
22  this method, it talks about optical
23  microscopy and the dispersion staining
24  method.  In the industry it's commonly

Page 140

1  referred to as polarized light
2  microscopy, or PLM.
3    Q.   So CTFA J4-1 prescribed
4  first that the material is examined under
5  XRD, correct?
6    A.   Yes.
7    Q.   And then thereafter, if
8  there is suspicious material,
9  essentially, to review it under polarized
10  light microscope or PLM?
11    A.   That is the protocol it
12  provides.
13    Q.   What is the detection limit
14  for XRD?
15    A.   It varies by the type of
16  equipment, the experience of the
17  interpreter.  Typically it is
18  acknowledged that somewhere between .1 to
19  .5 percent.
20    Q.   And, in fact, some sources
21  suggest that -- or state that XRD's
22  detection limit is .1 to 1 percent.
23       MS. ECHTMAN:  Objection.
24  BY MS. O'DELL:

Page 141

1    Q.   Is that true?
2    A.   I have not seen it stated as
3  1 percent.
4    Q.   Do you hold out RJ Lee as an
5  authoritative source from your
6  perspective on the XRD testing method?
7    A.   Yes, I do.
8    Q.   Let me show you what I'm
9  marking as Exhibit 9.
10       (Document marked for
11       identification as Exhibit
12       Hicks-9.)
13  BY MS. O'DELL:
14    Q.   It is a PowerPoint entitled
15  "Global Overview, Talc Sourcing and
16  Asbestos Requirements For Body Powders."
17  It's dated June 16, 2011.
18       Did I state that correctly?
19    A.   Yes, you did.
20    Q.   And this is a Johnson &
21  Johnson quality and compliance
22  presentation?
23    A.   Yes, it is.
24    Q.   And if you will turn to -- I

36 (Pages 138 to 141)

Donald Hicks

Page 142

1    was looking for a page number, but I'll
2    have to give you a Bates number at the
3    bottom.  The Bates number ending 5310.
4           Do you see that?
5        A.   Yes, I do.
6        Q.   And the source -- excuse me.
7    The title of this PowerPoint slide is
8    "Analytical Detection Limits," correct?
9        A.   That's correct.
10       Q.   And the source for this
11   data, according to the PowerPoint, is the
12   RJ Lee Group?
13          MS. SHARKO:  Wait.  Time
14   out.  All the -- each page of mine
15   has the same Bates number.  But
16   above the Bates number there's a
17   pale gray number.
18          MS. O'DELL:  Well, this is
19   a -- you're talking about -- this
20   is something that was produced to
21   us in native form, PowerPoint
22   only.
23          MS. SHARKO:  I'm not -- I'm
24   not quarreling with you.  I just

Page 143

1    want to -- you referred him to a
2    Bates number, but all the pages
3    have the same Bates numbers.  So I
4    want to make sure everybody is on
5    the same page.
6           MS. O'DELL:  Fair, fair,
7    fair.  This was not produced in
8    PDF.  So there's only one Bates,
9    and it's in the file name.
10          MS. SHARKO:  If you look
11   right above it there's page
12   numbers.
13          MS. O'DELL:  Okay.  Thank
14   you, Susan.
15   BY MS. O'DELL:
16       Q.   Do you see it?  It's 7, Page
17   7 -- excuse me -- Page 7.
18       A.   Yes, I do see it.
19       Q.   Okay.  And the source of
20   this information is the RJ Lee Group,
21   correct?
22       A.   That's correct.
23       Q.   And the detection limit for
24   XRD is .1 to 1 percent, true?

Page 144

1        A.   Yes.
2        Q.   And you see below it, it has
3    PLM.  What's the detection limit for PLM,
4    Mr. Hicks?
5        A.   It's indicated as 1 percent
6    by RJ Lee.
7        Q.   And at .1 percent detection
8    limit for XRD, that is a detection limit
9    of a thousand parts per million, true?
10       A.   That's correct.
11       Q.   Mr. Hicks, with a detection
12   limit of .1 percent, for both XRD and --
13   well, for XRD, if a test of talc detects
14   material less than .1 percent or if it's
15   present in trace levels, it does not mean
16   that -- and the test results are
17   negative, that doesn't mean that the ore
18   is free of asbestos, does it?
19          MS. ECHTMAN:  Objection.
20   Hypothetical.
21          THE WITNESS:  It meets the
22   nondetectable limitation of the
23   equipment that's being used yes.
24   BY MS. O'DELL:

Page 145

1        Q.   It does not mean that
2    asbestos is not present in that sample?
3           MS. ECHTMAN:  Objection.
4    BY MS. O'DELL:
5        Q.   True?
6        A.   XRD in and of itself, no.
7        Q.   So my statement was true?
8           MS. ECHTMAN:  Objection.
9    BY MS. O'DELL:
10       Q.   I just don't want us to be
11   cross talking on the record because of
12   the way you answered the question.
13          My question is, just because
14   there's a negative test does not mean
15   that there is not asbestos below the
16   detection limit of .1 true?
17          MS. ECHTMAN:  Objection.
18          THE WITNESS:  There's a
19   theoretical possibility.
20   BY MS. O'DELL:
21       Q.   It's more than theoretical,
22   isn't it?  You said that the testing
23   equipment itself has a limit of .1.  So
24   it's unknown what amounts of asbestos

37 (Pages 142 to 145)

Donald Hicks

Page 146

```
 1    material would be less than .1, true?
 2           MS. ECHTMAN:  Objection.
 3           THE WITNESS:  If you simply
 4        look at XRD by itself in
 5        isolation, it's a theoretical
 6        possibility, yes.
 7    BY MS. O'DELL:
 8        Q.   So the answer to my question
 9    is yes?
10           MS. ECHTMAN:  Objection.
11           THE WITNESS:  Yes.
12    BY MS. O'DELL:
13        Q.   Would you agree that TEM is
14    the gold standard for testing for
15    asbestos?
16           MS. ECHTMAN:  Objection to
17        form.
18           THE WITNESS:  I have heard
19        it called the gold standard.
20        Again, doing only TEM in isolation
21        is -- would not be recommended.
22        So you need to do a multitude of
23        testing to look for asbestos.
24    BY MS. O'DELL:
```

Page 147

```
 1        Q.   And that testing would
 2    include TEM, certainly?
 3        A.   It would.
 4        Q.   And government agencies,
 5    academia, researchers, and others refer
 6    to TEM as the gold standard for asbestos
 7    detection; is that a correct statement?
 8           MS. ECHTMAN:  Objection.
 9           THE WITNESS:  I have not
10        seen government officials citing
11        that it was the gold standard and
12        the primary standard to look for
13        asbestos.
14    BY MS. O'DELL:
15        Q.   Well, certainly, if you turn
16    over to Page 13 of this document, a
17    proposal is being made for the future of
18    TEM testing application.
19        Do you see that?
20        A.   Yes, I do.
21        Q.   And this proposal is being
22    made for the testing of Baby Powder --
23    Johnson & Johnson's Baby Powder products,
24    true?
```

Page 148

```
 1        A.   That's true.
 2        Q.   The proposal is being made
 3    because XRD and PLM can only detect at
 4    .1 percent, correct?
 5        A.   It -- well it depends on the
 6    equipment, the capability of the
 7    individual, the number of samples that
 8    are looked at.  And so the detection
 9    limit is dependent on many factors.  If
10    you look at a single sample, those are
11    the standards that are typically
12    referenced.
13        Q.   And indeed, that's the
14    standard that RJ Lee referenced, is .1 to
15    1 percent for XRD and 1 percent for PLM,
16    correct?
17        A.   That's correct.
18        Q.   And as a part of this
19    justification for the proposal, in
20    addition to the detection limit, this
21    states, "TEM is capable of PPM, or parts
22    per million, detection depending on
23    sample size and permits chemical analysis
24    and verification of a detected fiber."
```

Page 149

```
 1        Did I read that correctly?
 2        A.   Yes.
 3        Q.   It goes on to say, "Not part
 4    of compendia requirements, but known" --
 5    "TEM is known by government agencies,
 6    academia, researchers, and NGOs to be the
 7    gold and standard for asbestos
 8    detection."
 9           MS. ECHTMAN:  Objection to
10        form.
11    BY MS. O'DELL:
12        Q.   Is that what that says?
13           MS. ECHTMAN:  Objection to
14        form.
15           THE WITNESS:  That's what it
16        says.  Your original question was
17        do government agencies refer to
18        TEM as the gold standard.
19        I have not heard that ever
20        used -- that term used in
21        reference to TEM by any government
22        agency.
23    BY MS. O'DELL:
24        Q.   I think you misheard me.
```

38 (Pages 146 to 149)

Donald Hicks

Page 150

1    You said referred.  I said known, which
2    is exactly what this states, is that TEM
3    is known as the gold standard.  Are we in
4    agreement on that statement?
5         A.   I think that we agree that
6    TEM is highly valued by individuals, by
7    experts outside of -- or relative to
8    government agencies, academia,
9    researchers, et cetera.
10        It's the term "gold," I
11   think I've never heard that in a document
12   that I've seen from anybody on the
13   outside.
14        Q.   You've never heard the term
15   "gold standard"?
16        A.   I've heard it in the context
17   of discussing it with management, yes.
18   But I've not heard it from external
19   individuals saying it is the gold
20   standard.
21        Q.   J&J considered TEM to be the
22   gold standard for detection of asbestos
23   in talc?
24        A.   Yes.  It's not the only

Page 151

1    method.
2         Q.   What had happened prior to
3    June of 2011 that would have generated a
4    discussion of the testing of asbestos in
5    talc?
6         MS. ECHTMAN:  Objection.
7         THE WITNESS:  Prior to that
8    time period or around the time
9    period, there were claims by other
10   global government agencies about
11   talc and questions about talc
12   relative to asbestos.  And so it
13   became a very important management
14   topic to review.
15   BY MS. O'DELL:
16        Q.   And the reason it became a
17   very important topic is because asbestos
18   is known to be very hazardous to humans,
19   true?
20        MS. ECHTMAN:  Objection.
21        Outside the scope.  You can answer
22        in your personal capacity.
23        THE WITNESS:  Yeah,
24        certainly asbestos is well known

Page 152

1    to be a potential hazard in the
2    right form at the right levels.
3    BY MS. O'DELL:
4         Q.   And a hazard that causes or
5    can cause cancer, true?
6         MS. ECHTMAN:  Objection.
7         You can answer in your personal
8         capacity.
9         THE WITNESS:  I think it's
10        well documented from my
11        perspective that it can cause
12        mesothelioma.
13   BY MS. O'DELL:
14        Q.   Which is cancer?
15        MS. ECHTMAN:  Again, in his
16        personal capacity.
17   BY MS. O'DELL:
18        Q.   Which is cancer?
19        MS. ECHTMAN:  Same
20        objection.
21   BY MS. O'DELL:
22        Q.   You may answer.
23        A.   I know it as mesothelioma.
24   I don't refer to it as cancer.

Page 153

1         Q.   You know it is a type of
2    cancer, though, Mr. Hicks, don't you?
3         MS. ECHTMAN:  Objection.
4         And he can answer in his personal
5         capacity.
6         THE WITNESS:  Yeah, I'm not
7         the medical expert in this area,
8         and I would defer to our medical
9         experts.
10   BY MS. O'DELL:
11        Q.   You are a 40-year employee
12   of Johnson & Johnson.  Counsel keeps
13   objecting saying that you can answer in
14   your personal capacity, but not your
15   professional capacity as a representative
16   of Johnson & Johnson.
17        What you know about talc and
18   asbestos and talc is from your experience
19   as a 40-plus-year employee at Johnson &
20   Johnson, true?
21        MS. ECHTMAN:  Objection.
22        THE WITNESS:  Yes.
23   BY MS. O'DELL:
24        Q.   And that knowledge was

Donald Hicks

Page 154

1  obtained in your professional capacity,
2  true?
3         MS. ECHTMAN:  Objection.
4         THE WITNESS:  Yes.
5  BY MS. O'DELL:
6     Q.   And it was part of your
7  expertise as a quality assurance member
8  of management to ensure that Johnson &
9  Johnson's Baby Powder and Shower to
10  Shower did not contain hazardous
11  material, true?
12     A.   That is --
13         MS. ECHTMAN:  Objection to
14  form.
15         THE WITNESS:  That is
16  correct, part of my
17  responsibilities.  I might add
18  that it's also the responsibility
19  of many others within J&J, other
20  groups.
21  BY MS. O'DELL:
22     Q.   In addition to CTFA Method
23  J4-1 being the testing method required by
24  Johnson & Johnson for the testing of

Page 155

1  asbestos, there was also a testing method
2  called 7024, correct?
3     A.   Yes.
4     Q.   And what is 7024?
5     A.   Test Method 7024 defines the
6  transmission electron microscopy test
7  method for asbestos in talc.
8     Q.   And specifically 7024
9  controls the way that asbestos fibers are
10  counted for purposes of TEM testing,
11  true?
12         MS. ECHTMAN:  Objection to
13  form.
14         THE WITNESS:  Yes, it does
15  include that.
16  BY MS. O'DELL:
17     Q.   Let me show you what I've
18  marked as Exhibit Number 9:
19         MR. SILVER:  I think it
20  should be 10.
21         MS. O'DELL:  Let me have
22  that back, sir.  We'll mark it as
23  10.  I apologize.
24         (Document marked for

Page 156

1  identification as Exhibit
2  Hicks-10.)
3  BY MS. O'DELL:
4     Q.   I've handed you Exhibit 10.
5  Is that a copy of Test Method 7024?
6     A.   It is, yes.
7     Q.   And is the purpose of this
8  test method to explain the quantification
9  of asbestiform minerals in powdered talc?
10         MS. ECHTMAN:  Object to
11  form.
12         THE WITNESS:  Yes, using a
13  transmission electron microscopy.
14  BY MS. O'DELL:
15     Q.   And if you look down at
16  Paragraph 6, Mr. Hicks, it provides a
17  limit of quantifiable detection.
18         Do you see that?
19     A.   Yes, I do.
20     Q.   And it states that, "The
21  detection of five or more asbestiform
22  minerals of one variety in an analysis
23  constitutes a quantifiable level of
24  detection."

Page 157

1         Did I read that correctly?
2     A.   Yes, it does.
3     Q.   In other words, in order for
4  there to be a quantifiable level of
5  asbestos in a particular sample, there
6  had to be five or more fibers of the same
7  type of asbestos, true?
8     A.   Provided that the definition
9  of quantifiable is that -- is that as an
10  analytical chemist you're able to
11  identify and report the amount that is
12  there.  You may still report on one
13  fiber.  But if you want to report the
14  amount, then calculate it, you need five
15  fibers to get that -- a meaningful result
16  in terms of the amount that would be
17  there.
18     Q.   And meaningful according to
19  this particular test method?
20     A.   Yes.
21     Q.   In other test methods,
22  you'll agree with me that one fiber is
23  reported as meaningful and important?
24         MS. ECHTMAN:  Objection to

Donald Hicks

Page 158

1    form.
2         THE WITNESS:  Well, not only
3    other test methods, but also this
4    one.  If you're looking at what is
5    reportable, a single fiber is
6    reportable.  If you want to report
7    how much, what percentage of
8    material -- of the material is
9    asbestos, you need at least five
10   fibers in order to do a proper
11   calculation.
12   BY MS. O'DELL:
13        Q.   And if there were two fibers
14   of one type of asbestos and one fiber --
15   or three fibers of another type of
16   asbestos, under this protocol, that would
17   not be reported as a quantifiable level
18   of detection?
19        MS. ECHTMAN:  Objection to
20   form.
21        THE WITNESS:  It's the --
22   the Section 6.0 talks about the
23   amount, not whether you've
24   detected it.  It talks about the

Page 159

1    amount that you've detected.  If
2    you found one fiber, that would be
3    a detected level of asbestos and
4    would be reported as such.
5    BY MS. O'DELL:
6         Q.   Well, in fact, the method
7    states that the detection of five or more
8    asbestiform minerals of one variety in an
9    analysis constitutes a quantifiable
10   level.  That's what the specification
11   states.
12        MS. ECHTMAN:  Objection.  Go
13   ahead.
14        THE WITNESS:  In order to
15   calculate the mass or the
16   percentage or the quantity of the
17   asbestos, if it was detected, you
18   would need at least five fibers in
19   order to accurately quantify the
20   amount that you have.  If you have
21   a single fiber, you're still going
22   to report that as "I have found a
23   single fiber of asbestos."
24   BY MS. O'DELL:

Page 160

1         Q.   That -- according to 7024
2    would be a -- one fiber would be below
3    the quantifiable detection limit.
4    Finding one fiber of asbestos according
5    to 7024 would be below the quantifiable
6    detection limit?
7         A.   I'm not -- I disagree with
8    that strongly.  This whole section talks
9    about being able to determine the amount
10   in terms of a percentage or parts per
11   million or a weight percentage of the
12   number of fibers that you found that are
13   asbestos in your product so you can
14   record it as two parts per million with
15   some degree of reliability.  And that's
16   what this paragraph is referring to.
17        Q.   Even one fiber, according
18   to -- excuse me, let me start again.
19        Even one fiber would exceed
20   Johnson & Johnson's policy of no asbestos
21   in its talcum powder products, true?
22        A.   That is correct, yes.  Our
23   standard is not detectable.  Even a
24   single fiber would cause that to be an

Page 161

1    issue.
2         Q.   You testified earlier that
3    in addition to RJ Lee that you would
4    defer to Imerys and its employees as
5    experts in the testing of talc for
6    asbestos?
7         A.   Yes.
8         Q.   Do you know an individual by
9    the name of Julie Pier?
10        A.   I have spoken with that
11   individual, yes.
12        Q.   And did you speak with her
13   during your employment with Johnson &
14   Johnson?
15        A.   Yes, I did.
16        Q.   And do you respect Ms. Pier
17   and her expertise as a person who tests
18   talc for asbestos?
19        A.   My understanding is that she
20   is one of the asbestos talc testing
21   experts within Imerys.
22        (Document marked for
23   identification as Exhibit
24   Hicks-11.)

41 (Pages 158 to 161)

Donald Hicks

Page 162

BY MS. O'DELL:
2    Q.   Let me show you what I'm
3 going to mark as Exhibit 11. It's a
4 memorandum from Ms. Pier describing the
5 TM 7024 test method.
6        Do you see that?
7    A.   Yes.
8    Q.   And the purpose of the memo
9 is the explanation of the detection
10 limit. And you see it says, "Recently,
11 you asked for an explanation of the
12 reported detection limit of method TM
13 7024."
14        Do you see that?
15   A.   Yes, I do.
16   Q.   And that is in parens,
17 "Analysis of powdered talc for
18 asbestiform minerals by TEM, and it's
19 performed on Grade 66," which is a type
20 of talc.
21        Do you see that?
22   A.   Yes, I see that it states
23 that, yes.
24   Q.   And Ms. Pier explained,

Page 163

1 Paragraph 1, "The method states that the
2 limit of quantifiable detection is five
3 fibers. In other words, if only three
4 fibers are detected, we could say that
5 the amount detected is below the
6 quantifiable detection limit."
7        Do you see that?
8    A.   Yes, I do.
9    Q.   At least according to
10 experts in the field, the TM 7024
11 required that there be five or more
12 fibers of the same type in order for
13 there to be a quantifiable level of
14 detection and report it?
15       MS. ECHTMAN:  Objection.
16 BY MS. O'DELL:
17   Q.   Correct?
18       MS. ECHTMAN:  Objection.
19       THE WITNESS:  I think that
20 we need to be very careful here
21 because as an analytical -- in the
22 analytical world of testing, there
23 are really two things that you
24 consider. One is being able to

Page 164

1 detect something. The other one
2 is being able to quantify what you
3 detect.
4        Here she's talking about,
5 can I accurately quantify the
6 amount that I have in my
7 product -- if I detect -- how many
8 fibers do I need before I can make
9 that calculation.
10       She's agreeing with Test
11 Method 7024.
12 BY MS. O'DELL:
13   Q.   What she is saying is, we
14 can say that it's below the quantifiable
15 detection despite the fact that there's
16 presence of multiple asbestos fibers,
17 true?
18       MS. ECHTMAN:  Objection.
19       THE WITNESS:  What she's
20 saying is that she cannot --
21 cannot provide an accurate level
22 of the amount that's there based
23 upon finding less than five
24 fibers.

Page 165

1        She can tell whether it's
2 there or not. She cannot provide
3 a quantifiable level.
4 BY MS. O'DELL:
5    Q.   Even if it is unquantifiable
6 according to your definition of that
7 word, asbestos is still present, correct?
8        MS. ECHTMAN:  Object to
9 form.
10       THE WITNESS:  In this
11 hypothetical statement, yes, it
12 would still be present. And she
13 would still report it as having
14 found a fiber of asbestos. She
15 would not be able to quantify how
16 much she found. But she can say
17 that she's found two fibers, one
18 fiber, three fibers.
19       If she gets to five fibers,
20 she can provide a meaningful
21 calculation on the weight
22 percentage that is actually in the
23 product.
24 BY MS. O'DELL:

42 (Pages 162 to 165)

Donald Hicks

Page 166

1      Q.   But you would agree with me
2   that one fiber violates Johnson &
3   Johnson's policy to be -- for its talcum
4   powder products to be asbestos-free?
5      A.   We all agree, and I don't
6   see Julie stating that is not the case.
7   She in fact, by de facto review of this
8   document, I think she's agreeing with the
9   fact that even one fiber would be
10  reported as detected; however, if I need
11  a quantifiable limit to tell you how much
12  is exactly in that talc lot, I need at
13  least five fibers to make that mass
14  calculation correct and meaningful.
15     Q.   None of those words that
16  you've just said are in the document that
17  you're reading from, Mr. Hicks.  I mean,
18  all she says, if there's not five fibers,
19  if it's three, for example, it's not
20  quantifiable.  That's all that paragraph
21  says, correct?
22         MS. ECHTMAN:  Objection.
23         THE WITNESS:  Yes.  But
24  quantifiable means that I can

Page 167

1      provide a number to it, a quantity
2      number to it.
3          Nowhere in here is it saying
4      that if she found less than five
5      fibers she would not report it as
6      being there.
7   BY MS. O'DELL:
8      Q.   If there are less than five
9   fibers in a sample and it is reported
10  as -- asbestos is reported as not
11  present, then that would be an incorrect
12  statement, true?
13         MS. ECHTMAN:  Objection to
14  form.
15         THE WITNESS:  Let me -- go
16  ahead and repeat your question
17  just to make sure that I'm clear.
18  BY MS. O'DELL:
19     Q.   If there are less than five
20  fibers in a sample and it is reported
21  that asbestos is not present, then that
22  would be a false statement?
23         MS. ECHTMAN:  Objection to
24  form.

Page 168

1          You can answer.
2          THE WITNESS:  In a
3   hypothetical situation, yes.  But
4   she would still report it as
5   identified fibers.
6          I mean, we have to look at
7   the quantifiable and the
8   identification of a single fiber
9   as two different things.  It's
10  apples and oranges in terms of its
11  usefulness and meaning.
12         MS. O'DELL:  Why don't we
13  take about a five-minute break
14  now.
15         THE VIDEOGRAPHER:  The time
16  is now 1:46.  We are going off the
17  record.
18         (Short break.)
19         THE VIDEOGRAPHER:  The time
20  is now 1:59.  Back on the record.
21  BY MS. O'DELL:
22     Q.   Mr. Hicks, before we took a
23  short break, we were talking about
24  finding a fiber in a talc sample after

Page 169

1   it's been tested with TEM.
2          If an asbestos fiber was
3   found when being analyzed by TEM, one
4   fiber, who would that be reported to
5   under Johnson & Johnson's testing
6   protocols?
7      A.   I think the -- I mean,
8   ultimately it would come to -- would have
9   come to me or somebody in my position
10  from a reporting point of view.
11         So you would expect that
12  Imerys report that they found an issue or
13  RJ Lee that they found a single fiber and
14  if they didn't report it to me initially,
15  I would be the one that would -- would
16  have received that and taken action.
17     Q.   When you say that, what are
18  you referring to?
19     A.   A fiber, an asbestos fiber
20  in talc.
21     Q.   You are talking about the
22  test results themselves?
23     A.   That's correct.
24     Q.   And why would they report

43 (Pages 166 to 169)

Donald Hicks

Page 170

1  that to you?
2      A.   From a responsibility point
3  of view, any major issues, no matter what
4  they are, would come to ultimately to my
5  attention.  And you know, we would then
6  decide as a management team where to go
7  from there.  But as the quality head for
8  the baby line, it would certainly come to
9  me.
10      Q.   So finding asbestos fibers
11  in Baby Powder would be a serious issue?
12      A.   It would be.
13      Q.   And it's a serious issue
14  because it puts at risk the babies and
15  adults that are using Baby Powder
16  products, true?
17          MS. ECHTMAN:  Objection.
18      This is outside the scope of the
19      areas where he's been designated
20      as a 30(b)(6) witness.  But I'll
21      allow him to answer in his
22      personal capacity.
23          THE WITNESS:  Yes, there's
24      certainly a potential safety issue

Page 171

1      and it would be taken with all due
2      seriousness and communication to
3      decisionmakers across the company.
4  BY MS. O'DELL:
5      Q.   In 2011 in June of 2011, did
6  you make a recommendation as to the
7  action plan that should be put into place
8  in the event that there was a positive
9  test result or test results for asbestos
10  in Baby Powder?
11      A.   The executive management at
12  that time wanted to discuss what the
13  scenarios might be.  If asbestos were
14  found I would put together a hypothetical
15  example of one decision process one might
16  make for discussion purposes.
17      Q.   Who was -- who in executive
18  management asked you to undertake that
19  project?
20      A.   Gosh.  The specific names of
21  the individuals at that time, you know, I
22  don't recall who specifically asked for
23  that.  But I know it was asked for by
24  the -- by sort of the Baby executive

Page 172

1  management team.
2      Q.   And maybe you don't remember
3  individuals' names, but what positions
4  are you referring to, executive
5  management positions are you referring to
6  as the Baby executive -- I'm assuming you
7  are talking about the Baby Powder or the
8  Baby line?
9      A.   That's correct.
10      Q.   That executive management
11  team, what positions would be included in
12  that group?
13      A.   So this would be director
14  and vice presidential levels for R&D, for
15  procurement, for quality assurance,
16  safety, toxicology.
17      Q.   Would that executive team
18  include executives outside of Johnson &
19  Johnson's Consumer, Inc.?
20      A.   Not at that time, no.
21      Q.   At some period of time has
22  that executive team included, not only
23  JJCI employees, but also J&J employees?
24      A.   Not to my recollection.

Page 173

1  Whether -- I mean it's difficult to say
2  exactly what entity within J&J folks were
3  reporting to at any given time.  I'm
4  struggling with that.
5      Q.   In June of 2011, we've
6  looked at this PowerPoint that was marked
7  as an exhibit.  Exhibit 9, I believe.
8          Is the alert and action
9  recommendation plan that you compiled
10  contained on Page 13 of that PowerPoint?
11      A.   I have to look.  Yes.
12      Q.   And according to your
13  proposal, for an alert, that should
14  happen if there's a detection of one
15  single fiber, escalate, conduct
16  investigation, and resample to determine
17  level.
18          Did I read that correctly?
19      A.   Yes, you did.
20      Q.   And if there was a test that
21  showed less than five parts per million,
22  no evidence of chronic issue and mine
23  practices in control, no action
24  warranted.

44 (Pages 170 to 173)

Donald Hicks

Page 174

1    Did I read that correctly?
2    A.   Yes, you did.
3    Q.   If there was a test result
4  that was greater than five parts per
5  million, you describe that as a chronic
6  issue, develop mitigation plan, which may
7  include switch to new ore -- I'm assuming
8  you are talking about talc ore -- body.
9    Did I read that correctly?
10    MS. ECHTMAN:  Objection to
11    form.
12    THE WITNESS:  Yes.
13  BY MS. O'DELL:
14    Q.   And if there was test
15  results that were greater than ten parts
16  per million, you described that as a
17  chronic issue or -- excuse me.  Greater
18  or equal to ten parts per million,
19  chronic issue, or 20 parts per million,
20  single event, you remedies continue use
21  of talc supply, correct?
22    MS. ECHTMAN:  Objection to
23    form.
24    THE WITNESS:  Yes, that's

Page 175

1  what it states.
2  BY MS. O'DELL:
3    Q.   It also states -- it says,
4  "Note, ten parts per million equal 1/100
5  of XRD limit of detection."
6    Did I read that correctly?
7    A.   Yes.
8    Q.   Those were -- those were
9  your words and recommendation in June of
10  2011?
11    A.   It was not my
12  recommendation.  You have to understand
13  the context.  The context was our
14  requirements were nondetected, and the
15  global team -- the global team working on
16  baby wanted to know if there were any
17  other options than having a single fiber
18  being a failure.  And what would be the
19  action if we did find a single fiber.
20    And so this was a proposal,
21  theoretical proposal put together of one
22  way you could go.  It was discussed with
23  the team.  And my recollection is that
24  the team said no, we understand the issue

Page 176

1  here, and we could not align to having an
2  alert action level proposal.
3    Q.   And the team you're
4  referring to is the senior executive
5  team -- committee that invited you to
6  make this proposal to them, correct?
7    A.   That's correct.  They asked
8  me to put together -- you know, was there
9  any scenario under which an alert action
10  type of situation might be utilized in
11  the case of asbestos and talc.  The
12  takeaway from all that discussion,
13  everyone agreed that this was not an
14  option, it never went into the
15  specification, and the specification
16  remained at nondetected.
17    Q.   Did you present this
18  PowerPoint as an oral presentation during
19  this executive committee meeting?
20    A.   I did.
21    Q.   And were there Johnson &
22  Johnson employees present at that
23  meeting?
24    A.   It was all Johnson & Johnson

Page 177

1  employees at that meeting.
2    Q.   Were there executives of --
3    A.   Excuse me.  So let me
4  clarify.  When we talk about Johnson &
5  Johnson, it's all of Johnson & Johnson,
6  including consumer.  I mean, these were
7  all consumer folks.  There may have been
8  some legal folks there.  I don't know.
9    Q.   Let me ask you a couple of
10  follow-up questions about some other
11  testing methods.  Let me show you what
12  I'm marking as Plaintiff's Exhibit Number
13  12.
14    (Document marked for
15    identification as Exhibit
16    Hicks-12.)
17  BY MS. O'DELL:
18    Q.   This is a Test Method 7169.
19  Do you see that?
20    A.   Yes, I do.
21    Q.   And it's entitled "Arsenic
22  Content, Talc"?
23    A.   Yes, it is.
24    Q.   And according to this

45 (Pages 174 to 177)

Donald Hicks

Page 178

1    specification that the level of arsenic
2    in talcum powder was required to be less
3    than 2.5 parts per million.
4         A.   I'm sorry.  Where are you
5    reading?
6         Q.   I'm actually looking at the
7    last page.  I'm just trying to establish,
8    one, the test method that was
9    appropriate, and is this the controlling
10   document for that; and number two, was
11   the -- essentially the upper limit of
12   normal was at 2.5 parts per million for
13   arsenic.
14        MS. ECHTMAN:  Objection to
15   form.
16        THE WITNESS:  I think it's
17   difficult for me to comment on
18   this in that this document was
19   from the early to mid-'90s.  And
20   so I don't really have any
21   background in this particular
22   document.
23        I can indicate that it
24   appears to be equivalent to the

Page 179

1    USP method.  It uses essentially
2    the same process.  But that's
3    about as far as I can...
4    BY MS. O'DELL:
5         Q.   Was this test method the
6    prescribed test method for arsenic from
7    the time period 2006 to 2017?
8         A.   I would have to look at the
9    specification, if that's okay with you.
10        Q.   Yeah.  Sure.  Absolutely.
11        A.   So I'm looking at -- this is
12   Exhibit 6.  So it has limit of arsenic as
13   defined by the Bureau of Indian Standards
14   1462 or you can use inductive coupling
15   plasma method.  The limit is defined as 2
16   PPM.
17        Q.   And, I mean, I'm not trying
18   to be tricky here.  So this -- this
19   specification, this test method was not
20   in effect during the time period that you
21   were with quality assurance?
22        A.   To my knowledge, it was not
23   in effect.
24        Q.   Let me show you what I'm

Page 180

1    marking as Exhibit 13.
2         (Document marked for
3    identification as Exhibit
4    Hicks-13.)
5    BY MS. O'DELL:
6         Q.   This is a test method for
7    lead and cadmium.  Are you familiar with
8    this document?
9         A.   Let me take a look at it.
10        It's stated in this document
11   that it is for the adult skin and hair
12   care business and not the baby business,
13   so I don't know that that's a linkage of
14   this one to the specifications between
15   2006 and 2017.
16        Q.   You can put that aside.  In
17   regard to chromium, you're welcome to
18   look at it.  This is the specification
19   that was in effect in March 24, 2010.
20   It's in your notebook there at --
21        A.   Do you have the tab number?
22        Q.   Yeah, I was just about to
23   say that.  Thank you.  Tab 4.
24        A.   Tab 4.

Page 181

1         Q.   So the limit of chromium,
2    according to the specification, was no
3    more than .5 parts per million, correct?
4         A.   That's correct.
5         Q.   And chromium is a Group 1
6    carcinogen as designated by IARC,
7    correct?
8         MS. ECHTMAN:  I object that
9    it's outside the scope of the
10   topics that Mr. Hicks has been
11   designated on pursuant to the
12   30(b)(6) notice.  But I will allow
13   him to answer in his personal
14   capacity if he can.
15        THE WITNESS:  Yeah, that
16   information would typically be
17   handled by our toxicologist and
18   medical safety team who provide
19   the input to the limits that are
20   defined in the specifications.
21   Typically these limits are not
22   based upon a safety limit
23   necessarily.  They're based upon a
24   historical pattern for the talc

46 (Pages 178 to 181)

Donald Hicks

Page 182

1        that has been tested, and if you
2        look at it to make sure they're
3        well under the safety limit.
4    BY MS. O'DELL:
5        Q.   .5 parts per million had
6    been the specification for the limit of
7    chromium in talc for a number of years,
8    as of 2010, correct?
9        A.   That's correct, yes.
10       Q.   And in terms of the safety
11   issue, you're familiar with IARC, I'm
12   assuming, as a quality assurance --
13       A.   Yeah, I know them.  I'm
14   not -- I wouldn't say that I was familiar
15   with them.  I don't work on their
16   subcommittees or go to their meetings or
17   get their literature.
18       Q.   And certainly you would know
19   that they evaluate compounds like
20   chromium for purposes of determining
21   whether they are carcinogenic to humans,
22   true?
23           MS. ECHTMAN:  Objection
24       outside of the scope of the topics

Page 183

1        Mr. Hicks has been designated on,
2        but I'll allow him to answer in
3        his personal capacity.
4           THE WITNESS:  Yes, I am
5        aware that they do evaluate not
6        only elements, but compounds for
7        carcinogenicity as well as cancer
8        issues.
9    BY MS. O'DELL:
10       Q.   Based on your professional
11   knowledge, your 40 years of experience,
12   were you aware that they had reviewed
13   chromium and determined that it can cause
14   cancer in humans?
15           MS. ECHTMAN:  Objection.
16       I'll allow Mr. Hicks to answer in
17       his personal capacity.
18           THE WITNESS:  Yeah, again,
19       that's not my area of expertise.
20       I really look to our toxicology
21       group and our medical safety group
22       for making those kinds of
23       judgments.
24   BY MS. O'DELL:

Page 184

1        Q.   If I represent to you that
2    that's the case, Mr. Hicks, do you have
3    any reason to believe that I'm not being
4    truthful to you in saying that they have
5    determined that chromium, it can cause
6    cancer in humans?
7           MS. ECHTMAN:  Same
8        objection.
9           THE WITNESS:  The only thing
10       that I will state is that there
11       are different types of chromium
12       per conversations that I've had
13       with our toxicologists, the
14       medical safety team, and some are
15       more of a concern than others.
16           This morning I took chromium
17       as part of my multivitamin, so...
18   BY MS. O'DELL:
19       Q.   In terms of chromium, for
20   the talc that was being mined in China,
21   in the time period 2011, there were
22   consistent elevated amounts of chromium
23   above .5 parts per million, true?
24           MS. ECHTMAN:  Objection to

Page 185

1        form.
2           THE WITNESS:  And this is
3        based on?
4    BY MS. O'DELL:
5        Q.   Review of documents that
6    Johnson & Johnson has produced to us in
7    this litigation.
8        A.   I am aware that we needed --
9    that there was a desire to change the
10   specification, so that we were well
11   within the safety limits but more in line
12   with the likely amount of chromium that
13   was being found across the world.
14       Q.   In fact, the Chinese ore
15   consistently tested above .5 parts per
16   million for chromium, and that resulted
17   in an out of specification alert from a
18   quality and safety standpoint, true?
19           MS. ECHTMAN:  Objection.
20           THE WITNESS:  I think that
21       the word "consistency" is not my
22       recollection at all.  There were
23       issues where we were either at or
24       just slightly above that limit,

47 (Pages 182 to 185)

Donald Hicks

Page 186

```
 1        had a discussion, we talked to the
 2        toxicologists, the medical team,
 3        and they agreed that we can safely
 4        change the limit just slightly.
 5   BY MS. O'DELL:
 6        Q.   When a test is above the
 7   allowable limit, that results in
 8   something called an OSS, doesn't it?
 9            MS. ECHTMAN: Objection.
10            THE WITNESS: In some
11        organizations, yes. In Johnson &
12        Johnson that would be, yes.
13   BY MS. O'DELL:
14        Q.   Okay. And what does OSS
15   stand for?
16        A.   So that's out of
17   specification.
18        Q.   And in terms of quality
19   assurance, an OSS, or an out of
20   specification test or series of tests is
21   a problem, true?
22        A.   It's certainly an area that
23   needs attention, yes.
24        Q.   Yes. And I said OSS, my
```

Page 187

```
 1   colleague kindly remind me that I was
 2   saying OSS instead of OOS. Thank you.
 3            MS. ECHTMAN: I didn't want
 4        to correct you, but I didn't want
 5        to be accused of coaching anybody.
 6            MS. O'DELL: You can coach
 7        me if you would like. I'll
 8        listen.
 9   BY MS. O'DELL:
10        Q.   OOS, out of specification,
11   to be clear.
12        A.   That's correct.
13        Q.   And so if a test report came
14   back, was above the limit of the
15   allowable limit, that would generate
16   essentially an OOS report, correct?
17        A.   That's correct.
18        Q.   And part of good
19   manufacturing practices is to address out
20   of specification reports as soon as
21   possible.
22            MS. ECHTMAN: Object to
23        form.
24   BY MS. O'DELL:
```

Page 188

```
 1        Q.   True?
 2        A.   Yeah, certainly we would
 3   investigate this right away.
 4        Q.   As a result of the fact
 5   that -- let me strike that.
 6            The amount of chromium in
 7   the Chinese ore was running about three
 8   parts per million.
 9            Do you recall that?
10            MS. ECHTMAN: Objection to
11        form.
12            THE WITNESS: I don't recall
13        that specifically as to what the
14        level was, nor what the mine was
15        that level that you're speaking
16        about was found in.
17   BY MS. O'DELL:
18        Q.   And I'm talking about -- I'm
19   talking about mines -- the mine in China
20   from which Baby Powder was sourced.
21        A.   I understand that, yes.
22        Q.   And there were reports,
23   multiple reports showing that the amount
24   of chromium was greater than the
```

Page 189

```
 1   acceptable limit, .5 parts per million.
 2            Do you recall that?
 3        A.   I know that we have had
 4   issues with some test reports from some
 5   mines where it was above .5. The
 6   specifics, I do not recall at this point.
 7            We ultimately changed the
 8   spec to reflect, not only a safe level,
 9   but one that was more indicative of the
10   historical trend coming out of all the
11   mines.
12        Q.   And it was changed in order
13   that the test result would consistently
14   be within the upper limit, rather than be
15   an out of specification, true?
16            MS. ECHTMAN: Objection to
17        form.
18            THE WITNESS: We asked the
19        medical team and the toxicity team
20        if there was a recommendation to
21        allow that specification to be
22        modified. And they felt we were
23        well within the safety limits to
24        go slightly higher, which we
```

48 (Pages 186 to 189)

Donald Hicks

Page 190

1    ultimately did.
2    BY MS. O'DELL:
3         Q.    And you recommended yourself
4    that the upper limit should be changed
5    from .5 parts per million to seven parts
6    per million, true?
7         A.    I don't recall that, no.
8         Q.    Okay.  Well, ultimately
9    after that recommendation, the limit for
10   chromium was changed to seven parts per
11   million.
12           MS. ECHTMAN:  Objection.
13        Foundation.  And objection to
14        form.
15           MS. O'DELL:  Well let me
16        strike that, and I'll start again.
17   BY MS. O'DELL:
18        Q.    Take a look at Tab 4 of your
19   notebook, Mr. Hicks, with the
20   specifications.
21           And this was a specification
22   issued on December 16, 2010.
23        A.    Yes, I see that.
24        Q.    And the upper limit for

Page 191

1    chromium was changed as follows.
2           The maximum acceptable level
3    became two parts per million, true?
4         A.    I would have to look at a
5    specification that reflected that change.
6         Q.    I thought I directed you to
7    one.
8           MS. ECHTMAN:  Are you on Tab
9        4 or Tab 5?
10          MS. O'DELL:  Tab 5.
11          MS. ECHTMAN:  I think you
12        said Tab 4.
13          THE WITNESS:  Yeah, that --
14          MS. O'DELL:  I apologize if
15        I did.  I didn't intend to.
16   BY MS. O'DELL:
17        Q.    Tab 5.  Do you see that?
18        A.    Yeah.  Yeah.
19        Q.    So it was changed to two
20   parts per million as the acceptable
21   level?
22        A.    That's correct.
23          MR. SILVER:  Can you give us
24        the Bates number for that, please?

Page 192

1           MS. O'DELL:  JNJMC
2        000009937.
3    BY MS. O'DELL:
4         Q.    We talked --
5         A.    But just if I can interject.
6    Previously you said that it was changed
7    to seven PPM, which I wasn't aware that
8    that had ever happened.  I just want to
9    make sure that I'm clear.  Two PPM, yes,
10   I'm aware of.
11        Q.    Yes, okay.  That's fair.
12        A.    Okay.
13        Q.    The -- we talked earlier --
14   you can put that away, Mr. Hicks.  We
15   talked earlier about all the talc that
16   was used in Baby Powder during the time
17   period that you're speaking to, 2006 to
18   2017 originated in China.  You remember
19   that, that discussion and we talked about
20   the mines?
21        A.    Mm-hmm.  Yes, I do remember
22   that.
23        Q.    Have you ever visited the
24   mine in China?

Page 193

1         A.    I have not.  My team has.
2         Q.    Who on your team visited the
3    mine?
4         A.    It was one of our raw
5    material external manufacturing team
6    members, Mark Zappa.  I believe at the
7    time he was a manager or senior manager
8    for quality assurance.
9         Q.    And when did that audit or
10   site visit occur?
11        A.    That occurred in 2011.
12        Q.    And at this point -- strike
13   that.
14          Prior to Mr. Zappa's visit
15   to the mine in China, had a Johnson &
16   Johnson employee audited or visited the
17   mine there in China?
18        A.    Not from -- starting with
19   2006 when I became engaged.
20        Q.    And talc was sourced from
21   that mine for Baby Powder beginning in
22   2003, correct?
23        A.    That's correct.  Yes.
24        Q.    And so talc had been mined

49 (Pages 190 to 193)

Donald Hicks

Page 194

1  from the Chinese mine for a little over
2  eight years before there was a site visit
3  by Johnson & Johnson employee, true?
4       MS. ECHTMAN:  Objection.
5       THE WITNESS:  That is
6  correct.  Our trusted partners,
7  Imerys, had oversight to that mine
8  and did have boots on the ground
9  often from my understanding.
10       (Document marked for
11  identification as Exhibit
12  Hicks-14.)
13  BY MS. O'DELL:
14       Q.   Let me show you what I'm
15  marking as Exhibit Number 14 and ask if
16  you can identify that for me, please.
17       A.   Yes.  So this was a post
18  visit to the China mine slide deck that
19  was prepared by Mark Zappa, senior
20  manager of quality assurance, dated
21  April 15, 2011.  It's entitled "Guilin
22  Giguang Talc Mine and Grinding EMQA Trip
23  Review."
24       This was a management

Page 195

1  presentation in terms of output or
2  findings from his trip and what was the
3  discussion topic at -- by the Baby
4  business team.
5       Q.   If you will turn to Page 8
6  of the document.  You'll see that it's an
7  overview of the mine.  And it's Guiguang
8  mine.  Is that how you would say it?
9       A.   It's a difficult one, not
10  speaking Chinese.  Guiguang is another
11  interpretation of how one might say that.
12  I would defer to you though.
13       Q.   Well, we'll labor on
14  together.
15       So this was the mine that
16  sourced Baby Powder and Shower to Shower
17  talc.  It was an open pit mine, correct?
18       A.   Yes, mm-hmm.
19       Q.   And it says that the mine
20  output was 150,000 tons per year.
21       Was that tonnage, tonnage
22  that was allotted for mine or estimated for
23  J&J's use on a yearly basis?
24       A.   No, that was really the

Page 196

1  number of tons that they were extracting
2  from the mine as a whole.  J&J, well
3  Imerys and ultimately J&J were pulling a
4  fraction of that.
5       Q.   What's your estimate of the
6  amount of that that would ultimately be
7  used in talcum powder products on a
8  yearly basis?
9       MS. ECHTMAN:  Objection.
10  Overly broad and outside the
11  scope.
12       THE WITNESS:  Yeah, I could
13  only speculate at that.  And I
14  think there are others that have a
15  much more clear picture as to how
16  much was being pulled out for J&J.
17  BY MS. O'DELL:
18       Q.   You mentioned in our
19  discussion previously on specification
20  and specifically testing of unique ore
21  lots.  Do you remember that?
22       A.   Yes, I do.
23       Q.   And you were referring to
24  ore lots, and let me ask a question.

Page 197

1       Is an ore lot, from your
2  perspective, a term of art that denotes a
3  specific amount?  In other words, is
4  there a certain tonnage that is -- that
5  composes an ore lot?
6       A.   I've never seen the actual
7  definition, but what I've heard explained
8  to me is that if a customer, and Imerys
9  would be a customer, if they ordered a
10  specific amount, that a quantity will be
11  segregated for them at the -- you know,
12  of the purity level that they were asking
13  for.
14       Q.   So if I am understanding
15  what you're saying, are you saying that
16  an ore lot would be the amount of talc
17  that has actually been ordered?
18       A.   That's how it was explained
19  to me.  If that's how it operates in
20  actual practice, I don't really know.
21  But that's my understanding, yes.
22       I think it should be pointed
23  out as well that Imerys also as another
24  customer who may be using the same ore

Donald Hicks

Page 198

1  from the same ore lot or have other ore
2  lots that are coming into the Houston
3  facility.
4      Q.   Who accompanied Mr. Zappa on
5  this site visit or audit?
6      A.   We -- because we are not
7  mine experts, we contracted with RJ Lee
8  Group who has a mine consulting part of
9  their operation or part of their
10 business.  And that was a person by the
11 name of Drew Van Orden who accompanied
12 Mark Zappa over to the mine in China.  We
13 additionally had some representatives
14 from Johnson & Johnson China also who
15 were on this visit.
16     Q.   Let me ask you to turn to
17 Page 35.  There is a slide that
18 essentially is divided in half.
19 There's -- one half describes the current
20 mine-to-bottle process.
21         Do you see that?
22     A.   Yes, I do.
23     Q.   Is that an accurate
24 mine-to-bottle process in April of 2011?

Page 199

1      A.   Yeah, I think the current --
2  the column that says current
3  mine-to-bottle process is a very
4  abbreviated description of the steps that
5  talc takes before reaching the PTI plant
6  in Royston, Georgia.
7      Q.   But it -- though it may be
8  not as detailed as some other
9  descriptions, is that an accurate
10 mine-to-bottle process in 2011?
11     A.   I believe so.  I didn't
12 write it.  Mark Zappa did.  But I believe
13 that would be accurate.
14     Q.   Okay.  And is that
15 description an accurate description for
16 the time period 2012 to 2017?
17     A.   I believe that it is in
18 general, and so some variation.
19     Q.   In other words, from 2006 to
20 2017, it would have been mined in China,
21 it would have been put on -- it would
22 have been taken from the mine to the rail
23 yard by truck there in China, the Guilin.
24         Do you know how to say that?

Page 200

1      A.   I've heard it called Guilin.
2      Q.   Guilin.  So from the mine,
3  the talc traveled to Guilin rail yard by
4  truck, and then from -- by rail to port
5  in Hong Kong, by -- from the port in Hong
6  Kong to the port in Houston by sea, from
7  the port in Houston to Rio Tinto's
8  headquarter by truck in Texas, whereby
9  they would grind and decontaminate to
10 silo.
11         Rio Tinto to Pharma Tech or
12 PTI by rail.  Silo to dedicated sanitized
13 tankers.  And then rail to silo at PTI,
14 and in silo to blend/fill at PTI; is that
15 correct?
16     A.   Yeah.  This is an extremely
17 high view of the process mostly from
18 around the transportation perspective.
19     Q.   And my question really is,
20 would that be an accurate high level
21 view, albeit, but high level view of the
22 steps of the manufacturing process
23 throughout the time period that you're
24 here to talk about today, 2006 to '17?

Page 201

1      A.   At a very high level, I
2  think, yes.  I mean, there are a lot of
3  steps going on in between all these, of
4  course.  But I think that they were
5  looking at the transportation process,
6  you know, where it was shipped, and how
7  it was shipped, how it was transported.
8  That sort of thing.
9      Q.   Have you spoken to anyone at
10 Imerys in preparation for your deposition
11 here today?
12     A.   I have not.
13     Q.   Since your retirement in
14 2017 have you spoken to any employees or
15 former employees of Imerys?
16     A.   I have not.
17     Q.   Have -- strike that.
18         Are you aware of any audits
19 conducted by Imerys of the Chinese mining
20 company?
21     A.   I have not seen any formal
22 audits that have come across my desk.  My
23 understanding in talking to Imerys is
24 that they did have representatives there

Donald Hicks

Page 202

1    at the mine on a regular basis.
2        Q.   Has Johnson & Johnson
3    conducted any audits of Imerys?
4        A.   I personally have not seen a
5    formal audit report.  It doesn't mean one
6    doesn't exist.  But I personally have not
7    seen it.  There have been many trips to
8    the Houston facility for various topics,
9    to understand the process, to look at the
10   performance, to look at the types of
11   equipment that they use, to look at
12   possible changes to the process.  And,
13   you know, I was personally on a couple of
14   those trips at least, two or three.
15           (Document marked for
16           identification as Exhibit
17           Hicks-15.)
18   BY MS. O'DELL:
19       Q.   Let me show you what I'm
20   marking as Exhibit 15.  Have -- this is a
21   document entitled "Supplier Audit Report"
22   by Intertek dated April 29, 2009.  Have
23   you seen this document before?
24       A.   I specifically don't recall

Page 203

1    this document.  It doesn't mean that I
2    didn't see it.  There were thousands of
3    documents that one looks at on an annual
4    basis.
5        Q.   Well, it's a supplier audit
6    report.  It's dated April 23, 2009.  It's
7    an audit of Rio Tinto which is the
8    former -- the predecessor company for
9    Imerys.
10           MR. FERGUSON:  Object to the
11           form of the question.
12   BY MS. O'DELL:
13       Q.   It is the audit scope if you
14   look on Page 1 of the document.  It is a
15   third-party audit performed by Intertek
16   USA, d/b/a QTI on behalf of Johnson &
17   Johnson Consumer Companies, Inc.
18           "The audit will verify that
19   adequate quality systems are in place to
20   ensure the quality of materials supplied
21   to Johnson & Johnson Consumer Companies."
22           Did I read that correctly?
23       A.   Yes, that is accurate.
24       Q.   And a supplier audit of this

Page 204

1    type would have been done under the
2    auspices of quality assurance, true?
3        A.   That's correct.
4        Q.   And that would have been
5    under your responsibility as senior
6    director of product quality?
7        A.   Not in 2009.  That
8    responsibility in 2009 had been split by
9    then where raw material suppliers were
10   third-party suppliers were being managed
11   by a breakoff group that focused on those
12   kinds of activities.
13           My focus at that point was
14   the -- was baby products in general, all
15   of the baby products.
16       Q.   But Johnson & Johnson -- I
17   appreciate what you're saying that at
18   that moment may not have been under your
19   auspices, but Johnson & Johnson
20   commissioned an audit of Imerys as a
21   supplier of talc, true?
22       A.   That's correct.
23       Q.   And this information would
24   have been provided to Johnson & Johnson,

Page 205

1    this report?
2        A.   Yes.
3        Q.   And this audit includes
4    particular audit findings that reported
5    on you know various topics regarding
6    computerized systems, samples,
7    laboratory, process validation, and
8    production.
9            MS. ECHTMAN:  Objection to
10           form.
11   BY MS. O'DELL:
12       Q.   Do you see that, Mr. Hicks?
13       A.   Yes, I understand that to be
14   the general area that was reviewed, yes.
15       Q.   And if you'll turn to Page 7
16   of the audit report, you'll see that
17   there was a major finding in relation to
18   production.
19           Do you see that?
20       A.   I'm reading it now, yes.
21           MR. FERGUSON:  I'll object
22           to the form of the question.
23           THE WITNESS:  Yes, I do see
24           that.

52 (Pages 202 to 205)

Donald Hicks

Page 206

1  BY MS. O'DELL:
2      Q.   And if you turn to the next
3  page, on Page 8, it defies -- it defines,
4  excuse me, what is involved with a major
5  audit finding.
6          Do you see that?
7      A.   Yes, I do.
8      Q.   And a major audit finding
9  is, "An observation is defined as major
10 when any one or more of the following two
11 conditions apply:  Number 1, any
12 nonconformance or noncompliance that if
13 allowed to continue has moderate risk of
14 adversely affecting product quality, and
15 the observation represents a significant
16 gap and/or gaps in an application of one
17 or more quality elements or system
18 components necessary to meet regulatory
19 requirements.  This includes systematic
20 lack of documented evidence of the
21 application of the key elements."
22         Do you see that?
23         MS. ECHTMAN:  Objection.
24         THE WITNESS:  Yes, I do see

Page 207

1      that.
2  BY MS. O'DELL:
3      Q.   And so this audit -- if
4  you'll turn back to Page 5, there's an
5  audit summary -- resulted in five major
6  findings and five minor findings
7  regarding Imerys, correct?
8          MR. FERGUSON:  Object to
9      form.
10         MS. ECHTMAN:  Objection.
11         THE WITNESS:  I do see the
12     audit summary, yes.
13 BY MS. O'DELL:
14     Q.   And if you'll turn to Page 7
15 again.  You'll see that one of those
16 major findings relates to production.
17 And that production refers to the
18 production of talc ore, correct?
19         MS. ECHTMAN:  Objection.
20         THE WITNESS:  Yes.
21 BY MS. O'DELL:
22     Q.   And the finding states, "The
23 batch records have no traceability for an
24 incoming raw materials to final materials

Page 208

1  shipping.  The bulk ore is shipped to the
2  Houston port from China.  There is a
3  pre-inspection prior to offloading.  The
4  shipment is loaded onto trucks and
5  delivered and stored in designated areas
6  using concrete barriers to keep the
7  shipments" -- excuse me -- "to keep the
8  different shipments separated.
9          "The batch records do not
10 identify the shipments of ore used for
11 final product.  In some cases when one
12 shipment is depleted, another shipment
13 may be used to supplement the raw
14 material requirements for production.
15 However, there is no traceability of what
16 shipments of ore were used for the
17 production of the final material."
18         Did I read that correctly?
19         MS. ECHTMAN:  Objection.
20         THE WITNESS:  That's what it
21     states, yes.
22 BY MS. O'DELL:
23     Q.   And based on this audit of
24 the processing plant, the Houston plant,

Page 209

1  there was no way to accurately trace raw
2  materials from China through the Houston
3  plant with accuracy, correct?
4          MS. ECHTMAN:  Objection to
5      form.
6          THE WITNESS:  Well, I did
7      not take part in the audit.  And
8      you know, these are of course
9      opinions from the Intertek
10     auditing team.
11 BY MS. O'DELL:
12     Q.   And that certainly is what
13 is being stated there, that there's no
14 traceability of the raw ore through the
15 production process in Houston, true?
16         MS. ECHTMAN:  Objection.
17         THE WITNESS:  That's what it
18     states.  Of course you'd like to
19     also see the response back from
20     Imerys.  And any corrective
21     actions that they would have taken
22     relative to this audit.
23         I might also add that the
24     visits of teams that I was part

Donald Hicks

Page 210

1    of, there was clear evidence that
2    they had traceability from the ore
3    lot all the way to the mill lot.
4    BY MS. O'DELL:
5        Q.    According to Intertek, that
6    was not true in 2009, true?
7            MS. ECHTMAN:  Objection.
8            THE WITNESS:  I think it's
9            their opinion.  I don't know
10           whether it was true or not.
11   BY MS. O'DELL:
12       Q.    Certainly it was their audit
13   finding?
14       A.    It was their audit finding,
15   yes.
16       Q.    And they were hired by
17   Johnson & Johnson to audit the Houston
18   facility, true?
19       A.    Yes, they did.
20       Q.    How many occasions did you
21   visit the plant in Houston?
22       A.    Three at least, that I can
23   recall.
24       Q.    Do you know the time period

Page 211

1    during which those visits took place?
2        A.    It would have been in the
3    2009 to 2013 time frame.
4        Q.    Is -- are you familiar with
5    a document called a talc supplier
6    assessment questionnaire?
7        A.    Yes, I am.
8        Q.    And is that a questionnaire
9    that is prepared, in other words -- the
10   questionnaire is drafted and sent to
11   suppliers by quality assurance?
12       A.    Yes, it is.  Typically used
13   for new suppliers.
14       Q.    When was the use of a talc
15   supplier questionnaire instituted?
16       A.    My recollection that it
17   would have been around between 2009,
18   2011, somewhere in that time frame.
19           (Document marked for
20           identification as Exhibit
21           Hicks-16.)
22   BY MS. O'DELL:
23       Q.    I'll show you what I'm
24   marking as 20 -- excuse me, Exhibit 16.

Page 212

1            Is this a talc supplier
2    assessment questionnaire regarding Rio
3    Tinto (Luzenac)?
4        A.    It is a supplier assessment
5    questionnaire for Rio Tinto in Houston.
6        Q.    This would be the same
7    Houston facility that is now owned and
8    operated, and has been for some time, by
9    Imerys?
10       A.    Yes.
11       Q.    Turn to Page 2.  At Line 6
12   there's a question under mine
13   qualification and requalification.  It
14   states, "Does the supplier have a report
15   to support qualification of the talc
16   source mine, willing to share?"  And then
17   it says, "Document mine qualification
18   report," and then the comment there is
19   JFR.
20           Who or what is JFR?
21           MS. ECHTMAN:  Can you show
22   me where you are reading from?
23           THE WITNESS:  Yeah.
24           MS. O'DELL:  Page 2.

Page 213

1            MS. ECHTMAN:  What line?
2    Six?
3            MS. O'DELL:  Mm-hmm.
4            THE WITNESS:  Do you see it?
5            MS. ECHTMAN:  I don't see a
6    JFR.
7            MR. FERGUSON:  I don't see a
8    JFR.
9            MR. SILVER:  I don't see it
10   either.
11   BY MS. O'DELL:
12       Q.    Maybe --
13       A.    Perhaps another section.
14       Q.    Let me make sure that
15   there's not a wrong Bates number there.
16   Give me just a second.
17           MS. O'DELL:  What's the
18   Bates on that?
19           MS. ECHTMAN:  JNJ 530885.
20   On Page 2 of 8.
21           MS. O'DELL:  Sorry.  Excuse
22   me.  I'm going to take back that
23   document and give you all another
24   copy.  There was a different Bates

Donald Hicks

Page 214

1    number.  Sorry.
2         MS. ECHTMAN:  This is what
3    you're going to use as Exhibit 16.
4         MS. O'DELL:  Yes.  That will
5    make more sense now.
6         (Document remarked for
7    identification as Exhibit
8    Hicks-16.)
9    BY MS. O'DELL:
10    Q.   Sorry, Mr. Hicks.  Turn to
11    Page 2.
12         MS. SHARKO:  Do you want the
13    old copy back?
14         MS. O'DELL:  Yeah, sure.
15    Fine.
16    BY MS. O'DELL:
17    Q.   Do you see that now,
18    Exhibit 16?  It's a supplier assessment
19    questionnaire for Rio Tinto minerals
20    Luzenac, Houston, Texas, which is now
21    Imerys.  Do you see that?
22    A.   Yes.
23    Q.   And if you'll turn to Page
24    2, Line 6.  Page two, Line 6.  It says,

Page 215

1    "Does the supplier have a report to
2    support qualification of the talc source
3    mine, willing to share?  Mine
4    qualification report."  And it says JFR.
5         Was a document entitled mine
6    qualification report provided to
7    Johnson & Johnson?
8         MS. ECHTMAN:  Object to
9    form.
10         THE WITNESS:  Yeah, I think
11    the issue is that this is likely
12    to be a draft document that was
13    being put together.
14         I'm suspecting that JFR is
15    the person who is supposed to be
16    filling out that section.
17         I think in the prior one
18    that we saw, that section was
19    filled out.  It's probably more
20    likely to be closer to a completer
21    document than this one is.  It
22    appears to be a very early draft
23    that was being assembled.
24    BY MS. O'DELL:

Page 216

1    Q.   All right.  Fair enough.
2    I'm just -- these are documents that have
3    been provided.  And I'm just asking you
4    questions about them.  So I don't -- I'm
5    not quibbling over what you said about
6    another draft.  But my question really
7    related to mine qualification report.
8         Do you see that, on Page 2?
9    A.   Yes.
10    Q.   Was a mine qualification
11    report provided to quality assurance
12    regarding the Guangxi mine?
13    A.   My understanding is that
14    this site had been used for many, many
15    years, for decades, by Imerys.  It was
16    repeatedly tested over and over again.
17    And that's what they were using to
18    substantiate that the mine was a
19    quality -- in a qualified state.
20    Q.   Was a report of that mine
21    qualification process provided to
22    Johnson & Johnson?  That's my question.
23    A.   I don't know that there was
24    an original mine report.  And if so, it

Page 217

1    was not provided to me.
2         MS. O'DELL:  I'll say for
3    the record, Susan, we have
4    searched the entire production for
5    this document which appears to
6    have been provided in conjunction
7    with this assessment.  We're going
8    to request that it be produced to
9    us.
10         MS. SHARKO:  You need to put
11    all your requests in writing.  And
12    we'll take it under advisement.
13    I'm not going to go back to a
14    multi-page thing to look see to
15    see what my homework assignment
16    is.  Just send me a letter.
17         MS. O'DELL:  I will send you
18    a formal letter with a document
19    requesting it.  You just know it's
20    coming to you.  That's what -- but
21    this has not been provided --
22    provided to us.
23         MS. SHARKO:  I have no idea.
24    I will await your letter with

Donald Hicks

Page 218

1    interest.
2         MS. O'DELL:  Thank you.
3    BY MS. O'DELL:
4         Q.   Same question.  Have you
5    seen the mine qualification standard
6    operating procedure that is referenced in
7    this document?
8         MS. ECHTMAN:  Objection to
9    form.
10        THE WITNESS:  No, I
11   personally have not seen them, no.
12   BY MS. O'DELL:
13        Q.   Are you aware if that
14   standard operating procedure has been
15   provided to Johnson & Johnson?
16        MS. ECHTMAN:  Object to
17   form.
18        THE WITNESS:  No, I
19   personally am not aware of it.
20   BY MS. O'DELL:
21        Q.   You can put that aside,
22   Mr. Hicks.
23        What was Project Kansas?
24        A.   Project Kansas was an R&D

Page 219

1    procurement project, and it was primarily
2    looking at talc sourcing or were there
3    any talc sourcing opportunities that
4    should be considered, you know, driven by
5    my capacity, geopolitical situation, and
6    desire to consolidate activities, so...
7         Q.   Was a Project Kansas this
8    project that was focused on locating
9    alternative talc sources from the Guilin,
10   China mine?  In other words, talc at that
11   time in 29 -- all this time period --
12   excuse me, 2006 to 2017 to today is being
13   sourced from the Guilin mine in China.
14   We've established that.
15        And Project Kansas was an
16   effort to locate an alternative talc
17   source, correct?
18        A.   It was to evaluate
19   alternative talc sources, yes.
20        Q.   With the idea that talc
21   would no longer be sourced from China,
22   but would be sourced from some other mine
23   at some other part of the world?
24        MS. ECHTMAN:  Objection.

Page 220

1         THE WITNESS:  I don't think
2    that was the only context.  I
3    think the context was what if
4    there was potential for talc to
5    become unavailable out of the
6    China mine, what would we do?  Is
7    there a possibility, given the
8    mines that we use globally for
9    other -- other J&J companies
10   around the globe, do we want to
11   consolidate?  Is there a
12   production advantage to
13   consolidate?
14        And also just looking at
15   general capacity, could any one
16   company provide the amount of talc
17   that we need on a regular basis.
18   It was a multifaceted review.
19   BY MS. O'DELL:
20        Q.   And one of the facets of
21   that review that you haven't mentioned
22   thus far is the concern that there was
23   asbestos in the talc ore in China,
24   correct?

Page 221

1         MS. ECHTMAN:  Objection.
2         THE WITNESS:  No, I don't
3    think that is correct.
4    BY MS. O'DELL:
5         Q.   Well, in May of -- be
6    specific.  May 14, 2009 the Chinese
7    government's equivalent to the FDA,
8    issued a report finding that there was
9    asbestos in a Baby Powder sample.
10        Do you recall that?
11        MS. ECHTMAN:  Objection.
12   Outside the scope.
13        You can answer in your
14   personal capacity.
15        THE WITNESS:  Yes.  I do
16   remember that.
17   BY MS. O'DELL:
18        Q.   Well, you were not involved
19   in your personal capacity in addressing
20   the situation with a positive asbestos
21   result by the Chinese FDA.  You addressed
22   that in your professional capacity as a
23   senior quality assurance officer for
24   Johnson & Johnson, true?

56 (Pages 218 to 221)

Donald Hicks

Page 222

1 MS. ECHTMAN: Let me explain
2 the nature of my objection.
3 Mr. Hicks has been
4 designated on certain 30(b)(6)
5 topics in response to your notice.
6 And so when I object and I say he
7 can answer in his personal
8 capacity, I'm saying that it's
9 outside the designation on the
10 30(b)(6) notice.
11 And with that, he can answer
12 the question.
13 MS. O'DELL: Just hold that
14 thought, Mr. Hicks.
15 THE WITNESS: Okay.
16 MS. O'DELL: Mr. Hicks has
17 been designated for the results
18 regarding the purity of Johnson &
19 Johnson's talcum powder, which is
20 Topic 9. Certainly the results of
21 positive test results involving
22 asbestos as reported by the China
23 FDA would be a part of that, well
24 within the topic.

Page 223

1 He speaks on behalf of the
2 company in regard to this. This
3 was an instance when the Chinese
4 FDA reported to Johnson & Johnson
5 there was asbestos in their
6 product.
7 And I'm asking him
8 questions, not as an individual,
9 personal preference, personal
10 opinion. I'm asking on behalf of
11 Johnson & Johnson, what was their
12 response to that situation.
13 So it's inappropriate to say
14 that this line of questioning is
15 outside the scope of the notice,
16 because that's clearly not true.
17 MS. ECHTMAN: Well I
18 disagree. And it's my
19 understanding that we've taken the
20 position that talc that may have
21 been -- talcum powder products
22 that may have been sold in China
23 are not at issue in this case and
24 that we're designating the witness

Page 224

1 to speak to the talcum powder
2 products in the United States.
3 And that's the basis for my
4 objection.
5 MS. O'DELL: I can handle
6 that.
7 BY MS. O'DELL:
8 Q. Mr. Hicks, was the talc that
9 was involved in the positive test results
10 by the China FDA mined from the same mine
11 that sources Baby Powder that's sold in
12 the United States?
13 MS. ECHTMAN: Objection.
14 THE WITNESS: It's not clear
15 that it was absolutely that mine.
16 But it's likely to have been that
17 mine, yes.
18 MS. O'DELL: This is well
19 within the scope. It is talc
20 that's sourced from the same mine.
21 And as a result, it's well within
22 the scope.
23 BY MS. O'DELL:
24 Q. I'm going to take your

Page 225

1 responses to my questions, Mr. Hicks, as
2 being on behalf of Johnson & Johnson.
3 MS. ECHTMAN: I'm just going
4 to have a running objection, and
5 we can agree to disagree on that.
6 MS. O'DELL: You can note
7 the objection for the record. And
8 then we'll take it up at a later
9 time, but I'm here to ask what
10 Johnson & Johnson's response and
11 position was regarding this
12 situation.
13 MS. SHARKO: Let's take it
14 one question at a time. Ask the
15 next question, and if Ms. Echtman
16 has an objection, she'll make it.
17 Otherwise the witness will answer.
18 Regardless the witness will most
19 likely answer. Let's move on.
20 BY MS. O'DELL:
21 Q. In May of 2009, China -- the
22 Chinese FDA contacted Johnson & Johnson
23 and said there's been a positive test
24 result of Baby Powder, two Baby Powder

57 (Pages 222 to 225)

Donald Hicks

Page 226

1    bottles.
2         Do you recall that?
3         MS. ECHTMAN:  Objection.
4    And I object as outside the scope
5    of the notice as we interpret it.
6    I'll allow the witness to answer.
7         THE WITNESS:  Yes, I do
8    recall that.
9    BY MS. O'DELL:
10        Q.   And after Johnson & Johnson
11   was informed of that result, a team of
12   individuals were formed to address that
13   situation on behalf of Johnson & Johnson,
14   true?
15        MS. ECHTMAN:  Same objection
16   that it's outside the scope of the
17   notice as we interpret it.  The
18   witness may answer the question.
19        THE WITNESS:  Yes, the team
20   was formed.  I'd just like to
21   clarify that from a China SFDA
22   perspective, there were other
23   manufacturers' products that they
24   also made the same claim about.

Page 227

1    BY MS. O'DELL:
2         Q.   What was the name of the
3    response team that was formed here at
4    Johnson & Johnson to respond to these
5    asbestos test results?
6         MS. ECHTMAN:  Same objection
7    that it's outside the scope of the
8    notice, and I'll allow the witness
9    to answer the question.
10        THE WITNESS:  Gosh, I don't
11   remember the name of the group.
12   BY MS. O'DELL:
13        Q.   Why -- why did the FDA --
14   excuse me.
15        Why did Johnson & Johnson
16   form a team to deal with this issue?
17        MS. ECHTMAN:  Same
18   objection.
19        THE WITNESS:  Certainly if
20   it was a valid result it was a
21   very serious issue.  And it was
22   also a global issue in that
23   multiple manufacturing sites were
24   being fed from that same mine.

Page 228

1         (Document marked for
2    identification as Exhibit
3    Hicks-17.)
4    BY MS. O'DELL:
5         Q.   I've handed to you
6    Exhibit 17.  Have you seen this document
7    before?
8         A.   Let me look through it for a
9    second.  Yes, I have seen it before.
10        Q.   This is dated May 15, 2009.
11   Is that one day after Johnson & Johnson
12   was informed of the positive results?
13        MS. ECHTMAN:  Same
14   objection.  I'll allow the witness
15   to answer.
16        THE WITNESS:  Yeah, I don't
17   recall the exact day of the year
18   that we were alerted to this claim
19   by the Chinese SFDA.
20   BY MS. O'DELL:
21        Q.   It's fair to say that
22   Johnson & Johnson formed a team and began
23   to address this situation immediately
24   upon hearing of the positive asbestos

Page 229

1    results, correct?
2         MS. ECHTMAN:  Same
3    objection.
4         THE WITNESS:  Yes, this was
5    an important issue, and it was
6    reacted to very quickly by the
7    global network.
8    BY MS. O'DELL:
9         Q.   And if you'll turn to about
10   Page 2 of Exhibit 17.  You'll see that --
11        A.   Is that entitled
12   "Background"?  Because I don't see a page
13   here.
14        Q.   Yeah.  That's right.
15        A.   Okay.
16        Q.   It's background.  There are
17   no page numbers.
18        The SFDA held a
19   communication meeting in Beijing on May
20   14, 2009, informing 36 companies that 98
21   talc based products from these companies
22   were found to contain asbestos.
23        So this is -- it was
24   announced May 14th and May 15th.  There

58 (Pages 226 to 229)

Donald Hicks

Page 230

```
 1   is a technical update here at Johnson &
 2   Johnson.
 3         MS. ECHTMAN:  Same
 4   objection.
 5   BY MS. O'DELL:
 6     Q.   True?
 7     A.   It appears that way.  Yes.
 8     Q.   Yes.  And according to the
 9   SFDA, JJC -- which I'm assuming is
10   Johnson & Johnson Consumers; is that
11   correct?
12         MS. ECHTMAN:  Same
13   objection.
14         THE WITNESS:  Yes.  That
15   would refer to Johnson & Johnson
16   Consumers.
17   BY MS. O'DELL:
18     Q.   -- had one batch talc, raw
19   material, gives the sample number, with
20   0.6 percent asbestos.  And batch of
21   Johnson's Baby, JB, prickly heat powder
22   with .5 percent asbestos level.
23         Did I read that correctly?
24         MS. ECHTMAN:  Same
```

Page 231

```
 1   objection.
 2         THE WITNESS:  You did read
 3   it correctly, yes.
 4   BY MS. O'DELL:
 5     Q.   And .6 percent asbestos
 6   Mr. Hicks would be equivalent to 6,000
 7   parts per million of asbestos, true?
 8         MS. ECHTMAN:  Objection to
 9   form.  And same objection on the
10   scope of the notice.
11         THE WITNESS:  Yes, your math
12   is correct.
13   BY MS. O'DELL:
14     Q.   And similarly, the JB
15   prickly heat powder results were
16   .5 percent asbestos, which would be the
17   equivalent of 5,000 parts per million --
18         MS. ECHTMAN:  Objection.
19   BY MS. O'DELL:
20     Q.   -- of asbestos?
21         MS. ECHTMAN:  Objection to
22   form and same objection with
23   respect to the scope of the
24   notice.
```

Page 232

```
 1         THE WITNESS:  Yes, that's
 2   the correct translation of percent
 3   of PPM.
 4   BY MS. O'DELL:
 5     Q.   If you'll turn to the next
 6   page.  Under RM spec requirement, the
 7   second line says that, "China raw
 8   material talc is supplied from Guilin
 9   Giguang."
10         Did I read that correctly?
11         MS. ECHTMAN:  Objection to
12   form, and objection with respect
13   to the scope of the notice.
14         THE WITNESS:  That is the
15   name of the milling company in
16   China that provides the talc to
17   the Chinese affiliate.
18   BY MS. O'DELL:
19     Q.   And also provides talc for
20   use in Baby Powder to be sold in the
21   United States?
22     A.   Actually, it does not.
23   Guilin does not provide low talc to the
24   U.S.
```

Page 233

```
 1     Q.   Well, the better answer to
 2   my question is Guilin mines the talc,
 3   sells it to Imerys, and Imerys buys the
 4   talc and sells it to Johnson's Baby
 5   Powder -- for Johnson's Baby Powder, but
 6   it originates from the same mine, true?
 7     A.   It's implied here, yes.
 8     Q.   In fact, if you'll turn
 9   over -- I think it's Page 5 or 6.  I'm
10   not sure, Mr. Hicks.  But it's a table
11   called "raw talc asbestos test in China
12   and Japan."
13     A.   Yeah, just to clarify the
14   last statement.  It's not absolutely
15   clear where Guilin is getting their talc
16   from.  That's the name of their company.
17   It may not be where they are sourcing
18   from.  But they're sourcing from that
19   same general area in South China.
20     Q.   If you'll turn over to, I
21   think it's Page 6 of the same document.
22     A.   What is the title of the
23   page?
24     Q.   "Raw Talc Asbestos Test in
```

Donald Hicks

Page 234

1    China and Japan." There's a table.
2    You'll see there's a yellow box at the
3    bottom of the page.  And that yellow box
4    references the Johnson & Johnson samples
5    that tested positive.
6        Do you see that?
7        MS. ECHTMAN:  Objection to
8      form, and same objection on scope
9      of the notice.
10   BY MS. O'DELL:
11       Q.   Do you see that, sir?
12       A.   Yes, I do.
13       Q.   And it says, "These two
14   batches are not for J&J but from the same
15   mine and grinding facility and adjacent
16   with J&J products."
17       Does that refresh your
18   memory that the talc was mined -- that
19   tested positive was mined from the same
20   area that sources Johnson's Baby Powder
21   in the U.S.?
22       MS. ECHTMAN:  Objection to
23      form.  Same objection on scope of
24      the notice.

Page 235

1        THE WITNESS:  I really can't
2      confirm or deny whether it was the
3      same exact mine based upon the
4      information provided.
5    BY MS. O'DELL:
6        Q.   Certainly what it states
7    there, isn't it, that it is -- we can
8    turn back to it.  The clear -- they are
9    from the same mine and grinding facility?
10       MS. ECHTMAN:  Objection to
11      form, and same objection on scope
12      of the notice.
13   BY MS. O'DELL:
14       Q.   Isn't that what the document
15   says, Mr. Hicks?
16       A.   Well, it is not the -- which
17   page are we looking at?  Sorry.  Before I
18   comment.
19       Q.   It's the chart.
20       MS. ECHTMAN:  Objection to
21      form, and same objection on scope
22      of the notice.
23   BY MS. O'DELL:
24       Q.   It says, "The two batches

Page 236

1    are not from" -- "for J&J, but from the
2    same mine and grinding facility."
3        Did I read that correctly?
4        MS. ECHTMAN:  Objection to
5      form, and same objection with
6      respect to the notice.
7        THE WITNESS:  So, it
8      indicates --
9    BY MS. O'DELL:
10       Q.   Just yes or no, sir?  Did I
11   read that correctly?
12       A.   Yes, you read it correctly.
13       Q.   And obviously that would be
14   a source of major concern if the talc
15   mine that provides talc for Johnson's
16   Baby Powder in the U.S. tested positive
17   for asbestos?
18       MS. ECHTMAN:  Objection to
19      form and same objection on the
20      scope of the notice.
21       THE WITNESS:  I don't think
22      there's anything here that tells
23      me that it's in fact the same
24      material that was tested by

Page 237

1    molecular engineering of medical
2    resources at the Normal
3    University, was in fact our
4    product, where it came from, what
5    the chain of custody was.
6        I mean, I really can't
7      comment on what this is.  It could
8      be counterfeit product for all I
9      know.
10   BY MS. O'DELL:
11       Q.   But a document produced by
12   Johnson & Johnson for a presentation on
13   May 15, 2009, the presentation at which
14   you were present, states that the talc
15   came from the same mine that sources
16   Johnson & Johnson Baby Powder for the
17   U.S., true?
18       MS. ECHTMAN:  Objection to
19      form and same objection on scope
20      of the notice.
21       THE WITNESS:  I agree that
22      that's what it says.  It's not the
23      same grinding facility that's used
24      in the ore, to be clear.

60 (Pages 234 to 237)

Donald Hicks

Page 238

1  BY MS. O'DELL:
2      Q.   It's the same mine?
3      A.   It may be.
4      Q.   It says it's the same mine,
5  doesn't it?
6          MS. ECHTMAN:  Objection.
7          THE WITNESS:  That's what it
8      says.  This is our only
9      information put together within an
10     eight-hour period of this being
11     discovered.  I don't really know
12     what that means, nor do I know
13     whether it's a qualified
14     laboratory that did the testing.
15         (Document marked for
16     identification as Exhibit
17     Hicks-18.)
18  BY MS. O'DELL:
19     Q.   Let me show you what I'm
20  marking as Exhibit 18, Mr. Hicks.
21  Mr. Hicks, at the time of the
22  presentation we were just looking at, the
23  May 15, 2009 presentation, did you
24  question the veracity of the document

Page 239

1  that was presented during that meeting?
2          MS. ECHTMAN:  Objection to
3      form, and same objection with
4      respect to the scope of the
5      notice.
6          THE WITNESS:  I did not.
7      I'm not sure that the veracity is
8      necessarily applicable here.
9  BY MS. O'DELL:
10     Q.   Did you question the
11  accuracy of the document during the
12  meeting?
13         MS. ECHTMAN:  Objection to
14     form, and same objection on the
15     scope of the notice.
16         THE WITNESS:  You're
17     referring to the document that was
18     presented by the Johnson & Johnson
19     Chinese team to the Chinese
20     government?
21  BY MS. O'DELL:
22     Q.   No, I'm talking about
23  Exhibit 17 that you were just looking at.
24  Excuse me, sir.  I'm talking about the

Page 240

1  PowerPoint presentation that we were
2  just -- we were just talking about.
3      A.   Okay.
4      Q.   During that meeting when
5  that was presented --
6      A.   I thought we had moved on to
7  this document.  Sorry.
8      Q.   No problem.  Did you
9  question the accuracy of that information
10  during the course of that meeting?
11         MS. ECHTMAN:  Objection to
12     form, and same objection on scope
13     of the notice.
14         THE WITNESS:  That was
15     the -- certainly one of the
16     discussion topics about whether
17     the lab that is being used by SFDA
18     and in fact knew how to test for
19     asbestos properly and had the
20     correct requirements and correct
21     methods.
22  BY MS. O'DELL:
23     Q.   Did you question the fact
24  that the PowerPoint contained a statement

Page 241

1  that the talc had come from the same mine
2  that sources Johnson & Johnson Baby
3  Powder for the North America?  Did you
4  question that statement during the
5  meeting?
6          MS. ECHTMAN:  Objection to
7      form, and same objection on the
8      scope of the notice.
9          THE WITNESS:  I don't recall
10     having that discussion.
11     Specifically.  Probably did.  I
12     don't have a recollection.
13  BY MS. O'DELL:
14     Q.   You don't know one way or
15  the other?  So you're speculating?  Fair
16  sir?
17     A.   Yes, it is speculation.
18         MS. ECHTMAN:  Objection.
19  BY MS. O'DELL:
20     Q.   Yes.  You have no basis to
21  say that you question the veracity or the
22  truthfulness of that statement in that
23  meeting as you're sitting here today, do
24  you?

61 (Pages 238 to 241)

Donald Hicks

Page 242

```
 1          MS. ECHTMAN:  Objection to
 2    form, and same objection on the
 3    scope of the notice.
 4          THE WITNESS:  I'm sure that
 5    this was discussed.  I'm not sure
 6    what you're question really is.
 7    BY MS. O'DELL:
 8       Q.   I think my question is --
 9       A.   Maybe it's the term
10    "veracity."
11       Q.   I think I said accuracy.  So
12    let me state my question again.
13          If there was not significant
14    evidence that the talc that was used in
15    the bottles that tested positive came
16    from the same mine that sources talc for
17    North America, would there have been a
18    task force formed and the level of
19    attention and effort had it not been from
20    the same mine?
21          MS. ECHTMAN:  Objection to
22    form, and same objection on scope
23    of the notice.
24          THE WITNESS:  It is a bit of
```

Page 244

```
 1          THE WITNESS:  Yeah, no, I
 2    don't think so.  I think that if
 3    this had been found on talc that
 4    was pulled from an Indian mine or
 5    a Brazil mine, we would have had
 6    the same response.
 7    BY MS. O'DELL:
 8       Q.   The Skillman team that you
 9    talked about.  That's what it was called,
10    right, the Core Skillman Talc Technical
11    Team?
12       A.   Yes, it exists at the global
13    headquarters for consumer, which is in
14    Skillman.
15       Q.   And the team was formed for
16    purposes of addressing these positive
17    asbestos test results from the Chinese
18    FDA, true?
19       A.   It was formed to help our
20    representatives in China respond to this
21    issue, get to the bottom of it, determine
22    if it was real or if it was not.  And
23    there were also 30 -- 36 or 37 other
24    companies that were engaged in the same
```

Page 243

```
 1    speculation, but let me comment
 2    that I think that any time someone
 3    reports to us that they found
 4    asbestos, or any other impurity
 5    for that matter, beyond the limits
 6    that have been defined, it would
 7    be an issue for us to want to
 8    address.
 9          In this case, a large group
10    of people were involved because it
11    involved folks in China and folks
12    in the U.S. supporting them.
13    BY MS. O'DELL:
14       Q.   Well, and the reason for
15    that is because it was believed and was
16    the case that the talc that was -- that
17    tested positive came from the same mine
18    as the talc that is used in Johnson's
19    Baby Powder here in the United States,
20    true?
21          MS. ECHTMAN:  Objection to
22    form and same objection on the
23    scope of the notice.  You can
24    answer.
```

Page 245

```
 1    kind of discussion.
 2       Q.   If you'll look at
 3    Exhibit 18, the Skillman Talc Technical
 4    Team included numerous executives
 5    responsible for Baby Powder including
 6    yourself.  You were chair of the
 7    committee, true?
 8          MS. ECHTMAN:  Objection to
 9    form and same objection on scope
10    of the notice.
11          THE WITNESS:  Yeah, I was
12    the coordinator for the committee,
13    yeah.
14    BY MS. O'DELL:
15       Q.   It says on Page 22, you were
16    chair.  I'm not trying to give you a job
17    you didn't want.  But it says you were
18    chair of the committee.
19       A.   It may well be.  But I don't
20    know that we assigned an official title
21    to anything.
22       Q.   Well, at least in your
23    e-mail of May 22nd to a large group of
24    people, you outline the Skillman Talc
```

62 (Pages 242 to 245)

Donald Hicks

Page 246

1  Technical Team activities from May 15th
2  to May 21st, and you list the team
3  members. You're the chair.
4         MS. ECHTMAN: Objection on
5     grounds that it's outside the
6     scope.
7  BY MS. O'DELL:
8     Q.   Do you see that?
9     A.   Yes, I do. Yes, I was the
10 person calling the meetings and writing
11 output from those meetings.
12    Q.   And the specific purpose of
13 this team was to address the issue that
14 had arisen as a result of the positive
15 test from the China FDA?
16        MS. ECHTMAN: Objection,
17    based on outside of the scope of
18    the notice.
19        You may answer.
20        THE WITNESS: That's
21    correct. Our primary role was to
22    support the team in China, who was
23    working with the SFDA to
24    understand the situation. We were

Page 247

1     more in a supporting role.
2  BY MS. O'DELL:
3     Q.   You not only interacted with
4  J&J employees in China, but you also
5  hired RJ Lee to perform testing of talc
6  samples to be provided to the Chinese
7  FDA, true?
8         MS. ECHTMAN: Objection.
9     Outside the scope of the notice.
10    You may answer.
11        THE WITNESS: Yes, we did
12    hire RJ Lee. They did both
13    testing and helped from a
14    technical -- helped the team in
15    China understand some of the
16    technical issues relative to
17    asbestos testing so they can talk
18    more intellectually with the SFDA.
19    The SFDA would only talk in
20    Chinese. And I don't communicate
21    in Chinese.
22 BY MS. O'DELL:
23    Q.   Johnson & Johnson engaged
24 the help and assisted in the activities

Page 248

1  of Personal Care Products Council to
2  communicate with the SFDA, lobbying them
3  to address the testing protocols that
4  were being used at that time by the
5  Chinese FDA, true?
6         MS. ECHTMAN: Objection to
7     form. And objection on the
8     grounds that it's outside the
9     scope.
10        THE WITNESS: It's really
11    outside of my scope of
12    orientation.
13        My understanding is that
14    there was communication -- I mean,
15    clearly PCPC or CTFA at that point
16    was aware that this was an issue
17    and was asking similar questions.
18 BY MS. O'DELL:
19    Q.   The -- RJ Lee participated
20 in meetings, training meetings with the
21 SFDA to train them on the manner in which
22 RJ Lee performed testing for the
23 detection of asbestos in talc, true?
24        MS. ECHTMAN: Objection.

Page 249

1     Outside the scope of the notice.
2         THE WITNESS: My
3     recollection is that RJ Lee
4     provided training to the Johnson &
5     Johnson folks in China relative to
6     asbestos, what is asbestos, how
7     you test for it, some of the
8     pitfalls of doing asbestos
9     training that you can get into, so
10    that those folks can have an
11    intelligent conversation with the
12    SFDA.
13        RJ Lee continued to be a
14    resource when questions came up
15    from the Chinese team after they
16    have gone to the SFDA and come
17    back and added some additional
18    questions, et cetera.
19 BY MS. O'DELL:
20    Q.   RJ Lee participated with
21 Johnson & Johnson employees in the
22 development of a position paper that was
23 presented to the SFDA, true?
24        MS. ECHTMAN: Objection.

63 (Pages 246 to 249)

Donald Hicks

Page 250

1     Outside of the scope.
2         THE WITNESS:  Yes.  That's
3     my recollection.
4  BY MS. O'DELL:
5     Q.    And the position paper urged
6  the -- China's FDA to adopt the asbestos
7  testing protocol that Johnson & Johnson
8  had been requiring or requires in their
9  specifications, CTFA J4-1, true?
10    A.    They were urging --
11        MS. ECHTMAN:  Objection.
12    Outside of the scope.
13        You can answer.
14        THE WITNESS:  They were
15    urging them to apply standardized
16    methods, well recognized within
17    industry, whether they be USP, the
18    European Pharmaceutical standards,
19    the Indian standards, some
20    standard document, some standard
21    testing process that is available
22    on a global basis.
23  BY MS. O'DELL:
24    Q.    And one of those standards

Page 251

1  and ultimately, the one that China was
2  persuaded to adopt was the CTFA JF-1
3  standard of XRD, and if there's a
4  questionable finding PLM, true?
5        MS. ECHTMAN:  Objection.
6    Outside the scope.
7        THE WITNESS:  It's not
8    clear.  They did not adopt CTFA.
9    Clearly they wrote their own
10    procedure in the end, and I'm sure
11    took CTFA procedure into
12    consideration and used much of
13    that.
14  BY MS. O'DELL:
15    Q.    What's the difference in the
16  procedure that China adopted and CTFA
17  J4-1?
18        MS. ECHTMAN:  Objection.
19    Outside the scope.
20        THE WITNESS:  Yeah, that's
21    outside the scope.
22        It is, you know, certainly
23    written different in format.  I
24    think the overall protocol is the

Page 252

1    same, but I have not specifically
2    seen the final output from SFDA
3    since it was written in Chinese.
4  BY MS. O'DELL:
5    Q.    And so as I understand what
6  you just said, overall is your
7  understanding -- neither one of us read
8  Chinese -- the SFDA standard is generally
9  the same as CTFA J4-1 along with the
10  incorporation of Test Method 7024.  Is
11  that your understanding?
12        MS. ECHTMAN:  Objection.
13    Outside the scope.
14        THE WITNESS:  That is my
15    general understanding, which of
16    course is nearly identical to the
17    USP version and to other
18    government testing versions for
19    asbestos that exist around the
20    world.
21  BY MS. O'DELL:
22    Q.    And following discussions
23  with members of industry, including
24  Johnson & Johnson, including Personal

Page 253

1  Care Products Council, the Chinese SFDA
2  ultimately adopted the protocol that we
3  just talked about and retested samples of
4  Baby Powder, true?
5        MS. ECHTMAN:  Objection to
6    form.  And outside the scope.
7  BY MS. O'DELL:
8    Q.    Among -- excuse me.  Among
9  others.  But they retested the samples
10  that had previously tested positive?
11        MS. ECHTMAN:  Objection to
12    form and outside the scope.
13        THE WITNESS:  Yeah, I think
14    there was an outcry from all the
15    companies that had been notified
16    of an issue.  And they were
17    pushing to adopt an industry
18    standard and making sure that in
19    fact the individuals that were
20    doing the testing were well
21    qualified and educated on the
22    proper way to do asbestos testing.
23  BY MS. O'DELL:
24    Q.    So the Baby Powder bottles

64 (Pages 250 to 253)

Donald Hicks

Page 254

```
 1    we've just been talking about originally
 2    tested positive for asbestos.  There was
 3    a period of time where there's
 4    discussions with industry.  And
 5    ultimately new samples were submitted to
 6    the SFDA for retesting by Johnson &
 7    Johnson, true?
 8         MS. ECHTMAN:  Objection.
 9         And objection as outside the
10         scope.
11         THE WITNESS:  My
12         recollection was that samples that
13         the SFDA had were obtained and
14         sent to RJ Lee as well for testing
15         and there was no asbestos detected
16         in those samples.
17    BY MS. O'DELL:
18         Q.   Mr. Hicks, I lost my exhibit
19    stickers.  Here we go.  Good.
20         Let me show you what I've
21    marked as Exhibit 19.
22         (Document marked for
23         identification as Exhibit
24         Hicks-19.)
```

Page 255

```
 1    BY MS. O'DELL:
 2         Q.   This is a PowerPoint dated
 3    May 26, ostensibly 2009.
 4         Do you see that?
 5         A.   Yes, I do.
 6         Q.   That would be 12 days after
 7    the original test was reported as a
 8    positive for asbestos, true?
 9         MS. ECHTMAN:  Objection.
10         And objection as outside the
11         scope.
12    BY MS. O'DELL:
13         Q.   True?
14         MS. ECHTMAN:  Same
15         objection.
16    BY MS. O'DELL:
17         Q.   Just to make sure we're
18    clear, this presentation was given
19    12 days after J&J learned that there were
20    positive asbestos tests for Johnson's
21    Baby Powder, true?
22         MS. ECHTMAN:  Objection.
23         Foundation.  Objection to form and
24         outside the scope.
```

Page 256

```
 1         THE WITNESS:  Yes.  The
 2         dates indicate that.
 3    BY MS. O'DELL:
 4         Q.   And if you'll turn to
 5    Page 4, you'll see that the National
 6    Building Material Industrial Bureau
 7    SFDA-designated lab -- do you see that
 8    line?
 9         A.   Yes, I do.
10         Q.   It says, "Date of test
11    communicated May 14, 2009."  These are
12    the test results we've been talking
13    about.  Reported failed according to SFDA
14    information.  And that was true for both
15    raw material talc batch and for JB
16    prickly heat powder.
17         Do you see that?
18         MS. ECHTMAN:  Objection to
19         form.  Foundation.  And same
20         objection on scope of the notice.
21    BY MS. O'DELL:
22         Q.   Is that true, sir?
23         A.   Yes, I do see that.
24         Q.   And on May 19, five days
```

Page 257

```
 1    later, new samples were submitted and
 2    retested.
 3         Do you see that?
 4         A.   Yes, I do.
 5         MS. ECHTMAN:  Same
 6         objection.  Form and foundation
 7         and outside the scope of the
 8         notice.
 9    BY MS. O'DELL:
10         Q.   And these new samples with
11    the new test methodology urged by
12    Johnson & Johnson resulted in a passing
13    test.  True?
14         MS. ECHTMAN:  Objection to
15         form and foundation and outside
16         the scope of the notice.
17         THE WITNESS:  Well, urged by
18         a consortium of cosmetic
19         manufacturing companies that were
20         affected by this in China.
21    BY MS. O'DELL:
22         Q.   Including Johnson & Johnson?
23         A.   Including Johnson & Johnson.
24         Q.   And the new samples resulted
```

65 (Pages 254 to 257)

Donald Hicks

Page 258

1    in a negative asbestos test?
2         MS. ECHTMAN:  Objection to
3    form and foundation and outside
4    the scope of the notice.
5    BY MS. O'DELL:
6    Q.    True?
7    A.    That's correct.
8    Q.    What was the Johnson
9    conference that took place in 2011?
10        MS. ECHTMAN:  Objection to
11   form.
12        THE WITNESS:  Yeah, it's not
13   specific enough for me to even
14   attempt an answer.
15   BY MS. O'DELL:
16   Q.    Okay.  Fair enough.  Let me
17   try to be more clear.  Was there a
18   conference in July of 2011 during which
19   the analysis of talc in regard to the
20   presence of asbestos was discussed by not
21   only members of the team at Johnson &
22   Johnson, but also Imerys and others?
23   A.    I don't have immediate
24   recollection of that.  It's possible.

Page 259

1    Q.    Do you recall a presentation
2    by Julie Pier entitled "Analysis of Talc
3    Containing Asbestos"?
4         MS. ECHTMAN:  Objection.
5         THE WITNESS:  I recall Julie
6    doing a -- doing different
7    presentations at different
8    meetings that we had with Imerys
9    folks.
10        (Document marked for
11   identification as Exhibit
12   Hicks-20.)
13   BY MS. O'DELL:
14   Q.    Let me show you what I'm
15   marking as Exhibit 20.  You've seen this
16   document before, Mr. Hicks?
17   A.    Give me a second.  Let me
18   take a look at it and see if...
19        Yeah, I actually do not
20   remember this particular presentation.
21   Q.    Was there a Johnson
22   conference that took place involving
23   employees of Johnson & Johnson to discuss
24   the development of a new method for the

Page 260

1    analysis of asbestos in talc?
2    A.    Not that I'm aware of.
3    Q.    Excuse me.
4    A.    It would be a bit unusual to
5    use the term "Johnson" without using
6    Johnson & Johnson or J&J conference.  So
7    I don't know where this was given or what
8    context it was given.
9    Q.    In terms of conferences, are
10   you aware of -- let me strike that and
11   start again.
12        Is it your testimony on
13   behalf of Johnson & Johnson that there
14   was not a conference entitled a Johnson &
15   Johnson conference hosted by Johnson &
16   Johnson for purposes of discussing a new
17   method for testing talc for asbestos?
18        MS. ECHTMAN:  Objection.
19   This is outside the scope of the
20   topics which relate to what
21   testing was actually used.  And
22   asked and answered.  I'll allow
23   the witness to answer outside of
24   the 30(b)(6) context.

Page 261

1         MS. O'DELL:  Excuse me, sir.
2    Let me respond to the objection.
3         This is well within the
4    scope of testing protocols and
5    specifications, and so I believe
6    it's well within the scope.  I'm
7    stating that for the record.
8    BY MS. O'DELL:
9    Q.    Are you saying that this
10   conference from which this PowerPoint --
11   for which this PowerPoint was prepared
12   was not related to Johnson & Johnson?
13        MS. ECHTMAN:  Objection to
14   form, and objection that it's our
15   view that it's outside of the
16   scope of the 30(b)(6).  But the
17   witness can answer outside of that
18   context to the extent that he
19   knows.
20        THE WITNESS:  So from my
21   perspective, I have no knowledge
22   as to why this was created and
23   where it was presented.
24        MS. O'DELL:  Michelle, would

66 (Pages 258 to 261)

Donald Hicks

Page 262

1    you mark that on the record.
2        MS. SHARKO:  Do you have
3    something that links this document
4    to J&J?  It's an Imerys document
5    with Bates numbers.
6        MS. O'DELL:  There are
7    references to it that it's the
8    Johnson conference that led us to
9    that it was a Johnson & Johnson
10   related conference.  All we can do
11   is ask the witness.
12       If he's saying that he's
13   here on behalf of Johnson &
14   Johnson to testify about protocols
15   that were used in testing talc and
16   he's not aware of it, he has no
17   knowledge, I'm going to mark it
18   for the record.  I'm going to go
19   back and look at the context, and
20   we may for another witness who can
21   speak to that topic.
22       MS. SHARKO:  Note our
23   objection because now you are
24   asking about something that is an

Page 263

1    Imerys document, not one of ours.
2    So if you can show us something
3    that links this to Johnson &
4    Johnson -- I mean, Johnson is
5    obviously a very common name.
6    We're happy to look at it and talk
7    to the witness.
8        But just, you know, putting
9    up a piece of paper up that says
10   Johnson on it that's not from our
11   files is somewhat concerning to
12   me.  If you don't have it or don't
13   want to give it, so be it.  We can
14   move on.  I just wanted to make
15   that point.
16       MS. O'DELL:  We're not
17   confined to Johnson & Johnson
18   documents, as you know.  We
19   certainly can and should be able
20   to cross-examine the witness on
21   Imerys documents.
22       I've asked the question.  He
23   says he has no knowledge of this.
24   I think it's well within the scope

Page 264

1    of the notice.  We'll look at it.
2    We've marked it for the record.
3    And we'll raise it with the Court
4    if it's something that we feel
5    that you produced a witness that
6    doesn't have sufficient
7    information.
8    BY MS. O'DELL:
9        Q.   Mr. Hicks, let's move to
10   another topic.
11       A.   Okay.
12       Q.   Excuse me.  Give me one
13   minute.
14       MS. ECHTMAN:  Do you want to
15   take a break?
16       THE WITNESS:  It's a good
17   time to take a break.  How long --
18   how long do you want to run?
19       MS. O'DELL:  Five minutes,
20   and I've got about an hour and
21   40 minutes on the record.  I don't
22   know that I'll take all that.  But
23   if you want to take a break, that
24   will be fine.

Page 265

1        THE WITNESS:  Yeah, I think
2    now is a good time.
3        THE VIDEOGRAPHER:  The time
4    is now 4:02.  Going off the
5    record.
6        (Short break.)
7        THE VIDEOGRAPHER:  The time
8    is now 4:22.  Back on the record.
9    BY MS. O'DELL:
10       Q.   Mr. Hicks, we were talking
11   about July 2011 just a few minutes ago.
12   And specifically in relation to the
13   Johnson & Johnson -- excuse me, the
14   Johnson conference that we may need to
15   follow-up on later.  But also in 2011,
16   did it come to Johnson & Johnson's
17   attention that the Chinese mining company
18   was not compliant with Johnson &
19   Johnson's testing specifications?
20       MS. ECHTMAN:  Objection to
21   form.
22       THE WITNESS:  From my
23   perspective, I haven't seen that
24   information.

67 (Pages 262 to 265)

Donald Hicks

Page 266

1    BY MS. O'DELL:
2        Q.   Okay.  Was Johnson & Johnson
3    aware are that the Chinese mining company
4    was not capable of complying with the
5    specifications contained in Johnson &
6    Johnson's specifications for talc?
7            MS. ECHTMAN:  Objection.
8            THE WITNESS:  I can't recall
9        seeing a document to that effect.
10   BY MS. O'DELL:
11       Q.   I think you mentioned
12   earlier a person named Mark Zappa.
13       A.   Yes.
14       Q.   He was a member of your
15   team, yes?
16       A.   Yes, he was.
17           (Document marked for
18       identification as Exhibit
19       Hicks-21.)
20   BY MS. O'DELL:
21       Q.   Let me show you what I'm
22   marking as Exhibit 21.
23           MS. O'DELL:  Did I give you
24       mine?

Page 267

1            MS. ECHTMAN:  I don't know.
2    BY MS. O'DELL:
3        Q.   Did you get a highlighted
4    one?
5        A.   I did not.
6            (Whereupon, a discussion was
7        held off the record.)
8    BY MS. O'DELL:
9        Q.   This is an e-mail dated
10   November the 17th, 2011.
11           Do you see that?
12       A.   Yes, I do.
13       Q.   And it's regarding Project
14   Heat.  What is Project Heat?
15       A.   We were looking at the
16   potential of performing heat sanitization
17   inhouse at the PTI Royston facility
18   instead of performing that at the Imerys
19   facility in Houston, Georgia.
20       Q.   Houston, Texas?
21       A.   Houston, Texas.  Sorry.
22       Q.   It's been a long day.
23           The beginning of the e-mail
24   reads, "Important.  Guilin" -- that's the

Page 268

1    Chinese mining company, correct?
2        A.   Yes.  Guilin, actually.
3        Q.   Sorry.  "Guilin certificate
4    of analysis for talc is not fully
5    compliant to J&J global talc
6    specification.  Guilin is not capable of
7    using some of our specification test
8    methods."
9            Did I read that correctly?
10       A.   Yes, you did.
11       Q.   So Johnson & Johnson was
12   aware that Guilin was not able to be
13   fully compliant with Johnson & Johnson's
14   global talc specifications, true?
15           MS. ECHTMAN:  Objection.
16       Outside the scope and I'll let the
17       witness answer outside the
18       30(b)(6) context.
19           MS. O'DELL:  Counsel, one of
20       the topics is all the entities
21       that were performing testing on
22       talcum powder, which would include
23       Guilin, and so it's well within
24       the scope and I would -- that's my

Page 269

1        response to your objection.
2    BY MS. O'DELL:
3        Q.   You may answer, sir.
4        A.   It doesn't say what testing
5    is at issue here.  And we were, at this
6    time, looking at the potential to
7    purchase directly from Guilin and have
8    the C of A come directly from them.  I
9    know that they did not have TEM inhouse.
10   They had to send it out to an external
11   laboratory for example.  Other testing
12   may have had to have been sent out as
13   well.  I don't know whether this refers
14   to inhouse, can they do the testing that
15   we were requiring.
16       Q.   And in terms of what was
17   stated in the e-mail, it appears they're
18   not fully compliant with the global talc
19   specification and they are not capable of
20   using some of the specification test --
21   specified test methods, but it's not
22   clear which ones they're not capable of
23   complying?
24       A.   Yeah, it's really not clear.

68 (Pages 266 to 269)

Donald Hicks

Page 270

```
 1    It really could be anything.
 2        Q.   But Guilin was conducting
 3    testing, completing certificates of
 4    analysis that were required by Johnson &
 5    Johnson?
 6        MS. ECHTMAN:  Objection.
 7        Outside of the scope as previously
 8        stated, which is limited to U.S.
 9        talc supply.
10        MS. O'DELL:  It was the U.S.
11        talc supply.  It was talc mined in
12        China for U.S. Baby Powder.  So
13        this is well within the scope.
14    BY MS. O'DELL:
15        Q.   So Guilin was conducting
16    testing at the mine that populated
17    certificates of analysis for talc that
18    was shipped to Houston for use in Baby
19    Powder, true?
20        MS. ECHTMAN:  Objection.
21        You can answer.
22        THE WITNESS:  No, I don't
23        think that's true.  They were
24        performing testing for their own
```

Page 272

```
 1    with the specifications in Johnson &
 2    Johnson's raw material specs?
 3        MS. ECHTMAN:  Objection.
 4        THE WITNESS:  I think that
 5        Imerys certainly did.  I think the
 6        issue for Johnson & Johnson is
 7        that they were mining tons and
 8        tons of talc for many different
 9        companies for many different
10        applications.  And it was more
11        important for us to test the ore
12        that we were actually getting
13        versus ore that we were not
14        getting.
15    BY MS. O'DELL:
16        Q.   Well, in terms of -- I'm not
17    talking about ore you weren't getting.
18    We are talking about ore that was mined
19    and provided to J&J and whether Guilin
20    was capable of complying with the
21    specifications outlined by J&J.  That's
22    the context of our discussion, correct?
23        A.   That is the context.  I
24    think we have to be careful though that
```

Page 271

```
 1    information.  They may have been
 2    providing those testing results to
 3    Imerys.  Imerys was providing
 4    testing results conducted by their
 5    own laboratories and that's what
 6    they were sending to J&J.
 7    BY MS. O'DELL:
 8        Q.   You just stated that Guilin
 9    was testing for their own information and
10    that Johnson & Johnson did not require
11    nor rely on the testing that Guilin
12    performed, do I understand your testimony
13    correctly?
14        A.   It was certainly part of the
15    overall safeguard from -- you know, from
16    a mine perspective.  But those test
17    results were being generated for either
18    themselves or for their direct customers.
19    And the testing that we had done was
20    being done through Imerys.
21        Q.   And you had no interest in
22    ensuring, based on what you're saying --
23    no interest -- Johnson & Johnson had no
24    interest in ensuring that Guilin complied
```

Page 273

```
 1    the Guilin -- Guilin was not just
 2    separating our ore and testing the ore
 3    that would then be shipped to Imerys and
 4    converted back.  They're testing samples
 5    for many different companies on a regular
 6    basis where they're the direct supplier
 7    to those companies.
 8        So our reliance was on
 9    testing the ore that we actually got in
10    Houston.  That's the ore that we wanted
11    tested.
12        Q.   And to the degree that data
13    from Guilin was provided to Johnson &
14    Johnson, Johnson & Johnson would have
15    wanted that data to be based on tests
16    that were compliant with its own
17    specifications, true?
18        MS. ECHTMAN:  Objection to
19        form.
20        THE WITNESS:  The Guilin
21        mine is providing talcum test
22        results to Imerys, not to
23        Johnson & Johnson.
24        (Document marked for
```

69 (Pages 270 to 273)

Donald Hicks

Page 274

```
 1       identification as Exhibit
 2       Hicks-22.)
 3   BY MS. O'DELL:
 4       Q.   Let me show you what I'm
 5   marking as Exhibit 21.
 6           MS. ECHTMAN:  Are we on 22?
 7           THE WITNESS:  Can I just
 8       make one comment on Exhibit 21?
 9           MS. O'DELL:  No, sir.  We're
10       moving on.
11   BY MS. O'DELL:
12       Q.   I'm sure your lawyer will
13   ask you questions if she's got to
14   follow-up.  But for interest of time, I
15   need to move on.
16       A.   Fine.
17       Q.   Exhibit 22.
18           MS. ECHTMAN:  Can we get
19       copies of 22, please?
20           MS. O'DELL:  I thought I
21       gave them to you.  Oh, sorry.
22       Excuse me.
23   BY MS. O'DELL:
24       Q.   So Exhibit 22 is an e-mail
```

Page 275

```
 1   from Alan Chen to yourself dated
 2   November 28, 2011.
 3           Do you see that?
 4       A.   Yes, I do.
 5       Q.   And he writes, "Hi, Don and
 6   Mark," referring to Mark Zappa.  "As for
 7   the talc method" -- "test method issue,
 8   as we all" -- "as we all involved in and
 9   have been aware that test method
10   discrepancy issue is now existing at both
11   suppliers, Guilin, J&J site QC, and RJ
12   Lee.  Currently as advised from the team
13   we need suppliers to strictly adopt those
14   outlined in RM 008967."
15           Do you see that?
16       A.   Yes, yes.
17       Q.   And does that make clear
18   that Guilin was not compliant with the
19   testing methods outlined in RM 008967.
20           MS. ECHTMAN:  Objection.
21           THE WITNESS:  Yeah, I do see
22       the discussion, yes.
23   BY MS. O'DELL:
24       Q.   Okay.  Let me -- you can put
```

Page 276

```
 1   that aside.
 2           (Document marked for
 3       identification as Exhibit
 4       Hicks-23.)
 5   BY MS. O'DELL:
 6       Q.   Let me show you what I've
 7   marked as Exhibit 23.
 8           This is an e-mail from Janet
 9   Stanish, who is from Pharma Tech, and she
10   is writing to Johnson & Johnson
11   employees.
12           Do you see that?
13   November 8, 2011.
14       A.   Yes, I do.
15       Q.   She is referring in her
16   e-mail to certificates of analysis
17   requirements.
18           Do you see that?
19       A.   Yes, I do.
20       Q.   And specifically to a
21   certificate of analysis from Guilin for
22   milled lot and ore lot specifications.
23   And you'll turn over, Mr. Hicks, just to
24   be -- maybe this would help you some.  On
```

Page 277

```
 1   Page 2.  You'll see that a certificate of
 2   analysis from Guilin for milled lot and
 3   ore had been provided to Pharma Tech.
 4           It says, "Some of the test
 5   methods used by Guilin are not the same
 6   as listed in RM 008967.
 7           Do you see that?
 8       A.   Yes, I do.
 9       Q.   So it does appear that
10   certificates of analysis were being
11   provided by Pharma Tech in relation to
12   talc supplied for Johnson's Baby Powder
13   and that those test methods did not
14   comply with RM 008967?
15           MS. ECHTMAN:  Objection.
16       Foundation.  Objection to form.
17           THE WITNESS:  So to first
18       put this in context, there was an
19       R&D -- excuse me -- an R&D
20       project, looking at -- and
21       procurement project to change --
22       to possibly change the way that we
23       purchased talc, received talc, and
24       the question was do we bring talc
```

70 (Pages 274 to 277)

Donald Hicks

Page 278

1    in directly from the supplier as
2    the mining milling operation in
3    China.
4         And what this refers to is
5    that an initial cut and then
6    putting together a certificate for
7    that potential process was created
8    and sent to us for comment and
9    review.  Folks looked at it,
10   commented back.
11        So this is very much an
12   in-process.  This was not anything
13   to do with actual production.
14   This was an R&D project that we
15   were potentially getting ready to
16   initiate and ultimately the
17   decision was to cancel this
18   project.
19   BY MS. O'DELL:
20        Q.   In addition --
21        A.   And I --
22        Q.   Excuse me.
23        A.   And I suspect that -- this
24   is 22? -- that Exhibit 22 probably

Page 279

1    connects to the same thing.
2         Q.   In addition to Guilin's
3    inability to comply with the
4    specifications for whatever reason,
5    Ms. Stanish also writes that she's having
6    difficulty establishing linkage between
7    the COA and quarterly or testing
8    documents.  And this is a requirement for
9    me per section 10.0 of the spec.
10        So in addition to the
11   failure to comply with the testing,
12   there's also an inability to link the
13   test results with the ore itself, true?
14        MS. ECHTMAN:  Objection.
15        THE WITNESS:  No, I don't
16   think that's true.  I think that
17   there was a draft C of A that was
18   requested to be prepared by the
19   Guilin mulling company, which we
20   were not using on a regular basis.
21   We asked them to send it out, take
22   a look at it.  Folks both at PTI
23   and Johnson & Johnson did look at
24   it.  And they're making comments

Page 280

1    back that this isn't clear, you
2    know, this is not the test that
3    we -- that we recommend for
4    whatever topic is covered here in
5    these various sections.
6    BY MS. O'DELL:
7         Q.   Was the Guilin mill used to
8    process talc for use in Baby Powder to be
9    sold in the U.S.?
10        A.   No.
11        Q.   We talked -- thank you, sir.
12   You can put that aside.
13        We've talked several times
14   today about RJ Lee being the sole outside
15   lab that was hired by Johnson & Johnson
16   to test its talcum powder products.
17        Do you recall an audit of RJ
18   Lee that took place in March of 2012?
19        MS. ECHTMAN:  Objection.
20   Foundation.
21        THE WITNESS:  I do recall
22   that audit, yes.
23        (Document marked for
24   identification as Exhibit

Page 281

1    Hicks-24.)
2    BY MS. O'DELL:
3         Q.   I'll hand you what I've
4    marked as Exhibit 24.  It's a report from
5    that audit.  This is a Johnson & Johnson
6    Consumer Products worldwide audit report,
7    correct?
8         A.   That is correct, yes.
9         Q.   And this would be a document
10   that would be generated in the normal
11   course of business, true?
12        A.   It would be, yes.
13        Q.   And the audit took place on
14   -- excuse me, not on, but during March of
15   2012.
16        A.   It did, yes.
17        Q.   The audit was performed by
18   members of the QC team.
19        Do you see that?
20        A.   It was the QA team.  Quality
21   assurance, yes.
22        Q.   And quality assurance team
23   would have been at least in part under
24   your supervision at this time?

71 (Pages 278 to 281)

Donald Hicks

Page 282

1    A.   These individuals were not,
2  but we were working within the same
3  broad-based quality assurance unit.
4    Q.   If you'll turn to Page 4 of
5  7, you'll find an observation rating
6  classification.
7    A.   Yes, I see that.
8    Q.   And this audit that was
9  conducted was conducted of RJ Lee, true?
10   A.   Yes.
11   Q.   And part of the audit
12 process has this observation rating
13 classification, the most serious of which
14 is entitled critical.
15      Do you see that?
16   A.   Yes, I do.
17   Q.   And, "An observation is
18 defined as critical when any one or more
19 of the following conditions apply:  One,
20 any nonconformance or noncompliance that
21 already has or if allowed to continue
22 presents a high risk of adversely
23 affecting product performance, safety,
24 therapeutic efficacy, or regulatory

Page 283

1  requirements.
2        "Two, the observation
3  represents the complete absence and/or
4  systematic application of one or more
5  quality system elements or system
6  components necessary to meet regulatory
7  requirements.
8        "Three, the observation is a
9  repeated major relates to failure to meet
10 a commitment made to the regulatory
11 authority."
12      Turn over to the next page,
13 Mr. Hicks.
14      By the way, did you review
15 this in preparation for your deposition?
16   A.   I have seen this one, yes.
17   Q.   And RJ Lee received a
18 critical observation in relation to
19 certain testing methods, true?
20      MS. ECHTMAN:  Objection to
21 form.
22      THE WITNESS:  They did
23 receive a critical observation in
24 that essentially the documents

Page 284

1  were not available at the time of
2  the audit.
3  BY MS. O'DELL:
4    Q.   It says, number one, they
5  did not have TM 7164 and were using IP
6  2007, which would not be in compliance
7  with the raw materials specification
8  sheet that -- instituted by J&J, correct?
9        MS. ECHTMAN:  Objection.
10       THE WITNESS:  That's what it
11   reads, yes.
12 BY MS. O'DELL:
13   Q.   They had no current TM 7024
14 for asbestos testing at the site.  And RJ
15 Lee indicated that the test method was
16 not optimal for asbestos testing.  So
17 they had not been -- evidently not been
18 using it; is that correct?
19       MS. ECHTMAN:  Objection.
20       THE WITNESS:  Yes, that's
21   what it indicates here, yes.  I
22   might add RJ Lee did in fact
23   respond to all of these and these
24   documents were unavailable because

Page 285

1  the people that manage the
2  document control system for RJ Lee
3  were not there the day of the
4  audit and were not able to pull
5  them up on their system.  But if
6  you had their response and
7  corrective action, you'd be able
8  to see that.
9  BY MS. O'DELL:
10   Q.   The critical nature of the
11 observation was such that -- it wasn't --
12 despite RJ Lee's response, the critical
13 observation was not amended to be removed
14 by the audit team, was it?
15       MS. ECHTMAN:  Objection.
16       THE WITNESS:  It was
17   responded to by RJ Lee and
18   reviewed by the audit team.
19 BY MS. O'DELL:
20   Q.   And there was no change in
21 the audit report following RJ Lee's
22 response to the audit, correct?
23   A.   We typically would not
24 change audit reports once they have been

72 (Pages 282 to 285)

Donald Hicks

Page 286

1    written.  We respond to the statements.
2        Q.   All right.  So without a
3    change to the audit report, a critical
4    observation remained on RJ Lee's record,
5    if you will, within Johnson & Johnson?
6        MS. ECHTMAN:  Objection.
7        THE WITNESS:  That's my
8    recollection, yes.
9    BY MS. O'DELL:
10       Q.   And based on that audit,
11   which had not only that critical finding,
12   but other negative findings, a
13   determination was made within Johnson &
14   Johnson that RJ Lee could not be
15   classified as a GMP release test lab,
16   true?
17       A.   Based upon the initial
18   comments from the audit, that was the
19   conclusion.  However, RJ Lee did respond.
20   This critical observation was addressed
21   very, very quickly by them.  Most of it
22   was miscommunication between the auditor
23   and the folks that were available on
24   site.

Page 287

1        Q.   That was not my question,
2    sir.
3        A.   But it's important to have
4    the context, I think.
5        Q.   Okay.  I think your
6    question -- your response does not --
7    your answer was not responsive to my
8    question.  So let me just ask you again.
9        There was a critical
10   observation on RJ Lee's audit, true?
11       A.   Yes.
12       Q.   RJ Lee responded, true?
13       A.   Yes, they did.
14       Q.   That observation of critical
15   deficiencies remained on the audit after
16   RJ Lee responded, true?
17       MS. ECHTMAN:  Objection.
18       THE WITNESS:  It is standard
19       practice to leave it on the audit,
20       the original findings, yes, even
21       though it may have been corrected
22       or a miscommunication.
23   BY MS. O'DELL:
24       Q.   Based on the audit -- let me

Page 288

1    just say this.
2        Q.   RJ Lee was being considered
3    to be a testing lab for release purposes,
4    true?
5        MS. ECHTMAN:  Objection.
6        THE WITNESS:  They were
7    being considered for -- not for
8    release purposes, but for
9    monitoring of talc across the
10   globe.
11       (Document marked for
12   identification as Exhibit
13   Hicks-25.)
14   BY MS. O'DELL:
15       Q.   I'll show you what I've
16   marked as Exhibit 25.  This e-mail is
17   dated April 16, 2012.  Excuse me.  Yes,
18   April 16, 2012.
19       Do you see that?
20       A.   I do see that.
21       Q.   After the audit of RJ Lee.
22   And it is written by Michael Hollweck, a
23   quality assurance manager to yourself,
24   Mark Zappa, and Tom Himmelsbach.

Page 289

1        Do you see that?
2        A.   Yes, I do.
3        Q.   And Mr. Hollweck writes,
4    "All, please see the attached audit
5    report for the audit conducted by myself
6    and Sue Butler of RJ Lee as a release
7    testing facility."
8        Does that refresh your
9    memory that RJ Lee was being considered
10   as a release testing facility?
11       MS. ECHTMAN:  Objection.
12   Foundation.
13       THE WITNESS:  I think
14   Mr. Michael Hollweck was confused.
15   They were not being considered for
16   a release testing facility.  There
17   was no indication or project to
18   address that.
19   BY MS. O'DELL:
20       Q.   "Based on the results of our
21   audit we cannot classify them as a site
22   that can conduct GMP" -- good
23   manufacturing practices -- "releases for
24   Johnson & Johnson since there was one

73 (Pages 286 to 289)

Donald Hicks

Page 290

1    critical observation."
2         Did I read that correctly?
3         A.   You did.
4         Q.   In addition to the critical
5    observation in the audit that we've just
6    been talking about, Mr. Hicks, RJ Lee
7    also had two other major negative
8    observations and three other minor
9    observations, true?
10        A.   Yes.
11        Q.   And a major observation is,
12   "Any nonconformance or noncompliance that
13   if allowed to continue has a moderate
14   risk of adversely affecting product
15   performance, safety, therapeutic efficacy
16   or regulatory requirements.  The
17   observation represents the significant
18   gap and/or gaps in application of one or
19   more quality systems, elements, or system
20   components necessary to meet regulatory
21   requirements.  This includes systemic
22   lack of documented evidence of
23   application and the key elements, any
24   isolated noncompliance in not reporting,

Page 291

1    or reporting late any required regulatory
2    health authority reports or notification
3    is a major."
4         Did I read that correctly?
5         MS. ECHTMAN:  Objection.
6         MS. SHARKO:  Now, how is
7    "did I read that correctly"
8    appropriate 30(b)(6) testimony?  I
9    think we're going to have to take
10   it to the judge.  That's not the
11   purpose of the 30(b)(6)
12   deposition.
13        MS. O'DELL:  Certainly it
14   is.  Susan, I can ask the witness
15   about a document, a Johnson &
16   Johnson document, and ask him if I
17   present him with a document and
18   ask him if I read something
19   correctly.  That's perfectly
20   appropriate.
21   BY MS. O'DELL:
22        Q.   I think you said I read that
23   correctly, Mr. Hicks.
24        In the 2012 audit, RJ Lee

Page 292

1    had one critical, three major
2    observations, and three minor
3    observations, true?
4         A.   That's correct.
5         Q.   Couldn't call that a
6    positive audit, could you?
7         MS. ECHTMAN:  Objection.
8         THE WITNESS:  I think the
9    term "positive" is very general.
10   I think typically when we do
11   audits we have findings and RJ
12   responded to those findings.
13   BY MS. O'DELL:
14        Q.   Findings that were negative
15   and that called into question the testing
16   being performed at their lab, true?
17        MS. ECHTMAN:  Objection.
18        THE WITNESS:  I don't
19   believe so.  We continued to use
20   those results, continued to use RJ
21   Lee, and those corrective actions
22   were addressed.  Either they
23   turned out to not be accurate, or
24   they were corrected.

Page 293

1    BY MS. O'DELL:
2         Q.   Or Johnson & Johnson
3    overlooked them?
4         MS. ECHTMAN:  Objection.
5         THE WITNESS:  I don't think
6    that's the case.  There's no
7    evidence to support that.
8    BY MS. O'DELL:
9         Q.   Well, in 2016, Johnson &
10   Johnson conducted another audit of RJ
11   Lee.
12        A.   Yes, we did.
13        Q.   And did you review that
14   audit report in preparation for your
15   testimony here today as a 30(b)(6)
16   witness for J&J?
17        A.   Yes, I did.
18        (Document marked for
19        identification as Exhibit
20        Hicks-26.)
21   BY MS. O'DELL:
22        Q.   I'll show you what I'm
23   marking as Exhibit 26.  Is that a copy of
24   Johnson & Johnson's audit report of RJ

74 (Pages 290 to 293)

Donald Hicks

Page 294

1 Lee in relation to their audit dated
2 March 21-22, 2016?
3      A.   Yes, it is.
4      Q.   If you'll turn to Page 2,
5 audit detail at the top of the page.
6 According to this, the purpose of the
7 audit was as follows:
8           "The site was audited to
9 requirements of the FDA and Johnson &
10 Johnson.  An assessment was conducted for
11 the firm's overall capabilities to
12 successfully perform analytical testing
13 of J&J samples to regulatory and J&J
14 specifications, requirements and
15 expectations."
16           Was that the purpose of the
17 audit of RJ Lee by Johnson & Johnson?
18           MS. ECHTMAN:  Objection.
19           THE WITNESS:  I think it's a
20 general statement.  It is.  It
21 does not say for release testing,
22 which is not the case with RJ Lee.
23 BY MS. O'DELL:
24      Q.   I didn't ask you, sir, about

Page 295

1 release testing.  I just asked you, was
2 that the purpose of the audit in 2016?
3 Is that what the report says?
4           MS. ECHTMAN:  Ms. O'Dell, I
5 want to point out because there
6 was discussion earlier about what
7 was permissible in terms of
8 commenting on the witness's
9 answers.
10           And the letter to Honorable
11 Joel Pisano says, "The parties
12 shall cooperate during the course
13 of examination, will refrain from
14 unnecessary colloquy and
15 objections to answers and to
16 questions."
17           And so I just want to point
18 out that your question was asked
19 and answered.  And we should not
20 be moving to strike or telling the
21 witness that he didn't answer your
22 question when he did.  But I'll
23 let you go ahead.
24           MS. O'DELL:  I think my

Page 296

1           comment was I didn't ask him about
2 release testing.  And that was
3 very clear from my question.  I
4 just asked for the purpose of the
5 audit.
6 BY MS. O'DELL:
7      Q.   And so we're clear,
8 Mr. Hicks, the purpose of this audit was
9 to assess whether -- to assess the firm's
10 overall capabilities to successfully
11 perform analytical testing of J&J samples
12 to regulatory and J&J specifications,
13 requirements, and expectations.  That's
14 the stated purpose of this audit, true?
15      A.   It is, yes.
16      Q.   Was a rating assigned to RJ
17 Lee as a result of this audit?
18      A.   An audit rating was
19 assigned, yes.
20      Q.   And that rating was
21 marginal?
22      A.   Yes, it was.
23      Q.   If you'll turn to Page 10 of
24 14, it lists the observations from the

Page 297

1 audit.
2           The first observation
3 relates to the cleanliness of the lab and
4 equipment.
5           Do you see that?
6      A.   Yes, I do.
7      Q.   The second observation,
8 which is also a major observation,
9 relates to, "Performance qualification
10 has not been completed for XRF testing.
11 The PQ needs to be closed out.  The
12 associated procedures for the operation
13 and maintenance of the XRD 019 and XRD
14 026 lab equipment need to be effective
15 rather in draft and training completed as
16 soon as possible."
17           It goes on to say, "Software
18 validation, specific parameters on XRF
19 should have been applied when the
20 original samples were analyzed.  RJ Lee
21 must ensure these talc parameters are
22 validated for use in the XRD and XRF
23 equipment so that an analysis" -- excuse
24 me -- "that an analyst conducts a test

75 (Pages 294 to 297)

Donald Hicks

Page 298

1    with only the required parameters for
2    each test."
3        So two major observations.
4    One relating to the cleanliness of the
5    lab. Second relating to the fact that
6    XRD, one of the XRD machines is not
7    compliant in terms of software
8    validation.
9        MS. ECHTMAN: Objection.
10   BY MS. O'DELL:
11       Q. XR -- did I read that
12   correctly?
13       A. That is the indication from
14   reading this document, yes.
15       Q. And XRD is one of the major
16   types of tests that is performed on talc
17   samples, correct?
18       A. Yes, it is.
19       Q. XRD is performed on every
20   talc sample, correct?
21       A. That's correct.
22       Q. And having a machine that
23   has software that has not been validated
24   for specific talc parameters is a major

Page 299

1    concern in terms of the accuracy of the
2    testing, correct?
3        MS. ECHTMAN: Objection.
4        THE WITNESS: I don't know
5        that it says here that it's a
6        concern about the accuracy of the
7        testing.
8    BY MS. O'DELL:
9        Q. I'm asking you that
10   question. If the software is not
11   validated and it's not programmed to be
12   compliant with talc specifications, that
13   calls into question the results of the
14   testing performed by that XRD machine?
15       MS. ECHTMAN: Objection.
16       THE WITNESS: Not -- not
17       necessarily. I think the context
18       here is unclear, particularly
19       without comments from RJ Lee
20       relative to this observation.
21   BY MS. O'DELL:
22       Q. Well, this audit was
23   performed by employees of Johnson &
24   Johnson, true?

Page 300

1        A. Who are not experts in XRD
2    analysis.
3        Q. But they certainly had a
4    concern that the XRD had not been
5    programmed with specific talc parameters,
6    correct?
7        MS. ECHTMAN: Objection.
8        THE WITNESS: The
9        consequence of that is very much
10       unclear. I think the fact that
11       it's reported as a major, not a
12       critical, suggests that it's not a
13       -- not the strong issue that would
14       result in incorrect results.
15   BY MS. O'DELL:
16       Q. It doesn't say that on the
17   audit report though, does it?
18       MS. ECHTMAN: Objection.
19       THE WITNESS: No, but the
20       definition of a critical
21       observation is something that
22       would affect the outcome of the
23       results of the acceptability of
24       the material for release.

Page 301

1    BY MS. O'DELL:
2        Q. And the definition of a
3    major observation also involves issues of
4    health and safety, correct?
5        A. It also does, yes.
6        Q. If you'll turn to Page 11 of
7    14. This is another major finding
8    relating to the testing of talc in the
9    presence of chrysotile.
10       Do you see that?
11       A. Yes, I do.
12       Q. It says, "In several
13   instances a CAR" -- what's a CAR
14   Mr. Hicks, do you know?
15       A. It's commonly referred to as
16   a corrective action request or a report.
17       Q. -- "was not opened to
18   document why there was the presence of
19   chrysotile, white asbestos, in J&J
20   analytical reports." It says, "Tracking
21   sheet is used to list the sample number,
22   the initials date of a person who prepped
23   the samples and the initial" -- "and the
24   initial and the date of the analyst, the

76 (Pages 298 to 301)

Donald Hicks

Page 302

1    samples are split six ways for PLM, TEM,
2    XRD, XRF and two P-cup size containers
3    for CHEM."  And then, "In 5756-3, absence
4    of asbestos.
5        Then it goes on to say,
6    "Sample labels include sample number,
7    product number, or lot.
8        "The lab report stated that
9    for each talc sample number there was no
10   asbestiform minerals detected.  The
11   report was signed by Craig Huntington,
12   analyst, on 2/11/2016.  The tracking
13   sheet listed that final proofreading by
14   manager was done 2/11/2016, the same day.
15   Point count data sheet for the samples
16   indicated that there were no asbestos
17   (chrysotile, amosite, crocidolite,
18   anthrophyllite, tremolite, actinolite) or
19   non-asbestos fibers (cellulose,
20   fiberglass, et cetera).
21       "Polarized light microscopy
22   point count worksheet for asbestos
23   analysis of bulk samples, white talc
24   powder was reviewed.

Page 303

1        "The verified sample login
2    data sheet was completed for samples by
3    Linda M. on 2/8/2016.  The samples were
4    reprepped and analyzed on February 22nd,
5    2016.  It indicated that the sample in ID
6    3138494 had multiple chrysotile
7    particulate" -- or "particles."
8        Do you see that?
9        MS. ECHTMAN:  All right.
10   Objection.  Objection to you
11   reading portions of a document
12   incompletely into the record and
13   asking the witness if he sees
14   that, is not a proper question.
15       MS. SHARKO:  We're going to
16   take a break and call Judge
17   Pisano.  And then we will find out
18   what's appropriate or not.
19       MS. O'DELL:  Why can't I ask
20   him about an audit report and read
21   a portion and put it in context.
22   If I didn't, the objection would
23   be it's out of context.  And so
24   I've given him full context.  I'm

Page 304

1    asking if I read it correctly.
2    And now I'm going to ask him
3    further questions about it.
4        I think that's very
5    appropriate.
6        MS. SHARKO:  I disagree.  We
7    have a judge available.  Let's
8    call him and find out.  This won't
9    come off of your seven hours.
10       MS. O'DELL:  Let's go off
11   the record.
12       THE VIDEOGRAPHER:  The time
13   is now 5:14.  Going off the
14   record.
15       (Short break.)
16       THE VIDEOGRAPHER:  The time
17   is now 5:25.  Back on the record.
18   BY MS. O'DELL:
19       Q.   Mr. Hicks, when we went off
20   the record, we were discussing the
21   March 2016 audit by J&J of RJ Lee.  And
22   we were reviewing an audit finding, a
23   major audit finding that started on Page
24   11 and had continued onto Page 12

Page 305

1    regarding the retesting of a talc sample.
2    Does that reorient you where we were?
3        A.   Yes, it does.
4        Q.   All right.  RJ Lee had
5    tested a sample and it had been reported
6    as no asbestos present, correct?
7        MS. ECHTMAN:  Objection.
8        THE WITNESS:  It's a little
9    difficult to tell from this.  But
10   I believe that's the case, yes.
11   BY MS. O'DELL:
12       Q.   The sample was retested on
13   February 22, 2016.  And multiple
14   chrysotile particles were found, true?
15       MS. ECHTMAN:  Objection.
16       THE WITNESS:  That's what
17   this indicates, yes.
18   BY MS. O'DELL:
19       Q.   The retesting of the sample
20   was not documented adequately for sample
21   failure and it was "no root cause" for
22   the issue was documented.  Is that what
23   the audit team found in relation to this
24   particular incident?

77 (Pages 302 to 305)

Donald Hicks

Page 306

1          MS. ECHTMAN:  Objection.
2          THE WITNESS:  Yes, the
3     question was around -- the audit
4     observation was around the
5     documentation practices in those
6     situations.
7  BY MS. O'DELL:
8     Q.   Were the results for the
9  initial sample testing for this
10 particular sample, which was ID'd as
11 3138494, provided to Johnson & Johnson?
12         MS. ECHTMAN:  Objection.
13         THE WITNESS:  I do not know
14    that.
15 BY MS. O'DELL:
16    Q.   Did RJ Lee make Johnson &
17 Johnson aware of this retesting of the
18 sample without proper documentation prior
19 to -- excuse me.  I skipped a word.  Let
20 me start over.
21         Did RJ Lee report to
22 Johnson & Johnson the positive test
23 result for multiple chrysotile particles
24 prior to the audit?

Page 307

1          MS. ECHTMAN:  Objection.
2          THE WITNESS:  Not to my
3     knowledge.  No, but it does
4     indicate here that it was reported
5     in the J&J project report.  It's
6     not clear whether that was a
7     report that was sent to us or not.
8  BY MS. O'DELL:
9     Q.   And test results from RJ Lee
10 would have, according to the normal
11 procedure, been provided to your
12 department, the quality assurance
13 department?
14    A.   If it was in fact our group
15 submitting the samples for evaluation.
16 R&D as well was submitting samples
17 independently for evaluation.
18    Q.   But for quarterly test
19 results that were -- excuse me, for
20 quarterly tests that were being performed
21 on talcum powder samples, those test
22 reports came to your office as a matter
23 of course?
24    A.   Yes, they did.

Page 308

1     Q.   What procedure was in place
2  to alert Johnson & Johnson if asbestos
3  fibers were found in a talcum powder
4  sample?
5          MS. ECHTMAN:  Objection.
6          THE WITNESS:  Relative to RJ
7     Lee?
8  BY MS. O'DELL:
9     Q.   Yes.
10    A.   There was an open dialogue
11 between the two principals, including
12 myself, relative to any issue should be
13 shared immediately if a confirmed issue
14 was -- was determined.
15    Q.   The two principals that
16 you're referring to are yourself and Drew
17 Van Orden for RJ Lee?
18    A.   Yes.
19    Q.   And this open dialogue was
20 communications between the two of you?
21    A.   Yeah, we communicated on a
22 regular basis.  Yes.
23    Q.   All right.  But there was no
24 written policy directing Mr. Van Orden

Page 309

1  or anyone else at RJ Lee of the steps
2  that needed to be taken if a positive
3  talc -- if a talc sample had tested
4  positive for asbestos?
5          MS. ECHTMAN:  Objection.
6          THE WITNESS:  Well, the
7     requirement was none detected.  So
8     if it was confirmed as being
9     detected, that would be a failure.
10    And failures, of course, would
11    have been reported.
12 BY MS. O'DELL:
13    Q.   And what were -- what were
14 the reporting requirements for failed
15 test?
16         MS. ECHTMAN:  Objection to
17    form.
18         THE WITNESS:  To report it
19    immediately.
20 BY MS. O'DELL:
21    Q.   How?
22    A.   It might be through a phone
23 call.  It might be through an e-mail.
24    Q.   Was there any other --

Donald Hicks

Page 310

1  excuse me.  Strike that.
2          Was there a written policy
3  by J&J directing you as to how to handle
4  a positive test result for asbestos in
5  talcum powder?
6      A.   No.  There was a written
7  policy on how to handle specification
8  failures.
9          MS. SHARKO:  Why don't I
10         suggest setting up a dial-in, say,
11         at 7:30 tonight?
12         MS. O'DELL:  That works.
13 BY MS. O'DELL:
14     Q.   Let me ask some questions
15 about Pharma Tech just to make sure I've
16 covered that.
17     A.   Are we moving off this
18 exhibit?
19     Q.   Yes.  Was Pharma Tech
20 qualified for release testing during --
21 from 2006 to 2017?
22     A.   They were qualified to do
23 some release testing, yes.
24     Q.   But they were not qualified

Page 311

1  to do all the testing that would be
2  necessary to comply with the raw
3  materials specifications, correct?
4      A.   That's correct.  They in
5  fact did not have the equipment needed to
6  do any of those tests.
7      Q.   I think you mentioned this
8  earlier.  The testing they could do
9  was -- well, remind me.  What are the
10 tests that Pharma Tech could perform
11 within their testing facilities?
12     A.   So physical appearance.
13 They could do bulk density.  They could
14 do screening analysis.  They could do the
15 microbiological testing.
16     Q.   But they were not qualified
17 to test for arsenic, for example?
18     A.   No, they were not.
19     Q.   Heavy metals?
20     A.   No.
21     Q.   Asbestos certainly?
22     A.   No.  As I said they didn't
23 have the equipment to do that kind of
24 analysis.

Page 312

1      Q.   Mr. Hicks, let me show you
2  what I'm going to mark as Exhibit 27.
3          (Document marked for
4          identification as Exhibit
5          Hicks-27.)
6  BY MS. O'DELL:
7      Q.   I've handed you a document
8  entitled "Attestation Regarding Use of
9  Talc in J&J Body Powders" dated
10 December 19, 2014.  And this is a
11 document that you signed on behalf of
12 Johnson & Johnson as senior director
13 North America business quality and
14 compliance, Baby and Caribbean.
15         What is the purpose of this
16 document?
17     A.   There was a request from our
18 regulatory team to provide an attestation
19 regarding which baby powders and
20 head-to-toe body powders over the past
21 13 years contained talc.
22     Q.   What regulatory body
23 requested this information?
24     A.   I don't specifically recall

Page 313

1  at this point.  It was funneled through
2  our regulatory affairs team.
3      Q.   Is it your understanding
4  that this document was made a part of a
5  submission to the Food and Drug
6  Administration?
7      A.   It may have been.  I don't
8  recall specifically where it was used.
9      Q.   I'm going to show you a
10 series of documents, Mr. Hicks, that are
11 certificates of analysis.  And what I'd
12 like to know is based on the form of the
13 time period the certificate of analysis
14 was in effect and at what point in the
15 manufacturing process that that would
16 have been the appropriate certificate of
17 analysis.
18         (Document marked for
19         identification as Exhibit
20         Hicks-28.)
21 BY MS. O'DELL:
22     Q.   First let me show you what
23 I'm going to mark as Exhibit 28.  Is --
24 one, is this an exhibit -- excuse me -- a

Donald Hicks

Page 314

1    certificate of analysis that would be
2    required by the raw materials
3    specification RM 8967?
4              MS. ECHTMAN:  I just want to
5         object and note that it says it's
6         the Glacier 200 FCC talc.
7              MS. O'DELL:  Okay.
8    BY MS. O'DELL:
9         Q.   Let me just ask you.  Is
10   Glacier 200 FCC talc, talc that would be
11   used in Baby Powder?
12        A.   It is not.
13        Q.   Okay.  That's easy.  I'm not
14   trying to ask a trick question.  We've
15   got a ton of these, we're trying to
16   figure out what they go to and at what
17   point in the process.
18              (Document marked for
19         identification as Exhibit
20         Hicks-29.)
21   BY MS. O'DELL:
22        Q.   I'm going to show you
23   another one.  I'm going to mark it as
24   Exhibit 29.  Give me a moment.  I've lost

Page 315

1    my folder for that one so.  Here we go.
2              This is a certificate of
3    analysis that's required by the raw
4    materials Specification 8967?
5         A.   It does reference that J&J
6    specification in the C of A, yes.
7         Q.   And at what point in the
8    manufacturing process is this certificate
9    of analysis supposed to be generated?
10        A.   So this is generated for a
11   milled lot that is being shipped to the
12   PTI Royston, Georgia facility.
13        Q.   Where would the sample that
14   was tested to generate these results have
15   been obtained in the manufacturing
16   process?
17        A.   So for the milled talc, they
18   would -- which is referenced in the sort
19   of middle section of this document, that
20   would have been pulled after the milling
21   was complete and the product was -- or
22   the milled talc was being prepared for
23   either storage or movement into a -- into
24   a rail car.

Page 316

1              The lower section where it
2    says ore report data are the testing
3    results -- composite testing results on
4    that particular ore lot that the milled
5    lot was using.
6              (Document marked for
7         identification as Exhibit
8         Hicks-30.)
9    BY MS. O'DELL:
10        Q.   Let me show you what I'm
11   marking as Exhibit Number 30.  But before
12   I do that, for the testing that is
13   reported in Exhibit 29, who performed the
14   test for the results that are outlined in
15   middle and lower sections?
16              So those would be the --
17   first let me ask you about the middle
18   section where it talks about appearance,
19   whiteness, fineness, loose, bulk,
20   density.  Who would perform that testing?
21        A.   That would be the Imerys
22   Houston, Texas facility.
23        Q.   Would that test be performed
24   in Houston or in China?

Page 317

1         A.   They would be performed in
2    Houston.
3         Q.   For the ore report data at
4    the lower portion of the exhibit, would
5    those tests be performed prior to
6    milling?
7         A.   They would be pulled from
8    the -- samples would be pulled from the
9    ore lot at the -- in Houston Texas when
10   it's received and a composite sample
11   would then be selected and milled
12   together, and then testing would be done
13   on that milled composite lot.
14        Q.   I'm going to show you
15   Exhibit 30, which is another certificate
16   of analysis.  It appears to be generated
17   by Imerys.  This one is dated in 2016,
18   four years after the one that we
19   previously looked at.  It's got a
20   different format.
21              Was this certificate of
22   analysis and the information that's
23   contained therein designed by Johnson &
24   Johnson?

80  (Pages 314 to 317)

Donald Hicks

Page 318

1      A.   I think the answer to your
2   question is yes.  We had asked Imerys to
3   modify the format of their report, their
4   certificate of analysis report to
5   directly correlate to the J&J
6   specification for the purposes of making
7   it easier to have this report reviewed
8   upon incoming receipt at Pharma Tech.
9          MS. ECHTMAN:  I just want to
10   point out that this document
11   appears to be incomplete.  It says
12   Page 1 of 2, and we only have one
13   page.
14          MS. O'DELL:  You know, I
15   just -- we printed a full -- I
16   don't know that it came up in the
17   Relativity, our document system,
18   as more than one page.  So I think
19   it was produced as one page.  I'll
20   be happy to look.  But it's my
21   belief that it was produced as one
22   page only, not a two-page
23   document.
24          MS. ECHTMAN:  You'll have to

Page 319

1   check on that.
2          MS. O'DELL:  Yeah.
3   BY MS. O'DELL:
4      Q.   Was the testing -- when was
5   the testing that is reported in this
6   exhibit -- what number are we on?
7      A.   This is 30.
8      Q.   30.  Thank you.  Exhibit 30.
9   When was that testing performed in the
10   manufacturing process?
11          MS. ECHTMAN:  Objection to
12   form.
13          THE WITNESS:  So the testing
14   from 2.1 through 2.9 would have
15   been on the milled product, on the
16   actual milled product that would
17   be sent to PTI.  The test below
18   that would have been tested on the
19   ore lot as a composite of the ore
20   that was then milled and then
21   tested and ultimately shipped to
22   J&J, of course.  But would have
23   been a composite sample.
24

Page 320

1   BY MS. O'DELL:
2      Q.   Would all of these -- all of
3   these tests be performed in Houston?
4      A.   Not necessarily.
5      Q.   Which ones may not -- would
6   not necessarily be performed in Houston?
7      A.   I can't tell from this
8   particular sheet.  Maybe that's part of
9   Page 2.  I'm not sure.  But they do not
10   have the test lab indicated.  It looks
11   like they were potentially using Nova
12   Biologicals in Texas for the composite
13   sample for a lot number.
14      Q.   Would you repeat the name of
15   that lab?
16      A.   It's listed here as Nova
17   Biologicals.  So it's a little difficult
18   to tell.  In the right-hand column they
19   list the lab number reference, and they
20   list the lab as one through four.  Yet
21   the test lab codes only indicate Labs 1
22   through 2.  So I think without the second
23   page, the second page probably had that
24   additional reference for Labs 3 and 4.

Page 321

1      Q.   Stay tuned.  If it was
2   produced with two pages, I'll follow-up
3   tomorrow.  But at this point it was only
4   produced with one page, so we're a little
5   bit at a loss as to what the second page
6   was, if there was one.
7      A.   Okay.
8      Q.   In terms of results from
9   Guilin and the lab at the mine in China,
10   is it your testimony that those results
11   were not provided to J&J?
12      A.   That's correct yes.
13      Q.   The reason I ask that
14   question is we have a Guilin Giguang Talc
15   Development Company certificate of
16   analysis for talc powder.  It appears to
17   be for J&J, and it is largely in Chinese.
18          MS. ECHTMAN:  I think we've
19   already established that the
20   witness does not speak or read
21   Chinese.
22          MR. LAPINSKI:  I don't think
23   that has been brought up.  There's
24   no foundation for saying it.

Donald Hicks

Page 322

1      MS. ECHTMAN:  He did say it.
2      MS. O'DELL:  I certainly
3  don't speak Chinese.
4      MS. ECHTMAN:  If you've got
5  a certified translation, maybe we
6  can work with the document.
7      MS. O'DELL:  I'm just -- I'm
8  working with what was produced to
9  us.  Let me show it to you.
10     (Document marked for
11  identification as Exhibit
12  Hicks-31.)
13 BY MS. O'DELL:
14     Q.   It's Exhibit Number 31.  Is
15 that a certificate of analysis for
16 testing that was performed on Baby Powder
17 to be used in -- excuse me, talc to be
18 used in Baby Powder?
19     MS. ECHTMAN:  Objection.
20  And certainly objection to the
21  extent that it might relate to
22  Baby Powder intended for the
23  Chinese market.
24     MS. O'DELL:  That's a

Page 323

1  speaking objection.
2      MS. ECHTMAN:  You know what,
3  I'm going to say, also, you can't
4  ask the witness to answer
5  questions about a document that's
6  in Chinese.  You have the option
7  of getting a certified translation
8  of any document.  And you can show
9  him a translation.  But you
10  prefaced your question with saying
11  that it's in Chinese, and I'm not
12  going to allow him to speculate as
13  to what it might be.
14 BY MS. O'DELL:
15     Q.   Let me see.  I think I've
16 overlooked my file here with a copy.  Or
17 Mr. Hicks, if you would show counsel the
18 copy of the document.  Somehow I've lost
19 my copy.  You'll see that it's not
20 completely in Chinese.  There is English.
21 It is readable.
22     So my question to you simply
23 is this, Mr. Hicks:  Is that certificate
24 of analysis the result of testing of talc

Page 324

1  that was to be used in Baby Powder to be
2  sold in North America?
3      A.   It is not.
4      Q.   Okay.  What -- what country,
5  if you know, was that talc being tested
6  to be sold in?
7      A.   Well, just to be clear,
8  there are multiple certificates of
9  analysis that are included here.  There
10 are ones from the talc supplier for
11 India, for Thailand, and so -- and
12 Brazil.  So this is a compilation of a
13 number of certificates that are provided
14 from talc suppliers around the world for
15 their local market.
16     Q.   Okay.  Thank you.
17 Mr. Hicks, let me see if I can short
18 circuit this just for a moment.
19     As senior director of
20 quality assurance, did you receive -- you
21 were senior director of North American
22 business quality and compliance, Baby and
23 Caribbean.
24     In your capacity for Johnson

Page 325

1  & Johnson did you receive copies of
2  consumer complaints from individuals or
3  their families who had suffered and died
4  from ovarian cancer, and they were
5  reporting that they had used Baby Powder?
6      MS. ECHTMAN:  Objection.
7      THE WITNESS:  I would not
8  receive individual complaints.
9  That would go to our medical group
10  for evaluation.  And our consumer
11  contact folks would have logged
12  those.
13     We did have quarterly
14  meetings relative to complaint
15  trends, or if anything unusual was
16  coming through the system.
17 BY MS. O'DELL:
18     Q.   And in terms of them being
19 sent to you directly, I understand that
20 they weren't sent to you directly, but
21 were you copied on complaints from women
22 or their families who had used Baby
23 Powder and been diagnosed and/or passed
24 away from ovarian cancer?

82 (Pages 322 to 325)

Donald Hicks

Page 326

```
 1          MS. ECHTMAN:  Objection.
 2          THE WITNESS:  No.  That
 3     would have been outside of my
 4     scope.  As I said, those would go
 5     directly to the medical department
 6     for review, reach outs, if needed
 7     for more information.
 8     BY MS. O'DELL:
 9          Q.   Let me show you what I've
10     marked as, I think -- are we at 33 or 32?
11          A.   33.
12          (Document marked for
13     identification as Exhibit
14     Hicks-32.)
15     BY MS. O'DELL:
16          Q.   So Exhibit 33.  This is a --
17          MR. LAPINSKI:  I have 32.
18          MS. ECHTMAN:  I have 32.  If
19     you can pass around a copy that
20     would be great.
21          MS. O'DELL:  I just marked
22     on the exhibit.
23          THE WITNESS:  Do you want to
24     change this one.
```

Page 327

```
 1          MS. O'DELL:  Yeah, let me do
 2     that.
 3     BY MS. O'DELL:
 4          Q.   Thank you, sir.  This is a
 5     complaint that was received by Johnson &
 6     Johnson on June 24th, 2014.  And it
 7     relates to a complaint of a family who
 8     had ovarian cancer as a result of, or
 9     claiming it as a result of their use of
10     Baby Powder.
11          You were sent this -- this
12     e-mail from Robert Jaeger regarding this
13     particular complaint.
14          You then forward it to
15     others.  Kelly Gottfried and Lesley
16     Traver.  Who are they?
17          MS. ECHTMAN:  Objection to
18     the long preamble to the question
19     about who people are.  I'll allow
20     the witness to answer.
21          THE WITNESS:  Lesley Traver
22     was my boss at the time.  She was
23     VP of quality assurance for
24     consumer.
```

Page 328

```
 1          Kelly Gottfried I believe
 2     was in the communications --
 3     public communications side of the
 4     business.
 5     BY MS. O'DELL:
 6          Q.   What was the purpose of
 7     escalating this ovarian cancer complaint?
 8          A.   At the time we had a new
 9     policy for escalating any serious
10     complaints or events, and that policy,
11     when it was initially issued, there was a
12     bit of confusion relative to these types
13     of complaints and whether we needed to
14     escalate every one.  This was by 2014
15     already something that we were aware of
16     and the policy was changed to, we would
17     escalate new issues, but not the
18     continuation of existing types of issues.
19          Q.   Would ovarian cancer at this
20     time be a continuing issue?
21          MS. ECHTMAN:  Objection.
22     Outside the scope.  And I'll let
23     the witness answer outside of the
24     scope in his role as a 30(b)(6)
```

Page 329

```
 1     witness.
 2          THE WITNESS:  It would be an
 3     issue where they were repeat
 4     reports.  There was considerable
 5     public publicity relative to this
 6     issue on TV, news print, as well
 7     as advertising late at night.  And
 8     so that generated a number of
 9     these kinds of complaints being
10     sent in.
11     BY MS. O'DELL:
12          Q.   Numerous complaints were
13     received from women and their families
14     who were suffering or died from ovarian
15     cancer; is that what you're saying?
16          MS. ECHTMAN:  Objection.
17     Outside the scope of his role as a
18     30(b)(6) witness.  But I'll allow
19     him to answer outside of that
20     designation.
21          THE WITNESS:  In this case,
22     it's simply reported as to a
23     death.  It doesn't indicate cause
24     or potential cause.
```

83 (Pages 326 to 329)

Donald Hicks

Page 330

1    BY MS. O'DELL:
2        Q.   Okay.  What standard
3    operating procedure are you referring to
4    when you say it recently changed in this
5    time period of 2014?
6        A.   A --
7            MS. ECHTMAN:  Objection.  Go
8        ahead.
9            THE WITNESS:  There was a
10       revision to our issue escalation
11       policy in terms of what needed to
12       be escalated to various levels of
13       management.
14           And at this time there was
15       some question as to exactly how to
16       handle this type of complaint
17       coming in, whether it was a
18       repetitive type of event.
19   BY MS. O'DELL:
20       Q.   Did that policy have a
21   standard operating procedure number?
22       A.   It did.
23       Q.   Do you recall what the
24   number of the policy was that was at

Page 331

1    issue in this time frame of June 2014?
2        A.   No, I do not.
3        Q.   Was the name of the policy
4    an issue escalation policy?
5        A.   It would -- if you were
6    searching, it would have the term
7    "escalation" in the policy.
8        Q.   What is issue escalation?
9    What does that mean?
10       A.   It's ensuring that
11   executive -- that management, executive
12   management are aware that there is a
13   serious issue that's been reported or
14   that's found.  It might not be a customer
15   complaint.  It might be an out of spec
16   result.  In this case it was a customer
17   complaint.
18       Q.   What is -- what does the
19   acronym NALT stand for, N-A-L-T?
20           MS. ECHTMAN:  Objection.
21           THE WITNESS:  This refers to
22       the North American leadership
23       team.
24   BY MS. O'DELL:

Page 332

1        Q.   And when you refer to the
2    North America leadership team, who is
3    included in that group?
4        A.   So at this time, you would
5    have had, for example, mostly vice
6    presidential level individuals on this
7    team.  It might be marketing, sales, R&D,
8    quality, so it was a very high level team
9    looking at overall functioning of the
10   businesses.
11       Q.   Were the executive vice
12   presidents be a part of that team?
13           MS. ECHTMAN:  Objection to
14       the form.
15           THE WITNESS:  Vice
16       presidents were part of that team,
17       yes.
18   BY MS. O'DELL:
19       Q.   Would members of management
20   above the vice presidential level be a
21   part of that team?
22           MS. ECHTMAN:  Objection.
23           THE WITNESS:  Yes.  I would
24       say that there's -- I believe

Page 333

1        there's only one level above the
2        vice presidential level and that's
3        president.  And there's only one
4        president.
5    BY MS. O'DELL:
6        Q.   And so the president of
7    Johnson & Johnson would participate in
8    these North American leadership team
9    meetings?
10       A.   Johnson & Johnson Consumer
11   U.S.
12       Q.   Do -- --
13           MS. ECHTMAN:  Can you let us
14       know where we are on time?
15           THE VIDEOGRAPHER:  We're at
16       just about seven in about
17       30 seconds.  We're at seven hours
18       and 29 seconds right now.
19           MS. O'DELL:  Okay.  I'll
20       stop.
21           THE VIDEOGRAPHER:  The time
22       is now 6:09.  Going off the
23       record.
24           (Excused.)

84 (Pages 330 to 333)

Donald Hicks

Page 334

```
1     (Deposition adjourned at
2   approximately 6:09 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 336

INSTRUCTIONS TO WITNESS

```
1
2
3        Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8        After doing so, please sign
9   the errata sheet and date it.
10        You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14        It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 335

```
1
2           CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6   deposition is a true record of the
   testimony given by the witness.
7
        It was requested before
8   completion of the deposition that the
   witness, DONALD HICKS, have the
9   opportunity to read and sign the
   deposition transcript.
10
11
12   _____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  July 16, 2018
16
17
18        (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

Page 337

```
1        - - - - - -
           E R R A T A
2        - - - - - -
3
4   PAGE LINE CHANGE
5   ____ ____ _____
6     REASON: _____
7   ____ ____ _____
8     REASON: _____
9   ____ ____ _____
10    REASON: _____
11  ____ ____ _____
12    REASON: _____
13  ____ ____ _____
14    REASON: _____
15  ____ ____ _____
16    REASON: _____
17  ____ ____ _____
18    REASON: _____
19  ____ ____ _____
20    REASON: _____
21  ____ ____ _____
22    REASON: _____
23  ____ ____ _____
24    REASON: _____
```

85 (Pages 334 to 337)

Donald Hicks

Page 338

1
2              ACKNOWLEDGMENT OF DEPONENT
3
4              I,_____, do
5    hereby certify that I have read the
6    foregoing pages, 1 - 339, and that the
7    same is a correct transcription of the
8    answers given by me to the questions
9    therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   DONALD HICKS                DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
     _____
23   Notary Public
24

Page 339

1              LAWYER'S NOTES
2    PAGE  LINE
3    ____ ____ _____
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____

86 (Pages 338 to 339)

**A**

**A's** 112:23
**a.m** 1:17 12:8
73:16
**abbreviated**
199:4
**ability** 49:3
**able** 44:14 48:5
48:14 49:4
157:10 160:9
163:24 164:2
165:15 263:19
268:12 285:4,7
**absence** 283:3
302:3
**absolutely**
115:19 179:10
224:15 233:14
**absorption**
69:21 70:4
**academia** 147:5
149:6 150:8
**acceptability**
300:23
**acceptable**
64:23 78:4
189:1 191:2,20
**acceptance**
57:21 122:24
**accompanied**
198:4,11
**accompany**
86:14
**accuracy** 209:3
239:11 240:9
242:11 299:1,6
**accurate** 74:3
97:6 138:22
164:21 198:23
199:9,13,15
200:20 203:23
292:23 336:20
**accurately**
159:19 164:5
209:1
**accused** 187:5

**acknowledged**
140:18
**ACKNOWLE...**
338:2
**acronym** 331:19
**actinolite**
302:18
**action** 169:16
171:7 173:8,23
175:19 176:2,9
285:7 301:16
**actions** 209:21
292:21
**actively** 41:6
42:2,4
**activities** 204:12
219:6 246:1
247:24
**actual** 37:22
75:19 115:3
197:6,20
278:13 319:16
**add** 54:24
154:17 209:23
284:22
**added** 99:7,19
133:5,21
249:17
**addition** 37:3
67:2 148:20
154:22 161:3
278:20 279:2
279:10 290:4
**additional**
249:17 320:24
**additionally**
198:13
**address** 187:19
226:12 228:23
243:8 246:13
248:3 289:18
**addressed**
221:21 286:20
292:22
**addresses** 79:8
**addressing**
221:19 244:16

**adequate** 203:19
**adequately**
305:20
**adjacent** 234:15
**adjourned**
334:1
**Administration**
313:6
**adopt** 250:6
251:2,8 253:17
275:13
**adopted** 74:14
251:16 253:2
**adult** 180:11
**adults** 170:15
**advance** 68:21
**advantage**
220:12
**adversely**
206:14 282:22
290:14
**advertising**
329:7
**advised** 275:12
**advisement**
217:12
**affairs** 313:2
**affect** 300:22
**affiliate** 232:17
**agencies** 147:4
149:5,17 150:8
151:10
**agency** 149:22
**ago** 103:5
107:20 265:11
**agree** 21:5,6
42:23 43:3,4,8
43:18,23 44:4
44:6 47:8 66:4
101:15 130:1
131:3,8 146:13
150:5 157:22
166:1,5 225:5
237:21
**agreed** 66:23
69:11 134:1
176:13 186:3

**agreeing** 62:11
164:10 166:8
**agreement** 13:8
21:23 22:13
27:20 29:12
30:10,12
105:21 125:10
129:16 130:3
150:4
**ahead** 88:24
159:13 167:16
295:23 330:8
**Alabama** 2:4
**Alan** 275:1
**albeit** 200:21
**alert** 173:8,13
176:2,9 185:17
308:2
**alerted** 228:18
**Alexandria** 2:9
**align** 176:1
**aligned** 129:12
**alignment** 81:6
137:22
**ALLEN** 2:2
**allotted** 195:22
**allow** 45:5 46:3
47:14 48:1,24
49:13 65:13
107:8 136:1
170:21 181:12
183:2,16
189:21 226:6
227:8 228:14
260:22 323:12
327:19 329:18
**allowable** 186:7
187:15
**allowed** 78:21
206:13 282:21
290:13
**Alternate** 8:18
**alternative**
219:9,16,19
**aluminum** 70:11
78:18
**amended** 5:14

5:15 95:10
285:13
**America** 3:21
36:13,16 97:12
241:3 242:17
312:13 324:2
332:2
**American**
324:21 331:22
333:8
**amosite** 302:17
**amount** 28:16
29:8,13 59:11
59:18 78:20
157:11,14,16
158:23 159:1
159:20 160:9
163:5 164:6,22
185:12 188:6
188:23 196:6
197:3,10,16
220:16
**amounts** 145:24
184:22
**Amphibole** 6:15
**analyses** 82:14
101:2
**analysis** 7:7 8:13
63:23 64:3,8
67:16 68:12,16
69:20 85:5,13
86:5,17 87:1
88:12,13,16
91:7,8,12,13
91:18 99:21
101:20 102:6
103:8 105:7
107:2 110:9
111:7,21
112:14 113:8
114:5 148:23
156:22 159:9
162:17 258:19
259:2 260:1
268:4 270:4,17
276:16,21
277:2,10

297:23 300:2
302:23 311:14
311:24 313:11
313:13,17
314:1 315:3,9
317:16,22
318:4 321:16
322:15 323:24
324:9
**analyst** 297:24
301:24 302:12
**analytical** 68:14
142:8 157:10
163:21,22
294:12 296:11
301:20
**analyze** 39:9
**analyzed** 38:21
38:24 39:4,11
39:22 49:8
169:3 297:20
303:4
**and/or** 206:16
283:3 290:18
325:23 335:21
**announced**
229:24
**annual** 103:16
203:3
**answer** 11:5
28:20 44:10,14
45:5 46:3,12
47:5,15 48:2,5
48:15,24 49:13
49:24 50:11
51:1 53:3
60:17 62:19
65:14 66:3,19
67:10 89:18
90:20,21 97:15
108:18 110:17
112:2 116:4
122:12,15
124:13 135:2
136:2 137:1
146:8 151:21
152:7,22 153:4

153:13 168:1
170:21 181:13
183:2,16
221:13 222:7
222:11 225:17
225:19 226:6
226:18 227:9
228:15 233:1
243:24 246:19
247:10 250:13
258:14 260:23
261:17 268:17
269:3 270:21
287:7 295:21
318:1 323:4
327:20 328:23
329:19
**answered** 126:9
145:12 260:22
295:19
**answering**
107:11
**answers** 295:9
295:15 338:8
**anthrophyllite**
302:18
**anybody** 150:12
187:5
**apart** 86:7
**apologize**
155:23 191:14
**appear** 277:9
**appearance**
92:6 93:2
311:12 316:18
**APPEARAN...**
2:1 3:1 4:1
**appeared** 16:13
100:21
**appearing** 16:2
**appears** 59:21
97:6 178:24
215:22 217:5
230:7 269:17
317:16 318:11
321:16
**apples** 168:10

**applicable**
102:23 107:9
239:8
**application**
147:18 206:16
206:21 283:4
290:18,23
**applications**
272:10
**applied** 107:24
118:19 297:19
**apply** 206:11
250:15 282:19
335:19
**appreciate** 18:8
107:12 204:17
**appropriate**
178:9 291:8,20
303:18 304:5
313:16 336:6
**appropriately**
90:1
**approved** 58:2
81:13
**approximately**
16:19 25:2,16
26:13 27:14,23
28:4 60:13
87:10 125:21
334:2
**April** 55:14
104:3 194:21
198:24 202:22
203:6 288:17
288:18
**area** 17:13 26:9
39:12 47:18
49:16 51:10
103:21 153:7
183:19 186:22
205:14 233:19
234:20
**areas** 47:4
170:19 208:5
**argumentive**
116:5,7,7
**arisen** 246:14

**arrangement**
27:16 28:15
**arsenic** 47:9
50:22 65:2,4,9
65:10,18,19
66:5 70:18
78:21 92:10
98:3 177:21
178:1,13 179:6
179:12 311:17
**art** 197:2
**asbestiform**
6:15 156:9,21
159:8 162:18
302:10
**asbestos** 6:18
8:14 13:19
43:7,12 44:7
44:21 45:14,16
45:20,24,24
46:6 50:22
51:15,21 69:3
79:8,16 88:14
92:13 136:11
138:2,7 139:1
139:7,17
141:16 144:18
145:2,15,24
146:15,23
147:6,13 149:7
150:22 151:4
151:12,17,24
153:18 155:1,7
155:9 157:5,7
158:9,14,16
159:3,17,23
160:4,13,20
161:6,18,20
164:16 165:7
165:14 167:10
167:21 169:2
169:19 170:10
171:9,13
176:11 220:23
221:9,20
222:22 223:5
227:5 228:24

229:22 230:20
230:22 231:5,7
231:16,20
233:11,24
236:17 240:19
243:4 244:17
247:17 248:23
249:6,6,8
250:6 252:19
253:22 254:2
254:15 255:8
255:20 258:1
258:20 259:3
260:1,17
284:14,16
301:19 302:4
302:16,22
305:6 308:2
309:4 310:4
311:21
**asbestos-free**
166:4
**ASHCRAFT**
2:8
**Asia** 8:10
**aside** 30:23 68:2
73:5 134:6
180:16 218:21
276:1 280:12
**asked** 17:14
108:15 126:9
137:13 162:11
171:18,22,23
176:7 189:18
260:22 263:22
279:21 295:1
295:18 296:4
318:2
**asking** 21:13
48:18 52:24
53:22 106:6,7
121:6 132:18
137:16 197:12
216:3 223:7,10
248:17 262:24
299:9 303:13
304:1

aspect 139:3
assembled
    215:23
asserting 137:11
assess 296:9,9
assessment 7:18
    211:6 212:2,4
    214:18 217:7
    294:10
assigned 36:19
    245:20 296:16
    296:19
assignment
    217:15
assisted 247:24
associated 133:8
    136:4 297:12
Association
    137:21
assuming 33:12
    81:21 109:9
    110:5 172:6
    174:7 182:12
    230:9
assurance 13:11
    19:11,20 20:9
    20:14 36:10
    41:8 44:16
    46:19,22 72:17
    86:19 96:23
    124:23 127:16
    127:20 154:7
    172:15 179:21
    182:12 186:19
    193:8 194:20
    204:2 211:11
    216:11 221:23
    281:21,22
    282:3 288:23
    307:12 324:20
    327:23
ASTM 8:13
atomic 69:21
    70:3
attached 289:4
    336:12 338:11
attempt 258:14

attention 21:12
    170:5 186:23
    242:19 265:17
attestation 9:17
    312:8,18
attorney 336:16
attorney/client
    33:2,7
audit 7:15 9:9
    9:12,15 89:11
    89:16,23 90:5
    93:20 125:14
    126:20,22,22
    127:1,2,12,14
    127:22 128:12
    128:23 129:3
    193:9 198:5
    202:5,21 203:5
    203:7,13,15,18
    203:24 204:20
    205:3,4,16
    206:5,8 207:3
    207:5,12
    208:23 209:7
    209:22 210:12
    210:14,17
    280:17,22
    281:5,6,13,17
    282:8,11 284:2
    285:4,14,18,21
    285:22,24
    286:3,10,18
    287:10,15,19
    287:24 288:21
    289:4,5,21
    290:5 291:24
    292:6 293:10
    293:14,24
    294:1,5,7,17
    295:2 296:5,8
    296:14,17,18
    297:1 299:22
    300:17 303:20
    304:21,22,23
    305:23 306:3
    306:24
audited 125:19

126:3,11,15
    193:16 294:8
auditing 125:9
    128:6 209:10
auditor 286:22
audits 125:7
    126:1 201:18
    201:22 202:3
    292:11
auspices 204:2
    204:19
Austin 3:14
authoritative
    141:5
authority
    283:11 291:2
authorized
    93:22
available 108:22
    250:21 284:1
    286:23 304:7
Avenue 2:13
    3:14,18 4:3
average 25:12
    61:18
await 217:24
awaiting 133:6
aware 37:6,11
    46:5 47:20
    48:17 72:8
    77:7 89:7
    129:3 183:5,12
    185:8 192:7,10
    201:18 218:13
    218:19 248:16
    260:2,10
    262:16 266:3
    268:12 275:9
    306:17 328:15
    331:12

————————————
          B
————————————
B 5:10 6:2 7:2
    8:2 9:2 10:2
babies 170:14
baby 10:12
    18:19 19:1,7

19:13,21 22:14
    36:17,21 37:1
    37:3,8,9,9 43:7
    52:17 58:15
    59:3 76:23
    77:5 84:6
    85:15 94:19
    97:12 118:20
    120:11 124:6
    128:2,7,10
    147:22,23
    154:9 170:8,11
    170:15 171:10
    171:24 172:6,7
    172:8 175:16
    180:12 188:20
    192:16 193:21
    195:3,16
    204:14,15
    221:9 224:11
    225:24,24
    230:21 232:20
    233:4,5 234:20
    236:16 237:16
    241:2 243:19
    245:5 253:4,24
    255:21 270:12
    270:18 277:12
    280:8 312:14
    312:19 314:11
    322:16,18,22
    324:1,22 325:5
    325:22 327:10
back 23:16
    63:20 73:16
    99:2 100:21
    101:12 110:7
    117:2,12
    155:22 168:20
    187:14 207:4
    209:19 213:22
    214:13 217:13
    235:8 249:17
    262:19 265:8
    273:4 278:10
    280:1 304:17
background

33:16 38:1
    178:21 229:12
    229:16
bag 61:18 62:14
Bank 2:14
barriers 208:6
BARRY 4:2
base 106:16
baseball 87:11
based 82:24
    164:22 181:22
    181:23 183:10
    185:3 208:23
    229:21 235:3
    246:17 271:22
    273:15 286:10
    286:17 287:24
    289:20 313:12
basic 135:17
basis 36:23
    60:14,24 63:12
    70:20 87:3
    91:20 98:23
    103:16 195:23
    196:8 202:1
    203:4 220:17
    224:3 241:20
    250:22 273:6
    279:20 308:22
batch 207:23
    208:9 230:18
    230:20 256:15
batches 234:14
    235:24
Bates 118:15
    131:14,22
    132:6 142:2,3
    142:15,16
    143:2,3,8
    191:24 213:15
    213:18,24
    262:5
BEASLEY 2:2
began 35:4
    228:22
beginning 1:17
    30:8 32:11

37:19 51:24
71:3 193:21
267:23
**behalf** 27:9
44:17 75:5
95:22 203:16
223:1,10 225:2
226:13 260:13
262:13 312:11
**Beijing** 229:19
**belief** 318:21
**believe** 17:8
26:21 56:8
57:1 88:12
96:7 104:7,14
112:21 122:18
173:7 184:3
193:6 199:11
199:12,17
261:5 292:19
305:10 328:1
332:24
**believed** 243:15
**bell** 75:15
**best** 18:3 25:21
50:2 74:2
84:16
**better** 233:1
**beyond** 108:6
243:5
**bias** 14:20
**Biddle** 1:16 3:8
**bind** 15:8 21:13
**binder** 6:13
107:7,15,17,22
**Biologicals**
320:12,17
**bit** 242:24 260:4
321:5 328:12
**blend/fill** 200:14
**board** 17:20
**body** 6:19 9:18
141:16 174:8
312:9,20,22
**boots** 194:8
**boss** 327:22
**bottles** 92:19

226:1 242:15
253:24
**bottling** 61:8
128:9
**bottom** 69:18
93:20 99:11
111:6 118:15
132:4,7 142:3
234:3 244:21
**box** 2:18 99:16
234:2,3
**Brazil** 244:5
324:12
**break** 73:9,14
73:19 117:1,7
117:15 168:13
168:18,23
264:15,17,23
265:6 303:16
304:15
**breakoff** 204:11
**brief** 32:15
**briefly** 107:16
**bring** 21:12 23:7
23:10 277:24
**broad** 53:11
196:10
**broad-based**
282:3
**broaden** 35:16
**broader** 23:17
**brought** 321:23
**Brower** 13:24
**Brown** 4:8 12:4
**BS** 38:6
**Building** 256:6
**bulk** 59:22
208:1 302:23
311:13 316:19
**Bureau** 179:13
256:6
**burning** 116:12
**business** 41:20
55:4 97:3
128:8 180:12
180:12 195:4
198:10 281:11

312:13 324:22
328:4
**businesses**
332:10
**Butler** 289:6
**buys** 233:3

---

## C

**C** 9:20,22 10:6,8
67:18 85:4
88:3,11 112:9
112:22 269:8
279:17 315:6
**cabinet** 130:17
**cabinets** 130:11
**cadmium** 70:12
180:7
**calcium** 70:12
**calculate** 157:14
159:15
**calculation**
158:11 164:9
165:21 166:14
**calendar** 25:7
**call** 36:4 42:15
116:16 292:5
303:16 304:8
309:23
**called** 21:8 39:5
40:24 41:19
88:7 121:4
146:19 155:2
186:8 200:1
211:5 233:11
244:9 292:15
**calling** 246:10
**calls** 299:13
**Campus** 3:9
**cancel** 278:17
**cancer** 44:7,21
45:17 46:10
47:12,22 48:21
49:3,11,22
50:21 152:5,14
152:18,24
153:2 183:7,14
184:6 325:4,24

327:8 328:7,19
329:15
**capabilities**
294:11 296:10
**capability** 148:6
**capable** 44:21
148:21 266:4
268:6 269:19
269:22 272:20
**capacity** 44:11
45:6 46:4,13
47:16 48:2,18
49:1,14 50:1
50:12 51:2
61:11 62:20
65:15 66:3,20
67:11 72:9,12
93:14 96:22
151:22 152:8
152:16 153:5
153:14,15
154:1 170:22
181:14 183:3
183:17 219:5
220:15 221:14
221:19,22
222:8 324:24
**captured** 123:18
130:2
**car** 61:14,18
62:2,16,17
63:9 68:22
86:14 301:13
301:13 315:24
**carcinogen**
181:6
**carcinogenic**
182:21
**carcinogenicity**
183:7
**care** 128:6
180:12 248:1
253:1
**career** 16:15
35:4
**careful** 163:20
272:24

**carefully** 336:4
**Caribbean**
312:14 324:23
**cars** 61:6,10,24
63:10,17
**case** 14:1 17:2,3
17:4,5,7 20:16
24:10 28:6,10
28:11 29:19
30:9 32:14
33:13 34:7
35:22 36:2
64:6 111:13
124:1 166:6
176:11 184:2
223:23 243:9
243:16 293:6
294:22 305:10
329:21 331:16
**cases** 1:8 14:6
34:10 208:11
**cause** 44:7 45:20
46:6 47:12,22
48:21 49:3,10
49:22 123:2
152:5,11
160:24 183:13
184:5 305:21
329:23,24
**causes** 45:17
47:12 152:4
**causing** 44:21
50:21
**caution** 23:24
32:19
**cellulose** 302:19
**center** 2:18
42:15
**certain** 64:22
197:4 222:4
283:19
**certainly** 28:24
51:13,19 65:17
82:8 98:24
116:6 137:23
147:2,15
151:24 170:8

170:24 182:18
186:22 188:2
209:12 210:12
222:20 227:19
235:6 240:15
251:22 263:19
271:14 272:5
291:13 300:3
311:21 322:2
322:20
**certificate** 63:23
64:3,7 67:16
68:11,15 69:20
85:5,12 86:5
91:12 99:21
101:2,20 102:6
103:8 105:7
107:2 110:9
111:7,21 112:4
112:13 113:8
114:5 268:3
276:21 277:1
278:6 313:13
313:16 314:1
315:2,8 317:15
317:21 318:4
321:15 322:15
323:23 335:2
**certificates**
82:13 86:17,24
91:6,7,13,17
270:3,17
276:16 277:10
313:11 324:8
324:13
**certification**
335:18
**certified** 1:18,19
322:5 323:7
335:13,14
**certify** 335:5
338:5
**certifying**
335:22
**cetera** 150:9
249:18 302:20
**chain** 8:19 237:5

**chair** 245:6,16
245:18 246:3
**chance** 75:4
**change** 55:14
56:10 57:5,6
74:9 98:12,21
101:3 102:17
185:9 186:4
191:5 277:21
277:22 285:20
285:24 286:3
326:24 337:4
**changed** 56:4,5
57:1,3 96:7
99:4 189:7,12
190:4,10 191:1
191:19 192:6
328:16 330:4
**changes** 202:12
336:11 338:10
**characterizati...**
27:3 30:5
**charge** 128:16
**chart** 83:4 87:5
235:19
**check** 319:1
**CHEM** 302:3
**chemical** 88:13
88:15 121:4
148:23
**chemist** 157:10
**chemistry** 38:6
**Chen** 275:1
**CHEONG** 4:3
**China** 7:20 8:10
57:18 58:12
60:14 72:19
81:23 82:3,18
82:22 83:15
184:20 188:19
192:18,24
193:15,17
194:18 198:12
198:14 199:20
199:23 208:2
209:2 219:10
219:13,21

220:6,23
222:22 223:22
224:10 225:21
226:21 232:7
232:16 233:11
233:19 234:1
243:11 244:20
246:15,22
247:4,15 249:5
251:1,16
257:20 270:12
278:3 316:24
321:9
**China's** 250:6
**Chinese** 57:24
82:6,14 83:15
185:14 188:7
194:1 195:10
201:19 221:6
221:21 223:3
225:22 228:19
232:17 239:19
239:19 244:17
247:6,20,21
248:5 249:15
252:3,8 253:1
265:17 266:3
268:1 321:17
321:21 322:3
322:23 323:6
323:11,20
**chose** 108:8
134:24
**CHRISTOPH...**
2:13
**chromium**
48:20 49:9,9
50:23 70:16
79:1 92:22
98:3 180:17
181:1,5 182:7
182:20 183:13
184:5,11,16,19
184:22 185:12
185:16 188:6
188:24 190:10
191:1

**chronic** 173:22
174:5,17,19
**chrysotile** 301:9
301:19 302:17
303:6 305:14
306:23
**circuit** 324:18
**circumstances**
45:21
**citing** 147:10
**City** 84:19
**claim** 226:24
228:18
**claiming** 327:9
**claims** 151:9
**clarification**
60:2
**clarify** 22:8 72:9
108:3 134:21
139:2 177:4
226:21 233:13
**clarifying**
133:22
**classification**
282:6,13
**classified** 286:15
**classify** 289:21
**cleanliness**
297:3 298:4
**clear** 17:24
18:14 37:1
52:23 55:1,13
76:21 83:4
84:24 106:7
113:22 116:19
122:18 167:17
187:11 192:9
196:15 210:1
224:14 233:15
235:8 237:24
251:8 255:18
258:17 269:22
269:24 275:17
280:1 296:3,7
307:6 324:7
**clearly** 111:14
135:16 223:16

248:15 251:9
**close** 58:7
**closed** 297:11
**closer** 215:20
**CoA** 9:7 279:7
**coach** 110:15
136:21 187:6
**coaching** 137:9
187:5
**cobalt** 70:16
**codes** 320:21
**COHEN** 2:12
**collaboration**
80:19
**colleague**
115:21 187:1
**colleagues** 59:13
**collection**
134:23
**College** 1:16
**colloquy** 295:14
**Color** 64:19
**column** 83:7
85:4 99:11
199:2 320:18
**come** 57:11
117:2 169:8,9
170:4,8 201:22
241:1 249:16
265:16 269:8
304:9
**coming** 68:22
120:3 189:10
198:2 217:20
325:16 330:17
**comment**
178:17 212:18
235:18 237:7
243:1 274:8
278:8 296:1
**commented**
278:10
**commenting**
295:8
**comments** 115:7
116:8 279:24
286:18 299:19

Commerce 2:4
commission 338:21
commissioned 204:20
commitment 283:10
committed 43:19
committee 2:21 14:11 176:5,19 245:7,12,18
common 263:5
commonly 139:24 301:15
communicate 33:6 247:20 248:2
communicated 51:5 256:11 308:21
communication 171:2 229:19 248:14
communicatio... 35:16,19,19 308:20 328:2,3
companies 5:19 15:7,8 41:11 41:17 44:2 57:5 81:11 203:17,21 220:9 229:20 229:21 244:24 253:15 257:19 272:9 273:5,7
company 37:7 41:5,19 42:9 42:13 61:8 82:6,15,22 83:16 171:3 201:20 203:8 220:16 223:2 232:15 233:16 265:17 266:3 268:1 279:19 321:15

compendia 149:4
compensation 27:12,16 30:11
compilation 324:12
compiled 173:9
complaint 325:14 327:5,7 327:13 328:7 330:16 331:15 331:17
complaints 325:2,8,21 328:10,13 329:9,12
complete 42:21 120:15 122:1 122:19 129:9 283:3 315:21
completed 42:6 119:13 133:11 297:10,15 303:2
completely 116:23 323:20
completer 215:20
completing 270:3
completion 335:8
compliance 41:3 81:9 85:9 141:21 284:6 312:14 324:22
compliant 265:18 268:5 268:13 269:18 273:16 275:18 298:7 299:12
complied 271:24
comply 277:14 279:3,11 311:2
complying 266:4 269:23 272:20

component 77:17
components 98:22 206:18 283:6 290:20
composes 197:5
composite 67:20 69:21 98:18 111:11 316:3 317:10,13 319:19,23 320:12
composition 14:19 18:18
compound 45:16 47:11
compounds 182:19 183:6
computerized 205:6
concern 65:9,17 184:15 220:22 236:14 299:1,6 300:4
concerning 263:11
conclusion 286:19
concrete 208:6
conditions 206:11 282:19
conduct 40:10 71:5,17 72:3 127:21 173:15 289:22
conducted 90:18 201:19 202:3 271:4 282:9,9 289:5 293:10 294:10
conducting 40:8 270:2,15
conducts 297:24
conference 8:15 258:9,18 259:22 260:6 260:14,15

261:10 262:8 262:10 265:14
conferences 260:9
confined 263:17
confirm 99:3 101:19 102:12 105:6,12,15 113:7 114:4 235:2
confirmation 102:5 103:7 107:1 112:12 114:1
confirmed 99:20 308:13 309:8
confused 289:14
confusion 17:14 21:9 328:12
Congress 3:14
conjunction 217:6
connected 111:15,16
connects 113:1 279:1
consequence 300:9
consider 59:10 163:24
considerable 329:4
consideration 251:12
considered 58:2 150:21 219:4 288:2,7 289:9 289:15
consistency 185:21
consistent 184:22
consistently 185:15 189:13
consolidate 219:6 220:11 220:13

consortium 257:18
constitutes 156:23 159:9
consulting 40:24 41:3,6,10 42:2 42:4 198:8
consumer 5:18 15:6 16:7 21:4 21:15 31:11 36:10 42:15,18 44:19 172:19 177:6,7 203:17 203:21 244:13 281:6 325:2,10 327:24 333:10
Consumers 230:10,16
Cont'd 3:1 4:1 6:2 7:2 8:2 9:2 10:2
contact 325:11
contacted 225:22
contain 69:2 113:13,24 114:4 118:4 154:10 229:22
contained 135:18 173:10 240:24 266:5 312:21 317:23
containers 302:2
Containing 259:3
contains 113:17
contaminants 46:24
content 92:7 177:22
context 68:8 83:12 150:16 175:1,13 220:2,3 260:8 260:24 261:18 262:19 268:18

272:22,23
277:18 287:4
299:17 303:21
303:23,24
**continuation**
328:18
**continue** 24:7
174:20 206:13
282:21 290:13
**continued** 94:20
249:13 292:19
292:20 304:24
**continuing**
328:20
**contract** 9:8
27:15 42:5
**contracted**
198:7
**Contractor** 9:15
**contracts** 29:1
**contributed**
96:23
**control** 41:7
124:19 173:23
285:2 335:21
**controlled** 52:3
**controlling**
52:15 53:1,8
54:1 56:18
69:4 76:22
95:8,13 97:11
106:3 118:4
178:9
**controls** 155:9
**conversation**
32:15 36:3,5
40:18 249:11
**conversations**
32:2 35:15
184:12
**converted** 273:4
**conveyed** 86:6
**cooperate**
295:12
**coordinator**
245:12
**copied** 82:17

91:18 325:21
**copies** 23:8
86:24 90:9
124:4,15
274:19 325:1
**copper** 70:16
**copy** 23:5 30:20
31:1 97:6
109:9,17 130:9
156:5 213:24
214:13 293:23
323:16,18,19
326:19
**cordial** 116:22
**Core** 244:10
**corner** 93:17
**corporate** 48:19
**corporation**
21:21
**correct** 15:9
16:14 18:20,21
19:2,3,9,15,22
35:3,6,9 37:4
38:12,14,16,19
38:23 39:3,7,9
39:10,14,16,24
40:3,10,11
41:1,3 43:14
54:22,23 58:6
60:24 61:8,9
62:13 64:11,16
65:11,24 66:9
66:10,17,22
67:8 69:9
70:13 73:2
74:15 75:18
76:19 77:1,18
77:21 78:1,13
78:14,19,23
79:2,8,12,21
81:8,23,24
82:19 84:6,7
84:10,11 85:6
85:19,24 86:3
86:7 87:18
89:20 90:1
91:16 92:12,15

92:20,24 94:6
94:10 96:8
98:4 102:3
104:11 106:15
110:2,3,10
118:1,22
119:14 120:15
120:19 121:14
121:21,22
127:3 128:12
132:15,16
133:19 134:1
138:3 140:5
142:8,9 143:21
143:22 144:10
147:7 148:4,16
148:17 154:16
155:2 160:22
163:17 165:7
166:14,21
169:23 172:9
174:21 176:6,7
181:3,4,7
182:8,9 187:4
187:12,16,17
191:22 193:22
193:23 194:6
195:17 200:15
204:3,22 207:7
207:18 209:3
219:17 220:24
221:3 229:1
230:11 231:12
232:2 240:20
240:20 246:21
258:7 268:1
272:22 281:7,8
284:8,18
285:22 292:4
298:17,20,21
299:2 300:6
301:4 305:6
311:3,4 321:12
338:7
**corrected**
287:21 292:24
**corrections**

336:5,7 338:10
**corrective**
209:20 285:7
292:21 301:16
**correctly** 78:6
107:11 112:21
141:18 149:1
157:1 173:18
174:1,9 175:6
203:22 208:18
230:23 231:3
232:10 236:3
236:11,12
268:9 271:13
290:2 291:4,7
291:19,23
298:12 304:1
**correlate** 318:5
**correlation**
112:22
**cosmetic** 6:16
8:13 41:12,14
41:18,22,24
137:20 257:18
**COUGHLIN**
3:17
**Council** 248:1
253:1
**counsel** 12:17
13:8,24 23:4
24:17 25:14,24
26:4,12 27:17
34:1,16 40:17
75:22 108:8
109:9 110:6,15
110:16 115:11
118:1 119:1
134:9,24
153:12 268:19
323:17
**count** 302:15,22
**counted** 155:10
**counterfeit**
237:8
**country** 94:23
324:4
**County** 58:12

**couple** 14:9 31:7
177:9 202:13
**coupling** 179:14
**course** 33:15
37:5 55:3
64:19 73:10
97:3 201:4
209:8,18
240:10 252:16
281:11 295:12
307:23 309:10
319:22
**court** 1:1 12:13
12:19 264:3
336:20
**courteous**
116:21
**covered** 20:17
56:22 120:19
280:4 310:16
**covers** 115:23
**cplacitella@c...**
2:15
**crafted** 115:22
**Craig** 302:11
**creams** 42:1
**created** 97:2
261:22 278:7
**creation** 96:24
**critical** 282:14
282:18 283:18
283:23 285:10
285:12 286:3
286:11,20
287:9,14 290:1
290:4 292:1
300:12,20
**crocidolite**
302:17
**cross** 145:11
**cross-examine**
263:20
**CSX** 62:1
**CTFA** 79:11,14
137:20 138:1,5
138:19,24
139:6,15,18

140:3 154:22 248:15 250:9 251:2,8,11,16 252:9
**cubic** 61:20 62:3 62:14,15
**current** 79:14 198:19 199:1,2 284:13
**currently** 58:1 96:3 275:12
**curriculum** 5:17 23:5 31:2,5
**Curtis** 80:14
**custody** 237:5
**customer** 197:8 197:9,24 331:14,16
**customers** 271:18
**cut** 41:4 278:5
**CV** 31:8

---

**D**

**D** 5:2
**d/b/a** 203:16
**danger** 51:15 65:10,23 66:9 66:15 67:8
**dangerous** 45:16 46:24
**dangers** 50:8
**DANIEL** 2:17
**Darnell** 4:8 12:4
**data** 94:7 142:11 273:12,15 302:15 303:2 316:2 317:3
**date** 1:17 12:7 17:12 37:21,22 55:12 94:5 122:2 256:10 301:22,24 336:9 338:16
**dated** 141:17 194:20 202:22 203:6 228:10

255:2 267:9 275:1 288:17 294:1 312:9 317:17 335:15
**dates** 125:17,24 256:2
**day** 25:15 43:6 53:17 228:11 228:17 267:22 285:3 302:14 338:20
**days** 24:20 25:4 26:6,9,10 28:4 53:17 59:15 255:6,19 256:24 336:16
**de** 166:7
**deal** 227:16
**dealing** 59:12
**dealt** 59:19
**death** 329:23
**decades** 216:15
**December** 190:22 312:10
**decide** 170:6
**decision** 171:15 278:17
**decisionmakers** 171:3
**deck** 194:18
**decontaminate** 200:9
**dedicated** 200:12
**deemed** 336:19
**Defendant** 3:20 4:5
**defendants** 3:11 13:14
**defense** 26:4
**defer** 62:6 153:8 161:4 195:12
**deficiencies** 287:15
**defies** 206:3
**defined** 52:11 67:3 179:13,15

181:20 206:9 243:6 282:18
**defines** 69:5 155:5 206:3
**definition** 13:18 157:8 165:6 197:7 300:20 301:2
**definitions** 13:15
**degree** 14:16 38:9 85:20 130:22 160:15 273:12
**delineating** 137:9
**delivered** 63:18 208:5
**denotes** 197:2
**density** 59:22 64:17 92:6 311:13 316:20
**deny** 105:12 235:2
**department** 127:17,20 307:12,13 326:5
**dependent** 148:9
**depending** 93:14 126:19 148:22
**depends** 33:14 114:22 127:23 148:5
**depleted** 208:12
**deponent** 12:15 338:2
**deposed** 16:23 17:15,22
**deposing** 336:16
**deposition** 1:15 5:14,16 11:2 12:9 14:5,12 14:23 15:1 16:2,5,22

17:10,16 23:9 23:14,18 24:11 25:1 26:14 29:20 31:24 34:17 53:18 135:7 201:10 283:15 291:12 334:1 335:6,8 335:9 336:3,13 336:17,19
**depositions** 13:20 14:3,22 16:14,20
**deposits** 58:1
**deps@golkow...** 1:23
**describe** 174:5
**described** 128:11 174:16
**describes** 198:19
**describing** 162:4
**description** 5:13 6:5 7:5 8:5 9:5 10:5 199:4,15 199:15
**descriptions** 199:9
**designate** 20:20
**designated** 45:2 170:19 181:6 181:11 183:1 208:5 222:4,17
**designating** 223:24
**designation** 222:9 329:20
**designed** 317:23
**desire** 185:9 219:6
**desk** 201:22
**despite** 164:15 285:12
**detail** 69:17 294:5
**detailed** 199:8

**details** 48:13
**detect** 148:3 164:1,3,7
**detectable** 160:23
**detected** 148:24 158:24 159:1,3 159:17 163:4,5 166:10 254:15 302:10 309:7,9
**detection** 7:7 140:13,22 142:8 143:23 144:3,7,8,11 145:16 147:7 148:8,20,22 149:8 150:22 156:17,21,24 158:18 159:7 160:3,6 162:9 162:12 163:2,6 163:14 164:15 173:14 175:5 248:23
**detects** 144:13
**determination** 50:20 70:5 286:13
**determine** 95:24 139:16 160:9 173:16 244:21
**determined** 47:11,21 48:21 49:10 183:13 184:5 308:14
**determining** 182:20
**develop** 174:6
**developing** 80:17
**development** 8:12 10:8 72:14 80:5,8 249:22 259:24 321:15
**diagnosed** 325:23

**dial-in** 310:10
**dialogue** 308:10
  308:19
**dictate** 82:20
  116:3
**dictated** 69:8
  78:16 82:23
  139:6
**died** 325:3
  329:14
**difference**
  251:15
**different** 73:24
  113:18 127:9
  129:13 131:20
  168:9 184:11
  208:8 213:24
  251:23 259:6,7
  272:8,9 273:5
  317:20
**differently**
  43:11 128:21
**difficult** 173:1
  178:17 195:9
  305:9 320:17
**difficulty** 279:6
**diffraction**
  38:22 39:13
  139:20
**direct** 112:22
  271:18 273:6
  335:21
**directed** 91:14
  191:6
**directing** 129:18
  308:24 310:3
**Direction** 11:5
**directly** 37:12
  86:12 93:11
  111:16 269:7,8
  278:1 318:5
  325:19,20
  326:5
**director** 36:9
  46:21 96:22
  127:21 172:13
  204:6 312:12

324:19,21
**disagree** 62:8
  115:20 116:10
  116:10 160:7
  223:18 225:5
  304:6
**disagreeing**
  62:10
**discipline** 40:4,6
**disclose** 24:1
  32:20 137:6
**discovered**
  14:18 238:11
**discrepancy**
  275:10
**discuss** 19:5
  32:17 50:7,20
  51:15 171:12
  259:23
**discussed** 27:13
  33:4,10,12
  40:17 53:20
  109:18 175:22
  242:5 258:20
**discusses** 59:22
**discussing**
  150:17 260:16
  304:20
**discussion** 24:11
  25:17 46:16
  134:8 151:4
  171:16 176:12
  186:1 192:19
  195:3 196:19
  240:16 241:10
  245:1 267:6
  272:22 275:22
  295:6
**discussions** 24:2
  31:13 32:22
  33:1 51:20
  252:22 254:4
**dispersion**
  139:23
**District** 1:1,2
  12:12,13
**divided** 198:18

**division** 36:11
  127:20
**dlapinski@wi...**
  2:20
**DLH** 41:1,2
**doc** 23:12
**doctor** 38:11
  45:4 46:2
**doctors** 49:18
**document** 1:8
  15:14,17 23:3
  30:14 49:22
  52:20 53:14
  54:9,10,16,18
  55:1,2 59:21
  61:19 63:21
  64:8 70:24
  73:8 74:6,8,20
  75:20 76:1,8
  76:15 80:22
  88:21 93:17
  96:9,24 103:13
  106:20 109:4
  110:13,22
  111:3 114:11
  114:12,22
  115:1,2 119:2
  122:8 124:19
  131:20 132:5
  135:3,24
  138:13,17,20
  141:10 147:16
  150:11 155:24
  161:22 166:8
  166:16 177:14
  178:10,18,22
  180:2,8,10
  194:10 195:6
  202:15,21,23
  203:1,14 211:5
  211:19 212:17
  213:23 214:6
  215:5,12,21
  217:5,18 218:7
  228:1,6 233:21
  235:14 237:11
  238:15,24

239:11,17
  240:7 250:20
  254:22 259:10
  259:16 262:3,4
  263:1 266:9,17
  273:24 276:2
  280:23 281:9
  285:2 288:11
  291:15,16,17
  293:18 298:14
  301:18 303:11
  312:3,7,11,16
  313:4,18
  314:18 315:19
  316:6 318:10
  318:17,23
  322:6,10 323:5
  323:8,18
  326:12
**documentation**
  34:20,24 306:5
  306:18
**documented**
  152:10 206:20
  290:22 305:20
  305:22
**documenting**
  27:16
**documents** 11:8
  21:20 23:8,13
  23:22 24:9
  35:11 50:5,19
  51:7,14 52:11
  56:12 99:3
  100:22 104:16
  107:10,21
  108:4,7,11
  134:9,11,15,17
  134:23 135:6
  135:11,11,14
  135:18 136:4,8
  137:17 185:5
  203:3 216:2
  263:18,21
  279:8 283:24
  284:24 313:10
**doing** 82:11

115:15 128:5
  146:20 249:8
  253:20 259:6,6
  336:8
**Don** 275:5
**Donald** 1:15 5:4
  5:17 12:15,23
  335:8 338:16
**Dr** 32:6,9,13
  33:24 36:1
  40:19
**draft** 215:12,22
  216:6 279:17
  297:15
**drafted** 211:10
**drafting** 80:2,24
**Drew** 198:11
  308:16
**drill** 17:23
**Drinker** 1:16
  3:8
**Drive** 2:18 3:9
**driven** 219:4
**Drug** 313:5
**due** 171:1
**DUFFY** 3:17
**duly** 12:24 335:5
**duties** 124:22
**DWYER** 3:3

---

**E**

**E** 5:2,10 6:2 7:2
  8:2 9:2 10:2
  117:9,9 337:1
**e-mail** 8:6,17,20
  9:6,11 10:10
  35:18,24
  245:23 267:9
  267:23 269:17
  274:24 276:8
  276:16 288:16
  309:23 327:12
**earlier** 98:16
  109:18 161:2
  192:13,15
  266:12 295:6
  311:8

| | | | | |
|---|---|---|---|---|
| **early** 178:19 | 133:17 134:20 | 238:6 239:2,13 | 38:1 | 79:19 89:8 |
| 215:22 | 135:22 136:14 | 240:11 241:6 | **eechtman@or...** | 94:4 |
| **easier** 318:7 | 136:22,24 | 241:18 242:1 | 3:5 | **employee** 31:17 |
| **East** 1:16 | 137:3 140:23 | 242:21 243:21 | **effect** 54:4 55:7 | 35:2,20 50:6,7 |
| **EASTERN** 1:2 | 144:19 145:3,8 | 245:8 246:4,16 | 55:12,24 56:9 | 153:11,19 |
| **easy** 314:13 | 145:17 146:2 | 247:8 248:6,24 | 74:1,7 83:13 | 193:16 194:3 |
| **Echtman** 3:3 | 146:10,16 | 249:24 250:11 | 93:19 95:18 | **employees** 34:5 |
| 20:11 23:23 | 147:8 149:9,13 | 251:5,18 | 96:3 104:7 | 34:13,14 161:4 |
| 24:13 27:2 | 151:6,20 152:6 | 252:12 253:5 | 105:19,21 | 172:23,23 |
| 28:18 29:15 | 152:15,19 | 253:11 254:8 | 109:22 118:6 | 176:22 177:1 |
| 30:4 31:19 | 153:3,21 154:3 | 255:9,14,22 | 119:19 179:20 | 201:14,15 |
| 32:18 33:5 | 154:13 155:12 | 256:18 257:5 | 179:23 180:19 | 247:4 249:21 |
| 44:8,23 45:18 | 156:10 157:24 | 257:14 258:2 | 266:9 313:14 | 259:23 276:11 |
| 46:11 47:13,23 | 158:19 159:12 | 258:10 259:4 | **effective** 76:18 | 299:23 |
| 48:10,22 49:12 | 163:15,18 | 260:18 261:13 | 104:2 105:1 | **employment** |
| 49:23 50:10,24 | 164:18 165:8 | 264:14 265:20 | 297:14 | 161:13 |
| 51:17 52:5,18 | 166:22 167:13 | 266:7 267:1 | **efficacy** 282:24 | **EMQA** 7:13 |
| 53:4,10 60:1,8 | 167:23 170:17 | 268:15 270:6 | 290:15 | 194:22 |
| 60:10,16 61:1 | 174:10,22 | 270:20 272:3 | **effort** 219:16 | **engaged** 72:3 |
| 62:4,18 63:4 | 178:14 181:8 | 273:18 274:6 | 242:19 | 193:19 244:24 |
| 63:13 65:12 | 182:23 183:15 | 274:18 275:20 | **eight** 26:9 194:2 | 247:23 |
| 66:1,11,18 | 184:7,24 | 277:15 279:14 | **eight-hour** | **engineering** |
| 67:9 68:18 | 185:19 186:9 | 280:19 283:20 | 238:10 | 237:1 |
| 70:21 71:6,19 | 187:3,22 | 284:9,19 | **either** 27:17,24 | **English** 323:20 |
| 72:5,22 73:6 | 188:10 189:16 | 285:15 286:6 | 31:10 79:14 | **ensure** 44:2 |
| 74:4,18 75:16 | 190:12 191:8 | 287:17 288:5 | 91:24 115:10 | 46:22 65:5 |
| 77:22 86:1,8 | 191:11 194:4 | 289:11 291:5 | 185:23 213:10 | 89:12,23 |
| 88:22 90:2 | 196:9 205:9 | 292:7,17 293:4 | 271:17 292:22 | 138:21 154:8 |
| 92:3 93:7 | 206:23 207:10 | 294:18 295:4 | 315:23 | 203:20 297:21 |
| 94:11 95:2 | 207:19 208:19 | 298:9 299:3,15 | **electron** 39:13 | **ensuring** 43:1 |
| 97:14 98:5,13 | 209:4,16 210:7 | 300:7,18 303:9 | 40:1 79:17 | 44:1 271:22,24 |
| 99:24 100:7,16 | 212:21 213:1,5 | 305:7,15 306:1 | 136:12 155:6 | 331:10 |
| 101:6 102:9,20 | 213:19 214:2 | 306:12 307:1 | 156:13 | **entire** 217:4 |
| 103:11 104:12 | 215:8 218:8,16 | 308:5 309:5,16 | **electronically** | **entirety** 110:13 |
| 105:9 106:4,12 | 219:24 221:1 | 314:4 318:9,24 | 86:11 | 110:22 |
| 107:4 108:2,14 | 221:11 222:1 | 319:11 321:18 | **element** 99:7 | **entities** 3:11 |
| 109:11 110:11 | 223:17 224:13 | 322:1,4,19 | **elements** 183:6 | 18:17 21:7 |
| 110:19 111:24 | 225:3,15 226:3 | 323:2 325:6 | 206:17,21 | 268:20 |
| 112:17 113:10 | 226:15 227:6 | 326:1,18 | 283:5 290:19 | **entitled** 17:3 |
| 113:15 114:7 | 227:17 228:13 | 327:17 328:21 | 290:23 | 33:3,9 63:22 |
| 117:17,19 | 229:2 230:3,12 | 329:16 330:7 | **elevated** 184:22 | 115:13 141:14 |
| 120:16 121:15 | 230:24 231:8 | 331:20 332:13 | **ELYSE** 3:3 | 177:21 194:21 |
| 122:4,14 124:8 | 231:18,21 | 332:22 333:13 | **EMMEL** 2:3 | 202:21 215:5 |
| 124:17 126:8 | 232:11 234:7 | **Edison** 4:4 | **employ** 71:5 | 229:11 259:2 |
| 127:4 128:13 | 234:22 235:10 | **educated** 253:21 | **employed** 19:13 | 260:14 282:14 |
| 129:20 130:12 | 235:20 236:4 | **education** 38:4 | 20:10 45:12 | 312:8 |
| 131:6,21 132:3 | 236:18 237:18 | **educational** | 71:17 72:21 | **entity** 85:11 |

173:2
equal 174:18
  175:4
equipment
  140:16 144:23
  145:23 148:6
  202:11 297:4
  297:14,23
  311:5,23
equivalent
  69:22 114:13
  178:24 221:7
  231:6,17
errata 336:6,9
  336:12,15
  338:12
escalate 173:15
  328:14,17
escalated 330:12
escalating 328:7
  328:9
escalation 10:11
  330:10 331:4,7
  331:8
espouses 43:18
ESQUIRE 2:3,3
  2:8,13,17 3:3,3
  3:8,13,18 4:3
essence 41:18,22
  113:19
essentially 140:9
  178:11 179:1
  187:16 198:18
  283:24
establish 178:7
established 45:3
  129:6 219:14
  321:19
establishing
  279:6
estimate 26:7
  196:5
estimated
  195:22
et 150:9 249:18
  302:20
European

250:18
evaluate 83:1
  182:19 183:5
  219:18
evaluated 47:9
  111:13
evaluates
  123:19
evaluating
  88:14
evaluation
  307:15,17
  325:10
event 171:8
  174:20 330:18
events 328:10
everybody
  143:4
evidence 173:22
  206:20 210:1
  242:14 290:22
  293:7
evidently 284:17
exact 17:12
  24:18,21 25:3
  55:11 60:20
  68:10 75:12
  99:3 114:10
  125:24 126:5
  126:16 228:17
  235:3
exactly 28:22
  150:2 166:12
  173:2 330:15
examination
  15:12 295:13
examine 139:16
examined 13:1
  140:4
example 70:6
  78:5 166:19
  171:15 269:11
  311:17 332:5
exceed 160:19
excuse 20:8,18
  25:8 34:13
  57:2 62:2

70:17 75:21
114:1 125:3
126:2 133:8
142:6 143:17
160:18 174:17
177:3 206:4
208:7 211:24
213:21 219:12
227:14 239:24
253:8 260:3
261:1 264:12
265:13 274:22
277:19 278:22
281:14 288:17
297:23 306:19
307:19 310:1
313:24 322:17
Excused 333:24
executive
  171:11,17,24
  172:4,6,10,17
  172:22 176:4
  176:19 331:11
  331:11 332:11
executives
  172:18 177:2
  245:4
exercise 115:16
exhibit 15:15,18
  16:1,5,6 22:21
  22:21 30:15,19
  54:11,15 57:20
  69:19 76:2,6
  93:18 96:10,14
  97:20,24 99:6
  101:16 104:2
  109:3,5,15
  117:16,18,20
  117:23 134:11
  138:12,14
  141:9,11
  155:18 156:1,4
  161:23 162:3
  173:7,7 177:12
  177:15 179:12
  180:1,3 194:11
  194:15 202:16

202:20 211:20
211:24 214:3,7
214:18 228:2,6
229:10 238:16
238:20 239:23
245:3 254:18
254:21,23
259:11,15
266:18,22
274:1,5,8,17
274:24 276:3,7
278:24 280:24
281:4 288:12
288:16 293:19
293:23 310:18
312:2,4 313:19
313:23,24
314:19,24
316:7,11,13
317:4,15 319:6
319:8 322:11
322:14 326:13
326:16,22
exist 202:6
  252:19
existing 275:10
  328:18
exists 244:12
expect 127:15
  169:11
expectations
  294:15 296:13
experience
  140:16 153:18
  183:11
expert 61:23
  153:7
expertise 39:19
  40:5,7 44:22
  47:18 49:16
  51:10 103:22
  154:7 161:17
  183:19
experts 150:7
  153:9 161:5,21
  163:10 198:7
  300:1

expires 338:21
explain 156:8
  222:1
explained
  162:24 197:7
  197:18
explanation 7:6
  162:9,11
exposure 49:9
extent 116:14
  135:2,23
  136:15 137:6
  137:10 261:18
  322:21
external 128:17
  130:4 150:18
  193:5 269:10
extracted 59:2
extracting 196:1
extremely
  200:16

**F**

F 117:9
facets 220:20
facilities 125:8
  311:11
facility 63:19
  68:23 87:9
  91:9 121:16
  198:3 202:8
  210:18 212:7
  234:15 235:9
  236:2 237:23
  267:17,19
  289:7,10,16
  315:12 316:22
fact 94:17
  106:17 112:7
  133:4 138:22
  140:20 159:6
  164:15 166:7,9
  185:14 188:4
  233:8 236:23
  237:3 240:18
  240:23 253:19
  284:22 298:5

Donald Hicks

300:10 307:14
311:5
**facto** 166:7
**factors** 148:9
**facts** 33:13,15
**factual** 32:22
**fail** 336:18
**failed** 256:13
309:14
**failure** 175:18
279:11 283:9
305:21 309:9
**failures** 309:10
310:8
**fair** 22:2,16,17
61:17 62:3
63:6 95:7
118:17 143:6,6
143:7 192:11
216:1 228:21
241:15 258:16
**false** 167:22
**familiar** 29:1
110:5 180:7
182:11,14
211:4
**families** 325:3
325:22 329:13
**family** 327:7
**far** 99:11,16
179:3 220:22
**fax** 1:23
**FCC** 9:20 314:6
314:10
**FDA** 221:7,21
222:23 223:4
224:10 225:22
227:13 244:18
246:15 247:7
248:5 250:6
294:9
**February** 14:15
303:4 305:13
**fed** 227:24
**feel** 22:7 264:4
**feet** 62:3,14,15
**felt** 189:22

**FERGUSON**
3:13 22:3
203:10 205:21
207:8 213:7
**fiber** 148:24
157:13,22
158:5,14 159:2
159:21,23
160:2,4,17,19
160:24 165:14
165:18 166:2,9
168:8,24 169:2
169:4,13,19,19
173:15 175:17
175:19
**fiberglass**
302:20
**fibers** 155:9
157:6,15
158:10,13,15
159:18 160:12
163:3,4,12
164:8,16,24
165:17,18,19
166:13,18
167:5,9,20
168:5 170:10
302:19 308:3
**field** 163:10
**figure** 314:16
**file** 143:9 323:16
**files** 35:11
127:16 263:11
**filing** 130:10,16
**filled** 42:16,17
215:19
**filling** 215:16
**final** 207:24
208:11,17
252:2 302:13
**finally** 123:20
**find** 120:1
175:19 282:5
303:17 304:8
**finding** 160:4
164:23 168:24
170:10 205:17

206:5,8 207:22
210:13,14
221:8 251:4
286:11 301:7
304:22,23
**findings** 195:2
205:4 207:6,6
207:16 286:12
287:20 292:11
292:12,14
**fine** 32:23 87:12
87:14 214:15
264:24 274:16
**fineness** 316:19
**finish** 100:9
122:15
**finished** 30:21
92:19 93:21
**firm** 14:2 40:24
**firm's** 294:11
296:9
**first** 12:24 76:14
76:17 99:1
100:20 101:14
132:1 133:5
140:4 277:17
297:2 313:22
316:17
**five** 24:23,24
25:3,13 26:13
28:4 53:17
156:21 157:6
157:14 158:9
159:7,18 163:2
163:11 164:23
165:19 166:13
166:18 167:4,8
167:19 173:21
174:4 207:5,6
256:24 264:19
**five-minute**
168:13
**Florham** 3:9
**FLW** 1:6
**focus** 204:13
**focused** 37:9
38:4 50:16

204:11 219:8
**folder** 315:1
**folks** 51:5 173:2
177:7,8 243:11
243:11 249:5
249:10 259:9
278:9 279:22
286:23 325:11
**follow** 14:21
**follow-up** 14:21
134:7 177:10
265:15 274:14
321:2
**following** 57:24
127:11 206:10
252:22 282:19
285:21
**follows** 13:1
191:1 294:7
**Food** 313:5
**foot** 61:21
**force** 242:18
**foregoing**
335:18 338:6
**form** 22:4 51:18
52:6 66:12
68:19 70:22
71:7,20 77:23
87:10 88:23
90:3 93:8
94:12 95:3
97:15 98:6,14
100:1 110:17
112:1,18
113:11,16
114:8 120:17
122:5 129:21
142:21 146:17
149:10,14
152:2 154:14
155:13 156:11
158:1,20 165:9
167:14,24
174:11,23
178:15 185:1
187:23 188:11
189:17 190:14

203:11 205:10
205:22 207:9
209:5 215:9
218:9,17
227:16 231:9
231:22 232:12
234:8,23
235:11,21
236:5,19
237:19 239:3
239:14 240:12
241:7 242:2,22
243:22 245:9
248:7 253:6,12
255:23 256:19
257:6,15 258:3
258:11 261:14
265:21 273:19
277:16 283:21
309:17 313:12
319:12 332:14
338:10
**formal** 201:21
202:5 217:18
**format** 251:23
317:20 318:3
**formed** 40:24
226:12,20
227:3 228:22
242:18 244:15
244:19
**former** 35:1
201:15 203:8
**forward** 14:3
20:14 71:4,11
71:12 72:23
73:1 87:22
89:23 94:20
105:20 327:14
**found** 159:2,22
160:12 165:14
165:16,17
167:4 169:3,12
169:13 171:14
185:13 188:16
229:22 243:3
244:3 305:14

Donald Hicks

Page 352

305:23 308:3
331:14
**foundation**
63:14 100:8,17
101:7 105:10
112:18 190:13
255:23 256:19
257:6,15 258:3
277:16 280:20
289:12 321:24
**four** 16:14,19
26:17 317:18
320:20
**fraction** 196:4
**Fragrance**
137:21
**frame** 20:18,18
56:6 61:6
84:21 87:21
102:1,7,19
104:4 105:1
211:3,18 331:1
**Franklin** 4:3
**free** 22:7 144:18
**frequencies**
81:16 100:13
119:7,22
132:23 133:15
**frequency** 98:1
**frequently**
104:17
**front** 22:19
37:21 97:20
131:11
**fulfillment**
41:20 42:14
**full** 93:23
303:24 318:15
**fully** 268:4,13
269:18
**functioning**
332:9
**funneled** 313:1
**further** 15:3
42:6 100:22
304:3
**future** 147:17

**G**

**gap** 206:16
290:18
**gaps** 206:16
290:18
**general** 16:17,18
36:18 120:8
124:9 126:18
139:4,10
199:18 204:14
205:14 220:15
233:19 252:15
292:9 294:20
**generally** 24:3
33:17 252:8
**generate** 187:15
315:14
**generated** 94:9
94:14,18 151:3
271:17 281:10
315:9,10
317:16 329:8
**geologist** 38:13
**geopolitical**
219:5
**Georgia** 14:1
63:18 68:23
84:4,14,16
85:18 91:9,24
199:6 267:19
315:12
**GEREL** 2:8
**germane** 24:10
**getting** 233:15
272:12,14,17
278:15 323:7
**Giguang** 194:22
232:9 321:14
**give** 26:7 74:21
109:11 142:2
191:23 213:16
213:23 245:16
259:17 263:13
264:12 266:23
314:24
**given** 173:3

220:7 255:18
260:7,8 303:24
335:6 338:8
**gives** 230:19
**Glacier** 9:20
314:6,10
**gleaned** 94:8
**global** 6:17
36:14,23
141:15 151:10
175:15,15
227:22 229:7
244:12 250:22
268:5,14
269:18
**globally** 220:8
**globe** 36:21
220:10 288:10
**GMP** 120:4,9
125:9 286:15
289:22
**go** 17:21 24:12
81:20 88:24
91:8 101:12
159:12 167:15
170:6 175:22
182:16 189:24
217:13 254:19
262:18 295:23
304:10 314:16
315:1 325:9
326:4 330:7
**goes** 149:3
297:17 302:5
**going** 16:4 18:2
20:12 21:12
23:23 35:14
59:7,14,16
69:16 72:14
73:7,12 96:14
107:4 108:3
109:1 115:16
117:5 136:14
159:21 162:3
168:16 201:3
213:22 214:3
217:7,13

224:24 225:3
262:17,18
265:4 291:9
303:15 304:2
304:13 312:2
313:9,23
314:22,23
317:14 323:3
323:12 333:22
**gold** 146:14,19
147:6,11 149:7
149:18 150:3
150:10,15,19
150:22
**GOLDMAN**
2:17
**Golkow** 1:22
12:6
**good** 12:2 15:21
17:20 43:20
53:1 187:18
254:19 264:16
265:2 289:22
**Google** 61:24
**GORDON** 3:13
**Gosh** 171:20
227:10
**Gottfried**
327:15 328:1
**govern** 121:3
**government**
147:4,10 149:5
149:17,21
150:8 151:10
239:20 252:18
**government's**
221:7
**grade** 5:20 7:8
9:22 10:6
54:22 57:10,11
58:3 162:19
**gray** 1:18 12:20
142:17 335:12
**great** 17:19
22:18 23:4
326:20
**greater** 174:4,15

174:17 188:24
**grind** 200:9
**grinding** 7:13
68:13 111:9
194:22 234:15
235:9 236:2
237:23
**grocery** 94:22
**ground** 194:8
**grounds** 246:5
248:8
**group** 71:24
72:21 94:2
128:3,18
142:12 143:20
172:12 181:5
183:21,21
198:8 204:11
227:11 243:9
245:23 307:14
325:9 332:3
**groups** 154:20
**Guangxi** 58:12
58:22 59:1
216:12
**Guiguang** 7:12
10:8 58:5
195:7,10
**Guilin** 7:12 10:8
194:21 199:23
200:1,2,3
219:9,13 232:8
232:23 233:2
233:15 267:24
268:2,3,6,12
268:23 269:7
270:2,15 271:8
271:11,24
272:19 273:1,1
273:13,20
275:11,18
276:21 277:2,5
279:19 280:7
321:9,14
**Guilin's** 279:2
**Guping** 58:9

| **H** | | | | |
|---|---|---|---|---|
| **H** 5:10 6:2 7:2 8:2 9:2 10:2 | 267:14,14,16 | 224:8 225:1 | **Hicks-25** 9:11 | 222:13 |
| **hair** 180:11 | **heavy** 66:14,17 67:1 92:22 311:19 | 231:6 233:10 235:15 238:20 238:21 254:18 | 288:13 | **Hollweck** 288:22 289:3 289:14 |
| **half** 198:18,19 | **held** 1:16 12:10 229:18 267:7 | 259:16 264:9 265:10 276:23 | **Hicks-26** 9:14 293:20 | **homework** 217:15 |
| **hand** 16:4 281:3 | **help** 244:19 247:24 276:24 | 283:13 290:6 291:23 296:8 | **Hicks-27** 9:17 312:5 | **Hong** 200:5,5 |
| **handed** 31:1 156:4 228:5 312:7 | **helped** 135:17 247:13,14 | 301:14 304:19 312:1 313:10 | **Hicks-28** 9:20 313:20 | **Honorable** 295:10 |
| **handle** 224:5 310:3,7 330:16 | **helpful** 53:15 59:17 | 323:17,23 324:17 335:8 | **Hicks-29** 9:22 314:20 | **hopefully** 119:3 |
| **handled** 181:17 | **HERRINGT...** 3:2 | 338:16 | **Hicks-3** 5:17 30:16 | **hosted** 260:15 |
| **handling** 36:20 | **Hi** 275:5 | **Hicks-1** 5:14 15:16 | **Hicks-30** 10:6 316:8 | **hour** 27:14 28:17 29:9,10 29:14 264:20 |
| **happen** 173:14 | **Hicks** 1:15 5:4 5:17 12:16,23 | **Hicks-10** 6:21 156:2 | **Hicks-31** 10:8 322:12 | **hours** 25:16 27:23 304:9 333:17 |
| **happened** 151:2 192:8 | 13:4 15:4,21 20:4,7,11,24 | **Hicks-11** 7:6 161:24 | **Hicks-32** 10:10 326:14 | **housed** 123:11 |
| **happens** 76:14 | 22:12 29:2 30:19 31:7 | **Hicks-12** 7:9 177:16 | **Hicks-4** 5:18 54:12 | **Houston** 57:14 60:14 61:7 |
| **happy** 18:2,4 103:2 263:6 318:20 | 37:24 40:23 42:23 44:6 | **Hicks-13** 7:11 180:4 | **Hicks-5** 6:6 76:3 | 63:11 87:9 91:23 198:2 |
| **harassing** 116:15,20 | 45:1,10 47:8 47:15 48:1,17 | **Hicks-14** 7:12 194:12 | **Hicks-6** 6:9 96:11 | 200:6,7 202:8 208:2,24 209:2 |
| **hard** 112:7 | 48:24 49:13 51:24 59:9 | **Hicks-15** 7:15 202:17 | **Hicks-7** 6:13 109:6 | 209:15 210:17 210:21 212:5,7 |
| **hazard** 51:21 152:1,4 | 60:12 62:19 67:10 71:3 | **Hicks-16** 7:17 211:21 214:8 | **Hicks-8** 6:15 138:15 | 214:20 267:19 267:20,21 |
| **hazardous** 151:18 154:10 | 73:19 75:9,24 79:24 95:8 | **Hicks-17** 7:20 228:3 | **Hicks-9** 6:17 141:12 | 270:18 273:10 316:22,24 |
| **head** 62:23 74:22 128:1,3 170:7 | 97:18 106:11 108:19 109:10 | **Hicks-18** 8:6 238:17 | **high** 66:5,14 67:7 200:17,20 | 317:2,9 320:3 320:6 |
| **head-to-toe** 312:20 | 109:12,16 114:21 116:8 | **Hicks-19** 8:9 254:24 | 200:21 201:1 282:22 332:8 | **Huamei** 58:9 |
| **headquarter** 200:8 | 116:20 117:14 120:9 122:13 | **Hicks-2** 5:15 15:19 | **higher** 189:24 | **humans** 44:7 47:12,22 48:21 |
| **headquarters** 244:13 | 131:12 134:6 135:8 139:1 | **Hicks-20** 8:12 259:12 | **highlighted** 267:3 | 49:10 65:11,24 66:9,15 67:8 |
| **health** 47:10,21 49:8 291:2 301:4 | 144:4,11 153:2 156:16 166:17 | **Hicks-21** 8:17 266:19 | **highly** 150:6 | 151:18 182:21 183:14 184:6 |
| **heard** 146:18 149:19 150:11 | 168:22 181:10 183:1,16 184:2 | **Hicks-22** 8:20 274:2 | **Himmelsbach** 288:24 | **Huntington** 302:11 |
| 150:14,16,18 197:7 200:1 | 190:19 192:14 205:12 214:10 | **Hicks-23** 9:6 276:4 | **hire** 247:12 | **hygiene** 73:9 |
| **hearing** 228:24 | 218:22 222:3 222:14,16 | **Hicks-24** 9:8 281:1 | **hired** 210:16 247:5 280:15 | **hygienist** 38:18 |
| **heat** 8:18 230:21 231:15 256:16 | | | **historical** 181:24 189:10 | **hypothetical** 144:20 165:11 168:3 171:14 |
| | | | **history** 25:7 54:7 | |
| | | | **hold** 61:14 141:4 | |

**I**

**IARC** 50:20
51:4 181:6
182:11
**ID** 303:5
**ID'd** 306:10
**idea** 217:23
219:20
**identical** 252:16
**identification**
15:15,18 30:15
54:11 57:6
76:2 96:10
109:5 112:5
138:14 141:11
156:1 161:23
168:8 177:15
180:3 194:11
202:16 211:20
214:7 228:2
238:16 254:23
259:11 266:18
274:1 276:3
280:24 288:12
293:19 312:4
313:19 314:19
316:7 322:11
326:13
**identified** 168:5
**identify** 96:15
157:11 194:16
208:10
**identifying**
139:7
**III** 13:12
**Imerys** 3:20 6:8
6:12,21 7:8,10
7:16,19 8:16
9:21,23 21:20
21:22 57:13
67:21 68:3
69:11 80:20
82:4,11,23
83:1,15,18
87:9,17,20
88:10 89:8,15

89:16 90:10
161:4,21
169:12 194:7
196:3 197:8,23
201:10,15,19
201:23 202:3
203:9 204:20
207:7 209:20
212:9 214:21
216:15 233:3,3
258:22 259:8
262:4 263:1,21
267:18 271:3,3
271:20 272:5
273:3,22
316:21 317:17
318:2
**Imerys'** 21:21
**immediate**
258:23
**immediately**
228:23 308:13
309:19
**impact** 95:1
**imperative**
336:14
**implications**
77:5
**implied** 233:7
**important**
151:13,17
157:23 229:5
267:24 272:11
287:3
**imposed** 129:5
**impurity** 243:4
**in-process**
278:12
**inability** 279:3
279:12
**inappropriate**
123:13,17
223:13
**incident** 305:24
**include** 36:13
112:4 147:2
155:15 172:18

174:7 268:22
302:6
**included** 45:13
112:15 114:10
129:19,24
133:24 172:11
172:22 245:4
324:9 332:3
**includes** 205:3
206:19 290:21
**including** 14:22
177:6 245:5
252:23,24
257:22,23
308:11
**incoming**
207:24 318:8
**incomplete**
318:11
**incompletely**
303:12
**incorporated**
84:3 136:17
**incorporation**
252:10
**incorrect** 116:23
167:11 300:14
**independent**
71:13,16,22
81:13 87:23
88:2,4,6 93:20
93:22
**independently**
307:17
**INDEX** 11:2
**India** 324:11
**Indian** 179:13
244:4 250:19
**indicate** 25:3
29:18 111:14
178:23 256:2
307:4 320:21
329:23
**indicated** 28:3,8
91:8 98:20
144:5 284:15
302:16 303:5

320:10
**indicates** 111:10
236:8 284:21
305:17
**Indicating** 81:6
**indication**
289:17 298:13
**indicative** 189:9
**individual** 14:23
77:20 80:11
148:7 161:8,11
223:8 325:8
**individuals** 41:7
47:3 150:6,19
171:21 226:12
253:19 282:1
325:2 332:6
**individuals'**
172:3
**inductive**
179:14
**industrial** 38:17
256:6
**industry** 41:13
41:15 139:24
250:17 252:23
253:17 254:4
**infers** 112:6
**information**
28:22 32:21,23
33:8,16 34:20
51:4 74:10
81:7,12 95:16
95:19 96:1
135:18 143:20
181:16 204:23
235:4 238:9
240:9 256:14
264:7 265:24
271:1,9 312:23
317:22 326:7
**informational**
94:10
**informed**
226:11 228:12
**informing**
229:20

**inhouse** 267:17
269:9,14
**initial** 67:16
68:12 111:8
278:5 286:17
301:23,24
306:9
**initially** 169:14
328:11
**initials** 301:22
**initiate** 278:16
**Innovations**
41:19
**input** 81:3
181:19
**instance** 223:3
**instances** 301:13
**instituted** 102:1
102:18 105:5
120:11 121:21
211:15 284:8
**instructions**
22:23 23:1
336:1
**instruments**
139:15
**intellectually**
247:18
**intelligent**
249:11
**intend** 191:15
**intended** 77:14
87:6 322:22
**intent** 114:12,18
129:14
**Inter** 88:1
**interact** 36:22
**interacted** 247:3
**interest** 218:1
271:21,23,24
274:14
**interject** 192:5
**interpret** 226:5
226:17
**interpretation**
116:11 195:11
**interpreter**

140:17
**Intertek** 88:8,10
89:11,23 90:18
90:22 202:22
203:15 209:9
210:5
**inventory** 57:5
**investigate**
95:24 96:5
188:3
**investigation**
173:16
**invited** 176:5
**involved** 28:11
80:23 206:4
221:18 224:9
243:10,11
275:8
**involvement**
36:1 37:8
**involves** 301:3
**involving** 17:6,7
222:21 259:22
**IP** 284:5
**isolated** 290:24
**isolation** 146:5
146:20
**issue** 17:8 22:8
55:12 66:6,8
161:1 169:12
170:11,13,24
173:22 174:6
174:17,19
175:24 182:11
215:11 223:23
227:16,21,22
229:5 243:7
244:21 246:13
248:16 253:16
269:5 272:6
275:7,10
300:13 305:22
308:12,13
328:20 329:3,6
330:10 331:1,4
331:8,13
**issued** 96:19

99:1 109:23
118:10 120:13
131:17 132:14
190:22 221:8
328:11
**issues** 50:17
128:6 170:3
183:8 185:23
189:4 247:16
301:3 328:17
328:18
**items** 70:9 98:9

---

**J**

**J** 3:13
**J&J** 5:18 7:7,17
9:17 20:10
40:17 44:20
50:6,6,7 51:14
52:10 68:16
69:8,13 72:20
72:21 79:19
82:13,17,20
83:20 85:3
89:11 93:20,22
93:24 120:11
121:18 125:14
131:4 138:6
150:21 154:19
172:23 173:2
196:2,3,16
220:9 234:14
234:16 236:1
247:4 255:19
260:6 262:4
268:5 271:6
272:19,21
275:11 284:8
293:16 294:13
294:13 296:11
296:12 301:19
304:21 307:5
310:3 312:9
315:5 318:5
319:22 321:11
321:17
**J&J's** 195:23

**J4-1** 79:12,15
138:1,5,19,24
139:7,15 140:3
154:23 250:9
251:17 252:9
**Jaeger** 327:12
**Janet** 276:8
**January** 16:23
17:11,15,17
26:1,1,21 28:8
29:20 30:1,11
**Japan** 233:12
234:1
**JB** 7:20 8:9
230:21 231:14
256:15
**JBaby** 10:12
**Jcheong@bm...**
4:5
**JENNIFER** 2:3
4:3
**jennifer.emm...**
2:6
**Jersey** 1:2,17
2:14,19 3:9 4:4
12:11,14
**JF-1** 251:2
**JFR** 212:19,20
213:6,8 215:4
215:14
**JJC** 230:9
**JJCI** 19:13
95:23 172:23
**JNJ** 5:20 6:20
7:11,14 8:22
10:7,9 213:19
**JNJ00013364...**
9:10
**JNJ00052160...**
9:16
**JNJMC** 118:17
131:14 132:1
192:1
**JNJNL61_000...**
9:13
**JNJTALC000...**
7:21

**JNJTALC000...**
8:11
**JNJTALC000...**
9:19
**JNJTALC000...**
8:8
**JNJTALC000...**
9:7
**JNJTALC000...**
8:19
**JNJTALC000...**
6:14
**JNJTALC000...**
10:13
**job** 46:22 245:16
**Joel** 295:11
**Johnson** 1:4,5
3:11,11 8:15
15:5,5,6,6 16:6
16:6,7,7 18:18
18:24,24 19:6
19:6,12,12,20
20:20,20,24
21:1,3,3,3,4,11
21:11,14,14,14
21:15 25:24,24
26:12,12,16,16
27:9,9,17,17
27:18,18 28:15
28:15 29:12,13
31:10,10,10,11
31:17,17 32:2
32:3 34:1,2,15
34:15,20,21
35:2,2,5,5,20
35:20 36:7,7
36:11,11 41:11
41:11 42:24,24
43:5,5,11,11
43:16,16,17,17
43:19,19,24,24
44:18,18,18,18
46:20,20 48:20
48:20 54:19,19
59:3,3 64:9,10
64:13,14,21,21
68:3,3 69:11

69:12 71:4,4
71:17,17,23,23
72:3,3 75:5,6
78:11,11,15,16
79:10,10 80:1
80:1,20,21
82:12,12 84:9
84:9 86:23,23
89:22,22 90:4
90:5,8,8,15,15
90:19,19 91:2
91:2,3,3,18,19
94:4,4 95:23
95:23 121:11
121:12,21,21
123:21,22
124:3,3,14,14
129:5,5 130:7
130:7,8,8
141:20,21
147:23 153:12
153:12,16,16
153:19,20
154:8,24,24
160:20 161:13
161:14 166:2
169:5 172:18
176:21,22,24
176:24 177:4,5
177:5,5 185:6
185:6 186:11
186:12 193:15
193:16 194:3,3
198:14,14
202:2,2 203:16
203:17,21,21
204:16,16,19
204:19,24,24
210:17,17
215:7,7 216:22
216:22 218:15
218:15 221:24
221:24 222:18
223:4,4,11,11
225:2,2,10,22
225:22 226:10
226:10,13,13

228:11,11,22
228:22 230:1,2
230:10,10,15
230:15 234:4,4
237:12,12,16
237:16 239:18
239:18 241:2,2
247:23,23
249:4,5,21,21
250:7,7 252:24
252:24 254:6,7
257:12,12,22
257:22,23,23
258:8,21,22
259:21,23,23
260:5,6,6,13
260:13,14,15
260:15,16
261:12,12
262:8,9,9,13
262:14 263:3,4
263:4,10,17,17
265:13,13,14
265:16,18
266:2,2,5
268:11,11,13
270:4,5 271:10
271:10,23,23
272:1,6,6
273:13,14,14
273:14,23,23
276:10,10
279:23,23
280:15,15
281:5,5 286:5
286:5,13,14
289:24,24
291:15,16
293:2,2,9,10
293:24 294:9
294:10,17,17
299:23,24
306:11,11,16
306:17,22,22
308:2,2 312:12
312:12 317:23
317:24 324:24

325:1 327:5,6
333:7,7,10,10
**Johnson's** 18:19
19:20 147:23
154:9 160:20
166:3 169:5
172:19 222:19
225:10 230:21
233:4,5 234:20
236:15 243:18
255:20 265:16
265:19 266:6
268:13 272:2
277:12 293:24
**judge** 13:7 14:14
116:17 291:10
303:16 304:7
**judgments**
183:23
**Julie** 161:9
166:6 259:2,5
**July** 8:15 131:17
132:15 133:16
258:18 265:11
335:15
**juncture** 61:15
**June** 1:12 12:7
25:11,19 26:15
26:18 32:11
141:17 151:3
171:5 173:5
175:9 327:6
331:1
**justification**
148:19

_____

**K**

**K** 2:3 3:18
**Kansas** 218:23
218:24 219:7
219:15
**keep** 208:6,7
**keeps** 153:12
**Kelly** 327:15
328:1
**Kemble** 3:18
**KENNETH**

3:13
**kept** 124:19
**key** 206:21
290:23
**kferguson@g...**
3:15
**kind** 245:1
311:23
**kindly** 187:1
**kinds** 50:17
81:14 183:22
204:12 329:9
**knew** 240:18
**know** 17:21,22
17:22 33:10
48:8,12 49:7
53:24 54:5
55:16,20 56:17
75:3,10 81:12
95:11 120:9
121:8 128:7
135:15,16
152:23 153:1
153:17 161:8
170:5 171:21
171:23 175:16
176:8 177:8
180:13 182:13
182:18 189:3
197:11,20
199:24 201:6
202:13 205:5
209:8 210:9,24
216:23 217:19
219:4 237:9
238:11,12
241:14 245:20
251:22 260:7
263:8,18
264:22 267:1
269:9,13
271:15 280:2
299:4 301:14
306:13 313:12
318:14,16
323:2 324:5
333:14

**knowledge**
58:19 72:16
74:3 84:17
106:22 153:24
179:22 183:11
261:21 262:17
263:23 307:3
**known** 65:10
149:4,5 150:1
150:3 151:18
151:24
**knows** 261:19
**Kong** 200:5,6

_____

**L**

**L** 1:18 5:17
335:12
**L.L.P** 3:17
**lab** 71:22 72:2,7
72:20 88:2,4,6
93:4,12,23,24
94:3 240:17
256:7 280:15
286:15 288:3
292:16 297:3
297:14 298:5
302:8 320:10
320:15,19,20
320:21 321:9
**labeled** 68:12
69:20 111:8
**labels** 302:6
**labor** 195:13
**laboratories**
271:5
**laboratory**
71:14 81:14
88:7 89:14,17
90:6 205:7
238:14 269:11
**labs** 71:5,16
87:23 89:8
320:21,24
**lack** 100:8,17
206:20 290:22
**Lang** 58:10
**language** 113:14

113:18 114:4
114:10 129:13
129:17
**LAPINSKI** 2:17
321:22 326:17
**large** 68:7 243:9
245:23
**largely** 321:17
**late** 26:22 291:1
329:7
**latest** 56:22 96:1
**law** 1:16 14:2
**lawyer** 274:12
**LAWYER'S**
339:1
**Ldwyer@orri...**
3:6
**lead** 67:6,7
70:18 78:5,13
92:22 98:4
180:7
**leadership**
331:22 332:2
333:8
**learned** 255:19
**leave** 46:16
287:19
**led** 262:8
**Lee** 9:12 71:23
72:21 80:15,16
94:2,3,9,24
141:4 142:12
143:20 144:6
148:14 161:3
169:13 198:7
247:5,12
248:19,22
249:3,13,20
254:14 275:12
280:14,18
282:9 283:17
284:15,22
285:2,17
286:14,19
287:12,16
288:2,21 289:6
289:9 290:6

291:24 292:11
292:21 293:11
294:1,17,22
296:17 297:20
299:19 304:21
305:4 306:16
306:21 307:9
308:7,17 309:1
**Lee's** 285:12,21
286:4 287:10
**legal** 23:20
31:14 177:8
**Leigh** 2:3 15:22
118:14
**leigh.odell@b...**
2:5
**Lesley** 327:15
327:21
**let's** 62:16 81:20
101:12 115:24
117:1 225:13
225:19 264:9
304:7,10
**letter** 115:20
116:2 217:16
217:18,24
295:10
**letters** 132:1
**level** 65:9 125:5
156:23 157:4
158:17 159:3
159:10 163:13
164:21 165:3
173:17 176:2
178:1 188:14
188:15 189:8
191:2,21
197:12 200:20
200:21 201:1
230:22 242:18
332:6,8,20
333:1,2
**levels** 65:2,5
66:5,15 67:7
144:15 152:2
172:14 330:12
**LHG** 1:6

**LIABILITY** 1:6
**light** 39:1 140:1
140:10 302:21
**limit** 7:7 19:18
20:5 77:20
78:4 79:1,4
140:13,22
143:23 144:3,8
144:8,12
145:16,23
148:9,20
156:17 160:3,6
162:10,12
163:2,6 166:11
175:5 178:11
179:12,15
181:1,22 182:3
182:6 185:24
186:4,7 187:14
187:15 189:1
189:14 190:4,9
190:24
**limitation**
144:22
**limited** 41:10
53:19 84:20
93:1 270:8
**limits** 142:8
181:19,21
185:11 189:23
243:5
**Linda** 303:3
**line** 11:6,9,12,15
37:8 87:5
170:8 172:8
185:11 212:11
213:1 214:24
214:24 223:14
232:7 256:8
337:4 339:2
**link** 279:12
**linkage** 99:21
101:19 102:5
103:7 105:7
107:1 110:8
111:20 112:7
112:13 113:7

114:4 180:13
279:6
**linked** 101:2
**links** 262:3
263:3
**list** 71:16 246:2
301:21 320:19
320:20
**listed** 70:9 88:17
119:21 123:6
277:6 302:13
320:16
**listen** 187:8
**lists** 296:24
**literature** 40:13
182:17
**litigation** 1:7,22
12:6 28:2,5,5
185:7
**little** 43:10
194:1 305:8
320:17 321:4
**live** 36:4
**LLP** 2:8 3:2,8
3:13
**loaded** 208:4
**lobbying** 248:2
**local** 324:15
**locate** 219:16
**located** 71:24
84:3
**locating** 219:8
**location** 85:15
85:24 89:2
**LOGAN** 3:3
**logged** 325:11
**login** 303:1
**long** 25:12 33:5
37:13 264:17
264:18 267:22
327:18
**long-time** 35:2
**longer** 219:21
**Longguang** 58:9
**Longsheng**
58:11
**look** 22:21 24:20

37:18 54:8
57:19 59:20
77:9 87:4
97:23 99:2,10
101:9 102:11
105:13 107:9
109:16 110:12
110:21 111:2
113:4 115:20
125:8 132:3
138:11 143:10
146:4,23
147:12 148:10
156:15 168:6
173:11 179:8
180:9,18 182:2
183:20 190:18
191:4 202:9,10
202:11 203:14
217:14 228:8
245:2 259:18
262:19 263:6
264:1 279:22
279:23 318:20
**looked** 62:1
101:13,14
103:14 107:16
108:22 134:3
134:15 148:8
173:6 278:9
317:19
**looking** 21:19
25:5 33:16
43:16 61:17
69:18 81:10,15
88:11 91:10
97:18 99:6
100:21 113:5
117:15 135:15
142:1 158:4
178:6 179:11
201:5 219:2
220:14 235:17
238:22 239:23
267:15 269:6
277:20 332:9
**looks** 203:3

320:10
**loose** 316:19
**loss** 321:5
**lost** 254:18
314:24 323:18
**lot** 67:21,23 68:1
68:1,4,6,8 85:4
98:10,23 99:22
101:3,21 102:7
103:10,17
105:8 107:3
110:10 111:22
112:9,14,24
113:2,9 114:6
133:7,9 166:12
197:1,5,16
198:1 201:2
210:3,3 276:22
276:22 277:2
302:7 315:11
316:4,5 317:9
317:13 319:19
320:13
**lotions** 42:1
**lots** 93:21 133:7
196:21,24
198:2
**Louis** 84:22
**low** 232:23
**lower** 60:7 93:16
99:16 316:1,15
317:4
**lump** 87:10
**lunch** 117:2,7,15
**Luzenac** 212:3
214:20

**M**

**M** 2:13 3:8
303:3
**machine** 298:22
299:14
**machines** 298:6
**magnesium**
70:17
**mail** 86:12
**maintain** 35:10

Donald Hicks

Page 358

| | | | | |
|---|---|---|---|---|
| maintained 55:3 | 68:17 84:15,18 | 313:18 314:18 | 121:5 123:9,20 | 325:9 326:5 |
| maintenance | 85:4,15 94:21 | 316:6 322:10 | 125:13 131:16 | meet 24:8,16 |
| 297:13 | 99:9 120:4 | 326:10,12,21 | 203:20 207:24 | 206:18 283:6,9 |
| major 104:22 | 128:4,17 | market 41:23 | 207:24 209:2 | 290:20 |
| 170:3 205:17 | 187:19 193:5 | 322:23 324:15 | 284:7 311:3 | meeting 25:15 |
| 206:4,8,9 | 200:22 227:23 | marketing 1:5 | 314:2 315:4 | 176:19,23 |
| 207:5,16 | 257:19 289:23 | 123:2 332:7 | math 62:12,21 | 177:1 229:19 |
| 236:14 283:9 | 313:15 315:8 | marking 30:19 | 62:23,24 | 239:1,12 240:4 |
| 290:7,11 291:3 | 315:15 319:10 | 54:15 76:6 | 231:11 | 240:10 241:5 |
| 292:1 297:8 | Maple 2:13 | 138:12 141:9 | matter 12:11 | 241:23 |
| 298:3,15,24 | March 13:6 35:9 | 177:12 180:1 | 22:20 170:3 | meetings 24:21 |
| 300:11 301:3,7 | 76:18 93:19 | 194:15 202:20 | 243:5 307:22 | 24:24 25:9,10 |
| 304:23 | 96:19 118:10 | 211:24 238:20 | maximum 78:20 | 25:13,19 26:15 |
| making 183:22 | 120:14 121:14 | 259:15 266:22 | 191:2 | 26:18,19,20,22 |
| 253:18 279:24 | 122:3 129:10 | 274:5 293:23 | McTIERNAN | 27:24 28:8 |
| 318:6 | 129:24 131:2 | 316:11 | 4:2 | 30:1,2 34:1,16 |
| manage 285:1 | 180:19 280:18 | mass 159:15 | MDL 1:5 13:21 | 35:15 40:16 |
| managed 33:18 | 281:14 294:2 | 166:13 | mean 22:14 26:4 | 119:1 182:16 |
| 33:20,21 | 304:21 | material 6:6,9 | 27:7 33:14,19 | 246:10,11 |
| 204:10 | marginal 296:21 | 6:13 52:8,14 | 38:2 41:4 66:8 | 248:20,20 |
| management | mark 3:18 62:13 | 55:19,23 56:4 | 72:11 144:15 | 259:8 325:14 |
| 150:17 151:13 | 96:14 109:2 | 56:8 59:18 | 144:17 145:1 | 333:9 |
| 154:8 170:6 | 155:22 162:3 | 61:11,18 66:23 | 145:14 166:17 | meets 144:21 |
| 171:11,18 | 193:6 194:19 | 80:9 87:13 | 168:6 169:7 | member 154:7 |
| 172:1,5,10 | 198:12 199:12 | 91:1,14 95:12 | 173:1 177:6 | 266:14 |
| 194:24 330:13 | 262:1,17 | 97:9 100:6 | 179:17 201:2 | members 32:2 |
| 331:11,12 | 266:12 275:6,6 | 102:18 103:5 | 202:5 203:1 | 80:20 193:6 |
| 332:19 | 288:24 312:2 | 103:13 104:24 | 237:6 248:14 | 246:3 252:23 |
| manager 193:7 | 313:23 314:23 | 105:5 120:14 | 263:4 331:9 | 258:21 281:18 |
| 193:7 194:20 | marked 11:14 | 129:14 132:13 | meaning 79:20 | 332:19 |
| 288:23 302:14 | 15:14,17,24 | 140:4,8 144:14 | 114:13 168:11 | memo 7:6 162:8 |
| manganese | 30:14 54:10 | 146:1 154:11 | meaningful | memorandum |
| 70:17 | 76:1 96:9 | 158:8,8 193:5 | 48:14 157:15 | 162:4 |
| manner 248:21 | 109:4,14 | 204:9 208:14 | 157:18,23 | memory 16:21 |
| manufacture | 138:13 141:10 | 208:17 230:19 | 165:20 166:14 | 53:12 75:1 |
| 41:22 124:5 | 155:18,24 | 232:8 236:24 | means 81:22 | 88:23 107:5,23 |
| manufactured | 161:22 173:6 | 256:6,15 272:2 | 94:19 166:24 | 119:2 137:23 |
| 84:13,22 85:22 | 177:14 180:2 | 300:24 | 238:12 335:20 | 138:21 234:18 |
| manufacturer | 194:10 202:15 | materially 57:1 | meant 67:22 | 289:9 |
| 83:22,24 84:2 | 211:19 228:1 | 57:2 | 87:7 | mentioned |
| 130:5 | 238:15 254:21 | materials 52:9 | medical 38:11 | 14:14 56:10 |
| manufacturers | 254:22 259:10 | 54:2 73:20 | 45:4 46:2,15 | 134:8 196:18 |
| 125:11 | 264:2 266:17 | 74:17 76:22 | 49:17 50:15 | 220:21 266:11 |
| manufacturers' | 273:24 276:2,7 | 77:3 80:2,18 | 51:5 153:7,8 | 311:7 |
| 226:23 | 280:23 281:4 | 96:2,16 97:7 | 181:18 183:21 | mercury 70:18 |
| manufacturing | 288:11,16 | 101:24 104:23 | 184:14 186:2 | mesothelioma |
| 9:9 43:20 | 293:18 312:3 | 118:5 120:3 | 189:19 237:1 | 17:8 46:7,9 |

Donald Hicks

152:12,23
messy 21:24
met 15:22 23:20
25:4,23 26:3,6
26:11,15 28:9
metal 70:5
metals 66:14,17
67:1 92:22
311:19
method 6:21 7:9
7:11 8:13,22
69:22 77:15
79:14,15,18,20
138:1,1,5,24
139:7,18,22,24
141:6 151:1
154:22,23
155:1,5,7
156:5,8 157:19
159:6 162:5,12
163:1 164:11
177:18 178:8
179:1,5,6,15
179:19 180:6
252:10 259:24
260:17 275:7,7
275:9 284:15
methodology
139:6 257:11
methods 69:3,6
69:7,10 137:21
138:9 157:21
158:3 177:11
240:21 250:16
268:8 269:21
275:19 277:5
277:13 283:19
mic 75:23
Michael 288:22
289:14
Michelle 1:17
2:8 12:20
261:24 335:12
microbiological
92:7 311:15
microbiology
93:3

microscope
79:18 140:10
microscopy 39:2
40:2 139:23
140:2 155:6
156:13 302:21
mid-'90s 178:19
middle 315:19
316:15,17
mill 210:3 280:7
milled 57:14
87:12,14,17
112:8 113:2
129:8 133:7
276:22 277:2
315:11,17,22
316:4 317:11
317:13 319:15
319:16,20
milling 87:6,7
90:10,14 91:13
119:11,17
133:1 232:15
278:2 315:20
317:6
million 65:6
78:6,13,17,23
79:2,5 144:9
148:22 160:11
160:14 173:21
174:5,16,18,19
175:4 178:3,12
181:3 182:5
184:23 185:16
188:8 189:1
190:5,6,11
191:3,20 231:7
231:17
mine 7:13 57:17
58:10,22 59:1
81:23 82:3,7
82:10 142:14
173:22 188:14
188:19 192:24
193:3,15,17,21
194:1,7,18,22
195:7,8,15,17

195:19 196:2
198:7,8,12
199:22 200:2
202:1 212:12
212:16,17
215:3,3,5
216:7,10,12,18
216:20,24
218:5 219:10
219:13,22
220:6 224:10
224:15,17,20
227:24 233:6
234:15 235:3,9
236:2,15
237:15 238:2,4
241:1 242:16
242:20 243:17
244:4,5 266:24
270:16 271:16
273:21 321:9
mine-to-bottle
198:20,24
199:3,10
mined 57:16
72:19 184:20
193:24 199:20
224:10 234:18
234:19 270:11
272:18
mineralogist
38:15
minerals 6:15
156:9,22 159:8
162:18 214:19
302:10
mines 58:1,17
58:20,21 68:2
188:19 189:5
189:11 192:20
220:8 233:2
mining 82:6,14
82:21 83:15
201:19 265:17
266:3 268:1
272:7 278:2
minor 207:6

290:8 292:2
minute 264:13
minutes 15:23
103:5 264:19
264:21 265:11
miscommunic...
286:22 287:22
misheard
149:24
Missouri 84:19
85:22,24 92:1
misspoke 91:7
misstate 106:8
Misstates
102:21 106:5
106:13
mitigation 174:6
mm-hmm
192:21 195:18
213:3
moderate
206:13 290:13
modified 13:7
14:16 189:22
modify 318:3
molecular 237:1
moment 35:17
204:18 314:24
324:18
monitoring
288:9
Montgomery
2:4
month 61:6
63:10
monthly 60:14
60:24 63:11
morning 12:3
15:21 134:8
184:16
Morristown
3:19
Mount 3:18
move 73:7
114:17 115:5
115:13,24
119:3 225:19

263:14 264:9
274:15
moved 240:6
movement
315:23
moving 14:3
274:10 295:20
310:17
mparf@aol.co...
2:10
Msilver@cou...
3:20
mulling 279:19
multi-page
217:14
multifaceted
220:18
multiple 24:19
24:19 29:4
60:19 61:6
63:9,17 74:7
106:19 164:16
188:23 227:23
303:6 305:13
306:23 324:8
multitude
146:22
multivitamin
184:17

_____
**N**
_____
N 4:3 5:2 117:9
117:9,9
N-A-L-T 331:19
NALT 331:19
name 12:4 41:5
80:14 81:14
88:5 143:9
161:9 198:11
227:2,11
232:15 233:16
263:5 320:14
331:3
named 266:12
names 21:8
41:16 57:5
81:10 171:20

| | | | | |
|---|---|---|---|---|
| 172:3 | 100:4,12 | 331:22 332:2 | **NS** 9:22 10:6 | 14:2,8 15:20 |
| **narrow** 139:10 | 104:21 114:15 | 333:8 | **number** 16:1,5 | 15:22 20:3,15 |
| **National** 256:5 | 133:14,20,21 | **Notary** 1:19 | 23:21 24:19,21 | 20:22 22:6,10 |
| **native** 142:21 | 174:7 211:13 | 335:14 338:23 | 25:4 26:6,8 | 24:6,15 27:4,6 |
| **natural** 66:22 | 254:5 257:1,10 | **note** 13:22 14:9 | 28:7 30:19 | 28:19 29:23 |
| **nature** 222:2 | 257:11,24 | 175:4 225:6 | 53:19 54:6 | 30:17 31:21 |
| 285:10 | 259:24 260:16 | 262:22 314:5 | 57:20,24 58:3 | 32:24 33:9,11 |
| **nearly** 252:16 | 328:8,17 | **notebook** 109:2 | 68:10 74:6,16 | 44:15 45:7 |
| **necessarily** | **news** 329:6 | 109:10,15 | 74:21 75:3,11 | 46:8,18 47:19 |
| 121:18 181:23 | **NGOs** 149:6 | 117:16,20,24 | 75:13,14,18 | 48:7,16 49:6 |
| 239:8 299:17 | **Nicholson** 32:6 | 118:3,9 131:11 | 76:6 83:7 | 49:20 50:4,18 |
| 320:4,6 | 32:7,9,13 | 134:6,10 | 95:12 104:2 | 51:12,23 52:13 |
| **necessary** | 33:24 36:1 | 137:15 180:20 | 106:16 112:6 | 52:21 53:6,16 |
| 206:18 283:6 | 40:19 | 190:19 | 113:5 118:15 | 53:21 54:13 |
| 290:20 311:2 | **nickel** 47:20 | **noted** 12:17 | 121:8 126:6 | 60:6,9,11,22 |
| 336:4 | 49:22 50:8,22 | 336:11 338:11 | 131:22 132:11 | 61:4 62:7 63:1 |
| **need** 38:3 | 70:18 79:4 | **NOTES** 339:1 | 142:1,2,3,15 | 63:5,15 65:22 |
| 105:13 122:19 | 92:16 98:3 | **notice** 1:15 5:14 | 142:16,17 | 66:7,13 67:5 |
| 123:4 146:22 | **night** 329:7 | 5:16 13:15 | 143:2 148:7 | 67:13 68:24 |
| 157:14 158:9 | **nine** 26:10 | 16:6 22:19,22 | 155:18 160:12 | 71:2,10 72:1 |
| 159:18 163:20 | **NJ** 3:19 | 52:23 181:12 | 167:1,2 177:12 | 72:10 73:3,6 |
| 164:8 166:10 | **NMT** 78:8 | 222:5,10 | 178:10 180:21 | 73:10,18 74:11 |
| 166:12 217:10 | **non-asbestos** | 223:15 226:5 | 182:7 191:24 | 74:23 75:8 |
| 220:17 265:14 | 302:19 | 226:17 227:8 | 194:15 196:1 | 76:4 78:2 86:4 |
| 274:15 275:13 | **noncompliance** | 231:10,24 | 206:11 213:15 | 86:15 89:6 |
| 297:14 | 206:12 282:20 | 232:13 234:9 | 214:1 230:19 | 90:7 92:8 |
| **needed** 36:23 | 290:12,24 | 234:24 235:12 | 284:4 301:21 | 93:15 94:16 |
| 185:8 309:2 | **nonconforma...** | 235:22 236:6 | 302:6,7,9 | 95:6 96:12 |
| 311:5 326:6 | 206:12 282:20 | 236:20 237:20 | 316:11 319:6 | 97:17 98:11,15 |
| 328:13 330:11 | 290:12 | 239:5,15 | 320:13,19 | 100:3,9,11,23 |
| **needs** 74:10 | **nondetectable** | 240:13 241:8 | 322:14 324:13 | 101:11 102:14 |
| 186:23 297:11 | 144:22 | 242:3,23 | 329:8 330:21 | 103:1,23 |
| **negative** 144:17 | **nondetected** | 243:23 245:10 | 330:24 | 104:20 105:17 |
| 145:14 258:1 | 175:14 176:16 | 246:18 247:9 | **numbered** 96:18 | 106:6,9,21 |
| 286:12 290:7 | **nonresponsive** | 249:1 256:20 | **numbers** 18:15 | 107:13 108:9 |
| 292:14 | 115:6,18 116:4 | 257:8,16 258:4 | 57:6 60:4 | 108:17 109:1,7 |
| **neighborhood** | **noon** 117:1 | 264:1 | 132:2,6 143:3 | 109:13 110:14 |
| 26:17 63:7 | **normal** 77:20 | **notices** 13:6 | 143:12 229:17 | 110:23 111:18 |
| **neither** 252:7 | 87:1 97:3 | 15:2 16:2 | 262:5 | 112:10 113:3 |
| **network** 229:7 | 178:12 237:2 | **notification** | **numerals** 18:15 | 113:12,20 |
| **never** 38:21,24 | 281:10 307:10 | 291:2 | **numerical** 68:14 | 114:17,19 |
| 39:4 150:11,14 | **normally** 120:1 | **notified** 13:23 | **numerous** 245:4 | 115:5,12 116:2 |
| 176:14 197:6 | 122:7,8 | 253:15 | 329:12 | 116:18 117:13 |
| **new** 1:2,17 2:14 | **North** 36:13,16 | **Nova** 320:11,16 | | 117:18,21 |
| 2:19 3:4,4,9 | 97:11 241:3 | **November** | **O** | 118:16,18 |
| 4:4 8:13 12:10 | 242:17 312:13 | 267:10 275:2 | **O** 117:9,9,9 | 120:22 121:19 |
| 12:13 74:13,17 | 324:2,21 | 276:13 | **O'Dell** 2:3 5:5 | 122:11,21 |

| | | | | |
|---|---|---|---|---|
| 124:12,21 | 214:4,9,14,16 | 291:21 292:13 | 61:1 62:4,18 | 206:23 207:10 |
| 126:13 127:5 | 215:24 217:2 | 293:1,8,21 | 63:4,13 65:12 | 207:19 208:19 |
| 128:19 129:22 | 217:17 218:2,3 | 294:23 295:4 | 66:1,11,18 | 209:4,16 210:7 |
| 130:18 131:9 | 218:12,20 | 295:24 296:6 | 67:9 68:18 | 218:8 219:24 |
| 131:13,15,24 | 220:19 221:4 | 298:10 299:8 | 70:21 71:6,19 | 221:1,11 222:2 |
| 132:12 133:18 | 221:17 222:13 | 299:21 300:15 | 72:5,22 74:4 | 224:4,13 225:4 |
| 135:5 136:6,20 | 222:16 224:5,7 | 301:1 303:19 | 74:18 75:16 | 225:7,16 226:3 |
| 136:23 137:1 | 224:18,23 | 304:10,18 | 77:22 86:1,8 | 226:15 227:6 |
| 137:12 138:16 | 225:6,20 226:9 | 305:11,18 | 88:22 90:2 | 227:18 228:14 |
| 140:24 141:13 | 227:1,12 228:4 | 306:7,15 307:8 | 92:3 93:7 | 229:3 230:4,13 |
| 142:18 143:6 | 228:20 229:8 | 308:8 309:12 | 94:11 95:2 | 231:1,8,9,18 |
| 143:13,15 | 230:5,17 231:4 | 309:20 310:12 | 97:14 98:5,13 | 231:21,22 |
| 144:24 145:4,9 | 231:13,19 | 310:13 312:6 | 99:24 100:7,16 | 232:11,12 |
| 145:20 146:7 | 232:4,18 | 313:21 314:7,8 | 101:6 102:9,20 | 234:7,8,22,23 |
| 146:12,24 | 234:10 235:5 | 314:21 316:9 | 103:11 104:12 | 235:10,11,20 |
| 147:14 149:11 | 235:13,23 | 318:14 319:2,3 | 105:9 106:4,12 | 235:21 236:4,5 |
| 149:23 151:15 | 236:9 237:10 | 320:1 322:2,7 | 108:14 111:24 | 236:18,19 |
| 152:3,13,17,21 | 238:1,18 239:9 | 322:13,24 | 112:17 113:10 | 237:18,19 |
| 153:10,23 | 239:21 240:22 | 323:14 325:17 | 113:15 114:7 | 238:6 239:2,3 |
| 154:5,21 | 241:13,19 | 326:8,15,21 | 120:16 121:15 | 239:13,14 |
| 155:16,21 | 242:7 243:13 | 327:1,3 328:5 | 122:4,14 124:8 | 240:11,12 |
| 156:3,14 | 244:7 245:14 | 329:11 330:1 | 124:17 126:8 | 241:6,7,18 |
| 158:12 159:5 | 246:7 247:2,22 | 330:19 331:24 | 127:4,8 128:13 | 242:1,2,21,22 |
| 159:24 162:1 | 248:18 249:19 | 332:18 333:5 | 129:20 130:12 | 243:21,22 |
| 163:16 164:12 | 250:4,23 | 333:19 | 131:6 133:17 | 245:8,9 246:4 |
| 165:4,24 167:7 | 251:14 252:4 | **object** 13:14,18 | 135:22 140:23 | 246:16 247:8 |
| 167:18 168:12 | 252:21 253:7 | 22:3,7 107:5 | 144:19 145:3,8 | 248:6,7,24 |
| 168:21 171:4 | 253:23 254:17 | 110:16 116:3 | 145:17 146:2 | 249:24 250:11 |
| 174:13 175:2 | 255:1,12,16 | 136:15 156:10 | 146:10,16 | 251:5,18 |
| 177:17 179:4 | 256:3,21 257:9 | 165:8 181:8 | 147:8 149:9,13 | 252:12 253:5 |
| 180:5 182:4 | 257:21 258:5 | 187:22 203:10 | 151:6,20 152:6 | 253:11 254:8,9 |
| 183:9,24 | 258:15 259:13 | 205:21 207:8 | 152:20 153:3 | 255:9,10,15,22 |
| 184:18 185:4 | 261:1,8,24 | 215:8 218:16 | 153:21 154:3 | 255:23 256:18 |
| 186:5,13 187:6 | 262:6 263:16 | 222:6 226:4 | 154:13 155:12 | 256:20 257:6 |
| 187:9,24 | 264:8,19 265:9 | 314:5 | 157:24 158:19 | 257:14 258:2 |
| 188:17 190:2 | 266:1,10,20,23 | **objecting** | 159:12 163:15 | 258:10 259:4 |
| 190:15,17 | 267:2,8 268:19 | 153:13 | 163:18 164:18 | 260:18 261:2 |
| 191:10,14,16 | 269:2 270:10 | **objection** 27:2 | 166:22 167:13 | 261:13,14 |
| 192:1,3 194:13 | 270:14 271:7 | 28:18 29:15 | 167:23 170:17 | 262:23 265:20 |
| 196:17 202:18 | 272:15 274:3,9 | 30:4 31:19 | 174:10,22 | 266:7 268:15 |
| 203:12 205:11 | 274:11,20,23 | 32:18 44:8,23 | 178:14 182:23 | 269:1 270:6,20 |
| 206:1 207:2,13 | 275:23 276:5 | 45:9,18 46:11 | 183:15 184:8 | 272:3 273:18 |
| 207:21 208:22 | 278:19 280:6 | 47:13,24 48:11 | 184:24 185:19 | 275:20 277:15 |
| 209:11 210:4 | 281:2 284:3,12 | 48:22 49:12,23 | 186:9 188:10 | 277:16 279:14 |
| 210:11 211:22 | 285:9,19 286:9 | 50:10,24 51:17 | 189:16 190:12 | 280:19 283:20 |
| 212:24 213:3 | 287:23 288:14 | 52:5,18 53:5 | 190:13 194:4 | 284:9,19 |
| 213:11,17,21 | 289:19 291:13 | 53:10 60:16 | 196:9 205:9 | 285:15 286:6 |

Donald Hicks

287:17 288:5
289:11 291:5
292:7,17 293:4
294:18 298:9
299:3,15 300:7
300:18 303:10
303:10,22
305:7,15 306:1
306:12 307:1
308:5 309:5,16
319:11 322:19
322:20 323:1
325:6 326:1
327:17 328:21
329:16 330:7
331:20 332:13
332:22
**objections** 13:17
115:10 116:14
295:15
**observation**
206:9,15 282:5
282:12,17
283:2,8,18,23
285:11,13
286:4,20
287:10,14
290:1,5,11,17
297:2,7,8
299:20 300:21
301:3 306:4
**observations**
290:8,9 292:2
292:3 296:24
298:3
**obsolete** 55:19
74:13
**obtained** 154:1
254:13 315:15
**obviously** 75:1
236:13 263:5
**occasion** 124:24
**occasions**
210:20
**occur** 25:9 26:19
92:14 129:3
193:10

**occurred** 25:10
25:19 26:15,21
92:11 104:24
193:11
**occurring** 84:16
**ocean** 42:8,8,10
42:19
**OceanX** 41:19
42:10
**offered** 15:4
**offering** 20:4,7
**offhand** 54:8
**office** 307:22
**officer** 221:23
**offices** 1:16
**official** 245:20
**officials** 147:10
**offloading** 208:3
**Oh** 274:21
**okay** 17:19
21:18 22:18
23:12 24:13
27:21 42:12
62:12 63:8
71:15 73:4
77:2 97:22
99:15,18
108:24 110:19
117:22 119:24
132:9,17
139:13 143:13
143:19 179:9
186:14 190:8
192:11,12
199:14 222:15
229:15 240:3
258:16 264:11
266:2 275:24
287:5 314:7,13
321:7 324:4,16
330:2 333:19
**old** 214:13
**older** 99:3
**once** 32:16
126:15,15
285:24
**onerous** 116:16

**ones** 88:19
269:22 320:5
324:10
**ongoing** 42:20
74:9
**OOS** 187:2,10
187:16
**open** 195:17
308:10,19
**opened** 301:17
**operated** 212:8
**operates** 197:19
**operating** 87:1
120:20,23
121:2,7,8,17
123:22 124:4
124:15 125:1,1
127:1 130:9,23
218:6,14 330:3
330:21
**operation** 36:17
198:9 278:2
297:12
**operational**
131:2
**opinion** 210:9
223:10
**opinions** 209:9
**opportunities**
219:3
**opportunity**
16:11 335:9
**optical** 139:22
**optimal** 284:16
**option** 79:13
176:14 323:6
**options** 175:17
**oral** 176:18
**oranges** 168:10
**Orden** 198:11
308:17,24
**order** 13:22
14:15 42:16,17
64:22 115:9,21
116:12 126:22
157:3 158:10
159:14,19

163:12 189:12
**ordered** 197:9
197:17
**ore** 58:2 67:16
67:21,23 68:1
68:1,4,5,7,12
81:21,22 82:2
82:7 83:10
85:2,4 87:8,17
91:12 98:10
99:22 101:3,21
102:7 103:9,9
103:17 105:8
107:3 110:10
111:8,12,16,22
112:5,9,24
113:9 114:5
121:24 129:8
133:7,9,10
144:17 174:7,8
185:14 188:7
196:20,24
197:1,5,16,24
198:1,1 207:18
208:1,10,16
209:14 210:2
220:23 237:24
272:11,13,17
272:18 273:2,2
273:9,10
276:22 277:3
279:13 316:2,4
317:3,9 319:19
319:19
**Organization**
47:10,22 49:8
**organizations**
186:11
**orientation**
248:12
**original** 99:1
149:16 216:24
255:7 287:20
297:20 336:15
**originally** 254:1
**originated**
192:18

**originates** 233:6
**Orrick** 3:2
23:20 31:14
**OSS** 186:8,14,19
186:24 187:2
**ostensibly**
255:3
**outcome** 126:19
300:22
**outcry** 253:14
**outline** 77:15
245:24
**outlined** 272:21
275:14,19
316:14
**output** 195:1,20
246:11 252:2
**outs** 326:6
**outside** 44:9,13
44:22,24 45:19
45:22 47:14,24
48:23 49:3,24
65:13 66:2
71:5 93:13
150:7,13
151:21 170:18
172:18 181:9
182:24 196:10
221:12 222:9
223:15 226:4
226:16 227:7
246:5,17 247:9
248:8,11 249:1
250:1,12 251:6
251:19,21
252:13 253:6
253:12 254:9
255:10,24
257:7,15 258:3
260:19,23
261:15,17
268:16,17
270:7 280:14
326:3 328:22
328:23 329:17
329:19
**ovarian** 325:4

Donald Hicks

325:24 327:8
328:7,19
329:14
**overall** 251:24
252:6 271:15
294:11 296:10
332:9
**overhaul** 104:22
**overlap** 14:4
**overlooked**
293:3 323:16
**Overly** 53:11
196:10
**oversight** 47:3
128:7 194:7
**overview** 6:17
141:15 195:7
**owned** 212:7
**owner** 80:21

**P**

**P-cup** 302:2
**P.A** 2:17
**P.C** 2:2
**p.m** 334:2
**Pacific** 8:10
**packaging** 123:2
**page** 5:13 6:5
7:5 8:5 9:5
10:5 11:6,9,12
11:15 22:22
57:20 59:20,23
60:3,5,8 63:21
63:21 67:15
69:18 70:15
77:9 78:4
79:23 81:15
88:20 97:23
111:5 113:6
119:5 132:20
132:22 142:1
142:14 143:5
143:11,16,17
147:16 173:10
178:7 195:5
198:17 203:14
205:15 206:3,3

207:4,14
212:11,24
213:20 214:11
214:23,24
216:8 229:10
229:12,17
232:6 233:9,21
233:23 234:3
235:17 245:15
256:5 277:1
282:4 283:12
294:4,5 296:23
301:6 304:23
304:24 318:12
318:13,18,19
318:22 320:9
320:23,23
321:4,5 337:4
339:2
**pages** 143:2
321:2 338:6
**paid** 26:24 27:7
27:21 28:17
29:8,10,14,21
29:24 30:3,5
**pale** 142:17
**paper** 249:22
250:5 263:9
**papers** 40:13
**paragraph**
57:21,23,23
70:10 111:6
113:6,23 114:3
114:21 156:16
160:16 163:1
166:20
**paragraphs**
18:16
**parameters**
137:4 297:18
297:21 298:1
298:24 300:5
**parens** 162:16
**Parfitt** 2:8
115:22
**Park** 3:9
**part** 52:23 59:8

69:14 79:2
81:1 95:21
124:22 125:9
128:24 131:1
148:18 149:3
154:6,16
184:17 187:18
198:8,9 209:7
209:24 219:23
222:23 271:14
281:23 282:11
313:4 320:8
332:12,16,21
**participate**
126:21 333:7
**participated**
248:19 249:20
**participation**
31:23 32:14
35:21
**particle** 64:14
92:6 93:2
**particles** 303:7
305:14 306:23
**particular** 19:17
20:6 24:10
29:22 30:8
57:8 74:6
77:16 90:6
95:12 103:9,24
105:15 111:20
111:21 114:14
119:10 130:4
157:5,19
178:21 205:4
259:20 305:24
306:10 316:4
320:8 327:13
**particularly**
299:18
**particulate**
303:7
**parties** 128:4
295:11
**partners** 194:6
**parts** 65:6 78:5
78:12,17,23

79:5 144:9
148:21 160:10
160:14 173:21
174:4,15,18,19
175:4 178:3,12
181:3 182:5
184:23 185:15
188:8 189:1
190:5,5,10
191:3,20 231:7
231:17
**party** 84:1 93:6
**pass** 30:18
326:19
**passed** 325:23
**passing** 257:12
**pattern** 181:24
**PC** 2:12 4:2
**PCPC** 4:5
248:15
**PCPC_MDL0...**
6:16
**PDF** 143:8
**peer** 128:16
**peers** 36:22
**Pennsylvania**
71:24
**people** 243:10
245:24 285:1
327:19
**percent** 140:19
140:22 141:3
143:24 144:5,7
144:12,14
148:4,15,15
230:20,22
231:5,16 232:2
**percentage**
158:7 159:16
160:10,11
165:22
**perfectly** 291:19
**perform** 88:10
89:9 92:2
247:5 294:12
296:11 311:10
316:20

**performance**
202:10 282:23
290:15 297:9
**performed**
33:23 64:5
67:20 82:18
87:17 90:10,22
92:5,17,23
93:4,11 98:23
126:1 162:19
203:15 248:22
271:12 281:17
292:16 298:16
298:19 299:14
299:23 307:20
316:13,23
317:1,5 319:9
320:3,6 322:16
**performing**
267:16,18
268:21 270:24
**period** 25:9,11
37:14,16,19
56:23 57:8
58:19,24 74:14
89:4 99:4
101:5 104:10
104:19 106:3
106:18 108:1
108:21 121:1
125:18,22
126:4 127:24
138:7 151:8,9
172:21 179:7
179:20 184:21
192:17 199:16
200:23 210:24
219:11 238:10
254:3 313:13
330:5
**periodically**
95:11
**permissible**
295:7
**permits** 148:23
**permitted** 14:17
**person** 46:20

85:10 91:4
111:2 161:17
198:10 215:15
246:10 266:12
301:22
**personal** 35:11
44:11 45:6
46:4,12 47:16
48:2 49:1,14
50:1,11 51:1
62:20 65:14
66:3,20 67:11
151:22 152:7
152:16 153:4
153:14 170:22
181:13 183:3
183:17 221:14
221:19 222:7
223:9,9 248:1
252:24
**personally**
23:10 96:4
130:20 202:4,6
202:13 218:11
218:19
**perspective**
60:19 81:9
141:6 152:11
197:2 200:18
226:22 261:21
265:23 271:16
**persuaded**
251:2
**pertaining**
35:21
**pertinent** 35:11
**ph** 1:23
**Pharma** 85:18
85:23,23 86:6
86:21,22 91:15
91:24 92:2,11
92:14,17,23
93:3,4,11
94:21 99:8
123:23 124:4
124:16 125:2
125:19 130:10

130:24 200:11
276:9 277:3,11
310:15,19
311:10 318:8
**Pharmaceutical**
8:14 84:2
250:18
**Pharmacopeia**
65:21 67:4
**phone** 32:1 36:4
309:22
**physical** 311:12
**pick** 117:3
**picture** 196:15
**piece** 263:9
**Pier** 161:9,16
162:4,24 259:2
**Pisano** 13:8
295:11 303:17
**Pisano's** 14:15
**pit** 195:17
**pitfalls** 249:8
**place** 42:15 44:1
46:23 115:4
171:7 203:19
211:1 258:9
259:22 280:18
281:13 308:1
**placed** 92:18
**PLACITELLA**
2:12,13
**plaintiff's** 13:24
177:12
**plaintiffs** 13:7
26:3
**plaintiffs'** 2:20
14:10
**plan** 171:7 173:9
174:6
**planned** 42:7
**plant** 83:20 85:3
99:9 199:5
208:24,24
209:3 210:21
**plasma** 179:15
**please** 22:5
96:15 100:10

110:12,16
122:16 127:7
136:20 137:2
191:24 194:16
274:19 289:4
336:3,8
**PLM** 140:2,10
144:3,3 148:3
148:15 251:4
302:1
**plus** 36:14
**point** 14:18
29:18 30:13
37:20 42:5,7
42:22 55:18
56:3 59:15
62:9 65:18
71:13 73:23
80:13 86:18
98:8 120:5
125:23 129:17
169:10 170:2
189:6 193:12
204:13 248:15
263:15 295:5
295:17 302:15
302:22 313:1
313:14 314:17
315:7 318:10
321:3
**pointed** 197:22
**polarized** 39:1
140:1,9 302:21
**policy** 43:12
126:17 160:20
166:3 308:24
310:2,7 328:9
328:10,16
330:11,20,24
331:3,4,7
**populated**
270:16
**port** 200:4,5,6,7
208:2
**portion** 303:21
317:4
**portions** 303:11

**position** 36:8
169:9 223:20
225:11 249:22
250:5
**positions** 172:3
172:5,11
**positive** 171:8
221:20 222:21
224:9 225:23
228:12,24
234:5,19
236:16 242:15
243:16 244:16
246:14 253:10
254:2 255:8,20
292:6,9 306:22
309:2,4 310:4
**possibility**
145:19 146:6
220:7
**possible** 57:4
187:21 202:12
258:24 297:16
**possibly** 277:22
**post** 13:9,10,11
13:12 87:6,7
90:10,14 91:13
119:11,17
133:1 194:17
**post-milling**
91:22
**postgraduate**
38:9
**potential** 152:1
170:24 220:4
267:16 269:6
278:7 329:24
**potentially**
278:15 320:11
**pounds** 61:20
62:14,17 63:8
**powder** 1:5 6:7
6:10 8:9 10:9
10:12 18:19
19:1,7,14,21
22:12,14,15
28:2,12 34:9

37:3,9 38:21
39:1,5,12,22
40:14 43:2,7
43:13,21 44:3
45:13 47:1
50:8 51:16
52:2,17 53:9
55:8 58:15
59:4 60:15
71:18 72:4,20
76:23 77:5
84:6 85:16
87:12,15 92:2
92:18 94:19
96:17 97:12
102:17 104:9
118:20 120:11
124:6 128:10
147:22,23
154:9 160:21
166:4 170:11
170:15 171:10
172:7 178:2
188:20 192:16
193:21 195:16
196:7 221:9
222:19 223:21
224:1,11
225:24,24
230:21 231:15
232:20 233:5,5
234:20 236:16
237:16 241:3
243:19 245:5
253:4,24
255:21 256:16
268:22 270:12
270:19 277:12
280:8,16
302:24 307:21
308:3 310:5
314:11 321:16
322:16,18,22
324:1 325:5,23
327:10
**powdered** 156:9
162:17

**powders** 6:19
  9:18 141:16
  312:9,19,20
**PowerPoint**
  141:14 142:7
  142:11,21
  173:6,10
  176:18 240:1
  240:24 255:2
  261:10,11
**PPM** 148:21
  179:16 192:7,9
  232:3
**PQ** 297:11
**practice** 87:2
  115:3 130:15
  133:22 197:20
  287:19
**practices** 1:6
  43:20 173:23
  187:19 289:23
  306:5
**pre-inspection**
  208:3
**preamble**
  327:18
**predecessor**
  21:21 203:8
**prefaced** 323:10
**preference**
  223:9
**preparation**
  23:9,13 26:13
  28:1 31:23
  34:16 95:22
  108:12 135:7
  135:13 201:10
  283:15 293:14
**prepare** 23:18
  24:24 34:21
  40:20
**prepared** 20:13
  117:24 194:19
  211:9 261:11
  279:18 315:22
**preparing** 53:17
**prepped** 301:22

**prescribed**
  140:3 179:6
**presence** 138:2
  164:16 258:20
  301:9,18
**present** 26:2
  34:15 43:6
  94:5 118:6
  144:15 145:2
  165:7,12
  167:11,21
  176:17,22
  237:14 291:17
  305:6
**presentation**
  141:22 176:18
  195:1 237:12
  237:13 238:22
  238:23 240:1
  255:18 259:1
  259:20
**presentations**
  259:7
**presented** 239:1
  239:18 240:5
  249:23 261:23
**presents** 282:22
**preserve** 13:16
**president** 333:3
  333:4,6
**presidential**
  172:14 332:6
  332:20 333:2
**presidents**
  332:12,16
**pretty** 104:17
**prevent** 46:24
**prevents** 115:15
**previously**
  16:13 28:9
  88:20 91:8
  101:13 102:16
  137:15 192:6
  196:19 253:10
  270:7 317:19
**prickly** 230:21
  231:15 256:16

**primarily** 36:16
  41:24 80:8
  219:1
**primary** 58:21
  80:4,21 147:12
  246:21
**Princeton** 1:17
  12:10
**principals**
  308:11,15
**principles** 43:17
**print** 329:6
**printed** 318:15
**prior** 16:12
  20:19 72:15
  76:15,16
  100:22 101:3
  102:24 105:23
  106:23,24
  119:16 122:20
  123:4 126:19
  133:24 135:21
  151:2,7 193:14
  208:3 215:17
  306:18,24
  317:5
**privately** 31:16
**privilege** 33:2
  108:7 137:5,10
**privileged** 32:20
  33:7 135:1
**probably** 37:6
  53:14 104:15
  215:19 241:11
  278:24 320:23
**problem** 186:21
  240:8
**procedure**
  120:21,24
  121:3,7,9
  123:22 127:1
  127:11 130:24
  139:6 218:6,14
  251:10,11,16
  307:11 308:1
  330:3,21
**procedures**

  19:12,21 20:10
  46:23 124:5,15
  125:2 130:10
  135:20 297:12
**proceed** 14:7
**process** 68:17
  81:10 87:13
  94:21 95:1
  125:9 128:5
  171:15 179:2
  198:20,24
  199:3,10
  200:17,22
  201:5 202:9,12
  205:7 209:15
  216:21 250:21
  278:7 280:8
  282:12 313:15
  314:17 315:8
  315:16 319:10
**processed** 33:22
**processes** 44:1
  69:17
**processing** 58:3
  208:24
**procurement**
  172:15 219:1
  277:21
**procuring** 83:9
**produce** 127:1
  127:11
**produced** 13:5
  54:19 55:2
  142:20 143:7
  185:6 217:8
  237:11 264:5
  318:19,21
  321:2,4 322:8
**product** 59:12
  67:7 84:13,21
  90:11 91:1,23
  94:20 119:12
  119:14,15,21
  121:13 123:6
  129:19 160:13
  164:7 165:23
  204:6 206:14

  208:11 223:6
  237:4,8 282:23
  290:14 302:7
  315:21 319:15
  319:16
**production** 11:8
  19:1 72:9,12
  90:24 91:1
  205:8,18
  207:16,17,18
  208:14,17
  209:15 217:4
  220:12 278:13
**products** 1:5,6
  13:13 18:20
  19:2,8,14
  22:12,14 28:12
  36:18,21 37:1
  37:10 41:21
  42:1 43:2,7,13
  43:21 44:3
  45:13 47:1
  50:9 51:16
  52:3 53:9 55:9
  59:4 60:15
  71:18 72:4,20
  76:24 104:9
  124:7 128:2,8
  128:8 147:23
  160:21 166:4
  170:16 196:7
  204:14,15
  223:21 224:2
  226:23 229:21
  234:16 248:1
  253:1 280:16
  281:6
**professional**
  1:18 46:15,20
  153:15 154:1
  183:10 221:22
  335:13
**professionals**
  50:16
**programmed**
  299:11 300:5
**prohibited**

115:8
**project** 8:18
  171:19 218:23
  218:24 219:1,7
  219:8,15
  267:13,14
  277:20,21
  278:14,18
  289:17 307:5
**projects** 72:15
**pronounce** 58:4
**proofreading**
  302:13
**propensities**
  50:21
**proper** 89:12
  158:10 253:22
  303:14 306:18
**properly** 240:19
**properties** 77:10
  88:17 123:1
**property** 77:21
**proposal** 147:17
  147:21 148:2
  148:19 173:13
  175:20,21
  176:2,6
**propounded**
  338:9
**protected** 33:1
**protective** 13:22
**protocol** 115:14
  140:11 158:16
  250:7 251:24
  253:2
**protocols** 18:23
  45:11 169:6
  248:3 261:4
  262:14
**provide** 28:16
  28:21 48:14
  58:2 68:13
  77:19 164:21
  165:2,20 167:1
  181:18 220:16
  232:23 312:18
**provided** 22:23

23:4 31:2
68:16,21 83:1
86:24 90:15,19
110:6 134:10
157:8 204:24
215:6 216:3,11
216:21 217:1,6
217:21,22
218:15 235:4
247:6 249:4
272:19 273:13
277:3,11
306:11 307:11
321:11 324:13
**provides** 64:4
  140:12 156:16
  232:16,19
  236:15
**providing** 35:12
  271:2,3 273:21
**Province** 58:12
**PSC** 14:20
**PTI** 61:7 85:18
  91:9 121:2,7
  121:17 124:10
  124:11 125:14
  126:3,22
  127:15 128:9
  128:24 199:5
  200:12,13,14
  267:17 279:22
  315:12 319:17
**public** 1:19
  328:3 329:5
  335:14 338:23
**publicity** 329:5
**published** 40:12
  51:8
**pull** 285:4
**pulled** 68:2
  196:16 244:4
  315:20 317:7,8
**pulling** 196:3
**purchase** 269:7
**purchased** 84:9
  277:23
**purity** 197:12

222:18
**purpose** 20:8,21
  64:2 67:15
  70:1 156:7
  162:8 246:12
  291:11 294:6
  294:16 295:2
  296:4,8,14
  312:15 328:6
**purposes** 59:2
  72:19 94:10,19
  134:17 155:10
  171:16 182:20
  244:16 260:16
  288:3,8 318:6
**pursuant** 1:15
  13:5,21 14:14
  181:11
**pushing** 253:17
**put** 18:13 20:5
  30:22 68:4
  73:4 87:21
  123:8,14,17
  130:16 171:7
  171:14 175:21
  176:8 180:16
  192:14 199:21
  215:13 217:10
  218:21 238:9
  275:24 277:18
  280:12 303:21
**puts** 170:14
**putting** 263:8
  278:6

_____

**Q**

**QA** 281:20
**QC** 275:11
  281:18
**QTI** 203:16
**qualification**
  212:13,15,17
  215:2,4,6
  216:7,10,21
  218:5 297:9
**qualified** 39:8
  40:9 89:15

111:1 216:19
238:13 253:21
310:20,22,24
311:16
**quality** 13:10
  19:11,20 20:9
  20:14 36:10,17
  41:2,7,8 44:16
  46:19,22 72:17
  81:9 85:14
  86:19 96:22
  124:23 127:16
  127:19 128:1,3
  128:17 130:3
  141:21 154:7
  170:7 172:15
  179:21 182:12
  185:18 186:18
  193:8 194:20
  203:19,20
  204:2,6 206:14
  206:17 211:11
  216:11,19
  221:23 281:20
  281:22 282:3
  283:5 288:23
  290:19 307:12
  312:13 324:20
  324:22 327:23
  332:8
**quantifiable**
  156:17,23
  157:4,9 158:17
  159:9 160:3,5
  163:2,6,13
  164:14 165:3
  166:11,20,24
  168:7
**quantification**
  156:8
**quantify** 159:19
  164:2,5 165:15
**quantity** 159:16
  167:1 197:10
**quarantine**
  119:12 120:14
  123:14 129:18

129:23 131:4
**quarantined**
  119:16 120:6
  122:1 123:7
  133:9
**quarantining**
  119:20 120:2
  121:13 129:8
**quarreling**
  142:24
**quarry** 58:8,9
  58:10,11
**quarterly** 93:21
  94:1,8 99:22
  101:21 102:7
  105:8,8 107:3
  112:14 113:8
  114:5 279:7
  307:18,20
  325:13
**question** 17:24
  18:1,4 21:10
  22:4 23:17
  29:11 45:6
  46:4 47:5 48:6
  53:2 55:22
  57:9 62:13
  75:10 89:18
  100:10 102:23
  102:24 106:7
  108:18 110:18
  112:20 113:22
  115:17 120:7
  122:12 124:13
  126:12 137:2
  137:16 139:10
  145:12,13
  146:8 149:16
  167:16 196:24
  200:19 203:11
  205:22 212:12
  216:6,22 218:4
  222:12 225:14
  225:15 226:18
  227:9 233:2
  238:24 239:10
  240:9,23 241:4

Donald Hicks

242:12 263:22
277:24 287:1,6
287:8 292:15
295:18,22
296:3 299:10
299:13 303:14
306:3 314:14
318:2 321:14
323:10,22
327:18 330:15
**questionable**
251:4
**questioning**
223:14
**questionnaire**
7:18 211:6,8
211:10,15
212:2,5 214:19
**questions** 11:14
18:3,8 20:23
21:13 31:8
36:20 75:5
107:11 115:10
134:7 151:11
177:10 216:4
223:8 225:1
248:17 249:14
249:18 274:13
295:16 304:3
310:14 323:5
338:8
**quibbling** 216:5
**quick** 73:8
**quickly** 119:4
229:6 286:21

───────────
**R**
**R** 2:17 117:9
337:1,1
**R&D** 9:14
172:14 218:24
277:19,19
278:14 307:16
332:7
**rail** 61:6,10,14
61:18,23 62:2
62:16,17 63:9

63:9,17 68:22
86:14 199:22
200:3,4,12,13
315:24
**raise** 75:23
264:3
**ranges** 71:9
**Ratcliff** 17:4
29:19
**rate** 27:11
**rating** 282:5,12
296:16,18,20
**raw** 6:6,9,13
52:7,9,14 54:2
55:19,23 56:3
56:8 73:20
74:17 76:22
77:3 80:2,9,18
95:12 96:1,16
97:7,9 100:6
101:23 102:17
103:5,13
104:23,24
105:4 118:4
120:3 121:4
123:9,20
125:13 131:16
132:13 193:4
204:9 207:24
208:13 209:1
209:14 230:18
232:7 233:11
233:24 256:15
272:2 284:7
311:2 314:2
315:3
**reach** 326:6
**reaching** 199:5
**reacted** 229:6
**read** 16:12 23:2
23:9 115:1
122:10 131:21
149:1 157:1
173:18 174:1,9
175:6 203:22
208:18 230:23
231:2 232:10

236:3,11,12
252:7 268:9
290:2 291:4,7
291:18,22
298:11 303:20
304:1 321:20
335:9 336:3
338:5
**readable** 323:21
**reading** 78:6
122:22 166:17
178:5 205:20
212:22 298:14
303:11
**reads** 267:24
284:11
**ready** 278:15
**real** 244:22
**really** 26:5
44:12 51:4,9
51:11 125:4
163:23 178:20
183:20 195:24
197:20 200:19
216:6 235:1
237:6 238:11
242:6 248:10
269:24 270:1
**Realtime** 1:19
335:14
**reason** 56:7,24
65:4,8 96:6
104:6,14
151:16 184:3
243:14 279:4
321:13 336:5
337:6,8,10,12
337:14,16,18
337:20,22,24
**reasons** 57:7
**Reath** 1:16 3:8
**recall** 24:18 26:5
37:22 51:11,20
51:22 54:7
55:17 60:21
61:13 68:10
75:12 108:10

125:24 171:22
188:9,12 189:2
189:6 190:7
202:24 210:23
221:10 226:2,8
228:17 241:9
259:1,5 266:8
280:17,21
312:24 313:8
330:23
**receipt** 99:7
119:17 121:3
125:13 318:8
336:17
**receive** 82:13
90:9 91:4
283:23 324:20
325:1,8
**received** 67:21
85:8 87:8
169:16 277:23
283:17 317:10
327:5 329:13
**receives** 123:19
**receiving** 85:12
86:18
**recognize** 54:15
76:7
**recognized**
250:16
**recollection**
25:22 50:3
93:10 108:5,16
134:12,18,22
135:4,12,17,20
136:1,16 137:8
137:18 138:18
172:24 175:23
185:22 211:16
241:12 249:3
250:3 254:12
258:24 286:8
**recommend**
280:3
**recommendat...**
171:6 173:9
175:9,12

189:20 190:9
**recommended**
146:21 190:3
**record** 12:4,18
13:4,23 14:9
15:23 18:13
22:1 29:17
36:24 73:13,17
83:5 96:15
116:19 117:5
117:12 145:11
160:14 168:17
168:20 217:3
225:7 261:7
262:1,18 264:2
264:21 265:5,8
267:7 286:4
303:12 304:11
304:14,17,20
333:23 335:6
**records** 24:20
64:8 82:10
207:23 208:9
**Red** 2:14
**REES** 3:13
**refer** 18:15
20:24 21:20,22
22:11 37:1
111:5 147:5
149:17 152:24
230:15 332:1
**reference** 83:19
149:21 315:5
320:19,24
**referenced**
136:10 148:12
148:14 218:6
315:18
**references** 234:4
262:7
**referred** 39:15
75:2 83:6,14
113:5 140:1
143:1 150:1
301:15
**referring** 21:2,7
21:23 28:23

Donald Hicks

37:2 120:24
123:23 132:10
160:16 169:18
172:4,5 176:4
196:23 239:17
275:6 276:15
308:16 330:3
**refers** 87:13
207:17 269:13
278:4 331:21
**reflect** 189:8
**reflected** 67:19
191:5
**refrain** 295:13
**refresh** 107:22
119:2 134:12
135:3,20,24
138:18 234:17
289:8
**refreshed** 108:5
108:16 134:22
135:12 136:16
137:8,18
**refreshing**
134:18 137:23
**regard** 38:20
180:17 223:2
258:19
**regarding** 9:17
14:17,24 16:16
18:17,23 19:11
19:19 34:5
36:21 40:14
50:21 108:12
137:17 205:5
207:7 212:2
216:12 222:18
225:11 267:13
305:1 312:8,19
327:12
**Regardless**
225:18
**Registered** 1:18
335:13
**regular** 55:3
202:1 220:17
273:5 279:20

308:22
**regulatory**
206:18 282:24
283:6,10
290:16,20
291:1 294:13
296:12 312:18
312:22 313:2
**rejection** 123:3
**relate** 260:20
322:21
**related** 29:12
34:9 77:4
81:12 216:7
261:12 262:10
**relates** 1:8
207:16 283:9
297:3,9 327:7
**relating** 19:21
298:4,5 301:8
**relation** 19:6,13
19:17 28:1,1
31:22 205:17
265:12 277:11
283:18 294:1
305:23
**relative** 31:13
33:15,17 34:7
36:17 51:3
150:7 151:12
209:22 247:16
249:5 299:20
308:6,12
325:14 328:12
329:5
**Relativity**
318:17
**release** 94:15,18
122:20 123:4
286:15 288:3,8
289:6,10,16
294:21 295:1
296:2 300:24
310:20,23
**released** 129:15
**releases** 123:20
289:23

**reliability**
160:15
**reliance** 273:8
**rely** 271:11
**remain** 124:10
**remained**
176:16 286:4
287:15
**remarked** 214:6
**remedies** 174:20
**remember**
17:12 18:7
51:13 53:23
126:16 172:2
192:18,21
196:21 221:16
227:11 259:20
**remind** 187:1
311:9
**removed** 285:13
**rendered** 74:13
**reorient** 305:2
**repeat** 18:1
167:16 320:14
329:3
**repeated** 283:9
**repeatedly**
216:16
**repetitive**
330:18
**rephrase** 18:5
27:5
**replaced** 76:11
95:20
**report** 7:16 9:9
9:13,15 127:2
127:11 157:11
157:12,13
158:6 159:22
163:14 165:13
167:5 168:4
169:12,14,24
187:13,16
202:5,21 203:6
205:1,16
212:14,18
215:1,4,6

216:7,11,20,24
221:8 281:4,6
285:21 286:3
289:5 293:14
293:24 295:3
300:17 301:16
302:8,11
303:20 306:21
307:5,7 309:18
316:2 317:3
318:3,4,7
**reportable**
158:5,6
**reported** 88:3
90:24 157:23
158:17 159:4
162:12 166:10
167:9,10,20
169:4 205:4
222:22 223:4
255:7 256:13
300:11 305:5
307:4 309:11
316:13 319:5
329:22 331:13
**reporter** 1:18,18
1:19 12:19
335:13,14,14
335:22
**reporting**
169:10 173:3
290:24 291:1
309:14 325:5
**reports** 187:20
188:22,23
189:4 243:3
285:24 291:2
301:20 307:22
329:4
**reprepped**
303:4
**represent** 184:1
**representative**
48:19 153:15
**representatives**
198:13 201:24
244:20

**Representing**
2:20 3:11,20
4:5
**represents**
206:15 283:3
290:17
**reproduction**
335:20
**requalification**
212:13
**request** 11:8
217:8 301:16
312:17
**requested**
279:18 312:23
335:7
**requesting**
217:19
**requests** 217:11
**require** 103:6
271:10
**required** 19:6
64:9,14,21
65:19 69:8,13
70:8,19 77:15
79:11,19 90:18
90:23 103:18
120:5 121:12
154:23 163:11
178:2 270:4
291:1 298:1
314:2 315:3
**requirement**
65:1 66:16
70:24 90:13
99:20 100:5,12
101:1,18 102:4
105:6 106:23
106:24 110:8
112:12 113:24
119:12,20
120:12 121:24
123:6,14 129:4
129:7 133:4,14
133:21 232:6
279:8 309:7
**requirements**

Donald Hicks

6:18 9:7 52:12
77:10 81:17
82:24 88:18
100:14 119:7
122:20 123:1
132:23 141:16
149:4 175:14
206:19 208:14
240:20 276:17
283:1,7 290:16
290:21 294:9
294:14 296:13
309:14
**requires** 103:15
250:8
**requiring** 250:8
269:15
**resample** 173:16
**research** 72:13
80:5,7
**researchers**
147:5 149:6
150:9
**reserves** 14:20
**resource** 249:14
**resources** 237:2
**respect** 161:16
231:23 232:12
236:6 239:4
**respond** 139:12
227:4 244:20
261:2 284:23
286:1,19
**responded**
285:17 287:12
287:16 292:12
**responding**
21:10
**response** 18:7
48:5 115:17
209:19 222:5
223:12 225:10
227:3 244:6
269:1 285:6,12
285:22 287:6
**responses** 225:1
**responsibilities**

36:13,14
154:17
**responsibility**
36:15,20 37:12
47:2 80:4,17
81:5 82:5
89:16 128:15
128:23 154:18
170:2 204:5,8
**responsible**
18:17 37:16
43:1,24 52:2
52:16 53:8
55:8 79:24
80:9 82:1,9
83:9 85:11,11
86:16 104:8
128:12 245:5
**responsive**
287:7
**restate** 103:3
**result** 111:8
157:15 171:9
174:3 188:4
189:13 221:21
224:21 225:24
226:11 227:20
246:14 296:17
300:14 306:23
310:4 323:24
327:8,9 331:16
**resulted** 185:16
207:5 257:12
257:24
**results** 67:17
68:12,14 69:21
90:9,14,17
91:5,10 111:15
112:23 133:7
144:16 169:22
171:9 174:15
186:7 222:17
222:20,21
224:9 227:5
228:12 229:1
231:15 244:17
256:12 271:2,4

271:17 273:22
279:13 289:20
292:20 299:13
300:14,23
306:8 307:9,19
315:14 316:3,3
316:14 321:8
321:10
**retested** 253:3,9
257:2 305:12
**retesting** 254:6
305:1,19
306:17
**retired** 20:2
35:8 36:6
95:14
**retirement** 56:1
201:13
**return** 336:15
**review** 7:13
23:13,21 51:6
94:14 97:5
107:18,22
124:24 125:4
135:19 136:3
137:17 140:9
151:14 166:7
185:5 194:23
220:18,21
278:9 283:14
293:13 326:6
**reviewed** 23:8
24:9 85:8
98:20 107:14
108:11 115:2
119:1 123:4
134:17 135:6
135:15 137:23
138:18,21
183:12 205:14
285:18 302:24
318:7
**reviewing** 81:7
86:17 304:22
**revised** 56:12
**revision** 54:24
55:11 76:14,17

96:18 100:5,20
109:19 114:24
330:10
**revisions** 56:14
74:8 106:19
**right** 14:20 63:2
93:16 99:11,16
107:7 110:20
110:21 115:16
130:11 143:11
152:2,2 188:3
216:1 229:14
244:10 286:2
303:9 305:4
308:23 333:18
**right-hand**
320:18
**ring** 75:14
**Rio** 21:21,24
200:7,11 203:7
212:2,5 214:19
**risk** 170:14
206:13 282:22
290:14
**RJ** 71:23 72:21
94:2,3,9,24
141:4 142:12
143:20 144:6
148:14 161:3
169:13 198:7
247:5,12
248:19,22
249:3,13,20
254:14 275:11
280:14,17
282:9 283:17
284:14,22
285:2,12,17,21
286:4,14,19
287:10,12,16
288:2,21 289:6
289:9 290:6
291:24 292:11
292:20 293:10
293:24 294:17
294:22 296:16
297:20 299:19

304:21 305:4
306:16,21
307:9 308:6,17
309:1
**RM** 6:8,11
54:21 56:21
57:2 64:13
73:21 74:1
76:11,13 93:18
95:8,17 96:18
99:5 109:17
114:24 232:6
275:14,19
277:6,14 314:3
**Road** 1:16 2:9
**Robert** 327:12
**role** 125:4 128:7
246:21 247:1
328:24 329:17
**Roman** 18:15
**root** 305:21
**ROTH** 2:12
**roughly** 63:9
**routine** 87:3
91:20 130:14
**Royston** 61:7
63:11,18 68:22
84:4,13,16
91:9 199:6
267:17 315:12
**run** 264:18
**running** 188:7
225:4

| S |
|---|
**S** 5:10 6:2 7:2
8:2 9:2 10:2
117:9,9,9
**SAED** 39:16
**safe** 43:2 44:3
100:24 189:8
**safeguard**
271:15
**safely** 186:3
**safety** 65:17
170:24 172:16
181:18,22

183:21 184:14
185:11,18
189:23 282:23
290:15 301:4
**sales** 1:6 332:7
**sample** 38:22
   39:1,5,9,12,22
   67:20 111:11
   145:2 148:10
   148:23 157:5
   167:9,20
   168:24 221:9
   230:19 298:20
   301:21 302:6,6
   302:9 303:1,5
   305:1,5,12,19
   305:20 306:9
   306:10,18
   308:4 309:3
   315:13 317:10
   319:23 320:13
**samples** 14:19
   93:21 94:1,5
   98:2 148:7
   205:6 234:4
   247:6 253:3,9
   254:5,12,16
   257:1,10,24
   273:4 294:13
   296:11 297:20
   298:17 301:23
   302:1,15,23
   303:2,3 307:15
   307:16,21
   317:8
**sampling** 59:14
   81:10
**sanitization**
   267:16
**sanitized** 200:12
**sat** 17:16
**satisfactorily**
   133:10
**saw** 215:18
**saying** 106:1,10
   123:12 137:4
   150:19 153:13

164:13,20
167:3 184:4
187:2 197:15
197:15 204:17
222:8 261:9
262:12 271:22
321:24 323:10
329:15
**says** 57:24 68:11
   85:2 93:19
   99:11,15 111:6
   113:19 116:5
   123:1 149:12
   149:16 162:10
   166:18,21
   175:3 195:19
   199:2 212:17
   214:24 215:4
   232:7 234:13
   235:15,24
   237:22 238:4,8
   245:15,17
   256:10 263:9
   263:23 277:4
   284:4 295:3,11
   299:5 301:12
   301:20 314:5
   316:2 318:11
**scanning** 40:1
**scenario** 176:9
**scenarios**
   171:13
**scientific** 40:13
**scientist** 80:14
**scope** 44:9,13,24
   45:15,19,22,23
   47:14 48:1,23
   49:4,24 53:3
   65:13 66:2
   151:21 170:18
   181:9 182:24
   196:11 203:13
   221:12 223:15
   224:19,22
   226:4,16 227:7
   231:10,23
   232:13 234:8

234:23 235:11
235:21 236:20
237:19 239:4
239:15 240:12
241:8 242:3,22
243:23 245:9
246:6,17 247:9
248:9,11 249:1
250:1,12 251:6
251:19,21
252:13 253:6
253:12 254:10
255:11,24
256:20 257:7
257:16 258:4
260:19 261:4,6
261:16 263:24
268:16,24
270:7,13 326:4
328:22,24
329:17
**screening**
   311:14
**sea** 200:6
**searched** 217:4
**searching** 331:6
**second** 5:14,15
   18:6 75:22
   87:5 213:16
   228:9 232:7
   259:17 297:7
   298:5 320:22
   320:23 321:5
**seconds** 333:17
   333:18
**section** 88:18
   99:13 100:14
   122:23 158:22
   160:8 213:13
   215:16,18
   279:9 315:19
   316:1,18
**sections** 280:5
   316:15
**sector** 41:20
**see** 57:21 58:13
   59:23 61:20

62:16 63:22,23
69:23 77:12
79:7 81:16,18
81:21 99:12,17
99:18,23
109:17,20,24
115:23 118:12
119:8 132:4,22
133:2,12 142:4
143:16,18
144:2 147:19
156:18 162:6
162:10,14,21
162:22 163:7
166:6 177:19
190:23 191:17
195:6 198:21
203:2 205:12
205:16,19,23
206:6,22,24
207:11,15
209:19 213:4,5
213:7,9 214:17
214:21 216:8
217:14,15
229:10,12
234:2,6,11
246:8 255:4
256:5,7,17,23
257:3 259:18
267:11 275:3
275:15,21
276:12,18
277:1,7 281:19
282:7,15 285:8
288:19,20
289:1,4 297:5
301:10 303:8
323:15,19
324:17
**seeing** 266:9
**seen** 16:8 22:24
   50:5,19 51:7
   130:19,20
   141:2 147:10
   150:12 197:6
   201:21 202:4,7

202:23 218:5
218:11 228:6,9
252:2 259:15
265:23 283:16
**sees** 303:13
**segregated**
   197:11
**selected** 39:12
   317:11
**sells** 233:3,4
**SEM** 39:23
**Seminary** 2:9
**send** 217:16,17
   269:10 279:21
**sending** 271:6
**senior** 36:9
   46:21 96:22
   124:23 127:21
   176:4 193:7
   194:19 204:5
   221:23 312:12
   324:19,21
**sense** 126:14
   214:5
**sent** 51:9 68:5
   82:10 86:10,11
   86:12 93:22
   94:1 211:10
   254:14 269:12
   278:8 307:7
   319:17 325:19
   325:20 327:11
   329:10
**separate** 86:6
**separated** 208:8
**separating**
   273:2
**separation**
   128:1
**series** 186:20
   313:10
**serious** 170:11
   170:13 227:21
   282:13 328:9
   331:13
**seriousness**
   171:2

Donald Hicks

Page 371

served 13:6
46:21
Services 1:22
12:6
set 68:2 134:5
sets 60:4
setting 310:10
seven 117:17
190:5,10 192:7
304:9 333:16
333:17
SFDA 226:21
228:19 229:18
230:9 240:17
246:23 247:18
247:19 248:2
248:21 249:12
249:16,23
252:2,8 253:1
254:6,13
256:13
SFDA-design...
256:7
Shang 58:10
share 212:16
215:3
shared 128:15
308:13
Sharko 3:8 13:3
15:9 18:13
115:7,19 116:9
142:13,23
143:10 214:12
217:10,23
225:13 262:2
262:22 291:6
303:15 304:6
310:9
she'll 225:16
sheet 284:8
301:21 302:13
302:15 303:2
320:8 336:7,9
336:12,15
338:12
shelves 94:22
shifted 93:13

ship 68:4
shipment 86:7
99:12,15,20
111:12,17
112:5 208:4,12
208:12
shipments 208:7
208:8,10,16
shipped 42:17
60:13 61:7
91:23 113:2
201:6,7 208:1
270:18 273:3
315:11 319:21
shipping 208:1
short 73:14
168:18,23
265:6 304:15
324:17
Shorthand 1:18
335:13
shortly 104:3
show 15:24
52:19 53:13
54:14 74:19
76:5 96:13
108:8 134:24
141:8 155:17
162:2 177:11
179:24 194:14
202:19 211:23
212:21 238:19
254:20 259:14
263:2 266:21
274:4 276:6
288:15 293:22
312:1 313:9,22
314:22 316:10
317:14 322:9
323:8,17 326:9
showed 173:21
Shower 18:19
18:20 19:1,2,7
19:7,14,14,22
19:22 22:15,15
37:2,3,5,5,10
37:10,11,11,17

37:17 52:17,17
58:15,16 59:4
59:4 76:24,24
77:5,6 84:10
84:10,12,12,23
84:23 85:16,16
85:21,21 97:12
97:13 118:21
118:22 124:6,6
154:9,10
195:16,16
showing 188:23
side 328:3
sign 335:9 336:8
signed 302:11
312:11
significant
206:15 242:13
290:17
signing 336:10
silo 200:10,12
200:13,14
SILVER 3:18
118:14 155:19
191:23 213:9
similar 248:17
similarly 78:15
231:14
simply 146:3
323:22 329:22
single 103:17
148:10 158:5
159:21,23
160:24 168:8
169:13 173:15
174:20 175:17
175:19
sir 21:16 22:20
24:7 30:22
63:24 77:12
99:13 111:22
113:14,22
126:2 132:21
155:22 234:11
236:10 239:24
241:16 256:22
261:1 269:3

274:9 280:11
287:2 294:24
327:4
site 86:13 120:4
120:21 124:11
193:10 194:2
198:5 216:14
275:11 284:14
286:24 289:21
294:8
sites 227:23
sitting 56:16
110:23 241:23
situation 168:3
176:10 219:5
221:20 223:12
225:12 226:13
228:23 246:24
situations 74:9
306:6
six 25:16 213:2
302:1
size 64:15 87:10
92:7 93:2
148:23 302:2
Skillman 8:7
244:8,10,14
245:3,24
skin 180:11
skipped 306:19
slide 142:7
194:18 198:17
slightly 185:24
186:4 189:24
softball 87:11
software 297:17
298:7,23
299:10
sold 37:6,20,23
223:22 224:11
232:20 280:9
324:2,6
sole 280:14
somebody 169:9
somewhat
263:11
soon 187:20

297:16
SOP 122:9
123:18 130:2
SOPs 121:17,18
124:10 130:15
sorry 41:4 47:18
55:22 60:1
71:9 99:14
102:24 126:6
132:11 178:4
213:21 214:1
214:10 235:17
240:7 267:21
268:3 274:21
sort 59:17 87:1
93:3 104:22
128:20 171:24
201:8 315:18
sound 62:3 63:6
source 141:5
142:6,10
143:19 212:16
215:2 219:17
236:14
sourced 57:11
58:16 85:21
188:20 193:20
195:16 219:13
219:21,22
224:20
sources 140:20
219:9,19
224:11 234:20
237:15 241:2
242:16
sourcing 6:18
141:15 219:2,3
233:17,18
South 233:19
southern 57:17
space 336:6
speak 16:3
17:23 31:9,16
32:8 34:4,8
44:17 45:8
59:16 104:10
130:7 161:12

Donald Hicks

224:1 262:21
321:20 322:3
**speaking** 188:15
192:17 195:10
323:1
**speaks** 223:1
**spec** 57:8 129:24
189:8 232:6
279:9 331:15
**specialized**
84:21,23
**specific** 26:18
54:6 58:18
79:18 82:20
105:6 120:10
123:5 129:17
171:20 197:3
197:10 221:6
246:12 258:13
297:18 298:24
300:5
**specifically**
13:17 50:14
108:4,15 115:8
155:8 171:22
188:13 196:20
202:24 241:11
252:1 265:12
276:20 312:24
313:8
**specification**
5:19 6:6,10
52:15,24 53:7
54:1,3 55:7
56:4 59:9
64:13 69:1,14
73:21,22 74:12
74:13,17,24
75:11,13 76:10
76:11,12,22
77:3 78:22
80:3,18 81:4
82:24 83:12
85:9 87:22
88:19 90:23
95:9,13 96:17
97:7,10,11

98:20 99:1
100:6,15
101:14,19,24
103:6,14,18,19
104:1,21,23
106:2,11,15,16
109:18 113:23
114:15 118:10
118:19 119:18
120:13 121:12
121:20,23
122:2 123:15
123:16 129:7
129:10 131:5
131:17 132:10
132:14 133:6
159:10 176:15
176:15 178:1
179:9,19
180:18 181:2
182:6 185:10
185:17 186:17
186:20 187:10
187:20 189:15
189:21 190:21
191:5 196:19
268:6,7 269:19
269:20 284:7
310:7 314:3
315:4,6 318:6
**specifications**
6:13 52:3,8,10
52:22 53:20
56:18 75:7
80:10,24 89:24
96:2 101:4
102:11,16
105:14,19
107:7,23
108:13,20
112:15 118:5
120:10 123:10
133:24 136:18
137:7,14
180:14 181:20
190:20 250:9
261:5 265:19

266:5,6 268:14
272:1,21
273:17 276:22
279:4 294:14
296:12 299:12
311:3
**specifics** 51:11
135:16 189:6
**specified** 18:24
78:11 138:6
269:21
**specs** 272:2
**speculate** 61:3
196:13 323:12
**speculating**
241:15
**speculation**
131:1 241:17
243:1
**spend** 38:2
**spent** 27:24
43:15 53:17
**SPITZER** 2:17
**split** 204:8 302:1
**spoken** 32:4,13
161:10 201:9
201:14
**spring** 17:20
**St** 84:22
**stage** 81:21
119:17
**staining** 139:23
**stand** 78:8 83:21
186:15 331:19
**standard** 120:20
120:23 121:2,7
123:22 124:4
124:15 125:1
126:24 127:10
130:9,23
133:22 146:14
146:19 147:6
147:11,12
148:14 149:7
149:18 150:3
150:15,20,22
160:23 218:5

218:14 250:20
250:20 251:3
252:8 253:18
287:18 330:2
330:21
**standardized**
250:15
**standards** 18:23
148:11 179:13
250:18,19,24
**standpoint**
72:18 185:18
**Stanish** 276:9
279:5
**start** 114:2
160:18 190:16
260:11 306:20
**started** 304:23
**starting** 193:18
**state** 140:21
141:18 184:10
216:19 242:12
336:5
**stated** 141:2
180:10 209:13
269:17 270:8
271:8 296:14
302:8
**statement**
105:16 114:14
122:9,24
133:20 139:3
145:7 147:7
150:4 165:11
167:12,22
233:14 240:24
241:4,22
294:20
**statements**
286:1
**states** 1:1 12:12
65:20 67:3
148:21 150:2
156:20 159:7
159:11 162:22
163:1 175:1,3
207:22 208:21

209:18 212:14
224:2,12
232:21 235:6
237:14 243:19
**stating** 166:6
261:7
**Stay** 321:1
**steering** 2:21
14:10
**stenographic**
12:18
**steps** 139:14
199:4 200:22
201:3 309:1
**stickers** 254:19
**Stipulations**
11:11
**stop** 333:20
**storage** 315:23
**stored** 208:5
**stores** 94:22
**street** 2:4 3:4
**strictly** 275:13
**strike** 34:13
80:6 114:17
115:5,13 188:5
190:16 193:12
201:17 260:10
295:20 310:1
**strong** 300:13
**strongly** 160:8
**struggling** 173:4
**studies** 72:14
**subcommittees**
182:16
**subject** 8:7,18
8:21 9:7,12
10:11 108:6
336:10
**submission**
313:5
**submitted** 254:5
257:1
**submitting**
307:15,16
**Subscribed**
338:19

Donald Hicks

**Subsection**
119:6
**subsequent**
56:13
**subsidiaries**
31:18
**substance** 24:1
338:11
**substantiate**
216:18
**successfully**
294:12 296:10
**Sue** 289:6
**suffered** 325:3
**suffering** 329:14
**sufficient** 264:6
**suggest** 95:17
116:22 140:21
310:10
**suggests** 123:3
300:12
**Suite** 2:9,18
3:14
**summary** 8:8
64:4 207:5,12
**superseded**
95:20
**supervision**
281:24 335:22
**supplement**
208:13
**supplied** 203:20
232:8 277:12
**supplier** 7:15,17
57:13 64:6
83:5,5,8,9,13
127:2,12
129:18 202:21
203:5,24
204:21 211:5
211:15 212:1,4
212:14 214:18
215:1 273:6
278:1 324:10
**Supplier/** 9:14
**suppliers** 204:9
204:10 211:11

211:13 275:11
275:13 324:14
**supply** 8:19
174:21 270:9
270:11
**supplying** 59:2
**support** 11:2
105:24 212:15
215:2 246:22
293:7
**supporting**
243:12 247:1
**suppose** 93:14
**supposed**
215:15 315:9
**sure** 28:22 53:20
55:10 56:13
76:20 81:8
90:20 97:19,22
102:22 107:10
110:24 118:24
128:21 131:23
132:20 137:22
143:4 167:17
179:10 182:2
192:9 213:14
214:14 233:10
239:7 242:4,5
251:10 253:18
255:17 274:12
310:15 320:9
**Susan** 3:8 20:3
32:6,6 116:19
143:14 217:3
291:14
**susan.sharko...**
3:10
**suspect** 278:23
**suspecting**
215:14
**suspicious** 140:8
**SUTCLIFFE**
3:2
**swear** 12:20
**switch** 174:7
**sworn** 12:24
335:5 338:19

**system** 124:20
206:17 283:5,5
285:2,5 290:19
318:17 325:16
**systematic**
206:19 283:4
**systemic** 290:21
**systems** 203:19
205:6 290:19

———————
**T**
**T** 5:10 6:2 7:2
8:2 9:2 10:2
117:9 337:1
**tab** 109:16 113:5
118:9 131:10
131:19 180:21
180:23,24
190:18 191:8,9
191:10,12,17
**table** 77:11,14
81:20 119:7,10
119:22,23
132:22 233:10
234:1
**take** 73:8 77:9
116:24 117:1
130:15 138:11
168:13 180:9
190:18 209:7
213:22 217:12
224:24 225:8
225:13 259:18
264:15,17,22
264:23 279:21
291:9 303:16
**takeaway**
176:12
**taken** 1:15 13:21
14:13 29:20
81:22 169:16
171:1 199:22
209:21 223:19
309:2
**takes** 199:5
**talc** 3:21 5:20
6:7,10,16,18

7:12,17,20 8:7
8:14,18,21
9:17,20,22
10:6,8,9 12:11
28:4,5 33:17
52:4,8,12 54:3
54:21 57:10,11
57:14,16,17
58:4 59:1,3
60:13 63:11
64:22 65:2
66:16,22 72:18
73:21 76:23
77:4 78:12,16
78:21 79:11
80:10 83:2
84:5,8 85:20
87:24 89:9
93:21 95:13
107:24 112:8
114:16 118:20
118:21 121:5
121:24 139:8
139:16 141:15
144:13 150:23
151:5,11,11
153:17,18
155:7 156:9
161:5,18,20
162:17,20
166:12 168:24
169:20 174:8
174:21 176:11
177:22 181:24
182:7 184:20
192:15 193:20
193:24 194:22
195:17 197:16
199:5 200:3
204:21 207:18
211:5,14 212:1
212:15 215:2
219:2,3,9,10
219:16,19,20
220:4,16,23
223:20 224:8
224:19 229:21

230:18 232:8
232:16,19,23
233:2,4,11,15
233:24 234:18
236:14,15
237:14 241:1
242:14,16
243:16,18
244:3,10 245:3
245:24 247:5
248:23 256:15
258:19 259:2
260:1,17
262:15 266:6
268:4,5,14
269:18 270:9
270:11,11,17
272:8 275:7
277:12,23,23
277:24 280:8
288:9 297:21
298:16,20,24
299:12 300:5
301:8 302:9,23
305:1 309:3,3
312:9,21 314:6
314:10,10
315:17,22
321:14,16
322:17 323:24
324:5,10,14
**talcum** 15:8 8:9
22:12,14 28:2
28:12 34:9
38:21 39:1,5
39:12,22 40:14
43:1,13,21
44:3 45:12
47:1 50:8
51:16 52:2
53:9 55:8
60:15 71:18
72:4,20 92:2
92:18 96:17
102:17 104:9
160:21 166:3
178:2 196:7

Donald Hicks

| | | | | |
|---|---|---|---|---|
| 222:19 223:21 | 186:2 189:19 | 84:3 | 144:13,16 | 319:18,21 |
| 224:1 268:22 | 189:19 193:1,2 | **telephone** 35:15 | 145:14 155:5,6 | 324:5 |
| 273:21 280:16 | 193:5 195:4 | 40:18 | 156:5,8 157:19 | **testified** 13:1 |
| 307:21 308:3 | 209:10 226:11 | **tell** 74:24 126:17 | 157:21 158:3 | 29:9 98:16 |
| 310:5 | 226:19 227:3 | 165:1 166:11 | 162:5 164:10 | 101:23 102:15 |
| **talk** 24:2 37:24 | 227:16 228:22 | 305:9 320:7,18 | 169:22 171:9,9 | 161:2 |
| 45:11,22 59:14 | 239:19 244:8 | **telling** 295:20 | 173:20 174:3 | **testify** 13:9 |
| 75:6 125:12 | 244:11,15 | **tells** 236:22 | 174:14 177:18 | 18:16,22 19:10 |
| 177:4 200:24 | 245:4 246:1,2 | **TEM** 7:7 39:6,9 | 178:8 179:5,6 | 19:19 20:8,9 |
| 247:17,19 | 246:13,22 | 146:13,20 | 179:19 180:6 | 20:13 27:8 |
| 263:6 | 247:14 249:15 | 147:2,6,18 | 186:6,20 | 34:6 49:5 |
| **talked** 18:11 | 258:21 266:15 | 148:21 149:5 | 187:13 189:4 | 52:22 105:18 |
| 23:22 29:7 | 275:12 281:18 | 149:18,21 | 189:13 222:21 | 262:14 |
| 88:19 186:1 | 281:20,22 | 150:2,6,21 | 224:9 225:23 | **testifying** 18:12 |
| 192:4,13,15,19 | 285:14,18 | 155:10 162:18 | 227:5 233:11 | 95:22 |
| 244:9 253:3 | 305:23 312:18 | 169:1,3 269:9 | 233:24 240:18 | **testimony** 5:4 |
| 280:11,13 | 313:2 331:23 | 302:1 | 244:17 246:15 | 15:7 16:12 |
| **talking** 60:3,23 | 332:2,7,8,12 | **ten** 78:5,12 79:5 | 249:7 252:10 | 27:1 28:16 |
| 73:20 76:13 | 332:16,21 | 174:15,18 | 255:7 256:10 | 29:22 30:3,6 |
| 114:23,23 | 333:8 | 175:4 | 256:12 257:11 | 31:12,14 34:21 |
| 120:8,10 | **teams** 209:24 | **term** 131:3 | 257:13 258:1 | 35:12 37:15 |
| 130:23 142:19 | **Tech** 85:18,23 | 149:20 150:10 | 268:7 269:20 | 40:21 45:15 |
| 145:11 164:4 | 86:6,21,22 | 150:14 197:2 | 269:21 271:16 | 102:21 105:22 |
| 168:23 169:21 | 91:15,24 92:2 | 242:9 260:5 | 272:11 273:21 | 105:23 106:5,8 |
| 172:7 174:8 | 92:11,14,17,23 | 292:9 331:6 | 275:7,9 277:4 | 106:13 108:12 |
| 188:18,19 | 93:3,5,12 | **terms** 28:14 | 277:13 279:13 | 134:13,19 |
| 201:23 239:22 | 94:21 99:8 | 29:4,11 31:20 | 280:2,16 | 135:13,21 |
| 239:24 240:2 | 123:24 124:4 | 40:7 44:13 | 284:15 286:15 | 260:12 271:12 |
| 254:1 256:12 | 124:16 125:2 | 79:16 89:4 | 297:24 298:2 | 291:8 293:15 |
| 265:10 272:17 | 125:19 130:10 | 129:4,17 131:1 | 306:22 307:9 | 321:10 335:6 |
| 272:18 290:6 | 130:24 200:11 | 135:10 139:3 | 307:18,21 | **testing** 14:19 |
| **talks** 87:5 | 276:9 277:3,11 | 157:16 160:10 | 309:15 310:4 | 18:18 19:5 |
| 139:22 158:22 | 310:15,19 | 168:10 182:10 | 311:17 316:14 | 33:23 38:20 |
| 158:24 160:8 | 311:10 318:8 | 184:19 186:18 | 316:23 319:17 | 40:14 45:11,23 |
| 316:18 | **Tech's** 85:23 | 195:1 260:9 | 320:10,21 | 59:8,11 64:5,9 |
| **tangible** 139:11 | **technical** 7:20 | 269:16 272:16 | **tested** 65:2,5,20 | 64:14,17 67:1 |
| **tankers** 200:13 | 8:7,10 230:1 | 295:7 298:7 | 66:16 70:19 | 67:6,18,19 |
| **Target** 94:23 | 244:10 245:3 | 299:1 321:8 | 77:21 79:11,17 | 69:2,6 70:2,3,4 |
| **task** 242:18 | 246:1 247:14 | 325:18 330:11 | 98:3 112:24 | 70:7 71:5 72:4 |
| **team** 8:7,10 | 247:16 | **terrific** 61:24 | 169:1 182:1 | 72:18 81:13,16 |
| 23:21 31:15 | **technically** | **test** 6:21 7:9,11 | 185:15 216:16 | 82:2,6,9,11,18 |
| 80:5,8 81:2 | 103:20 | 8:22 40:8,10 | 234:5,19 | 87:17 88:9 |
| 125:6,7 170:6 | **TECHNICIAN** | 53:12 77:15 | 236:16,24 | 89:3,9,24 90:9 |
| 172:1,11,17,22 | 4:7 | 79:20 82:21 | 242:15 243:17 | 90:14,17,21 |
| 175:15,15,23 | **techniques** | 87:23 88:24 | 253:10 254:2 | 92:1,4,9,10,13 |
| 175:24 176:3,5 | 139:19 | 91:5,11 94:4 | 273:11 305:5 | 92:16,21 93:1 |
| 181:18 184:14 | **Technologies** | 107:6 111:15 | 309:3 315:14 | 93:12,23 94:8 |

Donald Hicks

| | | | | |
|---|---|---|---|---|
| 94:9,24 98:1,9 | 317:12 319:4,5 | 129:11,12 | 8:20 9:6,11 | 225:9,14 |
| 99:22 100:13 | 319:9,13 | 131:7 135:14 | 10:10 | 238:21 243:2 |
| 101:21 103:9 | 322:16 323:24 | 137:5 149:24 | **three** 65:6 96:19 | 248:4 254:3 |
| 103:15,16 | **tests** 67:2 71:18 | 150:5,11 152:9 | 126:18 158:15 | 264:17 265:2,3 |
| 112:14,23 | 88:16 89:12 | 155:19 163:19 | 163:3 165:18 | 265:7 269:6 |
| 114:6 119:6,21 | 90:18 98:17,22 | 166:8 169:7 | 166:19 188:7 | 274:14 281:24 |
| 120:15 122:1 | 119:13 133:10 | 178:16 185:20 | 202:14 210:22 | 284:1 304:12 |
| 129:9 132:23 | 161:17 186:20 | 191:11 196:14 | 283:8 290:8 | 304:16 313:13 |
| 133:7,15 | 255:20 273:15 | 197:22 199:1 | 292:1,2 | 327:22 328:8 |
| 135:19 136:5 | 298:16 307:20 | 201:2,4 210:8 | **till** 57:3 74:1 | 328:20 330:5 |
| 137:17 138:2,6 | 311:6,10 317:5 | 215:10,17 | **time** 12:8 19:18 | 330:14 331:1 |
| 138:24 141:6 | 320:3 | 220:1,3 221:3 | 19:19 20:5,17 | 332:4 333:14 |
| 145:22 146:14 | **Texas** 3:14 | 233:9,21 | 20:18 22:9 | 333:21 |
| 146:23 147:1 | 57:15 200:8 | 236:21 242:8 | 25:8,11,17 | **timeline** 85:2 |
| 147:18,22 | 214:20 267:20 | 242:11 243:2 | 26:2 27:8 | **times** 24:16 |
| 151:4 154:23 | 267:21 316:22 | 244:2,2 251:24 | 29:21 30:2 | 25:23 26:3,13 |
| 154:24 155:1 | 317:9 320:12 | 253:13 263:24 | 37:7,14,16,18 | 26:17 32:12 |
| 155:10 161:5 | **texting** 35:19 | 265:1 266:11 | 38:2 43:15 | 115:2 126:3 |
| 161:20 163:22 | **Thailand** 324:11 | 270:23 272:4,5 | 50:6 51:14 | 280:13 |
| 169:5 177:11 | **thank** 21:18 | 272:24 279:16 | 52:1 55:18 | **Tinto** 21:22,24 |
| 196:20 238:14 | 22:9 24:13 | 279:16 287:4,5 | 56:6,22 57:8 | 200:11 203:7 |
| 247:5,13,17 | 30:20,24 75:24 | 289:13 291:9 | 58:18,24 61:5 | 212:3,5 214:19 |
| 248:3,22 250:7 | 117:22 143:13 | 291:22 292:8 | 71:8 73:11,15 | **Tinto's** 200:7 |
| 250:21 252:18 | 180:23 187:2 | 292:10 293:5 | 74:2,14 76:24 | **title** 54:21 83:6 |
| 253:20,22 | 218:2 280:11 | 294:19 295:24 | 80:13 84:21 | 142:7 233:22 |
| 254:14 260:17 | 319:8 324:16 | 299:17 300:10 | 87:21 92:17 | 245:20 |
| 260:21 261:4 | 327:4 | 304:4 311:7 | 98:2 99:3 | **TM** 79:20 |
| 262:15 265:19 | **Thanks** 60:10 | 318:1,18 | 101:4 102:1,7 | 136:11 137:19 |
| 268:21 269:4 | **theoretical** | 320:22 321:18 | 102:19 104:4,9 | 162:5,12 |
| 269:11,14 | 145:19,21 | 321:22 323:15 | 104:19 105:1 | 163:10 284:5 |
| 270:3,16,24 | 146:5 175:21 | 326:10 | 106:3 108:1,21 | 284:13 |
| 271:2,4,9,11 | **therapeutic** | **third** 84:1 93:5 | 116:13 117:4 | **TM003845** 7:11 |
| 271:19 273:2,4 | 282:24 290:15 | 128:3 | 117:11 121:1 | **TM7024** 6:21 |
| 273:9 275:19 | **thing** 17:21 62:1 | **third-party** | 121:13 125:18 | **TM7169** 7:9 |
| 279:7,11 | 113:19 123:13 | 83:22,23 85:3 | 125:21 126:3,7 | **today** 14:13 16:3 |
| 283:19 284:14 | 184:9 201:8 | 89:8 99:8 | 126:17 127:23 | 16:9 18:12,16 |
| 284:16 288:3 | 217:14 279:1 | 125:11 128:4 | 133:5 138:7 | 19:4,10 20:12 |
| 289:7,10,16 | **things** 14:9 | 203:15 204:10 | 142:13 151:8,8 | 20:23 21:19 |
| 292:15 294:12 | 59:10 125:12 | **thirty** 336:16 | 168:15,19 | 22:11 23:19 |
| 294:21 295:1 | 163:23 168:9 | **thought** 105:20 | 171:12,21 | 26:14 27:1,8 |
| 296:2,11 | **think** 20:16 21:6 | 132:9 191:6 | 172:20,21 | 30:3 31:12,24 |
| 297:10 299:2,7 | 22:2 25:2 45:2 | 222:14 240:6 | 173:3 179:7,20 | 34:6,22 35:12 |
| 299:14 301:8 | 59:9,17 73:22 | 274:20 | 184:21 192:16 | 40:21 44:17 |
| 306:9 310:20 | 105:22 109:2 | **thousand** 144:9 | 193:7 199:16 | 45:10 56:17 |
| 310:23 311:1,8 | 114:9 115:12 | **thousands** 60:23 | 200:23 210:24 | 95:18 104:11 |
| 311:11,15 | 115:23 116:18 | 203:2 | 211:3,18 212:8 | 105:23 130:8 |
| 316:2,3,12,20 | 128:14 129:6 | **Thread** 8:6,17 | 219:11,11 | 134:13 135:13 |

200:24 201:11
219:12 241:23
280:14 293:15
**Today's** 12:7
**Toiletry** 137:21
**token** 39:21
**told** 73:24 103:4
130:11 137:18
**tolerance** 43:6
43:12
**Tom** 288:24
**tomorrow** 321:3
**ton** 314:15
**Tongzi** 58:11
**tonight** 310:11
**tonnage** 60:20
61:13 195:21
195:21 197:4
**tons** 60:20,24
61:11 68:9
195:20 196:1
272:7,8
**top** 74:21 294:5
**topic** 16:16
19:17 20:6,17
24:22 59:16
151:14,17
195:3 222:20
222:24 262:21
264:10 280:4
**topics** 13:9 14:4
14:17 15:1
18:11 34:5
45:1 49:19
53:19 81:14
181:10 182:24
202:8 205:5
222:5 240:16
260:20 268:20
**total** 26:8
**toxicity** 189:19
**toxicologist** 45:4
46:2 181:17
**toxicologists**
49:17 50:15
51:6 184:13
186:2

**toxicology**
172:16 183:20
**TPM** 83:20,20
85:3
**trace** 144:15
209:1
**traceability**
207:23 208:15
209:14 210:2
**tracking** 301:20
302:12
**train** 248:21
**trained** 38:3
**training** 38:2,5
248:20 249:4,9
297:15
**transcript** 335:9
335:19 336:17
336:19
**transcription**
338:7
**translation**
232:2 322:5
323:7,9
**transmission**
79:17 136:12
155:6 156:13
**transportation**
200:18 201:5
**transported**
63:10 201:7
**traveled** 200:3
**Traver** 327:16
327:21
**tremolite** 302:18
**trend** 189:10
**trends** 325:15
**trick** 314:14
**tricky** 179:18
**trip** 7:13 194:22
195:2
**trips** 202:7,14
**truck** 199:23
200:4,8
**trucks** 208:4
**true** 29:5,6
33:13 61:12

62:17 63:16
64:10 69:14
70:8,14,20
77:17 80:18
95:1,5 96:24
97:6 100:15
101:21,22
102:2,8 103:10
104:4,5 105:2
105:3,8 112:16
113:9 114:6
119:22 127:22
134:13,14
138:8 141:1
143:24 144:9
145:5,7,16
146:1 147:24
148:1 151:19
152:5 153:20
154:2,11
155:11 157:7
160:21 164:17
167:12 170:16
182:22 184:23
185:18 186:21
188:1 189:15
190:6 191:3
194:3 204:2,21
209:15 210:6,6
210:10,18
221:24 223:16
226:14 230:6
231:7 233:6
237:17 243:20
244:18 245:7
247:7 248:5,23
249:23 250:9
251:4 253:4
254:7 255:8,13
255:21 256:14
256:22 257:13
258:6 268:14
270:19,23
273:17 279:13
279:16 281:11
282:9 283:19
286:16 287:10

287:12,16
288:4 290:9
292:3,16
296:14 299:24
305:14 335:6
**trusted** 194:6
**truthful** 184:4
**truthfulness**
241:22
**try** 22:8 258:17
**trying** 126:14
139:10 178:7
179:17 245:16
314:14,15
**tuned** 321:1
**turn** 22:22 67:14
70:15 77:8
78:3 79:23
109:8 110:4,7
118:8 119:5
131:10 132:21
141:24 147:15
195:5 198:16
205:15 206:2
207:4,14
212:11 214:10
214:23 229:9
232:5 233:8,20
235:8 256:4
276:23 282:4
283:12 294:4
296:23 301:6
**turned** 292:23
**TV** 329:6
**two** 59:15 60:4
78:17,22
126:18 139:19
158:13 160:14
163:23 165:17
168:9 178:10
191:3,19 192:9
202:14 206:10
214:24 225:24
234:13 235:24
283:2 290:7
298:3 302:2
308:11,15,20

321:2
**two-page** 318:22
**type** 41:21 42:12
46:9 88:9
140:15 153:1
157:7 158:14
158:15 162:19
163:12 176:10
204:1 330:16
330:18
**types** 19:5 33:23
72:15 139:14
139:19 184:11
202:10 298:16
328:12,18
**typically** 25:15
29:5 42:1
68:21 70:4
140:17 148:11
181:16,21
211:12 285:23
292:10

---

**U**

**U.S** 13:13 21:7
36:16 232:24
234:21 236:16
237:17 243:12
270:8,10,12
280:9 333:11
**ultimately**
128:11 169:8
170:4 189:7
190:1,8 196:3
196:6 251:1
253:2 254:5
278:16 319:21
**unavailable**
220:5 284:24
**unclear** 299:18
300:10
**underground**
58:10
**understand** 15:3
16:13 19:16
25:18 26:11
35:7 38:3

40:23 52:1
59:17 87:16
95:10 110:20
112:20 175:12
175:24 188:21
202:9 205:13
246:24 247:15
252:5 271:12
325:19
**understanding**
19:24,24 21:2
37:15 58:23
59:5 67:24
73:1 89:2 98:8
138:23 139:5
161:19 194:9
197:14,21
201:23 216:13
223:19 248:13
252:7,11,15
313:3
**understands**
111:1
**understood**
21:16 24:5
**undertake**
171:18
**Union** 84:19
**unique** 67:23
68:1,5,7 98:23
111:12 196:20
**unit** 85:14 86:20
282:3
**United** 1:1 12:12
65:20 67:3
224:2,12
232:21 243:19
**University**
237:3
**unknown**
145:24
**unnecessary**
115:9 116:13
295:14
**unquantifiable**
165:5
**Unspecified**

10:12
**unusual** 260:4
325:15
**up-to-date** 31:4
31:6
**update** 7:20
8:11 57:7
230:1
**updated** 74:10
104:15,16,18
**upper** 77:19
178:11 189:14
190:4,24
**urged** 250:5
257:11,17
**urging** 250:10
250:15
**USA** 203:16
**use** 9:17 60:15
72:19 84:9
87:20,23 124:5
174:20 179:14
195:23 202:11
211:14 214:3
220:8 232:20
260:5 270:18
280:8 292:19
292:20 297:22
312:8 327:9
**usefulness**
168:11
**uses** 179:1
**USP** 5:20 54:22
79:14 179:1
250:17 252:17
**usually** 64:5
86:13
**utilized** 89:15
176:10

———————
**V**
**VA** 2:9
**vague** 53:11
**valid** 227:20
**validated**
297:22 298:23
299:11

**validation** 205:7
297:18 298:8
**valued** 150:6
**Van** 198:11
308:17,24
**variation** 199:18
**varied** 89:3
**varies** 140:15
**variety** 156:22
159:8
**various** 24:9
43:17 72:15
202:8 205:5
280:5 330:12
**veracity** 238:24
239:7 241:21
242:10
**verbal** 27:19
30:9
**verification**
148:24
**verified** 303:1
**verify** 75:19
101:9 203:18
**version** 54:7
55:24 56:22
76:16 95:9
99:5 252:17
**versions** 252:18
**versus** 85:9
272:13
**vice** 172:14
332:5,11,15,20
333:2
**video** 12:9
**videographer**
12:2,5 73:11
73:15 75:21
117:4,11
168:15,19
265:3,7 304:12
304:16 333:15
333:21
**VIDEOTAPE**
4:7
**Videotaped** 1:15
**view** 29:18

120:5 169:10
170:3 200:17
200:21,21
261:15
**violates** 166:2
**virtue** 94:17
128:10
**visit** 193:10,14
194:2,18 198:5
198:15 210:21
**visited** 192:23
193:2,16
**visits** 209:24
211:1
**vitae** 5:17 23:5
31:2,5
**Volume** 1:10
**VP** 327:23

———————
**W**
**Wait** 142:13
**walked** 104:1
**Walmart** 94:23
**want** 17:21 18:1
71:15 74:19,20
74:23 75:3
97:19 115:24
134:6 143:1,4
145:10 157:13
158:6 187:3,4
192:8 214:12
220:10 243:7
245:17 263:13
264:14,18,23
295:5,17 314:4
318:9 326:23
**wanted** 132:19
171:12 175:16
263:14 273:10
273:15
**wants** 111:3
**warranted**
173:24
**wasn't** 105:4
192:7 285:11
**way** 16:23 48:8
73:24 92:21

127:9 145:12
155:9 175:22
209:1 210:3
230:7 241:14
253:22 277:22
283:14
**ways** 302:1
**we'll** 21:19
117:2 155:22
195:13 217:12
225:8 264:1,3
**we're** 55:1 73:7
93:17 99:6
114:23 120:9
129:11,16
131:23 137:11
217:7 223:24
255:17 263:6
263:16 274:9
291:9 296:7
303:15 314:15
321:4 333:15
333:17
**we've** 40:17
88:19 109:14
129:6 133:24
173:5 219:14
223:19 254:1
256:12 264:2
280:13 290:5
314:14 321:18
**website** 43:16
**WEDINGER**
4:2
**week** 8:7 107:19
**weighs** 62:14
**weight** 160:11
165:21
**welcome** 180:17
**went** 15:23
176:14 304:19
**weren't** 272:17
325:20
**West** 3:4
**white** 301:19
302:23
**whiteness** 64:22

316:19
**WILENTZ** 2:17
**willing** 44:20
212:16 215:3
**witness** 11:5
12:21 14:24
20:21 23:24
24:5 29:16
30:7 31:20
32:19 44:12,17
46:5,14 47:17
48:4,12 49:2
49:15 50:2,13
51:3,19 52:7
52:19 53:13,16
60:18 61:2
62:5,22 65:16
66:4,21 67:12
68:20 70:23
71:8,21 72:6
72:24 74:5,19
75:17 77:24
86:2,9 89:1
90:4 92:4 93:9
94:13 95:4
97:16 98:7
100:2,18 101:8
102:10,22
103:12 104:13
105:11 106:14
107:9 108:8
110:12,15
111:4 112:3,19
113:17 114:9
120:18 121:16
122:6,15,17
124:9,18
126:10 128:14
130:13 131:7
132:8 134:24
135:2 136:3,19
136:21 144:21
145:18 146:3
146:11,18
147:9 149:15
151:7,23 152:9
153:6,22 154:4

154:15 155:14
156:12 158:2
158:21 159:14
163:19 164:19
165:10 166:23
167:15 168:2
170:20,23
174:12,24
178:16 181:15
183:4,18 184:9
185:2,20
186:10 188:12
189:18 191:13
194:5 196:12
205:23 206:24
207:11,20
208:20 209:6
209:17 210:8
212:23 213:4
215:10 218:10
218:18 220:1
221:2,15
222:15 223:24
224:14 225:17
225:18 226:6,7
226:18,19
227:8,10,19
228:14,16
229:4 230:14
231:2,11 232:1
232:14 235:1
236:7,21
237:21 238:7
239:6,16
240:14 241:9
242:4,24 244:1
245:11 246:20
247:11 248:10
249:2 250:2,14
251:7,20
252:14 253:13
254:11 256:1
257:17 258:12
259:5 260:23
261:17,20
262:11,20
263:7,20 264:5

264:16 265:1
265:22 266:8
268:17 270:22
272:4 273:20
274:7 275:21
277:17 279:15
280:21 283:22
284:10,20
285:16 286:7
287:18 288:6
289:13 291:14
292:8,18 293:5
293:16 294:19
295:21 299:4
299:16 300:8
300:19 303:13
305:8,16 306:2
306:13 307:2
308:6 309:6,18
319:13 321:20
323:4 325:7
326:2,23
327:20,21
328:23 329:1,2
329:18,21
330:9 331:21
332:15,23
335:5,6,8
336:1
**witness's** 295:8
**women** 325:21
329:13
**Woodbridge**
2:18,19
**word** 58:5
129:23 131:8
165:7 185:21
306:19
**words** 92:9
157:3 163:3
166:15 175:9
197:3 199:19
211:9 219:10
**work** 30:12
41:10 42:7,19
49:18 182:15
322:6

**working** 47:3
85:1 125:6
175:15 246:23
282:2 322:8
**works** 310:12
**worksheet**
302:22
**world** 47:10,21
49:8 163:22
185:13 219:23
252:20 324:14
**worldwide** 5:19
281:6
**wouldn't** 62:8
125:23 182:14
**write** 114:20
115:1 199:12
**writes** 275:5
279:5 289:3
**writing** 217:11
246:10 276:10
**written** 49:21
125:10 251:23
252:3 286:1
288:22 308:24
310:2,6
**wrong** 213:15
**wrote** 251:9
**WW** 7:17

_____
**X**
**X** 5:2,10 6:2 7:2
8:2 9:2 10:2
42:10,19
**x-ray** 38:22
139:20
**XR** 298:11
**XRD** 140:5,14
141:6 143:24
144:8,12,13
145:6 146:4
148:3,15 175:5
251:3 297:13
297:13,22
298:6,6,15,19
299:14 300:1,4
302:2

**XRD's** 140:21
**XRF** 297:10,18
297:22 302:2

_____
**Y**
**yard** 199:23
200:3
**yeah** 37:21
127:6,7 131:24
132:19 136:19
151:23 153:6
179:10 180:22
181:15 182:13
183:18 188:2
191:13,18,18
196:12 199:1
200:16 212:23
214:14 215:10
228:16 229:14
233:13 244:1
245:11,13
251:20 253:13
258:12 259:19
265:1 269:24
275:21 308:21
319:2 327:1
**year** 16:24 17:15
25:20 26:1
35:8 195:20
228:17
**yearly** 69:20
70:8,19 98:2
98:17 195:23
196:8
**years** 35:3 44:19
112:16 126:18
182:7 183:11
194:2 216:15
312:21 317:18
**yellow** 234:2,3
**York** 3:4,4

_____
**Z**
**Zappa** 193:6
194:19 198:4
198:12 199:12
266:12 275:6

Donald Hicks

| | | | | |
|---|---|---|---|---|
| 288:24 | **08967** 95:8 99:5 | **12:43** 117:12 | **2** 11:9 13:13 | 200:24 219:12 |
| **Zappa's** 193:14 | 101:24 | **125,000** 62:17 | 16:5 22:21 | 310:21 |
| **zero** 43:6,12 | | 63:3,8 | 57:24 179:15 | **2006-2007** |
| **Zhizhuo** 58:8 | **1** | **127** 2:13 | 212:11,24 | 104:19 |
| | **1** 8:7 11:15 | **13** 147:16 | 213:20 214:11 | **2007** 284:6 |
| **0** | 13:12 16:6 | 173:10 180:1 | 214:24 216:8 | **2009** 56:6,10,14 |
| **0.6** 230:20 | 22:21 109:16 | 312:21 | 229:10 277:1 | 56:19 57:3 |
| **000008597** | 113:5 140:18 | **138** 6:15 | 294:4 318:12 | 69:4 74:2,14 |
| 131:14 | 140:22,22 | **14** 194:15 221:6 | 320:9,22 | 95:14 98:24 |
| **000009937** | 141:3 143:24 | 229:20 256:11 | **2.0** 77:9 | 102:12,19 |
| 192:2 | 143:24 144:5,7 | 296:24 301:7 | **2.1** 319:14 | 105:14,22 |
| **000132148** 8:22 | 144:12,14 | **140471-76** 6:21 | **2.33** 79:7 | 106:20,24 |
| **000357471-88** | 145:16,23 | **140505-09** 7:10 | **2.5** 178:3,12 | 127:24 202:22 |
| 5:20 | 146:1 148:4,14 | **141** 6:17 | **2.9** 319:14 | 203:6 204:7,8 |
| **000415546-80** | 148:15,15 | **1462** 179:14 | **2/11/2016** | 210:6 211:3,17 |
| 7:14 | 163:1 181:5 | **14th** 229:24 | 302:12,14 | 221:6 225:21 |
| **000525310** 6:20 | 203:14 206:11 | **15** 5:5,14,15 | **2/8/2016** 303:3 | 228:10 229:20 |
| **000629320** 10:7 | 318:12 320:21 | 77:9 79:24 | **20** 174:19 | 237:13 238:23 |
| **000631364-80** | 338:6 | 81:15 194:21 | 211:24 259:15 | 255:3 256:11 |
| 10:9 | **1.4** 13:9 | 202:20 228:10 | 338:20 | **2009-2010** 102:1 |
| **000634054-61** | **1.628** 13:11 | 237:13 238:23 | **200** 9:20 27:14 | 105:1 |
| 7:11 | **1/100** 175:4 | **150,000** 195:20 | 29:10 314:6,10 | **2010** 76:18 |
| **00122446** | **1:46** 168:16 | **1510** 3:14 | **2003** 193:22 | 83:12,24 84:1 |
| 118:17 | **1:59** 168:20 | **156** 6:21 | **2005** 55:13,14 | 84:5,10 87:20 |
| **008967** 6:8,11 | **10** 2:18 4:3 | **15th** 229:24 | 56:9,14 57:3 | 93:19 101:4 |
| 76:13 93:18 | 57:20 119:6 | 246:1 | 98:19 103:12 | 102:19 180:19 |
| 95:17 96:18 | 155:20,23 | **16** 141:17 | 104:3 106:20 | 182:8 190:22 |
| 102:18 104:24 | 156:4 296:23 | 190:22 211:24 | **2006** 13:9,10,11 | **2011** 8:15 96:20 |
| 132:14 275:14 | **10.0** 279:9 | 214:3,18 | 13:12 18:20 | 98:2 100:6 |
| 275:19 277:6 | **10:48** 73:12 | 288:17,18 | 19:2,8 20:1,13 | 101:4 118:11 |
| 277:14 | **100** 62:2 | 335:15 | 20:19 37:19 | 119:19 120:14 |
| **019** 297:13 | **10019** 3:4 | **16-2738** 1:6 | 43:5 52:1 54:1 | 121:14 122:3 |
| **026** 297:14 | **105** 1:16 | **161** 7:6 | 54:4 55:12,15 | 129:10,24 |
| **031712-20** 7:16 | **109** 6:13 | **17** 200:24 228:6 | 56:1,19 58:19 | 131:2 141:17 |
| **033839-50** 6:12 | **11** 13:12 22:22 | 229:10 239:23 | 58:24 61:5 | 151:3 171:5,5 |
| **037018-26** 7:19 | 162:3 301:6 | **177** 7:9 | 69:4 71:4,11 | 173:5 175:10 |
| **049938-50** 6:8 | 304:24 | **17th** 267:10 | 71:12 72:23,24 | 184:21 193:11 |
| **07095** 2:19 | **11/17/11** 8:17 | **18** 57:20 60:8 | 89:22 94:5 | 194:21 198:24 |
| **07701** 2:14 | **11/28/11** 8:21 | 63:22 69:19 | 102:12 103:21 | 199:10 211:18 |
| **07932** 3:9 | **11/8/11** 9:6 | 238:20 245:3 | 104:3,7 105:14 | 258:9,18 |
| **07962** 3:19 | **11:00** 73:16 | **180** 7:11 | 105:20,21 | 265:11,15 |
| **08031** 54:21 | **12** 97:23 119:6 | **19** 254:21 | 107:24 108:21 | 267:10 275:2 |
| 56:21 57:2 | 177:13 255:6 | 256:24 312:10 | 109:23 118:6 | 276:13 |
| 64:13 73:21 | 255:19 304:24 | **194** 7:12 | 125:18 128:24 | **2012** 131:18 |
| 74:1 76:11 | **12/19/14** 9:18 | **1974** 35:5 | 138:7 179:7 | 132:15 133:16 |
| 109:17 114:24 | **12/5/96** 7:6 | | 180:15 192:17 | 199:16 280:18 |
| **08837** 4:4 | **12:01** 117:5 | **2** | 193:19 199:19 | 281:15 288:17 |

Donald Hicks

Page 380

288:18 291:24
**2013** 211:3
**2014** 312:10
327:6 328:14
330:5 331:1
**2016** 293:9
294:2 295:2
303:5 304:21
305:13 317:17
**2017** 20:1 35:9
58:19,24 61:5
95:14 103:21
108:21 125:19
129:1 138:8
179:7 180:15
192:18 199:16
199:20 201:14
219:12 310:21
**2018** 1:12 12:8
17:17 26:2
87:22 107:24
335:15
**202** 7:15
**21** 266:22 274:5
274:8
**21-22** 294:2
**212** 3:5
**214** 7:17
**217** 11:9
**218** 2:4
**21st** 246:2
**22** 245:15 274:6
274:17,19,24
278:24,24
305:13
**22311** 2:9
**228** 7:20
**22nd** 245:23
303:4
**23** 203:6 276:7
**238** 8:6
**24** 76:18 120:14
122:3 129:10
129:24 131:2
180:19 281:4
**24th** 96:19
118:11 327:6

**25** 5:20 9:22
10:6 54:22
57:10,11 61:20
62:14 63:2
73:21 288:16
**25/Guangxi**
58:3
**253366** 7:8
**255** 8:9
**259** 8:12
**26** 255:3 293:23
**262** 11:15
**266** 8:17
**269-2343** 2:5
**26th** 8:11
**27** 312:2
**274** 8:20
**276** 9:6
**28** 1:12 12:7
275:2 313:23
**281** 9:8
**288** 9:11
**29** 202:22
219:11 314:24
316:13 333:18
**293** 9:14
**2a** 58:3

——— **3** ———
**3** 30:19 83:7
132:15 320:24
**3.0** 63:22
**3.14** 69:1
**3.15** 69:2
**3.2** 59:22
**3/21-22/16** 9:15
**3/24/10** 6:7
**3/24/11** 6:11
**30** 5:17 244:23
316:11 317:15
319:7,8,8
333:17 336:16
**30(b)(6)** 15:1
170:20 181:12
222:4,10
260:24 261:16
268:18 291:8

291:11 293:15
328:24 329:18
**30th** 109:23
**31** 322:14
**312** 9:17
**313** 9:20
**3138494** 303:6
306:11
**314** 9:22
**316** 10:6
**32** 326:10,17,18
**322** 10:8
**326** 10:10
**33** 326:10,11,16
**334** 2:5
**339** 338:6
**35** 198:17
**350** 3:18
**36** 229:20
244:23
**36104** 2:4
**37** 244:23
**3rd** 131:17
133:16

——— **4** ———
**4** 54:15 57:20
69:19 77:9
88:20 101:16
104:2 180:23
180:24 190:18
191:9,12 256:5
282:4 320:24
**4/13/12** 9:9
**4/15/11** 7:14
**4/16/12** 7:14
**4/23/09** 7:16
**4:02** 265:4
**4:22** 265:8
**40** 183:11
264:21
**40-plus-year**
153:19
**40-some-odd**
44:19
**40-year** 153:11
**411701** 9:23

**411895** 9:21
**42** 35:3
**44413** 8:16
**4900** 2:9

——— **5** ———
**5** 63:21 76:6
79:1 88:20,20
93:18 140:19
181:3 182:5
184:23 185:15
189:1,5 190:5
191:9,10,17
207:4 230:22
231:16 233:9
**5,000** 62:15 63:2
231:17
**5,238** 62:3
**5.0** 122:23
**5/15/09** 7:21
**5:14** 304:13
**5:25** 304:17
**50-foot** 62:2
**506-3767** 3:5
**51** 3:4
**512.391.0183**
3:15
**52nd** 3:4
**530885** 213:19
**5310** 142:3
**54** 5:18
**549-7000** 3:10
**5756-3** 302:3

——— **6** ———
**6** 13:10 57:21
59:20,23 60:3
60:8 96:14
97:20,24 99:6
111:5 113:6
118:9 156:16
179:12 212:11
214:24,24
231:5 233:9,21
**6,000** 231:6
**6.0** 158:22
**6/16/11** 6:19

**6/24/14** 10:11
**6/9/09** 8:6
**6:09** 333:22
334:2
**60-plus** 61:11
**600** 3:9
**650** 2:9
**66** 7:8 162:19
**6th** 14:15

——— **7** ———
**7** 54:24 67:15
69:18 109:3,15
117:18,20,23
131:10,19
134:11 143:16
143:17,17
205:15 207:14
282:5
**7:30** 310:11
**7024** 79:20
136:11 137:19
155:2,4,5,8
156:5 160:1,5
162:5,13
163:10 164:11
252:10 284:13
**703** 2:10
**7164** 284:5
**7169** 177:18
**732** 2:14,19 4:4
**738-5600** 4:4
**747-9003** 2:14
**76** 6:6
**78701** 3:14

——— **8** ———
**8** 13:10 79:24
81:15 109:19
114:24 117:16
138:12 195:5
206:3 213:20
276:13
**8031** 55:19,23
56:8 101:13
103:4,6 105:21
**816** 3:14

Donald Hicks

**855-6066** 2:19
**8597** 132:2,6,8
**877.370.3377**
   1:23
**8967** 75:14
   105:5 314:3
   315:4

---

**9**

**9** 13:10,11 70:15
   97:23 119:5
   132:22,22
   141:9 155:18
   173:7 222:20
**9:31** 1:17 12:8
**90** 2:18
**900** 2:18
**917.591.5672**
   1:23
**931-5500** 2:10
**96** 6:9
**973** 3:10
**973-267-0058**
   3:19
**98** 229:20

Exhibit 44

Julie Pier

```
1                IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF NEW JERSEY

2

   _____

3                                 )  MDL NO.

   IN RE:  JOHNSON & JOHNSON      )  16-2738(FLW)(LHG)

4  TALCUM POWDER PRODUCTS         )

   MARKETING, SALES PRACTICES     )

5  AND PRODUCTS LIABILITY         )

   LITIGATION                     )

6                                 )

   THIS DOCUMENT RELATES TO ALL   )

7  CASES                          )

   _____)

8

9

10

11           PURSUANT TO NOTICE, the videotaped 30(b)(6)

12  deposition of Imerys Talc America, Inc., through the

13  oral testimony of JULIE PIER - VOLUME II was taken on

14  behalf of the Plaintiffs, at Gordon & Rees, 555

15  Seventeenth Street, Suite 3400, Denver, Colorado, on

16  September 13, 2018, commencing at 9:37 a.m., before

17  Melanie L. Giamarco, Registered Merit Reporter,

18  Certified Realtime Reporter, Registered Professional

19  Reporter and Notary Public within Colorado.

20

21

22

23

24

25
```

Julie Pier

|  | Page 106 |
|---|---|
| 1 | findings? |
| 2 | A. The testing is just done to show -- or |
| 3 | confirm that our testing that we did in the U.S. -- |
| 4 | that we get the SEM result. In Toulouse, they use |
| 5 | different instrumentation. So we just -- it's part |
| 6 | of our protocol, or program, is to have periodic |
| 7 | tests. Cross-checks we call them. |
| 8 | Q. Is Imerys' testing in Toulouse, this |
| 9 | rotational testing, is that done on composite |
| 10 | samples of the ore stream from Houston? |
| 11 | A. It is done on the -- it is done on a |
| 12 | monthly composite, yes. |
| 13 | Q. And so I might ask you a better |
| 14 | question. |
| 15 | How about the monthly composite? Could you |
| 16 | describe that composite for me, please? |
| 17 | A. When we -- the Houston lab has |
| 18 | designated representative products, meaning |
| 19 | products that represent the different ore streams. |
| 20 | And these are -- samples are taken at the Houston |
| 21 | mill each time a product is milled. And at the end |
| 22 | of the month, that composite sample for that |
| 23 | product is sent to Denver -- or it was Denver, now |
| 24 | San Jose. So it's a -- it represents a monthly |
| 25 | composite of a product that represents a specific |

|  | Page 107 |
|---|---|
| 1 | ore stream in Houston. |
| 2 | Q. And this is post milling; is that |
| 3 | correct? |
| 4 | A. That's correct. |
| 5 | Q. Is there ever a segregation of Grade 25, |
| 6 | Johnson's product, Baby Powder product, out from |
| 7 | the composite so that it is tested separately? |
| 8 | A. The Grade 25 that essentially goes to |
| 9 | Johnson & Johnson goes through the same process of |
| 10 | every time it's manufactured, a portion is taken |
| 11 | representative of that manufacture date for the |
| 12 | month, and that's one of the product streams |
| 13 | represented. |
| 14 | Q. So I don't think that was my question. |
| 15 | Specifically about Johnson & Johnson's |
| 16 | Grade 25 ore, is that ever tested separately from |
| 17 | the composite when composite testing is done? |
| 18 | MR. KLATT: Objection; form. |
| 19 | A. By TEM or . . . |
| 20 | Q. (By Mr. Green) By anything. Is it ever |
| 21 | tested? |
| 22 | A. Yes. And, I'm sorry, I have to |
| 23 | remember. Samples are taken as the railcar is |
| 24 | being filled in Houston, and the San Jose lab is |
| 25 | not involved in that. I believe that those -- that |

|  | Page 108 |
|---|---|
| 1 | that sample for that lot is sent directly to |
| 2 | Johnson & Johnson. |
| 3 | Q. Is that a requirement of Imerys of spec? |
| 4 | Is that why you do that? |
| 5 | A. I believe it is. |
| 6 | Q. Do you know why Johnson & Johnson |
| 7 | required that specification that they get a direct |
| 8 | sample of your ore for testing? |
| 9 | A. Well, it's not -- I mean, it's a product |
| 10 | at this point, so -- |
| 11 | Q. It's milled? |
| 12 | A. It's a milled product, yes, as the |
| 13 | railcar is be filled, so -- |
| 14 | Q. Do you know why? |
| 15 | A. I -- it was just part of the |
| 16 | specifications. My understanding is that |
| 17 | Johnson & Johnson does its own suite of tests on |
| 18 | that. |
| 19 | Q. With respect to Imerys France, does |
| 20 | Imerys France ever send to Imerys America the |
| 21 | results of its testing of Chinese ore, talc ore? |
| 22 | A. Yes, it does. |
| 23 | Q. How often? |
| 24 | A. We do the cross-check analysis with |
| 25 | approximately the same frequency -- well, I think |

|  | Page 109 |
|---|---|
| 1 | I -- I'm sorry. I think I mentioned that it was -- |
| 2 | once a -- it's -- I'm getting myself confused. I |
| 3 | apologize. |
| 4 | It's monthly composites. We rotate those |
| 5 | and send them to Europe. Europe does the testing |
| 6 | and sends the results to us. So for Grade 25 |
| 7 | specifically, that would be approximately once a |
| 8 | year. |
| 9 | Q. Does France send -- does Luzenac |
| 10 | France -- I'm sorry. |
| 11 | Does Imerys France send to Imerys America |
| 12 | the results of its testing on Chinese ore received |
| 13 | in France for European? |
| 14 | MR. KLATT: Objection; form. |
| 15 | A. I'm sorry. Are you asking about the |
| 16 | Chinese ore that's being imported to China or to |
| 17 | Europe? |
| 18 | Q. (By Mr. Green) I am. That last |
| 19 | question was. Not before. This last question was, |
| 20 | yes. |
| 21 | A. They do their own testing by SEM. And |
| 22 | they also do XRD and PLM. I don't think that they |
| 23 | share those results with us, per se, unless we ask |
| 24 | for it. |
| 25 | Q. What would prompt Imerys to ask for |

Julie Pier

---

Page 401

1  to admit, I am completely confused by all of that.
2  So can we back up and talk about that again?
3       What I'm trying to establish is how often
4  you are testing those samples of talc being sent to
5  Johnson & Johnson, and if a representative sample
6  of all the shipments of talc being sent to
7  Johnson & Johnson are being tested.
8       So let's start back with Vermont talc.  So
9  before 2003, when Imerys started importing Chinese
10  talc, were samples being tested on a regular basis
11  by TEM prior to 2003?
12       A.  Prior to 2003, the program was to do TEM
13  on post-milled samples on a quarterly basis.
14       Q.  Okay.  Can I stop you right there --
15       A.  Yes.
16       Q.  -- just so I can break that down?
17       So when you say "post-milled samples," that
18  means that talc has already been shipped to
19  Johnson & Johnson?
20       A.  The TEM testing is after the product is
21  made and after it is shipped, yes.
22       Q.  And we're talking about Vermont talc
23  prior to 2003?
24       A.  Yes.  At some point, it was quarterly.
25  I have even older records that indicate there was a

---

Page 402

1  time period we were doing this monthly as well.
2       Q.  And didn't you testify yesterday that
3  there was also some TEM sample testing taking place
4  before it was milled?
5       A.  Yes.
6       Q.  And before it was floated?
7       A.  Yes.
8       Q.  Okay.  How -- was every sample tested by
9  TEM before it's milled and floated?
10       A.  That was also a monthly composite.
11       Q.  How were the monthly composites
12  accumulated?
13       A.  For the product or for the pre-milled --
14       Q.  For what you're testing by TEM.
15       MR. SILVER:  Dave, in an attempt to help,
16  I'll let the witness answer.  Part of that might
17  have been in Pat Downey as per the previous e-mail.
18  Because I can't talk to her, I'm not sure what
19  she's familiar with and what she knows after it
20  hits her lab.
21       MR. DEARING:  Let's find out.  She seems to
22  know at lot about it, so let's find out.
23       MR. SILVER:  Like I said, just -- I'm trying
24  actually to help and clarify.
25       Q.  (By Mr. Dearing)  So you're talking

---

Page 403

1  about monthly composite testing of pre-milled,
2  pre-floated samples taken --
3       A.  Correct.
4       Q.  -- in Vermont?
5       A.  Correct.
6       Q.  Is that done on every load of talc
7  that's brought out of the mine?
8       MR. KLATT:  Objection; form.
9       A.  And Pat Downey does know more about
10  this, I believe, than I do, but my understanding is
11  that as the pre-floated material is going through
12  its first crushing step, that composite samples are
13  already automatically -- or individual samples are
14  automatically taken during that process and then
15  composited and ground for analysis by TEM.
16       Q.  (By Mr. Dearing)  And I think you told
17  me yesterday that's done so that you could analyze
18  the talc before you went through all the trouble of
19  milling and floating and all of that in case you
20  discovered some impurities, right?
21       A.  It's a way of keeping track and
22  monitoring what the ore is looking like.
23       Q.  So the monthly composite testing that
24  takes place before it's milled by TEM, has Imerys
25  maintained those records?

---

Page 404

1       A.  As much as we have been able to compile,
2  yes.
3       Q.  What does that mean?
4       A.  We have the records, and the reports we
5  just -- they're -- there were some gaps in the
6  reporting.  We weren't able to find every single
7  report, is all I am saying.
8       Q.  What about the samples?  Are those
9  samples preserved?  And I'm talking about the
10  pre-2003 Vermont talc, pre-milling TEM testing
11  samples.
12       A.  We did not start saving samples
13  indefinitely until 2002 time frame.
14       Q.  So are you saying those samples don't
15  exist?
16       A.  So prior to that, those samples, for
17  sure, don't exist.
18       Q.  Okay.  Were they destroyed?
19       MR. SILVER:  Objection.
20       I'm going to instruct the witness not to
21  answer per the Special Master's ruling.
22       MR. DEARING:  Can we go off the record for a
23  minute?
24       MS. O'DELL:  I don't think the Special
25  Master -- I mean, she has put in the record, just

---

Julie Pier

Page 573

1 record. Beginning of Media File 8. The time is
2 4:01.
3      MR. GREEN: Based on a discussion off the
4 record, I am going to withdraw Exhibit 27. And if
5 we could have that returned. We're marking as 27
6 another exhibit.
7      Q. (By Mr. Green) But before we get to
8 that exhibit, Miss Pier, I have some factual
9 questions that you might be able to answer.
10      In or about March of 2004, were you aware
11 that there was a TEM quarterly backlog of samples
12 since 2001?
13      A. There was a period of time that we had a
14 backlog of those samples, yes.
15      Q. And that backlog had existed since 2001;
16 is that correct?
17      MR. KLATT: Objection; form.
18      A. I don't have the exact range of dates.
19 It was the end of 2001, I believe, to 2002 or 2003
20 time period. It was approximately two years, maybe
21 slightly more than two years.
22      Q. (By Mr. Green) And the products that
23 were backlogged -- strike that.
24      The sampling that was backlogged during that
25 period of time, did that backlog affect J&J's

Page 574

1 product in any way, that is, its movement of its
2 product, its purchase and sale of its product
3 through you?
4      A. In fact, it did not.
5      Q. On or about March of 2004, were you
6 aware of a HIPO loss incident report?
7      A. I am aware of a -- yes. I'm aware of
8 this, yes.
9      Q. And could Imerys please tell me what a
10 HIPO is? That acronym, what does it stand for?
11      A. It stands for high potential for loss.
12 It's -- it's a sales-related database of incidents
13 that may happen that our customers may not view
14 favorably.
15      Q. And on or about March of 2004, did such
16 an incident occur to Imerys' knowledge?
17      A. I believe -- I believe it did occur
18 related to the backlog of these samples after the
19 product was made samples.
20      Q. And not to belabor a point, but a
21 question for you.
22      The prior exhibit indicated a backlog of
23 2001 to 2004. Is that the same backlog that you
24 were aware of in March of 2004?
25      A. I believe it was. I believe it was.

Page 575

1      MR. GREEN: Could I have IMERYS, please,
2 130369, please? And this will be marked now as
3 Exhibit 27.
4      (Exhibit 27 was marked for identification.)
5      Q. Do you have that document, Exhibit 27,
6 ma'am?
7      A. I have this document. Did you say what
8 page?
9      Q. I didn't. I just want to make sure that
10 you had it and you had a chance to see it. And
11 it's now the new exhibit, number 27.
12      Do you have that in front of you?
13      A. I do have this exhibit, yes.
14      Q. And this is IMERYS Bates number 130369.
15 Do you see that at the bottom of the first
16 page?
17      A. I do, yes.
18      Q. And this is Luzenac America Business
19 Development and Marketing Group document of
20 June 2004; do you see that?
21      MR. GREEN: Thank you for calling that out,
22 Zach.
23      Q. Do you see that, ma'am?
24      A. Yes, I do.
25      Q. And if I could direct your attention,

Page 576

1 please, to page 6 of this document.
2      MR. KLATT: I don't know that I consistently
3 noted this, but this is another two-sided exhibit,
4 just for the record.
5      MR. GREEN: Certainly.
6      Q. (By Mr. Green) Are you there, ma'am, on
7 page 6?
8      A. I do, yes.
9      Q. And page 6 is Bates number 130374; do
10 you see that on the right?
11      A. Yes, I do.
12      Q. And you also see on the left-hand side
13 that this was a protected document and it was
14 produced to us subject to a protective order; do
15 you see that?
16      A. I see those words, yes.
17      Q. Above that, there's a -- in bold?
18      MR. GREEN: And if you can call this out for
19 "Analytical," please.
20      Q. Above that, there's a bold caption
21 "Analytical"; do you see that?
22      A. I do see that, yes.
23      Q. And make sure that I read this
24 correctly, but it begins -- it begins on page 6 and
25 goes to 7. Just briefly, "The month of June was

# Exhibit 45

00:00:59
00:00:59
00:00:59
00:00:59
00:00:59

00:00:59

00:00:59
00:00:59
00:00:59
00:00:59
00:00:59
00:00:59
00:00:59
00:00:59
00:00:59
00:00:59
00:00:59

00:00:59

00:00:59

00:00:59

00:00:59
00:00:59
00:00:59

00:00:59

00:00:59

00:00:59

00:00:59

00:00:59

00:00:59

00:00:59
00:00:59
00:00:59
00:00:59
00:00:59

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS**
**STATE OF MISSOURI**
**The Honorable Rex M. Burlison, Judge**


**GAIL LUCILLE INGHAM, ET AL.**,  )
                                  )
        Plaintiffs,               )
                                  )
        vs.                       ) Cause No. 1522-CC10417-01
                                  )
**JOHNSON & JOHNSON, ET AL.**,    )
                                  )
        Defendants.               )


**TRIAL TRANSCRIPT**
**Volume 25**


**July 6, 2018**


**JENNIFER A. DUNN, RPR, CCR #485**
**OFFICIAL COURT REPORTER**
**CITY OF ST. LOUIS CIRCUIT COURT**
**TWENTY-SECOND JUDICIAL CIRCUIT**
**jdunncourts@yahoo.com**

55325

14:47:24  1        A      Yes, I didn't disagree with it.

14:47:27  2        Q      I know, but there was an objection that I had the

14:47:29  3    date wrong.  The approach was wrong everywhere.  Y'all used

14:47:33  4    the wrong approach all the time, didn't you?

14:47:36  5        A      I disagree with that.

14:47:38  6        Q      And the amount that you tested was super small if

14:47:40  7    you're talking about the really careful test, right?

14:47:44  8        A      The amount is small, but it's part of the protocol

14:47:49  9    which uses transmission microscopy, polarized light and

14:47:56  10   x-ray diffraction.

14:47:57  11       Q      With no concentration?

14:47:57  12       A      No.  Because they're using transmission

14:47:58  13   microscopy, it gives you the ability to detect parts per

14:48:04  14   million.

14:48:04  15       Q      Right.  You can detect something really small.

14:48:07  16   But the idea, like the Colorado School of Mines told you

14:48:10  17   that you were going to find the needle in the haystack by

14:48:13  18   just checking out, this is nearly impossible, isn't it?

14:48:18  19               Let's do it this way.  Let's do it this way.  Tell

14:48:21  20   the jury how much you would test in that electron

14:48:26  21   microscope.

14:48:27  22       A      It's a very, very small quantity.  Probably in

14:48:30  23   milligrams, a tiny amount, yes.

14:48:32  24       Q      It's actually 100 -- we'll write it off to the

14:48:37  25   side.  100 nanograms in each test, right?

14:48:46  1          A      Approximately, yes.

14:48:48  2          Q      Now, a nanogram is -- do you want to convert it to

14:48:54  3   grams for us?

14:48:55  4          A      .001 gram, I believe.

14:48:59  5          Q      It's one it's a 10 millionth of a gram.  It takes

14:49:07  6   10 million of those to make 1 gram, right?

14:49:11  7          A      It does.

14:49:12  8          Q      So you have to do 10 million of those tests to

14:49:19  9   get -- to test 1 gram, to get 1 gram, right?

14:49:24  10         A      Yes.

14:49:25  11         Q      And so you've got a bottle like this, 623 grams.

14:49:34  12   Right?  623 grams?

14:49:40  13         A      Yes.

14:49:41  14         Q      All right.  So 10 million to get 1 gram, and we

14:49:46  15   need 623 of those to test that bottle.  That means you've

14:49:52  16   got -- to test that bottle is going to take 6,230,000,000

14:50:12  17   tests if you don't concentrate it, isn't it?

14:50:18  18         A      If you do your math, yes.  But if you put it in

14:50:23  19   the context, that is one of the three tests done, and it

14:50:25  20   still looks at many, many, many thousands of particles under

14:50:28  21   that microscope.  Statistically you would pick it up if it

14:50:32  22   were there.

14:50:32  23         Q      No, no, no.  First of all, you and Mr. Bicks did

14:50:35  24   this during the exam already.  Y'all acted like you do three

14:50:40  25   tests on every sample, every eight hours, every shift, every

14:50:45   1   week, every month, for decades.  That is flat out false,

14:50:49   2   isn't it?

14:50:50   3        A    No, what you do --

14:50:52   4        Q    Is that a yes or no, is that true or false?

14:50:55   5        A    The samples are taken every hour.  They're

14:51:01   6   combined composite and the samples are taken from a

14:51:06   7   composite to test.

14:51:10   8        Q    Y'all did not do tests, all three tests, on all of

14:51:14   9   your samples for decades.  You didn't do that, did you?

14:51:18   10       A    No, initially --

14:51:19   11       Q    Thank you.

14:51:20   12       A    It wasn't done in every single batch.

14:51:23   13       Q    Not even close?

14:51:24   14       A    But TEM was being done on batches since 1972, '73

14:51:28   15   time frame.

14:51:29   16       Q    Uh-huh.  And you still haven't done enough to even

14:51:31   17   get into a small bottle.  That's just going to take forever,

14:51:35   18   hundreds of thousands to millions of years, right?

14:51:40   19       A    We test every bottle that goes on the market on

14:51:43   20   the shelf.

14:51:43   21       Q    Give me one.

14:51:44   22       A    But the methodology is that you don't need to do

14:51:47   23   that level of testing.  You can show whether or not there's

14:51:51   24   asbestos there or anything else by taking composite samples,

14:51:55   25   taking a representative portion of that and testing that.

5328

| | | |
|---|---|---|
| 14:51:58 | 1 | Q    And testing one 10 millionth of a gram and it |
| 14:52:03 | 2 | explains why y'all can't rarely find it, yet anybody else |
| 14:52:06 | 3 | that's pulling it off the shelves who concentrates it can |
| 14:52:11 | 4 | find immediately, you think? |
| 14:52:13 | 5 | A    No. |
| 14:52:13 | 6 | Q    All right.  Let's keep going.  Sir, in the |
| 14:52:14 | 7 | interest of my time, let's keep going.  You not only -- is |
| 14:52:19 | 8 | that the where, not only was the approach the wrong approach |
| 14:52:22 | 9 | everywhere, the amount's super small, but even the lab of |
| 14:52:26 | 10 | last resort didn't help. |
| 14:52:29 | 11 | You know what I mean by the lab of last resort? |
| 14:52:32 | 12 | A    No, but I'm sure you'll explain. |
| 14:52:34 | 13 | Q    Do you remember how y'all had this process where |
| 14:52:37 | 14 | one lab finds it positive and you send it to a second lab, |
| 14:52:40 | 15 | if they find asbestos, as a last resort you send it to RJ |
| 14:52:45 | 16 | Lee and let their lab determine it. |
| 14:52:49 | 17 | A    Is that a question? |
| 14:52:50 | 18 | Q    Yeah.  Do you remember that? |
| 14:52:51 | 19 | A    No. |
| 14:52:56 | 20 | MR. LANIER:   Your Honor, I'm going to get |
| 14:52:58 | 21 | copies for folks, and if you would assign a number to that. |
| 14:53:04 | 22 | And I'll just ask the questions without the document right |
| 14:53:07 | 23 | now.  If you want the document, we'll put it up here, sir. |
| 14:53:10 | 24 | Q    (By Mr. Lanier)  The truth of the matter is, at |
| 14:53:12 | 25 | one point, Johnson & Johnson went in and did an audit of the |