Exhibit 7

Alice M. Blount, Ph.D.

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

GAIL LUCILLE INGHAM      )
and ROBERT INGHAM, et    )
al.,                     )
                         )
          Plaintiffs,    )   Case Number:
                         )   1522-CC10417-01
v.                       )
                         )
JOHNSON & JOHNSON, et    )
al.,                     )
                         )
          Defendants.    )

FRIDAY, APRIL 13, 2018

- - -

          Videotaped deposition of Alice M.
Blount, Ph.D., held at the Best Western
Hotel, 5 Best Western Place, Rutland,
Vermont, commencing at 9:23 a.m., on the
above date, before Carrie A. Campbell,
Registered Diplomate Reporter, Certified
Realtime Reporter, Illinois, California &
Texas Certified Shorthand Reporter, Missouri
& Kansas Certified Court Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672
deps@golkow.com

Alice M. Blount, Ph.D.

Page 2

```
1      A P P E A R A N C E S :
2
       LANIER LAW FIRM, P.C.
3      BY:  W. MARK LANIER, ESQUIRE
            wml@lanierlawfirm.com
4      6810 FM 1960 West
       Houston, Texas 772690-1448
5      (713) 659-5200
6
7      LANIER LAW FIRM, P.C.
       BY:  RACHEL LANIER, ESQUIRE
8           rachel.lanier@lanierlawfirm.com
       126 East 56th Street, Sixth Floor
9      New York, New York 10022
       (212) 421-2800
10     Counsel for Plaintiffs
11
12
       ORRICK, HERRINGTON & SUTCLIFFE LLP
13     BY: MORTON DUBIN, ESQUIRE
            mdubin@orrick.com
14         KEVIN D. HYNES, ESQUIRE
            khynes@orrick.com
15     51 West 52nd Street
       New York, New York 10019
16     (212) 506-3742
       Counsel for Defendant Johnson &
17     Johnson
18
19
       SANDBERG, PHOENIX & VON GONTARD, P.C.
20     BY:  MARK A. PROST, ESQUIRE
            mprost@sandbergphoenix.com
21     600 Washington Avenue, 15th Floor
       St. Louis, Missouri  63101
22     (314) 446-4226
       Counsel for Imerys Talc America
23
24
25
```

Page 3

```
1          BLITZ, BARDGETT, & DEUTSCH, L.C.
           BY:  GLENN A. NORTON, ESQUIRE
2            gnorton@bbdlc.com
           120 South Central Avenue, Suite 1500
3          St. Louis, Missouri  63105
           (314) 863-1500
4          Court-Appointed Special Master
5
6      ALSO PRESENT:
           Jayne Conroy, Simmons Hanly Conroy
7          Ella Fassler, Lanier Law Firm
           Jonathan Cooper, Tucker Ellis
8
9
       V I D E O G R A P H E R :
10         CHRIS COUGHLIN,
           Golkow Litigation Services
11
                    - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                   INDEX
2                              PAGE
       APPEARANCES...................................  2
4      EXAMINATIONS
5          BY MR. LANIER............................   8
6          BY MR. DUBIN............................   43
7          BY MR. PROST............................   80
8          BY MR. LANIER...........................   86
9          BY MR. DUBIN............................   99
10         BY MR. LANIER............................ 105
11         BY MR. LANIER............................ 106
12         BY MR. LANIER............................ 107
13
14              EXHIBITS
15     No.   Description                  Page
16     1     Alice M. Blount résumé           8
17     2     Blount optical microscope       17
             photograph
18
       3     Blount optical microscope       17
19           photograph
20     4     Photograph of Alice M. Blount   19
             microscope
21
       5     Blount optical microscope       20
22           photograph
23     6     Blount optical microscope       20
             photograph
24
       7     OSHA Polarized Light Microscopy of   26
25           Asbestos printout
```

Page 5

```
1      8    April 23, 1998 letter from Alice M.   35
            Blount to M. Raymond Hatcher,
2           J&J-0049150
3      9    "The Facts About Talc Safety"    40
            printout
4
5      10   Lanier's handwritten demonstrative  42
            notes
6      11   "Process Mineralogy IX:          50
            Applications to Mineral
7           Beneficiation, Metallurgy, Gold,
            Diamonds, Ceramics, Environment and
8           Health"
9      12   "Amphibole Content of Cosmetic and  52
            Pharmaceutical Talcs," AM Blount
10
11     13   April 9, 2018 letter to Richard   54
            Meadow from Richard T. Bernardo
12     14   Bottle of Johnson & Johnson's baby  58
            powder supplied by Alice M. Blount
13
14     15   E-mail from Jonathan Cooper to    60
            Alice Blount
15     16   "Occupational Exposures to       70
            Non-Asbestiform Talc in Vermont,"
16          Boundy, et al.
17     17   May 21, 1987 McCrone Associates   72
            letter from Ian M. Stewart to
18          Donald M. Benniger,
            J&J-0044868
19
       18   November 19, 1975 letter from Gene  93
20          R. Grieger to Vernon Zeitz,
            J&J-0123236
21
       19   Letter about asbestos from Rio    94
22          Tinto Minerals
23     20   Luzenac America Technical Report,   97
            Julie Pier,
24          IMERYS422289 - IMERYS422290
25          (Exhibits attached to the deposition.)
```

Alice M. Blount, Ph.D.

Page 6

1    CERTIFICATE................................108
2    ACKNOWLEDGMENT OF DEPONENT...................110
3    ERRATA.....................................111
4    LAWYER'S NOTES.............................112
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1         VIDEOGRAPHER:  We are now on
2    the record.
3         My name is Chris Coughlin, and
4    I'm a videographer for Golkow
5    Litigation Services.
6         Today's date is April 13, 2018,
7    and the time is 9:23 a.m.
8         This video deposition is being
9    held in Rutland, Vermont, in the
10    matter of Gail Lucille Ingham and
11    Robert Ingham, et al., plaintiffs,
12    versus Johnson & Johnson, et al.,
13    defendants, in the Circuit Court of
14    the City of St. Louis, State of
15    Missouri, Case Number 1522-CC10417-01.
16         The deponent is Alice Blount,
17    Ph.D.
18         Will counsel please identify
19    yourselves and state whom you
20    represent.
21         MR. LANIER:  My name is Mark
22    Lanier, and I represent the ladies and
23    families affected by the ovarian
24    cancer in this trial.
25         MR. DUBIN:  My name is Morton

Page 8

1    Dubin.  I represent Johnson & Johnson.
2         MR. PROST:  May my name is Mark
3    Prost, and I represent Imerys Talc
4    America, Inc.
5         JUDGE NORTON:  I'm Glenn
6    Norton.  I'm the special master
7    appointed by the judge in these cases.
8         VIDEOGRAPHER:  All others will
9    appear on the stenographic record.
10         The court reporter is Carrie
11    Campbell, and she will now swear in
12    the witness.
13
14         ALICE M. BLOUNT, Ph.D.,
15    of lawful age, having been first duly sworn
16    to tell the truth, the whole truth and
17    nothing but the truth, deposes and says on
18    behalf of the Plaintiffs, as follows:
19
20         (Blount Exhibit 1 marked for
21    identification.)
22
23         DIRECT EXAMINATION
24    QUESTIONS BY MR. LANIER:
25    Q.    Good morning, Dr. Blount.

Page 9

1    A.    Good morning.
2    Q.    The jury knows me by now.  My
3    name is Mark Lanier, and we're playing a
4    videotape right now to the jury because
5    you're not live at the trial.  So this is
6    what we call a deposition.
7         Thank you for taking time this
8    morning.  I'm going to ask you some
9    questions, and then the other lawyers will
10    ask you some questions as well.  I'll
11    probably come back and ask you a few more,
12    and we'll try and move through this with all
13    speed.
14         Okay?
15    A.    Okay.
16    Q.    I've written your name down on
17    this sheet, and you can see down at the end,
18    Dr. Alice Blount.
19         Can you -- make sure I'm
20    pronouncing it right.  How do you say Blount?
21    A.    I say Blount, the same as you.
22    Q.    All right.  Very good.
23    A.    I'm not a southerner.
24    Q.    You're not a southerner.
25         No, you're from Illinois?

3  (Pages 6 to 9)

Alice M. Blount, Ph.D.

Page 10

1    A.    Yeah, that's not southern.
2    Q.    Okay.  That's not southern.
3  Fair enough.
4         Dr. Blount, I want to ask you
5  two important questions, and then we're going
6  to dig into some information behind your
7  answers.
8         Okay?
9    A.    Uh-huh.
10    Q.    The first question is this:
11  Have you tested Johnson & Johnson baby powder
12  for asbestos?
13    A.    Yes.
14    Q.    And then the important
15  follow-up question:  Does Johnson & Johnson
16  baby powder, or did it when you tested it,
17  have asbestos?
18         MR. DUBIN:  Object to form.
19         THE WITNESS:  Yes.
20  QUESTIONS BY MR. LANIER:
21    Q.    Now, because of your answers to
22  those questions, I want to ask you some
23  background information so the jury knows who
24  you are, and I want to ask you a little bit
25  about the asbestos you found.

Page 11

1         You are what we've listed in
2  this trial as a fact witness, so I'm not
3  asking you to give me expert opinions outside
4  of; just what you did and what you understand
5  from your actual actions.
6         Okay?
7    A.    Uh-huh.
8    Q.    All right.  So let's start out
9  with who you are.
10         Now, I've had the benefit --
11  and we'll get into this in a little more
12  detail later.  I've had the benefit of
13  meeting with you I think on about three
14  different times.  Three or four; is that
15  right?
16    A.    That's about right.
17    Q.    I know that on two of three of
18  those times we talked for about 20 or
19  30 minutes about this information over a cup
20  of coffee --
21    A.    Yes.
22    Q.    -- at the bakery.
23    A.    (Witness nods head.)
24    Q.    And then last night we had
25  dinner with your husband, Jack, at a

Page 12

1  delightful place, though I don't really think
2  we talked about this at all.
3    A.    No.
4    Q.    All right.  Dr. Blount, I want
5  the jury to get the benefit of knowing your
6  background, so let's start out talking about
7  that a little bit.
8         Where did you grow up as a
9  girl?
10    A.    I grew up in Carbondale,
11  Illinois.
12    Q.    Carbondale, Illinois.  That's
13  on the other side of the Mississippi River
14  from St. Louis where we're trying this case.
15    A.    Not that far.  We used to go
16  into St. Louis all the time.
17    Q.    That was the big city for you,
18  maybe.
19    A.    Yes, close.
20    Q.    Carbondale, Illinois.
21         And you brought with you some
22  papers today, and among those papers was a
23  résumé that you did when you were trying
24  to -- or when you were getting ready for a
25  position or something at Rutgers, I think.

Page 13

1         Is that right?
2    A.    Yes, Rutgers in Newark, Newark
3  branch of Rutgers.
4    Q.    Okay.  We'll get to you and
5  Rutgers in a minute.
6         By the way, just for grins,
7  tell the jury where you live now and why
8  we're having to do this by a deposition
9  instead of you just driving in from
10  Carbondale.
11         Where are we today?
12    A.    We're in Rutland, Vermont.
13    Q.    Rutland, Vermont.
14         And I know you still do some
15  consulting work, but basically --
16    A.    We came up here because I had a
17  job up here.
18    Q.    All right.  Very good.
19         And then your husband's
20  retired, I think?
21    A.    Yes.
22    Q.    All right.  So let's just grab
23  a couple of things off of your résumé to make
24  sure that we've got everything right.
25         This is a résumé that you did

4  (Pages 10 to 13)

Alice M. Blount, Ph.D.

Page 14

1    back when you were at the Department of
2    Geological Sciences at Rutgers in Newark,
3    New Jersey; is that right?
4        A.    That's right.
5        Q.    And your experience was you had
6    been working with the asbestos problem since
7    1972, specifically with how the FDA proposed
8    an optical method for detecting and
9    quantifying amphiboles and chrysotile in talc
10   used in food and drugs.
11           Is that right?
12       A.    So we're talking about 1972 --
13       Q.    Yes, ma'am.
14       A.    -- it was -- wasn't that --
15   that was when the Food and Drug came out with
16   this regulation for the pharmaceutical
17   industry, and my husband was working for the
18   pharmaceutical industry.  He was a chemist,
19   and he took -- he was in charge of that
20   department, and they put out this regulation
21   that nobody could understand.
22       Q.    Ah.
23       A.    And so the person in quality
24   control said, "Dr. Blount's wife is a
25   mineralogist," and so that's why I got

Page 15

1    involved in 1972, '73, in that region, yeah.
2        Q.    Okay.  Fantastic.
3           And the jury's got this from
4    other people, but would you just tell us what
5    an amphibole is?
6           Is that -- what is an
7    amphibole?
8        A.    It's a mineral.
9        Q.    It's a mineral?
10       A.    It's a mineral.
11       Q.    All right.  Now, the jury has
12   heard that asbestos can be an amphibole
13   asbestos or a chrysotile asbestos.
14       A.    Uh-huh.
15       Q.    Is that -- are we right on
16   that?
17       A.    (Witness nods head.)
18       Q.    Okay.  Now, before we go any
19   further, let's look at the education here.
20           You got your bachelor of
21   science with honors in geology in 1964 at the
22   University of Missouri; is that right?
23       A.    That's right.
24       Q.    Is that in Columbia, Missouri?
25       A.    Uh-huh, yes.

Page 16

1        Q.    And then you went to the
2    University of Wisconsin where you got a
3    master's of science in geology and a Ph.D. in
4    geology in 1970; is that right?
5        A.    That's right.
6        Q.    Now, you also got -- if I
7    remember the story correct, you also got a
8    husband at the University of Wisconsin?
9        A.    Yes, that's right.
10       Q.    It's not on your résumé.
11           How did you find your husband
12   when you were looking at rocks?
13       A.    Well, he was getting a Ph.D.
14   there, and I needed a computer program that
15   he had.  He was very good at writing computer
16   programs.  So I went over to the chemistry,
17   and I got this computer program from him, and
18   that's the whole story.
19       Q.    And you got the love of your
20   life.
21           You and I were talking about
22   this in doing the math.  You-all have been
23   married -- this year makes 50 years you-all
24   have been married?
25       A.    Yeah.

Page 17

1        Q.    That's incredible.
2           All right.  Your experience at
3    the time of this résumé back then, you were
4    curator of earth science at the Newark museum
5    and a research associate professor and member
6    of the graduate faculty for the Department of
7    Geological Sciences at Rutgers since 1972.
8           Is that right?
9        A.    That's right.
10       Q.    And you would actually teach
11   courses in optical mineralogy on a graduate
12   level at Rutgers?
13       A.    Right.
14       Q.    Can you tell us what optical
15   mineralogy is?
16       A.    Well, optical mineralogy is
17   what I would be doing on these samples that
18   I'm looking at to see if there's asbestos.
19   You take a glass slide, and you put your
20   sample on the glass slide, and then you use a
21   microscope so that you can really see what's
22   there.  And you can do some tests on -- when
23   they're on the slide, and that makes -- so
24   you can actually identify exactly what it is.
25           (Blount Exhibits 2 and 3 marked

Alice M. Blount, Ph.D.

Page 18

1     for identification.)
2  QUESTIONS BY MR. LANIER:
3     Q.    You brought some pictures, and
4  we'll go into more detail later, but two of
5  the pictures that we'll label -- let's get
6  these labels caught up.  We're going to label
7  your résumé as Exhibit Number 1 so the jury
8  can see it.  We'll put a number 1 on it.
9           And then we're going to label
10 these pictures as Exhibits Number 2 and 3 so
11 that we've got them as well.
12          And I'll put these up so the
13 jury can see them and the lawyers can see
14 them.
15          But I've put Exhibit 2 --
16 there's the 2 number.  I've put Exhibit 2 up
17 for the jury to see.
18          Is this something you took with
19 an optical microscope?
20    A.    You have a picture of the
21 microscope somewhere, I think.
22    Q.    Yes, you gave me a picture of
23 the microscope.  That's a good point.  I
24 should use that.  We'll mark it as Exhibit
25 Number 4.

Page 19

1        (Blount Exhibit 4 marked for
2     identification.)
3  QUESTIONS BY MR. LANIER:
4     Q.    What is Exhibit Number 4?
5  What's this picture we're looking at?
6     A.    That's my pictographic
7  microscope that I have at home.  It's my
8  microscope, yeah.
9     Q.    So this is your microscope you
10 have at home?
11    A.    Yeah.
12    Q.    An Olympus, looks like a BH2 --
13    A.    Yeah.
14    Q.    -- or an EH2?
15    A.    I think it's a BH2, yeah, with
16 a lot of accessories on it.
17    Q.    Yeah, I started to say, this
18 doesn't look like what we had in high school.
19    A.    No.
20    Q.    Is this what you used to take
21 this picture that we've got as Exhibit 2?
22    A.    Maybe you better show the
23 picture with the gray background.
24    Q.    Oh, gray background picture?
25 All right.

Page 20

1     A.    Yeah, because it's easier to
2  explain.
3     Q.    Yes.  Yes.
4        (Blount Exhibits 5 and 6 marked
5     for identification.)
6  QUESTIONS BY MR. LANIER:
7     Q.    We'll mark the gray background
8  picture as Exhibit Number 5.  So let's start
9  with that one.
10    A.    Is that the right -- is that
11 the right -- I have an arrow there.  Do you
12 have -- can you see the arrow at the side?
13    Q.    Yes.  Here's the arrow.  Does
14 that mean to point it out?
15    A.    Yeah, that's the right
16 direction.
17    Q.    Okay.  Now let me expand it so
18 that we've got a better view.
19          All right.
20    A.    And then you got the red one to
21 go with it, too.
22    Q.    I'm sorry?
23    A.    You got a red one that goes
24 with that, too.
25    Q.    Okay.  That would be -- this

Page 21

1  would be this one.
2     A.    Yeah, there should be -- the
3  arrow should be going -- yeah, that's good.
4     Q.    Okay.  So here, I'll put them
5  both up here together.
6     A.    So I -- first I have -- on the
7  right I have a picture through the microscope
8  without any filters or anything, but to tell
9  which direction is what we call the fast
10 direction or the slow direction, you have to
11 put the filter in.  So that's what I've done
12 on the left, I've put the filter in.  And it
13 makes the background look red, but it gives a
14 yellow tint to that fiber there.
15    Q.    All right.  So this that my
16 finger's drawing here, I'll put a circle
17 around it.  This is what you're calling a
18 fiber; is that right?
19    A.    I call it -- yes, I call that a
20 fiber.
21    Q.    Okay.  And so that's on Exhibit
22 Number 5?
23    A.    Uh-huh.
24    Q.    On Exhibit Number 6, it looks
25 like the same type thing, but it's all red on

6 (Pages 18 to 21)

Alice M. Blount, Ph.D.

Page 22

1  the background.
2      A.   Yes.
3      Q.   Is this the one where you --
4      A.   You put a filter in sort of the
5  middle part of the microscope, and it's the
6  color of the -- if it's yellow, then we know
7  what -- you know, we know it's an asbestos
8  fiber.  If it was blue, then it wouldn't be.
9  So that's why we have these colors here.
10     Q.   Ah, so that's what tells you
11 that that sphere-looking thing is asbestos?
12     A.   (Witness nods head.)
13     Q.   Okay.
14     A.   That's why we put the color in
15 there.
16     Q.   All right.  By the way, where
17 did you get this asbestos from that's in
18 these pictures?
19     A.   From Johnson & Johnson baby
20 powder.
21     Q.   All right.  Now, you actually
22 taught the graduate students how to use these
23 microscopes and do this work?
24     A.   Yes, we did -- yes, I taught
25 that.

Page 23

1      Q.   Okay.  And that's in addition
2  to supervising graduate thesis research and
3  teaching undergraduate courses as well?
4      A.   Yes.
5      Q.   And did you also consult with
6  several major industrial minerals companies
7  doing this very kind of work --
8      A.   Yeah.
9      Q.   -- identifying and counting
10 asbestos-type materials in industrial mineral
11 products?
12          Is that you?
13     A.   Yes, that's me.
14     Q.   All right.  Well, we've got a
15 list here of your publications at the time,
16 your references.  We'll set that aside for a
17 moment, though I did get two of your
18 publications from you.
19          I got the "Amphibole Content of
20 Cosmetic and Pharmaceutical Talcs" you
21 published in 1991; is that correct?
22     A.   Yeah, it looks like it.
23     Q.   And I made you sign it.  I got
24 an autographed copy, didn't I?
25     A.   That's right, you did.

Page 24

1      Q.   And I've also got your paper
2  from 1983 that I had kind of an original set
3  of, and I got you to sign that one as well,
4  didn't I?
5      A.   You did.
6      Q.   All right.  Well, I'd like to
7  make sure that -- so on your background we've
8  got your work at Rutgers, where you've got a
9  Ph.D. in mineralogy and geology; is that
10 right?
11     A.   Yes.
12     Q.   I can't spell mineralogy.
13 Mineralogy.
14          It's something like that.  I
15 can do geology.  Geology.
16          Okay.  And then you went to
17 Rutgers where you did some teaching and
18 research, and then you've also done
19 consulting for companies, all to -- not all,
20 but including to identify asbestos.
21          Is this fair?
22     A.   That's fair.
23     Q.   All right.  Now, I want to
24 change to a new subject here, so with that
25 being it, you've got your microscope.

Page 25

1          Where did you get the asbestos
2  from that you've put -- that we've seen here
3  in Exhibit 5 and 6?
4          You said you got it from the
5  Johnson & Johnson baby powder, but where did
6  the baby powder come from?
7      A.   Where the baby powder -- I
8  bought it off the shelf, I think in
9  New Jersey, but I'm not --
10     Q.   So you just bought it off the
11 shelf?
12     A.   Yeah.
13     Q.   Very good.
14          You've also got these two
15 pictures that I've marked as Exhibit 2 and 3.
16 And Exhibit 2, it looks like the -- is this
17 sphere-looking thing still the fiber?
18     A.   Yes.
19     Q.   Okay.  In one picture it's
20 yellow, and in the other picture it's blue
21 and it's going the opposite direction.
22          How is that?  Can you explain
23 that to me?
24     A.   Well, it's blue because it's
25 oriented in the opposite direction.  It will

7 (Pages 22 to 25)

Alice M. Blount, Ph.D.

Page 26

```
 1    change color from yellow to blue if you
 2    rotate it.  So we rotated it.
 3        Q.    Ah, so that's just you rotating
 4    the slide around?
 5        A.    Uh-huh.
 6        Q.    And that changes the color?
 7        A.    Yeah.
 8        Q.    Why is that?
 9        A.    Because the light -- the light
10    coming through the sample is polarized, and
11    so it's -- it has a different value as you
12    move it.
13        Q.    When I was asking you about
14    this over coffee, you showed me this OSHA
15    paper that -- this OSHA polarized light
16    microscopy of asbestos.
17        A.    Uh-huh.
18        Q.    And we'll mark this as Exhibit
19    Number 7 so everybody's got an ability to use
20    it and the jury gets to see it, I hope.
21            (Blount Exhibit 7 marked for
22            identification.)
23    QUESTIONS BY MR. LANIER:
24        Q.    Now, in that you pointed me to
25    this chart.
```

Page 27

```
 1        A.    Uh-huh.
 2        Q.    And this chart says --
 3        A.    Uh-huh.  But you need to look
 4    at this set with this chart.
 5        Q.    Oh, I need to look at --
 6        A.    Yeah, with the polarized, yeah.
 7        Q.    With these two or with these
 8    two?  Whoops.  We got to do some zoom work
 9    here.
10            Oh, I see.  I've mixed this up.
11        A.    You mixed it up.
12        Q.    I need do it this way.  Right.
13            So I'm going to put Exhibit 3,
14    the blue one on the left, and Exhibit 2, the
15    yellow one on the right.
16            Now, let's do that and have the
17    jury think of that while I show this.
18        A.    Yeah, let me think of that,
19    too.  I really did it for the other set that
20    you have.
21        Q.    Oh, for the other set.  Okay.
22            Well, let me do this.  Let me
23    read it first, and then we'll put the set up
24    here.
25        A.    Uh-huh.
```

Page 28

```
 1        Q.    "Birefringent fibers will
 2    change color as the microscope stage is
 3    rotated."
 4        A.    Uh-huh.
 5        Q.    "Asbestos fibers, except
 6    crystallite" --
 7            That's one kind of asbestos,
 8    right?
 9        A.    Uh-huh.
10        Q.    -- "will show colors as shown
11    here except under the condition of crossed
12    polars and a first order red compensator."
13            So pointed this way is blue;
14    that way is yellow.
15            I see in Exhibit --
16        A.    Wait a minute.
17        Q.    -- 3 blue and yellow; is that
18    right, or do I have it wrong?
19        A.    Can I see the -- can I see the
20    white paper?
21        Q.    Here, I'm going to give you all
22    of this.
23        A.    See the white paper.
24            It says crocidolite, which is
25    shown here.  So crocidolite -- oh, let's see.
```

Page 29

```
 1        Q.    Here we go.
 2        A.    Okay.  So you see here that
 3    this goes this way -- these -- I have them
 4    marked this way so you can see.  And you see
 5    that this is yellow now.
 6        Q.    Uh-huh.  I see.  I see.
 7        A.    But they're separate.  They're
 8    not this way, this way.  You have separate
 9    views, but you can see here now it's yellow,
10    which means that --
11        Q.    Ah, so that's your flipped
12    view.  So it's Exhibit Number 6 with
13    number 5.  And if we put Exhibit Number 6 up
14    here, it's going to be right here.  I've
15    outlined it in red, but that's hard to see.
16    Let me do black.
17        A.    Uh-huh, yeah, that's it.
18        Q.    All right.  So -- and then I'm
19    going to kind of fold it up just to give the
20    jury a chance to see.
21            Right next to the chart, that
22    yellow that we're looking at is the asbestos?
23        A.    Uh-huh.
24        Q.    Okay.  And you're nodding your
25    head and saying "uh-huh," but she's going to
```

8 (Pages 26 to 29)

Alice M. Blount, Ph.D.

Page 30

1  type this up as well.  And uh-huhs, even with
2  the great Carrie Campbell, can sometimes read
3  like huh-uhs, so I need to make sure I've got
4  a yes or no out loud, if you don't mind.
5      A.    Okay.  Yes.
6      Q.    All right.  So that is -- the
7  yellow like that is the asbestos; is that
8  right?
9      A.    That shows us, yes, that --
10  because of the -- the light goes through at
11  different rates going this way or this way,
12  so that makes a difference when you put this
13  filter in.  You can tell the difference
14  between the fast ray and the slow ray.
15      Q.    Super.  Super.
16          Now, you wrote up papers, and I
17  know in your 1991 paper you actually talked
18  about the fact that there was asbestos in the
19  baby powder.  It looks to me like you -- and
20  the jury will have a chance to read this in
21  more detail and see that Sample I, talc
22  Sample I, is actually Johnson & Johnson baby
23  powder, and nobody's fussing that.  The
24  company's got those records and --
25          MR. DUBIN:  Object to form.

Page 31

1  QUESTIONS BY MR. LANIER:
2      Q.    -- and everything else.  So
3  just accept that with me right now.
4          "Percent amphiboles in each
5  aspect ratio group for talc Sample I left and
6  M right compared with tremolite asbestos and
7  tremolite non-asbestiform."
8          So let me ask you as we zoom in
9  on the Johnson & Johnson.  Is the asbestos
10  that you found a tremolite asbestos?
11      A.    Yes.
12      Q.    And you can see this form of
13  it?  Is that the dotted line?
14      A.    Yes, that's what it -- what
15  the -- what they found out about it.
16      Q.    And if we look at your counts
17  in these talcs on an earlier page and we look
18  at that Sample I, which I think the record
19  shows is the Johnson & Johnson baby powder --
20          MR. DUBIN:  Objection.  Form.
21  QUESTIONS BY MR. LANIER:
22      Q.    -- these particles per
23  milligram, is that how many particles you
24  were finding of the asbestos?
25      A.    That's what it's finding on the

Page 32

1  slides, yeah.
2      Q.    Needles and fibers?
3      A.    But can we go back just a
4  little bit there?
5      Q.    Yes, tell me --
6      A.    The reason that I plot them up
7  like you show there is that it's very
8  difficult sometimes when you look at
9  something to know whether it's a needle or a
10  fiber or, you know, it's something that you
11  have to count or not.
12          But if you have a population --
13  and we know what the population is because
14  you just marked it.  And when I go through
15  and mine line up with that population, then I
16  know it's asbestos.  But if it doesn't line
17  up -- it might line up over here with the
18  other side, and then I would know it's not
19  asbestos.
20      Q.    Ah, okay.  So the other side,
21  because of the sizes and all, is more
22  nonasbestiform, but this is asbestiform, or
23  asbestos, because you've got this ratio down
24  here that's so big; is that it?
25      A.    Uh-huh.  That's the way --

Page 33

1  that's --
2      Q.    Okay.
3      A.    -- their population.
4      Q.    All right.  So this is is -- this
5  is asbestiform asbestos that you were finding
6  in the Johnson & Johnson baby powder that you
7  pulled off the shelf?
8      A.    Uh-huh.
9      Q.    And you weren't doing this
10  because anybody was paying you money to do
11  it, or were you getting paid to do it?
12      A.    No, I wasn't.
13          Well, I had some students
14  working on some talc projects, I guess, so it
15  may -- you know, I may have bought it then to
16  show the students what it looked like, you
17  know.
18      Q.    All right.  Part of your
19  teaching?
20      A.    Yeah.
21      Q.    Okay.  Very good.
22          I've got some more questions I
23  can ask you that I want to ask you, but I
24  think at this point I'm going to pause and
25  let the other lawyers go because I'm going to

9  (Pages 30 to 33)

Alice M. Blount, Ph.D.

Page 34

1  save these questions and come back with them
2  in a little bit.
3        So I'm going to pause at this
4  point -- no, let me go ahead and ask you a
5  couple more.  Bluff.  Sorry.
6        MR. DUBIN:  I was going to
7     object, but I was waiting.
8        MR. LANIER:  Bluff.
9  QUESTIONS BY MR. LANIER:
10       Q.    So you live in Vermont and you
11  still test things for asbestos; is that
12  right?  Do you still?
13       A.    I do -- not much anymore, but a
14  lot of what I did was only I had -- I had
15  property around the world, and we had to test
16  them -- their stuff for asbestos just like we
17  had to test here.  So we were doing the
18  testing for all of North America, South
19  America and Pacific Rim.
20        And these companies -- the
21  plants themselves would send the samples to
22  us, and that's -- I spent a lot of time doing
23  that.
24       Q.    All right.  I've had a chance
25  to look at some representations that Johnson

Page 35

1  & Johnson has made to -- in courts through
2  their lawyers, and just recently in
3  New Jersey, for example, January 29th of
4  1918 -- of 2018.  Yeah, real recent.  It was
5  a century ago.
6        January 29th of 2018, the
7  Johnson & Johnson lawyer made this
8  representation.  Said that "cosmetic talc
9  locations are not favorable for the
10  development of asbestos," and then went on to
11  talk about how asbestos needs "hard surfaces
12  that are cracked to develop, but talc is the
13  softest mineral on earth," so it's in soft
14  places.
15        Based upon your experience and
16  the facts that you've developed, is that
17  true, that cosmetic talc locations are not
18  favorable for the development of asbestos?
19        MR. DUBIN:  Objection to form.
20        MR. PROST:  Object to form.
21        THE WITNESS:  No, I wouldn't
22  say.  I wouldn't agree with that, no.
23        (Blount Exhibit 8 marked for
24     identification.)
25

Page 36

1  QUESTIONS BY MR. LANIER:
2        Q.    All right.  And then there's
3  one other letter that I've found interesting,
4  and we'll mark this as Exhibit Number 8.  And
5  I'm looking specifically at a letter that you
6  wrote, Alice M. Blount, Ph.D., mineralogist.
7        Is that you?
8        A.    Uh-huh, that's me.
9        Q.    And is that your signature?
10       A.    Yes, that is.
11       Q.    In fact, you signed your name
12  in 1998 just about exactly the same way you
13  signed your name for me at the bakery, coffee
14  shop in Rutland, Vermont, when I had you
15  autograph your article.
16       A.    Yeah, well...
17       Q.    That's 20 years.  You sign your
18  name the same way.
19       A.    Uh-huh.
20       Q.    All right.  So we've got your
21  letter here.
22       A.    Yeah.
23       Q.    And you wrote this letter to a
24  law firm that did asbestos work, Mehaffy and
25  Weber in Beaumont.

Page 37

1        Do you see that?
2        A.    Uh-huh.
3        Q.    You said, "Dear Mr. Hatcher,
4  according to your letter of March 31, 1998,
5  I've written and enclosed a report on the
6  occurrence, regulation and up-to-date
7  scientific views of asbestos, amphiboles and
8  intermediate fibers.  I've also enclosed
9  copies of my 1990 and '91 papers, one of
10  which I'm sure you already have."
11        Do you see where I'm reading?
12       A.    Uh-huh.
13       Q.    Now, you said this: "The 1991
14  paper was written because I became aware it
15  was a common opinion among industrial
16  hygienists that industrial talcs were better
17  than pharmaceutical and cosmetic talcs
18  because there was a regulation for the former
19  and not the latter.  I knew this was not the
20  case and wanted to set the record straight."
21        Do you see where I'm reading?
22       A.    Uh-huh.
23       Q.    "Although my papers report an
24  improved method for analysis" --
25        And for the jury, we call that

Alice M. Blount, Ph.D.

Page 38

1    the Blount method, but I'm not -- they can
2    read the paper if they want to see that.
3          -- "the determinations for the
4    sample labeled I, Johnson & Johnson's Vermont
5    talc, have been done by the traditional
6    methods as well."
7          So in addition to your Blount
8    method, did you test it by traditional means?
9          A.   Uh-huh, yes.
10         Q.   "As I told you, I believe that
11   Johnson & Johnson's Vermont talc contains
12   trace amounts of asbestos which are well
13   below those specified by OSHA."
14         A.   Uh-huh.
15         Q.   That's what you said, isn't it?
16         A.   Uh-huh.
17         Q.   "It should be noted that the
18   proposed FDA regulation, which was never
19   finalized, also specified the same .1 percent
20   limit for amphibole asbestos as OSHA."
21         Now, you are not a
22   toxicologist; is that fair?
23         A.   That's fair, yes.
24         Q.   So you don't know what level is
25   safe or unsafe, and you haven't done studies

Page 39

1    on the health effects; you just know asbestos
2    when you see it.
3          Is that right?
4          A.   That's right.  That's right.
5    Right.
6          MR. DUBIN:  Object to form.
7    QUESTIONS BY MR. LANIER:
8          Q.   Excellent.
9          And did you let the lawyers
10   know about the Johnson & Johnson talc having
11   these trace amounts of asbestos in this
12   letter?
13         A.   Did I tell who?
14         Q.   Yeah.
15         Yeah, you didn't hide it, did
16   you?
17         A.   No.
18         Q.   All right.  And by the way, we
19   know that also because down in the corner of
20   this letter -- see, here's the letter.  Down
21   in the corner it's got these numbers,
22   J&J-049150.
23         Do you see that?
24         A.   Uh-huh.
25         Q.   I'll highlight it.

Page 40

1          That means we got this document
2    from Johnson & Johnson; not from you.
3          MR. DUBIN:  Object to form.
4    QUESTIONS BY MR. LANIER:
5          Q.   Have you even seen this
6    document before I showed it to you?
7          Had you seen this document
8    since you wrote it?
9          A.   I don't think so.
10         (Blount Exhibit 9 marked for
11   identification.)
12   QUESTIONS BY MR. LANIER:
13         Q.   All right.  So if we look, for
14   example, at representations made by the
15   company, here's one on their website.  I'll
16   label it as Exhibit Number 9.  It talks about
17   the facts about talc safety.
18         February 24, 2016, this is just
19   on the website, blogj&j.com.  "Baby powder
20   made from cosmetic talc is one of Johnson's
21   oldest products and a long-time part of baby
22   care ritual."
23         This is the stuff used on
24   babies, right?
25         MR. DUBIN:  I'm going to object

Page 41

1    to form on that question and have a
2    subsequent objection with the document
3    with this witness.
4    QUESTIONS BY MR. LANIER:
5          Q.   Do you see where I'm reading?
6          A.   I see that.
7          Q.   And all I'm doing is setting up
8    a context here for the statement I'm going to
9    ask you about.
10         "Johnson's baby powder
11   continues to be popular with adults as well,
12   and in many parts of the world, it remains an
13   essential part of makeup and skin care
14   routines."
15         Do you see where it says that?
16         A.   Uh-huh.
17         Q.   Now, if you look at the very
18   first bullet point here, zoom in a little
19   bit, "A frequent misperception is that
20   Johnson's baby powder contains talc made with
21   asbestos, a substance classified as
22   cancer-causing.  Since the 1970s, talc used
23   in consumer products has been required to be
24   asbestos-free."
25         Do you see where I'm reading

11 (Pages 38 to 41)

Alice M. Blount, Ph.D.

Page 42

1    that?
2         A.    Yes.
3         Q.    Dr. Blount, based upon what you
4    know from what you did and your expertise,
5    was Johnson & Johnson's baby powder in the
6    19 -- since the 1970s asbestos-free or did it
7    have asbestos in it?
8              MR. DUBIN:  Objection.  Form.
9              THE WITNESS:  It had asbestos.
10             MR. LANIER:  Okay.  Thank you.
11        I'll pass the witness.  Let's
12   go off the record.
13             VIDEOGRAPHER:  Going off the
14   record.  The time is 9:59.
15        (Off the record at 9:59 a.m.)
16             (Blount Exhibit 10 marked for
17   identification.)
18             MR. LANIER:  I told Mr. Dubin
19   before we started I have told
20   Dr. Blount that we would compensate
21   her for her time.  I know that the
22   geologist fact witness for the company
23   was charging -- Pooley charged around
24   $400 an hour I think he said.  So
25   we're going to be paying her that

Page 43

1         time.  I don't know what her time is.
2         I don't know how much time she's got
3         in it.  Whatever it is, we're going to
4         be paying that, and I don't want the
5         other side not to be aware of that.  I
6         told Mr. Dubin but not Mr. Prost or
7         the judge.  Put that on the record.
8              JUDGE NORTON:  When Mr. Prost
9         comes back in, I'll mention it to him
10        if you've started or whatever.
11             MR. LANIER:  Thank you.
12             VIDEOGRAPHER:  Back on the
13        record.  The time 10:05.
14             CROSS-EXAMINATION
15   QUESTIONS BY MR. DUBIN:
16        Q.    Hi, Dr. Blount.  How are you?
17        A.    I'm fine.
18        Q.    Okay.  During the break, just
19   to address first, counsel who is here with
20   you, Mr. Lanier, indicated that you're being
21   paid for your time and for the time that you
22   met with Mr. Lanier previously; is that
23   correct?
24        A.    That's correct.
25        Q.    Okay.  And prior to your giving

Page 44

1    testimony this morning, had you set or
2    decided on any particular rate by which you
3    would be paid?
4         A.    Yes.
5         Q.    Okay.  When did you make that
6    decision?  What rate were you going to be
7    paid?
8         A.    $400 an hour or something like
9    that.
10             MR. LANIER:  Yeah.
11   QUESTIONS BY MR. DUBIN:
12        Q.    And when was that rate decided
13   on?
14        A.    I don't really know --
15             MR. LANIER:  Yeah.  Yeah, I met
16        with her a week ago.  So it would have
17        been a week ago, probably.
18   QUESTIONS BY MR. DUBIN:
19        Q.    But the actual rate, was that
20   just decided during the break that we've had
21   in between your testimony for Mr. Lanier?
22        A.    No.
23        Q.    Okay.  So you're representing
24   that the rate was decided on weeks ago?
25             MR. LANIER:  No, about a week

Page 45

1         ago when I met her, I told her that
2         whatever Pooley had charged is what
3         we'd -- we'd pay her that hourly rate
4         that you-all set for the geologist.
5    QUESTIONS BY MR. DUBIN:
6         Q.    All right.  Let's start with
7    some basic concepts.
8              There have been some words that
9    were used, if we can turn on the Elmo.
10             All right.  Amphibole.  What is
11   an amphibole?
12        A.    It's a silicate mineral.
13        Q.    Does amphibole mean asbestos?
14        A.    Not -- not always.  I think
15   there's some that are not considered
16   asbestos.  It's a group -- amphibole is a
17   group of mineral.  So, yeah.
18        Q.    So there are asbestos
19   amphiboles and there are non-asbestos
20   amphiboles, right?
21        A.    (Witness nods head.)
22        Q.    And another word that we were
23   talking a good bit about is tremolite?
24        A.    Uh-huh.
25        Q.    Now, is there also asbestos

12  (Pages 42 to 45)

Alice M. Blount, Ph.D.

Page 46

1  tremolite and non-asbestos tremolite?
2      A.   Yes, I would say so.
3  They're -- because sometimes it's sort of
4  blocky and other times it is a definite
5  fiber.  So you have -- you have to make a
6  decision when you see it.
7           And that's why I did that graph
8  he showed earlier.  You can see which ones
9  had an asbestiform form shape and which ones
10  don't.  That's what you have to do to make
11  sure that you're getting one that's actually
12  asbestos or not.
13      Q.   Right.
14           And so, for example, there's
15  another term that's also used.
16      A.   Cleavage, yeah.
17      Q.   Fragments, right?
18      A.   Yeah.
19      Q.   Cleavage fragments, right?
20           Is that a term that you're
21  familiar with?
22      A.   Yes.
23      Q.   And what is a cleavage
24  fragment?
25      A.   That's the way the mineral will

Page 47

1  actually break if you hammer it or something
2  so that you can -- you know, you break it.
3  It'll break along these cleavage lines, which
4  is an inherent structure of the crystal to
5  start out with.
6      Q.   And is it fair to say that a
7  cleavage fragment of tremolite is not
8  asbestos?
9      A.   I would say so, although there
10  are others that do not -- some people don't
11  say that.  Some people count everything.
12      Q.   Right.
13      A.   But if there's a cleavage
14  fragment, I would not count it as asbestos.
15      Q.   Okay.  And so if I understand
16  your testimony correctly, your sample that --
17  Sample I that you mentioned, you're saying
18  that that was a -- bought from a bottle of
19  Johnson & Johnson's baby powder?
20      A.   Yeah.  Baby powder, yeah.
21      Q.   Okay.  So when did you purchase
22  that bottle?
23      A.   I think I purchased it right
24  before I left New Jersey, which would be
25  1996.

Page 48

1      Q.   1996.
2           Okay.  And then presumably you
3  took one out of that bottle to do your
4  analysis of Sample I?
5      A.   Uh-huh.
6      Q.   And the first analysis that you
7  have of Sample I -- I think we looked at this
8  document a little bit a second ago.  Okay.
9           So this was the letter that
10  Mr. Lanier showed you to Mr. Hatcher --
11      A.   Uh-huh.
12      Q.   -- and it attaches a paper,
13  "The Detection and Quantification of Asbestos
14  and Other Trace Minerals."
15           And that's from -- is that
16  1990?
17      A.   I can't see it from here.
18      Q.   There's a date on the bottom.
19      MR. LANIER:  I can't see it.
20  QUESTIONS BY MR. DUBIN:
21      Q.   Well, do you still have a copy
22  of the document that --
23      A.   With everything --
24      MR. COOPER:  It's in the bottom
25      right corner.

Page 49

1      THE WITNESS:  1990, yeah.
2  QUESTIONS BY MR. DUBIN:
3      Q.   And so we'll go into this a
4  little bit in depth, but why is it that you
5  remember the timing of when you bought that
6  Johnson & Johnson bottle?
7           What brings to mind when you
8  did it?
9      A.   Because we were about ready to
10  come up here and move -- we were about ready
11  to move up here, and I remember I got it
12  right before we moved up here.
13      Q.   So when did you move up here?
14      A.   1996.
15      Q.   Okay.  And so one of the things
16  about this paper -- and I'm sorry for people
17  I'm making seasick with the Elmo -- you have
18  an analysis that we talked about a little bit
19  before of Sample I.
20           Do you see that?
21      A.   I, yeah.
22      Q.   All right?
23      A.   Uh-huh.
24      Q.   And now that Sample I, did
25  you -- did you -- you've done other studies

13  (Pages 46 to 49)

Alice M. Blount, Ph.D.

Page 50

1   that involve Sample I, right?
2       A.   Uh-huh.  I think so.
3       Q.   Okay.  And was Sample I always
4   the same material, as far as you know, or did
5   you switch it around?
6       A.   It was the same material.
7       Q.   Okay.  So let's look at -- I'm
8   going to hand you -- I'll mark this
9   separately.
10          MR. DUBIN:  What number are we
11   on?
12          (Blount Exhibit 11 marked for
13          identification.)
14   QUESTIONS BY MR. DUBIN:
15      Q.   Mark this as 11.
16          And do you recognize what I've
17   marked -- and I'll just put it up here -- as
18   Exhibit 11?
19          If you look at this, do you
20   recognize this paper?  It's the same thing
21   that you have in front of you.
22      A.   Same thing I have...
23      Q.   The next page is a paper by
24   you.
25      A.   Yes, I see that.

Page 51

1       Q.   Called "Detection and
2   Quantification of Asbestos and Other Trace
3   Materials {sic}."
4           You looked at the front page of
5   that before?
6       A.   Uh-huh.
7       Q.   And it indicates that this was
8   presented at a proceedings of International
9   Symposium of Applied Mineralogy in 1989,
10   correct?
11      A.   (Witness nods head.)
12      Q.   And the date on this paper, we
13   were trying to see it before, but now that
14   you have your own copy, is it a little easier
15   to see at the bottom of page 557 what the
16   date is?
17      A.   Uh-huh.  1990, yeah.
18      Q.   Okay.  And you'll see, for
19   example, there's analysis.  If you turn to
20   Table 2 on 567, there's analysis of a
21   Sample I.
22          Do you see that?
23      A.   Sample.
24      Q.   Under the comparison of values
25   obtained by traditional 1 milligram 100 field

Page 52

1   of view -- I'll point to it on the...
2       A.   Which one?
3       Q.   Do you see Sample I?
4       A.   I.  I.  Okay.  Uh-huh.
5       Q.   And so there were no fibers
6   detected in that Sample I by the traditional
7   methods, right?
8       A.   Uh-huh.
9       Q.   Okay.  But one thing we know
10   then is that Sample I can't be the Johnson &
11   Johnson baby powder that you said you bought
12   in 1996, right?
13      A.   That seems so.
14          (Blount Exhibit 12 marked for
15          identification.)
16   QUESTIONS BY MR. DUBIN:
17      Q.   And the same way we know this
18   paper that we've all been talking about --
19   I'm going to mark this next, Exhibit 12.
20      A.   Oh, we're doing this a
21   different way.
22      Q.   Just showing you --
23      A.   We're doing this one a
24   different way.  This a centrifuge way;
25   this one's not.

Page 53

1   QUESTIONS BY MR. DUBIN:
2       Q.   And also here we have this
3   paper that -- the other paper Mr. Lanier
4   asked you about, "Amphibole Content of
5   Cosmetic and Pharmaceutical Talcs," by AM
6   Blount.
7           This is the paper you wrote,
8   you talked about earlier?
9       A.   Uh-huh.
10      Q.   And this paper is dated 1991,
11   correct?
12      A.   Uh-huh.
13      Q.   So whatever we're claiming --
14   seeing in Sample I here can't be an analysis
15   of the baby powder that you purchased in
16   1996, correct?
17      A.   That was -- this one has --
18   what was the date you said?
19      Q.   This is 1991.
20      A.   1991.  Well, yeah, I guess
21   that's right.
22      Q.   Okay.  So do you know -- now,
23   let me also ask you:  You maintained the
24   samples that you've looked at in these papers
25   for many years, right?

14  (Pages 50 to 53)

Alice M. Blount, Ph.D.

Page 54

1      A.    Some of them, yeah, but not all
2  of them.
3      Q.    For example, not very long ago
4  I believe that you gave certain samples to
5  Dr. Mickey Gunter that you had maintained,
6  including Sample I, correct?
7      A.    I said it was Sample I.
8      Q.    And just so we have it in the
9  record, I'll mark this as next in order.
10         (Blount Exhibit 13 marked for
11     identification.)
12 QUESTIONS BY MR. DUBIN:
13     Q.    I know you're not aware of
14 this, but those samples have been made
15 available for testing by both plaintiff and
16 defense experts in this case.
17         MR. LANIER:  No.
18         MR. DUBIN:  You haven't seen
19     that letter?
20         MR. LANIER:  Oh, I've seen the
21     letter, but you-all have not made them
22     available to us yet.
23         MR. DUBIN:  Okay.  We can --
24     the letter will speak for itself.
25         THE WITNESS:  But I -- that

Page 55

1      sample's not the same one as this
2      other one.
3  QUESTIONS BY MR. DUBIN:
4      Q.    So that I is not the same I?
5      A.    No.
6      Q.    So what is that I?
7      A.    What's that I?  It's a Vermont
8  talc, but I don't know where it came from.
9      Q.    So is that the I that was
10 studied in the 1991 paper, the I that you've
11 provided for testing?
12     A.    You mean with the -- that we
13 plotted out, you mean?
14     Q.    Right.
15         Is the I that's described in
16 the 1991 paper the same I that you provided
17 to Dr. Gunter?
18     A.    Huh-uh, no.
19     Q.    So when did you obtain that
20 Sample I?
21     A.    Most recent?
22         Can't tell you.  I don't know.
23 I'd have to look at my records.
24     Q.    Do you know whether you
25 obtained that Sample I before the 1991 paper

Page 56

1  was published?
2      A.    No, it would have to be after
3  that.
4      Q.    Why is that?
5      A.    Because -- well, my
6  recollection is that the older sample was
7  obtained in New Jersey before I came up here.
8         The I that you're talking about
9  is something that I collected up here.
10     Q.    Why did you label it then
11 Sample I?
12     A.    Well, that's a good question.
13         What I usually did when I
14 was -- when I was collecting samples up here
15 is I usually just gave them a letter rather
16 than any other information on there
17 because -- and I put the number on the
18 bottom, a letter on the bottom, because when
19 I ran them, I didn't want to know who's they
20 were or where they came from.  I just wanted
21 to look at them.
22         So, unfortunately, some of the
23 things ended up with a letter than I'd
24 already -- that had already been used before.
25 So that's why I have two letter I's.

Page 57

1      Q.    Well, the other samples that
2  you gave to Dr. Gunter, did those letters
3  correspond to the correct samples back from
4  the 1991 paper?
5      A.    No, because they'd have to
6  be -- they were collected up here.
7      Q.    So was it -- do you still have
8  samples of other materials back from the 1991
9  papers?
10     A.    I don't think so.
11     Q.    So what were all those samples
12 that you gave to Dr. Gunter?
13     A.    They were samples I collected
14 after I had moved up here.
15     Q.    Weren't they from areas other
16 than Vermont?
17     A.    They may be because I had some
18 graduate students, and I may have had some
19 talc from them, too.
20     Q.    But didn't they all have
21 identification letters that corresponded to
22 the 1991 paper samples?
23     A.    I'm not sure.
24     Q.    Okay.  Now, why did you
25 maintain -- why do you maintain samples?  Why

15 (Pages 54 to 57)

Alice M. Blount, Ph.D.

Page 58

```
 1   is it your practice to maintain samples?
 2        A.    I don't know.  I like samples.
 3        Q.    What did the container of
 4   Johnson & Johnson that you remember look
 5   like -- that you remember using look like?
 6        A.    You want it?  It's in my purse.
 7             MR. LANIER:  Sure.
 8             MR. DUBIN:  All right.  We'll
 9   mark that as the next exhibit in
10   order.
11             (Blount Exhibit 14 marked for
12        identification.)
13   QUESTIONS BY MR. DUBIN:
14        Q.    Okay.
15        A.    It has some kind of number on
16   the bottom.  I don't know if it means
17   anything.
18        Q.    Let me see --
19             MR. LANIER:  The bottom is
20        stamped 231 D2, if that helps you.
21             MR. DUBIN:  It's stamped
22        231 D2.  There's a number on the side
23        that says --
24             THE WITNESS:  It's a cast
25        number.  It just says it's talc.  The
```

Page 59

```
 1        computer tells you it's talc and
 2        what -- if it's dangerous or not, and
 3        that's what that number...
 4             MR. DUBIN:  It says, "Baby
 5        products company, Skillman,
 6        New Jersey, 08558, at J&J PPC."  It's
 7        got number 3011 DR.
 8   QUESTIONS BY MR. DUBIN:
 9        Q.    And so this is the bottle that
10   you remember purchasing in 1996 before you
11   came up here, correct?
12        A.    Uh-huh.
13        Q.    Prior to 1996, had you obtained
14   talc from the Windsor area from any other
15   source that you can remember?
16        A.    I don't remember.
17        Q.    But it's fair to say that if
18   you had obtained talc from the Windsor,
19   Vermont, area prior to 1996, you don't know
20   what the source is, correct?
21        A.    That's right.
22        Q.    Trying to cut down a little
23   time, so moving around a little.
24             Do you recall sometime last
25   fall that an attorney, Jonathan Cooper, from
```

Page 60

```
 1   Johnson & Johnson e-mailed you to ask you
 2   some questions?
 3             Do you recall that at all?
 4        A.    Huh-uh.
 5             (Blount Exhibit 15 marked for
 6        identification.)
 7   QUESTIONS BY MR. DUBIN:
 8        Q.    Okay.  See if this refreshes
 9   your recollection.
10             Do you recall talking to -- do
11   you recall talking to Mr. Cooper in
12   connection with that e-mail?
13             MR. PROST:  At some point I'd
14        like to take a look at it, too.
15   QUESTIONS BY MR. DUBIN:
16        Q.    Do you recall reviewing a
17   report by Dr. Longo and then talking to
18   Mr. Cooper about what your views were about
19   it?
20        A.    No.
21        Q.    Do you recall receiving any
22   sort of report of an analysis of baby powder
23   by Dr. Longo?
24        A.    Huh-uh.
25        Q.    So you don't recall telling
```

Page 61

```
 1   Mr. Cooper that you thought what he was
 2   looking at wasn't asbestos?
 3        A.    (Witness shakes head.)
 4        Q.    So fair to say, though, to the
 5   extent you've looked at Johnson & Johnson
 6   baby powder, you've looked at one bottle?
 7        A.    No, I looked at -- over time
 8   I -- every now and then I get one just to see
 9   what it's looking like.
10        Q.    Do you have any results of
11   other analysis that you can provide?
12        A.    That I can dig out?
13             It would take a long time to
14   find it.  Would you like to pay me for...
15             MR. LANIER:  I'll make them pay
16        you for that.
17   QUESTIONS BY MR. DUBIN:
18        Q.    At least in none of your
19   meetings for Mr. Lanier did he ask you to go
20   find any of that data, right?
21        A.    No, he did not.  He did not.
22        Q.    Is it fair to say, though, that
23   if somebody claims to find, for example, one
24   tremolite structure, right, that happens to
25   be 3 to 1, that doesn't mean that they're
```

16 (Pages 58 to 61)

Alice M. Blount, Ph.D.

Page 62

```
1   finding asbestos necessarily, right?
2       A.   Right.
3       Q.   You would want to go and do
4   additional analysis beyond seeing one
5   tremolite particle to determine whether it
6   was really asbestos or not, right?
7       A.   Right.
8       Q.   Okay.  And you were asked about
9   whether you had views on health effects,
10  so -- but you're aware that there aren't
11  studies showing that the nonasbestiform
12  tremolites cause cancer, right?
13      A.   Right.
14      Q.   And is it your view that the
15  nonasbestiform forms of tremolite do not
16  cause cancer?
17          MR. LANIER:  I want to put an
18      objection to form.  We are not
19      offering her as an expert.  I don't
20      think anyone has.
21          MR. DUBIN:  I think you've
22      referred multiple times to her
23      expertise in your questions, but we'll
24      resolve it.
25
```

Page 63

```
1   QUESTIONS BY MR. DUBIN:
2       Q.   Again, you're of the opinion
3   that nonasbestiform tremolite does not cause
4   cancer, right?
5          That's been your opinion?
6       A.   I don't know.
7       Q.   Okay.  But certainly you can't
8   just come in and say that every tremolite
9   particle that's over 3 to 1 that you find,
10  that's asbestos, right?
11      A.   (Witness nods head.)
12      Q.   That wouldn't be a proper
13  methodology?
14      A.   I mean -- I mean, I've been to
15  conference and conference of geologists
16  arguing about what is asbestos and what is
17  not asbestos.  So, I mean, geologists have
18  not really reached a final conclusion on this
19  either.
20          The ASTM meetings I've been to,
21  I don't know how many of them, and this is
22  always the discussion, you know.
23      Q.   Okay.  And to be fair, I know
24  you don't recall, but that e-mail suggests
25  that we did at some point ask you to take a
```

Page 64

```
1   look at Dr. Longo's report, right, the e-mail
2   from Mr. Cooper?
3          Do you see that?
4       A.   E-mail from Mr. Cooper?
5       Q.   Well, let me ask you:  Did
6   Mr. Lanier ever ask you to look at an
7   expert's report called -- an individual,
8   Dr. Longo, to see what your thoughts were
9   about it?
10      A.   I don't remember.
11      Q.   Okay.  And if somebody was to
12  say that they didn't do an analysis by
13  optical microscopy, by PLM, PCM, because you
14  just can't see asbestos with it, would that
15  be correct or incorrect?
16      A.   That's incorrect.
17      Q.   Okay.  And in your 1992 --
18  sorry, '91 article, you listed out the
19  densities of various materials so that you
20  could -- because you were using a heavy
21  density liquid separation technique, correct?
22      A.   Yes.
23      Q.   So, for example, this is what
24  we're talking about, this 1991 paper.
25          Now, before I ask you that,
```

Page 65

```
1   first, did you consider at the time this
2   method to be experimental in nature?
3       A.   No.
4       Q.   The page here, you have various
5   densities for materials -- I know it's hard
6   to see, I'll try to zoom in -- including
7   anthophyllite, tremolite, actinolite and
8   talc, right?
9       A.   Uh-huh.
10      Q.   Was this method that you
11  developed capable of separating out and
12  detecting anthophyllite if it was there?
13      A.   Should be.
14      Q.   Okay.  So if someone were to
15  say that using your method, even if there was
16  anthophyllite in a sample, they couldn't see
17  it, that would be wrong, correct?
18      A.   It depends how they do the
19  method.  Because I -- to do this, I had to go
20  through each mineral, and I had to find out
21  its density.
22      Q.   Right.
23      A.   And I had to know what liquid
24  to use, what density liquid.  So it depends
25  on what you're running together, and once you
```

17 (Pages 62 to 65)

Alice M. Blount, Ph.D.

Page 66

1   know that, you can figure out what liquid to
2   use.
3           You just can't take what's
4   written here and just do it that -- you know,
5   with that -- with those numbers.
6       Q.   Right.  Precisely.
7           You chose a liquid density that
8   would allow you to see not only tremelite but
9   other forms of amphibole, correct?
10      A.   And I tested them out to see
11  what their density was, and then I had to
12  purchase a heavy liquid that fit right
13  between talc and these other ones so that I
14  could separate them out in -- what would come
15  to the bottom when I centrifuged it.  And
16  then I took a little tiny pipette and I
17  removed those things from the bottom, and
18  that's what went onto my glass slides.
19      Q.   Okay.  And so if somebody
20  decides to use a different density liquid,
21  they're not using the same method you were?
22      A.   Or if they're doing a different
23  density mineral, they would have to go
24  through that and decide which -- what liquid
25  they need to use.

Page 67

1       Q.   And so if somebody, for
2   example, selected a density of liquid that
3   didn't allow them to see anthophyllite, they
4   could make that decision, but then it would
5   be a different method?
6       A.   Uh-huh.
7       Q.   Right?
8       A.   Uh-huh.
9       Q.   And you don't know what
10  method --
11      A.   I don't know what --
12      Q.   -- Dr. Longo used in this case?
13      A.   I don't know the density of
14  anthophyllite right off my head either.
15      Q.   Do you have an opinion on the
16  comparative ability of the TEM, transmission
17  electron microscopy, and something like
18  optical microscopy to resolve asbestos fibers
19  or see asbestos fibers?
20      A.   TEM I would not do until after
21  I had done this, if I really want to look at
22  those, because sometimes when you get fibers,
23  you get them -- they're bundles.  So that's
24  when we go to the TEM or -- to see those
25  fibers.  Otherwise, I wouldn't be using them

Page 68

1   for -- in this method.
2       Q.   So you agree then that when
3   you're analyzing talc for asbestos, it's best
4   to start with an optical microscopy method
5   like PLM?
6       A.   Right.
7       Q.   And then you can take another
8   step, potentially, and also look at something
9   like transmission electron microscopy?
10      A.   If you wanted to get a real
11  close-up view of that.  But TEM is not good
12  for identifying lots of times.  It's just
13  looking for the structures.
14      Q.   Right.
15          PLM, one of the things that
16  it's better at than TEM is identifying
17  whether you're really looking at asbestos or
18  not as opposed to look -- just focusing on
19  something that may be a non-asbestos
20  amphibole, right?
21      A.   Uh-huh.
22      Q.   And so if you skip the PLM
23  stage, you're missing out on a lot of
24  important information that helps you tell
25  whether you're really looking at asbestos or

Page 69

1   not, correct?
2       A.   Uh-huh.
3       Q.   And in your view, in general,
4   to determine whether or not something is
5   asbestos or not, you don't want to just look
6   at one single structure; you want to look at
7   the characteristics of the population of the
8   fibers, right?
9       A.   Uh-huh.
10      Q.   Okay.  And ignoring the
11  characteristics of the population of the
12  fibers is not, I take it, good science in
13  your view?
14      A.   I don't think so, yeah.
15      Q.   All right.  And again,
16  Mr. Lanier didn't share with you any of the
17  reports or opinions of the experts like
18  Dr. Longo or Dr. Compton that he intends to
19  offer to the jury in this case, correct?
20      A.   I didn't see any.
21      Q.   Okay.  And are you aware that a
22  number of other researchers over time have
23  looked at Johnson & Johnson material to
24  determine whether or not they believe that it
25  has asbestos in it?

18  (Pages 66 to 69)

Alice M. Blount, Ph.D.

Page 70

```
1        A.    Oh, I assume they have.
2        Q.    Okay.  And let me just ask you
3   whether you're familiar with some of them
4   or -- at the time.  I'll mark this as next in
5   order.
6             (Blount Exhibit 16 marked for
7        identification.)
8   QUESTIONS BY MR. DUBIN:
9        Q.    Is this a paper that you're
10  familiar with?
11       A.    No.
12       Q.    Occupational Exposures.  I'll
13  put it up here.
14            So this is not something --
15  when you were asked this morning by
16  Mr. Lanier about the presence of asbestos in
17  Johnson & Johnson products, it's not
18  something that you had had an opportunity to
19  consider before expressing any views you have
20  about that, right?
21       A.    Say that again?
22       Q.    Well, you were asked this
23  morning by Mr. Lanier about whether there's
24  asbestos in Johnson & Johnson baby powder,
25  but this isn't something, this paper isn't
```

Page 71

```
1   something, that you were -- had considered in
2   expressing any views you have about that,
3   right, because you haven't read it?
4        A.    No, I haven't read it.  No.
5        Q.    For example, this is
6   individuals, Maryanne Boundy, William
7   Burgess, John Dement, who is at NIOSH.  And
8   did you know that they went in to do a study
9   of the Vermont mill and mine that made --
10  that provided the source talc for Johnson &
11  Johnson baby powder?
12       A.    Huh-uh.
13       Q.    And that they did -- they took
14  product samples and they took air samples and
15  that they analyzed those using techniques
16  like PLM, optical microscopy and transmission
17  electron microscopy?
18       A.    Huh-uh.
19       Q.    And that their conclusion was
20  that there was no asbestos?
21            You haven't seen that before?
22       A.    No.
23            But I guess my question here
24  is: I've been to so many asbestos
25  conferences, and I have never heard of these
```

Page 72

```
1   people, so why is that?
2        Q.    Do you know who John Dement is
3   at -- was it NIOSH now?
4        A.    But he never comes to meetings
5   or anything that we're having on asbestos.
6        Q.    Okay.  Are you familiar with an
7   organization McCrone, McCrone Industries?
8        A.    Uh-huh.
9        Q.    And you've cited to some of
10  their work over time analyzing asbestos?
11       A.    Uh-huh.
12       Q.    Were you aware that McCrone was
13  doing routine analysis of Johnson & Johnson
14  talc for asbestos by transmission electron
15  microscopy?
16       A.    Huh-uh.
17            (Blount Exhibit 17 marked for
18       identification.)
19  QUESTIONS BY MR. DUBIN:
20       Q.    I know you haven't had an
21  opportunity, I assume, to look at --
22  Mr. Lanier didn't show you this document when
23  he was preparing you to testify today,
24  correct?
25            MR. LANIER:  Objection.  Form.
```

Page 73

```
1            THE WITNESS:  Yes.
2   QUESTIONS BY MR. DUBIN:
3        Q.    Okay.  And so this is a letter
4   from McCrone -- McCrone Industries.
5        A.    Yeah, I know of them.
6        Q.    Yeah, McCrone Associates,
7   sorry.
8        A.    Go ahead.
9        Q.    1987.  And it's talking about
10  something with the EPA.  It says, "The
11  Illinois EPA wrote to Windsor Minerals to the
12  effect that they were satisfied that
13  Windsor's product is free of asbestos.  That
14  has always been our opinion and continues to
15  be our opinion based on over 15 years of
16  closely examining this product."
17            And again, this was not
18  something that you read or were shown by
19  Mr. Lanier to talk about your views today,
20  correct?
21            MR. LANIER:  Objection.  Form.
22  QUESTIONS BY MR. DUBIN:
23       Q.    Right?
24       A.    Right.
25       Q.    And are you aware that the FDA
```

19 (Pages 70 to 73)

Alice M. Blount, Ph.D.

Page 74

```
1   has done testing of talc for the presence of
2   asbestos?
3           Have you seen those testing
4   results?
5       A.   Huh-uh.
6       Q.   Okay.  And you didn't look for
7   purposes of your 1991 paper at any Chinese
8   talc, correct?
9       A.   No, I don't think so.
10      Q.   And you did look, though --
11  some of the other samples that you looked at
12  for your paper were raw ore samples from talc
13  from Vermont and ore samples from talc in
14  Italy, correct?
15      A.   Well, it's -- raw samples?
16      Q.   Well, what did you look at --
17  what else did you look at from Vermont?
18  Sorry, I apologize.
19      A.   Only what's in the talc
20  business.  And I was working for them and
21  I -- and I analyzed those.  And those were
22  coming in from Newfane and a Troy deposit.
23  And they were being processed in Chester and
24  in -- what's -- Johnson mills, and they came
25  to us.  And then I had to analyze them
```

Page 75

```
1   completely before they were -- became
2   products that the company would sell.
3           So I haven't had a chance to
4   look at those.
5       Q.   So let's start first with just
6   Italian.
7           Did you look in the 1991 paper
8   also at Italian talc?
9       A.   I think one of them was.
10      Q.   And was your conclusion that
11  there was not asbestos in the Italian talc?
12      A.   Do we have that paper?  I think
13  I did.  I'm not sure.
14          MR. LANIER:  1991?
15          MR. DUBIN:  Yeah.
16  QUESTIONS BY MR. DUBIN:
17      Q.   Is Italian talc H?
18      A.   Let's see.  Yes, something like
19  that.  Let's see.
20          Well, in this paper it says
21  cleavages and needles.
22      Q.   So your conclusion -- that was
23  not one of the samples that you identified
24  asbestos in, correct?
25      A.   I guess I would have to look
```

Page 76

```
1   further, but cleavages and needles which --
2   could be.  Could be.
3       Q.   Well, let's look at the
4   front -- let's look at the front of the
5   paper.
6       A.   Uh-huh.
7       Q.   You say, "Only one of the
8   samples was found to contain an amphibole
9   particle size distribution typical of
10  asbestos," correct?
11          Do you see that in the
12  abstract?  "Only one"?
13      A.   Oh, in the abstract.  Okay.
14          "Only one found to contain
15  amphibole particles of size distribution of
16  typical asbestos."
17          Yeah, I agree.
18      Q.   So that means the rest of the
19  samples, other than I, did not contain a
20  particle size distribution of amphibole
21  typical of asbestos, right?
22      A.   Yeah, we've done this kind of
23  a -- we would have done this to see what the
24  distribution was.
25      Q.   And that would include the
```

Page 77

```
1   Italian talc that you looked at and other
2   Vermont talcs that you looked at, correct?
3       A.   Some -- I don't know if all of
4   them, but some of them are.
5           These were pretty much the ones
6   we were running to check our own deposits
7   that -- only its own deposits.
8       Q.   Right.  And so --
9       A.   But I know there was an
10  Italian, I remember that being there, but I
11  can't tell you right now which one it was.
12      Q.   But fair to say that for the
13  Italian talc that you looked at, you didn't
14  find an amphibole particle size distribution
15  typical of asbestos, right?
16      A.   Uh-huh.
17      Q.   And you also, for the other
18  Vermont samples that you looked at, whatever
19  they are, you didn't find an amphibole
20  particle size distribution typical of
21  asbestos, right?
22      A.   Yes, I think that's right.
23      Q.   And just to clarify also, the
24  photos that Mr. Lanier showed of Sample I, do
25  you have other photos also, or are those all
```

20 (Pages 74 to 77)

Alice M. Blount, Ph.D.

Page 78

1   the photos that you have from that process?
2       A.    I don't think so.  I don't
3   think I have -- we had -- we had -- the
4   problem was that when we moved its
5   headquarters to Cincinnati, they got a new
6   director to track that lab, and he threw out
7   practically everything we had down here in
8   Vermont.  So a lot of that stuff was lost,
9   and I'm afraid there's no way I can get it
10  back.
11      Q.    So where did you get these
12  photos?
13      A.    These were ones I already had,
14  already printed out and, you know, I had
15  those.  But I have done a lot more work since
16  then, and that does not exist anymore.
17      Q.    Okay.  Did Mr. Lanier ask you
18  to try to find any other photos that you had
19  from your work or just those photos that you
20  brought today?
21      A.    Well, I was looking through to
22  see what I had, but knowing pretty much the
23  timeline, I know at one point the new
24  director decided to throw all of that stuff
25  out, so...

Page 79

1       Q.    All right.  And one of the
2   things that you note in your conclusion
3   section here is, "High grade talc powders are
4   uniformly low in amphibole content.  Indeed,
5   talc from some districts appears to be
6   completely free of such minerals."
7           Do you see that?
8       A.    Uh-huh.
9       Q.    So if an expert for the
10  plaintiffs was to testify there is no such
11  thing as asbestos-free talc, is that true?
12      A.    There's no such thing...
13      Q.    If their experts would say it
14  doesn't exist, there's no such thing as
15  asbestos-free talc, is that true?
16      A.    No.
17          MR. DUBIN:  Okay.  Let's take a
18  five-minute break.  I'll check my
19  notes and see if I have anything else;
20  otherwise, I'll pass back.
21          VIDEOGRAPHER:  Going off the
22  record.  The time is 10:50.
23      (Off the record at 10:50 a.m.)
24          VIDEOGRAPHER:  Back on the
25  record.  The time is 10:54.

Page 80

1           CROSS-EXAMINATION
2   QUESTIONS BY MR. PROST:
3       Q.    Good morning, Dr. Blount.  My
4   name is Mark Prost, and I represent a company
5   called Imerys Talc America.
6       A.    Uh-huh.
7       Q.    Nice to meet you.
8       A.    Hi.
9       Q.    Now, you and I have never met
10  or talked before; is that right?
11      A.    Right.
12      Q.    And I have not had coffee with
13  you or had dinner with you, and I haven't
14  sent you any information or e-mails or
15  anything like that, have I?
16      A.    That's right, you haven't.
17      Q.    And has anyone from Imerys
18  contacted you or tried to talk to you before
19  the deposition?
20      A.    I don't think so.
21      Q.    All right.  And I will say I
22  would like to maybe have coffee with you,
23  because I lived in Carbondale, Illinois, just
24  like you did.  I went to law school there.
25  So maybe after the deposition we can catch up

Page 81

1   a little bit.
2           Now, with the materials that
3   Mr. Lanier showed you, did he show you any
4   testing materials that my company, Imerys,
5   had done regarding Vermont talc?
6       A.    I don't think so.
7       Q.    So there's going to be a woman
8   from Imerys named Julie Pier who will
9   testify, and the jury will hear about her,
10  but she's going to talk about the testing
11  that Imerys did.
12          Are you aware of any of the
13  testing that Imerys did or the results of
14  that testing of Vermont talc?
15      A.    No.
16      Q.    You would agree it's a good
17  thing for a talc company to test its talc to
18  see if there is asbestos there, right?
19      A.    Right.
20      Q.    And would you expect a talc
21  company to test for all kinds of asbestos
22  such as tremolite and chrysotile?
23      A.    Uh-huh, yeah.
24      Q.    Now, your method, as I
25  understand it, is designed to test for

21 (Pages 78 to 81)

Alice M. Blount, Ph.D.

Page 82

1 amphiboles but not chrysotile asbestos; is
2 that right?
3     A.    I think you could do both.
4 Depends on, you know, which one it is, yeah.
5     Q.    But as I understand it, your
6 heavy liquid density testing is designed such
7 that chrysotile is not going to be found
8 after that -- after the preparation is done.
9 They're not as likely to be found; is that
10 right?
11     A.    Yeah, that's probably right.
12     Q.    So if a talc company wanted to
13 test its talc to see if there's chrysotile
14 asbestos, it probably wouldn't be a good idea
15 to use your preparation method; is that --
16     A.    You just have to recalibrate
17 for whatever you are -- whatever mineral you
18 are interested in.
19     Q.    All right.  Now, my
20 understanding is the reason you developed
21 your technique was so you could test the talc
22 faster.  Is that a fair way to describe it?
23          Why did you develop your
24 method?
25     A.    I developed my method because I

Page 83

1 wanted to be able to find the asbestos in
2 there, and most of the time there was so much
3 talc you couldn't find anything.  And also
4 the asbestos fibers sometimes hid underneath
5 the talc particles, so I wanted to separate
6 them so I could see them and measure them.
7 And I couldn't do in its original condition.
8     Q.    Now, there is an older way of
9 testing talc for asbestos that people were
10 doing before your method that took a lot
11 longer to do; is that true?  Because of the
12 problems you just described?
13     A.    I don't know how they did it.
14     Q.    So, but one of the problems you
15 were coming across and why you tried to
16 develop your method was that when you were
17 testing pharmaceutical or cosmetic-grade
18 talc, there was such extremely low levels of
19 amphiboles that it was taking too much time
20 to do it, and you wanted to find a faster
21 method; is that fair?
22     A.    No, I wanted to be able to find
23 it.  You can't find it if you've got all of
24 that talc covering over what you're looking
25 for.  So that's why I separate them, and then

Page 84

1 I can look at the stuff I'm interested in and
2 the talc won't bother me, won't be in my way
3 so I can't find things.
4     Q.    All right.  When you developed
5 your method, was it your intention for it to
6 be used by lawyers or experts in litigation
7 to try to prove that asbestos was causing
8 someone's cancer?
9     A.    No, I did it because only I
10 needed to know whether they had good talc or
11 not.  And in fact, the two deposits that they
12 had at that time they no longer have because
13 they know what's in there, and that's what
14 they needed to know.
15     Q.    And the two talc deposits, what
16 are you referring to?
17     A.    I'm referring to Troy and
18 Newfane.
19     Q.    Do you have any idea if Imerys
20 has ever mined talc from those two deposits?
21     A.    I don't know.
22          MR. PROST:  Ma'am, those are
23 all the questions that I have right
24 now, but I might have some later and I
25 might come back.  Thank you.

Page 85

1          VIDEOGRAPHER:  Going off the
2 record --
3          MR. LANIER:  We don't need to
4 go off the record.  We're going to
5 move.
6          MR. DUBIN:  Should I have a
7 running objection to form or you want
8 me to make them all the time?
9          JUDGE NORTON:  No, you don't
10 have to.  I'll let Mr. Lanier tell me
11 if he wants to change that.
12          You know, I see the objections
13 to form being made primarily so that
14 if the counsel had asked a question
15 was to call you out and say what's
16 wrong with the form, that's the only
17 way to make sure -- if he doesn't
18 care --
19          MR. LANIER:  I don't care.
20          JUDGE NORTON:  -- then they're
21 all preserved.
22          MR. DUBIN:  All right.  That's
23 great.  That's what I figured.
24          JUDGE NORTON:  So much easier.
25 I appreciate that.

22  (Pages 82 to 85)

Alice M. Blount, Ph.D.

Page 86

1    REDIRECT EXAMINATION
2  QUESTIONS BY MR. LANIER:
3        Q.    All right.  Dr. Blount, I want
4  to ask you some questions to clarify what's
5  been asked by the lawyers for Johnson &
6  Johnson and Imerys.
7            Okay?
8        A.    Uh-huh.
9        Q.    First of all, the Johnson &
10  Johnson lawyer asked you, are there different
11  kinds of amphiboles in tremolite, and you
12  said yes.
13           Remember that?
14        A.    Uh-huh.
15        Q.    My question, the important one,
16  is did you find tremolite asbestos in an
17  asbestiform in Johnson & Johnson baby powder?
18           Did you?
19        A.    Yeah.
20        Q.    Next subject.  I was having
21  trouble understanding about 1996, 1991, 1989,
22  purchase of baby powder.
23           Did you test Johnson & Johnson
24  baby powder more than once?
25        A.    Yes.

Page 87

1        Q.    And you may have written it up
2  once in a paper, but over the process of
3  however many times you tested it, did you
4  consistently find asbestos in it?
5        MR. DUBIN:  Objection to form.
6        THE WITNESS:  Yes.
7  QUESTIONS BY MR. LANIER:
8        Q.    Now, you noticed when Mr. Dubin
9  handed you a different paper than the one you
10  and I had discussed -- it was a book
11  chapter --
12        A.    Uh-huh.
13        Q.    -- you said that was a
14  different method, it was done at different
15  times.
16           I guess this goes back to the
17  other.  Have you done these tests more than
18  once?
19        A.    Which tests are we talking
20  about?
21        Q.    Tests to see if there's
22  asbestos in Johnson & Johnson baby powder.
23        A.    Yeah.
24        Q.    All right.  And then each time
25  you did it, if you had enough samples, you

Page 88

1  would have a letter I or maybe a letter A or
2  a letter B or a letter C for the different
3  samples, but would you change it each time?
4        A.    Would I change it?
5        Q.    Yeah.  In other words, I
6  thought -- explain this to the jury.
7            You were telling Mr. Dubin you
8  assigned the letters so that it would be
9  blind.
10        A.    Uh-huh.
11        Q.    What does that mean?  Explain
12  to the jury what you meant.
13        A.    Because I didn't want to know
14  which company it was from.  I wanted to --
15  you know, because I think you might get bias
16  that way and I didn't want to.  I wanted to
17  be fair.
18        Q.    So if Mr. Dubin thought that
19  you would always give an I to Johnson &
20  Johnson, then it wouldn't be blind at all,
21  would it?
22        A.    That's right.
23        Q.    So would your I -- sometimes it
24  might be Johnson & Johnson --
25        A.    Uh-huh.

Page 89

1        Q.    -- sometimes not; is that fair?
2        A.    Yes, that's fair.
3        Q.    That's how you make it blind,
4  right?
5        A.    Right.
6        Q.    All right.  Next section, next
7  area, topic.  Different methods of different
8  experts.
9            Now, Mr. Dubin put his own spin
10  into how he asked these questions --
11        MR. DUBIN:  Objection to form.
12  QUESTIONS BY MR. LANIER:
13        Q.    -- and I want to make sure that
14  we're clear.
15            Before you criticize other
16  people and decide whether their science is
17  good or bad, would you want time to actually
18  look at what they did and understand it?
19        A.    Uh-huh.
20        Q.    Is it important to you to study
21  what they did and why they did it before you
22  criticize them?
23        A.    Yeah.
24        Q.    Thank you.
25            And in that same vein, if

23  (Pages 86 to 89)

Alice M. Blount, Ph.D.

Page 90

1    different methods are used by different
2    experts, would you agree that companies
3    should use the best method that actually
4    finds asbestos if they want to find it?
5        A.   Yes.
6        Q.   Is that important?
7        A.   That's important.
8        Q.   I mean, the company shouldn't
9    be playing -- okay.  I got a 20-month-old
10   granddaughter.
11            MR. DUBIN:  Object to form.
12   QUESTIONS BY MR. LANIER:
13       Q.   And she's at the age now where
14   she likes to play hide and seek.
15       A.   Uh-huh.
16       Q.   And she'll play hide and seek
17   by pulling a napkin over her head at the
18   table, and I pretend I can't see her.  And
19   she believes me when she drops the napkin
20   down and wants me to exclaim "there you are!"
21            Are you with me?
22       A.   Uh-huh.
23       Q.   I mean, a company should not be
24   playing hide and seek.  A company should
25   really try to look for asbestos.

Page 91

1            Would you agree with that?
2        A.   Yeah.
3            MR. DUBIN:  Objection.  Form.
4    QUESTIONS BY MR. LANIER:
5        Q.   Now, next topic.  A lot of
6    questions were asked by Mr. Dubin, and I
7    think even one by Mr. Prost, about what I
8    showed you, when Mr. Lanier and Mr. Dubin
9    said this -- this is lawyer questioning:
10   "When Mr. Lanier prepared to you testify."
11           Ma'am, I didn't prepare you to
12   testify in the sense of anything other than
13   just explain to you what a deposition is and
14   ask you to tell the truth; is that right?
15       A.   That's right.
16       Q.   And I didn't show you things,
17   you showed me things, because I just wanted
18   to know what you knew; is that fair?
19            MR. DUBIN:  Objection.  Form.
20            THE WITNESS:  Uh-huh.
21   QUESTIONS BY MR. LANIER:
22       Q.   I wanted to know what you did,
23   and that's all we talked about.  I didn't
24   talk to you about what McCrone did, what
25   Julie Pier did or any of that, did I?

Page 92

1            MR. DUBIN:  Objection.  Form.
2            THE WITNESS:  No, you didn't.
3    QUESTIONS BY MR. LANIER:
4        Q.   So, for example, when the
5    lawyers start asking you about this and they
6    talked about -- Mr. Dubin talked about what
7    McCrone said, I didn't even remotely get into
8    you about what Mr. McCrone -- or what McCrone
9    would say for J&J or for another company or
10   whatever versus what the truth is.
11           You and I never talked about
12   McCrone's testing, did we?
13       A.   No, but he's dead anyway.
14       Q.   He's dead anyway.
15           Is truth important in science?
16       A.   Yes.  Yes.  Yes.
17       Q.   Is it important that companies
18   tell the truth?
19       A.   Yeah.
20            MR. DUBIN:  Objection.  Form.
21   QUESTIONS BY MR. LANIER:
22       Q.   And so if, for example, we see
23   the Exhibit 16 that you were asked about
24   where -- or as Mr. Dubin showed from the
25   McCrone letterhead this comment that

Page 93

1    "Windsor's product is free of asbestos.
2    That's always been our opinion and continues
3    to be our opinion based over 15 years of
4    closely examining this product."
5            Do you see that?
6        A.   Uh-huh.
7        Q.   That's what was shown to you
8    just now by Mr. Dubin.
9            What Mr. Dubin never showed you
10   is what I'll mark as Exhibit Number 18.
11           (Blount Exhibit 18 marked for
12   identification.)
13   QUESTIONS BY MR. LANIER:
14       Q.   Exhibit Number 18 is from that
15   same McCrone, the people who told everybody
16   that it's free of asbestos, that it's always
17   been their opinion after 15 years of closely
18   examining -- you can go back 12 years before
19   that, and that same McCrone says to Windsor,
20   the mine company, "We've analyzed your latest
21   series of 24 talc ore samples for asbestiform
22   minerals.  In our entire series, we found
23   only two asbestiform fibers, both
24   amphiboles."
25           They made this with a

24  (Pages 90 to 93)

Alice M. Blount, Ph.D.

Page 94

1  transmission electron microscope.  So they
2  found two in that sample that they did that
3  day.
4        Do you see that?
5     A.   Right.
6     Q.   And yet they'll tell everyone
7  else that it's free of asbestos, Windsor's
8  product is free of asbestos, always been our
9  opinion.
10        Is it important that what you
11  tell the world be the truth that you actually
12  know?
13        Is that important?
14     A.   Yeah.
15     Q.   I mean, would you say if you
16  analyzed something, and in these 24 samples
17  that you got on this day you found a couple
18  of asbestiform fibers that were amphiboles --
19        MR. DUBIN:  Objection.  Form.
20  QUESTIONS BY MR. LANIER:
21     Q.   -- would you say that it's
22  asbestos-free?
23     A.   No.
24        MR. DUBIN:  Objection.  Form.
25        (Blount Exhibit 19 marked for

Page 95

1     identification.)
2  QUESTIONS BY MR. LANIER:
3     Q.   All right.  By the same token,
4  I'll show you Exhibit Number 18 which is from
5  the mine company.  19.
6        Let me mark that as Exhibit 18.
7        Let me show you Exhibit
8  Number 19.  Here's a copy for you.
9        Exhibit Number 19.  And again,
10  I didn't show you these things because I was
11  asking you about what facts you knew, right?
12     A.   Uh-huh.  Right.
13     Q.   All right.  But now if they
14  want me to show you these things, here's
15  another one about an article on asbestos, and
16  this is from within the company that's now --
17  it's Rio Tinto Minerals at the time.  It's
18  now known as Imerys.
19        But in the process of this,
20  they say on the second page, "I'd seen and
21  read this article, and my first reaction was,
22  'Who really wrote this paper for John's
23  signature?'  I know John, he's a fairly
24  technical person, but excuse me, he would not
25  write such an article and cite 129

Page 96

1  references.  The answer is obvious on who
2  wrote it.  Regardless, I cannot agree with
3  the position.  We just don't have enough
4  facts.  Geologically, it doesn't make sense
5  to me you can have a mineral deposit that
6  just contains nonasbestiform tremolite.  I
7  believe the USGS study of talc from Death
8  Valley, California, nailed it correctly.  If
9  a deposit contains nonasbestiform tremolite,
10  there is also asbestiform tremolite naturally
11  present as well."
12        Would you agree with that?
13        In other words, if you've got
14  non --
15     A.   If you have -- I'm trying to --
16     Q.   Oh, I'm sorry.
17     A.   So he said nonasbestiform
18  tremolite...
19     Q.   I'll tell you what, I'm going
20  to move on in the interest of time.  And
21  because I have not designated you as an
22  expert, I'm not sure that's a fair question
23  for me to ask.
24     A.   Okay.
25     Q.   Then the last thing I need to

Page 97

1  talk to you about in regards to what the
2  lawyers asked you is the lawyer from Imerys
3  asked you about Julie Pier's tests and
4  accused me of not showing you those.
5        I'm going to show you one of
6  those so that nobody feels I shorted you.
7  We'll mark this as Exhibit Number 20.
8        (Blount Exhibit 20 marked for
9        identification.)
10  QUESTIONS BY MR. LANIER:
11     Q.   This is Julie Pier, Luzenac,
12  May of 2002, and this is her analysis of
13  fibrous material from the Argonaut waste
14  rock.
15        So this is rock that is left
16  over from their mining at Argonaut that
17  they're thinking about putting on our roads.
18     A.   Uh-huh.
19     Q.   It says -- and Argonaut, by the
20  way, that's Vermont; is that right?
21     A.   Uh-huh, that's right.
22     Q.   -- "a sample of fibrous
23  material from the waste rock on the west side
24  of the south end of the Argonaut, Vermont,
25  mine was submitted to the technical center

Alice M. Blount, Ph.D.

Page 98

1    for identification.  Result:  The fibrous
2    material is tremolite.  This was examined by
3    polarizing light microscopy using the
4    dispersion staining technique."
5            That's yours, isn't it?
6        A.    Uh-huh, that's the one we were
7    using, yeah.
8        Q.    "Tremolite was preliminarily
9    identified by this method.  Subsequent
10   analysis by scanning electron microscope and
11   transmission electron microscopy confirmed
12   the tremolite identification."
13           If we want to know if Julie
14   Pier thought there was asbestos in the
15   Vermont mines, I could have shown you this,
16   couldn't I?
17           MR. DUBIN:  Objection.  Form.
18           THE WITNESS:  Uh-huh.
19   QUESTIONS BY MR. LANIER:
20       Q.    I just didn't because I wanted
21   to know what you found.
22           MR. DUBIN:  Objection.  Form.
23   QUESTIONS BY MR. LANIER:
24       Q.    Is that fair?
25       A.    Yes, that's fair.

Page 99

1        Q.    And, ma'am, has your opinion
2    changed at all?  Did you find asbestos in the
3    Johnson & Johnson baby products sold on the
4    shelves on multiple occasions?
5        A.    I did.
6            MR. LANIER:  Thank you.
7            Pass the witness.
8            RECROSS-EXAMINATION
9    QUESTIONS BY MR. DUBIN:
10       Q.    Hey, how are you?  We're almost
11   done.  Don't worry about it.
12           Okay.  So first, I didn't quite
13   understand your -- one thing that you were
14   talking about with Mr. Lanier, so I just want
15   to clarify it, this idea of blinding samples.
16           So as I understand it, if you
17   have a Sample I -- and, for example, let's
18   say that's a Johnson & Johnson product --
19   then the next time you don't want that
20   Sample I necessarily to be Johnson & Johnson
21   because then you'll know what the results are
22   before you start, right?
23       A.    I don't want to -- let me -- I
24   won't know -- even if I put "I" there, I
25   wouldn't know -- I want the letters to be

Page 100

1    different each time so -- in different order
2    so that I don't -- have no idea which one's
3    which when I'm running it so I'm not biased
4    subconsciously, because that could happen.
5    So that's why I put these numbers.
6            Unfortunately, I didn't make a
7    good enough record, and I think some of them
8    got a little mixed up.
9        Q.    And so I don't know if you
10   still have the exhibits with you; otherwise I
11   can mark something different.
12           But -- so we see -- can I turn
13   the Elmo back on, sir?
14           So this is -- we looked at this
15   before.  It was Exhibit 8.  And here you're
16   talking about how -- you're writing to the
17   lawyers for Johnson & Johnson and you're
18   saying, "Johnson & Johnson, I've looked at it
19   as labeled -- sample labeled I by traditional
20   methods.  See Table 2, 567 in the 1990
21   paper," right?
22       A.    Uh-huh.
23       Q.    So this is the 1990 paper we
24   talked about that had some results for
25   Johnson & Johnson.

Page 101

1        A.    Uh-huh.
2        Q.    So the next time you look at
3    Johnson & Johnson, though -- the next time
4    you have a Sample I, that's not going to be
5    Johnson & Johnson anymore, right?
6        A.    Yeah, probably not.
7        Q.    And so when you do your
8    analysis for your 1991 paper, "Amphibole
9    Content of Cosmetic and Pharmaceutical
10   Talcs," and you've got results for Sample I,
11   because you've randomly blinded this, it's
12   likely that I isn't going to be Johnson &
13   Johnson again, right?
14       A.    Yeah, it may not be.
15       Q.    Okay.  And a couple other
16   questions.
17           So was this -- you were asked
18   about how many times you've looked at Johnson
19   & Johnson.
20           Was the bottle that we've got
21   as Exhibit 14, was that the first one that
22   you bought to analyze?
23       A.    I bought that one last -- in
24   New Jersey.  It may not have been the first
25   one.

26 (Pages 98 to 101)

Alice M. Blount, Ph.D.

Page 102

1    Q.    Do you have any results of any
2  analysis that you did on any other bottles
3  than this one?
4    A.    I'll have to look.  I don't
5  know.
6    Q.    Okay.  And fair to say, though,
7  you've kept this bottle for now -- somebody
8  help me with the math -- 23?  22 years,
9  right?
10   A.    22 years.
11   Q.    And if you had tested other
12 bottles of Johnson & Johnson, any reason that
13 you wouldn't have maintained those also?
14   A.    I don't know.
15   Q.    Okay.  But at least sitting
16 here today, there's no results of any other
17 testing that I can take a look at that we
18 have with us, right?
19   A.    With us today, don't think so.
20   Q.    And one of the things you were
21 asked a little bit about was a document
22 pertaining to McCrone, some McCrone analysis
23 in the 1970s Mr. Lanier showed you, right?
24   A.    Uh-huh.
25   Q.    Do you even know whether the

Page 103

1  samples that were being analyzed in that --
2  in that document were samples of talc that
3  would have gone into Johnson & Johnson baby
4  powder?
5    A.    I don't think so.
6    Q.    You don't know that, right?
7    A.    Do you have that -- do you have
8  that thing to look at?
9    Q.    Well, he gave you the document
10 before.
11         Well, for example, do you know
12 what the code HC means in that context?
13   A.    HC?  No.
14   Q.    Do you know whether it could be
15 an industrial talc?
16         You just don't know how Johnson
17 & Johnson used those numbers, right?  Or
18 letters, sorry.  H is a letter.
19   A.    No, I don't.
20   Q.    And you were asked a little bit
21 about waste rock.
22         Is it fair to say that when you
23 look at a large talc deposit, there may be
24 geological diversity in that deposit?  Right?
25   A.    More than likely.

Page 104

1    Q.    In particular, for example,
2  there may be areas towards the edges of talc
3  deposits where the talc comes into contact
4  with things like country rock, or you call it
5  black rock, or the like, right?
6    A.    Uh-huh.
7    Q.    And so at those edges of those
8  deposits, if you sample over there, you might
9  be more likely to find asbestos because it's
10 in conjunction with that harder rock mineral,
11 and there's also different minerals that can
12 come into play because of where it is
13 geologically, right?
14   A.    Yes, they are not really
15 homogeneous, most deposits.
16   Q.    And so it's important to
17 consider, when you're looking at a result of
18 a talc sample, where that talc sample was
19 actually taken from in a deposit, right?
20   A.    Right.
21   Q.    Okay.  And you were asked a
22 little bit about hide and seek and all the
23 like.
24         First, do you agree that an
25 expert should not change their testing

Page 105

1  methodology just based on who is paying them
2  in a litigation?
3    A.    Right.
4    Q.    Right?
5          And do you agree that if you're
6  trying to answer the question whether there's
7  asbestos in a material, you should use
8  methods that help you distinguish between
9  asbestiform and nonasbestiform amphiboles,
10 right?
11         If that's the -- if the
12 question you're being asked is, is there
13 asbestos, you should use the right methods to
14 answer that question, right?
15   A.    Right.
16         MR. DUBIN:  No further
17 questions.
18         MR. PROST:  No questions.
19    FURTHER REDIRECT EXAMINATION
20 QUESTIONS BY MR. LANIER:
21   Q.    Dr. Blount, after all these
22 questions are said and done, after everything
23 that's been discussed, just based on what you
24 did in your work, in your life, never
25 dreaming lawyers would contact you, can you

27 (Pages 102 to 105)

Alice M. Blount, Ph.D.

| Page 106 |
|---|
| 1  affirm that for decades, in the '80s and the |
| 2  '90s, at least, into the 2000s, Johnson & |
| 3  Johnson baby powder sold on the shelves had |
| 4  asbestos and asbestiform in it? |
| 5       MR. DUBIN:  Objection.  Form. |
| 6       THE WITNESS:  Yes. |
| 7       MR. LANIER:  Thank you.  That's |
| 8  all we've got. |
| 9       FURTHER RECROSS-EXAMINATION |
| 10  QUESTIONS BY MR. DUBIN: |
| 11     Q.   You were asked a very general |
| 12  question by Mr. Lanier. |
| 13        Do you agree that the best way |
| 14  to determine whether or not there was |
| 15  asbestos in these products is to look at the |
| 16  actual testing results? |
| 17     A.   Look at test -- yeah. |
| 18     Q.   Right. |
| 19        And so other than whatever we |
| 20  have in your papers that you brought here |
| 21  today, we have none of these test results |
| 22  that you're supposedly relying on for |
| 23  opinions in the '70s, '80s, '90s about |
| 24  Johnson & Johnson talc to look at today, |
| 25  right? |

| Page 107 |
|---|
| 1     A.   Yes. |
| 2       FURTHER REDIRECT EXAMINATION |
| 3  QUESTIONS BY MR. LANIER: |
| 4     Q.   But you're the one who did the |
| 5  work, aren't you? |
| 6     A.   Yes. |
| 7     Q.   So these are your test results |
| 8  you're talking about.  We don't need a sheet |
| 9  of paper, do we? |
| 10     A.   We're using kind of concept |
| 11  method anyway. |
| 12       MR. LANIER:  Okay.  Thank you. |
| 13       MR. DUBIN:  We can do this |
| 14  forever, I suppose.  All right.  Let's |
| 15  quit. |
| 16       MR. LANIER:  Thank you, |
| 17  Dr. Blount. |
| 18       VIDEOGRAPHER:  This concludes |
| 19  the April 13, 2018 deposition of |
| 20  Dr. Blount.  Going off the record. |
| 21  The time is 11:25. |
| 22  (Deposition concluded at 11:25 a.m.) |
| 23       - - - - - - - |
| 24 |
| 25 |

Page 108

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
of the examination, Alice M. Blount, Ph.D.,
was duly sworn by me to testify to the truth,
the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth, to the best of my
ability.

I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.

_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
#084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
Notary Public
Dated:  April 13, 2018

| Page 109 |
|---|
| 1       INSTRUCTIONS TO WITNESS |
| 2 |
| 3        Please read your deposition over |
| 4  carefully and make any necessary corrections. |
| 5  You should state the reason in the |
| 6  appropriate space on the errata sheet for any |
| 7  corrections that are made. |
| 8        After doing so, please sign the |
| 9  errata sheet and date it.  You are signing |
| 10  same subject to the changes you have noted on |
| 11  the errata sheet, which will be attached to |
| 12  your deposition. |
| 13        It is imperative that you return |
| 14  the original errata sheet to the deposing |
| 15  attorney within thirty (30) days of receipt |
| 16  of the deposition transcript by you.  If you |
| 17  fail to do so, the deposition transcript may |
| 18  be deemed to be accurate and may be used in |
| 19  court. |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

28 (Pages 106 to 109)

Alice M. Blount, Ph.D.

Page 110

| | | |
|---|---|---|
| 1 | ACKNOWLEDGMENT OF DEPONENT | 1     - - - - - - - |
| 2 | |     LAWYER'S NOTES |
| 3 | | 2 |
| 4 |     I,_____, do | 3   PAGE   LINE |
| | hereby certify that I have read the foregoing | 4   ____   ____   _____ |
| 5 | pages and that the same is a correct | 5   ____   ____   _____ |
| | transcription of the answers given by me to | 6   ____   ____   _____ |
| 6 | the questions therein propounded, except for | 7   ____   ____   _____ |
| | the corrections or changes in form or | 8   ____   ____   _____ |
| 7 | substance, if any, noted in the attached | 9   ____   ____   _____ |
| | Errata Sheet. | 10   ____   ____   _____ |
| 8 | | 11   ____   ____   _____ |
| 9 | | 12   ____   ____   _____ |
| 10 | | 13   ____   ____   _____ |
| 11 | | 14   ____   ____   _____ |
| 12 | | 15   ____   ____   _____ |
| | _____ | 16   ____   ____   _____ |
| | Alice M. Blount, Ph.D.     DATE | 17   ____   ____   _____ |
| 13 | | 18   ____   ____   _____ |
| 14 | | 19   ____   ____   _____ |
| 15 | Subscribed and sworn to before me this | 20   ____   ____   _____ |
| 16 | _____ day of _____, 20 _____. | 21   ____   ____   _____ |
| 17 | My commission expires: _____ | 22   ____   ____   _____ |
| 18 | | 23   ____   ____   _____ |
| 19 | Notary Public | 24   ____   ____   _____ |
| 20 | | 25 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

| | |
|---|---|
| 1 |     - - - - - - |
| |     E R R A T A |
| 2 |     - - - - - - |
| 3 | PAGE   LINE   CHANGE |
| 4 | ____   ____   _____ |
| 5 | REASON: _____ |
| 6 | ____   ____   _____ |
| 7 | REASON: _____ |
| 8 | ____   ____   _____ |
| 9 | REASON: _____ |
| 10 | ____   ____   _____ |
| 11 | REASON: _____ |
| 12 | ____   ____   _____ |
| 13 | REASON: _____ |
| 14 | ____   ____   _____ |
| 15 | REASON: _____ |
| 16 | ____   ____   _____ |
| 17 | REASON: _____ |
| 18 | ____   ____   _____ |
| 19 | REASON: _____ |
| 20 | ____   ____   _____ |
| 21 | REASON: _____ |
| 22 | ____   ____   _____ |
| 23 | REASON: _____ |
| 24 | ____   ____   _____ |
| 25 | REASON: _____ |

29 (Pages 110 to 112)