Exhibit 9

# In The Matter Of:

*Olson v.*
*J&J*

---

*May 10, 2019*

---

*Original File 051019 Olson.txt*

*Min-U-Script® with Word Index*

```
1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK - CIVIL TERM - PART 7
2   -------------------------------------------------X
    DONNA A. OLSON and ROBERT M. OLSON,
3
                            Plaintiff,
4                                           Index No.
         -against-                          190328/2017
5
    BRENNTAG NORTH AMERICA, INC.;
6   BRENNTAG SPECIALTIES, INC.,
         Individually, and f/k/a Mineral Pigment
7        Solutions, Inc., as successor-in-interest to
         Whittaker, Clark & Daniels, Inc.,
8   CYPRUS AMAX MINERALS COMPANY,
         Individually and as successor-in-interest to
9        American Talc Company, Metropolitan Talc
         Company, Inc., Charles Mathieu, Inc., and
10       Resource Processors, Inc.;
    IMERYS TALC AMERICA, INC.,
11  JOHNSON & JOHNSON CONSUMER, INC.;
    WHITTAKER, CLARK & DANIELS, INC.,
12       Individually and as successor-in-interest
         To American Talc Company, Metropolitan Talc
13       Company, Inc., Charles Mathieu, Inc., and
         Resource Processors, Inc.;
14
                            Defendants.
15  -------------------------------------------------X
                              60 Centre Street
16  TRIAL                     New York, New York
                              May 10, 2019
17
    B E F O R E:
18
              HONORABLE GERALD LEBOVITZ,
19                  Justice; and a jury

20

21
                 (Appearances on following page)
22

23

24                            ALAN F. BOWIN, CSR, RMR, CRR
                              BONNIE J. BICCIRILLO, CSR, CRR
25                            Official Court Reporters
```

**Proceedings**

1          AFTERNOON SESSION

2               *      *      *      *      *

3          THE COURT:  Shall we talk about Exhibit 44?

4          MR. BLOCK:  We still need -- do we have that

5     testimony that was linked with it?

6               We were looking for some testimony that forms a

7     basis of our application.  We don't have that pulled just

8     yet.  It is in my memory, but we're trying to find it in the

9     transcript.

10          THE COURT:  Do you want to do the motion to strike

11    Dr. Longo's testimony?

12          MR. KURLAND:  Sure.  I do want to address -- I

13    thought there was one other thing.  We have the Blount

14    thing.

15          THE COURT:  You want to do Blount first?

16          MR. KURLAND:  Whatever the Court is thinking.  It

17    would make sense to deal with the rebuttal case, the

18    purported rebuttal case.

19               So we could do that if you guys are ready?

20          MR. HARTLEY:  Yes, Ms. Samadi is going to argue

21    this.

22          THE COURT:  It is the plaintiffs' request for the

23    Blount report you want to talk about first?

24          MR. KURLAND:  Yes.

25          THE COURT:  Ms. Samadi, whenever you are ready.

**Proceedings**

1          MS. SAMADI:  Thank you, your Honor.

2          Your Honor, as we have filed in our letter, there

3     has been much discussion in this trial about Dr. Blount

4     and her testing of Johnson & Johnson Baby Powder.

5          As we admitted Exhibit 13, which is the Exhibit 1

6     to the letter that we have, that is a letter from Dr. Alice

7     Blount to M. Raymond Hatcher at a law firm and that letter

8     says, I quote from Dr. Blount:

9          "I have written and enclosed a report on the

10    occurring regulation and up-to-date scientific views of

11    asbestos amphiboles and intermediate fibers."

12          And as we were looking through our document

13    production, we noticed that the attachments to the letter,

14    we have the -- she also attached two other documents.  She

15    attached a 1990 study and 1991 study, but they did not

16    include or produce the attachment that appears to be a

17    16-page report from Dr. Blount.

18          So, we think it is discoverable.  We think it is

19    relevant.  It is on their we think -- what we think is

20    their -- is the Blount report because we're still not sure

21    because all we have is the privilege log.

22          So we would request that it be provided.  We --

23    they initially alleged attorney-client privilege on it.  It

24    is not between an attorney and a client as far as we know,

25    and I think it is fair to say Dr. Blount was never a client

8530

## Proceedings

1    of the Mehaffy firm.

2           And even if that was the case, they have waived the

3    privilege because they have waived the privilege over the

4    letter that -- the Exhibit 13, they let it come into

5    evidence without objecting to it and they produced it in

6    discovery.

7           And they also waived any privilege on the issue of

8    communications with Dr. Blount when they affirmatively

9    waived objection to Exhibit 766, which is a March 16, 1998,

10   letter between Mr. Hatcher at Mehaffy and general counsel

11   from Johnson & Johnson, and that is also discussing Johnson

12   & Johnson communications with Dr. Blount.

13          So --

14          MR. BLOCK:  I think you meant 767.

15          MS. SAMADI:  What did I say?

16          MR. BLOCK:  766.

17          MR. SAMADI:  Exhibit 767 is what I mean, Exhibit

18   767.

19          Your Honor, it is also not work product.  We know

20   from the privilege log that it was written by Dr. Blount and

21   so it is not attorney work product over the -- as you have

22   already ruled in the Hoffman case, it has to be actual

23   attorney thoughts and processes and it is not here.

24          And although they have not made any allegation that

25   it is trial preparation material under 3101(d)(2) on their

### Proceedings

1    privilege log, I expect them to in rebuttal; and we also

2    believe it does not warrant that, even that conditional

3    protection.

4            Well, first of all, they never even alleged it on

5    the log; and even if they have, they haven't proved what you

6    have to show under 3101(d)(2), including that it was created

7    solely for litigation or that Dr. Blount was any kind of

8    consultant at that time.

9            If you look at 767, the March 16th letter, I

10   believe they were still discussing whether or not they

11   even -- she would even be consulting or they wanted to even

12   hire her.  No decision had been made; and so a month later,

13   how are we supposed to know if that consultant relationship

14   even occurred?

15           And, your Honor, even if it initially did fall

16   under 3101(d)(2), that's a conditional privilege; and we

17   have shown substantial need in this case to get it and the

18   inability to get it elsewhere.

19           As I've described, what Dr. Blount told Johnson &

20   Johnson about asbestos and talc has been the heart of this

21   trial.  So it is very important, and we affirmatively have

22   shown that we can't get it from Dr. Hopkins, as he testified

23   that he had never seen it.  So the only place that we can

24   get the document is from Johnson & Johnson.

25           My co-counsel just reminded me, Dr. Hopkins

## Proceedings

1   testified that it was never in the possession of Johnson &

2   Johnson.  It was in the possession of the law firm.  So it

3   would also be necessary for us to get because if it is in

4   the possession of Johnson & Johnson -- and which we assume

5   it is because it is on their privilege log -- then what Dr.

6   Hopkins testified to is simply not true.

7          So we have shown substantial need in that way,

8   too.

9          MR. KURLAND:  So a couple of things, and we did not

10   submit anything in writing on this because this sort of came

11   in late the other day.

12          But, with regard to the timing of this request,

13   there's a protective order that the parties agreed to in the

14   case.  If I may hand this up (handed up to the Court) which

15   creates a 20-day notice period to challenge something with a

16   privileged designation.

17          This is Section 10.  It is on page 8; "And if at

18   anytime a party wishes for any reason to dispute the

19   designation of discovery material, the person shall notify

20   the designating party such a dispute in writing specifying

21   the Bates number.  The designated party shall respond within

22   twenty days of receiving the notification.  If the parties

23   are unable to amicably resolve the dispute, then in

24   accordance with the governing CMO, the party disputing a

25   designation shall first schedule a telephone conference

### Proceedings

1   between the Special Master and the parties.  Only after

2   compliance with the CMO may the parties file motion seeking

3   relief in connection with the protective order."

4          So that's been the sort of operating thing here.

5          The plaintiffs have unquestionably been aware that

6   this document was on our privilege log since we produced it

7   several years ago, this document was originally produced.

8   They attached the privilege log to their letter.

9          The first one is dated June of 2017.  The next one

10  is dated November of 2018.  There's been a privilege claimed

11  over this document both times.

12         The plaintiffs offered Exhibit 13.  They say we

13  waived any objections by not objecting to it when they

14  offered it.

15         That document was never on our privilege log.  We

16  have never claimed a privilege over Exhibit 13 that was

17  admitted.

18         Same thing with Exhibit 767.  They say when we came

19  in here and argued about that document in court, we waived

20  privilege over that document.  We never asserted privilege

21  over that document.

22         Yet, when they offered Exhibit 13, when they

23  received -- when our production was made, this was an

24  attachment to what they have now marked as Exhibit 13.

25  These documents were all produced together.

8534

**Proceedings**

1      This document was withheld.  The basis we asserted

2  is work product.  We believe that applies today.

3      But the point is if they had an issue, if they

4  wanted this report, it wasn't a secret.  If they wanted to

5  have a dispute about the privilege status of his report, the

6  time to do that was long before we came in here to try this

7  case and, certainly, long before we're on the eve of closing

8  arguments.

9      So, that raising this now is just simply untimely.

10  They have been on notice and able to raise this issue and

11  aware that we have withheld this document for a privilege

12  since we made our production going back several years ago.

13      So that's our first argument.

14      Setting that argument aside for a moment -- even

15  though we believe it is dispositive -- we, nevertheless,

16  believe that the document was properly withheld as work

17  product.

18      You can't waive work product.  And even choosing to

19  waive work product with respect to certain materials does

20  not waive work product with respect to all materials on that

21  subject, unlike the attorney-client privilege.

22      And I'll draw the Court's attention to a case we

23  talked about several times that lays out the distinction

24  between work product and attorney-client privilege very

25  clearly, I think; and that's the Charter One Bank vs Midtown

### Proceedings

1    Rochester case from Justice Stander in Monroe County,

2    Supreme, from 2002.

3            And that -- in that case, there's a number of

4    documents in question, and there's various privileges

5    asserted.  And with regard to work product, the Court

6    explains that "the work product of an attorney shall not be

7    obtainable.  This affords absolute immunity from disclosure

8    to the attorney's work product."  It says "Waiver of the

9    attorney-client privilege does not prevent a document from

10   being protected as work product of an attorney.  Whether or

11   not privileged, a record may qualify in whole or in part as

12   attorney work product or even trial preparation materials."

13           The court goes on, "The disclosure of a document

14   protected by the work product rule does not result in a

15   waiver of the privilege as to other documents."

16           So we don't believe by not asserting privilege over

17   the letter, we are -- or work-product privilege over the

18   letter, we are precluded from asserting it over the

19   attachment.

20           And with regard --

21           THE COURT:  What about when the work product is

22   nothing legal?

23           MR. KURLAND:  So, your Honor, in that regard, I'll

24   draw the Court's attention to the 1st Department case in

25   Hudson Insurance Company versus Oppenheim, a 2010 case,

### Proceedings

1    which states as we've already discussed in court about

2    consulting expert reports.

3         The 3101(c) privilege, it says -- this is

4    discussing a draft consulting expert report.  Says,

5    "Furthermore, the documents are subject to the attorney

6    work-product privilege.  See 3101(c).  Such privilege

7    extends to experts retained as consultants to assist in

8    analyzing preparing the case as adjunct to the lawyer's

9    strategic thought processes, thus qualifying for complete

10   exemption from disclosure."

11        And that is the law in New York as we discussed in

12   this case with respect to the papers that Dr. Mezei had

13   prepared, that he testified about preparing and submitted to

14   counsel that we didn't turn over and he's a testifying

15   expert.

16        Work product that is prepared by consulting experts

17   is protected from disclosure, and we believe that the

18   document in question was a draft consulting-expert report

19   that was prepared for counsel, and there's no surprise that

20   document wasn't in Johnson & Johnson's possession.

21        It was prepared for Johnson & Johnson's outside

22   counsel in the context of litigation; but whether or not it

23   is in the context of litigation, doesn't even matter for

24   3101(c).  It is not the conditional privilege.

25        Now even if the Court disagrees that a consulting

## Proceedings

1    expert's report is protected by 3101(c) in the face of the

2    authority from the 1st Department, we think 3101(d)

3    conditional privilege would still apply to this document

4    because the plaintiffs have not established there's a

5    substantial need.  And even if they did, the substantial

6    need would be for underlying factual information considered

7    by the consulting expert; not the expert's assemblage of

8    that information or their conclusions regarding that

9    information.

10          It would only be the underlying factual information

11   itself, and that's all they would be entitled to.

12          So, we stand by our privilege assertion.  We

13   believe that plaintiffs' objection to our production of this

14   document and their challenge to our privilege assertion is

15   untimely.

16          But, you know, if the Court does want to conduct an

17   in-camera review of the document, we are prepared to do

18   that; but we do not believe -- we believe this document was

19   appropriately withheld; that it continues to be protected by

20   work product and we are under no obligation to produce it in

21   this case at this time.

22          THE COURT:  Let me ask about the timeliness

23   argument.

24          What do you have to say about that?

25          MS. SAMADI:  Sure, your Honor.

8538

**Proceedings**

1          Dr. Hopkins got up on the stand and said that the

2     article or the report belonged to a law firm in Texas.  So,

3     he's put it at issue; and in this case and we, you know --

4     we're unaware that he was going to testify to that.

5          So it is relevant to show that that testimony was

6     misleading, and we wouldn't have known that that was

7     accurate or that we needed this document to potentially

8     impeach that.  We're kind of arguing with our hands tied

9     behind our back because we haven't seen the document.

10         But assuming that it was not, in fact, withheld

11    from Johnson & Johnson, then we could use it to impeach him

12    at that time.

13         I do agree -- and Johnson & Johnson has also taken

14    a stand in this trial that Dr. Blount never found asbestos

15    in their talc, and so I think that also is relevant and it's

16    been a big issue in this case.

17         The protective order I would like to point to

18    paragraph number 17, where it says:  "Modification

19    permitted.  Nothing in this order shall prevent any party or

20    other person from seeking modification of this order or from

21    objecting to discovery that it believes to be otherwise

22    improper."

23         And so, you know, of course, this Court has the

24    authority during trial once the evidence has come out to

25    determine whether or not a particular single document is

**Proceedings**

1    discoverable or not.

2           And I would also make the point that the rule of

3    completeness kind of applies here.  They have produced the

4    letter and they have produced some of the attachments, but

5    they haven't produced a single attachment.

6           THE COURT:  I don't know that I'm going to reach

7    the issue, but may I see the document that we're talking

8    about?

9           MR. KURLAND:  You may, your Honor.

10          THE COURT:  I'll return it to you in just a

11   moment.

12          MR. KURLAND:  Yes, you may.  And I'll just say,

13   also, that Dr. Blount was deposed by plaintiffs in the

14   context of this litigation.  The plaintiffs in this case

15   offered her testimony over our objection, and Dr. Blount

16   certainly would have personal knowledge of what she did.

17   So, she certainly could have been asked about her work at

18   that time.

19          And I'll, also, just note that Dr. Hopkins did not

20   put this at issue.  Dr. Hopkins was presented -- and I

21   don't have his testimony right in front of me, but my

22   recollection is very clear that Dr. Hopkins was presented

23   with Exhibit 13 and asked, Where is the attachment?  And he

24   was asked where is the attachment five or six times until

25   the Court sustained our objection to that question.  Dr.

**Proceedings**

1    Hopkins has no knowledge of this.

2          This exhibit was attached to a letter that was sent

3    to a law firm, and there's no indication that ever went to

4    Johnson & Johnson and there's nothing to impeach Dr. Hopkins

5    on.

6          So with that, I'm happy to provide the Court with a

7    copy of the document for in-camera review; and, again, we

8    stand by our privilege.

9          MR. BLOCK:  Your Honor, I just want to comment on

10   what Dr. Hopkins said because it was nonresponsive and it

11   was an attempt by Dr. Hopkins to not answer the question,

12   and then put something in front of the jury to try to have

13   the jury favor Johnson & Johnson or review the situation

14   favorably to Johnson & Johnson.

15         I said to him, Where is your report?  He said --

16   his answer would be, I don't know, or he would know where

17   the report is.

18         Instead, he comes out with this idea, he said --

19   and we could find the transcript.  He said, It is the

20   property of the law firm, and I think he said it would not

21   have been received in New Brunswick.  He said it was the

22   property of that law firm which, you know, for someone who

23   has been the corporate representative for Johnson & Johnson

24   in all these cases, then that's not true.

25         It wasn't the property of the law firm.  It was

8541

### Proceedings

1    something that was provided to Johnson & Johnson.  It is in

2    their files.

3         And I think, I think, your Honor, on the privilege

4    issue, I just want to say this.  Dr. Blount, if there ever

5    was a privilege, the substance of the opinion hasn't been

6    provided in the letters that are in evidence, that Dr.

7    Blount's opinion there's asbestos in Johnson's baby powder.

8    But what we don't have is the report which gives details

9    about asbestos in talc and may even talk about asbestos in

10   Johnson's Baby Powder and provides detailed information that

11   was in the hands of Johnson & Johnson on this very critical

12   issue where we have a company that's taken position in this

13   trial that there is never asbestos in baby powder.  They

14   never had a reason to believe there was asbestos in baby

15   powder, and these letters are kind of being marginalized as

16   what basis does she really have?  Well, the basis was set

17   forth in the expert report.

18        MR. KURLAND:  I'll just respond to that briefly.

19        Notwithstanding our privilege claims over this

20   document, we haven't discussed the substance of it; and the

21   plaintiffs have never seen it, but they're making

22   assumptions about what's in the report.

23        The Court can review it and then maybe we can talk

24   about it, but we believe it is entirely irrelevant and I'll

25   also just note that there is -- for the Court's information,

## Proceedings

1    there's no indication that Johnson & Johnson -- our

2    privilege log and document production actually makes this

3    clear.  But what the litigation files maintained by the

4    Mehaffy & Weber firm that were swept up in discovery in this

5    case, but just like the Windsor Minerals files that we were

6    talking about this morning that were swept up in discovery,

7    there were things that were produced throughout this

8    litigation that were never actually in the possession of

9    Johnson & Johnson, the client.

10          There was a fight in the MDL about whether we

11   needed to produce materials that were prepared in connection

12   with prior litigation.  There was a huge fight about that.

13   This was part of that, and Mehaffy & Weber litigation files

14   to a great extent were produced as part of the MDL

15   discovery, which was turned over in this case; but there's

16   still no indication that any of this actually ever went to

17   Johnson & Johnson, the defendant, as opposed to getting

18   swept up in litigation.

19          So I don't know before we argue more hypotheticals

20   if it is better to just allow the Court a few moments to

21   review the document; and then if you have a any questions

22   for us regarding the document, we're happy to address them,

23   but we would like to do that in-camera.

24          MR. BLOCK:  Your Honor, there is a representation

25   made by Mr. Kurland, and I just want to clarify what

8543

1     representation was just made.

2            I think what Mr. Kurland represented in court is

3     that this report from Dr. Blount was only received recently

4     by Johnson & Johnson in a sweep, some kind of sweep

5     involving MDL discovery.

6            I don't know if Mr. Kurland is telling the Court

7     that they don't have an enclosure letter showing that it was

8     received in 1998 by Johnson & Johnson or correspondence.

9            What I'm saying is if Mr. Kurland is saying to the

10    Court that he knows that this expert report or that this

11    report from Dr. Blount, the enclosure to the 1998

12    letter, if he says he knows that it was held by the Texas

13    law firm until the last couple of years when discovery was

14    done in the MDL, then I believe some evidence should be

15    presented as to that.

16           Conversely, if there's correspondence that shows

17    that that report from Dr. Blount was received back in 1998

18    or 1999 during the time they were fending the Coker case,

19    then that should be presented; but there were

20    representations made about that, but no evidence has been

21    presented.  And I think Mr. Kurland is talking about it

22    because I think it may be a material point here.

23           (Continued on next page)

24

25

BP

8544

## Proceedings

1    MR. BLOCK:  But I haven't seen any evidence, and if

2    there's some other letter in the privilege log that's being

3    withheld, you know, where this report is discussed, you

4    know, then that should be provided.

5    MS. SAMADI:  And, your Honor, one more point I

6    would make is that -- clearly -- that J&J attorneys recently

7    have had it and, likely, had it when they deposed

8    Dr. Blount.  So, depending on what's in the letter, or the

9    report -- and he's right; I haven't seen it, but depending

10   on what's in there, their cross-examination of Dr. Blount

11   could have been, you know, where they questioned -- they

12   essentially questioned her integrity and her methods and all

13   of this, when, in reality, they had a report from her that,

14   allegedly, they sought out years and years ago.

15   And so, the jury is entitled to know if they are

16   attempting to -- the relationship between Dr. Blount and

17   Johnson & Johnson and what she told them, if they're now

18   trying to weigh the evidence of their cross-examination.

19   MR. BLOCK:  They said, on cross-examination of

20   Dr. Blount in her video deposition -- and we could find

21   this, also -- "You don't have anything to back up what

22   you're saying."  I mean --

23   MR. KURLAND:  The document -- the production in

24   which this document was withheld as protected by work

25   product was made prior to Dr. Blount's deposition.  If the

ALAN F. BOWIN, CSR, RMR, CRR

### Proceedings

1  plaintiffs were interested in obtaining this document, they

2  could have made this application at that time, and they did

3  not make that application at this time [sic].

4        MR. BLOCK:  When they cross-examined Dr. Blount, as

5  I was saying, they said to her -- and we can look at the

6  transcript -- "You don't have anything to back up what

7  you're saying.  We don't have any of the reports; we don't

8  have anything in writing to show what you're saying is

9  true."

10        And so, I think the point Ms. Samadi is making is

11  that, you know, they can't -- you know -- they can't go on

12  offense like that if they're holding something that really

13  destroys that type of argument, and that type of

14  cross-examination would not have been in good faith.

15        MR. KURLAND:  Well, I think the Court should take a

16  moment to review the documents; but I think plaintiffs'

17  arguments are based on an assumption about what the report

18  says, which the report did not in fact say at all.

19        MR. HARTLEY:  Are we -- are we all --

20        Is it clear now that this is, in fact, the report

21  that was attached to the letter?  Because we only assume it

22  based on its place in the Bates range.

23        MR. KURLAND:  I pulled out the Bates number and

24  looked at the document because it has the slip sheet.

25        MR. HARTLEY:  I understand that.  I'm asking you,

8546

**Proceedings**

1    are you representing that it is the report?

2              MR. KURLAND:  I don't know.  I know what document

3    was withheld with that slip sheet, and so that's what I

4    pulled.  And I did not work at Mehaffy & Weber in the 1990s

5    and I have no personal knowledge of what was transmitted

6    with that letter when it was sent.  But the document that

7    was withheld was the Bates number -- that (indicating) is

8    the document that had a slip sheet.

9              MR. HARTLEY:  And it's from Alice Blount.

10             THE COURT:  Can I say?  That much, can I say?

11             MR. KURLAND:  I leave it to the Court's discretion,

12   but --

13             THE COURT:  Yeah, this (indicating) is the

14   document.

15             MR. HARTLEY:  Okay, thank you.

16             THE COURT:  It's clear.

17             MS. SAMADI:  And just for the record, that is

18   document Bates number J&JNL6_000052428.

19             MR. KURLAND:  No.

20             THE COURT:  It's the one that matches up with

21   J&J-0049150; and, very coincidentally, it is -151.

22             MR. KURLAND:  Right.

23             THE COURT:  But that's not the only reason why the

24   Court is satisfied that this (indicating) relates to what

25   we're talking about.

ALAN F. BOWIN, CSR, RMR, CRR

**Proceedings**

1      MR. KURLAND:  It doesn't have a production Bates

2   number on it because it was never produced, but it has a

3   document ID number on it and it's the next sequential

4   document ID number.  It's from the --

5      THE COURT:  That's exactly what it is.

6      MS. SAMADI:  After Exhibit 13 is the Bates number

7   that's right behind the letter that we --

8      MR. KURLAND:  Yes.  The -- yes.  In this case, the

9   document that plaintiffs have put into evidence as Exhibit

10   13 bears the serialization J&J-0049150.

11      MS. SAMADI:  Okay.

12      MR. KURLAND:  The document that was withheld begins

13   with the serial number J&J-0049151, which is the document

14   that is the report that we withheld and the Court is looking

15   at now.

16      THE COURT:  It's it.  And there are other reasons

17   why I say that it's it, beginning with the title of it.

18      MR. HARTLEY:  A report of Alice Blount, question

19   mark.

20      THE COURT:  Okay, I think it's clear that it's

21   related; it's directly related, and responds to.

22      So just give me a minute to talk about it and then

23   I'll come back and we'll go on to the next issue.

24      (Recess.)

25      THE COURT:  Ms. Samadi, so I have a question for

**Proceedings**

1     you --

2               MS. SAMADI:  Okay.

3               THE COURT:  -- and then I will return the document.

4               (Pause.)

5               MS. SAMADI:  Yes, your Honor.

6               THE COURT:  I'm a lawyer representing a client; I

7     hire you as my expert; I ask you a question dealing with

8     science; you give me an answer.

9               Is that work product, or not?

10              MS. SAMADI:  Absolutely not, your Honor, under the

11    Hoffman case, because it doesn't base -- come from the legal

12    expertise.  I can find that case, your Honor.

13              Yes, here (indicating) it is.

14              It says --

15              Sometimes, even if a lawyer wrote it and it was

16    scientifically based, it wouldn't be protected, I think.

17              But it says:  "Not every manifestation of a

18    lawyer's labors enjoys the absolute immunity of work

19    product.  The exemption should be limited to those materials

20    which are uniquely the product of a lawyer's learning and

21    professional skills, such as materials which would reflect

22    his legal research, analysis, conclusions, legal theory or

23    strategy."

24              And so -- you know, I don't know about you; I

25    didn't take any science in law school.  So it's not the

**Proceedings**

1    result of his legal education or his legal strategy.

2          So I would answer your question no, your Honor; it

3    is not protected.

4          MR. KURLAND:  And if I may just briefly respond,

5    your Honor, the Hoffman case, upon which the plaintiffs

6    rely, a 1980 First Department case, 758 A.D.2d 207,

7    addresses whether an attorney has an obligation to turn over

8    the names and addresses of witnesses it has identified.  So

9    that language about it doesn't come from the attorney's

10   thinking has to do with the names and addresses.

11         And the Hoffman case (indicating) is directly at

12   odds with the 2010 Hudson Insurance case from the First

13   Department, 72 A.D.3d 489, that says:  "3101(c) privilege

14   extends to experts retained as consultants to assist in

15   analyzing or preparing a case, the adjunct to the lawyer's

16   strategic thought process, thus qualifying for complete

17   exemption from disclosure," and citing a number of other

18   cases."

19         MS. SAMADI:  Your Honor, the Hoffman case was

20   stating a point of law which we cited it for.  If you would

21   like a different factual -- a factually distinct, other case

22   that cites the exact same point of law, I will point you to

23   Brooklyn Union Gas v. American Home Assurance Company, 23

24   A.D.3d 190, where it says:  "Attorney work product applies

25   only to documents prepared by counsel acting as such and to

## Proceedings

1    materials uniquely the product of a lawyer's learning and

2    professional skills, such as those reflecting an attorney's

3    legal research, analysis, conclusions, legal theory or

4    strategy."  And that cites to other cases, as well.

5         MR. KURLAND:  And Brooklyn Union Gas was an

6    insurance company's claims file, and insurance companies are

7    required to turn over their claims files because they're

8    prepared in the ordinary course of business in determining

9    whether or not they're going to provide coverage, and

10   that -- there's a long line of cases on that.  But again,

11   they were claiming privilege over -- an insurance company, a

12   defendant insurance company, was claiming privilege over its

13   claims file, saying it was work product; and insurance

14   company claims files are not work product, generally

15   speaking.

16        So that's another distinguishable case.

17        THE COURT:  Yeah.  We have a whole bunch of cases

18   that say that this sort of thing is work product.  I don't

19   know how, precisely, I'm going to decide this matter.

20        I am going to return this document to defendants

21   (handing).  Thank you.

22        MR. KURLAND:  Thank you, your Honor.

23        THE COURT:  Next.  The next point is, I guess,

24   Dr. Longo.

25        And thank you.

ALAN F. BOWIN, CSR, RMR, CRR