1002

                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
                  CIVIL ACTION NO 16-MD-2738(FLW)(LHG)


     _____      :
                                        :
     IN RE JOHNSON & JOHNSON            :  DAUBERT HEARING
     POWDER PRODUCTS MARKETING,         :  JULY 26, 2019
     SALES PRACTICES.                   :  VOLUME 5
     --------------------------         :


CLARKSON S. FISHER UNITED STATES COURTHOUSE
402 EAST STATE STREET, TRENTON, NJ  08608

B E F O R E:  THE HONORABLE FREDA L. WOLFSON, USDJ

A P P E A R A N C E S:

BEASLEY ALLEN, ESQUIRES
BY:  P. LEIGH O'DELL, ESQUIRE (ALABAMA)
          -and-
ASHCRAFT & GEREL, ESQUIRES
BY:  MICHELLE A. PARFITT, ESQUIRE (VIRGINIA)
          -and-
LEVIN PAPANTONIO, ESQUIRES
BY:  CHRISTOPHER V. TISI, ESQUIRE  (FLORIDA)
On behalf of Plaintiffs Steering Committee


DRINKER, BIDDLE & REATH, ESQUIRES
BY:  SUSAN M. SHARKO, ESQUIRE  (NEW JERSEY)
     JULIE L. TERSIGNI, ESQUIRE  (NEW JERSEY)
          -and-
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, ESQUIRES
BY:  JOHN H. BEISNER, ESQUIRE  (WASHINGTON, D.C.)
          -and-
PROSKAUER ROSE, ESQUIRES
BY:  BART H. WILLIAMS, ESQUIRE  (CALIFORNIA)
          -and-
WEIL GOTSHAL & MANGES, ESQUIRES
BY:  ALLISON M. BROWN, ESQUIRE
On behalf of Defendant Johnson & Johnson
                                    (Continued}


                  *  *  *  *  *
          VINCENT RUSSONIELLO, RPR, CRR, CCR
             OFFICIAL U.S. COURT REPORTER
                  (609) 588-9516

1003

A P P E A R A N C E S   C O N T I N U E D:

SEYFARRTH & SHAW, ESQUIRES
BY:  THOMAS L. LOCKE, ESQUIRE  (WASHINGTON D.C.)
On Behalf of Defendant Personal Care Products Council

Diette - Direct/Ms. Brown

1004

1          M O R N I N G   S E S S I O N

2

3          THE DEPUTY CLERK:  All rise.

4          THE COURT:  Thank you.  Good morning.

5          Would you call your witness.

6          MS. BROWN:  Good morning, your Honor.  We call

7    Dr. Diette to the stand.

8

9    **GREGORY B. DIETTE,** called as a witness on behalf of

10   the Defendants, having been first duly sworn,

11   testified as follows:

12

13   DIRECT EXAMINATION

14   BY MS. BROWN:

15   Q.    Good morning, Dr. Diette.

16   A.    Good morning.

17   Q.    We're excited to have you here today.

18          The Court already has your report and your CV

19   as Exhibit C 18?

20          MS. BROWN:  Your Honor, I can hand up another

21   copy of the report and CV.

22          THE COURT:  That would be great.

23          MS. BROWN:  May I approach?

24          THE COURT:  Thank you.  You may proceed.

25   Q.    Dr. Diette, I don't want to spend too much time

Diette - Direct/Ms. Brown

1005

1  on your education and your experience, but would you

2  at least introduce yourself to the Court and tell us

3  who you are and what you do.

4  A.    Sure.

5         Gregory Diette.  I'm a full professor at Johns

6  Hopkins University.  I have appointments in the School

7  of Medicine and the School of Public Health.  I

8  function in the traditional three roles there.

9  Q.    You have three major roles at Johns Hopkins?

10  A.    Yes.  I see patients, outpatients in the clinic

11  and also in inpatient settings as well.

12        I'm an educator.  So I teach medical students,

13  residents, fellows, the whole variety of trainees, and

14  I'm a researcher.  So I've had a full research

15  portfolio for a couple decades.

16  Q.    Are you, Dr. Diette, formally trained in the

17  field of epidemiology?

18  A.    I have a Master's degree from the School of

19  Public Health.

20  Q.    Do you do any teaching in the field of

21  epidemiology nowadays at Johns Hopkins?

22  A.    All sorts.  I'm a mentor to various either

23  junior faculty or fellows or residents.  Part of that

24  is teaching how to do a proper study, how to interpret

25  it, how to report it.

Diette - Direct/Ms. Brown

1006

1    I've taught in the classroom setting, for

2  example a class called design of clinical studies that

3  I co-directed.  There are a variety of different

4  lectures I give, and also just a lot of day-to-day

5  hands-on support as well.

6  Q.    You mentioned you are also a clinician, a

7  practicing physician as well?

8  A.    As well.

9  Q.    Would you just tell us what that practice looks

10  like?

11  A.    It is a mixture of things.

12    I see outpatients that are referred to me in

13  the clinic.  I cover the physiology lab.  The

14  physiology lab is where we do exercise tests and lung

15  function tests.  I attend in the intensive care unit

16  on the pulmonary service, taking care of pulmonary

17  patients where we also do consults on every sort of

18  patient in the hospital.  I attend in the oncology

19  center and then also the internal medical services as

20  well.

21  Q.    Have you conducted, Dr. Diette, your own

22  epidemiology research?

23  A.    Yes.  It has been an ongoing process for the

24  last couple of decades of doing a variety of human

25  based research, which falls under the heading of

Diette - Direct/Ms. Brown

1007

1    epidemiologic research.

2    Q.    Can you give me the types of organizations or

3    institutions that have funded your research over the

4    years?

5    A.    A mixture.  The government organizations include

6    NIH, the National Institutes of Health, Agency For

7    Health Care Research and Quality, Environmental

8    Protection Agency, and others, and then there's been

9    private foundations and industry as well.

10   Q.    Have you provided testimony to Congress

11   concerning some of your epidemiology research?

12   A.    Yes.

13   Q.    Dr. Diette, has the focus of your own research

14   been on ovarian cancer?

15   A.    No.

16   Q.    Does the fact that your own publications and

17   research do not focus on ovarian cancer prevent you

18   from being able to review and interpret the ovarian

19   epidemiology at issue here?

20   A.    Not at all.  The approach to epidemiology is a

21   fairly standard one where we are able to understand

22   exposures of various sorts to understand all sorts of

23   diseases and where there is risk or how to describe

24   what the distribution of the disease is.  It is

25   important, too, in my teaching, in mentoring -- not

Diette - Direct/Ms. Brown

1008

1  all of the teaching and mentoring is to people who

2  take care of lung patients.  I taught obstetricians,

3  ear, nose and throat surgeons, ophthalmologists, the

4  whole spectrum.

5  Q.    Would you tell us, Dr. Diette, a little bit

6  about your work with this MECOR organization?

7  A.    That's an organization within the American

8  Thoracic Society, and that society is our main lung

9  society for professionals around the world.  This is a

10  program I participated in for many years where we

11  teach epidemiologic methods to mostly physicians, but

12  also doctoral students and some other medical

13  professionals around the world how to do epidemiologic

14  research.

15  Q.    Have you participated in that program for a

16  number of years now, Dr. Diette?

17  A.    Several years.  I traveled overseas many times

18  to do that, and I've also done work in the United

19  States when the mentees come to our conference each

20  year to meet with them and help them with their

21  research.

22  Q.    The focus of that program is epidemiology?

23  A.    Absolutely.  We teach the basic methods.  I was

24  in charge of teaching advanced methods, and we also

25  help them literally with their study design and with

Diette - Direct/Ms. Brown

1009

1  interpretation of their findings and help them publish

2  their results as well.

3  Q.    Dr. Diette, do I always tease you about this

4  picture where you are in front of a tree?

5  A.    I don't know why.  It is less pretentious than a

6  white coat in a hospital.  That's the one I have been

7  using professionally.

8  Q.    Okay.  In addition to being a physician and an

9  epidemiologist, do you also do some work consulting as

10  an expert witness in litigation?

11  A.    Yes.

12  Q.    Can you give us an idea what percentage of your

13  time you devote doing some of the things you are doing

14  here today?

15  A.    It varied over time.  The first work I ever did

16  was more than 10 years ago.  Sometimes it is sporadic

17  and sometimes there is more.

18        I would say currently between 10 and

19  20 percent of my time, which includes -- my time

20  includes weekends and nights and holidays.  So I'm

21  talking about the full amount of time that's available

22  to me.

23  Q.    Do you do expert witness work only for

24  defendants in litigation?

25  A.    No, plaintiffs and defendants.

Diette - Direct/Ms. Brown

1010

1   Q.    Have you ever, in fact, Dr. Diette, turned down

2   someone who has approached you to do expert witness

3   work?

4   A.    All the time.  Pretty regularly.

5   Q.    In terms of the expert witness work that you do,

6   do you receive any assistance in terms of the

7   administrative aspect of that part of what you do?

8   A.    Absolutely.  Everything in my professional life

9   I depend on administrative support.  My work at

10  Hopkins I have administrative help, but I can't use

11  their services for outside work.  So I do work with a

12  company called Medical Science Affiliates that

13  provides administrative support to do various things

14  to help organize the materials.

15  Q.    Is it important to you to carve out some time to

16  do some of the expert consulting work that you do?

17  A.    It is for me.  I like it quite a bit.  It is

18  very interesting work.  It is a great window for me

19  into the legal profession and a different way -- and

20  sometimes having to converse with people and learning

21  how to explain things.

22        I do notice it helps me back at Hopkins when

23  I'm explaining things to patients.  You are always

24  trying to perfect your craft in terms of how to

25  communicate.  It all fits together.  It is a nice part

Diette - Direct/Ms. Brown

1011

1  of where I've got a very diverse career otherwise in

2  terms of research, teaching, and patient care, this is

3  one more aspect I find satisfying.

4  Q.    Dr. Diette, just to kind of give us a framework

5  for our discussion here this morning, what was your

6  task here in this case?

7  A.    We can see it on the slide here.  It was to

8  review the epidemiological literature regarding the

9  hypothesized connections between talc or asbestos in

10  talc and the development of ovarian cancer.

11  Q.    Did you conduct an investigation into that

12  hypothesis, and are you prepared to discuss with us

13  your conclusions here today?

14  A.    Yes.

15  Q.    Are you prepared to do that to a reasonable

16  degree of medical and scientific certainty?

17  A.    I am.

18  Q.    Just give us a brief understanding, what are

19  your conclusions having reviewed the epidemiology on

20  talc and ovarian cancer?

21  A.    I think the overarching conclusion is that what

22  it says here, the body of relevant epidemiological

23  evidence does not support a causal connection between

24  perineal use of talcum powder products, whatever

25  constituents those products may contain, in addition

Diette - Direct/Ms. Brown

1012

1  to talc, and ovarian cancer.

2  Q.   Dr. Diette, were you able to come to court

3  yesterday for a little bit of Dr. McTiernan's

4  testimony?

5  A.   I did.

6  Q.   Did you hear quite a big discussion about

7  relevant risk and confidence intervals?

8  A.   Yes.

9  Q.   Before we get to that, would you run through

10 with us the methodology that you employed in terms of

11 your own -- reaching your own opinions here?

12 A.   Generally speaking, I used a variety of methods

13 to try to find all of the relevant epidemiologic

14 studies using search engines, reading the papers

15 themselves, and looking at the citations in those

16 papers, and trying to make sure I had all of the

17 papers.  I read and analyzed every single one of the

18 studies.

19       I also looked to see where other professional

20 organizations, how they had approached the issue where

21 that was relevant, and then ultimately employed a

22 Bradford Hill-type assessment of the evidence.

23 Q.   And as part of your methodology, Dr. Diette, did

24 you review internal Johnson & Johnson company

25 documents?

Diette - Direct/Ms. Brown

1013

1    A.    I did not.

2    Q.    Was that important for you in reaching a

3    scientific opinion on the hypothesized connection

4    between talc and ovarian cancer?

5    A.    It is not a method I know that's part of an

6    epidemiological investigation.  So it wouldn't fit

7    into that particular question.

8    Q.    In terms of the discussion that we had here

9    yesterday, Doctor, to orient us, you recall

10   Dr. McTiernan speaking quite a bit about relative

11   risks and confidence intervals.  Is that right?

12   A.    I do.

13   Q.    And one of the things I'm hoping you can help us

14   to understand is how findings in epidemiology studies

15   are interpreted and reported and used in medicine.

16   Are you prepared to do that, Dr. Diette?

17   A.    Yes, I hope so.

18   Q.    Did you come up with what you thought was a good

19   example or a framework for that discussion?

20   A.    Yes.

21   Q.    Tell us what we are looking at and why you

22   believe it is helpful to understanding how

23   epidemiology findings are reported and used in

24   medicine.

25   A.    Sure.

Diette - Direct/Ms. Brown

1014

1      There is a lot to know about this study, and I

2   picked it on purpose.  I thought it would illustrate

3   to the Court the way that professionals in my field

4   interpret and report findings routinely.  So I picked

5   a study that was one of the ones I had reviewed.  It

6   is relevant to this matter because it is about a

7   potential risk factor in ovarian cancer.  It's also

8   relevant because it comes from the Nurses' Health

9   Study, which is one of the sources of cohort data.

10  Q.    Just to stop you right there, to orient us, this

11  is a study that was looking into what?  What was the

12  investigation here?

13  A.    The question was whether or not analgesics --

14  meaning aspirin and non-steroidal anti-inflammatory

15  agents, things like Ibuprofen -- whether or not they

16  are associated with the risk of ovarian cancer.

17  Q.    What were the overall conclusions of the study?

18  A.    Overall, it was kind of a mixture.  Overall they

19  found aspirin use altogether, there was no

20  association; that it looked as if there was a

21  protective association if you used low dose only, as

22  opposed to conventional dose aspirin, and it looked

23  like there was potentially a harmful effect from the

24  use of NSAIDS for non-steroidal.

25  Q.    This is a recent study.  Right, Dr. Diette?

Dubeau - Direct/Ms. Brown

1015

1  A.    Yes.  This is from 2018, which is part of the

2  reason I picked it also because I think these authors

3  are careful in their use of language as they interpret

4  their findings.  And so it tells us at least in 2018

5  in a good journal JAMA Oncology, the way that people

6  are reporting findings.

7  Q.    Does this paragraph that we have highlighted

8  here contain a number of different epidemiological

9  findings?

10  A.    Yeah, it is great.  It tell us really what their

11  main findings are.

12  Q.    Why don't you walk us through this paragraph and

13  help us understand how epidemiologists like yourself

14  take these numbers and translate them into a way to

15  report and talk about their findings.

16  A.    The first sentence that's highlighted, where it

17  says "significant associations between aspirin and

18  ovarian cancer risk were not observed." I would

19  emphasize the "were not observed."  It says, "When

20  current versus nonuse of any aspirin was evaluated

21  regardless of dose," and they have a hazard ratio, and

22  the hazard ratio is analogous to a relative risk or an

23  odds ratio.  It is a little different measure, but it

24  functions the same way.  And so what they say the

25  hazard ratio is .99 and so 1 would be no effect, and

Direct/Ms. Brown

1016

1  here they have a 95 percent confidence interval that

2  is .83 to 1.19.  That includes 1.

3       So the language is important here.  Even

4  though it is to the left of that 1, in other words,

5  pointing towards the protective side, they don't

6  interpret it as protective.  They interpret it as no

7  effect, and that's in part because it's very close to

8  1, but also because the confidence interval includes

9  1.

10       If we go on, we will see, however, when low

11  dose and standard dose aspirin were evaluated

12  separately, an inverse association for low dose

13  aspirin -- I'll pause there for a second.  The inverse

14  association is a hazard ratio of .77.  That's below

15  the 1 line.  We can see the confidence interval does

16  not include 1.  That's where they use the language

17  that "there is an inverse association."

18  Q.   Doctor, if we could put some of these key

19  take-aways on the flip chart, the sentence you are

20  pointing to here is showing us a confidence interval

21  that is less than 1.  Correct?

22  A.   That's right.  The entire confidence interval is

23  below 1.

24  Q.   Tell us how epidemiologists like yourself report

25  a finding like that where we are looking at a

Daubert Direct/Ms. Brown

1017

1  confidence interval less than 1.

2  A.    They use the word "inverse," and we might also

3  use the word "protective" if that were appropriate

4  which it would be in this case.

5  Q.    If you are looking at a finding with a

6  confidence interval below 1, in your field

7  epidemiologists interpret that to be a protective or

8  an inverse association?

9  A.    Absolutely.

10  Q.    Let's go on and see if we can understand more of

11  the findings.

12  A.    The rest of that sentence says:  "But no

13  association for standard dose aspirin."  And here it

14  is a hazard ratio of 1.17 with a confidence interval

15  that includes 1.

16  Q.    So here we have a confidence interval crossing

17  1.  Is that right?

18  A.    The confidence interval crosses 1.

19  Q.    How do epidemiologists like yourself interpret a

20  finding where the confidence interval is crossing 1?

21  A.    This way.  The way that they did, to say there

22  is no association even though that hazard ratio is to

23  the right of 1.

24        MR. TISI:  Your Honor, this is not on the

25  reliance list, and I believe they supplemented and we

Diette - Direct/Ms. Brown

1018

1    objected to this.

2            MS. BROWN:  Your Honor, for the record, in

3    advance of Dr. Diette's deposition we did serve a

4    supplemental list.  This article is listed as No. 3.

5    It was provided to the plaintiffs in advance of his

6    deposition, and they had the opportunity to discuss --

7            MR. TISI:  In advance of the deposition?

8            MS. BROWN:  Yes.

9            MR. TISI:  That's fine.

10           THE COURT:  Thank you.

11   BY MS. BROWN:

12   Q.    Picking back up where we were, and to orient

13   ourselves, Dr. Diette, you were explaining to us in

14   your world and in terms of real world understanding of

15   these epidemiology findings a confidence interval

16   below 1 is showing a protective or an inverse

17   association?

18   A.    That's right.

19   Q.    A confidence interval crossing 1 -- and we spoke

20   a lot about that yesterday with Dr. McTiernan -- would

21   show or be interpreted as no association.  Correct?

22   A.    Exactly.

23   Q.    Then if you continue on, do you have another

24   finding to help us understand?

25   A.    It is the final point here.

Diette - Direct/Ms. Brown

1019

1   The last finding here is that current use of

2   nonaspirin NSAIDS was positively associated with risk

3   of ovarian cancer compared with nonuse.  And here the

4   hazard ratio is 1.19, but the 95 percent confidence

5   interval does not cross 1.  And so here it is a very,

6   very similar hazard ratio to the one right before:

7   1.17 and 1.19 are nearly identical, but the words they

8   use are important because they say there is no

9   association for the 1.17 when it crossed 1.  And they

10  say it is positively associated in the one that did

11  not cross 1.

12  Q.    Dr. Diette, to round out our chart then this

13  study and in your world, when we have a confidence

14  interval greater than or equal to 1, that is reported

15  as a positive association.  Is that right?

16  A.    It is.  I thought this study showed it in a

17  nutshell.  It showed each one of those examples very

18  succinctly and it came from a highly credible study in

19  a highly credible journal, and it is current 2018.  So

20  this is the current way we express ourselves.

21        THE COURT:  Thank you for that clarification,

22  so I understand.

23        The fact that it is on 1 when you say cross,

24  it has to have something before the 1, less than the 1

25  and across, that's the crossover.  It can't just start

Direct/Ms. Brown

1020

1   at the 1.

2          THE WITNESS:  It has to go either from below

3   up above it or from above down below it.  Because the

4   p-Values that --

5          THE COURT:  I think I understand.  It has to

6   go on one side or the other to make it happen and that

7   1 is within it.  It can't just have 1 as the number?

8          THE WITNESS:  Exactly right.

9   BY MS. BROWN:

10  Q.   To follow up on Her Honor's question, in

11  reporting a positive association where the confidence

12  intervals are equal to or greater than 1, the findings

13  are interpreted as a positive association.  Correct?

14  A.   Correct.

15  Q.   Just to refresh, where the confidence interval,

16  as Her Honor was asking about, crosses 1, those

17  findings are interpreted as showing no association.

18  Right?

19  A.   Exactly.

20  Q.   And where the confidence interval, the entire

21  interval is below 1, those findings are interpreted as

22  showing a protective or an inverse association.  Is

23  that fair?

24  A.   Exactly right.

25  Q.   Now, another way to talk about these confidence

Diette - Direct/Ms. Brown

1021

1  intervals, Dr. Diette, is to use the term "statistical

2  significant."  Is that fair?

3  A.    It is.

4  Q.    Would it also be fair, then, to say where your

5  confidence interval is crossing 1, there is no

6  statistical significance?

7  A.    That's exactly right.

8  Q.    Many of the studies that Dr. McTiernan put up

9  yesterday had confidence intervals crossing 1; and

10  would you interpret those to be non-statistically

11  significant findings?

12  A.    Yes.  Each one of those for which that is true

13  would be non-statistically significant.

14  Q.    How would you then interpret that in sort of

15  regular people's speak?

16  A.    We would say there was no association found

17  within that particular study.

18  Q.    Does this mean, Dr. Diette, that we should draw

19  a bright line at statistical significance and keep

20  everything that reaches statistical significance and

21  throw out any study that doesn't achieve statistical

22  significance?

23  A.    All the studies provide information, but it is

24  one part of the information you get from the study.

25  Q.    And in conducting your review of the

Diesel - Direct/Ms. Brown

1022

1   epidemiology as it relates to talc and ovarian cancer,

2   did you employ a bright line rule to weight or value

3   studies with statistical significance differently or

4   better than those that did not reach statistical

5   significance?

6   A.     I tried to observe which ones were and which

7   ones were not.  I didn't exclude any in particular.  I

8   just noted which ones were and which ones were not

9   significant.

10  Q.     Why is it important for you as an epidemiologist

11  to take note of whether or not a study is achieving

12  findings that are reaching statistical significance?

13  A.     Because within that particular study the authors

14  of the study have conducted it in a way that they are

15  going to be willing to communicate that the finding

16  they have either does or doesn't endorse the idea

17  there is a difference in the two groups they are

18  looking at.  And so this is the convention for saying

19  there is not a difference that they can express.

20  Q.     I know you had the opportunity to review some of

21  plaintiffs' briefing in this matter.  Is that right?

22  A.     Yes.

23  Q.     Did you see the argument that was being advanced

24  in terms of abandoning the concept of statistical

25  significance?

Diette - Direct/Ms. Brown

1023

1    A.    I did.

2    Q.    Is that a concept you are familiar with in your

3    field, Dr. Diette?

4    A.    I have been familiar with that idea in my entire

5    career.

6    Q.    In your field is it generally accepted that we

7    should abandon the concept of statistical

8    significance?

9    A.    No, not in July 2019.  What you are discussing

10   is something that is a proposition and that may

11   happen.  As of right now that is not the case.

12   Q.    Have you understood this to be a theoretical

13   discussion that has gone on in your world for decades?

14   A.    It is a great one.  The idea is that you are

15   trying to have a system that explains something about

16   your data, and this is the system we have right now.

17   I think there is a good and appropriate craving for

18   something better always, and I think that is what is

19   going on.

20   Q.    In terms of your work that you had funded by

21   institutions like the National Institutes of Health,

22   and other government associations, have you reported

23   your findings in terms of whether or not they reached

24   statistical significance?

25   A.    Routinely, yes.

Diette - Direct/Ms. Brown

1024

1  Q.    In terms of your review of the talc and ovarian

2  cancer epidemiology, were the findings in those

3  studies reported with confidence intervals that would

4  suggest or indicate whether or not those findings

5  reached statistical significance?

6  A.    100 percent of the studies had either confidence

7  intervals or p-Values or both which is conveying

8  statistical significance.

9  Q.    Dr. Diette, with this framework in mind, I want

10 to ask you some questions about some of the

11 conclusions in the epidemiology studies that you

12 reviewed and relied on here.

13        Were you here yesterday, Dr. Diette, and did

14 you hear Dr. McTiernan's conclusions about what the

15 epidemiology shows in terms of causation?

16 A.    Yes.

17 Q.    Did you understand her opinion to be that based

18 on the talc epi in part, that there is a causal

19 association between talc and ovarian cancer?

20 A.    That's what I understood.

21 Q.    Do the epi studies themselves report on whether

22 or not they have found a causal association?

23 A.    I think there's a lot of cases where the authors

24 appropriately point out to the uncertainty that still

25 remains and it spans a couple of decades of reporting,

Diette - Direct/Ms. Brown

1025

1    that sort of uncertainty.

2    Q.    What are some of the examples of what the epi

3    studies themselves conclude?

4    A.    Those top two are two of the most recent

5    meta-analyses.  The first one says that it is unclear

6    whether a statistical association exists; and, if so,

7    whether it can be interpreted as reflecting some form

8    of bias or causal relationship.  So it is not clear

9    it's been established by that statement there is

10   causation.

11         The second one is a little clearer even

12   saying --

13         THE COURT:  You should use the names of the

14   studies for the record.  These are just PowerPoints

15   right now.

16   Q.    I'll jump in and help you on that score,

17   Dr. Diette.

18         For example, if we look at the Berge 2018

19   article at A-11, page 3, what do the authors of that

20   recent meta-analysis say about a potential causal

21   relationship between talc and ovarian cancer?

22   A.    Unclear whether a statistical association exists

23   and whether it can be interpreted as reflecting some

24   form of bias or a causal relationship.

25   Q.    And one of the studies Dr. McTiernan referred to

Diette - Direct/Ms. Brown

1026

1 quite a bit yesterday was a meta-analysis from 2018 by

2 Penninkilampi.

3         MS. BROWN:  And that is, for the record,

4 located at A 109, page 3.

5 Q.    What do the authors of that study say about

6 whether there is a causal link between talc use and

7 ovarian cancer?

8 A.    That it has not yet been established.

9 Q.    And in your review of all of the epidemiology

10 studies, Doctor, do you see consistent conclusions to

11 those which we just read?

12 A.    I think they are appropriately concerned in the

13 studies about whether or not causation can be

14 established.

15 Q.    I want to talk now about, Dr. Diette, in your

16 report, which Her Honor has, and which we have marked

17 as C 18, did you conduct a full Bradford Hill

18 analysis?

19 A.    I did.

20 Q.    We've already had Dr. Neel in here addressing

21 part of that and we have Dr. Saenz coming next week,

22 so I want to concentrate with you on a couple of areas

23 of that analysis today.  Is that okay?

24 A.    Absolutely.

25 Q.    Let's start with strength of association.  Why

Diette - Direct/Ms. Brown

1027

1   don't you start by telling us, in your view, is that a

2   good place to start when, when you are doing this kind

3   of analysis?

4   A.    It is a good starting point because the Bradford

5   Hill considerations start with the notion that once an

6   association has been established that that is the

7   jumping off point for doing a Bradford Hill type of

8   analysis.  So the strength becomes one of the

9   important anchor points of how you are going to

10  proceed.

11  Q.    Dr. McTiernan put up a slide yesterday that

12  indicated that she weighs this Bradford Hill factor as

13  one of the highest.  Do you agree with that?

14  A.    I do.  I think this is a very high one.

15  Q.    In your view, Dr. Diette, is it possible to

16  properly apply the Bradford Hill criteria and

17  conclude, based on this epidemiology, that the

18  association between talc use and ovarian cancer is

19  strong?

20  A.    No.  It is objectively weak in certain of the

21  studies and not existent in others.

22  Q.    First of all, is there a bright line rule in

23  terms of what is a strong association and what is a

24  weak association?

25  A.    There isn't an exact cut-off.

Deposed  Direct/Ms. Brown

1028

1  Q.    Do you get any guidance, for example, from the

2  Bradford Hill article itself?

3  A.    I think it was a very helpful way to express

4  what he was trying to convey; where, for example, he

5  mentioned a 200 fold increase was a large effect, and

6  that also saying in cigarette smokers it was 9 to 10

7  times the rate of lung cancer in smokers compared to

8  nonsmokers, and 20 to 30 in heavy smokers.  Those I

9  thought were good examples of what's clearly a strong

10 association.

11 Q.    You mentioned relative risks and odds ratio like

12 200 or 10.  Is that right?

13 A.    Exactly.

14 Q.    Has there been a positive relative risk reported

15 in all of the studies that have been done on talc and

16 ovarian cancer?

17 A.    Sure.  In certain of the case-controls have a

18 positive one.

19 Q.    What number are we looking at in terms of the

20 talc and ovarian cancer literature?

21 A.    The summaries of that are in the 1.2 to 1.3

22 range.

23 Q.    Have some of the authors of the talc

24 epidemiology commented on whether that kind of a

25 relative risk, 1.2, 1.3, is considered strong?

Diette - Direct/Ms. Brown

1029

1    A.    Yes.  This is an example here from Berge saying

2    their meta-analysis showed a weak but statistically

3    significant association.

4    Q.    One of the things we heard about yesterday,

5    Dr. Diette, was instances like HRT and secondhand

6    smoke where studies have produced a low relative risk.

7    Were you here for that testimony?

8    A.    Yes.

9    Q.    Let's take those one at a time.  In the case of

10   HRT, are you familiar generally with clinical studies

11   that showed about a 1.2 relative risk?

12   A.    Yes.

13   Q.    Help us understand how a relative risk that low

14   could have supported a causal inference or causal

15   association when it comes to HRT?

16   A.    That story comes from first observational

17   studies but was confirmed in randomized control

18   trials.  So when you find a small risk that you are

19   looking for in a randomized control trial, that's a

20   different circumstance for one.  So that's really the

21   best study design to confirm causation, and that's why

22   there is confidence in that because of the study

23   design.

24   Q.    Why is a randomized control trial a better study

25   design if you can do it?

Diette - Direct/Ms. Brown

1030

1  A.     Assuming it is properly done, it has the

2  advantage of assigning people to the exposure as

3  opposed to them finding their way to the exposure on

4  their own.  So it takes away the possibility somebody

5  is different and, therefore, having exposure.  This

6  way you control for that.  And it also helps to

7  minimize, not eliminate, but minimize confounding, and

8  it helps to minimize confounding of both known and

9  unknown confounders, which is really important.

10 Q.     We will talk a little bit about confounding in a

11 moment.

12        But as a practicing pulmonologist, are you

13 Dr. Diette, also familiar with the epidemiology

14 regarding secondhand smoke?

15 A.     Yes, generally, yes.

16 Q.     Yesterday secondhand smoke was raised as an

17 example of an area of epi with a low or weak relative

18 risk that, nonetheless, has been found causal.  Can

19 you help us explain that?

20 A.     Yes.  The starting point for that was knowing

21 already that tobacco smoke causes lung cancer.  This

22 was done in an era where the biologic plausibility or

23 even certainty was well-established, and the authors

24 of at least one of the studies that's been cited where

25 they looked at passive smoke in homes said that was so

Diette - Direct/Ms. Brown

1031

1  strong that's why they could interpret a 1.2 as being

2  causal along with many other things where they found

3  dose-response to be convincing, and many other

4  Bradford Hill criteria.

5          So, as an example, where you still go through

6  the Bradford Hill criteria, and you can arrive at a

7  conclusion of causation, just like you can go through

8  the criteria and not arrive at a causal conclusion.

9  Q.    In terms of your review of the talc and ovarian

10  cancer epidemiology, do you find it to be analogous to

11  the epidemiology of secondhand smoke and lung cancer?

12  A.    No, it is not.

13  Q.    Dr. Diette, we were speaking a minute ago about

14  some of the weak or low relative risks that were found

15  in some of the case-control studies.  Correct?

16  A.    That's right.

17  Q.    Can you help us understand how, in terms of a

18  body of epidemiology literature, a case-control study

19  fits?

20  A.    It is a good study design.  It is one of the two

21  main observational study designs with case-control and

22  cohort being the two.  You can use them in different

23  circumstances and you can talk about strengths and

24  weaknesses, but Leon Gordis, who was one of my

25  teachers, this is in addition to his book, he

Diecidue - Direct/Ms. Brown

1032

1    describes case-control studies coming after somebody

2    has made an observation or has the idea there might be

3    some signal, and then says that the next step to

4    elucidate the relationship is to do a cohort study to

5    help confirm it, and gives a good example of where for

6    a while people thought high fat diet increased the

7    risk of breast cancer because there was a signal from

8    case-control studies, and I think the odds ratio was

9    about 1.6, but cohort studies were done and showed

10   that wasn't the case, and now that issue has gone away

11   because of that sequence.  So this is one way they

12   conceptualize.  They have some similarities, but often

13   they are done in sequence.

14   Q.    In terms of the weak or low association seen in

15   some of the talc and ovarian cancer literature, is

16   that confined to the case-control studies?

17   A.    It is.

18   Q.    Tell us, were cohort --

19        THE COURT:  I want to go back.  I want to

20   follow up on the question, the previous area where he

21   answered the question.

22        You asked a question:  In terms of your review

23   of the talc and ovarian cancer epidemiology, do you

24   find it to be analogous to the epidemiology of

25   secondhand smoke and lung cancer?  He said:  No, it is

Daubed - Direct/Ms. Brown

1033

1   not.  I want him to summarize why he does not.

2        Can you answer that question for me?

3        THE WITNESS:  Absolutely.

4        Just to be clear, the starting point for both

5   of those is a weak relative risk; and in both cases,

6   investigators would be appropriately concerned that

7   they may have found something that isn't causal, and

8   they would be very worried especially because it is a

9   weak risk about the potential for confounders and for

10  bias and other issues.

11       In tobacco smoke, these studies were done so

12  well into the general knowledge about tobacco smoke

13  and lung cancer that that was no longer a question.

14  Nobody --

15       THE COURT:  I heard your answer to that.  Now,

16  we're going to move to your review of the talc study

17  and why you don't find it analogous.

18       THE WITNESS:  I have not seen anybody express

19  that there is a body of evidence for talc as a

20  carcinogen where that is already so well established

21  where you would take any finding and say that is

22  causal.

23       To go on, though, they also cited good

24  consistent dose-response findings in the secondhand

25  smoke study, and you will see later, but that is not

Dugdel - Direct/Ms. Brown

1034

1   what I believe is shown in the ovarian cancer

2   literature.  I think consistency was found there, and

3   it's not found here.

4        So it wasn't just one Bradford Hill criterion,

5   and the way those authors summarize in their final

6   paragraph is, they say there is an abundance of

7   Bradford Hill criteria that are satisfied, and,

8   therefore, that's why you should accept the small

9   relative risk.  I don't think there is that abundance

10  for talc and ovarian cancer.

11       THE COURT:  Okay.  Thank you.

12  BY MS. BROWN:

13  Q.   Just to sort of close the loop on what Her Honor

14  was asking about, was there also a proven or

15  understood biologically plausible mechanism by which

16  cigarette smoke can cause lung cancer?

17  A.   That was the point.  That was well enough worked

18  out in primary smokers that they were able to

19  extrapolate that because it is basically the same

20  smoke.

21  Q.   In terms of how that relates to the talc

22  epidemiology, in your review of the data, has there

23  been a proven biological mechanism by which talc can

24  cause ovarian cancer?

25  A.   I have not been able to identify it.  And I

1035

1  noticed the authors of the epidemiologic papers also

2  point to that as being not established.

3  Q.    Doctor, we spoke a little bit about some of the

4  case-controls weak or inconsistent, small, relative

5  risk.  What do the cohorts or the prospective studies

6  conclude on that score?

7  A.    For Gonzalez, they say, "douching, but not talc

8  use, was associated with increased risk.

9        Houghton:  "Based on our results, perineal

10  powder use does not appear to influence ovarian cancer

11  risk."

12       And Gertig:  "Our results provide little

13  support for any substantial association between

14  perineal talc use and ovarian cancer risk overall."

15  And we know that was updated in the Gates study, which

16  doesn't change that conclusion.

17       MS. BROWN:  For the record, we will note the

18  Gonzalez study is at A 47; the Houghton study is at A

19  65; and the Gertig study is at A 45.

20  Q.    Dr. Diette, to round out our discussion of the

21  strength of association, can you summarize your

22  opinion based on your review of the totality of the

23  evidence as to whether properly applying the Bradford

24  Hill criteria would allow you to conclude that there

25  is a strong association between talc use and ovarian

Daubert - Direct/Ms. Brown

1036

1   cancer?

2   A.     I think you have to conclude that it is weak.

3   One is the target.  It is almost impossible to have a

4   study land on 1.0.  When you get close to 1, you are

5   really getting remarkably low.  It doesn't mean it

6   can't be causal, but it makes you more concerned than

7   if it is a larger one.

8          One of the things we didn't show on the slide

9   for Bradford Hill is they gave an example for a

10  low-risk, which he said was about twofold or a little

11  less.  2-plus, I think most of my colleagues would

12  call a medium or high risk.  But in the ones,

13  especially, in the low ones, that is objectively weak.

14  That only comes from one study design, from the cohort

15  studies, if you pool it, there is no elevated risk.

16  Q.     Can you help us understand, first of all, when

17  you are dealing with a low or weak relative risk like

18  1.2 or 1.3, are there challenges to determining

19  causation in that context?

20  A.     There are.  This is a list of three of them.

21  They are not only a challenge when you have a low

22  estimated risk, but they are especially important when

23  you have a low risk because they are very susceptible

24  to distortion by these factors whereas a large

25  estimated risk which has less chance of being

Direct/Ms. Brown

1037

1    distorted, not no chance, but less chance.

2    Q.    We'll talk a little bit about what that means.

3    But in terms of identifying potential challenges to

4    interpreting a low or weak relative risk, did IARC

5    review this data and reach some similar conclusions?

6    A.    They did.  You will see at the bottom of that

7    slide they said "chance, bias or confounding could not

8    be ruled out with reasonable confidence."  They raised

9    the big three issues we grapple with in general.

10   Q.    Give us an understanding, what does it mean that

11   the chance or bias or confounding could be distorting

12   a small relative risk like a 1.2 or a 1.3?

13   A.    Chance is typically handled well by statistical

14   testing, but there is always a chance every time you

15   do a study, literally, you can get the wrong answer.

16   You are literally taking a chance reaching the wrong

17   conclusion.  That happens.

18        Bias is a systematic factor that distorts the

19   findings.  It can drag the risk up or down depending

20   upon which way it works.

21        Confounding are factors that are associated

22   with the exposure that are the real cause rather than

23   the thing you are studying.

24   Q.    Is the concern about bias, confounding and

25   chance heightened in a case where you don't have a

Diette - Direct/Ms. Brown

1038

1  strong association?

2  A.    Absolutely.  A low association is very

3  vulnerable to all three of those.

4  Q.    I want to talk to you about bias and

5  confounding.

6        Did you review the Penninkilampi study at

7  A 109 as part of your work here?

8  A.    I did.

9  Q.    Does Penninkilampi comment on something called

10 "recall bias"?

11 A.    Yes.

12 Q.    Tell us first what Penninkilampi says and help

13 us understand what that means, if you could,

14 Dr. Diette.

15 A.    In this particular citation he says that "a

16 limitation of the study is that it pools nonrandomized

17 studies, primarily case-control studies, and that the

18 retrospective nature of case-control studies

19 introduces the potential for recall bias.  In this

20 case it's entirely possible that patients with ovarian

21 cancer may be more aware of their previous talc use

22 and hence may be more likely to report higher past

23 use."

24        This is a 2018 opinion from an author after

25 having performed a meta-analysis.

Daubert - Direct/Ms. Brown

1039

1   Q.    And so explain to us -- I know we're going to

2   look at an example in a minute.  Explain to, in

3   practice, what does "recall bias" mean, how does it

4   work, and how does it happen?

5   A.    There is a broader heading, which is an

6   "information bias."  Information bias is when the

7   information that you get from your two groups -- in

8   this case, the cases with the disease and the controls

9   without disease.  It's different information.  And if

10  it is systematically different that creates a bias.

11  And that can come because of recall, not that you

12  don't remember well, but you remember selectively.

13  You have a different memory because you are sick and

14  because you have an illness.

15  Q.    Just to interrupt you there, Doctor, is it more

16  likely when someone has been diagnosed with a disease

17  and asked questions about habits or use of a product,

18  are you more likely to remember you might have used it

19  or something like that?

20  A.    That's the notion.  A classic example is a woman

21  who gives birth to a child with a birth defect will

22  rack their brain trying to think what might have

23  happened during pregnancy, which is a very different

24  experience than somebody who gave birth to a child

25  without a birth defect where she may not have thought

Diette - Direct/Ms. Brown

1040

1   about those issues at all.

2   Q.    Dr. Diette, did you review the Schildkraut 2016

3   paper at A 129 as part of your work here?

4   A.    Yes.

5   Q.    Does the Schildkraut paper inform your opinion

6   about the potential for recall bias in the talc

7   ovarian cancer epidemiology?

8   A.    It is amazing.

9   Q.    Tell us what is amazing about this particular

10  study.

11  A.    A few things.

12        One is that we talk about recall bias more

13  than we actually assess it.  All my colleagues I know

14  of are concerned about the potential for it in any

15  case-control study.  This is a rare example where

16  these authors sought to demonstrate it, and they did

17  demonstrate it, and they had a rationale where they

18  believed because of lawsuits, that might have

19  heightened awareness of talcum powder use, especially

20  among women with ovarian cancer.  So they chose 2014

21  as a date that happened in the midst of their study,

22  and they thought 2014 would mark a line where women

23  would suddenly become aware of the news about

24  lawsuits.

25  Q.    Did their study contain information where they

Diecidue - Direct/Ms. Brown

1041

1   sought out to test whether or not that was true?

2   A.     Yes.

3   Q.     Tell us, if you could, did you put together a

4   graph to help us understand what they did?

5   A.     I did.

6   Q.     I can give you the pointer if helpful.

7   A.     I don't need it.

8   Q.     Can you help us understand what they did in the

9   Schildkraut article and how, if at all, that speaks to

10  this idea of recall bias?

11  A.     This comes directly from the study itself.  On

12  the vertical axis is the percentage of women who

13  reported using genital talcum powder, and then cases

14  are in the yellow/gold color, and controls are in the

15  blue.

16         The left two bars are before 2014 and the

17  right two bars are after 2014.

18         There are a few things to observe here.  One

19  is before 2014, it was actually a very similar

20  proportion of women who reported talcum powder use,

21  and what's up above is a calculated relative risk

22  which is 1.19 and not significant before that date.

23  Q.     Just to go back to our cheat sheet here, we have

24  a relative risk of 1.19 and we have a confidence

25  interval crossing 1.  Right?

Diette - Direct/Ms. Brown

1042

1   A.    Yes.

2   Q.    To find it on your chart here, how would that

3   finding be interpreted?

4   A.    You interpret that finding as no association.

5   Q.    All right.  Go ahead.

6   A.    And then after 2014, there was an abrupt change

7   in the reporting of cases.  So it went from a little

8   over a third to a little over half of women now saying

9   that they had used talcum powder, if they happened to

10  have ovarian cancer.  And you will see the rate of

11  that in the controls was basically identical to what

12  it had been.  It is a really dramatic effect all of a

13  sudden pre-and post-2014.  And these authors are the

14  ones who chose that based on what they thought about.

15         The relative risk in that period is almost 3.

16  It's 2.91, and it is statistical significant.  Their

17  positive finding is confined to post 2014, and they

18  have a test I've highlighted down below.  It is a

19  statistical test that tells whether or not there is an

20  effect of that change in the years, and by the

21  statistical test they have done they say it is

22  statistically significant with a P of .005.

23  Q.    Before I ask you what that tell us, Dr. Diette,

24  if I understand you, the number of people who did not

25  have ovarian cancer who reported talc use before 2014

Dubose - Direct/Ms. Brown

1043

1    and after 2014, how would you compare those?

2    A.    The talc use --

3    Q.    Before and after, was it different?  Was it the

4    same?

5    A.    For the controls it was essentially the same.

6    For the cases it was dramatically different all of a

7    sudden.

8    Q.    What does that tell you as it relates to this

9    concept of recall bias that we have been discussing?

10   A.    It's extraordinarily consistent with it.  This

11   now goes into my teaching files.  The authors have

12   done a careful job of explaining why they looked for

13   it, and they found exactly what they were looking for,

14   and it is a differential effect in cases.  So people

15   who have the disease who change their reporting

16   abruptly, it's highly consistent with that.

17   Q.    Before we close out recall bias, in terms of

18   when you are looking at a relative risk of 1.2, 1.3,

19   what does something like that suggest could be doing

20   to that number?  How does that work out in real life?

21   A.    This is recall and recall related to lawsuits.

22   It also could illustrate the same effect that could be

23   happening for recall for other reasons or reporting

24   differences.

25         Women and people in general report about

Diecust - Direct/Ms. Brown

1044

1    sensitive topics differently.  It illustrates the idea

2    there could be a reporting difference in people based

3    on something about them.

4    Q.    What does it suggest in terms of a positive

5    association?  Does that suggest to you that that

6    association is true or real or something else?

7    A.    It is only true after 2014 in this study, and it

8    is really -- we have seen there's various entities and

9    authors who have worried about the potential for

10   recall bias.  This proves it's real in at least one of

11   the studies.

12   Q.    One of the other things that was indicated in

13   the IARC assessment of this epidemiology was something

14   called "confounding."  Is that right?

15   A.    That's right.

16   Q.    Can you explain to us what that is and why we

17   have a beer bottle and a cigarette?

18   A.    Yes.  Confounding refers to a factor which is

19   associated with the exposure itself that also is a

20   cause of the outcome you are looking at, and it

21   matters whether you can account for it or not.

22         So the example I have here is made up.  If you

23   were to do a study of a beer drinker and lung cancer,

24   you may well find there is a positive risk.  We don't

25   believe beer causes lung cancer, and we know some

Diette - Direct/Ms. Brown

1045

1   people go to bars and drink and smoke at the same

2   time.  So you want to account for the smoking.  The

3   smoking would be the confounder.  That's the real

4   cause of the lung cancer.

5   Q.    How has this idea of confounding been addressed

6   or captured in the talc ovarian cancer epidemiology?

7   A.    Confounding has been handled in almost every

8   single study to a certain degree.  There's about five

9   or six that I think one of the meta-analyses

10  identified as being uniformly or almost uniformly

11  accounted for, but there are many that are potentially

12  important that aren't accounted for in most of the

13  studies.

14        MR. TISI:  Objection, your Honor.  His expert

15  report does not talk about any other factor other than

16  douching.  It does not talk about family history,

17  socioeconomic status, hormone therapy, family history

18  of breast cancer.  It only talks about douching as a

19  confounding factor, and that's what we're prepared to

20  discuss with him today.

21        MS. BROWN:  Two things on that, your Honor.

22  Certainly he is speaking about the confounding factors

23  that were addressed in the talc ovarian epidemiology

24  which had been fully disclosed and counsel had the

25  opportunity to question Dr. Diette about.  There was

Diette - Direct/Ms. Brown

1046

1   also a discussion about potential confounding factors

2   at his deposition.  This is entirely consistent and

3   based on the very literature that was disclosed.

4        THE COURT:  At his deposition where there was

5   a discussion about confounding factors, were these

6   other items mentioned?

7        MS. BROWN:  I believe so, your Honor.  We will

8   check right now.

9        MR. TISI:  If they were mentioned, they were

10  mentioned in passing.

11       MS. BROWN:  To help the Court and move this

12  along, I will right now confine the discussion to

13  douching.

14       MR. TISI:  Douching was discussed in his

15  report.

16       THE COURT:  She's agreed, and everyone can

17  look back at the deposition and confirm as well if it

18  was discussed.

19  BY MS. BROWN:

20  Q.   Dr. Diette, confining yourself then just right

21  now to the potential confounding factor of douching,

22  can you help us understand how that plays out in the

23  talc/ovarian cancer epidemiology?

24  A.   Definitely.  We know about the Gonzalez study.

25  Q.   What were the findings of that and how does it

Diggle - Direct/Ms. Brown

1047

1    relate to this issue?

2    A.    The Gonzalez study examined douching and talc

3    use as a potential risk factor, and they found that

4    douching was positively associated with ovarian

5    cancer, and they found talc was not.  They found that

6    the two habits were associated with each other.  So

7    that women who douched also tended to use talc, and

8    vice versa.  So there was a strong relationship

9    between the two.

10         Although that study found a risk for talc,

11   that was less than 1 in that study, they still

12   concluded the douching might turn out to be important.

13   They gave reasons for it in terms of some potential

14   plausible reasons, and they also said if the earlier

15   studies had not accounted for that they may have

16   missed an important confounding factor.

17   Q.    Based on your review of the talc and ovarian

18   cancer epidemiology, were there a set of consistent

19   potential confounders that were addressed in those

20   studies?

21   A.    It wasn't consistent.  It varied from study to

22   study.  Even the accounting for confounders wasn't

23   uniform.  So even if someone was going after the same

24   basic concept, they didn't necessarily use the same

25   indicator or the same measure of that particular

Diette - Direct/Ms. Brown

1048

1  confounder.

2  Q.     What's the significance of a potentially

3  inconsistent controlling for confounders in a body of

4  epidemiology like this with a low to weak to

5  inconsistent relative risk?

6  A.     It matters a lot, and it matters for a couple of

7  reasons.  One is because confounding factors have a

8  much greater potential to distort the findings with a

9  low risk, and that is especially true in something

10 where the majority of cases of ovarian cancer don't

11 have a known risk.

12        So most occur without a known high risk.  So

13 most of the potential confounding is not known.  And,

14 so, there are really two reasons why this becomes very

15 important in this particular matter.

16 Q.     Dr. Diette, before we move on to a discussion of

17 dose-response, I wanted to ask you one more question

18 on recall bias.  We were addressing that in the

19 context of the Schildkraut study, do you remember

20 that?

21 A.     Yes.

22 Q.     There the inquiry was whether an individual was

23 reporting talc use pre-and-post lawsuit media

24 attention in 2014.  Do you recall that?

25 A.     I do.

Daubert - Direct/Ms. Brown

1049

1   Q.    Is recall bias something that could exist in the

2   epidemiology separate and apart from the 2014 media

3   attention on talc and ovarian cancer?

4   A.    Yes, of course.

5   Q.    Can you explain that to us, please?

6   A.    I would broaden that to say information bias.

7   We're talking about case-control studies, for example,

8   where the signal is found, right?  And in every study

9   where I could find whether it was acknowledged or not,

10  there were interviewers who administered the surveys.

11          Another form of bias introduced by

12  interviewers who know the status of somebody's disease

13  at the time they interviewed them.  So it's another

14  way to change what the information is that comes out

15  by probing more thoroughly when you know somebody has

16  cancer.  So the information bias as a general term

17  could be quite different and recall bias can occur on

18  its own without any media reports.

19  Q.    Were most of the case-control studies conducted

20  through that interview process you just discussed with

21  us?

22  A.    A majority were.  I don't know I can find for

23  sure they mentioned that as a method in every one, but

24  for the most part it was interview administered.

25  Q.    We heard some discussion yesterday from

Diette - Direct/Ms. Brown

1050

1    Dr. McTiernan about the survey process by which

2    members of the cohort studies were asked about their

3    habits.  Were you here for that, Dr. Diette?

4    A.    Yes.

5    Q.    Tell us about how the survey process could or

6    could not affect the reliability in the cohort

7    studies.

8    A.    One thing I would say, self-administered surveys

9    are not a feature of cohort studies.  They were in

10   these cohort studies, but they are not a feature.

11   Either of these studies designs could use

12   self-administered or interview administered or both in

13   the study.

14        Because we are talking about a sensitive topic

15   for some people, some women may be less forthcoming

16   about personal hygiene habits and I would say that is

17   especially acknowledged that issue in controls in

18   general, I'm not talking about just in this matter,

19   who have less at stake in that study, may be less

20   forthcoming about what their personal habits are.  So

21   with an interviewer there face-to-face, there is a

22   little bit of loss of privacy, so that can also induce

23   a little bit of a change as well.

24   Q.    I want to talk a little bit about dose-response.

25   Was this part of your review of the talc epidemiology?

Directs  Direct/Ms. Brown

1051

1   Did you consider the Bradford Hill criteria of

2   dose-response?

3   A.    I did.

4   Q.    Give us an understanding what your opinion is as

5   to whether the talc epidemiology shows a

6   dose-response.

7   A.    There is a lot of information to consider.  One

8   is that none of the cohort studies -- none of the

9   prospective cohort studies showed a dose-response.

10  Where there were case-control studies that had some

11  estimate of dose-response, the results were highly

12  variable.  So there were a few that purported to show

13  a positive dose-response.  There were also some that

14  showed a negative dose-response, meaning the more you

15  used, the lower your risk.

16        There is an example in my report of basically

17  a horizontal dose-response meaning there is no change

18  up or down no matter what your dose was.

19        Then we have some examples of some really

20  bizarre relationships.  So these are just three

21  specific studies.  I'll say it is Cook, Mills and

22  Rosenblatt.

23        MS. BROWN:  For the record, Cook is at A 21;

24  Mills is at A 94; and Rosenblatt is at A 125.

25  Q.    Help us to understand, if you could, what we are

Daubes - Direct/Ms. Brown

1052

1    looking at in terms of these three exemplar studies

2    found when it comes to dose-response.

3    A.    To be clear, each of these is using a different

4    scale.  But from left to right on each one, you go

5    from lower amount to higher amount of exposure.  What

6    you might expect to see is that in the lower left of

7    each one of those figures it would be the lowest

8    point; and the upper right would be the highest point,

9    if there is a positive dose-response.  If it is

10   negative, it might go from upper left all the way down

11   to the lower right.

12        But here there are things that don't make any

13   sense to me biologically, like why the third category

14   would have the lowest risk on the Cook one, and why

15   the first and fourth categories would have the same

16   risk.  These are just examples.  But in the context of

17   there being both positive, negative, no, and

18   haphazard, it is really a mess.  It is all over the

19   place, and it is not very reassuring that a

20   dose-response relationship has been established.

21   Q.    Is a dose-response relationship required for a

22   causal association?

23   A.    Not required, but it is one important criterion.

24   Q.    How did these findings as you described them to

25   us on inconsistent or variable dose-responses in the

Diette - Direct/Ms. Brown

1053

1  talc epidemiology inform your opinion in this case?

2  A.    I saw them as highly inconsistent, and it made

3  me very worried about whether or not the investigators

4  had measured properly what they had hoped to, or that

5  there is in fact no causal relationship, and this is

6  just what happens when you don't have a causal

7  relationship.

8  Q.    Did some of the studies themselves comment on

9  whether or not the authors, having conducted their own

10  study, found or did not find a dose-response?

11  A.    Yes.

12  Q.    Would you highlight some of those for the Court,

13  and we will also read the exhibit number.

14  A.    For a shorter one, the Health Canada from 2018,

15  there is a lack of an available exposure effect

16  relationship in the human epidemiologic data.

17  Q.    For the record, Health Canada is A 58.

18  A.    Houghton, this corroborates our results, there

19  was no statistically significant risk with increasing

20  duration of perineal powder use.

21  Q.    At A 65.

22        How do these findings inform your opinion,

23  Dr. Diette?

24  A.    I think the authors of various studies are

25  pointing this out because it is important, and one

Diecks - Direct/Ms. Brown

1054

1   would expect to see a dose-response.  As you said, it

2   is not required, but you would expect to see one for

3   an exposure that's causing a disease.

4   Q.    The final category as it relates to the Bradford

5   Hill analysis that I want to discuss with you is

6   consistency.

7          Can you tell us, No. 1, did you find

8   consistency in your review of the body of literature

9   related to talc and ovarian cancer?

10  A.    I didn't.  That's an important question because

11  you said the body of the evidence.  So this is not an

12  exercise of just trying to find consistency here and

13  there, or a couple of examples of a couple of things

14  that happened to agree, but really looking at the

15  total information you have available.

16  Q.    And so explain to us:  Did you attempt to

17  evaluate whether there was consistency in a number of

18  different areas that touch this area of scientific

19  inquiry?

20  A.    Yes.

21  Q.    Let's start with study design.  Tell us what

22  your inquiry was there and what it showed?

23  A.    Basically, the weak signal comes from

24  case-control studies only, and that there is not a

25  signal from cohort.  So when you do the retrospective

Diette - Direct/Ms. Brown

1055

1    studies you have a weak signal; and when you do the

2    prospective studies, you have no signal, and that's

3    inconsistent by study design.  The different study

4    designs produce a different result.

5    Q.    You next have listed "condom and diaphragms."

6    Tell us what you are referring to here and how that

7    informs your analysis.

8    A.    Since the general notion here is about perineal

9    application of talc and whether it migrates to the

10   ovaries and then causes some harm, many but not all

11   investigators looked at some other ways to get talc up

12   towards the ovaries, so in this case things that would

13   go directly into the vagina.  And so condoms and

14   diaphragms we're looking at, and for the most part

15   were either less than 1, but there was not a

16   consistent signal that there was harm or a positive

17   risk from these.  So that was inconsistent with the

18   notion that talc in the genital tract would lead to

19   ovarian cancer.

20   Q.    And dose-response we just discussed.  Right,

21   Dr. Diette?

22   A.    Yes.

23   Q.    Did you find those findings to be consistent or

24   inconsistent?

25   A.    Inconsistent, as we just showed.

Diette - Direct/Ms. Brown

1056

1   Q.    On your list you have tubal ligation.  Tell us

2   what that is and how that informs your assessment of

3   consistency here.

4   A.    Many investigators considered if you interrupted

5   the female reproductive tract, you would block the

6   pathway from the perineum to the ovaries.  So by tubal

7   ligation, you are cutting off the route through the

8   Fallopian tubes.  If the idea was correct, that

9   perineal talc migrates, this ought to interrupt that

10  exposure to the ovaries, and there were inconsistent

11  findings.  There were some positive, some negative,

12  but not consistent.

13  Q.    What you are saying, Doctor, is if the proposed

14  biological mechanism or exposure pathway by which talc

15  gets to the ovaries is migration, if a woman has a

16  tubal ligation, that would prevent a particle from

17  traveling through the Fallopian tubes to the ovaries,

18  if this theory were true, you would expect to see a

19  decreased risk in women who had tubal ligation.  Is

20  that right?

21  A.    Yes, inconsistently.  So some studies showed it

22  and some did not.

23  Q.    Finally, Dr. Diette, you have NSAIDS on the

24  list.  Tell us how that informed your determination

25  about whether or not the consistency factor of

1057

1    Bradford Hill was met here?

2    A.    There were several studies that considered -- or

3    were conceptualized as anti-inflammatory drugs, and

4    there were a mixture of findings.  So some positive,

5    some negative, including the study that we looked at

6    first, which actually had a positive risk for NSAIDS

7    use, meaning that there was higher risk of ovarian

8    cancer, which is inconsistent with the idea that

9    NSAIDS would be protective against ovarian cancer.

10   Q.    I want to show you something Dr. McTiernan used

11   yesterday, which is this forest plot.  Have you seen

12   something similar to this in some of the scientific

13   papers?

14   A.    Yes.

15   Q.    One of the things you'll recall from

16   Dr. McTiernan's testimony is that she suggested that

17   the findings of these epidemiology studies show

18   consistency.  Were you here for that?

19   A.    Yes.

20   Q.    In your view is that correct, Dr. Diette?

21   A.    It is not.  I think especially if we look down

22   at the cohort studies, there is something that for me

23   at least is a little misleading there which is to show

24   Gertig, Gates and Gates all in a row because it's

25   basically one study.  So it  makes it look as if

Diette - Direct/Ms. Brown

1058

1  there's five studies.

2        If we look at the most recent one, which is

3  the 2010, that box is a little to the right of 1; the

4  Houghton study is a little to the right of 1; and

5  Gonzalez is to the left.  I don't find that to be

6  consistent within the cohort studies.

7  Q.    What about the suggestion, Well, a whole bunch

8  of these studies have some point estimate around 1.2;

9  therefore, this entire body of epi is consistent.  How

10  do you interpret this body of literature?

11  A.    A couple of things.  It is not fully consistent

12  even if you summarize the risk for the case-control

13  studies.  But it is also compatible with what many

14  investigators are worried about, which is risk of bias

15  and confounding, which is you would expect to see it

16  driving the same direction.  So this wouldn't be a

17  surprise if you had, for example, recall bias or

18  confounding driving it a little bit to the right.

19  Q.    If we could go back to the PowerPoint a couple

20  of more areas I want to finish up with you,

21  Dr. Diette.

22        As it relates to study design, did some of the

23  meta-analyses like Berge 2018 comment on whether what

24  they were finding in case-controls versus cohorts were

25  consistent or not?

1059

1   A.    Yes.

2   Q.    Is Berge A-11 -- tell us what those authors

3   concluded on that score?

4   A.    This points to one of the points we were making

5   on the prior slide.  Several aspects of our results,

6   including the heterogeneity of results between case

7   control and cohort studies, however, do not support a

8   causal interpretation of the association.

9   Q.    Did you consider what the authors themselves

10  found on the consistency score when it came to doing

11  your Bradford Hill analysis?  For example, what the

12  Berge authors concluded here.

13  A.    Oh, yes.  This is the same concept I'm talking

14  about.

15  Q.    On this point, Dr. Diette, as we talked about

16  with strength of association, in your opinion, could

17  you properly apply a Bradford Hill analysis to this

18  epidemiology and conclude that the findings are

19  consistent?

20  A.    No.

21  Q.    Give us just a brief explanation of why that is.

22  A.    Because I think consistency is a global issue,

23  and just finding consistency between a couple of

24  studies is not enough.  These are broad categories of

25  inconsistency.  So when the study design helps to

Durocco - Direct/Ms. Brown

1060

1  determine what the result is, that's a big

2  inconsistency.  When dose-response is all over the

3  map, that's an inconsistency.  These are examples of

4  things where I don't think you can pool all of the

5  information that's available and say that is a

6  consistent finding.

7  Q.    Two quick areas before we conclude here this

8  morning.

9         You mentioned earlier a part of your

10  methodology included looking at organizations and

11  public health authorities like IARC that have reviewed

12  the talc epidemiology.  Is that right?

13  A.    That's right.

14  Q.    There was a suggestion yesterday that talc may

15  contain asbestos.  Did you hear that from

16  Dr. McTiernan?

17  A.    I did.

18  Q.    Did IARC conduct some epidemiology studies that

19  you reviewed as part of your work in this case that

20  informed your opinion on that score?

21  A.    They didn't conduct it, but they highlighted

22  studies they thought would be most informative for

23  that issue.

24  Q.    Explain to us what those studies were and how

25  they informed your opinion.

Diette - Direct/Ms. Brown

1061

1    A.    They pointed toward studies of miners and

2    millers of the source of talc with the idea being

3    these would be workers who would have really quite

4    high exposures, and they said because of that, that

5    would be a good place to look for cancer, if it was in

6    fact a carcinogen.

7    Q.    Did those studies of the talc miners and

8    millers, did they investigate whether those folks were

9    getting traditionally asbestos-related diseases like

10   mesothelioma?

11   A.    They did.

12   Q.    What were the findings?

13   A.    No mesothelioma in these studies from Vermont

14   and Italy and Austria and France.

15   Q.    Was this data included in IARC's review of the

16   cosmetic talc epidemiology?

17   A.    It was.

18   Q.    And did this inform in part IARC's determination

19   as it relates to the talc epidemiology recall chance

20   and bias could not be ruled out?

21   A.    It was one of their conclusions, but this

22   informed their opinion that talc at least from these

23   sources was not a carcinogen.

24   Q.    Dr. Diette, did IARC also look at data regarding

25   something called talc pleurodesis that Dr. McTiernan

Dubose - Direct/Ms. Brown

1062

1  discussed yesterday?

2  A.    Yes.

3  Q.    As a pulmonologist, have you instructed others

4  to perform talc pleurodesis or performed it yourself?

5  A.    I have done both.

6  Q.    Give us a little understanding of what the

7  procedure is.

8  A.    Sure.  This picture represents a couple but not

9  only the forms that we get it in.  What we get is

10  talcum powder in order to put it into the space

11  between the chest wall and the lung.  We do it by

12  making a small incision in the chest wall and

13  basically squirt it in there and leave it in there

14  long enough for it to have the therapeutic effect we

15  are looking for.

16  Q.    As it relates to whether or not this procedure

17  has caused cancer in individuals who have undergone

18  it, have you reviewed IARC's review of the literature

19  on that?

20  A.    I've looked at IARC, and also since then I've

21  looked for anything newer.

22  Q.    Tell us what the findings are as it relates to

23  whether or not injecting talc into the pleural space

24  causes cancer.

25  A.    It does not appear to cause cancer.

Diette - Direct/Ms. Brown

1063

1  Q.    Have folks who have undergone talc pleurodesis

2  been followed for decades to investigate that point?

3  A.    There are a few studies that have looked for

4  decades, and there is a whole variety of case series

5  and case reports as well.

6  Q.    Dr. Diette, could you then finally summarize for

7  us your opinion and review of the totality of the

8  evidence as it relates to what we asked you to do

9  here, investigate the hypothesized connection between

10 talc and ovarian cancer?

11 A.    The only signal I see is the pooled relative

12 risk from certain of the case-control studies and

13 otherwise -- which provides a weak association.  From

14 the cohort studies we get no association.  And I think

15 the other Bradford Hill criteria have serious issues

16 with them that don't support there being a causal link

17 between perineal talcum powder and ovarian cancer.

18 Q.    In your view, could a scientist properly apply

19 the Bradford Hill criteria to the talc epidemiology

20 and conclude that there is a causal association

21 between talc and ovarian cancer?

22 A.    It doesn't make sense to me.

23        MS. BROWN:  Thank you very much for your time,

24 Dr. Diette.

25        Unless your Honor has an area of inquiry, I'm

Diette - Direct/Ms. Brown

1064

1  all done.

2          THE COURT: I think they have something for

3  you.

4          MS. BROWN:  On the objection that counsel made

5  to the socioeconomic status, it is actually disclosed

6  as an opinion in his report at page 21.

7          THE COURT:  I saw it.  I think that was the

8  only one, and I did see it is in his report.  That was

9  on the confounding factors.

10          MS. BROWN:  Thank you.

11          THE COURT:  I did not see anything else on it.

12  You did not want to follow up on that to confirm that.

13          MS. BROWN:  I'll do it real quick.

14  BY MS. BROWN:

15  Q.    Dr. Diette, just to revisit this idea of

16  potential unknown or uncontrolled for confounders, we

17  had on the slide socioeconomic status.  Can you help

18  us understand what that means and how it relates to

19  the talc epi?

20  A.    Sure.  There is a paper by Alberg that I cited

21  which points to low socioeconomic status being a risk

22  factor for ovarian cancer.  That's typical of many

23  kinds of illnesses in the United States, that lower

24  socioeconomic status confers a risk for all sorts of

25  diseases.  What's hard about that is that low

Diette - Direct/Ms. Brown

1065

1    socioeconomic  status is a complex phenomenon; it

2    could mean low income; it could mean low education; it

3    could mean different food, different jobs, different

4    places where you live -- all sorts of different things

5    that all sort of coalesce together to make somebody

6    have a higher risk.

7            In most of the studies I saw there was not

8    measurement of socioeconomic status, and where there

9    was there was a crude indicator.  It might have been

10   education, which is a proxy for it, but it really

11   doesn't fully capture everything about socioeconomic

12   status.  So that's one more important potential

13   confounder that is undercovered in these studies.

14   Q.    The final question, Dr. Diette, is how does that

15   relate -- and when we are dealing with a disease like

16   ovarian cancer, how important is something like a

17   confounder like socioeconomic status that may not have

18   been controlled for in some of the studies?

19   A.    It is one more thing that would be missing from

20   the question, especially with a low or weak risk that

21   will distort the findings.

22           MS. BROWN:  Thank you, your Honor.

23           THE COURT:  We'll take a break now before we

24   start the cross.  It was an hour and a half.  So

25   you've got three hours.

Direct - Direct/Ms. Brown

1066

1         We're going to take a break.  So you can step

2  down.

3         THE DEPUTY CLERK:  All rise.

4         (Recess.)

5         (Continued on the next page.)

6  ///

Diette - Cross/Mr. Tisi

1067

1    THE DEPUTY CLERK:  All rise.

2    THE COURT:  Thank you.

3

4    **GREGORY B. DIETTE,** resumed.

5    CROSS-EXAMINATION

6    BY MR. TISI:

7    Q.    Good morning, Dr. Diette.

8         We met at your deposition.  Good to see you

9    again.  I kind of had a plan I was going to go at, but

10   I'm going to tackle first things first.

11   A.    Okay.

12   Q.    The first epidemiology study that addressed the

13   issue of ovarian cancer and talcum powder products was

14   1982.  Correct?

15   A.    That's my understanding.

16   Q.    There has been about 40 years of research since

17   then?

18   A.    Just about.

19   Q.    One of the last questions Ms. Brown asked you

20   was whether or not no reasonable scientist could reach

21   the conclusion that talcum powder products cause

22   ovarian cancer in 2019.  Is that your testimony?

23   A.    It is.

24   Q.    Could you please do me a favor and take out the

25   Penninkilampi study, please.  That is Exhibit No. 62

Roberto - Cross/Mr. Tisi

1068

1   in your binder.

2          The Penninkilampi study, if you go to the

3   conclusion, Ms. Brown asked you to read a sentence out

4   of it.

5          Let me ask you whether the Penninkilampi study

6   says the following.  This is just to orient us.  This

7   is a meta-analysis.  Correct?

8   A.    It is.

9   Q.    It says:

10          "The results of this review indicate that

11   perineal talc use is associated with a 24 to

12   39 percent increased risk of ovarian cancer."

13          Did I read that correctly?

14   A.    You did.

15   Q.    (Reading.)

16          "While the case-control studies are prone to

17   recall bias, especially with intense media attention

18   following commencement of litigation in 2014, the

19   confirmation of an association in cohort studies

20   between perineal talc use and serous invasive ovarian

21   cancer is suggestive of a causal association."

22          Do you see that?

23   A.    I do.

24   Q.    Is that an incorrect statement?

25   A.    There is more than one there.  Are we talking

Frusco - Cross/Mr. Tisi

1069

1   about the last statement or everything there?  It is

2   not disputable that the association that they estimate

3   from this ranges --

4   Q.    Doctor, is it suggestive of causal association?

5   A.    I'm just clarifying.  You read a lot of stuff.

6   I just want to know what I'm reacting to.

7          Specifically, we are saying --

8   Q.    Is it suggestive of a causal association?  Is

9   that what the authors say?

10         MS. BROWN:  Your Honor, could he be permitted

11  to finish his answer?

12         THE COURT:  Mr. Tisi, we're just starting.

13  Let him answer.  And he is right, there are several

14  sentences you read with different ideas in them.  So

15  let him break them down and answer it.

16  BY MR. TISI:

17  Q.    I will rephrase the question, if you don't mind.

18         Do the authors conclude that the data they

19  reviewed in this study is suggestive of a causal

20  association?

21  A.    That particular finding they say is suggestive

22  of a causal association.

23  Q.    If you go to the front page of this in the

24  conclusions it says:

25         "In general, there is a consistent association

Foster - Cross/Mr. Tisi

1070

1  between perineal talc use and ovarian cancer."

2        Do they say that?

3  A.    They do.

4  Q.    You disagree with that?

5  A.    Well, I don't know.  Within the boundaries of

6  this paper, for example?

7  Q.    This paper reviewed all the studies, did it not?

8  A.    No, it didn't.  They left out an important one.

9  But they reviewed many of the studies.

10 Q.    Do they also conclude that because there was a

11 specific association with a particular type of ovarian

12 cancer that that mitigated against recall bias?

13 A.    They did say that.  I wasn't done with the one

14 before.

15        THE COURT:  There was no answer to that yet.

16 He wanted to clarify he meant within the term of this

17 paper.  There wasn't an answer.

18 A.    They don't tell what specifically they are using

19 for it in general.  But they did have an estimate that

20 includes pooling all of the studies together, meaning

21 the case-controls and the cohort studies.  Those when

22 you pool them together, might support that statement.

23 If you look at the case-control separately, as they

24 often did from the cohorts, you get two different

25 answers to that.  So I'm assuming they're talking

Pretede - Cross/Mr. Tisi

1071

1    about if they pooled two heterogeneous groups of

2    studies, they get an overall finding that way.

3    Q.    Did the authors address the issue of

4    heterogeneity?

5    A.    They did.

6    Q.    Did they find there was heterogeneity?

7    A.    I didn't see a test of heterogeneity for the

8    study design I don't think.  They comment on whether

9    there is heterogeneity by outcomes.

10   Q.    Doctor, you've written a 51-page report.

11   Correct?

12   A.    That sounds about right.

13   Q.    This report is dated February 25th of this year?

14   A.    I'm sure it is.

15         Yes, it is.

16   Q.    The methodology used to analyze the causal

17   question in this case is the Bradford Hill criteria?

18   A.    That's part of the methodology.

19   Q.    You agree the Bradford Hill criteria is a

20   framework that epidemiologists use?

21   A.    I do.

22   Q.    And you agree, is there any important

23   epidemiologic study that you considered in your

24   analysis that you believe the plaintiffs' experts did

25   not?

Hoffeld - Cross/Mr. Tisi

1072

1  A.    I don't know.  I didn't try to make an

2  accounting of which ones which expert considered and

3  which ones they didn't.  So there are many plaintiffs'

4  experts here.  Right?  Are we talking about folks who

5  focused on epidemiologic studies?

6  Q.    Yes.

7  A.    I don't recall if there was one that was left

8  out.  I would say that I think each of them

9  acknowledge the meta-analyses, including the more

10  recent ones, which I think look like they have a

11  pretty complete list.  So either directly or

12  indirectly I think they've accounted for the

13  epidemiologic studies.

14  Q.    The Bradford Hill analysis also involved

15  consideration of biologic evidence as well?

16  A.    It does.

17  Q.    Can you think of any important biologic study

18  you considered that any of plaintiffs' experts did not

19  since you criticized them in your report?

20  A.    Could you be specific?

21  Q.    Did you identify any?  I just want to know if

22  the world of studies you looked at is exactly the same

23  for the most part in terms of the major studies that

24  the plaintiffs' experts looked at.

25  A.    I didn't memorize the list of studies they

Diette - Cross/Mr. Tisi

1073

1    looked at.

2    Q.    So you haven't identified any you think was a

3    major omission that they did not consider that you

4    did?

5    A.    For a biologically relevant study?

6    Q.    Right.

7    A.    I don't recall any that I saw that they left

8    out.

9    Q.    Now, there were studies you left out.  Correct?

10   A.    It depends upon what do you mean by "left out"?

11   Q.    We received two days ago a supplemental reliance

12   list --

13       MR. TISI:  Can you bring up PSC Diette 2.  We

14   were provided --

15       MS. BROWN:  Your Honor, if I may, counsel

16   objected to this list, and pursuant to that objection

17   we didn't use any of these studies on direct.  So I

18   would object, if I could, to the use of a list that

19   per agreement none of those studies were referenced on

20   direct.

21       MR. TISI:  I am not going to use them except

22   to say they were not part of his initial analysis.

23       THE COURT:  Are any of the ones on their list,

24   studies that were available at the time he wrote his

25   report?  You can ask that.  Ask that question.

Moorea - Cross/Mr. Tisi

1074

```
 1  BY MR. TISI:

 2  Q.   Are there studies on this list that were

 3  available at the time you issued your report?

 4        For example, Henderson 1971.  Was that

 5  available?

 6  A.   Yes.

 7  Q.   The title of that is "Talc and Carcinoma of the

 8  Ovaries and Cervix."  Do you see that?

 9  A.   Yes, I do.

10        THE COURT:  We don't have to go through all

11  these.  You can just look at the list.  We've already

12  gotten some answers, and I think the question is

13  whether they were cited or not.

14        Did you read them or consider them when you

15  wrote your report, those that were available before

16  you wrote your report?

17        THE WITNESS:  For sure some of these.  I can't

18  be sure all of them I read before the report.

19  BY MR. TISI:

20  Q.   No. 2, No. 4, No. 5, No. 6, and No. 7 all deal

21  with inflammation and talc.  Correct?

22  A.   They probably all have some bearing on

23  inflammation.

24  Q.   You have a section in your report dealing with

25  inflammation as a potential biologic mechanism for
```

Moeda - Cross/Mr. Tisi

1075

1    inducing ovarian cancer.  Correct?

2    A.    There is a topic about that.

3    Q.    Several pages, single-spaced pages, talking

4    about the evidence.  Correct?

5    A.    Can you point me to it?  I want to make sure

6    we're looking at the same thing.

7    Q.    If you go to page 40.

8    A.    I'm with you.

9    Q.    You go on for several pages on inflammation and

10   the biologic plausibility of talc inducing

11   inflammation?

12   A.    If several is 2 1/2, I agree with you.

13   Q.    None of these studies are discussed.  Correct?

14   A.    Not here.

15   Q.    Now, you understand the purpose of this

16   particular hearing is to focus on methodology and not

17   conclusions.  Correct?

18   A.    That's what I've heard.

19   Q.    We're not here to determine whether or not your

20   conclusion is correct, or, for example,

21   Dr. McTiernan's conclusion is correct.  Correct?

22          Do you understand that?

23   A.    I'm not sure that's entirely true one way or the

24   other, but I believe you.

25   Q.    Let me ask you this, Doctor:  Would you agree

Hecele - Cross/Mr. Tisi

1076

1   all studies, irrespective of design, have strengths

2   and weaknesses?

3   A.    Generally speaking, that is true.

4   Q.    That would include even controlled clinical

5   trials.  True?

6   A.    Absolutely.

7   Q.    Would you agree scientists often do disagree

8   about the relative strengths and weaknesses -- let's

9   focus on epidemiology studies.

10  A.    I didn't hear the whole question.

11  Q.    Would you agree scientists and epidemiologists

12  often disagree about the relative strengths and

13  weaknesses about epidemiologic studies?

14  A.    I'm sure that happens.

15  Q.    Would you agree that while the Bradford Hill

16  considerations are sometimes called criteria, they are

17  not really criterion in the sense of clicking off

18  boxes?

19  A.    They are often called criteria, and I agree with

20  you that it is not a checklist with boxes.

21  Q.    If I could, I'm going to show you, rather than

22  showing you an exhibit --

23       MR. TISI:  And, your Honor, it is on page 133.

24  Q.    You referred to Dr. Gordis as one of your

25  teachers?

1    A.    That's correct.

2         MR. TISI:  Your Honor, he is one of the

3    editors --

4         THE COURT:  That's okay.  I wasn't handed up

5    plaintiffs' book.

6         (Pause.)

7         MS. BROWN:  Where in the book, counsel?

8         MR. TISI:  It's 133.

9    Q.    He has a chapter on "From Association to

10   Causation Deriving Inferences From Epidemiologic

11   Studies."  Do you see that?

12   A.    I do.

13   Q.    This is a chapter you are familiar with.  Have

14   you seen this book before?

15   A.    So there are a couple of editions I have seen.

16   I think the Fifth edition.  And I have the current

17   one, which is either 2018 or 2019.  I don't know how

18   many changes they make from edition to edition, but if

19   this is an edition I have seen, then, yes.

20   Q.    Would you go to page 260.  I'm going to ask you

21   if you agree with this, Doctor.  It says:

22         "Although causal guidelines discussed in this

23   chapter are often referred to as criteria, this term

24   does not seem entirely appropriate.  Although it may

25   be a desirable goal to place causal inferences on a

Hulcec - Cross/Mr. Tisi

1078

1   firm quantitative and qualitative and structural

2   foundation, at present we do not have all the

3   information needed for doing so."

4          Do you agree with that?

5   A.   I don't think with that second sentence.  This

6   is a conversation we frequently have, is whether to

7   call them criteria.  Bradford Hill called them

8   considerations, whatever that means.  Criteria is a

9   pretty conventional term.  I don't know what's

10  inappropriate about it.  It is certainly stuff that

11  epidemiologists talk about all the time.

12  Q.   He goes on to say:

13         "The preceding list should therefore be

14  considered only guidelines that can be of most value

15  when coupled with reasoned judgment about the entire

16  body of available evidence in making decisions about

17  causation."

18         Is that true?

19  A.   I agree with it completely.

20  Q.   Does reasoned judgment play a role in deciding

21  whether or not cause and effect takes place?

22  A.   Of course, because it is not a statistical test

23  or something where there is an exact answer.

24  Q.   So scientists can and often do disagree with the

25  ultimate conclusion applying the very same

Ivester - Cross/Mr. Tisi

1079

1    methodology.   True?

2    A.    I don't know how often.  You asked me before

3    about individual studies and about disagreeing about

4    the relative importance.  I can't speak for everybody,

5    but I can speak for reasonable scientists that I know,

6    and I think if it's a close call maybe people

7    disagree.  But I don't think it's just a general

8    proposition it's all over the map.

9    Q.    I'm going to ask you this, Doctor.  You

10   understand before your report was issued in February

11   of this year, but after the plaintiffs' reports were

12   due, Health Canada issued a report involving talc and

13   among other things ovarian cancer?

14   A.    I'm aware of that.

15   Q.    The Judge has heard a lot about it, but I would

16   like to spend a little bit of time with it.  You read

17   that document?

18   A.    I have.

19   Q.    It is dated December 2018, and it is Exhibit

20   No. 56 in your binder, your Honor.  This document is

21   dated December 2018.

22   A.    I don't think I have a 56.  I'll follow along

23   with you and maybe find a copy if I need to.

24   Q.    This document -- let's talk about how this

25   document came about, to the best you know, by reading

Hsu??? - Cross/Mr. Tisi

1080

1   it.

2          First of all, when this document came out.

3   You understand Health Canada, first of all, is the

4   Canadian equivalent of the United States Food and Drug

5   Administration.  Correct?

6   A.    I don't really know what their role is, and I

7   don't know whether the equivalent of any particular

8   agency.  I know they are involved in health issues.

9   But I don't know how they relate to the FDA.

10  Q.    You understand, Doctor, before they issued this

11  particular report, they went ahead and Health Canada

12  asked for a study to be performed by an outside

13  contractor which ultimately became what has been

14  referred to as the Taher analysis.

15          Do you understand that?

16  A.    Yes.

17          MR. TISI:  The Taher analysis, for the record,

18  is Exhibit No. 63.

19  Q.    If you go to Exhibit No. 63, you go to page --

20  it was funded by Health Canada.  It's right in the

21  back there.  Do you see that?

22  A.    I do.

23  Q.    And following that, you understand that Health

24  Canada actually drafted this report.  Correct?  "This

25  report" being the screening assessment?

Hoese - Cross/Mr. Tisi

1081

1    A.    That's my understanding.

2    Q.    Do you understand this was peer-reviewed?

3    A.    I don't know what process it went through.  And

4    we're talking about Health Canada or Taher?

5    Q.    Health Canada?

6    A.    Because Taher has not been peer-reviewed.

7    Q.    If you would go to Health Canada on page 1 of

8    the document.

9    A.    I don't have the document.

10         (Pause.)

11   Q.    At the very bottom of page 1 it says:

12         "The human health portion of this assessment

13   has undergone external peer review and/or

14   consultation"?  Did you note that when you reviewed

15   this before.

16   A.    I did read that.  I just didn't recall it.

17   Q.    The human health portion contains what we

18   understand to be Health Canada's Bradford Hill

19   analysis.  Correct?

20   A.    It includes that.  That's right.

21   Q.    If you go to the very beginning, you say in your

22   expert report -- on page 49 you say:

23         "At the end of the day the Health Canada

24   assessment failed to conclude that talc use causes

25   ovarian cancer, and plaintiffs' experts misread the

Moore – Cross/Mr. Tisi

1082

1   report to the extent that they said that it did."

2          See that?

3   A.    I do.

4   Q.    You go on to say at the very beginning of your

5   expert report, it says:

6          "The assessment by Health Canada and the

7   related analysis by Muhammad Taher and others," you

8   reviewed those documents and you're consistent with

9   the opinions set forth above.

10          Do you see that?

11  A.    Did you read something else?

12  Q.    On page 47 of your report, you represent the

13  assessment by Health Canada and the related analysis

14  by Muhammad Taher is consistent with the opinions you

15  set forth above.  Do you see that?

16  A.    (No response.)

17  Q.    "And they do not support a conclusion that talc

18  causes ovarian cancer."

19  A.    That's correct.

20  Q.    That's not true, is it?

21  A.    It is true.  All you have to do, if you read to

22  the end of the Taher article, they arrive at the same

23  place IARC did.  They use the same language, and they

24  even evoke IARC by saying the 2010 monograph -- they

25  endorse the exact same conclusion IARC did.  It is

1083

1  absolutely not true they said there is cause.

2  Q.    Would you turn to the Health Canada draft

3  assessment, page Roman numeral III.  This is a

4  synopsis of the entire report.  Correct?

5  A.    Yes.

6  Q.    We pulled out what it says about their analysis.

7  It says:

8      "The meta-analyses of available human studies

9  in the peer-reviewed literature indicate a consistent

10  and statistically significant positive association

11  between perineal exposure to talc and ovarian cancer.

12  Further, available data are indicative of a causal

13  effect."

14      Do you see that, Doctor?

15  A.    I do.

16  Q.    I assume you disagree with that because in your

17  deposition you called that -- I think the words you

18  said were it was ridiculous?

19  A.    I don't know for a fact it was ridiculous.  But

20  the part of the Bradford Hill analysis was ridiculous.

21      This, by the way, is not the same as saying

22  that they've arrived at a conclusion that talcum

23  powder causes ovarian cancer.  If they are assembling

24  data, data could be indicative.  Just like we looked

25  at case-control studies, and a case-control study that

Rucca - Cross/Mr. Tisi

1084

1    has a positive odds ratio is indicative of.  But when

2    you summarize all the evidence together, that's a

3    different conclusion.  So just to say there is

4    available data is not the same as saying that talcum

5    powder causes ovarian cancer.

6    Q.    Let's look at what they did, Doctor.

7          Since this is about methodology, let's look at

8    what the methodology they used and see whether or not

9    it tracks the methodology that was used by you and by

10   the plaintiffs' experts in this case.

11         If you go to page 15 in the section that was

12   peer-reviewed, it talks about "perineal exposure to

13   talc."  Do you see that?

14   A.    I'm with you.

15   Q.    This is the section where they start talking

16   about the analysis of the talc data.  Correct?

17   A.    That's right.

18   Q.    And they acknowledge the IARC working group,

19   which we will talk about in a moment, in the first

20   paragraph.  Right?

21   A.    Acknowledge and recapitulate their conclusion.

22   Q.    As background material.  Correct?

23   A.    Correct.

24   Q.    Then they start to review the animal studies.

25   Do you see that?

Civita - Cross/Mr. Tisi

1085

1  A.    I do.

2  Q.    And they then, the next section, they start

3  talking about the human studies.  This is what

4  epidemiologists do.  Correct?

5  A.    Human studies?

6  Q.    They looked at the animal studies and they

7  looked at the human studies?

8  A.    Epidemiologists look at the human studies, for

9  sure, if we are talking about the relevant ones.  I

10 don't know that epidemiologists do a thorough review

11 of animal studies and may look for a summary.  But an

12 epidemiologist will consider animal studies.

13 Q.    Because that bears on the issue of biologic

14 plausibility.  Correct?

15 A.    It does.

16 Q.    So in this document Health Canada, after having

17 had an analysis by the outside Taher group, they then

18 write their own report, and in their own report they

19 summarize the human data and the animal data.

20 Correct?

21 A.    That's correct.

22 Q.    You will see table 6-1, which is a chart of many

23 of the different epidemiology studies that you have

24 talked about and Dr. McTiernan talked about.  Correct?

25 A.    Correct.

Inocce - Cross/Mr. Tisi

1086

1   Q.    Among the other things they list are the sample

2   size, et cetera.  Correct?

3   A.    That's correct.

4   Q.    If you go to page 18, they talk about "mode of

5   action."  See that?

6   A.    I do.

7   Q.    I want to pause here a minute and talk about

8   some of the things Health Canada is looking at again

9   only six months ago.  Correct?

10  A.    Correct.

11  Q.    This is contemporaneous with what we are doing

12  here today, correct, looking at the data?

13  A.    I guess, yes.

14  Q.    They say:

15        "With respect to talc specifically, local

16  chronic irritation leading to an inflammatory response

17  is one possible mechanism of tumor progression that is

18  frequently hypothesized.  It is known that persistent

19  indications of inflammation, including C-reactive

20  protein, tumour necrosis factor, and other

21  inflammatory markers, are detected in the blood of

22  women prior to a diagnosis of ovarian tumors."

23        Do you see that?

24  A.    I do.

25  Q.    It goes on at the bottom, the last sentence, it

Preston - Cross/Mr. Tisi

1087

1    says:

2            "There is support for an association of

3    inflammation and increased risk of ovarian cancer,"

4    citing the National Academy of Sciences."

5            Do you see that?

6    A.    I do.

7    Q.    I just want to confirm with you this is what

8    people outside the courtroom -- you understand that

9    Health Canada doesn't have anything to do with this

10   litigation whatsoever.  Correct?

11   A.    I think they do now.  Dr. McTiernan said they

12   invited her to participate in the process so they are

13   probably somehow linked.  Otherwise, I don't know of

14   any links.

15   Q.    At the time of this report you have no evidence

16   that they were involved in this litigation.

17   A.    No, of course not.

18   Q.    They are looking at the data; and if we are

19   trying to assess whether or not the experts in this

20   case are acting reasonably in their interpretation of

21   the data and studies, one of the places we might look

22   is to look at, as you pointed out, what people outside

23   at the courtroom are doing.  Correct?

24   A.    It includes that.

25   Q.    One of the things they are looking at here is,

Plassé - Cross/Mr. Tisi

1088

1  this isn't some harebrained idea that there is

2  inflammation, is a biologically plausible mechanism;

3  this is something that the scientists at Health Canada

4  looked at and assessed and put into their report.

5           I'm not asking whether they are correct or not

6  correct.  I'm asking you whether or not this is the

7  kind of information that experts did outside the

8  courtroom.

9  A.    This was done outside the courtroom.  Can you

10  repeat the first part of the question?  I lost you by

11  the time we got there.

12  Q.    Doctor, if you would look, this whole discussion

13  of inflammation is something that the scientists in

14  Health Canada were doing independent of what

15  plaintiffs' experts and you were doing when you were

16  preparing your expert report.  Correct?

17  A.    Correct.

18  Q.    If we are trying to check whether or not the

19  methodology that was being used by the experts in

20  trying to decide the question whether or not talcum

21  powder products cause ovarian cancer inflammation and

22  this discussion of the studies here are some

23  corroboration of that.  True?

24  A.    Oh, my gosh.  Some corroboration is very

25  different.  This says that local chronic irritation is

Ivette - Cross/Mr. Tisi

1089

1   a possible mechanism that is frequently hypothesized.

2   Hypothesis is something you serve up in order to test

3   whether it is true or not.  So to me to lead in with

4   that really is consistent with all of the uncertainty

5   I have seen expressed by other authors.  That's not

6   the same as it's been demonstrated.

7   Q.    Don't they go on and cite studies that support

8   that hypothesis?

9   A.    Sort of.  We have Trabert by 2014.

10  Q.    I'm just asking whether they cited articles that

11  support the hypothesis.

12  A.    Yes, indeed.

13  Q.    On the next page they talk about migration.

14  They call it translocation.  They talk about different

15  studies that deal with that issue?

16  A.    Correct.

17  Q.    The next paragraph after that they talk about

18  whether or not talc gets to the ovaries via inhalation

19  in the lymph nodes.  Correct?

20  A.    Are you saying --

21  Q.    It says."

22        "Another possible mode of action that is

23  hypothesized in the scientific literature is

24  immune-mediated."

25        Do you see that?

1090

1    A.    I thought you asked if they said it was by

2    inhalation.

3    Q.    I withdraw that.

4          The next section here talks about a different

5    mode of action other than migration.  Correct?

6    A.    That is correct.

7    Q.    And they provide the support for that.  Correct?

8    A.    Correct.

9    Q.    The next one is they talk about the

10   meta-analysis.  Correct?

11   A.    Correct.

12   Q.    And in there they talk about the fact that they

13   had gone ahead and contracted a new meta-analysis by

14   Taher.  Correct?

15   A.    They do.

16   Q.    And then they go through and they discuss each

17   of the different Bradford Hill criteria.  Correct?

18   A.    They do.

19   Q.    Let's take, for example, the strength of

20   association.  There is a discussion of that.  Correct?

21   A.    A discussion --

22   Q.    Of the strength of association.  Correct?

23   A.    That's not a conclusion, though.

24   Q.    I said they discuss it.

25   A.    I understand.  It is not the same as doing a

Freese - Cross/Mr. Tisi

1091

1   Bradford Hill analysis to discuss it.  You actually

2   have to do something with it.

3   Q.    They are considering each and every one of the

4   Bradford Hill criteria in this document.  Correct?

5   A.    They do.

6   Q.    The first one they consider is "strength," and

7   they discuss the meta-analyses and what is seen in the

8   meta-analyses.  Correct?

9   A.    They include that.

10  Q.    One of the things that they say, and I want to

11  spend a moment with this paragraph on page 20, it

12  says:

13          "The individual cohort studies did not show a

14  statistically significant association between perineal

15  talc use and ovarian cancer."

16          Correct?

17  A.    That's correct.

18  Q.    They go on to give reasons why that might have

19  under-estimated the risk.  Correct?

20  A.    They give some reasons why that could be.

21  Q.    "However, there was a positive association."

22  See that?

23  A.    In the case-control studies.

24  Q.    No --

25  A.    I'm sorry.  With the serous ovarian.

Preece - Cross/Mr. Tisi

1092

1  Q.    Correct.

2         (Reading.)

3         "However, there was a positive association

4  with statistical significance, specific to invasive

5  serous-type ovarian cancer in the cohort studies."

6         Do you see that?

7  A.    I do.

8  Q.    It says:

9         "Given the long latency for ovarian cancer,

10  the follow-up periods may not have been sufficient to

11  capture all the cases for the individual cohort

12  studies."

13        Do you see that?

14  A.    I do.

15  Q.    They are identifying the very same kind of

16  issues that you heard Dr. McTiernan talk about

17  yesterday.  Correct?

18  A.    Some of these, yes.

19  Q.    The next thing -- and, of course, as we talked

20  about before, Dr. McTiernan had no involvement in this

21  process of developing this report, to your knowledge?

22  A.    As far as I know, she did not.

23  Q.    The next thing it says:

24        "Given the rarity of ovarian cancer, many of

25  the available human studies may not be sufficiently

Hvezda - Cross/Mr. Tisi

1093

1     powered to detect a low odds ratio."

2          Do you see that?

3     A.    I do.

4     Q.    It goes on to say:

5          "With larger sample sizes, more individual

6     studies may have demonstrated stronger associations."

7          These are the very kinds of things that

8     Dr. McTiernan and plaintiffs' experts identified

9     totally independent of this analysis. Correct?

10    A.    These are the same things most of the folks

11    involved here have identified.  They didn't go out and

12    discover something new.  They've assembled some of the

13    same stuff that's out there.

14    Q.    If you go to the Taher report, they also talked

15    about the issue of nondifferential misclassification

16    because the people in the cohort studies, the women in

17    the cohort studies were only interviewed once during

18    the course of the study about their talc use.  Do you

19    remember that?

20    A.    Yes.  They hypothesized that was a possibility.

21    They didn't demonstrate that was a truth or a fact.

22    Q.    Doctor, you hypothesized recall bias was an

23    issue with these studies, that confounding was an

24    issue with these studies?

25    A.    What's kind of cool, though, is that I actually

1094

1  showed an exact example from these particular

2  epidemiologic studies which demonstrated it exactly.

3  So it's not just a hypothesis.  It's actually a fact

4  based on at least the one study.

5  Q.    What I'm trying to ask you, Doctor, is outside

6  the courtroom the scientists who were looking at the

7  same question you and Dr. McTiernan were looking at

8  were considering the very same kind of issues that you

9  and Dr. McTiernan talked about over the past two days.

10  Correct?

11  A.    Generally speaking, I'd say there is some

12  overlap with at least the content of what these are.

13  Q.    The next issue is on "consistency."  You

14  testified there is no consistency.  Correct?

15  A.    I did not.  I said when you look at the

16  information in total, that it doesn't satisfy the

17  consistency criterion because what I said was

18  including that you are not just looking for a couple

19  of examples where a couple of studies may be

20  consistent with each other, but does the total body of

21  evidence show consistency.

22  Q.    Well, Health Canada addressed that issue, did

23  they not, outside of the courtroom?

24  A.    They did.

25  Q.    They said:

Moorman - Cross/Mr. Tisi

1095

1    "Several meta-analyses conducted over the past

2    15 years calculated similar odds ratios and resulted

3    in similar conclusions."

4         Did I read correctly?

5    A.    You did.

6    Q.    It says:

7         "There is a small yet consistent and

8    statistically significant increased risk for ovarian

9    cancer with perineal talc use," and cites the very

10   same studies that you and Dr. McTiernan have talked

11   about over the past two days.  Correct?

12   A.    Yes.

13   Q.    They go on to say:

14        "The epidemiological studies examined in these

15   meta-analyses were conducted over different periods of

16   time across more than four decades among different

17   ethnicities and spanned many geographical areas

18   worldwide."

19        Do you see that?

20   A.    I see it.  They don't say whether there is

21   consistency or not.  You are exactly right.  They are

22   describing the same sorts of things Dr. McTiernan and

23   I considered.  But I also evaluated.  I don't see an

24   evaluation here whether they are consistent.

25   Q.    Doctor, in fairness, let me ask you this:  What

Proctor - Cross/Mr. Tisi

1096

1  is the importance of replication?

2  A.    In what context?

3  Q.    For epidemiology.

4  A.    It is so abstract, I'm not sure what you mean.

5  Q.    Does Dr. Gordis deal with that issue?

6  A.    I'm sure he probably does.

7  Q.    One of the important things about studies, not

8  when you are looking at an individual studies, but

9  when you are looking at multiple studies, is to see

10  whether or not those studies were conducted in

11  different populations with different researchers in

12  different areas under different conditions  using

13  different study designs.

14  A.    Yes.

15  Q.    By doing that, you reduce the issues of

16  confounding, bias, chance.  Correct?

17  A.    No, not necessarily.  The biases that we're

18  talking about in this case, such as information bias,

19  would function the same way.  That's why when you find

20  a very small risk, it is not surprising to find that

21  small risk in different places.  So the reason recall

22  bias functions in sick people differently than healthy

23  people, regardless of where they are, and when people

24  are shy or reluctant to talk about something

25  sensitive, that functions across countries as well.

Rucco - Cross/Mr. Tisi

1097

1    It doesn't necessarily take care of that problem.

2         And the confounders you still have to assess

3    them and acknowledge them.  Just doing studies in

4    multiple countries doesn't take care of confounders if

5    you don't assess the confounders.

6    Q.    Doctor, one of the issues you raised is

7    douching.  Correct?  Correct?

8    A.    Correct.

9    Q.    Douching was based upon what study?

10   A.    The Gonzalez study.

11   Q.    And the Gonzalez was a United States study?

12   A.    It is.

13   Q.    There were multiple studies conducted around the

14   world, correct, case-control studies?

15   A.    There are a few that were world-wide and most

16   U.S..

17   Q.    There were three studies in Australia, one study

18   in China, one study in Greece, a study in Israel,

19   several studies in Canada.  Correct?

20   A.    Correct.

21   Q.    In order to assess that question -- do you know

22   whether or not douching is even something that is a --

23   in order to be a confounder, douching would have to be

24   associated with the use of talc?

25   A.    If it is going to confound the relationship

Prusak - Cross/Mr. Tisi

1098

1  between talc and ovarian cancer.

2  Q.    Because confounding doesn't mean confusion.

3  There is a very specific formula or criteria to meet

4  the criteria to be a confounder.  Correct?

5  A.    It is definitely not confusion.

6  Q.    It has to be associated with the item under

7  study.  Correct?

8  A.    In order to confound the relationship between

9  the exposure and the outcome.

10  Q.    And so when you went and were looking at the

11  issue of douching, did you go and make any effort to

12  see whether or not in the other countries, in

13  Australia where they found statistically significant

14  increased risk in the case-control studies; in China,

15  where there was an increased risk, did you go and see

16  whether or not women douched in connection with the

17  use of talcum powder products?

18  A.    There are a couple of questions.  I did look at

19  every single study I had available to me to see

20  whether or not douching was accounted for.  There was

21  one case-control study that did account for it, and I

22  think there may be a second I found subsequent to

23  that.  That was all that I found.

24       Separately if there is a relationship between

25  douching and talcum powder use -- they for sure looked

Ivette - Cross/Mr. Tisi

1099

1  at that in the Gonzalez study.  I don't remember

2  whether any of the other studies looked at the

3  concordance of those two habits.

4  Q.    Did you go and see whether or not there was any

5  data in any of the other countries in which

6  douching -- because to be a confounder, it would have

7  to be related to the use of talcum powder and see

8  whether or not there's any use data that would confirm

9  that as a confounder in those countries?

10  A.    I think I just answered you.  I said I went and

11  looked at every single study for what they assessed

12  about douching.

13        I know for sure the Gonzalez study looked at

14  the correspondence of the two habits.  Together they

15  had an odds ratio of 2.1 for the relationship between

16  the two of them, and I don't recall whether there was

17  -- there is only one study or two studies at most that

18  even accounted for douching.

19  Q.    That wasn't my question.  There are three

20  Australian studies.  Correct?

21  A.    I don't remember the count.  I believe you.

22  Q.    There were three Australian studies, Purdie,

23  Green, and Merritt, all statistically significant in

24  Australia.  Correct?

25  A.    I'm confused by your title.

Poteus - Cross/Mr. Tisi

1100

1    THE COURT:  This is listed as recall bias and

2    not douching.  Based on that title, how does he know

3    they are douching?

4    Q.    The studies did not adjust for douching.  These

5    three studies did not adjust for douching.

6         My question is:  Do you know whether or not

7    women in Australia even douche?

8    A.    I have no idea.

9    Q.    Do you know whether or not that it is associated

10   with the use of talcum powder products in Australia?

11   A.    No idea.

12        THE COURT:  You are asking about the studies.

13   I would like to move on.  You are asking about has he

14   considered studies in this connection.  I thought you

15   were pointing these out as ones that considered it.

16   We started with Gonzalez.  He said he clearly did.  I

17   don't know where we are going with some hypotheticals,

18   whether they do.  You don't know either.  Maybe you

19   do.

20   Q.    Going back to the Health Canada assessment, if

21   you look at the specificity section, they talk about

22   that.  Correct?

23   A.    They do.

24   Q.    They identify specificity, that the cancers are

25   specific to the ovaries as opposed to any other of the

Roche - Cross/Mr. Tisi

1101

1    female anatomy.  Correct?

2    A.    They've gotten that so incorrect.  That's not

3    what specificity means in the Hill criteria.

4    Q.    You may disagree with their assessment but they

5    assessed it.  Correct?

6    A.    Well, in a couple of cases I don't see that they

7    assessed to reach a conclusion.  They just put down

8    some things they might have considered.  In some of

9    these cases they are saying stuff that isn't true.

10   For temporality, that you brought up, you said in all

11   case-control studies, reporting positive outcomes, the

12   participants recalled the exposure to talc preceded

13   the reported outcome.  Well, of course, that's true.

14   That's what happens in cross-sections, that you can

15   ask the people about the past.  That's not the same as

16   demonstrating temporality.  So they've actually

17   reported something here that doesn't show temporality.

18          It's just like the specificity thing, where

19   they say perineal talc exposure is specifically

20   associated with cancer of the ovary.  There has to be

21   a one-to-one association between the exposure and the

22   outcome, generally speaking, which is super rare.

23   This is just a sentence where they have the word

24   "specifically" in it.

25   Q.    Do you disagree with them?

Fusco - Cross/Mr. Tisi

1102

1    A.    I disagree that that  particular sentence is

2    supportive of the notion of specificity, even though

3    they've used the English word "specifically" in it.

4    Q.    They also addressed "biological gradient," which

5    is dose-response?

6    A.    Right.  They say there is a lack of available

7    exposure effect relationship.

8    Q.    They also say that seven studies provided some

9    evidence of increased risk of ovarian cancer with

10   increasing perineal applications of talc, although the

11   evidence wasn't clear.  Correct?

12   A.    Yes.

13   Q.    Does the Bradford Hill criteria require that

14   there be consistent statistically significant

15   increased risk for dose-response in order for this

16   criteria to be met?

17   A.    None of the Bradford Hill criteria are required

18   including that one.

19   Q.    "Biological plausibility," do they deal with

20   that issue, the next page?  Do they talk about the

21   issue of biological plausibility?

22   A.    Yes.

23   Q.    Do they say, "the presence of talc in the

24   ovaries has been documented"?

25   A.    They do.

Rosetto - Cross/Mr. Tisi

1103

1   Q.    "This evidence of retrograde transport supports

2   the biologic plausibility of the association between

3   perineal talc application and ovarian exposure."

4   Correct?

5   A.    They do.

6   Q.    And although they also say that the specific

7   cascade has not been established, you would agree that

8   they do discuss the biologic plausibility of migration

9   as being a mechanism by which talc gets to the

10  ovaries?

11  A.    They do discuss it.

12  Q.    They talk about "coherence" as well.  Correct?

13  A.    Yes.

14  Q.    And at the conclusion of all of this, Doctor,

15  they then make another statement that we talked about

16  before from the synopsis.  Correct?  They say:

17        "The most recent meta-analysis detailed above,

18  Taher 2018, and consistent with the Hill criteria,

19  suggests a small but consistent statistically

20  significant positive association between ovarian

21  cancer and perineal exposure to talc.  Further,

22  available data are indicative of a causal effect."

23        Do they say that?

24  A.    They do.

25  Q.    They go on to say later on -- if you go to page

Roseto - Cross/Mr. Tisi

1104

1  27, they repeat this statement, if you go to the

2  middle of the page, it says:

3          "Data from published meta-analyses of

4  epidemiological studies indicate a consistent and

5  statistically significant positive association between

6  perineal exposure to talc and ovarian cancer."

7          Do you see that?

8  A.    I do.

9  Q.    They quote another article which you are

10  familiar with; it says:

11          "It is unlikely that the association between

12  talc and ovarian cancer is due to confounding, and so

13  it is fair to say that there is a statistically robust

14  relationship between talc use and ovarian cancer, it

15  is likely to be causal."

16          MS. BROWN:  Counsel, I think you read that

17  incorrectly.

18  Q.    It says:

19          "It is unlikely that the association between

20  talc and ovarian cancer is due to confounding and so

21  it is fair to say that if there is a statistically

22  robust relationship between talc use and ovarian

23  cancer, it is likely to be causal."

24          Do you see that?

25  A.    I do.

Ivseco - Cross/Mr. Tisi

1105

1   Q.    And so outside the courtroom, separate and apart

2   from litigation, Health Canada did three things:

3   First, it commissioned the Taher study?

4   A.    Correct.

5   Q.    Second, it wrote a report?

6   A.    A draft report.

7   Q.    Third, it had that draft report peer-reviewed?

8   A.    Somehow.

9   Q.    And, fourth, it published it.  Correct?

10  A.    I don't know what "published" means.  It's

11  available.

12  Q.    Made it available?

13  A.    Yes.

14  Q.    If you go back to page 27 of the assessment,

15  after the sentence I read below, it says:

16        "Similarly, Penninkilampi and Eslick noted the

17  confirmation of an association in cohort studies

18  between perineal talc use and serious invasive ovarian

19  cancer is suggestive of a causal association."

20        See that?

21  A.    I would call it serous probably rather than

22  serious just so that it's correct.

23  Q.    That is the sentence we read before from the

24  Penninkilampi study?

25  A.    Yes, it's the same one.

Roberts - Cross/Mr. Tisi

1106

1    Q.    "Taher and colleagues noted that consistent with

2    previous evaluations by the International Agency for

3    Research on Cancer 2010, and more recent and

4    subsequent evaluations by individual investigators,

5    the present comprehensive evaluation of all currently

6    available relevant data indicates that perineal

7    exposure to talc is a possible cause of ovarian cancer

8    in humans."

9         Correct?

10   A.    Did they say that?  Yes --

11        MS. BROWN:  Can he be permitted to finish his

12   answer?

13        MR. TISI:  I just asked whether it says that.

14        THE COURT:  Well, these are quoting.  So we

15   have to be clear.  It is the article, whatever this

16   is, the draft screening report, quoting these various

17   sources you've already discussed.  It is not the

18   language of the Canadian people.  It is their quotes

19   from these articles.

20        MR. TISI:  Correct.

21        THE COURT:  Now, we can continue.

22        MS. BROWN:  Thank you.

23        THE COURT:  Can I just ask, and maybe there is

24   not an answer any of you can give me,  but is there

25   anywhere that reflects what the peer review was of

Pisero - Cross/Mr. Tisi

1107

1    this Canadian report?

2           MR. TISI:  I just have what you have, your

3    Honor.

4           THE COURT:  All right.

5    BY MR. TISI:

6    Q.    The next thing I want to do is I want to go to

7    the Taher paper.  Do you have that in front of you?

8    A.    Not anymore.  Is it in this binder?

9           MS. PARFITT:  It is number 63.

10          THE WITNESS:  Thank you.

11   Q.    On page 43 -- and this is outside of litigation.

12   You have no reason to believe that any of the Taher

13   authors have anything to do with this litigation.

14   Correct?

15          MS. BROWN:  Objection, your Honor.  It calls

16   for him to speculate.  How would he know either way?

17   It may very well have been funded by plaintiffs'

18   lawyers.

19          MR. TISI:  It is not funded by plaintiffs'

20   lawyers.

21          THE COURT:  I understand your representation.

22   The question is:  Do you know if the Taher report was

23   funded by any plaintiffs' lawyers?

24          THE WITNESS:  I'm not aware of that.

25   BY MR. TISI:

Hueebb - Cross/Mr. Tisi

1108

1  Q.    On page 43, the authors talk about the cohort

2  studies.  Correct?

3  A.    They do.

4  Q.    On page 43 they discuss three of the issues you

5  talked about before with respect to the talc studies,

6  do they not?

7  A.    Are there three?  I don't know.

8  Q.    The first one they talk about is latency.  Do

9  you see that?

10  A.    Yes.

11  Q.    (Reading.)

12        "Although cohort study designs are efficient

13  for examining diseases with a long latency period, it

14  is essential that the period between talc exposure and

15  the cancer diagnosis be sufficiently long."

16        See that?

17  A.    I do.

18  Q.    And they identify the cohort studies may not be

19  long enough to truly identify ovarian cancer related

20  to talc, do they not?

21  A.    So --

22  Q.    I'm asking whether they identify that as a

23  potential weakness of the cohort studies outside of

24  litigation.

25  A.    They are talking about latency here, and they

Investe - Cross/Mr. Tisi

1109

1    are talking about latency.  I agree with you.

2    Q.    One of the things counsel asked you before is

3    whether or not in assessing epidemiology studies, in

4    your experience, whether or not there is anything

5    different between cancer and the study of any other

6    kind of disease.  Do you remember that?

7    A.    Who asked that?

8    Q.    Counsel for Johnson & Johnson.

9    A.    Today?

10   Q.    Yes.

11   A.    Really?

12   Q.    Asked you with your qualifications.

13         Do you remember earlier on you were asked a

14   question about your qualifications, whether or not

15   your qualifications -- somebody with training in

16   epidemiology, who is primarily a pulmonary physician,

17   whether or not that allows you to analyze studies on

18   cancer?  Do you remember that question?

19   A.    Not exactly.  But I can answer it again if

20   that's is helpful.

21   Q.    I'm asking you this:  Do you know what the

22   latency period is for ovarian cancer?

23   A.    From what?

24   Q.    I'm asking you.

25   A.    I know, but it's an incomplete question.  If you

Moore - Cross/Mr. Tisi

1110

1  ask, What's the latency for lung cancer?, you have to

2  know what the exposure is you are talking about.  If

3  you ask, What's the latency for mesothelioma?, you

4  have to know what it is you are talking about because

5  the latency differs depending upon which exposure.

6  Q.    Have you done research into that?

7  A.    Research in the sense that I've looked to find

8  whether or not there is a known latency period between

9  talcum powder and ovarian cancer, and there is not.

10  Q.    And whether or not these studies are long enough

11  to actually capture that risk?

12  A.    They do seem to be long enough in general.

13        You are highlighting the Gonzalez study right

14  there.  All of these studies have older women, and

15  they are describing something that's a habit.  When

16  they ask them about talcum powder, it wouldn't have

17  been just on the day they asked them the question.

18  They are documenting a habit as opposed to just a

19  one-time event.

20        The Gonzalez study also asked about

21  pre-pubertal girls also, and so they have evidence

22  going back that many decades.  These are mature women

23  that were enrolled in the study.  So they actually

24  have that kind of time.

25        What I would say too because you showed me

Freese - Cross/Mr. Tisi

1111

1    Narod before, and Narod said we would need 200,000

2    women followed for 10 years, and with all three of

3    these studies, you have 200,000 women who were already

4    followed for 12 years, and of the other ones was an

5    average of eight years.  So you are getting awfully

6    close to the right amount of time, according to Narod.

7              One of the studies asked about talcum powder

8    use in the 20 years prior to the study.  I don't think

9    you can sort of say in general there is not enough

10   time that's gone by.  And that's even assuming you

11   knew, which I don't know how anybody could know, what

12   the latency period is between talcum powder and

13   ovarian cancer.

14   Q.    One of the advantages of a case-control study is

15   you can interview people after the fact and find out

16   when their exposure began?

17   A.    You can hope to.  But that's the disadvantages,

18   that's it's a hope to, because --

19   Q.    Doctor, one of the advantages of a case-control

20   study is you can interview women about their use

21   looking backwards.  Correct?

22   A.    You can interview them, yes.

23   Q.    And you can try and get information as best you

24   can about when they started to be exposed to the issue

25   at interest?

Foster - Cross/Mr. Tisi

1112

1   A.     You can try to.

2   Q.     You can't really do that in a cohort study, can

3   you?

4   A.     You do that because you are assessing the people

5   at some certain baseline, and you can also ask

6   questions of the women at baseline.

7          The same question is available to a person who

8   is enrolling in a cohort study as in a case-control

9   study.

10         Just to be clear.  You can ask a woman who is

11  enrolling in either type of study, What were your

12  habits last week?  10 years ago?  20 years ago?  That

13  question can be asked in any study design.

14  Q.     So getting back to my original question, the

15  issue of latency is an issue that was raised outside

16  of litigation in this study.  Correct?  The issue of

17  whether or not the cohort studies were long enough was

18  addressed outside of the courtroom.

19  A.     That is correct.

20  Q.     That is an issue both you and Dr. McTiernan

21  addressed in your reports?

22  A.     That is correct.

23  Q.     You have a disagreement?

24  A.     I don't remember what she says about latency.

25  If it's other than what I said, then I disagree with

Roseco - Cross/Mr. Tisi

1113

1  her.

2  Q.    The next one is under power.  Do you see the

3  next sentence?  This is the issue you were just

4  talking about as to whether or not the cohort studies

5  were large enough.  Correct?

6  A.    Large enough to what?

7  Q.    Large enough to detect an association.

8  A.    That's where there is a mistake.  Any size study

9  can detect an association.  But if we are talking

10 about power, we are talking about something different.

11 Q.    But the issue of whether or not these studies

12 were adequately powered to detect an association is an

13 issue that was raised outside of litigation.  Correct?

14 A.    Absolutely.

15 Q.    And it's an issue you have addressed in your

16 report.  Correct?

17 A.    Correct.

18 Q.    And it's an issue Dr. McTiernan and plaintiffs'

19 other experts addressed in their reports.  Correct?

20 A.    That's correct.

21 Q.    And it's an area upon which you disagree.

22 Correct?

23 A.    Yes.

24 Q.    Next page, page 44, they talk about the issue of

25 nondifferential misclassification.  Correct?

Ivester - Cross/Mr. Tisi

1114

1    A.    They do.

2    Q.    Remind us again what nondifferential

3    classification is?

4    A.    It's a broad category of whether people are

5    assigned to the wrong exposure but without there being

6    information that drives that; meaning that it's sort

7    of like a random or a haphazard kind of relationship

8    as opposed to it being determined by something in

9    particular.

10   Q.    It's an information bias.  Correct?

11   A.    It functions as an information bias.

12   Q.    And if you have nondifferential

13   misclassification unlike recall bias which can be an

14   exaggerated effect, nondifferential misclassification

15   is a bias that can attenuate an effect?

16   A.    Absolutely.

17   Q.    It's something you noted in your literature as

18   well.  Correct?

19   A.    What's my literature?

20   Q.    In your cohort studies there is always an issue

21   you have to consider of nondifferential

22   misclassification?

23   A.    Sure.

24   Q.    And that's one of the issues that's being

25   addressed here, whether or not assessing women at one

Moore - Cross/Mr. Tisi

1115

1  time in the cohort studies about their exposure to

2  either talc or powders is sufficient to, has a

3  potential of introducing nondifferential

4  misclassification?

5  A.    Correct.

6  Q.    That's an issue that was identified outside the

7  courtroom.  Correct?

8  A.    Correct.

9  Q.    It was addressed by you in your report.

10  Correct?

11  A.    Correct.

12  Q.    It was addressed by Dr. McTiernan and Dr.

13  Siemiatycki.  It was addressed by Dr. Moorman.

14  Correct?

15  A.    Correct.

16  Q.    It was addressed Dr. Singh.  Correct?

17  A.    I'm sure, but I don't remember.

18  Q.    It was addressed by Dr. Smith-Bindman?

19  A.    Yes.

20  Q.    And it's an area where you all addressed it and

21  you have a disagreement.  Correct?

22  A.    What's the disagreement?

23  Q.    About the effect of nondifferential

24  misclassification in the cohort studies?

25  A.    What the effect of it is?  I don't think I

Execro - Cross/Mr. Tisi

1116

disagree with how it works.

Q.    I'm asking whether it was assessed by all the experts in this case?

A.    Yes, it was.

Q.    This wasn't a situation where people were ignoring the potential of this bias?

A.    Nobody was ignoring bias or confounding or chance.

Q.    And so what I'm trying to ask you, Doctor, is both the Health Canada assessment and the Taher assessment were doing in parallel what you and I are doing here today; they were trying to make sense of the data and trying to see whether or not using the Bradford Hill criteria there was a cause and effect. Correct?

A.    Taher was a meta-analysis.  They did comment on cause and effect, and I think the draft Health Canada document is also trying to consider whether there is cause and effect.

Q.    So my question to you is, Doctor, totally separate from being involved in this litigation in this courtroom, in this courthouse in Trenton, New Jersey, people were doing the very same kind of analysis that you and Dr. McTiernan were talking about the past two days?

Tisei - Cross/Mr. Tisi

1117

1    A.    I don't think it's the exact same one.

2    Q.    I didn't say the exact same.

3    A.    I thought I heard you say exact same.

4          THE COURT:  It was very same.

5    Q.    They were doing a Bradford Hill analysis of the

6    available data looking at the very same studies that

7    we have all been talking about.  Correct?

8    A.    No.  They evoked the term Bradford Hill

9    analysis, and they didn't uniformly do a Bradford Hill

10   analysis.  That's when we looked at some of those

11   criteria you asked me to looked at, did they discuss

12   it?  Yes, they discussed it, but that is not the same

13   as analyzing it.

14   Q.    Doctor, outside the courtroom, totally separate

15   from what we are doing here, they analyzed, assessed

16   the very data that we have been talking about --

17   Penninkilampi, Eslick, case-controls, the cohorts --

18   they are all here.  Correct?

19   A.    I think you just twisted back what I just said

20   because I don't think in some cases they did assess.

21   They acknowledged certain things, but they didn't

22   always reach an assessment.

23   Q.    How do you know that?

24   A.    I read it.  That's what I'm saying.  The point I

25   where I was asking -- am I allowed to comment?  And

Fusco - Cross/Mr. Tisi

1118

1   you said, no.  You're just reading it.  So we're just

2   reading stuff in.  One of my comments would have been

3   is they just listed some things there, but they

4   haven't reached a conclusion.  Under strength of

5   association they don't declare whether it's weak or

6   strong as an example.  So --

7   Q.    Can you tell us but --

8         MS. BROWN:  Can he be allowed to finish his

9   answer before counsel asks another question?

10        THE COURT:  Fine.

11  A.    It's not enough to just say Bradford Hill, those

12  headings, and then fill in some stuff underneath.  You

13  actually have to analyze it.  And I'm saying based on

14  what I read, they didn't uniformly do that.

15  Q.    Let's move on.

16        THE COURT:  Perhaps now is a good time to

17  break for lunch, 12:30.

18        MR. TISI:  Yes.

19        THE COURT:  Basically, you used an hour and

20  15 minutes.  So you still have the bulk of your time

21  left.

22        THE DEPUTY CLERK:  All rise.

23        (Luncheon recess.)

24

25

Diette - Cross/Mr. Tisi

1119

1       **A F T E R N O O N     S E S S I O N**

2

3           (In open court.)

4           THE DEPUTY CLERK:  All rise.

5           THE COURT:  Thank you.

6

7       **GREGORY B. DIETTE,** resumed.

8

9       CROSS-EXAMINATION

10      BY MR. TISI:

11      Q.   I want to back up a little bit.  Let's see if we

12      can get some things out of the way.

13           First of all, I want to ask you a little bit

14      about your qualifications and then I'm going to talk

15      about your methodology.  So let me ask you a couple of

16      questions right off of the bat.

17           You are not an oncologist.  Correct?

18      A.   Correct.

19      Q.   You are Board Certified in pulmonology?

20      A.   Pulmonology and internal medicine.

21      Q.   There are people who actually do -- people who

22      are oncologists and people who do cancer research as

23      their primary focus of what they do.  Correct?

24      A.   That's correct.

25      Q.   You are not one of those people?

Hoetes - Cross/Mr. Tisi

1120

1    A.    I am not an oncologist, and that's my not my

2    primary focus.

3    Q.    Your research activities have not been focused

4    on researching causes of cancer?

5    A.    Not focused for sure.  I've had some studies

6    that pertained to cancer, but it has not been a focus.

7    Q.    Your focus is pulmonary diseases, things like

8    asthma, those kinds of things?

9    A.    More environmentally caused diseases in general,

10   including asthma, COPD, and other lung diseases.

11   Q.    And there are people actually at Johns Hopkins

12   who actually specialize in cancer epidemiology.  True?

13   A.    There have been.  I assume there are.  I don't

14   know who they are at the moment.

15   Q.    But people wouldn't, when they come to Johns

16   Hopkins, say:  I need a cancer epidemiologist; they

17   typically wouldn't say I need to speak to you.  Is

18   that fair?

19   A.    If somebody needed an epidemiologist, they might

20   come to me.  I honestly don't know what happens if

21   somebody says:  I want a cancer epidemiologist.  I

22   guess that's what I could say.

23   Q.    Now, counsel provided some slides here about

24   your background and research.  Is any of that related

25   to cancer or ovarian cancer?

Roccie - Cross/Mr. Tisi

1121

1    A.    So the clinical work -- I'll start there.

2    That's the part that slipped off the page there.  So

3    my clinical work includes training in cancer care as

4    an internist; and one of my responsibilities in the

5    hospital is to work in our oncology center.  There's

6    only people with cancer there.  So cancer care is

7    throughout the whole enterprise in a way.  So I'll see

8    people with cancer on the pulmonary service, on the

9    internal medicine service.  There are people with

10   cancer in my clinic.

11        The other issues are in terms of my degree,

12   part of that included studying cancer epidemiology as

13   part of the clinical epidemiology degree that led me

14   being a professor eventually of epidemiology, and the

15   teaching I do has included teaching of oncologists and

16   other folks who do that sort of research.

17   Q.    When Hopkins University puts information out

18   about you, it does not indicate that your research

19   interest primarily is cancer.  True?

20   A.    You know, I think either your colleague maybe

21   showed me something from our website.  I don't know

22   for the most part what my university puts out about

23   me.  There are a couple of websites out there that it

24   seems as if only lawyers seem to care about.  I don't

25   know what else gets out there.

Diette - Cross/Mr. Tisi

1122

1    Q.    This indicates your background as a professor of

2    medicine -- I'm sorry -- and expertise and research

3    interests?

4            Johns Hopkins University has Greg Diette, and

5    it has your expertise as asthma, chronic obstructive

6    pulmonary diseases, critical care medicine, pulmonary

7    medicine, and it actually indicates your research

8    interests are environmental impacts on lung disease.

9    Is that correct?

10   A.    That's what it says, yes.

11   Q.    And epidemiology of airway disease?

12   A.    Correct.

13   Q.    And chronic obstructive pulmonary disease and

14   asthma.  Correct?

15   A.    Correct.

16   Q.    Your CV is in the record.  That is really a good

17   summary of your primary focus of your professional

18   career?

19   A.    I wouldn't limit it to that.  I don't know what

20   website that is and why it was so succinct, but those

21   things are all true about me.

22           THE COURT:  At the top corner it said "Find an

23   Expert?"

24           THE WITNESS:  I didn't populate it.  Nobody

25   asked me to contribute to that.  If it's a way to find

Fubini - Cross/Mr. Tisi

1123

1   a clinical doctor, there are some sites where there

2   just was two or three bullets about reasons why

3   somebody might come to the doctor.  Anyway, it's

4   nowhere near complete.  Somebody just populated that.

5   Q.    Doctor, how many of your articles deal with risk

6   factors for gynecologic cancer?

7   A.    Zero.

8   Q.    How many people with ovarian cancer?

9   A.    Zero.

10  Q.    You have been an expert in many cases.  Correct?

11  How many cases this past year, past 12 months.

12  A.    Probably about 15 cases, I'd say.

13  Q.    You indicate this is 20 percent of your total

14  time.  That's not 20 percent of your professional

15  time.  It's 20 percent of your time period.  Correct?

16  A.    20 percent of the time I do some work.

17  Q.    You have testified primarily on issues relating

18  to lung disease.  Correct?

19  A.    Correct.

20  Q.    You are involved in several cases -- putting

21  this case aside -- several cases involving

22  mesothelioma and exposure to talc?

23  A.    I don't disagree there have been cases with lung

24  disease.  I don't know if "primarily" is right.

25  Certainly, there are lung disease cases.

Diette - Cross/Mr. Tisi

1124

1   Q.     Well, let me step back a bit and ask you this

2   directly, Doctor:  The issue we talked about, the

3   first observational study of ovarian cancer happened

4   in 1982.  From 1982 to now, has Johnson & Johnson or

5   any talc manufacturer ever come to you and said:

6   Dr. Diette, I really need your opinion on whether or

7   not talc causes ovarian cancer?

8   A.     No.

9   Q.     Even until today, Health Canada came out with

10  the recommendations we've talked about before, they

11  had a comment period where they could have people come

12  in and give comments.  Do you understand that to be

13  true?

14  A.     I understand it because your colleague told me

15  that.

16  Q.     You thought that this was such a sloppy work.

17  Did you ever take the time, given what you have done,

18  to write a letter and a comment to Health Canada to

19  say:  You know something?  You got it all wrong.  This

20  is how you are supposed to look at this question.

21         MS. BROWN:  Your Honor, I would object to

22  counsel's character of Dr. Diette's testimony.  He

23  didn't testify it was sloppy work.  I think he has

24  some critiques of their process, but I would object to

25  that characterization.

1125

1   MR. TISI:  Actually, your Honor, he did at his

2   deposition, and I can show him.  It takes about

3   5 seconds.

4   THE COURT:  It doesn't really matter the words

5   being used.  The real question is, you clearly

6   disagreed with some of the things they did in their

7   methods.  Did you ever write a letter?

8   THE WITNESS:  Other than this matter, I don't

9   even know who Health Canada is.  It is not part of my

10  business to write them letters about anything,

11  including this.

12  BY MR. TISI:

13  Q.    It is part of your business to be an expert.

14  Correct?

15  A.    In this particular matter.  But I honestly don't

16  know Health Canada.  I've never looked up something

17  about Health Canada.

18  Q.    That's interesting, Doctor, because let me ask

19  you this:  Health Canada -- did J&J ever say -- not

20  J&J's lawyers.  J&J the company.  Did any scientist at

21  J&J come to you and say:  You know, we have this

22  comment, period.  We need to write to Health Canada

23  and tell them why they are wrong about their draft

24  health assessment.  Did anybody come to you from the

25  company and say:  Dr. Diette, can you please help us

Moss - Cross/Mr. Tisi

1126

1  draft something to send to Health Canada, because they

2  got it all wrong?

3  A.    No.

4  Q.    Have you ever sought beyond the confines of this

5  expert report, or whatever expert reports you did in

6  litigation, to tell people about your opinions of your

7  colleagues, your professional colleagues, your

8  regulators, about your views of ovarian cancer and the

9  talc issue?

10  A.    Professional colleagues I've talked to.

11  Q.    Did you ever present to anybody, Grand Rounds,

12  or anything related to this issue?

13  A.    I have not given Grand Rounds on this issue.

14  Q.    Have you ever given a PowerPoint or a talk about

15  or anything about ovarian cancer and the risks and any

16  of the opinions you are prepared to give today?

17  A.    No.

18  Q.    Let's talk about some basic issues here.

19        Counsel asked you some questions about

20  hierarchy of evidence.  Do you remember those

21  questions?

22  A.    I do.

23  Q.    I was a little surprised counsel gave you the

24  Gordis text because I was going to give you the Gordis

25  text.

Roberto - Cross/Mr. Tisi

1127

1   You cite the Gordis text for the proposition

2   that cohort studies are better than case-control

3   studies, and there is a hierarchy of evidence.  Is

4   that true?

5   A.   I wouldn't agree with "better".  I can clarify

6   my thinking about hierarchy, but I can also wait for

7   your next question.

8   Q.   Keep going.

9   A.   When we are talking about a hierarchy of

10  evidence, it exists in terms of the clinical studies,

11  and there are strata.  For example, clinical trials

12  are considered among the highest quality or highest

13  tier of studies, the observational studies that are

14  cohort and case-control belong together, and beneath

15  those are case reports and case series.

16       But even within those strata you can still

17  sort.  So there are different kinds of clinical

18  trials.  And so within clinical trials, there are

19  different types of clinical trials.  So you would

20  place a randomized control trial above a nonrandomized

21  control trial.  And even within that band where you

22  say clinical trials are higher up than say

23  observational studies, they are still within that band

24  of the hierarchy.  And so when you get down to

25  observational studies, generally speaking, cohorts get

Rosero - Cross/Mr. Tisi

1128

1  the nod over case-control, but they do belong in the

2  same strata.

3  Q.    They do belong in the same strata and in fact

4  Dr. Gordis says they belong in the same strata, don't

5  they?

6  A.    I'm sure he said something approximately like

7  that.

8  Q.    So when counsel put this particular slide up,

9  nothing in this slide says that cohort studies are

10  more reliable than case-control studies; they just say

11  typically they come first.  Right?

12  A.    If you read it and try to understand it, I think

13  you will get that, though, because what this says is a

14  case-control study is useful as a first step.  But if

15  that's all you needed, it wouldn't say the next step

16  is to carry out a cohort study.

17         So the point here is that there is something

18  about the cohort study that adds value even when you

19  have information from the case-control study, and

20  that's exactly what that so-called real world example

21  shows, is that there is something to do next.

22  Q.    The real world is that case-control studies are

23  easier to do, they are easier to do, they are less

24  expensive, and that's why there are more of them.

25  Correct?

1129

1   A.   On average, they are less expensive.  They are

2   certainly more feasible to do time-wise in most cases.

3   Whether there's more of them, I don't know.  In this

4   matter, that might well be why.  But I don't know in

5   general for the world how they compare.

6   Q.   So if scientists are trying to discover an

7   association or not, the first step is because of

8   expense and ease is to do a case-control study.

9   Correct?

10  A.   Yes.  Just to dial it back, the first step would

11  be to report a case or a case series to make the

12  observation and then to try to follow that up with

13  what's next, and it could be either a case-control

14  study or a cohort.  It often is a case-control if

15  that's the feasible one to do.

16  Q.   Let's look at what Dr. Gordis actually says

17  about case-control and cohort studies.

18       I have another copy of Dr. Gordis' text.  Do

19  you have that up there, Doctor?

20  A.   I did not bring his text with me.

21  Q.   On page 257 of his textbook, he has an example

22  of how you look at studies; does he not?

23  A.   We're talking about Table 14-3, which is "The

24  Process For Using the Evidence and Developing

25  Recommendations on the Effectiveness of Prenatal

Roberts - Cross/Mr. Tisi

1130

1  Interventions."

2  Q.    Correct?

3       MR. TISI:  Your Honor, for the record, this is

4  in your book at plaintiffs' opposition Exhibit 133.

5       THE COURT:  Thank you.

6  Q.    If you go to the next page, Doctor, he talks

7  about this as an example.  He says:

8       "They thus defined an approach for looking at

9  causation that may have applicability far beyond

10  questions of effectiveness of prenatal measures."

11       Do you see that?

12  A.    I don't.

13  Q.    Do you see that, Doctor?

14  A.    I don't know what that sentence means all by

15  itself.  What's they?  It says, they thus define --

16  Q.    "They" -- the people who have drafted the

17  process for using evidence to develop recommendations

18  on prenatal interventions.

19  A.    Okay.

20  Q.    If you go to this Stage I, and this is really

21  useful because I think it illustrates what we have

22  been talking here.

23       If you go to Table 14-3, the first step is

24  "Categorizing Evidence By Quality and Source."

25       Do you see that?

Roede - Cross/Mr. Tisi

1131

1    A.    I do.

2    Q.    And the first is "Trials," and you talked about

3    that.  Correct?

4    A.    I did.

5    Q.    But even trials can be badly done.  Correct?

6    A.    Oh, any study can be badly done.

7    Q.    So you have to look at the trials.  You can't

8    just throw it in a category because it says

9    "randomized clinical trial" in front of it.  Correct?

10   A.    Of course.

11   Q.    The second is, "Cohort or Case-Control Studies."

12   Correct?

13   A.    Yes.

14   Q.    Underneath it talks about different aspects of

15   studies that can affect their quality.  Correct?

16   A.    Sure.

17   Q.    At the very bottom it says:

18         "Among other issues that must be considered in

19   reviewing the evidence are precision of the definition

20   of the outcome being measured, the degree to which the

21   study methodology has been described, adequacy of the

22   sample size, and the degree to which the

23   characteristics of the population studied and of the

24   intervention being evaluated have been described."

25         Correct?

Rhodes - Cross/Mr. Tisi

1132

1  A.     That's correct.

2  Q.     The concept they are trying to get through here

3  is you don't simply put things in a hierarchy because

4  there is some formula.  You have to look at the

5  attributes of each study and how they were conducted

6  and whether they were appropriate to answer the

7  question.  Correct?

8  A.     Of course.

9  Q.     So anybody who would come into court and simply

10 say, We have a pyramid or a hierarchy, where we put

11 cohorts above case-control, above case series, above

12 individual case reports, anybody who does that

13 mechanically isn't doing their job as an

14 epidemiologist.  Correct?

15 A.     You are absolutely incorrect.  This is one

16 table.  This doesn't help to define the entire

17 universe of what my profession does, and I think

18 invariably clinical trials, as you said, are the

19 highest tier of evidence, and there's a reason we use

20 them that way.

21        What you are also saying is that there are

22 quality issues, which I agree with, that allows the

23 clinical trial may not inform you as well as a really

24 good cohort because you may get better data from the

25 good quality study.

Roselo - Cross/Mr. Tisi

1133

1          Generally speaking, they belong in some order

2    as you evaluate them.  That was the point of the

3    earlier quote from the same textbook, which is talking

4    about the sequence of doing studies, that you confirm

5    what you think you learn from the case control or the

6    cohort.  The next step after that is a clinical trial,

7    if you can do it.  So there is a sequence that makes

8    sense.

9    Q.    Doctor, you indicated in your expert report --

10   I'm reading from it, on page 5 -- "cohort studies are

11   widely regarded as more reliable."  You cite Gordis.

12   There is nowhere in the Gordis text that says that.

13   Is that true?

14   A.    I didn't quote him.

15   Q.    You did quote him.  Actually, if you look at

16   your footnote here, it goes to footnote 3 of your

17   report, you cite generally Leon Gordis epidemiology

18   without a page, footnote 5 on page 5.

19   A.    I think you are confirming what I just said.  I

20   didn't provide a quote.  My interpretation from having

21   this textbook and having been taught from it,

22   different versions, and using it, is that what I said

23   is correct.

24   Q.    Doctor, in this big textbook, if this was such a

25   fundamental principal in this big textbook you used at

Roscoe - Cross/Mr. Tisi

1134

1    Johns Hopkins and cited in the Judicial Manual of

2    Scientific Evidence, if this was a fundamental

3    principle of epidemiology, don't you think Dr. Gordis

4    would say that?

5    A.    I have no idea what he would have said.  I'm

6    embarrassed we are even having this conversation

7    because this so baked in what I do for a living, and

8    what I was taught, and what I teach other people, that

9    it's not the kind of thing I usually provide a

10   citation for.

11   Q.    Being baked in --

12           THE COURT:  There is no quote.  I'm not sure

13   what you were saying.

14           MR. TISI:  Well, he's citing to the sentence

15   as a proposition -- he's citing the proposition there

16   is a hierarchy of evidence --

17           THE COURT:  You said it was in quotes.  He is

18   not quoting anything.  I want the record to be

19   correct.

20           MR. TISI:  No quotes, your Honor.  The

21   principle --

22           THE COURT:  Let's move on.

23   Q.    The next thing I would like to do -- would you

24   please bring up misconception.

25           Since this is baked in, and you are

Roberts - Cross/Mr. Tisi

1135

1    embarrassed we are having this conversation, do you

2    know who Ken Rothman is?

3    A.    I know of him.  I don't know him personally.

4    Q.    You are a peer reviewer for the journal

5    Epidemiology?

6    A.    Yes.

7    Q.    Do you know Dr. Rothman founded the journal

8    Epidemiology and was its editor for many years before

9    he retired from it?

10   A.    I do not.

11   Q.    Do you know that his textbook is widely used and

12   cited in the Judicial Manual of Scientific Evidence?

13   A.    I don't know what that is.

14   Q.    I'm going to show you what has been marked as

15   Exhibit No. 58.  It is an article titled, "Six

16   Persistent Misconceptions."

17          You have seen this article before.  Right?

18   A.    I think your colleague showed it to me.

19   Q.    Misconception No. 1, could you read it, please?

20   A.    (Reading.)

21          "There is a hierarchy of study designs,

22   randomized trials provide the greatest validity,

23   followed by cohort studies with case-controls being

24   least reliable."

25   Q.    And if you go down three paragraphs to the very

Reecke - Cross/Mr. Tisi

1136

1   bottom he discusses the issue of case-controls and

2   cohorts.  Do you see that?

3   A.    Yes.  But you skipped some stuff that would be

4   important in order to understand that particular

5   statement.

6   Q.    The stuff that's above deals with randomized

7   control trials.  Correct?

8   A.    The statement also deals with randomized control

9   trials.

10  Q.    I'm going down to the part that deals with

11  case-control and cohort studies.  It says:

12        "Trials are far from perfect.  Furthermore,

13  both cohort and case-control studies will yield valid

14  results when properly designed and carried out."

15        Do you see that?

16  A.    Yes.

17  Q.    Do you agree with that?

18  A.    Yes.

19  Q.    If you go down to the left-hand column, it says:

20        "Properly designed case-control studies will

21  produce the same results as properly designed cohort

22  studies.  When conflicts arise, they should stem from

23  problems with either or both studies."

24        Do you see that?

25  A.    I do.

Riesto - Cross/Mr. Tisi

1137

1    Q.    He doesn't say if conflicts arise, choose the

2    cohort?

3    A.    You should look at the studies entirely.

4    Q.    Exactly.  Next quote.

5          "Although case-control studies have long been

6    disparaged as being backwards versions of cohort

7    studies, starting from disease and tracing back to

8    possible causes, epidemiologists today understand

9    case-control studies to be conceptually identical to

10   cohort studies, apart from the efficiency gained that

11   comes from sampling the denominators rather than

12   conducting a complete census."

13         Did I read that correctly?

14   A.    You did.

15   Q.    So while you might be embarrassed we are having

16   this conversation, the idea that you don't simply

17   elevate cohort studies above case-control studies is

18   in the epidemiology methods literature.  Correct?

19   A.    You used a key word which is "simply."  I agree

20   with all the other propositions you put forth which is

21   you actually have to look at the studies and the

22   quality of the study.  So even if you insisted the

23   case-control studies and cohorts are exactly on the

24   same plane, it wouldn't change any of my opinions

25   about this matter.

Diette - Cross/Mr. Tisi

1138

1  Q.    Next concept is statistical significance.  We

2  talked about that a bit, and let's talk about it

3  again.  I would like to go to Dr. Rothman's textbook

4  on epidemiology.

5          MR. TISI:  Your Honor, it is Plaintiffs'

6  Exhibit 20.

7  Q.    This is Chapter 2 of the book entitled,

8  "Causation and Causal Inference."  Correct?

9  A.    I don't know.  I'm looking at something else.

10  Q.    It is in your binder, sir.  The title is "Modern

11  Epidemiology."  The copy of the book is right here.

12  "Modern Epidemiology."

13          MR. TISI:  Your Honor, for the record, it is

14  cited in the "Judicial Manual for Scientific Evidence"

15  as one of the references, and that is on Diette

16  Exhibit 1 -- it is Opposition Exhibit 20.

17          THE COURT:  I hope you have permission to copy

18  the chapter.  There is copyright.  I'm just noting

19  that.

20          MR. TISI:  Since I'm defending Dr. Rothman --

21          MS. BROWN:  Could we make sure Dr. Diette has

22  a copy of it.

23          THE WITNESS:  I have it now.

24  BY MR. TISI:

25  Q.    If you go to Chapter 2 entitled, "Causation and

Fusco - Cross/Mr. Tisi

1139

1    Causal Inference," 27, he says -- this is under the

2    consistency prong of the Bradford Hill criteria.  Am I

3    correct?

4              THE COURT:  What page did you say?

5              MR. TISI:  27.

6    Q.    Just to orient ourselves, this discusses the

7    Bradford Hill criteria and how it is taught to

8    epidemiology students.  Correct?

9    A.    What it says in this book?

10   Q.    Yes.  It says "causal criteria" on page 26.  The

11   first category is "strength"; the second category is

12   "consistency"?

13   A.    In terms of getting me to agree with what you

14   are saying, I don't doubt there are students that use

15   this.  When I took the case-control study course at

16   Johns Hopkins we used the book called Schlesselman.

17   So we didn't use this book.  I don't know why.  I

18   don't know whether other people use it or not, but

19   it's not the book I used.

20   Q.    On page 27, under the consistency prong, second

21   paragraph, Dr. Rothman and his colleague,

22   Dr. Greenland said:

23              "One mistake in implementing the consistency

24   criterion is so common that it deserves special

25   mention.  It's sometimes claimed a literature or set

Ivester - Cross/Mr. Tisi

1140

1    of results is inconsistent simply because some results

2    are statistically significant and some are not.  This

3    sort of evaluation is completely fallacious even if

4    one accepts the use of significance testing methods."

5         Do you see that?

6    A.    I do.

7    Q.    Do you agree with that?

8    A.    I believe we talked about this in my deposition,

9    that it says that if you do that it says some results

10   are statistically significant and some are not.  I

11   agree.  If that's all you did was line things up and

12   say these are and these are not, and that's simply

13   what you did, you would not be done with your

14   analysis, and I agree with that.

15   Q.    So if anybody had done a methodology and simply

16   sorted by statistical significance and put them in one

17   bucket on one hand, and nonsignificant results in

18   another bucket, and then sorted by study design, that

19   would not be proper methodology.  Correct?

20   A.    Incorrect.  Sorting them into buckets is not the

21   problem.  If we're going to read what he says, he says

22   to simply do that is a fallacy or it's fallacious.  I

23   agree with that.  If you do that and you stop there --

24   look at the Taher study; they count up how many

25   studies are statistically significant or not, and they

Ivancic - Cross/Mr. Tisi

1141

1   don't stop there either.  They are not wrong to

2   describe the studies as being statistically

3   significant or not.  They would be wrong if they only

4   did that.  That's how I read this.

5   Q.    The way you read it is in the context in which

6   it is written.  It is written under the section

7   involving consistency of association.  Correct?

8   A.    I'm reading this under the context of how it is

9   written?  Well, of course.

10  Q.    It is written in the section that deals with

11  consistency.  Correct?

12  A.    Exactly.

13  Q.    And so what we're trying to figure out, are

14  studies consistent.  Correct?

15  A.    Are studies consistent?

16  Q.    Yes, are multiple studies, when you line them

17  up, are they consistent?

18  A.    It says that if you simply do that, that you

19  have done something wrong.

20  Q.    And do you agree with that?

21  A.    If that's all you do.

22  Q.    The next thing I want is to show you another

23  textbook from Dr. Oleckno, and that is Opposition

24  Exhibit 1, 43.  I would ask you to go to page 222.

25          MS. BROWN:  Counsel, is that in the binder you

Tuccio - Cross/Mr. Tisi

1142

1    gave me?

2         MR. TISI:  It is in the binder.  It is

3    Exhibit 143.

4    Q.    On the left side on page 222 it says the

5    following:

6         "Finally, statistically significant is often

7    misinterpreted as meaning that the null hypothesis is

8    false or that the association is one of cause and

9    effect.  Neither can be demonstrated using statistical

10   significance testing, which depends on probabilities.

11   For these and other reasons most epidemiologists

12   prefer to use confidence intervals."

13        Do you see that?

14   A.    I do.

15   Q.    Do you agree with it?

16   A.    I'm still trying to figure out what this is.  I

17   don't know who Oleckno is.

18   Q.    Your colleague, Dr. Merlo, who is also an expert

19   in this case relied on this textbook.  You know who

20   Dr. Merlo is.  Right?

21   A.    I do.

22   Q.    Dr. Merlo, who is one of the other epidemiology

23   experts whose opinions they are challenging, has

24   relied on this textbook.

25   A.    I don't doubt you.  I just don't have any idea

1   who this is.

2   Q.    Well, do you agree with the principle most

3   epidemiologists look to confidence intervals rather

4   than just simply deciding whether or not something is

5   statistically significant or not?

6   A.    So I think most epidemiologists look at both of

7   those things, but you have to understand that they are

8   complimentary.  It's not as if one versus the other.

9   A 95 percent confidence interval is the equivalent of

10  establishing what a P of less than .05 is.

11        I think the way I have been hearing the

12  conversations go about this matter, there seems to be

13  some confusion about that.  But if the P is less than

14  .05, the 95 percent confidence interval is going to

15  include 1.  So they are basically redundant in one

16  way, but they tell you some complimentary information

17  about the significance.

18  Q.    So you look at it all?

19  A.    Of course.

20  Q.    When Dr. McTiernan was here yesterday, one of

21  the things she said was that you just don't simply

22  look at whether or not the lower bounds of the

23  confidence interval crosses 1.  She says you look at

24  it all.  You look at where the confidence intervals --

25  how tight they are, where the point estimates are, and

Ivester - Cross/Mr. Tisi

1144

1    how they line up.  You remember that testimony.

2    Correct?

3    A.    I do.

4    Q.    That's the way epidemiologists look at it.

5    Correct?

6    A.    You look at all of those things.  That doesn't

7    mean you can reach the conclusion that you are going

8    to reach just by doing that.

9    Q.    What you don't do is, you don't ignore

10   everything that happens on the right-hand side of the

11   null value and only see are there studies that cross 1

12   and then collapse it to only deal with the cohort

13   study?

14   A.    I think in almost any question you asked, if you

15   say you only do something, I'm going to disagree with

16   you.  If you say you do something, I may well agree

17   with you.  You certainly may look at whether or not

18   the confidence interval includes 1, and you should use

19   that to inform something about what the information is

20   telling you.  You should also do what you said which

21   is to also look at the confidence interval and how

22   wide it is.  Those are both things that you do.

23   Q.    At the end of the day, one of the things you

24   have to do is you exercise your professional judgment

25   to try to decide what this all means.  Correct?

Ivette - Cross/Mr. Tisi

1145

1   A.    Yes, although there is not information enough

2   information on that particular slide to reach the

3   conclusion whether or not there is causation.

4   Q.    I didn't say that, Doctor.  We're talking about

5   it in context of consistency of association.  One of

6   the things we talked about is:  Are these results

7   consistent?  What you don't do is you don't block off

8   what is to the right of the null value and then sort

9   them by study design.

10  A.    I agree that you don't simply do that.  Each

11  time you say "only" it suggests something.  But if all

12  of those values that we saw on that forest plot were

13  all well to the right of the line of unity, that one

14  line, that would tell us something.  If they were all

15  completely to the left, that would tell us something.

16  If there is a mixture, that tells us something.  So

17  you do look at it.  But how you reach your conclusion

18  about causation doesn't come from just looking at

19  that.

20  Q.    But one of the things you have to do when you do

21  look at this is to exercise your judgment and try to

22  decide what this all means?

23  A.    That's part of the picture.

24  Q.    Now, the other thing you said, and you asked and

25  I wrote this down when J&J's lawyer asked you, you

Iveson - Cross/Mr. Tisi

1146

1   said confidence interval crosses 1 means no

2   association.  Is that true?

3   A.    That's what we were reading from that article.

4   Q.    But that is not true, is it?  When it crosses 1,

5   you can't make any decision about association.

6   Correct?

7   A.    Incorrect.  That's why I brought that article,

8   because it comes from a current good journal, from the

9   Nurses' Health Study, and because those authors used

10  the conventions that those of us who publish papers

11  and write grants have to use when we communicate with

12  people.

13  Q.    Doctor, let me bring up Exhibit 142, please.

14        Are you familiar with the American Statistical

15  Association?

16  A.    Barely.  I've heard of them, and I've heard the

17  most I've ever heard in my life from you guys.

18  Q.    Do you know whether or not Dr. Ballman was an

19  officer -- one of your co-experts for J&J was an

20  officer of the American Statistical Association?

21  A.    I don't know.

22  Q.    Let me see if we could go to the next page.

23        It is the American Statistical Association's

24  statement on p-Values, Content, Process and Purpose.

25        Do you see that?

Rucker - Cross/Mr. Tisi

1147

1   A.    Yes.

2   Q.    One of the things -- I want to go through this

3   very briefly.

4         On the left-hand side at the bottom it says:

5         "The ASA Board decided to take up the

6   challenge of developing a policy statement on p-Values

7   and statistical significance, it did so recognizing

8   this was not a lightly taken step."

9         Do you see it?

10  A.    I do.

11  Q.    First of all, you are not a statistician or

12  biostatistician; are you?

13  A.    I don't hold myself out that way, but

14  biostatistics is part of my training and part of the

15  tool set that I use in my work.

16  Q.    Next column, second paragraph, this is by

17  contrast:

18        "The Board envisioned that the ASA statement

19  on p-Values and statistical significance would shed

20  light on an aspect of our field that is too often

21  misunderstood and misused in the broader research

22  community and in the process provides the community a

23  service."

24        Do you see that?

25  A.    I do.

Foster - Cross/Mr. Tisi

1148

1    Q.    (Reading.)

2          "The intended audience would be researchers,

3    practitioners, and science writers who are not

4    primarily statisticians.  Thus, this statement would

5    be quite different from anything previously

6    attempted."

7          Do you see that?

8    A.    I do.

9    Q.    This was the first and only time the American

10   Statistical Association ever took the step to make a

11   comment on a statistical matter.

12         Do you understand that to be true?

13   A.    I don't know.  It's interesting.

14   Q.    Next page.

15         "The people who are involved in this process"

16   -- if you go on the left-hand side.

17         Do you know who Jim Berger is and Steve

18   Goodman?

19   A.    I know Steve Goodman.

20   Q.    He is at Johns Hopkins; isn't he?

21   A.    Not anymore.

22   Q.    Was he?

23   A.    He was.

24   Q.    Good researcher?

25   A.    Yes.  I think so.

Rieber - Cross/Mr. Tisi

1149

1  Q.    Now, one of the things attached to this

2  editorial is the ASA statement on statistical

3  significance and p-Values.

4        Do you see it?

5  A.    I do.

6  Q.    Then if you go to the second paragraph on the

7  introduction, it says:

8        "Underpinning many published scientific

9  conclusions is the concept of statistical

10  significance, typically assessed with an index called

11  p-Value."

12        Do you see that?

13  A.    I do.

14  Q.    (Reading.)

15        "While the p-Value can be a useful statistical

16  measure, it is commonly misused and misinterpreted."

17        Do you see that?

18  A.    I do.

19  Q.    The next paragraph, it says, second sentence:

20        "The issues touched on here affect not only

21  research, but research funding, journal practices,

22  career advancement, scientific education, public

23  policy, journalism, and law."

24        Do you see that?

25  A.    I do.

Ricco - Cross/Mr. Tisi

1150

1    Q.    Let's go to the second statement that the ASA

2    makes on statistical significance.  It says:

3          "P-Values do not measure the probability that

4    the studied hypothesis is true or the probability that

5    the data were produced by random chance alone."

6          Do you see that?

7    A.    I do.

8    Q.    Do you agree with that?

9    A.    I do.

10   Q.    (Reading.)

11         "Researchers often wish to turn to a P-Value

12   into a statement about the truth of the null

13   hypothesis or about the probability that random chance

14   produced the observed data.  The p-Value is neither.

15   It is a statement about the data in relation to a

16   specified hypothetical explanation and is not a

17   statement about the explanation itself."

18         Do you see that?

19   A.    I do.

20   Q.    Do you agree with that?

21   A.    There is a lot there.  It depends upon the

22   context for this.  When you say -- if you want to turn

23   it into a statement about the truth of a null

24   hypothesis, it's not literally that.  It's the chance

25   you are willing to take to get the wrong answer.  So a

Iveese - Cross/Mr. Tisi

1151

1  lot of this I think is very confusingly described by

2  people, but these particular words I agree with them.

3  Q.    The next point is:

4        "Scientific conclusions and business or policy

5  decisions should not be based on whether p-Value

6  crosses a specific threshold.  Practices that reduce

7  data analysis or scientific inferences to a mechanical

8  bright line rule such as p-Value less than .05 for

9  justifying scientific claims or conclusions can lead

10  to erroneous beliefs and poor decision-making.  A

11  conclusion does not immediately become true on one

12  side of the divide or false on the other."

13        Do you see that?

14  A.    I do.

15  Q.    Do you agree with it?

16  A.    Generally speaking, you can reach the wrong

17  conclusion.  But I would say every single drug that

18  you and I take that has been approved by the FDA

19  requires a p-Value of less than .05.  Even if you

20  philosophically disagree with hypothesis testing or

21  some of the principles, this is the world we live in.

22  Q.    Doctor, drug approval is a different issue than

23  we're facing here.  We are trying to decide whether or

24  not the epidemiologic data on balance supports a

25  conclusion that there is an association and a

Inocco - Cross/Mr. Tisi

1152

1  consistency --

2  A.    It is not at all a different issue.  It is a

3  different application.  It's the same topic and the

4  same topic is if you set up a hypothesis and test it,

5  do you accept or reject the hypothesis?

6        My point is the FDA may be doing something

7  that is imperfect, but that is the world we live in.

8  That JAMA article we looked at earlier today, JAMA

9  Oncology, their editors and the authors may be doing

10 something imperfect,  but that's the world we live in.

11 If you want to report your results those are the rules

12 you use right now.

13 Q.    We're not talking about reporting the results.

14 We're talking about interpreting the results.

15       Let me ask the question.  I'm trying to get

16 from you not about publishing an article, not about

17 getting a drug approved.  I'm asking you a question.

18       We're looking at a series of studies and

19 trying to decide whether or not those studies, taken

20 in the aggregate, favor an association and a

21 consistency of association.

22 A.    What you are showing me --

23 Q.    There is no question pending.  Let me ask you

24 the question.

25       My question now is:  Isn't it important to

Plunkett - Cross/Mr. Tisi

1153

1    look at the totality of the data, including confidence

2    intervals, including p-Values, including the risk

3    estimates, look at it all and see what patterns arise?

4    A.    I already said that I agreed with you when you

5    asked me that before.

6    Q.    So you don't simply say:  You know, it crosses

7    the line, no association?

8    A.    In which case?

9    Q.    In the case of multiple studies.  If you have

10   multiple studies side-by-side, one having crossing 1

11   and all the others not crossing 1, you wouldn't say

12   that was not an association.  Correct?

13   A.    I think you are either misunderstanding

14   something or you are trying to be confusing.

15        First of all, I don't think the authors of

16   that paper misstated it when they said there was no

17   association when they reported that, and it is the

18   same hypothesis testing principle that's used when you

19   combine studies into one.

20        For example, the meta-analysis we looked at,

21   the meta-analyses combine a pooled estimate, and they

22   provide a p-Value based on the same principle of

23   hypothesis testing.  We looked at that forest plot.

24   It tells you something.  It doesn't tell you

25   everything.  And these things we're looking at here

1    don't tell you what to do in this circumstance.

2    Q.    Doctor, right after you filed your expert

3    report, the American Statistical Association came out

4    with a journal with 42 articles dealing with this very

5    issue, did it not?

6    A.    It did.

7    Q.    And it devoted the entire journal to this issue

8    because of what it described as a serious problem with

9    the use or the misuse of statistical significance.

10   Correct?

11   A.    That was one of the motivations.

12   Q.    And one of the articles that came out of that,

13   an editorial that I'm going to show you.  It is

14   Exhibit 13.

15        Doctor, I placed in front of you, this is

16   Diette Exhibit No. 13.  This is an article that

17   accompanied those 42 articles, but it happened to

18   appear in the journal Nature.

19        Do you see it?

20   A.    I do.

21   Q.    It is signed by, among others, Sander Greenland.

22   Correct?

23   A.    That's correct.

24   Q.    Dr. Greenland is the co-author on the book of

25   epidemiology that we talked about before.  Is that

Freese - Cross/Mr. Tisi

1155

1    correct?

2    A.    That's correct.

3    Q.    And Sander Greenland you know within a week of

4    this being circulated, 800 statisticians and different

5    researchers and epidemiologists signed onto this.

6    Correct?

7    A.    I think that's correct.

8    Q.    And it was widely circulated including amongst

9    the Johns Hopkins community.  Correct?

10   A.    You showed me -- your colleague showed me

11   something from our ICTR website that showed that it

12   had been posted there.

13   Q.    If anyone were to describe Dr. Rothman and

14   Dr. Greenland and any of these people as outliers,

15   would that be accurate?

16   A.    In what way?

17   Q.    Pariahs in the epidemiology community?

18   A.    That's not a term I use.  There is no reason to

19   disparage them.

20   Q.    Okay.  Now, in this article they describe what

21   they call a pervasive problem, and they say:

22          "Let's be clear about what must stop:  We

23   should never conclude that there is no difference or

24   no association just because a p-Value is larger than a

25   threshold such as .05 or equivalently because a

Huseby - Cross/Mr. Tisi

1156

1  confidence interval includes zero."

2          Do you see that?

3  A.    I do.

4  Q.    "Neither should we conclude that two studies

5  conflict because one has a statistically significant

6  result and the other does not.  These errors waste

7  research testify efforts and misinform policy

8  decisions."

9          Do you see that?

10  A.    I do.

11  Q.    Do you agree with the authors that you should

12  not -- epidemiologists must not say that studies

13  conflict because one has a statistically significant

14  result and the other one does not?

15  A.    I don't automatically agree with that.  I think

16  you have to look at the context for this.  I think you

17  showed me this is an editorial in a different journal

18  from Nature, which if you look at the exact same

19  journal issue, you will see that they provide

20  instructions to the authors on how to report their

21  p-Values and how to report their confidence intervals.

22  These are interesting ideas you are presenting.  I'm

23  not sure whether it is going to be the Court's job to

24  decide whether or not this has taken hold.

25          But I can tell you that in the current world I

Foster - Cross/Mr. Tisi

1157

1 work in of epidemiology and medicine we rely on

2 p-Values, we rely on 95 percent confidence intervals,

3 and I can't send a paper to a publication and say:  By

4 the way Sander Greenland said I shouldn't be doing

5 this,  so I don't want you to look at this.

6 Q.    Do you understand that we are suggesting you

7 jettison any concept of statistical significance?

8 A.    I can't tell what you're suggesting that you're

9 not saying now.

10 Q.    What he's saying here is you don't misuse it.

11 You don't conclude the two studies conflict because

12 one is statistically significant and one is not.

13 A.    It also says that you shouldn't use a p-Value

14 threshold such as .05.  Unfortunately, that's the

15 world we live in.  To me this is like if you decided a

16 jury trial of 12 people is the wrong way to do law.

17 Maybe there is a better way.  But I assume at the

18 moment you use 12 people in the jury pool.

19         This is the same thing.  There could be a

20 better way, but at the moment these are not the rules

21 of the game.  These are somebody's opinion about what

22 might happen.

23 Q.    Doctor, if you go back to the American

24 Statistical Society's statement, you have articles

25 going back to the 1960s that support the misuse.  You

Rosol - Cross/Mr. Tisi

1158

1  can take a look at it.  There are footnotes here going

2  back to the 1960s and '70s talking about that

3  epidemiologists should not do what you are doing.

4  A.    No.  What I told you earlier -- at least I've

5  told the Court earlier -- was this is an issue we have

6  been discussing ever since I have been in this field.

7  This is over 20 years.  It is a very interesting

8  issue, and it may at some point change.

9       You are cherry-picking a few quotes that are

10  opportunistic here.  But if you read the entire

11  introduction to that journal you are talking about,

12  you are going to see a lot of different opinions

13  including questions like:  Are we suggesting that we

14  abandon P-Values?  And they say no, and they go on and

15  on and say:  Well, what should the substitute be?

16  There are at least seven or eight major ideas of what

17  the substitute should be and they have not been

18  endorsed yet.

19  Q.    I really need you to focus on what I'm asking.

20  I'm asking, using statistical significance to define

21  consistency. I'm not asking you to publish a paper.

22  I'm not asking you to get a drug approved.  I'm not

23  asking you what it takes to get a paper published.

24  I'm asking you how do you interpret the results when

25  you're combining studies together.

Reece - Cross/Mr. Tisi

1159

1  So if you would stay focused on that, I'm

2  going to ask you a question.

3  The next question goes to the next page.  They

4  have a statement here that says:

5  "Beware of false conclusions."

6  If you look at the chart, they give a generic

7  example, and the generic example are two studies:  One

8  study they are keeping the point estimate exactly the

9  same.  Correct?

10  A.    That's correct.

11  Q.    One study has a tight confidence interval not

12  crossing 1?

13  A.    That's correct.

14  Q.    The other one has a longer confidence interval

15  crossing 1?

16  A.    That's correct.

17  Q.    And it would be wrong to say you look at this

18  little tail right here and say that these two studies

19  are inconsistent because this study crosses 1.

20  Correct?

21  A.    Well, there is obviously some difference in

22  those studies, and one has greater variability than

23  the other.  They both have the same point estimate but

24  you wouldn't look at those and say they are identical

25  because they are not.

Weese - Cross/Mr. Tisi

1160

1 | Q.    Consistency doesn't imply you have to have

2 | identical studies results.  How often does that

3 | happen?

4 | A.    Still, there is an inconsistency here.

5 | Q.    But to say that these two studies are

6 | inconsistent for the purpose of a Bradford Hill

7 | analysis, are you saying these two studies are

8 | inconsistent?

9 | A.    They might or might not be.  I would say more

10 | than just what you have on the slide there.  But what

11 | I would say is that if you looked at my slide from

12 | earlier today, I'm not saying the entire consistency

13 | criterion is fulfilled by whether things are

14 | statistically significant or not.  What I really

15 | focused on primarily was that the different designs

16 | produce different answers, and it is not because of

17 | something that looks like that.  It's because there is

18 | a null effect from the cohort studies and not the

19 | case-control.

20 |     The one up top would not be a good description

21 | of the average case-control effect and the bottom the

22 | average cohort effect.  You have to move the red dot

23 | way, way, way to the left, almost to the line of 1

24 | there.

25 | Q.    Doctor, when you were using the example with

Roslee - Cross/Mr. Tisi

1161

1    J&J's counsel, you were talking about one study, and

2    you talked about how wonderful the study was.  Do you

3    remember that?

4    A.    I did.

5    Q.    What we are talking about here is, not

6    evaluating internally one study but comparing studies

7    across a continuum of 40 years in multiple countries,

8    multiple researchers, multiple different designs.

9    Correct?

10   A.    Correct.

11   Q.    And so when you are comparing studies as opposed

12   to looking internally within a study, you have to have

13   some metric to kind of understand what those studies

14   are telling you.  True?

15   A.    Some metrics help.

16   Q.    What you are doing, what I think you are saying

17   is if it's statistically significant -- I wrote this

18   down -- counsel wrote it down.  If it's 1, it's no

19   association; and if it is no association, it is

20   inconsistent with a study that shows a positive

21   association.

22         Is that what you are saying or not?

23   A.    That's literally what that study language was.

24   Q.    And what I'm asking you, is:  Are these 800

25   statisticians and the people at the American

Hopkins - Cross/Mr. Tisi

1162

1   Statistical Association, you have one study and you

2   have a consensus statement, what are we to make of

3   that, Doctor?

4   A.    There is no consensus statement.  There are 800

5   people who signed onto the proposition we should look

6   into this and consider this.  If you read the entire

7   front end of that document from the statistical

8   association, you will see lots of good ideas in there,

9   and it is not a prescription for what to do.  It's a

10  call for considering potentially other ways of doing

11  business.

12  Q.    Doctor, they are not saying this is a call for

13  what not to do.  Back up to the prior page.

14        They are not saying what they are calling not

15  to do.  They are saying, let's be clear about what

16  must stop.

17  A.    You are reading from a different document.

18  Q.    Doctor, wouldn't you agree with me, when you go

19  back and take a look at the studies, that you have to

20  use people like you and Dr. McTiernan,

21  Dr. Siemiatycki, and Dr. Merlo, they have to use their

22  own judgment when looking at this plot.  There is no

23  mechanical way of doing it.

24        Is that true when you look at the forest plot?

25  If it were that easy, people like me could do it.  You

Houston - Cross/Mr. Tisi

1163

1  have to use your professional judgment to make that

2  call.  True?

3  A.    Make which call?

4  Q.    About whether or not this is a consistent

5  association.

6  A.    Well, if you use your professional judgment

7  correctly, you should look at those ones below that

8  heavy horizontal line that says "cohort studies."  You

9  should remove two of the bottom three because that's

10 redundant.  It's representing a single study three

11 times to make it look as if there are five different

12 results.  There are not.

13        You would take the most recent one which is

14 the Gates one at the bottom.  You would keep Gonzalez

15 and you would keep Houghton, and I think you would

16 reach a conclusion that those are consistently

17 approximately null, which is exactly the same thing

18 that the meta-analyses say when they analyze the

19 cohort studies by themselves.

20 Q.    And the reason why you say that is because in

21 your mind case-control studies are inferior by design

22 to cohort studies and some of these results cross 1.

23 Correct?

24 A.    No, you are incorrect.  The reason I'm saying it

25 is because that slide is misleading; and if we are

1  looking for consistency that I was talking about

2  earlier, it is the consistency by study design.

3       So regardless of what you think you know about

4  the ones that are all above that horizontal line,

5  there is an inconsistency between what you see up

6  above that line and what you see down below that line,

7  especially when you remove the misleading two extra

8  bars there.

9  Q.    I want to turn my attention to the bias issue

10 that you talked about before.  It's on page 19 of 20

11 of your report.  The study that you rely on, I tried

12 to write it down, and you said it's a teaching study.

13 It's the kind of study you would take and you are

14 going to teach people about the issue of recall bias.

15       Do you remember that?

16 A.    I do.

17 Q.    It's the Schildkraut study?

18 A.    It is.

19 Q.    And the Schildkraut study actually was written

20 by one of plaintiffs' experts, Dr. Moorman?

21 A.    Correct.

22 Q.    Your opinions on recall bias are on page 19 or

23 20.  The study that you primarily rely on is the

24 Schildkraut study.  Correct?

25 A.    Yes.

Moorman - Cross/Mr. Tisi

1165

1   Q.    And that's the study you told counsel is the one

2   you would use as a teaching study?

3   A.    Absolutely.

4   Q.    About recall bias.  Correct?

5   A.    Without a doubt.

6   Q.    And if you look at what Schildkraut said --

7   let's go to Schildkraut.

8         MR. TISI:  It's Exhibit No. 8, your Honor.

9   Q.    Let's just orient ourselves to what the study

10  actually said.

11        This is the Schildkraut study, and it's titled

12  the "Association Between Body Powder Use and Ovarian

13  Cancer," and this is from the AACES.  Correct?

14  A.    Yes.

15  Q.    Dr. Moorman is the last author which means she

16  is the senior author on the paper?

17  A.    Sometimes it does.

18  Q.    The results of the study as listed above is

19  powder use was common 62 percent of cases and

20  52 percent of controls.  Genital powder was associated

21  with an increased risk of epithelial ovarian cancer,

22  odds ratio 1.44, and a dose-response relationship was

23  found for duration of use and number of lifetime

24  applications.

25        Correct?

Rigler - Cross/Mr. Tisi

1166

1    A.    That's correct.

2    Q.    This is one of those studies that found an

3    association and found dose-response?

4    A.    In the combined pre-and-post 2014.

5    Q.    And if you look at the last page -- before we

6    talk about recall bias -- if you go to the last page,

7    page 1416, it says:

8          "The results of the current study showed that

9    genital powder use was associated with ovarian cancer

10   risk in African-American women and are consistent with

11   localized chronic inflammation in the ovary due to

12   particulates that travel through a direct transvaginal

13   route."

14         Do you see that?

15   A.    I do.

16   Q.    It's talking about biologic plausibility and

17   association  Correct?

18   A.    Correct.

19   Q.    "The dose-response observed for duration of

20   genital powder use provides further evidence for the

21   relationship between genital powder use and overall

22   EOC risk.  Our data suggest that the increased risk

23   due to genital powder applies to both serous and

24   nonserous histological subtypes of EOC?"

25         Do you see that?

Moorman - Cross/Mr. Tisi

1167

1    A.    I do.

2    Q.    First of all, you know that Dr. Moorman was not

3    our expert when she wrote this?

4          MS. BROWN:  Objection, your Honor.  How in the

5    world would he know that.

6    Q.    You read her deposition, haven't you?

7    A.    If I did, I don't remember that fact.

8          THE COURT:  Okay.  Let's move on.

9    Q.    Now, the issue of recall bias was addressed by

10   her using the very data that you say is exemplary of

11   the issue.  Correct?

12   A.    It is.

13   Q.    And if you look at the chart, and I think the

14   chart you referred to is chart Table II.  It shows a

15   differentiation between pre-and-post-2014 recall.  Is

16   that correct?

17   A.    Or reporting.

18   Q.    Or reporting.

19         Now, Dr. Schildkraut addressed that finding --

20   the Schildkraut authors addressed that finding; did

21   they not?

22   A.    They discussed it.

23   Q.    And if you go to page 1416, it says, last page

24   of the narrative, on the right-hand side:

25         "The authors state:  Although our findings

Moorman - Cross/Mr. Tisi

1168

1  suggest that the publicity of the class action

2  lawsuits may have increased reporting of body powder

3  use, our data do not support that recall bias before

4  2014 versus 2014 or later, which would account for the

5  association with body powder use and EOC.  It is

6  possible that the lawsuits sharpened the memories of

7  body power use and improved the accuracy of reported

8  use for both cases and controls interviewed in 2014 or

9  later."

10          Correct.

11  A.     That's correct.

12  Q.     She makes two observations:  No. 1 is, this

13  finding doesn't incriminate in any way the study that

14  came before 2014.  Correct?

15  A.     I think this is an extrapolation from their own

16  data.  This is a current era study.  They can't

17  comment from this study based on what was true

18  earlier.

19  Q.     I'm asking you what they said.

20  A.     I'm answering what I think they mean because

21  that's the way I heard you.  We just read the

22  statement.

23  Q.     Do you want to see what Dr. Moorman means about

24  that?

25  A.     Not particularly.  I think this is a really

Moeeu - Cross/Mr. Tisi

1169

1    interesting study.  They provide a really good

2    rationale for looking for an interaction.  They

3    demonstrate an interaction which you just showed in

4    Table II.  They calculated the p-Value for whatever

5    reason and showed that interaction was significant.

6           So it shows one of the clearest examples I

7    have seen, and the only one in this particular matter,

8    where there is evidence of recall bias within a

9    particular study.

10          MR. TISI:  Your Honor, permission to play a

11   very brief video clip, about 30 seconds on this issue.

12          THE COURT:  On which issue?

13          MR. TISI:  On the issue of recall bias.

14          THE COURT:  I'm not sure why we are doing

15   that.

16          MR. TISI:  I want to ask him whether or not he

17   agrees or disagrees about what she said about her own

18   study.

19          MS. BROWN:  Your Honor, I would object.  No.

20   1, I'm not sure what the relevance of that is.  No. 2,

21   there is no foundation he is even aware of that and

22   certainly has no impact on his opinion.  So I would

23   object on lack of foundation and relevance.

24          MR. TISI:  Your Honor, he spent a lot of time

25   discussing her study, A.  B, he spent a lot of time

Moore - Cross/Mr. Tisi

1170

1  criticizing her, and half of his report is spent

2  criticizing the methodology of the plaintiffs'

3  experts.  I think hearing from what a witness for

4  30 seconds --

5         THE COURT:  I'm not sure when you have a 30-

6  second clip, I have a problem with what was said

7  before and what was said later.  That's a problem I

8  have.  So I don't think that's going to be useful.  So

9  let's move on.  There is plenty of briefing on Dr.

10  Moorman, too.

11  BY MR. TISI:

12  Q.    Doctor, counsel asked you questions about IARC

13  and whether IARC addressed the issue?

14  A.    Which issue?

15  Q.    The issue of bias, recall bias.

16         Do you remember counsel for J&J asking you

17  whether IARC addressed the issue of whether recall

18  bias affected the case-control studies?

19  A.    Yes.

20  Q.    In fact, that was not a complete reading of what

21  IARC actually said, was it?

22  A.    It's a very long monograph.

23  Q.    It's not even a complete statement of what they

24  said about recall bias; was it?

25  A.    Let's have a look.

Roede - Cross/Mr. Tisi

1171

1    Q.    Let's have a look.

2          Would you please go to Exhibit 57 in your

3    booklet, page 409.  Why don't we address all of the

4    things IARC addressed here because it addresses bias,

5    chance, and confounding, all three things.  I intend

6    to discuss them differently so we don't have to go

7    back to the document.

8          IARC 2010 publication says the following --

9    explain for the record what IARC is.  IARC has pulled

10   together all the studies and looked at this issue --

11         THE COURT:  Do you want him to explain it or

12   do you want to explain it?

13         MR. TISI:  I apologize.

14   Q.    You understand that IARC looked at this issue in

15   2006?

16   A.    I do.

17   Q.    You understand they aggregated all the studies

18   that were then available?

19   A.    I do.

20   Q.    You understand those results were actually

21   published in 2010 and that's what we are looking at

22   now.  Correct?

23   A.    That's what I understand.

24   Q.    The first thing they looked at were some of the

25   issues you described:  Could chance explain these

Moore - Cross/Mr. Tisi

1172

observations or results?

"First, while chance cannot be ruled out as an explanation, it seemed very unlikely to be responsible for the consistent pattern of excess risks."

Do you see that?

A.    Yes.

Q.    First of all, they call it "consistent," correct, a consistent pattern?

A.    Correct.

Q.    When they talk about the risk, they talk about it in terms of consistency.  Correct?

A.    Correct.

Q.    Next sentence:

"A second possible explanation would be recall bias, to which case-control studies may be particularly susceptible."

See that?

A.    Yes.

Q.    (Reading.)

"This may have been the case had there been wide spread publicity about the possible association between the use of body powder and cancer.  In such circumstances, it is possible that women who had ovarian cancer could be more likely than women who did not to remember or over-report a habit, such as body

Roszeo - Cross/Mr. Tisi

1173

1    powder use, if they thought that it may have played a

2    role in their illness."

3              Did I read that correctly?

4    A.    You did.

5    Q.    (Reading.)

6              "There was a flurry of publicity in the U.S.A.

7    in the mid 1970s concerning the possible risks of

8    cancer posed by the use of talc body powders.

9    Following industry decision to market talc powders

10   with no asbestos, it was the opinion of the working

11   group that there had not been widespread public

12   concern about this issue, at least until relatively

13   recently.  Therefore, the working group considered it

14   unlikely that a bias could explain the set of

15   consistent findings that stretch out over two

16   decades."

17             Do you see that?

18   A.    Yes.  Would you mind just finishing.

19   Q.    I am.

20             "The group believed that recall bias was

21   possibly inherent in the case-control studies and

22   could not rule it out."

23             That's the sentence your counsel provided to

24   you.  Correct?

25             MS. BROWN:  Objection, your Honor.  That's

Roede - Cross/Mr. Tisi

1174

1  incorrect.  The IARC sentence we put out was the

2  definition of 2-B.  It was not this.  So I would

3  object to any suggestion we were somehow

4  misrepresenting that.

5        THE COURT:  All right.

6  BY MR. TISI:

7  Q.  Let's look at what they actually said.  They

8  said:

9        "The working group considered it unlikely that

10 such a bias in the context of talc and ovarian cancer

11 was the explanation."

12       Did they not say that?

13 A.  They said both that and that it was a

14 possibility.

15 Q.  It always is a possibility.  In fact, Dr. Gordis

16 addresses that in his book, but he says it almost

17 never happens; doesn't he?

18 A.  To the contrary.  He actually provides excellent

19 examples.

20 Q.  Let's go to his book, if you have it in front of

21 you.

22       THE COURT:  Mr. Tisi, you have a half hour

23 left.

24       MR. TISI:  I'm going to move on, your Honor.

25 Q.  Let's talk about that confounding.

Roddo - Cross/Mr. Tisi

1175

1    IARC also addressed the issue of confounding;

2    did it not?

3    A.    It did.

4    Q.    If you go to page 408 of the 2010 IARC report,

5    it says --

6         MR. TISI:  For the record, your Honor, that is

7    Exhibit 8.

8    Q.    It says:

9         "It is possible that confounding by

10   unrecognized risk factors may have distorted the

11   results.  One or more factors, if they are causes of

12   ovarian cancer and also associated with the population

13   of perineal use of talc, could induce the appearance

14   of an association between the use of talc and ovarian

15   cancer where there is none."

16        Do you see that?

17   A.    I do.

18   Q.    "In order for such an unrecognized risk factor

19   to induce the consistent pattern of excess risk in all

20   the case-control studies, it would be necessary for

21   the factor to be associated with perineal talc use

22   across different countries in different decades."

23        That's the issue I raised before.  Correct?

24   You would have to show the confounder in the case we

25   are talking about here with douching, it would have to

 1  be a pattern of use that would be the same in other

 2  countries, in different decades, and under different

 3  circumstances than it was in the Nurses Health Study,

 4  in the Sister Study.  Correct?

 5  A.    You would have to show it was different?

 6  Q.    You would have to show it was the same.

 7  A.    No.  If you wanted douching to be the only

 8  example, you would have to show that that was also

 9  present.

10  Q.    I'm talking about douching now.

11  A.    I missed that.  I thought we were talking about

12  here in general about confounders.

13  Q.    If douching was an issue, a true confounder, it

14  would have to be an issue that was associated with

15  talc use, not only in the sister study, but in every

16  study in every country in every decade in which this

17  issue was studied.  True?

18  A.    No, it wouldn't.

19  Q.    Doctor, isn't that what IARC is saying here:

20        "It would be necessary for the factor to be

21  associated with perineal talc use across different

22  countries and different decades to be a true

23  confounder in this circumstance"?

24  A.    They are saying that.  But what I'm saying is

25  that douching would not have to be the confounder, and

Moore - Cross/Mr. Tisi

1177

1  it wouldn't have to be present in all of those other

2  studies.

3  Q.    You can't say to a reasonable degree of medical

4  scientific certainty; and, in fact, you don't know

5  that confounding explained the risks of ovarian cancer

6  and talc in studies.  True?  You say it could and it

7  may?

8  A.    That I agree with.

9  Q.    But you don't say that it does; do you?

10 A.    No, most of the risks of ovarian cancer isn't

11 known and so most of the risk has not been accounted

12 for in any of the studies.

13 Q.    Just to be clear, you cannot say to a reasonable

14 degree of medical certainty that douching is a

15 confounder for the ovarian cancer study; can you?

16 A.    I cannot say that it is, correct.

17 Q.    And you cannot say any of the factors that you

18 discussed -- you cannot say that confounding is a

19 factor that in your opinion to a reasonable degree of

20 medical certainty affected the results of these

21 studies; can you?

22 A.    I think that genetic susceptibility likely did,

23 but I can't prove it to you.

24 Q.    Going back to the issue of recall bias, your

25 report is very clear that recall -- that you say it

Moore - Cross/Mr. Tisi

1178

1    could affect.  You are not telling the Court that to a

2    reasonable view of medical certainty based upon your

3    review of the entirety of the data that recall bias

4    was the explanation for the increased risk in the

5    case-control studies, are you?

6    A.    I can't say it has to be.  I can say it's

7    demonstrated in the one study affirmatively.

8    Q.    It's demonstrated in one study from 2014

9    forward, in that one study?

10   A.    True.

11   Q.    And most of these studies we are talking about

12   preceded 2014.  Correct?

13   A.    And didn't examine the issue.

14   Q.    Let me ask you this, Doctor:  On the recall bias

15   issue, you provided appendix A to your report, which

16   was a list of articles in a public media about talc

17   and ovarian cancer, and you used that to illustrate

18   the possibility prior to 2014 there may have been

19   publicity in some of these -- may have been publicity

20   that may have affected some of these women.  Correct?

21   A.    That's correct.

22   Q.    I can bring it up, but the record will reflect

23   and you can take a look at it, if you wish, you made

24   no attempt to correlate those media reports with the

25   studies at issue in this case?

Feueua - Cross/Mr. Tisi

1179

1    A.    How would you do that?

2    Q.    Well, you might say we have a couple of studies

3    from Australia, and let's see whether or not there was

4    any publicity in Australia.

5    A.    When we're talking about Schildkraut, they

6    didn't just say there was news reports.  They

7    literally had their own data to see whether that

8    occurred.  I can't do that even if you want me to.

9    Q.    The next question is, let me talk about the

10   issue of asbestos.

11        Would you agree with me, Doctor, there is no

12   safe dose of asbestos in your experience?

13   A.    I'd agree that there is no dose that's been

14   demonstrated to be safe, but I know there has to be

15   one.

16   Q.    And putting the issue of causation aside, would

17   you agree with me that if you are doing a Bradford

18   Hill analysis and you are looking for biologic

19   plausibility, you would agree with me on a couple of

20   basic principles -- let me rephrase the question.

21        No. 1, asbestos is a known carcinogen?

22   A.    That is correct.

23   Q.    No. 2, there are studies linking ovarian cancer

24   and asbestos?

25   A.    There are with some challenges to them.

Reece - Cross/Mr. Tisi

1180

1   Q.    No. 3, that IARC has taken the position that

2   asbestos is an ovarian carcinogen?

3   A.    Correct.

4   Q.    No. 4, you are looking at talcum powder products

5   in this case, and I think your phrase is "whatever

6   constituents are contained in the product"?

7   A.    Correct.

8   Q.    Now, when you are looking at the association

9   aspect of it, the statistical side of it, consistency

10  strength, et cetera, it's baked into the epidemiology.

11  Correct?

12  A.    If we're talking about the epidemiology that

13  relates perineal application of talcum powder and

14  ovarian cancer.  Is that correct?  I'm trying to

15  clarify because I want to make sure what question I'm

16  answering.

17  Q.    Yes, correct.

18        Let's take those statistical measures of

19  epidemiology and put them aside for a minute and talk

20  about biologic plausibility, which is the biology

21  aspect of it.

22        Considering whether or not the association

23  seen or suggested makes sense, you agree that's the

24  definition of biologic plausibility.  Correct?

25  A.    It's reasonable to call it that.

Pisece - Cross/Mr. Tisi

1181

1    Q.    So if biologic plausibility, if the definition

2    is:  Does the association make sense from a biologic

3    standpoint, if that is the definition, would the

4    presence of a carcinogen or a probable carcinogen in

5    the product, generally speaking, provide you with

6    additional information, that would allow you to say

7    this association we see, it makes sense it could be

8    causal?

9    A.    Not in this case, no.

10   Q.    I'm asking generally speaking.

11   A.    How does that work?  I understand it's a

12   hypothetical.

13   Q.    In evaluating biologic plausibility, if I have a

14   glass of soda and I drink it, and I get sick, and we

15   find out in the soda there is chili powder, and

16   somebody says, does it make sense that that soda made

17   Chris sick, would the presence of chili powder help

18   explain what happened to me?

19   A.    Maybe.  I don't know.

20   Q.    You don't think it would?

21   A.    I don't know.  Does chili powder make you sick?

22   Q.    All right.  If I have a bottle of talcum powder

23   and in this bottle are known carcinogens, and we have

24   a pattern of epidemiology studies which demonstrate an

25   increased risk, if I have a carcinogen in here, does

Moore - Cross/Mr. Tisi

1182

1  it help make sense in looking at the totality of the

2  data that that may be an explanation?

3  A.    Only in an abstract way.  I think you would have

4  to understand something about what kind of dose you

5  are talking to see if it makes any sense at all.

6  Q.    Dose goes to causation.  Correct?

7  A.    It can.

8  Q.    I'm talking about biologic plausibility, which

9  is a totally different concept; isn't it?

10 A.    Not necessarily.

11 Q.    But it can be?

12 A.    Well, it is to me because if you said that there

13 was a single fiber of asbestos in the bottle, and you

14 were going to say, is that biologically plausible it

15 causes cancer?, I would say, No.  I don't know of any

16 study that shows a single fiber can.  So it's not

17 enough to just know there's a single fiber.  You would

18 have to know something more about the dose.

19 Q.    How many women do you know, Doctor, who use a

20 bottle of baby powder once in their lifetime?  These

21 studies talk about lifetime use, daily use, weekly

22 use.  Correct?

23 A.    Some do, yes.

24 Q.    Some of these are over decades.  Correct?

25 A.    That's correct.

Rosebo - Cross/Mr. Tisi

1183

1    Q.    If there is a fiber or two or five or ten in

2    every bottle and use it for their lifetime, does that

3    help you decide on biologic plausibility?

4    A.    No.  Dose is a very different concept than that

5    just how many fibers are there.  Dose literally means

6    the amount of the substance that reaches the target

7    organ.

8    Q.    How many fibers does it take to cause

9    mesothelioma?

10   A.    No idea.

11   Q.    Can one fiber cause changes that are consistent

12   with mesothelioma?

13   A.    Really doubtful.

14   Q.    Can ten?

15   A.    No idea.

16   Q.    Would you agree with me that the presence of

17   asbestos, for example, is relevant to the question of

18   whether or not it is a biologically plausible

19   mechanism for causing ovarian cancer?

20   A.    Not without knowing something about the dose

21   that you are talking about.

22   Q.    Do you know that PCPC on behalf of the talc

23   industry presented a report to the FDA in 2009 on the

24   issue of ovarian cancer in talc?

25        MS. BROWN:  Objection, your Honor, to the

Moore - Cross/Mr. Tisi

1184

1    relevance of this.

2         MR. LOCKE:  I also object for lack of

3    foundation.

4         THE COURT:  What's the basis, Mr. Tisi?

5         MR. TISI:  Let me go to a published article.

6         THE COURT:  Okay.

7    BY MR. TISI:

8    Q.   Are you familiar with an article by Huncharek

9    and Muscat?

10        MR. TISI:  I apologize.  I grabbed the part

11   that did not have a highlight.

12   A.   I don't believe I have seen this one before.

13        MS. BROWN:  Is it in the binder, counsel?

14        MR. TISI:  It is.

15   Q.   If you go to page 505.

16        THE COURT:  What exhibit?

17        MR. TISI:  Exhibit 155, your Honor.

18        THE COURT:  What page?

19        MR. TISI:  Page 505.

20   Q.   This is a review, and I will represent to you

21   that this was an article that was authored by people

22   who were both consultants and expert witnesses for

23   J&J.

24        If you look at page 505, three-quarters of the

25   way down, there is a statement that begins with, "A

Reddy - Cross/Mr. Tisi

1185

1    number of investigators."

2         Do you see that?

3    A.    I do.

4    Q.    Go to page 505.  It says:

5         "A number of investigators initially

6    implicated talc products as possible carcinogens, as

7    before the early 1970s some talc products contained

8    small amounts of asbestos fibers.  Clearly, such

9    products could possibly represent a carcinogenic risk

10   secondary to asbestos contamination.  It should be

11   pointed out that this in no way implicates talc as a

12   toxin if the problematic constituent of such products

13   was asbestos fibers, not talc."

14        Do you see that?

15   A.    I do.

16   Q.    Putting aside the issue whether or not talc or

17   other constituents may be carcinogenic.  If it

18   contains asbestos, that is at least a biologic

19   explanation for the epidemiology.  Is that not

20   correct?

21   A.    Two things:  One, you still need the dose.  But

22   they are also citing an article Rohl, which has been

23   found to be unreliable.  That particular study has

24   been found to be unreliable because they couldn't

25   distinguish asbestiform from non-asbestiform fibers.

Hughes - Cross/Mr. Tisi

1186

1   The premise here is based on something --

2           MR. TISI:  I move to strike.

3   Q.    I'm asking you the question about whether or not

4   the presence of asbestos in talc can provide a

5   biologic plausible explanation that would be

6   consistent with the causal inference.

7   A.    I think I've already answered that.  This isn't

8   any different just because we read this.  My answer

9   stands from what I said before.

10  Q.    Your answer would be yes, that it could.

11          MS. BROWN:  Objection, your Honor.  That

12  misstates what he testified to before.

13          THE COURT:  I'll let him give his answer now.

14  BY MR. TISI:

15  Q.    The question is:  If there is presence of

16  asbestos in the talc could that provide a biologically

17  plausible explanation that is consistent with the

18  causal inference?

19  A.    I would say no unless you can tell me something

20  about what that dose would be.

21  Q.    I want to ask you a couple of questions about

22  the -- do you know whether or not the other day in

23  court, where you were told that another trial that a

24  corporate representative of J&J --

25          MS. BROWN:  Objection, your Honor.  It sounds

Diette - Cross/Mr. Tisi

1187

1   like counsel is about to give information about

2   testimony of a J&J corporate representative.  I would

3   object as inappropriate for this context, lacking

4   foundation, and irrelevant to the inquiry before the

5   Court and to Dr. Diette's testimony.

6            MR. TISI:  It's not irrelevant, your Honor.

7            THE COURT:  Let me hear what you are trying to

8   do.  I ruled before about the J&J documents testing

9   and did not admit them.  What are you trying to do now

10  that changes that?

11           MR. TISI:  I'm trying to demonstrate that J&J

12  has taken the position that there is no safe dose of

13  asbestos, none, not a fiber, not 20 fibers, not 100

14  fibers, and J&J's corporate representative --

15           THE COURT:  Even if you say that this expert

16  may not agree with it anyway.  We're dealing with his

17  opinions.  He's already says he disagrees.  Leave it

18  to that and ask him his opinions.

19  BY MR. TISI:

20  Q.    Doctor, do you know whether or not a reasonable

21  scientist looking at that question could reach a

22  contrary conclusion?

23  A.    So I'm clear, can you say what that question is?

24  Q.    A reasonable expert looking at talcum powder

25  products, if it contains asbestos or a known or

Direct Redirect/Ms. Brown

1188

1   potential carcinogen would be relevant to the issue of

2   biologic plausibility?

3          THE COURT:  I think you are asking the

4   question regardless of dose.

5   Q.    Regardless of dose.  One fiber.  Is one fiber --

6   A.    I think a reasonable scientist would not be on

7   firm ground if their opinion was a single fiber would

8   cause cancer.

9   Q.    Ten fibers?

10  A.    I don't know what the threshold would be.

11  Q.    Where would you be comfortable?

12  A.    I would be comfortable if you could tell me what

13  the dose was that the person received from the

14  exposure that you are talking about.

15  Q.    You don't know how many fibers it would take to

16  make it biologically plausible?

17  A.    No.  You still would have to translate it into a

18  dose.

19          MR. TISI:  Your Honor, I have no further

20  questions.  Thank you very much.

21          MS. BROWN:  With the Court's indulgence, I

22  have ten minutes of redirect.

23          THE COURT:  That's fine.

24  REDIRECT EXAMINATION

25  BY MS. BROWN:

Direct Redirect/Ms. Brown

1189

1    Q.    Just a few questions for you to finish out the

2    day.

3            I want to start by picking up where counsel

4    left off regarding a hypothetical asbestos

5    contamination of talcum powder.

6            Are you with me?

7    A.    I am.

8    Q.    When we heard from Dr. McTiernan yesterday she

9    testified whether talcum powder is contaminated with

10   any alleged constituent or not, the relevant body of

11   epidemiology to look to try to determine if there is a

12   causal association between talc and ovarian cancer, is

13   the talc epidemiology.  Do you agree with that?

14   A.    I do.

15   Q.    Tell us why.

16   A.    First of all, because it's what we have.  I

17   don't know if there is even a single study that

18   characterized what the powder -- what it contained.

19   In some cases the studies talked about powder that

20   either was or wasn't talc.  But even when it was talc,

21   for the most part it wasn't identified as what the

22   constituents were.

23            So I think we are left with whatever was

24   assessed as talcum powder application is what it is.

25   Everything about it, whether it's pure or not pure,

Direct Redirect/Ms. Brown

1190

1   whatever that means, is really part of the

2   epidemiology.

3   Q.    Counsel asked you some questions about a slide

4   you and I put up about IARC.  Do you remember that?

5   A.    I do.

6   Q.    And the slide that you and I put up actually

7   regarding IARC was not the one counsel showed you, was

8   it?

9   A.    That's correct.

10  Q.    What you and I put up in fact was IARC's

11  definition of the 2-B classification.  Is that right?

12  A.    Yes, this is part of the conclusion.

13  Q.    And in classifying talc in the 2-B category,

14  what are the issues that IARC raised as it relates to

15  the evidence or the quality of the evidence of

16  carcinogenicity?

17  A.    They said that chance bias or confounding could

18  not be ruled out with reasonable confidence.

19  Q.    And what was the year of this IARC monograph?

20  A.    It was published in 2010.

21  Q.    Does that remain the IARC classification today?

22  A.    Yes.

23  Q.    And one of the articles that you discussed with

24  the Court this morning regarding recall bias was the

25  Schildkraut article.  Is that correct?

Dietterich - Redirect/Ms. Brown

1191

1   A.    It is.

2   Q.    Do you recall the year the Schildkraut article

3   was published?

4   A.    It looks like 2016 is the copyright.

5   Q.    Did IARC have the benefit of the Schildkraut

6   results in 2010?

7   A.    No.

8   Q.    You were asked some questions, Dr. Diette, about

9   a textbook by a Dr. Rothman.  Do you remember that?

10  A.    I do.

11  Q.    And you were asked some questions about whether

12  it would be appropriate to look at cohort studies to

13  the exclusion of case-control studies or above and

14  beyond case-control studies.  Do you recall that?

15  A.    I do.

16  Q.    In performing your Bradford Hill analysis in

17  this case, did you do that?

18  A.    No.  I looked at all the studies of both

19  designs.

20  Q.    Did Dr. Rothman, though, actually look at the

21  talc epidemiology?

22  A.    He did.

23  Q.    And did he publish a paper about his

24  interpretation of the talc epidemiology?

25       MR. TISI:  Objection, your Honor, to the

Direct Redirect/Ms. Brown

1192

1   phrase "publication."  This is a report I was going to

2   use if you allow me to redirect on it, I'm happy to

3   allow her to use it, but it has not been published.

4          THE COURT:  It's not published?

5          MR. TISI:  It's not published.  It's a report

6   submitted to the National Toxicology Program.

7          THE COURT:  You said in your question --

8          MS. BROWN:  I'll rephrase.

9   BY MS. BROWN:

10  Q.    Are you aware of a report by Dr. Rothman

11  regarding the talc epidemiology in 2000?

12  A.    Yes.

13  Q.    Did Dr. Rothman comment on whether the relative

14  risk seen at that time of 1.31 was strong or weak?

15  A.    He used the characterization "weak."

16  Q.    And is that consistent with your understanding

17  of how a properly-applied Bradford Hill methodology

18  would view a 1.2 or a 1.3 relative risk?

19  A.    It is.

20  Q.    And does Dr. Rothman also indicate some

21  potential concerns or challenges to interpreting a

22  relative risk of 1.3?

23  A.    Yes.  He said that bias and causation are

24  competing explanations for the weak/positive

25  association.

Direct Redirect/Ms. Brown

1193

1    Q.    And is that consistent with the, Doctor, with

2    IARC's classification of the talc epidemiology?

3    A.    Yes.

4    Q.    And did Dr. Rothman also comment on whether or

5    not the talc epidemiology indicated a dose-response?

6    A.    If you look at the very top there, one of the

7    things he notes is that a nearly constant feature of

8    causal relations in epidemiology and in pathogenesis

9    of cancer, in particular, is a monotonically

10   increasing relation between measures of exposure and

11   disease risk.

12         And then what he did is estimated what the

13   curves looked like, two different curves, and found

14   they were inversed, meaning the more you used, they

15   would appear protective from ovarian cancer.

16   Q.    Is Dr. Rothman's finding on the lack of a

17   dose-response consistent with your review of the talc

18   epidemiology?

19   A.    That summarizes at the time some of the findings

20   which at that point looked more inverse rather than

21   flat or positive.

22   Q.    Since the publication of Doctor --

23         MR. TISI:  I object to the term "publication."

24         MS. BROWN:  I'll rephrase it.

25   BY MS. BROWN:

Direct/ Redirect/Ms. Brown

1194

1   Q.    Since 2002 have you reviewed the talc

2   epidemiology as it relates to whether or not a

3   dose-response has been seen?

4   A.    Yes.

5   Q.    And have you found a consistent dose-response?

6   A.    Not a consistent one.

7   Q.    You were shown a draft screening assessment from

8   Health Canada.  Do you remember that?

9   A.    I do.

10  Q.    And does Health Canada in fact make a statement

11  regarding biological gradient or dose-response?

12  A.    Yes.

13  Q.    And what is the conclusion as recently as

14  December 2018 of Health Canada regarding whether or

15  not the talc epidemiology evidence is a dose-response?

16  A.    There are a couple just to -- the first sentence

17  states that there is a lack of an available exposure

18  effect relationship in the human epidemiological data.

19       And they also talk about Taher and colleagues

20  isolated seven studies that provided some evidence of

21  increased risk of ovarian cancer with increasing

22  perineal applications of talc.  However, none

23  demonstrated both a clear dose-response, and I think

24  the next page says "and statistical significance."

25  Q.    Is that consistent, Doctor, with your

Direct Redirect/Ms. Brown

1195

1    application of the Bradford Hill methodology?

2    A.    It is.

3    Q.    You were asked some questions, Doctor, about

4    whether this draft screening assessment was

5    peer-reviewed.  Do you remember that?

6    A.    I do.

7    Q.    And does the draft screening assessment in fact

8    contain a sentence regarding what -- a statement as to

9    that peer-reviewed process?

10   A.    Let's see.  I know we saw it earlier.

11   Q.    The sentence beginning on the bottom of one of

12   the risk assessment, and going to two:

13        "The human health portion of this assessment

14   has undergone external peer review and/or

15   consultation?"

16        Do you see that?

17   A.    I do.

18   Q.    Does the draft "Screening Assessment" report any

19   additional information about what this external peer

20   review and/or consultation may have looked like?

21   A.    I didn't see anything else.

22   Q.    The draft "Screening Assessment" goes on to

23   state:

24        "This draft Screening Assessment focuses on

25   information critical to determining whether substances

Direct Redirect/Ms. Brown

1196

1   meet the criteria as set out in Section 64 of CEPA by

2   examining scientific information and incorporating a

3   weight of the evidence approach and precaution."

4          Do you see that, Doctor?

5   A.    I do.

6   Q.    And is there additional information available on

7   Health Canada's website regarding what Health Canada

8   views as required for this precautionary approach?

9   A.    Yes, it's this document that you have that I

10  have seen.

11  Q.    And this is Health Canada decision-making

12  framework for identifying, assessing and managing

13  health risks.

14          Does it not give information about the use of

15  a precautionary approach?

16  A.    Yes.

17  Q.    A key feature of managing health risks is that

18  decisions are often made in the presence of

19  considerable scientific uncertainty.  Is that correct?

20  A.    That's right.

21  Q.    (Reading.)

22          "A precautionary approach to decision-making

23  emphasizes the need to take timely and appropriate

24  preventative action even in the absence of a full

25  scientific demonstration of cause and effect."

Direct Redirect/Ms. Brown

1197

1    Is that how the Health Canada organization
2    described its precautionary approach?
3        MR. TISI:  Your Honor, let me object.  Counsel
4    went beyond.  I focused on the scientific portion of
5    the Health Canada.  She's focusing on the regulatory
6    application of it, which are two different parts, and
7    it's very misleading.  Health Canada had two goals
8    here, and I specifically stayed away from the one.
9    One is whether or not it needed to take regulatory
10   action under Canadian law to warn women and take
11   remedial steps.  That's where the precautionary issue
12   comes into being.
13       The scientific analysis, which was a Bradford
14   Hill analysis that you saw, is a separate -- was a
15   separate analysis.  I think it's misleading to
16   conflate the two.  I know this is a hearing, and we
17   can do whatever we want in the hearing.  There is no
18   jury present, but it's misleading because that is not
19   what the document says.
20       MS. BROWN:  Your Honor, we are working off the
21   document --
22       THE COURT:  It sounds more like Mr. Tisi
23   thinks you are going into an area that's not
24   appropriate for redirect.  That's what I was hearing.
25       MR. TISI:  Both.  A, it's inappropriate, and,

1    B, it's misleading.

2         THE COURT:  I don't know if it's misleading.

3    She is reading right from the document.

4         MR. TISI:  I focused on the scientific aspect

5    of it, which is the Bradford Hill aspect.  She's going

6    to the regulatory issues at Health Canada.  If you

7    look at the synopsis, the paragraph I read, which was

8    the scientific aspect of it -- and that's why I took a

9    little bit of time to go through and say which is the

10   portion that was peer-reviewed, and it was the health

11   effect section.

12        The other section of the document deals with

13   the Canadian Act, whatever.  And if you look at the

14   very last paragraph that follows the scientific

15   conclusion, they talk about, Now that we have this

16   result, what do we do with it?  I don't have the

17   document in front of me.

18        THE COURT:  Isn't that the point of it?  The

19   reason they went about this is to decide to take

20   action.  It's the same thing of anything we talk

21   about, about the governmental documents, IARC.  The

22   reason these reviews are being undertaken by a

23   governmental agency, here Health Canada, is to decide

24   is there some action to be taken; if it's IARC, how do

25   we classify it, what do we do.

Direct Redirect/Ms. Brown

1199

1    I don't think it's inappropriate.  Let's hear

2    it and move on.  I will give you a few minutes of

3    redirect just as I gave yesterday to Mr. Williams.

4    It's not late in the day.  We'll go a little longer.

5         MS. BROWN:  I can conclude quickly.

6    BY MS. BROWN:

7    Q.    The two points here, Dr. Diette, is counsel

8    represented that this document has been peer-reviewed;

9    and based just on the text of what we have regarding

10   the review process, is it clear from the document

11   itself whether it had been externally peer-reviewed or

12   there was some kind of consultation the details of

13   which we don't know?

14   A.    It's hard to tell whether it's either/or both.

15   Q.    And in terms of the focus of the draft-screening

16   assessment regarding the scientific information and

17   the approach to weighing the evidence, does Health

18   Canada speak to a precautionary approach?

19   A.    They do.

20   Q.    Does that precautionary approach that we just

21   looked at, where a preventive action can be taken in

22   the absence of full scientific demonstration of cause

23   and effect, is that consistent -- or I think counsel

24   used the term "very similar" or "almost the same" as a

25   Bradford Hill causal analysis?

Direct Redirect/Ms. Brown

1200

1   A.    No, it clearly doesn't require a causal

2   conclusion, that it's something that can come up short

3   of that.

4   Q.    Counsel asked you some questions about whether,

5   well, Health Canada had done the same thing you had,

6   and the two of you just reached separate conclusions.

7           In your review of the Health Canada document

8   and the precautionary approach that they took, was

9   Health Canada, the folks at Health Canada, employing

10  the same Bradford Hill criteria as you employed?

11          MR. TISI:   Objection.   Leading I guess is

12  okay.

13          MS. BROWN:   I'll rephrase.

14          THE COURT:   Leading has been the name of the

15  game in most of the direct that I've heard this week.

16          Go ahead.

17  BY MS. BROWN:

18  Q.    How would you compare, Dr. Diette, the Bradford

19  Hill methodology that you employed here with the

20  precautionary approach that Health Canada took in its

21  assessment?

22  A.    I'd say a couple of things.   One was I didn't

23  see they actually assessed each one of the criteria.

24  That was one difference.

25          But the purpose of Bradford Hill is to

Direct Redirect/Ms. Brown

1201

1    determine causation, and so it's a different exercise

2    that precautionary principle in general requires

3    somebody to, in essence, raise concern, but not to

4    have definitive proof or even a substantial evidence

5    of causation to take some action.

6    Q.    Dr. Diette, counsel spent a fair amount of time

7    asking you questions about consistency.  Do you recall

8    that?

9    A.    I do.

10   Q.    Do you recall questions suggesting you had made

11   a determination the epidemiology was inconsistent

12   based on a review of whether there was statistical

13   significance in the case-control studies?

14          MR. TISI:  Your Honor, I didn't even ask her

15   about this slide.  I think you gave counsel ten

16   minutes.

17          THE COURT:  She said she only needed ten.

18   Let's be fair.  The rule has been that on the redirect

19   we talked about it, what time could be spent.  I

20   clearly indicated you could have a half hour, an hour.

21   She just indicated she thought she only needed

22   ten minutes.  That is why we went through instead of

23   taking a break.

24          MS. BROWN:  This is the last topic.

25          THE COURT:  It wasn't because she was only

Diette - Redirect/Ms. Brown

1202

1    allotted that.

2    BY MS. BROWN:

3    Q.    Do you recall those questions about consistency

4    and how you had made your determination of whether or

5    not there was consistency in the talc epidemiology?

6    A.    Yes.

7    Q.    Dr. Diette, remind us the areas that you

8    considered in reaching your determination about

9    consistency.

10

11   A.    Several, but looking at the total evidence that

12   was available and what we had put up here were some

13   examples of there being differences by study design,

14   so that the retrospective did and the prospective did

15   not show an association, that condoms and diaphragms

16   contrary to what one might think did not have a

17   consistent association with ovarian cancer, that the

18   dose-response was really all over the map as we

19   discussed before, tubal ligation should interrupt,

20   wasn't consistently protective in the studies, and

21   NSAIDS, which are antiinflammatories are not

22   consistently associated with reduction and risk as

23   they might be, and in fact may be associated with

24   higher risk.

25   Q.    Did you make your determination that there was

Dubose - Recross/Mr. Tisi

1203

1   no consistency based solely on a review of whether or

2   not a study reached statistical significance or did

3   not?

4   A.    No.  I evaluated whether each one did or not.

5   But I didn't reach my evaluation of consistency solely

6   based on that.

7   Q.    Did you reach your conclusions about the talc

8   epidemiology by elevating cohort studies to the

9   exclusion of case-control study?

10  A.    No.

11  Q.    Did you consider the totality of the

12  epidemiological evidence as it relates to the

13  hypothesis that talc can cause ovarian cancer?

14  A.    Absolutely.

15  Q.    Do you believe that someone properly applying

16  the Bradford Hill criteria could possibly reach a

17  different result than you did in this case?

18  A.    No.

19        MS. BROWN:  I have no further questions.

20        THE COURT:  I'll give you a few minutes,

21  Mr. Tisi.

22

23  RECROSS-EXAMINATION

24  BY MR. TISI:

25  Q.    Counsel asked you some questions about -- and

1  I'm glad she did ask you some questions about --

2  Dr. Rothman's report in 2000.  This 2000 report is

3  19 years ago in terms of the studies that have gone on

4  between then and now.  Correct?

5  A.    Correct.

6  Q.    But the general principles that he describes

7  here are all the same.  Correct?  The methods?

8  A.    I don't remember every word of that, but,

9  certainly, at least many of the principles are the

10  same.

11  Q.    If you go to the second page of the document,

12  this is Exhibit 146, under "Exposure

13  Misclassifications," do you see that?

14  A.    Not yet.

15  Q.    It's on page 3.

16  A.    Okay.

17  Q.    J&J and PCPC and the talc industry hired

18  Dr. Rothman to present this to the National Toxicology

19  Program?  This was J&J's expert at the time.

20  A.    I heard that.  I'm not sure whether it's right

21  or not.

22  Q.    They didn't contact you at any time to do this

23  for them, right?

24  A.    That is correct.

25  Q.    But they did contact Dr. Rothman, and Dr.

Direct - Recross/Mr. Tisi

1205

1    Rothman here says:

2            "It is commonly believed that the validity  of

3    case-control study is worse than cohort studies, but

4    that view is a mistaken."

5            Do you see that?

6    A.    I do.

7    Q.    (Reading.)

8            "The validity of the study depends on the

9    specifics of the study design, the nature of the data,

10   and the nature of the hypothesis the study addresses."

11           Do you see that?

12   A.    I'm with you.

13   Q.    The truth of the matter is, because of the

14   nature of cancer, many of the studies of cancer are

15   case-control studies.  True?

16   A.    For rare cancers especially.

17   Q.    Ovarian cancer is a rare cancer; isn't it?

18   A.    It is.

19   Q.    So it's not surprising that the studies that are

20   the ones that are most used by people who study the

21   epidemiology of cancers are case-control studies.

22   True?

23   A.    It's not surprising.

24   Q.    He gives an example, and this is helpful:

25           "A cohort study that examines the long-term

Deluse - Recross/Mr. Tisi

1206

1    risk of cancer among coffee drinkers after a one-time

2    dietary assessment of coffee consumption would suffer

3    from weak exposure assessment. Although exposure

4    information might be accurate at the time it was

5    collected the exposure status of the cohort members

6    will change over time with time and the initial

7    measure might only poorly correlate with more

8    meaningful measures of coffee consumption."

9           What he is saying here is, Doctor, if you only

10   take the measurement once, that people's behavior

11   changes.  Right?

12   A.    It can change.

13   Q.    Often does change.  Correct?

14   A.    I don't know how often it does, but it can

15   change, is the point.

16   Q.    (Reading.)

17          "The effect of having a poor measure of

18   exposure will be considerable nondifferential

19   misclassification."

20          He uses the word "considerable."  Correct?

21   A.    That's correct.

22   Q.    Now, adding to that let's say instead of

23   studying coffee consumption, you want to study

24   caffeine consumption, and you ask people about coffee.

25          Now, if you ask them about coffee, they may

Direct - Recross/Mr. Tisi

1207

1   answer if you are not specific enough, you would

2   include decaffeinated coffee.  Right?

3   A.    I'm sorry?

4   Q.    If the questionnaire says, You drink coffee,

5   people --

6   A.    I understand.  I misheard.  This has been on my

7   mind since the Health Canada thing, which is they say

8   that there's 8,500 consumer products that have talc in

9   it.  That's like asking about perineal talcum powder

10  and not asking about the 8,499 other ones.

11  Q.    But you know the cohort studies, Houghton and

12  Gates, asked only once.  Right?

13  A.    Correct.

14  Q.    And not only that, but they only asked about

15  powder exposure.  It could be cornstarch.  It could be

16  other kinds of powders.  Right?

17  A.    I would have to look back to see which question

18  was used on which, but I know certain studies used

19  that broader.

20  Q.    And so both of those things combined have the

21  potential of raising nondifferential or, to use Dr.

22  Rothman's term, considerable nondifferential

23  misclassification.  Correct?

24  A.    Correct.

25  Q.    And that is the kind of bias -- you spent a lot

Direct Recross/Mr. Tisi

1208

1  of time talking about recall bias, but that's the kind

2  of bias that's towards the null?

3  A.    That is correct.

4  Q.    And that is a point that Dr. Rothman is making.

5        Another thing he says here, he talked about

6  another issue you raised, which is the issue of

7  confounding.  This is 19 years ago:

8        "Although there are some strong risk factors

9  for ovarian cancer, for any of them to be confounding

10  to the extent they could account for the positive

11  relations that have been reported, they would have to

12  be strongly correlated with talc use.  Family history,

13  ethnicity, obesity, and some reproductive factors are

14  poorly associated with the risk of ovarian cancer."

15        See that?

16  A.    I do.

17  Q.    (Reading.)

18        "But the magnitude of these associations does

19  not appear to be high enough to induce enough

20  confounding, even jointly, to completely explain the

21  positive association?"

22        Do you see that?

23  A.    I do.

24  Q.    So what he is saying is, in order for the

25  confounder to really explain the results of the study,

Direct - Recross/Mr. Tisi

1209

1  the confounder has to be closely correlated with, in

2  this case talc use, closely correlated causing the

3  disease itself, and it would have to be of an order of

4  magnitude that would have to be high enough to explain

5  the risk.  Correct?

6  A.    To be fair, they list four that they say the

7  magnitude does not appear high enough to induce enough

8  confounding.  But we know most of the explanation for

9  ovarian cancer isn't known.  So the majority of the

10  risk remains to be discovered, and all of that could

11  be confounding.

12  Q.    But what he is saying and whether you see IARC,

13  whether you see Dr. Rothman, whether the study we

14  talked about before, confounding has consistently been

15  said unlikely done, unlikely the result to be a cause

16  of the increased risk for the talc study.  You have

17  seen that in the literature.  Correct?

18  A.    I don't think what you said is right.  We've

19  looked at a variety of different statements on it.

20  Some consider it possible.  There is different

21  language that different investigators have used.

22  Q.    Counsel asked you about precautionary principles

23  in Health Canada, and I'm going to ask -- let me ask

24  you briefly.

25         Health Canada specifically excluded discussion

Direct - Recross/Mr. Tisi

1210

1    of asbestos in talc.  Right?

2    A.    They were focused on talc for this project.

3    Q.    And did they say that if talc was in the

4    asbestos, that they would categorize it in a

5    completely different way?

6    A.    I think you meant the other way around.  I think

7    you said if talc was in the asbestos.

8    Q.    If asbestos was in talc, it would be a

9    completely different issue and it would be governed by

10   a different set of regulations?

11   A.    I don't recall that, but I don't doubt that it

12   would be a different mechanism.

13   Q.    And so at least to Health Canada, the presence

14   or absence of asbestos in talc would have made a

15   difference.  Correct?  You saw that in the document.

16   A.    In how they regulate it?

17   Q.    Yes.

18   A.    Yes.

19   Q.    One other thing, in terms of what Health Canada

20   -- in terms of precautionary principles, do you know

21   what Health Canada is proposing to tell consumers

22   about the risk of talc?

23   A.    Beyond what is in these documents we looked at

24   today?

25   Q.    Yes.  Did you look on the website?

Diette - Recross/Mr. Tisi

1211

1       THE COURT:  He already said he doesn't know.

2   Let's move on.

3       MR. TISI:  So the record is clear --

4       THE COURT:  No.  We're dealing with the

5   document.  It's not part of what he's got.  He only

6   testified about the document.

7       Let's move on.  You are not going to get it

8   through him.

9       MR. TISI:  I have no further questions.

10      Thank you for your indulgence.

11      THE COURT:  Thank you.

12      You are excused, Dr. Diette.

13      (Witness excused.)

14      (Court adjourned at 3:30 p.m.)

15  ///

16

17

18

19

20

21

22

23

24

25

1212

1        I N D E X

2

3

4        **Proceedings**                                    **Page**

5

6     WITNESSES              Direct  Cross   Redirect  Recross

7
   Gregory B. Diette
8
       By Ms. Brown        1004     --      1185      --
9      By Mr. Tisi           --    1065       --     1200

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1213

# C E R T I F I C A T E

   PURSUANT TO TITLE 28, U.S.C., SECTION 753, THE

FOLLOWING TRANSCRIPT IS CERTIFIED TO BE AN ACCURATE

TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE

ABOVE-ENTITLED MATTER.


   S/Vincent Russoniello
   Vincent Russoniello, CCR
   Certificate No. 675

**'**

**'70s** [1] - 1158:2

**0**

**005** [1] - 1042:22
**05** [6] - 1143:10, 1143:14, 1151:8, 1151:19, 1155:25, 1157:14
**08608** [1] - 1002:7

**1**

**1** [62] - 1015:25, 1016:2, 1016:4, 1016:8, 1016:9, 1016:15, 1016:16, 1016:21, 1016:23, 1017:1, 1017:6, 1017:15, 1017:17, 1017:18, 1017:20, 1017:23, 1018:16, 1018:19, 1019:5, 1019:9, 1019:11, 1019:14, 1019:23, 1019:24, 1020:1, 1020:7, 1020:12, 1020:16, 1020:21, 1021:5, 1021:9, 1036:4, 1041:25, 1047:11, 1054:7, 1055:15, 1058:3, 1058:4, 1081:7, 1081:11, 1135:19, 1138:16, 1141:24, 1143:15, 1143:23, 1144:11, 1144:18, 1146:1, 1146:4, 1153:10, 1153:11, 1159:12, 1159:15, 1159:19, 1160:23, 1161:18, 1163:22, 1168:12, 1169:20, 1179:21
**1.0** [1] - 1036:4
**1.17** [3] - 1017:14, 1019:7, 1019:9
**1.19** [5] - 1016:2, 1019:4, 1019:7, 1041:22, 1041:24
**1.2** [9] - 1028:21, 1028:25, 1029:11, 1031:1, 1036:18, 1037:12, 1043:18, 1058:8, 1192:18

**1.3** [7] - 1028:21, 1028:25, 1036:18, 1037:12, 1043:18, 1192:18, 1192:22
**1.31** [1] - 1192:14
**1.44** [1] - 1165:22
**1.6** [1] - 1032:9
**1/2** [1] - 1075:12
**10** [6] - 1009:16, 1009:18, 1028:6, 1028:12, 1111:2, 1112:12
**100** [2] - 1024:6, 1187:13
**1004** [1] - 1212:8
**1065** [1] - 1212:9
**109** [2] - 1026:4, 1038:7
**1185** [1] - 1212:8
**12** [4] - 1111:4, 1123:11, 1157:16, 1157:18
**1200** [1] - 1212:9
**125** [1] - 1051:24
**129** [1] - 1040:3
**12:30** [1] - 1118:17
**13** [2] - 1154:14, 1154:16
**133** [3] - 1076:23, 1077:8, 1130:4
**14-3** [2] - 1129:23, 1130:23
**1416** [2] - 1166:7, 1167:23
**142** [1] - 1146:13
**143** [1] - 1142:3
**146** [1] - 1204:12
**15** [4] - 1084:11, 1095:2, 1118:20, 1123:12
**155** [1] - 1184:17
**16-MD-2738(FLW)(LHG** [1] - 1002:2
**18** [3] - 1004:19, 1026:17, 1086:4
**19** [4] - 1164:10, 1164:22, 1204:3, 1208:7
**1960s** [2] - 1157:25, 1158:2
**1970s** [2] - 1173:7, 1185:7
**1971** [1] - 1074:4
**1982** [3] - 1067:14, 1124:4

**2**

**2** [7] - 1073:13, 1074:20,

1075:12, 1138:7, 1138:25, 1169:20, 1179:23
**2-B** [3] - 1174:2, 1190:11, 1190:13
**2-plus** [1] - 1036:11
**2.1** [1] - 1099:15
**2.91** [1] - 1042:16
**20** [15] - 1009:19, 1028:8, 1091:11, 1111:8, 1112:12, 1123:13, 1123:14, 1123:15, 1123:16, 1138:6, 1138:16, 1158:7, 1164:10, 1164:23, 1187:13
**200** [2] - 1028:5, 1028:12
**200,000** [2] - 1111:1, 1111:3
**2000** [3] - 1192:11, 1204:2
**2002** [1] - 1194:1
**2006** [1] - 1171:15
**2009** [1] - 1183:23
**2010** [8] - 1058:3, 1082:24, 1106:3, 1171:8, 1171:21, 1175:4, 1190:20, 1191:6
**2014** [22] - 1040:20, 1040:22, 1041:16, 1041:17, 1041:19, 1042:6, 1042:17, 1042:25, 1043:1, 1044:7, 1048:24, 1049:2, 1068:18, 1089:9, 1166:4, 1168:4, 1168:8, 1168:14, 1178:8, 1178:12, 1178:18
**2016** [2] - 1040:2, 1191:4
**2018** [13] - 1015:1, 1015:4, 1019:19, 1025:18, 1026:1, 1038:24, 1053:14, 1058:23, 1077:17, 1079:19, 1079:21, 1103:18, 1194:14
**2019** [4] - 1002:4, 1023:9, 1067:22, 1077:17
**21** [2] - 1051:23, 1064:6
**222** [2] - 1141:24, 1142:4
**24** [1] - 1068:11

**257** [1] - 1129:21
**25th** [1] - 1071:13
**26** [2] - 1002:4, 1139:10
**260** [1] - 1077:20
**27** [5] - 1104:1, 1105:14, 1139:1, 1139:5, 1139:20
**28** [1] - 1213:5

**3**

**3** [7] - 1018:4, 1025:19, 1026:4, 1042:15, 1133:16, 1180:1, 1204:15
**30** [4] - 1028:8, 1169:11, 1170:4, 1170:5
**39** [1] - 1068:12
**3:30** [1] - 1211:14

**4**

**4** [2] - 1074:20, 1180:4
**40** [3] - 1067:16, 1075:7, 1161:7
**402** [1] - 1002:7
**408** [1] - 1175:4
**409** [1] - 1171:3
**42** [2] - 1154:4, 1154:17
**43** [4] - 1107:11, 1108:1, 1108:4, 1141:24
**44** [1] - 1113:24
**45** [1] - 1035:19
**47** [2] - 1035:18, 1082:12
**49** [1] - 1081:22

**5**

**5** [6] - 1002:5, 1074:20, 1125:3, 1133:10, 1133:18
**505** [4] - 1184:15, 1184:19, 1184:24, 1185:4
**51-page** [1] - 1071:10
**52** [1] - 1165:20
**56** [2] - 1079:20, 1079:22
**57** [1] - 1171:2
**58** [2] - 1053:17, 1135:15
**588-9516** [1] - 1002:25

**6**

**6** [1] - 1074:20
**6-1** [1] - 1085:22
**609** [1] - 1002:25

1215

**62** [2] - 1067:25, 1165:19
**63** [3] - 1080:18, 1080:19, 1107:9
**64** [1] - 1196:1
**65** [2] - 1035:19, 1053:21
**675** [1] - 1213:11

---

**7**

**7** [1] - 1074:20
**753** [1] - 1213:5
**77** [1] - 1016:14

---

**8**

**8** [2] - 1165:8, 1175:7
**8,499** [1] - 1207:10
**8,500** [1] - 1207:8
**800** [3] - 1155:4, 1161:24, 1162:4
**83** [1] - 1016:2

---

**9**

**9** [1] - 1028:6
**94** [1] - 1051:24
**95** [5] - 1016:1, 1019:4, 1143:9, 1143:14, 1157:2
**99** [1] - 1015:25

---

**A**

**A-11** [2] - 1025:19, 1059:2
**AACES** [1] - 1165:13
**abandon** [2] - 1023:7, 1158:14
**abandoning** [1] - 1022:24
**able** [5] - 1007:18, 1007:21, 1012:2, 1034:18, 1034:25
**ABOVE** [1] - 1213:8
**ABOVE-ENTITLED** [1] - 1213:8
**abrupt** [1] - 1042:6
**abruptly** [1] - 1043:16
**absence** [3] - 1196:24, 1199:22, 1210:14
**absolutely** [13] - 1008:23, 1010:8, 1017:9, 1026:24, 1033:3, 1038:2, 1076:6, 1083:1, 1113:14, 1114:16, 1132:15, 1165:3, 1203:14

**abstract** [2] - 1096:4, 1182:3
**abundance** [2] - 1034:6, 1034:9
**Academy** [1] - 1087:4
**accept** [2] - 1034:8, 1152:5
**accepted** [1] - 1023:6
**accepts** [1] - 1140:4
**accompanied** [1] - 1154:17
**according** [1] - 1111:6
**account** [5] - 1044:21, 1045:2, 1098:21, 1168:4, 1208:10
**accounted** [7] - 1045:11, 1045:12, 1047:15, 1072:12, 1098:20, 1099:18, 1177:11
**accounting** [2] - 1047:22, 1072:2
**accuracy** [1] - 1168:7
**ACCURATE** [1] - 1213:6
**accurate** [2] - 1155:15, 1206:4
**achieve** [1] - 1021:21
**achieving** [1] - 1022:11
**acknowledge** [4] - 1072:9, 1084:18, 1084:21, 1097:3
**acknowledged** [3] - 1049:9, 1050:17, 1117:21
**Act** [1] - 1198:13
**acting** [1] - 1087:20
**ACTION** [1] - 1002:2
**action** [10] - 1086:5, 1089:22, 1090:5, 1168:1, 1196:24, 1197:10, 1198:20, 1198:24, 1199:21, 1201:5
**activities** [1] - 1120:3
**adding** [1] - 1206:22
**addition** [3] - 1009:8, 1011:25, 1031:25
**additional** [3] - 1181:6, 1195:19, 1196:6
**address** [2] - 1071:3, 1171:3
**addressed** [24] - 1045:2, 1045:23, 1047:19, 1067:12, 1094:22,

1102:4, 1112:18, 1112:21, 1113:15, 1113:19, 1114:25, 1115:9, 1115:12, 1115:13, 1115:16, 1115:18, 1115:20, 1167:9, 1167:19, 1167:20, 1170:13, 1170:17, 1171:4, 1175:1
**addresses** [3] - 1171:4, 1174:16, 1205:10
**addressing** [2] - 1026:20, 1048:18
**adds** [1] - 1128:18
**adequacy** [1] - 1131:21
**adequately** [1] - 1113:12
**adjourned** [1] - 1211:14
**adjust** [2] - 1100:4, 1100:5
**administered** [5] - 1049:10, 1049:24, 1050:8, 1050:12
**Administration** [1] - 1080:5
**administrative** [4] - 1010:7, 1010:9, 1010:10, 1010:13
**admit** [1] - 1187:9
**advance** [3] - 1018:3, 1018:5, 1018:7
**advanced** [2] - 1008:24, 1022:23
**advancement** [1] - 1149:22
**advantage** [1] - 1030:2
**advantages** [2] - 1111:14, 1111:19
**affect** [4] - 1050:6, 1131:15, 1149:20, 1178:1
**affected** [3] - 1170:18, 1177:20, 1178:20
**Affiliates** [1] - 1010:12
**affirmatively** [1] - 1178:7
**African** [1] - 1166:10
**African-American** [1] - 1166:10
**agency** [2] - 1080:8, 1198:23
**Agency** [3] - 1007:6, 1007:8, 1106:2
**agents** [1] - 1014:15
**aggregate** [1] - 1152:20

**aggregated** [1] - 1171:17
**ago** [8] - 1009:16, 1031:13, 1073:11, 1086:9, 1112:12, 1204:3, 1208:7
**agree** [45] - 1027:13, 1054:14, 1071:19, 1071:22, 1075:12, 1075:25, 1076:7, 1076:11, 1076:15, 1076:19, 1077:21, 1078:4, 1078:19, 1103:7, 1109:1, 1127:5, 1132:22, 1136:17, 1137:19, 1139:13, 1140:7, 1140:11, 1140:14, 1140:23, 1141:20, 1142:15, 1143:2, 1144:16, 1145:10, 1150:8, 1150:20, 1151:2, 1151:15, 1156:11, 1156:15, 1162:18, 1177:8, 1179:11, 1179:13, 1179:17, 1179:19, 1180:23, 1183:16, 1187:16, 1189:13
**agreed** [2] - 1046:16, 1153:4
**agreement** [1] - 1073:19
**agrees** [1] - 1169:17
**ahead** [4] - 1042:5, 1080:11, 1090:13, 1200:16
**airway** [1] - 1122:11
**ALABAMA** [1] - 1002:11
**Alberg** [1] - 1064:20
**alleged** [1] - 1189:10
**ALLEN** [1] - 1002:10
**ALLISON** [1] - 1002:21
**allotted** [1] - 1202:1
**allow** [4] - 1035:24, 1181:6, 1192:2, 1192:3
**allowed** [2] - 1117:25, 1118:8
**allows** [2] - 1109:17, 1132:22
**almost** [8] - 1036:3, 1042:15, 1045:7, 1045:10, 1144:14, 1160:23, 1174:16, 1199:24

**alone** [1] - 1150:5
**altogether** [1] - 1014:19
**amazing** [2] - 1040:8, 1040:9
**American** [9] - 1008:7, 1146:14, 1146:20, 1146:23, 1148:9, 1154:3, 1157:23, 1161:25, 1166:10
**amount** [6] - 1009:21, 1052:5, 1111:6, 1183:6, 1201:6
**amounts** [1] - 1185:8
**AN** [1] - 1213:6
**analgesics** [1] - 1014:13
**analogous** [4] - 1015:22, 1031:10, 1032:24, 1033:17
**analyses** [12] - 1025:5, 1045:9, 1058:23, 1072:9, 1083:8, 1091:7, 1091:8, 1095:1, 1095:15, 1104:3, 1153:21, 1163:18
**analysis** [45] - 1025:20, 1026:1, 1026:18, 1026:23, 1027:3, 1027:8, 1029:2, 1038:25, 1054:5, 1055:7, 1059:11, 1059:17, 1068:7, 1071:24, 1072:14, 1073:22, 1080:14, 1080:17, 1081:19, 1082:7, 1082:13, 1083:6, 1083:20, 1084:16, 1085:17, 1090:10, 1090:13, 1091:1, 1093:9, 1103:17, 1116:16, 1116:24, 1117:5, 1117:9, 1117:10, 1140:14, 1151:7, 1153:20, 1160:7, 1179:18, 1191:16, 1197:13, 1197:14, 1197:15, 1199:25
**analyze** [4] - 1071:16, 1109:17, 1118:13, 1163:18
**analyzed** [2] - 1012:17, 1117:15
**analyzing** [1] - 1117:13

**anatomy** [1] - 1101:1
**anchor** [1] - 1027:9
**animal** [5] - 1084:24, 1085:6, 1085:11, 1085:12, 1085:19
**answer** [19] - 1033:2, 1033:15, 1037:15, 1069:11, 1069:13, 1069:15, 1070:15, 1070:17, 1078:23, 1106:12, 1106:24, 1109:19, 1118:9, 1132:6, 1150:25, 1186:8, 1186:10, 1186:13, 1207:1
**answered** [3] - 1032:21, 1099:10, 1186:7
**answering** [2] - 1168:20, 1180:16
**answers** [3] - 1070:25, 1074:12, 1160:16
**anti** [2] - 1014:14, 1057:3
**anti-inflammatory** [2] - 1014:14, 1057:3
**antiinflammatories** [1] - 1202:21
**anyway** [2] - 1123:3, 1187:16
**apart** [3] - 1049:2, 1105:1, 1137:10
**apologize** [2] - 1171:13, 1184:10
**appear** [6] - 1035:10, 1062:25, 1154:18, 1193:15, 1208:19, 1209:7
**appearance** [1] - 1175:13
**appendix** [1] - 1178:15
**applicability** [1] - 1130:9
**application** [7] - 1055:9, 1103:3, 1152:3, 1180:13, 1189:24, 1195:1, 1197:6
**applications** [3] - 1102:10, 1165:24, 1194:22
**applied** [1] - 1192:17
**applies** [1] - 1166:23
**apply** [3] - 1027:16, 1059:17, 1063:18
**applying** [3] - 1035:23, 1078:25, 1203:15

**appointments** [1] - 1005:6
**approach** [13] - 1004:23, 1007:20, 1130:8, 1196:3, 1196:8, 1196:15, 1196:22, 1197:2, 1199:17, 1199:18, 1199:20, 1200:8, 1200:20
**approached** [2] - 1010:2, 1012:20
**appropriate** [7] - 1017:3, 1023:17, 1077:24, 1132:6, 1191:12, 1196:23, 1197:24
**appropriately** [3] - 1024:24, 1026:12, 1033:6
**approval** [1] - 1151:22
**approved** [3] - 1151:18, 1152:17, 1158:22
**area** [7] - 1030:17, 1032:20, 1054:18, 1063:25, 1113:21, 1115:20, 1197:23
**areas** [7] - 1026:22, 1054:18, 1058:20, 1060:7, 1095:17, 1096:12, 1202:7
**argument** [1] - 1022:23
**arise** [3] - 1136:22, 1137:1, 1153:3
**ARPS** [1] - 1002:18
**arrive** [3] - 1031:6, 1031:8, 1082:22
**arrived** [1] - 1083:22
**article** [21] - 1018:4, 1025:19, 1028:2, 1041:9, 1082:22, 1104:9, 1106:15, 1135:15, 1135:17, 1146:3, 1146:7, 1152:8, 1152:16, 1154:16, 1155:20, 1184:5, 1184:8, 1184:21, 1185:22, 1190:25, 1191:2
**articles** [9] - 1089:10, 1106:19, 1123:5, 1154:4, 1154:12, 1154:17, 1157:24, 1178:16, 1190:23
**ASA** [4] - 1147:5,

1147:18, 1149:2, 1150:1
**asbestiform** [2] - 1185:25
**asbestos** [25] - 1011:9, 1060:15, 1061:9, 1173:10, 1179:10, 1179:12, 1179:21, 1179:24, 1180:2, 1182:13, 1183:17, 1185:8, 1185:10, 1185:13, 1185:18, 1186:4, 1186:16, 1187:13, 1187:25, 1189:4, 1210:1, 1210:4, 1210:7, 1210:8, 1210:14
**asbestos-related** [1] - 1061:9
**ASHCRAFT** [1] - 1002:12
**aside** [4] - 1123:21, 1179:16, 1180:19, 1185:16
**aspect** [8] - 1010:7, 1011:3, 1147:20, 1180:9, 1180:21, 1198:4, 1198:5, 1198:8
**aspects** [2] - 1059:5, 1131:14
**aspirin** [8] - 1014:14, 1014:19, 1014:22, 1015:17, 1015:20, 1016:11, 1016:13, 1017:13
**assembled** [1] - 1093:12
**assembling** [1] - 1083:23
**assess** [6] - 1040:13, 1087:19, 1097:2, 1097:5, 1097:21, 1117:20
**assessed** [9] - 1088:4, 1099:11, 1101:5, 1101:7, 1116:2, 1117:15, 1149:10, 1189:24, 1200:23
**assessing** [4] - 1109:3, 1112:4, 1114:25, 1196:12
**Assessment** [3] - 1195:18, 1195:22, 1195:24
**assessment** [25] - 1012:22, 1044:13, 1056:2, 1080:25, 1081:12, 1081:24,

1082:6, 1082:13, 1083:3, 1100:20, 1101:4, 1105:14, 1116:10, 1116:11, 1117:22, 1125:24, 1194:7, 1195:4, 1195:7, 1195:12, 1195:13, 1199:16, 1200:21, 1206:2, 1206:3

**assigned** [1] - 1114:5

**assigning** [1] - 1030:2

**assistance** [1] - 1010:6

**associated** [22] - 1014:16, 1019:2, 1019:10, 1035:8, 1037:21, 1044:19, 1047:4, 1047:6, 1068:11, 1097:24, 1098:6, 1100:9, 1101:20, 1165:20, 1166:9, 1175:12, 1175:21, 1176:14, 1176:21, 1202:22, 1202:23, 1208:14

**Association** [7] - 1077:9, 1146:15, 1146:20, 1148:10, 1154:3, 1162:1, 1165:12

**association** [104] - 1014:20, 1014:21, 1016:12, 1016:14, 1016:17, 1017:8, 1017:13, 1017:22, 1018:17, 1018:21, 1019:9, 1019:15, 1020:11, 1020:13, 1020:17, 1020:22, 1021:16, 1024:19, 1024:22, 1025:6, 1025:22, 1026:25, 1027:6, 1027:18, 1027:23, 1027:24, 1028:10, 1029:3, 1029:15, 1032:14, 1035:13, 1035:21, 1035:25, 1038:1, 1038:2, 1042:4, 1044:5, 1044:6, 1052:22, 1059:8, 1059:16, 1063:13, 1063:14, 1063:20, 1068:19, 1068:21, 1069:2, 1069:4, 1069:8,

1069:20, 1069:22, 1069:25, 1070:11, 1083:10, 1087:2, 1090:20, 1090:22, 1091:14, 1091:21, 1092:3, 1101:21, 1103:2, 1103:20, 1104:5, 1104:11, 1104:19, 1105:17, 1105:19, 1113:7, 1113:9, 1113:12, 1118:5, 1129:7, 1141:7, 1142:8, 1145:5, 1146:2, 1146:5, 1151:25, 1152:20, 1152:21, 1153:7, 1153:12, 1153:17, 1155:24, 1161:19, 1161:21, 1162:8, 1163:5, 1166:3, 1166:17, 1168:5, 1172:21, 1175:14, 1180:8, 1180:22, 1181:2, 1181:7, 1189:12, 1192:25, 1202:15, 1202:17, 1208:21

**Association's** [1] - 1146:23

**associations** [4] - 1015:17, 1023:22, 1093:6, 1208:18

**assume** [3] - 1083:16, 1120:13, 1157:17

**assuming** [3] - 1030:1, 1070:25, 1111:10

**asthma** [4] - 1120:8, 1120:10, 1122:5, 1122:14

**attached** [1] - 1149:1

**attempt** [2] - 1054:16, 1178:24

**attempted** [1] - 1148:6

**attend** [2] - 1006:15, 1006:18

**attention** [4] - 1048:24, 1049:3, 1068:17, 1164:9

**attenuate** [1] - 1114:15

**attributes** [1] - 1132:5

**audience** [1] - 1148:2

**Australia** [7] - 1097:17, 1098:13, 1099:24, 1100:7, 1100:10, 1179:3, 1179:4

**Australian** [2] - 1099:20, 1099:22

**Austria** [1] - 1061:14

**author** [4] - 1038:24, 1154:24, 1165:15, 1165:16

**authored** [1] - 1184:21

**authorities** [1] - 1060:11

**authors** [31] - 1015:2, 1022:13, 1024:23, 1025:19, 1026:5, 1028:23, 1030:23, 1034:5, 1035:1, 1040:16, 1042:13, 1043:11, 1044:9, 1053:9, 1053:24, 1059:2, 1059:9, 1059:12, 1069:9, 1069:18, 1071:3, 1089:5, 1107:13, 1108:1, 1146:9, 1152:9, 1153:15, 1156:11, 1156:20, 1167:20, 1167:25

**automatically** [1] - 1156:15

**available** [25] - 1009:21, 1053:15, 1054:15, 1060:5, 1073:24, 1074:3, 1074:5, 1074:15, 1078:16, 1083:8, 1083:12, 1084:4, 1092:25, 1098:19, 1102:6, 1103:22, 1105:11, 1105:12, 1106:6, 1112:7, 1117:6, 1171:18, 1194:17, 1196:6, 1202:12

**average** [4] - 1111:5, 1129:1, 1160:21, 1160:22

**aware** [6] - 1038:21, 1040:23, 1079:14, 1107:24, 1169:21, 1192:10

**awareness** [1] - 1040:19

**aways** [1] - 1016:19

**awfully** [1] - 1111:5

**axis** [1] - 1041:12

---

**B**

---

**baby** [1] - 1182:20

**background** [3] - 1084:22, 1120:24, 1122:1

**backwards** [2] - 1111:21, 1137:6

**badly** [2] - 1131:5, 1131:6

**baked** [4] - 1134:7, 1134:11, 1134:25, 1180:10

**balance** [1] - 1151:24

**Ballman** [1] - 1146:18

**band** [2] - 1127:21, 1127:23

**barely** [1] - 1146:16

**bars** [4] - 1041:16, 1041:17, 1045:1, 1164:8

**BART** [1] - 1002:20

**based** [22] - 1006:25, 1024:17, 1027:17, 1035:9, 1035:22, 1042:14, 1044:2, 1046:3, 1047:17, 1094:4, 1097:9, 1100:2, 1118:13, 1151:5, 1153:22, 1168:17, 1178:2, 1186:1, 1199:9, 1201:12, 1203:1, 1203:6

**baseline** [2] - 1112:5, 1112:6

**basic** [4] - 1008:23, 1047:24, 1126:18, 1179:20

**basis** [1] - 1184:4

**bat** [1] - 1119:16

**BE** [1] - 1213:6

**bearing** [1] - 1074:22

**bears** [1] - 1085:13

**BEASLEY** [1] - 1002:10

**became** [1] - 1080:13

**become** [2] - 1040:23, 1151:11

**becomes** [2] - 1027:8, 1048:14

**beer** [3] - 1044:17, 1044:23, 1044:25

**began** [1] - 1111:16

**beginning** [3] - 1081:21, 1082:4, 1195:11

**begins** [1] - 1184:25

**Behalf** [1] - 1003:4

**behalf** [4] - 1002:14, 1002:22, 1004:9,

1183:22
**behavior** [1] - 1206:10
**BEISNER** [1] - 1002:18
**beliefs** [1] - 1151:10
**belong** [5] - 1127:14, 1128:1, 1128:3, 1128:4, 1133:1
**below** [11] - 1016:14, 1016:23, 1017:6, 1018:16, 1020:2, 1020:3, 1020:21, 1042:18, 1105:15, 1163:7, 1164:6
**beneath** [1] - 1127:14
**benefit** [1] - 1191:5
**Berge** [5] - 1025:18, 1029:1, 1058:23, 1059:2, 1059:12
**Berger** [1] - 1148:17
**best** [3] - 1029:21, 1079:25, 1111:23
**better** [7] - 1022:4, 1023:18, 1029:24, 1127:2, 1132:24, 1157:17, 1157:20
**better"** [1] - 1127:5
**Between** [1] - 1165:12
**between** [47] - 1009:18, 1011:9, 1011:23, 1013:4, 1015:17, 1024:19, 1025:21, 1026:6, 1027:18, 1035:13, 1035:25, 1047:9, 1059:6, 1059:23, 1062:11, 1063:9, 1063:17, 1063:21, 1068:20, 1070:1, 1083:11, 1091:14, 1098:1, 1098:8, 1098:24, 1099:15, 1101:21, 1103:2, 1103:20, 1104:5, 1104:11, 1104:14, 1104:19, 1104:22, 1105:18, 1108:14, 1109:5, 1110:8, 1111:12, 1164:5, 1166:21, 1167:15, 1172:22, 1175:14, 1189:12, 1193:10, 1204:4
**beware** [1] - 1159:5
**beyond** [5] - 1126:4,

1130:9, 1191:14, 1197:4, 1210:23
**bias** [69] - 1025:8, 1025:24, 1033:10, 1037:7, 1037:11, 1037:18, 1037:24, 1038:4, 1038:10, 1038:19, 1039:3, 1039:6, 1039:10, 1040:6, 1040:12, 1041:10, 1043:9, 1043:17, 1044:10, 1048:18, 1049:1, 1049:6, 1049:11, 1049:16, 1049:17, 1058:14, 1058:17, 1061:20, 1068:17, 1070:12, 1093:22, 1096:16, 1096:18, 1096:22, 1100:1, 1114:10, 1114:11, 1114:13, 1114:15, 1116:6, 1116:7, 1164:9, 1164:14, 1164:22, 1165:4, 1166:6, 1167:9, 1168:3, 1169:8, 1169:13, 1170:15, 1170:18, 1170:24, 1171:4, 1172:15, 1173:14, 1173:20, 1174:10, 1177:24, 1178:3, 1178:14, 1190:17, 1190:24, 1192:23, 1207:25, 1208:1, 1208:2
**biases** [1] - 1096:17
**BIDDLE** [1] - 1002:16
**big** [5] - 1012:6, 1037:9, 1060:1, 1133:24, 1133:25
**binder** [7] - 1068:1, 1079:20, 1107:8, 1138:10, 1141:25, 1142:2, 1184:13
**Bindman** [1] - 1115:18
**biologic** [20] - 1030:22, 1072:15, 1072:17, 1074:25, 1075:10, 1085:13, 1103:2, 1103:8, 1166:16, 1179:18, 1180:20, 1180:24, 1181:1, 1181:2, 1181:13,

1182:8, 1183:3, 1185:18, 1186:5, 1188:2
**biological** [6] - 1034:23, 1056:14, 1102:4, 1102:19, 1102:21, 1194:11
**biologically** [8] - 1034:15, 1052:13, 1073:5, 1088:2, 1182:14, 1183:18, 1186:16, 1188:16
**biology** [1] - 1180:20
**biostatistician** [1] - 1147:12
**biostatistics** [1] - 1147:14
**birth** [4] - 1039:21, 1039:24, 1039:25
**bit** [18] - 1008:5, 1010:17, 1012:3, 1013:10, 1026:1, 1030:10, 1035:3, 1037:2, 1050:22, 1050:23, 1050:24, 1058:18, 1079:16, 1119:11, 1119:13, 1124:1, 1138:2, 1198:9
**bizarre** [1] - 1051:20
**block** [2] - 1056:5, 1145:7
**blood** [1] - 1086:21
**blue** [1] - 1041:15
**Board** [3] - 1119:19, 1147:5, 1147:18
**body** [17] - 1011:22, 1031:18, 1033:19, 1048:3, 1054:8, 1054:11, 1058:9, 1058:10, 1078:16, 1094:20, 1168:2, 1168:5, 1168:7, 1172:22, 1172:25, 1173:8, 1189:10
**Body** [1] - 1165:12
**book** [14] - 1031:25, 1077:5, 1077:7, 1077:14, 1130:4, 1138:7, 1138:11, 1139:9, 1139:16, 1139:17, 1139:19, 1154:24, 1174:16, 1174:20
**booklet** [1] - 1171:3

**bottle** [6] - 1044:17, 1181:22, 1181:23, 1182:13, 1182:20, 1183:2
**bottom** [10] - 1037:6, 1081:11, 1086:25, 1131:17, 1136:1, 1147:4, 1160:21, 1163:9, 1163:14, 1195:11
**boundaries** [1] - 1070:5
**bounds** [1] - 1143:22
**box** [1] - 1058:3
**boxes** [2] - 1076:18, 1076:20
**Bradford** [51] - 1012:22, 1026:17, 1027:4, 1027:7, 1027:12, 1027:16, 1028:2, 1031:4, 1031:6, 1034:4, 1034:7, 1035:23, 1036:9, 1051:1, 1054:4, 1057:1, 1059:11, 1059:17, 1063:15, 1063:19, 1071:17, 1071:19, 1072:14, 1076:15, 1078:7, 1081:18, 1083:20, 1090:17, 1091:1, 1091:4, 1102:13, 1102:17, 1116:14, 1117:5, 1117:8, 1117:9, 1118:11, 1139:2, 1139:7, 1160:6, 1179:17, 1191:16, 1192:17, 1195:1, 1197:13, 1198:5, 1199:25, 1200:10, 1200:18, 1200:25, 1203:16
**brain** [1] - 1039:22
**break** [5] - 1065:23, 1066:1, 1069:15, 1118:17, 1201:23
**breast** [2] - 1032:7, 1045:18
**brief** [3] - 1011:18, 1059:21, 1169:11
**briefing** [2] - 1022:21, 1170:9
**briefly** [2] - 1147:3, 1209:24
**bright** [4] - 1021:19,

1022:2, 1027:22, 1151:8
**bring** [5] - 1073:13, 1129:20, 1134:24, 1146:13, 1178:22
**broad** [2] - 1059:24, 1114:4
**broaden** [1] - 1049:6
**broader** [3] - 1039:5, 1147:21, 1207:19
**brought** [2] - 1101:10, 1146:7
**BROWN** [55] - 1002:21, 1004:6, 1004:14, 1004:20, 1004:23, 1018:2, 1018:8, 1018:11, 1020:9, 1026:3, 1034:12, 1035:17, 1045:21, 1046:7, 1046:11, 1046:19, 1051:23, 1063:23, 1064:4, 1064:10, 1064:13, 1064:14, 1065:22, 1069:10, 1073:15, 1077:7, 1104:16, 1106:11, 1106:22, 1107:15, 1118:8, 1124:21, 1138:21, 1141:25, 1167:4, 1169:19, 1173:25, 1183:25, 1184:13, 1186:11, 1186:25, 1188:21, 1188:25, 1192:8, 1192:9, 1193:24, 1193:25, 1197:20, 1199:5, 1199:6, 1200:13, 1200:17, 1201:24, 1202:2, 1203:19
**Brown** [1] - 1212:8
**brown** [2] - 1067:19, 1068:3
**bucket** [2] - 1140:17, 1140:18
**buckets** [1] - 1140:20
**bulk** [1] - 1118:20
**bullets** [1] - 1123:2
**bunch** [1] - 1058:7
**business** [4] - 1125:10, 1125:13, 1151:4, 1162:11
**BY** [35] - 1002:11, 1002:12, 1002:14,

1002:16, 1002:18, 1002:20, 1002:21, 1003:4, 1004:14, 1018:11, 1020:9, 1034:12, 1046:19, 1064:14, 1067:6, 1069:16, 1074:1, 1074:19, 1107:5, 1107:25, 1119:10, 1125:12, 1138:24, 1170:11, 1174:6, 1184:7, 1186:14, 1187:19, 1188:25, 1192:9, 1193:25, 1199:6, 1200:17, 1202:2, 1203:24

---

**C**

**C-reactive** [1] - 1086:19
**caffeine** [1] - 1206:24
**calculated** [3] - 1041:21, 1095:2, 1169:4
**CALIFORNIA** [1] - 1002:20
**Canada** [55] - 1053:14, 1053:17, 1079:12, 1080:3, 1080:11, 1080:20, 1080:24, 1081:4, 1081:5, 1081:7, 1081:23, 1082:6, 1082:13, 1083:2, 1085:16, 1086:8, 1087:9, 1088:3, 1088:14, 1094:22, 1097:19, 1100:20, 1105:2, 1116:10, 1116:17, 1124:9, 1124:18, 1125:9, 1125:16, 1125:17, 1125:19, 1125:22, 1126:1, 1194:8, 1194:10, 1194:14, 1196:7, 1196:11, 1197:1, 1197:5, 1197:7, 1198:6, 1198:23, 1199:18, 1200:5, 1200:7, 1200:9, 1200:20, 1207:7, 1209:23, 1209:25, 1210:13, 1210:19, 1210:21
**Canada's** [2] - 1081:18, 1196:7

---

**Canadian** [5] - 1080:4, 1106:18, 1107:1, 1197:10, 1198:13
**cancer** [155] - 1007:14, 1007:17, 1011:10, 1011:20, 1012:1, 1013:4, 1014:7, 1014:16, 1015:18, 1019:3, 1022:1, 1024:2, 1024:19, 1025:21, 1026:7, 1027:18, 1028:7, 1028:16, 1028:20, 1030:21, 1031:10, 1031:11, 1032:7, 1032:15, 1032:23, 1032:25, 1033:13, 1034:1, 1034:10, 1034:16, 1034:24, 1035:10, 1035:14, 1036:1, 1038:21, 1040:7, 1040:20, 1042:10, 1042:25, 1044:23, 1044:25, 1045:4, 1045:6, 1045:18, 1046:23, 1047:5, 1047:18, 1048:10, 1049:3, 1049:16, 1054:9, 1055:19, 1057:8, 1057:9, 1061:5, 1062:17, 1062:24, 1062:25, 1063:10, 1063:17, 1063:21, 1064:22, 1065:16, 1067:13, 1067:22, 1068:12, 1068:21, 1070:1, 1070:12, 1075:1, 1079:13, 1081:25, 1082:18, 1083:11, 1083:23, 1084:5, 1087:3, 1088:21, 1091:15, 1092:5, 1092:9, 1092:24, 1095:9, 1098:1, 1101:20, 1102:9, 1103:21, 1104:6, 1104:12, 1104:14, 1104:20, 1104:23, 1105:19, 1106:7, 1108:15, 1108:19, 1109:5, 1109:18, 1109:22, 1110:1, 1110:9,

1111:13, 1119:22, 1120:4, 1120:6, 1120:12, 1120:16, 1120:21, 1120:25, 1121:3, 1121:6, 1121:8, 1121:10, 1121:12, 1121:19, 1123:6, 1123:8, 1124:3, 1124:7, 1126:8, 1126:15, 1165:21, 1166:9, 1172:22, 1172:24, 1173:8, 1174:10, 1175:12, 1175:15, 1177:5, 1177:10, 1177:15, 1178:17, 1179:23, 1180:14, 1182:15, 1183:19, 1183:24, 1188:8, 1189:12, 1193:9, 1193:15, 1194:21, 1202:17, 1203:13, 1205:14, 1205:17, 1206:1, 1208:9, 1208:14, 1209:9
**Cancer** [2] - 1106:3, 1165:13
**cancers** [3] - 1100:24, 1205:16, 1205:21
**cannot** [5] - 1172:2, 1177:13, 1177:16, 1177:17, 1177:18
**capture** [3] - 1065:11, 1092:11, 1110:11
**captured** [1] - 1045:6
**carcinogen** [9] - 1033:20, 1061:6, 1061:23, 1179:21, 1180:2, 1181:4, 1181:25, 1188:1
**carcinogenic** [2] - 1185:9, 1185:17
**carcinogenicity** [1] - 1190:16
**carcinogens** [2] - 1181:23, 1185:6
**Carcinoma** [1] - 1074:7
**Care** [2] - 1003:4, 1007:7
**care** [10] - 1006:15, 1006:16, 1008:2, 1011:2, 1097:1, 1097:4, 1121:3, 1121:6, 1121:24, 1122:6
**career** [4] - 1011:1,

1023:5, 1122:18, 1149:22
**careful** [2] - 1015:3, 1043:12
**carried** [1] - 1136:14
**carry** [1] - 1128:16
**carve** [1] - 1010:15
**cascade** [1] - 1103:7
**Case** [1] - 1131:11
**case** [107] - 1011:6, 1017:4, 1023:11, 1028:17, 1029:9, 1031:15, 1031:18, 1031:21, 1032:1, 1032:8, 1032:10, 1032:16, 1035:4, 1037:25, 1038:17, 1038:18, 1038:20, 1039:8, 1040:15, 1049:7, 1049:19, 1051:10, 1053:1, 1054:24, 1055:12, 1058:12, 1058:24, 1059:6, 1060:19, 1063:4, 1063:5, 1063:12, 1068:16, 1070:21, 1070:23, 1071:17, 1083:25, 1084:10, 1087:20, 1091:23, 1096:18, 1097:14, 1098:14, 1098:21, 1101:11, 1111:14, 1111:19, 1112:8, 1117:17, 1123:21, 1127:2, 1127:14, 1127:15, 1128:1, 1128:10, 1128:14, 1128:19, 1128:22, 1129:8, 1129:11, 1129:13, 1129:14, 1129:17, 1132:11, 1132:12, 1133:5, 1135:23, 1136:1, 1136:11, 1136:13, 1136:20, 1137:5, 1137:9, 1137:17, 1137:23, 1139:15, 1142:19, 1153:8, 1153:9, 1160:19, 1160:21, 1163:21, 1170:18, 1172:15, 1172:20, 1173:21,

1175:20, 1175:24, 1178:5, 1178:25, 1180:5, 1181:9, 1191:13, 1191:14, 1191:17, 1201:13, 1203:9, 1203:17, 1205:3, 1205:15, 1205:21, 1209:2
**case-control** [62] - 1031:15, 1031:18, 1031:21, 1032:1, 1032:8, 1032:16, 1038:17, 1038:18, 1040:15, 1049:7, 1049:19, 1051:10, 1054:24, 1058:12, 1063:12, 1068:16, 1070:23, 1083:25, 1091:23, 1097:14, 1098:14, 1098:21, 1101:11, 1111:14, 1111:19, 1112:8, 1127:2, 1127:14, 1128:1, 1128:10, 1128:14, 1128:19, 1128:22, 1129:8, 1129:13, 1129:14, 1129:17, 1132:11, 1136:11, 1136:13, 1136:20, 1137:5, 1137:9, 1137:17, 1137:23, 1139:15, 1160:19, 1160:21, 1163:21, 1170:18, 1172:15, 1173:21, 1175:20, 1178:5, 1191:13, 1191:14, 1201:13, 1203:9, 1205:3, 1205:15, 1205:21
**Case-Control** [1] - 1131:11
**case-controls** [7] - 1028:17, 1035:4, 1058:24, 1070:21, 1117:17, 1135:23, 1136:1
**cases** [23] - 1024:23, 1033:5, 1039:8, 1041:13, 1042:7, 1043:6, 1043:14, 1048:10, 1092:11, 1101:6, 1101:9,

1117:20, 1123:10, 1123:11, 1123:12, 1123:20, 1123:21, 1123:23, 1123:25, 1129:2, 1165:19, 1168:8, 1189:19
**categories** [2] - 1052:15, 1059:24
**categorize** [1] - 1210:4
**Categorizing** [1] - 1130:24
**category** [7] - 1052:13, 1054:4, 1114:4, 1131:8, 1139:11, 1190:13
**Causal** [2] - 1138:8, 1139:1
**causal** [42] - 1011:23, 1024:18, 1024:22, 1025:8, 1025:20, 1025:24, 1026:6, 1029:14, 1030:18, 1031:2, 1031:8, 1033:7, 1033:22, 1036:6, 1052:22, 1053:5, 1053:6, 1059:8, 1063:16, 1063:20, 1068:21, 1069:4, 1069:8, 1069:19, 1069:22, 1071:16, 1077:22, 1077:25, 1083:12, 1103:22, 1104:15, 1104:23, 1105:19, 1139:10, 1181:8, 1186:6, 1186:18, 1189:12, 1193:8, 1199:25, 1200:1
**causation** [15] - 1024:15, 1025:10, 1026:13, 1029:21, 1031:7, 1036:19, 1078:17, 1130:9, 1145:3, 1145:18, 1179:16, 1182:6, 1192:23, 1201:1, 1201:5
**Causation** [3] - 1077:10, 1138:8, 1138:25
**caused** [2] - 1062:17, 1120:9
**causes** [13] - 1030:21, 1044:25, 1055:10, 1062:24, 1081:24, 1082:18, 1083:23, 1084:5, 1120:4, 1124:7,

1137:8, 1175:11, 1182:15
**causing** [3] - 1054:3, 1183:19, 1209:2
**CCR** [2] - 1002:24, 1213:11
**census** [1] - 1137:12
**center** [2] - 1006:19, 1121:5
**CEPA** [1] - 1196:1
**certain** [7] - 1027:20, 1028:17, 1045:8, 1063:12, 1112:5, 1117:21, 1207:18
**certainly** [7] - 1045:22, 1078:10, 1123:25, 1129:2, 1144:17, 1169:22, 1204:9
**certainty** [6] - 1011:16, 1030:23, 1177:4, 1177:14, 1177:20, 1178:2
**Certificate** [1] - 1213:11
**Certified** [1] - 1119:19
**CERTIFIED** [1] - 1213:6
**Cervix** [1] - 1074:8
**cetera** [2] - 1086:2, 1180:10
**challenge** [2] - 1036:21, 1147:6
**challenges** [4] - 1036:18, 1037:3, 1179:25, 1192:21
**challenging** [1] - 1142:23
**chance** [19] - 1036:25, 1037:1, 1037:7, 1037:11, 1037:13, 1037:14, 1037:16, 1037:25, 1061:19, 1096:16, 1116:8, 1150:5, 1150:13, 1150:24, 1171:5, 1171:25, 1172:2, 1190:17
**change** [13] - 1035:16, 1042:6, 1042:20, 1043:15, 1049:14, 1050:23, 1051:17, 1137:24, 1158:8, 1206:6, 1206:12, 1206:13, 1206:15
**changes** [4] - 1077:18,

1183:11, 1187:10, 1206:11

**Chapter** [2] - 1138:7, 1138:25

**chapter** [4] - 1077:9, 1077:13, 1077:23, 1138:18

**character** [1] - 1124:22

**characteristics** [1] - 1131:23

**characterization** [2] - 1124:25, 1192:15

**characterized** [1] - 1189:18

**charge** [1] - 1008:24

**chart** [8] - 1016:19, 1019:12, 1042:2, 1085:22, 1159:6, 1167:13, 1167:14

**cheat** [1] - 1041:23

**check** [2] - 1046:8, 1088:18

**checklist** [1] - 1076:20

**cherry** [1] - 1158:9

**cherry-picking** [1] - 1158:9

**chest** [2] - 1062:11, 1062:12

**child** [2] - 1039:21, 1039:24

**chili** [3] - 1181:15, 1181:17, 1181:21

**China** [2] - 1097:18, 1098:14

**choose** [1] - 1137:1

**chose** [2] - 1040:20, 1042:14

**Chris** [1] - 1181:17

**CHRISTOPHER** [1] - 1002:14

**chronic** [5] - 1086:16, 1088:25, 1122:5, 1122:13, 1166:11

**cigarette** [3] - 1028:6, 1034:16, 1044:17

**circulated** [2] - 1155:4, 1155:8

**circumstance** [3] - 1029:20, 1154:1, 1176:23

**circumstances** [3] - 1031:23, 1172:23, 1176:3

**citation** [2] - 1038:15, 1134:10

**citations** [1] - 1012:15

**cite** [4] - 1089:7, 1127:1, 1133:11, 1133:17

**cited** [8] - 1030:24, 1033:23, 1064:20, 1074:13, 1089:10, 1134:1, 1135:12, 1138:14

**cites** [1] - 1095:9

**citing** [4] - 1087:4, 1134:14, 1134:15, 1185:22

**CIVIL** [1] - 1002:2

**claimed** [1] - 1139:25

**claims** [1] - 1151:9

**clarification** [1] - 1019:21

**clarify** [3] - 1070:16, 1127:5, 1180:15

**clarifying** [1] - 1069:5

**CLARKSON** [1] - 1002:7

**class** [2] - 1006:2, 1168:1

**classic** [1] - 1039:20

**classification** [4] - 1114:3, 1190:11, 1190:21, 1193:2

**classify** [1] - 1198:25

**classifying** [1] - 1190:13

**classroom** [1] - 1006:1

**clear** [14] - 1025:8, 1033:4, 1052:3, 1102:11, 1106:15, 1112:10, 1155:22, 1162:15, 1177:13, 1177:25, 1187:23, 1194:23, 1199:10, 1211:3

**clearer** [1] - 1025:11

**clearest** [1] - 1169:6

**clearly** [6] - 1028:9, 1100:16, 1125:5, 1185:8, 1200:1, 1201:20

**CLERK** [5] - 1004:3, 1066:3, 1067:1, 1118:22, 1119:4

**clicking** [1] - 1076:17

**clinic** [3] - 1005:10, 1006:13, 1121:10

**clinical** [17] - 1006:2, 1029:10, 1076:4,

1121:1, 1121:3, 1121:13, 1123:1, 1127:10, 1127:11, 1127:17, 1127:18, 1127:19, 1127:22, 1131:9, 1132:18, 1132:23, 1133:6

**clinician** [1] - 1006:6

**clip** [2] - 1169:11, 1170:6

**close** [6] - 1016:7, 1034:13, 1036:4, 1043:17, 1079:6, 1111:6

**closely** [2] - 1209:1, 1209:2

**co** [3] - 1006:3, 1146:19, 1154:24

**co-author** [1] - 1154:24

**co-directed** [1] - 1006:3

**co-experts** [1] - 1146:19

**coalesce** [1] - 1065:5

**coat** [1] - 1009:6

**coffee** [8] - 1206:1, 1206:2, 1206:8, 1206:23, 1206:24, 1206:25, 1207:2, 1207:4

**coherence** [1] - 1103:12

**cohort** [66] - 1014:9, 1031:22, 1032:4, 1032:9, 1032:18, 1036:14, 1050:2, 1050:6, 1050:9, 1050:10, 1051:8, 1051:9, 1054:25, 1057:22, 1058:6, 1059:7, 1063:14, 1068:19, 1070:21, 1091:13, 1092:5, 1092:11, 1093:16, 1093:17, 1105:17, 1108:1, 1108:12, 1108:18, 1108:23, 1112:2, 1112:8, 1112:17, 1113:4, 1114:20, 1115:1, 1115:24, 1127:2, 1127:14, 1128:9, 1128:16, 1128:18, 1129:14, 1129:17, 1132:24, 1133:6, 1133:10, 1135:23, 1136:11, 1136:13, 1136:21, 1137:2, 1137:6, 1137:10,

1137:17, 1144:12, 1160:18, 1160:22, 1163:8, 1163:19, 1163:22, 1191:12, 1203:8, 1205:3, 1205:25, 1206:5, 1207:11

**Cohort** [1] - 1131:11

**cohorts** [8] - 1035:5, 1058:24, 1070:24, 1117:17, 1127:25, 1132:11, 1136:2, 1137:23

**collapse** [1] - 1144:12

**colleague** [6] - 1121:20, 1124:14, 1135:18, 1139:21, 1142:18, 1155:10

**colleagues** [7] - 1036:11, 1040:13, 1106:1, 1126:7, 1126:10, 1194:19

**collected** [1] - 1206:5

**color** [1] - 1041:14

**column** [2] - 1136:19, 1147:16

**combine** [2] - 1153:19, 1153:21

**combined** [2] - 1166:4, 1207:20

**combining** [1] - 1158:25

**comfortable** [2] - 1188:11, 1188:12

**coming** [2] - 1026:21, 1032:1

**commencement** [1] - 1068:18

**comment** [13] - 1038:9, 1053:8, 1058:23, 1071:8, 1116:16, 1117:25, 1124:11, 1124:18, 1125:22, 1148:11, 1168:17, 1192:13, 1193:4

**commented** [1] - 1028:24

**comments** [2] - 1118:2, 1124:12

**commissioned** [1] - 1105:3

**Committee** [1] - 1002:14

**common** [2] - 1139:24, 1165:19

1222

**commonly** [2] - 1149:16, 1205:2
**communicate** [3] - 1010:25, 1022:15, 1146:11
**community** [4] - 1147:22, 1155:9, 1155:17
**company** [4] - 1010:12, 1012:24, 1125:20, 1125:25
**compare** [3] - 1043:1, 1129:5, 1200:18
**compared** [2] - 1019:3, 1028:7
**comparing** [2] - 1161:6, 1161:11
**compatible** [1] - 1058:13
**competing** [1] - 1192:24
**complete** [5] - 1072:11, 1123:4, 1137:12, 1170:20, 1170:23
**completely** [6] - 1078:19, 1140:3, 1145:15, 1208:20, 1210:5, 1210:9
**complex** [1] - 1065:1
**complimentary** [2] - 1143:8, 1143:16
**comprehensive** [1] - 1106:5
**concentrate** [1] - 1026:22
**concept** [12] - 1022:24, 1023:2, 1023:7, 1043:9, 1047:24, 1059:13, 1132:2, 1138:1, 1149:9, 1157:7, 1182:9, 1183:4
**conceptualize** [1] - 1032:12
**conceptualized** [1] - 1057:3
**conceptually** [1] - 1137:9
**concern** [3] - 1037:24, 1173:12, 1201:3
**concerned** [4] - 1026:12, 1033:6, 1036:6, 1040:14
**concerning** [2] - 1007:11, 1173:7
**concerns** [1] - 1192:21
**conclude** [15] - 1025:3, 1027:17, 1035:6, 1035:24, 1036:2,

1059:18, 1060:7, 1063:20, 1069:18, 1070:10, 1081:24, 1155:23, 1156:4, 1157:11, 1199:5
**concluded** [3] - 1047:12, 1059:3, 1059:12
**conclusion** [31] - 1011:21, 1031:7, 1031:8, 1035:16, 1037:17, 1067:21, 1068:3, 1075:20, 1075:21, 1078:25, 1082:17, 1082:25, 1083:22, 1084:3, 1084:21, 1090:23, 1101:7, 1103:14, 1118:4, 1144:7, 1145:3, 1145:17, 1151:11, 1151:17, 1151:25, 1163:16, 1187:22, 1190:12, 1194:13, 1198:15, 1200:2
**conclusions** [17] - 1011:13, 1011:19, 1014:17, 1024:11, 1024:14, 1026:10, 1037:5, 1061:21, 1069:24, 1075:17, 1095:3, 1149:9, 1151:4, 1151:9, 1159:5, 1200:6, 1203:7
**concordance** [1] - 1099:3
**conditions** [1] - 1096:12
**condom** [1] - 1055:5
**condoms** [2] - 1055:13, 1202:15
**conduct** [4] - 1011:11, 1026:17, 1060:18, 1060:21
**conducted** [9] - 1006:21, 1022:14, 1049:19, 1053:9, 1095:1, 1095:15, 1096:10, 1097:13, 1132:5
**conducting** [2] - 1021:25, 1137:12
**conference** [1] - 1008:19
**confers** [1] - 1064:24
**confidence** [44] - 1012:7, 1013:11, 1016:1, 1016:8,

1016:15, 1016:20, 1016:22, 1017:1, 1017:6, 1017:14, 1017:16, 1017:18, 1017:20, 1018:15, 1018:19, 1019:4, 1019:13, 1020:11, 1020:15, 1020:20, 1020:25, 1021:5, 1021:9, 1024:3, 1024:6, 1029:22, 1037:8, 1041:24, 1142:12, 1143:3, 1143:9, 1143:14, 1143:23, 1143:24, 1144:18, 1144:21, 1146:1, 1153:1, 1156:1, 1156:21, 1157:2, 1159:11, 1159:14, 1190:18
**confine** [1] - 1046:12
**confined** [2] - 1032:16, 1042:17
**confines** [1] - 1126:4
**confining** [1] - 1046:20
**confirm** [7] - 1029:21, 1032:5, 1046:17, 1064:12, 1087:7, 1099:8, 1133:4
**confirmation** [2] - 1068:19, 1105:17
**confirmed** [1] - 1029:17
**confirming** [1] - 1133:19
**conflate** [1] - 1197:16
**conflict** [3] - 1156:5, 1156:13, 1157:11
**conflicts** [2] - 1136:22, 1137:1
**confound** [2] - 1097:25, 1098:8
**confounder** [15] - 1045:3, 1048:1, 1065:13, 1065:17, 1097:23, 1098:4, 1099:6, 1099:9, 1175:24, 1176:13, 1176:23, 1176:25, 1177:15, 1208:25, 1209:1
**confounders** [10] - 1030:9, 1033:9, 1047:19, 1047:22, 1048:3, 1064:16,

1097:2, 1097:4, 1097:5, 1176:12
**confounding** [42] - 1030:7, 1030:8, 1030:10, 1037:7, 1037:11, 1037:21, 1037:24, 1038:5, 1044:14, 1044:18, 1045:5, 1045:7, 1045:19, 1045:22, 1046:1, 1046:5, 1046:21, 1047:16, 1048:7, 1048:13, 1058:15, 1058:18, 1064:9, 1093:23, 1096:16, 1098:2, 1104:12, 1104:20, 1116:7, 1171:5, 1174:25, 1175:1, 1175:9, 1177:5, 1177:18, 1190:17, 1208:7, 1208:9, 1208:20, 1209:8, 1209:11, 1209:14
**confused** [1] - 1099:25
**confusing** [1] - 1153:14
**confusingly** [1] - 1151:1
**confusion** [3] - 1098:2, 1098:5, 1143:13
**Congress** [1] - 1007:10
**connection** [5] - 1011:23, 1013:3, 1063:9, 1098:16, 1100:14
**connections** [1] - 1011:9
**consensus** [2] - 1162:2, 1162:4
**consider** [12] - 1051:1, 1051:7, 1059:9, 1073:3, 1074:14, 1085:12, 1091:6, 1114:21, 1116:18, 1162:6, 1203:11, 1209:20
**considerable** [4] - 1196:19, 1206:18, 1206:20, 1207:22
**consideration** [1] - 1072:15
**considerations** [3] - 1027:5, 1076:16, 1078:8
**considered** [16] - 1028:25, 1056:4, 1057:2, 1071:23,

1072:2, 1072:18, 1078:14, 1095:23, 1100:14, 1100:15, 1101:8, 1127:12, 1131:18, 1173:13, 1174:9, 1202:8

**considering** [4] - 1091:3, 1094:8, 1162:10, 1180:22

**consistency** [38] - 1034:2, 1054:6, 1054:8, 1054:12, 1054:17, 1056:3, 1056:25, 1057:18, 1059:10, 1059:22, 1059:23, 1094:13, 1094:14, 1094:17, 1094:21, 1095:21, 1139:2, 1139:12, 1139:20, 1139:23, 1141:7, 1141:11, 1145:5, 1152:1, 1152:21, 1158:21, 1160:1, 1160:12, 1164:1, 1164:2, 1172:11, 1180:9, 1201:7, 1202:3, 1202:5, 1202:9, 1203:1, 1203:5

**consistent** [51] - 1026:10, 1033:24, 1043:10, 1043:16, 1046:2, 1047:18, 1047:21, 1055:16, 1055:23, 1056:12, 1058:6, 1058:9, 1058:11, 1058:25, 1059:19, 1060:6, 1069:25, 1082:8, 1082:14, 1083:9, 1089:4, 1094:20, 1095:7, 1095:24, 1102:14, 1103:18, 1103:19, 1104:4, 1106:1, 1141:14, 1141:15, 1141:17, 1145:7, 1163:4, 1166:10, 1172:4, 1172:7, 1172:8, 1173:15, 1175:19, 1183:11, 1186:6, 1186:17, 1192:16, 1193:1, 1193:17, 1194:5, 1194:6,

1194:25, 1199:23, 1202:17

**consistently** [4] - 1163:16, 1202:20, 1202:22, 1209:14

**constant** [1] - 1193:7

**constituent** [2] - 1185:12, 1189:10

**constituents** [4] - 1011:25, 1180:6, 1185:17, 1189:22

**consultants** [1] - 1184:22

**consultation** [4] - 1081:14, 1195:15, 1195:20, 1199:12

**consulting** [2] - 1009:9, 1010:16

**consults** [1] - 1006:17

**consumer** [1] - 1207:8

**consumers** [1] - 1210:21

**consumption** [4] - 1206:2, 1206:8, 1206:23, 1206:24

**contact** [2] - 1204:22, 1204:25

**contain** [5] - 1011:25, 1015:8, 1040:25, 1060:15, 1195:8

**contained** [3] - 1180:6, 1185:7, 1189:18

**contains** [3] - 1081:17, 1185:18, 1187:25

**contaminated** [1] - 1189:9

**contamination** [2] - 1185:10, 1189:5

**contemporaneous** [1] - 1086:11

**Content** [1] - 1146:24

**content** [1] - 1094:12

**context** [11] - 1036:19, 1048:19, 1052:16, 1096:2, 1141:5, 1141:8, 1145:5, 1150:22, 1156:16, 1174:10, 1187:3

**continue** [2] - 1018:23, 1106:21

**Continued** [1] - 1066:5

**continued** [1] - 1002:22

**continuum** [1] - 1161:7

**contracted** [1] - 1090:13

**contractor** [1] - 1080:13

**contrary** [3] - 1174:18, 1187:22, 1202:16

**contrast** [1] - 1147:17

**contribute** [1] - 1122:25

**Control** [1] - 1131:11

**control** [72] - 1029:17, 1029:19, 1029:24, 1030:6, 1031:15, 1031:18, 1031:21, 1032:1, 1032:8, 1032:16, 1038:17, 1038:18, 1040:15, 1049:7, 1049:19, 1051:10, 1054:24, 1058:12, 1059:7, 1063:12, 1068:16, 1070:23, 1083:25, 1091:23, 1097:14, 1098:14, 1098:21, 1101:11, 1111:14, 1111:19, 1112:8, 1127:2, 1127:14, 1127:20, 1127:21, 1128:1, 1128:10, 1128:14, 1128:19, 1128:22, 1129:8, 1129:13, 1129:14, 1129:17, 1132:11, 1133:5, 1136:7, 1136:8, 1136:11, 1136:13, 1136:20, 1137:5, 1137:9, 1137:17, 1137:23, 1139:15, 1160:19, 1160:21, 1163:21, 1170:18, 1172:15, 1173:21, 1175:20, 1178:5, 1191:13, 1191:14, 1201:13, 1203:9, 1205:3, 1205:15, 1205:21

**controlled** [2] - 1065:18, 1076:4

**controlling** [1] - 1048:3

**controls** [14] - 1028:17, 1035:4, 1039:8, 1041:14, 1042:11, 1043:5, 1050:17, 1058:24, 1070:21, 1117:17, 1135:23, 1136:1, 1165:20, 1168:8

**convention** [1] - 1022:18

**conventional** [2] - 1014:22, 1078:9

**conventions** [1] - 1146:10

**conversation** [4] - 1078:6, 1134:6, 1135:1, 1137:16

**conversations** [1] - 1143:12

**converse** [1] - 1010:20

**convey** [1] - 1028:4

**conveying** [1] - 1024:7

**convincing** [1] - 1031:3

**Cook** [3] - 1051:21, 1051:23, 1052:14

**cool** [1] - 1093:25

**COPD** [1] - 1120:10

**copy** [6] - 1004:21, 1079:23, 1129:18, 1138:11, 1138:17, 1138:22

**copyright** [2] - 1138:18, 1191:4

**corner** [1] - 1122:22

**cornstarch** [1] - 1207:15

**corporate** [3] - 1186:24, 1187:2, 1187:14

**Correct** [122] - 1016:21, 1018:21, 1020:13, 1031:15, 1068:7, 1071:11, 1073:9, 1075:1, 1075:4, 1075:17, 1080:5, 1081:19, 1083:4, 1084:16, 1084:22, 1085:4, 1085:20, 1085:24, 1086:2, 1086:9, 1087:10, 1087:23, 1088:16, 1089:19, 1090:5, 1090:7, 1090:10, 1090:14, 1090:17, 1090:20, 1091:4, 1091:16, 1091:19, 1092:17, 1093:9, 1094:10, 1094:14, 1095:11, 1096:16, 1097:7, 1097:19, 1099:20, 1099:24, 1100:22, 1102:11, 1103:12, 1105:9, 1106:9, 1108:2, 1111:21, 1113:5,

1113:13, 1113:16, 1113:19, 1113:22, 1114:10, 1114:18, 1115:7, 1115:10, 1115:14, 1115:16, 1115:21, 1116:15, 1117:7, 1117:18, 1119:17, 1119:23, 1122:14, 1123:10, 1123:15, 1123:18, 1128:25, 1129:9, 1131:3, 1131:5, 1131:9, 1131:12, 1131:15, 1131:25, 1132:7, 1132:14, 1138:8, 1139:8, 1140:19, 1141:7, 1141:11, 1141:14, 1144:2, 1144:5, 1144:23, 1146:6, 1153:12, 1154:10, 1154:22, 1155:6, 1155:9, 1159:9, 1159:20, 1161:9, 1163:23, 1164:24, 1165:4, 1165:13, 1165:25, 1166:17, 1167:11, 1168:10, 1168:14, 1171:22, 1172:11, 1176:4, 1178:12, 1178:20, 1180:11, 1180:24, 1182:6, 1182:22, 1182:24, 1204:4, 1206:20, 1207:23, 1209:17

**correct** [108] - 1020:14, 1056:8, 1057:20, 1067:14, 1074:21, 1075:13, 1075:20, 1075:21, 1077:1, 1080:24, 1082:19, 1084:23, 1085:14, 1085:21, 1085:25, 1086:3, 1086:10, 1086:12, 1088:5, 1088:6, 1088:17, 1089:16, 1090:6, 1090:8, 1090:11, 1090:22, 1091:8, 1091:17, 1092:1, 1097:7, 1097:8, 1097:14, 1097:20, 1098:4, 1098:7, 1101:1,

1101:5, 1103:4, 1103:16, 1105:4, 1105:22, 1106:20, 1107:14, 1112:16, 1112:19, 1112:22, 1113:17, 1113:20, 1113:25, 1115:5, 1115:8, 1115:11, 1115:15, 1119:18, 1119:24, 1122:9, 1122:12, 1122:15, 1123:19, 1125:14, 1130:2, 1132:1, 1133:23, 1134:19, 1136:7, 1137:18, 1139:3, 1154:23, 1155:1, 1155:2, 1155:7, 1159:10, 1159:13, 1159:16, 1161:10, 1164:21, 1166:1, 1166:18, 1167:16, 1168:11, 1172:8, 1172:9, 1172:12, 1173:24, 1175:23, 1177:16, 1178:21, 1179:22, 1180:3, 1180:7, 1180:14, 1180:17, 1182:25, 1185:20, 1190:9, 1190:25, 1196:19, 1204:5, 1204:7, 1204:24, 1206:13, 1206:21, 1207:13, 1207:24, 1208:3, 1209:5, 1210:15

**correctly** [5] - 1068:13, 1095:4, 1137:13, 1163:7, 1173:3

**correlate** [2] - 1178:24, 1206:7

**correlated** [3] - 1208:12, 1209:1, 1209:2

**correspondence** [1] - 1099:14

**corroborates** [1] - 1053:18

**corroboration** [2] - 1088:23, 1088:24

**cosmetic** [1] - 1061:16

**Council** [1] - 1003:4

**counsel** [32] - 1045:24, 1064:4, 1073:15, 1077:7, 1104:16,

1109:2, 1109:8, 1118:9, 1120:23, 1126:19, 1126:23, 1128:8, 1141:25, 1161:1, 1161:18, 1165:1, 1170:12, 1170:16, 1173:23, 1184:13, 1187:1, 1189:3, 1190:3, 1190:7, 1197:3, 1199:7, 1199:23, 1200:4, 1201:6, 1201:15, 1203:25, 1209:22

**counsel's** [1] - 1124:22

**count** [2] - 1099:21, 1140:24

**countries** [9] - 1096:25, 1097:4, 1098:12, 1099:5, 1099:9, 1161:7, 1175:22, 1176:2, 1176:22

**country** [1] - 1176:16

**couple** [23] - 1005:15, 1006:24, 1024:25, 1026:22, 1048:6, 1054:13, 1058:11, 1058:19, 1059:23, 1062:8, 1077:15, 1094:18, 1094:19, 1098:18, 1101:6, 1119:15, 1121:23, 1179:2, 1179:19, 1186:21, 1194:16, 1200:22

**coupled** [1] - 1078:15

**course** [11] - 1049:4, 1078:22, 1087:17, 1092:19, 1093:18, 1101:13, 1131:10, 1132:8, 1139:15, 1141:9, 1143:19

**court** [5] - 1012:2, 1119:3, 1132:9, 1186:23, 1211:14

**Court** [9] - 1004:18, 1005:2, 1014:3, 1046:11, 1053:12, 1158:5, 1178:1, 1187:5, 1190:24

**COURT** [72] - 1002:1, 1002:25, 1004:4, 1004:22, 1004:24, 1018:10, 1019:21, 1020:5, 1025:13,

1032:19, 1033:15, 1034:11, 1046:4, 1046:16, 1064:2, 1064:7, 1064:11, 1065:23, 1067:2, 1069:12, 1070:15, 1073:23, 1074:10, 1077:4, 1100:1, 1100:12, 1106:14, 1106:21, 1106:23, 1107:4, 1107:21, 1117:4, 1118:10, 1118:16, 1118:19, 1119:5, 1122:22, 1125:4, 1130:5, 1134:12, 1134:17, 1134:22, 1138:17, 1139:4, 1167:8, 1169:12, 1169:14, 1170:5, 1171:11, 1174:5, 1174:22, 1184:4, 1184:6, 1184:16, 1184:18, 1186:13, 1187:7, 1187:15, 1188:3, 1188:23, 1192:4, 1192:7, 1197:22, 1198:2, 1198:18, 1200:14, 1201:17, 1201:25, 1203:20, 1211:1, 1211:4, 1211:11

**Court's** [2] - 1156:23, 1188:21

**COURTHOUSE** [1] - 1002:7

**courthouse** [1] - 1116:22

**courtroom** [11] - 1087:8, 1087:23, 1088:8, 1088:9, 1094:6, 1094:23, 1105:1, 1112:18, 1115:7, 1116:22, 1117:14

**cover** [1] - 1006:13

**craft** [1] - 1010:24

**craving** [1] - 1023:17

**creates** [1] - 1039:10

**credible** [2] - 1019:18, 1019:19

**criteria** [34] - 1027:16, 1031:4, 1031:6, 1031:8, 1034:7, 1035:24, 1051:1, 1063:15, 1063:19, 1071:17,

1071:19, 1076:16,
1076:19, 1077:23,
1078:7, 1078:8,
1090:17, 1091:4,
1098:3, 1098:4, 1101:3,
1102:13, 1102:16,
1102:17, 1103:18,
1116:14, 1117:11,
1139:2, 1139:7,
1139:10, 1196:1,
1200:10, 1200:23,
1203:16
**criterion** [6] - 1034:4,
1052:23, 1076:17,
1094:17, 1139:24,
1160:13
**critical** [2] - 1122:6,
1195:25
**criticized** [1] - 1072:19
**criticizing** [2] - 1170:1,
1170:2
**critiques** [1] - 1124:24
**CROSS** [2] - 1067:5,
1119:9
**Cross** [1] - 1212:6
**cross** [7] - 1019:5,
1019:11, 1019:23,
1065:24, 1101:14,
1144:11, 1163:22
**CROSS-EXAMINATION**
[2] - 1067:5, 1119:9
**cross-sections** [1] -
1101:14
**crossed** [1] - 1019:9
**crosses** [8] - 1017:18,
1020:16, 1143:23,
1146:1, 1146:4, 1151:6,
1153:6, 1159:19
**crossing** [10] - 1017:16,
1017:20, 1018:19,
1021:5, 1021:9,
1041:25, 1153:10,
1153:11, 1159:12,
1159:15
**crossover** [1] - 1019:25
**CRR** [1] - 1002:24
**crude** [1] - 1065:9
**current** [9] - 1015:20,
1019:1, 1019:19,
1019:20, 1077:16,
1146:8, 1156:25,
1166:8, 1168:16
**curves** [2] - 1193:13

**cut** [1] - 1027:25
**cut-off** [1] - 1027:25
**cutting** [1] - 1056:7
**CV** [3] - 1004:18,
1004:21, 1122:16

**D**

**D.C** [2] - 1002:18, 1003:4
**daily** [1] - 1182:21
**data** [42] - 1014:9,
1023:16, 1034:22,
1037:5, 1053:16,
1061:15, 1061:24,
1069:18, 1083:12,
1083:24, 1084:4,
1084:16, 1085:19,
1086:12, 1087:18,
1087:21, 1099:5,
1099:8, 1103:22,
1104:3, 1106:6,
1116:13, 1117:6,
1117:16, 1132:24,
1150:5, 1150:14,
1150:15, 1151:7,
1151:24, 1153:1,
1166:22, 1167:10,
1168:3, 1168:16,
1178:3, 1179:7, 1182:2,
1194:18, 1205:9
**date** [2] - 1040:21,
1041:22
**dated** [3] - 1071:13,
1079:19, 1079:21
**DAUBERT** [1] - 1002:4
**day-to-day** [1] - 1006:4
**days** [4] - 1073:11,
1094:9, 1095:11,
1116:25
**deal** [6] - 1074:20,
1089:15, 1096:5,
1102:19, 1123:5,
1144:12
**dealing** [6] - 1036:17,
1065:15, 1074:24,
1154:4, 1187:16, 1211:4
**deals** [5] - 1136:6,
1136:8, 1136:10,
1141:10, 1198:12
**decade** [1] - 1176:16
**decades** [13] - 1005:15,
1006:24, 1023:13,
1024:25, 1063:2,
1063:4, 1095:16,

1110:22, 1173:16,
1175:22, 1176:2,
1176:22, 1182:24
**decaffeinated** [1] -
1207:2
**December** [3] - 1079:19,
1079:21, 1194:14
**decide** [9] - 1088:20,
1144:25, 1145:22,
1151:23, 1152:19,
1156:24, 1183:3,
1198:19, 1198:23
**decided** [2] - 1147:5,
1157:15
**deciding** [2] - 1078:20,
1143:4
**decision** [5] - 1146:5,
1151:10, 1173:9,
1196:11, 1196:22
**decision-making** [3] -
1151:10, 1196:11,
1196:22
**decisions** [4] - 1078:16,
1151:5, 1156:8, 1196:18
**declare** [1] - 1118:5
**decreased** [1] - 1056:19
**defect** [2] - 1039:21,
1039:25
**Defendant** [2] - 1002:22,
1003:4
**defendants** [2] -
1009:24, 1009:25
**Defendants** [1] - 1004:10
**defending** [1] - 1138:20
**define** [3] - 1130:15,
1132:16, 1158:20
**defined** [1] - 1130:8
**definitely** [2] - 1046:24,
1098:5
**definition** [6] - 1131:19,
1174:2, 1180:24,
1181:1, 1181:3, 1190:11
**definitive** [1] - 1201:4
**degree** [10] - 1005:18,
1011:16, 1045:8,
1121:11, 1121:13,
1131:20, 1131:22,
1177:3, 1177:14,
1177:19
**demonstrate** [6] -
1040:16, 1040:17,
1093:21, 1169:3,
1181:24, 1187:11

**demonstrated** [8] -
1089:6, 1093:6, 1094:2,
1142:9, 1178:7, 1178:8,
1179:14, 1194:23
**demonstrating** [1] -
1101:16
**demonstration** [2] -
1196:25, 1199:22
**denominators** [1] -
1137:11
**deposition** [11] - 1018:3,
1018:6, 1018:7, 1046:2,
1046:4, 1046:17,
1067:8, 1083:17,
1125:2, 1140:8, 1167:6
**DEPUTY** [5] - 1004:3,
1066:3, 1067:1,
1118:22, 1119:4
**Deriving** [1] - 1077:10
**describe** [4] - 1007:23,
1141:2, 1155:13,
1155:20
**described** [7] - 1052:24,
1131:21, 1131:24,
1151:1, 1154:8,
1171:25, 1197:2
**describes** [2] - 1032:1,
1204:6
**describing** [2] - 1095:22,
1110:15
**description** [1] - 1160:20
**deserves** [1] - 1139:24
**design** [20] - 1006:2,
1008:25, 1029:21,
1029:23, 1029:25,
1031:20, 1036:14,
1054:21, 1055:3,
1058:22, 1059:25,
1071:8, 1076:1,
1112:13, 1140:18,
1145:9, 1163:21,
1164:2, 1202:13, 1205:9
**designed** [3] - 1136:14,
1136:20, 1136:21
**designs** [9] - 1031:21,
1050:11, 1055:4,
1096:13, 1108:12,
1135:21, 1160:15,
1161:8, 1191:19
**desirable** [1] - 1077:25
**detailed** [1] - 1103:17
**details** [1] - 1199:12
**detect** [4] - 1093:1,

1113:7, 1113:9, 1113:12
**detected** [1] - 1086:21
**determination** [6] -
1056:24, 1061:18,
1201:11, 1202:4,
1202:8, 1202:25
**determine** [4] - 1060:1,
1075:19, 1189:11,
1201:1
**determined** [1] - 1114:8
**determining** [2] -
1036:18, 1195:25
**develop** [1] - 1130:17
**developing** [2] -
1092:21, 1147:6
**Developing** [1] - 1129:24
**development** [1] -
1011:10
**devote** [1] - 1009:13
**devoted** [1] - 1154:7
**diagnosed** [1] - 1039:16
**diagnosis** [2] - 1086:22,
1108:15
**dial** [1] - 1129:10
**diaphragms** [3] - 1055:5,
1055:14, 1202:15
**diet** [1] - 1032:6
**dietary** [1] - 1206:2
**diette** [4] - 1009:3,
1023:3, 1035:20,
1064:15
**Diette** [59] - 1004:7,
1004:15, 1004:25,
1005:5, 1005:16,
1006:21, 1007:13,
1008:5, 1008:16,
1010:1, 1011:4, 1012:2,
1012:23, 1013:16,
1014:25, 1018:13,
1019:12, 1021:1,
1021:18, 1024:9,
1024:13, 1025:17,
1026:15, 1027:15,
1029:5, 1030:13,
1031:13, 1038:14,
1040:2, 1042:23,
1045:25, 1046:20,
1048:16, 1050:3,
1053:23, 1055:21,
1056:23, 1057:20,
1058:21, 1059:15,
1061:24, 1063:6,
1063:24, 1065:14,

1067:7, 1073:13,
1122:4, 1124:6,
1125:25, 1138:15,
1138:21, 1154:16,
1191:8, 1199:7,
1200:18, 1201:6,
1202:7, 1211:12, 1212:7
**DIETTE** [3] - 1004:9,
1067:4, 1119:7
**Diette's** [3] - 1018:3,
1124:22, 1187:5
**difference** [7] - 1022:17,
1022:19, 1044:2,
2155:23, 1159:21,
1200:24, 1210:15
**differences** [2] -
1043:24, 1202:13
**different** [77] - 1006:3,
1010:19, 1015:8,
1015:23, 1029:20,
1030:5, 1031:22,
1039:9, 1039:10,
1039:13, 1039:23,
1043:3, 1043:6,
1049:17, 1052:3,
1054:18, 1055:3,
1055:4, 1065:3, 1065:4,
1069:14, 1070:24,
1084:3, 1085:23,
1088:25, 1089:14,
1090:4, 1090:17,
1095:15, 1095:16,
1096:11, 1096:12,
1096:13, 1096:21,
1109:5, 1113:10,
1127:17, 1127:19,
1131:14, 1133:22,
1148:5, 1151:22,
1152:2, 1152:3, 1155:4,
1156:17, 1158:12,
1160:15, 1160:16,
1161:8, 1162:17,
1163:11, 1175:22,
1176:2, 1176:5,
1176:21, 1176:22,
1182:9, 1183:4, 1186:8,
1193:13, 1197:6,
1201:1, 1203:17,
1209:19, 1209:20,
1209:21, 1210:5,
1210:9, 1210:10,
1210:12
**differential** [1] - 1043:14

**differentiation** [1] -
1167:15
**differently** [4] - 1022:3,
1044:1, 1096:22, 1171:6
**differs** [1] - 1110:5
**DIRECT** [1] - 1004:13
**direct** [4] - 1073:17,
1073:20, 1166:12,
1200:15
**Direct** [1] - 1212:6
**directed** [1] - 1006:3
**direction** [1] - 1058:16
**directly** [4] - 1041:11,
1055:13, 1072:11,
1124:2
**disadvantages** [1] -
1111:17
**disagree** [15] - 1070:4,
1076:7, 1076:12,
1078:24, 1079:7,
1083:16, 1101:4,
1101:25, 1102:1,
1112:25, 1113:21,
1116:1, 1123:23,
1144:15, 1151:20
**disagreed** [1] - 1125:6
**disagreeing** [1] - 1079:3
**disagreement** [3] -
1112:23, 1115:21,
1115:22
**disagrees** [2] - 1169:17,
1187:17
**disclosed** [3] - 1045:24,
1046:3, 1064:5
**discover** [2] - 1093:12,
1129:6
**discovered** [1] - 1209:10
**discuss** [13] - 1011:12,
1018:6, 1045:20,
1054:5, 1090:16,
1090:24, 1091:1,
1091:7, 1103:8,
1103:11, 1108:4,
1117:11, 1171:6
**discussed** [13] -
1046:14, 1046:18,
1049:20, 1055:20,
1062:1, 1075:13,
1077:22, 1106:17,
1117:12, 1167:22,
1177:18, 1190:23,
1202:19
**discusses** [2] - 1136:1,

1139:6
**discussing** [4] - 1023:9,
1043:9, 1158:6, 1169:25
**discussion** [16] - 1011:5,
1012:6, 1013:8,
1013:19, 1023:13,
1035:20, 1046:1,
1046:5, 1046:12,
1048:16, 1049:25,
1088:12, 1088:22,
1090:20, 1090:21,
1209:25
**disease** [18] - 1007:24,
1039:8, 1039:9,
1039:16, 1043:15,
1049:12, 1054:3,
1065:15, 1109:6,
1122:8, 1122:11,
1122:13, 1123:18,
1123:24, 1123:25,
1137:7, 1193:11, 1209:3
**diseases** [8] - 1007:23,
1061:9, 1064:25,
1108:13, 1120:7,
1120:9, 1120:10, 1122:6
**disparage** [1] - 1155:19
**disparaged** [1] - 1137:6
**disputable** [1] - 1069:2
**distinguish** [1] - 1185:25
**distort** [2] - 1048:8,
1065:21
**distorted** [2] - 1037:1,
1175:10
**distorting** [1] - 1037:11
**distortion** [1] - 1036:24
**distorts** [1] - 1037:18
**distribution** [1] -
1007:24
**DISTRICT** [2] - 1002:1,
1002:1
**diverse** [1] - 1011:1
**divide** [1] - 1151:12
**Doctor** [43] - 1013:9,
1016:18, 1026:10,
1035:3, 1039:15,
1056:13, 1075:25,
1077:21, 1079:9,
1080:10, 1083:14,
1084:6, 1088:12,
1093:22, 1094:5,
1095:25, 1103:14,
1116:9, 1116:20,
1117:14, 1123:5,

1124:2, 1125:18, 1129:19, 1130:6, 1130:13, 1133:9, 1133:24, 1145:4, 1154:2, 1160:25, 1162:3, 1162:12, 1170:12, 1178:14, 1179:11, 1182:19, 1193:1, 1193:22, 1194:25, 1195:3, 1196:4, 1206:9

**doctor** [13] - 1069:4, 1071:10, 1097:6, 1111:19, 1123:1, 1123:3, 1146:13, 1151:22, 1154:15, 1157:23, 1162:18, 1176:19, 1187:20

**doctoral** [1] - 1008:12

**document** [26] - 1079:17, 1079:20, 1079:24, 1079:25, 1080:2, 1081:8, 1081:9, 1085:16, 1091:4, 1116:18, 1162:7, 1162:17, 1171:7, 1196:9, 1197:19, 1197:21, 1198:3, 1198:12, 1198:17, 1199:8, 1199:10, 1200:7, 1204:11, 1210:15, 1211:5, 1211:6

**documented** [1] - 1102:24

**documenting** [1] - 1110:18

**documents** [5] - 1012:25, 1082:8, 1187:8, 1198:21, 1210:23

**done** [22] - 1008:18, 1028:15, 1030:1, 1030:22, 1032:9, 1032:13, 1033:11, 1042:21, 1043:12, 1062:5, 1064:1, 1070:13, 1088:9, 1110:6, 1124:17, 1131:5, 1131:6, 1140:13, 1140:15, 1141:19, 1200:5, 1209:15

**dose** [56] - 1014:21,

1014:22, 1015:21, 1016:11, 1016:12, 1017:13, 1031:3, 1033:24, 1048:17, 1050:24, 1051:2, 1051:6, 1051:9, 1051:11, 1051:13, 1051:14, 1051:17, 1051:18, 1052:2, 1052:9, 1052:20, 1052:21, 1052:25, 1053:10, 1054:1, 1055:20, 1060:2, 1102:5, 1102:15, 1165:22, 1166:3, 1166:19, 1179:12, 1179:13, 1182:4, 1182:6, 1182:18, 1183:4, 1183:5, 1183:20, 1185:21, 1186:20, 1187:12, 1188:4, 1188:5, 1188:13, 1188:18, 1193:5, 1193:17, 1194:3, 1194:6, 1194:11, 1194:15, 1194:23, 1202:18

**dose-response** [32] - 1031:3, 1033:24, 1048:17, 1050:24, 1051:2, 1051:6, 1051:9, 1051:11, 1051:13, 1051:14, 1051:17, 1052:2, 1052:9, 1052:20, 1052:21, 1053:10, 1054:1, 1055:20, 1060:2, 1102:5, 1102:15, 1165:22, 1166:3, 1166:19, 1193:5, 1193:17, 1194:3, 1194:5, 1194:11, 1194:15, 1194:23, 1202:18

**dose-responses** [1] - 1052:25

**dot** [1] - 1160:22

**doubt** [4] - 1139:14, 1142:25, 1165:5, 1210:11

**doubtful** [1] - 1183:13

**douche** [1] - 1100:7

**douched** [2] - 1047:7,

1098:16

**douching** [29] - 1035:7, 1045:16, 1045:18, 1046:13, 1046:14, 1046:21, 1047:2, 1047:4, 1047:12, 1097:7, 1097:9, 1097:22, 1097:23, 1098:11, 1098:20, 1098:25, 1099:6, 1099:12, 1099:18, 1100:2, 1100:3, 1100:4, 1100:5, 1175:25, 1176:7, 1176:10, 1176:13, 1176:25, 1177:14

**down** [20] - 1010:1, 1020:3, 1037:19, 1042:18, 1051:18, 1052:10, 1057:21, 1066:2, 1069:15, 1101:7, 1127:24, 1135:25, 1136:10, 1136:19, 1145:25, 1161:18, 1164:6, 1164:12, 1184:25

**Dr** [134] - 1004:7, 1004:15, 1004:25, 1005:16, 1006:21, 1007:13, 1008:5, 1008:16, 1010:1, 1011:4, 1012:2, 1012:3, 1012:23, 1013:10, 1013:16, 1014:25, 1018:3, 1018:13, 1018:20, 1019:12, 1021:1, 1021:8, 1021:18, 1023:3, 1024:9, 1024:13, 1024:14, 1025:17, 1025:25, 1026:15, 1026:20, 1026:21, 1027:11, 1027:15, 1029:5, 1030:13, 1031:13, 1038:14, 1040:2, 1042:23, 1045:25, 1046:20, 1048:16, 1050:1, 1050:3, 1053:23, 1055:21, 1056:23, 1057:10, 1057:16, 1057:20, 1058:21, 1059:15, 1060:16,

1061:24, 1061:25, 1063:6, 1063:24, 1065:14, 1067:7, 1075:21, 1076:24, 1085:24, 1087:11, 1092:16, 1092:20, 1093:8, 1094:7, 1094:9, 1095:10, 1095:22, 1096:5, 1112:20, 1113:18, 1115:12, 1115:13, 1115:16, 1115:18, 1116:24, 1124:6, 1124:22, 1125:25, 1128:4, 1129:16, 1129:18, 1134:3, 1135:7, 1138:3, 1138:20, 1138:21, 1139:21, 1139:22, 1141:23, 1142:18, 1142:20, 1142:22, 1143:20, 1146:18, 1154:24, 1155:13, 1155:14, 1162:20, 1162:21, 1164:20, 1165:15, 1167:2, 1167:19, 1168:23, 1170:9, 1174:15, 1187:5, 1189:8, 1191:8, 1191:9, 1191:20, 1192:10, 1192:13, 1192:20, 1193:4, 1193:16, 1199:7, 1200:18, 1201:6, 1202:7, 1204:2, 1204:18, 1204:25, 1207:21, 1208:4, 1209:13, 1211:12

**dr** [3] - 1009:3, 1035:20, 1064:15

**draft** [14] - 1083:2, 1105:6, 1105:7, 1106:16, 1116:17, 1125:23, 1126:1, 1194:7, 1195:4, 1195:7, 1195:18, 1195:22, 1195:24, 1199:15

**draft-screening** [1] - 1199:15

**drafted** [2] - 1080:24, 1130:16

**drag** [1] - 1037:19

**dramatic** [1] - 1042:12

**dramatically** [1] - 1043:6

**draw** [1] - 1021:18
**drink** [3] - 1045:1, 1181:14, 1207:4
**DRINKER** [1] - 1002:16
**drinker** [1] - 1044:23
**drinkers** [1] - 1206:1
**drives** [1] - 1114:6
**driving** [2] - 1058:16, 1058:18
**drug** [4] - 1151:17, 1151:22, 1152:17, 1158:22
**Drug** [1] - 1080:4
**drugs** [1] - 1057:3
**due** [5] - 1079:12, 1104:12, 1104:20, 1166:11, 1166:23
**duly** [1] - 1004:10
**duration** [3] - 1053:20, 1165:23, 1166:19
**during** [2] - 1039:23, 1093:17

---

**E**

**ear** [1] - 1008:3
**early** [1] - 1185:7
**ease** [1] - 1129:8
**easier** [2] - 1128:23
**EAST** [1] - 1002:7
**easy** [1] - 1162:25
**edition** [4] - 1077:16, 1077:18, 1077:19
**editions** [1] - 1077:15
**editor** [1] - 1135:8
**editorial** [3] - 1149:2, 1154:13, 1156:17
**editors** [2] - 1077:3, 1152:9
**education** [4] - 1005:1, 1065:2, 1065:10, 1149:22
**educator** [1] - 1005:12
**effect** [30] - 1014:23, 1015:25, 1016:7, 1028:5, 1042:12, 1042:20, 1043:14, 1043:22, 1053:15, 1062:14, 1078:21, 1083:13, 1102:7, 1103:22, 1114:14, 1114:15, 1115:23, 1115:25, 1116:14, 1116:17, 1116:19,

1142:9, 1160:18, 1160:21, 1160:22, 1194:18, 1196:25, 1198:11, 1199:23, 1206:17
**Effectiveness** [1] - 1129:25
**effectiveness** [1] - 1130:10
**efficiency** [1] - 1137:10
**efficient** [1] - 1108:12
**effort** [1] - 1098:11
**efforts** [1] - 1156:7
**eight** [2] - 1111:5, 1158:16
**either** [18] - 1005:22, 1020:2, 1022:16, 1024:6, 1050:11, 1055:15, 1072:11, 1077:17, 1100:18, 1107:16, 1112:11, 1115:2, 1121:20, 1129:13, 1136:23, 1141:1, 1153:13, 1189:20
**either/or** [1] - 1199:14
**elevate** [1] - 1137:17
**elevated** [1] - 1036:15
**elevating** [1] - 1203:8
**eliminate** [1] - 1030:7
**elucidate** [1] - 1032:4
**embarrassed** [3] - 1134:6, 1135:1, 1137:15
**emphasize** [1] - 1015:19
**emphasizes** [1] - 1196:23
**employ** [1] - 1022:2
**employed** [4] - 1012:10, 1012:21, 1200:10, 1200:19
**employing** [1] - 1200:9
**end** [4] - 1081:23, 1082:22, 1144:23, 1162:7
**endorse** [2] - 1022:16, 1082:25
**endorsed** [1] - 1158:18
**engines** [1] - 1012:14
**English** [1] - 1102:3
**enrolled** [1] - 1110:23
**enrolling** [2] - 1112:8, 1112:11
**enterprise** [1] - 1121:7

**entire** [11] - 1016:22, 1020:20, 1023:4, 1058:9, 1078:15, 1083:4, 1132:16, 1154:7, 1158:10, 1160:12, 1162:6
**entirely** [5] - 1038:20, 1046:2, 1075:23, 1077:24, 1137:3
**entirety** [1] - 1178:3
**entities** [1] - 1044:8
**entitled** [2] - 1138:7, 1138:25
**ENTITLED** [1] - 1213:8
**environmental** [1] - 1122:8
**Environmental** [1] - 1007:7
**environmentally** [1] - 1120:9
**envisioned** [1] - 1147:18
**EOC** [3] - 1166:22, 1166:24, 1168:5
**epi** [6] - 1024:18, 1024:21, 1025:2, 1030:17, 1058:9, 1064:19
**epidemiologic** [12] - 1007:1, 1008:11, 1008:13, 1012:13, 1035:1, 1053:16, 1071:23, 1072:5, 1072:13, 1076:13, 1094:2, 1151:24
**Epidemiologic** [1] - 1077:10
**epidemiological** [8] - 1011:8, 1011:22, 1013:6, 1015:8, 1095:14, 1104:4, 1194:18, 1203:12
**epidemiologist** [7] - 1009:9, 1022:10, 1085:12, 1120:16, 1120:19, 1120:21, 1132:14
**epidemiologists** [18] - 1015:13, 1016:24, 1017:7, 1017:19, 1071:20, 1076:11, 1078:11, 1085:4, 1085:8, 1085:10, 1137:8, 1142:11,

1143:3, 1143:6, 1144:4, 1155:5, 1156:12, 1158:3
**epidemiology** [84] - 1005:17, 1005:21, 1006:22, 1007:11, 1007:19, 1007:20, 1008:22, 1011:19, 1013:14, 1013:23, 1018:15, 1022:1, 1024:2, 1024:11, 1024:15, 1026:9, 1027:17, 1028:24, 1030:13, 1031:10, 1031:11, 1031:18, 1032:23, 1032:24, 1034:22, 1040:7, 1044:13, 1045:6, 1045:23, 1046:23, 1047:18, 1048:4, 1049:2, 1050:25, 1051:5, 1053:1, 1057:17, 1059:18, 1060:12, 1060:18, 1061:16, 1061:19, 1063:19, 1067:12, 1076:9, 1085:23, 1096:3, 1109:3, 1109:16, 1120:12, 1121:12, 1121:13, 1121:14, 1122:11, 1133:17, 1134:3, 1137:18, 1138:4, 1139:8, 1142:22, 1154:25, 1155:17, 1157:1, 1180:10, 1180:12, 1180:19, 1181:24, 1185:19, 1189:11, 1189:13, 1190:2, 1191:21, 1191:24, 1192:11, 1193:2, 1193:5, 1193:8, 1193:18, 1194:2, 1194:15, 1201:11, 1202:5, 1203:8, 1205:21
**Epidemiology** [4] - 1135:5, 1135:8, 1138:11, 1138:12
**epithelial** [1] - 1165:21
**equal** [2] - 1019:14, 1020:12
**equivalent** [3] - 1080:4, 1080:7, 1143:9
**equivalently** [1] -

1155:25
**era** [2] - 1030:22, 1168:16
**erroneous** [1] - 1151:10
**errors** [1] - 1156:6
**Eslick** [2] - 1105:16, 1117:17
**especially** [11] - 1033:8, 1036:13, 1036:22, 1040:19, 1048:9, 1050:17, 1057:21, 1065:20, 1068:17, 1164:7, 1205:16
**ESQUIRE** [9] - 1002:11, 1002:12, 1002:14, 1002:16, 1002:17, 1002:18, 1002:20, 1002:21, 1003:4
**ESQUIRES** [8] - 1002:10, 1002:12, 1002:13, 1002:16, 1002:18, 1002:19, 1002:21, 1003:3
**essence** [1] - 1201:3
**essential** [1] - 1108:14
**essentially** [1] - 1043:5
**established** [9] - 1025:9, 1026:8, 1026:14, 1027:6, 1030:23, 1033:20, 1035:2, 1052:20, 1103:7
**establishing** [1] - 1143:10
**estimate** [7] - 1051:11, 1058:8, 1069:2, 1070:19, 1153:21, 1159:8, 1159:23
**estimated** [4] - 1036:22, 1036:25, 1091:19, 1193:12
**estimates** [2] - 1143:25, 1153:3
**et** [2] - 1086:2, 1180:10
**ethnicities** [1] - 1095:17
**ethnicity** [1] - 1208:13
**evaluate** [2] - 1054:17, 1133:2
**evaluated** [5] - 1015:20, 1016:11, 1095:23, 1131:24, 1203:4
**evaluating** [2] - 1161:6, 1181:13
**evaluation** [4] - 1095:24,

1106:5, 1140:3, 1203:5
**evaluations** [2] - 1106:2, 1106:4
**event** [1] - 1110:19
**eventually** [1] - 1121:14
**evidence** [34] - 1011:23, 1012:22, 1033:19, 1035:23, 1054:11, 1063:8, 1072:15, 1075:4, 1078:16, 1084:2, 1087:15, 1094:21, 1102:9, 1102:11, 1103:1, 1110:21, 1126:20, 1127:3, 1127:10, 1130:17, 1131:19, 1132:19, 1134:16, 1166:20, 1169:8, 1190:15, 1194:15, 1194:20, 1196:3, 1199:17, 1201:4, 1202:11, 1203:12
**Evidence** [5] - 1129:24, 1130:24, 1134:2, 1135:12, 1138:14
**evoke** [1] - 1082:24
**evoked** [1] - 1117:8
**exact** [8] - 1027:25, 1078:23, 1082:25, 1094:1, 1117:1, 1117:2, 1117:3, 1156:18
**exactly** [17] - 1018:22, 1020:8, 1020:19, 1020:24, 1021:7, 1028:13, 1043:13, 1072:22, 1094:2, 1095:21, 1109:19, 1128:20, 1137:4, 1137:23, 1141:12, 1159:8, 1163:17
**exaggerated** [1] - 1114:14
**EXAMINATION** [5] - 1004:13, 1067:5, 1119:9, 1188:24, 1203:23
**examine** [1] - 1178:13
**examined** [2] - 1047:2, 1095:14
**examines** [1] - 1205:25
**examining** [2] - 1108:13, 1196:2
**example** [35] - 1006:2,

1013:19, 1025:18, 1028:1, 1028:4, 1029:1, 1030:17, 1031:5, 1032:5, 1036:9, 1039:2, 1039:20, 1040:15, 1044:22, 1049:7, 1051:16, 1058:17, 1059:11, 1070:6, 1074:4, 1075:20, 1090:19, 1094:1, 1118:6, 1127:11, 1128:20, 1129:21, 1130:7, 1153:20, 1159:7, 1160:25, 1176:8, 1183:17, 1205:24
**examples** [11] - 1019:17, 1025:2, 1028:9, 1051:19, 1052:16, 1054:13, 1060:3, 1094:19, 1169:6, 1174:19, 1202:13
**excellent** [1] - 1174:18
**except** [1] - 1073:21
**excess** [2] - 1172:4, 1175:19
**excited** [1] - 1004:17
**exclude** [1] - 1022:7
**excluded** [1] - 1209:25
**exclusion** [2] - 1191:13, 1203:9
**excused** [2] - 1211:12, 1211:13
**exemplar** [1] - 1052:1
**exemplary** [1] - 1167:10
**exercise** [5] - 1006:14, 1054:12, 1144:24, 1145:21, 1201:1
**exhibit** [3] - 1053:13, 1076:22, 1184:16
**Exhibit** [20] - 1004:19, 1067:25, 1079:19, 1080:18, 1080:19, 1130:4, 1135:15, 1138:6, 1138:16, 1141:24, 1142:3, 1146:13, 1154:14, 1154:16, 1165:8, 1171:2, 1175:7, 1184:17, 1204:12
**exist** [1] - 1049:1
**existent** [1] - 1027:21
**exists** [3] - 1025:6,

1025:22, 1127:10
**expect** [5] - 1052:6, 1054:1, 1054:2, 1056:18, 1058:15
**expense** [1] - 1129:8
**expensive** [2] - 1128:24, 1129:1
**experience** [4] - 1005:1, 1039:24, 1109:4, 1179:12
**Expert** [1] - 1122:23
**expert** [22] - 1009:10, 1009:23, 1010:2, 1010:5, 1010:16, 1045:14, 1072:2, 1081:22, 1082:5, 1088:16, 1123:10, 1125:13, 1126:5, 1133:9, 1142:18, 1154:2, 1167:3, 1184:22, 1187:15, 1187:24, 1204:19
**expertise** [2] - 1122:2, 1122:5
**experts** [17] - 1071:24, 1072:4, 1072:18, 1072:24, 1081:25, 1084:10, 1087:19, 1088:7, 1088:15, 1088:19, 1093:8, 1113:19, 1116:3, 1142:23, 1146:19, 1164:20, 1170:3
**explain** [17] - 1010:21, 1030:19, 1039:1, 1039:2, 1044:16, 1049:5, 1054:16, 1060:24, 1171:9, 1171:11, 1171:12, 1171:25, 1173:14, 1181:18, 1208:20, 1208:25, 1209:4
**explained** [1] - 1177:5
**explaining** [3] - 1010:23, 1018:13, 1043:12
**explains** [1] - 1023:15
**explanation** [12] - 1059:21, 1150:16, 1150:17, 1172:3, 1172:14, 1174:11, 1178:4, 1182:2, 1185:19, 1186:5, 1186:17, 1209:8

**explanations** [1] - 1192:24

**exposed** [1] - 1111:24

**Exposure** [1] - 1204:12

**exposure** [36] - 1030:2, 1030:3, 1030:5, 1037:22, 1044:19, 1052:5, 1053:15, 1054:3, 1056:10, 1056:14, 1083:11, 1084:12, 1098:9, 1101:12, 1101:19, 1101:21, 1102:7, 1103:3, 1103:21, 1104:6, 1106:7, 1108:14, 1110:2, 1110:5, 1111:16, 1114:5, 1115:1, 1123:22, 1188:14, 1193:10, 1194:17, 1206:3, 1206:5, 1206:18, 1207:15

**exposures** [2] - 1007:22, 1061:4

**express** [4] - 1019:20, 1022:19, 1028:3, 1033:18

**expressed** [1] - 1089:5

**extent** [2] - 1082:1, 1208:10

**external** [3] - 1081:13, 1195:14, 1195:19

**externally** [1] - 1199:11

**extra** [1] - 1164:7

**extraordinarily** [1] - 1043:10

**extrapolate** [1] - 1034:19

**extrapolation** [1] - 1168:15

---

**F**

---

**face** [2] - 1050:21

**face-to-face** [1] - 1050:21

**facing** [1] - 1151:23

**fact** [19] - 1007:16, 1010:1, 1019:23, 1053:5, 1061:6, 1083:19, 1090:12, 1093:21, 1094:3, 1111:15, 1128:3, 1167:7, 1170:20, 1174:15, 1177:4,

1190:10, 1194:10, 1195:7, 1202:23

**factor** [16] - 1014:7, 1027:12, 1037:18, 1044:18, 1045:15, 1045:19, 1046:21, 1047:3, 1047:16, 1056:25, 1064:22, 1086:20, 1175:18, 1175:21, 1176:20, 1177:19

**factors** [13] - 1036:24, 1037:21, 1045:22, 1046:1, 1046:5, 1048:7, 1064:9, 1123:6, 1175:10, 1175:11, 1177:17, 1208:8, 1208:13

**faculty** [1] - 1005:23

**failed** [1] - 1081:24

**fair** [9] - 1020:23, 1021:2, 1021:4, 1104:13, 1104:21, 1120:18, 1201:6, 1201:18, 1209:6

**fairly** [1] - 1007:21

**fairness** [1] - 1095:25

**fallacious** [2] - 1140:3, 1140:22

**fallacy** [1] - 1140:22

**Fallopian** [2] - 1056:8, 1056:17

**falls** [1] - 1006:25

**false** [3] - 1142:8, 1151:12, 1159:5

**familiar** [8] - 1023:2, 1023:4, 1029:10, 1030:13, 1077:13, 1104:10, 1146:14, 1184:8

**family** [3] - 1045:16, 1045:17, 1208:12

**far** [3] - 1092:22, 1130:9, 1136:12

**fat** [1] - 1032:6

**favor** [2] - 1067:24, 1152:20

**FDA** [4] - 1080:9, 1151:18, 1152:6, 1183:23

**feasible** [2] - 1129:2, 1129:15

**feature** [4] - 1050:9, 1050:10, 1193:7,

1196:17

**February** [2] - 1071:13, 1079:10

**fellows** [2] - 1005:13, 1005:23

**female** [2] - 1056:5, 1101:1

**few** [9] - 1040:11, 1041:18, 1051:12, 1063:3, 1097:15, 1158:9, 1189:1, 1199:2, 1203:20

**fiber** [9] - 1182:13, 1182:16, 1182:17, 1183:1, 1183:11, 1187:13, 1188:5, 1188:7

**fibers** [9] - 1183:5, 1183:8, 1185:8, 1185:13, 1185:25, 1187:13, 1187:14, 1188:9, 1188:15

**field** [8] - 1005:17, 1005:20, 1014:3, 1017:6, 1023:3, 1023:6, 1147:20, 1158:6

**Fifth** [1] - 1077:16

**figure** [2] - 1141:13, 1142:16

**figures** [1] - 1052:7

**filed** [1] - 1154:2

**files** [1] - 1043:11

**fill** [1] - 1118:12

**final** [4] - 1018:25, 1034:5, 1054:4, 1065:14

**finally** [3] - 1056:23, 1063:6, 1142:6

**findings** [36] - 1009:1, 1013:14, 1013:23, 1014:4, 1015:4, 1015:6, 1015:9, 1015:11, 1015:15, 1017:11, 1018:15, 1020:12, 1020:17, 1020:21, 1021:11, 1022:12, 1023:23, 1024:2, 1024:4, 1033:24, 1037:19, 1046:25, 1048:8, 1052:24, 1053:22, 1055:23, 1056:11, 1057:4, 1057:17, 1059:18, 1061:12, 1062:22, 1065:21, 1167:25,

1173:15, 1193:19

**fine** [3] - 1018:9, 1118:10, 1188:23

**finish** [5] - 1058:20, 1069:11, 1106:11, 1118:8, 1189:1

**finishing** [1] - 1173:18

**firm** [2] - 1078:1, 1188:7

**first** [38] - 1004:10, 1009:15, 1015:16, 1025:5, 1027:22, 1029:16, 1036:16, 1038:12, 1052:15, 1057:6, 1067:10, 1067:12, 1080:2, 1080:3, 1084:19, 1088:10, 1091:6, 1105:3, 1108:8, 1119:13, 1124:3, 1128:11, 1128:14, 1129:7, 1129:10, 1130:23, 1131:2, 1139:11, 1147:11, 1148:9, 1153:15, 1167:2, 1171:24, 1172:2, 1172:7, 1189:16, 1194:16

**FISHER** [1] - 1002:7

**fit** [1] - 1013:6

**fits** [2] - 1010:25, 1031:19

**five** [4] - 1045:8, 1058:1, 1163:11, 1183:1

**flat** [1] - 1193:21

**flip** [1] - 1016:19

**FLOM** [1] - 1002:18

**FLORIDA** [1] - 1002:14

**flurry** [1] - 1173:6

**focus** [12] - 1007:13, 1007:17, 1008:22, 1075:16, 1076:9, 1119:23, 1120:2, 1120:6, 1120:7, 1122:17, 1158:19, 1199:15

**focused** [8] - 1072:5, 1120:3, 1120:5, 1159:1, 1160:15, 1197:4, 1198:4, 1210:2

**focuses** [1] - 1195:24

**focusing** [1] - 1197:5

**fold** [1] - 1028:5

**folks** [6] - 1061:8,

1063:1, 1072:4, 1093:10, 1121:16, 1200:9
**follow** [6] - 1020:10, 1032:20, 1064:12, 1079:22, 1092:10, 1129:12
**follow-up** [1] - 1092:10
**followed** [4] - 1063:2, 1111:2, 1111:4, 1135:23
**FOLLOWING** [1] - 1213:6
**following** [6] - 1068:6, 1068:18, 1080:23, 1142:5, 1171:8, 1173:9
**follows** [2] - 1004:11, 1198:14
**Food** [1] - 1080:4
**food** [1] - 1065:3
**footnote** [3] - 1133:16, 1133:18
**footnotes** [1] - 1158:1
**FOR** [1] - 1002:1
**forest** [4] - 1057:11, 1145:12, 1153:23, 1162:24
**form** [3] - 1025:7, 1025:24, 1049:11
**formally** [1] - 1005:16
**forms** [1] - 1062:9
**formula** [2] - 1098:3, 1132:4
**forth** [3] - 1082:9, 1082:15, 1137:20
**forthcoming** [2] - 1050:15, 1050:20
**forward** [1] - 1178:9
**foundation** [5] - 1078:2, 1169:21, 1169:23, 1184:3, 1187:4
**foundations** [1] - 1007:9
**founded** [1] - 1135:7
**four** [2] - 1095:16, 1209:6
**fourth** [2] - 1052:15, 1105:9
**framework** [5] - 1011:4, 1013:19, 1024:9, 1071:20, 1196:12
**France** [1] - 1061:14
**FREDA** [1] - 1002:8
**frequently** [3] - 1078:6, 1086:18, 1089:1

**front** [8] - 1009:4, 1069:23, 1107:7, 1131:9, 1154:15, 1162:7, 1174:20, 1198:17
**fulfilled** [1] - 1160:13
**full** [6] - 1005:5, 1005:14, 1009:21, 1026:17, 1196:24, 1199:22
**fully** [2] - 1045:24, 1058:11, 1065:11
**function** [3] - 1005:8, 1006:15, 1096:19
**functions** [4] - 1015:24, 1096:22, 1096:25, 1114:11
**fundamental** [2] - 1133:25, 1134:2
**funded** [6] - 1007:3, 1023:20, 1080:20, 1107:17, 1107:19, 1107:23
**funding** [1] - 1149:21
**furthermore** [1] - 1136:12

---

**G**

**gained** [1] - 1137:10
**game** [2] - 1157:21, 1200:15
**Gates** [5] - 1035:15, 1057:24, 1163:14, 1207:12
**general** [16] - 1033:12, 1037:9, 1043:25, 1049:16, 1050:18, 1055:8, 1069:25, 1070:19, 1079:7, 1110:12, 1111:9, 1120:9, 1129:5, 1176:12, 1201:2, 1204:6
**generally** [13] - 1012:12, 1023:6, 1029:10, 1030:15, 1076:3, 1094:11, 1101:22, 1127:25, 1133:1, 1133:17, 1151:16, 1181:5, 1181:10
**generic** [2] - 1159:6, 1159:7
**genetic** [1] - 1177:22
**genital** [7] - 1041:13, 1055:18, 1165:20,

1166:9, 1166:20, 1166:21, 1166:23
**geographical** [1] - 1095:17
**GEREL** [1] - 1002:12
**Gertig** [3] - 1035:12, 1035:19, 1057:24
**girls** [1] - 1110:21
**given** [5] - 1092:9, 1092:24, 1124:17, 1126:13, 1126:14
**glad** [1] - 1204:1
**glass** [1] - 1181:14
**global** [1] - 1059:22
**goal** [1] - 1077:25
**goals** [1] - 1197:7
**Gonzalez** [13] - 1035:7, 1035:18, 1046:24, 1047:2, 1058:5, 1097:10, 1097:11, 1099:1, 1099:13, 1100:16, 1110:13, 1110:20, 1163:14
**Goodman** [2] - 1148:18, 1148:19
**Gordis** [13] - 1031:24, 1076:24, 1096:5, 1126:24, 1127:1, 1128:4, 1129:16, 1133:11, 1133:12, 1133:17, 1134:3, 1174:15
**Gordis'** [1] - 1129:18
**gosh** [1] - 1088:24
**GOTSHAL** [1] - 1002:21
**governed** [1] - 1210:9
**government** [2] - 1007:5, 1023:22
**governmental** [2] - 1198:21, 1198:23
**grabbed** [1] - 1184:10
**gradient** [2] - 1102:4, 1194:11
**Grand** [2] - 1126:11, 1126:13
**grants** [1] - 1146:11
**graph** [1] - 1041:4
**grapple** [1] - 1037:9
**great** [4] - 1004:22, 1010:18, 1015:10, 1023:14
**greater** [4] - 1019:14, 1020:12, 1048:8,

1159:22
**greatest** [1] - 1135:22
**Greece** [1] - 1097:18
**Green** [1] - 1099:23
**Greenland** [6] - 1139:22, 1154:21, 1154:24, 1155:3, 1155:14, 1157:4
**Greg** [1] - 1122:4
**GREGORY** [3] - 1004:9, 1067:4, 1119:7
**Gregory** [2] - 1005:5, 1212:7
**ground** [1] - 1188:7
**group** [6] - 1084:18, 1085:17, 1173:11, 1173:13, 1173:20, 1174:9
**groups** [3] - 1022:17, 1039:7, 1071:1
**guess** [3] - 1086:13, 1120:22, 1200:11
**guidance** [1] - 1028:1
**guidelines** [2] - 1077:22, 1078:14
**guys** [1] - 1146:17
**gynecologic** [1] - 1123:6

---

**H**

**habit** [3] - 1110:15, 1110:18, 1172:25
**habits** [8] - 1039:17, 1047:6, 1050:3, 1050:16, 1050:20, 1099:3, 1099:14, 1112:12
**half** [5] - 1042:8, 1065:24, 1170:1, 1174:22, 1201:20
**hand** [7] - 1004:20, 1136:19, 1140:17, 1144:10, 1147:4, 1148:16, 1167:24
**handed** [1] - 1077:4
**handled** [2] - 1037:13, 1045:7
**hands** [1] - 1006:5
**hands-on** [1] - 1006:5
**haphazard** [2] - 1052:18, 1114:7
**happy** [1] - 1192:2
**hard** [2] - 1064:25, 1199:14
**harebrained** [1] - 1088:1

1232

harm [2] - 1055:10, 1055:16
harmful [1] - 1014:23
hazard [8] - 1015:21, 1015:22, 1015:25, 1016:14, 1017:14, 1017:22, 1019:4, 1019:6
heading [2] - 1006:25, 1039:5
headings [1] - 1118:12
health [9] - 1060:11, 1080:8, 1081:12, 1081:17, 1125:24, 1195:13, 1196:13, 1196:17, 1198:10
Health [64] - 1005:7, 1005:19, 1007:6, 1007:7, 1014:8, 1023:21, 1053:14, 1053:17, 1079:12, 1080:3, 1080:11, 1080:20, 1080:23, 1081:4, 1081:5, 1081:7, 1081:18, 1081:23, 1082:6, 1082:13, 1083:2, 1085:16, 1086:8, 1087:9, 1088:3, 1088:14, 1094:22, 1100:20, 1105:2, 1116:10, 1116:17, 1124:9, 1124:18, 1125:9, 1125:16, 1125:17, 1125:19, 1125:22, 1126:1, 1146:9, 1176:3, 1194:8, 1194:10, 1194:14, 1196:7, 1196:11, 1197:1, 1197:5, 1197:7, 1198:6, 1198:23, 1199:17, 1200:5, 1200:7, 1200:9, 1200:20, 1207:7, 1209:23, 1209:25, 1210:13, 1210:19, 1210:21
healthy [1] - 1096:22
hear [6] - 1012:6, 1024:14, 1060:15, 1076:10, 1187:7, 1199:1
heard [14] - 1029:4, 1033:15, 1049:25, 1075:18, 1079:15, 1092:16, 1117:3,

1146:16, 1146:17, 1168:21, 1189:8, 1200:15, 1204:20
HEARING [1] - 1002:4
hearing [6] - 1075:16, 1143:11, 1170:3, 1197:16, 1197:17, 1197:24
heavy [2] - 1028:8, 1163:8
heightened [2] - 1037:25, 1040:19
help [27] - 1008:20, 1008:25, 1009:1, 1010:10, 1010:14, 1013:13, 1015:13, 1018:24, 1025:16, 1029:13, 1030:19, 1031:17, 1032:5, 1036:16, 1038:12, 1041:4, 1041:8, 1046:11, 1046:22, 1051:25, 1064:17, 1125:25, 1132:16, 1161:15, 1181:17, 1182:1, 1183:3
helpful [5] - 1013:22, 1028:3, 1041:6, 1109:20, 1205:24
helps [4] - 1010:22, 1030:6, 1030:8, 1059:25
hence [1] - 1038:22
Henderson [1] - 1074:4
heterogeneity [5] - 1059:6, 1071:4, 1071:6, 1071:7, 1071:9
heterogeneous [1] - 1071:1
hierarchy [9] - 1126:20, 1127:3, 1127:6, 1127:9, 1127:24, 1132:3, 1132:10, 1134:16, 1135:21
high [8] - 1027:14, 1032:6, 1036:12, 1048:12, 1061:4, 1208:19, 1209:4, 1209:7
higher [6] - 1038:22, 1052:5, 1057:7, 1065:6, 1127:22, 1202:24
highest [5] - 1027:13, 1052:8, 1127:12, 1132:19

highlight [2] - 1053:12, 1184:11
highlighted [4] - 1015:7, 1015:16, 1042:18, 1060:21
highlighting [1] - 1110:13
highly [5] - 1019:18, 1019:19, 1043:16, 1051:11, 1053:2
Hill [53] - 1012:22, 1026:17, 1027:5, 1027:7, 1027:12, 1027:16, 1028:2, 1031:4, 1031:6, 1034:4, 1034:7, 1035:24, 1036:9, 1051:1, 1054:5, 1057:1, 1059:11, 1059:17, 1063:15, 1063:19, 1071:17, 1071:19, 1072:14, 1076:15, 1078:7, 1081:18, 1083:20, 1090:17, 1091:1, 1091:4, 1101:3, 1102:13, 1102:17, 1103:18, 1116:14, 1117:5, 1117:8, 1117:9, 1118:11, 1139:2, 1139:7, 1160:6, 1179:18, 1191:16, 1192:17, 1195:1, 1197:14, 1198:5, 1199:25, 1200:10, 1200:19, 1200:25, 1203:16
Hill-type [1] - 1012:22
hired [1] - 1204:17
histological [1] - 1166:24
history [3] - 1045:16, 1045:17, 1208:12
hold [2] - 1147:13, 1156:24
holidays [1] - 1009:20
homes [1] - 1030:25
honestly [2] - 1120:20, 1125:15
Honor [43] - 1004:6, 1004:20, 1017:24, 1018:2, 1020:16, 1026:16, 1034:13, 1045:14, 1045:21,

1046:7, 1063:25, 1065:22, 1069:10, 1073:15, 1076:23, 1077:2, 1079:20, 1107:3, 1107:15, 1124:21, 1125:1, 1130:3, 1134:20, 1138:5, 1138:13, 1165:8, 1167:4, 1169:10, 1169:19, 1169:24, 1173:25, 1174:24, 1175:6, 1183:25, 1184:17, 1186:11, 1186:25, 1187:6, 1188:19, 1191:25, 1197:3, 1197:20, 1201:14
Honor's [1] - 1020:10
HONORABLE [1] - 1002:8
hope [4] - 1013:17, 1111:17, 1111:18, 1138:17
hoped [1] - 1053:4
hoping [1] - 1013:13
Hopkins [13] - 1005:6, 1005:9, 1005:21, 1010:10, 1010:22, 1120:11, 1120:16, 1121:17, 1122:4, 1134:1, 1139:16, 1148:20, 1155:9
horizontal [3] - 1051:17, 1163:8, 1164:4
hormone [1] - 1045:17
hospital [3] - 1006:18, 1009:6, 1121:5
Houghton [6] - 1035:9, 1035:18, 1053:18, 1058:4, 1163:15, 1207:11
hour [5] - 1065:24, 1118:19, 1174:22, 1201:20
hours [1] - 1065:25
HRT [3] - 1029:5, 1029:10, 1029:15
human [13] - 1006:24, 1053:16, 1081:12, 1081:17, 1083:8, 1085:3, 1085:5, 1085:7, 1085:8, 1085:19, 1092:25, 1194:18,

1195:13
**humans** [1] - 1106:8
**Huncharek** [1] - 1184:8
**hygiene** [1] - 1050:16
**hypothesis** [16] - 1011:12, 1089:2, 1089:8, 1089:11, 1094:3, 1142:7, 1150:4, 1150:13, 1150:24, 1151:20, 1152:4, 1152:5, 1153:18, 1153:23, 1203:13, 1205:10
**hypothesized** [8] - 1011:9, 1013:3, 1063:9, 1086:18, 1089:1, 1089:23, 1093:20, 1093:22
**hypothetical** [3] - 1150:16, 1181:12, 1189:4
**hypotheticals** [1] - 1100:17

**I**

**IARC** [33] - 1037:4, 1044:13, 1060:11, 1060:18, 1061:24, 1062:20, 1082:23, 1082:24, 1082:25, 1084:18, 1170:12, 1170:13, 1170:17, 1170:21, 1171:4, 1171:8, 1171:9, 1171:14, 1174:1, 1175:1, 1175:4, 1176:19, 1180:1, 1190:4, 1190:7, 1190:14, 1190:19, 1190:21, 1191:5, 1198:21, 1198:24, 1209:12
**IARC's** [5] - 1061:15, 1061:18, 1062:18, 1190:10, 1193:2
**Ibuprofen** [1] - 1014:15
**ICTR** [1] - 1155:11
**idea** [20] - 1009:12, 1022:16, 1023:4, 1023:14, 1032:2, 1041:10, 1044:1, 1045:5, 1056:8, 1057:8, 1061:2, 1064:15,

1088:1, 1100:8, 1100:11, 1134:5, 1137:16, 1142:25, 1183:10, 1183:15
**ideas** [4] - 1069:14, 1156:22, 1158:16, 1162:8
**identical** [5] - 1019:7, 1042:11, 1137:9, 1159:24, 1160:2
**identified** [6] - 1045:10, 1073:2, 1093:8, 1093:11, 1115:6, 1189:21
**identify** [6] - 1034:25, 1072:21, 1100:24, 1108:18, 1108:19, 1108:22
**identifying** [3] - 1037:3, 1092:15, 1196:12
**ignore** [1] - 1144:9
**ignoring** [2] - 1116:6, 1116:7
**II** [2] - 1167:14, 1169:4
**III** [1] - 1083:3
**illness** [2] - 1039:14, 1173:2
**illnesses** [1] - 1064:23
**illustrate** [3] - 1014:2, 1043:22, 1178:17
**illustrates** [2] - 1044:1, 1130:21
**immediately** [1] - 1151:11
**immune** [1] - 1089:24
**immune-mediated** [1] - 1089:24
**impact** [1] - 1169:22
**impacts** [1] - 1122:8
**imperfect** [2] - 1152:7, 1152:10
**implementing** [1] - 1139:23
**implicated** [1] - 1185:6
**implicates** [1] - 1185:11
**imply** [1] - 1160:1
**importance** [2] - 1079:4, 1096:1
**important** [24] - 1007:25, 1010:15, 1013:2, 1016:3, 1019:8, 1022:10, 1027:9, 1030:9, 1036:22,

1045:12, 1047:12, 1047:16, 1048:15, 1052:23, 1053:25, 1054:10, 1065:12, 1065:16, 1070:8, 1071:22, 1072:17, 1096:7, 1136:4, 1152:25
**impossible** [1] - 1036:3
**improved** [1] - 1168:7
**IN** [2] - 1002:4, 1213:7
**inappropriate** [4] - 1078:10, 1187:3, 1197:25, 1199:1
**incision** [1] - 1062:12
**include** [6] - 1007:5, 1016:16, 1076:4, 1091:9, 1143:15, 1207:2
**included** [4] - 1060:10, 1061:15, 1121:12, 1121:15
**includes** [11] - 1009:19, 1009:20, 1016:2, 1016:8, 1017:15, 1070:20, 1081:20, 1087:24, 1121:3, 1144:18, 1156:1
**including** [13] - 1057:5, 1059:6, 1072:9, 1086:19, 1094:18, 1102:18, 1120:10, 1125:11, 1153:1, 1153:2, 1155:8, 1158:13
**income** [1] - 1065:2
**incomplete** [1] - 1109:25
**inconsistency** [5] - 1059:25, 1060:2, 1060:3, 1160:4, 1164:5
**inconsistent** [17] - 1035:4, 1048:3, 1048:5, 1052:25, 1053:2, 1055:3, 1055:17, 1055:24, 1055:25, 1056:10, 1057:8, 1140:1, 1159:19, 1160:6, 1160:8, 1161:20, 1201:11
**inconsistently** [1] - 1056:21
**incorporating** [1] - 1196:2
**incorrect** [7] - 1068:24, 1101:2, 1132:15, 1140:20, 1146:7,

1163:24, 1174:1
**incorrectly** [1] - 1104:17
**increase** [1] - 1028:5
**increased** [16] - 1032:6, 1035:8, 1068:12, 1087:3, 1095:8, 1098:14, 1098:15, 1102:9, 1102:15, 1165:21, 1166:22, 1168:2, 1178:4, 1181:25, 1194:21, 1209:16
**increasing** [4] - 1053:19, 1102:10, 1193:10, 1194:21
**incriminate** [1] - 1168:13
**indeed** [1] - 1089:12
**independent** [2] - 1088:14, 1093:9
**index** [1] - 1149:10
**indicate** [7] - 1024:4, 1068:10, 1083:9, 1104:4, 1121:18, 1123:13, 1192:20
**indicated** [6] - 1027:12, 1044:12, 1133:9, 1193:5, 1201:20, 1201:21
**indicates** [3] - 1106:6, 1122:1, 1122:7
**indications** [1] - 1086:19
**indicative** [4] - 1083:12, 1083:24, 1084:1, 1103:22
**indicator** [2] - 1047:25, 1065:9
**indirectly** [1] - 1072:12
**individual** [8] - 1048:22, 1079:3, 1091:13, 1092:11, 1093:5, 1096:8, 1106:4, 1132:12
**individuals** [1] - 1062:17
**induce** [5] - 1050:22, 1175:13, 1175:19, 1208:19, 1209:7
**inducing** [2] - 1075:1, 1075:10
**indulgence** [2] - 1188:21, 1211:10
**industry** [4] - 1007:9, 1173:9, 1183:23, 1204:17
**inference** [3] - 1029:14,

1186:6, 1186:18
**Inference** [2] - 1138:8, 1139:1
**Inferences** [1] - 1077:10
**inferences** [2] - 1077:25, 1151:7
**inferior** [1] - 1163:21
**inflammation** [11] - 1074:21, 1074:23, 1074:25, 1075:9, 1075:11, 1086:19, 1087:3, 1088:2, 1088:13, 1088:21, 1166:11
**inflammatory** [4] - 1014:14, 1057:3, 1086:16, 1086:21
**influence** [1] - 1035:10
**inform** [6] - 1040:5, 1053:1, 1053:22, 1061:18, 1132:23, 1144:19
**information** [36] - 1021:23, 1021:24, 1039:6, 1039:7, 1039:9, 1040:25, 1049:6, 1049:14, 1049:16, 1051:7, 1054:15, 1060:5, 1078:3, 1088:7, 1094:16, 1096:18, 1111:23, 1114:6, 1114:10, 1114:11, 1121:17, 1128:19, 1143:16, 1144:19, 1145:1, 1145:2, 1181:6, 1187:1, 1195:19, 1195:25, 1196:2, 1196:6, 1196:14, 1199:16, 1206:4
**informative** [1] - 1060:22
**informed** [4] - 1056:24, 1060:20, 1060:25, 1061:22
**informs** [2] - 1055:7, 1056:2
**inhalation** [2] - 1089:18, 1090:2
**inherent** [1] - 1173:21
**initial** [2] - 1073:22, 1206:6
**injecting** [1] - 1062:23
**inpatient** [1] - 1005:11
**inquiry** [5] - 1048:22,

1054:19, 1054:22, 1063:25, 1187:4
**insisted** [1] - 1137:22
**instances** [1] - 1029:5
**instead** [2] - 1201:22, 1206:22
**Institutes** [2] - 1007:6, 1023:21
**institutions** [2] - 1007:3, 1023:21
**instructed** [1] - 1062:3
**instructions** [1] - 1156:20
**intend** [1] - 1171:5
**intended** [1] - 1148:2
**intense** [1] - 1068:17
**intensive** [1] - 1006:15
**interaction** [3] - 1169:2, 1169:3, 1169:5
**interest** [2] - 1111:25, 1121:19
**interesting** [6] - 1010:18, 1125:18, 1148:13, 1156:22, 1158:7, 1169:1
**interests** [2] - 1122:3, 1122:8
**internal** [4] - 1006:19, 1012:24, 1119:20, 1121:9
**internally** [2] - 1161:6, 1161:12
**International** [1] - 1106:2
**internist** [1] - 1121:4
**interpret** [14] - 1005:24, 1007:18, 1014:4, 1015:3, 1016:6, 1017:7, 1017:19, 1021:10, 1021:14, 1031:1, 1042:4, 1058:10, 1158:24
**interpretation** [5] - 1009:1, 1059:8, 1087:20, 1133:20, 1191:24
**interpreted** [8] - 1013:15, 1018:21, 1020:13, 1020:17, 1020:21, 1025:7, 1025:23, 1042:3
**interpreting** [3] - 1037:4, 1152:14, 1192:21
**interrupt** [3] - 1039:15, 1056:9, 1202:19
**interrupted** [1] - 1056:4

**interval** [29] - 1016:1, 1016:8, 1016:15, 1016:20, 1016:22, 1017:1, 1017:6, 1017:14, 1017:16, 1017:18, 1017:20, 1018:15, 1018:19, 1019:5, 1019:14, 1020:15, 1020:20, 1020:21, 1021:5, 1041:25, 1143:9, 1143:14, 1143:23, 1144:18, 1144:21, 1146:1, 1156:1, 1159:11, 1159:14
**intervals** [13] - 1012:7, 1013:11, 1020:12, 1021:1, 1021:9, 1024:3, 1024:7, 1142:12, 1143:3, 1143:24, 1153:2, 1156:21, 1157:2
**intervention** [1] - 1131:24
**Interventions** [1] - 1130:1
**interventions** [1] - 1130:18
**interview** [6] - 1049:20, 1049:24, 1050:12, 1111:15, 1111:20, 1111:22
**interviewed** [3] - 1049:13, 1093:17, 1168:8
**interviewer** [1] - 1050:21
**interviewers** [2] - 1049:10, 1049:12
**introduce** [1] - 1005:2
**introduced** [1] - 1049:11
**introduces** [1] - 1038:19
**introducing** [1] - 1115:3
**introduction** [2] - 1149:7, 1158:11
**invariably** [1] - 1132:18
**invasive** [3] - 1068:20, 1092:4, 1105:18
**inverse** [8] - 1016:12, 1016:13, 1016:17, 1017:2, 1017:8, 1018:16, 1020:22, 1193:20
**inversed** [1] - 1193:14
**investigate** [3] - 1061:8,

1063:2, 1063:9
**investigation** [3] - 1011:11, 1013:6, 1014:12
**investigators** [9] - 1033:6, 1053:3, 1055:11, 1056:4, 1058:14, 1106:4, 1185:1, 1185:5, 1209:21
**invited** [1] - 1087:12
**involved** [7] - 1072:14, 1080:8, 1087:16, 1093:11, 1116:21, 1123:20, 1148:15
**involvement** [1] - 1092:20
**involving** [3] - 1079:12, 1123:21, 1141:7
**irrelevant** [2] - 1187:4, 1187:6
**irrespective** [1] - 1076:1
**irritation** [2] - 1086:16, 1088:25
**IS** [1] - 1213:6
**isolated** [1] - 1194:20
**Israel** [1] - 1097:18
**issue** [77] - 1007:19, 1012:20, 1032:10, 1047:1, 1050:17, 1059:22, 1060:23, 1067:13, 1071:3, 1085:13, 1089:15, 1093:15, 1093:23, 1093:24, 1094:13, 1094:22, 1096:5, 1098:11, 1102:20, 1102:21, 1111:24, 1112:15, 1112:16, 1112:20, 1113:3, 1113:11, 1113:13, 1113:15, 1113:18, 1113:24, 1114:20, 1115:6, 1124:2, 1126:9, 1126:12, 1126:13, 1136:1, 1151:22, 1152:2, 1154:5, 1154:7, 1156:19, 1158:5, 1158:8, 1164:9, 1164:14, 1167:9, 1167:11, 1169:11, 1169:12, 1169:13, 1170:13, 1170:14, 1170:15, 1170:17,

1171:10, 1171:14, 1173:12, 1175:1, 1175:23, 1176:13, 1176:14, 1176:17, 1177:24, 1178:13, 1178:15, 1178:25, 1179:10, 1179:16, 1183:24, 1185:16, 1188:1, 1197:11, 1208:6, 1210:9

**issued** [4] - 1074:3, 1079:10, 1079:12, 1080:10

**issues** [20] - 1033:10, 1037:9, 1040:1, 1063:15, 1080:8, 1092:16, 1094:8, 1096:15, 1097:6, 1108:4, 1114:24, 1121:11, 1123:17, 1126:18, 1131:18, 1132:22, 1149:20, 1171:25, 1190:14, 1198:6

**Italy** [1] - 1061:14

**item** [1] - 1098:6

**items** [1] - 1046:6

**itself** [7] - 1028:2, 1041:11, 1044:19, 1130:15, 1150:17, 1199:11, 1209:3

---

### J

**J&J** [11] - 1125:19, 1125:20, 1125:21, 1146:19, 1170:16, 1184:23, 1186:24, 1187:2, 1187:8, 1187:11, 1204:17

**J&J's** [5] - 1125:20, 1145:25, 1161:1, 1187:14, 1204:19

**JAMA** [3] - 1015:5, 1152:8

**Jersey** [1] - 1116:23

**JERSEY** [3] - 1002:1, 1002:16, 1002:17

**jettison** [1] - 1157:7

**Jim** [1] - 1148:17

**job** [3] - 1043:12, 1132:13, 1156:23

**jobs** [1] - 1065:3

**JOHN** [1] - 1002:18

---

**Johns** [10] - 1005:5, 1005:9, 1005:21, 1120:11, 1120:15, 1122:4, 1134:1, 1139:16, 1148:20, 1155:9

**JOHNSON** [2] - 1002:4

**Johnson** [8] - 1002:22, 1012:24, 1109:8, 1124:4

**jointly** [1] - 1208:20

**journal** [12] - 1015:5, 1019:19, 1135:4, 1135:7, 1146:8, 1149:21, 1154:4, 1154:7, 1154:18, 1156:17, 1156:19, 1158:11

**journalism** [1] - 1149:23

**Judge** [1] - 1079:15

**judgment** [7] - 1078:15, 1078:20, 1144:24, 1145:21, 1162:22, 1163:1, 1163:6

**Judicial** [3] - 1134:1, 1135:12, 1138:14

**JULIE** [1] - 1002:17

**July** [1] - 1023:9

**JULY** [1] - 1002:4

**jump** [1] - 1025:16

**jumping** [1] - 1027:7

**junior** [1] - 1005:23

**jury** [3] - 1157:16, 1157:18, 1197:18

**justifying** [1] - 1151:9

---

### K

**keep** [4] - 1021:19, 1127:8, 1163:14, 1163:15

**keeping** [1] - 1159:8

**Ken** [1] - 1135:2

**key** [3] - 1016:18, 1137:19, 1196:17

**kind** [20] - 1011:4, 1014:18, 1027:2, 1028:24, 1067:9, 1088:7, 1092:15, 1093:25, 1094:8, 1109:6, 1110:24, 1114:7, 1116:23, 1134:9, 1161:13, 1164:13, 1182:4, 1199:12, 1207:25,

---

1208:1

**kinds** [5] - 1064:23, 1093:7, 1120:8, 1127:17, 1207:16

**knowing** [2] - 1030:20, 1183:20

**knowledge** [2] - 1033:12, 1092:21

**known** [11] - 1030:8, 1048:11, 1048:12, 1048:13, 1086:18, 1110:8, 1177:11, 1179:21, 1181:23, 1187:25, 1209:9

---

### L

**lab** [2] - 1006:13, 1006:14

**lack** [6] - 1053:15, 1102:6, 1169:23, 1184:2, 1193:16, 1194:17

**lacking** [1] - 1187:3

**land** [1] - 1036:4

**language** [7] - 1015:3, 1016:3, 1016:16, 1082:23, 1106:18, 1161:23, 1209:21

**large** [5] - 1028:5, 1036:24, 1113:5, 1113:6, 1113:7

**larger** [3] - 1036:7, 1093:5, 1155:24

**last** [12] - 1006:24, 1019:1, 1067:19, 1069:1, 1086:25, 1112:12, 1165:15, 1166:5, 1166:6, 1167:23, 1198:14, 1201:24

**late** [1] - 1199:4

**latency** [13] - 1092:9, 1108:8, 1108:13, 1108:25, 1109:1, 1109:22, 1110:1, 1110:3, 1110:5, 1110:8, 1111:12, 1112:15, 1112:24

**law** [3] - 1149:23, 1157:16, 1197:10

**lawsuit** [1] - 1048:23

**lawsuits** [5] - 1040:18, 1040:24, 1043:21,

---

1168:2, 1168:6

**lawyer** [1] - 1145:25

**lawyers** [5] - 1107:18, 1107:20, 1107:23, 1121:24, 1125:20

**lead** [3] - 1055:18, 1089:3, 1151:9

**leading** [3] - 1086:16, 1200:11, 1200:14

**learn** [1] - 1133:5

**learning** [1] - 1010:20

**least** [15] - 1005:2, 1015:4, 1030:24, 1044:10, 1057:23, 1061:22, 1094:4, 1094:12, 1135:24, 1158:4, 1158:16, 1173:12, 1185:18, 1204:9, 1210:13

**leave** [2] - 1062:13, 1187:17

**lectures** [1] - 1006:4

**led** [1] - 1121:13

**left** [21] - 1016:4, 1041:16, 1052:4, 1052:6, 1052:10, 1058:5, 1070:8, 1072:7, 1073:7, 1073:9, 1073:10, 1118:21, 1136:19, 1142:4, 1145:15, 1147:4, 1148:16, 1160:23, 1174:23, 1189:4, 1189:23

**left-hand** [3] - 1136:19, 1147:4, 1148:16

**legal** [1] - 1010:19

**LEIGH** [1] - 1002:11

**Leon** [2] - 1031:24, 1133:17

**less** [18] - 1009:5, 1016:21, 1017:1, 1019:24, 1036:11, 1036:25, 1037:1, 1047:11, 1050:15, 1050:19, 1055:15, 1128:23, 1129:1, 1143:10, 1143:13, 1151:8, 1151:19

**letter** [2] - 1124:18, 1125:7

**letters** [1] - 1125:10

**LEVIN** [1] - 1002:13

1236

**life** [3] - 1010:8, 1043:20, 1146:17
**lifetime** [4] - 1165:23, 1182:20, 1182:21, 1183:2
**ligation** [5] - 1056:1, 1056:7, 1056:16, 1056:19, 1202:19
**light** [1] - 1147:20
**lightly** [1] - 1147:8
**likely** [7] - 1038:22, 1039:16, 1039:18, 1104:15, 1104:23, 1172:24, 1177:22
**limit** [1] - 1122:19
**limitation** [1] - 1038:16
**line** [17] - 1016:15, 1021:19, 1022:2, 1027:22, 1040:22, 1140:11, 1141:16, 1144:1, 1145:13, 1145:14, 1151:8, 1153:7, 1160:23, 1163:8, 1164:4, 1164:6
**link** [2] - 1026:6, 1063:16
**linked** [1] - 1087:13
**linking** [1] - 1179:23
**links** [1] - 1087:14
**list** [17] - 1017:25, 1018:4, 1036:20, 1056:1, 1056:24, 1072:11, 1072:25, 1073:12, 1073:16, 1073:18, 1073:23, 1074:2, 1074:11, 1078:13, 1086:1, 1178:16, 1209:6
**listed** [5] - 1018:4, 1055:5, 1100:1, 1118:3, 1165:18
**literally** [7] - 1008:25, 1037:15, 1037:16, 1150:24, 1161:23, 1179:7, 1183:5
**literature** [16] - 1011:8, 1028:20, 1031:18, 1032:15, 1034:2, 1046:3, 1054:8, 1058:10, 1062:18, 1083:9, 1089:23, 1114:17, 1114:19, 1137:18, 1139:25, 1209:17

**litigation** [13] - 1009:10, 1009:24, 1068:18, 1087:10, 1087:16, 1105:2, 1107:11, 1107:13, 1108:24, 1112:16, 1113:13, 1116:21, 1126:6
**live** [5] - 1065:4, 1151:21, 1152:7, 1152:10, 1157:15
**living** [1] - 1134:7
**local** [2] - 1086:15, 1088:25
**localized** [1] - 1166:11
**located** [1] - 1026:4
**LOCKE** [2] - 1003:4, 1184:2
**long-term** [1] - 1205:25
**look** [72] - 1025:18, 1039:2, 1046:17, 1057:21, 1057:25, 1058:2, 1061:5, 1061:24, 1070:23, 1072:10, 1074:11, 1084:6, 1084:7, 1085:8, 1085:11, 1087:21, 1087:22, 1088:12, 1094:15, 1098:18, 1100:21, 1124:20, 1129:16, 1129:22, 1131:7, 1132:4, 1133:15, 1137:3, 1137:21, 1140:24, 1143:3, 1143:6, 1143:18, 1143:22, 1143:23, 1143:24, 1144:4, 1144:6, 1144:17, 1144:21, 1145:17, 1145:21, 1153:1, 1153:3, 1156:16, 1156:18, 1157:5, 1158:1, 1159:6, 1159:17, 1159:24, 1162:5, 1162:19, 1162:24, 1163:7, 1163:11, 1165:6, 1166:5, 1167:13, 1170:25, 1171:1, 1174:7, 1178:23, 1184:24, 1189:11, 1191:12, 1191:20, 1193:6, 1198:7, 1198:13, 1207:17,

1210:25
**looked** [39] - 1012:19, 1014:20, 1014:22, 1030:25, 1043:12, 1055:11, 1057:5, 1062:20, 1062:21, 1063:3, 1072:22, 1072:24, 1073:1, 1083:24, 1085:6, 1085:7, 1088:4, 1098:25, 1099:2, 1099:11, 1099:13, 1110:7, 1117:10, 1117:11, 1125:16, 1152:8, 1153:20, 1153:23, 1160:11, 1171:10, 1171:14, 1171:24, 1191:18, 1193:13, 1193:20, 1195:20, 1199:21, 1209:19, 1210:23
**looking** [46] - 1012:15, 1013:21, 1014:11, 1016:25, 1017:5, 1022:18, 1028:19, 1029:19, 1043:13, 1043:18, 1044:20, 1052:1, 1054:14, 1055:14, 1060:10, 1062:15, 1075:6, 1086:8, 1086:12, 1087:18, 1087:25, 1094:6, 1094:7, 1094:18, 1096:8, 1096:9, 1098:10, 1111:21, 1117:6, 1130:8, 1138:9, 1145:18, 1152:18, 1153:25, 1161:12, 1162:22, 1164:1, 1169:2, 1171:21, 1179:18, 1180:4, 1180:8, 1182:1, 1187:21, 1187:24, 1202:11
**looks** [3] - 1006:9, 1160:17, 1191:4
**loop** [1] - 1034:13
**loss** [1] - 1050:22
**lost** [1] - 1088:10
**low** [24] - 1014:21, 1016:10, 1016:12, 1029:6, 1029:13,

1030:17, 1031:14, 1032:14, 1036:5, 1036:10, 1036:13, 1036:17, 1036:21, 1036:23, 1037:4, 1038:2, 1048:4, 1048:9, 1064:21, 1064:25, 1065:2, 1065:20, 1093:1
**low-risk** [1] - 1036:10
**lower** [6] - 1051:15, 1052:5, 1052:6, 1052:11, 1064:23, 1143:22
**lowest** [2] - 1052:7, 1052:14
**lunch** [1] - 1118:17
**luncheon** [1] - 1118:23
**lung** [19] - 1006:14, 1008:2, 1008:8, 1028:7, 1030:21, 1031:11, 1032:25, 1033:13, 1034:16, 1044:23, 1044:25, 1045:4, 1062:11, 1110:1, 1120:10, 1122:8, 1123:18, 1123:23, 1123:25
**lymph** [1] - 1089:19

---

## M

**magnitude** [3] - 1208:18, 1209:4, 1209:7
**main** [3] - 1008:8, 1015:11, 1031:21
**major** [4] - 1005:9, 1072:23, 1073:3, 1158:16
**majority** [3] - 1048:10, 1049:22, 1209:9
**managing** [2] - 1196:12, 1196:17
**MANGES** [1] - 1002:21
**Manual** [3] - 1134:1, 1135:12, 1138:14
**manufacturer** [1] - 1124:5
**map** [3] - 1060:3, 1079:8, 1202:18
**mark** [1] - 1040:22
**marked** [2] - 1026:16, 1135:14
**markers** [1] - 1086:21
**market** [1] - 1173:9

1237

**MARKETING** [1] - 1002:4
**Master's** [1] - 1005:18
**material** [1] - 1084:22
**materials** [1] - 1010:14
**matter** [14] - 1014:6,
1022:21, 1048:15,
1050:18, 1051:18,
1125:4, 1125:8,
1125:15, 1129:4,
1137:25, 1143:12,
1148:11, 1169:7,
1205:13
**MATTER** [1] - 1213:8
**matters** [3] - 1044:21,
1048:6
**mature** [1] - 1110:22
**McTiernan** [25] -
1013:10, 1018:20,
1021:8, 1025:25,
1027:11, 1050:1,
1057:10, 1060:16,
1061:25, 1085:24,
1087:11, 1092:16,
1092:20, 1093:8,
1094:7, 1094:9,
1095:10, 1095:22,
1112:20, 1113:18,
1115:12, 1116:24,
1143:20, 1162:20,
1189:8
**McTiernan's** [4] - 1012:3,
1024:14, 1057:16,
1075:21
**MEAGHER** [1] - 1002:18
**mean** [12] - 1021:18,
1036:5, 1037:10,
1039:3, 1065:2, 1065:3,
1073:10, 1096:4,
1098:2, 1144:7, 1168:20
**meaning** [8] - 1014:14,
1051:14, 1051:17,
1057:7, 1070:20,
1114:6, 1142:7, 1193:14
**meaningful** [1] - 1206:8
**means** [14] - 1037:2,
1038:13, 1064:18,
1078:8, 1101:3,
1105:10, 1130:14,
1144:25, 1145:22,
1146:1, 1165:15,
1168:23, 1183:5, 1190:1
**meant** [2] - 1070:16,
1210:6

**measure** [6] - 1015:23,
1047:25, 1149:16,
1150:3, 1206:7, 1206:17
**measured** [2] - 1053:4,
1131:20
**measurement** [2] -
1065:8, 1206:10
**measures** [4] - 1130:10,
1180:18, 1193:10,
1206:8
**mechanical** [2] - 1151:7,
1162:23
**mechanically** [1] -
1132:13
**mechanism** [10] -
1034:15, 1034:23,
1056:14, 1074:25,
1086:17, 1088:2,
1089:1, 1103:9,
1183:19, 1210:12
**MECOR** [1] - 1008:6
**media** [6] - 1048:23,
1049:2, 1049:18,
1068:17, 1178:16,
1178:24
**mediated** [1] - 1089:24
**Medical** [1] - 1010:12
**medical** [8] - 1005:12,
1006:19, 1008:12,
1011:16, 1177:3,
1177:14, 1177:20,
1178:2
**medicine** [8] - 1013:15,
1013:24, 1119:20,
1121:9, 1122:2, 1122:6,
1122:7, 1157:1
**Medicine** [1] - 1005:7
**medium** [1] - 1036:12
**meet** [3] - 1008:20,
1098:3, 1196:1
**members** [2] - 1050:2,
1206:5
**memories** [1] - 1168:6
**memorize** [1] - 1072:25
**memory** [1] - 1039:13
**mentees** [1] - 1008:19
**mention** [1] - 1139:25
**mentioned** [8] - 1006:6,
1028:5, 1028:11,
1046:6, 1046:9,
1046:10, 1049:23,
1060:9
**mentor** [1] - 1005:22

**mentoring** [2] - 1007:25,
1008:1
**Merlo** [4] - 1142:18,
1142:20, 1142:22,
1162:21
**Merritt** [1] - 1099:23
**mesothelioma** [6] -
1061:10, 1061:13,
1110:3, 1123:22,
1183:9, 1183:12
**mess** [1] - 1052:18
**met** [3] - 1057:1, 1067:8,
1102:16
**meta** [22] - 1025:5,
1025:20, 1026:1,
1029:2, 1038:25,
1045:9, 1058:23,
1068:7, 1072:9, 1083:8,
1090:10, 1090:13,
1091:7, 1091:8, 1095:1,
1095:15, 1103:17,
1104:3, 1116:16,
1153:20, 1153:21,
1163:18
**meta-analyses** [12] -
1025:5, 1045:9,
1058:23, 1072:9,
1083:8, 1091:7, 1091:8,
1095:1, 1095:15,
1104:3, 1153:21,
1163:18
**meta-analysis** [10] -
1025:20, 1026:1,
1029:2, 1038:25,
1068:7, 1090:10,
1090:13, 1103:17,
1116:16, 1153:20
**method** [2] - 1013:5,
1049:23
**methodology** [19] -
1012:10, 1012:23,
1060:10, 1071:16,
1071:18, 1075:16,
1079:1, 1084:7, 1084:8,
1084:9, 1088:19,
1119:15, 1131:21,
1140:15, 1140:19,
1170:2, 1192:17,
1195:1, 1200:19
**methods** [8] - 1008:11,
1008:23, 1008:24,
1012:12, 1125:7,
1137:18, 1140:4, 1204:7

**metric** [1] - 1161:13
**metrics** [1] - 1161:15
**MICHELLE** [1] - 1002:12
**mid** [1] - 1173:7
**middle** [1] - 1104:2
**midst** [1] - 1040:21
**might** [25] - 1017:2,
1032:2, 1039:18,
1039:22, 1040:18,
1047:12, 1052:6,
1052:10, 1065:9,
1070:22, 1087:21,
1091:18, 1101:8,
1120:19, 1123:3,
1129:4, 1137:15,
1157:22, 1160:9,
1179:2, 1202:16,
1202:23, 1206:4, 1206:7
**migrates** [2] - 1055:9,
1056:9
**migration** [4] - 1056:15,
1089:13, 1090:5, 1103:8
**millers** [2] - 1061:2,
1061:8
**Mills** [2] - 1051:21,
1051:24
**mind** [5] - 1024:9,
1069:17, 1163:21,
1173:18, 1207:7
**miners** [2] - 1061:1,
1061:7
**minimize** [3] - 1030:7,
1030:8
**minute** [4] - 1031:13,
1039:2, 1086:7, 1180:19
**minutes** [6] - 1118:20,
1188:22, 1199:2,
1201:16, 1201:22,
1203:20
**misclassification** [9] -
1093:15, 1113:25,
1114:13, 1114:14,
1114:22, 1115:4,
1115:24, 1206:19,
1207:23
**Misclassifications** [1] -
1204:13
**misconception** [2] -
1134:24, 1135:19
**Misconceptions** [1] -
1135:16
**misheard** [1] - 1207:6
**misinform** [1] - 1156:7

1238

misinterpreted [2] - 1142:7, 1149:16
misleading [8] - 1057:23, 1163:25, 1164:7, 1197:7, 1197:15, 1197:18, 1198:1, 1198:2
misread [1] - 1081:25
misrepresenting [1] - 1174:4
missed [2] - 1047:16, 1176:11
missing [1] - 1065:19
misstated [1] - 1153:16
misstates [1] - 1186:12
mistake [2] - 1113:8, 1139:23
mistaken [1] - 1205:4
misunderstanding [1] - 1153:13
misunderstood [1] - 1147:21
misuse [3] - 1154:9, 1157:10, 1157:25
misused [2] - 1147:21, 1149:16
mitigated [1] - 1070:12
mixture [5] - 1006:11, 1007:5, 1014:18, 1057:4, 1145:16
mode [3] - 1086:4, 1089:22, 1090:5
Modern [1] - 1138:10
modern [1] - 1138:12
moment [6] - 1030:11, 1084:19, 1091:11, 1120:14, 1157:18, 1157:20
monograph [3] - 1082:24, 1170:22, 1190:19
monotonically [1] - 1193:9
months [2] - 1086:9, 1123:11
Moorman [6] - 1115:13, 1164:20, 1165:15, 1167:2, 1168:23, 1170:10
morning [8] - 1004:4, 1004:6, 1004:15, 1004:16, 1011:5, 1060:8, 1067:7, 1190:24
most [31] - 1025:4,

1036:11, 1045:12, 1048:12, 1048:13, 1049:19, 1049:24, 1055:14, 1058:2, 1060:22, 1065:7, 1072:23, 1078:14, 1093:10, 1097:15, 1099:17, 1103:17, 1121:22, 1129:2, 1142:11, 1143:2, 1143:6, 1146:17, 1163:13, 1177:10, 1177:11, 1178:11, 1189:21, 1200:15, 1205:20, 1209:8
mostly [1] - 1008:11
motivations [1] - 1154:11
move [14] - 1033:16, 1046:11, 1048:16, 1100:13, 1118:15, 1134:22, 1160:22, 1167:8, 1170:9, 1174:24, 1186:2, 1199:2, 1211:2, 1211:7
MR [69] - 1017:24, 1018:7, 1018:9, 1045:14, 1046:9, 1046:14, 1067:6, 1069:16, 1073:13, 1073:21, 1074:1, 1074:19, 1076:23, 1077:2, 1077:8, 1080:17, 1106:13, 1106:20, 1107:2, 1107:5, 1107:19, 1107:25, 1118:18, 1119:10, 1125:1, 1125:12, 1130:3, 1134:14, 1134:20, 1138:5, 1138:13, 1138:20, 1138:24, 1139:5, 1142:2, 1165:8, 1169:10, 1169:13, 1169:16, 1169:24, 1170:11, 1171:13, 1174:6, 1174:24, 1175:6, 1184:2, 1184:5, 1184:7, 1184:10, 1184:14, 1184:17, 1184:19, 1186:2, 1186:14, 1187:6, 1187:11, 1187:19,

1188:19, 1191:25, 1192:5, 1193:23, 1197:3, 1197:25, 1198:4, 1200:11, 1201:14, 1203:24, 1211:3, 1211:9
MS [55] - 1004:6, 1004:14, 1004:20, 1004:23, 1018:2, 1018:8, 1018:11, 1020:9, 1026:3, 1034:12, 1035:17, 1045:21, 1046:7, 1046:11, 1046:19, 1051:23, 1063:23, 1064:4, 1064:10, 1064:13, 1064:14, 1065:22, 1069:10, 1073:15, 1077:7, 1104:16, 1106:11, 1106:22, 1107:9, 1107:15, 1118:8, 1124:21, 1138:21, 1141:25, 1167:4, 1169:19, 1173:25, 1183:25, 1184:13, 1186:11, 1186:25, 1188:21, 1188:25, 1192:8, 1192:9, 1193:24, 1193:25, 1197:20, 1199:5, 1199:6, 1200:13, 1200:17, 1201:24, 1202:2, 1203:19
Muhammad [2] - 1082:7, 1082:14
multiple [9] - 1096:9, 1097:4, 1097:13, 1141:16, 1153:9, 1153:10, 1161:7, 1161:8
Muscat [1] - 1184:9
must [4] - 1131:18, 1155:22, 1156:12, 1162:16
MY [1] - 1213:7

## N

name [1] - 1200:14
names [1] - 1025:13
Narod [3] - 1111:1, 1111:6
narrative [1] - 1167:24
National [5] - 1007:6,

1023:21, 1087:4, 1192:6, 1204:18
nature [4] - 1038:18, 1205:9, 1205:10, 1205:14
Nature [2] - 1154:18, 1156:18
near [1] - 1123:4
nearly [2] - 1019:7, 1193:7
necessarily [4] - 1047:24, 1096:17, 1097:1, 1182:10
necessary [2] - 1175:20, 1176:20
necrosis [1] - 1086:20
need [10] - 1041:7, 1079:23, 1111:1, 1120:16, 1120:17, 1124:6, 1125:22, 1158:19, 1185:21, 1196:23
needed [6] - 1078:3, 1120:19, 1128:15, 1197:9, 1201:17, 1201:21
Neel [1] - 1026:20
negative [5] - 1051:14, 1052:10, 1052:17, 1056:11, 1057:5
never [3] - 1125:16, 1155:23, 1174:17
New [1] - 1116:22
NEW [3] - 1002:1, 1002:16, 1002:17
new [2] - 1090:13, 1093:12
newer [1] - 1062:21
news [2] - 1040:23, 1179:6
next [37] - 1026:21, 1032:3, 1055:5, 1066:5, 1085:2, 1089:13, 1089:17, 1090:4, 1090:9, 1092:19, 1092:23, 1094:13, 1102:20, 1107:6, 1113:2, 1113:3, 1113:24, 1127:7, 1128:15, 1128:21, 1129:13, 1130:6, 1133:6, 1134:23, 1137:4, 1138:1,

**1141:22, 1146:22, 1147:16, 1148:14, 1149:19, 1151:3, 1159:3, 1172:13, 1179:9, 1194:24
nice** [1] - 1010:25
**nights** [1] - 1009:20
**NIH** [1] - 1007:6
**NJ** [1] - 1002:7
**NO** [1] - 1002:2
**nobody** [3] - 1033:14, 1116:7, 1122:24
**nodes** [1] - 1089:19
**non** [5] - 1014:14, 1014:24, 1021:10, 1021:13, 1185:25
**non-asbestiform** [1] - 1185:25
**non-statistically** [2] - 1021:10, 1021:13
**non-steroidal** [2] - 1014:14, 1014:24
**nonaspirin** [1] - 1019:2
**nondifferential** [11] - 1093:15, 1113:25, 1114:2, 1114:12, 1114:14, 1114:21, 1115:3, 1115:23, 1206:18, 1207:21, 1207:22
**none** [8] - 1051:8, 1073:19, 1075:13, 1102:17, 1175:15, 1187:13, 1194:22
**nonetheless** [1] - 1030:18
**nonrandomized** [2] - 1038:16, 1127:20
**nonserous** [1] - 1166:24
**nonsignificant** [1] - 1140:17
**nonsmokers** [1] - 1028:8
**nonuse** [2] - 1015:20, 1019:3
**nose** [1] - 1008:3
**note** [3] - 1022:11, 1035:17, 1081:14
**noted** [4] - 1022:8, 1105:16, 1106:1, 1114:17
**notes** [1] - 1193:7
**NOTES** [1] - 1213:7
**nothing** [1] - 1128:9

**notice** [1] - 1010:22
**noticed** [1] - 1035:1
**noting** [1] - 1138:18
**notion** [5] - 1027:5, 1039:20, 1055:8, 1055:18, 1102:2
**nowadays** [1] - 1005:21
**nowhere** [2] - 1123:4, 1133:12
**NSAIDS** [6] - 1014:24, 1019:2, 1056:23, 1057:6, 1057:9, 1202:21
**null** [8] - 1142:7, 1144:11, 1145:8, 1150:12, 1150:23, 1160:18, 1163:17, 1208:2
**number** [12] - 1008:16, 1015:8, 1020:7, 1028:19, 1042:24, 1043:20, 1053:13, 1054:17, 1107:9, 1165:23, 1185:1, 1185:5
**numbers** [1] - 1015:14
**numeral** [1] - 1083:3
**Nurses** [1] - 1176:3
**Nurses'** [2] - 1014:8, 1146:9
**nutshell** [1] - 1019:17

**O**

**O'DELL** [1] - 1002:11
**obesity** [1] - 1208:13
**object** [10] - 1073:18, 1124:21, 1124:24, 1169:19, 1169:23, 1174:3, 1184:2, 1187:3, 1193:23, 1197:3
**objected** [2] - 1018:1, 1073:16
**objection** [11] - 1045:14, 1064:4, 1073:16, 1107:15, 1167:4, 1173:25, 1183:25, 1186:11, 1186:25, 1191:25, 1200:11
**objectively** [2] - 1027:20, 1036:13
**observation** [2] - 1032:2, 1129:12
**observational** [6] - 1029:16, 1031:21, 1124:3, 1127:13,

1127:23, 1127:25
**observations** [2] - 1168:12, 1172:1
**observe** [2] - 1022:6, 1041:18
**observed** [4] - 1015:18, 1015:19, 1150:14, 1166:19
**obstetricians** [1] - 1008:2
**obstructive** [2] - 1122:5, 1122:13
**obviously** [1] - 1159:21
**occur** [2] - 1048:12, 1049:17
**occurred** [1] - 1179:8
**odds** [8] - 1015:23, 1028:11, 1032:8, 1084:1, 1093:1, 1095:2, 1099:15, 1165:22
**OF** [2] - 1002:1, 1213:7
**officer** [2] - 1146:19, 1146:20
**OFFICIAL** [1] - 1002:25
**often** [16] - 1032:12, 1070:24, 1076:7, 1076:12, 1076:19, 1077:23, 1078:24, 1079:2, 1129:14, 1142:6, 1147:20, 1150:11, 1160:2, 1196:18, 1206:13, 1206:14
**older** [1] - 1110:14
**Oleckno** [2] - 1141:23, 1142:17
**omission** [1] - 1073:3
**once** [5] - 1027:5, 1093:17, 1182:20, 1206:10, 1207:12
**oncologist** [2] - 1119:17, 1120:1
**oncologists** [2] - 1119:22, 1121:15
**oncology** [2] - 1006:18, 1121:5
**Oncology** [2] - 1015:5, 1152:9
**One** [2] - 1040:12, 1159:7
**one** [164] - 1007:21, 1009:6, 1011:3, 1012:17, 1013:13,

1014:5, 1014:9, 1019:6, 1019:10, 1019:17, 1020:6, 1021:12, 1021:24, 1023:14, 1025:5, 1025:11, 1025:25, 1027:8, 1027:13, 1027:14, 1028:18, 1029:4, 1029:9, 1029:20, 1030:24, 1031:20, 1031:24, 1032:11, 1034:4, 1036:3, 1036:7, 1036:8, 1036:14, 1041:18, 1044:10, 1044:12, 1045:9, 1048:7, 1048:17, 1049:23, 1050:8, 1051:7, 1052:4, 1052:7, 1052:14, 1052:23, 1053:14, 1053:25, 1054:2, 1057:15, 1057:25, 1058:2, 1059:4, 1061:21, 1064:8, 1065:12, 1065:19, 1067:19, 1068:25, 1070:8, 1070:13, 1072:7, 1075:23, 1076:24, 1077:2, 1077:17, 1086:17, 1087:21, 1087:25, 1090:9, 1091:3, 1091:6, 1091:10, 1094:4, 1096:7, 1097:6, 1097:17, 1097:18, 1098:21, 1099:17, 1101:21, 1102:18, 1105:25, 1108:8, 1109:2, 1110:19, 1111:7, 1111:14, 1111:19, 1113:2, 1114:24, 1114:25, 1117:1, 1118:2, 1119:25, 1121:4, 1129:15, 1132:15, 1138:15, 1139:23, 1140:4, 1140:16, 1140:17, 1142:8, 1142:22, 1143:8, 1143:15, 1143:20, 1144:23, 1145:5, 1145:13, 1145:20, 1146:19, 1147:2, 1149:1, 1151:11,**

1240

1153:10, 1153:19,
1154:11, 1154:12,
1156:5, 1156:13,
1156:14, 1157:12,
1159:11, 1159:14,
1159:22, 1160:20,
1161:1, 1161:6, 1162:1,
1163:13, 1163:14,
1164:20, 1165:1,
1166:2, 1169:6, 1169:7,
1175:11, 1178:7,
1178:8, 1178:9,
1179:15, 1183:11,
1184:12, 1185:21,
1188:5, 1190:7,
1190:23, 1193:6,
1194:6, 1195:11,
1197:8, 1197:9,
1200:22, 1200:23,
1200:24, 1202:16,
1203:4, 1206:1, 1210:19
**one-time** [2] - 1110:19,
1206:1
**one-to-one** [1] - 1101:21
**ones** [19] - 1014:5,
1022:6, 1022:7, 1022:8,
1036:12, 1036:13,
1042:14, 1072:2,
1072:3, 1072:10,
1073:23, 1085:9,
1100:15, 1111:4,
1163:7, 1164:4,
1205:20, 1207:10
**ongoing** [1] - 1006:23
**open** [1] - 1119:3
**ophthalmologists** [1] -
1008:3
**opinion** [20] - 1013:3,
1024:17, 1035:22,
1038:24, 1040:5,
1051:4, 1053:1,
1053:22, 1059:16,
1060:20, 1060:25,
1061:22, 1063:7,
1064:6, 1124:6,
1157:21, 1169:22,
1173:10, 1177:19,
1188:7
**opinions** [11] - 1012:11,
1082:9, 1082:14,
1126:6, 1126:16,
1137:24, 1142:23,
1158:12, 1164:22,

1187:17, 1187:18
**opportunistic** [1] -
1158:10
**opportunity** [3] - 1018:6,
1022:20, 1045:25
**opposed** [6] - 1014:22,
1030:3, 1100:25,
1110:18, 1114:8,
1161:11
**Opposition** [2] -
1138:16, 1141:23
**opposition** [1] - 1130:4
**order** [11] - 1062:10,
1089:2, 1097:21,
1097:23, 1098:8,
1102:15, 1133:1,
1136:4, 1175:18,
1208:24, 1209:3
**organ** [1] - 1183:7
**organization** [3] -
1008:6, 1008:7, 1197:1
**organizations** [4] -
1007:2, 1007:5,
1012:20, 1060:10
**organize** [1] - 1010:14
**orient** [6] - 1013:9,
1014:10, 1018:12,
1068:6, 1139:6, 1165:9
**original** [1] - 1112:14
**otherwise** [3] - 1011:1,
1063:13, 1087:13
**ought** [1] - 1056:9
**ourselves** [4] - 1018:13,
1019:20, 1139:6, 1165:9
**outcome** [5] - 1044:20,
1098:9, 1101:13,
1101:22, 1131:20
**outcomes** [2] - 1071:9,
1101:11
**outliers** [1] - 1155:14
**outpatients** [2] -
1005:10, 1006:12
**outside** [17] - 1010:11,
1080:12, 1085:17,
1087:8, 1087:22,
1088:7, 1088:9, 1094:5,
1094:23, 1105:1,
1107:11, 1108:23,
1112:15, 1112:18,
1113:13, 1115:6,
1117:14
**Ovarian** [1] - 1165:12
**ovarian** [115] - 1007:14,

1007:17, 1007:18,
1011:10, 1011:20,
1012:1, 1013:4, 1014:7,
1014:16, 1015:18,
1019:3, 1022:1, 1024:1,
1024:19, 1025:21,
1026:7, 1027:18,
1028:16, 1028:20,
1031:9, 1032:15,
1032:23, 1034:1,
1034:10, 1034:24,
1035:10, 1035:14,
1035:25, 1038:20,
1040:7, 1040:20,
1042:10, 1042:25,
1045:6, 1045:23,
1047:4, 1047:17,
1048:10, 1049:3,
1054:9, 1055:19,
1057:7, 1057:9,
1063:10, 1063:17,
1063:21, 1064:22,
1065:16, 1067:13,
1067:22, 1068:12,
1068:20, 1070:1,
1070:11, 1075:1,
1079:13, 1081:25,
1082:18, 1083:11,
1083:23, 1084:5,
1086:22, 1087:3,
1088:21, 1091:15,
1091:25, 1092:5,
1092:9, 1092:24,
1095:8, 1098:1, 1102:9,
1103:3, 1103:20,
1104:6, 1104:12,
1104:14, 1104:20,
1104:22, 1105:18,
1106:7, 1108:19,
1109:22, 1110:9,
1111:13, 1120:25,
1123:8, 1124:3, 1124:7,
1126:8, 1126:15,
1165:21, 1166:9,
1172:24, 1174:10,
1175:12, 1175:14,
1177:5, 1177:10,
1177:15, 1178:17,
1179:23, 1180:2,
1180:14, 1183:19,
1183:24, 1189:12,
1193:15, 1194:21,
1202:17, 1203:13,
1205:17, 1208:9,

1208:14, 1209:9
**ovaries** [10] - 1055:10,
1055:12, 1056:6,
1056:10, 1056:15,
1056:17, 1089:18,
1100:25, 1102:24,
1103:10
**Ovaries** [1] - 1074:8
**ovary** [2] - 1101:20,
1166:11
**over-report** [1] - 1172:25
**overall** [6] - 1014:17,
1014:18, 1035:14,
1071:2, 1166:21
**overarching** [1] -
1011:21
**overlap** [1] - 1094:12
**overseas** [1] - 1008:17
**own** [14] - 1006:21,
1007:13, 1007:16,
1012:11, 1030:4,
1049:18, 1053:9,
1085:18, 1162:22,
1168:15, 1169:17,
1179:7

**P**

**p-Value** [10] - 1149:11,
1149:15, 1150:14,
1151:5, 1151:8,
1151:19, 1153:22,
1155:24, 1157:13,
1169:4
**P-Value** [1] - 1150:11
**p-Values** [10] - 1020:4,
1024:7, 1146:24,
1147:6, 1147:19,
1149:3, 1150:3, 1153:2,
1156:21, 1157:2
**P-Values** [1] - 1158:14
**p.m** [1] - 1211:14
**page** [59] - 1025:19,
1026:4, 1064:6, 1066:5,
1069:23, 1075:7,
1076:23, 1077:20,
1080:19, 1081:7,
1081:11, 1081:22,
1082:12, 1083:3,
1084:11, 1086:4,
1089:13, 1091:11,
1102:20, 1103:25,
1104:2, 1105:14,
1107:11, 1108:1,

1108:4, 1113:24, 1121:2, 1129:21, 1130:6, 1133:10, 1133:18, 1139:4, 1139:10, 1139:20, 1141:24, 1142:4, 1146:22, 1148:14, 1159:3, 1162:13, 1164:10, 1164:22, 1166:5, 1166:6, 1166:7, 1167:23, 1171:3, 1175:4, 1184:15, 1184:18, 1184:19, 1184:24, 1185:4, 1194:24, 1204:11, 1204:15

**Page** [1] - 1212:4

**pages** [3] - 1075:3, 1075:9

**PAPANTONIO** [1] - 1002:13

**paper** [13] - 1040:3, 1040:5, 1064:20, 1070:6, 1070:7, 1070:17, 1107:7, 1153:16, 1157:3, 1158:21, 1158:23, 1165:16, 1191:23

**papers** [6] - 1012:14, 1012:16, 1012:17, 1035:1, 1057:13, 1146:10

**paragraph** [12] - 1015:7, 1015:12, 1034:6, 1084:20, 1089:17, 1091:11, 1139:21, 1147:16, 1149:6, 1149:19, 1198:7, 1198:14

**paragraphs** [1] - 1135:25

**parallel** [1] - 1116:11

**PARFITT** [2] - 1002:12, 1107:9

**pariahs** [1] - 1155:17

**part** [38] - 1005:23, 1010:7, 1010:25, 1012:23, 1013:5, 1015:1, 1016:7, 1021:24, 1024:18, 1026:21, 1038:7, 1040:3, 1049:24, 1050:25, 1055:14, 1060:9, 1060:19,

1061:18, 1071:18, 1072:23, 1073:22, 1083:20, 1088:10, 1121:2, 1121:12, 1121:13, 1121:22, 1125:9, 1125:13, 1136:10, 1145:23, 1147:14, 1184:10, 1189:21, 1190:1, 1190:12, 1211:5

**participants** [1] - 1101:12

**participate** [1] - 1087:12

**participated** [2] - 1008:10, 1008:15

**particle** [1] - 1056:16

**particular** [25] - 1013:7, 1021:17, 1022:7, 1022:13, 1038:15, 1040:9, 1047:25, 1048:15, 1069:21, 1070:11, 1075:16, 1080:7, 1080:11, 1094:1, 1102:1, 1114:9, 1125:15, 1128:8, 1136:4, 1145:2, 1151:2, 1169:7, 1169:9, 1185:23, 1193:9

**particularly** [2] - 1168:25, 1172:16

**particulates** [1] - 1166:12

**parts** [1] - 1197:6

**passing** [1] - 1046:10

**passive** [1] - 1030:25

**past** [8] - 1038:22, 1094:9, 1095:1, 1095:11, 1101:15, 1116:25, 1123:11

**pathogenesis** [1] - 1193:8

**pathway** [2] - 1056:6, 1056:14

**patient** [2] - 1006:18, 1011:2

**patients** [5] - 1005:10, 1006:17, 1008:2, 1010:23, 1038:20

**pattern** [5] - 1172:4, 1172:8, 1175:19, 1176:1, 1181:24

**patterns** [1] - 1153:3

**Pause** [1] - 1081:10

**pause** [3] - 1016:13, 1077:6, 1086:7

**PCPC** [2] - 1183:22, 1204:17

**peer** [15] - 1081:2, 1081:6, 1081:13, 1083:9, 1084:12, 1105:7, 1106:25, 1135:4, 1195:5, 1195:9, 1195:14, 1195:19, 1198:10, 1199:8, 1199:11

**peer-reviewed** [10] - 1081:2, 1081:6, 1083:9, 1084:12, 1105:7, 1195:5, 1195:9, 1198:10, 1199:8, 1199:11

**pending** [1] - 1152:23

**Penninkilampi** [10] - 1026:2, 1038:6, 1038:9, 1038:12, 1067:25, 1068:2, 1068:5, 1105:16, 1105:24, 1117:17

**people** [55] - 1008:1, 1010:20, 1015:5, 1030:2, 1032:6, 1042:24, 1043:14, 1043:25, 1044:2, 1045:1, 1050:15, 1079:6, 1087:8, 1087:22, 1093:16, 1096:22, 1096:23, 1101:15, 1106:18, 1111:15, 1112:4, 1114:4, 1116:5, 1116:23, 1119:21, 1119:22, 1119:25, 1120:11, 1120:15, 1121:6, 1121:8, 1121:9, 1123:8, 1124:11, 1126:6, 1130:16, 1134:8, 1139:18, 1146:12, 1148:15, 1151:2, 1155:14, 1157:16, 1157:18, 1161:25, 1162:5, 1162:20, 1162:25, 1164:14, 1184:21, 1205:20, 1206:24, 1207:5

**people's** [2] - 1021:15,

1206:10

**per** [1] - 1073:19

**percent** [14] - 1009:19, 1016:1, 1019:4, 1024:6, 1068:12, 1123:13, 1123:14, 1123:15, 1123:16, 1143:9, 1143:14, 1157:2, 1165:19, 1165:20

**percentage** [2] - 1009:12, 1041:12

**perfect** [2] - 1010:24, 1136:12

**perform** [1] - 1062:4

**performed** [3] - 1038:25, 1062:4, 1080:12

**performing** [1] - 1191:16

**perhaps** [1] - 1118:16

**perineal** [27] - 1011:24, 1035:9, 1035:14, 1053:20, 1055:8, 1056:9, 1063:17, 1068:11, 1068:20, 1070:1, 1083:11, 1084:12, 1091:14, 1095:9, 1101:19, 1102:10, 1103:3, 1103:21, 1104:6, 1105:18, 1106:6, 1175:13, 1175:21, 1176:21, 1180:13, 1194:22, 1207:9

**perineum** [1] - 1056:6

**period** [9] - 1042:15, 1108:13, 1108:14, 1109:22, 1110:8, 1111:12, 1123:15, 1124:11, 1125:22

**periods** [2] - 1092:10, 1095:15

**permission** [2] - 1138:17, 1169:10

**permitted** [2] - 1069:10, 1106:11

**persistent** [1] - 1086:18

**Persistent** [1] - 1135:16

**person** [2] - 1112:7, 1188:13

**personal** [2] - 1050:16, 1050:20

**Personal** [1] - 1003:4

**personally** [1] - 1135:3

**pertained** [1] - 1120:6

1242

**pervasive** [1] - 1155:21
**phenomenon** [1] - 1065:1
**philosophically** [1] - 1151:20
**phrase** [2] - 1180:5, 1192:1
**physician** [3] - 1006:7, 1009:8, 1109:16
**physicians** [1] - 1008:11
**physiology** [2] - 1006:13, 1006:14
**picked** [3] - 1014:2, 1014:4, 1015:2
**picking** [3] - 1018:12, 1158:9, 1189:3
**picture** [3] - 1009:4, 1062:8, 1145:23
**place** [7] - 1027:2, 1052:19, 1061:5, 1077:25, 1078:21, 1082:23, 1127:20
**placed** [1] - 1154:15
**places** [3] - 1065:4, 1087:21, 1096:21
**Plaintiffs** [1] - 1002:14
**plaintiffs** [2] - 1009:25, 1018:5
**Plaintiffs'** [1] - 1138:5
**plaintiffs'** [18] - 1022:21, 1071:24, 1072:3, 1072:18, 1072:24, 1077:5, 1079:11, 1081:25, 1084:10, 1088:15, 1093:8, 1107:17, 1107:19, 1107:23, 1113:18, 1130:4, 1164:20, 1170:2
**plan** [1] - 1067:9
**plane** [1] - 1137:24
**plausibility** [16] - 1030:22, 1075:10, 1085:14, 1102:19, 1102:21, 1103:2, 1103:8, 1166:16, 1179:19, 1180:20, 1180:24, 1181:1, 1181:13, 1182:8, 1183:3, 1188:2
**plausible** [8] - 1034:15, 1047:14, 1088:2, 1182:14, 1183:18, 1186:5, 1186:17,

1188:16
**play** [2] - 1078:20, 1169:10
**played** [1] - 1173:1
**plays** [1] - 1046:22
**plenty** [1] - 1170:9
**pleural** [1] - 1062:23
**pleurodesis** [3] - 1061:25, 1062:4, 1063:1
**plot** [5] - 1057:11, 1145:12, 1153:23, 1162:22, 1162:24
**point** [27] - 1018:25, 1024:24, 1027:4, 1027:7, 1030:20, 1033:4, 1034:17, 1035:2, 1052:8, 1058:8, 1059:15, 1063:2, 1075:5, 1117:24, 1128:17, 1133:2, 1143:25, 1151:3, 1152:6, 1158:8, 1159:8, 1159:23, 1193:20, 1198:18, 1206:15, 1208:4
**pointed** [3] - 1061:1, 1087:22, 1185:11
**pointer** [1] - 1041:6
**pointing** [4] - 1016:5, 1016:20, 1053:25, 1100:15
**points** [5] - 1027:9, 1059:4, 1064:21, 1199:7
**policy** [4] - 1147:6, 1149:23, 1151:4, 1156:7
**pool** [4] - 1036:15, 1060:4, 1070:22, 1157:18
**pooled** [3] - 1063:11, 1071:1, 1153:21
**pooling** [1] - 1070:20
**pools** [1] - 1038:16
**poor** [2] - 1151:10, 1206:17
**poorly** [2] - 1206:7, 1208:14
**populate** [1] - 1122:24
**populated** [1] - 1123:4
**population** [2] - 1131:23, 1175:12
**populations** [1] - 1096:11
**portfolio** [1] - 1005:15

**portion** [5] - 1081:12, 1081:17, 1195:13, 1197:4, 1198:10
**posed** [1] - 1173:8
**position** [2] - 1180:1, 1187:12
**positive** [26] - 1019:15, 1020:11, 1020:13, 1028:14, 1028:18, 1042:17, 1044:4, 1044:24, 1051:13, 1052:9, 1052:17, 1055:16, 1056:11, 1057:4, 1057:6, 1083:10, 1084:1, 1091:21, 1092:3, 1101:11, 1103:20, 1104:5, 1161:20, 1193:21, 1208:10, 1208:21
**positively** [3] - 1019:2, 1019:10, 1047:4
**possibility** [5] - 1030:4, 1093:20, 1174:14, 1174:15, 1178:18
**possible** [15] - 1027:15, 1038:20, 1086:17, 1089:1, 1089:22, 1106:7, 1137:8, 1168:6, 1172:14, 1172:21, 1172:23, 1173:7, 1175:9, 1185:6, 1209:20
**possibly** [3] - 1173:21, 1185:9, 1203:16
**post** [3] - 1042:17, 1048:23, 1166:4
**post-2014** [1] - 1042:13
**posted** [1] - 1155:12
**potential** [24] - 1014:7, 1025:20, 1033:9, 1037:3, 1038:19, 1040:6, 1040:14, 1044:9, 1046:1, 1046:21, 1047:3, 1047:13, 1047:19, 1048:8, 1048:13, 1064:16, 1065:12, 1074:25, 1108:23, 1115:3, 1116:6, 1188:1, 1192:21, 1207:21
**potentially** [4] - 1014:23, 1045:11, 1048:2, 1162:10

**powder** [47] - 1011:24, 1035:10, 1040:19, 1041:13, 1041:20, 1042:9, 1053:20, 1062:10, 1063:17, 1067:13, 1067:21, 1083:23, 1084:5, 1088:21, 1098:17, 1098:25, 1099:7, 1100:10, 1110:9, 1110:16, 1111:7, 1111:12, 1165:19, 1165:20, 1166:9, 1166:20, 1166:21, 1166:23, 1168:2, 1168:5, 1172:22, 1173:1, 1180:4, 1180:13, 1181:15, 1181:17, 1181:21, 1181:22, 1182:20, 1187:24, 1189:5, 1189:9, 1189:18, 1189:19, 1189:24, 1207:9, 1207:15
**POWDER** [1] - 1002:4
**Powder** [1] - 1165:12
**powders** [4] - 1115:2, 1173:8, 1173:9, 1207:16
**power** [3] - 1113:2, 1113:10, 1168:7
**powered** [2] - 1093:1, 1113:12
**PowerPoint** [2] - 1058:19, 1126:14
**PowerPoints** [1] - 1025:14
**practice** [2] - 1006:9, 1039:3
**practices** [2] - 1149:21, 1151:6
**PRACTICES** [1] - 1002:5
**practicing** [2] - 1006:7, 1030:12
**practitioners** [1] - 1148:3
**pre** [4] - 1042:13, 1048:23, 1110:21, 1166:4
**pre-and** [1] - 1042:13
**pre-and-post** [2] - 1048:23, 1166:4
**pre-and-post-2014** [1] - 1167:15
**pre-pubertal** [1] -

1110:21

**precaution** [1] - 1196:3

**precautionary** [12] - 1196:8, 1196:15, 1196:22, 1197:2, 1197:11, 1199:18, 1199:20, 1200:8, 1200:20, 1201:2, 1209:22, 1210:20

**preceded** [2] - 1101:12, 1178:12

**preceding** [1] - 1078:13

**precision** [1] - 1131:19

**prefer** [1] - 1142:12

**pregnancy** [1] - 1039:23

**premise** [1] - 1186:1

**Prenatal** [1] - 1129:25

**prenatal** [2] - 1130:10, 1130:18

**prepared** [5] - 1011:12, 1011:15, 1013:16, 1045:19, 1126:16

**preparing** [1] - 1088:16

**prescription** [1] - 1162:9

**presence** [8] - 1102:23, 1181:4, 1181:17, 1183:16, 1186:4, 1186:15, 1196:18, 1210:13

**present** [7] - 1078:2, 1106:5, 1126:11, 1176:9, 1177:1, 1197:18, 1204:18

**presented** [1] - 1183:23

**presenting** [1] - 1156:22

**pretentious** [1] - 1009:5

**pretty** [3] - 1010:4, 1072:11, 1078:9

**prevent** [2] - 1007:17, 1056:16

**preventative** [1] - 1196:24

**preventive** [1] - 1199:21

**previous** [3] - 1032:20, 1038:21, 1106:2

**previously** [1] - 1148:5

**primarily** [8] - 1038:17, 1109:16, 1121:19, 1123:17, 1123:24, 1148:4, 1160:15, 1164:23

**primary** [4] - 1034:18, 1119:23, 1120:2,

1122:17

**principal** [1] - 1133:25

**principle** [6] - 1134:3, 1134:21, 1143:2, 1153:18, 1153:22, 1201:2

**principles** [6] - 1151:21, 1179:20, 1204:6, 1204:9, 1209:22, 1210:20

**privacy** [1] - 1050:22

**private** [1] - 1007:9

**probabilities** [1] - 1142:10

**probability** [3] - 1150:3, 1150:4, 1150:13

**probable** [1] - 1181:4

**probing** [1] - 1049:15

**problem** [6] - 1097:1, 1140:21, 1154:8, 1155:21, 1170:6, 1170:7

**problematic** [1] - 1185:12

**problems** [1] - 1136:23

**procedure** [2] - 1062:7, 1062:16

**proceed** [2] - 1004:24, 1027:10

**Proceedings** [1] - 1212:4

**Process** [2] - 1129:24, 1146:24

**process** [13] - 1006:23, 1049:20, 1050:1, 1050:5, 1081:3, 1087:12, 1092:21, 1124:24, 1130:17, 1147:22, 1148:15, 1195:9, 1199:10

**produce** [3] - 1055:4, 1136:21, 1160:16

**produced** [3] - 1029:6, 1150:5, 1150:14

**product** [3] - 1039:17, 1180:6, 1181:5

**Products** [1] - 1003:4

**products** [14] - 1011:24, 1011:25, 1067:13, 1067:21, 1088:21, 1098:17, 1100:10, 1180:4, 1185:6, 1185:7, 1185:9, 1185:12, 1187:25, 1207:8

**PRODUCTS** [1] - 1002:4

**profession** [2] - 1010:19, 1132:17

**professional** [9] - 1010:8, 1012:19, 1122:17, 1123:14, 1126:7, 1126:10, 1144:24, 1163:1, 1163:6

**professionally** [1] - 1009:7

**professionals** [3] - 1008:9, 1008:13, 1014:3

**professor** [3] - 1005:5, 1121:14, 1122:1

**program** [3] - 1008:10, 1008:15, 1008:22

**Program** [2] - 1192:6, 1204:19

**progression** [1] - 1086:17

**project** [1] - 1210:2

**prone** [1] - 1068:16

**prong** [2] - 1139:2, 1139:20

**proof** [1] - 1201:4

**proper** [2] - 1005:24, 1140:19

**properly** [11] - 1027:16, 1030:1, 1035:23, 1053:4, 1059:17, 1063:18, 1136:14, 1136:20, 1136:21, 1192:17, 1203:15

**properly-applied** [1] - 1192:17

**proportion** [1] - 1041:20

**proposed** [1] - 1056:13

**proposing** [1] - 1210:21

**proposition** [6] - 1023:10, 1079:8, 1127:1, 1134:15, 1162:5

**propositions** [1] - 1137:20

**PROSKAUER** [1] - 1002:19

**prospective** [4] - 1035:5, 1051:9, 1055:2, 1202:14

**Protection** [1] - 1007:8

**protective** [10] - 1014:21, 1016:5, 1016:6, 1017:3, 1017:7, 1018:16, 1020:22, 1057:9, 1193:15, 1202:20

**protein** [1] - 1086:20

**prove** [1] - 1177:23

**proven** [2] - 1034:14, 1034:23

**proves** [1] - 1044:10

**provide** [12] - 1021:23, 1035:12, 1090:7, 1133:20, 1134:9, 1135:22, 1153:22, 1156:19, 1169:1, 1181:5, 1186:4, 1186:16

**provided** [8] - 1007:10, 1018:5, 1073:14, 1102:8, 1120:23, 1173:23, 1178:15, 1194:20

**provides** [5] - 1010:13, 1063:13, 1147:22, 1166:20, 1174:18

**proxy** [1] - 1065:10

**PSC** [1] - 1073:13

**pubertal** [1] - 1110:21

**Public** [2] - 1005:7, 1005:19

**public** [4] - 1060:11, 1149:22, 1173:11, 1178:16

**publication** [5] - 1157:3, 1171:8, 1192:1, 1193:22, 1193:23

**publications** [1] - 1007:16

**publicity** [6] - 1168:1, 1172:21, 1173:6, 1178:19, 1179:4

**publish** [4] - 1009:1, 1146:10, 1158:21, 1191:23

**published** [12] - 1104:3, 1105:9, 1105:10, 1149:8, 1158:23, 1171:21, 1184:5, 1190:20, 1191:3, 1192:3, 1192:4, 1192:5

**publishing** [1] - 1152:16

**pulled** [2] - 1083:6, 1171:9

**pulmonary** [8] - 1006:16, 1109:16, 1120:7, 1121:8, 1122:6, 1122:13

**pulmonologist** [2] - 1030:12, 1062:3

**pulmonology** [2] -

1244

1119:19, 1119:20
**Purdie** [1] - 1099:22
**pure** [2] - 1189:25
**purported** [1] - 1051:12
**purpose** [4] - 1014:2, 1075:15, 1160:6, 1200:25
**Purpose** [1] - 1146:24
**PURSUANT** [1] - 1213:5
**pursuant** [1] - 1073:16
**put** [18] - 1016:18, 1021:8, 1027:11, 1041:3, 1062:10, 1088:4, 1101:7, 1128:8, 1132:3, 1132:10, 1137:20, 1140:16, 1174:1, 1180:19, 1190:4, 1190:6, 1190:10, 1202:12
**puts** [2] - 1121:17, 1121:22
**putting** [3] - 1123:20, 1179:16, 1185:16
**pyramid** [1] - 1132:10

---

**Q**

**qualifications** [4] - 1109:12, 1109:14, 1109:15, 1119:14
**qualitative** [1] - 1078:1
**Quality** [2] - 1007:7, 1130:24
**quality** [6] - 1127:12, 1131:15, 1132:22, 1132:25, 1137:22, 1190:15
**quantitative** [1] - 1078:1
**quarters** [1] - 1184:24
**questionnaire** [1] - 1207:4
**questions** [26] - 1024:10, 1039:17, 1067:19, 1098:18, 1112:6, 1119:16, 1126:19, 1126:21, 1130:10, 1158:13, 1170:12, 1186:21, 1188:20, 1189:1, 1190:3, 1191:8, 1191:11, 1195:3, 1200:4, 1201:7, 1201:10, 1202:3, 1203:19, 1203:25,

---

1204:1, 1211:9
**quick** [2] - 1060:7, 1064:13
**quickly** [1] - 1199:5
**quite** [7] - 1010:17, 1012:6, 1013:10, 1026:1, 1049:17, 1061:3, 1148:5
**quote** [7] - 1104:9, 1133:3, 1133:14, 1133:15, 1133:20, 1134:12, 1137:4
**quotes** [4] - 1106:18, 1134:17, 1134:20, 1158:9
**quoting** [3] - 1106:14, 1106:16, 1134:18

---

**R**

**rack** [1] - 1039:22
**raise** [1] - 1201:3
**raised** [8] - 1030:16, 1037:8, 1097:6, 1112:15, 1113:13, 1175:23, 1190:14, 1208:6
**raising** [1] - 1207:21
**random** [3] - 1114:7, 1150:5, 1150:13
**randomized** [8] - 1029:17, 1029:19, 1029:24, 1127:20, 1131:9, 1135:22, 1136:6, 1136:8
**range** [1] - 1028:22
**ranges** [1] - 1069:3
**rare** [4] - 1040:15, 1101:22, 1205:16, 1205:17
**rarity** [1] - 1092:24
**rate** [2] - 1028:7, 1042:10
**rather** [6] - 1037:22, 1076:21, 1105:21, 1137:11, 1143:3, 1193:20
**ratio** [15] - 1015:21, 1015:22, 1015:23, 1015:25, 1016:14, 1017:14, 1017:22, 1019:4, 1019:6, 1028:11, 1032:8, 1084:1, 1093:1, 1099:15, 1165:22

---

**rationale** [2] - 1040:17, 1169:2
**ratios** [1] - 1095:2
**RE** [1] - 1002:4
**reach** [15] - 1022:4, 1037:5, 1067:20, 1101:7, 1117:22, 1144:7, 1144:8, 1145:2, 1145:17, 1151:16, 1163:16, 1187:21, 1203:5, 1203:7, 1203:16
**reached** [5] - 1023:23, 1024:5, 1118:4, 1200:6, 1203:2
**reaches** [2] - 1021:20, 1183:6
**reaching** [5] - 1012:11, 1013:2, 1022:12, 1037:16, 1202:8
**reacting** [1] - 1069:6
**reactive** [1] - 1086:19
**read** [32] - 1012:17, 1026:11, 1053:13, 1068:3, 1068:13, 1069:5, 1069:14, 1074:14, 1074:18, 1079:16, 1081:16, 1082:11, 1082:21, 1095:4, 1104:16, 1105:15, 1105:23, 1117:24, 1118:14, 1128:12, 1135:19, 1137:13, 1140:21, 1141:4, 1141:5, 1158:10, 1162:6, 1167:6, 1168:21, 1173:3, 1186:8, 1198:7
**Reading** [13] - 1068:15, 1092:2, 1108:11, 1135:20, 1148:1, 1149:14, 1150:10, 1172:19, 1173:5, 1196:21, 1205:7, 1206:16, 1208:17
**reading** [10] - 1012:14, 1079:25, 1118:1, 1118:2, 1133:10, 1141:8, 1146:3, 1162:17, 1170:20, 1198:3
**real** [10] - 1018:14, 1037:22, 1043:20, 1044:6, 1044:10,

---

1045:3, 1064:13, 1125:5, 1128:20, 1128:22
**really** [30] - 1015:10, 1029:20, 1030:9, 1036:5, 1042:12, 1044:8, 1048:14, 1051:19, 1052:18, 1054:14, 1061:3, 1065:10, 1076:17, 1080:6, 1089:4, 1109:11, 1112:2, 1122:16, 1124:6, 1125:4, 1130:20, 1132:23, 1158:19, 1160:14, 1168:25, 1169:1, 1183:13, 1190:1, 1202:18, 1208:25
**reason** [10] - 1015:2, 1096:21, 1107:12, 1132:19, 1155:18, 1163:20, 1163:24, 1169:5, 1198:19, 1198:22
**reasonable** [13] - 1011:15, 1037:8, 1067:20, 1079:5, 1177:3, 1177:13, 1177:19, 1178:2, 1180:25, 1187:20, 1187:24, 1188:6, 1190:18
**reasonably** [1] - 1087:20
**reasoned** [2] - 1078:15, 1078:20
**reasons** [9] - 1043:23, 1047:13, 1047:14, 1048:7, 1048:14, 1091:18, 1091:20, 1123:2, 1142:11
**reassuring** [1] - 1052:19
**REATH** [1] - 1002:16
**recalled** [1] - 1101:12
**recapitulate** [1] - 1084:21
**receive** [1] - 1010:6
**received** [2] - 1073:11, 1188:13
**recent** [8] - 1014:25, 1025:4, 1025:20, 1058:2, 1072:10, 1103:17, 1106:3,

1163:13
**recently** [2] - 1173:13, 1194:13
**recess** [2] - 1066:4, 1118:23
**recognizing** [1] - 1147:7
**Recommendations** [1] - 1129:25
**recommendations** [2] - 1124:10, 1130:17
**record** [15] - 1018:2, 1025:14, 1026:3, 1035:17, 1051:23, 1053:17, 1080:17, 1122:16, 1130:3, 1134:18, 1138:13, 1171:9, 1175:6, 1178:22, 1211:3
**RECROSS** [1] - 1203:23
**Recross** [1] - 1212:6
**RECROSS-EXAMINATION** [1] - 1203:23
**red** [1] - 1160:22
**redirect** [5] - 1188:22, 1192:2, 1197:24, 1199:3, 1201:18
**Redirect** [1] - 1212:6
**REDIRECT** [1] - 1188:24
**reduce** [2] - 1096:15, 1151:6
**reduction** [1] - 1202:22
**redundant** [2] - 1143:15, 1163:10
**referenced** [1] - 1073:19
**references** [1] - 1138:15
**referred** [6] - 1006:12, 1025:25, 1076:24, 1077:23, 1080:14, 1167:14
**referring** [1] - 1055:6
**refers** [1] - 1044:18
**reflect** [1] - 1178:22
**reflecting** [2] - 1025:7, 1025:23
**reflects** [1] - 1106:25
**refresh** [1] - 1020:15
**regarded** [1] - 1133:11
**regarding** [13] - 1011:8, 1030:14, 1061:24, 1189:4, 1190:7, 1190:24, 1192:11, 1194:11, 1194:14,

1195:8, 1196:7, 1199:9, 1199:16
**regardless** [5] - 1015:21, 1096:23, 1164:3, 1188:4, 1188:5
**regular** [1] - 1021:15
**regularly** [1] - 1010:4
**regulate** [1] - 1210:16
**regulations** [1] - 1210:10
**regulators** [1] - 1126:8
**regulatory** [3] - 1197:5, 1197:9, 1198:6
**reject** [1] - 1152:5
**relate** [3] - 1047:1, 1065:15, 1080:9
**related** [9] - 1043:21, 1054:9, 1061:9, 1082:7, 1082:13, 1099:7, 1108:19, 1120:24, 1126:12
**relates** [14] - 1022:1, 1034:21, 1043:8, 1054:4, 1058:22, 1061:19, 1062:16, 1062:22, 1063:8, 1064:18, 1180:13, 1190:14, 1194:2, 1203:12
**relating** [1] - 1123:17
**relation** [2] - 1150:15, 1193:10
**relations** [2] - 1193:8, 1208:11
**relationship** [21] - 1025:8, 1025:21, 1025:24, 1032:4, 1047:8, 1052:20, 1052:21, 1053:5, 1053:7, 1053:16, 1097:25, 1098:8, 1098:24, 1099:15, 1102:7, 1104:14, 1104:22, 1114:7, 1165:22, 1166:21, 1194:18
**relationships** [1] - 1051:20
**relative** [28] - 1013:10, 1015:22, 1028:11, 1028:14, 1028:25, 1029:6, 1029:11, 1029:13, 1030:17, 1031:14, 1033:5,

1034:9, 1035:4, 1036:17, 1037:4, 1037:12, 1041:21, 1041:24, 1042:15, 1043:18, 1048:5, 1063:11, 1076:8, 1076:12, 1079:4, 1192:13, 1192:18, 1192:22
**relatively** [1] - 1173:12
**relevance** [3] - 1169:20, 1169:23, 1184:1
**relevant** [12] - 1011:22, 1012:7, 1012:13, 1012:21, 1014:6, 1014:8, 1073:5, 1085:9, 1106:6, 1183:17, 1188:1, 1189:10
**reliability** [1] - 1050:6
**reliable** [3] - 1128:10, 1133:11, 1135:24
**reliance** [2] - 1017:25, 1073:11
**relied** [3] - 1024:12, 1142:19, 1142:24
**reluctant** [1] - 1096:24
**rely** [4] - 1157:1, 1157:2, 1164:11, 1164:23
**remain** [1] - 1190:21
**remains** [2] - 1024:25, 1209:10
**remarkably** [1] - 1036:5
**remedial** [1] - 1197:11
**remember** [24] - 1039:12, 1039:18, 1048:19, 1093:19, 1099:1, 1099:21, 1109:6, 1109:13, 1109:18, 1112:24, 1115:17, 1126:20, 1144:1, 1161:3, 1164:15, 1167:7, 1170:16, 1172:25, 1190:4, 1191:9, 1194:8, 1195:5, 1204:8
**remind** [2] - 1114:2, 1202:7
**remove** [2] - 1163:9, 1164:7
**repeat** [2] - 1088:10, 1104:1
**rephrase** [5] - 1069:17, 1179:20, 1192:8,

1193:24, 1200:13
**replication** [1] - 1096:1
**report** [70] - 1004:18, 1004:21, 1005:25, 1014:4, 1015:15, 1016:24, 1024:21, 1026:16, 1038:22, 1043:25, 1045:15, 1046:15, 1051:16, 1064:6, 1064:8, 1071:10, 1071:13, 1072:19, 1073:25, 1074:3, 1074:15, 1074:16, 1074:18, 1074:24, 1079:10, 1079:12, 1080:11, 1080:24, 1080:25, 1081:22, 1082:1, 1082:5, 1082:12, 1083:4, 1085:18, 1087:15, 1088:4, 1088:16, 1092:21, 1093:14, 1105:5, 1105:6, 1105:7, 1106:16, 1107:1, 1107:22, 1113:16, 1115:9, 1126:5, 1129:11, 1133:9, 1133:17, 1152:11, 1154:3, 1156:20, 1156:21, 1164:11, 1170:1, 1172:25, 1175:4, 1177:25, 1178:15, 1183:23, 1192:1, 1192:5, 1192:10, 1195:18, 1204:2
**reported** [14] - 1013:15, 1013:23, 1019:14, 1023:22, 1024:3, 1028:14, 1041:13, 1041:20, 1042:25, 1101:13, 1101:17, 1153:17, 1168:7, 1208:11
**REPORTER** [1] - 1002:25
**reporting** [13] - 1015:6, 1020:11, 1024:25, 1042:7, 1043:15, 1043:23, 1044:2, 1048:23, 1101:11, 1152:13, 1167:17,

1246

1167:18, 1168:2

**reports** [10] - 1049:18, 1063:5, 1079:11, 1112:21, 1113:19, 1126:5, 1127:15, 1132:12, 1178:24, 1179:6

**represent** [3] - 1082:12, 1184:20, 1185:9

**representation** [1] - 1107:21

**representative** [3] - 1186:24, 1187:2, 1187:14

**represented** [1] - 1199:8

**representing** [1] - 1163:10

**represents** [1] - 1062:8

**reproductive** [2] - 1056:5, 1208:13

**require** [2] - 1102:13, 1200:1

**required** [5] - 1052:21, 1052:23, 1054:2, 1102:17, 1196:8

**requires** [2] - 1151:19, 1201:2

**research** [25] - 1005:14, 1006:22, 1006:25, 1007:1, 1007:3, 1007:11, 1007:13, 1007:17, 1008:14, 1008:21, 1011:2, 1067:16, 1110:6, 1110:7, 1119:22, 1120:3, 1120:24, 1121:16, 1121:18, 1122:2, 1122:7, 1147:21, 1149:21, 1156:7

**Research** [2] - 1007:7, 1106:3

**researcher** [2] - 1005:14, 1148:24

**researchers** [5] - 1096:11, 1148:2, 1150:11, 1155:5, 1161:8

**researching** [1] - 1120:4

**residents** [2] - 1005:13, 1005:23

**respect** [2] - 1086:15, 1108:5

**response** [34] - 1031:3,

1033:24, 1048:17, 1050:24, 1051:2, 1051:6, 1051:9, 1051:11, 1051:13, 1051:14, 1051:17, 1052:2, 1052:9, 1052:20, 1052:21, 1053:10, 1054:1, 1055:20, 1060:2, 1082:16, 1086:16, 1102:5, 1102:15, 1165:22, 1166:3, 1166:19, 1193:5, 1193:17, 1194:3, 1194:5, 1194:11, 1194:15, 1194:23, 1202:18

**responses** [1] - 1052:25

**responsibilities** [1] - 1121:4

**responsible** [1] - 1172:3

**rest** [1] - 1017:12

**result** [7] - 1055:4, 1060:1, 1156:6, 1156:14, 1198:16, 1203:17, 1209:15

**resulted** [1] - 1095:2

**results** [30] - 1009:2, 1035:9, 1035:12, 1051:11, 1053:18, 1059:5, 1059:6, 1068:10, 1136:14, 1136:21, 1140:1, 1140:9, 1140:17, 1145:6, 1152:11, 1152:13, 1152:14, 1158:24, 1160:2, 1163:12, 1163:22, 1165:18, 1166:8, 1171:20, 1172:1, 1175:11, 1177:20, 1191:6, 1208:25

**resumed** [2] - 1067:4, 1119:7

**retired** [1] - 1135:9

**retrograde** [1] - 1103:1

**retrospective** [3] - 1038:18, 1054:25, 1202:14

**review** [35] - 1007:18, 1011:8, 1012:24, 1021:25, 1022:20, 1024:1, 1026:9, 1031:9,

1032:22, 1033:16, 1034:22, 1035:22, 1037:5, 1038:6, 1040:2, 1047:17, 1050:25, 1054:8, 1061:15, 1062:18, 1063:7, 1068:10, 1081:13, 1084:24, 1085:10, 1106:25, 1178:3, 1184:20, 1193:17, 1195:14, 1195:20, 1199:10, 1200:7, 1201:12, 1203:1

**reviewed** [22] - 1011:19, 1014:5, 1024:12, 1060:11, 1060:19, 1062:18, 1069:19, 1070:7, 1070:9, 1081:2, 1081:6, 1081:14, 1082:8, 1083:9, 1084:12, 1105:7, 1194:1, 1195:5, 1195:9, 1198:10, 1199:8, 1199:11

**reviewer** [1] - 1135:4

**reviewing** [1] - 1131:19

**reviews** [1] - 1198:22

**revisit** [1] - 1064:15

**ridiculous** [3] - 1083:18, 1083:19, 1083:20

**right-hand** [2] - 1144:10, 1167:24

**rise** [5] - 1004:3, 1066:3, 1067:1, 1118:22, 1119:4

**risk** [98] - 1007:23, 1012:7, 1014:7, 1014:16, 1015:18, 1015:22, 1019:2, 1028:14, 1028:25, 1029:6, 1029:11, 1029:13, 1029:18, 1030:18, 1032:7, 1033:5, 1033:9, 1034:9, 1035:5, 1035:8, 1035:11, 1035:14, 1036:10, 1036:12, 1036:15, 1036:17, 1036:22, 1036:23, 1036:25, 1037:4, 1037:12, 1037:19, 1041:21, 1041:24, 1042:15, 1043:18, 1044:24, 1047:3,

1047:10, 1048:5, 1048:9, 1048:11, 1048:12, 1051:15, 1052:14, 1052:16, 1053:19, 1055:17, 1056:19, 1057:6, 1057:7, 1058:12, 1058:14, 1063:12, 1064:21, 1064:24, 1065:6, 1065:20, 1068:12, 1087:3, 1091:19, 1095:8, 1096:20, 1096:21, 1098:14, 1098:15, 1102:9, 1102:15, 1110:11, 1123:5, 1153:2, 1165:21, 1166:10, 1166:22, 1172:10, 1175:10, 1175:18, 1175:19, 1177:11, 1178:4, 1181:25, 1185:9, 1192:14, 1192:18, 1192:22, 1193:11, 1194:21, 1195:12, 1202:22, 1202:24, 1206:1, 1208:8, 1208:14, 1209:5, 1209:10, 1209:16, 1210:22

**risks** [10] - 1013:11, 1028:11, 1031:14, 1126:15, 1172:4, 1173:7, 1177:5, 1177:10, 1196:13, 1196:17

**robust** [2] - 1104:13, 1104:22

**Rohl** [1] - 1185:22

**role** [3] - 1078:20, 1080:6, 1173:2

**roles** [2] - 1005:8, 1005:9

**Roman** [1] - 1083:3

**ROSE** [1] - 1002:19

**Rosenblatt** [2] - 1051:22, 1051:24

**Rothman** [16] - 1135:2, 1135:7, 1138:20, 1139:21, 1155:13, 1191:9, 1191:20, 1192:10, 1192:13, 1192:20, 1193:4, 1204:18, 1204:25,

1205:1, 1208:4, 1209:13
**Rothman's** [4] - 1138:3, 1193:16, 1204:2, 1207:22
**round** [2] - 1019:12, 1035:20
**Rounds** [2] - 1126:11, 1126:13
**route** [2] - 1056:7, 1166:13
**routinely** [2] - 1014:4, 1023:25
**row** [1] - 1057:24
**RPR** [1] - 1002:24
**rule** [5] - 1022:2, 1027:22, 1151:8, 1173:22, 1201:18
**ruled** [5] - 1037:8, 1061:20, 1172:2, 1187:8, 1190:18
**rules** [2] - 1152:11, 1157:20
**run** [1] - 1012:9
**Russoniello** [2] - 1213:10, 1213:11
**RUSSONIELLO** [1] - 1002:24

**S**

**S/Vincent** [1] - 1213:10
**Saenz** [1] - 1026:21
**safe** [3] - 1179:12, 1179:14, 1187:12
**SALES** [1] - 1002:5
**sample** [3] - 1086:1, 1093:5, 1131:22
**sampling** [1] - 1137:11
**Sander** [3] - 1154:21, 1155:3, 1157:4
**satisfied** [1] - 1034:7
**satisfy** [1] - 1094:16
**satisfying** [1] - 1011:3
**saw** [8] - 1053:2, 1064:7, 1065:7, 1073:7, 1145:12, 1195:10, 1197:14, 1210:15
**scale** [1] - 1052:4
**Schildkraut** [16] - 1040:2, 1040:5, 1041:9, 1048:19, 1164:17, 1164:19, 1164:24, 1165:6, 1165:7, 1165:11, 1167:19,

1167:20, 1179:5, 1190:25, 1191:2, 1191:5
**Schlesselman** [1] - 1139:16
**School** [3] - 1005:6, 1005:7, 1005:18
**science** [1] - 1148:3
**Science** [1] - 1010:12
**Sciences** [1] - 1087:4
**Scientific** [3] - 1134:2, 1135:12, 1138:14
**scientific** [21] - 1011:16, 1013:3, 1054:18, 1057:12, 1089:23, 1149:8, 1149:22, 1151:4, 1151:7, 1151:9, 1177:4, 1196:2, 1196:19, 1196:25, 1197:4, 1197:13, 1198:4, 1198:8, 1198:14, 1199:16, 1199:22
**scientist** [5] - 1063:18, 1067:20, 1125:20, 1187:21, 1188:6
**scientists** [8] - 1076:7, 1076:11, 1078:24, 1079:5, 1088:3, 1088:13, 1094:6, 1129:6
**score** [5] - 1025:16, 1035:6, 1059:3, 1059:10, 1060:20
**Screening** [3] - 1195:18, 1195:22, 1195:24
**screening** [6] - 1080:25, 1106:16, 1194:7, 1195:4, 1195:7, 1199:15
**search** [1] - 1012:14
**second** [15] - 1016:13, 1025:11, 1078:5, 1098:22, 1105:5, 1131:11, 1139:11, 1139:20, 1147:16, 1149:6, 1149:19, 1150:1, 1170:6, 1172:14, 1204:11
**secondary** [1] - 1185:10
**secondhand** [6] - 1029:5, 1030:14, 1030:16, 1031:11, 1032:25, 1033:24
**seconds** [3] - 1125:3, 1169:11, 1170:4

**SECTION** [1] - 1213:5
**Section** [1] - 1196:1
**section** [10] - 1074:24, 1084:11, 1084:15, 1085:2, 1090:4, 1100:21, 1141:6, 1141:10, 1198:11, 1198:12
**sections** [1] - 1101:14
**see** [117] - 1005:10, 1006:12, 1011:7, 1012:19, 1016:10, 1016:15, 1017:10, 1022:23, 1026:10, 1033:25, 1037:6, 1042:10, 1052:6, 1054:1, 1054:2, 1056:18, 1058:15, 1063:11, 1064:8, 1064:11, 1067:8, 1068:22, 1071:7, 1074:8, 1077:11, 1080:21, 1082:2, 1082:10, 1082:15, 1083:14, 1084:8, 1084:13, 1084:25, 1085:22, 1086:5, 1086:23, 1087:5, 1089:25, 1091:22, 1092:6, 1092:13, 1093:2, 1095:19, 1095:20, 1095:23, 1096:9, 1098:12, 1098:15, 1098:19, 1099:4, 1099:7, 1101:6, 1104:7, 1104:24, 1105:20, 1108:9, 1108:16, 1113:2, 1116:13, 1119:11, 1121:7, 1130:11, 1130:13, 1130:25, 1136:2, 1136:15, 1136:24, 1140:5, 1142:13, 1144:11, 1146:22, 1146:25, 1147:9, 1147:24, 1148:7, 1149:4, 1149:12, 1149:17, 1149:24, 1150:6, 1150:18, 1151:13, 1153:3, 1154:19, 1156:2, 1156:9, 1156:19, 1158:12,

1162:8, 1164:5, 1164:6, 1166:14, 1166:25, 1168:23, 1172:5, 1172:17, 1173:17, 1175:16, 1179:3, 1179:7, 1181:7, 1182:5, 1185:2, 1185:14, 1195:10, 1195:16, 1195:21, 1196:4, 1200:23, 1204:13, 1205:5, 1205:11, 1207:17, 1208:15, 1208:22, 1209:12, 1209:13
**seem** [3] - 1077:24, 1110:12, 1121:24
**selectively** [1] - 1039:12
**self** [2] - 1050:8, 1050:12
**self-administered** [2] - 1050:8, 1050:12
**send** [2] - 1126:1, 1157:3
**senior** [1] - 1165:16
**sense** [12] - 1052:13, 1063:22, 1076:17, 1110:7, 1116:12, 1133:8, 1180:23, 1181:2, 1181:7, 1181:16, 1182:1, 1182:5
**sensitive** [3] - 1044:1, 1050:14, 1096:25
**sentence** [20] - 1015:16, 1016:19, 1017:12, 1068:3, 1078:5, 1086:25, 1101:23, 1102:1, 1105:15, 1105:23, 1113:3, 1130:14, 1134:14, 1149:19, 1172:13, 1173:23, 1174:1, 1194:16, 1195:8, 1195:11
**sentences** [1] - 1069:14
**separate** [7] - 1049:2, 1105:1, 1116:21, 1117:14, 1197:14, 1197:15, 1200:6
**separately** [3] - 1016:12, 1070:23, 1098:24
**sequence** [4] - 1032:11, 1032:13, 1133:4, 1133:7
**series** [5] - 1063:4, 1127:15, 1129:11, 1132:11, 1152:18

**serious** [4] - 1063:15, 1105:18, 1105:22, 1154:8
**serous** [5] - 1068:20, 1091:25, 1092:5, 1105:21, 1166:23
**serous-type** [1] - 1092:5
**serve** [2] - 1018:3, 1089:2
**service** [4] - 1006:16, 1121:8, 1121:9, 1147:23
**services** [2] - 1006:19, 1010:11
**set** [9] - 1047:18, 1082:9, 1082:15, 1139:25, 1147:15, 1152:4, 1173:14, 1196:1, 1210:10
**setting** [1] - 1006:1
**settings** [1] - 1005:11
**seven** [3] - 1102:8, 1158:16, 1194:20
**several** [12] - 1008:17, 1057:2, 1059:5, 1069:13, 1075:3, 1075:9, 1075:12, 1095:1, 1097:19, 1123:20, 1123:21, 1202:11
**SEYFARRTH** [1] - 1003:3
**SHARKO** [1] - 1002:16
**sharpened** [1] - 1168:6
**SHAW** [1] - 1003:3
**shed** [1] - 1147:19
**sheet** [1] - 1041:23
**short** [1] - 1200:2
**shorter** [1] - 1053:14
**show** [19] - 1018:21, 1036:8, 1051:12, 1057:10, 1057:17, 1057:23, 1076:21, 1091:13, 1094:21, 1101:17, 1125:2, 1135:14, 1141:22, 1154:13, 1175:24, 1176:5, 1176:6, 1176:8, 1202:15
**showed** [22] - 1019:16, 1019:17, 1029:2, 1029:11, 1032:9, 1051:9, 1051:14, 1054:22, 1055:25,

1056:21, 1094:1, 1110:25, 1121:21, 1135:18, 1155:10, 1155:11, 1156:17, 1166:8, 1169:3, 1169:5, 1190:7
**showing** [6] - 1016:20, 1018:16, 1020:17, 1020:22, 1076:22, 1152:22
**shown** [2] - 1034:1, 1194:7
**shows** [7] - 1024:15, 1051:5, 1128:21, 1161:20, 1167:14, 1169:6, 1182:16
**shy** [1] - 1096:24
**sick** [5] - 1039:13, 1096:22, 1181:14, 1181:17, 1181:21
**side** [11] - 1016:5, 1020:6, 1142:4, 1144:10, 1147:4, 1148:16, 1151:12, 1153:10, 1167:24, 1180:9
**side-by-side** [1] - 1153:10
**Siemiatycki** [2] - 1115:13, 1162:21
**signal** [9] - 1032:3, 1032:7, 1049:8, 1054:23, 1054:25, 1055:1, 1055:2, 1055:16, 1063:11
**signed** [3] - 1154:21, 1155:5, 1162:5
**significance** [30] - 1021:6, 1021:19, 1021:20, 1021:22, 1022:3, 1022:5, 1022:12, 1022:25, 1023:8, 1023:24, 1024:5, 1024:8, 1048:2, 1092:4, 1138:1, 1140:4, 1140:16, 1142:10, 1143:17, 1147:7, 1147:19, 1149:3, 1149:10, 1150:2, 1154:9, 1157:7, 1158:20, 1194:24, 1201:13, 1203:2
**significant** [30] -

1015:17, 1021:2, 1021:11, 1021:13, 1022:9, 1029:3, 1041:22, 1042:16, 1042:22, 1053:19, 1083:10, 1091:14, 1095:8, 1098:13, 1099:23, 1102:14, 1103:20, 1104:5, 1140:2, 1140:10, 1140:25, 1141:3, 1142:6, 1143:5, 1156:5, 1156:13, 1157:12, 1160:14, 1161:17, 1169:5
**similar** [7] - 1019:6, 1037:5, 1041:19, 1057:12, 1095:2, 1095:3, 1199:24
**similarities** [1] - 1032:12
**similarly** [1] - 1105:16
**simply** [13] - 1132:3, 1132:9, 1137:16, 1137:19, 1140:1, 1140:12, 1140:15, 1140:22, 1141:18, 1143:4, 1143:21, 1145:10, 1153:6
**Singh** [1] - 1115:16
**single** [12] - 1012:17, 1045:8, 1075:3, 1098:19, 1099:11, 1151:17, 1163:10, 1182:13, 1182:16, 1182:17, 1188:7, 1189:17
**single-spaced** [1] - 1075:3
**Sister** [1] - 1176:4
**sister** [1] - 1176:15
**sites** [1] - 1123:1
**situation** [1] - 1116:5
**six** [2] - 1045:9, 1086:9
**Six** [1] - 1135:15
**size** [3] - 1086:2, 1113:8, 1131:22
**sizes** [1] - 1093:5
**SKADDEN** [1] - 1002:18
**skipped** [1] - 1136:3
**SLATE** [1] - 1002:18
**slide** [15] - 1011:7, 1027:11, 1036:8, 1037:7, 1059:5,

1064:17, 1128:8, 1128:9, 1145:2, 1160:10, 1160:11, 1163:25, 1190:3, 1190:6, 1201:15
**slides** [1] - 1120:23
**slipped** [1] - 1121:2
**sloppy** [2] - 1124:16, 1124:23
**small** [10] - 1029:18, 1034:8, 1035:4, 1037:12, 1062:12, 1095:7, 1096:20, 1096:21, 1103:19, 1185:8
**Smith** [1] - 1115:18
**Smith-Bindman** [1] - 1115:18
**smoke** [13] - 1029:6, 1030:14, 1030:16, 1030:21, 1030:25, 1031:11, 1032:25, 1033:11, 1033:12, 1033:25, 1034:16, 1034:20, 1045:1
**smokers** [4] - 1028:6, 1028:7, 1028:8, 1034:18
**smoking** [2] - 1045:2, 1045:3
**so-called** [1] - 1128:20
**Society** [1] - 1008:8
**society** [2] - 1008:8, 1008:9
**Society's** [1] - 1157:24
**socioeconomic** [9] - 1045:17, 1064:5, 1064:17, 1064:21, 1064:24, 1065:1, 1065:8, 1065:11, 1065:17
**soda** [3] - 1181:14, 1181:15, 1181:16
**solely** [2] - 1203:1, 1203:5
**someone** [4] - 1010:2, 1039:16, 1047:23, 1203:15
**sometimes** [6] - 1009:16, 1009:17, 1010:20, 1076:16, 1139:25, 1165:17
**sorry** [3] - 1091:25, 1122:2, 1207:3

1249

**sort** [12] - 1006:17, 1021:14, 1025:1, 1034:13, 1065:5, 1089:9, 1111:9, 1114:6, 1121:16, 1127:17, 1140:3, 1145:8
**sorted** [2] - 1140:16, 1140:18
**sorting** [1] - 1140:20
**sorts** [6] - 1005:22, 1007:22, 1064:24, 1065:4, 1095:22
**sought** [3] - 1040:16, 1041:1, 1126:4
**sounds** [3] - 1071:12, 1186:25, 1197:22
**source** [1] - 1061:2
**Source** [1] - 1130:24
**sources** [3] - 1014:9, 1061:23, 1106:17
**space** [2] - 1062:10, 1062:23
**spaced** [1] - 1075:3
**spanned** [1] - 1095:17
**spans** [1] - 1024:25
**speaking** [12] - 1012:12, 1013:10, 1031:13, 1045:22, 1076:3, 1094:11, 1101:22, 1127:25, 1133:1, 1151:16, 1181:5, 1181:10
**speaks** [1] - 1041:9
**special** [1] - 1139:24
**specialize** [1] - 1120:12
**specific** [9] - 1051:21, 1070:11, 1072:20, 1092:4, 1098:3, 1100:25, 1103:6, 1151:6, 1207:1
**specifically** [8] - 1069:7, 1070:18, 1086:15, 1101:19, 1101:24, 1102:3, 1197:8, 1209:25
**specificity** [5] - 1100:21, 1100:24, 1101:3, 1101:18, 1102:2
**specifics** [1] - 1205:9
**specified** [1] - 1150:16
**spectrum** [1] - 1008:4
**speculate** [1] - 1107:16
**spend** [3] - 1004:25, 1079:16, 1091:11

**spent** [6] - 1169:24, 1169:25, 1170:1, 1201:6, 1201:19, 1207:25
**sporadic** [1] - 1009:16
**spread** [1] - 1172:21
**squirt** [1] - 1062:13
**Stage** [1] - 1130:20
**stake** [1] - 1050:19
**stand** [1] - 1004:7
**standard** [3] - 1007:21, 1016:11, 1017:13
**standpoint** [1] - 1181:3
**stands** [1] - 1186:9
**start** [12] - 1019:25, 1026:25, 1027:1, 1027:2, 1027:5, 1054:21, 1065:24, 1084:15, 1084:24, 1085:2, 1121:1, 1189:3
**started** [2] - 1100:16, 1111:24
**starting** [5] - 1027:4, 1030:20, 1033:4, 1069:12, 1137:7
**STATE** [1] - 1002:7
**state** [2] - 1167:25, 1195:23
**statement** [27] - 1025:9, 1068:24, 1069:1, 1070:22, 1103:15, 1104:1, 1136:5, 1136:8, 1146:24, 1147:6, 1147:18, 1148:4, 1149:2, 1150:1, 1150:12, 1150:15, 1150:17, 1150:23, 1157:24, 1159:4, 1162:2, 1162:4, 1168:22, 1170:23, 1184:25, 1194:10, 1195:8
**statements** [1] - 1209:19
**states** [1] - 1194:17
**States** [4] - 1008:19, 1064:23, 1080:4, 1097:11
**STATES** [2] - 1002:1, 1002:7
**statistical** [40] - 1021:1, 1021:6, 1021:19, 1021:20, 1021:21, 1022:3, 1022:4,

1022:12, 1022:24, 1023:7, 1023:24, 1024:5, 1024:8, 1025:6, 1025:22, 1037:13, 1042:16, 1042:19, 1042:21, 1078:22, 1092:4, 1138:1, 1140:16, 1142:9, 1147:7, 1147:19, 1148:11, 1149:2, 1149:9, 1149:15, 1150:2, 1154:9, 1157:7, 1158:20, 1162:7, 1180:9, 1180:18, 1194:24, 1201:12, 1203:2
**Statistical** [7] - 1146:14, 1146:20, 1146:23, 1148:10, 1154:3, 1157:24, 1162:1
**statistically** [26] - 1021:10, 1021:13, 1029:2, 1042:22, 1053:19, 1083:10, 1091:14, 1095:8, 1098:13, 1099:23, 1102:14, 1103:19, 1104:5, 1104:13, 1104:21, 1140:2, 1140:10, 1140:25, 1141:2, 1142:6, 1143:5, 1156:5, 1156:13, 1157:12, 1160:14, 1161:17
**statistician** [1] - 1147:11
**statisticians** [3] - 1148:4, 1155:4, 1161:25
**status** [11] - 1045:17, 1049:12, 1064:5, 1064:17, 1064:21, 1064:24, 1065:1, 1065:8, 1065:12, 1065:17, 1206:5
**stay** [1] - 1159:1
**stayed** [1] - 1197:8
**Steering** [1] - 1002:14
**stem** [1] - 1136:22
**STENOGRAPHIC** [1] - 1213:7
**step** [11] - 1032:3, 1066:1, 1124:1, 1128:14, 1128:15, 1129:7, 1129:10,

1130:23, 1133:6, 1147:8, 1148:10
**steps** [1] - 1197:11
**steroidal** [2] - 1014:14, 1014:24
**Steve** [2] - 1148:17, 1148:19
**still** [11] - 1024:24, 1031:5, 1047:11, 1097:2, 1118:20, 1127:16, 1127:23, 1142:16, 1160:4, 1185:21, 1188:17
**stop** [5] - 1014:10, 1140:23, 1141:1, 1155:22, 1162:16
**story** [1] - 1029:16
**strata** [5] - 1127:11, 1127:16, 1128:2, 1128:3, 1128:4
**STREET** [1] - 1002:7
**strength** [10] - 1026:25, 1027:8, 1035:21, 1059:16, 1090:19, 1090:22, 1091:6, 1118:4, 1139:11, 1180:10
**strengths** [4] - 1031:23, 1076:1, 1076:8, 1076:12
**stretch** [1] - 1173:15
**strike** [1] - 1186:2
**strong** [11] - 1027:19, 1027:23, 1028:9, 1028:25, 1031:1, 1035:25, 1038:1, 1047:8, 1118:6, 1192:14, 1208:8
**stronger** [1] - 1093:6
**strongly** [1] - 1208:12
**structural** [1] - 1078:1
**students** [4] - 1005:12, 1008:12, 1139:8, 1139:14
**studied** [3] - 1131:23, 1150:4, 1176:17
**studies** [262] - 1006:2, 1012:14, 1012:18, 1013:14, 1021:8, 1021:23, 1022:3, 1024:3, 1024:6, 1024:11, 1024:21, 1025:3, 1025:14, 1025:25, 1026:10,

1026:13, 1027:21,
1028:15, 1029:6,
1029:10, 1029:17,
1030:24, 1031:15,
1032:1, 1032:8, 1032:9,
1032:16, 1033:11,
1035:5, 1036:15,
1038:17, 1038:18,
1044:11, 1045:13,
1047:15, 1047:20,
1049:7, 1049:19,
1050:2, 1050:7, 1050:9,
1050:10, 1050:11,
1051:8, 1051:9,
1051:10, 1051:21,
1052:1, 1053:8,
1053:24, 1054:24,
1055:1, 1055:2,
1056:21, 1057:2,
1057:17, 1057:22,
1058:1, 1058:6, 1058:8,
1058:13, 1059:7,
1059:24, 1060:18,
1060:22, 1060:24,
1061:1, 1061:7,
1061:13, 1063:3,
1063:12, 1063:14,
1065:7, 1065:13,
1065:18, 1068:16,
1068:19, 1070:7,
1070:9, 1070:20,
1070:21, 1071:2,
1072:5, 1072:13,
1072:22, 1072:23,
1072:25, 1073:9,
1073:17, 1073:19,
1073:24, 1074:2,
1075:13, 1076:1,
1076:9, 1076:13,
1079:3, 1083:8,
1083:25, 1084:24,
1085:3, 1085:5, 1085:6,
1085:7, 1085:8,
1085:11, 1085:12,
1085:23, 1087:21,
1088:22, 1089:7,
1089:15, 1091:13,
1091:23, 1092:5,
1092:12, 1092:25,
1093:6, 1093:16,
1093:17, 1093:23,
1093:24, 1094:2,
1094:19, 1095:10,
1095:14, 1096:7,

1096:8, 1096:9,
1096:10, 1097:3,
1097:13, 1097:14,
1097:17, 1097:19,
1098:14, 1099:2,
1099:17, 1099:20,
1099:22, 1100:4,
1100:5, 1100:12,
1100:14, 1101:11,
1102:8, 1104:4,
1105:17, 1108:2,
1108:5, 1108:18,
1108:23, 1109:3,
1109:17, 1110:10,
1110:14, 1111:3,
1111:7, 1112:17,
1113:4, 1113:11,
1114:20, 1115:1,
1115:24, 1117:6,
1120:5, 1127:2, 1127:3,
1127:10, 1127:13,
1127:23, 1127:25,
1128:9, 1128:10,
1128:22, 1129:17,
1129:22, 1131:15,
1133:4, 1133:10,
1135:23, 1136:11,
1136:13, 1136:20,
1136:22, 1136:23,
1137:3, 1137:5, 1137:7,
1137:9, 1137:10,
1137:17, 1137:21,
1137:23, 1140:25,
1141:2, 1141:14,
1141:15, 1141:16,
1144:11, 1152:18,
1152:19, 1153:9,
1153:10, 1153:19,
1156:4, 1156:12,
1157:11, 1158:25,
1159:7, 1159:18,
1159:22, 1160:2,
1160:5, 1160:7,
1160:18, 1161:6,
1161:11, 1161:13,
1162:19, 1163:8,
1163:19, 1163:21,
1163:22, 1166:2,
1170:18, 1171:10,
1171:17, 1172:15,
1173:21, 1175:20,
1177:2, 1177:6,
1177:12, 1177:21,
1178:5, 1178:11,

1178:25, 1179:2,
1179:23, 1181:24,
1182:21, 1189:19,
1191:12, 1191:13,
1191:14, 1191:18,
1194:20, 1201:13,
1202:20, 1203:8,
1204:3, 1205:3,
1205:14, 1205:15,
1205:19, 1205:21,
1207:11, 1207:18
**Studies** [2] - 1077:11,
1131:11
**Study** [4] - 1014:9,
1146:9, 1176:3, 1176:4
**study** [178] - 1005:24,
1008:25, 1014:1,
1014:5, 1014:11,
1014:17, 1014:25,
1019:13, 1019:16,
1019:18, 1021:17,
1021:21, 1021:24,
1022:11, 1022:13,
1022:14, 1026:5,
1029:21, 1029:22,
1029:24, 1031:18,
1031:20, 1031:21,
1032:4, 1033:16,
1033:25, 1035:15,
1035:18, 1035:19,
1036:4, 1036:14,
1037:15, 1038:6,
1038:16, 1040:10,
1040:15, 1040:21,
1040:25, 1041:11,
1044:7, 1044:23,
1045:8, 1046:24,
1047:2, 1047:10,
1047:11, 1047:21,
1047:22, 1048:19,
1049:8, 1050:13,
1050:19, 1053:10,
1054:21, 1055:3,
1057:5, 1057:25,
1058:4, 1058:22,
1059:25, 1067:12,
1067:25, 1068:2,
1068:5, 1069:19,
1071:8, 1071:23,
1072:17, 1073:5,
1080:12, 1083:25,
1093:18, 1094:4,
1096:13, 1097:9,

1097:10, 1097:11,
1097:17, 1097:18,
1098:7, 1098:19,
1098:21, 1099:1,
1099:11, 1099:13,
1099:17, 1105:3,
1105:24, 1108:12,
1109:5, 1110:13,
1110:20, 1110:23,
1111:8, 1111:14,
1111:20, 1112:2,
1112:8, 1112:9,
1112:11, 1112:13,
1112:16, 1113:8,
1124:3, 1128:14,
1128:16, 1128:18,
1128:19, 1129:8,
1129:14, 1131:6,
1131:21, 1132:5,
1132:25, 1135:21,
1137:22, 1139:15,
1140:18, 1140:24,
1144:13, 1145:9,
1159:8, 1159:11,
1159:19, 1161:1,
1161:2, 1161:6,
1161:12, 1161:20,
1161:23, 1162:1,
1163:10, 1164:2,
1164:11, 1164:12,
1164:13, 1164:17,
1164:19, 1164:23,
1164:24, 1165:1,
1165:2, 1165:9,
1165:11, 1165:18,
1166:8, 1168:13,
1168:16, 1168:17,
1169:1, 1169:9,
1169:18, 1169:25,
1176:15, 1176:16,
1177:15, 1178:7,
1178:8, 1178:9,
1182:16, 1185:23,
1189:17, 1202:13,
1203:2, 1203:9, 1205:3,
1205:8, 1205:9,
1205:10, 1205:20,
1205:25, 1206:23,
1208:25, 1209:13,
1209:16
**studying** [3] - 1037:23,
1121:12, 1206:23
**stuff** [8] - 1069:5,

1078:10, 1093:13,
1101:9, 1118:2,
1118:12, 1136:3, 1136:6
**submitted** [1] - 1192:6
**subsequent** [2] -
1098:22, 1106:4
**substance** [1] - 1183:6
**substances** [1] - 1195:25
**substantial** [2] -
1035:13, 1201:4
**substitute** [2] - 1158:15,
1158:17
**subtypes** [1] - 1166:24
**succinct** [1] - 1122:20
**succinctly** [1] - 1019:18
**sudden** [2] - 1042:13,
1043:7
**suddenly** [1] - 1040:23
**suffer** [1] - 1206:2
**sufficient** [2] - 1092:10,
1115:2
**sufficiently** [2] -
1092:25, 1108:15
**suggest** [6] - 1024:4,
1043:19, 1044:4,
1044:5, 1166:22, 1168:1
**suggested** [2] - 1057:16,
1180:23
**suggesting** [4] - 1157:6,
1157:8, 1158:13,
1201:10
**suggestion** [3] - 1058:7,
1060:14, 1174:3
**suggestive** [6] - 1068:21,
1069:4, 1069:8,
1069:19, 1069:21,
1105:19
**suggests** [2] - 1103:19,
1145:11
**summaries** [1] - 1028:21
**summarize** [7] - 1033:1,
1034:5, 1035:21,
1058:12, 1063:6,
1084:2, 1085:19
**summarizes** [1] -
1193:19
**summary** [2] - 1085:11,
1122:17
**super** [1] - 1101:22
**supplemental** [2] -
1018:4, 1073:11
**supplemented** [1] -
1017:25

**support** [15] - 1006:5,
1010:9, 1010:13,
1011:23, 1035:13,
1059:7, 1063:16,
1070:22, 1082:17,
1087:2, 1089:7,
1089:11, 1090:7,
1157:25, 1168:3
**supported** [1] - 1029:14
**supportive** [1] - 1102:2
**supports** [2] - 1103:1,
1151:24
**supposed** [1] - 1124:20
**surgeons** [1] - 1008:3
**surprise** [1] - 1058:17
**surprised** [1] - 1126:23
**surprising** [3] - 1096:20,
1205:19, 1205:23
**survey** [2] - 1050:1,
1050:5
**surveys** [2] - 1049:10,
1050:8
**SUSAN** [1] - 1002:16
**susceptibility** [1] -
1177:22
**susceptible** [2] -
1036:23, 1172:16
**sworn** [1] - 1004:10
**synopsis** [3] - 1083:4,
1103:16, 1198:7
**system** [2] - 1023:15,
1023:16
**systematic** [1] - 1037:18
**systematically** [1] -
1039:10

---

**T**

**Table** [4] - 1129:23,
1130:23, 1167:14,
1169:4
**table** [2] - 1085:22,
1132:16
**tackle** [1] - 1067:10
**Taher** [20] - 1080:14,
1080:17, 1081:4,
1081:6, 1082:7,
1082:14, 1082:22,
1085:17, 1090:14,
1093:14, 1103:18,
1105:3, 1106:1, 1107:7,
1107:12, 1107:22,
1116:10, 1116:16,
1140:24, 1194:19

**tail** [1] - 1159:18
**take-aways** [1] - 1016:19
**Talc** [1] - 1074:7
**talc** [151] - 1011:9,
1011:10, 1011:20,
1012:1, 1013:4, 1022:1,
1024:1, 1024:18,
1024:19, 1025:21,
1026:6, 1027:18,
1028:15, 1028:20,
1028:23, 1031:9,
1032:15, 1032:23,
1033:16, 1033:19,
1034:10, 1034:21,
1034:23, 1035:7,
1035:14, 1035:25,
1038:21, 1040:6,
1042:25, 1043:2,
1045:6, 1045:23,
1047:2, 1047:5, 1047:7,
1047:10, 1047:17,
1048:23, 1049:3,
1050:25, 1051:5,
1053:1, 1054:9, 1055:9,
1055:11, 1055:18,
1056:9, 1056:14,
1060:12, 1060:14,
1061:2, 1061:7,
1061:16, 1061:19,
1061:22, 1061:25,
1062:4, 1062:23,
1063:1, 1063:10,
1063:19, 1063:21,
1064:19, 1068:11,
1068:20, 1070:1,
1074:21, 1075:10,
1079:12, 1081:24,
1082:17, 1083:11,
1084:13, 1084:16,
1086:15, 1089:18,
1091:15, 1093:18,
1095:9, 1097:24,
1098:1, 1101:12,
1101:19, 1102:10,
1102:23, 1103:3,
1103:9, 1103:21,
1104:6, 1104:12,
1104:14, 1104:20,
1104:22, 1105:18,
1106:7, 1108:5,
1108:14, 1108:20,
1115:2, 1123:22,
1124:5, 1124:7, 1126:9,

1173:8, 1173:9,
1174:10, 1175:13,
1175:14, 1175:21,
1176:15, 1176:21,
1177:6, 1178:16,
1183:22, 1183:24,
1185:6, 1185:7,
1185:11, 1185:13,
1185:16, 1186:4,
1186:16, 1189:12,
1189:13, 1189:20,
1190:13, 1191:21,
1191:24, 1192:11,
1193:2, 1193:5,
1193:17, 1194:1,
1194:15, 1194:22,
1202:5, 1203:7,
1203:13, 1204:17,
1207:8, 1208:12,
1209:2, 1209:16,
1210:1, 1210:2, 1210:3,
1210:7, 1210:8,
1210:14, 1210:22
**talc/ovarian** [1] -
1046:23
**talcum** [28] - 1011:24,
1040:19, 1041:13,
1041:20, 1042:9,
1062:10, 1063:17,
1067:13, 1067:21,
1083:22, 1084:4,
1088:20, 1098:17,
1098:25, 1099:7,
1100:10, 1110:9,
1110:16, 1111:7,
1111:12, 1180:4,
1180:13, 1181:22,
1187:24, 1189:5,
1189:9, 1189:24, 1207:9
**talks** [5] - 1045:18,
1084:12, 1090:4,
1130:6, 1131:14
**target** [2] - 1036:3,
1183:6
**task** [1] - 1011:6
**taught** [5] - 1006:1,
1008:2, 1133:21,
1134:8, 1139:7
**teach** [5] - 1005:12,
1008:11, 1008:23,
1134:8, 1164:14
**teachers** [2] - 1031:25,
1076:25

**teaching** [11] - 1005:20, 1005:24, 1007:25, 1008:1, 1008:24, 1011:2, 1043:11, 1121:15, 1164:12, 1165:2

**tease** [1] - 1009:3

**temporality** [3] - 1101:10, 1101:16, 1101:17

**ten** [7] - 1183:1, 1183:14, 1188:9, 1188:22, 1201:15, 1201:17, 1201:22

**tended** [1] - 1047:7

**term** [11] - 1021:1, 1049:16, 1070:16, 1077:23, 1078:9, 1117:8, 1155:18, 1193:23, 1199:24, 1205:25, 1207:22

**terms** [33] - 1010:5, 1010:6, 1010:24, 1011:2, 1012:10, 1013:8, 1018:14, 1022:24, 1023:20, 1023:23, 1024:1, 1024:15, 1027:23, 1028:19, 1031:9, 1031:17, 1032:14, 1032:22, 1034:21, 1037:3, 1043:17, 1044:4, 1047:13, 1052:1, 1072:23, 1121:11, 1127:10, 1139:13, 1172:11, 1199:15, 1204:3, 1210:19, 1210:20

**TERSIGNI** [1] - 1002:17

**test** [8] - 1041:1, 1042:18, 1042:19, 1042:21, 1071:7, 1078:22, 1089:2, 1152:4

**testified** [6] - 1004:11, 1094:14, 1123:17, 1186:12, 1189:9, 1211:6

**testify** [2] - 1124:23, 1156:7

**testimony** [9] - 1007:10, 1012:4, 1029:7, 1057:16, 1067:22, 1124:22, 1144:1, 1187:2, 1187:5

**testing** [7] - 1037:14, 1140:4, 1142:10, 1151:20, 1153:18, 1153:23, 1187:8

**tests** [2] - 1006:14, 1006:15

**text** [7] - 1126:24, 1126:25, 1127:1, 1129:18, 1129:20, 1133:12, 1199:9

**textbook** [11] - 1129:21, 1133:3, 1133:21, 1133:24, 1133:25, 1135:11, 1138:3, 1141:23, 1142:19, 1142:24, 1191:9

**THE** [89] - 1002:1, 1002:8, 1004:3, 1004:4, 1004:22, 1004:24, 1018:10, 1019:21, 1020:2, 1020:5, 1020:8, 1025:13, 1032:19, 1033:3, 1033:15, 1033:18, 1034:11, 1046:4, 1046:16, 1064:2, 1064:7, 1064:11, 1065:23, 1066:3, 1067:1, 1067:2, 1069:12, 1070:15, 1073:23, 1074:10, 1074:17, 1077:4, 1100:1, 1100:12, 1106:14, 1106:21, 1106:23, 1107:4, 1107:10, 1107:21, 1107:24, 1117:4, 1118:10, 1118:16, 1118:19, 1118:22, 1119:4, 1119:5, 1122:22, 1122:24, 1125:4, 1125:8, 1130:5, 1134:12, 1134:17, 1134:22, 1138:17, 1138:23, 1139:4, 1167:8, 1169:12, 1169:14, 1170:5, 1171:11, 1174:5, 1174:22, 1184:4, 1184:6, 1184:16, 1184:18, 1186:13, 1187:7, 1187:15, 1188:3, 1188:23, 1192:4, 1192:7,

1197:22, 1198:2, 1198:18, 1200:14, 1201:17, 1201:25, 1203:20, 1211:1, 1211:4, 1211:11, 1213:5, 1213:7

**themselves** [6] - 1012:15, 1024:21, 1025:3, 1053:8, 1059:9, 1163:19

**theoretical** [1] - 1023:12

**theory** [1] - 1056:18

**therapeutic** [1] - 1062:14

**therapy** [1] - 1045:17

**therefore** [5] - 1030:5, 1034:8, 1058:9, 1078:13, 1173:13

**they've** [6] - 1072:12, 1083:22, 1093:12, 1101:2, 1101:16, 1102:3

**thinking** [1] - 1127:6

**thinks** [1] - 1197:23

**third** [3] - 1042:8, 1052:13, 1105:7

**THOMAS** [1] - 1003:4

**Thoracic** [1] - 1008:8

**thorough** [1] - 1085:10

**thoroughly** [1] - 1049:15

**three** [22] - 1005:8, 1005:9, 1036:20, 1037:9, 1038:3, 1051:20, 1052:1, 1065:25, 1097:17, 1099:19, 1099:22, 1100:5, 1105:2, 1108:4, 1108:7, 1111:2, 1123:2, 1135:25, 1163:9, 1163:10, 1171:5, 1184:24

**three-quarters** [1] - 1184:24

**threshold** [4] - 1151:6, 1155:25, 1157:14, 1188:10

**throat** [1] - 1008:3

**throughout** [1] - 1121:7

**throw** [2] - 1021:21, 1131:8

**tier** [2] - 1127:13, 1132:19

**tight** [2] - 1143:25, 1159:11

**time-wise** [1] - 1129:2

**timely** [1] - 1196:23

**tisi** [1] - 1069:12

**Tisi** [5] - 1174:22, 1184:4, 1197:22, 1203:21, 1212:9

**TISI** [69] - 1002:14, 1017:24, 1018:7, 1018:9, 1045:14, 1046:9, 1046:14, 1067:6, 1069:16, 1073:13, 1073:21, 1074:1, 1074:19, 1076:23, 1077:2, 1077:8, 1080:17, 1106:13, 1106:20, 1107:2, 1107:5, 1107:19, 1107:25, 1118:18, 1119:10, 1125:1, 1125:12, 1130:3, 1134:14, 1134:20, 1138:5, 1138:13, 1138:20, 1138:24, 1139:5, 1142:2, 1165:8, 1169:10, 1169:13, 1169:16, 1169:24, 1170:11, 1171:13, 1174:6, 1174:24, 1175:6, 1184:5, 1184:7, 1184:10, 1184:14, 1184:17, 1184:19, 1186:2, 1186:14, 1187:6, 1187:11, 1187:19, 1188:19, 1191:25, 1192:5, 1193:23, 1197:3, 1197:25, 1198:4, 1200:11, 1201:14, 1203:24, 1211:3, 1211:9

**TITLE** [1] - 1213:5

**title** [4] - 1074:7, 1099:25, 1100:2, 1138:10

**titled** [2] - 1135:15, 1165:11

**TO** [2] - 1213:5, 1213:6

**tobacco** [3] - 1030:21, 1033:11, 1033:12

**today** [15] - 1004:17, 1009:14, 1011:13, 1026:23, 1045:20, 1086:12, 1109:9, 1116:12, 1124:9,

1253

1126:16, 1137:8, 1152:8, 1160:12, 1190:21, 1210:24

**together** [10] - 1010:25, 1041:3, 1065:5, 1070:20, 1070:22, 1084:2, 1099:14, 1127:14, 1158:25, 1171:10

**took** [5] - 1139:15, 1148:10, 1198:8, 1200:8, 1200:20

**tool** [1] - 1147:15

**top** [4] - 1025:4, 1122:22, 1160:20, 1193:6

**topic** [5] - 1050:14, 1075:2, 1152:3, 1152:4, 1201:24

**topics** [1] - 1044:1

**total** [5] - 1054:15, 1094:16, 1094:20, 1123:13, 1202:11

**totality** [5] - 1035:22, 1063:7, 1153:1, 1182:1, 1203:11

**totally** [4] - 1093:9, 1116:20, 1117:14, 1182:9

**touch** [1] - 1054:18

**touched** [1] - 1149:20

**toward** [1] - 1061:1

**towards** [3] - 1016:5, 1055:12, 1208:2

**Toxicology** [2] - 1192:6, 1204:18

**toxin** [1] - 1185:12

**Trabert** [1] - 1089:9

**tracing** [1] - 1137:7

**tracks** [1] - 1084:9

**tract** [2] - 1055:18, 1056:5

**traditional** [1] - 1005:8

**traditionally** [1] - 1061:9

**trained** [1] - 1005:16

**trainees** [1] - 1005:13

**training** [3] - 1109:15, 1121:3, 1147:14

**TRANSCRIPT** [1] - 1213:6

**TRANSCRIPTION** [1] - 1213:7

**translate** [2] - 1015:14, 1188:17

**translocation** [1] - 1089:14

**transport** [1] - 1103:1

**transvaginal** [1] - 1166:12

**travel** [1] - 1166:12

**traveled** [1] - 1008:17

**traveling** [1] - 1056:17

**tree** [1] - 1009:4

**TRENTON** [1] - 1002:7

**Trenton** [1] - 1116:22

**trial** [9] - 1029:19, 1029:24, 1127:20, 1127:21, 1131:9, 1132:23, 1133:6, 1157:16, 1186:23

**Trials** [2] - 1131:2, 1136:12

**trials** [13] - 1029:18, 1076:5, 1127:11, 1127:18, 1127:19, 1127:22, 1131:5, 1131:7, 1132:18, 1135:22, 1136:7, 1136:9

**tried** [2] - 1022:6, 1164:11

**True** [2] - 1088:23, 1163:2

**true** [38] - 1021:12, 1041:1, 1044:6, 1044:7, 1048:9, 1056:18, 1075:23, 1076:3, 1076:5, 1078:18, 1079:1, 1082:20, 1082:21, 1083:1, 1089:3, 1101:9, 1101:13, 1120:12, 1121:19, 1122:21, 1124:13, 1127:4, 1133:13, 1146:2, 1146:4, 1148:12, 1150:4, 1151:11, 1161:14, 1162:24, 1168:17, 1176:13, 1176:17, 1176:22, 1177:6, 1178:10, 1205:15, 1205:22

**truly** [1] - 1108:19

**truth** [4] - 1093:21, 1150:12, 1150:23, 1205:13

**try** [9] - 1012:13, 1072:1, 1111:23, 1112:1,

1128:12, 1129:12, 1144:25, 1145:21, 1189:11

**trying** [26] - 1010:24, 1012:16, 1023:15, 1028:4, 1039:22, 1054:12, 1087:19, 1088:18, 1088:20, 1094:5, 1116:9, 1116:12, 1116:13, 1116:18, 1129:6, 1132:2, 1141:13, 1142:16, 1151:23, 1152:15, 1152:19, 1153:14, 1180:14, 1187:7, 1187:9, 1187:11

**tubal** [5] - 1056:1, 1056:6, 1056:16, 1056:19, 1202:19

**tubes** [2] - 1056:8, 1056:17

**tumor** [1] - 1086:17

**tumors** [1] - 1086:22

**tumour** [1] - 1086:20

**turn** [5] - 1047:12, 1083:2, 1150:11, 1150:22, 1164:9

**turned** [1] - 1010:1

**twisted** [1] - 1117:19

**two** [43] - 1022:17, 1025:4, 1031:20, 1031:22, 1039:7, 1041:16, 1041:17, 1045:21, 1047:6, 1047:9, 1048:14, 1060:7, 1070:24, 1071:1, 1073:11, 1094:9, 1095:11, 1099:3, 1099:14, 1099:16, 1099:17, 1116:25, 1123:2, 1156:4, 1157:11, 1159:7, 1159:18, 1160:5, 1160:7, 1163:9, 1164:7, 1168:12, 1173:15, 1183:1, 1185:21, 1193:13, 1195:12, 1197:6, 1197:7, 1197:16, 1199:7, 1200:6

**twofold** [1] - 1036:10

**type** [5] - 1012:22, 1027:7, 1070:11,

1092:5, 1112:11

**types** [2] - 1007:2, 1127:19

**typical** [1] - 1064:22

**typically** [4] - 1037:13, 1120:17, 1128:11, 1149:10

---

**U**

---

**U.S** [1] - 1002:25

**U.S.** [1] - 1097:16

**U.S.A** [1] - 1173:6

**U.S.C** [1] - 1213:5

**ultimate** [1] - 1078:25

**ultimately** [2] - 1012:21, 1080:13

**uncertainty** [4] - 1024:24, 1025:1, 1089:4, 1196:19

**unclear** [2] - 1025:5, 1025:22

**uncontrolled** [1] - 1064:16

**under** [13] - 1006:25, 1091:19, 1096:12, 1098:6, 1113:2, 1118:4, 1139:1, 1139:20, 1141:6, 1141:8, 1176:2, 1197:10, 1204:12

**under-estimated** [1] - 1091:19

**undercovered** [1] - 1065:13

**undergone** [4] - 1062:17, 1063:1, 1081:13, 1195:14

**underneath** [2] - 1118:12, 1131:14

**underpinning** [1] - 1149:8

**understood** [3] - 1023:12, 1024:20, 1034:15

**undertaken** [1] - 1198:22

**unfortunately** [1] - 1157:14

**uniform** [1] - 1047:23

**uniformly** [4] - 1045:10, 1117:9, 1118:14

**unit** [1] - 1006:15

**United** [4] - 1008:18, 1064:23, 1080:4, 1097:11

**UNITED** [2] - 1002:1, 1002:7
**unity** [1] - 1145:13
**universe** [1] - 1132:17
**university** [1] - 1121:22
**University** [3] - 1005:6, 1121:17, 1122:4
**unknown** [2] - 1030:9, 1064:16
**unless** [2] - 1063:25, 1186:19
**unlike** [1] - 1114:13
**unlikely** [7] - 1104:11, 1104:19, 1172:3, 1173:14, 1174:9, 1209:15
**unrecognized** [2] - 1175:10, 1175:18
**unreliable** [2] - 1185:23, 1185:24
**up** [44] - 1004:20, 1013:18, 1018:12, 1020:3, 1020:10, 1021:8, 1027:11, 1032:20, 1037:19, 1041:21, 1044:22, 1051:18, 1055:11, 1058:20, 1064:12, 1073:13, 1077:4, 1089:2, 1092:10, 1101:10, 1119:11, 1125:16, 1127:22, 1128:8, 1129:12, 1129:19, 1134:24, 1140:11, 1140:24, 1141:17, 1144:1, 1146:13, 1147:5, 1152:4, 1160:20, 1162:13, 1164:5, 1178:22, 1189:3, 1190:4, 1190:6, 1190:10, 1200:2, 1202:12
**updated** [1] - 1035:15
**upper** [2] - 1052:8, 1052:10
**USDJ** [1] - 1002:8
**useful** [4] - 1128:14, 1130:21, 1149:15, 1170:8
**uses** [1] - 1206:20

**V**

**vagina** [1] - 1055:13
**valid** [1] - 1136:13
**validity** [3] - 1135:22, 1205:2, 1205:8
**value** [5] - 1022:2, 1078:14, 1128:18, 1144:11, 1145:8
**Value** [11] - 1149:11, 1149:15, 1150:11, 1150:14, 1151:5, 1151:8, 1151:19, 1153:22, 1155:24, 1157:13, 1169:4
**values** [1] - 1145:12
**Values** [11] - 1020:4, 1024:7, 1146:24, 1147:6, 1147:19, 1149:3, 1150:3, 1153:2, 1156:21, 1157:2, 1158:14
**variability** [1] - 1159:22
**variable** [2] - 1051:12, 1052:25
**varied** [2] - 1009:15, 1047:21
**variety** [6] - 1005:13, 1006:3, 1006:24, 1012:12, 1063:4, 1209:19
**various** [6] - 1005:22, 1007:22, 1010:13, 1044:8, 1053:24, 1106:16
**Vermont** [1] - 1061:13
**versa** [1] - 1047:8
**versions** [2] - 1133:22, 1137:6
**versus** [4] - 1015:20, 1058:24, 1143:8, 1168:4
**vertical** [1] - 1041:12
**via** [1] - 1089:18
**vice** [1] - 1047:8
**video** [1] - 1169:11
**view** [7] - 1027:1, 1027:15, 1057:20, 1063:18, 1178:2, 1192:18, 1205:4
**views** [2] - 1126:8, 1196:8
**VINCENT** [1] - 1002:24
**Vincent** [1] - 1213:11

**VIRGINIA** [1] - 1002:12
**VOLUME** [1] - 1002:5
**vulnerable** [1] - 1038:3

**W**

**wait** [1] - 1127:6
**walk** [1] - 1015:12
**wall** [2] - 1062:11, 1062:12
**warn** [1] - 1197:10
**WASHINGTON** [2] - 1002:18, 1003:4
**waste** [1] - 1156:6
**ways** [2] - 1055:11, 1162:10
**weak** [22] - 1027:20, 1027:24, 1029:2, 1030:17, 1031:14, 1032:14, 1033:5, 1033:9, 1035:4, 1036:2, 1036:13, 1036:17, 1037:4, 1048:4, 1054:23, 1055:1, 1063:13, 1065:20, 1118:5, 1192:14, 1192:15, 1206:3
**weak/positive** [1] - 1192:24
**weakness** [1] - 1108:23
**weaknesses** [4] - 1031:24, 1076:2, 1076:8, 1076:13
**website** [5] - 1121:21, 1122:20, 1155:11, 1196:7, 1210:25
**websites** [1] - 1121:23
**week** [4] - 1026:21, 1112:12, 1155:3, 1200:15
**weekends** [1] - 1009:20
**weekly** [1] - 1182:21
**weighing** [1] - 1199:17
**weighs** [1] - 1027:12
**weight** [2] - 1022:2, 1196:3
**WEIL** [1] - 1002:21
**well-established** [1] - 1030:23
**whatsoever** [1] - 1087:10
**whereas** [1] - 1036:24
**white** [1] - 1009:6
**whole** [7] - 1005:13, 1008:4, 1058:7, 1063:4,

1076:10, 1088:12, 1121:7
**wide** [3] - 1097:15, 1144:22, 1172:21
**widely** [3] - 1133:11, 1135:11, 1155:8
**widespread** [1] - 1173:11
**WILLIAMS** [1] - 1002:20
**Williams** [1] - 1199:3
**willing** [2] - 1022:15, 1150:25
**window** [1] - 1010:18
**wise** [1] - 1129:2
**wish** [2] - 1150:11, 1178:23
**withdraw** [1] - 1090:3
**WITNESS** [10] - 1020:2, 1020:8, 1033:3, 1033:18, 1074:17, 1107:10, 1107:24, 1122:24, 1125:8, 1138:23
**witness** [8] - 1004:5, 1004:9, 1009:10, 1009:23, 1010:2, 1010:5, 1170:3, 1211:13
**witnesses** [1] - 1184:22
**WITNESSES** [1] - 1212:6
**WOLFSON** [1] - 1002:8
**woman** [3] - 1039:20, 1056:15, 1112:10
**women** [26] - 1040:20, 1040:22, 1041:12, 1041:20, 1042:8, 1043:25, 1047:7, 1050:15, 1056:19, 1086:22, 1093:16, 1098:16, 1100:7, 1110:14, 1110:22, 1111:2, 1111:3, 1111:20, 1112:6, 1114:25, 1166:10, 1172:23, 1172:24, 1178:20, 1182:19, 1197:10
**wonderful** [1] - 1161:2
**word** [7] - 1017:2, 1017:3, 1101:23, 1102:3, 1137:19, 1204:8, 1206:20
**words** [5] - 1016:4, 1019:7, 1083:17,

1255

1125:4, 1151:2
**workers** [1] - 1061:3
**works** [2] - 1037:20, 1116:1
**world** [18] - 1008:9, 1008:13, 1018:14, 1019:13, 1023:13, 1072:22, 1097:14, 1097:15, 1128:20, 1128:22, 1129:5, 1151:21, 1152:7, 1152:10, 1156:25, 1157:15, 1167:5
**world-wide** [1] - 1097:15
**worldwide** [1] - 1095:18
**worried** [4] - 1033:8, 1044:9, 1053:3, 1058:14
**worse** [1] - 1205:3
**write** [7] - 1085:18, 1124:18, 1125:7, 1125:10, 1125:22, 1146:11, 1164:12
**writers** [1] - 1148:3
**written** [6] - 1071:10, 1141:6, 1141:9, 1141:10, 1164:19
**wrote** [8] - 1073:24, 1074:15, 1074:16, 1105:5, 1145:25, 1161:17, 1161:18, 1167:3

---

**Y**

**year** [6] - 1008:20, 1071:13, 1079:11, 1123:11, 1190:19, 1191:2
**years** [19] - 1007:4, 1008:10, 1008:16, 1008:17, 1009:16, 1042:20, 1067:16, 1095:2, 1111:2, 1111:4, 1111:5, 1111:8, 1112:12, 1135:8, 1158:7, 1161:7, 1204:3, 1208:7
**yellow/gold** [1] - 1041:14
**yesterday** [17] - 1012:3, 1013:9, 1018:20, 1021:9, 1024:13, 1026:1, 1027:11, 1029:4, 1030:16, 1049:25, 1057:11,

1060:14, 1062:1, 1092:17, 1143:20, 1189:8, 1199:3
**yield** [1] - 1136:13
**yourself** [6] - 1005:2, 1015:13, 1016:24, 1017:19, 1046:20, 1062:4

---

**Z**

**zero** [3] - 1123:7, 1123:9, 1156:1