711

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO 16-MD-2738(FLW)(LHG)


_____  :
IN RE JOHNSON & JOHNSON   :  DAUBERT HEARING
POWDER PRODUCTS MARKETING, :  JULY 25, 2019
SALES PRACTICES.          :  VOLUME 4
-------------------------  :


CLARKSON S. FISHER UNITED STATES COURTHOUSE
402 EAST STATE STREET, TRENTON, NJ  08608

B E F O R E:  THE HONORABLE FREDA L. WOLFSON, USDJ

A P P E A R A N C E S:

BEASLEY ALLEN, ESQUIRES
BY:  P. LEIGH O'DELL, ESQUIRE (ALABAMA)
        -and-
ASHCRAFT & GEREL, ESQUIRES
BY:  MICHELLE A. PARFITT, ESQUIRE (VIRGINIA)
        -and-
LEVIN PAPANTONIO, ESQUIRES
BY:  CHRISTOPHER V. TISI, ESQUIRE  (FLORIDA)
        -and-
ROBINSON CALCAGNIE, ESQUIRES
BY:  CYNTHIA L. GARBER, ESQUIRE  (CALIFORNIA)
behalf of the Plaintiffs Steering Committee


DRINKER, BIDDLE & REATH, ESQUIRES
BY:  SUSAN M. SHARKO, ESQUIRE  (NEW JERSEY)
     JULIE L. TERSIGNI, ESQUIRE  (NEW JERSEY)
        -and-
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, ESQUIRES
BY:  JOHN H. BEISNER, ESQUIRE  (WASHINGTON, D.C.)
        -and-
PROSKAUER ROSE, ESQUIRES
BY:  BART H. WILLIAMS, ESQUIRE  (CALIFORNIA)
On behalf of Defendant Johnson & Johnson
                          (Continued)


* * * * *
VINCENT RUSSONIELLO, RPR, CRR, CCR
OFFICIAL U.S. COURT REPORTER
(609)  588-9516

712

A P P E A R A N C E S   C O N T I N U E D:


WEIL GOTSHAL & MANGES, ESQUIRES
BY:  ALLISON M. BROWN, ESQUIRE
On behalf of Defendant Johnson & Johnson


SEYFARRTH & SHAW, ESQUIRES
BY:  THOMAS L. LOCKE, ESQUIRE  (WASHINGTON D.C.)
On Behalf of Defendant Personal Care Products Council

McTiernan - Direct/Ms. Parfitt

713

1           M O R N I N G   S E S S I O N

2

3           (In open court.)

4           THE DEPUTY CLERK:  All rise.

5           THE COURT:  Thank you.  Everyone may be

6    seated.

7           MS. PARFITT:  At this time Plaintiffs will

8    call Dr. Anne McTiernan.

9

10   **ANNE MC TIERNAN,** called as a witness on behalf of

11   the Plaintiffs, having been first duly sworn,

12   testified as follows:

13

14   DIRECT EXAMINATION

15   BY MS. PARFITT:

16   Q.    Dr. McTiernan, good morning.

17   A.    Good morning.

18   Q.    Would you please introduce yourself to the

19   Court.

20   A.    Good morning, your Honor.  My name is Dr. Anne

21   McTiernan.

22   Q.    Dr. McTiernan, have you brought with you today,

23   for purposes of assisting you with the opinions you

24   will be sharing with her Honor your expert report and

25   your curriculum vitae and addendum tables?

McTiernan - Direct/Ms. Parfitt

714

1  A.     Yes.

2  Q.     Have you also brought with you a binder of

3  materials that consist of the relevant literature you

4  may be discussing this morning with the Court?

5  A.     Yes.

6  Q.     Finally, in preparation for your testimony

7  today, did you assist me in preparing some slides that

8  we can focus on today?

9  A.     Yes.

10  Q.     We will be showing those throughout the course

11  of the morning.

12         Dr. McTiernan, would you share with us what

13  your profession and field of expertise is.

14  A.     I'm an epidemiologist, and I specialize in

15  women's health and cancer epidemiology.

16  Q.     We need to hear what epidemiology is, and

17  frankly why the field of epidemiology is important for

18  the discussion this morning of ovarian cancer and

19  talcum powder.

20  A.     Epidemiology is the study of disease in humans,

21  disease and risks.  In epidemiology, we can determine

22  what are the associations between an exposure and risk

23  of disease.  This is critical for this issue of talcum

24  powder products use in ovarian cancer because we don't

25  have clinical trial evidence.  Studies in humans we're

McTiernan - Direct/Ms. Parfitt

715

1   really relying on epidemiology.

2   Q.   You may move just a little bit closer to the

3   mic.  Thank you.

4        Dr. McTiernan, if you will, summarize for the

5   Court -- and we will put a slide up here -- your

6   qualifications and expertise to prepare you to offer

7   the opinions you will be giving in this case.

8   A.   In 1982 I completed a Ph.D. in epidemiology at

9   the University of Washington in Seattle, and I focused

10  on cancer epidemiology.

11       In 1989, I completed my medical degree at New

12  York Medical College.  And then I moved to Seattle and

13  completed a residency in internal medicine at the

14  University of Washington in 1992.

15  Q.   If you will -- we will move to the next slide --

16  briefly summarize for the Court the qualifications and

17  expertise with regard to academic appointments and

18  research.

19  A.   Sure.

20       I am a full member at the Fred Hutchinson

21  Cancer Research Center in Seattle.  This is a premier

22  independent cancer research center that first

23  identified bone marrow transplant, and it was the

24  first cancer prevention center in the country.  There

25  I study ways to prevent new and recurrent cancer.  I

McTiernan - Direct/Ms. Parfitt

716

1   conduct epidemiologic research, identify risk factors

2   for women such as breast and ovarian cancer, and I

3   study prevention methods to reduce population and

4   other markers of cancer risk.

5           I am also a research professor at the

6   University of Washington Schools of Medicine And

7   Public Health, and my departments there are

8   epidemiology and gerontology and geriatric medicine.

9   There I teach and mentor epidemiology students,

10  especially graduate students.

11  Q.    What other research activities are you involved

12  in?

13  A.    One key one is the Women's Health Initiative.

14  When I began at Fred Hutchinson in 1992, I was hired

15  to be a project director for the Women's Health

16  Initiative.  This includes a cohort study that we will

17  be talking about later.

18  Q.    If I can ask a question here.  You are speaking

19  of the Women's Health Initiative also the Houghton

20  Study?

21  A.    That's correct.

22  Q.    You were project director?

23  A.    Yes.

24  Q.    Please.

25  A.    There I've led the development of protocols

McTiernan - Direct/Ms. Parfitt

717

1    procedures, recruitment interventions because we had

2    trials as well, follow-up and outcomes including

3    ovarian cancer.

4           In terms of published research, I have

5    published over 400 scientific manuscripts and

6    peer-reviewed medical and scientific journals.

7           We put up here numbers of different types of

8    studies we will be talking about later that I've

9    published.  I've published 17 case-control studies,

10   127 cohort studies, 165 randomized clinical trials,

11   ten pooled analyses, five methods, multiple meta-

12   analyses and multiple reviews.

13   Q.    Thank you.  We will be speaking about many of

14   those a bit later.

15          Now, will you briefly discuss with us

16   positions where you are in an advisory or consultancy

17   position for either a national or international

18   research organization?

19   A.    Sure.  Two relevant ones are for the World

20   Health Organization.  They are the International

21   Agency for research on cancer.  This is the cancer

22   branch of the World Health Organization.

23          In 2002 I was a member of a working group that

24   completed a systematic review and produced a handbook

25   of cancer prevention.  That one was focused on

McTiernan - Direct/Ms. Parfitt

718

1    physical activity and weight control.  There I chaired

2    a section to identify biologically plausible

3    mechanisms linking physical activity and weight to

4    cancer.

5    Q.    Now, if you will, in the interest of time, just

6    briefly share with us as well what your work has been

7    with the World Cancer and other groups.

8    A.    The World Cancer Research Fund, I'm a member of

9    the Continuous Update Panel that conducts research on

10   cancer prevention and survivorship, and this is

11   focused on diet, nutrition, physical activity, and

12   obesity.

13   Q.    The work you do for the World Cancer Research

14   Fund is just focused on certain research areas?

15   A.    That's correct, diet, nutrition, physical

16   activity and obesity.

17   Q.    Please, if you will.

18   A.    I also advised for the U.S. Government, which

19   includes advisory for the U.S. Department of Health

20   and Human Services advisory committees on physical

21   activity guidelines in 2008 and 2018, and there I was

22   chair of the cancer subcommittee.

23        I have been principal investigator of multiple

24   NCI grants, including the Seattle Transdisciplinary

25   Research on energetics and cancer.

McTiernan - Direct/Ms. Parfitt

719

1        I have been a program reviewer for NCI

2    research and reviewed grant applications.

3        I have also reviewed grant applications for

4    the Department of Defense.

5    Q.    Dr. McTiernan, you spoke briefly about the

6    numerous almost 400 publications that you have

7    prepared over the course of your career.  Do you also

8    act as a peer reviewer?

9    A.    Yes.  For many medical and scientific journals.

10   It has been an ongoing work that I do.

11        MS. PARFITT:  Your Honor has your resume.  We

12   are going to move forward and address some of the

13   other issues, if I may.

14        THE WITNESS:  Okay.

15   Q.    Dr. McTiernan, what was the issue you were asked

16   to review in this case?

17   A.    So I was retained to review the current state of

18   the scientific literature regarding talcum powder

19   products and to opine on whether these products cause

20   ovarian cancer.

21   Q.    Have you formulated an opinion regarding the

22   association between talcum powder products and ovarian

23   cancer, and are you prepared today to share your

24   methodology for developing those opinions?

25   A.    Yes.

McTiernan - Direct/Ms. Parfitt

720

1    Q.    What are those opinions?

2    A.    My opinion as an epidemiologist and physician,

3    stated to a reasonable degree of medical and

4    scientific certainty, that use of talcum powder

5    products, including Johnson & Johnson Baby Powder and

6    Shower To Shower, in the genital perineal area can

7    cause ovarian cancer.  I base this opinion on the

8    statistically significant elevated risk seen with the

9    epidemiology data when they are combined, the

10   pathological evidence, the consistency of results

11   across geographic areas, and in different race and

12   ethnic groups, evidence of a positive dose-response

13   effect, and the plausible biological mechanism.

14   Q.    Dr. McTiernan, have you ever testified in a

15   court of law as an expert witness?

16   A.    No, I have not.

17   Q.    This is your first time in almost forty years of

18   a practicing epidemiologist that you have had the

19   pleasure of sitting up there and being quizzed.  Is

20   that correct?

21   A.    Yes.

22   Q.    Dr. McTiernan, why did you decide to be an

23   expert witness in this case?

24   A.    First I thought it would be an important issue

25   in women's health and public health.  Second, I wanted

McTiernan - Direct/Ms. Parfitt

721

1  to share my scientific skills and expertise on this

2  issue.

3  Q.    Now, in addition to your opinions you have set

4  forth in this litigation as an expert, have you shared

5  your opinions outside of this litigation?

6  A.    Yes, I have.

7  Q.    To whom have you shared your opinions?

8  A.    There are two major areas where I have shared

9  publicly.  The first is with Health Canada.  Health

10  Canada prepared and released a document publicly and

11  that stated that the meta-analyses of available human

12  study in the peer-reviewed literature indicated

13  consistent and statistically significant positive

14  association between perineal exposure to talc and

15  ovarian cancer, and they stated further that available

16  data are indicative of a causal effect.  This

17  conclusion agrees with my own, and that's what I

18  stated to them in public commentary.

19  Q.    We'll get to the public commentary in just one

20  moment.

21         A couple of questions.  To your understanding,

22  were there any dissimilarities between your

23  conclusions or your findings and that of Health

24  Canada?

25  A.    They were quite similar.  One difference is they

McTiernan - Direct/Ms. Parfitt

722

```
 1    made the assumption there was no asbestos in the
 2    talcum powder products.
 3    Q.    For purposes of your opinions that you are
 4    sharing not only with the Court but the Health Canada
 5    and Congress, you understand there is a presence of
 6    asbestos as well?
 7    A.    Yes.
 8    Q.    Did you both do a systematic review?
 9    A.    I did.
10    Q.    Did you both do a Bradford Hill causality
11    analysis?
12    A.    Yes.
13    Q.    You started to mention about a commentary.  Were
14    you provided an opportunity, after your read of the
15    Health Canada assessment, to provide your remarks to
16    Health Canada or your opinions to Health Canada?
17    A.    Yes.
18    Q.    You did that?
19    A.    Yes.
20    Q.    Why don't you tell us when and what you did.
21    A.    So in February of 2019, I submitted comments to
22    their website.  They invited public commentary.
23    Q.    What is it that you shared with Health Canada?
24    A.    I stated their conclusion agreed with mine.  I
25    told them how many publications I had reviewed, and
```

McTiernan - Direct/Ms. Parfitt

723

1   including pooled and meta-analyses, and I stated the

2   meta-analysis consistently showed that women who had

3   ever used talcum powder products in the genital area

4   had a statistically significant 22 to 31 percent

5   increased risk of developing epithelial ovarian cancer

6   overall, compared with women who had never used these

7   products.  I stated that the comprehensive combined

8   analyses also showed strong evidence of increased risk

9   of ovarian cancer with increasing number of lifetime

10  applications of these products in the perineal/genital

11  area.

12  Q.    After you submitted your comments, Dr.

13  McTiernan, what, if any, response did you receive from

14  Health Canada?

15  A.    The next slide shows their acting senior manager

16  contacted me and asked if I would be willing to offer

17  my scientific opinion and my expertise to help them as

18  they conclude their project.

19  Q.    Dr. McTiernan, after you made your comments

20  public to Health Canada and received a response by the

21  authorities at Health Canada requesting your expertise

22  in the future, did you have an opportunity to share

23  the opinions you are expressing today in the courtroom

24  with anyone else?  I believe you mentioned Congress?

25  A.    Yes, I did.

McTiernan - Direct/Ms. Parfitt

724

1    Q.    Tell us about that.

2    A.    I gave testimony to the U.S. Congress, to their

3    Committee on Oversight and Reform, Subcommittee on

4    Economic and Consumer Policy.

5    Q.    And, specifically, how did that come to be?

6    What were you asked to do so you knew what your

7    responsibility or role would be before Congress?

8    A.    One week before this meeting I was contacted by

9    the Committee and asked to provide my comments on the

10   association between talcum powder product use and risk

11   of ovarian cancer.

12   Q.    And did you have to submit that public comment?

13   A.    I did.  I had a prepared five minutes of the

14   comments, and I also had the opportunity to submit a

15   document, and those are public.

16   Q.    What I would like you to do is share with Her

17   Honor what your comments were to Congress with regard

18   to your opinions with regard to genital use of talcum

19   powder and causing ovarian cancer.  What did you tell

20   Congress?

21   A.    I told them how many studies I had reviewed.  I

22   told them that summarizing the data across those

23   studies consistently showed women who had ever used

24   these products in the genital area had a statistically

25   significant 22 to 31 percent increased risk of

McTiernan - Direct/Ms. Parfitt

725

1   developing epithelial ovarian cancer compared with

2   women who never used them.

3          I further talked about the combined analysis

4   that showed increasing amount of exposure to these

5   products, increased risk of developing ovarian cancer

6   further, and this is dose-response.  We'll talk more

7   about that later.

8   Q.    Next slide.

9          What else did you share with Congress?

10  A.    I further talked about biologically plausible

11  pathways through which these products can be causing

12  ovarian cancer and a particular focus on inflammatory

13  response that is caused by talc.

14         Also I talked about, given the frequency with

15  which asbestos has been found in personal use talc

16  products, I reviewed the literature on the

17  epidemiology of asbestos and risk of ovarian cancers.

18         And then I informed them that in 2012, the

19  International Agency for Research on Cancer stated

20  that a causal association between exposure to asbestos

21  and cancer of the ovary was clearly established, and

22  that that agency had classified fibrous talc, a

23  component of talcum powder products, as a Class 1

24  carcinogen, the most dangerous level of carcinogen.

25  Q.    Dr. McTiernan, so within this last year, you

McTiernan - Direct/Ms. Parfitt

726

1   have shared your published opinion on two occasions:

2   Health Canada and Congress.  Is that correct?

3   A.    Correct.

4   Q.    What I would like to do now, Dr. McTiernan, is

5   to move on to the methodology.

6         Her Honor is interested in hearing what the

7   methodology was and is that you employed in order to

8   arrive at your opinions that talcum powder products

9   can cause ovarian cancer.

10        Why don't we pull up the next slide.

11        What I'll ask you to do is walk the Court

12  through your methodology in a systematic way using the

13  chart, if that is helpful.

14  A.    Okay.

15        As I would do for any scientific research of

16  this type, what I am trying to look at, an overview

17  and do causal assessments, I would first formulate a

18  question.  So I did that.

19        The question in this case is:  What is the

20  association between talcum powder products and ovarian

21  cancer?

22        The second question was:  Can the use of

23  talcum powder products cause ovarian cancer?

24        I've conducted a systematic review --

25  Q.    When you say "systematic review," we heard about

McTiernan - Direct/Ms. Parfitt

727

1   systematic reviews.  What is it?

2   A.    It means you make the effort to look at all

3   available evidence -- in this case, epidemiologic

4   evidence, and that you do a careful searching through

5   a database and through relevant journal articles to

6   make sure you have the totality.

7        To do that, I defined search terms for the

8   database.  I conducted a PubMed search.  I provided

9   inclusion and exclusion criteria.  From all of that,

10  after reviewing all that, I found -- I identified 38

11  relevant original and peer-reviewed epidemiologic

12  publications.

13       As I continued my work on the report, I

14  updated the search and I continued to do that.

15  Q.    What is the next step?

16  A.    The next step is reviewing the data.  So I

17  reviewed relevant epidemiologic studies.  In those

18  studies I considered the statistical data, the

19  strength and weaknesses of study type, the effect of

20  possible bias, chance, confounding and differences in

21  exposure measures.  I considered dose-response, what

22  we talked about before.  I also considered data from

23  non-epidemiologic lines of evidence, such as animal,

24  cell, clinical and pathological studies.  I considered

25  non-talc components of talcum powder products and

McTiernan - Direct/Ms. Parfitt

728

1  impact on carcinogenicity such as asbestos, fibrous

2  talc, heavy metals, and fragrances.

3  Q.    After you had gathered this body of evidence, it

4  included not only epidemiologic evidence but also

5  other sciences that speak to the biological

6  plausibility that speak to cellular studies, animal

7  studies, pathological studies, you moved on to try to

8  aggregate it.  Is that correct?

9  A.    Yes.

10  Q.    Please.

11  A.    I extracted data into four tables.  We provided

12  those.  In my report there is Table H for

13  case-control, cohort, meta-analyses and pooled

14  studies.

15  Q.    Putting those tables together that are at the

16  end of your expert report, how did you go about

17  extracting certain study characteristics and why did

18  you do that?

19  A.    I chose the study characteristics that would be

20  most important to know about the breadth and depth of

21  individual studies, particularly to be able to know

22  how large the study was, where it was conducted, when

23  it was conducted, how many cases were included, how

24  many people without cancer were included, if it was a

25  cohort, how long it had been followed.  I looked at

McTiernan - Direct/Ms. Parfitt

729

1    dose-response.  The key metric is relative risk.

2    Relative risk is clearly the important element.  And I

3    also looked at the statistical testing on cancer

4    subtype.

5    Q.    One follow-up.  Why was it important, relevant

6    to the study of science that you extract this kind of

7    information from the studies?

8    A.    It is relevant in interpreting their final

9    results because these elements influence the results

10   they get and what they might mean.

11   Q.    Thank you.

12          Then what did you do?

13   A.    Then I conducted what we call a Bradford Hill

14   analysis; and using this analysis, which is a way to

15   assess for causality, I used independent judgment, I

16   weighed relevant evidence, and reached a conclusion.

17   Q.    Thank you, Dr. McTiernan.

18          Dr. McTiernan, is the epidemiology you have

19   employed in this case for purposes of developing your

20   opinions recognized and generally accepted by those

21   scientists in your field of expertise?

22   A.    It is, yes.

23   Q.    Do you in your own research and academic work

24   employ these same types of scientific reasoning and

25   epidemiology that you have used for purposes of

McTiernan - Direct/Ms. Parfitt

730

1  developing your opinions in this case?

2  A.    I do.  Most recently and notably the U.S.

3  Government work I have done for the physical activity

4  guidelines we used a similar process to evaluate

5  literature and do causal analysis and determine what

6  we believe the literature is stating.

7  Q.    In the course of talking about the methodology

8  that you employed in order to arrive at the opinions

9  that you have shared and will continue to share with

10  us today and have publicly, you talked about certain

11  epidemiological designs.  We're going to have a little

12  teaching session, if you will.

13       To the extent you can tie in any of your

14  thoughts your opinions with regard to talcum powder,

15  you can use those as examples.  What I would like to

16  do is take the next probably five, ten minutes just to

17  get a basic understanding of how you are going to be

18  approaching the studies for the Court and explaining

19  what they actually mean.  All right?

20  A.    Okay.

21  Q.    Let's step back and talk about the four

22  different types of study designs.

23  A.    The four types of data that are available for

24  this issue -- ovarian cancer and talcum powder product

25  use.

McTiernan - Direct/Ms. Parfitt

731

1            The first is case-control studies.  This is

2    where investigators would identify individuals with

3    ovarian cancer and then would identify people without

4    cancer, interview both about their use of products and

5    other variables to help with the interpretation, and

6    then they compare what exposure did the cases have and

7    what exposure did the controls have.

8    Q.    In this case, exposure to talcum powder

9    products?

10   A.    Yes.

11   Q.    In this case, what disease?

12   A.    Ovarian cancer.

13   Q.    Go ahead.

14   A.    Modern case-control studies tend to be

15   population-based.  The reason for that is to be

16   generalizability.  So if you have results from a

17   case-control study, can that refer to what the most

18   likely universe of results would be?

19   Q.    Let's step back a little bit.

20          There are two different types of case-control

21   studies.

22   A.    Yes, the first is population based.

23   Q.    What does that mean?

24   A.    It means the cases and controls come from the

25   population.  The cases often are identified through a

McTiernan - Direct/Ms. Parfitt

732

1    registry, and the controls will be from some

2    population group.

3          A second type of case-control studies is

4    hospital-based, and that's where investigators in one

5    hospital identify all the cases of ovarian cancer that

6    have happened in some period of time.

7          The controls they would select from other

8    hospitalized patients that don't have ovarian cancer.

9    This type of case-control study is less likely to be

10   done.

11   Q.   Which one?

12   A.    Hospital-based, because you can't generalize it

13   to the general population.  And because the controls

14   who are sick and in the hospital may be sick for

15   different reasons than the cases.

16          So, ideally, in a case-control study, the

17   cases and controls would be very similar except for

18   the one exposure you want to look at in this case,

19   talcum powder products.  We want to get rid of all of

20   the other kind of noise you could have when you are

21   looking at real people.

22          The second kind of study is a cohort study.

23   This is a study where women are identified at one

24   point, invited into a long-term prospective study.

25   They complete forms when they enter the study,

McTiernan - Direct/Ms. Parfitt

733

1    questionnaires; and, in this case, all of those

2    studies were self-administered questionnaires.

3    Q.    What is a "self-administered questionnaire"?

4    A.    As it sounds, the person completes the form

5    themselves.  Case-control studies, usually the data

6    are collected through an interviewer, a trained

7    interviewer.  So in the cohort studies, the women

8    enter -- the cohort, they complete the forms, datas

9    are collected and they are followed up over time until

10   cancers occur -- in this case, ovarian cancer, because

11   ovarian cancer is rare, you need a couple of hundred

12   thousand women followed for 20 years to find a large

13   number of cancer cases.

14   Q.    When you say "cases," there is a difference

15   between the total population that enters the study and

16   those actual cases of cancer?

17   A.    Yes.  The critical number is the number of

18   cases.  I have been involved with the design of

19   several cohorts and you design your cohort to be a

20   certain size in order to have the right number of

21   cases developing.  It is the number of cases of

22   ovarian cancer that occur.  That's the key variable.

23   Q.    Is there also another type of study where we

24   aggregate information?

25   A.    Yes.  There are two, and one is called

McTiernan - Direct/Ms. Parfitt

734

1    meta-analysis.  This is where an investigator collects

2    data from published studies.  So they get the specific

3    statistics from a published study and then analyzes

4    them and combines them into one summary statistic.

5    They collect this number called relative risk from

6    different studies and they combine those relative

7    risks so they could have one relative risk.  It gives

8    you a very big summary of what the literature looks

9    like overall.

10   Q.    We'll be talking about those a bit later.

11         What is the next study?

12   A.    The next study is a pooled analysis.  This is

13   where individual level data are obtained from the

14   individuals in the study, in this case, women.  So

15   women with ovarian cancer, women without ovarian

16   cancer.  Their data then are analyzed as if it is one

17   large study, and we have then also summary statistics

18   that are developed.  It is a very excellent way of

19   looking at data overall.

20   Q.    The value of doing an aggregate type of combined

21   study like meta-analyses and pooled would be what?

22   A.    You really can see what the picture is overall.

23   You can have much larger numbers.  The pooled example,

24   the pooled study we'll talk about has 14,000 cases in

25   it.  So you really have enough numbers to see what's

McTiernan - Direct/Ms. Parfitt

735

1  going on.  You could look at subgroup analyses.  You

2  could look at dose-response.  There is a lot of

3  advantages to looking at pooled analyses.

4  Q.    We'll talk about that a little bit later.

5        Dr. McTiernan, we talked about these

6  observational types of studies.  Correct?

7  A.    Yes.

8  Q.    Is there any type of study you do use in your

9  academic and professional research world and

10  considered but did not utilize in this case?

11 A.    Yes.  I conduct randomized clinical trials for

12 many different purposes.  The Women's Health

13 Initiative had three randomized trials in it.  In this

14 case, first, if you did a randomized clinical trial to

15 test where the talcum powder products cause ovarian

16 cancer, first of all, you would need hundreds of

17 thousands of women followed for decades before you

18 would have enough ovarian cancer cases developing.

19 Much more importantly, it would be the ethics, it

20 would not be ethical to test in a randomized trial

21 something you think could be harmful in order to see

22 if it does cause harm.  So randomized trials always

23 have to have the goal of can something have a benefit.

24 Q.    Thank you.  Dr. McTiernan, in your professional

25 research and academic work, do you design and publish

McTiernan - Direct/Ms. Parfitt

736

1   all core types of those studies, including randomized

2   control trials?

3   A.    I do, yes.

4   Q.    In evaluating the totality of the

5   epidemiological data on talcum powder products and

6   ovarian cancer, did you invoke a hierarchy of evidence

7   in order to better examine the association, the

8   relationship between talcum powder and ovarian cancer?

9   A.    No, I did not.  I looked at the totality.  I

10  looked at all of the studies, and I looked at the

11  studies that combined information.  I looked at

12  everything.

13  Q.    I guess, my question is you have this choice of

14  five studies.  You talked about why you didn't look at

15  any randomized control trials.  But with regard to the

16  case-control, the cohort, the meta-analyses, and the

17  pooled study, are there reasons that one type of study

18  might be more reliable, specifically when you are

19  looking at the issues you were asked to look at here?

20  A.    All of those studies provide useful information.

21  So I considered all of them.  I did not place any

22  hierarchy on them.  They all give useful information.

23        Epidemiology studies all can have benefits,

24  strengths, and they can all have weaknesses.  I

25  considered all of that when I reviewed the data.

McTiernan - Direct/Ms. Parfitt

737

1    Q.    The defendants here, you read their briefing and

2    suggested you should have made your focus more on the

3    cohort studies rather than you case-control studies.

4    Do you recall reading that?

5    A.    I do.

6    Q.    Why don't you agree with that?

7    A.    There are benefits and drawbacks to all these

8    types of studies.  I do not believe for this

9    particular question when you are looking at what a

10   woman has used, and you want to know her lifetime

11   exposure, and you want details, you are going to see

12   that best described in a case-control study that can

13   be focused.  The cohort studies have their strengths,

14   and we'll go over those in a bit also.  I found both

15   types of studies provided useful information, and I

16   summarized that in my deliberations.

17   Q.    In your work as a professional and researcher,

18   is there an example wherein a particular study type

19   was more suited for a particular scientific question?

20   A.    There are some instances, and I can give one

21   example.  With the World Cancer Research Fund, I sit

22   on a panel that advises them on interpretation of

23   dietary data.  Their mission is to focus on diet, and

24   diet is a very interesting thing to try to collect,

25   because if you ask people about their diet and they

McTiernan - Direct/Ms. Parfitt

738

1   have already developed cancer -- so in a case-control

2   study you will be asking people with cancer about

3   their diet, and comparing them to controls without the

4   diet.  Once somebody develops cancer, their diet

5   changes dramatically.  If you want to know what

6   somebody's previous diet effect on cancer risk is, it

7   is very difficult to do that in a case-control study.

8   The person has already changed.  Diet, you can't ask

9   somebody what they have eaten in the past.  We've

10  tried but researchers found that diet, if you ask

11  somebody at one point what the diet was a year ago,

12  they will tell you what they are currently eating,

13  even though they think it is a year ago, and this has

14  been tested.  Diet is one very particular study, a

15  variable.  It is complicated.  It is not like you are

16  asking somebody how many eggs you ate.  The dietary

17  forms in the Women's Health Initiative had 150 items,

18  and for each item you are asking people how often they

19  eat it and how large a serving is.  You can imagine

20  how complicated that is, and then if you ask somebody

21  to recall that.

22          So for diet studies, it is really an example

23  of somewhere where a cohort study may be more helpful;

24  ask somebody when they enter the cohort study what

25  their complicated dietary pattern was, and then follow

McTiernan - Direct/Ms. Parfitt

739

1    them forward over time.  You still have the issue

2    where you need to have a huge study to follow and

3    follow them long enough until ovarian cancer develops.

4    Q.    Johnson & Johnson claims your reliance on study

5    science in the case of talcum powder products and

6    ovarian cancer is inconsistent with the work you did

7    with the World Cancer Research Fund, which was

8    involving dietary habits and the need to do at that

9    time a cohort study.  Is the work you have done in

10   this case inconsistent with your prior research in

11   epidemiology?

12   A.    It is not inconsistent with my overall research

13   of published 17-case-control studies.  I have been

14   principal investigator of a case-control study.  I

15   participated in a pooled analysis involving my data

16   from case-control studies.  I participated in even

17   more cohort studies.  Hundreds of publications have

18   come out from the cohort studies that I worked with.

19   So I've looked at studies -- I've used studies across

20   the board in epidemiology because sometimes one study

21   works better than another.  Sometimes you do both.

22   Q.    And it depends on the study question.  Is that

23   correct, Dr. McTiernan?

24   A.    Absolutely, yes.

25   Q.    I'm going to shift gears a little bit now and

McTiernan - Direct/Ms. Parfitt

740

1    talk a little bit now, if you will, ask you to talk

2    about the first group of studies, and that would be

3    -- you talked about some tables you put together.  Is

4    that right?

5    A.    Yes, for the expert report.

6         THE COURT:  Those tables did not come out on

7    my copy.

8         MS. PARFITT:  We're not going to be using

9    those at all.  It is a question.

10   Q.    The reason for that demonstrative, Dr.

11   McTiernan, is just so you could identify for the Court

12   that there were four tables that you put together?

13   A.    Yes, they are.

14   Q.    And they dealt with data you selected from the

15   four different study types we just talked about.

16   Correct?

17   A.    Yes.

18   Q.    Did you assist me in taking that data and

19   putting that data together in four plots for the

20   individual studies?

21   A.    Yes.  You assisted me.  I told you what I needed

22   and then you kindly did the forest plot part for me,

23   yes.

24   Q.    We're going to get to those in just a moment.

25        Why did you want a forest plot.  What was the

McTiernan - Direct/Ms. Parfitt

741

1  purpose of plotting it along a forest plot?

2  A.    A forest plot is a way to visualize what's

3  happening across studies.  It is a commonly used

4  method.  If you look at the meta-analysis, trying to

5  see what did the data look like across studies, they

6  will do this, forest plot.

7  Q.    Directing your attention to this next exhibit,

8  it is a case-control and cohort study, all ovarian,

9  1982 to 2016.  Would you share with us the information

10  that's contained, perhaps giving us, first, a

11  description of the types of information and, then,

12  we're going to talk about how you interpreted that.

13  Fair?

14  A.    Okay.  I'm going to mark on the PowerPoint what

15  I'm pointing at.

16        This table on this side has the data that I

17  put into my expert report and we put into this slide.

18        The first column is just the Case-Control

19  Study.  That's the name of the study and the year it

20  was published.

21  Q.    How many of those did you review?

22  A.    28 case control studies.  And then the

23  nationality where it was conducted, the numbers of

24  cases.  It is a key number to help us interpret these

25  results, how many cases there were.

McTiernan - Direct/Ms. Parfitt

742

1    Q.    Does that represent cases of ovarian cancer?

2    A.    Cases of ovarian cancer, yes.

3          The number of controls, individuals without

4    cancer, whether the study was population-based or

5    hospital-based.

6          The next column says "DR" and that stands for

7    dose-response.  The question was, Did that study

8    address dose-responses?  Did the risk increase with

9    increasing doses?  If they did address it, that would

10   be "yes"; if they addressed it and found a positive

11   response.  If they addressed it and found no

12   dose-response, I would put the word "no" in there.  If

13   they did not even attempt it we put N/A.  And

14   "incomplete" if they attempted it but they had

15   incomplete data -- we'll talk more about dose-response

16   later.

17         The next column is "relative risk."  Relative

18   risk is the most important statistic in all of these

19   studies.  It refers to what is the risk in exposed

20   individuals compared to somebody who is not exposed.

21   What is the risk in somebody who used talcum powder

22   products compared to somebody who did not.  So the

23   relative risk tells us the strength, how large was the

24   association.  It tells us consistency when we look

25   across different studies.  It's the effect size.  It

McTiernan - Direct/Ms. Parfitt

743

1    is also called the "point estimate."  In some studies

2    you could see the words "odds ratio" or "O.R.".  It is

3    the same thing estimating "relative risk."

4           "HR" stands for "hazard ratio."  That means

5    the same thing.  So I'm always going to say relative

6    risk here for simplicity.

7           The next column and the one following it

8    referred to the confidence intervals, the lower limit

9    and upper limit of confidence interval.

10   Q.    Share with us what that means and how it is

11   interpreted.

12   A.    The confidence interval in epidemiologic studies

13   is a statistical tool to see how likely the universe

14   of results would fall within a particular interval.

15   If we knew the universe of results.  We don't.  So we

16   are always estimating.  The confidence interval does

17   not affect what the actual relative risk is for that

18   study.  It is just an estimate how the truth might lie

19   if we knew everything.

20   Q.    You said the confidence interval does not affect

21   at the relative risk.  Explain that?

22   A.     If you have a small narrow confidence interval,

23   if you have a wide one, if it crosses one, none of

24   that is going to affect what the actual relative risk

25   says.  The relative risk always says risk in talcum

McTiernan - Direct/Ms. Parfitt

744

1    powder use versus risk without.  That's a key

2    comparison.  The confidence interval is a statistical

3    tool that helps us interpret.  Confidence intervals

4    can range widely.  They will always be around the

5    relative risk.

6    Q.    Can you give us an example.

7    A.    Look at the top one.  That studies relative

8    risk.  It was approximately 1.4.  I should explain.

9    Along the very bottom here we have numbers that refer

10   to a number, that's a relative risk.  A risk of one is

11   no effect, no association.  If it is a relative risk

12   of 1.2, that would be a 20 percent increased risk for

13   users versus nonusers.  If it is to the left of the

14   line, it would be a lower risk in users versus

15   nonusers.  If the confidence interval crosses 1, so if

16   it includes one --

17   Q.    Take an example where it crosses 1.

18   A.    You can see right here it's called Moorman.

19   That study's relative risk was to the right of the

20   line.  It was a positive relative risk.  But the

21   confidence interval crossed the line, so it suggests

22   in the universe the relative risk can fall below 1.

23   It could be a negative risk or it could increase risk

24   because the line also goes to the right.

25   Q.    A situation or study like that where the

McTiernan - Direct/Ms. Parfitt

745

1    confidence interval, the lower bound is below 1, the

2    upper bound is above 1, you now said crossed 1.  Is

3    that correct?

4    A.    Yes.

5    Q.    What does that do to the significance of the

6    relative risk, the relative risk is above 1?

7    A.    It doesn't change the relative risk at all.  It

8    tells you in the universe, if you knew every person

9    who had ovarian cancer or not, you would have a

10   95 percent chance of it falling somewhere in that line

11   in that confidence area.  It is an estimate where a

12   relative risk might lie.

13   Q.    Is that reliable information, information that

14   scientists should recognize and consider in their

15   evaluation of studies?

16   A.    It is useful, yes.  The statisticians tell us

17   not to use it to determine if there is an effect or

18   not or what the effect size is.  They tell us it is

19   always the relative risk, and that's how I have

20   interpreted it.

21         People use this -- many scientists use this

22   term "statistical significance."  Statistical

23   significance wasn't invented by statisticians who

24   invented the tools.  It was more people that apply it,

25   and some people will say that a study is not

McTiernan - Direct/Ms. Parfitt

746

1    statistically significant if the confidence interval

2    includes one  if it extends across that line.

3    Q.    Dr. McTiernan, does a nonsignificant relative

4    risk, meaning that the confidence interval is less

5    than 1, mean that there is no association between the

6    exposure, in this case talcum powder products, and the

7    outcome ovarian cancer?

8    A.    It does not.  The association is driven by the

9    relative risk.  The confidence interval tells you how

10   likely, if you did know everything, that the relative

11   risk would fall within that confidence interval.

12   That's why it is called confidence interval -- how

13   confident you could be that's where it would fall if

14   you knew the totality of evidence.

15        The one thing -- there are two things that

16   determine what the confidence interval is.  One is how

17   large the sample size is.  Large sample size is always

18   better because it gives you more precision.  You are

19   more confident your relative risk falls within the

20   confidence interval.  Confidence intervals tend to be

21   smaller in the very larger studies.

22        The other thing that drives it is variability

23   around the average measure.

24   Q.    What do you mean by that?

25   A.    How variable were the numbers; was there a lot

747

1    of noise in the data.  And so much of that is driven

2    by sample size again, and some of it is driven just by

3    the nature of the data.

4         I've looked at thousands of forest plots in my

5    daily work.  I look at them all the time.  It is

6    unusual for a forest plot to show this distribution

7    when most things are to the right of the line --

8    Q.    Can you show us again?

9    A.    -- to the right of 1.0.  This tells us we have

10   quite a bit of consistency across the studies.

11   Q.    Is that to the right of the line?

12   A.    To the right of the line.

13        Most of the studies, almost all, except for

14   two studies, each of those dots refer to a study with

15   a couple of exceptions, almost all those dots, each

16   dot refers to the relative risk, and almost all of

17   them and to the right of the line with two studies

18   exception, one case-control study and one cohort

19   study.  There are a couple of studies that are

20   referred to twice here because they provided their

21   data separately for subgroups.

22        For example, Moorman was a study in white

23   women and black women and that presented the data

24   separately.  We couldn't combine it.  Booth presented

25   data separately for daily and weekly use, and there

McTiernan - Direct/Ms. Parfitt

748

1   wasn't a way to combine them.

2   Q.    Dr. McTiernan, you were talking about the

3   case-control.  Below that dark black line we have some

4   other studies.

5   A.    I was just about to get to that.  The cohort

6   studies we put separately because some of the data is

7   a little bit different.  In the cohort study, we put

8   the name, the nationality, the number of the cases --

9   again, a key variable.  And the next column says

10  "noncases."  These were women in the cohort who did

11  not develop ovarian cancer.

12          The following column is the follow-up years.

13          The next column -- the next few columns are

14  the same as above.  Dose-response is addressed or not,

15  relative risk, and the confidence interval.

16  Q.    How many cohort studies did you evaluate?

17  A.    This represents three cohort studies, even

18  though there are five lines there.  Gonzalez was from

19  the Sister Study, Houghton was the Women's Health

20  Initiative study I'm very familiar with, and the

21  following three -- Gertig, Gates, 2008, 2010 -- all

22  come from the Nurses' Health Study.  Three

23  publications from one study.

24  Q.    I think you mentioned the cases would be the

25  number of ovarian cancer cases regardless of the

McTiernan - Direct/Ms. Parfitt

749

1    number of women that were enrolled?

2    A.    That's right.  Again, it is the key variable for

3    knowing how to interpret these studies.  Gertig 2000

4    when that study was published, there were 307 cases.

5    The next study, Gates 2008, they chose 210 of those

6    cases to put in another study.  It is not really an

7    update.  Gates 2010 had followed the women longer, and

8    by that time there were 797 cases.

9    Q.    We'll discuss those a little bit more in a

10   little bit.

11          While you were discussing the tables and the

12   relevant parts of that table, there is something

13   called the p-Value.  What is the p-Value?

14   A.    The p-Value is not presented here but some

15   studies did show them in the data.  P-Value is another

16   statistical tool that gives us an idea of how to

17   interpret data.  So a p-Value refers to the likelihood

18   of rejecting hypothesis that there is no association.

19   We call that the null effect.  That's exactly what the

20   p-Value is.  So the p-Value ranges between zero and 1.

21   If a p-Value is, for example .05, that tells us that

22   on an estimated five times out of 100, we would make a

23   mistake by saying there is an effect when there really

24   was no effect.  That's a small amount.  If a p-Value

25   was .5, that tells us half the time we would make a

McTiernan - Direct/Ms. Parfitt

750

1  mistake by rejecting this, what we call null

2  hypothesis.

3       The statisticians that developed the tool

4  advised that people present what the p-Value is rather

5  than using any particular cut point.

6  Q.    "Cut point"?

7  A.    Yes.

8  Q.    What does that mean?

9  A.    Some scientists over time have developed -- I'm

10 trying to think of the word.

11 Q.    Convention?

12 A.    (Continuing) -- convention.  Thank you.  Have

13 commonly used a p-Value at certain levels and said

14 above that level is not statistically significant.

15 Below that level is statistically significant.

16 Q.    And what's that number, what's that convention?

17 A.    There are several conventions, but one that is

18 commonly used is P equals .05.  If it's that or less

19 some people would say that's a statistically

20 significant result.  If it is above that, they will

21 say that is not statistically significant.

22 Q.    What is the difference between a p-Value that is

23 less than .06 versus a p-Value that is less than .05?

24 A.    Virtually nothing.  It just means six times out

25 of 100 you would make a mistake by rejecting the

McTiernan - Direct/Ms. Parfitt

751

1    hypothesis that there is no effect versus five times

2    out of 100.  So, in reality, the statisticians tell us

3    and the American Statistical Association came out

4    clearly saying this is what you should do is say what

5    the p-Value is and not use a line in the sand to say

6    one is a valid result and one is not a valid result;

7    one is reliable and one is not reliable.  We don't

8    talk about p-Values here in the relative risk for

9    individual study.  But later on, when we talk about

10   dose-response, we will be presenting some p-Values.

11   Q.    Would it be appropriate as a scientist to

12   dismiss studies due to their p-Value?

13   A.    I believe it would be especially when you are

14   looking in the totality of evidence than to say one

15   study is statistically significant and one is not,

16   and, therefore, to dismiss the one where the p-Value

17   is greater than something doesn't give you the full

18   picture.  You really need the full picture.

19   Q.    Would it be inappropriate methodology to dismiss

20   as a finding a result that is not statistically

21   significant?

22   A.    To dismiss a study that is not significant, not

23   statistically significant?  It would be inappropriate

24   to dismiss that, yes.

25   Q.    It would be inappropriate?

McTiernan - Direct/Ms. Parfitt

752

1    A.    Inappropriate.

2    Q.    Dr. McTiernan, looking at this forest plot of

3    both case-control and cohort studies, what does the

4    data from this forest plot of the epidemiological

5    studies that you reviewed both case-control and cohort

6    tell us about the consistency of the data from your

7    review?

8    A.    It tells me it is remarkably consistent because

9    you could see that almost all of those relative risk

10   data points are to the right of the line.  They are

11   all indicating increased risk in ovarian cancer in

12   women who used talcum powder products compared to

13   women who do not use them.

14   Q.    That's regardless of study design.  Is that

15   correct?

16   A.    Yes.

17   Q.    Did you evaluate the role of chance as a

18   possible explanation for these study results, and if

19   you would tell us what does chance mean?

20   A.    You evaluate chance by looking at totality of

21   evidence.  You can't really tell chance by any of

22   these individual statistics.  It is not the correct

23   way to evaluate a statistic to say it only tells you

24   about chance.  The p-Value is really just how

25   incorrect would you be to reject a null hypothesis.

McTiernan - Direct/Ms. Parfitt

753

1    Q.    Now, in addition to the cases of all ovarian,

2    did you look at any subtypes of ovarian cancer?

3    A.    We did.   There are different types of ovarian

4    cancer.   90 percent of ovarian cancers are epithelial.

5    That's the surrounding area, the outside area of the

6    ovary.   Of those 70 are what we call serous, and there

7    are smaller percentages of other types of cancer.

8    There is enough data in several studies to look

9    separately at those women who develop serous ovarian

10   cancer compared to those -- in this case compared to

11   controls.

12   Q.    From your review of the case-control and cohort

13   study, looking at serous ovarian cancer, were you able

14   to render an opinion regarding the consistency of

15   those study results?

16   A.    Yes.   This slide has both the overall on top but

17   then the serous cancers on the bottom.   You really can

18   see again remarkable consistency.   The relative risks

19   are all to the right of the line under serous.   You

20   really see it is a consistent finding.

21        Again, on this slide we also just indicated

22   the relative risk and the confidence intervals.   You

23   see this across the study types.   You do see wide

24   confidence intervals for the serous, and that is

25   because these sample sizes are much smaller than for

McTiernan - Direct/Ms. Parfitt

754

1    the overall cancers.  You can see this in this

2    graphic.  If you compare the top, they tend to have

3    more narrow confidence intervals, more precise.  It is

4    wider in the bottom because they are smaller studies.

5    Sample size really matters.  The reason why they are

6    smaller, only about half the women in the studies that

7    can look at this were serous.

8    Q.    Again, to be clear, for instance, at the top

9    when you have that tight line, is that more precision

10   or less precision?

11   A.    More precision.

12   Q.    Of the smaller line?

13   A.    Yes.

14   Q.    Give us an example.  And a broad line would

15   suggest what?

16   A.    A broad line tells me it is a smaller sample

17   size and that there is less precision in that

18   estimate.  But, again, it doesn't affect the relative

19   risk.  It just affects what might happen in the

20   totality of what the real result might be if you had

21   the universe.

22   Q.    Dr. McTiernan, now that we have looked at the

23   data from the case-control and the cohort studies --

24   and would you call that source data?

25   A.    Source studies.

McTiernan - Direct/Ms. Parfitt

755

1    Q.    -- is there a standardized way to look at the

2    source studies overall or in the aggregate?

3    A.    Yes.  Meta-analyses are very useful, and in this

4    case we have seven meta-analysis that had been

5    published by the time I prepared my expert report, and

6    an additional study was made public after my report

7    was published.  That's the one at the top called

8    Taher.

9    Q.    You published meta-analysis and pooled analysis?

10   A.    I have, yes.

11   Q.    Tell us the importance or not of the information

12   that you gleaned from the meta-analysis and the pooled

13   studies, its advantages and disadvantages.

14   A.    So we presented much of the same data on this

15   slide for the individual studies with some

16   differences.  So, again, the study name and year is

17   presented.  We also wrote the number of studies

18   available in the next column.  This study, if you look

19   at the first meta-analysis that was published in 1992,

20   there were only six studies available at that time.

21   As we go up by year, you see more studies available.

22   By the time we get to the most recent meta-analyses,

23   they have the largest number of studies.  27 studies

24   in each one.

25   Q.    As you move up from Harlow in 1992, are you

McTiernan - Direct/Ms. Parfitt

756

1    looking at the same study, the studies that were

2    included in Harlow and some additional studies?

3    A.    Yes.   Each newer meta-analysis would subsume the

4    other studies below.   So we look at all of the

5    studies.   It is important to look at them and see what

6    was the knowledge at the time it was published.   But

7    the most valid, in my opinion, studies to look at are

8    going to be the three most recent.   They all have 27

9    studies in them.   They are very comprehensive.

10          We also included the number of cases in the

11   next line where they were available.   You can see from

12   the top two studies we have many more cases available

13   than were available for the individual source studies,

14   17,000 and 14,000 respectively.

15   Q.    Those are actual cases of ovarian cancer?

16   A.    Cases of ovarian cancer, yes.

17          Then we looked at whether they evaluated for

18   dose-response and then what the summary relative risk.

19   This is a relative risk calculated from the individual

20   studies data and their confidence intervals.

21   Q.    What does this information with regard to the

22   relative risk of the studies -- how does this inform

23   your opinion with regard to the totality of those

24   meta-analysis and pooled studies?

25   A.    This really helped form my opinion because I was

McTiernan - Direct/Ms. Parfitt

757

1   able to see what the data looked like overall, what's

2   the overall summary of what is happening in terms of

3   risk of ovarian cancer in talcum powder product users

4   compared to non-users.

5   Q.    What information does it provide you with regard

6   to the strength of the studies?

7   A.    It tells me the strength because of the

8   consistency across those studies and it tells me a

9   precise number.  I like to think, What is the relative

10  risk?  In this case it ranges between, for the most

11  comprehensive studies, this ranges between 1.22 to

12  1.31.  That's between a 22 to a 31 percent increased

13  risk of ovarian cancer in product users versus

14  non-users.

15  Q.    You got Langseth there that says 1.35?

16  A.    Langseth was older and there are 20 studies

17  there.  So it's not the most comprehensive.

18  Q.    You have Terry below there under pooled.  Did

19  you consider the totality of the meta-analysis and the

20  pooled analysis?

21  A.    I looked at both.  Terry is different.  We have

22  it separate because it is a different type of study.

23        The pooled analysis, again, is when

24  investigators share the actual data with the

25  coordinating center.  They have the opportunity of

McTiernan - Direct/Ms. Parfitt

758

1   having all the data on talcum powder products and on

2   ovarian cancer, but they also have information about

3   other variables to adjust their study for different

4   variables in case that could affect the result.

5   Q.    When you adjust their study for different

6   variables what are you speaking of?

7   A.    Sometimes in studies with humans when you are

8   trying to determine what effect some variable might

9   have on disease, there could be intervening variables.

10  We call them potential confounding variables.  That's

11  the type of variable if it is associated both with the

12  disease and with the exposure it could be influencing

13  results.

14  Q.    Give an example.

15  A.    An example might be, a commonly used example is

16  cigarette smokers and lung cancer.  If you did a study

17  and you determined that individuals who carry matches

18  have increased risk of lung cancer, you may be

19  misinterpreting the data.  And it is really about

20  smokers who carry matches, and it is the smoking that

21  causes lung cancer.

22        That is just one example.  In that case, you

23  might want to adjust for those variables, and you find

24  out matches don't cause lung cancer.

25  Q.    As you reviewed the various studies, did your

McTiernan - Direct/Ms. Parfitt

759

1    part of your systematic analysis include ruling out --

2    rather, examining the studies to see whether or not

3    confounding was addressed and whether it was adjusted

4    for confounding?

5    A.    I looked at that.  In all but one of the

6    case-control studies presented the information on

7    confounders.  The problem with confounding, you can't

8    assume from reading the paper that these are all the

9    potential confounding variables because the studies

10   will present the confounding variables and they will

11   present them for their data for their own study; and

12   you can't assume something should be a confounder, if

13   it wasn't in that study. It's always study specific,

14   the confounding.

15        I did go through the exercise of looking at

16   those individual studies that had reported on when

17   they took the confounders into account and when they

18   didn't, when they had a relative risk that was just a

19   plain old relative risk and then had one that was

20   adjusted for these confounders and ten presented both

21   of those types of data, and the relative risks were

22   almost identical in all but one, and that one only

23   changed, that relative risk changed a small amount.

24   That tells me if the relative risks don't change with

25   adjusting for confounding, then it really wasn't a

McTiernan - Direct/Ms. Parfitt

760

1    problem in their study.  If the relative risk looks

2    the same after adjustment, then it didn't affect the

3    relative risk.

4    Q.    Thank you.

5    A.    That was one of the benefits of a pooled

6    analysis.  You can check all that information and you

7    can adjust fully for all of the potential confounders

8    you know about.

9          The Terry study, it's a pooled analysis, and

10   it tells us they had 8,525 cases, a large number, and

11   it tells us they found a 24 percent increased risk of

12   ovarian cancer in using the statistical term, it was

13   statistically significant because the confidence

14   interval does not include one.

15   Q.    Dr. McTiernan, one last question, and we will

16   keep moving in the interest of time.

17         Looking at the relative risk for all the

18   meta-analysis and the pooled analysis, did any of the

19   lower bound confidence intervals, were any below 1?

20   A.    No.

21   Q.    What if any information did that provide?

22   A.    If you use the common terms, it would be the

23   always statistically significant.  The ones at the top

24   have -- are much more narrow and that tells me sample

25   size is bigger.  There is more precision to those

McTiernan - Direct/Ms. Parfitt

761

1    estimates in the most recent ones.  So I relied more

2    heavily on those more recent meta-analyses and the

3    pooled analysis.

4    Q.    Before we go on and touch on the various

5    studies, I believe you -- did you do a forest plot for

6    the serous group?

7    A.    Yes.

8    Q.    Again, why did you select serous versus some

9    other type of epithelial ovarian cancer?

10   A.    It was the most common subtype available in

11   these various studies, the most common data and most

12   common presented in these studies.  It accounts for

13   about half of all ovarian cancers.  It is a very

14   relevant one to present.

15   Q.    If you can sum up what this information tells us

16   with regard to the study findings.

17   A.    It suggests the relative risk of serous ranges

18   between 1.24 -- I'm going to say 32 because while

19   Taher influences me, it is not yet published, but it

20   is very interesting it is also in the same range.  So

21   increased relative risk of serous cancer with talcum

22   powder product use.  The confidence intervals are

23   narrow.  It tells me it is a precise estimate.

24   Q.    What does that information tell you about the

25   strength of the evidence?

McTiernan - Direct/Ms. Parfitt

762

1    A.    It tells me exact numbers.  I like to use that

2    to know what the exact level of increased risk is,

3    1.22 to 4-to-1.32.

4    Q.    You look at the number?

5    A.    I look at what the relative risk is telling us

6    what the data is showing.

7    Q.    So strength, in your opinion, is equated with

8    the relative risk number.  Is that correct?

9    A.    Yes.

10   Q.    You've talked about the various case-control,

11   cohorts, meta-analysis, pooled analysis.  What is

12   replication?

13   A.    Replication would be different, in different

14   types of research.  But in epidemiology we don't just

15   replicate results.  We look at totality of evidence.

16   So somebody might publish a study.  We wouldn't

17   necessarily design and produce an exact replica of

18   that.  What we do is determine a question, design a

19   study, look at important variables, and then look at

20   results.  But when you see similar findings across

21   different studies, across different areas, that is

22   akin to replication.  It tells you that you have

23   reliable findings.

24   Q.    Dr. McTiernan, what I want to do now is just

25   move briefly into a few of the studies, if I may.

McTiernan - Direct/Ms. Parfitt

763

1           First, is there a perfect study?

2   A.     No.

3   Q.     How many cohort studies did you say you looked

4   at?

5   A.     The three cohort studies.

6   Q.     Did you examine for purposes of your opinions

7   not only the three cohort studies, but their strengths

8   and weaknesses?

9   A.     I did, yes.

10  Q.     Did you do that as well for the case-control

11  studies?

12  A.     I did.

13  Q.     Briefly walk us through the cohort studies, tell

14  us the basic background, what the strength and

15  weaknesses are.  And we're going to do the same

16  generally about the case-control and then move on to

17  Bradford Hill.

18  A.     The three cohort studies were conducted in this

19  area.  The first was Nurses' Health Study.  In their

20  analysis they included 78,000 women.  By the time they

21  did their analysis, they had 307 cases of ovarian

22  cancer developed.  They collected their information on

23  the talcum powder product use in 1982.  They did not

24  update it.  Their question was on powders in general.

25  Q.     The questionnaire?

McTiernan - Direct/Ms. Parfitt

764

1    A.    The questionnaire was on powders in general

2    including talc and other powders.  It was not updated.

3    They asked about ever use, how often they used it, but

4    they didn't ask for how long they had used it.

5          Overall, for ovarian cancer they found a

6    relative risk of 1.09.  They did not see a

7    dose-response.

8          And for serous, they found a relative risk of

9    1.4.  So this was comparing users versus non-users.

10   Q.    How do you evaluate those numbers?  Are those

11   positive numbers?  Negative numbers?

12   A.    Yes.  Both in the positive direction for

13   confidence interval for ovarian cancer including 1;

14   confidence interval for serous did not include 1.

15   Q.    So for serous ovarian cancer, if you use the

16   nomenclature "statistically significant," was that

17   study statistically significant?

18   A.    Yes.

19   Q.    For ovarian cancer, was that a positive or

20   negative finding?

21   A.    It was a positive relative risk, but not

22   statistically significant, if you use the criteria of

23   crossing 1.

24         So strengths of cohort study for this specific

25   instance that it limits recall bias.  Recall bias is a

McTiernan - Direct/Ms. Parfitt

765

1  theoretical problem for case-control studies.  If

2  cases remembered use of something of a talcum powder

3  product differently than controls do, a prospective

4  cohort study is unlikely to have recall bias because

5  the women don't have ovarian cancer when they enter a

6  study.

7       There were some weaknesses, and I've listed

8  them here.  They were missing quite a bit of data.

9  They didn't ask about duration of use.  Their

10 exposures were potentially misclassified because they

11 didn't update.  If somebody was classified as a

12 nonuser at study entry and they started using, you

13 wouldn't know that.  If they were classified as a user

14 and stopped, you wouldn't know that.

15 Q.    What would that do to the relative risk?

16 A.    It would attenuate it, lower it.  It would make

17 it look like it's closer to 1 than it is in fact.

18      This is an issue for incomplete data for

19 either case-control or cohort studies.  In these cases

20 where the cohort studies did not update their data, we

21 call that that they had insufficient exposure level,

22 and it could make the relative risk look lower.

23 Q.    The relative risk may look lower than what it

24 actually is?

25 A.    Yes.  Small sample size gave it insufficient

McTiernan - Direct/Ms. Parfitt

766

1    power, and power is a statistical term to describe how

2    you need larger sample sizes to find the relative

3    risk, and it was nurses only.

4         I won't talk about the middle study.  It was

5    really just a subset for doing a genetic study.

6         Gates 2010, they followed women until they

7    developed ovarian cancer, by this time 797 women.  All

8    of the issues about this study are the same as the

9    first publication with one exception.  Under

10   "findings" they chose to use a different way of

11   classifying the participants.  So instead of comparing

12   users to non-users, they added together women who had

13   used a little bit, who had used less than once a week

14   to the non-users.

15   Q.   So in Gates 2010, they combined someone who was

16   not a user with someone who might have used the

17   product less than one week?

18   A.   Yes.

19   Q.   What does that do to the relative risk?

20   A.   That would attenuate the relative risk as well.

21   Q.   It could drive the risk down?

22   A.   Yes.

23   Q.   Please.

24   A.   So, otherwise, the other issues are the same.

25   They found a relative risk of 1.06 for overall ovarian

McTiernan - Direct/Ms. Parfitt

767

1  cancer and for serous ovarian cancer.

2  Q.    That relative risk of 1.06, is that a positive

3  relative risk?

4  A.    It is in the positive direction confidence

5  intervals include one.

6  Q.    The weaknesses that you just discussed with

7  Gertig 2000 would be very similar with Gates 2010.   Is

8  that correct?

9  A.    Yes.

10 Q.    Let's move to the next cohort study that you

11 reviewed.

12 A.    This is the Women's Health Initiative, one I

13 know very well because I was the project director and

14 very involved with this study when the questionnaire

15 was developed, and procedures and protocols were

16 developed.

17 Q.    How long were you involved in that study?

18 A.    15 years altogether.   I was project director for

19 five years; and after that I continued to lead the

20 outcomes evaluation part of the study.   So this study

21 had 93,000 women when it began; and by the time the

22 data collection was completed for this particular

23 study, 429 cases of ovarian cancer had occurred.   The

24 women completed information on use of powders similar

25 to the Nurses' Health Study by self-administered form

McTiernan - Direct/Ms. Parfitt

768

1   and by asking about general question about powders to

2   the private area.  The questionnaire asked about

3   duration but not frequency.

4   Q.    What's the follow-up to that?

5   A.    12 years.  And, again, it was not updated.  So

6   if somebody changed their exposure, you wouldn't know

7   it.  If they became a user, you wouldn't know it.  If

8   they became a nonuser, you wouldn't know it.  The

9   impact of that is to lower the relative risk or to

10  move it closer to 1.

11  Q.    What were the findings?

12  A.    For all ovarian cancer there is a 12 percent

13  increased risk similar to serous cancer, 13 percent

14  increased risk, but the confidence intervals included

15  1, positive relative risk.

16  Q.    Weaknesses?  Strengths?

17  A.    Strength, again, limits recall bias.  The

18  weaknesses are very similar to what we see for the

19  Nurses' Health Study.  There is a power issue because

20  of the small sample size.  Here sample size is key,

21  the number of cases that develop.  In a cohort study,

22  the only reason for enrolling so many women in a study

23  is to get enough cases.  In this case 429 cases is the

24  important number.  It was small compared to what you

25  need.

McTiernan - Direct/Ms. Parfitt

769

1  Q.    Going through those five weaknesses, missing

2  data, what does that do to the relative risk?  Does it

3  drive it higher?

4  A.    It would drive it lower, make it weaker, closer

5  to 1.

6  Q.    Exposure, not updated.  What would that do to

7  the relative risk?

8  A.    Same thing.  That would be part of incomplete

9  exposure information, it would attenuate it down.

10  Q.    Insufficient power number of cases?

11  A.    Same thing.  Not enough numbers.  It is more

12  difficult.  If you have a smaller sample size, it is

13  more difficult to find the relative risk in this range

14  that we're looking at.  We're looking at relative risk

15  1.2 to 1.4; and to find that in studies, you need a

16  larger sample size.

17         THE COURT:  I have a question, Dr. McTiernan,

18  before we go on.

19         For instance, when you indicated incomplete

20  dose-response analysis, you said you were the project

21  director for this.  You pointed out these are

22  weaknesses.  Why was it constructed in this way?

23         THE WITNESS:  Excellent question.  The Women's

24  Health Initiative was designed like many cohorts to

25  look at so many different outcomes, heart disease,

McTiernan - Direct/Ms. Parfitt

770

1    fractures, breast cancer, colorectal cancer.  So we

2    had to look at variables, risk factors for all of

3    those.

4         So in an ideal form questionnaire you would

5    have details on every single variable to a great

6    degree, as much data as you can collect.  This was a

7    government contract, and the government limited how

8    many pages we could ask the women to complete.  It was

9    a paper issue.  And so we really -- the committees

10   that worked on this had to limit the length of the

11   questionnaires, and that meant limiting how much

12   information we could collect on each question.

13   Perineal products use is really only relevant to

14   gynecologic cancers.  It wasn't asked for purpose of

15   looking at heart disease or breast cancer.

16        THE COURT:  So what you're telling me, this

17   was an initiative that was not specifically directed

18   towards talc and ovarian cancer.  There were a lot of

19   other health issues being addressed, a much broader

20   study?

21        THE WITNESS:  Yes.  You described it much

22   better than I do.  Thank you.

23        But the same is true for the Nurses' Health

24   Study and Sister Study.  They weren't designed

25   specifically for ovarian cancer.  By design,

McTiernan - Direct/Ms. Parfitt

771

1  case-control studies are designed for ovarian cancer.

2  That's one of the strengths of a case-control study,

3  strength of a cohort study, is that it is prospective,

4  limits this recall bias issue.

5         THE COURT:  For a cohort study, that was only

6  directed to the one issue that would be different?

7         THE WITNESS:  If you could do that, yes.

8  There aren't too many, but some of them do.

9         THE COURT:  Thank you for clarifying there are

10  other studies broader based as well.

11  BY MS. PARFITT:

12  Q.    Let's move on to the last cohort study that you

13  examined.

14  A.    Gonzalez was the cohort study called the Sister

15  Study, and to be in the study an individual had to

16  have a sister with breast cancer; and this is a

17  government-run study, and the main goal is to look at

18  risk factors for breast cancer.

19         So the sample size is designed for breast

20  cancer, and many of the questions are designed for

21  breast cancer.  They asked women when they entered the

22  study whether use of talc was in the 12 months before

23  enrollment, and they followed the women for just six

24  years before they decided to analyze these data.

25  Q.    12 months before the study, what is the

McTiernan - Direct/Ms. Parfitt

772

1   significance of that?

2   A.    It is very low exposure data, and the resulting

3   data are consistent with that.  Only about 13 percent

4   of women said, Yes, I used talc, because they only

5   asked about 12 months.  So if they asked about

6   lifetime or ever, they might have gotten a larger

7   number, but they only found out for 12 months.

8          So by the time they followed these women over

9   six years, they had 154 cases.  One thing that's very

10  important about this study is that they didn't confirm

11  many of the cases.  They only confirmed about two

12  thirds in fact had ovarian cancer.  I didn't mention

13  the other two cohorts were very good and did confirm

14  ovarian cancer.  That's really critical to know:  Did

15  this person really have ovarian cancer?  So the

16  results are no dose-response information in the study.

17  Q.    Some people have referred to this as the

18  "doucing" study.  How did douching weigh into the

19  results of the Sister Study?

20  A.    They did find douching did increase risk.  It

21  was also douching in the last 12 months.  But then

22  they adjusted for that variable and other potential

23  confounders and found it didn't affect the results.

24  With or without adjustment for douching, the relative

25  risk was approximately .7.  It was below 1, but it

McTiernan - Direct/Ms. Parfitt

773

1  didn't change by adjusting for it or not.

2  Q.    So based upon this study, what information does

3  it provide you with regard to studies in general,

4  adjusting or not adjusting for douching, and how that

5  might impact study results?

6  A.    It tells us for this study it was not a

7  confounder.  It didn't affect, even though it was

8  related to the disease and related to the other

9  exposure, it didn't make any difference to adjust for

10  it.

11        In terms of strength, the same strength as the

12  other cohort studies.  One of the main issues in my

13  mind is the very small sample size, 154 cases only,

14  and that there was a poor confirmation of cancer

15  diagnosis.

16  Q.    What would those limitations do to the relative

17  risk?

18  A.    Again, it would attenuate relative risk.

19  Q.    Let's move quickly, if we can, to the

20  case-control studies, and then we'll try to get down

21  the home stretch here.

22        There are some case-control studies we're not

23  going to describe each individual one.  Did you take

24  into consideration the limitations and strengths of

25  all of the case-control studies as well?

McTiernan - Direct/Ms. Parfitt

774

1   A.    Absolutely, and I wrote about each one in my

2   report.

3   Q.    In the meta-analyses and the pooled?

4   A.    Yes.

5         MS. PARFITT:  Your Honor has your report.

6   Q.    So if you can briefly discuss what they are and

7   we could move on.

8   A.    Strengths of this is the ascertainment of cases

9   was excellent.  I should mention the control of the

10  cohort studies, two of them had excellent

11  ascertainment of cases.  Most of the case-control

12  studies had detailed lifetime exposure information on

13  talcum powder product use.  Many were

14  population-based, and those are generalizable to the

15  population from which they are taken.

16        The larger case-control studies had what we

17  call sufficient power to determine the relative risk

18  that we are looking at, 1.2-to-1.4.  The potential

19  limitations, some of them did have insufficient power,

20  some were very small, especially the older studies.

21        As the newer studies came along, they realized

22  they needed to make their studies larger, and there

23  were.  There was some potential for exposure

24  misclassification here as well, if the study didn't

25  ask about fully, about lifetime use or if the women

McTiernan - Direct/Ms. Parfitt

775

1    didn't recall.

2         Case-control studies always have the potential

3    for recall bias.  Some methodologists say that's more

4    of a theoretical reason.

5    Q.    What does recall bias mean?

6    A.    If the cases remember something more or more

7    easily than do the controls, there could be a bias

8    between their findings, between their results.  Again,

9    the methodologists that look at this say it is more

10   theoretical but it is still something to consider.

11   Q.    Based upon your review of all of these

12   case-control, cohort studies, the study designs, what

13   is your opinion with regard to whether or not recall

14   bias impacted study findings?

15   A.    I think it is less likely because you have such

16   consistency across studies.  What is interesting is

17   that within studies, those that we're able to look at

18   type of ovarian cancer, this finding was seen only in

19   epithelial ovarian cancer, not in the other types.

20   There is a small number of cases that were not

21   epithelial.  You didn't see that association with

22   talcum powder product use.  If a woman with ovarian

23   cancer is more likely to recall use of these products,

24   you would expect to see it across all types of ovarian

25   cancer and you didn't see it in all types.

McTiernan - Direct/Ms. Parfitt

776

1    Q.    And you didn't see that?

2    A.    And you didn't see it in all types.  In all

3    epidemiologic studies there is potential for

4    confounding, and that's when an intervening variable

5    is affecting the results.  So I considered that in all

6    and looked to see whether they had adjusted for

7    confounding.

8    Q.    Dr. McTiernan, in spite of all the limitations

9    and strengths you considered with regard to the

10   epidemiological studies, are you confident in your

11   opinions talcum powder products cause ovarian cancer?

12   A.    I am, yes.

13         THE COURT:  Let's take our break now.

14         THE DEPUTY CLERK:  All rise.

15         (Recess.)

16

17

18

19

20

21

22

23

24

25

777

1          THE DEPUTY CLERK:  All rise.

2          THE COURT:  Thank you.

3

4

5   **ANNE MC TIERNAN,** resumed.

6

7   DIRECT EXAMINATION (continued)

8   BY MS. PARFITT:

9   Q.    Dr. McTiernan, when we took the quick break, we

10  were about to begin a discussion about the methodology

11  you employed for assessing talcum powder products can

12  cause ovarian cancer.  What is the methodology you

13  employed in order to make your causality assessment?

14  A.    I applied a Bradford Hill causation process

15  which involves investigating several aspects of

16  causation.  I looked at strength, temporality,

17  coherency, specificity, dose-response, experiment,

18  consistency, plausibility and analogy.  And then I

19  weighed the evidence and made a conclusion.

20  Q.    These Bradford Hill guidelines, are these

21  guidelines that are generally-accepted and recognized

22  by scientific bodies, both nationally and

23  internationally?

24  A.    Yes.

25  Q.    Are they a checklist of items?

McTiernan - Direct/Ms. Parfitt

778

1   A.     No, they are not.

2   Q.     What are they?

3   A.     They are aspects to consider.  Some may be

4   important for an issue and some may be less important.

5   Q.    For purposes of your opinion, did you consider

6   all of the nine factors?

7   A.    I did consider them all.

8   Q.    I would like to have you walk us through the

9   various aspects that you considered.  We already

10  talked and spent some time on the first one, strength.

11  My question to you is, did you, for purposes of your

12  opinion on causality, assess the strength of your

13  association?

14  A.    I did.

15          Looking at the data overall, I concluded the

16  risk of ovarian cancer was increased by 22 to

17  31 percent in users of these products compared to

18  non-users.

19  Q.    Is there a minimum relative risk?

20          THE COURT:  What was the percentage again?

21          THE WITNESS:  22 to 31 percent.

22          THE COURT:  Thank you.

23  Q.    Is there a minimum relative risk for a

24  determination of causality?

25  A.     There is not.

McTiernan - Direct/Ms. Parfitt

779

1   Q.   Dr. McTiernan, are there other examples of

2   exposure and disease where the associations are

3   similar to the associations you saw with talcum powder

4   products and ovarian cancer, briefly?

5   A.    There are several.  A couple that are relevant,

6   the Women's Health Initiative Clinical Trial --

7           MR. WILLIAMS:  Your Honor, I don't believe

8   this is in the report.  We are checking now.  I don't

9   believe it is in the report.

10          THE COURT:  Ms. Parfitt.

11          MS. PARFITT:  The two she picked were in the

12  report.  Do you want me to come back to that question?

13          MR. WILLIAMS:  That would be great.

14          THE COURT:  If there is an objection, you just

15  stop talking until we rule on it.

16          THE WITNESS:  Okay.

17          THE COURT:  Thank you.

18  Q.   You were starting to talk about HRT.  Was that

19  in your report?

20          MS. PARFITT:  I have it in the report, page 26

21  and 27.

22          MR. WILLIAMS:  Thank you, your Honor.

23          THE COURT:  SO we're back to the same

24  association question.

25  BY MS. PARFITT:

McTiernan - Direct/Ms. Parfitt

780

1  Q.    A couple of examples, and the first one you

2  started to speak about was HRT?

3  A.    The Women's Health Initiative Clinical Trial

4  found a relative risk of 1.26 in women assigned to a

5  hormone therapy for five years compared to placebo.

6  An observational study found a relative risk of 1.6

7  for HRT use.  This is for risk of breast cancer.

8  Q.    Any other examples?

9  A.    Another example is exposure to secondhand smoke.

10  I also found a relative risk in the similar range.

11  Q.    A similar range of the 1.2 to 1.31?

12  A.    Yes.

13  Q.    Let's move on to the next Bradford Hill aspect.

14  This would be consistency.  Again, we talked quite a

15  bit about the consistency earlier on in our

16  discussion.  What is your opinion with regard to

17  whether or not the Bradford Hill consideration of

18  consistency was met based upon your evaluation of the

19  literature and study you did?

20  A.    Across the studies -- and you could see it

21  visually in the forest plot.  There is a consistent

22  increased relative risk across studies for those who

23  were talcum powder users compared to non-users.

24  Q.    Over what period of time?

25  A.    Over from 1982 through 2016 and the results were

McTiernan - Direct/Ms. Parfitt

781

1  consistent across countries and across races and

2  ethnic groups as well as consistent within the studies

3  themselves.  You also see the same consistency with

4  serous cancer.  What is clear is that the important

5  thing to look at for consistency is the effect size,

6  the relative risk.  That determines consistency of

7  results in epidemiologic studies.

8  Q.    Let's move to a concept we haven't talked too

9  much about and biological plausibility.  Did you

10 consider biological plausibility for purposes of your

11 causation assessment?

12 A.    I did.

13 Q.    What is biological plausibility?

14 A.    Biological plausibility refers to does an

15 association make sense?  Is there some plausible

16 pathway through which exposure to these products can

17 cause cancer?

18 Q.    Is biological plausibility the same as

19 biological proof and biological certainty?

20 A.    No, it is not.

21 Q.    Why not?

22 A.    Biological plausibility the guideline is just

23 that if you determine a way in which this could

24 happen, that is sufficient to determine that a cause

25 could happen.

McTiernan - Direct/Ms. Parfitt

782

1    Q.    Based on the biology or science?

2    A.    This recognizes biology is a moving field.  At

3    one point we may understand more biology than what we

4    do at other points.

5    Q.    Dr. McTiernan, do you have an opinion whether it

6    is biologically plausible for talcum powder products

7    to cause ovarian cancer?

8    A.    Yes, I do.

9    Q.    What are those opinions?

10   A.    I believe talcum powder products, first of all,

11   contains known carcinogens, and there is a list of

12   them here, and IARC has been very clear that asbestos

13   causes ovarian cancer.  These several components or

14   constituents of talcum powder products are known

15   carcinogens, are classified as such by IARC, and these

16   constituents have been shown through various

17   laboratory studies and laboratory testing to be in

18   these products.

19        THE COURT:  Dr. McTiernan, you started by

20   saying, talking about known carcinogens, and you

21   mentioned the asbestos specifically.  Would your

22   opinion change if there was not asbestos in the talc?

23        THE WITNESS:  It wouldn't change because the

24   epidemiologic studies only asked about talcum powder

25   products.  They weren't able to ask the women, did you

McTiernan - Direct/Ms. Parfitt

783

1    use asbestos?  That is all from the product itself,

2    talcum powder product.

3    BY MS. PARFITT:

4    Q.    Dr. McTiernan, did you review any documents in

5    preparation for the opinions with regard to the

6    components of talcum powder products, just briefly?

7    A.    I did.  I reviewed some published literature.  I

8    reviewed some testing documents that were provided to

9    me by you and your colleagues showing that internal

10   testing by J&J and testing by Dr. Longo.

11         MR. WILLIAMS:  Objection to this line of

12   questioning concerning the J&J documents for purpose

13   of this hearing.

14         MS. PARFITT:  It was foundational, how she

15   finished forming her opinions --

16         THE COURT:  I'll let her talk about what she

17   reviewed without getting into the documents.

18   BY MS. PARFITT:

19   Q.    Did you review internal J&J testing documents?

20   A.    Yes.

21   Q.    Did you also review testing documents by

22   Dr. Longo?

23   A.    Yes.

24   Q.    Did you also review testing documents published

25   in the peer-reviewed literature?

McTiernan - Direct/Ms. Parfitt

784

1    A.    Yes.

2    Q.    And you reviewed IARC?

3    A.    I did.

4    Q.    Having reviewed that information, did you

5    satisfy yourself that talcum powder products that

6    Johnson & Johnson manufactured may contain these

7    component parts, these carcinogens?

8    A.    Yes.

9    Q.    For purposes of your opinion in this case, have

10   you made -- do you have the understanding that the

11   talcum powder products includes whatever is in the

12   talcum powder products, whether that be asbestos,

13   heavy metal and fragrance?

14   A.    Yes.

15   Q.    What is your next opinion?

16   A.    First, that the exposure that talcum powder

17   products can reach the Fallopian tubes and ovaries, it

18   is an open system and there is evidence that genital

19   application can migrate up through the genital tract.

20   We know from -- and in addition, these substances can

21   be inhaled and spread through the lymphatic system and

22   circulatory system.

23   Q.    What are the two pathways?

24   A.    Genital application and inhalation.  There has

25   been scientific clinical studies showing in humans --

McTiernan - Direct/Ms. Parfitt

785

1    we'll talk about migration -- that several clinical

2    studies in humans show that application of particles

3    of similar size to talc when applied to the genital

4    tract can move up to the Fallopian tubes and ovaries.

5    I keep saying "Fallopian tubes," which is relevant

6    because some ovarian cancers start in the Fallopian

7    tubes and then move up to the ovaries, so both

8    Fallopian tubes and ovaries are relevant.

9          So the substances have been applied either --

10   the substances themselves or a radioactive substance

11   or powder on gloves, and these were all when women

12   were about to have surgery, these substances were

13   applied; and when the women had surgery, hours or days

14   later the substances had migrated up.

15   Q.   Does that include talc particles as well?

16   A.   We know that talc is present in ovaries.  It was

17   shown to be present in several ovaries, and it was

18   shown to be present in lymph nodes, in the area around

19   the ovaries.  We know that in one study found that

20   after correcting for the surface contamination,

21   possibly in lymph nodes in that area, that inside the

22   lymph node there was talc, and it was highly

23   correlated with whether the woman reported use of

24   talc, that was McDonnell 2006 I listed there.

25   Q.   That's pathology?

McTiernan - Direct/Ms. Parfitt

786

1  A.    Pathology and clinical because the women

2  reported their use or not.  Yes, so talc is present

3  there.  It is in there.  The studies have shown that

4  substances can migrate.

5        The reasons the studies were not able to apply

6  talc and see if that migrates, it wouldn't be ethical

7  to do that.  They chose other substances, and many of

8  those were fertility type of studies.  They were able

9  to do those tests and see what happens.

10        The regulatory bodies also state that

11  migration is a plausible method for the substance

12  talcum powder product to reach the ovaries and

13  Fallopian tube, and the FDA stated it is

14  incontrovertible that it can migrate.

15        The next step I considered is what is a

16  possible pathway for carcinogenesis, and one I'm

17  interested in that I think is plausible is

18  inflammation.  We know from clinical studies that talc

19  when injected into the human body causes inflammation.

20  So there is a medical use of talc called.  It's called

21  a pleurodesis study.  This is for two types of

22  patients that develop air around their lung.  It's

23  called pneumothorax.  Some of those patients have

24  spontaneous pneumothorax and some have it because they

25  have a serious disease.  When talc is injected into

McTiernan - Direct/Ms. Parfitt

787

1    that area it causes inflammation that causes

2    adhesions, and that's why it is used as a one-time

3    treatment.  That inflammation shows up in the blood

4    within hours.  So we know that talc causes

5    inflammation.  Numerous animal studies show

6    inflammation and carcinogenic processes consistent

7    with carcinogenesis.

8            We know cell culture studies have shown that

9    talc applied can cause changes to cells that change

10   the genetics.  We call it epigenetics.  That can make

11   those changes that are premalignant and then can lead

12   to carcinogenesis.

13   Q.    You said epigenetics.

14   A.    Epigenetics.  Cancers of genetic disease, but

15   only about 10 percent of cancers are caused by genes

16   you inherit from your parents.

17           Other genetic causes are environment, and

18   talcum powder products is one environmental cause that

19   can affect the cell's genome and cause cancer that

20   way.

21   Q.    Any other credible scientific evidence that you

22   reviewed generally to support your opinion talc causes

23   an inflammatory pro-carcinogenic biologic effect in

24   the body?

25   A.    Yes.  We know from the in vitro and animal

McTiernan - Direct/Ms. Parfitt

788

1    studies that that can happen, and we know women who

2    have high inflammation in the blood have increased

3    risk for ovarian cancer.  Many of these cohort studies

4    have shown that.  We know women with inflammatory

5    conditions -- endometriosis, pelvic inflammatory

6    disease have increased risk.

7    Q.    Dr. McTiernan, have you included on your

8    demonstrative some of the studies that support both

9    pathologic studies, clinical studies, animal studies,

10   and in vitro studies to support this cascade of

11   events?

12   A.    Yes.

13   Q.    At the end of that, what happens?

14   A.    At the end of that, after inflammatory response

15   --

16   Q.    What is the role of inflammation on oxidative

17   stress, those things you have spoken about in the

18   pathogenesis of cancer?

19   A.    Inflammation, the process of that can cause

20   oxidative stress that then can cause genetic damage

21   and then cause cancer.

22        MS. PARFITT:  Dr. McTiernan -- and for the

23   Court, I made a misstatement on my McDonald.  I have

24   2006.  That should be McDonald 2019.

25        (Pause.)

McTiernan - Direct/Ms. Parfitt

789

1           MR. WILLIAMS:  Our objection, your Honor, is

2      that the McDonnell study was one that was discussed

3      expressly with the Court in chambers on a couple of

4      occasions.  It was listed on two other witnesses'

5      supplemental lists but not on Dr. McTiernan's list.

6      It was not referenced in her original report either.

7      Our objection is, for purposes of Dr. McTiernan's

8      testimony, it is not appropriate based on the Court's

9      previous ruling for her to testify concerning it.

10          THE COURT:  Was it on her supplemental list?

11          MS. PARFITT:  Yes.  It says "all briefing."

12          THE COURT:  No, no, no.  Did she list that

13     particular study on a supplemental list?

14          MS. PARFITT:  No, we did not.  We listed it

15     with the briefing.  It came out after her report,

16     after her testimony.

17          THE COURT:  I think you had some very specific

18     things listed and it is not there.

19          MS. PARFITT:  Because it was in the briefing

20     we didn't do that.  So we could move on.

21          THE COURT:  Let's move on.  Even though you

22     did it in the context of correcting the data on the

23     McDonald study, but we will not be discussing the

24     McDonald study as something you relied on.

25     BY MS. PARFITT:

McTiernan - Direct/Ms. Parfitt

790

1    Q.    Dr. McTiernan, do your opinions change with

2    regard to whether or not it is biologically plausible

3    for talcum powder products to cause ovarian cancer if

4    you did not consider the McDonald study?

5    A.    My opinions don't change at all, and my expert

6    report was completed before that paper was published.

7    Q.    Thank you.

8          Let's move on to the next.

9          THE COURT:  Did you complete your questioning?

10   I want to make sure where you were.  You got

11   interrupted about the date of the report.  I want to

12   make sure.

13   Q.    What role does inflammation and oxidative stress

14   have in the pathogenesis of ovarian cancer?

15   A.    Oxidative stress, it starts a cascade of DNA

16   damage, and it is one explanation through which

17   inflammation can cause ovarian cancer.

18   Q.    Dr. McTiernan, in the course of your review and

19   study and opinions, did you also consider studies that

20   perhaps disagreed with your opinion with regard to

21   whether or not talcum powder products can cause

22   ovarian cancer?

23   A.    Yes.

24   Q.    Did you take that into consideration in

25   rendering your opinions?

McTiernan - Direct/Ms. Parfitt

791

1    A.    Yes.

2    Q.    Moving on to the next aspect of Bradford Hill,

3    and that would be dose-response, otherwise known as

4    biological gradient.  What is dose-response?

5    A.    Dose-response is the question of whether the

6    increase in use of some product or increasing exposure

7    is associated with a change in level of relative risk.

8    In this case, our question was:  Does increasing use

9    of talcum powder products increase risk of ovarian

10   cancer?

11         One study that was able to look at this,

12   because they had such large numbers, was the Terry

13   study.  We'll use that as an example of dose-response.

14         One way to do dose-response is among people

15   who are using the product, to divide them into

16   categories, and then look across those categories,

17   compared to never users, what is the relative risk of

18   ovarian cancer in each of those categories.

19   Q.    Before you do that, what's the optimal metric if

20   there is one for dose-response?

21   A.    Relative risk in epidemiological studies, we

22   look at relative risk.  And so in the Terry study,

23   they divided women into four categories by level of

24   use of talcum powder products, and compared to never

25   users.  On this table, the letters "OR" stands for

McTiernan - Direct/Ms. Parfitt

792

1  odds ratio, and that's the same thing as relative

2  risk.

3         So what they are able to see, those women who

4  had never used.  The number there is 1.  That means

5  they are the comparison group.  When you see -- when

6  you look across the quartiles, that's --

7  Q.    Do you have a pointer?

8  A.    -- increasing level of use, and he's outlined it

9  nicely, you see the relative risk for the first

10 category is 1.14; for the second, 1.23; the third,

11 1.22; and the fourth, 1.32.  This is risk of any

12 ovarian cancer by level of use.

13        You see that the level goes up.  1.14 is

14 higher than 1.1, 1.23 to 2, are higher than the first

15 category, and the highest is the top category.

16        The authors' calculated confidence intervals

17 for each of those levels of relative risk, and they

18 all show significance or near significance meaning

19 they don't include 1.  The first category does, and

20 that's why it is often called "near significant."

21 That's how some people would describe that.

22        And then there is another statistical tool

23 that is often used in dose-response to calculate how

24 likely this trend would be -- sorry.  It tells us how

25 correct we are by rejecting a hypothesis, that there

McTiernan - Direct/Ms. Parfitt

793

1    is no dose-response.  So these would be p-Values.

2    They calculated p-Values in two different ways.  This

3    is called the p-Trend, and they included one of them

4    here in the table, but they put one in the text.

5    Q.    What is the significance of that?

6    A.    What this one is, p-Trend, this is looking only

7    at the people who used talcum powder products, just

8    comparing those four categories, and that trend is

9    .17.  What that means is that they are estimating that

10   17 times out of 100 you would make an error by

11   assuming there was a dose-response when there really

12   isn't.

13         I'm about to talk about the other p-Trend

14   which they describe in the text.  If you compare those

15   categories to the non-users, the p-Value is less than

16   .01.  That means it would be less than 1 time out of

17   100 that you would make a mistake by saying that there

18   was a trend when there really wasn't.

19         So three different ways of using a statistical

20   tool to help you interpret them.  I interpret this as

21   showing dose-response.  It shows the relative risk

22   confidence intervals that were narrow -- that weren't

23   terribly wide and did not include one.  The

24   statistical test compared to non-users was highly

25   significant although the statistical test comparing

McTiernan - Direct/Ms. Parfitt

794

1    only users was not.

2    Q.    Dr. McTiernan, would it be inappropriate

3    methodology to include never users in that assessment?

4    A.    I believe it is appropriate to include the never

5    users.  First of all, the statisticians advise that we

6    do include non-users.  But it would be comparable to,

7    in a clinical trial, if you wanted to look at what

8    effect different doses of a medicine would have you'd

9    randomly assign people to different doses and to a

10   placebo, and then you compare those different doses to

11   placebo.  That's kind of what we do in epidemiology,

12   comparing it to a placebo, to people without the

13   exposure.

14        So I believe it is correct to compare to that

15   and in my studies I usually do.  But I think it is

16   very correct as they did to show all of this so that

17   different investigators can see the data fully.  So I

18   think it's appropriate they presented two different

19   p-Values and that they showed confidence intervals.

20   Q.    Dr. McTiernan, is there a threshold response the

21   public would expect?

22   A.    A threshold of what, relative risk?

23   Q.    A threshold of relative risk.

24   A.    No, there is no particular one, and there are

25   different shapes a dose-response can have.  Some can

McTiernan - Direct/Ms. Parfitt

795

1   be a straight arrow -- I'm sorry.  Straight up, one

2   dose increases a certain amount.  It could be like

3   this one is, where it just shows that you see an

4   increase at the first level, and the second and third

5   look very similar, and the top level looks the

6   highest.  Some exposures have a curve, a U-shaped

7   curve.  So there are different types of things an

8   exposure can do in terms of dose-response.

9          In this one I interpret, because the highest

10  relative risk was in the highest dose, and you see

11  some step-wise increase, to me it really looks like

12  there is a dose-response.

13  Q.    Dr. McTiernan, do you have an opinion whether a

14  single dose of talcum powder can cause ovarian cancer?

15  A.    I think we don't know what a dose could cause.

16  If one piece of one application of talc got into the

17  ovaries or Fallopian tubes and sat in there and caused

18  an inflammation and continued because talc is unlikely

19  to be able to be rinsed away from the body, if it

20  continues in there and continues to cause

21  inflammation, perhaps.  But with more applications,

22  you have an idea there is more chance of the substance

23  being incorporated into the body, and therefore could

24  set up inflammation and other methods of causing

25  cancer.

McTiernan - Direct/Ms. Parfitt

796

1    Q.    Is there any other example?  Were there any

2    other studies that categorized the dose-response?

3    A.    Yes, two other meta-analyses.  The large

4    meta-analysis were able to do that, and this is data

5    from individual studies.

6          So this one is from one of the recent

7    meta-analysis Penninkilampi, and they were able to

8    find most studies that had some information either on

9    duration of use or total lifetime applications.  When

10   they looked at the 12 studies who had duration of use,

11   they looked at for those women who used for more than

12   10 years compared to less use, the relative risk was

13   1.25.  So that tells us long-term use has an effect.

14   Five of those studies they included the meta-analysis

15   had total lifetime applications.  So it's frequency

16   times duration.  And they divided those into two

17   categories corresponding to daily use for 10 years.

18   So 3600 total applications more or less, and you did

19   see an increase.  You see a relative risk of 1.32 for

20   the lower group users and 1.42 for the higher, and

21   this is compared to non-users.  The confidence

22   intervals did not include one, so they are

23   statistically significant.

24   Q.    Is there another way of categorizing

25   dose-response other than classifying these core files

McTiernan - Direct/Ms. Parfitt

797

1   and frequency duration?

2   A.    Another thing researchers often do is modeling,

3   and they will take all the information and do some

4   statistical models to smooth out curves and get an

5   estimate of where the risk increases with increasing,

6   in this case, either duration or frequency.  So the

7   Berge study meta-analysis looks at the studies that

8   had duration, and what they are modeling, they were

9   able to estimate that the relative risk was 1.16 for

10  each 10 years of use, also statistically significant.

11  And for the studies that had frequency for each one

12  dose per week, used one time per week, a relative risk

13  of 1.05, a 5 percent increase, also statistically

14  significant.

15        So this tells me there is a dose-response

16  effect looking across these different ways of doing

17  it, and that it is consistent across studies -- sorry.

18  I was about to say something else, but I forgot.

19  Q.    Dr. McTiernan, you talked about these studies

20  that demonstrated an increased dose-response with

21  increasing use and duration.  Does Bradford Hill

22  require there be a finding of dose-response?

23  A.    No, it does not.

24  Q.    And based upon the totality of your review of

25  the studies, let me ask you this:  Did you look at

McTiernan - Direct/Ms. Parfitt

798

1    studies that did not look at dose-response?

2    A.    I did.  Some studies didn't look at

3    dose-response.  Some looked at only frequency or

4    duration, not both.  Some looked at dose-response and

5    found no effect, and some looked at it and found

6    effect.

7    Q.    Based upon the totality of your review of those

8    studies that looked at dose-response, didn't look at

9    dose-response, or looked at dose-response and couldn't

10   find it, what is your opinion?

11   A.    Looking over all, there is a dose-response

12   particularly because the meta-analysis and the pooled

13   analysis saw that clearly.

14   Q.    What I'm going to do, to shorten this, is put up

15   a slide that you helped me prepare.  It is the

16   Bradford Hill guidelines.  We talked about strength

17   consistency, dose-response, and biological

18   plausibility.  What I would like you to do is briefly

19   go through the remaining, and then, in the interest of

20   time, tell us why you've got a weight category over

21   there.

22        MR. WILLIAMS:  Your Honor, we are mindful of

23   the time.  I don't see counsel cutting anything

24   actually.

25        THE COURT:  I think we are in major summary

McTiernan - Direct/Ms. Parfitt

799

1    stage right now.

2    BY MS. PARFITT:

3    Q.    Let me ask you this:  Did you consider the

4    remaining Bradford Hill considerations?

5    A.    I did.

6    Q.    What was the process you went after evaluating

7    the Bradford Hill guidelines?

8    A.    After review, I determined that I gave high or

9    significant weight to strength, consistency,

10   dose-response, plausibility, and temporality.  I gave

11   moderate weight to specificity and slight weight to

12   experiment; and for both coherency and analogy in my

13   opinion, I weighed it less than strength and

14   consistency.

15   Q.    Did the evidence you reviewed satisfy the

16   coherence category?

17   A.    Yes.

18   Q.    Did the evidence you reviewed satisfy

19   temporality aspect?

20   A.    Yes.

21   Q.    Did the evidence you reviewed satisfy the

22   specificity?

23   A.    Yes.

24   Q.    Did the evidence you reviewed satisfy the

25   analogy?

McTiernan - Direct/Ms. Parfitt

800

1    A.    Yes.

2    Q.    And you talked about the experiment.

3          Dr. McTiernan, in addition to the opinions

4    that you've shared with us today, are the opinions you

5    shared your opinions?

6    A.    Yes.

7    Q.    Did you consider opinions and recommendations of

8    other scientific and regulatory bodies who also opined

9    on the issue of whether or not talcum powder causes

10   ovarian cancer?

11   A.    Yes.

12   Q.    Did you learn anything from them?

13   A.    I was very interested to learn that some other

14   regulatory bodies found similar findings that I did,

15   such as Health Canada.

16   Q.    Were there regulatory bodies that have not

17   opined in the same way as you?

18   A.    There were some, yes, but they did not do a full

19   systematic review and a full causal analysis.

20          MR. WILLIAMS:  Objection.  Foundation, your

21   Honor.

22          THE COURT:  Sustained.

23   BY MS. PARFITT:

24   Q.    Dr. McTiernan, did you review other opinions of

25   scientific and medical and regulatory agencies on the

McTiernan - Direct/Ms. Parfitt

801

1  issue of talcum powder products?

2  A.    I did, yes.

3  Q.    Other than just Health Canada?

4  A.    I did, yes.

5  Q.    Which ones did you look at generally?

6  A.    IARC has looked at this in more detail, and they

7  have done a systematic review, but it was in 2006.

8         I've noted IARC plans to relook at talcum

9  powder product use and risk of ovarian cancer.  They

10  placed it in high priority.  At the time they reviewed

11  it, they only had data up until 2006, but they did a

12  full review.  So they classified talcum powders as

13  Class II B carcinogen.

14  Q.    Have you addressed in your report and in your

15  testimony by deposition some of the other regulatory

16  and scientific bodies that have also examined this

17  issue?

18  A.    I've looked into some of them, yes.

19  Q.    And you have taken that into consideration in

20  rendering your opinions?

21  A.    Yes.

22  Q.    Dr. McTiernan, summarize for us, interval, what

23  your opinions are today.

24  A.    My opinions are published studies --

25         MR. WILLIAMS:  I object.  These have already

McTiernan - Direct/Ms. Parfitt

802

1    been covered.

2          THE COURT:  Yes.  I looked back -- I think

3    it's your last slide, and every one of these has been

4    in her testimony.  If you think there is one that is

5    not, you could ask her specifically.

6          MS. PARFITT:  I think you are correct, your

7    Honor.

8          THE COURT:  I think they have all been

9    covered.  She's already indicated she helped create

10   these slides.  I understand she's adopting what I'm

11   seeing up there -- am I correct -- as your opinions?

12         THE WITNESS:  Yes.

13         MS. PARFITT:  Your Honor, at this time I would

14   conclude my examination.  And I appreciate your

15   courtesy with regard to the time.

16         THE COURT:  We'll break for lunch.  It is

17   12:15.  1 o'clock.

18         THE DEPUTY CLERK:  All rise.

19         (The luncheon recess is taken.)

20         (Continued on the next page.)

21   ///

22

23

24

25

McTiernan - Cross/Mr. Williams

803

1        **A F T E R N O O N    S E S S I O N**

2

3            THE DEPUTY CLERK:  All rise.

4            THE COURT:  Thank you.

5

6    **Anne McTiernan** resumed.

7

8    CROSS-EXAMINATION

9    BY MR. WILLIAMS:

10

11   Q.    Good afternoon, Dr. McTiernan.

12   A.    Good afternoon.

13   Q.    We have met before, have we not?

14   A.    Yes.

15   Q.    Let me ask you again to try to keep your voice

16   up.

17   A.    Okay.

18   Q.    Dr. McTiernan, you were retained in this

19   litigation to review the current state of scientific

20   literature regarding talcum powder products and opine

21   on whether those products cause ovarian cancer.  True?

22   A.    True.

23   Q.    The reference to talcum powder products in your

24   litigation report refers to commercially available

25   talcum powder products and all constituent elements

McTiernan - Cross/Mr. Williams

804

1   contained therein.  Correct?

2   A.    Yes.

3   Q.    Asbestos is an example of a constituent element

4   that in your opinion may be contained within talcum

5   powder products.  Correct?

6   A.    Yes.

7   Q.    You are not an expert in asbestos, though.

8   Right?

9   A.    Asbestos, in which way?

10  Q.    In the determination of whether a product --

11  yes, a product contains asbestos in the first

12  instance?

13  A.    In terms of testing?

14  Q.    That's right.

15  A.    Correct.

16  Q.    You are not an expert?

17  A.    Correct.

18  Q.    For that issue you are relying on others.

19  Correct?

20  A.    Yes.

21  Q.    You did not do a full systematic search for

22  causal analysis for asbestos?

23  A.    Correct.  I was not asked to do that.

24  Q.    To be clear, though, your opinion is that talcum

25  powder products can cause ovarian cancer even if those

McTiernan - Cross/Mr. Williams

805

1    products do not contain asbestos or any other

2    constituent element besides talc.  True?

3    A.    True.

4    Q.    You were first approached about any involvement

5    in talcum powder litigation in 2016.  Right?

6    A.    I would have to refresh my memory for the exact

7    dates.  I don't have them right with me.  I can get

8    them, but I don't have them.

9    Q.    Let me see if I can refresh your memory, and I

10   should have begun by saying there are two binders in

11   front of you, binder 1 and binder 2, and there should

12   also be a red binder as well.  Do you have that one?

13   A.    Yes.

14   Q.    That red binder should have your previous

15   testimony.

16        (Pause.)

17        Do you have the red binder in front of you,

18   Dr. McTiernan?

19   A.    Yes.

20   Q.    I'll direct your attention to page 12.

21        MR. WILLIAMS:  Permission to read, your Honor,

22   lines 12 through 15.

23        THE COURT:  Yes.

24   Q.    (Reading.)

25        "QUESTION:  Dr. McTiernan, when were you first

McTiernan - Cross/Mr. Williams

806

1    approached about any involvement in talcum powder

2    litigation?

3            "ANSWER:  It should have been 2016."

4            Does that refresh your memory, it was in fact

5    2016 when you were first approached?

6    A.    I remember saying that, yes.

7    Q.    And you would not have said that were it not

8    true.  Correct?

9    A.    Correct.  But even at that time I didn't have

10   the exact dates.  I didn't have documentation.  It was

11   from my memory then and it is now.

12   Q.    You have not personally conducted any research

13   on talcum powder use and risk for ovarian cancer as of

14   the time you were retained by plaintiffs' counsel.

15   Correct?

16   A.    I had read some papers prior to that.  I read

17   two cohort studies and pooled analysis, and because my

18   university is where some of the early case-control

19   studies occurred, I was aware of those, but I did not

20   do a systematic review until after I was retained.

21   Q.    I would like you to focus on my question.

22           You had not personally conducted any research

23   on talcum powder use and risk for ovarian cancer as of

24   the time you were retained.  Correct?

25   A.    I think I was understanding the word "research"

McTiernan - Cross/Mr. Williams

807

1    to mean read into it.  If you mean research conducting

2    the studies, no, I did not.

3    Q.    At the end of your testimony on direct

4    examination, counsel took you through this chart; and

5    at the end of the chart or on the right-hand side,

6    there was a discussion about biological plausibility

7    and, in particular, inflammation carcinogenesis.

8    Right?

9    A.    Yes.

10   Q.    And you listed here with the assistance of

11   counsel the basis for your opinion regarding

12   biological plausibility.  Correct?

13   A.    Yes.

14   Q.    The first thing you listed was clinical studies

15   and pleurodesis studies.  Right?

16   A.    Yes.

17   Q.    Have you looked into the studies that relate to

18   whether or not there is a relationship between

19   pleurodesis -- that is, the intentional injection of

20   talcum powder into the chest cavity for lungs and the

21   impact on cells?

22   A.    I think in my -- I think in my documents in my

23   report I cited to research in this area showing that

24   pleurodesis causes an inflammatory response.

25   Q.    Other than causing an inflammatory response, any

McTiernan - Cross/Mr. Williams

808

1   discussion that you are aware of or studies you are

2   aware of as to the impact on human cells of talc being

3   applied to them?

4   A.    I think I want to look at my report and see what

5   I said about pleurodesis.

6   Q.    Take a look in your book.  In the first notebook

7   it is Exhibit McTiernan 5-09, actually, the second

8   volume, Volume 2, and it is McTiernan 509.

9        (Pause.)

10       Have you ever seen this study before, Doctor?

11   A.    I don't believe I have.

12   Q.    This study you will see it is called the Nasreen

13   study.  It is from the year 2000, and I'll direct your

14   attention to the very beginning of the tab it says:

15       "Pleurodesis with talc is an accepted method

16   for the treatment of systematic pleural effusions

17   secondary to mesotheliomas."

18       Do you see that?

19   A.    Yes.

20   Q.    I want to direct your attention a few lines down

21   it says:

22       "The present study was designed to evaluate if

23   talc directly affects cell death of malignant

24   mesothelioma cells or normal pleural mesothelial cells

25   PMC."

McTiernan - Cross/Mr. Williams

809

1          You are familiar with the process of

2     pleurodesis?

3     A.     Yes.

4     Q.     Let's go to the bottom, the part we highlighted

5     down below.  It says:

6          "Talc did not induce apoptosis."

7          You understand, by the way, apoptosis is

8     planned cell death?

9     A.     Yes.

10    Q.     (Reading.)

11         "Talc did not induce apoptosis in PMC," and

12    those are the mesothelial cells.

13    A.     Pleural mesothelioma cells, that's what it

14    states.

15    Q.     That's what it referred to the PMC?

16    A.     Yes.

17    Q.     (Reading.)

18         "And glass beads did not cause significant

19    apoptosis in either MNC or PMC."

20         "The present study has demonstrated that talc

21    induces apoptosis in MMC without affecting normal

22    mesothelial cells of the pleura."

23         Did I read that right?

24    A.     Yes.

25    Q.     Let me ask you to turn to page 5 of Exhibit 509,

McTiernan - Cross/Mr. Williams

810

1   the conclusion, and direct your attention to the left

2   column at the very bottom.

3           Do you have that in front of you?

4           The Nasreen authors concluded:

5           "In conclusion, the significance of this study

6   is that talc induces apoptosis in MMC without

7   affecting normal pleural mesothelial cells.  These

8   findings also demonstrate that talc, a palliative

9   active agent, may have a therapeutic potential in

10  decreasing tumor burden.  Therefore, it may be

11  construed that talc not only induces pleurodesis, but

12  also decreases the size and mass of tumors in patients

13  with mesothelials."

14          Did I read that right?

15  A.    Yes.

16  Q.    Can you point the Court to any study that

17  suggests with respect to ovarian cells that talc

18  induces cellular proliferation -- strike that.

19          Can you point the Court to any study that was

20  part of your analysis that suggests when talc when

21  applied to ovarian causes harm to those cells leading

22  to malignancy?

23  A.    I think in my report I referred to Buz'Zard

24  which showed that talc applied to human ovarian

25  stromal and epithelial calls resulted in increased

McTiernan - Cross/Mr. Williams

811

1   reactive oxygen species, cell proliferation, the

2   excessive growth of cells, and neoplastic

3   transformation of cells.  So ovarian cells, not

4   pleural cells.

5   Q.    Any other study besides Buz'Zard for that

6   purpose cited in your report?

7   A.    That's what I have here, yes.

8   Q.    Let's take a look at it.  It is Exhibit A 16 and

9   in your book it should be Volume 1.

10         MR. WILLIAMS:  Your Honor, in your book it

11   should be Volume 1 as well.

12   Q.    Let me start with, first, principles.

13         The presence of oxidative stress in tissue

14   does not indicate that cancer will develop.  True?

15   A.    Oxidative stress is a risk factor for cancer.

16   Q.    The presence of oxidative stress in tissue does

17   not indicate that cancer will develop in that tissue.

18   True or not true?

19   A.    My opinion is that oxidative stress increases

20   risk for cancer.  So it is something we've looked at

21   as potentially part of carcinogenesis.

22   Q.    Any oxidative stress?

23   A.    There are many aspects to oxidative stress and

24   many parts of the cascade.  My understanding is that

25   increased oxidative stress is a risk factor for

McTiernan - Cross/Mr. Williams

812

1  carcinogenesis.

2  Q.    Do you remember the Buz'Zard study was to assess

3  the effects of a supplement made from modified French

4  maritime pine bark?

5  A.    Yes.

6  Q.    Have you advised anyone to start using the

7  product related to this study which is entitled

8  Pycnogenol?  See if that is referenced in the title of

9  the article.

10        Have you advised anyone to start using

11  pycnogenol for ovarian cancer?

12  A.    No.

13  Q.    The ovarian cells used in the French pine bark

14  study were genetically altered?

15  A.    Could you point to where that says that?

16  Q.    Let me ask you to assume the Buz'Zard study used

17  genetically altered ovarian cells that did not have a

18  p53 protein.  Can you make that assumption with me?

19  A.    I don't like making assumptions when we are

20  talking about scientific papers.  If you can show me

21  where it says they were not genetically altered, that

22  would help.

23  Q.    In court we are permitted to ask hypothetical

24  questions, so I would like to ask you one based on

25  your scientific knowledge separate and apart from the

McTiernan - Cross/Mr. Williams

813

1   study itself.

2          Would you assume with the Buz'Zard study used

3   genetically altered ovarian cells that did not have a

4   p53 protein?  Are you with me?

5   A.    I'm with you.  As a scientist, I don't make

6   assumptions like that.  I'm finding it difficult.  You

7   are trying to ask me a scientific question.

8   Q.    I am.

9   A.    I'm having trouble making assumptions for

10  something where I don't know what kind of cells they

11  used in the study.

12  Q.    You cited the Buz'Zard study for the proposition

13  that it showed reactive oxygen species increased if

14  talc was applied to cells.  Correct?

15  A.    Yes.

16  Q.    Let me direct your attention -- strike that.

17         The Buz'Zard study showed that the reactive

18  oxygen species actually decreased from baseline the

19  more talc was applied.  Do you remember that?

20  A.    I believe that was a temporary decrease, and

21  then it increased.  I would like to look at the

22  relevant graph.

23  Q.    It is on page 5 of Exhibit A 16.  I will direct

24  your attention to the top graph there.  This chart

25  reflects the author's findings on "Generation of

McTiernan - Cross/Mr. Williams

814

1    Reactive Oxygen Species From Ovarian Epithelial in

2    Response to Their Exposure to Talc."  Correct?

3    A.    This is the study where if you look under the

4    graph, the authors are explaining it more, that there

5    was an initial dose dependent decrease, but as time

6    increased the ROS generation rebounded and increased

7    compared with values at 24 hours.

8    Q.    Let's take a look at the graph.

9          You see 100 is the baseline, right, and the

10   unit of measurement is the percentage of ROS

11   generation.  Right?

12         Do you see that on the Y axis?

13   A.    Can you explain where you are seeing 100 is the

14   baseline?

15   Q.    Are you saying there was something else that was

16   the baseline?

17   A.    Just to explain what the graph is meaning.

18   Q.    I'll represent to you there has been testimony

19   concerning this graph, and I'll just ask you this:

20         Do you see as more talc is applied, and we

21   move to the right along the X axis, that the bar

22   charts go below the 100 line except for this one which

23   was at 50 micrograms per milliliter.  Can we agree on

24   that?

25   A.    Yes, I see that.  I'm wondering why the authors

McTiernan - Cross/Mr. Williams

815

1  wrote that was a temporary decrease and this

2  increased.

3  Q.    Perhaps could it have been because as each of

4  these bars for any one segment was 424, 72 and

5  120 hours, and in any given time period it did

6  increase.  Do you see from 24 to 72 to 120 hours?

7  Could it be that is what they were referring to?

8  A.    I'm not sure.  I'm just reading the writing it

9  increased over time.

10  Q.    What we do know is all of these except for one

11  is below the baseline.  You can agree on that?

12  A.    It looks like a temporary change from what they

13  wrote.

14  Q.    Are you speculating?

15  A.    They said it was an initial dose-dependent

16  decrease, and then that increased.  That's why I'm

17  confused.  It looks like the graph and the description

18  are showing -- the description is showing additional

19  information.

20  Q.    That's fine.  We'll move on.

21        The next studies you talked about were the

22  animal studies, and you list three.  Correct?

23  A.    Yes.

24  Q.    And you list these as studies that supposedly

25  support the notion that there is biological

McTiernan - Cross/Mr. Williams

816

1   plausibility that flows from talcum powder product use

2   to exposure to migration, to inflammation and

3   carcinogenesis.  That's why you cited them?

4   A.    I cited them as looking at the pieces of the

5   carcinogenic pathway.  This is one issue we see with

6   looking at this biological plausibility.  We have

7   different pieces of information along the chain of

8   possible biological mechanisms.

9   Q.    I assume you cited these not because they are

10  the worst studies you could cite, but they were the

11  strongest studies supporting your position for your

12  conclusion as a scientist?

13  A.    I didn't do a systematic review on biological

14  plausibility on animal studies.  What I did was I

15  looked for animal studies that possibly could explain

16  the association, and I did that with either PubMed

17  search or looking at references that were referenced

18  in epidemiological studies and the clinical studies.

19  Q.    You did read the studies, right?

20        Let's take a look at Keskin.  It is Exhibit A

21  85.

22  A.    Yes.

23  Q.    Exhibit A 85 is the 2009 study by Keskin that

24  you were just referencing.  Right?

25  A.    Yes.

McTiernan - Cross/Mr. Williams

817

1    Q.    It's entitled, "Does long-term talc exposure

2    have a carcinogenic effect on the female genital

3    system of rats."

4          Did I read that right?

5    A.    Yes.

6    Q.    Do you remember in this study the researchers

7    applied talc to rats intra-vaginally or perineally for

8    three months on a daily basis?

9    A.    I see that.

10   Q.    Let's go to the findings.

11         Page 2, second column, second paragraph, first

12   sentence.  Finding:

13         "In both the groups exposed to talc, Groups

14   III and IV, evidence of foreign body reaction and

15   infection along with an increase in inflammatory cells

16   were found in all the genital tissues.  General

17   infection was observed in 12 rats in the study group

18   and two rats in the control group.  Neoplastic change

19   was not found."

20         This study found that there was no neoplastic

21   change in the rats who had the talc directly placed

22   into their ovaries.  Correct?

23   A.    Yes.

24   Q.    The next study that you referred to on your

25   chart is the Hamilton study from 1984.  Did you read

McTiernan - Cross/Mr. Williams

818

1    that study?

2    A.    Can we go back to the former study Keskin?

3    Q.    Counsel will take you back if she wishes.

4          The Hamilton study is Exhibit A 53, which

5    should be in your first volume, Dr. McTiernan.  In

6    this study the authors surgically injected talcum

7    powder into the ovarian bursal sac of rats.  Right?

8    A.    Yes.

9    Q.    It was not the case that talc was applied to the

10   outside or the exterior of the rats' genital area.

11   Correct?  The talc was injected into the ovaries

12   themselves.  You remember that.  Right?

13   A.    Yes.

14   Q.    The researchers injected the talc into 10 rats.

15   Right?

16   A.    This is what the abstract says, yes.

17   Q.    And out of the 10 rats injected with talc, four

18   of them -- less than half -- showed some kind of

19   papillary change in the ovarian surface epithelium.

20   Is that right, Doctor?

21   A.    Yes.

22   Q.    The authors concluded, though, that the

23   epithelium covering the papillary areas was regular

24   with no evidence of cytoplasmic or nuclear atypia.

25   Correct?  That's on page 4 of the exhibit, right

McTiernan - Cross/Mr. Williams

819

1    column, in the carry over paragraph midway down.  That

2    was the conclusion of the study?

3    A.    Four of them developed papillary areas and

4    "papillary" means abnormal growth.

5    Q.    But any chronic inflammation that the Hamilton

6    study authors observed in the rats did not lead to

7    neoplastic changes?

8    A.    They are talking about papillary areas, again,

9    which is abnormal growth.

10   Q.    We were just reading the portion that said it

11   did not lead to neoplastic changes --

12   A.    Could we see the abstract again.

13   Q.    It is the next one.

14   A.    Back to the abstract.  I'm trying to read the

15   abstract.  This says something about this there.

16   Q.    Sure.

17         (Pause.)

18   A.    I don't see here in the abstract they are

19   concluding they are not related.  I see papillary

20   changes.  From my knowledge, "papillary" is an

21   abnormal growth, and papillary growth could be the

22   beginning of a carcinogenic process.

23   Q.    Are you speculating?

24   A.    I'm talking about my knowledge, and they talk of

25   four of 10 animals developing papillary changes.

McTiernan - Cross/Mr. Williams

820

1   Q.    Let's move on.  The next study you cited in

2   support of biological plausibility opinion in the case

3   was the NTP study from 1993.  Do you remember that?

4   A.    Yes, I do.

5   Q.    Now, you mentioned earlier today that there was

6   an agency that had found that talc could migrate from

7   the perineum to the ovaries.  Do you remember

8   testifying to that earlier today?

9         Do you remember testifying to that today?

10  A.    Yes, I stated the FDA said migration was

11  incontrovertible.

12  Q.    You based that on a letter you read at one

13  point?

14  A.    Yes.

15  Q.    Let's put that in front of you.  That's Exhibit

16  A 89.

17        MR. WILLIAMS:  Your Honor, for the record, it

18  is a letter dated April 1, 2014.

19  Q.    Is that the letter?

20  A.    I see it, yes.

21  Q.    Now, in this letter do you remember there was a

22  specific discussion of the NTP report?

23  A.    Maybe we could scroll to it or point to it in

24  the book.

25  Q.    It is on page 4 of the letter under toxicology

McTiernan - Cross/Mr. Williams

821

1    findings.  Do you see that heading?

2    A.    Yes.

3    Q.    There is a reference here that speaks of the NTP

4    report concluding that cosmetic grade talc caused

5    tumors in animals even though no asbestos-like fibers

6    were found.  The report made the following

7    observation:

8          "There was some evidence of carcinogenetic

9    activity in non-asbestiform talc from inhalation

10   studies in male rats based on an increased incidence

11   of benign or malignant pheochromocytomas of the

12   adrenal gland.  There was clear evidence of

13   carcinogenic activity of talc in female rats based on

14   increased incidences of alveolar/bronchiolar adenomas

15   and carcinomas of the lung and benign or malignant

16   pheochromocytomas of the adrenal gland.  There was no

17   evidence of carcinogenic activity of talc in male or

18   female mice exposed to 6 or 18 micrograms per cubic

19   meter.  However, this study lacks convincing

20   scientific support because of serious flaws in its

21   design and conduct including the investigators used

22   micronized talc instead of consumer grade talc

23   resulting in the experimental protocol not being

24   reflective of human exposure conditions in terms of

25   particle size."

McTiernan - Cross/Mr. Williams

822

1          Do you remember reading that in the FDA letter

2    regarding the NTP study upon which you rely?

3    A.    I see it now.

4    Q.    Let's go to the next page.

5          Do you remember the FDA letter upon which you

6    relied said:

7          "Investigators conceded that they had problems

8    with the aerosol generation system; whereby, the

9    target aerosol concentrations were either excessive or

10   not maintained during 26 of the 113 or 122 weeks of

11   the study.  The study did not include positive and

12   negative dust controls which would have permitted an

13   exact assessment of the talc's carcinogenicity

14   relative to the two control dusts?"

15         Do you remember reading that?

16   A.    I see it here.

17   Q.    They said further:

18         "In light of these shortcomings, a panel of

19   experts at the 1994 ISRTP/FDA workshop declared the

20   1993 NTP study has no relevance to human risk."

21         Did you cite that on direct examination?

22   A.    Did I cite this statement or that workshop?  I'm

23   not sure what the question is here.

24   Q.    Did you cite anything to the Court in your

25   direct examination testimony to the effect that the

823

1    shortcomings of the NTP rat study would be made

2    available to the Court?

3    A.    I'm a little confused.  I cited the study where

4    the NTP study showed that adrenal cancers developed in

5    female mice as well as alveolar bronchial which are

6    lung cancers.

7    Q.    Do you see this letter you have in front of you,

8    the exhibit which has the FDA letter?  Did you see

9    that at the time that you formed your opinions in this

10   case relying upon the NTP rat study?

11   A.    I did see this, and I saw this is a letter

12   describing officials' opinion.  I didn't see the full

13   report.  I don't know what that workshop was.  I don't

14   know if they published in a peer review.

15          All I know, I was able to see the NTP rat

16   study, evaluated it, saw that there was cancer

17   developing in animals exposed to talc, and that's why

18   I cited that.  But I believe this letter also then

19   does mention that migration is incontrovertible.

20   Q.    Next you cited under "in vitro studies" the

21   Fletcher and Saed study from 2018.  Right?

22   A.    I see that's here, yes.

23   Q.    You know Dr. Saed already testified here in

24   court, right?

25   A.    Yes.

McTiernan - Cross/Mr. Williams

824

1    Q.    Do you agree -- have you read Dr. Saed's

2    testimony from this proceeding?

3    A.    No, I have not.

4    Q.    Let me put this in front of you and ask you a

5    question.  This is the transcript from the other day

6    from the examination of Dr. Saed.  You see there it is

7    on page 119 of the transcript from the other day.

8    A.    Is this a final transcript?

9    Q.    It is.  My question to you is:  Do you agree

10   with Dr. Saed that prior to his analysis in 2018 and

11   the work that he has done in connection with his

12   retention by the plaintiffs' counsel in this matter

13   that there was not enough evidence to establish a

14   direct link and precise mechanism developing in

15   association between talc use and ovarian cancer?

16        MS. PARFITT:  Objection, your Honor.  I do not

17   believe we have a final sworn copy of that transcript.

18   She's been asked about testimony out of context.  One

19   section of Dr. Saed's has nothing before or after

20   that, no foundation what Dr. Saed had said.

21        MR. WILLIAMS:  I'll ask the question separate

22   and apart from the transcript.

23        THE COURT:  I don't know if you reserved the

24   righ to review the transcripts.  I believe these are

25   final transcripts.

McTiernan - Cross/Mr. Williams

825

1          (Pause.)

2          THE COURT:  So they have to go over them.

3          MS. PARFITT:  The other would be, I don't

4  believe Dr. Saed looked at the NTP study.  It goes to

5  my response; it is one question taken out of context

6  with all of Dr. Saed's testimony having no idea

7  whether Dr. Saed looked at the NTP study.

8          THE COURT:  I think he moved on from the NTP.

9  I think he went on to another study, the Fletcher/Saed

10  study.

11          MR. WILLIAMS:  That's correct.

12  BY MR. WILLIAMS:

13  Q.    My question to you, separate and apart from what

14  the final transcript will reflect, is Dr. Saed's

15  testimony:  As you sit here today, as a scientist, do

16  you believe that as of 2018, there was not enough

17  evidence to establish a biological mechanism, or, in

18  particular, a direct link and precise mechanism for

19  the association between talc use and ovarian cancer,

20  do you think it had already been established prior to

21  2018?

22  A.    I'm not a basic scientist.  I'm not a biologist.

23  What I look at in these studies for biological

24  plausibility -- I don't know what biological proof is

25  available.  I didn't do a systematic total review of

1    the biology.  And so I feel like I can't answer that

2    question.

3    Q.    So you are telling the Court it is not your

4    area.  Is that accurate?  Is that a fair statement?

5            MS. PARFITT:  Objection, your Honor.

6            MR. WILLIAMS:  She was nodding in the

7    affirmative.

8            THE COURT:  I'll let the answer go.

9    Q.    Let's go to some epidemiology.

10           Dr. McTiernan, for this litigation -- strike

11   that.

12   Q.    What I want to ask you now is a set of questions

13   relating to the fit between the conclusions of a

14   causal association between talc use and ovarian cancer

15   as reflected in the studies that you cite in your

16   report and the conclusions of those studies

17   themselves.  Do you have that topic in mind?

18   A.    I do now, yes.

19   Q.    For this litigation, you reviewed what you

20   assessed to be relevant published epidemiological

21   evidence concerning perineal use of talcum powder

22   products and ovarian cancer.  Right?

23   A.    Yes.

24   Q.    You reviewed 38 publications in scientific

25   journals.  Right?

McTiernan - Cross/Mr. Williams

827

1   A.    Yes.

2   Q.    Based on that review, it is your opinion that

3   evidence of an association between genital use of talc

4   powders and increased risk of ovarian cancer risk is,

5   in your words, highly consistent.  True?

6   A.    I've looked at the data from those individual

7   studies and at the meta-analyses, and from that I

8   concluded what you just stated.

9   Q.    Let's take a look at your report.  It is Exhibit

10   C 7 in your book, and for you, Dr. McTiernan, that

11   would be in Volume 2.

12        MR. WILLIAMS:  For your Honor it would be in

13   Volume 3.  And if we could go to page 64, and the

14   heading "Consistency of Association," page 64.  If we

15   can pull that up.

16   Q.    Do you see, Doctor, on that page, page 64, that

17   you wrote:

18        "Across the case control and cohort studies,

19   the association between use of talcum powder products

20   and risk of ovarian cancer was highly consistent"?

21   A.    Which page are you on?

22   Q.    I'm on page 64, Dr. McTiernan.

23        Did I read that right?  Was that your

24   conclusion?

25   A.    Yes.

McTiernan - Cross/Mr. Williams

828

1  Q.    Let me ask you now to look at one of the studies

2  you reviewed.  It is called the Berge study.  It is

3  from 2018.  It is in your notebook at Exhibit A 11.

4        MR. WILLIAMS:  Your Honor, also in your first

5  binder.

6  A.    I have it.

7  Q.    What we could do, Doctor, if at any time you

8  want to see the study itself, of course, you may.  You

9  may also check me by looking at the screen to see if I

10  am reading correctly.

11        Are you on Exhibit A 11, the Berge study?

12  A.    Yes.

13  Q.    The Berge study is one of the two recent

14  meta-analyses that you consider to be excellent.

15  Right?

16  A.    Yes.

17  Q.    The excellence of the Berge study, as you

18  describe it, is actually one of the reasons why you

19  say in your report that you did not conduct your own

20  meta-analysis in this litigation.  Correct?

21  A.    Yes.

22  Q.    Please look at the abstract on the cover page of

23  the Berge 2018 paper.  It is just below the list of

24  authors.  Do you see that right at the beginning?

25  A.    The abstract, yes.

McTiernan - Cross/Mr. Williams

829

1  Q.    When you read this study, the very first thing

2  that you said, as follows:

3        "Some fecal studies suggest an association

4  between genital use of talc powder  and increased risk

5  of ovarian cancer, but the evidence is not

6  consistent."

7        That's what you read at first.  Correct?

8  A.    Yes.

9  Q.    Let me ask you to focus on the last part of that

10  statement where the authors described that the

11  evidence suggesting an association between genital

12  talc use and ovarian cancer was not consistent.

13        My question is:  Did you disagree with that

14  description of the evidence of the authors?  Right.

15  A.    Yes.  I would like to add, most meta-analyses

16  are systematic reviews, would state something along

17  that line in order to justify publishing a

18  meta-analysis.  Otherwise, the journal might say, Why

19  publish a meta-analysis?  They have to give some

20  justification.

21  Q.    Are you now saying the authors of the Berge

22  study did not in fact believe that the evidence of an

23  association between genital talc use and ovarian

24  cancer was not consistent?  Are you testifying as to

25  their state of mind?

McTiernan - Cross/Mr. Williams

830

1   A.    I don't know what the state of mind was.  I know

2   this is a justification statement, a sort of

3   justification that's pretty standard in a

4   meta-analysis.

5   Q.    As far as the Court is concerned, for purposes

6   of assessing your reliance on this study, have we

7   accurately set forth on the board your conclusion that

8   the association was highly consistent and the Berge

9   study conclusion that the evidence was not consistent?

10  A.    This is what I stated, and I looked at the data

11  such as in Figure 2 of their paper, which is very

12  consistent to the forest plot here figure in the Berge

13  paper, shows consistency across the studies in terms

14  of the relative risk.

15  Q.    When you review a study, it is your practice to

16  always look at both the relative risk that is reported

17  and statistical significance.  Right?

18  A.    When I look at a study I look at the relative

19  risk and the statistical test the authors used to

20  describe the relative risk.

21  Q.    You always look at both the relative risk and

22  the statistical significance.  True or not true?

23  A.    I always look at the relative risk and the

24  results of whatever test they have done, whatever

25  statistical testing they have done.

McTiernan - Cross/Mr. Williams

831

1    Q.    Whatever statistical testing they have done you

2    look at it?

3    A.    Yes.

4    Q.    And you consider that along with the reported

5    relative risk.  Right?

6    A.    Yes.

7    Q.    Statistical significance is what epidemiologists

8    use that a likelihood of a relative risk or other

9    estimate of risk did not just occur by chance.

10   Correct?

11   A.    That's not a full explanation of the statistical

12   test, and I gave a wider explanation this morning, or

13   the real explanation of what these mean.  I think in

14   my report, my expert report, I talked about chance,

15   but what a p-Value really is is the probability that

16   you will make an error if you reject the hypothesis of

17   no association.  The confidence interval, the

18   95 percent confidence interval is the likelihood of

19   finding a relative risk in that range if you knew the

20   universe of what a relative risk was.  So it is a

21   little more extensive than just something by chance.

22   Q.    Statistical significance is what epidemiologists

23   use to determine the likelihood that the relative risk

24   or other estimate of risk did not just occur by

25   chance.  Correct?

McTiernan - Cross/Mr. Williams

832

1    A.    I'm not sure what you are reading from.

2    Q.    Your report.

3    A.    I remember I put that in.  What I explained this

4    morning was the statistical reasoning, the statistical

5    explanation of what the p-Value means.

6    Q.    Let me ask you look at page 13 of your report,

7    which is Exhibit C 7, the statistical analysis

8    section, the fourth sentence there.  You wrote:

9          "To determine the likelihood of these being

10   true estimates of risk, rather than just occurring by

11   chance, epidemiologists determine the statistical

12   significance."

13         That's what you wrote.  Right?

14   A.    Yes.

15   Q.    For the relative risk odds ratio and the hazard

16   ratio estimates, epidemiologists calculate a

17   confidence interval.  Right?

18   A.    Which shows the range of values the true risk

19   estimate likely represents.

20   Q.    And most commonly epidemiologists use a

21   95 percent confidence interval.  Right?

22   A.    The rest of the sentence, which means we are

23   95 percent sure a true relative risk or odds ratio

24   lies within that interval.

25   Q.    You wrote most commonly we -- you were referring

McTiernan - Cross/Mr. Williams

833

1  to was what was epidemiologists?

2  A.    Yes.

3  Q.    We epidemiologists use 95 percent confidence

4  interval, which means we are 95 percent sure that a

5  true relative risk or odds ratio lies within that

6  envelope of numbers.  Right?

7  A.    Yes.  It's consistent with what I described this

8  morning.

9  Q.    If a confidence interval -- and there is a lot

10  of talk whether it includes one, so I want to make

11  sure this is clear.

12        If a confidence interval includes the number

13  1.0, then you say the association between the exposure

14  and the disease could be null.  Correct?

15  A.    Yes.  That's consistent with the previous

16  sentence that it could lie in that interval and that

17  could be one if it includes that.

18            .

19  Q.    "Null" means nonexistent.  Right?

20  A.    "Null" means a relative risk of one meaning no

21  association.  So, yes, it could lie within that

22  interval.  If the interval includes one, it could be

23  one.

24  Q.    It could be null.  Correct?

25  A.    It could be a relative risk of one.

McTiernan - Cross/Mr. Williams

834

1  Q.    Relative risk of one means null?

2  A.    It means no association.

3  Q.    So "null," as you just said, there is no

4  association between the exposure and the disease.

5  True?

6  A.    If the relative risk is one, the estimate is

7  there is no association between exposure and the

8  disease.

9  Q.    Slightly different from what you wrote.  What

10  you write is:

11      "If a confidence includes the number 1.0, not

12  that it was 1.0, or if it includes or passes over 1.0,

13  you say that the association between the exposure and

14  the disease could be null."  Right?

15  A.    With emphasis on the word "could," that the

16  relative risk could be contained in that interval, if

17  that interval includes one, it could be 1; but it

18  could be any number between 1 and the top of the

19  interval, and any number between 1 and the bottom of

20  the interval.  It doesn't tell us it's going to be 1,

21  negative or positive.  Somewhere in that interval.

22  Again, it is a 95 percent probability estimate.

23  Q.    As you said a moment ago, "null" means no

24  association.  Right?

25  A.    If the relative risk fell on that, that would be

McTiernan - Cross/Mr. Williams

835

1    null.  That's why I say if 1.0 is in the confidence

2    interval, then it could be a null association, but it

3    doesn't mean it is.  It means it could.

4    Q.    Where a confidence interval crosses 1.0, as an

5    experienced epidemiologist, you say that the

6    association was not seen.  Right?

7    A.    Can you cite to where I said this?

8    Q.    I'm asking whether you believe that.

9    A.    Maybe you can state it again then.

10   Q.    Surely.

11          As an experienced epidemiologists, where

12   confidence interval crosses 1.0, the association was

13   not established, was not seen.  Correct?

14   A.    This is something that I've stated?  Are you

15   citing something?

16   Q.    I'm asking you a flat out question, which I'm

17   entitled to do.  So my question is:

18          As an experienced epidemiologist, where

19   confidence interval crosses 1.0, you say that an

20   association was not seen, not established?

21   A.    I think the real explanation of a confidence

22   interval is that if it includes 1.0, it could be a

23   null association.  It could fall anywhere within the

24   interval, and I think I'm saying the same thing -- go

25   ahead.

McTiernan - Cross/Mr. Williams

836

1  Q.   Have you completed your answer?

2  A.   Yes.

3  Q.   Let's go on to the Berge study.  We've already

4  talked about it a little bit.  It is Exhibit A 11.  I

5  would like to go to Figure 2, which is the forest plot

6  set forth in that study on page 8.

7       Figure 2 of the study identifies 27 different

8  epidemiologic studies.  I'm focusing on the

9  case-control studies portion of that chart.  Right,

10  Doctor?

11  A.   Yes.

12  Q.   It identifies 27 epidemiologic studies, 24 which

13  are retrospective case-control studies and three

14  prospective cohort studies.  Right?

15  A.   Yes.

16  Q.   Figure 2 shows the overall association between

17  "ever" use of genital talc and the risk of ovarian

18  cancer in the 27 studies.  Correct?

19  A.   Yes.

20  Q.   The associations that are reported in this

21  Figure 2 are estimated as relative risks, right, in

22  the column over to the right?

23  A.   Yes.

24  Q.   And they are set forth with a 95 percent

25  confidence interval.  Right?

McTiernan - Cross/Mr. Williams

837

1    A.    Yes.

2    Q.    Let me ask you about one of the studies here so

3    that we can understand how you applied concepts like

4    statistical significance and confidence intervals in

5    reaching your opinion.

6          Take a look at the reference to the Goodman

7    study.  That case-control study, like all of the other

8    case-control studies, listed here was retrospective in

9    design.  Right?

10   A.    Yes.

11   Q.    Retrospective studies are backwards, looking

12   where people are asked questions after they have

13   contracted the disease, and they are asked to recall

14   what they put on or in their bodies.  Correct?

15   A.    I would clarify, because the cases are the ones

16   that have developed the disease, if it is a

17   population-based study.  The cases develop the disease

18   and they asked about exposures; retrospectively, the

19   controls have not have a disease, so they are asked

20   about their exposure typically at a time when the

21   cases had developed their disease.  They usually are

22   asked to remember back some time.  I think your

23   distinction sounded like everybody had a disease.

24   That's what I was trying to clarify.

25   Q.    The cases have disease; the controls do not.

McTiernan - Cross/Mr. Williams

838

1   Correct?

2   A.    Correct.

3   Q.    Both groups of people are asked the same

4   questions; are they not?

5   A.    Yes.

6   Q.    Let's go back to the Goodman 2008 study.  The

7   relative risk for the Goodman 2008 study is 0.99.  Do

8   you see that?

9   A.    Yes.

10  Q.    The relative risk has a 95 percent confidence

11  interval.  Correct?

12  A.    Yes.

13  Q.    Now, to be clear, that confidence interval does

14  not mean that the true relative risk is in fact 0.99

15  as opposed to, say, 0.80 or 1.0 or 1.2.  Correct?

16  A.    That's correct.  The confidence interval does

17  not tell you the relative risk.  It just gives you a

18  likely range.

19  Q.    Instead, that confidence interval means that we

20  can be sure, 95 percent sure that a true relative risk

21  lies somewhere within the two numbers in the

22  parenthesis.  Correct?

23  A.    I think the statisticians wouldn't talk so much

24  about surety, but the rest of your statement is

25  correct.  It is an estimate that if you knew the

839

1    totality of the universe of evidence, that with

2    95 percent confidence it would fall within those

3    intervals.  It is still saying a very similar thing.

4    It is just that word "surety" is not guaranteed from

5    statistical tests.

6    Q.    Looking at the high end of the confidence

7    interval, the 1.4 number that would indicate genital

8    talc use is potentially associated in the Goodman

9    study with a 41 percent increased risk of developing

10   ovarian cancer.  Correct?

11   A.    I think it is not talking about the individual

12   study, the confidence interval.  It is talking about

13   the probability in a universe of what the relative

14   risk could lie in.  That's what I'm saying.  In the

15   Goodman study we know what the relative risk shows.

16   In this case, it shows .99.  So the confidence

17   interval doesn't move the relative risk within a

18   study.  It talks about what the universe of

19   information might be.

20   Q.    Dr. McTiernan, did something in my question

21   suggest to you I was saying the actual number was

22   0.99?

23   A.    Maybe I misheard you.  I thought you said in the

24   Goodman study it would be such.

25   Q.    We established a moment ago the 0.99 does not

McTiernan - Cross/Mr. Williams

840

1  mean that it is necessarily the correct number.

2  Right?

3  A.    In the universe.  I don't remember saying that.

4  Maybe I responded to something I didn't mean to.  We

5  know what the relative risk is in the Goodman study.

6  We don't know what the true relative risk is in the

7  universe of people with and without ovarian cancer.

8  Q.    All I'm trying to establish is that the numbers

9  that are within the parenthesis set forth a range, and

10  it suggests in the Goodman study at least that the

11  relative risk could reflect a 41 percent increase in

12  the chances of getting ovarian cancer; but at the low

13  end it could reflect a 30 percent decreased risk of

14  getting ovarian cancer.  Right?

15  A.    I think as long as you are not suggesting that

16  the Goodman study relative risk is different from what

17  it is.  It is talking about if you did the study

18  again, another study, the universe of information, the

19  relative risk could fall within that category given

20  the results in that one study.

21  Q.    Can I get a yes or no?

22       THE COURT:  He's basing it on the Goodman

23  study.  He's not talking about what might happen

24  again.  He's trying to get an answer what those

25  numbers reflect in this particular study for this

McTiernan - Cross/Mr. Williams

841

1  study.  Isn't that right?

2          MR. WILLIAMS:  That's correct.

3          THE COURT:  You can answer that.  Right?

4          THE WITNESS:  It is difficult.  My

5  understanding of statistics is relative risk doesn't

6  change based on what the confidence interval is.  The

7  relative risk is what it is.  The confidence interval

8  just tells us how we can infer this outside study,

9  what the true relative risk might be.  That's my

10  understanding.

11  BY MR. WILLIAMS:

12  Q.   Is that an understanding you've come to since

13  the time you have prepared your report?

14  A.   I've done more full reading, yes.  The American

15  Statistical Association has come out with some new

16  position statements, new statements about --

17          MR. WILLIAMS:  Can I cut her off, your Honor?

18          THE COURT:  You don't have to tell us what it

19  is.  All he asked is, and he said yes.

20  Q.   You have a different opinion now than at the

21  time you wrote your report.  Yes or no?

22  A.   It is more fully informed.

23  Q.   Because the confidence interval in Goodman 2008

24  includes the number 1, that means that the association

25  reported in that study could be null.  Correct?

McTiernan - Cross/Mr. Williams

842

1   A.    I would say the true relative risk could be

2   null.

3   Q.    You cannot rule out the possibility that there

4   is no association between ever genital talc use and

5   ovarian cancer in the Goodman study because of the

6   results that were reflected here which passed through

7   1.0.  Right?

8   A.    You are saying you cannot rule out no

9   association between genital talc use and risk of

10  ovarian cancer?

11  Q.    Precisely.

12  A.    To that I would say yes.

13  Q.    Let's take a look at the entire Figure 2 on this

14  page.  It consists of 24-case-control studies, and

15  then there are the three cohort studies down below.

16  Right?

17  A.    Yes.

18  Q.    Looking at the top of the forest plot Figure 2,

19  do you see the Hartge 1983-case-control study, second

20  one down from the top.  Do you see that?

21  A.    Yes.

22  Q.    That study as well includes the number 1.0

23  meaning the low end of the interval is below 1.0.

24  Right?

25  A.    Yes.

McTiernan - Cross/Mr. Williams

843

1    Q.    If we can go through this quickly.  The same is

2    true for Whittemore, 1983, right, the confidence

3    interval falls below 1.0?

4    A.    Yes.

5    Q.    Both 1999?

6    A.    Yes.

7    Q.    Harlow and Weiss, 1989?

8    A.    Yes.

9    Q.    Chen, 1992?

10   A.    Yes.

11   Q.    Rosenblatt, 1992?

12   A.    Yes.

13   Q.    Tzonou, 1993?

14   A.    Yes.

15   Q.    Godard, 1998?

16   A.    Yes.

17   Q.    Wong, 1999?

18   A.    Yes.

19   Q.    Goodman, 2008, that's what we just discussed.

20   Right?

21   A.    Yes.

22   Q.    Merritt, 2008?

23   A.    Yes.

24   Q.    And Rosenblatt 2011?

25   A.    Yes.

McTiernan - Cross/Mr. Williams

844

1   Q.    So if we just looked at those case-control

2   studies that had a confidence interval that crosses

3   over 1, there are 12 of them, 12 of the 24.  Correct?

4   A.    Yes.

5   Q.    Half of the case-control studies in the Berge

6   2018 meta-analysis have confidence intervals that

7   include the number 1.0.  Right?

8   A.    Yes.

9   Q.    That means that there are case-control studies,

10  the results of which are not statistically

11  significant.  Correct?

12  A.    If we look at the sample size, which I talked

13  about this morning, the smaller studies tend to have

14  very small -- tend to have wide confidence intervals.

15  So, yes, all of these confidence intervals include 1.

16  Q.    And that means there are 12 that are not

17  statistically significant.  Correct?

18  A.    If you are using the term "statistically

19  significant" to indicate that the confidence interval

20  includes 1, the answer is yes.

21  Q.    Let me ask you to look at your red binder at

22  your deposition testimony, and I'll direct you to page

23  245.  I'm directing your attention to page 245 through

24  line 24, to page 246, line 1.

25          "QUESTION:  And that means that there are 12

McTiernan - Cross/Mr. Williams

845

1    that are not statistically significant.  Correct?

2         "ANSWER:  Yes.

3         Was that your answer then?

4    A.    Yes.

5    Q.    The overall association in half of the studies

6    in Berge could be null.  Correct?

7    A.    Yes.

8    Q.    There in fact is no association between genital

9    talcum powder use and ovarian cancer in those

10   case-control studies.  Right?

11   A.    No, I wouldn't say that.

12   Q.    If the confidence interval includes the number

13   1.0, then we can say that the association between the

14   exposure and the disease could be null.  Correct?

15   A.    It could be null.  I think your next statement

16   was that there was no association.  So that's not the

17   same as could be no association.  I think you asked me

18   that there was no association.  So there is a

19   difference between was no association and could be no

20   association.

21   Q.    We went to the case-control retrospective

22   studies, but we haven't discussed the prospective

23   studies, so let's do that now.

24        You did a Bradford Hill analysis here, and you

25   put up those factors on the board.  Right?

1    A.    Yes.

2    Q.    Let's take out what we have marked as Exhibit A

3    63, which is a Bradford Hill presentation.  If you

4    turn to page 1 of Exhibit A 63, do you recognize as

5    the address by Sir Bradford Austin Hill that

6    identifies what has become known in your field as the

7    Bradford Hill factors or criteria?

8    A.    Yes.

9    Q.    Please turn to page 2 of Exhibit A 63, the

10   right-hand column, first full paragraph.  That is Sir

11   Bradford Hill's description of consistency.  Right?

12   A.    Yes.

13   Q.    He writes:

14        "Next on my list of features to be specially

15   considered I would place the consistency of the

16   observed association.  Has it be repeatedly observed

17   by different persons in different places,

18   circumstances, and times?"

19        Right?

20   A.    Yes.

21   Q.    Now, please turn to page 4 and look at the left

22   column, the very top paragraph that carries over from

23   the previous page.  There is a sentence there that

24   begins with:

25        "I myself would put a good deal of weight

McTiernan - Cross/Mr. Williams

847

1    upon:

2    A.    Can you please tell me where you are.  My page 4

3    of the Bradford Hill first paragraph starts "A

4    particular occupation" --

5    Q.    Can you see the page in the upper right-hand

6    corner, it should have 297 on it?

7    A.    Okay.

8    Q.    Left-hand column, first sentence:

9          "I would myself put a good deal of weight upon

10   similar results reached in quite different ways, for

11   example, prospectively and retrospectively."

12         Right?

13   A.    Yes.

14   Q.    He is saying, I think there should be particular

15   weight if there's consistency with retrospective

16   studies or forward looking studies.

17         Right?

18   A.    I don't see the word "should."  I see he said he

19   would put a good deal of weight on similar results

20   reached in quite different ways, for example,

21   prospectively and retrospectively.

22   Q.    In your opinion, the association between the use

23   of talcum powder products and the risk of ovarian

24   cancer is consistent across study designs,

25   specifically across case-control studies and cohort

McTiernan - Cross/Mr. Williams

848

1   studies?

2   A.    As I looked at the data this morning on the

3   forest plot, I saw consistency that most of the

4   studies were to the right of the line, most were in

5   the positive direction, the relative risk.

6   Q.    We put up your report earlier under the second

7   heading "consistency."  Do I need to put that up

8   again?  It said:

9        "Across the case-control and cohort studies,

10   the association between the use of talcum powder

11   products and risk of ovarian cancer was highly

12   consistent."

13        Do you remember?  Do you recall that?

14   A.    Yes.

15   Q.    The idea of a prospective cohort study, is that

16   people are asked what they do and what they put on,

17   and in their bodies right now when they are healthy,

18   and then they are followed along?  Correct?

19   A.    Yes.

20   Q.    You reviewed the Gertig 2000 study reporting on

21   the Nurses' Health Study cohort.  Right?

22   A.    Yes.

23   Q.    You reviewed the Gates 2008 paper also relating

24   to the Nurses' Health Study.  Right?

25   A.    Part of the 2008 was Nurses', part was a

McTiernan - Cross/Mr. Williams

849

1   case-control study.

2   Q.    You reviewed it?

3   A.    Yes.

4   Q.    You reviewed Gates 2010 also relating to the

5   Nurses' Health Study.  Right?

6   A.    Yes.

7   Q.    You reviewed the Houghton 2014 study?

8   A.    Yes.

9   Q.    That report relates to the Women's Health

10  Initiative on which you worked.  Right?

11  A.    Yes.

12  Q.    You also reviewed the Gonzalez 2016 study

13  reporting on the Sister Study cohort.  Right?

14  A.    Yes.

15  Q.    Those are five papers reporting results from

16  three prospective cohort studies that you reviewed.

17  Right?

18  A.    Yes.

19  Q.    True or not true:  Every single one of the

20  prospective cohort studies that you reviewed in

21  forming your opinions in this case reports an overall

22  risk estimate for genital talc use and ovarian cancer

23  that has a confidence interval crossing 1.0?

24  A.    Yes.  Usually I talk about the relative risk and

25  then I talk about the confidence interval.  I don't

850

1    usually talk about just one, but, yes.

2    Q.    I'm not asking you what you talk about.  Is the

3    answer to my question yes?

4    A.    As an epidemiologist, I don't just talk about

5    confidence intervals and about p-Values.  I talk about

6    relative risk for consistency.

7         THE COURT:  When he asks you a question,

8    respond to the question that he has.

9         THE WITNESS:  Okay.

10        THE COURT:  He is only focusing on that for

11   the moment.  I know we've heard your testimony about

12   how you viewed it all day tomorrow, so we understand

13   that.

14        MR. WILLIAMS:  Thank you, your Honor.

15   Q.    In 100 percent of the prospective cohort studies

16   there was no overall association found between genital

17   talc use and ovarian cancer.  Correct?

18   A.    I would have to disagree with that.

19   Q.    If confidence interval includes the number 1,

20   then we say the association between the exposure and

21   the disease could be null.  Correct?

22   A.    I agree with that.

23   Q.    In 100 percent of the prospective cohort studies

24   you could not rule out the possibility that the true

25   relative risk in each and every one of the prospective

McTiernan - Cross/Mr. Williams

851

1  studies is null.  Correct?

2  A.    I cannot -- say it again.  Just repeat it.  I

3  think it's close to what I understand, but, please.

4  Q.    You cannot rule out the possibility that the

5  true relative risk in each and every one of the

6  prospective cohort studies is null?

7  A.    Correct.

8  Q.    "Null" means zero, right, nonexistent?

9  A.    It means non-association or a relative risk of

10  1.

11  Q.    You cannot identify any prospective cohort study

12  concluding that there was a statistically significant

13  overall association between talc use and ovarian

14  cancer.  True?

15  A.    True.

16  Q.    It is your opinion an association between

17  genital talc use and ovarian cancer risk is highly

18  consistent across case-control and cohort studies

19  across those study designs.  That's your opinion.

20  Right?

21  A.    Yes.

22  Q.    One of the reasons that you did not perform your

23  own meta-analysis in this case was because you

24  believed the recently published Penninkilampi and

25  Berge meta-analyses were in your words excellent

McTiernan - Cross/Mr. Williams

852

1   studies.  Right?

2   A.    Yes.

3   Q.    Both of those studies included a meta-analysis

4   that stratified or broke-out study design, right?

5   They described cohorts and described case-controls

6   separately.  Correct?

7   A.    Yes.

8   Q.    Both Penninkilampi and Berge included an odds

9   ratio for the combined retrospective and case-control

10  studies on the one hand and a separate odds ratio for

11  the combined prospective cohort studies.  Right?

12  A.    I want to look at both of them.  Berge, I

13  believe so; and Penninkilampi, I would like to look at

14  again.

15  Q.    This is A 109, and I'm referring to page 6,

16  Table II.  That is a summary of pooled effect sizes in

17  a subgroup analysis.  Right, Doctor?

18  A.    Yes.

19  Q.    And it shows an overall association between any

20  perineal talc use and ovarian cancer stratified by

21  study design estimated as an odds ratio.  Right?

22  A.    Yes.

23  Q.    And looking at the stratified analysis in Table

24  No. 2, the combined odds ratio for the case-control

25  study was 1.35 with a 95 percent confidence interval

McTiernan - Cross/Mr. Williams

853

1    of 1.27 to 1.43.  Do you see that?

2    A.    Yes.

3    Q.    The study also shows the combined odds ratio for

4    the cohort studies.  Right?

5    A.    Yes.

6    Q.    The three cohort studies are listed there.

7    Correct?

8    A.    Yes.

9    Q.    And in that analysis that you rely upon for your

10   opinions, at the combined odds ratio for the cohort

11   studies was 1.06 with a 95 percent confidence interval

12   of 0.90.  Right?

13   A.    Confidence interval, that was the lower?

14   Q.    Yes.  It is right on the board there.  Do you

15   see any perineal use?

16   A.    I didn't hear the upper limit.

17   Q.    The upper limit is 1.25.  Do you see that?

18   A.    Yes.

19   Q.    This includes the null, which is the possibility

20   that there is in fact no association at all between

21   genital talc use and ovarian cancer.  Right?

22   A.    Yes.

23   Q.    Let's go to the Berge study.  That's Exhibit A

24   11.  Do you have that in front of you?

25   A.    Yes.

McTiernan - Cross/Mr. Williams

854

1   Q.    I direct your attention to Figure 2 on page 8.

2   If we pull out that chart, if we could look at the

3   bottom, a subtotal, and do you see the subtotal --

4   that's the wrong one -- the subtotal for the cohort

5   studies is 1.02.  We can agree that is an

6   extraordinarily low point estimate?

7   A.    It's low, yes.

8   Q.    And the confidence interval is 0.87 on the low

9   end and the upper end is 1.20.  Right?

10  A.    0.85.

11  Q.    0.85.  And the upper limit is 1.20.  Did I read

12  that right?

13  A.    Yes.

14  Q.    So the same confidence interval indicates that a

15  true combined risk estimate for the cohorts within

16  that range is as high as a 20 percent increased risk

17  and as low as a 15 percent decreased risk.  Right?

18  A.    Again, you are talking about -- the way I read

19  this is that the relative risk, the meta-analysis for

20  those three cohorts is a 1.02 relative risk with a

21  confidence interval that we just mentioned.  So that

22  indicates a confidence interval -- indicates what the

23  relative risk may truly be in the universe of cohort

24  studies.  That's what I'm trying to say.  I'm not sure

25  that confidence interval means that those three cohort

McTiernan - Cross/Mr. Williams

855

1    studies, their relative risk would be in that

2    interval, and you could already see the relative risk

3    for one of them falls outside of it.

4          That's why I'm saying when I look at a

5    confidence interval it means this is what a true

6    relative risk could fall within.

7    Q.    You would agree that the confidence interval at

8    the upper end would indicate a 20 percent increased

9    risk.  Right?

10   A.    Yes.

11   Q.    And equally true, based on the confidence

12   interval reported on page 7 of this exhibit, that the

13   relative risk could be as low as 0.85.  Correct?

14   A.    Yes.

15   Q.    Let me ask you some questions about power

16   calculation.  We have been talking about the cohort

17   studies, and I understand you have some criticisms of

18   the cohort studies.  Is that fair?

19   A.    There are strengths and limitations of both

20   cohort and case-control studies.

21   Q.    One reason that you have stated for the lack of

22   statistical significance in the cohort studies is that

23   the number of cases, the sample size of cancer cases

24   in those studies is too low.  Right?

25   A.    Yes.

McTiernan - Cross/Mr. Williams

856

1    Q.    You are distinguishing between the total sample

2    size on the one hand meaning every woman in the study

3    versus those women in the study who have cancer.

4    Right?

5    A.    The power to determine the relative risk depends

6    on the number of cases.

7    Q.    What is important for your analysis in terms of

8    the sample size is the number of cancer cases.

9    Correct?

10   A.    Yes.

11   Q.    You believe that the number of cancer cases

12   affects the statistical power of these cohort studies

13   we have been discussing.  Right?

14   A.    Individually, yes.

15         MR. WILLIAMS:  This is Dr. McTiernan's

16   testimony at page 215, lines 16, through the same

17   page, line 18:

18   Q.    (Reading.)

19         "QUESTION:  Do you believe that the number of

20   cases affects the statistical power of the studies"?

21   Q.    Line 16.

22         (Reading.)

23         "ANSWER:  Yes.

24         "QUESTION:  You believe the number of cases

25   affects the statistical power of the studies?

McTiernan - Cross/Mr. Williams

857

1      "ANSWER:  Yes."

2          Now, you performed your own power calculation

3   to determine the sample size that you believe is

4   required for a study to have sufficient power to

5   detect a statistically significant association.

6   Right?

7   A.    Yes.

8   Q.    And one of the reasons why you believe that the

9   meta-analyses that have been done in the last, say,

10  five years are helpful is that they are able to

11  combine the number of cancer cases.  True?

12  A.    Because they have additional power because they

13  have many more cases.

14  Q.    And the way that you get many more cases is by

15  combining the number of cancer cases among the

16  studies.  Correct?

17  A.    My understanding is meta-analyses' power

18  calculations don't just add together numbers.  I

19  haven't done the power calculations myself, but it is

20  not the same as adding.  But, conceptually, more cases

21  provides more power.  I just can't say that you would

22  apply the same power calculation to a meta-analysis

23  and then immediately get the right answer.

24  Q.    Let's get the record clear.

25          You have testified that you personally have

McTiernan - Cross/Mr. Williams

858

1   performed what is known as a power calculation to

2   determine the sample size that you believe is required

3   for a study.  Correct?

4   A.    An individual study, yes.

5   Q.    And you place particular importance on that

6   because you are focused on the number of cancer cases.

7   Right?

8   A.    Yes, in individual studies particularly.

9   Q.    Your calculation, the one in your litigation

10   report, you defined "good power" as power sufficient

11   to detect a relative risk of 1.3 with the statistical

12   significance of 0.05.  Right?

13   A.    Yes.

14   Q.    Based on your calculation, you concluded that

15   you have good power the number of cases would need to

16   be 931.  Correct?

17   A.    Yes.

18   Q.    None of the cohort or case-control studies that

19   you reviewed had sample sizes that large.  Right?

20   A.    Correct -- sorry.  None of the case-control or

21   cohort?

22   Q.    Correct.

23   A.    I think some of the case-control studies do have

24   sample sizes that big.

25   Q.    Almost none of the case-control and cohort

McTiernan - Cross/Mr. Williams

859

1  studies?

2  A.    I would need to look at the numbers.  There are

3  several that have more than 931, but it is not the

4  majority.

5  Q.    For that reason it was your opinion the

6  evaluation of the meta-analysis and the pooled

7  analyses with their larger sample sizes is critical to

8  understanding the state of the evidence.  Right?

9  A.    Yes.

10  Q.    And you wrote in your report on page 48, Exhibit

11  C 7, page 48, the meta-analysis section, bottom half,

12  after that hyperlink:

13        "Lack of statistical significance found in the

14  various studies is likely due to their small sample

15  sizes.  For this reason, evaluation of the

16  meta-analysis and pooled analysis with their larger

17  sample sizes is critical to understanding the state of

18  epidemiological evidence linking use of talcum powder

19  products to risk of ovarian cancer."

20        Correct?

21  A.    Yes.

22  Q.    These meta-analyses, they look at the number of

23  cases across the cases that are part of the

24  meta-analysis.  Right?

25  A.    Say it again.

McTiernan - Cross/Mr. Williams

860

1    Q.    The meta-analyses look at -- the meta-analyses

2    and the pooled analyses, with their larger sample

3    sizes, derive their larger sample sizes by taking the

4    sample sizes from multiple other studies and putting

5    them together.  Right?

6    A.    Yes.  In terms of power, however, it is not as

7    simple as adding them up together.  You get more power

8    by doing the meta-analysis, but it is a different

9    power calculation to my knowledge.  Doing a

10   meta-analysis corrects for much of the lack of numbers

11   in individual studies, but it doesn't completely

12   correct it from my understanding because of the

13   variability in the individual studies.  That's why I

14   don't want to say you immediately have completely

15   enough power by adding studies together.  I know there

16   are power calculations that are done specifically for

17   meta-analyses.

18   Q.    The point that you were making in performing

19   your power calculation -- let me stop for a second.

20   You performed a power calculation, did you not?

21   A.    I did to consider for individual studies.

22   Q.    The point you were making in performing your

23   power calculation was that with meta-analysis, with

24   their larger combined sample sizes, that could be used

25   to overcome the lack of statistical power.  True?

McTiernan - Cross/Mr. Williams

861

1    A.    The word "could" is key here, yes.

2    Q.    Did you understand me to be saying "could"?

3    A.    I thought I heard the word "could," that it

4    could overcome the lack of power in individual studies

5    -- maybe you could repeat what you said.

6    Q.    I'll ask the question again:

7          The point that you were making in performing

8    your power calculation was that meta-analyses with

9    their larger combined sample sizes can be used to

10   overcome that lack of statistical power.  Is that

11   true?

12   A.    It can correct for much of the problems.  It

13   just can't completely correct for individual studies'

14   lack of power, to my understanding.

15        MR. WILLIAMS:  Permission to read, your

16   Honor --

17        THE COURT:  Yes.

18        MR. WILLIAMS:  -- from the Doctor's deposition

19   at page 217, lines 12 through 16.

20        (Reading.)

21        "QUESTION:  The point you were making in

22   performing your power calculation was that

23   meta-analyses, with their larger combined sample

24   sizes, can be used to overcome that lack of

25   statistical power.  Is that true?

McTiernan - Cross/Mr. Williams

862

1      "ANSWER:  Yes."

2  Q.    Now, Doctor, I would like you to take a look at

3  the Berge 2018 meta-analysis, which is Exhibit A 11

4  and I would ask you to turn to page 7.

5      Take a look at the paragraph starting at the

6  top of the right-hand column there, halfway down that

7  paragraph starting with, "It should be noted."  Are

8  you with me?

9  A.    Yes.

10  Q.    The Berge study wrote:

11      "It should be noted that the cohort studies

12  included in the meta-analysis comprised a total of

13  429 cases of ovarian cancer cases exposed to genital

14  talc and 943 unexposed cases.  The statistical power

15  of the meta-analysis of these cohort studies to detect

16  an RR of 1.25 similar to the result of the

17  meta-analysis of case-control studies was 0.99.  Thus,

18  low power of case-control studies cannot be invoked as

19  explanation of the heterogeneity of the results."

20      Is that what they said?

21  A.    Yes.

22  Q.    The Berge study is one of the two meta-analyses

23  that you said is an excellent study.  Right?

24  A.    I'm just noting the 429 cases does not look

25  correct for the cohort studies.

McTiernan - Cross/Mr. Williams

863

1    Q.    I'm asking you a question, Doctor.

2          The Berge study is one of the two

3    meta-analyses that you said is an excellent study.

4    Correct?

5    A.    Yes.

6    Q.    And what they list here on page 7 of the Berge

7    study is 429 cases or exposed cases of ovarian cancer

8    and 943 unexposed ovarian cancer cases.  Right?

9    A.    Yes.  I misread it.  That's what they say.

10   Q.    If you add those two numbers together, you get

11   over 3900 actual cancer cases.  Right?

12   A.    Yes.

13   Q.    Now, in your report, based on your power

14   calculation, you concluded that the minimum number of

15   cases would need to be 931.  Correct?

16   A.    Yes.

17   Q.    Can we agree 1372 is more than 931?

18   A.    Yes.  But my power calculation was for an

19   individual study.  However, they have done a power

20   calculation, and I assume they have done it for

21   meta-analysis.  So I would trust their statement that

22   the power was .99 rather than extrapolating from my

23   power calculation which was for one study.

24   Q.    This Berge study that you say is an excellent

25   study sets forth a power calculation that suggests

McTiernan - Cross/Mr. Williams

864

1   that lack of power should not be a valid criticism of

2   the cohort studies.  Correct?

3   A.    Given their power calculation.

4   Q.    And you have no reason, as you said a moment

5   ago, to doubt that calculation.  Correct?

6   A.    Correct.

7   Q.    Let me ask some questions about epidemiology and

8   some basic principles.

9         You mentioned on direct examination that you

10  have worked on comprehensive written reports for the

11  U.S. Government in your career?

12  A.    Yes.

13  Q.    And in the section of your report entitled

14  "Overall Approach," -- if we can pull that up, it is

15  page 7 -- you had an overall section in your report,

16  and you drew upon your years of experience, and you

17  wrote that for purposes of your work here you drew

18  upon that experience with synthesizing and

19  interpreting large numbers of epidemiologic studies

20  for comprehensive reports.  Right?

21        Let me draw your attention to this particular

22  part.

23  A.    It says, page 9 --

24        THE COURT:  He has it up on the screen.

25        THE WITNESS:  I see it.

McTiernan - Cross/Mr. Williams

865

1    Q.    (Reading.)

2          "Among the different engagements that you had

3    is work with the World Health Organization

4    International Agency for research on cancer, IARC, and

5    the World Cancer Research Fund" -- correct?

6    A.    Yes.

7    Q.    (Continuing.)

8          -- "for the World Cancer Research Fund, you

9    are a member of the advisory panel of experts that

10   guides interpretation of meta-analyses and does

11   systematic reviews of nutrition, physical activity,

12   obesity and risk factors for many cancers, including

13   ovarian cancer."

14         Is that true?

15   A.    My work on that panel is completed.  I'm on an

16   interim panel now.

17   Q.    As of the time I took your deposition, you were

18   still on that panel.  Correct?

19   A.    I might have stated it had recently come to an

20   end.  I believe I stated that in the deposition.

21   Q.    In your binder, take a look at Exhibit A 153.

22         MR. WILLIAMS:  This is the World Cancer

23   Research Fund, Judge, the evidence report.

24   Q.    Do you have that in front of you?

25   A.    153 in Binder 1, I don't see it.

McTiernan - Cross/Mr. Williams

866

1              (Pause.)

2    Q.    Do you have that in front of you?

3    A.    Yes.

4    Q.    Now, the continuous research project that you

5    did for 2018, the purpose of it was to consider

6    scientific research from around the world, and to

7    evaluate that literature and make findings based on

8    it.  Is that accurate?

9    A.    Yes.

10   Q.    The third paragraph explains on the page that we

11   have on the board, which is, I think, page 5 of the

12   document, explains why the CUP does all of its work

13   and it says:

14              "Through this process the CUP ensures that

15   everyone including policymakers, health professionals,

16   and members of the public has access to the most

17   up-to-date information on how to reduce the risk of

18   developing cancer."

19              (Pause.)

20              Do you have that in front of you, Doctor?

21   A.    Yes, I do.

22   Q.    There is a portion of this report where you and

23   your colleagues explained how to cite the document.

24   It is on page 5.  It is another section on the same

25   page, how to cite the third expert report.  Correct?

McTiernan - Cross/Mr. Williams

867

1   A.     Yes.

2   Q.     So the idea is, this is an actual report that

3   could be cited, and you explain how it could be cited

4   if one chose to do so.  Correct?

5   A.     Yes.

6   Q.     And as of last year, in 2018, you were a member

7   of what was called the "Advisory Panel of Experts For

8   the World Cancer Research Fund."  Right?

9   A.     Yes.

10  Q.     This exhibit, A 153, was published by that

11  organization at the time you served as a panelist for

12  the organization in 2018.  Correct?

13  A.     This exhibit was published at that time.  Is

14  that what you are saying?

15  Q.     I'm saying this exhibit was publish by the WCRF

16  at the time you served as a panelist for that

17  organization in 2018?

18  A.     Yes.

19  Q.     2018 was two years after you were retained by

20  plaintiffs' counsel.  Correct?

21  A.     Yes.

22  Q.     Let's turn to page 31.

23         You were acknowledged here in the left-hand

24  column at the bottom, and you appear in the photograph

25  that appears on that page.  Right?

McTiernan - Cross/Mr. Williams

868

1    A.    Yes.

2    Q.    The expert advisory panel that you were on,

3    guided interpretation of meta-analyses and systematic

4    reviews on those topics we discussed, nutrition,

5    physical activity, obesity, and risk for many

6    cancers -- right?

7    A.    For those variables specifically, yes.

8    Q.    Including ovarian cancer.  Correct?

9    A.    Yes.

10   Q.    Please turn to page 8 of the exhibit.  The last

11   paragraph is on study design.  That paragraph on study

12   design starts by saying:

13         "Each study design has its advantages and

14   limitations" -- you said that here today?

15   A.    Yes.

16   Q.    You agree with the WCRF there are good things

17   and bad things about any study.  Correct?

18   A.    There are good things and bad things --

19   Q.    Any study type?

20   A.    Yes.

21   Q.    True or not true:

22         "The hierarchy of epidemiological evidence

23   places cohort studies above case-control studies?"

24   A.    I would note that the top of this section --

25   this is a box issues concerning interpretation of

McTiernan - Cross/Mr. Williams

869

1    epidemiologic tests.

2         It states:

3         "Interpretation of epidemiologic evidence on

4    identity, nutrition, and physical activity, and the

5    risk of cancer is complex, and expert judgment is

6    essential.  General considerations that need to be

7    taken into account when evidence is assembled and

8    assessed include the following" -- and then there are

9    six bullet points, and I believe Mr.  Williams is

10   talking about the bottom bullet point under that

11   heading."

12   Q.    True or not true:

13        "You and your colleagues published a report

14   that says:  The hierarchy of epidemiological evidence

15   places cohort studies above case-control studies with

16   ecological studies and case reports at the bottom.

17   There are merits in considering a number of different

18   study designs.  Cohort studies are likely to be the

19   main source of evidence owing to the long latent

20   period for cancer to develop and also to their

21   prospective design.  However, in some circumstances

22   case-control studies and ecological studies may also

23   make a useful contribution to the evidence.  See

24   Section 7."

25        Did I read that correctly?

McTiernan - Cross/Mr. Williams

870

1   A.    Yes.  And that's referring to the diet, physical

2   activity and nutrition variables it mentions at the

3   top.

4   Q.    Did I read it correctly?

5   A.    Yes.

6   Q.    If you look at the last paragraph in the

7   left-hand column -- and I would like to turn to page

8   22 now -- the last paragraph in the left-hand column

9   says:

10        "The work from the 2007 second expert report

11  was used as a starting point."  Correct?

12  A.    Yes.

13  Q.    The acronym SLR in the continuous update project

14  refers to systematic literature review.  Correct?

15  A.    Yes.

16  Q.    Continuing on page 22 of the update project

17  report, it says:

18        "The first stage of the SLRs was a

19  comprehensive search using standardized search

20  strategy -- a standardized search strategy for the

21  scientific literature for randomized controlled trials

22  and cohort studies published since 2006 using

23  MedLine."

24        Right?

25  A.    Yes.

McTiernan - Cross/Mr. Williams

871

1    Q.    And it goes on to explain:

2          "Because case-control studies are particularly

3    prone to recall and other bias, they were not

4    routinely reviewed.  However, if there were no or very

5    few RCTs or cohort studies, they were included.  That

6    was the methodology you employed."

7          Right?

8    A.    This is what they stated at the last meeting I

9    was in.  They stated that they do include case-control

10   in the search.  So here it's clear what they say about

11   review.  But the search part is not completely

12   correct.

13         MR. WILLIAMS:  Move to strike as

14   nonresponsive.

15         THE COURT:  His question was, Is that what the

16   report says?

17         THE WITNESS:  Then yes.

18   BY MR. WILLIAMS:

19   Q.    For the analysis that you did in this

20   litigation, you reviewed prospective cohort studies.

21   Right?

22   A.    You are talking about the current -- the current

23   litigation?

24   Q.    Yes.  I'm jumping forward to today.

25   A.    Yes.

McTiernan - Cross/Mr. Williams

872

1    Q.    The work you have done in this matter you

2    reviewed prospective cohort studies.  Right?

3    A.    Yes.

4    Q.    None of those studies concluded that there was a

5    statistically significant overall association between

6    talc use and ovarian cancer.  Right?

7    A.    Their conclusion, correct.

8    Q.    Would you agree with me that if you had only

9    looked at the cohort studies in this case, like you

10   did as part of the expert advisory panel for the World

11   Cancer Research Fund, you would not have been able to

12   opine talcum powder causes ovarian cancer?

13   A.    If I didn't look at the totality of evidence, I

14   might have come up with a different answer.

15   Q.    My question was a little different.  My question

16   was:  If you had only looked at the cohort studies,

17   all of which found no statistically significant

18   association, you would not have been able to come to a

19   conclusion that talc actually causes ovarian cancer.

20   Correct?

21   A.    I think I can't assume what I would come up

22   with.  I know one of the cohort studies did have a

23   positive association for serous cancer.  I haven't

24   considered -- to answer your question, I haven't

25   considered what my conclusion would have been if I

McTiernan - Cross/Mr. Williams

873

1    looked only at a subset of studies.

2    Q.    In your last answer, you mentioned one of the

3    studies found a positive association for serous

4    invasive ovarian cancer.  You just said that, right?

5    A.    Yes.

6    Q.    You are referring to Gertig 2000.  Right?

7    A.    Yes.

8    Q.    You are aware later Gertig studies -- strike

9    that.

10         Later studies that followed the same women

11   along farther in time through 2006, 2008, 2010 did not

12   find a statistically significant positive association

13   between use of talc and serous invasive ovarian

14   cancer.  Correct?

15   A.    They used a different comparison.  It is

16   difficult to say what they would have found if they

17   used the same comparison.  So they did not.  They

18   compared "ever" uses plus "once-a-week" users to

19   "greater" users.  I don't know what the relative risk

20   would have looked like had they done the same

21   comparison as the first paper.

22   Q.    Let's unpack that.  You do not know what the

23   relative risk would have looked like had they used the

24   same criteria, is what you are saying.  Right?

25   A.    Yes.

McTiernan - Cross/Mr. Williams

874

1    Q.    But you also do not know it would have been

2    different than the finding that they made in 2010.

3    Correct?

4    A.    Correct.

5    Q.    You do not deny that in 2010, when the women had

6    been followed for a longer period of time, the

7    positive association for serous invasive ovarian

8    cancer fell away and there was no statistically

9    significant association.  True?

10   A.    There was no association in their data as they

11   presented it.

12           MR. WILLIAMS:  Your Honor, is this a good time

13   for a break?

14           THE COURT:  Absolutely.  Thank you.

15           THE DEPUTY CLERK:  All rise.

16           (Recess is taken.)

17           (Continued on the next page.)

18   ///

19

20

21

22

23

24

25

McTiernan - Cross/Mr. Williams

875

1        THE DEPUTY CLERK:  All rise.

2        THE COURT:  Thank you.

3

4    **Anne McTiernan**, resumed.

5

6    CROSS-EXAMINATION

7    BY MR. WILLIAMS:

8    Q.    Good afternoon, Dr. McTiernan.

9        In your opinion, if risk for disease increases

10   with the amount of exposure, the likelihood of a

11   causal relationship goes up.  Right?

12   A.    Yes.

13   Q.    That is essentially the concept of

14   dose-response.  Right?

15   A.    Yes.

16   Q.    You reviewed the Terry 2013 study, and we

17   referred to that earlier today, which is Exhibit A 31.

18   Do you have that in front of you?

19   A.    Yes.

20   Q.    In your opinion, the Terry 2013 pooled analysis

21   provides strong evidence that perineal use of talcum

22   powder causes ovarian cancer.  Right?

23   A.    I'm sorry.  You said 831 for the reference, yes.

24   Q.    I said A 139.  We have it up on the board.

25        It is your opinion that that study provides

McTiernanS - Cross/Mr. Williams

876

1    strong evidence that perineal talcum powder causes

2    ovarian cancer.  Right?

3    A.    Yes.

4    Q.    In your report Exhibit C 7, page 55 of the

5    report, you wrote:

6          "The Terry, et al, pooled analysis provides

7    strong evidence that perineal talcum powder product

8    use causes ovarian cancer.  Strong here does not

9    pertain to the size of the odds ratio/relative risk.

10   Rather, it refers to the fact that the number of cases

11   included was larger than any previous study.  The

12   eight-case-control studies included showed similar

13   effect sizes for association of genital powder use and

14   ovarian cancer risk consistency."

15         This the part I want to focus on.

16         "The dose-response effect was clear and there

17   were enough numbers of cases to determine effects on

18   subtypes of ovarian cancer."

19         I read that right?

20   A.    Yes.

21   Q.    The opinion is based in part on your conclusion

22   that the study showed a clear dose-response effect.

23   Right?

24   A.    Yes.

25   Q.    Terry 2013 pooled eight case control studies.

McTiernan - Cross/Mr. Williams

877

1    Correct?

2    A.    Yes.

3    Q.    The data from five of those case-control studies

4    were previously published -- meaning published in a

5    different paper -- before they were mentioned in Terry

6    2013's pooled analysis.  Correct?

7    A.    Yes.

8    Q.    And you wrote that in your report.  You made

9    that precise statement that the data from five of the

10   studies were previously published, but that three were

11   not previously published?

12          Do you remember that?

13   A.    Yes.

14   Q.    In this litigation -- and I mean in your report

15   for this litigation -- you define a pooled analysis --

16   and this is page 22 of your report, Exhibit C 7, first

17   full paragraph, first sentence -- you defined a pooled

18   analysis as "a type of meta-analysis where original

19   individual level data from various published and/or

20   unpublished epidemiological studies are combined and

21   reanalyzed."

22          Did I read that right?

23   A.    Yes.

24   Q.    Now, Terry 2013, which included previously

25   unpublished talc data from three case control studies

McTiernan - Cross/Mr. Williams

878

1    fits the description of a pooled analysis in your

2    litigation report here.   Right?

3    A.     Yes.

4    Q.     So in relying on Terry 2013 as part of the

5    science relating to use of talcum powder and risk of

6    ovarian cancer, you relied on the data from those

7    previously unpublished studies.   Correct?

8    A.     I relied on the data on the eight studies that

9    included those three unpublished, yes.

10   Q.     Now, let me pull up your report again.   There is

11   one citation there, citation No. 39.   There is one and

12   only one citation there.   Correct?   There is just

13   citation for that proposition.   Correct?

14   A.     I'm trying to find my report.

15   Q.     I'll represent to you that is the Terry study.

16   Will you take my representation?

17   A.     Okay.

18   Q.     I would like to pull up your definition again of

19   what a pooled analysis is.

20          MR. WILLIAMS:   If we could put that up, page

21   22, C-7.

22   Q.     Looking at the first two sentences there, you

23   cannot point us to any referenced material that you

24   have reviewed anywhere that describes a pooled

25   analysis, using the words that you set forth here in

879

1  your report.  Correct?

2  A.    I'm not sure.  There have been methods, papers

3  written about pooled analyses.  I'm not sure if

4  they -- I'm not sure if they use these particular

5  concepts.

6  Q.    You wrote these two sentences here on page 24 of

7  your report, correct, defining a pooled analysis?

8  A.    It is in my report, yes.

9  Q.    My question was a simple one; it was -- can you

10  point the Court to any reference material that you

11  have reviewed that describes a pooled analysis, using

12  those words, with particular reference to published

13  and/or unpublished epidemiological studies?

14  A.    I know that I did not cite -- I did not cite

15  Friedenreich 1993 as a description of pooled analyses.

16  And I did not cite that in my report.  I did use World

17  Cancer Research Fund methods description in my report

18  that's cited not here but cited overall in the report.

19  Q.    Now, the Friedenreich paper 1993 is not

20  referenced in your report?

21  A.    It is not in my report.

22  Q.    Let's talk about the World Cancer Research Fund

23  document.  It has already been discussed, Exhibit A

24  153, the "judging the evidence" report that you, your

25  colleagues published in 2018, just last year.

McTiernan - Cross/Mr. Williams

880

1    A.    But this report --

2    Q.    There is no question pending.

3          Let's take it one step at a time.

4          Please turn to page 12 of Exhibit 153.  Do you

5    have that in hand.

6    A.    On the -- yes.

7    Q.    On the right-hand side of that page, do you see

8    a definition of "pooled analysis" that is contained in

9    the report?  Do you see that?

10   A.    Yes.

11   Q.    Here you and your colleagues wrote:

12         "Pooled analysis is a type of meta-analysis in

13   which original individual level data from various

14   published epidemiological studies of a similar type,

15   usually prospective cohort studies, are combined and

16   reanalyzed."

17         Did I read that right?

18   A.    Yes.

19   Q.    It goes on and says:

20         "The combination of data from multiple studies

21   creates a larger data set and increased statistical

22   power."

23         Right?

24   A.    Yes.

25   Q.    The sentence also includes the phrase "of a

McTiernan - Cross/Mr. Williams

881

1   similar type, usually prospective cohort studies."

2          Do you see that?

3   A.    Yes.

4   Q.    So in the World Cancer Research Fund definition

5   of a "pooled analysis," it references studies of a

6   similar type, usually prospective cohort studies.

7   Right?

8   A.    Yes, it says that.

9   Q.    Let's look at the version of your report.

10          In your report you wrote:

11          "Pooled analysis is the type of meta-analysis

12   where original individual level data from various

13   published and/or unpublished epidemiological studies.

14   The definition in the World Cancer Research Fund does

15   not say and/or unpublished."

16          Can we agree?

17   A.    Yes.

18   Q.    And your definition in your report at page 22

19   does not include the language that was included in the

20   World Cancer Research Fund of a similar type, usually

21   prospective cohort studies.  Right?

22   A.    Correct.

23   Q.    Now, did the members of the World Cancer

24   Research Fund have your report at the time this study

25   came out?  This paper from WCRF came out in 2018.

McTiernan - Cross/Mr. Williams

882

1    A.    No.

2    Q.    You did have the WCRF paper at the time you

3    wrote your report for this matter.  Right?

4    A.    Yes.

5    Q.    And you personally typed up your paper.

6    Correct?

7    A.    Yes.

8    Q.    And when you typed it up, you added "and/or

9    unpublished."  Right?

10   A.    I included those words, yes.

11   Q.    And you took out a similar type, usually

12   prospective cohort studies.  Right?

13   A.    Those words are not in my version, yes.

14   Q.    The reason that you added "and/or unpublished"

15   was that you knew that the study that you were relying

16   upon with its pooled analysis included data from three

17   studies that were unpublished.  Right?

18   A.    I don't think so.  Pooled analyses, they're

19   pooling projects that begin with no published studies.

20   The pooled analysis I collaborated in began with us

21   providing data to investigators, some of which had

22   been published, some not.  The NCI funds many pooling

23   projects.  Pooling projects can be with randomized

24   control trials.  It is very common.  Pooling projects

25   have been with case control studies.  One of my

McTiernan - Cross/Mr. Williams

883

1    pooling projects was case-control studies.  One of my

2    projects was a pooling study of randomized trials.  My

3    statement in the report needed to be more general than

4    what WCRF indicated.

5    Q.    Let's go to your report C-7, page 8, first full

6    paragraph, your description of the Terry pooled

7    analysis.  What you wrote in your report was the

8    pooled analysis which included data from five

9    previously published and three unpublished

10   case-control studies.

11           And you went on."

12           That's what you wrote?

13   A.    Yes.

14   Q.    And the reason you took this part out in the

15   description of a pooled analysis -- and by "this

16   part," I'm referring to the words "of a similar type

17   usually prospective cohort studies," is that you knew

18   if the definition of pooled analysis that you and your

19   colleagues used for the WCRF had been applied to this

20   case, it would have focused the Court on the

21   prospective cohort studies, none of which has found an

22   association between talc use and ovarian cancer.

23           Is that true?

24   A.    No.

25   Q.    Do you deny you added the words "and/or

McTiernan - Cross/Mr. Williams

884

1    unpublished" and removed the words "of a similar type

2    usually prospective cohort studies" when you wrote the

3    definition of "pooled analysis" in your report?

4    A.    I agree many of the words are the same.  This is

5    an epidemiologic concept.  If I were to write what the

6    WCRF definition says in some other context, it would

7    not be correct because it is not true that only cohort

8    studies are done for pooled analyses.

9         Pooled analyses -- as I mentioned, my first

10   pooled analysis was years before 2016.  It was

11   20 years before, which was case-control studies.  My

12   second pooled analysis was a couple of years before

13   2016.  That was randomized control trials.  I also

14   participated in cohort study pooled analysis, and

15   published from that.  And so it is a very general type

16   of epidemiology.  It's not limited to cohort studies.

17        So it would be incorrect for me to say

18   "usually prospective cohort studies" because that is

19   not the case.  And for published and/or unpublished, I

20   didn't want to leave a statement that says "original

21   individual data from published epidemiologic studies"

22   because that is not the case.  In some pooled projects

23   there will be published and unpublished data, and that

24   has been true in my studies and many other pooled

25   projects.

McTiernan - Cross/Mr. Williams

885

1    Q.    Did you understand my last question to be

2    suggesting your definition of a pooled analysis from

3    the WCRF paper said only prospective studies?

4          I read it accurately and said "usually

5    prospective cohort studies," I read that correctly;

6    didn't I?

7    A.    Even the word --

8    Q.    One question at a time.

9          Did I read it correctly or not?  I said

10   "usually and not only."  Right?

11   A.    It sounds like that's what you said, yes.

12   Q.    My point is, if you had focused your attention

13   on the prospective studies for purposes of this

14   matter, then the definition that you and your

15   colleagues used for the WCRF would have hurt the

16   plaintiffs in this case; would it not?

17          MS. PARFITT:  I object.

18          MR. WILLIAMS:  Hurt the plaintiffs' position.

19          THE COURT:  Thank you.

20   BY MR. WILLIAMS:

21   Q.    Do you understand my question?

22   A.    My purpose in writing it was to be complete

23   about the methodology, and it didn't occur to me what

24   would help one side or the other when I wrote my

25   methodology.

McTiernan - Cross/Mr. Williams

886

1    Q.    In both definitions, the one in the WCRF paper

2    and in your report here, the next sentence appears

3    word-for-word.  Right?  The combination of data from

4    multiple studies creates a larger data set and

5    increased statistical power.  Correct?

6    A.    Yes.

7    Q.    Let me ask you some questions on dose-response,

8    please.

9          On the question of dose-response, -- that is,

10   whether the studies you reviewed showed or did not

11   show an increasing risk of ovarian cancer from

12   increased talc use -- you agree that not all of the

13   studies on that list of the 28 studies, looked into

14   that question.  Right?

15   A.    Correct.

16   Q.    Of the studies that did look into dose-response,

17   not all of those studies found a dose-response.

18   Right?

19   A.    Correct.

20   Q.    Some purported to find a trend; some did not.

21   True?

22   A.    Correct.

23   Q.    So just on that question, the question of

24   whether or not the studies that looked at

25   dose-response found a trend, the studies reached

McTiernan - Cross/Mr. Williams

887

1   inconsistent results.  True or not.  True?

2   A.    True.

3   Q.    Your opinion in this litigation is that

4   cumulative exposure, meaning frequency of genital talc

5   use, how often one uses it, and duration or times

6   duration, meaning years of talc use is the optimal

7   metric of dose-response effects.  Right?

8   A.    Yes.

9   Q.    You agree, though, not all studies examining the

10  cumulative dose-response found a trend or a

11  dose-response.  Correct?

12  A.    When you say "trend," maybe you can define that.

13  Q.    Sure.

14        For purposes of my question, please focus on

15  those studies that examined what you call cumulative

16  dose-response, meaning cumulative use, frequency times

17  duration.  Do you have that subset in mind?

18  A.    Yes.

19  Q.    With those studies that did use that type of

20  calculation, some purported to find a dose-response

21  and some did not.  Right?

22  A.    Correct.

23  Q.    So on that question, the question of whether or

24  not the studies that looked at a cumulative use found

25  a dose-response, on that question, the studies reached

888

1    inconsistent results.  Right?

2    A.    Correct.

3    Q.    Let's go to Terry A 139.  I'll direct your

4    attention to page 8, the right-hand column, first full

5    paragraph about midway down.  I'm looking for the

6    sentence that begins "although":

7            The authors wrote:

8            "Although a significant increase in risk with

9    an increasing number of genital powder applications

10   was found for nonmucinous epithelial ovarian cancer,

11   when non-users were included in the analysis, no trend

12   in cumulative use was evident in analyses restricted

13   to ever users of genital powder."

14           That's what the authors wrote in their study.

15   Correct?

16   A.    That's what they wrote, yes.

17   Q.    The question of whether a trend in cumulative

18   use was evident in Terry, you've come to an opposite

19   conclusion to the conclusion of the authors of that

20   study with respect to ever-never use?

21   A.    I think they are not talking about ever/never

22   use but dose-response.

23   Q.    I'm talking about a dose-response effect when

24   the analysis is restricted to people who actually used

25   talcum powder.

889

1    A.    Only users.

2    Q.    Correct.

3    A.    The first part of that sentence says, "although

4    a significant increase in risk with an increasing

5    number of genital powder applications was found for

6    nonmucinous, epithelial ovarian cancer when non-users

7    were included in the analysis."

8          This is the issue, and I talked about it this

9    morning.  When non-users with a comparison -- which is

10   a very valid comparison, there was a statistically

11   significant p-Value.  When they were not included,

12   when it was only the users compared among themselves,

13   the p-Value was .17.  Those are the two different

14   statistical tests I look at.  I also look at the

15   confidence intervals for each of those levels.

16   Q.    Let me focus you on the part I was trying to

17   focus you on.  I was trying to focus you on A 139,

18   page 8.  The part I was trying to focus you on is the

19   part after the comma.  It goes on and says:

20          "No trend in cumulative use was evident in

21   analyses restricted to ever users of genital powder."

22          That's what they said.  Correct?

23   A.    Yes.

24   Q.    And just for clarification, the issue here is

25   whether or not in calculating a dose-response the

McTiernan - Cross/Mr. Williams

890

1    authors of a study include in the calculation of

2    dose-response people who never used talc at all.

3    Right?

4    A.    Yes.

5    Q.    You say for purposes of this matter and for

6    purposes of emphasizing that Terry in your view shows

7    dose-response.  You say that the people who never used

8    talc should be included in the calculation.  Right?

9    A.    Yes.  Although I think it is very appropriate

10   they did it both ways.

11   Q.    And what the author said was that there was no

12   trend if you focused only on people who actually used

13   talc, and then watched what happened if they used more

14   and more over their lifetimes.  Fair?

15   A.    Yes.  And they also reported when they included

16   non-users.

17   Q.    They reported it both ways.  Right?

18   A.    Yes.

19   Q.    You said I think earlier today something to the

20   effect of statisticians favor including those who

21   never used the product, did you say something to that

22   effect?

23   A.    That's my understanding, that unless there is

24   some other reason to exclude non-users, it is

25   appropriate to include them.

McTiernan - Cross/Mr. Williams

891

1    Q.    What is that understanding based on?

2    A.    That it's appropriate to include non-users when

3    you are looking at a dose-response effect, unless

4    there is some other reason non-users are so different

5    they should be excluded.  I liken it to if you are

6    testing a dose for effectiveness in a randomized

7    trial, you would compare to placebo.

8    Q.    If you are testing the effect of a dose, there

9    should a dose.  Right?  This is a crude example.  If

10   someone were testing the effect of drinking beer, you

11   would test the effect of one can of beer versus the

12   effect of 10 cans of beer.  You wouldn't necessarily

13   include zero cans of beer?

14   A.    I think you would.  We note the test of trends

15   that were -- the two tests of trends we're both

16   referring to are the tests including relative risk.

17   These relative risks were calculated comparing to the

18   non-users.

19   Q.    You said earlier today there was some basis --

20   strike that.

21          You said earlier today that statisticians

22   prefer to include people who never used the substance.

23   Tell the Court the basis for that.

24          Can you cite some periodical or study to that

25   effect.

McTiernan - Cross/Mr. Williams

892

1  A.    Dr. Sander Greenland, and I don't have the

2  article on the top of my head.

3  Q.    Anything else?

4  A.    That would be the reference I have.

5  Q.    Are you familiar with an epidemiologist named

6  Britton Trabert.

7  A.    He's an epidemiologist?

8  Q.    I believe so, or statistician, one or the other?

9  You don't know the name?

10  A.    I don't.

11  Q.    Let me show you an article and see if you have

12  seen it.

13        Britton Trabert is a woman.  I beg your

14  pardon?

15        This is a commentary entitled:

16        "Body powder and ovarian cancer risk, what is

17  the roll of recall bias?"

18        Authored by Britton Trabert.  It is dated

19  2016.  Have you ever read this article before?

20  A.    No, it doesn't look familiar.

21  Q.    Let me direct your attention to the lower

22  right-hand corner of the right-hand column on page --

23  the first page of the document, which we will mark as

24  McTiernan 521.  It says at the bottom of the page,

25  quote:

McTiernan - Cross/Mr. Williams

893

1          "In addition, when a pronounced binary

2     association is present use of the never or no category

3     in assessing trend can induce a trend where none

4     exists.  The recent OCAS analysis reported no trend

5     with increasing lifetime application when restricted

6     to talc users."  And it has a citation to note 18.

7          Do you see that?  And that citation is to the

8     Terry paper.

9     A.    Yes.

10    Q.    Now, you would agree that if the people who did

11    not ever use talc are excluded from the analysis of

12    the dose-response, the conclusion of the Terry paper

13    was that there was no significant dose-response.

14    Right?

15    A.    My conclusion would be that the p-Value is .17

16    but the relative risks still remain the same.  They

17    increase with increasing dose over the four

18    categories.

19    Q.    There was no significant trend if the people who

20    never used talc were excluded from the calculation.

21    Right?

22    A.    The trend was not statistically significant,

23    correct.

24    Q.    Which means that there was no association that

25    you could establish.  Correct?

McTiernan - Cross/Mr. Williams

894

1    A.    It doesn't change the relative risk.

2    Q.    Let's talk about the Penninkilampi study as it

3    relates to -- actually, not that one.  Let's do

4    another one.

5          Let's talk about the Harlow paper.

6    A.    Which one is this?

7    Q.    It is 1992.  It is Exhibit A 55.

8          Do you remember that Harlow 1992 was one of

9    the papers that did use the metric that you say is

10   proper, which is frequency times duration?  That's

11   true.  Correct?

12   A.    Yes.

13   Q.    Turn to page 8, left-hand column, the first full

14   page.  It says:

15         "As a continuous variable in a multi variate

16   model, no significant dose-response was observed

17   between total genital applications of talc and ovarian

18   cancer risk."  Correct?

19   A.    Yes, it states that.

20   Q.    One of the other studies you reviewed is Cook

21   1997.  This is Exhibit A 21?

22         This is one of the studies you read.  Right?

23   A.    Yes.

24   Q.    Your conclusion in your report, if we could call

25   up Exhibit C 7 at page 71 in the chart, that you had

McTiernan - Cross/Mr. Williams

895

1  in the back of your report, you listed Cook as a study

2  where there was no cumulative lifetime days,

3  therefore, no dose-response.  Is that right, Doctor?

4  A.    I think what that means is no dose-response

5  found and that was the matrix she looked at cumulative

6  lifetime days.

7  Q.    Let's take a look at the study then.  Exhibit A

8  21 in your book is the Cook study.  Let me ask you to

9  go there.  Please turn to page 6, Table 3.  Do you see

10  there is a table where the study includes

11  dose-response?

12  A.    Yes.

13  Q.    And it has information based on cumulative

14  lifetime days of any perineal dusting.  Correct?

15  A.    Yes.

16  Q.    It says:

17      "Any perineal dusting," and it looks at less

18  than 2,000 lifetime days going up to over 10,000

19  lifetime days, and it lists the results.  Correct?

20  A.    Correct.

21  Q.    And so at less than 2,000 lifetime days it is

22  1.8 risk ratio.  Right?

23  A.    Yes.

24  Q.    And then if people use more talc for between

25  2,000 and 5,000 lifetime days, the risk ratio goes

McTiernan - Cross/Mr. Williams

896

1    down.  Agreed?

2    A.    Yes.

3    Q.    And the risk ratio goes down for people who use

4    more talc between 5,000 and 10,000 lifetime days.

5    Right?

6    A.    Yes.

7    Q.    If they use more than 10,000, it goes up again.

8    Right?

9    A.    Yes.

10   Q.    That would have been kind of an upside down U if

11   one were to plot it on a graph.  Right?

12   A.    Yes.

13   Q.    Did that refresh your memory that the Cook study

14   did not in fact find a dose-response?

15   A.    Yes.  And that's what I indicated in that table.

16   Q.    I thought you were saying you were not sure

17   that's what you indicated in the table?

18   A.    If I put the word "no" and "no dose-response,"

19   and that the metric is what was in parenthesis.

20   Q.    Let's look at Cramer 19 -- actually, let's look

21   at your table first.  It is Exhibit C 7.  That's your

22   report of the table, in the back, is page 70, a

23   similar table we used before.

24        Actually, that's not the right one.  We're

25   looking for the entry that says "no lifetime

McTiernan - Cross/Mr. Williams

897

1   applications."  It is page 70, Table 1, Cramer 1999

2   entry.

3           What you wrote here with respect to

4   dose-response for Cramer is:

5           "Yes, there is dose-response lifetime

6   applications when Fallopian tubes present with an O.R.

7   for less than 3,000 uses of 1.54 and more than 10,000

8   1.72 as the RR -- excuse me -- between three and

9   10,000 1.72 and for more than 10,000 1.80."

10          That's what you cited.  Right?

11  A.    Yes.  The only correction is "patent" instead of

12  "present."

13  Q.    Now, on this one you did not list a p-Value or

14  say anything about statistical significance, as you

15  did with the Harlow study a few minutes ago on your

16  chart.  Correct?

17  A.    Correct, it is not there.

18  Q.    You accurately just stated there is no p-Value

19  listed on your chart because they did not calculate

20  one.  Is that right?

21  A.    I don't know.  I would have to look at the

22  study.

23  Q.    Will you take my representation that --

24  A.    Yes.

25  Q.    Where in Table 1 can we tell whether the

McTiernan - Cross/Mr. Williams

898

1    dose-response data that you chose to include here is

2    for genital talc use as opposed to, for example, non-

3    genital use?  Can we tell from reading your chart?

4    A.    Can you tell me which number the paper is?

5    Q.    It is A 23.  Exhibit A23 is Cramer 1999.  I'll

6    direct your attention in that exhibit to page 5, Table

7    3.  Do you have that in front of you?

8    A.    Yes.

9    Q.    Now, what you reported in your chart that was in

10   the report provided to the Court was that in this area

11   here in Table No. 3 --

12          MR. WILLIAMS:  For the record, I'm focusing on

13   the portion that says "applications censored."

14   Q.    You were referring to the fact that if one used

15   talc less than 3,000 times, the risk ratio was lower

16   than if one used it more than 10,000 times.  This

17   portion I'm indicating with the laser.  Correct?

18   A.    Yes.

19   Q.    There was another chart for total applications

20   here that listed for people who are using genital

21   talc.  It lists less than 3,000 uses a risk and odds

22   ratio of 1.84.  Correct?

23   A.    Yes.

24   Q.    An odds ratio for 3,000 to 10,000 uses of 1.43.

25   Correct?

McTiernan - Cross/Mr. Williams

899

1   A.    Yes.

2   Q.    And an odds ratio of more than 10,000 uses of

3   1.43.  Correct?

4   A.    Yes.

5   Q.    That odds ratio goes down not up with more uses.

6   Correct?

7   A.    Correct.

8   Q.    You could see here this sets forth a p-Value

9   which is 0.472.  Correct?

10  A.    Yes.

11  Q.    And that p-Value is more than .05.  Right?

12  A.    Yes.

13  Q.    Which means it is not statistically significant.

14  True?

15  A.    Yes.

16  Q.    You chose to use this trend, this set of values,

17  that includes nongenitally exposed people.  Right?

18  A.    I believe I did not put a p-Value in the table.

19  I didn't include either one of those p-Values.  That's

20  why I was confused why I had nothing there.

21  Q.    What you included in the table, Doctor, was a

22  statement that this Cramer 1999 showed, yes, a

23  dose-response, and then you simply listed the date

24  that appears here under the applications censored

25  group for people including folks who did not use talc

900

1   in the genital area; they used it elsewhere.  Right?

2   A.    Yes.  If I had room in the table, I would have

3   put the relative risk and the confidence intervals and

4   did the p-Value.  I would have focused on the genital

5   exposure patients.  The issue is, though, I don't know

6   what those RRs referred to, and so I would need to

7   look back at the paper to see that.  It looks like

8   they are not giving full data of genitally exposed --

9   Q.    Can we agree, Doctor, if you had focused the

10  Court on the total application PSC date for people who

11  used talc only in the genital area, that you would not

12  have been able to report to the Court that there was a

13  dose-response because there wasn't?

14  A.    But there is in the bottom one, where it is

15  called "pelvic censored," and that is people who had

16  patent Fallopian tubes, and there is some science, the

17  case-control studies, particularly suggesting the risk

18  is greater in people who have patent Fallopian tubes

19  so that the material can move up.  If I had room, I

20  could have put both in there.

21  Q.    You can't tell the Court what happens to the

22  statistical significance in the bottom group, the

23  pelvic censored group, when the nongenitally exposed

24  women are excluded; right?  You can't do that?

25  A.    They gave the p-Values.  They provided it.  It's

McTiernan - Cross/Mr. Williams

901

1   the relative risk that now I'm saying I can't.  But

2   there is a dose-response you can see with confidence

3   intervals that do not include one.  The question is

4   which group are those referring to.  But my statement

5   is correct.  There is a dose-response in that group.

6   Q.    Right here in the portion that relates to people

7   who actually used talc in the perineal area, there is

8   data under "total applications" that does not have a

9   statistically significant result.  Correct?

10  A.    If you look at patent, which I've stated on the

11  table, then you see that.

12  Q.    Just a yes or no if you can give it.  There is

13  data on this table for total applications that

14  includes people who use talc in the perineal area, and

15  that does not show dose-response.  True or not true?

16  A.    If I reported on that table, I would say that,

17  but I reported on the other table.

18  Q.    And the answer is yes?

19  A.    The question again was?

20  Q.    I'll move on.

21        Let's go to a study called Mills 2004.  This

22  is a retrospective case-control study by Mills.  You

23  reviewed this data.  Correct?

24  A.    Yes.

25  Q.    Please take a look at page 4, Table II.  This is

McTiernan - Cross/Mr. Williams

902

1    Exhibit A 94.  This includes data on dose-response.

2    Correct?

3    A.    Yes.

4    Q.    And there is a portion that talks about

5    cumulative use frequency times duration.  Right?

6    A.    Yes.

7    Q.    It include never users?

8    A.    Yes.

9    Q.    It include four different quartiles.  Correct?

10   A.    Yes.

11   Q.    And it lists in the right-hand column odds

12   ratios for each of those quartiles.  Correct?

13   A.    Yes.

14   Q.    The first quartile, meaning the lowest exposure

15   calculated using the metric you say is the best one

16   frequency times duration, it reports 1.03 as the point

17   estimate.  Correct?

18   A.    Yes.

19   Q.    And that value is not statistically significant.

20   Correct?

21   A.    Yes.

22   Q.    The second quartile people who use more talc

23   than people in the first quartile, the result is 1.81

24   statistically significant.  Right?

25   A.    Correct.

1    Q.    The third quartile goes down.  That's for people

2    who used more talc than those in the first two

3    quartiles.  True?

4    A.    Correct.

5    Q.    It goes down to 1.74.  Right?

6    A.    Correct.

7    Q.    And for people who are have the highest exposure

8    which is who reported the most use calculated by

9    frequency times duration, the odds ratio is 1.06.  Not

10   statistically significant.  Correct?

11   A.    Correct.

12   Q.    This study does not show a dose-response.

13   Correct?

14   A.    I agree.  That's what I indicated in my table.

15   Q.    Right.  In your table, if you add them all up --

16   I'm not going to ask you to do it now.  It will take

17   too long -- there are a number of studies that analyze

18   frequency times duration that show no dose-response

19   and some that purport to show a dose-response.  Is

20   that right?

21   A.    I haven't added it recently.  I did it for my

22   report, but I don't know the exact numbers.

23   Q.    I'm not asking you to add right now.  There are

24   some that show a dose-response and some that do not.

25   A.    Correct.

McTiernan - Cross/Mr. Williams

904

1  Q.    We have talked about the Terry study and your

2  conclusions there and your calculations.  Right?

3  A.    Yes.

4  Q.    That is one of the ones you said showed

5  dose-response.  True?

6  A.    Yes.

7  Q.    We talked about Cramer 1999.  That's another you

8  said showed a positive dose-response.  True?

9  A.    Yes.

10  Q.    Let's move on.

11        The most thorough case-control studies in your

12  opinion were those that differentiated among different

13  areas of exposure to talc.

14  A.    Are you citing something in my report?

15  Q.    I am.

16  A.    I want to see what it refers to.

17  Q.    By areas of exposure, I mean perineal use.  One

18  area of exposure is the use of talcum powder products

19  on the diaphragm.  Correct?

20  A.    Correct.

21  Q.    Please turn to the Cramer 2016 study we marked

22  earlier.  It is A 25.  Do you have that in front of

23  you?

24  A.    Yes.

25  Q.    Table 1 is entitled type, "Timing and Duration

McTiernan - Cross/Mr. Williams

905

1   of Genital Talc Use."  Right?

2   A.    Yes.

3   Q.    It lists potential exposure in women with no

4   personal use.  Right?

5   A.    Yes.

6   Q.    And it pulls out diaphragm only use.  Correct?

7   A.    Correct.

8   Q.    And we're talking about diaphragms that have

9   some sort of talc on them.  Right?

10  A.    Is that how they define it?

11  Q.    Let's look at what the data shows.

12  A.    I want to see how they asked -- I want to check

13  how they are asking about the diaphragm use.

14        I see, yes, they have that.

15  Q.    That's the reason why it would be relevant

16  because if a woman had talc on her diaphragm and

17  inserts the diaphragm, it is closer to the ovaries

18  than if a woman dusts herself outside, say, in her

19  panties.  Correct?

20  A.    It did not ask if they rinsed it off prior to

21  applying spermicidal jelly, so we don't know about

22  talc from that question.

23  Q.    What the results indicated were that people who

24  used the diaphragm, and that was their exposure to

25  talc, the odds ratio was 0.73 with a statistically

McTiernan - Cross/Mr. Williams

906

1    insignificant confidence interval of 0.57 to 0.93.

2    Correct?

3    A.    No.  The traditional interpretation of a

4    confidence interval is where it includes 1.  This does

5    not.

6    Q.    It does not include 1?

7    A.    So that would suggest statistical significance

8    around that odds ratio.

9    Q.    I beg your pardon.  Because the odds ratio is

10   below 1, and because the confidence interval does not

11   hit 1.0, this is statistically significant?

12   A.    Yes.

13   Q.    So the result is a statistically significant

14   finding of a protective effect for the use of a

15   diaphragm with talc on it.  Correct?

16   A.    Yes.  With the caveat we don't know if the woman

17   rinsed the diaphragm before putting spermicidal jelly

18   and before inserting.  So we don't know about the

19   amount of real exposure.

20   Q.    Are we assuming every woman in the study --

21   A.    Some women would have been instructed to do it

22   that and some not.

23   Q.    You know that the study did not do that?

24   A.    I don't know that they asked about whether they

25   rinsed it or not.

McTiernan - Cross/Mr. Williams

907

1  Q.    You don't know one way or the other they did?

2  A.    Right.

3  Q.    But we do know there is a statistically

4  significant finding of a protective effect, meaning if

5  the epidemiological evidence is credited, it would

6  mean if the women used the diaphragm with talc on it,

7  she would have a lower chance of getting ovarian

8  cancer.  Correct?

9  A.    If there was talc on it.  That's what we don't

10  know.

11  Q.    Let me have you look at the Berge study, the

12  2018 meta-analysis.  This is one of the studies you

13  said was excellent.  Right?

14  A.    Which number is this?

15  Q.    A 11.  I'll direct you to Table II on page 7.

16  Do you have that there?

17  A.    Yes.

18  Q.    This study, one of the ones that you say was

19  excellent in terms of its methodology, lists with one

20  of its findings for the use of a diaphragm a

21  statistically significant protective effect odds ratio

22  of 0.75 with a confidence interval that does not cross

23  1, 0.73 on the low end to 0.88 on the high end.

24  Correct?

25  A.    Yes.

McTiernan - Cross/Mr. Williams

908

1   Q.    Please turn to the Penninkilampi study.  That's

2   Exhibit A 109.  Please look at page 5.

3           Page 5 has a table, Table 1, that like the

4   other studies we just looked at, references diaphragm

5   use.  Correct?

6   A.    Yes.

7   Q.    And it references the method of talc use

8   suggesting talc was on the diaphragm.  Right?

9   A.    Yes.

10  Q.    This one is not statistically significant

11  because it crosses 1.0.  Correct?

12  A.    Yes.

13  Q.    But the finding was 0.84 as the odds ratio.

14  Correct?

15  A.    Yes.

16  Q.    So if it had been statistically significant,

17  like the other two studies we just looked at, it would

18  have had a protective effect.  Correct?

19  A.    Yes.

20  Q.    Earlier today you testified on direct

21  examination that an odds ratio of 1.4 is -- strike

22  that.

23          You testified an odds ratio of 1.4 has in the

24  past sufficed for purposes of findings there is a

25  causal connection between a substance and some

McTiernan - Cross/Mr. Williams

909

1   disease.  Correct?

2   A.    I don't recall talking about causality.  I

3   recall talking about some additional risk factors in

4   the low range.

5   Q.    You talked about HRT, did you not?

6   A.    Yes.

7   Q.    Let's take a look at your report and what it

8   said about HRT.  That's hormone replacement therapy,

9   for the record.  That's Exhibit C 7, page 26.  Is that

10  the portion of your report?

11          Doctor, that references HRT?

12  A.    Yes.

13  Q.    There is a sentence that starts at the bottom of

14  26 and carries over; and at the end of that sentence

15  it has a citation to number 55, reference number 55.

16  Correct?

17  A.    Yes.

18  Q.    If you go to page 80 of your report -- let's

19  look at that reference.  Do you have that in front of

20  you?

21  A.    Yes.

22  Q.    That reference 55 is to a study written by

23  Rossouw.  It is from 2002.  Correct?

24  A.    Yes.

25  Q.    This was a study you cited talking about the

McTiernan - Cross/Mr. Williams

910

1    principal results from the Women's Health Initiative

2    Randomized Control trial.   Right?

3    A.    Yes.

4    Q.    So with respect to HRT, a randomized control

5    trial had been conducted that showed the association.

6    Right?

7    A.    Yes.

8    Q.    There hasn't been a randomized control trial,

9    nor could there be, in your view, for talcum powder?

10   A.    That's correct.

11   Q.    It goes on on the next sentence at the top of

12   page 27.   The sentence says:

13        "A meta-analysis of clinical trials and

14   observational studies in 2018 found that use of this

15   therapy increased risk of breast cancer by

16   59 percent."

17        Did I read that right?

18   A.    Yes.

19   Q.    And it cites item 56.   Correct?

20   A.    Yes.

21   Q.    Let's turn to page 80 and see what item 56 is.

22   That was a study by Kim dated 2018.   Correct?

23   A.    Yes.

24   Q.    It says:

25        "Menopausal Hormone Therapy and the Risk of

McTiernan - Cross/Mr. Williams

911

Breast Cancer By histological Type and Race:   A

Meta-Analysis of Randomized Controlled Trials and

Cohort Studies."

          Did I read that right?

A.     Yes.

Q.     So here there were not only randomized trials

but there were cohort, forward-looking cohort studies

with respect to HRT.  Right?

A.     Yes.

Q.     That's very different than the situation before

Her Honor, is it not?

A.     In terms of?

Q.     In terms of whether or not there have been

randomized control trials.  Right?

A.     Correct.

Q.     What you are focusing on for purposes of your

testimony is case-control studies and cohort studies.

Correct?

A.     Yes.

Q.     But the cohort studies for our purposes are all

studies that find no statistically significant

association between the use of talc and ovarian

cancer.  True?

A.     Correct.

Q.     Let me ask you some questions on confounding.

McTiernan - Cross/Mr. Williams

912

1  For the talc studies that presented both adjusted and

2  unadjusted risk ratios, your opinion is that those

3  studies found little effect of confounding variables.

4  True?

5  A.    Yes.  For the studies that showed both the

6  unadjusted odds ratios and the adjusted odds ratios,

7  nine out of 10 of them had very similar results.

8  Q.    You believe that all, all except for one of the

9  talc studies that you reviewed performed adjustments

10  for several potential confounding variables?

11  A.    Yes.

12  Q.    And you agreed this morning or you stated this

13  morning on direct examination with plaintiffs'

14  counsel, you said that your systematic analysis

15  examined whether or not a study adjusted for

16  confounding.  Do you remember saying that?

17  A.    Yes.

18  Q.    But the truth is, Doctor, that you did not

19  actually look at the specific confounding or

20  confounders for each of those studies.  Right?

21  A.    I did look at the tables in which they indicated

22  confounders.  They were different in each study.  I

23  assumed that they reported the ones that they adjusted

24  for.

25  Q.    You did not look at the specific confounders for

McTiernan - Cross/Mr. Williams

913

1  each of the studies?

2  A.    I did look at confounders.  I read through the

3  tables and list of variables they listed.

4  Q.    Please take a look at your deposition, page 175,

5  line 25 to 176, line 16:

6         "QUESTION:  Without reviewing the study, are

7  you able to tell us, as you sit here, how many of the

8  case-control studies you read and reviewed and are

9  relying on in this case do not adjust for body mass

10  index?

11         "ANSWER:  No, I did not count that.

12         "QUESTION:  Why not?

13         "ANSWER:  I was tasked to look at the overall

14  association.  I did not look at specific confounders

15  for each of the studies."

16         That was your testimony.  Right?

17  A.    I see what you mean.  For my expert report, I

18  did not go through and mark for which studies adjusted

19  for BMI and which did not, but I did look at the

20  studies to see what variables they adjusted for as I

21  reviewed them.

22  Q.    My question was whether I read correctly your

23  testimony.  Did I do that?

24  A.    To me it looks like the testimony you were

25  asking then was about body mass index, BMI.

McTiernan - Cross/Mr. Williams

914

1  Q.    Did I read it correctly?  Was that your

2  testimony?

3  A.    I'm not sure which section you are talking

4  about.

5         THE COURT:  He's not asking you to comment

6  upon.  He wants to know what he read to you, was that

7  accurate?  What he read, does that appear in the

8  transcript you testified to?

9         THE WITNESS:  Yes.

10  BY MR. WILLIAMS:

11  Q.    One of the items that you placed on your bases

12  for finding a causal association between talc use and

13  ovarian cancer, you referenced IARC.  Right?

14  A.    Yes.

15  Q.    And you are familiar with that agency because

16  you've done work for them.  Right?

17  A.    Yes.

18  Q.    You know that IARC has five different categories

19  into which it places substances.  Right?

20  A.    Yes.

21  Q.    Group 1 is substances that IARC believes are

22  carcinogenic to humans.  Right?

23  A.    Yes.

24  Q.    Group 2 A is for substances IARC believes are --

25  probably carcinogenic.  Right?

McTiernan - Cross/Mr. Williams

915

1   A.     Yes.

2   Q.     Group 2 B is for substances that IARC believes

3   are possibly carcinogenic.  Right?

4   A.     Yes.

5   Q.     Group 3 is for substances that are not

6   classifiable.  Right?

7   A.     Yes.

8   Q.     And Group 4, finally, is for substances IARC

9   believes are probably not carcinogenic.  Right?

10  A.     Yes.

11  Q.     You know, there is only one substance that has

12  ever been placed in Category IV?

13  A.     I knew it was very small.

14  Q.     In 2006 IARC listed perineal use in the 2-B

15  category.  Correct?

16  A.     Yes.

17  Q.     That's 2-B, possible carcinogenic.  Right?

18  A.     Yes.

19  Q.     Please take a look at the IARC monograph.  It is

20  Exhibit A 72 K.  It is a really long document.  Sorry

21  about the length.  I would like you to look at page 46

22  of the 2010 IARC monograph on talc.

23         Do you have that in front of you?

24         Using the numbers at the bottom of the page,

25  page 46.  It's also on the board.  See there is a

McTiernan - Cross/Mr. Williams

916

1    reference to Group 2 B?

2    A.    Yes.

3    Q.    And this category is used for agents for which

4    there is "limited evidence of carcinogenicity in

5    humans and less than sufficient evidence of

6    carcinogenicity in experimental animals."

7          Do you see that?

8    A.    Yes.

9    Q.    Please turn now to page 42, a few lines earlier.

10   The term "limited evidence of carcinogenicity" is a

11   defined term in the monograph.  Correct?

12   A.    Yes.

13   Q.    There is a definition at the bottom of this

14   page, page 52, for "limited evidence of

15   carcinogenicity."  Right?

16   A.    Yes.

17   Q.    The definition is:

18         "A positive association has been observed

19   between exposure to the agent and cancer for which a

20   causal interpretation is considered by the working

21   group to be credible, but chance, bias, or confounding

22   could not be ruled out with reasonable confidence."

23         Right?

24   A.    That's what it says, yes.

25   Q.    So IARC was saying it could not rule out chance

McTiernan - Cross/Mr. Williams

917

1    or luck with respect to talcum powder use, perineal

2    use, and ovarian cancer.  Correct?

3    A.    At the time when they reviewed the data which I

4    believe was about 2008.  So 10 years ago.

5    Q.    This is the IARC monograph from 2010, but they

6    looked at the data before that.  Right?

7    A.    Yes.

8    Q.    IARC was also saying that it could not rule out

9    bias.  Right?

10   A.    Yes.

11   Q.    You understand that to mean recall bias.

12   Correct?

13   A.    It could be any bias.

14   Q.    And IARC was also saying it could not rule out

15   confounding factors.  Correct?

16   A.    Correct.

17   Q.    Now, IARC has never moved perineal talc up to a

18   higher classification than Group 2 B.  Right?

19   A.    But they are going to reconsider it.  They

20   classified it as high priority for review again.

21   Q.    Do you have any knowledge one way or the other

22   how many items are listed on that elevated interest

23   list?

24   A.    It is a minimal number.  I believe we added that

25   to the list.

McTiernan - Cross/Mr. Williams

918

1   Q.    Do you know how many?

2   A.    I believe we added that to the list of items.

3   Q.    Let me ask you this:  As of today at this point

4   in time when the Court is assessing whether or not

5   sufficient evidence exists to say that talc causes

6   ovarian cancer, as you have opined, IARC still lists

7   perineal talc use as a Group 2 B substance.  Correct?

8   A.    They have not reviewed it again yet.

9   Q.    The answer is yes?

10  A.    Yes.

11  Q.    When you say IARC would reach a different

12  conclusion now -- strike that.

13        Do you think IARC would reach a different

14  conclusion now?  That was the suggestion you are

15  making by saying they may prioritize a review.  Are

16  you saying their conclusion would be different?

17  A.    I can't speak for their working group.  I don't

18  know who would be on it.  I don't know what they would

19  decide, but I do know the evidence looks quite

20  different now than it looked 10 years ago.

21  Q.    So if you were to suggest to the Court the

22  conclusion would be different, you would be

23  speculating.  Right?

24  A.    I said I don't know who is going to be on the

25  committee.  I don't know what they would state.  I do

McTiernan - Cross/Mr. Williams

919

1    know the evidence has changed, but I can't say how

2    they would vote.

3    Q.    My question is different.  If you were to say

4    that IARC would change its opinion today, you would be

5    speculating?

6    A.    Yes.

7    Q.    In order for IARC to move a substance from Group

8    2 B possible to a higher group, IARC would have to

9    rule out chance, bias, and confounding factors, all

10   three.  Correct?

11   A.    I haven't read the exact criteria for the next

12   level up.

13   Q.    You mentioned Health Canada.  Let me ask you a

14   few questions about that.

15         You identified 127 documents or other

16   materials as references in your litigation report.

17   Correct?

18   A.    Yes.

19   Q.    Those materials that you relied on to form the

20   basis of your opinions in this case, right, those are

21   all of the materials.  Correct?

22   A.    Yes.

23   Q.    None of the documents on your reliance list was

24   published by the Food and Drug Administration.

25   Correct?

McTiernan - Cross/Mr. Williams

920

1    A.    I don't recall if I included the letter from

2    them.  I don't recall.  I would have to look through.

3    Q.    None of the documents -- I'll get to that in a

4    second.  None of the documents on your reliance list

5    was published by the National Cancer Institute.

6    Correct?

7    A.    The National Cancer Institute itself, not a

8    grant that was funded through the National Cancer

9    Institute.

10   Q.    Let's take both.  How about by NCI itself?

11   A.    I don't recall including anything that was from

12   NCI.

13   Q.    And branches of NCI --

14   A.    Several of the studies I mentioned were funded

15   by NCI.

16   Q.    Funded by NCI is one thing, put out by the

17   organization itself is another.  Right?

18   A.    Yes.

19   Q.    Your litigation report identified another 113

20   documents as materials considered, right, in addition

21   to the references?

22   A.    I don't know the exact number, but I'll believe

23   you, yes.

24   Q.    A few of those documents were led, sent to the

25   FDA.  Do you remember that?

McTiernan - Cross/Mr. Williams

921

1    A.    I don't recall.

2    Q.    Take a look at Exhibit C 7, your report, page

3    86.

4    A.    Is it in Volume 1 or Volume 2?

5    Q.    It is in Volume 2.  It is your report.  It is

6    C-7.

7    A.    Okay.

8    Q.    Take a look at page 86.  All I want to focus you

9    on are items 68 to 70.  See those?

10   A.    Yes.

11   Q.    Those are all letters from the Cancer Prevention

12   Coalition to the FDA; are they not?

13   A.    I see two of those, yes.

14   Q.    None of those 113 additional materials and data

15   considered were authored by the FDA.  Right?

16   A.    I don't see it here.

17   Q.    None of those documents were published by the

18   NCI.  Right?

19   A.    None of these -- the numbers you gave me, none

20   say "NCI," no.

21   Q.    If you would take a look at Exhibit A 89, I

22   believe, this was not a document you actually relied

23   upon for your opinions in the case.  It is one you

24   heard about that talked about migration.  Do you

25   recall that?

McTiernan - Cross/Mr. Williams

922

1    A.    Yes.

2    Q.    This one is the letter dated April 1, 2014, and

3    I'll direct your attention to the first paragraph on

4    the third page.  This is a document that was

5    responsive to the three or four letters that we just

6    looked at on your reference list that were to the FDA.

7    You recall those letters, right?

8            MS. PARFITT:  I object.  It is on her reliance

9    list, the FDA 2014 letter.  Counsel is suggesting she

10   didn't rely on it.  That was my understanding of your

11   question.

12           MR. WILLIAMS:  That was my understanding.  I

13   thought the witness testified it was not on the

14   reliance list.  If it is, I'm mistaken.  But that

15   doesn't matter for purposes of my question.

16           THE COURT:  That's fine.

17   Q.    Doctor, I'll ask you this:  Whether or not it is

18   on your reliance list, what the letter said in

19   response to those citizens' petitions was paragraph 3:

20           "After careful review and consideration of the

21   information submitted in your petitions, the comments

22   received in response to the petitions, and review of

23   the additional scientific information, this letter is

24   to advise you that FDA is denying your petitions.  FDA

25   did not find that the data submitted presented

McTiernan - Cross/Mr. Williams

923

1    conclusive evidence of a causal association between

2    talc use in the perineal area and ovarian cancer."

3         Did I read that correctly?

4    A.    Yes.

5    Q.    So you focused the Court on the Health Canada

6    draft study.  Correct?

7    A.    Yes.

8    Q.    You did not point the Court to your review

9    reflecting that government agencies in the United

10   States like the FDA have found that the evidence is

11   insufficient to find a causal association.  Right?

12   A.    Right.  I don't know if the FDA has done a

13   systematic review like Health Canada does.  I have not

14   seen a publication of systematic review and causal

15   analysis from the FDA.  This is what I've seen, this

16   letter.

17   Q.    You don't know one way or the other whether the

18   careful review that is referred to in Exhibit A 89 was

19   a systematic review by your definition?

20   A.    They don't reference a systematic review and

21   they don't reference a publication.

22   Q.    It is accurate to say that your conclusion here

23   is inconsistent with the conclusions set forth by the

24   FDA in its letter in response to the petition?

25   A.    That's correct.

McTiernan - Cross/Mr. Williams

924

1    Q.    Just a couple more things.

2          First I wanted to make sure that --

3          MR. WILLIAMS:  Your Honor and counsel, this is

4    the McTiernan report, Exhibit C 7, page 13,

5    description of a confidence interval, forward.

6    Q.    I put up a board and I wanted to ask you,

7    Doctor, it says:

8          "If a confidence interval includes the number

9    1.0, then we say the association between the exposure

10   and the disease could be null."

11         Did I read that right?

12   A.    Yes.

13   Q.    That is your writing in your report.  Correct?

14   A.    Yes.

15   Q.    Now, if a confidence interval in a study were to

16   be exactly 1.0, that would be no association.

17   Correct?

18   A.    I don't know what the relative risk is that you

19   are referring to.

20   Q.    I misspoke.

21         If the relative risk were reported as 1.0,

22   that would mean no association.  Correct?

23   A.    Yes.

24   Q.    That is to say, if the point estimate were 1.0,

25   that would be no association.  True?

McTiernan – Cross/Mr. Williams

925

1   A.    Correct.

2   Q.    Okay.  If the confidence interval, the range,

3   includes 1.0, that is, it goes above and below 1.0,

4   you cannot say that there is an association.  Right?

5   A.    What we can say is that the association between

6   exposure and disease could be null.  So it could be.

7   That's exactly what I said here, that it could be

8   null.

9   Q.    Let me ask you some questions about your -- you

10  mentioned you spoke to Congress, and I just have a

11  couple of questions about that.

12        You indicated you were asked to speak to

13  Congress.  Who asked you?

14  A.    I believe his name was Mr. Cunningham.  He was

15  the Chief of Staff for that subcommittee.

16  Q.    Do you know how that particular subcommittee got

17  your name?

18  A.    I don't know.

19  Q.    Your litigation report in this matter is dated

20  November 16th of last year.  Correct?

21  A.    If that's what's here, I believe it.

22  Q.    A few months later after that you appeared

23  before the subcommittee of Congress.  That was on

24  March 12th of this year.  Right?

25  A.    Yes.

McTiernan - Cross/Mr. Williams

926

1    Q.    You read aloud from a prepared statement that

2    day.   Correct?

3    A.    Yes.

4    Q.    And you were asked to give that testimony -- I

5    think you said this when you spoke that day -- because

6    you had conducted a thorough and systematic review of

7    the science linking use of talcum powder products and

8    the risk of ovarian cancer.   Right?

9    A.    That's correct.

10   Q.    Now, do you know whether or not anybody from

11   Johnson & Johnson was asked to attend that hearing?

12   A.    I don't know.

13        MS. PARFITT:   Objection, your Honor.   I can't

14   imagine how Dr. McTiernan would know if anyone from

15   Johnson & Johnson --

16        THE COURT:   I think she already answered it.

17   She said "I don't know."

18   Q.    When you appeared that day you were accompanied

19   by several of the plaintiffs' lawyers, is that right,

20   who are in the room today?

21   A.    There were several people there.   The main

22   person accompanying me was the Vice President for

23   Government Affairs at my institution, Fred Hutchinson.

24   Q.    And Ms. Parfitt was there and Ms. O'Dell was

25   there?

McTiernan - Cross/Mr. Williams

927

1    A.    Yes.  And several other people in the room.

2    Q.    Did you know beforehand plaintiffs' counsel

3    would be attending?

4    A.    Yes.

5    Q.    Do you know whether plaintiffs' counsel played

6    any role in your being invited to testify?

7    A.    I don't know.

8    Q.    You don't know one way or at the other?

9    A.    I don't know.

10   Q.    Did you meet with plaintiffs' counsel in advance

11   of hearing?  I don't want to know what you said to

12   them or them to you, but did you meet with them prior

13   to the hearing?

14   A.    Yes.

15   Q.    Did you travel to the hearing with them?

16   A.    No -- travel to the meeting with them?

17   Q.    Yes.  Did you go over to Congress with them that

18   day?

19   A.    Yes.

20   Q.    Now, did you share a copy of your written

21   statement to the subcommittee with plaintiffs' counsel

22   before you testified?

23   A.    I did, and also to my Vice President of

24   Government Affairs.

25         MS. PARFITT:  Your Honor, I object at this

McTiernan - Cross/Mr. Williams

928

1   point in time.  I understand how the substance of Dr.

2   McTiernan's opinions are relevant, but I think we have

3   gone a bit afield as to how she got there.  It is

4   clear I was there.  Ms. O'Dell was there.  I'm just

5   not sure where we are going.

6          MR. WILLIAMS:  Counsel raised the issue.  I

7   did not.

8          MS. PARFITT:  I raised the issue of her

9   appearance before Congress.

10         THE COURT:  I understand.  I'll permit a few

11  questions.

12         I don't know if you have anything else.  I

13  know where you are going with it.

14         MR. WILLIAMS:  There is actually a little bit

15  more.

16         THE COURT:  Let me hear it.

17  BY MR. WILLIAMS:

18  Q.   You told the subcommittee your opinion that

19  perineal talc use is associated with a 22 to

20  31 percent increased risk.  Right?

21  A.   Yes.

22  Q.   You did not talk about cohort studies?

23  A.   I didn't talk about specific studies.  I talked

24  about totality of evidence.

25  Q.   You did not talk about the cohort studies saying

McTiernan - Cross/Mr. Williams

929

1   there is not an association.  True?

2   A.    No, I did not.

3   Q.    Now, in the written materials that you provided,

4   you mentioned that you had been hired by plaintiffs in

5   litigation.

6          THE COURT:  You are referring to written

7   materials she provided to Congress.

8          MR. WILLIAMS:  Yes.

9   A.    Yes, I disclosed, yes.

10  Q.    You disclosed there that you had been hired by

11  plaintiffs in litigation.  Right?

12  A.    Yes.

13  Q.    But in your oral presentation -- which was

14  televised; am I right?

15  A.    Yes.

16  Q.    In your oral presentation, you did not say that

17  you were hired by plaintiffs' lawyers in litigation,

18  did you?

19  A.    I don't recall.

20  Q.    In your oral presentation you said that you were

21  there on behalf of consumers.  Right?

22  A.    I don't have the document right with me.

23  Q.    Let's see if we could bring it up.

24  A.    Can you tell me what number it is so I could

25  look at the whole thing?

930

1    Q.    It is McTiernan 510 in your book.  That would be

2    in book No. 2.

3          My only point is that when you were speaking

4    as opposed to the writing, when you were talking on

5    television, you said as part of this review, I

6    prepared an expert report on behalf of consumers for

7    an ongoing multi-district litigation.  Right?

8    A.    Oh, so I did disclose.  Okay.

9    Q.    The word you used was "consumers," not that you

10   were hired by plaintiffs' counsel on behalf of

11   plaintiffs in litigation?

12   A.    I didn't use that word, no.

13   Q.    You did not indicate in any way that you were

14   there as an expert who was being paid in litigation on

15   behalf of specific plaintiffs, did you?

16   A.    I didn't use the word "paid," no.

17   Q.    Nor did you use the word "plaintiffs."  Right?

18   A.    I didn't use the word "plaintiffs," no.

19   Q.    And you changed the wording that was contained

20   in your written submission that you used the word

21   "plaintiffs."  Right?

22   A.    I'm sorry.  I can't remember what I said.  I

23   just know that I disclosed there.  I thought I

24   disclosed here.  I don't know what that wording was to

25   compare.

McTiernan - Cross/Mr. Williams

931

1        MR. WILLIAMS:  Thank you, your Honor.  No

2   further questions.

3        MS. PARFITT:  Do you want to break or go

4   forward?

5        THE COURT:  I'm good if you are.

6        Let's take a break.

7        THE DEPUTY CLERK:  All rise.

8        (Recess.)

9        (Continued on the next page.)

10  ///

McTiernan - Redirect/Ms. Parfitt

932

1        THE DEPUTY CLERK:  All rise.

2        THE COURT:  Thank you.

3

4    **ANNE MC TIERNAN**, resumed.

5

6    REDIRECT EXAMINATION

7    BY MS. PARFITT:

8    Q.    Good afternoon, Dr. McTiernan.  I'm going to try

9    to move as quickly as I can.

10       MS. PARFITT:  And I appreciate the Court's

11   indulgence.

12   Q.    Dr. McTiernan,, you were asked about your

13   Congressional presentation?

14   A.    Yes.

15   Q.    And you indicated that I was there and

16   Ms. O'Dell was there.  Correct?

17   A.    Yes.

18   Q.    Were there victims there, too?

19   A.    Yes, there were.

20       MR. WILLIAMS:  Objection.  Not appropriate.

21       THE COURT:  They were going to object to the

22   word "victims."

23   Q.    Were there "consumers" there?

24   A.    Yes.

25   Q.    Did the consumers also make statements?

McTiernan - Redirect/Ms. Parfitt

933

1    A.    Yes.  There was one that did.

2    Q.    Do you recall what the statement was?

3    A.    I don't recall his exact statement.  He was the

4    son of a woman with ovarian cancer who passed away

5    from the disease.

6    Q.    Are you aware whether or not any J&J employees

7    were there?

8    A.    I don't know.

9    Q.    Now, were you paid by the plaintiffs' counsel

10   here to show up for Congress?

11   A.    No.

12   Q.    You came on your own volition?

13   A.    I came as an independent scientist.

14   Q.    Now, throughout the course of the day -- if we

15   could throw up the forest plot.

16         Now, counsel asked you many, many questions

17   about your opinions on consistency.  Do you recall

18   those questions by Mr. Williams?

19   A.    Yes.

20   Q.    Specifically, he talked about the consistency

21   and the role of statistical significance among

22   epidemiological studies.  Do you recall that?

23   A.    Yes.

24   Q.    Do you recall Mr. Williams made a distinction

25   between not what the relative risk was but p-Value or

McTiernan - Redirect/Ms. Parfitt

934

1   whether something was statistically significant or not

2   statistically significant for purposes of consistency?

3   Do you recall that examination?

4   A.    Yes.

5   Q.    What I would like to do -- do you know who

6   Kenneth Rothman is?

7   A.    Yes.

8   Q.    Who is Dr. Rothman?

9   A.    He's an epidemiologist who specializes in the

10  methodology of epidemiology and the applications of

11  statistics.  I took a course from him in 1977.  So I

12  learned his methods early on, and in my Ph.D. program

13  my mentor was a colleague of his.  They both trained

14  at Harvard.  So I continued to use similar methods

15  after that training.

16  Q.    Are you aware Dr. Rothman, along with Sander

17  Greenland and Timothy Lash published A Modern

18  Epidemiology book?

19  A.    Yes.

20  Q.    Are you familiar with that book?

21  A.    Yes.

22  Q.    What I would like to do is pull up Chapter 2,

23  page 27, of the Modern Epidemiology, Third Edition, by

24  Doctor Rothman, et al..  At the top of the page it

25  says:  Chapter 2, "Causation and Causal Inference."

McTiernan - Redirect/Ms. Parfitt

935

1   Do you see that?

2   A.    Yes.

3   Q.    Then there is a section on "Consistency."  Do

4   you see that?

5   A.    Yes.

6   Q.    Why don't you go down to the second full

7   paragraph, and let me ask you a question.

8         Dr. Rothman states:

9         "One mistake in implementing the consistency

10  criterion is so common that it deserves special

11  mention.  It is sometimes claimed that a literature or

12  set of results is inconsistent simply because some

13  results are statistically significant and some are

14  not.  This sort of evaluation is completely fallacious

15  even if one accepts the use of significance testing

16  methods."

17        Did I read that correctly?

18  A.    Yes.

19  Q.    Do you agree with Dr. Rothman?

20  A.    Yes.

21  Q.    Is that opinion consistent with not only that

22  which you shared with the Court today but with Health

23  Canada, the regulatory body for Canada and Congress?

24  A.    Yes.

25  Q.    Dr. McTiernan, you were asked about IARC's

McTiernan - Redirect/Ms. Parfitt

936

1   classification of talc back in 2006 when the working

2   group considered it.  Do you recall those questions?

3   A.    Yes.

4   Q.    And you understand, Dr. McTiernan, that IARC's

5   monograph that was published in 2010 was based upon

6   what?

7   A.    It was based upon talc without fibrous talc, and

8   it was with the assumption it did not contain

9   asbestos, and it was based on studies up until a

10  couple of years or a year prior to when they did their

11  deliberations.

12  Q.    So the evaluation of IARC back in 2006 was

13  literature up until 2006, and that would include

14  literature on biological plausibility.  Correct?

15  A.    Yes.

16  Q.    That would include literature on anything with

17  regard to pathology.  Right?

18  A.    Yes.

19  Q.    That would include literature with regard to

20  mechanistic studies?

21  A.    Yes.

22  Q.    And that would include the epidemiological

23  literature.  Correct?

24  A.    Yes.

25  Q.    Have you had an opportunity to review IARC's

McTiernan - Redirect/Ms. Parfitt

937

1   2012 monograph?

2   A.    Yes, I have.

3   Q.    And how is talc with asbestos classified in IARC

4   2012?

5   A.    It is classified as Class 1, the highest level.

6   Q.    The highest level of what?

7   A.    Carcinogen.

8   Q.    Now, you were asked about biological

9   plausibility by Mr. Williams.  Does one need a direct

10   and precise evidence of mechanism in order for there

11   to be biological plausibility?

12   A.    No.

13   Q.    Dr. McTiernan, is asbestos an inflammatory

14   agent?

15   A.    Asbestos can cause inflammation, yes.

16   Q.    Can fibrous talc cause inflammation?

17   A.    Yes.

18   Q.    Do both asbestos fibrous talc and heavy metals

19   provide further evidence of a biological plausible

20   explanation that talcum powder products can cause

21   ovarian cancer?

22   A.    Yes.

23   Q.    You were asked several questions about the

24   Penninkilampi study and the Berge study.  Do you

25   recall those?

McTiernan - Redirect/Ms. Parfitt

938

1  A.    Yes.

2  Q.    And, specifically, with regard to the issue of

3  dose-response -- you were asked by counsel about some

4  individual source case-control studies.  Do you recall

5  that?

6  A.    Yes.

7  Q.    What I would like to talk to you about are the

8  meta-analyses that were done 2018, just last year.

9        If I understand your testimony correctly, the

10  meta-analysis that were done in 2018 by Berge and by

11  Penninkilampi included the aggregate epidemiological

12  literature on talcum powder products and ovarian

13  cancer.  Is that correct?

14  A.    That's correct.

15  Q.    So those authors looked back.  They didn't take

16  a snapshot in 2006 or a snapshot in 2003, but they did

17  a look-back at the epidemiological literature.  Is

18  that correct?

19  A.    That's correct, and included all of the studies

20  that had been done before that time.

21  Q.    That included Dr. Cramer's study back in 1982.

22  Is that correct?

23  A.    Yes.

24  Q.    Let's talk for a minute on Penninkilampi.  A

25  couple of questions.  You were asked specifically with

McTiernan - Redirect/Ms. Parfitt

939

1    regard to the Berge study whether or not there was

2    heterogeneity in the case-control study.  Do you

3    recall that question?

4    A.    Yes.

5           MS. PARFITT:  Cory, would you please bring up

6    Penninkilampi and, specifically, if you would kindly

7    go to page 46.

8           And if you would highlight that first full

9    paragraph.

10   Q.    Let me read:

11          "This meta-analysis had several strengths.

12   None of the analyses in this review had statistically

13   significant heterogeneity except for the non-perineal

14   application, which indicates consistency in the

15   direction and magnitude of the effect size between

16   individual studies and strengthening the reliability

17   of the pooled effect sizes."

18          Did I read that correctly?

19   A.    Yes.

20   Q.    What does that -- what does "heterogeneity"

21   mean?  What are they telling us about the consistency

22   of the case-control and cohort studies, because

23   Penninkilampi was case-control and cohort?  Correct?

24   A.    Yes.

25   Q.    What are they telling us?

McTiernan - Redirect/Ms. Parfitt

940

1   A.   From meta-analysis it is common to test whether

2   there is heterogeneity; do the individual studies vary

3   greatly from the overall summary relative risk?

4        First of all, the meta-analyses should do

5   this.  It is good methodology.  And when they say

6   there is no significant heterogeneity that suggests

7   similar to the points we see on the forest plot, when

8   they test that statistically, things are looking like

9   they track quite well across the studies.  The average

10  relative risk reflects what the studies in aggregate

11  are showing.

12  Q.   So when we were looking at the case-control

13  cohort studies a little bit earlier, we were looking

14  at this forest plot of case-control and cohort studies

15  and talking about heterogeneity, what is it about that

16  forest plot of case-control and cohort studies in 1982

17  all the way up to 2018?  How does that speak to the

18  lack of heterogeneity?

19  A.   This is my forest plot, and this shows the

20  studies except for two are to the right.  So they are

21  all trending in the positive direction.  Looking at

22  the bottom line what these numbers represent.

23  Q.   Are you talking about these?

24  A.   Yes, it goes from negative .2 up to 4.  At the

25  largest relative risk is 4.  So you really see what

McTiernan - Redirect/Ms. Parfitt

941

1   this is referring to.  Most of the relative risks are

2   in the same range as what the overall relative risk

3   that the two meta-analyses have found.  So it is a

4   very consistent finding, very consistent set of

5   studies.

6   Q.    Similarly, you were asked about dose-response.

7   Do you remember that series of questions?

8   A.    Yes.

9   Q.    What did the Penninkilampi authors find with

10  regard to dose-response?

11        Let's put it up.  Let's go to page 45.

12        MS. PARFITT:  For the record, it is

13  Exhibit 62.

14        THE COURT:  Thank you.

15  Q.    Go ahead.

16  A.    So they looked both at long-term use and at

17  number of total lifetime applications.

18        MS. PARFITT:  Cory, if you could highlight

19  down that last paragraph on the right.

20  Q.    Does that help?

21  A.    They found a greater risk of ovarian cancer with

22  more than 3600 lifetime applications compared to those

23  with fewer lifetime applications.

24        I would like to point out again the data.

25  That's what I like to look at, the data table.

1    Q.    That's Table II.

2    A.    In the middle here, where it says "length of

3    use," that whole four lines there, that shows what the

4    numbers "O" were.  So less than 3600, the relative

5    risk was 1.32.  Over that amount was 1.52.  The

6    confidence intervals did not include 1.

7          They also look at long-term use.  That was

8    10 years or more, and they found a relative risk of

9    1.29.  Also confidence intervals did not include 1.

10   Q.    Dr. McTiernan, you were asked about the FDA

11   letter of 2014.  Correct?

12   A.    Yes.

13   Q.    You were asked whether the FDA had made a causal

14   analysis.  Is that correct?

15   A.    Yes.

16   Q.    I believe your response was you did not see they

17   had done a systematic review.  Correct?

18   A.    Correct.

19   Q.    Did Health Canada do a systematic review, and

20   Bradford Hill analysis?

21   A.    Yes, they did.

22   Q.    Let's see what they had to say about causality.

23         MS. PARFITT:  Cory, if you could pull up the

24   Health Canada assessment.  Specifically, if you could

25   go to -- okay.

McTiernan - Redirect/Ms. Parfitt

943

1  Q.    Focusing your attention at the next-to-the-last

2  paragraph, it states:

3       "The meta-analysis of the available human

4  studies in the peer review literature indicate a

5  consistent and statistically significant positive

6  association between perineal exposure to talc and

7  ovarian cancer.  Further available data are indicative

8  of a causal effect."

9       Did I read that correctly?

10  A.    Yes.

11  Q.    Do you agree with the opinion of Health Canada

12  with regard to the fact that based upon the

13  meta-analysis, the peer-reviewed literature that not

14  only is there a statistically significant positive

15  association between perineal exposure and talc, but

16  the available data are indicative of a causal effect?

17  A.    Yes.

18  Q.    Is that consistent with the opinions you have

19  shared with this Court today?

20  A.    Yes, it is.

21  Q.    Let's go back to Penninkilampi.  Page 47.  Under

22  "Conclusions."

23       Penninkilampi is a 2018 meta-analysis.

24  Correct?

25  A.    Yes.

McTiernan - Redirect/Ms. Parfitt

944

1    Q.    Under "Conclusion":

2         "The results of this review indicate that

3    perineal talc is associated with a 24 percent to

4    39 percent increased risk of ovarian cancer.  While

5    the results of case control studies are prone to

6    recall bias especially with intense media attention

7    following commencement of litigation in 2014, the

8    confirmation of an association in cohort studies

9    between perineal talc use and serious invasive ovarian

10   cancer is suggestive of a causal association."

11        Did I read that correctly?

12   A.    Yes.

13   Q.    Do you agree with the authors of Penninkilampi?

14   A.    I do.

15   Q.    Are you aware of any more recent meta-analysis

16   since the Berge, Penninkilampi and the Health Canada

17   report?

18   A.    Yes.  Another meta-analysis was referred to and

19   made available with Health Canada by Taher, et al.

20   Q.    Are the conclusions of Health Canada, the

21   Penninkilampi meta-analysis and the Berge

22   meta-analysis all concluding that there is a causal

23   relationship?

24   A.    Yes.

25   Q.    I should not have included Berge in that.  You

McTiernan - Redirect/Ms. Parfitt

945

1   talk about that?

2   A.    The data are remarkably consistent among those

3   three meta-analyses.

4   Q.    When you looked at the Berge, regardless of what

5   the narrative is, what is it that you look at?

6   A.    I look at the data.

7   Q.    And what does the data tell you in the Berge

8   study?

9   A.    The data tells me that there is a statistically

10  significant increased risk of ovarian cancer in women

11  that used genital talcum powder products compared to

12  non-users.

13  Q.    What does the data tell you in the Berge study

14  with regard to any increased risk in dose-response?

15  A.    The Berge also looked at dose-response in models

16  and they found statistically significant association

17  with increased duration and increased frequency of

18  use.

19  Q.    Berge was a 2018 meta-analysis?

20  A.    Correct.

21  Q.    You were asked at the start of Mr. Williams'

22  discussion with you about pleurodesis.  Do you recall

23  that?

24  A.    Yes.

25  Q.    Dr. McTiernan, are you aware of any

McTiernan - Redirect/Ms. Parfitt

946

1  peer-reviewed literature that indicates whether

2  pleurodesis is associated with adverse effects and it

3  is not advised in patients without malignant pleural

4  effusions?

5  A.    Yes.  Some clinical groups are recommending that

6  talc not be used for this instance.  There was one

7  study that found that small size talc powders were

8  associated with adverse events and --

9        MR. WILLIAMS:  I hate to interrupt.  I believe

10 this is a new opinion.

11       MS. PARFITT:  Your Honor, she was

12 cross-examined by Mr. Williams on the issue of

13 pleurodesis and its health effects.  Pleurodesis was a

14 positive thing.  It is only fair I be permitted to ask

15 Dr. McTiernan if there are any studies with regard to

16 the adverse effects.

17       MR. WILLIAMS:  Counsel raised pleurodesis on

18 direct examination.  This is new.  The only reason I

19 raised it is they raised it.

20       MS. PARFITT:  She's commenting on a study

21 where she's indicating the adverse effects.

22       THE COURT:  I have a general answer now and no

23 more beyond that.

24       MS. PARFITT:  Thank you.

25 BY MS. PARFITT:

McTiernan - Redirect/Ms. Parfitt

947

1   Q.    Now, if I can direct your attention to the

2   Bradford Hill statement, and, again, that is

3   Exhibit 1.

4           Let me did direct your attention to page 11,

5   interval, under "tests of significance."

6           Dr. McTiernan, referring to the Bradford Hill

7   statement, specifically what Bradford Hill had to say

8   about tests of significance, it read:

9           "No formal activities of significance can

10  answer those questions.  Such tests can and should

11  remind us of the effects that the play of chance can

12  create, and they will instruct us in the likely

13  magnitude of those effects.  Beyond that, they

14  contribute nothing to the proof of our hypothesis."

15          Did I read that correctly?

16  A.    Yes.

17  Q.    Do you agree with Sir Bradford Hill?

18  A.    I do.

19  Q.    I may have misunderstood Mr. Williams' question.

20  I hope I'm not redundant on this.  Do you recall you

21  were questioned with regard to your definition of a

22  pooled study?  Do you recall that?

23  A.    Yes.

24  Q.    Let me direct your attention to the Terry study

25  itself.

McTiernan - Redirect/Ms. Parfitt

948

1          MS. PARFITT:  And if you would, Cory, go to

2    page 815.

3    Q.    Dr. McTiernan,, how did you characterize or what

4    kind of study design did you characterize the Terry

5    study?

6    A.    It is a pooled analysis.

7    Q.    What did the authors of the study -- how did

8    they characterize their study?

9    A.    As a pooled analysis.

10   Q.    They say this pooled analysis of eight case

11   control studies, including 9,859 controls and 8,525

12   ovarian cancer cases?

13   A.    Yes.

14   Q.    Is that a large study?

15   A.    Very large, especially for ovarian cancer which

16   is a rare cancer.

17   Q.    What meaningful information can that provide in

18   a study of that size?

19   A.    You would have much better ability to determine

20   relative risk, to determine the statistical

21   significance, to look at dose-response, to look at

22   subgroups.

23   Q.    The questionnaire for the WHI, the study you

24   were project director for, how did they define talcum

25   powder?  Was it all powders?  Was it talcum?  How it

McTiernan - Redirect/Ms. Parfitt

949

1   was it defined?

2   A.     The question was about powder applied to the

3   private area, and they gave examples of talc,

4   deodorizing powder, or baby powder.

5   Q.     Similarly, in the Nurses', the health study,

6   what was the definition of the powder?

7   A.     The question was about powder applied to the

8   perineal area, also with an explanation of talc, baby

9   powder, and deodorizing powder.

10  Q.     The Sister Study, the third cohort study, how

11  was that question defined?

12  A.     Specifically about talc.

13  Q.     So two out of the three cohort studies asked

14  generally about powder, talc, cornstarch, deodorizing

15  powder.  Is that correct?

16  A.     That's correct.

17  Q.     What impact would that question have on the

18  relative risk?

19  A.     It would reduce it, attenuate it, toward the

20  null, towards 1, because you have less complete

21  information on use of talc.  The women who used other

22  powders would be mixed in with talc users.

23  Q.     So this error of misclassification would occur?

24  A.     Yes.

25  Q.     That would attenuate it further towards the

McTiernan - Recross/Mr. Williams

950

1    null?

2    A.     That's right.

3    Q.     In other words, the study results would be

4    lower?

5    A.     Would be lower than what you would have if they

6    more accurately ascertained talc use.

7    Q.     But for that they would have been higher.  Is

8    that what you are saying?

9    A.     Yes.

10   Q.     When I said, misclassification, would it be more

11   correct, it is nondifferential misclassification?

12   A.     Yes.

13          MS. PARFITT:  Your Honor, I have no further

14   questions.

15          Dr. McTiernan, thank you very much.

16          Your Honor, thank you for your time.

17          MR. WILLIAMS:  Your Honor, may I have

18   five-minutes?

19          THE COURT:  Yes.

20

21   RECROSS-EXAMINATION

22   BY MR. WILLIAMS:

23   Q.     Doctor, I'll be as brief as I can.

24          The first topic you were asked some questions

25   on, the IARC 2012 monograph in redirect examination,

McTiernan - Recross/Mr. Williams

951

1  let me ask you about that.  It is Exhibit A 70 in your

2  book.

3          MR. WILLIAMS:  If we would call up page 230,

4  please.

5  Q.    I'll direct you to page 230, the left-hand

6  column, Section 1.6 midway down.

7          Do you agree that the 2012 IARC monograph --

8  strike that.

9          Do you agree with the portion of the 2012 IARC

10 monograph that says that "talc containing asbestiform

11 fines is a term that has been used inconsistently in

12 the literature"?

13 A.    Can you show me where that is here?

14 Q.    The middle of the paragraph.

15 A.    I see this.

16 Q.    Do you agree with that statement or do you have

17 no knowledge either way?

18 A.    I don't have knowledge of that.  It sounds like

19 a toxicology question.

20 Q.    Not your area?

21 A.    Not my area.

22 Q.    You did not include in your report IARC's

23 statement that talc containing asbestiform fibers is a

24 term that has been used inconsistently in the

25 literature.  True?

McTiernan - Recross/Mr. Williams

952

1    A.    True.

2    Q.    And you did not include it in your testimony a

3    few moments ago either, that point?

4    A.    True.

5    Q.    Do you agree with IARC that the term

6    "asbestiform talc" has erroneously been used for talc

7    products that contain elongated mineral fragments that

8    are not asbestiform?

9    A.    I don't have knowledge of that either.

10   Q.    No information of either way?

11   A.    No.

12   Q.    You would defer to people like Mr. Longo for

13   that?

14   A.    People with expertise.

15   Q.    Do you agree with IARC differences in the use of

16   the same term asbestiform must be considered when

17   evaluating the literature on talc?  That is on the

18   same page a little farther down.

19   A.    I have no knowledge of that either.

20   Q.    And in neither your report nor in the testimony

21   on redirect examination, did you mention any of those

22   things that are also contained in the IARC 2012

23   monograph.  Correct?

24   A.    Correct.

25   Q.    Next topic is Penninkilampi.  You were asked

953

1    about that on redirect examination.

2            MR. WILLIAMS:  If we could bring up page 5 of

3    Exhibit A 109.

4    Q.    We looked at this earlier.  Table 1 on page 5

5    midway down.

6            With respect to the issue of dose-response, do

7    you see the reported odds ratios for the total

8    applications of talc use about halfway down?

9    A.    Yes.

10   Q.    There are just two categories of data there,

11   less than 36 applications and more than that.

12   Correct?

13   A.    Yes.

14   Q.    Now, a p-Trend, a p-Value, as you've testified,

15   estimates how likely an observed trend is due to

16   chance.  Right?

17   A.    It is a little more than that.  It is how

18   accurate you would be about saying that -- rejecting

19   there being no trend.

20   Q.    Actually, you wrote in your report that a

21   p-Value estimates how likely the observed association

22   is due to chance.

23   A.    I know.  I was just explaining further.

24   Q.    You wrote in your report what I just said.

25   Right?

McTiernan - Recross/Mr. Williams

954

1    A.    I agree.

2    Q.    There is no probability or p-Value trend in any

3    of the data you reviewed in Penninkilampi.  Is that

4    right?

5    A.    Correct.  They used confidence intervals

6    instead.

7    Q.    There is no p-Value reported anywhere in the

8    study?

9    A.    For these data, no.  They do have p-Values for

10   heterogeneity and publication bias.

11   Q.    With respect to Penninkilampi, which in your

12   report you stated found a dose-response you did so

13   even though the authors themselves did not conclude

14   dose-response.  Right?

15   A.    I look at the data and, as I mentioned earlier,

16   there were three methods to look at dose-response:

17   one is look at the relative risk with confidence

18   intervals; one is to do p-Value with the unexposed;

19   and one is to do p-Value without the unexposed.

20   Q.    In this data, the authors themselves did not

21   report any p-Value at all?

22   A.    They did not.

23   Q.    Next topic counsel asked you on redirect

24   examination, about a Taher meta-analysis.  Do you

25   recall that?

McTiernan - Recross/Mr. Williams

955

1   A.    Yes.

2   Q.    Let's take a look at Exhibit A 137.

3        MS. PARFITT:  Your Honor, you were very

4   gracious with me, so I do not want to be not gracious

5   myself, but I think we are past our five minutes.

6        MR. WILLIAMS:  Forgive me, your Honor, if I

7   may, the Taher study was not part of Dr. McTiernan's

8   articles originally included in her reference list.

9   Counsel just raised it on redirect examination, and so

10  I'm just simply trying.

11       MS. PARFITT:  Your Honor, let me be heard on

12  that.  At the time of her deposition, we did not have

13  her report.  We did not have Health Canada.  We

14  supplemented all of that timely.  So I don't think

15  that's quite correct.

16       THE COURT:  Either way, you've got another

17  couple of minutes.  You didn't take up all your time.

18  We're not going to go at this at length, but keep it

19  short, Mr. Williams.  It will take us longer to argue

20  the point than give the testimony.

21  BY MR. WILLIAMS:

22  Q.    Now, the Taher study is not one of the articles

23  you originally had on your list.  Correct?

24  A.    Correct.

25  Q.    It was made public after your litigation report

McTiernan - Recross/Mr. Williams

956

1    was submitted as a matter of fact.  Right?

2    A.    Yes.

3    Q.    You are not actually relying on the Taher

4    studies for your opinions in this matter.  Is that

5    correct?

6    A.    That's correct.

7    Q.    The study contains a meta-analysis.  Right?

8    A.    Yes.

9    Q.    And the authors calculated an overall relative

10   risk of 1.28 for their meta-analysis.  Right?

11   A.    I don't have that table in front of me.  Is it

12   in one of these documents?

13   Q.    Let's bring up page 29.

14   A.    What's the document number?

15   Q.    A 137.

16         There is the Section 3.4 meta-analysis.  Do

17   you see that reference there, 1.28 with a confidence

18   interval of 1.20 to 1.37?

19   A.    Yes.

20   Q.    Please turn to the conclusion of the study.  It

21   is on page 50, if we could pull that out.

22         In the conclusion it says in that last

23   sentence:

24         "Consistent with previous evaluations the IARC

25   in 2010 and subsequent evaluations by individual

McTiernan - Recross/Mr. Williams

957

1   investigators, the present comprehensive evaluation of

2   all currently available relevant data indicates that

3   perineal exposure to talc powder is a possible cause

4   of ovarian cancer in humans."

5          Do you see that?

6   A.    Yes.

7   Q.    That reference specifically states that it is

8   consistent with IARC from 2010.  Correct?

9   A.    That's what it states.

10  Q.    And the IARC definition in 2010 was, as we went

11  through today, that chance, luck, bias, confounding

12  factors could not be ruled out.  Correct?

13  A.    Yes.  But I would note these authors didn't do a

14  full causal analysis.  They only did the meta-analysis

15  part.

16  Q.    Now, the full causal analysis that you are

17  referring to today that you did --

18  A.    Yes.

19  Q.    -- includes the biological plausibility that we

20  have gone through with you today.  Right?

21  A.    Yes.

22  Q.    It includes the analysis of consistency that we

23  have gone through with you today.  Correct?

24  A.    Yes.

25  Q.    I take it you disagree with the conclusion of

McTiernan - Recross/Mr. Williams

958

1   the authors of the Taher study?

2   A.    Yes.

3   Q.    There are no scientific publications that were

4   available to you during your review in connection with

5   your opinions in this litigation that were not

6   available to the authors of the Taher 2018 study.

7   True?

8   A.    I don't know when they did their work.

9   Meta-analysis take a great deal of time.  They may

10  take a couple of years.  I don't know when they did

11  their reviews and when they did their evaluations.

12  Q.    Last thing.

13         On the question of consistency, counsel asked

14  you questions about Penninkilampi and Berge on direct.

15  Do you recall that?

16  A.    Yes.

17  Q.    The Berge study specifically came to the

18  conclusion -- and this is page 7 of Exhibit A 11:

19         "This analysis provided evidence of

20  heterogeneity of results between the two groups of

21  studies with an association generally detected in

22  case-control studies but not in cohort studies."

23         That's what Berge concluded.  Right?

24  A.    Yes.

25  Q.    That is one of the meta-analyses that you

959

1  believe was excellent.  Right?

2  A.    Yes.

3          MR. WILLIAMS:  No further questions, your

4  Honor.

5          THE COURT:  We're good.

6          MS. PARFITT:  We're good.

7          THE COURT:  We'll end for the day.  Now you

8  are excused.

9          (Witness excused.)

10          (Proceedings adjourned.)

11  ///

12

13

14

15

16

17

18

19

20

21

22

23

24

25

960

1                              I N D E X

2

3

4       **Proceedings**                                    **Page**

5

6        WITNESSES                Direct  Cross   Redirect  Recross

7

        **Anne McTiernan**
8
        By Ms. Parfitt            713      --       931      --
9       By Mr. Williams           --      803       --      949

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

961

**C E R T I F I C A T E**

PURSUANT TO TITLE 28, U.S.C., SECTION 753, THE

FOLLOWING TRANSCRIPT IS CERTIFIED TO BE AN ACCURATE

TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE

ABOVE-ENTITLED MATTER.


S/Vincent Russoniello
Vincent Russoniello, CCR
Certificate No. 675

## 0

**0.05** [1] - 858:12
**0.472** [1] - 899:9
**0.57** [1] - 906:1
**0.73** [2] - 905:25, 907:23
**0.75** [1] - 907:22
**0.80** [1] - 838:15
**0.84** [1] - 908:13
**0.85** [3] - 854:10, 854:11, 855:13
**0.87** [1] - 854:8
**0.88** [1] - 907:23
**0.90** [1] - 853:12
**0.93** [1] - 906:1
**0.99** [5] - 838:7, 838:14, 839:22, 839:25, 862:17
**01** [1] - 793:16
**05** [4] - 749:21, 750:18, 750:23, 899:11
**06** [1] - 750:23
**08608** [1] - 711:7

## 1

**1** [57] - 725:23, 744:15, 744:17, 744:22, 745:1, 745:2, 745:6, 746:5, 749:20, 760:19, 764:13, 764:14, 764:23, 765:17, 768:10, 768:15, 769:5, 772:25, 792:4, 792:19, 793:16, 802:17, 805:11, 811:9, 811:11, 820:18, 834:17, 834:18, 834:19, 834:20, 841:24, 844:3, 844:15, 844:20, 844:24, 846:4, 850:19, 851:10, 865:25, 897:1, 897:25, 904:25, 906:4, 906:6, 906:10, 907:23, 908:3, 914:21, 921:4, 922:2, 937:5, 942:6, 942:9, 947:3, 949:20, 953:4
**1.0** [26] - 747:9, 833:13, 834:11, 834:12, 835:1, 835:4, 835:12, 835:19, 835:22, 838:15, 842:7, 842:22, 842:23, 843:3, 844:7, 845:13, 849:23, 906:11, 908:11, 924:9, 924:16, 924:21, 924:24, 925:3
**1.02** [2] - 854:5, 854:20

**1.03** [1] - 902:16
**1.05** [1] - 797:13
**1.06** [4] - 766:25, 767:2, 853:11, 903:9
**1.09** [1] - 764:6
**1.1** [1] - 792:14
**1.14** [2] - 792:10, 792:13
**1.16** [1] - 797:9
**1.2** [4] - 744:12, 769:15, 780:11, 838:15
**1.2-to-1.4** [1] - 774:18
**1.20** [3] - 854:9, 854:11, 956:18
**1.22** [3] - 757:11, 762:3, 792:11
**1.23** [2] - 792:10, 792:14
**1.24** [1] - 761:18
**1.25** [3] - 796:13, 853:17, 862:16
**1.26** [1] - 780:4
**1.27** [1] - 853:1
**1.28** [2] - 956:10, 956:17
**1.29** [1] - 942:9
**1.3** [1] - 858:11
**1.31** [2] - 757:12, 780:11
**1.32** [3] - 792:11, 796:19, 942:5
**1.35** [2] - 757:15, 852:25
**1.37** [1] - 956:18
**1.4** [6] - 744:8, 764:9, 769:15, 839:7, 908:21, 908:23
**1.42** [1] - 796:20
**1.43** [3] - 853:1, 898:24, 899:3
**1.52** [1] - 942:5
**1.54** [1] - 897:7
**1.6** [2] - 780:6, 951:6
**1.72** [2] - 897:8, 897:9
**1.74** [1] - 903:5
**1.8** [1] - 895:22
**1.80** [1] - 897:9
**1.81** [1] - 902:23
**1.84** [1] - 898:22
**10** [12] - 787:15, 796:12, 796:17, 797:10, 818:14, 818:17, 819:25, 891:12, 912:7, 917:4, 918:20, 942:8
**10,000** [9] - 895:18, 896:4, 896:7, 897:7, 897:9, 898:16, 898:24, 899:2

**100** [10] - 749:22, 750:25, 751:2, 793:10, 793:17, 814:9, 814:13, 814:22, 850:15, 850:23
**109** [3] - 852:15, 908:2, 953:3
**11** [8] - 828:3, 828:11, 836:4, 853:24, 862:3, 907:15, 947:4, 958:18
**113** [3] - 822:10, 920:19, 921:14
**119** [1] - 824:7
**12** [17] - 768:5, 768:12, 771:22, 771:25, 772:5, 772:7, 772:21, 796:10, 805:20, 805:22, 817:17, 844:3, 844:16, 844:25, 861:19, 880:4
**120** [2] - 815:5, 815:6
**122** [1] - 822:10
**127** [2] - 717:10, 919:15
**12:15** [1] - 802:17
**12th** [1] - 925:24
**13** [4] - 768:13, 772:3, 832:6, 924:4
**137** [2] - 955:2, 956:15
**1372** [1] - 863:17
**139** [3] - 875:24, 888:3, 889:17
**14,000** [2] - 734:24, 756:14
**15** [3] - 767:18, 805:22, 854:17
**150** [1] - 738:17
**153** [5] - 865:21, 865:25, 867:10, 879:24, 880:4
**154** [2] - 772:9, 773:13
**16** [6] - 811:8, 813:23, 856:16, 856:21, 861:19, 913:5
**16-MD-2738(FLW)(LHG** [1] - 711:2
**165** [1] - 717:10
**16th** [1] - 925:20
**17** [5] - 717:9, 793:9, 793:10, 889:13, 893:15
**17,000** [1] - 756:14
**17-case-control** [1] - 739:13
**175** [1] - 913:4
**176** [1] - 913:5
**18** [3] - 821:18, 856:17, 893:6

**19** [1] - 896:20
**1977** [1] - 934:11
**1982** [6] - 715:8, 741:9, 763:23, 780:25, 938:21, 940:16
**1983** [1] - 843:2
**1983-case-control** [1] - 842:19
**1984** [1] - 817:25
**1989** [2] - 715:11, 843:7
**1992** [8] - 715:14, 716:14, 755:19, 755:25, 843:9, 843:11, 894:7, 894:8
**1993** [5] - 820:3, 822:20, 843:13, 879:15, 879:19
**1994** [1] - 822:19
**1997** [1] - 894:21
**1998** [1] - 843:15
**1999** [6] - 843:5, 843:17, 897:1, 898:5, 899:22, 904:7

## 2

**2** [27] - 792:14, 805:11, 808:8, 817:11, 827:11, 830:11, 836:5, 836:7, 836:16, 836:21, 842:13, 842:18, 846:9, 852:24, 854:1, 914:24, 915:2, 916:1, 917:18, 918:7, 919:8, 921:4, 921:5, 930:2, 934:22, 934:25, 940:24
**2,000** [3] - 895:18, 895:21, 895:25
**2-B** [2] - 915:14, 915:17
**20** [6] - 733:12, 744:12, 757:16, 854:16, 855:8, 884:11
**2000** [5] - 749:3, 767:7, 808:13, 848:20, 873:6
**2002** [2] - 717:23, 909:23
**2003** [1] - 938:16
**2004** [1] - 901:21
**2006** [11] - 785:24, 788:24, 801:7, 801:11, 870:22, 873:11, 915:14, 936:1, 936:12, 936:13, 938:16
**2007** [1] - 870:10
**2008** [12] - 718:21, 748:21, 749:5, 838:6,

838:7, 841:23, 843:19, 843:22, 848:23, 848:25, 873:11, 917:4
**2009** [1] - 816:23
**2010** [15] - 748:21, 749:7, 766:6, 766:15, 767:7, 849:4, 873:11, 874:2, 874:5, 915:22, 917:5, 936:5, 956:25, 957:8, 957:10
**2011** [1] - 843:24
**2012** [7] - 725:18, 937:1, 937:4, 950:25, 951:7, 951:9, 952:22
**2013** [5] - 875:16, 875:20, 876:25, 877:24, 878:4
**2013's** [1] - 877:6
**2014** [6] - 820:18, 849:7, 922:2, 922:9, 942:11, 944:7
**2016** [10] - 741:9, 780:25, 805:5, 806:3, 806:5, 849:12, 884:10, 884:13, 892:19, 904:21
**2018** [25] - 718:21, 823:21, 824:10, 825:16, 825:21, 828:3, 828:23, 844:6, 862:3, 866:5, 867:6, 867:12, 867:17, 867:19, 879:25, 881:25, 907:12, 910:14, 910:22, 938:8, 938:10, 940:17, 943:23, 945:19, 958:6
**2019** [3] - 711:4, 722:21, 788:24
**21** [2] - 894:21, 895:8
**210** [1] - 749:5
**215** [1] - 856:16
**217** [1] - 861:19
**22** [11] - 723:4, 724:25, 757:12, 778:16, 778:21, 870:8, 870:16, 877:16, 878:21, 881:18, 928:19
**23** [1] - 898:5
**230** [2] - 951:3, 951:5
**24** [8] - 760:11, 814:7, 815:6, 836:12, 844:3, 844:24, 879:6, 944:3
**24-case-control** [1] - 842:14
**245** [2] - 844:23
**246** [1] - 844:24

**25** [3] - 711:4, 904:22, 913:5
**26** [4] - 779:20, 822:10, 909:9, 909:14
**27** [8] - 755:23, 756:8, 779:21, 836:7, 836:12, 836:18, 910:12, 934:23
**28** [3] - 741:22, 886:13, 961:4
**29** [1] - 956:13
**297** [1] - 847:6

**3**

**3** [6] - 827:13, 895:9, 898:7, 898:11, 915:5, 922:19
**3,000** [4] - 897:7, 898:15, 898:21, 898:24
**3.4** [1] - 956:16
**30** [1] - 840:13
**307** [2] - 749:4, 763:21
**31** [8] - 723:4, 724:25, 757:12, 778:17, 778:21, 867:22, 875:17, 928:20
**32** [1] - 761:18
**36** [1] - 953:11
**3600** [3] - 796:18, 941:22, 942:4
**38** [2] - 727:10, 826:24
**39** [2] - 878:11, 944:4
**3900** [1] - 863:11

**4**

**4** [9] - 711:5, 818:25, 820:25, 846:21, 847:2, 901:25, 915:8, 940:24, 940:25
**4-to-1.32** [1] - 762:3
**400** [2] - 717:5, 719:6
**402** [1] - 711:7
**41** [2] - 839:9, 840:11
**42** [1] - 916:9
**424** [1] - 815:4
**429** [5] - 767:23, 768:23, 862:13, 862:24, 863:7
**45** [1] - 941:11
**46** [3] - 915:21, 915:25, 939:7
**47** [1] - 943:21
**48** [2] - 859:10, 859:11

**5**

**5** [11] - 749:25, 797:13, 809:25, 813:23, 866:11, 866:24, 898:6, 908:2, 908:3, 953:2, 953:4
**5,000** [2] - 895:25, 896:4
**5-09** [1] - 808:7
**50** [2] - 814:23, 956:21
**509** [2] - 808:8, 809:25
**510** [1] - 930:1
**52** [1] - 916:14
**521** [1] - 892:24
**53** [1] - 818:4
**55** [5] - 876:4, 894:7, 909:15, 909:22
**56** [2] - 910:19, 910:21
**588-9516** [1] - 711:25
**59** [1] - 910:16

**6**

**6** [3] - 821:18, 852:15, 895:9
**609** [1] - 711:25
**62** [1] - 941:13
**63** [3] - 846:3, 846:4, 846:9
**64** [4] - 827:13, 827:14, 827:16, 827:22
**675** [1] - 961:10
**68** [1] - 921:9

**7**

**7** [18] - 772:25, 827:10, 832:7, 855:12, 859:11, 862:4, 863:6, 864:15, 869:24, 876:4, 877:16, 894:25, 896:21, 907:15, 909:9, 921:2, 924:4, 958:18
**70** [5] - 753:6, 896:22, 897:1, 921:9, 951:1
**71** [1] - 894:25
**713** [1] - 960:8
**72** [3] - 815:4, 815:6, 915:20
**753** [1] - 961:4
**78,000** [1] - 763:20
**797** [2] - 749:8, 766:7

**8**

**8** [7] - 836:6, 854:1,

868:10, 883:5, 888:4, 889:18, 894:13
**8,525** [2] - 760:10, 948:11
**80** [2] - 909:18, 910:21
**803** [1] - 960:9
**815** [1] - 948:2
**831** [1] - 875:23
**85** [2] - 816:21, 816:23
**86** [2] - 921:3, 921:8
**89** [3] - 820:16, 921:21, 923:18

**9**

**9** [1] - 864:23
**9,859** [1] - 948:11
**90** [1] - 753:4
**93,000** [1] - 767:21
**931** [5] - 858:16, 859:3, 863:15, 863:17, 960:8
**94** [1] - 902:1
**943** [2] - 862:14, 863:8
**949** [1] - 960:9
**95** [13] - 745:10, 831:18, 832:21, 832:23, 833:3, 833:4, 834:22, 836:24, 838:10, 838:20, 839:2, 852:25, 853:11
**99** [2] - 839:16, 863:22

**A**

**A23** [1] - 898:5
**ability** [1] - 948:19
**able** [19] - 728:21, 753:13, 757:1, 775:17, 782:25, 786:5, 786:8, 791:11, 792:3, 795:19, 796:4, 796:7, 797:9, 823:15, 857:10, 872:11, 872:18, 900:12, 913:7
**abnormal** [3] - 819:4, 819:9, 819:21
**ABOVE** [1] - 961:7
**ABOVE-ENTITLED** [1] - 961:7
**absolutely** [3] - 739:24, 774:1, 874:14
**abstract** [7] - 818:16, 819:12, 819:14, 819:15, 819:18, 828:22, 828:25
**academic** [4] - 715:17, 729:23, 735:9, 735:25

**accepted** [3] - 729:20, 777:21, 808:15
**accepts** [1] - 935:15
**access** [1] - 866:16
**accompanied** [1] - 926:18
**accompanying** [1] - 926:22
**account** [2] - 759:17, 869:7
**accounts** [1] - 761:12
**accurate** [5] - 826:4, 866:8, 914:7, 923:22, 953:18
**ACCURATE** [1] - 961:5
**accurately** [4] - 830:7, 885:4, 897:18, 950:6
**acknowledged** [1] - 867:23
**acronym** [1] - 870:13
**act** [1] - 719:8
**acting** [1] - 723:15
**ACTION** [1] - 711:2
**active** [1] - 810:9
**activities** [2] - 716:11, 947:9
**activity** [13] - 718:1, 718:3, 718:11, 718:16, 718:21, 730:3, 821:9, 821:13, 821:17, 865:11, 868:5, 869:4, 870:2
**actual** [8] - 733:16, 743:17, 743:24, 756:15, 757:24, 839:21, 863:11, 867:2
**add** [5] - 829:15, 857:18, 863:10, 903:15, 903:23
**added** [7] - 766:12, 882:8, 882:14, 883:25, 903:21, 917:24, 918:2
**addendum** [1] - 713:25
**adding** [3] - 857:20, 860:7, 860:15
**addition** [6] - 721:3, 753:1, 784:20, 800:3, 893:1, 920:20
**additional** [7] - 755:6, 756:2, 815:18, 857:12, 909:3, 921:14, 922:23
**address** [4] - 719:12, 742:8, 742:9, 846:5
**addressed** [6] - 742:10, 742:11, 748:14, 759:3,

770:19, 801:14
**adenomas** [1] - 821:14
**adhesions** [1] - 787:2
**adjourned** [1] - 959:10
**adjust** [6] - 758:3, 758:5, 758:23, 760:7, 773:9, 913:9
**adjusted** [10] - 759:3, 759:20, 772:22, 776:6, 912:1, 912:6, 912:15, 912:23, 913:18, 913:20
**adjusting** [4] - 759:25, 773:1, 773:4
**adjustment** [2] - 760:2, 772:24
**adjustments** [1] - 912:9
**administered** [3] - 733:2, 733:3, 767:25
**Administration** [1] - 919:24
**adopting** [1] - 802:10
**adrenal** [3] - 821:12, 821:16, 823:4
**advance** [1] - 927:10
**advantages** [3] - 735:3, 755:13, 868:13
**adverse** [4] - 946:2, 946:8, 946:16, 946:21
**advise** [2] - 794:5, 922:24
**advised** [5] - 718:18, 750:4, 812:6, 812:10, 946:3
**advises** [1] - 737:22
**advisory** [6] - 717:16, 718:19, 718:20, 865:9, 868:2, 872:10
**Advisory** [1] - 867:7
**aerosol** [2] - 822:8, 822:9
**Affairs** [2] - 926:23, 927:24
**affect** [9] - 743:17, 743:20, 743:24, 754:18, 758:4, 760:2, 772:23, 773:7, 787:19
**affecting** [3] - 776:5, 809:21, 810:7
**affects** [5] - 754:19, 808:23, 856:12, 856:20, 856:25
**afield** [1] - 928:3
**afternoon** [4] - 803:11, 803:12, 875:8, 932:8

**agencies** [2] - 800:25, 923:9
**agency** [3] - 725:22, 820:6, 914:15
**Agency** [3] - 717:21, 725:19, 865:4
**agent** [3] - 810:9, 916:19, 937:14
**agents** [1] - 916:3
**aggregate** [6] - 728:8, 733:24, 734:20, 755:2, 938:11, 940:10
**ago** [9] - 738:11, 738:13, 834:23, 839:25, 864:5, 897:15, 917:4, 918:20, 952:3
**agree** [28] - 737:6, 814:23, 815:11, 824:1, 824:9, 850:22, 854:5, 855:7, 863:17, 868:16, 872:8, 881:16, 884:4, 886:12, 887:9, 893:10, 900:9, 903:14, 935:19, 943:11, 944:13, 947:17, 951:7, 951:9, 951:16, 952:5, 952:15, 954:1
**agreed** [3] - 722:24, 896:1, 912:12
**agrees** [1] - 721:17
**ahead** [3] - 731:13, 835:25, 941:15
**air** [1] - 786:22
**akin** [1] - 762:22
**al** [2] - 876:6, 944:19
**al.** [1] - 934:24
**ALABAMA** [1] - 711:11
**ALLEN** [1] - 711:10
**ALLISON** [1] - 712:5
**almost** [8] - 719:6, 720:17, 747:13, 747:15, 747:16, 752:9, 759:22, 858:25
**aloud** [1] - 926:1
**altered** [4] - 812:14, 812:17, 812:21, 813:3
**altogether** [1] - 767:18
**alveolar** [1] - 823:5
**alveolar/bronchiolar** [1] - 821:14
**American** [2] - 751:3, 841:14
**amount** [7] - 725:4, 749:24, 759:23, 795:2,

875:10, 906:19, 942:5
**AN** [1] - 961:5
**analogy** [3] - 777:18, 799:12, 799:25
**analyses** [45] - 717:11, 717:12, 721:11, 723:1, 723:8, 728:13, 734:21, 735:1, 735:3, 736:16, 755:3, 755:22, 761:2, 774:3, 796:3, 827:7, 828:14, 829:15, 851:25, 857:9, 859:7, 859:22, 860:1, 860:2, 860:17, 861:8, 861:23, 862:22, 863:3, 865:10, 868:3, 879:3, 879:15, 882:18, 884:8, 884:9, 888:12, 889:21, 938:8, 939:12, 940:4, 941:3, 945:3, 958:25
**analyses'** [1] - 857:17
**Analysis** [1] - 911:2
**analysis** [134] - 722:11, 723:2, 725:3, 729:14, 730:5, 734:1, 734:12, 739:15, 741:4, 755:4, 755:9, 755:12, 755:19, 756:3, 756:24, 757:19, 757:20, 757:23, 759:1, 760:6, 760:9, 760:18, 761:3, 762:11, 763:20, 763:21, 769:20, 796:4, 796:7, 796:14, 797:7, 798:12, 798:13, 800:19, 804:22, 806:17, 810:20, 824:10, 828:20, 829:18, 829:19, 830:4, 832:7, 844:6, 845:24, 851:23, 852:3, 852:17, 852:23, 853:9, 854:19, 856:7, 857:22, 859:6, 859:11, 859:16, 859:24, 860:8, 860:10, 860:23, 862:3, 862:12, 862:15, 862:17, 863:21, 871:19, 875:20, 876:6, 877:6, 877:15, 877:18, 878:1, 878:19, 878:25, 879:7, 879:11, 880:8, 880:12, 881:5, 881:11, 882:16, 882:20, 883:7, 883:8, 883:15, 883:18, 884:3, 884:10, 884:12, 884:14, 885:2,

888:11, 888:24, 889:7, 893:4, 893:11, 907:12, 910:13, 912:14, 923:15, 938:10, 939:11, 940:1, 942:14, 942:20, 943:3, 943:13, 943:23, 944:15, 944:18, 944:21, 944:22, 945:19, 948:6, 948:9, 948:10, 954:24, 956:7, 956:10, 956:16, 957:14, 957:16, 957:22, 958:9, 958:19

**analyze** [2] - 771:24, 903:17

**analyzed** [1] - 734:16

**analyzes** [1] - 734:3

**animal** [8] - 727:23, 728:6, 787:5, 787:25, 788:9, 815:22, 816:14, 816:15

**animals** [4] - 819:25, 821:5, 823:17, 916:6

**Anne** [5] - 713:8, 713:20, 803:6, 875:4, 960:7

**ANNE** [3] - 713:10, 777:5, 932:4

**answer** [16] - 826:1, 826:8, 836:1, 840:24, 841:3, 844:20, 845:3, 850:3, 857:23, 872:14, 872:24, 873:2, 901:18, 918:9, 946:22, 947:10

**ANSWER** [7] - 806:3, 845:2, 856:23, 857:1, 862:1, 913:11, 913:13

**answered** [1] - 926:16

**apart** [3] - 812:25, 824:22, 825:13

**apoptosis** [6] - 809:6, 809:7, 809:11, 809:19, 809:21, 810:6

**appear** [2] - 867:24, 914:7

**appearance** [1] - 928:9

**appeared** [2] - 925:22, 926:18

**application** [7] - 784:19, 784:24, 785:2, 795:16, 893:5, 900:10, 939:14

**applications** [23] - 719:2, 719:3, 723:10, 795:21, 796:9, 796:15, 796:18, 888:9, 889:5,

894:17, 897:1, 897:6, 898:13, 898:19, 899:24, 901:8, 901:13, 934:10, 941:17, 941:22, 941:23, 953:8, 953:11

**applied** [17] - 777:14, 785:3, 785:9, 785:13, 787:9, 808:3, 810:21, 810:24, 813:14, 813:19, 814:20, 817:7, 818:9, 837:3, 883:19, 949:2, 949:7

**apply** [3] - 745:24, 786:5, 857:22

**applying** [1] - 905:21

**appointments** [1] - 715:17

**appreciate** [2] - 802:14, 932:10

**Approach** [1] - 864:14

**approached** [3] - 805:4, 806:1, 806:5

**approaching** [1] - 730:18

**appropriate** [8] - 751:11, 789:8, 794:4, 794:18, 890:9, 890:25, 891:2, 932:20

**April** [2] - 820:18, 922:2

**area** [26] - 720:6, 723:3, 723:11, 724:24, 745:11, 753:5, 763:19, 768:2, 785:18, 785:21, 787:1, 807:23, 818:10, 826:4, 898:10, 900:1, 900:11, 901:7, 901:14, 904:18, 923:2, 949:3, 949:8, 951:20, 951:21

**areas** [9] - 718:14, 720:11, 721:8, 762:21, 818:23, 819:3, 819:8, 904:13, 904:17

**argue** [1] - 955:19

**ARPS** [1] - 711:19

**arrive** [2] - 726:8, 730:8

**arrow** [1] - 795:1

**article** [4] - 812:9, 892:2, 892:11, 892:19

**articles** [3] - 727:5, 955:8, 955:22

**asbestiform** [6] - 821:9, 951:10, 951:23, 952:6, 952:8, 952:16

**asbestos** [23] - 722:1,

722:6, 725:15, 725:17, 725:20, 728:1, 782:12, 782:21, 782:22, 783:1, 784:12, 804:3, 804:7, 804:9, 804:11, 804:22, 805:1, 821:5, 936:9, 937:3, 937:13, 937:15, 937:18

**asbestos-like** [1] - 821:5

**ascertained** [1] - 950:6

**ascertainment** [2] - 774:8, 774:11

**ASHCRAFT** [1] - 711:12

**aspect** [3] - 780:13, 791:2, 799:19

**aspects** [4] - 777:15, 778:3, 778:9, 811:23

**assembled** [1] - 869:7

**assess** [3] - 729:15, 778:12, 812:2

**assessed** [2] - 826:20, 869:8

**assessing** [4] - 777:11, 830:6, 893:3, 918:4

**assessment** [6] - 722:15, 777:13, 781:11, 794:3, 822:13, 942:24

**assessments** [1] - 726:17

**assign** [1] - 794:9

**assigned** [1] - 780:4

**assist** [2] - 714:7, 740:18

**assistance** [1] - 807:10

**assisted** [1] - 740:21

**assisting** [1] - 713:23

**associated** [7] - 758:11, 791:7, 839:8, 928:19, 944:3, 946:2, 946:8

**Association** [3] - 751:3, 827:14, 841:15

**association** [94] - 719:22, 721:14, 724:10, 725:20, 726:20, 736:7, 742:24, 744:11, 746:5, 746:8, 749:18, 775:21, 778:13, 779:24, 781:15, 816:16, 824:15, 825:19, 826:14, 827:3, 827:19, 829:3, 829:11, 829:23, 830:8, 831:17, 833:13, 833:21, 834:2, 834:4, 834:7, 834:13, 834:24, 835:2, 835:6, 835:12,

835:20, 835:23, 836:16, 841:24, 842:4, 842:9, 845:5, 845:8, 845:13, 845:16, 845:17, 845:18, 845:19, 845:20, 846:16, 847:22, 848:10, 850:16, 850:20, 851:9, 851:13, 851:16, 852:19, 853:20, 857:5, 872:5, 872:18, 872:23, 873:3, 873:12, 874:7, 874:9, 874:10, 876:13, 883:22, 893:2, 893:24, 910:5, 911:22, 913:14, 914:12, 916:18, 923:1, 923:11, 924:9, 924:16, 924:22, 924:25, 925:4, 925:5, 929:1, 943:6, 943:15, 944:8, 944:10, 945:16, 953:21, 958:21

**associations** [4] - 714:22, 779:2, 779:3, 836:20

**assume** [7] - 759:8, 759:12, 812:16, 813:2, 816:9, 863:20, 872:21

**assumed** [1] - 912:23

**assuming** [2] - 793:11, 906:20

**assumption** [3] - 722:1, 812:18, 936:8

**assumptions** [3] - 812:19, 813:6, 813:9

**ate** [1] - 738:16

**attempt** [1] - 742:13

**attempted** [1] - 742:14

**attend** [1] - 926:11

**attending** [1] - 927:3

**attention** [20] - 741:7, 805:20, 808:14, 808:20, 810:1, 813:16, 813:24, 844:23, 854:1, 864:21, 885:12, 888:4, 892:21, 898:6, 922:3, 943:1, 944:6, 947:1, 947:4, 947:24

**attenuate** [6] - 765:16, 766:20, 769:9, 773:18, 949:19, 949:25

**atypia** [1] - 818:24

**Austin** [1] - 846:5

**author** [1] - 890:11

**author's** [1] - 813:25

966

**authored** [2] - 892:18, 921:15
**authorities** [1] - 723:21
**authors** [25] - 810:4, 814:4, 814:25, 818:6, 818:22, 819:6, 828:24, 829:10, 829:14, 829:21, 830:19, 888:7, 888:14, 888:19, 890:1, 938:15, 941:9, 944:13, 948:7, 954:13, 954:20, 956:9, 957:13, 958:1, 958:6
**authors'** [1] - 792:16
**available** [21] - 721:11, 721:15, 727:3, 730:23, 755:18, 755:20, 755:21, 756:11, 756:12, 756:13, 761:10, 803:24, 823:2, 825:25, 943:3, 943:7, 943:16, 944:19, 957:2, 958:4, 958:6
**average** [2] - 746:23, 940:9
**aware** [8] - 806:19, 808:1, 808:2, 873:8, 933:6, 934:16, 944:15, 945:25
**axis** [2] - 814:12, 814:21

**B**

**baby** [2] - 949:4, 949:8
**Baby** [1] - 720:5
**background** [1] - 763:14
**backwards** [1] - 837:11
**bad** [2] - 868:17, 868:18
**bar** [1] - 814:21
**bark** [2] - 812:4, 812:13
**bars** [1] - 815:4
**BART** [1] - 711:21
**base** [1] - 720:7
**based** [33] - 731:15, 731:22, 732:4, 732:12, 742:4, 742:5, 771:10, 773:2, 774:14, 775:11, 780:18, 782:1, 789:8, 797:24, 798:7, 812:24, 820:12, 821:10, 821:13, 827:2, 837:17, 841:6, 855:11, 858:14, 863:13, 866:7, 876:21, 891:1, 895:13, 936:5, 936:7, 936:9, 943:12
**baseline** [5] - 813:18,

814:9, 814:14, 814:16, 815:11
**bases** [1] - 914:11
**basic** [4] - 730:17, 763:14, 825:22, 864:8
**basing** [1] - 840:22
**basis** [5] - 807:11, 817:8, 891:19, 891:23, 919:20
**BE** [1] - 961:5
**beads** [1] - 809:18
**BEASLEY** [1] - 711:10
**became** [2] - 768:7, 768:8
**become** [1] - 846:6
**beer** [4] - 891:10, 891:11, 891:12, 891:13
**beforehand** [1] - 927:2
**beg** [2] - 892:13, 906:9
**began** [3] - 716:14, 767:21, 882:20
**begin** [2] - 777:10, 882:19
**beginning** [3] - 808:14, 819:22, 828:24
**begins** [2] - 846:24, 888:6
**begun** [1] - 805:10
**behalf** [8] - 711:16, 711:22, 712:5, 713:10, 929:21, 930:6, 930:10, 930:15
**Behalf** [1] - 712:8
**BEISNER** [1] - 711:20
**believes** [4] - 914:21, 914:24, 915:2, 915:9
**below** [17] - 744:22, 745:1, 748:3, 750:15, 756:4, 757:18, 760:19, 772:25, 809:5, 814:22, 815:11, 828:23, 842:15, 842:23, 843:3, 906:10, 925:3
**benefit** [1] - 735:23
**benefits** [3] - 736:23, 737:7, 760:5
**benign** [2] - 821:11, 821:15
**Berge** [37] - 797:7, 828:2, 828:11, 828:13, 828:17, 828:23, 829:21, 830:8, 830:12, 836:3, 844:5, 845:6, 851:25, 852:8, 852:12, 853:23,

862:3, 862:10, 862:22, 863:2, 863:6, 863:24, 907:11, 937:24, 938:10, 939:1, 944:16, 944:21, 944:25, 945:4, 945:7, 945:13, 945:15, 945:19, 958:14, 958:17, 958:23
**best** [2] - 737:12, 902:15
**better** [5] - 736:7, 739:21, 746:18, 770:22, 948:19
**between** [69] - 714:22, 719:22, 721:14, 721:22, 724:10, 725:20, 726:20, 733:15, 736:8, 746:5, 749:20, 750:22, 757:10, 757:11, 757:12, 761:18, 775:8, 807:18, 824:15, 825:19, 826:13, 826:14, 827:3, 827:19, 829:4, 829:11, 829:23, 833:13, 834:4, 834:7, 834:13, 834:18, 834:19, 836:16, 842:4, 842:9, 845:8, 845:13, 845:19, 847:22, 848:10, 850:16, 850:20, 851:13, 851:16, 852:19, 853:20, 856:1, 872:5, 873:13, 883:22, 894:17, 895:24, 896:4, 897:8, 908:25, 911:22, 914:12, 916:19, 923:1, 924:9, 925:5, 933:25, 939:15, 943:6, 943:15, 944:9, 958:20
**beyond** [2] - 946:23, 947:13
**bias** [20] - 727:20, 764:25, 765:4, 768:17, 771:4, 775:3, 775:5, 775:7, 775:14, 871:3, 892:17, 916:21, 917:9, 917:11, 917:13, 919:9, 944:6, 954:10, 957:11
**BIDDLE** [1] - 711:17
**big** [2] - 734:8, 858:24
**bigger** [1] - 760:25
**binary** [1] - 893:1
**Binder** [1] - 865:25
**binder** [9] - 714:2, 805:11, 805:12, 805:14, 805:17, 828:5, 844:21, 865:21

**binders** [1] - 805:10
**biologic** [1] - 787:23
**biological** [27] - 720:13, 728:5, 781:9, 781:10, 781:13, 781:14, 781:18, 781:19, 781:22, 791:4, 798:17, 807:6, 807:12, 815:25, 816:6, 816:8, 816:13, 820:2, 825:17, 825:23, 825:24, 936:14, 937:8, 937:11, 937:19, 957:19
**biologically** [4] - 718:2, 725:10, 782:6, 790:2
**biologist** [1] - 825:22
**biology** [4] - 782:1, 782:2, 782:3, 826:1
**bit** [19] - 715:2, 717:14, 731:19, 734:10, 735:4, 737:14, 739:25, 740:1, 747:10, 748:7, 749:9, 749:10, 765:8, 766:13, 780:15, 836:4, 928:3, 928:14, 940:13
**black** [2] - 747:23, 748:3
**blood** [2] - 787:3, 788:2
**BMI** [2] - 913:19, 913:25
**board** [8] - 739:20, 830:7, 845:25, 853:14, 866:11, 875:24, 915:25, 924:6
**bodies** [8] - 777:22, 786:10, 800:8, 800:14, 800:16, 801:16, 837:14, 848:17
**body** [10] - 728:3, 786:19, 787:24, 795:19, 795:23, 817:14, 892:16, 913:9, 913:25, 935:23
**bone** [1] - 715:23
**book** [11] - 808:6, 811:9, 811:10, 820:24, 827:10, 895:8, 930:1, 930:2, 934:18, 934:20, 951:2
**booth** [1] - 747:24
**bottom** [18] - 744:9, 753:17, 754:4, 809:4, 810:2, 834:19, 854:3, 859:11, 867:24, 869:10, 869:16, 892:24, 900:14, 900:22, 909:13, 915:24, 916:13, 940:22
**bound** [3] - 745:1, 745:2,

760:19
**box** [1] - 868:25
**Bradford** [23] - 722:10, 729:13, 763:17, 777:14, 777:20, 780:13, 780:17, 791:2, 797:21, 798:16, 799:4, 799:7, 845:24, 846:3, 846:5, 846:7, 846:11, 847:3, 942:20, 947:2, 947:6, 947:7, 947:17
**branch** [1] - 717:22
**branches** [1] - 920:13
**breadth** [1] - 728:20
**break** [6] - 776:13, 777:9, 802:16, 874:13, 931:3, 931:6
**breast** [9] - 716:2, 770:1, 770:15, 771:16, 771:18, 771:19, 771:21, 780:7, 910:15
**Breast** [1] - 911:1
**brief** [1] - 950:23
**briefing** [4] - 737:1, 789:11, 789:15, 789:19
**briefly** [10] - 715:16, 717:15, 718:6, 719:5, 762:25, 763:13, 774:6, 779:4, 783:6, 798:18
**bring** [4] - 929:23, 939:5, 953:2, 956:13
**Britton** [3] - 892:6, 892:13, 892:18
**broad** [2] - 754:14, 754:16
**broader** [2] - 770:19, 771:10
**broke** [1] - 852:4
**broke-out** [1] - 852:4
**bronchial** [1] - 823:5
**brought** [2] - 713:22, 714:2
**BROWN** [1] - 712:5
**bullet** [2] - 869:9, 869:10
**burden** [1] - 810:10
**bursal** [1] - 818:7
**Buz'Zard** [7] - 810:23, 811:5, 812:2, 812:16, 813:2, 813:12, 813:17
**BY** [30] - 711:11, 711:12, 711:14, 711:15, 711:18, 711:20, 711:21, 712:5, 712:7, 713:15, 771:11,

777:8, 779:25, 783:3, 783:18, 789:25, 799:2, 800:23, 803:9, 825:12, 841:11, 871:18, 875:7, 885:20, 914:10, 928:17, 932:7, 946:25, 950:22, 955:21

## C

**C-7** [3] - 878:21, 883:5, 921:6
**CALCAGNIE** [1] - 711:15
**calculate** [3] - 792:23, 832:16, 897:19
**calculated** [7] - 756:19, 792:16, 793:2, 891:17, 902:15, 903:8, 956:9
**calculating** [1] - 889:25
**calculation** [23] - 855:16, 857:2, 857:22, 858:1, 858:9, 858:14, 860:9, 860:19, 860:20, 860:23, 861:8, 861:22, 863:14, 863:18, 863:20, 863:23, 863:25, 864:3, 864:5, 887:20, 890:1, 890:8, 893:20
**calculations** [4] - 857:18, 857:19, 860:16, 904:2
**CALIFORNIA** [2] - 711:15, 711:21
**Canada** [26] - 721:9, 721:10, 721:24, 722:4, 722:15, 722:16, 722:23, 723:14, 723:20, 723:21, 726:2, 800:15, 801:3, 919:13, 923:5, 923:13, 935:23, 942:19, 942:24, 943:11, 944:16, 944:19, 944:20, 955:13
**Cancer** [23] - 715:21, 718:7, 718:8, 718:13, 725:19, 737:21, 739:7, 865:5, 865:8, 865:22, 867:8, 872:11, 879:17, 879:22, 881:4, 881:14, 881:20, 881:23, 911:1, 920:5, 920:7, 920:8, 921:11
**cancer** [229] - 714:15, 714:18, 714:24, 715:10, 715:22, 715:24, 715:25, 716:2, 716:4, 717:3,

717:21, 717:25, 718:4, 718:10, 718:22, 718:25, 719:20, 719:23, 720:7, 721:15, 723:5, 723:9, 724:11, 724:19, 725:1, 725:5, 725:12, 725:21, 726:9, 726:21, 726:23, 728:24, 729:3, 730:24, 731:3, 731:4, 731:12, 732:5, 732:8, 733:10, 733:11, 733:13, 733:16, 733:22, 734:15, 734:16, 735:16, 735:18, 736:6, 736:8, 738:1, 738:2, 738:4, 738:6, 739:3, 739:6, 742:1, 742:2, 742:4, 745:9, 746:7, 748:11, 748:25, 752:11, 753:2, 753:4, 753:7, 753:10, 753:13, 756:15, 756:16, 757:3, 757:13, 758:2, 758:16, 758:18, 758:21, 758:24, 760:12, 761:9, 761:21, 763:22, 764:5, 764:13, 764:15, 764:19, 765:5, 766:7, 767:1, 767:23, 768:12, 768:13, 770:1, 770:15, 770:18, 770:25, 771:1, 771:16, 771:18, 771:20, 771:21, 772:12, 772:14, 772:15, 773:14, 775:18, 775:19, 775:23, 775:25, 776:11, 777:12, 778:16, 779:4, 780:7, 781:4, 781:17, 782:7, 782:13, 787:19, 788:3, 788:18, 788:21, 790:3, 790:14, 790:17, 790:22, 791:10, 791:18, 792:12, 795:14, 795:25, 800:10, 801:9, 803:21, 804:25, 806:13, 806:23, 811:14, 811:15, 811:17, 811:20, 812:11, 823:16, 824:15, 825:19, 826:14, 826:22, 827:4, 827:20, 829:5, 829:12, 829:24, 836:18, 839:10, 840:7, 840:12, 840:14, 842:5, 842:10, 845:9, 847:24, 848:11, 849:22, 850:17, 851:14, 851:17, 852:20, 853:21, 855:23, 856:3, 856:8, 856:11,

857:11, 857:15, 858:6, 859:19, 862:13, 863:7, 863:8, 863:11, 865:4, 865:13, 866:18, 868:8, 869:5, 869:20, 872:6, 872:12, 872:19, 872:23, 873:4, 873:14, 874:8, 875:22, 876:2, 876:8, 876:14, 876:18, 878:6, 883:22, 886:11, 888:10, 889:6, 892:16, 894:18, 907:8, 910:15, 911:23, 914:13, 916:19, 917:2, 918:6, 923:2, 926:8, 933:4, 937:21, 938:13, 941:21, 943:7, 944:4, 944:10, 945:10, 948:12, 948:15, 948:16, 957:4
**cancers** [14] - 725:17, 733:10, 753:4, 753:17, 754:1, 761:13, 770:14, 785:6, 787:14, 787:15, 823:4, 823:6, 865:12, 868:6
**cannot** [8] - 842:3, 842:8, 851:2, 851:4, 851:11, 862:18, 878:23, 925:4
**cans** [2] - 891:12, 891:13
**carcinogen** [4] - 725:24, 801:13, 937:7
**carcinogenesis** [7] - 786:16, 787:7, 787:12, 807:7, 811:21, 812:1, 816:3
**carcinogenetic** [1] - 821:8
**carcinogenic** [12] - 787:6, 787:23, 816:5, 817:2, 819:22, 821:13, 821:17, 914:22, 914:25, 915:3, 915:9, 915:17
**carcinogenicity** [6] - 728:1, 822:13, 916:4, 916:6, 916:10, 916:15
**carcinogens** [4] - 782:11, 782:15, 782:20, 784:7
**carcinomas** [1] - 821:15
**Care** [1] - 712:8
**career** [2] - 719:7, 864:11
**careful** [3] - 727:4, 922:20, 923:18
**carries** [2] - 846:22,

909:14
**carry** [3] - 758:17, 758:20, 819:1
**cascade** [3] - 788:10, 790:15, 811:24
**case** [135] - 715:7, 717:9, 719:16, 720:23, 726:19, 727:3, 728:13, 729:19, 730:1, 731:1, 731:8, 731:11, 731:14, 731:17, 731:20, 732:3, 732:9, 732:16, 732:18, 733:1, 733:5, 733:10, 734:14, 735:10, 735:14, 736:16, 737:3, 737:12, 738:1, 738:7, 739:5, 739:10, 739:14, 739:16, 741:8, 741:22, 746:6, 747:18, 748:3, 752:3, 752:5, 753:10, 753:12, 754:23, 755:4, 757:10, 758:4, 758:22, 759:6, 762:10, 763:10, 763:16, 765:1, 765:19, 768:23, 771:1, 771:2, 773:20, 773:22, 773:25, 774:11, 774:16, 775:2, 775:12, 784:9, 791:8, 797:6, 806:18, 818:9, 820:2, 823:10, 827:18, 836:9, 836:13, 837:7, 837:8, 839:16, 844:1, 844:5, 844:9, 845:10, 845:21, 847:25, 848:9, 849:1, 849:21, 851:18, 851:23, 852:5, 852:9, 852:24, 855:20, 858:18, 858:20, 858:23, 858:25, 862:17, 862:18, 868:23, 869:15, 869:22, 871:2, 871:9, 872:9, 876:12, 876:25, 877:3, 877:25, 882:25, 883:1, 883:10, 883:20, 884:11, 884:19, 884:22, 885:16, 900:17, 901:22, 904:11, 911:17, 913:8, 913:9, 919:20, 921:23, 938:4, 939:2, 939:22, 939:23, 940:12, 940:14, 940:16, 944:5, 948:10, 958:22
**Case** [1] - 741:18
**case-control** [84] -

717:9, 728:13, 731:1, 731:14, 731:17, 731:20, 732:3, 732:9, 732:16, 733:5, 736:16, 737:3, 737:12, 738:1, 738:7, 739:14, 739:16, 741:8, 747:18, 748:3, 752:3, 752:5, 753:12, 754:23, 759:6, 762:10, 763:10, 763:16, 765:1, 765:19, 771:1, 771:2, 773:20, 773:22, 773:25, 774:11, 774:16, 775:2, 775:12, 806:18, 836:9, 836:13, 837:7, 837:8, 844:1, 844:5, 844:9, 845:10, 845:21, 847:25, 848:9, 849:1, 851:18, 852:9, 852:24, 855:20, 858:18, 858:20, 858:23, 858:25, 862:17, 862:18, 868:23, 869:15, 869:22, 871:2, 871:9, 877:3, 883:1, 883:10, 884:11, 900:17, 901:22, 904:11, 911:17, 913:8, 938:4, 939:2, 939:22, 939:23, 940:12, 940:14, 940:16, 958:22
**Case-Control** [1] - 741:18
**case-controls** [1] - 852:5
**cases** [78] - 728:23, 731:6, 731:24, 731:25, 732:5, 732:15, 732:17, 733:13, 733:14, 733:16, 733:18, 733:21, 734:24, 735:18, 741:24, 741:25, 742:1, 742:2, 748:8, 748:24, 748:25, 749:4, 749:6, 749:8, 753:1, 756:10, 756:12, 756:15, 756:16, 760:10, 763:21, 765:2, 765:19, 767:23, 768:21, 768:23, 769:10, 772:9, 772:11, 773:13, 774:8, 774:11, 775:6, 775:20, 837:15, 837:17, 837:21, 837:25, 855:23, 856:6, 856:8, 856:11, 856:20, 856:24, 857:11, 857:13, 857:14, 857:15, 857:20, 858:6, 858:15, 859:23, 862:13, 862:14,

862:24, 863:7, 863:8, 863:11, 863:15, 876:10, 876:17, 948:12
**categories** [10] - 791:16, 791:18, 791:23, 793:8, 793:15, 796:17, 893:18, 914:18, 953:10
**categorized** [1] - 796:2
**categorizing** [1] - 796:24
**category** [10] - 792:10, 792:15, 792:19, 798:20, 799:16, 840:19, 893:2, 915:15, 916:3
**Category** [1] - 915:12
**Causal** [1] - 934:25
**causal** [21] - 721:16, 725:20, 726:17, 730:5, 800:19, 804:22, 826:14, 875:11, 908:25, 914:12, 916:20, 923:1, 923:11, 923:14, 942:13, 943:8, 943:16, 944:10, 944:22, 957:14, 957:16
**causality** [7] - 722:10, 729:15, 777:13, 778:12, 778:24, 909:2, 942:22
**causation** [3] - 777:14, 777:16, 781:11
**Causation** [1] - 934:25
**caused** [4] - 725:13, 787:15, 795:17, 821:4
**causes** [17] - 758:21, 782:13, 786:19, 787:1, 787:4, 787:17, 787:22, 800:9, 807:24, 810:21, 872:12, 872:19, 875:22, 876:1, 876:8, 918:5
**causing** [4] - 724:19, 725:11, 795:24, 807:25
**caveat** [1] - 906:16
**cavity** [1] - 807:20
**CCR** [2] - 711:24, 961:9
**cell** [5] - 727:24, 787:8, 808:23, 809:8, 811:1
**cell's** [1] - 787:19
**cells** [21] - 787:9, 807:21, 808:2, 808:24, 809:12, 809:13, 809:22, 810:7, 810:17, 810:21, 811:2, 811:3, 811:4, 812:13, 812:17, 813:3, 813:10, 813:14, 817:15
**cellular** [2] - 728:6,

810:18
**censored** [4] - 898:13, 899:24, 900:15, 900:23
**Center** [1] - 715:21
**center** [3] - 715:22, 715:24, 757:25
**certain** [6] - 718:14, 728:17, 730:10, 733:20, 750:13, 795:2
**certainty** [2] - 720:4, 781:19
**Certificate** [1] - 961:10
**CERTIFIED** [1] - 961:5
**chain** [1] - 816:7
**chair** [1] - 718:22
**chaired** [1] - 718:1
**chambers** [1] - 789:3
**chance** [21] - 727:20, 745:10, 752:17, 752:19, 752:20, 752:21, 752:24, 795:22, 831:9, 831:14, 831:21, 831:25, 832:11, 907:7, 916:21, 916:25, 919:9, 947:11, 953:16, 953:22, 957:11
**chances** [1] - 840:12
**change** [16] - 745:7, 759:24, 773:1, 782:22, 782:23, 787:9, 790:1, 790:5, 791:7, 815:12, 817:18, 817:21, 818:19, 841:6, 894:1, 919:4
**changed** [6] - 738:8, 759:23, 768:6, 919:1, 930:19
**changes** [7] - 738:5, 787:9, 787:11, 819:7, 819:11, 819:20, 819:25
**Chapter** [2] - 934:22, 934:25
**characteristics** [2] - 728:17, 728:19
**characterize** [3] - 948:3, 948:4, 948:8
**chart** [13] - 726:13, 807:4, 807:5, 813:24, 817:25, 836:9, 854:2, 894:25, 897:16, 897:19, 898:3, 898:9, 898:19
**charts** [1] - 814:22
**check** [3] - 760:6, 828:9, 905:12
**checking** [1] - 779:8

checklist [1] - 777:25
Chen [1] - 843:9
chest [1] - 807:20
Chief [1] - 925:15
choice [1] - 736:13
chose [7] - 728:19, 749:5, 766:10, 786:7, 867:4, 898:1, 899:16
CHRISTOPHER [1] - 711:14
chronic [1] - 819:5
cigarette [1] - 758:16
circulatory [1] - 784:22
circumstances [2] - 846:18, 869:21
citation [7] - 878:11, 878:12, 878:13, 893:6, 893:7, 909:15
cite [12] - 816:10, 822:21, 822:22, 822:24, 826:15, 835:7, 866:23, 866:25, 879:14, 879:16, 891:24
cited [16] - 807:23, 811:6, 813:12, 816:3, 816:4, 816:9, 820:1, 823:3, 823:18, 823:20, 867:3, 879:18, 897:10, 909:25
cites [1] - 910:19
citing [2] - 835:15, 904:14
citizens' [1] - 922:19
CIVIL [1] - 711:2
claimed [1] - 935:11
claims [1] - 739:4
clarification [1] - 889:24
clarify [2] - 837:15, 837:24
clarifying [1] - 771:9
CLARKSON [1] - 711:7
Class [3] - 725:23, 801:13, 937:5
classifiable [1] - 915:6
classification [2] - 917:18, 936:1
classified [8] - 725:22, 765:11, 765:13, 782:15, 801:12, 917:20, 937:3, 937:5
classifying [2] - 766:11, 796:25
clear [12] - 754:8, 781:4,

782:12, 804:24, 821:12, 833:11, 838:13, 857:24, 871:10, 876:16, 876:22, 928:4
clearly [4] - 725:21, 729:2, 751:4, 798:13
CLERK [9] - 713:4, 776:14, 777:1, 802:18, 803:3, 874:15, 875:1, 931:7, 932:1
clinical [15] - 714:25, 717:10, 727:24, 735:11, 735:14, 784:25, 785:1, 786:1, 786:18, 788:9, 794:7, 807:14, 816:18, 910:13, 946:5
Clinical [2] - 779:6, 780:3
close [1] - 851:3
closer [5] - 715:2, 765:17, 768:10, 769:4, 905:17
Coalition [1] - 921:12
coherence [1] - 799:16
coherency [2] - 777:17, 799:12
Cohort [1] - 911:3
cohort [119] - 716:16, 717:10, 728:13, 728:25, 732:22, 733:7, 733:8, 733:19, 736:16, 737:3, 737:13, 738:23, 738:24, 739:9, 739:17, 739:18, 741:8, 747:18, 748:5, 748:7, 748:10, 748:16, 748:17, 752:3, 752:5, 753:12, 754:23, 763:3, 763:5, 763:7, 763:13, 763:18, 764:24, 765:4, 765:19, 765:20, 767:10, 768:21, 771:3, 771:5, 771:12, 771:14, 773:12, 774:10, 775:12, 788:3, 806:17, 827:18, 836:14, 842:15, 847:25, 848:9, 848:15, 848:21, 849:13, 849:16, 849:20, 850:15, 850:23, 851:6, 851:11, 851:18, 852:11, 853:4, 853:6, 853:10, 854:4, 854:23, 854:25, 855:16, 855:18, 855:20, 855:22, 856:12, 858:18, 858:21, 858:25, 862:11, 862:15,

862:25, 864:2, 868:23, 869:15, 869:18, 870:22, 871:5, 871:20, 872:2, 872:9, 872:16, 872:22, 880:15, 881:1, 881:6, 881:21, 882:12, 883:17, 883:21, 884:2, 884:7, 884:14, 884:16, 884:18, 885:5, 911:7, 911:17, 911:20, 928:22, 928:25, 939:22, 939:23, 940:13, 940:14, 940:16, 944:8, 949:10, 949:13, 958:22
cohorts [7] - 733:19, 762:11, 769:24, 772:13, 852:5, 854:15, 854:20
collaborated [1] - 882:20
colleague [1] - 934:13
colleagues [7] - 783:9, 866:23, 869:13, 879:25, 880:11, 883:19, 885:15
collect [4] - 734:5, 737:24, 770:6, 770:12
collected [3] - 733:6, 733:9, 763:22
collection [1] - 767:22
collects [1] - 734:1
College [1] - 715:12
colorectal [1] - 770:1
column [24] - 741:18, 742:6, 742:17, 743:7, 748:9, 748:12, 748:13, 755:18, 810:2, 817:11, 819:1, 836:22, 846:10, 846:22, 847:8, 862:6, 867:24, 870:7, 870:8, 888:4, 892:22, 894:13, 902:11, 951:6
columns [1] - 748:13
combination [2] - 880:20, 886:3
combine [4] - 734:6, 747:24, 748:1, 857:11
combined [17] - 720:9, 723:7, 725:3, 734:20, 736:11, 766:15, 852:9, 852:11, 852:24, 853:3, 853:10, 854:15, 860:24, 861:9, 861:23, 877:20, 880:15
combines [1] - 734:4
combining [1] - 857:15
comma [1] - 889:19

commencement [1] - 944:7
comment [2] - 724:12, 914:5
commentary [5] - 721:18, 721:19, 722:13, 722:22, 892:15
commenting [1] - 946:20
comments [7] - 722:21, 723:12, 723:19, 724:9, 724:14, 724:17, 922:21
commercially [1] - 803:24
Committee [3] - 711:16, 724:3, 724:9
committee [1] - 918:25
committees [2] - 718:20, 770:9
common [7] - 760:22, 761:10, 761:11, 761:12, 882:24, 935:10, 940:1
commonly [6] - 741:3, 750:13, 750:18, 758:15, 832:20, 832:25
comparable [1] - 794:6
compare [7] - 731:6, 754:2, 793:14, 794:10, 794:14, 891:7, 930:25
compared [22] - 723:6, 725:1, 742:20, 742:22, 752:12, 753:10, 757:4, 768:24, 778:17, 780:5, 780:23, 791:17, 791:24, 793:24, 796:12, 796:21, 814:7, 873:18, 889:12, 941:22, 945:11
comparing [7] - 738:3, 764:9, 766:11, 793:8, 793:25, 794:12, 891:17
comparison [7] - 744:2, 792:5, 873:15, 873:17, 873:21, 889:9, 889:10
complete [6] - 732:25, 733:8, 770:8, 790:9, 885:22, 949:20
completed [9] - 715:8, 715:11, 715:13, 717:24, 767:22, 767:24, 790:6, 836:1, 865:15
completely [5] - 860:11, 860:14, 861:13, 871:11, 935:14
completes [1] - 733:4

**complex** [1] - 869:5
**complicated** [3] - 738:15, 738:20, 738:25
**component** [2] - 725:23, 784:7
**components** [3] - 727:25, 782:13, 783:6
**comprehensive** [8] - 723:7, 756:9, 757:11, 757:17, 864:10, 864:20, 870:19, 957:1
**comprised** [1] - 862:12
**conceded** [1] - 822:7
**concentrations** [1] - 822:9
**concept** [3] - 781:8, 875:13, 884:5
**concepts** [2] - 837:3, 879:5
**conceptually** [1] - 857:20
**concerned** [1] - 830:5
**concerning** [5] - 783:12, 789:9, 814:19, 826:21, 868:25
**conclude** [3] - 723:18, 802:14, 954:13
**concluded** [8] - 778:15, 810:4, 818:22, 827:8, 858:14, 863:14, 872:4, 958:23
**concluding** [4] - 819:19, 821:4, 851:12, 944:22
**conclusion** [29] - 721:17, 722:24, 729:16, 777:19, 810:1, 810:5, 816:12, 819:2, 827:24, 830:7, 830:9, 872:7, 872:19, 872:25, 876:21, 888:19, 893:12, 893:15, 894:24, 918:12, 918:14, 918:16, 918:22, 923:22, 956:20, 956:22, 957:25, 958:18
**Conclusion** [1] - 944:1
**conclusions** [6] - 721:23, 826:13, 826:16, 904:2, 923:23, 944:20
**Conclusions** [1] - 943:22
**conclusive** [1] - 923:1
**conditions** [2] - 788:5, 821:24
**conduct** [4] - 716:1,

735:11, 821:21, 828:19
**conducted** [11] - 726:24, 727:8, 728:22, 728:23, 729:13, 741:23, 763:18, 806:12, 806:22, 910:5, 926:6
**conducting** [1] - 807:1
**conducts** [1] - 718:9
**confidence** [101] - 743:8, 743:9, 743:12, 743:16, 743:20, 743:22, 744:2, 744:3, 744:15, 744:21, 745:1, 745:11, 746:1, 746:4, 746:9, 746:11, 746:12, 746:16, 746:20, 748:15, 753:22, 753:24, 754:3, 756:20, 760:13, 760:19, 761:22, 764:13, 764:14, 767:4, 768:14, 792:16, 793:22, 794:19, 796:21, 831:17, 831:18, 832:17, 832:21, 833:3, 833:9, 833:12, 834:11, 835:1, 835:4, 835:12, 835:19, 835:21, 836:25, 837:4, 838:10, 838:13, 838:16, 838:19, 839:2, 839:6, 839:12, 839:16, 841:6, 841:7, 841:23, 843:2, 844:2, 844:6, 844:14, 844:15, 844:19, 845:12, 849:23, 849:25, 850:5, 850:19, 852:25, 853:11, 853:13, 854:8, 854:14, 854:21, 854:22, 854:25, 855:5, 855:7, 855:11, 889:15, 900:3, 901:2, 906:1, 906:4, 906:10, 907:22, 916:22, 924:5, 924:8, 924:15, 925:2, 942:6, 942:9, 954:5, 954:17, 956:17
**confident** [3] - 746:13, 746:19, 776:10
**confirm** [2] - 772:10, 772:13
**confirmation** [2] - 773:14, 944:8
**confirmed** [1] - 772:11
**confounder** [2] - 759:12, 773:7
**confounders** [10] -

759:7, 759:17, 759:20, 760:7, 772:23, 912:20, 912:22, 912:25, 913:2, 913:14
**confounding** [20] - 727:20, 758:10, 759:3, 759:4, 759:7, 759:9, 759:10, 759:14, 759:25, 776:4, 776:7, 911:25, 912:3, 912:10, 912:16, 912:19, 916:21, 917:15, 919:9, 957:11
**confused** [3] - 815:17, 823:3, 899:20
**Congress** [16] - 722:5, 723:24, 724:2, 724:7, 724:17, 724:20, 725:9, 726:2, 925:10, 925:13, 925:23, 927:17, 928:9, 929:7, 933:10, 935:23
**Congressional** [1] - 932:13
**connection** [3] - 824:11, 908:25, 958:4
**consider** [15] - 745:14, 757:19, 775:10, 778:3, 778:5, 778:7, 781:10, 790:4, 790:19, 799:3, 800:7, 828:14, 831:4, 860:21, 866:5
**consideration** [5] - 773:24, 780:17, 790:24, 801:19, 922:20
**considerations** [2] - 799:4, 869:6
**considered** [19] - 727:18, 727:21, 727:22, 727:24, 735:10, 736:21, 736:25, 776:5, 776:9, 778:9, 786:15, 846:15, 872:24, 872:25, 916:20, 920:20, 921:15, 936:2, 952:16
**considering** [1] - 869:17
**consist** [1] - 714:3
**consistency** [34] - 720:10, 742:24, 747:10, 752:6, 753:14, 753:18, 757:8, 775:16, 777:18, 780:14, 780:15, 780:18, 781:3, 781:5, 781:6, 798:17, 799:9, 799:14, 830:13, 846:11, 846:15,

847:15, 848:3, 848:7, 850:6, 876:14, 933:17, 933:20, 934:2, 935:9, 939:14, 939:21, 957:22, 958:13
**Consistency** [2] - 827:14, 935:3
**consistent** [30] - 721:13, 752:8, 753:20, 772:3, 780:21, 781:1, 781:2, 787:6, 797:17, 827:5, 827:20, 829:6, 829:12, 829:24, 830:8, 830:9, 830:12, 833:7, 833:15, 847:24, 848:12, 851:18, 935:21, 941:4, 943:5, 943:18, 945:2, 956:24, 957:8
**consistently** [2] - 723:2, 724:23
**consists** [1] - 842:14
**constituent** [3] - 803:25, 804:3, 805:2
**constituents** [2] - 782:14, 782:16
**constructed** [1] - 769:22
**construed** [1] - 810:11
**consultancy** [1] - 717:16
**Consumer** [1] - 724:4
**consumer** [1] - 821:22
**consumers** [5] - 929:21, 930:6, 930:9, 932:23, 932:25
**contacted** [2] - 723:16, 724:8
**contain** [4] - 784:6, 805:1, 936:8, 952:7
**contained** [7] - 741:10, 804:1, 804:4, 834:16, 880:8, 930:19, 952:22
**containing** [2] - 951:10, 951:23
**contains** [3] - 782:11, 804:11, 956:7
**contamination** [1] - 785:20
**context** [4] - 789:22, 824:18, 825:5, 884:6
**continue** [1] - 730:9
**continued** [7] - 711:22, 727:13, 727:14, 767:19, 777:7, 795:18, 934:14
**Continued** [3] - 802:20,

874:17, 931:9
**continues** [2] - 795:20
**continuing** [3] - 750:12, 865:7, 870:16
**continuous** [3] - 866:4, 870:13, 894:15
**Continuous** [1] - 718:9
**contract** [1] - 770:7
**contracted** [1] - 837:13
**contribute** [1] - 947:14
**contribution** [1] - 869:23
**Control** [2] - 741:18, 910:2
**control** [103] - 717:9, 718:1, 728:13, 731:1, 731:14, 731:17, 731:20, 732:3, 732:9, 732:16, 733:5, 736:2, 736:15, 736:16, 737:3, 737:12, 738:1, 738:7, 739:14, 739:16, 741:8, 741:22, 747:18, 748:3, 752:3, 752:5, 753:12, 754:23, 759:6, 762:10, 763:10, 763:16, 765:1, 765:19, 771:1, 771:2, 773:20, 773:22, 773:25, 774:9, 774:11, 774:16, 775:2, 775:12, 806:18, 817:18, 822:14, 827:18, 836:9, 836:13, 837:7, 837:8, 844:1, 844:5, 844:9, 845:10, 845:21, 847:25, 848:9, 849:1, 851:18, 852:9, 852:24, 855:20, 858:18, 858:20, 858:23, 858:25, 862:17, 862:18, 868:23, 869:15, 869:22, 871:2, 871:9, 876:12, 876:25, 877:3, 877:25, 882:24, 882:25, 883:1, 883:10, 884:11, 884:13, 900:17, 901:22, 904:11, 910:4, 910:8, 911:14, 911:17, 913:8, 938:4, 939:2, 939:22, 939:23, 940:12, 940:14, 940:16, 944:5, 948:11, 958:22
**Controlled** [1] - 911:2
**controlled** [1] - 870:21
**controls** [16] - 731:7, 731:24, 732:1, 732:7, 732:13, 732:17, 738:3,

742:3, 753:11, 765:3, 775:7, 822:12, 837:19, 837:25, 852:5, 948:11
**convention** [3] - 750:11, 750:12, 750:16
**conventions** [1] - 750:17
**convincing** [1] - 821:19
**Cook** [4] - 894:20, 895:1, 895:8, 896:13
**coordinating** [1] - 757:25
**copy** [3] - 740:7, 824:17, 927:20
**core** [2] - 736:1, 796:25
**corner** [2] - 847:6, 892:22
**cornstarch** [1] - 949:14
**correct** [93] - 716:21, 718:15, 720:20, 726:2, 726:3, 728:8, 739:23, 745:3, 752:15, 752:22, 762:8, 767:8, 792:25, 794:14, 794:16, 802:6, 802:11, 804:15, 804:17, 804:23, 806:9, 818:11, 818:25, 825:11, 833:24, 838:2, 838:16, 838:25, 840:1, 841:2, 845:1, 851:7, 858:20, 858:22, 860:12, 861:12, 861:13, 862:25, 864:6, 865:5, 871:12, 872:7, 874:4, 878:12, 879:7, 881:22, 884:7, 886:15, 886:19, 886:22, 887:22, 888:2, 893:23, 895:20, 897:16, 897:17, 898:17, 899:7, 901:5, 901:23, 902:25, 903:4, 903:6, 903:11, 903:25, 904:20, 905:7, 910:10, 911:15, 911:24, 917:16, 918:7, 919:10, 923:25, 925:1, 926:9, 938:13, 938:14, 938:18, 938:19, 938:22, 942:14, 942:18, 945:20, 949:15, 949:16, 950:11, 952:24, 954:5, 955:15, 955:24, 956:5, 956:6
**Correct** [134] - 735:6, 740:16, 804:1, 804:5, 804:19, 806:8, 806:15, 806:24, 807:12, 813:14,

814:2, 815:22, 817:22, 828:20, 829:7, 831:10, 831:25, 833:14, 835:13, 836:18, 837:14, 838:1, 838:11, 838:15, 838:22, 839:10, 841:25, 844:3, 844:11, 844:17, 845:6, 845:14, 848:18, 850:17, 850:21, 851:1, 852:6, 853:7, 855:13, 856:9, 857:16, 858:3, 858:16, 859:20, 863:4, 863:15, 864:2, 864:5, 865:18, 866:25, 867:4, 867:12, 867:20, 868:8, 868:17, 870:11, 870:14, 872:20, 873:14, 874:3, 877:1, 877:6, 878:7, 878:13, 879:1, 882:6, 886:5, 887:11, 888:15, 889:2, 889:22, 893:25, 894:11, 894:18, 895:14, 895:19, 898:22, 898:25, 899:3, 899:6, 899:9, 901:9, 902:2, 902:9, 902:12, 902:17, 902:20, 903:10, 903:13, 904:19, 905:6, 905:19, 906:2, 906:15, 907:8, 907:24, 908:5, 908:11, 908:14, 908:18, 909:1, 909:16, 909:23, 910:19, 910:22, 911:18, 915:15, 916:11, 917:2, 917:12, 917:15, 919:17, 919:21, 919:25, 920:6, 923:6, 924:13, 924:17, 924:22, 925:20, 926:2, 932:16, 936:14, 936:23, 939:23, 942:11, 942:17, 943:24, 952:23, 953:12, 955:23, 957:8, 957:12, 957:23
**correcting** [2] - 785:20, 789:22
**correction** [1] - 897:11
**correctly** [14] - 828:10, 869:25, 870:4, 885:5, 885:9, 913:22, 914:1, 923:3, 935:17, 938:9, 939:18, 943:9, 944:11, 947:15
**corrects** [1] - 860:10
**correlated** [1] - 785:23

**corresponding** [1] - 796:17
**Cory** [4] - 939:5, 941:18, 942:23, 948:1
**cosmetic** [1] - 821:4
**Council** [1] - 712:8
**counsel** [23] - 798:23, 806:14, 807:4, 807:11, 818:3, 824:12, 867:20, 912:14, 922:9, 924:3, 927:2, 927:5, 927:10, 927:21, 928:6, 930:10, 933:9, 933:16, 938:3, 946:17, 954:23, 955:9, 958:13
**count** [1] - 913:11
**countries** [1] - 781:1
**country** [1] - 715:24
**couple** [14] - 721:21, 733:11, 747:15, 747:19, 779:5, 780:1, 789:3, 884:12, 924:1, 925:11, 936:10, 938:25, 955:17, 958:10
**course** [7] - 714:10, 719:7, 730:7, 790:18, 828:8, 933:14, 934:11
**court** [4] - 713:3, 720:15, 812:23, 823:24
**COURT** [60] - 711:1, 711:25, 713:5, 740:6, 769:17, 770:16, 771:5, 771:9, 776:13, 777:2, 778:20, 778:22, 779:10, 779:14, 779:17, 779:23, 782:19, 783:16, 789:10, 789:12, 789:17, 789:21, 790:9, 798:25, 800:22, 802:2, 802:8, 802:16, 803:4, 805:23, 824:23, 825:2, 825:8, 826:8, 840:22, 841:3, 841:18, 850:7, 850:10, 861:17, 864:24, 871:15, 874:14, 875:2, 885:19, 914:5, 922:16, 926:16, 928:10, 928:16, 929:6, 931:5, 932:2, 932:21, 941:14, 946:22, 950:19, 955:16, 959:5, 959:7
**Court** [29] - 713:19, 714:4, 715:5, 715:16, 722:4, 726:11, 730:18,

740:11, 788:23, 789:3, 810:16, 810:19, 822:24, 823:2, 826:3, 830:5, 879:10, 883:20, 891:23, 898:10, 900:10, 900:12, 900:21, 918:4, 918:21, 923:5, 923:8, 935:22, 943:19

**Court's** [2] - 789:8, 932:10

**courtesy** [1] - 802:15

**COURTHOUSE** [1] - 711:7

**courtroom** [1] - 723:23

**cover** [1] - 828:22

**covered** [2] - 802:1, 802:9

**covering** [1] - 818:23

**Cramer** [7] - 896:20, 897:1, 897:4, 898:5, 899:22, 904:7, 904:21

**Cramer's** [1] - 938:21

**create** [2] - 802:9, 947:12

**creates** [2] - 880:21, 886:4

**credible** [2] - 787:21, 916:21

**credited** [1] - 907:5

**criteria** [5] - 727:9, 764:22, 846:7, 873:24, 919:11

**criterion** [1] - 935:10

**critical** [5] - 714:23, 733:17, 772:14, 859:7, 859:17

**criticism** [1] - 864:1

**criticisms** [1] - 855:17

**CROSS** [2] - 803:8, 875:6

**Cross** [1] - 960:6

**cross** [2] - 907:22, 946:12

**CROSS-EXAMINATION** [2] - 803:8, 875:6

**cross-examined** [1] - 946:12

**crossed** [2] - 744:21, 745:2

**crosses** [8] - 743:23, 744:15, 744:17, 835:4, 835:12, 835:19, 844:2, 908:11

**crossing** [2] - 764:23, 849:23

**CRR** [1] - 711:24

**crude** [1] - 891:9

**cubic** [1] - 821:18

**culture** [1] - 787:8

**cumulative** [12] - 887:4, 887:10, 887:15, 887:16, 887:24, 888:12, 888:17, 889:20, 895:2, 895:5, 895:13, 902:5

**Cunningham** [1] - 925:14

**CUP** [2] - 866:12, 866:14

**current** [4] - 719:17, 803:19, 871:22

**curriculum** [1] - 713:25

**curve** [2] - 795:6, 795:7

**curves** [1] - 797:4

**cut** [3] - 750:5, 750:6, 841:17

**cutting** [1] - 798:23

**CYNTHIA** [1] - 711:15

**cytoplasmic** [1] - 818:24

**D**

**D.C** [2] - 711:20, 712:7

**daily** [4] - 747:5, 747:25, 796:17, 817:8

**damage** [2] - 788:20, 790:16

**dangerous** [1] - 725:24

**dark** [1] - 748:3

**data** [108] - 720:9, 721:16, 724:22, 727:16, 727:18, 727:22, 728:11, 730:23, 733:5, 734:2, 734:13, 734:16, 734:19, 736:5, 736:25, 737:23, 739:15, 740:14, 740:18, 740:19, 741:5, 741:16, 742:15, 747:1, 747:3, 747:21, 747:23, 747:25, 748:6, 749:15, 749:17, 752:4, 752:6, 752:10, 753:8, 754:23, 754:24, 755:14, 756:20, 757:1, 757:24, 758:1, 758:19, 759:11, 759:21, 761:11, 762:6, 765:8, 765:18, 765:20, 767:22, 769:2, 770:6, 771:24, 772:2, 772:3, 778:15, 789:22, 794:17, 796:4, 801:11, 827:6, 830:10, 848:2,

874:10, 877:3, 877:9, 877:19, 877:25, 878:6, 878:8, 880:13, 880:20, 880:21, 881:12, 882:16, 882:21, 883:8, 884:21, 884:23, 886:3, 886:4, 898:1, 900:8, 901:8, 901:13, 901:23, 902:1, 905:11, 917:3, 917:6, 921:14, 922:25, 941:24, 941:25, 943:7, 943:16, 945:2, 945:6, 945:7, 945:9, 945:13, 953:10, 954:3, 954:9, 954:15, 954:20, 957:2

**database** [2] - 727:5, 727:8

**datas** [1] - 733:8

**date** [4] - 790:11, 866:17, 899:23, 900:10

**dated** [5] - 820:18, 892:18, 910:22, 922:2, 925:19

**dates** [2] - 805:7, 806:10

**DAUBERT** [1] - 711:4

**days** [9] - 785:13, 895:2, 895:6, 895:14, 895:18, 895:19, 895:21, 895:25, 896:4

**deal** [4] - 846:25, 847:9, 847:19, 958:9

**dealt** [1] - 740:14

**death** [2] - 808:23, 809:8

**decades** [1] - 735:17

**decide** [2] - 720:22, 918:19

**decided** [1] - 771:24

**declared** [1] - 822:19

**decrease** [4] - 813:20, 814:5, 815:1, 815:16

**decreased** [3] - 813:18, 840:13, 854:17

**decreases** [1] - 810:12

**decreasing** [1] - 810:10

**Defendant** [3] - 711:22, 712:5, 712:8

**defendants** [1] - 737:1

**Defense** [1] - 719:4

**defer** [1] - 952:12

**define** [4] - 877:15, 887:12, 905:10, 948:24

**defined** [6] - 727:7, 858:10, 877:17, 916:11,

949:1, 949:11

**defining** [1] - 879:7

**definition** [16] - 878:18, 880:8, 881:4, 881:14, 881:18, 883:18, 884:3, 884:6, 885:2, 885:14, 916:13, 916:17, 923:19, 947:21, 949:6, 957:10

**definitions** [1] - 886:1

**degree** [3] - 715:11, 720:3, 770:6

**deliberations** [2] - 737:16, 936:11

**demonstrate** [1] - 810:8

**demonstrated** [2] - 797:20, 809:20

**demonstrative** [2] - 740:10, 788:8

**deny** [2] - 874:5, 883:25

**denying** [1] - 922:24

**deodorizing** [3] - 949:4, 949:9, 949:14

**Department** [2] - 718:19, 719:4

**departments** [1] - 716:7

**dependent** [2] - 814:5, 815:15

**deposition** [7] - 801:15, 844:22, 861:18, 865:17, 865:20, 913:4, 955:12

**depth** [1] - 728:20

**DEPUTY** [9] - 713:4, 776:14, 777:1, 802:18, 803:3, 874:15, 875:1, 931:7, 932:1

**derive** [1] - 860:3

**describe** [6] - 766:1, 773:23, 792:21, 793:14, 828:18, 830:20

**described** [6] - 737:12, 770:21, 829:10, 833:7, 852:5

**describes** [2] - 878:24, 879:11

**describing** [1] - 823:12

**description** [11] - 741:11, 815:17, 815:18, 829:14, 846:11, 878:1, 879:15, 879:17, 883:6, 883:15, 924:5

**deserves** [1] - 935:10

**design** [16] - 733:18, 733:19, 735:25, 752:14,

762:17, 762:18, 770:25, 821:21, 837:9, 852:4, 852:21, 868:11, 868:12, 868:13, 869:21, 948:4
**designed** [6] - 769:24, 770:24, 771:1, 771:19, 771:20, 808:22
**designs** [6] - 730:11, 730:22, 775:12, 847:24, 851:19, 869:18
**detail** [1] - 801:6
**detailed** [1] - 774:12
**details** [2] - 737:11, 770:5
**detect** [3] - 857:5, 858:11, 862:15
**detected** [1] - 958:21
**determination** [2] - 778:24, 804:10
**determine** [18] - 714:21, 730:5, 745:17, 746:16, 758:8, 762:18, 774:17, 781:23, 781:24, 831:23, 832:9, 832:11, 856:5, 857:3, 858:2, 876:17, 948:19, 948:20
**determined** [2] - 758:17, 799:8
**determines** [1] - 781:6
**develop** [8] - 748:11, 753:9, 768:21, 786:22, 811:14, 811:17, 837:17, 869:20
**developed** [12] - 734:18, 738:1, 750:3, 750:9, 763:22, 766:7, 767:15, 767:16, 819:3, 823:4, 837:16, 837:21
**developing** [13] - 719:24, 723:5, 725:1, 725:5, 729:19, 730:1, 733:21, 735:18, 819:25, 823:17, 824:14, 839:9, 866:18
**development** [1] - 716:25
**develops** [2] - 738:4, 739:3
**diagnosis** [1] - 773:15
**diaphragm** [12] - 904:19, 905:6, 905:13, 905:16, 905:17, 905:24, 906:15, 906:17, 907:6, 907:20,

908:4, 908:8
**diaphragms** [1] - 905:8
**diet** [15] - 718:11, 718:15, 737:23, 737:24, 737:25, 738:3, 738:4, 738:6, 738:8, 738:10, 738:11, 738:14, 738:22, 870:1
**dietary** [4] - 737:23, 738:16, 738:25, 739:8
**difference** [5] - 721:25, 733:14, 750:22, 773:9, 845:19
**differences** [3] - 727:20, 755:16, 952:15
**different** [62] - 717:7, 720:11, 730:22, 731:20, 732:15, 734:6, 735:12, 740:15, 742:25, 748:7, 753:3, 757:21, 757:22, 758:3, 758:5, 762:13, 762:21, 766:10, 769:25, 771:6, 793:2, 793:19, 794:8, 794:9, 794:10, 794:17, 794:18, 794:25, 795:7, 797:16, 816:7, 834:9, 836:7, 840:16, 841:20, 846:17, 847:10, 847:20, 860:8, 865:2, 869:17, 872:14, 872:15, 873:15, 874:2, 877:5, 889:13, 891:4, 902:9, 904:12, 911:10, 912:22, 914:18, 918:11, 918:13, 918:16, 918:20, 918:22, 919:3
**differentiated** [1] - 904:12
**differently** [1] - 765:3
**difficult** [6] - 738:7, 769:12, 769:13, 813:6, 841:4, 873:16
**DIRECT** [2] - 713:14, 777:7
**direct** [28] - 805:20, 807:3, 808:13, 808:20, 810:1, 813:16, 813:23, 822:21, 822:25, 824:14, 825:18, 844:22, 854:1, 864:9, 888:3, 892:21, 898:6, 907:15, 908:20, 912:13, 922:3, 937:9, 946:18, 947:1, 947:4,

947:24, 951:5, 958:14
**Direct** [1] - 960:6
**directed** [2] - 770:17, 771:6
**directing** [2] - 741:7, 844:23
**direction** [5] - 764:12, 767:4, 848:5, 939:15, 940:21
**directly** [2] - 808:23, 817:21
**director** [6] - 716:15, 716:22, 767:13, 767:18, 769:21, 948:24
**disadvantages** [1] - 755:13
**disagree** [3] - 829:13, 850:18, 957:25
**disagreed** [1] - 790:20
**disclose** [1] - 930:8
**disclosed** [4] - 929:9, 929:10, 930:23, 930:24
**discuss** [3] - 717:15, 749:9, 774:6
**discussed** [6] - 767:6, 789:2, 843:19, 845:22, 868:4, 879:23
**discussing** [4] - 714:4, 749:11, 789:23, 856:13
**discussion** [7] - 714:18, 777:10, 780:16, 807:6, 808:1, 820:22, 945:22
**disease** [31] - 714:20, 714:21, 714:23, 731:11, 758:9, 758:12, 769:25, 770:15, 773:8, 779:2, 786:25, 787:14, 788:6, 833:14, 834:4, 834:8, 834:14, 837:13, 837:16, 837:17, 837:19, 837:21, 837:23, 837:25, 845:14, 850:21, 875:9, 909:1, 924:10, 925:6, 933:5
**dismiss** [5] - 751:12, 751:16, 751:19, 751:22, 751:24
**dissimilarities** [1] - 721:22
**distinction** [2] - 837:23, 933:24
**distinguishing** [1] - 856:1
**distribution** [1] - 747:6

**district** [1] - 930:7
**DISTRICT** [2] - 711:1, 711:1
**divide** [1] - 791:15
**divided** [2] - 791:23, 796:16
**DNA** [1] - 790:15
**Doctor** [17] - 808:10, 818:20, 827:16, 828:7, 836:10, 852:17, 862:2, 863:1, 866:20, 895:3, 899:21, 900:9, 909:11, 912:18, 924:7, 934:24, 950:23
**doctor** [1] - 922:17
**Doctor's** [1] - 861:18
**document** [11] - 721:10, 724:15, 866:12, 866:23, 879:23, 892:23, 915:20, 921:22, 922:4, 929:22, 956:14
**documentation** [1] - 806:10
**documents** [16] - 783:4, 783:8, 783:12, 783:17, 783:19, 783:21, 783:24, 807:22, 919:15, 919:23, 920:3, 920:4, 920:20, 920:24, 921:17, 956:12
**done** [23] - 730:3, 732:10, 739:9, 801:7, 824:11, 830:24, 830:25, 831:1, 841:14, 857:9, 857:19, 860:16, 863:19, 863:20, 872:1, 873:20, 884:8, 914:16, 923:12, 938:8, 938:10, 938:20, 942:17
**dose** [107] - 720:12, 725:6, 727:21, 729:1, 735:2, 742:7, 742:8, 742:12, 742:15, 748:14, 751:10, 756:18, 764:7, 769:20, 772:16, 777:17, 791:3, 791:4, 791:5, 791:13, 791:14, 791:20, 792:23, 793:1, 793:11, 793:21, 794:25, 795:2, 795:8, 795:10, 795:12, 795:14, 795:15, 796:2, 796:25, 797:12, 797:15, 797:20, 797:22, 798:1, 798:3, 798:4, 798:8,

974

798:9, 798:11, 798:17,
799:10, 814:5, 815:15,
875:14, 876:16, 876:22,
886:7, 886:9, 886:16,
886:17, 886:25, 887:7,
887:10, 887:11, 887:16,
887:20, 887:25, 888:22,
888:23, 889:25, 890:2,
890:7, 891:3, 891:6,
891:8, 891:9, 893:12,
893:13, 893:17, 894:16,
895:3, 895:4, 895:11,
896:14, 896:18, 897:4,
897:5, 898:1, 899:23,
900:13, 901:2, 901:5,
901:15, 902:1, 903:12,
903:18, 903:19, 903:24,
904:5, 904:8, 938:3,
941:6, 941:10, 945:14,
945:15, 948:21, 953:6,
954:12, 954:14, 954:16
**dose-dependent** [1] -
815:15
**dose-response** [95] -
720:12, 725:6, 727:21,
729:1, 735:2, 742:7,
742:12, 742:15, 748:14,
751:10, 756:18, 764:7,
769:20, 772:16, 777:17,
791:3, 791:4, 791:5,
791:13, 791:14, 791:20,
792:23, 793:1, 793:11,
793:21, 794:25, 795:8,
795:12, 796:2, 796:25,
797:15, 797:20, 797:22,
798:1, 798:3, 798:4,
798:8, 798:9, 798:11,
798:17, 799:10, 875:14,
876:16, 876:22, 886:7,
886:9, 886:16, 886:17,
886:25, 887:7, 887:10,
887:11, 887:16, 887:20,
887:25, 888:22, 888:23,
889:25, 890:2, 890:7,
891:3, 893:12, 893:13,
894:16, 895:3, 895:4,
895:11, 896:14, 896:18,
897:4, 897:5, 898:1,
899:23, 900:13, 901:2,
901:5, 901:15, 902:1,
903:12, 903:18, 903:19,
903:24, 904:5, 904:8,
938:3, 941:6, 941:10,

945:14, 945:15, 948:21,
953:6, 954:12, 954:14,
954:16
**dose-responses** [1] -
742:8
**doses** [4] - 742:9, 794:8,
794:9, 794:10
**dot** [1] - 747:16
**dots** [2] - 747:14, 747:15
**doubt** [1] - 864:5
**douching** [5] - 772:18,
772:20, 772:21, 772:24,
773:4
**doucing** [1] - 772:18
**down** [22] - 766:21,
769:9, 773:20, 808:20,
809:5, 819:1, 842:15,
842:20, 862:6, 888:5,
896:1, 896:3, 896:10,
899:5, 903:1, 903:5,
935:6, 941:19, 951:6,
952:18, 953:5, 953:8
**Dr** [89] - 713:8, 713:16,
713:20, 713:22, 714:12,
715:4, 719:5, 719:15,
720:14, 720:22, 723:12,
723:19, 725:25, 726:4,
729:17, 729:18, 735:5,
735:24, 739:23, 740:10,
746:3, 748:2, 752:2,
754:22, 760:15, 762:24,
769:17, 776:8, 777:9,
779:1, 782:5, 782:19,
783:4, 783:10, 783:22,
788:7, 788:22, 789:5,
789:7, 790:1, 790:18,
794:2, 794:20, 795:13,
797:19, 800:3, 800:24,
801:22, 803:11, 803:18,
805:18, 805:25, 818:5,
823:23, 824:1, 824:6,
824:10, 824:19, 824:20,
825:4, 825:6, 825:7,
825:14, 826:10, 827:10,
827:22, 839:20, 856:15,
875:8, 892:1, 926:14,
928:1, 932:8, 932:12,
934:8, 934:16, 935:8,
935:19, 935:25, 936:4,
937:13, 938:21, 942:10,
945:25, 946:15, 947:6,
948:3, 950:15, 955:7
**DR** [1] - 742:6

**draft** [1] - 923:6
**dramatically** [1] - 738:5
**draw** [1] - 864:21
**drawbacks** [1] - 737:7
**drew** [2] - 864:16, 864:17
**DRINKER** [1] - 711:17
**drinking** [1] - 891:10
**drive** [3] - 766:21, 769:3,
769:4
**driven** [3] - 746:8, 747:1,
747:2
**drives** [1] - 746:22
**Drug** [1] - 919:24
**due** [4] - 751:12, 859:14,
953:15, 953:22
**duly** [1] - 713:11
**Duration** [1] - 904:25
**duration** [19] - 765:9,
768:3, 796:9, 796:10,
796:16, 797:1, 797:6,
797:8, 797:21, 798:4,
887:5, 887:6, 887:17,
894:10, 902:5, 902:16,
903:9, 903:18, 945:17
**during** [2] - 822:10,
958:4
**dust** [1] - 822:12
**dusting** [2] - 895:14,
895:17
**dusts** [2] - 822:14,
905:18

---

### E

**early** [2] - 806:18, 934:12
**easily** [1] - 775:7
**EAST** [1] - 711:7
**eat** [1] - 738:19
**eaten** [1] - 738:9
**eating** [1] - 738:12
**ecological** [2] - 869:16,
869:22
**Economic** [1] - 724:4
**Edition** [1] - 934:23
**effect** [44] - 720:13,
721:16, 727:19, 738:6,
742:25, 744:11, 745:17,
745:18, 749:19, 749:23,
749:24, 751:1, 758:8,
781:5, 787:23, 794:8,
796:13, 797:16, 798:5,
798:6, 817:2, 822:25,
852:16, 876:13, 876:16,
876:22, 888:23, 890:20,

890:22, 891:3, 891:8,
891:10, 891:11, 891:12,
891:25, 906:14, 907:4,
907:21, 908:18, 912:3,
939:15, 939:17, 943:8,
943:16
**effectiveness** [1] - 891:6
**effects** [9] - 812:3,
876:17, 887:7, 946:2,
946:13, 946:16, 946:21,
947:11, 947:13
**effort** [1] - 727:2
**effusions** [2] - 808:16,
946:4
**eggs** [1] - 738:16
**eight** [4] - 876:12,
876:25, 878:8, 948:10
**eight-case-control** [1] -
876:12
**either** [16] - 717:17,
765:19, 785:9, 789:6,
796:8, 797:6, 809:19,
816:16, 822:9, 899:19,
951:17, 952:3, 952:9,
952:10, 952:19, 955:16
**element** [3] - 729:2,
804:3, 805:2
**elements** [2] - 729:9,
803:25
**elevated** [2] - 720:8,
917:22
**elongated** [1] - 952:7
**elsewhere** [1] - 900:1
**emphasis** [1] - 834:15
**emphasizing** [1] - 890:6
**employ** [1] - 729:24
**employed** [6] - 726:7,
729:19, 730:8, 777:11,
777:13, 871:6
**employees** [1] - 933:6
**end** [16] - 728:16,
788:13, 788:14, 807:3,
807:5, 839:6, 840:13,
842:23, 854:9, 855:8,
865:20, 907:23, 909:14,
959:7
**endometriosis** [1] -
788:5
**energetics** [1] - 718:25
**engagements** [1] - 865:2
**enrolled** [1] - 749:1
**enrolling** [1] - 768:22
**enrollment** [1] - 771:23

ensures [1] - 866:14
enter [4] - 732:25, 733:8, 738:24, 765:5
entered [1] - 771:21
enters [1] - 733:15
entire [1] - 842:13
ENTITLED [1] - 961:7
entitled [6] - 812:7, 817:1, 835:17, 864:13, 892:15, 904:25
entry [3] - 765:12, 896:25, 897:2
envelope [1] - 833:6
environment [1] - 787:17
environmental [1] - 787:18
epidemiologic [17] - 716:1, 727:3, 727:11, 727:17, 727:23, 728:4, 743:12, 776:3, 781:7, 782:24, 836:8, 836:12, 864:19, 869:1, 869:3, 884:5, 884:21
epidemiological [19] - 730:11, 736:5, 752:4, 776:10, 791:21, 816:18, 826:20, 859:18, 868:22, 869:14, 877:20, 879:13, 880:14, 881:13, 907:5, 933:22, 936:22, 938:11, 938:17
epidemiologist [9] - 714:14, 720:2, 720:18, 835:5, 835:18, 850:4, 892:5, 892:7, 934:9
epidemiologists [8] - 831:7, 831:22, 832:11, 832:16, 832:20, 833:1, 833:3, 835:11
epidemiology [23] - 714:15, 714:16, 714:17, 714:20, 714:21, 715:1, 715:8, 715:10, 716:8, 716:9, 720:9, 725:17, 729:18, 729:25, 736:23, 739:11, 739:20, 762:14, 794:11, 826:9, 864:7, 884:16, 934:10
Epidemiology [2] - 934:18, 934:23
epigenetics [3] - 787:10, 787:13, 787:14
epithelial [9] - 723:5,

725:1, 753:4, 761:9, 775:19, 775:21, 810:25, 888:10, 889:6
Epithelial [1] - 814:1
epithelium [2] - 818:19, 818:23
equally [1] - 855:11
equals [1] - 750:18
equated [1] - 762:7
erroneously [1] - 952:6
error [3] - 793:10, 831:16, 949:23
especially [5] - 716:10, 751:13, 774:20, 944:6, 948:15
ESQUIRE [10] - 711:11, 711:12, 711:14, 711:15, 711:18, 711:18, 711:20, 711:21, 712:5, 712:7
ESQUIRES [9] - 711:10, 711:12, 711:13, 711:15, 711:17, 711:19, 711:21, 712:4, 712:7
essential [1] - 869:6
essentially [1] - 875:13
establish [4] - 824:13, 825:17, 840:8, 893:25
established [5] - 725:21, 825:20, 835:13, 835:20, 839:25
estimate [18] - 743:1, 743:18, 745:11, 754:18, 761:23, 797:5, 797:9, 831:9, 831:24, 832:19, 834:6, 834:22, 838:25, 849:22, 854:6, 854:15, 902:17, 924:24
estimated [3] - 749:22, 836:21, 852:21
estimates [5] - 761:1, 832:10, 832:16, 953:15, 953:21
estimating [3] - 743:3, 743:16, 793:9
et [3] - 876:6, 934:24, 944:19
ethical [2] - 735:20, 786:6
ethics [1] - 735:19
ethnic [2] - 720:12, 781:2
evaluate [8] - 730:4, 748:16, 752:17, 752:20, 752:23, 764:10, 808:22,

866:7
evaluated [2] - 756:17, 823:16
evaluating [3] - 736:4, 799:6, 952:17
evaluation [8] - 745:15, 767:20, 780:18, 859:6, 859:15, 935:14, 936:12, 957:1
evaluations [3] - 956:24, 956:25, 958:11
events [2] - 788:11, 946:8
ever-never [1] - 888:20
ever/never [1] - 888:21
evidence [66] - 714:25, 720:10, 720:12, 723:8, 727:3, 727:4, 727:23, 728:3, 728:4, 729:16, 736:6, 746:14, 751:14, 752:21, 761:25, 762:15, 777:19, 784:18, 787:21, 799:15, 799:18, 799:21, 799:24, 817:14, 818:24, 821:8, 821:12, 821:17, 824:13, 825:17, 826:21, 827:3, 829:5, 829:11, 829:14, 829:22, 830:9, 839:1, 859:8, 859:18, 865:23, 868:22, 869:3, 869:7, 869:14, 869:19, 869:23, 872:13, 875:21, 876:1, 876:7, 879:24, 907:5, 916:4, 916:5, 916:10, 916:14, 918:5, 918:19, 919:1, 923:1, 923:10, 928:24, 937:10, 937:19, 958:19
evident [3] - 888:12, 888:18, 889:20
exact [10] - 762:1, 762:2, 762:17, 805:6, 806:10, 822:13, 903:22, 919:11, 920:22, 933:3
exactly [3] - 749:19, 924:16, 925:7
EXAMINATION [6] - 713:14, 777:7, 803:8, 875:6, 932:6, 950:21
examination [15] - 802:14, 807:4, 822:21, 822:25, 824:6, 864:9, 908:21, 912:13, 934:3,

946:18, 950:25, 952:21, 953:1, 954:24, 955:9
examine [2] - 736:7, 763:6
examined [5] - 771:13, 801:16, 887:15, 912:15, 946:12
examining [2] - 759:2, 887:9
example [21] - 734:23, 737:18, 737:21, 738:22, 744:6, 744:17, 747:22, 749:21, 754:14, 758:14, 758:15, 758:22, 780:9, 791:13, 796:1, 804:3, 847:11, 847:20, 891:9, 898:2
examples [5] - 730:15, 779:1, 780:1, 780:8, 949:3
excellence [1] - 828:17
excellent [12] - 734:18, 769:23, 774:9, 774:10, 828:14, 851:25, 862:23, 863:3, 863:24, 907:13, 907:19, 959:1
except [7] - 732:17, 747:13, 814:22, 815:10, 912:8, 939:13, 940:20
exception [2] - 747:18, 766:9
exceptions [1] - 747:15
excessive [2] - 811:2, 822:9
exclude [1] - 890:24
excluded [4] - 891:5, 893:11, 893:20, 900:24
exclusion [1] - 727:9
excuse [1] - 897:8
excused [2] - 959:8, 959:9
exercise [1] - 759:15
Exhibit [45] - 808:7, 809:25, 811:8, 813:23, 816:20, 816:23, 818:4, 820:15, 827:9, 828:3, 828:11, 832:7, 836:4, 846:2, 846:4, 846:9, 853:23, 859:10, 862:3, 865:21, 875:17, 876:4, 877:16, 879:23, 880:4, 894:7, 894:21, 894:25, 895:7, 896:21, 898:5,

902:1, 908:2, 909:9, 915:20, 921:2, 921:21, 923:18, 924:4, 941:13, 947:3, 951:1, 953:3, 955:2, 958:18

**exhibit** [9] - 741:7, 818:25, 823:8, 855:12, 867:10, 867:13, 867:15, 868:10, 898:6

**exists** [2] - 893:4, 918:5

**expect** [2] - 775:24, 794:21

**experience** [2] - 864:16, 864:18

**experienced** [3] - 835:5, 835:11, 835:18

**experiment** [3] - 777:17, 799:12, 800:2

**experimental** [2] - 821:23, 916:6

**expert** [20] - 713:24, 720:15, 720:23, 721:4, 728:16, 740:5, 741:17, 755:5, 790:5, 804:7, 804:16, 831:14, 866:25, 868:2, 869:5, 870:10, 872:10, 913:17, 930:6, 930:14

**expertise** [8] - 714:13, 715:6, 715:17, 721:1, 723:17, 723:21, 729:21, 952:14

**Experts** [1] - 867:7

**experts** [2] - 822:19, 865:9

**explain** [7] - 743:21, 744:8, 814:13, 814:17, 816:15, 867:3, 871:1

**explained** [2] - 832:3, 866:23

**explaining** [3] - 730:18, 814:4, 953:23

**explains** [2] - 866:10, 866:12

**explanation** [10] - 752:18, 790:16, 831:11, 831:12, 831:13, 832:5, 835:21, 862:19, 937:20, 949:8

**exposed** [10] - 742:19, 742:20, 817:13, 821:18, 823:17, 862:13, 863:7, 899:17, 900:8, 900:23

**exposure** [54] - 714:22, 721:14, 725:4, 725:20, 727:21, 731:6, 731:7, 731:8, 732:18, 737:11, 746:6, 758:12, 765:21, 768:6, 769:6, 769:9, 772:2, 773:9, 774:12, 774:23, 779:2, 780:9, 781:16, 784:16, 791:6, 794:13, 795:8, 816:2, 817:1, 821:24, 833:13, 834:4, 834:7, 834:13, 837:20, 845:14, 850:20, 875:10, 887:4, 900:5, 902:14, 903:7, 904:13, 904:17, 904:18, 905:3, 905:24, 906:19, 916:19, 924:9, 925:6, 943:6, 943:15, 957:3

**Exposure** [1] - 814:2

**exposures** [3] - 765:10, 795:6, 837:18

**expressing** [1] - 723:23

**expressly** [1] - 789:3

**extends** [1] - 746:2

**extensive** [1] - 831:21

**extent** [1] - 730:13

**exterior** [1] - 818:10

**extract** [1] - 729:6

**extracted** [1] - 728:11

**extracting** [1] - 728:17

**extraordinarily** [1] - 854:6

**extrapolating** [1] - 863:22

---

### F

**fact** [12] - 765:17, 772:12, 806:4, 829:22, 838:14, 845:8, 853:20, 876:10, 896:14, 898:14, 943:12, 956:1

**factor** [2] - 811:15, 811:25

**factors** [11] - 716:1, 770:2, 771:18, 778:6, 845:25, 846:7, 865:12, 909:3, 917:15, 919:9, 957:12

**fair** [5] - 741:13, 826:4, 855:18, 890:14, 946:14

**fall** [8] - 743:14, 744:22, 746:11, 746:13, 835:23,

839:2, 840:19, 855:6

**fallacious** [1] - 935:14

**falling** [1] - 745:10

**Fallopian** [10] - 784:17, 785:4, 785:5, 785:6, 785:8, 786:13, 795:17, 897:6, 900:16, 900:18

**falls** [3] - 746:19, 843:3, 855:3

**familiar** [6] - 748:20, 809:1, 892:5, 892:20, 914:15, 934:20

**far** [1] - 830:5

**favor** [1] - 890:20

**FDA** [18] - 786:13, 820:10, 822:1, 822:5, 823:8, 920:25, 921:12, 921:15, 922:6, 922:9, 922:24, 923:10, 923:12, 923:15, 923:24, 942:10, 942:13

**features** [1] - 846:14

**February** [1] - 722:21

**fecal** [1] - 829:3

**fell** [2] - 834:25, 874:8

**female** [4] - 817:2, 821:13, 821:18, 823:5

**fertility** [1] - 786:8

**few** [11] - 748:13, 762:25, 808:20, 871:5, 897:15, 916:9, 919:14, 920:24, 925:22, 928:10, 952:3

**fewer** [1] - 941:23

**fibers** [2] - 821:5, 951:23

**fibrous** [5] - 725:22, 728:1, 936:7, 937:16, 937:18

**field** [5] - 714:13, 714:17, 729:21, 782:2, 846:6

**Figure** [7] - 830:11, 836:5, 836:7, 836:21, 842:13, 842:18, 854:1

**figure** [2] - 830:12, 836:16

**files** [1] - 796:25

**final** [5] - 729:8, 824:8, 824:17, 824:25, 825:14

**finally** [2] - 714:6, 915:8

**findings** [16] - 721:23, 761:16, 762:20, 762:23, 766:10, 768:11, 775:8, 775:14, 800:14, 810:8,

813:25, 817:10, 821:1, 866:7, 907:20, 908:24

**fine** [2] - 815:20, 922:16

**fines** [1] - 951:11

**finished** [1] - 783:15

**first** [62] - 713:11, 715:22, 715:24, 720:17, 720:24, 721:9, 726:17, 731:1, 731:22, 735:14, 735:16, 740:2, 741:10, 741:18, 755:19, 763:1, 763:19, 766:9, 778:10, 780:1, 782:10, 784:16, 792:9, 792:14, 792:19, 794:5, 795:4, 804:11, 805:4, 805:25, 806:5, 807:14, 808:6, 811:12, 817:11, 818:5, 828:4, 829:1, 829:7, 846:10, 847:3, 847:8, 870:18, 873:21, 877:16, 877:17, 878:22, 883:5, 884:9, 888:4, 889:3, 892:23, 894:13, 896:21, 902:14, 902:23, 903:2, 922:3, 924:2, 939:8, 940:4, 950:24

**FISHER** [1] - 711:7

**fit** [1] - 826:13

**fits** [1] - 878:1

**five** [19] - 717:11, 724:13, 730:16, 736:14, 748:18, 749:22, 751:1, 767:19, 769:1, 780:5, 796:14, 849:15, 857:10, 877:3, 877:9, 883:8, 914:18, 950:18, 955:5

**five-minutes** [1] - 950:18

**flat** [1] - 835:16

**flaws** [1] - 821:20

**Fletcher** [1] - 823:21

**Fletcher/Saed** [1] - 825:9

**FLOM** [1] - 711:19

**FLORIDA** [1] - 711:14

**flows** [1] - 816:1

**focus** [13] - 714:8, 725:12, 737:2, 737:23, 806:21, 829:9, 876:15, 887:14, 889:16, 889:17, 889:18, 921:8

**focused** [12] - 715:9, 717:25, 718:11, 718:14, 737:13, 858:6, 883:20,

885:12, 890:12, 900:4, 900:9, 923:5

**focusing** [5] - 836:8, 850:10, 898:12, 911:16, 943:1

**folks** [1] - 899:25

**follow** [7] - 717:2, 729:5, 738:25, 739:2, 739:3, 748:12, 768:4

**follow-up** [4] - 717:2, 729:5, 748:12, 768:4

**followed** [11] - 728:25, 733:9, 733:12, 735:17, 749:7, 766:6, 771:23, 772:8, 848:18, 873:10, 874:6

**FOLLOWING** [1] - 961:5

**following** [6] - 743:7, 748:12, 748:21, 821:6, 869:8, 944:7

**follows** [2] - 713:12, 829:2

**Food** [1] - 919:24

**FOR** [1] - 711:1

**foreign** [1] - 817:14

**forest** [20] - 740:22, 740:25, 741:1, 741:2, 741:6, 747:4, 747:6, 752:2, 752:4, 761:5, 780:21, 830:12, 836:5, 842:18, 848:3, 933:15, 940:7, 940:14, 940:16, 940:19

**forgive** [1] - 955:6

**forgot** [1] - 797:18

**form** [5] - 733:4, 756:25, 767:25, 770:4, 919:19

**formal** [1] - 947:9

**formed** [1] - 823:9

**former** [1] - 818:2

**forming** [2] - 783:15, 849:21

**forms** [3] - 732:25, 733:8, 738:17

**formulate** [1] - 726:17

**formulated** [1] - 719:21

**forth** [9] - 721:4, 830:7, 836:6, 836:24, 840:9, 863:25, 878:25, 899:8, 923:23

**forty** [1] - 720:17

**forward** [7] - 719:12, 739:1, 847:16, 871:24,

911:7, 924:5, 931:4

**forward-looking** [1] - 911:7

**foundation** [2] - 800:20, 824:20

**foundational** [1] - 783:14

**four** [15] - 728:11, 730:21, 730:23, 740:12, 740:15, 740:19, 791:23, 793:8, 818:17, 819:3, 819:25, 893:17, 902:9, 922:5, 942:3

**fourth** [2] - 792:11, 832:8

**fractures** [1] - 770:1

**fragments** [1] - 952:7

**fragrance** [1] - 784:13

**fragrances** [1] - 728:2

**frankly** [1] - 714:17

**Fred** [3] - 715:20, 716:14, 926:23

**FREDA** [1] - 711:8

**French** [2] - 812:3, 812:13

**frequency** [15] - 725:14, 768:3, 796:15, 797:1, 797:6, 797:11, 798:3, 887:4, 887:16, 894:10, 902:5, 902:16, 903:9, 903:18, 945:17

**Friedenreich** [2] - 879:15, 879:19

**front** [16] - 805:11, 805:17, 810:3, 820:15, 823:7, 824:4, 853:24, 865:24, 866:2, 866:20, 875:18, 898:7, 904:22, 909:19, 915:23, 956:11

**full** [20] - 715:20, 751:17, 751:18, 800:18, 800:19, 801:12, 804:21, 823:12, 831:11, 841:14, 846:10, 877:17, 883:5, 888:4, 894:13, 900:8, 935:6, 939:8, 957:14, 957:16

**fully** [4] - 760:7, 774:25, 794:17, 841:22

**Fund** [15] - 718:8, 718:14, 737:21, 739:7, 865:5, 865:8, 865:23, 867:8, 872:11, 879:17, 879:22, 881:4, 881:14, 881:20, 881:24

**funded** [3] - 920:8,

920:14, 920:16

**funds** [1] - 882:22

**future** [1] - 723:22

---

**G**

---

**GARBER** [1] - 711:15

**Gates** [8] - 748:21, 749:5, 749:7, 766:6, 766:15, 767:7, 848:23, 849:4

**gathered** [1] - 728:3

**gears** [1] - 739:25

**general** [10] - 732:13, 763:24, 764:1, 768:1, 773:3, 817:16, 869:6, 883:3, 884:15, 946:22

**generalizability** [1] - 731:16

**generalizable** [1] - 774:14

**generalize** [1] - 732:12

**generally** [7] - 729:20, 763:16, 777:21, 787:22, 801:5, 949:14, 958:21

**generally-accepted** [1] - 777:21

**Generation** [1] - 813:25

**generation** [3] - 814:6, 814:11, 822:8

**genes** [1] - 787:15

**genetic** [4] - 766:5, 787:14, 787:17, 788:20

**genetically** [4] - 812:14, 812:17, 812:21, 813:3

**genetics** [1] - 787:10

**genital** [39] - 720:6, 723:3, 724:18, 724:24, 784:18, 784:19, 784:24, 785:3, 817:2, 817:16, 818:10, 827:3, 829:4, 829:11, 829:23, 836:17, 839:7, 842:4, 842:9, 845:8, 849:22, 850:16, 851:17, 853:21, 862:13, 876:13, 887:4, 888:9, 888:13, 889:5, 889:21, 894:17, 898:2, 898:3, 898:20, 900:1, 900:4, 900:11, 945:11

**Genital** [1] - 905:1

**genitally** [1] - 900:8

**genome** [1] - 787:19

**geographic** [1] - 720:11

**GEREL** [1] - 711:12

**geriatric** [1] - 716:8

**gerontology** [1] - 716:8

**Gertig** [6] - 748:21, 749:3, 767:7, 848:20, 873:6, 873:8

**given** [4] - 725:14, 815:5, 840:19, 864:3

**gland** [2] - 821:12, 821:16

**glass** [1] - 809:18

**gleaned** [1] - 755:12

**gloves** [1] - 785:11

**goal** [2] - 735:23, 771:17

**Godard** [1] - 843:15

**Gonzalez** [3] - 748:18, 771:14, 849:12

**Goodman** [13] - 837:6, 838:6, 838:7, 839:8, 839:15, 839:24, 840:5, 840:10, 840:16, 840:22, 841:23, 842:5, 843:19

**GOTSHAL** [1] - 712:4

**government** [4] - 770:7, 771:17, 923:9

**Government** [5] - 718:18, 730:3, 864:11, 926:23, 927:24

**government-run** [1] - 771:17

**gracious** [2] - 955:4

**grade** [2] - 821:4, 821:22

**gradient** [1] - 791:4

**graduate** [1] - 716:10

**grant** [3] - 719:2, 719:3, 920:8

**grants** [1] - 718:24

**graph** [8] - 813:22, 813:24, 814:4, 814:8, 814:17, 814:19, 815:17, 896:11

**graphic** [1] - 754:2

**great** [3] - 770:5, 779:13, 958:9

**greater** [4] - 751:17, 873:19, 900:18, 941:21

**greatly** [1] - 940:3

**Greenland** [2] - 892:1, 934:17

**group** [17] - 717:23, 732:2, 740:2, 761:6, 792:5, 796:20, 817:17, 817:18, 899:25, 900:22,

900:23, 901:4, 901:5, 916:21, 918:17, 919:8, 936:2
**Group** [9] - 914:21, 914:24, 915:2, 915:5, 915:8, 916:1, 917:18, 918:7, 919:7
**Groups** [1] - 817:13
**groups** [7] - 718:7, 720:12, 781:2, 817:13, 838:3, 946:5, 958:20
**growth** [5] - 811:2, 819:4, 819:9, 819:21
**guaranteed** [1] - 839:4
**guess** [1] - 736:13
**guided** [1] - 868:3
**guideline** [1] - 781:22
**guidelines** [6] - 718:21, 730:4, 777:20, 777:21, 798:16, 799:7
**guides** [1] - 865:10
**gynecologic** [1] - 770:14

---

**H**

**habits** [1] - 739:8
**half** [7] - 749:25, 754:6, 761:13, 818:18, 844:5, 845:5, 859:11
**halfway** [2] - 862:6, 953:8
**Hamilton** [3] - 817:25, 818:4, 819:5
**hand** [18] - 807:5, 846:10, 847:5, 847:8, 852:10, 856:2, 862:6, 867:23, 870:7, 870:8, 880:5, 880:7, 888:4, 892:22, 894:13, 902:11, 951:5
**handbook** [1] - 717:24
**Harlow** [6] - 755:25, 756:2, 843:7, 894:5, 894:8, 897:15
**harm** [2] - 735:22, 810:21
**harmful** [1] - 735:21
**Hartge** [1] - 842:19
**Harvard** [1] - 934:14
**hate** [1] - 946:9
**hazard** [2] - 743:4, 832:15
**head** [1] - 892:2
**heading** [4] - 821:1, 827:14, 848:7, 869:11

---

**health** [8] - 714:15, 720:25, 721:9, 770:19, 866:15, 946:13, 949:5
**Health** [49] - 716:7, 716:13, 716:15, 716:19, 717:20, 717:22, 718:19, 721:9, 721:23, 722:4, 722:15, 722:16, 722:23, 723:14, 723:20, 723:21, 726:2, 735:12, 738:17, 748:19, 748:22, 763:19, 767:12, 767:25, 768:19, 769:24, 770:23, 779:6, 780:3, 800:15, 801:3, 848:21, 848:24, 849:5, 849:9, 865:3, 910:1, 919:13, 923:5, 923:13, 935:22, 942:19, 942:24, 943:11, 944:16, 944:19, 944:20, 955:13
**healthy** [1] - 848:17
**hear** [3] - 714:16, 853:16, 928:16
**heard** [5] - 726:25, 850:11, 861:3, 921:24, 955:11
**HEARING** [1] - 711:4
**hearing** [6] - 726:6, 783:13, 926:11, 927:11, 927:13, 927:15
**heart** [2] - 769:25, 770:15
**heavily** [1] - 761:2
**heavy** [3] - 728:2, 784:13, 937:18
**help** [7] - 723:17, 731:5, 741:24, 793:20, 812:22, 885:24, 941:20
**helped** [3] - 756:25, 798:15, 802:9
**helpful** [3] - 726:13, 738:23, 857:10
**helps** [1] - 744:3
**herself** [1] - 905:18
**heterogeneity** [10] - 862:19, 939:2, 939:13, 939:20, 940:2, 940:6, 940:15, 940:18, 954:10, 958:20
**hierarchy** [4] - 736:6, 736:22, 868:22, 869:14
**high** [7] - 788:2, 799:8, 801:10, 839:6, 854:16, 907:23, 917:20

---

**higher** [7] - 769:3, 792:14, 796:20, 917:18, 919:8, 950:7
**highest** [7] - 792:15, 795:6, 795:9, 795:10, 903:7, 937:5, 937:6
**highlight** [2] - 939:8, 941:18
**highlighted** [1] - 809:4
**highly** [7] - 785:22, 793:24, 827:5, 827:20, 830:8, 848:11, 851:17
**Hill** [22] - 722:10, 729:13, 763:17, 777:14, 777:20, 780:13, 780:17, 791:2, 797:21, 798:16, 799:4, 799:7, 845:24, 846:3, 846:5, 846:7, 847:3, 942:20, 947:2, 947:6, 947:7, 947:17
**Hill's** [1] - 846:11
**hired** [5] - 716:14, 929:4, 929:10, 929:17, 930:10
**histological** [1] - 911:1
**hit** [1] - 906:11
**home** [1] - 773:21
**Honor** [37] - 713:20, 713:24, 719:11, 724:17, 726:6, 774:5, 779:7, 779:22, 789:1, 798:22, 800:21, 802:7, 802:13, 805:21, 811:10, 820:17, 824:16, 826:5, 827:12, 828:4, 841:17, 850:14, 861:16, 874:12, 911:11, 924:3, 926:13, 927:25, 931:1, 946:11, 950:13, 950:16, 950:17, 955:3, 955:6, 955:11, 959:4
**HONORABLE** [1] - 711:8
**hope** [1] - 947:20
**Hormone** [1] - 910:25
**hormone** [2] - 780:5, 909:8
**hospital** [5] - 732:4, 732:5, 732:12, 732:14, 742:5
**hospital-based** [3] - 732:4, 732:12, 742:5
**hospitalized** [1] - 732:8
**Houghton** [3] - 716:19, 748:19, 849:7
**hours** [5] - 785:13,

---

787:4, 814:7, 815:5, 815:6
**HR** [1] - 743:4
**HRT** [8] - 779:18, 780:2, 780:7, 909:5, 909:8, 909:11, 910:4, 911:8
**huge** [1] - 739:2
**Human** [1] - 718:20
**human** [7] - 721:11, 786:19, 808:2, 810:24, 821:24, 822:20, 943:3
**humans** [8] - 714:20, 714:25, 758:7, 784:25, 785:2, 914:22, 916:5, 957:4
**hundred** [1] - 733:11
**hundreds** [2] - 735:16, 739:17
**hurt** [2] - 885:15, 885:18
**Hutchinson** [3] - 715:20, 716:14, 926:23
**hyperlink** [1] - 859:12
**hypothesis** [7] - 749:18, 750:2, 751:1, 752:25, 792:25, 831:16, 947:14
**hypothetical** [1] - 812:23

---

**I**

**IARC** [37] - 782:12, 782:15, 784:2, 801:6, 801:8, 865:4, 914:13, 914:18, 914:21, 914:24, 915:2, 915:8, 915:14, 915:19, 915:22, 916:25, 917:5, 917:8, 917:14, 917:17, 918:6, 918:11, 918:13, 919:4, 919:7, 919:8, 936:12, 937:3, 950:25, 951:7, 951:9, 952:5, 952:15, 952:22, 956:24, 957:8, 957:10
**IARC's** [4] - 935:25, 936:4, 936:25, 951:22
**idea** [5] - 749:16, 795:22, 825:6, 848:15, 867:2
**ideal** [1] - 770:4
**ideally** [1] - 732:16
**identical** [1] - 759:22
**identified** [6] - 715:23, 727:10, 731:25, 732:23, 919:15, 920:19
**identifies** [3] - 836:7, 836:12, 846:6

**identify** [7] - 716:1, 718:2, 731:2, 731:3, 732:5, 740:11, 851:11
**identity** [1] - 869:4
**II** [5] - 801:13, 852:16, 901:25, 907:15, 942:1
**III** [1] - 817:14
**imagine** [2] - 738:19, 926:14
**immediately** [2] - 857:23, 860:14
**impact** [6] - 728:1, 768:9, 773:5, 807:21, 808:2, 949:17
**impacted** [1] - 775:14
**implementing** [1] - 935:9
**importance** [2] - 755:11, 858:5
**important** [14] - 714:17, 720:24, 728:20, 729:2, 729:5, 742:18, 756:5, 762:19, 768:24, 772:10, 778:4, 781:4, 856:7
**importantly** [1] - 735:19
**IN** [2] - 711:4, 961:6
**inappropriate** [5] - 751:19, 751:23, 751:25, 752:1, 794:2
**incidence** [1] - 821:10
**incidences** [1] - 821:14
**include** [36] - 759:1, 760:14, 764:14, 767:5, 785:15, 792:19, 793:23, 794:3, 794:4, 794:6, 796:22, 822:11, 844:7, 844:15, 869:8, 871:9, 881:19, 890:1, 890:25, 891:2, 891:13, 891:22, 898:1, 899:19, 901:3, 902:7, 902:9, 906:6, 936:13, 936:16, 936:19, 936:22, 942:6, 942:9, 951:22, 952:2
**included** [34] - 728:4, 728:23, 728:24, 756:2, 756:10, 763:20, 768:14, 788:7, 793:3, 796:14, 852:3, 852:8, 862:12, 871:5, 876:11, 876:12, 877:24, 878:9, 881:19, 882:10, 882:16, 883:8, 888:11, 889:7, 889:11, 890:8, 890:15, 899:21,

920:1, 938:11, 938:19, 938:21, 944:25, 955:8
**includes** [29] - 716:16, 718:19, 744:16, 746:2, 784:11, 833:10, 833:12, 833:17, 833:22, 834:11, 834:12, 834:17, 835:22, 841:24, 842:22, 844:20, 845:12, 850:19, 853:19, 880:25, 895:10, 899:17, 901:14, 902:1, 906:4, 924:8, 925:3, 957:19, 957:22
**including** [16] - 717:2, 718:24, 720:5, 723:1, 736:1, 764:2, 764:13, 821:21, 865:12, 866:15, 868:8, 890:20, 891:16, 899:25, 920:11, 948:11
**inclusion** [1] - 727:9
**incomplete** [5] - 742:14, 742:15, 765:18, 769:8, 769:19
**inconsistent** [7] - 739:6, 739:10, 739:12, 887:1, 888:1, 923:23, 935:12
**inconsistently** [2] - 951:11, 951:24
**incontrovertible** [3] - 786:14, 820:11, 823:19
**incorporated** [1] - 795:23
**incorrect** [2] - 752:25, 884:17
**increase** [15] - 742:8, 744:23, 772:20, 791:6, 791:9, 795:4, 795:11, 796:19, 797:13, 815:6, 817:15, 840:11, 888:8, 889:4, 893:17
**increased** [44] - 723:5, 723:8, 724:25, 725:5, 744:12, 752:11, 757:12, 758:18, 760:11, 761:21, 762:2, 768:13, 768:14, 778:16, 780:22, 788:2, 788:6, 797:20, 810:25, 811:25, 813:13, 813:21, 814:6, 815:2, 815:9, 815:16, 821:10, 821:14, 827:4, 829:4, 839:9, 854:16, 855:8, 880:21, 886:5, 886:12, 910:15,

928:20, 944:4, 945:10, 945:14, 945:17
**increases** [4] - 795:2, 797:5, 811:19, 875:9
**increasing** [13] - 723:9, 725:4, 742:9, 791:6, 791:8, 792:8, 797:5, 797:21, 886:11, 888:9, 889:4, 893:5, 893:17
**independent** [3] - 715:22, 729:15, 933:13
**index** [2] - 913:10, 913:25
**indicate** [8] - 811:14, 811:17, 839:7, 844:19, 855:8, 930:13, 943:4, 944:2
**indicated** [12] - 721:12, 753:21, 769:19, 802:9, 883:4, 896:15, 896:17, 903:14, 905:23, 912:21, 925:12, 932:15
**indicates** [6] - 854:14, 854:22, 939:14, 946:1, 957:2
**indicating** [3] - 752:11, 898:17, 946:21
**indicative** [3] - 721:16, 943:7, 943:16
**individual** [30] - 728:21, 734:13, 740:20, 751:9, 752:22, 755:15, 756:13, 756:19, 759:16, 771:15, 773:23, 796:5, 827:6, 839:11, 858:4, 858:8, 860:11, 860:13, 860:21, 861:4, 861:13, 863:19, 877:19, 880:13, 881:12, 884:21, 938:4, 939:16, 940:2, 956:25
**individually** [1] - 856:14
**individuals** [5] - 731:2, 734:14, 742:3, 742:20, 758:17
**induce** [3] - 809:6, 809:11, 893:3
**induces** [4] - 809:21, 810:6, 810:11, 810:18
**indulgence** [1] - 932:11
**infection** [2] - 817:15, 817:17
**infer** [1] - 841:8
**Inference** [1] - 934:25

**inflammation** [19] - 786:18, 786:19, 787:1, 787:3, 787:5, 787:6, 788:2, 788:16, 788:19, 790:13, 790:17, 795:18, 795:21, 795:24, 807:7, 816:2, 819:5, 937:15, 937:16
**inflammatory** [9] - 725:12, 787:23, 788:4, 788:5, 788:14, 807:24, 807:25, 817:15, 937:13
**influence** [1] - 729:9
**influences** [1] - 761:19
**influencing** [1] - 758:12
**inform** [1] - 756:22
**information** [40] - 729:7, 733:24, 736:11, 736:20, 736:22, 737:15, 741:9, 741:11, 745:13, 755:11, 756:21, 757:5, 758:2, 759:6, 760:6, 760:21, 761:15, 761:24, 763:22, 767:24, 769:9, 770:12, 772:16, 773:2, 774:12, 784:4, 796:8, 797:3, 815:19, 816:7, 839:19, 840:18, 866:17, 895:13, 922:21, 922:23, 948:17, 949:21, 952:10
**informed** [2] - 725:18, 841:22
**inhalation** [2] - 784:24, 821:9
**inhaled** [1] - 784:21
**inherit** [1] - 787:16
**initial** [2] - 814:5, 815:15
**initiative** [1] - 770:17
**Initiative** [12] - 716:13, 716:16, 716:19, 735:13, 738:17, 748:20, 767:12, 769:24, 779:6, 780:3, 849:10, 910:1
**injected** [6] - 786:19, 786:25, 818:6, 818:11, 818:14, 818:17
**injection** [1] - 807:19
**inserting** [1] - 906:18
**inserts** [1] - 905:17
**inside** [1] - 785:21
**insignificant** [1] - 906:1
**instance** [5] - 754:8, 764:25, 769:19, 804:12,

946:6
**instances** [1] - 737:20
**instead** [5] - 766:11, 821:22, 838:19, 897:11, 954:6
**Institute** [3] - 920:5, 920:7, 920:9
**institution** [1] - 926:23
**instruct** [1] - 947:12
**instructed** [1] - 906:21
**insufficient** [5] - 765:21, 765:25, 769:10, 774:19, 923:11
**intense** [1] - 944:6
**intentional** [1] - 807:19
**interest** [4] - 718:5, 760:16, 798:19, 917:22
**interested** [3] - 726:6, 786:17, 800:13
**interesting** [3] - 737:24, 761:20, 775:16
**interim** [1] - 865:16
**internal** [3] - 715:13, 783:9, 783:19
**international** [1] - 717:17
**International** [3] - 717:20, 725:19, 865:4
**internationally** [1] - 777:23
**interpret** [7] - 741:24, 744:3, 749:3, 749:17, 793:20, 795:9
**interpretation** [8] - 731:5, 737:22, 865:10, 868:3, 868:25, 869:3, 906:3, 916:20
**interpreted** [3] - 741:12, 743:11, 745:20
**interpreting** [2] - 729:8, 864:19
**interrupt** [1] - 946:9
**interrupted** [1] - 790:11
**interval** [85] - 743:9, 743:12, 743:14, 743:16, 743:20, 743:22, 744:2, 744:15, 744:21, 745:1, 746:1, 746:4, 746:9, 746:11, 746:12, 746:16, 746:20, 748:15, 760:14, 764:13, 764:14, 801:22, 831:17, 831:18, 832:17, 832:21, 832:24, 833:4, 833:9, 833:12, 833:16,

833:22, 834:16, 834:17, 834:19, 834:20, 834:21, 835:2, 835:4, 835:12, 835:19, 835:22, 835:24, 836:25, 838:11, 838:13, 838:16, 838:19, 839:7, 839:12, 839:17, 841:6, 841:7, 841:23, 842:23, 843:3, 844:2, 844:19, 845:12, 849:23, 849:25, 850:19, 852:25, 853:11, 853:13, 854:8, 854:14, 854:21, 854:22, 854:25, 855:2, 855:5, 855:7, 855:12, 906:1, 906:4, 906:10, 907:22, 924:5, 924:8, 924:15, 925:2, 947:5, 956:18
**intervals** [28] - 743:8, 744:3, 746:20, 753:22, 753:24, 754:3, 756:20, 760:19, 761:22, 767:5, 768:14, 792:16, 793:22, 794:19, 796:22, 837:4, 839:3, 844:6, 844:14, 844:15, 850:5, 889:15, 900:3, 901:3, 942:6, 942:9, 954:5, 954:18
**intervening** [2] - 758:9, 776:4
**interventions** [1] - 717:1
**interview** [1] - 731:4
**interviewer** [2] - 733:6, 733:7
**intra** [1] - 817:7
**intra-vaginally** [1] - 817:7
**introduce** [1] - 713:18
**invasive** [4] - 873:4, 873:13, 874:7, 944:9
**invented** [2] - 745:23, 745:24
**investigating** [1] - 777:15
**investigator** [3] - 718:23, 734:1, 739:14
**Investigators** [1] - 822:7
**investigators** [7] - 731:2, 732:4, 757:24, 794:17, 821:21, 882:21, 957:1
**invited** [3] - 722:22, 732:24, 927:6
**invoke** [1] - 736:6

**invoked** [1] - 862:18
**involved** [4] - 716:11, 733:18, 767:14, 767:17
**involvement** [2] - 805:4, 806:1
**involves** [1] - 777:15
**involving** [2] - 739:8, 739:15
**IS** [1] - 961:5
**ISRTP/FDA** [1] - 822:19
**issue** [25] - 714:23, 719:15, 720:24, 721:2, 730:24, 739:1, 765:18, 768:19, 770:9, 771:4, 771:6, 778:4, 800:9, 801:1, 801:17, 804:18, 816:5, 889:8, 889:24, 900:5, 928:6, 928:8, 938:2, 946:12, 953:6
**issues** [7] - 719:13, 736:19, 766:8, 766:24, 770:19, 773:12, 868:25
**item** [3] - 738:18, 910:19, 910:21
**items** [6] - 738:17, 777:25, 914:11, 917:22, 918:2, 921:9
**itself** [7] - 783:1, 813:1, 828:8, 920:7, 920:10, 920:17, 947:25
**IV** [2] - 817:14, 915:12

**J**

**J&J** [4] - 783:10, 783:12, 783:19, 933:6
**jelly** [2] - 905:21, 906:17
**JERSEY** [3] - 711:1, 711:18, 711:18
**JOHN** [1] - 711:20
**JOHNSON** [2] - 711:4
**Johnson** [14] - 711:22, 712:5, 720:5, 739:4, 784:6, 926:11, 926:15
**journal** [2] - 727:5, 829:18
**journals** [3] - 717:6, 719:9, 826:25
**Judge** [1] - 865:23
**judging** [1] - 879:24
**judgment** [2] - 729:15, 869:5
**JULIE** [1] - 711:18
**JULY** [1] - 711:4

**jumping** [1] - 871:24
**justification** [3] - 829:20, 830:2, 830:3
**justify** [1] - 829:17

**K**

**keep** [4] - 760:16, 785:5, 803:15, 955:18
**Kenneth** [1] - 934:6
**Keskin** [3] - 816:20, 816:23, 818:2
**key** [9] - 716:13, 729:1, 733:22, 741:24, 744:1, 748:9, 749:2, 768:20, 861:1
**Kim** [1] - 910:22
**kind** [8] - 729:6, 732:20, 732:22, 794:11, 813:10, 818:18, 896:10, 948:4
**kindly** [2] - 740:22, 939:6
**knowing** [1] - 749:3
**knowledge** [10] - 756:6, 812:25, 819:20, 819:24, 860:9, 917:21, 951:17, 951:18, 952:9, 952:19
**known** [6] - 782:11, 782:14, 782:20, 791:3, 846:6, 858:1

**L**

**laboratory** [2] - 782:17
**lack** [10] - 855:21, 859:13, 860:10, 860:25, 861:4, 861:10, 861:14, 861:24, 864:1, 940:18
**lacks** [1] - 821:19
**Langseth** [2] - 757:15, 757:16
**language** [1] - 881:19
**large** [14] - 728:22, 733:12, 734:17, 738:19, 742:23, 746:17, 760:10, 791:12, 796:3, 858:19, 864:19, 948:14, 948:15
**larger** [17] - 734:23, 746:21, 766:2, 769:16, 772:6, 774:16, 774:22, 859:7, 859:16, 860:2, 860:3, 860:24, 861:9, 861:23, 876:11, 880:21, 886:4
**largest** [2] - 755:23,

940:25

**laser** [1] - 898:17

**Lash** [1] - 934:17

**last** [21] - 725:25, 760:15, 771:12, 772:21, 802:3, 829:9, 857:9, 867:6, 868:10, 870:6, 870:8, 871:8, 873:2, 879:25, 885:1, 925:20, 938:8, 941:19, 943:1, 956:22, 958:12

**latent** [1] - 869:19

**law** [1] - 720:15

**lawyers** [2] - 926:19, 929:17

**lead** [4] - 767:19, 787:11, 819:6, 819:11

**leading** [1] - 810:21

**learn** [2] - 800:12, 800:13

**learned** [1] - 934:12

**least** [1] - 840:10

**leave** [1] - 884:20

**led** [2] - 716:25, 920:24

**left** [9] - 744:13, 810:1, 846:21, 847:8, 867:23, 870:7, 870:8, 894:13, 951:5

**left-hand** [6] - 847:8, 867:23, 870:7, 870:8, 894:13, 951:5

**LEIGH** [1] - 711:11

**length** [4] - 770:10, 915:21, 942:2, 955:18

**less** [26] - 732:9, 746:4, 750:18, 750:23, 754:10, 754:17, 766:13, 766:17, 775:15, 778:4, 793:15, 793:16, 796:12, 796:18, 799:13, 818:18, 895:17, 895:21, 897:7, 898:15, 898:21, 916:5, 942:4, 949:20, 953:11

**letter** [19] - 820:12, 820:18, 820:19, 820:21, 820:25, 822:1, 822:5, 823:7, 823:8, 823:11, 823:18, 920:1, 922:2, 922:9, 922:18, 922:23, 923:16, 923:24, 942:11

**letters** [4] - 791:25, 921:11, 922:5, 922:7

**level** [19] - 725:24, 734:13, 750:14, 750:15,

762:2, 765:21, 791:7, 791:23, 792:8, 792:12, 792:13, 795:4, 795:5, 877:19, 880:13, 881:12, 919:12, 937:5, 937:6

**levels** [3] - 750:13, 792:17, 889:15

**LEVIN** [1] - 711:13

**lie** [5] - 743:18, 745:12, 833:16, 833:21, 839:14

**lies** [3] - 832:24, 833:5, 838:21

**lifetime** [21] - 723:9, 737:10, 772:6, 774:12, 774:25, 796:9, 796:15, 893:5, 895:2, 895:6, 895:14, 895:18, 895:19, 895:21, 895:25, 896:4, 896:25, 897:5, 941:17, 941:22, 941:23

**lifetimes** [1] - 890:14

**light** [1] - 822:18

**likelihood** [6] - 749:17, 831:8, 831:18, 831:23, 832:9, 875:10

**likely** [14] - 731:18, 732:9, 743:13, 746:10, 775:15, 775:23, 792:24, 832:19, 838:18, 859:14, 869:18, 947:12, 953:15, 953:21

**liken** [1] - 891:5

**limit** [6] - 743:8, 743:9, 770:10, 853:16, 853:17, 854:11

**limitations** [6] - 773:16, 773:24, 774:19, 776:8, 855:19, 868:14

**limited** [5] - 770:7, 884:16, 916:4, 916:10, 916:14

**limiting** [1] - 770:11

**limits** [3] - 764:25, 768:17, 771:4

**line** [30] - 744:14, 744:20, 744:21, 744:24, 745:10, 746:2, 747:7, 747:11, 747:12, 747:17, 748:3, 751:5, 752:10, 753:19, 754:9, 754:12, 754:14, 754:16, 756:11, 783:11, 814:22, 829:17, 844:24, 848:4, 856:17,

856:21, 913:5, 940:22

**lines** [8] - 727:23, 748:18, 805:22, 808:20, 856:16, 861:19, 916:9, 942:3

**link** [2] - 824:14, 825:18

**linking** [3] - 718:3, 859:18, 926:7

**list** [24] - 782:11, 789:5, 789:10, 789:12, 789:13, 815:22, 815:24, 828:23, 846:14, 863:6, 886:13, 897:13, 913:3, 917:23, 917:25, 918:2, 919:23, 920:4, 922:6, 922:9, 922:14, 922:18, 955:8, 955:23

**listed** [16] - 765:7, 785:24, 789:4, 789:14, 789:18, 807:10, 807:14, 837:8, 853:6, 895:1, 897:19, 898:20, 899:23, 913:3, 915:14, 917:22

**lists** [7] - 789:5, 895:19, 898:21, 902:11, 905:3, 907:19, 918:6

**literature** [28] - 714:3, 719:18, 721:12, 725:16, 730:5, 730:6, 734:8, 780:19, 783:7, 783:25, 803:20, 866:7, 870:14, 870:21, 935:11, 936:13, 936:14, 936:16, 936:19, 936:23, 938:12, 938:17, 943:4, 943:13, 946:1, 951:12, 951:25, 952:17

**litigation** [28] - 721:4, 721:5, 803:19, 803:24, 805:5, 806:2, 826:10, 826:19, 828:20, 858:9, 871:20, 871:23, 877:14, 877:15, 878:2, 887:3, 919:16, 920:19, 925:19, 929:5, 929:11, 929:17, 930:7, 930:11, 930:14, 944:7, 955:25, 958:5

**LOCKE** [1] - 712:7

**long-term** [5] - 732:24, 796:13, 817:1, 941:16, 942:7

**Longo** [3] - 783:10, 783:22, 952:12

**look** [124] - 726:16,

727:2, 732:18, 735:1, 735:2, 736:14, 736:19, 741:4, 741:5, 742:24, 744:7, 747:5, 753:2, 753:8, 754:7, 755:1, 755:18, 756:4, 756:5, 756:7, 762:4, 762:5, 762:15, 762:19, 765:17, 765:22, 765:23, 769:25, 770:2, 771:17, 775:9, 775:17, 781:5, 791:11, 791:16, 791:22, 792:6, 794:7, 795:5, 797:25, 798:1, 798:2, 798:8, 801:5, 808:4, 808:6, 811:8, 813:21, 814:3, 814:8, 816:20, 825:23, 827:9, 828:1, 828:22, 830:16, 830:18, 830:21, 830:23, 831:2, 832:6, 837:6, 842:13, 844:12, 844:21, 846:21, 852:12, 852:13, 854:2, 855:4, 859:2, 859:22, 860:1, 862:2, 862:5, 862:24, 865:21, 870:6, 872:13, 881:9, 886:16, 889:14, 892:20, 895:7, 896:20, 897:21, 900:7, 901:10, 901:25, 905:11, 907:11, 908:2, 909:7, 909:19, 912:19, 912:21, 912:25, 913:2, 913:4, 913:13, 913:14, 913:19, 915:19, 915:21, 920:2, 921:2, 921:8, 921:21, 929:25, 938:17, 941:25, 942:7, 945:5, 945:6, 948:21, 954:15, 954:16, 954:17, 955:2

**look-back** [1] - 938:17

**looked** [54] - 728:25, 729:3, 736:9, 736:10, 736:11, 739:19, 747:4, 754:22, 756:17, 757:1, 757:21, 759:5, 763:3, 776:6, 777:16, 796:10, 796:11, 798:3, 798:4, 798:5, 798:8, 798:9, 801:6, 801:18, 802:2, 807:17, 811:20, 816:15, 825:4, 825:7, 827:6, 830:10, 844:1, 848:2,

982

872:9, 872:16, 873:1, 873:20, 873:23, 886:13, 886:24, 887:24, 895:5, 908:4, 908:17, 917:6, 918:20, 922:6, 938:15, 941:16, 945:4, 945:15, 953:4

**looking** [38] - 732:21, 734:19, 735:3, 736:19, 737:9, 751:14, 752:2, 752:20, 753:13, 756:1, 759:15, 760:17, 769:14, 770:15, 774:18, 778:15, 793:6, 797:16, 798:11, 816:4, 816:6, 816:17, 828:9, 837:11, 839:6, 842:18, 847:16, 852:23, 878:22, 888:5, 891:3, 896:25, 911:7, 940:8, 940:12, 940:13, 940:21

**looks** [11] - 734:8, 760:1, 795:5, 795:11, 797:7, 815:12, 815:17, 895:17, 900:7, 913:24, 918:19

**low** [12] - 772:2, 840:12, 842:23, 854:6, 854:7, 854:8, 854:17, 855:13, 855:24, 862:18, 907:23, 909:4

**lower** [16] - 743:8, 744:14, 745:1, 760:19, 765:16, 765:22, 765:23, 768:9, 769:4, 796:20, 853:13, 892:21, 898:15, 907:7, 950:4, 950:5

**lowest** [1] - 902:14

**luck** [2] - 917:1, 957:11

**lunch** [1] - 802:16

**luncheon** [1] - 802:19

**lung** [7] - 758:16, 758:18, 758:21, 758:24, 786:22, 821:15, 823:6

**lungs** [1] - 807:20

**lymph** [3] - 785:18, 785:21, 785:22

**lymphatic** [1] - 784:21

---

**M**

---

**magnitude** [2] - 939:15, 947:13

**main** [4] - 771:17, 773:12, 869:19, 926:21

**maintained** [1] - 822:10

**major** [2] - 721:8, 798:25

**majority** [1] - 859:4

**male** [2] - 821:10, 821:17

**malignancy** [1] - 810:22

**malignant** [4] - 808:23, 821:11, 821:15, 946:3

**manager** [1] - 723:15

**MANGES** [1] - 712:4

**manufactured** [1] - 784:6

**manuscripts** [1] - 717:5

**March** [1] - 925:24

**maritime** [1] - 812:4

**mark** [3] - 741:14, 892:23, 913:18

**marked** [2] - 846:2, 904:21

**markers** [1] - 716:4

**MARKETING** [1] - 711:4

**marrow** [1] - 715:23

**mass** [3] - 810:12, 913:9, 913:25

**matches** [3] - 758:17, 758:20, 758:24

**material** [3] - 878:23, 879:10, 900:19

**materials** [8] - 714:3, 919:16, 919:19, 919:21, 920:20, 921:14, 929:3, 929:7

**matrix** [1] - 895:5

**matter** [9] - 824:12, 872:1, 882:3, 885:14, 890:5, 922:15, 925:19, 956:1, 956:4

**MATTER** [1] - 961:7

**matters** [1] - 754:5

**MC** [3] - 713:10, 777:5, 932:4

**McDonald** [5] - 788:23, 788:24, 789:23, 789:24, 790:4

**McDonnell** [2] - 785:24, 789:2

**McTiernan** [74] - 713:8, 713:16, 713:21, 713:22, 714:12, 715:4, 719:5, 719:15, 720:14, 720:22, 723:13, 723:19, 725:25, 726:4, 729:17, 729:18, 735:5, 735:24, 739:23, 740:11, 746:3, 748:2, 752:2, 754:22, 760:15, 762:24, 769:17, 776:8,

777:9, 779:1, 782:5, 782:19, 783:4, 788:7, 788:22, 790:1, 790:18, 794:2, 794:20, 795:13, 797:19, 800:3, 800:24, 801:22, 803:6, 803:11, 803:18, 805:18, 805:25, 808:7, 808:8, 818:5, 826:10, 827:10, 827:22, 839:20, 875:4, 875:8, 892:24, 924:4, 926:14, 930:1, 932:8, 932:12, 935:25, 936:4, 937:13, 942:10, 945:25, 946:15, 947:6, 948:3, 950:15, 960:7

**McTiernan's** [5] - 789:5, 789:7, 856:15, 928:2, 955:7

**MEAGHER** [1] - 711:19

**mean** [22] - 729:10, 730:19, 731:23, 746:5, 746:24, 750:8, 752:19, 775:5, 807:1, 831:13, 835:3, 838:14, 840:1, 840:4, 877:14, 904:17, 907:6, 913:17, 917:11, 924:22, 939:21

**meaning** [12] - 746:4, 792:18, 814:17, 833:20, 842:23, 856:2, 877:4, 887:4, 887:6, 887:16, 902:14, 907:4

**meaningful** [1] - 948:17

**means** [30] - 727:2, 731:24, 743:4, 743:10, 750:24, 792:4, 793:9, 793:16, 819:4, 832:5, 832:22, 833:4, 833:19, 833:20, 834:1, 834:2, 834:23, 835:3, 838:19, 841:24, 844:9, 844:16, 844:25, 851:8, 851:9, 854:25, 855:5, 893:24, 895:4, 899:13

**meant** [1] - 770:11

**measure** [1] - 746:23

**measurement** [1] - 814:10

**measures** [1] - 727:21

**mechanism** [5] - 720:13, 824:14, 825:17, 825:18, 937:10

**mechanisms** [2] - 718:3, 816:8

**mechanistic** [1] - 936:20

**media** [1] - 944:6

**medical** [6] - 715:11, 717:6, 719:9, 720:3, 786:20, 800:25

**Medical** [1] - 715:12

**Medicine** [1] - 716:6

**medicine** [3] - 715:13, 716:8, 794:8

**MedLine** [1] - 870:23

**meet** [2] - 927:10, 927:12

**meeting** [3] - 724:8, 871:8, 927:16

**member** [5] - 715:20, 717:23, 718:8, 865:9, 867:6

**members** [2] - 866:16, 881:23

**memory** [5] - 805:6, 805:9, 806:4, 806:11, 896:13

**Menopausal** [1] - 910:25

**mention** [6] - 722:13, 772:12, 774:9, 823:19, 935:11, 952:21

**mentioned** [14] - 723:24, 748:24, 782:21, 820:5, 854:21, 864:9, 873:2, 877:5, 884:9, 919:13, 920:14, 925:10, 929:4, 954:15

**mentions** [1] - 870:2

**mentor** [2] - 716:9, 934:13

**merits** [1] - 869:17

**merritt** [1] - 843:22

**mesothelial** [4] - 808:24, 809:12, 809:22, 810:7

**mesothelials** [1] - 810:13

**mesothelioma** [2] - 808:24, 809:13

**mesotheliomas** [1] - 808:17

**met** [2] - 780:18, 803:13

**Meta** [1] - 911:2

**meta** [92] - 717:11, 721:11, 723:1, 723:2, 728:13, 734:1, 734:21, 736:16, 741:4, 755:3, 755:4, 755:9, 755:12, 755:19, 755:22, 756:3,

756:24, 757:19, 760:18, 761:2, 762:11, 774:3, 796:3, 796:4, 796:7, 796:14, 797:7, 798:12, 827:7, 828:14, 828:20, 829:15, 829:18, 829:19, 830:4, 844:6, 851:23, 851:25, 852:3, 854:19, 857:9, 857:17, 857:22, 859:6, 859:11, 859:16, 859:22, 859:24, 860:1, 860:8, 860:10, 860:17, 860:23, 861:8, 861:23, 862:3, 862:12, 862:15, 862:17, 862:22, 863:3, 863:21, 865:10, 868:3, 877:18, 880:12, 881:11, 907:12, 910:13, 938:8, 938:10, 939:11, 940:1, 940:4, 941:3, 943:3, 943:13, 943:23, 944:15, 944:18, 944:21, 944:22, 945:3, 945:19, 954:24, 956:7, 956:10, 956:16, 957:14, 958:9, 958:25

**meta-analyses** [30] - 721:11, 723:1, 728:13, 734:21, 736:16, 755:3, 755:22, 761:2, 774:3, 796:3, 827:7, 828:14, 829:15, 851:25, 857:9, 859:22, 860:1, 860:17, 861:8, 861:23, 862:22, 863:3, 865:10, 868:3, 938:8, 940:4, 941:3, 945:3, 958:25

**meta-analyses'** [1] - 857:17

**meta-analysis** [60] - 723:2, 734:1, 741:4, 755:4, 755:9, 755:12, 755:19, 756:3, 756:24, 757:19, 760:18, 762:11, 796:4, 796:7, 796:14, 797:7, 798:12, 828:20, 829:18, 829:19, 830:4, 844:6, 851:23, 852:3, 854:19, 857:22, 859:6, 859:11, 859:16, 859:24, 860:8, 860:10, 860:23, 862:3, 862:12, 862:15, 862:17, 863:21, 877:18, 880:12, 881:11, 907:12,

910:13, 938:10, 939:11, 940:1, 943:3, 943:13, 943:23, 944:15, 944:18, 944:21, 944:22, 945:15, 954:24, 956:7, 956:10, 956:16, 957:14, 958:9

**Meta-Analysis** [1] - 911:2

**metal** [1] - 784:13

**metals** [2] - 728:2, 937:18

**meter** [1] - 821:19

**method** [4] - 741:4, 786:11, 808:15, 908:7

**methodologists** [2] - 775:3, 775:9

**methodology** [15] - 719:24, 726:5, 726:7, 726:12, 730:7, 751:19, 777:10, 777:12, 794:3, 871:6, 885:23, 885:25, 907:19, 934:10, 940:5

**methods** [9] - 716:3, 717:11, 795:24, 879:2, 879:17, 934:12, 934:14, 935:16, 954:16

**metric** [6] - 729:1, 791:19, 887:7, 894:9, 896:19, 902:15

**mic** [1] - 715:3

**mice** [2] - 821:18, 823:5

**MICHELLE** [1] - 711:12

**micrograms** [2] - 814:23, 821:18

**micronized** [1] - 821:22

**middle** [3] - 766:4, 942:2, 951:14

**midway** [4] - 819:1, 888:5, 951:6, 953:5

**might** [19] - 729:10, 736:18, 743:18, 745:12, 754:19, 754:20, 758:8, 758:15, 758:23, 762:16, 766:16, 772:6, 773:5, 829:18, 839:19, 840:23, 841:9, 865:19, 872:14

**migrate** [4] - 784:19, 786:4, 786:14, 820:6

**migrated** [1] - 785:14

**migrates** [1] - 786:6

**migration** [6] - 785:1, 786:11, 816:2, 820:10, 823:19, 921:24

**milliliter** [1] - 814:23

**Mills** [2] - 901:21, 901:22

**mind** [5] - 773:13, 826:17, 829:25, 830:1, 887:17

**mindful** [1] - 798:22

**mine** [1] - 722:24

**mineral** [1] - 952:7

**minimal** [1] - 917:24

**minimum** [3] - 778:19, 778:23, 863:14

**minute** [1] - 938:24

**minutes** [6] - 724:13, 730:16, 897:15, 950:18, 955:5, 955:17

**misclassification** [4] - 774:24, 949:23, 950:10, 950:11

**misclassified** [1] - 765:10

**misheard** [1] - 839:23

**misinterpreting** [1] - 758:19

**misread** [1] - 863:9

**missing** [2] - 765:8, 769:1

**mission** [1] - 737:23

**misspoke** [1] - 924:20

**misstatement** [1] - 788:23

**mistake** [5] - 749:23, 750:1, 750:25, 793:17, 935:9

**mistaken** [1] - 922:14

**misunderstood** [1] - 947:19

**mixed** [1] - 949:22

**MMC** [2] - 809:21, 810:6

**MNC** [1] - 809:19

**model** [1] - 894:16

**modeling** [2] - 797:2, 797:8

**models** [2] - 797:4, 945:15

**moderate** [1] - 799:11

**Modern** [2] - 934:17, 934:23

**modern** [1] - 731:14

**modified** [1] - 812:3

**moment** [6] - 721:20, 740:24, 834:23, 839:25, 850:11, 864:4

**moments** [1] - 952:3

**monograph** [10] - 915:19, 915:22, 916:11, 917:5, 936:5, 937:1, 950:25, 951:7, 951:10, 952:23

**months** [7] - 771:22, 771:25, 772:5, 772:7, 772:21, 817:8, 925:22

**Moorman** [2] - 744:18, 747:22

**morning** [14] - 713:16, 713:17, 713:20, 714:4, 714:11, 714:18, 831:12, 832:4, 833:8, 844:13, 848:2, 889:9, 912:12, 912:13

**most** [27] - 725:24, 728:20, 730:2, 731:17, 742:18, 747:7, 747:13, 755:22, 756:7, 756:8, 757:10, 757:17, 761:1, 761:10, 761:11, 774:11, 796:8, 829:15, 832:20, 832:25, 848:3, 848:4, 866:16, 903:8, 904:11, 941:1

**move** [29] - 715:2, 715:15, 719:12, 726:5, 755:25, 762:25, 763:16, 767:10, 768:10, 771:12, 773:19, 774:7, 780:13, 781:8, 785:4, 785:7, 789:20, 789:21, 790:8, 814:21, 815:20, 820:1, 839:17, 871:13, 900:19, 901:20, 904:10, 919:7, 932:9

**moved** [4] - 715:12, 728:7, 825:8, 917:17

**moving** [3] - 760:16, 782:2, 791:2

**MR** [52] - 779:7, 779:13, 779:22, 783:11, 789:1, 798:22, 800:20, 801:25, 803:9, 805:21, 811:10, 820:17, 824:21, 825:11, 825:12, 826:6, 827:12, 828:4, 841:2, 841:11, 841:17, 850:14, 856:15, 861:15, 861:18, 865:22, 871:13, 871:18, 874:12, 875:7, 878:20, 885:18, 885:20, 898:12, 914:10,

984

922:12, 924:3, 928:6, 928:14, 928:17, 929:8, 931:1, 932:20, 946:9, 946:17, 950:17, 950:22, 951:3, 953:2, 955:6, 955:21, 959:3

**MS** [45] - 713:7, 713:15, 719:11, 740:8, 771:11, 777:8, 779:11, 779:20, 779:25, 783:3, 783:14, 783:18, 788:22, 789:11, 789:14, 789:19, 789:25, 799:2, 800:23, 802:6, 802:13, 824:16, 825:3, 826:5, 885:17, 922:8, 926:13, 927:25, 928:8, 931:3, 932:7, 932:10, 939:5, 941:12, 941:18, 942:23, 946:11, 946:20, 946:24, 946:25, 948:1, 950:13, 955:3, 955:11, 959:6

**multi** [2] - 894:15, 930:7
**multi-district** [1] - 930:7
**multiple** [6] - 717:11, 717:12, 718:23, 860:4, 880:20, 886:4
**must** [1] - 952:16
**MY** [1] - 961:6

## N

**N/A** [1] - 742:13
**name** [7] - 713:20, 741:19, 748:8, 755:16, 892:9, 925:14, 925:17
**named** [1] - 892:5
**narrative** [1] - 945:5
**narrow** [5] - 743:22, 754:3, 760:24, 761:23, 793:22
**Nasreen** [2] - 808:12, 810:4
**National** [3] - 920:5, 920:7, 920:8
**national** [1] - 717:17
**nationality** [2] - 741:23, 748:8
**nationally** [1] - 777:22
**nature** [1] - 747:3
**NCI** [10] - 718:24, 719:1, 882:22, 920:10, 920:12, 920:13, 920:15, 920:16, 921:18, 921:20

**near** [2] - 792:18, 792:20
**necessarily** [3] - 762:17, 840:1, 891:12
**need** [16] - 714:16, 733:11, 735:16, 739:2, 739:8, 751:18, 766:2, 768:25, 769:15, 848:7, 858:15, 859:2, 863:15, 869:6, 900:6, 937:9
**needed** [3] - 740:21, 774:22, 883:3
**negative** [6] - 744:23, 764:11, 764:20, 822:12, 834:21, 940:24
**neoplastic** [5] - 811:2, 817:18, 817:20, 819:7, 819:11
**never** [16] - 723:6, 725:2, 791:17, 791:24, 792:4, 794:3, 794:4, 888:20, 890:2, 890:7, 890:21, 891:22, 893:2, 893:20, 902:7, 917:17
**New** [1] - 715:11
**NEW** [3] - 711:1, 711:18, 711:18
**new** [5] - 715:25, 841:15, 841:16, 946:10, 946:18
**newer** [2] - 756:3, 774:21
**next** [42] - 715:15, 723:15, 725:8, 726:10, 727:15, 727:16, 730:16, 734:11, 734:12, 741:7, 742:6, 742:17, 743:7, 748:9, 748:13, 749:5, 755:18, 756:11, 767:10, 780:13, 784:15, 786:15, 790:8, 791:2, 802:20, 815:21, 817:24, 819:13, 820:1, 822:4, 823:20, 845:15, 846:14, 874:17, 886:2, 910:11, 919:11, 931:9, 943:1, 952:25, 954:23
**next-to-the-last** [1] - 943:1
**nicely** [1] - 792:9
**nine** [2] - 778:6, 912:7
**NJ** [1] - 711:7
**NO** [1] - 711:2
**node** [1] - 785:22
**nodes** [2] - 785:18, 785:21

**noise** [2] - 732:20, 747:1
**nomenclature** [1] - 764:16
**non** [26] - 727:23, 727:25, 757:4, 757:14, 764:9, 766:12, 766:14, 778:18, 780:23, 793:15, 793:24, 794:6, 796:21, 821:9, 851:9, 888:11, 889:6, 889:9, 890:16, 890:24, 891:2, 891:4, 891:18, 898:2, 939:13, 945:12
**non-asbestiform** [1] - 821:9
**non-association** [1] - 851:9
**non-epidemiologic** [1] - 727:23
**non-perineal** [1] - 939:13
**non-talc** [1] - 727:25
**non-users** [20] - 757:4, 757:14, 764:9, 766:12, 766:14, 778:18, 780:23, 793:15, 793:24, 794:6, 796:21, 888:11, 889:6, 889:9, 890:16, 890:24, 891:2, 891:4, 891:18, 945:12
**noncases** [1] - 748:10
**nondifferential** [1] - 950:11
**none** [15] - 743:23, 858:18, 858:20, 858:25, 872:4, 883:21, 893:3, 919:23, 920:3, 920:4, 921:14, 921:17, 921:19, 939:12
**nonexistent** [2] - 833:19, 851:8
**nongenitally** [2] - 899:17, 900:23
**nonmucinous** [2] - 888:10, 889:6
**nonresponsive** [1] - 871:14
**nonsignificant** [1] - 746:3
**nonuser** [2] - 765:12, 768:8
**nonusers** [2] - 744:13, 744:15
**normal** [3] - 808:24,

809:21, 810:7
**notably** [1] - 730:2
**note** [4] - 868:24, 891:14, 893:6, 957:13
**notebook** [2] - 808:6, 828:3
**noted** [3] - 801:8, 862:7, 862:11
**NOTES** [1] - 961:6
**nothing** [4] - 750:24, 824:19, 899:20, 947:14
**noting** [1] - 862:24
**notion** [1] - 815:25
**November** [1] - 925:20
**NTP** [12] - 820:3, 820:22, 821:3, 822:2, 822:20, 823:1, 823:4, 823:10, 823:15, 825:4, 825:7, 825:8
**nuclear** [1] - 818:24
**null** [29] - 749:19, 750:1, 752:25, 833:14, 833:19, 833:20, 833:24, 834:1, 834:3, 834:14, 834:23, 835:1, 835:2, 835:23, 841:25, 842:2, 845:6, 845:14, 845:15, 850:21, 851:1, 851:6, 851:8, 853:19, 924:10, 925:6, 925:8, 949:20, 950:1
**number** [66] - 723:9, 733:13, 733:17, 733:20, 733:21, 734:5, 741:24, 742:3, 744:10, 748:8, 748:25, 749:1, 750:16, 755:17, 755:23, 756:10, 757:9, 760:10, 762:4, 762:8, 768:21, 768:24, 769:10, 772:7, 775:20, 792:4, 833:12, 834:11, 834:18, 834:19, 839:7, 839:21, 840:1, 841:24, 842:22, 844:7, 845:12, 850:19, 855:23, 856:6, 856:8, 856:11, 856:19, 856:24, 857:11, 857:15, 858:6, 858:15, 859:22, 863:14, 869:17, 876:10, 888:9, 889:5, 898:4, 903:17, 907:14, 909:15, 917:24, 920:22, 924:8, 929:24, 941:17, 956:14
**numbers** [27] - 717:7,

734:23, 734:25, 741:23, 744:9, 746:25, 762:1, 764:10, 764:11, 769:11, 791:12, 833:6, 838:21, 840:8, 840:25, 857:18, 859:2, 860:10, 863:10, 864:19, 876:17, 903:22, 915:24, 921:19, 940:22, 942:4

**numerous** [2] - 719:6, 787:5

**nurses** [1] - 766:3

**Nurses'** [10] - 748:22, 763:19, 767:25, 768:19, 770:23, 848:21, 848:24, 848:25, 849:5, 949:5

**nutrition** [6] - 718:11, 718:15, 865:11, 868:4, 869:4, 870:2

---

**O**

**o'clock** [1] - 802:17

**O'DELL** [1] - 711:11

**O'Dell** [3] - 926:24, 928:4, 932:16

**O.R** [1] - 897:6

**O.R."** [1] - 743:2

**obesity** [4] - 718:12, 718:16, 865:12, 868:5

**object** [5] - 801:25, 885:17, 922:8, 927:25, 932:21

**objection** [9] - 779:14, 783:11, 789:1, 789:7, 800:20, 824:16, 826:5, 926:13, 932:20

**observation** [1] - 821:7

**observational** [3] - 735:6, 780:6, 910:14

**observed** [8] - 817:17, 819:6, 846:16, 894:16, 916:18, 953:15, 953:21

**obtained** [1] - 734:13

**OCAS** [1] - 893:4

**occasions** [2] - 726:1, 789:4

**occupation** [1] - 847:4

**occur** [6] - 733:10, 733:22, 831:9, 831:24, 885:23, 949:23

**occurred** [2] - 767:23, 806:19

**occurring** [1] - 832:10

---

**odds** [28] - 743:2, 792:1, 832:15, 832:23, 833:5, 852:8, 852:10, 852:21, 852:24, 853:3, 853:10, 876:9, 898:21, 898:24, 899:2, 899:5, 902:11, 903:9, 905:25, 906:8, 906:9, 907:21, 908:13, 908:21, 908:23, 912:6, 953:7

**OF** [2] - 711:1, 961:6

**offer** [2] - 715:6, 723:16

**OFFICIAL** [1] - 711:25

**officials'** [1] - 823:12

**often** [7] - 731:25, 738:18, 764:3, 792:20, 792:23, 797:2, 887:5

**old** [1] - 759:19

**older** [2] - 757:16, 774:20

**once** [3] - 738:4, 766:13, 873:18

**once-a-week** [1] - 873:18

**One** [1] - 716:13

**one** [188] - 716:13, 717:25, 721:19, 721:25, 724:8, 729:5, 732:4, 732:11, 732:18, 732:23, 733:25, 734:4, 734:7, 734:16, 736:17, 737:20, 738:11, 738:14, 739:20, 743:7, 743:23, 744:7, 744:10, 744:16, 746:2, 746:15, 746:16, 747:18, 748:23, 750:17, 751:6, 751:7, 751:14, 751:15, 751:16, 755:7, 755:24, 758:22, 759:5, 759:19, 759:22, 760:5, 760:14, 760:15, 761:14, 766:9, 766:17, 767:5, 767:12, 771:2, 771:6, 772:9, 773:12, 773:23, 774:1, 778:10, 780:1, 782:3, 785:19, 786:16, 787:2, 787:18, 789:2, 790:16, 791:11, 791:14, 791:20, 793:3, 793:4, 793:6, 793:23, 794:24, 795:1, 795:3, 795:9, 795:16, 796:6, 796:22, 797:11, 797:12, 802:3, 802:4, 805:12, 812:24, 814:22, 815:4, 815:10, 816:5,

---

819:13, 820:12, 824:18, 825:5, 828:1, 828:13, 828:18, 833:10, 833:17, 833:20, 833:22, 833:23, 833:25, 834:1, 834:6, 834:17, 837:2, 840:20, 842:20, 849:19, 850:1, 850:25, 851:5, 851:22, 852:10, 854:4, 855:3, 855:21, 856:2, 857:8, 858:9, 862:22, 863:2, 863:23, 867:4, 872:22, 873:2, 878:11, 878:12, 879:9, 880:3, 882:25, 883:1, 885:8, 885:24, 886:1, 887:5, 891:11, 892:8, 894:3, 894:4, 894:6, 894:8, 894:20, 894:22, 896:11, 896:24, 897:13, 897:20, 898:14, 898:16, 899:19, 900:14, 901:3, 902:15, 904:4, 904:17, 907:1, 907:12, 907:18, 907:19, 908:10, 912:8, 914:11, 915:11, 917:21, 920:16, 921:23, 922:2, 923:17, 927:8, 933:1, 935:9, 935:15, 937:9, 946:6, 954:17, 954:18, 954:19, 955:22, 956:12, 958:25

**one-time** [1] - 787:2

**ones** [8] - 717:19, 760:23, 761:1, 801:5, 837:15, 904:4, 907:18, 912:23

**ongoing** [2] - 719:10, 930:7

**open** [2] - 713:3, 784:18

**opine** [3] - 719:19, 803:20, 872:12

**opined** [3] - 800:8, 800:17, 918:6

**opinion** [48] - 719:21, 720:2, 720:7, 723:17, 726:1, 753:14, 756:7, 756:23, 756:25, 762:7, 775:13, 778:5, 778:12, 780:16, 782:5, 782:22, 784:9, 784:15, 787:22, 790:20, 795:13, 798:10, 799:13, 804:4, 804:24, 807:11, 811:19, 820:2,

---

823:12, 827:2, 837:5, 841:20, 847:22, 851:16, 851:19, 859:5, 875:9, 875:20, 875:25, 876:21, 887:3, 904:12, 912:2, 919:4, 928:18, 935:21, 943:11, 946:10

**opinions** [44] - 713:23, 715:7, 719:24, 720:1, 721:3, 721:5, 721:7, 722:3, 722:16, 723:23, 724:18, 726:8, 729:20, 730:1, 730:8, 730:14, 763:6, 776:11, 782:9, 783:5, 783:15, 790:1, 790:5, 790:19, 790:25, 800:3, 800:4, 800:5, 800:7, 800:24, 801:20, 801:23, 801:24, 802:11, 823:9, 849:21, 853:10, 919:20, 921:23, 928:2, 933:17, 943:18, 956:4, 958:5

**opportunity** [5] - 722:14, 723:22, 724:14, 757:25, 936:25

**opposed** [3] - 838:15, 898:2, 930:4

**opposite** [1] - 888:18

**optimal** [2] - 791:19, 887:6

**OR** [1] - 791:25

**oral** [3] - 929:13, 929:16, 929:20

**order** [9] - 726:7, 730:8, 733:20, 735:21, 736:7, 777:13, 829:17, 919:7, 937:10

**organization** [5] - 717:18, 867:11, 867:12, 867:17, 920:17

**Organization** [3] - 717:20, 717:22, 865:3

**original** [6] - 727:11, 789:6, 877:18, 880:13, 881:12, 884:20

**originally** [2] - 955:8, 955:23

**otherwise** [3] - 766:24, 791:3, 829:18

**outcome** [1] - 746:7

**outcomes** [3] - 717:2, 767:20, 769:25

outlined [1] - 792:8
outside [6] - 721:5, 753:5, 818:10, 841:8, 855:3, 905:18
Ovarian [1] - 814:1
ovarian [177] - 714:18, 714:24, 716:2, 717:3, 719:20, 719:22, 720:7, 721:15, 723:5, 723:9, 724:11, 724:19, 725:1, 725:5, 725:12, 725:17, 726:9, 726:20, 726:23, 730:24, 731:3, 731:12, 732:5, 732:8, 733:10, 733:11, 733:22, 734:15, 735:15, 735:18, 736:6, 736:8, 739:3, 739:6, 741:8, 742:1, 742:2, 745:9, 746:7, 748:11, 748:25, 752:11, 753:1, 753:2, 753:3, 753:4, 753:9, 753:13, 756:15, 756:16, 757:3, 757:13, 758:2, 760:12, 761:9, 761:13, 763:21, 764:5, 764:13, 764:15, 764:19, 765:5, 766:7, 766:25, 767:1, 767:23, 768:12, 770:18, 770:25, 771:1, 772:12, 772:14, 772:15, 775:18, 775:19, 775:22, 775:24, 776:11, 777:12, 778:16, 779:4, 782:7, 782:13, 785:6, 788:3, 790:3, 790:14, 790:17, 790:22, 791:9, 791:18, 792:12, 795:14, 800:10, 801:9, 803:21, 804:25, 806:13, 806:23, 810:17, 810:21, 810:24, 811:3, 812:11, 812:13, 812:17, 813:3, 818:7, 818:19, 824:15, 825:19, 826:14, 826:22, 827:4, 827:20, 829:5, 829:12, 829:23, 836:17, 839:10, 840:7, 840:12, 840:14, 842:5, 842:10, 845:9, 847:23, 848:11, 849:22, 850:17, 851:13, 851:17, 852:20, 853:21, 859:19, 862:13, 863:7, 863:8, 865:13, 868:8, 872:6, 872:12,

872:19, 873:4, 873:13, 874:7, 875:22, 876:2, 876:8, 876:14, 876:18, 878:6, 883:22, 886:11, 888:10, 889:6, 892:16, 894:17, 907:7, 911:22, 914:13, 917:2, 918:6, 923:2, 926:8, 933:4, 937:21, 938:12, 941:21, 943:7, 944:4, 944:9, 945:10, 948:12, 948:15, 957:4
ovaries [13] - 784:17, 785:4, 785:7, 785:8, 785:16, 785:17, 785:19, 786:12, 795:17, 817:22, 818:11, 820:7, 905:17
ovary [2] - 725:21, 753:6
Overall [1] - 864:14
overall [26] - 723:6, 734:9, 734:19, 734:22, 739:12, 753:16, 754:1, 755:2, 757:1, 757:2, 764:5, 766:25, 778:15, 836:16, 845:5, 849:21, 850:16, 851:13, 852:19, 864:15, 872:5, 879:18, 913:13, 940:3, 941:2, 956:9
overcome [4] - 860:25, 861:4, 861:10, 861:24
Oversight [1] - 724:3
overview [1] - 726:16
owing [1] - 869:19
own [7] - 721:17, 729:23, 759:11, 828:19, 851:23, 857:2, 933:12
oxidative [11] - 788:16, 788:20, 790:13, 790:15, 811:13, 811:15, 811:16, 811:19, 811:22, 811:23, 811:25
oxygen [3] - 811:1, 813:13, 813:18
Oxygen [1] - 814:1

---

**P**

p-Trend [4] - 793:3, 793:6, 793:13, 953:14
p-Value [37] - 749:13, 749:14, 749:15, 749:17, 749:20, 749:21, 749:24, 750:4, 750:13, 750:22,

750:23, 751:5, 751:12, 751:16, 752:24, 793:15, 831:15, 832:5, 889:11, 889:13, 893:15, 897:13, 897:18, 899:8, 899:11, 899:18, 900:4, 933:25, 953:14, 953:21, 954:2, 954:7, 954:18, 954:19, 954:21
p-Values [9] - 751:8, 751:10, 793:1, 793:2, 794:19, 850:5, 899:19, 900:25, 954:9
p53 [2] - 812:18, 813:4
page [106] - 779:20, 802:20, 805:20, 809:25, 813:23, 817:11, 818:25, 820:25, 822:4, 824:7, 827:13, 827:14, 827:16, 827:21, 827:22, 828:22, 832:6, 836:6, 842:14, 844:22, 844:23, 844:24, 846:4, 846:9, 846:21, 846:23, 847:2, 847:5, 852:15, 854:1, 855:12, 856:16, 856:17, 859:10, 859:11, 861:19, 862:4, 863:6, 864:15, 864:23, 866:10, 866:11, 866:24, 866:25, 867:22, 867:25, 868:10, 870:7, 870:16, 874:17, 876:4, 877:16, 878:20, 879:6, 880:4, 880:7, 881:18, 883:5, 888:4, 889:18, 892:22, 892:23, 892:24, 894:13, 894:14, 894:25, 895:9, 896:22, 897:1, 898:6, 901:25, 907:15, 908:2, 908:3, 909:9, 909:18, 910:12, 910:21, 913:4, 915:21, 915:24, 915:25, 916:9, 916:14, 921:2, 921:8, 922:4, 924:4, 931:9, 934:23, 934:24, 939:7, 941:11, 943:21, 947:4, 948:2, 951:3, 951:5, 952:18, 953:2, 953:4, 956:13, 956:21, 958:18
Page [1] - 960:4
pages [1] - 770:8
paid [3] - 930:14, 930:16,

933:9
palliative [1] - 810:8
Panel [2] - 718:9, 867:7
panel [8] - 737:22, 822:18, 865:9, 865:15, 865:16, 865:18, 868:2, 872:10
panelist [2] - 867:11, 867:16
panties [1] - 905:19
PAPANTONIO [1] - 711:13
paper [20] - 759:8, 770:9, 790:6, 828:23, 830:11, 830:13, 848:23, 873:21, 877:5, 879:19, 881:25, 882:2, 882:5, 885:3, 886:1, 893:8, 893:12, 894:5, 898:4, 900:7
papers [5] - 806:16, 812:20, 849:15, 879:2, 894:9
papillary [9] - 818:19, 818:23, 819:3, 819:4, 819:8, 819:19, 819:20, 819:21, 819:25
paragraph [22] - 817:11, 819:1, 846:10, 846:22, 847:3, 862:5, 862:7, 866:10, 868:11, 870:6, 870:8, 877:17, 883:6, 888:5, 922:3, 922:19, 935:7, 939:9, 941:19, 943:2, 951:14
pardon [2] - 892:14, 906:9
parenthesis [3] - 838:22, 840:9, 896:19
parents [1] - 787:16
Parfitt [3] - 779:10, 926:24, 960:8
PARFITT [47] - 711:12, 713:7, 713:15, 719:11, 740:8, 771:11, 774:5, 777:8, 779:11, 779:20, 779:25, 783:3, 783:14, 783:18, 788:22, 789:11, 789:14, 789:19, 789:25, 799:2, 800:23, 802:6, 802:13, 824:16, 825:3, 826:5, 885:17, 922:8, 926:13, 927:25, 928:8, 931:3, 932:7, 932:10,

939:5, 941:12, 941:18, 942:23, 946:11, 946:20, 946:24, 946:25, 948:1, 950:13, 955:3, 955:11, 959:6

**part** [26] - 740:22, 759:1, 767:20, 769:8, 809:4, 810:20, 811:21, 829:9, 848:25, 859:23, 864:22, 871:11, 872:10, 876:15, 876:21, 878:4, 883:14, 883:16, 889:3, 889:16, 889:18, 889:19, 930:5, 955:7, 957:15

**participants** [1] - 766:11

**participated** [3] - 739:15, 739:16, 884:14

**particle** [1] - 821:25

**particles** [2] - 785:2, 785:15

**particular** [20] - 725:12, 737:9, 737:18, 737:19, 738:14, 743:14, 750:5, 767:22, 789:13, 794:24, 807:7, 825:18, 840:25, 847:4, 847:14, 858:5, 864:21, 879:4, 879:12, 925:16

**particularly** [5] - 728:21, 798:12, 858:8, 871:2, 900:17

**parts** [3] - 749:12, 784:7, 811:24

**passed** [2] - 842:6, 933:4

**passes** [1] - 834:12

**past** [3] - 738:9, 908:24, 955:5

**patent** [4] - 897:11, 900:16, 900:18, 901:10

**pathogenesis** [2] - 788:18, 790:14

**pathologic** [1] - 788:9

**pathological** [3] - 720:10, 727:24, 728:7

**pathology** [3] - 785:25, 786:1, 936:17

**pathway** [3] - 781:16, 786:16, 816:5

**pathways** [2] - 725:11, 784:23

**patients** [6] - 732:8, 786:22, 786:23, 810:12, 900:5, 946:3

**pattern** [1] - 738:25

**pause** [4] - 805:16, 819:17, 825:1, 866:1

**Pause** [3] - 788:25, 808:9, 866:19

**peer** [9] - 717:6, 719:8, 721:12, 727:11, 783:25, 823:14, 943:4, 943:13, 946:1

**peer-reviewed** [6] - 717:6, 721:12, 727:11, 783:25, 943:13, 946:1

**pelvic** [3] - 788:5, 900:15, 900:23

**pending** [1] - 880:2

**Penninkilampi** [21] - 796:7, 851:24, 852:8, 852:13, 894:2, 908:1, 937:24, 938:11, 938:24, 939:6, 939:23, 941:9, 943:21, 943:23, 944:13, 944:16, 944:21, 952:25, 954:3, 954:11, 958:14

**people** [47] - 728:24, 731:3, 732:21, 737:25, 738:2, 738:18, 745:21, 745:24, 745:25, 750:4, 750:19, 772:17, 791:14, 792:21, 793:7, 794:9, 794:12, 837:12, 838:3, 840:7, 848:16, 888:24, 890:2, 890:7, 890:12, 891:22, 893:10, 893:19, 895:24, 896:3, 898:20, 899:17, 899:25, 900:10, 900:15, 900:18, 901:6, 901:14, 902:22, 902:23, 903:1, 903:7, 905:23, 926:21, 927:1, 952:12, 952:14

**per** [4] - 797:12, 814:23, 821:18

**percent** [38] - 723:4, 724:25, 744:12, 745:10, 753:4, 757:12, 760:11, 768:12, 768:13, 772:3, 778:17, 778:21, 787:15, 797:13, 831:18, 832:21, 832:23, 833:3, 833:4, 834:22, 836:24, 838:10, 838:20, 839:2, 839:9, 840:11, 840:13, 850:15, 850:23, 852:25, 853:11,

854:16, 854:17, 855:8, 910:16, 928:20, 944:3, 944:4

**percentage** [2] - 778:20, 814:10

**percentages** [1] - 753:7

**perfect** [1] - 763:1

**perform** [1] - 851:22

**performed** [4] - 857:2, 858:1, 860:20, 912:9

**performing** [4] - 860:18, 860:22, 861:7, 861:22

**perhaps** [4] - 741:10, 790:20, 795:21, 815:3

**perineal** [27] - 720:6, 721:14, 770:13, 826:21, 852:20, 853:15, 875:21, 876:1, 876:7, 895:14, 895:17, 901:7, 901:14, 904:17, 915:14, 917:1, 917:17, 918:7, 923:2, 928:19, 939:13, 943:6, 943:15, 944:3, 944:9, 949:8, 957:3

**perineal/genital** [1] - 723:10

**perineally** [1] - 817:7

**perineum** [1] - 820:7

**period** [5] - 732:6, 780:24, 815:5, 869:20, 874:6

**periodical** [1] - 891:24

**permission** [2] - 805:21, 861:15

**permit** [1] - 928:10

**permitted** [3] - 812:23, 822:12, 946:14

**person** [5] - 733:4, 738:8, 745:8, 772:15, 926:22

**Personal** [1] - 712:8

**personal** [2] - 725:15, 905:4

**personally** [4] - 806:12, 806:22, 857:25, 882:5

**persons** [1] - 846:17

**pertain** [1] - 876:9

**petition** [1] - 923:24

**petitions** [4] - 922:19, 922:21, 922:22, 922:24

**Ph.D** [2] - 715:8, 934:12

**pheochromocytomas** [2] - 821:11, 821:16

**photograph** [1] - 867:24

**phrase** [1] - 880:25

**physical** [10] - 718:1, 718:3, 718:11, 718:15, 718:20, 730:3, 865:11, 868:5, 869:4, 870:1

**physician** [1] - 720:2

**picked** [1] - 779:11

**picture** [3] - 734:22, 751:18

**piece** [1] - 795:16

**pieces** [2] - 816:4, 816:7

**pine** [2] - 812:4, 812:13

**place** [3] - 736:21, 846:15, 858:5

**placebo** [5] - 780:5, 794:10, 794:11, 794:12, 891:7

**placed** [4] - 801:10, 817:21, 914:11, 915:12

**places** [4] - 846:17, 868:23, 869:15, 914:19

**plain** [1] - 759:19

**plaintiffs** [8] - 885:16, 929:4, 929:11, 930:11, 930:15, 930:17, 930:18, 930:21

**Plaintiffs** [3] - 711:16, 713:7, 713:11

**plaintiffs'** [13] - 806:14, 824:12, 867:20, 885:18, 912:13, 926:19, 927:2, 927:5, 927:10, 927:21, 929:17, 930:10, 933:9

**planned** [1] - 809:8

**plans** [1] - 801:8

**plausibility** [21] - 728:6, 777:18, 781:9, 781:10, 781:13, 781:14, 781:18, 781:22, 798:18, 799:10, 807:6, 807:12, 816:1, 816:6, 816:14, 820:2, 825:24, 936:14, 937:9, 937:11, 957:19

**plausible** [9] - 718:2, 720:13, 725:10, 781:15, 782:6, 786:11, 786:17, 790:2, 937:19

**play** [1] - 947:11

**played** [1] - 927:5

**pleasure** [1] - 720:19

**pleura** [1] - 809:22

**pleural** [6] - 808:16,

808:24, 809:13, 810:7, 811:4, 946:3
**pleurodesis** [13] - 786:21, 807:15, 807:19, 807:24, 808:5, 808:15, 809:2, 810:11, 945:22, 946:2, 946:13, 946:17
**plot** [20] - 740:22, 740:25, 741:1, 741:2, 741:6, 747:6, 752:2, 752:4, 761:5, 780:21, 830:12, 836:5, 842:18, 848:3, 896:11, 933:15, 940:7, 940:14, 940:16, 940:19
**plots** [2] - 740:19, 747:4
**plotting** [1] - 741:1
**plus** [1] - 873:18
**PMC** [4] - 808:25, 809:11, 809:15, 809:19
**pneumothorax** [2] - 786:23, 786:24
**point** [30] - 732:24, 738:11, 743:1, 750:5, 750:6, 782:3, 810:16, 810:19, 812:15, 820:13, 820:23, 854:6, 860:18, 860:22, 861:7, 861:21, 869:10, 870:11, 878:23, 879:10, 885:12, 902:16, 918:3, 923:8, 924:24, 928:1, 930:3, 941:24, 952:3, 955:20
**pointed** [1] - 769:21
**pointer** [1] - 792:7
**pointing** [1] - 741:15
**points** [4] - 752:10, 782:4, 869:9, 940:7
**Policy** [1] - 724:4
**policymakers** [1] - 866:15
**pooled** [66] - 717:11, 723:1, 728:13, 734:12, 734:21, 734:23, 734:24, 735:3, 736:17, 739:15, 755:9, 755:12, 756:24, 757:18, 757:20, 757:23, 760:5, 760:9, 760:18, 761:3, 762:11, 774:3, 798:12, 806:17, 852:16, 859:6, 859:16, 860:2, 875:20, 876:6, 876:25, 877:6, 877:15, 877:17,

878:1, 878:19, 878:24, 879:3, 879:7, 879:11, 879:15, 880:8, 880:12, 881:5, 881:11, 882:16, 882:18, 882:20, 883:6, 883:8, 883:15, 883:18, 884:3, 884:8, 884:9, 884:10, 884:12, 884:14, 884:22, 884:24, 885:2, 939:17, 947:22, 948:6, 948:9, 948:10
**pooling** [5] - 882:19, 882:22, 882:24, 883:1, 883:2
**Pooling** [1] - 882:23
**poor** [1] - 773:14
**population** [11] - 716:3, 731:15, 731:22, 731:25, 732:2, 732:13, 733:15, 742:4, 774:14, 774:15, 837:17
**population-based** [4] - 731:15, 742:4, 774:14, 837:17
**portion** [9] - 819:10, 836:9, 866:22, 898:13, 898:17, 901:6, 902:4, 909:10, 951:9
**position** [4] - 717:17, 816:11, 841:16, 885:18
**positions** [1] - 717:16
**positive** [24] - 720:12, 721:13, 742:10, 744:20, 764:11, 764:12, 764:19, 764:21, 767:2, 767:4, 768:15, 822:11, 834:21, 848:5, 872:23, 873:3, 873:12, 874:7, 904:8, 916:18, 940:21, 943:5, 943:14, 946:14
**possibility** [4] - 842:3, 850:24, 851:4, 853:19
**possible** [7] - 727:20, 752:18, 786:16, 816:8, 915:17, 919:8, 957:3
**possibly** [3] - 785:21, 816:15, 915:13
**potential** [11] - 758:10, 759:9, 760:7, 772:22, 774:18, 774:23, 775:2, 776:3, 810:9, 905:3, 912:10
**potentially** [3] - 765:10,

811:21, 839:8
**Powder** [1] - 720:5
**powder** [108] - 714:19, 714:24, 719:18, 719:22, 720:4, 722:2, 723:3, 724:10, 724:19, 725:23, 726:8, 726:20, 726:23, 727:25, 730:14, 730:24, 731:8, 732:19, 735:15, 736:5, 736:8, 739:5, 742:21, 744:1, 746:6, 752:12, 757:3, 758:1, 761:22, 763:23, 765:2, 774:13, 775:22, 776:11, 777:11, 779:3, 780:23, 782:6, 782:10, 782:14, 782:24, 783:2, 783:6, 784:5, 784:11, 784:12, 784:16, 785:11, 786:12, 787:18, 790:3, 790:21, 791:9, 791:24, 793:7, 795:14, 800:9, 801:1, 801:9, 803:20, 803:23, 803:25, 804:5, 804:25, 805:5, 806:1, 806:13, 806:23, 807:20, 816:1, 818:7, 826:21, 827:19, 829:4, 845:9, 847:23, 848:10, 859:18, 872:12, 875:22, 876:1, 876:7, 876:13, 878:5, 888:9, 888:13, 888:25, 889:5, 889:21, 892:16, 904:18, 910:9, 917:1, 926:7, 937:20, 938:12, 945:11, 948:25, 949:2, 949:4, 949:6, 949:7, 949:9, 949:14, 949:15, 957:3
**POWDER** [1] - 711:4
**powders** [10] - 763:24, 764:1, 764:2, 767:24, 768:1, 801:12, 827:4, 946:7, 948:25, 949:22
**power** [49] - 766:1, 768:19, 769:10, 774:17, 774:19, 855:15, 856:5, 856:12, 856:20, 856:25, 857:2, 857:4, 857:12, 857:17, 857:19, 857:21, 857:22, 858:1, 858:10, 858:15, 860:6, 860:7, 860:9, 860:15, 860:16, 860:19, 860:20, 860:23,

860:25, 861:4, 861:8, 861:10, 861:14, 861:22, 861:25, 862:14, 862:18, 863:13, 863:18, 863:19, 863:22, 863:23, 863:25, 864:1, 864:3, 880:22, 886:5
**PowerPoint** [1] - 741:14
**practice** [1] - 830:15
**PRACTICES** [1] - 711:5
**practicing** [1] - 720:18
**precise** [7] - 754:3, 757:9, 761:23, 824:14, 825:18, 877:9, 937:10
**precisely** [1] - 842:11
**precision** [6] - 746:18, 754:9, 754:10, 754:11, 754:17, 760:25
**prefer** [1] - 891:22
**premalignant** [1] - 787:11
**premier** [1] - 715:21
**preparation** [2] - 714:6, 783:5
**prepare** [2] - 715:6, 798:15
**prepared** [8] - 719:7, 719:23, 721:10, 724:13, 755:5, 841:13, 926:1, 930:6
**preparing** [1] - 714:7
**presence** [3] - 722:5, 811:13, 811:16
**present** [14] - 750:4, 759:10, 759:11, 761:14, 785:16, 785:17, 785:18, 786:2, 808:22, 809:20, 893:2, 897:6, 897:12, 957:1
**presentation** [5] - 846:3, 929:13, 929:16, 929:20, 932:13
**presented** [12] - 747:23, 747:24, 749:14, 755:14, 755:17, 759:6, 759:20, 761:12, 794:18, 874:11, 912:1, 922:25
**presenting** [1] - 751:10
**President** [2] - 926:22, 927:23
**pretty** [1] - 830:3
**prevent** [1] - 715:25
**Prevention** [1] - 921:11

**prevention** [4] - 715:24, 716:3, 717:25, 718:10

**previous** [7] - 738:6, 789:9, 805:14, 833:15, 846:23, 876:11, 956:24

**previously** [6] - 877:4, 877:10, 877:11, 877:24, 878:7, 883:9

**principal** [3] - 718:23, 739:14, 910:1

**principles** [2] - 811:12, 864:8

**prioritize** [1] - 918:15

**priority** [2] - 801:10, 917:20

**private** [2] - 768:2, 949:3

**pro** [1] - 787:23

**pro-carcinogenic** [1] - 787:23

**probability** [4] - 831:15, 834:22, 839:13, 954:2

**problem** [3] - 759:7, 760:1, 765:1

**problems** [2] - 822:7, 861:12

**procedures** [2] - 717:1, 767:15

**proceeding** [1] - 824:2

**Proceedings** [2] - 959:10, 960:4

**process** [7] - 730:4, 777:14, 788:19, 799:6, 809:1, 819:22, 866:14

**processes** [1] - 787:6

**produce** [1] - 762:17

**produced** [1] - 717:24

**product** [22] - 724:10, 730:24, 757:3, 757:13, 761:22, 763:23, 765:3, 766:17, 774:13, 775:22, 783:1, 783:2, 786:12, 791:6, 791:15, 801:9, 804:10, 804:11, 812:7, 816:1, 876:7, 890:21

**PRODUCTS** [1] - 711:4

**products** [70] - 714:24, 719:19, 719:22, 720:5, 722:2, 723:3, 723:7, 723:10, 724:24, 725:5, 725:11, 725:16, 725:23, 726:8, 726:20, 726:23, 727:25, 731:4, 731:9, 732:19, 735:15, 736:5,

739:5, 742:22, 746:6, 752:12, 758:1, 770:13, 775:23, 776:11, 777:11, 778:17, 779:4, 781:16, 782:6, 782:10, 782:14, 782:18, 782:25, 783:6, 784:5, 784:11, 784:12, 784:17, 787:18, 790:3, 790:21, 791:9, 791:24, 793:7, 801:1, 803:20, 803:21, 803:23, 803:25, 804:5, 804:25, 805:1, 826:22, 827:19, 847:23, 848:11, 859:19, 904:18, 926:7, 937:20, 938:12, 945:11, 952:7

**Products** [1] - 712:8

**profession** [1] - 714:13

**professional** [3] - 735:9, 735:24, 737:17

**professionals** [1] - 866:15

**professor** [1] - 716:5

**program** [2] - 719:1, 934:12

**project** [10] - 716:15, 716:22, 723:18, 767:13, 767:18, 769:20, 866:4, 870:13, 870:16, 948:24

**projects** [8] - 882:19, 882:23, 882:24, 883:1, 883:2, 884:22, 884:25

**proliferation** [2] - 810:18, 811:1

**prone** [2] - 871:3, 944:5

**pronounced** [1] - 893:1

**proof** [3] - 781:19, 825:24, 947:14

**proper** [1] - 894:10

**proposition** [2] - 813:12, 878:13

**PROSKAUER** [1] - 711:21

**prospective** [29] - 732:24, 765:3, 771:3, 836:14, 845:22, 848:15, 849:16, 849:20, 850:15, 850:23, 850:25, 851:6, 851:11, 852:11, 869:21, 871:20, 872:2, 880:15, 881:1, 881:6, 881:21, 882:12, 883:17, 883:21, 884:2, 884:18, 885:3,

885:5, 885:13

**prospectively** [2] - 847:11, 847:21

**protective** [4] - 906:14, 907:4, 907:21, 908:18

**protein** [2] - 812:18, 813:4

**protocol** [1] - 821:23

**protocols** [2] - 716:25, 767:15

**provide** [8] - 722:15, 724:9, 736:20, 757:5, 760:21, 773:3, 937:19, 948:17

**provided** [11] - 722:14, 727:8, 728:11, 737:15, 747:20, 783:8, 898:10, 900:25, 929:3, 929:7, 958:19

**provides** [4] - 857:21, 875:21, 875:25, 876:6

**providing** [1] - 882:21

**PSC** [1] - 900:10

**public** [11] - 720:25, 721:18, 721:19, 722:22, 723:20, 724:12, 724:15, 755:6, 794:21, 866:16, 955:25

**Public** [1] - 716:7

**publication** [4] - 766:9, 923:14, 923:21, 954:10

**publications** [7] - 719:6, 722:25, 727:12, 739:17, 748:23, 826:24, 958:3

**publicly** [3] - 721:9, 721:10, 730:10

**publish** [4] - 735:25, 762:16, 829:19, 867:15

**published** [48] - 717:4, 717:5, 717:9, 726:1, 734:2, 734:3, 739:13, 741:20, 749:4, 755:5, 755:7, 755:9, 755:19, 756:6, 761:19, 783:7, 783:24, 790:6, 801:24, 823:14, 826:20, 851:24, 867:10, 867:13, 869:13, 870:22, 877:4, 877:10, 877:11, 877:19, 879:12, 879:25, 880:14, 881:13, 882:19, 882:22, 883:9, 884:15, 884:19, 884:21, 884:23, 919:24, 920:5,

921:17, 934:17, 936:5

**publishing** [1] - 829:17

**PubMed** [2] - 727:8, 816:16

**pull** [9] - 726:10, 827:15, 854:2, 864:14, 878:10, 878:18, 934:22, 942:23, 956:21

**pulls** [1] - 905:6

**purport** [1] - 903:19

**purported** [2] - 886:20, 887:20

**purpose** [6] - 741:1, 770:14, 783:12, 811:6, 866:5, 885:22

**purposes** [22] - 713:23, 722:3, 729:19, 729:25, 735:12, 763:6, 778:5, 778:11, 781:10, 784:9, 789:7, 830:5, 864:17, 885:13, 887:14, 890:5, 890:6, 908:24, 911:16, 911:20, 922:15, 934:2

**PURSUANT** [1] - 961:4

**put** [32] - 715:5, 717:7, 740:3, 740:12, 741:17, 742:12, 742:13, 748:6, 748:7, 749:6, 793:4, 798:14, 820:15, 824:4, 832:3, 837:14, 845:25, 846:25, 847:9, 847:19, 848:6, 848:7, 848:16, 878:20, 896:18, 899:18, 900:3, 900:20, 920:16, 924:6, 941:11

**putting** [4] - 728:15, 740:19, 860:4, 906:17

**Pycnogenol** [1] - 812:8

**pycnogenol** [1] - 812:11

**Q**

**qualifications** [2] - 715:6, 715:16

**quartile** [4] - 902:14, 902:22, 902:23, 903:1

**quartiles** [4] - 792:6, 902:9, 902:12, 903:3

**QUESTION** [7] - 805:25, 844:25, 856:19, 856:24, 861:21, 913:6, 913:12

**questioned** [1] - 947:21

**questioning** [2] - 783:12, 790:9

990

**questionnaire** [7] - 733:3, 763:25, 764:1, 767:14, 768:2, 770:4, 948:23
**questionnaires** [3] - 733:1, 733:2, 770:11
**questions** [26] - 721:21, 771:20, 812:24, 826:12, 837:12, 838:4, 855:15, 864:7, 886:7, 911:25, 919:14, 925:9, 925:11, 928:11, 931:2, 933:16, 933:18, 936:2, 937:23, 938:25, 941:7, 947:10, 950:14, 950:24, 958:14, 959:3
**quick** [1] - 777:9
**quickly** [3] - 773:19, 843:1, 932:9
**quite** [9] - 721:25, 747:10, 765:8, 780:14, 847:10, 847:20, 918:19, 940:9, 955:15
**quizzed** [1] - 720:19
**quote** [1] - 892:25

## R

**Race** [1] - 911:1
**race** [1] - 720:11
**races** [1] - 781:1
**radioactive** [1] - 785:10
**raised** [6] - 928:6, 928:8, 946:17, 946:19, 955:9
**Randomized** [2] - 910:2, 911:2
**randomized** [17] - 717:10, 735:11, 735:13, 735:14, 735:20, 735:22, 736:1, 736:15, 870:21, 882:23, 883:2, 884:13, 891:6, 910:4, 910:8, 911:6, 911:14
**randomly** [1] - 794:9
**range** [13] - 744:4, 761:20, 769:13, 780:10, 780:11, 831:19, 832:18, 838:18, 840:9, 854:16, 909:4, 925:2, 941:2
**ranges** [4] - 749:20, 757:10, 757:11, 761:17
**rare** [2] - 733:11, 948:16
**rat** [3] - 823:1, 823:10, 823:15

**rather** [6] - 737:3, 750:4, 759:2, 832:10, 863:22, 876:10
**ratio** [29] - 743:2, 743:4, 792:1, 832:15, 832:16, 832:23, 833:5, 832:9, 852:10, 852:21, 852:24, 853:3, 853:10, 895:22, 895:25, 896:3, 898:15, 898:22, 898:24, 899:2, 899:5, 903:9, 905:25, 906:8, 906:9, 907:21, 908:13, 908:21, 908:23
**ratio/relative** [1] - 876:9
**ratios** [5] - 902:12, 912:2, 912:6, 953:7
**rats** [11] - 817:3, 817:7, 817:17, 817:18, 817:21, 818:7, 818:14, 818:17, 819:6, 821:10, 821:13
**rats'** [1] - 818:10
**RCTs** [1] - 871:5
**RE** [1] - 711:4
**reach** [4] - 784:17, 786:12, 918:11, 918:13
**reached** [5] - 729:16, 847:10, 847:20, 886:25, 887:25
**reaching** [1] - 837:5
**reaction** [1] - 817:14
**Reactive** [1] - 814:1
**reactive** [3] - 811:1, 813:13, 813:17
**read** [49] - 722:14, 737:1, 805:21, 806:16, 807:1, 809:23, 810:14, 816:19, 817:4, 817:25, 819:14, 820:12, 824:1, 827:23, 829:1, 829:7, 854:11, 854:18, 861:15, 869:25, 870:4, 876:19, 877:22, 880:17, 885:4, 885:5, 885:9, 892:19, 894:22, 910:17, 911:4, 913:2, 913:8, 913:22, 914:1, 914:6, 914:7, 919:11, 923:3, 924:11, 926:1, 935:17, 939:10, 939:18, 943:9, 944:11, 947:8, 947:15
**reading** [12] - 737:4, 759:8, 815:8, 819:10, 822:1, 822:15, 828:10,

832:1, 841:14, 856:18, 856:22, 898:3
**Reading** [5] - 805:24, 809:10, 809:17, 861:20, 865:1
**real** [5] - 732:21, 754:20, 831:13, 835:21, 906:19
**reality** [1] - 751:2
**realized** [1] - 774:21
**really** [26] - 715:1, 734:22, 734:25, 738:22, 749:6, 749:23, 751:18, 752:21, 752:24, 753:17, 753:20, 754:5, 756:25, 758:19, 759:25, 766:5, 770:9, 770:13, 772:14, 772:15, 793:11, 793:18, 795:11, 831:15, 915:20, 940:25
**reanalyzed** [2] - 877:21, 880:16
**reason** [15] - 731:15, 740:10, 754:5, 768:22, 775:4, 855:21, 859:5, 859:15, 864:4, 882:14, 883:14, 890:24, 891:4, 905:15, 946:18
**reasonable** [2] - 720:3, 916:22
**reasoning** [2] - 729:24, 832:4
**reasons** [6] - 732:15, 736:17, 786:5, 828:18, 851:22, 857:8
**REATH** [1] - 711:17
**rebounded** [1] - 814:6
**receive** [1] - 723:13
**received** [2] - 723:20, 922:22
**recent** [8] - 755:22, 756:8, 761:1, 761:2, 796:6, 828:13, 893:4, 944:15
**recently** [4] - 730:2, 851:24, 865:19, 903:21
**recess** [2] - 802:19, 931:8
**Recess** [2] - 776:15, 874:16
**recognize** [2] - 745:14, 846:4
**recognized** [2] - 729:20, 777:21

**recognizes** [1] - 782:2
**recommendations** [1] - 800:7
**recommending** [1] - 946:5
**reconsider** [1] - 917:19
**record** [5] - 820:17, 857:24, 898:12, 909:9, 941:12
**RECROSS** [1] - 950:21
**Recross** [1] - 960:6
**RECROSS-EXAMINATION** [1] - 950:21
**recruitment** [1] - 717:1
**recurrent** [1] - 715:25
**red** [4] - 805:12, 805:14, 805:17, 844:21
**REDIRECT** [1] - 932:6
**Redirect** [1] - 960:6
**redirect** [5] - 950:25, 952:21, 953:1, 954:23, 955:9
**reduce** [3] - 716:3, 866:17, 949:19
**redundant** [1] - 947:20
**refer** [3] - 731:17, 744:9, 747:14
**reference** [17] - 803:23, 821:3, 837:6, 875:23, 879:10, 879:12, 892:4, 909:15, 909:19, 909:22, 916:1, 922:6, 923:20, 923:21, 955:8, 956:17, 957:7
**referenced** [6] - 789:6, 812:8, 816:17, 878:23, 879:20, 914:13
**references** [7] - 816:17, 881:5, 908:4, 908:7, 909:11, 919:16, 920:21
**referencing** [1] - 816:24
**referred** [10] - 743:8, 747:20, 772:17, 809:15, 810:23, 817:24, 875:17, 900:6, 923:18, 944:18
**referring** [14] - 815:7, 832:25, 852:15, 870:1, 873:6, 883:16, 891:16, 898:14, 901:4, 924:19, 929:6, 941:1, 947:6, 957:17
**refers** [8] - 742:19,

747:16, 749:17, 781:14, 803:24, 870:14, 876:10, 904:16

**reflect** [4] - 825:14, 840:11, 840:13, 840:25

**reflected** [2] - 826:15, 842:6

**reflecting** [1] - 923:9

**reflective** [1] - 821:24

**reflects** [2] - 813:25, 940:10

**Reform** [1] - 724:3

**refresh** [4] - 805:6, 805:9, 806:4, 896:13

**regard** [26] - 715:17, 724:17, 724:18, 730:14, 736:15, 756:21, 756:23, 757:5, 761:16, 773:3, 775:13, 776:9, 780:16, 783:5, 790:2, 790:20, 802:15, 936:17, 936:19, 938:2, 939:1, 941:10, 943:12, 945:14, 946:15, 947:21

**regarding** [6] - 719:18, 719:21, 753:14, 803:20, 807:11, 822:2

**regardless** [3] - 748:25, 752:14, 945:4

**registry** [1] - 732:1

**regular** [1] - 818:23

**regulatory** [7] - 786:10, 800:8, 800:14, 800:16, 800:25, 801:15, 935:23

**reject** [2] - 752:25, 831:16

**rejecting** [5] - 749:18, 750:1, 750:25, 792:25, 953:18

**relate** [1] - 807:17

**related** [4] - 773:8, 812:7, 819:19

**relates** [3] - 849:9, 894:3, 901:6

**relating** [4] - 826:13, 848:23, 849:4, 878:5

**relationship** [4] - 736:8, 807:18, 875:11, 944:23

**relative** [173] - 729:1, 729:2, 734:5, 734:6, 734:7, 742:17, 742:23, 743:3, 743:5, 743:17, 743:21, 743:24, 743:25,

744:5, 744:7, 744:10, 744:11, 744:19, 744:20, 744:22, 745:6, 745:7, 745:12, 745:19, 746:3, 746:9, 746:10, 746:19, 747:16, 748:15, 751:8, 752:9, 753:18, 753:22, 754:18, 756:18, 756:19, 756:22, 757:9, 759:18, 759:19, 759:21, 759:23, 759:24, 760:1, 760:3, 760:17, 761:17, 761:21, 762:5, 762:8, 764:6, 764:8, 764:21, 765:15, 765:22, 765:23, 766:2, 766:19, 766:20, 766:25, 767:2, 767:3, 768:9, 768:15, 769:2, 769:7, 769:13, 769:14, 772:24, 773:16, 773:18, 774:17, 778:19, 778:23, 780:4, 780:6, 780:10, 780:22, 781:6, 791:7, 791:17, 791:21, 791:22, 792:1, 792:9, 792:17, 793:21, 794:22, 794:23, 795:10, 796:12, 796:19, 797:9, 797:12, 822:14, 830:14, 830:16, 830:18, 830:20, 830:21, 830:23, 831:5, 831:8, 831:19, 831:20, 831:23, 832:15, 832:23, 833:5, 833:20, 833:25, 834:1, 834:6, 834:16, 834:25, 836:21, 838:7, 838:10, 838:14, 838:17, 838:20, 839:13, 839:15, 839:17, 840:5, 840:6, 840:11, 840:16, 840:19, 841:5, 841:7, 841:9, 842:1, 848:5, 849:24, 850:6, 850:25, 851:5, 851:9, 854:19, 854:20, 854:23, 855:1, 855:2, 855:6, 855:13, 856:5, 858:11, 873:19, 873:23, 891:16, 891:17, 893:16, 894:1, 900:3, 901:1, 924:18, 924:21, 933:25, 940:3, 940:10, 940:25, 941:1, 941:2, 942:4, 942:8, 948:20, 949:18, 954:17, 956:9

**released** [1] - 721:10

**relevance** [1] - 822:20

**relevant** [19] - 714:3, 717:19, 727:5, 727:11, 727:17, 729:5, 729:8, 729:16, 749:12, 761:14, 770:13, 779:5, 785:5, 785:8, 813:22, 826:20, 905:15, 928:2, 957:2

**reliability** [1] - 939:16

**reliable** [5] - 736:18, 745:13, 751:7, 762:23

**reliance** [7] - 739:4, 830:6, 919:23, 920:4, 922:8, 922:14, 922:18

**relied** [7] - 761:1, 789:24, 822:6, 878:6, 878:8, 919:19, 921:22

**relook** [1] - 801:8

**rely** [3] - 822:2, 853:9, 922:10

**relying** [7] - 715:1, 804:18, 823:10, 878:4, 882:15, 913:9, 956:3

**remain** [1] - 893:16

**remaining** [2] - 798:19, 799:4

**remarkable** [1] - 753:18

**remarkably** [2] - 752:8, 945:2

**remarks** [1] - 722:15

**remember** [23] - 775:6, 806:6, 812:2, 813:19, 817:6, 818:12, 820:3, 820:7, 820:9, 820:21, 822:1, 822:5, 822:15, 832:3, 837:22, 840:3, 848:13, 877:12, 894:8, 912:16, 920:25, 930:22, 941:7

**remembered** [1] - 765:2

**remind** [1] - 947:11

**removed** [1] - 884:1

**render** [1] - 753:14

**rendering** [2] - 790:25, 801:20

**repeat** [2] - 851:2, 861:5

**repeatedly** [1] - 846:16

**replacement** [1] - 909:8

**replica** [1] - 762:17

**replicate** [1] - 762:15

**replication** [3] - 762:12, 762:13, 762:22

**report** [110] - 713:24, 727:13, 728:12, 728:16, 740:5, 741:17, 755:5, 755:6, 774:2, 774:5, 779:8, 779:9, 779:12, 779:19, 779:20, 789:6, 789:15, 790:6, 790:11, 801:14, 803:24, 807:23, 808:4, 810:23, 811:6, 820:22, 821:4, 821:6, 823:13, 826:16, 827:9, 828:19, 831:14, 832:2, 832:6, 841:13, 841:21, 848:6, 849:9, 858:10, 859:10, 863:13, 864:13, 864:15, 865:23, 866:22, 866:25, 867:2, 869:13, 870:10, 870:17, 871:16, 876:4, 876:5, 877:8, 877:14, 877:16, 878:2, 878:10, 878:14, 879:1, 879:7, 879:8, 879:16, 879:17, 879:18, 879:20, 879:21, 879:24, 880:1, 880:9, 881:9, 881:10, 881:18, 881:24, 882:3, 883:3, 883:5, 883:7, 884:3, 886:2, 894:24, 895:1, 896:22, 898:10, 900:12, 903:22, 904:14, 909:7, 909:10, 909:18, 913:17, 919:16, 920:19, 921:2, 921:5, 924:4, 924:13, 925:19, 930:6, 944:17, 951:22, 952:20, 953:20, 953:24, 954:12, 954:21, 955:13, 955:25

**reported** [19] - 759:16, 785:23, 786:2, 830:16, 831:4, 836:20, 841:25, 855:12, 890:15, 890:17, 893:4, 898:9, 901:16, 901:17, 903:8, 912:23, 924:21, 953:7, 954:7

**REPORTER** [1] - 711:25

**reporting** [3] - 848:20, 849:13, 849:15

**reports** [5] - 849:21, 864:10, 864:20, 869:16, 902:16

**represent** [4] - 742:1, 814:18, 878:15, 940:22

**representation** [2] -

878:16, 897:23
**represents** [2] - 748:17, 832:19
**requesting** [1] - 723:21
**require** [1] - 797:22
**required** [2] - 857:4, 858:2
**research** [26] - 715:18, 715:22, 716:1, 716:5, 716:11, 717:4, 717:18, 717:21, 718:9, 718:14, 719:2, 726:15, 729:23, 735:9, 735:25, 739:10, 739:12, 762:14, 806:12, 806:22, 806:25, 807:1, 807:23, 865:4, 866:4, 866:6
**Research** [18] - 715:21, 718:8, 718:13, 718:25, 725:19, 737:21, 739:7, 865:5, 865:8, 865:23, 867:8, 872:11, 879:17, 879:22, 881:4, 881:14, 881:20, 881:24
**researcher** [1] - 737:17
**researchers** [4] - 738:10, 797:2, 817:6, 818:14
**reserved** [1] - 824:23
**residency** [1] - 715:13
**respect** [8] - 810:17, 888:20, 897:3, 910:4, 911:8, 917:1, 953:6, 954:11
**respectively** [1] - 756:14
**respond** [1] - 850:8
**responded** [1] - 840:4
**Response** [1] - 814:2
**response** [108] - 720:12, 723:13, 723:20, 725:6, 725:13, 727:21, 729:1, 735:2, 742:7, 742:11, 742:12, 742:15, 748:14, 751:10, 756:18, 764:7, 769:20, 772:16, 777:17, 788:14, 791:3, 791:4, 791:5, 791:13, 791:14, 791:20, 792:23, 793:1, 793:11, 793:21, 794:20, 794:25, 795:8, 795:12, 796:2, 796:25, 797:15, 797:20, 797:22, 798:1, 798:3, 798:4, 798:8, 798:9, 798:11, 798:17,

799:10, 807:24, 807:25, 825:5, 875:14, 876:16, 876:22, 886:7, 886:9, 886:16, 886:17, 886:25, 887:7, 887:10, 887:11, 887:16, 887:20, 887:25, 888:22, 888:23, 889:25, 890:2, 890:7, 891:3, 893:12, 893:13, 894:16, 895:3, 895:4, 895:11, 896:14, 896:18, 897:4, 897:5, 898:1, 899:23, 900:13, 901:2, 901:5, 901:15, 902:1, 903:12, 903:18, 903:19, 903:24, 904:5, 904:8, 922:19, 922:22, 923:24, 938:3, 941:6, 941:10, 942:16, 945:14, 945:15, 948:21, 953:6, 954:12, 954:14, 954:16
**responses** [1] - 742:8
**responsibility** [1] - 724:7
**responsive** [1] - 922:5
**rest** [2] - 832:22, 838:24
**restricted** [4] - 888:12, 888:24, 889:21, 893:5
**result** [10] - 750:20, 751:6, 751:20, 754:20, 758:4, 862:16, 901:9, 902:23, 906:13
**resulted** [1] - 810:25
**resulting** [2] - 772:2, 821:23
**results** [41] - 720:10, 729:9, 731:16, 731:18, 741:25, 743:14, 743:15, 752:18, 753:15, 758:13, 762:15, 762:20, 772:16, 772:19, 772:23, 773:5, 775:8, 776:5, 780:25, 781:7, 830:24, 840:20, 842:6, 844:10, 847:10, 847:19, 849:15, 862:19, 887:1, 888:1, 895:19, 905:23, 910:1, 912:7, 935:12, 935:13, 944:2, 944:5, 950:3, 958:20
**resume** [1] - 719:11
**resumed** [4] - 777:5, 803:6, 875:4, 932:4
**retained** [6] - 719:17, 803:18, 806:14, 806:20,

806:24, 867:19
**retention** [1] - 824:12
**retrospective** [7] - 836:13, 837:8, 837:11, 845:21, 847:15, 852:9, 901:22
**retrospectively** [3] - 837:18, 847:11, 847:21
**review** [51] - 717:24, 719:16, 719:17, 722:8, 726:24, 726:25, 741:21, 752:7, 753:12, 775:11, 783:4, 783:19, 783:21, 783:24, 790:18, 797:24, 798:7, 799:8, 800:19, 800:24, 801:7, 801:12, 803:19, 806:20, 816:13, 823:14, 824:24, 825:25, 827:2, 830:15, 870:14, 871:11, 917:20, 918:15, 922:20, 922:22, 923:8, 923:13, 923:14, 923:18, 923:19, 923:20, 926:6, 930:5, 936:25, 939:12, 942:17, 942:19, 943:4, 944:2, 958:4
**reviewed** [54] - 717:6, 719:2, 719:3, 721:12, 722:25, 724:21, 725:16, 727:11, 727:17, 736:25, 752:5, 758:25, 767:11, 783:7, 783:8, 783:17, 783:25, 784:2, 784:4, 787:22, 799:15, 799:18, 799:21, 799:24, 801:10, 826:19, 826:24, 828:2, 848:20, 848:23, 849:2, 849:4, 849:7, 849:12, 849:16, 849:20, 858:19, 871:4, 871:20, 872:2, 875:16, 878:24, 879:11, 886:10, 894:20, 901:23, 912:9, 913:8, 913:21, 917:3, 918:8, 943:13, 946:1, 954:3
**reviewer** [2] - 719:1, 719:8
**reviewing** [3] - 727:10, 727:16, 913:6
**reviews** [6] - 717:12, 727:1, 829:16, 865:11, 868:4, 958:11
**rid** [1] - 732:19

**righ** [1] - 824:24
**right-hand** [9] - 807:5, 846:10, 847:5, 862:6, 880:7, 888:4, 892:22, 902:11
**rinsed** [4] - 795:19, 905:20, 906:17, 906:25
**rise** [9] - 713:4, 776:14, 777:1, 802:18, 803:3, 874:15, 875:1, 931:7, 932:1
**risk** [260] - 714:22, 716:1, 716:4, 720:8, 723:5, 723:8, 724:10, 724:25, 725:5, 725:17, 729:1, 729:2, 734:5, 734:7, 738:6, 742:8, 742:17, 742:18, 742:19, 742:21, 742:23, 743:3, 743:6, 743:17, 743:21, 743:24, 743:25, 744:1, 744:5, 744:8, 744:10, 744:11, 744:12, 744:14, 744:19, 744:20, 744:22, 744:23, 745:6, 745:7, 745:12, 745:19, 746:4, 746:9, 746:11, 746:19, 747:16, 748:15, 751:8, 752:9, 752:11, 753:22, 754:19, 756:18, 756:19, 756:22, 757:3, 757:10, 757:13, 758:18, 759:18, 759:19, 759:23, 760:1, 760:3, 760:11, 760:17, 761:17, 761:21, 762:2, 762:5, 762:8, 764:6, 764:8, 764:21, 765:15, 765:22, 765:23, 766:3, 766:19, 766:20, 766:21, 766:25, 767:2, 767:3, 768:9, 768:13, 768:14, 768:15, 769:2, 769:7, 769:13, 769:14, 770:2, 771:18, 772:20, 772:25, 773:17, 773:18, 774:17, 778:16, 778:19, 778:23, 780:4, 780:6, 780:7, 780:10, 780:22, 781:6, 788:3, 788:6, 791:7, 791:9, 791:17, 791:21, 791:22, 792:2, 792:9, 792:11, 792:17, 793:21, 794:22, 794:23, 795:10,

796:12, 796:19, 797:5, 797:9, 797:12, 801:9, 806:13, 806:23, 811:15, 811:20, 811:25, 822:20, 827:4, 827:20, 829:4, 830:14, 830:16, 830:19, 830:20, 830:21, 830:23, 831:5, 831:8, 831:9, 831:19, 831:20, 831:23, 831:24, 832:10, 832:15, 832:18, 832:23, 833:5, 833:20, 833:25, 834:1, 834:6, 834:16, 834:25, 836:17, 838:7, 838:10, 838:14, 838:17, 838:20, 839:9, 839:14, 839:15, 839:17, 840:5, 840:6, 840:11, 840:13, 840:16, 840:19, 841:5, 841:7, 841:9, 842:1, 842:9, 847:23, 848:5, 848:11, 849:22, 849:24, 850:6, 850:25, 851:5, 851:9, 851:17, 854:15, 854:16, 854:17, 854:19, 854:20, 854:23, 855:1, 855:2, 855:6, 855:9, 855:13, 856:5, 858:11, 859:19, 865:12, 866:17, 868:5, 869:5, 873:19, 873:23, 875:9, 876:9, 876:14, 878:5, 886:11, 888:8, 889:4, 891:16, 892:16, 894:1, 894:18, 895:22, 895:25, 896:3, 898:15, 898:21, 900:3, 900:17, 901:1, 909:3, 910:15, 912:2, 924:18, 924:21, 926:8, 928:20, 933:25, 940:3, 940:10, 940:25, 941:2, 941:21, 942:5, 942:8, 944:4, 945:10, 945:14, 948:20, 949:18, 954:17, 956:10
**Risk** [1] - 910:25
**risks** [9] - 714:21, 734:7, 753:18, 759:21, 759:24, 836:21, 891:17, 893:16, 941:1
**ROBINSON** [1] - 711:15
**role** [6] - 724:7, 752:17, 788:16, 790:13, 927:6, 933:21

**roll** [1] - 892:17
**room** [4] - 900:2, 900:19, 926:20, 927:1
**ROS** [2] - 814:6, 814:10
**ROSE** [1] - 711:21
**Rosenblatt** [2] - 843:11, 843:24
**Rossouw** [1] - 909:23
**Rothman** [6] - 934:6, 934:8, 934:16, 934:24, 935:8, 935:19
**routinely** [1] - 871:4
**RPR** [1] - 711:24
**RR** [2] - 862:16, 897:8
**RRs** [1] - 900:6
**rule** [9] - 779:15, 842:3, 842:8, 850:24, 851:4, 916:25, 917:8, 917:14, 919:9
**ruled** [2] - 916:22, 957:12
**ruling** [2] - 759:1, 789:9
**run** [1] - 771:17
**RUSSONIELLO** [1] - 711:24
**Russoniello** [2] - 961:9, 961:9

**S**

**S/Vincent** [1] - 961:9
**sac** [1] - 818:7
**Saed** [7] - 823:21, 823:23, 824:6, 824:10, 824:20, 825:4, 825:7
**Saed's** [4] - 824:1, 824:19, 825:6, 825:14
**SALES** [1] - 711:5
**sample** [32] - 746:17, 747:2, 753:25, 754:5, 754:16, 760:24, 765:25, 766:2, 768:20, 769:12, 769:16, 771:19, 773:13, 844:12, 855:23, 856:1, 856:8, 857:3, 858:2, 858:19, 858:24, 859:7, 859:14, 859:17, 860:2, 860:3, 860:4, 860:24, 861:9, 861:23
**sand** [1] - 751:5
**Sander** [2] - 892:1, 934:16
**sat** [1] - 795:17
**satisfy** [5] - 784:5, 799:15, 799:18, 799:21,

799:24
**saw** [5] - 779:3, 798:13, 823:11, 823:16, 848:3
**Schools** [1] - 716:6
**science** [6] - 729:6, 739:5, 782:1, 878:5, 900:16, 926:7
**sciences** [1] - 728:5
**scientific** [26] - 717:5, 717:6, 719:9, 719:18, 720:4, 721:1, 723:17, 726:15, 729:24, 737:19, 777:22, 784:25, 787:21, 800:8, 800:25, 801:16, 803:19, 812:20, 812:25, 813:7, 821:20, 826:24, 866:6, 870:21, 922:23, 958:3
**scientist** [6] - 751:11, 813:5, 816:12, 825:15, 825:22, 933:13
**scientists** [4] - 729:21, 745:14, 745:21, 750:9
**screen** [2] - 828:9, 864:24
**scroll** [1] - 820:23
**search** [10] - 727:7, 727:8, 727:14, 804:21, 816:17, 870:19, 870:20, 871:10, 871:11
**searching** [1] - 727:4
**seated** [1] - 713:6
**Seattle** [4] - 715:9, 715:12, 715:21, 718:24
**second** [17] - 720:25, 726:22, 732:3, 732:22, 792:10, 795:4, 808:7, 817:11, 842:19, 848:6, 860:19, 870:10, 884:12, 902:22, 920:4, 935:6
**secondary** [1] - 808:17
**secondhand** [1] - 780:9
**section** [10] - 718:2, 824:19, 832:8, 859:11, 864:13, 864:15, 866:24, 868:24, 914:3, 935:3
**Section** [3] - 869:24, 951:6, 956:16
**SECTION** [1] - 961:4
**see** [118] - 734:22, 734:25, 735:21, 737:11, 741:5, 743:2, 743:13, 744:18, 752:9, 753:18,

753:20, 753:23, 754:1, 755:21, 756:5, 756:11, 757:1, 759:2, 762:20, 764:6, 768:18, 775:21, 775:24, 775:25, 776:1, 776:2, 776:6, 780:20, 781:3, 786:6, 786:9, 792:3, 792:5, 792:9, 792:13, 794:17, 795:3, 795:10, 796:19, 798:23, 805:9, 808:4, 808:12, 808:18, 812:8, 814:9, 814:12, 814:20, 814:25, 815:6, 816:5, 817:9, 819:12, 819:18, 819:19, 820:20, 821:1, 822:3, 822:16, 823:7, 823:8, 823:11, 823:12, 823:15, 823:22, 824:6, 827:16, 828:8, 828:9, 828:24, 838:8, 842:19, 842:20, 847:5, 847:18, 853:1, 853:15, 853:17, 854:3, 855:2, 864:25, 865:25, 869:23, 880:7, 880:9, 881:2, 892:11, 893:7, 895:9, 899:8, 900:7, 901:2, 901:11, 904:16, 905:12, 905:14, 910:21, 913:17, 913:20, 915:25, 916:7, 921:9, 921:13, 921:16, 929:23, 935:1, 935:4, 940:7, 940:25, 942:16, 942:22, 951:15, 953:7, 956:17, 957:5
**seeing** [2] - 802:11, 814:13
**segment** [1] - 815:4
**select** [2] - 732:7, 761:8
**selected** [1] - 740:14
**self** [3] - 733:2, 733:3, 767:25
**self-administered** [3] - 733:2, 733:3, 767:25
**senior** [1] - 723:15
**sense** [1] - 781:15
**sent** [1] - 920:24
**sentence** [16] - 817:12, 832:8, 832:22, 833:16, 846:23, 847:8, 877:17, 880:25, 886:2, 888:6, 889:3, 909:13, 909:14, 910:11, 910:12, 956:23

**sentences** [2] - 878:22, 879:6
**separate** [5] - 757:22, 812:25, 824:21, 825:13, 852:10
**separately** [6] - 747:21, 747:24, 747:25, 748:6, 753:9, 852:6
**series** [1] - 941:7
**serious** [3] - 786:25, 821:20, 944:9
**serous** [21] - 753:6, 753:9, 753:13, 753:17, 753:19, 753:24, 754:7, 761:6, 761:8, 761:17, 761:21, 764:8, 764:14, 764:15, 767:1, 768:13, 781:4, 872:23, 873:3, 873:13, 874:7
**served** [2] - 867:11, 867:16
**Services** [1] - 718:20
**serving** [1] - 738:19
**session** [1] - 730:12
**set** [14] - 721:3, 795:24, 826:12, 830:7, 836:6, 836:24, 840:9, 878:25, 880:21, 886:4, 899:16, 923:23, 935:12, 941:4
**sets** [2] - 863:25, 899:8
**seven** [1] - 755:4
**several** [16] - 733:19, 750:17, 753:8, 777:15, 779:5, 782:13, 785:1, 785:17, 859:3, 912:10, 920:14, 926:19, 926:21, 927:1, 937:23, 939:11
**SEYFARRTH** [1] - 712:7
**shaped** [1] - 795:6
**shapes** [1] - 794:25
**share** [12] - 714:12, 718:6, 719:23, 721:1, 723:22, 724:16, 725:9, 730:9, 741:9, 743:10, 757:24, 927:20
**shared** [10] - 721:4, 721:7, 721:8, 722:23, 726:1, 730:9, 800:4, 800:5, 935:22, 943:19
**sharing** [2] - 713:24, 722:4
**SHARKO** [1] - 711:18
**SHAW** [1] - 712:7

**shift** [1] - 739:25
**short** [1] - 955:19
**shortcomings** [2] - 822:18, 823:1
**shorten** [1] - 798:14
**show** [17] - 747:6, 747:8, 749:15, 785:2, 787:5, 792:18, 794:16, 812:20, 886:11, 892:11, 901:15, 903:12, 903:18, 903:19, 903:24, 933:10, 951:13
**showed** [18] - 723:2, 723:8, 724:23, 725:4, 794:19, 810:24, 813:13, 813:17, 818:18, 823:4, 876:12, 876:22, 886:10, 899:22, 904:4, 904:8, 910:5, 912:5
**Shower** [2] - 720:6
**showing** [9] - 714:10, 762:6, 783:9, 784:25, 793:21, 807:23, 815:18, 940:11
**shown** [6] - 782:16, 785:17, 785:18, 786:3, 787:8, 788:4
**shows** [15] - 723:15, 787:3, 793:21, 795:3, 830:13, 832:18, 836:16, 839:15, 839:16, 852:19, 853:3, 890:6, 905:11, 940:19, 942:3
**sick** [2] - 732:14
**side** [4] - 741:16, 807:5, 880:7, 885:24
**significance** [26] - 745:5, 745:22, 745:23, 772:1, 792:18, 793:5, 810:5, 830:17, 830:22, 831:7, 831:22, 832:12, 837:4, 855:22, 858:12, 859:13, 897:14, 900:22, 906:7, 933:21, 935:15, 947:5, 947:8, 947:9, 948:21
**significant** [63] - 720:8, 721:13, 723:4, 724:25, 746:1, 750:14, 750:15, 750:20, 750:21, 751:15, 751:21, 751:22, 751:23, 760:13, 760:23, 764:16, 764:17, 764:22, 792:20, 793:25, 796:23, 797:10, 797:14, 799:9, 809:18,

844:11, 844:17, 844:19, 845:1, 851:12, 857:5, 872:5, 872:17, 873:12, 874:9, 888:8, 889:4, 889:11, 893:13, 893:19, 893:22, 894:16, 899:13, 901:9, 902:19, 902:24, 903:10, 906:11, 906:13, 907:4, 907:21, 908:10, 908:16, 911:21, 934:1, 934:2, 935:13, 939:13, 940:6, 943:5, 943:14, 945:10, 945:16
**similar** [30] - 721:25, 730:4, 732:17, 762:20, 767:7, 767:24, 768:13, 768:18, 779:3, 780:10, 780:11, 785:3, 795:5, 800:14, 839:3, 847:10, 847:19, 862:16, 876:12, 880:14, 881:1, 881:6, 881:20, 882:11, 883:16, 884:1, 896:23, 912:7, 934:14, 940:7
**similarly** [2] - 941:6, 949:5
**simple** [2] - 860:7, 879:9
**simplicity** [1] - 743:6
**simply** [3] - 899:23, 935:12, 955:10
**single** [3] - 770:5, 795:14, 849:19
**Sister** [6] - 748:19, 770:24, 771:14, 772:19, 849:13, 949:10
**sister** [1] - 771:16
**sit** [3] - 737:21, 825:15, 913:7
**sitting** [1] - 720:19
**situation** [2] - 744:25, 911:10
**six** [5] - 750:24, 755:20, 771:23, 772:9, 869:9
**size** [30] - 733:20, 742:25, 745:18, 746:17, 747:2, 754:5, 754:17, 760:25, 765:25, 768:20, 769:12, 769:16, 771:19, 773:13, 781:5, 785:3, 810:12, 821:25, 844:12, 855:23, 856:2, 856:8, 857:3, 858:2, 876:9, 939:15, 946:7, 948:18

**sizes** [16] - 753:25, 766:2, 852:16, 858:19, 858:24, 859:7, 859:15, 859:17, 860:3, 860:4, 860:24, 861:9, 861:24, 876:13, 939:17
**SKADDEN** [1] - 711:19
**skills** [1] - 721:1
**SLATE** [1] - 711:19
**slide** [11] - 715:5, 715:15, 723:15, 725:8, 726:10, 741:17, 753:16, 753:21, 755:15, 798:15, 802:3
**slides** [2] - 714:7, 802:10
**slight** [1] - 799:11
**slightly** [1] - 834:9
**SLR** [1] - 870:13
**SLRs** [1] - 870:18
**small** [13] - 743:22, 749:24, 759:23, 765:25, 768:20, 768:24, 773:13, 774:20, 775:20, 844:14, 859:14, 915:13, 946:7
**smaller** [9] - 746:21, 753:7, 753:25, 754:4, 754:6, 754:12, 754:16, 769:12, 844:13
**smoke** [1] - 780:9
**smokers** [2] - 758:16, 758:20
**smoking** [1] - 758:20
**smooth** [1] - 797:4
**snapshot** [2] - 938:16
**SO** [1] - 779:23
**someone** [3] - 766:15, 766:16, 891:10
**sometimes** [4] - 739:20, 739:21, 758:7, 935:11
**somewhere** [4] - 738:23, 745:10, 834:21, 838:21
**son** [1] - 933:4
**sorry** [7] - 792:24, 795:1, 797:17, 858:20, 875:23, 915:20, 930:22
**sort** [3] - 830:2, 905:9, 935:14
**sounded** [1] - 837:23
**sounds** [3] - 733:4, 885:11, 951:18
**source** [6] - 754:24, 754:25, 755:2, 756:13, 869:19, 938:4

speaking [4] - 716:18, 717:13, 758:6, 930:3
speaks [1] - 821:3
special [1] - 935:10
specialize [1] - 714:14
specializes [1] - 934:9
specially [1] - 846:14
Species [1] - 814:1
species [3] - 811:1, 813:13, 813:18
specific [10] - 734:2, 759:13, 764:24, 789:17, 820:22, 912:19, 912:25, 913:14, 928:23, 930:15
specifically [18] - 724:5, 736:18, 770:17, 770:25, 782:21, 802:5, 847:25, 860:16, 868:7, 933:20, 938:2, 938:25, 939:6, 942:24, 947:7, 949:12, 957:7, 958:17
specificity [3] - 777:17, 799:11, 799:22
speculating [4] - 815:14, 819:23, 918:23, 919:5
spent [1] - 778:10
spermicidal [2] - 905:21, 906:17
spite [1] - 776:8
spoken [1] - 788:17
spontaneous [1] - 786:24
spread [1] - 784:21
Staff [1] - 925:15
stage [2] - 799:1, 870:18
standard [1] - 830:3
standardized [3] - 755:1, 870:19, 870:20
stands [3] - 742:6, 743:4, 791:25
start [5] - 785:6, 811:12, 812:6, 812:10, 945:21
started [4] - 722:13, 765:12, 780:2, 782:19
starting [4] - 779:18, 862:5, 862:7, 870:11
starts [4] - 790:15, 847:3, 868:12, 909:13
STATE [1] - 711:7
state [10] - 719:17, 786:10, 803:19, 829:16, 829:25, 830:1, 835:9, 859:8, 859:17, 918:25

statement [20] - 822:22, 826:4, 829:10, 830:2, 838:24, 845:15, 863:21, 877:9, 883:3, 884:20, 899:22, 901:4, 926:1, 927:21, 933:2, 933:3, 947:2, 947:7, 951:16, 951:23
statements [3] - 841:16, 932:25
STATES [2] - 711:1, 711:7
states [7] - 809:14, 869:2, 894:19, 935:8, 943:2, 957:7, 957:9
States [1] - 923:10
stating [1] - 730:6
statistic [3] - 734:4, 742:18, 752:23
Statistical [2] - 751:3, 841:15
statistical [46] - 727:18, 729:3, 743:13, 744:2, 745:22, 749:16, 760:12, 766:1, 792:22, 793:19, 793:24, 793:25, 797:4, 830:17, 830:19, 830:22, 830:25, 831:1, 831:7, 831:11, 831:22, 832:4, 832:7, 832:11, 837:4, 839:5, 855:22, 856:12, 856:20, 856:25, 858:11, 859:13, 860:25, 861:10, 861:25, 862:14, 880:21, 886:5, 889:14, 897:14, 900:22, 906:7, 933:21, 948:20
statistically [54] - 720:8, 721:13, 723:4, 724:24, 746:1, 750:14, 750:15, 750:19, 750:21, 751:15, 751:20, 751:23, 760:13, 760:23, 764:16, 764:17, 764:22, 796:23, 797:10, 797:13, 844:10, 844:17, 844:18, 845:1, 851:12, 857:5, 872:5, 872:17, 873:12, 874:8, 889:10, 893:22, 899:13, 901:9, 902:19, 902:24, 903:10, 905:25, 906:11, 906:13, 907:3, 907:21, 908:10, 908:16, 911:21, 934:1,

934:2, 935:13, 939:12, 940:8, 943:5, 943:14, 945:9, 945:16
statistician [1] - 892:8
statisticians [8] - 745:16, 745:23, 750:3, 751:2, 794:5, 838:23, 890:20, 891:21
statistics [5] - 734:3, 734:17, 752:22, 841:5, 934:11
Steering [1] - 711:16
STENOGRAPHIC [1] - 961:6
step [7] - 727:15, 727:16, 730:21, 731:19, 786:15, 795:11, 880:3
step-wise [1] - 795:11
still [6] - 739:1, 775:10, 839:3, 865:18, 893:16, 918:6
stop [2] - 779:15, 860:19
stopped [1] - 765:14
straight [2] - 795:1
strategy [2] - 870:20
stratified [3] - 852:4, 852:20, 852:23
STREET [1] - 711:7
strength [17] - 727:19, 742:23, 757:6, 757:7, 761:25, 762:7, 763:14, 768:17, 771:3, 773:11, 777:16, 778:10, 778:12, 798:16, 799:9, 799:13
strengthening [1] - 939:16
strengths [11] - 736:24, 737:13, 763:7, 764:24, 768:16, 771:2, 773:24, 774:8, 776:9, 855:19, 939:11
stress [11] - 788:17, 788:20, 790:13, 790:15, 811:13, 811:15, 811:16, 811:19, 811:22, 811:23, 811:25
stretch [1] - 773:21
strike [9] - 810:18, 813:16, 826:10, 871:13, 873:8, 891:20, 908:21, 918:12, 951:8
stromal [1] - 810:25
strong [5] - 723:8,

875:21, 876:1, 876:7, 876:8
strongest [1] - 816:11
students [2] - 716:9, 716:10
Studies [1] - 911:3
studies [394] - 714:25, 717:8, 717:9, 717:10, 724:21, 724:23, 727:17, 727:18, 727:24, 728:6, 728:7, 728:14, 728:21, 729:7, 730:18, 731:1, 731:14, 731:21, 732:3, 733:2, 733:5, 733:7, 734:2, 734:6, 735:6, 736:1, 736:10, 736:11, 736:14, 736:20, 736:23, 737:3, 737:8, 737:13, 737:15, 738:22, 739:13, 739:16, 739:17, 739:18, 739:19, 740:2, 740:20, 741:3, 741:5, 741:22, 742:19, 742:25, 743:1, 743:12, 744:7, 745:15, 746:21, 747:10, 747:13, 747:14, 747:17, 747:19, 748:4, 748:6, 748:16, 748:17, 749:3, 749:15, 751:12, 752:3, 752:5, 753:8, 754:4, 754:6, 754:23, 754:25, 755:2, 755:13, 755:15, 755:17, 755:20, 755:21, 755:23, 756:1, 756:2, 756:4, 756:5, 756:7, 756:9, 756:12, 756:13, 756:20, 756:22, 756:24, 757:6, 757:8, 757:11, 757:16, 758:7, 758:25, 759:2, 759:6, 759:9, 759:16, 761:5, 761:11, 761:12, 762:21, 762:25, 763:3, 763:5, 763:7, 763:11, 763:13, 763:18, 765:1, 765:19, 765:20, 769:15, 771:1, 771:10, 773:3, 773:12, 773:20, 773:22, 773:25, 774:10, 774:12, 774:16, 774:20, 774:21, 774:22, 775:2, 775:12, 775:16, 775:17, 776:3, 776:10, 780:20, 780:22, 781:2, 781:7, 782:17,

782:24, 784:25, 785:2,
786:3, 786:5, 786:8,
786:18, 787:5, 787:8,
788:1, 788:3, 788:8,
788:9, 788:10, 790:19,
791:21, 794:15, 796:2,
796:5, 796:8, 796:10,
796:14, 797:7, 797:11,
797:17, 797:19, 797:25,
798:1, 798:2, 798:8,
801:24, 806:17, 806:19,
807:2, 807:14, 807:15,
807:17, 808:1, 815:21,
815:22, 815:24, 816:10,
816:11, 816:14, 816:15,
816:18, 816:19, 821:10,
823:20, 825:23, 826:15,
826:16, 827:7, 827:18,
828:1, 829:3, 830:13,
836:8, 836:9, 836:12,
836:13, 836:14, 836:18,
837:2, 837:8, 837:11,
842:14, 842:15, 844:2,
844:5, 844:9, 844:13,
845:5, 845:10, 845:22,
845:23, 847:16, 847:25,
848:1, 848:4, 848:9,
849:16, 849:20, 850:15,
850:23, 851:1, 851:6,
851:18, 852:1, 852:3,
852:10, 852:11, 853:4,
853:6, 853:11, 854:5,
854:24, 855:1, 855:17,
855:18, 855:20, 855:22,
855:24, 856:12, 856:20,
856:25, 857:16, 858:8,
858:18, 858:23, 859:1,
859:14, 860:4, 860:11,
860:13, 860:15, 860:21,
861:4, 862:11, 862:15,
862:17, 862:18, 862:25,
864:2, 864:19, 868:23,
869:15, 869:16, 869:18,
869:22, 870:22, 871:2,
871:5, 871:20, 872:2,
872:4, 872:9, 872:16,
872:22, 873:1, 873:3,
873:8, 873:10, 876:12,
876:25, 877:3, 877:10,
877:20, 877:25, 878:7,
878:8, 879:13, 880:14,
880:15, 880:20, 881:1,
881:5, 881:6, 881:13,
881:21, 882:12, 882:17,

882:19, 882:25, 883:1,
883:10, 883:17, 883:21,
884:2, 884:8, 884:11,
884:16, 884:18, 884:21,
884:24, 885:3, 885:5,
885:13, 886:4, 886:10,
886:13, 886:16, 886:17,
886:24, 886:25, 887:9,
887:15, 887:19, 887:24,
887:25, 894:20, 894:22,
900:17, 903:17, 904:11,
907:12, 908:4, 908:17,
910:14, 911:7, 911:17,
911:20, 911:21, 912:1,
912:3, 912:5, 912:9,
912:20, 913:1, 913:8,
913:15, 913:18, 913:20,
920:14, 928:22, 928:23,
928:25, 933:22, 936:9,
936:20, 938:4, 938:19,
939:16, 939:22, 940:2,
940:9, 940:10, 940:13,
940:14, 940:16, 940:20,
941:5, 943:4, 944:5,
944:8, 946:15, 948:11,
949:13, 956:4, 958:21,
958:22
**studies'** [1] - 861:13
**Study** [16] - 716:20,
741:19, 748:19, 748:22,
763:19, 767:25, 768:19,
770:24, 771:15, 772:19,
848:21, 848:24, 849:5,
849:13, 949:10
**study** [324] - 714:20,
715:25, 716:3, 716:16,
721:12, 727:19, 728:17,
728:19, 728:22, 729:6,
730:22, 731:17, 732:9,
732:16, 732:22, 732:23,
732:24, 732:25, 733:15,
733:23, 734:3, 734:11,
734:12, 734:14, 734:17,
734:21, 734:24, 735:8,
736:17, 737:12, 737:18,
738:2, 738:7, 738:14,
738:23, 738:24, 739:2,
739:4, 739:9, 739:14,
739:20, 739:22, 740:15,
741:8, 741:19, 742:4,
742:7, 743:18, 744:25,
745:25, 747:14, 747:18,
747:19, 747:22, 748:7,

748:20, 748:23, 749:4,
749:5, 749:6, 751:9,
751:15, 751:22, 752:14,
752:18, 753:13, 753:15,
753:23, 755:6, 755:16,
755:18, 756:1, 757:22,
758:3, 758:5, 758:16,
759:11, 759:13, 760:1,
760:9, 761:16, 762:16,
762:19, 763:1, 764:17,
764:24, 765:4, 765:6,
765:12, 766:4, 766:5,
766:8, 767:10, 767:14,
767:17, 767:20, 767:23,
768:21, 768:22, 770:20,
771:2, 771:3, 771:5,
771:12, 771:14, 771:15,
771:17, 771:22, 771:25,
772:10, 772:16, 772:18,
773:2, 773:5, 773:6,
774:24, 775:12, 775:14,
780:6, 780:19, 785:19,
786:21, 789:2, 789:13,
789:23, 789:24, 790:4,
790:19, 791:11, 791:13,
791:22, 797:7, 808:10,
808:12, 808:13, 808:22,
809:20, 810:5, 810:16,
810:19, 811:5, 812:2,
812:7, 812:14, 812:16,
813:1, 813:2, 813:11,
813:12, 813:17, 814:3,
816:23, 817:6, 817:17,
817:20, 817:24, 817:25,
818:1, 818:2, 818:4,
818:6, 819:2, 819:6,
820:1, 820:3, 821:19,
822:2, 822:11, 822:20,
823:1, 823:3, 823:4,
823:10, 823:16, 823:21,
825:4, 825:7, 825:9,
825:10, 828:2, 828:8,
828:11, 828:13, 828:17,
829:1, 829:22, 830:6,
830:9, 830:15, 830:18,
836:3, 836:6, 836:7,
837:7, 837:17, 838:6,
838:7, 839:9, 839:12,
839:15, 839:18, 839:24,
840:5, 840:10, 840:16,
840:17, 840:18, 840:20,
840:23, 840:25, 841:1,
841:8, 841:25, 842:5,
842:19, 842:22, 847:24,

848:15, 848:20, 849:1,
849:7, 849:12, 851:11,
851:19, 852:4, 852:21,
852:25, 853:3, 853:23,
856:2, 856:3, 857:4,
858:3, 858:4, 862:10,
862:22, 862:23, 863:2,
863:3, 863:7, 863:19,
863:23, 863:24, 863:25,
868:11, 868:13, 868:17,
868:19, 869:18, 875:16,
875:25, 876:11, 876:22,
878:15, 881:24, 882:15,
883:2, 884:14, 888:14,
888:20, 890:1, 891:24,
894:2, 895:1, 895:7,
895:8, 895:10, 896:13,
897:15, 897:22, 901:21,
901:22, 903:12, 904:1,
904:21, 906:20, 906:23,
907:11, 907:18, 908:1,
909:22, 909:25, 910:22,
912:15, 912:22, 913:6,
923:6, 924:15, 937:24,
938:21, 939:1, 939:2,
945:8, 945:13, 946:7,
946:20, 947:22, 947:24,
948:4, 948:5, 948:7,
948:8, 948:14, 948:18,
948:23, 949:5, 949:10,
950:3, 954:8, 955:7,
955:22, 956:7, 956:20,
958:1, 958:6, 958:17
**study's** [1] - 744:19
**Subcommittee** [1] -
724:3
**subcommittee** [6] -
718:22, 925:15, 925:16,
925:23, 927:21, 928:18
**subgroup** [2] - 735:1,
852:17
**subgroups** [2] - 747:21,
948:22
**submission** [1] - 930:20
**submit** [2] - 724:12,
724:14
**submitted** [5] - 722:21,
723:12, 922:21, 922:25,
956:1
**subsequent** [1] - 956:25
**subset** [3] - 766:5, 873:1,
887:17
**substance** [9] - 785:10,

786:11, 795:22, 891:22, 908:25, 915:11, 918:7, 919:7, 928:1
**substances** [13] - 784:20, 785:9, 785:10, 785:12, 785:14, 786:4, 786:7, 914:19, 914:21, 914:24, 915:2, 915:5, 915:8
**subsume** [1] - 756:3
**subtotal** [3] - 854:3, 854:4
**subtype** [2] - 729:4, 761:10
**subtypes** [2] - 753:2, 876:18
**sufficed** [1] - 908:24
**sufficient** [6] - 774:17, 781:24, 857:4, 858:10, 916:5, 918:5
**suggest** [5] - 754:15, 829:3, 839:21, 906:7, 918:21
**suggested** [1] - 737:2
**suggesting** [6] - 829:11, 840:15, 885:2, 900:17, 908:8, 922:9
**suggestion** [1] - 918:14
**suggestive** [1] - 944:10
**suggests** [7] - 744:21, 761:17, 810:17, 810:20, 840:10, 863:25, 940:6
**suited** [1] - 737:19
**sum** [1] - 761:15
**summarize** [3] - 715:4, 715:16, 801:22
**summarized** [1] - 737:16
**summarizing** [1] - 724:22
**summary** [8] - 734:4, 734:8, 734:17, 756:18, 757:2, 798:25, 852:16, 940:3
**supplement** [1] - 812:3
**supplemental** [3] - 789:5, 789:10, 789:13
**supplemented** [1] - 955:14
**support** [6] - 787:22, 788:8, 788:10, 815:25, 820:2, 821:20
**supporting** [1] - 816:11
**supposedly** [1] - 815:24

**surely** [1] - 835:10
**surety** [2] - 838:24, 839:4
**surface** [2] - 785:20, 818:19
**surgery** [2] - 785:12, 785:13
**surgically** [1] - 818:6
**surrounding** [1] - 753:5
**survivorship** [1] - 718:10
**SUSAN** [1] - 711:18
**sustained** [1] - 800:22
**sworn** [2] - 713:11, 824:17
**synthesizing** [1] - 864:18
**system** [5] - 784:18, 784:21, 784:22, 817:3, 822:8
**systematic** [26] - 717:24, 722:8, 726:12, 726:24, 726:25, 727:1, 759:1, 800:19, 801:7, 804:21, 806:20, 808:16, 816:13, 825:25, 829:16, 865:11, 868:3, 870:14, 912:14, 923:13, 923:14, 923:19, 923:20, 926:6, 942:17, 942:19

**T**

**tab** [1] - 808:14
**table** [22] - 741:16, 749:12, 791:25, 793:4, 895:10, 896:15, 896:17, 896:21, 896:22, 896:23, 899:18, 899:21, 900:2, 901:11, 901:13, 901:16, 901:17, 903:14, 903:15, 908:3, 941:25, 956:11
**Table** [14] - 728:12, 852:16, 852:23, 895:9, 897:1, 897:25, 898:6, 898:11, 901:25, 904:25, 907:15, 908:3, 942:1, 953:4
**tables** [9] - 713:25, 728:11, 728:15, 740:3, 740:6, 740:12, 749:11, 912:21, 913:3
**Taher** [9] - 755:8, 761:19, 944:19, 954:24, 955:7, 955:22, 956:3, 958:1, 958:6
**talc** [148] - 721:14,

725:13, 725:15, 725:22, 727:25, 728:2, 764:2, 770:18, 771:22, 772:4, 782:22, 785:3, 785:15, 785:16, 785:22, 785:24, 786:2, 786:6, 786:18, 786:20, 786:25, 787:4, 787:9, 787:22, 795:16, 795:18, 805:2, 808:2, 808:15, 808:23, 809:6, 809:11, 809:20, 810:6, 810:8, 810:11, 810:17, 810:20, 810:24, 813:14, 813:19, 814:20, 817:1, 817:7, 817:13, 817:21, 818:9, 818:11, 818:14, 818:17, 820:6, 821:4, 821:9, 821:13, 821:17, 821:22, 823:17, 824:15, 825:19, 826:14, 827:3, 829:4, 829:12, 829:23, 836:17, 839:8, 842:4, 842:9, 849:22, 850:17, 851:13, 851:17, 852:20, 853:21, 862:14, 872:6, 872:19, 873:13, 877:25, 883:22, 886:12, 887:4, 887:6, 890:2, 890:8, 890:13, 893:6, 893:11, 893:20, 894:17, 895:24, 896:4, 898:2, 898:15, 898:21, 899:25, 900:11, 901:7, 901:14, 902:22, 903:2, 904:13, 905:9, 905:16, 905:22, 905:25, 906:15, 907:6, 907:9, 908:7, 908:8, 911:22, 912:1, 912:9, 914:12, 915:22, 917:17, 918:5, 918:7, 923:2, 928:19, 936:1, 936:7, 937:3, 937:16, 937:18, 943:6, 943:15, 944:3, 944:9, 946:6, 946:7, 949:3, 949:8, 949:12, 949:14, 949:21, 949:22, 950:6, 951:10, 951:23, 952:6, 952:17, 953:8, 957:3
**Talc** [2] - 814:2, 905:1
**talc's** [1] - 822:13
**talcum** [92] - 714:19, 714:23, 719:18, 719:22, 720:4, 722:2, 723:3,

724:10, 724:18, 725:23, 726:8, 726:20, 726:23, 727:25, 730:14, 730:24, 731:8, 732:19, 735:15, 736:5, 736:8, 739:5, 742:21, 743:25, 746:6, 752:12, 757:3, 758:1, 761:21, 763:23, 765:2, 774:13, 775:22, 776:11, 777:11, 779:3, 780:23, 782:6, 782:10, 782:14, 782:24, 783:2, 783:6, 784:5, 784:11, 784:12, 784:16, 786:12, 787:18, 790:3, 790:21, 791:9, 791:24, 793:7, 795:14, 800:9, 801:1, 801:8, 801:12, 803:20, 803:23, 803:25, 804:4, 804:24, 805:5, 806:1, 806:13, 806:23, 807:20, 816:1, 818:6, 826:21, 827:19, 845:9, 847:23, 848:10, 859:18, 872:12, 875:21, 876:1, 876:7, 878:5, 888:25, 904:18, 910:9, 917:1, 926:7, 937:20, 938:12, 945:11, 948:24, 948:25
**talks** [2] - 839:18, 902:4
**target** [1] - 822:9
**tasked** [1] - 913:13
**teach** [1] - 716:9
**teaching** [1] - 730:12
**televised** [1] - 929:14
**television** [1] - 930:5
**temporality** [3] - 777:16, 799:10, 799:19
**temporary** [3] - 813:20, 815:1, 815:12
**ten** [3] - 717:11, 730:16, 759:20
**tend** [5] - 731:14, 746:20, 754:2, 844:13, 844:14
**term** [15] - 732:24, 745:22, 760:12, 766:1, 796:13, 817:1, 844:18, 916:10, 916:11, 941:16, 942:7, 951:11, 951:24, 952:5, 952:16
**terms** [14] - 717:4, 727:7, 757:2, 760:22, 773:11, 795:8, 804:13, 821:24,

830:13, 856:7, 860:6, 907:19, 911:12, 911:13
**terribly** [1] - 793:23
**Terry** [22] - 757:18, 757:21, 760:9, 791:12, 791:22, 875:16, 875:20, 876:6, 876:25, 877:5, 877:24, 878:4, 878:15, 883:6, 888:3, 888:18, 890:6, 893:8, 893:12, 904:1, 947:24, 948:4
**TERSIGNI** [1] - 711:18
**test** [11] - 735:15, 735:20, 793:24, 793:25, 830:19, 830:24, 831:12, 891:11, 891:14, 940:1, 940:8
**tested** [1] - 738:14
**testified** [10] - 713:12, 720:14, 823:23, 857:25, 908:20, 908:23, 914:8, 922:13, 927:22, 953:14
**testify** [2] - 789:9, 927:6
**testifying** [3] - 820:8, 820:9, 829:24
**testimony** [27] - 714:6, 724:2, 789:8, 789:16, 801:15, 802:4, 805:15, 807:3, 814:18, 822:25, 824:2, 824:18, 825:6, 825:15, 844:22, 850:11, 856:16, 911:17, 913:16, 913:23, 913:24, 914:2, 926:4, 938:9, 952:2, 952:20, 955:20
**testing** [15] - 729:3, 782:17, 783:8, 783:10, 783:19, 783:21, 783:24, 804:13, 830:25, 831:1, 891:6, 891:8, 891:10, 935:15
**tests** [9] - 786:9, 839:5, 869:1, 889:14, 891:15, 891:16, 947:5, 947:8, 947:10
**text** [2] - 793:4, 793:14
**THE** [84] - 711:1, 711:8, 713:4, 713:5, 719:14, 740:6, 769:17, 769:23, 770:16, 770:21, 771:5, 771:7, 771:9, 776:13, 776:14, 777:1, 777:2, 778:20, 778:21, 778:22,

779:10, 779:14, 779:16, 779:17, 779:23, 782:19, 782:23, 783:16, 789:10, 789:12, 789:17, 789:21, 790:9, 798:25, 800:22, 802:2, 802:8, 802:12, 802:16, 802:18, 803:3, 803:4, 805:23, 824:23, 825:2, 825:8, 826:8, 840:22, 841:3, 841:4, 841:18, 850:7, 850:9, 850:10, 861:17, 864:24, 864:25, 871:15, 871:17, 874:14, 874:15, 875:1, 875:2, 885:19, 914:5, 914:9, 922:16, 926:16, 928:10, 928:16, 929:6, 931:5, 931:7, 932:1, 932:2, 932:21, 941:14, 946:22, 950:19, 955:16, 959:5, 959:7, 961:4, 961:6
**themselves** [8] - 733:5, 781:3, 785:10, 818:12, 826:17, 889:12, 954:13, 954:20
**theoretical** [3] - 765:1, 775:4, 775:10
**therapeutic** [1] - 810:9
**Therapy** [1] - 910:25
**therapy** [3] - 780:5, 909:8, 910:15
**therefore** [4] - 751:16, 795:23, 810:10, 895:3
**therein** [1] - 804:1
**third** [7] - 792:10, 795:4, 866:10, 866:25, 903:1, 922:4, 949:10
**Third** [1] - 934:23
**thirds** [1] - 772:12
**THOMAS** [1] - 712:7
**thorough** [2] - 904:11, 926:6
**thoughts** [1] - 730:14
**thousand** [1] - 733:12
**thousands** [2] - 735:17, 747:4
**three** [28] - 735:13, 748:17, 748:21, 748:22, 756:8, 763:5, 763:7, 763:18, 793:19, 815:22, 817:8, 836:13, 842:15, 849:16, 853:6, 854:20,

854:25, 877:10, 877:25, 878:9, 882:16, 883:9, 897:8, 919:10, 922:5, 945:3, 949:13, 954:16
**threshold** [3] - 794:20, 794:22, 794:23
**throughout** [2] - 714:10, 933:14
**throw** [1] - 933:15
**tie** [1] - 730:13
**TIERNAN** [3] - 713:10, 777:5, 932:4
**tight** [1] - 754:9
**timely** [1] - 955:14
**Timing** [1] - 904:25
**Timothy** [1] - 934:17
**TISI** [1] - 711:14
**tissue** [3] - 811:13, 811:16, 811:17
**tissues** [1] - 817:16
**title** [1] - 812:8
**TITLE** [1] - 961:4
**TO** [2] - 961:4, 961:5
**today** [28] - 713:22, 714:7, 714:8, 719:23, 723:23, 730:10, 800:4, 801:23, 820:5, 820:8, 820:9, 825:15, 868:14, 871:24, 875:17, 890:19, 891:19, 891:21, 908:20, 918:3, 919:4, 926:20, 935:22, 943:19, 957:11, 957:17, 957:20, 957:23
**together** [10] - 728:15, 740:3, 740:12, 740:19, 766:12, 857:18, 860:5, 860:7, 860:15, 863:10
**tomorrow** [1] - 850:12
**took** [7] - 759:17, 777:9, 807:4, 865:17, 882:11, 883:14, 934:11
**tool** [6] - 743:13, 744:3, 749:16, 750:3, 792:22, 793:20
**tools** [1] - 745:24
**top** [20] - 744:7, 753:16, 754:2, 754:8, 755:7, 756:12, 760:23, 792:15, 795:5, 813:24, 834:18, 842:18, 842:20, 846:22, 862:6, 868:24, 870:3, 892:2, 910:11, 934:24
**topic** [4] - 826:17,

950:24, 952:25, 954:23
**topics** [1] - 868:4
**total** [14] - 733:15, 796:9, 796:15, 796:18, 825:25, 856:1, 862:12, 894:17, 898:19, 900:10, 901:8, 901:13, 941:17, 953:7
**totality** [15] - 727:6, 736:4, 736:9, 746:14, 751:14, 752:20, 754:20, 756:23, 757:19, 762:15, 797:24, 798:7, 839:1, 872:13, 928:24
**touch** [1] - 761:4
**toward** [1] - 949:19
**towards** [3] - 770:18, 949:20, 949:25
**toxicology** [2] - 820:25, 951:19
**Trabert** [3] - 892:6, 892:13, 892:18
**track** [1] - 940:9
**tract** [2] - 784:19, 785:4
**traditional** [1] - 906:3
**trained** [2] - 733:6, 934:13
**training** [1] - 934:15
**TRANSCRIPT** [1] - 961:5
**transcript** [7] - 824:5, 824:7, 824:8, 824:17, 824:22, 825:14, 914:8
**TRANSCRIPTION** [1] - 961:6
**transcripts** [2] - 824:24, 824:25
**Transdisciplinary** [1] - 718:24
**transformation** [1] - 811:3
**transplant** [1] - 715:23
**travel** [2] - 927:15, 927:16
**treatment** [2] - 787:3, 808:16
**trend** [20] - 792:24, 793:8, 793:18, 886:20, 886:25, 887:10, 887:12, 888:11, 888:17, 889:20, 890:12, 893:3, 893:4, 893:19, 893:22, 899:16, 953:15, 953:19, 954:2
**Trend** [4] - 793:3, 793:6, 793:13, 953:14

trending [1] - 940:21
trends [2] - 891:14, 891:15
TRENTON [1] - 711:7
Trial [2] - 779:6, 780:3
trial [8] - 714:25, 735:14, 735:20, 794:7, 891:7, 910:2, 910:5, 910:8
trials [14] - 717:2, 717:10, 735:11, 735:13, 735:22, 736:2, 736:15, 870:21, 882:24, 883:2, 884:13, 910:13, 911:6, 911:14
Trials [1] - 911:2
tried [1] - 738:10
trouble [1] - 813:9
true [51] - 770:23, 803:22, 805:3, 806:8, 811:18, 830:22, 832:10, 832:18, 832:23, 833:5, 834:5, 838:14, 838:20, 840:6, 841:9, 842:1, 843:2, 849:19, 850:24, 851:5, 851:15, 854:15, 855:5, 855:11, 857:11, 861:11, 861:25, 865:14, 868:21, 869:12, 874:9, 883:23, 884:7, 884:24, 886:21, 887:1, 887:2, 894:11, 901:15, 903:3, 924:25, 929:1, 952:1, 952:4, 958:7
True [13] - 803:21, 805:2, 811:14, 827:5, 851:14, 860:25, 887:1, 899:14, 904:5, 904:8, 911:23, 912:4, 951:25
truly [1] - 854:23
trust [1] - 863:21
truth [2] - 743:18, 912:18
try [5] - 728:7, 737:24, 773:20, 803:15, 932:8
trying [15] - 726:16, 741:4, 750:10, 758:8, 813:7, 819:14, 837:24, 840:8, 840:24, 854:24, 878:14, 889:16, 889:17, 889:18, 955:10
tube [1] - 786:13
tubes [9] - 784:17, 785:4, 785:5, 785:7, 785:8, 795:17, 897:6, 900:16,

900:18
tumor [1] - 810:10
tumors [2] - 810:12, 821:5
turn [16] - 809:25, 846:4, 846:9, 846:21, 862:4, 867:22, 868:10, 870:7, 880:4, 894:13, 895:9, 904:21, 908:1, 910:21, 916:9, 956:20
twice [1] - 747:20
two [42] - 717:19, 721:8, 726:1, 731:20, 733:25, 746:15, 747:14, 747:17, 756:12, 772:11, 772:13, 774:10, 779:11, 784:23, 786:21, 789:4, 793:2, 794:18, 796:3, 796:16, 805:10, 806:17, 817:18, 822:14, 828:13, 838:21, 862:22, 863:2, 863:10, 867:19, 878:22, 879:6, 889:13, 891:15, 903:2, 908:17, 921:13, 940:20, 941:3, 949:13, 953:10, 958:20
Type [1] - 911:1
type [28] - 726:16, 727:19, 732:3, 732:9, 733:23, 734:20, 735:8, 736:17, 737:18, 757:22, 758:11, 761:9, 775:18, 786:8, 868:19, 877:18, 880:12, 880:14, 881:1, 881:6, 881:11, 881:20, 882:11, 883:16, 884:1, 884:15, 887:19, 904:25
typed [2] - 882:5, 882:8
types [22] - 717:7, 729:24, 730:22, 730:23, 731:20, 735:6, 736:1, 737:8, 737:15, 740:15, 741:11, 753:3, 753:7, 753:23, 759:21, 762:14, 775:19, 775:24, 775:25, 776:2, 786:21, 795:7
typically [1] - 837:20
Tzonou [1] - 843:13

U

U-shaped [1] - 795:6
U.S [6] - 711:25, 718:18, 718:19, 724:2, 730:2,

864:11
U.S.C [1] - 961:4
unadjusted [2] - 912:2, 912:6
under [13] - 753:19, 757:18, 766:9, 814:3, 820:25, 823:20, 848:6, 869:10, 899:24, 901:8, 943:21, 944:1, 947:5
unexposed [4] - 862:14, 863:8, 954:18, 954:19
unit [1] - 814:10
UNITED [2] - 711:1, 711:7
United [1] - 923:9
universe [14] - 731:18, 743:13, 743:15, 744:22, 745:8, 754:21, 831:20, 839:1, 839:13, 839:18, 840:3, 840:7, 840:18, 854:23
University [3] - 715:9, 715:14, 716:6
university [1] - 806:18
unless [2] - 890:23, 891:3
unlikely [2] - 765:4, 795:18
unpack [1] - 873:22
unpublished [14] - 877:20, 877:25, 878:7, 878:9, 879:13, 881:13, 881:15, 882:9, 882:14, 882:17, 883:9, 884:1, 884:19, 884:23
unusual [1] - 747:6
up [65] - 715:5, 717:2, 717:7, 720:19, 726:10, 729:5, 733:9, 748:12, 755:21, 755:25, 761:15, 768:4, 784:19, 785:4, 785:7, 785:14, 787:3, 792:13, 795:1, 795:24, 798:14, 801:11, 802:11, 803:16, 827:15, 845:25, 848:6, 848:7, 860:7, 864:14, 864:24, 866:17, 872:14, 872:21, 875:11, 875:24, 878:10, 878:18, 878:20, 882:5, 882:8, 894:25, 895:18, 896:7, 899:5, 900:19, 903:15, 917:17, 919:12, 924:6,

929:23, 933:10, 933:15, 934:22, 936:9, 936:13, 939:5, 940:17, 940:24, 941:11, 942:23, 951:3, 953:2, 955:17, 956:13
up-to-date [1] - 866:17
update [6] - 749:7, 763:24, 765:11, 765:20, 870:13, 870:16
Update [1] - 718:9
updated [4] - 727:14, 764:2, 768:5, 769:6
upper [8] - 743:9, 745:2, 847:5, 853:16, 853:17, 854:9, 854:11, 855:8
upside [1] - 896:10
USDJ [1] - 711:8
useful [6] - 736:20, 736:22, 737:15, 745:16, 755:3, 869:23
user [3] - 765:13, 766:16, 768:7
users [43] - 744:13, 744:14, 757:3, 757:4, 757:13, 757:14, 764:9, 766:12, 766:14, 778:17, 778:18, 780:23, 791:17, 791:25, 793:15, 793:24, 794:1, 794:3, 794:5, 794:6, 796:20, 796:21, 873:18, 873:19, 888:11, 888:13, 889:1, 889:6, 889:9, 889:12, 889:21, 890:16, 890:24, 891:2, 891:4, 891:18, 893:6, 902:7, 945:12, 949:22
uses [7] - 873:18, 887:5, 897:7, 898:21, 898:24, 899:2, 899:5
utilize [1] - 735:10

V

vaginally [1] - 817:7
valid [5] - 751:6, 756:7, 864:1, 889:10
Value [37] - 749:13, 749:14, 749:15, 749:17, 749:20, 749:21, 749:24, 750:4, 750:13, 750:22, 750:23, 751:5, 751:12, 751:16, 752:24, 793:15, 831:15, 832:5, 889:11, 889:13, 893:15, 897:13,

1000

897:18, 899:8, 899:11, 899:18, 900:4, 933:25, 953:14, 953:21, 954:2, 954:7, 954:18, 954:19, 954:21
**value** [2] - 734:20, 902:19
**values** [3] - 814:7, 832:18, 899:16
**Values** [9] - 751:8, 751:10, 793:1, 793:2, 794:19, 850:5, 899:19, 900:25, 954:9
**variability** [2] - 746:22, 860:13
**variable** [11] - 733:22, 738:15, 746:25, 748:9, 749:2, 758:8, 758:11, 770:5, 772:22, 776:4, 894:15
**variables** [17] - 731:5, 758:3, 758:4, 758:6, 758:9, 758:10, 758:23, 759:9, 759:10, 762:19, 770:2, 868:7, 870:2, 912:3, 912:10, 913:3, 913:20
**variate** [1] - 894:15
**various** [10] - 758:25, 761:4, 761:11, 762:10, 778:9, 782:16, 859:14, 877:19, 880:13, 881:12
**vary** [1] - 940:2
**version** [2] - 881:9, 882:13
**versus** [10] - 744:1, 744:13, 744:14, 750:23, 751:1, 757:13, 761:8, 764:9, 856:3, 891:11
**Vice** [2] - 926:22, 927:23
**victims** [2] - 932:18, 932:22
**view** [2] - 890:6, 910:9
**viewed** [1] - 850:12
**VINCENT** [1] - 711:24
**Vincent** [1] - 961:9
**VIRGINIA** [1] - 711:12
**virtually** [1] - 750:24
**visualize** [1] - 741:2
**visually** [1] - 780:21
**vitae** [1] - 713:25
**vitro** [3] - 787:25, 788:10, 823:20

**voice** [1] - 803:15
**volition** [1] - 933:12
**VOLUME** [1] - 711:5
**volume** [2] - 808:8, 818:5
**Volume** [8] - 808:8, 811:9, 811:11, 827:11, 827:13, 921:4, 921:5
**vote** [1] - 919:2

**W**

**walk** [3] - 726:11, 763:13, 778:8
**wants** [1] - 914:6
**Washington** [3] - 715:9, 715:14, 716:6
**WASHINGTON** [2] - 711:20, 712:7
**watched** [1] - 890:13
**ways** [8] - 715:25, 793:2, 793:19, 797:16, 847:10, 847:20, 890:10, 890:17
**WCRF** [10] - 867:15, 868:16, 881:25, 882:2, 883:4, 883:19, 884:6, 885:3, 885:15, 886:1
**weaker** [1] - 769:4
**weaknesses** [10] - 727:19, 736:24, 763:8, 763:15, 765:7, 767:6, 768:16, 768:18, 769:1, 769:22
**website** [1] - 722:22
**week** [6] - 724:8, 766:13, 766:17, 797:12, 873:18
**weekly** [1] - 747:25
**weeks** [1] - 822:10
**weigh** [1] - 772:18
**weighed** [3] - 729:16, 777:19, 799:13
**weight** [10] - 718:1, 718:3, 798:20, 799:9, 799:11, 846:25, 847:9, 847:15, 847:19
**WEIL** [1] - 712:4
**Weiss** [1] - 843:7
**whereby** [1] - 822:8
**wherein** [1] - 737:18
**WHI** [1] - 948:23
**white** [1] - 747:22
**Whittemore** [1] - 843:2
**whole** [2] - 929:25, 942:3
**wide** [4] - 743:23, 753:23, 793:23, 844:14

**widely** [1] - 744:4
**wider** [2] - 754:4, 831:12
**WILLIAMS** [53] - 711:21, 779:7, 779:13, 779:22, 783:11, 789:1, 798:22, 800:20, 801:25, 803:9, 805:21, 811:10, 820:17, 824:21, 825:11, 825:12, 826:6, 827:12, 828:4, 841:2, 841:11, 841:17, 850:14, 856:15, 861:15, 861:18, 865:22, 871:13, 871:18, 874:12, 875:7, 878:20, 885:18, 885:20, 898:12, 914:10, 922:12, 924:3, 928:6, 928:14, 928:17, 929:8, 931:1, 932:20, 946:9, 946:17, 950:17, 950:22, 951:3, 953:2, 955:6, 955:21, 959:3
**Williams** [7] - 869:9, 913:18, 933:24, 937:9, 946:12, 955:19, 960:9
**Williams'** [2] - 945:21, 947:19
**willing** [1] - 723:16
**wise** [1] - 795:11
**wishes** [1] - 818:3
**witness** [4] - 713:10, 720:15, 720:23, 922:13
**WITNESS** [13] - 719:14, 769:23, 770:21, 771:7, 778:21, 779:16, 782:23, 802:12, 841:4, 850:9, 864:25, 871:17, 914:9
**Witness** [1] - 959:9
**WITNESSES** [1] - 960:6
**witnesses'** [1] - 789:4
**WOLFSON** [1] - 711:8
**woman** [10] - 737:10, 775:22, 785:23, 856:2, 892:13, 905:16, 905:18, 906:16, 906:20, 933:4
**women** [54] - 716:2, 723:2, 723:6, 724:23, 725:2, 732:23, 733:7, 733:12, 734:14, 734:15, 735:17, 747:23, 748:10, 749:1, 749:7, 752:12, 752:13, 753:9, 754:6, 763:20, 765:5, 766:6, 766:7, 766:12, 767:21,

767:24, 768:22, 770:8, 771:21, 771:23, 772:4, 772:8, 774:25, 780:4, 782:25, 785:11, 785:13, 786:1, 788:1, 788:4, 791:23, 792:3, 796:11, 856:3, 873:10, 874:5, 900:24, 905:3, 906:21, 907:6, 945:10, 949:21
**women's** [2] - 714:15, 720:25
**Women's** [12] - 716:13, 716:15, 716:19, 735:12, 738:17, 748:19, 767:12, 769:23, 779:6, 780:3, 849:9, 910:1
**wondering** [1] - 814:25
**Wong** [1] - 843:17
**word** [19] - 742:12, 750:10, 806:25, 834:15, 839:4, 847:18, 861:1, 861:3, 885:7, 886:3, 896:18, 930:9, 930:12, 930:16, 930:17, 930:18, 930:20, 932:22
**word-for-word** [1] - 886:3
**wording** [2] - 930:19, 930:24
**words** [12] - 743:2, 827:5, 851:25, 878:25, 879:12, 882:10, 882:13, 883:16, 883:25, 884:1, 884:4, 950:3
**works** [1] - 739:21
**workshop** [3] - 822:19, 822:22, 823:13
**World** [19] - 717:19, 717:22, 718:7, 718:8, 718:13, 737:21, 739:7, 865:3, 865:5, 865:8, 865:22, 867:8, 872:10, 879:16, 879:22, 881:4, 881:14, 881:20, 881:23
**world** [2] - 735:9, 866:6
**worst** [1] - 816:10
**write** [2] - 834:10, 884:5
**writes** [1] - 846:13
**writing** [4] - 815:8, 885:22, 924:13, 930:4
**written** [7] - 864:10, 879:3, 909:22, 927:20, 929:3, 929:6, 930:20

1001

**wrote** [29] - 755:17, 774:1, 815:1, 815:13, 827:17, 832:8, 832:13, 832:25, 834:9, 841:21, 859:10, 862:10, 864:17, 876:5, 877:8, 879:6, 880:11, 881:10, 882:3, 883:7, 883:12, 884:2, 885:24, 888:7, 888:14, 888:16, 897:3, 953:20, 953:24

## Y

**year** [13] - 725:25, 738:11, 738:13, 741:19, 755:16, 755:21, 808:13, 867:6, 879:25, 925:20, 925:24, 936:10, 938:8
**years** [24] - 720:17, 733:12, 748:12, 767:18, 767:19, 768:5, 771:24, 772:9, 780:5, 796:12, 796:17, 797:10, 857:10, 864:16, 867:19, 884:10, 884:11, 884:12, 887:6, 917:4, 918:20, 936:10, 942:8, 958:10
**York** [1] - 715:12
**yourself** [2] - 713:18, 784:5

## Z

**zero** [3] - 749:20, 851:8, 891:13