# Exhibit B

Page 1

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        FOR THE COUNTY OF LOS ANGELES

3

4   Coordinated Proceeding        ) JCCP No. 4674
    Special Title (Rule 3.550)        )
5                                     )
    LAOSD ASBESTOS CASES              )
6   _____)
                                      )
7   LINDA ZIMMERMAN,                  )
                                      ) Case No. BC720153
8                                     )
            Plaintiff,                )
9                                     )
        vs.                           )
10                                    )
    AUTOZONE, INC., et al.,           ) (Pages 1 - 137)
11                                    )
            Defendants.               )
12  _____)

13

14            VOLUME II

15        TELEPHONIC DEPOSITION OF

16          ANDREAS SALDIVAR

17        THURSDAY, MARCH 19, 2020

18

19

20

21

22

23

24  Reported by:     IRENE NAKAMURA, RPR, CLR
                California CSR 9478, Hawaii CSR 496
25               Nevada CSR 893, Washington CCR 3177

Case 3:16-md-02738-MAS-RLS   Document 12990-2   Filed 04/09/20   Page 3 of 56 PageID: 109069

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                    Pages 2–5

## Page 2

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA
2         FOR THE COUNTY OF LOS ANGELES
3
4  Coordinated Proceeding     ) JCCP No. 4674
   Special Title (Rule 3.550)  )
5                              )
   LAOSD ASBESTOS CASES        )
6  _____)
                               )
7  LINDA ZIMMERMAN,            )
                               ) Case No. BC720153
8                              )
       Plaintiff,              )
9                              )
       vs.                     )
10                             )
   AUTOZONE, INC., et al.,     )
11                             )
       Defendants.            )
12 _____)
13
14
15              VOLUME II
16
17
18        Telephonic Deposition of ANDREAS SALDIVAR, taken
19  on behalf of Plaintiff, commencing at 8:02 a.m. PST,
20  Thursday, March 19, 2020, before IRENE NAKAMURA, Certified
21  Shorthand Reporter for the State of California No. 9478,
22  RPR, CLR, Hawaii CSR No. 496, Nevada CSR No. 893,
23  Washington CCR No. 3177.
24
25

## Page 3

1  TELEPHONIC APPEARANCES:
2
3  For Plaintiff:
4      SIMON GREENSTONE PANATIER
       BY:  CHRIS PANATIER, ESQ.
5        1201 Elm Street
         Suite 3400
6        Dallas, Texas  75204
         (214) 276-7680
7        cpanatier@sgptrial.com
8
9  For Defendants WHITTAKER CLARK & DANIELS INC.:
10     BERKES CRANE ROBINSON & SEAL LLP
       BY:  VIIU SPANGLER-KHARE, ESQ.
11       515 South Figueroa Street
         Suite 1500
12       Los Angeles, California  90071
         (213) 955-1150
13       vspanglerkhare@bcrslaw.com
14
15 For Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON
   CONSUMER, INC.:
16
       KING & SPALDING
17     BY:  KEVIN HYNES, ESQ.
       1185 Avenue of the Americas
18       34th Floor
       New York, New York 10036
19       (212) 556-2100
       khynes@kslaw.com
20
21
22
23
24
25

## Page 4

1  TELEPHONIC APPEARANCES (continued):
2
3  For Defendant CHANEL INC.:
4      MANNING GROSS + MASSENBURG LLP
       BY:  CHRIS O. MASSENBURG, ESQ.
5        14 Wall Street
         28th Floor
6        New York, New York 10005
         (504) 799-0504
7        cmassenburg@mgmlaw.com
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1              I N D E X
2
3  DEPONENT:        EXAMINATION          PAGE:
4  Andreas Saldivar
5        BY MR. PANATIER        8
6        BY MR. MASSENBURG      107
7        BY MR. HYNES           108
8        BY MR. PANATIER        124
9        BY MR. HYNES           126
10       BY MR. PANATIER        128
11
12
13
14     INFORMATION TO BE SUPPLIED
15       (None.)
16
17
18
19     QUESTIONS INSTRUCTED NOT TO ANSWER
20       (None.)
21
22
23
24
25

Case 3:16-md-02738-MAS-RLS   Document 12990-2   Filed 04/09/20   Page 4 of 56 PageID: 109070

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 6–9

Page 6

1    I N D E X (continued):
2
3           E X H I B I T S
4   PLAINTIFF'S                          PAGE:
5   EXHIBIT 1    NOTICE OF TELEPHONIC      58
              DEPOSITION OF ANDREAS
6             SALDIVAR
              (7 pages)
7
    EXHIBIT 4    EMAILS EXCHANGES BETWEEN   58
8             MR. SALDIVAR & MR. PANATIER
              (3 pages)
9
10  DEFENDANT'S
11  EXHIBIT 2    DEFENDANT JOHNSON & JOHNSON'S  58
              OBJECTIONS TO NOTICE OF
12            TELEPHONIC DEPOSITION OF
              ANDREAS SALDIVAR AND REQUEST
13            FOR DOCUMENTS
              (19 pages)
14
    EXHIBIT 3    DEFENDANT CHANEL'S OBJECTIONS  58
15            TO NOTICE OF TELEPHONIC
              DEPOSITION OF ANDREAS SALDIVAR
16            AND REQUEST FOR DOCUMENTS
              (18 pages)
17
18
19
20
21
22
23
24
25

Page 7

1          LOS ANGELES, CALIFORNIA;
2          THURSDAY, MARCH 19, 2020
3              8:02 A.M. PST
4              -o0o-
5
6       MS. SPANGLER-KHARE:  Can we have a stipulation
7   that an objection by one is an objection by all is and the
8   motion to strike?
9       MR. PANATIER:  Yeah, if you guys actually do it.
10      MS. SPANGLER-KHARE:  Okay.
11      DEPOSITION OFFICER:  I am not at the same location
12  as the witness.
13      Is there any objection to my administering
14  the oath remotely?
15      MR. PANATIER:  No.
16
17          ANDREAS SALDIVAR,
18      called as a deponent and sworn in by
19      the deposition officer, was examined
20          and testified as follows:
21              -o0o-
22
23      DEPOSITION OFFICER:  Mr. Saldivar, do you
24  solemnly swear that the testimony you are about to give in
25  this matter now pending will be the truth, the whole

Page 8

1   truth, and nothing but the truth?
2       THE DEPONENT:  I do.
3       DEPOSITION OFFICER:  Thank you.
4       You may proceed.
5
6              EXAMINATION
7   BY MR. PANATIER:
8       Q.   Good morning, Mr. Saldivar.  How are you?
9       A.   I'm good.  Thanks.  How are you?
10      Q.   Good.  Can you go ahead and state your name,
11  please.
12      A.   Andreas Saldivar.
13      Q.   Are you safely self-distancing, doing your
14  social distancing?
15      A.   As much as possible, I am.  Being in a
16  laboratory, it's hard to work from home.  So -- but we do
17  that within the lab, as well.
18      Q.   Right.  You don't have a T.E.M in your bathroom?
19      A.   No, but I actually do know a few retired T.E.M
20  people who do have their own T.E.M. in their house.
21      Q.   Wow.  Wow.  Okay.  This is a continuation of the
22  deposition that you gave last summer.
23      And this one is specifically -- we're just
24  going to be talking about updating your work primarily
25  with the F.D.A. contract that you were working on last

Page 9

1   summer and then issued a report on this fall?
2       Do you understand that?
3       A.   I do.
4       Q.   Okay.  So I kind of want to go back and get our
5   chronology.
6       So first things first is you issued a
7   report -- or the F.D.A. released a report you had done on
8   sample D58 in October of 2019; is that accurate?
9       A.   I think that's when -- I believe that's when
10  they released it, yeah.
11      Q.   Okay.  Now, at that time, did they release any
12  other of the reports from any other of the sampling that
13  you had been working on under that specific contract?
14      A.   I believe they had released other reports from
15  that contract earlier than I -- yeah, I know they had.
16  They had released some -- yeah, I believe in the spring
17  and maybe a few in the summer.
18      Q.   So that will help us get our bearing.
19      So this contract -- and when we talk about
20  this then-current F.D.A. contract, can you just describe
21  for me in whatever the simplest terms you can about the
22  breadth of that contract in terms of how many total
23  samples you were looking at and what you were doing,
24  please?
25      A.   I don't recall the exact total.  It's -- it's

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 10–13

Page 10

1   around 50 samples.  And they send us material blind.
2           We perform analysis for them, and then we
3   send them our results, and at some point after, they get
4   our results; they release them to the public.
5       Q.    All right.  And for these approximately 50
6   samples that you looked at blind, over what period of time
7   was your lab conducting the analysis of these samples?
8       A.    Almost over -- almost the entire last calendar
9   year.
10      Q.    Okay.  And now that wasn't all your lab was
11  doing, but this particular contract took about that long
12  to do.
13          Is that what you're saying?
14      A.    They didn't send us stuff all in one go.  They
15  sent us small batches so we do a small batch; give them
16  results, and then sometime later, sometimes weeks,
17  sometimes months later, they would send us some more.  And
18  so, no, this was certainly not all of our lab was doing.
19      Q.    Okay.  Can you describe for me generally how the
20  samples would arrive at AMA?
21      A.    Usually somebody from the F.D.A. would bring
22  them over in person to us.
23      Q.    Okay.  And how were they -- how were they
24  packaged?
25      A.    They were -- in -- in vials, in -- sometimes

Page 11

1   clear, sometimes not, but they typically were -- I
2   don't -- I'm not sure if any of them were even actually
3   clear, but they were in small vials and there would be
4   maybe five or ten grams of material in there.
5       Q.    Right.  And were these -- did these vials have
6   screw-on caps?
7       A.    Yes.
8       Q.    Were they secured in any other way other than
9   just being screwed on?  Were they taped or adhered in any
10  other way?
11      A.    I think there was -- in our reports, we put
12  pictures of the samples of how they were received, and I'm
13  not on a computer right now so I can't -- I can't look.
14  But I believe that there was tape on them as well.
15      Q.    Okay.  I have some pictures in the reports that
16  show, you know, a clear, for instance, sample D58, a
17  clear -- looks like glass or a plastic vial with a white
18  plastic lid, is that generally how you received them from
19  the F.D.A., was that their vials?
20      A.    Yeah, I believe so.  I think some of the -- I
21  think -- I think some of the vials were not clear, but
22  maybe like translucent, like semi-clear, but if -- that's
23  the -- yeah, that is certainly how we got that.
24      Q.    Okay.  And it also looks like there's a clear
25  tape around the top that -- that is half on the lid and

Page 12

1   half on the bottle itself, and then wrapped around the
2   bottle -- is that the F.D.A.'s doing, the tape?
3       A.    Yeah, that would be their doing.
4       Q.    Okay.  So then when you would receive them and
5   then take the sample, how did you proceed to get the
6   powder out of the vial?
7       A.    Well, you -- first, we logged them into our
8   system and then in a hood, we will take and split out --
9   take out three aliquots from each vial and not use all of
10  the material.  And then we will put those into other
11  containers, our own containers.  And we will do that in a
12  hood.
13      Q.    Okay.  So -- so let's say we're dealing with one
14  of these vials that have this clear -- it looks like
15  Scotch tape around the top.
16          Do you just peel that tape off, or do you
17  slice it?
18      A.    You -- I -- that's likely going to be dependent
19  on -- on each vial.  I'm not sure.  I don't know if it was
20  peeled off or if it was sliced.
21      Q.    Okay.  Then the bottle's unscrewed and from that
22  you pull out from each sample the -- the three individual
23  components, what you would call aliquots, which is a
24  science word for a sample, of the sample; right?
25      A.    Yes.

Page 13

1       Q.    Okay.  And you would take three from each one of
2   the vials received from F.D.A.; right?
3       A.    Yes.
4       Q.    So, for instance, for D58, which by the way, as
5   of now, I know they were sent to you blind.
6           But did you gain an understanding as to
7   what the source of the powder was for D58?
8       A.    Yes.
9       Q.    What is that?
10      A.    It was a Johnson & Johnson material.
11      Q.    Okay.  Do you understand that was a baby powder?
12      A.    Yes.
13      Q.    Okay.  So for D58, for instance, you had three
14  aliquots that you label as -- you give them an AMA sample,
15  I mean; correct?
16      A.    Correct.
17      Q.    And in this case, the sample I.D. for D58 as
18  received by the F.D.A. was 308006-6 and then you had 6A
19  and 6B, as well, and those would represent the three
20  aliquots; correct?
21      A.    Yes.
22      Q.    All right.  How many different technicians at
23  AMA were working on the contract for the F.D.A., this
24  specific contract that occupied most of last year?
25      A.    I don't recall the total number of people, but

ANDREAS SALDIVAR, Vol II on 03/19/2020                                   Pages 14–17
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 14

1  it would be -- it probably was on the order of -- people
2  who actually handled the material from login to finish, it
3  probably would be somewhere in the order of six, maybe
4  seven total.
5      Q.    Okay.
6      A.    And not -- and that would be across the entire
7  contract.
8      Q.    Sure.
9            And for purposes of the T.E.M. analysis
10 that was done under this contract, how many different
11 T.E.M. analysts worked on this F.D.A. contract?
12     A.    It's three or -- and if you count quality
13 control, it was probably four.
14     Q.    Okay.  Were all of these people employed already
15 when this contract began at AMA?
16     A.    Yes.
17     Q.    Okay.  And were all of these people -- had all
18 of these people, these T.E.M. analysts, been trained
19 either before arriving at AMA or at AMA?
20     A.    They were all trained at AMA.
21     Q.    Okay.  Were you the one that trained them?
22     A.    Yes.  Me, among other people, as well, but yeah,
23 I was one of the primary trainers for all of them.
24     Q.    All right.  And I take it that if they are
25 employed as a T.E.M. analyst at AMA, and they are allowed

Page 15

1  to work on this contract, that you believe them to be
2  sufficiently trained, skilled and able to do their job; is
3  that correct?
4      A.    That's correct.
5      Q.    And even now, after the reports have come out,
6  the final reports have been made public, I take it you
7  still hold that same opinion that your -- your technicians
8  were trained, skilled, and able to do their jobs.
9            Is that fair?
10     A.    That's correct, yes.
11     Q.    Okay.  And now, you also said that QC was run,
12 a quality control.  And would that have been run by a
13 different technician for any given sample?  So, for
14 instance, if you had an analyst named Bob, and Bob did
15 sample D58, then would the QC have been done by Bob or
16 somebody else?
17     A.    It's possible that it would be done by Bob and
18 possibly done by someone else.  If the -- our laboratory
19 information management system, Lim system, or our database
20 randomly assigns quality control, what we call replicate
21 QC means the sample has to be analyzed by a different
22 analyst.
23           If it says duplicate QC, then the sample
24 has to be reanalyzed by the same analyst.  So whatever is
25 assigned, for each set of samples, you have the

Page 16

1  possibility of -- and there's a higher percentage of
2  replicate versus duplicate QC, but there is a possibility
3  of both situations, same analysts and different analysts.
4      Q.    And if -- if it's the same analysts, do they
5  know that they already analyzed the sample once or is that
6  blind to them?
7      A.    It's -- it is somewhat blind, but they can
8  easily figure it out.  So I would say -- in most cases
9  they do know.  They are looking at completely different
10 preparation from the original one.
11     Q.    Gotcha.  Okay.  So in order for -- so, for
12 instance, for the samples, the two aliquots that were
13 found to be positive for chrysotile for sample D58, in
14 order for those results to be reported as final, would the
15 QC on those two samples have to verify the chrysotile yet
16 again?
17     A.    That -- there would be an assumption that --
18 that -- that there was an actual -- and I don't recall
19 whether this is true or not, because the QC is assigned
20 for batches of samples.
21           So if you -- let's say you get a batch of
22 20 samples in -- it's going to -- and you have to have a
23 certain percentage of QC, QC is not going to be assigned
24 to every single sample.
25           It's going to look through there and be,

Page 17

1  okay, in order to maintain our proper QC percentage, I'm
2  going to assign two samples, and this is the Lim system
3  doing its random thing.  So -- so many of the samples are
4  not going to have quality control assigned to them.
5  Specifically to that sample, but some will.
6      Q.    Yeah, and I probably should have asked that
7  first, which is -- and I do understand that QC is -- is
8  not usually done in every sample.
9            It's done on an -- on enough samples to
10 where you have a level of confidence that the samples were
11 run correctly.
12           Is that fair?
13     A.    Correct.
14     Q.    All right.  Let me see here.  What was the total
15 contract value with the F.D.A. for this 50-or-so samples
16 to AMA?
17     A.    It was -- I don't know the actual number, but we
18 can probably figure it out here, because it was 500 per
19 aliquot.
20           So -- so 50 samples times 3 aliquots each,
21 so that's 150 times 500 dollars, and then there was a few
22 other sort of, like, reporting generation fees and things
23 like that.  So -- it's -- I'm trying to figure that out in
24 my head what the total would be, but --
25     Q.    Well, 50 times three is --

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 18–21

Page 18

1    A.   Somewhere around the order, I would say it's
2  between -- it's around 80,000 dollars.
3    Q.   Yeah.  That's about what I was going to come in
4  at.
5    A.   Okay.
6    Q.   And the methodology you used was your standard
7  ELAP method that you've been using for a number of years;
8  is that right?
9    A.   It's a modified ELAP method, but it's what we've
10  been using for F.D.A. and for other talent samples for
11  quite some time.
12    Q.   It -- has it changed at all from going all the
13  way back to 2015 with the sampling you did -- with the
14  analysis you did with Colgate-Palmolive?
15    A.   It has, yeah.
16    Q.   In what way?
17    A.   It changed in -- now, we -- we count everything.
18  Everything that we see.  So if I see -- if I saw a piece
19  of an anthophyllite that was a cube, and it was one to
20  one, I would count it.
21    Q.   Okay.  Would you -- when you said you would
22  count it, you would note it on the bench sheet.
23       Is that what you mean?
24    A.   Yeah, I would.  I would measure its length and
25  its width.  I would get the fraction on it.  I would get

Page 19

1  chemistry on it.  And I would put it in.  I would just say
2  it's -- I would -- I would say it's anthophyllite.  I
3  wouldn't determine -- I mean, a one-to-one cube everybody
4  knows -- there's no dispute there that that's not
5  asbestos.
6       But regardless of its dimensions,
7  regardless of its shape, if it's amphibole, we're going
8  to -- we're going to count it.
9    Q.   Okay.  And then you would, of course, note
10  the -- how it's categorized, whether it was fiber, a
11  matrix cluster, a bundle or -- I don't know what you would
12  call that.  Junk?
13    A.   You would call that -- you would -- you would
14  call that a particle.
15    Q.   Okay.  Okay.  Now, with regard to this contract
16  as a whole, 50 or so samples, can you just give me a
17  ballpark?  I doubt you have all 50 reports in front of
18  you.
19       Can you give me a ballpark of how many
20  positive total samples you found at your lab, found out of
21  that group?
22    A.   It's -- I believe -- I would say less than ten.
23    Q.   All right.
24    A.   I don't recall.  I don't have any of the reports
25  in front of me, actually.

Page 20

1    Q.   That's fine.  That's fine.  Because we have the
2  reports.  The exact number would be in the reports.  I
3  just want to get your ballpark.
4    A.   Yeah.
5    Q.   But backing up a little bit, and we're going to
6  go back into these reports here in a second, just my way
7  of housekeeping.
8       When I deposed you on June 21st, 2019, as
9  you're sitting here today, can you think of any of the
10  opinions that you rendered there or any statements you
11  rendered there that were out of line with what you believe
12  now or have any of your statements or opinions changed,
13  any material statements or opinion?
14    A.   I -- I don't believe so, no.
15    Q.   Okay.  Now, during the pendency of this -- of
16  this work with F.D.A., I remember that when I talked to
17  you in June, I had asked you about work with F.D.A., and
18  you had mentioned that you were under a current contract
19  then.
20       That was this contract that you and I were
21  talking about; correct?
22    A.   Yes.
23    Q.   Okay.  And during the pendency of that work,
24  did you have any conversations about that work with any
25  representatives, whether it be an attorney or an employee

Page 21

1  or anybody for any talc company or company that sells talc
2  products about that testing?
3    A.   Only -- and I was asked many, many times about
4  this stuff when people would see me.  But it would be -- I
5  would give generalizations about it.  So, yeah, I have
6  been asked many, many times by many people about it.  And
7  a good chunk of this contract is -- is confidential, and
8  the F.D.A. reminds me that it's confidential, but I can --
9  I can, you know, they release stuff, and I can speak in
10  general.
11       So people have asked me about it over and
12  over and over again, yeah.
13    Q.   And aside from generalities, I'm looking at talc
14  for the F.D.A.  I'm doing the typical analysis I do.
15       Do you specifically discuss any of the
16  results before the reports were released with anybody?
17    A.   No.
18    Q.   Okay.
19       MR. MASSENBURG:  This was asked and answered in
20  the prior deposition that Mr. Saldivar provided pursuant
21  to your notice in both Welch and Zimmerman cases.
22  BY MR. PANATIER:
23    Q.   To be clear, Mr. Andreas, I am asking you
24  whether or not you discussed the results of any of the
25  testing you did for the F.D.A. which continued beyond

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 22–25

Page 22

1  June, did it not?
2     A.   It did, yes.
3     Q.   Okay.  And so I'm just wrapping it all together.
4  During the entire pendency of this contract with the
5  F.D.A. and testing talc for asbestos, before the results
6  were made public, you did not discuss the results with
7  anybody; correct?
8     A.   No.  I did not.  And honestly, there's nothing
9  for us to discuss.
10          The way we find out what that material is
11  is the same way you do, is one day -- they never call us
12  and tell us, oh, what you just analyzed is this.  We have
13  to go look at their public release of it.
14          So what they send us is blind, and we give
15  them the results, and what we -- and the way we find out
16  what we just looked at is -- is when they release it
17  publicly and then we know, we just analyzed that.
18     Q.   So even if you had wanted to, and I'm not saying
19  you would ever do this.
20          Even if you had wanted to tell the results
21  to somebody, the best you could have done was to say,
22  well, some were negative; some were positive.  I don't
23  know whose talc I was testing.
24          Is that fair?
25     A.   That's correct.

Page 23

1     Q.   All right.  Now, once the reports begin to be
2  made public by the F.D.A., did you -- for instance, with
3  the -- with the D58 report, which that report, I believe,
4  was dated August -- sorry.  October 3rd, and then it was
5  revised October 11th, did you get any phone calls or have
6  any contact with anyone from J&J once that report came
7  out?
8     A.   No.
9     Q.   Has anybody from Johnson & Johnson contacted you
10  to this date about that report?
11     A.   No, they have not.
12     Q.   Okay.  Has Alan Segrave contacted you about that
13  report?
14     A.   No, he has not.
15     Q.   Has Matthew Sanchez or anybody from R.J. Lee
16  contacted you about that report?
17     A.   No.
18     Q.   Okay.  So now I'm going to make this an even
19  broader question, which is has -- has any -- has anybody
20  reached out to talk to you about this report other than --
21  and that's excluding because we're going to talk about it,
22  that's excluding E-mail I sent you in, I think it was,
23  early February?
24     A.   Yes, they have.
25     Q.   Okay.

Page 24

1     A.   A lot of people have.
2     Q.   All right.
3     A.   Mostly reporters.  A lot of reporters.  And
4  mostly reporters.  I even had a -- somebody from -- a
5  House -- a House committee was -- contacted me about it.
6  And so.
7     Q.   Okay.
8     A.   And pretty much gave them the same answer that
9  you have to contact the F.D.A.
10     Q.   All right.  And that -- and your report, so I
11  have -- I have the report that was issued on October 11,
12  and then I have the final report -- you know, quote
13  unquote "final report," that came out, I think, March 9th,
14  which is on the day that the F.D.A. released all of the
15  reports.
16          Is that accurate, to your recollection?
17     A.   I wasn't sure of their final release.  They
18  had -- they had most of the stuff from us well before
19  March 9th --
20     Q.   Okay.
21     A.   They had all of -- I think it's not most.  They
22  had all of the stuff from us before March 9th.
23     Q.   When was your testing completed internally on
24  all of the samples regarding the F.D.A. contract?
25     A.   In December, I believe.

Page 25

1     Q.   All right.  And so even though, for instance,
2  the Johnson & Johnson report was made public by the F.D.A.
3  in October, there were still samples that you were still
4  working on at that time.  Fair?
5     A.   Yes.
6     Q.   Was there -- were all of your reports for all
7  of the sampling under the F.D.A. contract completed by
8  December, or was it January?
9     A.   I -- I would have to look.  It was -- it's one
10  or the other.  It's either December or January.  It was --
11  I would have -- I would actually have to see the report to
12  see when we -- when we did the last analysis on them.
13     Q.   Okay.
14     A.   It was right around there.
15     Q.   But it was sometime between December and
16  January?
17     A.   Correct.
18     Q.   All right.  Were there ever any substantive
19  changes made to your report with regards to sample D58,
20  the Johnson & Johnson sample?
21     A.   I don't believe I can answer that question.
22     Q.   Explain that, then.
23     A.   Because the F.D.A. has specifically told me not
24  to -- their exact quote was "We don't want you answering
25  any questions about that."

ANDREAS SALDIVAR, Vol II on 03/19/2020                                    Pages 26–29
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 26

1    Q.   About whether or not there were -- there were
2  any substantive changes made?
3    A.   About specifics regarding any of their -- their
4  samples.  And they reminded me of that not that long ago.
5    Q.   Okay.  So can -- let me ask you this:  Have
6  you -- have you contacted the F.D.A. and told them that
7  you expect to be deposed on these?
8    A.   No, I have not.  I mean, not recently.  They --
9  I've -- they know -- they know my scientific contact.
10  There was my main contact.  There -- I have told him, I
11  said people -- you know, people are going to ask me
12  questions about this, and some will be in depositions and
13  then -- and some will be in meetings and things like that.
14  And he's the one who told me, "Well, we don't want you
15  answering any questions about that."
16    Q.   Now, is that John Gaspar?
17    A.   No.
18    Q.   Okay.  Who is it?
19    A.   Steve Wolfgang.
20        MR. MASSENBURG:  No, no, no.  Let me just say --
21  this is Chris Massenburg.
22        Andreas, I don't know to the extent you
23  know whether or not your contact at the F.D.A. who
24  spoke to specifically are part of that same privilege that
25  counsel could seek that information from F.D.A.

Page 27

1  separately.
2        If it's not confidential and you're certain
3  it's not, who your contact is, then feel free to disclose
4  it.
5        At least I wanted to make the objection and
6  inform you that if you believe for any reason or are
7  unsure for any reason, as to whether or not your contacts
8  there or primary contact is confidential in any way, or
9  F.D.A. required or request that be kept confidential,
10  please do not disclose that now, and we can take that for
11  the Court at another time.
12        THE DEPONENT:  They haven't ever specifically
13  told me that what you just said about their, you know --
14  their -- their names.  I mean, their names are all over
15  the reports that they released.
16        What they have told me is when I get
17  inquiries about any of their work, they gave me an --
18  and I can't remember her name right now or her contact
19  information, but as a specific person -- all the way I said,
20  I can't remember her name.  It was Mary something, I
21  believe.  I might be wrong.  That they wanted me to -- if
22  I get a question about it, give them this information, and
23  they wanted to channel it all through her.
24  BY MR. PANATIER:
25    Q.   Okay.  So first of all, just for the record,

Page 28

1  counsel for Chanel, Mr. Massenburg, represented that he
2  believed that some of this was subject to a quote-unquote
3  "privilege."
4        I think that concept is quite a stretch.
5        I don't think there's any privilege here.
6  The issue is confidentiality or not.  And this person at
7  the F.D.A., Mr. Saldivar, Mary somebody.
8    A.   I'm not sure.  I'm not sure if it's Mary, but I
9  can't remember her name.
10    Q.   We will call her Mary for the purpose of the
11  deposition as a monitor, but this person at the F.D.A.
12  that you were told to funnel inquiries through, we will
13  obviously request that information to be produced to the
14  extent that we are not able to get answers in this
15  deposition because you believe you are under some sort of
16  confidentiality and not talk about certain things.
17        Hopefully, we can talk about what is out
18  there in the public and get by it, but to the extent that
19  there is any matters you can't talk about, we would ask
20  for that information so that we can go through the
21  appropriate channels, as you have laid them out for us.
22  Okay?
23    A.   Yeah, but I could -- I could -- I could later on
24  today, if I hadn't already done it, I could E-mail you
25  that contact information.  I don't know if I gave it to

Page 29

1  you or not.
2    Q.   Okay.  Well, why don't you do this:  Later on
3  today, why don't you E-mail that contact information to me
4  and Mr. Massenburg so he has it.
5    A.   Okay.
6    Q.   All right.  So moving along?
7        MR. MASSENBURG:  Andreas, why don't we do this,
8  contrary to counsel's -- Mr. Panatier's belief that we
9  know you openly -- when litigation is pending against
10  Chanel, and you are a testifying expert and had already
11  testified on behalf of Chanel in this case and then the
12  "Welch" case pursuant to counsel's notice.  We disagree on
13  that point, and it may be taken up at a later date.
14        As it stands right now, if you could in
15  this case, since -- "Zimmerman" is the case this is
16  noticed for, and you are a testifying expert on behalf
17  of Chanel, if there's any documents or contacts or
18  information to share, that you need to E-mail -- if you
19  will E-mail that to me only.
20        THE DEPONENT:  Okay.
21        MR. MASSENBURG:  And I will get that to
22  Mr. Panatier or his office.
23        If there are objections to anything -- I
24  don't anticipate there will be -- or any objections, I
25  will notify counsel of those objections and the contents

ANDREAS SALDIVAR, Vol II on 03/19/2020                                            Pages 30–33
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 30

1  of the document so we can take that up with the Court.
2          Like I said, I don't think that's going to
3  happen.  But just so we're clear, I don't want, in the
4  "Zimmerman" case, E-mailing Mr. Panatier directly as he
5  had sought your -- you know, inquired as to several
6  matters by E-mail without my presence while this case was
7  pending.  But like he said, he's going to take those
8  issues up later.  So thank you.
9          MR. PANATIER:  I will --
10         THE DEPONENT:  I will send it to you later
11  today.  And then -- and then you can send it to Chris.
12         MR. PANATIER:  That's -- that's acceptable.
13  BY MR. PANATIER:
14     Q.   All right.  So going back to what we -- what is
15  out there in the public and if we go over to something
16  that is a communication you believe is confidential, just
17  let me know.
18         With regard to the work you did, has anyone
19  come to inspect the AMA lab in the -- in the wake of these
20  results with specific -- specific attention to these
21  results?
22         In other words, has anyone come to the --
23  let me strike that.
24         Has anyone inspected AMA labs since these
25  results have been made public?

Page 31

1     A.   Yes.
2     Q.   Okay.  And what type of inspection was that?
3     A.   It was -- like, an audit, a laboratory audit of
4  our practices and our procedures.
5     Q.   And who conducted that audit?
6     A.   The F.D.A.
7     Q.   Okay.  They conducted that audit after you had
8  done your -- your final reports?
9     A.   Yes.
10    Q.   Okay.  So this would have been sometime in
11  either late December or January or February?
12    A.   It was in January.
13    Q.   Okay.  And was this a -- a routine audit, or was
14  this a sort of special order?
15    A.   It -- it -- I would not say it's routine.  But
16  every contract that -- that you get from them, there is a
17  thing in there that they can audit you at any time that
18  they choose, any time that they want.  And so if it was
19  within the contract, and -- but it wasn't something like
20  our -- our math lab or A.I.H.A. or ELAP audits, which are
21  routine, and they come at a specific, you know, every two
22  years type of thing.  This was not an audit like that.
23    Q.   Okay.  And were there any -- were there any
24  major deficiencies found?
25    A.   No.

Page 32

1     Q.   Okay.  Was there -- were there any findings of
2  lab contamination with asbestos?
3     A.   No.
4     Q.   Okay.  And were you given a paper copy of this
5  report or an electronic copy?
6     A.   Still waiting for it.
7     Q.   Okay.  But at the time, I take it, since you've
8  said that these issues did not come up where you -- where
9  you -- were the results generally communicated to you in
10  terms of --
11    A.   Yes.  The -- the auditors did verbally tell us
12  some things, and they have asked for some things from us
13  since then.  They asked that we would -- they asked that
14  with stuff specifically related to their samples that
15  maybe they would ask for an SOP to be clarified or
16  something along that.
17         They didn't really ask for any -- us to
18  change anything they were doing and sometimes they wanted
19  things to -- to have more details.  But there was -- but
20  that's about the extent of it.
21    Q.   Okay.  And has your lab, in its inspections with
22  NABLab which or E-Lab or A.I.H.A. -- and let's just say
23  the last five years, okay, during the pendency of when you
24  had been serving as an expert witness.
25         Within the last five years, have you --

Page 33

1  has -- have -- has your lab failed any of its inspections?
2     A.   No.  We have not failed an inspection.  Every
3  single inspection -- well, not every single one, because
4  there's been a few that we have -- there's a few that we
5  have where there's no deficiencies found.  Sometimes
6  there's suggestions.  But the last NABLab when I think
7  there was two deficiencies found or something like that,
8  but --
9     Q.   Okay.
10    A.   In general, we've done really well on
11  inspections.
12    Q.   Right.  And from lab to lab, you know, do they
13  inspect -- it's my understanding that NABLab or E-Lab or
14  A.I.H.A., they are looking at hundreds and hundreds of
15  things, of items; is that correct?
16    A.   They are, yes.
17    Q.   And so from time to time they might find a
18  deficiency here or there, they notify you of it and then
19  you are supposed to correct it; is that correct?
20    A.   That's correct.
21    Q.   All right.  Has any of those results -- just in
22  the last five years, have any of those audits resulted in
23  a deficiency that says AMA has an asbestos contamination
24  problem?
25    A.   No.

ANDREAS SALDIVAR, Vol II on 03/19/2020                                            Pages 34–37
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 34

1    Q.    Alan Segrave has inspected your lab; isn't that
2    true?
3    A.    That's correct.
4    Q.    Okay.  And when he inspected your lab, did
5    Mr. Segrave -- when was that, that he inspected your lab?
6    A.    It was -- he was -- the last May or June.
7    Q.    Okay.  Had he ever inspected a lab before that?
8    A.    No.
9    Q.    Has he done it since?
10   A.    No.
11   Q.    So just one time?
12   A.    Correct.
13   Q.    Okay.  Did Mr. Segrave note any material
14   deficiencies with your lab?
15            MR. MASSENBURG:  Andreas, this is Massenburg.  I
16   am sorry.  Let me interject.  I will only represent to you
17   that Mr. Segrave testified in the Zimmerman case on behalf
18   of Chanel already when he was asked questions and when
19   asked questions about his inspection of your lab as a part
20   of his audit inspection duties, he indicated that the
21   results were confidential, and he could not disclose them.
22            I don't know personally or professionally
23   whether that same standard applies to you as to the
24   results, or it just applies to the inspector, Mr. Segrave.
25   So I'm not objecting.

Page 35

1            I'm only advising that that is what he
2    said.  So if you have an understanding or belief that the
3    results are somehow confidential or privileged, then let
4    us know.  If not, then please answer as you see fit.
5            THE DEPONENT:  Okay.
6            MR. PANATIER:  I would just object that that is
7    not an objection.  It's an attempt to coach the witness.
8    There's no such privilege that exists.
9            To the extent that there's any
10   confidentiality.  It's held by the lab, and everybody
11   knows that.
12            But, sir, if you can answer the question.
13            MR. MASSENBURG:  I'm not going to continue to
14   argue with you on this.  I'm sorry.
15            THE DEPONENT:  What do you mean by "material
16   deficiency"?
17   BY MR. PANATIER:
18   Q.    Yeah.  Like, so for instance, some people might
19   say, "Oh, there was a manual that was supposed to be in a
20   certain area."  I wouldn't consider that a material
21   deficiency, do you?
22   A.    No.
23   Q.    Okay.  A material deficiency would be something
24   like they -- they're not calibrating their equipment
25   correctly.  There is an emanation problem?

Page 36

1    A.    Okay.
2    Q.    Big picture deals.
3    A.    Right.  We had no deficiencies like that.
4    Q.    Okay.
5    A.    And just --
6            (Speaking simultaneously.)
7    A.    And that's correct.  And just to be clear on --
8    I can discuss my NABLab and E-Lab and A.I.H.A. inspection
9    results with anyone.
10            What I can't do with that data is, I can't
11   use it as sort of like an advertisement thing.  So if I
12   had a "no" deficiency inspection, I can't then go out and
13   say, "Hey, customers, look at me; I'm great."  I can't do
14   that.
15   Q.    Okay.  Understood.
16            So for purposes of Mr. Segrave's
17   inspection, did he note -- now I'm going to go to
18   nonmaterial things.
19            Did he note nonmaterial deficiencies any
20   smaller -- smaller deficiencies?
21   A.    Yeah, I believe it were two.  And only one of
22   them I recall was that on our T.E.M. AHERA report, which
23   is a type of air sample analysis.  We did not have a
24   statement of uncertainty on our report.
25   Q.    What does that mean?

Page 37

1    A.    It's a -- it's -- an uncertainty is -- you give
2    somebody a result, and you want them to be able to know,
3    okay, what are the upper and lower confidence limits of
4    that report.  Like -- what would -- if you gave somebody a
5    result of five, what would be the -- is five the definite,
6    you know, answer?  Or is there a range surrounding that?
7            And so you have to give a statement of --
8    of like, not specific, like, to that result, but -- but
9    what the general range of uncertainty is regarding
10   results.
11   BY MR. PANATIER:
12   Q.    Okay.  Has anybody, other than the -- so just to
13   clarify:  No one other than the F.D.A. has conducted an
14   inspection of your lab in the wake of the public release
15   of these results; correct?
16   A.    With regards to what you're talking about, I
17   believe we had a Maryland drinking water inspection for
18   lead in water analysis.
19   Q.    Okay.  Okay.  And I appreciate that.  And I am
20   just focused on your asbestos work.
21   A.    Okay.
22   Q.    Has anyone from Bureau Veritas or R.J. Lee Group
23   come to inspect any of the -- your grid preparations with
24   regard to this F.D.A. contract work you did?
25   A.    No.

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 38–41

Page 38

1    Q.   Has anybody from Johnson & Johnson visited your
2  lab in the wake of these reports?
3    A.   No.
4    Q.   Okay.  Have you reviewed Bureau Veritas's
5  examination of its aliquots of the same samples you looked
6  at?
7    A.   No.
8    Q.   Have you -- same question for R.J. Lee Group,
9  have you looked at their reports regarding the same
10  samples you looked at?
11    A.   No.
12    Q.   With specific focus on sample D58, the J&J
13  sample, you have three aliquots of that, and you -- I
14  believe your report says, you ran three lab blanks for
15  those three aliquots; is that correct?
16    A.   The -- the lab blanks would have been for that
17  batch of samples.  There might have been one -- I don't
18  believe there was one specific to that sampler.  It would
19  have been -- because that sample was not submitted by
20  itself.  It was submitted in a batch.
21    Q.   Right.  So you would have had lab blanks there
22  that would have been applicable to an entire batch of
23  these samples; is that right?
24    A.   That's correct.
25    Q.   And your lab blanks always came up negative;

Page 39

1  correct?
2    A.   Correct.
3    Q.   Or non-detect would be a better term.
4        Is that fair?
5    A.   Yes.
6    Q.   Okay.  And your -- you have three lab blanks for
7  this batch.
8        And my understanding is that you analyzed
9  those two times each?
10    A.   No.  You analyzed the lab blank once.  But
11  you're analyzing more than one blank with the batch.
12    Q.   Okay.  I understand.
13        Is it your lab's typical procedure to do
14  three lab blanks with any batch, that is, analyzes for --
15    A.   No.  It depends on the size of the batch.
16    Q.   Okay.  Explain that.
17    A.   You can -- you could have less if -- if I got a
18  batch of samples and it was, like, two samples.  And
19  there's only going to be one blank associated with those
20  two samples.
21        If I got a batch of samples and it was,
22  like, 60 samples, there's going to be many, many more
23  blanks associated with that than there would be with the
24  small set.
25    Q.   Let me ask you this:  You said you prepped, you

Page 40

1  know, a set of blanks with a batch.
2    A.   Uh-huh.
3    Q.   How many total -- how many total blanks did AMA
4  run so far -- you don't have to tell me the exact number,
5  because we can get that from your report.
6        But just ballpark, how many total blanks
7  did AMA run in the course of its analysis on the 50 or so
8  samples that was for the F.D.A.?
9    A.   There would have been something along the lines
10  of -- I'm going to count them up in my head and
11  approximate this, but -- it's going to be somewhere in the
12  order of 50-plus blanks.
13    Q.   Okay.
14    A.   Of various types of blanks.
15    Q.   Were they all non-detect?
16    A.   Yes.
17    Q.   Okay.
18    A.   All the ones -- all the ones that we analyzed
19  would be non-detect.  If you have a batch of samples
20  that -- that are all non-detect, all of your results are
21  non-detect, you don't always analyze the blanks associated
22  with it.  There are certain types of blanks.  There are
23  filter preparation blanks that if you have a detect with
24  the with this type of material, you analyze that blank.
25        If that blank ends in -- and there's a

Page 41

1  numbering system for it -- if that blank ends in 5 or 0,
2  regardless of whether you had to detect or not, you're
3  going to analyze that blank.
4        But if you had a non-detect on your
5  entire batch of samples, and you would then not -- and
6  that blank didn't end in 5 or 0, you would not analyze
7  that blank.
8    Q.   I understand.
9        And the reason for that being that, if you
10  got a non-detect in the sample, you know that you don't
11  need to check for contamination because -- for lack of
12  contamination because you didn't find anything in the
13  sample that could potentially explain why you got a
14  positive.
15        Is that fair?
16    A.   Right.  That's correct.
17    Q.   Okay.  So of the 50 total blanks, were -- can
18  you tell me were all 50 analyzed or what percentage would
19  be --
20    A.   I don't believe -- and I know not all 50 were
21  analyzed, and if your next question is how many were, I
22  don't recall the number.  I could figure that out, but I
23  don't recall the number.
24    Q.   Okay.  So if we wanted to figure it out, what
25  would you -- because I'm not going to make you sit here

ANDREAS SALDIVAR, Vol II on 03/19/2020                                    Pages 42–45
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 42

1   and do it.  What would I need to do?  Would I need to look
2   for blanks that end in 5 or 0, and I can assume those were
3   analyzed?
4        A.    If what you would -- would you do is on the
5   reports that the -- as long as it wasn't redacted by the
6   F.D.A., and I don't think this part was, but down at the
7   bottom, there's a quality control section of each of those
8   reports that we listed.
9              It will tell you -- it will tell you
10  what -- what we -- whether the blank was analyzed and what
11  the result of the blank was.
12       Q.    Okay.  I understand.
13             And then you said if it ends in a 5 or 0,
14  it was run.
15             Would there have been any others that would
16  have been run that don't end in a 5 or a 0?
17       A.    Yeah, there's material blanks which are where --
18  where we take a known negative talc material, and we run
19  that through with the samples.
20             And then there's filter blanks because
21  these things, your samples eventually end up on filters,
22  and now you're preparing those filters.
23             The filter blanks are the ones that have
24  the numbering system to them where -- where you analyze it
25  if there's a detect or if -- or if the blank ends in 5 or

Page 43

1   0.  The material blanks are all analyzed.  All the
2   material blanks are all analyzed regardless of whether you
3   have a detector or not.
4        Q.    Okay.  And so I will go through and look at
5   these on my own and not waste your time doing it.
6              But let me ask you this:  Just off the top
7   of your head, could you -- can you say, well, look, I
8   don't know the specific number of blanks that were
9   analyzed, but I know it was at least half.
10             Can you do that?
11       A.    It -- it would be -- in total, if you were to
12  take all the material blanks and add up all of the filter
13  blanks, it's going to be about half, yeah.
14       Q.    Okay.
15       A.    But specifically since all of the material
16  blanks get analyzed.
17       Q.    Yeah.  Okay.  So it would be your expectation
18  that at least -- you got at least 25 or so blanks that
19  were analyzed and came up non-detect or thereabouts.
20  Fair?
21       A.    Yeah, I would say that's -- that's accurate.
22       Q.    Okay.  We've been going about an hour.  Do you
23  want to take a five- or ten-minute break?
24       A.    Yeah, I wouldn't mind getting some water.
25       Q.    Okay.  Let's just do -- let's do five minutes.

Page 44

1   How about that?
2        A.    Okay.  All right.
3              MR. PANATIER:  Okay, folks.
4              (Whereupon, a recess was held
5              from 8:56 a.m. to 9:01 a.m.)
6              MR. PANATIER:  Let's go back on.
7   BY MR. PANATIER:
8        Q.    All right.  So let's talk just a little bit
9   about your analysis.
10             One of the -- first of all, are you -- are
11  you -- have you been made aware of any criticisms that
12  Alan Segrave has leveled on your work that you did under
13  this F.D.A. contract?
14       A.    I do know that -- I am aware that other labs
15  looked at this stuff and could not -- did not find what we
16  found.
17       Q.    Well, do you know that they didn't find
18  chrysotile, or do you know that they're saying that the
19  results are negative?
20             MR. MASSENBURG:  Objection; form.
21             THE DEPONENT:  I know that -- I mean, I saw a
22  presentation in that F.D.A. meeting last month from
23  R.J. Lee where they were saying that the -- that we
24  misidentified something.
25             And then I also -- but they -- and then

Page 45

1   I -- but I don't know the -- the extent of, like, exactly
2   how -- I haven't seen their reports.
3   BY MR. PANATIER:
4        Q.    Okay.
5        A.    I'm aware that -- I'm aware that -- that --
6   that -- their results differ from ours.
7        Q.    Are you aware that R.J. Lee Group found
8   chrysotile asbestos in the same table you looked at?
9              MR. MASSENBURG:  Objection; misstates facts.
10             THE DEPONENT:  No, I was not aware of that.
11  BY MR. PANATIER:
12       Q.    Did you know that they also found chrysotile
13  asbestos in two samples of retained talc from the same lot
14  that your bottle came from?
15             Did you know that?
16       A.    No.
17             MR. MASSENBURG:  Objection; assumes facts not in
18  evidence.
19             THE DEPONENT:  No, I did not.
20  BY MR. PANATIER:
21       Q.    Okay.  Did you know that Alan Segrave identified
22  dozens and dozens of long thin fibers that he labeled as
23  M-G-X-I, but says he was unable to get a fraction on?  Did
24  you know that?
25             MR. MASSENBURG:  Objection.

ANDREAS SALDIVAR, Vol II on 03/19/2020                    Pages 46–49
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 46

1     THE DEPONENT:  I did know that, yes.
2  BY MR. PANATIER:
3     Q.   Okay.
4     A.   I didn't know it was dozens.  I knew -- I did
5  know that, though.
6     Q.   Okay.  So do you know -- are you aware of how
7  R.J. Lee Group has attempted to explain away its findings?
8     MR. MASSENBURG:  Objection to form.
9     THE DEPONENT:  No.
10     MR. MASSENBURG:  Calls for speculation,
11  foundation.
12  BY MR. PANATIER:
13     Q.   Sorry.  Did you answer?
14     A.   Yeah.  No, I am not aware.
15     Q.   Okay.  You have not actually looked at the Alan
16  Segrave Bureau Veritas report or the R.J. Lee Group report
17  pertaining to these same samples, have you?
18     A.   I -- I have not looked at the R.J. Lee one.  I
19  have -- I actually have the Alan Segrave report, but I
20  have not looked at it.
21     Q.   Okay.  I would just, because -- because I
22  believe that -- well, I would just recommend that before
23  you state that -- that you're aware that their results
24  differ from yours, I think you should read their reports.
25  That's just -- I think you should read that.

Page 47

1     So do you have any plans to read it?
2     A.   I have Alan Segrave's report.  So I probably
3  will read it.  I don't have the R.J. Lee report.  But I do
4  know of this stuff because I am in constant communication
5  with the F.D.A.
6     Q.   Okay.  Now, has the F.D.A. told you that your
7  results are wrong for the -- for D58?
8     A.   No.
9     Q.   Has the F.D.A. told you that they are going to
10  withdraw your results or take them out of the public
11  purview?
12     A.   No.
13     Q.   Okay.  Has the F.D.A. told you that, "Hey, you
14  need to explain why R.J. Lee Group and Bureau Veritas say
15  that -- that these are actually negative"?  Have they done
16  that?
17     A.   No.
18     Q.   As far as your involvement on this contract, do
19  you view it as concluded as between AMA and F.D.A.?
20     A.   No.
21     Q.   And please explain what -- why that is?
22     A.   Because they call me almost every single day.
23     Q.   Okay.  And I don't want to get into anything
24  that might be confidential, but does it have anything to
25  do with, for instance, re-running any of the samples or

Page 48

1  re-analyzing any of these samples?
2     A.   No.  I wouldn't be able to anyway because
3  they're in possession of everything.
4     Q.   Okay.  So they took -- they once -- once your
5  work was done, they retrieved all of the samples; is that
6  correct?
7     A.   Correct.
8     Q.   Did they retrieve the grid?
9     A.   Yeah.  They took --
10     Q.   They have -- okay.  So they have the grids, too.
11  All right.
12     As far as -- let me ask a totally different
13  question than what I did before which is:  As far as this
14  contract goes, did you deem the analytical work on these
15  50 samples to be concluded?
16     A.   I do.
17     Q.   Okay.  Can you categorize for me just -- just,
18  again, and I -- I don't need any specifics, but what types
19  of general issues the F.D.A. is contacting you about?  Is
20  it just housekeeping stuff?  Is it, you know, formatting
21  stuff?  Can you just give me some appreciation as to the
22  general category it falls into?
23     A.   Housekeeping.  Housekeeping is the top one, and
24  then we also just started another contract with them.  So
25  they contacted us about that, too, so.

Page 49

1     Q.   Right.  And, of course, you and I have just used
2  this term "housekeeping," but we haven't defined it for
3  anybody else.
4     Can you tell me what you mean when you use
5  the word "housekeeping"?
6     A.   They'll be like -- they'll want us to send a --
7  the latest revision of an SOP or something like that.
8     They'll want to make sure that -- it's
9  general nonanalytical items that they'll contact us
10  about -- about the contract that we're discussing, and
11  then for the contract with this next batch of samples,
12  it's much more specific to -- to analysis and when are we
13  going to finish and stuff like that.
14     Q.   All right.  Do you have -- so you have another
15  contract that you're about to begin work on with the
16  F.D.A.
17     Do you know how many samples that's going
18  to be?
19     A.   I don't know the total it will be.  I think
20  their first submittal to us was 12 samples.
21     Q.   Okay.  And approximately when was that
22  submission?
23     A.   About a week ago.
24     Q.   Okay.  In the -- in the group that we are
25  talking about, 50 or so samples that took most of last

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 50–53

Page 50

1  year to analyze.
2          Do you know how many total Johnson &
3  Johnson samples were actually analyzed?
4      A.   No.
5      Q.   Let's -- let's talk about in the -- in what I
6  believe to be the final report, there's a record changes
7  report entry, and there's two dates that are entered on
8  this.
9          One is October 11, 2019, and one is
10 October 8, 2019?
11         And it has a description of just changes
12 that have been done.
13         For instance, added initials and dates, to
14 strike -- to all strike-throughs and additions to
15 gravimetric rate sheets and it has other stuff like that.
16         Can you just describe what types of entry
17 it is?
18     A.   It is -- it's -- it's an entry -- they looked at
19 an initial report that they had with us, and they have had
20 some findings.  It's crossing the T's and dotting the I's
21 kind of entries; you know, making sure everything is as
22 solid as possible.
23     Q.   Okay.  Let's see here.
24         One of them was, it said change the word
25 "fiber" to "structure."

Page 51

1          Is that just in keeping with T.E.M.
2  nomenclature?  Was that all that was or was that something
3  else?
4      A.   That would be in keeping with T.E.M.
5  nomenclature because in T.E.M. and in general, not
6  everything you observe is a fiber.
7      Q.   Right.  Now, of course, with the chrysotile you
8  identified in sample D58, those were all fibers; correct?
9      A.   I can't -- I can't answer that specifically.
10     Q.   Is that just because you don't have it in front
11 of you?
12     A.   No.  That's because of the F.D.A. specifically
13 telling me not to.
14     Q.   Okay.  All right.  Another -- well, let me ask
15 you this question:  Generally in your experience as, you
16 know, someone who has worked in a lab work a long time,
17 someone who has done a lot of T.E.M., does chrysotile ever
18 exist in a nonfibrous form?
19     A.   No, it does not.  Chrysotile is by -- chrysotile
20 is asbestos, and it's fibrous asbestos.
21     Q.   Okay.
22     A.   There are lizardite and tigerite are related to
23 it, and those are nonfibrous forms of -- of the same --
24 very similar mineral, but if it's chrysotile, it's
25 fibrous.

Page 52

1      Q.   Okay.  And how do you know that what you looked
2  at here was chrysotile as opposed to lizardite or
3  sepiolite or something like that?
4      A.   For chrysotile in general, it's going to have --
5  it's going to be fibrous.  It has a very specific
6  defraction pattern.
7          And in most situations, you can see that
8  it has a hollow tube which is a certain morphological
9  characteristic of it.  And for a properly trained skilled
10 analyst, it's very easy to identify.
11     Q.   Okay.  And would you -- would you categorize
12 your analyst as properly-skilled, trained analyst?
13     A.   Yes.
14     Q.   Okay.  One of the other things I wanted to ask
15 you about this report -- let me see here if I can find
16 it.  It was -- it said that in the special instruction
17 section of the log-in sheet was revised to include the
18 F.D.A. cancellation of a request for analyzing a fourth
19 aliquot of D58 which would have been labeled 308006-6C as
20 you did 006, and then you did 6A and 6B.
21         So there was a fourth aliquot.  Had it
22 already been prepared?
23     A.   That's -- that goes into the realm of stuff they
24 don't want me to discuss.
25     Q.   Okay.  What -- what --

Page 53

1      A.   You would have to ask them.
2      Q.   Okay.  But what we know just from the face of
3  this is at some point per this report, the F.D.A.
4  cancelled the request to analyze a fourth aliquot;
5  correct?
6      A.   That's what the report says.
7      Q.   Okay.  And I'm not asking for the reason,
8  because I take it you'll put it in that bucket of things I
9  need to talk to the F.D.A. about, but were you given a
10 reason why?
11     A.   I think you'll need to ask them.
12     Q.   Okay.  All right.  Stand by.  Were you --
13         And I think you answered this, and I
14 think it was -- but I just want to make sure I'm very
15 clear.
16         You said that the F.D.A. had retrieved all
17 of the samples.  Had they retrieved your couple of grams
18 that you put in your own vials?  Did they take those, too?
19     A.   Yes, they do.
20     Q.   Okay.  So you -- AMA literally has no more talc
21 material or grid or any other preparation --
22     A.   No.
23     Q.   -- of any of the talc that was analyzed by AMA;
24 right?
25     A.   Hello?

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.
Pages 54–57

Page 54

1    Q.    They take --
2    A.
3          MR. MASSENBURG:  Hello?  Hello?
4          MR. PANATIER:  Yes, I can hear you.
5          MR. MASSENBURG:  Can you hear me?
6          MR. PANATIER:  Yes.
7          THE DEPONENT:  No, I mean, you and I can hear
8    each other, Chris.  I don't think Chris Massenburg can
9    hear us.
10         MR. PANATIER:  Yeah, but that's not important.
11         (Laughter.)
12         MR. PANATIER:  Let's go off the record and let's
13   just let Chris get back on.  We'll just take a break until
14   we do that.
15         (Short recess held.)
16         (Whereupon, a discussion was held
17         off the record.)
18   BY MR. PANATIER:
19   Q.    Okay.  Mr. Saldivar, so with regard to this new
20   contract, do you know whether or not that's a contract to
21   test cosmetic talc for asbestos?
22   A.    Yes, it is a contract for that, yes.
23   Q.    Okay.
24   A.    Not just cosmetic talc, but it's better framed
25   as opposed to cosmetic talc, it's talc-containing

Page 55

1    cosmetics is a better way to say it.
2    Q.    Okay.  All right.  So let's talk -- let's chat
3    about -- the preparation that you did on the -- in the end
4    to get the -- to get the record clear on this.
5          I have asked you before about the
6    preparation that your lab did on sample D58 for the report
7    that was released in October, haven't I?
8    A.    Yes.
9    Q.    Right?  I E-mailed you in February; correct?
10   A.    Correct.
11   Q.    All right.  Let me just pull this up real fast.
12   Okay.  Actually, it wasn't February.  I'm sorry.  I think
13   it was January 28th.
14         Does that sound about right?
15   A.    Okay.  It was in -- it was in that time frame.
16   Q.    Okay.  So that was an E-mail I asked you about
17   some of the work you did for the F.D.A.; correct?
18   A.    Yes.
19   Q.    In that E-mail, did I ever bring up Chanel?
20   A.    No.
21   Q.    Did I ask you about any of the testing you had
22   done on Chanel products?
23   A.    No.  You did not.
24   Q.    Did I only ask you about the J&J samples that
25   you had tested under your F.D.A. contract?

Page 56

1    A.    I believe you asked me that, and I told you that
2    I couldn't speak to specifics on that, but I could -- but
3    I answered like, you know, general preparation questions
4    to you and general -- like blank contamination --
5    Q.    Right.
6    A.    -- questions.
7    Q.    We had -- right.
8          We had a -- we had a discussion that would
9    generically apply to how you prepare your reference
10   samples for the most part in your blanks; correct?
11   A.    Correct.
12   Q.    Okay.  And you even told me in -- in those
13   E-mails that there was -- that there was certain
14   categories of information you could not talk about; right?
15   A.    That's correct.
16   Q.    Okay.  In thinking back on our communications,
17   was there anything you stated there that you felt was
18   inaccurate or -- or something you should not have
19   disclosed under the F.D.A. testing?
20   A.    I don't believe so.  I think I spoke to you
21   about general preparation techniques.
22   Q.    Yeah.
23   A.    And I even -- I even specified I believe -- I
24   think I am almost positive that I told you I couldn't
25   speak to specifics on that contract.

Page 57

1    Q.    Right.  In fact, I'm going to quote you.
2          You said:
3          "Hi, Chris.  I am good.  I hope
4          you are as well.  Regarding the F.D.A.
5          work, although all the work is done
6          for that contract, it doesn't expire
7          until March 31st.  All our
8          nondisclosure agreements are still in
9          place.  Some of what you ask is
10         general, though."
11         And then you told me some general things
12   about your reference materials; correct?
13   A.    Yes, I believe so.
14   Q.    Okay.  So what I want to do is I am going to ask
15   you some of the things that you told me about in that
16   E-mail, but we will just do it here on the record.
17   A.    Okay.
18   Q.    So with regard to --
19         MR. MASSENBURG:  I'm sorry.  Panatier, this is
20   Massenburg.
21         Can you attach or send those E-mails that
22   you are commenting on to Irene so we can attach those as
23   exhibits to this deposition?
24         MR. PANATIER:  Yeah, I actually had planned to.
25   Let me attach it here.  And, Irene, can you tell me

ANDREAS SALDIVAR, Vol II on 03/19/2020                                        Pages 58–61
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 58

1   your -- you know what?  I bet you I have it.  I don't
2   know.
3            (Whereupon, a discussion was held
4            off the record.)
5            MR. PANATIER:  I have my notice, which we will
6   make Exhibit 1.  I have J&J's objections.  We can make
7   that Exhibit 2.
8            If Chris has objections, he can E-mail you
9   those, we will make those Exhibit 3.
10           The E-mail that we've been discussing, we
11  will make that Exhibit 4.
12           How is that?
13       (Whereupon, Plaintiff's Exhibit Nos. 1 and
14       4 were marked for identification by the
15       deposition officer and is attached
16       hereto.)
17       (Whereupon, Defendant's Exhibit Nos. 2 and
18       3 were marked for identification by the
19       deposition officer and is attached
20       hereto.)
21           MR. MASSENBURG:  No objection here.
22           MR. PANATIER:  Okay.  All right.  So I'm sending
23  you Exhibits 1, 2, and 4, and Massenburg will send you 3.
24  Okay?  All right.
25           DEPOSITION OFFICER:  Okay.  Thank you.

Page 59

1            MR. MASSENBURG:  Irene, you should have my
2   objections.  I sent those earlier.
3            MR. PANATIER:  So his objections will be 3.  All
4   right.
5   BY MR. PANATIER:
6       Q.   You guys good to continue?
7       A.   Yes.
8       Q.   Okay.  So one of the things I want to ask you
9   about, and I have asked you about this before, with regard
10  to this F.D.A. work is the preparation of your chrysotile
11  standard.
12           And one of the things that it says in their
13  report was that the reference sample was made from the
14  same Sigma-Aldrich talc powder spiked with 10 percent
15  chrysotile.  The reference sample was analyzed by and it
16  was redacted on September 18th, 2019, and found to be
17  within an acceptable limit.
18           So, first of all, your 10 percent
19  chrysotile standard, does that mean that you are putting a
20  grid under the hood and pouring raw chrysotile onto it til
21  you cover the grid by 10 percent?
22      A.   No.
23      Q.   What does it mean?
24      A.   It's -- we made a -- we made a -- I believe it's
25  a .1, or it might be a 1, a 3 and a 10 percent reference

Page 60

1   material where we took -- weighed out a certain amount of
2   Sigma-Aldrich, and we weighed out a certain amount of
3   chrysotile.  We mixed those together, and we put them into
4   a solution, and at the -- after we filter all -- and this
5   is not just for F.D.A.; this is for any talc samples we
6   get.
7            We -- after we filter and prepare the
8   client samples, we take some of that solution, and we will
9   pick one at random, and we will filter that, too.
10      Q.   Okay.  So to break this up a little bit, AMA has
11  the standards of chrysotile on -- on hand; correct?
12      A.   Yes.
13      Q.   Okay.  And that sample, the 10 percent
14  chrysotile in talc samples is an aqueous or liquid sample;
15  correct?
16      A.   It is, yeah.
17      Q.   Okay.  You are not just -- just so everyone's
18  clear, you are not dumping chrysotile into talc under the
19  hood next to your grid preparation for these samples, are
20  you?
21      A.   That's correct.
22      Q.   Okay.  You are -- you are taking the aqueous
23  solution and prepping grid with that aqueous solution
24  under the hood; correct?
25      A.   That's correct.  We're taking that aqueous

Page 61

1   solution, and we are filtering a portion of that, and then
2   we take the filter and put that on the grids.
3       Q.   Ah.  So when you had filtered the aqueous
4   solutions on to the filter, is that done next to the
5   sample preparation?
6       A.   It's -- it's done at -- all of the other samples
7   have been done already.  That's the last one you do.
8       Q.   Ah.  Okay.  So you -- you take a -- I take it
9   you take a pipette or a dropper and you drop some of that
10  solution onto the grid -- onto the filter?
11      A.   You -- you -- you pipe that out a certain amount
12  of it and you put that into -- into, like, 30 milliliters
13  of water and then you filter in the entire thing.  You
14  want that -- if you put it directly on the filter, you
15  wouldn't have a uniformed distribution so you're adding it
16  to some additional clean water and then filtering the
17  entire thing.
18      Q.   Ah.  So you're taking an already liquid solution
19  that contains talc and chrysotile.
20           You are putting that into another liquid,
21  and that is being placed onto the -- the seven -- seven
22  millimeter radius filter; is that right?
23      A.   It's a 47 millimeter.
24      Q.   Oh, I'm sorry.  Okay.  47-millimeter filter; is
25  that correct?

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 62–65

Page 62

1    A.    Yes, that's correct.

2    Q.    And at this point, all of the other samples have

3  been prepped and -- meaning that the sample of the sample

4  talc are already filtered and on grid; is that right?

5    A.    They are -- they are filtered.  They are

6  filtered, and they are already separated from -- from the

7  referenced sample.

8          And the blank sample is prepared right

9  before the reference sample, too -- well, no, the blank

10  sample is prepared after the reference sample.

11         And then you -- and, but when they -- when

12  they go down on the grids, after you have cut them and you

13  have carbon-coated them, you're now taking out small

14  sections of -- each filter and laying it down on the

15  grids.

16         The last one that you're going to put down

17  onto the grids is either the reference or the blank

18  sample.

19    Q.    Okay.

20    A.    All of the customer samples would have gone down

21  on the grids before.

22    Q.    Okay.  Now, when you are putting the filter

23  containing the reference sample and putting that filter

24  portion onto the grid, is that done -- how is that done in

25  relation to -- I know what you said as far as timing, it's

Page 63

1  done last, but as far as relation spatially, how is that

2  done with regard to the samples?

3    A.    It -- it -- you could put up to about those side

4  filters once you cut a portion out about, for -- three,

5  four, maybe five filters on a slide that's going to go

6  into the carbon coater.  It -- it's -- it potentially

7  could be on the same slide as an actual client sample.

8    Q.    Okay.  And when you say that they were -- is

9  that what it means when it says that they -- of the --

10  of -- let me see the reference samples -- I think

11  somewhere it says here, I'm looking for it.  Ah, yeah.

12         The blank and reference sample controls

13  were prepared and they were prepared alongside customer

14  samples.

15         Does that mean that they were prepared in

16  the sense that the carbon coating went on, potentially

17  alongside the customer samples?

18    A.    Yes.

19    Q.    Okay.  It does not mean that someone is -- is

20  handling raw chrysotile under the hood next to the client

21  samples; correct?

22    A.    That's correct.

23    Q.    All right.  And regardless of whether or not

24  they were in proximity to the customer samples or anything

25  like that, all of the blanks were non-detect to the extent

Page 64

1  they were analyzed; correct?

2    A.    Yes.

3    Q.    And since we're talking about D58, for D58 the

4  J&J sample, because chrysotile was found in the sample,

5  the blanks were analyzed; correct?

6    A.    The blanks were analyzed, yes.

7    Q.    And those blanks were non-detect for any

8  asbestos; true?

9    A.    With regards to blanks, yes, and that is -- that

10  is -- the F.D.A., I believe -- the F.D.A. has put that out

11  so.

12    Q.    Right.  Yeah, that's in the report.  Let's see

13  here.  Your count sheet.  On your count sheet for -- and

14  I'm looking at sample -- sample 6A.

15         You've got your notations for the two

16  chrysotile structures identified.  You have a length and

17  width and elemental I.D.  You also have S-A-E-D and it

18  says S-A-E-D -- I can't -- I can't tell what it says after

19  that because it's kind of blurry.

20         Do you know what it says after that -- so

21  it says F.D.A., like --

22    A.    If -- if for chrysotile, if there's something in

23  the -- for chrysotile -- this is in general, too, because

24  it's -- it would -- it would say something along the order

25  of P-O-S for positive.

Page 65

1    Q.    Yeah.  Well, one says positive and one says, I

2  think, U-T-O?

3    A.    That's "unable to obtain."

4    Q.    Okay.  So that means you can't get the S-A-E-D

5  pattern.

6          And I think you got a note in here that

7  that second -- that second fiber of chrysotile was

8  confirmed based on tubular morphology; is that correct?

9    A.    I don't have that sheet in front of me and that

10  would be getting into the very specifics of analysis of

11  that sample, so I wouldn't be able to answer that anyway.

12    Q.    All right.  Let me see here.

13         If at any point during this -- oh, let me

14  ask you this:  Did you produce a chrysotile reference grid

15  for every batch of samples?  Or did you just prep it once?

16    A.    No.  We did it for every batch of samples, and

17  that is standard practice for -- for any -- any talc

18  samples that we have that come in.

19         For every batch of them, we produce for

20  reference samples.

21    Q.    All right.  And to be clear, that is a prepping

22  a reference sample as you did, a chrysotile reference

23  sample, that is a generally accepted methodology for doing

24  so, is it not?

25    A.    It -- I don't know if it's generally accepted.

ANDREAS SALDIVAR, Vol II on 03/19/2020                                      Pages 66–69
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 66

1  There's -- there's not much literature out there on how to
2  make your own reference samples.
3           And with regards to asbestos and talc, it
4  can actually be quite -- quite difficult.  But that's --
5  you know, the way we've chosen to do it is to make it an
6  aqueous solution and weigh out portions of it.  I have
7  tried to do it with -- with like very low concentrations
8  of tremolite.  I have not been successful.
9      Q.   All right.  Did the F.D.A. raise any objections
10 to how you prepare the reference standard?
11     A.   No.
12     Q.   Okay.  And this continued to -- this would be --
13 the current contract you are on would be the third
14 contract you've done for the F.D.A.?
15     A.   Yes.
16     Q.   Okay.  And, again, all of your lab blanks to the
17 extent that they were run in this work of over 50 samples
18 analyzed were non-detect; correct?
19     A.   Correct.
20     Q.   All right.  Going forward, do you have -- do you
21 have any concerns that your lab is a contaminated lab?
22     A.   No.  I don't have concerns about that.
23           I mean, our lab analyzes a lot of samples,
24 and on any given year, it's -- it's not as much as it was,
25 say, 20 years ago, but we still find asbestos in five,

Page 67

1  six, seven, eight thousand samples a year.  You figure out
2  that -- how many times we have -- we see asbestos every
3  single day.  And -- and there's a lot of stuff out there
4  with asbestos in it.  A lot.
5           And so we have to be careful and we -- we
6  run a lot of blank samples.  And in the course of a year,
7  we -- we do find a couple from time to time that have
8  asbestos on it.  It won't be much.  But, you know,
9  they're -- we have to take great care and if something
10 like that happens, we -- we -- depending on the nature
11 of the situation, we will -- you know, we will do an
12 investigation of it, or -- or just remind people prepping
13 of good practices, but -- I mean, it is something we have
14 to be aware of and be -- be cognizant of because we do see
15 a lot of -- we see a lot of positive samples come through
16 our laboratory.
17     Q.   Okay.  And I think you told me in your E-mail,
18 you said that last year, we found asbestos in
19 approximately 6,000 samples; is that true?
20     A.   Yeah.  That -- that -- I believe I did tell you
21 that.
22     Q.   And you said that you do thousands of blanks
23 each year and you get two or three hits; is that right?
24     A.   That would be accurate, yeah.
25     Q.   And that is out of -- that is out of 6,000

Page 68

1  samples?
2      A.   That's -- that's 6,000 positive samples out of
3  like 80,000 total samples or 70,000 total samples.
4  Something like that, yeah.
5      Q.   Okay.  So your lab is running 70 to 80,000
6  samples for asbestos and you're finding approximately
7  6,000 that contain asbestos and you said that you might
8  get two or three hits for -- in your blanks; is that fair?
9      A.   Correct.
10     Q.   Okay.  In the case where you do get a hit, do
11 you -- what is your -- what is your procedure for
12 conducting an investigation and then re-running samples?
13     A.   If -- if the samples were -- if the associated
14 samples were all negative, and you got a hit on a blank,
15 you're not going to rerun the samples, but you are going
16 to make sure you clean the area, again, where the samples
17 were prepared, you're going to have a conversation with
18 whoever handled those samples and remind them of proper
19 tool cleaning practices and things like that.
20           If the samples that -- if you found
21 something on your blank and the associated samples did
22 have asbestos in them, then you're going to look at --
23 you're -- you're going to then investigate -- you will
24 likely have to re-prep some samples then.
25     Q.   Okay.

Page 69

1      A.   Especially if -- if you're coming back with a
2  sample that is trace, meaning it's less than 1 percent
3  asbestos, and your blank is showing something like that.
4  Well, if your blank has something on it like that, you
5  better make sure that your -- that -- that you're not the
6  source of the asbestos in your client sample.
7      Q.   Okay.  And you said that -- you know -- if you
8  are running a total of 80,000 samples and you get two or
9  three hits, I did the math on that for the percentage and
10 you would just -- you would just divide three by 80,000 to
11 get the percentage; right?
12     A.   Not quite.  Because you're also not running --
13 you're not running, you know, a blank for every single
14 live sample you have.
15           So it's -- it's -- but you are -- there are
16 blanks run for every single set of samples that you have
17 or batch of samples.  There's -- sometimes there's large
18 sets that are going to have more than one blank.  And this
19 goes across and we run blanks for P.L.M. and for T.E.M.,
20 as well.
21           So it's not -- to get the correct
22 percentage, you would -- you would figure out, okay, how
23 many total blanks did I have?
24           And then you would take your total number
25 of hits and divide it by the total number of blanks that

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 70–73

Page 70

1    you had.  Not the total number of client samples that you
2    had.
3        Q.    Gotcha.  Either way, any number of positives
4    that you might get in a blank in a given year when
5    considering very, very large number of samples you run
6    would be extremely small, extremely low?
7        A.    It is extremely small.  Yes.
8        Q.    All right.  And by the way, have you worked at
9    other labs other than AMA?
10       A.    No, I -- well, in college, yeah, but not
11   professionally.
12       Q.    Okay.  Have you looked into doing a heavy liquid
13   density separation -- preparation technique for your talc
14   work?
15       A.    I have the liquid and I even assigned one of my
16   guys to practice with it, to which I just did that a
17   little while ago.  I have -- I have some concerns about
18   that -- about that preparation technique.
19       Q.    Okay.  What are your concerns?
20       A.    That -- that --
21            MR. MASSENBURG:  Sorry, Andreas.  This is
22   Massenburg again.  I just object that this exact line
23   of questions was asked and answered in your earlier
24   deposition, and in the "Zimmerman" and "Welch" matter that
25   was noticed by Mr. Panatier's firm and you discussed it in

Page 71

1    detail.  So asked and answered.
2            MR. PANATIER:  Yeah, I'm going to ask just a
3    couple of questions about it, because now we've got
4    someone's that's actually working on it at the office.  I
5    don't intend to retread all of that.
6    BY MR. PANATIER:
7        Q.    If you can just answer just the question about
8    your concerns about the method, and then we will move on.
9        A.    It's -- its inability -- first of all, you're
10   not going to find chrysotile using it.  And I think that's
11   an important -- important thing to be analyzing for.
12            And then if you were dealing with
13   anthophyllite, that does have little to no iron in it.
14   Then it's also not dense enough to use the heavy liquid
15   separation technique.
16            And we actually see a lot of samples that
17   have a mixture of talc and anthophyllite.
18       Q.    Okay.  Has the F.D.A. asked you to do any
19   analysis with heavy liquid density separation prep?
20       A.    No, they haven't.
21       Q.    Okay.  All right.  So you recall that in June
22   when we did your first deposition in this case, that you
23   very graciously went through some math with me where we --
24   we tried to figure out what fraction of a gram you were
25   actually looking at with a given sample.  And --

Page 72

1        A.    Correct.
2        Q.    And, yeah.  And I wanted to do that on this
3    depo.  Because I think we just -- I think -- and I'm -- my
4    recollection might be poor.  I think we just sort of
5    picked one at random, and I think it was a -- it was a raw
6    talc material that we had looked at at that time.
7            Do you recall that?
8        A.    Correct.
9        Q.    All right.  And so what I would like to do is
10   just do the same math just with this specific sample so
11   we're not really picking one at random.
12            We're sort of picking one that we know what
13   the sample is.  It's not a sample that was done for
14   litigation.  It was done under the F.D.A. contract.
15            Are you okay to do that?
16       A.    Yeah.  As much as I can do it off the top of my
17   head, yeah.
18       Q.    Well, I have the numbers here and I will just
19   represent them to you based on what it says here in the
20   report.  And we can just go off that.  If I'm wrong, then
21   the number will be -- then we can ignore the number.
22            But I will just go off of what is in your
23   report, and we should be able to go a little bit quicker
24   than last time because I now kind of know how to do it.
25   The first thing --

Page 73

1            MR. MASSENBURG:  I'm sorry.  I'm sorry.  Chris,
2    this is Massenburg, again.  I would just say if you do
3    have a calculator and/or access to the report Mr. Panatier
4    is referencing, I would encourage you to review those
5    and/or go along with him and attempt to make the
6    calculations yourself.
7            I am not stating here that Mr. Panatier
8    would be wrong in his calculations, but in past experience
9    myself, sometimes there's been errors in his
10   calculations under these or similar circumstances.  With
11   that caveat, I will leave it to your discretion on how to
12   proceed.
13   BY MR. PANATIER:
14       Q.    Well -- and with -- just -- just to give
15   ourselves a framework, Mr. Saldivar, you and I did this
16   together last time, and we verified the math, didn't we?
17       A.    Yeah, to the best of my ability.  I mean it was
18   doing it in my head.  So.
19       Q.    Well, we were in person, and I had a calculator;
20   right?
21       A.    I guess so.  If you say you did.  I don't
22   remember.
23       Q.    Okay.
24       A.    We all have calculators now on our phones, so.
25       Q.    We certainly do.  To the extent that you want to

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 74–77

Page 74

1  bring up the report or to the extent that you want to have
2  your calculator there, please do.
3      A.   Okay.  I don't have the access to the report
4  right now.
5      Q.   Okay.
6      A.   But I -- I can calculate if I have to.
7      Q.   That's fine.  I will -- I will just quote to you
8  the numbers that are -- that are here from the report and
9  we will just use those.  Okay?
10     A.   Uh-huh.
11     Q.   So the first thing -- the first thing obviously
12  is our -- our starting weight.  And the starting weight
13  that we have -- let me see here.
14          Starting weight, it says that you weigh out
15  .1 to .8 grams of material.
16          On average, would that be like .4 or .5?
17     A.   Somewhere around there, yeah.
18     Q.   Okay.  So why don't we do .4, and you just take
19  that.
20          And the next thing that happens is you
21  digest away the organics; right?
22     A.   Correct.
23     Q.   And you record the post ash weight; correct?
24     A.   That's correct.
25     Q.   Okay.

Page 75

1      A.   Yup.
2      Q.   So -- so -- if I want to know, in looking at one
3  of these reports, what the post ashing weight was, where
4  would I look?
5      A.   Um...  If the F.D.A. has included our weight
6  sheets on there, it would -- it would -- you would take
7  the -- the weight of the vessel, crucible or vessel, glass
8  vial -- we put them in glass vials -- the post ash weight
9  of that and you would subtract the weight of the empty
10  vial.
11     Q.   Right.  Okay.  I'm going to -- I think we
12  actually have that here.
13          So let's just do -- sample -- we will do
14  sample 6B, and what I have here is I have a sheet called
15  Gravimetric Reduction Infiltration Bench Sheet, and for
16  6B, I have the mass of the vial in the sample, the mass
17  post ash vial sample, the mass filter and petri dish, the
18  mass post acid wash going all the way across, the
19  filtration weights and all of that.
20          Is that what we would need?
21     A.   Yes.  That's correct.  Yeah.
22     Q.   Okay.  So for -- and let's -- instead of taking
23  averages, let's just use the exact numbers here.  So for
24  6B, it says mass grams vial, and it says 7.1687.
25          What does that mean?  The mass grams vial?

Page 76

1      A.   It's the mass of the empty vial.
2      Q.   Okay.  And then if I have the mass gram of the
3  vial sample for 6B, that is 7.6634.
4          So if we want to know how much of the talc
5  is there in the actual -- that was actually taken, we
6  would actually just subtract the mass of the vial from the
7  mass of the vial of plus the sample; right?
8      A.   You take the mass of the vial and the sample and
9  subtract the mass of the vial.  That's correct.
10     Q.   So if I take 7.6634 and I subtract 7.1687, I
11  get -- and it's right between what you and I said, .49
12  grams.
13     A.   Yes.
14     Q.   As what the weight of the talc was.  Okay.  And
15  then, if we want to know how much was digested away, we
16  have this mass grams post ash, and its vial and samples,
17  and it tells us that it's -- it's 7.6622.  So it sounds to
18  me like --
19     A.   So not very much.  Not very much was taken away
20  during ashing.
21     Q.   Right.  Because our total weight with both was
22  7.6634, and after ashing, it's 7.6622; right?
23     A.   Correct.
24     Q.   So if we wanted to know the percentage, we would
25  take the 7.6622 and divide that by 7.6634; correct?

Page 77

1      A.   You want to -- if you know the percent, you take
2  the difference between those two numbers, which is .12 --
3  .0012.
4      Q.   Okay.
5      A.   And then you divide that by the initial sample
6  weight of .49.
7      Q.   Ah.  Okay.
8      A.   And then you multiply that by 100.
9      Q.   Okay.  So if we -- if you wanted to know the
10  percentage, then we divide the -- you said we divide .0012
11  by .49?
12     A.   Yeah.  And then multiply that by 100.
13     Q.   Okay.  So I get .00244898, and I'm going to
14  multiply that by 100?
15     A.   And then you get about a quarter of a percent.
16     Q.   Yeah.  So .24.  So we're looking at 99.76%
17     A.   Yeah.
18     Q.   Percent?  Okay.
19     A.   Correct.
20     Q.   Okay.  So of our starting weight of .49 grams,
21  if we want to know the remaining weight after ashing, we
22  just take .49 grams and we multiply it by .9976; right?
23     A.   Or you just take 7.6622 and minus 7.1687 which
24  is easier.
25     Q.   So 7.6622 minus 7.1687?

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 78–81

Page 78

1   A.   Yeah.
2   Q.   That tells me we are at --
3   A.   It should be .0012 less than the -- than the
4   initial weight.
5   Q.   Okay.  It's .0012 percent less or grams less?
6   A.   No.  Grams less, yeah.
7   Q.   Okay.  So we just take our .49 and subtract
8   .0012; fair?
9   A.   Yeah.  I think -- I'm doing it here by hand.  I
10  think the initial was .4947, so your next one is going to
11  be .4935 or something like that.  It should be .4935.
12  Q.   That's what I got.  So .493 -- well, if we start
13  with .49 grams, it has to be less; right?
14  A.   Yes, it is, but 7.6634 minus 7.1687 isn't
15  exactly .49.  It's .4947.
16  Q.   Ah, okay.  Okay.  So after ashing, our weight of
17  the sample is .4935 grams; right?
18  A.   Right.
19  Q.   Okay.  Okay.  So typically you then -- you
20  suspend half of that into 100 ml; right?
21  A.   There's another step in between.
22  Q.   Okay.
23  A.   So now you're going to do the acid treatment.
24  Q.   Ah.
25  A.   So that was the ashing.  So now you're going to

Page 79

1   do the acid treatment.  So to do that, you take what is in
2   the vial, the .4935.
3        You add your acid to it and you let it
4   digest for about five to ten minutes.
5        And then you filter that -- that solution,
6   that acid solution, and you've added some water in to stop
7   the -- the -- to dilute the acid afterwards.
8        But you add that -- you then filter that
9   onto a pre-weight filter.
10       As a matter of fact, and you've pre-weighed
11  the petri dish that that filter you're going to put that
12  filter in, too, and so -- then you let it dry and then
13  you -- you weigh that again.
14       So now you can -- so now you can calculate
15  how much you lost to acid dissolution.
16  Q.   Okay.  And we got the numbers here.  So tell me
17  how we do that.
18       We have the math of the filter and in the
19  petri dish.
20       Do we need that?
21  A.   Yes, we do.
22  Q.   So that is 6.0903.
23  A.   Okay.
24  Q.   And then we have the math post acid of the
25  filter in the petri dish, which is 6.5285.

Page 80

1   A.   Okay.  So now you're going to take the 6.5285.
2   Q.   Uh-huh.
3   A.   And you're going to minus the 6.0903.
4   Q.   Okay.  And I get .4382?
5   A.   Yeah, that's what I get, too.
6        So, now, to figure out your -- your
7   percentage of acid dissolution, you're going to take your
8   initial sample weight .4947 minus the .4382 to get the
9   difference.
10  Q.   Okay.  So we're going to take .4947 and
11  subtract --
12  A.   Minus the -- minus -- agree.
13  Q.   Okay.
14  A.   The .4382.
15  Q.   Okay.  I get .0565.
16  A.   That's what I get, too.  And now you divide that
17  by your initial sample weight, .4947.  And then multiply
18  it by a hundred.
19  Q.   Okay.  I get 11.42.
20  A.   That's a -- that sounds about right.
21  Q.   And then we subtract that from a hundred, and to
22  get our weight after acid and ashing; correct?
23  A.   That's correct.  And so we had -- we had a about
24  a quarter percent in -- in the -- in the ashing.
25       So you would take that percent and

Page 81

1   this percent, and you minus those from a hundred.  And
2   you're going to have your percentage of -- of residue
3   remaining.
4   Q.   Right.  So we've had 11.42 after acid and then
5   we had .24 after ash, so our total loss would be 11.66
6   grams; is that correct?
7   A.   Yeah.  That sounds about right, yeah.
8   Q.   Okay.  And then we subtract that from 100.  So
9   100 minus 11.66 equals 88.34; right?
10  A.   So that's what is remaining.
11  Q.   That's right.
12       So we have our remaining weight.  So we
13  have a starting weight of .49.  And we multiply that times
14  88.34; right?
15  A.   (No audible response by the deponent.)
16  Q.   And that tells us --
17  A.   Um...  Yeah, that -- that should equal -- that
18  should be equal to the .4382.  Because you've already
19  figured out -- you've already figured out what you have
20  left.
21  Q.   Right.  Right.  So --
22  A.   So you already know that number.  That's how
23  you figured out the 88.  That's how you figured out
24  your percent loss.  So you already know what you have
25  left.  You have .4382 left.

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 82

1    Q.   I did .4328.  I don't think it's that important,
2    but...
3    A.   Well, it is -- there -- that -- because we're --
4    we're taking numbers that go well beyond the two decimal
5    places and we are rounding them and yeah --
6    Q.   Yeah --
7    A.   But you -- you know -- you -- you already know,
8    you weighed your filter with your -- with your sample on
9    it, and you had your -- your -- you knew where those --
10   that filter and that petri dish weight before, so you know
11   that this point in the sample prep, you have .4382 left.
12   Q.   Okay.  So we have .4382 grams?
13   A.   Yeah.
14   Q.   Now, going back to the procedure here on your
15   report -- all right.
16        Do you still -- this is not in the report.
17   It wasn't in the last report that you and I went over
18   either, but you told me that you suspend half of that into
19   100 --
20   A.   You -- you take approximately half of that
21   .4382, and you suspend that into 100 milliliters of water.
22   So let's just say for this, you put in --
23   Q.   .219 --
24   A.   -- .21, yeah, .21 or .22, somewhere around .215.
25   Q.   Okay.

Page 83

1    A.   And then you put that into the water and then
2    you filter a -- actually a small portion of that.
3        You -- you suspend it into 100 millimeters,
4    and then you're filtering somewhere 2 milliliters in that,
5    sometimes it's less than that; sometimes it's even less
6    than 1 millimeter of it.
7    Q.   Okay.  Let's stop there.
8        So -- so -- it -- we're -- if we're
9    doing -- it looks like it's .22 grams, and we want to know
10   what that is per ml, we simply divide the .22 by 100;
11   correct?
12   A.   Yes.
13   Q.   To get the grams per ml; right?
14   A.   Right.
15   Q.   Okay.  Now, if I want to know exactly how much
16   was placed onto the filter, will that be recorded in here?
17   Or is that something that is so remote that you don't
18   record it either?
19   A.   No.  There -- there should be a sheet --
20   Q.   Okay.
21   A.   -- in there.  There should be a filtration sheet
22   or something like that, and I don't know if F.D.A. put
23   that out, but in general, there would be an amount of that
24   solution of that 100-millimeter solution that was filtered
25   onto the 47 millimeter filter.

Page 84

1        And obviously, somewhere between -- between
2    .2 millimeters up to about 2 milliliters.
3    Q.   And here -- here it says about .2 ml with the
4    volumes filtered.
5        Is that what I'm looking for?
6    A.   Yes.
7    Q.   Okay.  So if it's .2 ml, then -- and we know
8    that there's .0022 grams per ml, then if we want to know
9    how much was filtered on, we know that in the total of .4
10   ml; right?  Or, no, I'm sorry.
11       We know it's .2 ml, and we would --
12   A.   It's basically -- it's -- it's basically
13   1/500ths --
14   Q.   Right.
15   A.   -- of -- of the amount that's in -- that's in
16   that jar.  So we know we put in .22 in there.
17       So 1/500ths of that is actually what makes
18   it onto the filter.
19   Q.   Wow.  And so if we know that there's .0022 grams
20   per ml, we basically want 2/10ths of that; right?
21   A.   Right.
22   Q.   Right?
23       So we would take -- we would take .0022
24   times .1 which would give us 1/10th, multiply that times
25   2, and that would give us 2/10ths which would be .00044.

Page 85

1        Does that sound right?
2    A.   Yeah.  That sounds about right.
3    Q.   And that is .0044 (sic) grams that would be
4    placed onto the filter; right?
5    A.   That's correct.
6    Q.   Can you guys hear my dog howling?
7    A.   I heard something.  I heard a little bit.  But
8    not much.
9    Q.   Let me know if it gets in the way, because
10   they're idiots, and that's what they're doing right now.
11   Okay.
12       So we're at .00044 grams that are placed
13   onto the filter.
14       The filter, you told me before, is a -- how
15   much square area, effective square area?
16   A.   I -- it's something around a thousand.  It's
17   right around a thousand 50 square millimeters of the
18   effective filter area.
19   Q.   Okay.  Let me just -- let me just bring up --
20   A.   I am using thousands.  It's going to be easier
21   to calculate.
22   Q.   Yeah.  I think you told me the exact number last
23   time.  Yeah, you said -- you said and that's -- that's a
24   good memory.  You said 1047.
25       Is that -- is that the same as 1050?

ANDREAS SALDIVAR, Vol II on 03/19/2020                                    Pages 86–89
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 86

1    A.    No.  It's 1047.
2    Q.    Okay.  So 1047 square millimeters is our filter.
3          And so if we want to know grams per square
4    millimeter, we simply divide the .00044 grams by 1047;
5    correct?
6    A.    Uh-huh.
7    Q.    And I get .00000042 grams per square millimeter;
8    correct?
9    A.    That sounds about right.  Yeah.
10   Q.    Okay.  And then for this if we want to know
11   about the actual area looked at, the square millimeters,
12   you looked at how many grid openings per sample?
13   A.    So, for instance, for this sample that you've
14   just on the calculation for, this one, we now do 20 grid
15   openings.
16   Q.    All right.  So -- so for sample 6B that we've
17   been talking about of -- of -- of D58, 6B, you're saying
18   that there's 20 grid openings analyzed; fair?
19   A.    Yeah.
20   Q.    So we would take our -- each grid opening is --
21   I think you told me --
22   A.    It's around -- yeah, about .014 millimeters.
23   You take .014 and multiply that by 20 to get the total
24   area analyzed.
25          And then you -- you could then calculate --

Page 87

1    then you -- that's a -- that's a percentage or a fraction
2    of a millimeter that was actually analyzed.
3          And so then you figure out the total number
4    of grams per millimeter on there.
5          So now you can figure out the total -- the
6    actual total amount of sample that was looked at.
7    Q.    Right.  So --
8    A.    That is very small.
9    Q.    Right.  So if you've got .014 millimeter for a
10   grid opening times 20, I get .28 square millimeters;
11   right?
12   A.    Yes.
13   Q.    Okay.
14   A.    So about a quarter of a millimeter.
15   Q.    Okay.  And if we know that there is a .00000042
16   grams per square millimeter, we would just multiply that
17   by times .28; right?
18   A.    Yes.
19   Q.    Okay.  And I get .00000012.  Total grams
20   analyzed per aliquot.
21          Is that correct for this aliquot a -- a
22   sample --
23   A.    For that aliquot, that sounds -- that sounds
24   about right.
25   Q.    Okay.  And if I want to know what proportion of

Page 88

1    a gram that is, I simply divide that into one; correct?
2    A.    You would -- you would take -- if you want to
3    know the percentage of it, you would take that particular
4    weight.  And you -- and well, since you're going to -- you
5    take your weight of something and divide it by -- divide
6    it by your -- you know -- you know -- for this, it's --
7    you are dividing by 1, so it's going to be the same
8    number.  You just multiply it by a hundred to get a
9    percentage.
10   Q.    Well, I'm not looking for a percentage.  I'm
11   looking for proportion -- we are talking about the same
12   thing, but I want to --
13   A.    Well, a percentage is a proportion.
14   Q.    I understand.  I understand.
15          But in terms of we can say 25 percent or we
16   can say .14; right?
17          So what I want to do is -- if I want to
18   know what fraction of a gram was looked at, I can simply
19   divide this into one; correct?
20   A.    No.  Because -- you're -- you're -- no, because
21   then you're going to end up with -- I think -- it has to
22   be the -- the fraction of the --
23   Q.    Well, it's very simply, if I want to know how
24   many times .00000012 goes into a gram, I divide it into
25   one; right?

Page 89

1    A.    Yeah.  Yeah.
2    Q.    So I'm going to take one, I'm going to divide it
3    by point one, two, three, four, five, six zeros 12, and I
4    get 8,333,333, which means that for this analysis, and we
5    may have looked at 1/8,333,333rd of a gram; right?
6    A.    That -- that sounds about right, because you are
7    dealing in with what's on a T.E.M. grid, and you are
8    dealing down in the nanograms's range.
9    Q.    Right.  And so you and I did this before with
10   our other one.  The samples, each sample aliquot that you
11   are looking at, of course, is the homogenized sample;
12   correct?
13   A.    Yes.
14   Q.    And so all things being equal, in order to find
15   one fiber -- in order to find one fiber based on this
16   analytical sensitivity, there would have to be about
17   8,333,333 present; correct?
18   A.    In a -- in a -- in a gram?
19   Q.    Yeah.
20   A.    For -- for this particular situation, it
21   would -- it would -- it would calculate out to something
22   like that.
23   Q.    Okay.  And --
24   A.    But there's also -- have -- but just to point
25   out with the -- one of the reasons, too, that you take a

ANDREAS SALDIVAR, Vol II on 03/19/2020                                    Pages 90–93
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 90

1  multi-analytical approach to this which includes P.L.M.
2  is because with P.L.M., you get to look at much more
3  sample than you get to look at with T.E.M.
4     Q.   Yeah.  And you have a tradeoff.  And you get to
5  look at more samples --
6     A.   Yeah.
7     Q.   -- but you have a different type --
8     A.   Much less resolution.
9     Q.   Yeah.  Okay.  So -- and these chrysotile fibers,
10  by the way, these were not identified by P.L.M., and they
11  were not visible by P.L.M.; correct?
12     A.   Stuff like that, no, you would not see it by
13  P.L.M.
14     Q.   Right.  Because we're talking about based on
15  the count sheet, you are talking about width of these
16  chrysotile fibers of .05, .06.  That's not resolvable-type
17  P.L.M.; correct?
18     A.   Right.  So your hopes for the P.L.M. approach to
19  it as well, too, that you see chrysotile is often bundled,
20  and your -- your hopes are that since you get to look at
21  orders of magnitude more sampled by P.L.M., that you would
22  run across something that is resolvable by the optical
23  microscope that would -- you know, so --
24     Q.   Right.
25     A.   That's the multi-task approach to looking for

Page 91

1  this stuff.
2     Q.   Right.  And so, for instance, if we are looking
3  at sample test B that we have been looking at, that would
4  report that there were four chrysotile fibers found;
5  right?
6     A.   Uh-huh.  I believe that's what the final report
7  says.
8     Q.   Okay.  And so if we want to know the approximate
9  concentration in terms of actual fibers per gram, we know
10  that to find one, we are talking about that 8 million
11  range.  And if you assign --
12     A.   Yeah.
13     Q.   Go ahead.  Sorry.
14     A.   It's a little bit more complicated than that in
15  that chrysotile in nature, this is in general, stays
16  bundled quite often.
17           And so part of our preparation process
18  is -- is we want to -- we want to break up those bundles.
19  We want to break up those bundles and disperse that stuff
20  as much as possible.
21           So if it's staying bundled like that, it
22  would be -- it would be more -- it would be more difficult
23  to find.  So we want to break that up.
24           We want to break it up, and we want to
25  disperse it as much as possible.

Page 92

1           So we use ultrasonics in the preparation.
2           The acid dissolution is a very aggressive
3  method, and it helps to -- all of this agitation of the
4  sample helps to do that.  So if you were able to take --
5  so by going backwards and saying that okay, one gram has
6  this many millions of fibers in it, that is true, if
7  you -- but if -- in its raw form, would it be in there as
8  8 million individual fibers?  It wouldn't be.  It would
9  likely be in there as -- as a certain number of bundles
10  because bundles themselves especially with chrysotile can
11  have thousands and thousands of fibers in each bundle.
12     Q.   But -- okay.
13     A.   It is a useful number to give you some idea of
14  what you're looking at.
15     Q.   So -- so let's -- we -- I'm going to examine
16  that.
17           But going on what was actually seen, we
18  know that four fibers were identified in that sample
19  and we know that as on a fibers per gram analytical
20  sensitivity, you are about 8 million.
21           If we wanted to know how many after prep,
22  okay, I'm accepting your caveat on the prep and how it
23  affects the -- the talc.
24           I mean, I -- I hear that.  I'm going to ask
25  you a few questions about that.

Page 93

1     A.   Okay.
2     Q.   But based on what was actually found, if we want
3  to know the total numbers of those fibers as they existed
4  after prep, you simply take the four -- the analytical
5  sensitivity of a little over 8 million; correct?
6     A.   Yes.
7     Q.   Giving us 24 -- 32 million?
8        MR. MASSENBURG:  Object to the form.
9        THE DEPONENT:  Yes, yes.
10  BY MR. PANATIER:
11     Q.   Okay.  And so as far as what actually existed
12  after prep, okay, and we will talk about the others, but
13  what it listed in the sample after prep was something on
14  the order of 32 million fibers per gram; correct?
15        MR. MASSENBURG:  Object to the form.  Same
16  objections --
17        (Speaking simultaneously.)
18        THE DEPONENT:  Yeah, it would be something like
19  that.
20        MR. MASSENBURG:  Andreas, I apologize.  This is
21  Chris, and I think we are just going to get a few
22  objections, and I hate to talk over you.
23        Chris, is it okay if I wait until Andreas
24  finishes his answer before I make my objection just so
25  that I'm not interrupting the answer?

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 94–97

Page 94

1    MR. PANATIER:  Sure.
2    MR. MASSENBURG:  My objection is it's an
3  incomplete hypothetical, assumes facts, speculation, and
4  vague.
5  BY MR. PANATIER:
6    Q.   Okay, sir.  You can answer.
7    A.   Yes.
8    Q.   Okay.  All right.  Now, going back to some of
9  the things that you said about the prep, that one of the
10  things you are doing, you are doing sonication; you're
11  doing the act of prep and so forth.
12    It would be your expectation that to the
13  extent that there are bundles present of that chrysotile,
14  that those methods would further break up those bundle; is
15  that correct?
16    A.   Yes.  That's what you wanted to do if it's
17  there.
18    Q.   Right.  And you're not assuming, are you, that
19  as the talc arrives to you, to the extent that there's
20  chrysotile there, that's all of the chrysotile present is
21  in bundles at that point, are you?
22    A.   Now, you make no assumptions like that at all,
23  no.
24    Q.   Right.  And that's because you understand that
25  this talc has already been extensively milled.  You know

Page 95

1  that; right?
2    A.   Yes.  And even during milling, it is -- and I
3  can tell you this from trying to make my own reference
4  material that to get it to disperse in milling is
5  difficult.
6    It takes on -- I found that the best way to
7  get it to break up is ultrasonication.
8    Q.   Okay.  But I guess my question is:  You don't
9  know -- you haven't looked at or -- and probably are not
10  aware of anyone who's done it -- I'm not, but that of what
11  proportion of chrysotile as it exists in samples like this
12  to the extent it exists, prior to being analyzed is in
13  bundle versus individual fibrils, have you?
14    A.   No, I have not.
15    Q.   Okay.  And so -- and so while it would be your
16  expectation that the preparation, your preparation would
17  increase the number of fibrils by breaking up some
18  bundles, you have no way of telling us, well, we know that
19  it increased the number of fibrils or individual fibers by
20  X amount; correct?
21    A.   No, I would not.  I can think of some ways you
22  can do it, but -- but I do not, no.
23    Q.   Okay.  And so -- and so -- what I believe I hear
24  you -- I am hearing you say is that even though, yes, as
25  tested sample 58 or D58, the J&J sample, even though as

Page 96

1  tested under your method, it contained approximately
2  32 million of the chrysotile fibers, it would be your
3  expectation that however it arrived at AMA, it contained
4  less structures than the 32 million because it had not yet
5  been prepped with acid and sonication; is that correct?
6    MR. MASSENBURG:  Objection to the form.
7    THE DEPONENT:  I -- I -- I would expect
8  that for any talc sample that I found chrysotile in.
9  BY MR. PANATIER:
10    Q.   Okay.  Sure.
11    MR. MASSENBURG:  Let me just enter my objection.
12  I just object that it's overbroad, speculation, vague,
13  improper and incomplete hypothetical, assumes facts not in
14  evidence.
15    MR. PANATIER:  That's fine.
16  BY MR. PANATIER:
17    Q.   And, sir, as you sit here today, you cannot tell
18  us in a scientific way -- well, I know that it's the
19  actual number of structures prior to preparation was
20  75 percent of that 32 million or 10 percent of that
21  32 million.  You have not done that.
22    Is that fair?
23    A.   I have not.
24    MR. MASSENBURG:  Objection.
25  BY MR. PANATIER:

Page 97

1    Q.   Okay.  All right.  We've been going a little bit
2  more than an hour and ten minutes on that second section.
3  I am very close to being done, Mr. Saldivar.
4    Do you want to do just a five-or
5  seven-minute break?
6    A.   Yeah, I could use one right now.
7    Q.   Okay.  Let's -- let's do that, and we will come
8  back.
9    A.   Okay.  All right.
10    MR. MASSENBURG:  Do you mind if we do ten?  I
11  just -- in case anybody needs to go to the restroom or
12  otherwise?
13    MR. PANATIER:  Ten is fine.
14    MR. MASSENBURG:  All right.
15    (Whereupon, a recess was held
16    from 10:25 a.m. to 10:41 a.m.)
17  BY MR. PANATIER:
18    Q.   There have been a few questions I have asked
19  you, you know, I think that's all been in the purview of
20  the F.D.A., and I have not impressed on those, and then
21  there have been questions that you have answered
22  pertaining to these reports you did under the contract
23  with the F.D.A.
24    To the extent you have answered questions,
25  is it your judgment that you are -- you are within your

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 98–101

Page 98

1  purview and you are fine to talk about those issues?

2     A.    Yes, because I believe the stuff that I answered

3  is -- it's -- it has more to do with the technique, and

4  that technique is used on more than just F.D.A. samples.

5     Q.    Okay.  All right.  Did you meet with

6  Mr. Massenburg, I take it, via phone prior to this

7  deposition?

8     A.    Yes.

9     Q.    All right.  And how long did you guys meet?

10    A.    It was probably over two phone calls that lasted

11  total less than an hour.

12    Q.    Okay.  What was generally the subject of those

13  conversations?

14    A.    Just today's deposition, what -- what -- and

15  about my -- you know -- what I'm prepared to testify about

16  and whatnot.

17    Q.    Okay.  What is your current rate?

18    A.    For doing analysis and stuff like this, and --

19  and depositions and document review, and things like that,

20  it's 350 bucks an hour.

21    Q.    Okay.  And have you looked at or been shown

22  Dr. Longo's report using the Colorado school of mines

23  iodine method on the Chanel sample?

24    A.    No, I have not.

25    Q.    Okay.  Were you -- before I mentioned it, were

Page 99

1  you aware that it existed?

2     A.    I was not aware that that specific report

3  existed.

4          I did see at the talc meeting, the F.D.A.'s

5  talc meeting last month, he briefly talked about the

6  chrysotile with the iodine staining.

7     Q.    Okay.  All right.  Is that something you ever

8  employed to identify chrysotile in talc?

9     A.    No.

10    Q.    All right.  Okay.  In this case -- and I just do

11  not remember from the first deposition -- but in this

12  case, are you retained in "Zimmerman"?  Are you retained

13  by anybody other than Chanel?

14    A.    No.

15    Q.    Okay.  Are you still a -- serving in a

16  testifying capacity -- testifying expert capacity for

17  Johnson & Johnson in any cases, to your knowledge?

18    A.    I was retained by them for a whole bunch of

19  cases sometime ago, and as they come up, I generally am

20  dropped from the case.

21          So I -- I likely am still -- you know,

22  officially retained for some cases, yeah.

23    Q.    Do you know whether or not the "Zimmerman" case

24  is one of those?

25    A.    I -- I don't.  And I actually don't know whether

Page 100

1  I am.  I don't think I am.  But I'm not -- I couldn't be

2  100 percent sure about that.

3     Q.    Okay.

4          MR. MASSENBURG:  He was not a retained --

5          MR. HYNES:  He was not retained in the

6  "Zimmerman" case on behalf of Johnson & Johnson which was

7  established during the course of the first day of

8  deposition in this case.

9          MR. PANATIER:  Okay.

10  BY MR. PANATIER:

11    Q.    Sir, to the extent that J&J does retain you in

12  cases, do they pay you a retainer?  Let me ask you a

13  different question.

14          To the extent anybody retains you to be a

15  testifying expert or retains you in litigation, is the

16  retainer paid to AMA?

17    A.    They -- there has been in the past and in

18  general, we're -- we're not really asking for one, asking

19  for one up front, but in the past, in the past that has

20  happened.

21    Q.    How long has it been since you at AMA were

22  charging enough for a retainer?

23    A.    I have actually -- this is a guess on my part

24  because all the billing stuff, I -- I just give my hours

25  to our CFO and then he does it.  It -- it's been years, I

Page 101

1  believe, since we asked for a retainer.  But he -- he -- I

2  mean, he may have, but -- but so I don't really know the

3  answer to -- to that.

4     Q.    Okay.  But it's been years?

5     A.    I believe so, yeah.

6     Q.    Okay.  Have you asked to look at Alan Segrave or

7  Bureau Veritas's analysis of the J&J sample that was

8  subject to the F.D.A. contract that you did?

9          MR. HYNES:  Asked and answered.

10         THE DEPONENT:  I have the report.  I haven't

11  looked at it yet, though.

12  BY MR. PANATIER:

13    Q.    Oh, I'm sorry.  I'm sorry.  What I meant was,

14  have you asked to look at the actual samples or his grid

15  preparations?

16    A.    No, I have not.

17         MR. HYNES:  I just wanted to object to that that

18  would be subject to the confidentiality provision from

19  F.D.A. in the broadest sense, but again Mr. Saldivar

20  answered it, so nevermind.

21  BY MR. PANATIER:

22    Q.    Okay.  Mr. Saldivar, to your knowledge, is Alan

23  Segrave part of this F.D.A. contract that you executed

24  over the last year?

25    A.    He's not part of the contract I'm on.  If

ANDREAS SALDIVAR, Vol II on 03/19/2020                                    Pages 102–105
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 102

1   they -- if they -- he would have to be in some capacity
2   contact -- contracted by them if they asked him to look at
3   something so he would -- but he's not on the same contract
4   that I'm on.
5       Q.   Yeah.  Do you know whether or not F.D.A. has
6   contracted with Alan Segrave to look at these samples?
7       A.   No, I don't.
8       Q.   Do you know whether or not Johnson & Johnson
9   has?
10      A.   No -- I don't know specifically how he ended up
11  with the sample whether it was via the F.D.A. asking him
12  or Johnson & Johnson asking.
13      Q.   All right.  So it looks to me, there's between
14  sample 6A and for aliquot 6A and 6B of the Johnson &
15  Johnson sample.  It looks to me like there's six total
16  chrysotile structures identified, two in 6A and four in
17  6B.  One of them it says unable to obtain the pattern.
18  The rest it says positive for S-A-E-D.
19           My question is this:  As a total percentage
20  of the chrysotile fibers you've looked at, can you give me
21  in some ballpark estimate as to how often you're unable to
22  get the fraction pattern for chrysotile?
23      A.   Maybe 25 percent of the time.
24      Q.   Okay.
25      A.   Let's say, between 10 and 25 percent of the

Page 103

1   time.  In certain samples, it's much less of an issue.
2   Some samples -- I mean, there's all kinds of reasons why
3   you cannot get a defraction pattern.
4       Q.   Yeah.
5       A.   For instance, if you have multiple fibers or
6   structures adjacent to each other and you start looking at
7   the defraction pattern of each one, well, the defraction
8   for chrysotile doesn't last for a very long time; like 45
9   seconds to a minute.  By the time you get to the last one,
10  that pattern might be gone.
11      Q.   Is it the case that the -- the beam degrades
12  the -- the chrysotile -- the crystal structure?
13      A.   There's water in -- in the system and the
14  beam -- there's a beam of radiation, and it's hitting it,
15  and it does degrade the system, yes.
16      Q.   Okay.  But for your experiences between 10 and
17  25 percent of the time, you're unable to get a fraction
18  pattern meaning that between 75 and 90 percent of the
19  time, you are.  Fair?
20      A.   Yeah.
21      Q.   Okay.  And, in fact, here you have six examples
22  of this, where in five your lab got a pattern, and in one,
23  it did not; right?
24      A.   Yes.  That's what -- that's what it says, yeah.
25  That's what that means.

Page 104

1       Q.   Yeah.
2       A.   Right.
3       Q.   Okay.  Now, between your first deposition in
4   this case and now setting aside the work that you have
5   done for F.D.A., have you done any other work on Chanel
6   samples or on source talc that would have been relevant
7   to Chanel?  Meaning either Italian, Guangxi Chinese, or
8   Australian?
9       A.   No, we haven't.
10      Q.   All right.  Have you been asked to look at -- I
11  already asked you about Dr. Longo's recent iodine work
12  that he did on some Chanel.
13           Setting that aside, since June, have you
14  looked at any of Dr. Longo's testing of Chanel product?
15      A.   No, I haven't.
16      Q.   All right.  Okay.  One second.  I am just
17  looking at my notes.  Hold up.
18      A.   Okay.
19      Q.   Would you agree, sir, that non-detect as a
20  scientific term simply means what it says?
21           In other words, whatever you are looking
22  for was not detected.  It does not mean whatever you were
23  looking for is not present; correct?
24      A.   That's correct.
25      Q.   All right.  Have you reviewed any additional

Page 105

1   materials?  So setting aside the testing stuff I asked you
2   about, have you reviewed any other materials that would
3   influence your testimony in the "Zimmerman" case since
4   June?
5       A.   No.
6           MR. MASSENBURG:  Let me just object to those
7   lines of questions outside the scope of the Court's order
8   for the purposes of this deposition which was limited very
9   much in scope to Mr. Saldivar's testing on behalf of the
10  F.D.A. and recent findings and whether or not that would
11  affect his opinion as to Chanel or Chanel products needs
12  to be tested.
13           Of course, Chris, I'm giving you leeway.
14  But I just wanted to make sure we don't go outside the
15  scope of the Court's order.
16           MR. PANATIER:  Yeah.  Again, I was just asking a
17  you a follow-up question.
18  BY MR. PANATIER:
19      Q.   With regard to that sort of final issue, sir,
20  Chanel, I take it your opinions regarding Chanel would be
21  simply based on your testing.
22           In other words, if you tested Chanel and
23  got non-detect, would your testimony be that I tested
24  Chanel, and I got non-detect, or would it be something
25  broader than that?

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 106–109

Page 106

1    MR. MASSENBURG:  That I object to the vagueness
2  of the question and improper scope and limitation.
3    THE DEPONENT:  That is essentially correct.  I
4  tested Chanel many, many, many, many times and repeatedly
5  got non-detects.
6  BY MR. PANATIER:
7    Q.   Okay.  Now, are you in any way broadening that
8  to a larger opinion?
9       In other words, I'm very aware of your
10  opinion that, okay, I tested a lot of -- a lot of Chanel
11  samples, and I got -- and I got non-detect.
12       Are you broadening that at all to opinions
13  that you would give to a jury to say "I have an opinion
14  that Chanel talc products do not contain asbestos"?  Are
15  you going to give that opinion?
16    MR. MASSENBURG:  Objection; vague,
17  argumentative.
18    THE DEPONENT:  No.  And I don't think I could
19  give that opinion.  I could only really give the opinion
20  on the method of analysis I use and the samples I
21  analyzed.
22  BY MR. PANATIER:
23    Q.   Okay.  Okay.  Sir, those are all of the
24  questions I have for you.
25       I don't know if anybody else has any

Page 107

1  follow-up questions, but thank you for your time, and I
2  hope that you continue to stay safe in our pandemic.
3    A.   Same to all of you.  It's a crazy time right
4  now.
5    MR. PANATIER:  Anybody else?
6    MR. MASSENBURG:  Does anybody else have any
7  questions?
8    MR. HYNES:  Yeah, this is Kevin Hynes on the
9  phone.  I just have a few minutes of questions.
10    MR. MASSENBURG:  Kevin, this is Chris
11  Massenburg.  I have just a couple of -- if you want to let
12  me go first real quick.
13    MR. HYNES:  Yeah, sure, go ahead.
14       And if you want to take a two-minute break
15  or just plow on ahead?
16    MR. MASSENBURG:  I would charge through if it's
17  okay with Andreas.
18    MR. HYNES:  Yeah, go for it.
19
20       EXAMINATION
21  BY MR. MASSENBURG:
22    Q.   Mr. Saldivar, this is Chris Massenburg.  I just
23  wanted to make it clear, based on one of the questions
24  that Mr. Panatier asked about a non-detect -- certainly
25  finding of non-detect when analyzing talc samples or

Page 108

1  products containing talc, when your lab finds non-detect
2  of asbestos, you certainly aren't saying that there is
3  asbestos in it, and you're not saying that it's possible
4  that there's asbestos in it.
5       You're saying you were unable to find it
6  through your various methods of analysis; correct?
7    A.   That's correct.
8    Q.   And you have tested Chanel talc-based powders on
9  multiple occasions, and to be clear, have you ever found a
10  chrysotile or any amphiboles in any of those samples that
11  you have tested through your rigorous methods?
12    A.   No.
13    MR. MASSENBURG:  That's all I have.
14
15       EXAMINATION
16  BY MR. HYNES:
17    Q.   This is Kevin Hynes.  Hi, Mr. Saldivar.  How are
18  you today?
19    A.   Hi, Kevin.  I'm good.  Thanks.
20    Q.   Good.  Thanks for taking the time today under
21  the unique and difficult circumstances in the country.
22       As Chris mentioned, I hope you and all of
23  your analysts stay safe and healthy during this crazy
24  time.
25    A.   Yeah.  Same to you guys.

Page 109

1    Q.   Thanks.
2       And so I just have a few clarifying
3  questions that -- just let me know if you are not able to
4  answer them based on current agreement with your F.D.A.
5  contract.  Okay?
6    A.   Okay.
7    Q.   First topic is laboratory blanks.  I think you
8  said that your laboratory prepares certain blanks for a
9  batch of samples; is that right?
10    A.   Correct.  That's correct.
11    Q.   And what is the batch of samples?  You said it
12  can be about 20 different samples at a time; is that
13  right?
14    A.   The minimum like number of material blanks
15  you're going to do is at least one per -- per 20 samples.
16  And once it -- and if it was a batch of -- of 40 samples,
17  you would be doing more than -- more than that.  And
18  you're going to be doing a blank for each of your
19  preparation sessions, too.
20       So, for instance, if I decided I'm going to
21  prep half of a batch of samples today, well, that --
22  there's going to be a blank associated with them, too.
23       So, but it -- it -- there's a size
24  dependency on it, but there's also a time dependency on it
25  or with it, as well.

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 110–113

Page 110

1    Q.   Okay.  And that batch, when you are saying the
2  term "sample," is that the original sample before it's
3  been split into triplicate aliquots, or would it be
4  something --
5    A.   It's after.  I'm counting each one of those
6  aliquots as a sample.
7    Q.   Okay.  And can you explain to me, you mentioned
8  material blanks and I think filtering blanks.
9         Can you just explain to me what is a
10  material blank?
11    A.   Material blank is we take some known negative
12  talc, and we use the Sigma-Aldrich talc, and that follows
13  the other samples all the way through the preparation
14  process, so it's weighed out just like any other talc
15  sample we would have or talc-containing cosmetic.
16         And it -- it follows the samples all the
17  way through to grid preparation.
18    Q.   Okay.  And then filtering blanks, what are
19  those?
20    A.   Filtering blanks are when you are filtering your
21  final solution on filters, you are running through --
22  in -- in your filtration assembly, you are running through
23  just plain water through them.  And you're looking --
24  because you want to make sure that your filtration
25  assembly is, in fact, clean.

Page 111

1         And then that follows the rest of the
2  filters through every -- every other step, and it's a
3  check on your tools that you used in the hood.  It's your
4  check on your carbon coder, as well.
5    Q.   And you mentioned that for this -- each batch,
6  there may be -- there are material blanks and there are
7  filtering blanks; is that right?
8    A.   That's correct.
9    Q.   Okay.  There may not be blanks specifically
10  associated with the specific sample within that batch; is
11  that correct?
12    A.   That's correct.
13    Q.   Okay.  Is it possible that blanks may be
14  prepared on a different day than the specific sample that
15  is within a batch?
16    A.   There's -- there's -- generally at least one
17  blank that will have followed that sample the whole way,
18  and it will have been prepared at the same time as that
19  sample.
20    Q.   Is that always --
21    A.   That would be -- that would be the filter blank
22  is -- is definitely or the material blank associated with
23  the batch, there is a possibility that it could be
24  prepared on -- on another day.
25         In general, it's -- it's -- it's not.

Page 112

1  But -- this is just within our manner -- we're talking
2  about the realm of not just talc analysis, all of my
3  analysis.
4         We have for -- for -- for bulk samples,
5  we have a lot of material blanks, and there is that
6  possibility with bulk T.E.M. analysis of material blank
7  not being prepared at the same time on the same day.
8         It's gone through all of these steps,
9  but you had a huge -- if you had a set of a hundred
10  samples, you may not be finishing all of the preparation
11  on one single day.  You wouldn't be.
12         And so blanks are generally prepared at the
13  end.
14         So it's never going to leave the side, but
15  it's going to be side by side with the rest -- with the
16  sample the whole time, but could be that the blank is --
17  is -- gets its acid treatment on a different day than the
18  first sample in the batch.
19    Q.   Okay.  And is that the same for the analysis
20  of blanks that are -- blanks essentially analyzed on
21  different days than the samples from within the batch?
22    A.   That's -- that's absolutely -- and that's
23  especially when dealing with talc analysis, the analysis
24  takes a long time, and you're doing the analysis over
25  multiple days, and the last thing that you are typically

Page 113

1  analyzing is your -- is your blank sample.
2    Q.   And thank you.  First prior to the D58 sample,
3  it's possible that those may have been prepared on
4  different days than the -- than the blanks may have been
5  prepared on the different days than the aliquots from D58?
6    A.   The material blank, the filter blank is going to
7  be on the same day --
8    Q.   Okay.  But the material blank --
9       (Speaking simultaneously.)
10    A.   It's possible.  It's possible --
11    Q.   (Indiscernible.)
12       (Speaking simultaneously.)
13    A.   Yes, it's possible.  Yeah.
14    Q.   Okay.  And would that information be contained
15  in the report that was disclosed by the F.D.A.?
16    A.   Perhaps.  I'm -- I'm -- I'm not sure.  I'm
17  not -- I'm not sure about that.
18    Q.   Where is that information typically contained in
19  your report --
20    A.   What -- (Speaking simultaneously.)
21         What you would -- what you would see is you
22  are going to look at the weight sheet, and you're going to
23  look at the -- at the filtration sheet, and there may be a
24  point where it has -- it may have a line that says, it has
25  a date that is -- or -- that is, you know, these samples

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 114–117

Page 114

1 above here were prepared on this day, and below -- below
2 this line, they're prepared on this date or something like
3 that.  Or it might have it next to the sample.
4        Q.    Okay.  So if I'm looking at a page of the
5 report, the gravimetric reduction and filtration bench
6 sheet and modified ELAP 198.4, is that where I would go
7 into to get that information?
8        A.    Yeah.
9        A.    Okay.
10       A.    And there is also the sheet that would have the
11 filtration announced that's going to have the dates on it,
12 too, so.
13       Q.    Right.  So as I'm looking at that sheet, and for
14 the record, I think that's page 37 of my version of what
15 was produced by the F.D.A., it's 55 total pages.
16             I see sort of in the right column, there
17 are different dates written in hand notation, and then if
18 you look at the top right, there's an entry for filtered
19 by present things redacted off numbered, and then if you
20 look at there bar 9CA03.45, and then the date, and it says
21 "see margin."
22             So my question, I guess, Mr. Saldivar, is I
23 would go to the margin to see what date the sample and all
24 these reports were prepared for this particular batch; is
25 that right?

Page 115

1        A.    Yes.
2        Q.    Okay.  So if I look at the three aliquots from
3 sample D58, which were your laboratory 308006-6-6A, dash
4 6B, to the right of that I have -- it's a -- in the column
5 of August 30th, 2019.
6             So Mr. Saldivar, that would suggest that
7 those three aliquots were prepared on August 30th, 2019;
8 is that right?
9        A.    That's correct, yes.
10       Q.    Okay.  And then if I scroll two pages down and
11 now I'm on page 39 of 55, and saying page 3 of 3 of this
12 gravimetric reduction of filtration bench sheet and
13 modified ELAP 198.4, I have entries for three blanks that
14 are marked NB19-645 and NB19-646 and NB19-647.
15             Mr. Salvidar, those are the laboratory
16 blanks that were prepared with those batches; correct?
17       A.    Correct.
18       Q.    Okay.  And that -- if -- on the right side here,
19 I have a date of September 5th, 2019.
20             So I guess, Mr. Saldivar, that would
21 suggest that these three blanks were prepared on
22 September 5th, 2019; is that correct?
23       A.    That's correct.
24       Q.    Okay.  I have another question that came up, and
25 just let me -- I can't get into it.

Page 116

1             I think that's what you suggested, but on
2 page 26 of the 55-page report, there's a three-line entry,
3 and I'll just read it out for the record, September 30th,
4 2019, by -- it was redacted a person's name, quietly
5 reflected the analyzed fourth aliquot; for example,
6 308006-6/B58, this was added as 3080066C and an entry
7 October 1st, 2019 by the name is redacted.
8             We required -- requested that to cancel
9 the request to analyze 3080066C preparation was mostly
10 complete by the time we received the cancellation notice,
11 and that no analysis was performed.
12             So, Mr. Saldivar -- so the F.D.A. was your
13 client for this project; correct?
14       A.    Correct.
15       Q.    And so to suggest that on September 30th, the
16 F.D.A. requested that you analyze this for aliquots from
17 the D58 sample; is that correct?
18       A.    That's correct.
19       Q.    Okay.  And then the next day after you had
20 mostly concluded preparation of that fourth aliquot that
21 they requested that you cancel the analysis of that fourth
22 aliquot; is that correct?
23       A.    Yes.
24       Q.    And I think you said this, but to the extent you
25 had conversations with the F.D.A. regarding the reasons

Page 117

1 for the cancellations of those analysis, you are not going
2 to discuss that here with us today; is that right?
3       A.    That's correct.
4       Q.    And that's because you believe that information
5 is subject to confidentiality provisions with your
6 contract with the F.D.A.?
7       A.    Yes.
8       Q.    Okay.  I'll move off of that.
9             Another thing that was mentioned is we were
10 discussing some of the findings in sample 308006-6B.
11             And so this is a -- this is a third aliquot
12 that your laboratory analyzed from this D58 sample, and
13 the count sheet has structures identified.
14             There's a structure 1-A, structure 1-B,
15 structure 1-C, and a structure 2.
16             Do you recall discussing these particular
17 entries with Mr. Panatier earlier today?
18       A.    Yes.
19       Q.    Okay.  And I think Mr. Panatier asked you about
20 the -- the classification of structures 1, 2, and 3, and
21 you said that the final report sufficed those three
22 structures as fibers, and I see elsewhere there is also
23 some discussion of that as a cluster.
24             To the extent there's any communication
25 with the F.D.A. regarding the classification of that

Case 3:16-md-02738-MAS-RLS   Document 12990-2   Filed 04/09/20   Page 32 of 56 PageID: 109098

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 118–121

Page 118

1  particular cluster or set of three fibers, is that
2  something that you are prepared to discuss at today's
3  deposition?
4      A.   No, I'm not.
5      Q.   Okay.  And is that because you believe that is
6  covered by your confidentiality agreement with the F.D.A.?
7      A.   Yes, and they told me that.
8      Q.   Okay.  And hypothetically if there are four
9  total structures identified on a count sheet, those four
10  structures would be at your method of quantification;
11  correct?
12     A.   That's correct.
13     Q.   Okay.  But if there are two structures
14  identified on the count sheet, those two structures would
15  be below your methods whether it's quantification; is that
16  correct?
17     A.   Yes.  Yes.
18     Q.   Okay.
19     A.   And we would go -- reported that as less than
20  the limit of quantification.
21     Q.   Okay.  Is the classification of particular
22  particles may affect whether something is identified,
23  if something may be above or below the limit of
24  quantification in an analysis; correct?
25     A.   Correct.

Page 119

1      Q.   Were there some questions from Mr. Panatier
2  regarding reporting out of results in terms of fibers per
3  gram as opposed to a percent weight?  Do you recall that
4  questioning?
5      A.   Yes.
6      Q.   Okay.  And those -- those figures, the fibers
7  per gram figure that Mr. Panatier and you went through
8  doing that calculation, that would be affected, the
9  numbers would be different if the total of number of
10  structures were reduced in the analysis; correct?
11     A.   It should be, yes.  And it would be if -- it
12  would be, and it should be by anybody doing it properly.
13     Q.   Okay.  Right.  And so as you see the two
14  structures, you're going to have half of the fiber per
15  gram reported as you were -- as you see four structures?
16     A.   Yes.
17     Q.   Okay.  And you -- your laboratory typically does
18  not report results in terms of fiber per gram; is that
19  correct?
20     A.   That's correct.
21     Q.   Okay.  And why is that?
22     A.   Because you can manipulate that number to be
23  almost anything you want.
24     Q.   Right.  And from your perspective, it's percent
25  weight basis the more appropriate figure to report of

Page 120

1  results in terms of the asbestos contaminations of talcum
2  powder products?
3      A.   It -- it's the way I -- I would like to do it,
4  because you can't really manipulate that number.
5      Q.   Right.  Can you give me an example of how you
6  can manipulate a fiber per gram number?
7      A.   Yes.  Let's say, for instance, the room you're
8  sitting in was a grid opening and -- and we're counting
9  2x4s in that grid opening in that room.
10          So there's one 2x4 sitting in there; right,
11  and we count 20 rooms which is equivalent to 20-grid
12  openings, and so that's the one -- the only thing we saw
13  is that one 2x4.
14          So -- and if we then from that wanted to
15  figure out that, you know, how many 2x4s are in the entire
16  Empire State Building, because there's a ton of rooms in
17  there, and we have only looked at a few, the proper way to
18  do it would be like, okay, well, how many rooms did we
19  look at?  How many 2x4s did we find?  And then figure out
20  that calculation.  That would be the proper way of doing
21  it.
22          You can manipulate that by saying, Well,
23  that 2x4 is -- it has this certain mass to it.  And how
24  many of the smallest possible pieces of wood, let's say
25  the smallest possible thing you can find are toothpicks,

Page 121

1  and you calculate out that I can fit 100,000 toothpicks
2  into that one 2x4.
3          So instead of multiplying the 2x4 and
4  extrapolate that number, you've now changed it to be
5  like, well, in that particular mass of that 2x4, I could
6  theoretically have 100,000 toothpicks, and I'm going to
7  expand that number, and come up with a -- with that number
8  per -- per room.
9          So you can take -- if I have a big
10  structure, a big amphibole structure, something like that,
11  and I figure out that -- that I could have fit in a
12  thousand of the smallest possible countable amphibole
13  structures of that same type, proper way to calculate
14  out the fibers per gram would be to take out that one
15  structure and multiply out based on that.
16          Because I found that one improper way and
17  the way you can manipulate that is to say, Well, the mass
18  of that structure can translate to this many possible
19  fibers.  And if you take that number and then extrapolate
20  that, that's -- that's not a proper way to do it.
21     Q.   Okay.  So to the effect that you can buy us a
22  total number for fiber per gram relatively high easily if
23  you are using a fiber per gram reporting of it?
24     A.   If -- if you are -- if you did it in the way I
25  described to you.

Case 3:16-md-02738-MAS-RLS Document 12990-2 Filed 04/09/20 Page 33 of 56 PageID: 109099

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Pages 122–125

Page 122

1    Q.   Uh-huh.  Is that way in which the 8 million
2  fibers per gram analytical sensitivity was -- was
3  calculated based on Mr. Panatier's math earlier today?
4    A.   No.  The way he did it was the proper way.
5    Q.   Now, Mr. Saldivar, you -- this contract from
6  2019 with the F.D.A., you tested other samples of
7  Johnson's baby powder and do not detect any asbestos in
8  those other samples that are tested under 2019 contract;
9  correct?
10    A.   I actually don't know that.
11    Q.   To the extent --
12    A.   I don't -- I don't know the identity of all of
13  those samples.  We -- we find out the identity of D58
14  after the fact, but I -- I -- I was -- actually, I was
15  actually not aware that other samples in that batch were
16  Johnson & Johnson.
17    Q.   Okay.  To the extent that the F.D.A. issued a
18  press release that there was at least one other sample,
19  and that that batch was Johnson & Johnson's baby powder
20  and it was non-detect, and it was a non-detect baby powder
21  was found as part of that testing?
22    A.   Yes.  If you say so, but there was another one
23  in there, and it was from that batch, and it was not a
24  detect that would be -- that would be from that contract,
25  yeah.

Page 123

1    Q.   Okay.  And then your prior contract in 2009 and
2  2010 with the F.D.A. included testing of those samples of
3  Johnson & Johnson's baby powder in which you did not
4  detect any asbestos; correct?
5    A.   Correct.
6    Q.   Okay.  And you've also issued a report dated
7  March 20th, 2018 involving the testing of certain samples
8  of Italian talc or that were provided to you by R.J. Lee
9  Group that were tested using the same modified New York
10  ELAP method that we've been discussing here, and your
11  laboratory reported no asbestos in any of those more than
12  a dozen Italian talc core samples tested; is that correct?
13    A.   I believe so, yes.
14    Q.   And then you've also issued a report dated
15  March 30th, 2018, which involved the testing of certain
16  samples of Italian talc core and Vermont talc core
17  organized deposits that were provided to you by the --
18  Dr. (Inaudible) also tested using that modified New York
19  ELAP method in your laboratory reported no asbestos in any
20  of those for more than a dozen samples from the Vermont
21  and Italy tested; correct?
22    A.   I believe that's correct, yes.
23    Q.   Okay.
24    A.   In one of those batches that might have --
25        MR. MASSENBURG:  Hold on one second.  Hold on

Page 124

1  one second.  Sorry, Kevin.
2        I'm just going to place an objection to
3  this line of questioning, because it wasn't subject to the
4  judge's ruling, and I was not prepared to go into it.  I
5  it is something I would absolutely want to question
6  Mr. Saldivar about.
7        Feel free to continue asking, but we may
8  ask for a -- another session to depose Mr. Saldivar on
9  that J&J testing that he did in 2018 on the various source
10  talcs, but go ahead.
11        THE DEPONENT:  Also just to be clear.  It's not
12  my intention with regards to this case to testify
13  regarding anything other than the work I've done for
14  Chanel.
15        MR. MASSENBURG:  Right.
16        MR. HYNES:  Okay.  Thanks so much, Mr. Saldivar.
17  That's all of the questions I have.
18        MR. MASSENBURG:  Okay.
19        MR. PANATIER:  This is Panatier.  I just have
20  one little follow-up, Mr. Saldivar.
21
22        FURTHER EXAMINATION
23  BY MR. PANATIER:
24    Q.   One of the issues that you and I discussed and
25  then we will -- just discussed with Mr. Hynes had to do

Page 125

1  with the fact that bundles -- your expectations would be
2  that any bundles of chrysotile, you would expect to break
3  up to some extent during preparation; right?
4    A.   That's the goal, yes.
5    Q.   Okay.  And, sir, are you aware that chrysotile
6  bundles, to the extent that they're inhaled into the
7  lungs, they break up into their constituent fibrils over
8  time?
9    A.   Sure.
10    Q.   Have you --
11    A.   I have -- I have seen a paper presented on that,
12  yes.  I have seen multiple papers presented at conferences
13  that say exactly that.
14        MR. MASSENBURG:  Let me just object that it's
15  outside the scope.
16        MR. PANATIER:  All right.
17        MR. MASSENBURG:  Sorry, Chris.  This is
18  Massenburg.  I raise no offense, of course, when I say
19  that this is just outside the scope of expertise of
20  Mr. Saldivar.
21        THE DEPONENT:  Yeah, it certainly --
22  certainly -- this is certainly not in my realm of
23  expertise.  I can only go on, you know, what I have seen
24  presented so.
25  BY MR. PANATIER:

ANDREAS SALDIVAR, Vol II on 03/19/2020                                      Pages 126–129
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 126

1    Q.    Sure.  And my purpose of asking that is,
2    because if you're going to -- if someone is going to
3    suggest that in looking at the numbers as they are found
4    after the preparation where bundles have been broken up is
5    somehow misleading us to what is actually there, well,
6    then I'm just -- I'm basically asking you if you have seen
7    whether or not there is a correlation to fiber bundle
8    breakup when those bundles enter the human body.
9          You said you have seen papers presented on
10   that, but it's not your expertise; is that correct?
11   A.    Correct.
12   Q.    Okay.  All right.
13         MR. PANATIER:  Those are all of the questions I
14   have.
15         MR. HYNES:  I have one quick thing that I have
16   forgotten.  I am just going over my notes here.  Just give
17   me one second.  One second.
18
19              FURTHER EXAMINATION
20   BY MR. HYNES:
21   Q.    All right.  Mr. Saldivar, I forgot to ask you
22   one thing here.  So let's see.  So we were discussing the
23   four aliquots that were prepared and the testing of that
24   aliquot canceled.
25         Do you recall that?

Page 127

1    A.    Yes.
2    Q.    Okay.  And so if you find trace levels of
3    chrysotile in a particular style -- talc sample, is it
4    your typical practice to validate those findings with
5    additional testing?
6    A.    In the past I have done that.
7    Q.    Okay.  But that was not done with sample D58;
8    correct?
9          MR. MASSENBURG:  I will just again object to
10   confidentiality that we have discussed multiple times.
11         I just want to be very careful that the
12   scope of the deposition was limited by the Court, not by
13   me.  Mr. Saldivar has received his own communications from
14   F.D.A. as to what the confidentiality is.
15         I'm sure he would love to be able to talk
16   about this in more detail.  I just want to be very careful
17   for his sake unrelated to the "Zimmerman" case, that he
18   does not breach that.
19         If he is comfortable answering the
20   question, I don't have a problem with him answering it.  I
21   just -- to me, it seemed to be touching on that issue, so
22   I would object on that note.
23         MR. HYNES:  Yeah, if he can't answer due to your
24   confidentiality.  Fine.  Go ahead.
25         THE DEPONENT:  Well, you read to me exactly

Page 128

1    what's in the report and in there and that --
2          We did issue that particular statement and
3    it's in our report, and that's about as far as I can go
4    with that.
5    BY MR. HYNES:
6    Q.    Okay.  Okay.  To the extent that you may have
7    desired to do additional testing or additional validation
8    on that sample and the F.D.A did not permit you to do,
9    that's not something that you are prepared to testify
10   about today; is that correct?
11   A.    Correct.
12   Q.    Okay.  That's it.  Thanks.
13         MR. PANATIER:  Okay.  So that leaves me to have
14   to ask a couple of follow-ups from that issue.
15
16              FURTHER EXAMINATION
17   BY MR. PANATIER:
18   Q.    Sir, those questions were phrased in terms of if
19   you wanted to do additional validation, it -- it -- you
20   were asked to prepare the 6C aliquot and then asked not to
21   test it.  You did not -- the AMA did not go to the F.D.A.
22   and say, "We want to do another aliquot," and the F.D.A.
23   said "No;" correct?
24   A.    I can't answer that.
25   Q.    Okay.  You were asked whether or not your

Page 129

1    results were validated.  It's kind of a vague question.
2          Here's my question:  For the results you
3    turned over to the U.S.F.D.A., as a result of this
4    contract of some 50 samples, whether or not those were --
5    those results reported in non-detect or a positive finding
6    of asbestos, does AMA stand behind all of its results?
7    A.    Yes.
8          MR. MASSENBURG:  Form.
9    BY MR. PANATIER:
10   Q.    Okay.  And did AMA follow all of the appropriate
11   separation and analytical methodologies that it told the
12   F.D.A. it would?
13   A.    We did, and we also followed all instructions
14   from the F.D.A.
15   Q.    Okay.  All right.  In that respect, sir, did you
16   turn over all results to the F.D.A.?
17   A.    We did.
18   Q.    Okay.  All right.  Those all of the questions I
19   have.
20         Are we off?
21         MR. MASSENBURG:  I just want to make a statement
22   on the record.  This is Chris Massenburg.
23         Mr. Saldivar, thank you so much for taking
24   time, and keeping this as scheduled as previously.
25         I do believe that some of the questions

Page 130

1 that were asked at least slightly outside the scope of
2 the Court's ruling, but I gave deference to counsel and
3 subject to those objections that I did make on the record,
4 in order to prevent and avoid Mr. Saldivar from having to
5 go through a third deposition in the same case.  I trust
6 Mr. Saldivar's answered to everything that he was able to
7 answer, everything he was asked.  And those things he was
8 not able to answer were subject to, for the most part, at
9 least -- subject to F.D.A. confidentiality provisions that
10 are outside of his personal choice or professional choice,
11 and if it is something that F.D.A. has imposed upon him.
12        He has agreed to send me after the
13 deposition the contact information from the F.D.A. contact
14 he had been dealing with, and I will forward that to
15 counsel who is on the phone so they have that information.
16        But I do want to make sure I'm clear for
17 the record that Mr. Saldivar has appeared here voluntarily
18 at our request pursuant to the Court overruling our
19 objections to the deposition taking place.  He had
20 answered all of the questions asked that he was able to.
21        I wanted to make sure there was no
22 disagreement with that by any counsel on the phone because
23 I do not want Mr. Saldivar to have to go through a third
24 deposition if there's some way to avoid that by addressing
25 those issues now.  I would like to do that now before we

Page 131

1 hang up.
2        MR. PANATIER:  I'm sorry.  What specific issue
3 do you think should be addressed now?
4        MR. MASSENBURG:  If you or anyone else on the
5 phone believes that there is cause for a third deposition
6 of Mr. Saldivar to take place in the "Zimmerman" case.
7        MR. PANATIER:  At this time, I do not.  It's
8 subject to whatever the F.D.A. says.  When we talk to the
9 F.D.A., they, yes, he may talk about x, y or z, we may ask
10 for a third deposition.  We may not or we may.  That's
11 totally up to the F.D.A.
12        MR. MASSENBURG:  And pursuant to the California
13 rules and our prior discussions, you guys are paying for
14 Mr. Saldivar's time today?
15        MR. PANATIER:  We will, yes.  And, Mr. Saldivar,
16 how many hours did we use?  We used about three hours,
17 3-1/2?
18        THE DEPONENT:  We -- three and a half.  We
19 started at 11:00.  It's 2:30 now.  So, well, it's Eastern
20 time so.
21        MR. PANATIER:  And how much is that per hour?
22        THE DEPONENT:  350.
23        MR. PANATIER:  Okay.  We will -- we will -- we
24 will get -- you know, it would be good if you can send an
25 invoice to Mr. Massenburg so we have a record, and then he

Page 132

1 can forward it to us, and we will pay it.
2        THE DEPONENT:  Okay.  That works.
3        MR. PANATIER:  Thank you.
4        THE DEPONENT:  The invoice will come from
5 Charles Ryan is who you will see the invoice come from.
6        MR. PANATIER:  Okay.  Sounds good.  All right.
7 I think we're done, guys.
8        THE DEPONENT:  Thank you.
9        MR. MASSENBURG:  You do have the right to read
10 and sign the deposition if you want to.  Some experts
11 choose to waive that.
12        The deposition was taken by agreement
13 remotely with all parties in their separate rooms and so
14 all by phone.  I leave that choice to you.
15        Do you want to read and sign?
16        THE DEPONENT:  I -- I found it beneficial to
17 read and sign.  And a lot of times just because of certain
18 scientific terms some people have never heard before, so
19 if it's -- it's good to read it.
20        MR. MASSENBURG:  And, Irene, if you have any
21 questions about any of the verbiage used by Mr. Panatier
22 or I, Kevin or anyone else on the phone, we would be happy
23 to answer those questions for you.
24        DEPOSITION OFFICER:  Great.  Thank you.
25        MR. MASSENBURG:  Thanks, everybody.

Page 133

1        THE DEPONENT:  Okay.  See you guys.
2        (whereupon, proceedings were
3        concluded at 11:33 a.m. PST.)
4        -o0o-
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Page 134

1   State of California   )
                          )
2   County of Los Angeles )

3

4

5

6          Deponent's Declaration

7

8

9       I certify under penalty of perjury that the

10  foregoing is true and correct.

11

12

13

14

15  Executed at _____ on _____.

16

17

18

19      _____
             (Signature of Deponent)

20

21

22

23

24

25

Page 135

1   State of California    )
                           )
2   County of Los Angeles  )

3

4       I, Irene Nakamura, Certified Stenographic

5   Reporter, Certificate No. 9478, for the State of

6   California, hereby certify:

7       I am the deposition officer who

8   Stenographically recorded the foregoing deposition;

9       Written Notice Pursuant to Code of Civil

10  Procedure, Section 2025.520, having been sent to the

11  deponent, the deponent:

12      ( )  IN PERSON MADE THE CHANGES SET
             FORTH IN THE FOREGOING TRANSCRIPT;

13      ( )  APPROVED THE TRANSCRIPT BY SIGNING IT;

14      ( )  FAILED OR REFUSED TO SIGN THE
             TRANSCRIPT BY NOT SIGNING IT;

15

16      ( )  BY SIGNED LETTER ATTACHED HERETO,
             MADE THE CHANGES SET FORTH THEREIN

17           AND APPROVED, OR REFUSED TO
             APPROVE, THE TRANSCRIPT;

18

19      ( )  FAILED TO CONTACT THE DEPOSITION
             OFFICER WITHIN THE ALLOTTED TIME
             PERIOD.

20

21

     DATED: _____
22

23      _____

24           (DEPOSITION OFFICER)

25

Page 136

1   State of California   )
                          )ss
2   County of Los Angeles )

3

4       I, IRENE NAKAMURA, Certified Shorthand Reporter,

5   Certificate No. 9478, for the State of California, hereby

6   certify:

7       The foregoing proceedings were taken before me at

8   the time and place therein set forth, at which time the

9   deponent was placed under oath by me;

10      The testimony of the deponent and all objections

11  made at the time of the examination were recorded

12  stenographically by me and were thereafter transcribed;

13      The foregoing transcript is a true and correct

14  transcript of my shorthand notes so taken;

15      I further certify that I am neither counsel for

16  nor related to any party to said action, nor in any way

17  interested in the outcome thereof.

18      In witness whereof, I have hereunto subscribed my

19  name this 20th day of March, 2020.

20

21

22      _____

        IRENE NAKAMURA, RPR, CLR
23      Certified Shorthand Reporter
        in and for the State of California
24      License No. 9478, Nevada No. 893
        Hawaii No. 496, Washington No. 3177
25      iDepo Reporters
        323-393-3768 or 1-888-99-iDEPO

Page 137

1              ERRATA LIST

2

3   Page/Line  From        To

4   _____  _____  _____

5   _____  _____  _____

6   _____  _____  _____

7   _____  _____  _____

8   _____  _____  _____

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24  _____  _____  _____

25  _____  _____  _____

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                    Index: -o0o-—4382

**Exhibits**

**Exhibit 1**  6:5 58:6
**Exhibit 2**  6:11 58:7
**Exhibit 3**  6:14 58:9
**Exhibit 4**  6:7 58:11

---

**-**

**-o0o-**  7:4,21 133:4

---

**0**

**0**  41:1,6 42:2,13,16 43:1
**00000012**  87:19 88:24
**00000042**  86:7 87:15
**00044**  84:25 85:12 86:4
**0012**  77:3,10 78:3,5,8
**0022**  84:8,19,23
**00244898**  77:13
**0044**  85:3
**006**  52:20
**014**  86:22,23 87:9
**05**  90:16
**0565**  80:15
**06**  90:16

---

**1**

**1**  58:6,13,23 59:25 69:2 74:15
83:6 84:24 88:7 117:20
**1-A**  117:14
**1-B**  117:14
**1-C**  117:15
**1/10th**  84:24
**1/500ths**  84:13,17
**1/8,333,333rd**  89:5
**10**  59:14,18,21,25 60:13 96:20
102:25 103:16
**100**  77:8,12,14 78:20 81:8,9

82:19,21 83:3,10 100:2
**100,000**  121:1,6
**100-millimeter**  83:24
**1047**  85:24 86:1,2,4
**1050**  85:25
**10:25**  97:16
**10:41**  97:16
**11**  24:11 50:9
**11.42**  80:19 81:4
**11.66**  81:5,9
**11:00**  131:19
**11:33**  133:3
**11th**  23:5
**12**  49:20 77:2 89:3
**14**  88:16
**150**  17:21
**18th**  59:16
**19**  7:2
**198.4**  114:6 115:13
**1st**  116:7

---

**2**

**2**  58:7,17,23 83:4 84:2,3,7,11,
25 117:15,20
**2/10ths**  84:20,25
**20**  16:22 66:25 86:14,18,23
87:10 109:12,15 120:11
**20-grid**  120:11
**2009**  123:1
**2010**  123:2
**2015**  18:13
**2018**  123:7,15 124:9
**2019**  9:8 20:8 50:9,10 59:16
115:5,7,19,22 116:4,7 122:6,8
**2020**  7:2
**20th**  123:7
**21**  82:24
**215**  82:24

**219**  82:23
**21st**  20:8
**22**  82:24 83:9,10 84:16
**24**  77:16 81:5 93:7
**25**  43:18 88:15 102:23,25
103:17
**26**  116:2
**28**  87:10,17
**28th**  55:13
**2:30**  131:19
**2x4**  120:10,13,23 121:2,3,5
**2x4s**  120:9,15,19

---

**3**

**3**  17:20 58:9,18,23 59:3,25
115:11 117:20
**3-1/2**  131:17
**30**  61:12
**308006-6**  13:18
**308006-6-6A**  115:3
**308006-6/B58**  116:6
**308006-6B**  117:10
**308006-6C**  52:19
**3080066C**  116:6,9
**30th**  115:5,7 116:3,15 123:15
**31st**  57:7
**32**  93:7,14 96:2,4,20,21
**350**  98:20 131:22
**37**  114:14
**39**  115:11
**3rd**  23:4

---

**4**

**4**  58:11,14,23 74:16,18 84:9
**40**  109:16
**4328**  82:1
**4382**  80:4,8,14 81:18,25
82:11,12,21

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

**45** 103:8

**47** 61:23 83:25

**47-millimeter** 61:24

**49** 76:11 77:6,11,20,22 78:7, 13,15 81:13

**493** 78:12

**4935** 78:11,17 79:2

**4947** 78:10,15 80:8,10,17

---
**5**

**5** 41:1,6 42:2,13,16,25 74:16

**50** 10:1,5 17:20,25 19:16,17 40:7 41:17,18,20 48:15 49:25 66:17 85:17 129:4

**50-or-so** 17:15

**50-plus** 40:12

**500** 17:18,21

**55** 114:15 115:11

**55-page** 116:2

**58** 95:25

**5th** 115:19,22

---
**6**

**6,000** 67:19,25 68:2,7

**6.0903** 79:22 80:3

**6.5285** 79:25 80:1

**60** 39:22

**6A** 13:18 52:20 64:14 102:14, 16

**6B** 13:19 52:20 75:14,16,24 76:3 86:16,17 102:14,17 115:4

**6C** 128:20

---
**7**

**7.1687** 75:24 76:10 77:23,25 78:14

**7.6622** 76:17,22,25 77:23,25

**7.6634** 76:3,10,22,25 78:14

**70** 68:5

**70,000** 68:3

**75** 96:20 103:18

---
**8**

**8** 50:10 74:15 91:10 92:8,20 93:5 122:1

**8,333,333** 89:4,17

**80,000** 18:2 68:3,5 69:8,10

**88** 81:23

**88.34** 81:9,14

**8:02** 7:3

**8:56** 44:5

---
**9**

**90** 103:18

**99.76** 77:16

**9976** 77:22

**9:01** 44:5

**9CA03.45** 114:20

**9th** 24:13,19,22

---
**A**

**A.I.H.A.** 31:20 32:22 33:14 36:8

**a.m.** 7:3 44:5 97:16 133:3

**ability** 73:17

**absolutely** 112:22 124:5

**acceptable** 30:12 59:17

**accepted** 65:23,25

**accepting** 92:22

**access** 73:3 74:3

**accurate** 9:8 24:16 43:21 67:24

**acid** 75:18 78:23 79:1,3,6,7, 15,24 80:7,22 81:4 92:2 96:5 112:17

**act** 94:11

**actual** 16:18 17:17 63:7 76:5 86:11 87:6 91:9 96:19 101:14

**add** 43:12 79:3,8

**added** 50:13 79:6 116:6

**adding** 61:15

**additional** 61:16 104:25 127:5 128:7,19

**additions** 50:14

**addressed** 131:3

**addressing** 130:24

**adhered** 11:9

**adjacent** 103:6

**administering** 7:13

**advertisement** 36:11

**advising** 35:1

**affect** 105:11 118:22

**affected** 119:8

**affects** 92:23

**aggressive** 92:2

**agitation** 92:3

**agree** 80:12 104:19

**agreed** 130:12

**agreement** 109:4 118:6 132:12

**agreements** 57:8

**ahead** 8:10 91:13 107:13,15 124:10 127:24

**AHERA** 36:22

**air** 36:23

**Alan** 23:12 34:1 44:12 45:21 46:15,19 47:2 101:6,22 102:6

**aliquot** 17:19 52:19,21 53:4 87:20,21,23 89:10 102:14 116:5,20,22 117:11 126:24 128:20,22

**aliquots** 12:9,23 13:14,20 16:12 17:20 38:5,13,15 110:3, 6 113:5 115:2,7 116:16 126:23

**allowed** 14:25

**alongside** 63:13,17

**AMA** 10:20 13:14,23 14:15, 19,20,25 17:16 30:19,24 33:23 40:3,7 47:19 53:20,23 60:10 70:9 96:3 100:16,21 128:21 129:6,10

**amount** 60:1,2 61:11 83:23 84:15 87:6 95:20

**amphibole** 19:7 121:10,12

**amphiboles** 108:10

**analysis** 10:2,7 14:9 18:14 21:14 25:12 36:23 37:18 40:7 44:9 49:12 65:10 71:19 89:4 98:18 101:7 106:20 108:6 112:2,3,6,19,23,24 116:11,21 117:1 118:24 119:10

**analyst** 14:25 15:14,22,24 52:10,12

**analysts** 14:11,18 16:3,4 108:23

**analytical** 48:14 89:16 92:19 93:4 122:2 129:11

**analyze** 40:21,24 41:3,6 42:24 50:1 53:4 116:9,16

**analyzed** 15:21 16:5 22:12, 17 39:8,10 40:18 41:18,21 42:3,10 43:1,2,9,16,19 50:3 53:23 59:15 64:1,5,6 66:18 86:18,24 87:2,20 95:12 106:21 112:20 116:5 117:12

**analyzes** 39:14 66:23

**analyzing** 39:11 52:18 71:11 107:25 113:1

**and/or** 73:5

**Andreas** 7:17 8:12 21:23 26:22 29:7 34:15 70:21 93:20, 23 107:17

**ANGELES** 7:1

**announced** 114:11

**answering** 25:24 26:15 127:19,20

**answers** 28:14

**anthophyllite** 18:19 19:2 71:13,17

**anticipate** 29:24

**apologize** 93:20

**appeared** 130:17

**applicable** 38:22

**applies** 34:23,24

**apply** 56:9

**appreciation** 48:21

**approach** 90:1,18,25

**approximate** 40:11 91:8

**approximately** 10:5 49:21 67:19 68:6 82:20 96:1

**aqueous** 60:14,22,23,25 61:3 66:6

**area** 35:20 68:16 85:15,18 86:11,24

**argue** 35:14

**argumentative** 106:17

**arrive** 10:20

**arrived** 96:3

**arrives** 94:19

**arriving** 14:19

**asbestos** 19:5 22:5 32:2 33:23 37:20 45:8,13 51:20 54:21 64:8 66:3,25 67:2,4,8, 18 68:6,7,22 69:3,6 106:14 108:2,3,4 120:1 122:7 123:4, 11,19 129:6

**ash** 74:23 75:8,17 76:16 81:5

**ashing** 75:3 76:20,22 77:21 78:16,25 80:22,24

**assembly** 110:22,25

**assign** 17:2 91:11

**assigned** 15:25 16:19,23 17:4 70:15

**assigns** 15:20

**assume** 42:2

**assumes** 45:17 94:3 96:13

**assuming** 94:18

**assumption** 16:17

**assumptions** 94:22

**attach** 57:21,22,25

**attached** 58:15,19

**attempt** 35:7 73:5

**attempted** 46:7

**attention** 30:20

**attorney** 20:25

**audible** 81:15

**audit** 31:3,5,7,13,17,22 34:20

**auditors** 32:11

**audits** 31:20 33:22

**August** 23:4 115:5,7

**Australian** 104:8

**average** 74:16

**averages** 75:23

**avoid** 130:4,24

**aware** 44:11,14 45:5,7,10 46:6,14,23 67:14 95:10 99:1,2 106:9 122:15 125:5

---

**B**

**baby** 13:11 122:7,19,20 123:3

**back** 9:4 18:13 20:6 30:14 44:6 54:13 56:16 69:1 82:14 94:8 97:8

**backing** 20:5

**backwards** 92:5

**ballpark** 19:17,19 20:3 40:6 102:21

**bar** 114:20

**based** 65:8 72:19 89:15 90:14 93:2 105:21 107:23 109:4 121:15 122:3

**basically** 84:12,20 126:6

**basis** 119:25

**batch** 10:15 16:21 38:17,20, 22 39:7,11,14,15,18,21 40:1, 19 41:5 49:11 65:15,16,19 69:17 109:9,11,16,21 110:1 111:5,10,15,23 112:18,21 114:24 122:15,19,23

**batches** 10:15 16:20 115:16 123:24

**bathroom** 8:18

**beam** 103:11,14

**bearing** 9:18

**began** 14:15

**begin** 23:1 49:15

**behalf** 29:11,16 34:17 100:6 105:9

**belief** 29:8 35:2

**believed** 28:2

**believes** 131:5

**bench** 18:22 75:15 114:5 115:12

**beneficial** 132:16

**bet** 58:1

**big** 36:2 121:9,10

**billing** 100:24

**bit** 20:5 44:8 60:10 72:23 85:7 91:14 97:1

**blank** 39:10,11,19 40:24,25 41:1,3,6,7 42:10,11,25 56:4 62:8,9,17 63:12 67:6 68:14,21 69:3,4,13,18 70:4 109:18,22 110:10,11 111:17,21,22 112:6,16 113:1,6,8

**blanks** 38:14,16,21,25 39:6, 14,23 40:1,3,6,12,14,21,22,23 41:17 42:2,17,20,23 43:1,2,8, 12,13,16,18 56:10 63:25 64:5, 6,7,9 66:16 67:22 68:8 69:16, 19,23,25 109:7,8,14 110:8,18, 20 111:6,7,9,13 112:5,12,20 113:4 115:13,16,21

**blind** 10:1,6 13:5 16:6,7 22:14

**blurry** 64:19

**Bob** 15:14,15,17

**body** 126:8

**bottle** 12:1,2 45:14

**bottle's** 12:21

**bottom** 42:7

**breach** 127:18

**breadth** 9:22

**break** 43:23 54:13 60:10

**breaking** 91:18,19,23,24 94:14 95:7 97:5 107:14 125:2,7

**breaking** 95:17

**breakup** 126:8

**briefly** 99:5

**bring** 10:21 55:19 74:1 85:19

**broadening** 106:7,12

**broader** 23:19 105:25

**broadest** 101:19

**broken** 126:4

**bucket** 53:8

**bucks** 98:20

**Building** 120:16

**bulk** 112:4,6

**bunch** 99:18

**bundle** 19:11 92:11 94:14 95:13 126:7

**bundled** 90:19 91:16,21

**bundles** 91:18,19 92:9,10 94:13,21 95:18 125:1,2,6 126:4,8

**Bureau** 37:22 38:4 46:16 47:14 101:7

**buy** 121:21

---

**C**

**calculate** 74:6 79:14 85:21 86:25 89:21 121:1,13

**calculated** 122:3

**calculation** 86:14 119:8 120:20

**calculations** 73:6,8,10

**calculator** 73:3,19 74:2

**calculators** 73:24

**calendar** 10:8

**calibrating** 35:24

**California** 7:1 131:12

**call** 12:23 15:20 19:12,13,14 22:11 28:10 47:22

**called** 7:18 75:14

**calls** 23:5 46:10 98:10

**cancel** 116:8,21

**canceled** 126:24

**cancellation** 52:18 116:10

**cancellations** 117:1

**cancelled** 53:4

**capacity** 99:16 102:1

**caps** 11:6

**carbon** 63:6,16 111:4

**carbon-coated** 62:13

**care** 67:9

**careful** 67:5 127:11,16

**case** 13:17 29:11,12,15 30:4, 6 34:17 68:10 71:22 97:11 99:10,12,20,23 100:6,8 103:11 104:4 105:3 124:12 127:17 130:5 131:6

**cases** 16:8 21:21 99:17,19,22 100:12

**categories** 56:14

**categorize** 48:17 52:11

**categorized** 19:10

**category** 48:22

**caveat** 73:11 92:22

**CFO** 100:25

**Chanel** 28:1 29:10,11,17 34:18 55:19,22 98:23 99:13 104:5,7,12,14 105:11,20,22, 24 106:4,10,14 108:8 124:14

**change** 32:18 50:24

**changed** 18:12,17 20:12 121:4

**channel** 27:23

**channels** 28:21

**characteristic** 52:9

**charge** 107:16

**charging** 100:22

**Charles** 132:5

**chat** 55:2

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Index: check–correct

**check** 41:11 111:3,4

**chemistry** 19:1

**Chinese** 104:7

**choice** 130:10 132:14

**choose** 31:18 132:11

**chosen** 66:5

**Chris** 26:21 30:11 54:8,13 57:3 58:8 73:1 93:21,23 105:13 107:10,22 108:22 125:17 129:22

**chronology** 9:5

**chrysotile** 16:13,15 44:18 45:8,12 51:7,17,19,24 52:2,4 59:10,15,19,20 60:3,11,14,18 61:19 63:20 64:4,16,22,23 65:7,14,22 71:10 90:9,16,19 91:4,15 92:10 94:13,20 95:11 96:2,8 99:6,8 102:16,20,22 103:8,12 108:10 125:2,5 127:3

**chunk** 21:7

**circumstances** 73:10 108:21

**clarified** 32:15

**clarify** 37:13

**clarifying** 109:2

**classification** 117:20,25 118:21

**clean** 61:16 68:16 110:25

**cleaning** 68:19

**clear** 11:1,3,16,17,21,24 12:14 21:23 30:3 36:7 53:15 55:4 60:18 65:21 107:23 108:9 124:11 130:16

**client** 60:8 63:7,20 69:6 70:1 116:13

**close** 97:3

**cluster** 19:11 117:23 118:1

**coach** 35:7

**coater** 63:6

**coating** 63:16

**coder** 111:4

**cognizant** 67:14

**Colgate-palmolive** 18:14

**college** 70:10

**Colorado** 98:22

**column** 114:16 115:4

**comfortable** 127:19

**commenting** 57:22

**committee** 24:5

**communicated** 32:9

**communication** 30:16 47:4 117:24

**communications** 56:16 127:13

**company** 21:1

**complete** 116:10

**completed** 24:23 25:7

**completely** 16:9

**complicated** 91:14

**components** 12:23

**computer** 11:13

**concentration** 91:9

**concentrations** 66:7

**concept** 28:4

**concerns** 66:21,22 70:17,19 71:8

**concluded** 47:19 48:15 116:20 133:3

**conducted** 31:5,7 37:13

**conducting** 10:7 68:12

**conferences** 125:12

**confidence** 17:10 37:3

**confidential** 21:7,8 27:2,8,9 30:16 34:21 35:3 47:24

**confidentiality** 28:6,16 35:10 101:18 117:5 118:6 127:10,14,24 130:9

**confirmed** 65:8

**constant** 47:4

**constituent** 125:7

**contact** 23:6 24:9 26:9,10,23 27:3,8,18 28:25 29:3 49:9 102:2 130:13

**contacted** 23:9,12,16 24:5 26:6 48:25

**contacting** 48:19

**contacts** 27:7 29:17

**contained** 96:1,3 113:14,18

**containers** 12:11

**contaminated** 66:21

**contamination** 32:2 33:23 41:11,12 56:4

**contaminations** 120:1

**contents** 29:25

**continuation** 8:21

**continue** 35:13 59:6 107:2 124:7

**continued** 21:25 66:12

**contract** 8:25 9:13,15,19,20, 22 10:11 13:23,24 14:7,10,11, 15 15:1 17:15 19:15 20:18,20 21:7 22:4 24:24 25:7 31:16,19 37:24 44:13 47:18 48:14,24 49:10,11,15 54:20,22 55:25 56:25 57:6 66:13,14 72:14 97:22 101:8,23,25 102:3 109:5 117:6 122:5,8,24 123:1 129:4

**contracted** 102:2,6

**contrary** 29:8

**control** 14:13 15:12,20 17:4 42:7

**controls** 63:12

**conversation** 68:17

**conversations** 20:24 98:13 116:25

**copy** 32:4,5

**core** 123:12,16

**correct** 13:15,16,20 15:3,4,10 17:13 20:21 22:7,25 25:17 33:15,19,20 34:3,12 36:7 37:15 38:15,24 39:1,2 41:16 48:6,7 51:8 53:5 55:9,10,17 56:10,11,15 57:12 60:11,15,

Case 3:16-md-02738-MAS-RLS   Document 12990-2   Filed 04/09/20   Page 42 of 56 PageID: 109108

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                    Index: correctly–directly

21,24,25 61:25 62:1 63:21,22
64:1,5 65:8 66:18,19 68:9
69:21 72:1,8 74:22,23,24
75:21 76:9,23,25 77:19 80:22,
23 81:6 83:11 85:5 86:5,8
87:21 88:1,19 89:12,17 90:11,
17 93:5,14 94:15 95:20 96:5
104:23,24 106:3 108:6,7
109:10 111:8,11,12 115:9,16,
17,22,23 116:13,14,17,18,22
117:3 118:11,12,16,24,25
119:10,19,20 122:9 123:4,5,
12,21,22 126:10,11 127:8
128:10,11,23

**correctly** 17:11 35:25

**correlation** 126:7

**cosmetic** 54:21,24,25 110:15

**cosmetics** 55:1

**counsel** 26:25 28:1 29:25
130:2,15,22

**counsel's** 29:8,12

**count** 14:12 18:17,20,22 19:8
40:10 64:13 90:15 117:13
118:9,14 120:11

**countable** 121:12

**counting** 110:5 120:8

**country** 108:21

**couple** 53:17 67:7 71:3
107:11 128:14

**Court** 27:11 30:1 127:12
130:18

**Court's** 105:7,15 130:2

**cover** 59:21

**covered** 118:6

**crazy** 107:3 108:23

**criticisms** 44:11

**crossing** 50:20

**crucible** 75:7

**crystal** 103:12

**cube** 18:19 19:3

**current** 20:18 66:13 98:17
109:4

**customer** 62:20 63:13,17,24

**customers** 36:13

**cut** 62:12 63:4

---

### D

**D58** 9:8 11:16 13:4,7,13,17
15:15 16:13 23:3 25:19 38:12
47:7 51:8 52:19 55:6 64:3
86:17 95:25 113:2,5 115:3
116:17 117:12 122:13 127:7

**dash** 115:3

**data** 36:10

**database** 15:19

**date** 23:10 29:13 113:25
114:2,20,23 115:19

**dated** 23:4 123:6,14

**dates** 50:7,13 114:11,17

**day** 22:11 24:14 47:22 67:3
100:7 111:14,24 112:7,11,17
113:7 114:1 116:19

**days** 112:21,25 113:4,5

**dealing** 12:13 71:12 89:7,8
112:23 130:14

**deals** 36:2

**December** 24:25 25:8,10,15
31:11

**decided** 109:20

**decimal** 82:4

**deem** 48:14

**Defendant's** 58:17

**deference** 130:2

**deficiencies** 31:24 33:5,7
34:14 36:3,19,20

**deficiency** 33:18,23 35:16,
21,23 36:12

**defined** 49:2

**definite** 37:5

**defraction** 52:6 103:3,7

**degrade** 103:15

**degrades** 103:11

**dense** 71:14

**density** 70:13 71:19

**dependency** 109:24

**dependent** 12:18

**depending** 67:10

**depends** 39:15

**depo** 72:3

**deponent** 7:18 8:2 27:12
29:20 30:10 35:5,15 44:21
45:10,19 46:1,9 54:7 81:15
93:9,18 96:7 101:10 106:3,18
124:11 125:21 127:25 131:18,
22 132:2,4,8,16 133:1

**depose** 124:8

**deposed** 20:8 26:7

**deposition** 7:11,19,23 8:3,22
21:20 28:11,15 57:23 58:15,
19,25 70:24 71:22 98:7,14
99:11 100:8 104:3 105:8
118:3 127:12 130:5,13,19,24
131:5,10 132:10,12,24

**depositions** 26:12 98:19

**deposits** 123:17

**describe** 9:20 10:19 50:16

**description** 50:11

**desired** 128:7

**detail** 71:1 127:16

**details** 32:19

**detect** 40:23 41:2 42:25
122:7,24 123:4

**detected** 104:22

**detector** 43:3

**determine** 19:3

**differ** 45:6 46:24

**difference** 77:2 80:9

**difficult** 66:4 91:22 95:5
108:21

**digest** 74:21 79:4

**digested** 76:15

**dilute** 79:7

**dimensions** 19:6

**directly** 30:4 61:14

disagree 29:12

disagreement 130:22

disclose 27:3,10 34:21

disclosed 56:19 113:15

discretion 73:11

discuss 21:15 22:6,9 36:8 52:24 117:2 118:2

discussed 21:24 70:25 124:24,25 127:10

discussing 49:10 58:10 117:10,16 123:10 126:22

discussion 54:16 56:8 58:3 117:23

discussions 131:13

dish 75:17 79:11,19,25 82:10

disperse 91:19,25 95:4

dispute 19:4

dissolution 79:15 80:7 92:2

distancing 8:14

distribution 61:15

divide 69:10,25 76:25 77:5,10 80:16 83:10 86:4 88:1,5,19,24 89:2

dividing 88:7

document 30:1 98:19

documents 29:17

dog 85:6

dollars 17:21 18:2

dotting 50:20

doubt 19:17

dozen 123:12,20

dozens 45:22 46:4

drinking 37:17

drop 61:9

dropped 99:20

dropper 61:9

dry 79:12

due 127:23

dumping 60:18

duplicate 15:23 16:2

duties 34:20

E

E-LAB 32:22 33:13 36:8

E-MAIL 23:22 28:24 29:3,18, 19 30:6 55:16,19 57:16 58:8, 10 67:17

E-MAILED 55:9

E-MAILING 30:4

E-MAILS 56:13 57:21

earlier 9:15 59:2 70:23 117:17 122:3

early 23:23

easier 77:24 85:20

easily 16:8 121:22

Eastern 131:19

easy 52:10

effect 121:21

effective 85:15,18

ELAP 18:7,9 31:20 114:6 115:13 123:10,19

electronic 32:5

elemental 64:17

emanation 35:25

Empire 120:16

employed 14:14,25 99:8

employee 20:25

empty 75:9 76:1

encourage 73:4

end 41:6 42:2,16,21 55:3 88:21 112:13

ended 102:10

ends 40:25 41:1 42:13,25

enter 96:11 126:8

entered 50:7

entire 10:8 14:6 22:4 38:22 41:5 61:13,17 120:15

entries 50:21 115:13 117:17

entry 50:7,16,18 114:18 116:2,6

equal 81:17,18 89:14

equals 81:9

equipment 35:24

equivalent 120:11

errors 73:9

essentially 106:3 112:20

established 100:7

estimate 102:21

eventually 42:21

everyone's 60:17

evidence 45:18 96:14

exact 9:25 20:2 25:24 40:4 70:22 75:23 85:22

examination 8:6 38:5 107:20 108:15 124:22 126:19 128:16

examine 92:15

examined 7:19

examples 103:21

excluding 23:21,22

executed 101:23

Exhibit 58:6,7,9,11,13,17

exhibits 57:23 58:23

exist 51:18

existed 93:3,11 99:1,3

exists 35:8 95:11,12

expand 121:7

expect 26:7 96:7 125:2

expectation 43:17 94:12 95:16 96:3

expectations 125:1

experience 51:15 73:8

experiences 103:16

expert 29:10,16 32:24 99:16 100:15

expertise 125:19,23 126:10

experts 132:10

**expire** 57:6

**explain** 25:22 39:16 41:13 46:7 47:14,21 110:7,9

**extensively** 94:25

**extent** 26:22 28:14,18 32:20 35:9 45:1 63:25 66:17 73:25 74:1 94:13,19 95:12 97:24 100:11,14 116:24 117:24 122:11,17 125:3,6 128:6

**extrapolate** 121:4,19

**extremely** 70:6,7

---

**F**

**F.d.a** 128:8

**F.D.A.** 8:25 9:7,20 10:21 11:19 13:2,18,23 14:11 17:15 18:10 20:16,17 21:8,14,25 22:5 23:2 24:9,14,24 25:2,7, 23 26:6,23,25 27:9 28:7,11 31:6 37:13,24 40:8 42:6 44:13,22 47:5,6,9,13,19 48:19 49:16 51:12 52:18 53:3,9,16 55:17,25 56:19 57:4 59:10 60:5 64:10,21 66:9,14 71:18 72:14 75:5 83:22 97:20,23 98:4 101:8,19,23 102:5,11 104:5 105:10 109:4 113:15 114:15 116:12,16,25 117:6,25 118:6 122:6,17 123:2 127:14 128:21,22 129:12,14,16 130:9,11,13 131:8,9,11

**F.d.a.'s** 12:2 99:4

**face** 53:2

**fact** 57:1 79:10 103:21 110:25 122:14 125:1

**facts** 45:9,17 94:3 96:13

**failed** 33:1,2

**fair** 15:9 17:12 22:24 25:4 39:4 41:15 43:20 68:8 78:8 86:18 96:22 103:19

**fall** 9:1

**falls** 48:22

**fast** 55:11

**February** 23:23 31:11 55:9, 12

**feel** 27:3 124:7

**fees** 17:22

**felt** 56:17

**fiber** 19:10 50:25 51:6 65:7 89:15 119:14,18 120:6 121:22,23 126:7

**fibers** 45:22 51:8 90:9,16 91:4,9 92:6,8,11,18,19 93:3, 14 95:19 96:2 102:20 103:5 117:22 118:1 119:2,6 121:14, 19 122:2

**fibrils** 95:13,17,19 125:7

**fibrous** 51:20,25 52:5

**figure** 16:8 17:18,23 41:22,24 67:1 69:22 71:24 80:6 87:3,5 119:7,25 120:15,19 121:11

**figured** 81:19,23

**figures** 119:6

**filter** 40:23 42:20,23 43:12 60:4,7,9 61:2,4,10,13,14,22, 24 62:14,22,23 75:17 79:5,8, 9,11,12,18,25 82:8,10 83:2, 16,25 84:18 85:4,13,14,18 86:2 111:21 113:6

**filtered** 61:3 62:4,5,6 83:24 84:4,9 114:18

**filtering** 61:1,16 83:4 110:8, 18,20 111:7

**filters** 42:21,22 63:4,5 110:21 111:2

**filtration** 75:19 83:21 110:22, 24 113:23 114:5,11 115:12

**final** 15:6 16:14 24:12,13,17 31:8 50:6 91:6 105:19 110:21 117:21

**find** 22:10,15 33:17 41:12 44:15,17 52:15 66:25 67:7 71:10 89:14,15 91:10,23 108:5 120:19,25 122:13 127:2

**finding** 68:6 107:25 129:5

**findings** 32:1 46:7 50:20 105:10 117:10 127:4

**finds** 108:1

**fine** 20:1 74:7 96:15 97:13 98:1 127:24

**finish** 14:2 49:13

**finishes** 93:24

**finishing** 112:10

**firm** 70:25

**fit** 35:4 121:1,11

**five-** 43:23

**five-or** 97:4

**focus** 38:12

**focused** 37:20

**folks** 44:3

**follow** 129:10

**follow-up** 105:17 107:1 124:20

**follow-ups** 128:14

**forgot** 126:21

**forgotten** 126:16

**form** 44:20 46:8 51:18 92:7 93:8,15 96:6 129:8

**formatting** 48:20

**forms** 51:23

**forward** 66:20 130:14 132:1

**found** 16:13 19:20 31:24 33:5,7 44:16 45:7,12 59:16 64:4 67:18 68:20 91:4 93:2 95:6 96:8 108:9 121:16 122:21 126:3 132:16

**foundation** 46:11

**fourth** 52:18,21 53:4 116:5, 20,21

**fraction** 18:25 45:23 71:24 87:1 88:18,22 102:22 103:17

**frame** 55:15

**framed** 54:24

**framework** 73:15

**free** 27:3 124:7

**front** 19:17,25 51:10 65:9 100:19

**funnel** 28:12

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.

Index: gain–identify

## G

**gain** 13:6

**Gaspar** 26:16

**gave** 8:22 24:8 27:17 28:25 37:4 130:2

**general** 21:10 33:10 37:9 48:19,22 49:9 51:5 52:4 56:3, 4,21 57:10,11 64:23 83:23 91:15 100:18 111:25

**generalities** 21:13

**generalizations** 21:5

**generally** 10:19 11:18,23 32:9 51:15 65:23,25 98:12 99:19 111:16 112:12

**generation** 17:22

**generically** 56:9

**give** 7:24 10:15 13:14 19:16, 19 21:5 22:14 27:22 37:1,7 48:21 73:14 84:24,25 92:13 100:24 102:20 106:13,15,19 120:5 126:16

**giving** 93:7 105:13

**glass** 11:17 75:7,8

**goal** 125:4

**good** 8:8,9,10 21:7 57:3 59:6 67:13 85:24 108:19,20 131:24 132:6,19

**Gotcha** 16:11 70:3

**graciously** 71:23

**gram** 71:24 76:2 88:1,18,24 89:5,18 91:9 92:5,19 93:14 119:3,7,15,18 120:6 121:14, 22,23 122:2

**grams** 11:4 53:17 74:15 75:24,25 76:12,16 77:20,22 78:5,6,13,17 81:6 82:12 83:9, 13 84:8,19 85:3,12 86:3,4,7 87:4,16,19

**gravimetric** 50:15 75:15 114:5 115:12

**great** 36:13 67:9 132:24

**grid** 37:23 48:8 53:21 59:20, 21 60:19,23 61:10 62:4,24

65:14 86:12,14,18,20 87:10 89:7 101:14 110:17 120:8,9

**grids** 48:10 61:2 62:12,15,17, 21

**group** 19:21 37:22 38:8 45:7 46:7,16 47:14 49:24 123:9

**Guangxi** 104:7

**guess** 73:21 95:8 100:23 114:22 115:20

**guys** 7:9 59:6 70:16 85:6 98:9 108:25 131:13 132:7 133:1

## H

**half** 11:25 12:1 43:9,13 78:20 82:18,20 109:21 119:14 131:18

**hand** 60:11 78:9 114:17

**handled** 14:2 68:18

**handling** 63:20

**hang** 131:1

**happen** 30:3

**happened** 100:20

**happy** 132:22

**hard** 8:16

**hate** 93:22

**head** 17:24 40:10 43:7 72:17 73:18

**healthy** 108:23

**hear** 54:4,5,7,9 85:6 92:24 95:23

**heard** 85:7 132:18

**hearing** 95:24

**heavy** 70:12 71:14,19

**held** 35:10 44:4 54:15,16 58:3 97:15

**helps** 92:3,4

**hereto** 58:16,20

**Hey** 36:13 47:13

**high** 121:22

**higher** 16:1

**hit** 68:10,14

**hits** 67:23 68:8 69:9,25

**hitting** 103:14

**hold** 15:7 104:17 123:25

**hollow** 52:8

**home** 8:16

**homogenized** 89:11

**honestly** 22:8

**hood** 12:8,12 59:20 60:19,24 63:20 111:3

**hope** 57:3 107:2 108:22

**hopes** 90:18,20

**hour** 43:22 97:2 98:11,20 131:21

**hours** 100:24 131:16

**house** 8:20 24:5

**housekeeping** 20:7 48:20, 23 49:2,5

**howling** 85:6

**huge** 112:9

**human** 126:8

**hundred** 80:18,21 81:1 88:8 112:9

**hundreds** 33:14

**Hynes** 100:5 101:9,17 107:8, 13,18 108:16,17 124:16,25 126:15,20 127:23 128:5

**hypothetical** 94:3 96:13

**hypothetically** 118:8

## I

**I's** 50:20

**I.D.** 13:17 64:17

**idea** 92:13

**identification** 58:14,18

**identified** 45:21 51:8 64:16 90:10 92:18 102:16 117:13 118:9,14,22

**identify** 52:10 99:8

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                    Index: identity–lasted

**identity** 122:12,13

**idiots** 85:10

**ignore** 72:21

**important** 54:10 71:11 82:1

**imposed** 130:11

**impressed** 97:20

**improper** 96:13 106:2 121:16

**inability** 71:9

**inaccurate** 56:18

**Inaudible** 123:18

**include** 52:17

**included** 75:5 123:2

**includes** 90:1

**incomplete** 94:3 96:13

**increase** 95:17

**increased** 95:19

**Indiscernible** 113:11

**individual** 12:22 92:8 95:13, 19

**Infiltration** 75:15

**influence** 105:3

**inform** 27:6

**information** 15:19 26:25 27:19,22 28:13,20,25 29:3,18 56:14 113:14,18 114:7 117:4 130:13,15

**inhaled** 125:6

**initial** 50:19 77:5 78:4,10 80:8,17

**initials** 50:13

**inquired** 30:5

**inquiries** 27:17 28:12

**inspect** 30:19 33:13 37:23

**inspected** 30:24 34:1,4,5,7

**inspection** 31:2 33:2,3 34:19,20 36:8,12,17 37:14,17

**inspections** 32:21 33:1,11

**inspector** 34:24

**instance** 11:16 13:4,13 15:14

16:12 23:2 25:1 35:18 47:25 50:13 86:13 91:2 103:5 109:20 120:7

**instruction** 52:16

**instructions** 129:13

**intend** 71:5

**intention** 124:12

**interject** 34:16

**internally** 24:23

**interrupting** 93:25

**investigate** 68:23

**investigation** 67:12 68:12

**invoice** 131:25 132:4,5

**involved** 123:15

**involvement** 47:18

**involving** 123:7

**iodine** 98:23 99:6 104:11

**Irene** 57:22,25 59:1 132:20

**iron** 71:13

**issue** 28:6 103:1 105:19 127:21 128:2,14 131:2

**issued** 9:1,6 24:11 122:17 123:6,14

**issues** 30:8 32:8 48:19 98:1 124:24 130:25

**Italian** 104:7 123:8,12,16

**Italy** 123:21

**items** 33:15 49:9

---

**J**

**J&j** 23:6 38:12 55:24 64:4 95:25 100:11 101:7 124:9

**J&j's** 58:6

**January** 25:8,10,16 31:11,12 55:13

**jar** 84:16

**job** 15:2

**jobs** 15:8

**John** 26:16

**Johnson** 13:10 23:9 25:2,20 38:1 50:2,3 99:17 100:6 102:8,12,14,15 122:16,19 123:3

**Johnson's** 122:7,19 123:3

**judge's** 124:4

**judgment** 97:25

**June** 20:8,17 22:1 34:6 71:21 104:13 105:4

**Junk** 19:12

**jury** 106:13

---

**K**

**keeping** 51:1,4 129:24

**Kevin** 107:8,10 108:17,19 124:1 132:22

**kind** 9:4 50:21 64:19 72:24 129:1

**kinds** 103:2

**knew** 46:4 82:9

**knowledge** 99:17 101:22

---

**L**

**lab** 8:17 10:7,10,18 19:20 30:19 31:20 32:2,21 33:1,12 34:1,4,5,7,14,19 35:10 37:14 38:2,14,16,21,25 39:6,10,14 51:16 55:6 66:16,21,23 68:5 103:22 108:1

**lab's** 39:13

**label** 13:14

**labeled** 45:22 52:19

**laboratory** 8:16 15:18 31:3 67:16 109:7,8 115:3,15 117:12 119:17 123:11,19

**labs** 30:24 44:14 70:9

**lack** 41:11

**laid** 28:21

**large** 69:17 70:5

**larger** 106:8

**lasted** 98:10

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                    Index: late–methodology

**late** 31:11

**latest** 49:7

**Laughter** 54:11

**laying** 62:14

**lead** 37:18

**leave** 73:11 112:14 132:14

**leaves** 128:13

**Lee** 23:15 37:22 38:8 44:23 45:7 46:7,16,18 47:3,14 123:8

**leeway** 105:13

**left** 81:20,25 82:11

**length** 18:24 64:16

**level** 17:10

**leveled** 44:12

**levels** 127:2

**lid** 11:18,25

**Lim** 15:19 17:2

**limit** 59:17 118:20,23

**limitation** 106:2

**limited** 105:8 127:12

**limits** 37:3

**lines** 40:9 105:7

**liquid** 60:14 61:18,20 70:12, 15 71:14,19

**listed** 42:8 93:13

**literally** 53:20

**literature** 66:1

**litigation** 29:9 72:14 100:15

**live** 69:14

**lizardite** 51:22 52:2

**location** 7:11

**log-in** 52:17

**logged** 12:7

**login** 14:2

**long** 10:11 26:4 42:5 45:22 51:16 98:9 100:21 103:8 112:24

**Longo's** 98:22 104:11,14

**looked** 10:6 22:16 38:5,9,10 44:15 45:8 46:15,18,20 50:18 52:1 70:12 72:6 86:11,12 87:6 88:18 89:5 95:9 98:21 101:11 102:20 104:14 120:17

**LOS** 7:1

**loss** 81:5,24

**lost** 79:15

**lot** 24:1,3 45:13 51:17 66:23 67:3,4,6,15 71:16 106:10 112:5 132:17

**love** 127:15

**low** 66:7 70:6

**lower** 37:3

**lungs** 125:7

---

**M**

**M-G-X-I** 45:23

**made** 15:6 22:6 23:2 25:2,19 26:2 30:25 44:11 59:13,24

**magnitude** 90:21

**main** 26:10

**maintain** 17:1

**major** 31:24

**make** 23:18 27:5 41:25 49:8 53:14 58:6,9,11 66:2,5 68:16 69:5 73:5 93:24 94:22 95:3 105:14 107:23 110:24 129:21 130:3,16,21

**makes** 84:17

**making** 50:21

**management** 15:19

**manipulate** 119:22 120:4,6, 22 121:17

**manner** 112:1

**manual** 35:19

**March** 7:2 24:13,19,22 57:7 123:7,15

**margin** 114:21,23

**marked** 58:14,18 115:14

**Mary** 27:20 28:7,8,10

**Maryland** 37:17

**mass** 75:16,17,18,24,25 76:1, 2,6,7,8,9,16 120:23 121:5,17

**Massenburg** 21:19 26:20,21 28:1 29:4,7,21 34:15 35:13 44:20 45:9,17,25 46:8,10 54:3,5,8 57:19,20 58:21,23 59:1 70:21,22 73:1,2 93:8,15, 20 94:2 96:6,11,24 97:10,14 98:6 100:4 105:6 106:1,16 107:6,10,11,16,21,22 108:13 123:25 124:15,18 125:14,17, 18 127:9 129:8,21,22 131:4, 12,25 132:9,20,25

**material** 10:1 11:4 12:10 13:10 14:2 20:13 22:10 34:13 35:15,20,23 40:24 42:17,18 43:1,2,12,15 53:21 60:1 72:6 74:15 95:4 109:14 110:8,10, 11 111:6,22 112:5,6 113:6,8

**materials** 57:12 105:1,2

**math** 31:20 69:9 71:23 72:10 73:16 79:18,24 122:3

**matrix** 19:11

**matter** 7:25 70:24 79:10

**matters** 28:19 30:6

**Matthew** 23:15

**meaning** 62:3 69:2 103:18 104:7

**means** 15:21 63:9 65:4 89:4 103:25 104:20

**meant** 101:13

**measure** 18:24

**meet** 98:5,9

**meeting** 44:22 99:4,5

**meetings** 26:13

**memory** 85:24

**mentioned** 20:18 98:25 108:22 110:7 111:5 117:9

**method** 18:7,9 71:8 92:3 96:1 98:23 106:20 118:10 123:10, 19

**methodologies** 129:11

**methodology** 18:6 65:23

Case 3:16-md-02738-MAS-RLS Document 12990-2 Filed 04/09/20 Page 48 of 56 PageID: 109114

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                    Index: methods–openings

**methods** 94:14 108:6,11 118:15

**microscope** 90:23

**milled** 94:25

**milliliters** 61:12 82:21 83:4 84:2

**millimeter** 61:22,23 83:6,25 86:4,7 87:2,4,9,14,16

**millimeters** 83:3 84:2 85:17 86:2,11,22 87:10

**milling** 95:2,4

**million** 91:10 92:8,20 93:5,7, 14 96:2,4,20,21 122:1

**millions** 92:6

**mind** 43:24 97:10

**mineral** 51:24

**mines** 98:22

**minimum** 109:14

**minus** 77:23,25 78:14 80:3,8, 12 81:1,9

**minute** 103:9

**minutes** 43:25 79:4 97:2 107:9

**misidentified** 44:24

**misleading** 126:5

**misstates** 45:9

**mixed** 60:3

**mixture** 71:17

**ml** 78:20 83:10,13 84:3,7,8,10, 11,20

**modified** 18:9 114:6 115:13 123:9,18

**monitor** 28:11

**month** 44:22 99:5

**months** 10:17

**morning** 8:8

**morphological** 52:8

**morphology** 65:8

**motion** 7:8

**move** 71:8 117:8

**moving** 29:6

**multi-analytical** 90:1

**multi-task** 90:25

**multiple** 103:5 108:9 112:25 125:12 127:10

**multiply** 77:8,12,14,22 80:17 81:13 84:24 86:23 87:16 88:8 121:15

**multiplying** 121:3

_____

**N**

**NABLAB** 32:22 33:6,13 36:8

**named** 15:14

**names** 27:14

**nanograms's** 89:8

**nature** 67:10 91:15

**NB19-645** 115:14

**NB19-646** 115:14

**NB19-647** 115:14

**negative** 22:22 38:25 42:18 44:19 47:15 68:14 110:11

**nevermind** 101:20

**nomenclature** 51:2,5

**non-detect** 39:3 40:15,19,20, 21 41:4,10 43:19 63:25 64:7 66:18 104:19 105:23,24 106:11 107:24,25 108:1 122:20 129:5

**non-detects** 106:5

**nonanalytical** 49:9

**nondisclosure** 57:8

**nonfibrous** 51:18,23

**nonmaterial** 36:18,19

**Nos** 58:13,17

**notation** 114:17

**notations** 64:15

**note** 18:22 19:9 34:13 36:17, 19 65:6 127:22

**notes** 104:17 126:16

**notice** 21:21 29:12 58:5

116:10

**noticed** 29:16 70:25

**notify** 29:25 33:18

**number** 13:25 17:17 18:7 20:2 40:4 41:22,23 43:8 69:24,25 70:1,3,5 72:21 81:22 85:22 87:3 88:8 92:9,13 95:17,19 96:19 109:14 119:9, 22 120:4,6 121:4,7,19,22

**numbered** 114:19

**numbering** 41:1 42:24

**numbers** 72:18 74:8 75:23 77:2 79:16 82:4 93:3 119:9 126:3

_____

**O**

**oath** 7:14

**object** 35:6 70:22 93:8,15 96:12 101:17 105:6 106:1 125:14 127:9,22

**objecting** 34:25

**objection** 7:7,13 27:5 35:7 44:20 45:9,17,25 46:8 58:21 93:24 94:2 96:6,11,24 106:16 124:2

**objections** 29:23,24,25 58:6, 8 59:2,3 66:9 93:16,22 130:3, 19

**observe** 51:6

**obtain** 65:3 102:17

**occasions** 108:9

**occupied** 13:24

**October** 9:8 23:4,5 24:11 25:3 50:9,10 55:7 116:7

**offense** 125:18

**office** 29:22 71:4

**officer** 7:11,19,23 8:3 58:15, 19,25 132:24

**officially** 99:22

**one-to-one** 19:3

**opening** 86:20 87:10 120:8,9

**openings** 86:12,15,18 120:12

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                          Index: openly–practice

**openly** 29:9

**opinion** 15:7 20:13 105:11
106:8,10,13,15,19

**opinions** 20:10,12 105:20
106:12

**opposed** 52:2 54:25 119:3

**optical** 90:22

**order** 14:1,3 16:11,14 17:1
18:1 31:14 40:12 64:24 89:14,
15 93:14 105:7,15 130:4

**orders** 90:21

**organics** 74:21

**organized** 123:17

**original** 16:10 110:2

**overbroad** 96:12

**overruling** 130:18

                    **P**

**P-O-S** 64:25

**P.L.M.** 69:19 90:1,2,10,11,13,
17,18,21

**packaged** 10:24

**pages** 114:15 115:10

**paid** 100:16

**Panatier** 7:9,15 8:7 21:22
27:24 29:22 30:4,9,12,13
35:6,17 37:11 44:3,6,7 45:3,
11,20 46:2,12 54:4,6,10,12,18
57:19,24 58:5,22 59:3,5 71:2,
6 73:3,7,13 93:10 94:1,5 96:9,
15,16,25 97:13,17 100:9,10
101:12,21 105:16,18 106:6,22
107:5,24 117:17,19 119:1,7
124:19,23 125:16,25 126:13
128:13,17 129:9 131:2,7,15,
21,23 132:3,6,21

**Panatier's** 29:8 70:25 122:3

**pandemic** 107:2

**paper** 32:4 125:11

**papers** 125:12 126:9

**part** 26:24 34:19 42:6 56:10
91:17 100:23 101:23,25
122:21 130:8

**particle** 19:14

**particles** 118:22

**parties** 132:13

**past** 73:8 100:17,19 127:6

**pattern** 52:6 65:5 102:17,22
103:3,7,10,18,22

**pay** 100:12 132:1

**paying** 131:13

**peel** 12:16

**peeled** 12:20

**pendency** 20:15,23 22:4
32:23

**pending** 7:25 29:9 30:7

**people** 8:20 13:25 14:1,14,
17,18,22 21:4,6,11 24:1 26:11
35:18 67:12 132:18

**percent** 59:14,18,21,25 60:13
69:2 77:1,15,18 78:5 80:24,25
81:1,24 88:15 96:20 100:2
102:23,25 103:17,18 119:3,24

**percentage** 16:1,23 17:1
41:18 69:9,11,22 76:24 77:10
80:7 81:2 87:1 88:3,9,10,13
102:19

**perform** 10:2

**performed** 116:11

**period** 10:6

**permit** 128:8

**person** 10:22 27:19 28:6,11
73:19

**person's** 116:4

**personal** 130:10

**personally** 34:22

**perspective** 119:24

**pertaining** 46:17 97:22

**petri** 75:17 79:11,19,25 82:10

**phone** 23:5 98:6,10 107:9
130:15,22 131:5 132:14,22

**phones** 73:24

**phrased** 128:18

**pick** 60:9

**picked** 72:5

**picking** 72:11,12

**picture** 36:2

**pictures** 11:12,15

**piece** 18:18

**pieces** 120:24

**pipe** 61:11

**pipette** 61:9

**place** 57:9 124:2 130:19
131:6

**places** 82:5

**plain** 110:23

**Plaintiff's** 58:13

**planned** 57:24

**plans** 47:1

**plastic** 11:17,18

**plow** 107:15

**point** 10:3 29:13 53:3 62:2
65:13 82:11 89:3,24 94:21
113:24

**poor** 72:4

**portion** 61:1 62:24 63:4 83:2

**portions** 66:6

**positive** 16:13 19:20 22:22
41:14 56:24 64:25 65:1 67:15
68:2 102:18 129:5

**positives** 70:3

**possession** 48:3

**possibility** 16:1,2 111:23
112:6

**possibly** 15:18

**post** 74:23 75:3,8,17,18 76:16
79:24

**potentially** 41:13 63:6,16

**pouring** 59:20

**powder** 12:6 13:7,11 59:14
120:2 122:7,19,20 123:3

**powders** 108:8

**practice** 65:17 70:16 127:4

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                    Index: practices–re-prep

practices 31:4 67:13 68:19

pre-weighed 79:10

pre-weight 79:9

prep 65:15 71:19 82:11 92:21, 22 93:4,12,13 94:9,11 109:21

preparation 16:10 40:23 53:21 55:3,6 56:3,21 59:10 60:19 61:5 70:13,18 91:17 92:1 95:16 96:19 109:19 110:13,17 112:10 116:9,20 125:3 126:4

preparations 37:23 101:15

prepare 56:9 60:7 66:10 128:20

prepared 52:22 62:8,10 63:13,15 68:17 98:15 111:14, 18,24 112:7,12 113:3,5 114:1, 2,24 115:7,16,21 118:2 124:4 126:23 128:9

prepares 109:8

preparing 42:22

prepped 39:25 62:3 96:5

prepping 60:23 65:21 67:12

presence 30:6

present 89:17 94:13,20 104:23 114:19

presentation 44:22

presented 125:11,12,24 126:9

press 122:18

pretty 24:8

prevent 130:4

previously 129:24

primarily 8:24

primary 14:23 27:8

prior 21:20 95:12 96:19 98:6 113:2 123:1 131:13

privilege 26:24 28:3,5 35:8

privileged 35:3

problem 33:24 35:25 127:20

procedure 39:13 68:11 82:14

procedures 31:4

proceed 8:4 12:5 73:12

proceedings 133:2

process 91:17 110:14

produce 65:14,19

produced 28:13 114:15

product 104:14

products 21:2 55:22 105:11 106:14 108:1 120:2

professional 130:10

professionally 34:22 70:11

project 116:13

proper 17:1 68:18 120:17,20 121:13,20 122:4

properly 52:9 119:12

properly-skilled 52:12

proportion 87:25 88:11,13 95:11

provided 21:20 123:8,17

provision 101:18

provisions 117:5 130:9

proximity 63:24

PST 7:3 133:3

public 10:4 15:6 22:6,13 23:2 25:2 28:18 30:15,25 37:14 47:10

publicly 22:17

pull 12:22 55:11

purpose 28:10 126:1

purposes 14:9 36:16 105:8

pursuant 21:20 29:12 130:18 131:12

purview 47:11 97:19 98:1

put 11:11 12:10 19:1 53:8,18 60:3 61:2,12,14 62:16 63:3 64:10 75:8 79:11 82:22 83:1, 22 84:16

putting 59:19 61:20 62:22,23

                                Q

QC 15:11,15,21,23 16:2,15, 19,23 17:1,7

quality 14:12 15:12,20 17:4 42:7

quantification 118:10,15,20, 24

quarter 77:15 80:24 87:14

question 23:19 25:21 27:22 35:12 38:8 41:21 48:13 51:15 71:7 95:8 100:13 102:19 105:17 106:2 114:22 115:24 124:5 127:20 129:1,2

questioning 119:4 124:3

questions 25:25 26:12,15 34:18,19 56:3,6 70:23 71:3 92:25 97:18,21,24 105:7 106:24 107:1,7,9,23 109:3 119:1 124:17 126:13 128:18 129:18,25 130:20 132:21,23

quick 107:12 126:15

quicker 72:23

quietly 116:4

quote 24:12 25:24 57:1 74:7

quote-unquote 28:2

                                R

R.J. 23:15 37:22 38:8 44:23 45:7 46:7,16,18 47:3,14 123:8

radiation 103:14

radius 61:22

raise 66:9 125:18

ran 38:14

random 17:3 60:9 72:5,11

randomly 15:20

range 37:6,9 89:8 91:11

rate 50:15 98:17

raw 59:20 63:20 72:5 92:7

re-analyzing 48:1

re-prep 68:24

Case 3:16-md-02738-MAS-RLS   Document 12990-2   Filed 04/09/20   Page 51 of 56 PageID: 109117

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                    Index: re-running–run

**re-running** 47:25 68:12

**reached** 23:20

**read** 46:24,25 47:1,3 116:3 127:25 132:9,15,17,19

**real** 55:11 107:12

**realm** 52:23 112:2 125:22

**reanalyzed** 15:24

**reason** 27:6,7 41:9 53:7,10

**reasons** 89:25 103:2 116:25

**recall** 9:25 13:25 16:18 19:24 36:22 41:22,23 71:21 72:7 117:16 119:3 126:25

**receive** 12:4

**received** 11:12,18 13:2,18 116:10 127:13

**recent** 104:11 105:10

**recently** 26:8

**recess** 44:4 54:15 97:15

**recollection** 24:16 72:4

**recommend** 46:22

**record** 27:25 50:6 54:12,17 55:4 57:16 58:4 74:23 83:18 114:14 116:3 129:22 130:3,17 131:25

**recorded** 83:16

**redacted** 42:5 59:16 114:19 116:4,7

**reduced** 119:10

**reduction** 75:15 114:5 115:12

**reference** 56:9 57:12 59:13, 15,25 62:9,10,17,23 63:10,12 65:14,20,22 66:2,10 95:3

**referenced** 62:7

**referencing** 73:4

**reflected** 116:5

**regard** 19:15 30:18 37:24 54:19 57:18 59:9 63:2 105:19

**related** 32:14 51:22

**relation** 62:25 63:1

**release** 9:11 10:4 21:9 22:13,

16 24:17 37:14 122:18

**released** 9:7,10,14,16 21:16 24:14 27:15 55:7

**relevant** 104:6

**remaining** 77:21 81:3,10,12

**remember** 20:16 27:18,20 28:9 73:22 99:11

**remind** 67:12 68:18

**reminded** 26:4

**reminds** 21:8

**remote** 83:17

**remotely** 7:14 132:13

**rendered** 20:10,11

**repeatedly** 106:4

**replicate** 15:20 16:2

**report** 9:1,7 23:3,6,10,13,16, 20 24:10,11,12,13 25:2,11,19 32:5 36:22,24 37:4 38:14 40:5 46:16,19 47:2,3 50:6,7,19 52:15 53:3,6 55:6 59:13 64:12 72:20,23 73:3 74:1,3,8 82:15, 16,17 91:4,6 98:22 99:2 101:10 113:15,19 114:5 116:2 117:21 119:18,25 123:6,14 128:1,3

**reported** 16:14 118:19 119:15 123:11,19 129:5

**reporters** 24:3,4

**reporting** 17:22 119:2 121:23

**reports** 9:12,14 11:11,15 15:5,6 19:17,24 20:2,6 21:16 23:1 24:15 25:6 27:15 31:8 38:2,9 42:5,8 45:2 46:24 75:3 97:22 114:24

**represent** 13:19 34:16 72:19

**representatives** 20:25

**represented** 28:1

**request** 27:9 28:13 52:18 53:4 116:9 130:18

**requested** 116:8,16,21

**required** 27:9 116:8

**rerun** 68:15

**residue** 81:2

**resolution** 90:8

**resolvable** 90:22

**resolvable-type** 90:16

**respect** 129:15

**response** 81:15

**rest** 102:18 111:1 112:15

**restroom** 97:11

**result** 37:2,5,8 42:11 129:3

**resulted** 33:22

**results** 10:3,4,16 16:14 21:16,24 22:5,6,15,20 30:20, 21,25 32:9 33:21 34:21,24 35:3 36:9 37:10,15 40:20 44:19 45:6 46:23 47:7,10 119:2,18 120:1 129:1,2,5,6,16

**retain** 100:11

**retained** 45:13 99:12,18,22 100:4,5

**retainer** 100:12,16,22 101:1

**retains** 100:14,15

**retired** 8:19

**retread** 71:5

**retrieve** 48:8

**retrieved** 48:5 53:16,17

**review** 73:4 98:19

**reviewed** 38:4 104:25 105:2

**revised** 23:5 52:17

**revision** 49:7

**rigorous** 108:11

**room** 120:7,9 121:8

**rooms** 120:11,16,18 132:13

**rounding** 82:5

**routine** 31:13,15,21

**rules** 131:13

**ruling** 124:4 130:2

**run** 15:11,12 17:11 40:4,7 42:14,16,18 66:17 67:6 69:16, 19 70:5 90:22

Case 3:16-md-02738-MAS-RLS   Document 12990-2   Filed 04/09/20   Page 52 of 56 PageID: 109118

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                                    Index: running–sir

**running** 68:5 69:8,12,13
110:21,22

**Ryan** 132:5

---

**S**

**S-A-E-D** 64:17,18 65:4
102:18

**safe** 107:2 108:23

**safely** 8:13

**sake** 127:17

**Saldivar** 7:17,23 8:8,12 21:20
28:7 54:19 73:15 97:3 101:19,
22 107:22 108:17 114:22
115:6,20 116:12 122:5 124:6,
8,16,20 125:20 126:21 127:13
129:23 130:4,17,23 131:6,15

**Saldivar's** 105:9 130:6
131:14

**Salvidar** 115:15

**sample** 9:8 11:16 12:5,22,24
13:14,17 15:13,15,21,23 16:5,
13,24 17:5,8 25:19,20 36:23
38:12,13,19 41:10,13 51:8
55:6 59:13,15 60:13,14 61:5
62:3,7,8,9,10,18,23 63:7,12
64:4,14 65:11,22,23 69:2,6,14
71:25 72:10,13 75:13,14,16,
17 76:3,7,8 77:5 78:17 80:8,
17 82:8,11 86:12,13,16 87:6,
22 89:10,11 90:3 91:3 92:4,18
93:13 95:25 96:8 98:23 101:7
102:11,14,15 110:2,6,15
111:10,14,17,19 112:16,18
113:1,2 114:3,23 115:3
116:17 117:10,12 122:18
127:3,7 128:8

**sampled** 90:21

**sampler** 38:18

**samples** 9:23 10:1,6,7,20
11:12 15:25 16:12,15,20,22
17:2,3,9,10,15,20 18:10
19:16,20 24:24 25:3 26:4
32:14 38:5,10,17,23 39:18,20,
21,22 40:8,19 41:5 42:19,21
45:13 46:17 47:25 48:1,5,15
49:11,17,20,25 50:3 53:17
55:24 56:10 60:5,8,14,19 61:6
62:2,20 63:2,10,14,17,21,24
65:15,16,18,20 66:2,17,23

67:1,6,15,19 68:1,2,3,6,12,13,
14,15,16,18,20,21,24 69:8,16,
17 70:1,5 71:16 76:16 89:10
90:5 95:11 98:4 101:14 102:6
103:1,2 104:6 106:11,20
107:25 108:10 109:9,11,12,
15,16,21 110:13,16 112:4,10,
21 113:25 122:6,8,13,15
123:2,7,12,16,20 129:4

**sampling** 9:12 18:13 25:7

**Sanchez** 23:15

**scheduled** 129:24

**school** 98:22

**science** 12:24

**scientific** 26:9 96:18 104:20
132:18

**scope** 105:7,9,15 106:2
125:15,19 127:12 130:1

**Scotch** 12:15

**screw-on** 11:6

**screwed** 11:9

**scroll** 115:10

**seconds** 103:9

**section** 42:7 52:17 97:2

**sections** 62:14

**secured** 11:8

**seek** 26:25

**Segrave** 23:12 34:1,5,13,17,
24 44:12 45:21 46:16,19
101:6,23 102:6

**Segrave's** 36:16 47:2

**self-distancing** 8:13

**sells** 21:1

**semi-clear** 11:22

**send** 10:1,3,14,17 22:14
30:10,11 49:6 57:21 58:23
130:12 131:24

**sending** 58:22

**sense** 63:16 101:19

**sensitivity** 89:16 92:20 93:5
122:2

**separate** 132:13

**separated** 62:6

**separately** 27:1

**separation** 70:13 71:15,19
129:11

**sepiolite** 52:3

**September** 59:16 115:19,22
116:3,15

**serving** 32:24 99:15

**session** 124:8

**sessions** 109:19

**set** 15:25 39:24 40:1 69:16
112:9 118:1

**sets** 69:18

**setting** 104:4,13 105:1

**seven-minute** 97:5

**shape** 19:7

**share** 29:18

**sheet** 18:22 52:17 64:13 65:9
75:14,15 83:19,21 90:15
113:22,23 114:6,10,13 115:12
117:13 118:9,14

**sheets** 50:15 75:6

**short** 54:15

**show** 11:16

**showing** 69:3

**shown** 98:21

**sic** 85:3

**side** 63:3 112:14,15 115:18

**Sigma-aldrich** 59:14 60:2
110:12

**sign** 132:10,15,17

**similar** 51:24 73:10

**simplest** 9:21

**simply** 83:10 86:4 88:1,18,23
93:4 104:20 105:21

**simultaneously** 36:6 93:17
113:9,12,20

**single** 16:24 33:3 47:22 67:3
69:13,16 112:11

**sir** 35:12 94:6 96:17 100:11
104:19 105:19 106:23 125:5

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                            Index: sit–T.E.M.

128:18 129:15

**sit**  41:25 96:17

**sitting**  20:9 120:8,10

**situation**  67:11 89:20

**situations**  16:3 52:7

**size**  39:15 109:23

**skilled**  15:2,8 52:9

**slice**  12:17

**sliced**  12:20

**slide**  63:5,7

**slightly**  130:1

**small**  10:15 11:3 39:24 62:13
70:6,7 83:2 87:8

**smaller**  36:20

**smallest**  120:24,25 121:12

**social**  8:14

**solemnly**  7:24

**solid**  50:22

**solution**  60:4,8,23 61:1,10,18
66:6 79:5,6 83:24 110:21

**solutions**  61:4

**someone's**  71:4

**sonication**  94:10 96:5

**SOP**  32:15 49:7

**sort**  17:22 28:15 31:14 36:11
72:4,12 105:19 114:16

**sought**  30:5

**sound**  55:14 85:1

**sounds**  76:17 80:20 81:7
85:2 86:9 87:23 89:6 132:6

**source**  13:7 69:6 104:6 124:9

**SPANGLER-KHARE**  7:6,10

**spatially**  63:1

**speak**  21:9 56:2,25

**speaking**  36:6 93:17 113:9,
12,20

**special**  31:14 52:16

**specific**  9:13 13:24 27:19
30:20 31:21 37:8 38:12,18

43:8 49:12 52:5 72:10 99:2
111:10,14 131:2

**specifically**  8:23 17:5 21:15
25:23 26:24 27:12 32:14
43:15 51:9,12 102:10 111:9

**specifics**  26:3 48:18 56:2,25
65:10

**speculation**  46:10 94:3
96:12

**spiked**  59:14

**split**  12:8 110:3

**spoke**  26:24 56:20

**spring**  9:16

**square**  85:15,17 86:2,3,7,11
87:10,16

**staining**  99:6

**stand**  53:12 129:6

**standard**  18:6 34:23 59:11,
19 65:17 66:10

**standards**  60:11

**stands**  29:14

**start**  78:12 103:6

**started**  48:24 131:19

**starting**  74:12,14 77:20 81:13

**state**  8:10 46:23 120:16

**stated**  56:17

**statement**  36:24 37:7 128:2
129:21

**statements**  20:10,12,13

**stating**  73:7

**stay**  107:2 108:23

**staying**  91:21

**stays**  91:15

**step**  78:21 111:2

**steps**  112:8

**Steve**  26:19

**stipulation**  7:6

**stop**  79:6 83:7

**stretch**  28:4

**strike**  7:8 30:23 50:14

**strike-throughs**  50:14

**structure**  50:25 103:12
117:14,15 121:10,15,18

**structures**  64:16 96:4,19
102:16 103:6 117:13,20,22
118:9,10,13,14 119:10,14,15
121:13

**stuff**  10:14 21:4,9 24:18,22
32:14 44:15 47:4 48:20,21
49:13 50:15 52:23 67:3 90:12
91:1,19 98:2,18 100:24 105:1

**style**  127:3

**subject**  28:2 98:12 101:8,18
117:5 124:3 130:3,8,9 131:8

**submission**  49:22

**submittal**  49:20

**submitted**  38:19,20

**substantive**  25:18 26:2

**subtract**  75:9 76:6,9,10 78:7
80:11,21 81:8

**successful**  66:8

**sufficed**  117:21

**sufficiently**  15:2

**suggest**  115:6,21 116:15
126:3

**suggested**  116:1

**suggestions**  33:6

**summer**  8:22 9:1,17

**supposed**  33:19 35:19

**surrounding**  37:6

**suspend**  78:20 82:18,21 83:3

**swear**  7:24

**sworn**  7:18

**system**  12:8 15:19 17:2 41:1
42:24 103:13,15

---

**T**

---

**T.e.m**  8:18,19

**T.E.M.**  8:20 14:9,11,18,25
36:22 51:1,4,5,17 69:19 89:7

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                    Index: table–tube

90:3 112:6

**table**  45:8

**takes**  95:6 112:24

**taking**  60:22,25 61:18 62:13
75:22 82:4 108:20 129:23
130:19

**talc**  21:1,13 22:5,23 42:18
45:13 53:20,23 54:21,24,25
59:14 60:5,14,18 61:19 62:4
65:17 66:3 70:13 71:17 72:6
76:4,14 92:23 94:19,25 96:8
99:4,5,8 104:6 106:14 107:25
108:1 110:12,14 112:2,23
123:8,12,16 127:3

**talc-based**  108:8

**talc-containing**  54:25
110:15

**talcs**  124:10

**talcum**  120:1

**talent**  18:10

**talk**  9:19 23:20,21 28:16,17,
19 44:8 50:5 53:9 55:2 56:14
93:12,22 98:1 127:15 131:8,9

**talked**  20:16 99:5

**talking**  8:24 20:21 37:16
49:25 64:3 86:17 88:11 90:14,
15 91:10 112:1

**tape**  11:14,25 12:2,15,16

**taped**  11:9

**technician**  15:13

**technicians**  13:22 15:7

**technique**  70:13,18 71:15
98:3,4

**techniques**  56:21

**telling**  51:13 95:18

**tells**  76:17 78:2 81:16

**ten**  11:4 19:22 79:4 97:2,10,
13

**ten-minute**  43:23

**term**  39:3 49:2 104:20 110:2

**terms**  9:21,22 32:10 88:15
91:9 119:2,18 120:1 128:18
132:18

**test**  54:21 91:3 128:21

**tested**  55:25 95:25 96:1
105:12,22,23 106:4,10 108:8,
11 122:6,8 123:9,12,18,21

**testified**  7:20 29:11 34:17

**testify**  98:15 124:12 128:9

**testifying**  29:10,16 99:16
100:15

**testimony**  7:24 105:3,23

**testing**  21:2,25 22:5,23 24:23
55:21 56:19 104:14 105:1,9,
21 122:21 123:2,7,15 124:9
126:23 127:5 128:7

**then-current**  9:20

**theoretically**  121:6

**thereabouts**  43:19

**thin**  45:22

**thing**  17:3 31:17,22 36:11
61:13,17 71:11 72:25 74:11,
20 88:12 112:25 117:9
120:12,25 126:15,22

**things**  9:6 17:22 26:13 28:16
32:12,19 33:15 36:18 42:21
52:14 53:8 57:11,15 59:8,12
68:19 89:14 94:9,10 98:19
114:19 130:7

**thinking**  56:16

**thousand**  67:1 85:16,17
121:12

**thousands**  67:22 85:20
92:11

**three-line**  116:2

**THURSDAY**  7:2

**tigerite**  51:22

**til**  59:20

**time**  9:11 10:6 18:11 25:4
27:11 31:17,18 32:7 33:17
34:11 43:5 51:16 55:15 67:7
72:6,24 73:16 85:23 102:23
103:1,8,9,17,19 107:1,3
108:20,24 109:12,24 111:18
112:7,16,24 116:10 125:8
129:24 131:7,14,20

**times**  17:20,21,25 21:3,6 39:9
67:2 81:13 84:24 87:10,17

88:24 106:4 127:10 132:17

**timing**  62:25

**today**  20:9 28:24 29:3 30:11
96:17 108:18,20 109:21
117:2,17 122:3 128:10 131:14

**today's**  98:14 118:2

**told**  25:23 26:6,10,14 27:13,
16 28:12 47:6,9,13 56:1,12,24
57:11,15 67:17 82:18 85:14,
22 86:21 118:7 129:11

**ton**  120:16

**tool**  68:19

**tools**  111:3

**toothpicks**  120:25 121:1,6

**top**  11:25 12:15 43:6 48:23
72:16 114:18

**topic**  109:7

**total**  9:22,25 13:25 14:4
17:14,24 19:20 40:3,6 41:17
43:11 49:19 50:2 68:3 69:8,
23,24,25 70:1 76:21 81:5 84:9
86:23 87:3,5,6,19 93:3 98:11
102:15,19 114:15 118:9 119:9
121:22

**totally**  48:12 131:11

**touching**  127:21

**trace**  69:2 127:2

**tradeoff**  90:4

**trained**  14:18,20,21 15:2,8
52:9,12

**trainers**  14:23

**translate**  121:18

**translucent**  11:22

**treatment**  78:23 79:1 112:17

**tremolite**  66:8

**triplicate**  110:3

**true**  16:19 34:2 64:8 67:19
92:6

**trust**  130:5

**truth**  7:25 8:1

**tube**  52:8

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.                    Index: tubular–years

**tubular** 65:8

**turn** 129:16

**turned** 129:3

**two-minute** 107:14

**type** 31:2,22 36:23 40:24 90:7
  121:13

**types** 40:14,22 48:18 50:16

**typical** 21:14 39:13 127:4

**typically** 11:1 78:19 112:25
  113:18 119:17

---

                    **U**

**U-T-O** 65:2

**U.S.F.D.A.** 129:3

**Uh-huh** 40:2 74:10 80:2 86:6
  91:6 122:1

**ultrasonication** 95:7

**ultrasonics** 92:1

**unable** 45:23 65:3 102:17,21
  103:17 108:5

**uncertainty** 36:24 37:1,9

**understand** 9:2 13:11 17:7
  39:12 41:8 42:12 88:14 94:24

**understanding** 13:6 33:13
  35:2 39:8

**Understood** 36:15

**uniformed** 61:15

**unique** 108:21

**unquote** 24:13

**unrelated** 127:17

**unscrewed** 12:21

**unsure** 27:7

**updating** 8:24

**upper** 37:3

---

                    **V**

**vague** 94:4 96:12 106:16
  129:1

**vagueness** 106:1

**valid** 129:16

**turn** 129:16

**validate** 127:4

**validated** 129:1

**validation** 128:7,19

**verbally** 32:11

**verbiage** 132:21

**verified** 73:16

**verify** 16:15

**Veritas** 37:22 46:16 47:14

**Veritas's** 38:4 101:7

**Vermont** 123:16,20

**version** 114:14

**versus** 16:2 95:13

**vessel** 75:7

**vial** 11:17 12:6,9,19 75:8,10,
  16,17,24,25 76:1,3,6,7,8,9,16
  79:2

**vials** 10:25 11:3,5,19,21
  12:14 13:2 53:18 75:8

**view** 47:19

**visible** 90:11

**visited** 38:1

**volumes** 84:4

**voluntarily** 130:17

---

                    **W**

**wait** 93:23

**waiting** 32:6

**waive** 132:11

**wake** 30:19 37:14 38:2

**wanted** 22:18,20 27:5,21,23
  32:18 41:24 52:14 72:2 76:24
  77:9 92:21 94:16 101:17
  105:14 107:23 120:14 128:19
  130:21

**wash** 75:18

**waste** 43:5

**water** 37:17,18 43:24 61:13,
  16 79:6 82:21 83:1 103:13
  110:23

**ways** 95:21

**week** 49:23

**weeks** 10:16

**weigh** 66:6 74:14 79:13

**weighed** 60:1,2 82:8 110:14

**weight** 74:12,14,23 75:3,5,7,
  8,9 76:14,21 77:6,20,21 78:4,
  16 80:8,17,22 81:12,13 82:10
  88:4,5 113:22 119:3,25

**weights** 75:19

**Welch** 21:21 29:12 70:24

**whatnot** 98:16

**white** 11:17

**width** 18:25 64:17 90:15

**withdraw** 47:10

**Wolfgang** 26:19

**wood** 120:24

**word** 12:24 49:5 50:24

**words** 30:22 104:21 105:22
  106:9

**work** 8:16,24 15:1 20:16,17,
  23,24 27:17 30:18 37:20,24
  44:12 48:5,14 49:15 51:16
  55:17 57:5 59:10 66:17 70:14
  104:4,5,11 124:13

**worked** 14:11 51:16 70:8

**working** 8:25 9:13 13:23 25:4
  71:4

**works** 132:2

**Wow** 8:21 84:19

**wrapped** 12:1

**wrapping** 22:3

**written** 114:17

**wrong** 27:21 47:7 72:20 73:8

---

                    **Y**

**year** 10:9 13:24 50:1 66:24
  67:1,6,18,23 70:4 101:24

**years** 18:7 31:22 32:23,25
  33:22 66:25 100:25 101:4

ANDREAS SALDIVAR, Vol II on 03/19/2020
LINDA ZIMMERMAN vs. AUTOZONE, INC., et al.          Index: York–Zimmerman

**York** 123:9,18

**Yup** 75:1

_____

**Z**
_____

**zeros** 89:3

**Zimmerman** 21:21 29:15
30:4 34:17 70:24 99:12,23
100:6 105:3 127:17 131:6