**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON DIVISION**

|  |  |
|---|---|
| ) | Docket No. 3:16-md-02738-FLW-LHG |
| ) | |
| IN RE: ) | |
| ) | Clarkson S. Fisher Building |
| JOHNSON & JOHNSON TALCUM ) | & U.S. Courthouse |
| POWDER PRODUCTS MARKETING, ) | 402 East State Street |
| SALES PRACTICES, AND PRODUCTS ) | Trenton, New Jersey 08608 |
| LIABILITY LITIGATION. ) | |
| ) | May 6, 2020 |
| ) | 11:00 a.m. |

TRANSCRIPT OF STATUS CONFERENCE HELD VIA ZOOM
HONORABLE FREDA L. WOLFSON
UNITED STATES CHIEF DISTRICT COURT JUDGE


APPEARANCES VIA ZOOM:

For the Plaintiffs:       Beasley Allen Law Firm
                          By:  LEIGH O'DELL, ESQ.
                          218 Commerce Street
                          Montgomery, Alabama 36104

                          Ashcraft & Gerel, LLP
                          By:  MICHELLE A. PARFITT, ESQ.
                          120 E. Baltimore Street
                          Suite 1802
                          Baltimore, Maryland 21202

                          Cohen, Placitella & Roth, PC
                          By:  CHRISTOPHER PLACITELLA, ESQ.
                          2001 Market Street
                          Suite 2900
                          Philadelphia, Pennsylvania 19103

Courtroom Deputy:         Jacqueline Merrigan

Law Clerk:                Wayne Fang

**TRANSCRIPTION SERVICE:**     **TRANSCRIPTS PLUS, INC.**
                               **435 Riverview Circle**
                               **New Hope, Pennsylvania 18938**
                               **Telephone:  215-862-1115**
                               **e-mail CourtTranscripts@aol.com**


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES VIA ZOOM:
(continued)

For the Plaintiffs:        Burns Charest LLP
                           By:  WARREN BURNS, ESQ.
                           900 Jackson Street
                           Suite 500
                           Dallas, Texas 75202

                           Golomb & Honik, P.C.
                           By:  RICHARD GOLOMB, ESQ.
                           1835 Market Street
                           Suite 2900
                           Philadelphia, Pennsylvania 19103

                           Levin Papantonio
                           By:  CHRISTOPHER V. TISI, ESQ.
                           316 S. Baylen Street
                           Suite 600
                           Pensacola, Florida 32502

                           Levin Sedran & Berman LLP
                           By:  LAURENCE BERMAN, ESQ.
                                MICHAEL WEINKOWITZ, ESQ.
                           510 Walnut Street
                           Suite 500
                           Philadelphia, Pennsylvania 19106

                           Motley Rice
                           By:  DANIEL LAPINSKI, ESQ.
                           210 Lake Drive East
                           Cherry Hill, New Jersey 08002

                           Napoli Shkolnik PLLC
                           By:  HUNTER SHKOLNIK, ESQ.
                                ALASTAIR FINDEIS, ESQ.
                           360 Lexington Avenue
                           11th Floor
                           New York, New York 10017

                           Baron & Budd, P.C.
                           By:  SINDHU DANIEL, ESQ.
                           3102 Oak Lawn Avenue, Suite 1100
                           Dallas, Texas 75219
```

```
APPEARANCES VIA ZOOM:
(continued)

For the Defendants:        Faegre Drinker
                           By:  SUSAN M. SHARKO, ESQ.
                                JESSICA BRENNAN, ESQ.
                           600 Campus Drive
                           Florham Park, New Jersey 07932

                           Skadden Arps Slate Meagher & Flom, LLP
                           By:  JOHN BEISNER, ESQ.
                                ALLISON BROWN, ESQ.
                           1440 New York Avenue, N.W.
                           Washington, DC 20005

For PTI Union and          Tucker Ellis LLP
PTI Royston Defendants:     By:  CAROLINE TINSLEY, ESQ.
                           100 South Fourth Street
                           Suite 600
                           St. Louis, Missouri 63102

                           Hardin Kundla McKeon & Poletto
                           By:  JANET L. POLETTO, ESQ.
                           673 Morris Avenue
                           Springfield, New Jersey 07081

For PCPC Defendants:       Seyfarth Shaw LLP
                           By:  THOMAS T. LOCKE, ESQ.
                           975 F Street, N.W.
                           Washington, DC 20004

For Joel Pisano,           Walsh Pizzi O'Reilly Falanga
Special Master:            By: ZAHIRE D. ESTRELLA-CHAMBERS, ESQ.
                           100 Mulberry Street
                           15th Floor
                           Newark, New Jersey 07102
```

4

1    **(IN INSTANCES WHERE VOICES ARE FADING IN AND OUT DUE TO**

2    **TECHNICAL INTERRUPTION, AN INDISCERNIBLE RESULTED)**

3    <u>TRENTON, NEW JERSEY  MAY 6, 2020  11:00 A.M.</u>

4        (Call to order of the Court)

5        THE COURT:  Okay, well, this should do it, please.

6  I'm going to go through from who I see on the screen, and you

7  can just say hello, and go back and mute again when we're done.

8  If you're not talking, be on mute throughout.  As soon as

9  somebody wants to talk, you can.

10   (The Court engaged in off-the-record colloquy with Mr. Fang)

11        THE COURT:  Let me see whose name's coming up right

12  now on my screen.  I have John Beisner, right?

13        MR. BEISNER:  Yes, Your Honor.  Yes, I am here.

14        THE COURT:  Okay.  Brown, right?

15        MS. BROWN:  Good morning, Judge.

16        THE COURT:  I have one for Locke, but no picture, are

17  you there?

18        MR. LOCKE:  Your Honor, I'm not sure why I don't have

19  a picture.

20        THE COURT:  You have to go to the side of your

21  screen, and I think and do gallery view so everything comes in,

22  and join it.  I don't know, I'm not good at this too, but okay.

23  Well, find your way in, Mr. Locke, okay?

24        I have Warren Burns.

25        MR. BURNS:  Good morning, Your Honor.

1          THE COURT:  Chris Tisi; I have Michael Weinkowitz;

2   Sindhu Daniel, who do you represent?

3          MS. DANIEL:  Here; the plaintiffs, Your Honor.

4          THE COURT:  Okay.  Most of these people are

5   plaintiffs' people; okay, hold on.

6          All right, let me go to my next screen.  I have

7   Laurence Berman, Hunter Shkolnik --

8          MR. SHKOLNIK:  Good morning.

9          THE COURT:  -- (indiscernible) Alastair Findeis --

10  I'm not getting these right.  I have a Leigh O'Dell; Jessica

11  Brennan --

12         MS. SHARKO:  Judge, it's --

13         THE COURT:  I have --

14         MS. SHARKO:  Judge, actually it's Susan Sharko

15  logging in as Jessica Brennan because I couldn't make my

16  password work.

17                        (Laughter)

18         THE COURT:  Okay.  So she's in a different place, can

19  she -- she can't --

20         MS. SHARKO:  So she dialed in by phone and let me be

21  on the video.

22         THE COURT:  Okay, fair enough.  Okay, and then Ms.

23  Estrella, I think you're on for Judge Pisano from his office,

24  right?

25         MS. ESTRELLA-CHAMBERS:  Yes, good morning, Your

1 Honor; I'm on for Judge Pisano.

2             THE COURT:  Okay.

3             MS. ESTRELLA-CHAMBERS:  Good morning, everyone.

4             THE COURT:  Good morning.  Michelle Parfitt, you

5 don't want to be seen?

6             MS. PARFITT:  Your Honor, I would not mind being

7 seen.  The problem is I logged in without it.  If I can log

8 back out, and come back in, I can get the video up.  I just

9 didn't want to be late.

10             THE COURT:  Okay, that's fine.  And let's see who

11 else we have here.

12             MS. PARFITT:  Thank you; good morning.

13             THE COURT:  And I have Caroline Tinsley.  And then I

14 have a lot of phone numbers, I don't know who you are.  Or do I

15 have anyone else who I haven't mentioned?

16             MR. PLACITELLA:  Your Honor, Chris Placitella; I like

17 your background.

18             THE COURT:  Yeah, I already mentioned you, though.

19 You were on first --

20             MR. PLACITELLA:  Oh, I didn't hear that.

21             THE COURT:  Okay.

22             MR. GOLOMB:  Good morning, Your Honor.  Richard

23 Golomb here.

24             THE COURT:  I already mentioned you, too.

25             MR. GOLOMB:  Okay.

1            MS. POLETTO:  Good morning, Your Honor.  Janet

2  Poletto for the PTI defendants.

3            THE COURT:  Okay.

4            MR. LAPINSKI:  Your Honor, good morning.  This is Dan

5  Lapinski, I'm on via telephone.

6            THE COURT:  Okay, all right.  For the moment, let me

7  just tell you where we are.  I've had some Zooms, but this is

8  Vinnie's first zoom, and so (indiscernible) walked in.  What we

9  did is we set the recording up for now on the Zoom, so that you

10 can still have a transcript, and Vinnie's trying to figure how

11 to get in, and he may get in with us at some point.

12           But so we are still going to go formally as we

13 normally do to try and have a transcript of this, and hopefully

14 this recording will work; I haven't done that part of it yet.

15           Okay.  Well, welcome, everyone.  And I hope because

16 you're all on the line, that everyone is doing well, and safe,

17 yes?

18           UNIDENTIFIED ATTORNEY:  Yes.

19           UNIDENTIFIED ATTORNEY:  We are.

20           UNIDENTIFIED ATTORNEY:  Yes, thank you.

21           THE COURT:  Your families are --

22           UNIDENTIFIED ATTORNEY:  Your Honor --

23           THE COURT:  Families are good, everybody's doing

24 okay, all right.

25           So here we are trying to move ahead.  I got the

1  status letter that was sent out yesterday; I had an opportunity

2  to review it.  And let's talk about where we're going now, and

3  what my view on this is.

4        The way I see us going about this is with regard to

5  plaintiff discovery is that I want to get to the point of

6  selecting a small group of cases.  That could be plaintiffs'

7  picking, what they think are their best, defendant picking out

8  who they think are their best, and get what I would consider a

9  bellwether group together, and take the discovery on those.

10 Not on 16,000 individuals at the moment.

11        MS. O'DELL:  Your Honor, can I -- can I comment?

12        THE COURT:  Who's that speaking?

13        MS. O'DELL:  This is Leigh O'Dell.

14        THE COURT:  Gotcha.

15        MS. O'DELL:  Good morning, Your Honor.  Would you

16 rather us comment now or wait?  And I'm sorry if I interrupted

17 the Court.

18        THE COURT:  No, you can comment now because I'm

19 telling you where my mind is on this, on plaintiff discovery so

20 you can weigh in.  Go ahead.

21        MS. O'DELL:  Okay.  I apologize for -- I mean we

22 agree that we want to proceed expeditiously.  And what we tried

23 to outline in the status report, though, it was general,

24 because we wanted to hear Your Honor's views, is that there be

25 a small percentage of cases from which we get key

1 characteristics in order to be able to select a subset of cases

2 for bellwether consideration --

3          THE COURT:  I'm sorry, give me one second.

4      (The Court addressing unrelated matter off-the-record)

5          THE COURT:  Okay, go ahead.

6          MS. O'DELL:  So a small number of cases that -- or a

7 small percentage of cases from which we get key characteristics

8 so that we would be able to have a rational basis for putting

9 forward cases for a discovery pool, a small discovery pool that

10 ultimately bellwether trials would be selected from there.  And

11 so we were thinking of a very abbreviated five to six-page --

12          THE COURT:  One second.

13      (The Court addressing unrelated matter off-the-record)

14          THE COURT:  Okay, go ahead.  I'm sorry.  Go ahead,

15 Ms. Parfitt -- Ms. O'Dell.  Hello?

16          MS. O'DELL:  Thank you.  Yes, thank you.

17          THE COURT:  Hello?

18          MS. O'DELL:  You cut out for a minute there, Your

19 Honor, but you're back.

20          So ten to 15 percent of the cases, if we could have a

21 very small profile form that's four to five pages would be

22 easily accomplished by the firm so we could capture key

23 characteristics such as type of cancer, usage, some limited

24 medical history that would give us a rational basis to select a

25 group of cases that we think would provide information for the

1  Court and for the parties as they begin to select cases for

2  discovery, and then cases ultimately for bellwether selection.

3       And so we think that could be done in 90 days from

4  the date of the order, and that would get the process started

5  in a very robust way, but would provide the necessary

6  information that we need.

7       MS. SHARKO:  So speaking for --

8       THE COURT:  Ms. Sharko?

9       MS. SHARKO:  I'm sorry.

10      THE COURT:  Go ahead, Ms. Sharko.

11      MS. SHARKO:  Thank you.

12      So speaking for the defendants, we're very concerned

13  that what Ms. O'Dell just outlined sends us down a long slow

14  march through lots of case-specific discovery that we really

15  don't need at this time.

16      Our suggestion is that Your Honor pick a small number

17  of cases randomly, and the parties can then quickly do a new

18  fact sheet and medical records, and trial cases could be picked

19  from that pool.

20      I would also remind the Court that we do have a case

21  from the District of New Jersey that was worked up almost to

22  the point of being trial ready with Judge Goodman before the

23  MDL was created, and that's the Chakalos case.  But to us, the

24  most important thing is a small pool and random selection by

25  the Court.

1          We, the defendants, have no information about cases

2  other than Chakalos because we did no case-specific discovery.

3  So we are -- there is a great imbalance there between our

4  knowledge and the plaintiffs' knowledge in terms of picking

5  cases.

6          THE COURT:  Okay.

7          MS. PARFITT:  Your Honor, this is Michelle Parfitt,

8  if I may?  And, again, I apologize for the absence of video,

9  but perhaps of all, I've spared you.

10          If I could just comment, as well.  What Ms. O'Dell

11  has outlined provides the defendants what they say they don't

12  have.  Doing ten to 15 percent of these very short truncated

13  profile forms gives the Court -- and I think the Court would

14  have a very good sense of what is representative of the cases

15  that are before her.

16          It won't take very long to get that done, it's basic

17  information.  But I think, you know, relevant information to

18  the Court, and the Court's sense of what is it that's been

19  filed in my courthouse short of, you know, what the complaints

20  say, which are more general.

21          So I think if we can accomplish that in a very

22  efficient manner, and that's what we have done.  We've worked

23  hard to create a form, it's done, it's ready to be circulated

24  to the parties.  And if we could get approval of that, get it

25  out to our 10, 15 percent representative --

12

1          THE COURT:  I'm not sure how you're picking out your

2   representatives, when you say your ten to --

3                    (Cellular phone ringing)

4          THE COURT:  Vinnie calling.  Hold on.

5      (The Court addressing unrelated matter off the record)

6          THE COURT:  I don't know where you're coming up with

7   your ten to 15 percent, and how you're going to do that.

8          MS. PARFITT:  It can be random, as well.

9          MS. O'DELL:  Your Honor, can I comment -- can I

10  comment on that?  And -- I'm sorry, Michelle, I didn't mean

11  to --

12         MS. PARFITT:  That's all right, Leigh; go ahead.

13         MS. O'DELL:  But there -- you know, there is a --

14  defendants certainly have a list of cases that have been filed,

15  that's something that the plaintiffs' steering committee does

16  not have.  So we don't know -- we know general numbers from the

17  status report, but we don't know the individual cases.  But you

18  can take that list of cases and randomly select ten to 15

19  percent of those for purposes of these, you know, very limited

20  profile forms.

21         THE COURT:  But, by the way, ten to 15 percent of

22  16,000 plaintiffs, we're talking over 16 hundred people, that's

23  too big.

24         MS. O'DELL:  Well, but, Your Honor --

25         MS. PARFITT:  Well, Your Honor, we wouldn't work up

1   the 16 hundred.  What we were suggesting is that we do these

2   short profile forms on the 16 hundred, and then take a very

3   small subset of that to actually then provide the Court with a

4   much more fulsome type of fact sheet.  So the Court would have

5   additional information -- (indiscernible - background noise) 40

6   of those, but at least we had randomly looked at what is before

7   the Court, maybe 16 hundred, whatever that percentage would be.

8   And then out of that, when we have that information, a very

9   short period of time, we could also do a choice -- the

10  plaintiffs could select, the defendants could select, the Court

11  could select out of that number maybe a total of 40, 30,

12  whatever the Court felt, and then the more fulsome work-up

13  could be done.  Again, all very efficiently and all very, I

14  think, valuable information for the Court.  And so we wouldn't

15  be working up 16 hundred, not at all.  It would be whatever

16  Your Honor feels is perhaps a more manageable number, what's

17  been done in other situations, in other MDLs.  (Indiscernible -

18  background noise) do 40.  Again, whatever Your Honor would

19  believe would be most reasonable.

20          And so to --

21          THE COURT:  By the way, if anyone's not talking,

22  would you please mute?  Because I'm getting too much background

23  noise.  Okay.

24          MS. SHARKO:  So in the Benicar MDL we had with Judge

25  Kugler, he did random selection of small pool, I want to say it

1  was 20.  People had a short time to decide if they wanted to

2  pursue their case or take it --

3           THE COURT:  One second, Ms. Sharko.

4           Whoever it is, I've got lots of people who are not

5  muted.  Too much rustling of paper and background noise makes

6  it difficult to hear.  Please mute if you're not talking.  Do

7  you know how to do it?

8           Mr. Golomb, I can see you're not muted.  Mr. Berman,

9  you're not muted.  There's so many that are not muted.  So

10 please do it.

11          Okay, the rest -- it looks like everybody else is

12 cooperating.

13          Okay.  Go ahead.

14          MR. BERMAN:  Your Honor, this is --

15          THE COURT:  Mr. Berman --

16          MR. BERMAN:  -- Mr. Berman.  I am on my telephone.

17 I've muted my phone, I am not using my computer, so that's why

18 it doesn't show up as mute on your screen.  But I am muted.

19          THE COURT:  Okay, go ahead.  Go ahead.  Continue Ms.

20 Sharko.

21          MS. SHARKO:  So in the Benicar MDL with Judge Kugler,

22 he did random selection, it was very efficient.  We had a pool

23 of, I want to say maybe 20; I can go back and check that.  And

24 I think it's important to give the plaintiffs, once selected, a

25 week or two to decide if they want to go forward with their

1 case or take a dismissal so we don't work-up cases and then

2 have them be dismissed.  And then we work-up that small pool of

3 ten or 15, or maybe even 20.  That can be done pretty

4 efficiently.

5          If we're going to go beyond that -- and 16 hundred

6 cases is mind-boggling, that will take a year.

7          MS. O'DELL:  Your Honor, just to be clear, because I

8 think Ms. Sharko may have a misconception.  We're not talking

9 about full discovery on 16 hundred cases.  We're talking about

10 a 90-day period where we get information regarding the types of

11 cancer individual cases involve.

12          We have no information right now.  The short form

13 complaint does not provide the type of cancer, that's

14 critically important.  Is it epithelial ovarian cancer or

15 another type of genital cancer?

16          And so for the process to be efficient for the Court,

17 you could select randomly 50 cases, and if it doesn't have --

18 the -- the case does not involve the type of cancer that the

19 Court has ruled the science is reliable and experts have opined

20 on, then it's not a rational process.

21          So what we've suggested is 90-day period to get

22 information on a small percentage, ten percent is

23 representative.  We can be assured that we know what the

24 overall group of cases look like, we get that information in 90

25 days.

1            From there, we put forward cases that would be that

2   very small number that go through full case work-up.

3            And then from there, the Court and the parties can

4   select the bellwethers.  We think that's very efficient.  It

5   will not delay the onset of a trial --

6            THE COURT:  How do you decide which ones you want to

7   do a full case work-up on?

8            MS. O'DELL:  I think at that point, once we have

9   information, we can look at those 16 hundred and say -- and we

10  expect the Court will have an idea of what type case you want

11  to try, but we'll know what those cases involve.  And then we

12  can make a selection based on the key characteristics of that

13  case.  Is it the right cancer?  What's the medical background

14  of the particular plaintiff?  What's their level of usage?  Is

15  it one day or 50 years once a day?  Those are really important

16  to make sure that the process is meaningful to the Court and

17  meaningful to the parties going forward, and so that's why

18  we've proposed this -- you know, this sort of protocol.

19           MS. SHARKO:  But that should come after random

20  selection because right now, the defendants anyway, have no

21  basis for picking the ten cases, or the 20 cases, or God

22  forbid, the 16 hundred cases that will start to be discovered.

23           MS. O'DELL:  This would be a rational basis for both

24  parties to select cases that would be meaningful for their own

25  purposes.  And 90 days would certainly not slow down the

1  process of setting the case for trial, particularly in the

2  light of sort of the delays associated with COVID-19.  We can

3  do this during this period, get this done, ensure that the

4  cases that are worked up, whether they be, you know, 25, 35, or

5  50, that those are good cases and they're going to provide the

6  Court with the information it needs.

7          THE COURT:  What do you mean --

8          MS. PARFITT:  If I can add --

9          THE COURT:  What do you mean "good cases"?

10         MS. PARFITT:  Your Honor?  Am I off mute?

11         THE COURT:  Who's that?  I'm sorry.

12         MS. PARFITT:  This is Michelle, yes, Your Honor.

13         I was going to say with regard to "good," we don't

14  mean good favorable; we mean representative.

15         We understand that what the Court wants before her is

16  a case that is representative of what the disease is and what

17  the case is about, and that's why we're proposing what we are.

18         We absolutely believe we can get this done

19  efficiently, or we wouldn't represent to the Court that we

20  could.

21         Ms. Sharko continues to say 16 hundred cases would be

22  worked up.  Sixteen hundred cases will not be worked up.  If

23  Your Honor --

24         THE COURT:  Okay, let me ask a question.  How are you

25  even going to go about your 16 hundred?  Are you saying that's

1 a random, taking ten percent?

2          MS. PARFITT:  Correct.

3          MS. O'DELL:  Yes, Your Honor.  And that can be done

4 in a variety of ways that's very fair, and we can assure that

5 it's random.  And it would be -- it can be done through MDL

6 Centrality, which is sort of the online platform that we had

7 proposed early on in the case for use with, you know, plaintiff

8 fact sheet information.  The same platform can be used to

9 generate a random selection of cases.

10          THE COURT:  Okay.

11          MS. SHARKO:  I think Judge Kugler did random

12 selection just with the Clerk's Office, and his law clerk.

13          THE COURT:  Yeah, I mean I'm -- you know, look, I'm

14 not going to weigh in right now on what "random" means.  Let's

15 just talk about the process for a moment and the cases.

16          Also, by the way, Benicar only had about 2,000 cases

17 in it.  It was a much different MDL than I have, so I don't

18 want to use that as my template and saying that that's the way

19 I'm going to go about this.

20          But look, I don't have a problem with having some

21 percentage; I'm not convinced it has to be 16 hundred.  I don't

22 know why it can't be several hundred that are a random

23 selection, and then we pick a smaller number from that, I'm

24 okay with that idea.

25          MS. O'DELL:  Your Honor, if we -- you know, if -- you

1  know, 16 hundred, maybe that feels too many.  But in light of

2  the fact that, you know, the cases would be spread across

3  multiple firms, if we did a thousand, it would make no

4  difference in terms of the timing.  We would just have more

5  information to be informed.

6          And once, you know, 90 days from the order is

7  entered, we get that information, that would allow us -- if

8  that's a thousand cases, that's a robust number that both

9  parties could be informed about the particular characteristics

10 of the case.

11         MS. PARFITT:  And, frankly, Your Honor, if I might

12 add, that within that 90-day period of time, we'll have what we

13 have.  I think we're prepared to represent to the Court that

14 whatever information we're able to collect within that period

15 of time will be the information that we will use going forward.

16 And I think it will be, indeed, helpful to the Court to have

17 the best picture available to her so that you -- you know, we

18 have a good understanding of what this case is really about.

19 Not good because it's positive for the plaintiff, not good

20 because it's more positive for the defendant, just an informed

21 choice of cases before the Court.

22         THE COURT:  Well, I'm still trying to figure out the

23 second step.  Assume it's a thousand cases, assume it's 500

24 cases, whatever it is, what's next after the 90 days?

25         MS. PARFITT:  Right.  There would be a period of time

1   where each parties -- each one of the parties -- if you say

2   you're selecting 500, you ultimately ended up with 500 or a

3   thousand, there would be period of time everyone would have the

4   opportunity to review those characteristics of those cases, and

5   then make a proposal.  In some cases, it's been X number of

6   cases are selected by the plaintiff, X number of cases are

7   selected by the defendant.  There have been MDLs where X number

8   of cases were selected by the Court for work-up so that you can

9   begin to narrow the population of cases that are actually

10  receiving full work-up and discovery.

11          And then the next phase would be what kind of case-

12  specific discovery would be appropriate.  Oftentimes, I know,

13  in other MDLs the courts -- and I'm sure the Court is aware of,

14  the court has said I'm going to limit it to X number of

15  depositions, or perhaps not.

16          So there's different phases, but we get to that

17  number after Your Honor decides ultimately I want to look at a

18  total of 40 cases, let's do a full work-up on maybe 40 of a

19  thousand, 600, 500.

20          Then we do a select -- we work them up, that smaller

21  number.  Again, randomly selected from a larger number of a

22  thousand or 16 hundred.  And then from that, there can be a

23  selection process by each one of the parties, including the

24  Court, should you desire.

25          THE COURT:  But what you just said is a little -- Ms.

 1  Parfitt, I heard two different things.

 2          MS. PARFITT:  All right.

 3          THE COURT:  What I heard you say is that after the --

 4  whatever number it is, a thousand, 500, that you'll all go

 5  through them, and you'll pick a smaller subset to look at.  Now

 6  I heard you say it will be randomly decided which --

 7          MS. PARFITT:  I meant to say random, Your Honor, and

 8  I correct myself.  I meant it would all be random.

 9          The initial selection from the thousand, 500,

10  whatever it would be, would be a random selection of say 40.

11  And then from that -- or whatever number Your Honor chooses,

12  the parties would then have the ability to say we request these

13  five; defendants say we request these five; the Court may say

14  I'd like to propose these five for a more fulsome work-up.

15          THE COURT:  But what --

16          MS. PARFITT:  There's many ways you could do it.

17          THE COURT:  But my problem with what you just said is

18  then I don't understand why we need the two-step test.  If the

19  thousand are randomly selected --

20          MS. PARFITT:  Correct.

21          THE COURT:  -- and then from that, 50 are randomly

22  selected, everything's been randomized, and nothing has been

23  looked at.

24          MS. O'DELL:  Your Honor, if I could maybe --

25          MS. PARFITT:  Well, no, no, no, no.  I think I -- I

1  may have misspoke.  What would happen is out of that thousand,

2  16 hundred, 500 cases, we would have these short profile forms

3  prepared on that group, these very short pieces of information,

4  if you want to -- if I may say.

5          The data that Ms. O'Dell described:  What kind of

6  cancer they have; how often have they used the product; have

7  they used this product.  We would then distill from that 16

8  hundred cases that information and then decide upon maybe 40,

9  whatever the Court decides, which would then have a more

10 fulsome work-up where depositions would be taken.  More -- if

11 medical records were missing, we would get those medical

12 records.

13         THE COURT:  How do you decide which 40 is my question

14 to you?

15         MS. O'DELL:  Ms. -- Ms. -- Your Honor, may I

16 interject here?  I think that 40, whether it's 40 or 50 --

17         MS. PARFITT:  50.

18         MS. O'DELL:  In many cases, it's been 50.  That would

19 be something that we would propose the parties nominate a

20 certain number of cases, and maybe a certain number of cases

21 the Court decides to pick randomly.  (Indiscernible - multiple

22 speakers).

23         THE COURT:  Okay.  And so that what you're saying is

24 that next step is not random.

25         MS. O'DELL:  Correct.

1          THE COURT:  That's what I was getting by the language

2  being used.  It's not, it's being selected by each of you

3  probably picking out what you like on each side.

4          MS. O'DELL:  Or, Your Honor, we -- certainly we have

5  our different views of the case.  But also, we can take your

6  input about the type of case you like to try, and I'm sure the

7  parties can come together and be reasonable in their

8  selections.

9          For example, we have different -- we have women who

10 are in extremis situations that we need to give consideration

11 because, you know, they may not have their day in court if

12 there's further delay.  We have different stages of ovarian

13 cancer that we might -- that the Court might want more

14 information on.

15         So I think that the parties can meet and confer on a

16 group of cases to propose.  And maybe it ends up plaintiffs

17 propose a certain number, and defense proposes a certain

18 number, and the Court proposes a certain number.

19         But that group -- but that larger group would be for

20 the purpose of learning what is representative and instructive

21 in the overall group of cases.

22         THE COURT:  Okay.  Ms. Sharko, anything you'd like to

23 say?

24         MS. SHARKO:  Yes, I want to make sure I understand

25 the proposal.  So the Court would randomly pick a number of

1  cases, it sounds like the bidding is somewhere between 20 and

2  16 hundred.  Those people would fill out --

3          MS. O'DELL:  Un-un't, no.

4          MS. SHARKO:  Just let me finish, please.

5          MS. O'DELL:  I'm sorry, Susan.

6          MS. SHARKO:  Those -- that pool of people would fill

7  out this abbreviated fact sheet and produce the key medical

8  records, and then from -- and there would be no discovery of

9  the defendants, the burden is on the plaintiffs to do medical

10  records and the basic facts.

11          And then from that pool, that random pool, whether

12  it's 20 to 500, or a thousand, or whatever, there would be some

13  method agreed upon to select a smaller number of cases that

14  would undergo the traditional work-up with depositions and the

15  like.

16          And then from that smaller pool, trial cases would be

17  selected.

18          MS. O'DELL:  Your Honor, could I just address one

19  aspect, and maybe a couple, but I know the Court knows our

20  position on this on the plaintiffs' side.

21          But on the defense side, there is information we need

22  on the cases regarding defendants' interaction with the

23  plaintiffs' treating physicians.  If a particular GYN

24  oncologist is a speaker or a consultant for Johnson & Johnson,

25  then that's information that we need to know during the

1  discovery process for these cases so we'll be able to be

2  informed about that as we make --

3        THE COURT:  No, but we haven't -- she hasn't gotten

4  to the discovery phase.  She's talking about the first -- well,

5  we talked about what all three are, and we haven't talked about

6  what discovery will look like once -- additional discovery as

7  Ms. Sharko referred to it.  What she has just -- the first

8  phase, when we're selecting whatever number it will be, and

9  I'll talk about that in a moment, you know, 500, a thousand,

10  she's saying that's all on the plaintiffs' side because you're

11  providing these fact sheets.  It's after that that then we go

12  to the next stage.  That's accurate?

13        MS. PARFITT:  Your Honor, if I may?  This is

14  Michelle, if I could just offer on that point?

15        THE COURT:  Yes.

16        MS. PARFITT:  What Ms. O'Dell was referencing is

17  sometimes referred to as a defendant's fact sheet.  It's very

18  similar to the profile form that we're talking about, again, a

19  very limited document, perhaps just a handful of questions that

20  make an inquiry concerning whether or not the doctor, the

21  treating doctor, in fact, was an individual who was a speaker

22  for the company or a consultant.  Also sometimes asks the

23  communication between the treating doctor and J&J.  It's a very

24  limited inquiry that is usually exchanged at the same time.

25  When we provide -- when we're asked to complete a profile sheet

1  for our clients, we also provide --

2                    (Cellular phone ringing)

3            THE COURT:  I'm sorry, judges are really --

4                        (Laughter)

5            MS. PARFITT:  Not a problem.

6            THE COURT:  Too many things going on in our court,

7  what can I tell you?

8            MS. PARFITT:  I can certainly appreciate that.

9            THE COURT:  Okay, go ahead.

10           MS. PARFITT:  So if I may, it would be a

11 contemporaneous, for the most part, exchange where we would

12 have the profile form that would be agreed upon by the parties,

13 and then this very short, again, defendants' fact sheet that

14 just makes an inquiry that also provides us information about

15 the communication, relationship, association between relevant

16 parties to a case.  For instance, a treating doctor, and

17 whether or not they worked for J&J at some point in time;

18 whether or not there were advertisements sent to local

19 pharmacies where the individual had actually obtained their

20 baby powder.

21           But it's important -- it's an important inquiry,

22 again, very limited, but it is exchanged at the same time.

23 It's not discovery, as Your Honor -- and that is phase we're

24 going to talk about in a short while, hopefully after we decide

25 this process.  But it is something that's generally done

1  contemporaneous with the exchange of the profile form.  We have

2  to answer the plaintiffs' profile form; J&J would then respond

3  to a few questions that are asked of them specific to a client,

4  and they provide us that information.

5          So I just wanted to make that distinction because I

6  know we are going to talk about the discovery ahead of us, but

7  this is a distinct type of information that we would want to

8  get a little bit earlier on in the process.  While we're

9  gathering information about our client, J&J would be gathering

10  a little bit of information about the relationship between the

11  treater, and perhaps their company.

12          MS. SHARKO:  So that makes a big difference, Judge.

13          First of all, we strongly oppose doing these fact

14  sheets.  I don't think they make sense in the context of a

15  consumer product.  And everybody's saying "J&J," but J&J is a

16  holding company.  J&J, the company, doesn't do these

17  communications.

18          So I'm not sure where the plaintiffs want us to go to

19  get this information.  I submit that it would be very

20  challenging, if not impossible.

21          But my key point right now, because I assume we'll

22  meet and confer, and then argue about whether down the road

23  there would be a defense fact sheet.  The idea that the

24  defendant should have to do all this discovery on a pool of a

25  thousand people in 90 days is overwhelming.  That's just

1  impossible, and it's not necessary.

2         THE COURT:  Okay, all right.  If somebody -- if no

3  one else has anything specific to say, let me react to the

4  first step, okay?

5         I think, and as I've indicated, that I'll agree to a

6  certain number of plaintiffs that will be randomly selected,

7  and we can talk about how that random selection occurs in a

8  moment.  From which then a much smaller number will be worked

9  up for discovery.

10         I agree that a first step for whatever that number is

11  -- let's talk about the number in a moment -- I'm not going to

12  require defendant fact sheets for that.  It's going to be

13  simply the basic plaintiff fact sheet.

14         What we're talking about here is creating a pool of

15  people that are being randomly selected that you can, as you

16  say, help determine what kind of cancer and usage, those are

17  all plaintiff-specific.  That's what I'm interested in at this

18  point.

19         We're not getting to the other things when we talk

20  about biases, and who advertised in what way, and what the

21  discussions were.  That does not need to be done at that bigger

22  set of plaintiffs.

23         And the burden is on the plaintiffs during this time

24  period to get them together.  So you want a bigger subset, and

25  you want to spend that time over the next 90 days doing them,

1  you've got a thousand to pick from.  Go for it, okay?

2              MS. PARFITT:  Thank you, Your Honor.

3              THE COURT:  All right.

4          From that -- and how are we -- do we want to randomly

5  select them?  I'm not even sure -- I know when you said, Ms.

6  Sharko, that in Judge Kugler's, they just used the Clerk's

7  Office, first of all, our Clerks' Office is burdened, and we

8  are not in the courthouse these days.  I'm not going to -- and

9  I want to get going on this now, so I'm not going to burden my

10  Clerk's Office to do that.

11          If you can come up with some method for how to do

12  this random selection, good.  And let's -- and I don't want to

13  make this a whole issue unto itself, so I'd like to get that

14  resolved quickly.  Look, there have been delays in getting all

15  of our expert discovery done, it took a long time for the

16  *Daubert* motions, and all the hearings, the briefing, and my

17  opinion, and now we're ready to move, and I don't want anymore

18  delays built in.

19          So are you telling -- I don't know, somebody could

20  write a computer program --

21              MS. O'DELL:  Your Honor, we can take a list of --

22              MS. PARFITT:  So I can --

23              MS. O'DELL:  And we can take a list of cases, Your

24  Honor, and either -- there are numbers of methods for

25  randomizing.  We can take a list and randomize them through

1  Excel.  I had proposed using MDL Centrality simply because we

2  need a platform for people to upload their information from

3  these fact sheets, and so it all could be done in the same

4  location.

5          But I don't think that we have a real dispute.  We

6  can get these randomized in a way that is appropriate, and

7  there are a number of methods, and we can talk to --

8          THE COURT:  Okay.

9          MS. O'DELL:  -- the defendants about that.

10         MS. SHARKO:  In one litigation I was involved in, I

11 believe they just -- they had a list of the cases, I guess it

12 was in order of filing, that all of us should be able to

13 access, and then they used a random number generator on a

14 computer.  So if the random number came up as 53, Case Number

15 53 on that list went into the pool, then they did it again.

16         THE COURT:  That's what I said, I'm sure some

17 computer geniuses out there can randomize numbers and do it.

18 So however you like, figure it out, let's get them.  We have to

19 come up with what this fact sheet looks like, you'll have to

20 determine what these preliminary inquiries are that are useful

21 to anyone, okay?  And get that done in the 90 days.  So --

22         MS. O'DELL:  If --

23         THE COURT:  Yeah?

24         MS. O'DELL:  Your Honor, if we can just say 90 days

25 from the date the order goes out, it's what we've proposed.

1 And the reason I say that is because it's going to take us a

2 couple of days, I'm sure, to agree on the form, get with the

3 Clerk's Office to get a list, which we're not -- we don't have

4 access to that.  And we are going to get this out to the

5 plaintiffs' bar as soon as possible.  So we're going to hit the

6 ground running, but what we're proposing is 90 days from the

7 date the order is entered.

8           THE COURT:  Okay.

9           MS. O'DELL:  Thank you.

10          THE COURT:  Get an order drafted and get it to me.

11 The sooner you do it, the better.

12          MS. O'DELL:  Yes, we'll do that, Your Honor.

13          THE COURT:  Now I still am not crystal clear on the

14 second stage when we pick this much smaller number from this,

15 and that you said it's going to be everyone kind of weighing

16 in, reviewing these thousand forms, which is a lot of work, and

17 coming up with cases that you think are representative of what

18 you think should go forward on discovery.  Right, that was the

19 second stage?

20          MS. O'DELL:  That's right, Your Honor.

21          MS. PARFITT:  That's right.

22          THE COURT:  Okay.  And what are we talking about, 40

23 cases for work-up?

24          MS. PARFITT:  Forty, 50.  I think, again, we are

25 flexible, Your Honor, with that.

1              THE COURT:  Okay.

2              MS. PARFITT:  I think that's probably a good --

3              THE COURT:  Ms. Sharko?

4              MS. SHARKO:  Oh, I think it should be much smaller,

5   we need to move ahead quickly.  I would say ten to 20.

6              MS. PARFITT:  I think that's too small, Your Honor.

7              THE COURT:  Well, I think -- let me just say this:

8   I'm of the view that 40 makes sense for discovery work-up

9   because from there, I think it will be a much smaller number

10  than ultimately becomes an appropriate trial group.  There may

11  be things that happen in those cases that make them, once you

12  go through discovery, not appropriate to go forward.  And if we

13  have to start eliminating, I don't want to have to go back to

14  this random selection.

15             So let's say we start with 40, but the idea it's

16  obviously not what we're trying, it's going to be much smaller

17  in number, okay?

18             MS. SHARKO:  Could we have a provision in there that

19  the plaintiffs, if they're going to dismiss a case from this

20  pool of 40, they have one week from selection to do it?

21  Because we shouldn't -- we can't end up the way it happens so

22  often in MDLs where the plaintiffs start dismissing cases as

23  they go down the road of depositions, or work-up, or even when

24  the work-up is done.

25             THE COURT:  Well, let me be clear.  If right off the

1  bat, yes, they may look at a case and say.  But if they have to

2  discuss this with another attorney, one week is probably not

3  enough.  Let's talk about a two-week period that they can get a

4  quick reaction.

5        It doesn't mean that somewhere down the line

6  something else might not be dismissed as they go through the

7  discovery process.  They're not barred from dismissing

8  something later on;  I'm sure you'd never object to them

9  dismissing later on.  But I think at the outset, because I know

10  they need to consult with someone, if it's that obvious, yes,

11  let's do a two-week period, okay?

12        Okay.  Then we have to talk about how long we will

13  require for the discovery of those cases.

14        MS. O'DELL:  Your Honor, could we have opportunity to

15  meet and confer with defendants on the length of period for

16  discovery to see if we can come to agreement of which

17  depositions will be appropriate, can maybe be narrowed in a

18  certain way?  Because we're going to have certainly the

19  plaintiff and treating physicians, then you'll need a period of

20  time for that information to be received from case specific

21  experts, expert discovery, and then I'm assuming defense

22  experts, and defense expert discovery.  So --

23        THE COURT:  I'm going to have to say, I've just

24  changed my view on this.  I think I want to -- instead of 40

25  cases, I want to limit it to 30 cases.  Obviously if you

1  eliminate any right off the bat, and we want to add a few more,

2  then we add -- allow a few more.  But let's start with 30.

3            MS. PARFITT:  All right.

4            THE COURT:  All right?  I'll let you work on the --

5  we're far off from getting there because we still have the 90-

6  day period.  So you can still discuss what kind of time periods

7  for discovery, all right, on the individual cases?  But let's

8  select 30, okay.

9            The other discovery that was brought up in the status

10 memo was with regard to discovery from the defendants, and what

11 that will look like.  And the position of the defendant is that

12 they don't believe that you're going to require extensive

13 discovery from them given that so much discovery has been done

14 of them already in other cases and cases have gone to trial.

15 So I think you have to define exactly what it is that you want

16 to -- and we don't -- we've had this position from the

17 beginning, we don't want to duplicate discovery that's already

18 been had, right?

19            MS. SHARKO:  Right.  And so, Your Honor --

20            MR. TISI:  Yes, Your Honor.

21            MS. SHARKO:  -- if I could put this in context --

22            MR. TISI:  Your Honor --

23            MS. SHARKO:  -- because we looked it up, across the

24 litigation, there have been --

25            THE COURT:  I'm sorry, who else was speaking besides

1  Ms. Sharko?  Somebody else was trying to talk.

2          MR. TISI:  It was Chris Tisi.  I'll defer to Susan

3  right now since she was talking.

4          MS. SHARKO:  Thank you.

5          THE COURT:  Go ahead.

6          MS. SHARKO:  *So we've produced two million pages of

7  documents.  If you put them end-to-end, it would cover the New

8  Jersey Turnpike three times.  There are more than 20,000 pages

9  of deposition testimony, which are from 90 days of depositions

10 of current and former employees.  And all together, if you look

11 at all talc cases, there's been over 500 days of trial

12 involving most of the lawyers on this call.

13         So to the extent any discovery is needed of us, it

14 should be very minimal.  And we would ask that the plaintiffs

15 give us a specific and discreet list.  And if we can't agree on

16 it, we can go to Judge Pisano.  But this case has been

17 discovered ad infinitum.

18         MR. TISI:  Judge, this is Chris Tisi.  First of all,

19 good morning.

20         THE COURT:  Good morning.

21         MR. TISI:  I wanted to respond to that.  First of

22 all, I think it's unfair to count the number of pages.  The

23 truth of the matter is, to the best of my knowledge, there were

24 probably less than five depositions taken in their individual

25 capacity of J&J employees, and many of those cases were very

36

1  old, five to ten years -- five to ten years ago when the case

2  was significantly less developed.  And for example, I

3  understand that there was a witness taken in 2009 based upon a

4  document production of about 50,000 documents.

5       The truth of the matter is, we are in a completely

6  different posture here in the MDL.  We were bifurcated, at

7  J&J's request, to deal only with science issues.  And the Court

8  understood when were talking about those issues that there may

9  come a time to do discovery for trial purposes.

10      We have elements of the case that we have to pursue.

11 For example, let me give you some examples of the things that

12 have not been worked up in this MDL, and certainly not, to a

13 large extent, in State Court trials:

14      We were not permitted to do, first of all, any

15 individual corporate depositions; they were all done by

16 30(b)(6);

17      We were not permitted to explore what J&J knew, and

18 when they knew it;

19      We were to permitted to do a -- put together a

20 timeline of what J&J knew over the past 50 years;

21      We were not -- we did not pursue depositions on why

22 warnings were not given.

23      THE COURT:  I'm going to interrupt you, Mr. Tisi.

24 I'm going to interrupt you.  I don't want to hear chapter and

25 verse today of what you think you haven't been able to do that

1  you want to do.

2          MR. TISI:  Correct.

3          THE COURT:  I'm not going to rule on this today.  You

4  think that there's discovery that you require, please send to

5  the defendant the areas that you think that you require that

6  you do not yet have discovery on, what kinds of witnesses you

7  think you need to depose that you have not deposed, and let's

8  get specific with them, and they'll react to it.

9          MR. TISI:  Okay.

10          THE COURT:  And if you can't resolve it, those become

11  things we'll resolve.  Today's not the day to go into this.

12          MR. TISI:  Okay.

13          THE COURT:  You'll just say that what they gave you

14  did not include this, let them have time to respond.  So come

15  up with your list to them, make your request.  And, frankly,

16  over this 90-day period, I think that's something that could be

17  done because you've got a lot of people on the plaintiffs'

18  side, and I know the whole idea is when I set up this committee

19  for you when I was concerned about how many were involved on a

20  steering committee, everybody was going to have a different

21  thing to do.  So someone will be starting to take care of this

22  and get these requests out so that this can be worked on.

23          I want to move forward now.  We're all getting older,

24  so I want to get this going.

25          MR. TISI:  Well, Judge, let me --

1          THE COURT:  Okay?  So send those out --

2          MR. TISI:  And we've started --

3          THE COURT:  That should be done -- is someone still

4     talking?

5                    (No audible response heard)

6          THE COURT:  That should be done during the same 90-

7     day period.  What those areas are that you think you do not

8     have discovery on so that we do not delay, okay?

9          MR. TISI:  Okay.  May I ask a question, Your Honor,

10    just a point of clarification?

11         THE COURT:  All right.

12         MR. TISI:  We're trying to develop a list of people

13    who we would like to depose in their individual capacity.  As

14    you indicated, we're all getting a little bit older.  This

15    product has been on the market for a long time.  Can we send

16    them a list of people -- some people, we don't know whether or

17    not they're even around, alive, or have passed.  I -- before we

18    kind of put together a proposal for witnesses we want to take,

19    it would be useful to know whether or not the people -- these

20    people are still alive, and that's a concern with a product

21    that's been on the market for a long time.

22         THE COURT:  You can (indiscernible) get that

23    information, okay?

24         MR. TISI:  Okay.

25         THE COURT:  That's fine.

1          MR. TISI:  Thank you.  Thank you.

2          THE COURT:  So what's the next thing?  Okay, let's

3   turn to -- I think those were the main things we wanted to

4   address today.  And let me just briefly talk about some of the

5   other issues with regard to cases, and duplication, and all of

6   these things that still apparently need to be cleaned up,

7   right?

8          MS. O'DELL:  That's correct.

9          THE COURT:  Okay.  Who's working on that?

10         MS. PARFITT:  Your Honor, we have conferred.  We have

11  lists from the defendants of the duplicate filings, etc., and

12  we are reconciling them.  Lists were just provided this week,

13  and the parties are working together to --

14         THE COURT:  Hello?

15         MS. PARFITT:  Yes.

16         MS. O'DELL:  Judge, can you hear --

17         THE COURT:  Ms. Parfitt, you're coming in and out.

18         MS. PARFITT:  Your Honor, can you hear me now?

19         THE COURT:  What's that?

20         MS. PARFITT:  Can you hear me?

21         THE COURT:  That's better, yes.

22         MS. PARFITT:  Okay.  What I was saying is we have

23  conferred with the defendants.  We have been provided a list or

24  lists of cases where there are duplication, and the parties are

25  going to work together so that we can reconcile those numbers

1  and get some finality to this.  I know it's been on the status

2  reports for some time, and we will work with haste to get that

3  done, as well.

4            THE COURT:  Yes.

5            MS. PARFITT:  Your Honor, I think I lost you -- yes,

6  there you are.

7            THE COURT:  No, I hear you.  That's fine.

8            MS. PARFITT:  Thank you.  Thank you.

9            THE COURT:  And then I think before duplicate, I

10  guess there was another issue that was raised on Page 5, I

11  think, of the status memo with regard to individuals, about 135

12  plaintiffs who have not filed short form complaints.  And I

13  guess defense is asking that we direct them to do so by June

14  30th or forever be quiet, right, Ms. Sharko?

15            MS. SHARKO:  That is correct.

16            MS. PARFITT:  And, again, Your Honor, that is another

17  area where we are conferring, or we'll continue to confer with

18  defendant to make sure that we have an accurate list of those

19  people, and that that action is taken.

20            So, again, I don't think that this should be a

21  problem, it just will take a little time for us.  The parties

22  aren't in disagreement about what needs to be done, we just

23  need to make sure we have the appropriate list, we've

24  reconciled the names, and we're conferring with the right

25  clients and law firms.

1          THE COURT:  Okay.  So then we can go with that June

2    30th suggested date to get this accomplished?

3          MS. PARFITT:  Your Honor, we will certainly do our

4    best to do that.  If we need additional time, we would ask the

5    Court to approach the Court about that.  But certainly let's

6    use that as a time period that we can --

7          THE COURT:  Okay.  Okay, that's fine.

8          The steering committee's request on Page 6 on a case

9    management order.

10          MS. PARFITT:  Yes, Your Honor.

11          THE COURT:  -- on a order.

12          MS. PARFITT:  Yes.

13          THE COURT:  You're going to be filing a motion?

14          MS. PARFITT:  Correct.

15          THE COURT:  Okay, then we don't need to discuss that

16    today.

17          MS. PARFITT:  And, Your Honor, we anticipate being

18    able to get that to the Court hopefully by next week --

19          THE COURT:  Okay.

20          MS. PARFITT:  -- for Your Honor, yes.

21          THE COURT:  With regard to PCPC, you're going to

22    refile your motion, is that correct?

23                (No audible response heard)

24          THE COURT:  Hello?  Where's PCPC?

25          MR. LOCKE:  Your Honor, this is Tom Locke.

42

1          Do we need to refile the motion?  We felt like it's
2    out there, it's ready for plaintiffs to respond.  If you want
3    us to refile it, we can do that, but the hope is to get a quick
4    response from plaintiffs.

5          THE COURT:  No, I mean, look, if you're staying with
6    the briefing as it is, remember all of this was basically put
7    on hold.  I think what you should just do is send a letter
8    saying that you now ask that your motion be re-listed, and the
9    briefing will begin from the other side, okay?

10          MR. LOCKE:  Thank you, Your Honor.

11          THE COURT:  That's fine.  So please do that, and that
12    will be the trigger then for the plaintiffs to respond, and you
13    can confer on how much time is required, and send me an order.

14          Looking at the list that you've attached on pending
15    motions, I can tell you that a number of these things you
16    talked about that were supposed to be terminated pursuant to
17    Case Management Order 8, that's been done.

18          With regard to some of these where they were the
19    remand, it involved the Royston and PTI union, that's now an
20    opinion that's heavily in progress now that *Daubert* is done.
21    You can expect to have an opinion on that later this month,
22    that will be out, okay?  And that involves a number of these
23    motions that are listed here on the remand.

24          Obviously all of the Imerys motions are terminated,
25    stayed.

1    And then the last one on the list, I think that we

2  dealt with, Bowie, right, Wayne?  We did that?

3    MR. FANT:  Yes, we did it yesterday.

4    THE COURT:  Okay, I'm -- yes, we're done --

5    UNIDENTIFIED ATTORNEY:  We have.

6    THE COURT:  -- dealing with that, okay.

7    So I think for the bulk of these, you should expect

8  an opinion this month.  And then there's some that come under

9  the Rule 41 motions, and some of them involve different issues,

10 and hopefully soon thereafter in June.  We're going to clean up

11 all these motions as best as we can so that you have a good

12 picture of where we are, so things are coming.

13    What other issues, if any, do you have with me today?

14    UNIDENTIFIED ATTORNEY:  Nothing, Your Honor.

15    THE COURT:  Nothing, okay.

16    All right, let me just make also just one last

17 comment now that you have the *Daubert* opinion, which took a bit

18 of time.  You know that there are limitations in that as to

19 what's going to be presented (indiscernible).

20    You realize also that a number of the experts

21 obviously I decided went to the weight as opposed to exclusion.

22 I think you probably also got a flavor from some of the things

23 that I said as to perhaps how I would see it, but I am not the

24 finder of fact on some of what -- of those expert.  None of

25 them are perfect, let me put it that way, and I would say that

44

1   on both sides.  And some less perfect than others, but that
2   will be for another day.
3           So I want to be clear, and I guess the reason I want
4   to say that is -- I will say this:  I was a little taken aback
5   as the headline in the Law Journal that picked up on a quote
6   about obliterated.  It's not a fair reading of my opinion, and
7   I think that created some press that was not fair.
8           So, please, everyone, when you talk, be realistic.
9   You can get excited, but this is not a case that should play in
10  the press.  So I just want to make that comment, that word was
11  -- I've had a couple of people reach out who said, "I actually
12  read your 141 pages, and that's not what happened."  So just
13  please be a little careful in your language to the press.
14  We're going to try this case based on the facts, based on the
15  evidence, based on what's there, and I just wanted to, you know
16  --  I wasn't sure if I was going to mention that today, but I
17  thought it appropriate, and to keep that in mind as you make
18  statements, and being responsible as lawyers about that, okay?
19          Anything else?
20          MS. O'DELL:  No, Your Honor.
21          MS. PARFITT:  No, I don't believe so.  We certainly
22  appreciate your taking the time to speak with us today.
23          THE COURT:  Yes.  And Judge Pisano's in the loop, and
24  he has read the entire 141-page opinion, too.  And I told him
25  get ready.  He saw the status memo, and he says he's ready.  He

1  happens to be down in, I know, in Beaufort, and sheltered in.

2  But it doesn't matter whether he's in New Jersey or not,

3  everything's by video or phone anyway, so you can contact him.

4  His associate, as you know, is on the phone.  And he's ready to

5  go, and you know he responds quickly.

6      We are really not going into court at this point, and

7  we're coming up with trying to come up with plans of how we're

8  phasing getting back.  But what you have to do with me at this

9  point doesn't require being in court, so we can get a call any

10 time that you need, and since there are less proceedings going

11 on, I could pretty much be available in that sense.

12     But rest assured, the one thing this has done is that

13 we're all hunkered in and working hard on getting out what we

14 want to get out, and catching up.

15     So I appreciate everybody getting on today, and next

16 time if we do this, you don't have to be so dressed up, and --

17 unless you have your sweat pants on or jeans on the bottom as I

18 do, but --

19              (Laughter)

20     THE COURT:  We laugh about this but, you know, my

21 husband does land use, and he's been doing now -- they started

22 these meetings at night with the towns, and I'll walk in and

23 see him on his Zoom with his white shirt and tie, and his sweat

24 pants on.  But, you know, that's the world today, right?  Okay.

25 So it's fine, we don't have to be that formal when we're on the

1  next time, too.  You're all professionals, I get it.

2         So let me know if you need anything.  You'll start to

3  get yourselves together.  We will move ahead.  We'll have more

4  conferences.  You know, the problem will be for the Court at

5  some point in time, which is that we will have a lot of catch-

6  up to do for cases on jury trials, and I don't even know when

7  we're going to get jurors back in the courthouse, it's a big

8  topic of discussion.  And for those of you that are in other

9  parts of the country, you know New Jersey's been hit badly, and

10  what to do with that backlog of criminal cases that should have

11  gone to trial that have speedy trial concerns have been hit.

12  So we're going to try and do the best we can to catch up on

13  those, and just to let you know in the mix, I mean that is a

14  problem that we have for jury trials.

15         So it will be a phasing in our Court.  I mean those

16  are some of the calls that I'll be getting, and as we

17  discussed, and we don't have the best guidance yet obviously in

18  New Jersey, we're still under very, very close restrictions

19  here from the State.  So I don't know how else to do -- what

20  else to tell you about that as to where we may be and when

21  we'll be, but hopefully we'll be catching up sometime come the

22  fall.  But, you know, I'm sure for those of you in New York,

23  you'll appreciate it; I don't know what New York is doing yet.

24  But we're all trying to figure out an get guidance of what a

25  jury might look like, how we can bring them in, how they could

1  be seated in the jury box, you know, if you still have social

2  distancing in place and things of that nature.

3         So it's tough questions that we've got to answer.

4  And even bringing, you know, a group of you into the courtroom

5  when we, you know, how -- what social distancing we're still

6  going to have in place for the lawyers.  You know, I have a

7  patent trial that's coming in, and they usually fill the

8  courtroom.  But -- so even though I don't have a jury, what do

9  I do with that?

10        We're going to figure those out.  We're going to get

11 better in about a month of figuring, I think, where we are,

12 though it may not be perfect as to what we'll know, so that's

13 next.

14        And all of you, I guess when you get 90 days out, and

15 start with depositions, we'll figure out how you're going to do

16 that, as well.  We'll have those discussions.

17        So Judge Pisano's available, I'm around.  But if

18 there are discovery issues, some of those nitty gritties, you

19 know, randomization if you've got them, you can get him on, and

20 he'll tell you what he thinks, okay?

21        Okay.  Everybody stay well.  Take care.

22        MS. PARFITT:  You, as well, Your Honor; thank you so

23 much.

24        MULTIPLE SPEAKERS:  Thank you.

25        THE COURT:  All right, take care.  Bye-bye.

48

1          UNIDENTIFIED ATTORNEY:  Thanks, Judge.

2              (Whereupon, the hearing was adjourned.)

3

4              CERTIFICATE OF TRANSCRIBER

5

6      I, KAREN HARTMANN, a certified Electronic Court

7  Transcriber, certify that the foregoing is a correct transcript

8  from the electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11

12

13

14

15  Karen Hartmann, AAERT CET 475  Date: May 12, 2020

16  TRANSCRIPTS PLUS, INC.

17

18

19

20

21

22

23

24

25