# Exhibit 43

Linda Loretz, M.D.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

------------------------------x

IN RE JOHNSON & JOHNSON        ) MDL No.

TALCUM POWDER PRODUCTS         ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,     )

AND PRODUCTS LIABILITY         )

LITIGATION                     )

                               )

THIS DOCUMENT RELATES TO       )

ALL CASES                      )

------------------------------x

V O L U M E  I

VIDEOTAPED 30(b)(6) DEPOSITION OF DEFENDANT
PERSONAL CARE PRODUCTS COUNCIL
by and through its Designated Representative,

LINDA LORETZ, M.D.

WASHINGTON, D.C.

TUESDAY, JULY 17, 2018

9:10 A.M.

Reported by: Leslie A. Todd

Golkow Litigation Services - 877.370.DEPS

| | |
|---|---|
| Page 110 | Page 112 |

**Page 110**

1  should probably -- more specifics probably make --
2  are clearer than that.
3      Q   Okay.
4      A   So minutes related to the Talc
5  Interested Party Task Force.  Some of the outcomes
6  related to the ISRTP, FDA, CTFA workshop,
7  published papers.
8      Q   Published papers?
9      A   That came out of that workshop as well
10  as the planning minutes.
11          Submissions to NTP.  And again, minutes
12  related to -- to that -- that work, and e-mails
13  related to these efforts.  Some publications
14  related to talc and ovarian cancer.
15      Q   Is that it?
16      A   No.  I mean, we looked at the
17  specification -- the talc specifications, CTFA
18  talc specification.  Response to the citizens
19  petition.
20      Q   Okay.
21      A   So basically the documents that relate
22  to the kind of big events along the way related to
23  talc.
24      Q   Okay.  And were all these documents
25  provided to you by lawyers?

**Page 111**

1      A   Yes.
2      Q   Did you do any of your own independent
3  investigation to refresh your recollection or to
4  learn more about the topics you're going to be
5  asked to testify about?
6      A   Not really, no.
7      Q   Not really?  Or not at all?
8      A   I'm just trying to think.  Pretty much
9  not at all.  Did I look up something because I had
10  a thought, was this -- you know, possibly, but
11  for -- absolutely the bulk was just in preparation
12  with my attorneys.
13      Q   Okay.  Well, listen, I'm -- you know,
14  we -- we really need to be precise with each
15  other, okay?
16      A   Okay.
17      Q   And I'll do my best to ask precise
18  questions, and if I don't, please let me know.  I
19  know your lawyer will do his best to let me know
20  when I don't ask a very good question, and by no
21  means am I saying I'm good at it.  I do my best,
22  but I'm always not real good at it.  But it's
23  important that you and I be precise with each
24  other --
25      A   Mm-hmm.

**Page 112**

1      Q   -- so that we know exactly what the
2  other one is talking about.  Do you agree with
3  that?
4      A   Yes.
5      Q   Okay.  So when you say the bulk of
6  and maybe this, maybe that --
7      A   I'm trying to think if I can think of a
8  single one that I actually looked at.  Like if I
9  had a question, what was the outcome of the IARC,
10  what was the exact wording on that, that's kind of
11  something that I might have looked up.
12      Q   Okay.  You might have looked at.
13          Remember the question is, did you look
14  up -- do your own investigation at all, did you
15  look at anything outside of what these lawyers
16  gave you, to do your own investigation in order to
17  refresh your recollection to prepare for this
18  deposition?
19      A   I can't think of anything specifically
20  that I looked at, no.
21      Q   Okay.  Fair enough.  If you think of
22  something, will you let me know?
23      A   I will be happy to.
24      Q   Okay.  All right.  You know one thing
25  that I noticed while Mr. Golomb was asking you

**Page 113**

1  questions was one document in particular, and I
2  don't remember which one it was off the top of my
3  head -- actually, I think it was Exhibit 4.
4          MR. LOCKE:  You may want to use this.
5          MR. MEADOWS:  Is that yours?
6          MR. LOCKE:  Yes.
7          MR. MEADOWS:  Exhibit 4 --
8          MR. LOCKE:  Oh, no, no, that's 5.  This
9  is 4.
10          MR. MEADOWS:  You know what, I think it
11  was Exhibit 5 as well.
12  BY MR. MEADOWS:
13      Q   Both of those exhibits, I believe you
14  testified that you had never seen them before?
15      A   I think what I -- no.  I think what I
16  testified to is I don't recall ever seeing this.
17  This looks like something somebody faxed to us
18  unsolicited.  I don't know who it went to.  I
19  don't believe I reviewed this in my preparation.
20          MR. LOCKE:  And -- and let the record
21  reflect the witness is identifying Exhibit 4 when
22  she refers to "this."
23          MR. MEADOWS:  Okay.
24          THE WITNESS:  And then this is obviously
25  an e-mail I wrote, so obviously I have seen it

Linda Loretz, M.D.

Page 114

1  before because I wrote it. Did I look at it in my
2  preparation for this, I'm honestly not sure. It
3  certainly looks like a normal e-mail and we looked
4  at these types of e-mails. Did I look at this
5  specific one, I may well have.
6  BY MR. MEADOWS:
7      Q   Okay. But you would agree that
8  Exhibit 4 --
9          MR. LOCKE: Can I -- can I just say the
10 second "this" that the witness was referring to
11 was Exhibit 5.
12         MR. MEADOWS: You may.
13         MR. LOCKE: Okay.
14 BY MR. MEADOWS:
15     Q   Exhibit 4, that is a document from the
16 PCPC files, correct?
17     A   That's what it says on it, yes.
18     Q   Right. And you just pointed down in
19 the --
20     A   Yep.
21     Q   -- bottom right-hand corner, right?
22     A   Yes.
23     Q   And then there is a Bates -- what we
24 call a Bates stamp number there, correct?
25     A   Yes, correct.

Page 115

1      Q   And it's got -- it uses the, I believe,
2  the letters PCPC on it, right?
3      A   Correct.
4      Q   So it's a document that came from the
5  PCPC corporate files, correct?
6      A   Yes.
7      Q   And you're here today to testify as a
8  corporate representative on behalf of PCPC,
9  correct?
10     A   That is correct.
11     Q   And you say you've never seen that
12 document before?
13     A   I'm saying I do not recall seeing it.
14     Q   Okay.
15     A   I have not seen it in my preparation. I
16 think that I would remember.
17     Q   Okay. And with respect to Exhibit
18 No. 5, I don't think that came from a PCPC file,
19 did it?
20     A   It did not. It says Imerys.
21     Q   It says Imerys?
22     A   Yes.
23     Q   Okay. But it is an e-mail that you
24 obviously wrote, correct?
25     A   Correct, yes.

Page 116

1      Q   And you agree that that is an e-mail
2  that you wrote.
3      A   Yes.
4      Q   Okay. But did you ever -- did you see
5  that document in any of the documents that your
6  lawyers gave to you?
7      A   I may have. I simply don't recall.
8  Because it's a very -- I mean, this is the kind of
9  thing that I wrote, these are the kind of
10 documents we reviewed. Did I review this specific
11 one, I may well have.
12     Q   I'll represent to you that I looked for
13 that document in the PCPC production, and I did
14 not find it. Would that surprise you?
15     A   No.
16     Q   No? Why does that not surprise you?
17     A   I -- we have -- I -- I don't know that
18 we would keep this document.
19     Q   You don't know that you would keep your
20 e-mails?
21     A   We have a document retention policy, I
22 believe, when we're -- we keep them for a certain
23 amount of time, but not --
24     Q   What is that policy?
25     A   I'm not sure.

Page 117

1      Q   Okay. Who would know?
2      A   It's a legal department policy.
3      Q   Okay. So who -- who in your company
4  would know the most about the document retention
5  policy with respect to e-mails?
6          MR. LOCKE: Objection. Beyond the
7  scope.
8  BY MR. MEADOWS:
9      Q   Do you know?
10     A   Our legal department.
11     Q   Your legal department. Okay.
12         So if I want to talk to somebody about
13 e-mails that don't seem to have been produced to
14 us, that would be someone in your legal
15 department.
16         MR. LOCKE: Objection. Beyond the scope
17 and to form.
18 BY MR. MEADOWS:
19     Q   Is that correct?
20     A   They know the most about the document
21 retention policy, yes.
22     Q   Okay. When did that document retention
23 policy come into effect, do you know?
24     A   I really --
25         MR. LOCKE: Objection --

30 (Pages 114 to 117)