Exhibit 78

**COUNCIL OF THE DISTRICT OF COLUMBIA**
**COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY**
**COMMITTEE REPORT**
1350 Pennsylvania Avenue, NW, Washington, DC 20004

2010 NOV 19 PM 12: 55

OFFICE OF THE
SECRETARY

| | |
|---|---|
| **TO:** | All Councilmembers |
| **FROM:** | Councilmember Phil Mendelson, *Phil Mendelson* |
| | Chairman, Committee on Public Safety and the Judiciary |
| **DATE:** | November 18, 2010 |
| **SUBJECT:** | Report on Bill 18-893, "Anti-SLAPP Act of 2010" |

The Committee on Public Safety and the Judiciary, to which Bill 18-893, the "Anti-SLAPP Act of 2010" was referred, reports favorably thereon with amendments, and recommends approval by the Council.

## CONTENTS

I.     Background and Need .................................................... 1
II.    Legislative Chronology ................................................. 5
III.   Position of the Executive .............................................. 6
IV.   Comments of Advisory Neighborhood Commissions ............. 6
V.     Summary of Testimony ............................................... 6
VI.   Impact on Existing Law .............................................. 7
VII.   Fiscal Impact ........................................................... 7
VIII. Section-by-Section Analysis ....................................... 7
IX.   Committee Action ...................................................... 8
X.     Attachments ............................................................. 8

## I.     BACKGROUND AND NEED

Bill 18-893, the Anti-SLAPP Act of 2010, incorporates substantive rights with regard to a defendant's ability to fend off lawsuits filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view. Such lawsuits, often referred to as strategic lawsuits against public participation -- or SLAPPs -- have been increasingly utilized over the past two decades as a means to muzzle speech or efforts to petition the government on issues of public interest. Such cases are often without merit, but achieve their filer's intention of punishing or preventing opposing points of view, resulting in a chilling effect on the exercise of constitutionally protected rights. Further, defendants of a SLAPP must dedicate a substantially amount of money, time, and legal resources. The impact is not limited to named defendants willingness to speak out, but prevents others from voicing concerns as well. To remedy this Bill 18-893 follows the model set forth in a number of other jurisdictions, and mirrors language found in federal law, by incorporating substantive rights that allow a defendant to more expeditiously, and more equitably, dispense of a SLAPP.

**History of Strategic Lawsuits against Public Participation:**

In what is considered the seminal article regarding SLAPPs, University of Denver College of Law Professor George W. Pring described what was then (1989), considered to be a growing litigation "phenomenon":

> Americans are being sued for speaking out politically.  The targets are typically not extremists or experienced activists, but normal, middle-class and blue-collar Americans, many on their first venture into the world of government decision making.  The cases are not isolated or localized aberrations, but are found in every state, every government level, every type of political action, and every public issue of consequence.  There is no dearth of victims: in the last two decades, thousands of citizens have been sued into silence.[1]

These lawsuits, Pring noted, are typically an effort to stop a citizen from exercising their political rights, or to punish them for having already done so.  To further identify the problem, and be able to draw possible solutions, Pring engaged in a nationwide study of SLAPPs with University of Denver sociology Professor Penelope Canan.

Pring and Canan's study established the base criteria of a SLAPP as: (1) a civil complaint or counterclaim (for monetary damages and/or injunction); (2) filed against non-governmental individuals and/or groups; (3) because of their communications to a government body, official or electorate; and (4) on an issue of some public interest or concern.[2]  The study of 228 SLAPPs found that, despite constitutional, federal and state statute, and court decisions that expressly protect the actions of the defendants, these lawsuits have been allowed to flourish because they appear, or are camouflaged by those bringing the suit, as a typical tort case.  The vast majority of the cases identified by the study were brought under legal charges of defamation (such as libel and slander), or as such business torts as interference with contract.[3]

In identifying possible solutions to litigation aimed at silencing public participation, Pring paid particular attention to a 1984 opinion of the Colorado Supreme Court establishing a new rule for trial courts to allow for dismissal motions for SLAPP suits.[4]  In recognition of the

---

[1] George W. Pring, *SLAPPS: Strategic Lawsuits against Public Participation*, Pace Env. L. Rev, Paper 132, 1 (1989), *available at* http://digitalcommons.pace.edu/cgi/viewcontent.cgi?article=1122&context=envlaw (last visited Nov. 17, 2010).
[2] *Id.* at 7-8.
[3] *Id.* at 8-9.
[4] Protect Our Mountain Env't, Inc. v. District Court, 677 P.2d 1361 (Colo. 1984).  The three-prong test develop by the court requires:

> When [ ] a plaintiff sues another for alleged misuse or abuse of the administrative or judicial processes of government, and the defendant files a motion to dismiss by reason of the constitutional right to petition, the plaintiff must make a sufficient showing to permit the court to reasonably conclude that the defendant's petitioning activities were not immunized from liability under the First Amendment because: (1) the defendant's administrative or judicial claims were devoid of reasonable factual support, or, if supportable, lacked any cognizable basis in law for their assertion; and (2) the primary purpose of the defendant's petitioning activity was to harass the

growing problem of SLAPPs, a number of jurisdictions have, legislatively, created a similar special motion to dismiss in order to expeditiously, and more fairly deal with SLAPPs. According to the California Anti-SLAPP Project, a public interest law firm and policy organization dedicated to fighting SLAPPs in California, as of January 2010 there are approximately 28 jurisdictions in the United States that have adopted anti-SLAPP measures. Likewise, there are nine jurisdictions (not including the District of Columbia) that are currently considering legislation to address the issue. Also, one other jurisdiction has joined Colorado in addressing SLAPPs through judicial doctrine.[5]

This issue has also recently been taken up by the federal government, with the introduction of the H.R. 4363, the Citizen Participation Act of 2009. This legislation would provide certain procedural protections for any act in furtherance of the constitutional right of petition or free speech, and specifically incorporate a special motion to dismiss for SLAPPs.[6]

**SLAPPs in the District of Columbia:**

Like the number of jurisdictions that have sensed the need to address SLAPPs legislatively, the District of Columbia is no stranger to SLAPPs. The American Civil Liberties Union of the Nation's Capital (ACLU), in written testimony provided to the Committee (attached), described two cases in which the ACLU was directly involved, as counsel for defendants, in such suits against District residents.[7]

The actions that typically draw a SLAPP are often, as the ACLU noted, the kind of grassroots activism that should be hailed in our democracy. In one of the examples provided, the ACLU discussed the efforts of two Capitol Hill advocates that opposed the efforts of a certain developer. When the developer was unable to obtain a building permit, the developer sued the activists and the community organization alleging they "conducted meetings, prepared petition drives, wrote letters and made calls and visits to government officials, organized protests, organized the preparation and distribution of … signs, and gave statements and interviews to various media."[8] Such activism, however, was met with years of litigation and, but for the ACLU's assistance, would have resulted in outlandish legal costs to defend. Though the actions

---

plaintiff or to effectuate some other improper objective; and (3) the defendant's petitioning activity had the capacity to adversely affect a legal interest of the plaintiff.

*Id.* at 1369.
[5] California Anti-SLAPP Project (CASP) website, Other states: Statutes and cases, *available at* http://www.casp.net/statutes/menstate.html (last visited Nov. 11, 2010).
[6] http://www.thomas.gov/cgi-bin/bdquery/D?d111:1:./temp/~bdLBBX:@@@L&summ2=m&l/home/LegislativeData.php|
[7] *Bill 18-893, Anti-SLAPP Act of 2010: Public Hearing of the Committee on Public Safety and the Judiciary*, Sept. 17, 2010, at 2-3 (written testimony Arthur B. Spitzer, Legal Director, American Civil Liberties Union of the Nation's Capital).
[8] *Id.* at 2 (quoting from lawsuit in *Father Flanagan's Boys Home v. District of Columbia et al.*, Civil Action No. 01-1732 (D.D.C)).

of these participants should have been protected, they, and any others who wished to express opposition to the project, were met with intimidation.

What has been repeated by many who have studied this issue, from Pring on, is that the goal of the litigation is not to win the lawsuit but punish the opponent and intimidate them into silence. As Art Spitzer, Legal Director for the ACLU, noted in his testimony "[l]*itigation itself* is the plaintiff's weapon of choice."[9]

## District Anti-SLAPP Act:

In June 2010, legislation was introduced to remedy this nationally recognized problem here in the District of Columbia. As introduced, this measure closely mirrored the federal legislation introduced the previous year. Bill 18-893 provides a defendant to a SLAPP with substantive rights to expeditiously and economically dispense of litigation aimed to prevent their engaging in constitutionally protected actions on matters of public interest.

Following the lead of other jurisdictions, which have similarly extended absolute or qualified immunity to individuals engaging in protected actions, Bill 18-893 extends substantive rights to defendants in a SLAPP, providing them with the ability to file a special motion to dismiss that must be heard expeditiously by the court. To ensure a defendant is not subject to the expensive and time consuming discovery that is often used in a SLAPP as a means to prevent or punish, the legislation tolls discovery while the special motion to dismiss is pending. Further, in recognition that SLAPP plaintiffs frequently include unspecified individuals as defendants -- in order to intimidate large numbers of people that may fear becoming named defendants if they continue to speak out -- the legislation provides an unnamed defendant the ability to quash a subpoena to protect his or her identity from disclosure if the underlying action is of the type protected by Bill 18-893. The legislation also allows for certain costs and fees to be awarded to the successful party of a special motion to dismiss or a special motion to quash.

Bill 18-893 ensures that District residents are not intimidated or prevented, because of abusive lawsuits, from engaging in political or public policy debates. To prevent the attempted muzzling of opposing points of view, and to encourage the type of civic engagement that would be further protected by this act, the Committee urges the Council to adopt Bill 18-893.

## II.    LEGISLATIVE CHRONOLOGY

June 29, 2010      Bill 18-893, the "Anti-SLAPP Act of 2010," is introduced by Councilmembers Cheh and Mendelson, co-sponsored by Councilmember M. Brown, and is referred to the Committee on Public Safety and the Judiciary.

---

[9] *Id.* at 3.

| July 9, 2010 | Notice of Intent to act on Bill 18-893 is published in the *District of Columbia Register*. |
| August 13, 2010 | Notice of a Public Hearing is published in the *District of Columbia Register*. |
| September 17, 2010 | The Committee on Public Safety and the Judiciary holds a public hearing on Bill 18-893. |
| November 18, 2010 | The Committee on Public Safety and the Judiciary marks-up Bill 18-893. |

## III.   POSITION OF THE EXECUTIVE

The Executive provided no witness to testify on Bill 18-893 at the September 17, 2010 hearing. The Office of the Attorney General provided a letter subsequent to the hearing stating the need to review the legislation further.

## IV.   COMMENTS OF ADVISORY NEIGHBORHOOD COMMISSIONS

The Committee received no testimony or comments from Advisory Neighborhood Commissions.

## V.   SUMMARY OF TESTIMONY

The Committee on Public Safety and the Judiciary held a public hearing on Bill 18-893 on Friday, September 17, 2010. The testimony summarized below is from that hearing. A copy of submitted testimony is attached to this report.

*Robert Vinson Brannum, President, D.C. Federation of Civic Associations, Inc.,* testified in support of Bill 18-893.

*Ellen Opper-Weiner, Public Witness,* testified in support of Bill 18-893. Ms. Opper-Weiner recounted her own experience in SLAPP litigation, and suggested several amendments to strengthen the legislation.

*Dorothy Brizill, Public Witness,* testified in support of Bill 18-893. Ms. Brizill recounted her own experience in SLAPP litigation. She stated that the legislation is the next step in advancing free speech in the District of Columbia.

*Arthur B. Spitzer, Legal Director, American Civil Liberties Union of the Nation's Capital,* provided a written statement in support of the purpose and general approach of Bill 18-

Committee on Public Safety and the Judiciary                                   Page 6 of 8
Report on Bill 18-893                                                   November 18, 2010

893, but suggested several changes to the legislation as introduced.  A copy of this statement is attached to this report.

Although no Executive witness presented testimony, Attorney General for the District of Columbia, Peter Nickles, expressed concern that certain provisions of the bill might implicate the Home Rule Act prohibition against enacting any act with respect to any provision of Title 11 of the D.C. Official Code.  A copy of his letter is attached to this report.

## VI.      IMPACT ON EXISTING LAW

Bill 18-893 adds new provisions in the D.C. Official Code to provide an expeditious process for dealing with strategic lawsuits against public participation (SLAPPs).  Specifically, the legislation provides a defendant to a SLAPP with substantive rights to have a motion to dismiss heard expeditiously, to delay burdensome discovery while the motion to dismiss is pending, and to provide an unnamed defendant the ability to quash a subpoena to protect his or her identity from disclosure if the underlying action is of the type protected by Bill 18-893.  The legislation also allows for the costs of litigation to be awarded to the successful party of a special motion to dismiss created under this act.

## VII.     FISCAL IMPACT

The attached November 16, 2010 Fiscal Impact Statement from the Chief Financial Officer states that funds are sufficient to implement Bill 18-893.  This legislation requires no additional funds or staff.

## VIII.    SECTION-BY-SECTION ANALYSIS

Several of the changes to the Committee Print from Bill 18-893 as introduced stem from the recommendations of the American Civil Liberties Union of the Nation's Capital (ACLU).  For a more thorough explanation of these changes, see the September 17, 2010 testimony of the ACLU attached to this report.

Section 1          States the short title of Bill 18-893.

Section 2          Incorporates definitions to be used throughout the act.

Section 3          Creates the substantive right of a party subject to a claim under a SLAPP suit to file a special motion to dismiss within 45 days after service of the claim.

| | |
|---|---|
| *Subsection* (a) | Creates a substantive right of a defendant to pursue a special motion to dismiss for a lawsuit regarding an act in furtherance of the right of advocacy on issues of public interest. |
| *Subsection* (b) | Provides that, upon a prima facie showing that the activity at issue in the litigation falls under the type of activity protected by this act, the court shall dismiss the case unless the responding party can show a likelihood of succeeding upon the merits. |
| *Subsection* (c) | Tolls discovery proceedings upon the filing of a special motion to dismiss under this act.  As introduced the legislation permitted an exemption to this for good cause shown.  The Committee Print has tightened this language in this provision so that the court may permit specified discovery if it is assured that such discovery would not be burdensome to the defendant. |
| *Subsection* (d) | Requires the court to hold an expedited hearing on a special motion to dismiss filed under this act. |
| | As introduced, the Committee Print contained a subsection (e) that would have provided a defendant with a right of immediate appeal from a court order denying a special motion to dismiss.  While the Committee agrees with and supports the purpose of this provision, a recent decision of the DC Court of Appeals states that the Council exceeds its authority in making such orders reviewable on appeal.[10]  The dissenting opinion in that case provides a strong argument for why the Council should be permitted to legislate this issue.  However, under the majority opinion the Council is restricted from expanding the authority of District's appellate court to hear appeals over non-final orders of the lower court.  The provision that has been removed from the bill as introduced would have provided an immediate appeal over a non-final order (a special motion to dismiss). |
| <u>Section 4</u> | Creates a substantive right of a person to pursue a special motion to quash a subpoena aimed at obtaining a persons identifying information relating to a lawsuit regarding an act in furtherance of the right of advocacy on issues of public interest. |
| *Subsection* (a) | Creates the special motion to quash. |
| *Subsection* (b) | Provides that, upon a prima facie showing that the underlying claim is of the type of activity protected by this act, the court shall grant the special |

---

[10] *See* Stuart v. Walker, 09-CV-900 (DC Ct of App 2010) at 4-5.

|              | motion to quash unless the responding party can show a likelihood of succeeding upon the merits. |
|--------------|---|
| <u>Section 5</u> | Provides for the awarding of fees and costs for prevailing on a special motion to dismiss or a special motion to quash.  The court is also authorized to award reasonable attorney fees where the underlying claim is determined to be frivolous. |
| <u>Section 6</u> | Provides exemptions to this act for certain claims. |
| <u>Section 7</u> | Adopts the Fiscal Impact Statement. |
| <u>Section 8</u> | Establishes the effective date by stating the standard 30-day Congressional review language. |

## IX.    COMMITTEE ACTION

On November 18, 2010, the Committee on Public Safety and the Judiciary met to consider Bill 18-893, the "Anti-SLAPP Act of 2010."  The meeting was called to order at 1:50 p.m., and Bill 18-893 was the fourth item on the agenda.  After ascertaining a quorum (Chairman Mendelson and Councilmembers Alexander, Cheh, and Evans present; Councilmembers Bowser absent), Chairman Mendelson moved the print, along with a written amendment to repeal section 3(e) of the circulated draft print, with leave for staff to make technical changes.  After an opportunity for discussion, the vote on the print was three aye (Chairman Mendelson and Councilmembers Evans and Cheh), and one present (Councilmember Alexander).  Chairman Mendelson then moved the report, with leave for staff to make technical and editorial changes. After an opportunity for discussion, the vote on the report was three aye (Chairman Mendelson and Councilmembers Evans and Cheh), and one present (Councilmember Alexander).  The meeting adjourned at 2:15 p.m.

## X.    ATTACHMENTS

1.      Bill 18-893 as introduced.

2.      Written testimony and comments.

3.      Fiscal Impact Statement

4.      Committee Print for Bill 18-893.

**COUNCIL OF THE DISTRICT OF COLUMBIA**
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

**Memorandum**

---

To:          Members of the Council

From:        Cynthia Brock-Smith, Secretary to the Council

Date:        July 7, 2010

Subject:     (Correction)
             Referral of Proposed Legislation


Notice is given that the attached proposed legislation was introduced in the
Legislative Meeting on Tuesday, June 29, 2010. Copies are available in
Room 10, the Legislative Services Division.


TITLE: "Anti-SLAPP Act of 2010", B18-0893


INTRODUCED BY: Councilmembers Cheh and Mendelson

CO-SPONSORED BY: Councilmember M. Brown


The Chairman is referring this legislation to the Committee on Public Safety
and the Judiciary.


Attachment

cc: General Counsel
    Budget Director
    Legislative Services

Councilmember Phil Mendelson

Councilmember Mary M. Cheh

A BILL

_____

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

_____

Councilmembers Mary M. Cheh and Phil Mendelson introduced the following bill, which
        was referred to the Committee on _____.

To provide a special motion for the quick and efficient dismissal of strategic lawsuits
        against public participation (SLAPPs), to stay proceedings until the motion is
        considered, to provide a motion to quash attempts to seek personally identifying
        information; and to award the costs of litigation to the successful party on a
        special motion.

        BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA,

That this act may be cited as the "Anti-SLAPP Act of 2010".

        Sec. 2. Definitions.

        For the purposes of this Act, the term:

        (1) "Act in furtherance of the right of free speech" means:

                (A) Any written or oral statement made:

                        (i) In connection with an issue under consideration or review by a

legislative, executive, or judicial body, or any other official proceeding authorized by

law;

                        (ii) In a place open to the public or a public forum in connection

with an issue of public interest; or

1

1         (B) Any other conduct in furtherance of the exercise of the constitutional

2  right to petition the government or the constitutional right of free expression in

3  connection with an issue of public interest.

4        (2) "Issue of public interest" means an issue related to health or safety;

5  environmental, economic or community well-being; the District government; a public

6  figure; or a good, product or service in the market place. The term "issue of public

7  interest" shall not be construed to include private interests, such as statements directed

8  primarily toward protecting the speaker's commercial interests rather than toward

9  commenting on or sharing information about a matter of public significance.

10       (3) "Claim" includes any civil lawsuit, claim, complaint, cause of action, cross-

11  claim, counterclaim, or other judicial pleading or filing requesting relief.

12       (4) "Government entity" means the Government of the District of Columbia and

13  its branches, subdivisions, and departments.

14       Sec. 3. Special Motion to Dismiss.

15       (a) A party may file a special motion to dismiss any claim arising from an act in

16  furtherance of the right of free speech within 45 days after service of the claim.

17       (b) A party filing a special motion to dismiss under this section must make a

18  prima facie showing that the claim at issue arises from an act in furtherance of the right

19  of free speech. If the moving party makes such a showing, the responding party may

20  demonstrate that the claim is likely to succeed on the merits.

21       (c) Upon the filing of a special motion to dismiss, discovery proceedings on the

22  claim shall be stayed until notice of entry of an order disposing of the motion, except that

23  the court, for good cause shown, may order that specified discovery be conducted.

1    (d) The court shall hold an expedited hearing on the special motion to dismiss,

2    and issue a ruling as soon as practicable after the hearing. If the special motion to dismiss

3    is granted, dismissal shall be with prejudice.

4    (e) The defendant shall have a right of immediate appeal from a court order

5    denying a special motion to dismiss in whole or in part.

6    Sec. 4. Special Motion to Quash.

7    (a) A person whose personally identifying information is sought, pursuant to a

8    discovery order, request, or subpoena, in connection with an action arising from an act in

9    furtherance of the right of free speech may make a special motion to quash the discovery

10    order, request, or subpoena.

11    (b) The person bringing a special motion to quash under this section must make a

12    prima facie showing that the underlying claim arises from an act in furtherance of the

13    right of free speech. If the person makes such a showing, the claimant in the underlying

14    action may demonstrate that the underlying claim is likely to succeed on the merits.

15    Sec. 5. Fees and costs.

16    (a) The court may award a person who substantially prevails on a motion brought

17    under sections 3 or 4 of this Act the costs of litigation, including reasonable attorney fees.

18    (b) If the court finds that a motion brought under sections 3 or 4 of this Act is

19    frivolous or is solely intended to cause unnecessary delay, the court may award

20    reasonable attorney fees and costs to the responding party.

21    Sec. 6. Exemptions.

22    (a) This Act shall not apply to claims brought solely on behalf of the public or

23    solely to enforce an important right affecting the public interest.

3

1       (b) This Act shall not apply to claims brought against a person primarily engaged

2   in the business of selling or leasing goods or services, if the statement or conduct from

3   which the claim arises is a representation of fact made for the purpose of promoting,

4   securing, or completing sales or leases of, or commercial transactions in, the person's

5   goods or services, and the intended audience is an actual or potential buyer or customer.

6       Sec. 7: Fiscal impact statement.

7       The Council adopts the fiscal impact statement in the committee report as the

8   fiscal impact statement required by section 602(c)(3) of the District of Columbia Home

9   Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-

10  206.02(c)(3)).

11      Sec. 8.  Effective date.

12      This act shall take effect following approval by the Mayor (or in the event of veto

13  by the Mayor, action by the Council to override the veto), a 30-day period of

14  Congressional review as provided in section 602(c)(1) of the District of Columbia Home

15  Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-

16  206.02(c)(1)), and publication in the District of Columbia Register.

Testimony of the
**American Civil Liberties Union
of the Nation's Capital**

by

Arthur B. Spitzer
Legal Director

before the

Committee on Public Safety and the Judiciary
of the
Council of the District of Columbia

on

Bill 18-893, the
"Anti-SLAPP Act of 2010"

September 17, 2010

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

     The ACLU of the Nation's Capital appreciates this opportunity to testify on Bill 18-893. We support the purpose and the general approach of this bill, but we believe it requires some significant polishing in order to achieve its commendable goals.

### Background

     In a seminal study about twenty years ago, two professors at the University of Denver identified a widespread pattern of abusive lawsuits filed by one side of a political or public policy dispute—usually the side with deeper pockets and ready access to counsel—to punish or prevent the expression of opposing points of view. They dubbed these "Strategic Lawsuits Against Public Participation," or "SLAPPs." *See* George W. Pring and Penelope Canan, SLAPPS: Getting Sued for Speaking Out (Temple University Press 1996). They pinpointed several criteria that identify a SLAPP:

     — The actions complained of "involve communicating with government officials, bodies, or the electorate, or encouraging others to do so." *Id.* at 150.

     — The defendants are "involved in speaking out for or against some issue under consideration by some level of government or the voters." *Id.*

1

— The legal claims filed against the speakers tend to fall into predictable categories such as defamation, interference with prospective economic advantage, invasion of privacy, and conspiracy. *Id.* at 150-51.

— The lawsuit often names "John or Jane Doe defendants." *Id.* at 151. "We have found whole communities chilled by the inclusion of Does, fearing 'they will add my name to the suit.'" *Id.*

The authors "conservatively estimate[d] that … tens of thousands of Americans have been SLAPPed, and still more have been muted or silenced by the threat." *Id.* at xi. Finding that "the legal system is not effective in controlling SLAPPs," *id.*, they proposed the adoption of anti-SLAPP statutes to address the problem. *Id.* at 201.

Responding to the continuing use of SLAPPs by those seeking to silence opposition to their activities, twenty-six states and the Territory of Guam have now enacted anti-SLAPP statutes.[1]

The ACLU of the Nation's Capital has been directly involved, as counsel for defendants, in two SLAPPs involving District of Columbia residents.

In the first case, a developer that had been frustrated by its inability to obtain a building permit sued a community organization (Southeast Citizens for Smart Development) and two Capitol Hill activists (Wilbert Hill and Ellen Opper-Weiner) who had opposed its efforts. The lawsuit claimed that the defendants had violated the developer's rights when they "conducted meetings, prepared petition drives, wrote letters and made calls and visits to government officials, organized protests, organized the preparation and distribution of … signs, and gave statements and interviews to various media," and when they created a web site that urged people to "call, write or e-mail the mayor" to ask him to stop the project. The defendants' activities exemplified the kind of grassroots activism that should be hailed in a democracy, and the lawsuit was a classic SLAPP. The case was eventually dismissed, and the dismissal affirmed on appeal.[2] But the litigation took several years, and during all that time the defendants and their neighbors were worried about whether they might face liability. Because the ACLU represented the citizens and their organization at no charge, they were not financially harmed. But had they been required to retain paid counsel, the cost would have been substantial, and intimidating.

---

[1] Links to these statutes can be found at http://www.casp.net/menstate.html.

[2] *Father Flanagan's Boys Home v. District of Columbia, et al.,* Civil Action No. 01-1732 (D.D.C.), *aff'd*, 2003 WL 1907987 (No. 02-7157, D.C. Cir. 2003).

2

In the second case we represented Dorothy Brizill, who needs no introduction to this Committee.  She was sued in Guam for defamation, invasion of privacy, and "interference with prospective business advantage," based on statements she made in a radio interview broadcast there about the activities of the gambling entrepreneur who backed the proposed 2004 initiative to legalize slot machines in the District of Columbia.  This lawsuit was also a classic SLAPP, filed against her in the midst of the same entrepreneur's efforts to legalize slot machines on Guam, in an effort to silence her.  And to intimidate his opponents, twenty "John Does" were also named as defendants.  With the help of Guam's strong anti-SLAPP statute, the case was dismissed, and the dismissal was affirmed by the Supreme Court of Guam.[3]  But once again, the litigation lasted more than two years, and had Ms. Brizill been required to retain paid counsel to defend herself, it would have cost her hundreds of thousands of dollars.

As professors Pring and Canan demonstrated, a SLAPP plaintiff's real goal is not to win the lawsuit but to punish his opponents and intimidate them and others into silence.  *Litigation itself* is the plaintiff's weapon of choice; a long and costly lawsuit is a victory for the plaintiff even if it ends in a formal victory for the defendant.  That is why anti-SLAPP legislation is needed: to enable a defendant to bring a SLAPP to an end quickly and economically.

### Bill 18-893

Bill 18-893 would help end SLAPPs quickly and economically by making available to the defendant a "special motion to dismiss" that has four noteworthy features:
- The motion must be heard and decided expeditiously.
- Discovery is generally stayed while the motion is pending.
- If the motion is denied the defendant can take an immediate appeal.
- Most important, the motion is to be granted if the defendant shows that he or she was engaged in protected speech or activity, unless the plaintiff can show that he or she is nevertheless likely to succeed on the merits.

Speaking generally, this is sensible path to the desired goal, and speaking generally, the ACLU endorses it.  If a lawsuit looks like a SLAPP, swims like a SLAPP, and quacks like a SLAPP, then it probably is a SLAPP, and it is fair and reasonable to put the burden on the plaintiff to show that it isn't a SLAPP.

We do, nevertheless, have a number of suggestions for improvement, including a substantive change in the definition of the conduct that is to be protected by the proposed law.

---

[3] *Guam Greyhound, Inc. v. Brizill*, 2008 Guam 13, 2008 WL 4206682.

**Section 2(1).**  The bill begins by defining the term "Act in furtherance of the right of free speech," which is used to signify the conduct that can be protected by a special motion to dismiss.  In our view, it would be better to use a different term, because the "right of free speech" is already a term in very common use, with a broader meaning than the meaning given in this bill, and it will be impossible, or nearly so, for litigants, lawyers and even judges (and especially the news media) to avoid confusion between the common meaning of the "right of free speech" and the special, narrower meaning given to it in this bill.  It would be akin to defining the term "fruit" to mean "a curved yellow edible food with a thick, easily-peeled skin."  This specially-defined term deserves a special name that will not require a struggle to use correctly.  We suggest "Act in furtherance of the right of advocacy on issues of public interest."

**Section 2(1)(A).**  Because there is no conjunction at the end of section 2(1)(A)(i), the bill is ambiguous as to whether sections 2(1)(A)(i) and (ii) are conjunctive or disjunctive.  That is, in order to be covered, must a statement be made "In connection with an ... official proceeding" *and* "In a place open to the public or a public forum in connection with an issue of public interest," or is a statement covered if it is made *either* "In connection with an ... official proceeding," *or* "In a place open to the public or a public forum in connection with an issue of public interest"?

We urge the insertion of the word "or" at the end of section 2(1)(A)(i) to make it clear that statements are covered in either case.  A statement made "In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" certainly deserves anti-SLAPP protection whether it is made in a public place or in a private place.  For example, a statement made to a group gathered by invitation in a person's living room, or made to a Councilmember during a non-public meeting, should be protected.  Likewise, a statement made "In a place open to the public or a public forum in connection with an issue of public interest" deserves anti-SLAPP protection whether of not it is also connected to an "official proceeding."  For example, statements by residents addressing a "Stop the Slaughterhouse" rally should be protected even if no official proceeding regarding the construction of a slaughterhouse has yet begun.[4]

---

[4]  It appears that these definitions, along with much of Bill 18-893, were modeled on the Citizen Participation Act of 2009, H.R. 4364 (111th Cong., 1st Sess.), introduced by Rep. Steve Cohen of Tennessee (*available at* http://thomas.loc.gov/cgi-bin/query/z?c111: H.R.4364.IH:).  In that bill it is clear that speech or activity that falls under any one of these definitions is covered.

4

**Section 2(1)(B).**  Section 2(1)(B) expands the definition of protected activity to include "any other conduct in furtherance of the exercise of the constitutional right to petition the government or the constitutional right of free expression in connection with an issue of public interest."  We fully agree with the intent of this provision, but we think it fails as a definition because it is backwards— it requires a court *first* to determine whether given conduct is protected by the Constitution *before* it can determine whether that conduct is covered by the Anti-SLAPP Act.  But if the conduct is protected by the Constitution, then there is no need for the court to determine whether it is covered by the Anti-SLAPP Act: a claim arising from that conduct must be dismissed because the conduct is protected by the Constitution. And yet the task of determining whether given conduct is protected by the Constitution is often quite difficult, and can require exactly the kinds of lengthy, expensive legal proceedings (including discovery) that the bill is intended to avoid.

This very problem arose in the *Brizill* case, where the Guam anti-SLAPP statute protected "acts in furtherance of the Constitutional rights to petition," and Mr. Baldwin argued that the statute therefore provided no broader protection for speech than the Constitution itself provided.  *See* 2008 Guam 13 ¶ 28.  He argued, for example, that Ms. Brizill's speech was not protected by the statute because it was defamatory, and defamation is not protected by the Constitution.  As a result, the defendant had to litigate the constitutional law of defamation on the way to litigating the SLAPP issues. This should not be necessary, as the purpose of an anti-SLAPP law is to provide broader protection than existing law already provides.  Bill 18-893 should be amended to avoid creating the same problem here.[5]

We therefore suggest amending Section 2(1)(B) to say: "Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest."

**Section 2(4).**  Section 2(4) defines the term "government entity."  But that term is never used in the bill.  It should therefore be deleted.[6]

---

[5]  The Supreme Court of Guam ultimately rejected the argument that "Constitutional rights" meant "constitutionally protected rights," *see id.* at ¶ 32, but that was hardly a foregone conclusion, and the D.C. Court of Appeals might not reach the same conclusion under Section 2(1)(B).

[6]  The same term is defined in H.R. 4364, but it is then used in a section providing that "A government entity may not recover fees pursuant to this section."

5

**Section 3(b).**  We agree with what we understand to be the intent of this provision, setting out the standards for a special motion to dismiss.  But the text of this section fails to accomplish its purpose because it never actually spells out what a court is supposed to do.  We suggest revising Section 3(b) as follows:

> (b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

**Section 3(c).**  We agree that discovery should be stayed on a claim as to which a special motion to dismiss has been filed.  This is an important protection, for discovery is often burdensome and expensive.  Because expression on issues of public interest deserves special protection, a plaintiff who brings a claim based on a defendant's expression on an issue of public interest ought to be required to show a likelihood of success on that claim without the need for discovery.

A case may exist in which a plaintiff could prevail on such a claim after discovery but cannot show a likelihood of success without discovery, but in our view the dismissal of such a hypothetical case is a small price to pay for the public interest that will be served by preventing the all-but-automatic discovery that otherwise occurs in civil litigation over the sorts of claims that are asserted in SLAPPs.

As an exception to the usual stay of discovery, Section 3(c) permits a court to allow "specified discovery" after the filing of a special motion to dismiss "for good cause shown."  We agree that a provision allowing some discovery ought to be included for the exceptional case.  But while the "good cause" standard has the advantage of being flexible, it has the disadvantage of being completely subjective, so that a judge who simply feels that it's unfair to dismiss a claim without discovery can, in effect, set the Anti-SLAPP Act aside and allow a case to proceed in the usual way.  In our view, it would be better if the statute spelled out more precisely the circumstances under which discovery might be allowed, and also included a provision allowing the court to assure that such discovery would not be burdensome to the defendant.  For example: "...except that the court may order that specified discovery be conducted when it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome.  Such an order may be conditioned upon the plaintiff paying any expenses incurred by the defendant in responding to such discovery."

Finally, we note that this section provides that discovery shall be stayed "until notice of entry of an order disposing of the motion." That language tracks H.R. 4364, but "notice of entry" of court orders is not part of D.C. Superior Court procedure. We suggest that the bill be amended to provide that "… discovery proceedings on the claim shall be stayed until the motion has been disposed of, including any appeal taken under section 3(e), …"

**Sections 3(d) and (e).** We agree that a special motion to dismiss should be expedited and that its denial should be subject to an interlocutory appeal. The Committee may wish to consider whether the Court of Appeals should also be directed to expedite its consideration of such an appeal. The D.C. Court of Appeals often takes years to rule on appeals.

**Section 4.** Section 4 is focused on the fact that SLAPPs frequently include unspecified individuals (John and Jane Does) as defendants. As observed by professors Pring and Canan, this is one of the tactics employed by SLAPP plaintiffs to intimidate large numbers of people, who fear that they may become named defendants if they continue to speak out on the relevant public issue.

There can be very legitimate purposes for naming John and Jane Does as defendants in civil litigation. The ACLU sometimes names John and Jane Does as defendants when it does not yet know their true identities—for example, when unknown police officers are alleged to have acted unlawfully.[7] It is therefore necessary to balance the right of a plaintiff to proceed against an as-yet-unidentified person who has violated his rights, and to use the court system to discover that person's identity, against the right of an individual not to be made a defendant in an abusive SLAPP that was filed for the purpose of retaliating against, or chilling, legitimate civic activity.

We believe that Section 4 strikes an appropriate balance by making available to a John or Jane Doe a "special motion to quash," protecting his or her identity from disclosure if he or she was acting in a manner that is protected by the Anti-SLAPP Act, and if the plaintiff cannot make the same showing of likely success on the merits that is required to defeat a special motion to dismiss.

Like Section 3(b), however, Section 4(b) never actually spells out what a court is supposed to do. We therefore suggest revising Section 4(b) in the same manner we suggested revising Section 3(b):

---

[7] *See, e.g., YoungBey v. District of Columbia, et al.*, No. 09-cv-596 (D.D.C.) (suing the District of Columbia, five named MPD officers, and 27 "John Doe" officers in connection with an unlawful pre-dawn SWAT raid of a District resident's home).

7

(b) If a person bringing a special motion to quash under this section makes a prima facie showing that the underlying claim arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the party seeking his or her personally identifying information demonstrates that the underlying claim is likely to succeed on the merits, in which case the motion shall be denied.

**Section 6(a).** Section 6(a) provides that "This Act shall not apply to claims brought solely on behalf of the public or solely to enforce an important right affecting the public interest." This language is vague and tremendously broad. Almost any plaintiff can and will assert that he is bringing his claims "to enforce an important right affecting the public interest," and neither this bill nor any other source we know gives a court any guidance regarding what "an important right affecting the public interest" might be. The plaintiffs in the two SLAPP suits described above, in which the ACLU of the Nation's Capital represented the defendants, vigorously argued that they were seeking to enforce an important right affecting the public interest: the developer argued that it was seeking to provide housing for disadvantaged youth; the gambling entrepreneur argued that he was seeking to prevent vicious lies from affecting the result of an election.

Thus, this provision will almost certainly add an entire additional phase to the litigation of every SLAPP suit, with the plaintiff arguing that the anti-SLAPP statute does not even apply to his case because he is acting in the public interest. To the extent that courts accept such arguments, this provision is a poison pill with the potential to turn the anti-SLAPP statute into a virtually dead letter. At a minimum, it will subject the rights of SLAPP defendants to the subjective opinions of more than 75 different Superior Court judges regarding what is or is not "an important right affecting the public interest."

Moreover, we think the exclusion created by Section 6(a) is constitutionally problematic because it incorporates a viewpoint-based judgment about what is or is not in the public interest—after all, what is in the public interest necessarily depends upon one's viewpoint.

—Assume, for example, that D.C. Right To Life (RTL) makes public statements that having an abortion causes breast cancer. Assume Planned Parenthood sues RTL, alleging that those statements impede its work and cause psychological harm to its members. RTL files a special motion to dismiss under the Anti-SLAPP Act, showing that it was communicating views to members of the public in connection with an issue of public interest. But Planned Parenthood responds that its lawsuit is not subject to the Anti-SLAPP Act because it was

8

"brought ... solely to enforce an important right affecting the public interest," to wit, the right to reproductive choice.

—Now assume that Planned Parenthood makes public statements that having an abortion under medical supervision is virtually risk-free. RTL sues Planned Parenthood, alleging that those statements impede its work and cause psychological harm to its members. Planned Parenthood files a special motion to dismiss under the Anti-SLAPP Act, showing that it was communicating views to members of the public in connection with an issue of public interest. But RTL responds that its lawsuit is not subject to the Anti-SLAPP Act because it was "brought ... solely to enforce an important right affecting the public interest," to wit, the right to life.

Are both lawsuits exempt from the Anti-SLAPP Act? Neither? One but not the other? We fear that the result is likely to depend on the viewpoint of the judge regarding which asserted right is "an important right affecting the public interest." But the First Amendment requires the government to provide evenhanded treatment to speech on all sides of public issues. We see no good reason for the inclusion of Section 6(a), and many pitfalls. Accordingly, we urge that it be deleted.[8]

Thank you for your consideration of our comments.

---

[8]   Section 10 of H.R. 4364, on which Section 6(a) of Bill 18-893 is modeled, begins with the catchline "Public Enforcement." It therefore appears that Section 10 was intended to exempt only enforcement actions brought by the government.

Even if that is true, we see no good reason to exempt the government, as a litigant, from a statute intended to protect the rights of citizens to speak freely on issues of public interest. To the contrary, the government should be held to the strictest standards when it comes to respecting those rights. *See, e.g., White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) (holding that the advocacy activities of neighbors who opposed the conversion of a motel into a multi-family housing unit for homeless persons were protected by the First Amendment, and that an intrusive eight-month investigation into their activities and beliefs by the regional Fair Housing and Equal Opportunity Office violated their First Amendment rights).

We therefore urge the complete deletion of Section 6(a), as noted above. However, if the Committee does not delete Section 6(a) entirely, its coverage should be limited to lawsuits brought by the government.

JUDICIAL MEMBER MENDELS

**GOVERNMENT OF THE DISTRICT OF COLUMBIA** AUG 17 PM 4: 11
Office of the Attorney General

★ ★ ★



**ATTORNEY GENERAL**

September 17, 2010

The Honorable Phil Mendelson
Chairperson
Committee on Public Safety & the Judiciary
Council of the District of Columbia
1350 Pennsylvania Avenue, N.W., Ste. 402
Washington, D.C. 20004

Re: Bill 18-893, the "Anti-SLAPP Act of 2010"

Dear Chairperson Mendelson:

I have not yet had the opportunity to study in depth Bill 18-893, the "Anti-SLAPP Act of 2010" ("bill"), which will be the subject of a hearing before your committee today, but I do want to register a preliminary concern about the legislation.

To the extent that sections 3 (special motion to dismiss) and 4 (special motion to quash) of the bill would impact SLAPPs filed in the Superior Court of the District of Columbia, the legislation may run afoul of section 602(a)(4) of the District of Columbia Home Rule Act, approved December 24, 1973, Pub. L. 93-198, 87 Stat. 813 (D.C. Official Code § 1-206.02(a)(4) (2006 Repl.)), which prohibits the Council from enacting any act "with respect to any provision of Title 11 [of the D.C. Code]." In particular, D.C. Official Code § 11-946 (2001) provides, for example, that the Superior Court "shall conduct its business according to the Federal Rules of Civil Procedure...unless it prescribes or adopts rules which modify those Rules [subject to the approval of the Court of Appeals]." As you know, the Superior Court subsequently adopted rules of procedure for civil actions, including Rules 12(c) (Motion for judgment on the pleadings), 26-37 (Depositions and Discovery), and 56 (Summary judgment), which appear to afford the parties to civil actions rights and opportunities that sections 3 and 4 of the bill can be construed to abrogate. Thus, the bill may conflict with the Superior Court's rules of civil procedure and, consequently, violate section 602(a)(4) of the Home Rule Act insofar as that section preserves the D.C. Courts' authority to adopt rules of procedure free from interference by the Council. Accordingly, I suggest that – if you have not already done so – you solicit comments concerning the legislation from the D.C. Courts.

Sincerely,

*Peter J. Nickles*

Peter J. Nickles
Attorney General for the District of Columbia

cc: Vincent Gray, Chairman, Council of the District of Columbia
    Yvette Alexander, Council of the District of Columbia

Government of the District of Columbia
Office of the Chief Financial Officer



**Natwar M. Gandhi**
Chief Financial Officer

## MEMORANDUM

| | |
|---|---|
| **TO:** | **The Honorable Vincent C. Gray**<br>**Chairman, Council of the District of Columbia** |
| **FROM:** | **Natwar M. Gandhi**<br>**Chief Financial Officer** |
| **DATE:** | **November 16, 2010** |
| **SUBJECT:** | **Fiscal Impact Statement – "Anti-SLAPP Act of 2010"** |
| **REFERENCE:** | **Bill Number 18-893, Draft Committee Print Shared with the OCFO on November 15, 2010** |

**Conclusion**

Funds are sufficient in the FY 2011 through FY 2014 budget and financial plan to implement the provisions of the proposed legislation.

**Background**

The proposed legislation would provide a special motion for the quick dismissal of claims "arising from an act in furtherance of the right of advocacy on issues of public interest,"[1] which are commonly referred to as strategic lawsuits against public participation (SLAPPs). SLAPPs are generally defined as retaliatory lawsuits intended to silence, intimidate, or punish those who have used public forums to speak, petition, or otherwise move for government action on an issue. Often the goal of SLAPPs is not to win, but rather to engage the defendant in a costly and long legal battle. This legislation would provide a way to end SLAPPs quickly and economically by allowing for this special motion and requiring the court to hold an expedited hearing on it.

In addition, the proposed legislation would provide a special motion to quash attempts arising from SLAPPs to seek personally identifying information, and would allow the courts to award the costs of litigation to the successful party on a special motion.

---

[1] Defined in the proposed legislation as (A) Any written or oral statement made:  (i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (ii) In a place open to the public or a public forum in connection with an issue of public interest; or (B) Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest.

The Honorable Vincent C. Gray
FIS:  B18-893 "Anti-SLAPP Act of 2010," Draft Committee Print Shared with the OCFO on November 15, 2010

Lastly, the proposed legislation would exempt certain claims from the special motions.

**Financial Plan Impact**

Funds are sufficient in the FY 2011 through FY 2014 budget and financial plan to implement the provisions of the proposed legislation.  Enactment of the proposed legislation would not have an impact on the District's budget and financial plan as it involves private parties and not the District government (the Courts are federally-funded). If effective, the proposed legislation could have a beneficial impact on current and potential SLAPP defendants.

**COMMITTEE PRINT**                                                      1

Committee on Public Safety & the Judiciary                              2

November 18, 2010                                                       3

                                                                        4

                                                                        5

A BILL                                        6


18-893                                        7


IN THE COUNCIL OF THE DISTRICT OF COLUMBIA   8

                                                                        9

To provide a special motion for the quick and efficient dismissal of strategic lawsuits against    10
    public participation, to stay proceedings until the motion is considered, to provide a    11
    motion to quash attempts to seek personally identifying information; and to award the    12
    costs of litigation to the successful party on a special motion.    13

    BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this    14

act may be cited as the "Anti-SLAPP Act of 2010".                      15

    Sec. 2. Definitions.                             16

    For the purposes of this act, the term:          17

    (1)  "Act in furtherance of the right of advocacy on issues of public interest" means:    18

        (A)  Any written or oral statement made:    19

            (i)  In connection with an issue under consideration or review by a    20

legislative, executive, or judicial body, or any other official proceeding authorized by law; or    21

            (ii)  In a place open to the public or a public forum in connection with an    22

issue of public interest.                                              23

1

(B)  Any other expression or expressive conduct that involves petitioning the 1

government or communicating views to members of the public in connection with an issue of 2

public interest. 3

(2)  "Issue of public interest" means an issue related to health or safety; environmental, 4

economic, or community well-being; the District government; a public figure; or a good, product, 5

or service in the market place.  The term "issue of public interest" shall not be construed to 6

include private interests, such as statements directed primarily toward protecting the speaker's 7

commercial interests rather than toward commenting on or sharing information about a matter of 8

public significance. 9

(3)  "Claim" includes any civil lawsuit, claim, complaint, cause of action, cross-claim, 10

counterclaim, or other judicial pleading or filing requesting relief. 11

Sec. 3. Special Motion to Dismiss. 12

(a)  A party may file a special motion to dismiss any claim arising from an act in 13

furtherance of the right of advocacy on issues of public interest within 45 days after service of the 14

claim. 15

(b)  If a party filing a special motion to dismiss under this section makes a prima facie 16

showing that the claim at issue arises from an act in furtherance of the right of advocacy on 17

issues of public interest, then the motion shall be granted unless the responding party 18

demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be 19

denied. 20

(c)(1)  Except as provided in paragraph (2), upon the filing of a special motion to dismiss, 21

discovery proceedings on the claim shall be stayed until the motion has been disposed of. 22

2

(2)  When it appears likely that targeted discovery will enable the plaintiff to 1

defeat the motion and that the discovery will not be unduly burdensome, the court may order that 2

specialized discovery be conducted.  Such an order may be conditioned upon the plaintiff paying 3

any expenses incurred by the defendant in responding to such discovery. 4

(d)  The court shall hold an expedited hearing on the special motion to dismiss, and issue 5

a ruling as soon as practicable after the hearing.  If the special motion to dismiss is granted, 6

dismissal shall be with prejudice. 7

Sec. 4. Special Motion to Quash. 8

(a)  A person whose personally identifying information is sought, pursuant to a discovery 9

order, request, or subpoena, in connection with a claim arising from an act in furtherance of the 10

right of advocacy on issues of public interest may make a special motion to quash the discovery 11

order, request, or subpoena. 12

(b)  If a person bringing a special motion to quash under this section makes a prima facie 13

showing that the underlying claim arises from an act in furtherance of the right of advocacy on 14

issues of public interest, then the motion shall be granted unless the party seeking his or her 15

personally identifying information demonstrates that the underlying claim is likely to succeed on 16

the merits, in which case the motion shall be denied. 17

Sec. 5.  Fees and costs. 18

(a)  The court may award a person who substantially prevails on a motion brought under 19

sections 3 or 4 of this Act the costs of litigation, including reasonable attorney fees. 20

3

(b)  If the court finds that a motion brought under sections 3 or 4 of this Act is frivolous     1

or is solely intended to cause unnecessary delay, the court may award reasonable attorney fees     2

and costs to the responding party.     3

     Sec. 6.  Exemptions.     4

     This Act shall not apply to claims brought against a person primarily engaged in the     5

business of selling or leasing goods or services, if the statement or conduct from which the claim     6

arises is a representation of fact made for the purpose of promoting, securing, or completing sales     7

or leases of, or commercial transactions in, the person's goods or services, and the intended     8

audience is an actual or potential buyer or customer.     9

     Sec. 7.  Fiscal impact statement.     10

     The Council adopts the attached fiscal impact statement as the fiscal impact statement     11

required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December     12

24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).     13

     Sec. 8.  Effective date.     14

     This act shall take effect following approval by the Mayor (or in the event of veto by the     15

Mayor, action by the Council to override the veto), a 30-day period of Congressional review as     16

provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December     17

24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of     18

Columbia Register.     19

4