# Exhibit 79

Testimony of the
**American Civil Liberties Union
of the Nation's Capital**

by

Arthur B. Spitzer
Legal Director

before the

Committee on Public Safety and the Judiciary
of the
Council of the District of Columbia

on

Bill 18-893, the
"Anti-SLAPP Act of 2010"

September 17, 2010

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

The ACLU of the Nation's Capital appreciates this opportunity to testify on Bill 18-893. We support the purpose and the general approach of this bill, but we believe it requires some significant polishing in order to achieve its commendable goals.

### Background

In a seminal study about twenty years ago, two professors at the University of Denver identified a widespread pattern of abusive lawsuits filed by one side of a political or public policy dispute—usually the side with deeper pockets and ready access to counsel—to punish or prevent the expression of opposing points of view. They dubbed these "Strategic Lawsuits Against Public Participation," or "SLAPPs." *See* George W. Pring and Penelope Canan, SLAPPS: GETTING SUED FOR SPEAKING OUT (Temple University Press 1996). They pinpointed several criteria that identify a SLAPP:

— The actions complained of "involve communicating with government officials, bodies, or the electorate, or encouraging others to do so." *Id.* at 150.

— The defendants are "involved in speaking out for or against some issue under consideration by some level of government or the voters." *Id.*

1

— The legal claims filed against the speakers tend to fall into predictable categories such as defamation, interference with prospective economic advantage, invasion of privacy, and conspiracy. *Id.* at 150-51.

— The lawsuit often names "John or Jane Doe defendants." *Id.* at 151. "We have found whole communities chilled by the inclusion of Does, fearing 'they will add my name to the suit.'" *Id.*

The authors "conservatively estimate[d] that … tens of thousands of Americans have been SLAPPed, and still more have been muted or silenced by the threat." *Id.* at xi. Finding that "the legal system is not effective in controlling SLAPPs," *id.*, they proposed the adoption of anti-SLAPP statutes to address the problem. *Id.* at 201.

Responding to the continuing use of SLAPPs by those seeking to silence opposition to their activities, twenty-six states and the Territory of Guam have now enacted anti-SLAPP statutes.[1]

The ACLU of the Nation's Capital has been directly involved, as counsel for defendants, in two SLAPPs involving District of Columbia residents.

In the first case, a developer that had been frustrated by its inability promptly to obtain a building permit sued a community organization (Southeast Citizens for Smart Development) and two Capitol Hill activists (Wilbert Hill and Ellen Opper-Weiner) who had opposed its efforts. The lawsuit claimed that the defendants had violated the developer's rights when they "conducted meetings, prepared petition drives, wrote letters and made calls and visits to government officials, organized protests, organized the preparation and distribution of … signs, and gave statements and interviews to various media," and when they created a web site that urged people to "call, write or e-mail the mayor" to ask him to stop the project. The defendants' activities exemplified the kind of grassroots activism that should be hailed in a democracy, and the lawsuit was a classic SLAPP. The case was eventually dismissed, and the dismissal affirmed on appeal.[2] But the litigation took several years, and during all that time the defendants and their neighbors were worried about whether they might face liability. Because the ACLU represented the citizens and their organization at no charge, they were not financially harmed. But had they been required to retain paid counsel, the cost would have been substantial, and intimidating.

---

[1] Links to these statutes can be found at http://www.casp.net/menstate.html.

[2] *Father Flanagan's Boys Home v. District of Columbia, et al.,* Civil Action No. 01-1732 (D.D.C.), *aff'd*, 2003 WL 1907987 (No. 02-7157, D.C. Cir. 2003).

2

In the second case we represented Dorothy Brizill, who needs no introduction to this Committee. She was sued in Guam for defamation, invasion of privacy, and "interference with prospective business advantage," based on statements she made in a radio interview broadcast there about the activities of the gambling entrepreneur who backed the proposed 2004 initiative to legalize slot machines in the District of Columbia. This lawsuit was also a classic SLAPP, filed against her in the midst of the same entrepreneur's efforts to legalize slot machines on Guam, in an effort to silence her. And to intimidate his opponents, twenty "John Does" were also named as defendants. With the help of Guam's strong anti-SLAPP statute, the case was dismissed, and the dismissal was affirmed by the Supreme Court of Guam.[3] But once again, the litigation lasted more than two years, and had Ms. Brizill been required to retain paid counsel to defend herself, it would have cost her hundreds of thousands of dollars.

As professors Pring and Canan demonstrated, a SLAPP plaintiff's real goal is not to win the lawsuit but to punish his opponents and intimidate them and others into silence. *Litigation itself* is the plaintiff's weapon of choice; a long and costly lawsuit is a victory for the plaintiff even if it ends in a formal victory for the defendant. That is why anti-SLAPP legislation is needed: to enable a defendant to bring a SLAPP to an end quickly and economically.

### Bill 18-893

Bill 18-893 would help end SLAPPs quickly and economically by making available to the defendant a "special motion to dismiss" that has four noteworthy features:
- The motion must be heard and decided expeditiously.
- Discovery is generally stayed while the motion is pending.
- If the motion is denied the defendant can take an immediate appeal.
- Most important, the motion is to be granted if the defendant shows that he or she was engaged in protected speech or activity, unless the plaintiff can show that he or she is nevertheless likely to succeed on the merits.

Speaking generally, this is sensible path to the desired goal, and speaking generally, the ACLU endorses it. If a lawsuit looks like a SLAPP, swims like a SLAPP, and quacks like a SLAPP, then it probably is a SLAPP, and it is fair and reasonable to put the burden on the plaintiff to show that it isn't a SLAPP.

We do, nevertheless, have a number of suggestions for improvement, including a substantive change in the definition of the conduct that is to be protected by the proposed law.

---

[3] *Guam Greyhound, Inc. v. Brizill*, 2008 Guam 13, 2008 WL 4206682.

**Section 2(1).** The bill begins by defining the term "Act in furtherance of the right of free speech," which is used to signify the conduct that can be protected by a special motion to dismiss. In our view, it would be better to use a different term, because the "right of free speech" is already a term in very common use, with a broader meaning than the meaning given in this bill, and it will be impossible, or nearly so, for litigants, lawyers and even judges (and especially the news media) to avoid confusion between the common meaning of the "right of free speech" and the special, narrower meaning given to it in this bill. It would be akin to defining the term "fruit" to mean "a curved yellow edible food with a thick, easily-peeled skin." This specially-defined term deserves a special name that will not require a struggle to use correctly. We suggest "Act in furtherance of the right of advocacy on issues of public interest."

**Section 2(1)(A).** Because there is no conjunction at the end of section 2(1)(A)(i), the bill is ambiguous as to whether sections 2(1)(A)(i) and (ii) are conjunctive or disjunctive. That is, in order to be covered, must a statement be made "In connection with an ... official proceeding" *and* "In a place open to the public or a public forum in connection with an issue of public interest," or is a statement covered if it is made *either* "In connection with an ... official proceeding," *or* "In a place open to the public or a public forum in connection with an issue of public interest"?

We urge the insertion of the word "or" at the end of section 2(1)(A)(i) to make it clear that statements are covered in either case. A statement made "In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" certainly deserves anti-SLAPP protection whether it is made in a public place or in a private place. For example, a statement made to a group gathered by invitation in a person's living room, or made to a Councilmember during a non-public meeting, should be protected. Likewise, a statement made "In a place open to the public or a public forum in connection with an issue of public interest" deserves anti-SLAPP protection whether of not it is also connected to an "official proceeding." For example, statements by residents addressing a "Stop the Slaughterhouse" rally should be protected even if no official proceeding regarding the construction of a slaughterhouse has yet begun.[4]

---

[4] It appears that these definitions, along with much of Bill 18-893, were modeled on the Citizen Participation Act of 2009, H.R. 4364 (111th Cong., 1st Sess.), introduced by Rep. Steve Cohen of Tennessee (*available at* http://thomas.loc.gov/cgi-bin/query/z?c111:H.R.4364.IH:). In that bill it is clear that speech or activity that falls under any one of these definitions is covered.

4

**Section 2(1)(B).** Section 2(1)(B) expands the definition of protected activity to include "any other conduct in furtherance of the exercise of the constitutional right to petition the government or the constitutional right of free expression in connection with an issue of public interest." We fully agree with the intent of this provision, but we think it fails as a definition because it is backwards—it requires a court *first* to determine whether given conduct is protected by the Constitution *before* it can determine whether that conduct is covered by the Anti-SLAPP Act. But if the conduct is protected by the Constitution, then there is no need for the court to determine whether it is covered by the Anti-SLAPP Act: a claim arising from that conduct must be dismissed because the conduct is protected by the Constitution. And yet the task of determining whether given conduct is protected by the Constitution is often quite difficult, and can require exactly the kinds of lengthy, expensive legal proceedings (including discovery) that the bill is intended to avoid.

This very problem arose in the *Brizill* case, where the Guam anti-SLAPP statute protected "acts in furtherance of the Constitutional rights to petition," and Mr. Baldwin argued that the statute therefore provided no broader protection for speech than the Constitution itself provided. *See* 2008 Guam 13 ¶ 28. He argued, for example, that Ms. Brizill's speech was not protected by the statute because it was defamatory, and defamation is not protected by the Constitution. As a result, the defendant had to litigate the constitutional law of defamation on the way to litigating the SLAPP issues. This should not be necessary, as the purpose of an anti-SLAPP law is to provide broader protection than existing law already provides. Bill 18-893 should be amended to avoid creating the same problem here.[5]

We therefore suggest amending Section 2(1)(B) to say: "Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest."

**Section 2(4).** Section 2(4) defines the term "government entity." But that term is never used in the bill. It should therefore be deleted.[6]

---

[5] The Supreme Court of Guam ultimately rejected the argument that "Constitutional rights" meant "constitutionally protected rights," *see id.* at ¶ 32, but that was hardly a foregone conclusion, and the D.C. Court of Appeals might not reach the same conclusion under Section 2(1)(B).

[6] The same term is defined in H.R. 4364, but it is then used in a section providing that "A government entity may not recover fees pursuant to this section."

5

**Section 3(b).**  We agree with what we understand to be the intent of this provision, setting out the standards for a special motion to dismiss.  But the text of this section fails to accomplish its purpose because it never actually spells out what a court is supposed to do.  We suggest revising Section 3(b) as follows:

> (b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

**Section 3(c).**  We agree that discovery should be stayed on a claim as to which a special motion to dismiss has been filed.  This is an important protection, for discovery is often burdensome and expensive.  Because expression on issues of public interest deserves special protection, a plaintiff who brings a claim based on a defendant's expression on an issue of public interest ought to be required to show a likelihood of success on that claim without the need for discovery.

A case may exist in which a plaintiff could prevail on such a claim after discovery but cannot show a likelihood of success without discovery, but in our view the dismissal of such a hypothetical case is a small price to pay for the public interest that will be served by preventing the all-but-automatic discovery that otherwise occurs in civil litigation over the sorts of claims that are asserted in SLAPPs.

As an exception to the usual stay of discovery, Section 3(c) permits a court to allow "specified discovery" after the filing of a special motion to dismiss "for good cause shown."  We agree that a provision allowing some discovery ought to be included for the exceptional case.  But while the "good cause" standard has the advantage of being flexible, it has the disadvantage of being completely subjective, so that a judge who simply feels that it's unfair to dismiss a claim without discovery can, in effect, set the Anti-SLAPP Act aside and allow a case to proceed in the usual way.  In our view, it would be better if the statute spelled out more precisely the circumstances under which discovery might be allowed, and also included a provision allowing the court to assure that such discovery would not be burdensome to the defendant.  For example: "…except that the court may order that specified discovery be conducted when it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome.  Such an order may be conditioned upon the plaintiff paying any expenses incurred by the defendant in responding to such discovery."

Finally, we note that this section provides that discovery shall be stayed "until notice of entry of an order disposing of the motion." That language tracks H.R. 4364, but "notice of entry" of court orders is not part of D.C. Superior Court procedure. We suggest that the bill be amended to provide that "... discovery proceedings on the claim shall be stayed until the motion has been disposed of, including any appeal taken under section 3(e), ..."

**Sections 3(d) and (e).** We agree that a special motion to dismiss should be expedited and that its denial should be subject to an interlocutory appeal. The Committee may wish to consider whether the Court of Appeals should also be directed to expedite its consideration of such an appeal. The D.C. Court of Appeals often takes years to rule on appeals.

**Section 4.** Section 4 is focused on the fact that SLAPPs frequently include unspecified individuals (John and Jane Does) as defendants. As observed by professors Pring and Canan, this is one of the tactics employed by SLAPP plaintiffs to intimidate large numbers of people, who fear that they may become named defendants if they continue to speak out on the relevant public issue.

There can be very legitimate purposes for naming John and Jane Does as defendants in civil litigation. The ACLU sometimes names John and Jane Does as defendants when it does not yet know their true identities—for example, when unknown police officers are alleged to have acted unlawfully.[7] It is therefore necessary to balance the right of a plaintiff to proceed against an as-yet-unidentified person who has violated his rights, and to use the court system to discover that person's identity, against the right of an individual not to be made a defendant in an abusive SLAPP that was filed for the purpose of retaliating against, or chilling, legitimate civic activity.

We believe that Section 4 strikes an appropriate balance by making available to a John or Jane Doe a "special motion to quash," protecting his or her identity from disclosure if he or she was acting in a manner that is protected by the Anti-SLAPP Act, and if the plaintiff cannot make the same showing of likely success on the merits that is required to defeat a special motion to dismiss.

Like Section 3(b), however, Section 4(b) never actually spells out what a court is supposed to do. We therefore suggest revising Section 4(b) in the same manner we suggested revising Section 3(b):

---

[7] *See, e.g., YoungBey v. District of Columbia, et al.*, No. 09-cv-596 (D.D.C.) (suing the District of Columbia, five named MPD officers, and 27 "John Doe" officers in connection with an unlawful pre-dawn SWAT raid of a District resident's home).

7

> (b) If a person bringing a special motion to quash under this section makes a prima facie showing that the underlying claim arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the party seeking his or her personally identifying information demonstrates that the underlying claim is likely to succeed on the merits, in which case the motion shall be denied.

**Section 6(a).** Section 6(a) provides that "This Act shall not apply to claims brought solely on behalf of the public or solely to enforce an important right affecting the public interest." This language is vague and tremendously broad. Almost any plaintiff can and will assert that he is bringing his claims "to enforce an important right affecting the public interest," and neither this bill nor any other source we know gives a court any guidance regarding what "an important right affecting the public interest" might be. The plaintiffs in the two SLAPP suits described above, in which the ACLU of the Nation's Capital represented the defendants, vigorously argued that they were seeking to enforce an important right affecting the public interest: the developer argued that it was seeking to provide housing for disadvantaged youth; the gambling entrepreneur argued that he was seeking to prevent vicious lies from affecting the result of an election.

Thus, this provision will almost certainly add an entire additional phase to the litigation of every SLAPP suit, with the plaintiff arguing that the anti-SLAPP statute does not even apply to his case because he is acting in the public interest. To the extent that courts accept such arguments, this provision is a poison pill with the potential to turn the anti-SLAPP statute into a virtually dead letter. At a minimum, it will subject the rights of SLAPP defendants to the subjective opinions of more than 75 different Superior Court judges regarding what is or is not "an important right affecting the public interest."

Moreover, we think the exclusion created by Section 6(a) is constitutionally problematic because it incorporates a viewpoint-based judgment about what is or is not in the public interest—after all, what is in the public interest necessarily depends upon one's viewpoint.

—Assume, for example, that D.C. Right To Life (RTL) makes public statements that having an abortion causes breast cancer. Assume Planned Parenthood sues RTL, alleging that those statements impede its work and cause psychological harm to its members. RTL files a special motion to dismiss under the Anti-SLAPP Act, showing that it was communicating views to members of the public in connection with an issue of public interest. But Planned Parenthood responds that its lawsuit is not subject to the Anti-SLAPP Act because it was

8

"brought ... solely to enforce an important right affecting the public interest," to wit, the right to reproductive choice.

—Now assume that Planned Parenthood makes public statements that having an abortion under medical supervision is virtually risk-free. RTL sues Planned Parenthood, alleging that those statements impede its work and cause psychological harm to its members. Planned Parenthood files a special motion to dismiss under the Anti-SLAPP Act, showing that it was communicating views to members of the public in connection with an issue of public interest. But RTL responds that its lawsuit is not subject to the Anti-SLAPP Act because it was "brought ... solely to enforce an important right affecting the public interest," to wit, the right to life.

Are both lawsuits exempt from the Anti-SLAPP Act? Neither? One but not the other? We fear that the result is likely to depend on the viewpoint of the judge regarding which asserted right is "an important right affecting the public interest." But the First Amendment requires the government to provide evenhanded treatment to speech on all sides of public issues. We see no good reason for the inclusion of Section 6(a), and many pitfalls. Accordingly, we urge that it be deleted.[8]

Thank you for your consideration of our comments.

---

[8] Section 10 of H.R. 4364, on which Section 6(a) of Bill 18-893 is modeled, begins with the catchline "Public Enforcement." It therefore appears that Section 10 was intended to exempt only enforcement actions brought by the government.

Even if that is true, we see no good reason to exempt the government, as a litigant, from a statute intended to protect the rights of citizens to speak freely on issues of public interest. To the contrary, the government should be held to the strictest standards when it comes to respecting those rights. *See, e.g., White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) (holding that the advocacy activities of neighbors who opposed the conversion of a motel into a multi-family housing unit for homeless persons were protected by the First Amendment, and that an intrusive eight-month investigation into their activities and beliefs by the regional Fair Housing and Equal Opportunity Office violated their First Amendment rights).

We therefore urge the complete deletion of Section 6(a), as noted above. However, if the Committee does not delete Section 6(a) entirely, its coverage should be limited to lawsuits brought by the government.

9