**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION**<br><br><br>This Document Relates to All Cases Filed Against Defendant Personal Care Products Council | **Civil Action No. 3:16-md-2738-FLW-LHG**<br><br>**MDL No. 2738** |

**THE PLAINTIFFS' STEERING COMMITTEE'S OPPOSITION IN RESPONSE TO
DEFENDANT PERSONAL CARE PRODUCT COUNCIL'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION .............................................................................................. 1

LEGAL STANDARD......................................................................................... 1

CHOICE OF LAW ............................................................................................ 1

SUMMARY OF FACTS .................................................................................... 6

ARGUMENT ................................................................................................... 8

I.      THE *NOERR-PENNINGTON* DOCTRINE DOES NOT PROVIDE BLANKET
        IMMUNITY FOR PCPC'S ACTIONS. ............................................................. 9

        A.      An Analysis of *Noerr-Pennington* under District of Columbia Law Demonstrates
                that PCPC Is Not Entitled to Immunity. ............................................. 12

        B.      An Analysis of *Noerr-Pennington* under New Jersey Law Demonstrates that
                PCPC Is Not Entitled to Immunity. ..................................................... 16

II.     THE DISTRICT OF COLUMBIA ANTI-SLAPP ACT DOES NOT SHIELD PCPC
        FROM PLAINTIFFS' CLAIMS.................................................................... 18

        A.      PCPC's Motion is Procedurally Improper and Untimely. ..................... 18

        B.      The District of Columbia Anti-SLAPP Act does not protect PCPC's private,
                commercial activities and statements..................................................... 20

                1. PCPC fails to make a prima facie showing—as required—that the actions
                alleged by Plaintiffs were acts in the furtherance of the right of advocacy. ......... 20

                2. PCPC acted in furtherance of its own and its members' *private, commercial
                interests* and not on issues of *public interest*. ...................................... 31

                3. The legislative history of the Act confirms that PCPC is not entitled to Anti-
                SLAPP protection. .............................................................................. 36

                4. The court in *Simpson* misapplied the law and facts in that case, and this Court
                should not rely on the analysis in *Simpson*. .......................................... 37

                5. PCPC has failed to establish a prima facie case under the Act; therefore,
                Plaintiffs are not required to prove the likelihood of their success on the merits. 39

III.    PLAINTIFFS' COMMON LAW CLAIMS PRESENT GENUINE DISPUTES OF FACT
        FOR DETERMINATION BY A JURY. ............................................................ 39

        A.      Plaintiffs' Negligence Claim Presents Genuine Disputes of Material Facts. ....... 40

B.     Plaintiffs' Fraud and Fraudulent Concealment Claims Present Genuine Disputes of Material Facts. ................................................................................................. 44

C.     Plaintiffs' Conspiracy Claim Presents Genuine Disputes of Material Fact. ......... 52

1. PCPC entered into an agreement with J&J and other companies. .................... 53

2. As part of the agreement, PCPC participated in unlawful acts. ........................ 55

3. Plaintiffs' injuries were caused by the unlawful and tortious acts performed by members of the conspiracy in furtherance of their common scheme. .................. 56

IV.    EVEN IF THE NEW JERSEY PRODUCT LIABLITY ACT APPLIED HERE, IT WOULD NOT PRECLUDE PLAINTIFFS' CLAIMS. ................................................... 56

CONCLUSION .......................................................................................................................... 59

## TABLE OF AUTHORITIES

### CASES

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001) ........................... 17

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) .................................... 10

*Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691 (D.N.J. 2011) .................................... 59

*Barry v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 17674 (D.D.C. Feb. 4, 2020) ............. 5

*Becker v. Tessitore*, 356 N.J. Super. 233, 812 A.2d 369 (App. Div. 2002) ................................. 57

*Beckwith v. Bethlehem Steel Corp.*, 182 N.J. Super 376, 440 A.2d 1372 (Law Div. 1981) ......... 57

*Bennett v. Kiggins*, 377 A.2d 57 (D.C. 1977) ................................................................................ 44

*California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ............................ 10

*Cevenini v. Archbishop of Washington*, 707 A.2d 768 (D.C.1998) .............................................. 50

*Choose Energy, Inc. v. Amer. Petroleum Inst.*, 87 F. Supp. 3d 1218 (N.D. Cal. 2015) .............. 35

*City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991) ............................... 10

*City Solutions Inc. v. Clear Channel Communications, Inc.,* 365 F.3d 835 (9th Cir.2004) ......... 50

*Comm. to Protect Our Agric. Water v. Occidental Oil & Gas*, 235 F. Supp. 3d 1132 (E.D. Cal. 2017) ................................................................................................................................ 15

*Covad Comm'cns Co. v. Bell Atlantic Corp.*, 398 F.3d 666 (D.C. Cir. 2005) ............................. 12

*D.C. v. Zukerberg,* 880 A.2d 276 (D.C. 2005) ............................................................................. 44

*Diamond v. Davis*, 680 A.2d 364 (D.C. 1996) ............................................................................. 51

*District of Columbia v. Watkins*, 684 A.2d 395 (D.C.1996) ........................................................ 41

*District of Columbia v. White*, 442 A.2d 159 (D.C. 1982) .......................................................... 40

*District of Columbia v. Wilson*, 721 A.2d 591 (D.C.1998) ......................................................... 41

*Doe v. Burke*, 2016 WL 932799 (D.C. Mar. 10, 2016) ............................................................... 20

*Drake v. McNair*, 993 A.2d 607 (D.C. 2010) .............................................................................. 50

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) .................................................................................................................................. passim

*Estate of Chappelle v. Sanders*, 442 A.2d 157 (D.C.1982) ........................................................ 50

*Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d 724 (D.C. 2000) .................... 53, 55

*Firestone v. Firestone,*  76 F.3d 1205 (1996) ............................................................................. 51

*Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999 (D.C. 2020)............................................. 44

*Fraser v. Bovino*, 317 N.J. Super 23 (App. Div. 1998) .............................................................. 15

*Gonzalez v. Borough of Red Bank*, 2020 U.S. Dist. LEXIS 74178 (D.N.J. Apr. 28, 2020) ........... 1

*Griva v. Davison,* 637 A.2d 830 (D.C.1994) .............................................................................. 53

*Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983) ........................................................... 53, 55

*Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011)................................................ 40

*Henao v. Smiths Detection,* Inc., No. CV 18-2564 (TJK), 2019 WL 2476631 (D.D.C. June 13, 2019) ......................................................................................................................................... 40

*Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31 (D.C. 1989) ......................................... 4

*Hernandez v. Amcord, Inc.*, 215 Cal. App. 4th 659, 678-79 (Cal. Ct. App. 2013)....................... 11

*In re Accutane Litig.*, 235 N.J. 229 (2018) .............................................................................. 2, 3

*In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 789 (7th Cir. 1989)......... 11

*In re Cheerios Mktg. & Sales Practices Litig.*, 2012 WL 3952069 (D.N.J. Sept. 10, 2012).......... 2

*In re Lead Paint Litig.*, 191 N.J. 405 (2007)............................................................................. 58

*International Underwriters v. Boyle,* 365 A.2d 779 (D.C.1976)................................................. 53

*Kaiser-Georgetown Cmty. Health Plan, Inc. v. Stutsman*, 491 A.2d 502 (D.C. 1985) ................. 5

*Koruba v. Am. Honda Motor Co.*, 396 N.J. Super. 517 (App. Div. 2007) ............................. 58, 59

*Main St. at Woolwich, LLC v. Ammons Supermarket, Inc.*, 165 A.3d 821 (N.J. App. Div. 2017)16

*McAlonan v. Tracy*, No. A-6034-07T2, 2011 WL 6125 (N.J. Super. Ct. App. Div., Mar. 16, 2010) ................................................................................................................................... 16, 17

*McBryde v. Amoco Oil Co.,* 404 A.2d 200 (1979)...................................................................... 53

*Murray v. Motorola, Inc.*, 2011 D.C. Super. LEXIS 3 .............................................................. 42

*Nader v. The Democratic Nat. Comm.*, 555 F. Supp. 2d 137 (D.D.C. 2008) ........................ 12, 13

*Oveissi v. Islamic Republic of Iran*, 573 F.3d 835 (D.C. Cir. 2009) ............................................... 4

*Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615 (3d Cir. 2020) ............................ 1

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) ...................................................................................................................................... 10

*Pyles v. HSBC Bank USA, N.A.,* 172 A.3d 903 (D.C. 2017) ....................................................... 44

*Sherrod v. Breitbart*, 720 F.3d 932 (D.C. Cir. 2013) ................................................................. 19

*Smith v. United States*, 157 F. Supp. 3d 32 (D.D.C. 2016) ......................................................... 40

*Stone v. Troy Constr., LLC*, 935 F.3d 141 (3d Cir. 2019) ........................................................... 1

*Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016) ..................................... 5

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965) ................................................. passim

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ................................. 13

*Venetian Casino Resort v. N.L.R.B.*, 793 F.3d 85 (D.C. Cir. 2015) ..................................... 12, 13

*Village Supermarket, Inc. v. Mayfair*, 269 N.J. Super. 224 (Law Div. 1995) ............................ 15

*Virginia Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc.,* 878 A.2d 1226 (D.C. 2005) ................................................................................................................... 50

*Waldon v. Covington,* 415 A.2d 1070 (D.C.1980) ...................................................................... 55

*Wash. Metro. Area Transit Auth. v. Ferguson*, 977 A.2d 375 (D.C. 2009) ................................. 40

*Weishapl v. Sowers*, 771 A.2d 1014 (D.C. 2001) ....................................................................... 53

*Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995) ........................................................................ 12

*William J. Davis, Inc. v. Young*, 412 A.2d 1187 (D.C.1980) ...................................................... 50

*Williams v. Williams*, 390 A.2d 4 (D.C. 1978) ............................................................................ 5

*Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2012 U.S. Dist. LEXIS 2160, at *17-19 (E.D. Pa. Jan. 9, 2012) ....................................................................................................................................... 11

## STATUTES

District of Columbia Anti-SLAPP Act of 2010, DC Code § 16-5502 ................................... passim

New Jersey Product Liability Act, N.J.S.A. 2A:58C-8 ........................................................ 56, 57

**TREATISES**

*Restatement (Second) Conflict of Laws* ...................................................................................... 2, 3

**REGULATIONS**

Federal Register, Vol 37, No. 202-Wednesday, October 18, 1972 .............................................. 45

## INTRODUCTION

Plaintiffs with cases pending against Defendant Personal Care Products Council (PCPC), by and through the Plaintiffs' Steering Committee (PSC), submit this Opposition in response to PCPC's Motion for Summary Judgment (ECF No. 9713). In its Motion, PCPC argues that it is shielded from liability under the *Noerr-Pennington* doctrine and the District of Columbia Anti-SLAPP Act and that Plaintiffs' claims fail as a matter of law. As discussed in this Opposition, PCPC's arguments fail, and the Court should deny its Motion.

## LEGAL STANDARD

When reviewing a motion for summary judgment, a court must "view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Stone v. Troy Constr., LLC*, 935 F.3d 141, 147 n.6 (3d Cir. 2019)).

As this Court has previously stated, "[i]n deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. . . . [c]redibility determinations are the province of the factfinder." *Gonzalez v. Borough of Red Bank*, 2020 U.S. Dist. LEXIS 74178, at *9 (D.N.J. Apr. 28, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992)).

## CHOICE OF LAW

At issue here are cases filed against PCPC that have designated either New Jersey or the District of Columbia as the venue for remand.[1] In an MDL, the transferee court applies the

---

[1]     New Jersey and the District of Columbia are the only jurisdictions at issue because pursuant to Case Management Order No. 10 "each and every civil action" that was designated for remand to a U.S. District Court other than New Jersey or the District of Columbia was dismissed as to Defendant PCPC.

choice-of-law rules of the transferor court (venue designated for remand).  *See In re Cheerios Mktg. & Sales Practices Litig.*, 2012 WL 3952069, *7 (D.N.J. Sept. 10, 2012); *see also* Case Management Order No. 2 ("[choice-of-law] determinations shall be made in accordance with the law of the jurisdiction that would apply to the action had the matter been initially filed in the Original District[] . . . *i.e.*, the district to which the Plaintiff seeks transfer upon completion of pretrial proceedings.").[2] Therefore, to determine what state's substantive law will apply, this Court must make a choice-of-law determination for the cases designated for remand to New Jersey applying New Jersey's choice-of-law rules and another choice-of-law determination for the cases designated for remand to the District of Columbia applying D.C.'s choice-of-law rules.

Here, the choice-of-law analyses for both New Jersey and the District of Columbia indicate that the substantive laws of the District of Columbia should apply to the cases designated for remand to New Jersey ***and*** to the cases designated for remand to the District of Columbia.

**New Jersey Choice-of-Law Analysis.** In New Jersey, when a conflict of law arises, New Jersey courts apply the "most-significant-relationship" test set out in the *Restatement (Second) Conflict of Laws* ("*Conflict Restatement*") to determine which state's substantive law applies. *In re Accutane Litig.*, 235 N.J. 229, 257 (2018). Generally, under the most-significant-relationship test "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in [*Conflict Restatement*] § 6 to the occurrence and the parties, in which event the local law of the other state will be applied." *Id.* at 259-60 (quoting

---

[2]     Case Management Order No. 2 was the "Direct Filing Order" that permitted cases to be directly filed in this MDL Court but without the case losing an ability to be remanded to the Court where the case would have been originally filed.

*Conflict Restatement* §146). A New Jersey court will consider the following factors to determine whether the law of a state other than the state of injury will control:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

*Id.* at 260 (quoting *Conflict Restatement* §145).

An analysis of these factors confirms that the substantive laws of the District of Columbia apply to all cases designating New Jersey as the venue for remand.

On the first factor, the individuals who have designated New Jersey as their venue for remand were likely injured in multiple states, but it's unlikely that many—if any—of these Plaintiffs were actually injured in New Jersey.  Because Co-Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc.[3] are New Jersey corporations, New Jersey resident  plaintiffs cannot establish subject-matter jurisdiction in federal court because there would be no diversity of citizenship between a New Jersey resident plaintiff and the Johnson & Johnson Defendants. Accordingly, there should not be any New Jersey residents in this MDL. As a result, it's likely that none of the plaintiffs seeking remand to New Jersey were actually injured in New Jersey, considering that most people receive medical treatment in the states where they reside. Accordingly, this factor does not weigh in favor of one state in particular, but rather supports applying the law of the individual states where plaintiffs were injured.

On the second factor, as it relates to PCPC, the conduct that caused Plaintiffs' injuries occurred in the District of Columbia. PCPC coordinated its defense of talc, including the

---

[3]     In this Opposition, Johnson & Johnson and Johnson & Johnson Consumer Inc. are collectively referred to as either the Johnson & Johnson Defendants or J&J.

promotion and dissemination of misinformation about talc, from its District of Columbia offices. PCPC also established standards and testing methods for talc at its District of Columbia offices. Accordingly, this factor weighs strongly in favor of applying the law of the District of Columbia.

On the third factor, the plaintiffs reside in multiple states.[4]  However, PCPC is incorporated in, and has its principal place of business in, the District of Columbia. Since the plaintiffs are from different states but are all suing PCPC, a District of Columbia corporation, this factor also weighs in favor of applying the law of the District of Columbia.

On the fourth factor, the relationship between the parties is centered in the District of Columbia. PCPC operates out of the District of Columbia, and, as discussed throughout this Opposition, coordinated relevant activities with other Defendants and committed tortious acts against Plaintiffs in the District of Columbia. This factor also weighs in favor of applying the law of the District of Columbia.

All in all, New Jersey's most-significant-relationship test strongly supports applying the substantive law of the District of Columbia to all cases in which New Jersey is designated as the venue for remand.

**District of Columbia Choice-of-Law Analysis.** When there is a conflict of laws, District of Columbia courts "blend a governmental interests analysis with a most significant relationship test." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009) (citing *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40-41 & n.18 (D.C. 1989) (internal quotations omitted)).

---

[4]      Again, none of the Plaintiffs should be residents of New Jersey because New Jersey plaintiffs would not able to allege federal subject matter jurisdiction.

The governmental interests test looks "to evaluate the governmental policies underlying the applicable laws and to determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Kaiser-Georgetown Cmty. Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985) (quoting *Williams v. Williams*, 390 A.2d 4, 5-6 (D.C. 1978)). Here, while both New Jersey and the District of Columbia have interests in applying their laws, the above discussion of the connection that New Jersey has to the claims against PCPC demonstrates that New Jersey's interest is minimal. Few Plaintiffs, if any, are actually residents of New Jersey because such a Plaintiff would not have subject matter jurisdiction in federal court. While the Johnson & Johnson Defendants are from New Jersey, the focus in this motion is on PCPC, which is located in Washington, D.C. The relevant conduct of the Johnson & Johnson Defendants in New Jersey is minimally relevant to the claims against PCPC, whose conduct occurred in Washington, D.C.  On balance, based on the current factual record, the interests of the District of Columbia outweigh the interests of New Jersey as to the conduct of PCPC.  Importantly, even if the interests were equal, D.C. law would still apply to because,  "[a]s a general rule, the law of the forum governs, unless the foreign state has a ***greater*** interest in the controversy." *Barry v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 17674, *45 (D.D.C. Feb. 4, 2020) (quoting *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 39 (D.D.C. 2016)) (internal quotations marks omitted) (emphasis added). Absent any clear evidence or justification for why New Jersey has a greater interest than the District of Columbia in seeing its laws applied to the claims against PCPC, this part of the District of Columbia's choice-of-law analysis leads to the application of the law of the District of Columbia.

The most-significant-relationship test in the District of Columbia follows the same factors as New Jersey. For the same reasons discussed above. these factors also lead to the

application of the law of the District of Columbia for the cases designated for remand to the District of Columbia.

In conclusion, the substantive laws of the District of Columbia will apply to all cases filed against PCPC, regardless of whether New Jersey or the District of Columbia is the venue for remand.[5]

## SUMMARY OF FACTS

The Personal Care Products Council[6] is the trade association for the cosmetics industry. During the relevant timeframe, Johnson & Johnson has been an active member of PCPC. Over the course of five decades, PCPC—in coordination with J&J, other cosmetic companies, and third parties—actively sought to suppress, conceal, and misrepresent information related to the dangers of talc used in cosmetic products, including Johnson's Baby Powder and Shower to Shower.

In the 1970s, PCPC formed a Talc Task Force in order to coordinate the industry's response to claims that cosmetic talc contained asbestos and ultimately PCPC and the Talc Task Force created testing standards for asbestos that would become the industry standard. Over the next four decades, PCPC convened the Talc Task Force any time an issue arose related to the safety of talc. In the 1980s, for example, the Talc Task Force sought to discredit epidemiology studies and concerns related to the association between talc and ovarian cancer. In the 1990s and 2000s, the Talc Task Force worked to ensure that talc was not listed as a carcinogen by the

---

[5]    If the Court holds that the law of the District of Columbia applies, it need not consider PCPC's arguments based on the New Jersey Product Liability Act.  Instead, the Court need only address whether the District of Columbia Anti-SLAPP Act and District of Columbia common law would preclude liability against PCPC.

[6]    PCPC was formerly known as the Cosmetics, Toiletry and Fragrance Association (CTFA). For the purposes of this brief and in cited documents, the acronyms PCPC and CTFA are interchangeable.

government and to discredit additional studies on the association between talc and ovarian cancer.

In 1976, PCPC created the Cosmetic Ingredient Review (CIR). The purported purpose of the CIR was to review the safety of cosmetic ingredients. However, rather than creating an independent review panel that operated with scientific rigor, PCPC created the CIR to be an industry puppet it used to rubber stamp the safety of cosmetic ingredients used by PCPC's member companies and ensure they would not be subject to any additional regulations. The CIR is completely funded by PCPC and shares the same office with PCPC. CIR staff (rather than the expert panel members) write the safety assessment published by CIR, and the CIR expert panel spends very little time actually discussing the safety of ingredients it review. And despite the fact that PCPC was aware of safety concerns related to talc, the CIR did not perform a review of talc until the early 2010s. When it did finally perform its review, it allowed an inappropriate amount of industry influence and control over the process, resulting in the publication of a safety assessment that misrepresented the science about talc.

PCPC also developed and published specifications and definitions for cosmetic ingredients. These specifications and definitions were adopted as industry standards by member companies and are used by the industry to substantiate the safety of ingredients used in cosmetics despite the fact that these standards are inadequate.

As described in much greater detail below, through all of these actions, PCPC breached its duty to consumers to substantiate the safety of talc and participated in a conspiracy with J&J and others to misrepresent and conceal the dangers of talc, to the detriment of Plaintiffs.

## ARGUMENT

In it Motion, PCPC advances four arguments as to why the Court should enter summary judgment in its favor. For reasons discussed in this Opposition, all of these arguments fail.

First, PCPC argues that the *Noerr-Pennington* doctrine shields it from liability "for actions relating to petitioning the government." (PCPC Mem. at 1.)[7] However, the U.S. Supreme Court as well as courts in the District of Columbia have never applied this doctrine in a product liability case alleging negligence, fraud, and conspiracy. And, contrary to PCPC's assertions, this doctrine does not insulate PCPC's action in this case, especially because Plaintiffs are not claiming liability solely on the basis of PCPC's acts of petitioning the government. Further, even if applicable, PCPC's material misrepresentations fall outside the boundary of protection provided by this doctrine.

Second, PCPC argues that the District of Columbia Anti-SLAPP Act "precludes liability arising from advocacy on issues of public interest." (*Id.*) As an initial matter, PCPC's motion is untimely in all (or almost all cases) at issue here because PCPC did not file a special motion to dismiss within 45 days of service of the complaints as required by the Act. Even if the Court finds the motion timely filed, Plaintiffs' claims are not related solely to statements made by PCPC to the government or in public forums. And because PCPC advocated for private, commercial interests instead of on issues of public interest, it is not afforded protection under the Act for any of its actions.

Third, PCPC argues that there are no genuine disputes of material fact in Plaintiffs' common law claims of negligence, fraud, fraudulent concealment, and conspiracy. (*Id.*) As

---

[7]     Defendant Personal Care Products Council's Memorandum of Law in Support of its Motion for Summary Judgment is referred to herein as "PCPC Mem. at ___."

detailed in Section III, *infra*, Plaintiffs' claims most certainly raise genuine disputes of material fact that should be resolved by a jury.

Finally, PCPC argues the New Jersey Product Liability Act (NJPLA) subsumes all common law claims and precludes liability because PCPC is not a manufacturer or seller. As Plaintiffs argue, based on a choice-of-law analysis, District of Columbia law—not New Jersey law—applies to cases filed against PCPC; therefore, the NJPLA is not applicable. Even if it were, PCPC's arguments rely on a narrow and inaccurate reading of what defines a "seller" under the NJPLA.

For these reasons, the Court should deny PCPC's Motion.

## I.   THE *NOERR-PENNINGTON* DOCTRINE DOES NOT PROVIDE BLANKET IMMUNITY FOR PCPC'S ACTIONS.

The *Noerr-Pennington* Doctrine does not immunize tortious conduct in the public, scientific, academic, or commercial marketplace. By moving for summary judgment and claiming immunity for its misrepresentations concerning talc while simultaneously preventing the public from learning about the dangers and harms of talcum powder products, Defendant PCPC demands this Court extend this common law doctrine outside the boundaries of all prior lower court decisions and far beyond the original intent of the United States Supreme Court.

The *Noerr-Pennington*  doctrine arose to protect legitimate associational activity from federal antitrust scrutiny.  Through the doctrine's two namesake cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), the Supreme Court held that private parties are immune from federal antitrust liability when multiple actors work together to legitimately attempt to influence the passage or enforcement of legislation that might otherwise have anticompetitive effects.

The United States Supreme Court has shown substantive and operative restraint regarding application of the *Noerr-Pennington* doctrine.  Substantively, the Supreme Court has never applied the *Noerr-Pennington* doctrine outside of the antitrust or federal labor law context. *See, e.g.*, *Allied Tube*; *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991); *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993).  This is not an antitrust or labor-related case.

Operatively, the Supreme Court has specified that parties exercise their right to petition when they "advocate their causes and points of view respecting resolution of their business and economic interests," *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972), or attempt to "influence the passage or enforcement of laws," *Noerr*, 365 U.S. at 135. Whether conduct constitutes protected petitioning activity "depends not only on its impact, but also on the context and nature of the activity." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 504 (1988).  However, the protection does not "cover activity that was not genuinely intended to influence government action." *Id*. at 508 n. 10.

Plaintiffs are not seeking to impose liability on Defendants, including PCPC, because of any concerted efforts to "petition" the federal government to obtain favorable legislation or regulatory action.  Rather, Plaintiffs seek to hold Defendant PCPC liable for its tortious failure to warn, misrepresentations, intentional concealment of relevant information, and other tortious conduct aimed at Plaintiffs and other users of talcum powder.

Despite PCPC's claim that it "cannot be liable for exercising its First Amendment right to lobby and its related publicity activities," *Noerr-Pennington's* application affords Defendant no protection for the causes of action levied against it.  (*See* PCPC Mem. at 4.). To the extent *Noerr-Pennington* could apply to the legal claims at issue here, Plaintiffs are not alleging that the

inducement of any governmental action on the part of PCPC caused Plaintiffs to develop ovarian cancer.  Rather, Plaintiffs allege that PCPC is liable for tort claims arising out of injuries caused to Plaintiffs and the consuming public due to PCPC's negligent and intentional conduct, as discussed in later sections of this Opposition, despite knowledge of talcum powder's health and safety risks.  Existing evidence shows that PCPC knew of the increased risk of ovarian cancer that talcum powder products posed, but nonetheless attempted to manipulate governmental and non-governmental public discourse through deliberate misrepresentations and misinformation. To the extent PCPC argues that there is disagreement regarding the science and research concerning talc, thereby making its statements justifiable (PCPC Mem. at 7), its position raises questions of material fact best left for a jury.  Even if this Court were to indulge PCPC's strained arguments that *Noerr-Pennington*  immunity applies to their activities directed at petitioning the government, a jury may find that Defendant's conduct either falls short of the safe-harbor provided by *Noerr-Pennington* or that its conduct was directed at the public and at forestalling government oversight, stripping them of *Noerr-Pennington* immunity and rendering this issue inappropriate for disposition by summary judgment.

"[T]he *Noerr-Pennington* doctrine is not a rule of evidence."  *Hernandez v. Amcord, Inc.*, 215 Cal. App. 4th 659, 678-79 (Cal. Ct. App. 2013); *see also, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 789 (7th Cir. 1989) (Posner, J.) ("The district judge thus erred in…treating the [*Noerr-Pennington*] doctrine as a rule of evidence that forbids the introduction of evidence."); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2012 U.S. Dist. LEXIS 2160, at *17-19 (E.D. Pa. Jan. 9, 2012) (same).  Because the doctrine is not a rule of evidence, in the context of state law claims like those brought by Plaintiffs in this case, the applicability of *Noerr-Pennington* immunity is a matter of substantive state law.  Neither the laws of New Jersey

nor Washington D.C. support Defendant's claim that *Noerr-Pennington* immunizes PCPC from liability for its tortious conduct.

> **A.    An Analysis of *Noerr-Pennington* under District of Columbia Law Demonstrates that PCPC Is Not Entitled to Immunity.**

The *Noerr–Pennington* doctrine holds that defendants who petition the government for redress of grievances, "whether by efforts to influence legislative or executive action or by seeking redress in court," are immune from liability for such activity under the First Amendment. *Covad Comm'cns Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005). As noted above, the doctrine's provenance lies in the field of antitrust law, but like many jurisdictions, courts in the District of Columbia have extended its scope to include common-law torts such as malicious prosecution and abuse of process. *Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995). However, the District of Columbia has never expanded the *Noerr-Pennington* doctrine to operate as a *per se* bar against liability for tort claims sounding in negligence or fraud in the product liability context.

PCPC is attempting to fit a square peg into a round hole. The legal authority PCPC claims vests it with immunity under *Noerr-Pennington* bears almost no relation whatsoever to either the facts of this dispute or the causes of action arising therefrom. PCPC cites to *Nader v. The Democratic Nat. Comm.*, 555 F. Supp. 2d 137 (D.D.C. 2008) and *Venetian Casino Resort v. N.L.R.B.*, 793 F.3d 85 (D.C. Cir. 2015) as support for the proposition that "efforts to influence legislative or executive action or by seeking redress in court, are immune from liability for such activity under the First Amendment." *Nader,* 555 F. Supp. 2d at 156. But PCPC's tortious conduct at issue here are not efforts to influence legislative action, meaning that the above line of authority cited by PCPC does not provide it with *Noerr Pennington* immunity from the present causes of action.

*Nader* concerned allegations by the plaintiff that the Democratic National Committee and companion organizations conspired to keep then-candidate Ralph Nader off the 2004 presidential ballot via lawsuits challenging his eligibility. The plaintiffs brought claims of civil conspiracy, malicious prosecution and abuse of process arising out of that litigation. *Venetian* was a labor law case in which the plaintiff called the police on striking employees, and the issue before the D.C. Circuit was whether contacting the police was a "petition" under *Noerr-Pennington* to afford the Venetian immunity from liability for disrupting the union's protected action.  Neither case has anything to do with the matter currently before this Court: PCPC does not describe any examples of its purported advocacy, let alone how its conduct constitutes a protected petition under *Noerr-Pennington*.

More to the point, although no D.C. court has applied *Noerr-Pennington* to tort claims sounding in negligence or fraud in the product liability context, the D.C. Circuit has held where statements were "intended to defraud consumers… *Noerr–Pennington* protection does not apply." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1124 (D.C. Cir. 2009).  In *Philip Morris*, the government alleged that defendants violated RICO statutes by joining together in a decades-long conspiracy to deceive the American public about the health effects and addictiveness of smoking cigarettes. *Id*. at 1105-06.  Specifically, the government alleged that defendants fraudulently denied that smoking causes cancer and emphysema, that secondhand smoke causes lung cancer and endangers children's respiratory and auditory systems, that nicotine is an addictive drug that defendants manipulated to sustain addiction, that light and low tar cigarettes are not less harmful than full flavor cigarettes, and that defendants intentionally marketed tobacco products to youth. *Id*. at 1106.

The tobacco companies attempted to invoke *Noerr-Pennington* as protection for these

statements, but the D.C. Circuit refused to apply the doctrine because the companies were aware that the statements at issue were false. *Id*. at 1124.  As in *Philip Morris*, Plaintiffs have asserted causes of action for fraud, alleging that Defendants, including PCPC, knowingly and intentionally misrepresented the danger of talcum powder to consumers.  As described herein, there is a plethora of evidence that PCPC has known the true nature of the risks of ovarian cancer associated with talcum powder use for decades while it misled the public through deliberate efforts to suppress or obfuscate this truth.  Therefore, even if PCPC were correct that *Noerr-Pennington* could be applied in product liability lawsuits (which it is not), its fraudulent and misrepresentative conduct is of the exact sort that the D.C. Circuit has ruled is *not* afforded protection from liability under *Noerr-Pennington*.  Moreover, the question of whether PCPC "purposefully" misled the public is one that requires a jury to decide; it constitutes a genuine dispute of material fact that necessitates this Court's denial of Defendant's Motion for Summary Judgment.

Finally, as set forth above, not only is this not an antitrust case, but PCPC's conduct that is alleged to have harmed Plaintiffs bears no relation to the type of government advocacy protected by *Noerr-Pennington*.  For example, there is evidence that as early as 1970s PCPC was aware of and worked in concert with J&J and other companies to conceal the presence of asbestos in talc. In 1976, PCPC formed the Cosmetic Ingredient Review (CIR), an organization PCPC used to publish literature in medical journals for the purpose of overstating the safety of its members' products, including talcum powder.  The material misrepresentations contained in this published literature were directed at the medical community and the public at large, and they were not part of a governmental filing. Accordingly, the material misrepresentations do not qualify for petitioning immunity.  PCPC also formed a task force to obfuscate and undermine

14

evidence that talcum powder was unsafe.  These actions, in addition to countless others engaged in by PCPC and its co-Defendants, constitute private conduct for the purpose of benefiting private cosmetic industry interests.  This is not the sort of constitutionally protected government-petitioning "speech" that *Noerr-Pennington* was designed to insulate from liability, and Defendant's Motion does not offer any concrete examples of PCPC conduct that meets that standard.

Perhaps that is because the authority that PCPC relies on in support of its argument is wholly inapposite to the facts before this Court.  Its citation to *Comm. to Protect Our Agric. Water v. Occidental Oil & Gas*, 235 F. Supp. 3d 1132, 1157 (E.D. Cal. 2017) for the proposition that "trade associations have no liability" bears no relation to this case whatsoever, as it concerned allegations of oil and gas companies' (and related trade associations') attempts to petition the federal government to increase oil production in violation of RICO statutes.  Likewise, the two New Jersey cases PCPC cites, *Fraser v. Bovino*, 317 N.J. Super 23, 37 (App. Div. 1998) and *Village Supermarket, Inc. v. Mayfair*, 269 N.J. Super. 224, 229-32 (Law Div. 1995), both arose out of defendants' efforts to leverage the power of local government to stymie plaintiffs' plans to develop land for economically competitive uses.  PCPC's cited authority all implicate antitrust claims or similar allegations of anti-competitive activity, along with efforts on the part of defendants to petition the government to those ends.

In conclusion, courts in the District of Columbia have not extended *Noerr-Pennington* immunity to product liability claims involving fraud, negligence, and conspiracy, as is the case here. As a result, the Court should reject PCPC's argument that it is immune under *Noerr-Pennington*.

**B.      An Analysis of *Noerr-Pennington* under New Jersey Law Demonstrates that PCPC Is Not Entitled to Immunity.[8]**

Much like the District of Columbia, no New Jersey court has ever extended *Noerr-Pennington* protection to immunize a defendant from tort claims sounding in negligence or fraud in the product liability context.  Consequently, PCPC's claim of immunity from liability for its conduct pursuant to *Noerr-Pennington* under New Jersey law is left just as wanting as it was following an analysis of the District of Columbia law.

New Jersey courts have also never applied *Noerr-Pennington* as a bar to liability for tort claims sounding in negligence and fraud, and PCPC provides no authority in support of that proposition.  As PCPC recognizes, only a few state and federal courts have applied the doctrine outside of the narrow antitrust context, but New Jersey has never contemplated that *Noerr-Pennington*  would immunize a defendant from the type of tort claims at issue in this case. PCPC's reliance on *Main St. at Woolwich, LLC v. Ammons Supermarket, Inc.*, 165 A.3d 821 (N.J. App. Div. 2017) mischaracterizes the scope of *Noerr-Pennington* immunity in New Jersey, conspicuously neglecting to mention that the *Main St.* court noted while other jurisdictions have applied the doctrine, they have done so only to "common-law torts *such as malicious prosecution and abuse of process*." *Id*. at 826 (emphasis added). The court then went on to find that New Jersey courts have only extended *Noerr-Pennington*'s reach outside of the antitrust context to cases regarding land use and other anticompetitive disputes. *Id*. (collection cases).

The limits of *Noerr-Pennington* immunity under New Jersey law are further supported by PCPC's citation to *McAlonan v. Tracy*, No. A-6034-07T2, 2011 WL 6125 (N.J. Super. Ct. App. Div., Mar. 16, 2010), *cert. denied*, 202 N.J. 347 (2010), an unreported, non-precedential case

---

[8]      If the Court makes a choice-of-law determination that the law of the District of Columbia applies, as argued by Plaintiffs, then the Court does not need to consider the application of the *Noerr-Pennington* doctrine under New Jersey law.

wherein plaintiff appealed a trial judge's decision to refuse to admit into evidence certain statements made to the government by defendant Toyota regarding proposed regulations of motor vehicle crash protection requirements. *Id*. at *13.  To the extent *Noerr-Pennington* was applicable, it was only in the context of the admissibility of evidence, as the tort claims brought against Toyota as the result of plaintiff's injuries were permitted to go to trial.  That is because, like this case, the injuries to plaintiff in *McAlonan* were not alleged to have been caused by the inducement of any governmental action on the part of Toyota, but rather the result of negligence in permitting an unsafe product to be marketed and sold.  *Noerr-Pennington* was never contemplated to apply to traditional tort claims brought by victims of bodily harm, PCPC provides no authority (and none exists) that New Jersey has expanded the doctrine to apply to such cases, and PCPC's argument that it is immune from liability on this basis lacks merit.

As noted above, *Noerr-Pennington* does not apply because the harm for which Plaintiffs seek relief was not caused by any statements or actions made to influence a government body, but rather by PCPC's role in misleading the public about the dangers of talcum powder, including the funding and release of materially false information about talcum powder products it knew to be unsafe. Defendant argues in its Motion that the *Noerr-Pennington* doctrine "protects two types of actions: 'injuries which result from the petitioning itself' and 'injuries caused by government action which results from the petitioning.'" *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 251 (3d Cir. 2001).  However, PCPC does not endeavor to provide this Court with any examples of its "petitioning" protected under *Noerr-Pennington*, nor does it offer any nexus between this purported petitioning and the injuries suffered by Plaintiffs.

In sum, the PCPC conduct that is alleged to have harmed Plaintiffs falls outside the long-established contours of the *Noerr Pennington* doctrine under both Washington D.C. and New

Jersey law.  There are no factual allegations that PCPC petitioned any government body for anti-competitive purposes, nor do Plaintiffs allege that any such petitioning "speech" was the proximate cause of Plaintiffs' injuries. In fact, PCPC does not cite to a single court anywhere, in any jurisdiction, that has endorsed PCPC's argument that a defendant is shielded from liability for "speech" that facilitated the marketing and distribution of a product it knew, or had reason to know, was unsafe.  Accordingly, PCPC's *Noerr Pennington* argument should be rejected.

## II.     THE DISTRICT OF COLUMBIA ANTI-SLAPP ACT DOES NOT SHIELD PCPC FROM PLAINTIFFS' CLAIMS.

In its Motion, PCPC argues that its activities and statements that form the basis of Plaintiffs' claims are protected by the District of Columbia Anti-SLAPP Act of 2010 ("the Act"). But as discussed below, PCPC's activities and statements do not fall under the protection of the Act, and its Motion should be denied.

### A.     PCPC's Motion is Procedurally Improper and Untimely.

A motion for summary judgment is not the proper vehicle to seek dismissal of an action under the District of Columbia Anti-SLAPP Act. The Act itself clearly states that "[a] party may file a special motion to dismiss[.]" D.C. Code § 16-5502. PCPC, therefore, should have filed a special motion to dismiss as required by the Act rather than a motion for summary judgment.

Even setting aside the improper form of PCPC's motion, the motion is also time barred to the extent that any of the underlying cases at issue here were served against PCPC before March 22, 2019 (45 days prior to the filing of PCPC's Motion).[9] The D.C. Anti-SLAPP Act requires a party to file a special motion to dismiss within 45 days after service of the claim. D.C. Code §

---

[9]     Additionally, in any case filed against PCPC after May 6, 2020 (the date of the filing of the Motion for Summary Judgment), the motion is not ripe because it has not actually been filed in those cases.

16-5502. If not filed within this timeframe, the motion is time-barred. *Id.* (*see Sherrod v. Breitbart*, 720 F.3d 932, 937-938 (D.C. Cir. 2013) ("The district court concluded that defendants' motion to dismiss was untimely because it was not filed within the 45-day period set in the D.C. Anti-SLAPP Act. . . . The district court therefore properly denied as untimely defendants' motion to dismiss . . . .")).

PCPC may try to argue that filing notices of appearances in cases pursuant to Case Management Order No. 4 preserved its right to bring its motion at any time in any case. Even if PCPC filed notices of appearance in these cases, the D.C. Circuit has addressed this issue and concluded that the time limit contained in the Act cannot be extended by court order. In *Sherrod*, the parties filed a consent motion to extend the time to respond to the complaint, which the Court granted. As the court in *Sherrod* noted, "[t]he motion did not mention the D.C. Anti-SLAPP Act." *Sherrod*, 720 F.3d at 937.[10] The court went on to hold that while "district courts [have] wide discretion to modify the time limits set forth in the rules[,] [s]tatutory time limits are different." *Id.* at 938. As a result, although PCPC may argue that CMO No. 4 preserved its right to file an Anti-SLAPP motion, CMO No. 4 did not and could not extend the time for PCPC to file its motion under the Act.

For these reasons, PCPC's attempt to invoke the protections of the Act is time-barred for any case that was filed against PCPC prior to March 22, 2019.  This covers all, or at least the vast majority, of cases currently pending against PCPC. Unless PCPC can show that its Motion is timely in any of the cases filed in the MDL, the Court should deny the Motion as untimely and it need not bother addressing the merits of PCPC's arguments.

---

[10]     Case Management Order No. 4 does not mention the Anti-SLAPP Act.

**B.      The District of Columbia Anti-SLAPP Act does not protect PCPC's private, commercial activities and statements.**

The Act "was enacted by the D.C. Council to protect the targets of suits intended as a weapon to chill or silence speech." *Doe v. Burke*, 2016 WL 932799 at *1 (D.C. Mar. 10, 2016) (internal punctuation omitted). The intent of the Act is to provide defendants the option to "file a special motion to dismiss any claim arising from **an act in furtherance of the right of advocacy on issues of public interest** . . . ." D.C. Code Ann. § 16-5502(a). Pursuant to the Act, the moving party must "make a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest," which PCPC has failed to do. *Id.* at § 16-5502(b). If a defendant meets its burden of establishing a *prima facie* case, the burden shifts to the responding party to "demonstrate[] that the claim is likely to succeed on the merits." *Id.*

There are two elements for which PCPC is required to make a *prima facie* showing under the Act: (1) "an act in furtherance of the right of advocacy," taken (2) "on issues of public interest." D.C. Code Ann. § 16-5501. PCPC is unable to satisfy either of the required elements.

**1.      PCPC fails to make a prima facie showing—as required—that the actions alleged by Plaintiffs were acts in the furtherance of the right of advocacy.**

PCPC alleges that its statements to the government and the public are acts in furtherance of the right of advocacy. The Act defines an "act in furtherance of the right of advocacy on issues of public interest" as follows:

(A) Any written or oral statement made:

(i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or

                  (ii) In a place open to the public or a public forum in connection with an issue of public interest; or

          (B) Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest.

D.C. Code Ann. § 16-5501(1).

But Plaintiffs' claims are not limited to the statements made by PCPC to the government or in public forums. Importantly, Plaintiffs allege that PCPC and the other Defendants acted in concert to pool their substantial resources to defend talc used in talcum powder products. (*See* Am. Master Compl. ¶ 35.) Therefore, the coordinated statements and actions *among the Defendants*, taken to defend the continued use of talc, form part of Plaintiffs' claims. PCPC's statements and actions directed to the government and public are only part of these claims. The underlying bases of the claims involve not only statements to the government and public, but also statements among the Defendants, which are not "acts in furtherance of the right of advocacy." And these private statements and activities are critical to Plaintiffs' claims against PCPC and certainly do not fall within the definition of "acts in furtherance of the right of advocacy."

Additionally, the Act certainly does not cover the failure to make statements to the government or the public. For example, Plaintiffs' allege that "[e]ven though PCPC knew of the safety concerns surrounding talc and talc based body powders for almost three decades, the CIR did not begin to review talc until after the first lawsuit alleging a link between talc use and ovarian cancer was filed." (Am. Master Compl. ¶ 39.) These actions do not involve any statements at all and therefore cannot possibly be considered an "act in furtherance."

Over the years, PCPC coordinated the defense of the safety of talc in private meetings among cosmetic companies. These meetings and communications were not open to the public and at times did not even concern issues related to government regulatory reviews of talc.

For example, PCPC's formation and operation of the Talc Task Force is one of the most critical components of Plaintiffs' claims against PCPC.[11] Originally, PCPC formed the Talc Task Force in the 1970s in response to claims that cosmetic talc contained asbestos. The Talc Task Force met throughout the 1970s to coordinate the industry's response and in order to develop voluntary, self-regulating standards. (Talc Task Force Minutes, Feb. 7, 1975, CPC-POLAKOWTRSCPT00000266, attached as **Exhibit 1**; Talc Task Force Minutes, Mar. 11, 1976, JNJ000254100, attached as **Exhibit 2**; Talc Subcommittee Minutes, Mar. 15, 1976, CPC-POLAKOWTRSCPT00000326, attached as **Exhibit 3**; Talc Task Force Minutes, Sept. 9, 1976, WCD000081, attached as **Exhibit 4**; Talc Task Force Minutes, Sept. 29, 1976, WCD000200, attached as **Exhibit 5**; Talc Task Force Minutes, Dec. 6, 1977, JNJ000307294, attached as **Exhibit 6**.) As discussed in more detail below, application of the standards that PCPC and the defendants devised resulted in material levels of asbestos in talc and talc products because the "detectable level" of the tests was inadequate. The industry knew these tests were defective and insufficient to ensure that talcum powder did not contain asbestos, yet it used these tests to fraudulently assure consumers and the government that asbestos was not present in talc and that other harmful minerals were not present at deleterious levels.

---

[11] For ease of reference, Plaintiffs refer to this entity as the "Talc Task Force" or the "Task Force" although over the years, it has been called the CTFA Task Force, the Talc Subcommittee, the Ad Hoc Talc Task Force, the Talc Task Force, and the Talc Interested Party Task Force. Membership also changed over time. However, regardless of the nomenclature or the membership, at all times PCPC coordinated the Talc Task Force's activities. J&J was an active member of the Talc Task Force during all relevant times.

The Talc Task Force took action again in the 1980s after the publication in 1982 of the seminal Cramer epidemiology study that found a statically significant increased risk of ovarian cancer among women who used talcum powder. (Ad Hoc Talc Task Force Minutes, Nov. 11, 1982, JNJ000089586, attached as **Exhibit 7**.). PCPC sent letters to journal editors and scientists, independent of any government advocacy or legislative proceedings, in an attempt to publicly discredit Dr. Cramer's work.  Similarly, PCPC published responses to statements in papers and articles that cosmetic talc contained asbestos by claiming that talc is asbestos-free, despite their knowledge and evidence to the contrary. (JNJ000029681, attached as **Exhibit 8**; JNJ000036430, attached as **Exhibit 9**; JNJ000036440, attached as **Exhibit 10**; JNJ000058415, attached as **Exhibit 11**; PCPC0080419, attached as **Exhibit 12**.)

In 1992, PCPC reconvened the Talc Task Force and, for more than the following decade, held Task Force meetings and calls among member companies. One of the PCPC's leading toxicologists, Linda Loretz, was vitally important when it came to organizing studies and drafting submissions for the NTP's review of talc. Dr. Loretz helped lead or coordinate the Talc Task Force for numerous years. Dr. Loretz was also involved in the Talc Task Force efforts to retain speakers for the December 2000 Board of Scientific Counselors Meeting wherein they supported the safety of talc. Through the years these Talc Task Forces were also used to continue defining cosmetic talc, and how it should be defined by different regulatory bodies.  (Minutes, July 21, 1993, JNJ000011704, attached as **Exhibit 13**; Minutes, Sept. 16, 1993, JNJ000022756, attached as **Exhibit 14**; Minutes, Apr. 12, 1994, JNJ000023178, attached as **Exhibit 15**; Minutes, July 25, 1994, PCPC0075236, attached as **Exhibit 16**; Draft Minutes, Jan. 18, 1995, PCPC0080396, attached as **Exhibit 17**; Conference Call Minutes, April 19, 2000, PCPC_MDL00028357, attached as **Exhibit 18**; Conference Call Minutes, Oct. 16, 2000,

IMERYS240345, attached as **Exhibit 19**;  Minutes, Feb. 19, 2001, IMERYS239856, attached as **Exhibit 20**; Conference Call Minutes, July 30, 2001, JNJ000001864, attached as **Exhibit 21**; Conference Call Minutes, June 2, 2004, IMERYS288396, attached as **Exhibit 22**; Conference Call Minutes, June 24, 2004, IMERYS288390, attached as **Exhibit 23**.)

  From 1992 to 2009, Defendants, including J&J and Imerys, contributed funds to the Talc Task Force so PCPC could hire scientists and consultants to help Defendants not only battle regulatory efforts, but actively disseminate scientific and medical information that was intended to mislead the public about the safety of talc. (PCPC_MDL00029273, attached as **Exhibit 24**; PCPC_MDL00027958, attached as **Exhibit 25**; Talc Task Force Ledger 1992-2009, Ex. 3 to Deposition of Mark Pollak, PCPC Corporate Representative, August 29, 2018, attached as **Exhibit 26**.)  By pooling resources, the Talc Task Force paid for most of the 1994 International Society of Regulatory Toxicology and Pharmacology (the ISRTP) "industry friendly" workshop. (**Ex. 13**). The Talc Task Force also paid for consultants to attend this workshop and arranged the presenters. This 1994 symposium was hosted jointly by the ISRTP, the FDA, and PCPC. For this symposium, PCPC contributed the lion's share of the funding for the symposium with a $20,000 contribution prior to the event and an additional $4,650 contribution to the ISRTP after the favorable publication of manuscripts related to the workshop (PCPC_MDL00026142, attached as **Exhibit 27**; PCPC_MDL00028481, attached as **Exhibit 28**.). In further preparation for this workshop PCPC retained Dr. Alfred Wehner (a long-time PCPC and J&J expert) to offer input and directly influence the workshop. (PCPC_MDL00028665, attached as **Exhibit 29**; *see also* PCPC_MDL00020804, attached as **Exhibit 30**; PCPC_MDL00028677, attached as **Exhibit 31**.) PCPC co-wrote, with other Talc Task Force members, an article on talc and was the lead presenter at the workshop. (IMERYS095244, attached as **Exhibit 32**.) Following the workshop,

the Talc Task Force agreed to provide extra funding to the ISRTP for preparing and publishing an article about the workshop, which PCPC was permitted to review and edit. (JNJ000016566, attached as **Exhibit 33**;  **Ex. 28**; **Ex. 30**.)

Notably, during this time, the Talc Task Force also sought to prevent regulatory action by the National Toxicology Program (NTP).[12] As PCPC's Safety and Regulatory Toxicology Committee noted in its meeting minutes, ███████████████████████████
███████████████████████████ █████████████████████████
████████████████████████████████████████████████
████ (PCPC Safety and Regulatory Toxicology Committee Minutes, Feb. 21, 2001, PCPC0035731, attached as **Exhibit 34** at 10.)  Admittedly, Imerys (one of the Talc Task Force member companies) "work[ed] through the auspices of the CTFA" to defend talc and prevent regulation by the NTP. (S. Jarvis Talc Presentation at 6, IMERYS178944, attached as **Exhibit 35**.)

In order to prevent the listing of talc in the NTP report and further regulatory action, the TIPTF coordinated a roster of "speakers for industry" who influenced the members of the NTP committee to vote not to list talc as a carcinogen at the NTP meeting on December 13-15, 2000. (NTP Summary Minutes, Dec. 13-15, 2000, at attached as **Exhibit 36**.) Indeed, Imerys and the TIPTF succeeded in preventing the NTP's regulatory action that would have listed talc as a carcinogen, even stating in an email that "the victory in this battle is extremely significant." ("Great News on Talc!" Email, Dec. 15, 2000, JNJ000373701, attached as **Exhibit 37**.) PCPC's work, in coordination with J&J and other companies, significantly impacted the public

---

[12]     "NTP is an interagency program composed of, and supported by, three government agencies within the Department of Health and Human Services[.]" *Organization*, National Toxicology Program, https://ntp.niehs.nih.gov/about/org/index.html  (accessed on June 7, 2020).

perception of talc. If NTP had listed talc as a carcinogen, then people would have been made aware of the dangers of talc. But because of the industry influence in the NTP, the NTP Board of Scientific Counselors (BSC) took the unusual step of going against the recommendation of the review groups (combined 13-2 to list talc as a carcinogen), and talc was not listed as a carcinogen causing the public to remain unaware of the dangers.

PCPC also formed and operated the Scientific Advisory Executive Committee (SAEC) and the Safety and Regulatory Toxicology Committee (SRTC). These committees, comprised of members of the cosmetic industry, focused on safety issues facing the cosmetic industry (including talc). The committees oversaw various task forces (including the Talc Task Force) and regularly met at PCPC's headquarters in the District of Columbia. (*See, e.g.,* SAEC Minutes , Feb. 27, 1997, CPC-NYCALTRSCPT00009958, attached as **Exhibit 38**; **Ex. 34**, at 1; SRTC Minutes July 18, 2001, PCPC_MDL00010215, attached as **Exhibit 39**; SRTC Draft Minutes, Mar. 26, 2002, JNJ000388775, attached as **Exhibit 40**; SRTC Minutes, July 13, 2004, PCPC0035754 at 1, attached as **Exhibit 41**.)

PCPC, either on its own or through the Talc Task Force, hired third parties privately to consult on issues related to talc safety. PCPC (through the Talc Task Force), authorized and funded the retention of a Washington, DC-based consulting organization—the Weinberg Group—that identified and found experts ███████████████████████████ ██████████ for the NTP review of talc (Weinberg Group 0004-0006, attached as **Exhibit 42**; Deposition of Linda Loretz on Jul. 18, 2018 at 112:6-114:7, attached as **Exhibit 43**; JNJ000564167, attached as **Exhibit 44**.)

Along with the Weinberg Group, PCPC authorized the retention of Nichols-Dezenhall, a Washington, DC-based crisis management group. (Talc Task Force Conf. Call Minutes, Oct. 16,

2000, JNJ000013664, attached as **Exhibit 45**.) Nichols-Dezenhall developed a contingency plan ███████████████████████████████████████ in case talc was listed as a carcinogen by the NTP. (Nichols-Dezenhall Memorandum, PCPC0077968, attached as **Exhibit 46**.) PCPC also retained Dr. Alfred Wehner to represent industry at the ISRTP conference in 1994, as discussed above. (**Ex. 29**.)

To be clear, industry over several decades devoted considerable efforts and finances to develop strategies to prevent outside regulation of cosmetic products so that PCPC and its members could continue to self-regulate the cosmetic industry and purposefully mislead the public, the government and the scientific community by skewing the public perception of talc safety and concealing the dangers associated with the talcum powder products, specifically the increased risk of ovarian cancer caused by the genital use of talcum powder products.

PCPC's activities in operating the CIR also form one of the main bases for Plaintiffs' claims. The Cosmetic Industry Review was formed by PCPC in 1976 to voluntarily self-regulate cosmetics. Its purpose ostensibly was to ███████████████████████████████████ ████████████████████████████ (PCPC_MDL00010633, 34, attached as **Exhibit 47**.) But, rather than establish an expert panel that actually operated with scientific independence and rigor, PCPC established a panel that simply supported the industry by rubber stamping ingredients as safe for use in cosmetics.  PCPC's actions through the CIR misrepresented and concealed from consumers material facts related to the overall safety of talc. To that point, of the thousands of ingredients CIR has reviewed over the years, it has only found 12 to be unsafe for use in cosmetics. (*See* Am. Master Compl. ¶38.) And, rather than having ingredient reviews conducted by scientists who specialize in the hazards at issue (for example, in the case of talc, having oncologists or epidemiologists review the scientific data), the CIR expert panel that

reviewed talc did not have a single epidemiologist or oncologist and a dermatologist led the discussion about the safety of talc. In fact, the CIR expert panel typically spends very little time actually discussing the safety of the ingredients it reviews, including when it reviewed talc. Given the number of ingredients reviewed each year, the panel spends an average of approximately 20 minutes discussing the safety of each one. (Am. Master. Compl. ¶38.) Compared with other ingredient review boards such as International Agency for Research on Cancer (IARC), it is obvious that CIR does not apply a level of scientific rigor to its work in determining whether ingredients are safe or not.

Despite fallacious claims that the "CIR and the review process are independent from the Council and cosmetics industry[,]" the facts are that the CIR is wholly funded by and shares the same office space as PCPC. (Deposition of Mark Pollak on Feb. 18, 2016 at 16:24-17:9, attached as **Exhibit 48**; Loretz Dep. on Jan. 8, 2016 at 40:13-15, attached as **Exhibit 49**)  And CIR staff are employees of PCPC, subject to PCPC's policies and procedures. (Loretz Dep. on Oct. 2, 2018 at 834:20-835:2, attached as **Exhibit 50**.) Former PCPC President Edward Kavanaugh once boasted that CIR is one of three core parts of the organization and ███████████ ███████████████████ (PCPC_MDL00015232, attached as **Exhibit 51**.) This industry-funded and managed safety review program ███████████████ ███████████████ (*Id.*) In fact, in 2003, CTFA even stated in their annual report that the CIR program is "the linchpin of their self-regulatory programs." (2003 CIR Annual Report, attached as **Exhibit 52**.)

It's clear that when the CIR finally decided to review the safety of talc, it was "industry friendly" allowing considerable industry comment and guidance in the process. Notably  an Imerys consultant describes their meetings as ███████████ (R. Zazenski Email, Mar.

22, 2007, IMERYS3619465, attached as **Exhibit 53**.)

J&J and Imerys attended at least one CIR meeting in the District of Columbia. (*See* CIR Panel Meeting Dec. 10-11, 2012, IMERYS329339, attached as **Exhibit 54** at 2.) Further, Tim McCarthy of J&J worked to ████████████████████████ as chairman of the PCPC Science Regulatory and Toxicology Committee (SRTC). (McCarthy Email, Oct. 15, 2008, JNJ000384773, attached as **Exhibit 55**.) This committee was responsible for providing guidance to CIR. Mr. McCarthy also encouraged Imerys to ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

(Zazenski Email, Oct. 26, 2007, IMERYS280641, attached as **Exhibit 56**.)

In addition, Imerys, who had retained the Center for Regulatory Effectiveness (CRE) to improperly influence the NTP reviews of talc, again used their services to aid in directing the CIR review of talc in 2012.  William Kelly, a CRE attorney, submitted comments and presented to the CIR on talc safety without disclosing his relationship with industry, although he was being paid by Imerys in coordination with J&J and PCPC. ("The Center for Regulatory Effectiveness is not representing a particular company or industry segment in filing these comments." CRE Comments on CIR Draft, Oct. 19, 2012, MDL_KELLY00017302, attached as **Exhibit 57**; *see also* CIR Meeting Minutes, attached as **Exhibit 58**; MBS-CRE Invoice Oct. 2012, MBS-CRE000191, attached as **Exhibit 59**.)  But Mr. Kelly began his campaign even before the CIR began its review of talc in 2012. As far back as 2007 (well before the CIR review of talc is announced to the public), Mr. Kelly had ████████████████████████████

████████████████████████████ (**Ex. 53**.) Overall, Imerys ████████████

████████████████████████ (*Id.*)  In 2011, Mr. Kelly had already

 and was [REDACTED] (S. Shripal Email, Oct. 3, 2011, IMERYS226115, attached as **Exhibit 60** at 2.)  For example, Monice Fiume of the CIR, the [REDACTED] and principal author of the CIR's safety assessment of talc, spoke with Mr. Kelly in 2011 and told him [REDACTED] even though [REDACTED] on the review. (Bill Kelly Email, Oct. 14, 2011, IMERYS065205, attached as **Exhibit 61**.) All of this was done with the goal of helping the Talc Task Force control the direction of the CIR's purportedly independent and scientific review of talc.

After all of the industry guidance and without any experts in epidemiology, oncology, or female anatomy on the review panel, CIR issued its conclusions and published its paper on the safety of talc, finding talc to be perfectly safe. (*See* Fiume et al., *Safety Assessment of Talc as Used in Cosmetics*, 34 Int'l J. Toxicology 665 (2015)).[13] It ultimately determined that talc was "safe in the present practices of use . . . ." (*Id.*)[14] In reaching this conclusion, the panel followed the reasoning of the lead expert on the review (Dr. Belsito, a dermatologist) that talc does not

---

[13]      Based on a review of the evidence, this safety assessment was actually written primarily by Monice Fiume, who only has a Bachelor's Degree in Science and no advanced degrees or certifications in any relevant fields of science. The actual members of the expert panel provided a minimal amount of written or oral input into the design of the assessment and essentially only approved the ultimate conclusions during a meeting about the assessment.  (PCPC0011431, attached as **Exhibit 62**; PCPC0011582, attached as **Exhibit 63**; and PCPC0011835, attached as **Exhibit 64**.)  Ms. Fiume is an employee of the CIR, whose compensation is ultimately paid by PCPC, and, at the time the "safety review" of talc was published, worked at the same location as PCPC.

[14]      Mr. Kelly's comments submitted to the CIR are actually cited by the CIR as authority in their final safety assessment and CIR erroneously considered him an independent scientist although not a health or science professional. (JNJ 000490528, attached as **Exhibit 65**; IMERYS149314, attached as **Exhibit 66**, MBS-CRE000031, attached as **Exhibit 67**.)

migrate, and the panel also operated under the assumption that talc was asbestos-free since 1976 in part based on the PCPC specifications published that year. (**Ex. 63** (talc discussion at 105-133); **Ex. 64** (talc discussion at 47-50).)   It's not surprising that the CIR reached this conclusion, given how Mr. Kelly boasted that the CRE (working for Imerys with PCPC's knowledge) "engineered the CIR report from the outset[,]" (Kelly Email, April 15, 2013, MBS-CRE000271, attached as **Exhibit 68**.)

This "self-regulation" resulted in false or misleading information on the safety of talc being released to the public, including thousands of women who used talcum powder products and were subsequently diagnosed with ovarian cancer. PCPC's failure to ensure an independent, scientifically sound review of talc by the CIR is one of Plaintiffs' key allegations.

PCPC also independently developed self-regulatory standards for the cosmetics industry related to the testing of talc, including the presence of asbestos in talc. ██████████████ ████████████████████████████████████████████ PCPC_MDL00031603-09, attached as **Exhibit 69**.)

At best, *some* of PCPC's activities and statements over the decades might fall under the definitions of "acts in furtherance of the right of advocacy" (not considering the second element, public interest), but for PCPC to argue that ***all*** of its activities and statements fall under this definition borders on the absurd.

For these reasons, PCPC has failed to establish a prima facie case under the first element.

> **2. PCPC acted in furtherance of its own and its members' *private, commercial interests* and not on issues of *public interest*.**

Even if the Court determines that PCPC's activities and statements constitute "acts in furtherance of the right of advocacy," because PCPC acted on behalf of private interests rather

than public interests in undertaking these activities and making these statements, PCPC is not entitled to the protection of the Act.

The second element, "issue of public interest," is defined as follows in the Act:

> "Issue of public interest" means an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place. **The term "issue of public interest" shall not be construed to include *private interests*, such as statements directed primarily toward protecting the speaker's *commercial interests* rather than toward commenting on or sharing information about a matter of public significance.**

D.C. Code Ann. § 16-5501(3) (emphasis added).

Rather than advocating on issues of public interest, PCPC advocated for its private interests and the commercial interests of the members. PCPC, in concert with the other Defendants, made statements among themselves, to the government, and to the public defending the safety of talc as used in the Products. (Am. Master Compl. ¶¶ 35-36.) Statements made by PCPC concerning the safety of talc were not made with the primary purpose of "commenting on or sharing information about a matter of public significance." Instead, all of the actions taken and statements made by PCPC were on behalf of the cosmetic industry to advance private, commercial interests. If PCPC was not the trade association for the cosmetics industry, it would not have taken any of those actions or made any of those statements. Therefore, PCPC's activities and statements are all directly related to its private, commercial interests and the private, commercial interests of the cosmetics industry.

PCPC's public statements are also instructive.  Historically, PCPC's mission statement has been to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ (PCPC0052415, attached as **Exhibit 70**.) The mission of its public affairs and communications department is to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (PCPC Public

Affairs & Communications PowerPoint,  Ex. 10 to Linda Loretz Dep. 7/17/18, at 4, attached as **Exhibit 71**.) And in its 2003 annual report, PCPC noted that it "represents the interests of the industry at the local, state, national, and international levels." (**Ex. 52**.) As PCPC (then CTFA) President Edward Kavanaugh stated in 1995, PCPC has a ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████ (**Ex. 51**.)

To this point, PCPC's senior executive vice president, Mark Pollak, testified that PCPC is the "trade association for the cosmetic and personal care products industry," which represents more than 600 member companies who manufacture, distribute, and supply personal care products in the U.S." (Pollak Decl. ¶¶ 4−5, attached as **Exhibit 72**.) The Defendants who use or supply talc in cosmetic products (J&J, JJCI, and Imerys) are among PCPC's members.[15] (*Id.* at ¶ 6.) PCPC would not exist as a trade association without its members and, therefore, PCPC has an inherent private interest in advocating for its members.[16] PCPC promoted the benefits of membership on its website by stating that members can "[p]articipate in Council committees to help develop programs and find solutions that **benefit the industry**." (*Benefits of Council Membership*, Personal Care Products Council (May 19, 2016), http://www.personalcarecouncil.org/member-benefits (emphasis added), attached as **Exhibit 73**.)

Mr. Pollak even admits that rather than advocating on issues of *public interest*, PCPC advocates "on issues of *interest to some or all of its members*." (*Id.* at ¶ 10 (emphasis added).)

---

[15]    In 2017, J&J contributed $490,000 to PCPC in dues and is in the top ten highest contributors to PCPC in terms of dues. (Pollak Dep. on Aug. 29, 2018 at 105:15-106:1, attached as **Exhibit 75**.)

[16]    PCPC's Form 990 tax return, discussed *infra*, shows that approximately two-thirds of PCPC's revenue comes from membership dues, a significant amount of which are directly tied to revenue the companies receive from selling talc products.

On its website, PCPC advertised that it "represents the industry at the federal, state, and local level on issues of *interest to the cosmetic and personal care industry.*" (*Legislative Advocacy*, Personal Care Products Council (May 18, 2016), http://www.personalcarecouncil.org/legislation-regulation/legislative-advocacy, attached as **Exhibit 74**.)  Although Mr. Pollak states that these issues of interest to its members "*may* involve issues of health, safety, and/or products[,]" it is clear that the private, commercial interests of its members *primarily* drove PCPC's actions alleged in Plaintiffs' Complaint. (Pollak Decl. at ¶ 10 (emphasis added), **Ex.72**.)

PCPC's tax returns further reveal the true motivations behind all of its statements and activities. In its tax return, PCPC summarizes its mission as follows: "represent the common **business interests** of the personal care products industry." (PCPC's Form 990 (2014) at Part I(1), attached as **Exhibit 76** (emphasis added).) It further describes its mission as "to secure and provide through the Council the cooperation and united efforts of the personal care products industry in any matters relating to the welfare of the industry . . . ." (*Id.* at Part III(1).) Institutionally, PCPC is motivated by the private, commercial interests of its member companies.

Notably, PCPC does not deny that it has a "direct pecuniary interest" in representing the interests of its member companies and in defending the safety of talc. As acknowledged by PCPC, membership dues are based on member sales.[17] (Pollak Decl. ¶ 10, attached as **Exhibit 77**.) Therefore, PCPC's actions in misrepresenting and concealing material facts related to talc are driven by, and directly impact, PCPC's revenue. Without funding from its member companies, PCPC would not exist. As a result, PCPC statements and activities regarding the

---

[17]     As previously referenced, membership dues account for over two-thirds of PCPC's annual revenue.

safety of talc were made for the purpose of advancing the private, commercial interests of itself and its member companies.

PCPC cites *Choose Energy, Inc. v. Amer. Petroleum Inst.*, 87 F. Supp. 3d 1218 (N.D. Cal. 2015), for the proposition that Anti-SLAPP statutes protects both private and corporate speech relating to any issue in which the public is interested.  PCPC's reliance on *Choose Energy*, however, is legally and factually ill-founded and misplaced.  As precedent, *Choose Energy* is wholly inapplicable because the California Anti-SLAPP Act at issue in *Choose Energy* does not have the same definition of "public interest" as contained in the D.C. Anti-SLAPP Act. All of the cases in California that have analyzed the California Anti-SLAPP have done so using a different definition than the one contained in the D.C. Anti-SLAPP Act. Therefore, California caselaw is not helpful in interpreting the definition of an "issue of public interest" under the Act.

Factually, *Choose Energy* is inapplicable because the plaintiff's allegations in that case arose solely out of statements that the defendant, a trade association for the petroleum industry, made on its website during a relatively short period of time. *Id.* at 1219-20. Here, Plaintiffs' allegations are significantly different and go far beyond statements made on PCPC's website. The decades-long duration and pervasive scope of PCPC's misconduct makes the analysis of this case much different. Plaintiffs claim that PCPC—over the course of decades (from the 1970s until 2010s)—not only conspired with the other Defendants to coordinate the a defense of talc, but also established intentionally inadequate standards for the testing of talc and (despite public representations to the contrary) failed to undertake a timely, objective scientific review of the safety of talc. Because PCPC's statements and activities are not limited to a short period of time about one issue but range from the 1970s to recent years on numerous issues related to talc, this case is not as simple as *Choose Energy*.

In conclusion, because PCPC advocated for issues related to its and its member companies' private, commercial interests, instead of advocating on issues of public interest, PCPC has failed to establish a prima facie case under this element of the Act.  Therefore, the Court should deny its Motion.

### 3.  The legislative history of the Act confirms that PCPC is not entitled to Anti-SLAPP protection.

In addition to the clear statutory language, the legislative history confirms that PCPC is not entitled to the protection of the Act. In discussing the Anti-SLAPP Act, the D.C. Council Committee on Public Safety and the Judiciary stated, "[t]he actions that typically draw a SLAPP are often, as the ACLU noted, the kind of grassroots activism that should be hailed in our democracy."  (D.C. Council, Comm. on Pub. Safety & the Judiciary, Report on Bill 18-893, at 3 (Nov. 18, 2010) ("Comm. Report"), attached as **Exhibit 78**.) Furthermore, an ACLU representative testified to the Committee that the plaintiff in these actions is "usually the side with deeper pockets and ready access to counsel." (Comm. Report, Testimony of the American Civil Liberties Union of the Nation's Capital before the (Comm. on Pub. Safety & the Judiciary, at 1 (Sept. 17, 2010), attached as **Exhibit 79**.)

Here, PCPC's alleged activities are the exact opposite of "grassroots activism"; rather, its activities were driven by the pecuniary interests of its corporate members. As such, PCPC is certainly the "side with the deeper pockets and ready access to counsel." The D.C. Council never intended for the Anti-SLAPP Act to apply to private, commercial activities and statements, and this Court should not extend the protection of the Act.

Moreover, the Committee Report to the Act cited a study that showed that "[t]he vast majority of the cases identified by the study were brought under legal charges of defamation (such as libel and slander), or as such business torts as interference with contract." (Comm. Rep.

at 2 (citing George W. Pring, *SLAPPS: Strategic Lawsuits against Public Participation*, Pace Env. L. Rev., Paper 132, 1 (1989)). Plaintiffs have not brought any such claims against PCPC in this case.

### 4. The court in *Simpson* misapplied the law and facts in that case, and this Court should not rely on the analysis in *Simpson*.

In 2017, in *Simpson v. Johnson & Johnson, et al.*, a trial court in the District of Columbia heard more limited arguments related to the Act in another talcum powder case where the facts were not yet developed.  The *Simpson* court granted PCPC's special motion to dismiss under the Anti-SLAPP Act and dismissed the claims against PCPC. As a lower court decision from the District of Columbia, *Simpson* is not binding on this Court. Moreover, Plaintiffs here assert that the *Simpson* court misapplied the law and that the facts were not as fully developed in that case due to lack of discovery.[18] As a result, this Court need not and should not rely on the *Simpson* court's reasoning.

Notably, the *Simpson* court held that because PCPC did not make "any representations regarding a particular product, only about the safety of talc in general[,] . . . PCPC does not have . . . a commercial interest to protect. (*Simpson* Hr'g Tr. at 39:19-24, attached as **Exhibit 80**.) But the only reason PCPC made *any* representations about the safety of talc was because talc was used in its members' products. Therefore, PCPC essentially made representations about a number of different products manufactured by its members. Although PCPC did not necessarily advocate for particular products, it advocated for the principal ingredients contained in talcum powder products manufactured by its member companies, including Johnson's Baby Powder and Shower to Shower. In the case of Johnson's Baby Powder and other cosmetic talc products, the

---

[18]     At the time of briefing in *Simpson*, discovery had not been exchanged in the case.

products are comprised almost entirely of talc to the point that advocating for the safety of talc is tantamount to advocating for the safety of those products on the market. The *Simpson* court chose to ignore that fact.

The *Simpson* court also erred in applying California caselaw as part of its reasoning, which informed the court's decision on the second element of the analysis, "issue of public interest." As noted above, however, the California Anti-SLAPP Act does not have the same definition of "public interest" as the D.C. Anti-SLAPP Act. There is no provision related to "private, commercial interests" in the California Act. All of the cases in California that have analyzed the California Anti-SLAPP have done so using a different definition than the one contained in the D.C. Anti-SLAPP Act. Therefore, the logic of the *Simpson* court is fundamentally flawed. California caselaw is not useful in interpreting the definition of an "issue of public interest" and the *Simpson* court erred by failing to appreciate the differences in the language of the statutes and in relying on California case law to interpret the Act.

Finally, the *Simpson* court indicated that statements made between defendants may not fall within the definition of "acts in furtherance," but noted that "plaintiff fails to show what these statements were or how they would further her underlying claims. (*Simpson* Hr'g Tr. at 43:7-9, **Ex. 80**.) Here, Plaintiffs' have detailed the numerous interactions between Defendants that form the basis for Plaintiffs' claims, especially conspiracy (*see* Section III(3), *infra*)).

For these reasons, *Simpson* is wholly distinguishable from the present case and should not be considered when determining whether PCPC's conduct qualifies for protection under the D.C. Anti-SLAPP Act.

**5. PCPC has failed to establish a prima facie case under the Act; therefore, Plaintiffs are not required to prove the likelihood of their success on the merits.**

Because PCPC failed the preliminary requirement to establish a prima facie case, the burden has not shifted to Plaintiffs to prove the likelihood of their success on the merits. Only if PCPC "makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest," would Plaintiffs have to respond by demonstrating the likelihood of their success on the merits. D.C. Code Ann. § 5502(b).  As set out above, PCPC has failed to meet its burden to establish a prima facie case because its statements and actions, as alleged in the Complaint, all relate to PCPC's private, commercial interests. Additionally, statements and actions between the Defendants (as opposed to the government or the public) at issue in Plaintiffs' claims do not fall under the protection of the Act. Because PCPC has not made out a prima facie case, Plaintiffs do not have the burden of proving the likelihood that they would prevail on the merits. And, as a result, PCPC's Special Motion to Dismiss should be denied.

Regardless, Plaintiffs will address the likelihood of success on the merits in Section III, *infra*, in responding to PCPC's common law challenges.

## III. PLAINTIFFS' COMMON LAW CLAIMS PRESENT GENUINE DISPUTES OF FACT FOR DETERMINATION BY A JURY.[19]

Despite PCPC's arguments that there are not any disputes of material facts on Plaintiffs' common law claims of negligence, fraud and fraudulent concealment, and conspiracy, the evidence proves otherwise.

---

[19]    PCPC cites New Jersey law in their arguments related to the common law claims, despite the fact that it argues that the New Jersey Product Liability Act subsumes all common law claims in New Jersey. It's not clear why PCPC cites New Jersey law in this section, the PSC will only address the common law claims under D.C. law, and the Court should not consider any of

A.       **Plaintiffs' Negligence Claim Presents Genuine Disputes of Material Facts.**

In this case, PCPC voluntarily undertook and breached its duty to Plaintiffs to self-regulate the cosmetic industry, to create testing standards, to publish definitions and standards, and to substantiate the safety of cosmetic ingredients.

For a negligence claim, D.C. law requires a plaintiff to allege there was "a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *Wash. Metro. Area Transit Auth. v. Ferguson*, 977 A.2d 375, 377 (D.C. 2009)*; see also Smith v. United States*, 157 F. Supp. 3d 32, 40 (D.D.C. 2016) ("To establish a claim for negligence, a plaintiff must allege that (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty; and (3) the defendant's acts proximately caused the plaintiff to suffer an injury." (citing *Wash. Metro. Area Transit*, 977 A.2d at 377)).  To meet this standard, a plaintiff "must specify a negligent act and 'characterize the duty whose breach might have resulted in negligence liability.'" *Id.* (quoting *District of Columbia v. White*, 442 A.2d 159, 162 (D.C. 1982)).  Accordingly, to find negligence under DC law requires first finding the existence of a duty and second finding a foreseeable injury, although the language used by some courts may blur the distinction between "duty" and "foreseeable injury.*" See Henao v. Smiths Detection,* Inc., No. CV 18-2564 (TJK), 2019 WL 2476631, at *4 (D.D.C. June 13, 2019) ( "under District of Columbia law, 'a court's examination of whether a duty exists [is] a 'foreseeability of harm test' that is determined, in large part, by the nature of the relationship between the parties.'" (quoting *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 794 (D.C. 2011) (alteration in original)); *District of Columbia v. Wilson*, 721 A.2d

---

PCPC's citations to New Jersey law as New Jersey law is not controlling. PCPC's interwoven references to D.C. and New Jersey law in its Motion only serve to confuse the issues.

591, 600 (D.C.1998) ("To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable." (quoting *District of Columbia v. Watkins*, 684 A.2d 395, 402 (D.C.1996)).

**Duty.** PCPC first undertook a duty to consumers, including Plaintiffs, in the 1970s by working with the industry to publish standards for testing talc for the presence of asbestos and other harmful minerals. These standards, prefixed with "CTFA," PCPC's former name, have been used by the cosmetics industry ever since and, more particularly, have been used by the cosmetics industry to assure (wrongfully) consumers and the government that talc was free of asbestos and did not contain harmful levels of arsenic, lead, and quartz:

| Substance | Method for Testing |
|---|---|
| Fibrous Amphibole (Asbestiform Tremolite etc.) | CTFA J 4-1 |
| Arsenic | CTFA E 1-1, Parts I-a and II |
| Lead | CTFA E 2-2, Parts I-A and II |
| Quartz | CTFA J 5-1 (DTA) or CTFA J 6-1 (XRD) |

As part of the development of these standards, PCPC published a specification for talc that defined it as follows: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ (PCPC_MDL00007402, attached as **Exhibit 81**.) The development and use of these standards by the industry kept both consumers and the government in the dark about the presence of harmful constituent minerals in talc for decades.

PCPC also undertook a duty to consumers, including Plaintiffs, by publishing the *International Cosmetic Ingredient Dictionary and Handbook* (formerly called the *CTFA Cosmetic Ingredient Dictionary*). First published in 1973, there have been approximately 16

editions published over the years, with the most recent publication in 2016. This Dictionary provides uniform names and definitions for cosmetic ingredients using a system developed by PCPC called International Nomenclature Cosmetic Ingredient (INCI). PCPC's central responsibility regarding the definition of ingredients is evidenced by the fact that the industry and the government uniformly refer to cosmetic ingredient names by reference to the 2nd edition of the Dictionary published in 1977.

PCPC further undertook a duty to substantiate the safety of cosmetic ingredients by establishing the Cosmetic Ingredient Review. As discussed above, the CIR is a fundamentally flawed, regulatory review panel that merely rubber stamps the safety of ingredients used by the cosmetic industry.

Even to this day, PCPC recognizes their duty to consumers "remains to help consumers make informed decisions and have confidence in the products they use each day." (https://www.cosmeticsdesign.com/Article/2020/03/10/The-PCPC-s-focus-on-science-safety-and-sustainability, attached as **Exhibit 82**.)

PCPC's reliance on *Murray v. Motorola, Inc.* is misplaced and inapplicable here. *Murray* is not controlling law as it was decided by a lower court in the District of Columbia. In fact, the court in *Murray* even noted that "[t]here exists no case in this jurisdiction that controls the issue presented here." *Murray v. Motorola, Inc.*, 2011 D.C. Super. LEXIS 3, *80.

Further, *Murray* only addressed standard-setting and testing and whether that created a duty. The court, however, did not address whether a trade association's creation of a panel to review the safety of products marketed by members of the trade association constituted an acceptance of a duty. Here, PCPC created the CIR as a means to substantiate the safety of cosmetic ingredients and publish results to the public, including consumers of products

42

containing those ingredients. On its own, PCPC's formation and operation of the CIR created a duty to consumers because PCPC undertook the responsibility to review and assess the safety of ingredients used in cosmetic products.

In this case, PCPC accepted a duty to consumers to regulate the cosmetic industry, create testing standards, publish definitions and standards, and substantiate the safety of cosmetic ingredients—including talc.

**Breach of Duty.** "PCPC breached its duty of care to Plaintiffs and the consuming public by negligently failing to ensure that the J&J and Imerys Talc complied with and adhered to the PCPC standards, norms and /or bylaws concerning the safe manufacture, design, labeling, marketing, distribution and/or branding of" talc products and by "allowing [talc products] to be introduced into the federal, state and local streams of interstate commerce despite their significant health and safety risks of which PCPC had full knowledge."  (Am. Master Compl. ¶ 138.)

By failing to develop more stringent standards for the testing of talc,[20] by failing to establish a review panel that actually thoroughly evaluated the safety of talc, and by concealing the dangerous nature of talc from consumers and the government, PCPC breached its duty of care to consumers, including Plaintiffs.

 **Proximate Cause.** Courts in D.C. take a deferential approach to the issue of proximate cause. "'Proximate cause is generally a factual issue to be resolved by the jury,' however, it becomes a question of law 'when the evidence adduced at trial will not support a rational finding

---

[20]     PCPC argues that because J&J conducted additional tests on its cosmetic talc, the tests published by PCPC "are inapplicable in this litigation." (PCPC's Mem. at 16.) J&J still conducted the CTFA tests for its cosmetic talc, and PCPC does not argue that J&J did not conduct the CTFA tests. Simply because it conducted other tests does not make the tests published by PCPC inapplicable.

of proximate cause.'" *D.C. v. Zukerberg,* 880 A.2d 276, 281–82 (D.C. 2005) (citation omitted). Here, there is substantial evidence that PCPC failed to substantiate the safety of talc and concealed the dangers of talc, and as a result, Plaintiffs were not aware of the risks of using cosmetic products containing talc, creating a factual issue to be resolved by a jury.

> **B.    Plaintiffs' Fraud and Fraudulent Concealment Claims Present Genuine Disputes of Material Facts.**

The District of Columbia has adopted a traditional definition of common law fraud requiring a plaintiff to plead: "(1) a false representation; (2) of a material fact; (3) made with knowledge of its falsity; (4) with an intent to deceive; and (5) detrimental reliance." *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1004 n.5 (D.C. 2020) (citing *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C. 1977)); *see also Pyles v. HSBC Bank USA, N.A.,* 172 A.3d 903, 907–08 (D.C. 2017) ("The criteria to prove common-law fraud are well-established. Briefly put, a plaintiff must show that the defendant, with the intent to deceive the plaintiff, knowingly made a false representation of a material fact on which plaintiff justifiably and detrimentally relied.").

Plaintiffs' complaint provides particularized details regarding PCPC's allegedly fraudulent misrepresentations. For example, the complaint alleges that PCPC engaged in fraudulent conduct directed at preventing regulation of talc products by local state and federal governmental agencies.[21]  (*See* Am. Master Compl. ¶ 164.)

In this case, PCPC has been making fraudulent misrepresentations or committing outright fraud for decades, starting in 1976 when PCPC developed and published the specifications for the newly defined "cosmetic talc" in order to distinguish it from "industrial talc" or other grades

---

[21]    As explained above, the fact that PCPC's misrepresentations to governmental actors was directed at preventing governmental regulation undermines PCPC's argument that it could qualify for *Noerr-Pennington* immunity.

of talc. This can be easily seen by comparing CTFA specifications from the early 1970s to the revised specifications adopted November 7, 1976. (JNJ000281901, attached as **Exhibit 83**; (IMERYS137726, attached as **Exhibit 84**.) This change was made after many years of increasing concerns that talc contained asbestos. At that point in time, the cosmetic industry needed to take action in order to keep talc on the market. This newly created cosmetic talc specification called for testing the talc to ensure it had no detectable levels of asbestos, however the testing method that ended up being adopted (the CTFA J4-1 testing method) had a weak level of detection as it could only detect tremolite asbestos (as well as other amphibole asbestos) at levels of 0.5% or higher and did not even test for either chrysotile asbestos or fibrous talc. (JNJ000218562, attached as **Exhibit 85**.) PCPC knew that both chrysotile and fibrous talc were also dangerous like tremolite asbestos.[22] Nevertheless, PCPC used this inadequate testing standard to make public claims that talc was "asbestos free" and thus safe for the public and Defendants have been using this standard to support the fraudulent claims that talc is free from asbestos for decades.

For example, in 1986, PCPC and the Talc Task Force sent a letter to Dr. Sidney Gelliss at Pediatric Notes claiming that ███████████████████████████████████ ████████████████████████ (**Ex. 9**.)

Along with making fraudulent statements about talc's purity or freedom from asbestos, the CTFA has consistently been involved in making misrepresentations or fraudulent claims about talc in general. By the early 1990's, there had been numerous epidemiological studies showing a statistically significant association between perineal talc use and ovarian cancer. This along with a study by the National Toxicology Program in 1992 led to the industry organizing a

---

[22]    Occupational Safety and Health Administration (OSHA). 37 Fed. Reg. No. 202, October 18, 1972 at 22142.

workshop or symposium to defend talc in 1994. As discussed previously, this symposium led to the publication of misleading publications on the safety of talc. *See infra* Section II(B)(1).

In a November 11, 1994 response to the Citizen's Petition[23] seeking carcinogenic labeling on all cosmetic talc products, PCPC claimed that the workshop supports the safety of talc and all types of talc containing consumer products. (PCPC0075385, attached as **Exhibit 86**.) PCPC doubled down the next day and added a new sentence saying, ███████████████ ███████████████████████████████ (PCPC0075387, attached as **Exhibit 87**.) They continued to make similar statements over the next several years including an official response submitted to the FDA relating to the Cancer Prevention Coalition Citizens Petition. This 1995 misleading response was developed and edited by Steve Gettings with PCPC, along with the assistance of J&J employees Mike Chudkowski and Bill Ashton, and Talc Task Force consultant, Dr. Wehner. (JNJ00021286, attached as **Exhibit 88**.)

This symposium was primarily made up of the major cosmetic industry players and included many members from industry outside of J&J and Imerys (then Luzenac). One of the other members was Carter-Wallace, a company primarily engaged in the manufacture and distribution of condoms. (IMERYS210870, attached as **Exhibit 89**.) Carter-Wallace had been using talc to dust their condoms for many years and was thus highly interested in any potential regulation of talc or updates in the science on talc. In 1996, after this symposium, and after the publication of several additional studies, Carter-Wallace led the condom industry in a movement to remove talcum powder from condoms due to health concerns over the increased risk of ovarian cancer. This was widely publicized in newspaper articles, medical journals and even

---

[23] Under federal law, any person can submit to the FDA a Citizen's Petition requesting that the FDA take action related to a particular product that falls under the FDA regulatory scheme.

encouraged by the FDA. (JNJ000053072, attached as **Exhibit 90**; PCPC0066819, attached as **Exhibit 91**; JNJ000016158, attached as **Exhibit 92**; IMERYS-A_0011817, attached as **Exhibit 93**.) During this entire time period, Carter-Wallace was also an active member of PCPC and had been actively involved with PCPC and talc issues since at least 1982. (PCPC_MDL00010250, attached as **Exhibit 94**; PCPC_MDL00015287, attached as **Exhibit 95**; PCPC_MDL00030856, attached as **Exhibit 96**; PCPC_MDL00044793, attached as **Exhibit 97**.) Accordingly, it is clear that by 1996, PCPC knew from the actions of one of its members and all of the additional epidemiological studies that had been published that there was a statistically significant association between perineal talc use and ovarian cancer.  Yet, even armed with this knowledge and while one of PCPC's members was making a move that exemplifies corporate and civic responsibility for the cosmetic industry, PCPC nevertheless continued making fraudulent statements to the public whenever there is any increased publicity regarding the safety of talc use.

Throughout 1996 and 1997 the CTFA continued issuing response statements regarding the symposium that included saying ████████████████████████████████ ████████████████████████████████████████████████ ████████████ Meanwhile in March 1997, Dr. Wehner (the same expert toxicologist PCPC had hired to be their consultant at the symposium) informed J&J of false information released by PCPC:



(JNJ000031001, attached as **Exhibit 98**.) Wehner went on to attack many of the responses the CTFA had given over the last several years saying they just kept getting worse and that many of the statements were "outright false." (JNJ000011933, attached as **Exhibit 99**.) PCPC's own talc expert realized they were making fraudulent and misleading statements to the public. Ultimately, the consumers were relying upon these statements as the PCPC was supposed to be monitoring and regulating the cosmetics industry in general.

PCPC continued making similar statements into the 2000s while perpetrating the false claim that talc was asbestos free. This was especially clear in the early 2000s when the National Toxicology Program (NTP) began its review of talc. PCPC hired the Weinberg Group and Nichols-Dezenhall at a cost of $150,000 in order to support their efforts to prevent the NTP from listing talc as a carcinogen. As a critical part of these efforts, PCPC was also supporting Luzenac and submitting comments to the NTP under PCPC's name rather than Luzenac's. (PCPC0066630, attached as **Exhibit 100**.) At the same time Luzenac had hired the Center for Regulatory Effectiveness (CRE) and come up with what was ultimately the "fatal flaw," strategy that was used to derail the NTP's efforts. This strategy was based on the claim that the studies showing an increased association between perineal talc use and ovarian cancer were based on the notion that talc manufactured prior to 1976 *contained asbestos* while all talc manufactured after 1976 was "asbestos free." PCPC was aware of this strategy and the CRE's submission of this strategy to the NTP, once again based primarily on the faulty testing method that PCPC created and their fraudulent statements over the years that talc was free of asbestos. (PCPC0072893, attached as **Exhibit 101**.)

PCPC further made fraudulent statements through the Cosmetic Ingredient Review (CIR). As discussed previously, from its inception, the Cosmetic Ingredient Review has served

48

as the industry sponsored review group that simply rubber stamped the safety cosmetic ingredients to ensure that the ingredients would not be subject to any regulation by the government. When the talc review came up, it was considered ███████████ that they needed to handle. (PCPC_MDL0103539, attached as **Exhibit 102**.)  Ultimately, the CRE once again got involved and both PCPC and CRE submitted materials to the CIR. The CRE claims to be an independent third party with no affiliations to industry, meanwhile PCPC is aware of their close ties to Luzenac/Imerys but never informed the CIR of this fact. (PCPC_MDL00023425, attached as **Exhibit 103**.) This eventually led to the CIR adopting the suggestions of the CRE and PCPC and publishing a very favorable review of cosmetic talc, finding it safe as it was currently used. PCPC knew that this review was rushed, biased, and did not consider relevant evidence.  PCPC also knew that the CIR generally reviewed hundreds of ingredients every year while almost never finding an ingredient to be unsafe, and that industry (notably PCPC) played a major, inappropriate role in the CIR review. (PCPC_MDL00092069, attached as **Exhibit 104**; PCPC_MDL00020026, attached as **Exhibit 105**; PCPC_MDL00022149, attached as **Exhibit 106**.)  In the 2013 CIR Compendium published by PCPC, CIR had the nerve to fraudulently state that ██████████████████████████████████████████████████████████ ██████████████████████████████ (**Ex. 47**.) Despite all of this, PCPC continues to promote the safety of talc and the independence of the CIR. Consumers are forced to rely upon their statements and the CIR review as the cosmetic industry is self-regulating and at best, the FDA typically will adopt the suggestions from the CIR.

It is also worth noting that while a fraud claim (be it intentional or negligent) requires detrimental reliance, "It is not ... necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in

influencing his conduct … it is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *Virginia Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc.,* 878 A.2d 1226, 1238 (D.C. 2005) (quoting *City Solutions Inc. v. Clear Channel Communications, Inc.,* 365 F.3d 835, 840 (9th Cir.2004) (alterations in original)). It's evident that Plaintiffs detrimentally relied on assertions by PCPC (including the CIR) that talc was safe because they remained unaware of the safety concerns with talc due to PCPC fraudulent statements and omissions and continued to use products containing talc.

Fraudulent concealment does not necessarily give rise to an independent cause of action, but it is worth discussing what elements must be pled under DC common law in order to allow for a finding of fraudulent concealment.  "It is well established that affirmative acts employed by a party to fraudulently conceal either the existence of a claim or facts forming the basis of a cause of action toll the running of limitations periods." *Estate of Chappelle v. Sanders*, 442 A.2d 157, 158 (D.C.1982) (citations omitted); *accord, William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1192 (D.C.1980) ( "[t]he defendant's affirmative efforts to divert or prevent discovery of the original fraud give a continuing character to the original act which deprives it of statute of limitations protection until discovery"). *See also Drake v. McNair,* 993 A.2d 607, 619–20 (D.C. 2010).

 "It has consistently been the law in the District of Columbia that fraudulent concealment requires 'something of an affirmative nature designed to prevent discovery of [a] cause of action.'"  *Cevenini v. Archbishop of Washington*, 707 A.2d 768, 773–774 (D.C.1998) (quoting *William J. Davis, Inc. v. Young*, 412 A.2d at 1191-92).  Here Plaintiffs allege that PCPC engaged in a longstanding campaign of affirmative conduct designed to prevent discovery of dangers

50

associated with use of talc products by governmental regulators and the public at large. Moreover, there is nothing that would suggest that plaintiffs failed to exercise due diligence or were otherwise negligent in not investigating the dangers regarding the use of talc products. Indeed, finding the due diligence standard satisfied may be further supported by arguing that, as an advocacy organization that retained scientific experts, the PCPC assumed a fiduciary relationship with plaintiff consumers who purchased and used talc products because they undertook a duty to substantiate the safety of cosmetic ingredients such as talc. *See Diamond v. Davis*, 680 A.2d 364, 378 (D.C. 1996) ("[I]n a close, confidential relationship, the degree of reasonable reliance is likely to be much greater — and the reasonable diligence on the part of the plaintiff much less — than would exist where the parties had been in an adversary relationship."); *see also Firestone v. Firestone*, 76 F.3d 1205, 1209 (1996) (failure to disclose information may be sufficient to establish fraudulent concealment when one party has a fiduciary obligation to the other party).

In fact, PCPC was one of the primary financial backers and supporters of scientific experts. Unbeknownst to the public, PCPC was responsible for identifying, hiring, and ultimately influencing what, when, and where PCPC's funded experts would publish scientific studies that would support PCPC's position on talc. All of these efforts were either undertaken by themselves or through third parties such as the Weinberg Group, Nicholls-Dezenhall, or Burson-Martsellar. Over the years, PCPC funded numerous scientific studies and groups, starting in 1985 with the funding of Dr. Wehner's studies on particle translocation and continuing for decades to include critical industry friendly meta-analysis and publications from Dr. Joshua

Muscat and Dr. Michael Huncharek.[24] These efforts were all undertaken to fraudulently conceal the dangers of perineal talc use after the science clearly demonstrated an increased risk of ovarian cancer. Significantly, many of these efforts were made after the PCPC in response to a request from their sister organization in the United Kingdom (the CTPA), asked for their assistance in identifying spokespersons on the talc/ovarian cancer issue. On June 6, 1996, PCPC replied to this request and informed CTPA that they ██████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████ (PCPC0072694, attached as **Exhibit 113**.) Instead, PCPC once again pointed to the biased findings from the 1994 CTFA/ISRTP/FDA symposium. This symposium and the studies that PCPC funded over the years end up being the linchpin they rely upon to fraudulently conceal the dangers of talc and keep this knowledge from the general public and Plaintiffs in particular.

For decades, PCPC intentionally misrepresented the safety of talc and concealed the dangers of talc to the detriment of consumers.

### C. Plaintiffs' Conspiracy Claim Presents Genuine Disputes of Material Fact.

Under District of Columbia law, the elements of civil conspiracy are: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the

---

[24] Wehner et al., *Do Particles Translocate From the Vagina to the Oviducts and Beyond?* 23 Fd. Chem. Toxic. 367 (1985), attached as **Exhibit 107**; Wehner et al., *On Talc Translocation From the Vagina to the Oviducts and Beyond*, 24 Fd. Chem. Toxic. 329 (1986), attached as **Exhibit 108**; PCPC_MDL00015494, attached as **Exhibit 109**; PCPC00061912, attached as **Exhibit 110**; PCPC0027850, attached as **Exhibit 111**; IMERYS125259, attached as **Exhibit 112**.

parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Griva v. Davison,* 637 A.2d 830, 848 (D.C.1994); *see also Halberstam v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983).

As an initial matter, DC courts have indicated that the presumption is not to dismiss conspiracy claims on summary judgment. "Since the elements of conspiracy involve a subjective state of mind (*i.e.,* motive), disposition of such a claim by summary judgment is not appropriate generally. *See Weishapl v. Sowers*, 771 A.2d 1014, 1023–24 (D.C. 2001) (citing *International Underwriters v. Boyle,* 365 A.2d 779, 785 (D.C.1976)). Regardless, Plaintiffs can demonstrate that PCPC participated in a civil conspiracy in this case.

### 1.   PCPC entered into an agreement with J&J and other companies.

Proof of an agreement to participate in a civil conspiracy does not need to be direct. "Where there is no direct evidence of an agreement between the alleged co-conspirators, there must be circumstantial evidence from which a common intent can be inferred." *See Weishapl*, 771 A.2d at 1023–24 (citing *Halberstam v. Welch,* 705 F.2d at 480).  Moreover, courts apply a liberal standard when assessing the validity of conspiracy allegations on a motion to dismiss.  In *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d 724 (D.C. 2000), the court considered the validity of a civil conspiracy allegation.  Although the court found the Plaintiffs' claim floundered because it could not satisfy the second element (see *infra*), at the outset the court noted that it would construe the plaintiffs' complaint "liberally" when determining if an "agreement" had been adequately alleged.  *Id*. at 738 (citing *McBryde v. Amoco Oil Co.,* 404 A.2d 200, 202 (1979)).

PCPC and the other Defendants agreed to work together to defend talcum powder products and to keep the government "out of their backyard" since at least 1973 through the Talc

Task Force, as discussed in previous sections (*see, e.g.,* JNJTALC000071142, attached as **Exhibit 114**; PCPC_MDL00031934, attached as **Exhibit 115**.) At the direction of the Talc Task Force, PCPC used Defendants' pooled funds to take an active role in the science by paying for studies and their publication, recruiting consultants as speakers, and sponsoring ███████ ██████ workshops. (JNJ000001403, attached as **Exhibit 116**; JNJ000046271, attached as **Exhibit 117**; **Ex. 13**; PCPC0075364, attached as **Exhibit 118**; JNJ000240311, attached as **Exhibit 119**; IMERYS288570, attached as **Exhibit 120**; PCPC_MDL00032703, attached as **Exhibit 121**; PCPC_MDL00145227, attached as **Exhibit 122**.) In 1994, the lead ISRTP workshop presentation was given by PCPC, however, this presentation was prepared and influenced by J&J's ███████████████████ (JNJ000023733, attached as **Exhibit 123**.) During the NTP review in 2000, J&J was on the ████████ and ████████ for the PCPC submission to the NTP. (JNJ000404511, attached as **Exhibit 124**.) J&J noted that ████ ████████████████ even though there was a ████████████ (*Id.*) Informally, PCPC acted on behalf of J&J and Imerys as needed to defend talc, with the companies noting at times that they acted ████████████ even though J&J paid for and did much the most work. (**Ex. 7**; **Ex. 100**; PCPC0082507, attached as **Exhibit 125**; **Ex. 35**.)

    There is substantial evidence of an agreement among PCPC and the defendants, specifically J&J and Imerys. However, PCPC also had a formal agreement with J&J providing additional funding for the ISRTP workshop. (JNJ000240488, attached as **Exhibit 126**.) J&J agreed to commit an extra $10,000 to fund a talc task force consultant's attendance at the industry workshop. (*Id.*) █████████████████████████ As such, PCPC had both formal and

informal agreements with other parties, including Imerys.

PCPC also had a signed agreement from J&J to fund PCPC's efforts "with regard to the management, coordination, and development of scientific data, information, and assessments by consultants etc., pertaining to the continued safe use of talc." (**Ex. 119**.) J&J guaranteed funding "to reimburse CTFA for the direct costs of the research and Task Force expenses" up to $10,000 per year with the ability for the PCPC to request more as needed. (*Id.*). Through this agreement, J&J also agreed to indemnify PCPC "from or growing out of these activities." (*Id.*) This "guarantee to support CTFA talc interested party task force activities," is further proof of the agreement between PCPC and J&J.

### 2.   As part of the agreement, PCPC participated in unlawful acts.

Civil conspiracy also requires proof of unlawful activity. "[T]here is no recognized independent tort action for civil conspiracy in the District of Columbia." *Waldon v. Covington,* 415 A.2d 1070, 1074 n. 14 (D.C.1980). Instead, "civil conspiracy depends on performance of some underlying tortious act." *Halberstam,* 705 F.2d at 479. In other words, entering into an agreement with another party, by itself, is "not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort." *Id.* In *Exec. Sandwich Shoppe*, the plaintiff had alleged that the defendants engaged in a civil conspiracy to commit an "economic tort." *Id.* at 738.  The court dismissed the plaintiffs' civil conspiracy claim even though it was willing to infer the existence of an "agreement" because it found that the plaintiff's economic tort theory failed as a matter of law.  *Id.*  As a result, the plaintiff's civil conspiracy claim also failed "for lack of an underlying tortious act."  *Id.*

Plaintiffs have explained previously how PCPC committed the underlying tortious acts of fraud as discussed. *See* Section  III(B), *supra*. Therefore, this element of civil conspiracy also is

satisfied.

### 3. Plaintiffs' injuries were caused by the unlawful and tortious acts performed by members of the conspiracy in furtherance of their common scheme.

As mentioned above, the final two elements of civil conspiracy are "(3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme."

Plaintiffs suffered injuries as a result of the fraud committed by PCPC and co-defendants J&J and Imerys in furtherance of their common scheme to prevent the public from understanding the risks of ovarian cancer caused by talcum powder products and failing to warn plaintiffs of the risks. As such, all of the elements of civil conspiracy are satisfied.

## IV.   EVEN IF THE NEW JERSEY PRODUCT LIABLITY ACT APPLIED HERE, IT WOULD NOT PRECLUDE PLAINTIFFS' CLAIMS.

As noted previously, PCPC erroneously argues that New Jersey law should apply to claims asserted against it. Where, as here: (1) the injuries suffered by each individual Plaintiff; (2) the conduct of PCPC that caused Plaintiffs' injuries; (3) the domicile of the interested parties; and (4) the place where the relationship between the parties was centered are all outside of the State, New Jersey cannot be found to have the "most-significant-relationship." The substantive law of the District of Columbia, not New Jersey, applies in cases against PCPC. However, even if New Jersey law applied, Defendant's arguments that the New Jersey Product Liability Act ("NJPLA") precludes Plaintiffs' claims are misplaced.

PCPC's argument that Plaintiffs' claims against it are precluded relies on a narrow and inaccurate reading of what defines a "seller" under the NJPLA. For purposes of its argument, PCPC limits a "seller" to "someone who is involved in placing the product in the line of commerce." (PCPC Mem. at 12.) However, a much broader and more accurate interpretation of

the NJPLA shows that a seller, in addition to including someone involved in placing the product in the line of commerce, also includes those who "market" the product. *See* N.J.S.A. 2A:58C-8.

As alleged in the Master Complaint and outlined herein, PCPC's actions constitute marketing within the meaning of the NJPLA. PCPC actively caused information to be released to the public for purposes of influencing the perception of talcum powder and talc-based products. PCPC suppressed material information about the safety of talcum powder, its link to an increased risk of ovarian cancer, and that talcum powder contains asbestos. It did so in order to promote the private, commercial interests of itself and its members, and to influence the market for Defendants' talcum powder products. PCPC also did so to promote its pecuniary interest as Defendant's revenues were directly linked to the success of the products.

The cases relied upon by PCPC to argue it is not a seller provide little support. In *Becker v. Tessitore*, 356 N.J. Super. 233, 245 812 A.2d 369, 376 (App. Div. 2002), a case involving a driver who was struck by a piece of tire detread, NJPLA claims were dismissed where the court found that the defendant trucking company was neither the manufacturer nor seller of a failed tire it had purchased for use on one of its vehicles. Likewise, *Beckwith v. Bethlehem Steel Corp.*, 182 N.J. Super 376, 440 A.2d 1372 (Law Div. 1981), is distinguishable from the present matter for several reasons. To start, in *Beckwith*, plaintiffs did not allege that the trade association, the Asbestos Information Association/North America, Inc., had caused harm. *Id.* at 385. Nor did plaintiffs argue that the association had any pecuniary interest in the litigation. *Id.* Instead, plaintiffs sought to join the association for the sole purpose of obtaining discovery. *Id.* at 379. In contrast, the present matter alleges that PCPC caused harm to Plaintiffs by misrepresenting to, and concealing material facts from, the consuming public related to talcum powder and that Plaintiffs relied upon the statements and omissions of PCPC to their detriment. Plaintiffs have

further asserted that PCPC's actions were undertaken, in part, because it had and has a pecuniary interest in the sale of talcum powder products.

Lastly, summary judgment is not warranted on the sole basis that the Master Complaint does not specifically allege violations of the NJPLA.  As an initial matter, the Master Complaint is a pleading that encompasses all causes of action. As noted in each Count in the Master Complaint, "Plaintiffs plead all Counts of this First Amended Master Long Form Complaint in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of individual Plaintiffs' resident State."  (*See, i.e.* Master Complaint ¶¶ 57, 132, 159, 197 and 209.)  Further, the causes of action asserted by Plaintiffs are entirely consistent with the comprehensive legislative scheme of the NJPLA. Plaintiffs do not look to hold PCPC accountable for causes of action that would go beyond the scope of the NJPLA but, instead, have pled causes of action that are consistent and in line with the NJPLA.

Defendant's misguided attempt to escape liability by arguing that all causes of action are subsumed by the NJPLA is borne out in the cases upon which the arguments rely.  In *In re Lead Paint Litig.*, 191 N.J. 405 (2007), the New Jersey Supreme Court dismissed claims of public nuisance brought by local government entities, holding that "to recognize plaintiffs' right to pursue these manufacturers, we would create a cause of action entirely inconsistent with the PLA's comprehensive legislative scheme."  *Id.* at  439.  In the present matter, as noted above, Plaintiffs' causes of action are consistent with the legislative scheme of the NJPLA.  Likewise, *Koruba v. Am. Honda Motor Co.*, 396 N.J. Super. 517, 531 (App. Div. 2007), makes clear that the NJPLA no longer recognizes negligence as a viable ***separate*** claim for harm.  In *Koruba*, claims against the defendant seller were dismissed not because the seller alleged negligence instead of alleging a violation of the PLA, but because plaintiff failed to produce "competent

evidence to support a product liability claim." *Id.* at 532.[25]  Plaintiffs have produced competent evidence to support a product liability claim against PCPC and PCPC's argument that the NJPLA precludes Plaintiffs' claims must fail.

## CONCLUSION

PCPC is not shielded from liability by the *Noerr-Pennington* doctrine or the D.C. Anti-SLAPP Act, and Plaintiffs' claims present genuine disputes of material fact that should be resolved by a jury. For these reasons, summary judgment is inappropriate and the Court should deny PCPC's Motion.

Dated:        June 8, 2020            Respectfully submitted,

/s/ *Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel: 202-783-6400
Fax: 202-416-6392
mparfitt@ashcraftlaw.com

/s/ *P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: 334-269-2343
Fax: 334-954-7555
Leigh.odell@beasleyallen.com

***Plaintiffs' Co-Lead Counsel***

---

[25]    In *Arlandson v. Hartz Mountian Corp.*, 792 F. Supp. 2d 691 (D.N.J. 2011), another case relied upon by Defendant, the court similarly recognized that failure to plead NJPLA does not warrant dismissal where the claims sound in product liability.  *See id.* at 703-04 (permitting amendment where plaintiff classified her claims as "non-product liability" by alleging only economic damages related to the price of the product, but recognizing a viable cause of action if sounding in product liability).

/s/ *Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Avenue
Red Bank, NJ 07701
Tel: 732-747-9003
Fax: 732-747-9004
cplacitella@cprlaw.com

***Plaintiffs' Liaison Counsel***

**PLAINTIFFS' EXECUTIVE COMMITTEE:**

Warren T. Burns
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, TX 75201
Tel: 469-904-4551
Fax: 469-444-5002
wburns@burnscharest.com

Richard Golomb
GOLOMB & HONIK, P.C.
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
rgolomb@golombhonik.com

Richard H. Meadow
THE LANIER LAW FIRM PC
6810 FM 1960 West
Houston, TX 77069
Tel: 713-659-5200
Fax: 713-659-2204
richard.meadow@lanierlawfirm.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK PLLC
360 Lexington Avenue, 11thFloor
New York, NY 10017
Tel: 212-397-1000
hunter@napolilaw.com

**PLAINTIFFS' STEERING COMMITTEE:**

Laurence S. Berman
Michael M. Weinkowitz
LEVIN, SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
Fax: 215-592-4663
lberman@lfsblaw.com

Timothy G. Blood
BLOOD, HURST & O'REARDON, LLP
701 B Street, Suite 1700
San Diego, CA 92101
Tel: 619-338-1100
Fax: 619-338-1101
tblood@bholaw.com

Sindhu S. Daniel
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, #1100

Jeff S. Gibson
WAGNER REESE, LLP
11939 N. Meridian St.

Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181
sdaniel@baronbudd.com

Kristie M. Hightower
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA 70601
Tel: 337-439-0707
Fax: 337-439-1029
khightower@lundylawllp.com

Victoria Maniatis
SANDERS PHILLIPS GROSSMAN, LLC
100 Garden City Plaza, Suite 500
Garden City, NJ 11530
Tel: 516-640-3913
Fax: 516-741-0128
vmaniatis@thesandersfirm.com

Eric H. Weinberg
THE WEINBERG LAW FIRM
149 Livingston Avenue
New Brunswick, NJ 08901
Tel: 732-246-7080
Fax: 732-246-1981
ehw@erichweinberg.com

Christopher V. Tisi
LEVIN PAPANTONIO
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
ctisi@levinlaw.com

Carmel, IN 46032
Tel: (317) 569-0000
Fax: (317) 569-8088
jgibson@wagnerreese.com

Daniel R. Lapinski
MOTLEY RICE LLC
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
Tel: 856-667-0500
Fax: 856-667-5133
dlapinski@motleyrice.com

Carmen S. Scott
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel: 843-216-9162
Fax: 843-216-9450
cscott@motleyrice.com

Richard L. Root
MORRIS BART, LLC
Pan America Life Center
601 Poydras St., 24th Fl.
New Orleans, LA 70130
Tel. 504-525-8000
Fax: 504-599-3392
rroot@morrisbart.com

61