**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

IN RE:  JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS      **MDL No. 16-2738 (FLW) (LHG)**
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY
LITIGATION

**DEFENDANT PERSONAL CARE PRODUCTS COUNCIL'S
REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

DATED: June 22, 2020           Respectfully submitted,

                    PERSONAL CARE PRODUCTS COUNCIL

By:   */s/ Thomas T. Locke*
       Thomas T. Locke
       Renee Appel
       SEYFARTH SHAW LLP
       975 F Street, N.W.
       Washington, DC  20004
       Telephone:  (202) 463-2400
       Facsimile:  (202) 828-5393
       tlocke@seyfarth.com
       rappel@seyfarth.com

       Richard W. Wedinger
       Jennifer Cheong
       BARRY, McTIERNAN & WEDINGER P.C.
       10 Franklin Avenue
       Edison, NJ 08837
       Telephone: (732) 738-5600
       Facsimile: (732) 738-7518
       rwedinger@bmctwlaw.com
       jcheong@bmctwlaw.com

       *Attorneys for Defendant Personal Care
       Products Council*

## <u>TABLE OF CONTENTS</u>

CHOICE OF LAW ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I.     PCPC HAS NO LIABILITY FOR LOBBYING AND RELATED ACTIVITIES............ 3

     A.     The First Amendment Protects PCPC's Actions. .................................. 3

         1.     The First Amendment Right to Petition and the Noerr-Pennington Protections Apply to Plaintiffs' Common Law Tort Claims. .................... 4

         2.     Plaintiffs' Claims are Premised on Petitioning and Related Activities. ...................................................................................... 7

         3.     Neither the "Sham" Nor the So-Called "Fraud" Exceptions Apply. ........ 14

         4.     Plaintiffs' Evidentiary Argument Does Not Save Their Claims............... 17

     B.     D.C.' s Anti-SLAPP Statute Precludes Plaintiffs' Claims Against PCPC. ......... 17

         1.     Plaintiffs' Procedural Anti-SLAPP Argument Fails................................. 18

         2.     PCPC Engaged in Acts in Furtherance of the Right of Advocacy. .......... 18

         3.     Talc Safety is an Issue of Public Concern. ................................................ 20

         4.     D.C. Courts Benefit from the Interpretation of California's Anti-SLAPP Statute, Which Supports Dismissal............................................. 21

II.     NEW JERSEY'S PRODUCT LIABILITY ACT PRECLUDES PLAINTIFFS' CLAIMS BECAUSE PCPC IS NOT A MANUFACTURER OR SELLER. ................. 21

III.     PLAINTIFFS CANNOT OVERCOME THE DEFICIENCIES IN THEIR COMMON LAW CLAIMS................................................................................ 24

     A.     As a Matter of Law, Plaintiffs' Negligence Claim Fails. .................................... 25

         1.     PCPC Owed No Duty to Plaintiffs. ........................................................... 25

         2.     PCPC's Actions Did Not Cause Plaintiffs' Injuries. ................................ 29

     B.     As a Matter of Law, Plaintiffs' Fraud Claim Fails. ............................................. 31

     C.     As a Matter of Law, Plaintiffs' Conspiracy Claim Fails. ................................... 34

CONCLUSION.................................................................................................. 35

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*,
  263 F.3d 239 (3d Cir. 2001)................................................................................3, 11

*In re Accutane Litig.*,
  235 N.J. 229, 194 A.3d 503 (2018)............................................................................2

*Ali v. Mid-Atl. Settlement Servs., Inc.*,
  640 F. Supp. 2d 1 (D.D.C. 2009), *aff'd sub nom. Ali v. Tolbert*, 636 F.3d 622
  (D.C. Cir. 2011) .....................................................................................................34

*Allied Tube & Conduit Corporate v. Indian Head*,
  486 U.S. 492 (1988)..............................................................................................6, 12

*Allstate New Jersey Ins. Co. v. Amazon.com, Inc.*,
  CV172738FLWLHG, 2018 WL 3546197 (D.N.J. July 24, 2018) .........................23

*Arlandson v. Hartz Mountain Corp.*,
  792 F. Supp. 2d 691 (D.N.J. 2011) .........................................................................22

*Armstrong Surgical Ctr. Armstrong County Mem. Hosp.*, 185 F.3d 154 (3d Cir.
  1999) ......................................................................................................................16

*Bailey v. Edward Hines Lumber Co.*,
  308 Ill. App. 3d 58, 719 N.E.2d 178 (1999) ...........................................................26

*Balt. Scrap Corp. v. David J. Joseph Co.*,
  237 F.3d 394 (4th Cir. 2001) ...................................................................................9

*Banner v. Hoffmann-La Roche Inc.*,
  383 N.J. Super. 364, 891 A.2d 1229 (App. Div. 2006), *cert. denied*, 190 N.J.
  393 (2007)..............................................................................................................22

*BE&K Constr. Co. v. Nat'l Labor Relations Bd.*,
  536 U.S. 516 (2002)..............................................................................................3, 15

*Beascock v. Dioguardi Enters.*,
  130 Misc. 2d 25, 494 N.Y.S. 2d 974 (1985).............................................................26

*Boley v. Atl. Monthly Grp.*,
  950 F. Supp. 2d 249 (D.D.C. 2013) ........................................................................21

*Brownsville Golden Age Nursing Home, Inc. v. Wells*,
  839 F.2d 155 (3rd Cir. 1988) ...................................................................................6

i

*Busby v. Capital One*,
772 F. Supp. 2d 268 (D.D.C. 2011) ....................................................................................33

*Calif. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)...................................................................................................4, 15

*Campbell v. PMI Food Equip. Group, Inc.*,
509 F.3d 776 (6th Cir. 2007) .............................................................................................6

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
168 F.3d 119 (3d Cir. 1999)..............................................................................................16

*Chen v. District of Columbia*,
256 F.R.D. 267 (D.D.C. 2009)..........................................................................................34

*City of Millville v. Rock*,
683 F. Supp. 2d 319 (D.N.J. 2010) ...................................................................................34

*Claypotch v. Heller, Inc.*,
360 N.J. Super. 472 (App. Div. 2003) ...............................................................................23

*Columbia v. Omni Outdoor Adver., Inc.*,
499 U.S. 365 (1991).......................................................................................................6, 16

*Covad Commc'ns, Inc. v. Bell Atl. Corp.*,
398 F.3d 666 (D.C. Cir. 2005) ..........................................................................................14

*In re CR Bronco, LLC*,
CIV.A. 09-3036 JEI, 2010 WL 3862366 (D.N.J. Sept. 27, 2010)....................................24

*Doe No. 1 v. Burke*,
91 A.3d 1031 (D.C. 2014) .................................................................................................20

*Doerflein v. Six Flags Great Adventure*,
No. A-0522-04T2, 2006 WL 392980 (N.J. Super. Ct. App. Div. Feb. 22,
2006) ..................................................................................................................................23

*Dukes v. Pneumo Abex Corp.*,
386 Ill. App. 3d 425, 900 N.E.2d 1128 (2008) .................................................................35

*E. Sav. Bank, FSB v. Papageorge*,
31 F. Supp. 3d 1 (D.D.C. 2014) ..........................................................................................5

*Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)..................................................................................................*passim*

*Exec. Sandwich Shoppe v. Carr Realty Corp.*,
749 A.2d 724 (D.C. 2000) .................................................................................................34

ii

*Farah v. Esquire Magazine, Inc.*,
   863 F. Supp. 2d 29 (D.D.C. 2012) ...........................................................................21

*Fed. Prescription Serv. v. Am. Pharm. Ass'n*,
   663 F.2d 253 (D.C. Cir. 1981) ...........................................................................15, 16

*Fid. & Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc.*,
   936 F. Supp. 2d 441 (D.N.J. 2013) .......................................................................22

*Forras v. Rauf*,
   39 F. Supp. 3d 45 (D.D.C. 2014), *aff'd on other grounds*, 812 F.3d 1102 (D.C.
   Cir. 2016) ...............................................................................................................17

*In re Fort Totten Metrorail Cases*,
   895 F. Supp. 2d 48 (D.D.C. 2012) .......................................................................30

*Fritz v. Islamic Republic of Iran*,
   320 F. Supp. 3d 48 (D.D.C. 2018) ..........................................................................3

*Ginsberg v. Quest Diagnostics, Inc.*,
   227 N.J. 7, 147 A.3d 434 (2016) .............................................................................2

*Gunsalus v. Celotex Corp.*,
   674 F. Supp. 1149 (E.D. Pa. 1987) .......................................................................30

*Hamilton v. Accu-Tek*,
   935 F. Supp. 1307 (E.D.N.Y. 1996) .......................................................................6

*Hanberry v. Hearst Corp.*,
   276 Cal. App. 2d 680, 81 Cal. Rptr. 519 (Ct. App. 1969) ....................................26

*Hanover 3201 Realty, LLC, v. Village Supermarkets, Inc.*,
   806 F.3d 162 (3d Cir. 2015) ...........................................................................15, 16

*Hempstead v. Gen. Fire Extinguisher*,
   269 F. Supp. 109 (D. Del. 1967) ..........................................................................26

*Hernandez v. Amcord, Inc.*,
   215 Cal App. 4th 569 (2013) ...........................................................................5, 17

*Hinton v. United States*,
   714 F. Supp. 2d 157 (D.D.C. 2010) .....................................................................29

*In re IBP Confidential Business Documents Litig.*,
   755 F.2d 1300 (8th Cir. 1985) ................................................................................9

*Inox Wares Pvt. Ltd. v. Interchange Bank*,
   Civ.A.A 06-4307 (SRC), 2008 WL 4691906 (D.N.J. Oct. 22, 2008) ....................25

*Jappell v. Am. Ass'n of Blood Banks*,
   162 F. Supp. 2d 476 (E.D.V.A. 2001) ...................................................................27

*Jefferson v. Collins*,
   905 F. Supp. 2d 269 (D.D.C. 2012) .....................................................................33

*Koruba v. Am. Honda Motor Co.*,
   396 N.J. Super. 517, 935 A.2d 787 (App. Div. 2007) ..........................................22

*In re Lead Paint Litig.*,
   191 N.J. 405, 924 A.2d 484 (2007)......................................................................22

*Leibholz v. Hariri*,
   No. CIV. 05-5148 DRD, 2011 WL 1466139 (D.N.J. Apr. 15, 2011), *aff'd*, 510
   F. App'x 112 (3d Cir. 2013) ................................................................................32

*Lewis v. Lead Indus. Ass'n*,
   342 Ill. App. 3d 95, 793 N.E.2d 869 (2003) ........................................................33

*In re Lipitor Antitrust Litig.*,
   868 F.3d 231 (3d Cir. 2017)..................................................................................14

*Lockman v. S.R. Smith*,
   LLC, 4:07-CV-0217, 2010 WL 11566367 (N.D. Ga. May 14, 2010), *aff'd*,
   405 F. App'x 471 (11th Cir. 2010) .......................................................................27

*Lynn v. Amoco Oil Co.*,
   459 F. Supp. 2d 1175 (M.D. Ala. 2006) ..............................................................35

*Manistee Town Ctr. v. City of Glendale*,
   227 F.3d 1090 (9th Cir. 2000) ..............................................................................11

*Meyers v. Donnatacci*,
   220 N.J. Super. 73, 531 A.2d 398 (Law. Div. 1987) ...........................................26

*U.S. ex rel. Morton v. A Plus Benefits, Inc.*,
   139 F. App'x 980 (10th Cir. 2005) .......................................................................32

*N.A.A.C.P. v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)................................................................................................8

*N. Jersey Interiors, L.L.C. v. New Jersey Reg'l Council of Carpenters*,
   No. 11-724, 2012 WL 816749 (D.N.J. Mar. 9, 2012) ..........................................19

*Nader v. The Dem. Nat'l Comm.*,
   555 F. Supp. 2d 137 (D.D.C. 2008), *aff'd on other grounds*, 567 F.3d 692
   (D.C. Cir. 2009) ..........................................................................................5, 14, 34

iv

*Nova Bank v. Samuel D. Schenker, L.L.C.,*
   A-0553-13T4, 2015 WL 751529 (N.J. Super. Ct. App. Div. Feb. 24, 2015) .........................34

*In re Orthopedic Bone Screw Prod. Liab. Litig.,*
   193 F.3d 781 (3d Cir. 1999)...................................................................................................34

*Ortzian v. McNeilus Truck & Mfg.,*
   CIV. 07-0646 (DRD), 2008 WL 5118608 (D.N.J. Dec. 4, 2008), *aff'd,* 354 F.
   App'x 668 (3d Cir. 2009).......................................................................................................29

*Pfizer Inc. v. Giles (In re Asbestos Sch. Litig.),*
   46 F.3d 1284 (3d Cir. 1994)....................................................................................................5

*Picciano v. Costco Wholesale Corp.,*
   A-3071-17T2, 2019 WL 930279 (N.J. Super. Ct. App. Div. Feb. 25, 2019),
   *cert. denied*, 238 N.J. 234, 209 A.3d 220 (2019)....................................................................24

*Port Auth. of New York & New Jersey v. Arcadian Corp.,*
   991 F. Supp. 390 (D.N.J. 1997), *aff'd*, 189 F.3d 305 (3d Cir. 1999)......................................29

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,*
   508 U.S. 49 (1993)..............................................................................................6, 12, 15, 16

*Sandza v. Barclays Bank PLC,*
   151 F. Supp. 3d 94 (D.D.C. 2015) .........................................................................................34

*Santana Prods. Inc. v. Bobrick Washroom Equip., Inc.,*
   401 F.3d 123 (3rd Cir. 2005) ...................................................................................................8

*Scott v. Hern,*
   216 F.3d 897 (10th Cir. 2000) .................................................................................................6

*Sherrod v. Breitbart,*
   720 F.3d 932 (D.C. Cir. 2013) ...............................................................................................18

*Simpson v. Johnson & Johnson,*
   No. 2016 CA 001931 (D.C. Super. Ct., Jan. 13, 2017) ..........................................18, 19, 20, 21

*Sinclair v. Merck & Co., Inc.,*
   195 N.J. 51, 948 A.2d 587 (2008)...........................................................................................22

*Sizemore v. Georgia-Pac. Corp.,*
   6:94-2894 3, 1996 WL 498410 (D.S.C. Mar. 8, 1996), *aff'd sub nom.*
   *Sizemore v. Hardwood Plywood & Veneer Ass'n*, 114 F.3d 1177 (4th Cir.
   1997) ................................................................................................................................30, 35

*Snyder v. Am. Ass'n of Blood Banks,*
   144 N.J. 269, 676 A.2d 1036 (1996)........................................................................................28

*Sosa v. DIRECTTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) .............................................................................7

*In re Tobacco/Governmental Health Care Costs Litig.*,
   83 F. Supp. 2d 125 (D.D.C. 1999), *aff' sub nom. Serv. Employees Int'l Union
   v. Philip Morris Inc.*, 249 F.3d 1068 (D.C. Cir. 2001) .........................................30

*TS Media, Inc. v. Public Broadcasting Serv.*,
   No. 2018 CA 001247 B, 2018 WL 2323233 (D.C. Super. May 15, 2018) ...........................21

*Tuosto v. Philip Morris USA Inc.*,
   2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007) ..........................................................6

*U.S. Golf Ass'n v. St. Andrews Sys.*,
   749 F.2d 1028 (3d Cir. 1984) ..........................................................................24

*U.S. v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ...........................................................10, 11, 31, 32

*U.S. v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006) ...............................10

*United Mine Workers v. Pennington*,
   381 U.S. 657 (1965) ..............................................................................12, 14

*Universal Underwriters Ins. Grp. v. Pub. Serv. Elec. & Gas Co.*,
   103 F. Supp. 2d 744 (D.N.J. 2000) ....................................................................22

*Venetian Casino Resort v. N.L.R.B.*,
   793 F.3d 85 (D.C. Cir. 2015) ...........................................................................4

*Video Int'l Prod., Inc. v. Warner-Amex Cable Comms., Inc.*,
   858 F.2d 1075 (5th Cir. 1988) .........................................................................6

*We, Inc. v. City of Phila.*,
   174 F.3d 322 (3rd Cir. 1999) ..........................................................................6

*In re Welding Fume Prod. Liab. Litig.*,
   526 F. Supp. 2d 775 (N.D. Ohio 2007) .............................................................25, 35

*Whelan v. Abell*,
   48 F.3d 1247 (D.C. Cir. 1995) .......................................................................5, 16

*Whitehill v. Elkins*,
   389 U.S. 54 (1967) .....................................................................................3

*Woodward & Lothrop v. Baron*,
   CIV. A. 84-0513, 1984 WL 861 (D.D.C. June 19, 1984) ..................................................33

**Statutes**

United States Constitution First Amendment ........................................................ *passim*

15 U.S.C. ch. 39 § 1453 .........................................................................................26

15 U.S.C. ch. 39 § 1454 .........................................................................................26

15 U.S.C. ch. 39 § 1455 .........................................................................................26

Anti-Strategic Lawsuit Against Public Participation Act ...................................... *passim*

D.C. Code § 16-5501(1) ........................................................................................19

D.C. Code § 16-5501(1)(A)(i) ...............................................................................20

D.C. Code § 16-5501(3) ........................................................................................20

Food, Drug & Cosmetic Act ..............................................................................25, 26

New Jersey Product Liability Act .......................................................................... *passim*

21 CFR § 740.10 ...................................................................................................28

65 FR 61352 (Oct. 17, 2000) ................................................................................10

Plaintiffs seek to hold Personal Care Products Council ("PCPC") liable for injuries allegedly arising from products that PCPC neither made nor sold, arguing that it engaged in a conspiracy to misrepresent to the government and the public facts regarding the ingredient talc. Plaintiffs' claims fail as a matter of law, and PCPC is entitled to summary judgment.

First, PCPC's alleged conduct relates to petitioning the government and related activities on regulating talc.  This conduct is protected by the First Amendment, and Plaintiffs have not met their burden of showing that an exception to the Noerr Pennington doctrine applies.  And, Plaintiffs have not even attempted to meet their burden under D.C.'s Anti-Strategic Lawsuit Against Public Participation Act ("Anti-SLAPP Act") to show that their claims likely will succeed.  These defenses are independent and complete bars to Plaintiffs' claims.

Second, the New Jersey Product Liability Act ("NJPLA") does not permit Plaintiffs' claims because PCPC is merely a trade association, not a manufacturer or seller, notwithstanding Plaintiffs' specious argument.  This also is an independent and complete bar to Plaintiffs' claims.

Third, even if Plaintiffs could overcome those hurdles—and they cannot— as a matter of law, PCPC did not owe Plaintiffs a duty and PCPC's purported conduct did not cause their injuries.  Plaintiffs cannot establish that PCPC committed fraud or that they relied on any alleged statements made by PCPC.  And, because Plaintiffs cannot show that PCPC agreed to pursue an illegal goal or engaged in unlawful conduct, their conspiracy claim fails.  There is no negligent conspiracy cause of action.

## <u>CHOICE OF LAW</u>

The Court does not need to resolve choice of law to grant PCPC's motion because, as discussed in Part I.A.1 below, the applicability of the First Amendment is not a matter of state law.  As explained in PCPC's Memorandum of Law ("Mot.") (ECF 9713-1) at 2-4, New Jersey

or Washington, D.C. law applies to the extent that any issues survive PCPC's First Amendment defense. If a conflict exists between the laws of those jurisdictions, New Jersey law applies.

As to the common law causes of action, where the jurisdictions differ are the NJPLA and D.C.'s Anti-SLAPP statute—both of which preclude Plaintiffs' claims against PCPC. The New Jersey and D.C. choice-of-law tests are largely inapplicable because only one factor is known, PCPC's domicile. "In a complex case with many parties from different states, the trial court retains the discretion to decline a defendant-by-defendant approach and, utilizing a Restatement §§ 146, 145 and 6 analysis … apply the law of a single state to claims asserted against all defendants." *Ginsberg v. Quest Diagnostics, Inc.*, 227 N.J. 7, 20, 147 A.3d 434, 442 (2016). The "two most significant Restatement factors" in multi-party litigation are "certainty, predictability and uniformity of result" and "ease in the determination and application of the law to be applied." *In re Accutane Litig.*, 235 N.J. 229, 263, 194 A.3d 503, 523 (2018) (citing Restatement Second (Conflict of Laws) § 6). "[A]pplying a single standard" over thousands of cases would "ensure predictable and uniform results—rather than disparate outcomes among similarly situated plaintiffs" who used the same products. *Id.* "There can be no question that administrative ease and efficiency favor the application of [the forum's state law]." *Id.*

Here, that analysis points to the application of New Jersey law. It is the law of the forum and, therefore, supports ease of administration. New Jersey law also ensures uniformity of result across Plaintiffs and Defendants. Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, "J&J") are based in New Jersey. The location of J&J is relevant as J&J products are at issue. Inconsistent results could occur if D.C. law applied to one defendant and New Jersey law applied to others, particularly as to claims asserted against all defendants.

2

Furthermore, under D.C.'s blended "governmental interest" analysis, New Jersey has a paramount interest in advancing its legislature's intent to limit the scope of product liability actions to the NJPLA. *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 89 (D.D.C. 2018). Applying D.C.'s common law would frustrate New Jersey's products liability framework. Accordingly, New Jersey law should apply to the common law claims.

## ARGUMENT

## I.   PCPC HAS NO LIABILITY FOR LOBBYING AND RELATED ACTIVITIES.

The First Amendment of the United States Constitution and the *Noerr-Pennington* protections preclude liability because Plaintiffs' allegations arise from PCPC's protected petitioning and related activities. In addition, PCPC has established a prima facie showing that D.C.'s Anti-SLAPP statute applies, and Plaintiffs have not even attempted to meet their burden of demonstrating that their claims are likely to succeed on the merits.

### A.   The First Amendment Protects PCPC's Actions.

Plaintiffs' Opposition barely mentions the First Amendment, even though that is a centerpiece of PCPC's motion for summary judgment. Plaintiffs' effort to limit the First Amendment to a "narrow" context fails.

The First Amendment provides, in pertinent part: "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The protections of the Petition Clause have been extended to the States via the Fourteenth Amendment. *Whitehill v. Elkins*, 389 U.S. 54, 57 (1967). The right to petition is among "the most precious of liberties safeguarded by the Bill of Rights," and "is implied by the very idea of a government, republican in form." *BE&K Constr. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516, 524-525 (2002) (citations and internal punctuation omitted); *see also A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 251 (3d Cir. 2001) (same).

3

The Noerr Pennington doctrine is one of the ways that courts implement the protections guaranteed by First Amendment right to petition.  *Venetian Casino Resort v. N.L.R.B.*, 793 F.3d 85, 90 (D.C. Cir. 2015).  The Supreme Court created the Noerr Pennington doctrine as a means to avoid finding a conflict between the Sherman Act (which limits competitors from working together) and the First Amendment right to petition.  *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139 (1961) (rejecting construction of Sherman Act "that would disqualify people from taking a public position on matters in which they are financially interested" because it would "deprive the people of their right to petition in the very instances in which that right may be of the most importance to them.").  The Noerr Pennington protections extend to the act of petitioning federal agencies so that groups with common interests may not be held liable for "advocat[ing] their causes and points of view respecting resolution of their business and economic interests." *Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972). These protections apply to trade associations.  *Noerr*, 365 U.S. at 139.

Plaintiffs argue that the First Amendment does not apply because: (1) "the applicability of Noerr-Pennington immunity is a matter of substantive state law" and does not apply to Plaintiffs' common law tort claims; (2) Plaintiffs' claims do not relate solely to petitioning and related activities; (3) PCPC allegedly made "misrepresentations [that] fall outside the boundary of protection provided by [the Noerr Pennington] doctrine;" and (4) the First Amendment and the Noerr Pennington doctrine are not evidentiary rules.  These arguments fail as a matter of law.

### 1.   The First Amendment Right to Petition and the Noerr-Pennington Protections Apply to Plaintiffs' Common Law Tort Claims.

Plaintiffs attempt to characterize the right to petition as a "common law doctrine."  Opp. at 9.  The First Amendment is not common law and it is not superseded by common law claims.  As, the D.C. Circuit explained in a case involving the Noerr Pennington doctrine:

> We know that a state cannot constitutionally impose liability based on proof of libel and slander in their unreconstructed forms, *New York Times v. Sullivan*, 376 U.S. 254, 268-69, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1963) ("libel can claim no talismanic immunity from constitutional limitations"), so there is nothing inherently sacrosanct about common law torts. *Cf. NAACP v. Button*, 371 U.S. 415, 429, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963) ("a State cannot foreclose the exercise of constitutional rights by mere labels").

*Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995).  Likewise, the Third Circuit, in a products liability case, held that the First Amendment protects the right of a manufacturer to join organizations that participate in public debate, make contributions to them, and attend their meetings.  *Pfizer Inc. v. Giles (In re Asbestos Sch. Litig.)*, 46 F.3d 1284, 1294 (3d Cir. 1994).

Plaintiffs concede—as they must—that D.C. courts have extended the scope of Noerr Pennington protections "to include common-law torts such as malicious prosecution and abuse of process."  Opp. at 12; *see also E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 19 (D.D.C. 2014) (holding that the D.C. "Circuit has extended Noerr-Pennington immunity from its original antitrust context to common law torts").  Although Plaintiffs' argue that the doctrine should not extend to their personal injury claims, the very cases that Plaintiffs cite indicate the opposite.

For example, *Hernandez v. Amcord, Inc.*, 215 Cal App. 4th 569 (2013), considered the merits and scope of the doctrine in a personal injury case.  There, the court reiterated that "the Bill of Rights protects the right of petition" and, in many instances, the Noerr-Pennington doctrine "shields defendants from liability based on their legitimate right to petition government officials."  *Id.* at 678, 679.[1]  *See also Nader v. The Dem. Nat'l Comm.*, 555 F. Supp. 2d 137, 156-

---

[1] Plaintiffs' argument that Noerr-Pennington "is a matter of substantive state law" is belied by *Hernandez*, which states that the doctrine arises from federal or constitutional law.  *Id.* at 680 n.9 ("Though we are not bound by federal authority, we may consider it persuasive on issues of federal or constitutional law).  *See also id.* (quoting *Tichinin v. City of Morgan Hill*, 177 Cal.App.4th 1049, 1064 n.7 (2009) ("Many of the Noerr-Pennington cases are decisions from lower federal appellate and district courts. 'While we are not bound by decisions of the lower

57 (D.D.C. 2008) (granting motion to dismiss common law claims based in part on Noerr

Pennington doctrine), *aff'd on other grounds*, 567 F.3d 692, 696 (D.C. Cir. 2009) (reasoning, in

*dicta*, that First Amendment protections apply to common law torts).

Contrary to Plaintiffs' assertion, the First Amendment right to petition and the Noerr

Pennington doctrine have barred liability in state common law tort claims, including products

liability claims.  *See, e.g.*, *Tuosto v. Philip Morris USA Inc.*, 2007 WL 2398507, at *5-6, 86

(S.D.N.Y. Aug. 21, 2007); *Hamilton v. Accu-Tek*, 935 F. Supp. 1307, 1317 (E.D.N.Y. 1996).

*See also We, Inc. v. City of Phila.*, 174 F.3d 322, 326-27 (3rd Cir. 1999) ("the purpose of Noerr-

Pennington as applied in areas outside the antitrust field is the protection of the right to

petition"); *Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 790 (6th Cir. 2007); *Scott v.

Hern*, 216 F.3d 897, 914 (10th Cir. 2000); *Brownsville Golden Age Nursing Home, Inc. v. Wells*,

839 F.2d 155, 160 (3rd Cir. 1988); *Video Int'l Prod., Inc. v. Warner-Amex Cable Comms., Inc.*,

858 F.2d 1075, 1084 (5th Cir. 1988) ("There is simply no reason that a common-law tort can any

more permissibly abridge or chill the constitutional right of petition than can a statutory claim

such as antitrust.").[2]

---

federal courts, even on federal questions, they are persuasive and entitled to great weight."
(citations omitted)).

[2] Plaintiffs cite *Allied Tube & Conduit Corporate v. Indian Head*, 486 U.S. 492 (1988),
*Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365 (1991), and *Professional Real Estate
Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) ("*PRE*") for the
proposition that "the Supreme Court has never applied the Noerr-Pennington doctrine outside of
the antitrust or federal labor law context."  Opp. at 10.  But, these cases do not address that issue.
*Allied Tube* held that competitors attempting to influence a private association are not protected
from antitrust liability.  486 U.S. at 501-03. *Omni Outdoor* held that the Noerr Pennington
doctrine protected a city and private entity from liability for a conspiracy claim arising from
restrictions on outdoor billboards.  499 U.S. at 372-77.  And, as discussed below, *PRE* explained
the "sham" exception to the Noerr Pennington doctrine.  508 U.S. at 56.

### 2.     *Plaintiffs' Claims are Premised on Petitioning and Related Activities.*

Plaintiffs argue that the First Amendment and Noerr-Pennington protections do not apply because "Plaintiffs' claims are not related **solely** to statements made by PCPC to the government or in public forums." Opp. at 8 (emphasis added). However, all of the relevant exhibits that Plaintiffs cite relate to PCPC's interactions with the federal government and in public forums. Plaintiffs' claims are, in fact, premised on their allegation that PCPC attempted to "manipulate governmental and non-governmental public discourse." Opp. at 11.

That is precisely the activity that the Noerr Pennington doctrine protects. As Plaintiffs' concede, "the Supreme Court has specified that parties exercise their right to petition when they 'advocate their causes and points of view respecting resolution of their business and economic interests,' . . . or attempt to 'influence the passage or enforcement of laws.'" Opp. at 10 (quoting *California Motor*, 404 U.S. at 511, and *Noerr*, 365 U.S. at 135, respectively). **This protection extends to private conversations that relate to petitioning activity**. *Sosa v. DIRECTTV, Inc.*, 437 F.3d 923, 932–35 (9th Cir. 2006) (explaining that to give "adequate 'breathing space' to the right of petition" . . . "communications between private parties are sufficiently within the protection of the Petition Clause to trigger the *Noerr-Pennington doctrine*, so long as they are sufficiently related to petitioning activity.").

Rather than supporting Plaintiffs' argument, the vast majority of Plaintiffs' exhibits are textbook examples of activity that the First Amendment and Noerr Pennington protects. For example, Plaintiffs cite to the talc "task force" at least 51 times in their 60-page brief. They argue that "PCPC's formation and operation of the Talc Task Force is one of the most critical components of Plaintiffs' claims against PCPC." Opp. at 22. Yet, the exhibits that they cite as task force meeting minutes show that the Food & Drug Administration (the "FDA") requested

documentation from talc manufacturers, which they provided.[3]  *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 924 (1982) ("Regular attendance and participation at [] meetings ... is an insufficient predicate on which to impose liability").

Likewise, Exhibits 13 to 23, 32, 33, 38 to 41, 94 to 97, 129, and 130 each describe PCPC and the task forces' interactions with the FDA, the National Toxicology Program (the "NTP"), and other government entities.  These are precisely the government-trade association interactions that the Supreme Court has held are protected under the First Amendment.  *See, e.g.*, *Noerr*, 365 U.S. at 137-41 (protecting right of businesses to associate for petitioning).  "Noerr-Pennington immunity extends beyond attempts to influence the passage and enforcement of laws and applies equally to efforts to influence administrative agency action." *Santana Prods. Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 131 n.13 (3rd Cir. 2005).

Similarly, Plaintiffs reference more than 25 times the "1994 symposium [that] was hosted jointly by the [International Society of Regulatory Toxicology & Pharmacology], the FDA, and PCPC" (Opp. at 24) as evidence in support of Plaintiffs' claims.  Again, the cited exhibits undercut Plaintiffs' arguments.  Not only did it obviously involve government interaction, the FDA requested that PCPC co-sponsor the event.[4]  Participation was protected activity.

Many of Plaintiffs' exhibits relate to petitions submitted by activists to the FDA regarding the alleged harm caused by cosmetic talc.  Exhibits 17, 24, 28, 86, 87, 88, 109, 112

---

[3] *See, e.g.*, Ex. 1 (CPC-POLAKOWTRSCPT00000267) (meeting minutes with FDA regarding talc specifications); Ex. 2 (small group to meet that afternoon with FDA); Ex. 3 (CPC-POLAKOWTRSCPT 00000327) (summarizing meeting with FDA, revised standard for talc and Congressional oversight hearings that day); Exs. 4 and 5 (documenting meetings and seeking input from critics of cosmetics regarding talc specifications, which was shared with the FDA); Ex. 6 (FDA participated at task force meeting finalizing talc specifications).  Some of Plaintiffs' exhibits are highlighted.  It is not clear who made the highlights.

[4] Ex. 13, 89 (at 3), 127.  Exs. 25 through 30, 119, 120, and 126 merely reflect that responding to government inquiries and requests costs money.

relate to PCPC's responses to those petitions.[5]  The very term "citizen's petition" indicates that activity related to such petitions is protected by the First Amendment.

Plaintiffs argue that PCPC's retention of consultants and experts support Plaintiffs' claims.  PCPC did retain experts regarding toxicology and epidemiology to speak at the FDA's 1994 workshop, the 2000 NTP public hearing and to respond to "citizen's petitions."[6]  PCPC also funded research in connection with submissions to governmental entities, including the FDA and the NTP.[7]  This is protected by the First Amendment.  *See, e.g.*, *In re IBP Confidential Business Documents Litig.*, 755 F.2d 1300, 1310 (8th Cir. 1985) ("The right to petition means more than simply the right to communicate directly with the government.  It necessarily includes those activities reasonably and normally attendant to effective petitioning."); *Balt. Scrap Corp. v.*

---

[5] Ex. 17—discusses potential response to 1994 citizen's petition; Ex. 24—PCPC's letter to the FDA, with attachments, responding to citizen's petition; Ex. 28—1996 potential response to citizen's petition; Exs. 86, 87—"press-response statement" to the 1994 Citizen's Petition, providing no evidence that it was published or read; Ex. 88—CTFA's June 1995 CTFA response to 1994 citizen's petition; Exs. 109 and 112—appear to be the same 2009 response to the 2008 citizens' petition.

[6] Exs. 31, 42-45.  Exhibit 46 reflects that a public relations firm submitted a proposal.  As plaintiffs know, PCPC did not retain a public relations firm to submit or prepare any materials to the NTP.  Loretz Dep. 658:13-19 (Oct. 1, 2018); Pollak Dep. 68:7-10 (Aug. 29, 2018) **(attached as Exhibits A and B**, respectively).  Plaintiffs' citation to a document that they know is irrelevant smacks of desperation. Likewise, Plaintiffs citation to Exhibit 101 is inapposite as PCPC did not retain the entity that drafted the document nor was PCPC aware of the entity's involvement until after Exhibit 101 was submitted to the NTP.  Any suggestion that PCPC was aware of Imerys' so-called "fatal flaw" strategy is false.  Loretz Dep. 140:23-25 to 141:1; 142:1-4 (Jul. 17, 2018) (attached as **Exhibit C**).  Plaintiffs reliance on Exhibit 98 is odd as it is a letter from Dr. Wehner to J&J (not PCPC), and it refers to correspondence from the previous day (also neither sent nor received by PCPC) referring to a potential response by, among others, Senator Edward Kennedy to PCPC talking points that plaintiffs offer no evidence were ever published.  Plaintiffs apparently elected not to include the prior day's letter because it demonstrates that this exchange relates to protected First Amendment petitioning regarding the regulation of talc.

[7] *See, e.g.*, Ex. 109 (response to 2008 citizen's petition enclosing analysis of epidemiologists); Ex. 110 (PCPC memorandum regarding 2008 meeting with FDA acting commissioner in which FDA had "long list" of questions for which PCPC would submit written responses); Ex. 7 (task force studied scientific issues regarding talc).

*David J. Joseph Co.*, 237 F.3d 394, 398 (4th Cir. 2001) (secret funding of lawsuit was protected under Noerr Pennington doctrine, even though funding party was not litigant).

Plaintiffs argue that CTFA worked on a "strategy to prevent the listing of talc in the 10th" Report on Carcinogens ("RoC") published by the NTP.[8]  Opp. at 25.  PCPC was submitting comments pursuant to a Federal Register Notice.[9]  NTP Board of Scientific Counselors Meeting; Review of Nominations for Listing in the 10th RoC, 65 FR 61352 (Oct. 17, 2000) (attached as **Exhibit D**) (calling for public comments and participation at hearing); National Toxicology Program; Call for Public Comments on 9 Substances Proposed for Listing in or Delisting from the Report on Carcinogens and Call for Public Comments on Substances, Mixtures and Exposure Circumstances Proposed for Listing in the Report on Carcinogens, Tenth Edition, 65 FR 17889–17893 (Apr. 5, 2000) (calling for public comments on the nominations to be reviewed in 2000 for listing in the 10th RoC) (attached as **Exhibit E**).  This is First Amendment protected activity.

Plaintiffs complain at length that PCPC advocates to Congress and government agencies on behalf of cosmetic manufacturers.[10]  Exhibit 74 is a typical example as it addresses PCPC's legislative advocacy on behalf of its members.  As discussed above, the Supreme Court has long recognized that trade associations have a protected First Amendment right to advocate to the government on behalf of their members.  *See, e.g.*, *Noerr*, 365 U.S. at 137–41.[11]

---

[8] Opp. at 25, Exs. 34–37.  PCPC neither drafted nor received exhibit 35, it apparently is a draft Imerys' presentation.

[9] Exhibit 36 is the summary of meeting minutes published by the NTP.  Plaintiffs did not include with the exhibit the attached Federal Register Notice.

[10] Opp. at 32–35 (citing Exs. 70–77), and at 53–54 (citing Exs. 114–125).  *See also* Exhibit 129 and 130 (internal PCPC documents discussing, among other things, legislative and FDA advocacy).

[11] Plaintiffs' citation to the cigarette litigation supports PCPC's position.  In that litigation, the courts held that the manufacturers were not liable for their genuine lobbying activities.  *U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095, 1125 (D.C. Cir. 2009); 449 F. Supp. 2d  1, 34 (D.D.C.

Plaintiffs also complain at length that PCPC sent letters to journals and published materials regarding the cosmetic manufacturers' views on the alleged link between talc and ovarian cancer.[12]  This argument also fails.  Plaintiffs allege that these actions were taken to prevent the regulation by the FDA of talc, including the citizen's petitions' demands to the FDA for warning labels.  The First Amendment and the Noerr Pennington doctrine protect not only direct political advocacy to government agencies, but also public information campaigns.  *See Noerr*, 365 U.S. at 137-41 (holding that publicity campaign (including "[c]irculars, speeches, newspaper articles, editorials, magazine articles, memoranda") to influence legislation was not actionable); *A.D. Bedell*, 263 F.3d 252-53 (Third Circuit surveying broad scope of "non-traditional" petitioning activity); *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000) ("A publicity campaign directed at the general public and seeking government action is covered by Noerr-Pennington immunity.").

Plaintiffs argue that PCPC is liable because it "published specifications and definitions for cosmetic ingredients," including "voluntary, self-regulating" specifications for talc.  Opp. at 7, 22.  PCPC discusses other aspects of that argument below in Parts II and III.  For the purposes of this section, the point is that Plaintiffs allege that those specifications were developed through myriad communications with the FDA throughout the 1970s to prevent the FDA's regulation of

---

2006)  (dismissing as lobbying allegations, distinguishing "the majority of the racketeering acts alleged as part of the addiction and manipulation sub-schemes [which] do not constitute petitioning activity before the Congress, or the executive branch.")  The non-manufacturer defendants were dismissed on other grounds.  *Philip Morris*, 566 F.3d at 1135.

[12] Ex. 8—unsent draft; Ex. 9—response to request for information regarding similarities between talc and asbestos;  Ex. 10—discusses scientific studies reaching different results; Ex. 11—identifies error in scientist's article; Ex. 12—letter to Greenpeace with attachments; Ex. 16—discusses possible letter to the editor. Plaintiffs offer no evidence that any of these letters were published or that they were read by the recipients.

11

talc.[13]  The end result were what Plaintiffs call voluntary, self-regulating specifications.  For example, Exhibit 6 demonstrates that an FDA representative participated in the task force meeting in which the voluntary, self-regulating talc specifications were finalized.  Similarly, Exhibit 1 demonstrates that the use of the phrase "non-detectable" asbestos in the talc specifications was suggested by the FDA.[14]  PCPC has no liability for government action resulting from the petitioning. *United Mine Workers v. Pennington*, 381 U.S. 657, 671 (1965).

Plaintiffs argue that "one of the main bases" of their claim is "PCPC's activities in operating" the Cosmetic Ingredient Review ("CIR").  Opp. at 27.  Plaintiffs' emphasis on CIR is odd because it did not publish an article on cosmetic talc until 2015.  Ex. 65.  Until that time, CIR could not could have influenced Plaintiffs' (or anyone else's) decisions regarding talc. So, what Plaintiffs actually are arguing when they discuss CIR is that Congress and the FDA should not have allowed cosmetics manufacturers to "self-regulate."  This is evident from the first sentence of the CIR discussion, which states, in part:

> To be clear, industry over several decades devoted considerable efforts and finances to develop strategies to prevent outside regulation of cosmetic products so that PCPC and its members could continue to self-regulate the cosmetic industry. . . .

Opp. at 27.  PCPC is not liable for the decisions that Congress and the FDA made (or did not make) regarding regulating cosmetics or talc.  *See*, *e.g.*, *Allied Tube*, 486 U.S. at 502 (holding that a petitioner cannot be liable for a successful effort to influence government action); *PRE*, 508 U.S. at 58 (same).

Rather than supporting their argument, the exhibits that Plaintiffs cite demonstrate that "PCPC's activities" were continuous dialogues with Congress and the FDA.  Plaintiffs cite

---

[13] *See, e.g.*, Exs. 1-6 (documenting six years of interactions with the FDA on the topic).

[14] Ex. 1 (CPC-POLAKOWTRSCPT00000267).

Exhibit 51 for the proposition that CIR is "'a key reason why [cosmetics manufacturers] have voluntary, self-regulation.'"  Opp. at 28 (quoting past CTFA president).  That may be true.  But, Plaintiffs' complaint is with Congress because, as Exhibit 51 also states, "CIR began in 1976 in response to Congressional concerns raised about the safety of cosmetic ingredients."[15]

Plaintiffs neglect to mention that the FDA is on the liaison panel of the CIR.  Exs. 54, 104 (at 5-6); 105 (at 3-4).  The FDA receives all CIR materials—including draft reports and third-party submissions—and FDA representatives attend the CIR panel meetings, including the talc sessions.  Exs. 58, 62, 63, 64.  Plaintiffs also neglect to mention that the Consumer Federation of America, who are consumer advocates, is on CIR's Steering Committee, receives all materials and attends meetings.  Exs. 58, 62, 63, 64.

Exhibit 54 is another example of the transparency and interactive nature of the CIR's process.  Exhibit 54 is 341 pages of publically-available information regarding CIR's first of two multi-day sessions on talc.  The information, which was circulated before the first session, includes a two-page summary of government interactions on talc, notices for public input, procedures, drafts, comments, and identification of those who submitted materials.  CIR published transcripts of the sessions.  Exs. 62, 63, 64.  A former plaintiffs' expert even attended the first session.  Ex. 58 (D. Steinberg).  This is the epitome of an open and transparent process with government involvement.  In any event, PCPC has no liability for Congress and the FDA's decisions regarding what plaintiffs characterize as the voluntary self-regulation of cosmetics.

*    *    *

---

[15] Ex. 51 (PCPC_MDL00015232).  The remainder of Ex. 51 describes a litany of exchanges with the FDA and Congress on a variety of topics.  PCPC cannot be liable for these exchanges, which are protected by the First Amendment.

13

In summary, the evidence demonstrates that Plaintiffs' claims are based on PCPC's interactions with the government regarding the regulation of talc, which are protected by the First Amendment and the Noerr Pennington doctrine.

### 3. Neither the "Sham" Nor the So-Called "Fraud" Exceptions Apply.

Plaintiffs argue that PCPC's interactions with the government are not protected by the First Amendment because PCPC engaged in "intentional or negligent" fraud. Opp. at 51. That argument fails as a matter of law.

As an initial matter, even if there were a negligent fraud claim—and there is not—that claim would not undercut the applicability of the right to petition. Plaintiffs do not cite a single case in which the right to petition was negated on the grounds of negligence.

And, even if Plaintiffs' intentional misrepresentation allegations were supported by evidence—and they are not—Plaintiffs' claims would fail. From the outset, the Supreme Court has held that, even efforts to "deliberately deceive[] the public and public officials" and to use unethical means are protected from liability. *Noerr*, 365 U.S. at 145. *See also id.* at 139 ( "The purpose or motive in petitioning government officials is irrelevant."); *Pennington*, 381 U.S. at 669-71 (shielding defendants from liability for "concerted effort to influence").

The Supreme Court has recognized a single exception to the protection provided by the First Amendment right to petition, the "sham" exception. PCPC addressed the inapplicability of the exception in a full page of its Motion at 6. Yet, nowhere in Plaintiffs' 60-page Opposition do they mention the sham exception, even though plaintiffs bear the burden of establishing the exception's applicability. *See, e.g.*, *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 272 (3d Cir. 2017); *Covad Commc'ns, Inc. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005); *Nader v. The Dem. Nat'l Comm.*, 555 F. Supp. 2d 137, 156-57 (D.D.C. 2008), *aff'd on other grounds*, 567

14

F.3d 692 (D.C. Cir. 2009).  Accordingly, Plaintiffs have conceded by omission the inapplicability of the "sham" exception.

Notwithstanding that concession, a brief discussion of the sham exception is useful in understanding why Plaintiffs' fraud allegations fail.  The "sham" exception standard was explained in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) ("*PRE*"), and further explained by the Third Circuit in *Hanover 3201 Realty, LLC, v. Village Supermarkets, Inc.*, 806 F.3d 162, 179-81 (3d Cir. 2015).  In *PRE*, The Supreme Court held, that to qualify as a sham, a "lawsuit must be objectively baseless."  508 U.S. at 60. In *Hanover*, the Third Circuit further distinguished the applicability of the exception in a single lawsuit versus a series of lawsuits.  *See also Cal. Motor Transp.*, 404 U.S. at 508 (applying sham exception in adjudicatory context to party who filed frivolous objections to license application). Nowhere do any of these decisions suggest that these sham exception tests apply outside of the adjudicatory context.  As PCPC explained in its Motion at 6, for lobbying and related activity, the sham exception applies only when there is overtly corrupt conduct, such as bribing a government official.  *Fed. Prescription Serv. v. Am. Pharm. Ass'n*, 663 F.2d 253, 262 (D.C. Cir. 1981).  Plaintiffs make no such allegations and, therefore, the sham exception is inapplicable.

Moreover, even if the sham exception standard for adjudicatory proceedings applied here—and it does not—PCPC would prevail because, as discussed above in Part I.A.2, PCPC did not initiate proceedings and its positions were not "objectively baseless," which is demonstrated by the regulatory agencies' consistent agreement with PCPC.  "Under the objective prong, the plaintiff must show that the defendant's petitioning was 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.'" *BE&K Constr.*, 536 U.S. at 526 (*quoting PRE*, 508 U.S. at 60).  A plaintiff cannot make this showing if the defendant's

petitioning activity has succeeded as "a successful 'effort to influence governmental action ... certainly cannot be characterized as a sham.'" *PRE*, 508 U.S. at 58 (*quoting Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988)).  "[E]ven when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *PRE*, 508 U.S. at 60 n. 5.  *Cf. Hanover 3201*, 806 F.3d at 181-83 (defendant repeatedly lost in adjudicatory proceedings).

Some courts recognize a "fraud" exception to the Noerr Pennington doctrine, which Plaintiffs have not raised in their Opposition.  The Supreme Court and the Third Circuit do not recognize this exception.  *See, e.g.*, *Armstrong Surgical Ctr. Armstrong County Mem. Hosp.*, 185 F.3d 154, 160 (3d Cir. 1999); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 123 (3d Cir. 1999) ("declin[ing] to carve out a new exception to the broad immunity that Noerr/ Pennington provides" even in the litigation context).  And, even the courts that recognize a fraud exception apply it only in the adjudicatory context, not to lobbying and related activity.  *Armstrong*, 185 F.3d at 163 (recognizing distinction in other Circuits that fraud exception in adjudicative context is not applicable for lobbying); *Federal Prescription*, 663 F.2d at 263 (distinguishing between "misrepresentation (in the adjudicatory process)" and "overtly corrupt conduct, such as bribes (in any context)"); *Whelan*, 48 F.3d 124-55 (addressing alleged falsehoods solely in lawsuits and adjudicatory administrative proceeding).[16]

The narrow exceptions to the First Amendment and Noerr Pennington do not apply.

---

[16] The Supreme Court has also held that there is no "conspiracy" exception to the Noerr Pennington protection.  *Omni*, 499 U.S. at 382 ("[W]e conclude that a 'conspiracy' exception to Noerr must be rejected.").

### 4. *Plaintiffs' Evidentiary Argument Does Not Save Their Claims.*

Plaintiffs cite a California intermediate appellate court decision for the proposition that the First Amendment and the Noerr Pennington doctrine are not evidentiary rules.  In *Hernandez*, the court merely affirmed that, "while a corporation's petitioning of government officials may not itself form the basis of liability, evidence of such petitioning activity may be admissible if otherwise relevant to show the purpose and character of other actions of the corporation."  215 Cal App. 4th at 679 (citing *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 789 (7th Cir. 1999) (which noted that evidence relating to petitioning "can be excluded under Rule 403 if confusing or unduly prejudicial").  That proves nothing.

Here, unlike the defendant in *Hernandez*, PCPC is not a product manufacturer or seller.  And, unlike the product manufacturer in *Hernandez*, as discussed in Part I.A.2 above, Plaintiffs' allegations against PCPC are premised solely on its petitioning activity.  As discussed in Parts II and III below, there is no separate basis for liability.  *Hernandez* confirms that lobbying cannot serve as the basis of liability for conspiracy—the Noerr-Pennington doctrine shields PCPC from liability for its petitioning government officials.  *Id*. at 680.

\*        \*        \*

PCPC is entitled to summary judgment solely on the basis of the First Amendment.

### B.  <u>D.C.'s Anti-SLAPP Statute Precludes Plaintiffs' Claims Against PCPC</u>.

If Plaintiffs are correct that D.C. law applies, D.C.'s Anti-SLAPP Act precludes liability.  The Act "is substantive—or at the very least, has substantive consequences." *Forras v. Rauf*, 39 F. Supp. 3d 45, 52 (D.D.C. 2014), *aff'd on other grounds*, 812 F.3d 1102 (D.C. Cir. 2016).  The Act was designed to prevent the very type of litigation brought by Plaintiffs, which seeks to stop "expression of opposing points of view" as to an issue of public safety.  *Id.*

1. ***Plaintiffs' Procedural Anti-SLAPP Argument Fails***.

Plaintiffs argue that PCPC's Anti-SLAPP argument is untimely.  Plaintiffs ignore that Defendants' rights to object to individual Complaints were preserved by CMO-2, ¶D.  New complaints are being filed every day.  Thus, there is no single date by which to measure the traditional 45-day period set forth in the Anti-SLAPP statute.  The defense is timely.

In addition, PCPC expressly preserved the defense.  PCPC's first motion to dismiss included the Anti-SLAPP ground.  ECF 100 at 11–20.  After Plaintiffs filed an Amended Master Complaint, PCPC filed a second Motion to Dismiss, narrowly tailored to personal jurisdiction, preserving the Anti-SLAPP ground for summary judgment. ECF No. 256 at 1.

Moreover, Plaintiffs' procedural argument is ironic as they caused any delay.  Plaintiffs argued that they were entitled to discovery on the alleged conspiracy to manipulate science, which the Court granted.  Then, Plaintiffs sought, and were granted, a year to respond to PCPC's motion for summary judgment.  Before now, Plaintiffs never objected to PCPC asserting the Anti-SLAPP defense. And, Plaintiffs are not prejudiced by any delay.  They have known from the outset that PCPC would pursue the defense.  They benefitted from the added time and discovery to further develop their position regarding the Anti-SLAPP argument.

In contrast, PCPC would be prejudiced if denied the ability to raise the defense.  The Act "allow[s] a defendant to more expeditiously, and more equitably, dispense" with a suit.  *Sherrod v. Breitbart*, 720 F.3d 932, 934 (D.C. Cir. 2013).  The purpose of the Act remains apropos—even at this stage of litigation—thwarting litigation "aimed to punish or prevent the expression of opposing points of view."  *Id.*

2. ***PCPC Engaged in Acts in Furtherance of the Right of Advocacy.***

In *Simpson v. Johnson & Johnson*, No. 2016 CA 001931 (D.C. Super. Ct., Jan. 13, 2017), the court held that the claims against PCPC were barred by D.C.'s Anti-SLAPP statute.

18

Plaintiffs contend that *Simpson* was based on "more limited arguments" and that the facts were "not yet developed." Opp. at 37. However, that case involved substantially the same allegations brought by the same counsel. In *Simpson*, like here, Plaintiffs alleged:

- PCPC formed the talc interested party task force to prevent regulation of talc (Motion, Ex. 1, ¶¶34, 140(a); *cf.* MDL Compl. ¶34–35; Opp. at 22, 23).

- PCPC disseminated scientific data regarding the safety of talc (Motion, Ex. 1, ¶140(e), Ex. 2, 42: 3-4; c.f. MDL Compl. ¶164(e); Opp. at 23).

- Defendants were members of PCPC and paid dues (Motion, Ex. 2, 13:10-12; c.f. MDL Compl. ¶36; Opp. at 24).

- PCPC hired scientists who published materials regarding talc (Motion, Ex. 1 ¶140(b), Ex. 2, 17:8-11; c.f. MDL Compl. ¶164(b); Opp. at 24, 26).

- PCPC lobbied the NTP not to list talc as a carcinogen (Motion, Ex. 1, ¶156(b)(ii); Ex. 2, 4:7-9, 6:23-24; c.f. MDL Compl. ¶213(b)(ii); Opp. at 23, 25).

- PCPC developed voluntary self-regulatory specifications for talc (Motion, Ex. 1, ¶79; c.f. MDL Compl. ¶136; Opp. at 31).

Plaintiffs fail to cite any meaningful differences in the allegations or information derived from discovery in the MDL that would cause this Court to reach a different conclusion than *Simpson*. Plaintiffs' counsel did not appeal the *Simpson* decision. An argument that *Simpson* misapplied the statute is suspect. *See N. Jersey Interiors, L.L.C. v. New Jersey Reg'l Council of Carpenters,* No. 11-724, 2012 WL 816749, at *2 (D.N.J. Mar. 9, 2012) ("[M]ere disagreement with a court's decision normally should be raised through the appellate process.").

D.C.'s Anti-SLAPP law identifies three forms of conduct that are treated as an "act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5501(1). Plaintiffs concede that PCPC's alleged conduct falls within that conduct, but argue that communications among defendants do not—an argument that was rejected in *Simpson* (*See* Plaintiffs' Opp. in *Simpson* at 4-6) (attached as **Exhibit F**). As discussed above in Part I.A.2,

Plaintiffs' argument is belied by their reliance on evidence of communications with the government.

In any event, PCPC's communications were for the purpose of coordinating a response to the regulation of talc or informing the public about the safety of talc.  The Act protects statements made "[i]n connection with an issue under consideration or review" by the government, regardless of whether those statements were made public.  D.C. Code § 16-5501(1)(A)(i); *see also* Council on the District of Columbia Committee on Public Safety and the Judiciary, Report on Bill 18–893, Anti–SLAPP Act of 2010 (Nov. 18, 2010) at 4 (attached as **Exhibit G**) (legislative history clarifying that point).

### 3.        *Talc Safety is an Issue of Public Concern.*

The Act defines "public interest" to include "an issue related to health or safety."  D.C. Code § 16-5501(3).  As *Simpson* observed, "an issue of public interest is an issue in which the public is interested."  Mot., Ex. 2, 38:12-13.   Plaintiffs relentlessly characterize their case as being about the deception on the "consuming public" about the "safety of talc."  To argue, as they do here, that the public is not interested in the safety of talc is disingenuous.

Plaintiffs argue that PCPC's statements did not involve a "public interest" because they concerned a commercial interest.  However, as *Simpson* reasoned, there is a distinction between a trade association promoting a specific product—which PCPC did not do—and a trade association speaking generally about the safety of an ingredient.  Mot., Ex. 2, 39:9-13.   Nowhere do Plaintiffs allege that PCPC promoted a specific product.

Indeed, courts have rejected the argument that, to establish a prima facie case, the speaker must "disprove commercial motivation, even where such motivation is not apparent from the content of the speech."  *Doe No. 1 v. Burke*, 91 A.3d 1031, 1043 (D.C. 2014) (holding that "such a presumption is inappropriate in the context of a prima facie showing, for which we have held

20

the burden of proof is not onerous."); *see also Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 38-39 (D.D.C. 2012) (dismissing tort claim under D.C. Anti-SLAPP Act and rejecting applicability of "commercial speech exception"); *TS Media, Inc. v. Public Broadcasting Serv.*, No. 2018 CA 001247 B, 2018 WL 2323233, at *3 (D.C. Super. May 15, 2018) (same).  PCPC's communications are protected because they relate to public issues.

### 4.  D.C. Courts Benefit from the Interpretation of California's Anti-SLAPP Statute, Which Supports Dismissal.

Like here, in *Simpson*, plaintiffs contended that reliance on California law was improper because California does not have the same definition of "public interest" (*See* Motion, Ex. 2, 18:3-18).  As stated in *Simpson*, "where necessary and appropriate, the Court will look to decisions from other jurisdictions, particularly California, which has a well-developed body of case law interpreting a similar California statute for guidance and predicting how the D.C. Court of Appeals would interpret the District's Anti-SLAPP statute." Mot., Ex. 2, 34:19-24.  The Court further said it "found the language of the California Anti-SLAPP statute to be sufficiently similar" and, therefore, "California court interpretations of California's Anti-SLAPP statute to be beneficial and persuasive, recognizing again it is not identical language." *Id.*, 36:17-25.  *See also Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 254-55 (D.D.C. 2013) (stating that, "[w]here appropriate, then, the Court will look to decisions from other jurisdictions (particularly those from California, which has a well-developed body of Anti-SLAPP jurisprudence) for guidance in predicting how the D.C. Court of Appeals would interpret its own Anti-SLAPP law.").

In sum, D.C.'s Anti-SLAPP Act precludes Plaintiffs' claims.

## II.  NEW JERSEY'S PRODUCT LIABILITY ACT PRECLUDES PLAINTIFFS' CLAIMS BECAUSE PCPC IS NOT A MANUFACTURER OR SELLER.

Plaintiffs concede that, as to PCPC, this is a "product liability case alleging negligence, fraud, and conspiracy."  Opp. at 8.  "Product liability actions...are governed by [the] Products

Liability Act (PLA), N.J.S.A. 2A:58C-1 to-11." *Banner v. Hoffmann-La Roche Inc.*, 383 N.J. Super. 364, 375, 891 A.2d 1229, 1235 (App. Div. 2006), *cert. denied*, 190 N.J. 393 (2007).  The NJPLA was enacted "based on an 'urgent need for remedial legislation to establish clear rules with respect to certain matters relating to actions for damages for harm caused by products." *Sinclair v. Merck & Co., Inc.*, 195 N.J. 51, 62, 948 A.2d 587, 593 (2008) (citing N.J.S.A. § 2A:58C−1(a)).  "The Legislature intended...to limit the liability of manufacturers so as to 'balance[ ] the interests of the public and the individual with a view towards economic reality." *Id*. at 593.  *See also Roberts v. Rich Foods, Inc.*, 139 N.J. 365, 374, 948 A.2d 587, 593 (1995) (holding that Act "limit[s] the expansion of products-liability law.").

Because, as Plaintiffs repeatedly state, this is a product liability case, all claims must be brought only under the NJPLA.  *Fid. & Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc.*, 936 F. Supp. 2d 441, 450–51 (D.N.J. 2013) ("Count I is a general claim for negligence related to a defective product which is subsumed by the PLA."); *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 703 (D.N.J. 2011) ("[R]egardless of how a claim is pleaded, where the *core issue* is the harmfulness of the product's chemicals, the claim must be pleaded as an NJPLA claim."). *See also In re Lead Paint Litig.*, 191 N.J. 405, 924 A.2d 484 (2007) (holding that the NJPLA is "one unified, statutorily defined theory of recovery for harm caused by a product"); *Koruba v. Am. Honda Motor Co.*, 396 N.J. Super. 517, 531, 935 A.2d 787, 795 (App. Div. 2007) (holding that the NJPLA "governs 'any claim or action ... for harm caused by a product, irrespective of the theory underlying the claim, except actions for ... breach of an express warranty.").  In their Amended Complaint, Plaintiffs fail to assert any claim against PCPC under the NJPLA.  Instead, Plaintiffs assert claims that are subsumed by the NJPLA.  *See Universal Underwriters Ins. Grp. v. Pub. Serv. Elec. & Gas Co.*, 103 F. Supp. 2d 744, 746 (D.N.J. 2000).  Those claims fail.

Moreover, as explained in PCPC's Motion at 10–13, the NJPLA permits product liability claims against only manufacturers and product sellers.  PCPC is neither.  Yet, in an attempt to shoehorn their claim into the NJPLA, Plaintiffs argue that PCPC is a "seller" and, therefore, strictly liable to them. Opp. at 56–57.  **Plaintiffs cite no authority** in support of their argument, and we also have not found any decision supporting Plaintiffs' novel theory.

In 1995, New Jersey amended the NJPLA, separately defining manufacturer and "product seller."  *See Claypotch v. Heller, Inc.*, 360 N.J. Super. 472, 483 (App. Div. 2003).  The amended NJPLA defines a "product seller" as

> any person who, in the course of a business conducted for that purpose: sells; distributes; leases; installs; prepares or assembles a manufacturer's product according to the manufacturer's plan, intention, design, specifications or formulations; blends; packages; labels; markets; repairs; maintains or otherwise is involved in placing a product in the line of commerce.

N.J.S.A. § 2A:58C-8, enacting N.J.S.A. 2A:58C-8 to -9.

"Despite the PLA's broad language and the state courts' expansive interpretation of strict products liability law, the reach of the PLA is not boundless." *Allstate New Jersey Ins. Co. v. Amazon.com, Inc.*, CV172738FLWLHG, 2018 WL 3546197, at *7 (D.N.J. July 24, 2018); *see also Doerflein v. Six Flags Great Adventure*, No. A-0522-04T2, 2006 WL 392980, at *3 (N.J. Super. Ct. App. Div. Feb. 22, 2006) (collecting cases regarding "product seller").  In determining whether a defendant is a "product seller," "[t]he focus is on a party's control of the product itself—that is, the ability to exercise dominance over, for example, the manner in which the product is sold." *Allstate*, 2018 WL 3546197, at *7.  Even where a party is deemed to be involved in the chain of distribution, it must "exercise[] control over the product sufficient to make it a 'product seller' under the PLA." *Id.* at *8.

Plaintiffs allege, without evidence, that PCPC is a seller because it "market[ed] a product."  Opp. at 56.  However, PCPC has never placed any cosmetics in the line of commerce,

and PCPC has never maintained control over any cosmetics.  There is no evidence that PCPC advertised J&J Baby Powder or Shower-to-Shower.  Nor did PCPC receive proceeds from the sale of those products.  Plaintiffs only evidence, as deficient as it is (*see* Part I), is that PCPC lobbied the federal government regarding the ingredient talc, not the finished products at issue here.  **Plaintiffs cite no case, and PCPC has found none, holding a trade association to be a "product seller" under the NJPLA**.  *See generally Picciano v. Costco Wholesale Corp.*, A-3071-17T2, 2019 WL 930279, at *5 (N.J. Super. Ct. App. Div. Feb. 25, 2019), *cert. denied*, 238 N.J. 234, 209 A.3d 220 (2019) (holding defendants had no seller liability because they did not alter or re-brand product, or manipulate the packaging in any way).

As with the bases set forth in Part I, the Court need go no further—PCPC is entitled to summary judgment based solely on the NJPLA.

## III. PLAINTIFFS CANNOT OVERCOME THE DEFICIENCIES IN THEIR COMMON LAW CLAIMS.[17]

Even if the First Amendment, the Noerr Pennington doctrine, the D.C. Anti-SLAPP Act and the NJPLA did not preclude Plaintiffs' claims—and they do—the claims would still fail. Plaintiffs' blanket assertion of a factual dispute does not cure the impediments to their claims. As a matter of law, Plaintiffs cannot establish that PCPC owed them a duty, nor can they establish that PCPC's purported conduct caused them injury.  Plaintiffs also cannot establish that PCPC committed fraud or that they relied on any alleged statements made by PCPC.  Lastly,

---

[17] For purposes of this discussion, PCPC draws from D.C. and New Jersey law. Due to the unique nature of the allegations against a trade association, PCPC provides guidance from other jurisdictions in the absence of law from D.C. or New Jersey.  *See U.S. Golf Ass'n v. St. Andrews Sys.*, 749 F.2d 1028, 1039 (3d Cir. 1984) ("In this Circuit the federal courts in interpreting state law will look not only to binding precedent, but also to trends in lower state courts which indicate the direction of state law."); *In re CR Bronco, LLC*, CIV.A. 09-3036 JEI, 2010 WL 3862366, at *2 (D.N.J. Sept. 27, 2010) ("In seeking to draw this fine distinction, the Court will look to case law from other circuits since there is no other guidance in the Third Circuit.").

because Plaintiffs cannot show that PCPC agreed to pursue an illegal goal or to engage in illegal conduct, their conspiracy claim fails.  There is no negligent conspiracy cause of action.

A.     **As a Matter of Law, Plaintiffs' Negligence Claim Fails.**

Plaintiffs' claims present a legal question for the Court—does PCPC's purported conduct give rise to a duty?  *See Inox Wares Pvt. Ltd. v. Interchange Bank*, Civ.A.A 06-4307 (SRC), 2008 WL 4691906, at *3 (D.N.J. Oct. 22, 2008).  The answer is no.  PCPC—a trade association that neither makes nor sells cosmetics—did not owe Plaintiffs a duty.  And, even assuming *arguendo* that it did, PCPC's conduct did not cause Plaintiffs' injuries.

*1.     PCPC Owed No Duty to Plaintiffs.*

"[C]ourts have repeatedly held that trade associations, themselves, have no duty to users of products in that trade."  *In re Welding Fume Prod. Liab. Litig*., 526 F. Supp. 2d 775, 799 (N.D. Ohio 2007) (collecting cases).  Plaintiffs cannot overcome this hurdle.

Plaintiffs allege that the topics highlighted in this section establish a duty.  They do not.

*"Voluntary Self-regulation."*  Plaintiffs offer no evidence that PCPC ever agreed to test the J&J products or that the FDA expected PCPC to test J&J products.  This point cannot be over emphasized. Plaintiffs also offer no evidence that PCPC had laboratories to test products. Plaintiffs offer no evidence that PCPC agreed to inspect manufacturers' facilities or to sanction manufacturers for the purported failure to follow specifications.  Plaintiffs offer no evidence that the FDA expected PCPC to do any of these things.  The reason is simple—there is no evidence.

The responsibility for testing cosmetics resides with the manufacturer.  And, the FDA, not PCPC, regulates cosmetics.  *See* Food, Drug & Cosmetic Act (P.L. 75-71721) (the "FD&C Act"); CFR 700-740.  In fact, in their complaint, Plaintiffs concede that "[t]alc as a cosmetic ingredient and talc based body powder as a cosmetic product is regulated by the FDA." Amended Compl. ¶53 (citing 21 C.F.R. 740.1).  The U.S. Department of Health and Human

25

Services, in which the FDA resides, is tasked with "promulgat[ing] regulations for the efficient enforcement" of the FD&C Act and pursuant to the Fair Packaging & Labeling Act (15 USC ch. 39 §§ 1453, 1454, 1455). The FDA has exercised this authority regarding talc by, for example, asking manufacturers to stop using talc on surgical gloves and condoms. Amended Compl. ¶¶ 40, 42. While the FDA did solicit comments regarding talc from the public, including PCPC, the FDA did not delegate its authority to regulate cosmetics.

*Talc specification*. PCPC, working with the FDA and manufacturers, published a definition of the ingredient cosmetic talc, which included tests for detecting contaminants. PCPC never agreed, and had no authority, to enforce compliance with the ingredient definition. Plaintiffs offer no evidence that the FDA expected, or relied on, PCPC to enforce the definition, because there is none. Therefore, this case is like many others in which trade associations had no duty. *See, e.g.*, *Meyers v. Donnatacci*, 220 N.J. Super. 73, 76, 531 A.2d 398, 400 (Law. Div. 1987) (holding that trade association had no duty because it had no power to enforce voluntary standards); *Bailey v. Edward Hines Lumber Co.*, 308 Ill. App. 3d 58, 64, 719 N.E.2d 178, 183 (1999) (holding that trade association had no duty where it published standards but had no control over compliance); *Beascock v. Dioguardi Enters.*, 130 Misc. 2d 25, 31, 494 N.Y.S. 2d 974, 979 (1985) (holding no duty where trade association promulgated standards but had no control over manufacturers). Like those defendants, PCPC "neither mandates nor monitors the use of its standards by any manufacturer." *Beascock*, 130 Misc. 2d at 31.

Unlike the present case, courts have extended a duty to trade associations only in instances in which the trade associations engaged in testing, certified industry members' products for compliance, or affixed the trade associations' seal for approval. *Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680, 686, 81 Cal. Rptr. 519 (Ct. App. 1969); *Hempstead v. Gen. Fire*

26

*Extinguisher*, 269 F. Supp. 109, 116 (D. Del. 1967).  Plaintiffs offer no evidence that PCPC accredited products or manufacturing facilities.

Plaintiffs also offer no evidence that PCPC had an enforcement mechanism to ensure compliance with voluntary specifications.  Nor do Plaintiffs offer evidence that PCPC wielded "substantial power" over manufacturers.  *Cf. Jappell v. Am. Ass'n of Blood Banks*, 162 F. Supp. 2d 476 (E.D.V.A. 2001).  To the contrary, Plaintiffs argue that manufacturers controlled PCPC.

***International Cosmetic Ingredient Dictionary***. Plaintiffs argue that PCPC's publication of a dictionary created a duty, but they do not explain how any such duty relates to this litigation. The dictionary merely "recommend[s] uniform nomenclature for ingredients available for use by the cosmetic industry."  Preface of Dictionary (attached as **Exhibit H**).  The dictionary expressly states that nomenclature "does not include or imply standards or grades of purity."  *Id.*  The dictionary does not pertain to warning labels or communications about the safety of an ingredient, much less the finished products at issue here.  *See, e.g.*, *Lockman v. S.R. Smith*, LLC, 4:07-CV-0217, 2010 WL 11566367, at *9 (N.D. Ga. May 14, 2010), *aff'd*, 405 F. App'x 471 (11th Cir. 2010) (no duty where pool standards did not increase risk to swimmers).

***Cosmetic Ingredient Review***.  Notwithstanding Plaintiffs' contention that "PCPC's activities in operating the CIR also form one of the main bases for Plaintiffs' claims," Opp. at 27, in their 60-page brief, Plaintiffs only include two conclusory sentences regarding CIR's supposed duty.  Opp. at 42.  Plaintiffs' lengthy discussion about CIR, Opp. at 27-31, 48-49, relates to its alleged deficiencies.  That discussion does not establish a duty.

Contrary to Plaintiffs unsupported allegation, CIR does not regulate cosmetics or publish literature regarding products.  CIR studies cosmetic **ingredients**, as its title indicates.  The FDA has the sole authority to determine whether products and ingredients are safe.  *See* Loretz Dep.

27

917:10–15 (Oct. 2, 2019) (noting that FDA does not always adopt CIR's ingredient conclusions) (attached as **Exhibit I**).  Manufacturers—not PCPC—have responsibility to ensure that their finished products are safe.  21 CFR § 740.10.

Providing information to scientists and manufacturers (notably, Plaintiffs offer no evidence that any consumer ever heard of CIR, much less read its reports) regarding cosmetic ingredients does not create a duty.  If it did, every published scientist would be a guarantor of the products incorporating ingredients about which the scientist offered an opinion.

*       *       *

In sum, PCPC owed no duty to Plaintiffs.  That conclusion is demonstrated by comparing a case in which a duty was found to exist, *Snyder v. Am. Ass'n of Blood Banks,* 144 N.J. 269, 676 A.2d 1036 (1996).  In *Snyder*, unlike here, the trade association annually inspected and accredited members, and the FDA permitted blood banks to substitute the trade association's standards for FDA regulations.  *Id.* at 301, 676 A.2d at 1052 (citing 21 C.F.R. § 606.100(d) (1984)).  The New Jersey Supreme Court reasoned,

> Significantly, the [trade association] annually inspects and accredits member institutions. It conditions accreditation on compliance with standards published in its Standards for Blood Banks and Transfusion Services and procedures outlined in its Technical Manual.
>
> *       *       *
>
> Both the state and federal government, as well as the blood-banking industry, generally accept [trade association] standards as authoritative. Consequently, blood banks throughout the nation rely on those standards.
>
> *       *       *
>
> At all relevant times, [the trade association] exerted considerable influence over the practices and procedures over its member banks.

*Id*. at 277-79, 293, 676 A.2d at 1040, 1049 (also reasoning that trade association inspects blood banks and if blood bank loses its trade association accreditation, it could lose its state licensure).

28

None of those critical facts are present here.  Therefore, PCPC did not voluntarily undertake a duty to Plaintiffs. "[I]f there is no duty, there can be no breach, and hence no negligence." *Hinton v. United States*, 714 F. Supp. 2d 157, 161 (D.D.C. 2010).

### 2. PCPC's Actions Did Not Cause Plaintiffs' Injuries.

Proximate causation is an issue of law.  *Port Auth. of New York & New Jersey v. Arcadian Corp*., 991 F. Supp. 390, 406 (D.N.J. 1997), *aff'd*, 189 F.3d 305 (3d Cir. 1999). Plaintiffs "must introduce evidence which provides a reasonable basis for the conclusion that it was more likely than not that the negligent conduct of the defendant was a cause in fact of the injury." *Ortzian v. McNeilus Truck & Mfg.*, CIV. 07-0646 (DRD), 2008 WL 5118608, at *3 (D.N.J. Dec. 4, 2008), *aff'd,* 354 F. App'x 668 (3d Cir. 2009).  They have failed to do so.

Plaintiffs' sole causation argument is that PCPC "failed to substantiate the safety of talc and concealed the dangers of talc," which resulted in Plaintiffs being unaware of the risks of using cosmetic products containing talc.  Opp. at 43.  As a preliminary matter, **those alleged breaches of duty are different than the alleged negligence duties discussed above**.  Plaintiffs offer no evidence that PCPC had a duty to publicize the alleged dangers of talc.  Nor do Plaintiffs offer evidence that PCPC had a duty "to substantiate the safety of talc."  As noted above, if there is no duty, there can be no breach, and hence no negligence.

Even if Plaintiffs could establish the negligence duties discussed in their Opposition arising from "voluntary self-regulation," the talc specification, the ingredient dictionary, and the CIR—and they cannot—the causal connection between the alleged breaches of those duties and Plaintiffs' injuries is too attenuated.

Plaintiffs allege that they were injured by J&J Baby Powder and Shower-to-Shower. They assert causes of action against J&J for strict liability and failure to warn.  If they can prove those allegations, then they may be able to demonstrate that J&J's products caused Plaintiffs'

injuries.  In contrast, PCPC's alleged conduct—lobbying for manufacturers to self-regulate, publishing a definition for talc and an ingredient dictionary, and funding CIR—did not cause Plaintiffs' injuries.  That is, Plaintiffs' injuries did not naturally flow from PCPC's actions.  *See In re Fort Totten Metrorail Cases*, 895 F. Supp. 2d 48, 70 (D.D.C. 2012) ("Proximate cause has been defined as that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.").

Lack of causation is reinforced by D.C.'s doctrine of remoteness (which Plaintiffs, by extension, contend should apply).  *In re Tobacco/Governmental Health Care Costs Litig.*, 83 F. Supp. 2d 125, 129 (D.D.C. 1999), *aff' sub nom. Serv. Employees Int'l Union v. Philip Morris Inc.*, 249 F.3d 1068 (D.C. Cir. 2001) (concluding that secondhand smoke injury was "too remote to find proximate cause under traditional remoteness analysis").  PCPC's activities are far too remote from Plaintiffs' injuries, which allegedly were caused by products that the manufacturer —not PCPC—tested.

Put another way, PCPC's alleged conduct did not increase Plaintiffs' risk.  *See Sizemore v. Georgia-Pac. Corp.*, 6:94-2894 3, 1996 WL 498410, at *4 (D.S.C. Mar. 8, 1996), *aff'd sub nom. Sizemore v. Hardwood Plywood & Veneer Ass'n*, 114 F.3d 1177 (4th Cir. 1997) (explaining that conduct of trade association did not increase risk to plaintiff such that it caused "some physical change to the environment");  *Gunsalus v. Celotex Corp.,* 674 F. Supp. 1149, 1157 (E.D. Pa. 1987) (granting summary judgment on plaintiff's good Samaritan liability claim because, even if association had assumed a duty to perform research and provide plaintiff with information regarding the dangers of cigarette smoking, plaintiff had produced no evidence that the breach of that duty increased the risk of harm to plaintiff).

The talc specification simply did not increase Plaintiffs' risk, especially as J&J conducted additional testing using electron microscopy. This is particularly true as to talc itself, as opposed to alleged contaminants in talc. Plaintiffs allege that talc as a pure mineral causes ovarian cancer. The specification did not increase any risk as to the mineral talc because the specification does not address the alleged carcinogenicity of pure talc  The same is true of the dictionary. It had no bearing on Plaintiffs' decisions to use J&J products. Likewise, CIR's 2012/2013 analysis of the ingredient talc and CIR's 2015 article could not have affected Plaintiffs' use of the products at issue or the FDA's pre-2013 regulatory decisions. As a result, Plaintiffs' negligence claim also fails on this basis.

**B.**     **As a Matter of Law, Plaintiffs' Fraud Claim Fails**.

In their Opposition, Plaintiffs concede that, to prove fraud, they must establish: (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation. Opp. at 44. Plaintiffs also concede that a fraudulent concealment claim "does not necessarily give rise to an independent cause of action," and, at a minimum, requires a "close, confidential relationship" between parties, a "fiduciary obligation," or a duty to disclose material facts. Opp. at 50, 51. Plaintiffs cannot establish those elements.

Plaintiffs attempt to draw similarities between their fraud claim and the RICO claims asserted against cigarette manufacturers, but that litigation actually demonstrates why Plaintiffs' fraud claim fails. *See U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009). First, as discussed above in Part I.A., in the cigarette litigation, the courts held that the defendant manufacturers were not liable for their genuine lobbying activities. Applying that standard to PCPC, there is nothing left to form the basis of a fraud claim because all of Plaintiffs' supposed evidence relates to PCPC's lobbying regarding talc regulation and related activities. Unlike the

cigarette manufacturers, PCPC did not publish full page ads in major newspapers proclaiming the safety, non-addictiveness and supposed benefits of products. Instead, PCPC's conduct was related, in Plaintiffs' words, to the voluntary self-regulation of cosmetics.

Second, in stark contrast to the cigarette litigation, here, there is no authoritative finding equivalent to the Surgeon General's report about smoking causing cancer. In fact, Plaintiffs' own experts distinguish between association (a potential relationship) and causation (a definitive relationship). *See, e.g., Daubert* hearing, Clarke-Pearson Tr. 1645:11–13 (recognizing that Penninkilampi study stated that a causal link has not been established) (attached as **Exhibit J**); McTiernan Tr. 849–851 (recognizing that every prospective cohort study had a confidence interval that included 1.0 or below and, therefore, an association may not exist) (attached as **Exhibit K**). Indeed, before talc litigation, no scientist had published the opinion that talc causes cancer. *See* Clarke-Pearson Tr. 1578:24-25 to 1579:1-20, 1592:7–12, 1593:21–25, 1595:12–15, 1667:18–25 (admitting that, before being retained as an expert in this litigation in 2018, he had not formed an opinion that talc causes ovarian cancer) (Ex. J).

Accordingly, the statements that PCPC made decades ago in connection with lobbying cannot support a fraud claim. *See Leibholz v. Hariri*, No. CIV. 05-5148 DRD, 2011 WL 1466139, at *9 (D.N.J. Apr. 15, 2011), *aff'd*, 510 F. App'x 112 (3d Cir. 2013) (distinguishing between statements of fact and those of opinion that cannot support a fraud claim). Put simply, "[e]xpressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false." *U.S. ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980, 983 (10th Cir. 2005) (internal quotation marks omitted).

Moreover, unlike the cigarette litigation, Plaintiffs offer no evidence that PCPC made statements with knowledge of their falsity. *Cf. Philip Morris*, 566 F.3d at 1126 (observing that

manufacturers' research revealed hazards of smoking).  Plaintiffs offer no evidence that PCPC (or anyone else) knew for a fact that talc causes ovarian cancer.  The issue of whether talc causes ovarian cancer is still hotly contested today, and PCPC is on the side of the vast majority of scientists who have found that talc does not.  Plaintiffs also assume facts for which they have provided no evidence.  For example, Plaintiffs argue that PCPC knew talc contained asbestos, but none of the exhibits that Plaintiffs include with their Complaint or Opposition support that assertion. At best, the exhibits show that the FDA, manufacturers and PCPC discussed detectable limits of asbestos.  Although Plaintiffs survived *Daubert* challenges to the admissibility of some of their experts' opinions, that does not equate to establishing a factual issue regarding whether PCPC made a false representation, with knowledge of its falsity, and with the intent to deceive.

Moreover, although Plaintiffs concede that they must establish that they detrimentally relied on PCPC's allegedly false representations, Opp. at 50, Plaintiffs offer no evidence of that. Under D.C. law, "[a] plaintiff may recover for a defendant's fraudulent statement only if the plaintiff took some action in reliance on that statement." *Busby v. Capital One*, 772 F. Supp. 2d 268, 276 (D.D.C. 2011). *See also Woodward & Lothrop v. Baron*, CIV. A. 84-0513, 1984 WL 861, at *2 (D.D.C. June 19, 1984) (same).  Plaintiffs do not even allege awareness of PCPC, much less a relationship or communication with PCPC.  *See, e.g., Jefferson v. Collins*, 905 F. Supp. 2d 269, 287 (D.D.C. 2012) (finding that plaintiffs could not demonstrate detrimental reliance where they did not allege any contact or awareness).  Nor do Plaintiffs offer evidence of action they allegedly took by relying on PCPC's alleged statements.  *See, e.g., Lewis v. Lead Indus. Ass'n*, 342 Ill. App. 3d 95, 104, 793 N.E.2d 869, 876 (2003) (dismissing fraud claim where "plaintiffs do not allege that they exposed their children to lead-based paint in reliance upon any statement made by any of the defendants.  Accordingly, Plaintiffs' fraud claim fails.

64492243v.1

In addition to the foregoing reasons, Plaintiffs' fraudulent concealment theory fails because PCPC had no duty to communicate any information to them.  "[M]ere silence does not constitute fraud unless there is a duty to speak."  *Ali v. Mid-Atl. Settlement Servs., Inc.*, 640 F. Supp. 2d 1, 8 (D.D.C. 2009), *aff'd sub nom. Ali v. Tolbert*, 636 F.3d 622 (D.C. Cir. 2011).  Such a duty arises only in instances where there is a special or fiduciary relationship between the parties.  *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 107 (D.D.C. 2015); *City of Millville v. Rock*, 683 F. Supp. 2d 319, 330 (D.N.J. 2010) ("It is well settled that a party has no duty to disclose information to another party in a business transaction unless [1] a fiduciary relationship exists between them, [2] unless the transaction itself is fiduciary in nature, or [3] unless one party expressly reposes a trust and confidence in the other.") (quotations omitted).  No such relationship exists between Plaintiffs and PCPC.

Plaintiffs cannot support a claim for fraud based on misrepresentation or concealment.

### C.    As a Matter of Law, Plaintiffs' Conspiracy Claim Fails.

As discussed in PCPC's Motion at 20–21, "civil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort."  *Nader*, 567 F.3d at 697.  *See also In re Orthopedic Bone Screw Prod. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999) ("[T]he law uniformly requires that conspiracy claims be predicated upon an underlying tort that would be independently actionable against a single defendant."); *Nova Bank v. Samuel D. Schenker, L.L.C.*, A-0553-13T4, 2015 WL 751529, at *3 (N.J. Super. Ct. App. Div. Feb. 24, 2015) (same).  Because Plaintiffs cannot establish fraud, their conspiracy claim fails.  *See Nader*, 567 F.3d at 697.  Negligence cannot serve as a predicate because conspiracy requires an unlawful act or a lawful act committed for an unlawful purpose.  *Exec. Sandwich Shoppe v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000); *Chen v. District of Columbia*, 256 F.R.D. 267, 273 n. 5 (D.D.C. 2009).

34

In their Opposition, Plaintiffs allege that defendants conspired to "defend" talc and promote "voluntary self-regulation." Those are not unlawful purposes. By Plaintiffs' logic, all trade associations and their members would be subject to conspiracy claims based on membership fees and lobbying. That is not the law. "[P]articipation in an industry association itself does not automatically support a finding of a conspiratorial agreement." *Lynn v. Amoco Oil Co.*, 459 F. Supp. 2d 1175, 1186 (M.D. Ala. 2006). "[C]ircumstances that are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy, and it is certainly lawful to associate with other industry participants in trade organizations." *Welding Fume*, 526 F. Supp. 2d at 805. *See also Dukes v. Pneumo Abex Corp.*, 386 Ill. App. 3d 425, 443, 900 N.E.2d 1128, 1142 (2008) ("Membership and involvement in a trade organization, by itself, does not support an inference of involvement in a conspiracy.").

Moreover, Plaintiffs offer no evidence that any unlawful agreement was "for the purpose of injuring" them. *Sizemore*, 1996 WL 498410, at *13. Conspiracy requires a specific intent to injure a plaintiff. *Id.* Evidence that the alleged conspirators "acted with malice towards" the plaintiff is required. *Id.* Plaintiffs' injuries allegedly arose from their use of products (as discussed above regarding causation), not from any alleged agreement between Defendants.

Bringing Plaintiffs' argument full circle, "[i]n short, the plaintiffs seek to show that the defendants conspired together by agreeing to develop standards and petitioning state and federal government entities to adopt them. Such activity is protected by the Constitution and may not be proof of the conspiracy that the plaintiffs allege." *Lynn*, 459 F. Supp. 2d at 1191.

## CONCLUSION

For the foregoing reasons, PCPC respectfully requests that its motion for summary judgment be granted.

64492243v.1