**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 3:16-md-02738 |

-------------------------------------------------------

This relates to:

*Gena Abbott, Administrator of the Estate of Michelle Rodgers, and on behalf Cameron Morris, the minor child of Michelle Rodgers, Plaintiff*

*v.*

*Johnson & Johnson, Johnson & Johnson Consumer Inc.*
*Defendants*

Case 3:19-cv-15158

**PLAINTIFF'S AMENDED PETITION AND JURY DEMAND**

COMES NOW Plaintiff GENA ABBOTT, administrator of the Estate of Decedent Michelle Rodgers ("Decedent"), and on behalf of Michelle Rodgers's minor child, Cameron Morris, complaining of the various Defendants listed below and for cause of action would show the Court and Jury as follows:

**PARTIES AND JURISDICTION**

1.      Decedent Michelle Rodgers was a citizen and resident of Dyersburg, Tennessee in Dyer County. Gena Abbott and Cameron Morris are also citizens of Dyersburg, Tennessee in Dyer County.

2.     Decedent was diagnosed with ovarian cancer which was directly and proximately caused by her regular and prolonged exposure to Shower to Shower Body Powder.

3.     Decedent Michelle Rodgers died on August, 18, 2019, due to her advanced stage ovarian cancer. She was 50 years old when she died.

4.     Cameron Morris is Decedent Michelle Rodgers's minor child.

5.     Gena Abbott is Decedent Michelle Rodgers's sister.

6.     Defendant JOHNSON & JOHNSON is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. At all relevant times, JOHNSON & JOHNSON was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing Shower to Shower Body Powder. At all relevant times, Johnson & Johnson regularly transacted, solicited, and conducted business in all fifty States of the United States, including Tennessee.

7.     Defendant JOHNSON & JOHNSON CONSUMER INC. f/k/a JOHNSON & JOHNSON CONSUMER COMPANIES INC. is a New Jersey corporation with its principal place of business in Skillman, New Jersey. At all relevant times, upon information and belief, JOHNSON & JOHNSON CONSUMER INC. was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing Shower to Shower Body Powder. At all relevant times, JOHNSON & JOHNSON CONSUMER INC. regularly transacted, solicited, and conducted business in all fifty States of the United States, including Tennessee.

8.     At all relevant times, Defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. have engaged in the research, development, formulation, manufacture, design, testing, licensing, sale, distribution, marketing and/or introducing into

interstate commerce, either directly or indirectly through third parties or related entities, Johnson's Baby Powder.

9.      Defendant JOHNSON & JOHNSON CONSUMER INC. is and has been at all relevant times a wholly-owned subsidiary of Defendant JOHNSON & JOHNSON, under the complete dominion of and control of Defendant JOHNSON & JOHNSON. Hereinafter, unless otherwise delineated, these two entities together shall be referred to as the "Johnson & Johnson Defendants."

10.     Defendant PERSONAL CARE PRODUCTS COUNCIL ("PCPC") f/k/a COSMETIC, TOILETRY, AND FRAGRANCE ASSOCIATION ("CTFA"), is a corporation organized under the laws of the District of Columbia, with its principal place of business in Washington, District of Columbia. At all relevant times, upon information and belief, Johnson & Johnson have been active members of PCPC. PCPC is the successor or continuation of CTFA, and PCPC is legally responsible for CTFA's conduct.

11.     At all relevant times, upon information and belief, PCPC was a national trade association representing the personal care and cosmetics industry for the purposes of and, in fact, interacting with and influencing local, state and federal governmental agencies on issues related to, among other things, the regulation and marketing of talc based body powders and Shower to Shower.  The actions of Defendant PCPC in Washington D.C. has and have had repercussions throughout the talc industry, and in all states of the United States.

## FACTUAL ALLEGATIONS

12.     At all relevant times, Shower to Shower, manufactured and supplied by the Johnson & Johnson Defendants, swas defective and unreasonably dangerous because, despite the the Johnson & Johnson Defendants' knowledge that Shower to Shower was carcinogenic and could

cause an increased risk of ovarian cancer when applied to the female perineal area, a reasonably foreseeable use of these powders. The Johnson & Johnson Defendants failed to provide adequate warning or instruction to consumers, including Decedent, regarding the increased risk of ovarian cancer when these powders are applied to the female perineal area.

13.    From 1980 to 1996, Decedent used these powders to powder her body, including her perineal or genital area, a use that was reasonably foreseeable and for which these Shower to Shower was supplied.

14.    Decedent was diagnosed with Stage IV epithelial ovarian cancer on March 28, 2019, at Kirkland Cancer Center, in Jackson, Tennessee.

15.    Talc is a magnesium trisilicate and is mined from the earth. Talc is an inorganic mineral.

16.    Talc is the main substance in Shower to Shower, which the Johnson & Johnson Defendants manufactured, bottled, and sold. Shower to Shower is composed almost entirely of talc.

17.    At all pertinent times, a feasible alternative to the products has existed. For example, cornstarch is an organic carbohydrate that is quickly broken down by the body with no known health effects. Cornstarch powders have been sold and marketed for the same uses as the products with nearly the same effectiveness.

18.    Historically, Johnson's Baby Powder has been a symbol of freshness, cleanliness, and purity. During the time in question, Defendants advertised and marketed these products as the beacon of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" helping keep skin feeling dry and comfortable, and "clinically

proven gentle and mild." The Johnson & Johnson Defendants instructed women through advertisements to dust themselves with this product to mask odors.

19.     During the time in question, the Johnson and Johnson Defendants advertised and marketed the product Shower to Shower as safe for use by women as evidenced in its slogan "A sprinkle a day keeps odor away," and through advertisements such as "Your body perspires in more places than just under your arms. Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day." And "SHOWER to SHOWER can be used all over your body."

20.     In 1971, the first study was conducted that suggested an association between talc and ovarian cancer. This study was conducted by Dr. W.J. Henderson and others in Cardiff, Wales.

21.     In 1982, the first epidemiologic study was performed on talc powder use in the female genital area. This study was conducted by Dr. Daniel Cramer and others. This study found a 92% increased risk in ovarian cancer with women who reported genital talc use. Shortly after this study was published, Dr. Bruce Semple of Johnson & Johnson came and visited Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that Johnson & Johnson should place a warning on its talcum powders about the ovarian cancer risks so that women can make an informed decision about their health.

22.     Since 1982, there have been approximately twenty-two (22) additional epidemiologic studies providing data regarding the association of talc and ovarian cancer. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use in women.

    a.  In 1983, a case-control study found a 150% increased risk of ovarian cancer

for women who use talcum powder in the genital area. Hartge, P., *et al*. Talc and Ovarian Cancer. *JAMA*. 1983; 250(14):1844.

b.  In 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539 control women found that 52% of the cancer patients habitually used talcum powder on the genital area before their cancer diagnosis. The study showed a 50% increase in risk of ovarian cancer in women that used talcum powder on their genital area and a positive dose-response relationship. Whittemore AS, *et al*. Personal and environmental characteristics related to  epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am. J. Epidemiol*. 1988 Dec; 128(6):1228-40.

c.  A 1989 study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls, and found a 29% increased risk in ovarian cancer with women who reported genital talcum powder use more than once each week. Booth, M., *et al*. Risk factors for ovarian cancer: a case-control study. *Br J Cancer*. 1989 Oct; 60(4):592-8.

d.  In 1992, a case-control study found a statistically significant 80% increased risk of ovarian cancer in women with more than 10,000 lifetime perineal applications of talc, demonstrating a positive dose-response relationship. Harlow BL, *et al*. Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol*. 1992 Jul; 80(1):19-26.

e.  Another 1992 case-control study reported a 70% increased risk from genital talc use and a 379% increased risk of ovarian cancer of women who used

talc on sanitary napkins in their genital area. Rosenblatt, K.A. *et al.* Mineral fiber exposure and the development of ovarian cancer. *Gynecol Oncol.* 1992 Apr; 45(1):20-5.

f.   In 1995, the largest study of its kind to date found a statistically significant 27% increased risk in ovarian cancer for women who regularly use talc in the abdominal or perineal area. Purdie, D., *et al.* Reproductive and other factors and risk of epithelial ovarian cancer: An Australian case-control study. Survey of Women's Health Study Group. *Int J Cancer.* 1995 Sep 15; 62(6):678-84.

g.   In 1996, a case-control study found a statistically significant 97% increased risk of ovarian cancer in women who used what they described as a "moderate" or higher use of talc-based powders in their genital area. *See* Shushan, A., *et al.* Human menopausal gonadotropin and the risk of epithelial ovarian cancer. *Fertil. Steril.* 1996 Jan; 65(1):13-8.

h.   In 1997, a case control study of 313 women with ovarian cancer and 422 without this disease found that the women with cancer were more likely to have applied talcum powder to their external genitalia area. Women using these products had a statistically significant 50% to 90% higher risk of developing ovarian cancer. Cook, LS, *et al.* Perineal powder exposure and the risk of ovarian cancer. *Am. J Epidemiol.* 1997 Mar 1; 145(5):459-65.

i.   In 1997, a case-control study involving over 1,000 women found a statistically significant increased risk of 42% for ovarian cancer for women who applied talc via sanitary napkins to their perineal area. Chang, S, *et al.*

Perineal talc exposure and risk of ovarian carcinoma. *Cancer*. 1997 Jun 15; 79(12):2396-401.

j.  In 1998, a case-control study found a 149% increased risk of ovarian cancer in women who used talc-based powders on their perineal area. Godard, B., *et al.* Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Am J Obstet Gynecol*. 1998 Aug; 179(2):403-10.

k.  Dr. Daniel Cramer conducted another case-control study in 1999, observing 563 women newly diagnosed with epithelial ovarian cancer and 523 women in a control. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineal area and an 80% increase in risk for women with over 10,000 lifetime applications. Cramer, DW, *et al.* Genital talc exposure and risk of ovarian cancer. *Int J Cancer*. 1999 May 5; 81(3):351-56.

l.  In 2000, a case-control study of over 2,000 women found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. Ness, RB, *et al.* Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology*. 2000 Mar; 11(2):111-7.

m.  In 2004, a case-control study of nearly 1,400 women from 22 counties in Central California found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use, and a 77% increased risk of serous invasive ovarian cancer from women's genital talc use. Importantly, this study also examined women's use of cornstarch powders as an alternative to talc, and found no increased risk in ovarian cancer

in women in the cornstarch group, further supporting the causal connection between genital talc use and ovarian cancer. Mills, PK, *et al*. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer*. 2004 Nov 10; 112(3):458-64.

n.  In 2008, a combined study of over 3,000 women from a New England-based case-control study found a general 36% statistically significant increased risk of epithelial ovarian cancer from genital talc use and a 60% increased risk of the serous invasive ovarian cancer subtype. The study also found a strong dose- response relationship between the cumulative talc exposure and incidence of ovarian cancer, adding further support to the causal relationship. Gates, MA, *et al.* Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer. *Cancer Epidemiol Biomarkers Prev*. 2008 Sep; 17(9):2436-44.

o.  A 2009 case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with increasing frequency and duration of talc use, with an overall statistically significant 53% increased risk of ovarian cancer from genital talc use. That increased risk rose dramatically, to 108%, in women with the longest duration and most frequent talc use. Wu, AH, *et al.* Markers of inflammation and risk of ovarian cancer in Los Angeles County. *Int. J Cancer*. 2009 Mar 15; 124(6):1409-15.

p.  In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use. Rosenblatt, KA, *et al.* Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer*

*Causes Control*. 2011 May; 22(5):737-42.

    q.   In June of 2013, a pooled analysis of over 18,000 women in eight case-control studies found a 20% to 30% increased risk of women developing epithelial ovarian cancer from genital powder use. The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence." Terry, KL, *et al.* Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res (Phila)*. 2013 Aug; 6(8):811-21.

23.    In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

24.    In response to the United States National Toxicology Program's study, the Cosmetic Toiletry and Fragrance Association (CTFA) formed the Talc Interested Party Task Force (TIPTF). Defendants were members of the CTFA. The stated purpose of the TIPTF was to pool financial resources of these companies in an effort to collectively defend talc use at all costs and to prevent regulation of any type over this industry. The TIPTF hired scientists to perform biased research regarding the safety of talc, members of the TIPTF edited scientific reports of the scientists hired by this group prior to the submission of these scientific reports to governmental agencies, members of the TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on regulatory bodies regarding talc. All of these activities have been well coordinated and planned by these companies and organizations over the past four (4) decades in an effort to prevent

regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to cancer.

25.     On November 10, 1994, the Cancer Prevention Coalition mailed a letter to then Johnson & Johnson C.E.O, Ralph Larson, informing his company that studies as far back as 1960's ". . . show[ ] conclusively that the frequent use of talcum powder in the genital area pose[] a serious health risk of ovarian cancer." The letter cited a recent study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate.

26.     The letter concluded by requesting that Johnson & Johnson withdraw talc products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about ovarian cancer risk they pose.

27.     In 1996, the condom industry stopped dusting condoms with talc due to the growing health concerns.

28.     In February of 2006, the International Association for the Research of Cancer (IARC) part of the World Health Organization published a paper whereby they classified perineal use of talc based body powder as a "Group 2B" human carcinogen. IARC which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%. IARC concluded with this "Evaluation": "There is limited evidence in

humans for the carcinogenicity of perineal use of talc-based body powder." By definition "Limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

29.     In approximately 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A," "very toxic," 51 "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS). Asbestos is also classified as "D2A".

30.     In 2006, Imerys Talc began placing a warning on the Material Safety Data Sheets (MSDS) it provided to Defendants regarding the talc it sold to them to be used in the Products. These MSDSs not only provided the warning information about the IARC classification but also included warning information regarding "States Rights to Know" and warning information about the Canadian Government's "D2A" classification of talc as well.

31.     Defendants had a duty to know and warn about the hazards associated with the use of Shower to Shower.

32.     Defendants failed to inform customers and end users of Shower to Shower of a known catastrophic health hazard associated with the use of Shower to Shower.

33.     In addition, Defendants procured and disseminated false, misleading, and biased information regarding the safety of Shower to Shower to the public and used influence over governmental and regulatory bodies regarding talc.


### COUNT I – STRICT LIABILITY – FAILURE TO WARN
**(Against the Johnson & Johnson Defendants)**

34.     Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

35.     The Johnson & Johnson Defendants are liable under a theory of strict products liability as set forth in §402A of the Restatement of Torts (Second).

36.     At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce Shower to Shower.

37.     At all relevant times, the Johnson & Johnson Defendants knew or should have known that the use of Shower to Shower in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

38.     Had Decedent received warning and/or instruction from the Johnson & Johnson Defendants regarding the increased risk of ovarian cancer associated with Shower to Shower when applied to the perineal area, Decedent would not have used Shower to Shower in this manner.

39.     Due to the absence of any warning or instruction by the Johnson & Johnson Defendants as to the significant health and safety risks posed by Shower to Shower as described herein, Decedent was unaware that Shower to Shower created an increased risk of ovarian cancer, as this danger was not known to the general public.

40.     As the direct and proximate result of the reasonably foreseeable use of Shower to Shower as manufactured, formulated, marketed, tested, promoted, sold, distributed and introduced into the stream of commerce by the Johnson & Johnson Defendants, Decedent

suffered damages for which she is entitled to recovery, including but not limited to pain and suffering, compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT II – STRICT LIABILITY –DEFECTIVE MANUFACTURE AND DESIGN
### (Against the Johnson & Johnson Defendants)

41.     Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

42.     The Johnson & Johnson Defendants are liable under a theory of strict products liability as set forth in §402A of the Restatement of Torts (Second).

43.     At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising and otherwise introducing Shower to Shower into the stream of interstate commerce, which they sold and distributed throughout the United States.

44.     At all relevant times, Shower to Shower was expected to and did reach Decedent without a substantial change in condition.

45.     At all relevant times, Shower to Shower was defectively and improperly manufactured and designed by the Johnson & Johnson Defendants in that, when Shower to Shower left the hands of the Johnson & Johnson Defendants, the foreseeable risks of Shower to Shower far outweighed the benefits associated with their design and formulation.

46.     At all relevant times, Shower to Shower were defectively manufactured and designed by the Johnson & Johnson Defendants in that their design and formulation was more dangerous than an ordinary consumer would expect when used as intended and reasonably foreseeable manner.

47.     At all relevant times, the Johnson & Johnson defendants  created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

48.     At all relevant times, a reasonable and safer alternative design existed, which could have feasibly been employed by the Johnson & Johnson Defendants to manufacture a product with the same therapeutic purpose as Shower to Shower.  Despite knowledge of this reasonable and safer alternative design, the Johnson & Johnson Defendants failed to alter Shower to Shower' design and formulation. The magnitude of the danger created by Shower to Shower far outweighs the costs associated with using an alternative, safer design.

49.     As a direct and proximate result of the defective design and manufacture of Shower to Shower, Decedent suffered damages, and death, for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT III – BREACH OF EXPRESS WARRANTIES
### (Against the Johnson & Johnson Defendants)

50.     Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

51.     The Johnson & Johnson Defendants, through their advertising and promotional materials, expressly warranted and affirmed that Shower to Shower were safe for the uses for which they were intended and for uses which were reasonably foreseeable. The Johnson & Johnson Defendants' express warranties extended beyond delivery of Shower to Shower and expressly warranted the future performance of Shower to Shower. These express warranties include, but are not limited to, the following:

a.  The Johnson & Johnson Defendants advertised and labeled Johnson's Baby Powder as safe for application all over the body, including the following: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms."

b.  The Johnson & Johnson advertised SHOWER to SHOWER to be applied around or on the perineal area.  For example, the Johnson & Johnson Defendants advertised that women should use SHOWER to SHOWER to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort." "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

52.     At all relevant times, the Johnson & Johnson Defendants breached said express warranties in that Shower to Shower were unsafe and ineffective for application all over the body, specifically when used in the female perineal area, because Shower to Shower, when used in this manner for which the Johnson & Johnson Defendants advertised and promoted, significantly increased the risk of developing ovarian cancer among consumers.

53.     At all relevant times, the Johnson & Johnson Defendants had knowledge of the hazards and health risks posed by Shower to Shower when applied to the perineal area.

54.     At all relevant times, the Johnson & Johnson Defendants willfully failed to disclose the defects and health risks of Shower to Shower to Decedent and the consuming public.

55.     At all relevant times, in reliance upon the express warranties made by the Johnson & Johnson Defendants as set forth above, Decedent purchased and used Shower to Shower in their perineal area, believing that Shower to Shower were safe when used in this manner.

56.     As a direct and proximate result of the Johnson & Johnson Defendants' express warranties concerning Shower to Shower, as described herein, Decedent has suffered the injuries and damages, and death, for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT IV – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against the Johnson & Johnson Defendants)

57.     Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

58.     At the time the Johnson & Johnson Defendants manufactured, marketed, labeled, promoted, distributed and/or sold Shower to Shower, Defendants knew of the uses for which Shower to Shower were intended, including use by women in the perineal area, and impliedly warranted Shower to Shower were merchantable and fit for the ordinary purposes for which they were intended.

59.     Members of the consuming public, including consumers such as Decedent, were intended third-party beneficiaries of the warranty.

60.     Shower to Shower were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

61.     Decedent reasonably relied on the Johnson & Johnson Defendants representations that Shower to Shower were safe and free of defects.

62.     The Johnson & Johnson Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Decedent's injuries.

63.     The Johnson & Johnson Defendants' conduct, as described above, was extreme and outrageous.  Defendants risked the lives of the consumers and users of their products, including Decedent, with knowledge of the safety and efficacy problems, and suppressed this knowledge from Decedent and the general public. The Johnson & Johnson Defendants made conscious decisions not to redesign, relabel, warn or inform Decedent or the unsuspecting consuming public. The Johnson & Johnson Defendants' outrageous conduct warrants an award of punitive damages.

64.     As a direct and proximate result of the Johnson & Johnson Defendants' implied warranties of merchantability concerning Shower to Shower, as described herein, Decedent has suffered from the injuries and damages, and death, for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

### COUNT V – BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
**(Against the Johnson & Johnson Defendants)**

65.     Decedent incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

66.     The Johnson & Johnson Defendants manufactured, supplied and sold Shower to Shower with an implied warranty that they were fit for the particular purpose for which they were warranted.

67.     Members of the consuming public, including Decedent, were the intended third-party beneficiaries of the warranty.

68.     Shower to Shower was not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

69.     Decedent reasonably relied on the Johnson & Johnson Defendants' representations that Shower to Shower was safe and effective for use by women in the perineal area.

70.     The Johnson & Johnson Defendants' breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Decedent's injuries.

71.     The Johnson & Johnson Defendants' conduct, as described above, was extreme and outrageous. The Johnson & Johnson Defendants risked the lives of the consumers and users of their products, including Decedent, by having knowledge of the safety and efficacy problems associated with Shower to Shower, but suppressing this knowledge from the general public. The Johnson & Johnson Defendants made conscious decisions not to redesign, relabel, warn or inform the unsuspecting consuming public. The Johnson & Johnson Defendants' outrageous conduct warrants an award of punitive damages.

72.     As a direct and proximate result of the Johnson & Johnson Defendants' implied warranties of fitness concerning Shower to Shower, as described herein, Decedent has suffered from the injuries and damages, and death, for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VI – NEGLIGENCE
### (The Johnson & Johnson Defendants)

73.     Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

74.     At all relevant times, the Johnson & Johnson Defendants manufactured, designed, formulated, marketed, tested, promoted, supplied, sold and/or distributed Shower to Shower in the regular course of business.

75.     At all relevant times, the Johnson & Johnson Defendants had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution and sale of Shower to Shower.

76.     At all relevant times, the Johnson & Johnson Defendants had a duty to act with reasonable care and to warn Decedent and the consuming public of the risk, dangers and adverse side effects of Shower to Shower.

77.     At all relevant times, the Johnson & Johnson Defendants knew or should have known that Shower to Shower were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

78.     The Johnson & Johnson Defendants breached their duty to Decedent and were otherwise negligent in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution and/or sale of Shower to Shower utilized by Decedent, which were inherently dangerous and defective, and unfit and unsafe for their intended and reasonably foreseeable uses.

79.     The Johnson & Johnson Defendants were further negligent in failing to accompany Shower to Shower with proper warnings or adequate labeling regarding the dangerous and potentially fatal health risks associated with the use of Shower to Shower, particularly when used in the perineal area of women, which was their intended or reasonable foreseeable use.

80.     As a direct and proximate result of the   Johnson & Johnson Defendants' negligence, Decedent has suffered damages, and death, for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VII – NEGLIGENCE
### (Against PCPC)

81.     Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

82.     At all relevant times, PCPC was a national trade association representing the personal care and cosmetics industry of which the Johnson & Johnson Defendants were active members.

83.     At all relevant times, upon information and belief, the purpose and intent of PCPC was to interact with and influence local, state and federal governmental agencies on issues related to, among other things, the regulation and marketing of talc based body powders and Shower to Shower.

84.     At all relevant times, PCPC had actual knowledge of the significant risk of ovarian cancer caused by application of talc, talc based body powders and Shower to Shower to the female perineal area.

85.     At all relevant times, PCPC voluntarily undertook a duty of care to Decedent by self-regulating the cosmetics industry by promulgating federal, state and local standards, norms and/or bylaws that govern, control and/or inform the manufacturing, design, labeling, marketing, distribution and/or branding practices of its member companies, including but not limited to the Johnson & Johnson Defendants and Imerys Talc.

86.     At all relevant times, PCPC had the means and authority to control the federal, state and local safety standards of the Johnson & Johnson Defendants and Imerys Talc in the manufacturing, design, labeling, marketing, distribution and/or branding of talc, talc based body powder and Shower to Shower.

87.     PCPC breached its duty of care to Decedent and the consuming public by negligently failing to ensure that the Johnson & Johnson Defendants and Imerys Talc complied with and adhered to the PCPC standards, norms and/or bylaws concerning the safe manufacture, design, labeling, marketing, distribution and/or branding of talc, talc based body powders and Shower to Shower, and subsequently allowing the talc, talc based body powders and products to be introduced into the federal, state and local streams of interstate commerce despite their significant health and safety risks of which PCPC had full knowledge.

88.     PCPC engaged in activities for the unlawful purpose of promoting its private and commercial interests, the interests of its member companies and talc, specifically, talc based body powder and Shower to Shower. PCPC's coordinated efforts, specifically designed to influence the regulation and marketing of talc, talc based body powder and Shower to Shower on a local, state and national level, facilitated conduct which had no legitimate purpose. PCPC's conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

89.     As a direct and proximate result of PCPC's negligence, the Johnson & Johnson Defendants manufactured, designed, labeled, marketed, distributed and branded talc, talc based body powders and Shower to Shower on a federal, state and local level in a way that foreseeably caused a significant risk of ovarian cancer when the talc, talc based body powders and/or Shower to Shower were applied to the female perineal area.

90.     As a further direct and proximate result of PCPC's negligence, Decedent has suffered damages, and death, for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT VIII – NEGLIGENT MISREPRESENTATION
### (Against the Johnson & Johnson Defendants)

91.     Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

92.     At all relevant times, the  Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling and/or distributing Shower to Shower.

93.     At all relevant times, the  Johnson & Johnson Defendants had a duty to disclose to consumers and the public material facts about Shower to Shower, including the material fact that application of Shower to Shower to the female perineal area causes a significantly increased risk of ovarian cancer.

94.     Through their actions and omissions in advertising, promoting, labeling and otherwise, the Johnson & Johnson Defendants made public misrepresentations of material facts to, and/or concealed material facts from, consumers like Decedent concerning the character, safety and effectiveness of Shower to Shower.

95.     At all relevant times, those misrepresentations and omissions included, but were not limited to, the following:

   a.  The Johnson & Johnson Defendants labeled and advertised Johnson's Baby Powder in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use

SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day; and "SHOWER to SHOWER can be used all over your body."

b. The Johnson & Johnson Defendants advertised the product SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort."

96.     Had Defendants disclosed true and accurate material facts concerning the risks of the use of Shower to Shower, in particular the risk of developing ovarian cancer from using Shower to Shower in the female perineal area, Decedent would not have purchased and/or received Shower to Shower and/or used Shower to Shower in that manner.

97.     Decedent's reliance upon the      Johnson & Johnson Defendants' misrepresentations and omissions were justified and reasonable because, among other reasons, those misrepresentations and omissions were made by individuals and entities who were in a position to know the material facts concerning Shower to Shower and the association between Shower to Shower and the incidence of ovarian cancer, while Decedent was not in a position to know these material facts, and because the Johnson & Johnson Defendants failed to warn or otherwise provide notice to the consuming public as to the risks of Shower to Shower, thereby inducing Decedent to use Shower to Shower in lieu of safer alternatives and in ways that created unreasonably dangerous risks to their health. At all relevant times, the Johnson & Johnson Defendants' corporate officers, directors and/or managing agents knew of and ratified the acts of the Johnson & Johnson Defendants, as alleged herein.

98.     As a direct and proximate result of the  Johnson & Johnson Defendants' negligent misrepresentations and/or omissions concerning the risks and benefits of Shower to Shower, Decedent has suffered from the injuries, and death, and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## <u>COUNT IX – FRAUD</u>
### (Against the Johnson & Johnson Defendants)

99.     Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

100.     At all relevant times, the Johnson & Johnson Defendants intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users, including Decedent.

101.     At all relevant times, the Johnson & Johnson Defendants misrepresented and/or concealed material facts concerning Shower to Shower to consumers, including Decedent, with knowledge of the falsity of their misrepresentations.

102.     At all relevant times, upon information and belief, the misrepresentations and concealments concerning Shower to Shower made by the Johnson & Johnson Defendants include, but are not limited to the following:

    a.   The Johnson & Johnson Defendants falsely labeled and advertised Johnson's Baby Powder in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable," "a sprinkle a day keeps the odor away," "your body perspires in more places than just under your arms."

    b.   The Johnson & Johnson Defendants falsely advertised SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe

Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort." "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day," and "SHOWER to SHOWER can be used all over your body."

c.   The Johnson & Johnson Defendants, through the advertisements described above, knowingly misrepresented to Decedent and the public that Shower to Shower were safe for use all over the body, including the perineal areas of women.

d.   The Johnson & Johnson Defendants intentionally failed to disclose that talc and the associated products, when used in the perineal area, increase the risk of ovarian cancer.

e.   The Johnson & Johnson Defendants intentionally failed to include adequate warnings with Shower to Shower regarding the potential and actual risks of using Shower to Shower in the perineal area on women and the nature, scope, severity and duration of any serious injuries resulting therefrom.

f.   Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, the Johnson & Johnson Defendants falsely marketed, advertised, labeled and sold Shower to Shower as safe for public consumption and usage, including for use by women to powder their perineal areas.

103.   At all relevant times, the Johnson & Johnson Defendants actively, knowingly and intentionally concealed and misrepresented these material facts to the consuming public

with the intent to deceive the public and Decedent, and with the intent that consumers would purchase and use Shower to Shower in the female perineal area.

104.    At all relevant times, the consuming public, including Decedent, would not otherwise have purchased Shower to Shower and/or applied Shower to Shower in the perineal area if they had been informed of the risks associated with the use of Shower to Shower in the perineal area.

105.    At all relevant times, Decedent relied on the Johnson & Johnson Defendants' misrepresentations concerning the safety of Shower to Shower when purchasing Johnson's Baby Powder and using Shower to Shower on their personal areas, and their reliance was reasonable and justified.

106.    As a direct and proximate result of the Johnson & Johnson Defendants' fraudulent conduct concerning Shower to Shower, as described herein, Decedent has suffered and will continue to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT X – FRAUD
### (Against PCPC)

107.    Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

108.    At all relevant times, PCPC intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users of talc based body powders and Shower to Shower, including Decedent.

109.    At all relevant times, PCPC intentionally, willfully and/or recklessly, with the intent to deceive, misrepresented and/or concealed materials facts to local, state and federal

regulators in order to unduly influence the regulation and marketing of talc, talc based body powders and Shower to Shower. The actions of PCPC on a local, state and federal level impacted what material facts were or could be disclosed to consumers and users of talc based body powders and Shower to Shower, including Decedent.

110.    At all relevant times, PCPC, on a local, state and federal level, fraudulently misrepresented and/or concealed material facts to consumers and users of Shower to Shower, including Decedent, with knowledge of the falsity of their misrepresentations.

111.    At all relevant times, PCPC fraudulently misrepresented and/or concealed materials facts to local, state and federal regulators in order to unduly influence the regulation and marketing of talc, talc based body powders and Shower to Shower.  The fraudulent actions of PCPC on a local, state and federal level impacted what material facts were or could be disclosed to consumers and users of talc based body powders and Shower to Shower, including Decedent.

112.    At all relevant times, upon information and belief, PCPC's conduct giving rise to fraud includes, but is not limited, to the following:

    a.   PCPC formed the TIPTF, with the purpose of self-regulating the talc industry and to pool financial resources in an effort to prevent regulation of talc, including talc based body powders and Shower to Shower.

    b.   PCPC, through the TIPTF, hired and funded scientists to perform research regarding the safety of talc.  The TIPTF then edited the scientific reports in an effort to skew the data so that it demonstrated safety of talc and talc based body powder and suppressed data demonstrating these dangers. The TIPTF then released and disseminated this biased and intentionally misleading data to local,

state and federal governmental agencies, with the intent that the biased and intentionally misleading data would influence material facts that were or could be disclosed to consumers of talc, talc based body powders and Shower to Shower, including Decedent.

c.  PCPC, through the TIPTF, knowingly released false information about the safety of talc based body powder to the consuming public with the intent to induce consumers, including the Decedent, to purchase talc based body powders.

d.  PCPC extensively lobbied and used political and economic influence on local, state and federal governmental bodies in order to prevent regulation of talc based body powder, including Shower to Shower. These efforts were based knowingly on false and misleading information about the safety of talc and talc based body powder.

e.  PCPC caused to be released, published and disseminated, medical and scientific data, literature and reports containing information and statements regarding the risks of ovarian cancer which PCPC knew were incorrect, incomplete and misleading.

f.  PCPC's action impacted the perceptions about the safety of talc and talc based body powder in the public domain in a manner that falsely made it appear as though Shower to Shower were safe and that their use did not pose a risk for women of contracting cancer of the reproductive system. PCPC's actions contaminated and falsely influenced the risk /benefit information available   in the public domain to the detriment of consumers, including the Plaintiff.

113.    At all relevant times, PCPC actively, knowingly and intentionally concealed and misrepresented these material facts to consumers, including Decedent, with the intent to deceive the public and Decedent, and with the intent that consumers would purchase and use talc based body powder and Shower to Shower in the female perineal area.

114.    At all relevant times, PCPC actively, knowingly and intentionally misrepresented these material facts to local, state and federal governmental agencies with the intent to deceive these agencies and influence material facts conveyed to consumers, including Decedent, with the intent that consumers would purchase and use talc based body powder and Shower to Shower in the female genital area.

115.    The consuming public, including Decedent, would not have purchased talc based body powders and/or Shower to Shower and/or applied talc based body powders and/or Shower to Shower in the perineal area if they had been informed of the risks associated with the use of Shower to Shower in that manner.

116.    At all relevant times, Decedent relied on PCPC's self-regulation of and misrepresentations concerning the safety of talc based body powders and Shower to Shower and PCPC's fraudulent conduct when purchasing talc based body powders and/or Shower to Shower and using them in their perineal areas, and their reliance was reasonable and justified.

117.    PCPC engaged in, coordinated or facilitated conduct with no legitimate purpose, and used various improper means to achieve unlawful ends, such that its conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

118.    As a direct and proximate result of PCPC's fraudulent conduct concerning talc based body powder and Shower to Shower, as described herein, Decedent has suffered from

the injuries and damages, and death, for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT XI – VIOLATION OF Tennessee's Consumer Protection Act Tenn. Code Ann. Sec. 47-18-101,
### (Against the Johnson & Johnson Defendants)

119.    Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

120.    Decedent purchased and used Shower to Shower primarily for personal use and thereby suffered ascertainable losses as a result of the Johnson & Johnson Defendants' actions in violation of the consumer protection laws applicable to the individual Decedent's resident State of Tennessee.

121.    Unfair methods of competition or deceptive acts or practices that were proscribed by law, include the following:

a.   Representing that goods or services have characteristics, ingredients, user benefits or qualities that they do not have;

b.   Advertising goods or services with the intent not to sell them as advertised;

c.   Over-promotion of Shower to Shower including but not limited to over-promotion of their safety and efficacy; and

d.   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

122.    The Johnson & Johnson Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Shower to Shower.

123.    The Johnson & Johnson Defendants uniformly communicated the purported benefits of Shower to Shower while failing to disclose the serious and dangerous risk of ovarian cancer related to the use of these powders, especially use in the perineal area, and of the true state of these powders' safety, efficacy and usefulness. The Johnson & Johnson Defendants made these representations to consumers, including Decedent, in the marketing and advertising described herein. The Johnson & Johnson Defendants' conduct in connection with Shower to Shower was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because the Johnson & Johnson Defendants misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, safety, efficacy and advantages of Shower to Shower.

124.    As a result of these violations of consumer protection laws, Decedent has incurred damage and other expenses, for which the Johnson & Johnson Defendants are liable.

125.    As a direct and proximate result of the Johnson & Johnson Defendants' violation of consumer protection laws concerning Shower to Shower, as described herein, Decedent has suffered and will continue to suffer from the damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT XII – FRAUDULENT CONCEALMENT
### (Against the Johnson & Johnson Defendants)

126.    Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

127.    Prior to Decedent's use of Shower to Shower and during the period in which Decedent actually used Shower to Shower, the Johnson & Johnson Defendants fraudulently suppressed material information regarding the safety and efficacy of Shower to Shower and

the availability of an alternative feasible safer design, including but not limited to, information regarding the safe use of cornstarch based products for the same purposes. Furthermore, the Johnson & Johnson Defendants fraudulently concealed the safety information about the use of Shower to Shower, generally, and on the perineal area, specifically. Decedent believed the fraudulent misrepresentations and fraudulent concealment described throughout this Complaint were intentional so as to maintain the sales volumes of Shower to Shower.

128.    The  Johnson & Johnson Defendants intentionally concealed safety issues with Shower to Shower in order to induce consumers, including Decedent, to purchase Shower to Shower.

129.    At the time the Johnson & Johnson Defendants concealed the fact that Shower to Shower were not safe as designed and marketed, the Johnson & Johnson Defendants were under a duty to communicate this information to the general public in such a manner that the general public could appreciate the risks associated with using Shower to Shower, generally.

130.    Decedent relied upon the Defendants' false and fraudulent misrepresentations and concealments regarding the safety of Shower to Shower.

131.    As a direct and proximate result of the Johnson & Johnson Defendants' malicious and intentional concealment of material and information, the Johnson & Johnson Defendants caused or significantly contributed to Decedent's injuries.

132.    The Johnson & Johnson Defendants furthered this fraudulent concealment through a continued and systematic failure to disclose information to Decedent and the public.

133.    The Johnson & Johnson Defendants' acts before, during and/or after the act causing Decedent's injuries prevented Decedent from discovering the injury or cause thereof.

134.    The Johnson & Johnson Defendants' conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which the Johnson & Johnson Defendants must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Decedent.

135.    As a direct and proximate result of the Johnson & Johnson Defendants' fraudulent concealment concerning Shower to Shower, as described herein, Decedent has suffered and will continue to suffer from the damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT XIII – FRAUDULENT CONCEALMENT
### (Against PCPC)

136.    Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

137.    Prior to Decedent's use of Shower to Shower and during the period in which Decedent actually used Shower to Shower, PCPC fraudulently suppressed material information regarding the safety and efficacy of talc based body powders and Shower to Shower and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch based products for the same purposes. Furthermore, PCPC fraudulently concealed the safety information about the use of talc, generally, and talc based body powder on the perineal area, specifically. Decedent believes the fraudulent misrepresentations and fraudulent concealment described throughout this Complaint was intentional so as to maintain the sales volume of talc, talc based body powders and Shower to Shower.

138.    PCPC fraudulently suppressed material information from local, state and federal government agencies regarding the safety and efficacy of talc based body powders and Shower to Shower and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch based products for the same purposes. Furthermore, PCPC fraudulently concealed the safety information about the use of talc, generally, and the application of talc based body powder to the female genital area, specifically.

139.    PCPC intentionally concealed safety issues with talc based body powders, generally, in order to induce consumers, including Decedent, to purchase Shower to Shower.

140.    At the time PCPC concealed the fact that talc based body powders and Shower to Shower were not safe as designed and marketed by the Johnson & Johnson Defendants, PCPC was under a duty to communicate this information to local, state and federal agencies, as well as the general public, in such a manner that the general public could appreciate the risks associated with using Shower to Shower, generally.

141.    Decedent relied upon the Defendants' false and fraudulent misrepresentations and concealments regarding the safety of talc based body powders and Shower to Shower when used in the female genital area.

142.    PCPC engaged in, coordinated or facilitated conduct with no legitimate purpose, and used various improper means to achieve unlawful ends, such that its conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

143.    As a direct and proximate result of PCPC's malicious and intentional concealment of material and information, PCPC caused or significantly contributed to Decedent's injuries.

144.    PCPC furthered this fraudulent concealment through a continued and systematic failure to disclose information to local, state and federal government agencies, Decedent and the public.

145.    PCPC's acts before, during and/or after the act causing Decedent's injuries prevented Decedent from discovering the injury or cause thereof.

146.    PCPC's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which PCPC must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Decedent.

147.    As a direct and proximate result of PCPC's fraudulent concealment concerning Shower to Shower, as described herein, Decedent has suffered and will continue to suffer from the damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## COUNT XIV – CIVIL CONSPIRACY
### (Against the PCPC and the Johnson & Johnson Defendants)

148.    Plaintiff incorporates by reference each preceding and succeeding paragraph as if set forth fully herein.

149.    At all relevant times, the PCPC and the Johnson & Johnson Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated, acted in concert, aided and abetted and/or conspired to cause Decedent's injuries by exposing Decedent to Shower to Shower, which are harmful and dangerous.

150.    Further, at all relevant times, the PCPC, and the Johnson & Johnson Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted and/or conspired to defraud Decedent and consumers of Shower to Shower regarding the true nature

of Shower to Shower and their potential to cause ovarian cancer when used in a reasonably foreseeable manner.

151.    At all relevant times, the PCPC and the Johnson & Johnson Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted and/or conspired to defraud Decedent and consumers of Shower to Shower with the purpose of maintaining the popularity and reputation of Shower to Shower and, therefore, maintaining high sales of Shower to Shower, at the expense of consumer safety.

152.    At all relevant times, pursuant to and in furtherance of said conspiracies, the PCPC and the Johnson & Johnson Defendants performed the following overt and unlawful acts:

     a.   For many decades, upon information and belief, PCPC, the Johnson & Johnson Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports which indicate that, when applied to the perineal area, an ordinary and foreseeable use by women, talc based body powder and Shower to Shower are unreasonably dangerous, hazardous, deleterious to human health, carcinogenic and potentially deadly;

     b.   Upon information and belief, despite the medical and scientific data, literature and test reports possessed by and available to the PCPC and the Johnson & Johnson Defendants,  jointly and in conspiracy with each other, fraudulently, willfully and maliciously:

    i.  Withheld, concealed and suppressed said medical information regarding the increased risk of ovarian cancer from consumers, including Decedent;

    ii.  Through the TIPTF, PCPC Johnson & Johnson Defendants instituted a "defense strategy" to defend talc based body powder at all costs. Admittedly, the PCPC and the Johnson & Johnson Defendants, through the TIPTF, used their influence over the NTP Subcommittee, and the threat of litigation against the NTP, to prevent the NTP from classifying talc as a carcinogen on its 10th RoC;

    iii.  PCPC and the Johnson & Johnson Defendants, through the TIPTF, used their influence over local, state and federal agencies to control material facts disclosed to consumers, including Decedent; and

    iv.  Caused to be released, published and disseminated medical and scientific data, literature, and test reports containing information and statements regarding the risks of ovarian cancer, which PCPC the Johnson & Johnson Defendants knew were incorrect, incomplete and misleading.

c.  Upon information and belief, by these false and fraudulent representations, omissions and concealments, PCPC and the Johnson & Johnson Defendants intended to induce consumers, including Decedent, to rely upon said false and fraudulent representations, omissions and concealments, and to continue to expose themselves to the dangers inherent in the use of talc based body powders and Shower to Shower.

153.    Decedent reasonably relied upon the aforementioned fraudulent representations, omissions and concealments made by the PCPC and the Johnson & Johnson Defendants regarding the nature of talc based body powder and Shower to Shower.

154.    PCPC engaged in, coordinated or facilitated conduct with no legitimate purpose, and used various improper means to achieve unlawful ends, such that its conduct constituted a sham and therefore takes PCPC outside the purview of *Noerr-Pennington* immunity or similar immunities.

155.    As a direct and proximate result of PCPC and the Johnson & Johnson Defendants' overt unlawful acts regarding the nature of talc based baby powder and Shower to Shower which were made pursuant to and in furtherance of a common scheme, and Decedent's reliance thereon, Decedent has suffered from the injuries and damages, and death, for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above referenced claims and causes of action, jointly and severally, as follows:

a. Awarding compensatory damages including, but not limited to pain, suffering, discomfort, physical impairment, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

b. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

c. Any items of damage or loss recoverable under New Jersey Wrongful Death Act, N.J. Stat. § 2A:31, et seq.;

d. Any items of damage or loss recoverable under New Jersey Survival Act, N.J. Stat. § 2A:15-3;

e. Any items of damage or loss recoverable under the Tennessee Wrongful Death Act, Tenn. Code Ann. § 20-5-113, or otherwise;

f. any other damages or losses properly recoverable pursuant to New Jersey law, Tennessee law, and/or common law

g. Prejudgment interest;

h. Post-judgment interest;

i. Awarding reasonable attorneys' fees;

j. Awarding the costs of these proceedings; and

k. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues triable.

DATED: Monday, October 19, 2020          RESPECTFULLY SUBMITTED,

_/s/ Eric Przybysz_____
FEARS NACHAWATI, PLLC
Eric Przybysz #24102381
Darren P. McDowell #24025520
5473 Blair Rd.
Dallas, Texas 75231
Tel. (214) 890-0711
Fax (214) 890-0712
ATTORNEYS FOR THE PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of October, 2020, a true and correct copy of the above and foregoing document was served via electronic case filing on all counsel of record.

*/s/ Eric Przybysz*
_____

Eric Przybysz
Texas Bar No. 24102381
ericp@fnlawfirm.com
**Fears Nachawati, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. 214-890-0711
Fax 214-890-0711