# Exhibit 1

Page 1

                SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - MIDDLESEX COUNTY
                DOCKET NO. MID-L-3095-18 AS
                        CIVIL ACTION


MARIA FOLEY AND JOSEPH        :
FOLEY, HUSBAND AND WIFE,      :
                              :
                Plaintiffs,   :
                              :
          vs.                 :
                              :
AVON PRODUCTS, INC., et       :
al.,                          :
                              :
                Defendants.   :

(CAPTION CONTINUED ON FOLLOWING PAGE)

------------------------------

                    - - -
             Friday, February 15, 2019
                    - - -

          Oral sworn videotaped deposition

of NANCY MUSCO, held at the law offices of

Drinker, Biddle & Reath LLP, 105 College Road

East, Princeton, New Jersey commencing at

10:11 a.m. before Sharon L. Martin,

Registered Professional Reporter, Certified

Court Reporter-NJ, Notary Public.


                    - - -

             MAGNA LEGAL SERVICES

                (866) 624-6221

               www.MagnaLS.com



Page 2

```
 1          SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
 2          DOCKET NO. MID-L-600-18 AS
                CIVIL ACTION
 3
    LISA FRACE, INDIVIDUALLY      :
 4  AND AS REPRESENTATIVE OF      :
    THE ESTATE OF CAROLE          :
 5  DICERBO, DECEASED,            :
                                  :
 6          Plaintiffs,           :
                                  :
 7      vs.                       :
                                  :
 8  BRENNTAG NORTH AMERICA, et    :
    al,                           :
 9                                :
            Defendants.  :
10
11  -------------------------------------------
12          SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
13          DOCKET NO. MID-L-4252-18 AS
                CIVIL ACTION
14
15  VICMAR GATMAITAN,             :
    INDIVIDUALLY AND AS           :
16  REPRESENTATIVE OF THE         :
    ESTATE OF MELISSA E.          :
17  ROONEY, DECEASED,             :
                                  :
18          Plaintiffs,           :
                                  :
19      vs.                       :
                                  :
20  IMERYS TALC AMERICA, INC.,    :
    et al.,                       :
21                                :
            Defendants.  :
22
23
24
25  (CAPTION CONTINUED ON FOLLOWING PAGE)
```

Page 3

```
 1          SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
 2          DOCKET NO. MID-L-6805-16 AS
                CIVIL ACTION
 3
    ANITA GRABOWSKI and ALFRED    :
 4  GRABOWSKI, HUSBAND and        :
    WIFE,                         :
 5                                :
            Plaintiffs, :
 6                                :
      vs.                         :
 7                                :
 8  BRENNTAG NORTH AMERICA, et    :
    al.,                          :
 9                                :
            Defendants.  :
10
11  -------------------------------------------
12
13          SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
14          DOCKET NO. MID-L-2456-18 AS
                CIVIL ACTION
15
    ROBERT GREENE, III,           :
16  INDIVIDUALLY AND AS           :
    ADMINISTRATOR OF THE ESTATE   :
17  OF DEBORAH GREENE BRAKE,      :
    DECEASED; STEPEHEN A.         :
18  BRAKE; AND THE INDIVIDUAL     :
    HEIRS OF THE ESTATE OF        :
19  DEBORAH GREENE BRAKE,         :
                                  :
20          Plaintiffs,           :
                                  :
21      vs.                       :
                                  :
22  BRENNTAG NORTH AMERICA, et    :
    al.,                          :
23                                :
            Defendants.  :
24
25  (CAPTION CONTINUED ON FOLLOWING PAGE)
```

Page 4

```
 1          SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
 2          DOCKET NO. MID-L-4826-18 AS
                CIVIL ACTION
 3
    EMMA GRIFFIN AND WALTER       :
 4  GRIFFIN, HUSBAND AND WIFE,    :
                                  :
 5          Plaintiffs, :
                                  :
 6      vs.                       :
                                  :
 7  CYPRUS AMAX MINERALS          :
    COMPANY, et al.,              :
 8                                :
            Defendants.  :
 9
10  -------------------------------------------
11          SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
12          DOCKET NO. MID-L-5368-17 AS
                CIVIL ACTION
13
    MATTHEW HODJERA and SYLVIA    :
14  DUFF-PETO,                    :
                                  :
15          Plaintiffs, :
                                  :
16      vs.                       :
                                  :
17  BORGWARNER MORSE TEC, LLC,    :
    et al.,                       :
18                                :
            Defendants.  :
19
20
21
22
23
24
25  (CAPTION CONTINUED ON FOLLOWING PAGE)
```

Page 5

```
 1          SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
 2          DOCKET NO. MID-L-7049-16 AS
                CIVIL ACTION
 3
    D'ANGELA M. MCNEILL-GEORGE,   :
 4                                :
            Plaintiff, :
 5                                :
      vs.                         :
 6                                :
 7  BRENNTAG NORTH AMERICA, et    :
    al.,                          :
 8          Defendants.  :
 9  -------------------------------------------
10          SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
11          DOCKET NO. MID-L-598-18 AS
                CIVIL ACTION
12
    LORETTA SELVAGGIO,            :
13                                :
            Plaintiff, :
14                                :
      vs.                         :
15                                :
16  BRENNTAG NORTH AMERICA, et    :
    al.,                          :
17                                :
            Defendants.  :
18  -------------------------------------------
19          SUPERIOR COURT OF NEW JERSEY
            LAW DIVISION - MIDDLESEX COUNTY
20          DOCKET NO. MID-L-6635-17 AS
                CIVIL ACTION
21
    LEONARD E. WENDOWSKI, SR.,    :
22  AND KATHLEEN WENDOWSKI,       :
    HUSBAND AND WIFE,             :
23          Plaintiff, :
      vs.                         :
24  IMERYS TALC AMERICA, INC.,    :
    et al.,                       :
25          Defendants.  :
```





Page 6

A P P E A R A N C E S :

COHEN, PLACITELLA, ROTH, P.C.
BY: CHRISTOPHER PLACITELLA, ESQUIRE
JARED M. PLACITELLA, ESQUIRE
LEA CALLAHAN, PARALEGAL
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 567-3500
cplacitella@cprlaw.com
jmplacitella@cprlaw.com
Counsel for the Plaintiffs

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
BY: RICHARD T. BERNARDO, ESQUIRE
ANDREW KARP, ESQUIRE
4 Times Square
New York, NY 10036
(212) 735-3453
richard.bernardo@skadden.com
andrew.karp@skadden.com
Counsel for the Defendant, Johnson &
Johnson

McGIVNEY, KLUGER & COOK, P.C.
BY: JONATHAN C. LEE, ESQUIRE
18 Columbia Turnpike
Florham Park, NJ 07932
(973) 822-1110
jlee@mkclaw.us.com
Counsel for the Defendant, Whittaker,
Clark & Daniels

Page 7

A P P E A R A N C E S (CONTINUED):

O'TOOLE, SCRIVO, FERNANDEZ, WEINER,
VAN LIEU, LLC
BY: LESLIE ELLIS LOMBARDY, ESQUIRE
(via telephone)
14 Village Park Road
Cedar Grove, NJ 07009
(973) 239-5700
llombardy@oslaw.com
Counsel for the Defendant,
Colgate-Palmolive Co.

RAWLE & HENDERSON, LLP
BY: LINDA DOBBINS, ESQUIRE
(via telephone)
The Widener Building
One South Penn Square
Philadelphia, PA 19107
(215) 575-4303
ldobbins@rawle.com
Counsel for the Defendant, Cyprus Amax
Minerals Company

HAWKINS, PARNELL & YOUNG, LLP
BY: ELIZABETH KELLY, ESQUIRE
(via telephone)
600 Lexington Avenue, 8th Floor
New York, NY 10022
(646) 589-8722
ekelly@hpylaw.com
Counsel for the Defendant, Revlon, Inc.

- - -

A L S O   P R E S E N T :

Thomas Karwacki, The Videotape Operator

Page 8

W I T N E S S   I N D E X

TESTIMONY OF:  NANCY MUSCO
EXAMINATION                    PAGE

By Mr. C. Placitella        12

- - -

E X H I B I T S

EXHIBIT NAME    DESCRIPTION          PAGE

Exhibit P-1    Letter dated        11
               September 13, 2018,
               Corporate Deposition
               Notice and Request for
               Production of Documents
Exhibit P-2    Chart               71
Exhibit P-3    Trial transcript of John  183
               Hopkins, Ph.D.

Exhibit P-4    Handwritten document  173

Exhibit P-5    Ad           181

Exhibit P-6    Depositions and testimony 288
               of Dr. Hopkins
Exhibit P-7    Testimonies and       288
               interrogatories for Selby
               and Krushinski
Exhibit P-8A   Documents sent to    289
               Dr. Hopkins

Exhibit P-8B   Documents sent to    289
               Dr. Hopkins

Page 9

E X H I B I T S (CONTINUED)

EXHIBIT NAME    DESCRIPTION       PAGE

Exhibit P-9    Unidentified documents  290
Exhibit P-10   Deposition transcript   290
               of Nancy Musco

Exhibit P-11   Complaint          291

Exhibit P-12   Complaint          291

Exhibit P-13   Complaint          291

Exhibit P-14   Notes              291

(**Exhibits P-6 through P-14 were retained
by Mr. C. Placitella)

Exhibit J&J-8    April 15, 1969 Memo   65
Exhibit J&J-172  Deposition transcript  207
                 of Glenn A. Hemstock

Exhibit J&J-173  Continuation deposition  208
                 transcript of Glenn
                 Hemstock

Exhibit J&J-188  Stipulation of Dismissal 224

Exhibit J&J-195  Affidavit            266

Exhibit J&J-277  Answers to Plaintiffs'  173
                 Supplemental
                 Interrogatories

Exhibit J&J-282  (Not attached)       262

3  (Pages 6 to 9)



Page 10

1       E X H I B I T S (CONTINUED)
2
3       EXHIBIT NAME   DESCRIPTION        PAGE
4
        Exhibit J&J-294  Deposition transcript   202
5               of Roger N. Miller
6       Exhibit J&J-412  Handwritten document    34
7       Exhibit J&J-436  Deposition transcript   210
            Of Peter N. Gale
8
        Exhibit J&J-446  Agreement           274
9
        Exhibit J&J-448  Memo             154
10
        Exhibit J&J-450  Letter           152
11
        Exhibit J&J-452  Memo             155
12
        Exhibit J&J-453  Document entitled    170
13          George Lee's Talc Files
14      Exhibit J&J-456  Memo             282
15      Exhibit J&J-483  Memo             203
16      Exhibit J&J-486  Privilege log         74
17      Exhibit J&J-488  Chart            146
18
                ---
19
20
21
22
23
24
25

Page 11

```
1                    - - -
2               (Exhibit P-1, Letter dated
3   September 13, 2018, Corporate Deposition
4   Notice and Request for Production of
5   Documents, is marked for identification.)
6                    - - -
7         THE VIDEOTAPE OPERATOR:  We are
8   now on the record.
9               This begins videotape number
10  one in the deposition of Nancy Musco in the
11  Matter of the Estate of Maria Foley versus
12  Avon Products, Inc., et al., in the Superior
13  Court of New Jersey, Law Division, Middlesex
14  County, Docket number MID-L-3095-18 AS.
15              Today is Friday, February 15,
16  2019 and the time is 10:11 a.m.
17              This deposition is being taken
18  at 105 College Road East, Princeton, New
19  Jersey at the request of Cohen, Placitella &
20  Roth.
21              The videographer is Thomas
22  Karwacki of Magna Legal Services.
23              And the court reporter is
24  Sharon Martin of Magna Legal Services.
25              Appearance of counsel will be
```

Page 12

```
1   noted on the stenographic record.
2               Will the court reporter please
3   swear in the witness?
4                    - - -
5               NANCY MUSCO, having been duly
6   sworn, was examined and testified as follows:
7         THE VIDEOTAPE OPERATOR:  You
8   may proceed.
9                    - - -
10              EXAMINATION
11                   - - -
12  BY MR. C. PLACITELLA:
13      Q.  Good morning, Miss Musco.  How are
14  you?
15      A.  Good morning.
16      Q.  We're here together again.
17              You're here -- last time I took
18  your deposition you were taken as a fact
19  witness in this case; do you recall that?
20      A.  Yes, I do.
21      Q.  And today you understand that you
22  are here testifying not as a fact witness,
23  but on behalf of Johnson & Johnson as their
24  corporate representative, correct?
25      A.  Yes.
```

Page 13

```
1       Q.  Okay.
2           MR. C. PLACITELLA:  Can you
3   please give the witness P-1?
4   BY MR. C. PLACITELLA:
5       Q.  P-1 is the deposition notice for
6   this case.  And if you can go to the notice
7   itself, it asks that Johnson & Johnson
8   produce the representative with the most
9   knowledge concerning discovery responses
10  historically provided by Johnson & Johnson
11  and Windsor Minerals concerning the asbestos
12  content of talc, Johnson's Baby Powder or
13  Shower to Shower sold by Johnson & Johnson,
14  Windsor Minerals or Eastern Magnesia Talc
15  Company.
16          Do you see that?
17      A.  Yes.
18      Q.  Okay.
19      A.  That's what it says.
20      Q.  Are you that person?
21      A.  Yes, I am.
22      Q.  Okay.  And how is it -- why are you
23  the person most qualified to respond to
24  this -- to this -- notice?
25          MR. BERNARDO:  Object to the
```



Page 14

1    form of the question.
2        THE WITNESS:  In my career with
3    Johnson & Johnson, in the specific time
4    period, I was the person who would be
5    involved in supply -- or helping to supply
6    the answers to said interrogatories.
7    BY MR. C. PLACITELLA:
8        Q.  Okay.  Now, and you understand that
9    you are here to answer questions as Johnson &
10   Johnson, the corporation, not Nancy Musco,
11   correct?
12       A.  Correct.
13       Q.  Okay.  And you understand that
14   information that we will address includes
15   what information Johnson & Johnson had in its
16   possession over time concerning the potential
17   hazards associated with the talc that it
18   sold, correct?
19       MR. BERNARDO:  Object to the
20   form of the question.
21       THE WITNESS:  I am here to talk
22   about the documents associated with this and
23   the discovery responses.
24   BY MR. C. PLACITELLA:
25       Q.  So the answer is yes?

Page 15

1        A.  I'm here to talk about the --
2    the -- as we said, as it says here in the
3    notice.  Not here to talk about any dangers
4    of talc, because talc used in cosmetic
5    application of Johnson's Baby Powder is safe.
6        Q.  All right.  You know that you are
7    here to talk about what information Johnson &
8    Johnson had in its possession concerning the
9    asbestos content of talc and whether that
10   information was provided in response to
11   discovery in lawsuits historically, correct?
12       MR. BERNARDO:  Object to the
13   form of the question.
14       THE WITNESS:  Yes, that's
15   correct.
16   BY MR. C. PLACITELLA:
17       Q.  Okay.  Can you tell me everything
18   you did in order to prepare for today's
19   deposition?
20       A.  Yes, I did a lot.  I -- most
21   important thing is I looked at the documents
22   that you presented to me last time to help
23   ensure that they had been looked at by the
24   company.  I looked at depositions, testimony
25   of Dr. Hopkins.  I spoke to one of the people

Page 16

1    responsible for conducting the searches to
2    help ensure that we had all the information
3    available for you that you requested.  And I
4    also spoke directly with Dr. Hopkins.
5        Q.  Okay.  And when did you speak to
6    Dr. Hopkins?
7        A.  Last week.
8        Q.  And what was the substance of your
9    conversation with him?
10       A.  We spoke specifically about the
11   documents that you and I had discussed in our
12   last deposition.
13       Q.  Did he tell you that he testified
14   in a case that's ongoing in California right
15   now?
16       A.  I know that he is, yes.
17       Q.  Did you know that he testified in
18   that case that the information that you
19   supplied in answers to interrogatories was
20   inaccurate --
21       MR. BERNARDO:  Object to form.
22   BY MR. C. PLACITELLA:
23       Q.  -- and incomplete?
24       MR. BERNARDO:  Object to the
25   form of the question and the characterization

Page 17

1    of Mr. Hopkins' testimony.
2        (Reporter clarification.)
3        MR. BERNARDO:  Of Dr. Hopkins'
4    testimony.
5        THE WITNESS:  I don't know what
6    Dr. Hopkins said in his testimony, no.
7    BY MR. C. PLACITELLA:
8        Q.  So you never had a conversation
9    where he said under oath before a jury who is
10   listening to a case right now that the
11   information that you supplied that you swore
12   to was true was incomplete and inaccurate --
13       MR. BERNARDO:  Object.
14   BY MR. C. PLACITELLA:
15       Q.  -- you never knew that?
16       MR. BERNARDO:  Object to the
17   form of the question and the characterization
18   of Dr. Hopkins' testimony.
19       Do you have the testimony to
20   show her --
21       MR. C. PLACITELLA:  I'm going
22   to get there.
23       MR. BERNARDO:  -- Mr.
24   Placitella?
25       Okay.

5  (Pages 14 to 17)


MAGNA
LEGAL SERVICES

Page 18

1    THE WITNESS:  I did not discuss
2  Dr. Hopkins' testimony that you're referring
3  to.
4  BY MR. C. PLACITELLA:
5    Q.  If he was asked specifically about
6  sworn information that you provided under
7  oath in a trial, wouldn't you have hoped as
8  part of your preparation that that's
9  something that he would have told you?
10    A.  He and I discussed the specifics of
11  the documents that you had asked for and
12  specifically what's involved in the notice
13  that you provided.
14    Q.  So how long did you talk to
15  Dr. Hopkins?
16    A.  Close to an hour.
17    Q.  Okay.  And you went over all of the
18  documents with him?
19    A.  I went over specific documents.
20    Q.  What documents were those?
21    A.  So many documents.  They were
22  specific documents that Dr. Hopkins had and
23  that were pertinent to the issues.  As I
24  said, the ones that you and I discussed.
25    Q.  And when you say the ones you and I

Page 19

1  discussed, what do you mean by that?
2    A.  They were brought up at my last
3  deposition.
4    I wanted to discuss these with
5  Dr. Hopkins to help ensure that he was
6  familiar with them and that he had answered
7  the questions.
8    Q.  Okay.  And did he tell you that
9  when I deposed him that a chart was created
10  concerning what was in the documents?
11    A.  We did not discuss his testimony at
12  all.  We discussed those particular
13  documents.
14    Q.  Okay.  So you spoke with
15  Dr. Hopkins, who is the person -- who was the
16  other person you spoke with?
17    A.  Miss Pam Downs (phonetic).
18    Q.  And who is she and what was her
19  job?
20    A.  She is one of the people
21  responsible for the searches of all of their
22  pertinent documents.
23    Q.  Okay.  And what was the substance
24  of your discussion with her?
25    A.  I wanted to be comfortable in the

Page 20

1  way that she conducted the search and just
2  help reassure myself that she had looked in
3  all the different avenues.
4    Q.  Approximately how much time have
5  you spent preparing for today's deposition?
6    A.  Approximately six, seven days.
7    Q.  Six or seven days, eight hours a
8  day?
9    A.  Approximately.
10    Q.  And you were compensated for that?
11    A.  Yes, I was compensated for my time.
12    Q.  At what rate?
13    A.  $185 an hour.
14    Q.  Okay.  And can you tell me
15  specifically what documents you reviewed in
16  preparation for today's deposition?
17    A.  As I mentioned earlier, any of the
18  documents that you asked for, made sure that
19  they were provided to you.  And anything that
20  had to do with the alleged asbestos content
21  of talc.
22    Q.  So you looked at all documents
23  related to asbestos testing for the Johnson &
24  Johnson talc?
25    A.  I --

Page 21

1    MR. BERNARDO:  Object to the
2  form of the question.
3    THE WITNESS:  I looked at them.
4  I -- I had counsel pull out which ones were
5  pertinent for me, because there's so many for
6  me to go through.  It would almost be
7  impossible.  I looked at so that I would know
8  which documents were pertinent.
9  BY MR. C. PLACITELLA:
10    Q.  Okay.  So am I under -- my
11  understanding correct that you began at
12  Johnson & Johnson in approximately 1983?
13    A.  1982.
14    Q.  1982.
15    And when you started there you were
16  the person who worked in -- on Johnson's Baby
17  Powder in the Marketing Department?
18    A.  No, I was actually part of
19  regulatory, which was part of Research and
20  Development.
21    Q.  Right.
22    And what was your job
23  responsibilities?
24    A.  My job responsibilities when I
25  first started was responding to consumers,



Page 22

```
 1    whether it be by letter or phone with any
 2    questions, concerns that they had about any
 3    of the Johnson's baby products.
 4        Q.  Including any talc-related product?
 5        A.  Yes.
 6        Q.  Okay.  And you had that
 7    responsibility from 1982 until 2001?
 8        A.  Approximately.
 9        Q.  Okay.
10        A.  2000ish, yeah.
11        Q.  Okay.  And in 2001 you went to work
12    for the R&D Department; is that correct?
13        A.  Yes, it was part of the R&D
14    Department.
15        Q.  But your job basically stayed the
16    same, although you were in the R&D
17    Department --
18        A.  Some of the same responsibilities,
19    yes.
20        Q.  And you were the person in charge
21    of communicating to the public and health
22    care professionals information related to the
23    safety of Johnson's Baby Powder, correct?
24        A.  I was one of the people, yes.
25        Q.  Okay.  You, as I think you
```

Page 23

```
 1    indicated, were also the person in charge of
 2    gathering information to answer questions
 3    that Johnson & Johnson was required to answer
 4    fully and honestly when sued over injuries
 5    alleged to have occurred from exposure to
 6    baby powder, correct?
 7            MR. BERNARDO:  Object to the
 8    form of the question.
 9            THE WITNESS:  Could you
10    rephrase that, please?
11    BY MR. C. PLACITELLA:
12        Q.  Sure.
13        You were the person in charge of
14    gathering information that were required to answer
15    questions that were required to answer
16    discovery responses, fully and honestly, when
17    Johnson & Johnson was sued over exposure to
18    talc, correct?
19        A.  As part of my responsibilities I
20    would work with counsel to direct them to the
21    appropriate people to answer whatever
22    questions may have been put forth.
23        Q.  And those cases involved lung
24    disease, such as cancer and -- lung cancer
25    and ovarian cancer, correct?
```

Page 24

```
 1        A.  There were some allegations of
 2    that, yes.
 3        Q.  All right.  In fact, you were the
 4    point person for gathering discovery for
 5    litigation historically at Johnson & Johnson,
 6    correct?
 7            MR. BERNARDO:  Object to the
 8    form of the question.
 9            THE WITNESS:  I did not gather
10    the information.  As I said, I -- I helped
11    counsel and told them the people that would
12    be most appropriate to answer their
13    questions.
14    BY MR. C. PLACITELLA:
15        Q.  And you started that sometime in
16    the early 1980s?
17        A.  Yes.
18        Q.  Okay.  And you were aware of the
19    records that were used that were available to
20    respond to discovery, correct?
21            MR. BERNARDO:  Object to the
22    form of the question.
23            THE WITNESS:  Well, there were
24    no specific records.  Again, I directed
25    counsel to the appropriate people who would
```

Page 25

```
 1    answer based on their expertise or what
 2    information they had.
 3    BY MR. C. PLACITELLA:
 4        Q.  And you were aware that Johnson &
 5    Johnson was sued many times in cases alleging
 6    injury from its talc-related products,
 7    correct?
 8            MR. BERNARDO:  Object to the
 9    form of the question.
10            THE WITNESS:  I was aware that
11    there were cases, yes.
12    BY MR. C. PLACITELLA:
13        Q.  All right.  You understood that
14    information that was available to answer
15    questions in one case would be relevant to
16    answer similar questions in other cases,
17    correct?
18            MR. BERNARDO:  Object to the
19    form of the question.
20            THE WITNESS:  Yes, it could be.
21    BY MR. C. PLACITELLA:
22        Q.  Am I correct that the information
23    concerning what happened in prior cases came
24    from the Legal Department and that those
25    files were in the possession of the Legal
```





Page 26

1  Department?
2  A.  Could you rephrase that?
3  Q.  Sure.
4       When you were responding in a -- in
5  a case, you knew that the Legal Department
6  had information from prior cases, correct?
7       MR. BERNARDO:  Object to the
8  form of the question.
9       THE WITNESS:  Again, I don't
10  know specifically what information the Legal
11  Department may have had.  But when they
12  needed to have a specific answer, I would
13  help direct them to the person most
14  appropriate to answer that.
15  BY MR. C. PLACITELLA:
16  Q.  All right.  And at some point in
17  time you became aware of something known as a
18  litigation hold, correct?
19  A.  I'm familiar with that, yes.
20  Q.  What is a litigation hold?
21  A.  My understanding of that is when
22  our counsel would let us -- anybody in the
23  company hold to any documents related to a
24  specific legal case.
25  Q.  Okay.  And when is the first time

Page 27

1  that you became aware that Johnson & Johnson
2  had a -- any kind of litigation hold for talc
3  cases related to exposure to Johnson &
4  Johnson talc products?
5       MR. BERNARDO:  Object to the
6  form of the question.
7       THE WITNESS:  I don't remember
8  any specific dates.
9  BY MR. C. PLACITELLA:
10  Q.  What is the first evidence that you
11  have, when I say "you," Johnson & Johnson, as
12  to when a litigation hold was first imposed
13  in talc-related litigation?
14       MR. BERNARDO:  Object to the
15  form of the question, beyond the scope of the
16  notice and what we tendered this witness for.
17       You can answer in your personal
18  capacity, if you know.
19       THE WITNESS:  No, I do not
20  know.
21  BY MR. C. PLACITELLA:
22  Q.  So you as Johnson & Johnson here to
23  talk about the historic discovery responses
24  have no idea when a litigation hold was first
25  imposed, correct?

Page 28

1       MR. BERNARDO:  Same objection.
2       THE WITNESS:  Not the specific
3  dates, no.
4  BY MR. C. PLACITELLA:
5  Q.  Okay.  So am I correct that the
6  person charged with -- well, strike that.
7       You understand that discovery is a
8  pretrial process where the parties are
9  required to provide information relative to
10  the allegations and defendant -- and defenses
11  asserted in a case?
12  A.  I understand that discovery may be
13  specific questions presented by the
14  plaintiffs for the defendants to answer.
15  Q.  What is your understanding
16  concerning Johnson & Johnson's obligations
17  when responding truthfully and fully to
18  questions posed to it in litigation?
19       MR. BERNARDO:  Object to the
20  form of the question.  Call for --
21  conclusion.
22       THE WITNESS:  I fully
23  understand that they should and do answer
24  truthfully and completely.
25  BY MR. C. PLACITELLA:

Page 29

1  Q.  Okay.  When asked to provide
2  information, am I correct that Johnson &
3  Johnson recognizes -- well, let me ask, that
4  there is a material difference between
5  certifying that there is no evidence
6  whatsoever and that there is evidence, but
7  that you don't believe the evidence is
8  accurate?
9       MR. BERNARDO:  Object to the
10  form of the question.
11       THE WITNESS:  Could you ask
12  that again, please?
13  BY MR. C. PLACITELLA:
14  Q.  Sure.
15       You're asked a question about
16  whether evidence exists.  You understand
17  there is a difference, you, Johnson &
18  Johnson, about whether the evidence exists at
19  all versus that there is evidence, but you
20  just don't believe that it's accurate --
21       MR. BERNARDO:  Object.
22  BY MR. C. PLACITELLA:
23  Q.  -- or reliable?
24       MR. BERNARDO:  Object to the
25  form of the question.

8  (Pages 26 to 29)



Page 30

1   BY MR. C. PLACITELLA:
2       Q.   Do you understand the difference?
3       A.   I'm not sure I understand the
4   question.
5       Q.   Okay.  So let's try to break it
6   down.
7            When you're asked, Is there any
8   evidence that you got here today by car;
9   what's your understanding of that question?
10           MR. BERNARDO:  Object to the
11  form of the question.
12           THE WITNESS:  That, you know,
13  the answer that I got here by car.
14  BY MR. C. PLACITELLA:
15      Q.   So can there be circumstantial
16  evidence that you got here by car?
17           Do I have to have the car in front
18  of me or the photo of you driving the car?
19      A.   If you didn't believe me.
20      Q.   Okay.  So my question to you is
21  when Johnson & Johnson is asked in discovery,
22  Is there any evidence of asbestos content in
23  Johnson & Johnson talc; what is your
24  understanding as to what's being asked of
25  you?

Page 31

1       A.   You're asking if there's any
2   evidence that there is asbestos in the talc
3   of Johnson's Baby Powder.
4       Q.   Right.
5            And what -- and if there is testing
6   related to whether Johnson & Johnson talc
7   contained asbestos, is that evidence in your
8   mind --
9            MR. BERNARDO:  Object.
10  BY MR. C. PLACITELLA:
11      Q.   -- to Johnson & Johnson?
12           MR. BERNARDO:  Object to the
13  form of the question.
14           THE WITNESS:  Any, any evidence
15  would be something, yes.
16  BY MR. C. PLACITELLA:
17      Q.   Right.
18      A.   If there were.
19      Q.   So, for example, if a -- if a test
20  was run to determine whether Johnson's Baby
21  Powder contained asbestos and there were
22  results from that test, that would be
23  evidence, correct?
24           MR. BERNARDO:  Object to the
25  form of the question.

Page 32

1            THE WITNESS:  Yes.
2   BY MR. C. PLACITELLA:
3       Q.   Okay.  You understand that
4   Johnson & Johnson had a duty to provide
5   accurate and complete information when
6   responding to discovery in talc litigation,
7   correct?
8            MR. BERNARDO:  Object to the
9   form of the question.
10           THE WITNESS:  Yes.
11  BY MR. C. PLACITELLA:
12      Q.   Okay.  You understand that if
13  Johnson & Johnson did not provide accurate
14  and complete information, citizens could lose
15  the rights that were given to them to proceed
16  to trial, correct?
17           MR. BERNARDO:  Object to the
18  form of the question, calls for a legal
19  conclusion.
20           THE WITNESS:  I -- I can't
21  answer that legal-wise.  I don't understand
22  that.
23  BY MR. C. PLACITELLA:
24      Q.   You understand, you, Johnson &
25  Johnson understood that it was wrong to

Page 33

1   withhold information with the objective of
2   obtaining dismissals of cases that were filed
3   against Johnson & Johnson, correct?
4            MR. BERNARDO:  Object to the
5   form of the question.
6            THE WITNESS:  This seems like a
7   legal question and I'm not equipped to answer
8   that.
9   BY MR. C. PLACITELLA:
10      Q.   I'm not asking you -- I'm saying
11  you, Johnson & Johnson, not Nancy Musco,
12  understood that it was wrong to withhold
13  information with the objective of obtaining
14  dismissals of cases for lawsuits filed
15  against Johnson & Johnson, correct?
16      A.   Again, that's a -- seems to me like
17  a legal conclusion.  No.
18      Q.   "No" what?
19      A.   I can't -- I can't answer that,
20  because I don't know what that means.
21      Q.   So you don't know, Johnson &
22  Johnson does not know whether it's wrong to
23  withhold information with the objective of
24  obtaining dismissals of lawsuits, Johnson &
25  Johnson doesn't know that?



Page 34

1    MR. BERNARDO: Object to the
2  form of the question.
3    THE WITNESS: I cannot comment
4  on any legal conclusions or any legal
5  directions.
6  BY MR. C. PLACITELLA:
7    Q.  When you were working on issues
8  concerning the safety of talc, you were
9  repeatedly -- well, let's just --
10    MR. C. PLACITELLA: Can you
11  give me 412?
12    MR. BERNARDO: Do you have a
13  copy for me?
14    MR. C. PLACITELLA: Yeah, I
15  will, absolutely.
16    Here's one for you, for the
17  record.
18    (Exhibit J&J-412, Handwritten
19  document, is marked for identification.)
20  BY MR. C. PLACITELLA:
21    Q.  Now, I'm going to -- what's marked
22  here as Musco-1, do you recall this exhibit
23  from the last time that we were together and
24  I took your deposition?
25    A.  I don't recall specifically.

Page 35

1    Q.  Is there --
2    A.  I know that you wrote down some
3  things.
4    Q.  Okay.  So let me see if I can...
5  See if this refreshes your memory.
6    MR. C. PLACITELLA: Where's
7  your audio?
8    (At which time the following
9  audio recording is played for the witness.)
10    "QUESTION: Did the talc that
11  was used in any J&J Baby Powder product ever
12  contain any amount of asbestos; do you see
13  that?
14    "ANSWER: Yeah, I see that.
15    "QUESTION: That was a question
16  that -- or questions like that that you were
17  called upon to answer as part of your job at
18  Johnson & Johnson, correct?
19    "ANSWER: Yes.
20    "QUESTION: Okay.  And that
21  question was raised over and over again by
22  people outside of Johnson & Johnson from
23  almost the time you started working there,
24  correct?
25    "UNIDENTIFIED COUNSEL: Object

Page 36

1  to the form of the question.
2    "You can answer.  Excuse me.
3    "ANSWER: I know it was a
4  question that we received, yes."
5    (At which time the audio
6  playback is concluded.)
7  BY MR. C. PLACITELLA:
8    Q.  Do you recall giving that
9  testimony?
10    MR. BERNARDO: Object to the
11  form of the question and the playing of the
12  prior testimony.
13    THE WITNESS: Yes, I do.
14    (Reporter clarification.)
15    MR. BERNARDO: And the playing
16  of the prior testimony.  I'll move my mic.
17  Object to the form of the question and the
18  playing of the prior testimony.
19  BY MR. C. PLACITELLA:
20    Q.  Do you recall giving that
21  testimony?
22    A.  I did.
23    Q.  Is that testimony fair and
24  accurate?
25    A.  Yes.

Page 37

1    Q.  Am I correct that the question that
2  was asked of you over and over again when you
3  worked for Johnson & Johnson in one way or
4  another was did the talc that was used in any
5  J&J product ever contain any amount of
6  asbestos?
7    A.  We were asked lots of different
8  questions through the years, not specifically
9  always in that form.
10    Q.  Do you --
11    A.  But, yes.
12    Q.  Okay.  And that same question or
13  questions like that was asked over and over
14  in litigation related to asbestos -- strike
15  that.
16    That same question was asked of
17  Johnson & Johnson or questions like that in
18  litigation related to Johnson's Baby Powder,
19  correct?
20    A.  Yes, I believe that's the question.
21    Q.  Okay.  And that was the -- one
22  of -- that was a question that you were the
23  point person for gathering information on to
24  respond to, correct?
25    MR. BERNARDO: Object to the

10  (Pages 34 to 37)



Page 38

1  form of the question.
2      THE WITNESS:  I worked with
3  counsel to provide specific -- help provide
4  specific answers to specific questions that
5  would be related to a Complaint.
6  BY MR. C. PLACITELLA:
7      Q.  And the answer to the question, Did
8  the talc that was used in any Johnson &
9  Johnson Baby Powder product ever contain any
10  amount of asbestos; when you answer it,
11  always was, There is no evidence that
12  Johnson's Baby Powder contained any amount of
13  asbestos.  There never was and there never
14  will be.
15      That was your response, correct?
16      MR. BERNARDO:  Object to the
17  form of the question.
18      THE WITNESS:  That's correct.
19  BY MR. C. PLACITELLA:
20      Q.  Okay.  And when Johnson & Johnson
21  was asked the same question in litigation
22  they gave the same response, that is, there
23  is no evidence that Johnson's Baby Powder
24  contained any amount of asbestos, correct?
25      MR. BERNARDO:  Object to the

Page 39

1  form of the question.
2      THE WITNESS:  That's the
3  position of the company, that there's no
4  asbestos used in the cosmetic talc of
5  Johnson's Baby Powder.
6  BY MR. C. PLACITELLA:
7      Q.  My question is, was the answer
8  that was provided every time the question was
9  asked in the context of a lawsuit, correct?
10      MR. BERNARDO:  Object to the
11  form of the question.
12      THE WITNESS:  I do not know if
13  that was the specific answer that was
14  provided each time.
15  BY MR. C. PLACITELLA:
16      Q.  All right.  You know that when that
17  question was asked that Johnson & Johnson
18  always took the possession -- took position
19  in litigation that there is no evidence that
20  Johnson's Baby Powder contained any amount of
21  asbestos, correct?
22      MR. BERNARDO:  Object to the
23  form of the question.
24      THE WITNESS:  The position of
25  Johnson & Johnson is that there is no

Page 40

1  asbestos in the cosmetic talc of Johnson's
2  Baby Powder.
3  BY MR. C. PLACITELLA:
4      Q.  So the answer to my question is
5  yes?
6      A.  Yes.
7      Q.  Okay.  And when you, Johnson &
8  Johnson told the public that there is no
9  evidence that Johnson's Baby Powder contained
10  any amount of asbestos and there never was
11  and there never will be, it was your intent,
12  that is, you, Johnson & Johnson, to convey
13  that there was zero chance of exposing
14  families to asbestos by using Johnson's Baby
15  Powder, correct?
16      A.  The -- the position is that there's
17  no asbestos in the cosmetic talc.  So
18  Johnson's Baby Powder would not be exposing
19  anyone to asbestos.
20      Q.  Your intent was to convey that
21  there was zero chance of exposing families to
22  asbestos by using Johnson's Baby Powder,
23  correct?
24      MR. BERNARDO:  Object to the
25  form of the question.

Page 41

1      THE WITNESS:  Our intent was to
2  inform whomever was asking that there is no
3  asbestos in the cosmetic talc.
4      MR. C. PLACITELLA:  I'm going
5  to go to video.
6  BY MR. C. PLACITELLA:
7      Q.  I'm going to show you your
8  testimony from last time.
9      (At which time the following
10  audio recording is played for the witness.)
11      "QUESTION:  And when you had
12  these conversations, for example, with the
13  mothers and the consumers, your intent was to
14  convey to them that there was zero chance of
15  exposing their families to asbestos at any
16  level using Johnson's Baby Powder, correct?
17      "ANSWER:  I -- my job was to
18  reassure them that they could feel safe and
19  comfortable using Johnson's Baby Powder,
20  because it does not contain asbestos.
21      "QUESTION:  Right:
22      "So there was zero chance of
23  exposing their families to asbestos by using
24  Johnson's Baby Powder, that was your intent
25  to convey to them, correct?

11  (Pages 38 to 41)



Page 42

1    "ANSWER:  That's correct.
2    "QUESTION:  Okay."
3         (At which time the audio
4    playback is concluded.)
5    BY MR. C. PLACITELLA:
6    Q.  Do you recall giving that
7    testimony?
8    A.  I see that's what I said.
9    Q.  Okay.
10        Am I correct that you're aware that
11   Johnson & Johnson also told the Federal
12   Government there was never any evidence of
13   asbestos in Johnson's Baby Powder?
14        MR. BERNARDO:  Object to the
15   form of the question, beyond the scope of the
16   notice.
17        You can answer in your
18   individual capacity.
19        THE WITNESS:  I cannot speak
20   about specific conversations, but there is no
21   asbestos in the cosmetic talc.
22   BY MR. C. PLACITELLA:
23   Q.  My question was, you knew that
24   Johnson & Johnson told the Federal Government
25   there was never any evidence of asbestos in

Page 43

1    Johnson's Baby Powder, correct?
2         MR. BERNARDO:  Same objection.
3         THE WITNESS:  I can't answer
4    that.
5         MR. C. PLACITELLA:  Okay.  Go
6    back to the video, please.
7         That's fine.
8    BY MR. C. PLACITELLA:
9    Q.  Do you know what the National
10   Toxicology --
11        THE VIDEOTAPE OPERATOR:  You
12   have to let me...
13        MR. C. PLACITELLA:  Go ahead.
14        THE VIDEOTAPE OPERATOR:  Go
15   ahead.
16   BY MR. C. PLACITELLA:
17   Q.  Do you know what the National
18   Toxicology Program was?
19   A.  Yes.  I --
20   Q.  What was that?
21   A.  I'm familiar with it.
22   Q.  Was that a branch of the Federal
23   Government?
24   A.  No, it was not.
25   Q.  Had nothing to do with the Federal

Page 44

1    Government?
2    A.  It worked with the Federal
3    Government, yes, but I -- I can't tell you
4    all the specifics of it.
5    Q.  Okay.  Did you tell the National
6    Toxicology Program that there was no evidence
7    of asbestos in Johnson's Baby Powder?
8         MR. BERNARDO:  Object to the
9    form of the question, beyond the scope of the
10   notice.
11        You can answer in your
12   individual capacity.
13        THE WITNESS:  I'm -- there were
14   meetings with the NTP, yes.
15   BY MR. C. PLACITELLA:
16   Q.  And you told them, you, Johnson &
17   Johnson, told the NTP that there was no
18   evidence whatsoever of asbestos in Johnson's
19   Baby Powder, correct?
20        MR. BERNARDO:  Object to the
21   form of the question.
22        THE WITNESS:  My understanding
23   that we're to talk about today the things
24   that you specifically put in the notice.  I
25   believe we talked about that last time we

Page 45

1    met.
2    BY MR. C. PLACITELLA:
3    Q.  Yeah.  And what was your answer?
4         MR. BERNARDO:  Object to the
5    form of the question, asked and answered.
6         THE WITNESS:  Whatever you have
7    on record.
8    BY MR. C. PLACITELLA:
9    Q.  Okay.  Well, let's see if this
10   refreshes your memory.
11        MR. BERNARDO:  Before we
12   refresh her memory, let me just interject.
13        Mr. Placitella, the notice is
14   very clear what the scope of this deposition
15   is.  And statements made to the Federal
16   Government is well outside the scope of this
17   notice.  This witness is being prepared to
18   testify --
19        MR. C. PLACITELLA:  Well, we'll
20   let a judge decide that, Mr. Bernardo.
21        MR. BERNARDO:  Let me finish my
22   objection.
23        This witness is not being
24   tendered to testify on behalf of the company
25   with respect to statements to the Federal



Page 46

```
 1    Government.
 2         I'm trying not to interrupt the
 3    deposition and letting her answer if she
 4    knows in her individual capacity, but I just
 5    want to make sure that my question is clear.
 6    And you're absolutely right, a judge can
 7    decide it.
 8    BY MR. C. PLACITELLA:
 9      Q.  When you say "individual capacity,"
10    you were working for Johnson & Johnson on the
11    National Toxicology Project, were you not?
12      A.  I was not specifically working on
13    the project, that was part of my
14    responsibilities.
15      Q.  Right.
16         Well, let me show you your
17    testimony from the last time.
18         THE VIDEOTAPE OPERATOR:  Stand
19    by.
20         (At which time the following
21    audio recording is played for the witness.)
22         "QUESTION:  My question to you
23    was, did you know that one of the primary
24    bases for battling the issue of talc before
25    the National Toxicology Project was the
```

Page 47

```
 1    position asserted that there was never any
 2    evidence of asbestos in the talc used in
 3    Johnson's Baby Powder?
 4         "UNIDENTIFIED COUNSEL:  Object
 5    to the form of the question.
 6         "QUESTION:  Just asking if you
 7    know.  It's not a fight.
 8         "UNIDENTIFIED COUNSEL:  Well,
 9    it's a -- it's a hard question to follow, but
10    you can answer if you understand it.
11         "ANSWER:  Well, the basis was
12    that there's no asbestos in the talc used in
13    Johnson's Baby Powder."
14         (At which time the audio
15    playback is concluded.)
16    BY MR. C. PLACITELLA:
17      Q.  Do you recall giving that
18    testimony?
19         MR. BERNARDO:  Same objection.
20         THE WITNESS:  That's -- that's
21    my voice, yes.
22    BY MR. C. PLACITELLA:
23      Q.  Okay.  Now, based upon your
24    research and knowledge, when does Johnson &
25    Johnson say that the first lawsuit was filed
```

Page 48

```
 1    against it alleging injury from exposure to
 2    talc?
 3         MR. BERNARDO:  Object to the
 4    form of the question.
 5    BY MR. C. PLACITELLA:
 6      Q.  When was the first lawsuit filed?
 7      A.  My recollection, in the late '90s.
 8      Q.  It's your belief that the first
 9    lawsuit alleging injury from exposure to talc
10    was the late '90s?
11      A.  I can't give you exact dates when
12    any lawsuits were filed.
13      Q.  Okay.  I'm not asking you, Nancy
14    Musco.  I'm asking you, Johnson & Johnson.
15    When was the first lawsuit filed against you,
16    Johnson & Johnson, alleging injury from
17    exposure to talc sold by Johnson & Johnson?
18         MR. BERNARDO:  Object to the
19    form of the question, beyond the scope of the
20    notice.
21         You can answer in your
22    individual capacity, if you know.
23         THE WITNESS:  Do not know.
24    BY MR. C. PLACITELLA:
25      Q.  Okay.  When was the -- Johnson --
```

Page 49

```
 1    when was the first lawsuit filed against
 2    Johnson & Johnson alleging injury from
 3    exposure to talc sourced by mines owned by
 4    Johnson & Johnson?
 5         MR. BERNARDO:  Same objection.
 6         THE WITNESS:  Again, I cannot
 7    give you dates.
 8    BY MR. C. PLACITELLA:
 9      Q.  Did you do any research or speak to
10    anybody to find out when the first lawsuits
11    relating to baby powder were filed against
12    Johnson & Johnson?
13         MR. BERNARDO:  Same objection.
14         THE WITNESS:  Not specific
15    dates, no.
16    BY MR. C. PLACITELLA:
17      Q.  Why not?
18         MR. BERNARDO:  Same objection.
19         THE WITNESS:  Any of the
20    research that I did in preparation today was
21    specifically for the information that is
22    noted in the -- the -- the notice.  I didn't
23    get into specific dates.
24    BY MR. C. PLACITELLA:
25      Q.  Well, but the notice asks for your
```



Page 50

1    information on your historical responses.  So
2    how can you figure out what the information
3    was on historical responses if you don't know
4    when the first lawsuit was filed?
5        A.  Because it was -- my concentration
6    was on the responses, not on specific dates.
7        Q.  Okay.  Well, let me ask you this,
8    do you know how John -- Johnson & Johnson
9    Corporate was kept in the loop concerning
10   lawsuits involving baby powder?
11           MR. BERNARDO:  Object to the
12   form of the question.
13           Again, I'm going to renew my
14   objection.  Chris, I'm trying not to be
15   obstructive this early in the deposition, but
16   this is really well beyond what we understood
17   from the words in the notice the scope of
18   this deposition was to be.
19           But if you know that in your
20   individual capacity, please go ahead and
21   answer.
22           THE WITNESS:  I would assume
23   that they would be filed with the -- with the
24   Law Department in the company.
25   BY MR. C. PLACITELLA:

Page 51

1        Q.  Well, who was in charge of the
2    litigation involving Johnson & Johnson talc
3    products at Johnson & Johnson?
4           MR. BERNARDO:  Same objection.
5           THE WITNESS:  Different people.
6    BY MR. C. PLACITELLA:
7        Q.  Well, who's the person that you
8    reported to when you -- when you were working
9    on the cases?
10           MR. BERNARDO:  Object to the
11   form of the question, same objection.
12           THE WITNESS:  I did not report
13   to a specific person.
14   BY MR. C. PLACITELLA:
15       Q.  So as you sit here testifying on
16   behalf of Johnson & Johnson, it's your
17   testimony that you don't know who was in
18   charge of the talc litigation inside of
19   Johnson & Johnson?
20           MR. BERNARDO:  Object to the
21   form of the question.  And this witness is
22   not being tendered to testify as to who was
23   in charge of litigation or any other
24   litigation matters, other than the discovery
25   responses.

Page 52

1           THE WITNESS:  As I said, there
2    were -- there were different people.
3    BY MR. C. PLACITELLA:
4        Q.  Well, what people do you remember?
5        A.  I could give you names, but, again,
6    I didn't come prepared to talk about
7    different names.
8        Q.  Well, give me the names.
9        A.  One of the lawyers was John
10   O'Shaughnessy.
11       Q.  Okay.  Did you have interaction
12   with John O'Shaughnessy concerning discovery
13   responses in talc-related cases?
14           MR. BERNARDO:  Object to the
15   form of the question.
16           And go ahead and answer, but
17   just please be mindful of privileged
18   communications.  You can answer the question.
19           THE WITNESS:  Mr. O'Shaughnessy
20   and I would have conversations, yes.
21   BY MR. C. PLACITELLA:
22       Q.  And what was his role?
23           MR. BERNARDO:  Object to the
24   form of the question.
25           THE WITNESS:  I don't know his

Page 53

1    specific role.
2    BY MR. C. PLACITELLA:
3        Q.  Was he general counsel at the time?
4           MR. BERNARDO:  Object to the
5    form of the question.
6           THE WITNESS:  I already told
7    you, I don't know his exact title or his
8    role.
9    BY MR. C. PLACITELLA:
10       Q.  Who was the person, if you know --
11   well, you should know, who was the person in
12   charge of gathering evidence to supply
13   answers to discovery in talc cases involving
14   Johnson & Johnson?
15       A.  There'd be many different people
16   involved in that.
17       Q.  But who was the person in charge?
18       A.  I don't know who the person in
19   charge was.  We would prepare questions
20   accordingly and we were working with counsel.
21       Q.  So was it the lawyer that was in
22   charge?
23           MR. BERNARDO:  Object to the
24   form of the question.
25   BY MR. C. PLACITELLA:



Page 54

1      Q.  Was it Mr. O'Shaughnessy the one
2  that was in charge?
3      A.  I don't think it's a question of in
4  charge.  We all collaborated.  As I told you
5  earlier, that I worked with Mr. O'Shaughnessy
6  to help direct him to appropriate people.
7      Q.  You say "we all collaborated,"
8  who's "we all"?
9      A.  A lot of different people in the
10  company.
11      Q.  So you don't have any names?
12      A.  It would depend on the specific
13  questions asked.
14      Q.  So you don't remember any of the
15  names?
16      A.  I can tell you about different
17  names.  They'd be different names at
18  different times.
19      Q.  Okay.  When the evidence was
20  gathered, where was it stored?
21          MR. BERNARDO:  Object to the
22  form of the question.
23  BY MR. C. PLACITELLA:
24      Q.  In responding to discovery, where
25  was the evidence stored?

Page 55

1          MR. BERNARDO:  Object to the
2  form of the question.
3          THE WITNESS:  There would not
4  necessarily be evidence that was gathered.
5  It was in many times the form of responses
6  from individual person that might be most
7  knowledgeable.  So there was no particular
8  evidence that related to each question.
9  BY MR. C. PLACITELLA:
10      Q.  Well, you never turned over any
11  evidence in response to discovery?
12      A.  That was not my role.  And as I
13  said earlier, counsel would have
14  conversations with the appropriate people.
15  And there's -- their answers were based on
16  their own expertise.
17      Q.  My question is, you're here for --
18  as Johnson & Johnson, not Nancy Musco.  And
19  I'm asking you, Johnson & Johnson, where did
20  you store the evidence that was gathered in
21  order to respond to discovery in talc-related
22  cases?
23          MR. BERNARDO:  Object to the
24  form of the question, already answered.
25          THE WITNESS:  I think it's

Page 56

1  important for you to understand that there's
2  not necessarily a pile of evidence that goes
3  with each question.
4          Those questions are responded
5  to by the person most knowledgeable of that
6  area, which is based on their experience,
7  their expertise, years of it.
8  BY MR. C. PLACITELLA:
9      Q.  Listen to my question.
10          When evidence was gathered up,
11  physical evidence, where was it stored within
12  Johnson & Johnson when it was used to respond
13  to discovery in litigation?
14          MR. BERNARDO:  Object to the
15  form of the question, asked and answered
16  twice already.
17          THE WITNESS:  I'm trying to
18  answer your question that there was not
19  evidence or piles of information, papers to
20  go with the responses.  Those were based on
21  the individuals' expertise.
22          This is what they did all the
23  time.
24  BY MR. C. PLACITELLA:
25      Q.  So, as you sit here today, you have

Page 57

1  no information that Johnson & Johnson
2  actually turned over any documentary evidence
3  in any talc-related case?
4          MR. BERNARDO:  Object to the
5  form of the question.
6          THE WITNESS:  What I was
7  responding to were the -- the process that
8  we -- how we prepared answers for specific
9  questions and interrogatories.  And there's
10  no hard evidence to go with each question.
11  BY MR. C. PLACITELLA:
12      Q.  Well, was there hard evidence with
13  any of the questions that you recall that
14  you've researched?
15      A.  I don't recall that there were.
16      Q.  Okay.  And after the discovery
17  responses were provided, where were those
18  discovery responses stored at Johnson &
19  Johnson?
20          MR. BERNARDO:  Object to the
21  form of the question.
22          THE WITNESS:  Most probably
23  with the Complaint file.
24  BY MR. C. PLACITELLA:
25      Q.  And where was that?



Page 58

1    A.  It could be with the Legal
2  Department.
3    Q.  Who was in charge of overseeing the
4  Complaint file?
5      MR. BERNARDO:  Object to the
6  form of the question.
7      THE WITNESS:  I would assume it
8  would be, you know, the Legal Department, but
9  I don't know specific person, the files.
10 BY MR. C. PLACITELLA:
11   Q.  When Johnson & Johnson -- I just
12 want to be clear, when Johnson & Johnson was
13 sued in a talc-related case, is it Johnson &
14 Johnson's testimony that no physical evidence
15 was ever gathered and turned over to the
16 Plaintiffs in a lawsuit, as far as your
17 research demonstrated?
18      MR. BERNARDO:  Object, object
19 to the form of the question and
20 characterization of her prior testimony.
21      THE WITNESS:  If there had been
22 specific documents that were requested, they
23 would be made available, yes.
24 BY MR. C. PLACITELLA:
25   Q.  And where would those documents

Page 59

1  then be stored after they were made
2  available?
3    A.  They could be stored in different
4  places.
5    Q.  Where were they stored?
6    A.  If there was --
7      MR. BERNARDO:  Object to the
8  form of the question.
9      THE WITNESS:  If there were
10 documents, they could be stored in a legal --
11 internally in a legal department or maybe
12 with outside counsel.
13 BY MR. C. PLACITELLA:
14   Q.  Okay.  Now, did you understand that
15 Johnson & Johnson was involved -- strike
16 that.
17      Am I correct that Johnson & Johnson
18 was sued in talc cases that involved both
19 industrial talc and cosmetic talc?
20   A.  Yes.
21   Q.  And you understand that the
22 cosmetic and industrial talcs came from the
23 same mine?
24      MR. BERNARDO:  Object to the
25 form of the question.

Page 60

1      THE WITNESS:  I know they can
2  come from the same mine, but not necessarily
3  the same location.
4  BY MR. C. PLACITELLA:
5    Q.  So do you understand, for example,
6  that the talc that was used in Johnson's Baby
7  Powder came from the same mine that
8  industrial talc came from that was sold by
9  Johnson & Johnson?
10      MR. BERNARDO:  Object to the
11 form of the question.  Again, outside the
12 scope of the notice and what this witness is
13 being tendered for.
14      But if you know you can answer
15 in your individual capacity.
16      THE WITNESS:  I can't get into
17 industrial talc, because I'm here to talk
18 about cosmetic talc, as set forth in the
19 notice.
20 BY MR. C. PLACITELLA:
21   Q.  Well, you understand you provided
22 discovery responses that indicate that the
23 industrial talc and the cosmetic talc came
24 from the exact same source, correct?
25      MR. BERNARDO:  Object to the

Page 61

1  form of the question.
2      THE WITNESS:  I'm here today
3  to -- you know, as said in the notice, to
4  talk about cosmetic talk.
5  BY MR. C. PLACITELLA:
6    Q.  So the -- what's the answer to my
7  question?
8      You understand that Johnson &
9  Johnson provided discovery responses
10 indicating that the cosmetic and the
11 industrial talc came from the exact same
12 mine --
13      MR. BERNARDO:  Object.
14 BY MR. C. PLACITELLA:
15   Q.  -- correct?
16      MR. BERNARDO:  Object to the
17 form of the question.
18      If there's a specific response
19 to show the witness, I think that would make
20 this process quicker, and easier and more
21 accurate.
22      MR. C. PLACITELLA:  Please
23 don't, don't do that.
24      MR. BERNARDO:  Please don't
25 do --

16  (Pages 58 to 61)



Page 62

1    MR. C. PLACITELLA: It's not --
2    MR. BERNARDO: -- what you're
3  doing.
4    MR. C. PLACITELLA: It's not --
5  it's not proper under our rules. You're here
6  under pro hac vice admission. Please don't
7  do that. Okay?
8    Your -- your responses are to
9  form and for form only.
10    MR. BERNARDO: Well --
11    MR. C. PLACITELLA: Otherwise
12  we'll get the judge on the phone and we'll
13  deal with you. Okay?
14    MR. BERNARDO: That's fine.
15    MR. C. PLACITELLA: All right.
16    MR. BERNARDO: But --
17    MR. C. PLACITELLA: Can you
18  read my question back, please?
19    (At which time the following
20  question is read:
21    "QUESTION: You understand that
22  Johnson & Johnson provided discovery
23  responses indicating that the cosmetic and
24  the industrial talc came from the exact same
25  mine?")

Page 63

1    THE WITNESS: I -- I -- I --
2    MR. BERNARDO: Object to the
3  form of the question.
4    THE WITNESS: I don't know
5  that, no.
6  BY MR. C. PLACITELLA:
7    Q. Do you -- do you -- have you ever
8  heard of the Hammondsville mine?
9    A. I have heard of it, yes.
10    Q. You understand that that was a
11  source of talc for Johnson's Baby Powder?
12    A. I believe so, yes.
13    Q. Do you understand that that was
14  also a source of talc for industrial talc
15  sold by Johnson & Johnson?
16    MR. BERNARDO: Object to the
17  form of the question.
18    THE WITNESS: Again, it may
19  have been. I'm not the authority on anything
20  about the mines.
21  BY MR. C. PLACITELLA:
22    Q. Okay. Have you ever heard of the
23  Johnson mine?
24    A. Yes, I have.
25    Q. Do you understand that that was a

Page 64

1  source of cosmetic talc for Johnson's Baby
2  Powder?
3    MR. BERNARDO: Object to the
4  form of the question.
5    THE WITNESS: I believe so.
6  BY MR. C. PLACITELLA:
7    Q. Now, you understand that the
8  possibility that Johnson & Johnson was likely
9  to -- was going to be sued over Johnson &
10  Johnson's baby powder dated back to the
11  1960s, correct?
12    A. Could you rephrase --
13    MR. BERNARDO: Object --
14    THE WITNESS: -- that question?
15    MR. BERNARDO: Object to the
16  form of the question.
17  BY MR. C. PLACITELLA:
18    Q. The possibility of facing lawsuits
19  involving Johnson & Johnson was recognized by
20  Johnson & Johnson going back to the 1960s,
21  correct?
22    MR. BERNARDO: Object to the
23  form of the question, beyond the scope of the
24  notice.
25    You can answer in your

Page 65

1  individual capacity, if you know.
2    THE WITNESS: I don't know.
3    MR. C. PLACITELLA: Can you
4  give me number 8?
5    (Exhibit J&J-8, April 15, 1969
6  Memo, is marked for identification.)
7    MR. BERNARDO: Are these marked
8  as exhibits already, Chis? Already marked --
9    MR. C. PLACITELLA: Yeah, I've
10  premarked.
11    MR. BERNARDO: Okay, great.
12    And what is -- what number is
13  this?
14    MR. C. PLACITELLA: This is
15  J&J-8.
16    MR. BERNARDO: Okay.
17    MR. C. PLACITELLA: It's an
18  April 15, 1969 memo on Johnson & Johnson
19  stationery from Dr. Thompson.
20  BY MR. C. PLACITELLA:
21    Q. Do you know who Dr. Thompson was?
22    A. No, I do not.
23    Q. You don't know that he was the
24  Medical Director of Johnson & Johnson at any
25  point in time?



Page 66

1    A.  Other than I see MD after his name,
2  I did not know that.
3    Q.  What about Mr. Ashton, do you know
4  who he was?
5    A.  I believe he worked for the
6  company, yes.
7    Q.  Do you know that he worked for the
8  company on talc?
9    A.  I know that.
10    Q.  Do you know he worked on talc
11  lawsuits?
12        MR. BERNARDO:  Object to the
13  form of the question.
14        THE WITNESS:  I do not know
15  that specifically, no.
16  BY MR. C. PLACITELLA:
17    Q.  Do you know that he was known in
18  the company as Mr. Talc?
19    A.  No.
20        MR. BERNARDO:  Object to the
21  form of the -- okay.
22  BY MR. C. PLACITELLA:
23    Q.  Okay.  You go to the second page --
24  where Dr. Thompson writes, Since the usage of
25  these products is so widespread, and the

Page 67

1  existence of pulmonary disease is increasing,
2  it is not inconceivable that we could become
3  involved in litigation in which pulmonary
4  fibrosis or other changes might be rightfully
5  or wrongfully attributed to inhalation of our
6  powder formulations.  It might be that
7  someone in the Law Department should be
8  consulted with regard to the defensibility of
9  our position in the event that such a
10  situation could ever arise.
11        Is this the first time you ever
12  heard that?
13        MR. BERNARDO:  Object to the
14  form of the question.
15        THE WITNESS:  I have read this
16  before.
17  BY MR. C. PLACITELLA:
18    Q.  You did?
19    A.  Mm-hmm.
20    Q.  Okay.  And in what context?
21    A.  In my preparation for this
22  deposition.
23    Q.  Okay.  And why did you look at this
24  in preparation for today's deposition?
25    A.  Because these are a part of the

Page 68

1  documents concerning the content of asbestos.
2    Q.  Okay.  And do you know how long
3  after Dr. Thompson predicted that Johnson &
4  Johnson would be sued in a baby powder case
5  or a talc case Johnson & Johnson was actually
6  sued for the first time?
7        MR. BERNARDO:  Object to the
8  form of the question.
9        THE WITNESS:  No, I do not.
10  BY MR. C. PLACITELLA:
11    Q.  Okay.  Do you understand that when
12  Johnson & Johnson is sued over a product that
13  it manufactures that it's put on notice that
14  people were making complaints in a court of
15  law that they believe they were injured from
16  those products?
17        MR. BERNARDO:  Object to the
18  form of the question.
19        THE WITNESS:  I believe that's
20  the process, yes.
21  BY MR. C. PLACITELLA:
22    Q.  Okay.  When that happened do you
23  know whether there was a reporting
24  requirement for Johnson & Johnson to provide
25  that information to its auditors or its

Page 69

1  insurers?
2        MR. BERNARDO:  Object to the
3  form of the question.
4        Chris, we're just getting so
5  beyond the scope of the notice.  You know,
6  maybe we talk at a break, because maybe we do
7  need to get Judge Viscomi on the phone --
8        MR. C. PLACITELLA:  Sure.
9        MR. BERNARDO.  This deposition
10  is not about legal duties, legal holds.  This
11  deposition, as we understood it, is about
12  written responses to discovery.  And this
13  witness is being tendered for that.  I'm
14  allowing her if she knows the answers in her
15  individual capacity.  But I just want to make
16  it very clear, we are not designating her as
17  the corporate representative on these topics.
18        MR. C. PLACITELLA:  Well,
19  actually, when we were in the judge's
20  chambers and Mr. Guard (phonetic) was there,
21  the judge specifically told Mr. Guard, he
22  saw -- she saw this deposition as relevant to
23  the issue of spoliation, in addition to the
24  notice.  So...  And we're going to talk about
25  that.



Page 70

1        MR. BERNARDO:  Okay.  We will.
2        MR. C. PLACITELLA:  Okay.
3   BY MR. C. PLACITELLA:
4      Q.  So when is the first discovery
5   response, what year was that from that you
6   reviewed in preparing for today's deposition?
7      A.  I don't recall the exact years.
8      Q.  Well, do you have them with you?
9      A.  Yes, we have -- I -- I had asked
10  counsel to do a chart so that I could
11  remember, but I don't have it in front of me
12  right now.
13     Q.  Okay.
14        MR. C. PLACITELLA:  Can -- do
15  we have the chart and I --
16        MR. BERNARDO:  Yeah.
17        MR. C. PLACITELLA:  -- can take
18  a look at it.
19        MR. BERNARDO:  And, Chris,
20  when -- I don't want to interrupt your
21  questioning, but we've been going for about
22  an hour.  When you're at a breaking point,
23  just let us know.
24        MR. C. PLACITELLA:  Mm-hmm.
25        MR. BERNARDO:  Because I also

Page 71

1   think we ought to discuss this off the
2   record --
3        MR. C. PLACITELLA:  Mm-hmm.
4        MR. BERNARDO:  -- so we can
5   have some understanding here.
6        MR. C. PLACITELLA:  Why don't
7   we mark this.  Do you have an extra copy?
8        MR. BERNARDO:  Can probably get
9   something copied at a break.
10        MR. C. PLACITELLA:  Sure.
11        (Exhibit P-2, Chart, is marked
12  for identification.)
13        MR. C. PLACITELLA:  I'll put it
14  over here.  Can you switch this to Elmo?
15        THE VIDEOTAPE OPERATOR:  Yes.
16  Stand by.
17  BY MR. C. PLACITELLA:
18     Q.  So --
19        MR. BERNARDO:  I'm sorry.  What
20  number is this marked as?
21        THE COURT REPORTER:  P-2.
22        MR. C. PLACITELLA:  This is
23  marked P-2.  It was just handed to me by
24  counsel.
25  BY MR. C. PLACITELLA:

Page 72

1      Q.  Can you tell me what this is and
2   why it was prepared?
3      A.  I had asked counsel to prepare this
4   for me, just to really satisfy my curiosity
5   of the cases that you had cited in your
6   notice.
7      Q.  When you say "curiosity," what were
8   you curious about?
9      A.  I wanted to know specifically what
10  the injuries were that were alleged in these
11  Complaints, similar to what I would do when I
12  worked at the company.
13     Q.  Okay.  And the first record you
14  found of a Complaint involving baby powder
15  was the Gambino case in 1983?
16        MR. BERNARDO:  Object to the
17  form of the question.
18        THE WITNESS:  No, these --
19        MR. BERNARDO:  Characterization
20  of her prior testimony.
21        THE WITNESS:  These were the
22  list of the Complaints that you had mentioned
23  in your notice.
24  BY MR. C. PLACITELLA:
25     Q.  Well, what was the first record

Page 73

1   that you found of a lawsuit involving talc or
2   Johnson's Baby Powder?
3        MR. BERNARDO:  Object to the
4   form of the question.
5        THE WITNESS:  These were all
6   lawsuits.
7        I actually was able to review
8   interrogatories for both Shelby and then
9   there's a second page of Krushinski.
10  BY MR. C. PLACITELLA:
11     Q.  That wasn't my question.
12        My question is, what is the first
13  record that you found concerning a -- or that
14  you reviewed in terms of date or a year of a
15  lawsuit involving talc sold by Johnson &
16  Johnson?
17        Is it 1983?
18        MR. BERNARDO:  Object to the
19  form of the question.
20        THE WITNESS:  Well, that's the
21  year, that first year that's mentioned here,
22  yes.
23  BY MR. C. PLACITELLA:
24     Q.  So the answer is yes?
25        MR. BERNARDO:  Object to the

19  (Pages 70 to 73)



Page 74

1  form of the question.
2      THE WITNESS:  Yes, it would be
3  1983.
4      MR. C. PLACITELLA:  Okay.  So
5  can you...
6      (Exhibit J&J-486, Privilege
7  log, is marked for identification.)
8  BY MR. C. PLACITELLA:
9    Q.  Now, I'm going to show you what's
10 been marked Johnson & Johnson-486.  I'll give
11 it to your attorney first.
12     MR. BERNARDO:  And I'll object
13 to this and state that this witness is not
14 being tendered to testify as to what I
15 believe is a privilege log.
16     BY MR. C. PLACITELLA:  Right.
17     And I'm going to tell you which
18 I -- this is -- this is the privilege log, an
19 excerpt from the privilege log supplied by
20 Johnson & Johnson in these cases.  And what
21 we did is we sorted it by date involving
22 lawsuits related to baby powder.
23 BY MR. C. PLACITELLA:
24   Q.  Can you take a look at that?
25     MR. BERNARDO:  Same objection.

Page 75

1  BY MR. C. PLACITELLA:
2    Q.  And you see that the first, the
3  first date here is, at least on this exhibit,
4  is 2/10/1971; do you see that?
5      MR. BERNARDO:  Can you see it
6  on there?
7      THE WITNESS:  I see that it's
8  highlighted here.
9  BY MR. C. PLACITELLA:
10   Q.  And the description says,
11 Attachment to letter from counsel to client
12 regarding talc samples in connection with
13 ongoing and anticipated litigation.
14     Do you see that?
15   A.  I see that's highlighted here.
16   Q.  Do you see -- do you see on the
17 next one there's another entry, 4/9/1971, and
18 it talks about, Attachment by counsel
19 pursuant to pending and anticipated
20 litigation regarding Johnson's Baby Powder.
21     Do you see that?
22     MR. BERNARDO:  Object to the
23 form of the question.
24     THE WITNESS:  I see those
25 words.  I can't see the date.

Page 76

1  BY MR. C. PLACITELLA:
2    Q.  Well, the date is over here,
3  4/9/71.  See it?
4    A.  Okay.
5    Q.  Okay.  And did you know that
6  Johnson & Johnson was sued over baby powder
7  in 1971?
8      MR. BERNARDO:  Object to the
9  form of the question.  Again, outside the
10 scope of the notice and not tendering --
11 outside the scope of the notice and not
12 tendering this witness for this topic, this
13 corporate representative.
14     THE WITNESS:  I don't know what
15 this is.  You said something about
16 privileged.  I don't even know what that
17 means.  So I don't know what I'm looking at.
18 BY MR. C. PLACITELLA:
19   Q.  It means that these are documents
20 that your lawyer withheld from production,
21 because they say that they are privileged.
22 But they are -- the log itself is still
23 evidential that the cases took place.
24     Did you ever -- were you ever
25 provided any files from lawsuits against

Page 77

1  Johnson & Johnson involving baby powder from
2  1971?
3      MR. BERNARDO:  Object to the
4  form of the question.
5      THE WITNESS:  My understanding
6  was that I was here today to talk about the
7  specific things in your notice.  And I
8  prepared my chart because of the specific
9  cases that you have.
10 BY MR. C. PLACITELLA:
11   Q.  No, ma'am, that's not what you are
12 here to talk about.
13     You are here to talk about, the
14 corporate representative concerning the
15 discovery responses historically provided by
16 Johnson & Johnson concerning the asbestos
17 content of talc, Johnson's Baby Powder or
18 Shower to Shower.
19     Do you see that?
20   A.  Yes, I see that.
21   Q.  Historical responses mean, as long
22 as you've been sued.  There's not any
23 limitation by the number of the cases that I
24 set forth and I knew about.
25     You understand that, right?

20  (Pages 74 to 77)



Page 78

1      MR. BERNARDO:  Object to the
2  form of the question.
3      THE WITNESS:  You're saying
4  that there's no limitation.
5  BY MR. C. PLACITELLA:
6    Q.  Right.
7      So what you did, is the only thing
8  that you did to prepare for today's
9  deposition is to look at information that I
10  asked you to bring with you, correct?
11    A.  No.
12      MR. BERNARDO:  Object to the
13  form of the question.
14      THE WITNESS:  That's -- that's
15  incorrect, that's not all I did.
16  BY MR. C. PLACITELLA:
17    Q.  Okay.
18    A.  I told you earlier, you know, the
19  depositions, the testimonies that I reviewed,
20  my conversations for almost an hour with
21  Dr. Hopkins.  Most importantly, to reassure
22  myself that he has seen everything that has
23  been provided and that there was nothing new
24  that the company has not seen.
25    Q.  Okay.  Well, no one showed you any

Page 79

1  files, lawsuit files concerning baby powder
2  from 1971, correct?
3    A.  I did not specifically review any
4  of those, no.
5    Q.  They were not provided to you?
6      MR. BERNARDO:  Object to the
7  form of the question.
8      THE WITNESS:  That's correct.
9  BY MR. C. PLACITELLA:
10    Q.  All right.  Where are those records
11  from 1971?
12      MR. BERNARDO:  Object to the
13  form of the question.
14      THE WITNESS:  I do not know.
15  BY MR. C. PLACITELLA:
16    Q.  Okay.  Well, I'm not asking you,
17  I'm asking Johnson & Johnson.
18      Johnson & Johnson, where are the
19  records from the lawsuits from 1971 involving
20  Johnson's Baby Powder, where are they?
21      MR. BERNARDO:  Object to the
22  form of the question.
23      THE WITNESS:  I do not know.
24  They could be in different places.
25  BY MR. C. PLACITELLA:

Page 80

1    Q.  Like where?
2    A.  If -- they could be with their
3  outside counsel files.  If there were actual
4  discoveries even filed for any of these, I --
5  I don't know.
6    Q.  Let's go down to 1972.  Do you see
7  there's an entry for 1972 concerning pending
8  and anticipated litigation?
9    A.  I see that.  It says that, yes.
10      MR. BERNARDO:  Object to the
11  form of the question.
12  BY MR. C. PLACITELLA:
13    Q.  Where are the file -- the lawsuit
14  files related to Johnson & Johnson from 1972?
15      MR. BERNARDO:  Object to the
16  form of the question.
17      THE WITNESS:  My answer would
18  be the same.
19  BY MR. C. PLACITELLA:
20    Q.  What about, do you see where it
21  says that you were sued in 1973 and that a
22  memorandum was prepared concerning Johnson's
23  Baby Powder regulatory matters in 1973; where
24  are those files?
25      MR. BERNARDO:  Object to the

Page 81

1  form of the question.
2      THE WITNESS:  I see that
3  this is here.  I can't tell you where
4  these -- these files were specifically,
5  because I did not come prepared to speak
6  about these.
7  BY MR. C. PLACITELLA:
8    Q.  Well, you are here to talk about
9  the historical discovery responses.  How do
10  you know whether there were historical
11  discovery responses if you never looked at
12  the files?
13    A.  Well, what I did do is speak to one
14  of the people that is involved in doing
15  searches for us to make sure that we had
16  everything available.  And this is -- there
17  were no discovery responses in these cases.
18  I'm not prepared to speak about them.
19    Q.  How do you know there were no
20  discovery responses in these cases?
21    A.  I'm -- I believe that we're here
22  today to talk about the specific scope.  And
23  I guess we're interpreting it different.  It
24  sounds like to be like we are.
25    Q.  So what about 1974, do you see that

21  (Pages 78 to 81)



Page 82

1    Johnson & Johnson was sued in talc cases in
2    1974, according to their own responses?
3        A.  That's what it says there, yes.
4        Q.  Okay.  And you see, if you turn it
5    over, they were sued in 1976?
6        A.  I see those dates, yes.
7        Q.  Okay.  You see they were sued in
8    1977?
9        A.  Again, I see those dates.
10       Q.  You see that they were sued in
11   1978?
12       A.  I see that, yes.
13       Q.  Okay.  Do you see that they were
14   sued in baby powder litigation in 1979?
15           MR. BERNARDO:  Object to the
16   form of the question.
17           THE WITNESS:  I see all this,
18   yes.
19   BY MR. C. PLACITELLA:
20       Q.  Okay.  And I'll ask you during the
21   break to look at this -- well, let me just
22   ask you about some specific cases.
23       Listed here in this log is 1981; do
24   you see that?
25       A.  I see what you highlighted, yes.

Page 83

1        Q.  Okay.  And you see where it talks
2    about pending litigation?
3        A.  I can't see it.
4        Q.  Sorry.
5        A.  I see that --
6        Q.  See that?
7        A.  -- what it says, yes.
8        Q.  And it talks about a case called
9    Westfall; do you see that?
10       A.  Yes, I see that.
11       Q.  What do you know about the Westfall
12   case?
13       A.  I believe that had to do with
14   industrial talc.
15       Q.  Okay.  Did you review the files
16   related to the Westfall case?
17       A.  I -- I -- vaguely familiar with it
18   when I saw that it had to deal with
19   industrial talc.  I didn't feel that that was
20   within the scope of this.
21       Q.  Did you know that the Westfall case
22   involved talc from the mines that you say
23   were used in baby powder?
24           MR. BERNARDO:  Object to the
25   form of the question and the characterization

Page 84

1    of prior testimony.
2            THE WITNESS:  As I said, I -- I
3    am not an authority on what mines were used.
4            Well, I do know specifically
5    the cosmetic talc used in Johnson's Baby
6    Powder does not contain asbestos.
7    BY MR. C. PLACITELLA:
8        Q.  What was my question?
9        A.  You would have to repeat that back
10   to me.
11       Q.  Do you have any idea what my
12   question was?
13       A.  You asked me if I was familiar with
14   Westfall.
15       Q.  What's that got to do with whether
16   it has asbestos?
17       Was that my question?
18           MR. BERNARDO:  Object to the
19   form of the question.
20   BY MR. C. PLACITELLA:
21       Q.  Or were you just, you know, wound
22   up and going to just give a response?
23           MR. BERNARDO:  Object to the
24   form of the question, that's completely
25   inappropriate.

Page 85

1            THE WITNESS:  No, I think it's
2    important that this was about industrial
3    talc.  And that was not my interpretation of
4    the notice today.
5    BY MR. C. PLACITELLA:
6        Q.  Did you skip the Westfall case
7    because you, Johnson & Johnson, knew that
8    there was proof in that case that there was
9    asbestos in the mine owned by Johnson &
10   Johnson?
11           MR. BERNARDO:  Object to the
12   form of the question.
13           THE WITNESS:  No, I did not.
14   BY MR. C. PLACITELLA:
15       Q.  You knew that, though, right?
16           MR. BERNARDO:  Objection.
17   BY MR. C. PLACITELLA:
18       Q.  You knew that the mine that was
19   owned by Johnson & Johnson that was the issue
20   in the Westfall case had asbestos in it,
21   right?
22           MR. BERNARDO:  Object to the
23   form of the question.
24   BY MR. C. PLACITELLA:
25       Q.  You knew that?

22  (Pages 82 to 85)



Page 86

1      You, Johnson & Johnson knew that?
2      A.  No, I did not.  I did not go into
3  detail with this, because it was industrial
4  talc.
5      Q.  Okay.  What about the next page,
6  from 1982 the Joly case?
7      What do you know about the Joly
8  case?
9      A.  I don't know anything about it.
10     Q.  You're sure about that?
11     A.  This is the first I'm seeing it.
12     Q.  You're sure about that?
13     A.  I don't recollect anything on this,
14  no.
15     Q.  So you did not review any records
16  concerning the Joly case against
17     A.  It's not familiar to me, no.
18     Q.  So before coming here today, were
19  you aware that Johnson & Johnson was sued in
20  a talc case, according to their own privilege
21  log from 1971 until 2010, each and every
22  year, except 1975?
23          MR. BERNARDO:  Object to the
24  form of the question.
25          THE WITNESS:  No, I'm not

Page 87

1  familiar with the dates, no.
2  BY MR. C. PLACITELLA:
3      Q.  Okay.  And you don't any of the
4  records and did not review any of the records
5  related to any of the cases on this privilege
6  log, other than what is marked on P-2?
7          MR. BERNARDO:  Object to the
8  form of the question.
9  BY MR. C. PLACITELLA:
10     Q.  Is that fair?
11     A.  Yes.
12     Q.  And other than the records, the
13  cases that are marked or set forth in P-2,
14  you have no idea whatsoever, that is you,
15  Johnson & Johnson, where the records are
16  related to the lawsuits filed against
17  Johnson & Johnson from 1971 until 2010 --
18          MR. BERNARDO:  Object to the --
19  BY MR. C. PLACITELLA:
20     Q.  -- correct?
21          MR. BERNARDO:  Object to the
22  form of the question.  Beyond the scope of
23  the notice.
24          You can answer in your
25  individual capacity if you know.

Page 88

1          THE WITNESS:  I don't know.
2  BY MR. C. PLACITELLA:
3      Q.  And you have no idea what discovery
4  responses were proffered by Johnson & Johnson
5  in any of the lawsuits that are referenced in
6  the log marked P-487 [verbatim]?
7          MR. BERNARDO:  Object to the
8  form of the question.
9          THE WITNESS:  Is that large
10  thing 487?
11  BY MR. C. PLACITELLA:
12     Q.  Yes.
13     A.  This is the first I've seen this.
14     Q.  So in preparing for today's
15  deposition, your attorneys never provided you
16  any records related to discovery responses
17  from any case on this exhibit, other than
18  what you have marked here as P-2; is that
19  fair?
20          MR. BERNARDO:  Object to the
21  form of the question.
22          THE WITNESS:  As I said, this
23  is the first I had seen this document.
24          MR. C. PLACITELLA:  Okay.  Why
25  don't we take a break now.

Page 89

1          THE VIDEOTAPE OPERATOR:  The
2  time is 11:20 a.m.  We're off the record.
3          (Brief recess.)
4          THE VIDEOTAPE OPERATOR:  Time
5  is 11:42 a.m.  We are on the record.
6          MR. C. PLACITELLA:  Okay, thank
7  you.
8  BY MR. C. PLACITELLA:
9      Q.  I have to ask the question.  I hope
10  I know the answer.
11          Am I fair to -- is it fair to
12  assume you didn't discuss your deposition
13  during the break?
14     A.  We did not.
15     Q.  Okay.  Good.
16          You said before you spoke to Pamela
17  Downs and she did the search.
18          What exactly did she search?
19     A.  My understanding is that she
20  search -- searched, excuse me, for the
21  documents that you have listed in the second
22  part of the deposition -- of the notice that
23  you had served us.
24     Q.  Okay.  And what did, what did she
25  use to search; was it a computer, was it a

23  (Pages 86 to 89)



| Page 90 | Page 91 |
|---|---|

**Page 90**

1  database, what?
2      A.   She used search terms.  I know that
3  she searched by name.  She searched by --
4  excuse me, she searched by product.
5      Q.   So she -- when she conducted her
6  search, she didn't look at all lawsuits
7  historically that Johnson & Johnson was
8  involved with concerning talc, only the
9  lawsuits that were mentioned on P-1; is that
10  fair?
11      A.   My understanding is that she did
12  the search for the documents that you
13  requested.
14      Q.   Okay.  So in your preparing
15  information concerning historical discovery
16  responses, you never went beyond the specific
17  cases that we were aware of and that were
18  listed on P-1 correct?
19          MR. BERNARDO:  Object to the
20  form of the question.
21          THE WITNESS:  My concentration
22  was on what is listed in the first part of
23  your notice.  And we ensured that Miss Downs
24  had searched for everything that was involved
25  in part 2.  Excuse me.

**Page 91**

1  BY MR. C. PLACITELLA:
2      Q.   But she didn't search for all
3  historical discovery responses in talc cases
4  that were provided by Johnson & Johnson, I
5  take it?
6      A.   That's my understanding.
7      Q.   And she certainly didn't search for
8  any of the cases that are set forth in this
9  log, 486, other than what's on your list,
10  correct?
11      A.   I don't believe so, no.
12      Q.   Where would the information be
13  stored for the lawsuits that were set forth
14  on the log, 486?
15      A.   They could be in various places.  I
16  don't know specifically where they would be.
17      Q.   Well, is it in the Legal
18  Department?
19      A.   Some of it could be in the Legal
20  Departments if -- if there were any documents
21  associated with it.  And they also could be
22  in outside counsels.
23      Q.   Well, we know that there were
24  documents associated with it, right?  Because
25  they actually list the documents.  So, for

| Page 92 | Page 93 |
|---|---|

**Page 92**

1  example, you know, in this first entry, the
2  first two entries, it lists documents.  So
3  they know that there were documents in the
4  Legal Department, correct?
5          MR. BERNARDO:  Object, object
6  to the form of the question.
7          THE WITNESS:  As I told you
8  earlier, this is the first time I've seen
9  this.  It says Privilege Description.  I
10  don't know really what that means.  Does it
11  mean they're documents or not?  I don't know.
12  BY MR. C. PLACITELLA:
13      Q.   Well, let's just look at it.  It
14  says, Attachment prepared by counsel.
15          Attachment is not an apple or an
16  orange, right?
17          It's a piece of paper, right?
18      A.   It says attachment here, yes.
19      Q.   All right.  Pursuant to pending and
20  anticipated litigation.
21          You understand that means current
22  cases and cases in the future?
23          MR. BERNARDO:  Object to the
24  form of the question.
25          THE WITNESS:  Again, I can't

**Page 93**

1  comment on any of this.
2  BY MR. C. PLACITELLA:
3      Q.   Regarding Johnson's Baby Powder
4  litigation, right?
5      A.   That's what it says, yes.
6      Q.   So according to this, there were
7  documents apparently in the department, in
8  the Legal Department related to a case file
9  in 1971 --
10          MR. BERNARDO:  Object.
11  BY MR. C. PLACITELLA:
12      Q.   -- correct?
13          MR. BERNARDO:  Object to the
14  form of the question.
15          THE WITNESS:  You're reading
16  what it says here.
17  BY MR. C. PLACITELLA:
18      Q.   And, for example, the very first
19  entry on here talks about letters concerning
20  samples in connection with ongoing and
21  anticipated litigation; do you see that?
22      A.   That's what it says, yes.
23      Q.   Well, what -- who had -- who
24  retained talc samples related to litigation,
25  to your knowledge?

24  (Pages 90 to 93)



Page 94

```
 1              MR. BERNARDO:  Object to the
 2   form of the question.
 3   BY MR. C. PLACITELLA:
 4       Q.  Is that the Legal Department?
 5       A.  I don't know.  I don't -- I can't
 6   comment on this today.
 7       Q.  Well, what does J&J know about talc
 8   samples that were involved in litigation as
 9   set forth in their own privilege log?
10              MR. BERNARDO:  Object to the
11   form of the question.  Beyond the scope of
12   the notice.
13              You can answer in your
14   individual capacity, if you know.
15              THE WITNESS:  I can't answer
16   that.
17   BY MR. C. PLACITELLA:
18       Q.  So in preparing historical -- to be
19   here today to talk about historical discovery
20   responses, you have no information whatsoever
21   about samples that were part of the
22   litigation discovery process, correct?
23              MR. BERNARDO:  Object, object
24   to the form of the question.
25              THE WITNESS:  I -- again, I
```

Page 95

```
 1   cannot answer on any of these cases.  I'm not
 2   familiar.
 3   BY MR. C. PLACITELLA:
 4       Q.  Now, in your preparation and in the
 5   knowledge of Johnson & Johnson, do you have a
 6   record or any information of a single case
 7   where Johnson & Johnson turned over asbestos
 8   testing data prior to 2017?
 9              MR. BERNARDO:  Object to the
10   form of the question.
11              THE WITNESS:  Could you repeat
12   that question?
13   BY MR. C. PLACITELLA:
14       Q.  Yes, ma'am.
15              Am I correct -- well, strike that.
16              Do you have any evidence that
17   Johnson & Johnson turned over in a lawsuit
18   involving talc testing data related to
19   asbestos and talc prior to 2017?
20       A.  If it was requested, Johnson &
21   Johnson would have turned it over.
22       Q.  When does your research -- or when
23   does Johnson & Johnson maintain is the first
24   time that it turned over testing data
25   concerning asbestos in Johnson & Johnson talc
```

Page 96

```
 1   in litigation?
 2              When is the first time that
 3   happened?
 4       A.  I -- again, it would be whenever it
 5   was requested.
 6       Q.  But from your knowledge, so you
 7   believe that the first time it was requested
 8   it was turned over?
 9              MR. BERNARDO:  Object to the
10   form of the question.
11              THE WITNESS:  If there were
12   specific documents requested, they would have
13   been.  I -- we're talking generally so I
14   don't know the answer to this.
15   BY MR. C. PLACITELLA:
16       Q.  Well, you know, for example, when
17   lawyers in cases involving cancer and baby
18   powder ask for testing data, Johnson &
19   Johnson took the position that they weren't
20   going to turn it over because it was
21   privileged.
22              MR. BERNARDO:  Object.
23   BY MR. C. PLACITELLA:
24       Q.  You know that, right?
25              MR. BERNARDO:  Object to the
```

Page 97

```
 1   form of the question.
 2   BY MR. C. PLACITELLA:
 3       Q.  You saw that, right?
 4       A.  I don't know this, no.
 5       Q.  Okay.  That would be wrong,
 6   wouldn't you say?
 7              MR. BERNARDO:  Object to the
 8   form of the question.
 9              THE WITNESS:  I can't -- I
10   can't comment on that.
11   BY MR. C. PLACITELLA:
12       Q.  I mean, that would be a wrong thing
13   to do if you had testing data concerning
14   asbestos in a talc and you withheld it and
15   asserted privilege as a -- as a reason for
16   not turning it over, correct?
17              MR. BERNARDO:  Object, object
18   to the form of the question.
19              THE WITNESS:  If Johnson &
20   Johnson knew that anything about any of its
21   products were dangerous, they would take
22   steps to correct that.
23   BY MR. C. PLACITELLA:
24       Q.  Ma'am, that wasn't my question.
25              My question was, if you had
```

25  (Pages 94 to 97)


MAGNA ▶
LEGAL SERVICES

Page 98

1    information in your possession, that's you,
2    Johnson & Johnson, concerning testing data on
3    asbestos and talc that was requested in a
4    lawsuit, it would be wrong not to turn that
5    over, correct?
6            MR. BERNARDO:  Object to the
7    form of the question.
8            THE WITNESS:  I just have to
9    say, if it were requested they would turn
10   over whatever was appropriate.
11   BY MR. C. PLACITELLA:
12      Q.  Right.
13          And if they didn't turn it over,
14   that would be wrong, correct?
15          MR. BERNARDO:  Object to the
16   form of the question.
17          THE WITNESS:  I can't say wrong
18   or right, or whatever legal basis there would
19   be.  So I can't comment on that.
20   BY MR. C. PLACITELLA:
21      Q.  Okay.  You, Johnson & Johnson,
22   can't testify or attest to whether it would
23   be wrong or right to turn over asbestos
24   testing data if requested in a lawsuit;
25   Johnson & Johnson doesn't know if that's

Page 99

1    wrong or right?
2            MR. BERNARDO:  Object to the
3    form of the question.
4            THE WITNESS:  No, I'm not
5    saying that.
6            I'm just saying that if there
7    had been a legal decision as to why some
8    evidence or whatever you're asking for was
9    not given, I -- I can't even comment on that.
10   All I can say is that if there was ever
11   anything concrete and scientific saying that
12   any product was unsafe, Johnson & Johnson
13   would not hide that.
14   BY MR. C. PLACITELLA:
15      Q.  When you say "concrete and
16   scientific," what do you mean by that?
17      A.  I mean that scientific evidence
18   that had been peer reviewed, that had been
19   researched, Johnson & Johnson would take
20   steps to do something about the products.
21      Q.  When you say peer review, what do
22   you mean by that?
23      A.  Peer reviewed means that the -- the
24   particular expertise have reviewed a
25   particular medical journal or whatever it

Page 100

1    has -- whatever it is and made comments on
2    it.
3        Q.  So unless -- so if you have
4    evidence in your possession about asbestos in
5    baby powder, you're saying you don't have to
6    turn it over unless it's commented on or
7    reviewed by a medical journal?
8            MR. BERNARDO:  Object to the
9    form of the question.
10   BY MR. C. PLACITELLA:
11      Q.  Is that what you're saying?
12          MR. BERNARDO:  Object to the
13   form of the question.
14          THE WITNESS:  That's not what I
15   said.
16   BY MR. C. PLACITELLA:
17      Q.  All right.  So what I'm asking you,
18   if you have evidence in your possession
19   related to testing of asbestos in baby
20   powder, what was your obligation in
21   litigation to turn that over?
22          MR. BERNARDO:  Object to the
23   form of the question.  She's not here in the
24   capacity as a lawyer.  She's not -- this is
25   not within the scope of the notice.

Page 101

1            You can answer in your
2    individual capacity --
3            MR. C. PLACITELLA:  Is that an
4    objection to form?
5            MR. BERNARDO:  I'm -- given the
6    way you're conducting this deposition,
7    Mr. Placitella, I think I'm entitled to point
8    out that your questions are well beyond the
9    scope, and clarify the extent to which we are
10   tendering this witness as a corporate
11   representative.  So it is beyond form, but I
12   think --
13          MR. C. PLACITELLA:  Okay.
14          MR. BERNARDO:  -- it's
15   appropriate under the circumstances.
16   BY MR. C. PLACITELLA:
17      Q.  You understand that you're here to
18   talk about the historical discovery responses
19   provided by Johnson & Johnson, correct?
20      A.  My --
21      Q.  In lawsuits, correct?
22      A.  My understanding is that I'm here
23   today to talk about -- or the way that I have
24   interpreted the notice to be, which there
25   seems to be some disagreement with.

26 (Pages 98 to 101)



Page 102

1    So it's specifically discovery
2   responses concerning the asbestos content of
3   talc, Johnson & Johnson's Baby Powder, Shower
4   to Shower.
5       Q.  Correct.
6       So if Johnson & Johnson had
7   information in its possession concerning
8   asbestos content in baby powder, it would
9   have been wrong to not turn that over in a
10  lawsuit, correct?
11      MR. BERNARDO:  Object to the
12  form of the question.
13      THE WITNESS:  Again, I -- I
14  feel comfortable that Johnson & Johnson has
15  turned over everything that has been
16  requested.
17  BY MR. C. PLACITELLA:
18      Q.  Every time it was asked for?
19      MR. BERNARDO:  Object to the
20  form of the question.
21      THE WITNESS:  I can't comment
22  on other cases, on other notices or anything.
23  I don't know anything about that.
24  BY MR. C. PLACITELLA:
25      Q.  Okay.  I'm not asking you to

Page 103

1   comment.  I'm asking you, Johnson & Johnson.
2       Johnson & Johnson does not know
3   whether it turned over asbestos testing
4   evidence in lawsuits when requested?
5       Johnson & Johnson doesn't know
6   that?
7       A.  I'm representing Johnson & Johnson,
8   yes.  Because Johnson & Johnson is a company,
9   not a person.  But it is not -- I do not know
10  this, yes.
11      Q.  So Johnson & Johnson does not know?
12      MR. BERNARDO:  Object to the
13  form of the question, beyond the scope of the
14  notice.
15      THE WITNESS:  This is not what
16  I was prepared to speak about today.
17  BY MR. C. PLACITELLA:
18      Q.  You are here to talk about the
19  historical responses.  And I'm saying,
20  historically, you don't know whether
21  Johnson & Johnson has actually turned over
22  the evidence and when is the first time it
23  turned over the evidence?
24      A.  No, I do not know.
25      Q.  So Johnson & Johnson has no idea

Page 104

1   when the first time it turned over in the
2   context of a lawsuit asbestos testing
3   evidence, correct?
4       MR. BERNARDO:  Object, object
5   to the form of the question.  This witness is
6   not being tendered to address this.
7       And she can answer in her
8   individual capacity, if she knows.
9       THE WITNESS:  I do not know.
10  BY MR. C. PLACITELLA:
11      Q.  What do you know about the Joly
12  case?
13      A.  I told you earlier, I'm not
14  familiar with that case.
15      Q.  You're certain?
16      A.  I don't remember it.
17      Q.  You have no personal involvement in
18  the case?
19      A.  I didn't say that.  I don't
20  remember.  It's been, what?  Ten years, at
21  least, that I've been out of the company.  So
22  I -- and what year is this?  I don't even
23  know.
24      Q.  Well, you're here to talk about --
25  you're Johnson & Johnson.

Page 105

1       Does Johnson & Johnson know
2   anything about the Joly case?
3       MR. BERNARDO:  Object to the
4   form of the question.
5       THE WITNESS:  I'm not here
6   today to prepare to speak about the Joly
7   case.
8   BY MR. C. PLACITELLA:
9       Q.  What about the Yuhas case, did you
10  ever hear of that?
11      A.  No, I did not.
12      Q.  Does Johnson & Johnson know
13  anything about the Edley case?
14      A.  I'm not familiar with the cases
15  that you're citing now.
16      Q.  You do know something about the
17  Gambino case?
18      A.  I've heard of the name, yes.
19      Q.  What do you know about the Gambino
20  case?
21      A.  That is one of the ones that was
22  listed, which you requested documents, but
23  I -- that's why I had asked for that chart,
24  to refresh myself, because the top of my
25  head, I don't remember what Gambino was.

27 (Pages 102 to 105)



Page 106

1      Q.  Well, where are the records related
2   to the Gambino case?
3            MR. BERNARDO:  Object to the
4   form of the question.
5            THE WITNESS:  If there were any
6   records, they -- they would have been
7   provided to you as requested.
8   BY MR. C. PLACITELLA:
9      Q.  Well, did you review records
10  related to the Gambino case?
11     A.  I did review the Complaint, that's,
12  again, why, you know, the composite and the
13  chart so I could just remember.  I wanted to
14  know what the Complaint was.
15     Q.  So other than the Gambino
16  Complaint, you didn't review anything else as
17  related to the Gambino case in order to
18  testify here today?
19           MR. BERNARDO:  Object to the
20  form of the question.
21  BY MR. C. PLACITELLA:
22     Q.  Correct?
23     A.  I reviewed the documents for
24  which -- or the cases for which there were
25  documents and discovery responses, yes.

Page 107

1      Q.  What did you review in connection
2   with the Gambino case?
3      A.  As I said, I just reviewed the
4   Complaint and that was all that was
5   available.
6      Q.  Okay.  So do you know what the
7   source of the talc was that was at issue in
8   the Gambino case?
9            MR. BERNARDO:  Object to the
10  form of the question.
11           THE WITNESS:  I'm not familiar
12  with the sources of the talc for each
13  specific case, no.
14  BY MR. C. PLACITELLA:
15     Q.  What happened to the plaintiff in
16  the Gambino case?
17           What happened to that case?
18           MR. BERNARDO:  Object to the
19  form of the question.
20           THE WITNESS:  I don't remember.
21  BY MR. C. PLACITELLA:
22     Q.  Were the records from the Gambino
23  case when the case was over preserved?
24           MR. BERNARDO:  Object to the
25  form of the -- object to the form of the

Page 108

1   question.
2            THE WITNESS:  If there were
3   records for when a case was over, I would
4   have to believe that they were preserved,
5   yes.
6   BY MR. C. PLACITELLA:
7      Q.  Okay.  Where?
8      A.  I -- I don't know specifically.
9   They might even be outside counsel.
10     Q.  What about the Selby case, what do
11  you know about that?
12     A.  Again, I know that was one of the
13  ones listed.
14     Q.  And what do you know about the
15  Selby case?
16     A.  May I have the -- the chart that...
17           THE COURT REPORTER:  Here you
18  go.
19           THE WITNESS:  Thank you.
20           Now, what it says here, that I
21  was most interested in the Complaint that was
22  filed and this is talcosis.  It was filed in
23  1993.
24  BY MR. C. PLACITELLA:
25     Q.  What did you review in connection

Page 109

1   with the Selby case?
2      A.  If there were any discovery
3   responses for Selby.
4      Q.  And what -- what is it -- what do
5   you remember of -- from the discovery
6   responses?
7      A.  I think the important thing about
8   this, this was a talcosis case.
9      Q.  That's all you remember from the
10  discovery?
11     A.  Yes.
12     Q.  Okay.  And what happened to the
13  Selby case?
14     A.  I don't know.
15     Q.  Okay.  Have you ever heard of a
16  case called Andonian?
17     A.  No, I have not.
18     Q.  What about a case filed by Fae
19  Miller?
20     A.  No, not familiar.
21     Q.  What about the Coker case?
22     A.  Coker is -- is one of the ones
23  listed in your notice.
24     Q.  Okay.  And what do you know about
25  the Coker case?

28  (Pages 106 to 109)



Page 110

1     A.  The Coker case was -- alleged
2  injury was peritoneal mesothelioma.  And it
3  was filed in 1997.
4     Q.  What else do you know?
5     A.  That is all I know about it.
6     Q.  What do you know about the
7  discovery responses provided in the Coker
8  case?
9        MR. BERNARDO:  Object to the
10  form of the question.
11        THE WITNESS:  I do not know if
12  there were discovery responses.
13  BY MR. C. PLACITELLA:
14     Q.  You're the person here to testify
15  about this, with the most knowledge
16  concerning the historical discovery responses
17  and you know nothing about the discovery
18  responses; is that what you're saying?
19        MR. BERNARDO:  Object to the
20  form of the question and the characterization
21  of her testimony.
22        THE WITNESS:  No, I'm not
23  saying that.
24        Remember, I -- I talked about
25  how we did the searches and -- and I

Page 111

1  reassured myself that all searches were as
2  thorough as could be.  And -- and there
3  were -- there's no more information about the
4  Coker case.
5  BY MR. C. PLACITELLA:
6     Q.  Other than a Complaint?
7     A.  Yes.
8     Q.  What about the Durham case; did you
9  ever hear of that?
10     A.  No, I'm not familiar with that.
11     Q.  What about the Cooper case, what do
12  you know about the Cooper case?
13     A.  Seems that it was a rash was the
14  alleged complaint in 1986.
15     Q.  What happened to the Cooper case?
16     A.  I do not know.
17     Q.  Where -- did you review any
18  discovery responses related to the Cooper
19  case?
20     A.  If they had been made available, I
21  would have.  And I don't believe they were
22  available.
23     Q.  Okay.  What about the Cunningham
24  case, what do you know about that?
25     A.  That we couldn't find anything on

Page 112

1  the Cunningham case.
2     Q.  So you know nothing?
3     A.  Yes.
4        MR. BERNARDO:  Object --
5  BY MR. C. PLACITELLA:
6     Q.  What about the --
7        MR. BERNARDO:  -- to the form
8  of the question.
9  BY MR. C. PLACITELLA:
10     Q.  -- Kreppel case?
11     A.  I don't know that name.
12     Q.  K-r-e-p-p-e-l, you know nothing
13  about that?
14     A.  Oh, Kreppel.  I thought you said...
15     Q.  Right.
16     A.  Yeah, that something was filed in
17  1988, but they could not identify it.
18     Q.  So you have no records, Johnson &
19  Johnson has no records related to the Kreppel
20  case?
21        MR. BERNARDO:  Object to the
22  form of the question.
23        THE WITNESS:  Nothing could be
24  found internally.  Again, something may have
25  been in outside counsel files.

Page 113

1  BY MR. C. PLACITELLA:
2     Q.  Well, what kind of search was done
3  for the Kreppel case?
4     A.  The same that I already explained
5  to you was done on all the cases.  They were
6  searched by as many terms as -- as provided.
7     Q.  So you didn't review any discovery
8  responses related to the Kreppel case?
9     A.  If they had been made available, I
10  would have reviewed them, and there were none
11  available.
12     Q.  What about the Lopez case, what do
13  you know about that?
14     A.  The same thing, it's -- I think
15  it's important to note that it's industrial
16  talc, but I don't have any more information.
17     Q.  How do you know that?
18     A.  That was what was obvious, you
19  know, set forth in the actual Complaint.
20     Q.  So the only thing you had related
21  to the Lopez case was the Complaint?
22     A.  That was all that was available.
23  Again, I saw this was industrial talc, so I
24  did not go any further with this.  But if
25  there were any discovery responses or

29 (Pages 110 to 113)



Page 114

1  anything else associated with any of these
2  cases, it would have been made available to
3  me and to you.
4      Q.  What about the Ritter case, what do
5  you know about that?
6      A.  Same thing, this is industrial
7  talc.
8      Q.  Okay.  And what discovery responses
9  did you review?
10     A.  If there had been discovery
11 responses I would have reviewed them, and I
12 believe none were available.  And, again,
13 it's industrial talc.
14     Q.  What about the Roberts case?
15     A.  This is -- this concerns a
16 deodorant product, chronic lesions of the
17 armpits.
18     Q.  I don't care about that.
19         What about the case of Sheldon
20 Sullivan, what do you know about that?
21     A.  We don't know much.  The Complaint
22 did not specify what the injury was.
23     Q.  Am I correct that when you actually
24 at least in one case swore under oath that
25 information you were providing was true and

Page 115

1  accurate, to your knowledge, correct?
2          MR. BERNARDO:  Object to the
3  form of the question.
4          THE WITNESS:  Would you ask
5  that question again?
6  BY MR. C. PLACITELLA:
7      Q.  Sure.
8          You actually certified answers to
9  interrogatories in some cases, correct?
10     A.  From time to time, yes.
11     Q.  And when you did that, you swore
12 under oath that the information that you were
13 provided was true and accurate, to the best
14 of your knowledge, correct?
15     A.  Yes.
16     Q.  And you agree with me that when
17 swearing under oath, the information that
18 you're swearing to is only as good as the
19 information that you're provided?
20     A.  I mean, I took it very seriously
21 when I would sign anything and swear that.
22 And I felt confident that the people that I
23 directed counsel to speak with would provide
24 the right answers.
25     Q.  Did you ever testify under oath

Page 116

1  that the -- that when swearing under oath the
2  information you were swearing to was only as
3  good as the information you were provided?
4      A.  No, I did not swear to that.
5          MR. C. PLACITELLA:  I'm going
6  to go video, please.
7          (At which time the following
8  audio recording is played for the witness.)
9          "QUESTION:  So if you're
10 getting information about the product, the
11 information --
12         (Multiple speakers,
13 unintelligible crosstalk.)
14         MR. BERNARDO:  Is this supposed
15 to be video?
16         THE WITNESS:  There's no video.
17         "ANSWER:  Yes, from our -- our
18 scientists, I believe and trust their
19 expertise, yes."
20         (At which time the audio
21 playback is concluded.)
22         MR. C. PLACITELLA:  She's not
23 seeing the video.
24         THE COURT REPORTER:  Can we cue
25 that up again, because...

Page 117

1          MR. C. PLACITELLA:  Sure.
2          Tell me when you're ready.
3          THE VIDEOTAPE OPERATOR:  Stand
4  by.  The time is 12:05 p.m.  Off the record.
5          (Off-the-record discussion.)
6          THE VIDEOTAPE OPERATOR:  Time
7  is 12:06 p.m. on the record.  Stand by.  Go
8  ahead.
9          (At which time the following
10 audio recording is played for the witness.)
11         "QUESTION:  So if you're
12 getting -- ")
13         MR. BERNARDO:  Still not coming
14 up.
15         "QUESTION:  -- information
16 about the product the information -- "
17         MR. BERNARDO:  There you go.
18         "QUESTION:  -- the information
19 that you're providing is only as good as the
20 information that's been provided to you,
21 correct?
22         "ANSWER:  Yes, from our -- our
23 scientists, I believe and trust their
24 expertise, yes.")
25         (At which time the audio



Page 118

1   playback is concluded.)
2   BY MR. C. PLACITELLA:
3       Q.  Do you recall that testimony?
4           THE VIDEOTAPE OPERATOR:  Okay,
5   counsel.
6   BY MR. C. PLACITELLA:
7       Q.  So the information that you relay
8   in answering interrogatories is only as good
9   as the information provided to you, correct?
10          MR. BERNARDO:  Object to the
11  form of the question.
12          THE WITNESS:  I wouldn't use
13  "only."
14          As I said before, that I -- I
15  trust these people.  I worked with them for
16  years.  These weren't just somebody down the
17  street that I grabbed and said, You know,
18  would you answer this?
19          These were people who were
20  experts in their fields.  And that's why they
21  were chosen.
22  BY MR. C. PLACITELLA:
23      Q.  Well, let me ask you some questions
24  about that.
25          Even though you were the person in

Page 119

1   charge of responding to consumer inquiries
2   and answering -- and certifying
3   interrogatories about talc safety, there were
4   discussions about the dangers of Johnson's
5   Baby Powder you were never privy to, correct?
6       A.  There -- I don't think there were
7   discussions about the dangers of Johnson's
8   Baby Powder.  In our normal course of
9   business, we would always discuss our
10  products, ensuring that they are safe.  So,
11  yeah, there would be discussions, but not
12  that it was unsafe.
13          MR. C. PLACITELLA:  Okay.  Can
14  I go to the video, please?
15          THE VIDEOTAPE OPERATOR:  Stand
16  by.  Go ahead, sir.
17          (At which time the following
18  audio recording is played for the witness.)
19          "QUESTION:  And they had
20  discussions outside of your presence about
21  the dangers or problems associated with baby
22  powder and those were never communicated to
23  you as the person who was in charge of
24  dealing with the public as it relates to baby
25  powder, right?

Page 120

1           "UNIDENTIFIED COUNSEL:  Same
2   objection, compound, vague and ambiguous.
3           "You can answer.
4           "ANSWER:  There may have been
5   conversations that I was not privy to, yes."
6           (At which time the audio
7   playback is concluded.)
8   BY MR. C. PLACITELLA:
9       Q.  Do you recall giving that
10  testimony?
11      A.  That's me.
12      Q.  Am I correct that although you were
13  the person who certified answers to
14  interrogatories, no asbestos testing evidence
15  was ever provided to you, correct?
16      A.  That was not my role.  They -- they
17  could have shown me study and research.  And
18  I really wouldn't understand it.  That's why
19  we had experts who would understand it.
20  That's who we relied on.
21      Q.  All right.  Let me ask the question
22  again.
23          Am I correct that no asbestos
24  testing evidence was ever provided to you in
25  any capacity, correct?

Page 121

1           MR. BERNARDO:  Object to the
2   form of the question.
3           THE WITNESS:  As -- as I said,
4   I did answer you, that I did not review any
5   of that.  That was not my role.
6   BY MR. C. PLACITELLA:
7       Q.  Even when you certified information
8   about asbestos testing evidence under oath,
9   correct?
10          MR. BERNARDO:  Object to the
11  form of the question.
12          THE WITNESS:  The same thing.
13  I felt comfortable.  I could verify, nothing
14  was jumping out at me as wrong.  It was the
15  company's position that there was no asbestos
16  in the cosmetic talc used in Johnson's Baby
17  Powder.  And I felt very comfortable in the
18  people who answered the questions.
19  BY MR. C. PLACITELLA:
20      Q.  What was my question?
21      A.  Repeat it, please.
22      Q.  Do you have any idea what it was?
23      A.  You asked me if I had ever seen or
24  reviewed any of the studies.  There was no
25  reason for me to.



Page 122

1    Q.  Even though you were certifying
2  under oath about what was or was not in the
3  studies?
4         MR. BERNARDO:  Object to the
5  form.
6  BY MR. C. PLACITELLA:
7    Q.  There was no reason for you to look
8  at them --
9    A.  I --
10   Q.  -- or even see them?
11   A.  I wasn't certifying what was in or
12 not in the studies.  I was certifying that
13 these questions had been answered.  Again, I
14 directed counsel to speak with those who
15 could most expertly answer the questions.
16   Q.  Ma'am, you certified under oath
17 under penalty of perjury that the information
18 provided was true and accurate, to the best
19 of your knowledge, did you not?
20   A.  Yes, that's correct.
21   Q.  And in doing that you never
22 reviewed a single piece of paper before
23 making that certification, correct?
24   A.  That's correct.  That was not my
25 role to do it.  I was representing the

Page 123

1  company, because the company can't sign.  But
2  I started the process by sending counsel to
3  speak with those who could best answer.  So I
4  knew right up front that the right people
5  were involved.
6    Q.  The answer to my question is,
7  ma'am, when you certified interrogatories
8  under oath, under penalty of perjury, and
9  said they were true and accurate, to the best
10 of your knowledge, you never reviewed a
11 single piece of paper before doing so,
12 correct?
13        MR. BERNARDO:  Object to the
14 form of the question, asked and answered.
15        THE WITNESS:  If there were
16 papers involved, I did not review them, no.
17 BY MR. C. PLACITELLA:
18   Q.  And you swore under oath that the
19 sources from what -- where Johnson Baby --
20 where Johnson & Johnson got its baby powder
21 never contained either asbestos or Tremolite;
22 you swore to that, correct?
23        MR. BERNARDO:  Object to the
24 form of the question.
25        THE WITNESS:  I verified the

Page 124

1  answers that were given to those questions.
2  BY MR. C. PLACITELLA:
3    Q.  Verify means you just signed them?
4    A.  No, I did not just sign them.  As I
5  said, if anything ever jumped out at me, but
6  I had the experts answer those questions.
7    Q.  You never reviewed any evidence
8  whatsoever before swearing under oath that
9  there was no evidence of asbestos or
10 Tremolite in Johnson's Baby Powder, correct?
11        MR. BERNARDO:  Object to the
12 form of the question.
13        THE WITNESS:  I did not review
14 any specific documents, but, again, the
15 people that I had answer these questions were
16 the right people to answer them and most
17 knowledgeable.  And...
18 BY MR. C. PLACITELLA:
19   Q.  Who's the person who told you that
20 there was no evidence of asbestos in
21 Johnson's -- or Tremolite in Johnson's talc
22 that you based your certification under
23 penalty of perjury on?
24        Who is that person?
25        MR. BERNARDO:  Object to the

Page 125

1  form of the question.
2         THE WITNESS:  I really don't
3  remember what specific person answered the
4  specific questions that were involved in a
5  specific interrogatory for a specific
6  Complaint.
7  BY MR. C. PLACITELLA:
8    Q.  Well, was it a scientist or a
9  lawyer?
10   A.  No, it was always a scientist.
11   Q.  Okay.  Who?
12        Who told you that, that there was
13 never any evidence whatsoever?
14   A.  The different scientists that I
15 worked with through the years.  As I said,
16 there was not one specific one that was
17 always the answer for.
18        These -- these were based on not
19 just one particular case.  These would be
20 studies, and research, and different
21 experiments and everything that were going
22 on, ongoing.  So it wasn't just, Aha, there's
23 a question here, let's go find the answer.
24        We were -- as a company, this was
25 our responsibility to be doing all the time.



Page 126

1     Q.  Am I correct that ultimately what
2  was provided and what you swore to was
3  decided by the Johnson & Johnson lawyers --
4         MR. BERNARDO:  Object to the
5  form of the question.
6  BY MR. C. PLACITELLA:
7     Q.  -- correct?
8     A.  No.  The responses were provided
9  by, again, the experts in response to the
10  particular questions of the Complaint.
11    Q.  Ma'am, the lawyers ultimately
12 decided what was going to be communicated in
13 lawsuits related to baby powder, not you,
14 correct?
15    A.  It's not me or the lawyers.  It's
16 the excerpts for the particular question.
17        MR. C. PLACITELLA:  All right.
18 Can we go to video, please?
19        THE VIDEOTAPE OPERATOR:  Stand
20 by.  Okay.
21        (At which time the following
22 audio recording is played for the witness.)
23        "QUESTION:  So the lawyers made
24 a determination as to what was going to be
25 communicated and what was not going to be

Page 127

1  communicated, it was not you; is that fair?
2        "UNIDENTIFIED COUNSEL:  Object
3  to the form of the question.
4        "You may answer.
5        "THE WITNESS:  They -- since it
6  was a legal matter, they were the appropriate
7  person to make the final decisions."
8        (At which time the audio
9  playback is concluded.)
10 BY MR. C. PLACITELLA:
11    Q.  Do you recall giving that
12 testimony?
13    A.  That was me in the video.
14    Q.  Okay.  In the answers to
15 interrogatories that you swore to, did you
16 ever mention the names of any of the
17 scientists that you said provided the
18 information that there was no asbestos,
19 evidence of asbestos in the Johnson & Johnson
20 talc?
21        MR. BERNARDO:  Object to the
22 form of the question.
23        THE WITNESS:  Are you referring
24 to the specific interrogatories?
25 BY MR. C. PLACITELLA:

Page 128

1     Q.  Anytime.
2        I couldn't find any, so I'm asking
3  you if you have any recollection.
4     A.  If -- if the question asked for a
5  specific person, it was provided.
6     Q.  So unless it was asked for a
7  specific person, you never provided the basis
8  for your verification that there was no
9  evidence of asbestos in Johnson's Baby Powder
10 in lawsuits involving Johnson & Johnson
11 talc --
12        MR. BERNARDO:  Object.
13 BY MR. C. PLACITELLA:
14    Q.  -- correct?
15        MR. BERNARDO:  Object to the
16 form of the question.
17        THE WITNESS:  There -- again,
18 if there was a question where they required a
19 specific person's name, yes.  Other than
20 that, there was no need to.
21 BY MR. C. PLACITELLA:
22    Q.  Okay.  So you, Johnson & Johnson,
23 when you were verifying discovery in lawsuits
24 involving Johnson & Johnson talc, you did not
25 have any scientist certify that the

Page 129

1  information provided under oath was true and
2  accurate, correct?
3        You never did that?
4     A.  No, there was no need to.
5     Q.  What they did is they had the
6  person from Marketing just sign the
7  interrogatories without ever reviewing a
8  single document, correct?
9     A.  No, that's --
10        MR. BERNARDO:  Object to the
11 form of the question.
12        THE WITNESS:  That's incorrect.
13 As I explained to you, that the appropriate
14 person would be answering the question, that
15 these weren't just some people who just
16 happened to be down the hall.  The specific,
17 whether it was a scientist, whoever was
18 necessary to answer the question.
19 BY MR. C. PLACITELLA:
20    Q.  But as Johnson & Johnson sits here
21 today, they can't identify a single scientist
22 who provided the information that was put in
23 sworn discovery responses that -- for the
24 basis for there was no evidence of asbestos
25 in Johnson & Johnson talc, correct?



Page 130

1        MR. BERNARDO:  Object to the
2    form of the question.
3        THE WITNESS:  There definitely
4    was basis for that.  We had many different
5    scientists.  I believe you've spoken to one
6    of them, Dr. Hopkins.
7    BY MR. C. PLACITELLA:
8        Q.  That wasn't my question.
9        As Johnson & Johnson sits here
10    today under oath on behalf of the
11    corporation, you can't identify a single
12    scientist that provided information that
13    justified your swearing under oath that there
14    was no evidence whatsoever of asbestos in any
15    Johnson & Johnson talc product, correct?
16        MR. BERNARDO:  Object to the
17    form of the question.
18        THE WITNESS:  As I said, there
19    were no names that required it.  So asking
20    for different complaints, different
21    interrogatories, I could sit here and give
22    you a lot of different names.  I just
23    mentioned one for you.
24    BY MR. C. PLACITELLA:
25        Q.  Oh, so you spoke to Dr. Hopkins in

Page 131

1    responding -- and certifying answers to
2    interrogatories; is that what you're saying?
3        A.  No.  As I explained earlier, my
4    role was not to speak directly to the
5    internal experts.  My role was to suggest and
6    direct counsel to speak to those experts.
7    And they may have had those conversations.
8    It would be different people for different
9    responses.
10        Q.  Okay.  So now we're getting
11    somewhere.
12        When you verified the
13    interrogatories under oath, you never had a
14    conversation with any of the scientists,
15    correct?
16        A.  Not for that specific case, but I
17    have worked with those scientists --
18        Q.  No, ma'am.
19        A.  -- 30 years and so I knew that they
20    would be the right person.
21        Q.  All right.  So that's -- that's --
22    that's where I'm -- let's be very specific
23    here.  When you certified interrogatories
24    under penalty of perjury indicating that
25    there was no asbestos or no evidence of

Page 132

1    asbestos in any Johnson & Johnson talc
2    product, you, Nancy Musco, never had a
3    conversation with any scientist in that
4    regard, correct?
5        MR. BERNARDO:  Object to the
6    form of the question.
7        THE WITNESS:  As I said, I had
8    many conversations with them throughout my
9    everyday work.  And that is why I asked them
10    to speak to counsel to respond to that.
11    BY MR. C. PLACITELLA:
12        Q.  All right, all right.  That's not
13    my question, ma'am.
14        I'm saying when you had to answer
15    and certify a specific question, is there any
16    evidence of asbestos in Johnson's Baby
17    Powder, you, in answering that question never
18    spoke to a single scientist, correct?
19        MR. BERNARDO:  Object to the
20    form of the question.
21        THE WITNESS:  Again, not in
22    relation to that specific question.  But
23    throughout my tenure at Johnson & Johnson,
24    yes, I did.
25    BY MR. C. PLACITELLA:

Page 133

1        Q.  Okay.  But in answering discovery
2    under oath and swearing to the veracity of a
3    statement provided that there was no evidence
4    of asbestos in Johnson's Baby Powder, in that
5    capacity you never spoke to a single
6    scientist, correct?
7        MR. BERNARDO:  Object to the
8    form of the question.
9        THE WITNESS:  There was no need
10    for me to have a conversation with them at
11    that particular time, because I was familiar
12    with what they knew and understood.  And I
13    knew what their answers would be.
14    BY MR. C. PLACITELLA:
15        Q.  Let me ask --
16        MR. C. PLACITELLA:  Can you
17    read my question back, please?
18        (At which time the following
19    question is read:
20        "QUESTION:  But in answering
21    discovery under oath and swearing to the
22    veracity of a statement provided that there
23    was no evidence of asbestos in Johnson's Baby
24    Powder, in that capacity you never spoke to a
25    single scientist, correct?")



Page 134

```
1            MR. BERNARDO:  Object to the
2   form of the question.
3   BY MR. C. PLACITELLA:
4        Q.  Can you answer that question,
5   please?
6        A.  As I said, for that specific -- a
7   specific answer, I did not have a
8   conversation.
9            My role was to ensure that counsel
10  was speaking to the correct person to answer
11  it.
12           The reason that I went with those
13  people was because of those many
14  conversations I had throughout my tenure.
15       Q.  Okay.
16       A.  I spoke to them often.
17       Q.  What was my question, ma'am?
18       A.  You asked me if I spoke with them
19  each time that there was a question.  No, I
20  did not.  I spoke to them many times
21  throughout my tenure.
22       Q.  Okay.  And the -- what was
23  ultimately included in an answer, a discovery
24  response came through Johnson & Johnson's
25  lawyers, correct?
```

Page 135

```
1            MR. BERNARDO:  Object.
2   BY MR. C. PLACITELLA:
3        Q.  In other words, the chain of
4   information was that the scientists provided
5   the information to Johnson & Johnson's
6   lawyers and then Johnson & Johnson put
7   that -- lawyers put that information down in
8   response to discovery and then you certified
9   that it was true and accurate, correct?
10       A.  Yes, the process would be that the
11  counsel would have conversations with the
12  expert.  The expert would provide their
13  answers, and counsel compile it all and then
14  provided it back to whomever requested it.
15  But they did not change the answer or address
16  the answer, no.
17       Q.  "No," what?
18       A.  No, they -- they were the ones who
19  put it all together to communicate it to
20  whomever had requested it originally.  But it
21  was the experts who provided, the internal
22  experts who provided the answers.
23       Q.  When you swore under oath that
24  there was no evidence whatsoever of asbestos
25  in Johnson's Baby Powder, that was based upon
```

Page 136

```
1   an answer that was put down by the lawyers
2   who spoke to the experts, correct?
3            MR. BERNARDO:  Object to form
4   of question.
5            THE WITNESS:  Everybody I
6   worked with, we knew the company's position.
7   I verified that everything that was written
8   there was consistent with that position.
9   BY MR. C. PLACITELLA:
10       Q.  When you say "company's position,"
11  what do you mean by that?
12       A.  That there is no asbestos in the
13  cosmetic talc used for Johnson's Baby Powder.
14       Q.  There's no evidence of asbestos,
15  there never was and there never will be;
16  isn't that the company position?
17       A.  Yes, in the cosmetic talc used for
18  Johnson's Baby Powder.
19       Q.  You -- excuse me.
20           It was -- I'm looking at your
21  answer to P -- I want to go to Musco-1, it
22  was your position in responding to discovery
23  under oath that there were never any -- there
24  was no evidence, no studies and no reports
25  indicating that there was asbestos in any
```

Page 137

```
1   Johnson & Johnson Baby Powder product,
2   correct?
3            MR. BERNARDO:  Object to the
4   form of the question.
5            THE WITNESS:  Could you repeat
6   that question?
7            MR. C. PLACITELLA:  Can you
8   read it back, please?
9   BY MR. C. PLACITELLA:
10       Q.  And when I say "you," I mean
11  Johnson & Johnson.
12           (At which time the following
13  question is read:
14           "QUESTION:  I'm looking at your
15  answer to P -- I want to go to Musco-1, it
16  was your position in responding to discovery
17  under oath that there was no evidence, no
18  studies and no reports indicating that there
19  was asbestos in any Johnson & Johnson Baby
20  Powder product, correct?")
21           THE WITNESS:  That's correct.
22  BY MR. C. PLACITELLA:
23       Q.  Okay.  And that's what was told to
24  you by Dr. Hopkins, correct?
25       A.  It wasn't a question of just told
```



Page 138

1    to me.  We discussed the various documents
2    that you had presented.  My purpose of the
3    conversation with Dr. Hopkins was to reaffirm
4    that he was familiar with everything, that
5    there was nothing new that plaintiffs had
6    provided, and that he was familiar with all
7    the different paperwork and documents.
8       Q.  So, as you sit here today, in
9    preparing for this deposition, you were not
10   aware that Dr. Hopkins in trial, under oath,
11   testified that there were, in fact, reports
12   or studies indicating there was asbestos in
13   Johnson & Johnson talc, correct?
14          MR. BERNARDO:  Object to the
15   form of the question.
16   BY MR. C. PLACITELLA:
17      Q.  You're not aware of that?
18      A.  I'm not aware specifically what
19   Dr. Hopkins said or didn't say in his
20   testimony.
21      Q.  And if he would have said that,
22   that would be completely at odds with what
23   you testified to here under oath and in
24   swearing to answers to interrogatories, true?
25          MR. BERNARDO:  Object to the

Page 139

1    form of the question.
2          THE WITNESS:  I don't know what
3    Dr. Hopkins said, so I -- I can't comment on
4    that.  But consistent that there is not
5    asbestos in the cosmetic talc used in
6    Johnson's Baby Powder.
7    BY MR. C. PLACITELLA:
8       Q.  Your statement is there's no
9    evidence.  And there never was any evidence
10   of asbestos in any Johnson & Johnson cosmetic
11   talc product, correct?
12      A.  Yes.
13      Q.  That's your position?
14      A.  Yes.
15      Q.  And that's what you swore to
16   repeatedly under oath in answering
17   interrogatories and in your deposition,
18   correct?
19          MR. BERNARDO:  Object to the
20   form of the question and the characterization
21   of prior testimony.
22          THE WITNESS:  Yes.
23   BY MR. C. PLACITELLA:
24      Q.  And that's what Johnson & Johnson
25   asserts here, before this jury, under oath

Page 140

1    that there was never any reports or evidence
2    that there was asbestos in any Johnson &
3    Johnson talcum powder product, correct?
4       A.  That's correct.
5          MR. C. PLACITELLA:  Can we go
6    to the video, please?
7          THE VIDEOTAPE OPERATOR:  Stand
8    by.
9    BY MR. C. PLACITELLA:
10      Q.  Do you recognize the person on
11   this --
12          THE VIDEOTAPE OPERATOR:  Go
13   ahead.
14   BY MR. C. PLACITELLA:
15      Q.  Do you recognize the person on this
16   screen?
17      A.  Yes, I do.
18      Q.  Who is that?
19      A.  That's Dr. John Hopkins.
20      Q.  Okay.  I want to play you his
21   testimony.
22          MR. BERNARDO:  Do you happen to
23   have the transcript she can read while
24   she's --
25          MR. C. PLACITELLA:  I'm going

Page 141

1    to play it for you.
2          MR. BERNARDO:  Well, I
3    understand that, I'm asking --
4          (At which time the following
5    audio recording is played for the witness.)
6          "ANSWER:  Repeat the question,
7    please.
8          "QUESTION:  Yes.
9          "Do you know for a fact studies
10   have indicated asbestos in your talc, which
11   you claim is asbestos-free, true?
12          "ANSWER:  Studies have
13   reported."
14          (At which time the audio
15   playback is concluded.)
16          (Unintelligible by reporter.)
17          (Reporter clarification.)
18          THE WITNESS:  Yeah, it's hard
19   for me to understand, too.
20          MR. C. PLACITELLA:  We'll do it
21   again.
22          (Off-the-record discussion.)
23          (At which time the following
24   audio recording is played for the witness.)
25          "ANSWER:  Repeat the question,

36 (Pages 138 to 141)



Page 142

1  please.
2       "QUESTION:  Yes.
3       "Do you know for a fact studies
4  have indicated asbestos in your talc, which
5  you claim is asbestos-free, true?
6       "ANSWER:  Studies have
7  reported, yes."
8       (At which time the audio
9  playback is concluded.)
10  BY MR. PLACITELLA:
11     Q.  Dr. Hopkins never -- Dr. Hopkins
12  never told you that he testified in a court
13  of law that, in fact, there were studies that
14  reported asbestos in the talc that you say is
15  asbestos-free?
16       MR. BERNARDO:  Object to the
17  form.
18  BY MR. C. PLACITELLA:
19     Q.  Correct?
20       MR. BERNARDO:  Object.
21  BY MR. C. PLACITELLA:
22     Q.  You never saw this before?
23       MR. BERNARDO:  Object to the
24  form of the question.
25       THE WITNESS:  I never saw this

Page 143

1  before and he and I did not discuss his
2  testimony, no.
3  BY MR. C. PLACITELLA:
4     Q.  That's completely at odds with what
5  you just testified to, isn't it?
6       MR. BERNARDO:  Object to the
7  form of the question.
8       THE WITNESS:  No, it's not.
9  BY MR. C. PLACITELLA:
10     Q.  How is it consistent?
11     A.  You know, again, I can't comment on
12  what Dr. Hopkins said here.  But, yeah, our
13  understanding that there are studies, we're
14  not saying that they are right or complete,
15  but, yeah, there have been studies saying
16  that.
17     Q.  All right.  So there is evidence of
18  asbestos in the Johnson & Johnson Baby Powder
19  and by the way of studies, correct?
20       MR. BERNARDO:  Object to the
21  form of the question.
22       THE WITNESS:  You know, I'm not
23  an expert on that, the studies, but
24  Dr. Hopkins is and he can best explain that
25  to you.

Page 144

1  BY MR. C. PLACITELLA:
2     Q.  Ma'am, you said there were no
3  studies, no evidence, but, in fact, we now
4  know based on Dr. Hopkins' sworn testimony
5  that there, in fact, are studies and that
6  they were testified to by the corporate
7  representative for Johnson & Johnson before a
8  jury, correct?
9     A.  Yes, we've just taken his testimony
10  out of context.  So I don't know what came
11  before, after.  And I don't want to comment
12  on his testimony.
13     Q.  You know now for the first time,
14  ma'am, that Johnson & Johnson has stated
15  under oath in a court of law, that despite
16  what you said and what you testified to on
17  behalf of Johnson & Johnson here that there
18  are, in fact, studies demonstrating that
19  there was asbestos in the talc that you say
20  was asbestos-free, correct?
21       MR. BERNARDO:  Object to the
22  form of the question.
23       THE WITNESS:  I don't want to
24  take Dr. Hopkins' testimony out of context.
25  I don't know what came before or after.  And

Page 145

1  that would be unfair to all involved.  And I
2  don't want to -- I -- I can't comment on what
3  he said.
4  BY MR. C. PLACITELLA:
5     Q.  Well, isn't it unfair to all
6  involved, ma'am, the fact that you never had
7  a conversation with Dr. Hopkins about whether
8  he knew that there were studies and he
9  testified that there were studies; isn't that
10  unfair?
11       MR. BERNARDO:  Object to the
12  form of the question.
13       THE WITNESS:  Dr. Hopkins and I
14  discussed, went through different research,
15  experiments, studies that were done.  I
16  wanted to make sure that he was familiar with
17  them, because he's the best person to talk
18  about them, I'm not.
19  BY MR. C. PLACITELLA:
20     Q.  So it was unfair to you, wasn't it,
21  if Dr. Hopkins testified under oath that
22  there were, in fact, studies showing there
23  was asbestos in the Johnson & Johnson product
24  and that was never relayed to you, correct?
25       That was unfair to you?

37 (Pages 142 to 145)



Page 146

```
 1              MR. BERNARDO:  Object to the
 2   form of the question.
 3              THE WITNESS:  No, it was not
 4   unfair.
 5   BY MR. C. PLACITELLA:
 6       Q.   Okay.  You thought that was okay?
 7       A.   Again, I don't want to comment on
 8   his testimony, because I don't know what came
 9   before or after.
10       Q.   Okay.  Now --
11              MR. C. PLACITELLA:  Do you have
12   the chart?  The chart, mm-hmm.
13              (Exhibit J&J-488, Chart, is
14   marked for identification.)
15   BY MR. C. PLACITELLA:
16       Q.   I'm going to show you what has been
17   marked Hopkin -- J&J-488.
18              You've seen this before?
19              MR. C. PLACITELLA:  You can --
20   I only have two, they're big.
21              We'll go to Elmo, please.
22   BY MR. C. PLACITELLA:
23       Q.   You have in front of you
24   Exhibit 488, which was marked as Exhibit 28
25   in Dr. Hopkins' deposition.  Did you ever --
```

Page 147

```
 1   and you saw this the last time we were here,
 2   correct?
 3       A.   I believe so.
 4       Q.   And after testifying -- and I think
 5   the last time we were here you said that you
 6   never had seen this chart before you gave
 7   your deposition, correct?
 8       A.   That's correct.
 9       Q.   Okay.  And you actually knew
10   nothing about this chart, correct?
11       A.   I had not seen it before.
12       Q.   And you know now that this chart
13   was prepared at the deposition of Dr. Hopkins
14   live at the deposition, you know that,
15   correct?
16       A.   No, I don't know what it was used
17   for.
18       Q.   Have you -- when you spoke to
19   Dr. Hopkins and you were preparing for this
20   deposition, did you review this chart with
21   him?
22       A.   No, I did not.
23       Q.   All right.  Did you review the
24   chart at all?
25       A.   No, I did not.
```

Page 148

```
 1       Q.   So even though you were asked about
 2   this chart in the last deposition, you took
 3   no steps to -- in preparing for today's
 4   deposition concerning the -- the veracity of
 5   historical discovery responses to look at
 6   this chart or any of the evidence mentioned
 7   in this chart, correct?
 8              MR. BERNARDO:  Object, object
 9   to the form of the question.
10              THE WITNESS:  I did not look at
11   this specific chart.  I looked at different
12   evidence, but I did not look at this specific
13   chart.
14   BY MR. C. PLACITELLA:
15       Q.   Okay.  And, for example, this chart
16   has the -- it's in chronological order, it
17   has the date; do you see that?
18       A.   I see that, yes.
19       Q.   The entity that did the test,
20   right, the author, correct?
21       A.   I see that, yes.
22       Q.   The test method, what was tested,
23   what the test actually revealed; do you see
24   that?
25       A.   I see that.
```

Page 149

```
 1       Q.   Okay.  Any comments that
 2   Dr. Hopkins had concerning the chart?
 3       A.   I see Dr. Hopkins' --
 4       Q.   Do you see that?
 5       A.   -- comments.
 6       Q.   Okay.
 7              (Reporter clarification.)
 8              THE WITNESS:  I see
 9   Dr. Hopkins' comments.
10   BY MR. C. PLACITELLA:
11       Q.   All right.  But in testifying under
12   oath that there was no evidence whatsoever of
13   asbestos in any Johnson & Johnson talc
14   product, you never discussed the chart that
15   he created with him concerning that evidence,
16   correct?
17              MR. BERNARDO:  Object to the
18   form of the question.
19              THE WITNESS:  As I said, I did
20   not discuss the specific chart.
21   BY MR. C. PLACITELLA:
22       Q.   And this was not a chart that you
23   were shown in preparation for your deposition
24   today, correct?
25              MR. BERNARDO:  Object to the
```



Page 150

```
 1    form of the question.
 2         THE WITNESS:  No, it was not.
 3         MR. C. PLACITELLA:  Black book.
 4    BY MR. C. PLACITELLA:
 5    Q.   This was marked at your last
 6    deposition as Musco-2.  It's heavy, so I only
 7    brought one copy.
 8         Do you, do you -- do you want to
 9    flip through it?
10    A.   I see what it is.
11    Q.   Do you recall this book?
12    A.   I know that there was a large book.
13    Yes.
14    Q.   And what's in that book?
15    A.   It looks like an awful lot of
16    scientific information.
17    Q.   And did you discuss with anybody
18    from your -- between your last deposition and
19    this deposition the information that's in
20    that book?
21    A.   I don't know exactly what's in this
22    book.  I certainly didn't go through this.
23    But, yes, we -- we discussed specific
24    information.  I had conversations with
25    Dr. Hopkins about specific studies.  And I
```

Page 151

```
 1    would assume that they're in this book.
 2    Q.   Okay.  And prior to your deposition
 3    last time, although you were the person that
 4    swore under oath concerning Johnson &
 5    Johnson's historical discovery responses, you
 6    had never seen a single one of those
 7    documents marked in Musco-2, correct?
 8    A.   That's correct.  My role wasn't to
 9    look at the specific studies.
10    Q.   Right.
11    A.   But to ensure that the correct
12    people were response in -- responding.
13    Q.   When you swore under oath that
14    there was no evidence whatsoever, no one ever
15    showed you any of the studies or documents
16    that are in Musco-2, correct?
17    A.   I don't know everything that's in
18    here, but I did not look at any specific
19    studies in response to the depositions.
20         MR. C. PLACITELLA:  Let's --
21    give me 450.
22         MR. BERNARDO:  When you're at a
23    stopping place for lunch, we've been going
24    about an hour.
25         MR. C. PLACITELLA:  All right.
```

Page 152

```
 1    BY MR. C. PLACITELLA:
 2    Q.   I want to show you what has been
 3    marked as Exhibit 450.
 4         MR. BERNARDO:  I'm sorry, what
 5    was the exhibit number, please?
 6         MR. C. PLACITELLA:  450.
 7         (Exhibit J&J-450, Letter, is
 8    marked for identification.)
 9    BY MR. C. PLACITELLA:
10    Q.   450 is a letter from George Lee to
11    Roger Miller concerning the Joly case.  Do
12    you see that?
13    A.   I see it says that, yes.
14    Q.   And it's dated December 3, 1982,
15    correct?
16    A.   Correct.
17    Q.   This is not a document that was
18    provided to you by counsel, correct?
19         MR. BERNARDO:  Object to the
20    form of the question.
21         THE WITNESS:  That's correct.
22    BY MR. C. PLACITELLA:
23    Q.   But you know about this case from
24    your own knowledge, right?
25    A.   No.  As I told you earlier, I
```

Page 153

```
 1    didn't remember Joly at all.
 2    Q.   Okay.  Bruce Semple, MD, he was the
 3    Medical Director?
 4    A.   Yes, he was.
 5    Q.   And you had dealings with him,
 6    correct?
 7    A.   Yes, I did.
 8    Q.   Okay.  And George Lee is who?
 9    A.   I believe he was one of our
10    research scientists.
11    Q.   Okay.  And Roger Miller was the
12    President of Windsor Minerals owned by
13    Johnson & Johnson, correct?
14    A.   That's my recollection, yes.
15    Q.   Okay.  And what the research
16    scientist is writing to Dr. Miller and asking
17    if he has any information concerning ongoing
18    studies; do you see that?
19    A.   That's what it says.
20    Q.   Did you in your research on
21    historical discovery responses come across
22    any of the ongoing studies that were
23    referenced here in this letter?
24    A.   I'm not familiar with what -- what
25    he's referencing here, so...
```



Page 154

```
1              MR. C. PLACITELLA:  Give me
2    448.
3              (Exhibit J&J-448, Memo, is
4    marked for identification.)
5              MR. C. PLACITELLA:  I want to
6    switch it, this is 448.
7    BY MR. C. PLACITELLA:
8         Q.  448 is a May 10, 1985 memo entitled
9    Ingestions and Inhalations - Johnson's Baby
10   Powder, January 1982 to January 1985.
11        Do you see that?
12        A.  Yes, I do.
13        Q.  And you are copied, correct?
14        A.  Yes, I am.
15        Q.  And the Medical Director for
16   Johnson & Johnson is copied, correct?
17        A.  Yes.
18        Q.  And who is Mr. McTernan?
19        A.  She is the --
20        Q.  Or she.
21        A.  -- Director of Regulatory.
22        Q.  So she's the Director of
23   Regulatory?
24        A.  That's correct.
25        Q.  And this references the Joly case,
```

Page 155

```
1    doesn't it?
2         A.  The Joly case is indicated here,
3    yes.
4         Q.  All right.  And the Complaint
5    number for the Joly case is 02043; do you see
6    that?
7         A.  That's what it says, yes.
8         Q.  Okay.  Now, you know, do you not,
9    that Johnson & Johnson actually acknowledged
10   internally that Joly who filed a lawsuit
11   against Johnson & Johnson was injured from
12   Johnson & Johnson's talc; you know that,
13   correct?
14             MR. BERNARDO:  Object to the
15   form of the question.
16             THE WITNESS:  I don't know
17   that, no.
18             MR. C. PLACITELLA:  Okay.  Can
19   you give me 452, please?
20             (Exhibit J&J-452, Memo, is
21   marked for identification.)
22   BY MR. C. PLACITELLA:
23        Q.  452 is a June 17, 1985 memo from
24   Patricia Mills, who said was in charge of
25   Regulatory?
```

Page 156

```
1         A.  No.
2         Q.  Who she was what -- who?
3    [Verbatim]
4         A.  She was a nurse reporting to me at
5    the time in Medical Services.
6         Q.  Okay.  And copied on this
7    memorandum is you --
8         A.  Correct.
9         Q.  -- correct?
10        And the memo went to the Medical
11   Director at Johnson & Johnson, correct?
12        A.  Bruce Semple, that's correct.
13        Q.  All right.
14             MR. BERNARDO:  I'm not going to
15   interrupt each time, because I just want a
16   running objection to the use of these
17   documents.  My position, it's outside the
18   scope of the notice --
19             MR. C. PLACITELLA:  Oh, yeah,
20   it's way outside the scope.
21             MR. BERNARDO:  She can --
22             MR. C. PLACITELLA:  It's
23   directly related.
24             MR. BERNARDO:  Let me finish my
25   objection.
```

Page 157

```
1             And she can answer in her
2    personal capacity.  We're not tendering her
3    to talk about specific lawsuits --
4             MR. C. PLACITELLA:  Well, we'll
5    let the judge.
6             MR. BERNARDO:  I think that's
7    what happens with objections.
8             MR. C. PLACITELLA:  Okay, okay.
9    BY MR. C. PLACITELLA:
10        Q.  And the title is Ingestions and
11   Inhalations Requiring Medical Attention,
12   Johnson's Baby Powder; do you see that?
13        A.  That's what it says.
14        Q.  And under Complaint 2 -- 02043,
15   there's one for inhalation; do you see that?
16        A.  That's correct.
17        Q.  And that's Miss Joly, correct?
18        A.  That's what it comes back to, yes,
19   seems to be.
20        Q.  All right.  That's the person who
21   filed a lawsuit against you, correct?
22        A.  I assume it's the same person.
23        Q.  Right.
24             And it says, History:  Consumer
25   used Johnson's Baby Powder for years since
```



Page 158

1  unable to use deodorant due to allergies.
2      Do you see that?
3      A.  That's what it says.
4      Q.  And what it says is, Findings:
5  Scarring of lung tissue was noted on X-ray.
6  Pulmonary function studies revealed very
7  severe obstruction of the small airways.
8  Consumer did not respond to bronchodilators.
9  Talc crystals were identified in the
10  consumer's sputum.
11      Correct?
12      A.  That's what --
13      MR. BERNARDO:  Object to the
14  form of the question.
15      THE WITNESS:  That's what it
16  says.
17  BY MR. C. PLACITELLA:
18      Q.  Correct?
19      And -- and under Outcome, this is
20  the memo to the Medical Director of Johnson &
21  Johnson and copied to you, under Outcome it
22  talks about lung damage due to long-term
23  inhalation of talc from Johnson's Baby
24  Powder, correct?
25      A.  That's what it says.

Page 159

1      Q.  Okay.  And nowhere in any memo did
2  Johnson & Johnson dispute that, correct?
3      MR. BERNARDO:  Object to the
4  form of the question.  Again, outside the
5  scope of the notice.
6      THE WITNESS:  I don't know if
7  that was the purpose of this memo.
8  BY MR. C. PLACITELLA:
9      Q.  You have no recollection of this
10  information being provided by the person who
11  worked for you to the Medical Director of
12  Johnson & Johnson ever being disputed,
13  correct?
14      MR. BERNARDO:  Object to the
15  form of the question.
16      THE WITNESS:  I -- until you
17  put this in front of me, I didn't remember
18  anything about Joly.  It was, what?
19  Thirty-three years ago.
20  BY MR. C. PLACITELLA:
21      Q.  Right.
22      And you didn't -- and you were not
23  provided any of the information from the Joly
24  case in order to -- to testify here today,
25  correct?

Page 160

1      MR. BERNARDO:  Object to the
2  form of the -- of the question.
3      THE WITNESS:  That's correct.
4  BY MR. C. PLACITELLA:
5      Q.  Okay.  Clearly, your lawyers knew
6  about the Joly case, correct?
7      MR. BERNARDO:  Object to the
8  form of the question.
9      THE WITNESS:  I do not know.
10      MR. C. PLACITELLA:  Well, can
11  you give me the privilege log, please.
12      Can we go to the Elmo, please?
13  BY MR. C. PLACITELLA:
14      Q.  So I'm going to go back to the log.
15  See where it says here, 1/16/1982?
16      A.  Yes.
17      Q.  Okay.  And there's information from
18  George Lee.  He wasn't a lawyer, by the way,
19  right?
20      A.  No.
21      Q.  Okay.  And it went to John Beidler.
22  Who's that?
23      A.  I believe he's an attorney.
24      Q.  And it was also copied to the
25  Medical Director, correct?

Page 161

1      A.  That's what it says.
2      Q.  All right.  And it talks about
3  memos concerning the Joly case, correct?
4      A.  That's what it says.
5      Q.  Okay.  In fact, there are many
6  memos related to the Joly case, correct?
7      A.  The name is mentioned a few times,
8  yes.
9      Q.  So, clearly, if your lawyers put
10  this on a log of information they weren't
11  going to turn over, they had knowledge of the
12  Joly case, correct?
13      MR. BERNARDO:  Object to the
14  form of the question.
15      THE WITNESS:  I don't know what
16  the purpose of this log is.
17  BY MR. C. PLACITELLA:
18      Q.  Well, you're the person testifying
19  on historical discovery responses and you
20  have no idea what a privilege log purpose is?
21      MR. BERNARDO:  Object to the
22  form of the question.
23      THE WITNESS:  I'm not a lawyer.
24  BY MR. C. PLACITELLA:
25      Q.  You don't know that certain



Page 162

```
1    information is being withheld in this case
2    under claim of privilege related to lawsuits
3    against Johnson & Johnson?
4            MR. BERNARDO:  Object to the
5    form of the question, beyond the scope of the
6    notice.
7            She can answer in her
8    individual capacity.
9    BY MR. C. PLACITELLA:
10   Q.  You're asking -- I'm asking you on
11   behalf of Johnson & Johnson.
12           MR. BERNARDO:  And I --
13   BY MR. C. PLACITELLA:
14   Q.  Johnson & Johnson does not know
15   what a privilege log is?
16           MR. BERNARDO:  This witness --
17   BY MR. C. PLACITELLA:
18   Q.  In responding to historical
19   discovery responses, Johnson & Johnson does
20   not know when responding to discovery whether
21   it is withholding information or not; is that
22   what you're saying?
23           MR. BERNARDO:  Object to the
24   form of the question.  This witness is not
25   being tendered to explain or provide
```

Page 163

```
1    information about privilege logs provided in
2    this litigation, that is not within the scope
3    of the notice.  She can answer in her
4    individual capacity, but she's not here as a
5    corporate representative of Johnson & Johnson
6    with respect to this question.
7            MR. C. PLACITELLA:  With all
8    due respect, she's here on the historical
9    discovery responses provided by Johnson &
10   Johnson in talc litigation.
11           So I'm going to ask the
12   question again.
13   BY MR. C. PLACITELLA:
14   Q.  Johnson -- you, Johnson & Johnson
15   are saying here under oath that you have no
16   idea that information was being withheld
17   under claim of privilege in the Joly case,
18   correct?
19           MR. BERNARDO:  Object to the
20   form of the question.  Same objection as
21   before.
22           You can answer in your
23   individual capacity, if you know.
24           THE WITNESS:  I don't know.
25   BY MR. C. PLACITELLA:
```

Page 164

```
1    Q.  When you were being asked to
2    prepare for this deposition, even though
3    there was information that was withheld, so
4    Johnson & Johnson's lawyers obviously know
5    that the case existed, they didn't supply you
6    with a single piece of paper related to the
7    Joly case, correct?
8            MR. BERNARDO:  Object to the
9    form of the question.
10           THE WITNESS:  I did not review
11   the Joly case, no.
12   BY MR. C. PLACITELLA:
13   Q.  Even though the Johnson & Johnson
14   Medical Director got a memo indicating that
15   Miss Joly was injured from Johnson & Johnson
16   Baby Powder --
17           MR. BERNARDO:  Object --
18   BY MR. C. PLACITELLA:
19   Q.  -- correct?
20           MR. BERNARDO:  Object to the
21   form of the question, same objection.
22           THE WITNESS:  This is a memo
23   informing him of the case.
24   BY MR. C. PLACITELLA:
25   Q.  Right.
```

Page 165

```
1            And you were copied?
2    A.  Yes, I was.
3    Q.  And even though you were copied and
4    it involved the Medical Director at Johnson &
5    Johnson, in preparing for today's deposition
6    no information was provided for you about
7    this case, which, by the way, predates any
8    case that's on your list, correct?
9            MR. BERNARDO:  Object to the
10   form of the question.
11           THE WITNESS:  There seemed to
12   be several questions there.  Could you ask
13   that again?
14   BY MR. C. PLACITELLA:
15   Q.  Well, let me ask you this, this
16   case was pending at least in 1982, correct?
17   A.  1982 is listed there.
18   Q.  Right.
19           The first case on your list is from
20   what date?
21           1983, correct?
22   A.  That's what I have, yes.
23   Q.  All right.  So Johnson & Johnson's
24   attorneys had information in their possession
25   concerning a lawsuit filed by someone that
```



Page 166

1   Johnson & Johnson acknowledged internally was
2   hurt by baby powder and never showed you that
3   information in preparation for today's
4   deposition --
5            MR. BERNARDO:  Object to the
6   form --
7   BY MR. C. PLACITELLA:
8       Q.   -- correct?
9            MR. BERNARDO:  -- of the
10  question.
11           THE WITNESS:  My understanding
12  is that this is not within the scope, and I
13  don't have the answer.
14           MR. C. PLACITELLA:  Okay.  We
15  can take a break now.
16           MR. BERNARDO:  Before we go on
17  break, with all due respect, I just want to
18  make an objection on the record, for the
19  record.
20           Mr. Placitella, you and I had
21  numerous conversations about this deposition.
22  And, in fact, we filed a motion for
23  protective order with respect to this
24  deposition.  We withdrew the motion with the
25  understanding that this deposition would

Page 167

1   focus on discovery responses of the Johnson &
2   Johnson Defendants.
3            The company made significant
4   efforts to try and identify what could
5   reasonably be identified.  You and I spoke
6   about exactly what we did and what we didn't
7   do for purposes of this deposition.
8            We also spoke about the fact
9   that we would try and prepare this witness.
10  And we wanted copies of responses that would
11  be the subject.
12           We in good faith, I, in
13  particular, provided you with a letter that
14  specified what we did identify pursuant to
15  those responses.
16           You, in response provided us
17  some documents that the witness looked at the
18  other day.
19           We did not discuss any of these
20  types of questions.  This witness is not
21  prepared to address them, as you can see,
22  because this was not at all what our
23  understanding of what this deposition would
24  be.
25           I note that we have been now

Page 168

1   going for several hours and you've not yet
2   shown the witness a single discovery response
3   regarding the asbestos content of talc.
4            I know you have your position
5   and you're welcome to set it on the record,
6   but because these depositions end up in other
7   places, I just wanted to clarify what our
8   position is.
9            MR. C. PLACITELLA:  First of
10  all, your statement is incomplete.
11           What I said was that I would
12  provide you with any documents that I found
13  outside of what you had already produced
14  related to litigation, which I did.  So if I
15  did an independent examination and found it
16  in some court file, I gave it to you.
17           I also indicated and we had an
18  agreement that any documents that were
19  produced by Johnson & Johnson were fair game
20  for this witness.  And any documents that
21  were used in any trials or depositions of
22  Johnson & Johnson representatives were fair
23  game.
24           There is nothing unfair.  This
25  is a -- information on what did Johnson &

Page 169

1   Johnson provide in terms of historical
2   discovery responses.  And it is highly
3   relevant, highly relevant that there were
4   numerous cases that involved Johnson Baby
5   Powder and Johnson's talc powder where no
6   information is known by Johnson & Johnson
7   according to this witness.  She is Johnson &
8   Johnson.  She had the responsibility.  She is
9   the one who said she ordered the searches.
10  And, clearly, there was information available
11  in this case, directly related, because it's
12  right on their privilege log to Johnson &
13  Johnson cases that were never shown to her
14  and that were produced.
15           Moreover, it is troubling that
16  there are documents related to actual cases
17  involving Johnson & Johnson Baby Powder that
18  this witness was aware of and not prepared to
19  testify to.
20           So that's the completion of the
21  statement.
22           MR. BERNARDO:  Actually, I
23  think it isn't, Mr. Placitella.  And we could
24  go on, and we won't for some time.  But I
25  will just say that I disagree with what

43 (Pages 166 to 169)



Page 170

1  you're characterizing, what we discussed,
2  because we did have a specific discussion
3  about what the purpose of this deposition
4  was.  But if we need to, we'll just let the
5  judge address that.  I -- suffice it to say
6  that I disagree with what you're saying.
7          MR. C. PLACITELLA:  Well, let's
8  do that.
9          Okay.  How long do you need for
10  lunch?
11          THE VIDEOTAPE OPERATOR:  The
12  time is 12:53 p.m.  Off the record.
13          (Luncheon recess.)
14          THE VIDEOTAPE OPERATOR:  The
15  time is now 1:51 p.m.  We are on the record.
16          MR. C. PLACITELLA:  Okay.  Can
17  you give me 453?
18          (Exhibit J&J-453, Document
19  entitled George Lee's Talc Files, is marked
20  for identification.)
21  BY MR. C. PLACITELLA:
22      Q.  453 is a document entitled George
23  Lee's Talc Files, Transferred to CIS
24  July 1988.
25          And George Lee I think you told me

Page 171

1  was what?
2      A.  My recollection is he worked in
3  R&D.
4      Q.  Okay.  And what's CIS?
5      A.  Don't know.
6      Q.  And according to this document, as
7  of July 1988, George Lee had a file on the
8  Joly case, correct?
9      A.  I have never seen this document
10  before.  So all I see that it says Joly talc
11  suit.
12      Q.  Right.
13      A.  I don't know what he had or didn't
14  have.
15      Q.  So where's that information?
16          MR. BERNARDO:  Object to the
17  form of the question.
18          THE WITNESS:  I do not know.
19  BY MR. C. PLACITELLA:
20      Q.  Was that information from the Joly
21  talc suit ever made available to you when you
22  were certifying interrogatory answers on
23  behalf of Johnson & Johnson?
24      A.  If there was information available,
25  I would have reviewed it.  I don't know what

Page 172

1  information was or was not --
2      Q.  I thought you told me you never --
3      A.  -- involved in this.
4      Q.  I thought you told me you never
5  reviewed the information?
6      A.  I didn't.
7      Q.  So --
8          (Reporter clarification.)
9          THE WITNESS:  Didn't, did not.
10  BY MR. C. PLACITELLA:
11      Q.  Okay.  So although there was a Joly
12  talc suit file in 1988, Johnson & Johnson has
13  no idea where it is --
14          MR. BERNARDO:  Object --
15  BY MR. C. PLACITELLA:
16      Q.  -- correct?
17          MR. BERNARDO:  Object to the
18  form of the question.
19          THE WITNESS:  I do not know
20  where it is, no.
21  BY MR. C. PLACITELLA:
22      Q.  Now, one of the cases that you
23  certified interrogatory answers in was the
24  Krushinski case, correct?
25      A.  That's correct.

Page 173

1      Q.  Okay.  And...
2          MR. C. PLACITELLA:  Give me
3  277.
4          (Exhibit J&J-277, Answers to
5  Plaintiffs' Supplemental Interrogatories, is
6  marked for identification.)
7          MR. C. PLACITELLA:  By the way,
8  can you go to the Elmo for a second?
9  BY MR. C. PLACITELLA:
10      Q.  So in responding to -- into
11  discovery in the course of litigation, did
12  Johnson & Johnson see a difference in saying
13  there is no evidence versus there is
14  evidence, but we, Johnson & Johnson, don't
15  believe it's reliable; do you see that as
16  different?
17          MR. BERNARDO:  Object to the
18  form of the question.
19          THE WITNESS:  It's hard for me
20  to answer, taken out of context, but, yes,
21  they're different sentences.
22          MR. C. PLACITELLA:  Can we mark
23  this next, please?
24          (Exhibit P-4, Handwritten
25  document, is marked for identification.)



Page 174

1          MR. C. PLACITELLA: 277,
2     please.
3     BY MR. C. PLACITELLA:
4          Q.  Do you recognize 277 as a set of
5     interrogatories that you certified as true
6     and accurate under oath in the Krushinski
7     case?
8          A.  Yes, this appears to be that.
9          Q.  And I'm going to direct you to
10    interrogatory number 19, which asks if you
11    were basically ever sued before in a
12    Johnson's Baby Powder case; do you see that?
13         A.  I'd have to read it --
14         Q.  Go ahead.
15         A.  -- to see exactly.
16         Q.  Go ahead.
17         A.  (At which time the Witness reviews
18    the document.)
19         Okay.
20         Q.  Do you see that?
21         A.  Yes, I do.
22         Q.  And in response to whether you were
23    sued before in a Johnson's Baby Powder case,
24    you list the Selby case and the Gambino case,
25    correct?

Page 175

1          MR. BERNARDO:  Object to the --
2     object to the form of the question.
3          THE WITNESS:  No, I didn't say
4     that's the only time we were sued.  I said
5     that was what I had interrogatories.
6     BY MR. C. PLACITELLA:
7          Q.  Well, it says, Has Johnson &
8     Johnson ever received notice of any claim,
9     correct?
10         A.  Yes.
11         Q.  And the only two cases that you
12    listed were Selby and Gambino, correct?
13         A.  No, I have all these cases here.
14         Q.  No, no.
15         A.  I --
16         Q.  Ma'am, I'm asking you --
17         A.  Oh.
18         Q.  -- when you certified under oath,
19    under penalty of perjury whether Johnson &
20    Johnson was ever sued in a baby powder case,
21    you certified under oath that the only two
22    cases were the Selby case and the Gambino
23    case, correct?
24         MR. BERNARDO:  Object, object
25    to the form of the question.  It's beyond the

Page 176

1     scope of the notice, insofar as it's not a
2     question that has anything to do with the
3     asbestos content of talc.
4          But go ahead and answer if
5     you can.
6          MR. C. PLACITELLA:  Well, we'll
7     get there.
8          MR. BERNARDO:  I'm sure you
9     will.
10    BY MR. C. PLACITELLA:
11         Q.  Go ahead.
12         A.  Those two cases are listed in the
13    response, yes.
14         Q.  Okay.  You never mentioned the Joly
15    case, correct?
16         A.  There is no mention of it here, no.
17         Q.  Why not?
18         MR. BERNARDO:  Same objection.
19         THE WITNESS:  I think because
20    it was a different kind of case.
21    BY MR. C. PLACITELLA:
22         Q.  Well, it was a pulmonary
23    fibrosis --
24         A.  That's not what they were
25    asking for.

Page 177

1          Q.  -- case, wasn't it?
2          A.  I think it was talcosis, I'm not
3     sure.
4          Q.  Well, it asks for anything on
5     talcosis, doesn't it?
6          If they developed talcosis or
7     fibrosis, right?
8          That's what was asked of you.
9          A.  That's what it says, yes.
10         Q.  So why didn't you include the Joly
11    case?  You certainly knew about it, you
12    worked on it.
13         MR. BERNARDO:  Object to the
14    form of the question.
15         THE WITNESS:  There may not
16    have been any more information, I -- to
17    provide.
18    BY MR. C. PLACITELLA:
19         Q.  Ma'am, I just showed you documents
20    from the Johnson & Johnson's file, did I not?
21    Showing that Joly filed a lawsuit in 1982
22    before the Gambino case and that the
23    Johnson & Johnson Medical Director, as well
24    as yourself, knew about it?
25         MR. BERNARDO:  I object to the

45 (Pages 174 to 177)



Page 178

1    form of the question.
2    BY MR. C. PLACITELLA:
3        Q.   Right?
4            MR. BERNARDO:  Beyond the scope
5    of the notice.
6            THE WITNESS:  Our -- my
7    understanding is that the Joly case was not
8    within the scope of the notice.
9    BY MR. C. PLACITELLA:
10       Q.   Ma'am, why didn't you answer
11   correctly under oath interrogatory 19 in the
12   Krushinski case and indicate that you, in
13   fact, knew about the Joly case?
14           MR. BERNARDO:  Object to --
15   BY MR. C. PLACITELLA:
16       Q.   Why not?
17           MR. BERNARDO:  Object to the
18   form of the question, beyond the scope of the
19   notice.
20           THE WITNESS:  Again, my
21   understanding is it's not within the scope of
22   the notice.
23   BY MR. C. PLACITELLA:
24       Q.   Scope of what notice?
25       A.   The notice that you presented to

Page 179

1    have me here today and to speak about.
2        Q.   Ma'am, I'm asking you, you swore
3    under oath, under penalty of perjury that
4    these were the only two cases.  And I'm
5    asking you why you didn't mention the Joly
6    case?
7            MR. BERNARDO:  Object to the
8    form of the question.
9            THE WITNESS:  Again, it's not
10   within the scope.
11   BY MR. C. PLACITELLA:
12       Q.   So you didn't answer the
13   information under oath, because it's not in
14   the scope of the notice here?
15       A.   I -- I don't know why it was not
16   mentioned specifically in here.  My
17   understanding was we were not to talk --
18   going to be talking about these other cases,
19   Joly that you keep talking about.  I don't
20   know why it was not specifically mentioned
21   here.
22       Q.   Well, it certainly should have
23   been, right?
24           MR. BERNARDO:  Object to the
25   form of the question.

Page 180

1    BY MR. C. PLACITELLA:
2        Q.   You swore under oath that you knew
3    about it.
4            MR. BERNARDO:  Object to the
5    form of the question.
6            THE WITNESS:  I can't say
7    whether it should have been or not.
8    BY MR. C. PLACITELLA:
9        Q.   I mean, your Medical Director
10   actually had a memo to him saying that, what?
11   That the person had fibrosis?
12       Do we have it?
13       Here, let's go back and look at it.
14       Scarring of the lung tissue was
15   noted on X-ray.  Consumer did not respond to
16   bronchodilators.
17       You certainly knew about it,
18   correct?
19           MR. BERNARDO:  Object to the
20   form of the question.
21           THE WITNESS:  My name is on the
22   memo, yes.
23           MR. C. PLACITELLA:  And by the
24   way, can you give me that other document
25   while we're here.  No, the one on the ad.

Page 181

1            (Exhibit P-5, Ad, is marked for
2    identification.)
3    BY MR. C. PLACITELLA:
4        Q.   So I read this, I read this ad.  I
5    think it was in the New York Times and you,
6    Johnson & Johnson states, that if you had any
7    reason to believe talc was unsafe, it would
8    never have been on your shelves, correct?
9        A.   That's correct.
10       Q.   Okay.  So, but the Medical Director
11   had notice as far back as 1985 that someone
12   using your baby powder had scarring of the
13   lung that was evident on X-ray, very severe
14   obstruction of small airways, did not respond
15   to bronchodilators and actually found your
16   talc in the consumer's sputum, but you never
17   took it off the market, right?
18           MR. BERNARDO:  Object to the
19   form of the question.
20           THE WITNESS:  It was not taken
21   off market, no.
22   BY MR. C. PLACITELLA:
23       Q.   Now, back to the Krushinski case,
24   if you can go to interrogatory number 17.  In
25   interrogatory number 17 it says, Describe in

46  (Pages 178 to 181)



Page 182

1  detail all processes, procedures and testing
2  performed upon the talc used in the
3  manufacture of Johnson's Baby Powder to
4  reduce or eliminate the existence of
5  asbestos, tremolite or other contaminants in
6  Johnson's Baby Powder.
7        Correct?
8     A.  That's what it says, yes.
9     Q.  And you verified under oath that to
10  the best of defendant's knowledge talc used
11  in the manufacture of Johnson & Johnson's
12  Baby Powder never contained asbestos in any
13  form, or tremolite.  Defendant's sources of
14  talc were selected for their lack of
15  contaminants and further, testing was
16  performed over a significant number of years
17  by outside laboratories which verified that
18  defendant's talc sources did not contain
19  asbestos or tremolite.
20        Do you see that?
21     A.  Yes, I do.
22     Q.  Okay.  Do you recall swearing to
23  that under oath?
24     A.  That's -- that's part of the
25  interrogatories, yes.

Page 183

1     Q.  Okay.
2        MR. C. PLACITELLA:  Now, can
3  you give me Dr. Hopkins' testimony?
4        (Exhibit P-3, Trial transcript
5  of John Hopkins, Ph.D., is marked for
6  identification.)
7  BY MR. C. PLACITELLA:
8     Q.  I'm going to give you the chance to
9  look at the testimony of Dr. Hopkins that's
10  given during the trial that's going on now,
11  specifically about your answer under oath.
12  I'll give you a chance to take a look at it.
13  And we've marked it P-3.  Give it to counsel
14  first.
15        MR. BERNARDO:  And I'm going to
16  object to your asking the witness to review
17  somebody's trial testimony in real time to
18  determine what was said, particularly since
19  it was a long trial with a lot of testimony.
20  And I don't think any of us know here whether
21  there was additional to this or otherwise.
22        But subject to that
23  objection...
24        Do you have another copy of
25  that, Chris?

Page 184

1        MR. C. PLACITELLA:  I have one
2  copy, but I put it up there so everyone can
3  see it.
4  BY MR. C. PLACITELLA:
5     Q.  When they're talking about -- here
6  and I'll put the copy up right next to it.
7        MR. BERNARDO:  Can you give her
8  an opportunity to read it?
9  BY MR. C. PLACITELLA:
10     Q.  Yeah, take your time, take your
11  time.
12     A.  (At which time the Witness reviews
13  the document.)
14     Q.  What do you want to look at it?
15     A.  Well, I was looking at the left
16  side --
17     Q.  No, I want you to look at the
18  transcript.
19     A.  -- and then it changed.
20        MR. BERNARDO:  He wants you to
21  look at the whole section that pertains to
22  that answer so you can answer.
23        THE WITNESS:  Yeah.
24        So where are we starting?
25  BY MR. C. PLACITELLA:

Page 185

1     Q.  Under 105, where it talks about
2  your interrogatory number 17.  "Those are the
3  answers," "they are," "turn back to number
4  17;" do you see it?
5     A.  Just a minute.  I want to get the
6  full context of it.  Okay.
7        (At which time the Witness reviews
8  the document.)
9        MR. BERNARDO:  Let me also
10  object.  I'm not sure how much the witness
11  has read.  And you certainly can ask her
12  questions.  But I recall that that testimony
13  was interrupted by a long encounter with
14  Judge Seligman and that it was subsequently
15  re-addressed again.
16        So, again, I'm raising my
17  objection to asking this witness here in real
18  time to read trial testimony that is fairly
19  lengthy and comment on it.
20        MR. C. PLACITELLA:  Well, the
21  problem is that she said she consulted
22  Dr. Hopkins and relied upon him.  So I want
23  to see whether Dr. Hopkins was telling her
24  the truth.
25        MR. BERNARDO:  Well...



1          MR. C. PLACITELLA:  Or whether
2    Johnson & Johnson ever conveyed to this
3    witness the truth --
4          MR. BERNARDO:  Well --
5          MR. C. PLACITELLA:  -- in -- in
6    getting this deposition prepared.
7          MR. BERNARDO:  The truth is in
8    the entirety of Mr. Hopkins' testimony.
9          MR. C. PLACITELLA:  Okay.
10         MR. BERNARDO:  Not the two or
11   three pages that the witness has just had the
12   opportunity to read.
13         And I don't think your
14   characterization of the testimony earlier
15   today is the truth, but...
16         MR. C. PLACITELLA:  Well, you
17   know what, you can ask her anything you want
18   on redirect.
19         MR. BERNARDO:  I'm just
20   commenting on the process here and the
21   procedure and I object to that.
22         MR. C. PLACITELLA:  Okay.
23   BY MR. C. PLACITELLA:
24      Q.  Did you not testify when you
25   started that the person you relied upon in

1    preparing for today's deposition, one of them
2    was Dr. Hopkins; did you say that?
3       A.  Yes.
4       Q.  Okay.  And he was also one of the
5    people that was relied upon in swearing to
6    interrogatories under oath, correct?
7       A.  He has -- he -- we may have
8    consulted with him with different times,
9    since I -- as I told you earlier, I don't
10   remember exactly.
11      Q.  Right.
12         And in your sworn answers to
13   interrogatories under oath, you say, To the
14   best of defendant's knowledge, in
15   interrogatory 7 [verbatim], talc used in the
16   manufacture of Johnson & Johnson's Baby
17   Powder never contained asbestos in any form,
18   or tremolite.
19         Correct?
20      A.  You just said number 7?
21      Q.  17.
22      A.  Oh, 17, okay.
23      Q.  Then it goes on to say, Defendant's
24   sources of talc were selected for their lack
25   of contaminants and were further tested --

1    and further, testing was performed over a
2    significant number of years by outside
3    laboratories who verified the defendant's
4    talc sources did not contain asbestos or
5    tremolite.
6          That's what you swore to, right?
7       A.  That's what it says, yes.
8       Q.  Okay.  And Dr. Hopkins under oath
9    before a jury just this past month is
10   directed to your response, your sworn
11   response, number 17; do you see that?
12      A.  It appears that way.  It's hard for
13   me to follow.
14      Q.  Well, if you look it says, it says,
15   As we read -- the first sentence here, I want
16   to read the second sentence of that answer.
17         And does not that track exactly
18   your answer, where it says, Defendant's
19   sources of talc were selected for their lack
20   of contaminants?
21         It's the exact duplicate, correct?
22      A.  It's the same sentence, yes.
23      Q.  Right.
24         And he says it goes to number 17,
25   which is your interrogatory answer, correct?

1          MR. BERNARDO:  Object to the
2    form of the question.
3          THE WITNESS:  Yes.
4    BY MR. C. PLACITELLA:
5       Q.  Okay.  And he then asks, And we
6    know, do we not -- we know, do we not,
7    Dr. Hopkins, that the Battelle
8    Laboratories -- do you know who they are?
9       A.  No, I don't.
10      Q.  No one ever told you about the
11   Battelle Laboratories?
12      A.  I -- I know the names, but I'm not
13   going to know which laboratory is which.
14      Q.  Okay.  At least for the Italian
15   talc, actually verified that the Italian talc
16   tanning source of talc [verbatim] -- for
17   Johnson & Johnson did contain tremolite,
18   correct?
19         And his answer was, the Battelle
20   reports from the '50s did mention trace
21   tremolite.
22         And the question is, And it did so
23   in hundreds of tests, correct?
24         And his answer was, Yes.  In
25   several hundred tests, they reported trace



Page 190

1    tremolite.
2        Correct?
3        A.  That's what it says, yes.
4        Q.  And despite that information in the
5    possession of Johnson & Johnson that several
6    hundred tests showed trace tremolite,
7    Johnson & Johnson asked you to certify under
8    oath that there was never any evidence
9    whatsoever of tremolite, correct?
10        MR. BERNARDO:  Object, object
11    to the form of the question, the
12    characterization of the response.
13        THE WITNESS:  I mean, I think
14    it's -- it's important to understand that,
15    just like you're taking the testimony out of
16    context, you're taking this particular
17    question out of context.  And as for
18    anything, I would like to look at the
19    Complaint it relates to, rather than just a
20    question on its own.  And that's what I did
21    in my preparation.
22    BY MR. C. PLACITELLA:
23        Q.  Ma'am, I'm going to ask you the
24    question again.
25        Do you believe me -- do you believe

Page 191

1    that an honest and forthright witness can
2    provide a simple answer to a simple question?
3        MR. BERNARDO:  Object to the
4    form of the question.  It's not an
5    appropriate question.
6        THE WITNESS:  To a simple
7    question, yes.
8    BY MR. C. PLACITELLA:
9        Q.  Okay.  And I am asking you, ma'am,
10    that when you swore under oath, under penalty
11    of perjury in the Krushinski case that there
12    was no evidence whatsoever of tremolite in
13    the Johnson products, Johnson & Johnson never
14    told you about the tests they had as
15    testified to by Dr. Hopkins that there were
16    hundreds of tests showing tremolite in the
17    talc used in Johnson -- you were never told
18    that, correct?
19        MR. BERNARDO:  Object to the
20    form of the question.
21        THE WITNESS:  I think it's
22    important to understand whether we're talking
23    about tremolite or tremolite asbestos, which
24    is what I wanted to make clear when I looked
25    at this Complaint.  And this Complaint

Page 192

1    specifically mentions the type of asbestos,
2    one included as tremolite asbestos.
3        I mean, it is confusing, I will
4    grant that.  But at the time this litigation
5    was talking about tremolite, we were always
6    talking about tremolite asbestos.
7    BY MR. C. PLACITELLA:
8        Q.  Ma'am, what's the difference
9    between tremolite and tremolite asbestos?
10        A.  Obviously, a big difference.
11        Q.  What's the difference, ma'am?
12        What's your understand -- what is
13    Johnson --
14        A.  One is asbestos and one is not.
15        Q.  Ma'am, what is the difference
16    between tremolite and tremolite asbestos?
17        What is Johnson & Johnson's
18    understanding of the difference, since you
19    said that?
20        A.  One is asbestos and one is not.
21        Q.  What makes it different?
22        MR. BERNARDO:  Object.
23    BY MR. C. PLACITELLA:
24        Q.  What differentiation, asbestos
25    tremolite versus non-asbestos tremolite?

Page 193

1        A.  I -- I can't go into the
2    configuration.  I know it's the different
3    shapes and all, but one is asbestos and one
4    is not.
5        Q.  Ma'am, tell me what exactly you
6    know when you swore under oath that there was
7    no evidence of tremolite, what you understood
8    the difference to be?
9        A.  My understanding is that this --
10        Q.  Ma'am, when you swore under oath --
11        MR. BERNARDO:  Object to the
12    form.  She --
13    BY MR. C. PLACITELLA:
14        Q.  -- when you answered the
15    interrogatories --
16        MR. BERNARDO:  Chris, you asked
17    her a question and she started answering and
18    you interrupted her.
19    BY MR. C. PLACITELLA:
20        Q.  When you answered under oath in the
21    Krushinski case, what was your understanding
22    at that time between the difference between
23    tremolite and tremolite asbestos?
24        MR. BERNARDO:  Object to the
25    form of the question.

49  (Pages 190 to 193)



Page 194

```
1           THE WITNESS:  As I just said to
2    you, the difference is one is asbestos and
3    one is not.  And at the time of this
4    interrogatory, which was specifically
5    answered in response to a Complaint, it was
6    dealing with tremolite asbestos.
7    BY MR. C. PLACITELLA:
8       Q.  This answer asks you the existence
9    of asbestos or tremolite, does it not; isn't
10   that the question?
11      A.  Yeah, and I admitted, it's
12   confusing.  It could have been worded better.
13      Q.  Could have been worded better?
14      A.  Yes.
15      Q.  How do you word mistruths better?
16           MR. BERNARDO:  Object to the
17   form of the question.
18           THE WITNESS:  It's not a
19   mistruth.
20   BY MR. C. PLACITELLA:
21      Q.  So you believe that when you said
22   there's never any -- there's no evidence and
23   it never contained any form of tremolite,
24   that was an accurate statement?
25           MR. BERNARDO:  Object to the
```

Page 195

```
1    form of the question and to the statement,
2    the characterization of the words on the
3    paper there.
4           THE WITNESS:  Yeah, that's not
5    what it said.  It says any form of asbestos
6    or tremolite.
7    BY MR. C. PLACITELLA:
8       Q.  Correct.
9           So when we're talking about
10   asbestos, they were saying any form, and then
11   they asked about tremolite in addition,
12   correct?
13           The question did not ask you
14   asbestos tremolite, it's asked about
15   tremolite, correct?
16      A.  My understanding and our
17   understanding at the time is we were talking
18   about tremolite asbestos, because I don't
19   know -- I -- would have been talking about
20   non-asbestos tremolite.  We were -- the
21   litigations would address tremolite asbestos,
22   that's why I went back to the Complaint to
23   make sure because it is confusing.
24      Q.  So your testimony today is that
25   when you provided the interrogatory answers
```

Page 196

```
1    in the Krushinski case, you understood the
2    difference between what you thought was
3    tremolite and tremolite asbestos in every
4    way, correct?
5           MR. BERNARDO:  Object to the
6    form of the question.
7           THE WITNESS:  I'm saying that I
8    understood the word tremolite to mean
9    tremolite asbestos, because it was a
10   litigation about that.
11   BY MR. C. PLACITELLA:
12      Q.  Okay.  And when you answered that,
13   you -- you -- did you know what fibrous
14   tremolite was?
15      A.  That's -- that's kind of beyond
16   what I understand.  I don't know.
17      Q.  Well, did you know that under
18   Johnson & Johnson's definition of fibrous
19   tremolite that that's asbestos, did you know
20   that?
21           MR. BERNARDO:  Object to the
22   form of the question.
23           THE WITNESS:  I -- that's not
24   my specialty, I don't know.
25   BY MR. C. PLACITELLA:
```

Page 197

```
1       Q.  The truth of the matter is you
2    don't know anything about tremolite, what's
3    fibrous, what's not fibrous, what's asbestos
4    and what's not asbestos, true?
5       A.  Well, I had conversations with
6    Dr. Hopkins specifically about this, because,
7    as I said, it's confusing.  And I believe he
8    addressed it if you saw his entire testimony.
9       Q.  Okay.  So you did read his entire
10   testimony?
11      A.  I did not read his entire -- I
12   read -- I read his testimony.  But do I
13   remember everything that's in there?  No.
14      Q.  Oh, so you were given Dr. Hopkins'
15   testimony in preparation for today's
16   deposition?
17      A.  Yes, as I told you earlier, I did
18   read some of his deposition and some of his
19   testimony.  Not all of it, nor do I remember
20   everything that was said.
21      Q.  Do you remember reading his
22   testimony in the Levitt case that I put in
23   front of you?
24      A.  No, I don't remember.
25           MR. BERNARDO:  Mr. Placitella,
```



Page 198

```
 1   for the record, we provided you with a box
 2   of -- which will clarify what she did and
 3   didn't read of the testimony that she read.
 4   BY MR. C. PLACITELLA:
 5      Q.   Okay.  So it's your testimony that
 6   when you said no evidence of tremolite, you
 7   meant asbestos tremolite; that's your
 8   testimony?
 9      A.   Yes.
10      Q.   Okay.  And at that point in time
11   you had no information whatsoever available
12   to Johnson & Johnson that any test done of
13   any Johnson & Johnson Baby Powder ever found
14   asbestos containing tremolite; is that
15   your -- is that your testimony?
16      A.   No.  My testimony is that there was
17   no tremolite asbestos.
18      Q.   Ma'am, when you signed under oath,
19   under penalty of perjury this answer, is it
20   your testimony that Johnson & Johnson had no
21   evidence whatsoever of any tests showing that
22   there was asbestos containing tremolite in
23   its baby powder or talc products?
24      A.   Yes, the position is that there is
25   no tremolite asbestos in the cosmetic talc of
```

Page 199

```
 1   Johnson's Baby Powder.
 2      Q.   And is it your position that when
 3   you signed this under oath, Johnson & Johnson
 4   had no evidence in its possession that there
 5   was fibrous tremolite in the Johnson's talc
 6   products?
 7           MR. BERNARDO:  Object to the
 8   form of the question.
 9           THE WITNESS:  As I said
10   earlier, I can't get into fibrous or not
11   fibrous.  I don't know what that means.
12   BY MR. C. PLACITELLA:
13      Q.   Well, in making this shouldn't you
14   know that when -- when it's referred to as
15   fibrous tremolite, Johnson & Johnson
16   considered that asbestos?
17           Shouldn't you know that?
18      A.   No.  Again, that's why we have
19   experts to be able to answer those things.
20      Q.   Okay.  Now, when I asked you
21   questions about this very question in our
22   last deposition, you never, ever mentioned,
23   did you, anything about a difference in your
24   perception between asbestos and non-asbestos
25   tremolite, correct?
```

Page 200

```
 1      A.   I don't remember exactly what I
 2   said.
 3      Q.   Do I need to show it to you?
 4      A.   If you would like to.
 5      Q.   Okay.  Well, we'll take a break and
 6   I'll show it to you.
 7           And it was after you met with the
 8   lawyers, now you came up with the explanation
 9   that there's a difference when you answered
10   the question between asbestos tremolite and
11   non-asbestos tremolite, correct?
12           MR. BERNARDO:  Object to the
13   form of the question.
14           THE WITNESS:  No, I -- I didn't
15   come up with this.  Actually, you asked me a
16   lot of different questions last time we met.
17   And there was some of those things that I
18   didn't have answers to.  So I don't like
19   being like that, and I wanted to clarify
20   things.  So I did ask to speak -- to see
21   different documents and that's why I had the
22   conversation, one of the reasons I had the
23   conversation with Dr. Hopkins.
24   BY MR. C. PLACITELLA:
25      Q.   Okay.  Well, we'll do some -- okay,
```

Page 201

```
 1   let's talk about -- we'll come back to that.
 2           By the way, so you looked -- you
 3   looked at the Krushinski discovery responses.
 4   What other cases did you actually look at the
 5   discovery responses?
 6      A.   Well, as indicated, we looked at
 7   Selby and Krushinski.
 8      Q.   That's -- those are the only two?
 9      A.   Those are the only two that they
10   had discovery responses available for.
11      Q.   So out of the thousands of cases
12   that Johnson & Johnson been involved in
13   since 1972, you only looked at two sets of
14   discovery responses in order to prepare for
15   today's deposition?
16           MR. BERNARDO:  Object to the --
17   BY MR. C. PLACITELLA:
18      Q.   Is that fair?
19           MR. BERNARDO:  Object to the
20   form of the question.
21           THE WITNESS:  I don't know
22   whether there were thousands, but it is our
23   understanding according to the notice that
24   you provided, and these were the discovery
25   responses that were available.
```



MAGNA
LEGAL SERVICES

Page 202

BY MR. C. PLACITELLA:
1
2    Q.  So, to your knowledge, from the
3  time Johnson & Johnson became involved in
4  baby powder litigation from 1972 until the
5  present -- up till the time you're preparing
6  for this deposition, there are only two sets
7  of discovery responses made available to you?
8         MR. BERNARDO:  Object to the
9  form of the question.
10  BY MR. C. PLACITELLA:
11    Q.  Is that right?
12    A.  There are only two that I looked
13  at, yes.
14    Q.  Okay.  Now --
15         MR. C. PLACITELLA:  Give me
16  294.
17         (Exhibit J&J-294, Deposition
18  transcript of Roger N. Miller, is marked for
19  identification.)
20         MR. BERNARDO:  What was the
21  number, Chris?
22         MR. C. PLACITELLA:  294.
23         MR. BERNARDO:  Thank you.
24  BY MR. C. PLACITELLA:
25    Q.  294 is the deposition of Roger

Page 203

1  Miller given in the Westfall case.
2    Q.  Do you see that?
3    A.  That's what it says, yes.
4    Q.  And Roger Miller was the President
5  of Windsor Minerals, right?
6    A.  I believe so, yes.
7    Q.  And did your lawyers ever share
8  this deposition with you?
9    A.  No, I did not see this.
10    Q.  Okay.  And if you look at the
11  second page, do you see that Johnson &
12  Johnson had actually had lawyers there at
13  this deposition for Windsor?
14    A.  I guess that's what that means.
15    Q.  Okay.  And when is the first time
16  that Johnson & Johnson was given notice of
17  the Westfall case?
18         MR. BERNARDO:  Object to the
19  form of the question, beyond the scope of the
20  notice.
21         You can answer in your
22  individual capacity, if you know.
23         THE WITNESS:  I don't know.
24         (Exhibit J&J-483, Memo, is
25  marked for identification.)

Page 204

BY MR. C. PLACITELLA:
1
2    Q.  483 is a memo from July 5, 1981 on
3  Johnson & Johnson stationery, entitled Talc
4  Suit, Westfall versus Metropolitan Talc.
5    Do you see that?
6    A.  That's what it says, yes.
7    Q.  And it says, Background:
8  Metropolitan Talc (our former source of
9  domestic ground Italian talc) is being sued
10  by survivors of Mr. Westfall.  His autopsy
11  report alleges his death was due to
12  mesothelioma.
13    Do you see that?
14    A.  That's correct, that's what it
15  says.
16    Q.  At some point in time, Johnson &
17  Johnson actually became a defendant in the
18  Westfall case, did it not?
19    A.  I don't know.
20    Q.  Okay.
21    A.  I do know that this involved
22  industrial talc, that's all I know.
23    Q.  It involved industrial talc out of
24  the Johnson mine, correct?
25    A.  Yes.

Page 205

1    Q.  Okay.  And in addition to the
2  Italian talc?
3         MR. BERNARDO:  Object to the
4  form of the question.  Again, beyond the
5  scope of the notice.
6         If you know in your individual
7  capacity.
8         THE WITNESS:  I don't know.
9  BY MR. C. PLACITELLA:
10    Q.  Well, it says "Italian talc" right
11  on the top, right?  It's on your letterhead.
12    A.  Is there a question?  I'm sorry.
13    Q.  Yeah.  It says Italian talc right
14  on the top, right?
15    A.  Background, it says our former
16  source of domestic ground Italian talc.
17    Q.  Right.
18         And you're aware, I assume, that
19  the -- there were scientists who testified
20  with Johnson & Johnson's lawyers present that
21  they found asbestos in the Johnson mine,
22  correct?  You knew that?
23         MR. BERNARDO:  Object to the
24  form of the question, beyond the scope of the
25  notice.  Not answering in her corporate



Page 206

1    capacity.
2        (Reporter clarification.)
3        MR. BERNARDO:  Sorry.
4    Objecting it's beyond the scope of the
5    notice, the witness is not responding as a
6    corporate representative on this issue.
7        MR. C. PLACITELLA:  Well,
8    that's -- that's your -- we'll see what the
9    judge says.  Okay?
10       MR. BERNARDO:  I'm just making
11   my objection and noting it.
12   BY MR. C. PLACITELLA:
13       Q.  You knew that, right?
14       A.  I don't know that.
15       Q.  So you never knew before you came
16   here today that Johnson & Johnson's lawyers
17   sat in a deposition where the scientists who
18   did the tests on the Johnson & Johnson mine
19   said they found asbestos in the mine; you
20   never knew that?
21       MR. BERNARDO:  Object to the
22   form of the question, same objection.
23       THE WITNESS:  I don't know.
24       MR. C. PLACITELLA:  Give me
25   172.

Page 207

1        (Exhibit J&J-172, Deposition
2    transcript of Glenn A. Hemstock, is marked
3    for identification.)
4    BY MR. C. PLACITELLA:
5        Q.  I'll show you what has been marked
6    J&J-172.  This is the deposition of Glenn
7    Hemstock taken in the Westfall case.
8        MR. BERNARDO:  And same
9    objection to asking the witness about
10   depositions.  It's beyond the scope of the
11   notice.  And she's not read the deposition.
12   BY MR. C. PLACITELLA:
13       Q.  And it's versus Windsor Minerals as
14   one of the defendants, correct?
15       A.  That's what it says.
16       Q.  Okay.  And if you go to the third
17   page, it actually indicates that Johnson &
18   Johnson's general counsel was at the
19   deposition, right?
20       MR. BERNARDO:  Object to the
21   form of the question.
22       THE WITNESS:  A name is listed
23   there, yes.
24   BY MR. C. PLACITELLA:
25       Q.  So he certainly knew and Johnson &

Page 208

1    Johnson certainly knew what information was
2    revealed in that deposition, correct?
3        A.  The lawyer's name is listed there,
4    yes.
5        Q.  Did you ever have any dealings with
6    John Beidler?
7        A.  I knew of him, yes.
8        Q.  Did he ever tell you that he
9    attended depositions where scientists
10   testified they found asbestos in the Vermont
11   mines once owned by Johnson & Johnson?
12       MR. BERNARDO:  Object to the
13   form of the question.
14       THE WITNESS:  No, he did not.
15       (Exhibit J&J-173, Continuation
16   deposition transcript of Glenn Hemstock, is
17   marked for identification.)
18   BY MR. C. PLACITELLA:
19       Q.  Okay.  Let me show you 173, which
20   is the continuation of Dr. Hemstock's
21   deposition.
22       I'll show you on the second page,
23   you'll see that Johnson & Johnson's lawyers
24   are there at the deposition again?
25       MR. BERNARDO:  Same objection

Page 209

1    with respect to all of these deposition
2    transcripts.
3        THE WITNESS:  I see them there,
4    yes.
5    BY MR. C. PLACITELLA:
6        Q.  And I flipped to page 17 of the
7    deposition.  You see where the scientist is
8    asked, "Now, you testified that your
9    department has tested both the processed talc
10   and the raw talc ore from the Emtal mine for
11   the presence of chrysotile asbestos; is that
12   correct?
13       "ANSWER:  Yes.
14       "Has your department in its
15   research found chrysotile asbestos in both
16   processed talc and raw ore from the Emtal
17   mine?
18       "ANSWER:  Yes."
19       Do you see that?
20       MR. BERNARDO:  Same objection.
21       THE WITNESS:  I see it says
22   that, yes.
23   BY MR. C. PLACITELLA:
24       Q.  That information was never relayed
25   to you as the person who was either

53 (Pages 206 to 209)


MAGNA
LEGAL SERVICES

Page 210

1   testifying here today or certified
2   interrogatory answers on behalf of Johnson &
3   Johnson, correct?
4       A.  I have not seen this before, no.
5       MR. C. PLACITELLA:  Can you
6   give me 436, please?
7       (Exhibit J&J-436, Deposition
8   transcript of Peter N. Gale, is marked for
9   identification.)
10  BY MR. C. PLACITELLA:
11      Q.  I'm going to show you the
12  deposition of Peter Gale, who is another
13  scientist who testified in the case.
14      MR. BERNARDO:  Same objection
15  with respect to this testimony, as also with
16  respect to the other testimonies.
17  BY MR. C. PLACITELLA:
18      Q.  All right.  And you can see on the
19  second page that the lawyers for Johnson &
20  Johnson were at this deposition as well?
21      A.  I see the names listed, yes.
22      Q.  Okay.  And if you go to page 19, he
23  talks about the studies he did himself.  He
24  says, "What analysis did you run on the
25  second round of studies?

Page 211

1       "WITNESS:  Scanning electron
2   microscopy, transmission electron microscopy,
3   selected area diffraction.
4       "Where did you perform those tests?
5       "Georgia Tech.
6       "When were those tests performed?
7       "Late fall '78 and January and
8   February of '79, I believe.
9       "Do you recall today what those
10  tests revealed?
11      "I recall that there were fibers
12  found in those talcs, yes.
13      "Did you identify the nature,
14  mineralogic nature of the fibers that were
15  found?
16      "ANSWER:  Yes.
17      "What was the nature of those
18  fibers?
19      "ANSWER:  I determined those fibers
20  were chrysotile fibers.
21      "QUESTION:  How did you determine
22  those fibers were chrysotile fibers?
23      "ANSWER:  Using selected area
24  electron diffraction in conjunction with
25  transmission electron microscopy."

Page 212

1       Do you see that?
2       MR. BERNARDO:  Object to the
3   form of the question.  And object to your
4   reading into the transcript --
5   BY MR. C. PLACITELLA:
6       Q.  Do you see that?
7       MR. BERNARDO:  -- excerpts of
8   deposition testimony.
9       THE WITNESS:  I see that, yes.
10  BY MR. C. PLACITELLA:
11      Q.  And before today and in responding
12  to all these interrogatories under oath, no
13  one ever told you from Johnson & Johnson,
14  even though you knew the lawyers, that there
15  was testimony of scientists under oath that
16  found asbestos in the Vermont mines once
17  owned by Johnson & Johnson, correct?
18      A.  We did not review these
19  testimonies.
20      Q.  So is the answer correct, you were
21  never told?
22      A.  We did not review these specific
23  testimonies.
24      MR. C. PLACITELLA:  Now, give
25  me 441.

Page 213

1   BY MR. C. PLACITELLA:
2       Q.  Let me ask you the question this
3   way to keep it moving, do you know that that
4   case was settled confidentially under oath --
5       MR. BERNARDO:  Object to the
6   form of the question.
7   BY MR. C. PLACITELLA:
8       Q.  -- by Johnson & Johnson?
9       A.  I do not know that.
10      Q.  Now, in the same year that these
11  scientists testified under oath with
12  Johnson & Johnson lawyers present, you were
13  sued in the Gambino case, right?
14      MR. BERNARDO:  Object to the
15  form of the question, beyond the scope of the
16  notice.
17      THE WITNESS:  I don't know what
18  year what happened.
19  BY MR. C. PLACITELLA:
20      Q.  Well, what did your chart say about
21  Gambino?
22      A.  Gambino is listed as 1983.
23      Q.  And that's the date of this
24  deposition, correct?
25      A.  I have to go back to the deposition

54  (Pages 210 to 213)



Page 214

1    and see that.
2        Q.  1983?
3        A.  Okay.
4        Q.  Okay.  So in the same years that
5    the scientists testified that the mines once
6    owned by Johnson & Johnson contained
7    asbestos, you were sued in Middlesex County,
8    New Jersey in the Gambino case, correct?
9            MR. BERNARDO:  Object to the
10   form of the question, beyond the scope of the
11   notice.  This witness isn't being tendered as
12   a corporate representative on the subject of
13   litigation.
14           You can go ahead answer in your
15   personal capacity.
16   BY MR. C. PLACITELLA:
17       Q.  Here, I put it up there for you,
18   it's 291; do you see it?
19       A.  All I know is the years are the
20   same.
21       Q.  Right.  In Middlesex County,
22   New Jersey; do you see that?
23       A.  I see it says that, yes.
24       Q.  And it involved Johnson's Baby
25   Powder, correct?

Page 215

1        A.  I see it says that.
2        Q.  And according to your earlier
3    testimony, your lawyers didn't have any other
4    information on Gambino to provide to you,
5    correct?
6            MR. BERNARDO:  Object to the
7    form of the question.
8            THE WITNESS:  There were no
9    discovery records.
10           MR. C. PLACITELLA:  Okay.  Can
11   you give me the...
12   BY MR. C. PLACITELLA:
13       Q.  Well, I want to show you again the
14   log of documents not turned over.  There were
15   plenty of documents related to the Gambino
16   case, you were just never shared them, were
17   you?
18           MR. BERNARDO:  Object to the
19   form of the question.
20   BY MR. C. PLACITELLA:
21       Q.  According to your own privilege
22   log, the -- the log that you put in this
23   courthouse, there were plenty of documents
24   related to the Gambino case --
25           MR. BERNARDO:  Object to the

Page 216

1    form of the question.
2    BY MR. C. PLACITELLA:
3        Q.  -- correct?
4            MR. BERNARDO:  Are you pointing
5    to a discovery response in there, Chris?  I
6    can't read it from here.
7            MR. C. PLACITELLA:  I'm
8    point -- I'm pointing to your entry that
9    there were memorandums, memorandums,
10   memorandums, memorandums.
11           MR. BERNARDO:  But you're not
12   pointing to a discovery response?  I just
13   want to be able to see it.
14   BY MR. C. PLACITELLA:
15       Q.  There were plenty of documents
16   never shared with you, that's all I'm asking.
17           MR. BERNARDO:  Object to the
18   form of the question.
19           THE WITNESS:  I was not shared
20   any interrogatories, no.
21   BY MR. C. PLACITELLA:
22       Q.  Okay.  And you see here who was
23   involved in defending the Gambino case.  Who
24   is Donald Jones?
25       A.  He's one of the scientists,

Page 217

1    Johnson & Johnson.
2        Q.  And, also, Mr. Ashton was involved?
3        A.  I see the names there.
4        Q.  Well, Mr. Ashton certainly knew
5    about the testing that showed asbestos in
6    Johnson's Baby Powder, right?
7            MR. BERNARDO:  Object to the
8    form of the question.  Again, I object to
9    this whole line of questioning and asking
10   this witness about a privilege log generated
11   by lawyers in litigation, Chris.  You know
12   that's inappropriate.  You know it's not
13   within the scope of this notice.
14           MR. C. PLACITELLA:  No, I think
15   it's totally within the scope.
16           MR. BERNARDO:  I think it's
17   completely inappropriate.  And you know this
18   witness is not here to address privilege
19   logs, lawsuits filed or other --
20           MR. C. PLACITELLA:  Okay.
21           MR. BERNARDO:  -- kinds of
22   questions that you've been asking for an hour
23   now.
24           MR. C. PLACITELLA:  Okay.
25   BY MR. C. PLACITELLA:



Page 218

1      Q.   What happened to Mr. Gambino's
2   case, do you know?  Mrs. Gambino's case?
3           MR. BERNARDO:  Object to the
4   form of the question, outside the scope of
5   the notice.
6           THE WITNESS:  I don't know.
7   BY MR. C. PLACITELLA:
8      Q.   It was non-suited, wasn't it?
9           MR. BERNARDO:  Object to the
10  form of the question.
11  BY MR. C. PLACITELLA:
12     Q.   Do know what non-suit means?
13     A.   No, I do not.
14     Q.   It means it was dismissed because
15  the information -- they didn't have the
16  information necessary to move forward.  Did
17  you know that?
18     A.   I told you, I did not know the
19  outcome.
20     Q.   Did you -- did you know that your
21  lawyer stated in court in California
22  concerning the Gambino case that the lawsuit
23  was ultimately dismissed without
24  adjudication?
25           MR. BERNARDO:  Object to the

Page 219

1   form of the question.
2   BY MR. C. PLACITELLA:
3      Q.   Did you know that?
4           MR. BERNARDO:  Beyond the scope
5   of the notice.
6           THE WITNESS:  I don't even know
7   what that means.
8   BY MR. C. PLACITELLA:
9      Q.   Okay.  And you didn't look at a
10  single document other than the Complaint
11  related to the Gambino case, correct?
12     A.   I -- my understanding was that we
13  were to talk about discovery responses, and
14  there were no discovery responses.
15     Q.   I want to get right to that now.
16           MR. C. PLACITELLA:  Give me
17  188.
18           THE WITNESS:  Where are we on
19  time, as far as a break?
20           MR. BERNARDO:  You want to take
21  a break?
22           THE WITNESS:  Yes, please.
23           MR. BERNARDO:  Chris, we've
24  been -- we have been going about an hour.
25  Can we take --

Page 220

1           MR. C. PLACITELLA:  Can we take
2   less than a half hour break this time?
3           MR. BERNARDO:  We have not been
4   taking half hour breaks.  We try to be very
5   conscious.  We came in four minutes after our
6   45-minute lunch.
7           MR. C. PLACITELLA:  Okay.  Take
8   a break.  Go ahead.
9           THE VIDEOTAPE OPERATOR:  The
10  time is 2:41 p.m.  Off the record.
11           (Brief recess.)
12           THE VIDEOTAPE OPERATOR:  The
13  time is 2:58 p.m.  On the record.
14  BY MR. C. PLACITELLA:
15     Q.   Okay.  So in preparation for
16  today's deposition, did your -- or did you
17  review the information concerning the Edley
18  case?
19     A.   I'm not familiar with that.
20           (Reporter clarification.)
21           MR. C. PLACITELLA:  Edley,
22  E-d-l-e-y.
23  BY MR. C. PLACITELLA:
24     Q.   You're not familiar with that?
25     A.   No.

Page 221

1      Q.   So Johnson & Johnson doesn't know
2   anything about the Edley case?
3           MR. BERNARDO:  Object to the
4   form of the question, beyond the scope of the
5   notice.
6           THE WITNESS:  In preparation
7   for today, I did not review that case.
8   BY MR. C. PLACITELLA:
9      Q.   Well, Johnson & Johnson certainly
10  knew about the Edley case, correct?
11           MR. BERNARDO:  Object.
12           THE WITNESS:  I did not review
13  it for today, no.
14  BY MR. C. PLACITELLA:
15     Q.   Did you know that the Edley case
16  was filed in the same courthouse as the
17  Gambino case?
18     A.   I did not --
19           MR. BERNARDO:  Object to the
20  form of the question.
21           THE WITNESS:  -- review that
22  question for -- that case for today.
23  BY MR. C. PLACITELLA:
24     Q.   Okay.  Did you know it was filed by
25  a well respected lawyer named Ronald Grayzel?



Page 222

1          MR. BERNARDO:  Object to the
2    form of the question.
3          THE WITNESS:  I did not review
4    that case for today.
5    BY MR. C. PLACITELLA:
6       Q.   Do you know what information
7    Mr. Grayzel asked for in terms of the
8    asbestos content of the talc sold by
9    Johnson & Johnson?
10      A.   I did not review that case, so I'm
11   not familiar with it.
12      Q.   Well, not -- but you're not here as
13   you, Nancy Musco.  You're here as Johnson &
14   Johnson.
15          Does Johnson & Johnson know --
16          MR. BERNARDO:  Object --
17   BY MR. C. PLACITELLA:
18      Q.   -- what happened in the Edley case?
19          MR. BERNARDO:  Object to the
20   form of the question, beyond the scope of the
21   notice.  She's not here as a corporate
22   representative with respect to the Edley
23   case.
24          MR. C. PLACITELLA:  That says
25   you.

Page 223

1          MR. BERNARDO:  That's exactly
2    right.
3          MR. C. PLACITELLA:  No, that
4    says you.  Well, the judge will decide that.
5    BY MR. C. PLACITELLA:
6       Q.   So Johnson & Johnson, as you sit
7    here today, knows nothing about the Edley
8    case --
9          MR. BERNARDO:  Object to the --
10   BY MR. C. PLACITELLA:
11      Q.   -- correct?
12          MR. BERNARDO:  -- form of the
13   question.
14          THE WITNESS:  I did not review
15   that case.
16   BY MR. C. PLACITELLA:
17      Q.   You knew, Johnson & Johnson, did
18   you not, that the Edley case has been brought
19   up in multiple trials related to Johnson's
20   Baby Powder; you knew that, right?
21          MR. BERNARDO:  Object to the
22   form of the question.
23          THE WITNESS:  I did not review
24   that case, so I don't know anything about it.
25   BY MR. C. PLACITELLA:

Page 224

1       Q.   You know that courts have ruled
2    that the Edley case was relevant to the
3    Johnson & Johnson Baby Powder cases; you know
4    that, right?
5          MR. BERNARDO:  Object to the
6    form.
7    BY MR. C. PLACITELLA:
8       Q.   You, Johnson & Johnson, you know
9    that?
10      A.   I --
11          MR. BERNARDO:  The witness is
12   not speaking on behalf of Johnson & Johnson
13   with respect to this question.
14          THE WITNESS:  I did not review
15   this case.
16   BY MR. C. PLACITELLA:
17      Q.   Okay.
18          (Exhibit J&J-188, Stipulation
19   of Dismissal, is marked for identification.)
20   BY MR. C. PLACITELLA:
21      Q.   I want to give you 188.  And I ask
22   you to look at the third page, which is the
23   Affidavit written by Roger Miller.
24          Do you see that?
25      A.   I see that's what it says, yes.

Page 225

1       Q.   Do you see that was an Affidavit
2    executed in the Edley case in Middlesex
3    County, New Jersey in 1987; do you see that?
4          MR. BERNARDO:  Object to the
5    form of the question.
6          THE WITNESS:  I see Middlesex.
7    I don't see the date.
8    BY MR. C. PLACITELLA:
9       Q.   And did you know that Johnson &
10   Johnson used this Affidavit to get -- to
11   obtain a dismissal from Mr. Edley who claimed
12   that he was injured from Johnson's talc; did
13   you know that?
14          MR. BERNARDO:  Object to the
15   form of the question, beyond the scope of the
16   notice.
17          THE WITNESS:  I did not review
18   the Edley case.
19   BY MR. C. PLACITELLA:
20      Q.   Okay.  You see Mr. Miller when he
21   says he was President of Windsor Minerals;
22   that's accurate, correct?
23      A.   I see that's what it says, yes.
24      Q.   And he says that in his paragraph 2
25   that, The exclusive business of Windsor

57 (Pages 222 to 225)



Page 226

1 Minerals is, and has been the last 18 years,
2 the mining and milling of talc from a single
3 mining district in Windsor, Vermont. That
4 mining district is the exclusive source of
5 talc for all of the Johnson's Baby Powder
6 sold in the United States.
7         Did you know that?
8             MR. BERNARDO: Object to the
9 form of the question. Object to this
10 Affidavit as outside of the scope of the
11 notice. And object to this witness answering
12 in her representative capacity.
13             THE WITNESS: I did not review
14 this.
15 BY MR. C. PLACITELLA:
16     Q. It says, In addition to supplying
17 the talc for Johnson's Baby Powder, Windsor
18 Minerals also sells a portion of its product
19 to independent industrial users.
20         Do you see that?
21             MR. BERNARDO: Same objection.
22             THE WITNESS: That's what's
23 written here.
24 BY MR. C. PLACITELLA:
25     Q. Okay. And what Mr. Miller swears

Page 227

1 to under oath in paragraph 3 is, All of the
2 talc mined by Windsor Minerals, Inc., whether
3 it is ultimately sold to industrial users or
4 used in Johnson's Baby Powder, is sampled and
5 tested for the presence of asbestos.
6         Do you see that?
7             MR. BERNARDO: Same objection.
8             THE WITNESS: That's what it
9 says.
10 BY MR. C. PLACITELLA:
11     Q. He does not distinguish between
12 industrial and baby powder, does he, in terms
13 of source and testing?
14             MR. BERNARDO: Same objection.
15             THE WITNESS: That's what it
16 says here.
17 BY MR. C. PLACITELLA:
18     Q. And he says, No evidence of the
19 presence of asbestos in Windsor Minerals'
20 product has ever been revealed by this
21 testing; do you see that?
22             MR. BERNARDO: Same objection.
23             THE WITNESS: That's what the
24 sentence says.
25 BY MR. C. PLACITELLA:

Page 228

1     Q. And then what he does is, to back
2 that statement up he says, See Exhibit A, and
3 he attaches a report from McCrone, correct?
4             MR. BERNARDO: Same objection.
5             THE WITNESS: I see there's a
6 report here, yes.
7 BY MR. C. PLACITELLA:
8     Q. And who is McCrone?
9     A. I believe it's a testing service.
10     Q. All right. And that Affidavit is a
11 lie, isn't it?
12             MR. BERNARDO: Object to the
13 form of the question, beyond the scope of the
14 notice. The witness is not answering in her
15 capacity as a corporate representative with
16 respect to these questions.
17 BY MR. C. PLACITELLA:
18     Q. Ma'am, that Affidavit is a lie;
19 isn't it?
20     A. I have never seen this before and I
21 can't comment on it.
22     Q. Well, you know what the information
23 was, you're here to testify on what the
24 historical discovery responses have been.
25 That Affidavit from the President of Windsor

Page 229

1 Minerals is a lie, isn't it?
2             MR. BERNARDO: Object to the
3 form of the question, same objection.
4             THE WITNESS: I'm not prepared
5 to answer this.
6 BY MR. C. PLACITELLA:
7     Q. Okay.
8             MR. C. PLACITELLA: Can you
9 give me 28?
10 BY MR. C. PLACITELLA:
11     Q. By the way -- oops, can we go back?
12 You see on the first page, the letter written
13 to the lawyer for Mr. Edley by Johnson &
14 Johnson; do you see that? It says --
15     A. Do we have that document here?
16     Q. Yeah, it's right, it's right in
17 front of your documents.
18     A. This one.
19     Q. Look at the first page, 188.
20         It says, Enclosed please find an
21 Affidavit on behalf of Windsor Minerals,
22 signed by Roger Miller, President of Windsor
23 Minerals since 1968. Also enclosed you will
24 find an assay from a McCrone Environmental.
25 I trust these documents will now enable you




Page 230

1  to sign a dismissal as was done in the Yuhas
2  case.
3       Do you see that?
4           MR. BERNARDO:  Object to the
5  form of the question.
6           THE WITNESS:  That's what it
7  says.
8  BY MR. C. PLACITELLA:
9    Q.  Remember before you said you didn't
10  know anything about Yuhas case.  Now we know,
11  right?  The Yuhas case was dismissed as well,
12  wasn't it?
13    A.  I --
14           MR. BERNARDO:  Object to the
15  form of the question.
16           THE WITNESS:  -- don't know
17  anything about the Yuhas case.
18  BY MR. C. PLACITELLA:
19    Q.  You don't know that an Affidavit
20  was prepared by Johnson & Johnson in the
21  Yuhas case saying there was no evidence that
22  ever revealed the presence of asbestos and
23  that was responsible for getting that case
24  dismissed; you didn't know that?
25       You, Johnson & Johnson don't know

Page 231

1  that?
2           MR. BERNARDO:  Object to the
3  form of the question.  She's not testifying
4  on behalf of Johnson & Johnson with respect
5  to a topic that is wildly outside the scope
6  of the notice.
7           THE WITNESS:  I'm not here
8  prepared to talk about the Yuhas case.
9  BY MR. C. PLACITELLA:
10    Q.  It says, I trust these documents
11  will now enable you to sign a dismissal as
12  was done in the Yuhas.  I've taken the
13  liberty of drafting the dismissal and
14  enclosing same for your signature along with
15  a self-addressed stamped envelope.
16       Do you see that?
17    A.  I see that sentence, yes.
18    Q.  And the very first page of this
19  document is the Stipulation of Dismissal
20  signed by the lawyer for Mr. Edley after he
21  got the Miller Affidavit, right?
22           MR. BERNARDO:  Object to the
23  form of the question, beyond the scope of the
24  notice.  The witness is not answering in her
25  corporate representative capacity.

Page 232

1  BY MR. C. PLACITELLA:
2    Q.  So Mr. Edley gave up his rights to
3  proceed with his lawsuit after he received
4  the Affidavit from the President of Windsor
5  Minerals, right?
6           MR. BERNARDO:  Same objection.
7           THE WITNESS:  I -- I can't
8  comment on that.
9  BY MR. C. PLACITELLA:
10    Q.  The very first page talks about
11  supplemental answers to supplemental
12  interrogatories; do you see that?  The letter
13  to Mr. Grayzel.
14    A.  Yes.
15    Q.  Where are those interrogatories?
16    A.  I am not here prepared to talk
17  about this.  I don't know.
18    Q.  Okay.  So can we go to -- do you
19  see this -- this -- this statement here by
20  the President of Windsor Minerals, No
21  evidence of the presence of asbestos in
22  Windsor Mineral product has ever been
23  revealed by this testing.
24       Do you see that?
25    A.  I see that sentence.

Page 233

1    Q.  Okay.  Now focusing on the word
2  "revealed," got that?
3    A.  I see that word, yes.
4    Q.  Okay.  Now, can you go to this
5  Hopkin -- this chart Hopkins-28, please?
6       Do you see on Hopkins-28 created at
7  the Hopkins dep there's a paragraph that
8  talks about what the test revealed?
9    A.  I see that, yes.
10    Q.  And let's just -- because --
11  because Mr. Miller relied on the McCrone
12  testing for his Affidavit, let's just talk
13  and look at the McCrone tests.  Okay?  To see
14  if that was the only test.  No test ever
15  revealed any evidence.  Okay.
16       So let's go to 1971; do you see
17  that?
18           MR. BERNARDO:  Object to the
19  form of the question.
20           THE WITNESS:  I -- there's --
21  yeah, there's a couple things under 1971.
22  BY MR. C. PLACITELLA:
23    Q.  Right.
24       And do you see where it says the
25  testing entity is McCrone?



Page 234

1    A.  Yes.
2    Q.  And do you see where it says that
3  the product that was tested was Shower to
4  Shower?
5    A.  Yes.
6    Q.  Okay.  And do you see where it
7  says, Fiber of chrysotile, was very clear.
8  Medicated powder we found one fiber of
9  chrysotile, Shower to Shower.  We feel
10  strongly it may be chrysotile.  Chrysotile is
11  very low.  Final report, Shower to Shower,
12  the fiber content of Shower to Shower is
13  quite low in comparison to previous samples
14  investigated.  We found three suspect fibers.
15  Of these two were found one field and
16  probably have the same source, very possibly
17  contamination.  It is still questionable
18  whether they are chrysotile.  We have,
19  however, found traces of chrysotile in G-11,
20  one of the additives to Shower to Shower, and
21  this might be a possible source of the
22  contaminant fibers.
23    Do you see that?
24    MR. BERNARDO:  Object to the
25  form of the question.  Object to the use of

Page 235

1  this document and this summary of the
2  document.  It's not in front of the witness,
3  that's been created by Plaintiff's counsel.
4  This is well beyond the scope of the notice.
5    MR. C. PLACITELLA:  That's
6  absolutely a false statement.  And I'm --
7  I'm -- and please don't do that, please don't
8  do that.  You are violating the court rules
9  and please don't do that.
10    MR. BERNARDO:  You are
11  violating the court rules by asking the
12  witness questions that are so wildly beyond
13  the scope of what this deposition is.
14    MR. C. PLACITELLA:  Okay.
15  Well, you know what, we'll let Judge Viscomi
16  make that decision.  Okay?
17    MR. BERNARDO:  You've said that
18  several times.  I'm happy to do that.
19    MR. C. PLACITELLA:  So...
20    MR. BERNARDO:  I'm just
21  preserving a record for my client.
22  BY MR. C. PLACITELLA:
23    Q.  And you see over here where it says
24  Hopkins Comments?
25    A.  I see those words.

Page 236

1    Q.  And you see he has no comments,
2  correct?
3    MR. BERNARDO:  Object to the
4  form of the question, same objection.
5  BY MR. C. PLACITELLA:
6    Q.  And you see where here it says,
7  Satisfies Johnson & Johnson's definition of
8  asbestos and the answer is yes; do you see
9  that?
10    MR. BERNARDO:  Object to the
11  form of the question.
12    THE WITNESS:  I can't comment
13  on these.  I don't know what this means.
14  It's all taken out of context.  I'm -- I
15  don't know what any of this means.
16  BY MR. C. PLACITELLA:
17    Q.  Ma'am, this particular study was
18  never referenced or alluded to in the Miller
19  Affidavit that said, No, the evidence -- the
20  presence of asbestos was never revealed by
21  any test, right?
22    This was not part of that?
23    MR. BERNARDO:  Object to the
24  form of the question, same objection.
25  BY MR. C. PLACITELLA:

Page 237

1    Q.  Correct?
2    A.  Again, I can't comment on this.
3    Q.  Okay.  Let's go down to 10/12/1971.
4  Again, testing entity was McCrone, correct?
5    A.  That's what it says, yes.
6    Q.  And it went to Goudie.  Who's
7  Goudie?
8    A.  I don't know.
9    Q.  Okay.  And, again, this was tested
10  Shower to Shower, correct?
11    MR. BERNARDO:  Same objection
12  to this whole line of questioning.
13    THE WITNESS:  You're reading
14  what's here, yes.
15  BY MR. C. PLACITELLA:
16    Q.  Right.
17    And what the chart says the test
18  revealed was traces of chrysotile in one of
19  the additives, correct?
20    A.  Those are the words that are here.
21    Q.  And under the top -- under the --
22  under the column whether that satisfies the
23  definition of asbestos of Johnson & Johnson,
24  the answer is yes, correct?
25    MR. BERNARDO:  Object to the



Page 238

1  form of the question.
2        THE WITNESS:  The word "yes" is
3  written here, but I cannot interpret on what
4  any of this means.
5  BY MR. C. PLACITELLA:
6     Q.  All right.  And this is nowhere
7  referenced in the dep -- in the Affidavit of
8  Mr. Miller, is it?
9     A.  I can't comment on this chart.
10    Q.  Ma'am, these -- this test that's
11 set forth in this chart is nowhere referenced
12 in the Affidavit of Mr. Miller concerning
13 what was found in Johnson's Baby Powder,
14 correct?
15       MR. BERNARDO:  Object to the
16 form of the question.
17       THE WITNESS:  I don't see this
18 mentioned there, no.
19 BY MR. C. PLACITELLA:
20    Q.  And, ma'am, you know that that
21 binder that's in front of you has all of
22 these tests in there, correct?
23    A.  I don't know -- I cannot tell you
24 everything that's in that binder.
25    Q.  Well, I'm going to represent to

Page 239

1  you, like I did the last time, that all of
2  those tests are set forth in that binder.
3  Did you look through that binder before you
4  came here today?
5     A.  I knew that the binder existed, I
6  knew that it involves tests, but I did not
7  look at every single one of them, no.
8     Q.  Before you came here and testified
9  under oath that there is no evidence
10 whatsoever of asbestos in baby powder, you
11 never went back and looked at the binder that
12 was shown to you last time under oath?
13    A.  Actually, I did better and had the
14 conversation with Dr. Hopkins, because I
15 could look at this all the time and it
16 wouldn't mean anything to me.  So I wanted to
17 make sure that he was familiar with all the
18 things that you're referencing.
19    Q.  Well, the last time you were with
20 me, you were told that that chart was created
21 at the deposition of Dr. Hopkins, right?
22    A.  I don't remember this chart.
23    Q.  You don't remember that chart?
24    A.  You're saying you showed it to me,
25 I don't remember.  And I don't --

Page 240

1     Q.  Do I need to play the video that
2  shows you that you knew about it?
3     A.  If you say you did.  I said I don't
4  remember.
5     Q.  All right.  And you never discussed
6  this chart or any of its contents with
7  Dr. Hopkins in preparation for today's
8  deposition, correct?
9        MR. BERNARDO:  Object to the
10 form of the question.
11 BY MR. C. PLACITELLA:
12    Q.  Correct?
13       MR. BERNARDO:  Characterization
14 of what this witness says she's done.
15       THE WITNESS:  No.  As I said, I
16 did not discuss this specific chart, no.
17 BY MR. C. PLACITELLA:
18    Q.  Okay.  Let's go down to 11/11/1971.
19 Another McCrone test using TEM for Shower to
20 Shower.  The results of that test are
21 mentioned nowhere in the Miller Affidavit,
22 correct?
23    A.  I did not --
24       MR. BERNARDO:  Object to the
25 form of the question.

Page 241

1        THE WITNESS:  -- see the...
2  BY MR. C. PLACITELLA:
3     Q.  In fact, none of these tests that
4  we've simply looked at on the first page of
5  this document were ever referenced by you or
6  Johnson & Johnson in any answer to
7  interrogatory ever, correct?
8        MR. BERNARDO:  Object, object
9  to the form of the question.
10 BY MR. C. PLACITELLA:
11    Q.  Correct?
12    A.  If they were pertinent to the
13 question asked in the interrogatory, they
14 would have been mentioned.  But since they
15 were not, I imagine they were not pertinent
16 to --
17    Q.  So when you were asked questions
18 under oath in interrogatories whether there
19 was any evidence of asbestos, you didn't
20 think that any of the documents that are set
21 forth in this chart have any relevance
22 whatsoever?
23       MR. BERNARDO:  Object to the
24 form of the question.
25       THE WITNESS:  I know that the



Page 242

1 experts who provided those answers don't
2 depend on just documents standing alone, that
3 they use their experience and their
4 expertise, along with any science that's
5 available.
6 BY MR. C. PLACITELLA:
7    Q.  Yes, ma'am.
8       And nowhere did you ever turn over
9 before 19 -- before 2017 any of these tests,
10 you, Johnson & Johnson, correct?
11       MR. BERNARDO:  Object to the
12 form of the question, outside of the scope of
13 the notice.
14       If you know in your individual
15 capacity, you can answer.
16       THE WITNESS:  No, I don't know.
17 BY MR. C. PLACITELLA:
18    Q.  Okay, that's 1971.
19       Let's go to 1972, another test by
20 McCrone.  Do you see where they use TEM
21 looking for the asbestos, presence of
22 asbestos in Johnson's Baby Powder; do you see
23 that?
24    A.  I see that's written, yes.
25    Q.  And what they found was both

Page 243

1 samples contained an insignificant amount of
2 tremolite, tremolite rods; do you see that?
3    A.  That's what it says.
4    Q.  And under the chart where does it
5 satisfy the definition of asbestos under
6 Johnson & Johnson, the answer is yes,
7 correct?
8       MR. BERNARDO:  Object to the
9 form of the question, same objection as
10 prior.
11       THE WITNESS:  I see the word
12 "yes."
13 BY MR. C. PLACITELLA:
14    Q.  Right.
15       But even though there -- as
16 according to Dr. Hopkins's chart, a test from
17 1972 showing what Johnson & Johnson deems
18 satisfying its definition of asbestos in baby
19 powder, you never referenced that in your
20 answer to interrogatories in Krushinski,
21 correct?
22    A.  These -- these were not written
23 specifically in answer to any of those
24 answers.
25    Q.  Okay.  You never referenced this,

Page 244

1 correct?
2    A.  Again, I don't know what this is.
3 You keep referring to it as Dr. Hopkins'
4 chart.  Yes, you may have showed it to me, I
5 don't remember.  But I don't know what each
6 column means.  The entire testing is not
7 here.  So I -- I can't -- I can't comment
8 here.
9    Q.  Yes, ma'am.
10       What I asked you was when you
11 answered the interrogatories in the
12 Krushinski case under oath, you never
13 referenced a 10/27/72 test from McCrone
14 finding samples of tremolite rods that
15 Johnson & Johnson admits satisfies its
16 definition of asbestos, correct?
17       MR. BERNARDO:  Object to the
18 form of the question.
19       THE WITNESS:  I did not provide
20 the answers.
21 BY MR. C. PLACITELLA:
22    Q.  Right.
23    A.  As I explained, I had the experts,
24 the internal experts provide the answers and
25 they would have used whatever science was

Page 245

1 credible and available.
2    Q.  Okay.  And this test was never
3 referenced in -- in -- in Mr. Miller's
4 Affidavit, correct, this McCrone test, when
5 he said no presence ever revealed --
6       MR. BERNARDO:  Object to the
7 form --
8 BY MR. C. PLACITELLA:
9    Q.  -- correct?
10       MR. BERNARDO:  -- of the
11 question.
12 BY MR. C. PLACITELLA:
13    Q.  Wasn't, wasn't referenced, right?
14    A.  It's not referenced, no.
15    Q.  Okay.  Let's go to the next McCrone
16 test.
17       Here's one from 1974.  And that was
18 done, it says McCrone, Lee.  This was done at
19 the Hammondsville ore; do you see that?
20    A.  I see that, where it says, yes.
21    Q.  And it says, Chrysotile fibers
22 suppression was indicated.  Dartmouth finds
23 amphibole 100 to 200 parts per million in the
24 ore and 9,000 in the ore.  McCrone finds
25 chrysotile in ore and finished product.

62 (Pages 242 to 245)



Page 246

```
 1          Do you see that?
 2          MR. BERNARDO: Object to the
 3   form of the question, beyond the scope of the
 4   notice. The witness is not responding in her
 5   corporate representative capacity --
 6   BY MR. C. PLACITELLA:
 7       Q. Do you see that?
 8          MR. BERNARDO: -- to these
 9   questions.
10          THE WITNESS: All I could tell
11   you is that's what it says.
12   BY MR. C. PLACITELLA:
13       Q. And under the column does it
14   satisfy Johnson & Johnson's definition of
15   asbestos, the answer is yes --
16          MR. BERNARDO: Same objection.
17   BY MR. C. PLACITELLA:
18       Q. -- correct?
19       A. I see the word "yes."
20       Q. Okay. Not referenced anywhere in
21   Mr. Miller's Affidavit, correct?
22          MR. BERNARDO: Same objection.
23          THE WITNESS: I see that it's
24   not.
25   BY MR. C. PLACITELLA:
```

Page 247

```
 1       Q. Let's go to the next McCrone test,
 2   4/24/74.
 3          By the way, did Dr. Hopkins tell
 4   you about any of this when you had this
 5   conversation with him?
 6       A. We didn't discuss his chart, as you
 7   refer to it.
 8       Q. Well, did he tell you about any of
 9   these tests that found asbestos by McCrone?
10       A. He did not talk about any kind of
11   tests that found asbestos.
12       Q. Okay. And here it talks about a
13   test done of the Argonaut mine. And it says
14   again, TEM finds chrysotile and fibrous
15   tremolite; do you see that?
16       A. That's what it says.
17       Q. And that satisfies Johnson &
18   Johnson's definition of asbestos, right?
19       A. The word "yes" is written there.
20       Q. Okay. And then there's another
21   test by McCrone in 1974, correct?
22       A. Yes.
23          MR. BERNARDO: Objection.
24   BY MR. C. PLACITELLA:
25       Q. And another one under that in 1974,
```

Page 248

```
 1   correct?
 2          MR. BERNARDO: Just a running
 3   objection to this entire chart, so I don't
 4   keep interrupting, on the basis that I
 5   explained before.
 6          THE WITNESS: That's what's
 7   written here.
 8   BY MR. C. PLACITELLA:
 9       Q. Okay. And then another test in
10   October 1974, correct?
11       A. I see that, yes.
12       Q. And another one by McCrone in --
13   and strike that.
14          And all the tests done by McCrone
15   in 1974 when you go to the column, does the
16   test satisfy the definition of asbestos, it
17   all is yes, right?
18       A. The word "yes" is written there,
19   but I don't know what that means. I don't
20   know what these testing mean, testing means.
21   Dr. Hopkins could describe this in much
22   better words than I could. I don't know what
23   any of this means.
24       Q. Yes, ma'am. But we're here to
25   determine the veracity of the discovery
```

Page 249

```
 1   responses that were provided historically by
 2   Johnson & Johnson. Discovery responses that
 3   you certified and others certified, you
 4   understand that, correct?
 5       A. Yes.
 6       Q. And no interrogatory ever certified
 7   as true and accurate under oath by Johnson &
 8   Johnson that you're aware of ever mentioned
 9   any of these tests by McCrone, correct?
10          MR. BERNARDO: Object to the
11   form of the question.
12          THE WITNESS: As I said
13   earlier, there was no specific questions that
14   asked about any kind of testing. The answers
15   were based on the internal experts'
16   experience, expertise and the accurate
17   science.
18          MR. C. PLACITELLA: Can you
19   read my question back, please, and see if I
20   can get an answer to it?
21          (At which time the following
22   question is read:
23          "QUESTION: And no
24   interrogatory ever certified as true and
25   accurate under oath by Johnson & Johnson that
```

63 (Pages 246 to 249)



Page 250

1  you're aware of ever mentioned any of these
2  tests by McCrone, correct?")
3          THE WITNESS:  That's correct.
4  They did not answer these -- they did not
5  cite these specifically, no.
6  BY MR. C. PLACITELLA:
7      Q.  Okay.  And then in 1975, according
8  to this, there's another test by McCrone,
9  correct?
10         And it says, Confirmed asbestos,
11  low to medium, bundles of amphiboles and that
12  satisfied Johnson & Johnson's definition of
13  asbestos, right?
14         MR. BERNARDO:  Object to the
15  form of the question.
16         THE WITNESS:  Again, the word
17  "yes" is written there.  I don't know what
18  any of this means.
19  BY MR. C. PLACITELLA:
20     Q.  Okay.  And, again, in 1975 another
21  test by McCrone, fibers of asbestos, answer
22  yes, correct?
23     A.  Those are the words written.
24     Q.  Okay.  Now we're up to 1975, that's
25  ten years -- 12 years before Miller executed

Page 251

1  his Affidavit.  And on McCrone tests alone, I
2  have one, two, three, four, five, six, seven,
3  eight, nine, ten, 11, 12, 13 tests that were
4  never mentioned by McCrone, that were never
5  mentioned in the Miller Affidavit, correct?
6          MR. BERNARDO:  Object to the
7  form of the question, same objection with
8  respect to scope as I've made numerous times.
9          (Reporter clarification.)
10         MR. BERNARDO:  That I've made
11  numerous times.
12         THE WITNESS:  I -- I cannot
13  comment on the Affidavit.  I'm not here to
14  talk about that, that particular Affidavit,
15  nor this chart.
16  BY MR. C. PLACITELLA:
17     Q.  And, ma'am, I'm not going to
18  belabor the point here, but in 1983 there was
19  another McCrone test, correct?
20         MR. BERNARDO:  Same objection.
21         THE WITNESS:  That's what it
22  says.
23  BY MR. C. PLACITELLA:
24     Q.  And then another McCrone test in
25  '84, correct?

Page 252

1          MR. BERNARDO:  Same objection.
2          THE WITNESS:  That's what it
3  says.
4  BY MR. C. PLACITELLA:
5      Q.  And another McCrone test in 1986?
6          MR. BERNARDO:  Same objection.
7  BY MR. C. PLACITELLA:
8      Q.  Correct?
9          MR. BERNARD:  Same objection,
10  same objection.
11         THE WITNESS:  That's what it
12  says.
13  BY MR. C. PLACITELLA:
14     Q.  Correct?
15     A.  That's what it says.
16     Q.  All right.  And what Miller did, he
17  cited a single test by McCrone for the
18  evidence that asbestos was never found in any
19  Johnson & Johnson product and omitted every
20  other McCrone test on this chart, correct?
21         MR. BERNARDO:  Object to the
22  form of the question.
23         THE WITNESS:  I cannot comment
24  on the Miller Affidavit, nor this chart.
25  BY MR. C. PLACITELLA:

Page 253

1      Q.  And, actually, when you looked at
2  the 1983 and '84 tests, right, Miller himself
3  received the tests that satisfied Johnson &
4  Johnson's definition of asbestos, according
5  to this chart, correct?
6          MR. BERNARDO:  Object to the
7  form of the question.
8          THE WITNESS:  I can't interpret
9  this, this chart.  And I'm not here to talk
10  about it.
11  BY MR. C. PLACITELLA:
12     Q.  Okay.  So I ask you again, Miss
13  Musco, is Mr. Miller's Affidavit a lie?
14         MR. BERNARDO:  Object to the
15  form of the question.
16  BY MR. C. PLACITELLA:
17     Q.  Based on what you've seen here
18  today.
19     A.  I'm not here today to talk about
20  Mr. Miller's Affidavit.  I can't comment.
21     Q.  Ma'am, you are here as designated
22  as Johnson & Johnson's representative on the
23  veracity of discovery responses provided
24  historically in talc litigation.  You
25  understand that, correct?



Page 254

1      A.  I believe that there's a
2  misunderstanding about the scope of our --
3  our notice, yes.
4      Q.  Ma'am, I asked you those questions
5  when we started.  Can we agree that every
6  test up until Miller signed his Affidavit in
7  1987 was never referenced, every test in this
8  chart, not one was referenced in Miller's
9  Affidavit when he certified under oath to get
10  Mr. Edley's case dismissed, not one of these
11  tests was ever referenced, correct?
12      MR. BERNARDO:  Objection to the
13  form of the question, beyond the scope.  This
14  witness is not here as a corporate
15  representative with respect to that
16  Affidavit.
17      THE WITNESS:  I -- I cannot
18  comment on the Affidavit.
19  BY MR. C. PLACITELLA:
20      Q.  You think that's okay to do that?
21      MR. BERNARDO:  Same objection.
22  BY MR. C. PLACITELLA:
23      Q.  To swear under oath to get some --
24  get somebody to give up their rights and only
25  provide half the truth?

Page 255

1      Do you think Johnson is -- does
2  Johnson & Johnson think that's okay?
3      MR. BERNARDO:  Object to the
4  form of the question, same objection with
5  respect to scope.
6      THE WITNESS:  I -- I can't
7  answer that kind of question.
8  BY MR. C. PLACITELLA:
9      Q.  I'm asking does Johnson & Johnson
10  believe it was okay to file an Affidavit in
11  this very state, in Middlesex County and get
12  somebody to give up their rights, saying
13  there's no evidence whatsoever, when they had
14  evidence from the same company over and over
15  for more than a decade; do you think that was
16  right on behalf of Johnson & Johnson?
17      MR. BERNARDO:  Object to the
18  form, same objection with respect to the
19  scope.
20      THE WITNESS:  I can't comment
21  on the Affidavit.
22  BY MR. C. PLACITELLA:
23      Q.  So Johnson & Johnson cannot comment
24  on whether it was proper to use an Affidavit
25  saying there was no evidence whatsoever to

Page 256

1  get somebody's case dismissed, when it
2  clearly had evidence to the contrary in its
3  possession; is that what you're saying?
4      MR. BERNARDO:  You've --
5  answered -- asked the question several times.
6  She's answered it.  We've objected based upon
7  the scope.  You're --
8      MR. C. PLACITELLA:  Please
9  don't do this.
10      MR. BERNARDO:  Don't tell me
11  "please don't do this."
12      MR. C. PLACITELLA:  Please.
13      MR. BERNARDO:  You're beginning
14  to become harassing, Mr. Placitella.
15      MR. C. PLACITELLA:  Okay.
16  Well, can you pull out -- do you have his
17  Affidavit?
18  BY MR. C. PLACITELLA:
19      Q.  Ma'am, can you answer my question?
20      A.  Would you please repeat the
21  question?
22      MR. C. PLACITELLA:  Could you
23  repeat the question, please?
24      (At which time the following
25  question is read:

Page 257

1      "QUESTION:  So Johnson &
2  Johnson cannot comment on whether it was
3  proper to use an Affidavit saying there was
4  no evidence whatsoever to get somebody's case
5  dismissed, when it clearly had evidence to
6  the contrary in its...")
7  BY MR. C. PLACITELLA:
8      Q.  Can you answer that?
9      A.  I -- I -- it didn't sound like it
10  was completed.
11      THE COURT REPORTER:  I need a
12  minute.
13      MR. C. PLACITELLA:  Take your
14  time.  You know what, let me just keep moving
15  I'll make you...
16      (Off-the-record discussion.)
17  BY MR. C. PLACITELLA:
18      Q.  Did you know that the reason that
19  Mr. Hopkins never told you about the Miller
20  Affidavit or the tests that were missing was
21  because he filed the same Affidavit in other
22  cases?
23      MR. BERNARDO:  Object to the
24  form.
25  BY MR. C. PLACITELLA:



Page 258

1    Q.  Did you know he filed the same
2  Affidavit in other cases?
3         MR. BERNARDO:  Object to the
4  form of the question.
5         THE WITNESS:  I can't answer
6  that, because I'm not familiar with the
7  Affidavit, because I'm not here to talk about
8  that.  It was my understanding that this was
9  not within the scope of the notice.
10  BY MR. C. PLACITELLA:
11    Q.  Ma'am, given the evidence that's on
12  Hopkins-28, would you sign that Affidavit?
13         MR. BERNARDO:  Object to the
14  form of the question, same as before.
15         THE WITNESS:  Are you referring
16  to the original --
17  BY MR. C. PLACITELLA:
18    Q.  The Affidavit signed by Miller in
19  the Edley case, would you sign that Affidavit
20  in order to get Mr. Edley to dismiss his
21  case, would you sign it?
22         MR. BERNARDO:  Objection.
23  BY MR. C. PLACITELLA:
24    Q.  Given everything that we've gone
25  through?

Page 259

1         MR. BERNARDO:  Object to the
2  form of the question.
3         THE WITNESS:  I can't even
4  answer that, that wouldn't be my role.  I
5  don't have complete information.  I don't
6  know enough about it.
7  BY MR. C. PLACITELLA:
8    Q.  Ma'am, could you just move that
9  book in -- in front of the camera so the
10  camera can pick it up, please?
11    A.  Are you referring to the --
12    Q.  Yes, ma'am.
13         That's the book of testing
14  documents that go along with this chart; you
15  know that, right?
16         MR. BERNARDO:  Object to the
17  form of the question.
18         THE WITNESS:  That's what you
19  have said, yes.
20  BY MR. C. PLACITELLA:
21    Q.  And have you gone back and verified
22  that when you swore to answers to
23  interrogatories under oath that you never
24  referenced a single one of the tests in that
25  book?

Page 260

1         MR. BERNARDO:  Object to the
2  form of the question.
3         THE WITNESS:  I told you
4  earlier, I could go back and read every one
5  of them, but it wouldn't make that much sense
6  to me, because this is not my expertise,
7  which is why I had the conversation with
8  Dr. Hopkins to ensure that he has read them.
9  He's the expert.  And that he understands
10  them.
11  BY MR. C. PLACITELLA:
12    Q.  Ma'am, that wasn't my question.
13         My question was, am I correct that
14  when you swore to interrogatories under oath
15  on behalf of Johnson & Johnson and others
16  swore to interrogatories under oath of
17  Johnson & Johnson, none of the tests in that
18  book were ever supplied or referenced in any
19  way, correct?
20         MR. BERNARDO:  Object to the
21  form of the question.
22         THE WITNESS:  It -- it was not
23  appropriate to do that, because, again, we
24  had the experts answering the questions based
25  on their information and their knowledge.

Page 261

1  There's no specific set of studies that goes
2  with each answer.
3  BY MR. C. PLACITELLA:
4    Q.  All right.  Let me ask the question
5  again, please.
6         When you answered interrogatories
7  under oath and others did the same thing on
8  behalf of Johnson & Johnson, you can't point
9  to a single instance where any of the results
10  that are in that book were ever supplied or
11  referenced by Johnson & Johnson, correct?
12    A.  Well, I can't speak for others who
13  have provided answers, but I can speak for
14  what I did.  And, again, I did not go back
15  and look at each one of these.  Again, I
16  trusted the people that I asked to respond to
17  the questions.
18    Q.  Ma'am, we'd like to finish --
19         MR. BERNARDO:  Listen to his
20  question.
21  BY MR. C. PLACITELLA:
22    Q.  -- at some point in time, okay?
23         MR. BERNARDO:  It's getting
24  late, but just listen to his question.
25  BY MR. C. PLACITELLA:

66  (Pages 258 to 261)



Page 262

1      Q.  Ma'am, please.
2          When you answered interrogatories
3   under oath, you never supplied or referenced
4   any of the studies that are set forth in that
5   book in front of you, true?
6      A.  No, I did not.
7      Q.  And as you sit here today, you
8   don't have any evidence that anybody else at
9   Johnson & Johnson when they were certifying
10  answers to interrogatories referenced or
11  supplied any of the testing documents in that
12  book in front of you, correct?
13     A.  Not in direct response, no.
14         MR. C. PLACITELLA:  Now, can
15  you give me 282?
16         (Exhibit J&J-282, is marked for
17  identification.)
18  BY MR. C. PLACITELLA:
19     Q.  Do you know how many times
20  Johnson & Johnson filed affidavits in courts
21  of law indicating that there was no evidence
22  whatsoever in order to get people's cases
23  dismissed?
24         MR. BERNARDO:  Object to the
25  form of the question.

Page 263

1          THE WITNESS:  No, I do not.
2   BY MR. C. PLACITELLA:
3      Q.  You have in front of you another
4   Affidavit signed by Roger Miller a year after
5   the Edley Affidavit in the Andonian case,
6   correct?
7          MR. BERNARDO:  Object to the
8   form of the question.
9          THE WITNESS:  I see those
10  names, yes.
11  BY MR. C. PLACITELLA:
12     Q.  Right.  And, again, Roger Miller
13  states under oath, All of the talc mined by
14  Windsor Minerals, Inc. has been regularly
15  sampled or tested for the presence of
16  asbestos.  No evidence of the presence of
17  asbestos in Windsor Minerals' product has
18  ever been revealed by this testing.
19         Correct?
20     A.  That's what it says.
21     Q.  And if I go to --
22         MR. C. PLACITELLA:  Where is
23  the chart?
24  BY MR. C. PLACITELLA:
25     Q.  By 1988 according to the Hopkins

Page 264

1   chart, there were one, two, three, four,
2   five, six, seven, eight, nine, ten, 11, 12,
3   13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23,
4   24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34,
5   35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45;
6   do you see that?  Forty-five entries on
7   Dr. Hopkins' chart talking about testing
8   evidence on asbestos, correct?
9          MR. BERNARDO:  Object to the
10  form of the question, beyond the scope of the
11  notice.
12         You can answer in your
13  individual capacity, if you can.
14         THE WITNESS:  I heard you count
15  them up to those numbers, but...
16  BY MR. C. PLACITELLA:
17     Q.  Well, do you want to count it again
18  and see if I got it right?
19     A.  It's not necessary for me.  I
20  cannot comment on this chart.
21     Q.  And not one of the tests set forth
22  in that chart or in that book are referenced
23  anywhere on the Andonian Affidavit filed by
24  Roger Miller in order to get cases dismissed,
25  correct?

Page 265

1          MR. BERNARDO:  Object to the
2   form of the question.  Object, beyond the
3   scope of the notice.
4          You can answer in your
5   individual capacity, if you can.
6          THE WITNESS:  I can't comment
7   on it.
8   BY MR. C. PLACITELLA:
9      Q.  None of the tests referenced on the
10  chart up until the time he signed this
11  Affidavit in 1988 are referenced anywhere in
12  his Affidavit, correct?
13         MR. BERNARDO:  Same objection.
14         THE WITNESS:  I'm not prepared
15  to comment on the Affidavit or any of the
16  testing on the chart.
17  BY MR. C. PLACITELLA:
18     Q.  Ma'am, all I'm asking you is any of
19  the testing listed on the chart, any of them
20  reflected anywhere in his Affidavit?
21         MR. BERNARDO:  Same objection.
22         THE WITNESS:  I do not see them
23  listed here, no.
24  BY MR. C. PLACITELLA:
25     Q.  Okay.



Page 266

1          MR. C. PLACITELLA:  Now, can
2    you give me 195, please?
3          (Exhibit J&J-195, Affidavit, is
4    marked for identification.)
5    BY MR. C. PLACITELLA:
6      Q.   195.
7          MR. BERNARDO:  Same objection
8    with respect to the use of the document.
9    BY MR. C. PLACITELLA:
10     Q.   Is an Affidavit --
11         MR. BERNARDO:  I won't repeat
12   it, same objection with respect to the use of
13   this document.
14   BY MR. C. PLACITELLA:
15     Q.   -- signed by William Ashton in
16   Somerset County, New Jersey, do you see that?
17     A.   I see it's an Affidavit.  And I see
18   Mr. Ashton's name.
19     Q.   And Mr. Ashton is one of the
20   scientists who was knowledgeable and who
21   worked on the talc litigation, correct?
22     A.   He was assigned to Johnson &
23   Johnson, yes.
24     Q.   In fact, he was involved in the
25   defense of the Westfall case, correct?

Page 267

1      A.   I don't know for sure.
2      Q.   And he was known --
3          MR. C. PLACITELLA:  Okay.  Let
4    me -- can we go to the Elmo, please?  Sorry.
5    BY MR. C. PLACITELLA:
6      Q.   This is in the privilege log chart.
7    Do you see here talks about the Westfall
8    case?
9          MR. BERNARDO:  I'll renew my
10   objection with respect --
11   BY MR. C. PLACITELLA:
12     Q.   Do you see that?
13         MR. BERNARDO:  With respect --
14         THE WITNESS:  I see --
15         MR. BERNARDO:  -- to the use of
16   the privilege log.
17   BY MR. C. PLACITELLA:
18     Q.   Okay.
19     A.   I see what you've highlighted.
20     Q.   All right.  And do you see if you
21   go across that William Ashton was involved in
22   the case; do you see that?
23     A.   I see his name that you're
24   highlighting.
25     Q.   And he corresponded with the

Page 268

1    lawyers in the Westfall case, correct?
2      A.   I see you're highlighting names.  I
3    don't know what this all means.
4      Q.   And also involved according to this
5    log was the Medical Director for Johnson &
6    Johnson, he was involved in the Westfall case
7    according to this log, correct?
8      A.   I see you have highlighted those
9    names.
10     Q.   Okay.  So William Ashton clearly
11   knew what was going on in the Westfall case,
12   as did the Medical Director for Johnson &
13   Johnson, correct?
14         MR. BERNARDO:  Object to the
15   form of the question.
16         THE WITNESS:  I can't comment.
17   This was the first time I saw this.  I don't
18   know what it is and I was not here today to
19   talk about this.
20   BY MR. C. PLACITELLA:
21     Q.   Okay.  Well, let's look at --
22         MR. C. PLACITELLA:  Can we go
23   back to the iPad, please?
24   BY MR. C. PLACITELLA:
25     Q.   Ashton states in the beginning of

Page 269

1    his Affidavit that he has been involved in
2    the talc business for Johnson & Johnson for
3    35 years, correct?
4      A.   That's what it says.
5      Q.   Okay.  And he's been to the talc
6    deposits and knows all about them, correct?
7      A.   It says he was actively involved.
8      Q.   Okay.  And then can you go to the
9    next page of his Affidavit?  He says, From
10   the 1940s to the 1980s, talc mined in Vermont
11   and specifically, the talc mined by Engelhard
12   (and its predecessors) from the talc mine
13   located in Johnson, Vermont has been
14   considered to be talc free from contamination
15   of asbestos.
16         Do you see that?
17         MR. BERNARDO:  Object to the
18   form of the question, same objection --
19   BY MR. C. PLACITELLA:
20     Q.   Do you see that?
21         MR. BERNARDO:  -- with respect
22   to this Affidavit and the scope of this
23   notice.
24   BY MR. C. PLACITELLA:
25     Q.   Do you see that?



Page 270

1     A.  I see that's what those sentences
2  say.
3     Q.  That's a lie, right?
4        MR. BERNARDO:  Object to the
5  form of the question.
6        THE WITNESS:  I cannot comment
7  on this.  I was not here today prepared to
8  talk about this.  It's...
9  BY MR. C. PLACITELLA:
10    Q.  Well, you were here again today,
11  designated as to the veracity of the
12  discovery responses historically by Johnson &
13  Johnson, correct?
14    A.  It is my understanding that this is
15  not within the scope of what I was here today
16  to talk about.
17    Q.  Okay.  And if you look in the
18  Affidavit, Mr. Ashton actually attaches one
19  of the depositions from the Westfall case,
20  correct?
21        MR. BERNARDO:  Object to the
22  form of the question, same objection with
23  respect to the scope.
24        THE WITNESS:  It says that's
25  what it is.

Page 271

1  BY MR. C. PLACITELLA:
2     Q.  Right.
3        It was a videotaped deposition of
4  Alfred Chidester; do you see that?
5     A.  That's what it says.
6     Q.  And when he attaches the
7  deposition, he doesn't reference at all the
8  depositions of the scientists who testified
9  in the Westfall case who said they found
10  asbestos in the mine, does he?
11        MR. BERNARDO:  Object to the
12  form of the question.
13        THE WITNESS:  I'm not here
14  today to talk about this.  So I have no idea
15  what he did or didn't do or why he did or
16  didn't do.
17  BY MR. C. PLACITELLA:
18    Q.  Ma'am, why don't you take a look at
19  the Affidavit and see if he attaches anywhere
20  the transcripts of the actual scientists who
21  did the testing and who've testified under
22  oath, as we went through before, that they
23  found asbestos in the mine.  Take a look, see
24  if it's there.
25    A.  I don't see any other testimony,

Page 272

1  no.
2     Q.  He certainly didn't attach the
3  testimony of Dr. Hemstock that I put up here
4  on the screen, who testified that he found
5  chrysotile asbestos in the mine, did he?
6        MR. BERNARDO:  Object to the
7  form of the question.  Object to the use of
8  this Affidavit.  And this testimony is beyond
9  the scope of this notice.
10        THE WITNESS:  I have not seen
11  this before.  My understanding is beyond
12  the scope.  And I'm -- I would have to read
13  this whole thing.
14  BY MR. C. PLACITELLA:
15    Q.  Okay.  And, ma'am, so when this
16  Mr. Talc, Johnson & Johnson's Mr. Talc stated
17  under oath in an Affidavit that the talc and
18  the mine was asbestos-free, that was a fib,
19  right?
20        MR. BERNARDO:  Object to the
21  form of the question.  Same objection with
22  respect to the scope.
23        THE WITNESS:  Are you referring
24  to Mr. Ashton when you say --
25  BY MR. C. PLACITELLA:

Page 273

1     Q.  Yes, ma'am.
2     A.  -- "Mr. Talc"?
3     Q.  Yes, ma'am.
4     A.  I know him as Mr. Ashton.
5        I -- I can't comment on this.  I
6  did not come here today to discuss this.
7     Q.  Do you know how many cases were
8  dismissed for people by -- that -- how many
9  cases this Affidavit caused to be dismissed?
10        MR. BERNARDO:  Object to the
11  form of the question, beyond the scope.
12        You can answer in your personal
13  capacity if you can.
14        THE WITNESS:  I do not know.
15  BY MR. C. PLACITELLA:
16    Q.  Do you think this was an okay thing
17  to do?
18        MR. BERNARDO:  Same objection.
19  BY MR. C. PLACITELLA:
20    Q.  The Chief Scientist in talc for
21  Johnson & Johnson, does Johnson & Johnson
22  think this was an okay thing to do, to file
23  an Affidavit saying there's no evidence,
24  when, in fact, he was involved in the lawsuit
25  himself and saw the evidence, think that's



Page 274

1  okay?
2       MR. BERNARDO:  Same objection.
3       THE WITNESS:  I can't answer
4  that.
5  BY MR. C. PLACITELLA:
6    Q.  Well, I'm not asking if you can
7  answer.  I'm asking you, Johnson & Johnson,
8  do you think that's okay --
9       MR. BERNARDO:  Same objection.
10 BY MR. C. PLACITELLA:
11   Q.  -- to do that?
12      MR. BERNARDO:  Not here to
13 answer questions beyond the scope of the
14 notice.
15      THE WITNESS:  I can't answer
16 that.
17 BY MR. C. PLACITELLA:
18   Q.  You can't or you won't?
19   A.  I'm not here today to talk about
20 that.
21   Q.  Okay.
22      MR. C. PLACITELLA:  Can you
23 give me 446?
24      (Exhibit J&J-446, Agreement, is
25 marked for identification.)

Page 275

1  BY MR. C. PLACITELLA:
2    Q.  Take a second, because it's big.
3    Can you take a look at that,
4  please?
5    446 is an Agreement between Cypress
6  Minerals and Johnson & Johnson, dated
7  January 6, 1989; do you see that?
8       MR. BERNARDO:  Object to the
9  form of the question, beyond the scope of the
10 notice.
11 BY MR. C. PLACITELLA:
12   Q.  That was during the time that you
13 were working on the talc cases, right?
14   A.  This is during the time that I was
15 employed by Johnson & Johnson, yes.
16   Q.  Okay.  And according to Exhibit I,
17 Johnson & Johnson was named in numerous cases
18 as of 1989, correct?
19      MR. BERNARDO:  Object to the
20 form of the question.
21      THE WITNESS:  I've never seen
22 this before.  I don't know how to read it.
23 This doesn't seem to be within scope.  And so
24 I can't comment.
25 BY MR. C. PLACITELLA:

Page 276

1    Q.  Ma'am, there's -- mentioned is the
2  Andonian case, correct?
3    A.  I see that name.
4    Q.  All right.  That's the Affidavit
5  that I just showed you, right --
6    A.  Yes, you did.
7    Q.  -- from Mr. Miller?
8    And then there's another one, the
9  Miller case; do you see that?
10   A.  I see those names.
11   Q.  Okay.  And in preparing for today's
12 deposition, did you look at any of the
13 discovery from any of those cases?
14      MR. BERNARDO:  Object to the
15 form of the question.
16      THE WITNESS:  No, I did not.
17 BY MR. C. PLACITELLA:
18   Q.  Okay.  And if you look at the next
19 page, do you see that they actually detail
20 where the cases are filed and they total that
21 as of 1989 there were 1,827 cases involving
22 Windsor at that point in time; do you see
23 that?
24      MR. BERNARDO:  Object to the
25 form of the question, beyond the scope of the

Page 277

1  notice.  She's not here as a corporate
2  representative with respect to the litigation
3  profile.
4       THE WITNESS:  All I can see is
5  what you point out to me in the numbers and I
6  have not seen this before.
7  BY MR. C. PLACITELLA:
8    Q.  And you have not reviewed in
9  preparation for today's deposition any of the
10 discovery responses from any of those 1,800
11 cases, correct?
12      MR. BERNARDO:  Object to the
13 form of the question.
14      THE WITNESS:  It is my
15 understanding that these were not within the
16 scope of the notice.
17 BY MR. C. PLACITELLA:
18   Q.  And how do you say that?
19   A.  Excuse me?
20   Q.  Why is that?
21      Why is that?
22      Why aren't they in the scope?
23   A.  Because that was not our
24 interpretation of this and there seems to be
25 some misunderstanding about that.

70  (Pages 274 to 277)



MAGNA
LEGAL SERVICES

Page 278

1      Q.  So you are -- Johnson & Johnson,
2  you have an interpretation or is that
3  something the lawyer told you?
4              MR. BERNARDO:  Object to the
5  form of the question.
6              THE WITNESS:  That is my
7  understanding.
8  BY MR. C. PLACITELLA:
9      Q.  Okay.  So when you prepared for
10  today's deposition, you didn't look at any of
11  the discovery responses from any of these
12  1,800 cases, correct?
13      A.  That's correct.
14      Q.  Okay.  And you didn't even know
15  about the false affidavits that Roger Miller
16  filed in connection with these cases, did
17  you?
18              MR. BERNARDO:  Object to the
19  form of the question, characterization of the
20  Affidavit.
21              THE WITNESS:  I can't comment
22  one way or the other on the affidavits.
23  BY MR. C. PLACITELLA:
24      Q.  Okay.  Now, at this same period of
25  time while you were handling these cases,

Page 279

1  Johnson & Johnson, or you were the point
2  person, destroyed all the records they had --
3              MR. BERNARDO:  Object.
4  BY MR. C. PLACITELLA:
5      Q.  -- at the mine, correct?
6              MR. BERNARDO:  Object to the
7  form of the question, outside the scope of
8  the notice.  This witness is not here to
9  testify with respect to documentation from
10  the mine.
11  BY MR. C. PLACITELLA:
12      Q.  Ma'am, you understand that part of
13  the obligation of a company is to turn over
14  the records it has in the context of
15  discovery, correct?
16      A.  I know that their obligation is to
17  turn over whatever is requested.
18      Q.  And to keep, when they're sued over
19  and over again, to keep those records,
20  correct?
21              MR. BERNARDO:  Object.
22  BY MR. C. PLACITELLA:
23      Q.  You know that?
24              MR. BERNARDO:  Object to the
25  form of the question, calls for a legal

Page 280

1  conclusion.
2              (Reporter clarification.)
3              MR. BERNARDO:  Calls for a
4  legal conclusion.  This witness is not here
5  to testify with respect to legal hold
6  obligations.
7              THE WITNESS:  I don't know the
8  specifics of any requirements.
9  BY MR. C. PLACITELLA:
10      Q.  Ma'am, when you certified answers
11  to interrogatories under oath in the
12  Krushinski case, you did it without the
13  benefit of any of the documents that were
14  kept at the mine where the product came out,
15  right?
16              MR. BERNARDO:  Object to the
17  form of the question.
18              THE WITNESS:  As I've -- I've
19  already addressed, that there were no
20  specific documents that were in response to
21  the questions.  That we relied upon the
22  knowledge and the expertise of the particular
23  people who answered the questions.
24  BY MR. C. PLACITELLA:
25      Q.  Ma'am, no one ever told you as the

Page 281

1  corporate representative of Johnson & Johnson
2  that all of the records related to the mine
3  were actually destroyed in 1989 while
4  litigation was pending?
5              You did not know that before you
6  came here today?
7              MR. BERNARDO:  Object to the
8  form of the question.
9              Chris, I've said this many
10  times and I'm going to begin to instruct the
11  witness not to answer, because this is
12  nothing short of harassment.
13              MR. C. PLACITELLA:  Yeah, well,
14  we'll see.
15              MR. BERNARDO:  No, no, let me
16  finish.
17              You know she is not here to
18  address this.  We've made that abundantly
19  clear.
20              MR. C. PLACITELLA:  I know what
21  you think.
22              MR. BERNARDO:  You continue --
23  it's not what I think.
24              MR. C. PLACITELLA:  That's what
25  you think.



Page 282

1          MR. BERNARDO: It's what we've
2  told you. And we've made it abundantly
3  clear. And you're now asking her questions
4  about legal holds and documents that you well
5  know the response and position on.
6          MR. C. PLACITELLA: Okay, okay.
7  BY MR. C. PLACITELLA:
8      Q. Ma'am, did you know that when you
9  were certifying answers to interrogatories
10  that all of the documents related to the
11  Hammondsville mine were destroyed; did you
12  know that?
13          MR. BERNARDO: Object to the
14  form of the question and the
15  characterization.
16          THE WITNESS: I don't know
17  anything about documents at the mines.
18  BY MR. C. PLACITELLA:
19      Q. I'm going to show you what's been
20  marked J&J-456.
21          (Exhibit J&J-456, Memo, is
22  marked for identification.)
23  BY MR. C. PLACITELLA:
24      Q. J&J-456 is a memo from R. Denton on
25  Johnson & Johnson letterhead.

Page 283

1      Who's R. Denton?
2      A. I don't know.
3      Q. To W. Ashton. That's Bill Ashton,
4  right?
5      A. I would assume so.
6      Q. He's the same Ashton who executed
7  the Affidavit we just went through, correct?
8      A. Yes, he is.
9      Q. Okay. And on page 3 of the
10  Johnson & Johnson memo it states, quote, The
11  specifics of the mining operation at
12  Hammondsville are uncertain, as most of the
13  pre-Luzenac records were destroyed by the
14  mine management just -- staff, just prior to
15  the J&J divestiture and the Cyprus purchase.
16      Do you see that?
17          MR. BERNARDO: Object to the
18  form of the question.
19  BY MR. C. PLACITELLA:
20      Q. Do you see that?
21          MR. BERNARDO: Outside the
22  scope of the notice and object to --
23          (Multiple speakers,
24  overlapping, unintelligible crosstalk.)
25  BY MR. C. PLACITELLA:

Page 284

1      Q. Is today the first time that you
2  learned --
3          THE COURT REPORTER: I'm sorry,
4  I didn't get the tail end of his objection.
5          MR. BERNARDO: Sorry. And
6  objected to asking the witness about this
7  document. She's not answering in a corporate
8  capacity.
9  BY MR. C. PLACITELLA:
10      Q. Is today the first time that you
11  learned that when you were certifying
12  interrogatories under oath that the documents
13  concerning the mining operation of
14  Hammondsville were destroyed before you ever
15  answered the interrogatory?
16          MR. BERNARDO: Object to the
17  form.
18  BY MR. C. PLACITELLA:
19      Q. Today's the first time you learned
20  that?
21          MR. BERNARDO: Object to the
22  form of the question, same objections as
23  before.
24          THE WITNESS: I have not seen
25  this before. It's my understanding that this

Page 285

1  is not what I'm here to discuss.
2  BY MR. C. PLACITELLA:
3      Q. Ma'am, I'm asking you a question.
4      When you certified interrogatories
5  under oath, is this the first time that you
6  learned that the documents from the mine, the
7  Hammondsville mine that was the source for
8  the baby powder were destroyed? It's a yes
9  or no answer.
10          MR. BERNARDO: Object to the
11  form of the question.
12          THE WITNESS: I'm trying to
13  answer you. I am not here today to talk
14  about this. This is the first I have seen
15  it.
16          MR. C. PLACITELLA: Okay.
17  Let's take a break.
18          THE VIDEOTAPE OPERATOR: The
19  time is 3:56 p.m., off the record.
20          (Brief recess.)
21          THE VIDEOTAPE OPERATOR: Time
22  is 4:18 p.m., on the record.
23          MR. BERNARDO: So
24  Mr. Placitella and I discussed how much more
25  time he believes he needs to take this



Page 286

1  deposition.  And I believe he indicated at
2  least several more hours.
3       I also have a direct
4  examination that I would like to do of the
5  witness.
6       Miss Musco during the break
7  told me that she's been here all day and
8  getting tired.  And that if we're going to
9  have to continue, she would prefer to do that
10  on a separate date.
11       Mr. Placitella and I obviously
12  from the transcript disagree as to what the
13  proper scope of this deposition is and should
14  be, but we will sort that out among ourselves
15  and possibly or probably with Judge Viscomi.
16       I will reserve my right to do a
17  direct exam of Miss Musco.
18       But, otherwise, we agree that
19  after marking and having Miss Musco describe
20  the box of documents that she has brought
21  with her today, we will adjourn for today and
22  meet and confer as to the remainder of the
23  deposition.
24       Is that a fair
25  characterization, Mr. Placitella?

Page 287

1       MR. C. PLACITELLA:  We agree.
2       MR. BERNARDO:  Look at that.
3  See what happens on a Friday afternoon.
4       MR. C. PLACITELLA:  We can
5  always agree to disagree.
6       MR. BERNARDO:  Well, do you
7  want to ask her to -- or how do you --
8       MR. C. PLACITELLA:  Well, I
9  want to just go through these documents,
10  identify them and have them marked and this
11  way we'll save time next time.
12       MR. BERNARDO:  Do you
13  understand what he's asking you to do?
14       THE WITNESS:  Yes.
15  BY MR. C. PLACITELLA:
16    Q.  So the first one is --
17       MR. BERNARDO:  So let me just
18  for the record point out that -- that we
19  brought with us today a banker's box of
20  various binders and other documents that
21  Miss Musco had reviewed or otherwise
22  considered in connection with her preparation
23  for today's deposition.  And we're going to
24  have Miss Musco describe each of them for the
25  record.

Page 288

1       (Exhibit P-6, Depositions and
2  testimony of Dr. Hopkins, is marked for
3  identification.)
4  BY MR. C. PLACITELLA:
5    Q.  All right.  What's that marked,
6  P-6?
7    A.  Yeah, P-6.
8    Q.  All right.  Marked P-6, what's P-6?
9    A.  P-6 is the depositions and
10  testimony of Dr. Hopkins, which I reviewed.
11    Q.  Okay.  Did you look at any of the
12  ones I took?
13    A.  Excuse me?
14       MR. BERNARDO:  Matter of fact,
15  I think she did.
16  BY MR. C. PLACITELLA:
17    Q.  Did you look at the ones I took?
18    A.  Oh, I was most interested in those.
19    Q.  Okay.  So then you know all about
20  the chart.
21       (Exhibit P-7, Testimonies and
22  interrogatories for Selby and Krushinski, is
23  marked for identification.)
24       THE WITNESS:  Okay.  These are
25  the specific interrogatories of Selby.

Page 289

1  And -- yeah.
2  BY MR. C. PLACITELLA:
3    Q.  Just identify the exhibit number.
4    A.  Oh, sorry.
5    Q.  Please.
6    A.  P-7.
7    Q.  Okay.
8       MR. BERNARDO:  Please make sure
9  your description is complete for the record.
10       THE WITNESS:  Yes, these
11  include testimonies and interrogatories of
12  for Selby and Krushinski, the specific
13  complaints.
14       (Exhibit P-8A, Documents sent
15  to Dr. Hopkins, is marked for
16  identification.)
17       (Exhibit P-8B, Documents sent
18  to Dr. Hopkins, is marked for
19  identification.)
20       THE WITNESS:  These are
21  already --
22  BY MR. C. PLACITELLA:
23    Q.  No, stick... Just --
24    A.  Oh, sorry.  P-8.
25    Q.  Mm-hmm.



Page 290

1    A.  Oh, P-8A, P-8B.  And if you put
2  them together these should be everything
3  that's contained in your big binder of all
4  the documents that were sent to Dr. Hopkins.
5         (Exhibit P-9, Unidentified
6  documents, is marked for identification.)
7         THE WITNESS:  P-9, these were
8  the specific documents I believe that you
9  sent us, yes, like, two days ago, yes.  What
10  they are, I don't know.
11  BY MR. C. PLACITELLA:
12    Q.  You don't know what's in there?
13    A.  It looks like a lot of scientific
14  stuff.
15    Q.  So am I correct that you didn't
16  review any of that in preparation --
17    A.  Yes, I went through it all.
18    Q.  Oh, you did?
19    A.  Yeah.
20    Q.  Oh, okay.
21         (Exhibit P-10, Deposition
22  transcript of Nancy Musco, is marked for
23  identification.)
24         THE WITNESS:  P-10 would be the
25  transcript of my deposition in November 28,

Page 291

1  yeah, 28th.
2         MR. BERNARDO:  You can just
3  identify all of these together.
4         THE WITNESS:  Yeah, these were
5  specific complaints that I asked to see,
6  Selby, Krushinski and Westfall.
7         (Exhibit P-11, Complaint, is
8  marked for identification.)
9         (Exhibit P-12, Complaint, is
10  marked for identification.)
11         (Exhibit P-13, Complaint, is
12  marked for identification.)
13         THE WITNESS:  Oh, I'm sorry,
14  P-13, I keep forgetting, 11, 12, and 13.
15         (Exhibit P-14, Notes, is marked
16  for identification.)
17         THE WITNESS:  These were the
18  notes that I took during my conversation with
19  Dr. Hopkins, P-14.
20         MR. BERNARDO:  That's
21  everything.
22  BY MR. C. PLACITELLA:
23    Q.  Is that everything?
24         MR. BERNARDO:  That's
25  everything that's in the box.

Page 292

1  BY MR. C. PLACITELLA:
2    Q.  All right.  We have to work out a
3  day.  Thank you for -- have a good weekend.
4         MR. PLACITELLA:  Happy
5  birthday.
6         (Off-the-record discussion.)
7         THE VIDEOTAPE OPERATOR:  This
8  concludes the deposition.  The time is
9  4:24 p.m.  We're off the record.
10         (Witness excused.)
11         (Testimony concluded at
12  4:24 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 293

1          C E R T I F I C A T E
2    I, Sharon L. Martin, a Notary Public,
3  Certified Court Reporter of the State of New
4  Jersey, Registered Professional Reporter, do
5  hereby certify that prior to the commencement
6  of the examination,
7          NANCY MUSCO
8  was duly sworn by me to testify to the truth,
9  the whole truth and nothing but the truth.
10  I do further certify that the foregoing is a
11  true and accurate transcript of the testimony
12  as taken stenographically by and before me at
13  the time, place and on the date hereinbefore
14  set forth.
15  I do further certify that I am neither a
16  relative nor employee nor attorney nor
17  counsel of any of the parties to this action,
18  and that I am neither a relative nor employee
19  of such attorney or counsel and that I am not
20  financially interested in this action.
21  _____
22  SHARON L. MARTIN, RPR, CCR-NJ-XI02021
23  Notary Public
24  My Commission Expires September 25, 2021
25  Date:  2/19/2019

74  (Pages 290 to 293)



**A**

**a.m** 1:18 11:16 89:2 89:5
**able** 73:7 199:19 216:13
**absolutely** 34:15 46:6 235:6
**abundantly** 281:18 282:2
**accurate** 29:8,20 32:5,13 36:24 61:21 115:1,13 122:18 123:9 129:2 135:9 174:6 194:24 225:22 249:7,16,25 293:11
**acknowledged** 155:9 166:1
**action** 1:2 2:2,14 3:2,14 4:2,12 5:2 5:11,20 293:17,20
**actively** 269:7
**actual** 80:3 113:19 169:16 271:20
**ad** 8:18 180:25 181:1,4
**addition** 69:23 195:11 205:1 226:16
**additional** 183:21
**additives** 234:20 237:19
**address** 14:14 104:6 135:15 167:21 170:5 195:21 217:18 281:18
**addressed** 197:8 280:19
**adjourn** 286:21
**adjudication** 218:24
**ADMINISTRAT...** 3:16

**admission** 62:6
**admits** 244:15
**admitted** 194:11
**Affidavit** 9:20 224:23 225:1,10 226:10 228:10,18 228:25 229:21 230:19 231:21 232:4 233:12 236:19 238:7,12 240:21 245:4 246:21 251:1,5,13 251:14 252:24 253:13,20 254:6,9 254:16,18 255:10 255:21,24 256:17 257:3,20,21 258:2 258:7,12,18,19 263:4,5 264:23 265:11,12,15,20 266:3,10,17 269:1 269:9,22 270:18 271:19 272:8,17 273:9,23 276:4 278:20 283:7
**affidavits** 262:20 278:15,22
**afternoon** 287:3
**ago** 159:19 290:9
**agree** 115:16 254:5 286:18 287:1,5
**agreement** 10:8 168:18 274:24 275:5
**Aha** 125:22
**ahead** 43:13,15 50:20 52:16 117:8 119:16 140:13 174:14,16 176:4 176:11 214:14 220:8
**airways** 158:7 181:14
**al** 1:8 2:8,20 3:8,22 4:7,17 5:7,16,24 11:12

**Alfred** 3:3 271:4
**allegations** 24:1 28:10
**alleged** 20:20 23:5 72:10 110:1 111:14
**alleges** 204:11
**alleging** 25:5 48:1,9 48:16 49:2
**allergies** 158:1
**allowing** 69:14
**alluded** 236:18
**Amax** 4:7 7:13
**ambiguous** 120:2
**AMERICA** 2:8,20 3:7,22 5:6,15,24
**amount** 35:12 37:5 38:10,12,24 39:20 40:10 243:1
**amphibole** 245:23
**amphiboles** 250:11
**analysis** 210:24
**Andonian** 109:16 263:5 264:23 276:2
**ANDREW** 6:11
**andrew.karp@s...** 6:13
**ANITA** 3:3
**answer** 14:9,25 23:2,3,14,15,21 24:12 25:1,14,16 26:12,14 27:17 28:14,23 30:13 32:21 33:7,19 35:14,17,19 36:2 36:3 38:7,10 39:7 39:13 40:4 41:17 42:1,17 43:3 44:11 45:3 46:3 47:10,11 48:21 50:21 52:16,18 56:18 60:14 61:6 64:25 73:24 80:17 87:24 89:10 94:13 94:15 95:1 96:14

**101:1 104:7** 116:17 117:22 118:18 120:3,4 121:4 122:15 123:3,6 124:6,15 124:16 125:17,23 127:4 129:18 132:14 134:4,7,10 134:23 135:15,16 136:1,21 137:15 141:6,12,25 142:6 157:1 162:7 163:3 163:22 166:13 173:20 176:4 178:10 179:12 183:11 184:22,22 188:16,18,25 189:19,24 191:2 194:8 198:19 199:19 203:21 209:13,18 211:16 211:19,23 212:20 214:14 229:5 236:8 237:24 241:6 242:15 243:6,20,23 246:15 249:20 250:4,21 255:7 256:19 257:8 258:5 259:4 261:2 264:12 265:4 273:12 274:3,7,13 274:15 281:11 285:9,13
**answered** 19:6 45:5 55:24 56:15 121:18 122:13 123:14 125:3 193:14,20 194:5 196:12 200:9 244:11 256:5,6 261:6 262:2 280:23 284:15
**answering** 118:8 119:2 129:14 132:17 133:1,20

**139:16 193:17** 205:25 226:11 228:14 231:24 260:24 284:7
**answers** 9:21 14:6 16:19 38:4 53:13 55:15 57:8 69:14 115:8,24 120:13 124:1 127:14 131:1 133:13 135:13,22 138:24 171:22 172:23 173:4 185:3 187:12 195:25 200:18 210:2 232:11 242:1 243:24 244:20,24 249:14 259:22 261:13 262:10 280:10 282:9
**anticipated** 75:13 75:19 80:8 92:20 93:21
**anybody** 26:22 49:10 150:17 262:8
**Anytime** 128:1
**apparently** 93:7
**Appearance** 11:25
**appears** 174:8 188:12
**apple** 92:15
**application** 15:5
**appropriate** 23:21 24:12,25 26:14 54:6 55:14 98:10 101:15 127:6 129:13 191:5 260:23
**approximately** 20:4,6,9 21:12 22:8
**April** 9:15 65:5,18
**area** 56:6 211:3,23
**Argonaut** 247:13
**armpits** 114:17



**ARPS** 6:10
**asbestos** 13:11 15:9
   20:20,23 30:22
   31:2,7,21 35:12
   37:6,14 38:10,13
   38:24 39:4,21
   40:1,10,14,17,19
   40:22 41:3,15,20
   41:23 42:13,21,25
   44:7,18 47:2,12
   68:1 77:16 84:6
   84:16 85:9,20
   95:7,19,25 97:14
   98:3,23 100:4,19
   102:2,8 103:3
   104:2 120:14,23
   121:8,15 123:21
   124:9,20 127:18
   127:19 128:9
   129:24 130:14
   131:25 132:1,16
   133:4,23 135:24
   136:12,14,25
   137:19 138:12
   139:5,10 140:2
   141:10 142:4,14
   143:18 144:19
   145:23 149:13
   168:3 176:3 182:5
   182:12,19 187:17
   188:4 191:23
   192:1,2,6,9,14,16
   192:20,24 193:3
   193:23 194:2,6,9
   195:5,10,14,18,21
   196:3,9,19 197:3
   197:4 198:7,14,17
   198:22,25 199:16
   199:24 200:10
   205:21 206:19
   208:10 209:11,15
   212:16 214:7
   217:5 222:8 227:5
   227:19 230:22
   232:21 236:8,20
   237:23 239:10

   241:19 242:21,22
   243:5,18 244:16
   246:15 247:9,11
   247:18 248:16
   250:10,13,21
   252:18 253:4
   263:16,17 264:8
   269:15 271:10,23
   272:5
**asbestos-free**
   141:11 142:5,15
   144:20 272:18
**Ashton** 66:3 217:2
   217:4 266:15,19
   267:21 268:10,25
   270:18 272:24
   273:4 283:3,3,6
**Ashton's** 266:18
**asked** 18:5,11
   20:18 29:1,15
   30:7,21,24 37:2,7
   37:13,16 38:21
   39:9,17 45:5
   54:13 56:15 70:9
   72:3 78:10 84:13
   102:18 105:23
   121:23 123:14
   128:4,6 132:9
   134:18 148:1
   164:1 177:8 190:7
   193:16 195:11,14
   199:20 200:15
   209:8 222:7
   241:13,17 244:10
   249:14 254:4
   256:5 261:16
   291:5
**asking** 31:1 33:10
   41:2 47:6 48:13
   48:14 55:19 79:16
   79:17 99:8 100:17
   102:25 103:1
   128:2 130:19
   141:3 153:16
   162:10,10 175:16
   176:25 179:2,5

   183:16 185:17
   191:9 207:9
   216:16 217:9,22
   235:11 255:9
   265:18 274:6,7
   282:3 284:6 285:3
   287:13
**asks** 13:7 49:25
   174:10 177:4
   189:5 194:8
**assay** 229:24
**asserted** 28:11 47:1
   97:15
**asserts** 139:25
**assigned** 266:22
**associated** 14:17,22
   91:21,24 114:1
   119:21
**assume** 50:22 58:7
   89:12 151:1
   157:22 205:18
   283:5
**attach** 272:2
**attached** 9:23
**attaches** 228:3
   270:18 271:6,19
**attachment** 75:11
   75:18 92:14,15,18
**attended** 208:9
**Attention** 157:11
**attest** 98:22
**attorney** 74:11
   160:23 293:16,19
**attorneys** 88:15
   165:24
**attributed** 67:5
**audio** 35:7,9 36:5
   41:10 42:3 46:21
   47:14 116:8,20
   117:10,25 119:18
   120:6 126:22
   127:8 141:5,14,24
   142:8
**auditors** 68:25
**author** 148:20
**authority** 63:19

   84:3
**autopsy** 204:10
**available** 16:3
   24:19 25:14 58:23
   59:2 81:16 107:5
   111:20,22 113:9
   113:11,22 114:2
   114:12 169:10
   171:21,24 198:11
   201:10,25 202:7
   242:5 245:1
**Avenue** 7:17
**avenues** 20:3
**Avon** 1:7 11:12
**aware** 24:18 25:4
   25:10 26:17 27:1
   42:10 86:19 90:17
   138:10,17,18
   169:18 205:18
   249:8 250:1
**awful** 150:15

---
**B**
**B** 8:8 9:1 10:1
**baby** 13:12 15:5
   21:16 22:3,23
   23:6 31:3,20
   35:11 37:18 38:9
   38:12,23 39:5,20
   40:2,9,14,18,22
   41:16,19,24 42:13
   43:1 44:7,19 47:3
   47:13 49:11 50:10
   60:6 63:11 64:1
   64:10 68:4 72:14
   73:2 74:22 75:20
   76:6 77:1,17 79:1
   79:20 80:23 82:14
   83:23 84:5 93:3
   96:17 100:5,19
   102:3,8 119:5,8
   119:21,24 121:16
   123:19,20 124:10
   126:13 128:9
   132:16 133:4,23
   135:25 136:13,18

   137:1,19 139:6
   143:18 154:9
   157:12,25 158:23
   164:16 166:2
   169:4,17 174:12
   174:23 175:20
   181:12 182:3,6,12
   187:16 198:13,23
   199:1 202:4
   214:24 217:6
   223:20 224:3
   226:5,17 227:4,12
   238:13 239:10
   242:22 243:18
   285:8
**back** 43:6 62:18
   64:10,20 84:9
   133:17 135:14
   137:8 157:18
   160:14 180:13
   181:11,23 185:3
   195:22 201:1
   213:25 228:1
   229:11 239:11
   249:19 259:21
   260:4 261:14
   268:23
**Background** 204:7
   205:15
**banker's** 287:19
**based** 25:1 47:23
   55:15 56:6,20
   124:22 125:18
   135:25 144:4
   249:15 253:17
   256:6 260:24
**bases** 46:24
**basically** 22:15
   174:11
**basis** 47:11 98:18
   128:7 129:24
   130:4 248:4
**Battelle** 189:7,11
   189:19
**battling** 46:24
**began** 21:11



**beginning** 256:13
268:25
**begins** 11:9
**behalf** 12:23 45:24
51:16 130:10
144:17 162:11
171:23 210:2
224:12 229:21
231:4 255:16
260:15 261:8
**Beidler** 160:21
208:6
**belabor** 251:18
**belief** 48:8
**believe** 29:7,20
30:19 37:20 44:25
63:12 64:5 66:5
68:15,19 74:15
81:21 83:13 91:11
96:7 108:4 111:21
114:12 116:18
117:23 130:5
147:3 153:9
160:23 173:15
181:7 190:25,25
194:21 197:7
203:6 211:8 228:9
254:1 255:10
286:1 290:8
**believes** 285:25
**benefit** 280:13
**BERNARD** 252:9
**Bernardo** 6:10
13:25 14:19 15:12
16:21,24 17:3,13
17:16,23 21:1
23:7 24:7,21 25:8
25:18 26:7 27:5
27:14 28:1,19
29:9,21,24 30:10
31:9,12,24 32:8
32:17 33:4 34:1
34:12 36:10,15
37:25 38:16,25
39:10,22 40:24
42:14 43:2 44:8

44:20 45:4,11,20
45:21 47:19 48:3
48:18 49:5,13,18
50:11 51:4,10,20
52:14,23 53:4,23
54:21 55:1,23
56:14 57:4,20
58:5,18 59:7,24
60:10,25 61:13,16
61:24 62:2,10,14
62:16 63:2,16
64:3,13,15,22
65:7,11,16 66:12
66:20 67:13 68:7
68:17 69:2,9 70:1
70:16,19,25 71:4
71:8,19 72:16,19
73:3,18,25 74:12
74:25 75:5,22
76:8 77:3 78:1,12
79:6,12,21 80:10
80:15,25 82:15
83:24 84:18,23
85:11,16,22 86:23
87:7,18,21 88:7
88:20 90:19 92:5
92:23 93:10,13
94:1,10,23 95:9
96:9,22,25 97:7
97:17 98:6,15
99:2 100:8,12,22
101:5,14 102:11
102:19 103:12
104:4 105:3 106:3
106:19 107:9,18
107:24 110:9,19
112:4,7,21 115:2
116:14 117:13,17
118:10 121:1,10
122:4 123:13,23
124:11,25 126:4
127:21 128:12,15
129:10 130:1,16
132:5,19 133:7
134:1 135:1 136:3
137:3 138:14,25

139:19 140:22
141:2 142:16,20
142:23 143:6,20
144:21 145:11
146:1 148:8
149:17,25 151:22
152:4,19 155:14
156:14,21,24
157:6 158:13
159:3,14 160:1,7
161:13,21 162:4
162:12,16,23
163:19 164:8,17
164:20 165:9
166:5,9,16 169:22
171:16 172:14,17
173:17 175:1,24
176:8,18 177:13
177:25 178:4,14
178:17 179:7,24
180:4,19 181:18
183:15 184:7,20
185:9,25 186:4,7
186:10,19 189:1
190:10 191:3,19
192:22 193:11,16
193:24 194:16,25
196:5,21 197:25
199:7 200:12
201:16,19 202:8
202:20,23 203:18
205:3,23 206:3,10
206:21 207:8,20
208:12,25 209:20
210:14 212:2,7
213:5,14 214:9
215:6,18,25 216:4
216:11,17 217:7
217:16,21 218:3,9
218:25 219:4,20
219:23 220:3
221:3,11,19 222:1
222:16,19 223:1,9
223:12,21 224:5
224:11 225:4,14
226:8,21 227:7,14

227:22 228:4,12
229:2 230:4,14
231:2,22 232:6
233:18 234:24
235:10,17,20
236:3,10,23
237:11,25 238:15
240:9,13,24 241:8
241:23 242:11
243:8 244:17
245:6,10 246:2,8
246:16,22 247:23
248:2 249:10
250:14 251:6,10
251:20 252:1,6,21
253:6,14 254:12
254:21 255:3,17
256:4,10,13
257:23 258:3,13
258:22 259:1,16
260:1,20 261:19
261:23 262:24
263:7 264:9 265:1
265:13,21 266:7
266:11 267:9,13
267:15 268:14
269:17,21 270:4
270:21 271:11
272:6,20 273:10
273:18 274:2,9,12
275:8,19 276:14
276:24 277:12
278:4,18 279:3,6
279:21,24 280:3
280:16 281:7,15
281:22 282:1,13
283:17,21 284:5
284:16,21 285:10
285:23 287:2,6,12
287:17 288:14
289:8 291:2,20,24
**best** 115:13 122:18
123:3,9 143:24
145:17 182:10
187:14
**better** 194:12,13,15

239:13 248:22
**beyond** 27:15 42:15
44:9 48:19 50:16
64:23 69:5 87:22
90:16 94:11 101:8
101:11 103:13
162:5 175:25
178:4,18 196:15
203:19 205:4,24
206:4 207:10
213:15 214:10
219:4 221:4
222:20 225:15
228:13 231:23
235:4,12 246:3
254:13 264:10
265:2 272:8,11
273:11 274:13
275:9 276:25
**Biddle** 1:16
**big** 146:20 192:10
275:2 290:3
**Bill** 283:3
**binder** 238:21,24
239:2,3,5,11
290:3
**binders** 287:20
**birthday** 292:5
**Black** 150:3
**book** 150:3,11,12
150:14,20,22
151:1 259:9,13,25
260:18 261:10
262:5,12 264:22
**BORGWARNER**
4:17
**box** 198:1 286:20
287:19 291:25
**BRAKE** 3:17,18,19
**branch** 43:22
**break** 30:5 69:6
71:9 82:21 88:25
89:13 166:15,17
200:5 219:19,21
220:2,8 285:17
286:6



**breaking** 70:22
**breaks** 220:4
**BRENNTAG** 2:8
  3:7,22 5:6,15
**Brief** 89:3 220:11
  285:20
**bring** 78:10
**bronchodilators**
  158:8 180:16
  181:15
**brought** 19:2 150:7
  223:18 286:20
  287:19
**Bruce** 153:2 156:12
**Building** 7:11
**bundles** 250:11
**business** 119:9
  225:25 269:2

---

**C**

**C** 6:1,17 7:1 8:5
  9:13 12:12 13:2,4
  14:7,24 15:16
  16:22 17:7,14,21
  18:4 21:9 23:11
  24:14 25:3,12,21
  26:15 27:9,21
  28:4,25 29:13,22
  30:1,14 31:10,16
  32:2,11,23 33:9
  34:6,10,14,20
  35:6 36:7,19 38:6
  38:19 39:6,15
  40:3 41:4,6 42:5
  42:22 43:5,8,13
  43:16 44:15 45:2
  45:8,19 46:8
  47:16,22 48:5,24
  49:8,16,24 50:25
  51:6,14 52:3,21
  53:2,9,25 54:23
  55:9 56:8,24
  57:11,24 58:10,24
  59:13 60:4,20
  61:5,14,22 62:1,4
  62:11,15,17 63:6

63:21 64:6,17
65:3,9,14,17,20
66:16,22 67:17
68:10,21 69:8,18
70:2,3,14,17,24
71:3,6,10,13,17
71:22,25 72:24
73:10,23 74:4,8
74:16,23 75:1,9
76:1,18 77:10
78:5,16 79:9,15
79:25 80:12,19
81:7 82:19 84:7
84:20 85:5,14,17
85:24 87:2,9,19
88:2,11,24 89:6,8
91:1 92:12 93:2
93:11,17 94:3,17
95:3,13 96:15,23
97:2,11,23 98:11
98:20 99:14
100:10,16 101:3
101:13,16 102:17
102:24 103:17
104:10 105:8
106:8,21 107:14
107:21 108:6,24
110:13 111:5
112:5,9 113:1
115:6 116:5,22
117:1 118:2,6,22
119:13 120:8
121:6,19 122:6
123:17 124:2,18
125:7 126:6,17
127:10,25 128:13
128:21 129:19
130:7,24 132:11
132:25 133:14,16
134:3 135:2 136:9
137:7,9,22 138:16
139:7,23 140:5,9
140:14,25 141:20
142:18,21 143:3,9
144:1 145:4,19
146:5,11,15,19,22

148:14 149:10,21
150:3,4 151:20,25
152:1,6,9,22
154:1,5,7 155:18
155:22 156:19,22
157:4,8,9 158:17
159:8,20 160:4,10
160:13 161:17,24
162:9,13,17 163:7
163:13,25 164:12
164:18,24 165:14
166:7,14 168:9
170:7,16,21
171:19 172:10,15
172:21 173:2,7,9
173:22 174:1,3
175:6 176:6,10,21
177:18 178:2,9,15
178:23 179:11
180:1,8,23 181:3
181:22 183:2,7
184:1,4,9,25
185:20 186:1,5,9
186:16,22,23
189:4 190:22
191:8 192:7,23
193:13,19 194:7
194:20 195:7
196:11,25 198:4
199:12 200:24
201:17 202:1,10
202:15,22,24
204:1 205:9 206:7
206:12,24 207:4
207:12,24 208:18
209:5,23 210:5,10
210:17 212:5,10
212:24 213:1,7,19
214:16 215:10,12
215:20 216:2,7,14
216:21 217:14,20
217:24,25 218:7
218:11 219:2,8,16
220:1,7,14,21,23
221:8,14,23 222:5
222:17,24 223:3,5

223:10,16,25
224:7,16,20 225:8
225:19 226:15,24
227:10,17,25
228:7,17 229:6,8
229:10 230:8,18
231:9 232:1,9
233:22 235:5,14
235:19,22 236:5
236:16,25 237:15
238:5,19 240:11
240:17 241:2,10
242:6,17 243:13
244:21 245:8,12
246:6,12,17,25
247:24 248:8
249:18 250:6,19
251:16,23 252:4,7
252:13,25 253:11
253:16 254:19,22
255:8,22 256:8,12
256:15,18,22
257:7,13,17,25
258:10,17,23
259:7,20 260:11
261:3,21,25
262:14,18 263:2
263:11,22,24
264:16 265:8,17
265:24 266:1,5,9
266:14 267:3,5,11
267:17 268:20,22
268:24 269:19,24
270:9 271:1,17
272:14,25 273:15
273:19 274:5,10
274:17,22 275:1
275:11,25 276:17
277:7,17 278:8,23
279:4,11,22 280:9
280:24 281:13,20
281:24 282:6,7,18
282:23 283:19,25
284:9,18 285:2,16
287:1,4,8,15
288:4,16 289:2,22

290:11 291:22
292:1 293:1,1
**California** 16:14
  218:21
**Call** 28:20
**CALLAHAN** 6:4
**called** 35:17 83:8
  109:16
**calls** 32:18 279:25
  280:3
**camera** 259:9,10
**cancer** 23:24,24,25
  96:17
**capacity** 27:18
  42:18 44:12 46:4
  46:9 48:22 50:20
  60:15 65:1 69:15
  87:25 94:14
  100:24 101:2
  104:8 120:25
  133:5,24 157:2
  162:8 163:4,23
  203:22 205:7
  206:1 214:15
  226:12 228:15
  231:25 242:15
  246:5 264:13
  265:5 273:13
  284:8
**CAPTION** 1:10
  2:25 3:25 4:25
**car** 30:8,13,16,17
  30:18
**care** 22:22 114:18
**career** 14:2
**CAROLE** 2:4
**case** 12:19 13:6
  16:14,18 17:10
  25:15 26:5,24
  28:11 57:3 58:13
  68:4,5 72:15 83:8
  83:12,16,21 85:6
  85:8,20 86:6,8,16
  86:20 88:17 93:8
  95:6 104:12,14,18
  105:2,7,9,13,17



105:20 106:2,10
106:17 107:2,8,13
107:16,17,23,23
108:3,10,15 109:1
109:8,13,16,18,21
109:25 110:1,8
111:4,8,11,12,15
111:19,24 112:1
112:10,20 113:3,8
113:12,21 114:4
114:14,19,24
125:19 131:16
152:11,23 154:25
155:2,5 159:24
160:6 161:3,6,12
162:1 163:17
164:5,7,11,23
165:7,8,16,19
169:11 171:8
172:24 174:7,12
174:23,24,24
175:20,22,23
176:15,20 177:1
177:11,22 178:7
178:12,13 179:6
181:23 191:11
193:21 196:1
197:22 203:1,17
204:18 207:7
210:13 213:4,13
214:8 215:16,24
216:23 218:2,2,22
219:11 220:18
221:2,7,10,15,17
221:22 222:4,10
222:18,23 223:8
223:15,18,24
224:2,15 225:2,18
230:2,10,11,17,21
230:23 231:8
244:12 254:10
256:1 257:4
258:19,21 263:5
266:25 267:8,22
268:1,6,11 270:19
271:9 276:2,9

280:12
**cases** 23:23 25:5,11
25:16,23 26:6
27:3 33:2,14 51:9
52:13 53:13 55:22
59:18 72:5 74:20
76:23 77:9,23
81:17,20 82:1,22
87:5,13 90:17
91:3,8 92:22,22
95:1 96:17 102:22
105:14 106:24
113:5 114:2 115:9
169:4,13,16
172:22 175:11,13
175:22 176:12
179:4,18 201:4,11
224:3 257:22
258:2 262:22
264:24 273:7,9
275:13,17 276:13
276:20,21 277:11
278:12,16,25
**caused** 273:9
**CCR-NJ-XI02021**
293:22
**Cedar** 7:5
**certain** 104:15
161:25
**certainly** 91:7
150:22 177:11
179:22 180:17
185:11 207:25
208:1 217:4 221:9
272:2
**certification** 122:23
124:22
**certified** 1:19 115:8
120:13 121:7
122:16 123:7
131:23 135:8
172:23 174:5
175:18,21 210:1
249:3,3,6,24
254:9 280:10
285:4 293:3

**certify** 128:25
132:15 190:7
293:5,10,15
**certifying** 29:5
119:2 122:1,11,12
131:1 171:22
262:9 282:9
284:11
**chain** 135:3
**chambers** 69:20
**chance** 40:13,21
41:14,22 183:8,12
**change** 135:15
**changed** 184:19
**changes** 67:4
**characterization**
16:25 17:17 58:20
72:19 83:25
110:20 139:20
186:14 190:12
195:2 240:13
278:19 282:15
286:25
**characterizing**
170:1
**charge** 22:20 23:1
23:13 51:1,18,23
53:12,17,19,22
54:2,4 58:3 119:1
119:23 155:24
**charged** 28:6
**chart** 8:15 10:17
19:9 70:10,15
71:11 77:8 105:23
106:13 108:16
146:12,12,13
147:6,10,12,20,24
148:2,6,7,11,13
148:15 149:2,14
149:20,22 213:20
233:5 237:17
238:9,11 239:20
239:22,23 240:6
240:16 241:21
243:4,16 244:4
247:6 248:3

251:15 252:20,24
253:5,9 254:8
259:14 263:23
264:1,7,20,22
265:10,16,19
267:6 288:20
**Chidester** 271:4
**Chief** 273:20
**Chis** 65:8
**chosen** 118:21
**Chris** 50:14 69:4
70:19 183:25
193:16 202:21
216:5 217:11
219:23 281:9
**CHRISTOPHER**
6:3
**chronic** 114:16
**chronological**
148:16
**chrysotile** 209:11
209:15 211:20,22
234:7,9,10,10,18
234:19 237:18
245:21,25 247:14
272:5
**circumstances**
101:15
**circumstantial**
30:15
**CIS** 170:23 171:4
**cite** 250:5
**cited** 72:5 252:17
**citing** 105:15
**citizens** 32:14
**CIVIL** 1:2 2:2,14
3:2,14 4:2,12 5:2
5:11,20
**claim** 141:11 142:5
162:2 163:17
175:8
**claimed** 225:11
**clarification** 17:2
36:14 141:17
149:7 172:8 206:2
220:20 251:9

280:2
**clarify** 101:9 168:7
198:2 200:19
**Clark** 6:20
**clear** 45:14 46:5
58:12 69:16
191:24 234:7
281:19 282:3
**clearly** 160:5 161:9
169:10 256:2
257:5 268:10
**client** 75:11 235:21
**Close** 18:16
**Cohen** 6:3 11:19
**Coker** 109:21,22,25
110:1,7 111:4
**Colgate-Palmolive**
7:7
**collaborated** 54:4,7
**College** 1:16 11:18
**Columbia** 6:17
**column** 237:22
244:6 246:13
248:15
**come** 52:6 60:2
81:5 153:21
200:15 201:1
273:6
**comes** 157:18
**comfortable** 19:25
41:19 102:14
121:13,17
**coming** 86:18
117:13
**commencement**
293:5
**commencing** 1:17
**comment** 34:3 93:1
94:6 97:10 98:19
99:9 102:21 103:1
139:3 143:11
144:11 145:2
146:7 185:19
228:21 232:8
236:12 237:2
238:9 244:7



251:13 252:23 253:20 254:18 255:20,23 257:2 264:20 265:6,15 268:16 270:6 273:5 275:24 278:21
**commented** 100:6
**commenting** 186:20
**comments** 100:1 149:1,5,9 235:24 236:1
**Commerce** 6:5
**Commission** 293:24
**communicate** 135:19
**communicated** 119:22 126:12,25 127:1
**communicating** 22:21
**communications** 52:18
**company** 4:7 7:14 13:15 15:24 26:23 39:3 45:24 50:24 54:10 66:6,8,18 72:12 78:24 103:8 104:21 123:1,1 125:24 136:16 167:3 255:14 279:13
**company's** 121:15 136:6,10
**comparison** 234:13
**compensated** 20:10 20:11
**compile** 135:13
**complaint** 9:7,8,9 38:5 57:23 58:4 72:14 106:11,14 106:16 107:4 108:21 111:6,14 113:19,21 114:21

125:6 126:10 155:4 157:14 190:19 191:25,25 194:5 195:22 219:10 291:7,9,11
**complaints** 68:14 72:11,22 130:20 289:13 291:5
**complete** 32:5,14 143:14 259:5 289:9
**completed** 257:10
**completely** 28:24 84:24 138:22 143:4 217:17
**completion** 169:20
**composite** 106:12
**compound** 120:2
**computer** 89:25
**concentration** 50:5 90:21
**concerning** 13:9,11 14:16 15:8 19:10 25:23 28:16 34:8 50:9 52:12 68:1 73:13 77:14,16 79:1 80:7,22 86:16 90:8,15 93:19 95:25 97:13 98:2 102:2,7 110:16 148:4 149:2,15 151:4 152:11 153:17 161:3 165:25 218:22 220:17 238:12 284:13
**concerns** 22:2 114:15
**concluded** 36:6 42:4 47:15 116:21 118:1 120:7 127:9 141:15 142:9 292:11
**concludes** 292:8
**conclusion** 28:21 32:19 33:17 280:1

280:4
**conclusions** 34:4
**concrete** 99:11,15
**conducted** 20:1 90:5
**conducting** 16:1 101:6
**confer** 286:22
**confident** 115:22
**confidentially** 213:4
**configuration** 193:2
**Confirmed** 250:10
**confusing** 192:3 194:12 195:23 197:7
**conjunction** 211:24
**connection** 75:12 93:20 107:1 108:25 278:16 287:22
**conscious** 220:5
**considered** 199:16 269:14 287:22
**consistent** 136:8 139:4 143:10
**consulted** 67:8 185:21 187:8
**consumer** 119:1 157:24 158:8 180:15
**consumer's** 158:10 181:16
**consumers** 21:25 41:13
**contain** 35:12 37:5 38:9 41:20 84:6 182:18 188:4 189:17
**contained** 31:7,21 38:12,24 39:20 40:9 123:21 182:12 187:17 194:23 214:6 243:1 290:3

**containing** 198:14 198:22
**contaminant** 234:22
**contaminants** 182:5,15 187:25 188:20
**contamination** 234:17 269:14
**content** 13:12 15:9 20:20 30:22 68:1 77:17 102:2,8 168:3 176:3 222:8 234:12
**contents** 240:6
**context** 39:9 67:20 104:2 144:10,24 173:20 185:6 190:16,17 236:14 279:14
**continuation** 9:17 208:15,20
**continue** 281:22 286:9
**CONTINUED** 1:10 2:25 3:25 4:25 7:1 9:1 10:1
**contrary** 256:2 257:6
**conversation** 16:9 17:8 131:14 132:3 133:10 134:8 138:3 145:7 200:22,23 239:14 247:5 260:7 291:18
**conversations** 41:12 42:20 52:20 55:14 78:20 120:5 131:7 132:8 134:14 135:11 150:24 166:21 197:5
**convey** 40:12,20 41:14,25
**conveyed** 186:2

**COOK** 6:16
**Cooper** 111:11,12 111:15,18
**copied** 71:9 154:13 154:16 156:6 158:21 160:24 165:1,3
**copies** 167:10
**copy** 34:13 71:7 150:7 183:24 184:2,6
**corporate** 8:13 11:3 12:24 50:9 69:17 76:13 77:14 101:10 144:6 163:5 205:25 206:6 214:12 222:21 228:15 231:25 246:5 254:14 277:1 281:1 284:7
**corporation** 14:10 130:11
**correct** 12:24 14:11 14:12,18 15:11,15 21:11 22:12,23 23:6,18,25 24:6 24:20 25:7,17,22 26:6,18 27:25 28:5 29:2 31:23 32:7,16 33:3,15 35:18,24 37:1,19 37:24 38:15,18,24 39:9,21 40:15,23 41:16,25 42:1,10 43:1 44:19 59:17 60:24 61:15 64:11 64:21 78:10 79:2 79:8 87:20 90:18 91:10 92:4 93:12 94:22 95:15 97:16 97:22 98:5,14 101:19,21 102:5 102:10 104:3 106:22 114:23 115:1,9,14,19



117:21 118:9
119:5 120:12,15
120:23,25 121:9
122:20,23,24
123:12,22 124:10
126:1,7,14 128:14
129:2,8,25 130:15
131:15 132:4,18
133:6,25 134:10
134:25 135:9
136:2 137:2,20,21
137:24 138:13
139:11,18 140:3,4
142:19 143:19
144:8,20 145:24
147:2,7,8,10,15
148:7,20 149:16
149:24 151:7,8,11
151:16 152:15,16
152:18,21 153:6
153:13 154:13,16
154:24 155:13
156:8,9,11,12
157:16,17,21
158:11,18,24
159:2,13,25 160:3
160:6,25 161:3,6
161:12 163:18
164:7,19 165:8,16
165:21 166:8
171:18 172:16,24
172:25 174:25
175:9,12,23
176:15 180:18
181:8,9 182:7
187:6,19 188:21
188:25 189:18,23
190:2,9 191:18
195:8,12,15 196:4
199:25 200:11
204:14,24 205:22
207:14 208:2
209:12 210:3
212:17,20 213:24
214:8,25 215:5
216:3 219:11

221:10 223:11
225:22 228:3
236:2 237:1,4,10
237:19,24 238:14
238:22 240:8,12
240:22 241:7,11
242:10 243:7,21
244:1,16 245:4,9
246:18,21 247:21
248:1,10 249:4,9
250:2,3,9,22
251:5,19,25 252:8
252:14,20 253:5
253:25 254:11
260:13,19 261:11
262:12 263:6,19
264:8,25 265:12
266:21,25 268:1,7
268:13 269:3,6
270:13,20 275:18
276:2 277:11
278:12,13 279:5
279:15,20 283:7
290:15
**correctly** 178:11
**corresponded**
267:25
**cosmetic** 15:4 39:4
40:1,17 41:3
42:21 59:19,22
60:18,23 61:4,10
62:23 64:1 84:5
121:16 136:13,17
139:5,10 198:25
**counsel** 6:8,14,19
7:7,13,19 11:25
21:4 23:20 24:11
24:25 26:22 35:25
38:3 47:4,8 53:3
53:20 55:13 59:12
70:10 71:24 72:3
75:11,18 80:3
92:14 108:9
112:25 115:23
118:5 120:1
122:14 123:2

127:2 131:6
132:10 134:9
135:11,13 152:18
183:13 207:18
235:3 293:17,19
**counsels** 91:22
**count** 264:14,17
**County** 1:1 2:1,13
3:1,13 4:1,11 5:1
5:10,19 11:14
214:7,21 225:3
255:11 266:16
**couple** 233:21
**course** 119:8
173:11
**court** 1:1,20 2:1,12
3:1,13 4:1,11 5:1
5:10,19 11:13,23
12:2 68:14 71:21
108:17 116:24
142:12 144:15
168:16 218:21
235:8,11 257:11
284:3 293:3
**courthouse** 215:23
221:16
**courts** 224:1
262:20
**cplacitella@cprl...**
6:7
**created** 19:9
149:15 233:6
235:3 239:20
**credible** 245:1
**crosstalk** 116:13
283:24
**crystals** 158:9
**cue** 116:24
**Cunningham**
111:23 112:1
**curiosity** 72:4,7
**curious** 72:8
**current** 92:21
**Cypress** 275:5
**Cyprus** 4:7 7:13
283:15

**D**

**D** 8:1
**D'ANGELA** 5:3
**damage** 158:22
**dangerous** 97:21
**dangers** 15:3 119:4
119:7,21
**Daniels** 6:20
**Dartmouth** 245:22
**data** 95:8,18,24
96:18 97:13 98:2
98:24
**database** 90:1
**date** 73:14 74:21
75:3,25 76:2
148:17 165:20
213:23 225:7
286:10 293:13,25
**dated** 8:12 11:2
64:10 152:14
275:6
**dates** 27:8 28:3
48:11 49:7,15,23
50:6 82:6,9 87:1
**day** 20:8 167:18
286:7 292:3
**days** 20:6,7 290:9
**deal** 62:13 83:18
**dealing** 119:24
194:6
**dealings** 153:5
208:5
**death** 204:11
**DEBORAH** 3:17
3:19
**decade** 255:15
**DECEASED** 2:5,17
3:17
**December** 152:14
**decide** 45:20 46:7
223:4
**decided** 126:3,12
**decision** 99:7
235:16
**decisions** 127:7

**deems** 243:17
**defendant** 6:14,19
7:7,13,19 28:10
204:17
**defendant's** 182:10
182:13,18 187:14
187:23 188:3,18
**defendants** 1:9 2:9
2:21 3:9,23 4:8,18
5:7,17,25 28:14
167:2 207:14
**defending** 216:23
**defense** 266:25
**defenses** 28:10
**defensibility** 67:8
**definitely** 130:3
**definition** 196:18
236:7 237:23
243:5,18 244:16
246:14 247:18
248:16 250:12
253:4
**demonstrated**
58:17
**demonstrating**
144:18
**Denton** 282:24
283:1
**deodorant** 114:16
158:1
**dep** 233:7 238:7
**department** 21:17
22:12,14,17 25:24
26:1,5,11 50:24
58:2,8 59:11 67:7
91:18 92:4 93:7,8
94:4 209:9,14
**Departments** 91:20
**depend** 54:12 242:2
**deposed** 19:9
**deposition** 1:14
8:13 9:6,16,17
10:4,7 11:3,10,17
12:18 13:5 15:19
16:12 19:3 20:5
20:16 34:24 45:14



46:3 50:15,18
67:22,24 69:9,11
69:22 70:6 78:9
88:15 89:12,22
101:6 138:9
139:17 146:25
147:7,13,14,20
148:2,4 149:23
150:6,18,19 151:2
164:2 165:5 166:4
166:21,24,25
167:7,23 170:3
186:6 187:1
197:16,18 199:22
201:15 202:6,17
202:25 203:8,13
206:17 207:1,6,11
207:19 208:2,16
208:21,24 209:1,7
210:7,12,20 212:8
213:24,25 220:16
235:13 239:21
240:8 271:3,7
276:12 277:9
278:10 286:1,13
286:23 287:23
290:21,25 292:8
**depositions** 8:19
15:24 78:19
151:19 168:6,21
207:10 208:9
270:19 271:8
288:1,9
**deposits** 269:6
**describe** 181:25
248:21 286:19
287:24
**description** 8:10
9:3 10:3 75:10
92:9 289:9
**designated** 253:21
270:11
**designating** 69:16
**despite** 144:15
190:4
**destroyed** 279:2

281:3 282:11
283:13 284:14
285:8
**detail** 86:3 182:1
276:19
**determination**
126:24
**determine** 31:20
183:18 211:21
248:25
**determined** 211:19
**developed** 177:6
**Development** 21:20
**DICERBO** 2:5
**difference** 29:4,17
30:2 173:12 192:8
192:10,11,15,18
193:8,22 194:2
196:2 199:23
200:9
**different** 20:3 37:7
51:5 52:2,7 53:15
54:9,16,17,18
59:3 79:24 81:23
125:14,20 130:4
130:20,20,22
131:8,8 138:7
145:14 148:11
173:16,21 176:20
187:8 192:21
193:2 200:16,21
**differentiation**
192:24
**diffraction** 211:3
211:24
**direct** 23:20 26:13
54:6 131:6 174:9
262:13 286:3,17
**directed** 24:24
115:23 122:14
188:10
**directions** 34:5
**directly** 16:4 131:4
156:23 169:11
**Director** 65:24
153:3 154:15,21

154:22 156:11
158:20 159:11
160:25 164:14
165:4 177:23
180:9 181:10
268:5,12
**disagree** 169:25
170:6 286:12
287:5
**disagreement**
101:25
**discoveries** 80:4
**discovery** 13:9
14:23 15:11 23:16
24:4,20 27:23
28:7,12 30:21
32:6 51:24 52:12
53:13 54:24 55:11
55:21 56:13 57:16
57:18 60:22 61:9
62:22 69:12 70:4
77:15 81:9,11,17
81:20 88:3,16
90:15 91:3 94:19
94:22 101:18
102:1 106:25
109:2,5,10 110:7
110:12,16,17
111:18 113:7,25
114:8,10 128:23
129:23 133:1,21
134:23 135:8
136:22 137:16
148:5 151:5
153:21 161:19
162:19,20 163:9
167:1 168:2 169:2
173:11 201:3,5,10
201:14,24 202:7
215:9 216:5,12
219:13,14 228:24
248:25 249:2
253:23 270:12
276:13 277:10
278:11 279:15
**discuss** 18:1 19:4

19:11 71:1 89:12
119:9 143:1
149:20 150:17
167:19 240:16
247:6 273:6 285:1
**discussed** 16:11
18:10,24 19:1,12
138:1 145:14
149:14 150:23
170:1 240:5
285:24
**discussion** 19:24
117:5 141:22
170:2 257:16
292:6
**discussions** 119:4,7
119:11,20
**disease** 23:24 67:1
**dismiss** 258:20
**dismissal** 9:19
224:19 225:11
230:1 231:11,13
231:19
**dismissals** 33:2,14
33:24
**dismissed** 218:14
218:23 230:11,24
254:10 256:1
257:5 262:23
264:24 273:8,9
**dispute** 159:2
**disputed** 159:12
**distinguish** 227:11
**district** 226:3,4
**divestiture** 283:15
**Division** 1:1 2:1,13
3:1,13 4:1,11 5:1
5:10,19 11:13
**DOBBINS** 7:10
**Docket** 1:2 2:2,13
3:2,14 4:2,12 5:2
5:11,20 11:14
**document** 8:17
10:6,12 34:19
88:23 129:8
152:17 170:18,22

171:6,9 173:25
174:18 180:24
184:13 185:8
219:10 229:15
231:19 235:1,2
241:5 266:8,13
284:7
**documentary** 57:2
**documentation**
279:9
**documents** 8:14,23
8:24 9:5 11:5
14:22 15:21 16:11
18:11,18,19,20,21
18:22 19:10,13,22
20:15,18,22 21:8
26:23 58:22,25
59:10 68:1 76:19
89:21 90:12 91:20
91:24,25 92:2,3
92:11 93:7 96:12
105:22 106:23,25
124:14 138:1,7
151:7,15 156:17
167:17 168:12,18
168:20 169:16
177:19 200:21
215:14,15,23
216:15 229:17,25
231:10 241:20
242:2 259:14
262:11 280:13,20
282:4,10,17
284:12 285:6
286:20 287:9,20
289:14,17 290:4,6
290:8
**doing** 62:3 81:14
122:21 123:11
125:25
**domestic** 204:9
205:16
**Donald** 216:24
**Downs** 19:17 89:17
90:23
**Dr** 8:20,23,25



15:25 16:4,6 17:3
17:6,18 18:2,15
18:22 19:5,15
65:19,21 66:24
68:3 78:21 130:6
130:25 137:24
138:3,10,19 139:3
140:19 142:11,11
143:12,24 144:4
144:24 145:7,13
145:21 146:25
147:13,19 149:2,3
149:9 150:25
153:16 183:3,9
185:22,23 187:2
188:8 189:7
191:15 197:6,14
200:23 208:20
239:14,21 240:7
243:16 244:3
247:3 248:21
260:8 264:7 272:3
288:2,10 289:15
289:18 290:4
291:19
**drafting** 231:13
**Drinker** 1:16
**driving** 30:18
**due** 158:1,22 163:8
166:17 204:11
**DUFF-PETO** 4:14
**duly** 12:5 293:8
**duplicate** 188:21
**Durham** 111:8
**duties** 69:10
**duty** 32:4

**E**

**E** 2:16 5:21 6:1,1
7:1,1,23,23 8:1,1
8:8 9:1 10:1 293:1
293:1
**E-d-l-e-y** 220:22
**earlier** 20:17 54:5
55:13 78:18 92:8
104:13 131:3

152:25 186:14
187:9 197:17
199:10 215:2
249:13 260:4
**early** 24:16 50:15
**easier** 61:20
**East** 1:17 11:18
**Eastern** 13:14
**Edley** 105:13
220:17,21 221:2
221:10,15 222:18
222:22 223:7,18
224:2 225:2,11,18
229:13 231:20
232:2 258:19,20
263:5
**Edley's** 254:10
**efforts** 167:4
**eight** 20:7 251:3
264:2
**either** 123:21
209:25
**ekelly@hpylaw.c...**
7:19
**electron** 211:1,2,24
211:25
**eliminate** 182:4
**ELIZABETH** 7:16
**ELLIS** 7:4
**Elmo** 71:14 146:21
160:12 173:8
267:4
**EMMA** 4:3
**employed** 275:15
**employee** 293:16
293:18
**Emtal** 209:10,16
**enable** 229:25
231:11
**enclosed** 229:20,23
**enclosing** 231:14
**encounter** 185:13
**Engelhard** 269:11
**ensure** 15:23 16:2
19:5 134:9 151:11
260:8

**ensured** 90:23
**ensuring** 119:10
**entire** 197:8,9,11
244:6 248:3
**entirety** 186:8
**entitled** 10:12
101:7 154:8
170:19,22 204:3
**entity** 148:19
233:25 237:4
**entries** 92:2 264:6
**entry** 75:17 80:7
92:1 93:19 216:8
**envelope** 231:15
**Environmental**
229:24
**equipped** 33:7
**ESQUIRE** 6:3,4,10
6:11,17 7:4,10,16
3:18 11:11
**Estate** 2:4,16 3:16
3:18 11:11
**et** 1:7 2:8,20 3:7,22
4:7,17 5:6,15,24
11:12
**event** 67:9
**Everybody** 136:5
**everyday** 132:9
**evidence** 27:10
29:5,6,7,16,18,19
30:8,16,22 31:2,7
31:14,23 38:11,23
39:19 40:9 42:12
42:25 44:6,18
47:2 53:12 54:19
54:25 55:4,8,11
55:20 56:2,10,11
56:19 57:2,10,12
58:14 95:16 99:8
99:17 100:4,18
103:4,22,23 104:3
120:14,24 121:8
124:7,9,20 125:13
127:19 128:9
129:24 130:14
131:25 132:16
133:3,23 135:24

136:14,24 137:17
139:9,9 140:1
143:17 144:3
148:6,12 149:12
149:15 151:14
173:13,14 190:8
191:12 193:7
194:22 198:6,21
199:4 227:18
230:21 232:21
233:15 236:19
239:9 241:19
252:18 255:13,14
255:25 256:2
257:4,5 258:11
262:8,21 263:16
264:8 273:23,25
**evident** 181:13
**evidential** 76:23
**exact** 48:11 53:7
60:24 61:11 62:24
70:7 188:21
**exactly** 89:18
150:21 167:6
174:15 187:10
188:17 193:5
200:1 223:1
**exam** 286:17
**examination** 8:4
12:10 168:15
286:4 293:6
**examined** 12:6
**example** 31:19
41:12 60:5 92:1
93:18 96:16
148:15
**excerpt** 74:19
**excerpts** 126:16
212:7
**exclusive** 225:25
226:4
**excuse** 36:2 89:20
90:4,25 136:19
277:19 288:13
**excused** 292:10
**executed** 225:2

250:25 283:6
**exhibit** 8:10,12,15
8:16,17,18,19,21
8:23,24 9:3,5,6,7
9:8,9,10,15,16,17
9:19,20,21,23
10:3,4,6,7,8,9,10
10:11,12,14,15,16
10:17 11:2 34:18
34:22 65:5 71:11
74:6 75:3 88:17
146:13,24,24
152:3,5,7 154:3
155:20 170:18
173:4,24 181:1
183:4 202:17
203:24 207:1
208:15 210:7
224:18 228:2
262:16 266:3
274:24 275:16
282:21 288:1,21
289:3,14,17 290:5
290:21 291:7,9,11
291:15
**exhibits** 9:12 65:8
**existed** 164:5 239:5
**existence** 67:1
182:4 194:8
**exists** 29:16,18
**experience** 56:6
242:3 249:16
**experiments**
125:21 145:15
**expert** 135:12,12
143:23 260:9
**expertise** 25:1
55:16 56:7,21
99:24 116:19
117:24 242:4
249:16 260:6
280:22
**expertly** 122:15
**experts** 118:20
120:19 124:6
126:9 131:5,6



135:21,22 136:2
199:19 242:1
244:23,24 260:24
**experts'** 249:15
**Expires** 293:24
**explain** 143:24
162:25
**explained** 113:4
129:13 131:3
244:23 248:5
**explanation** 200:8
**exposing** 40:13,18
40:21 41:15,23
**exposure** 23:5,17
27:3 48:1,9,17
49:3
**extent** 101:9
**extra** 71:7

**F**

**F** 293:1
**facing** 64:18
**fact** 12:18,22 24:3
138:11 141:9
142:3,13 144:3,5
144:18 145:6,22
161:5 166:22
167:8 178:13
241:3 266:24
273:24 288:14
**Fae** 109:18
**fair** 36:23 87:10
88:19 89:11,11
90:10 127:1
168:19,22 201:18
286:24
**fairly** 185:18
**faith** 167:12
**fall** 211:7
**false** 235:6 278:15
**familiar** 19:6 26:19
43:21 83:17 84:13
86:17 87:1 95:2
104:14 105:14
107:11 109:20
111:10 133:11

138:4,6 145:16
153:24 220:19,24
222:11 239:17
258:6
**families** 40:14,21
41:15,23
**far** 58:16 181:11
219:19
**February** 1:12
11:15 211:8
**Federal** 42:11,24
43:22,25 44:2
45:15,25
**feel** 41:18 83:19
102:14 234:9
**felt** 115:22 121:13
121:17
**FERNANDEZ** 7:3
**fib** 272:18
**fiber** 234:7,8,12
**fibers** 211:11,14,18
211:19,20,22,22
234:14,22 245:21
250:21
**fibrosis** 67:4
176:23 177:7
180:11
**fibrous** 196:13,18
197:3,3 199:5,10
199:11,15 247:14
**field** 234:15
**fields** 118:20
**fight** 47:7
**figure** 50:2
**file** 57:23 58:4
80:13 93:8 168:16
171:7 172:12
177:20 255:10
273:22
**filed** 33:2,14 47:25
48:6,12,15 49:1
49:11 50:4,23
80:4 87:16 108:22
108:22 109:18
110:3 112:16
155:10 157:21

165:25 166:22
177:21 217:19
221:16,24 257:21
258:1 262:20
264:23 276:20
278:16
**files** 10:13 25:25
58:9 76:25 79:1,1
80:3,14,24 81:4
81:12 83:15
112:25 170:19,23
**final** 127:7 234:11
**financially** 293:20
**find** 49:10 111:25
125:23 128:2
229:20,24
**finding** 244:14
**Findings** 158:4
**finds** 245:22,24
247:14
**fine** 43:7 62:14
**finish** 45:21 156:24
261:18 281:16
**finished** 245:25
**first** 21:25 26:25
27:10,12,24 47:25
48:6,8,15 49:1,10
50:4 67:11 68:6
70:4 72:13,25
73:12,21 74:11
75:2,3 86:11
88:13,23 90:22
92:1,2,8 93:18
95:23 96:2,7
103:22 104:1
144:13 165:19
168:9 183:14
188:15 203:15
229:12,19 231:18
232:10 241:4
268:17 284:1,10
284:19 285:5,14
287:16
**five** 251:2 264:2
**flip** 150:9
**flipped** 209:6

**FLOM** 6:10
**Floor** 7:17
**Florham** 6:18
**focus** 167:1
**focusing** 233:1
**Foley** 1:4,4 11:11
**follow** 47:9 188:13
**following** 1:10 2:25
3:25 4:25 35:8
41:9 46:20 62:19
116:7 117:9
119:17 126:21
133:18 137:12
141:4,23 249:21
256:24
**follows** 12:6
**foregoing** 293:10
**forgetting** 291:14
**form** 14:1,20 15:13
16:21,25 17:17
21:2 23:8 24:8,22
25:9,19 26:8 27:6
27:15 28:20 29:10
29:25 30:11 31:13
31:25 32:9,18
33:5 34:2 36:1,11
36:17 37:9 38:1
38:17 39:1,11,23
40:25 42:15 44:9
44:21 45:5 47:5
48:4,19 50:12
51:11,21 52:15,24
53:5,24 54:22
55:2,5,24 56:15
57:5,21 58:6,19
59:8,25 60:11
61:1,17 62:9,9
63:3,17 64:4,16
64:23 66:13,21
67:14 68:8,18
69:3 72:17 73:4
73:19 74:1 75:23
76:9 77:4 78:2,13
79:7,13,22 80:11
80:16 81:1 82:16
83:25 84:19,24

85:12,23 86:24
87:8,22 88:8,21
90:20 92:6,24
93:14 94:2,11,24
95:10 96:10 97:1
97:8,18 98:7,16
99:3 100:9,13,23
101:4,11 102:12
102:20 103:13
104:5 105:4 106:4
106:20 107:10,19
107:25,25 110:10
110:20 112:7,22
115:3 118:11
121:2,11 122:5
123:14,24 124:12
125:1 126:5 127:3
127:22 128:16
129:11 130:2,17
132:6,20 133:8
134:2 136:3 137:4
138:15 139:1,20
142:17,24 143:7
143:21 144:22
145:12 146:2
148:9 149:18
150:1 152:20
155:15 158:14
159:4,15 160:2,8
161:14,22 162:5
162:24 163:20
164:9,21 165:10
166:6 171:17
172:18 173:18
175:2,25 177:14
178:1,18 179:8,25
180:5,20 181:19
182:13 187:17
189:2 190:11
191:4,20 193:12
193:25 194:17,23
195:1,5,10 196:6
196:22 199:8
200:13 201:20
202:9 203:19
205:4,24 206:22


MAGNA
LEGAL SERVICES

207:21 208:13
212:3 213:6,15
214:10 215:7,19
216:1,18 217:8
218:4,10 219:1
221:4,20 222:2,20
223:12,22 224:6
225:5,15 226:9
228:13 229:3
230:5,15 231:3,23
233:19 234:25
236:4,11,24 238:1
238:16 240:10,25
241:9,24 242:12
243:9 244:18
245:7 246:3
249:11 250:15
251:7 252:22
253:7,15 254:13
255:4,18 257:24
258:4,14 259:2,17
260:2,21 262:25
263:8 264:10
265:2 268:15
269:18 270:5,22
271:12 272:7,21
273:11 275:9,20
276:15,25 277:13
278:5,19 279:7,25
280:17 281:8
282:14 283:18
284:17,22 285:11
**former** 204:8
205:15
**formulations** 67:6
**forth** 23:22 60:18
77:24 87:13 91:8
91:13 94:9 113:19
238:11 239:2
241:21 262:4
264:21 293:14
**forthright** 191:1
**Forty-five** 264:6
**forward** 218:16
**found** 72:14 73:1
73:13 112:24

168:12,15 181:15
198:13 205:21
206:19 208:10
209:15 211:12,15
212:16 234:8,14
234:15,19 238:13
242:25 247:9,11
252:18 271:9,23
272:4
**four** 220:5 251:2
264:1
**FRACE** 2:3
**free** 269:14
**Friday** 1:12 11:15
287:3
**front** 30:17 70:11
123:4 146:23
159:17 197:23
229:17 235:2
238:21 259:9
262:5,12 263:3
**full** 185:6
**fully** 23:4,16 28:17
28:22
**function** 158:6
**further** 113:24
182:15 187:25
188:1 293:10,15
**future** 92:22

### G

**G-11** 234:19
**Gale** 10:7 210:8,12
**Gambino** 72:15
105:17,19,25
106:2,10,15,17
107:2,8,16,22
174:24 175:12,22
177:22 213:13,21
213:22 214:8
215:4,15,24
216:23 218:22
219:11 221:17
**Gambino's** 218:1,2
**game** 168:19,23
**gather** 24:9

**gathered** 54:20
55:4,20 56:10
58:15
**gathering** 23:2,14
24:4 37:23 53:12
**GATMAITAN**
2:15
**general** 53:3
207:18
**generally** 96:13
**generated** 217:10
**George** 10:13
152:10 153:8
160:18 170:19,22
170:25 171:7
**Georgia** 211:5
**getting** 69:4 116:10
117:12 131:10
186:6 230:23
261:23 286:8
**give** 13:3 34:11
48:11 49:7 52:5,8
65:4 74:10 84:22
130:21 151:21
154:1 155:19
160:11 170:17
173:2 180:24
183:3,8,12,13
184:7 202:15
206:24 210:6
212:24 215:11
219:16 224:21
229:9 254:24
255:12 262:15
266:2 274:23
**given** 32:15 99:9
101:5 124:1
183:10 197:14
203:1,16 258:11
258:24
**giving** 36:8,20 42:6
47:17 120:9
127:11
**Glenn** 9:16,18
207:2,6 208:16
**go** 13:6 21:6 41:5

43:5,13,14 50:20
52:16 56:20 57:10
66:23 80:6 86:2
108:18 113:24
116:6 117:7,17
119:14,16 125:23
126:18 136:21
137:15 140:5,12
146:21 150:22
160:12,14 166:16
169:24 173:8
174:14,16 176:4
176:11 180:13
181:24 193:1
207:16 210:22
213:25 214:14
220:8 229:11
232:18 233:4,16
237:3 240:18
242:19 245:15
247:1 248:15
259:14 260:4
261:14 263:21
267:4,21 268:22
269:8 287:9
**goes** 56:2 187:23
188:24 261:1
**going** 17:21 34:21
41:4,7 50:13 64:9
64:20 69:24 70:21
74:9,17 84:22
96:20 116:5
125:21 126:12,24
126:25 140:25
146:16 151:23
156:14 160:14
161:11 163:11
168:1 174:9
179:18 183:8,10
183:15 189:13
190:23 210:11
219:24 238:25
251:17 268:11
281:10 282:19
286:8 287:23
**good** 12:13,15

89:15 115:18
116:3 117:19
118:8 167:12
292:3
**Goudie** 237:6,7
**Government** 42:12
42:24 43:23 44:1
44:3 45:16 46:1
**grabbed** 118:17
**GRABOWSKI** 3:3
3:4
**grant** 192:4
**Grayzel** 221:25
222:7 232:13
**great** 65:11
**GREENE** 3:15,17
3:19
**GRIFFIN** 4:3,4
**ground** 204:9
205:16
**Grove** 7:5
**Guard** 69:20,21
**guess** 81:23 203:14

### H

**H** 8:8 9:1 10:1
**hac** 62:6
**half** 220:2,4 254:25
**hall** 129:16
**Hammondsville**
63:8 245:19
282:11 283:12
284:14 285:7
**handed** 71:23
**handling** 278:25
**Handwritten** 8:17
10:6 34:18 173:24
**happen** 140:22
**happened** 25:23
68:22 96:3 107:15
107:17 109:12
111:15 129:16
213:18 218:1
222:18
**happens** 157:7
287:3



**happy** 235:18
292:4
**harassing** 256:14
**harassment** 281:12
**hard** 47:9 57:10,12
141:18 173:19
188:12
**HAWKINS** 7:16
**hazards** 14:17
**head** 105:25
**health** 22:21
**hear** 105:10 111:9
**heard** 63:8,9,22
67:12 105:18
109:15 264:14
**heavy** 150:6
**HEIRS** 3:18
**held** 1:15
**help** 15:22 16:2
19:5 20:2 26:13
38:3 54:6
**helped** 24:10
**helping** 14:5
**Hemstock** 9:16,18
207:2,7 208:16
272:3
**Hemstock's** 208:20
**HENDERSON** 7:9
**hereinbefore**
293:13
**hide** 99:13
**highlighted** 75:8,15
82:25 267:19
268:8
**highlighting** 267:24
268:2
**highly** 169:2,3
**historic** 27:23
**historical** 50:1,3
77:21 81:9,10
90:15 91:3 94:18
94:19 101:18
103:19 110:16
148:5 151:5
153:21 161:19
162:18 163:8

**169:1** 228:24
**historically** 13:10
15:11 24:5 77:15
90:7 103:20 249:1
253:24 270:12
**History** 157:24
**HODJERA** 4:13
**hold** 26:18,20,23
27:2,12,24 280:5
**holds** 69:10 282:4
**honest** 191:1
**honestly** 23:4,16
**hope** 89:9
**hoped** 18:7
**Hopkin** 146:17
233:5
**Hopkins** 8:16,20,23
8:25 15:25 16:4,6
17:6 18:15,22
19:5,15 78:21
130:6,25 137:24
138:3,10,19 139:3
140:19 142:11,11
143:12,24 145:7
145:13,21 147:13
147:19 149:2
150:25 183:5,9
185:22,23 187:2
188:8 189:7
191:15 197:6
200:23 233:7
235:24 239:14,21
240:7 247:3
248:21 257:19
260:8 263:25
288:2,10 289:15
289:18 290:4
291:19
**Hopkins'** 17:1,3,18
18:2 144:4,24
146:25 149:3,9
183:3 186:8
197:14 244:3
264:7
**Hopkins's** 243:16
**Hopkins-28** 233:5

**233:6** 258:12
**hour** 18:16 20:13
70:22 78:20
151:24 217:22
219:24 220:2,4
**hours** 20:7 168:1
286:2
**hundred** 189:25
190:6
**hundreds** 189:23
191:16
**hurt** 166:2
**HUSBAND** 1:4 3:4
4:4 5:22

**I**

**idea** 27:24 84:11
87:14 88:3 103:25
121:22 161:20
163:16 172:13
271:14
**identification** 11:5
34:19 65:6 71:12
74:7 146:14 152:8
154:4 155:21
170:20 173:6,25
181:2 183:6
202:19 203:25
207:3 208:17
210:9 224:19
262:17 266:4
274:25 282:22
288:3,23 289:16
289:19 290:6,23
291:8,10,12,16
**identified** 158:9
167:5
**identify** 112:17
129:21 130:11
167:4,14 211:13
287:10 289:3
291:3
**III** 3:15
**imagine** 241:15
**IMERYS** 2:20 5:24
**important** 15:21

**56:1** 85:2 109:7
113:15 190:14
191:22
**importantly** 78:21
**imposed** 27:12,25
**impossible** 21:7
**inaccurate** 16:20
17:12
**inappropriate**
84:25 217:12,17
**include** 177:10
289:11
**included** 134:23
192:2
**includes** 14:14
**Including** 22:4
**incomplete** 16:23
17:12 168:10
**inconceivable** 67:2
**incorrect** 78:15
129:12
**increasing** 67:1
**independent**
168:15 226:19
**indicate** 60:22
178:12
**indicated** 23:1
141:10 142:4
155:2 168:17
201:6 245:22
286:1
**indicates** 207:17
**indicating** 61:10
62:23 131:24
136:25 137:18
138:12 164:14
262:21
**individual** 3:18
42:18 44:12 46:4
46:9 48:22 50:20
55:6 60:15 65:1
69:15 87:25 94:14
101:2 104:8 162:8
163:4,23 203:22
205:6 242:14
264:13 265:5

**INDIVIDUALLY**
2:3,15 3:16
**individuals'** 56:21
**industrial** 59:19,22
60:8,17,23 61:11
62:24 63:14 83:14
83:19 85:2 86:3
113:15,23 114:6
114:13 204:22,23
226:19 227:3,12
**inform** 41:2
**information** 14:14
14:15 15:7,10
16:2,18 17:11
18:6 22:22 23:2
23:14 24:10 25:2
25:14,22 26:6,10
28:9 29:2 32:5,14
33:1,13,23 37:23
49:21 50:1,2
56:19 57:1 68:25
78:9 90:15 91:12
94:20 95:6 98:1
102:7 111:3
113:16 114:25
115:12,17,19
116:2,3,10,11
117:15,16,18,20
118:7,9 121:7
122:17 127:18
129:1,22 130:12
135:4,5,7 150:16
150:19,24 153:17
159:10,23 160:17
161:10 162:1,21
163:1,16 164:3
165:6,24 166:3
168:25 169:6,10
171:15,20,24
172:1,5 177:16
179:13 190:4
198:11 208:1
209:24 215:4
218:15,16 220:17
222:6 228:22
259:5 260:25



**informing** 164:23
**Ingestions** 154:9
 157:10
**inhalation** 67:5
 157:15 158:23
**Inhalations** 154:9
 157:11
**injured** 68:15
 155:11 164:15
 225:12
**injuries** 23:4 72:10
**injury** 25:6 48:1,9
 48:16 49:2 110:2
 114:22
**inquiries** 119:1
**inside** 51:18
**insignificant** 243:1
**insofar** 176:1
**instance** 261:9
**instruct** 281:10
**insurers** 69:1
**intent** 40:11,20
 41:1,13,24
**interaction** 52:11
**interested** 108:21
 288:18 293:20
**interject** 45:12
**internal** 131:5
 135:21 244:24
 249:15
**internally** 59:11
 112:24 155:10
 166:1
**interpret** 238:3
 253:8
**interpretation** 85:3
 277:24 278:2
**interpreted** 101:24
**interpreting** 81:23
**interrogatories**
 8:21 9:22 14:6
 16:19 57:9 73:8
 115:9 118:8 119:3
 120:14 123:7
 127:15,24 129:7
 130:21 131:2,13

131:23 138:24
 139:17 173:5
 174:5 175:5
 182:25 187:6,13
 193:15 212:12
 216:20 232:12,15
 241:18 243:20
 244:11 259:23
 260:14,16 261:6
 262:2,10 280:11
 282:9 284:12
 285:4 288:22,25
 289:11
**interrogatory**
 125:5 171:22
 172:23 174:10
 178:11 181:24,25
 185:2 187:15
 188:25 194:4
 195:25 210:2
 241:7,13 249:6,24
 284:15
**interrupt** 46:2
 70:20 156:15
**interrupted** 185:13
 193:18
**interrupting** 248:4
**investigated** 234:14
**involved** 14:5 18:12
 23:23 53:16 59:15
 59:18 67:3 81:14
 83:22 90:8,24
 94:8 123:5,16
 125:4 145:1,6
 165:4 169:4 172:3
 201:12 202:3
 204:21,23 214:24
 216:23 217:2
 266:24 267:21
 268:4,6 269:1,7
 273:24
**involvement**
 104:17
**involves** 239:6
**involving** 50:10
 51:2 53:13 64:19

72:14 73:1,15
 74:21 77:1 79:19
 95:18 96:17
 128:10,24 169:17
 276:21
**iPad** 268:23
**issue** 46:24 69:23
 85:19 107:7 206:6
**issues** 18:23 34:7
**Italian** 189:14,15
 204:9 205:2,10,13
 205:16

--- J ---

**J&J** 35:11 37:5
 94:7 283:15
**J&J-172** 9:16
 207:1,6
**J&J-173** 9:17
 208:15
**J&J-188** 9:19
 224:18
**J&J-195** 9:20
 266:3
**J&J-277** 9:21
 173:4
**J&J-282** 9:23
 262:16
**J&J-294** 10:4
 202:17
**J&J-412** 10:6
 34:18
**J&J-436** 10:7
 210:7
**J&J-446** 10:8
 274:24
**J&J-448** 10:9
 154:3
**J&J-450** 10:10
 152:7
**J&J-452** 10:11
 155:20
**J&J-453** 10:12
 170:18
**J&J-456** 10:14
 282:20,21,24

**J&J-483** 10:15
 203:24
**J&J-486** 10:16
 74:6
**J&J-488** 10:17
 146:13,17
**J&J-8** 9:15 65:5,15
**January** 154:10,10
 211:7 275:7
**JARED** 6:4
**Jersey** 1:1,17 2:1
 2:12 3:1,13 4:1,11
 5:1,10,19 11:13
 11:19 214:8,22
 225:3 266:16
 293:4
jlee@mkclaw.us....
 6:19
jmplacitella@cp...
 6:7
**job** 19:19 21:22,24
 22:15 35:17 41:17
**John** 8:16 50:8 52:9
 52:12 140:19
 160:21 183:5
 208:6
**Johnson** 6:14,14
 12:23,23 13:7,7
 13:10,10,13,13
 14:3,3,9,10,15,15
 15:7,8 20:23,24
 21:12,12 23:3,3
 23:17,17 24:5,5
 25:4,5 27:1,1,3,4
 27:11,11,22,22
 28:16 29:2,3,17
 29:18 30:21,21,23
 30:23 31:6,6,11
 31:11 32:4,4,13
 32:13,24,25 33:3
 33:3,11,11,15,15
 33:21,22,24,25
 35:18,18,22,22
 37:3,3,17,17 38:8
 38:9,20,20 39:17
 39:17,25,25 40:7

40:8,12,12 42:11
 42:11,24,24 44:16
 44:17 46:10,10
 47:24,25 48:14,14
 48:16,16,17,17,25
 49:2,2,4,4,12,12
 50:8,8 51:2,2,3,3
 51:16,16,19,19
 53:14,14 55:18,18
 55:19,19 56:12,12
 57:1,1,18,19
 58:11,11,12,12,13
 59:15,15,17,17
 60:9,9 61:8,9
 62:22,22 63:15,15
 63:23 64:8,8,9,19
 64:19,20,20 65:18
 65:18,24,24 68:3
 68:4,5,5,12,12,24
 68:24 73:15,16
 74:10,20,20 76:6
 76:6 77:1,1,16,16
 79:17,17,18,18
 80:14,14 82:1,1
 85:7,7,9,10,19,19
 86:1,1,19,19
 87:15,15,17,17
 88:4,4 90:7,7 91:4
 91:4 95:5,5,7,7,17
 95:17,20,21,23,23
 95:25,25 96:18,19
 97:19,20 98:2,2
 98:21,21,25,25
 99:12,12,19,19
 101:19,19 102:3,6
 102:6,14,14 103:1
 103:1,2,2,5,5,7,7
 103:8,8,11,11,21
 103:21,25,25
 104:25,25 105:1,1
 105:12,12 112:18
 112:19 123:19,20
 123:20 126:3,3
 127:19,19 128:10
 128:10,22,22,24
 128:24 129:20,20



129:25,25 130:9,9
130:15,15 132:1,1
132:23,23 134:24
135:5,6,6 137:1,1
137:11,11,19,19
138:13,13 139:10
139:10,24,24
140:2,3 143:18,18
144:7,7,14,14,17
144:17 145:23,23
149:13,13 151:4
153:13,13 154:16
154:16 155:9,9,11
155:11,12 156:11
156:11 158:20,21
159:2,2,12,12
162:3,3,11,11,14
162:14,19,19
163:5,5,9,10,14
163:14,14 164:4
164:13,13,15,15
165:4,5,23 166:1
166:1 167:1,2
168:19,19,22,22
168:25 169:1,4,6
169:6,7,8,12,13
169:17,17 171:23
171:23 172:12,12
173:12,12,14,14
175:7,8,19,20
177:20,23,23
181:6,6 182:11
186:2,2 187:16
189:17,17 190:5,5
190:7,7 191:13,13
191:13,17 192:13
192:17 196:18
198:12,12,13,13
198:20,20 199:3,3
199:15,15 201:12
201:12 202:3,3
203:11,12,16,16
204:3,3,16,17,24
205:20,21 206:16
206:18,18 207:17
207:25 208:1,11

208:11,23 210:2,3
210:19,20 212:13
212:13,17,17
213:8,8,12,12
214:6,6 217:1,1
221:1,1,9,9 222:9
222:9,13,14,15,15
223:6,6,17,17
224:3,3,8,8,12,12
225:9,10 229:13
229:14 230:20,20
230:25,25 231:4,4
236:7 237:23,23
241:6,6 242:10,10
243:6,6,17,17
244:15,15 246:14
247:17 249:2,2,7
249:8,25,25
250:12 252:19,19
253:3,22 255:1,2
255:2,9,9,16,16
255:23,23 257:1,2
260:15,15,17,17
261:8,8,11,11
262:9,9,20,20
266:22,23 268:5,6
268:12,13 269:2,2
269:13 270:12,13
272:16 273:21,21
273:21,21 274:7,7
275:6,6,15,15,17
275:17 278:1,1
279:1,1 281:1,1
282:25,25 283:10
283:10

**Johnson's** 13:12
15:5 21:16 22:3
22:23 28:16 31:3
31:20 37:18 38:12
38:23 39:5,20
40:1,9,14,18,22
41:16,19,24 42:13
43:1 44:7,18 47:3
47:13 58:14 60:6
63:11 64:1,10
73:2 75:20 77:17

79:20 80:22 84:5
93:3 102:3 119:4
119:7 121:16
124:10,21,21
128:9 132:16
133:4,23 134:24
135:5,25 136:13
136:18 139:6
151:5 154:9
155:12 157:12,25
158:23 164:4
165:23 169:5
174:12,23 177:20
182:3,6,11 187:16
192:17 196:18
199:1,5 205:20
206:16 207:18
208:23 214:24
217:6 223:19
225:12 226:5,17
227:4 236:7
238:13 242:22
246:14 247:18
250:12 253:4,22
272:16
**Johnson-486** 74:10
**Joly** 86:6,7,16
104:11 105:2,6
152:11 153:1
154:25 155:2,5,10
157:17 159:18,23
160:6 161:3,6,12
163:17 164:7,11
164:15 171:8,10
171:20 172:11
176:14 177:10,21
178:7,13 179:5,19
**JONATHAN** 6:17
**Jones** 216:24
**JOSEPH** 1:4
**journal** 99:25
100:7
**judge** 45:20 46:6
62:12 69:7,21
157:5 170:5
185:14 206:9

223:4 235:15
286:15
**judge's** 69:19
**July** 170:24 171:7
204:2
**jumped** 124:5
**jumping** 121:14
**June** 155:23
**jury** 17:9 139:25
144:8 188:9
**justified** 130:13

### K

**K-r-e-p-p-e-l**
112:12
**KARP** 6:11
**Karwacki** 7:24
11:22
**KATHLEEN** 5:22
**keep** 179:19 213:3
244:3 248:4
257:14 279:18,19
291:14
**KELLY** 7:16
**kept** 50:9 280:14
**kind** 27:2 113:2
176:20 196:15
247:10 249:14
255:7
**kinds** 217:21
**KLUGER** 6:16
**knew** 17:15 26:5
42:23 77:24 85:7
85:15,18,25 86:1
97:20 123:4
131:19 133:12,13
136:6 145:8 147:9
160:5 177:11,24
178:13 180:2,17
205:22 206:13,15
206:20 207:25
208:1,7 212:14
217:4 221:10
223:17,20 239:5,6
240:2 268:11
**know** 15:6 16:16,17

17:5 21:7 26:10
27:18,20 30:12
33:20,21,22,25
35:2 36:3 39:12
39:16 43:9,17
46:23 47:7 48:22
48:23 50:3,8,19
51:17 52:25 53:7
53:10,11,18 58:8
58:9 60:1,14 61:3
63:4 65:1,2,21,23
66:2,3,7,9,10,14
66:17 68:2,23
69:5 70:23 72:9
76:5,14,16,17
78:18 79:14,23
80:5 81:10,19
83:11,21 84:4,21
86:7,9 87:25 88:1
89:10 90:2 91:16
91:23 92:1,3,10
92:11 94:5,7,14
96:14,16,24 97:4
98:25 102:23
103:2,5,9,11,20
103:24 104:9,11
104:23 105:1,12
105:16,19 106:12
106:14 107:6
108:8,11,12,14
109:14,24 110:4,5
110:6,11,17
111:12,16,24
112:2,11,12
113:13,17,19
114:5,20,21
118:17 139:2
141:9 142:3
143:11,22 144:4
144:10,13,25
146:8 147:12,14
147:16 150:12,21
151:17 152:23
155:8,12,16 159:6
160:9 161:15,25
162:14,20 163:23



163:24 164:4
168:4 171:5,13,18
171:25 172:19
179:15,20 183:20
186:17 189:6,6,8
189:12,13 193:2,6
195:19 196:13,16
196:17,19,24
197:2 199:11,14
199:17 201:21
203:22,23 204:19
204:21,22 205:6,8
206:14,23 213:3,9
213:17 214:19
217:11,12,17
218:2,6,12,17,18
218:20 219:3,6
221:1,15,24 222:6
222:15 223:24
224:1,3,8 225:9
225:13 226:7
228:22 230:10,10
230:16,19,24,25
232:17 235:15
236:13,15 237:8
238:20,23 241:25
242:14,16 244:2,5
248:19,20,22
250:17 257:14,18
258:1 259:6,15
262:19 267:1
268:3,18 273:4,7
273:14 275:22
278:14 279:16,23
280:7 281:5,17,20
282:5,8,12,16
283:2 288:19
290:10,12
**knowledge** 13:9
47:24 93:25 95:5
96:6 110:15 115:1
115:14 122:19
123:10 152:24
161:11 182:10
187:14 202:2
260:25 280:22

**knowledgeable**
55:7 56:5 124:17
266:20
**known** 26:17 66:17
169:6 267:2
**knows** 46:4 69:14
104:8 223:7 269:6
**Kreppel** 112:10,14
112:19 113:3,8
**Krushinski** 8:22
73:9 172:24 174:6
178:12 181:23
191:11 193:21
196:1 201:3,7
243:20 244:12
280:12 288:22
289:12 291:6

---

## L

**L** 1:18 7:23 293:2
293:22
**laboratories** 182:17
188:3 189:8,11
**laboratory** 189:13
**lack** 182:14 187:24
188:19
**large** 88:9 150:12
**late** 48:7,10 211:7
261:24
**law** 1:1,15 2:1,13
3:1,13 4:1,11 5:1
5:10,19 11:13
50:24 67:7 68:15
142:13 144:15
262:21
**lawsuit** 39:9 47:25
48:6,9,15 49:1
50:4 58:16 73:1
73:15 79:1 80:13
95:17 98:4,24
102:10 104:2
155:10 157:21
165:25 177:21
218:22 232:3
273:24
**lawsuits** 15:11

33:14,24 48:12
49:10 50:10 64:18
66:11 73:6 74:22
76:25 79:19 87:16
88:5 90:6,9 91:13
101:21 103:4
126:13 128:10,23
157:3 162:2
217:19
**lawyer** 53:21 76:20
100:24 125:9
160:18 161:23
218:21 221:25
229:13 231:20
278:3
**lawyer's** 208:3
**lawyers** 52:9 96:17
126:3,11,15,23
134:25 135:6,7
136:1 160:5 161:9
164:4 200:8 203:7
203:12 205:20
206:16 208:23
210:19 212:14
213:12 215:3
217:11 268:1
**ldobbins@rawle.....**
7:13
**LEA** 6:4
**learned** 284:2,11
284:19 285:6
**Lee** 6:17 152:10
153:8 160:18
170:25 171:7
245:18
**Lee's** 10:13 170:19
170:23
**left** 184:15
**legal** 1:23 11:22,24
25:24,25 26:5,10
26:24 32:18 33:7
33:17 34:4,4 58:1
58:8 59:10,11
69:10,10 91:17,19
92:4 93:8 94:4
98:18 99:7 127:6

279:25 280:4,5
282:4
**legal-wise** 32:21
**lengthy** 185:19
**LEONARD** 5:21
**lesions** 114:16
**LESLIE** 7:4
**let's** 30:5 34:9 45:9
80:6 92:13 125:23
131:22 151:20
170:7 180:13
201:1 233:10,12
233:16 237:3
240:18 242:19
245:15 247:1
268:21 285:17
**letter** 8:12 10:10
11:2 22:1 75:11
152:7,10 153:23
167:13 229:12
232:12
**letterhead** 205:11
282:25
**letters** 93:19
**letting** 46:3
**level** 41:16
**Levitt** 197:22
**Lexington** 7:17
**liberty** 231:13
**lie** 228:11,18 229:1
253:13 270:3
**LIEU** 7:3
**limitation** 77:23
78:4
**LINDA** 7:10
**line** 217:9 237:12
**LISA** 2:3
**list** 72:22 91:9,25
165:8,19 174:24
**listed** 82:23 89:21
90:18,22 105:22
108:13 109:23
165:17 175:12
176:12 207:22
208:3 210:21
213:22 265:19,23

**listen** 56:9 261:19
261:24
**listening** 17:10
**lists** 92:2
**litigation** 24:5
26:18,20 27:2,12
27:13,24 28:18
32:6 37:14,18
38:21 39:19 51:2
51:18,23,24 56:13
67:3 75:13,20
80:8 82:14 83:2
92:20 93:4,21,24
94:8,22 96:1
100:21 163:2,10
168:14 173:11
192:4 196:10
202:4 214:13
217:11 253:24
266:21 277:2
281:4
**litigations** 195:21
**live** 147:14
**LLC** 4:17 7:3
**llombardy@osla...**
7:6
**LLP** 1:16 6:10 7:9
7:16
**located** 269:13
**location** 60:3
**log** 10:16 74:7,15
74:18,19 76:22
82:23 86:21 87:6
88:6 91:9,14 94:9
160:11,14 161:10
161:16,20 162:15
169:12 215:14,22
215:22 217:10
267:6,16 268:5,7
**logs** 163:1 217:19
**LOMBARDY** 7:4
**long** 18:14 68:2
77:21 170:9
183:19 185:13
**long-term** 158:22
**look** 67:23 70:18



74:24 78:9 82:21
90:6 92:13 122:7
148:5,10,12 151:9
151:18 180:13
183:9,12 184:14
184:17,21 188:14
190:18 201:4
203:10 219:9
224:22 229:19
233:13 239:3,7,15
261:15 268:21
270:17 271:18,23
275:3 276:12,18
278:10 287:2
288:11,17
**looked** 15:21,23,24
20:2,22 21:3,7
81:11 148:11
167:17 191:24
201:2,3,6,13
202:12 239:11
241:4 253:1
**looking** 76:17
136:20 137:14
184:15 242:21
**looks** 150:15
290:13
**loop** 50:9
**Lopez** 113:12,21
**LORETTA** 5:12
**lose** 32:14
**lot** 15:20 54:9
130:22 150:15
183:19 200:16
290:13
**lots** 37:7
**low** 234:11,13
250:11
**lunch** 151:23
170:10 220:6
**Luncheon** 170:13
**lung** 23:23,24 158:5
158:22 180:14
181:13

———————
**M**

**M** 5:3 6:4
**ma'am** 77:11 95:14
97:24 122:16
123:7 126:11
131:18 132:13
134:17 144:2,14
145:6 175:16
177:19 178:10
179:2 190:23
191:9 192:8,11,15
193:5,10 198:18
228:18 236:17
238:10,20 242:7
244:9 248:24
251:17 253:21
254:4 256:19
258:11 259:8,12
260:12 261:18
262:1 265:18
271:18 272:15
273:1,3 276:1
279:12 280:10,25
282:8 285:3
**Magna** 1:23 11:22
11:24
**Magnesia** 13:14
**maintain** 95:23
**making** 68:14
122:23 199:13
206:10
**management**
283:14
**manufacture** 182:3
182:11 187:16
**manufactures**
68:13
**Maria** 1:4 11:11
**mark** 71:7 173:22
**marked** 11:5 34:19
34:21 65:6,7,8
71:11,20,23 74:7
74:10 87:6,13
88:6,18 146:14,17
146:24 150:5
151:7 152:3,8
154:4 155:21

170:19 173:6,25
181:1 183:5,13
202:18 203:25
207:2,5 208:17
210:8 224:19
262:16 266:4
274:25 282:20,22
287:10 288:2,5,8
288:23 289:15,18
290:6,22 291:8,10
291:12,15
**market** 6:5 181:17
181:21
**Marketing** 21:17
129:6
**marking** 286:19
**Martin** 1:18 11:24
293:2,22
**material** 29:4
**matter** 11:11 127:6
197:1 288:14
**matters** 51:24
80:23
**MATTHEW** 4:13
**McCrone** 228:3,8
229:24 233:11,13
233:25 237:4
240:19 242:20
244:13 245:4,15
245:18,24 247:1,9
247:21 248:12,14
249:9 250:2,8,21
251:1,4,19,24
252:5,17,20
**McGIVNEY** 6:16
**MCNEILL-GEO...**
5:3
**McTernan** 154:18
**MD** 66:1 153:2
**MEAGHER** 6:10
**mean** 19:1 77:21
92:11 97:12 99:16
99:17,22 115:20
136:11 137:10
180:9 190:13
192:3 196:8

239:16 248:20
**means** 33:20 76:17
76:19 92:10,21
99:23 124:3
199:11 203:14
218:12,14 219:7
236:13,15 238:4
244:6 248:19,20
248:23 250:18
268:3
**meant** 198:7
**medical** 65:24
99:25 100:7 153:3
154:15 156:5,10
157:11 158:20
159:11 160:25
164:14 165:4
177:23 180:9
181:10 268:5,12
**Medicated** 234:8
**medium** 250:11
**meet** 286:22
**meetings** 44:14
**MELISSA** 2:16
**memo** 9:15 10:9,11
10:14,15 65:6,18
154:3,8 155:20,23
156:10 158:20
159:1,7 164:14,22
180:10,22 203:24
204:2 282:21,24
283:10
**memorandum**
80:22 156:7
**memorandums**
216:9,9,10,10
**memory** 35:5 45:10
45:12
**memos** 161:3,6
**mention** 127:16
176:16 179:5
189:20
**mentioned** 20:17
72:22 73:21 90:9
130:23 148:6
161:7 176:14

179:16,20 199:22
238:18 240:21
241:14 249:8
250:1 251:4,5
276:1
**mentions** 192:1
**mesothelioma**
110:2 204:12
**met** 45:1 200:7,16
**method** 148:22
**Metropolitan** 204:4
204:8
**mic** 36:16
**microscopy** 211:2,2
211:25
**MID-L-2456-18**
3:14
**MID-L-3095-18**
1:2 11:14
**MID-L-4252-18**
2:13
**MID-L-4826-18**
4:2
**MID-L-5368-17**
4:12
**MID-L-598-18**
5:11
**MID-L-600-18** 2:2
**MID-L-6635-17**
5:20
**MID-L-6805-16**
3:2
**MID-L-7049-16**
5:2
**Middlesex** 1:1 2:1
2:13 3:1,13 4:1,11
5:1,10,19 11:13
214:7,21 225:2,6
255:11
**Miller** 10:5 109:19
152:11 153:11,16
202:18 203:1,4
224:23 225:20
226:25 229:22
231:21 233:11
236:18 238:8,12



240:21 250:25 251:5 252:16,24 253:2 254:6 257:19 258:18 263:4,12 264:24 276:7,9 278:15
**Miller's** 245:3 246:21 253:13,20 254:8
**milling** 226:2
**million** 245:23
**Mills** 155:24
**mind** 31:8
**mindful** 52:17
**mine** 59:23 60:2,7 61:12 62:25 63:8 63:23 85:9,18 204:24 205:21 206:18,19 209:10 209:17 247:13 269:12 271:10,23 272:5,18 279:5,10 280:14 281:2 282:11 283:14 285:6,7
**mined** 227:2 263:13 269:10,11
**Mineral** 232:22
**mineralogic** 211:14
**Minerals** 4:7 7:14 13:11,14 153:12 203:5 207:13 225:21 226:1,18 227:2 229:1,21,23 232:5,20 263:14 275:6
**Minerals'** 227:19 263:17
**mines** 49:3 63:20 83:22 84:3 208:11 212:16 214:5 282:17
**mining** 226:2,3,4 283:11 284:13
**minute** 185:5 257:12

**minutes** 220:5
**missing** 257:20
**mistruth** 194:19
**mistruths** 194:15
**misunderstanding** 254:2 277:25
**mm-hmm** 67:19 70:24 71:3 146:12 289:25
**month** 188:9
**morning** 12:13,15
**MORSE** 4:17
**mothers** 41:13
**motion** 166:22,24
**move** 36:16 218:16 259:8
**moving** 213:3 257:14
**multiple** 116:12 223:19 283:23
**Musco** 1:15 8:3 9:6 11:10 12:5,13 14:10 33:11 48:14 55:18 132:2 222:13 253:13 286:6,17,19 287:21,24 290:22 293:7
**Musco-1** 34:22 136:21 137:15
**Musco-2** 150:6 151:7,16

**N**

**N** 6:1 7:1,23 8:1,1 10:5,7 202:18 210:8
**name** 8:10 9:3 10:3 66:1 90:3 105:18 112:11 128:19 161:7 180:21 207:22 208:3 266:18 267:23 276:3
**named** 221:25 275:17

**names** 52:5,7,8 54:11,15,17,17 127:16 130:19,22 189:12 210:21 217:3 263:10 268:2,9 276:10
**Nancy** 1:15 8:3 9:6 11:10 12:5 14:10 33:11 48:13 55:18 132:2 222:13 290:22 293:7
**National** 43:9,17 44:5 46:11,25
**nature** 211:13,14 211:17
**necessarily** 55:4 56:2 60:2
**necessary** 129:18 218:16 264:19
**need** 69:7 128:20 129:4 133:9 170:4 170:9 200:3 240:1 257:11
**needed** 23:14 26:12
**needs** 285:25
**neither** 293:15,18
**never** 17:8,15 38:13 38:13 40:10,11 42:12,25 47:1 55:10 81:11 88:15 90:16 119:5,22 122:21 123:10,21 124:7 125:13 128:7 129:3 131:13 132:2,17 133:5,24 136:15 136:15,23 139:9 140:1 142:11,12 142:22,25 145:6 145:24 147:6 149:14 151:6 166:2 169:13 171:9 172:2,4 176:14 181:8,16 182:12 187:17 190:8 191:13,17

194:22,23 199:22 206:15,20 209:24 212:21 215:16 216:16 228:20 236:18,20 239:11 240:5 243:19,25 244:12 245:2 251:4,4 252:18 254:7 257:19 259:23 262:3 275:21
**new** 1:1,17 2:1,12 3:1,13 4:1,11 5:1 5:10,19 6:12 7:18 11:13,18 78:23 138:5 181:5 214:8 214:22 225:3 266:16 293:3
**nine** 251:3 264:2
**NJ** 6:18 7:5
**non-asbestos** 192:25 195:20 199:24 200:11
**non-suit** 218:12
**non-suited** 218:8
**normal** 119:8
**NORTH** 2:8 3:7,22 5:6,15
**Notary** 1:20 293:2 293:23
**note** 113:15 167:25
**noted** 12:1 49:22 158:5 180:15
**notes** 9:10 291:15 291:18
**notice** 8:13 11:4 13:5,6,24 15:3 18:12 27:16 42:16 44:10,24 45:13,17 48:20 49:22,25 50:17 60:12,19 61:3 64:24 68:13 69:5,24 72:6,23 76:10,11 77:7 85:4 87:23 89:22 90:23 94:12

100:25 101:24 103:14 109:23 156:18 159:5 162:6 163:3 175:8 176:1 178:5,8,19 178:22,24,25 179:14 181:11 201:23 203:16,20 205:5,25 206:5 207:11 213:16 214:11 217:13 218:5 219:5 221:5 222:21 225:16 226:11 228:14 231:6,24 235:4 242:13 246:4 254:3 258:9 264:11 265:3 269:23 272:9 274:14 275:10 277:1,16 279:8 283:22
**notices** 102:22
**noting** 206:11
**November** 290:25
**NTP** 44:14,17
**number** 11:9,14 65:4,12 71:20 77:23 152:5 155:5 174:10 181:24,25 182:16 185:2,3 187:20 188:2,11 188:24 202:21 289:3
**numbers** 264:15 277:5
**numerous** 166:21 169:4 251:8,11 275:17
**nurse** 156:4
**NY** 6:12 7:18

**O**

**O** 7:23
**O'Shaughnessy** 52:10,12,19 54:1



54:5
**O'TOOLE** 7:3
**oath** 17:9 18:7
  114:24 115:12,17
  115:25 116:1
  121:8 122:2,16
  123:8,18 124:8
  129:1 130:10,13
  131:13 133:2,21
  135:23 136:23
  137:17 138:10,23
  139:16,25 144:15
  145:21 149:12
  151:4,13 163:15
  174:6 175:18,21
  178:11 179:3,13
  180:2 182:9,23
  183:11 187:6,13
  188:8 190:8
  191:10 193:6,10
  193:20 198:18
  199:3 212:12,15
  213:4,11 227:1
  239:9,12 241:18
  244:12 249:7,25
  254:9,23 259:23
  260:14,16 261:7
  262:3 263:13
  271:22 272:17
  280:11 284:12
  285:5
**object** 13:25 14:19
  15:12 16:21,24
  17:13,16 21:1
  23:7 24:7,21 25:8
  25:18 26:7 27:5
  27:14 28:19 29:9
  29:21,24 30:10
  31:9,12,24 32:8
  32:17 33:4 34:1
  35:25 36:10,17
  37:25 38:16,25
  39:10,22 40:24
  42:14 44:8,20
  45:4 47:4 48:3,18
  50:11 51:10,20

52:14,23 53:4,23
54:21 55:1,23
56:14 57:4,20
58:5,18,18 59:7
59:24 60:10,25
61:13,16 63:2,16
64:3,13,15,22
66:12,20 67:13
68:7,17 69:2
72:16 73:3,18,25
74:12 75:22 76:8
77:3 78:1,12 79:6
79:12,21 80:10,15
80:25 82:15 83:24
84:18,23 85:11,22
86:23 87:7,18,21
88:7,20 90:19
92:5,5,23 93:10
93:13 94:1,10,23
94:23 95:9 96:9
96:22,25 97:7,17
97:17 98:6,15
99:2 100:8,12,22
102:11,19 103:12
104:4,4 105:3
106:3,19 107:9,18
107:24,25 110:9
110:19 112:4,21
115:2 118:10
121:1,10 122:4
123:13,23 124:11
124:25 126:4
127:2,21 128:12
128:15 129:10
130:1,16 132:5,19
133:7 134:1 135:1
136:3 137:3
138:14,25 139:19
142:16,20,23
143:6,20 144:21
145:11 146:1
148:8,8 149:17,25
152:19 155:14
158:13 159:3,14
160:1,7 161:13,21
162:4,23 163:19

164:8,17,20 165:9
166:5 171:16
172:14,17 173:17
175:1,2,24,24
177:13,25 178:14
178:17 179:7,24
180:4,19 181:18
183:16 185:10
186:21 189:1
190:10,10 191:3
191:19 192:22
193:11,24 194:16
194:25 196:5,21
199:7 200:12
201:16,19 202:8
203:18 205:3,23
206:21 207:20
208:12 212:2,3
213:5,14 214:9
215:6,18,25
216:17 217:7,8
218:3,9,25 221:3
221:11,19 222:1
222:16,19 223:9
223:21 224:5
225:4,14 226:8,9
226:11 228:12
229:2 230:4,14
231:2,22 233:18
234:24,25 236:3
236:10,23 237:25
238:15 240:9,24
241:8,8,23 242:11
243:8 244:17
245:6 246:2
249:10 250:14
251:6 252:21
253:6,14 255:3,17
257:23 258:3,13
259:1,16 260:1,20
262:24 263:7
264:9 265:1,2
268:14 269:17
270:4,21 271:11
272:6,7,20 273:10
275:8,19 276:14

276:24 277:12
278:4,18 279:3,6
279:21,24 280:16
281:7 282:13
283:17,22 284:16
284:21 285:10
**objected** 256:6
  284:6
**Objecting** 206:4
**objection** 28:1 43:2
  45:22 47:19 49:5
  49:13,18 50:14
  51:4,11 74:25
  85:16 101:4 120:2
  156:16,25 163:20
  164:21 166:18
  176:18 183:23
  185:17 206:11,22
  207:9 208:25
  209:20 210:14
  226:21 227:7,14
  227:22 228:4
  229:3 232:6 236:4
  236:24 237:11
  243:9 246:16,22
  247:23 248:3
  251:7,20 252:1,6
  252:9,10 254:12
  254:21 255:4,18
  258:22 265:13,21
  266:7,12 267:10
  269:18 270:22
  272:21 273:18
  274:2,9 284:4
**objections** 157:7
  284:22
**objective** 33:1,13
  33:23
**obligation** 100:20
  279:13,16
**obligations** 28:16
  280:6
**obstruction** 158:7
  181:14
**obstructive** 50:15
**obtain** 225:11

**obtaining** 33:2,13
  33:24
**obvious** 113:18
**obviously** 164:4
  192:10 286:11
**occurred** 23:5
**October** 248:10
**odds** 138:22 143:4
**Off-the-record**
  117:5 141:22
  257:16 292:6
**offices** 1:15
**Oh** 112:14 130:25
  156:19 175:17
  187:22 197:14
  288:18 289:4,24
  290:1,18,20
  291:13
**okay** 13:1,18,22
  14:8,13 15:17
  16:5 17:25 18:17
  19:8,14,23 20:14
  21:10 22:6,9,11
  22:25 24:18 26:25
  28:5 29:1 30:5,20
  32:3,12 35:4,20
  37:12,21 38:20
  40:7 42:2,9 43:5
  44:5 45:9 47:23
  48:13,25 50:7
  52:11 54:19 57:16
  59:14 62:7,13
  63:22 65:11,16
  66:21,23 67:20,23
  68:2,11,22 70:1,2
  70:13 72:13 74:4
  76:4,5 78:17,25
  79:16 82:4,7,13
  82:20 83:1,15
  86:5 87:3 88:24
  89:6,15,24 90:14
  97:5 98:21 101:13
  102:25 107:6
  108:7 109:12,15
  109:24 111:23
  114:8 118:4



119:13 125:11
126:20 127:14
128:22 131:10
133:1 134:15,22
137:23 140:20
146:6,6,10 147:9
148:15 149:1,6
151:2 153:2,8,11
153:15 155:8,18
156:6 157:8,8
159:1 160:5,17,21
161:5 166:14
170:9,16 171:4
172:11 173:1
174:19 176:14
181:10 182:22
183:1 185:6 186:9
186:22 187:4,22
188:8 189:5,14
191:9 196:12
197:9 198:5,10
199:20 200:5,25
200:25 202:14
203:10,15 204:20
205:1 206:9
207:16 208:19
210:22 214:3,4
215:10 216:22
217:20,24 219:9
220:7,15 221:24
224:17 225:20
226:25 229:7
232:18 233:1,4,10
233:13,15 234:6
235:14,16 237:3,9
240:18 242:18
243:25 245:2,15
246:20 247:12,20
248:9 250:7,20,24
253:12 254:20
255:2,10 256:15
261:22 265:25
267:3,18 268:10
268:21 269:5,8
270:17 272:15
273:16,22 274:1,8

274:21 275:16
276:11,18 278:9
278:14,24 282:6,6
283:9 285:16
288:11,19,24
289:7 290:20
**omitted** 252:19
**once** 208:11 212:16
214:5
**ones** 18:24,25 21:4
105:21 108:13
109:22 135:18
288:12,17
**ongoing** 16:14
75:13 93:20
125:22 153:17,22
**oops** 229:11
**operation** 283:11
284:13
**Operator** 7:24 11:7
12:7 43:11,14
46:18 71:15 89:1
89:4 117:3,6
118:4 119:15
126:19 140:7,12
170:11,14 220:9
220:12 285:18,21
292:7
**opportunity** 184:8
186:12
**Oral** 1:14
**orange** 92:16
**order** 15:18 55:21
106:17 148:16
159:24 166:23
201:14 258:20
262:22 264:24
**ordered** 169:9
**ore** 209:10,16
245:19,24,24,25
**original** 258:16
**originally** 135:20
**ought** 71:1
**outcome** 158:19,21
218:19
**outside** 35:22 45:16

59:12 60:11 76:9
76:11 80:3 91:22
108:9 112:25
119:20 156:17,20
159:4 168:13
182:17 188:2
218:4 226:10
231:5 242:12
279:7 283:21
**ovarian** 23:25
**overlapping** 283:24
**overseeing** 58:3
**owned** 49:3 85:9,19
153:12 208:11
212:17 214:6

_____

**P**

**P** 6:1,1 7:1,1,23
136:21 137:15
**P-1** 8:12 11:2 13:3
13:5 90:9,18
**P-10** 9:6 290:21,24
**P-11** 9:7 291:7
**P-12** 9:8 291:9
**P-13** 9:9 291:11,14
**P-14** 9:10,12
291:15,19
**P-2** 8:15 71:11,21
71:23 87:6,13
88:18
**P-3** 8:16 183:4,13
**P-4** 8:17 173:24
**P-487** 88:6
**P-5** 8:18 181:1
**P-6** 8:19 9:12 288:1
288:6,7,8,8,9
**P-7** 8:21 288:21
289:6
**P-8** 289:24
**P-8A** 8:23 289:14
290:1
**P-8B** 8:24 289:17
290:1
**P-9** 9:5 290:5,7
**P.C** 6:3,16
**p.m** 117:4,7 170:12

170:15 220:10,13
285:19,22 292:9
292:12
**PA** 6:6 7:12
**page** 1:10 2:25 3:25
4:25 8:4,10 9:3
10:3 66:23 73:9
86:5 203:11
207:17 208:22
209:6 210:19,22
224:22 229:12,19
231:18 232:10
241:4 269:9
276:19 283:9
**pages** 186:11
**Pam** 19:17
**Pamela** 89:16
**paper** 92:17 122:22
123:11 164:6
195:3
**papers** 56:19
123:16
**paperwork** 138:7
**paragraph** 225:24
227:1 233:7
**PARALEGAL** 6:4
**Park** 6:18 7:5
**PARNELL** 7:16
**part** 18:8 21:18,19
22:13 23:19 35:17
46:13 67:25 89:22
90:22,25 94:21
182:24 236:22
279:12
**particular** 19:12
55:7 99:24,25
125:19 126:10,16
133:11 167:13
190:16 236:17
251:14 280:22
**particularly** 183:18
**parties** 28:8 293:17
**parts** 245:23
**Patricia** 155:24
**peer** 99:18,21,23
**penalty** 122:17

123:8 124:23
131:24 175:19
179:3 191:10
198:19
**pending** 75:19 80:7
83:2 92:19 165:16
281:4
**Penn** 7:11
**people** 15:25 19:20
22:24 23:21 24:11
24:25 35:22 51:5
52:2,4 53:15 54:6
54:9 55:14 68:14
81:14 115:22
118:15,19 121:18
123:4 124:15,16
129:15 131:8
134:13 151:12
187:5 261:16
273:8 280:23
**people's** 262:22
**perception** 199:24
**perform** 211:4
**performed** 182:2
182:16 188:1
211:6
**period** 14:4 278:24
**peritoneal** 110:2
**perjury** 122:17
123:8 124:23
131:24 175:19
179:3 191:11
198:19
**person** 13:20,23
14:4 19:15,16
21:16 22:20 23:1
23:13 24:4 26:13
28:6 37:23 51:7
51:13 53:10,11,17
53:18 55:6 56:5
58:9 103:9 110:14
118:25 119:23
120:13 124:19,24
125:3 127:7 128:5
128:7 129:6,14
131:20 134:10



140:10,15 145:17
151:3 157:20,22
159:10 161:18
180:11 186:25
209:25 279:2
**person's** 128:19
**personal** 27:17
104:17 157:2
214:15 273:12
**pertains** 184:21
**pertinent** 18:23
19:22 21:5,8
241:12,15
**Peter** 10:7 210:8,12
**Ph.D** 8:16 183:5
**Philadelphia** 6:6
7:12
**phone** 22:1 62:12
69:7
**phonetic** 19:17
69:20
**photo** 30:18
**physical** 56:11
58:14
**pick** 259:10
**piece** 92:17 122:22
123:11 164:6
**pile** 56:2
**piles** 56:19
**place** 76:23 151:23
293:13
**places** 59:4 79:24
91:15 168:7
**Placitella** 6:3,3,4
8:5 9:13 11:19
12:12 13:2,4 14:7
14:24 15:16 16:22
17:7,14,21,24
18:4 21:9 23:11
24:14 25:3,12,21
26:15 27:9,21
28:4,25 29:13,22
30:1,14 31:10,16
32:2,11,23 33:9
34:6,10,14,20
35:6 36:7,19 38:6

38:19 39:6,15
40:3 41:4,6 42:5
42:22 43:5,8,13
43:16 44:15 45:2
45:8,13,19 46:8
47:16,22 48:5,24
49:8,16,24 50:25
51:6,14 52:3,21
53:2,9,25 54:23
55:9 56:8,24
57:11,24 58:10,24
59:13 60:4,20
61:5,14,22 62:1,4
62:11,15,17 63:6
63:21 64:6,17
65:3,9,14,17,20
66:16,22 67:17
68:10,21 69:8,18
70:2,3,14,17,24
71:3,6,10,13,17
71:22,25 72:24
73:10,23 74:4,8
74:16,23 75:1,9
76:1,18 77:10
78:5,16 79:9,15
79:25 80:12,19
81:7 82:19 84:7
84:20 85:5,14,17
85:24 87:2,9,19
88:2,11,24 89:6,8
91:1 92:12 93:2
93:11,17 94:3,17
95:3,13 96:15,23
97:2,11,23 98:11
98:20 99:14
100:10,16 101:3,7
101:13,16 102:17
102:24 103:17
104:10 105:8
106:8,21 107:14
107:21 108:6,24
110:13 111:5
112:5,9 113:1
115:6 116:5,22
117:1 118:2,6,22
119:13 120:8

121:6,19 122:6
123:17 124:2,18
125:7 126:6,17
127:10,25 128:13
128:21 129:19
130:7,24 132:11
132:25 133:14,16
134:3 135:2 136:9
137:7,9,22 138:16
139:7,23 140:5,9
140:14,25 141:20
142:10,18,21
143:3,9 144:1
145:4,19 146:5,11
146:15,19,22
148:14 149:10,21
150:3,4 151:20,25
152:1,6,9,22
154:1,5,7 155:18
155:22 156:19,22
157:4,8,9 158:17
159:8,20 160:4,10
160:13 161:17,24
162:9,13,17 163:7
163:13,25 164:12
164:18,24 165:14
166:7,14,20 168:9
169:23 170:7,16
170:21 171:19
172:10,15,21
173:2,7,9,22
174:1,3 175:6
176:6,10,21
177:18 178:2,9,15
178:23 179:11
180:1,8,23 181:3
181:22 183:2,7
184:1,4,9,25
185:20 186:1,5,9
186:16,22,23
189:4 190:22
191:8 192:7,23
193:13,19 194:7
194:20 195:7
196:11,25 197:25
198:4 199:12

200:24 201:17
202:1,10,15,22,24
204:1 205:9 206:7
206:12,24 207:4
207:12,24 208:18
209:5,23 210:5,10
210:17 212:5,10
212:24 213:1,7,19
214:16 215:10,12
215:20 216:2,7,14
216:21 217:14,20
217:24,25 218:7
218:11 219:2,8,16
220:1,7,14,21,23
221:8,14,23 222:5
222:17,24 223:3,5
223:10,16,25
224:7,16,20 225:8
225:19 226:15,24
227:10,17,25
228:7,17 229:6,8
229:10 230:8,18
231:9 232:1,9
233:22 235:5,14
235:19,22 236:5
236:16,25 237:15
238:5,19 240:11
240:17 241:2,10
242:6,17 243:13
244:21 245:8,12
246:6,12,17,25
247:24 248:8
249:18 250:6,19
251:16,23 252:4,7
252:13,25 253:11
253:16 254:19,22
255:8,22 256:8,12
256:14,15,18,22
257:7,13,17,25
258:10,17,23
259:7,20 260:11
261:3,21,25
262:14,18 263:2
263:11,22,24
264:16 265:8,17
265:24 266:1,5,9

266:14 267:3,5,11
267:17 268:20,22
268:24 269:19,24
270:9 271:1,17
272:14,25 273:15
273:19 274:5,10
274:17,22 275:1
275:11,25 276:17
277:7,17 278:8,23
279:4,11,22 280:9
280:24 281:13,20
281:24 282:6,7,18
282:23 283:19,25
284:9,18 285:2,16
285:24 286:11,25
287:1,4,8,15
288:4,16 289:2,22
290:11 291:22
292:1,4
**plaintiff** 5:4,13,23
107:15
**Plaintiff's** 235:3
**plaintiffs** 1:5 2:6,18
3:5,20 4:5,15 6:8
28:14 58:16 138:5
**Plaintiffs'** 9:21
173:5
**play** 140:20 141:1
240:1
**playback** 36:6 42:4
47:15 116:21
118:1 120:7 127:9
141:15 142:9
**played** 35:9 41:10
46:21 116:8
117:10 119:18
126:22 141:5,24
**playing** 36:11,15,18
**please** 12:2 13:3
23:10 29:12 43:6
50:20 52:17 61:22
61:24 62:6,18
116:6 119:14
121:21 126:18
133:17 134:5
137:8 140:6 141:7



142:1 146:21
152:5 155:19
160:11,12 173:23
174:2 210:6
219:22 229:20
233:5 235:7,7,9
249:19 256:8,11
256:12,20,23
259:10 261:5
262:1 266:2 267:4
268:23 275:4
289:5,8
**plenty** 215:15,23
216:15
**point** 24:4 26:16
37:23 65:25 70:22
101:7 198:10
204:16 216:8
251:18 261:8,22
276:22 277:5
279:1 287:18
**pointing** 216:4,8,12
**portion** 226:18
**posed** 28:18
**position** 39:3,18,24
40:16 47:1 67:9
96:19 121:15
136:6,8,10,16,22
137:16 139:13
156:17 168:4,8
198:24 199:2
282:5
**possession** 14:16
15:8 25:25 39:18
98:1 100:4,18
102:7 165:24
190:5 199:4 256:3
**possibility** 64:8,18
**possible** 234:21
**possibly** 234:16
286:15
**potential** 14:16
**powder** 13:12 15:5
21:17 22:23 23:6
31:3,21 35:11
37:18 38:9,12,23

39:5,20 40:2,9,15
40:18,22 41:16,19
41:24 42:13 43:1
44:7,19 47:3,13
49:11 50:10 60:7
63:11 64:2,10
67:6 68:4 72:14
73:2 74:22 75:20
76:6 77:1,17 79:1
79:20 80:23 82:14
83:23 84:6 93:3
96:18 100:5,20
102:3,8 119:5,8
119:22,25 121:17
123:20 124:10
126:13 128:9
132:17 133:4,24
135:25 136:13,18
137:1,20 139:6
140:3 143:18
154:10 157:12,25
158:24 164:16
166:2 169:5,5,17
174:12,23 175:20
181:12 182:3,6,12
187:17 198:13,23
199:1 202:4
214:25 217:6
223:20 224:3
226:5,17 227:4,12
234:8 238:13
239:10 242:22
243:19 285:8
**pre-Luzenac**
283:13
**predates** 165:7
**predecessors**
269:12
**predicted** 68:3
**prefer** 286:9
**premarked** 65:10
**preparation** 18:8
20:16 49:20 67:21
67:24 95:4 149:23
166:3 190:21
197:15 220:15

221:6 240:7 277:9
287:22 290:16
**prepare** 15:18
53:19 72:3 78:8
105:6 164:2 167:9
201:14
**prepared** 45:17
52:6 57:8 72:2
77:8 80:22 81:5
81:18 92:14
103:16 147:13
167:21 169:18
186:6 229:4
230:20 231:8
232:16 265:14
270:7 278:9
**preparing** 20:5
70:6 88:14 90:14
94:18 138:9
147:19 148:3
165:5 187:1 202:5
276:11
**presence** 119:20
209:11 227:5,19
230:22 232:21
236:20 242:21
245:5 263:15,16
**present** 202:5
205:20 213:12
**presented** 15:22
28:13 138:2
178:25
**preserved** 107:23
108:4
**preserving** 235:21
**President** 153:12
203:4 225:21
228:25 229:22
232:4,20
**pretrial** 28:8
**previous** 234:13
**primary** 46:23
**Princeton** 1:17
11:18
**prior** 25:23 26:6
36:12,16,18 58:20

72:20 84:1 95:8
95:19 139:21
151:2 243:10
283:14 293:5
**privilege** 10:16
74:6,15,18,19
86:20 87:5 92:9
94:9 97:15 160:11
161:20 162:2,15
163:1,17 169:12
215:21 217:10,18
267:6,16
**privileged** 52:17
76:16,21 96:21
**privy** 119:5 120:5
**pro** 62:6
**probably** 57:22
71:8 234:16
286:15
**problem** 185:21
**problems** 119:21
**procedure** 186:21
**procedures** 182:1
**proceed** 12:8 32:15
232:3
**process** 28:8 57:7
61:20 68:20 94:22
123:2 135:10
186:20
**processed** 209:9,16
**processes** 182:1
**produce** 13:8
**produced** 168:13
168:19 169:14
**product** 22:4 35:11
37:5 38:9 68:12
90:4 99:12 114:16
116:10 117:16
130:15 132:2
137:1,20 139:11
140:3 145:23
149:14 226:18
227:20 232:22
234:3 245:25
252:19 263:17
280:14

**production** 8:14
11:4 76:20
**products** 1:7 11:12
22:3 25:6 27:4
51:3 66:25 68:16
97:21 99:20
119:10 191:13
198:23 199:6
**Professional** 1:19
293:4
**professionals** 22:22
**proffered** 88:4
**profile** 277:3
**Program** 43:18
44:6
**project** 46:11,13,25
**proof** 85:8
**proper** 62:5 255:24
257:3 286:13
**protective** 166:23
**provide** 28:9 29:1
32:4,13 38:3,3
68:24 115:23
135:12 162:25
168:12 169:1
177:17 191:2
215:4 244:19,24
254:25
**provided** 13:10
15:10 18:6,13
20:19 39:8,14
57:17 60:21 61:9
62:22 76:25 77:15
78:23 79:5 88:15
91:4 101:19 106:7
110:7 113:6
115:13,19 116:3
117:20 118:9
120:15,24 122:18
126:2,8 127:17
128:5,7 129:1,22
130:12 133:3,22
135:4,14,21,22
138:6 152:18
159:10,23 163:1,9
165:6 167:13,16



195:25 198:1
201:24 242:1
249:1 253:23
261:13
**providing** 114:25
117:19
**public** 1:20 22:21
40:8 119:24 293:2
293:23
**pull** 21:4 256:16
**pulmonary** 67:1,3
158:6 176:22
**purchase** 283:15
**purpose** 138:2
159:7 161:16,20
170:3
**purposes** 167:7
**pursuant** 75:19
92:19 167:14
**put** 23:22 44:24
68:13 71:13
129:22 135:6,7,19
136:1 159:17
161:9 184:2,6
197:22 214:17
215:22 272:3
290:1

**Q**

**qualified** 13:23
**question** 14:1,20
15:13 16:25 17:17
21:2 23:8 24:8,22
25:9,19 26:8 27:6
27:15 28:20 29:10
29:15,25 30:4,9
30:11,20 31:13,25
32:9,18 33:5,7
34:2 35:10,15,15
35:20,21 36:1,4
36:11,17 37:1,12
37:16,20,22 38:1
38:7,17,21 39:1,7
39:8,11,17,23
40:4,25 41:11,21
42:2,15,23 44:9

44:21 45:5 46:5
46:22,22 47:5,6,9
48:4,19 50:12
51:11,21 52:15,18
52:24 53:5,24
54:3,22 55:2,8,17
55:24 56:3,9,15
56:18 57:5,10,21
58:6,19 59:8,25
60:11 61:1,7,17
62:18,20,21 63:3
63:17 64:4,14,16
64:23 66:13 67:14
68:8,18 69:3
72:17 73:4,11,12
73:19 74:1 75:23
76:9 77:4 78:2,13
79:7,13,22 80:11
80:16 81:1 82:16
83:25 84:8,12,17
84:19,24 85:12,23
86:24 87:8,22
88:8,21 89:9
90:20 92:6,24
93:14 94:2,11,24
95:10,12 96:10
97:1,8,18,24,25
98:7,16 99:3
100:9,13,23
102:12,20 103:13
104:5 105:4 106:4
106:20 107:10,19
108:1 110:10,20
112:8,22 115:3,5
116:9 117:11,15
117:18 118:11
119:19 120:21
121:2,11,20 123:6
123:14,24 124:12
125:1,23 126:5,16
126:23 127:3,22
128:4,16,18
129:11,14,18
130:2,8,17 132:6
132:13,15,17,20
132:22 133:8,17

133:19,20 134:2,4
134:17,19 136:4
137:4,6,13,14,25
138:15 139:1,20
141:6,8,25 142:2
142:24 143:7,21
144:22 145:12
146:2 148:9
149:18 150:1
152:20 155:15
158:14 159:4,15
160:2,8 161:14,22
162:5,24 163:6,12
163:20 164:9,21
165:10 166:10
171:17 172:18
173:18 175:2,25
176:2 177:14
178:1,18 179:8,25
180:5,20 181:19
189:2,22 190:11
190:17,20,24
191:2,4,5,7,20
193:17,25 194:10
194:17 195:1,13
196:6,22 199:8,21
200:10,13 201:20
202:9 203:19
205:4,12,24
206:22 207:21
208:13 211:21
212:3 213:2,6,15
214:10 215:7,19
216:1,18 217:8
218:4,10 219:1
221:4,20,22 222:2
222:20 223:13,22
224:13 225:5,15
226:9 228:13
229:3 230:5,15
231:3,23 233:19
234:25 236:4,11
236:24 238:1,16
240:10,25 241:9
241:13,24 242:12
243:9 244:18

245:11 246:3
249:11,19,22,23
250:15 251:7
252:22 253:7,15
254:13 255:4,7
256:5,19,21,23,25
257:1 258:4,14
259:2,17 260:2,12
260:13,21 261:4
261:20,24 262:25
263:8 264:10
265:2 268:15
269:18 270:5,22
271:12 272:7,21
273:11 275:9,20
276:15,25 277:13
278:5,19 279:7,25
280:17 281:8
282:14 283:18
284:22 285:3,11
**questionable**
234:17
**questioning** 70:21
217:9 237:12
**questions** 14:9 19:7
22:2 23:2,15,22
24:13 25:15,16
28:13,18 35:16
37:8,13,17 38:4
53:19 54:13 56:4
57:9,13 101:8
118:23 121:18
122:13,15 124:1,6
124:15 125:4
126:10 165:12
167:20 185:12
199:21 200:16
217:22 228:16
235:12 241:17
246:9 249:13
254:4 260:24
261:17 274:13
280:21,23 282:3
**quicker** 61:20
**quite** 234:13
**quote** 283:10

**R**

**R** 6:1 7:1,23 282:24
283:1 293:1
**R&D** 22:12,13,16
171:3
**raised** 35:21
**raising** 185:16
**rash** 111:13
**rate** 20:12
**raw** 209:10,16
**RAWLE** 7:9
**re-addressed**
185:15
**read** 62:18,20
67:15 133:17,19
137:8,13 140:23
174:13 181:4,4
184:8 185:11,18
186:12 188:15,16
197:9,11,12,12,18
198:3,3 207:11
216:6 249:19,22
256:25 260:4,8
272:12 275:22
**reading** 93:15
197:21 212:4
237:13
**ready** 117:2
**reaffirm** 138:3
**real** 183:17 185:17
**really** 50:16 72:4
92:10 120:18
125:2
**reason** 97:15
121:25 122:7
134:12 181:7
257:18
**reasonably** 167:5
**reasons** 200:22
**reassure** 20:2 41:18
78:21
**reassured** 111:1
**Reath** 1:16
**recall** 12:19 34:22
34:25 36:8,20



42:6 47:17 57:13
57:15 70:7 118:3
120:9 127:11
150:11 182:22
185:12 211:9,11
**received** 36:4 175:8
232:3 253:3
**recess** 89:3 170:13
220:11 285:20
**recognize** 140:10
140:15 174:4
**recognized** 64:19
**recognizes** 29:3
**recollect** 86:13
**recollection** 48:7
128:3 153:14
159:9 171:2
**record** 11:8 12:1
34:17 45:7 71:2
72:13,25 73:13
89:2,5 95:6 117:4
117:7 166:18,19
168:5 170:12,15
198:1 220:10,13
235:21 285:19,22
287:18,25 289:9
292:9
**recording** 35:9
41:10 46:21 116:8
117:10 119:18
126:22 141:5,24
**records** 24:19,24
79:10,19 86:15
87:4,4,12,15
88:16 106:1,6,9
107:22 108:3
112:18,19 215:9
279:2,14,19 281:2
283:13
**redirect** 186:18
**reduce** 182:4
**refer** 247:7
**reference** 271:7
**referenced** 88:5
153:23 236:18
238:7,11 241:5

243:19,25 244:13
245:3,13,14
246:20 254:7,8,11
259:24 260:18
261:11 262:3,10
264:22 265:9,11
**references** 154:25
**referencing** 153:25
239:18
**referred** 199:14
**referring** 18:2
127:23 244:3
258:15 259:11
272:23
**reflected** 265:20
**refresh** 45:12
105:24
**refreshes** 35:5
45:10
**regard** 67:8 132:4
**regarding** 75:12,20
93:3 168:3
**Registered** 1:19
293:4
**regularly** 263:14
**regulatory** 21:19
80:23 154:21,23
155:25
**related** 20:23 22:22
26:23 27:3 31:6
37:14,18 38:5
55:8 74:22 80:14
83:16 87:5,16
88:16 93:8,24
95:18 100:19
106:1,10,17
111:18 112:19
113:8,20 126:13
156:23 161:6
162:2 164:6
168:14 169:11,16
215:15,24 219:11
223:19 281:2
282:10
**relates** 119:24
190:19

**relating** 49:11
**relation** 132:22
**relative** 28:9
293:16,18
**relay** 118:7
**relayed** 145:24
209:24
**relevance** 241:21
**relevant** 25:15
69:22 169:3,3
224:2
**reliable** 29:23
173:15
**relied** 120:20
185:22 186:25
187:5 233:11
280:21
**remainder** 286:22
**remember** 27:7
52:4 54:14 70:11
104:16,20 105:25
106:13 107:20
109:5,9 110:24
125:3 153:1
159:17 187:10
197:13,19,21,24
200:1 230:9
239:22,23,25
240:4 244:5
**renew** 50:13 267:9
**repeat** 84:9 95:11
121:21 137:5
141:6,25 256:20
256:23 266:11
**repeatedly** 34:9
139:16
**rephrase** 23:10
26:2 64:12
**report** 51:12
204:11 228:3,6
234:11
**reported** 51:8
141:13 142:7,14
189:25
**reporter** 1:19 11:23
12:2 17:2 36:14

71:21 108:17
116:24 141:16,17
149:7 172:8 206:2
220:20 251:9
257:11 280:2
284:3 293:3,4
**Reporter-NJ** 1:20
**reporting** 68:23
156:4
**reports** 136:24
137:18 138:11
140:1 189:20
**represent** 238:25
**representative** 2:4
2:16 12:24 13:8
69:17 76:13 77:14
101:11 144:7
163:5 206:6
214:12 222:22
226:12 228:15
231:25 246:5
253:22 254:15
277:2 281:1
**representatives**
168:22
**representing** 103:7
122:25
**request** 8:13 11:4
11:19
**requested** 16:3
58:22 90:13 95:20
96:5,7,12 98:3,9
98:24 102:16
103:4 105:22
106:7 135:14,20
279:17
**required** 23:3,15
28:9 128:18
130:19
**requirement** 68:24
**requirements**
280:8
**Requiring** 157:11
**research** 21:19
47:24 49:9,20
58:17 95:22

120:17 125:20
145:14 153:10,15
153:20 209:15
**researched** 57:14
99:19
**reserve** 286:16
**respect** 45:25 163:6
163:8 166:17,23
209:1 210:15,16
222:22 224:13
228:16 231:4
251:8 254:15
255:5,18 266:8,12
267:10,13 269:21
270:23 272:22
277:2 279:9 280:5
**respected** 221:25
**respond** 13:23
24:20 37:24 55:21
56:12 132:10
158:8 180:15
181:14 261:16
**responded** 56:4
**responding** 21:25
26:4 28:17 32:6
54:24 57:7 119:1
131:1 136:22
137:16 151:12
162:18,20 173:10
206:5 212:11
246:4
**response** 15:10
38:15,22 55:11
61:18 70:5 84:22
126:9 134:24
135:8 151:12,19
167:16 168:2
174:22 176:13
188:10,11 190:12
194:5 216:5,12
262:13 280:20
282:5
**responses** 13:9
14:23 23:16 27:23
50:1,3,6 51:25
52:13 55:5 56:20



57:17,18 60:22
61:9 62:8,23
69:12 77:15,21
81:9,11,17,20
82:2 88:4,16
90:16 91:3 94:20
101:18 102:2
103:19 106:25
109:3,6 110:7,12
110:16,18 111:18
113:8,25 114:8,11
126:8 129:23
131:9 148:5 151:5
153:21 161:19
162:19 163:9
167:1,10,15 169:2
201:3,5,10,14,25
202:7 219:13,14
228:24 249:1,2
253:23 270:12
277:10 278:11
**responsibilities**
21:23,24 22:18
23:19 46:14
**responsibility** 22:7
125:25 169:8
**responsible** 16:1
19:21 230:23
**results** 31:22
240:20 261:9
**retained** 9:12 93:24
**revealed** 148:5
158:6 208:2
211:10 227:20
230:22 232:23
233:2,8,15 236:20
237:18 245:5
263:18
**review** 73:7 79:3
83:15 86:15 87:4
99:21 106:9,11,16
107:1 108:25
111:17 113:7
114:9 121:4
123:16 124:13
147:20,23 164:10

183:16 212:18,22
220:17 221:7,12
221:21 222:3,10
223:14,23 224:14
225:17 226:13
290:16
**reviewed** 20:15
70:6 73:14 78:19
99:18,23,24 100:7
106:23 107:3
113:10 114:11
121:24 122:22
123:10 124:7
171:25 172:5
277:8 287:21
288:10
**reviewing** 129:7
**reviews** 174:17
184:12 185:7
**Revlon** 7:19
**RICHARD** 6:10
**richard.bernard...**
6:13
**right** 15:6 16:14
17:10 21:21 24:3
25:13 26:16 31:4
31:17 39:16 41:21
46:6,15 62:15
70:12 74:16 77:25
78:6 79:10 85:15
85:21 91:24 92:16
92:17,19 93:4
96:24 97:3 98:12
98:18,23 99:1
100:17 112:15
115:24 119:25
120:21 123:4,4
124:16 126:17
131:20,21 132:12
132:12 143:14,17
147:23 148:20
149:11 151:10,25
152:24 155:4
156:13 157:20,23
159:21 160:19
161:2 164:25

165:18,23 169:12
171:12 177:7
178:3 179:23
181:17 184:6
187:11 188:6,23
202:11 203:5
205:10,11,13,14
205:17 206:13
207:19 210:18
213:13 214:21
217:6 219:15
223:2,20 224:4
228:10 229:16,16
230:11 231:21
232:5 233:23
236:21 237:16
238:6 239:21
240:5 243:14
244:22 245:13
247:18 248:17
250:13 252:16
253:2 255:16
259:15 261:4
263:12 264:18
267:20 270:3
271:2 272:19
275:13 276:4,5
280:15 283:4
286:16 288:5,8
292:2
**rightfully** 67:4
**rights** 32:15 232:2
254:24 255:12
**Ritter** 114:4
**Road** 1:16 7:5
11:18
**ROBERT** 3:15
**Roberts** 114:14
**rods** 243:2 244:14
**Roger** 10:5 152:11
153:11 202:18,25
203:4 224:23
229:22 263:4,12
264:24 278:15
**role** 52:22 53:1,8
55:12 120:16

121:5 122:25
131:4,5 134:9
151:8 259:4
**Ronald** 221:25
**ROONEY** 2:17
**Roth** 6:3 11:20
**round** 210:25
**RPR** 293:22
**ruled** 224:1
**rules** 62:5 235:8,11
**run** 31:20 210:24
**running** 156:16
248:2

_____
**S**
**S** 6:1 7:1,23,23 8:1
8:1,8 9:1 10:1
**safe** 15:5 41:18
119:10
**safety** 22:23 34:8
119:3
**sampled** 227:4
263:15
**samples** 75:12
93:20,24 94:8,21
234:13 243:1
244:14
**sat** 206:17
**satisfied** 250:12
253:3
**satisfies** 236:7
237:22 244:15
247:17
**satisfy** 72:4 243:5
246:14 248:16
**satisfying** 243:18
**save** 287:11
**saw** 69:22,22 83:18
97:3 113:23
142:22,25 147:1
197:8 268:17
273:25
**saying** 33:10 78:3
99:5,6,11 100:5
100:11 103:19
110:18,23 131:2

132:14 143:14,15
162:22 163:15
170:6 173:12
180:10 195:10
196:7 230:21
239:24 255:12,25
256:3 257:3
273:23
**says** 13:19 15:2
75:10 80:9,21
82:3 83:7 92:9,14
92:18 93:5,16,22
108:20 152:13
153:19 155:7
157:13,24 158:3,4
158:16,25 160:15
161:1,4 171:10
175:7 177:9
181:25 182:8
188:7,14,14,18,24
190:3 195:5 203:3
204:6,7,15 205:10
205:13,15 206:9
207:15 209:21
210:24 214:23
215:1 222:24
223:4 224:25
225:21,23,24
226:16 227:9,16
227:18,24 228:2
229:14,20 230:7
231:10 233:24
234:2,7 235:23
236:6 237:5,17
240:14 243:3
245:18,20,21
246:11 247:13,16
250:10 251:22
252:3,12,15
263:20 269:4,7,9
270:24 271:5
**Scanning** 211:1
**scarring** 158:5
180:14 181:12
**science** 242:4
244:25 249:17



**scientific** 99:11,16 99:17 150:16 290:13
**scientist** 125:8,10 128:25 129:17,21 130:12 132:3,18 133:6,25 153:16 209:7 210:13 273:20
**scientists** 116:18 117:23 125:14 127:17 130:5 131:14,17 135:4 153:10 205:19 206:17 208:9 212:15 213:11 214:5 216:25 266:20 271:8,20
**scope** 27:15 42:15 44:9 45:14,16 48:19 50:17 60:12 64:23 69:5 76:10 76:11 81:22 83:20 87:22 94:11 100:25 101:9 103:13 156:18,20 159:5 162:5 163:2 166:12 176:1 178:4,8,18,21,24 179:10,14 203:19 205:5,24 206:4 207:10 213:15 214:10 217:13,15 218:4 219:4 221:4 222:20 225:15 226:10 228:13 231:5,23 235:4,13 242:12 246:3 251:8 254:2,13 255:5,19 256:7 258:9 264:10 265:3 269:22 270:15,23 272:9 272:12,22 273:11 274:13 275:9,23 276:25 277:16,22

279:7 283:22 286:13
**screen** 140:16 272:4
**SCRIVO** 7:3
**search** 20:1 89:17 89:18,20,25 90:2 90:6,12 91:2,7 113:2
**searched** 89:20 90:3,3,4,24 113:6
**searches** 16:1 19:21 81:15 110:25 111:1 169:9
**second** 66:23 73:9 89:21 173:8 188:16 203:11 208:22 210:19,25 275:2
**section** 184:21
**see** 13:16 35:4,5,12 35:14 42:8 45:9 66:1 75:2,4,5,7,14 75:15,16,16,21,24 75:25 76:3 77:19 77:20 80:6,9,20 81:2,25 82:4,6,7,9 82:10,12,13,17,24 82:25 83:1,3,5,6,9 83:10 93:21 122:10 148:17,18 148:21,23,25 149:3,4,8 150:10 152:12,13 153:18 154:11 155:5 157:12,15 158:2 160:15 167:21 171:10 173:12,15 174:12,15,20 182:20 184:3 185:4,23 188:11 200:20 203:2,9,11 204:5,13 206:8 208:23 209:3,7,19 209:21 210:18,21 212:1,6,9 214:1

214:18,22,23 215:1 216:13,22 217:3 224:24,25 225:1,3,6,7,20,23 226:20 227:6,21 228:2,5 229:12,14 230:3 231:16,17 232:12,19,24,25 233:3,6,9,13,16 233:24 234:2,6,23 235:23,25 236:1,6 236:8 238:17 241:1 242:20,22 242:24 243:2,11 245:19,20 246:1,7 246:19,23 247:15 248:11 249:19 263:9 264:6,18 265:22 266:16,17 266:17 267:7,12 267:14,19,20,22 267:23 268:2,8 269:16,20,25 270:1 271:4,19,23 271:25 275:7 276:3,9,10,19,22 277:4 281:14 283:16,20 287:3 291:5
**seeing** 86:11 116:23
**seen** 78:22,24 88:13 88:23 92:8 121:23 146:18 147:6,11 151:6 171:9 210:4 228:20 253:17 272:10 275:21 277:6 284:24 285:14
**Selby** 8:21 108:10 108:15 109:1,3,13 174:24 175:12,22 201:7 288:22,25 289:12 291:6
**selected** 182:14 187:24 188:19 211:3,23

**self-addressed** 231:15
**Seligman** 185:14
**sells** 226:18
**SELVAGGIO** 5:12
**Semple** 153:2 156:12
**sending** 123:2
**sense** 260:5
**sent** 8:23,24 289:14 289:17 290:4,9
**sentence** 188:15,16 188:22 227:24 231:17 232:25
**sentences** 173:21 270:1
**separate** 286:10
**September** 8:12 11:3 293:24
**seriously** 115:20
**served** 89:23
**service** 228:9
**Services** 1:23 11:22 11:24 156:5
**set** 60:18 77:24 87:13 91:8,13 94:9 113:19 168:5 174:4 238:11 239:2 241:20 261:1 262:4 264:21 293:14
**sets** 201:13 202:6
**settled** 213:4
**seven** 20:6,7 251:2 264:2
**severe** 158:7 181:13
**shapes** 193:3
**share** 203:7
**shared** 215:16 216:16,19
**Sharon** 1:18 11:24 293:2,22
**Shelby** 73:8
**Sheldon** 114:19
**shelves** 181:8

**short** 281:12
**show** 17:20 41:7 46:16 61:19 74:9 146:16 152:2 200:3,6 207:5 208:19,22 210:11 215:13 282:19
**showed** 78:25 151:15 166:2 177:19 190:6 217:5 239:24 244:4 276:5
**Shower** 13:13,13 77:18,18 102:3,4 234:3,4,9,9,11,11 234:12,12,20,20 237:10,10 240:19 240:20
**showing** 145:22 177:21 191:16 198:21 243:17
**shown** 120:17 149:23 168:2 169:13 239:12
**shows** 240:2
**side** 184:16
**sign** 115:21 123:1 124:4 129:8,21 231:11 258:12,19 258:21
**signature** 231:14
**signed** 124:3 198:18 199:3 229:22 231:20 254:6 258:18 263:4 265:10 266:15
**significant** 167:3 182:16 188:2
**similar** 25:16 72:11
**simple** 191:2,2,6
**simply** 241:4
**single** 95:6 122:22 123:11 129:8,21 130:11 132:18 133:5,25 151:6



164:6 168:2
219:10 226:2
239:7 252:17
259:24 261:9
**sir** 119:16
**sit** 51:15 56:25
130:21 138:8
223:6 262:7
**sits** 129:20 130:9
**situation** 67:10
**six** 20:6,7 251:2
264:2
**SKADDEN** 6:10
**skip** 85:6
**SLATE** 6:10
**small** 158:7 181:14
**sold** 13:13 14:18
48:17 60:8 63:15
73:15 222:8 226:6
227:3
**somebody** 118:16
254:24 255:12
**somebody's** 183:17
256:1 257:4
**Somerset** 266:16
**sorry** 71:19 83:4
152:4 205:12
206:3 267:4 284:3
284:5 289:4,24
291:13
**sort** 286:14
**sorted** 74:21
**sound** 257:9
**sounds** 81:24
**source** 60:24 63:11
63:14 64:1 107:7
189:16 204:8
205:16 226:4
227:13 234:16,21
285:7
**sourced** 49:3
**sources** 107:12
123:19 182:13,18
187:24 188:4,19
**South** 7:11
**speak** 16:5 42:19

49:9 81:5,13,18
103:16 105:6
115:23 122:14
123:3 131:4,6
132:10 179:1
200:20 261:12,13
**speakers** 116:12
283:23
**speaking** 134:10
224:12
**specialty** 196:24
**specific** 14:3 18:19
18:22 24:24 26:12
26:24 27:8 28:2
28:13 38:3,4,4
39:13 42:20 49:14
49:23 50:6 51:13
53:1 54:12 57:8
58:9,22 61:18
77:7,8 81:22
82:22 90:16 96:12
107:13 124:14
125:3,4,5,5,16
127:24 128:5,7,19
129:16 131:16,22
132:15,22 134:6,7
148:11,12 149:20
150:23,25 151:9
151:18 157:3
170:2 212:22
240:16 249:13
261:1 280:20
288:25 289:12
290:8 291:5
**specifically** 16:10
18:5,12 20:15
26:10 34:25 37:8
44:24 46:12 49:21
66:15 69:21 72:9
79:3 81:4 84:4
91:16 102:1 108:8
138:18 179:16,20
183:11 192:1
194:4 197:6
243:23 250:5
269:11

**specifics** 18:10 44:4
280:8 283:11
**specified** 167:14
**specify** 114:22
**spent** 20:5
**spoke** 15:25 16:4
16:10 19:14,16
89:16 130:25
132:18 133:5,24
134:16,18,20
136:2 147:18
167:5,8
**spoken** 130:5
**spoliation** 69:23
**sputum** 158:10
181:16
**Square** 6:5,11 7:11
**SR** 5:21
**staff** 283:14
**stamped** 231:15
**Stand** 46:18 71:16
117:3,7 119:15
126:19 140:7
**standing** 242:2
**started** 21:15,25
24:15 35:23 123:2
186:25 193:17
254:5
**starting** 184:24
**state** 74:13 255:11
293:3
**stated** 144:14
218:21 272:16
**statement** 133:3,22
139:8 168:10
169:21 194:24
195:1 228:2
232:19 235:6
**statements** 45:15
45:25
**states** 181:6 226:6
263:13 268:25
283:10
**stationery** 65:19
204:3
**stayed** 22:15

**stenographic** 12:1
**stenographically**
293:12
**STEPEHEN** 3:17
**steps** 97:22 99:20
148:3
**stick** 289:23
**Stipulation** 9:19
224:18 231:19
**stopping** 151:23
**store** 55:20
**stored** 54:20,25
56:11 57:18 59:1
59:3,5,10 91:13
**street** 6:5 118:17
**strike** 28:6 37:14
59:15 95:15
248:13
**strongly** 234:10
**studies** 121:24
122:3,12 125:20
136:24 137:18
138:12 141:9,12
142:3,6,13 143:13
143:15,19,23
144:3,5,18 145:8
145:9,15,22
150:25 151:9,15
151:19 153:18,22
158:6 210:23,25
261:1 262:4
**study** 120:17
236:17
**stuff** 290:14
**subject** 167:11
183:22 214:12
**subsequently**
185:14
**substance** 16:8
19:23
**sued** 23:4,17 25:5
58:13 59:18 64:9
68:4,6,12 76:6
77:22 80:21 82:1
82:5,7,10,14
86:19 174:11,23

175:4,20 204:9
213:13 214:7
279:18
**suffice** 170:5
**suggest** 131:5
**suit** 171:11,21
172:12 204:4
**Suite** 6:5
**Sullivan** 114:20
**summary** 235:1
**Superior** 1:1 2:1,12
3:1,13 4:1,11 5:1
5:10,19 11:12
**supplemental** 9:22
173:5 232:11,11
**supplied** 16:19
17:11 74:19
260:18 261:10
262:3,11
**supply** 14:5,5 53:12
164:5
**supplying** 226:16
**supposed** 116:14
**suppression** 245:22
**sure** 20:18 23:12
26:3 29:14 30:3
46:5 69:8 71:10
81:15 86:10,12
115:7 117:1
145:16 176:8
177:3 185:10
195:23 239:17
267:1 289:8
**survivors** 204:10
**suspect** 234:14
**swear** 12:3 115:21
116:4 254:23
**swearing** 115:17,18
116:1,2 124:8
130:13 133:2,21
138:24 182:22
187:5
**swears** 226:25
**switch** 71:14 154:6
**swore** 17:11 114:24
115:11 123:18,22



126:2 127:15
135:23 139:15
151:4,13 179:2
180:2 188:6
191:10 193:6,10
259:22 260:14,16
**sworn** 1:14 12:6
18:6 129:23 144:4
187:12 188:10
293:8
**SYLVIA** 4:13

---

**T**

**T** 6:10 7:23 8:1,8
9:1 10:1 293:1,1
**tail** 284:4
**take** 70:17 74:24
88:25 91:5 97:21
99:19 144:24
166:15 183:12
184:10,10 200:5
219:20,25 220:1,7
257:13 271:18,23
275:2,3 285:17,25
**taken** 11:17 12:18
144:9 173:20
181:20 207:7
231:12 236:14
293:12
**talc** 2:20 5:24 10:13
13:12,14 14:17
15:4,4,9 20:21,24
23:18 27:2,4
30:23 31:2,6 32:6
34:8 35:10 37:4
38:8 39:4 40:1,17
41:3 42:21 46:24
47:2,12 48:2,9,17
49:3 51:2,18
53:13 59:18,19,19
60:6,8,17,18,23
60:23 61:11 62:24
63:11,14,14 64:1
66:8,10,18 68:5
73:1,15 75:12
77:17 82:1 83:14

83:19,22 84:5
85:3 86:4,20 90:8
91:3 93:24 94:7
95:18,19,25 97:14
98:3 102:3 107:7
107:12 113:16,23
114:7,13 119:3
121:16 124:21
127:20 128:11,24
129:25 130:15
132:1 136:13,17
138:13 139:5,11
141:10 142:4,14
144:19 149:13
155:12 158:9,23
163:10 168:3
169:5 170:19,23
171:10,21 172:12
176:3 181:7,16
182:2,10,14,18
187:15,24 188:4
188:19 189:15,15
189:16 191:17
198:23,25 199:5
204:3,4,8,9,22,23
205:2,10,13,16
209:9,10,16 222:8
225:12 226:2,5,17
227:2 253:24
263:13 266:21
269:2,5,10,11,12
269:14 272:16,16
272:17 273:2,20
275:13
**talc-related** 22:4
25:6 27:13 52:13
55:21 57:3 58:13
**talcosis** 108:22
109:8 177:2,5,6
**talcs** 59:22 211:12
**talcum** 140:3
**talk** 14:21 15:1,3,7
18:14 27:23 44:23
52:6 60:17 61:4,4
69:6,24 77:6,12
77:13 81:8,22

94:19 101:18,23
103:18 104:24
145:17 157:3
179:17 201:1
219:13 231:8
232:16 233:12
247:10 251:14
253:9,19 258:7
268:19 270:8,16
271:14 274:19
285:13
**talked** 44:25
110:24
**talking** 96:13
179:18,19 184:5
191:22 192:5,6
195:9,17,19 264:7
**talks** 75:18 83:1,8
93:19 158:22
161:2 185:1
210:23 232:10
233:8 247:12
267:7
**tanning** 189:16
**TEC** 4:17
**Tech** 211:5
**telephone** 7:4,10,17
**tell** 15:17 16:13
19:8 20:14 44:3,5
54:16 72:1 74:17
81:3 117:2 193:5
208:8 238:23
246:10 247:3,8
256:10
**telling** 185:23
**TEM** 240:19
242:20 247:14
**ten** 104:20 250:25
251:3 264:2
**tendered** 27:16
45:24 51:22 60:13
69:13 74:14 104:6
162:25 214:11
**tendering** 76:10,12
101:10 157:2
**tenure** 132:23

134:14,21
**terms** 73:14 90:2
113:6 169:1 222:7
227:12
**test** 31:19,22
148:19,22,23
198:12 233:8,14
233:14 236:21
237:17 238:10
240:19,20 242:19
243:16 244:13
245:2,4,16 247:1
247:13,21 248:9
248:16 250:8,21
251:19,24 252:5
252:17,20 254:6,7
**tested** 148:22
187:25 209:9
227:5 234:3 237:9
263:15
**testified** 12:6 16:13
16:17 138:11,23
142:12 143:5
144:6,16 145:9,21
191:15 205:19
208:10 209:8
210:13 213:11
214:5 239:8 271:8
271:21 272:4
**testify** 45:18,24
51:22 74:14 98:22
106:18 110:14
115:25 159:24
169:19 186:24
228:23 279:9
280:5 293:8
**testifying** 12:22
51:15 147:4
149:11 161:18
210:1 231:3
**testimonies** 8:21
78:19 210:16
212:19,23 288:21
289:11
**testimony** 8:3,19
15:24 17:1,4,6,18

17:19 18:2 19:11
36:9,12,16,18,21
36:23 41:8 42:7
46:17 47:18 51:17
58:14,20 72:20
84:1 110:21 118:3
120:10 127:12
138:20 139:21
140:21 143:2
144:4,9,12,24
146:8 183:3,9,17
183:19 185:12,18
186:8,14 190:15
195:24 197:8,10
197:12,15,19,22
198:3,5,8,15,16
198:20 210:15
212:8,15 215:3
271:25 272:3,8
288:2,10 292:11
293:11
**testing** 20:23 31:5
95:8,18,24 96:18
97:13 98:2,24
100:19 103:3
104:2 120:14,24
121:8 182:1,15
188:1 217:5
227:13,21 228:9
232:23 233:12,25
237:4 244:6
248:20,20 249:14
259:13 262:11
263:18 264:7
265:16,19 271:21
**tests** 189:23,25
190:6 191:14,16
198:21 206:18
211:4,6,10 233:13
238:22 239:2,6
241:3 242:9 247:9
247:11 248:14
249:9 250:2 251:1
251:3 253:2,3
254:11 257:20
259:24 260:17



264:21 265:9
**thank** 89:6 108:19
202:23 292:3
**They'd** 54:17
**thing** 15:21 78:7
88:10 97:12 109:7
113:14,20 114:6
121:12 261:7
272:13 273:16,22
**things** 35:3 44:23
77:7 199:19
200:17,20 233:21
239:18
**think** 22:25 54:3
55:25 61:19 71:1
85:1 101:7,12
109:7 113:14
119:6 147:4 157:6
169:23 170:25
176:19 177:2
181:5 183:20
186:13 190:13
191:21 217:14,16
241:20 254:20
255:1,2,15 273:16
273:22,25 274:8
281:21,23,25
288:15
**third** 207:16
224:22
**Thirty-three**
159:19
**Thomas** 7:24 11:21
**Thompson** 65:19
65:21 66:24 68:3
**thorough** 111:2
**thought** 112:14
146:6 172:2,4
196:2
**thousands** 201:11
201:22
**three** 186:11
234:14 251:2
264:1
**till** 202:5
**time** 11:16 12:17

14:3,16 15:22
20:4,11 26:17,25
34:23 35:8,23
36:5 39:8,14 41:8
41:9 42:3 44:25
46:17,20 47:14
53:3 56:23 62:19
65:25 67:11 68:6
89:2,4 92:8 95:24
96:2,7 102:18
103:22 104:1
115:10,10 116:7
116:20 117:4,6,9
117:25 119:17
120:6 125:25
126:21 127:8
133:11,18 134:19
137:12 141:4,14
141:23 142:8
144:13 147:1,5
151:3 156:5,15
169:24 170:12,15
174:17 175:4
183:17 184:10,11
184:12 185:7,18
192:4 193:22
194:3 195:17
198:10 200:16
202:3,5 203:15
204:16 219:19
220:2,10,13 239:1
239:12,15,19
249:21 256:24
257:14 261:22
265:10 268:17
275:12,14 276:22
278:25 284:1,10
284:19 285:5,19
285:21,25 287:11
287:11 292:8
293:13
**times** 6:11 25:5
54:18 55:5 134:20
161:7 181:5 187:8
235:18 251:8,11
256:5 262:19

281:10
**tired** 286:8
**tissue** 158:5 180:14
**title** 53:7 157:10
**today** 11:15 12:21
30:8 44:23 49:20
56:25 61:2 77:6
81:22 85:4 86:18
94:6,19 101:23
103:16 105:6
106:18 129:21
130:10 138:8
149:24 159:24
179:1 186:15
195:24 206:16
210:1 211:9
212:11 221:7,13
221:22 222:4
223:7 239:4
253:18,19 262:7
268:18 270:7,10
270:15 271:14
273:6 274:19
281:6 284:1,10
285:13 286:21,21
287:19
**today's** 15:18 20:5
20:16 67:24 70:6
78:8 88:14 148:3
165:5 166:3 187:1
197:15 201:15
220:16 240:7
276:11 277:9
278:10 284:19
287:23
**told** 18:9 24:11
40:8 42:11,24
44:16,17 53:6
54:4 69:21 78:18
92:7 104:13
124:19 125:12
137:23,25 142:12
152:25 170:25
172:2,4 187:9
189:10 191:14,17
197:17 212:13,21

218:18 239:20
257:19 260:3
278:3 280:25
282:2 286:7
**top** 105:24 205:11
205:14 237:21
**topic** 76:12 231:5
**topics** 69:17
**total** 276:20
**totally** 217:15
**Toxicology** 43:10
43:18 44:6 46:11
46:25
**trace** 189:20,25
190:6
**traces** 234:19
237:18
**track** 188:17
**transcript** 8:16 9:6
9:16,18 10:4,7
140:23 183:4
184:18 202:18
207:2 208:16
210:8 212:4
286:12 290:22,25
293:11
**transcripts** 209:2
271:20
**Transferred**
170:23
**transmission** 211:2
211:25
**tremolite** 123:21
124:10,21 182:5
182:13,19 187:18
188:5 189:17,21
190:1,6,9 191:12
191:16,23,23
192:2,5,6,9,9,16
192:16,25,25
193:7,23,23 194:6
194:9,23 195:6,11
195:14,15,18,20
195:21 196:3,3,8
196:9,14,19 197:2
198:6,7,14,17,22

198:25 199:5,15
199:25 200:10,11
243:2,2 244:14
247:15
**trial** 8:16 18:7
32:16 138:10
183:4,10,17,19
185:18
**trials** 168:21
223:19
**troubling** 169:15
**true** 17:12 114:25
115:13 122:18
123:9 129:1 135:9
138:24 141:11
142:5 174:5 197:4
249:7,24 262:5
293:11
**trust** 116:18 117:23
118:15 229:25
231:10
**trusted** 261:16
**truth** 185:24 186:3
186:7,15 197:11
254:25 293:8,9,9
**truthfully** 28:17,24
**try** 30:5 167:4,9
220:4
**trying** 46:2 50:14
56:17 285:12
**turn** 82:4 96:20
98:4,9,13,23
100:6,21 102:9
161:11 185:3
242:8 279:13,17
**turned** 55:10 57:2
58:15 95:7,17,21
95:24 96:8 102:15
103:3,21,23 104:1
215:14
**turning** 97:16
**Turnpike** 6:17
**twice** 56:16
**two** 6:5 92:2 146:20
175:11,21 176:12
179:4 186:10



201:8,9,13 202:6
202:12 234:15
251:2 264:1 290:9
**type** 192:1
**types** 167:20

———————

**U**

**ultimately** 126:1,11
134:23 218:23
227:3
**unable** 158:1
**uncertain** 283:12
**understand** 12:21
14:8,13 28:7,12
28:23 29:16 30:2
30:3 32:3,12,21
32:24 47:10 56:1
59:14,21 60:5,21
61:8 62:21 63:10
63:13,25 64:7
68:11 77:25 92:21
101:17 120:18,19
141:3,19 190:14
191:22 192:12
196:16 249:4
253:25 279:12
287:13
**understanding**
21:11 26:21 28:15
30:9,24 44:22
71:5 77:5 89:19
90:11 91:6 101:22
143:13 166:11,25
167:23 178:7,21
179:17 192:18
193:9,21 195:16
195:17 201:23
219:12 258:8
270:14 272:11
277:15 278:7
284:25
**understands** 260:9
**understood** 75:13
32:25 33:12 50:16
69:11 133:12
193:7 196:1,8

**unfair** 145:1,5,10
145:20,25 146:4
168:24
**Unidentified** 9:5
35:25 47:4,8
120:1 127:2 290:5
**unintelligible**
116:13 141:16
283:24
**United** 226:6
**unsafe** 99:12
119:12 181:7
**usage** 66:24
**use** 89:25 118:12
156:16 158:1
234:25 242:3,20
255:24 257:3
266:8,12 267:15
272:7
**users** 226:19 227:3

———————

**V**

**vague** 120:2
**vaguely** 83:17
**VAN** 7:3
**various** 91:15
138:1 287:20
**veracity** 133:2,22
148:4 248:25
253:23 270:11
**verbatim** 88:6
156:3 187:15
189:16
**verification** 128:8
**verified** 123:25
131:12 136:7
182:9,17 188:3
189:15 259:21
**verify** 121:13 124:3
**verifying** 128:23
**Vermont** 208:10
212:16 226:3
269:10,13
**versus** 11:11 29:19
173:13 192:25
204:4 207:13

**vice** 62:6
**VICMAR** 2:15
**video** 41:5 43:6
116:6,15,16,23
119:14 126:18
127:13 140:6
240:1
**videographer**
11:21
**videotape** 7:24 11:7
11:9 12:7 43:11
43:14 46:18 71:15
89:1,4 117:3,6
118:4 119:15
126:19 140:7,12
170:11,14 220:9
220:12 285:18,21
292:7
**videotaped** 1:14
271:3
**Village** 7:5
**violating** 235:8,11
**Viscomi** 69:7
235:15 286:15
**voice** 47:21
**vs** 1:6 2:7,19 3:6,21
4:6,16 5:5,14,23

———————

**W**

**W** 8:1 283:3
**WALTER** 4:3
**want** 46:5 58:12
69:15 70:20
136:21 137:15
140:20 144:11,23
145:2 146:7 150:8
152:2 154:5
156:15 166:17
184:14,17 185:5
185:22 186:17
188:15 215:13
216:13 219:15,20
224:21 264:17
287:7,9
**wanted** 19:4,25
72:9 106:13

145:16 167:10
168:7 191:24
200:19 239:16
**wants** 184:20
**wasn't** 73:11 97:24
122:11 125:22
130:8 137:25
145:20 151:8
160:18 177:1
218:8 230:12
245:13,13 260:12
**way** 20:1 37:3
101:6,23 143:19
156:20 160:18
165:7 173:7
180:24 188:12
196:4 201:2 213:3
229:11 247:3
260:19 278:22
287:11
**we'll** 45:19 62:12
62:12 141:20
146:21 157:4
170:4 176:6 200:5
200:25 201:1
206:8 235:15
281:14 287:11
**we're** 12:16 44:23
69:4,24 81:21,23
89:2 96:13 131:10
143:13 157:2
180:25 191:22
195:9 248:24
250:24 286:8
287:23 292:9
**we've** 70:21 144:9
151:23 183:13
219:23 241:4
256:6 258:24
281:18 282:1,2
**week** 16:7
**weekend** 292:3
**WEINER** 7:3
**welcome** 168:5
**WENDOWSKI**
5:21,22

**went** 18:17,19
22:11 90:16
134:12 145:14
156:10 160:21
195:22 237:6
239:11 271:22
283:7 290:17
**weren't** 96:19
118:16 129:15
161:10
**Westfall** 83:9,11,16
83:21 84:14 85:6
85:20 203:1,17
204:4,10,18 207:7
266:25 267:7
268:1,6,11 270:19
271:9 291:6
**whatsoever** 29:6
44:18 87:14 94:20
124:8 125:13
130:14 135:24
149:12 151:14
190:9 191:12
198:11,21 239:10
241:22 255:13,25
257:4 262:22
**Whittaker** 6:19
**who've** 271:21
**Widener** 7:11
**widespread** 66:25
**WIFE** 1:4 3:4 4:4
5:22
**wildly** 231:5 235:12
**William** 266:15
267:21 268:10
**Windsor** 13:11,14
153:12 203:5,13
207:13 225:21,25
226:3,17 227:2,19
228:25 229:21,22
232:4,20,22
263:14,17 276:22
**withdrew** 166:24
**withheld** 76:20
97:14 162:1
163:16 164:3



**withhold** 33:1,12
33:23
**withholding** 162:21
**witness** 12:3,19,22
13:3 14:2,21
15:14 17:5 18:1
21:3 23:9 24:9,23
25:10,20 26:9
27:7,16,19 28:2
28:22 29:11 30:12
31:14 32:1,10,20
33:6 34:3 35:9
36:13 38:2,18
39:2,12,24 41:1
41:10 42:19 43:3
44:13,22 45:6,17
45:23 46:21 47:20
48:23 49:6,14,19
50:22 51:5,12,21
52:1,19,25 53:6
55:3,25 56:17
57:6,22 58:7,21
59:9 60:1,12,16
61:2,19 63:1,4,18
64:5,14 65:2
66:14 67:15 68:9
68:19 69:13 72:18
72:21 73:5,20
74:2,13 75:7,24
76:12,14 77:5
78:3,14 79:8,14
79:23 80:17 81:2
82:17 84:2 85:1
85:13 86:25 88:1
88:9,22 90:21
92:7,25 93:15
94:15,25 95:11
96:11 97:9,19
98:8,17 99:4
100:14 101:10
102:13,21 103:15
104:5,9 105:5
106:5 107:11,20
108:2,19 110:11
110:22 112:23
115:4 116:8,16

117:10 118:12
119:18 121:3,12
123:15,25 124:13
125:2 126:22
127:5,23 128:17
129:12 130:3,18
132:7,21 133:9
136:5 137:5,21
139:2,22 141:5,18
141:24 142:25
143:8,22 144:23
145:13 146:3
148:10 149:8,19
150:2 152:21
155:16 158:15
159:6,16 160:3,9
161:15,23 162:16
162:24 163:24
164:10,22 165:11
166:11 167:9,17
167:20 168:2,20
169:7,18 171:18
172:9,19 173:19
174:17 175:3
176:19 177:15
178:6,20 179:9
180:6,21 181:20
183:16 184:12,23
185:7,10,17 186:3
186:11 189:3
190:13 191:1,6,21
194:1,18 195:4
196:7,23 199:9
200:14 201:21
203:23 205:8
206:5,23 207:9,22
208:14 209:3,21
211:1 212:9
213:17 214:11
215:8 216:19
217:10,18 218:6
219:6,18,22 221:6
221:12,21 222:3
223:14,23 224:11
224:14 225:6,17
226:11,13,22

227:8,15,23 228:5
228:14 229:4
230:6,16 231:7,24
232:7 233:20
235:2,12 236:12
237:13 238:2,17
240:14,15 241:1
241:25 242:16
243:11 244:19
246:4,10,23 248:6
249:12 250:3,16
251:12,21 252:2
252:11,23 253:8
254:14,17 255:6
255:20 258:5,15
259:3,18 260:3,22
263:1,9 264:14
265:6,14,22
267:14 268:16
270:6,24 271:13
272:10,23 273:14
274:3,15 275:21
276:16 277:4,14
278:6,21 279:8
280:4,7,18 281:11
282:16 284:6,24
285:12 286:5
287:14 288:24
289:10,20 290:7
290:24 291:4,13
291:17 292:10
**word** 194:15 196:8
233:1,3 238:2
243:11 246:19
247:19 248:18
250:16
**worded** 194:12,13
**words** 50:17 75:25
135:3 195:2
235:25 237:20
248:22 250:23
**work** 22:11 23:20
132:9 292:2
**worked** 21:16 37:3
38:2 44:2 54:5
66:5,7,10 72:12

118:15 125:15
131:17 136:6
159:11 171:2
177:12 266:21
**working** 34:7 35:23
46:10,12 51:8
53:20 275:13
**wouldn't** 18:7 97:6
118:12 120:18
239:16 259:4
260:5
**wound** 84:21
**writes** 66:24
**writing** 153:16
**written** 69:12 136:7
224:23 226:23
229:12 238:3
242:24 243:22
247:19 248:7,18
250:17,23
**wrong** 32:25 33:12
33:22 97:5,12
98:4,14,17,23
99:1 102:9 121:14
**wrongfully** 67:5
**wrote** 35:2
**www.MagnaLS.c...**
1:25

**X**

**X** 8:1,8 9:1 10:1
**X-ray** 158:5 180:15
181:13

**Y**

**yeah** 22:10 34:14
35:14 45:3 65:9
70:16 112:16
119:11 141:18
143:12,15 156:19
184:10,23 194:11
195:4 205:13
229:16 233:21
281:13 288:7
289:1 290:19
291:1,4

**year** 70:5 73:14,21
73:21 86:22
104:22 213:10,18
263:4
**years** 37:8 56:7
70:7 104:20
118:16 125:15
131:19 157:25
159:19 182:16
188:2 214:4,19
226:1 250:25,25
269:3
**York** 6:12 7:18
181:5
**YOUNG** 7:16
**Yuhas** 105:9 230:1
230:10,11,17,21
231:8,12

**Z**

**zero** 40:13,21 41:14
41:22

**0**

**02043** 155:5 157:14
**07009** 7:5
**07932** 6:18

**1**

**1,800** 277:10
278:12
**1,827** 276:21
**1/16/1982** 160:15
**1:51** 170:15
**10** 154:8
**10/12/1971** 237:3
**10/27/72** 244:13
**10:11** 1:18 11:16
**100** 245:23
**10022** 7:18
**10036** 6:12
**105** 1:16 11:18
185:1
**11** 8:12 251:3 264:2
291:14
**11/11/1971** 240:18



**11:20** 89:2
**11:42** 89:5
**12** 8:5 250:25 251:3 264:2 291:14
**12:05** 117:4
**12:06** 117:7
**12:53** 170:12
**13** 8:12 11:3 251:3 264:3 291:14
**14** 7:5 264:3
**146** 10:17
**15** 1:12 9:15 11:15 65:5,18 264:3
**152** 10:10
**154** 10:9
**155** 10:11
**16** 264:3
**17** 155:23 181:24 181:25 185:2,4 187:21,22 188:11 188:24 209:6 264:3
**170** 10:12
**172** 206:25
**173** 8:17 9:21 208:19
**18** 6:17 226:1 264:3
**181** 8:18
**183** 8:16
**185** 20:13
**188** 219:17 224:21 229:19
**19** 174:10 178:11 210:22 242:9 264:3
**19103** 6:6
**19107** 7:12
**1940s** 269:10
**195** 266:2,6
**1960s** 64:11,20
**1968** 229:23
**1969** 9:15 65:5,18
**1971** 76:7 77:2 79:2 79:11,19 86:21 87:17 93:9 233:16 233:21 242:18

**1972** 80:6,7,14 201:13 202:4 242:19 243:17
**1973** 80:21,23
**1974** 81:25 82:2 245:17 247:21,25 248:10,15
**1975** 86:22 250:7 250:20,24
**1976** 82:5
**1977** 82:8
**1978** 82:11
**1979** 82:14
**1980s** 24:16 269:10
**1981** 82:23 204:2
**1982** 21:13,14 22:7 86:6 152:14 154:10 165:16,17 177:21
**1983** 21:12 72:15 73:17 74:3 165:21 213:22 214:2 251:18 253:2
**1985** 154:8,10 155:23 181:11
**1986** 111:14 252:5
**1987** 225:3 254:7
**1988** 112:17 170:24 171:7 172:12 263:25 265:11
**1989** 275:7,18 276:21 281:3
**1993** 108:23
**1997** 110:3

**2**
**2** 90:25 157:14 225:24
**2/10/1971** 75:4
**2/19/2019** 293:25
**2:41** 220:10
**2:58** 220:13
**20** 264:3
**200** 245:23
**2000ish** 22:10
**2001** 6:5 22:7,11

**2010** 86:21 87:17
**2017** 95:8,19 242:9
**2018** 8:12 11:3
**2019** 1:12 11:16
**202** 10:4
**2021** 293:24
**203** 10:15
**207** 9:16
**208** 9:17
**21** 264:3
**210** 10:7
**212** 6:12
**215** 6:6 7:12
**22** 264:3
**224** 9:19
**23** 264:3
**239-5700** 7:6
**24** 264:4
**25** 264:4 293:24
**26** 264:4
**262** 9:23
**266** 9:20
**27** 264:4
**274** 10:8
**277** 173:3 174:1,4
**28** 146:24 229:9 264:4 290:25
**282** 10:14 262:15
**288** 8:19,21
**289** 8:23,24
**28th** 291:1
**29** 264:4
**290** 9:5,6
**2900** 6:5
**291** 9:7,8,9,10 214:18
**294** 202:16,22,25

**3**
**3** 152:14 227:1 283:9
**3:56** 285:19
**30** 131:19 264:4
**31** 264:4
**32** 264:4
**33** 264:4

**34** 10:6 264:4
**35** 264:5 269:3
**36** 264:5
**37** 264:5
**38** 264:5
**39** 264:5

**4**
**4** 6:11
**4/24/74** 247:2
**4/9/1971** 75:17
**4/9/71** 76:3
**4:18** 285:22
**4:24** 292:9,12
**40** 264:5
**41** 264:5
**412** 34:11
**42** 264:5
**43** 264:5
**436** 210:6
**44** 264:5
**441** 212:25
**446** 274:23 275:5
**448** 154:2,6,8
**45** 264:5
**45-minute** 220:6
**450** 151:21 152:3,6 152:10
**452** 155:19,23
**453** 170:17,22
**483** 204:2
**486** 91:9,14
**487** 88:10
**488** 146:24

**5**
**5** 204:2
**50s** 189:20
**567-3500** 6:6
**575-4303** 7:12
**589-8722** 7:18

**6**
**6** 275:7
**600** 7:17
**624-6221** 1:24

**646** 7:18
**65** 9:15

**7**
**7** 187:15,20
**71** 8:15
**735-3453** 6:12
**74** 10:16
**78** 211:7
**79** 211:8

**8**
**8** 65:4
**822-1110** 6:18
**84** 251:25 253:2
**866** 1:24
**8th** 7:17

**9**
**9,000** 245:24
**90s** 48:7,10
**973** 6:18 7:6



Exhibit 2

Page 294

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. MID-L-3095-18 AS
- - -

                                       :

MARIA FOLEY AND JOSEPH FOLEY,    :
husband and wife,                 :
                                      :

        Plaintiffs,           :
                                        :

        vs.                    :
                                      :

AVON PRODUCTS, INC., et al.,    :
                                      :

        Defendants.           :
                                      :

(Caption continued on following   :
page)                              :
                  - - -
Friday, March 8, 2019
- - -

VOLUME II

        Videotaped deposition of NANCY
MUSCO, taken pursuant to Notice at the l
Middlesex County Courthouse, 56 Paterson
Street, New Brunswick, New Jersey 08901,
commencing at 10:19 AM, on the above date,
before Constance S. Kent, Certified Court
Reporter and Notary Public for the State of
New Jersey.

* * *

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 295

```
 1        SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION - MIDDLESEX COUNTY
 2         DOCKET NO. MID-L-600-18 AS
 3    LISA FRACE, Individually    :
       and as representative of the :
 4     Estate of Carole DiCerbo,   :
       deceased.                   :
 5                                 :
          Plaintiffs,              :
 6                                 :
          vs.                      :
 7                                 :
      BRENNTAG NORTH AMERICA,      :
 8     et al.,                     :
                                   :
 9        Defendants.              :
      ------------------------------------------
10
          SUPERIOR COURT OF NEW JERSEY
11         LAW DIVISION - MIDDLESEX COUNTY
           DOCKET NO. MID-L-4252-18 AS
12
13    VICMAR GATMAITAN,            :
       individually and as         :
14     Representative of the        :
       Estate OF MELISSA E.        :
       ROONEY,deceased,            :
15                                 :
          Plaintiffs,              :
16                                 :
          vs.                      :
17                                 :
      IMERYS TALC AMERICA, INC.,   :
18     et al.,                     :
                                   :
19        Defendants.              :
20
21
22
23
24
25    (Caption continued on following page.)
           MAGNA LEGAL SERVICES
```

Page 296

```
 1        SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION - MIDDLESEX COUNTY
 2         DOCKET NO. MID-L-4826-18 AS
 3    EMMA GRIFFIN and WALTER      :
       GRIFFIN, husband and wife,  :
 4                                 :
          Plaintiffs,              :
 5                                 :
          v.                       :
 6                                 :
      CYPRUS AMAX MINERALS         :
 7     COMPANY, et al.,            :
                                   :
 8        Defendants.              :
                            _____
 9        SUPERIOR COURT OF NEW JERSEY
10         LAW DIVISION - MIDDLESEX COUNTY
           DOCKET NO. MID-L-5368-17 AS
11
12    MATTHEW HODJERA and          :
       SYLVIA DUFF-PETO,           :
13        Plaintiffs,              :
                                   :
14        v.                       :
                                   :
15    BORGWARNER MORSE TEC,        :
       LLC, et al,                 :
16                                 :
          Defendants.              :
17
18
19
20
21
22
23
24
25    (Caption continued on following page.)
           MAGNA LEGAL SERVICES
```

Page 297

```
 1        SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION - MIDDLESEX COUNTY
 2         DOCKET NO. MID-L-6805-18 AS
 3
      ANITA GRABOWSKI and ALFRED   :
 4     GRABOWSKI, husband and wife, :
 5        Plaintiffs,              :
                                   :
 6        v.                       :
                                   :
 7    BRENNTAG NORTH AMERICA,      :
       et al.,                     :
 8                                 :
          Defendants.              :
 9                          _____
10
11        SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION - MIDDLESEX COUNTY
12         DOCKET NO. MID-L-2456-18 AS
13    ROBERT GREENE, III,          :
       individually and as         :
14     Administrator of the        :
       Estate of Deborah           :
15     Greene Brake, deceased,     :
       Stephen A. Brake, and       :
16     the individual heirs of     :
       the Estate of Deborah       :
17     Green Brake,                :
18        Plaintiffs,              :
                                   :
19        v.                       :
                                   :
20    BRENNTAG NORTH AMERICA,      :
       et al.,                     :
21                                 :
          Defendants.              :
22
23
24
25    (Captioned continued on following page.)
           MAGNA LEGAL SERVICES
```

Page 298

```
 1        SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION - MIDDLESEX COUNTY
 2         DOCKET NO. MID-L-7049-16 AS
 3    D'ANGELA M. McNEILL-         :
       GEORGE,                     :
 4                                 :
          Plaintiff,               :
 5                                 :
          v.                       :
 6                                 :
      BRENNTAG NORTH AMERICA,      :
 7     et al.,                     :
                                   :
 8        Defendants.              :
                            _____
 9
10        SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION - MIDDLESEX COUNTY
11         DOCKET NO. MID-L-598-18 AS
12    LORETTA SELVAGGIO,           :
13        Plaintiff,               :
                                   :
14                                 :
      BREENTAG NORTH AMERICA,      :
15     et al.,                     :
                                   :
16        Defendants.              :
                            _____
17
18        SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION - MIDDLESEX COUNTY
19         DOCKET NO. MID-L-6635-18 AS
20    LEONARD E. WENDOWSKI, SR.,   :
       and KATHLEEN WENDOWSKI,     :
       husband and wife,          :
21                                 :
          Plaintiff,               :
22                                 :
          v.                       :
23                                 :
24    IMERYS TALC AMERICA, INC.,   :
       et al.,                     :
25        Defendants.              :
           MAGNA LEGAL SERVICES
```

2  (Pages 295 to 298)



Page 299

```
1    A P P E A R A N C E S:
2    COHEN, PLACITELLA, ROTH, P.C.
3      BY: CHRISTOPHER PLACITELLA, ESQUIRE
          JARED M. PLACITELLA, ESQUIRE
4    Two Commerce Square
     2001 Market Street, Suite 2900
     Philadelphia, PA 19103
5    215.567.3500
     cplacitella@cprlaw.com
6    jmplacitella@cprlaw.com
     Counsel for the Plaintiffs
7
8    SKADDEN, ARPS, SLATE, MEAGHER &
     FLOM, LLP
9      BY: RICHARD T. BERNARDO, ESQUIRE
          ANDREW KARP, ESQUIRE
10   4 Times Square
     New York, New York 10036
11   212.735.3453
     richard.bernardo@skadden.com
12   andrew.karp@skadden.com
     Counsel for the Defendant, Johnson &
13   Johnson
14
15   McGIVNEY, KLUGER & COOK, P.C.
       BY: JONATHAN C. LEE, ESQUIRE
16   18 Columbia Turnpike
     Florham Park, New Jersey 07932
17   973.822.1110
     jlee@mkclaw.us.com
18   Counsel for the Defendant,
     Whittaker, Clark & Daniels
19
20   OTOOLE, SCRIVO, FERNANDEZ, WEINER,
     VAN LIEU, LLC
21     BY: GARY VAN LIEU, ESQUIRE
     14 Village Park Road
22   Cedar Grove, New Jersey 07009
     973.239.5700
23   gvanlieu@oslaw.com
     Counsel for the Defendant,
24   Colgate-Palmolive Co.
25
```

MAGNA LEGAL SERVICES

Page 300

```
1    APPEARANCES, continued
2
3    RAWLE & HENDERSON, LLP
       BY: SEBASTIAN GOLDSTEIN, ESQUIRE
4    The Widener Building
     One South Penn Square
5    Philadelphia, Pennsylvania 19107
     215.575.4303
6    njasbestos@rawle.com
     Counsel for the Defendant, Cyprus
7    Amax Minerals Company
8    HAWKINS, PARNELL & YOUNG, LLP
       BY: MANUEL A. GUEVARA, ESQUIRE
9    600 Lexington Avenue, 8th Floor
     New York, New York 10022
10   646.589.8722
     mguevara@hpylaw.com
11   Counsel for the Defendant, Revlon,
     Inc.
12
13   ALSO PRESENT:
14
     Lea Callahan, Paralegal
15
     Ray Moore, Video Specialist
16
17
18
19
20
21
22
23
24
25
```

MAGNA LEGAL SERVICES

Page 301

```
1              - - -
2            I N D E X
3              - - -
4
5    Testimony of: NANCY MUSCO
6    By Mr. Placitella       306
7    By Mr. Bernardo         425
8    By Mr. Placitella       446
9
10
11             - - -
12         E X H I B I T S
13             - - -
14
15   NO.      DESCRIPTION       PAGE
16   Exhibit   Deposition of Dr.   316
     P-6      Hopkins
17   Exhibit   Binder            317
     P-7
18
     Exhibit   Binder            318
19   P8-A
20   Exhibit   Binder            318
     P8-B
21
     Exhibit   Affidavit of Roger  333
22   P-9      Miller
23   Exhibit   Complaint and Demand for  336
     J&J-316   Trial by Jury, Gambino
24             v. Johnson & Johnson
               Baby Products Company
25
```

MAGNA LEGAL SERVICES

Page 302

```
1    NO.       DESCRIPTION        PAGE
2    Exhibit    Defendant Johnson &   380
     J&J-337    Johnson Consumer
3              Products, Inc's
               Supplemental Responses
4              to Plaintiffs' Special
               Interrogatories, Bates
5              Interim-Disco-00000062
               through 68
6
7    Exhibit    June 27th, 1995 memo  382
     J&J-326    entitled, "CTFA response
8              to Cancer Prevention
               Coalition Citizen's
9              Petition," Bates JNJ
               000021285 through 322
10   Exhibit    Memorandum dated     390
     J&J-216    10/16/97, McKenna to
11             Wiles, Sharp, Re: Coker
               v. Johnson & Johnson
12             54.212,
               Mesothelioma/Talc
13             Medical Research, Bates
               JNJ 000319333 through
14             337
15   Exhibit    Email, Bates JNJ      395
     J&J-217    000280280
16
17   Exhibit    Fax dated 4/17/98,    397
     J&J-219    Grange to O'Shaughnessy,
18             Bates IMERYS 209394
               through 397
19   Exhibit    Hobson documents     401
     J&J-319
20
21   Exhibit    Reuters article      408
     J&J-482    entitled, "Johnson &
22             Johnson knew for decades
               that asbestos lurked in
23             its baby powder"
24   Exhibit    Affidavit of John    415
     J&J-230    Hopkins
25
```

MAGNA LEGAL SERVICES

3 (Pages 299 to 302)



Page 303

```
 1    NO.         DESCRIPTION         PAGE
 2    Exhibit   Deposition transcript of
      J&J-294      Roger N. Miller        451
 3
      Exhibit   Handwritten Notes        467
 4    P-14
 5    Exhibit   Copy of Hopkins chart    476
      J&J-414
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25             MAGNA LEGAL SERVICES
```

Page 304

```
 1                  - - -
 2      DEPOSITION SUPPORT INDEX
 3                  - - -
 4
 5    Direction to Witness Not to Answer
 6    Page Line    Page Line    Page Line
 7    87  20       88   17
 8
 9
10    Request for Production of Documents
11    Page Line    Page Line    Page Line
12    None
13
14
15    Stipulations
16    Page Line    Page Line    Page Line
17    None
18
19
20    Question Marked
21    Page Line    Page Line    Page Line
22    None
23
24
25             MAGNA LEGAL SERVICES
```

Page 305

```
 1           THE VIDEOGRAPHER:  We are now
 2    on the record.
 3           This begins DVD No. 1 in the
 4    deposition of Nancy Musco, in the matter of
 5    Foley versus Avon Products Incorporated, et
 6    al., in the Superior Court of New Jersey,
 7    Law Division, Middlesex County, Docket No.
 8    MID-L-3095-18.
 9           Today is March 8th, 2019, and
10    the time is 10:19 AM.
11           This deposition is being taken
12    at 56 Paterson Street, New Brunswick, New
13    Jersey, at the request of Cohen, Placitella
14    and Roth.
15           The videographer is Ray Moore
16    of Magna Legal Services and the court
17    reporter is Connie Kent of Magna Legal
18    Services.
19           Counsel will be noted on the
20    stenographic record.
21           Will the court reporter please
22    swear in the witness.
23           NANCY MUSCO, having been first
24    duly sworn, was examined and testified as
25    follows:
             MAGNA LEGAL SERVICES
```

Page 306

```
 1                  - - -
 2         E X A M I N A T I O N
 3                  - - -
 4    BY MR. PLACITELLA:
 5        Q.   Okay.  Good morning, Ms. Musco.
 6    How are you?
 7        A.   Good morning.
 8        Q.   We're here for the second day
 9    of your deposition.
10           I think last time we were
11    together you told us that you spent
12    approximately six to seven business days
13    preparing for your deposition; is that
14    correct?
15        A.   That is correct.
16        Q.   Okay.  And since the last
17    deposition, did you review any additional
18    documents?
19        A.   I reviewed my deposition from
20    that day.
21        Q.   Other than the deposition you
22    gave your first day, did you review
23    anything else?
24        A.   I reviewed some complaint
25    files, yes.
             MAGNA LEGAL SERVICES
```

4  (Pages 303 to 306)



Page 307

1    Q.   Okay.  What specifically did
2  you review?
3    A.   I specifically asked to see the
4  Joly file.
5    Q.   Okay.  And is there a Joly
6  file?
7    A.   When I say the file, I wanted
8  to see what the actual complaint was in
9  that case.
10   Q.   So when you said you reviewed
11 the Joly file, the only thing you asked for
12 was the complaint, nothing else?
13   A.   Well, I was curious to see what
14 the complaint was.  In this case it was not
15 talcosis, I believe it was an acute
16 bronchitis.
17   Q.   Did you understand my question?
18   A.   I believe so, yes.
19   Q.   Okay.  My question to you was:
20 Did you review -- did you ask to see
21 anything other than the complaint filed?
22   A.   I asked to see the complaint
23 filed, that was it.
24   Q.   Did you ask to see any of the
25 discovery from the Joly case?
MAGNA LEGAL SERVICES

Page 308

1    A.   No, I did not because when I
2  saw the complaint and saw it was acute
3  bronchitis, I didn't think it was within
4  the scope.
5    Q.   Okay.  Let me ask the question
6  again:  Did you ask to see any of the
7  discovery from the Joly case?
8         MR. BERNARDO:  Object to the
9  form of the question.
10        THE WITNESS:  No, I did not.
11 BY MR. PLACITELLA:
12   Q.   Okay.  And you understand that
13 the Joly case involved alleged injury to
14 exposure to baby powder, correct?
15   A.   That was the alleged
16 allegation, yes.
17   Q.   In addition to the Joly
18 complaint, what other documents did you
19 look at?
20   A.   As I said earlier, my
21 deposition from last time we met.
22   Q.   So just the Joly complaint and
23 your deposition?
24   A.   That's correct.
25   Q.   Okay.  And did you speak to any
MAGNA LEGAL SERVICES

Page 309

1  fact witnesses?
2    A.   No, I did not.
3    Q.   Okay.  Did you discuss your --
4  the substance of your testimony with
5  Counsel?
6    A.   In general terms, yes.
7    Q.   Okay.  Did anything that -- any
8  of those discussions cause you to change
9  your testimony in any material way?
10        MR. BERNARDO:  Object to the
11 form of the question.
12        THE WITNESS:  No.
13 BY MR. PLACITELLA:
14   Q.   Okay.  And how much more time
15 did you spend between the last deposition
16 and today's deposition preparing?
17   A.   It was about three hours.
18   Q.   Three hours.
19        And during the last -- it's
20 been about three weeks since you were
21 deposed the last time?
22   A.   I believe so, yes.
23   Q.   Did you check with the Law
24 Department for any responsive answers that
25 were called for that we discussed the last
MAGNA LEGAL SERVICES

Page 310

1  time in your deposition?
2    A.   No, I had no communications
3  with them.
4    Q.   Did you check -- the last time
5  you told us that there -- there may be
6  materials that were responsive with outside
7  counsel.
8         Do you recall that?
9         MR. BERNARDO:  Object to the
10 form of the question.
11        THE WITNESS:  Yes.
12 BY MR. PLACITELLA:
13   Q.   Okay.  Did you check with
14 outside counsel to determine what
15 responsive materials were in possession of
16 your lawyers?
17   A.   No, I did not check with any
18 outside counsels.
19   Q.   Last time you told us you
20 verified interrogatories on more than one
21 occasion.
22        Do you recall that?
23   A.   Yes.
24   Q.   Did you look for any additional
25 interrogatories that you verified in
MAGNA LEGAL SERVICES



Page 311

1    addition to the Krushinski case?
2         A.   No, I did not.
3         Q.   Why not?
4         A.   Because I did not believe that
5    they were within the scope.
6         Q.   Okay.  And you, the witness,
7    were making a determination about what was
8    within and not within the scope of the
9    subpoena served on Johnson & Johnson?
10        A.   Yes, my interpretation of it
11   and also with advice of Counsel.
12        Q.   Okay.  Now, last time we
13   addressed a number of topics.  We addressed
14   Johnson & Johnson litigation history.
15            Do you recall that?
16        A.   Yes.
17        Q.   Okay.  We addressed discovery
18   Johnson -- discovery responses that Johnson
19   & Johnson says they were able to locate.
20            Do you recall that?
21        A.   Yes.
22        Q.   Okay.  We addressed
23   representations that were made in some of
24   those discovery responses.
25            Do you recall that?
                MAGNA LEGAL SERVICES

Page 312

1         A.   Yes.
2         Q.   Okay.  We also discussed the
3    basis for the representations that were
4    made in Johnson & Johnson's discovery
5    responses, correct?
6         A.   Yes.
7         Q.   Okay.  Now, you understand
8    that -- and during the course of that
9    deposition, both you and your counsel
10   objected to the scope of a number of
11   questions that I asked you, correct?
12        A.   Yes.
13            MR. BERNARDO:  Object to the
14   form of the question.
15   BY MR. PLACITELLA:
16        Q.   Correct?
17        A.   Yes.
18        Q.   Okay.  And you understand that
19   we appeared before the court here in
20   Middlesex County to address the concerns
21   raised by your counsel, correct?
22            MR. BERNARDO:  Object to the
23   form of the question.
24            THE WITNESS:  I understand that
25   there was a conversation, yes.
                MAGNA LEGAL SERVICES

Page 313

1    BY MR. PLACITELLA:
2         Q.   And you understand that that's
3    why we're here in the courthouse having
4    your deposition taken as opposed to
5    Counsel's office, correct?
6             MR. BERNARDO:  Object to the
7    form of the question.
8             THE WITNESS:  I know that the
9    venue was changed at the suggestion of the
10   court, but...
11   BY MR. PLACITELLA:
12        Q.   Okay.  Well -- so I'm going to
13   tell you what I'm going to do today so
14   we're all on the same page.  I'm going to
15   address the objections that you raised
16   directly and see if we can sort them out.
17   Okay?
18        A.   Okay.
19            MR. BERNARDO:  Objection.
20   BY MR. PLACITELLA:
21        Q.   And I'm going to hope to make
22   clear exactly what information you reviewed
23   in preparation for your deposition and what
24   was made available to you.  Okay?
25        A.   Okay.
                MAGNA LEGAL SERVICES

Page 314

1             MR. BERNARDO:  Object to the
2    form of the question.
3    BY MR. PLACITELLA:
4         Q.   And when I'm done with that,
5    I'm going to finish going through the
6    information that we believe is relevant to
7    this deposition.  Okay?
8         A.   Okay.
9         Q.   Okay.  So the last time we were
10   together, at the end of the deposition,
11   you, Johnson & Johnson, produced a number
12   of binders that were in a Bankers box.
13            Do you recall that?
14        A.   Yes, I do.
15        Q.   And you testified that those
16   binders were documents that you reviewed
17   and considered in conjunction with your
18   preparation for the deposition, correct?
19            MR. BERNARDO:  Object to the
20   form of the question and the
21   characterization of her testimony.
22            THE REPORTER:  I'm sorry.  Can
23   we go off the record for a second?
24            THE VIDEOGRAPHER:  The time is
25   now 10:27 AM.  We're going off the record.
                MAGNA LEGAL SERVICES



Page 315

1    (Discussion held off the
2  record.)
3    THE VIDEOGRAPHER:  The time is
4  now 10:28 AM.  We are back on the record.
5  BY MR. PLACITELLA:
6    Q.  You and your counsel
7  represented at the end of the deposition
8  that the binders that you produced were
9  documents that you reviewed and considered
10  in connection with your preparation for the
11  deposition, correct?
12    MR. BERNARDO:  Object to the
13  form of the question.
14    THE WITNESS:  Yes, there were a
15  number of binders that were in that box,
16  yes.
17  BY MR. PLACITELLA:
18    Q.  Okay.  And that you also sent
19  all of those binders with -- to John
20  Hopkins and had a conversation about them,
21  correct?
22    MR. BERNARDO:  Object to the
23  form of the question.
24    And Mr. Placitella, if we could
25  be specific because there are a lot of
MAGNA LEGAL SERVICES

Page 316

1  binders and I don't think her testimony was
2  that all of them were sent.
3    I'm just asking that you let
4  her see so we can be clear as to what was
5  sent and not sent to have a clear record.
6    MR. PLACITELLA:  Okay.
7  BY MR. PLACITELLA:
8    Q.  So you have all the binders in
9  front of you to your right.
10    Do you see them?
11    A.  I see binders, yes.
12    Q.  Okay.  And do we need to go
13  through them again so we're all on the
14  same --
15    A.  Well, I need to be familiar
16  with what specifically they are, yes.
17    Q.  Okay.  So why don't we start
18  with the lowest numbered binder, which I
19  think is 6.
20    A.  Yes, 6 is the lowest.
21    Q.  Okay.  So what is 6?
22    A.  It is the deposition of
23  Dr. Hopkins --
24    Q.  Okay.
25    A.  -- and testimony.
MAGNA LEGAL SERVICES

Page 317

1    Q.  And you reviewed that?
2    A.  I reviewed that, yes.  This --
3  I did not send this or we did not send this
4  to Dr. Hopkins, but I reviewed it.
5    Q.  Okay.  And then the next binder
6  is what?
7    A.  This would be P-7.
8    Q.  Uh-huh.  And P-7 is what?
9    A.  This looks to be different
10  complaint cases, first one being Selby.
11    Q.  Do you recall reviewing this
12  binder?
13    A.  Yes.
14    Q.  Okay.  And did you send this to
15  Dr. Hopkins?
16    A.  No.
17    Q.  Okay.  But it was one of the
18  binders that you --
19    A.  It was in the box that we
20  presented to you.
21    Q.  And that you relied upon?
22    MR. BERNARDO:  Object to the
23  form of the question.
24  BY MR. PLACITELLA:
25    Q.  You reviewed it in preparation
MAGNA LEGAL SERVICES

Page 318

1  for your deposition?
2    A.  I reviewed, yes.
3    Q.  Okay.  And what's the next
4  numbered binder?
5    A.  P-8A.
6    Q.  All right.  Is there an 8A and
7  an 8B?
8    A.  Yes, there is.
9    Q.  And what are they collectively?
10    A.  They are a lot of it looks like
11  testing material.
12    Q.  And this -- did you review 8A
13  and 8B in preparation for your deposition?
14    A.  I did not review each one of
15  these, but I was familiar with these and I
16  believe these were sent to Dr. Hopkins.
17    Q.  And then you had a conversation
18  with Dr. Hopkins about those binders?
19    A.  We had a conversation -- a
20  specific conversation about certain
21  testing.
22    Q.  But -- so those binders were
23  produced as documents you relied upon for
24  your deposition, correct?
25    MR. BERNARDO:  Object to the
MAGNA LEGAL SERVICES



Page 319

```
1    form of the question.
2         THE WITNESS:  I looked at them,
3    I cannot tell you everything that's in
4    them, and they were a basis, yes.
5    BY MR. PLACITELLA:
6         Q.   Okay.  And all those binders
7    were also sent to -- those binders were
8    sent to Dr. Hopkins, correct?
9         A.   Yes, 8A and 8B.
10        Q.   Okay.  And you identified them
11   at the end of the last deposition as part
12   of your reliance materials, correct?
13        MR. BERNARDO:  Object to the
14   form of the question.
15        THE WITNESS:  They're part of
16   what I saw, yes.
17   BY MR. PLACITELLA:
18        Q.   Okay.  And then what's the next
19   numbered --
20        A.   P-9.
21        Q.   P-9 is what?
22        A.   This was something that you
23   sent to -- to my counsel right before our
24   last deposition I believe.
25        Q.   Right.  You understand that I
                  MAGNA LEGAL SERVICES
```

Page 320

```
1    had an agreement with your counsel that any
2    document that Johnson & Johnson did not
3    produce directly and was not admitted into
4    a trial or prior deposition that I located
5    I would send to Counsel so they could share
6    it with you.
7         You understand that, correct?
8         MR. BERNARDO:  Object to the
9    form of the question.
10        THE WITNESS:  I don't know
11   exactly what your agreement was.
12   BY MR. PLACITELLA:
13        Q.   Okay.  Well, did you review
14   that binder?
15        A.   I did see this, yes.
16        Q.   Okay.  Now, in the last
17   deposition, you were asked specific
18   questions about the Edley -- the Edley
19   case.
20        Do you recall that?
21        A.   I remember the name.
22        Q.   Correct?
23        A.   I remember that name, yes.
24        Q.   Okay.  In fact, I asked you
25   multiple questions about the Edley case,
                  MAGNA LEGAL SERVICES
```

Page 321

```
1    correct?
2         A.   I believe so.
3         Q.   And every time I asked you a
4    question about the Edley case, your
5    response to me was basically you don't know
6    anything about the Edley case, you've never
7    seen anything about the Edley case,
8    correct?
9         MR. BERNARDO:  Object to the
10   form of the question.
11        THE WITNESS:  Yes, because my
12   understanding was it was not within the
13   scope of the notice.
14   BY MR. PLACITELLA:
15        Q.   Okay.  Well, let's make sure
16   we're on the same page here.  So if --
17        MR. PLACITELLA:  Do you have
18   the iPad?
19   BY MR. PLACITELLA:
20        Q.   Under oath on page 105, you
21   state: I'm not familiar with the cases,
22   and that includes the Edley and the Yuhas
23   case, right?
24        A.   That's correct.
25        Q.   Okay.  And then on page 220 and
                  MAGNA LEGAL SERVICES
```

Page 322

```
1    221, you were asked again whether in
2    preparation for the deposition you ever
3    reviewed any information concerning the
4    Edley case and you said no, correct?
5         A.   That's correct.
6         Q.   And then on 21, I said:
7         "So Johnson & Johnson doesn't
8    know anything about the Edley case?"
9         Mr. -- Mr. Bernardo objected
10   that it was beyond the scope, and you said:
11        "In preparation for today, I
12   did not review that case."
13        Correct?
14        MR. BERNARDO:  Objection to the
15   form of the question.
16        THE WITNESS:  That's correct.
17   BY MR. PLACITELLA:
18        Q.   And you repeated again in
19   response to questions on 221, that you knew
20   nothing about the Edley case, correct?
21        A.   That's correct.
22        Q.   And then on -- I'm sorry.
23   That's the problem.  Then on 2 -- page
24   223 or 224, I asked you -- and 225, I asked
25   you questions about an affidavit that was
                  MAGNA LEGAL SERVICES
```

8 (Pages 319 to 322)



Page 323

1 filed in the Edley case by Roger Miller.
2     Do you recall that?
3     MR. BERNARDO: Object to the
4 form of the question.
5     And I'm just going to renew the
6 same objections I made in the transcript
7 that you're referring to --
8     MR. PLACITELLA: Okay.
9     MR. BERNARDO: -- so as not to
10 interrupt these questions.
11     MR. PLACITELLA: All right.
12 BY MR. PLACITELLA:
13     Q.  Correct? I asked you about the
14 Miller affidavit --
15     A.  Yes, you did.
16     Q.  -- from the Edley case?
17     And I showed you the affidavit
18 and you said you didn't know anything about
19 it, right?
20     MR. BERNARDO: Object to the
21 form of the question.
22     THE WITNESS: I was not
23 familiar with it, no.
24 BY MR. PLACITELLA:
25     Q.  Okay. And then on page 227, I
                    MAGNA LEGAL SERVICES

Page 324

1 asked you again about the Miller affidavit
2 submitted in the Edley case.
3     Do you see that?
4     A.  Yes.
5     MR. BERNARDO: Object to the
6 form of the question. Same objection.
7 BY MR. PLACITELLA:
8     Q.  And then again your counsel
9 objected and you said you didn't know
10 anything about it, right?
11     MR. BERNARDO: Object to the
12 form of the question. Same objection.
13     THE WITNESS: Yes, because I
14 did not believe it was in the scope, so I
15 had not reviewed it, no.
16 BY MR. PLACITELLA:
17     Q.  Okay. Can you go to the 8A
18 binder, please?
19     This is one of the binders you
20 reviewed in preparation for your
21 deposition, correct?
22     A.  This was the basis of one --
23 one of -- some of the conversations that I
24 had in preparation for this.
25     Q.  Okay.
                    MAGNA LEGAL SERVICES

Page 325

1     A.  Yes.
2     Q.  And under 8A, can you go to tab
3 33, please?
4     A.  33 in 8A?
5     Q.  33 in 8A.
6     Now, 33 in the -- in your
7 binder, 8A, is captioned in the Edley case,
8 correct?
9     A.  I'm not seeing that it says
10 Edley here. Oh, yes, okay.
11     Q.  Edley. And can you turn to the
12 next page in your binder? You see there's
13 an affidavit in the Edley case?
14     A.  Yes.
15     Q.  Right? And that affidavit is
16 sworn to by Roger Miller, correct?
17     A.  I see that, yes.
18     Q.  All right. And the date for
19 that affidavit -- and that's his signature,
20 and the date for that affidavit is 1991,
21 correct?
22     A.  Yes.
23     Q.  Okay. And he was the president
24 of your mining company, correct?
25     MR. BERNARDO: Object to the
                    MAGNA LEGAL SERVICES

Page 326

1 form of the question and beyond the scope
2 of the notice.
3     The witness can answer in her
4 personal capacity, and I'll assert this for
5 any questions on --
6     MR. PLACITELLA: You can assert
7 all you want, but --
8     MR. BERNARDO: Mr.
9 Placitella --
10     MR. PLACITELLA: -- it's in her
11 review materials.
12     I just want to make clear so I
13 court that listens to your objections about
14 scope understands exactly what we're
15 talking about.
16     MR. BERNARDO: And I appreciate
17 that, Mr. Placitella. I'm not trying to
18 pick a fight here and you seem to be
19 getting angry.
20     MR. PLACITELLA: I'm not angry.
21     MR. BERNARDO: But you
22 interrupted my objection, and I'm simply
23 trying to preserve it for the record so
24 that I don't repeat it and interrupt your
25 questioning.
                    MAGNA LEGAL SERVICES



Page 327

1    So I'm asking for a running
2  objection with respect to questions about
3  this affidavit.
4    MR. PLACITELLA:  Okay.  You
5  have any running objection you want about
6  what's ever in the books that she reviewed.
7  How's that?
8    MR. BERNARDO:  Thank you.
9    MR. PLACITELLA:  Okay.
10  BY MR. PLACITELLA:
11    Q.   So what he says is:
12    "I'm the president of Windsor
13  Minerals."
14    Correct?
15    A.   I see that in the second
16  paragraph, yes.
17    Q.   And what he says is that:
18    "The exclusive business of
19  Windsor Minerals has been for the last
20  18 years, the mining and milling of talc
21  from a single mining district in Windsor,
22  Vermont."
23    Correct?
24    A.   That's what it says here.
25    Q.   Okay.  And:
       MAGNA LEGAL SERVICES

Page 328

1    "The mining district is the
2  exclusive source for all of the Johnson's
3  Baby Powder sold in the United States."
4    Correct?
5    A.   That's what it says here.
6    Q.   Okay.  It says:
7    "In addition to supplying the
8  talc for Johnson's Baby Powder, Windsor
9  Minerals also sells a portion of its
10  product to independent industrial users."
11    Correct?
12    A.   That's what it says.
13    Q.   Okay.  And what he swears to
14  under oath, he says:
15    "All of the talc mined by
16  Windsor Minerals, Inc., whether it is
17  ultimately sold to industrial users or used
18  in Johnson's Baby Powder, is sampled and
19  tested for the presence of asbestos."
20    Correct?
21    A.   That's what he says.
22    Q.   And he swears under oath:
23    "No evidence of the presence of
24  asbestos in Windsor Minerals product has
25  ever been revealed by this testing."
       MAGNA LEGAL SERVICES

Page 329

1    Correct?
2    A.   That's what it says, yes.
3    Q.   Okay.  And then this affidavit
4  was then used to have Mr. Edley, right here
5  in this courthouse, dismiss his lawsuit
6  based upon the representations made by
7  Windsor Minerals and Johnson & Johnson,
8  correct?
9    MR. BERNARDO:  Object to --
10  object to the form of the question.  Well
11  beyond the scope of the notice.
12    You can answer in your
13  individual capacity.
14    THE WITNESS:  I -- that seems
15  to be a legal question.  I don't know what
16  was used or what wasn't used.
17  BY MR. PLACITELLA:
18    Q.   Okay.  Well, let's go to the
19  cover letter that's in your binder.
20    You see there's a binder
21  here -- a letter on July 23rd, 1997?
22    A.   Which tab is that?
23    Q.   It's still under tab 33.
24    MR. BERNARDO:  And same
25  objection with respect to the use of this
       MAGNA LEGAL SERVICES

Page 330

1  document and questions pertaining to it.
2    MR. PLACITELLA:  You can have a
3  running objection to every question I ask
4  about what's in her binder.
5    MR. BERNARDO:  Okay.  From time
6  to time --
7    MR. PLACITELLA:  You don't have
8  to keep doing it.
9    MR. BERNARDO:  From time to
10  time, I will renew it.
11    MR. PLACITELLA:  Okay.
12    THE WITNESS:  What are you
13  referring to here?
14  BY MR. PLACITELLA:
15    Q.   The July 23rd, 1987 letter.
16    A.   I see that, yes.
17    Q.   Okay.  And these -- this is
18  from your lawyers to Ronald Grayzel, who
19  has an office right here in Edison,
20  New Jersey.
21    Do you see that?
22    A.   I see that's the address here,
23  yes.
24    Q.   Right.  And your lawyer's
25  offices are right here two blocks from the
       MAGNA LEGAL SERVICES



Page 331

```
 1   courthouse.
 2        Do you see that?
 3        A.   I don't -- I see that there's
 4   some of the addresses.  I don't even know
 5   who any of these people are, so that's what
 6   it says here.
 7        Q.   And it says:
 8        "Dear Mr. Grayzel, Enclosed
 9   please find the affidavit on behalf of
10   Windsor Minerals signed by Roger Miller,
11   president of Windsor Minerals since 1968.
12   Also enclosed you'll find an assay from
13   McCrone Environmental Services."
14        Do you see that?
15        A.   That's what it says.
16        Q.   "I trust that these documents
17   will now enable you to sign a dismissal as
18   was done in the Yuhas file."
19        Do you see that?
20        A.   That's what it says.
21        Q.   Okay.  And then if you go to
22   the first page in your tab 33, on the same
23   exact date that your letter was sent,
24   Mr. Grayzel signed a stipulation of
25   dismissal with prejudice dismissing his
              MAGNA LEGAL SERVICES
```

Page 332

```
 1   client's case against your company,
 2   correct?
 3        MR. BERNARDO:  Object to the
 4   form of the question.
 5        THE WITNESS:  That's what it
 6   says here.
 7   BY MR. PLACITELLA:
 8        Q.   Right.  Now, you also stated in
 9   your prior deposition that you have no
10   knowledge of the Yuhas case and what
11   happened to it, correct?
12        A.   And that's correct.
13        Q.   But actually you do know what
14   happened to it because in your tab 33, your
15   lawyers make clear what happened to the
16   Yuhas file, it was dismissed just like the
17   Edley case, correct?
18        MR. BERNARDO:  Object --
19   BY MR. PLACITELLA:
20        Q.   That's what it says.
21        MR. BERNARDO:  Object to the
22   form of the question.
23        THE WITNESS:  That's what it
24   says here, yes.
25   BY MR. PLACITELLA:
              MAGNA LEGAL SERVICES
```

Page 333

```
 1        Q.   Now, do you recall I asked you
 2   last time whether Mr. Miller had signed
 3   other similar affidavits during the course
 4   of the litigation that were used to get
 5   people to dismiss their cases.
 6        Do you recall that?
 7        A.   I don't recall that specific
 8   question, no.
 9        Q.   Do you recall whether I asked
10   you about the Faye Miller case?
11        A.   I don't remember that, no.
12        Q.   Can you go to your binder, P-9.
13   P-9, if you flip to, like, the third page
14   is an affidavit in the Faye Miller case
15   signed by Roger Miller.
16        Do you see that?  I put it up
17   on the screen.
18        A.   I see that on the screen, yes.
19        Q.   All right.  And again, Roger
20   Miller states under oath:
21        "All of the talc mined by
22   Windsor Minerals has been regularly sampled
23   and tested for the presence of asbestos.
24   No evidence of the presence of asbestos in
25   Windsor Minerals product has ever been
              MAGNA LEGAL SERVICES
```

Page 334

```
 1   revealed by this testing."
 2        Correct?
 3        MR. BERNARDO:  Object to the
 4   form of the question.
 5   BY MR. PLACITELLA:
 6        Q.   That's what he says, right?
 7        MR. BERNARDO:  Beyond the
 8   scope.
 9        You can answer in your
10   individual capacity if you can.
11        THE WITNESS:  I see that it
12   says that there, yes.
13   BY MR. PLACITELLA:
14        Q.   Okay.  And the last time we
15   were together, you also testified under
16   oath that the only thing you reviewed in
17   reference to the Gambino case was the
18   complaint as that was all that was
19   available.
20        Do you recall that testimony?
21        A.   I remember talking about the
22   Gambino, yes.  And I reviewed -- or I --
23   the things that I reviewed were any
24   responses to discovery questions or
25   interrogatories.
              MAGNA LEGAL SERVICES
```



Page 335

```
1        Q.   Okay.  So let's -- let's look
2   at, to be clear, what your testimony was as
3   it related to the Gambino case.
4            On page 105, I first raised the
5   Gambino case with you.  I said:
6            "What do you know about the
7   Gambino case?"
8            And you wrote (sic):
9            "That is the one -- one of the
10  ones that was listed which you requested
11  documents, but I -- that's why I asked for
12  that chart, to refresh myself, because the
13  top of my head (sic), I don't remember what
14  Gambino was."
15           Do you remember that?
16       A.   Yes.
17       Q.   Okay.  And then on page 214, I
18  asked you additional questions about the
19  Gambino case, and 215.  And I asked you:
20           "So in the same years that the
21  scientists testified that the mines once
22  owned by Johnson & Johnson contained
23  asbestos, you were sued in Middlesex County
24  in the Gambino case, correct?"
25           Mr. -- Mr. Bernardo objects to
```

MAGNA LEGAL SERVICES

Page 336

```
1   the scope of my question, and I said:
2            "Here, I put it up there for
3   you.  It's 291.  Do you see that?
4            "All I know is the years are
5   the same.
6            "Right.  In Middlesex County,
7   New Jersey.  Do you see that?
8            "I see that, yes.
9            "And it involved baby powder,
10  correct?
11           "Answer:  I see that.
12           "And according to your earlier
13  testimony, your lawyers didn't have any
14  other information on Gambino to provide to
15  you."
16           And you said under oath:
17           "There were no discovery
18  records."
19           Do you recall that testimony?
20       A.   Yes.
21       Q.   Okay.
22       MR. PLACITELLA:  Can you give
23  me J&J 316, please?
24  BY MR. PLACITELLA:
25       Q.   J&J-316 is the Gambino file
```

MAGNA LEGAL SERVICES

Page 337

```
1   obtained from the Middlesex County
2   Courthouse, and if you flip through it,
3   there are interrogatory answers on behalf
4   of Johnson & Johnson.
5            Do you see that?
6       MR. BERNARDO:  Object to the
7   form of the question.
8            I'm also going to object,
9   Chris, because, for purposes of allowing
10  the witness to be prepared, it was my
11  understanding, and perhaps I misunderstood,
12  that we had an agreement that if you were
13  going to ask the witness questions about
14  documents that you found or obtained from a
15  court file, that they would be provided in
16  advance so the witness would have an
17  opportunity to review them.
18           Having made that objection, the
19  witness can respond as she can.
20       MR. PLACITELLA:  Well, I'm
21  going to put a response to that on the
22  record when somebody reads this.
23           Our agreement was I would
24  provide you any documents that I located
25  that weren't used in prior Johnson &
```

MAGNA LEGAL SERVICES

Page 338

```
1   Johnson depositions or admitted at trial
2   against Johnson & Johnson.  That was our
3   agreement.
4   BY MR. PLACITELLA:
5       Q.   Ms. Musco, did you know that
6   this -- that these sets of interrogatories
7   were testified to by Dr. Hopkins in his
8   deposition?
9       MR. BERNARDO:  Object to the
10  form of the question.
11       THE WITNESS:  No.
12  BY MR. PLACITELLA:
13       Q.   Did you know that they were
14  actually used in trial here in Middlesex
15  County in this very courtroom?
16       A.   No, I do not know that.
17       Q.   And when you said that there
18  were no discovery responses available in
19  the Gambino case under oath, these were
20  responses that were never supplied to you,
21  and I'm talking about you, I mean Johnson &
22  Johnson's representative --
23       MR. BERNARDO:  Object --
24  BY MR. PLACITELLA:
25       Q.   -- correct?
```

MAGNA LEGAL SERVICES

12  (Pages 335 to 338)



Page 339

1    MR. BERNARDO:  Object to the
2  form of the question.
3    THE WITNESS:  I did not see
4  these before, no.
5  BY MR. PLACITELLA:
6    Q.   Okay.  So when you testified
7  before under oath that Johnson & Johnson
8  did not have any discovery responses as it
9  related to the Gambino case, that was, in
10  fact, a false statement, correct?
11    MR. BERNARDO:  Object to the
12  form of the question.
13    THE WITNESS:  To the best of my
14  understanding, it was true at the time.
15  BY MR. PLACITELLA:
16    Q.   But what -- but it really was a
17  false statement, ma'am.  I'm not talking
18  about you, Nancy Musco, I'm talking about
19  Johnson & Johnson.  You're here on behalf
20  of Johnson & Johnson, and clearly Johnson &
21  Johnson had this information in its
22  possession when you testified the first
23  time that there were no discovery responses
24  available from the Gambino case, correct?
25    MR. BERNARDO:  Object to the

MAGNA LEGAL SERVICES

Page 340

1  form of the question and to the
2  characterization of her prior testimony.
3    THE WITNESS:  I don't know
4  that.
5  BY MR. PLACITELLA:
6    Q.   Okay.  You -- last time I asked
7  you about --
8    MR. PLACITELLA:  Do you have
9  the Hopkins chart?
10  BY MR. PLACITELLA:
11    Q.   Last time I asked you some
12  questions about a chart that Dr. Hopkins
13  prepared during his testimony.
14    Do you recall that?
15    A.   Yes.
16    Q.   And what you told me under oath
17  was that you never looked at the Hopkins
18  chart in preparation for your deposition,
19  correct?
20    A.   That was correct, yes.
21    Q.   And you said that you were
22  never shown the Hopkins chart in
23  preparation for your deposition, correct?
24    A.   I had not seen it specifically,
25  no.

MAGNA LEGAL SERVICES

Page 341

1    Q.   And you further testified under
2  oath that you never discussed the Hopkins
3  chart with Dr. Hopkins himself, correct?
4    A.   No, I did not.
5    Q.   Okay.  Now, can you go to book
6  8B?  And can you turn to tab 78, please?
7    Now, in your book that you gave
8  me last -- at the end of the last
9  deposition -- are you with me?  Are you on
10  tab 78?  Yes?
11    A.   I am.
12    Q.   And what you have on tab 78 is
13  a chart with Exhibit No. Hopkins 28,
14  correct?
15    A.   That's what it says, yes.
16    Q.   Okay.  And what you have in
17  front of you, can you hold it up, is the
18  big version of that chart so you can read
19  it, correct?  I have one here.
20    A.   It looks to be the same, yes.
21    Q.   All right.  Hopkins-28, right?
22    A.   That's what it's called, yes.
23    Q.   Hopkins-28, the big version I
24  have, is the blowup of the same chart in
25  your book tab No. 78, correct?

MAGNA LEGAL SERVICES

Page 342

1    A.   Yes.
2    Q.   Okay.  And the last time we
3  were together I asked you questions about
4  the Westfall case.
5    Do you recall that?
6    A.   Yes, I do.
7    Q.   Okay.  And I think you said
8  that you were vaguely familiar with the
9  Westfall case, is that fair?
10    A.   Yes.
11    Q.   And that you denied any
12  knowledge that the mine at issue in the
13  Westfall case had asbestos in it, correct?
14    MR. BERNARDO:  Object to the
15  form of the question, beyond the scope of
16  the notice, and the witness --
17    THE REPORTER:  I'm sorry, sir?
18    MR. BERNARDO:  Object to the
19  form of the question, beyond the scope of
20  the notice.
21    The witness may answer in her
22  personal capacity if she knows.
23    THE WITNESS:  What was the
24  question?
25  BY MR. PLACITELLA:

MAGNA LEGAL SERVICES

13  (Pages 339 to 342)



Page 343

1      Q.   In your -- well, let's just go
2   to your testimony.
3          I asked you on page 85:
4          "You knew the mine that was
5   owned by Johnson & Johnson that was the
6   issue in the Westfall case had asbestos in
7   it."
8          Mr. Bernardo objected.  I
9   responded again:
10         "You knew that?"
11         And your response was:
12         "No, I did not.  I did not go
13  into that detail with this because it was
14  industrial talc."
15         Do you see that?
16     A.   Yes.
17     Q.   Okay.  And I then asked you if
18  you ever read the deposition of the
19  scientist who was deposed in the -- in the
20  Westfall case.
21         Do you recall that?
22     A.   Specifically, no.
23     Q.   Okay.  Well, let's go to your
24  testimony.
25         You see that on page 206, I
                    MAGNA LEGAL SERVICES

Page 344

1   said:
2          "You never knew before you came
3   here today that Johnson & Johnson's lawyers
4   sat in a deposition where the scientists
5   who did the tests on the Johnson & Johnson
6   mine said they found asbestos in the mine?
7   You never knew that?"
8          And then there was an objection
9   by Mr. Bernardo, artfully so, and --
10         MR. BERNARDO:  Which he renews
11  here.
12         MR. PLACITELLA:  Which he can
13  renew here all he wants.  Thank you.
14  BY MR. PLACITELLA:
15     Q.   And I handed you the transcript
16  of Dr. Glen Hemstock.
17         Do you see that?
18     A.   I see that, yes.
19     Q.   And then when I handed it to
20  you, your attorney, Mr. Bernardo said:
21         "And the same objection to
22  asking the witness about depositions.  It's
23  beyond the scope and she's not read the
24  deposition."
25         Do you see that?
                    MAGNA LEGAL SERVICES

Page 345

1      A.   Yes.
2      Q.   Okay.  And then I actually
3   pulled out the Hemstock deposition and
4   showed it to you and showed you where the
5   general counsel from Johnson & Johnson was
6   sitting in a deposition.
7          Do you recall that?
8      A.   I recall you showing me that,
9   yes.
10     Q.   Okay.
11         MR. BERNARDO:  Same objections
12  as stated in that transcript.
13  BY MR. PLACITELLA:
14     Q.   And do you recall that I --
15  that I --
16         MR. BERNARDO:  Same objections
17  as stated in that transcript.
18  BY MR. PLACITELLA:
19     Q.   That I pointed to you on page
20  17 of the transcript, and showed you where
21  the scientist testified under oath that he
22  found asbestos in the Johnson mine?
23         Do you see that?
24     A.   I see that conversation --
25     Q.   Okay.
                    MAGNA LEGAL SERVICES

Page 346

1      A.   -- from last time, yes.
2      Q.   And I asked you:
3          "That information was never
4   relayed to you as the person who was either
5   testifying here today or who certified
6   interrogatory answers on behalf of Johnson
7   & Johnson, correct?"
8          And your answer to me was,
9   under oath:
10         "I have not seen this before,
11  no."
12         Correct?
13     A.   I had not seen what you showed
14  me, no.
15     Q.   Okay.  Can you go to, in your
16  book, in your reliance book, 8B, tab 55.
17         You see at tab 55 in your
18  reliance materials --
19     A.   I see --
20     Q.   -- is the deposition in the
21  Westfall case of Glen Hemstock?
22         MR. BERNARDO:  Object to the
23  form of the question.
24  BY MR. PLACITELLA:
25     Q.   Do you see that?
                    MAGNA LEGAL SERVICES

14  (Pages 343 to 346)



Page 347

1    A.   I see that.
2    Q.   Okay.  And do you see that
3  present at the deposition was the general
4  counsel for Johnson & Johnson?
5    A.   Where -- where am I seeing
6  that?
7    Q.   The third page, you flip it
8  over, and in your book it says, John M.
9  Beidler, Esquire, General Counsel, Johnson
10 & Johnson.
11     Do you see that?
12   A.   Yes.
13   Q.   Okay.  And then if you flip to
14 your tab 57, there's the continuation of
15 Dr. Hemstock's deposition in the Westfall
16 case, correct?
17   A.   That's what it says, yes.
18   Q.   Okay.  And if you turn to page
19 17 of the deposition in your book.  Got it?
20   A.   Yes.
21   Q.   The scientist is asked:
22     "Now, you testified that your
23 department has tested both processed talc
24 and raw talc ore from the Emtal mine for
25 the presence of chrysotile asbestos; is

MAGNA LEGAL SERVICES

Page 348

1  that correct?
2    "Answer:  Yes.
3    "Has your department in its
4  research found chrysotile asbestos in both
5  processed talc and raw ore from the Emtal
6  mine?
7    "Answer:  Yes."
8    Do you see that?
9    A.   I see it says that, yes.
10   Q.   Okay.  Now, in your deposition
11 at page 268, I asked you under oath if you
12 had any information related to the
13 affidavit signed by your scientist, William
14 Ashton.
15     Do you recall that?
16   A.   Yes.
17     MR. BERNARDO:  Object to the
18 form of the question, and a running
19 objection with respect to this affidavit
20 beyond the scope --
21     MR. PLACITELLA:  Okay.
22     MR. BERNARDO:  -- of the
23 notice.
24 BY MR. PLACITELLA:
25   Q.   Do you see that?

MAGNA LEGAL SERVICES

Page 349

1    MR. BERNARDO:  She can answer
2  in her individual capacity.
3    THE REPORTER:  I'm so sorry.
4  Can we go off the record?
5    THE VIDEOGRAPHER:  The time is
6  now 11:05 AM.  We are going off the record.
7    (Discussion held off the
8  record.)
9    THE VIDEOGRAPHER:  The time is
10 now 11:07 AM.  We are back on the record.
11 BY MR. PLACITELLA:
12   Q.   Okay.  So I'm going to go to --
13 I asked you questions, if you recall, about
14 what was attached to Dr. Ashton's
15 affidavit, and I asked you whether he
16 had -- attached to that affidavit was
17 testimony from the Westfall case.
18     Do you recall that?
19   A.   I recall discussing IT, yes.
20   Q.   Okay.  And do you recall your
21 telling me you had no idea what was
22 attached to the Ashton affidavit?
23   A.   I had not seen it before.
24   Q.   Right.  And what you testified
25 to under oath was that you had -- you had

MAGNA LEGAL SERVICES

Page 350

1  never seen and had -- did not have the
2  Ashton affidavit available to you, correct?
3    MR. BERNARDO:  Object to the
4  form of the question.
5    THE WITNESS:  I believe I told
6  you in the beginning when we talked about
7  Westfall that because it was dealing with
8  industrial talc, I did not feel it was
9  within -- within the scope of the notice
10 that you had sent.
11 BY MR. PLACITELLA:
12   Q.   Ma'am, you testified under oath
13 that you had never seen the Ashton
14 affidavit and you didn't know anything
15 about it, correct?
16     MR. BERNARDO:  Object to the
17 form of the question.
18     THE WITNESS:  Yes, that's
19 correct.
20 BY MR. PLACITELLA:
21   Q.   Okay.  So can we go to your
22 reliance materials on 8B, No. 53.
23     MR. BERNARDO:  Object to the
24 form of the question.
25 BY MR. PLACITELLA:

MAGNA LEGAL SERVICES

15  (Pages 347 to 350)



1      Q.   And actually, in your reliance
2   materials under tab 53 is the Ashton
3   affidavit, correct?
4           MR. BERNARDO:  Object to the
5   form of the question.
6           THE WITNESS:  That's what it
7   says here.
8   BY MR. PLACITELLA:
9      Q.   Okay.  And what Dr. Ashton says
10  in his affidavit is:
11          "From the 1940s through the
12  1980s, talc mined in Vermont, and
13  specifically the talc mined by Engelhard
14  and its predecessors from the talc mine
15  located in Johnson, Vermont, (the Johnson
16  mine), has been considered to be talc-free
17  from contamination by asbestos."
18          Correct?
19     A.   That's what it says.
20     Q.   Okay.  And in paragraph 8 of
21  your executive's affidavit, Mr. Ashton, he
22  talks about attaching the testimony of
23  Dr. Chidester.
24          Do you see that?
25     A.   I see it says that.
            MAGNA LEGAL SERVICES

1      Q.   It says:
2           "Dr. Chidester stated that he
3   never found veins of chrysotile asbestos in
4   talc located in Vermont."
5           Do you see that?
6      A.   I see that sentence, yes.
7      Q.   Okay.  And then what one of the
8   documents that you, Johnson & Johnson,
9   attached to this affidavit was the
10  deposition of Dr. Chidester from the
11  Westfall case, correct?
12          MR. BERNARDO:  Object to the
13  form of the question.  Also object to the
14  use of this document, beyond the scope of
15  the notice.
16          THE WITNESS:  I guess that's
17  attached.  I -- I don't know.
18  BY MR. PLACITELLA:
19     Q.   And that's the same case -- the
20  same docket number as the Hemstock
21  deposition that you have also attached to
22  your reliance materials as tab 57, right?
23          MR. BERNARDO:  Object to the
24  form of the question.
25          THE WITNESS:  I don't know.
            MAGNA LEGAL SERVICES

1   BY MR. PLACITELLA:
2      Q.   Well, let's take a look.  I
3   flipped it for you.  You see Westfall,
4   Docket No. 0269?
5      A.   Yes, I see it says that.
6      Q.   Right.  You see the Chidester
7   deposition, Docket No. 0269 in your
8   reliance materials?
9      A.   Uh-huh, yes.
10     Q.   Okay.  Now, when you attached
11  that affidavit -- when you attached that
12  transcript to the -- to the -- to your
13  affidavit, I mean, you, Johnson & Johnson,
14  you knew that Dr. Chidester had told you
15  privately that he actually found asbestos
16  in Vermont mines, correct?
17          MR. BERNARDO:  Object to the
18  form of the question, beyond the scope of
19  the notice.
20          You can answer in your
21  individual capacity if you can.
22          THE WITNESS:  I know nothing
23  about that, no.
24  BY MR. PLACITELLA:
25     Q.   Okay.  Well --
            MAGNA LEGAL SERVICES

1           MR. PLACITELLA:  Can you give
2   me P-7?
3   BY MR. PLACITELLA:
4      Q.   Can you go to your binder P-7,
5   please?
6           P-7, by the way, was this one
7   of the reliance documents that you sent to
8   Dr. Hopkins?
9           MR. BERNARDO:  Objection to the
10  form of the question.
11          THE WITNESS:  No.  8A and 8B
12  were sent to Dr. Hopkins.
13  BY MR. PLACITELLA:
14     Q.   Okay.  So can we go to tab 25?
15     A.   In P-7?
16     Q.   Yes, in P-7.  You see tab 25 in
17  P-7 are actually your answers to
18  interrogatories in the Westfall case?
19          Do you see that?
20     A.   Yes, they seem to be.
21     Q.   Okay.  And if you go to page
22  5 -- there's a thing that says, "As to AH
23  Chidester."
24          Do you see that?
25     A.   Yes.
            MAGNA LEGAL SERVICES

16  (Pages 351 to 354)



Page 355

```
 1        Q.   And it says, under Q5:
 2        "Have you ever found asbestos
 3   present in any testing of minerals taken
 4   from Vermont?"
 5        Do you see that?
 6        A.   I see that question, yes.
 7        Q.   And he -- and the response from
 8   Dr. Chidester is:
 9        "Yes.  Asbestos is not found
10   in -- is not found in a mineral, asbestos
11   was tested by chemical analysis, x-ray and
12   differential thermo analysis.  The asbestos
13   found was chrysotile."
14        Correct?
15        MR. BERNARDO:  Object to the
16   form of the question, beyond the scope of
17   the notice.
18        She can answer in her
19   individual capacity if she can.
20        THE WITNESS:  I see all that
21   written here.
22   BY MR. PLACITELLA:
23        Q.   That statement is directly
24   contrary to the sworn affidavit of Johnson
25   & Johnson in the Ashton affidavit saying
```
MAGNA LEGAL SERVICES

Page 356

```
 1   asbestos was never found in Vermont,
 2   correct?
 3        MR. BERNARDO:  Object to the
 4   form of the question.
 5        THE WITNESS:  I can't answer
 6   because it's taken out of content (sic).  I
 7   don't know what came before or after.
 8   BY MR. PLACITELLA:
 9        Q.   Okay.  Well, what content (sic)
10   do you need?  These are your answers.
11        MR. BERNARDO:  Object to the
12   form of the question.
13        THE WITNESS:  The complete
14   studies and what he's referring to and --
15   BY MR. PLACITELLA:
16        Q.   Well, where are they?
17        A.   Well, what was done, when I
18   talked to Dr. Hopkins, I wanted to make
19   sure that he was familiar with any
20   allegations and evidence that had been
21   brought forth, and so we had conversations
22   about all this and really renewed my
23   understanding that there is no asbestos in
24   the cosmetic talc used in Johnson's Baby
25   Powder.
```
MAGNA LEGAL SERVICES

Page 357

```
 1        Q.   Okay.  Ma'am, your -- I move to
 2   strike your answer as non-responsive.
 3        Let me move further to Section
 4   C, page 9.
 5        Do you see that?  In your
 6   answers to interrogatories.  Do you see
 7   that?
 8        A.   I see Section C, yes.
 9        Q.   And you see this goes -- and
10   it -- these are questions as it relates to
11   Dr. Frederick Pooley.
12        Do you see that?
13        A.   I see that name, yes.
14        Q.   He's your expert, right?
15        MR. BERNARDO:  Object to the
16   form of the question.
17        THE WITNESS:  I don't know who
18   he is.
19   BY MR. PLACITELLA:
20        Q.   He -- well, you signed lots of
21   interrogatories with his name in it, didn't
22   you?
23        MR. BERNARDO:  Object to the
24   form of the question.
25        THE WITNESS:  I did not sign
```
MAGNA LEGAL SERVICES

Page 358

```
 1   interrogatories with his name.
 2   BY MR. PLACITELLA:
 3        Q.   You're sure?
 4        A.   I don't remember doing that.
 5        Q.   Okay.  You don't know that he
 6   served as a consulting expert to Johnson &
 7   Johnson in talc cases from the 1980s well
 8   into the 2000s?  You didn't know that?
 9        MR. BERNARDO:  Object to the
10   form of the question.
11        THE WITNESS:  I don't remember
12   his name specifically, no.
13   BY MR. PLACITELLA:
14        Q.   Did you know that he testified
15   as little as a year ago on behalf of
16   Johnson & Johnson under oath in -- in
17   New York?
18        A.   He may have.  I don't know
19   that.
20        Q.   Okay.  Did you -- you see here
21   where it talks about what he did?  It asks
22   if he ever actually looked at the tissue of
23   Mr. Westfall as the expert for Johnson &
24   Johnson?
25        MR. BERNARDO:  Object to the
```
MAGNA LEGAL SERVICES

17 (Pages 355 to 358)



Page 359

1  form of the question.
2  BY MR. PLACITELLA:
3      Q.   See here it says:
4          "How many tissue samples were
5  you" -- "were obtained from the autopsy
6  specimen for testing?"
7          Do you see that?
8      A.  I see that question, yes.
9      Q.  And it says:
10         "The tissue specimen from the
11 left lung included a mixture of lung tissue
12 and also tumor material."
13         Do you see that?
14     A.  I see the sentence, yes.
15     Q.  Okay.  And in question 5, they
16 asked you to detail the procedures that
17 were used in looking at the tissue and what
18 was found.
19         Do you see that?
20     A.  I'm reading it now.
21     Q.   And it talks about that they
22 took a sample and they used x-rays and
23 cameras and took all kinds of pictures, and
24 they also used a transmission electron
25 microscope.
              MAGNA LEGAL SERVICES

Page 360

1          Do you see that?
2          MR. BERNARDO:  Object to the
3  form of the question, beyond the scope of
4  the notice.
5          The witness can answer in her
6  individual capacity if she can.
7          THE WITNESS:  I see that that's
8  what they're talking about, yes.
9  BY MR. PLACITELLA:
10     Q.   Okay.  And on the next page,
11 they talk about:
12         "The definition of fibrous
13 particles adopted for the first stage
14 examination was that of a particle with a
15 3-to-1 axial ratio."
16         Do you see that?
17         MR. BERNARDO:  Object to the
18 form.
19         THE WITNESS:  I see it says
20 that, yes.
21 BY MR. PLACITELLA:
22     Q.   It says:
23         "In total, over 200 fibrous
24 particles were detected, analyzed and
25 sized, and the results are shown in Table 1
              MAGNA LEGAL SERVICES

Page 361

1  attached to these answers."
2          Do you see that?
3      A.  I see it says that, yes.
4      Q.   And it says:
5          "It can be seen in Table 1 that
6  the asbestos minerals were chrysotile,
7  amosite, tremolite and crocidolite."
8          Do you see that?
9      A.  I see that, yes.
10     Q.   And it says:
11         "They were detected in dust" --
12 "dust extracts with chrysotile being the
13 most commonly observed fiber, followed by
14 amosite, while fibers of tremolite and
15 crocidolite were scarce."
16         Do you see that?
17         MR. BERNARDO:  Object to the
18 form of the question, beyond the scope of
19 the notice.
20         The witness can answer in her
21 individual capacity if she can.
22         THE WITNESS:  I see these
23 sentences, yes.
24 BY MR. PLACITELLA:
25     Q.   Okay.  And if you flip to A-12,
              MAGNA LEGAL SERVICES

Page 362

1  they asked Dr. Pooley if he ever took any
2  photographs of what he saw.
3          Do you see that?
4          MR. BERNARDO:  Same objection.
5          THE WITNESS:  Yes.
6  BY MR. PLACITELLA:
7      Q.   And it says -- he asks the
8  photographs -- the lawyers have the
9  photographs, right?
10     A.   It says they're in the custody
11 of counsel, yes.
12     Q.   Okay.  So where are those
13 photographs today?
14         MR. BERNARDO:  Object to the
15 form of the question.
16         THE WITNESS:  I guess they're
17 in the custody of counsel.
18 BY MR. PLACITELLA:
19     Q.   Okay.  And if we flip to the
20 end, you can see Table 1.  You see where it
21 says:
22         "Number of fibers per gram
23 times ten to the sixth in dried tissue."
24         Do you see that?
25         MR. BERNARDO:  Same objections.
              MAGNA LEGAL SERVICES



Page 363

1          THE WITNESS:  I see it says
2  that, yes.
3  BY MR. PLACITELLA:
4       Q.   Right.  So in a gram of
5  Mr. Westfall's tissue, your expert found 29
6  million chrysotile fibers, right?
7       A.   I can't comment on this.  I
8  don't understand any of this.  This is not
9  within my expertise.
10      Q.   He also found 9,400,000 talc
11  fibers, correct, in the lung of
12  Mr. Westfall?
13          MR. BERNARDO:  Same objections.
14          THE WITNESS:  Again, I can't
15  interpret what this table is.
16  BY MR. PLACITELLA:
17      Q.   And he also found tremolite in
18  the lung of Mr. Westfall, correct?
19      A.   No, I cannot comment on what
20  any of this is.
21      Q.   Okay.  Now, in --
22          MR. PLACITELLA:  Give me back
23  8A and 8B.
24  BY MR. PLACITELLA:
25      Q.   When you, Johnson & Johnson,

MAGNA LEGAL SERVICES

Page 364

1  signed the affidavit -- when William Ashton
2  signed the affidavit on behalf of Johnson &
3  Johnson, he never mentioned the fact that
4  he was aware, as was your general counsel,
5  that the scientists in the Westfall case
6  found chrysotile asbestos in the Johnson
7  mine, correct?  It was never mentioned.
8          MR. BERNARDO:  Object to the
9  form of the question, beyond the scope of
10  the notice.
11          The witness can answer in her
12  individual capacity if she knows.
13          THE WITNESS:  I can't comment
14  on that.
15  BY MR. PLACITELLA:
16      Q.   Okay.  Now, that would be a
17  non-truth.  Do you agree?
18          MR. BERNARDO:  Object to the
19  form of the question.  Same objection.
20  BY MR. PLACITELLA:
21      Q.   Well, let me ask you the
22  question this way:  Do you think that was
23  an okay thing to do, you, Johnson &
24  Johnson, to do that, to have -- to sign an
25  affidavit saying there was no proof, there

MAGNA LEGAL SERVICES

Page 365

1  was no evidence, when you had the person
2  signing the affidavit with contrary
3  information?
4          MR. BERNARDO:  Object to the
5  form of the question, beyond the scope.
6  BY MR. PLACITELLA:
7       Q.   Was that okay?
8       A.   I can't answer that question.
9       Q.   Well, why not?  You're Johnson
10  & Johnson.  You're here to talk about what
11  you did right and what you did wrong.
12          MR. BERNARDO:  Object to the
13  form.
14  BY MR. PLACITELLA:
15      Q.   Are you saying that it was okay
16  or not okay --
17          MR. BERNARDO:  Object to the
18  form of the question.
19  BY MR. PLACITELLA:
20      Q.   -- to have your executive sign
21  this affidavit saying there was no proof
22  when, in fact, you know there was proof?
23          MR. BERNARDO:  Object to the
24  form of the question.
25          THE WITNESS:  I don't know that

MAGNA LEGAL SERVICES

Page 366

1  there indeed is proof, and I can't answer
2  that.
3  BY MR. PLACITELLA:
4       Q.   Well, do I have to show you
5  anything other than the transcripts that
6  you didn't attach to your affidavit or the
7  interrogatory answers that your company
8  filled out to tell you -- show what the
9  truth was?
10          MR. BERNARDO:  Object to the
11  form of the question.
12          THE WITNESS:  The proof is a
13  scientific proof, and I have had
14  conversations with the scientists who have
15  reviewed that, and I'm -- I'm comfortable
16  with what we have always believed.
17  BY MR. PLACITELLA:
18      Q.   So you talked to scientists who
19  reviewed the transcripts here and your own
20  interrogatory answers and they told you
21  everything you did was fine, is that what
22  you're saying?
23          MR. BERNARDO:  Object to the
24  form of the question, beyond the scope of
25  the notice.

MAGNA LEGAL SERVICES

19  (Pages 363 to 366)



Page 367

1  THE WITNESS: That's not what
2  I'm saying, no.
3  BY MR. PLACITELLA:
4  Q.  Okay.  Now, you, you know, right,
5  you, Johnson & Johnson, know that you used
6  this affidavit to extricate yourself and
7  have thousands of cases dismissed that you
8  were involved in?
9  MR. BERNARDO:  Object to --
10  BY MR. PLACITELLA:
11  Q.  That was the point, you knew
12  that, correct?
13  MR. BERNARDO:  Object to the
14  form of the question.
15  Mr. Placitella, you asked her
16  this line of questioning at the last
17  deposition and I objected to it, you asked
18  her this question about an hour ago and she
19  said she doesn't know, and you asked it
20  again.
21  I think this is becoming
22  argumentative and harassing and I do
23  question whether at a break we ought to ask
24  Judge Viscomi to discuss this because I
25  don't think this is appropriate in light of
MAGNA LEGAL SERVICES

Page 368

1  the testimony that's been given.
2  MR. PLACITELLA: Okay.  Please,
3  don't do that.  If you want to make a
4  speaking objection, dismiss the witness
5  from the stand.  Okay?  Let's not do that.
6  BY MR. PLACITELLA:
7  Q.  Now, you know, you, Johnson &
8  Johnson know -- let me just -- can you go
9  to your 8 -- your tab -- your folder 8B
10  again?  And can you go to tab 58?
11  First of all, before we do
12  that, I apologize.  Can you go to tab 54?
13  Tab 54 in your reliance materials is a
14  privilege log of Johnson & Johnson.
15  Do you see that?
16  MR. BERNARDO:  Object to the
17  form of the question.
18  THE WITNESS:  I see it says
19  that, yes.
20  BY MR. PLACITELLA:
21  Q.  Okay.  And do you see all of
22  these entries related to Ashton?
23  A.  I see what you're highlighting,
24  yes.
25  Q.  And you see that they pre- ---
MAGNA LEGAL SERVICES

Page 369

1  MR. PLACITELLA:  Let's do that
2  after the break.
3  BY MR. PLACITELLA:
4  Q.  And now, if you go to your tab
5  58, please, in your binder?  You see this
6  is a letter from May 17th, 1989?
7  This is in your binder,
8  correct?
9  MR. BERNARDO:  Object to the
10  form of the question.
11  THE WITNESS:  Yes, it's in the
12  binder.
13  BY MR. PLACITELLA:
14  Q.  Okay.  And can you see here
15  that what's sent to these lawyers is the
16  affidavit of -- your affidavit, your
17  Johnson & Johnson affidavit, and what's
18  represented is:
19  "The unequivocal conclusion as
20  set forth in Ashton affidavit is that the
21  talc from the Johnson Vermont mine did not
22  contain asbestos."
23  Do you see that?
24  MR. BERNARDO:  Object to the
25  form of the question, beyond the scope of
MAGNA LEGAL SERVICES

Page 370

1  the notice.
2  The witness can answer in her
3  individual capacity if she can.
4  THE WITNESS:  I see those
5  words, yes.
6  BY MR. PLACITELLA:
7  Q.  And then what is urged here is
8  that:
9  "After you review this
10  affidavit, will you voluntarily agree to
11  voluntarily dismiss your case?"
12  Do you see that?
13  A.  I see it says that, yes.
14  Q.  Now, can you go to P-9 again?
15  Folder P-9.
16  MR. BERNARDO:  Chris, when
17  you're at a breaking point.
18  MR. PLACITELLA:  I'm almost
19  done.
20  MR. BERNARDO:  We've been going
21  for over an hour.
22  MR. PLACITELLA:  I'm almost
23  done.
24  MR. BERNARDO:  That's fine.
25  BY MR. PLACITELLA:
MAGNA LEGAL SERVICES



Page 371

```
 1        Q.   P-9 is an -- the first page is
 2   an August 4th, 1992 letter.
 3        Do you see that?
 4        A.   I'm sorry?
 5        Q.   In your folder -- in your book,
 6   P-9?
 7        A.   In P-9.
 8        Q.   Right?
 9        A.   Where in P-9 is it?
10        Q.   The very first -- the flip-side
11   of the very first page.
12        A.   Oh, okay.  Yes, I see that.
13        Q.   It says:
14        "We recently learned that your
15   firm voluntarily dismissed Windsor
16   Mineral," that's you, right, Johnson &
17   Johnson, Windsor Mineral, right?
18        MR. BERNARDO:  Object to the
19   form of the question, beyond the scope of
20   the notice.
21        The witness can answer in her
22   individual capacity if she can.
23   BY MR. PLACITELLA:
24        Q.   That's you, right?  Windsor
25   Minerals is you?
             MAGNA LEGAL SERVICES
```

Page 372

```
 1        A.   Yes.
 2        Q.   Okay.
 3        "From the Akron cases some time
 4   ago after reviewing an affidavit supplied
 5   by Windsor."
 6        Do you see that?
 7        A.   It says that, yes.
 8        Q.   Okay.  It says:
 9        "No evidence of the presence of
10   asbestos in Windsor Minerals' product has
11   ever been revealed by this testing."
12        That's right out of Miller's
13   affidavit, correct?
14        MR. BERNARDO:  Object to the
15   form of the question.  Same objections with
16   respect to scope.
17   BY MR. PLACITELLA:
18        Q.   Right out of your president's
19   affidavit?
20        A.   I can't comment on that.
21        Q.   Okay.  And can you see that the
22   affidavit is right on the very next page,
23   ma'am?  It's the Faye Miller affidavit that
24   we went through that was in your other
25   reliance materials, and the quote is
             MAGNA LEGAL SERVICES
```

Page 373

```
 1   directly from paragraph 4 of your company's
 2   affidavit:
 3        "No evidence of the presence of
 4   asbestos in Windsor Minerals' products has
 5   ever been revealed by this testing."
 6        And that's what's quoted in
 7   this letter asking these lawyers to dismiss
 8   their cases; is that right?
 9        MR. BERNARDO:  Same objection.
10        THE WITNESS:  They -- they
11   attached that, yes.
12   BY MR. PLACITELLA:
13        Q.   And do you recall last time we
14   actually went through and I showed you the
15   dismissal notices filed in the Miller case
16   that were -- do you remember us doing that?
17        A.   Yes.
18        Q.   Okay.
19        MR. PLACITELLA:  This is a good
20   time to break.
21        THE VIDEOGRAPHER:  The time is
22   now 11:32 AM.  We are going off the record.
23        (Recess.)
24        THE VIDEOGRAPHER:  The time is
25   now 11:46 AM.  We are back on the record.
             MAGNA LEGAL SERVICES
```

Page 374

```
 1   BY MR. PLACITELLA:
 2        Q.   Okay.  I just have a few more
 3   questions on this then I'm going to move
 4   on.
 5        MR. PLACITELLA:  Can you give
 6   me the Elmo?
 7   BY MR. PLACITELLA:
 8        Q.   Going back to your affidavit,
 9   when I say you, I mean Johnson & Johnson,
10   that affidavit was signed by your
11   Mr. Ashton on May 8th, 1989, correct?
12        A.   That appears to be the name and
13   the date, yes.
14        Q.   Okay.  And if you go to the
15   next tab in your reliance materials --
16        A.   Would you tell me what tab it
17   is again, please?
18        Q.   Yes, ma'am, 54.
19        MR. BERNARDO:  Object to the
20   form of the question.
21   BY MR. PLACITELLA:
22        Q.   8B-54.  That's the log -- your
23   log.  It has an Exhibit No. 69.
24        Do you know what that exhibit
25   number is from, by the way?
             MAGNA LEGAL SERVICES
```

21 (Pages 371 to 374)



Page 375

1      A.   I have no idea, and I don't
2  even know what a privilege log is.
3      Q.   Okay.  Well, you see in your
4  privilege log on the same date, May 8,
5  1989.
6          Do you see that?
7      A.   I see what you're pointing to.
8      Q.   Okay.  And you see where it's
9  from an Ira Dembrow?
10         Do you see that?
11     A.   I see that name, yes.
12     Q.   To William Ashton.
13         Do you see that?
14     A.   I see the name, yes.
15     Q.   To John O'Shaughnessy?
16         Do you see that?
17     A.   Yes.
18     Q.   He's the one of the lawyers who
19  worked with you in defending the talc
20  cases, right?
21     A.   Yes, he's one of the lawyers I
22  worked with.
23     Q.   Bruce Sempel, he was your
24  medical director?
25     A.   That's correct.
              MAGNA LEGAL SERVICES

Page 376

1      Q.   Howard Sloan, who is he?
2      A.   I don't know.
3      Q.   Okay.  And then again on the
4  same date is another memo between
5  Mr. Dembrow, Mr. Ashton, your lawyer and
6  your medical director, correct?
7      A.   I see those names listed, yes.
8      Q.   Okay.  And then there are a
9  number of other entries leading up to
10  May 8th.
11         Do you see that?
12     A.   I see lots of different dates,
13  yes.
14     Q.   Okay.  And then keeping in mind
15  those names, Dembrow, Sloan.  Do you see
16  that?
17         If you go to your tab --
18         MR. PLACITELLA:  What's the tab
19  number?  Hold on.
20  BY MR. PLACITELLA:
21     Q.   If you go to your tab No. 58,
22  this is a letter that attaches the
23  affidavit.
24         Do you recall that?  We just
25  went through that?
              MAGNA LEGAL SERVICES

Page 377

1      A.   We just talked about this, yes.
2      Q.   All right.
3          MR. BERNARDO:  Same objections
4  as previously noted.
5  BY MR. PLACITELLA:
6      Q.   And you see that Mr. Dembrow
7  and Mr. Sloan, the people on your privilege
8  log, are on this letter?
9      A.   I saw the name Sloan before.  I
10  don't know about who the other people are.
11     Q.   Dembrow?  Do you remember I
12  showed you he --
13     A.   Yeah.
14     Q.   He corresponded with Mr. Ashton
15  the day it was signed?
16     A.   I see those names, yes.
17     Q.   And he was one of the people
18  who was corresponding with Mr. Ashton along
19  with Mr. O'Shaughnessy and your medical
20  director.
21         Do you recall that?
22     A.   I saw those names on that log,
23  but again, I don't know what any of that
24  means.
25     Q.   Okay.
              MAGNA LEGAL SERVICES

Page 378

1          MR. PLACITELLA:  So give me my
2  notes back.
3  BY MR. PLACITELLA:
4      Q.   Okay.  New subject.
5          Last time we spoke about -- or
6  you mentioned the Selby case.
7          Do you recall that?
8          Well, before that.  Do you
9  recall last time we went through various
10  discovery responses that spanned from,
11  like, 1971 to 1992?
12         Do you recall that?
13     A.   I recall I was talking about
14  different complaints, yes.
15         MR. BERNARDO:  Can we go off
16  the record for a moment?
17         MR. PLACITELLA:  Yeah.
18         THE VIDEOGRAPHER:  The time
19  is --
20         MR. BERNARDO:  I just want to
21  make sure you understand your outline is
22  being --
23         MR. PLACITELLA:  That's okay.
24  Thank you.  Nothing to be hidden here.
25         MR. BERNARDO:  I just wanted
              MAGNA LEGAL SERVICES



Page 379

1   you to know.
2        MR. PLACITELLA:  Okay.  But
3   thank you.
4        MR. BERNARDO:  And me.
5        MR. PLACITELLA:  That's fine.
6   Thank you, though.
7   BY MR. PLACITELLA:
8        Q.   And we ended up in 1992.
9        Do you recall that?
10       A.   I don't remember the specific
11  dates, no.
12       Q.   All right.  The Faye Miller
13  case was 1992.  Do you remember we went
14  through them, the Faye Miller case?
15       A.   I remember we now discussed
16  that, yes.
17       Q.   Okay.  And then the next case I
18  wanted to talk to you about was from 1993
19  and that was the Selby case.
20       Do you recall that?
21       A.   Yes.
22       Q.   And that's one of the responses
23  that you reviewed, correct?
24       A.   Yes.
25       Q.   Okay.  And --
            MAGNA LEGAL SERVICES

Page 380

1        MR. PLACITELLA:  Can you give
2   the witness 337?  I'm going to the Elmo.
3        THE WITNESS:  Thank you.
4   BY MR. PLACITELLA:
5        Q.   337 -- 337 are Johnson &
6   Johnson's answers to interrogatories in the
7   Selby case.
8        Do you see that?
9        A.   Yes.
10       Q.   You've seen these before,
11  correct?
12       A.   Yes.
13       Q.   Okay.  And if you go to the
14  final page, which is interrogatory answer
15  No. 36.  It says:
16       "Do you have any knowledge of
17  any tests and/or studies conducted
18  concerning the health effects of asbestos
19  on humans."
20       And your response is:
21       "There has been no asbestos in
22  the product during the time plaintiff
23  claims to have used it.  Accordingly, the
24  information sought by this interrogatory is
25  neither relevant to the subject matter of
            MAGNA LEGAL SERVICES

Page 381

1   this action as to JJCPI nor is it
2   reasonably calculated to lead to
3   discoverable evidence."
4        Do you see that?
5        A.   I see that it says that, yes.
6        Q.   Okay.  And it says:
7        If plaintiff has evidence that
8   the product has contained asbestos at any
9   time that you, Johnson & Johnson, will
10  reconsider whether you're going to turn
11  over the information, right?
12       MR. BERNARDO:  Object to the
13  form of the question.
14       THE WITNESS:  That's not what
15  it says.
16  BY MR. PLACITELLA:
17       Q.   It says, "Will reconsider this
18  response."
19       A.   Yes.
20       Q.   That's what it says, right?
21       A.   Yes.
22       Q.   And who was Thomas Pulliam?
23       A.   I do not know.
24       Q.   Okay.
25       MR. PLACITELLA:  Can you give
            MAGNA LEGAL SERVICES

Page 382

1   Ms. Musco J&J-326?  Give a copy to Counsel.
2        MR. BERNARDO:  Thank you.
3   BY MR. PLACITELLA:
4        Q.   J&J-326 is a June 27th, 1995
5   memo entitled, "CTFA Response to Cancer
6   Prevention Coalition Citizen's Petition."
7        Did you see that?
8        A.   Yes.
9        Q.   And on here you're copied?
10       A.   Yes.
11       Q.   Right?  Mr. O'Shaughnessy
12  copied?
13       A.   Yes.
14       Q.   Right?  Mr. -- Dr. Hopkins is
15  copied, correct?
16       A.   Yes.
17       Q.   Do you recall this?
18       A.   A long time ago.
19       Q.   Okay.  Down at the bottom, also
20  is copied Mr. Ashton, Mr. Chudkowski and A.
21  Winner.
22       Do you see that?
23       A.   Yes.
24       Q.   Okay.  And who is A. Winner, do
25  you know?
            MAGNA LEGAL SERVICES

23  (Pages 379 to 382)



Page 383

```
 1         A.   I don't remember exactly.  I
 2    remember the name, but I don't remember --
 3         Q.   Okay.  These are pretty much
 4    the same people who were working on the
 5    litigation for talc around the same time,
 6    right?
 7         A.   These are people who were
 8    involved, yes.
 9         Q.   Okay.  And in this particular
10    response, which went to the FDA, correct?
11         A.   Yes.
12         Q.   Okay.  In this particular
13    response you asserted that, again to the
14    FDA, that there's no evidence of asbestos
15    in your talc, correct?
16         MR. BERNARDO:  Object to the
17    form of the question.  The question is on
18    an FDA submissions by the witness who was
19    not put up for that topic.
20         She can answer in her
21    individual capacity if she can.
22         THE WITNESS:  That's what it
23    says, yes.
24    BY MR. PLACITELLA:
25         Q.   Okay.  Now, these were all the
```

MAGNA LEGAL SERVICES

Page 384

```
 1    same people that were involved, other than
 2    yourself, in actually defending the Coker
 3    case, correct?
 4         A.   I don't remember who was
 5    involved specifically in the Coker case.
 6         Q.   Okay.  Now, am I correct
 7    that -- do you know anything about the
 8    Coker case?
 9         A.   I know that there was a
10    complaint.  I don't remember which one it
11    was.
12         Q.   Okay.  Last time when we were
13    together --
14         MR. PLACITELLA:  Give me a
15    second.
16    BY MR. PLACITELLA:
17         Q.   I asked you about the Coker
18    case.  I said:
19         "What about the Coker case?"
20         You said it's one of the ones
21    listed on your notice.
22         I said:
23         "And what do you know about the
24    Coker case:
25         And your response was:
```

MAGNA LEGAL SERVICES

Page 385

```
 1         "The Coker case was (sic)
 2    alleged injury was peritoneal mesothelioma
 3    and it was filed in 1997."
 4         Do you recall that?
 5         A.   I see that, yes.
 6         Q.   Does that refresh your memory?
 7         A.   Uh-huh.
 8         Q.   And it says:
 9         "What else do you know about
10    it?"
11         And you said:
12         "That is all I know about it.
13         "What do you know about the
14    discovery responses provided in the Coker
15    case?"
16         And your response was:
17         "I do not know if there were
18    discovery responses."
19         Do you recall that?
20         A.   Yes.
21         Q.   Okay.  Now, can you look at
22    your P-9, please?  And if you flip about
23    halfway through P-9, there is an exhibit
24    entitled J&J-318.  See if you can find
25    that.  I put it up here to help you.
```

MAGNA LEGAL SERVICES

Page 386

```
 1         A.   Can you give me an idea of
 2    where it is?
 3         MR. PLACITELLA:  Do you want to
 4    find it for her, Jared?
 5    BY MR. PLACITELLA:
 6         Q.   So in your binder, P-9, is, in
 7    fact, a copy of court and discovery
 8    materials from the Coker file, correct?
 9         MR. BERNARDO:  Object to the
10    form of the question.
11         THE WITNESS:  It looks like a
12    lot of court material.
13    BY MR. PLACITELLA:
14         Q.   Right.  So you did have
15    material in the Coker case?
16         A.   I'm not seeing any discovery.
17         MR. BERNARDO:  Object to the
18    form of the question.
19    BY MR. PLACITELLA:
20         Q.   Okay.  Well, we're going to get
21    there.
22         You see there is something in
23    the file called Deposition Upon Written
24    Questions in the Coker case?  And I put it
25    up here on the screen.
```

MAGNA LEGAL SERVICES

24  (Pages 383 to 386)





1    MR. BERNARDO:  Object to the
2  form of the question.  That's not the
3  document that's on the screen.
4    MR. PLACITELLA:  I'm putting it
5  up.  Let me see if I can help her out.
6  Wait, hold on.
7    Why don't we do it this way and
8  we'll come back to try to save some time.
9  BY MR. PLACITELLA:
10    Q.  You see that the material here,
11  there's a lot of material here related to
12  the Coker case, correct?
13    A.  Yeah, I'm seeing a lot of
14  medical records or requests for them.
15    Q.  Right.  And I'm going to come
16  back to that in a minute, but can you go to
17  your book 8B and go to tab 76, please?
18    In your book at tab 76 is a
19  letter from Alice Blount, April 23rd, 1998,
20  to your lawyers.
21    Do you see that?
22    MR. BERNARDO:  Object to the
23  form of the question, beyond the scope.
24    The witness can answer in her
25  individual capacity with respect to this
      MAGNA LEGAL SERVICES

1  document.
2    THE WITNESS:  I see that it's a
3  letter signed by an Alice Blount.
4  BY MR. PLACITELLA:
5    Q.  You've seen this letter before,
6  right?
7    A.  Yes.
8    Q.  Okay.
9    A.  At the last deposition.
10    Q.  Right.  And in this letter
11  that -- Alice Blount told you that she had
12  analyzed Johnson & Johnson's Vermont talc,
13  right?  That's what she told you, right?
14    A.  That's what it seems to say,
15  yes.
16    Q.  And it says:
17    "As I told you, I believe that
18  Johnson & Johnson's Vermont talc contains
19  trace amounts of asbestos which are well
20  below those specified by OSHA."
21    Do you see that?
22    A.  I see that sentence, yes.
23    Q.  Okay.  And so that was part of
24  the Coker file that was available to you as
25  part of your review in this case, correct?
      MAGNA LEGAL SERVICES

1    MR. BERNARDO:  Object to the
2  form of the question.
3    THE WITNESS:  This letter was
4  part of the files that I sent to
5  Dr. Hopkins after our first deposition.
6  BY MR. PLACITELLA:
7    Q.  Yes, ma'am.  And so this letter
8  was one of the letters that was available
9  to you in preparing for today's deposition,
10  correct?
11    A.  It was in the binder, yes.
12    Q.  Right.  And this is about
13  what -- in essence what your expert was
14  telling you in the Coker case about what
15  she found in the baby powder, right?
16    MR. BERNARDO:  Object to the
17  form of the question.
18    THE WITNESS:  I see that it's a
19  letter from her.  I don't know anything
20  else other than that.
21  BY MR. PLACITELLA:
22    Q.  Well, you have -- this is
23  not about Nancy Musco, whether she knows.
24  This came from Johnson & Johnson's files.
25  Johnson & Johnson was certainly aware that
      MAGNA LEGAL SERVICES

1  Dr. Alice Blount right here from Rutgers
2  University told them in the context of the
3  Coker case she found asbestos in Johnson's
4  Baby Powder.  Johnson & Johnson was
5  certainly aware of that, correct?
6    MR. BERNARDO:  Object to the
7  form of the question, beyond the scope of
8  the notice.
9    THE WITNESS:  I see that what
10  she has said in the letter here.
11  BY MR. PLACITELLA:
12    Q.  Okay.  And --
13    MR. PLACITELLA:  Where is my
14  book.  Can you give me 216?
15    MR. BERNARDO:  I'll also put an
16  objection on the record with respect to the
17  use of this document beyond the scope of
18  the notice.
19  BY MR. PLACITELLA:
20    Q.  In preparing your -- being
21  prepared for today's deposition to testify
22  about information that was available to
23  Johnson & Johnson when responding to
24  discovery, did you review this file from
25  the Johnson -- from Johnson & Johnson's
      MAGNA LEGAL SERVICES



Page 391

```
 1    records dated (sic) J&J-216?
 2           Did you review this?
 3           MR. BERNARDO:  Object to the
 4    form of the question.
 5           THE WITNESS:  I have not seen
 6    this, no.
 7    BY MR. PLACITELLA:
 8       Q.   Okay.  So in preparing you for
 9    today's deposition concerning what
10    information was available to Johnson &
11    Johnson when preparing responses to
12    discovery, this document was not provided
13    to you, correct?
14           MR. BERNARDO:  Object to the
15    form of the question.
16           THE WITNESS:  I had not seen
17    this before, but my understanding was that
18    I was here to talk about the answers to the
19    interrogatories.
20    BY MR. PLACITELLA:
21       Q.   We're going to get to it.
22           Ma'am, this was not provided to
23    you, correct?
24       A.   No.  As I said, I had -- this
25    is the first I've seen it.
```
MAGNA LEGAL SERVICES

Page 392

```
 1       Q.   Okay.  And if we go to the
 2    second page, you see the paragraph that
 3    talks about reports of patients with
 4    mesothelioma.
 5           Do you see that?
 6       A.   I see that it says that, yes.
 7       Q.   And then it talks about,
 8    "Mesothelioma can be caused by non-
 9    occupational exposure to mineral fibers is
10    not in doubt."
11           Do you see that?
12       A.   I see the sentences you're
13    highlighting, yes.
14       Q.   And it says:
15           "In addition, communities built
16    around natural sources of tremolite have
17    experienced incidents of the disease
18    through non-occupational exposure."
19           Do you see that?
20       A.   I see that sentence, yes.
21       Q.   You go on to state:
22           "Mesothelioma may occur after
23    brief or indirect exposure to asbestos."
24           Do you see that yes?
25       A.   Yes, I see these sentences,
```
MAGNA LEGAL SERVICES

Page 393

```
 1    yes.  I don't know who wrote this.
 2       Q.   Well, do you have any doubt
 3    that it came from your files and it was
 4    written on behalf or for Johnson & Johnson?
 5       A.   I don't know that it was.
 6       Q.   Okay.  Then we go to the next
 7    section on talc.
 8           By the way, there's no question
 9    it's labeled Coker versus Johnson &
10    Johnson, right?
11       A.   It says that, yes.
12       Q.   Okay.  So let's go onto the
13    section about talc, and it says:
14           "However, in several
15    mesothelioma patients studied, both talc
16    fibers and tremolite were detected.  In
17    fact, the majority of asbestos bodies
18    isolated from the lungs of women in the
19    general population have tremolite or
20    anthophyllite, and because tremolite and
21    anthophyllite are known contaminants of
22    talc, this data suggests that rare cases of
23    mesothelioma among women with no other
24    identifiable exposure might be related to
25    exposure to cosmetic talc."
```
MAGNA LEGAL SERVICES

Page 394

```
 1           Did you see that?
 2       A.   I see it says that, yes.
 3       Q.   And then underneath that it
 4    says:
 5           "Environmental factors must be
 6    given a mayor consideration in the
 7    incidents of mesothelioma."
 8           Do you see that?
 9       A.   I see these sentences, yes.
10       Q.   And it talks about one of the
11    environmental factors being talc miners.
12    It says:
13           "Tremolite asbestos is a known
14    contaminant of some deposits of talc."
15           Do you see that?
16       A.   I see it says that, yes.
17       Q.   And my question to you is:
18    When you were relying upon the experts in
19    verifying answers to interrogatories, was
20    any of this information in this internal
21    Johnson & Johnson memo ever made known to
22    you?
23       A.   I was not the one supplying the
24    answers.  The appropriate person for that
25    particular issue would be supplying it, and
```
MAGNA LEGAL SERVICES



Page 395

1   I do know that our scientists were very
2   much aware of any data or specifically any
3   proof and evidence of the issues.
4       Q.   Okay.  So -- but my question to
5   you was:  When you were verifying the
6   interrogatories as true and accurate, was
7   this information shared with you, Nancy
8   Musco?
9       A.   No, it was not my job to be
10  reviewing these.  And frankly, I -- I'm not
11  an expert at this and I really wouldn't
12  know how to comment on this.
13      Q.   Okay.  Now --
14          MR. PLACITELLA:  Can you give
15  me 217?
16  BY MR. PLACITELLA:
17      Q.   217 is a memo from William
18  Ashton.
19          Do you see that?
20      A.   Yes, it says that, yes.
21      Q.   Is this the same William Ashton
22  who executed the affidavit we went through
23  earlier, correct?
24      A.   I would assume so, yes.
25      Q.   And he talks about a recent

MAGNA LEGAL SERVICES

Page 396

1   publication that became important in the
2   Abraham Coker case alleging dusting powder
3   contains fibrous talc particles.
4       Do you see that?
5       A.   Yes.
6       Q.   And he copies Dr. Hopkins.
7       Do you see that?
8       A.   Yes.
9       Q.   Did you know that Dr. Hopkins
10  was involved in defending the Coker case?
11      A.   I don't know specifically what
12  cases Dr. Hopkins has been called for.
13      Q.   Okay.  These were some of the
14  same people who in the very same year were
15  part of the citizens petition that we went
16  through a little bit earlier, the response
17  to the citizens petition, correct?
18      A.   These people worked with
19  Johnson's Baby Powder and talc, yes.
20      Q.   Okay.  And who was Lusenac, do
21  you know?
22          MR. BERNARDO:  Object to the
23  form of the question.
24          THE WITNESS:  Lusenac I believe
25  was a supplier.  I don't know exactly.

MAGNA LEGAL SERVICES

Page 397

1          MR. PLACITELLA:  Okay.  Can you
2   give me 219?
3   BY MR. PLACITELLA:
4       Q.   219 is a memo, Ray (sic) Coker
5   versus Johnson & Johnson.
6       Do you see that?
7       A.   That's what it says, yes.
8       Q.   And it's from Lusenac to John
9   O'Shaughnessy at Johnson & Johnson who was
10  in charge of the talc litigation at this
11  point in time, correct?
12      A.   Yes.
13      Q.   And was Lusenac says is:
14      "I'm just coming back from
15  Italy where I met two scientists are (sic)
16  preparing documents to help solve your
17  case."
18          Do you see that?
19      A.   I see that sentence, yes.
20      Q.   Okay.
21          MR. PLACITELLA:  Sorry.  Put it
22  up here.
23  BY MR. PLACITELLA:
24      Q.   Do you see that?
25          What information did Lusenac

MAGNA LEGAL SERVICES

Page 398

1   give you, Johnson & Johnson, to help you
2   fight the Coker case, if you know?
3       A.   I do not know.
4       Q.   It talks in here something
5   about the Rabino -- something about Rabino.
6       Do you know anything about
7   that?
8       A.   No.
9       Q.   Okay.  Now, in our last
10  deposition, I asked you specifically
11  whether you, Johnson & Johnson, ever
12  refused to turn over asbestos testing data
13  based upon an assertion of privilege.
14      Do you recall that?
15      A.   I recall some conversations
16  about that, yes.
17      Q.   Okay.  Let's go to it so we're
18  on the same page.  On page 95 -- blow it
19  up.  I asked you:
20      "Now, in your preparation and
21  knowledge of Johnson & Johnson, do you have
22  a record of any information of a single
23  case where Johnson & Johnson turned over
24  asbestos testing data prior to 2017?"
25      Mr. Bernardo objects.  You

MAGNA LEGAL SERVICES

27 (Pages 395 to 398)



Page 399

1  asked for me to repeat it, I do.  And then
2  I go on and I say:
3        "When does your research or
4  when does Johnson & Johnson maintain is the
5  first time that it turned over testing data
6  concerning asbestos in Johnson & Johnson
7  talc in litigation?  When is the first time
8  that happened?"
9        And you say:
10       "I -- again, it will be
11 whenever it was requested."
12       And I asked you again:
13       "But from your knowledge, so
14 you believe the first time it was requested
15 it was turned over?"
16       And you -- after an objection,
17 you say:
18       "If there were specific
19 documents requested, they would have been
20 if I were talking generally, so I don't
21 know the answer to this."
22       And then I asked you:
23       "Well, you know, for example
24 when lawyers in cases involving cancer and
25 baby powder asked for testing data, Johnson

MAGNA LEGAL SERVICES

Page 400

1  & Johnson took the position that they
2  weren't going to turn it over because it
3  was privileged."
4        And there's an objection.  And
5  you said:
6        "I don't know this, no."
7        And I said:
8        "Well, that would be wrong,
9  wouldn't you say?"
10       And you said:
11       "I can't comment on that."
12       Now, in your review of the
13 materials in relation to the Coker case,
14 you're aware, are you not, that you
15 defended the Coker case exactly the same
16 way that you defended every other case,
17 which is, it was your position that there
18 was no evidence of any asbestos in any
19 Johnson & Johnson Baby Powder or Shower to
20 Shower, correct?
21       MR. BERNARDO:  Object to the
22 form of the question.
23       THE WITNESS:  I don't know.
24 You know, I can't comment on the legal
25 basis for it, but I do know that there is

MAGNA LEGAL SERVICES

Page 401

1  no asbestos in the cosmetic talc for
2  Johnson's Baby Powder.
3  BY MR. PLACITELLA:
4     Q.   Right.  So in the context of
5  the Coker case, you didn't change your
6  position from prior cases, your position
7  still was there was no evidence, correct?
8     A.   Correct.
9        MR. BERNARDO:  Object to the
10 form of the question.
11 BY MR. PLACITELLA:
12    Q.   Okay.  And that's what was
13 related (sic) to the plaintiffs' lawyers,
14 correct?
15    A.   Yes.
16    Q.   Okay.  Now, if I go back to
17 319.  I want to make sure I get this right.
18       MR. PLACITELLA:  I'm sorry,
19 give her 319.  That's part of the --
20       MR. BERNARDO:  I'm sorry?  Can
21 I just see what it is?
22       MR. PLACITELLA:  Sure.  It was
23 in the binder.
24       MR. BERNARDO:  That's what I
25 was going to ask.

MAGNA LEGAL SERVICES

Page 402

1        MR. PLACITELLA:  It's in the
2  binder.
3  BY MR. PLACITELLA:
4     Q.   I'm -- I am referring
5  specifically in -- to the document in the
6  Coker case that says, "Defendants'
7  Objections to Plaintiff's Deposition on
8  Written Questions to the Commission of Nell
9  McCallum & Associates."
10       Do you see that?
11    A.   I see that it says that, yes.
12    Q.   And it says:
13       "Comes now Johnson & Johnson
14 Companies, a defendant in the above
15 lawsuit, and files this objection to
16 depositions on written questions to the
17 Colorado School of Mines Research Institute
18 and to the Commission of Nell McCallum &
19 Associates."
20       You've seen testing results in
21 the binders that you sent to Dr. Hopkins
22 related to Colorado School of Mines,
23 correct?
24    A.   I believe there were some, yes.
25    Q.   Right.  And on the next page,

MAGNA LEGAL SERVICES

28  (Pages 399 to 402)



Page 403

```
 1    we're looking at --
 2         MR. BERNARDO:  While you are
 3    looking at -- I'm going to object to the
 4    form of the question.
 5         But I'm also going to object --
 6    I'm sorry.  I'm not going to object to the
 7    form of the question, I'm going to object
 8    to the use of this document as beyond the
 9    scope of the notice.
10         MR. PLACITELLA:  Okay.
11    BY MR. PLACITELLA:
12         Q.   On the next page, it -- let's
13    start with question 3 that you were
14    objecting to.
15         I'm sorry.  Let's look at 4.
16    I'm sorry.  It says:
17         "Please state if you found the
18    presence of asbestos or asbestiform
19    materials" -- "minerals."
20         Do you see that?
21         A.   I see it says that, yes.
22         Q.   And you -- and Johnson &
23    Johnson's response is, after saying it's
24    vague and ambiguous and assumes facts not
25    in evidence:
             MAGNA LEGAL SERVICES
```

Page 404

```
 1         "Furthermore, the question
 2    requires witness to speculate and provide
 3    an expert opinion that witness is not
 4    qualified to express.  Finally, the
 5    information requested from the witness is
 6    subject to proprietary and trade secret
 7    privileges of the defendant."
 8         Do you see that?
 9         A.   Yes, I see that.
10         Q.   And then when it asks you to
11    produce documents, you further state that
12    the request violates the Texas Rules of
13    Civil Procedure, and you complain about the
14    subpoena, and then you say:
15         "Finally, the information
16    requested from the witness is subject to
17    propriety" -- "proprietary and trade secret
18    privileges of the defendant."
19         Do you see that?
20         A.   I see it says that, yes.
21         Q.   Okay.  And in the same group of
22    documents, you filed similar objections as
23    it relates to getting discovery from
24    McCrone and Associates.
25         Do you see that?
             MAGNA LEGAL SERVICES
```

Page 405

```
 1         MR. BERNARDO:  Object to the
 2    form of the question.  Same objection with
 3    respect to the scope of the notice.
 4         THE WITNESS:  I see it says
 5    that.
 6    BY MR. PLACITELLA:
 7         Q.   Right.  And this is in the
 8    Coker case, and you know from your review
 9    of the binders you gave to Dr. Hopkins,
10    that there is testing information in those
11    binders related to work that was done by
12    McCrone and Associates, correct?
13         A.   Yes, I believe so.
14         Q.   Okay.  And Johnson & Johnson's
15    position in the Coker case as related to
16    getting information from McCrone and
17    Associates was that that information was
18    proprietary and a trade secret according to
19    your responses, correct?
20         A.   That's what the sentence says,
21    yes.
22         Q.   Now, as you sit here, do you
23    have any evidence that any information
24    related to McCrone or Colorado School of
25    Mines was ever turned over to the plaintiff
             MAGNA LEGAL SERVICES
```

Page 406

```
 1    in the Coker case?
 2         A.   I don't know what was turned
 3    over.
 4         Q.   As you sit here, do you have
 5    any evidence to prove that you turned over
 6    any evidence to the plaintiff in the Coker
 7    case related to the testing of asbestos?
 8         MR. BERNARDO:  Object to the
 9    form of the question.
10         THE WITNESS:  I don't know what
11    was turned over.  If it was appropriate to
12    be turned over, I would assume it would be.
13    BY MR. PLACITELLA:
14         Q.   But you don't know?
15         A.   No, I do not.
16         Q.   So Johnson & Johnson, as it
17    sits here, does not know what evidence it
18    turned over in the Coker case?
19         MR. BERNARDO:  Object to the
20    form of the question, beyond the scope of
21    the notice.
22         The witness can answer in her
23    individual capacity.
24         THE WITNESS:  I don't know.
25    BY MR. PLACITELLA:
             MAGNA LEGAL SERVICES
```



Page 407

1    Q.   Okay.  And do you have any
2   evidence, as you sit here, today that the
3   information that Alice Blount gave you
4   during the Coker case was ever turned over
5   to the plaintiff in that case?
6         MR. BERNARDO:  Same objections.
7         THE WITNESS:  Again, I do not
8   know what was turned over.
9   BY MR. PLACITELLA:
10       Q.   Does that mean that Johnson &
11  Johnson does not know or you don't know?
12       A.   Since it's not within the scope
13  of the notice, I can't comment on it and I
14  don't know.
15       Q.   Ma'am, with all due respect, I
16  move to strike your answer, "It's not
17  within the scope of the notice."  That's
18  what the judge will decide.
19       My question to you was:  Do you
20  have any evidence, as you sit here today,
21  that Johnson & Johnson turned over any
22  evidence concerning asbestos testing to the
23  plaintiff in the Coker case?
24       A.   I do not know what was turned
25  over and what was not.

MAGNA LEGAL SERVICES

Page 408

1    Q.   Okay.  And when you say you do
2   not know, does that mean you do not know,
3   Nancy Musco, or Johnson & Johnson does not
4   know?
5         MR. BERNARDO:  Object to the
6   form of the question.
7         THE WITNESS:  Since I'm right
8   now answering for myself, I do not know.
9   BY MR. PLACITELLA:
10       Q.   No, ma'am, with all due
11  respect, you're here answering for Johnson
12  & Johnson, but somebody else will make that
13  determination, and I strike -- I move to
14  strike your response.
15       Now, let's talk about a case,
16  we spent a couple minutes on it, so I'm not
17  going to spend a lot of time on it here.
18  The next case after 1998 -- by the way, do
19  you know what happened to the Coker case?
20       A.   No, I do not.
21       Q.   Okay.
22         MR. PLACITELLA:  Can you give
23  me 482?
24  BY MR. PLACITELLA:
25       Q.   482.  Marked J&J-482 is an

MAGNA LEGAL SERVICES

Page 409

1   article that recently appeared in the
2   Reuters -- by Reuters entitled, "Johnson &
3   Johnson knew for decades that asbestos
4   lurked in its baby powder."
5         Have you ever seen this before?
6       A.   Yes, I have.
7       Q.   Okay.  And when?
8       A.   Soon after it came out.
9       Q.   Did you ever read it in
10  preparation for today's deposition?
11       A.   No.
12       Q.   Okay.  I just want to ask you
13  one question just in terms of information
14  on the Coker case.  I don't want to ask you
15  about the article itself.
16         MR. BERNARDO:  Object to the
17  question --
18  BY MR. PLACITELLA:
19       Q.   In the section --
20         MR. BERNARDO:  -- as beyond the
21  scope of the notice.
22  BY MR. PLACITELLA:
23       Q.   Herschel Hobson, who was the
24  lawyer in the Coker case, is quoted in this
25  article and he said that he asked Johnson &

MAGNA LEGAL SERVICES

Page 410

1   Johnson for any research it had into the
2   health of mine workers, top production
3   records from the mid-'40s through the '80s,
4   depositions from managers of three labs
5   that tested talc for J&J, and any documents
6   related to testing for fibrous or
7   asbestiform materials.
8         Do you have any information, as
9   you sit here today, to say that that is
10  incorrect?
11         MR. BERNARDO:  Object to the
12  form of the question.  Object, beyond the
13  scope of the notice.
14         THE WITNESS:  As I already told
15  you, I do not know what was or wasn't
16  handed over.
17  BY MR. PLACITELLA:
18       Q.   Okay.  And -- sorry, my last
19  question on this and I'll move on.
20         According to the article
21  Mr. Hobson said that:
22       "Without the evidence from
23  Johnson & Johnson and no hope of getting
24  any, he advised Coker to drop the suit."
25       Do you see that?

MAGNA LEGAL SERVICES





Page 411

1      MR. BERNARDO: Same objection.
2      THE WITNESS: That's what it
3  says here.
4  BY MR. PLACITELLA:
5      Q.  Do you have any information, as
6  you sit here today, on behalf of Johnson &
7  Johnson to rebut that statement by Mr.
8  Hobson that he dismissed the case because
9  he just didn't have the proof and Johnson &
10  Johnson didn't turn anything over?
11      A.  Sounds like it would be kind of
12  a legal conclusion and I can't comment on
13  that.
14      Q.  I'm just saying, do you have
15  any evidence, as you sit here today, to
16  disprove what Mr. Hobson is saying here is
17  that he dropped the case because you didn't
18  turn any evidence over?
19      MR. BERNARDO: Beyond the scope
20  of the notice.
21      The witness can answer in her
22  individual capacity.
23      THE WITNESS: As I said, I
24  can't comment. I don't know his reasonings
25  or what he did or didn't do.
        MAGNA LEGAL SERVICES

Page 412

1  BY MR. PLACITELLA:
2      Q.  Okay. And now I want to just
3  talk to you hopefully about something
4  because we went through this, I just want
5  to put it in context.
6      You actually certified the
7  answers to interrogatories in the
8  Krushinski case, correct?
9      A.  That's correct.
10      Q.  Okay. And came -- that case
11  was filed right after the Coker case was
12  dismissed, correct?
13      A.  I don't remember the dates.
14      Q.  Okay. Do you remember it was
15  filed sometime in the late 1990s?
16      A.  Again, I would not say for
17  sure. Whatever --
18      Q.  Do you remember that you
19  certified answers to interrogatories in the
20  year 2000 in those cases?
21      A.  I know I certified them. I
22  guess that's the date, yes.
23      Q.  Right. And --
24      MR. PLACITELLA: Do you have
25  277?
        MAGNA LEGAL SERVICES

Page 413

1  BY MR. PLACITELLA:
2      Q.  Okay. 277, and I think you
3  have these in your binders, are the answers
4  to interrogatories that you certified.
5      Do you recognize those?
6      A.  Yes.
7      Q.  Okay. And specifically -- and
8  let me just go to the end.
9      This is your signature?
10      A.  Yes, it is.
11      Q.  Correct? Make sure I got it.
12      And you say:
13      "The foregoing answers are true
14  and accurate to the best of my knowledge.
15  I am aware that if any of the foregoing
16  statements made by me are willfully false,
17  I may be subject to punishment."
18      Correct?
19      MR. BERNARDO: Object to the
20  form of the question.
21      THE WITNESS: Yes, that's what
22  it says.
23  BY MR. PLACITELLA:
24      Q.  And I'm not going to go over
25  all of the things, we asked you about them
        MAGNA LEGAL SERVICES

Page 414

1  the last time, just in context, and answer
2  to Interrogatory 17, says:
3      "Describe in detail all
4  processes, procedures and testing performed
5  upon talc used" -- "the talc used in the
6  manufacture of Johnson's Baby Powder to
7  reduce or eliminate the existence of
8  asbestos, tremolite or other contaminants
9  in Johnson's Baby Powder."
10      Correct?
11      A.  Yes.
12      Q.  And what you state specifically
13  in the beginning of that answer is:
14      "To the best of defendant's
15  knowledge, talc used in the manufacture of
16  Johnson & Johnson's Baby Powder never
17  contained asbestos in any form or
18  tremolite."
19      Correct?
20      MR. BERNARDO: Object to the
21  form of the question.
22      THE WITNESS: That's what it
23  says, yes.
24  BY MR. PLACITELLA:
25      Q.  Okay. Now, I forgot to ask you
        MAGNA LEGAL SERVICES



Page 415

1   last time and then I'm going to move off of
2   these.
3        Did you ever -- before signing
4   these interrogatories, did you ever
5   actually read the questions and answers
6   before signing them?
7        A.   Yes, I did.
8        Q.   Okay.  Now --
9        MR. PLACITELLA:  Can you give
10  me 230?
11       I'll just do this one and maybe
12  we'll break, Rich?
13       MR. BERNARDO:  Sure.
14       MR. PLACITELLA:  So you can do
15  lunch.
16  BY MR. PLACITELLA:
17       Q.   230 is an affidavit filed by
18  John Hopkins in the Durham case.
19       Do you see this?
20       A.   Yes.
21       Q.   In preparation and in
22  discussing -- let's just go to the -- and
23  you see on the last page, the affidavit is
24  signed by John Hopkins.
25       Do you see that?
    MAGNA LEGAL SERVICES

Page 416

1        A.   Yes.
2        Q.   And he concludes saying:
3        "It may be concluded that there
4   has never been asbestos contamination of
5   the talc used by Johnson & Johnson in the
6   United States from the period in question,
7   1955 to 2002."
8        Correct?
9        A.   Yes.
10       Q.   And that's essentially what
11  Roger Miller signed in his affidavits,
12  correct?
13       MR. BERNARDO:  Object to the
14  form of the question, beyond the scope.
15       The witness may answer in her
16  individual capacity with respect to the
17  affidavit.
18       THE WITNESS:  Yes, this is the
19  position that there is no asbestos.
20  BY MR. PLACITELLA:
21       Q.   And it's consistent with the
22  affidavit signed by Mr. Ashton as well,
23  correct?
24       A.   This is the general statement,
25  yes.
    MAGNA LEGAL SERVICES

Page 417

1        Q.   And in preparing for today's
2   deposition, did Dr. Hopkins ever tell you
3   that he, himself, certified under oath that
4   there was no evidence of any asbestos at
5   any time in Johnson -- in Johnson &
6   Johnson's cosmetic talc?
7        A.   Yes, we did discuss that.
8        Q.   Okay.
9        A.   And I know that is what his
10  understanding.
11       Q.   All right.  So he told you
12  about this affidavit?
13       A.   Not specifically about the
14  affidavit, no, but I know that that is his
15  understanding, but we did not discuss the
16  specific affidavit.
17       Q.   Did he tell you that based upon
18  this affidavit, the Durham case was
19  dismissed?
20       MR. BERNARDO:  Object to the
21  form of the question, beyond the scope of
22  the notice.
23       You can answer in your
24  individual capacity if you know.
25       THE WITNESS:  No, we did not
    MAGNA LEGAL SERVICES

Page 418

1   discuss that.
2   BY MR. PLACITELLA:
3        Q.   Okay.  Now -- and then we're
4   going to break for lunch.  I just want to
5   make sure I kind of -- I have some
6   questions.
7        Currently there is an appeal
8   before the New Jersey Appellate Division
9   related to Johnson & Johnson's Baby Powder
10  and talc.
11       Do you -- do you know about
12  that?
13       MR. BERNARDO:  Object to the
14  form of the question.
15       THE WITNESS:  I don't know what
16  specifically there is, no.
17  BY MR. PLACITELLA:
18       Q.   Do you know anything about the
19  appeal?
20       A.   No.
21       Q.   There's an issue before the
22  Appellate Division as to when or if Johnson
23  & Johnson ever told anybody before 2017
24  that they had testing evidence related to
25  Johnson & Johnson's talc or cosmetic talc
    MAGNA LEGAL SERVICES

32  (Pages 415 to 418)



Page 419

```
 1    products.  What's the answer?  Did you ever
 2    give to any plaintiff in any case prior to
 3    2017 any testing evidence related to the
 4    Johnson & Johnson's Baby Powder or its
 5    sources?
 6           MR. BERNARDO:  Object to the
 7    form of the question.
 8           THE WITNESS:  I can't answer
 9    that, no.
10    BY MR. PLACITELLA:
11       Q.  Well, you're Johnson & Johnson,
12    how could you not know?
13           MR. BERNARDO:  Objection.
14    BY MR. PLACITELLA:
15       Q.  You either did or you didn't.
16       A.  If it was requested and it was
17    appropriate to give the answers and -- or
18    the evidence, it was given.
19       Q.  So you know that for a fact
20    that's what happened?
21       A.  If it was appropriate, yes.
22       Q.  So as you sit here today, can
23    you point to a single case, do you have any
24    evidence in front of you, can you point to
25    a single case where you turned over the
            MAGNA LEGAL SERVICES
```

Page 420

```
 1    evidence of a testing related to Johnson's
 2    Baby Powder before 2017?
 3           MR. BERNARDO:  Object to the
 4    form of the question.
 5    BY MR. PLACITELLA:
 6       Q.  Can you point to a single
 7    case --
 8           MR. BERNARDO:  Object.
 9    BY MR. PLACITELLA:
10       Q.  -- you Johnson & Johnson.
11           MR. BERNARDO:  Objection to the
12    form of the question, beyond the scope of
13    the notice, and asked and answered multiple
14    times.
15           You can answer in your
16    individual capacity if you know.
17           THE WITNESS:  No, I cannot.
18    BY MR. PLACITELLA:
19       Q.  Okay.  So as you sit here
20    today, Johnson & Johnson, to be clear,
21    cannot point to a single case prior to 2017
22    where it turned over evidence related to
23    the testing of Johnson & Johnson's talc,
24    baby powder or sources of that baby powder
25    related to asbestos, correct?
            MAGNA LEGAL SERVICES
```

Page 421

```
 1           MR. BERNARDO:  Same objections.
 2           THE WITNESS:  No, I cannot.
 3           MR. PLACITELLA:  Okay.  We can
 4    take a break for lunch now.  Thank you.
 5           THE VIDEOGRAPHER:  The time is
 6    now 12:40 PM.  We're going off the record.
 7           (Lunch recess.)
 8           THE VIDEOGRAPHER:  The time is
 9    now 1:34 PM.  We are back on the record.
10    BY MR. PLACITELLA:
11       Q.  Okay.  Do you have all of those
12    binders in front of you?  Okay.  I'm just
13    going to approach you for -- just help
14    organize some of this stuff.
15           So this P-8A, right?
16       A.  Correct.
17       Q.  And this is P-8B, correct?
18       A.  Correct.
19       Q.  Okay.  This is the evidence you
20    sent to Dr. Hopkins?
21       A.  Correct.
22       Q.  Okay.  This is evidence,
23    correct?
24           MR. BERNARDO:  Object to the
25    form of the question.
            MAGNA LEGAL SERVICES
```

Page 422

```
 1           THE WITNESS:  It's not
 2    evidence, it's lots -- just different
 3    documents.
 4    BY MR. PLACITELLA:
 5       Q.  Well, it's evidence we used
 6    today, correct?
 7       A.  Okay.
 8       Q.  And there's testing evidence in
 9    here?
10       A.  There's some, yes.
11           MR. BERNARDO:  Object to the
12    form of the question.
13    BY MR. PLACITELLA:
14       Q.  And this is Musco-2.  Do you
15    remember this from the last time?
16           Okay.  This is all the tests,
17    remember?
18       A.  I know it was a big book.
19       Q.  All right.  Do you want -- do
20    you want to look through it again to make
21    sure?  This is the testing evidence --
22       A.  Uh-huh.
23       Q.  -- from Dr. Hopkins'
24    deposition.
25           Do you recall that?
            MAGNA LEGAL SERVICES
```

33 (Pages 419 to 422)



Page 423

1      A.   Okay.  Are you trying to block
2  me?
3      Q.   No.  This is the testing
4  evidence from Dr. Hopkins?
5          MR. BERNARDO:  Object to the
6  form of the question.
7          THE WITNESS:  It seems to be a
8  mixture of a lot of things from
9  Dr. Hopkins.
10 BY MR. PLACITELLA:
11     Q.   Okay.  Am I correct that none
12 of this evidence, to your knowledge, he was
13 ever turned over to any plaintiff or you
14 have no evidence that any of this was ever
15 turned over to any plaintiff before 2017,
16 correct?
17         MR. BERNARDO:  Object to the
18 form of the question.
19         THE WITNESS:  I do not know.
20 BY MR. PLACITELLA:
21     Q.   As you sit here today, do you
22 have any evidence to prove that any of this
23 was ever turned over to any plaintiff
24 before 2017?
25         MR. BERNARDO:  Object to the
                MAGNA LEGAL SERVICES

Page 424

1  form of the question.
2          THE WITNESS:  I do not know
3  what was turned over or not turned over.
4  BY MR. PLACITELLA:
5      Q.   As you sit here today, do you
6  have any contemporaneous evidence to prove
7  that any of this was ever turned over to
8  any plaintiff before 2017?
9          MR. BERNARDO:  Object to the
10 form of the question, beyond the scope of
11 the notice.
12         THE WITNESS:  I do not know
13 what was turned over.
14 BY MR. PLACITELLA:
15     Q.   So Johnson & Johnson does not
16 know whether any of this evidence was ever
17 turned over to any plaintiff before 2017?
18         MR. BERNARDO:  Object to the
19 form of the question, beyond the scope of
20 the notice.
21         You can answer in your
22 individual capacity if you can.
23         THE WITNESS:  I don't know.
24 It's not something I had prepared for
25 within the scope for today.
                MAGNA LEGAL SERVICES

Page 425

1          MR. PLACITELLA:  I'll pass the
2  witness and reserve the right for redirect.
3          MR. BERNARDO:  All right.
4  Could we go off the record?
5          THE VIDEOGRAPHER:  The time is
6  now 1:37 PM.  We are going off the record.
7          (Discussion held with the
8  Court.)
9          THE VIDEOGRAPHER:  The time is
10 now 1:44 PM.  We are back on the record.
11             - - -
12         E X A M I N A T I O N
13             - - -
14 BY MR. BERNARDO:
15     Q.   Good afternoon, Ms. Musco.  We
16 obviously already know each other, but let
17 me just introduce myself for the record
18 here.
19         I'm Rich Bernardo, and I'm
20 going to ask you some questions on behalf
21 of the Johnson & Johnson defendants.
22         And first, I appreciate you've
23 been here for now this is the second day
24 and there's been a passage of some time
25 between your first day and your second day,
                MAGNA LEGAL SERVICES

Page 426

1  so if I ask you something that you don't
2  recall, let me know and I can help you
3  refresh your recollection perhaps with a
4  transcript or otherwise.
5      A.   Okay.
6      Q.   First, we didn't really get an
7  opportunity for you to introduce yourself
8  to the jury, Ms. Musco.  Just if you
9  wouldn't mind, tell the jury a little about
10 yourself, where you grew up, where you went
11 to school?
12     A.   Born and raised in New Jersey
13 so I'm a Jersey girl.
14         I went to college in
15 Connecticut, University of Bridgeport in
16 Connecticut.
17         I am a registered nurse.  That
18 is something I always wanted to be ever
19 since I was a little girl, so my first jobs
20 all revolved around that from volunteering
21 to working in the hospital.
22         I went from my clinical
23 experience taking care of severely burned
24 patients in St. Barnabas in Livingston.  So
25 I had skin trauma to taking care of healthy
                MAGNA LEGAL SERVICES



Page 427

1    skin when I joined Johnson & Johnson in
2    1982, and I started out with Johnson's baby
3    products.
4        Q.   Okay.
5        A.   And then I had various
6    positions with Johnson & Johnson for
7    30 years, and then after that, I am now a
8    program manager for Dress For Success,
9    Central New Jersey, it's a nonprofit, where
10   I teach job development and life skills.
11       MR. PLACITELLA:  Move to
12   strike.  Beyond the scope of the
13   deposition.  Move to strike, nonresponsive
14   to the question.
15   BY MR. BERNARDO:
16       Q.   And how long were you a
17   practicing nurse, Ms. Musco?
18       A.   Well, I'm still a practicing
19   nurse.
20       MR. PLACITELLA:  Excuse me.
21       Objection, beyond the scope of
22   the deposition.
23       She's being here -- produced
24   here, as you told me, so the record is
25   clear, as a representative of Johnson &
        MAGNA LEGAL SERVICES

Page 428

1    Johnson and not a practicing nurse for
2    litigation veracity.
3        You can answer the question
4    now.
5        THE WITNESS:  I have been a
6    registered nurse since 1975, and my
7    capacity in my positions both in the
8    hospital and Johnson & Johnson were that of
9    a registered nurse.
10   BY MR. BERNARDO:
11       Q.   Okay.  And -- and why did you
12   stop nursing practice?
13       A.   I never stopped nursing
14   practice.
15       MR. PLACITELLA:  Excuse me,
16   before you start.
17       Objection, beyond the scope.
18       You can answer now.
19       MR. BERNARDO:  And you can have
20   a continuing objection to all of them if
21   you chose or you can raise it at each one.
22   That's fine with me.
23       MR. PLACITELLA:  I have to make
24   sure I articulate it.  Thank you.
25       MR. BERNARDO:  Okay.
        MAGNA LEGAL SERVICES

Page 429

1        THE WITNESS:  I have just
2    practiced nursing in different capacities.
3    BY MR. BERNARDO:
4        Q.   Okay.  And I'm sorry, what year
5    did you go to Johnson & Johnson?
6        A.   I started at Johnson & Johnson
7    in 1982.
8        Q.   Okay.  And -- and tell me about
9    your experience at Johnson & Johnson.
10       MR. PLACITELLA:  Objection to
11   the form.
12       You can answer.
13       THE WITNESS:  I had many
14   different positions at Johnson & Johnson.
15   I enjoyed them all.  I was able to work
16   with many talented, fantastic people.  It
17   was a very positive experience.
18   BY MR. BERNARDO:
19       Q.   Let's talk about why you're
20   here today and why you were testifying a
21   few weeks ago, which this deposition is the
22   continuation of.
23       Ms. Musco, what is your
24   understanding of what this deposition would
25   be about?
        MAGNA LEGAL SERVICES

Page 430

1        MR. PLACITELLA:  Objection to
2    form.
3        THE WITNESS:  My understanding
4    is that I am here today to talk about the
5    process of the obtaining the answers and
6    supplying the answers to specific
7    interrogatories for cases involving
8    Johnson's Baby Powder.
9    BY MR. BERNARDO:
10       Q.   And where did you get that
11   understanding?
12       A.   Well, it was my interpretation
13   of the notice and then also working with
14   Counsel.
15       Q.   Okay.  Did you do anything to
16   prepare for your testimony today and the
17   last day you were here on behalf of Johnson
18   & Johnson?
19       A.   Yes, I definitely did.
20       Q.   Can you tell us what you did?
21       A.   Well, after reading the notice
22   and understanding the notice, I first spoke
23   to the people -- one of the people who was
24   responsible for doing the searches to
25   understand the process, understanding
        MAGNA LEGAL SERVICES

35  (Pages 427 to 430)



Page 431

1    better where the requested information may
2    be found, did we search everywhere possible
3    for it, where was there even the
4    information that was requested, did it even
5    exist.  I did that.
6            I asked to look at some of the
7    complaint files really just to remind
8    myself.  I wasn't familiar with all the
9    cases.  I wanted to see what the complaints
10   were.
11           I read different documents.  In
12   particular, the last time I was deposed
13   there were a number of documents, a lot of
14   them that Mr. Placitella had presented to
15   me, that I had not seen before and I wasn't
16   familiar with, so I did ask that they be
17   sent to Dr. John Hopkins, who is the expert
18   on these matters, to make sure that he had
19   seen them.
20           And then I followed that up and
21   I had about an hour conversation with
22   Dr. Hopkins.  He went through specific
23   tests or allegations that had been
24   presented and explained them to me, not
25   that I remember them, because a little
                MAGNA LEGAL SERVICES

Page 432

1    highly scientific, but it reassured what
2    I've always known.  So you know, I felt
3    much more comfortable after that.
4        Q.   Let me back up.
5             Ms. Musco, the documents that
6    you sent or asked to be sent to
7    Dr. Hopkins, can you identify them for the
8    record by exhibit number so we're clear
9    here?
10       A.   Oh, yes.  That would be
11   Exhibit 8 -- P-8A and P-8B.
12       Q.   Okay.  Thank you.
13            And Ms. Musco, did you
14   personally review each of the documents in
15   Exhibits 8A and 8B?
16       A.   No.
17       Q.   Did you -- did you conduct any
18   review of them?
19       A.   I looked at them to see what
20   they were.  There were a lot of things that
21   I don't understand so I certainly could not
22   tell you everything that was in there, but
23   because a lot of them had been brought up,
24   that's why I asked that they be sent to
25   Dr. Hopkins because he would be the most
                MAGNA LEGAL SERVICES

Page 433

1    familiar with them.
2        Q.   And during the deposition,
3    Mr. Placitella referred to Exhibit 8A and
4    8B as reliance materials.
5             Do you agree with that
6    characterization?
7             MR. PLACITELLA:  Objection to
8    the form of the question.
9             THE WITNESS:  I didn't agree
10   with the word "reliance."  They were a
11   basis, but I did not rely on them for my
12   responses.  As I said, those were the
13   documents that I asked to be shared with
14   Dr. Hopkins because I wanted to feel
15   comfortable that he was familiar with them,
16   that this was nothing new.
17   BY MR. BERNARDO:
18       Q.   Okay.  During your deposition,
19   you discussed the fact that from time to
20   time you signed or certified or verified, I
21   think different words were used, responses
22   to interrogatories.
23            Do you recall that?
24       A.   Yes.
25       Q.   I'd like to take a step back
                MAGNA LEGAL SERVICES

Page 434

1    and can you explain in your own
2    understanding what an interrogatory is in
3    case the jury is not familiar with that
4    term?
5        A.   My understanding is that
6    interrogatories are questions asked when a
7    complaint has been filed.
8        Q.   And do you have an
9    understanding of the process through which
10   interrogatory responses that are the
11   subject of the deposition notice were
12   prepared?
13       A.   Well, yes, I know that -- the
14   process that we used.  I was not always
15   involved in the process, but if there were
16   questions that Counsel needed direction who
17   the best person to speak with was, I would
18   direct them to that appropriate person.
19       Q.   Why -- why were you in
20   particular involved, if you know,
21   Ms. Musco?
22       A.   I was really involved because
23   throughout my tenure, I had the opportunity
24   to work with just about every department in
25   the company and the different experts that
                MAGNA LEGAL SERVICES

36  (Pages 431 to 434)



Page 435

```
 1   would be the best ones to answer.  So it's
 2   a big company, and I would help make that
 3   process easier and direct Counsel to those
 4   appropriate people.
 5       Q.   Did you interview the
 6   individuals yourself?
 7       A.   No.
 8       Q.   Why not?
 9       A.   Because it wouldn't make sense,
10   you know, it was best that they speak
11   directly to Counsel because I -- I couldn't
12   relay their message.  It was a conversation
13   that needed to happen between Counsel and
14   the expert.
15       Q.   Why is that?
16       A.   Because I knew that the people
17   that I was choosing were the experts.  I --
18   as I said before, I wasn't just going down
19   the hall and grabbing somebody, you know,
20   Hey, can you answer this?  I carefully
21   chose the people that could best answer and
22   could best supply that answer to Counsel,
23   and my position was not to interview them.
24   That wasn't my responsibility.
25       Q.   We discussed from time to time
                  MAGNA LEGAL SERVICES
```

Page 436

```
 1   you -- you signed or certified or verified.
 2   What does that mean to you to have done
 3   that?
 4       A.   It means that I did read every
 5   answer -- every question, every answer to
 6   help ensure that they had all been
 7   answered, that I had directed Counsel to
 8   the appropriate person.
 9       Q.   How do you know the individuals
10   that you identified were providing accurate
11   information or do you know that?
12       A.   Because again, I knew the
13   people that I was directing Counsel to
14   speak with.  These were people I worked
15   with again throughout 30 years, and I knew
16   that they were the appropriate people.  I
17   got to work with them, I got to listen to
18   them.  I'd hear them at internal meetings,
19   I'd hear them at professional meetings.  So
20   I trusted that they had the complete
21   answers.
22       Q.   I want -- I want to move
23   forward to the present time as opposed to
24   talking now -- I think we've been talking
25   about your time when you were assisting
                  MAGNA LEGAL SERVICES
```

Page 437

```
 1   in -- in providing information or providing
 2   access to individuals for the responses.
 3       So when you were preparing for
 4   this deposition, did you do anything to
 5   ascertain the basis of the responses that
 6   you identified that were responsive to the
 7   notice?
 8       A.   Well, again, you know, the
 9   conversations that I had reviewing them,
10   the conversations that I had with
11   Dr. Hopkins to just solidify what I always
12   knew, that these were the correct
13   responses.
14       Q.   Did -- did you make any efforts
15   to identify if there were any compilations
16   of documents linked to these responses?
17       MR. PLACITELLA:  Objection to
18   form.
19       THE WITNESS:  Yes, that was
20   part of my original conversation with one
21   of the people who was responsible for the
22   searches.  I didn't think there were, but I
23   wanted to make sure that there was no pile
24   anywhere that was responsible for each
25   answer.  These were what people did every
                  MAGNA LEGAL SERVICES
```

Page 438

```
 1   day in their work, so it's not like they
 2   opened a drawer and said, you know, Here's
 3   the page that answers that.
 4   BY MR. BERNARDO:
 5       Q.   Let me -- let me take an aside
 6   here for a minute.
 7       At the end of your questioning
 8   by Mr. Placitella before I began, he asked
 9   you a number of questions about whether you
10   have any knowledge of any documents that
11   were produced or when they were produced.
12       Do you recall those questions?
13       A.   Yes, I do.
14       Q.   In connection with preparing
15   for this deposition, did you make any
16   efforts to determine what documents were
17   produced by Johnson & Johnson in response
18   to discovery requests, to document
19   requests?
20       A.   No, I specifically looked at
21   the notice and stayed within the scope of
22   the notice.  So my understanding of that
23   was it had to do with the discovery
24   responses.
25       Q.   Go back to, you mentioned you
                  MAGNA LEGAL SERVICES
```



Page 439

```
1    looked for or asked somebody to look for
2    documents. Who did you ask, by the way, to
3    understand if there were documents that
4    were linked up to these responses?
5        A. Well, the person I spoke to, I
6    can't right now think of her last name,
7    it's Pam. As I said, she was one of the
8    people responsible for the searches, and in
9    understanding, you know, how she did the
10   searches, was there anything else, was
11   there any other file to understand that
12   better. So that's the person I spoke with.
13       Q. Okay. Mr. Placitella asked you
14   a number of specific document -- I'm sorry,
15   specific questions about documents that you
16   couldn't answer, in particular documents in
17   binders 8A and 8B.
18       Do you recall that?
19       A. Yes, I do.
20       Q. Why didn't you conduct a
21   further review of those once you sent them
22   to Dr. Hopkins?
23       MR. PLACITELLA: Objection,
24   mischaracterizes her prior testimony.
25   Object to form.
                    MAGNA LEGAL SERVICES
```

Page 440

```
1        THE WITNESS: Well, some of
2    them that he asked I didn't feel were in
3    the scope because they had to do with
4    industrial talc, and my understanding was
5    that the notice had to do with cosmetic
6    talc and Johnson's Baby Powder and Shower
7    to Shower.
8    BY MR. BERNARDO:
9        Q. Okay. Also, Mr. Placitella
10   raised with you a number of affidavits.
11       Do you recall that?
12       A. Yes.
13       Q. Did you review those?
14       A. No, I did not.
15       Q. And why hadn't you reviewed
16   those?
17       A. For the reason that I just
18   said, that these had to do with cases with
19   industrial talc and I didn't believe they
20   were within the scope.
21       Q. Do you have any understanding
22   of why only a few sets of responses that
23   discuss the issue of asbestos and talc were
24   located?
25       A. No, but my understanding is
                    MAGNA LEGAL SERVICES
```

Page 441

```
1    that there may not have been -- in the
2    first place there may not have been
3    discovery responses, or they may have been
4    with an outside counsel and we didn't know
5    where they were. So you know, and I
6    believe that we had agreed that we weren't
7    going to search outside counsels, but every
8    attempt was made to find whatever was
9    available.
10       Q. On the first day of your
11   testimony, Ms. Musco, a number of times you
12   testified that documents were not available
13   in one case or another other than the
14   complaint.
15       Do you -- do you recall --
16   first, do you recall that testimony?
17       A. Yes.
18       Q. And what -- what did you mean
19   by that?
20       A. I meant the spec- -- I mean,
21   there may have been documents, but the
22   specific documents that had been requested
23   in the notice, which were answers to
24   interrogatories in discovery.
25       Q. Do you have any knowledge one
                    MAGNA LEGAL SERVICES
```

Page 442

```
1    way or the other if there were documents
2    pertaining to those cases other than
3    whether there were discovery responses or
4    discovery correspondence?
5        A. The other documents, no.
6        Q. Did you make any efforts to
7    look for that?
8        A. Other than discovery responses,
9    no, I did not.
10       Q. Why not?
11       A. Because, again, my
12   interpretation of the notice was that we
13   were talking about discovery responses.
14       Q. Okay. And do you have any
15   knowledge as to whether there were searches
16   that were done in addition to the searches
17   of the company files of the cases
18   specifically cited in the notices to see if
19   there were discovery responses?
20       MR. PLACITELLA: Object to the
21   form.
22       THE WITNESS: Could you ask
23   that again, please?
24   BY MR. BERNARDO:
25       Q. Sure.
                    MAGNA LEGAL SERVICES
```



Page 443

1    MR. PLACITELLA:  Do you object,
2  too?
3    MR. BERNARDO:  She objects,
4  too.
5    MR. PLACITELLA:  Okay.
6  BY MR. BERNARDO:
7    Q.   Ms. -- Ms. Musco, you testified
8  during your deposition that searches were
9  made with respect to the specific cases
10  listed in the notice.
11    Do you recall that?
12    A.   Yes.
13    Q.   Okay.  Do you have knowledge as
14  to whether there were searches done for
15  discovery -- responsive discovery responses
16  other than with respect to ones in those
17  cases?
18    MR. PLACITELLA:  Objection to
19  the form.
20    THE WITNESS:  No, I do not.
21  BY MR. BERNARDO:
22    Q.   Okay.  I'm going to switch
23  gears a little bit.
24    On the first day of your
25  deposition, Mr. Placitella asked you about
MAGNA LEGAL SERVICES

Page 444

1  the Johnson mine and whether talc from the
2  Johnson mine was used in Johnson's Baby
3  Powder.
4    Do you recall that testimony?
5    A.   Yes, I do.
6    Q.   And you said you believed it
7  did.
8    Do you recall that?
9    A.   Yes.
10    Q.   What did you mean by that?
11    A.   Well, now I -- my understanding
12  at the time was that when Mr. Placitella
13  said Johnson's mine, I thought he meant the
14  mines owned by Johnson's under the
15  Johnson's umbrella, you know, the
16  numerous -- the different ones that were
17  owned by Johnson & Johnson or used by
18  Johnson & Johnson.
19    Q.   Are you aware that there's a
20  mine that's actually called the Johnson
21  mine?
22    A.   I am now.
23    Q.   When did you first become aware
24  that there's a mine called the Johnson
25  mine?
MAGNA LEGAL SERVICES

Page 445

1    A.   Yesterday.
2    Q.   And how did you become aware of
3  that?
4    A.   In discussions with you.
5    MR. PLACITELLA:  What?
6    MR. BERNARDO:  In discussions
7  with Counsel.
8    MR. PLACITELLA:  Can you mark
9  that, please?
10  BY MR. BERNARDO:
11    Q.   Do you have an understanding of
12  whether the Johnson mine supplied talc for
13  Johnson Baby Powder?
14    A.   No, I don't.  I'm not really
15  familiar which mine supplied what.  I'm not
16  an expert on the mines, and I think that's
17  why I just heard Johnson's, you know,
18  thinking like we say Johnson's Baby Powder,
19  it's Johnson's mine.
20    Q.   And last, Ms. Musco, you talked
21  about a number of discovery interrogatory
22  responses, I think there were a couple in
23  the Selby case and some in the Krushinski
24  case during your deposition.
25    Do you recall that?
MAGNA LEGAL SERVICES

Page 446

1    A.   Yes.
2    Q.   As you sit here today, do you
3  believe that those responses are truthful
4  and accurate?
5    A.   Yes.
6    MR. BERNARDO:  I don't have any
7  further questions.
8    MR. PLACITELLA:  Okay.  I'm
9  going to need five to ten minutes.
10    THE VIDEOGRAPHER:  The time is
11  now 2:02 PM.  We are going off the record.
12    (Recess.)
13    THE VIDEOGRAPHER:  The time is
14  now 2:16 PM.  We are back on the record.
15    - - -
16    E X A M I N A T I O N
17    - - -
18  BY MR. PLACITELLA:
19    Q.   Ma'am, do you have an
20  understanding of what the penalty of
21  perjury is in the state of New Jersey?
22    MR. BERNARDO:  Object to --
23  BY MR. PLACITELLA:
24    Q.   What it is?
25    MR. BERNARDO:  Object to the
MAGNA LEGAL SERVICES

39  (Pages 443 to 446)



Page 447

1    form of the question.
2         THE WITNESS:  I don't know the
3    exact punishment, no.
4    BY MR. PLACITELLA:
5         Q.   And you, in fact, signed
6    certifications indicating that you knew
7    that if you told a non-truth, you were
8    subject to punishment and could go to jail,
9    correct?
10        MR. BERNARDO:  Object to the
11   form of the question.
12        THE WITNESS:  Yes.
13   BY MR. PLACITELLA:
14        Q.   And you knew that when you were
15   testifying here under oath that if you
16   perjured yourself, you could be subject to
17   penalties, correct?
18        A.   That's my understanding, yes.
19        Q.   Now, do you recall that when we
20   started this deposition, I was very
21   specific with you and I asked you questions
22   about whether you had spoken with anybody,
23   including your lawyers, and whether, based
24   on that discussion, you were going to
25   change your testimony in any way.
                MAGNA LEGAL SERVICES

Page 448

1         Do you recall me asking those
2    questions?
3         MR. BERNARDO:  Object to the
4    form of the question, mischaracterizes the
5    question, mischaracterizes the statement.
6    BY MR. PLACITELLA:
7         Q.   Do you recall me asking that
8    question?
9         A.   I know you asked me whether I
10   had conversations, yes.
11        MR. PLACITELLA:  Okay.  Can you
12   please, Court -- Madam Court Reporter, read
13   back the question and answer I asked you to
14   find in the -- that we started this
15   deposition with?
16        (Pertinent portion of the
17   record is read.)
18   BY MR. PLACITELLA:
19        Q.   Do you recall giving that
20   testimony under oath, ma'am --
21        A.   That's what I said.
22        Q.   -- here on the witness stand in
23   Middlesex County?
24        A.   That's what I said, yes.
25        Q.   Okay.  I'm going to show you
                MAGNA LEGAL SERVICES

Page 449

1    your testimony from the last time.
2         MR. PLACITELLA:  Are you ready?
3         THE VIDEOGRAPHER:  There's no
4    speakers hooked up to it.
5         MR. PLACITELLA:  Right.  Why
6    are we getting no sound?
7         THE VIDEOGRAPHER:  The time is
8    now 2:18 PM.  We're going off the record.
9         (Recess.)
10        THE VIDEOGRAPHER:  The time is
11   now 2:22 PM.  We are back on the record.
12   BY MR. PLACITELLA:
13        Q.   This is your testimony from
14   last time.  I want to play it for you.
15        (Audio played.)
16        Okay.  That was your testimony
17   before you had a conversation with your
18   lawyer and you changed your testimony,
19   correct?
20        MR. BERNARDO:  Object to the
21   form of the question, and object to not
22   showing the witness the transcript in which
23   there is obviously important testimony
24   right before what you just showed her.
25   BY MR. PLACITELLA:
                MAGNA LEGAL SERVICES

Page 450

1         Q.   Ma'am, do you recall giving
2    that testimony?
3         Here, I'll play it again?
4         (Audio played.)
5         MR. BERNARDO:  Same objection.
6    BY MR. PLACITELLA:
7         Q.   Do you recall giving that
8    testimony, ma'am?
9         A.   That is my voice there.  I also
10   remember saying that I really don't know
11   much about the mines at all.
12        Q.   Ma'am, do you recall giving --
13   let me play it again for the record.
14        (Audio played.)
15        MR. BERNARDO:  Object to the
16   continued playing of the testimony in --
17   BY MR. PLACITELLA:
18        Q.   Do you recall giving that
19   testimony, ma'am?
20        MR. BERNARDO:  -- that is not
21   the prior statement.
22   BY MR. PLACITELLA:
23        Q.   Do you recall giving that
24   testimony under oath, ma'am?
25        A.   Yes, I -- that's what I said.
                MAGNA LEGAL SERVICES



Page 451

1      Q.   Okay.  Now --
2      MR. PLACITELLA:  Can you give
3  me J&J-294, please?
4  BY MR. PLACITELLA:
5      Q.   I'm going to show you up on the
6  screen the deposition from your -- the
7  president of your company, Roger Miller, in
8  the Westfall case.
9      Do you remember we went through
10  this the last time and I showed it to you?
11     A.   Yes.
12     Q.   Okay.  And you see on page 16
13  Mr. Miller is asked about the different
14  grades of talc that came out of the Johnson
15  mine.
16     Do you see that?
17     A.   I'm reading that now because
18  this is the first I've seen this.
19     MR. BERNARDO:  Object to the
20  form of the question, beyond the scope of
21  the notice.
22     You can answer in your
23  individual capacity.
24     MR. PLACITELLA:  Well, it's not
25  beyond the scope of the conversation you
MAGNA LEGAL SERVICES

Page 452

1  had with her off the record.
2      MR. BERNARDO:  To correct what
3  was --
4      MR. PLACITELLA:  Okay.  Don't
5  even --
6      MR. BERNARDO:  -- beyond the
7  scope of the notice.
8      MR. PLACITELLA:  Don't even go
9  there.  Don't even go there, okay?  Just
10  don't go there.
11     THE WITNESS:  I see it.  You've
12  highlighted this, yes.
13  BY MR. PLACITELLA:
14     Q.   And you see where it says that
15  one of the grades from the Johnson mine is
16  the No. 500?
17     Here, I'll blow it up for you.
18     A.   I see --
19     Q.   "Was given the No. 500, and the
20  products of the floatation process of the
21  refining process are the 500 series
22  products."
23     Do you see that?
24     A.   I see it says that, yes.
25     Q.   Okay.  Now, go to your binder,
MAGNA LEGAL SERVICES

Page 453

1  8A.  8A-1, the very first document in your
2  binder that you sent to Dr. Hopkins, the
3  very first document.
4      Do you see that?
5      A.   Yes.
6      Q.   Do you have it in front of you?
7      A.   Yes.
8      Q.   You see where it says
9  Cosmetics?
10     A.   Yes, I do.
11     Q.   Okay.  You go to the second
12  page, see where it talks about Emtals for
13  cosmetics?
14     A.   That's what it says, yes.
15     Q.   Do you see where it talks about
16  Emtal 500 for cosmetics coming from the
17  Vermont -- Johnson, Vermont mine?
18     MR. BERNARDO:  Object to the
19  form of the question, beyond the scope
20  of the notice.
21     You can answer in your
22  individual capacity.
23     THE WITNESS:  That's what it
24  says, yes.
25  BY MR. PLACITELLA:
MAGNA LEGAL SERVICES

Page 454

1      Q.   And it also talks about the
2  Windsor 66 product being used in -- in
3  cosmetic, too, correct?
4      MR. BERNARDO:  Object to the
5  form of the question.
6      THE WITNESS:  I see those
7  numbers and I see that.  I don't know what
8  any of this means.
9  BY MR. PLACITELLA:
10     Q.   Yes, ma'am.  And can you tell
11  me, as you sit here today, everything else
12  you discussed with your lawyers in
13  preparation for today's deposition and the
14  deposition the first time?
15     MR. BERNARDO:  Object to the
16  form of the question, instruct the witness
17  not to answer.  Calls for privileged
18  communications.  We can certainly call
19  Judge Viscomi if you like.
20     MR. PLACITELLA:  I'll file a
21  motion.
22  BY MR. PLACITELLA:
23     Q.   Ma'am, you had conversations
24  with your lawyers about the substance of
25  your testimony, correct?
MAGNA LEGAL SERVICES

41  (Pages 451 to 454)



Page 455

1        MR. BERNARDO:  Object to the
2   form of the question.
3        THE WITNESS:  As I told you
4   earlier, we discussed my deposition
5   generally, yes.
6   BY MR. PLACITELLA:
7        Q.   Okay.  Now -- and just so the
8   record is clear, and based upon those
9   discussions with your lawyers, you have
10  changed your testimony here today?
11       MR. BERNARDO:  Object to the
12  form.
13  BY MR. PLACITELLA:
14       Q.   True or false?
15       MR. BERNARDO:  Object to the
16  form of the question.
17       THE WITNESS:  False.
18  BY MR. PLACITELLA:
19       Q.   You haven't changed your
20  testimony?
21       A.   No.
22       MR. BERNARDO:  Objection to
23  form of the question.
24       MR. PLACITELLA:  Okay.
25  BY MR. PLACITELLA:
            MAGNA LEGAL SERVICES

Page 456

1        Q.   So let's have the record clear.
2   On the record, tell me everything you
3   discussed with your lawyers about your
4   testimony --
5        MR. BERNARDO:  Object --
6   BY MR. PLACITELLA:
7        Q.   -- that you gave the last time?
8        MR. BERNARDO:  Object to the
9   form of the question and instruct the
10  witness not to answer.  I'm asking that
11  this stop and that we call in Judge Viscomi
12  right now.  I'm making that request.
13       MR. PLACITELLA:  Well, I'm
14  not -- I'm done.  I'm going to file a
15  motion.
16       MR. BERNARDO:  No, no.
17       MR. PLACITELLA:  There's no
18  reason to do it now.
19       MR. BERNARDO:  No, no, no.
20       MR. PLACITELLA:  No, I'm not
21  doing it now.
22       MR. BERNARDO:  Mr. Placitella,
23  I'm asking --
24       MR. PLACITELLA:  I'm sorry.
25  It's my -- you can do whatever you want
            MAGNA LEGAL SERVICES

Page 457

1   when I'm done with my questioning.  I'm
2   done.
3        MR. BERNARDO:  That's fine.
4        MR. PLACITELLA:  I'm done.
5   Okay?  All right?  I'm done with asking the
6   question.  You've directed her not to
7   answer it and -- and we're going to deal
8   with it --
9        MR. BERNARDO:  No, we're going
10  to --
11       MR. PLACITELLA:  -- in a motion
12  practice.  Yes, we are.
13       MR. BERNARDO:  We're going
14  to --
15       MR. PLACITELLA:  It's my
16  motion.  No, we're not dealing with it now.
17       MR. BERNARDO:  And I'm going to
18  ask if I'm allowed to redirect the witness,
19  and I'm planning to do that.  And in
20  connection with that, I'm going to ask for
21  Judge Viscomi.
22       And in fact, before I redirect
23  the witness, I think I'm going to take a
24  brief break and try to find the judge.
25       THE VIDEOGRAPHER:  The time is
            MAGNA LEGAL SERVICES

Page 458

1   now 2:29 PM.
2        We're going off the record.
3        MR. PLACITELLA:  I'm not done.
4        MR. BERNARDO:  You just said
5   you were.
6        MR. PLACITELLA:  I'm not done
7   with my questions.  I have a lot more
8   questions.  I'm not done.  I'm done with
9   this line of questioning.  You directed her
10  not to answer and I'll file a motion and
11  I'm going to keep asking my questions.
12       MR. BERNARDO:  I'm going to ask
13  for Judge Viscomi in any event.
14       (Discussion held with the
15  Court.)
16       THE VIDEOGRAPHER:  The time is
17  now 2:48 PM.  We are back on the record.
18  BY MR. PLACITELLA:
19       Q.   Okay.  We had a conversation
20  with the judge so I'm going to ask you this
21  question:  Did you understand it was a
22  material issue as to whether -- well,
23  scratch that.
24       When we started the deposition,
25  do you recall giving the following
            MAGNA LEGAL SERVICES




Page 459

1    testimony, and I'm going to play it out
2    loud because the video doesn't work, okay?
3    In terms of scope of the deposition.
4            Do you recall this?
5            (Audio played.)
6            Do you recall giving that
7    testimony?
8        A.   Yes, I do.
9        Q.   Okay.  Now, you recall from the
10   affidavits that I showed you from
11   Mr. Miller where he said under oath that
12   the cosmetic talc and the industrial talc
13   came from the same mine.
14           Do you recall that?
15           MR. BERNARDO:  Object to the
16   form of the question.
17           THE WITNESS:  I don't recall
18   that he said that, no.
19   BY MR. PLACITELLA:
20       Q.   Okay.  We went through this, do
21   you remember the Edley affidavit from this
22   morning?
23           MR. PLACITELLA:  Can I --
24           THE WITNESS:  I remember the
25   name, yes.
                MAGNA LEGAL SERVICES

Page 460

1    BY MR. PLACITELLA:
2        Q.   Do you recall --
3            THE VIDEOGRAPHER:  The time is
4    now 2:51 PM.  We're going off the record.
5    BY MR. PLACITELLA:
6        Q.   I'll read -- I'll read it while
7    you're trying to figure it out.
8            The affidavit that's in your
9    book --
10           MR. BERNARDO:  I'm sorry, are
11   we on the record, Chris?
12           MR. PLACITELLA:  Yes.
13           MR. BERNARDO:  I thought he
14   just said we're going off the record.
15           MR. PLACITELLA:  I'm trying to
16   finish this.  The judge told me I had an
17   hour.
18           MR. BERNARDO:  I know, Chris.
19   I'm not trying to be argumentative, but I
20   thought he said we're off the record.  I
21   thought you wanted to be on the record.
22           THE WITNESS:  He did say that.
23           THE VIDEOGRAPHER:  The time is
24   now 2:52 PM.  We are back on the record.
25   BY MR. PLACITELLA:
                MAGNA LEGAL SERVICES

Page 461

1        Q.   This is the affidavit from the
2    president of your company we went through
3    this morning.
4            Do you see that?
5        A.   Yes, president of the mine,
6    yes.
7        Q.   Right.
8            MR. PLACITELLA:  This is --
9    BY MR. PLACITELLA:
10       Q.   And in the affidavit,
11   Mr. Miller states:
12           "The mining district is
13   exclusive source of talc for all Johnson's
14   Baby Powder sold in the United States.  In
15   addition to supplying the talc for
16   Johnson's Baby Powder, Windsor Minerals
17   also sells a portion of its products to
18   independent industrial users."
19           Do you see that?
20       A.   Yes, I see that.
21           MR. BERNARDO:  Objection.
22   BY MR. PLACITELLA:
23       Q.   On the back he says:
24           "All of the talc mined by
25   Windsor Minerals, Inc., whether it is
                MAGNA LEGAL SERVICES

Page 462

1    ultimately sold to industrial users or used
2    in Johnson's Baby Powder, is sampled and
3    tested for presence of asbestos."
4            Right?
5        A.   Yes.
6        Q.   Okay.  Now, you have binders --
7    your attorney asked you about binders 8A
8    and 8B.
9            Do you see them in front of
10   you?
11       A.   Yes.
12       Q.   Who selected what was going to
13   be put in those binders, you or your
14   lawyers?
15       A.   Well, a lot of it was based on
16   my first deposition with you.  I had asked
17   that those things be sent to Dr. Hopkins so
18   that I would understand them, and as I
19   explained earlier, to make sure that he was
20   well aware of them.  So that's really what
21   a lot of it is.
22       Q.   I'm not asking -- who made the
23   selection, ma'am, as to what was going to
24   go in those binders?
25       A.   My attorneys and myself.
                MAGNA LEGAL SERVICES



Page 463

1    Q.   So your lawyers made the
2  selection with you and that was what was
3  sent to Dr. Hopkins, correct?
4          MR. BERNARDO:  Object to the
5  form of the question.
6  BY MR. PLACITELLA:
7    Q.   Correct?
8    A.   This is what was sent, yes.
9    Q.   And it did not include all of
10 the information that was -- is in Musco-2,
11 does it?
12   A.   What's Musco-2?
13   Q.   The big fat binder in front of
14 you.  All of that information is not in the
15 binders you sent to Dr. Hopkins, is it?
16   A.   You mean all of this
17 information?
18   Q.   Yes, ma'am.
19   A.   I don't believe so.  I don't
20 know.
21   Q.   So what happened was your
22 lawyers determined what was going -- what
23 you were going to review, they put it in 8A
24 and 8B, and then you sent that off to
25 Dr. Hopkins, correct?
              MAGNA LEGAL SERVICES

Page 464

1          MR. BERNARDO:  Object to the
2  form of the question.
3          THE WITNESS:  Based -- based on
4  our understanding of the notice, that
5  material was sent to Mr. -- Dr. Hopkins.
6  BY MR. PLACITELLA:
7    Q.   And that included the very
8  first document in your binder that talked
9  about the Johnson mine talc being used in
10 cosmetic talc, right?
11         MR. BERNARDO:  Object to the
12 form of the question.
13         THE WITNESS:  What's in 8A and
14 8B was sent to Dr. Hopkins.
15 BY MR. PLACITELLA:
16   Q.   Right.  And it's the very first
17 document in your binder that talks about
18 talc from the Johnson mine, we just went
19 through this, used in cosmetic talc, right?
20 Very first document.
21   A.   That's in here, yes.
22   Q.   Okay.  And then you called
23 Dr. Hopkins after you sent the material,
24 correct?
25   A.   Correct.
              MAGNA LEGAL SERVICES

Page 465

1    Q.   Okay.  And Dr. Hopkins is not a
2  Johnson & Johnson employee, correct?
3    A.   Not at this time, no.
4    Q.   And he never worked with you
5  personally in answering any discovery
6  related to lawsuits involving talc that you
7  were involved with, correct?
8    A.   Not directly, no.
9    Q.   All right.  You never had a
10 single conversation with him about lawsuits
11 involving talc until Johnson & Johnson
12 arranged for you to call him in preparation
13 for this deposition, correct?
14         MR. BERNARDO:  Object to the
15 form of the question.
16         THE WITNESS:  We had had
17 conversations through the course of my
18 tenure at Johnson & Johnson, but not
19 directly related to any particular
20 complaints.
21 BY MR. PLACITELLA:
22   Q.   My question was, ma'am:  You
23 never had a conversation with Dr. Hopkins
24 about any lawsuit whatsoever until such
25 time that counsel for Johnson & Johnson put
              MAGNA LEGAL SERVICES

Page 466

1  in touch with Dr. Hopkins, correct?
2          MR. BERNARDO:  Object to the
3  form of the question.
4          THE WITNESS:  That's correct.
5  BY MR. PLACITELLA:
6    Q.   And Dr. Hopkins is not an
7  employee of Johnson & Johnson, is he?
8    A.   Not at this time, no.
9    Q.   And what happened was that
10 Johnson & Johnson then paid Dr. Hopkins to
11 look at the material that you sent him and
12 then have a conversation to tell you what
13 he thinks the material means, correct?
14         MR. BERNARDO:  Object to the
15 form of the question.
16         THE WITNESS:  I don't know.
17 I'm sure he was paid for his time like all
18 of us, but I -- I don't know anything about
19 that.
20 BY MR. PLACITELLA:
21   Q.   Well, how much was he getting
22 paid in order to brief you for this
23 deposition?
24         MR. BERNARDO:  Object to the
25 form of the question.
              MAGNA LEGAL SERVICES



Page 467

```
 1          THE WITNESS:  I have no idea.
 2   BY MR. PLACITELLA:
 3       Q.    And as a result of -- as a
 4   result of your conversation, you took down
 5   notes, correct?
 6       A.    That's correct.
 7       Q.    Okay.
 8          MR. PLACITELLA:  Do you have
 9   her notes?
10          MR. BERNARDO:  And I'm going to
11   object for the record.  This is not
12   something that came up on her direct.
13   This is something that could have been
14   asked before and should have been asked
15   before.
16          Go ahead.
17          MR. PLACITELLA:  Okay.  Give
18   the witness a copy of her notes.
19   BY MR. PLACITELLA:
20       Q.    Okay.  You have in front of you
21   your notes?
22       A.    Yes.
23       Q.    Okay.  I have them here under
24   the Elmo.
25          These are your notes, correct?
                MAGNA LEGAL SERVICES
```

Page 468

```
 1       A.    Yes.
 2       Q.    And they're P-14, correct?
 3       A.    Yes.
 4       Q.    And they're taken on Drinker,
 5   Biddle & Reath station -- notepads?
 6       A.    Yes, they are.
 7       Q.    So did you take these while you
 8   were at the law firm of Drinker, Biddle &
 9   Reath?
10       A.    Yes, I did.
11       Q.    And was anybody in the room
12   with you while you were taking these notes?
13       A.    Yes.
14       Q.    And who was in the room with
15   you while you were taking these notes?
16       A.    Both my attorneys, Mr. Karp and
17   Mr. Bernardo.
18       Q.    So Mr. Bernardo and Mr. Karp
19   were in the room while you were speaking to
20   Dr. Hopkins and he was briefing you on his
21   perceptions of what was in the documents
22   you sent him, correct?
23          MR. BERNARDO:  Object to form
24   of the question.
25          THE WITNESS:  They were both in
                MAGNA LEGAL SERVICES
```

Page 469

```
 1   the room at the other end of the table, but
 2   I was having a conversation with
 3   Dr. Hopkins.
 4   BY MR. PLACITELLA:
 5       Q.    Right.  And did your lawyers at
 6   any point in time during your conversation
 7   with Dr. Hopkins provide any additional
 8   information or input?
 9       A.    No, they did not.
10       Q.    So they sat there quietly the
11   whole time and listened?
12       A.    They were talking amongst
13   themselves.
14       Q.    Okay.  So did they have any --
15   did they say anything to Dr. Hopkins?
16       A.    No, they did not.
17       Q.    Okay.  And so -- and the
18   information you received from Dr. Hopkins
19   with the lawyers in the room was part of
20   the basis for the testimony that you've
21   given in this deposition, correct?
22          MR. BERNARDO:  Object to the
23   form of the question.
24          THE WITNESS:  I don't know that
25   I would call it the basis for the
                MAGNA LEGAL SERVICES
```

Page 470

```
 1   testimony.  I -- the reason that I spoke to
 2   Dr. Hopkins is because I wanted, as I've
 3   said before, to make sure that this was
 4   nothing new, that he had reviewed -- he was
 5   familiar with all the allegations and I
 6   wanted to make sure of that.
 7   BY MR. PLACITELLA:
 8       Q.    Okay.  But then you wrote down
 9   notes based on your conversation with
10   Dr. Hopkins while your lawyer was in the
11   room and you brought them to the -- to the
12   deposition to -- if I asked you questions,
13   you were going to refer to the notes,
14   right?
15          MR. BERNARDO:  Object to the
16   form of the question.
17          THE WITNESS:  No, I was told
18   that they had to be brought to the
19   deposition so they're here.
20   BY MR. PLACITELLA:
21       Q.    Okay.  So whatever is in these
22   notes is not the basis for anything you had
23   to say in this deposition?
24       A.    I really took notes.  I do this
25   every time I'm on the phone automatically.
                MAGNA LEGAL SERVICES
```

45  (Pages 467 to 470)



Page 471

1   It's just to focus myself in the
2   conversation.  So I heard a lot from
3   Dr. Hopkins, a lot of it was science.  As I
4   said, I'm not the expert in that, so I
5   couldn't repeat back really what he said.
6        Q.   So do you remember what you
7   said about your notes the last time we were
8   together?
9        A.   Not exactly, no.
10       Q.   Okay.  And -- well, let's just
11  look at your notes.  Okay?  Let's -- so
12  let's look at your notes where it talks
13  about No. 6.
14            Do you see that?
15       MR. PLACITELLA:  Can you give
16  me book 6?
17  BY MR. PLACITELLA:
18       Q.   You see No. 6?
19       A.   Yes.
20       Q.   Okay.  And what that does is
21  that refers to Exhibit 6 in tab 5, correct?
22       A.   No, I -- this was numbers that
23  Dr. Hopkins was using on the phone, that
24  perhaps it was just his way of referring.
25  I don't know exactly what he was tying it

MAGNA LEGAL SERVICES

Page 472

1   into.  I just wrote it down as he said it.
2        Q.   Well, here, I'm looking at it.
3   Here's 1971, Colorado mine, right?  Your
4   notes.  And there's an Exhibit No. 6,
5   right?  Your notes say No. 6, 1971, and you
6   wrote down Colorado mine, correct?
7        A.   As I said, I wrote down what
8   Dr. Hopkins said, which was No. 6.
9        Q.   And then tell me what your
10  notes say about what Dr. Hopkins said.
11       A.   I have, "Colorado mine, trace
12  tremolite 1971.  Ashton, one sample that
13  Langer found.  Several labs.  Princeton,
14  MIT, FDA, Dartmouth all confirmed no
15  asbestos."
16       Q.   Okay.  And --
17       MR. PLACITELLA:  Sorry.
18  J&J-65.  My fault.  I'm sorry.  I should
19  let you know that I -- hold on.  It's still
20  not here.  Let's go to 22.
21  BY MR. PLACITELLA:
22       Q.   Can you go to your tab 8A-19?
23       MR. BERNARDO:  I'm sorry, 8A-
24  19?
25       MR. PLACITELLA:  Uh-huh.

MAGNA LEGAL SERVICES

Page 473

1   BY MR. PLACITELLA:
2        Q.   November 5th, 1975.
3        MR. PLACITELLA:  That's what
4   I'm missing, I'm doing this wrong.  I'm
5   back in sync.
6   BY MR. PLACITELLA:
7        Q.   All right.  So in your -- in
8   your notes you have a No. 25, "Don't know
9   if industrial or cosmetic".
10            Do you see that?
11       A.   Yes.
12       Q.   And 25 is at 8A-19, correct?
13       A.   It says Exhibit 25.
14       Q.   Correct?  And so I'm clear that
15  this exhibit under the Elmo, 25,
16  corresponds to your notes with Dr. Hopkins,
17  correct?
18       A.   As I said earlier, these were
19  the numbers that Dr. Hopkins gave me, so I
20  do not know for sure if it's -- that's what
21  it relates to.
22       Q.   Okay.  Let's go to -- let's go
23  to your notes 22.  Okay?  No. 22 talks
24  about what?  What does that say, 22?
25       A.   It says, "Imerys 1976, Vermont.

MAGNA LEGAL SERVICES

Page 474

1   Don't know what the sample is.  Sediment
2   returned to test tube.  No baby powder
3   talc."
4        Q.   Right.  And is that your tab
5   No. 17, Exhibit 22?
6        A.   As I said earlier, I don't know
7   specifically.  These numbers were given to
8   me by Dr. Hopkins.
9        Q.   So although -- well, maybe I
10  can shortcut all this.
11            Although you wrote down notes
12  based on your conversations with
13  Dr. Hopkins, you have no idea what exhibits
14  in the binder you sent him they actually
15  refer to, correct?
16       A.   As I said earlier, these were
17  his numbers.  He specifically talked about
18  these kind of testing where there were
19  allegations to make it a little clearer to
20  me and reassure me, but I can't say for
21  sure what his numbering system was.
22       Q.   Okay.  So you don't know what
23  he was going through having a conversation
24  with him -- just so we're clear, you have
25  no idea from looking at anything in 8A or

MAGNA LEGAL SERVICES



Page 475

1    8B what he was talking about, correct?
2        A.   I don't know specifically his
3    numbering system, but you know, as you have
4    pointed out, the number, the place, it
5    seems to it, but it's Dr. Hopkins numbers,
6    you know, he gave me.
7        Q.   Right.  But you never connected
8    the two?
9        A.   No.
10       Q.   Okay.  So all you did was
11   basically listen to Dr. Hopkins, he gave
12   you a number, he told you what he thought
13   about that number and you wrote it down,
14   correct?
15       A.   Yes.  I asked for his
16   interpretation of the different allegations
17   and that's what he gave me.
18       Q.   Okay.  But you have no idea,
19   just so we're clear, what tab in either one
20   of these binders those notes even refer to,
21   correct?
22       A.   I don't know specifically.  He
23   gave me these numbers, yes.
24       Q.   Okay.  So we'd have to ask
25   Dr. Hopkins?
                    MAGNA LEGAL SERVICES

Page 476

1        A.   Yes.
2        Q.   Okay.  So did you ever ask
3    Dr. Hopkins whether the -- by the way,
4    did -- did -- were your lawyers taking
5    notes while this was going on?
6        A.   I don't think so.  As I said,
7    they were at the other end of the table
8    talking amongst themselves.  They were not
9    part of the conversation.
10       Q.   Okay.  And -- okay.
11           MR. PLACITELLA:  So give me the
12   Hopkins chart.
13   BY MR. PLACITELLA:
14       Q.   This is a big copy of the
15   Hopkins chart, J&J-414, Hopkins-28 that was
16   in your binder.
17           Do you see that?
18       A.   Yes.
19       Q.   Okay.  Will you take the big
20   copy out?  And let's just talk about it.
21           You see -- first of all, can
22   you look through this chart and you see how
23   the chart is headed, it's date, exhibit
24   number, testing entity, author, recipient,
25   purpose stated, test method, mine, what was
                    MAGNA LEGAL SERVICES

Page 477

1    tested, special preparation, what test
2    revealed, Hopkins comments.
3            Do you see that?
4        A.   I see that, yes.
5            MR. BERNARDO:  Object to the
6    form of the question.
7    BY MR. PLACITELLA:
8        Q.   And can you tell me -- so for
9    example, under J&J-257, it talks about
10   McCrone.
11           Do you see that?
12       A.   I see that, yes.
13       Q.   And by the way, when you talked
14   to Dr. Hopkins about this chart, did he
15   tell you how he created this chart?
16           MR. BERNARDO:  Object to the
17   form of the question.
18           THE WITNESS:  I did not talk to
19   him about this chart.  I don't know if he
20   created it or you created it based on his
21   comments, so I didn't talk to him
22   specifically about this.
23   BY MR. PLACITELLA:
24       Q.   So where he talks about find --
25   where the chart talks about chrysotile
                    MAGNA LEGAL SERVICES

Page 478

1    being found in Shower to Shower, you don't
2    know anything about that, correct?
3            MR. BERNARDO:  Object to the
4    form of the question.
5            THE WITNESS:  I don't know what
6    this is referring to here, no.
7    BY MR. PLACITELLA:
8        Q.   Okay.  So maybe I can get us
9    out of here early.
10           Am I correct that you don't
11   have any evidence, as you sit here today,
12   on behalf of Johnson & Johnson that a
13   single one of the tests that are set forth
14   in this chart were ever supplied to any
15   plaintiff before 2017 as part of discovery,
16   correct?
17           MR. BERNARDO:  Object to the
18   form of the question.
19   BY MR. PLACITELLA:
20       Q.   Take a look at it --
21           MR. BERNARDO:  Asked and
22   answered.
23   BY MR. PLACITELLA:
24       Q.   -- 'cause I don't -- I don't
25   want you -- I don't want you to do it
                    MAGNA LEGAL SERVICES

47  (Pages 475 to 478)



Page 479

```
 1    haphazardly.  Take a look at the chart,
 2    please.
 3        A.   I don't know what was supplied
 4    to the plaintiffs.
 5        Q.   Please take a look at the
 6    chart.
 7        A.   I don't have to look at it
 8    because I really do not know what was
 9    supplied to the plaintiff.
10        Q.   As you sit here today
11    testifying on behalf of Johnson & Johnson,
12    am I correct that you don't have any
13    evidence that you can show the court that
14    any of the tests that are set forth in this
15    chart were ever provided to a single
16    plaintiff before 2017, correct?
17            MR. BERNARDO:  Object to the
18    form of the question, beyond the scope of
19    the notice.
20            You can answer in your
21    individual capacity.
22            THE WITNESS:  I don't know
23    because my understanding was that was not
24    what I was here to talk about today.
25    BY MR. PLACITELLA:
                MAGNA LEGAL SERVICES
```

Page 480

```
 1        Q.   Okay.  And would you agree that
 2    all of the test results, whether you agree
 3    with them or not, on this chart are
 4    evidence?
 5            MR. BERNARDO:  Object to the
 6    form of the question.
 7            THE WITNESS:  That's kind of
 8    hard for me to answer because I think of
 9    evidence as proof, but if it was
10    appropriate for them to be given to the
11    plaintiffs and discussed, then I would
12    think they would be.
13    BY MR. PLACITELLA:
14        Q.   But you have no proof to that
15    effect at all, correct?
16        A.   No, I do not.
17        Q.   All right.  And you were the
18    one that was here produced by Johnson &
19    Johnson to testify under oath as to what
20    was in the possession of Johnson & Johnson
21    and what was turned over to the plaintiffs
22    as part of discovery?  That's the part I
23    just read you in the first question I asked
24    you in the deposition, correct?
25            MR. BERNARDO:  Object to the
                MAGNA LEGAL SERVICES
```

Page 481

```
 1    form of the question.
 2            THE WITNESS:  My understanding
 3    that I was here today to discuss the
 4    discovery responses.
 5    BY MR. PLACITELLA:
 6        Q.   Ma'am, do you remember the
 7    first question I asked you and I just
 8    played it for you again, that you are here
 9    to testify about what information was in
10    possession of Johnson & Johnson and what
11    was turned over in the course of discovery?
12            Do you recall that?
13        A.   The specific discovery
14    responses.
15        Q.   Yes, ma'am.  And as you sit
16    here today, you don't have a single piece
17    of evidence to indicate that you ever
18    turned any test over related to the testing
19    of asbestos in Johnson & Johnson talc to a
20    single plaintiff, correct?
21            MR. BERNARDO:  Object to the
22    form of the question.
23            THE WITNESS:  My understanding
24    if it was appropriate to be turned over,
25    that it would have been, but I do not know
                MAGNA LEGAL SERVICES
```

Page 482

```
 1    what was or was not turned over.
 2    BY MR. PLACITELLA:
 3        Q.   Ma'am, I'm going to ask the
 4    question again:  As you sit here today, you
 5    do not have any evidence to prove that you
 6    ever turned over a single test concerning
 7    asbestos and Johnson & Johnson talc to any
 8    plaintiff before 2017, correct?
 9            MR. BERNARDO:  Object to the
10    form of the question.
11            THE WITNESS:  Again, I do not
12    know what was turned over or what was not
13    turned over.
14    BY MR. PLACITELLA:
15        Q.   Ma'am, I promise you you'll get
16    out of here on time.  Just please try to
17    answer my question.
18            MR. BERNARDO:  I believe she
19    has a couple times.
20    BY MR. PLACITELLA:
21        Q.   As you sit here today, you do
22    not have any evidence that any test related
23    to asbestos and Johnson & Johnson talc was
24    ever turned over to any plaintiff in any
25    case before 2017.  You have no evidence
                MAGNA LEGAL SERVICES
```

48 (Pages 479 to 482)



Page 483

1 with you, do you?
2     MR. BERNARDO:  Object to the
3 form of the question.
4     THE WITNESS:  I'm trying to
5 answer it.  I don't know what was or
6 wasn't.  I did not come today prepared to
7 show you evidence of what was or was not
8 turned over.
9 BY MR. PLACITELLA:
10    Q.  Ma'am, all I'm asking you, as
11 you sit here today, do you have any
12 evidence that you turned over a single one
13 of these tests set forth in Musco-2 or on
14 this chart to any plaintiff before 2017?
15 That's my question.
16    A.  And my answer is still the
17 same:  I don't know what was or was not
18 turned over.
19    Q.  But, ma'am, you're here on
20 behalf of Johnson & Johnson as the person
21 to testify about what was and what was not
22 turned over.  And are you saying that you,
23 Johnson & Johnson, have no idea what was
24 turned over or not?
25     MR. BERNARDO:  Object to the
MAGNA LEGAL SERVICES

Page 484

1 form of the question.
2     THE WITNESS:  My understanding
3 is that I'm here today to discuss the
4 discovery responses.
5 BY MR. PLACITELLA:
6    Q.  Ma'am, yes or no:  Do you have
7 any evidence that you ever turned over a
8 single test for asbestos in Johnson &
9 Johnson talc before 2017?  Do you have any
10 evidence whatsoever?
11     MR. BERNARDO:  Object to the
12 form of the question.
13     THE WITNESS:  I can't answer
14 that because I don't know what was handed
15 over or what was not.
16     I'm trying to be helpful, but
17 I -- I do not have any knowledge of that
18 and I was not prepared to discuss that
19 today.
20 BY MR. PLACITELLA:
21    Q.  Okay.  Ma'am, in the
22 interrogatory responses that you signed,
23 and you said you verified a number of them,
24 do you have any evidence that when you
25 signed answers to interrogatories, that you
MAGNA LEGAL SERVICES

Page 485

1 turned over, you, Johnson & Johnson, any
2 evidence related to the testing of Johnson
3 & Johnson talc for asbestos?
4     MR. BERNARDO:  Object to the
5 form of the question.
6     THE WITNESS:  If it was
7 requested and it was appropriate to send,
8 then it would have been sent.  So I do not
9 know if it was sent or not.
10 BY MR. PLACITELLA:
11    Q.  Ma'am, you certified answers to
12 interrogatories under oath, under penalty
13 of perjury in numerous cases, did you not?
14    A.  Yes.  There were different
15 ones, yes.
16    Q.  And what I'm asking you is:  Do
17 you have any proof, as you sit here today,
18 that when you did that, you ever turned
19 over a single document in conjunction with
20 those responses related to the testing of
21 Johnson Baby Powder for asbestos?
22     MR. BERNARDO:  Object to the
23 form of the question.
24     THE WITNESS:  I don't remember
25 turning it over.  I don't remember what was
MAGNA LEGAL SERVICES

Page 486

1 turned over.  Again, that was not my
2 responsibilities.  I'm not here to discuss
3 that.  I don't know what was turned over or
4 not.
5 BY MR. PLACITELLA:
6    Q.  Ma'am, do you have any
7 evidence, as you sit here today, that in
8 any of the discovery responses that you
9 certified as true and accurate ever turned
10 over testing evidence related to Johnson &
11 Johnson Baby Powder for asbestos?  It's a
12 simple yes or no question.
13     MR. BERNARDO:  Object to the
14 form of the question.  She's answered it
15 multiple times.
16 BY MR. PLACITELLA:
17    Q.  Do you have any evidence?
18     MR. BERNARDO:  And she's
19 answered why she can't answer it yes or no
20 as well.
21     MR. PLACITELLA:  Please don't
22 do that.  That is not a form objection.
23 Please don't do that.
24     MR. BERNARDO:  Then please
25 don't harass the witness.
MAGNA LEGAL SERVICES

49  (Pages  483 to 486)



Page 487

1    MR. PLACITELLA:  Please don't
2  do that.  I'm just trying to get an answer
3  to my question.
4    THE WITNESS:  And I'm really
5  trying to answer it.  I don't believe it's
6  a yes or no.  I don't know one way or the
7  other.
8  BY MR. PLACITELLA:
9    Q.   Okay.  So as you sit here
10  today, Johnson & Johnson does not know
11  whether, when they were responding to
12  discovery -- because this is not Nancy
13  Musco. I'm asking you, Johnson & Johnson,
14  as you sit here today, Johnson & Johnson
15  cannot produce any evidence that they ever
16  turned over a single test concerning
17  asbestos in Johnson & Johnson talc at any
18  point in time to any plaintiff, correct?
19    MR. BERNARDO:  Object to the
20  form of the question.
21    THE WITNESS:  Again, I can't
22  answer because my it's understanding today
23  that I was here to discuss the discovery
24  interrogatory responses.
25  BY MR. PLACITELLA:
        MAGNA LEGAL SERVICES

Page 488

1    Q.   Yes, 'ma'am, and in conjunction
2  with the discovery responses, even under
3  your understanding, no discovery response
4  ever attached a single test that you
5  certified, a single test related to testing
6  of Johnson & Johnson Baby Powder for
7  asbestos, correct?
8    MR. BERNARDO:  Object to the
9  form of the question.
10    THE WITNESS:  At this point, I
11  don't even know what the question is.
12  BY MR. PLACITELLA:
13    Q.   Ma'am, when you signed
14  interrogatories, did you ever attach to any
15  of the interrogatories that you certified
16  as true and accurate under oath, did you
17  ever attach or supply a single test of
18  Johnson & Johnson talc for asbestos?
19    Did you ever do it?
20    A.   It wasn't my responsibility to
21  do that.  The questions were given to the
22  appropriate person, and if there was an
23  appropriate response that required testing
24  to be sent and it felt it was appropriate
25  to answer and send, it would have been.
        MAGNA LEGAL SERVICES

Page 489

1    Q.   Ma'am --
2    A.   But I do not know whether they
3  were sent or not.
4    Q.   Ma'am, I'm not asking you,
5  Nancy Musco, I'm asking you, Johnson &
6  Johnson.
7    You, Johnson & Johnson, have no
8  idea whether you ever sent a single test to
9  any plaintiff concerning testing for
10  asbestos in Johnson & Johnson talc,
11  correct?
12    MR. BERNARDO:  Object to the
13  form of the question.
14  BY MR. PLACITELLA:
15    Q.   You, Johnson & Johnson.  Not
16  Nancy Musco.
17    MR. BERNARDO:  Object to the
18  form of the question, beyond the scope of
19  the notice.
20    You can answer it if you can.
21    THE WITNESS:  I have -- because
22  I'm answering as Johnson & Johnson, it's
23  beyond the scope of what we're here to talk
24  about --
25  BY MR. PLACITELLA:
        MAGNA LEGAL SERVICES

Page 490

1    Q.   Ma'am --
2    A.   -- so I do not know.
3    Q.   Ma'am, you believe that it was
4  your determination to figure out what the
5  scope of this deposition was?  You thought
6  that was your role?
7    A.   That was part of my role, yes.
8    Q.   Not your lawyers?  You didn't
9  think your lawyers made that determination?
10  In preparing for this deposition, you made
11  the determination what the scope of the
12  deposition notice was.
13    MR. BERNARDO:  Object to the
14  form.
15  BY MR. PLACITELLA:
16    Q.   Is that -- is that your
17  testimony under oath?
18    MR. BERNARDO:  Object to the
19  form of the question.
20    THE WITNESS:  We both did.
21  BY MR. PLACITELLA:
22    Q.   So you decided what -- you,
23  based upon this notice -- is this marked by
24  the way?
25    MS. CALLAHAN:  P-2 I believe.
        MAGNA LEGAL SERVICES



Page 491

1       MR. PLACITELLA: Okay.
2  BY MR. PLACITELLA:
3       Q.   Based upon P-1 -- P-1 says,
4  you're the person -- the representative of
5  Johnson & Johnson with the most knowledge
6  concerning discovery responses historically
7  provided by Johnson & Johnson and Windsor
8  Minerals concerning the asbestos content of
9  talc, Johnson's Baby Powder, Shower to
10 Shower sold by Johnson & Johnson, Windsor
11 Minerals and Eastern Magnesia Talc Company.
12      Do you see that?
13      A.   Yes, I do.
14      Q.   And you understand that
15 discovery responses involve more than just
16 interrogatory answers, correct?
17      A.   My understanding is that
18 they're the direct responses to the
19 interrogatories in discovery.
20      Q.   Ma'am, you understand that
21 discovery responses are more than answers
22 to interrogatories, correct?
23      A.   My understanding is that these
24 were direct responses that was requested.
25      Q.   Well, you see on the very next
        MAGNA LEGAL SERVICES

Page 492

1  page it actually details information that
2  you were asked to bring and consider.  It
3  included correspondence related to
4  discovery, correct?
5       A.   For the specific complaints,
6  yes.
7       Q.   Okay.  Discovery responses,
8  ma'am, correct?
9       A.   For the specific cases, yes.
10      Q.   All right.  Affidavits, ma'am?
11      A.   Yes.
12      Q.   All right.  Certifications,
13 correct?
14      A.   Yes.
15      Q.   Okay.  And just so the record
16 is clear, although Johnson & Johnson was
17 involved based upon what we went through
18 last time in litigation involving baby
19 powder from 1971 to the present, you only
20 reviewed two sets of interrogatories in
21 order to prepare for your deposition,
22 correct?
23      MR. BERNARDO:  Object to the
24 form of the question.
25 BY MR. PLACITELLA:
        MAGNA LEGAL SERVICES

Page 493

1       Q.   That's it?
2       A.   My understanding is that I was
3  to review and respond to discovery
4  responses and they were not available to me
5  any other discovery responses.
6       Q.   Okay.  Ma'am, let me ask the
7  question again.
8       Although Johnson & Johnson was
9  involved in litigation based on what we did
10 from 1971 to the present involving
11 Johnson's Baby Powder, you only reviewed
12 two interrogatory responses in preparation
13 for the -- this deposition, correct?
14      A.   That's correct.
15      Q.   Okay.
16      MR. BERNARDO:  Object to the
17 form of the question.
18 BY MR. PLACITELLA:
19      Q.   And you -- and out of all of
20 the interrogatory responses that you
21 certified yourself, you only reviewed one
22 set of interrogatory responses, correct?
23      MR. BERNARDO:  Object to the
24 form of the question.
25      THE WITNESS:  I believe there
        MAGNA LEGAL SERVICES

Page 494

1  was only one specific one that I did
2  certify myself.
3  BY MR. PLACITELLA:
4       Q.   You told me that you certified
5  multiple --
6       A.   Of the baby powder.
7       Q.   Right.  I'm sorry, what did you
8  say?
9       A.   Of the baby powder, yes.
10      Q.   Right.
11      A.   There's one.
12      Q.   Right.
13      A.   There's one.  And there may
14 have been others throughout the years that
15 I did.
16      Q.   Right.  And that --
17      A.   But they weren't necessarily
18 baby powder.
19      Q.   You don't have any
20 recollection?
21      A.   No, I don't.
22      Q.   Okay.  All right.  Well, then,
23 how do you know if they're baby powder or
24 not?
25      A.   Because I know that these were
        MAGNA LEGAL SERVICES



Page 495

1   the ones that were discussed.  I mean,
2   30 years, there was a lot of products, a
3   lot of cases.
4       Q.   Okay.  So let me ask you the
5   following questions on behalf of Johnson &
6   Johnson.
7           Did Johnson & Johnson make any
8   mistakes in how they supplied discovery
9   responses in lawsuits involving baby powder
10  from your perspective on behalf of Johnson
11  & Johnson?
12          MR. BERNARDO:  Object to the
13  form of the question, beyond the scope of
14  the notice.
15          You can answer in your
16  individual capacity.
17          THE WITNESS:  I don't know what
18  you mean by mistakes.
19  BY MR. PLACITELLA:
20      Q.   Well, did they -- should they
21  have provided certain information that they
22  didn't -- did they make any mistakes?
23          MR. BERNARDO:  Same objection.
24  BY MR. PLACITELLA:
25      Q.   Here's what I'm trying to
            MAGNA LEGAL SERVICES

Page 496

1   avoid, ma'am, to be clear.  I don't want to
2   see your lawyer get up in a -- in a -- in a
3   trial and say mistakes were made, but they
4   were innocent mistakes, and so I'm just
5   asking you:  From your -- from the
6   perspective of Johnson & Johnson, were any
7   mistakes made in how you responded to
8   discovery in terms of the information you
9   supplied related to Johnson's Baby Powder
10  and testing for asbestos?  Were any
11  mistakes made?
12          MR. BERNARDO:  Object to the
13  form of the question, beyond the scope of
14  the notice.
15          THE WITNESS:  I can't answer
16  that.
17  BY MR. PLACITELLA:
18      Q.   You can't answer it?
19      A.   No.
20      Q.   Okay.
21          MR. PLACITELLA:  Just give me
22  two minutes to look at my notes.
23          THE VIDEOGRAPHER:  Off the
24  record?
25          MR. PLACITELLA:  Yeah, you can
            MAGNA LEGAL SERVICES

Page 497

1   go off the record.
2           THE VIDEOGRAPHER:  The time is
3   now 3:29 PM.  We are going off the record.
4           (Brief recess.)
5           THE VIDEOGRAPHER:  The time is
6   now 3:31 PM.  We are back on the record.
7   BY MR. PLACITELLA:
8       Q.   Okay.  Do you have 8A-32 in
9   front of you?
10      A.   From where?
11      Q.   From your books.
12      A.   8A you said?
13      Q.   8A, No. 32.  This is from the
14  books that you and your counsel selected to
15  send to Dr. Hopkins, correct?
16      A.   This is the book sent to
17  Dr. Hopkins, yes.
18      Q.   Okay.  And 8A-32 is entitled,
19  "What did testing reveal?"
20          Do you see that?
21      A.   I see it says that, yes.
22      Q.   And over here on the left side
23  is a date and on the right is a result.
24          Do you see that?
25      A.   That's what it says, yes.
            MAGNA LEGAL SERVICES

Page 498

1       Q.   And over here it says, for
2   example, date, 12/4/70, and the result is 5
3   to 10 percent fibrous talc, tremolite,
4   actinolite.
5           Do you see that?
6       A.   That's what it says, yes.
7       Q.   Were these results ever
8   provided to any plaintiff, to your
9   knowledge?
10          MR. BERNARDO:  Objection to the
11  form of the question.
12          THE WITNESS:  I do not know.
13  BY MR. PLACITELLA:
14      Q.   Okay.  Next, 7/7/71 under "What
15  did the testing reveal?  Tremolite and
16  actinolite."
17          Do you see that?
18      A.   I see it says that, yes.
19      Q.   Okay.  The next one, it says,
20  7/29/71, Johnson & Johnson.  Fibrous
21  minerals, tremolite, actinolite in terms of
22  what did the testing reveal.
23          Do you see that?
24      A.   I see it says that, yes.
25      Q.   Do you have any evidence that
            MAGNA LEGAL SERVICES

52  (Pages 495 to 498)



Page 499

1    this test was turned over to any plaintiff
2    at any point in time?
3         MR. BERNARDO: Object to the
4    form of question, beyond the scope of the
5    notice.
6         You can answer in your
7    individual capacity if you know.
8         THE WITNESS: I don't know what
9    this is and what it was from and who wrote
10   it.
11   BY MR. PLACITELLA:
12        Q.  Ma'am, this is in your book
13   that you sent to Dr. Hopkins, so you and
14   your lawyers put this together.  You must
15   have thought it was important or you
16   wouldn't have sent it.  So let me ask you
17   the questions.
18        Let's go to 2/26/73.  This
19   talks about from Colorado to Ashton,
20   tremolite, actinolite, asbestos-type
21   materials.
22        Was this test ever sent to any
23   plaintiff?
24        A.  I don't know.
25        Q.  Okay.  Next is a report -- I'll

MAGNA LEGAL SERVICES

Page 500

1    skip down.
2         Reference, 4/24/74, McCrone.
3    On the chart What the tests reveal, and it
4    talks about chrysotile, Argonaut.
5         Do you see that?
6         A.  I see it says that.
7         Q.  Does -- was this test ever
8    supplied to any plaintiff?
9         A.  I don't know.
10        Q.  Okay.  And the next is a --
11   under "What did the test reveal" chart,
12   there is a mention of a report from
13   McCrone.
14        Do you see that?  10/10/74?
15        A.  I see it says that, yes.
16        Q.  And it says chrysotile fibers.
17        Do you have any evidence that
18   this report was ever supplied to a single
19   plaintiff?
20        MR. BERNARDO: Same objection
21   with respect to this entire document and
22   scope.
23        You may answer.
24        THE WITNESS: I don't know.
25   BY MR. PLACITELLA:

MAGNA LEGAL SERVICES

Page 501

1         Q.  Okay.  Next is 2/2/75, entitled
2    Cyprus.  Result: Asbestos mineral
3    tremolite, possibly chrysotile.
4         Do you have any evidence that
5    this test result --
6         MR. BERNARDO: Object to the
7    form --
8    BY MR. PLACITELLA:
9         Q.  -- was supplied to any
10   plaintiff?
11        MR. BERNARDO: Object to the
12   form of the question.
13        THE WITNESS: I do not know.
14   BY MR. PLACITELLA:
15        Q.  Okay.  Next is a listing
16   10/8/65, Miller to McCrone, under Result:
17   Fibers of asbestos.
18        Do you have any evidence that
19   the test that was sent from Miller to
20   McCrone talking about fibers of asbestos
21   was ever turned over to a single plaintiff?
22        A.  I don't know.
23        Q.  Okay.  Next is 1/15/75 from
24   McCrone to Zeitz.  Under Result:  Fibers of
25   asbestos 10 times.

MAGNA LEGAL SERVICES

Page 502

1         Do you have any evidence that
2    this test was ever turned over to a single
3    plaintiff?
4         A.  I --
5         MR. BERNARDO: Same objection.
6         THE WITNESS: I do not know.
7    BY MR. PLACITELLA:
8         Q.  Okay.  Next is a date, 1/25/77,
9    Pooley to Roll (ph).  Under Result:  Fibers
10   of antigorite.
11        Do you have any evidence that
12   this test was ever turned over to a single
13   plaintiff?
14        A.  I do not know.
15        Q.  Okay.  Next -- I'm skipping a
16   little bit because I was told by the judge
17   I had to get done by quarter of, so let's
18   just go from -- to -- skip up to 1978.
19        10/6/78, McCrone to Windsor.
20   Result: Chrysotile fibers.
21        Do you have any evidence that
22   this test was ever turned over to a single
23   plaintiff?
24        A.  I do not, no.
25        Q.  Okay.  Next is a -- well, the

MAGNA LEGAL SERVICES

53 (Pages 499 to 502)



Page 503

1  next two say mine unknown, so I'm going to
2  skip those.
3           Then it says 9/1/83, McCrone,
4  and under Result, it says:  Fibers at
5  Argonaut.
6           Do you know Argonaut was a mine
7  that was used for Johnson Baby Powder?
8           MR. BERNARDO:  Object to the
9  form of the question.
10          THE WITNESS:  As I said
11  earlier, I am not familiar with all the
12  names of the mines.
13  BY MR. PLACITELLA:
14     Q.  Do you have any evidence that
15  this test was ever turn over to a single
16  plaintiff?
17     A.  I do not know.
18     Q.  Okay.  There's another test
19  here, 11/2/84 from McCrone.  Chrysotile
20  fibers.
21          Do you see that result?
22     A.  I see it says that.
23     Q.  Is that the same McCrone that
24  you filed discovery responses saying that
25  the information that they had was a trade
           MAGNA LEGAL SERVICES

Page 504

1  secret?
2           MR. BERNARDO:  Object to the
3  form of the question.
4           THE WITNESS:  I -- again, I
5  don't know what this is and what it relates
6  to.
7  BY MR. PLACITELLA:
8     Q.  But McCrone, that's the company
9  that you filed discovery responses in the
10  Coker case and said that information from
11  McCrone was a trade secret, right?
12          MR. BERNARDO:  Object to the
13  form of the question.
14  BY MR. PLACITELLA:
15     Q.  That's what you said, you
16  Johnson & Johnson.
17          Do you remember that?
18     A.  I don't believe -- I don't know
19  that that was said.
20     Q.  Okay.  You don't remember that
21  document?
22     A.  I remember there were
23  documents.  I don't remember what they
24  said.
25     Q.  All right.  A few more.
           MAGNA LEGAL SERVICES

Page 505

1           8/22/85, test from McCrone.
2  Result:  Chrysotile asbestos.
3           Do you have any evidence that
4  this test was ever sent to a single
5  plaintiff?
6           MR. BERNARDO:  Object to the
7  form of the question.
8           THE WITNESS:  I do not know.
9  BY MR. PLACITELLA:
10     Q.  Okay.  And 4/26/86, McCrone to
11  Miller, chrysotile asbestos.  Do you have
12  any evidence this test was ever sent to a
13  single plaintiff?
14     A.  I do not know.
15     Q.  Okay.  The next test, 9/8/86,
16  McCrone to Miller, Windsor Hammonsville,
17  Goodrock exposed to -- George Goodrock
18  exposed to fibers.
19          Do you know who that is --
20     A.  No.
21     Q.  -- who worked for you?
22          Okay.  And then the last one,
23  3/30/1987, tremolite, correct?
24     A.  That's what it says.
25     Q.  All right.  One more question,
           MAGNA LEGAL SERVICES

Page 506

1  ma'am.  One more question and I'm done.
2           MR. PLACITELLA:  Tab 33 and 34.
3  BY MR. PLACITELLA:
4     Q.  All of these tests that we just
5  went through, ma'am, every one of them
6  predated the affidavit signed by the
7  president of your company in July 1987
8  where you said that there was no testing
9  evidence ever showing asbestos in any
10  Johnson & Johnson product, correct?
11          MR. BERNARDO:  Object to the
12  form.
13  BY MR. PLACITELLA:
14     Q.  Every one of the tests we just
15  went through?
16          MR. BERNARDO:  Object to the
17  form of the question, beyond the scope of
18  the notice.
19          You can answer in your
20  individual capacity if you know.
21          THE WITNESS:  The dates seem to
22  be before, yes.
23          MR. PLACITELLA:  Okay.  That's
24  all the questions I have.  Thank you.
25          THE VIDEOGRAPHER:  The time is
           MAGNA LEGAL SERVICES



Page 507

1  now 3:39 PM.  This concludes today's
2  deposition.
3         (Witness excused.)
4         (Deposition concluded at
5  approximately 3:39 PM.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 508

1              CERTIFICATE
2         I, CONSTANCE S. KENT, a Notary
3  Public and Certified Court Reporter of the
4  State of New Jersey, do hereby certify that
5  prior to the commencement of the
6  examination, NANCY MUSCO, was duly sworn by
7  me to testify to the truth, the whole truth
8  and nothing but the truth.
9         I DO FURTHER CERTIFY that the
10  foregoing is a verbatim transcript of the
11  testimony as taken stenographically by and
12  before me at the time, place and on the
13  date hereinbefore set forth, to the best of
14  my ability.
15         I DO FURTHER CERTIFY that I am
16  neither a relative nor employee nor
17  attorney nor counsel of any of the parties
18  to this action, and that I am neither a
19  relative nor employee of such attorney or
20  counsel, and that I am not financially
21  interested in the action.
22  _____
23  CONSTANCE S. KENT, CCR, RPR, CR
     Notary Number: 2325233
24  Notary Expiration: 1/13/2020
     CCR Number: 30XI00118300
25  Dated: March 13, 2019

Page 509

1              LAWYER'S NOTES
2  PAGE  LINE
3  _____ _____ _____
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____
25  _____ _____ _____

55  (Pages 507 to 509)



**A**

**A-12** 361:25
**ability** 508:14
**able** 311:19 429:15
**Abraham** 396:2
**access** 437:2
**accurate** 395:6
413:14 436:10
446:4 486:9
488:16
**actinolite** 498:4,16
498:21 499:20
**action** 381:1 508:18
508:21
**actual** 307:8
**acute** 307:15 308:2
**addition** 308:17
311:1 328:7
392:15 442:16
461:15
**additional** 306:17
310:24 335:18
469:7
**address** 312:20
313:15 330:22
**addressed** 311:13
311:13,17,22
**addresses** 331:4
**Administrator**
297:14
**admitted** 320:3
338:1
**adopted** 360:13
**advance** 337:16
**advice** 311:11
**advised** 410:24
**affidavit** 301:21
302:23 322:25
323:14,17 324:1
325:13,15,19,20
327:3 329:3 331:9
333:14 348:13,19
349:15,16,22
350:2,14 351:3,10
351:21 352:9

353:11,13 355:24
355:25 364:1,2,25
365:2,21 366:6
367:6 369:16,16
369:17,20 370:10
372:4,13,19,22,23
373:2 374:8,10
376:23 395:22
415:17,23 416:17
416:22 417:12,14
417:16,18 459:21
460:8 461:1,10
506:6
**affidavits** 333:3
416:11 440:10
459:10 492:10
**afternoon** 425:15
**ago** 358:15 367:18
372:4 382:18
429:21
**agree** 364:17
370:10 433:5,9
480:1,2
**agreed** 441:6
**agreement** 320:1
320:11 337:12,23
338:3
**AH** 354:22
**ahead** 467:16
**Akron** 372:3
**al** 294:7 295:8,18
296:7,15 297:7,20
298:7,15,24 305:6
**ALFRED** 297:3
**Alice** 387:19 388:3
388:11 390:1
407:3
**allegation** 308:16
**allegations** 356:20
431:23 470:5
474:19 475:16
**alleged** 308:13,15
385:2
**alleging** 396:2
**allowed** 457:18
**allowing** 337:9

**Amax** 296:6 300:6
**ambiguous** 403:24
**AMERICA** 295:7
295:17 297:7,20
298:6,14,23
**amosite** 361:7,14
**amounts** 388:19
**analysis** 355:11,12
**analyzed** 360:24
388:12
**and/or** 380:17
**ANDREW** 299:9
**andrew.karp@s...**
299:12
**angry** 326:19,20
**ANITA** 297:3
**answer** 304:5 326:3
329:12 334:9
336:11 342:21
346:8 348:2,7
349:1 353:20
355:18 356:5
357:2 360:5
361:20 364:11
365:8 366:1 370:2
371:21 380:14
383:20 387:24
399:21 406:22
407:16 411:21
414:1,13 416:15
417:23 419:1,8
420:15 424:21
428:3,18 429:12
435:1,20,21,22
436:5,5 437:25
439:16 448:13
451:22 453:21
454:17 456:10
457:7 458:10
479:20 480:8
482:17 483:5,16
484:13 486:19
487:2,5,22 488:25
489:20 495:15
496:15,18 499:6
500:23 506:19

**answered** 420:13
436:7 478:22
486:14,19
**answering** 408:8,11
465:5 489:22
**answers** 309:24
337:3 346:6
354:17 356:10
357:6 361:1 366:7
366:20 380:6
391:18 394:19,24
412:7,19 413:3,13
415:5 419:17
430:5,6 436:21
438:3 441:23
484:25 485:11
491:16,21
**anthophyllite**
393:20,21
**antigorite** 502:10
**anybody** 418:23
447:22 468:11
**apologize** 368:12
**appeal** 418:7,19
**APPEARANCES**
300:1
**appeared** 312:19
409:1
**appears** 374:12
**Appellate** 418:8,22
**appreciate** 326:16
425:22
**approach** 421:13
**appropriate** 367:25
394:24 406:11
419:17,21 434:18
435:4 436:8,16
480:10 481:24
485:7 488:22,23
488:24
**approximately**
306:12 507:5
**April** 387:19
**Argonaut** 500:4
503:5,6
**argumentative**

367:22 460:19
**ARPS** 299:8
**arranged** 465:12
**artfully** 344:9
**article** 302:20
409:1,15,25
410:20
**articulate** 428:24
**asbestiform** 403:18
410:7
**asbestos** 302:22
328:19,24 333:23
333:24 335:23
342:13 343:6
344:6 345:22
347:25 348:4
351:17 352:3
353:15 355:2,9,10
355:12 356:1,23
361:6 364:6
369:22 372:10
373:4 380:18,21
381:8 383:14
388:19 390:3
392:23 393:17
394:13 398:12,24
399:6 400:18
401:1 403:18
406:7 407:22
409:3 414:8,17
416:4,19 417:4
420:25 440:23
462:3 472:15
481:19 482:7,23
484:8 485:3,21
486:11 487:17
488:7,18 489:10
491:8 496:10
501:2,17,20,25
505:2,11 506:9
**asbestos-type**
499:20
**ascertain** 437:5
**Ashton** 348:14
349:22 350:2,13
351:2,9,21 355:25



364:1 368:22
369:20 374:11
375:12 376:5
377:14,18 382:20
395:18,21 416:22
472:12 499:19
**Ashton's** 349:14
**aside** 438:5
**asked** 307:3,11,22
312:11 320:17,24
321:3 322:1,24,24
323:13 324:1
333:1,9 335:11,18
335:19 340:6,11
342:3 343:3,17
346:2 347:21
348:11 349:13,15
359:16 362:1
367:15,17,19
384:17 398:10,19
399:1,12,22,25
409:25 413:25
420:13 431:6
432:6,24 433:13
434:6 438:8 439:1
439:13 440:2
443:25 447:21
448:9,13 451:13
462:7,16 467:14
467:14 470:12
475:15 478:21
480:23 481:7
492:2
**asking** 316:3 327:1
344:22 373:7
448:1,7 456:10,23
457:5 458:11
462:22 483:10
485:16 487:13
489:4,5 496:5
**asks** 358:21 362:7
404:10
**assay** 331:12
**assert** 326:4,6
**asserted** 383:13
**assertion** 398:13

**assisting** 436:25
**Associates** 402:9,19
404:24 405:12,17
**assume** 395:24
406:12
**assumes** 403:24
**attach** 366:6
488:14,17
**attached** 349:14,16
349:22 352:9,17
352:21 353:10,11
361:1 373:11
488:4
**attaches** 376:22
**attaching** 351:22
**attempt** 441:8
**attorney** 344:20
462:7 508:17,19
**attorneys** 462:25
468:16
**Audio** 449:15 450:4
450:14 459:5
**August** 371:2
**author** 476:24
**automatically**
470:25
**autopsy** 359:5
**available** 313:24
334:19 338:18
339:24 350:2
388:24 389:8
390:22 391:10
441:9,12 493:4
**Avenue** 300:9
**avoid** 496:1
**Avon** 294:7 305:5
**aware** 364:4 389:25
390:5 395:2
400:14 413:15
444:19,23 445:2
462:20
**axial** 360:15

—————————
**B**
—————————
**B** 301:12
**baby** 301:24 302:22

308:14 328:3,8,18
336:9 356:24
389:15 390:4
396:19 399:25
400:19 401:2
409:4 414:6,9,16
418:9 419:4 420:2
420:24,24 427:2
430:8 440:6 444:2
445:13,18 461:14
461:16 462:2
474:2 485:21
486:11 488:6
491:9 492:18
493:11 494:6,9,18
494:23 495:9
496:9 503:7
**back** 315:4 349:10
363:22 373:25
374:8 378:2 387:8
387:16 397:14
401:16 421:9
425:10 432:4
433:25 438:25
446:14 448:13
449:11 458:17
460:24 461:23
471:5 473:5 497:6
**Bankers** 314:12
**Barnabas** 426:24
**based** 329:6 398:13
417:17 447:23
455:8 462:15
464:3,3 470:9
474:12 477:20
490:23 491:3
492:17 493:9
**basically** 321:5
475:11
**basis** 312:3 319:4
324:22 400:25
433:11 437:5
469:20,25 470:22
**Bates** 302:4,8,13,15
302:17
**becoming** 367:21

**began** 438:8
**beginning** 350:6
414:13
**begins** 305:3
**behalf** 331:9 337:3
339:19 346:6
358:15 364:2
393:4 411:6
425:20 430:17
478:12 479:11
483:20 495:5,10
**Beidler** 347:9
**believe** 307:15,18
309:22 311:4
314:6 318:16
319:24 321:2
324:14 350:5
388:17 396:24
399:14 402:24
405:13 440:19
441:6 446:3
463:19 482:18
487:5 490:3,25
493:25 504:18
**believed** 366:16
444:6
**Bernardo** 299:9
301:7 308:8
309:10 310:9
312:13,22 313:6
313:19 314:1,19
315:12,22 317:22
318:25 319:13
320:8 321:9 322:9
322:14 323:3,9,20
324:5,11 325:25
326:8,16,21 327:8
329:9,24 330:5,9
332:3,18,21 334:3
334:7 335:25
337:6 338:9,23
339:1,11,25
342:14,18 343:8
344:9,10,20
345:11,16 346:22
348:17,22 349:1

350:3,16,23 351:4
352:12,23 353:17
354:9 355:15
356:3,11 357:15
357:23 358:9,25
360:2,17 361:17
362:4,14,25
363:13 364:8,18
365:4,12,17,23
366:10,23 367:9
367:13 368:16
369:9,24 370:16
370:20,24 371:18
372:14 373:9
374:19 377:3
378:15,20,25
379:4 381:12
382:2 383:16
386:9,17 387:1,22
389:1,16 390:6,15
391:3,14 396:22
398:25 400:21
401:9,20,24 403:2
405:1 406:8,19
407:6 408:5
409:16,20 410:11
411:1,19 413:19
414:20 415:13
416:13 417:20
418:13 419:6,13
420:3,8,11 421:1
421:24 422:11
423:5,17,25 424:9
424:18 425:3,14
425:19 427:15
428:10,19,25
429:3,18 430:9
433:17 438:4
440:8 442:24
443:3,6,21 445:6
445:10 446:6,22
446:25 447:10
448:3 449:20
450:5,15,20
451:19 452:2,6
453:18 454:4,15



455:1,11,15,22
456:5,8,16,19,22
457:3,9,13,17
458:4,12 459:15
460:10,13,18
461:21 463:4
464:1,11 465:14
466:2,14,24
467:10 468:17,18
468:23 469:22
470:15 472:23
477:5,16 478:3,17
478:21 479:17
480:5,25 481:21
482:9,18 483:2,25
484:11 485:4,22
486:13,18,24
487:19 488:8
489:12,17 490:13
490:18 492:23
493:16,23 495:12
495:23 496:12
498:10 499:3
500:20 501:6,11
502:5 503:8 504:2
504:12 505:6
506:11,16
**best** 339:13 413:14
414:14 434:17
435:1,10,21,22
508:13
**better** 431:1 439:12
**beyond** 322:10
326:1 329:11
334:7 342:15,19
344:23 348:20
352:14 353:18
355:16 360:3
361:18 364:9
365:5 366:24
369:25 371:19
387:23 390:7,17
403:8 406:20
409:20 410:12
411:19 416:14
417:21 420:12

424:10,19 427:12
427:21 428:17
451:20,25 452:6
453:19 479:18
489:18,23 495:13
496:13 499:4
506:17
**Biddle** 468:5,8
**big** 341:18,23
422:18 435:2
463:13 476:14,19
**binder** 301:17,18
301:20 316:18
317:5,12 318:4
320:14 324:18
325:7,12 329:19
329:20 330:4
333:12 354:4
369:5,7,12 386:6
389:11 401:23
402:2 452:25
453:2 463:13
464:8,17 474:14
476:16
**binders** 314:12,16
315:8,15,19 316:1
316:8,11 317:18
318:18,22 319:6,7
324:19 402:21
405:9,11 413:3
421:12 439:17
462:6,7,13,24
463:15 475:20
**bit** 396:16 443:23
502:16
**block** 423:1
**blocks** 330:25
**Blount** 387:19
388:3,11 390:1
407:3
**blow** 398:18 452:17
**blowup** 341:24
**bodies** 393:17
**book** 341:5,7,25
346:16,16 347:8
347:19 371:5

387:17,18 390:14
422:18 460:9
471:16 497:16
499:12
**books** 327:6 497:11
497:14
**BORGWARNER**
296:15
**Born** 426:12
**bottom** 382:19
**box** 314:12 315:15
317:19
**Brake** 297:15,15,17
**break** 367:23 369:2
373:20 415:12
418:4 421:4
457:24
**breaking** 370:17
**BREENTAG**
298:14
**BRENNTAG** 295:7
297:7,20 298:6
**Bridgeport** 426:15
**brief** 392:23 457:24
466:22 497:4
**briefing** 468:20
**bring** 492:2
**bronchitis** 307:16
308:3
**brought** 356:21
432:23 470:11,18
**Bruce** 375:23
**Brunswick** 294:17
305:12
**Building** 300:3
**built** 392:15
**burned** 426:23
**business** 306:12
327:18

──────────
**C**
──────────
**C** 299:1,15 357:4,8
**calculated** 381:2
**call** 454:18 456:11
465:12 469:25
**Callahan** 300:14

490:25
**called** 309:25
341:22 386:23
396:12 444:20,24
464:22
**Calls** 454:17
**cameras** 359:23
**cancer** 302:7 382:5
399:24
**capacities** 429:2
**capacity** 326:4
329:13 334:10
342:22 349:2
353:21 355:19
360:6 361:21
364:12 370:3
371:22 383:21
387:25 406:23
411:22 416:16
417:24 420:16
424:22 428:7
451:23 453:22
479:21 495:16
499:7 506:20
**Caption** 294:9
295:25 296:25
**captioned** 297:25
325:7
**care** 426:23,25
**carefully** 435:20
**Carole** 295:4
**case** 307:9,14,25
308:7,13 311:1
320:19,25 321:4,6
321:7,23 322:4,8
322:12,20 323:1
323:16 324:2
325:7,13 332:1,10
332:17 333:10,14
334:17 335:3,5,7
335:19,24 338:19
339:9,24 342:4,9
342:13 343:6,20
346:21 347:16
349:17 352:11,19
354:18 364:5

370:11 373:15
378:6 379:13,14
379:17,19 380:7
384:3,5,8,18,19
384:24 385:1,15
386:15,24 387:12
388:25 389:14
390:3 396:2,10
397:17 398:2,23
400:13,15,16
401:5 402:6 405:8
405:15 406:1,7,18
407:4,5,23 408:15
408:18,19 409:14
409:24 411:8,17
412:8,10,11
415:18 417:18
419:2,23,25 420:7
420:21 434:3
441:13 445:23,24
451:8 482:25
504:10
**cases** 317:10
321:21 333:5
358:7 367:7 372:3
373:8 375:20
393:22 396:12
399:24 401:6
412:20 430:7
431:9 440:18
442:2,17 443:9,17
485:13 492:9
495:3
**cause** 309:8 478:24
**caused** 392:8
**CCR** 508:23,24
**Cedar** 299:21
**Central** 427:9
**certain** 318:20
495:21
**certainly** 389:25
390:5 432:21
454:18
**CERTIFICATE**
508:1
**certifications** 447:6



492:12
**certified** 294:19
346:5 412:6,19,21
413:4 417:3
433:20 436:1
485:11 486:9
488:5,15 493:21
494:4 508:3
**certify** 494:2 508:4
508:9,15
**change** 309:8 401:5
447:25
**changed** 313:9
449:18 455:10,19
**characterization**
314:21 340:2
433:6
**charge** 397:10
**chart** 303:5 335:12
340:9,12,18,22
341:3,13,18,24
476:12,15,22,23
477:14,15,19,25
478:14 479:1,6,15
480:3 483:14
500:3,11
**check** 309:23 310:4
310:13,17
**chemical** 355:11
**Chidester** 351:23
352:2,10 353:6,14
354:23 355:8
**choosing** 435:17
**chose** 428:21
435:21
**Chris** 337:9 370:16
460:11,18
**CHRISTOPHER**
299:2
**chrysotile** 347:25
348:4 352:3
355:13 361:6,12
363:6 364:6
477:25 500:4,16
501:3 502:20
503:19 505:2,11

**Chudkowski**
382:20
**cited** 442:18
**Citizen's** 302:8
382:6
**citizens** 396:15,17
**Civil** 404:13
**claims** 380:23
**Clark** 299:18
**clear** 313:22 316:4
316:5 326:12
332:15 335:2
420:20 427:25
432:8 455:8 456:1
473:14 474:24
475:19 492:16
496:1
**clearer** 474:19
**clearly** 339:20
**client's** 332:1
**clinical** 426:22
**CLR** 508:23
**Coalition** 302:8
382:6
**Cohen** 299:2
305:13
**Coker** 302:11
384:2,5,8,17,19
384:24 385:1,14
386:8,15,24
387:12 388:24
389:14 390:3
393:9 396:2,10
397:4 398:2
400:13,15 401:5
402:6 405:8,15
406:1,6,18 407:4
407:23 408:19
409:14,24 410:24
412:11 504:10
**Colgate-Palmolive**
299:23
**collectively** 318:9
**college** 426:14
**Colorado** 402:17
402:22 405:24

472:3,6,11 499:19
**Columbia** 299:15
**come** 387:8,15
483:6
**Comes** 402:13
**comfortable** 366:15
432:3 433:15
**coming** 397:14
453:16
**commencement**
508:5
**commencing**
294:18
**comment** 363:7,19
364:13 372:20
395:12 400:11,24
407:13 411:12,24
**comments** 477:2,21
**Commerce** 299:3
**Commission** 402:8
402:18
**commonly** 361:13
**communications**
310:2 454:18
**communities**
392:15
**Companies** 402:14
**company** 296:7
300:6 301:24
325:24 332:1
366:7 434:25
435:2 442:17
451:7 461:2
491:11 504:8
506:7
**company's** 373:1
**compilations**
437:15
**complain** 404:13
**complaint** 301:23
306:24 307:8,12
307:14,21,22
308:2,18,22
317:10 334:18
384:10 431:7
434:7 441:14

**complaints** 378:14
431:9 465:20
492:5
**complete** 356:13
436:20
**concerning** 322:3
380:18 391:9
399:6 407:22
482:6 487:16
489:9 491:6,8
**concerns** 312:20
**concluded** 416:3
507:4
**concludes** 416:2
507:1
**conclusion** 369:19
411:12
**conduct** 432:17
439:20
**conducted** 380:17
**confirmed** 472:14
**conjunction** 314:17
485:19 488:1
**connected** 475:7
**Connecticut** 426:15
426:16
**connection** 315:10
438:14 457:20
**Connie** 305:17
**consider** 492:2
**consideration**
394:6
**considered** 314:17
315:9 351:16
**consistent** 416:21
**Constance** 294:19
508:2,23
**consulting** 358:6
**Consumer** 302:2
**contain** 369:22
**contained** 335:22
381:8 414:17
**contains** 388:18
396:3
**contaminant**
394:14

**contaminants**
393:21 414:8
**contamination**
351:17 416:4
**contemporaneous**
424:6
**content** 356:6,9
491:8
**context** 390:2 401:4
412:5 414:1
**continuation**
347:14 429:22
**continued** 294:9
295:25 296:25
297:25 300:1
450:16
**continuing** 428:20
**contrary** 355:24
365:2
**conversation**
312:25 315:20
318:17,19,20
345:24 431:21
435:12 437:20
449:17 451:25
458:19 465:10,23
466:12 467:4
469:2,6 470:9
471:2 474:23
476:9
**conversations**
324:23 356:21
366:14 398:15
437:9,10 448:10
454:23 465:17
474:12
**COOK** 299:14
**copied** 382:9,12,15
382:20
**copies** 396:6
**copy** 303:5 382:1
386:7 467:18
476:14,20
**correct** 306:14,15
308:14,24 312:5
312:11,16,21



313:5 314:18
315:11,21 318:24
319:8,12 320:7,22
321:1,8,24 322:4
322:5,13,16,20,21
323:13 324:21
325:16,21,24
327:14,23 328:4
328:11,20 329:1,8
332:2,11,12,17
334:2 335:24
336:10 338:25
339:10,24 340:19
340:20,23 341:3
341:14,19,25
342:13 346:7,12
347:16 348:1
350:2,15,19 351:3
351:18 352:11
353:16 355:14
356:2 363:11,18
364:7 367:12
369:8 372:13
374:11 375:25
376:6 379:23
380:11 382:15
383:10,15 384:3,6
386:8 387:12
388:25 389:10
390:5 391:13,23
395:23 396:17
397:11 400:20
401:7,8,14 402:23
405:12,19 412:8,9
412:12 413:11,18
414:10,19 416:8
416:12,23 420:25
421:16,17,18,21
421:23 422:6
423:11,16 437:12
447:9,17 449:19
452:2 454:3,25
463:3,7,25 464:24
464:25 465:2,7,13
466:1,4,13 467:5
467:6,25 468:2,22

469:21 471:21
472:6 473:12,14
473:17 474:15
475:1,14,21 478:2
478:10,16 479:12
479:16 480:15,24
481:20 482:8
487:18 488:7
489:11 491:16,22
492:4,8,13,22
493:13,14,22
497:15 505:23
506:10
**corresponded**
377:14
**correspondence**
442:4 492:3
**corresponding**
377:18
**corresponds**
473:16
**cosmetic** 356:24
393:25 401:1
417:6 418:25
440:5 454:3
459:12 464:10,19
473:9
**cosmetics** 453:9,13
453:16
**counsel** 299:6,12,17
299:23 300:6,11
305:19 309:5
310:7,14 311:11
312:9,21 315:6
319:23 320:1,5
324:8 345:5 347:4
347:9 362:11,17
364:4 382:1
430:14 434:16
435:3,11,13,22
436:7,13 441:4
445:7 465:25
497:14 508:17,20
**Counsel's** 313:5
**counsels** 310:18
441:7

**County** 294:1,16
295:1,11 296:1,10
297:1,11 298:1,10
298:18 305:7
312:20 335:23
336:6 337:1
338:15 448:23
**couple** 408:16
445:22 482:19
**course** 312:8 333:3
465:17 481:11
**court** 294:1,19
295:1,10 296:1,9
297:1,11 298:1,9
298:17 305:6,16
305:21 312:19
313:10 326:13
337:15 386:7,12
425:8 448:12,12
458:15 479:13
508:3
**courthouse** 294:16
313:3 329:5 331:1
337:2
**courtroom** 338:15
**cover** 329:19
**cplacitella@cprl...**
299:5
**created** 477:15,20
477:20
**crocidolite** 361:7
361:15
**CTFA** 302:7 382:5
**curious** 307:13
**Currently** 418:7
**custody** 362:10,17
**Cyprus** 296:6
300:6 501:2

---
**D**
---
**D** 301:2
**D'ANGELA** 298:3
**Daniels** 299:18
**Dartmouth** 472:14
**data** 393:22 395:2
398:12,24 399:5

399:25
**date** 294:18 325:18
325:20 331:23
374:13 375:4
376:4 412:22
476:23 497:23
498:2 502:8
508:13
**dated** 302:10,16
391:1 508:25
**dates** 376:12
379:11 412:13
506:21
**day** 306:8,20,22
377:15 425:23,25
425:25 430:17
438:1 441:10
443:24
**days** 306:12
**deal** 457:7
**dealing** 350:7
457:16
**Dear** 331:8
**Deborah** 297:14,16
**decades** 302:21
409:3
**deceased** 295:4
297:15
**decide** 407:18
**decided** 490:22
**defendant** 299:12
299:17,23 300:6
300:11 302:2
402:14 404:7,18
**defendant's** 414:14
**defendants** 294:8
295:9,19 296:8,16
297:8,21 298:8,16
298:25 425:21
**Defendants'** 402:6
**defended** 400:15,16
**defending** 375:19
384:2 396:10
**definitely** 430:19
**definition** 360:12
**Demand** 301:23

**Dembrow** 375:9
376:5,15 377:6,11
**denied** 342:11
**department** 309:24
347:23 348:3
434:24
**deposed** 309:21
343:19 431:12
**deposition** 294:14
301:15 303:2
304:2 305:4,11
306:9,13,17,19,21
308:21,23 309:15
309:16 310:1
312:9 313:4,23
314:7,10,18 315:7
315:11 316:22
318:1,13,24
319:11,24 320:4
320:17 322:2
324:21 332:9
338:8 340:18,23
341:9 343:18
344:4,24 345:3,6
346:20 347:3,15
347:19 348:10
352:10,21 353:7
367:17 386:23
388:9 389:5,9
390:21 391:9
398:10 402:7
409:10 417:2
422:24 427:13,22
429:21,24 433:2
433:18 434:11
437:4 438:15
443:8,25 445:24
447:20 448:15
451:6 454:13,14
455:4 458:24
459:3 462:16
465:13 466:23
469:21 470:12,19
470:23 480:24
490:5,10,12
492:21 493:13



507:2,4
depositions 338:1
  344:22 402:16
  410:4
deposits 394:14
Describe 414:3
DESCRIPTION
  301:14 302:1
  303:1
detail 343:13
  359:16 414:3
details 492:1
detected 360:24
  361:11 393:16
determination
  311:7 408:13
  490:4,9,11
determine 310:14
  438:16
determined 463:22
development
  427:10
DiCerbo 295:4
different 317:9
  376:12 378:14
  422:2 429:2,14
  431:11 433:21
  434:25 444:16
  451:13 475:16
  485:14
differential 355:12
direct 434:18 435:3
  467:12 491:18,24
directed 436:7
  457:6 458:9
directing 436:13
direction 304:5
  434:16
directly 313:16
  320:3 355:23
  373:1 435:11
  465:8,19
director 375:24
  376:6 377:20
discoverable 381:3
discovery 307:25

308:7 311:17,18
311:24 312:4
334:24 336:17
338:18 339:8,23
378:10 385:14,18
386:7,16 390:24
391:12 404:23
438:18,23 441:3
441:24 442:3,4,8
442:13,19 443:15
443:15 445:21
465:5 478:15
480:22 481:4,11
481:13 484:4
486:8 487:12,23
488:2,3 491:6,15
491:19,21 492:4,7
493:3,5 495:8
496:8 503:24
504:9
discuss 309:3
  367:24 417:7,15
  418:1 440:23
  481:3 484:3,18
  486:2 487:23
discussed 309:25
  312:2 341:2
  379:15 433:19
  435:25 454:12
  455:4 456:3
  480:11 495:1
discussing 349:19
  415:22
discussion 315:1
  349:7 425:7
  447:24 458:14
discussions 309:8
  445:4,6 455:9
disease 392:17
dismiss 329:5 333:5
  368:4 370:11
  373:7
dismissal 331:17,25
  373:15
dismissed 332:16
  367:7 371:15

411:8 412:12
  417:19
dismissing 331:25
disprove 411:16
district 327:21
  328:1 461:12
Division 294:1
  295:1,11 296:1,10
  297:1,11 298:1,10
  298:18 305:7
  418:8,22
docket 294:2 295:2
  295:11 296:2,10
  297:2,12 298:2,10
  298:18 305:7
  352:20 353:4,7
document 320:2
  330:1 352:14
  387:3 388:1
  390:17 391:12
  402:5 403:8
  438:18 439:14
  453:1,3 464:8,17
  464:20 485:19
  500:21 504:21
documents 302:19
  304:10 306:18
  308:18 314:16
  315:9 318:23
  331:16 335:11
  337:14,24 352:8
  354:7 397:16
  399:19 404:11,22
  410:5 422:3
  431:11,13 432:5
  432:14 433:13
  437:16 438:10,16
  439:2,3,15,16
  441:12,21,22
  442:1,5 468:21
  504:23
doing 330:8 358:4
  373:16 430:24
  456:21 473:4
doubt 392:10 393:2
Dr 301:15 316:23

317:4,15 318:16
318:18 319:8
338:7 340:12
341:3 344:16
347:15 349:14
351:9,23 352:2,10
353:14 354:8,12
355:8 356:18
357:11 362:1
382:14 389:5
390:1 396:6,9,12
402:21 405:9
417:2 421:20
422:23 423:4,9
431:17,22 432:7
432:25 433:14
437:11 439:22
453:2 462:17
463:3,15,25 464:5
464:14,23 465:1
465:23 466:1,6,10
468:20 469:3,7,15
469:18 470:2,10
471:3,23 472:8,10
473:16,19 474:8
474:13 475:5,11
475:25 476:3
477:14 497:15,17
499:13
drawer 438:2
Dress 427:8
dried 362:23
Drinker 468:4,8
drop 410:24
dropped 411:17
due 407:15 408:10
DUFF-PETO
  296:12
duly 305:24 508:6
Durham 415:18
  417:18
dust 361:11,12
dusting 396:2
DVD 305:3

————— E —————

E 295:14 298:19
  299:1,1 301:2,12
  306:2 425:12
  446:16
earlier 308:20
  336:12 395:23
  396:16 455:4
  462:19 473:18
  474:6,16 503:11
early 478:9
easier 435:3
Eastern 491:11
Edison 330:19
Edley 320:18,18,25
  321:4,6,7,22
  322:4,8,20 323:1
  323:16 324:2
  325:7,10,11,13
  329:4 332:17
  459:21
effect 480:15
effects 380:18
efforts 437:14
  438:16 442:6
either 346:4 419:15
  475:19
electron 359:24
eliminate 414:7
Elmo 374:6 380:2
  467:24 473:15
Email 302:15
EMMA 296:3
employee 465:2
  466:7 508:16,19
Emtal 347:24 348:5
  453:16
Emtals 453:12
enable 331:17
enclosed 331:8,12
ended 379:8
Engelhard 351:13
enjoyed 429:15
ensure 436:6
entire 500:21
entitled 302:7,21
  382:5 385:24



409:2 497:18
501:1
**entity** 476:24
**entries** 368:22
376:9
**environmental** 331:13 394:5,11
**Esquire** 299:2,3,9,9 299:15,20 300:3,8 347:9
**essence** 389:13
**essentially** 416:10
**Estate** 295:4,14 297:14,16
**et** 294:7 295:8,18 296:7,15 297:7,20 298:7,15,24 305:5
**event** 458:13
**evidence** 328:23 333:24 356:20 365:1 372:9 373:3 381:3,7 383:14 395:3 400:18 401:7 403:25 405:23 406:5,6,17 407:2,20,22 410:22 411:15,18 417:4 418:24 419:3,18,24 420:1 420:22 421:19,22 422:2,5,8,21 423:4,12,14,22 424:6,16 478:11 479:13 480:4,9 481:17 482:5,22 482:25 483:7,12 484:7,10,24 485:2 486:7,10,17 487:15 498:25 500:17 501:4,18 502:1,11,21 503:14 505:3,12 506:9
**exact** 331:23 447:3
**exactly** 313:22 320:11 326:14

**383:1** 396:25
400:15 471:9,25
**examination** 360:14 508:6
**examined** 305:24
**example** 399:23 477:9 498:2
**exclusive** 327:18 328:2 461:13
**Excuse** 427:20 428:15
**excused** 507:3
**executed** 395:22
**executive** 365:20
**executive's** 351:21
**exhibit** 301:15,17 301:18,20,21,23 302:2,6,10,15,16 302:19,20,23 303:2,3,5 341:13 374:23,24 385:23 432:8,11 433:3 471:21 472:4 473:13,15 474:5 476:23
**exhibits** 432:15 474:13
**exist** 431:5
**existence** 414:7
**experience** 426:23 429:9,17
**experienced** 392:17
**expert** 357:14 358:6,23 363:5 389:13 395:11 404:3 431:17 435:14 445:16 471:4
**expertise** 363:9
**experts** 394:18 434:25 435:17
**Expiration** 508:24
**explain** 434:1
**explained** 431:24 462:19
**exposed** 505:17,18

**exposure** 308:14 392:9,18,23 393:24,25
**express** 404:4
**extracts** 361:12
**extricate** 367:6

**F**
**fact** 309:1 320:24 339:10 364:3 365:22 386:7 393:17 419:19 433:19 447:5 457:22
**factors** 394:5,11
**facts** 403:24
**fair** 342:9
**false** 339:10,17 413:16 455:14,17
**familiar** 316:15 318:15 321:21 323:23 342:8 356:19 431:8,16 433:1,15 434:3 445:15 470:5 503:11
**fantastic** 429:16
**fat** 463:13
**fault** 472:18
**Fax** 302:16
**Faye** 333:10,14 372:23 379:12,14
**FDA** 383:10,14,18 472:14
**feel** 350:8 433:14 440:2
**felt** 432:2 488:24
**FERNANDEZ** 299:19
**fiber** 361:13
**fibers** 361:14 362:22 363:6,11 392:9 393:16 500:16 501:17,20 501:24 502:9,20 503:4,20 505:18

**fibrous** 360:12,23 396:3 410:6 498:3 498:20
**fight** 326:18 398:2
**figure** 460:7 490:4
**file** 307:4,6,7,11 331:18 332:16 336:25 337:15 386:8,23 388:24 390:24 439:11 454:20 456:14 458:10
**filed** 307:21,23 323:1 373:15 385:3 404:22 412:11,15 415:17 434:7 503:24 504:9
**files** 306:25 389:4 389:24 393:3 402:15 431:7 442:17
**filled** 366:8
**final** 380:14
**Finally** 404:4,15
**financially** 508:20
**find** 331:9,12 385:24 386:4 441:8 448:14 457:24 477:24
**fine** 366:21 370:24 379:5 428:22 457:3
**finish** 314:5 460:16
**firm** 371:15 468:8
**first** 305:23 306:22 317:10 331:22 335:4 339:22 360:13 368:11 371:1,10,11 389:5 391:25 399:5,7,14 425:22,25 426:6 426:19 430:22 441:2,10,16 443:24 444:23 451:18 453:1,3

**454:14** 462:16
464:8,16,20
476:21 480:23
481:7
**five** 446:9
**flip** 333:13 337:2 347:7,13 361:25 362:19 385:22
**flip-side** 371:10
**flipped** 353:3
**floatation** 452:20
**FLOM** 299:8
**Floor** 300:9
**Florham** 299:16
**focus** 471:1
**folder** 368:9 370:15 371:5
**Foley** 294:4,4 305:5
**followed** 361:13 431:20
**following** 294:9 295:25 296:25 297:25 458:25 495:5
**follows** 305:25
**foregoing** 413:13 413:15 508:10
**forgot** 414:25
**form** 308:9 309:11 310:10 312:14,23 313:7 314:2,20 315:13,23 317:23 319:1,14 320:9 321:10 322:15 323:4,21 324:6,12 326:1 329:10 332:4,22 334:4 337:7 338:10 339:2,12 340:1 342:15,19 346:23 348:18 350:4,17 350:24 351:5 352:13,24 353:18 354:10 355:16 356:4,12 357:16 357:24 358:10



359:1 360:3,18
361:18 362:15
364:9,19 365:5,13
365:18,24 366:11
366:24 367:14
368:17 369:10,25
371:19 372:15
374:20 381:13
383:17 386:10,18
387:2,23 389:2,17
390:7 391:4,15
396:23 400:22
401:10 403:4,7
405:2 406:9,20
408:6 410:12
413:20 414:17,21
416:14 417:21
418:14 419:7
420:4,12 421:25
422:12 423:6,18
424:1,10,19
429:11 430:2
433:8 437:18
439:25 442:21
443:19 447:1,11
448:4 449:21
451:20 453:19
454:5,16 455:2,12
455:16,23 456:9
459:16 463:5
464:2,12 465:15
466:3,15,25
468:23 469:23
470:16 477:6,17
478:4,18 479:18
480:6 481:1,22
482:10 483:3
484:1,12 485:5,23
486:14,22 487:20
488:9 489:13,18
490:14,19 492:24
493:17,24 495:13
496:13 498:11
499:4 501:7,12
503:9 504:3,13
505:7 506:12,17

**forth** 356:21
369:20 478:13
479:14 483:13
508:13
**forward** 436:23
**found** 337:14 344:6
345:22 348:4
352:3 353:15
355:2,9,10,13
356:1 359:18
363:5,10,17 364:6
389:15 390:3
403:17 431:2
472:13 478:1
**FRACE** 295:3
**frankly** 395:10
**Frederick** 357:11
**Friday** 294:11
**front** 316:9 341:17
419:24 421:12
453:6 462:9
463:13 467:20
497:9
**further** 341:1 357:3
404:11 439:21
446:7 508:9,15
**Furthermore** 404:1

**G**

**Gambino** 301:23
334:17,22 335:3,5
335:7,14,19,24
336:14,25 338:19
339:9,24
**GARY** 299:20
**GATMAITAN**
295:12
**gears** 443:23
**general** 309:6
345:5 347:3,9
364:4 393:19
416:24
**generally** 399:20
455:5
**George** 298:3
505:17

**getting** 326:19
404:23 405:16
410:23 449:6
466:21
**girl** 426:13,19
**give** 336:22 354:1
363:22 374:5
378:1 380:1
381:25 382:1
384:14 386:1
390:14 395:14
397:2 398:1
401:19 408:22
415:9 419:2,17
451:2 467:17
471:15 476:11
496:21
**given** 368:1 394:6
419:18 452:19
469:21 474:7
480:10 488:21
**giving** 448:19 450:1
450:7,12,18,23
458:25 459:6
**Glen** 344:16 346:21
**go** 314:23 316:12
324:17 325:2
329:18 331:21
333:12 341:5
343:1,12,23
346:15 349:4,12
350:21 354:4,14
354:21 368:8,10
368:12 369:4
370:14 374:14
376:17,21 378:15
380:13 387:16,17
392:1,21 393:6,12
398:17 399:2
401:16 413:8,24
415:22 425:4
429:5 438:25
447:8 452:8,9,10
452:25 453:11
462:24 467:16
472:20,22 473:22

473:22 497:1
499:18 502:18
**goes** 357:9
**going** 313:12,13,14
313:21 314:5,5,25
323:5 337:8,13,21
349:6,12 370:20
373:22 374:3,8
380:2 381:10
386:20 387:15
391:21 400:2
401:25 403:3,5,6
403:7 408:17
413:24 415:1
418:4 421:6,13
425:6,20 435:18
441:7 443:22
446:9,11 447:24
448:25 449:8
451:5 456:14
457:7,9,13,17,20
457:23 458:2,11
458:12,20 459:1
460:4,14 462:12
462:23 463:22,23
467:10 470:13
474:23 476:5
482:3 497:3 503:1
**GOLDSTEIN**
300:3
**good** 306:5,7
373:19 425:15
**Goodrock** 505:17
505:17
**grabbing** 435:19
**GRABOWSKI**
297:3,4
**grades** 451:14
452:15
**gram** 362:22 363:4
**Grange** 302:17
**Grayzel** 330:18
331:8,24
**Green** 297:17
**Greene** 297:13,15
**grew** 426:10

**GRIFFIN** 296:3,3
**group** 404:21
**Grove** 299:21
**guess** 352:16
362:16 412:22
**GUEVARA** 300:8
**gvanlieu@oslaw....**
299:22

**H**

**H** 301:12
**halfway** 385:23
**hall** 435:19
**Hammonsville**
505:16
**handed** 344:15,19
410:16 484:14
**Handwritten** 303:3
**haphazardly** 479:1
**happen** 435:13
**happened** 332:11
332:14,15 399:8
408:19 419:20
463:21 466:9
**harass** 486:25
**harassing** 367:22
**hard** 480:8
**HAWKINS** 300:8
**head** 335:13
**headed** 476:23
**health** 380:18
410:2
**healthy** 426:25
**hear** 436:18,19
**heard** 445:17 471:2
**heirs** 297:16
**held** 315:1 349:7
425:7 458:14
**help** 385:25 387:5
397:16 398:1
421:13 426:2
435:2 436:6
**helpful** 484:16
**Hemstock** 344:16
345:3 346:21
352:20



Hemstock's 347:15
HENDERSON 300:2
hereinbefore 508:13
Herschel 409:23
Hey 435:20
hidden 378:24
highlighted 452:12
highlighting 368:23 392:13
highly 432:1
historically 491:6
history 311:14
Hobson 302:19 409:23 410:21 411:8,16
HODJERA 296:11
hold 341:17 376:19 387:6 472:19
hooked 449:4
hope 313:21 410:23
hopefully 412:3
Hopkins 301:16 302:24 303:5 315:20 316:23 317:4,15 318:16 318:18 319:8 338:7 340:9,12,17 340:22 341:2,3,13 354:8,12 356:18 382:14 389:5 396:6,9,12 402:21 405:9 415:18,24 417:2 421:20 423:4,9 431:17,22 432:7,25 433:14 437:11 439:22 453:2 462:17 463:3,15,25 464:5 464:14,23 465:1 465:23 466:1,6,10 468:20 469:3,7,15 469:18 470:2,10 471:3,23 472:8,10 473:16,19 474:8

474:13 475:5,11 475:25 476:3,12 476:15 477:2,14 497:15,17 499:13
Hopkins' 422:23
Hopkins-28 341:21 341:23 476:15
hospital 426:21 428:8
hour 367:18 370:21 431:21 460:17
hours 309:17,18
How's 327:7
Howard 376:1
humans 380:19
husband 294:4 296:3 297:4 298:20

_____

I
idea 349:21 375:1 386:1 467:1 474:13,25 475:18 483:23 489:8
identifiable 393:24
identified 319:10 436:10 437:6
identify 432:7 437:15
II 294:12
III 297:13
Imerys 295:17 298:23 302:17 473:25
important 396:1 449:23 499:15
Inc's 302:3
incidents 392:17 394:7
include 463:9
included 359:11 464:7 492:3
includes 321:22
including 447:23
Incorporated 305:5
incorrect 410:10

independent 328:10 461:18
INDEX 304:2
indicate 481:17
indicating 447:6
indirect 392:23
individual 297:16 329:13 334:10 349:2 353:21 355:19 360:6 361:21 364:12 370:3 371:22 383:21 387:25 406:23 411:22 416:16 417:24 420:16 424:22 451:23 453:22 479:21 495:16 499:7 506:20
individually 295:3 295:13 297:13
individuals 435:6 436:9 437:2
industrial 328:10 328:17 343:14 350:8 440:4,19 459:12 461:18 462:1 473:9
information 313:22 314:6 322:3 336:14 339:21 346:3 348:12 365:3 380:24 381:11 390:22 391:10 394:20 395:7 397:25 398:22 404:5,15 405:10,16,17,23 407:3 409:13 410:8 411:5 431:1 431:4 436:11 437:1 463:10,14 463:17 469:8,18 481:9 492:1 495:21 496:8 503:25 504:10

injury 308:13 385:2
innocent 496:4
input 469:8
Institute 402:17
instruct 454:16 456:9
interested 508:21
Interim-Disco-00... 302:5
internal 394:20 436:18
interpret 363:15
interpretation 311:10 430:12 442:12 475:16
interrogatories 302:4 310:20,25 334:25 338:6 354:18 357:6,21 358:1 380:6 391:19 394:19 395:6 412:7,19 413:4 415:4 430:7 433:22 434:6 441:24 484:25 485:12 488:14,15 491:19,22 492:20
interrogatory 337:3 346:6 366:7 366:20 380:14,24 414:2 434:2,10 445:21 484:22 487:24 491:16 493:12,20,22
interrupt 323:10 326:24
interrupted 326:22
interview 435:5,23
introduce 425:17 426:7
involve 491:15
involved 308:13 336:9 367:8 383:8 384:1,5 396:10 434:15,20,22

465:7 492:17 493:9
involving 399:24 430:7 465:6,11 492:18 493:10 495:9
iPad 321:18
Ira 375:9
isolated 393:18
issue 342:12 343:6 394:25 418:21 440:23 458:22
issues 395:3
Italy 397:15

_____

J
J&J 336:23 410:5
J&J-216 302:10 391:1
J&J-217 302:15
J&J-219 302:17
J&J-230 302:24
J&J-257 477:9
J&J-294 303:2 451:3
J&J-316 301:23 336:25
J&J-318 385:24
J&J-319 302:19
J&J-326 302:7 382:1,4
J&J-337 302:2
J&J-414 303:5 476:15
J&J-482 302:21 408:25
J&J-65 472:18
jail 447:8
Jared 299:3 386:4
Jersey 294:1,17,21 295:1,10 296:1,9 297:1,11 298:1,9 298:17 299:16,21 305:6,13 330:20 336:7 418:8 426:12,13 427:9



446:21 508:4
**JJCPI** 381:1
jlee@mkclaw.us....
  299:17
jmplacitella@cp...
  299:6
**JNJ** 302:8,13,15
**job** 395:9 427:10
**jobs** 426:19
**John** 302:23 315:19
  347:8 375:15
  397:8 415:18,24
  431:17
**Johnson** 299:12,13
  301:24,24 302:2,2
  302:11,11,21,21
  311:9,9,14,14,18
  311:18,19 312:4
  314:11,11 320:2,2
  322:7,7 329:7,7
  335:22,22 337:4,4
  337:25 338:1,2,2
  338:21 339:7,7,19
  339:19,20,20,20
  339:21 343:5,5
  344:3,5,5 345:5,5
  345:22 346:6,7
  347:4,4,9,10
  351:15,15 352:8,8
  353:13,13 355:24
  355:25 358:6,7,16
  358:16,23,24
  363:25,25 364:2,3
  364:6,23,24 365:9
  365:10 367:5,5
  368:7,8,14,14
  369:17,17,21
  371:16,17 374:9,9
  380:5 381:9,9
  388:12,18 389:24
  389:25,25 390:4,4
  390:23,23,25,25
  391:10,11 393:4,4
  393:9,10 394:21
  394:21 397:5,5,9
  397:9 398:1,1,11

398:11,21,21,23
398:23 399:4,4,6
399:6,25 400:1,19
400:19 402:13,13
403:22 405:14
406:16,16 407:10
407:11,21,21
408:3,3,11,12
409:2,3,25 410:1
410:23,23 411:6,7
411:9,10 414:16
416:5,5 417:5,5
418:9,22,23,25
419:4,11,11
420:10,10,20,20
420:23 424:15,15
425:21,21 427:1,1
427:6,6,25 428:1
428:8,8 429:5,5,6
429:6,9,9,14,14
430:17,18 438:17
438:17 444:1,2,17
444:17,18,18,20
444:24 445:12,13
451:14 452:15
453:17 464:9,18
465:2,2,11,11,18
465:18,25,25
466:7,7,10,10
478:12,12 479:11
479:11 480:18,19
480:20,20 481:10
481:10,19,19
482:7,7,23,23
483:20,20,23,23
484:8,9 485:1,1,2
485:3,21 486:10
486:11 487:10,10
487:13,13,14,14
487:17,17 488:6,6
488:18,18 489:5,6
489:7,7,10,10,15
489:15,22,22
491:5,5,7,7,10,10
492:16,16 493:8,8
495:5,6,7,7,10,11

496:6,6 498:20,20
503:7 504:16,16
506:10,10
**Johnson's** 312:4
  328:2,8,18 338:22
  344:3 356:24
  380:6 388:12,18
  389:24 390:3,25
  396:19 401:2
  403:23 405:14
  414:6,9,16 417:6
  418:9,25 419:4
  420:1,23 427:2
  430:8 440:6 444:2
  444:13,14,15
  445:17,18,19
  461:13,16 462:2
  491:9 493:11
  496:9
**joined** 427:1
**Joly** 307:4,5,11,25
  308:7,13,17,22
**JONATHAN**
  299:15
**JOSEPH** 294:4
**judge** 367:24
  407:18 454:19
  456:11 457:21,24
  458:13,20 460:16
  502:16
**July** 329:21 330:15
  506:7
**June** 302:6 382:4
**jury** 301:23 426:8,9
  434:3

_____
**K**
_____
**Karp** 299:9 468:16
  468:18
**KATHLEEN**
  298:20
**keep** 330:8 458:11
**keeping** 376:14
**Kent** 294:19 305:17
  508:2,23
**kind** 411:11 418:5

474:18 480:7
**kinds** 359:23
**KLUGER** 299:14
**knew** 302:21
  322:19 343:4,10
  344:2,7 353:14
  367:11 409:3
  435:16 436:12,15
  437:12 447:6,14
**know** 313:8 320:10
  321:5 322:8
  323:18 324:9
  329:15 331:4
  332:13 335:6
  336:4 338:5,13,16
  340:3 350:14
  352:17,25 353:22
  356:7 357:17
  358:5,8,14,18
  365:22,25 367:4,5
  367:19 368:7,8
  374:24 375:2
  376:2 377:10,23
  379:1 381:23
  382:25 384:7,9,23
  385:9,12,13,17
  389:19 393:1,5
  395:1,12 396:9,11
  396:21,25 398:2,3
  398:6 399:21,23
  400:6,23,24,25
  405:8 406:2,10,14
  406:17,24 407:8
  407:11,11,14,24
  408:2,2,4,8,19
  410:15 411:24
  412:21 417:9,14
  417:24 418:11,15
  418:18 419:12,19
  420:16 422:18
  423:19 424:2,12
  424:16,23 425:16
  426:2 432:2
  434:13,20 435:10
  435:19 436:9,11
  437:8 438:2 439:9

441:4,5 444:15
445:17 447:2
448:9 450:10
454:7 460:18
463:20 466:16,18
469:24 471:25
472:19 473:8,20
474:1,6,22 475:2
475:3,6,22 477:19
478:2,5 479:3,8
479:22 481:25
482:12 483:5,17
484:14 485:9
486:3 487:6,10
488:11 489:2
490:2 494:23,25
495:17 498:12
499:7,8,24 500:9
500:24 501:13,22
502:6,14 503:6,17
504:5,18 505:8,14
505:19 506:20
**knowledge** 332:10
  342:12 380:16
  398:21 399:13
  413:14 414:15
  423:12 438:10
  441:25 442:15
  443:13 484:17
  491:5 498:9
**known** 393:21
  394:13,21 432:2
**knows** 342:22
  364:12 389:23
**Krushinski** 311:1
  412:8 445:23

_____
**L**
_____
**l** 294:15
**labeled** 393:9
**labs** 410:4 472:13
**Langer** 472:13
**late** 412:15
**law** 294:1 295:1,11
  296:1,10 297:1,11
  298:1,10,18 305:7



309:23 468:8
**lawsuit** 329:5
402:15 465:24
**lawsuits** 465:6,10
495:9
**lawyer** 376:5
409:24 449:18
470:10 496:2
**lawyer's** 330:24
509:1
**lawyers** 310:16
330:18 332:15
336:13 344:3
362:8 369:15
373:7 375:18,21
387:20 399:24
401:13 447:23
454:12,24 455:9
456:3 462:14
463:1,22 469:5,19
476:4 490:8,9
499:14
**Lea** 300:14
**lead** 381:2
**leading** 376:9
**learned** 371:14
**LEE** 299:15
**left** 359:11 497:22
**legal** 294:24 295:25
296:25 297:25
298:25 299:25
300:25 301:25
302:25 303:25
304:25 305:16,17
305:25 306:25
307:25 308:25
309:25 310:25
311:25 312:25
313:25 314:25
315:25 316:25
317:25 318:25
319:25 320:25
321:25 322:25
323:25 324:25
325:25 326:25
327:25 328:25

329:15,25 330:25
331:25 332:25
333:25 334:25
335:25 336:25
337:25 338:25
339:25 340:25
341:25 342:25
343:25 344:25
345:25 346:25
347:25 348:25
349:25 350:25
351:25 352:25
353:25 354:25
355:25 356:25
357:25 358:25
359:25 360:25
361:25 362:25
363:25 364:25
365:25 366:25
367:25 368:25
369:25 370:25
371:25 372:25
373:25 374:25
375:25 376:25
377:25 378:25
379:25 380:25
381:25 382:25
383:25 384:25
385:25 386:25
387:25 388:25
389:25 390:25
391:25 392:25
393:25 394:25
395:25 396:25
397:25 398:25
399:25 400:24,25
401:25 402:25
403:25 404:25
405:25 406:25
407:25 408:25
409:25 410:25
411:12,25 412:25
413:25 414:25
415:25 416:25
417:25 418:25
419:25 420:25

421:25 422:25
423:25 424:25
425:25 426:25
427:25 428:25
429:25 430:25
431:25 432:25
433:25 434:25
435:25 436:25
437:25 438:25
439:25 440:25
441:25 442:25
443:25 444:25
445:25 446:25
447:25 448:25
449:25 450:25
451:25 452:25
453:25 454:25
455:25 456:25
457:25 458:25
459:25 460:25
461:25 462:25
463:25 464:25
465:25 466:25
467:25 468:25
469:25 470:25
471:25 472:25
473:25 474:25
475:25 476:25
477:25 478:25
479:25 480:25
481:25 482:25
483:25 484:25
485:25 486:25
487:25 488:25
489:25 490:25
491:25 492:25
493:25 494:25
495:25 496:25
497:25 498:25
499:25 500:25
501:25 502:25
503:25 504:25
505:25 506:25
**LEONARD** 298:19
**let's** 321:15 329:18
335:1,1 343:1,23

353:2 368:5 369:1
393:12 398:17
403:12,15 408:15
415:22 429:19
456:1 471:10,11
471:12 472:20
473:22,22 476:20
499:18 502:17
**letter** 329:19,21
330:15 331:23
369:6 371:2 373:7
376:22 377:8
387:19 388:3,5,10
389:3,7,19 390:10
**letters** 389:8
**Lexington** 300:9
**LIEU** 299:20,20
**life** 427:10
**light** 367:25
**line** 304:6,6,6,11,11
304:11,16,16,16
304:21,21,21
367:16 458:9
509:2
**linked** 437:16
439:4
**LISA** 295:3
**listed** 335:10 376:7
384:21 443:10
**listen** 436:17
475:11
**listened** 469:11
**listens** 326:13
**listing** 501:15
**litigation** 311:14
333:4 383:5
397:10 399:7
428:2 492:18
493:9
**little** 358:15 396:16
426:9,19 431:25
443:23 474:19
502:16
**Livingston** 426:24
**LLC** 296:15 299:20
**LLP** 299:8 300:2,8

**locate** 311:19
**located** 320:4
337:24 351:15
352:4 440:24
**log** 368:14 374:22
374:23 375:2,4
377:8,22
**long** 382:18 427:16
**look** 308:19 310:24
335:1 353:2
385:21 403:15
422:20 431:6
439:1 442:7
466:11 471:11,12
476:22 478:20
479:1,5,7 496:22
**looked** 319:2
340:17 358:22
432:19 438:20
439:1
**looking** 359:17
403:1,3 472:2
474:25
**looks** 317:9 318:10
341:20 386:11
**LORETTA** 298:11
**lot** 315:25 318:10
386:12 387:11,13
408:17 423:8
431:13 432:20,23
458:7 462:15,21
471:2,3 495:2,3
**lots** 357:20 376:12
422:2
**loud** 459:2
**lowest** 316:18,20
**lunch** 415:15 418:4
421:4,7
**lung** 359:11,11
363:11,18
**lungs** 393:18
**lurked** 302:22
409:4
**Lusenac** 396:20,24
397:8,13,25



| M | | | | |
|---|---|---|---|---|
| **M** 298:3 299:3 | 338:25 339:25 | 430:25 431:25 | **MANUEL** 300:8 | **mean** 338:21 |
| 306:2 347:8 | 340:25 341:25 | 432:25 433:25 | **manufacture** 414:6 | 353:13 374:9 |
| 425:12 446:16 | 342:25 343:25 | 434:25 435:25 | 414:15 | 407:10 408:2 |
| **ma'am** 339:17 | 344:25 345:25 | 436:25 437:25 | **March** 294:11 | 436:2 441:18,20 |
| 350:12 357:1 | 346:25 347:25 | 438:25 439:25 | 305:9 508:25 | 444:10 463:16 |
| 372:23 374:18 | 348:25 349:25 | 440:25 441:25 | **MARIA** 294:4 | 495:1,18 |
| 389:7 391:22 | 350:25 351:25 | 442:25 443:25 | **mark** 445:8 | **means** 377:24 |
| 407:15 408:10 | 352:25 353:25 | 444:25 445:25 | **marked** 304:20 | 436:4 454:8 |
| 446:19 448:20 | 354:25 355:25 | 446:25 447:25 | 408:25 490:23 | 466:13 |
| 450:1,8,12,19,24 | 356:25 357:25 | 448:25 449:25 | **Market** 299:4 | **meant** 441:20 |
| 454:10,23 462:23 | 358:25 359:25 | 450:25 451:25 | **material** 309:9 | 444:13 |
| 463:18 465:22 | 360:25 361:25 | 452:25 453:25 | 318:11 359:12 | **medical** 302:13 |
| 481:6,15 482:3,15 | 362:25 363:25 | 454:25 455:25 | 386:12,15 387:10 | 375:24 376:6 |
| 483:10,19 484:6 | 364:25 365:25 | 456:25 457:25 | 387:11 458:22 | 377:19 387:14 |
| 484:21 485:11 | 366:25 367:25 | 458:25 459:25 | 464:5,23 466:11 | **meetings** 436:18,19 |
| 486:6 488:1,13 | 368:25 369:25 | 460:25 461:25 | 466:13 | **MELISSA** 295:14 |
| 489:1,4 490:1,3 | 370:25 371:25 | 462:25 463:25 | **materials** 310:6,15 | **memo** 302:6 376:4 |
| 491:20 492:8,10 | 372:25 373:25 | 464:25 465:25 | 319:12 326:11 | 382:5 394:21 |
| 493:6 496:1 | 374:25 375:25 | 466:25 467:25 | 346:18 350:22 | 395:17 397:4 |
| 499:12 506:1,5 | 376:25 377:25 | 468:25 469:25 | 351:2 352:22 | **Memorandum** |
| **Madam** 448:12 | 378:25 379:25 | 470:25 471:25 | 353:8 368:13 | 302:10 |
| **Magna** 294:24 | 380:25 381:25 | 472:25 473:25 | 372:25 374:15 | **memory** 385:6 |
| 295:25 296:25 | 382:25 383:25 | 474:25 475:25 | 386:8 400:13 | **mention** 500:12 |
| 297:25 298:25 | 384:25 385:25 | 476:25 477:25 | 403:19 410:7 | **mentioned** 364:3,7 |
| 299:25 300:25 | 386:25 387:25 | 478:25 479:25 | 433:4 499:21 | 378:6 438:25 |
| 301:25 302:25 | 388:25 389:25 | 480:25 481:25 | **matter** 305:4 | **mesothelioma** |
| 303:25 304:25 | 390:25 391:25 | 482:25 483:25 | 380:25 | 385:2 392:4,8,22 |
| 305:16,17,25 | 392:25 393:25 | 484:25 485:25 | **matters** 431:18 | 393:15,23 394:7 |
| 306:25 307:25 | 394:25 395:25 | 486:25 487:25 | **MATTHEW** | **Mesothelioma/T...** |
| 308:25 309:25 | 396:25 397:25 | 488:25 489:25 | 296:11 | 302:12 |
| 310:25 311:25 | 398:25 399:25 | 490:25 491:25 | **mayor** 394:6 | **message** 435:12 |
| 312:25 313:25 | 400:25 401:25 | 492:25 493:25 | **McCallum** 402:9 | **met** 308:21 397:15 |
| 314:25 315:25 | 402:25 403:25 | 494:25 495:25 | 402:18 | **method** 476:25 |
| 316:25 317:25 | 404:25 405:25 | 496:25 497:25 | **McCrone** 331:13 | **mguevara@hpyl...** |
| 318:25 319:25 | 406:25 407:25 | 498:25 499:25 | 404:24 405:12,16 | 300:10 |
| 320:25 321:25 | 408:25 409:25 | 500:25 501:25 | 405:24 477:10 | **microscope** 359:25 |
| 322:25 323:25 | 410:25 411:25 | 502:25 503:25 | 500:2,13 501:16 | **mid-'40s** 410:3 |
| 324:25 325:25 | 412:25 413:25 | 504:25 505:25 | 501:20,24 502:19 | **MID-L-2456-18** |
| 326:25 327:25 | 414:25 415:25 | 506:25 | 503:3,19,23 504:8 | 297:12 |
| 328:25 329:25 | 416:25 417:25 | **Magnesia** 491:11 | 504:11 505:1,10 | **MID-L-3095-18** |
| 330:25 331:25 | 418:25 419:25 | **maintain** 399:4 | 505:16 | 294:2 305:8 |
| 332:25 333:25 | 420:25 421:25 | **majority** 393:17 | **McGIVNEY** | **MID-L-4252-18** |
| 334:25 335:25 | 422:25 423:25 | **making** 311:7 | 299:14 | 295:11 |
| 336:25 337:25 | 424:25 425:25 | 456:12 | **McKenna** 302:10 | **MID-L-4826-18** |
| | 426:25 427:25 | **manager** 427:8 | **McNEILL-** 298:3 | 296:2 |
| | 428:25 429:25 | **managers** 410:4 | **MEAGHER** 299:8 | **MID-L-5368-17** |



296:10
**MID-L-598-18**
298:10
**MID-L-600-18**
295:2
**MID-L-6635-18**
298:18
**MID-L-6805-18**
297:2
**MID-L-7049-16**
298:2
**Middlesex** 294:1,16
295:1,11 296:1,10
297:1,11 298:1,10
298:18 305:7
312:20 335:23
336:6 337:1
338:14 448:23
**Miller** 301:22
303:2 323:1,14
324:1 325:16
331:10 333:2,10
333:14,15,20
372:23 373:15
379:12,14 416:11
451:7,13 459:11
461:11 501:16,19
505:11,16
**Miller's** 372:12
**milling** 327:20
**million** 363:6
**mind** 376:14 426:9
**mine** 342:12 343:4
344:6,6 345:22
347:24 348:6
351:14,16 364:7
369:21 410:2
444:1,2,13,20,21
444:24,25 445:12
445:15,19 451:15
452:15 453:17
459:13 461:5
464:9,18 472:3,6
472:11 476:25
503:1,6
**mined** 328:15

333:21 351:12,13
461:24
**mineral** 355:10
371:16,17 392:9
501:2
**minerals** 296:6
300:6 327:13,19
328:9,16,24 329:7
331:10,11 333:22
333:25 355:3
361:6 371:25
403:19 461:16,25
491:8,11 498:21
**Minerals'** 372:10
373:4
**miners** 394:11
**mines** 335:21
353:16 402:17,22
405:25 444:14
445:16 450:11
503:12
**mining** 325:24
327:20,21 328:1
461:12
**minute** 387:16
438:6
**minutes** 408:16
446:9 496:22
**mischaracterizes**
439:24 448:4,5
**missing** 473:4
**mistakes** 495:8,18
495:22 496:3,4,7
496:11
**misunderstood**
337:11
**MIT** 472:14
**mixture** 359:11
423:8
**moment** 378:16
**Moore** 300:15
305:15
**morning** 306:5,7
459:22 461:3
**MORSE** 296:15
**motion** 454:21

456:15 457:11,16
458:10
**move** 357:1,3 374:3
407:16 408:13
410:19 415:1
427:11,13 436:22
**multiple** 320:25
420:13 486:15
494:5
**Musco** 294:15
301:5 305:4,23
306:5 338:5
339:18 382:1
389:23 395:8
408:3 425:15
426:8 427:17
429:23 432:5,13
434:21 441:11
443:7 445:20
487:13 489:5,16
508:6
**Musco-2** 422:14
463:10,12 483:13

---

## N

**N** 299:1 301:2
303:2 306:2,2
425:12,12 446:16
446:16
**name** 320:21,23
357:13,21 358:1
358:12 374:12
375:11,14 377:9
383:2 439:6
459:25
**names** 376:7,15
377:16,22 503:12
**Nancy** 294:14
301:5 305:4,23
339:18 389:23
395:7 408:3
487:12 489:5,16
508:6
**natural** 392:16
**necessarily** 494:17
**need** 316:12,15

356:10 446:9
**needed** 434:16
435:13
**neither** 380:25
508:16,18
**Nell** 402:8,18
**never** 321:6 338:20
340:17,22 341:2
344:2,7 346:3
350:1,13 352:3
356:1 364:3,7
414:16 416:4
428:13 465:4,9,23
475:7
**new** 294:1,17,17,21
295:1,10 296:1,9
297:1,11 298:1,9
298:17 299:10,10
299:16,21 300:9,9
305:6,12,12
330:20 336:7
358:17 378:4
418:8 426:12
427:9 433:16
446:21 467:12
470:4 508:4
**njasbestos@rawl...**
300:5
**non-** 392:8
**non-occupational**
392:18
**non-responsive**
357:2
**non-truth** 364:17
447:7
**nonprofit** 427:9
**nonresponsive**
427:13
**NORTH** 295:7
297:7,20 298:6,14
**Notary** 294:20
508:2,23,24
**noted** 305:19 377:4
**notepads** 468:5
**notes** 303:3 378:2
467:5,9,18,21,25

468:12,15 470:9
470:13,22,24
471:7,11,12 472:4
472:5,10 473:8,16
473:23 474:11
475:20 476:5
496:22 509:1
**notice** 294:15
321:13 326:2
329:11 342:16,20
348:23 350:9
352:15 353:19
355:17 360:4
361:19 364:10
366:25 370:1
371:20 384:21
390:8,18 403:9
405:3 406:21
407:13,17 409:21
410:13 411:20
417:22 420:13
424:11,20 430:13
430:21,22 434:11
437:7 438:21,22
440:5 441:23
442:12 443:10
451:21 452:7
453:20 464:4
479:19 489:19
490:12,23 495:14
496:14 499:5
506:18
**notices** 373:15
442:18
**November** 473:2
**number** 311:13
312:10 314:11
315:15 352:20
362:22 374:25
376:9,19 431:13
432:8 438:9
439:14 440:10
441:11 445:21
475:4,12,13
476:24 484:23
508:23,24



318:4 319:19
**numbering** 474:21
  475:3
**numbers** 454:7
  471:22 473:19
  474:7,17 475:5,23
**numerous** 444:16
  485:13
**nurse** 426:17
  427:17,19 428:1,6
  428:9
**nursing** 428:12,13
  429:2

---

**O**

**O** 306:2 425:12
  446:16
**O'Shaughnessy**
  302:17 375:15
  377:19 382:11
  397:9
**O'TOOLE** 299:19
**oath** 321:20 328:14
  328:22 333:20
  334:16 336:16
  338:19 339:7
  340:16 341:2
  345:21 346:9
  348:11 349:25
  350:12 358:16
  417:3 447:15
  448:20 450:24
  459:11 480:19
  485:12 488:16
  490:17
**object** 308:8 309:10
  310:9 312:13,22
  313:6 314:1,19
  315:12,22 317:22
  318:25 319:13
  320:8 321:9 323:3
  323:20 324:5,11
  325:25 329:9,10
  332:3,18,21 334:3
  337:6,8 338:9,23
  339:1,11,25

342:14,18 346:22
348:17 350:3,16
350:23 351:4
352:12,13,23
353:17 355:15
356:3,11 357:15
357:23 358:9,25
360:2,17 361:17
362:14 364:8,18
365:4,12,17,23
366:10,23 367:9
367:13 368:16
369:9,24 371:18
372:14 374:19
381:12 383:16
386:9,17 387:1,22
389:1,16 390:6
391:3,14 396:22
400:21 401:9
403:3,5,6,7 405:1
406:8,19 408:5
409:16 410:11,12
413:19 414:20
416:13 417:20
418:13 419:6
420:3,8 421:24
422:11 423:5,17
423:25 424:9,18
439:25 442:20
443:1 446:22,25
447:10 448:3
449:20,21 450:15
451:19 453:18
454:4,15 455:1,11
455:15 456:5,8
459:15 463:4
464:1,11 465:14
466:2,14,24
467:11 468:23
469:22 470:15
477:5,16 478:3,17
479:17 480:5,25
481:21 482:9
483:2,25 484:11
485:4,22 486:13
487:19 488:8

489:12,17 490:13
490:18 492:23
493:16,23 495:12
496:12 499:3
501:6,11 503:8
504:2,12 505:6
506:11,16
**objected** 312:10
  322:9 324:9 343:8
  367:17
**objecting** 403:14
**objection** 313:19
  322:14 324:6,12
  326:22 327:2,5
  329:25 330:3
  337:18 344:8,21
  348:19 354:9
  362:4 364:19
  368:4 373:9
  390:16 399:16
  400:4 402:15
  405:2 411:1
  419:13 420:11
  427:21 428:17,20
  429:10 430:1
  433:7 437:17
  439:23 443:18
  450:5 455:22
  461:21 486:22
  495:23 498:10
  500:20 502:5
**objections** 313:15
  323:6 326:13
  345:11,16 362:25
  363:13 372:15
  377:3 402:7
  404:22 407:6
  421:1
**objects** 335:25
  398:25 443:3
**observed** 361:13
**obtained** 337:1,14
  359:5
**obtaining** 430:5
**obviously** 425:16
  449:23

**occasion** 310:21
**occupational** 392:9
**occur** 392:22
**office** 313:5 330:19
**offices** 330:25
**Oh** 325:10 371:12
  432:10
**okay** 306:5,16
  307:1,5,19 308:5
  308:12,25 309:3,7
  309:14 310:13
  311:6,12,17,22
  312:2,7,18 313:12
  313:17,18,24,25
  314:7,8,9 315:18
  316:6,12,17,21,24
  317:5,14,17 318:3
  319:6,10,18
  320:13,16,24
  321:15,25 323:8
  323:25 324:17,25
  325:10,23 327:4,9
  327:25 328:6,13
  329:3,18 330:5,11
  330:17 331:21
  334:14 335:1,17
  336:21 339:6
  340:6 341:5,16
  342:2,7 343:17,23
  345:2,10,25
  346:15 347:2,13
  347:18 348:10,21
  349:12,20 350:21
  351:9,20 352:7
  353:10,25 354:14
  354:21 356:9
  357:1 358:5,20
  359:15 360:10
  361:25 362:12,19
  363:21 364:16,23
  365:7,15,16 367:4
  368:2,5,21 369:14
  371:12 372:2,8,21
  373:18 374:2,14
  375:3,8 376:3,8
  376:14 377:25

378:4,23 379:2,17
379:25 380:13
381:6,24 382:19
382:24 383:3,9,12
383:25 384:6,12
385:21 386:20
388:8,23 390:12
391:8 392:1 393:6
393:12 395:4,13
396:13,20 397:1
397:20 398:9,17
401:12,16 403:10
404:21 405:14
407:1 408:1,21
409:7,12 410:18
412:2,10,14 413:2
413:7 414:25
415:8 417:8 418:3
420:19 421:3,11
421:12,19,22
422:7,16 423:1,11
426:5 427:4
428:11,25 429:4,8
430:15 432:12
433:18 439:13
440:9 442:14
443:5,13,22 446:8
448:11,25 449:16
451:1,12 452:4,9
452:25 453:11
455:7,24 457:5
458:19 459:2,9,20
462:6 464:22
465:1 467:7,17,20
467:23 469:14,17
470:8,21 471:10
471:11,20 472:16
473:22,23 474:22
475:10,18,24
476:2,10,10,19
478:8 480:1
484:21 487:9
491:1 492:7,15
493:6,15 494:22
495:4 496:20
497:8,18 498:14



498:19 499:25
500:10 501:1,15
501:23 502:8,15
502:25 503:18
504:20 505:10,15
505:22 506:23
**once** 335:21 439:21
**ones** 335:10 384:20
435:1 443:16
444:16 485:15
495:1
**opened** 438:2
**opinion** 404:3
**opportunity** 337:17
426:7 434:23
**opposed** 313:4
436:23
**order** 466:22
492:21
**ore** 347:24 348:5
**organize** 421:14
**original** 437:20
**OSHA** 388:20
**ought** 367:23
**outline** 378:21
**outside** 310:6,14,18
441:4,7
**owned** 335:22
343:5 444:14,17

**P**
**P** 299:1,1
**P-1** 491:3,3
**P-14** 303:4 468:2
**P-2** 490:25
**P-6** 301:16
**P-7** 301:17 317:7,8
354:2,4,6,15,16
354:17
**P-8A** 318:5 421:15
432:11
**P-8B** 421:17 432:11
**P-9** 301:22 319:20
319:21 333:12,13
370:14,15 371:1,6
371:7,9 385:22,23

386:6
**P.C** 299:2,14
**P8-A** 301:19
**P8-B** 301:20
**PA** 299:4
**page** 294:10 295:25
296:25 297:25
301:14 302:1
303:1 304:6,6,6
304:11,11,11,16
304:16,16,21,21
304:21 313:14
321:16,20,25
322:23 323:25
325:12 331:22
333:13 335:4,17
343:3,25 345:19
347:7,18 348:11
354:21 357:4
360:10 371:1,11
372:22 380:14
392:2 398:18,18
402:25 403:12
415:23 438:3
451:12 453:12
492:1 509:2
**paid** 466:10,17,22
**Pam** 439:7
**paragraph** 327:16
351:20 373:1
392:2
**Paralegal** 300:14
**Park** 299:16,21
**PARNELL** 300:8
**part** 319:11,15
388:23,25 389:4
396:15 401:19
437:20 469:19
476:9 478:15
480:22,22 490:7
**particle** 360:14
**particles** 360:13,24
396:3
**particular** 383:9,12
394:25 431:12
434:20 439:16

465:19
**parties** 508:17
**pass** 425:1
**passage** 425:24
**Paterson** 294:16
305:12
**patients** 392:3
393:15 426:24
**penalties** 447:17
**penalty** 446:20
485:12
**Penn** 300:4
**Pennsylvania** 300:4
**people** 331:5 333:5
377:7,10,17 383:4
383:7 384:1
396:14,18 429:16
430:23,23 435:4
435:16,21 436:13
436:14,16 437:21
437:25 439:8
**percent** 498:3
**perceptions** 468:21
**performed** 414:4
**period** 416:6
**peritoneal** 385:2
**perjured** 447:16
**perjury** 446:21
485:13
**person** 346:4 365:1
394:24 434:17,18
436:8 439:5,12
483:20 488:22
491:4
**personal** 326:4
342:22
**personally** 432:14
465:5
**perspective** 495:10
496:6
**pertaining** 330:1
442:2
**Pertinent** 448:16
**petition** 302:8
382:6 396:15,17
**ph** 502:9

**Philadelphia** 299:4
300:4
**phone** 470:25
471:23
**photographs** 362:2
362:8,9,13
**pick** 326:18
**pictures** 359:23
**piece** 481:16
**pile** 437:23
**place** 441:2 475:4
508:12
**Placitella** 299:2,2,3
301:6,8 305:13
306:4 308:11
309:13 310:12
312:15 313:1,11
313:20 314:3
315:5,17,24 316:6
316:7 317:24
319:5,17 320:12
321:14,17,19
322:17 323:8,11
323:12,24 324:7
324:16 326:6,9,10
326:17,20 327:4,9
327:10 329:17
330:2,7,11,14
332:7,19,25 334:5
334:13 336:22,24
337:20 338:4,12
338:24 339:5,15
340:5,8,10 342:25
344:12,14 345:13
345:18 346:24
348:21,24 349:11
350:11,20,25
351:8 352:18
353:1,24 354:1,3
354:13 355:22
356:8,15 357:19
358:2,13 359:2
360:9,21 361:24
362:6,18 363:3,16
363:22,24 364:15
364:20 365:6,14

365:19 366:3,17
367:3,10,15 368:2
368:6,20 369:1,3
369:13 370:6,18
370:22,25 371:23
372:17 373:12,19
374:1,5,7,21
376:18,20 377:5
378:1,3,17,23
379:2,5,7 380:1,4
381:16,25 382:3
383:24 384:14,16
386:3,5,13,19
387:4,9 388:4
389:6,21 390:11
390:13,19 391:7
391:20 395:14,16
397:1,3,21,23
401:3,11,18,22
402:1,3 403:10,11
405:6 406:13,25
407:9 408:9,22,24
409:18,22 410:17
411:4 412:1,24
413:1,23 414:24
415:9,14,16
416:20 418:2,17
419:10,14 420:5,9
420:18 421:3,10
422:4,13 423:10
423:20 424:4,14
425:1 427:11,20
428:15,23 429:10
430:1 431:14
433:3,7 437:17
438:8 439:13,23
440:9 442:20
443:1,5,18,25
444:12 445:5,8
446:8,18,23 447:4
447:13 448:6,11
448:18 449:2,5,12
449:25 450:6,17
450:22 451:2,4,24
452:4,8,13 453:25
454:9,20,22 455:6



MAGNA
LEGAL SERVICES

455:13,18,24,25
456:6,13,17,20,22
456:24 457:4,11
457:15 458:3,6,18
459:19,23 460:1,5
460:12,15,25
461:8,9,22 463:6
464:6,15 465:21
466:5,20 467:2,8
467:17,19 469:4
470:7,20 471:15
471:17 472:17,21
472:25 473:1,3,6
476:11,13 477:7
477:23 478:7,19
478:23 479:25
480:13 481:5
482:2,14,20 483:9
484:5,20 485:10
486:5,16,21 487:1
487:8,25 488:12
489:14,25 490:15
490:21 491:1,2
492:25 493:18
494:3 495:19,24
496:17,21,25
497:7 498:13
499:11 500:25
501:8,14 502:7
503:13 504:7,14
505:9 506:2,3,13
506:23
**plaintiff** 298:4,12
298:21 380:22
381:7 405:25
406:6 407:5,23
419:2 423:13,15
423:23 424:8,17
478:15 479:9,16
481:20 482:8,24
483:14 487:18
489:9 498:8 499:1
499:23 500:8,19
501:10,21 502:3
502:13,23 503:16
505:5,13

**Plaintiff's** 402:7
**plaintiffs** 294:5
295:5,15 296:4,13
297:5,18 299:6
479:4 480:11,21
**plaintiffs'** 302:4
401:13
**planning** 457:19
**play** 449:14 450:3
450:13 459:1
**played** 449:15
450:4,14 459:5
481:8
**playing** 450:16
**please** 305:21
324:18 325:3
331:9 336:23
341:6 354:5 368:2
369:5 374:17
385:22 387:17
403:17 442:23
445:9 448:12
451:3 479:2,5
482:16 486:21,23
486:24 487:1
**PM** 421:6,9 425:6
425:10 446:11,14
449:8,11 458:1,17
460:4,24 497:3,6
507:1,5
**point** 367:11
370:17 397:11
419:23,24 420:6
420:21 469:6
487:18 488:10
499:2
**pointed** 345:19
475:4
**pointing** 375:7
**Pooley** 357:11
362:1 502:9
**population** 393:19
**portion** 328:9
448:16 461:17
**position** 400:1,17
401:6,6 405:15

416:19 435:23
**positions** 427:6
428:7 429:14
**positive** 429:17
**possession** 310:15
339:22 480:20
481:10
**possible** 431:2
**possibly** 501:3
**powder** 302:22
308:14 328:3,8,18
336:9 356:25
389:15 390:4
396:2,19 399:25
400:19 401:2
409:4 414:6,9,16
418:9 419:4 420:2
420:24,24 430:8
440:6 444:3
445:13,18 461:14
461:16 462:2
474:2 485:21
486:11 488:6
491:9 492:19
493:11 494:6,9,18
494:23 495:9
496:9 503:7
**practice** 428:12,14
457:12
**practiced** 429:2
**practicing** 427:17
427:18 428:1
**pre-** 368:25
**predated** 506:6
**predecessors**
351:14
**prejudice** 331:25
**preparation** 313:23
314:18 315:10
317:25 318:13
322:2,11 324:20
324:24 340:18,23
398:20 409:10
415:21 454:13
465:12 477:1
493:12

**prepare** 430:16
492:21
**prepared** 337:10
340:13 390:21
424:24 434:12
483:6 484:18
**preparing** 306:13
309:16 389:9
390:20 391:8,11
397:16 417:1
437:3 438:14
490:10
**presence** 328:19,23
333:23,24 347:25
372:9 373:3
403:18 462:3
**present** 300:13
347:3 355:3
436:23 492:19
493:10
**presented** 317:20
431:14,24
**preserve** 326:23
**president** 325:23
327:12 331:11
451:7 461:2,5
506:7
**president's** 372:18
**pretty** 383:3
**Prevention** 302:7
382:6
**previously** 377:4
**Princeton** 472:13
**prior** 320:4 332:9
337:25 340:2
398:24 401:6
419:2 420:21
439:24 450:21
508:5
**privately** 353:15
**privilege** 368:14
375:2,4 377:7
398:13
**privileged** 400:3
454:17
**privileges** 404:7,18

**problem** 322:23
**Procedure** 404:13
**procedures** 359:16
414:4
**process** 430:5,25
434:9,14,15 435:3
452:20,21
**processed** 347:23
348:5
**processes** 414:4
**produce** 320:3
404:11 487:15
**produced** 314:11
315:8 318:23
427:23 438:11,11
438:17 480:18
**product** 328:10,24
333:25 372:10
380:22 381:8
454:2 506:10
**production** 304:10
410:2
**products** 294:7
301:24 302:3
305:5 373:4 419:1
427:3 452:20,22
461:17 495:2
**professional** 436:19
**program** 427:8
**promise** 482:15
**proof** 364:25
365:21,22 366:1
366:12,13 395:3
411:9 480:9,14
485:17
**proprietary** 404:6
404:17 405:18
**propriety** 404:17
**prove** 406:5 423:22
424:6 482:5
**provide** 336:14
337:24 404:2
469:7
**provided** 337:15
385:14 391:12,22
479:15 491:7



495:21 498:8
**providing** 436:10
437:1,1
**Public** 294:20
508:3
**publication** 396:1
**pulled** 345:3
**Pulliam** 381:22
**punishment** 413:17
447:3,8
**purpose** 476:25
**purposes** 337:9
**pursuant** 294:15
**put** 333:16 336:2
337:21 383:19
385:25 386:24
390:15 397:21
412:5 462:13
463:23 465:25
499:14
**putting** 387:4

**Q**

**Q5** 355:1
**qualified** 404:4
**quarter** 502:17
**question** 304:20
307:17,19 308:5,9
309:11 310:10
312:14,23 313:7
314:2,20 315:13
315:23 317:23
319:1,14 320:9
321:4,10 322:15
323:4,21 324:6,12
326:1 329:10,15
330:3 332:4,22
333:8 334:4 336:1
337:7 338:10
339:2,12 340:1
342:15,19,24
346:23 348:18
350:4,17,24 351:5
352:13,24 353:18
354:10 355:6,16
356:4,12 357:16

357:24 358:10
359:1,8,15 360:3
361:18 362:15
364:9,19,22 365:5
365:8,18,24
366:11,24 367:14
367:18,23 368:17
369:10,25 371:19
372:15 374:20
381:13 383:17,17
386:10,18 387:2
387:23 389:2,17
390:7 391:4,15
393:8 394:17
395:4 396:23
400:22 401:10
403:4,7,13 404:1
405:2 406:9,20
407:19 408:6
409:13,17 410:12
410:19 413:20
414:21 416:6,14
417:21 418:14
419:7 420:4,12
421:25 422:12
423:6,18 424:1,10
424:19 427:14
428:3 433:8 436:5
447:1,11 448:4,5
448:8,13 449:21
451:20 453:19
454:5,16 455:2,16
455:23 456:9
457:6 458:21
459:16 463:5
464:2,12 465:15
465:22 466:3,15
466:25 468:24
469:23 470:16
477:6,17 478:4,18
479:18 480:6,23
481:1,7,22 482:4
482:10,17 483:3
483:15 484:1,12
485:5,23 486:12
486:14 487:3,20

488:9,11 489:13
489:18 490:19
492:24 493:7,17
493:24 495:13
496:13 498:11
499:4 501:12
503:9 504:3,13
505:7,25 506:1,17
**questioning** 326:25
367:16 438:7
457:1 458:9
**questions** 312:11
320:18,25 322:19
322:25 323:10
326:5 327:2 330:1
334:24 335:18
337:13 340:12
342:3 349:13
357:10 374:3
386:24 402:8,16
415:5 418:6
425:20 434:6,16
438:9,12 439:15
446:7 447:21
448:2 458:7,8,11
470:12 488:21
495:5 499:17
506:24
**quietly** 469:10
**quote** 372:25
**quoted** 373:6
409:24

**R**

**R** 299:1
**Rabino** 398:5,5
**raise** 428:21
**raised** 312:21
313:15 335:4
426:12 440:10
**rare** 393:22
**ratio** 360:15
**raw** 347:24 348:5
**RAWLE** 300:2
**Ray** 300:15 305:15
397:4

**read** 341:18 343:18
344:23 409:9
415:5 431:11
436:4 448:12,17
460:6,6 480:23
**reading** 359:20
430:21 451:17
**reads** 337:22
**ready** 449:2
**really** 339:16
356:22 395:11
426:6 431:7
434:22 445:14
450:10 462:20
470:24 471:5
479:8 487:4
**reason** 440:17
456:18 470:1
**reasonably** 381:2
**reasonings** 411:24
**reassure** 474:20
**reassured** 432:1
**Reath** 468:5,9
**rebut** 411:7
**recall** 310:8,22
311:15,20,25
314:13 317:11
320:20 323:2
333:1,6,7,9
334:20 336:19
340:14 342:5
343:21 345:7,8,14
348:15 349:13,18
349:19,20 373:13
376:24 377:21
378:7,9,12,13
379:9,20 382:17
385:4,19 398:14
398:15 422:25
426:2 433:23
438:12 439:18
440:11 441:15,16
443:11 444:4,8
445:25 447:19
448:1,7,19 450:1
450:7,12,18,23

458:25 459:4,6,9
459:14,17 460:2
481:12
**received** 469:18
**recess** 373:23 421:7
446:12 449:9
497:4
**recipient** 476:24
**recognize** 413:5
**recollection** 426:3
494:20
**reconsider** 381:10
381:17
**record** 305:2,20
314:23,25 315:2,4
316:5 326:23
337:22 349:4,6,8
349:10 373:22,25
378:16 390:16
398:22 421:6,9
425:4,6,10,17
427:24 432:8
446:11,14 448:17
449:8,11 450:13
452:1 455:8 456:1
456:2 458:2,17
460:4,11,14,20,21
460:24 467:11
492:15 496:24
497:1,3,6
**records** 336:18
387:14 391:1
410:3
**redirect** 425:2
457:18,22
**reduce** 414:7
**refer** 470:13 474:15
475:20
**reference** 334:17
500:2
**referred** 433:3
**referring** 323:7
330:13 356:14
402:4 471:24
478:6
**refers** 471:21



refining 452:21
refresh 335:12
    385:6 426:3
refused 398:12
registered 426:17
    428:6,9
regularly 333:22
related 335:3 339:9
    348:12 368:22
    387:11 393:24
    401:13 402:22
    405:11,15,24
    406:7 410:6 418:9
    418:24 419:3
    420:1,22,25 465:6
    465:19 481:18
    482:22 485:2,20
    486:10 488:5
    492:3 496:9
relates 357:10
    404:23 473:21
    504:5
relation 400:13
relative 508:16,19
relay 435:12
relayed 346:4
relevant 314:6
    380:25
reliance 319:12
    346:16,18 350:22
    351:1 352:22
    353:8 354:7
    368:13 372:25
    374:15 433:4,10
relied 317:21
    318:23
rely 433:11
relying 394:18
remember 320:21
    320:23 333:11
    334:21 335:13,15
    358:4,11 373:16
    377:11 379:10,13
    379:15 383:1,2,2
    384:4,10 412:13
    412:14,18 422:15

422:17 431:25
    450:10 451:9
    459:21,24 471:6
    481:6 485:24,25
    504:17,20,22,23
remind 431:7
renew 323:5 330:10
    344:13
renewed 356:22
renews 344:10
repeat 326:24
    399:1 471:5
repeated 322:18
report 499:25
    500:12,18
reporter 294:20
    305:17,21 314:22
    342:17 349:3
    448:12 508:3
reports 392:3
representations
    311:23 312:3
    329:6
representative
    295:3,13 338:22
    427:25 491:4
represented 315:7
    369:18
request 304:10
    305:13 404:12
    456:12
requested 335:10
    399:11,14,19
    404:5,16 419:16
    431:1,4 441:22
    485:7 491:24
requests 387:14
    438:18,19
required 488:23
requires 404:2
research 302:13
    348:4 399:3
    402:17 410:1
reserve 425:2
respect 327:2
    329:25 348:19

372:16 387:25
    390:16 405:3
    407:15 408:11
    416:16 443:9,16
    500:21
respond 337:19
    493:3
responded 343:9
    496:7
responding 390:23
    487:11
response 302:7
    321:5 322:19
    337:21 343:11
    355:7 380:20
    381:18 382:5
    383:10,13 384:25
    385:16 396:16
    403:23 408:14
    438:17 488:3,23
responses 302:3
    311:18,24 312:5
    334:24 338:18,20
    339:8,23 378:10
    379:22 385:14,18
    391:11 405:19
    433:12,21 434:10
    437:2,5,13,16
    438:24 439:4
    440:22 441:3
    442:3,8,13,19
    443:15 445:22
    446:3 481:4,14
    484:4,22 485:20
    486:8 487:24
    488:2 491:6,15,18
    491:21,24 492:7
    493:4,5,12,20,22
    495:9 503:24
    504:9
responsibilities
    486:2
responsibility
    435:24 488:20
responsible 430:24
    437:21,24 439:8

responsive 309:24
    310:6,15 437:6
    443:15
result 467:3,4
    497:23 498:2
    501:2,5,16,24
    502:9,20 503:4,21
    505:2
results 360:25
    402:20 480:2
    498:7
returned 474:2
Reuters 302:20
    409:2,2
reveal 497:19
    498:15,22 500:3
    500:11
revealed 328:25
    334:1 372:11
    373:5 477:2
review 306:17,22
    307:2,20 318:12
    318:14 320:13
    322:12 326:11
    337:17 370:9
    388:25 390:24
    391:2 400:12
    405:8 432:14,18
    439:21 440:13
    463:23 493:3
reviewed 306:19,24
    307:10 313:22
    314:16 315:9
    317:1,2,4,25
    318:2 322:3
    324:15,20 327:6
    334:16,22,23
    366:15,19 379:23
    440:15 470:4
    492:20 493:11,21
reviewing 317:11
    372:4 395:10
    437:9
Revlon 300:11
revolved 426:20
Rich 415:12 425:19

RICHARD 299:9
richard.bernard...
    299:11
right 316:9 318:6
    319:23,25 321:23
    323:11,19 324:10
    325:15,18 329:4
    330:19,24,25
    332:8 333:19
    334:6 336:6
    341:21,21 349:24
    352:22 353:6
    357:14 362:9
    363:4,6 365:11
    367:4 371:8,16,17
    371:24 372:12,18
    372:22 373:8
    375:20 377:2
    379:12 381:11,20
    382:11,14 383:6
    386:14 387:15
    388:6,10,13,13
    389:12,15 390:1
    393:10 401:4,17
    402:25 405:7
    408:7 412:11,23
    417:11 421:15
    422:19 425:2,3
    439:6 449:5,24
    456:12 457:5
    461:7 462:4
    464:10,16,19
    465:9 469:5
    470:14 472:3,5
    473:7 474:4 475:7
    480:17 492:10,12
    494:7,10,12,16,22
    497:23 504:11,25
    505:25
Road 299:21
ROBERT 297:13
Roger 301:21 303:2
    323:1 325:16
    331:10 333:15,19
    416:11 451:7
role 490:6,7



**Roll** 502:9
**Ronald** 330:18
**room** 468:11,14,19
469:1,19 470:11
**ROONEY,decea...**
295:14
**Roth** 299:2 305:14
**RPR** 508:23
**Rules** 404:12
**running** 327:1,5
330:3 348:18
**Rutgers** 390:1

**S**

**S** 294:19 299:1
301:12 508:2,23
**sample** 359:22
472:12 474:1
**sampled** 328:18
333:22 462:2
**samples** 359:4
**sat** 344:4 469:10
**save** 387:8
**saw** 308:2,2 319:16
362:2 377:9,22
**saying** 355:25
364:25 365:15,21
366:22 367:2
403:23 411:14,16
416:2 450:10
483:22 503:24
**says** 311:19 325:9
327:11,17,24
328:5,6,12,14,21
329:2 331:6,7,15
331:20 332:6,20
332:24 334:6,12
341:15 347:8,17
348:9 351:7,9,19
351:25 352:1
353:5 354:22
355:1 359:3,9
360:19,22 361:3,4
361:10 362:7,10
362:21 363:1
368:18 370:13

371:13 372:7,8
380:15 381:5,6,15
381:17,20 383:23
385:8 388:16
392:6,14 393:11
393:13 394:2,4,12
394:16 395:20
397:7,13 402:6,11
402:12 403:16,21
404:20 405:4,20
411:3 413:22
414:2,23 452:14
452:24 453:8,14
453:24 461:23
473:13,25 491:3
497:21,25 498:1,6
498:18,19,24
500:6,15,16 503:3
503:4,22 505:24
**scarce** 361:15
**school** 402:17,22
405:24 426:11
**science** 471:3
**scientific** 366:13
432:1
**scientist** 343:19
345:21 347:21
348:13
**scientists** 335:21
344:4 364:5
366:14,18 395:1
397:15
**scope** 308:4 311:5,8
312:10 321:13
322:10 324:14
326:1,14 329:11
334:8 336:1
342:15,19 344:23
348:20 350:9
352:14 353:18
355:16 360:3
361:18 364:9
365:5 366:24
369:25 371:19
372:16 387:23
390:7,17 403:9

405:3 406:20
407:12,17 409:21
410:13 411:19
416:14 417:21
420:12 424:10,19
424:25 427:12,21
428:17 438:21
440:3,20 451:20
451:25 452:7
453:19 459:3
479:18 489:18,23
490:5,11 495:13
496:13 499:4
500:22 506:17
**scratch** 458:23
**screen** 333:17,18
386:25 387:3
451:6
**SCRIVO** 299:19
**search** 431:2 441:7
**searches** 430:24
437:22 439:8,10
442:15,16 443:8
443:14
**SEBASTIAN** 300:3
**second** 306:8
314:23 327:15
384:15 392:2
425:23,25 453:11
**secret** 404:6,17
405:18 504:1,11
**section** 357:3,8
393:7,13 409:19
**Sediment** 474:1
**see** 307:3,8,13,20
307:22,24 308:6
313:16 316:4,10
316:11 320:15
324:3 325:12,17
327:15 329:20
330:16,21,22
331:2,3,14,19
333:16,18 334:11
336:3,7,8,11
337:5 339:3
343:15,25 344:17

344:18,25 345:23
345:24 346:17,19
346:25 347:1,2,11
348:8,9,25 351:24
351:25 352:5,6
353:3,5,6 354:16
354:19,24 355:5,6
355:20 357:5,6,8
357:9,12,13
358:20 359:3,7,8
359:13,14,19
360:1,7,16,19
361:2,3,8,9,16,22
362:3,20,20,24
363:1 368:15,18
368:21,23,25
369:5,14,23 370:4
370:12,13 371:3
371:12 372:6,21
375:3,6,7,8,10,11
375:13,14,16
376:7,11,12,15
377:6,16 380:8
381:4,5 382:7,22
385:5,24 386:22
387:5,10,21 388:2
388:21,22 389:18
390:9 392:2,5,6
392:11,12,19,20
392:24,25 394:1,2
394:8,9,15,16
395:19 396:4,7
397:6,18,19,24
401:21 402:10,11
403:20,21 404:8,9
404:19,20,25
405:4 410:25
415:19,23,25
431:9 432:19
442:18 451:12,16
452:11,14,18,23
452:24 453:4,8,12
453:15 454:6,7
461:4,19,20 462:9
471:14,18 473:10
476:17,21,22

477:3,4,11,12
491:12,25 496:2
497:20,21,24
498:5,17,18,23,24
500:5,6,14,15
503:21,22
**seeing** 325:9 347:5
386:16 387:13
**seen** 321:7 340:24
346:10,13 349:23
350:1,13 361:5
380:10 388:5
391:5,16,25
402:20 409:5
431:15,19 451:18
**Selby** 317:10 378:6
379:19 380:7
445:23
**selected** 462:12
497:14
**selection** 462:23
463:2
**sells** 328:9 461:17
**SELVAGGIO**
298:11
**Sempel** 375:23
**send** 317:3,3,14
320:5 485:7
488:25 497:15
**sense** 435:9
**sent** 315:18 316:2,5
316:5 318:16
319:7,8,23 331:23
350:10 354:7,12
369:15 389:4
402:21 421:20
431:17 432:6,6,24
439:21 453:2
462:17 463:3,8,15
463:24 464:5,14
464:23 466:11
468:22 474:14
485:8,9 488:24
489:3,8 497:16
499:13,16,22
501:19 505:4,12



**sentence** 352:6
359:14 388:22
392:20 397:19
405:20
**sentences** 361:23
392:12,25 394:9
**series** 452:21
**served** 311:9 358:6
**Services** 294:24
295:25 296:25
297:25 298:25
299:25 300:25
301:25 302:25
303:25 304:25
305:16,18,25
306:25 307:25
308:25 309:25
310:25 311:25
312:25 313:25
314:25 315:25
316:25 317:25
318:25 319:25
320:25 321:25
322:25 323:25
324:25 325:25
326:25 327:25
328:25 329:25
330:25 331:13,25
332:25 333:25
334:25 335:25
336:25 337:25
338:25 339:25
340:25 341:25
342:25 343:25
344:25 345:25
346:25 347:25
348:25 349:25
350:25 351:25
352:25 353:25
354:25 355:25
356:25 357:25
358:25 359:25
360:25 361:25
362:25 363:25
364:25 365:25
366:25 367:25

368:25 369:25
370:25 371:25
372:25 373:25
374:25 375:25
376:25 377:25
378:25 379:25
380:25 381:25
382:25 383:25
384:25 385:25
386:25 387:25
388:25 389:25
390:25 391:25
392:25 393:25
394:25 395:25
396:25 397:25
398:25 399:25
400:25 401:25
402:25 403:25
404:25 405:25
406:25 407:25
408:25 409:25
410:25 411:25
412:25 413:25
414:25 415:25
416:25 417:25
418:25 419:25
420:25 421:25
422:25 423:25
424:25 425:25
426:25 427:25
428:25 429:25
430:25 431:25
432:25 433:25
434:25 435:25
436:25 437:25
438:25 439:25
440:25 441:25
442:25 443:25
444:25 445:25
446:25 447:25
448:25 449:25
450:25 451:25
452:25 453:25
454:25 455:25
456:25 457:25
458:25 459:25

460:25 461:25
462:25 463:25
464:25 465:25
466:25 467:25
468:25 469:25
470:25 471:25
472:25 473:25
474:25 475:25
476:25 477:25
478:25 479:25
480:25 481:25
482:25 483:25
484:25 485:25
486:25 487:25
488:25 489:25
490:25 491:25
492:25 493:25
494:25 495:25
496:25 497:25
498:25 499:25
500:25 501:25
502:25 503:25
504:25 505:25
506:25
**set** 369:20 478:13
479:14 483:13
493:22 508:13
**sets** 338:6 440:22
492:20
**seven** 306:12
**severely** 426:23
**share** 320:5
**shared** 395:7
433:13
**Sharp** 302:11
**shortcut** 474:10
**show** 366:4,8
448:25 451:5
479:13 483:7
**showed** 323:17
345:4,4,20 346:13
373:14 377:12
449:24 451:10
459:10
**Shower** 400:19,20
440:6,7 478:1,1

491:9,10
**showing** 345:8
449:22 506:9
**shown** 340:22
360:25
**sic** 335:8,13 356:6,9
385:1 391:1 397:4
397:15 401:13
**side** 497:22
**sign** 331:17 357:25
364:24 365:20
**signature** 325:19
413:9
**signed** 331:10,24
333:2,15 348:13
357:20 364:1,2
374:10 377:15
388:3 415:24
416:11,22 433:20
436:1 447:5
484:22,25 488:13
506:6
**signing** 365:2 415:3
415:6
**similar** 333:3
404:22
**simple** 486:12
**simply** 326:22
**single** 327:21
398:22 419:23,25
420:6,21 465:10
478:13 479:15
481:16,20 482:6
483:12 484:8
485:19 487:16
488:4,5,17 489:8
500:18 501:21
502:2,12,22
503:15 505:4,13
**sir** 342:17
**sit** 405:22 406:4
407:2,20 410:9
411:6,15 419:22
420:19 423:21
424:5 446:2
454:11 478:11

479:10 481:15
482:4,21 483:11
485:17 486:7
487:9,14
**sits** 406:17
**sitting** 345:6
**six** 306:12
**sixth** 362:23
**sized** 360:25
**SKADDEN** 299:8
**skills** 427:10
**skin** 426:25 427:1
**skip** 500:1 502:18
503:2
**skipping** 502:15
**SLATE** 299:8
**Sloan** 376:1,15
377:7,9
**sold** 328:3,17
461:14 462:1
491:10
**solidify** 437:11
**solve** 397:16
**somebody** 337:22
408:12 435:19
439:1
**Soon** 409:8
**sorry** 314:22
322:22 342:17
349:3 371:4
397:21 401:18,20
403:6,15,16
410:18 429:4
439:14 456:24
460:10 472:17,18
472:23 494:7
**sort** 313:16
**sought** 380:24
**sound** 449:6
**Sounds** 411:11
**source** 328:2
461:13
**sources** 392:16
419:5 420:24
**South** 300:4
**spanned** 378:10



speak 308:25
434:17 435:10
436:14
speakers 449:4
speaking 368:4
468:19
spec- 441:20
special 302:4 477:1
Specialist 300:15
specific 315:25
318:20 320:17
333:7 379:10
399:18 417:16
430:6 431:22
439:14,15 441:22
443:9 447:21
481:13 492:5,9
494:1
specifically 307:1,3
316:16 340:24
343:22 351:13
358:12 384:5
395:2 396:11
398:10 402:5
413:7 414:12
417:13 418:16
438:20 442:18
474:7,17 475:2,22
477:22
specified 388:20
specimen 359:6,10
speculate 404:2
spend 309:15
408:17
spent 306:11
408:16
spoke 378:5 430:22
439:5,12 470:1
spoken 447:22
Square 299:3,10
300:4
SR 298:19
St 426:24
stage 360:13
stand 368:5 448:22
start 316:17 403:13

428:16
started 427:2 429:6
447:20 448:14
458:24
state 294:20 321:21
392:21 403:17
404:11 414:12
446:21 508:4
stated 332:8 345:12
345:17 352:2
476:25
statement 339:10
339:17 355:23
411:7 416:24
448:5 450:21
statements 413:16
states 328:3 333:20
416:6 461:11,14
station 468:5
stayed 438:21
stenographic
305:20
stenographically
508:11
step 433:25
Stephen 297:15
stipulation 331:24
Stipulations 304:15
stop 428:12 456:11
stopped 428:13
Street 294:17 299:4
305:12
strike 357:2 407:16
408:13,14 427:12
427:13
studied 393:15
studies 356:14
380:17
stuff 421:14
subject 378:4
380:25 404:6,16
413:17 434:11
447:8,16
submissions 383:18
submitted 324:2
subpoena 311:9

404:14
substance 309:4
454:24
Success 427:8
sued 335:23
suggestion 313:9
suggests 393:22
suit 410:24
Suite 299:4
Superior 294:1
295:1,10 296:1,9
297:1,11 298:1,9
298:17 305:6
Supplemental
302:3
supplied 338:20
372:4 445:12,15
478:14 479:3,9
495:8 496:9 500:8
500:18 501:9
supplier 396:25
supply 435:22
488:17
supplying 328:7
394:23,25 430:6
461:15
SUPPORT 304:2
sure 321:15 356:19
358:3 378:21
401:17,22 412:17
413:11 415:13
418:5 422:21
428:24 431:18
437:23 442:25
462:19 466:17
470:3,6 473:20
474:21
swear 305:22
swears 328:13,22
switch 443:22
sworn 305:24
325:16 355:24
508:6
SYLVIA 296:12
sync 473:5
system 474:21

475:3

_____

T

T 299:9 301:12
306:2 425:12
446:16
tab 325:2 329:22,23
331:22 332:14
341:6,10,12,25
346:16,17 347:14
351:2 352:22
354:14,16 368:9
368:10,12,13
369:4 374:15,16
376:17,18,21
387:17,18 471:21
472:22 474:4
475:19 506:2
table 360:25 361:5
362:20 363:15
469:1 476:7
take 353:2 421:4
433:25 438:5
457:23 468:7
476:19 478:20
479:1,5
taken 294:15
305:11 313:4
355:3 356:6 468:4
508:11
talc 295:17 298:23
327:20 328:8,15
333:21 343:14
347:23,24 348:5
350:8 351:12,13
351:14 352:4
356:24 358:7
363:10 369:21
375:19 383:5,15
388:12,18 393:7
393:13,15,22,25
394:11,14 396:3
396:19 397:10
399:7 401:1 410:5
414:5,5,15 416:5
417:6 418:10,25

418:25 420:23
440:4,6,19,23
444:1 445:12
451:14 459:12,12
461:13,15,24
464:9,10,18,19
465:6,11 474:3
481:19 482:7,23
484:9 485:3
487:17 488:18
489:10 491:9,11
498:3
talc-free 351:16
talcosis 307:15
talented 429:16
talk 360:11 365:10
379:18 391:18
408:15 412:3
429:19 430:4
476:20 477:18,21
479:24 489:23
talked 350:6
356:18 366:18
377:1 445:20
464:8 474:17
477:13
talking 326:15
334:21 338:21
339:17,18 360:8
378:13 399:20
436:24,24 442:13
469:12 475:1
476:8 501:20
talks 351:22 358:21
359:21 392:3,7
394:10 395:25
398:4 453:12,15
454:1 464:17
471:12 473:23
477:9,24,25
499:19 500:4
teach 427:10
TEC 296:15
tell 313:13 319:3
366:8 374:16
417:2,17 426:9



429:8 430:20
432:22 454:10
456:2 466:12
472:9 477:8,15
**telling** 349:21
389:14
**ten** 362:23 446:9
**tenure** 434:23
465:18
**term** 434:4
**terms** 309:6 409:13
459:3 496:8
498:21
**test** 474:2 476:25
477:1 480:2
481:18 482:6,22
484:8 487:16
488:4,5,17 489:8
499:1,22 500:7,11
501:5,19 502:2,12
502:22 503:15,18
505:1,4,12,15
**tested** 328:19
333:23 347:23
355:11 410:5
462:3 477:1
**testified** 305:24
314:15 334:15
335:21 338:7
339:6,22 341:1
345:21 347:22
349:24 350:12
358:14 441:12
443:7
**testify** 390:21
480:19 481:9
483:21 508:7
**testifying** 346:5
429:20 447:15
479:11
**testimony** 301:5
309:4,9 314:21
316:1,25 334:20
335:2 336:13,19
340:2,13 343:2,24
349:17 351:22

368:1 430:16
439:24 441:11,16
444:4 447:25
448:20 449:1,13
449:16,18,23
450:2,8,16,19,24
454:25 455:10,20
456:4 459:1,7
469:20 470:1
490:17 508:11
**testing** 318:11,21
328:25 334:1
355:3 359:6
372:11 373:5
398:12,24 399:5
399:25 402:20
405:10 406:7
407:22 410:6
414:4 418:24
419:3 420:1,23
422:8,21 423:3
474:18 476:24
481:18 485:2,20
486:10 488:5,23
489:9 496:10
497:19 498:15,22
506:8
**tests** 344:5 380:17
422:16 431:23
478:13 479:14
483:13 500:3
506:4,14
**Texas** 404:12
**thank** 327:8 344:13
378:24 379:3,6
380:3 382:2 421:4
428:24 432:12
506:24
**thermo** 355:12
**thing** 307:11
334:16 354:22
364:23
**things** 334:23
413:25 423:8
432:20 462:17
**think** 306:10 308:3

316:1,19 342:7
364:22 367:21,25
413:2 433:21
436:24 437:22
439:6 445:16,22
457:23 476:6
480:8,12 490:9
**thinking** 445:18
**thinks** 466:13
**third** 333:13 347:7
**Thomas** 381:22
**thought** 444:13
460:13,20,21
475:12 490:5
499:15
**thousands** 367:7
**three** 309:17,18,20
410:4
**time** 305:10 306:10
308:21 309:14,21
310:1,4,19 311:12
314:9,24 315:3
321:3 330:5,6,9
330:10 333:2
334:14 339:14,23
340:6,11 342:2
346:1 349:5,9
372:3 373:13,20
373:21,24 378:5,9
378:18 380:22
381:9 382:18
383:5 384:12
387:8 397:11
399:5,7,14 408:17
414:1 415:1 417:5
421:5,8 422:15
425:5,9,24 431:12
433:19,20 435:25
435:25 436:23,25
444:12 446:10,13
449:1,7,10,14
451:10 454:14
456:7 457:25
458:16 460:3,23
465:3,25 466:8,17
469:6,11 470:25

471:7 482:16
487:18 492:18
497:2,5 499:2
506:25 508:12
**times** 299:10
362:23 420:14
441:11 482:19
486:15 501:25
**tissue** 358:22 359:4
359:10,11,17
362:23 363:5
**today** 305:9 313:13
322:11 344:3
346:5 362:13
407:2,20 410:9
411:6,15 419:22
420:20 422:6
423:21 424:5,25
429:20 430:4,16
446:2 454:11
455:10 478:11
479:10,24 481:3
481:16 482:4,21
483:6,11 484:3,19
485:17 486:7
487:10,14,22
**today's** 309:16
389:9 390:21
391:9 409:10
417:1 454:13
507:1
**told** 306:11 310:5
310:19 340:16
350:5 353:14
366:20 388:11,13
388:17 390:2
410:14 417:11
418:23 427:24
447:7 455:3
460:16 470:17
475:12 494:4
502:16
**top** 335:13 410:2
**topic** 383:19
**topics** 311:13
**total** 360:23

**touch** 466:1
**trace** 388:19
472:11
**trade** 404:6,17
405:18 503:25
504:11
**transcript** 303:2
323:6 344:15
345:12,17,20
353:12 426:4
449:22 508:10
**transcripts** 366:5
366:19
**transmission**
359:24
**trauma** 426:25
**tremolite** 361:7,14
363:17 392:16
393:16,19,20
394:13 414:8,18
472:12 498:3,15
498:21 499:20
501:3 505:23
**trial** 301:23 320:4
338:1,14 496:3
**true** 339:14 395:6
413:13 455:14
486:9 488:16
**trust** 331:16
**trusted** 436:20
**truth** 366:9 508:7,7
508:8
**truthful** 446:3
**try** 387:8 457:24
482:16
**trying** 326:17,23
423:1 460:7,15,19
483:4 484:16
487:2,5 495:25
**tube** 474:2
**tumor** 359:12
**turn** 325:11 341:6
347:18 381:10
398:12 400:2
411:10,18 503:15
**turned** 398:23



399:5,15 405:25
406:2,5,11,12,18
407:4,8,21,24
419:25 420:22
423:13,15,23
424:3,3,7,13,17
480:21 481:11,18
481:24 482:1,6,12
482:13,24 483:8
483:12,18,22,24
484:7 485:1,18
486:1,3,9 487:16
499:1 501:21
502:2,12,22
**turning** 485:25
**Turnpike** 299:15
**two** 299:3 330:25
397:15 475:8
492:20 493:12
496:22 503:1
**tying** 471:25

---

**U**

**Uh-huh** 317:8
353:9 385:7
422:22 472:25
**ultimately** 328:17
462:1
**umbrella** 444:15
**underneath** 394:3
**understand** 307:17
308:12 312:7,18
312:24 313:2
319:25 320:7
363:8 378:21
430:25 432:21
439:3,11 458:21
462:18 491:14,20
**understanding**
321:12 337:11
339:14 356:23
391:17 417:10,15
429:24 430:3,11
430:22,25 434:2,5
434:9 438:22
439:9 440:4,21,25

444:11 445:11
446:20 447:18
464:4 479:23
481:2,23 484:2
487:22 488:3
491:17,23 493:2
**understands**
326:14
**unequivocal** 369:19
**United** 328:3 416:6
461:14
**University** 390:2
426:15
**unknown** 503:1
**urged** 370:7
**use** 329:25 352:14
390:17 403:8
**users** 328:10,17
461:18 462:1

---

**V**

**v** 296:5,14 297:6,19
298:5,13,22
301:24 302:11
**vague** 403:24
**vaguely** 342:8
**VAN** 299:20,20
**various** 378:9
427:5
**veins** 352:3
**venue** 313:9
**veracity** 428:2
**verbatim** 508:10
**verified** 310:20,25
433:20 436:1
484:23
**verifying** 394:19
395:5
**Vermont** 327:22
351:12,15 352:4
353:16 355:4
356:1 369:21
388:12,18 453:17
453:17 473:25
**version** 341:18,23
**versus** 305:5 393:9

397:5
**VICMAR** 295:12
**video** 300:15 459:2
**videographer**
305:1,15 314:24
315:3 349:5,9
373:21,24 378:18
421:5,8 425:5,9
446:10,13 449:3,7
449:10 457:25
458:16 460:3,23
496:23 497:2,5
506:25
**Videotaped** 294:14
**Village** 299:21
**violates** 404:12
**Viscomi** 367:24
454:19 456:11
457:21 458:13
**voice** 450:9
**VOLUME** 294:12
**voluntarily** 370:10
370:11 371:15
**volunteering**
426:20
**vs** 294:6 295:6,16

---

**W**

**Wait** 387:6
**WALTER** 296:3
**want** 326:7,12
327:5 368:3
378:20 386:3
401:17 409:12,14
412:2,4 418:4
422:19,20 436:22
436:22 449:14
456:25 478:25,25
496:1
**wanted** 307:7
356:18 378:25
379:18 426:18
431:9 433:14
437:23 460:21
470:2,6
**wants** 344:13

**wasn't** 329:16
410:15 431:8,15
435:18,24 483:6
488:20
**way** 309:9 354:6
364:22 374:25
387:7 393:8
400:16 408:18
439:2 442:1
447:25 471:24
476:3 477:13
487:6 490:24
**we'll** 387:8 415:12
**we're** 306:8 313:3
313:14 314:25
316:13 321:16
326:14 386:20
391:21 398:17
403:1 418:3 421:6
432:8 449:8 457:7
457:9,13,16 458:2
460:4,14,20
474:24 475:19
489:23
**we've** 370:20
436:24
**weeks** 309:20
429:21
**WEINER** 299:19
**WENDOWSKI**
298:19,20
**went** 372:24 373:14
376:25 378:9
379:13 383:10
395:22 396:15
412:4 426:10,14
426:22 431:22
451:9 459:20
461:2 464:18
492:17 506:5,15
**weren't** 337:25
400:2 441:6
494:17
**Westfall** 342:4,9,13
343:6,20 346:21
347:15 349:17

350:7 352:11
353:3 354:18
358:23 363:12,18
364:5 451:8
**Westfall's** 363:5
**whatsoever** 465:24
484:10
**Whittaker** 299:18
**Widener** 300:3
**wife** 294:4 296:3
297:4 298:20
**Wiles** 302:11
**willfully** 413:16
**William** 348:13
364:1 375:12
395:17,21
**Windsor** 327:12,19
327:21 328:8,16
328:24 329:7
331:10,11 333:22
333:25 371:15,17
371:24 372:5,10
373:4 454:2
461:16,25 491:7
491:10 502:19
505:16
**Winner** 382:21,24
**witness** 304:5
305:22 308:10
309:12 310:11
311:6 312:24
313:8 315:14
319:2,15 320:10
321:11 322:16
323:22 324:13
326:3 329:14
330:12 332:5,23
334:11 337:10,13
337:16,19 338:11
339:3,13 340:3
342:16,21,23
344:22 350:5,18
351:6 352:16,25
353:22 354:11
355:20 356:5,13
357:17,25 358:11



360:5,7,19 361:20
361:22 362:5,16
363:1,14 364:11
364:13 365:25
366:12 367:1
368:4,18 369:11
370:2,4 371:21
373:10 380:2,3
381:14 383:18,22
386:11 387:24
388:2 389:3,18
390:9 391:5,16
396:24 400:23
404:2,3,5,16
405:4 406:10,22
406:24 407:7
408:7 410:14
411:2,21,23
413:21 414:22
416:15,18 417:25
418:15 419:8
420:17 421:2
422:1 423:7,19
424:2,12,23 425:2
428:5 429:1,13
430:3 433:9
437:19 440:1
442:22 443:20
447:2,12 448:22
449:22 452:11
453:23 454:6,16
455:3,17 456:10
457:18,23 459:17
459:24 460:22
464:3,13 465:16
466:4,16 467:1,18
468:25 469:24
470:17 477:18
478:5 479:22
480:7 481:2,23
482:11 483:4
484:2,13 485:6,24
486:25 487:4,21
488:10 489:21
490:20 493:25
495:17 496:15

498:12 499:8
500:24 501:13
502:6 503:10
504:4 505:8
506:21 507:3
**witnesses** 309:1
**women** 393:18,23
**word** 433:10
**words** 370:5 433:21
**work** 405:11
429:15 434:24
436:17 438:1
459:2
**worked** 375:19,22
396:18 436:14
465:4 505:21
**workers** 410:2
**working** 383:4
426:21 430:13
**wouldn't** 395:11
400:9 426:9 435:9
499:16
**written** 355:21
386:23 393:4
402:8,16
**wrong** 365:11
400:8 473:4
**wrote** 335:8 393:1
470:8 472:1,6,7
474:11 475:13
499:9
**www.MagnaLS.c...**
294:25

---

### X

**X** 301:2,12 306:2
425:12 446:16
**x-ray** 355:11
**x-rays** 359:22

---

### Y

**Yeah** 377:13
378:17 387:13
496:25
**year** 358:15 396:14
412:20 429:4

**years** 327:20
335:20 336:4
427:7 436:15
494:14 495:2
**Yesterday** 445:1
**York** 299:10,10
300:9,9 358:17
**YOUNG** 300:8
**Yuhas** 321:22
331:18 332:10,16

---

### Z

**Zeitz** 501:24

---

### 0

**000021285** 302:9
**000280280** 302:15
**000319333** 302:13
**0269** 353:4,7
**07009** 299:21
**07932** 299:16
**08901** 294:17

---

### 1

**1** 305:3 360:25
361:5 362:20
**1/13/2020** 508:24
**1/15/75** 501:23
**1/25/77** 502:8
**1:34** 421:9
**1:37** 425:6
**1:44** 425:10
**10** 498:3 501:25
**10/10/74** 500:14
**10/16/97** 302:10
**10/6/78** 502:19
**10/8/65** 501:16
**10:19** 294:18
305:10
**10:27** 314:25
**10:28** 315:4
**10022** 300:9
**10036** 299:10
**105** 321:20 335:4
**11/2/84** 503:19
**11:05** 349:6

**11:07** 349:10
**11:32** 373:22
**11:46** 373:25
**12/4/70** 498:2
**12:40** 421:6
**13** 508:25
**14** 299:21
**16** 451:12
**17** 304:7 345:20
347:19 414:2
474:5
**17th** 369:6
**18** 299:15 327:20
**19** 472:24
**19103** 299:4
**19107** 300:4
**1940s** 351:11
**1955** 416:7
**1968** 331:11
**1971** 378:11 472:3
472:5,12 492:19
493:10
**1975** 428:6 473:2
**1976** 473:25
**1978** 502:18
**1980s** 351:12 358:7
**1982** 427:2 429:7
**1987** 330:15 506:7
**1989** 369:6 374:11
375:5
**1990s** 412:15
**1991** 325:20
**1992** 371:2 378:11
379:8,13
**1993** 379:18
**1995** 302:6 382:4
**1997** 329:21 385:3
**1998** 387:19 408:18

---

### 2

**2** 322:23
**2/2/75** 501:1
**2/26/73** 499:18
**2:02** 446:11
**2:16** 446:14
**2:18** 449:8

**2:22** 449:11
**2:29** 458:1
**2:48** 458:17
**2:51** 460:4
**2:52** 460:24
**20** 304:7
**200** 360:23
**2000** 412:20
**2000s** 358:8
**2001** 299:4
**2002** 416:7
**2017** 398:24 418:23
419:3 420:2,21
423:15,24 424:8
424:17 478:15
479:16 482:8,25
483:14 484:9
**2019** 294:11 305:9
508:25
**206** 343:25
**209394** 302:17
**21** 322:6
**212.735.3453**
299:11
**214** 335:17
**215** 335:19
**215.567.3500** 299:5
**215.575.4303** 300:5
**216** 390:14
**217** 395:15,17
**219** 397:2,4
**22** 472:20 473:23
473:23,24 474:5
**220** 321:25
**221** 322:1,19
**223** 322:24
**224** 322:24
**225** 322:24
**227** 323:25
**230** 415:10,17
**2325233** 508:23
**23rd** 329:21 330:15
387:19
**25** 354:14,16 473:8
473:12,13,15
**268** 348:11



**277** 412:25 413:2
**27th** 302:6 382:4
**28** 341:13
**29** 363:5
**2900** 299:4
**291** 336:3

---

**3**

**3** 403:13
**3-to-1** 360:15
**3/30/1987** 505:23
**3:29** 497:3
**3:31** 497:6
**3:39** 507:1,5
**30** 427:7 436:15
  495:2
**306** 301:6
**30XI00118300**
  508:24
**316** 301:15 336:23
**317** 301:17
**318** 301:18,20
**319** 401:17,19
**32** 497:13
**322** 302:9
**33** 325:3,4,5,6
  329:23 331:22
  332:14 506:2
**333** 301:21
**336** 301:23
**337** 302:14 380:2,5
  380:5
**34** 506:2
**36** 380:15
**380** 302:2
**382** 302:6
**390** 302:10
**395** 302:15
**397** 302:16,18

---

**4**

**4** 299:10 373:1
  403:15
**4/17/98** 302:16
**4/24/74** 500:2
**4/26/86** 505:10

**401** 302:19
**408** 302:20
**415** 302:23
**425** 301:7
**446** 301:8
**451** 303:2
**467** 303:3
**476** 303:5
**482** 408:23,25
**4th** 371:2

---

**5**

**5** 354:22 359:15
  471:21 498:2
**500** 452:16,19,21
  453:16
**53** 350:22 351:2
**54** 368:12,13
  374:18
**54.212** 302:12
**55** 346:16,17
**56** 294:16 305:12
**57** 347:14 352:22
**58** 368:10 369:5
  376:21
**5th** 473:2

---

**6**

**6** 316:19,20,21
  471:13,16,18,21
  472:4,5,8
**600** 300:9
**624-6221** 294:24
**646.589.8722**
  300:10
**66** 454:2
**68** 302:5
**69** 374:23

---

**7**

**7/29/71** 498:20
**7/7/71** 498:14
**76** 387:17,18
**78** 341:6,10,12,25

---

**8**

**8** 294:11 351:20
  368:9 375:4
  432:11
**8/22/85** 505:1
**80s** 410:3
**85** 343:3
**866** 294:24
**87** 304:7
**88** 304:7
**8A** 318:6,12 319:9
  324:17 325:2,4,5
  325:7 354:11
  363:23 432:15
  433:3 439:17
  453:1 462:7
  463:23 464:13
  474:25 497:12,13
**8A-** 472:23
**8A-1** 453:1
**8A-19** 472:22
  473:12
**8A-32** 497:8,18
**8B** 318:7,13 319:9
  341:6 346:16
  350:22 354:11
  363:23 368:9
  387:17 432:15
  433:4 439:17
  462:8 463:24
  464:14 475:1
**8B-54** 374:22
**8th** 300:9 305:9
  374:11 376:10

---

**9**

**9** 357:4
**9,400,000** 363:10
**9/1/83** 503:3
**9/8/86** 505:15
**95** 398:18
**973.239.5700**
  299:22
**973.822.1110**
  299:16



Exhibit 3

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF RHODE ISLAND

3    * * * * * * * * * * * * * * * * * * * *

4
     DAVID HOWARD WESTFALL, in his              *
5    capacity as Administrator of the
     Estate of Thomas Howard Westfall,          *
6    and in his capacity as Administrator
     of the Estate of BETTY F. WESTFALL         *
7
             vs.                                *
8                                                       C. A. #79-0269
     WHITTAKER, CLARK & DANIELS, et al          *
9
     * * * * * * * * * * * * * * * * * * * *

10

11

12
            DEPOSITION of ROGER N. MILLER, a witness in the above-
13   entitled cause, taken on behalf of the Plaintiffs, pursuant to
     Notice, before Lynne S. Irons, a Notary Public in and for the
14   State of Rhode Island, at the offices of Decof & Grimm, One
     Smith Hill, Providence, Rhode Island on October 29, 1982 at
15   1:00 P.M.

16

17

18

19

20

21

22

23

24

**WI** *Woods & Irons*
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434



EXHIBIT
tabbies J&J 894

J&J-0129864
JNJ 000064796

A P P E A R A N C E S

For the Plaintiffs............DECOF & GRIMM
                              BY:  R. DANIEL PRENTISS, ESQUIRE
                              and VINCENT T. CANNON, ESQUIRE

For the Defendant.............HINCKLEY & ALLEN
    (Whittaker, Clark &     BY:  ROBERT W. LOVEGREEN, ESQUIRE
     Daniels)

For the Defendant.........NUTTER, McCLENNEN & FISH
    (Windsor)               BY:  EDWARD P. LEIBENSPERGER,
                                                  ESQUIRE
                            and  JOSEPH BLUTE, ESQUIRE

For the Defendant.........HANSON, CURRAN & PARKS
    (Metropolitan)          BY:  DENNIS McCARTEN, ESQUIRE

For the Defendant ......ROBERTS, CARROLL, FELDSTEIN &
    (Pfeizer)               TUCKER
                            BY:  BERNDT W. ANDERSON, ESQUIRE

For the Defendant ......RICE, DOLAN, KIERNAN & KERSHAW
    (Vermont Talc)          BY:  JOHN F. DOLAN, ESQUIRE

J&J-0129865
JNJ 000064797

# E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1 | LETTER DATED SEPTEMBER 12, 1966 TO MR. ESCKILSEN FROM THOMAS F. CURRY, WITH ATTACHMENT.................................... | 44 |
| 2 | BUREAU OF MINES REPORT DATED MARCH 29-30, 1966.............................................. | 48 |
| 3 | LETTER DATED FEBRUARY 24, 1950 TO MR. MAGNUS FROM HARRY B. ASHE..................... | 48 |
| 4 | LETTER ON EASTERN MAGNESIA STATIONERY WITH A DATE CONTAINING THE FIRST SENTENCE OF AUGUST 21, 1958............................. | 48 |
| 5 | LETTER DATED MAY 20, 1966 TO MR. ESCKILSEN FROM HARRY B. ASHE............................. | 48 |
| 6 | LETTER DATED APRIL 18, 1967 TO MR. ESCKILSEN FROM HARRY B. ASHE, WITH SUMMARY ATTACHED...... | 48 |
| 7 | LETTER DATED APRIL 12, 1965 TO MR. ESCKILSEN FROM MR. HARRY B. ASHE........................... | 48 |
| 8 | REPORT ON THE LETTERHEAD OF SKINNER, SHERMAN & LUBERS, INC. DATED JANUARY 20, 1967............ | 48 |
| 9 | LETTER DATED DECEMBER 5, 1960 TO MR. MAGNUS FROM THOMAS F. CURRY, WITH ATTACHMENT.......... | 48 |
| 10 | LETTER DATED MARCH 27, 1962 TO MR. ESCKILSEN FROM THE C. P. HALL COMPANY, WITH ATTACHMENT...48 | |
| 11 | SERIES OF LEDGER SHEET PAGES WHICH RELATE TO WHITTAKER, CLARK & DANIELS, INC., A TOTAL OF 12 PAGES................................... | 48 |
| 12 | LEDGER SHEETS THAT CARRY AN ACCOUNT CALLED UNITED STATES RUBBER COMPANY, BAGS............ | 48 |

**W** Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129866
JNJ 000064798

# E X H I B I T S  (PAGE 2)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 13 | SINGLE PAGE FROM A LEDGER THAT ALSO CONTAINS THE NAME UNITED STATES RUBBER COMPANY, BAGS...........................48 | 48 |
| 14 | LIST OF FIRMS TOGETHER WITH CERTAIN STATISTICS ABOUT THOSE WITH THE DATE 1961 ENTITLED, "CARLOAD & TRUCKLOAD CUSTOMERS......48 | 48 |
| 15 | SINGLE PAGE ENTITLED, "SHIPMENTS" DATED 1942-1957...........................48 | 48 |
| 16 | ARTICLES OF ASSOCIATION OF EASTERN MAGNESIA TALC CO., INC...........................48 | 48 |
| 17 | LETTER DATED FEBRUARY 2, 1959 TO MR. MAGNUS FROM A. PEARLEY FEEN, WITH ATTACHMENTS........48 | 48 |
| 18 | ANNUAL REPORTS TO THE STATE OF VERMONT DATED 1950-1966...........................48 | 48 |
| 19 | GRAPHS AND FIGURES WITH A TITLE, "EMTCO 1. Industry Sales 1960-1965"...........................48 | 48 |
| 20 | SEVERAL PAGES OF FIGURES, A COPY WITH A TITLE PAGE, IT STATES, "13. Rubber."...........................48 | 48 |
| 21 | SIXTEEN CONTRACTS BETWEEN EASTERN MAGNESIA TALC CO., INC. AND UNITED STATES RUBBER COMPANY...........................62 | 62 |



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129867
JNJ 000064799

# INDEX

1
2

WITNESS:    ROGER N. MILLER

Direct examination by Mr. Prentiss.................2

Cross-examination by Mr. Anderson................80

Cross-examination by Mr. Dolan...................82

Cross-examination by Mr. Lovegreen..............83

Recross-examination by Mr. Anderson.............87

Redirect examination by Mr. Prentiss............88

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129868

JNJ 000064800

2

ROGER N. MILLER

Being duly sworn, deposes and testifies as follows:

DIRECT EXAMINATION BY MR. PRENTISS

Q   Mr. Miller, by whom are you employed?

A   Windsor Minerals.

Q   How long have you been employed by that company?

A   Sixteen years.

Q   So what would be the year that you began working there?

A   1966.

Q   Where were you employed prior to that?

A   Buckman Laboratories, Memphis, Tennessee.

Q   How long did you work for -- was it Buckman Laboratories?

A   Yes.

Q   How long did you work there?

A   Nine-and-a-half years.

Q   What was your job there?

A   I was vice-president of manufacturing.

Q   What was the nature of the business of Buckman Laboratories?

A   They are manufacturers of industrial microorganism control chemicals.

Q   So you began there approximately 1956?

A   I believe that is right, yes, I don't have the exact date.

Q   Where did you work prior to that, Mr. Miller?



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129869

JNJ 000064801

1    A    I worked for the International Talc Company in

2    Gouverneur, New York.

3    Q    What was your capacity with the International Talc Company?

4    A    I was chief engineer.

5    Q    How long were you employed with that firm?

6    A    With that firm and their predecessor firm, two-and-a-

7    half years, I believe.

8    Q    Where, sir, were you employed prior to going to work for

9    the International Talc Company and/or its predecessor

10    corporation?

11.    A    I was employed in the State of Washington for Border-

12    Lord Mining Company.

13    Q    Can you spell the name of that firm?

14    A    Border, B-o-r-d-e-r, hyphen Lord, L-o-r-d Mining

15    Company.

16    Q    What part of Washington was that in?

17    A    The office was in Seattle.

18    Q    Did it have mining operations in the State of Washington?

19    A    It had mining operations in the North Cascades.

20    Q    What was the product that was mined?

21    A    Tungsten.

22    Q    How long did you work for that firm?

23    A    About one year.

24    Q    Where did you work prior to that?

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129870
JNJ 000064802

4

1   A    I was a student.

2  Q   Where?

3   A    University of Washington, Seattle, Washington.

4  Q   What was your area of concentration?

5   A    Mining engineering.

6  Q   Did you receive a degree?

7   A    Yes.

8  Q   Bachelor of Science degree?

9   A    Yes.

10  Q   What year?

11   A    I'll say 1952.  I'm not certain, 1952.

12  Q   Were you raised in the Seattle area?

13   A    I was raised in a town called Coeur d'Alene, Idaho.

14  Q   When you went to work for the Windsor Minerals Company --

15   is that the correct name, sir?

16   A    Yes, Windsor Minerals, Inc.

17  Q   When you went to work for Windsor Minerals, Inc. in 1966,

18   what was your capacity?

19   A    Vice-president of operations.

20  Q   What was the business of the Windsor Company at the time

21   you joined?

22   A    They were miners -- their name at that time was

23   Eastern Magnesia Talc Company.  Their business was mining

24   and processing of talc.

WP   Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129871
JNJ 000064803

5

1    Q.   Where was it located?

2    A.   The offices were in South Burlington, Vermont.

3    Q.   Are you still vice-president of operations of Windsor?

4    A.   No, sir, I am now president of Windsor.

5    Q.   When did you become president?

6    A.   1969, I believe.

7    Q.   What were your responsibilities as vice-president of

8    operations?

9    A.   I oversaw the operations of the mines and mills and

10   shipping facility, packaging and shipping facilities.

11   Q.   Where were the mines located?

12   A.   The mines were located in Johnson, Vermont and in

13   Hammondsville, Vermont.

14   Q.   Was there one mine in each of those locations?

15   A.   There was one active mine in each of those locations.

16   Q.   Where is Hammondsville, Vermont in relation to Johnson?

17   A.   About 105 miles directly south.

18   Q.   Had the Eastern Magnesia Talc Company operated other mines

19   besides the Johnson and Hammondsville prior to your joining

20   the firm?

21   A.   To my knowledge, they had.

22   Q.   Where were those located?

23   A.   In Waterbury, Vermont and at -- not Essex, let me

24   think a minute, Payston, P-a-y-s-t-o-n.  Can I ask a question?



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129872
JNJ 000064804

6

1            MR. LEIBENSPERGER: You can ask me a

2     question.  Off the record.

3                  (OFF THE RECORD)

4   Q   Were there any other mines that were operated by Eastern

5     Magnesia prior to your joining the firm than Waterbury and

6     Fayston?

7            MR. LEIBENSPERGER:  Going back to what

8     date?

9            MR. PRENTISS:  To the extent of your

10     knowledge.

11            MR. LEIBENSPERGER:  I would object to

12     anything prior to 1945, or you can say 1940, as not being

13     relevant to this case.

14            MR. PRENTISS:  We'll go from 1940.

15   A    To my knowledge, only these properties were operating.

16   Q   So your testimony is that to the best of your knowledge,

17     from 1940 on, the only mines that were operated by

18     Eastern Magnesia were at Waterbury, Vermont, Fayston,

19     Vermont, Johnson, Vermont and Hammondsville, Vermont,

20     is that correct?

21   A    Yes.

22   Q   As vice-president of operations of Eastern Magnesia, did

23     you become familiar to some extent with the history of

24     that firm's operation in the talc business?

**Woods & Irons**
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129873
JNJ 000064805

7

1          MR. LEIBENSPERGER:   Objection to the

2     form.  You can answer.

3     A.    To some extent.

4  Q   Do you know whether Eastern Magnesia, prior to your joining

5     the firm, had purchased mines from other talc companies

6     in Vermont?

7     A.    Can you expand on that question?  I'm not sure if you

8     are using the right language.

9  Q   I may well be using incorrect language.  Tell me if you

10    are familiar with a firm called Vermont Mineral Products,

11    Incorporated.

12    A.    I have seen records referring to Vermont Mineral

13    Products.

14 Q   Do you know whether that company, Vermont Mineral Products,

15    Inc. owned a mine at Chester Depot in Vermont?

16    A.    No, I don't know.

17 Q   Do you know whether EMT, and by EMT I mean Eastern Magnesia

18    Talc Company, EMT purchased any mines from Vermont Mineral

19    Products, Inc.?

20             MR. DOLAN:   Purchased any mines?

21             MR. PRENTISS:   Yes.

22    A.    It's my belief that the Hammondsville mine was

23    acquired from Vermont Mineral Products, but I don't know

24    that as a fact.

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129874
JNJ 000064806

8

1   Q   Do you have any familiarity at all with a talc mine in

2       Reading, Vermont?

3   A   That almost certainly is the Hammondsville mine.

4   Q   Mr. Miller, so that I can be clear on the corporate history,

5       when you joined Eastern Magnesia Talc Company, was that

6       firm, to your knowledge, a subsidiary of any other firms?

7   A   Yes.

8   Q   What firm?

9   A   Johnson & Johnson.

10  Q   Was it a wholly-owned subsidiary of Johnson & Johnson?

11  A   It's my understanding, yes.

12  Q   To your knowledge, when did Johnson & Johnson either acquire

13      or incorporate EMT?

14          MR. LEIBENSPERGER:   Objection to the

15      form.  Go ahead.

16  A   I believe 1964, but that answer is provided in the

17      Interrogatories.

18          MR. LEIBENSPERGER:   The answer is in

19      the Interrogatories.

20  Q   I have seen that.  Is your understanding that Johnson &

21      Johnson incorporated EMT in 1964?

22          MR. LEIBENSPERGER:   His understanding

23      I'm not so sure is relevant.  It is in the Answers to

24      Interrogatories.

**WP** WOODS & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129875

JNJ 000064807

9

1          MR. PRENTISS:   It's his answer.

2          MR. LEIBENSPERGER:   What is?   That's

3     what I'm saying.   There is his answer.   He has sworn to it

4     in the Answers to Interrogatories.   For example, he says

5     1964 and his Answer to Interrogatories says 1965, so it

6     seems to me that the Answer to Interrogatory is there and

7     there's no reason to inquire of the same question that

8     you already have.   You can obviously inquire further.

9     Q    Mr. Miller, was there an Eastern Magnesia Talc Company in

10    existence prior to Johnson & Johnson acquiring or

11    incorporating a firm of that name in 1965?

12    A    Yes.

13    Q    And what was the business of that firm?

14    A    To my knowledge, mining and processing mineral talc.

15    Q    In your Answer to Interrogatories, you stated that Johnson

16    & Johnson acquired all of the assets and most of the

17    liabilities of Eastern Magnesia Talc on September 17, 1965.

18    To your knowledge, what did the assets of Eastern Magnesia

19    Talc consist of at that time?

20    A    Mining properties, mineral processing plants, a

21    corporate office; predominantly those.

22    Q    What were the liabilities that were assumed or acquired

23    by Johnson & Johnson in that transaction?

24    A    The financial obligations which carry through the

Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129876
JNJ 000064808

10

1  transaction and responsibilities and the liabilities

2  related to the prior operations of the Eastern Magnesia

3  Talc Company.

4  Q  What liabilities were not acquired by Johnson & Johnson?

5  A  I don't know.

6  Q  When you say in your answer most of the liabilities, did

7  you have in mind that there were some liabilities that

8  were excluded from acquisition in that transaction?

9  A  No, my answer was intended to convey the fact that I

10  was not present nor privy to all of the negotiations and

11  the interactions that took place at that time and I didn't

12  want to suggest that I was.

13  Q  But you do not have any knowledge of any liabilities that

14  were excluded from acquisition in that purchase transaction

15  or whatever that transaction was?

16  A  No.

17  Q  When Johnson & Johnson acquired Eastern Magnesia, you

18  stated that it acquired its offices as well as its mining

19  properties.  Did it acquire all of the documents and files

20  and papers that were in that office at the time of the

21  acquisition?

22  A  To my knowledge, yes.

23  Q  In the course of answering interrogatories that were pro-

24  pounded by the Plaintiff to you, you made reference at



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129877

JNJ 000064809

11

1    different points to records that you reviewed and that you

2    referred to to formulate your answers.  Can you describe

3    what records Windsor today possesses going back to 1945

4    for the operations of Eastern Magnesia Talc from 1945 onward?

5                    MR. LEIBENSPERGER:  I'm going to object

6    to that question.  You have a Rule 34 request that we have

7    responded to.  We have described the records.  It is a

8    vague question and I don't know whether you think that he

9    will now be able to orally give you an index of what they

10   have or give you some general concept of what they have,

11   but I don't think it's a fair question.

12                   MR. PRENTISS:  Let me withdraw the

13   question, maybe that's too vague.

14   Q    Let's start with sales records.  Does Windsor have complete

15   sales records for EMT going back to 1945?

16   A    No.

17   Q    To what extent does Windsor have sales records of EMT going

18   back to 1945?

19                   MR. LEIBENSPERGER:  Again, I'm going

20   to object because that answer is in the interrogatories

21   and is in the documents that are being produced.  Now

22   you are asking him orally to repeat it.  If we are going

23   to take the time for him to look it up to make sure he now

24   remembers exactly what he put in the interrogatories, we

**woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129878
JNJ 000064810

12

1   can do that, but I don't think we ought to trip him up

2   with it.

3   MR. PRENTISS:   I'm not trying to trip

4   him up, I'm trying to, and I can say this on the record

5   for your benefit, Mr. Miller, what I'm trying to do is

6   get from you a general description of the extent to which

7   you have complete records and the extent to which you have

8   holes in your records.

9   Q   So with regard to my question on sales records, do you have

10   a complete record for any period of time?

11   A   No.

12   Q   Not even up to date?

13   MR. LEIBENSPERGER:   I object to the form

14   of the question.

15   A   It's my understanding that we are dealing with a

16   period of time from 1945 to 1967.  We have no complete

17   sales records for any of that period of time for Eastern

18   Magnesia Talc Company.

19   Q   Do you have records that are specific to certain mines for

20   that period of time?

21   A   We have records which allude to the products, to my

22   knowledge, that came from certain mines, identified those

23   products by the grade number of the material.

24   Q   I guess my question is, how do you know that your records

**WI** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129879

JNJ 000064811

13

1   from 1945 for sales to 1967 are incomplete?

2               MR. LEIBENSPERGER:   Objection to the

3   form of the question.

4   A.   We were unable to find any of what I believe you

5   understand to be sales records for that period of time.

6   At the time Eastern Magnesia Talc Company was sold to

7   Minerals and Chemicals Phillip, they came with a truck

8   and we loaded every relevant document they asked for into

9   the vehicle and they took those away.  We made no record

10   nor list in detail of those materials.

11   Q   Let me go back.  There was an action that took place in

12   1967 whereby EMT's northern Vermont operations were sold

13   to Minerals and Chemicals Phillip Corporation of Maryland,

14   is that right?

15   A.   Yes.

16   Q   What assets or products did EMT retain of its own?  Do you

17   understand my question?

18   A.   Well, I understand your question, but EMT ceased to

19   exist at the time of that transaction.

20   Q   Then Windsor, what did Windsor have after it sold the

21   northern properties and the name EMT, the Minerals and

22   Chemicals Phillip?

23   A.   Windsor retained the mineral producing facility at

24   West Windsor, Vermont, the mill, the Hammondsville mine,

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129880
JNJ 000064812

14

1  certain other properties in southern counties and the

2  office in South Burlington.

3  Q  At the time of that transaction, did Windsor, now Windsor,

4  transport to the Phillip Corporation all of the records

5  having to do with northern properties including the

6  Johnson mine?

7  A  No.

8  Q  What records were transported to the new corporation, the

9  Phillip Corporation?

10 A  I cannot detail all of them.  Looking at what we now

11 have in hand, I am aware that all the sales records went.

12 I would expect that the cost records all went because I

13 found very few of them.  By-and-large, the records that

14 were transferred were those records which they would

15 require to understand the business, its products and its

16 success or failure.  I'm sorry I'm being general.

17 Q  I understand.  In your Answers to Interrogatories, you

18 state in Answer number four that all talc which was sold

19 by Windsor or its predecessors to Uniroyal and Whittaker,

20 Clark & Daniels, was mined by EMT prior to 1967 at the

21 Johnson mine in Johnson, Vermont.  On what do you base that

22 statement?

23 A  We have accounts payable cards for U.S. Rubber, which

24 it's my understanding is now Uniroyal, concerning shipments

**WP** *Woods & Irons*
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129881

JNJ 000064813

15

of talc to the plant in Providence, Rhode Island in which grade 40 is the only grade of material. I know that the products of the Johnson mill had 40 series numbers in the first installation. That's the basis for my understanding.

Q    Those are accounts receivable cards?

A    Accounts payable cards. Aren't they, or are they receivables?

MR. LEIBENSPERGER:   They would be sales of products, right?

THE WITNESS:   Yes, they are sales.

Q    Do you have complete records of accounts receivable cards regarding United States Rubber Company for the period 1945 through 1967?

MR. LEIBENSPERGER:   Objection.

A    No.

Q    How do you know that you don't have complete records of accounts receivable cards for that period?

MR. LEIBENSPERGER:   Objection.

A    In answering the interrogatories, we searched for records and as the interrogatories disclose, there was a period of time in which there was no information at all.

Q    Do you have a copy of your Answers to Interrogatories in front of you, sir?

A    Yes.



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129882
JNJ 000064814

16

Q   I will refer you to Answer number 17 on page 16.

A     Yes.

Q   You show in the Answer at the middle of the page the period 1956 through 1959 where it is stated that there are not records.  Is that the period that you are referring to?

A     Yes.

Q   Other than that period of those four years, do you have complete accounts receivable card records regarding United States Rubber Company for Windsor or its predecessor corporations for the period 1945 through 1967?

A   I don't know.

        MR. LEIBENSPERGER:  You answered my question.  This Answer to Interrogatory stops at 1961 and you just included 1967 in your answer.

        MR. PRENTISS:  Mr. Miller's earlier statement was that he understood the inquiry to be between 1945 and 1967.

A   ...I don't know.  We have brought forward the documents we were able to find.  There may well have been other documents.

Q   In other words, you have certain accounts receivable cards that refer to United States Rubber Company plant in Providence, Rhode Island, is that right?

A     Yes.



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129883
JNJ 000064815

17

Q   Of those that you have, all of them refer to a grade of talc that you identify as having been produced at the Johnson mine in Johnson, Vermont, is that correct?

A   They refer to grade 40 talc, which I believed to have been consistently numbered with the other products at the Johnson mill and I therefore assume that grade 40 is part of the four series products out of the Johnson mine. I was never present or involved when any grade 40 was ever produced or sold.

Q   So you don't know for a fact that the grade 40 talc of that type was only mined from the Johnson mine, is that correct?

    MR. LEIBENSPERGER:   Objection to the question.

A   Right. No, I don't.

Q   To go to those grades for a moment, Mr. Miller, what does a grade number connotate?

    MR. LEIBENSPERGER:   Objection to the form.

A   To my understanding, the grade number connotates the source, the mill from which the material was produced.

Q   Was talc mined by EMT milled at the site of the mine?

A   Yes. Excuse me, at a mill operated in conjunction with the mine. They are a mile or two apart. They are not at the mine site.

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129884
JNJ 000064816

18

| | |
|---|---|
| 1 | Q | EMT had no central milling facilities that would provide |
| 2 | | milling for talc from more than one mine? |
| 3 | A | No. |
| 4 | Q | Could you turn to page 25 of your Answers to Interrogatories, |
| 5 | | sir.  Interrogatory number 29 -- |
| 6 | | MR. LOVEGREEN:  What page? |
| 7 | | MR. PRENTISS:  Twenty-five. |
| 8 | Q | ...Your response number 29f you describe talc and talc |
| 9 | | grades and you relate that talc grades after processing |
| 10 | | with a series of numbers in the 40's and at grades after |
| 11 | | refining with a series of numbers, each 500 or in one case |
| 12 | | it says 5,490.  Can you describe the difference between |
| 13 | | processing and refining. |
| 14 | A | In the terminology which we have used, processing |
| 15 | | involved the direct production of a product by simply |
| 16 | | grinding or changing in particle size the ore.  Refining |
| 17 | | involves a process in which some component of the ore is |
| 18 | | separated from other components of the ore and one or more |
| 19 | | of them are sold as separate materials.  In this particular |
| 20 | | instance, the grade numbers beginning with four are |
| 21 | | products, or I presume to be products produced in what is |
| 22 | | called the dry mill, the direct grinding mill.  Somewhat |
| 23 | | after these products have been developed, another addition |
| 24 | | was built to the mill, was given the number 500 and the |

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129885
JNJ 000064817

1      products of the flotation process of the refining process

2      are the 500 series products.

3  Q  So to your knowledge, all products that contain any of

4      these numbers that you have listed in response number 29f

5      would have come from what facility?

6  A    The ore would have been produced from the Johnson mine.

7      The products would have been produced from the Johnson mill.

8  Q  What were the numbers associated with the Hammondsville mine?

9  A    The Hammondsville mine products in the period to 1967

10     were processed in two facilities; one of them produced

11     grades 36 and 37, the other produced grades 66, 600, 649

12     and 699.

13  Q  Is the Hammondsville mine still operated by Windsor?

14  A    Yes.

15  Q  Has Windsor ever sold talc produced from the Hammondsville

16     mine to Whittaker, Clark & Daniels?

17  A    No, not to my knowledge.

18  Q  What records did you research to determine that?

19  A    This is information given to me by my predecessor.

20  Q  Who is that?

21  A    Mr. Esckilson.

22  Q  When did you speak to Mr. Esckilson on this question?

23  A    When I came to work in 1966, Mr. Esckilson explained

24     to me the products sold to the roofing industry had never

J&J-0129886
JNJ 000064818

20

1    been sold through an agent and the grade 66 or 36 and 37

2    are roofing industry products exclusively.

3  Q    The grades 36 and 37 are roofing products?

4  A    Yes.

5  Q    What about the grades 66 or 600 or the other grades that

6    you described as being produced by the Hammondsville

7    facility?

8  A    These were toiletries quality products.  They were

9    very highly refined products from flotation.

10 Q    What is the difference in the talc, the physical structure

11   of it, or chemical properties or anything else between

12   talc used for the roofing industry and the talc that was

13   produced by the Johnson mine?

14              MR. LEIBENSPERGER:  I object to the

15   form of the question.

16 A    The talc sold to the roofing industry is sold at a

17   very coarse particle size and is uniquely micaceous.

18 Q    Could you explain what that micaceous means.

19 A    With the form of a plate.

20 Q    To your knowledge, what was the use to which the grades,

21   40 grade talc was put when sold by Windsor?

22              MR. LEIBENSPERGER:  You mean by EMT.

23              MR. PRENTISS:  By EMT, excuse me.

24 A    To my understanding, they were sold in the rubber

**WI**  Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129887
JNJ 000064819

21

1      industry, the plastic industry, the paint industry, in

2      the gypsum wallboard industry, in the toiletries industry,

3      in the agricultural industry.

4   Q   Was there any one of those grades that was, to your know-

5      ledge, utilized by the rubber industry more predominantly

6      than another grade?

7               MR. LEIBENSPERGER:   Objection to the form.

8   A   I don't know.

9   Q   So as far as you know, there wasn't any one of those

10     numbers 40, 41, 44 or alike which was sold in greater

11.    quantity for use in the rubber industry than the other

12     grades?

13              MR. LEIBENSPERGER:   Objection to the

14     form.

15   A   I don't know.

16   Q   After you went to work for EMT, did EMT continue to sell

17     talc for use in the rubber industry?

18   A   Yes.

19   Q   For how long?

20   A   I can only speak because I only worked in this

21     organization for about 15 months during that period of time.

22     They did, I know that, but I don't know anything else.

23   Q   Did they sell to Whittaker, Clark & Daniels during that

24     period of time?



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129888
JNJ 000064820

22

1    A   I don't know.

2    Q  Do you know whether they sold to Uniroyal during that period

3    of time?

4    A   No.

5    Q  You don't know?

6    A   I don't know.

7    Q  Do you know whether any of the records that you have

8    produced or referred to in your Answers give that answer?

9    A   I believe the dates are included in the deposition,

10    I mean in the interrogatories.

11    Q  Do you know whether the talc or any talc mined at the

12    Waterbury, Vermont mine was sold for use in the rubber

13    industry?

14    A   No, I don't know.

15    Q  Can you tell me this, do you know what properties of talc

16    are sought for use in the rubber industry?

17    A   I don't know.

18    Q  Is the talc that was mined at the Waterbury, Vermont

19    mine similar in quality to the talc mined in Johnson?

20               MR. LEIBENSPERGER:  Objection to the form.

21    A   I don't know.  The Waterbury mine was closed long

22    before I got there.

23    Q  I will ask you the same questions with regard to the

24    Fayston, Vermont mine.  Do you have any knowledge at all



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129889
JNJ 000064821

23

1  about the quality or type of talc mined at Fayston, Vermont?

2  A I know only that it was a program conducted during

3  the second World War in an attempt to find steatite grade

4  talc for military purposes and the operation was short-lived,

5  that's all I know about it.

6 Q How many different processing facilities for talc were

7  owned by EMT?

8  A Are you asking me with reference to a particular point

9  in time?

10 Q To your knowledge, over the course of time between 1945 and

11  1967, how many different facilities did EMT have for the

12  processing of talc?

13  A Four.

14 Q And those were located where?

15  A At Johnson, Vermont, at Waterbury, Vermont, at Gassetts

16  or Chester Depot, Vermont and at West Windsor, Vermont.

17 Q The Chester Depot facility was for which mine?

18  A For the Hammondsville mine.

19 Q The West Windsor was for which mine?

20  A The Hammondsville mine.

21 Q To your knowledge, is the Johnson, Vermont mine still in

22  operation?

23  A Yes.

24 Q What was the sales organization for EMT -- did EMT undertake



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129890
JNJ 000064822

24

1    its own direct sales of talc to customers?

2    A.    Yes.

3    Q    Did EMT also sell to distributors?

4    A.    Yes.

5    Q    Did EMT have its own sales force going out into the field?

6    A.    Yes.

7    Q    Did EMT deal directly with either Uniroyal or United States

8    Rubber Company, Providence, Rhode Island?

9                    MR. LEIBENSPERGER:   Objection to form.

10    A.    I don't know.

11.   Q    Do you know whether any talc sold by EMT to Whittaker,

12    Clark & Daniels were sold for end use at the Uniroyal

13    plant in Providence?

14    A.    I don't know.

15    Q    How was the talc sold by EMT delivered to its customers?

16    A.    The processed material was sold either in multi-wall

17    paper sacks or in bulk.  The bulk materials were shipped

18    by truck, or by rail.  The bagged materials were shipped

19    in either less truck load or full truck load or less car-

20    load or full carloads or rail cars.  So customers provided

21    their own vehicles.

22    Q    Do you know whether EMT ever sold talc to Whittaker, Clark

23    & Daniels for direct delivery to the Uniroyal plant in

24    Providence?

J&J-0129891
JNJ 000064823

25

1   A.   I don't know.

2   Q.   Do you know if there's anyone who would be able to answer

3   that question?

4   A.   I don't know.

5   Q.   You referred to your predecessor at EMT, who was that?

6   A.   Mr. Emil Esckilson.

7   Q.   Who lives in Gouverneur, New York?

8   A.   Yes.

9   Q.   Do you know if he is still there?

10   A.   Yes.

11   Q.   Do you know where he works?

12   A.   He is retired.  He is an elderly man.

13   Q.   As vice-president of operations, did you have responsibility

14   for sales?

15   A.   No.

16   Q.   Who had responsibility for sales in EMT at the time that

17   you were vice-president of operations?

18   A.   Mr. Esckilson.

19   Q.   Did he continue to work there after you came on?

20   A.   Yes.

21   Q.   Who had responsibility for sales prior to your going to

22   work for EMT?

23   A.   Mr. Esckilson.

24   Q.   So you kind of took over part of his responsibilities and

J&J-0129892
JNJ 000064824

26

1   he continued to have responsibility for sales, is that

2   correct?

3   A    Yes.

4   Q   Do you know how far prior to your coming on with EMT, Mr.

5   Esckilson had responsibility for sales?

6   A    It's my understanding that he began his responsibilities

7   in 1955.

8   Q   Do you know who his predecessor was?

9   A    Mr. E. W. Magnus, M-a-g-n-u-s.

10  Q   Who is deceased?

11  A    Who is deceased.

12  Q   Do you know whether Minerals and Chemicals Phillip

13  Corporation has been notified of this lawsuit?

14              MR. LEIBENSPERGER:  You can answer.

15  A    I believe they have.

16  Q   Did you communicate to that corporation regarding this

17  lawsuit?

18  A    No.

19  Q   Did someone at Windsor make that communication, to your

20  knowledge?

21  A    Well, what communication are you talking about?

22  Q   Any communication.

23              MR. LEIBENSPERGER:  Well, then I object

24  to the question.  I don't understand the question.  The

J&J-0129893

JNJ 000064825

27

1    first question I thought was whether or not he knew whether

2    service had been made upon them.

3                          MR. PRENTISS:  No, whether they were

4    notified of this lawsuit, not service.

5        A    Okay, I didn't understand that.

6    Q   Why don't we go back.

7        A    Why don't you start over.

8    Q   Have you communicated to Minerals and Chemicals Phillip

9    Corporation the fact that Windsor has been sued in this

10   lawsuit?

11       A    Yes.

12   Q   To whom did you communicate that?

13       A    A gentleman from New Jersey.  I'm sorry, I don't

14   recall his name.

15   Q   Did you discuss with him the records that Phillip Corporation

16   obtained at the time that it acquired that northern operations

17   portion of the EMT business?

18       A    Yes.

19   Q   Did he tell you whether Phillip Corporation still retained

20   those documents?

21       A    This was a telephone conversation?

22   Q   Yes, sir.

23       A    He subsequently returned my call, said there had been

24   two floods in their office in New Jersey and that the

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129894
JNJ 000064826

28

1    records were no longer there.

2  Q   Does Phillip Corporation have offices in Johnson, Vermont?

3  A       Let me ask counsel a question.

4                    (WITNESS AND COUNSEL CONFERRING)

5  A   ...Yes, they do.

6  Q   This gentleman that you conversed with told you that the

7      Phillip Corporation had transported all of the records that

8      it had obtained from EMT to New Jersey?

9  A   No.

10 Q   What records did he tell you had been transported to New

11     Jersey?

12 A       I asked about a specific movement of records, the

13     trailer, the guy backed the trailer in and we loaded all

14     the records.  The man who took those records told me that

15     they were going to New Jersey, so my inquiry related to what

16     had happened to the trailer load of records that had gone

17     to New Jersey.

18 Q   To your recollection, what records were put into that

19     trailer for transportation to New Jersey?

20 A       I answered that previously.during this interrogation,

21     so you can refer back to that, the general records having

22     to do with sales and the business.

23 Q   What other records were there?

24                 MR. LEIBENSPERGER:   That were not



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129895
JNJ 000064827

29

1     transported?

2             MR. PRENTISS:   To New Jersey in that

3     truck load.

4             MR. LEIBENSPERGER:   Again, I object to

5     the extent that you're asking him to orally give you an

6     index or page-by-page description.  To the extent he can

~     give you a generalized answer of what he remembers, I don't

8     have any objection.

9             MR. PRENTISS:   Or if you can refer me

10    to some better source for the information.

11.   A    All of the correspondence files, all of the payroll

12    records, all of the tax records, surveying, engineering,

13    blueprints, designs, quotations, supplier catalogs, those

14    types of materials were present in the office in South

15    Burlington.

16    Q   When you say sales records, when you refer to sales records

17    as having been transported to New Jersey, can you just

18    state generically what you included as being sales records?

19    A    The records of purchase orders, copies of purchase

20    orders, the salesmen's reports of call, the materials

21    used in the selling campaign of the corporation, correspond-

22    ence to and from customers.

23    Q   Did the gentleman from New Jersey tell you that all of

24    those records were destroyed in the flood?

J&J-0129896
JNJ 000064828

30

1  A   He told me that they could find none of them and they

2  had had two floods, was I believe his entire answer to me.

3  Q   In the shipping of talc, did EMT have its own fleet of

4  trucks?

5  A   No.

6  Q   Did it use common carriers?

7  A   To my understanding, common carriers and customer

8  trucks.

9  Q   Now, in your Answer to Interrogatory number five, Mr.

10  Miller, you stated that EMT produced talc between the

11  period 1904 and 1967.  What is the basis on which you

12  answered that?

13  A   The corporate records, when we searched for the old

14  recorded documents, we found indications of initiation of

15  operations around 1904.

16  Q   So your understanding is that Eastern Magnesia was formed

17  in 1904?

18  A   No, there were predecessor corporations that we have

19  answered elsewhere, the chain of construction.

20  Q   So the first predecessor of Eastern Magnesia was formed

21  in 1904, is that what your answer is?

22  A   That was my understanding, yes.

23  Q   In your Answer to Interrogatory number six you state that

24  the brand or commercial name of the talc was EMTAL.  Was

W  Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

1   there a logo or similar kind of corporate symbol

2   incorporating those letters?

3       A.   Yes.

4   Q   Would you be able, if I gave you a piece of paper and a

5   pencil, to approximately draw what that corporate logo

6   looked like?

7       A.   I can describe it generally, I think, with adequate

8   clarity. It looks exactly like an interstate sign in that

9   it is a shield and above the bar on the shield it said

10   "EMTAL." That's my recollection.

11  Q   It had all five of those letters of equal size?

12      A.   That was my understanding from my recollection, yes.

13  Q   What colors?

14      A.   I believe they were gray and blue, blue above and

15   gray below.  I'm not certain that that was consistent.

16  Q   What color were the letters EMTAL?

17      A.   They were white.  They showed basically through in

18   the examples that I saw.

19  Q   In your response number seven on page four, beginning on

20   page four, you have described a series of tests that were

21   done on talc produced in the Johnson mine.  Can you tell

22   me on what basis you have given that answer?

23      A.   My responsibilities included the operation of the

24   Johnson mill.  There were the tests that were being performed

*Woods & Irons*
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129898
JNJ 000064830

32

1   on the product of the Johnson mine, those grades of materials

2   that were listed at the time that I was there.   These were

3   my recollection of the tests that were being performed.

4   Q.   As to letter G, microscopic examination to estimate

5   morphology of talc and associated minerals, was that test

6   done on-site?

7   A.   These examinations were done on-site and were an

8   ordinary part of most research and product development

9   programs.   So they might have been done also by consultants

10   who report their definitions of what they examine.

11   Q   Do you know whether EMT was in the habit of submitting

12   material for analysis by consultants?

13          MR. LEIBENSPERGER:   Objection to the form?

14   A.   I don't know.

15   Q   During the time that you were associated with EMT?

16   A.   Yes.

17   Q   And to whom did it submit those examples?

18   A.   Bartel Memorial Institute in Columbus, Ohio consulted

19   with Eastern Mag on minerals and processing and I believe

20   would have certainly as geologists and petrologists, would

21   have examined microscopically the materials.

22   Q   What was the purpose of the examination by Bartel?

23   A.   They were working with us in optimizing the processing

24   plants, the refining processes to make pure talc from mixed

J&J-0129899
JNJ 000064831

33

material.  It's necessary to separate the nontalc materials

from the talc materials.  That's achieved by subdividing

the material first to the size of which all nontalc is

separated from talc and you use a microscope to see when

the surfaces are clean.

Q    What were the associated minerals that you were trying to

separate from the pure talc at the Johnson mine?

A    Magnesite, a ferruginous variety of magnetite,

chlorite and calciferous  sulfide, iron sulfide.

Q    Was there serpentine associated with the talc deposit at

the Johnson mine?

          MR. LEIBENSPERGER:  Objection to the

form of the question.

A    Yes.

Q    Was that a mineral that was sought to be separated from

the talc as a part of this refinement process?

A    No.

Q    Why not?

A    The talc and serpentine don't coexist in the minable,

the commercial sections of the mine.

Q    Can you explain what you mean by that, they they don't

coexist?

A    You are not dealing with an intermixture of talc and

serpentine.  Serpentine was the grandparent of the talc,

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129900
JNJ 000064832

34

1    the talc formed around it.  The mining of the commercial

2    talc took place away from the serpentine, out of contact

3    with the serpentine.

4    Q   Was the deposit that was mined at the Johnson mine a

5        deposit that included both talc and serpentine?

6                        MR. LEIBENSPERGER:  I object to the

7        form.  What do you mean by "deposit"?

8    Q   Let me ask you if you understand what I'm saying when I

9        say "deposit", Mr. Miller.

10   A      The serpentine coexisted within the limits of mining

11       with talc, but not in the mining areas.  I don't know how

12       better to describe it to you.  I can't sell serpentine,

13       so there was no mining activity in serpentine.

14   Q   The Johnson mine, was that an open-pit mine?

15   A      No.

16   Q   It was a tunnel dug into some sort of a geologic structure?

17   A      It was an inclined shaft.

18   Q   How far down did that go?

19   A      To my knowledge, about 400 feet.

20   Q   Was there just that one shaft at the Johnson mine?

21   A      No.

22                        MR. LEIBENSPERGER:  We should probably

23       put a time period for these questions regarding the length

24       of the shaft and how many shafts, because it may have changed



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129901
JNJ 000064833

35

1   over time.

2   A.   I want to be sure you understand that.

3   Q.   During the time that you worked at EMT, how many shafts

4   were in operation?

5   A.   One.

6   Q.   How many other shafts had been in operation prior to that

7   shaft?

8   A.   It's my understanding from historical references that

9   there had been two prior shafts.

10  Q.   Were they in the same geographic vicinity as the shaft

11  that was operating at the time that you were working with EMT?

12  A.   Yes, they were in the same ore body.

13  Q.   Did that ore body contain both talc and serpentine?

14  A.   Well, serpentine isn't ore.   The ore body didn't

15  contain any serpentine.   The zone in which the ore body

16  occurs had serpentine in it, but it isn't in the ore body.

17  Q.   In the zone in which the ore body occurred, was there also

18  serpentine existing?

19  A.   Yes.

20  Q.   And the shaft went into the rocks that contained the ore

21  body, is that correct?

22  A.   The shaft was in the talc zone.

23  Q.   Was there any serpentine anywhere present in that shaft,

24  the one that was operating while you were working there?



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129902
JNJ 000064834

36

1    A    I don't know.  It had been there for a long time

2    before I got there.

3    Q    Physically, by observation, in the shaft, can you tell

4    me the difference between serpentine and talc?

5    A    On fresh exposures, you can.

6    Q    On an old exposure, can you?

7    A    No, the dust accumulates on the surface and oxidizes

8    and everything is the color of that wall right there.

9    Q    Referring to kind of a buff color, tan color?

10   A    Darker.

11   Q    How physically is the talc mined?

12   A    You are referring to the Johnson mine?

13   Q    Yes, sir.

14   A    To my understanding, an inclined shaft is sunk in the

15   talc center.  Stations or levels are established plus or

16   minus 100 feet apart.  Horizontal drifts, d-r-i-f-t-s,

17   are driven under the overlying ore body.  Raises, inclined

18   openings upward are driven into the underbody of the ore

19   body and these are then enlarged into stopes, s-t-o-p-e-s,

20   from which the ore is extracted, dropped through the

21   raises into rail cars, transported to the shaft, dropped

22   into the skip, s-k-i-p, and hoisted to the surface.  That's

23   a short course.

24   Q    How is the ore loosened to be put into the rail car?



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129903
JNJ 000064835

37

1    A    By drilling and blasting.

2    Q    What is the nature of the drills used?  What does it look

3    like?

4    A    A pneumatic drill.  It looks very much like a jackhammer

5    that you are familiar with.

6    Q    While you were working at the EMT plant, did the workers

7    who were mining, actually mining, distinguish between

8    serpentine and talc in their drilling and blasting to

9    obtain ore to be transported up the shaft?

10   A    The workers were directed by the supervisors who did.

11   Q    Is the talc deposit at the Johnson mine, the talc ore body

12   a solid, monolithic deposit of pure talc?

13                 MR. LEIBENSPERGER:  Objection to the form.

14   A    No.

15   Q    Is it an area of talc that's interspersed with different

16   kinds of impurities?

17                 MR. LEIBENSPERGER:  Objection to the

18   form.

19   A    I will give you another short course.  Talc is a

20   metamorphic mineral.  It's derived in place from something

21   else.  In the case of talc, it's derived from a class of

22   materials called ultramaphic materials, dark, very dark

23   materials.  In that process, it's accomplished geologically

24   in a zonal form.  The best way to conceive of a talc deposit

J&J-0129904
JNJ 000064836

38

is to think of an onion and you take off a layer at a time. The character of the material changes as you go towards the core of the onion. That's what a talc deposit looks like. Talc in the Johnson mine was commonly interspersed with materials that are locally called cinders, c-i-n-d-e-r-s. These are relics of talc parents, or of the wall rock surrounding the talc. They are largely composed of the siliceous materials and of beatite, dark minerals which are extremely deleterious to the talc which is sold by its whiteness.

Q.  Now, you have analogized the talc deposit to an onion and you said that the character of the material changes as you penetrate to the core of this onion type structure.

A.  It's a three-dimensional material.

Q.  At the core of the onion is the pure talc, is that correct?

A.  No, at the core of the onion, in my experience, are relatively rich in carbonate materials and relatively low in talc. The wall, the exterior surface is relatively rich in talc and relatively low in carbonated material. It's a zonal material.

Q.  Can you further analogize from the onion structure that you have described as to where serpentine deposits or contaminants would be in relation to these layers of the onion-like structure?

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129905

JNJ 000064837

39

1           MR. LEIBENSPERGER:  Objection to the form.

2     A.   From my own experience in the Johnson mine, I never

3     saw any there.  Subsequent information has come to me of

4     later developments in the mine which have identified

5     serpentine.  In my own knowledge, I never saw any serpentine.

6     Q   From your experience and education as a mining engineer,

7     are you familiar with the manner, physically, in which

8     serpentine would associate itself with talc deposits in

9     a geologic deposit area such as was present at the Johnson

10    mine?

11.          MR. LEIBENSPERGER:  I am going to object

12    to the form of the question.  At the end of it you related

13    it to the Johnson mine, but you started out the question

14    sort of hypothetical, how the serpentine would be found

15    with talc.  I think it should be one or the other.  Do you

16    want a hypothetical or do you want to ask him about

17    Johnson & Johnson?

18          MR. PRENTISS:  I'm going with respect to

19    a deposit such as the Johnson mine.

20          MR. LEIBENSPERGER:  I object to the

21    form of that question.  I think you should ask him what

22    was the deposit at the Johnson mine, not such as or would

23    be, what it was.

24          MR. PRENTISS:  Well, I think he answered



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129906

JNJ 000064838

40

1     the question.

2                    MR. LEIBENSPERGER:  I object to the form

3     of the question.  You can answer it if you understand it.

4     A     Yes, I understand the relationships between talc and

5     serpentine.

6  Q  Physically, how does serpentine intersperse, if it does,

7     with talc in a deposit where talc and serpentine are

8     associated?

9                    MR. LEIBENSPERGER:  I object to the

10    form of the question.

11    A     To characterize this --

12                   MR. LEIBENSPERGER:  Again, we are talk-

13    ing about the Johnson mine or are you getting into his

14    expert opinion?

15                   MR. PRENTISS:  I'm talking about the

16    Johnson mine.

17    A     ...I really can't describe the Johnson mine because

18    as I indicated earlier, I didn't ever see any serpentine

19    at the Johnson mine.

20 Q  What later information did you acquire that led you to

21    believe that there was serpentine associated with the

22    Johnson mine?

23    A     I read a thesis produced by college students at the

24    University of Vermont.



woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129907

JNJ 000064839

41

1   Q   What was the name of that student?

2   A   I don't know.

3   Q   When did you read it?

4   A   Three months ago, perhaps three months ago.

5   Q   Do you know whether chrysotile asbestos was associated in

6   any way with the talc mined at the Johnson mine?

7   A   My own experience, I never saw any.

8   Q   Have you since acquired information that would suggest

9   that there was chrysotile asbestos associated with the

10   Johnson mine?

11   A   No.

12   Q   Did the paper by the student at the University of Vermont

13   make any suggestion or reference to chrysotile asbestos

14   as being associated with the Johnson mine?

15   A   Not to my recollection, no.

16   Q   Let me show you a document, Mr. Miller, that you produced

17   in response to one of our requests for discovery and it's

18   a letter dated September 12, 1966 to Mr. E. Esckilson,

19   president of Eastern Magnesia Talc Company.  Have you ever

20   seen that?

21   A   Yes.

22   Q   Can you tell me where you found that?

23   A   I believe I found it in the files that we have.

24   Q   That's one of the documents that you brought down here today



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129908
JNJ 000064840

42

1    in response to the request?

2    A.   Yes.

3   Q  Was that Mr. E. Esckilson, that's the president of Eastern

4    Magnesia who was your predecessor at the time you took over

5    Vermont operations, is that correct?

6    A.   Yes.

7   Q  And you found that document in the files of Windsor as

8    successor to EMT, is that right?

9    A.   Yes, I had seen it before.

10   Q  Did you see it at the time that it came in or shortly after

11    that?

12    A.   I don't know.  I probably did.

13   Q  Was that retained by EMT in the regular course of its

14    business, that record?

15    A.   I believe so, yes.

16   Q  And that related to the business of EMT's operations in

17    the talc industry?

18    A.   Yes.

19   Q  Was it a document, or did EMT receive documents like that

20    on a regular basis?

21               MR. LEIBENSPERGER:  Objection to the form.

22               MR. PRENTISS:  Let me rephrase that.

23   Q  Did EMT receive documents like that on a regular basis from

24    the government agency that produced that document?

WP Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129909

JNJ 000064841

43

1          MR. LEIBENSPERGER:  Objection to the form.

2     A.   No.

3  Q   Did EMT ask to have the United States Department of Interior

4     come in and do any kind of a survey of its mines?

5     A.   No.

6  Q   Do you know the reason that the United States Department

-     of the Interior made the survey that it did which culminated

8     in this report?

9     A.   Yes.

10  Q   What was the reason?

11    A.   The United States Bureau of Mines of the Department

12    of the Interior is the predecessor in responsibility to

13    an organization now called MSHA, the Mining Safety Health

14    Administration.  They were responsible for safety surveil-

15    lance in the mines.

16  Q   Did they inspect the mines on a regular basis?

-          MR. LEIBENSPERGER:  Objection to the

18    form of the question.

19    A.   On an irregular basis.

20  Q   About how many times a year, would you say?

21    A.   I don't know.

22  Q   Would it be more than one time a year, Mr. Miller, to your

23    knowledge?

24    A.   I don't know.

## Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129910
JNJ 000064842

44

(PLAINTIFFS' EXHIBIT #1 MARKED FOR IDENTIFICATION)

Q    I will refer you to page three of the enclosure that's accompanying this letter, an enclosure entitled, "Airborne Dust Survey Report, Johnson Mine and Mill, Eastern Magnesia Talc Company, Inc., Johnson, Vermont". At page three in the two paragraphs under the heading, "Settled Dust Samples," there is a statement, "Small amount of chrysolite," and that statement appears also in the second paragraph under that heading, chrysolite. What is chrysolite?

A    It's a mineral.

Q    Is that distinct from chrysotile?

A    Yes.

Q    What was the method used, if you know, for collection of dust by the United States Department of Interior for the preparation of this analysis?

A    Can I have a moment?

Q    Certainly.

A    Referring to page two, they indicate that airborne dust samples were collected at locations selected by company officials as those which would best represent airborne samples. In this period, to my understanding, they were taken by a technique called a midget impinger from which measured volumes of gases were educted against a membrane

WP
woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129911

JNJ 000064843

45

and the membrane was then projected on a screen and the

number of particles counted and by relating the temperature

and the volume of flow and the cross-sectional area of the

screen, it was possible to determine the weight, or the

number, excuse me, the number of particles per cubic foot

in the atmosphere at the point of the sample.  I'm sorry

I can't be anymore definite than that.

MR. PRENTISS:  I think what I'd like to

do is have a recess and go through some of these documents

and resume in about 20 minutes or so.

(SHORT BREAK)

MR. PRENTISS:  For Exhibit #2, I've got

a U.S. Department of Interior, Bureau of Mines report dated

March 29 to 30, 1966.  Exhibit #3 is a letter, State of

Vermont, Department of Health stationery to Mr. E. W.

Magnus, dated February 24, 1950.  Exhibit #4 is a letter on

Eastern Magnesia stationery with a date containing the

first sentence of August 21, 1958.  There is no addressee

on that letter.

Exhibit #5 is a letter, State of Vermont, Department of

Health to Mr. Esckilson dated May 20, 1966.  Exhibit #6 is

a letter from the State of Vermont, Department of Health

to Mr. Esckilson dated April 18, 1967, two pages.  Exhibit

#7 is a letter --



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129912
JNJ 000064844

46

1    MR. LEIBENSPERGE:  Just to correct that

2    last one, you said two pages.  I think the second one is

3    just a carbon of the first one.  It's the same letter.

4    MR. PRENTISS:  Exhibit #7 is a letter

5    from the State of Vermont, Department of Health to Mr.

6    Esckilson dated April 12, 1965.  Exhibit #8 is a report

7    on the letterhead of Skinner, Sherman & Lukens dated

8    January 20, 1967.

9    Exhibit #9 is a letter to Mr. Magnus of Eastern

10    Magnesia Talc Company dated December 5, 1960 together with

11    an enclosure.

12    MR. LEIBENSPERGER:  The enclosure

13    appears to be the 1960 U.S. Bureau of Mines report.

14    MR. PRENTISS:  Exhibit #10 is a letter

15    containing two pages of enclosures to Eastern Magnesia

16    Talc Company from the C. P. Hall Company dated March 27,

17    1962.  Exhibit #11 is a series of ledger sheet pages which

18    relate to Whittaker, Clark & Daniels, Inc., New York 7,

19    New York, a total of 12 pages.

20  Q   I will ask Mr. Miller, I have a loose bundle of pages here,

21    one actual bundle of pages is stapled, ledger sheet pages

22    entitled, "United States Rubber Company" and then there is

23    a loose sheet that also was entitled, "United States Rubber

24    Company".

WP  Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129913
JNJ 000064845

47

A.    1955, 1954.

Q    What does that date say?

         MR. LEIBENSPERGER:   I think that's

through 1963, possibly.

A.    1944, 1945, 1946, 1947, 1948, 1949, 1950, 1951, 1952, 1953,

1954, 1955.  This is a mistake, Mechanical Rubber Company,

that doesn't belong here.  I see, it says United States

Rubber Company.  Well, 1955, if that's it, 1955 and then

that's part of this.

         MR. PRENTISS:   Why don't we mark it

separately if we can't identify it.  Number 12 is a stapled

bundle of ledger sheets that carry, apparently, an account

called United States Rubber Company of Providence.  Number

13 is a single page from a ledger that also contains the

name "United States Rubber Company, Bags".  Number 14 is a

list of firms together with certain statistics about those

with the date 1961.  It's entitled, "Car Load and Truck

Load Customers".

         MR. LOVEGREEN:   Is that 1961 or 1960,

isn't it two years?

         MR. LEIBENSPERGER:   There's a column for

1960 and a column for 1961.

         MR. PRENTISS:   Number 15 is a single

page with handwritten figures and it's entitled, "Shipments"

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129914
JNJ 000064846

48

and the handwritten figures indicate the years 1942 through 1957. Number 16 is a document entitled, "Articles of Association of Eastern Magnesia Talc Company, Inc.". Number 17 is a bundle of documents, six pages. It's headed with the letter on the stationery of A. Pearley Feen to Mr. Magnus at Eastern Magnesia Talc Company carrying a date of February 2, 1959. Off the record.

(OFF THE RECORD)

MR. PRENTISS: Number 18 is a bundle of annual reports to the State of Vermont, it appears to be by the Eastern Magnesia Talc Company. The first report is 1950 and the bundle appears to go through 1966.

MR. LEIBENSPERGER: We haven't gone through these to see if each year is there.

MR. PRENTISS: There may be other years, but I will entitle the whole bundle as Exhibit #18. Number 19 is a several-page document of graphs and figures with a title, "EMTCO. 1. Industry Sales. 1960-1965." Number 20 is several pages of figures, a copy with a title page, it states, "13. Rubber."

(PLAINTIFFS' EXHIBITS #2 THROUGH #20 MARKED FOR IDENTIFICATION)

Q    Mr. Miller, we have just marked documents as Exhibits #1 through #20.  Are all these documents documents that you

**WI** Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129915

JNJ 000064847

49

1    have brought with you today in response to the notice of

2    deposition that was issued concerning this deposition of

3    you?

4                MR. LEIBENSPERGER:  Well, in response

5    to the request for production of documents.

6    A    Yes.

7    Q    Where did you obtain all these documents?

8    A    From the files of Windsor Minerals.

9    Q    Are you, as the president of Windsor Minerals, the person

10   with the ultimate responsibility for the care, custody

11   and control of all of these documents?

12   A    Yes.

13   Q    To your knowledge, were these documents compiled in the

14   regular course of the business of Windsor Minerals or its

15   predecessor corporations?

16               MR. LEIBENSPERGER:  Objection to the form

17   of the question.

18   A    To my knowledge, yes.

19   Q    To your knowledge, was the business of Windsor Minerals

20   or its predecessors to keep such files and records as

21   part of its business.

22               MR. LEIBENSPERGER:  Objection to the

23   form of the question.

24   A    I have no certain knowledge of what the processes

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129916
JNJ 000064848

50

1      were in record-keeping.

2  Q  But you obtained these from the business files of Windsor

3      and from its predecessor corporations where appropriate?

4  A    Yes.

5  Q  Could you refer to your Answers to Interrogatories, Mr.

6      Miller.  I'd like you to refer to response number 11b.

7      You referred to the location of the plant or facility

8      involved in the sale and/or distribution of talc as being

9      in Burlington, Vermont prior to 1959 and in South Burlington,

10     Vermont from 1959 to 1967.  What was the change that

11     occurred in 1959?

12  A    The change in location of the corporation's offices

13     which included the sales offices.

14  Q  Was there any change in the milling facility or location

15     of the milling facility or any other processing facilities

16     at that time?

17  A    Not to my knowledge.

18  Q  You testified that you inquired of the Phillip Corporation

19     as to records in response to the discovery request that

20     was served on Windsor as a part of this lawsuit.  Did you

21     make inquiry of any other person regarding documents or

22     any other information in response to the discovery that

23     was served on you as part of this litigation?

24             MR. LEIBENSPERGER:  I object to the



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129917

JNJ 000064849

1    question to the extent that it would include inquiries

2    made to counsel as coming within the attorney/client

3    privilege.

4  Q.  With the exception, excluding inquiries of counsel, did you

5    inquire of any other person?

6    A.   Yes.

7  Q.  Who?

8    A.   Are you on question 11 still?

9  Q.  No, I'm talking in general as to your inquiries regarding

10   our request for discovery in this lawsuit.

11   A.   I believe that we have given you a list of all of the

12   parties to whom I have inquired as part of the Answer to

13   Interrogatories.

14              MR. LEIBENSPERGER:  No, we have not.

15   A.   ...Okay, Mr. Emil Esckilson, Lorenzo Rodizza.

16  Q.  Who is that?

17   A.   He is the controller of Windsor Minerals.

18  Q.  Rodizza; how do you spell that?

19   A.   R-o-d-i-z-z-a.

20  Q.  He is currently controller of Windsor?

21   A.   Yes.

22  Q.  Who else?

23   A.   Rose Buzzwell.

24  Q.  Who is she?



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129918
JNJ 000064850

52

1   A.   She is my secretary.  Frank Hasty, H-a-s-t-y.

2  Q   Who is he?

3   A.   Office manager.  Emil Eskilson, that's the former

4  president, Eastern Mag.  Mr. Chittister.

5  Q   Who is he?

6   A.   He is a geologist.

7  Q   For whom?

8   A.   United States Geological Survey.

9  Q   Anyone else?

10   A.   William Gregg.

11  Q   Who is he?

12   A.   He is a geologist.

13  Q   For whom is he employed by?

14   A.   He is a professor at the Michigan College of Mines

15  and Technologies.

16              (SHORT BREAK)

17  Q   After Mr. Gregg, did you have any other person that you

18  inquired of regarding this?

19   A.   Harry Ashe, A-s-h-e.

20  Q   Where is he?

21   A.   He is in Williamstown, Vermont, Williamstown, Vermont.

22  Q   Who does he work for?

23   A.   He is a former  director of occupational health, the

24  State Board of Health, State of Vermont.

J&J-0129919
JNJ 000064851

53

1   Q   What other person?

2   A   Nancy Butera and Marge Gillian.

3   Q   Who was the woman Butera?

4   A   She is a clerk at the same office where Harry used to

5   work.

6   Q   And Marge Gillian?

7   A   She also worked for the Board of Health in occupational

8   health.  I believe she is a clerk.

9   Q   Any other person?

10   A   W. A. Dezaine, D-e-z-a-i-n-e.

11   Q   Who is he?

12   A   He was an underground miner at the Johnson mine.

13   Q   The underground miner?

14   A   He was an underground miner at the Johnson mine.

15   Q   Does he still work for EMT?

16   A   He works for Windsor Minerals.

17   Q   Any other person?

18   A   Ed Padgorski, P-a-d-g-o-r-s-k-i.

19   Q   Who is he?

20   A   He was a former director of the United States Bureau

21   of Mines office in Albany, New York.

22   Q   Any other person?

23   A   Lucien Lemery.

24   Q   How do you spell that?

J&J-0129920
JNJ 000064852

54

1       A       L-a-m-e-r-y.

2    Q  Who is he?

3       A       He was a mill employee of Eastern Magnesia Talc

4    Company.

5    Q  Where is he employed now?

6       A       He works for Windsor Minerals at the present time.

7    Q  Any other person?

8       A       Roger Perkins, he is a former -- he is retired, he

9    was a former mill employee of Eastern Magnesia Talc.

10   Q  Where does he live?

11      A       Johnson, Vermont.

12   Q  Is there any other person?

13      A       Did I give you Mr. Esckilson?

14   Q  Yes, you did.

15      A       The gentleman from Englehart.

16   Q  What was his name?

17      A       I still haven't thought of it.  It's a Scotch name,

18   McIlwain, a name similar to McIlwain.

19   Q  You made reference just a moment ago to Englehart.  Who is

20   Englehart?

21      A       Phillip-Englehart, they have changed their name.  It

22   was Minerals and Chemicals Phillip when they bought

23   Eastern Mag and they have since changed their name, I

24   believe, to Englehart Minerals and Chemicals.

**W** Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129921
JNJ 000064853

55

1   Q     To your knowledge, those are one-in-the-same corporation?

2   A     It is my understanding.

3   Q     What was the purpose of your inquiry to Mr. Chittister

4      of the United States Geological Survey?

5                MR. LEIBENSPERGER:  I object to that.

6      Mr. Chittister is a potential expert so I think the

7      inquiries to Mr. Chittister were in the nature of obtaining

8      expert testimony, which I think is proper discovery only

9      allowed under 26(b)(4), and not through this deposition.

10   Q     What was the nature of your inquiry of Mr. William Gregg?

11               MR. LEIBENSPERGER:  I object on the

12      same grounds with respect to him.

13   Q     What was the nature of your inquiry to Mr. Barry Ashe?

14   A     I inquired of Mr. Ashe regarding records of sampling

15      and morphology of the materials when the State Board of

16      Health conducted their tests.

17   Q     Have you provided in response to our discovery requests

18      everything that Mr. Ashe was able to provide you?

19   A     Mr. Ashe led me to these materials, yes, sir.  I did

20      say that he was no longer a state employee, didn't I, he's

21      retired.

22   Q     Mr. Padgorski was the former director of the U.S. Bureau

23      of Mines office in Albany, New York, is that correct?

24   A     Yes.



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129922
JNJ 000064854

56

| | |
|---|---|
| 1 | Q What was the nature of your inquiry to him? |
| 2 | A  I asked him for copies of the U.S. Bureau of Mine |
| 3 | dust sampling reports of the Johnson mine. |
| 4 | Q Is Mr. Rodizza still in the employ of Windsor? |
| 5 | A  Yes. |
| 6 | Q Do you still have the Answers to Interrogatories in front |
| 7 | of you? |
| 8 | A  Yes. |
| 9 | Q Would you turn to response number 29 on page 25.  In 29a, |
| 10 | response 29a, the question is, "State the date or dates |
| 11 | you first commenced operations involving the processing or |
| 12 | refining of talc," and your answer is, "Eastern Magnesia |
| 13 | Talc Company, circa 1933."  Earlier, or in response to an |
| 14 | earlier interrogatory and in earlier questions in this |
| 15 | deposition you stated your knowledge or understanding to |
| 16 | be that operations under either EMT or its predecessors |
| 17 | had begun in 1904.  Can you explain that? |
| 18 | A  The question added the word "refining" and the flotation |
| 19 | plant went in, I believe, in 1933. |
| 20 | Q Was there processing carried on prior to that? |
| 21 | A  Yes. |
| 22 | Q But the refining operation began in 1933? |
| 23 | A  Yes. |
| 24 | Q What was the manner of packaging of talc that was sold by |



WP woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129923

JNJ 000064855

57

1    EMT other than that which was sold in bulk?

2    A.   Multi-wall, paper bags.

3  Q.  What was the writing that was on those bags?

4    A.  I don't know.

5  Q.  Do you know whether EMT during the period 1945 and 1967

6    contained any warnings or other statements on its packaging

7    for talc which related dangers or any other hazards

8    associated with exposure to talc?

9    A.  I don't know.

10  Q.  Do you know if there is any person who would know that?

11           MR. LEIBENSPERGER:  I object to the

12    form of that question.  I suppose if he knows, if somebody

13    that has told him that they know, that would be a fair

14    question, but you said who would know it.  You'd be

15    speculating about somebody else's knowledge.

16    A.  I don't know of anyone.

17  Q.  Did you ask this question of Mr. Esckilson?

18    A.  No.

19  Q.  Why not?

20           MR. LEIBENSPERGER:  I object to the

21    form of that.  You don't need to answer.  It's not an

22    objection to form, it's an objection to substance.  It's

23    irrelevant.

24           MR. PRENTISS:  Well, I don't think it is

woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129924
JNJ 000064856

58

1    irrelevant.

2              MR. LEIBENSPERGER:  He has no obligation

3    to make inquiry of people outside of Windsor Minerals.

4    The interrogatories are directed to Windsor Minerals.  Now,

5    to the extent that he is talking with people, you can ask

6    him the substance of their conversations clearly, and you

7    have, but I don't think you have any right to have him

8    speculate on why he asks one thing or didn't ask another

9    thing.

10             MR. PRENTISS:  I think I do, actually.

11   He said he made inquiry of these people as part of his

12   efforts to answer these interrogatories and respond to

13   this discovery.

14             MR. LEIBENSPERGER:  I instruct you not

15   to answer.

16   Q    What did you ask Mr. Esckilson?

17   A    I asked Mr. Esckilson for any information or records
     he
18   I might have concerning sales.

19   Q    Did you make any inquiry of him regarding any of the

20   substance of the interrogatories that were served on you

21   other than information regarding sales?

22   A    I asked him when the office was relocated, because

23   I didn't know that.  It turned out he was wrong.  I asked

24   him about sales or sales records, or records radiating to



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129925

JNJ 000064857

59

1        U. S. Rubber Company or Whittaker, Clark & Daniels.

2  Q   Windsor, more properly EMT, had contracts over a period

3        of time with the United States Rubber Company in New York,

4        New York. Are you familiar with the contents of any of

5        those contracts?

6  A   I am aware that they exist. We found them in the

7        files. I haven't studied them carefully.

8  Q   EMT also delivered and sold and delivered talc to United

9        States Rubber Company plants in various part of New England;

10       are you aware of that?

11  A   Yes, I am.

12  Q   Do you know whether the sales of talc to United States

13       Rubber Company factories in New England were made pursuant

14       to contracts between EMT and United States Rubber Company

15       of New York?

16  A   I don't know.

17              MR. PRENTISS: I'm asking to have these

18       contracts marked.

19              MR. LEIBENSPERGER: As one exhibit?

20              MR. PRENTISS: To save time, I think we

21       might as well mark them as one exhibit. I'd like to recite

22       into the record the dates of the contracts so that we are

23       clear on that.

24  Q   I will show them to you, Mr. Miller, and I will finish up



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129926
JNJ 000064858

60

1    with them, so you can go ahead and take a look at them.

2                    MR. PRENTISS:   I have a contract between

3    Eastern Magnesia Talc Company and United States Rubber which

4    is dated December 14, 1954.  Another which is dated the 9th

5    of December, 1955 between EMT and U. S. Rubber.  I have

6    another which carries the same date.

7  Q    Can you tell me whether those are duplicates?

8                    MR. LEIBENSPERGER:   Well, I object to

9    that, unless you know from some prior investigations they

10   are duplicates.  If you are asking at the moment for him

11   to compare them word-for-word to see whether they are

12   duplicates, that's not a fair question.

13  Q    Do you know?  You compiled these documents to bring down

14   here, didn't you?

15  A    I don't know that they are.  On the face of it, they

16   are not, because the front page is different.

17                   MR. PRENTISS:   I have another contract

18   between Eastern Magnesia and United States Rubber dated

19   November 25, 1957.  Contract dated November 21, 1951 between

20   EMT and United States Rubber.  Contract dated February 17,

21   1948 between Eastern Magnesia and United States Rubber.

22   A three-page document, including a last-page contract that

23   carries a date of July 7, 1941.  A statement with attached

24   contract between Eastern Mangesia Talc Company and United



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129927
JNJ 000064859

61

1    States Rubber carrying a date of January 14, 1942.

2                   MR. LEIBENSPERGER:  I'm going to object

3    to 1941 and 1942 being outside the time period.  They

4    shouldn't have been included in the documents produced.

5    I thought we had pulled them out.  Maybe we should take

6    the ones before 1945 out of this exhibit.

7                   MR. PRENTISS:  Let me take a look at

8    them.  We can pull them out of the exhibit.

9                   MR. LEIBENSPERGER:  They are not within

10   your document request, so we are not going to produce them.

11                  MR. PRENTISS:  Contract between Eastern

12   Magnesia and United States Rubber carrying the date

13   December 21, 1946.  Contract between Eastern Magnesia and

14   United States Rubber carrying the date December 14, 1954.

15   Another contract between Eastern Magnesia and United States

16   Rubber carrying the date December 14, 1954.  Another con-

17   tract bearing the date December 14, 1954 between Eastern

18   Magnesia and United States Rubber.  Contract bearing the

19   date October 20, 1945 between Eastern Magnesia and U. S.

20   Rubber.  Another contract between Eastern Magnesia and

21   United States Rubber bearing the date December 12, 1952.

22   Next is a three-page contract between Eastern Magnesia and

23   United States Rubber dated December 9, 1948 and a contract

24   between Eastern Magnesia and U. S. Rubber dated December 22,

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129928
JNJ 000064860

62

1    1949.  A contract dated January 16, 1951 between Eastern

2    Magnesia and U. S. Rubber.  Finally, a contract dated

3    December 3, 1953 between Eastern Magnesia and United States

4    Rubber.  I'd like to have these marked as a single exhibit.

5                        (PLAINTIFFS' EXHIBIT #21 MARKED FOR
                          IDENTIFICATION)
6

7    Q   Mr. Miller, where did you find those contracts?

8    A     In the accumulated record.  They were brought to me

9    by Mr. Hasty.

10   Q   And those were contained in the files of Windsor Minerals,

11   Inc.?

12   A     Yes.

13   Q   To your knowledge, were those contracts maintained in the

14   files of EMT, Eastern Magnesia in the regular course of its

15   business?

16   A     I presume so.  I don't know that.

17   Q   And you are custodian now as president of Windsor of the

18   files, of those files of EMT retained by Windsor, is that

19   correct?

20   A     Yes.

21   Q   To your knowledge, are those contracts that were entered

22   into by EMT in the course of its sale of talc?

23   A     Not to my knowledge, no.

24   Q   Do you have any knowledge that they were, that they are not



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129929
JNJ 000064861

63

1    authentic?

2    A    I have no knowledge that they form the basis of a

3    business relationship between Eastern Mag, all I have are

4    the contracts.

5    Q    Can you tell me, Mr. Miller, whether from the time you

6    began work at Eastern Magnesia there was any use of breath-

7    ing apparatus or masks of the like of a protective nature

8    used by miners who mined talc for Eastern Magnesia?

9    A    Yes.

10   Q    What was the kind of device that they used?

11   A    A permeable membrane.

12   Q    Was it a company policy to require use of those masks?

13   A    In some circumstances.

14   Q    What circumstances?

15   A    If a man was exposed to excessive burden.

16   Q    What was considered excessive dust burden?

17   A    Burden in excessive of the threshold limit values.

18   Q    What threshold limit values did EMT utilize?

19   A    The indsutry standard.

20   Q    Which industry standard is that?

21   A    The ACGIH.

22   Q    Can you tell me what those initials stand for?

23   A    American Conference of Governmental and Industrial

24   Hygienics.



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I. 02903
(401) 331-6434

J&J-0129930

JNJ 000064862

64

1   Q.   Were those standards published periodically?

2   A.   Yes.

3   Q.   How would EMT make the determination that dust at anytime

4   exceeded the level that was published as being the threshold

5   level?

6   A.   They were guided by the Bureau of Mines in the State

7   of Vermont.

8   Q.   Were there then some operations of the mining process that

9   were deemed to be areas where masks must be worn?

10   A.   Yes.

11   Q.   During the time that you worked for EMT, did EMT provide

12   communication to any of its customers as to those threshold

13   levels?

14   A.   I don't know.

15   Q.   You don't know?

16   A.   No.

17   Q.   You were vice-president of operations in that capacity.

18   Did you have any responsibility for communication of such

19   information to the customers of EMT?

20               MR. LEIBENSPERGER:  Objection to the form.

21   A.   No.

22   Q.   Was there any person in EMT who had any responsibilities

23   for communication of such threshold limits to customers of

24   EMT?

J&J-0129931
JNJ 000064863

65

1    A    I don't know.

2  Q    Do you know what the purpose of protective masks was?

3    A    Yes.

4  Q    What?

5    A    To limit the burden on the lungs below 20 million

6    particles per cubic foot.

7  Q    Are you aware of any hazards that can result from inhalation

8    of dust in excess of whatever the threshold limit is?

9              MR. LEIBENSPERGER:   What dust are we

10    talking about?

11              MR. PRENTISS:   The dust that protective

12    masks were proposed to be on miners to protect against.

13    A    By indirection, I believe the standards were established

14    in response to a medical need.

15  Q    Do you know what the medical need was?

16    A    No.

17  Q    Do you know what diseases were claimed or feared to result

18    from inhalation of dust?

19              MR. LEIBENSPERGER:   Objection to the form.

20  Q    ...In the talc mines?

21              MR. LEIBENSPERGER:   Objection to the form.

22    A    I don't know.  I haven't read the deliberations of

23    the committee.

24  Q    So you were never told that by any person?

J&J-0129932
JNJ 000064864

66

1    A    No.   In general, you are talking about pneumoconiosis?

2    Q    What is pneumoconiosis versus a burden on a lung from

3    particulate material?

4    A    Farmers, everyone breathing dust is susceptible to

5    this from a variety of dust.

6    Q    What is talcosis?

7         MR. LEIBENSPERGER:   I'm going to object

8    to the question to the extent you are asking for an expert

9    medical opinion of what talcosis is.   Mr. Miller is not a

10   person with a medical background.

11   Q    I'm going to show you what's been marked as Exhibit #6

12   in this deposition, Mr. Miller, and that's a letter from

13   the State of Vermont, Department of Health and there is a

14   letter to Mr. Esckilson.   It contains on it first the

15   number of total payroll, number X-rayed and then a line

16   that says, "Diagnosis, colon, quote, 'Talcosis,'" and the

17   number four.   Have you seen that before today?

18   A    Yes.

19   Q    Did you see that at the time that it came in?   It's dated

20   April 18, 1967.

21   A    My initials are not on it.   I don't know.

22   Q    Do you know what this word "talcosis" refers to on that

23   document?

24   A    I believe it refers to an interpretation by this

W
Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129933
JNJ 000064865

67

1  department of their reading of the X-rays.

2  Q  What is your understanding of what talcosis is as it

3  relates to that document?

4              MR. LEIBENSPERGER:  Objection and

5  instruct the witness not to answer.

6  Q  Mr. Miller, you were in charge of operations at Windsor

7  or at EMT, and that included the mining of the talc, didn't it?

8  A  Yes.

9  Q  And it included such things as health and safety of workers?

10  A  Yes.

11  Q  And as part of your responsibilities in charge of the

12  health and safety of the workers, did you know that some of

13  your workers were being diagnosed as having talcosis in

14  April, 1967?

15  A  In all probability, yes.

16  Q  What do you understand talcosis to be?

17              MR. LEIBENSPERGER:  I object.  You're

18  asking for a medical definition.

19              MR. PRENTISS:  I'm asking for his opinion.

20              MR. LEIBENSPERGER:  May I finish my

21  statement?  You are asking him for a definition of a

22  medical word that's totally irrelevant to this case.

23  There's no evidence anywhere at all in this case of talcosis,

24  so I object to the question and instruct the witness not to

**W P**  Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129934
JNJ 000064866

68

1    answer.

2                        MR. PRENTISS:  I'm just asking, for the

3    record, for this gentleman's understanding of the matter

4    that was within his responsibility, his area of

5    responsibility by his own testimony.  Are you instructing

6    this witness not to answer questions regarding his under-

7    standing of what matters are within his responsibility?

8                        MR. LEIBENSPERGER:  Absolutely not,

9    I'm instructing the witness not to answer your prior

10   question, Mr. Prentiss.

11   Q   Mr. Miller, over the course of the time that you were in

12   charge of operations at EMT, how many workers had talcosis?

13   A   I don't know.

14   Q   And those workers who have talcosis, have further studies

15   been done regarding the nature of the problems or disease,

16   to your knowledge?

17                       MR. LEIBENSPERGER:  May I ask a question

18   before I instruct the witness not to answer the question.

19   May I ask for some statement by the questioner as to why

20   this is relevant to this case.  This is the case of Westfall.

21                       MR. PRENTISS:  Certainly.

22                       MR. LEIBENSPERGER:  If it's relevant,

23   I will let the witness answer the question.

24                       MR. PRENTISS:  Talcosis, to my

**WI** Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129935
JNJ 000064867

69

1   understanding, is a very general and non-definitional

2   term that has been used over the course of decades to

3   describe any one of a number of lung diseases that are

4   attributed to talc inhalation, including, but not limited

5   to, mesothelioma, cancer of the lung, and mixed pneumoco-

6   niosis due to a variety of powder inhalation and so the

7   mere statement of talcosis does not exclude any particular

8   disease that happens to be at issue in this lawsuit.

9           MR. LEIBENSPERGER:  So in your opinion,

10  when you use the word "talcosis", it includes mesothelioma

11  as a possible subdefinition of talcosis?

12          MR. PRENTISS:  I'm not giving my opinion,

13  I'm asking the witness' understanding, the witness who had

14  responsibility for this aspect of the operation of this firm.

15          MR. LEIBENSPERGER:  I don't think there

16  is any medical evidence to support your opinion, but I

17  will let it go a little further.

18  Q    It is my understanding that there were annual surveys

19  similar to the study that you made reference to and those

20  annual surveys are conducted by the State of Vermont?

21  A    Yes.

22  Q    Did EMT, to your knowledge, conduct any studies regarding

23  the nature of the problem that those workers who were

24  diagnosed by the State of Vermont as having talcosis?

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129936
JNJ 000064868

70

A.     Not to my knowledge.

Q.     During the time that you were there?

A.     Yes.

Q.     Do you know whether EMT did any such studies of its own prior to the time that you came to work for EMT?

A.     I don't know.

Q.     During any of the time that you were with EMT, did you have any association or responsibility for sales?

A.     No.

Q.     Do you know how long prior to your going to work for EMT that there was a policy within EMT that miners in certain aspects of the mining operation would wear prospective masks?

A.     No.

Q.     That wasn't in effect when you arrived there?

A.     Yes.   I presume when you use the word "miner", you are talking about miners and millers; you are talking about the hourly employees in the mines and the processing plant both.

Q.     I was referring to people wh go down into the mines, but were there other employees of EMT who were required, under policies of EMT to wear protective masks?

A.     Yes.

Q.     What other employees?

A.     Employees in the mill might under similar exposure be

W&I   woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129937
JNJ 000064869

71

1       required to take the same preventative steps.

2   Q   Mr. Miller, on July 16, 1982 you executed an affidavit in

3       connection with this lawsuit.  Do you recall that?

4   A   Yes.

5   Q   In paragraph 11 of that affidavit you stated, "Windsor is

6       not a" quote,"'successor corporation,' to Eastern Magnesia

7       Talc Company, Inc. as is alleged in the complaint." On

8       what basis did you make that statement?

9   A   I did it on the basis of my understanding of what

10      had gone before it.

11  Q   Did your understanding since that time change?

12  A   Yes.

13  Q   You also executed an affidavit on October 18, 1982 in

14      connection with this case.  Do you recall that?

15  A   Yes.

16  Q   Now, in that affidavit, you make reference to a W. H.

17      Ashton; who is he?

18  A   He is an employee of Johnson & Johnson.

19  Q   What is his capacity or position now?

20  A   He is a physical scientist.

21  Q   Where is his office?

22  A   In New Jersey.

23  Q   Did you call him in connection with this lawsuit?

24  A   No.



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129938
JNJ 000064870

72

1   Q   Did he call you?

2   A   No.

3   Q   In your affidavit you state that in February, 1981 Mr.

4   Ashton, an employee of J&J, Johnson & Johnson was contacted

5   by William Curran, Esquire, an attorney representing

6   Metropolitan Talc Company in the present case. Where did

7   you get that information?

8   A   Mr. Bolden, an attorney.

9   Q   Who is Mr. Bolden?

10   A   He is an attorney with Johnson & Johnson.

11   Q   Where is his office?

12   A   In New Jersey.

13   Q   Did Mr. Bolden contact you to relate that to you?

14                   MR. LEIBENSPERGER:  At what time?  You

15   mean in preparation for submitting the affidavit?

16                   MR. PRENTISS:  This affidavit.

17                   MR. LEIBENSPERGER:  I'm still not sure

18   what contact you are referring to.

19                   MR. PRENTISS:  I am trying to find out

20   where this affiant obtained the information that supported

21   his sworn testimony.

22   A   As I stated here, Mr. Curran's contact was made known

23   to Frank Bolden, an attorney employed by J&J.

24                   MR. LEIBENSPERGER:  The question is with



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129939
JNJ 000064871

73

1    respect to the preparation of the affidavit and signing it.

2    You say Mr. Bolden provided the information and I think

3    the question was, did he contact you to provide it.

4                    THE WITNESS:  Yes.

5    Q    When did he contact you?

6    A    In early 1981.

7                    MR. LEIBENSPERGER:  Wait a minute, I'm

8    not sure of that, though.  The question was, when did he

9    contact you with respect to the preparation of this affidavit.

10                   THE WITNESS:  In recent months.

11   Q    Let me go to your answer, the earlier answer.  When did

12   you first hear from Mr. Bolden in relation to this subject

13   matter, that's the conversation with Mr. Curran?

14   A    It was early 1981, from my recollection.

15   Q    What did Mr. Bolden say to you in that conversation?

16                   MR. LEIBENSPERGER:  I'm going to

17   object, only to the extent -- I'm not going to object at all.

18                   MR. PRENTISS:  I understand the

19   difficulty of the attorney/client, but I think we've got

20   to answer these questions.

21                   MR. LEIBENSPERGER:  To the extent he

22   was just relating factual matters is not within the

23   privilege, so if there is any parts of the conversation

24   that was legal advice that would be privileged, but as I

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129940
JNJ 000064872

74

1  understand it, I'm not objecting.

2  A    Mr. Bolden contacted me, said he had been contacted

3  by an attorney for Metropolitan Talc who was involved with

4  the question regarding Italian Talc and Frank was inquiring

5  of me did I have information or test results in those

6  types of things which could be useful with regard to

7  Italian Talc and I told him No.

8  Q  Why didn't Mr. Bolden, do you know, did he tell you why

9  he contacted you to find out about Italian Talc?

10  A    I don't know why?

11  Q  Do you know whether Johnson & Johnson owns any other firms

12  or subsidiaries that are involved in the talc business

13  besides Windsor?

14  A    No.

15         MR. LEIBENSPERGER:  Was it No, that

16  you don't know or No?

17  A ...No, they don't own any others, to my knowledge.

18  Q  They don't own any other besides Windsor?

19  A    No.

20  Q  So you are it as far as talc for Johnson & Johnson is

21  concerned?

22  A    As far as Windsor Minerals is concerned.  I am it

23  as far as Windsor selling talc products.

24  Q  But you, the corporation, Windsor is the only talc

**WP**  Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129941
JNJ 000064873

75

1    manufacturer/miner to your knowledge that Johnson & Johnson

2    owns?

3    A.    Yes.

4  Q    Where is Mr. Bolden's office again; what part of New Jersey,

5    what city?

6    A.    New Brunswick, New Jersey.

7  Q    You said that -- did Mr. Bolden tell you that he had been

8    contacted by Mr. Curran?

9    A.    I believe that's what he told me.

10  Q    Your affidavit states that Mr. Curran contacted Mr. Ashton

11    and that Mr. Ashton contacted Mr. Bolden.  Is it possible

12    that Mr. Curran contacted both or that your recollection

13    is a little vague on that?

14    A.    I'm not sure of that.  I'm trying to state to you

15.    what my recollection was.

16  Q    How well do you recall that conversation that you had with

17    Mr. Bolden?

18    A.    Not well at all, because it wasn't a significant

19    conversation.  It didn't have anything to do with this.

20  Q    Are you certain Mr. Bolden told you he was only inquiring

21    about Italian Talc?

22    A.    Yes, I remember that.

23  Q    Why are you certain about that?

24    A.    Because I remember my answer, which was that I had no

J&J-0129942
JNJ 000064874

76

1    information regarding Italian Talc.

2  Q   Are you sure that he didn't say to you that it just

3     involved talc in general?

4  A    Yes, I'm sure that that was not the conversation.

5  Q   He couldn't have said that there was a lawsuit that

6     related to talc and that Mr. Curran was only involved in

7     Italian Talc, or Mr. Curran wants to know is Italian

8     Talc; could it have been that way?

9  A    No, that was not the conversation.

10  Q   Tell me what the conversation was, to the very best of your

11     recollection.

12  A    He called and said, my understanding is he called

13     that ~~contract~~ *Contact* had been made from Metropolitan Talc

14     inquiring whether Johnson & Johnson had information that

15     Metropolitan could use to defend Italian Talc from some

16     charges.  I'm not even sure he told me whether it was a

17     lawsuit, and that's the substance of the question that he

18     asked me, did we have information that they could use and

19     my answer was No.

20  Q   You didn't speak directly to Mr. Curran, did you?

21  A    No.

22  Q   Now, Mr. Bolden, in your affidavit, you state that he as

23     an attorney employed by Johnson & Johnson and assigned to

24     Johnson & Johnson's companies and subsidiaries dealing



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129943
JNJ 000064875

77

1   with talc.  How many subsidiaries does Johnson & Johnson

2   have dealing with talc?

3   A.   Two.

4   Q   What is the other one?

5   A.   One is Johnson & Johnson Baby Products Company and

6   one is Windsor Minerals, Incorporated.

7   Q   Now, is Mr. Bolden Windsor Minerals' corporate counsel?

8   A.   Mr. Bolden is on my Board.  He is in the office of

9   the general counsel of J&J.  He is on my Board as a

10  representative of the parent corporation and is the

11  consulting attorney to myself.

12  Q   Is he in the corporate structure, is he assigned as the

13  corporate counsel for Windsor?

14  A.   Yes.

15  Q   You don't have any other corporate counsel, do you?

16  A.   No.

17                  MR. LEIBENSPERGER:  For this lawsuit,

18  you mean?

19                  THE WITNESS:  Wait, I might not have

20  answered that correctly.  We, from time to time, in Vermont

21  use attorneys in land acquisition matters.

22  Q   They are on a case-by-case basis, you may hire an attorney

23  to do something for you?

24  A.   Right.

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129944
JNJ 000064876

78

1   Q   Mr. Miller, in a couple of contracts which have been

2       marked as Exhibit #21 there is reference made to a talc

3       number 23. What is that?

4   A   I don't know.

5   Q   Can you tell me what Exhibit #15 purports to show? It's

6       the handwritten table of shipment years, 1942 through 1957.

7   A   In going through our records, attempting to define

8       the sales, you asked questions regarding the sales in

9       dollars and tons from the various operations. We had

10      very sketchy information. This piece of paper had this

11      table of dollar value of shipments from Johnson & Johnson

12      and it was unique because we didn't have those numbers

13      necessarily anywhere else, so I put it in wanting to be as

14      *inclusive* conclusive as I could.

15  Q   So you prepared Exhibit #15 from the materials in the file?

16  A   This was just a piece of paper in the file.

17  Q   You didn't actually draw these?

18  A   This is an old piece of paper that I found in the file.

19  Q   Do you know whether they are dollars or tons?

20  A   Yes, I'm sure they are dollars -- wait a minute, let

21      me look at that. These Goddamn guys reported tonnages in

22      tenths.

23              MR. LEIBENSPERGER:  Off the record.

24          (OFF THE RECORD)



**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129945
JNJ 000064877

1                     THE WITNESS:  These are dollars.

2                     MR. LEIBENSPERGER:  Off the record.

3                     (OFF THE RECORD)

4 Q.   In your answer Number 36, response Number 36 to the Inter-

5      rogatories, the question is whether you have destroyed

6      documents or records pertaining to a variety of categories

7      and your response is, quote "See response to Interrogatory

8      Number 35." In answer  Number 35, you state that there

9      was no program of retention or destruction of records or

10     documents for the company, to your knowledge?

11 A.   That is right.

12 Q.   Now, does that reach back to EMT and to your knowledge of

13     the EMT operations prior to your coming on with the firm?

14 A.   To the degree I have knowledge of it, I have no know-

15     ledge or understanding of any program.

16 Q.   But the question Number 36 asks without regard to programs.

17     Let me ask you then, without regard to your program, do

18     you know if any documents were destroyed?

19 A.   I don't know.  Well, wait a minute, 36-G, the guy

20     from Englehart told me that the floods had destroyed those

21     sales records.  These refer to the sales records.

22               MR. PRENTISS:  I don't have anything

23     further, thank you.

24     CROSS-EXAMINATION BY MR. ANDERSON



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129946
JNJ 000064878

80

## CROSS-EXAMINATION BY MR. ANDERSON

1  Q.  Has the talc that was mined from the Johnson mine ever,

2  to your knowledge, been tested for any kind of asbestos

3  or asbestos-like material?

4              MR. LEIBENSPERGER: Has it been tested

5  for it or has the test resulted in it?

6              MR. ANDERSON:  Has it been tested

7  for it?

8              MR. LEIBENSPERGER:  At any time?

9              MR. ANDERSON:  At any time, to your

10  knowledge, we'll say from 1945 to '67?

11  A.  The information provided by the Bureau of Mines in

12  their two reports, and by the State of Vermont, it's

13  very closely descriptive of the mineralogical composition

14  of that ore body and you asked me has it been tested for

15  asbestos.  All I can refer you to are those documents which

16  on close analysis found none.  Now, I have to presume,

17  having mentioned none, they found none.

18  Q.  When you say the U.S. Mine Reports, you are talking about

19  the air samples they took that you described earlier?

20  A.  Yes.

21  Q.  The company has not, to your knowledge, done any testing,

22  is that correct?

23  A.  Not to my knowledge.

24  Q.  And they haven't hired anybody to do any testing, is that correct?

**WI  Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129947
JNJ 000064879

81

1                    MR. LEIBENSPERGER:  You're talking

2     about what period?

3                    MR. ANDERSON:  '45 to '67.

4     A.  Not to my knowledge.

5   Q.  And your company doesn't own the Johnson Mine anymore?

6     A.  No, we don't.

7   Q.  Do you know if the talc at the Johnson Mine has been tes-

8     ted after 1967 for the content of asbestos or asbestos-like

9     material?

10    A.  By presumption only I know that.

11  Q.  You presume that it must have been?

12    A.  I presume that it must have been because I know that

13    their products are offered as asbestos-free.

14  Q.  But you have no personal knowledge of the testing?

15    A.  No, I don't.

16  Q.  Do you know if the company that now owns the Johnson Mine

17    is using the same shaft that was used from 1945 to 1967?

18    A.  Yes.

19  Q.  They are?

20    A.  Right.

21                   MR. ANDERSON:  I don't have anything

22    else.

23                   MR. CURRAN:  I don't have any questions.

24  CROSS-EXAMINATION BY MR. DOLAN

Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129948
JNJ 000064880

82

## CROSS-EXAMINATION BY MR. DOLAN

1  Q.  In your Answer to Interrogatory Number 17, you state in

2      17A that Windsor through EMT sold talc to Uniroyal in

3      Providence from 1945 until 1954, and 1960 until 1961, and

4      the records that have been introduced are your support

5      for those statements?

6      A.  My source for that information.

7  Q.  Now, where did you get those records?

8      A.  These were in the files of Windsor Minerals.

9  Q.  But you don't know where the records are for the years,

10     say 1904 until 1954 and 1960 or 1961 to 1965?

11     A.  I know where the records are up to 1945, but I was not

12     inquired of prior to 1945.  You said 1904, that's why.

13 Q.  No, 1954 to 1960 and 1961 to 1965?

14     A.  I don't know where those records are.

15 Q.  The other thing that was in your Answer to Interrogatories,

16     you indicate that Johnson & Johnson from 1965 to 1967 had

17     control of that mine, right?

18     A.  Yes.

19 Q.  Do you have any records from 1965 to 1967?

20     A.  I have described the records that we previously produced.

21 Q.  So that Johnson & Johnson has custodian of the record?

22     A.  That Windsor Minerals has custodian of the records.

23 Q.  What do you have for 1965 to 1967?

24     A.  Correspondence.  It's better to say by exclusion.  We

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129949
JNJ 000064881

83

1   know that we transferred the sales records, the sales

2   information, the sales correspondence, the pricing infor-

3   mation, the descriptive materials, those things that would

4   be a part of selling and we transferred those financial

5   records, cost accounting records which were not part of

6   our required retention for tax purposes.

7  Q.  Where did you transfer them to?

8    A.   To Englehart.

9               MR. LEIBENSPERGER:   You mean Minerals

10  and Chemicals Phillips.

11  Q.  So that for those two years you are saying also those were

12  destroyed by flood also?

13    A.   When we sold the company, they required or asked us

14  as for all their current sales, customer lists and the whole

15  thing.

16              MR. DOLAN: That's all I have.

17    <u>CROSS-EXAMINATION BY MR. LOVEGREEN</u>

18  Q.  Mr. Miller, you were at Eastern Magnesia in 1965, is that

19  correct?

20    A.   No, I began in 1966.

21  Q.  From May 1966 until you sold a portion of the business to

22  I will call it Phillips, do you have any recollection of

23  sales of talc at Eastern Magnesia to Uniroyal in Providence?

24    A.   No.



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.   02903
(401) 331-6434

J&J-0129950
JNJ 000064882

84

Q.  Were you involved in sales at all at that time?

A.  No.

Q.  Who was?

A.  Mr. Esckilson.

Q.  And he was the only person?

A.  No.

Q.  Who else was?

A.  Lee Esckilson, H. Mailer, J. Carpenter.

Q.  Are any of those people still working for Windsor?

A.  No.

Q.  Do you know where they are located at this time?

A.  Mr. Esckilson is in Gouverneur, New York.  Lee Esckilson, even his father doesn't know where he is.  Howard Mailer is dead, and John Carpenter  lives in Burlington, Vermont.

Q.  And they constituted the sales force, is that correct?

A.  That's my understanding, that is correct.

Q.  Now, you indicated that the records from 1965 forward were given to Phillips when they purchased the northern part of the business, yet in your contracts which are Number 21, the contracts are dated and they are annual contracts, is that correct?

A.  They are as they are.  They appear to be an annual succession of contracts, yes.

Q.  You have no knowledge of these contracts yourself?

**WI** *Woods & Irons*
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129951
JNJ 000064883

85

1   A. No.

2  Q.  Were there any contracts entered into between Eastern

3       Magnesia and U.S. Rubber Company while you were at Eastern

4       Magnesia?

5   A. Not to my knowledge.

6  Q.  Do you know whether or not Exhibit 21 exhausts all of the

7       contracts between Eastern Magnesia and United States Rub-

8       ber Company?

9   A. I do not know, no.

10  Q.  There may be other contracts around that aren't present

11      in this particular Exhibit?

12  A.  There may be.  I have no knowledge of that at all.

13  Q.  If they do exist, you have no knowledge of it, is that

14      what you are saying?

15  A. Yes.

16  Q.  Referring to Exhibit 11, Mr. Miller, I believe we've got

17      the correct Number here, is that 11?

18                  MR. PRENTISS:  Yes.  You are refer-

19      ring to the Whittaker, Clark and Daniels ledger sheets?

20                  MR. LOVEGREEN:  Right.

21  Q.  They appear to be for the years 1955, is that correct?

22  A.  Yes, and '56, '57, '58, '59 and '60 in the bundle that I

23      have.

24  Q.  In the second bundle is '60 to '62, is that correct?

**Woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129952
JNJ 000064884

86

A.   Through July of '62.

Q.   And the third bundle is '62 through July of '67, is that correct?

A.   Right, yes.

Q.   Now, in the column roughly in the middle of the page under where it says "shipped to" there are certain designations, is that correct?

A.   Yes.

Q.   Would it be fair for me to assume that the names indicated in that column would be the shipping destination of the products sold by you or Eastern Magnesia to Whittaker, Clark and Daniels?

A.   I really can't make an assumption about it. I didn't have anything to do with it.  I found these in the files and they have to be read as they are.

Q.   You have no way of interpreting these documents, is that fair to say?

A.   No, I don't have any way.  Some of the information is meaningful, some of it isn't.

Q.   Have you ever inquired of anybody regarding the interpretation of Exhibit 11?

A.   No.

Q.   Did you ever discuss this with Mr. Eskilson?

A.   Eskilson?



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129953

JNJ 000064885

87

Q. Yes.

A. Yes, I discussed Whittaker, Clark and Daniels sales of Eastern Mag.

Q. Did you ask him where the materials or products were shipped where there is a blank on the column shipped to?

A. No.

Q. Do you know, to your own knowledge, where they were shipped to?

A. No, I don't.

Q. Do you have any person at Whittaker, Clark and Daniels that Eastern Magnesia dealt with in a sale of any talc product at any time?

A. No, sir, I don't.

MR. LOVEGREEN: That's all I have, thank you.

RECROSS-EXAMINATION BY MR. ANDERSON

Q. Plaintiff's Exhibit 20 for Identification, can you tell us what that document is?

A. Can I tell you what this is?

Q. Yes, do you know what it is?

A. I can tell you what it appears to be. This is a portion of a compilation which, it is my understanding, was prepared shortly after the acquisition as a document of explanation for the marketing and distribution of talc products

**woods & Irons**
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129954

JNJ 000064886

88

from Eastern Magnesia Talc Co.

Q. This was prepared by Eastern Magnesia Talc Co.?

A. Yes, it was.  It is my understanding it was.

Q. On page 4?

A. Yes.

Q. Roman numeral II, second paragraph Arabic number 2-B, the rubber is described apparently as having a high iron content; is that what that refers to? I'm sorry, I mean the talc?

A. Come here and show me where you are talking about.

Q. High iron content under filler and reinforcing?

A. Yes.

Q. Do you know, to your personal knowledge, that the talc sold by Eastern Magnesia Talc Co. had a high iron content relative to other types of talc?

A. Yes.

Q. Do you know what percent iron content it had?

A. No.

MR. ANDERSON: I have no further questions.

MR. PRENTISS: I have just a couple more.

REDIRECT EXAMINATION BY MR. PRENTISS

Q. First, you answered Mr. Anderson by stating that the talc

**W**  
**Woods & Irons**  
Suite 300 ● 56 Washington Street  
Providence, R. I.   02903  
(401) 331-6434

J&J-0129955

JNJ 000064887

89

1    mined at Johnson utilized the one shaft?

2    A.  Yes.

3    Q.  For the entire period from 1945 to 1967?

4    A.  That's my understanding.

5    Q.  What is the basis of that understanding?

6    A.  Conversations with the staff at the mine.  Do you know

7    what a shaft is?

8    Q.  Only from what you have explained today.

9    A.  The shaft is the primary opening through which men

10   and materials travel and out which the ore comes.  The

11   openings of the ground are not shafts.  To my knowledge,

12   that shaft has been in use since 1945.  I could be mistaken

13   but I believe it has.

14   Q.  But you did say there are two other shafts that were opera-

15   ted at one time at the Johnson mine?

16   A.  I said in the same ore body, yes.  Those that became

17   unusable, they moved over successfully and used those.

18   Q.  Do you know the proximity of the shaft that you think

19   was in operation for that entire period to the other shafts.

20   A.  In a general sense, I do.

21   Q.  About how far away?

22   A.  Quarter of a mile.

23   Q.  Each?

24   A.  No.



Woods & Irons
Suite 300 • 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129956
JNJ 000064888

90

Q.   Quarter of a mile?

A.   One or two.  Three were fairly close together and four was about a quarter of a mile.  Two and three were very small exploratory operations.

Q.   Two and three are the ones that you don't think have been in operation since 1945?

A.   Yes.

Q.   But all of them were in the same ore body?

A.   It's my understanding that they were, yes.

Q.   How far did the risers--

A.   You mean the stopes.

Q.   The stopes, the lateral extensions from the shaft go before they were exhausted and moved onto the next stope?

A.   The mine is best viewed as a vertical deposit and the horizontal openings are in successively decreasing depth.  The vertical openings could be as high as 300 feet. They pass more than one level.

Q.   So for the shaft end of the stope to the stone end of the stope, how long would that be?  Do you understand my question?

A.   No.

Q.   Am I correct in understanding that you have a shaft and from the shaft you have a hole that branches off of the shaft?

J&J-0129957
JNJ 000064889

1    A.  No, you have horizontal openings.  The shaft is *steeply* deeply
2    inclined.  You have a horizontal opening that goes out to
3    the limit ore body and then you mine the panels.
4  Q.  You stated that EMT Talc had a high iron content level
5    relative to other talcs?
6    A.  Yes.
7  Q.  Was that the Johnson Talc or the Hammonsville Talc or
8    both?
9    A.  Both.
10  Q.  Exhibit 20, which is the portion of the compilation, do
11    you have the rest of that compilation?
12    A.  Yes.
13  Q.  Would we be able to get that if we filed our request, if
14    I make a request for the compilation prepared by EMT for
15    Phillips Co. in connection with the transfer?
16    A.  No, with J & J.
17                    MR. LEIBENSPERGER:  This is the first
18    transfer from Eastern Mag. to J & J.
19                    MR. PRENTISS:  Do you know what I'm
20    talking about?
21                    MR. LEIBENSPERGER:  I know what you're
22    talking about.  I'd have to see the request and look at
23    the documents to see the relevance of objections, but sub-
24    ject to that I know what you are talking about.



Woods & Irons
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129958
JNJ 000064890

92

MR. PRENTISS:  Just to make it simple, we have an understanding, I will ask for the complete compilation of which Exhibit 20 for this deposition is a part.  Thank you, I have no further questions.

(DEPOSITION CLOSED)

* * * * * * * * * * * * * **

C E R T I F I C A T E

I, Lynne S. Irons, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of Roger N. Miller, a Witness  in the above-entitled cause, was taken by me on behalf of the Plaintiffs, pursuant to Notice, before Lynne. S. Irons, a Notary Public in and for the State of Rhode Island at the offices of Decof & Grimm, One Smith Hill, Providence, Rhode Island on October 29, 1982 at 1:30 P.M.; that said witness personally appeared; that prior to the testimony of said witness he was first duly sworn and cautioned to tell the truth, the whole truth, and nothing but the truth and that Roger N. Miller thereupon testified as in the foregoing annexed deposition set out.

I further certify that the foregoing was taken down by me in stenotype and was reduced to typewriting ; it is a true and correct copy of my notes taken at the time of the above-entitled deposition.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 2ND day of November, 1983.

Lynne S. Irons,

LYNNE S. IRONS, NOTARY PUBLIC/ CERTIFIED COURT REPORTER

**W** **Woods & Irons**
Suite 300 ● 56 Washington Street
Providence, R. I.  02903
(401) 331-6434

J&J-0129959
JNJ 000064891

Exhibit 4

```
                                                      Page 1

 1              SUPERIOR COURT OF NEW JERSEY
                LAW DIVISION - MIDDLESEX COUNTY
 2              DOCKET NO. MID-1809-17AS
                APPELLATE DOCKET NO._____
 3
 4     DOUGLAS AND ROSALYN BARDEN,     )
                                       ) TRIAL
 5              Plaintiff,             )
                                       )
 6              v.                     )
                                       ) (VOLUME 1 OF 2)
 7     BRENNTAG NORTH AMERICA, et al., )
                Defendants.            )
 8     ----------------------------    )
       DAVID CHARLES ETHERIDGE AND     )
 9     DARLENE PASTORE ETHERIDGE,      ) MID-L-0932-17AS
                                       )
10              Plaintiffs,            )
                                       )
11              v.                     )
                                       )
12     BRENNTAG NORTH AMERICA, et al., )
                                       )
13              Defendants.            )
       ----------------------------    )
14     D'ANGELA McNEILL-GEORGE,        )
                                       ) MID-L-7049-16AS
15              Plaintiff,             )
                                       )
16              v.                     )
                                       )
17     BRENNTAG NORTH AMERICA, et al., )
                                       )
18              Defendants.            )
       ----------------------------    )
19     WILLIAM AND ELIZABETH RONNING,  )
                                       ) MID-L-6040-17AS
20              Plaintiffs,            )
                                       )
21              v.                     )
                                       )
22     BRENNTAG NORTH AMERICA, et al., )
                                       )
23              Defendants.            )
24
25     Job No. NJ3446610
```

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

Page 2

1
2      Place:  Middlesex County Courthouse
             56 Paterson Street
3            New Brunswick, New Jersey  08903
4
       Date:   Monday, July 22, 2019
5              9:24 a.m.
             (Volume 1 of 2)
6            (Pages 1 - 200)
7
8
9
10
11 Before:
12     HON. ANA C. VISCOMI, J.S.C.,
13
14
15
16
17 TRANSCRIPT ORDERED BY:
18     MOSHE MAIMON ESQ.
       LEVY KONIGSBERG
19
20
21
       SILVIA P. WAGE, CCR CRR
22     PRIORITY ONE
       290 West Mount Pleasant Avenue
23     Livingston, New Jersey  07039
       (718) 983-1234
24     E-mail:  P1steno@veritext.com
25

Page 4

1            I N D E X
2 WITNESS: JOHN HOPKINS           PAGE
3 DIRECT EXAMINATION BY MR. PANATIER        12
4        E X H I B I T S
5 NO.          DESCRIPTION        PAGE
6 Plaintiff's Exhibit 2064            190
  Plaintiff's Exhibit 2304            199
7 Plaintiff's Exhibit 2345            121
  Plaintiff's Exhibit 2360            107
8 Plaintiff's Exhibit 2364            199
  Plaintiff's Exhibit 2367            199
9 Plaintiff's Exhibit 2368            199
  Plaintiff's Exhibit 2374            199
10 Plaintiff's Exhibit 2381           199
   Plaintiff's Exhibit 2382           199
11 Plaintiff's Exhibit 2385           199
   Plaintiff's Exhibit 2390           199
12 Plaintiff's Exhibit 2391           199
   Plaintiff's Exhibit 2393           199
13 Plaintiff's Exhibit 2403           199
   Plaintiff's Exhibit 2412           199
14 Plaintiff's Exhibit 2413           199
   Plaintiff's Exhibit 2434           199
15 Plaintiff's Exhibit 2594           111
   Plaintiff's Exhibit 2614           197
16 Plaintiff's Exhibit 2738           72
   Plaintiff's Exhibit 2836           90
17 Plaintiff's Exhibit 3162           118
   Plaintiff's Exhibit 3173           139
18 Plaintiff's Exhibit 3378           199
   Plaintiff's Exhibit 3624           148
19 Plaintiff's Exhibit 3695-14        82
   Plaintiff's Exhibit 3695-15        59
20 Plaintiff's Exhibit 3695-8         51
   Plaintiff's Exhibit 3695-22        199
21 Plaintiff's Exhibit 3695-23        161
   Plaintiff's Exhibit 3695-27        178
22
23
24
25

Page 3

1 A P P E A R A N C E S:
2
    CHRISTOPHER PLACITELLA, ESQ.
3   COHEN PLACITELLA & ROTH
    127 Maple Avenue
4   Red Bank, New Jersey  07701
    -and-
5   MOSHE MAIMON, ESQ.
    LEVY KONIGSBERG
6   800 Third Avenue
    11th Floor
7   New York, New York  10022
    -and-
8   CHRIS J. PANATIER, ESQ.
    SIMON GREENSTONE PANATIER
9   1201 Elm Street
    Suite 3400
10  Dallas, Texas  75270
    Attorneys for Plaintiffs, Douglas and
11  Rosalyn Barden, Charles Etheridge and
    Darlene Pastore Etheridge, D'Angela
12  McNeill-George, William and Elizabeth
    Ronning
13
14  DIANE P. SULLIVAN, ESQ.
    JACK NOLAN, ESQ.
15  WEIL GOTSCHAL & MANGES LLP
    17 Hulfish Street
16  Suite 201
    Princeton, New Jersey  08542
17  -and-
    JOHN C. GARDE, ESQ.
18  JOHN FLAHERTY, ESQ.
    McCARTER & ENGLISH
19  Four Gateway Center
    100 Mulberry Street
20  Newark, New Jersey  07102
    Attorneys for Defendants Johnson & Johnson,
21  and Johnson and Johnson Consumer, Inc.
22
23
24
25

Page 5

1         THE COURT:  Good morning, Dr.
2  Hopkins.
3         THE WITNESS:  Good morning, your
4  Honor.
5         (Sidebar.)
6         THE COURT:  So we are at sidebar and
7  we began argument on Friday.  I think all the
8  arguments were in relative to --
9         (There is a discussion off the
10  record.)
11         THE COURT:  I don't know.  Was there
12  additional argument that counsel wanted to make or
13  are we done with argument?  (INAUDIBLE.)
14         MS. SULLIVAN:  And just to emphasize,
15  your Honor, Evidence Rule 701 and lay opinion from
16  fact witnesses can be permitted, if it's consistent
17  with your experience in product -- particularly, in
18  product liability case.
19         And, specifically, citing the
20  Appellate Division's decision in Navarro v. George
21  Koch & Sons, 512 -- I'm sorry, 211 N.J. Super. 558
22  and, actually, the Court held it might be reversible
23  to not permit that kind of testimony.
24         MR. MAIMON:  Just a moment, your
25  Honor.

2 (Pages 2 - 5)

Page 6

1    THE COURT:  Sure.
2    MR. MAIMON:  So Rule 701 does allow
3 lay opinion testimony.  But that has to be based on
4 the perception of the witness.  And so the classic
5 example is that a witness can say how fast was a car
6 going but, for instance, the Appellate Division and
7 the Supreme Court has held that it would be error to
8 let a police officer say the car was going so fast
9 and the car was speeding based on the statements of
10 others because that's just a vehicle to admit
11 hearsay.  And I'm just looking at the commentary on
12 Rule 701.
13    Very clearly, the commentary makes
14 that a nonexpert may give his opinions on matters of
15 common knowledge and observation but not on areas
16 that would usurp the function of expert opinion.
17    The discussion of products liability
18 cases has been restricted to people who were
19 involved in the design so that the designers of
20 products such as a chair, and that's the Navarro
21 case, could say that providing an undersized chair,
22 this is the reason it was designed that way, so
23 that's somewhat of an opinion, but it's not an
24 opinion where it goes to the product defect.  It's
25 not an opinion that's an expert opinion.  It's

Page 7

1 opinion within not only the knowledge but the
2 perception of somebody.  And I think that we get --
3 we get confused when we say that a person's personal
4 knowledge is based on what other people have told
5 them.  And our courts have said that the party
6 opponent exception is -- is allowed to have those
7 statements.  But the same way in which we could
8 offer in the Answers to Interrogatories of Johnson &
9 Johnson, they could not offer in their own Answers
10 to Interrogatories.
11    We could offer the corporate
12 representative deposition of Johnson & Johnson.  The
13 rule on admissibility of depositions makes it clear
14 as well as the case law they could not offer their
15 own.  And so we do not believe that Dr. Hopkins can
16 offer any opinions where he lacks personal
17 knowledge.
18    MS. SULLIVAN:  And, your Honor, just
19 to follow up on the Navarro case, it wasn't the
20 chair case.  It actually involves the design of
21 latches and the Court held that the employee there
22 who was familiar with design manufacturer testing
23 issues should be able to testify consistent with his
24 knowledge and experience with the company.
25    MR. PLACITELLA:  And that employee

Page 8

1 had personal knowledge.
2    THE COURT:  Okay.  So here where this
3 is going to come in is the whole issue with his
4 cross-examination and so I previously ruled so
5 there's no personal use testimony coming in.
6 There's no expert testimony going to come in because
7 he's not an expert.  There is no hearsay testimony
8 coming in unless it meets one of the exceptions.
9    With regard to this whole area, I
10 believe, this is going to -- from what you've --
11 Counsel advised really kind of come up during
12 cross-examination of the witness.
13    So I've previously allowed testimony
14 within, I believe, the confines of 602 and 701.  We
15 have to remember his role at the company was as the
16 head of product safety for the time period that he
17 was there.  And so if it's within his personal
18 knowledge in that role, the Court will allow that
19 testimony.
20    This is going to be the situation
21 where, I mean, Counsel, if you feel that he's going
22 outside that role and not testifying within his
23 personal knowledge, then we can come to sidebar.
24    MR. PANATIER:  Yes, your Honor.
25    THE COURT:  Okay?

Page 9

1    MR. MAIMON:  Understood.
2    MS. SULLIVAN:  Yes, your Honor.
3    THE COURT:  Thank you.
4    MR. MAIMON:  Thank you, your Honor.
5    (Sidebar ends.)
6    THE COURT:  So let's get the Jurors
7 in.  Everything is working here now.
8    I'll step out so we can bring in the
9 Jurors.
10    (Recess taken 9:32 a.m.)
11    (Jury enters.)
12    THE COURT:  Good morning.  Please be
13 seated.  Make sure cell phones are turned off.
14 Officer, you can just give the envelopes to the
15 Jurors, they'll pass them around to the correct
16 individuals.
17    THE WITNESS:  May I approach?
18    THE COURT:  Yes, please.  Have a
19 seat, Dr. Hopkins.
20    Good morning, everyone.  Today is
21 July 22, 2019.  This is the trial in the matter of
22 Douglas and Rosalyn Barden versus Johnson &
23 Johnson -- Counsel, you may be seated -- Darlene and
24 David Etheridge versus Johnson & Johnson, D'Angela
25 McNeill versus Johnson & Johnson and William and

3 (Pages 6 - 9)

Page 10

1 Elizabeth Ronning versus Johnson & Johnson.
2        May I have appearances please for
3 the Plaintiffs.
4        MR. MAIMON:  Thank you, your Honor.
5 Good morning.  Good morning, everyone.  Moshe
6 Maimon, Chris Panatier and Chris Placitella for the
7 Bardens, the Etheridges, the Ronnings and Ms.
8 McNeill.
9        THE COURT:  Thank you.
10        And on behalf of the Defendant,
11 Johnson & Johnson and Johnson & Johnson Consumer,
12 Incorporated.
13        MS. SULLIVAN:  Thank you, your Honor,
14 good morning.  Hi, Jurors.  Good morning, everyone.
15 Diane Sullivan and Jack Nolan for J&J.
16        MR. NOLAN:  Good morning.
17        THE COURT:  Welcome back, Members of
18 the Jury.  As you may recall, we have not finished
19 the testimony of Dr. Compton who started his
20 testimony on Friday.  Similarly, we have not
21 completed the testimony of Dr. Webber.
22        In order to accommodate witnesses'
23 schedule, we're now going to move to a different
24 witness.
25        Plaintiffs may call their next

Page 11

1 witness.
2        MR. PANATIER:  Thank you, your Honor.
3 At this time Plaintiffs call the
4 corporate representative of Johnson & Johnson, John
5 Hopkins, who is already standing at the witness
6 stand.
7        DR. HOPKINS:  Thank you.  Good
8 morning, Jury.  Good morning, your Honor.
9        THE COURT:  Good morning.
10        Could you please remain seated,
11 Dr. Hopkins, momentarily, while you are administered
12 the oath.  If you could remain standing, I'm sorry.
13 If I said "seated," I apologize.
14        THE CLERK:  State your full name and
15 spell your last name, please.
16        THE WITNESS:  John Hopkins,
17 H-O-P-K-I-N-S.
18 J O H N   H O P K I N S,        SWORN.
19        THE COURT:  Officer, if you could
20 just remove the bible from there.
21        Please be seated.  Thank you.
22        MR. PANATIER:  And, your Honor, just
23 by way of organization, I have a testimony binder.
24 Can I give this to your Honor?
25        THE COURT:  Yes, please.

Page 12

1        MR. PANATIER:  And there's already a
2 binder there and I've provided Counsel with a binder
3 of Dr. Hopkins's prior testimony.  And we'll be
4 tendering exhibits to Defense Counsel as they come.
5 Dr. Hopkins has an exhibit binder there.  And here
6 is...
7        THE COURT:  Thank you.
8        MR. PANATIER:  There may be more
9 volumes but we're going to start on Volume 1.
10 DIRECT EXAMINATION BY MR. PANATIER:
11     Q.    Good morning, everybody.
12        So please introduce yourself.
13     A.    John -- yes, John Hopkins.
14     Q.    Okay.  Now, you are here as the
15 corporate representative for Johnson & Johnson and
16 Johnson & Johnson Consumer, Inc., correct?
17     A.    Yes.
18     Q.    You don't work for us, we have not
19 paid you to come here and testify, correct?
20     A.    That is correct.
21     Q.    Alright.  You currently do not work
22 for Johnson & Johnson, correct?
23     A.    Correct.
24     Q.    You are a consultant?
25     A.    Correct.

Page 13

1     Q.    And the last year that you worked at
2 Johnson & Johnson was, approximately, 2000?
3     A.    Correct.
4     Q.    So, since 2000, you have been a
5 consultant, a paid consultant, right?
6     A.    Yes.
7     Q.    To Johnson & Johnson and its other
8 companies, right?
9     A.    To Johnson & Johnson, yes.
10     Q.    Well, here, for instance, you're
11 being paid by both Johnson & Johnson and Johnson &
12 Johnson Consumer, Inc., even though you might get
13 just one check; fair?
14     A.    Fair.
15     Q.    Okay, alright.  And what is the rate
16 that you are charging them per hour?
17     A.    My company bills my time at 300 US
18 per hour.
19     Q.    Now, you've said your company.
20        Your company is a company that you run with
21 your wife, correct?
22     A.    Yes, and we employ some people as
23 well, yes.
24     Q.    Alright.  How many people do you
25 employ?

4 (Pages 10 - 13)

Page 14

1    A.    Besides my wife and myself, there's
2 two full-time and one part-time.
3    Q.    So the two full-time are you and your
4 wife and one part-time?
5    A.    No.  Besides my wife and myself, two
6 full-time and one part-time.
7    Q.    That company is called Innova?
8    A.    Innovant Research Limited, yes.
9    Q.    Okay.  And that is the company that
10 then bills for your time and then pays you?
11    A.    Correct.
12    Q.    Okay.  So, even though you are not
13 currently an employee of Johnson & Johnson, you are
14 the face of Johnson & Johnson at this trial.  Do you
15 understand that?
16    A.    I am today, yes.
17    Q.    And do you understand that what you
18 say are the words of Johnson & Johnson, correct?
19    A.    Yes.
20    Q.    You have served in this capacity on,
21 can we say, numerous occasions now?
22    A.    Yes.
23    Q.    In fact, next week you're going to
24 Kentucky to do it again, correct?
25    A.    Yes.

Page 15

1    Q.    You've already testified this year
2 several times in the same capacity at trial; isn't
3 that true?
4    A.    Yes.
5    Q.    You have done it last year at trial
6 several times, correct?
7    A.    Yes.
8    Q.    And the year before?
9    A.    Yes.
10    Q.    Now, let's talk a little -- let's get
11 our bearings a little bit about Johnson & Johnson
12 and baby powder.
13        Now Johnson & Johnson started selling
14 baby powder in the 1800s, correct?
15    A.    18 -- 1894, as I recollect, yes.
16    Q.    In fact, they were giving it away in
17 maternity kits, right?
18    A.    Originally, no, it was sold where
19 they -- a large giant dis-bandage to take away an
20 irritation and then later it became a mom's product.
21    Q.    That's fine.
22        At some point early on they were putting the
23 Johnson's Baby Powder into maternity kits in
24 hospitals, correct?
25    A.    Yes.

Page 16

1    Q.    And they still sell -- they sell it
2 worldwide, correct?
3    A.    Yes.
4    Q.    Until about the early 1960s, the talc
5 that was used in Johnson & Johnson's Baby Powder was
6 Italian talc for the most part, right?
7    A.    Until around about '67, yes.
8    Q.    It was Italian?
9    A.    It was from a mine in Italy, yes.
10    Q.    The Val Chisone region, correct?
11    A.    The Fontana mine in the Val Chisone
12 region, a particular mine, yes.
13    Q.    Prior to 1967 or some time in the
14 '30s and '40s, they also used some domestic talcs
15 and California talc, correct?
16    A.    The only time it used domestic was
17 during the war when Nazi u-boats were sinking
18 shipments going from Italy.  That was around about
19 from 1941 to end of '45.  So there was that time
20 window when a domestic source was being used.
21    Q.    The Nazis were looking for the talc
22 boats and sinking the talc boats?
23    A.    The Nazis were sinking all boats.
24    Q.    Okay.  And they used California talc
25 during the '40s, correct?

Page 17

1    A.    That is my understanding.  A
2 particular -- I don't know which mine, but a
3 particular California talc was used during the war,
4 during World War II.
5    Q.    Does the Grantham mine, a mine sound
6 familiar to you?
7    A.    The Grantham mine was a mine that was
8 evaluated but never used by Johnson & Johnson in the
9 1970s.  I have no...
10    Q.    You don't believe Grantham was ever
11 used prior to --
12    A.    No.  There's no evidence whatsoever
13 that Grantham was ever used and it has ever been
14 used.  It was evaluated briefly during the early
15 1970s along with 50 other mines as an alternative
16 source of domestic talc.  None of those were ever
17 approved, including the Grantham mine.
18    Q.    Okay.  We'll come back to the '40s
19 then.  We don't have anybody who was exposed in the
20 '40s here, so we might just address it briefly.
21        After '67, Johnson & Johnson had
22 purchased a mine in Vermont, correct?
23    A.    They did, yes.
24    Q.    Well, they purchased it prior to
25 1967, right?

5 (Pages 14 - 17)

Page 18

1    A.    They did, yes.
2    Q.    And they ran --
3    A.    Three or four years before.
4    Q.    Okay. And they ran that mine through
5  a company called Windsor Minerals, right?
6    A.    The company that purchased the mine
7  was a subsidiary of Johnson & Johnson. It was
8  purchased, I think, around about 1964, Windsor
9  Minerals did. And it was not actually fully
10 approved and set in motion as a baby talc source
11 until the mid '60s, '67 and it was phased in and
12 Italian talc was phased out. But the company that
13 owned the mine was a subsidiary called Windsor
14 Minerals.
15   Q.    Right. And Johnson & Johnson used
16 the Vermont sourced talc for its -- all of its
17 domestic talc in the United States from,
18 approximately, 1967 or so until 2003; is that
19 correct?
20   A.    Correct.
21   Q.    Alright. Now, there was some overlap
22 with the Italian talc and the Vermont talc, correct?
23   A.    Yes. One was phased in and the other
24 was phased out during the 1967, '68 time frame.
25   Q.    Okay. In 1980 there was a mine

Page 19

1  strike in Vermont, correct?
2    A.    There was. And that was December
3  1980 and the mine was closed, so for about three
4  months until February '81.
5    Q.    Are you sure it wasn't --
6    A.    Sorry.
7    Q.    -- December 1979?
8    A.    Sorry. December 1979 there was a
9  mine strike which ran into -- from 1980, January,
10 February, it was sourced from Italy.
11   Q.    Right. And they went back to the
12 00000 Italian Val Chisone talc?
13   A.    Which is the same talc that they were
14 using in Europe at the same time, yes.
15   Q.    After 2003 all the talc that's been
16 sourced for Johnson's Baby Powder and Shower to
17 Shower sold here in the US is China, Guangxi,
18 correct?
19   A.    There is a mine in China, the Guangxi
20 mine, which is a, like a high grade cosmetic talc,
21 yes.
22   Q.    Johnson & Johnson owned the Vermont
23 mine until 1989 when it sold it to a company called
24 Cyprus, correct?
25   A.    Yes.

Page 20

1    Q.    And in 2012, we all know the Shower
2  to Shower product, that was sold by Johnson &
3  Johnson to a company called Valeant, right?
4    A.    It was, yes.
5    Q.    So Johnson & Johnson no longer owns
6  the Shower to Shower product line, right?
7    A.    Not since 2012, no.
8    Q.    It, obviously, still owns Johnson's
9  Baby Powder, correct?
10   A.    Yes.
11   Q.    Johnson & Johnson Corporate in New
12 Brunswick made all health and safety policy
13 decisions with regard to asbestos and talc products,
14 correct?
15   A.    The -- yes, the company in New Jersey
16 is the parent company for all the global companies
17 made those decisions, yes.
18   Q.    And testing results between Johnson &
19 Johnson and, for instance, Johnson & Johnson
20 Consumer, Inc., which I'm just going to call JJCI,
21 test results, health and safety information were
22 freely exchanged between those two companies,
23 correct?
24   A.    I've not seen any evidence that it
25 was not. So, I guess, the answer is going to be,

Page 21

1  yes. But I've not seen evidence that anything was
2  withheld.
3    Q.    Right. Because you wouldn't want
4  Johnson & Johnson getting health and safety
5  information that was important to the products being
6  made and sold by JJCI and not given to them,
7  correct?
8    A.    Correct, yes. Like I say, I've not
9  seen evidence that it was ever -- there was any ever
10 data withheld.
11   Q.    In fact, the evidence you've seen is
12 that any evidence -- any health and safety
13 information that Johnson & Johnson had was given to
14 JJCI and vice versa, correct?
15   A.    Yes.
16   Q.    Now, you have reviewed many thousands
17 of documents, correct?
18   A.    Yes.
19   Q.    And in this litigation, this talc
20 asbestos litigation, you have reviewed, I think,
21 you've told me, 10 to 15,000 documents?
22   A.    I guess it is, yes, yes.
23   Q.    Now, you know that Johnson & Johnson
24 has turned over around a million documents in this
25 litigation, correct?

6 (Pages 18 - 21)

Page 22

1    A.    So you tell me, yes.
2    Q.    Well, so my question is -- so I'm a
3 lawyer, right?  Well, presumably.
4    A.    I'll give you that.
5    Q.    Okay.  I don't work at Johnson &
6 Johnson as far as you know, do I?
7    A.    Correct.
8    Q.    The best person to tell us whether or
9 not you've looked at all the documents would be
10 Johnson & Johnson, right?
11    A.    Yes.
12    Q.    And that's you?
13    A.    Yes.
14    Q.    So have you looked at all their
15 documents?
16    A.    I've not looked at a million
17 documents.  I reckon I've looked at between 10 and
18 15,000, which from my understanding are pertinent to
19 the topic we're talking about today; in other words,
20 the documents that support the safety of talc.
21    Q.    Now, some of the questions we heard
22 last week of our experts were, they got the
23 documents from us, from the lawyers, okay.
24    Didn't you get the documents from the
25 Johnson & Johnson lawyers?

Page 23

1    A.    Not necessarily.  As part of my job
2 when I first joined the company in 1976, I met with
3 the then medical director, Dr. Semple, and he
4 regularly appraised me of the history because I was
5 the only toxicologist outside of the United States.
6 So I was responsible for Europe.  And he apprised me
7 of the recent history of talc, talc safety and talc
8 issues in the early '70s, late '60s, early '70s.
9 And we went through several binders of documentation
10 that Dr. Semple reviewed with me to get me up to
11 speed.  So not all of those, certainly, did not come
12 from the attorneys.
13    I was -- had a whole file of those in my
14 office in the UK, right back from the mid '70s.
15    Q.    So, if you will turn -- there is the,
16 I believe, the black notebook there.
17    A.    Uh-huh.
18    Q.    That one should have some of your
19 past testimony in it.
20    A.    Okay.
21    Q.    Okay.  If you would turn to the page
22 marked 2018-10-23.  So they're in date order from
23 earliest to latest and there is a deposition in
24 there that is 2018-10-23.
25    A.    It's in the middle, okay.

Page 24

1    Q.    Okay.  And if you can turn please,
2 sir, to Page 18.  Are you there?
3    A.    We have it, yes.
4    Q.    Alright.  On Line 6, starting on
5 Line 6 you were asked this.  "In the year and a half
6 since I first -- or not year and a half.  In the
7 13 months since I first deposed you in August of
8 2017, do you know whether you've looked at all the
9 documents?"
10    Your answer was, "Since 2017 I've looked at
11 many many thousands of documents, many binders, each
12 four or five inches thick.
13    Okay.  And you continue.
14    I've certainly gone through many, many
15 thousands of documents.  I've looked -- have I
16 looked at every one?  I don't know.  But I've looked
17 at every one that was provided to and by the
18 attorneys which were considered relevant to the
19 cases in question."
20    My follow-up question, "Well, just a
21 minute ago you said 'hundreds'; is it thousands?
22    Answer: It's many thousands.  I can see in
23 my office several binders.  Each may be four inches
24 thick and there are many of those.  So it must run
25 into the thousands, yes."

Page 25

1    And my last question there.  "Did you
2 receive the binders there from the Johnson & Johnson
3 lawyers?
4    Answer: Yes."
5    Was that all read correctly?
6    A.    Yes.  One does not exclude the other.
7    Q.    Let me ask you this question.
8    As the person who is the embodiment of
9 Johnson & Johnson here and as the person who has
10 done this numerous times over the past couple of
11 years, do you have freedom to go through Johnson &
12 Johnson's database to look at the documents?
13    A.    Yes.
14    Q.    Okay.  And how often have you done
15 that?
16    A.    Very simply, let's look at this in
17 the --
18    Q.    Can you answer the question?  How
19 often have you done that?
20    MS. SULLIVAN:  Your Honor, I'm going
21 to object to interrupting the witness in the middle
22 of an answer.
23    THE COURT:  You can answer the
24 question, Dr. Hopkins.
25    THE WITNESS:  I will, your Honor,

7 (Pages 22 - 25)

Page 26

1  yes.
2      A.    I have not had the occasion to
3  because I have many thousands of documents which
4  together provide me with the data that I need to
5  answer any question you may have.
6      Q.    Do you -- I'm sorry, did you say that
7  the "many thousand of documents" you looked at have
8  given you the information to answer all the
9  questions I might have?
10     A.    That is my understanding, yes.  I'm
11 not aware --
12     Q.    How do you know that?
13     A.    Because the documentation I have is a
14 very complex and full record and story that tells
15 that the story of the evaluation of talc, all the
16 various experts who are looking at it, the
17 correspondence with the Food and Drug Administration
18 here in the United States.
19     I have a -- I have binders and binders of
20 these in my office in the UK.  I don't think there's
21 any more that I don't have.
22     Q.    Okay.  Do you even know whether you
23 looked at 1 percent of all the documents that have
24 been turned over by Johnson & Johnson in this
25 litigation?

Page 27

1      A.    I believe I've looked at -- I say
2  between 10 and 15,000, which I don't know what
3  percent that is, because I don't know whether that
4  million that you talk about are even relevant.  They
5  may be comments from someone.  I visited someone
6  last week and this is what we talked about.  I don't
7  know that's relevant.  That could be part of the
8  million.
9          What I am saying is that the 10 to
10 15,000 that I've looked at provide me with the
11 evidence to say this product is safe and I can
12 answer any question you may have.
13     Q.    Well, first of all, 10,000 documents
14 would be 1 percent of a million, right?
15     A.    Yeah.
16     Q.    Okay.  And how can you know whether
17 or not the other 990,000 documents are relevant, if
18 you haven't looked at them?
19     A.    Well, like I say, if you have a
20 situation where you've got the information, I have
21 the information.  Getting duplicates or replicates
22 of the same ones from -- where three or four people
23 or five or six people are copied in, do I get all of
24 their individual copies?  If one suffices.  Because
25 that's very often the case, that you send a document

Page 28

1  and there about six or eight people copied in on it.
2          Did I get each of those six or eight
3  people's?  No, I got one copy and that was identical
4  no doubt to each of the copies that the other six or
5  eight people got.
6          So we look in a scenario where many
7  of those 990,000 or whatever it may be are totally
8  redundant.  They're duplicates.
9      Q.    If you haven't looked at them, how
10 can you testify to this jury that they're
11 "duplicates"?
12     A.    What I can say is that if you look at
13 any of those documents in here, you will see that
14 there's half a dozen, six, eight, ten different
15 people copied in on the same document.  Each of
16 those people will have had their own file and that
17 can well be part of your million documents.
18     What I'm saying is that the 10 or 15,000
19 that I have reviewed provides me with enough
20 information to answer any question you may have.
21     Q.    I'm sure there are some duplicates.
22 You and I have probably looked at duplicates before,
23 right?
24     A.    Yeah.  There's often ten people
25 copied in on the same document.

Page 29

1      Q.    Is it your testimony here under oath
2  that the other 990,000 documents are all duplicates
3  of the first 10,000?
4      A.    The answer is, I do not know.  What I
5  have told you is of the 10 or 15,000 --
6          MR. PANATIER:  Your Honor, I'm just
7  going to object to nonresponse.  He answered but he
8  did not --
9          MS. SULLIVAN:  Your Honor, I'm going
10 to object to the objection, to the interruption.
11 Also, this has been covered.
12         THE COURT:  Let's move on.  Thank
13 you.
14 BY MR. PANATIER:
15     Q.    Let me ask you this question.
16     Has Johnson & Johnson put all of those
17 documents on-line for the public to see?
18     A.    I don't know.
19     Q.    You don't know?
20     A.    I mean, you have documents that
21 are -- many are attorney/client privileged, you'll
22 have copies of those.  If you've been given a
23 million documents, then you have those.  And they're
24 between you and the company.
25     Q.    So you don't know if the documents

8 (Pages 26 - 29)

Page 30

1 have been put on-line by Johnson & Johnson's for all
2 people to see?
3     A.    I don't know whether they have or
4 whether they have not. What I can say is that I
5 have read probably between 10 and 15,000, which are
6 pertinent to the topic we're talking about. Whether
7 the other --
8     Q.    I'm not asking you about that
9 anymore. Now I'm asking you about something
10 specific.
11        You don't know whether or not Johnson
12 & Johnson has put those documents on-line for all to
13 see, do you?
14     A.    No.
15     Q.    Because we have heard that -- you
16 know Ms. Sullivan, right, correct?
17     A.    Yes, I know Ms. Sullivan.
18     Q.    Ms. Sullivan has put you on the stand
19 before, correct?
20     A.    Yes.
21     Q.    Did Ms. Sullivan tell you that she
22 told this jury that Johnson & Johnson's documents
23 were free for all to see on-line? Did you even know
24 that that existed?
25     A.    No.

Page 31

1     Q.    To the extent that it does, can you
2 tell us when they put them on-line?
3     A.    Well, like I say, you're telling me
4 or asking me something that I do not have knowledge
5 of. So I cannot answer that question.
6     Q.    Johnson & Johnson had a big medical
7 library, right?
8     A.    They had a library, yes, certainly,
9 when I was working there.
10     Q.    They had subscriptions to journals
11 like Journal of the American Medical Association,
12 right?
13     A.    We did, yes.
14     Q.    New England Journal of Medicine
15 right?
16     A.    Uh-huh, yep.
17     Q.    The Lancet --
18     A.    Yes.
19     Q.    -- right?
20        The New York Academy of Sciences, correct?
21     A.    Probably, yes. I can't remember that
22 one but, yes.
23     Q.    And I'll tell you for most of these,
24 if you want to see your testimony, I've asked you
25 these questions before.

Page 32

1     A.    You have, yes. You have, yeah.
2     Q.    And Johnson & Johnson was aware of
3 asbestos disease going back to the turn of the last
4 century, correct?
5     A.    When you say, "Johnson & Johnson,"
6 there are no doubt people in the medical department
7 who got a medical training or a toxicology training
8 who worked in the medical department who would have
9 knowledge of asbestos toxicology --
10     Q.    Sure. And Johnson & Johnson --
11     A.    -- whenever -- worldwide.
12     Q.    Yes. And Johnson & Johnson was aware
13 that in the 1930s, asbestos was associated with
14 cancer, correct?
15     A.    I'm sure there were individuals in
16 the medical department who would have that knowledge
17 as part of their medical training.
18     Q.    And you've testified before, sir,
19 that the knowledge of asbestos inhalation as a cause
20 of lung cancer and mesothelioma was known way before
21 1968, correct?
22     A.    Yeah, as a toxicologist, you're
23 taught that people who worked in World War I and gas
24 mask manufacturing, it was not a healthy profession.
25     Q.    Okay. But it wasn't just "gas

Page 33

1 masks," was it?
2     A.    Well, that was -- I gave that as one
3 example of why people are aware that asbestos is not
4 a healthy material.
5     Q.    Johnson & Johnson being already a
6 large company in the 1960s was well aware of the
7 hazard of asbestos, correct?
8     A.    I'm sure that there were one or two
9 medically qualified individuals, as we said, in the
10 medical department who would have had that
11 knowledge. Johnson & Johnson has not been in the
12 asbestos business, so it would not be widely
13 disseminated throughout the whole company.
14     Q.    Well, Johnson & Johnson has patented
15 asbestos containing products, correct?
16     A.    An individual has patented, I
17 believe, it was an ironing board cover, which was --
18 -- yeah, or something like that, but it was not part
19 -- it was never sold. The company has not sold
20 asbestos products.
21     Q.    You and I have gone through about
22 four patents that Johnson & Johnson patented
23 asbestos-containing products before, have we not?
24     A.    We have and there were people in the
25 surgical dressings division who were looking at

9 (Pages 30 - 33)

Page 34

1 asbestos materials as heat resistant, yes.
2     Q.    Now, let's talk about baby powder.
3     Johnson & Johnson understands -- first of
4 all, talc is a mineral, is it not?
5     A.    Talc is a mineral.  It's mined out
6 the ground, yes.
7     Q.    Correct.  And Johnson & Johnson,
8 actually, had their own mine and they mine and they
9 mined it out of the ground, correct?
10     A.    They did, yes.
11     Q.    Okay.  Baby powder, when it is used
12 on a baby, okay, that baby will inhale some of that
13 talc, correct?
14     A.    It's theoretically possible.  If you
15 put the powder on your hand and run it on baby's
16 bottom, it's theoretically possible.
17     Q.    Will you turn please, sir, to the tab
18 that is 2017, 8/15.  It should be the first tab.
19          Because, sir, it's not
20 "theoretically possible," right, it happens,
21 correct?
22     A.    Show me where you're referring.
23     Q.    Page 66.
24          MS. SULLIVAN:  I'm sorry, which page?
25          MR. PANATIER:  I'm sorry, hold on one

Page 35

1 second.
2 BY MR. PANATIER:
3     Q.    It is going to be Page 67, sorry,
4 bottom of the page, Line 25.
5     A.    Sorry.  Would you give me the
6 reference again?
7     Q.    Yes, sir.
8     A.    2017...
9     Q.    This is 2017, 8/15, August 15, 2017.
10 That's when I came to London to take your
11 deposition.  Do you remember that?
12     A.    Yes.  So Page 60...
13     Q.    Seven.
14     A.    We have that, yes.
15     Q.    Okay.  Down at Line 25.  Sir --
16 sorry, have you found it?
17     A.    Yes.
18     Q.    "Sir, Johnson & Johnson has
19 understood for decades that when talc powder is used
20 on an infant or a child, they will inhale some of
21 the talc into their lungs?"
22          Your answer, "there is always the
23 possibility when talc is used, we will inhale talc."
24          My question, "and it's not really a
25 possibility, right?"

Page 36

1          Your answer, "Yes."
2          "I mean, it happens?"
3          Your answer, "It happens, yes."
4          Do you still agree with your prior
5 testimony?
6     A.    Yes, that's what I said.  It's a
7 possibility.
8     Q.    By the way, that was the Herford
9 case, right?
10     A.    Yeah, probably.
11     Q.    If you could just look at the cover
12 page.
13     A.    Yes.
14     Q.    Sir --
15     A.    Yes.
16     Q.    -- baby powder is an extremely dusty
17 product, correct?
18     A.    I disagree.  It's not "dusty."  You
19 put it on your hands, it spreads all over your skin.
20 It doesn't -- you're not getting clouds of dust.
21     Q.    So, for any of us who have done this
22 with a squeeze, that squeezing motion --
23     A.    You're not meant to do that.  You're
24 meant to put it on your hand and spread it on the
25 kin.

Page 37

1     Q.    Oh, does the bottle say, don't
2 squeeze it?
3     A.    The bottle tells you how to use it.
4 The bottle tells you to put it on your hands and
5 spread it over baby's -- baby's bottom and legs.
6     Q.    So, for any of us who might have seen
7 dust come out, were we hallucinating?
8          MS. SULLIVAN:  Objection, your Honor,
9 argument, lawyer argument.
10          THE COURT:  Please rephrase.
11 And no speaking objections, thank you.
12 BY MR. PANATIER:
13     Q.    Sir -- sir, are you saying -- let's
14 go back to the initial question.  We're in 2017.
15 You said, yes, a child will inhale some of the talc,
16 right?
17     A.    Yes.
18     Q.    Do you still agree with that?
19     A.    We breathe in dust from the
20 atmosphere in this room.  Whether it's talc or
21 whatever, we can still inhale.  We inhale.  We
22 exhale.  That's what we do.
23     Q.    I'm not talking about dust in this
24 room.  I'm talking about Johnson's Baby Powder,
25 right?

10 (Pages 34 - 37)

Page 38

1     A.     Yes.
2     Q.     Okay.  So let's stick to the product
3  that your company made.
4          When a parent or a sibling or
5  somebody in the family powders a child, a baby from
6  birth until whenever they're diaper trained,
7  diaper -- potty trained or out of diapers whether
8  it's age two or three or whatever, whenever they are
9  powdered, they breathe in some of that talc, do they
10  not, sir?
11     A.     We all do, yes.
12     Q.     The baby does?
13     A.     The baby does, adults do, yes.
14     Q.     Anybody who is powdered with
15  Johnson's Baby Powder, especially, as a child, is
16  going to breathe in some of that dust, are they not?
17     A.     Yeah, we breathe in, we breathe out,
18  yes.
19     Q.     Alright.  Johnson & Johnson
20  understood that it would be very, very bad for
21  business and J&J's representation if it ever came
22  out that baby powder or any of its talc products
23  ever contained asbestos, correct?
24     A.     If the baby powder did contain
25  asbestos, it would be bad for business, if it did,

Page 39

1  yes.
2     Q.     Now, it's still your testimony here
3  almost two years after I first took your deposition
4  that there has never been any asbestos in Johnson's
5  Baby Powder, right?
6     A.     Not in the baby powder that's sold,
7  no, no.
8     Q.     Was it in the baby powder that wasn't
9  sold?
10     A.     No, not in the baby powder, no.
11     Q.     Okay.  Sir, isn't it true that
12  Johnson & Johnson knows that baby powder shouldn't
13  be used on children at all?
14     A.     I don't agree with that.
15     Q.     Now, Johnson & Johnson owns a website
16  called BabyCenter.com, right?
17     A.     There is a website which is not --
18  it's not -- the web -- the web -- the link and the
19  web domain name is owned by Johnson & Johnson.
20     Q.     Johnson & Johnson owns and runs
21  BabyCenter.com, right?
22     A.     It does not run it.  It is -- it's
23  run by a separate independent group.  It's not part
24  of Johnson & Johnson.  They own the domain name, but
25  they have no --

Page 40

1     Q.     Do you remember that in October of
2  2018 you and I went through a series of documents
3  about Baby Center where Johnson & Johnson was,
4  actually, talking about posting content on
5  BabyCenter.com?  Do you remember that?
6     A.     No, you'd need to remind me.  What
7  I've said, I believe in 2018, was that Johnson &
8  Johnson doesn't have the responsibility for the text
9  that goes on to that domain name.
10     Q.     Johnson & Johnson owns it, right?
11     A.     They own the domain name, but not the
12  content.  The content is written by people who are
13  not part of Johnson & Johnson.
14     Q.     Right.  And you and I talked about
15  this?
16     A.     We did.  And I tried to make that
17  clear.  It is -- what goes on to that website is not
18  the responsibility of Johnson & Johnson.  It's done
19  by outside group.
20     Q.     Johnson & Johnson owns and controls
21  the website, correct?
22     A.     They own the domain name.  They do
23  not control what goes onto that website.
24     Q.     They own it but they have no control
25  on what goes on the website?

Page 41

1     A.     Sounds crazy.  That's my
2  understanding, that they own the domain name but
3  they do not control what goes onto the website.
4     Q.     I agree with you, it does sound
5  crazy.  Because you're saying --
6          MS. SULLIVAN:  Objection, your Honor,
7  lawyer argument.
8          MR. PANATIER:  It does sound crazy.
9          THE COURT:  Objection sustained.
10          No speaking objections.  That's the
11  second time.
12  BY MR. PANATIER:
13     Q.     Dr. Hopkins, your testimony to this
14  jury is that Johnson & Johnson -- by the way, this
15  is a huge company, right, everybody knows that?
16     A.     Yes.
17     Q.     Okay.  That Johnson & Johnson owns a
18  website domain name and they conceded all control of
19  that domain name to somebody else; is that correct?
20     A.     I've not seen the terms of the
21  agreement.  But what I do know is that the content
22  of what is written on that website is not approved
23  or disapproved by Johnson & Johnson.  They don't
24  take responsibility for what is written on that
25  website.

11 (Pages 38 - 41)

Page 42

1    Q.    Let's take a look at BabyCenter.com.
2          MS. SULLIVAN:  Your Honor, based on
3  the testimony, objection as to hearsay.
4          THE COURT:  I'm going to allow him to
5  try to establish foundation for it.
6          Go ahead.
7          MR. PANATIER:  We'll get the
8  document.  We'll move ahead and do that.
9          THE COURT:  Okay.
10  BY MR. PANATIER:
11    Q.    We'll come back to Baby Center, okay.
12          We can bookmark this with this
13  question.
14          Johnson & Johnson, certainly, doesn't
15  put on its baby powder or any of its talc a warning
16  that says, this may contain asbestos, does it?
17    A.    No, it doesn't.
18    Q.    It doesn't put a warning on it that
19  says, do not use on babies?
20    A.    No, it doesn't.
21    Q.    Right.  Because it's, specifically,
22  marketed for babies, right?
23    A.    Yes.
24    Q.    Johnson & Johnson has always stated
25  that it has a zero tolerance policy for asbestos,

Page 43

1  correct?
2    A.    Yes.
3    Q.    And Johnson & Johnson has always told
4  the public that there's never been a single fiber of
5  asbestos in any of its talc for Johnson's Baby
6  Powder or Shower to Shower, correct?
7    A.    Yes.
8    Q.    It told that to customers, nurses,
9  doctors and regulators and hospitals, correct?
10    A.    Yes.
11    Q.    Johnson & Johnson has stated that
12  there should never ever ever be asbestos in baby
13  powder, not a single fiber, zero, correct?
14    A.    I can't remember the exact
15  phraseology, but the principle is the same.  I'll
16  agree with the principle, correct.
17    Q.    Well, okay.  And just to separate
18  that out, Johnson & Johnson agrees today now in 2019
19  that baby powder should never have any asbestos in
20  it, correct?
21    A.    Yes.
22    Q.    That means zero asbestos, correct?
23    A.    Yeah, it's non-detected.  You can't
24  find it.  There's none there, yes.
25    Q.    We're going to get into what

Page 44

1  "non-detect" means.
2          MS. SULLIVAN:  Objection, your Honor.
3          THE COURT:  Overruled.
4    Q.    There shouldn't be any asbestos in
5  baby powder, period, correct?
6    A.    Yes.
7    Q.    It should be asbestos-free, correct?
8    A.    Yes.
9    Q.    "Asbestos-free" means zero, correct?
10    A.    Yes.
11    Q.    As you have said before, any amount
12  of tremolite in the form of asbestos, quote, "those
13  needles," like you say, any amount is not allowed,
14  correct?
15    A.    Tremolite -- I know what I said.
16  Tremolite asbestos is not allowed.  Tremolite is a
17  relatively harmless mineral in its block or rock
18  form.
19    Q.    You have stated before that asbestos
20  in the form of needles such as tremolite shouldn't
21  be in the baby powder?
22    A.    Asbestos should not be in baby
23  powder.  Tremolite can occur -- most tremolite
24  occurs in the form of a nonasbestos form or rod
25  form.

Page 45

1    Q.    Has Johnson & Johnson always
2  internally believed in a zero tolerance policy for
3  asbestos?
4    A.    That is my understanding, yes.
5    Q.    You agree any asbestos in baby powder
6  is too much?
7    A.    Yeah, that's what we just said, yes.
8    Q.    The reason is that no mother or
9  father would ever buy any baby powder if it even had
10  one fiber of asbestos in it, correct?
11    A.    Well, you're asking me to speculate.
12  But if the product had asbestos in it, I wouldn't
13  buy it.
14    Q.    Right.
15          And Johnson & Johnson's expectation
16  would be that no one else would buy it either,
17  right?
18    A.    Well, it's speculative, but it's a
19  reasonable speculation.
20    Q.    And Johnson & Johnson knows that
21  asbestos in its talc could make people sick because
22  Johnson & Johnson knows that asbestos is a
23  carcinogen and causes mesothelioma, correct?
24    A.    Several questions there.
25          Asbestos causes -- can cause

12 (Pages 42 - 45)

Page 46

1 mesothelioma, correct, yes.
2    Q.    Well, let's just go to -- go to
3 8/15/17, it's the first one, Page 33.
4         MS. SULLIVAN:  What line, Counsel?
5         MR. PANATIER:  Give me a second.
6 BY MR. PANATIER:
7    Q.    Okay.  First of all, Johnson &
8 Johnson agrees asbestos is a carcinogen, correct?
9    A.    Yes.
10    Q.    And Johnson & Johnson agrees that no
11 carcinogen should be contained in the Johnson's Baby
12 Powder, correct?
13    A.    Yes.
14    Q.    Okay.  Go to 4/11/2018 on Page 108.
15 Are you there?
16    A.    Yes.
17    Q.    Okay.  On Line 18, you were asked
18 this question.
19         MS. SULLIVAN:  Objection, your Honor,
20 in terms of the procedure.  This is not (INAUDIBLE).
21 I'm not sure --
22         MR. PANATIER:  It is.
23         THE COURT:  Sidebar.
24         (Sidebar.)
25         THE COURT:  Okay.  Page, what are

Page 47

1 we --
2         MR. PANATIER:  108, Line 18 through
3 22.  This is the exact question I asked him before
4 and he didn't answer.  He said, I agree it's a
5 carcinogen, but that's not the question.  He said, I
6 agree it's a carcinogen --
7         THE COURT:  Well, this time the same
8 question.  You said it's a compound question.  So
9 I'll allow it.  Go ahead.
10         MR. PANATIER:  Thank you, your Honor.
11         MS. SULLIVAN:  Thank you.
12         (Sidebar ends.)
13 BY MR. PANATIER:
14    Q.    Doctor, you were asked this question,
15 "Johnson & Johnson knows that asbestos in its talc
16 could make people sick because Johnson & Johnson
17 knows asbestos is a carcinogen and can cause
18 mesothelioma?"
19         And what was your answer?
20    A.    What page are you on, again?
21    Q.    Same Page, 108.
22    A.    108.  Beg your pardon, I was on a
23 different page.
24    Q.    Line 18 through 22.  Your answer was,
25 "That is correct."

Page 48

1    A.    Yeah.  That's what I said five
2 minutes ago.
3    Q.    You said -- when I asked you the
4 question, you said, yes, asbestos is a carcinogen.
5 This was a slightly different question, but we can
6 move on.
7         Johnson & Johnson knows there is no safe
8 level of asbestos exposure, correct?
9    A.    Scientists have not shown a safe
10 level.  So, yeah, I would not disagree.
11    Q.    There is no known safe level of
12 asbestos exposure, especially, for children,
13 correct?
14    A.    Again, same answer.  There's no -- no
15 evidence to say otherwise, so we'll assume it's
16 correct.
17    Q.    Well, in fact, your answer, if you
18 could go right below on Page 108, you were asked
19 this question.  "Okay, and Johnson & Johnson knows
20 there's no safe level of asbestos exposure,
21 especially for children, correct, sir?"
22         And your answer was again, "There is
23 no known safe level," correct?
24    A.    Yes.  That's what I said.
25    Q.    And then the followup question was,

Page 49

1 "That's right, especially, for children, correct?"
2         And you said, "yes," correct?
3    A.    That's right.  That's what I agree,
4 yeah.
5    Q.    Alright.  Johnson & Johnson
6 understands that if you had just 1 percent by weight
7 of asbestos in a four-ounce bottle of the Johnson's
8 Baby Powder, you don't know if it would be trillions
9 or millions or billions of fibers, but it would be a
10 very large number, correct?
11    A.    Yes.
12    Q.    In eight ounces of Johnson's Baby
13 Powder there would be tens to hundreds of trillions
14 of particles, correct?
15    A.    I don't think anyone has ever counted
16 them.  But you could estimate that would be many,
17 many trillions, yes.
18    Q.    Okay.  And we can look at your
19 testimony from 2017 --
20    A.    Yeah.
21    Q.    -- but, I believe, you said there
22 could be tens to hundreds of trillions of particles?
23    A.    Yes.
24    Q.    Okay.  And if we just wanted to get
25 an understanding of what that would mean in terms of

13 (Pages 46 - 49)

Page 50

1  how much asbestos was present, you and I did this
2  calculation.
3      If you had .00001 percent chrysotile and
4  there are only a trillion particles in the whole
5  bottle, not tens or hundreds, you would still have
6  10 million fibers per container, correct?
7      A.   That's the math, yes.
8      Q.   Okay.  Alright.  Do you know whether
9  or not Johnson & Johnson has put together an
10 official good rocks, bad rocks company policy?
11     A.   I've not seen any such company
12 policy.  The company policy is very clear on the
13 quality of talc and what specification a talc must
14 meet, absence of asbestos minerals.
15     Q.   Is there a good rocks, bad rocks list
16 that they keep?
17     A.   I've not seen such a document that's
18 kept.
19     Q.   Alright.  So Johnson & Johnson
20 understood, of course, that not only would parents
21 be diapering their children, but that siblings would
22 help out, too, correct?
23     A.   Well, that's speculation.  I don't
24 ever recollect my kids diapering their younger
25 brothers and sisters, but maybe some people do.

Page 51

1      Q.   If you would turn please, sir, to --
2  in the exhibit binder there, it should be
3  chronological and you should be looking for a
4  document that is -- the tab should say "1955" on it.
5  And you've already turned one tab, sir, so you might
6  be missing it.  Is that it?
7      A.   Yes.
8      Q.   1955, February 22nd?
9      A.   Yeah.  Yeah.
10     Q.   Okay.  Do you see that that is a
11 document dated February 22, 1955 on Johnson &
12 Johnson letterhead?
13     A.   It is.
14     Q.   Okay.
15          MR. PANATIER:  Your Honor, I offer
16 this into evidence as Plaintiffs Exhibit 3695-8.
17          MS. SULLIVAN:  Your Honor, just a
18 second, please.
19     A.   Okay.
20          THE COURT:  Hold on.
21          MS. SULLIVAN:  No objection, your
22 Honor.
23          THE COURT:  So admitted.
24          (Plaintiff's Exhibit 3695-8 was moved
25     into evidence.)

Page 52

1          THE COURT:  You may proceed.
2  BY MR. PANATIER:
3      Q.   Dr. Hopkins, do you see this document
4  from 1955 where -- let me zoom in on this a little
5  bit.  It's from W.B. Birchfield.  "You recently
6  asked Mr. Quackenboss" -- that's a name -- "what we
7  were doing along the lines of providing educational
8  material to clinics conducting new mother classes.
9  In addition to rather extensive use of our bathing
10 time for baby film, we have been providing
11 quantities of a special occasional chart, a sample
12 of which is attached.  This chart was first produced
13 in early 1954 and has been reprinted several times.
14 It is authentic and has enjoyed wide acceptance,
15 okay."
16      So have you seen this now?
17     A.   Yes.
18     Q.   Okay.  Now, do you know when, for
19 instance, do you know when Mr. Etheridge was born,
20 David Ethridge?
21     A.   I don't.
22     Q.   Do you know who that is?
23     A.   I believe it's one of the -- your
24 Plaintiffs.
25     Q.   Right.

Page 53

1      A.   Clients, yes.
2      Q.   And you understand he has
3  mesothelioma?
4      A.   I do, yes.
5      Q.   Do you know when his sister started
6  powdering him?
7      A.   I do not.
8      Q.   So let's take a peak at one of these
9  brochures.  You can see that they have a "How a Baby
10 Grows" brochure.  Do you see that?
11     A.   I do, yes.
12     Q.   And then if you turn the page,
13 there's this document "How to Bathe a Baby."  Do you
14 see that?
15     A.   Yes.
16     Q.   We can zoom in a little bit on it.
17 And you see it looks like a mother and older
18 daughter, right?
19     A.   Yeah, it looks 17, 18, yeah, yeah.
20     Q.   Well, look just right here.  "A
21 visual chart for students who have baby brothers and
22 sisters at home or who serve as mother's helper or
23 babysitters or for those who are studying childcare
24 or may soon start families of their own."
25      So Johnson & Johnson certainly

14 (Pages 50 - 53)

Page 54

1 understood that brothers and sisters might be
2 helping out mom, right?  Right, I mean, this is --
3       A.    Well, it talks -- it talks about
4 those who are about to start families of their own
5 so -- yeah.
6       Q.    Well, that's the last part.
7       A.    But the photograph you're hiding
8 there is just -- if you can move it along, the jury
9 can see it, is a girl who is maybe an older brother
10 or older sister, but she looks about 16, 17.
11      Q.    Okay.  Well, I'm not an expert in
12 dating people.
13            But what it says is that it's a
14 visual chart for students who have baby brothers and
15 sisters at home, does it not?
16      A.    Yes, for students, yeah.
17      Q.    Or who serve as mother's helpers or
18 babysitters or for those who are studying childcare,
19 right?
20      A.    Yes.
21      Q.    It's not just for students, it's for
22 brothers and sisters as well as, correct?
23      A.    Those who are studying childcare,
24 yes.
25      Q.    Okay.

Page 55

1       A.    Like I say, the picture typifies a
2 typical teenager who's maybe learning not baby care,
3 childcare.
4       Q.    Sure.  And she's got a bottle of
5 something in her hand, right?
6       A.    Yes.
7       Q.    Okay.  Let's go over to this little
8 square up at the top.  You see, "place bath needs
9 within reach," and you see the fourth one to the
10 last is "baby powder," right?
11      A.    Yes, uh-huh.
12      Q.    And then if we go down to the
13 bottom -- I turned up the brightness on this thing.
14 Let me see if I can.  There we go.  There we go.
15            And do you see where it says,
16 "Sprinkle baby powder on cotton ball, pat lightly
17 over large areas of body," right?
18      A.    Yes.
19      Q.    So, as of 1955, Johnson & Johnson
20 understands that brothers and sisters are going to
21 help out diapering, bathing the children, correct?
22      A.    Well, as you say, in the very first
23 paragraph, it talks about students, people who were
24 going into childcare or child baby care management
25 who could well be brothers and sisters.

Page 56

1       Q.    Okay.  Because I just want to be
2 clear.  The word "brothers and sisters" is on this
3 document, right?
4       A.    Yes.
5       Q.    Okay.  So it wouldn't be speculation
6 to say that brothers and sisters would help out at
7 home because Johnson & Johnson published a document
8 called "How to Bathe a Baby" that deals,
9 specifically, with brothers and sisters helping out
10 at home, right?
11      A.    Yeah.  On the picture they show a
12 girl who looks like 17.
13      Q.    Is Johnson & Johnson saying there's a
14 cutoff age?
15      A.    No.  The picture they show and that
16 they talk about students and childcare, it is of
17 that age.  They are not saying here's, you know,
18 here's something for a four-year old, go and bathe
19 or diaper your two-year old brother.  It's a picture
20 of a girl who is in her teens and they talk about
21 students getting into childcare.
22      Q.    They talk about a number of different
23 scenarios, right?
24      A.    But the theme here is about older
25 children.

Page 57

1       Q.    Does it say "older children"?
2       A.    Well, the picture is clearly one of a
3 17-year-old, 16 or 17-year-old.
4       Q.    How old was Linda Etheridge when she
5 started powdering David Etheridge?
6       A.    I don't know.
7       Q.    Have you read any of the depositions
8 of the actual people that are involved in this case?
9            MS. SULLIVAN:  Objection to the form.
10 Sorry.
11            THE COURT:  Overruled.
12            You can answer.
13 BY MR. PANATIER:
14      Q.    Have you read any of the depositions
15 of Mr. Etheridge, his sister, have you read those?
16      A.    No.
17      Q.    What about -- what about the
18 Ronnings?
19      A.    No.
20      Q.    How about the Bardens?
21      A.    No.
22      Q.    What about the D'Angela McNeill and
23 her brother and her mother?
24      A.    No.
25      Q.    If you'll turn to -- it should be --

15 (Pages 54 - 57)

Page 58

1  here you go, 2003, which I think is in Binder 4.
2  I'll bring you Binder 4.
3         MR. PANATIER:  And, your Honor, I'll
4  bring you Binder 4 as well.  There it is, your
5  Honor.
6         THE COURT:  Thank you, very much.
7         MR. PANATIER:  Sure.
8  BY MR. PANATIER:
9     Q.    Do you need help finding that one?
10    A.    2003?
11    Q.    2003.
12    A.    Yes.
13    Q.    That's all it says.  That's it right
14  there.  That's it right there.
15    Sir, do you see that this is a
16  presentation, "reactive usage for oil and powder of
17  Johnson's Baby Powder, a beauty essential"?  Do you
18  see that?
19    A.    Yes.
20    Q.    Let me ask you this.
21    Johnson & Johnson understood that people
22  would also sprinkle baby powder on the sheets of
23  their bed, correct?
24    A.    That's what -- yeah, I've heard that.
25  I've never heard of anyone doing it but, yeah.

Page 59

1     Q.    Do you know whether or not D'Angela
2  McNeill did it?
3     A.    I don't, no.
4     Q.    So go ahead and turn --
5         MR. PANATIER:  Oh, your Honor, this
6  is Exhibit 3695-15.  And we offer it into evidence.
7         MS. SULLIVAN:  No objection.
8         THE COURT:  I'm sorry?
9         MS. SULLIVAN:  No objection, your
10  Honor.
11         THE COURT:  So admitted.
12         (Plaintiff's Exhibit 3695-15 was
13  moved   into evidence.)
14     Q.    If you will turn to the last page,
15  sir.  It says, "reactive usage for oil and powder
16  alternative uses for Johnson's powder."
17         THE COURT:  Counsel, the word is not
18  "reactive."
19         MS. SULLIVAN:  I apologize, your
20  Honor.  I didn't realize this is not a J&J document.
21         MR. PANATIER:  Oh, I'm sorry,
22  "reactivate."
23         MS. SULLIVAN:  I do object --
24         THE COURT:  Hold on.
25         MS. SULLIVAN:  -- this is not a J&J

Page 60

1  document.
2         THE COURT:  Okay.  Sidebar.
3         (Sidebar.)
4         MS. SULLIVAN:  Your Honor, I object
5  on hearsay.  It's from a public relations firm.  It
6  doesn't have a J&J Bates number on it.  The
7  changeovers --
8         MR. PANATIER:  The native Power
9  Points when they produced them natively, so this is
10  the actual file.
11         THE COURT:  Wait.  What do you mean
12  by "native"?
13         MR. PANATIER:  So they produce
14  documents in two ways.  One is like when you've seen
15  a document like the previous one where they put a
16  Bates Stamp on it.  "Native" means instead of
17  producing a printout, they produced the actual Power
18  Point and the file has the Bates Stamp that was
19  produced by Johnson & Johnson in this case.  Counsel
20  knows that.  It is a Johnson & Johnson document.
21         MS. SULLIVAN:  It's a public
22  relations worldwide document.  I object on hearsay.
23         MR. PANATIER:  They have documents
24  that they have produced by third parties all the
25  time.  The documents are full of those.  This is a

Page 61

1  Johnson & Johnson document.  If Counsel is making a
2  representation that it's not Johnson & Johnson --
3         MS. SULLIVAN:  I'm not saying -- if
4  you're representing we produced it, I have no
5  evidence to dispute it, except I don't see a Bates
6  number.  But it's clearly not their document.
7         MR. PANATIER:  They contract with
8  third parties all the time to produce information
9  for them.  That's what this is.
10         THE COURT:  Okay.  I just need -- if
11  Counsel is asserting that this was not produced by
12  Johnson & Johnson, I just need the authentication
13         MR. PANATIER:  I'll get the Bates
14  Stamp and come back to it.  That's fine.
15         MS. SULLIVAN:  And, your Honor, I
16  just ask that he point out that this is from a
17  public relations.  This is really misleading to say
18  it's Johnson & Johnson.  He should say it's public
19  relations.
20         THE COURT:  If Johnson & Johnson
21  hired PR firms to prepare advertisements for them
22  whether it be TV, print, et cetera, then I just need
23  the foundation on that.  I need the authentication
24  on that and then you can use it.
25         Alright.  Do you have it?

16 (Pages 58 - 61)

Page 62

1        MR. PANATIER:  Yes.  But we are going
2 to have to pull it up, because we didn't think that
3 they were going to object to their own document.
4 But we'll have to pull up the file --
5        THE COURT:  You can take that up on
6 cross-examination.
7        So do you have it or do you want to
8 move and --
9        MR. PANATIER:  Well, we'll have to --
10 we'll have to look it up.
11        THE COURT:  Okay.  Fine.  Thank you.
12        (Sidebar ends.)
13 BY MR. PANATIER:
14     Q.    Alright, let me ask you this
15 question:  Johnson & Johnson hired PR firms to put
16 together information for them, correct?
17     A.    Public relations --
18     Q.    On different subjects.
19     A.    Advertising firms and public
20 relations firms, they were often involved, say, come
21 in, give us some ideas.
22     Q.    Okay.  So you said you had never
23 heard of people putting baby powder in their sheets?
24     A.    I've heard of it.  But it's not
25 something that I've ever heard Johnson & Johnson

Page 63

1 saying this is something that you should do.
2     Q.    Johnson & Johnson knows people did
3 that, right?
4     A.    Well, I know that people have done
5 that.  I've heard of that.  But it's not something
6 that I've ever seen in Johnson & Johnson
7 correspondence that we're aware that people have
8 this use for it.
9     Q.    Is it possible that you haven't seen
10 it because it's in the 990,000 documents you haven't
11 looked at?
12     A.    It's possible, yes.
13     Q.    Alright.  We'll come back to that,
14 okay.
15        (There is a discussion off the
16        record.)
17 BY MR. PANATIER:
18     Q.    Dr. Hopkins, Johnson & Johnson
19 understood that any presence of amphibole mineral
20 whether in the form of asbestos as you say or not,
21 should not have been in the powder, correct?
22     A.    I don't -- I don't agree with that.
23 Amphibole -- amphiboles are present in just about
24 every county in the United States.  They're
25 invariably quite harmless.  It's a geological

Page 64

1 descriptor, but it doesn't mean it's harmful.
2        MR. PANATIER:  Your Honor, I would
3 move to strike everything after the initial answer
4 as non-responsive.  He's opining on whether or not
5 it's harmless --
6        THE COURT:  Objection is sustained.
7 Jury will disregard anything after the initial
8 response.
9        Continue.
10        MR. PANATIER:  Thank you, your Honor.
11 BY MR. PANATIER:
12     Q.    Sir, if you'll go ahead and turn to
13 the depositions' notebook there to 2017, 8-17, so
14 August 17, 2017.  Okay.
15     A.    What page?
16     Q.    It will be 1037, 1,037.  That was a
17 long deposition.
18     A.    Uh-huh.  We have it, yes.
19     Q.    I'm going to jump ahead here briefly
20 and I'm going to ask you to confirm that we've heard
21 about XRD, X-ray diffraction, that detection
22 technique.  You're familiar with that?
23     A.    Yes, sir.
24     Q.    XRD is not a microscope, correct?
25     A.    No, it's a piece of equipment.

Page 65

1     Q.    Right.  And all it tells you is
2 whether or not a mineral is present.  It doesn't
3 tell you what it looks like, right?
4     A.    No.
5     Q.    Correct?
6     A.    Correct, yes.
7     Q.    It doesn't tell you whether it's in
8 fibers or whether it's in chunks, correct?
9     A.    Yes.  You to have look at other
10 techniques.
11     Q.    Right.  So, if you could look,
12 please, sir, at Page 1037.  You were asked this
13 question.
14        MS. SULLIVAN:  Can I have the line,
15 Counsel?
16        MR. PANATIER:  Yeah, Line 8.
17 BY MR. PANATIER:
18     Q.    And to the --
19        MS. SULLIVAN:  I'm sorry, your Honor.
20 If I can just have a minute.
21        MR. PANATIER:  Counsel, are you
22 ready?
23        MS. SULLIVAN:  (INAUDIBLE)
24 impeachment is concerned.
25        THE COURT:  How about we do that at

17 (Pages 62 - 65)

1 sidebar.
2          (Sidebar.)
3          THE COURT:  So it's Line 8 through
4 what?
5          MR. PANATIER:  Line 8 through 24.
6          THE COURT:  Okay.  I'll hear you.
7          MR. PANATIER:  1037.
8          THE COURT:  Go ahead.
9          MS. SULLIVAN:  What are you
10 impeaching him on, saying it's inconsistent with
11 this?  What are you impeaching him on?
12          MR. PANATIER:  He said the presence
13 of the minerals is fine.  And I'm impeaching him
14 because here he says it should have been rejected.
15 That's direct impeachment.
16          MS. SULLIVAN:  Where is that?
17          MR. PANATIER:  Right here.  That's
18 grounds for rejection.
19          MS. SULLIVAN:  I don't think it's
20 impeachment, your Honor.
21          THE COURT:  It does qualify for
22 impeachment based upon his response relative to the
23 distinction whether or not with any amphiboles.
24          So go ahead.
25          MS. SULLIVAN:  Okay.  Thank you, your

1 Honor.
2          (Sidebar ends.)
3 BY MR. PANATIER:
4      Q.   Sir, it was Johnson & Johnson's
5 policy, correct, to reject any talc that had the
6 presence of the mineral at all, correct?
7      A.   Sorry, the mineral, what mineral?
8      Q.   Amphibole mineral.
9      A.   Amphibole, right.  The step is that
10 you look at X-ray diffraction and if you get a
11 positive result for an amphibole, you reject it
12 until you've done the next step, which is polarized
13 light microscopy so that you can actually see what
14 kind of amphibole it is, whether it's a harmless
15 material or an asbestiform material.
16      Q.   Let's look and see what you said,
17 okay.  Line 8.  "And to the extent that any, any
18 lots of talc were tested and there was a positive
19 XRD for amphiboles minerals at anytime, was that lot
20 placed on hold before it used?"
21          And your answer was, "The way the testing
22 would have been done, it was -- it would not have
23 been -- it was not have been filled," correct?
24      A.   Until it had polarized light, yes.
25      Q.   Oh, I'm sorry.  Did you say "until it

1 had polarized light" there?
2      A.   No, but I'm asking --
3      Q.   Okay.  Let's go to the next question.
4          "So, if a lot was positive just by XRD, it
5 would have been rejected?"
6          And your answer was, "That was my
7 belief," correct?
8      A.   Yeah, and that is the case.  It is
9 correct.  It would have been rejected until it had
10 come out of rejection by validated whether or not
11 polarized light showed a problem or not.
12      Q.   So you didn't say that here, did you?
13      A.   You didn't ask me.
14      Q.   I didn't ask you here either and you
15 volunteered it, didn't you?
16          MS. SULLIVAN:  Objection, you Honor,
17 that's argument.
18          THE COURT:  Objection sustained.
19          Let's not argue with the witness,
20 please.
21 BY MR. PANATIER:
22      Q.   Sir, look, let's look at what you
23 said.  "So if a lot was positive just by XRD" --
24 that's just the mineral, correct, sir?
25      A.   XRD would pick up amphibole.

1      Q.   "It would have been rejected, that is
2 my belief," correct?
3      A.   It would have been rejected until it
4 was de-rejected or un-rejected.  It would have been
5 held until you had done the test.  So you reject
6 it -- you can't fill it until you've clarified what
7 the problem was.
8      Q.   Did you say that here?
9      A.   Here -- just now?  No.
10      Q.   No.  We know you said it just now;
11 here?
12      A.   No, but you didn't ask me to go on
13 and explain it any further when you asked me that
14 question back in 2017.
15      Q.   Well, I asked you right after --
16          MS. SULLIVAN:  Objection, your Honor,
17 this is argument.
18          THE COURT:  Overruled.
19 BY MR. PANATIER:
20      Q.   "And by XRD, you're just detecting
21 the mineral presence, correct?"
22      Answer:  "Correct."
23          And I asked you again, "but that was grounds
24 of J&J for rejection; is that true?"
25      Answer:  "That is the specification,"

18 (Pages 66 - 69)

Page 70

1 correct?
2      A.    Yes.
3      Q.    So I asked it you about it again and
4 you didn't say anything about, well, until it's
5 un-rejected, did you?
6      A.    I didn't give you that additional
7 information because you didn't ask for it.
8      Q.    I didn't ask for it either and you
9 did, correct?  Correct?
10      A.    You -- okay.  I think I've explained
11 that you reject it until you've got reasons to
12 un-reject it.
13            (There is a discussion off the
14      record.)
15 BY MR. PANATIER:
16      Q.    You know Fred Pooley, right?
17      A.    Yes, I do.  I know him well.
18      Q.    We've heard a lot about Fred Pooley
19 in this case.
20            So, in 1996, you were at the company,
21 you were at Johnson & Johnson, right?
22      A.    Yes.
23      Q.    Okay.  If you will turn please, sir,
24 to the tab for 1996.  And we might be going into
25 another binder.  Nope.  I think it's in Binder 4.

Page 71

1 It should be January 29, 1996.
2      A.    Yes.
3      Q.    Okay.  And, sir, this is a memo that
4 is a Johnson & Johnson memo, correct?
5      A.    It is, yes.
6      Q.    There's really two communications
7 here.  The page before is a communication from Bill
8 Ashton to you, correct?
9      A.    Yes.
10      Q.    And then there's a follow-up from you
11 to Ian Philipson, the head of scientific services at
12 the Cosmetic, Toiletry and Perfume Association
13 Limited, correct?
14      A.    Yes.
15      Q.    Now, we've heard of CTFA, that was
16 the Cosmetics, Toiletries and Fragrances Association
17 here in the States, right?
18      A.    Yes.
19      Q.    And Great Britain had a similar
20 version called the CTPA, correct?
21      A.    Yes.
22      Q.    Alright.
23            MR. PANATIER:  Your Honor, at this
24 time we offer Plaintiff's Exhibit 2738 into
25 evidence.

Page 72

1            MS. SULLIVAN:  No objection.
2            THE COURT:  So admitted.
3            What is the numbering on this one?
4 I'm sorry.
5            MR. PANATIER:  2738, your Honor.
6            THE COURT:  Thank you.
7            (Plaintiff's Exhibit 2738 was moved
8      into evidence.)
9      Q.    So let's go back to January 22, 1996.
10 This is from Bill Ashton to you, right?
11      A.    Yes.
12      Q.    Okay.  And here it says, "From Bill,
13 attached is Page 11 of the current issue of a CTPA
14 guide wherein Fred Pooley makes the suggestion that
15 any batch of cosmetic talc which reads positive for
16 the presence of amphiboles should be rejected even
17 if subsequent examination establishes whether or not
18 the mineral is fibrous or non-fibrous."
19            Now, I've shown you this before,
20 correct?
21      A.    Yes.
22      Q.    "We need clarification on this since
23 it is in conflict in all the work here in US based
24 primarily on the mineral tremolite, which is present
25 in trace amounts in many high grade talcs, including

Page 73

1 Johnson & Johnson's," right?
2      A.    Yes.
3      Q.    Okay.  "The mineral tremolite is
4 chemically a calcium silicate and occurs in two
5 crystallographic habits, fibrous, which is called
6 tremolite asbestos and prismatic or non-fibrous,
7 which is non-asbestiform."  Did I read that, right?
8      A.    You did.
9      Q.    Okay.  So let's get our definitions
10 straight.
11            You agree with what Bill Ashton said
12 here --
13            MS. SULLIVAN:  Your Honor, I'm sorry.
14            THE COURT:  Wait, wait, wait.
15 Counsel, sidebar.
16            MR. PANATIER:  I'm sorry?
17            MS. SULLIVAN:  I was going to ask him
18 to read the line for completion.
19            MR. PANATIER:  Sure.
20 BY MR. PANATIER:
21      Q.    "Here in the US, a controversy has
22 been under way for the past 25 years."
23            MS. SULLIVAN:  And then the next one.
24            MR. PANATIER:  I'll read the whole
25 paragraph.

19 (Pages 70 - 73)

1          MS. SULLIVAN:  No, just the next one.
2          MR. PANATIER:  No, I'll read the
3  whole paragraph.
4          MS. SULLIVAN:  Okay.
5  BY MR. PANATIER:
6     Q.     "All agencies and health oriented
7  groups have accepted the view that only the rare
8  fibrous tremolite might be hazard as opposed to the
9  harmless prismatic form.  This has been fought at
10  many meetings of science groups and in the courts
11  mainly spearheaded by the RT Vanderbilt Company who
12  sells large tonnage of trimellitic talc to the
13  ceramic industries here and abroad."
14          And, Dr. Hopkins, you know that
15  Johnson & Johnson actually attended some meetings
16  with RT Vanderbilt, right?
17     A.     I believe RT Vanderbilt attended
18  meetings with the Food and Drug Administration at
19  which Johnson & Johnson was also present.
20     Q.     So in this memo, Bill Ashton says
21  "fibrous tremolite," right?  It says "fibrous
22  tremolite."  "Fibrous," which is called tremolite
23  asbestos, right?  Correct, sir?
24     A.     Yeah, if it meets the definition of
25  tremolite asbestos, it would be asbestos.

1     Q.     And what Bill Ashton says here is,
2  "Fibrous which is called tremolite asbestos,"
3  correct?
4     A.     That's what is written.
5     Q.     Okay.  And you agree with that,
6  right?
7     A.     Well, as I said, tremolite asbestos
8  is a fibrous form as opposed to a rod form or like
9  my pencil.
10     Q.     And let's look at what he quotes what
11  Dr. Pooley said in the CTPA.
12          So Dr. Pooley was, actually, writing the
13  CTPA guide in England, correct?
14     A.     He was part of a -- several people
15  who were writing a first draft, yes.
16     Q.     Oh, was this just a first draft?
17     A.     Well, I don't know on that date
18  whether it was a draft or what.  I don't -- yeah, my
19  cover letter said I showed bill a draft of the CPTA
20  guide for his comment.
21     Q.     Okay.  My question was, is it a first
22  draft, what you said?
23     A.     Well, I don't know whether it was a
24  first draft or second draft.  It was a draft.
25     Q.     So under section -- is that 5.2?

1  Does that look like 5.2?
2     A.     Yes.
3     Q.     Fiber minerals amphiboles.  And it
4  says, "as the description of the mineralogical
5  processes involved in the formation of talc may have
6  shown, amphiboles are possible contaminants.  These
7  include tremolite, anthophyllite, actinolite, et
8  cetera.  Tremolite, the most common amphibole
9  contaminant occurs only rarely as the fibrous form
10  and the varieties of massive tremolite which under
11  the microscope appear to contain fibers commonly
12  comprise mainly thick fibers or cleavage fragments
13  which do not present the same health hazard."
14  "However --
15          MS. SULLIVAN:  And you left out "as
16  asbestos."
17          MR. PANATIER:  "As asbestos."
18  BY MR. PANATIER:
19     Q.     "However, in order to eliminate any
20  hazard to the consumer which might arise from the
21  need to interpret fiber shape and dimensions and to
22  facilitate routine screening the CTPA view is that
23  if an amphibole is detected by X-ray diffraction
24  that batch of talc is unacceptable for cosmetic use
25  whether or not subsequent examination by optical or

1  electromicroscopy shows that the contaminant is not
2  fibrous.  In this respect, the CTPA specification is
3  even more stringent than others which refer only to
4  fibrous amphiboles."
5          Now that's consistent with what you
6  testified to about if there was a presence of
7  amphiboles by XRD at J&J, it was to be rejected,
8  correct?
9     A.     No.  It's not consistent.  What I
10  said in the J&J specification, and you know this, is
11  that if you find amphibole by X-ray diffraction, you
12  put the whole thing on hold.  You reject it until
13  you can show that the amphibole was the harmless
14  form or the rod form of tremolite or whatever it may
15  be, but not the fibrous one that looks flexible like
16  human hair, that's asbestos.  But in rod or cleavage
17  form, it looks like, than it's not asbestos.  So you
18  do the microscope piece.  You look at it under a
19  microscope.
20     Q.     We will get to all that.  Well, let's
21  compare what you said with this.
22          Here's what you said.  "If it's positive by
23  XRD, it would be rejected.  That is your belief,
24  right?
25          And I asked, "And by 'XRD,' you're just

Page 78

1 detecting the mineral, correct?
2      "Yes, that was grounds for rejection.
3 That's the specification."
4      Now we're looking at what Dr. Pooley
5 said. "Presence of XRD should be grounds for
6 rejection," correct?
7      A.    In this draft that you're referring
8 to --
9      MR. PANATIER:  Your Honor, at this
10 time I would object to non-responsive.
11      THE WITNESS:  I'm sorry.
12      MR. PANATIER:  I would just like a
13 yes or no.
14      THE COURT:  Please answer the
15 question.
16      A.    Yeah.  Would you rephrase the
17 question.  I'm getting lost.
18      Q.    Yes.  Dr. Pooley is saying that the
19 presence of the mineral at all is grounds for
20 rejection, correct?
21      A.    That's what he is saying on that
22 draft -- first draft, yes.
23      Q.    Well, you know that's the current
24 specification for the CTPA, don't you?
25      A.    No, it isn't.

Page 79

1      Q.    When did it change?
2      A.    I don't know.  But I looked more
3 recently and it's not the current specification.
4      Q.    What's "the current specification"?
5      A.    You would have to go on their website
6 and look it up.
7      Q.    Aren't you on the committee that
8 helps with that specification?
9      A.    Yes.  I'm on -- I'm on a scientific
10 committee, yes.
11      Q.    Well, let's look at the 2016 version,
12 okay?
13      A.    Well, why don't we look at 2018 or
14 '19 version.
15      Q.    This was the only one I as able to
16 get, but we can look at -- we can look and see if
17 they changed it after 2016, okay?
18      A.    Okay.
19      (There is a discussion off the
20      record.)
21      Q.    It should be right in the back of
22 your Binder 4.  It should be dated 2016.  It should
23 be entitled "Cosmetic Talc a CTPA Guide."  Do you
24 have that?
25      A.    I do, yes.

Page 80

1      Q.    Okay.  Great.  So just so we can get
2 our bearings a little bit, if you'll just turn to
3 the first page.
4      MS. SULLIVAN:  Your Honor, I'm going
5 to object because of the time frame here.
6      THE COURT:  Objection overruled.
7      You can go, proceed.
8 BY MR. PANATIER:
9      Q.    Do you see under "Acknowledgment,"
10 sir?
11      A.    Yes.
12      Q.    It says, "The Cosmetic, Toiletry and
13 Perfumery Association wishes to thank members of the
14 CTPA talc task force for their time and enthusiasm
15 in preparing the latest revision of this document."
16      And who is the last person listed?
17      A.    Myself.
18      Q.    You?
19      A.    Yes.
20      Q.    John Hopkins?
21      A.    Yes.
22      Q.    Innovant Research, right?
23      A.    Yes.
24      MR. PANATIER:  Your Honor, we offer
25 this into evidence.

Page 81

1      MS. SULLIVAN:  It's for 2016.
2      THE COURT:  Sidebar.
3      (Sidebar.)
4      THE COURT:  The purpose for which
5 you're seeking admission?
6      MR. PANATIER:  Yes, it's to impeach
7 the witness for purposes of what he just said, that
8 it's not part of the -- it's not of the protocol.
9 He's trying to fight it.  In 2016 he tried to fight
10 it, in 2017 in his depo.
11      MS. SULLIVAN:  The protocol in 2016
12 has nothing to do with this case, your Honor.
13      MR. PANATIER:  There was exposure in
14 2016.
15      THE COURT:  Okay.  Well, even if
16 there wasn't exposure, for the sake of argument, in
17 2016, I'm allowing its admission for purposes of
18 impeaching credibility based upon the testimony of
19 this witness relative to that Bill Ashton memo to
20 him referencing the CTPA guide and the language at
21 issue.
22      MS. SULLIVAN:  I don't see where the
23 impeachment is.  I don't understand.  All he showed
24 was the acknowledgment.
25      THE COURT:  Do you want to show

21 (Pages 78 - 81)

1 Counsel?
2          MR. PANATIER: Yeah. I haven't gone
3 into it further yet; Page 13 and Page 16, where it
4 says the exact same thing.
5          MS. SULLIVAN: This is consistent,
6 your Honor. It says, tremolite occurs only rarely
7 in fibrous forms. It's not inconsistent and I'll
8 object because it's not proper impeachment.
9          MR. PANATIER: Your Honor, amphibole
10 detected by X-ray diffraction that matches
11 unacceptable or cosmetic uses --
12          THE COURT: As for impeachment
13 purposes. Thank you.
14          (Sidebar ends.)
15 BY MR. PANATIER:
16     Q.     Doctor, is it your --
17          THE COURT: Hold on a second.
18          MR. PANATIER: I'm sorry.
19          THE COURT: This document has been
20 offered into admission. The Court now accepts it
21 into admission.
22          (Plaintiff's Exhibit 3695-14 was moved
23          into evidence.)
24          MR. PANATIER: Thank you, your Honor.
25 It's Exhibit 3695-14.

1 BY MR. PANATIER:
2     Q.     Now, Dr. Hopkins, barring some
3 C-change in the CTPA between 2016 and now, let's
4 look at this.
5          Let's take a look at Page 14. Okay. Tell
6 me when you're there. And if it's helpful, it's up
7 there, too.
8     A.     It's okay. No, I got Page 14, yeah.
9     Q.     Alright. Now, it says, "As the
10 description of the mineralogical processes involved
11 in the formation of talc may have shown, amphiboles
12 are possible contaminants, these include tremolite,
13 anthophyllite, actinolite, et cetera. Tremolite the
14 most common amphibole contaminant occurs only rarely
15 as the fibrous form and the varieties of massive
16 tremolite, which under the microscope appear to
17 contain fibers, commonly comprise mainly thick
18 fibers or cleavage fragments which do not present
19 the same hazard as asbestos."
20          Now, first of all, that's exactly
21 what he said in 1996 in the letter you got, isn't
22 it?
23     A.     Yes.
24     Q.     Okay.
25     A.     Yes. Yes --

1     Q.     Let's see if the rest is consistent.
2 "However, in order to eliminate any hazard to the
3 consumer, which might arise from the need to
4 interpret fiber shape and dimensions and to
5 facilitate routine screening, the CTPA view is that
6 if an amphibole is detected by X-ray diffraction,
7 that batch of talc is unacceptable for cosmetic use
8 whether or not subsequent examination by optical or
9 electromicroscopy shows that the contaminant is not
10 fibrous." Did I read that right?
11     A.     You did.
12     Q.     And look here's from the previous
13 exhibit. Can you see that up on the screen, sir?
14     A.     Yes.
15     Q.     It says the same thing.
16     A.     It does. But there is an explanation
17 and I'm happy to give it.
18     Q.     Sir, this is 20 consistent years from
19 1996 to 2016 where they're saying the same thing,
20 correct?
21     A.     They're saying the same thing and
22 there is an explanation and I'm happy to give it.
23 If you --
24     Q.     And you gave that explanation --
25     A.     -- if you will allow me.

1          THE COURT: Hold on.
2          THE WITNESS: Sorry.
3          THE COURT: It's okay.
4          MS. SULLIVAN: I object to the
5 interruption.
6          THE COURT: There is no question
7 pending.
8          Proceed.
9          MR. PANATIER: Thank you, your Honor.
10 BY MR. PANATIER:
11     Q.     You gave that explanation for the
12 first time today, you did not give that explanation
13 when I deposed you in 2017, did you?
14     A.     I have given the explanation -- the
15 test methodology requires you to do X-ray
16 diffraction followed by polarized light microscopy
17 and, if necessary, by other microscope methods.
18          (There is a discussion off the
19          record.)
20     Q.     We know this. Johnson & Johnson
21 never rejected a single lot for the presence of
22 amphibole or amphibole asbestos, correct? Correct?
23     A.     If a lot had failed the
24 specification, which is the test using X-ray
25 diffraction for amphibole followed by polarized

22 (Pages 82 - 85)

Page 86

1 light microscopy and transmission electron
2 microscopy, if it had failed those tests, which
3 would have picked up asbestos, it would have been
4 rejected.
5      Q.    No lot was ever rejected, correct?
6      A.    I don't know whether a lot was
7 rejected or not.  It could well have gone into
8 industrial talc.  I'm not going to speculate.  But
9 any lot that fails those three tests would not have
10 been used to make baby powder.
11            THE COURT:  This would be a good time
12 for a break, Counsel.
13            MR. PANATIER:  That's fine.
14            THE COURT:  Alright.  So Members of
15 the Jury, we're going to take a 15-minute break.  No
16 discussions with regard to this case, including the
17 testimony you've just heard.  No research of any
18 kind whatsoever.
19            Please be ready to come back upstairs
20 at five after.  Enjoy your break.
21            (Jury exits.)
22            THE COURT:  And we're off the record.
23 Dr. Hopkins, you may step down.
24            THE WITNESS:  Thank you.
25            (Recess taken 10:50 to 11:12 a.m.)

Page 87

1            (Jury enters.)
2            THE COURT:  Please be seated.  Make
3 sure cell phones are turned off.
4            You may continue.
5            MR. PANATIER:  Thank you, your Honor.
6      Q.    So, Dr. Hopkins, at this point we
7 have documentation, a policy to reject anything with
8 amphiboles.  We have that from 1996 CTPA, correct?
9      A.    That's the British --
10      A.    Yes.
11      A.    -- document.  That is their document,
12 yes.  But, as I said, I'm happy to give an
13 explanation why but --
14            MR. PANATIER:  Your Honor, I'm going
15 to object at this time to nonresponsive and move to
16 strike.
17      A.    The answer is, yes.
18            THE COURT:  Thank you, Dr. Hopkins.
19      Q.    We also saw 2016 CTPA, same policy,
20 correct?
21      A.    We did, yes.
22      Q.    Also, we have your testimony from
23 2017 where you said presence by XRD, which only
24 detects the amphiboles would be grounds for
25 rejection, correct?

Page 88

1      A.    Yes.  And I explained until you've
2 done otherwise.
3      Q.    Okay.  Well, if you would turn to the
4 tab.  Actually, I think it's there already.  I
5 turned it there for you.
6            December 28, 2016, you got that tab?
7 The title is the, "The Process for Qualification and
8 Approval of a New or Alternate Source of Cosmetic
9 Talc"?
10      A.    Yes.
11      Q.    Okay.  That's a document you authored
12 correct?
13      A.    Yes, I gave guidance to an affiliate
14 in, I think, it's Indonesia as to their thinking
15 process, yes.
16      Q.    The title is, "The Process for
17 Qualification and Approval of a New Or Alternate
18 Source of Cosmetic Talc" and it regards the global
19 specification, correct?
20      A.    I don't see that title.
21      Q.    Okay.  Well --
22      A.    Let me read it.
23      Q.    We'll look at it together.
24            MR. PANATIER:  You Honor, I offer
25 this in evidence.

Page 89

1            THE COURT: Any objection?
2            MS. SULLIVAN: Your Honor, just a
3 sidebar on this.
4            THE COURT: Sure.
5            MS. SULLIVAN: Thank you.
6            THE COURT: Just to be clear, this is
7 2836 being offered?
8            MR. PANATIER: 2836.
9            THE COURT: Okay.
10            (Sidebar.)
11            MS. SULLIVAN: Your Honor, I'm just
12 going to object.  The last document was a London
13 2016 standard that has been (INAUDIBLE).  This is an
14 Indonesian, you know, again post-dating the time
15 frame at issue in this case and the recommendations.
16 It's not relevant under the time period at issue and
17 we would object to the document.
18            THE COURT:  And the basis for which
19 you're seeking to introduce this?
20            MR. PANATIER:  Right here.  Dr.
21 Hopkins stated there are certain parameters for
22 which a minimum standard must be maintained on a
23 global basis.  These consist of freedom from
24 asbestos and amphibole minerals.
25            MR. MAIMON:  We also have evidence,

23 (Pages 86 - 89)

Page 90

1  your Honor, this document was used by J&J for its
2  specification for Johnson's Baby Powder everywhere
3  in the world including the United States and I
4  deposed one of their officials on this based just on
5  the document's fact.
6          THE COURT:  Based on the document and
7  how it reads, I'm going to admit it into evidence.
8  It does not exceed use; in other words, it's not
9  just looking outside of the country.  It's also
10 being what's specified on a global basis.
11         MS. SULLIVAN:  Thank you, your Honor.
12         (Sidebar ends.)
13         THE COURT:  This document is now
14 admitted into evidence.
15         You may proceed.
16         (Plaintiff's Exhibit 2836 was moved
17         into evidence.)
18         MR. PANATIER:  Thank you, your Honor.
19 BY MR. PANATIER:
20    Q.    This is a document you John Hopkins
21 offered, right?
22    A.    Yes, in response to a question, yes.
23    Q.    And it says, "Cosmetic grades of talc
24 to be used in Johnson & Johnson products must meet
25 standards for both mineralogical and microbial

Page 91

1  purity," correct?
2     A.    Yes.
3     Q.    That's true for the whole world,
4  correct?
5     A.    Yes.
6     Q.    Let's go down here to your bullet
7  point.  "There are, however, certain parameters for
8  which a minimum standard must be maintained on a
9  global basis."
10        "Global" includes the United States,
11 correct?
12    A.    Yes.
13    Q.    Okay.  "These consist of No. 1
14 freedom from asbestos and amphibole minerals,"
15 correct?
16    A.    Yes, that's what I wrote.  And I'm
17 happy to explain why I wrote that.
18    Q.    Well, I just want to talk about what
19 you wrote.
20        You wrote in 2005, on a global basis,
21 no asbestos and no amphibole minerals, correct, did
22 you write that?
23    A.    I wrote that.  And I'm happy to
24 explain why I wrote that to that individual in, I
25 believe, Indonesia.

Page 92

1     Q.    The truth is there is a robust
2  history of amphibole minerals in Johnson & Johnson's
3  talc that they used for baby powder, correct?
4     A.    You can find nonasbestos amphibole
5  minerals in pretty well every county in the United
6  States and you will find nonasbestos amphibole
7  material in many talc sources from around the world.
8          MR. PANATIER:  Your Honor, I'm going
9  to move to strike.
10    A.    Sorry, didn't I answer the question?
11         THE COURT:  No.  Doctor, if you could
12 please listen to the question and answer that
13 question only.
14         Why don't we do it one more time.
15    Q.    If you'll turn, please, sir, back to
16 the deposition binder, the first deposition
17 8/15/2017, Page 311.  It's, actually, 312.  Sorry,
18 these print over a page.  Page 312, starting with
19 Line 8.
20         MS. SULLIVAN:  I'm just going to
21 object because it's not inconsistent with what he
22 just said.
23         THE COURT:  I'm sorry, beginning
24 where?
25         MR. PANATIER:  Page 312/Line 8

Page 93

1  through 12.
2          THE COURT:  Objection overruled.
3          You may proceed.
4  MR. PANATIER:
5     Q.    Okay.  Doctor, I asked you this
6  question.  "We were discussing a document at the
7  time.
8          Well, he probably mentioned tremolite
9  because as we know there's a very robust record of
10 the mineral tremolite being present in the ores that
11 Johnson & Johnson uses, correct?"
12        And what was your answer?
13    A.    I'm sorry, what page are we on?
14    Q.    Page 312.
15    A.    What line?
16    Q.    Line 8 through 12.
17    A.    Okay.  Sorry.  The print is blurred.
18 Yeah.
19    Q.    Is your print "blurred"?
20    A.    Yeah, yeah.  It says, "As we know,
21 there is a very robust record of the mineral," and
22 then there's nothing.
23    Q.    Let me give you mine, if it's
24 blurred.
25    A.    Yeah, we can swap then.

24 (Pages 90 - 93)

1    Q.    Hold on.
2    A.    See there's nothing there?
3    Q.    Yeah, here, look at my copy.
4    A.    Okay.
5    Q.    So, when I asked you, if there was a
6 robust record of tremolite in the source talc for
7 Johnson's Baby Powder, your answer was what?
8    A.    Yeah, correct, yeah.  I just said
9 that a few minutes ago.
10   Q.    There was a robust record, correct?
11   A.    Of tremolite, yes.
12   Q.    Okay.  For CTPA in 1996, 2016 your
13 global specification they all said no amphibole
14 minerals.
15       My question is tremolite is an amphibole
16 mineral, correct?
17   A.    My global specification was not a
18 global specification.
19       MR. PANATIER:  Your Honor, I'm going
20 to object as nonresponsive.
21       MS. SULLIVAN:  He didn't even answer
22 before you decided it's nonresponsive.
23       MR. PANATIER:  I asked if tremolite
24 was an amphibole.
25       THE COURT:  That response is stricken

1 from the record.
2       Can you ask the question one more
3 time.
4       MR. PANATIER:  Yes.
5       THE COURT:  Please listen to the
6 question, Dr. Hopkins.
7    Q.    Is tremolite an amphibole?
8    A.    Tremolite is an amphibole.
9    Q.    Okay.  Anthophyllite is an amphibole,
10 right?
11   A.    Yes.
12   Q.    Actinolite is an amphibole?
13   A.    They all are, yes.
14   Q.    Chrysotile is a different type of
15 mineral, it's serpentine, correct?
16   A.    It is serpentine, yes.
17   Q.    Chrysotile -- anytime you see a
18 reference to chrysotile, we don't have to talk
19 whether it's good rock or a bad rock, that's
20 asbestos always, correct?
21   A.    Yes.
22   Q.    Sir, we have heard a little bit in
23 this case about the Battel Memorial Altitudes.
24       You're familiar with Battel, correct?
25   A.    I am, yes, yes.

1    Q.    And you know that Battel found
2 tremolite in the Italian source or for Johnson's
3 baby powder several hundred times, correct?
4    A.    They found tremolite, not asbestos
5 tremolite.  They found tremolite, yes.
6       MR. PANATIER:  Your Honor, I move to
7 strike.  I asked whether they found tremolite.
8    A.    The answer is, yes.
9       THE COURT:  Thank you, Doctor.
10   Q.    Alright.  Alright.  Several hundred
11 times, correct?
12   A.    They found tremolite.
13   Q.    There is extensive testing
14 demonstrating tremolite in both the Italian and
15 Vermont ore, correct?
16   A.    Yeah.
17   Q.    And by the early 1970s Johnson &
18 Johnson had numerous reports of tremolite in both,
19 correct?
20   A.    Yes.
21   Q.    So I brought up Bill Ashton before
22 and I wrote down last night a series of people which
23 might help us speed this up, okay.  So can you see
24 my list of people here?
25   A.    I need my driving glasses.

1    Q.    Yeah.  Can you --
2    A.    Yes.
3    Q.    Can you read them okay?
4    A.    I can read them, yes.
5    Q.    So, as documents come up, this might
6 help us keep track of the cast of characters, okay?
7    A.    Yes.
8    Q.    And I've entitled this, "J&J People
9 Involved in Talc Asbestos," with the caveat that
10 there are others, right?
11   A.    Probably.
12   Q.    You're not on there, right, you
13 weren't?
14   A.    Yeah, yeah.
15   Q.    So, just to get straight -- and I'd
16 love if you correct me if any of these are incorrect
17 and we can mark it out and we can make an
18 adjustment.  But let's just go through them.  This
19 will save us time moving forward as we go through
20 the documents, okay?
21   A.    Okay.
22   Q.    Is that alright?
23       Alright.  Bill Ashton, senior science, head
24 of talc, someone who you said was regarded as
25 Mr. Talc, correct?

Page 98

1    A.    Yes, he's an expert geologist, yes.
2    Q.    David R. Clare, he was the President
3 of J&J?
4    A.    He was at one time, yes.
5    Q.    In the '70s?
6    A.    Generally around '76, as I recollect,
7 yes.
8    Q.    Al Goudie was a J&J physician,
9 correct?
10    A.    As a scientist.
11    Q.    Was he not a physician?
12    A.    No.
13    Q.    He was not?
14    A.    I don't believe he was.  I think he
15 was a scientist.
16    Q.    Okay.  Well, we'll -- I'm not going
17 to mark it up.  I'm going to put that in parentheses
18 because I think we might see a document on that, but
19 I'm going to write "scientist" and we'll put a
20 little question mark over "physician."
21        DD Johnston, President of J&J Baby Products
22 Company, correct?
23    A.    Yes.
24    Q.    Gavin Hildick-Smith was the Director
25 of Medical Affairs?

Page 99

1    A.    Yes, he was an MD, yeah.
2    Q.    And he was an MD, okay.  We'll put
3 "MD."
4        General Johnson, there was actually -- so
5 was he a general, had he been a general?
6    A.    He was a World War II general, yes.
7    Q.    Did he have a first name?
8    A.    I can't remember.  He did, obviously.
9    Q.    Yeah.  I don't know it.
10    A.    I can't remember it now.
11    Q.    But they always refer to him General
12 Johnson.
13        But he's not like Johnson & Johnson Johnson,
14 is he?
15    A.    He was the grandson of the founder,
16 yes, or great grandson.
17    Q.    He was an executive, correct?
18    A.    Yes.
19    Q.    And George Lee was the Director of
20 Applied Research, true?
21    A.    Yes.
22    Q.    Tim McCarthy, he's more recent.  He
23 was the Director of Toxicology for baby R&D and
24 products stewardship, correct?
25    A.    Yes.

Page 100

1    Q.    Roger Miller he was the President of
2 Windsor Minerals.  That was the company that Johnson
3 & Johnson owned that mined the Vermont talc?
4    A.    The mining company, yes.
5    Q.    W. Nashed, now, do you know what his
6 first name was?
7    A.    I've forgotten.  I do know, but it's
8 slipped my mind.
9    Q.    If I knew it, I would have written
10 it.
11        But Dr. Nashed, correct?
12    A.    Yes.
13    Q.    And he was the Director of Science
14 Information, true?
15    A.    Yes.
16    Q.    Okay.  He had a big role when it came
17 to talc and asbestos, did he not?
18    A.    He was a coordinator.  He was kind of
19 a central point and correspondence would go in and
20 go out.
21    Q.    D.R. Petterson medical director baby
22 products, right?
23    A.    He was, yes.
24    Q.    Robert Rolle, Assistant Director
25 Analytical Research Baby Powder Products, true?

Page 101

1    A.    Yes.
2    Q.    John Scheltz he was the CTPA task
3 force chairman on the committee to develop J4-1,
4 correct?
5    A.    He was 1 of 20 people on that
6 committee, yes.
7    Q.    He was the chairperson?
8    A.    He was chairperson, yes.
9    Q.    Bruce Semple, he's more recent,
10 correct?
11    A.    Yeah, he's an MD.
12    Q.    And he was a medical director?
13    A.    He was at one point, yes.
14    Q.    T.H. Shelley Research Director,
15 right?
16    A.    He was, yeah.
17    Q.    Lorena Telofski more recent again,
18 she's the scientific engagement leader, correct?
19    A.    Well, that's the title you've got
20 there.  I don't know what the current title is but,
21 yes.  I'll not argue.
22    Q.    In fairness, there's some documents
23 in the mid 2000s that she's uses the NATRA title at
24 the time, okay?
25    A.    Okay, yeah.

26 (Pages 98 - 101)

Page 102

1    Q.    Charles -- I can't say that --
2    W-a-h-s-c-z-u-k?
3    A.    I think it's pronounced Wajsczuk, but
4    I don't know him.
5    Q.    Okay, great; medical Safety Officer,
6    right?
7    A.    Yeah.
8    Q.    Okay.  Alright.  So this might help
9    us keep our bearings as we move forward.
10        Now, sir, Johnson & Johnson understands that
11   talc, specifically, for use on babies but really for
12   all purposes has no medicinal benefit, right?
13   A.    It's not a therapeutic medicinal, no,
14   there's no --
15   Q.    It doesn't have --
16   A.    It doesn't treat nor cure disease.
17   Q.    It doesn't have any health benefits?
18   A.    It helps cool the skin and keeps the
19   skin from chaffing.  It's -- call it dry lubricant.
20   The talc particles slide over each other so they
21   help stop chaffing but --
22   Q.    Okay.  Other than that --
23   A.    -- it's not medicinal, I don't know.
24   Q.    Other than chaffing, does it have any
25   health benefits, sir?

Page 103

1    A.    I'm not aware of any curative --
2    disease curative benefits, no.  It's a skin dry
3    lubricant.
4    Q.    You can turn, please, sir, it's going
5    to be in the big binder to June 17, 1966.  It should
6    be near the front.  Here it is.
7        Now, first of all, Johnson & Johnson refers
8    to the baby powder.  It's an important product to
9    Johnson & Johnson, right?
10   A.    Yes, it's been sold for over hundred
11   years.
12   Q.    It's not one that they ever made -- I
13   mean, they ever made a ton of money from relatively
14   speaking, right?
15   A.    No, virtually none.
16   Q.    It was far more important to Johnson
17   & Johnson in terms of reputation, correct?
18   A.    Yes, it was a historical product.
19   Q.    Johnson & Johnson?
20   A.    From the 1890s.
21   Q.    I'm sorry?
22   A.    From the 1890s.
23   Q.    Johnson & Johnson referred to the
24   baby powder as their flagship product, correct?
25   A.    I've seen that expression, yes.

Page 104

1    Q.    They referred to it as the
2    cornerstone of their baby products franchise,
3    correct?
4    A.    It was the first baby product, yes.
5    Q.    They've even referred to it as the
6    sacred cow, right?
7    A.    I've heard that expression from one
8    individual.
9    Q.    Right; in the Johnson & Johnson
10   documents, true?
11   A.    Yes.
12   Q.    Okay.  So let's look at this document
13   it's dated 1966.  It is from W.H. Steinberg to Gavin
14   Hildick-Smith, okay, Director of Medical Affairs,
15   correct?
16   A.    Yes.
17        MR. PANATIER:  Alright.  I'm going to
18   offer this into evidence, your Honor, Exhibit 2360.
19        MS. SULLIVAN:  Your Honor, this was
20   in limine issue and it's also --
21        THE COURT:  Sidebar.
22        (Sidebar.)
23        THE COURT:  What's the in limine
24   issue?
25        MS. SULLIVAN:  This was other adverse

Page 105

1    -- it's like a cancer -- this is the asphyxiation
2    issue.  It has nothing to do with mesothelioma.
3    These are the kids who choked or asphyxiated
4    because of the blocking air, yeah, from the powder.
5    It's a 403 issue and it's also hearsay, of course.
6        MR. PANATIER:  First of all, it's
7    here to -- to address hearsay within hearsay goes to
8    notice.
9        Second of all, as far as the overall
10   safety --
11        THE COURT:  Wait a minute.  One
12   person at a time.
13        MR. PANATIER:  Overall safety Counsel
14   for Johnson & Johnson brought this up in opening
15   statement.  She said the product is safe and it goes
16   to the fact that if they had heeded the doctor's
17   warnings for whatever reason and they stopped
18   selling the product, we don't have this case.
19        MS. SULLIVAN:  This is --
20        THE COURT:  So that's the issue?
21        MR. PANATIER:  That's correct.
22        THE COURT:  Thank you.
23        MS. SULLIVAN:  This is notice as
24   asphyxiation from blocking.  It has nothing to do
25   with cancer and mesothelioma.

27 (Pages 102 - 105)

1          MR. PANATIER:  Great point.  It's
2  actually --
3          MS. SULLIVAN:  And it's hearsay.
4  This is hearsay within hearsay.
5          MR. PANATIER:  Actually, in opening
6  Counsel argued that they put warnings on because
7  babies would poured it over their faces.
8          THE COURT:  Okay.  I'm going to allow
9  it.  It goes to the issue of notice.
10          Now having said that, this is not
11  what you pointed to Ms. Sullivan's opening statement
12  but it does not open the door --
13          MR. PANATIER:  To anything.  No, not
14  I'm not doing that.
15          THE COURT:  I want to be clear on
16  that.
17          And in terms of the hearsay upon
18  hearsay, so this is commenting upon an article in
19  (INAUDIBLE) corporate of spokesperson what issue
20  that you are looking to point out is, is what?
21          MR. PANATIER:  Is the hazard that
22  they were aware of, your Honor.
23          MS. SULLIVAN:  Which had nothing to
24  do with cancer.
25          MR. PANATIER:  It has no health

1  benefit, which we are talking about.
2          MR. SULLIVAN:  Which he's already
3  testified --
4          THE COURT:  Thank you.
5          MS. SULLIVAN:  Thank you, your Honor.
6          MR. PANATIER:  Thank you.
7          (Sidebar ends.)
8          MR. PANATIER:  It's 2360, your Honor.
9          THE COURT:  Yes, now admitted into
10  evidence.
11          (Plaintiff's Exhibit 2360 was moved
12          into evidence.)
13      Q.    Now, sir, let's take a peak at this
14  together.  It says, "subject Johnson's baby powder
15  talc aspiration."  That means breathing in, right?
16      A.    In context, it's blocking your nose,
17  yes.
18      Q.    "Reference is made to the attached
19  note from Mr. J. Detry forwarding an article by Drs.
20  Hughes and Colmer which appeared in June 1966
21  American Journal of Diseases of Children.  Baby
22  powder represents the cornerstone of our baby
23  products franchise.  In addition we have a large
24  investment in the talc mine."
25          At this point they had already bought the

1  Vermont mine, correct?
2      A.    Yes.
3      Q.    So "the cornerstone of our baby
4  powder's franchise" and "we have a large investment
5  in talc mine," Mr. Steinberg felt were important to
6  state when discussing this article about the
7  aspiration of talc for children, correct?
8      A.    Yeah, you read what was written.
9      Q.    And he quotes the article.  "In
10  conclusion, it is strongly urged that talcum powder
11  be removed from the environment of children and that
12  the traditional association of talcum powder and
13  babies be abandoned.  It has no medicinal value
14  wherever placed.  It serves as a foreign body and,
15  at least, three deaths in an unknown morbidity of
16  resulted from this talcum powder."
17          Now "morbidity" means sickness or illness,
18  correct?
19      A.    Yes.
20      Q.    Okay.  He writes, "Would it be
21  possible for us to initiate basic work to explore
22  this phenomenon either to obtain data to refute this
23  problem or to develop mechanisms to reduce the
24  hazard?"  Is that what he writes?
25      A.    Yes.  He commented on what was

1  written in the American Journal of Disease of
2  Children and then wrote what you read, yeah.
3      Q.    Okay, okay.  So Johnson & Johnson was
4  aware that doctors were recommending against the use
5  of baby powder as of 1966, true?
6      A.    Well, these particular doctors
7  responding to cases where children had choked or got
8  powder on their nose would breathe that comet.  So
9  that is noted in the Johnson's files, yes.
10      Q.    When did Johnson & Johnson first add
11  a safety lid to prevent that to its baby powder?
12      A.    A safety lid?
13      Q.    A safety cap to prevent from children
14  opening it and pouring on their faces and aspiring
15  talc?
16      A.    Well, there's always been a lid with
17  little holes in.  The issue is the size of the
18  holes.
19      Q.    Yeah.
20      A.    Yeah.
21      Q.    So is there a safety lid?
22      A.    As of today?
23      Q.    Yes.
24      A.    Well, there's -- the holes are
25  structured in a certain way that getting a large

Page 110

1 amount tipped on your face shouldn't happen. The
2 holes are certain tiny size and you have to turn it.
3      Q.     All there is the twisty we're all
4 familiar with?
5      A.     Yeah, yeah.
6      Q.     Let's skip ahead to 1976. That one
7 was 1966. If you'll turn to March 22, 1976, it
8 might be in Binder 2. Here you go.
9           MR. PANATIER: Your Honor, I have the
10 bad news of delivering you another binder.
11     Q.     Dr. Hopkins, let me just find this
12 one for you.
13      Dr. Hopkins, this is a document that you and
14 I have gone over before, true?
15     A.     Yes.
16     Q.     Okay. That is dated March 22, 1976
17 and it's a memo from Bruce Semple, Medical Director.
18 And it is to D.R. Petterson or Petterson, yeah,
19 medical director of, correct, baby products?
20     A.     Yeah.
21     Q.     And it is about a phone dialogue with
22 someone at NIOSH, correct?
23     A.     Yes.
24     Q.     NIOSH is the National Institute for
25 Occupational Safety and Health, true?

Page 111

1      A.     Yes.
2           MR. PANATIER: Your Honor, at this
3 time, we offer this into evidence 2594.
4           MS. SULLIVAN: No objection.
5           THE COURT: So admitted.
6           (Plaintiff's Exhibit 2594 was moved
7           into evidence.)
8      Q.     So this phone call they had was with
9 D.H. Groth, Doctor -- chief of the pathology
10 section, correct?
11     A.     Yes.
12     Q.     And to get our bearings, the J&J
13 person, this was Bruce Semple, says, "I identified
14 myself and the reason for phoning. He was pleasant
15 and cooperative. He recalled being phoned around
16 Wednesday, March 17th, '76 by a woman who he thought
17 was a Cincinnati newspaper. She said that she had
18 called Dr. Arthur Langer to inquire about nickel in
19 talk. He used the Christian name Tom for Langer and
20 first and then corrected it in the manner that would
21 lead one to suspect that he does not know Langer.
22 Langer had referred her to Groth as an expert in
23 trace medical toxicology. So we're talking about a
24 phone call that this reporter had with brother at
25 NIOSH, right?

Page 112

1      A.     Yes.
2      Q.     Okay. Let's skip down here. "She
3 then asked him about asbestos and he said that this
4 was a different problem and that he would not
5 recommend using talc on babies because of the
6 possibility of asbestos inhalation regardless of the
7 contamination level. He felt that this would
8 constitute an unnecessary risk."
9           MS. SULLIVAN: Can I just ask in the
10 interest of completeness, your Honor, that Counsel
11 read the next two lines as well.
12     Q.     "He seemed quite surprised when I
13 informed him that there was no asbestos in JBP and
14 that Langer himself agreed. We then discussed the
15 safety of pure talc and he affirmed that at the
16 cosmetic use exposure levels he did not believe that
17 there would be a safety problem." Did I read that
18 right?
19     A.     You did, yes.
20     Q.     Now, we're going to get to Dr.
21 Langer. And Dr. Langer -- are you here to say that
22 Dr. Langer retracted his results about asbestos in
23 Johnson's Baby Powder, or have you changed that
24 opinion?
25     A.     Dr. Langer published a paper with his

Page 113

1 colleague Dr. Rolle in 1976 where he gave the
2 results of his studies on Johnson's powder and many
3 other powders.
4      Q.     We'll discuss that.
5      Bottom line is Dr. Groth, NIOSH, 1976 says,
6 talcum powder shouldn't be used on babies, right?
7      A.     That's what he said based on his
8 misunderstanding.
9      Q.     "Based on his misunderstanding"?
10     A.     Yeah, because he thought mistakenly
11 that the possibility of asbestos inhalation.
12          (There is a discussion off the
13 record.)
14          THE COURT: Let's go off the record.
15          (Recess taken 11:38 to 11:40 p.m.)
16          THE COURT: Let's go back on the
17 record.
18          Whenever you're ready to continue.
19          MR. PANATIER: Sure.
20 BY MR. PANATIER:
21     Q.     Doctor, you're aware that Dr. Langer
22 tested Johnson's Baby Powder a number of times,
23 right?
24     A.     Yes.
25     Q.     And you're saying that in 1976 he

29 (Pages 110 - 113)

1 published a paper where he did not report Johnson --
2 asbestos in Johnson & Johnson's, true?
3    A.   Yes, his peer reviewed scientific
4 publication with Dr. Rolle did not report asbestos
5 in baby powder.
6    Q.   You know that earlier he actually
7 brought Johnson & Johnson to his offices in Mount
8 Sinai and showed him the asbestos in earlier
9 samples, correct?
10    A.   Well, what I'm saying is when he did
11 his earlier experiments, he mistakenly claimed to
12 have found asbestos.  When he learned how to do his
13 test methods properly, he did not find it and that
14 was the data he published.
15    Q.   So you're saying that he retracted
16 his results?
17    A.   I'm not using the word retraction.
18 You're putting words there.
19    What I'm saying is that when he published
20 his final publication in a peer reviewed scientific
21 journal, he did not claim to have found asbestos in
22 Johnson's Baby Powder.
23    Q.   You know that those were two
24 different samples, two bottles, different samples,
25 than what he tested in '71, correct?

1    A.   What he tested in '71 was when he was
2 developing his methodologies, by the time he had
3 learned how to do his technique correctly.  He was
4 not finding asbestos in -- not only Johnson's
5 powders, but others he was looking at.
6    Q.   Is it your testimony that Dr. Langer
7 maintained that he did not find asbestos then in
8 Johnson's Baby Powders?
9    A.   He wrote to -- an article to the, I
10 think, it was the New York Times where he claimed he
11 was mistaken and he did not find it.
12    Q.   If you can turn please, sir, to the
13 tab December 12, 2018.  It should be in the thin
14 binder.  Hold on.  I'll find it.
15    Okay.  Yep.  Here it is, right here.  It's
16 that tab right there.
17    And I just want you to turn to the page
18 marked 6-10.  See at the bottom, bottom right, they
19 say page number, out of ten?
20    A.   Yes, yes, I have that.
21    Q.   Go to 6 of 10.
22    A.   Yes.
23    MS. SULLIVAN:  Your Honor, can we
24 have a sidebar on this?
25    THE COURT:  Yeah, sure.

1    (Sidebar.)
2    MS. SULLIVAN:  Your Honor, this is
3 the Reuters article from last year.  It's written by
4 both -- the New York Times were speaking to the
5 Plaintiffs' lawyers.  It has a picture of Martin
6 Lear (phonetic) attached to it.  It is -- he's going
7 to ask about hearsay.  It's not an ancient document.
8 He's going to ask what was said (INAUDIBLE) --
9 what's in the article.  It is completely improper
10 and I believe it's inadmissible (INAUDIBLE).
11    MR. PANATIER:  Your Honor, if I can,
12 first of all, this isn't Reuters.  This is the New
13 York Times.
14    Second of all, Dr. Langer -- Dr.
15 Hopkins just quoted saying Dr. Langer in the New
16 York Times was quoted as saying that he was
17 mistaken.  The quote that I'm interested right
18 here -- I'm not going to show pictures of Mark
19 Lear -- is right here.
20    THE COURT:  "In a recent interview,
21 Mr. Langer told the Times that Dr. Chalmers only
22 spoke for himself and for the institution, not our
23 research group.  He reiterated that his team had
24 detected asbestos in Johnson's Baby Powder.  I stand
25 by that today absolutely."

1    MR. PANATIER:  That's all.
2    MS. SULLIVAN:  That's hearsay, your
3 Honor.  There's no exception.  It's 2018.
4    THE COURT:  Well -- right.  The
5 witness testified with regard to the New York Times
6 article referring to a letter to the editor --
7    MS. SULLIVAN:  It's during the '70s.
8    THE COURT:  -- that the Jury has
9 already seen.
10    MR. PANATIER:  That's correct.
11    THE COURT:  The same could be made by
12 the Court, admitted by the Court.  And based upon
13 his response, the Court will allow only this portion
14 of it to be shown.
15    MR. PANATIER:  So we'll offer it
16 subject to redaction.
17    THE COURT:  Yes.
18    MS. SULLIVAN:  And, your Honor, this
19 is not -- the prior argument is to hearsay
20 statements, such as ancient document and statement
21 against interest.  This meets neither.
22    MR. PANATIER:  This is to impeach the
23 witness's statement.
24    THE COURT:  I'll allow it for
25 impeachment purposes only.  Thank you.

30 (Pages 114 - 117)

1          (Sidebar ends.)
2 BY MR. PANATIER:
3     Q.    Have you found Page 6 of 10, sir?
4          THE COURT:  Sir, subject to the
5 Court's ruling, this document, portions of it, are
6 now admitted into evidence.
7          (Plaintiff's Exhibit 3162 was moved
8      into evidence.)
9          THE WITNESS:  Yes.
10 BY MR. PANATIER:
11    Q.    Okay.  And just for purposes of
12 understanding what we're looking at, this is a New
13 York Times article --
14         THE COURT:  I'm sorry.  What was the
15 marking of this?  I apologize.
16         MR. PANATIER:  This one is 3162, your
17 Honor.
18         THE COURT:  Thank you.
19 BY MR. PANATIER:
20    Q.    This is a New York Times article from
21 December of 2018, right, if you look at the front
22 page?
23    A.    Yes.
24    Q.    Okay.  And let's go here to Page 6 of
25 10.  You see where it says, "In a recent interview,

1 Mr. Langer told the times that Dr. Chalmers spoke
2 for himself and for the institution not our research
3 group.  He reiterated that his team had detected
4 asbestos in Johnson's Baby Powder.  I stand by that
5 today absolutely, he said."  Do you see that?
6     A.    I see what is written in that
7 discussion with the New York Times.
8     Q.    Do you accept that Mr. Langer gave
9 this interview to the New York Times and he stated
10 that?
11    A.    Look, I said you read what was
12 written in an interview with the New York Times.
13    Q.    And what Dr. Langer said was that
14 they had found asbestos in the baby powder and that
15 he stands by it today, right?
16    A.    That's what he said.
17    Q.    Okay.
18    A.    Yes.
19    Q.    If you'll turn to the document marked
20 1959.  It's in the big fat one right towards the
21 front.  It just says "1959" on it.  So it should be
22 fairly early.  Here, let me help you.
23    A.    I've got it.  No worry.
24    Q.    That's not it.
25    A.    That's not it.

1     Q.    It just says "1959" on it.  So just
2 the tab should just say -- there you go, right
3 there.  Well, that's my fault.  You don't have one.
4 Here, I'm going to let you look at it briefly and
5 then we'll --
6          THE COURT:  I'll give the witness
7 mine.
8          MR. PANATIER:  Okay.  Thank you, your
9 Honor.  I'm sorry, sometimes they don't get copied
10 over.
11         THE COURT:  That's alright.
12         Here you go, Dr. Hopkins.
13         THE WITNESS:  Thank you, your Honor.
14 BY MR. PANATIER:
15    Q.    Thank you.
16    Alright.  Dr. Hopkins, I'm sorry for that.
17    This is a February 17, 1959 memo that you
18 and I have gone over before, correct?
19    A.    Yes.
20    Q.    It's about a trip that Johnson &
21 Johnson took to Italy to the mine where they got the
22 Italian talc, right?
23    A.    Yes.
24    Q.    Okay.
25         MR. PANATIER:  Your Honor, at this

1 time we offer Plaintiff's Exhibit 2345 into
2 evidence.
3          MS. SULLIVAN:  No objection.
4          THE COURT:  So admitted.
5          (Plaintiff's Exhibit 2345 was moved
6      into evidence.)
7     Q.    Okay.  So here we go.  This is the
8 memo and it says, "Important persons interviewed
9 titles and organizations represented:  Nick Massey,
10 Johnson & Johnson; Dr. Stefano, MD, son-in-law of
11 Charles Matthew, Matthew & Company is sole North
12 American agent for Balcizone."
13    So Charles Matthew isn't a person, at least,
14 here, it's a company, correct?
15    A.    Yes.
16    Q.    And they imported the Italian talc
17 that Johnson & Johnson was using in the US, true?
18    A.    Yes.
19    Q.    Now, we're going to talk about Dr.
20 Stefano later, so I want to make sure we know who he
21 is.
22    He's the son-in-law of the owner of
23 Charles Matthew, correct?
24    A.    That's what it says.
25    Q.    His wife is the chief stockholder in

1 the company, true?
2     A.    That's what it says.
3     Q.    Okay.  Now, we're going to talk about
4 some of these studies, these Battelle studies.  So I
5 want to get our bearings on what was being looked
6 at.
7         So, if you go to synopsis, it says, "The
8 owners, mills and high grade mine of the Society
9 Talco Val Chisone were visited.  It was learned that
10 all of the high grade talc comes from one mine with
11 rare exception.  It was also learned that Grade 2 is
12 the same of run of mine and that Grade 1 is not a
13 specifically hand selected product."
14        So Grade 1 and 2 are both coming from --
15        MS. SULLIVAN:  It's not
16 "specifically."
17    Q.    "It's not especially a hand selected
18 product."
19        MR. PANATIER:  Thank you.
20    Q.    Correct?
21    A.    That's what's written, yes.
22    Q.    And they're coming from the same
23 mine, correct?
24    A.    One is run of mine, which means it's
25 kind of the end of the day stuff that's coming off

1 that's supposedly the premium.  "Run of mine" is a
2 manufacturing term.
3     Q.    Okay.
4     A.    They're different.
5     Q.    They're both coming out of the same
6 mine?
7     A.    Yes.
8     Q.    Go ahead and turn the page, if you
9 will, sir.
10        It says, "The Val Chisone company
11 brings in millions of dollars per year, much of
12 which goes to the personal fortunes of the
13 stockholders."
14        And is it, in Italian, do you know if it's
15 villa or villa?
16    A.    Villa.
17    Q.    "The Villa family is very wealthy and
18 holds a unique position in the modern world.  It
19 controls the Germanasca Valley in an almost futile
20 sense.  The Val Chisone miners were worried lest we
21 had found poisonous minerals in the talc or had
22 otherwise displeased.  When told we merely had
23 a scheme for improving their excellent talc, they
24 were most anxious to cooperate."
25        "Massey" -- now he's with J&J, right?

1     A.    Yes.
2     Q.    (Continuing.) "Explained that our
3 problem was not a matter of dissatisfaction but that
4 about one-third of the doctors are presently
5 advising against the use of baby talc in as much
6 starches and oils have a greater purity and there is
7 no dangerous dust to inhale."  Now, let's stop
8 there.
9         We have now this is 1959.  They're reporting
10 that one-third of doctors are recommending against
11 baby talc, true?
12    A.    Well, that's what's written.
13    Q.    Well, that's what the Johnson &
14 Johnson person said, true?
15    A.    Yes, that's what's written, yes.
16    Q.    Okay.  We saw that again in 1966,
17 seven years after this, right?
18    A.    Well, we saw that three -- two
19 doctors had written into the American Baby Journal
20 not to use talc, yes.
21    Q.    I'm just asking if we saw that in
22 '66?
23    A.    We did, yes.
24    Q.    And we saw it again in 1976 with
25 NIOSH, true?

1     A.    You need to refresh my mind on that.
2     Q.    That was the growth conversation.
3     A.    The growth, yeah -- well, he then --
4 I did a little more in that paragraph where you had
5 not yellow highlighted where he explained that he
6 was not so concerned and you read that out to me.
7     Q.    And then we established what Langer
8 still maintains, correct?
9     A.    You established what he wrote or
10 spoke in an interview to the New York Times,
11 correct.
12    Q.    "Massey explained that J&J has no
13 desire to get into the mining business."  And that
14 was true for another five years, right?
15    A.    Yes, yes.
16    Q.    Because they did get into the mining
17 business, right?
18    A.    Yes.
19    Q.    "Its objective is to produce a
20 superior powder to reverse the present market trend,
21 which is away from talc," right?
22    A.    Yes.
23    Q.    So they wanted to strengthen the
24 position of talc in the market, true?
25    A.    Well, you can only comment on what it

Page 126

1 says. The objective is to produce a superior
2 powder.
3    Q.    Okay. If you will, sir, turn to
4 Page 4. It's at the top. And they discuss this
5 whole run of mine and all of this. "When the whole
6 run of mine ore both chunks and fine is ground, it
7 is designated Grade 2. Grade 2, therefore, is the
8 same as run of mine. When primarily coarse chunks
9 are grounded, it's designated Grade 1. The logic in
10 the operation appears to be that whereas the coarse
11 contaminants have been removed at the picking shed
12 at the mine, the contaminants which are in the fine
13 particles are necessarily overlooked. Hence,
14 milling primarily coarse run of mine ore produces a
15 slightly purer product Grade 1 than does the milling
16 of the whole run of mine ore both chunks and fines
17 Grade 2."
18    Okay. So we've got Grade 1, Grade 2?
19    A.    Yes.
20    Q.    Let's look at some test results.
21 This one will be in the big binder May 23, 1958.
22    MR. PANATIER: Your Honor, this is
23 Exhibit 2344. It's already in evidence.
24    THE COURT: What was the date of?
25    MR. PANATIER: This one is May 23,

Page 127

1 1958.
2 BY MR. PANATIER:
3    Q.    You found that, sir?
4    A.    Uh-huh, yes.
5    Q.    Alright. This is a Battelle report,
6 right? What it looks like they're doing -- they're
7 studying the talc ores, right?
8    A.    Yeah, it's a study on floatation.
9    Q.    Right. "Floatation" is the process
10 that Johnson & Johnson was using only on the baby
11 powder, not on its industrial products, correct?
12    A.    Yes.
13    Q.    Okay. You can see here they say,
14 "Italian No. 2 talc likewise responded favorably to
15 floatation. The two methods were developed which
16 yielded products that contained 96 to 97 percent
17 platy talc and 2 to 3 percent fibrous talc.
18 Mineralogically, these products are superior to the
19 Italian No. 1 talc, which is being used by J&J for
20 baby powder," correct?
21    A.    Yes.
22    Q.    So floating the No. 2 they've got
23 something that was better than what J&J was already
24 using, right?
25    A.    Better than non-floated, yes, yes.

Page 128

1    Q.    So let's see what they found in this.
2 And can you just look up here. This is Table 1.
3    A.    Yeah.
4    Q.    Do you see here, sir, where they look
5 in the Italian No. 2 and No. 1 and they find
6 anywhere from 1 to less than 1 percent to trace
7 tremolite?
8    A.    Tremolite, yes.
9    Q.    Right, the mineral, correct?
10    A.    The mineral tremolite, yes.
11    Q.    Yes. And, of course, there are many
12 many many minerals, accessory minerals associated
13 with talc, correct?
14    A.    Yes, in the mine you get carbonates,
15 chalk.
16    Q.    Yes.
17    A.    Yeah, magnesium carbonate, calcium
18 carbonate.
19    Q.    There's dozens of accessory minerals
20 that are present often in the talc, correct?
21    A.    Not sure about "dozens." But,
22 certainly, probably into double figures you can
23 get --
24    Q.    Okay, double figures.
25    A.    -- different minerals, yes. It

Page 129

1 depends on the mine.
2    Q.    The three -- well, it looks like
3 three are picked out by the talc to focus on. The
4 talc, the carbonates and tremolite, right?
5    A.    Yes.
6    Q.    Now, they didn't include all the
7 other potential accessory minerals, right, they only
8 focused on these three, true?
9    A.    Well, if you add up 48, 43, 5 and 4
10 that's pretty well everything.
11    Q.    Let me ask you this.
12    Was the finding of tremolite something that
13 was good news to Johnson & Johnson?
14    A.    It wasn't bad news cause the other
15 studies had shown that the tremolite was the
16 harmless block form, the rod form.
17    Q.    This should have been rejected,
18 right, because there was amphibole, right?
19    A.    Not necessarily. Because back in --
20 even as far back as the late 1940s, the company was
21 using optical microscopy methods to look at the
22 talc. It wasn't just X-ray diffraction. In fact,
23 I'm not even sure X-ray diffraction was being used
24 much at that time. The results, of course --
25    MR. PANATIER: I'm going to object as

33 (Pages 126 - 129)

1 nonresponsive, your Honor, move to strike.
2          MS. SULLIVAN:  Your Honor, he's
3 answering the question.
4          THE COURT:  Objection overruled.
5 BY MR. PANATIER:
6     Q.    Page 4, Table 2.  They find more
7 tremolite, right, in Italian 2 and Italian 1,
8 correct?
9     A.    Oh, I got the wrong page.  What page
10 is this?
11    Q.    Page 4.
12    A.    Yes.
13    Q.    Okay.  I'm just going to go through
14 this.  You probably -- you can just look at the page
15 up here, if it will be quicker for you.
16    Page 7, Table 5, they find more tremolite in
17 the Italian No. 11 and Italian No. 2, right?
18    A.    Yes.
19    Q.    That's -- the Italian 1 is the stuff
20 they are then using, right?
21    A.    Yes.
22    Q.    We know from the visit to the mine
23 that both Italian 1 and Italian 2 are coming from
24 the same source ore, correct?
25    A.    From the Fontana mine, yes.

1     Q.    Yes.  If you turn to Page 10, four
2 more results with tremolite, correct?
3     A.    Yes.
4     Q.    If you turn to Page 14, there is
5 another result for tremolite for Italian 1 and
6 Italian 2, true?
7     A.    Yes.  There is trace of tremolite in
8 Italian talc, yeah.
9     Q.    Well, there it's full 2 percent and
10 under 1 percent, correct?
11    A.    On floated talc, it's less than one
12 per -- less than one, yes.
13    Q.    And then if you turn to the Appendix
14 A1 and A2, they run a bunch of tests on these,
15 right?
16    A.    Yes.
17    Q.    And they find tremolite numerous
18 times.  Can we agree on that?
19    A.    They do.  They find a mineral called
20 tremolite, yes.
21    Q.    Okay.  Sir, if you'll turn to
22 May 9th, 1958.
23          MR. PANATIER:  This is in evidence,
24 your Honor.  This is Exhibit 2343.
25 BY MR. PANATIER:

1     Q.    Alright, sir.  We're just going to
2 look at this one briefly.  This is from 1958,
3 May 9th.  And it says that, "In the grit from this
4 talc," they say, "it occurs as aggregates of talc
5 and contaminants as acicular" -- and "acicular"
6 means needlelike, correct?
7     A.    Yes.
8     Q.    (Continuing.)  "And fibrous particles
9 of talc and amphibole as shards of granules of
10 amphibole or carbonate and titanite, rutile, zircon,
11 apatite and other accessory minerals."
12          Those would be some of those other
13 minerals that sometimes appear in the talc, true?
14    A.    Yes.
15    Q.    And then down at the bottom it says,
16 "The Italian No. 1 contains from less than 1 percent
17 to about 3 percent of contaminants.  The
18 contamination is natural and consists mostly of
19 carbonate with minor amphibole and rare accessory
20 minerals."
21    And down here you can see it says, "The
22 amphibole component has been established to be the
23 variety tremolite," right?
24    A.    Yes.
25    Q.    And, of course, if you look in the

1 introduction page here, it says, "This is Russell's
2 copy," okay.  And I don't think that I have R.S.
3 Russell up here.
4          But who is R. Russell?  Who is Robert
5 Russell?
6     A.    Bob Russell was a scientist in the
7 research department.
8     Q.    Okay.  I'm just going to but Russell
9 as a scientist.
10    So it says this is his copy.  So he's
11 received this, right?
12    A.    Yes.
13    Q.    Okay.  You can set that aside, sir,
14 or if you're ready to turn to the next page.
15    Let's do July 31st, 1959.  This was
16 discussed last week.  This one is in evidence and
17 it's 2346.
18    This is, again, another Battelle study from
19 July 31st, 1959, correct?
20    A.    Yes.
21    Q.    And, again, sir, you're testing the
22 floatation and they're finding tremolite again and
23 again, correct?
24    A.    Yeah, you find tremolite, yeah.
25    Q.    Okay.  You see here they find it and

34 (Pages 130 - 133)

1 they note that it's largely fine acicular particles.

2     "Acicular" means needlelike, right?

3     A.    Well, it's like the old Greek word,

4 yeah, I mean, it's like the shape of my pen.

5     Q.    Okay.  If you go to Page 32, although

6 you can just look up here.

7       There's many more results finding tremolite

8 over and over and over again, correct?

9     A.    You will find trace of tremolite in

10 Italian talc.

11    Q.    Johnson & Johnson absolutely knew

12 that tremolite was a consistent mineral that was

13 present in the Italian talc, correct?

14    A.    Yes, it's one of several minerals

15 that are present in talc.

16    Q.    Right, I mean, we can look through

17 this.  We are going to find it more often than not,

18 aren't we?

19    A.    You'll find it occasionally, yeah.

20    Q.    Okay.  Here it is, again, okay.

21 Johnson & Johnson received these tests and knew

22 about them, correct?

23    A.    Yes.

24    Q.    Let's go to December 31st, 1959.

25         MR. PANATIER:  This will be

1 Exhibit 2349.  This is already in evidence, your

2 Honor.

3 BY MR. PANATIER:

4     Q.    Another Battelle study and I'm almost

5 done with the Battelle studies.  You see that,

6 December 31st, '59?

7     A.    Yeah.

8     Q.    And, again, sir, they found more and

9 more results for tremolite in the ore, correct?

10    A.    Yeah, yes, tremolite.

11    Q.    If you go to the very last page,

12 again, it's kind of small type.  But you can see

13 over and over again -- by the way, when it says,

14 less than one, that's not the same as trace,

15 correct, because when they find trace, they mark

16 trace, true?

17    A.    Sometimes they mark trace, yeah.  And

18 sometimes they mark less than one.

19    Q.    Okay.

20    A.    Yeah.

21    Q.    And they're not reporting on all

22 those other accessory minerals, the apatite, the

23 titanite, the other ones, they're reporting on

24 tremolite, dolomite and talc?

25    A.    They are.  But when you add up

1 horizontally, that pretty well comes to a hundred.

2     Q.    Okay.

3     A.    Between platy, non-platy, yeah.

4 That's pretty well everything there.  So it doesn't

5 mean you're going to get apatite or rutile or any of

6 the minerals in those particular samples.

7     Q.    Next one -- go to -- this says

8 March 8th, 1960.  And this one is in evidence as

9 2350.

10        You see this is pilot plant

11 beneficiation of Italian run of mine talc,

12 March 8th, 1960, right?

13    A.    Yes.

14    Q.    Okay.  Let's just go to one of their

15 tables where they do characteristics of talc

16 products.  Tremolite, they find it in every single

17 one, right?

18    A.    What table is that?

19    Q.    This is Table 8.

20    A.    Yes, they report tremolite.

21    Q.    And, of course, they find it in a

22 Johnson & Johnson shelf product that was a sample

23 from 1958, right?

24    A.    August '58, yes.

25    Q.    Okay.  So we know -- they know by

1 now, this is 1960, certainly, that even if they

2 benefitiate, they float the talc, that tremolite

3 makes it through that process and even into the

4 final product, right?

5     A.    Yes, if they -- yes.

6     Q.    Johnson & Johnson knew there was

7 tremolite unequivocally in the source ore and in the

8 final product, correct?

9     A.    Tremolite, yes, tremolite.

10    Q.    Yes, I understand.

11    A.    Yeah.

12    Q.    If you will turn, sir, to -- it

13 should just be marked 2,000.  So it's probably in

14 that final binder.  It should be marked 2,000 and

15 it's in that last binder.  Let me know when you have

16 it.

17    A.    Yeah, we have it.

18    Q.    Can you see, sir -- you know what

19 interrogatories are, right?

20    A.    Yes.

21    Q.    Interrogatories are questions in a

22 lawsuit where one person asks questions of the other

23 and the other has to answer them under oath, just

24 like you've taken the oath in a courtroom, right?

25    A.    Yes.

Page 138

1    Q.    Okay.  And these are Johnson &
2 Johnson's answers to interrogatories filed here in
3 Middlesex County, right?
4    A.    Yes.
5    Q.    Okay.  In the Krishinsky case, do you
6 see that?
7    A.    Yes.
8    Q.    And if you go to the end, go to very
9 end, the last page, you'll see that there's a
10 certification by the person from Johnson & Johnson
11 who answered those interrogatories, Nancy Musco.  Do
12 you see that?
13    A.    I see that, yes.
14    Q.    And this is signed May 23, 2000,
15 right?
16    A.    Yes, it is, yeah.
17    Q.    That's 40 years give or take after
18 most of the Battelle studies we saw, right?
19    A.    Yes.
20    Q.    Okay.
21          MR. PANATIER:  Your Honor, we offer
22 these into evidence, Exhibit 3173.
23          MS. SULLIVAN:  I believe your Honor
24 has already ruled on this.
25          THE COURT:  Can I see you at sidebar.

Page 139

1          (Sidebar.)
2          MS. SULLIVAN:  Your Honor, we have --
3          THE COURT:  Wait, wait, wait.  I
4 didn't hear you.  Just get closer.
5          MS. SULLIVAN:  Sure.
6          THE COURT:  Go ahead.
7          MS. SULLIVAN:  We had a continuing
8 objection to the line of lawsuits.  But your Honor
9 already ruled on that so...
10          THE COURT:  I did.  Okay.  Thank you.
11          (Sidebar ends.)
12          THE COURT:  It's now admitted into
13 evidence.
14          (Plaintiff's Exhibit 3173 was moved
15          into evidence.)
16          MR. PANATIER:  Thank you.
17 BY MR. PANATIER:
18    Q.    Sir, will you turn to Question 17,
19 please.
20    A.    Yes.
21    Q.    The question that Johnson & Johnson
22 was asked was, "Describe in detail all processes,
23 procedures and testing performed upon the talc used
24 in the manufacture of Johnson's Baby Powder to
25 reduce or eliminate the existence of asbestos,

Page 140

1 tremolite or other contaminants in Johnson's baby
2 powder."
3          And what Johnson & Johnson wrote here in
4 2000 and verified was, "To the best of Defendant's
5 knowledge, talc used in the manufacture of Johnson &
6 Johnson's Baby Powder never contained asbestos in
7 any form or tremolite."  Did I read that right?
8    A.    You read what was written, yes.
9    Q.    And that's sworn answer was false,
10 correct?
11    A.    I'm not going to speculate it was
12 intended to be false.  It is not correct.
13    Q.    Let's parse that out, right.  It's
14 false, correct?
15    A.    It is not correct.
16    Q.    And it was certified -- it was
17 certified by Nancy Musco who is someone that you
18 have actually worked with in this litigation,
19 correct?
20    A.    I never actually met Nancy Musco.  I
21 think I may have spoken to her once on the phone,
22 but she was -- when I was based here in New Jersey,
23 she was in the same building, but I don't believe I
24 ever actually met her.
25    Q.    Have you met with any individuals

Page 141

1 with Johnson & Johnson to help them prepare for
2 their depositions in this litigation?
3    A.    I don't really understand the
4 question.
5    Q.    Sure.  Did you help prepare any
6 Johnson & Johnson employees or former employees for
7 their depositions?
8    A.    I've not been involved in this
9 particular deposition, no.
10    Q.    I'm not asking about this case.
11    A.    Oh, right.
12    Q.    I'm asking for any depositions, have
13 you helped prepare any people whether it be Ms.
14 Musco or Nicholson or anybody else for their
15 depositions?
16          MS. SULLIVAN:  Your Honor, sidebar.
17          THE COURT:  Sure.
18          Don't answer.
19          (Sidebar.)
20          MS. SULLIVAN:  Your Honor, I don't
21 know what the answer is, but he's a consultant for
22 Johnson & Johnson.  And if the company had him
23 prepare employees, that's privileged and work
24 product.
25          THE COURT:  One person at a time.

36 (Pages 138 - 141)

1      MS. PLACITELLA:  I was at the
2  deposition, your Honor.  She testified under oath as
3  I recall that she spoke to Dr. Hopkins and that was
4  part of the basis for being prepared to testify as a
5  corporate representative for Johnson & Johnson in
6  these cases.  Dr. Nicholson and Nancy Musco, I
7  believe, said the exact same thing, not only that
8  but they were on the phone going over all the tests
9  and what they meant.
10      MR. MAIMON:  By designating this
11  gentleman as the corporate representative, your
12  Honor, they've waived attorney-client privilege.
13  He's no longer -- he's not -- by evoking the rule
14  what -- the Federal equivalent 30(b)(6) to designate
15  him, to educate him and so forth, they've waived any
16  attorney-client privilege with regard to him.
17      MS. SULLIVAN:  Not for preparation of
18  other witnesses.
19      MR. PLACITELLA:  I, actually, recall
20  Dr. Nicholson -- and I can probably find it -- bring
21  in the notes from her conversation, which were
22  marked at her deposition and she said she actually
23  relied upon them in her testimony.
24      THE COURT:  Okay.
25      MR. PANATIER:  Right now the question

1  is, did you help prepare them.
2      THE COURT:  That's not privileged and
3  I'll allow it.  Thank you.
4      (Sidebar ends.)
5      (There is a discussion off the
6      record.)
7      THE COURT:  You can answer the
8  question, Doctor.
9      THE WITNESS:  Would you repeat it?  I
10  just want to make sure it's top of mind.
11  BY MR. PANATIER:
12  Q.    Did you help in this litigation meet
13  with via in person or on the phone prepare Ms. Musco
14  or Ms. Nicholson for their testimony?
15  A.    In this litigation?
16  Q.    In this litigation.
17  A.    The answer is, no, not in this
18  litigation.
19      THE COURT:  No, wait, wait.  The
20  witness was pointing to the Answers to
21  Interrogatories.  So please be clear with what
22  you're asking.
23  BY MR. PANATIER:
24  Q.    This presently, me and you, this
25  litigation?

1  A.    Not in this litigation, no.
2  Q.    You did not, not this case or any
3  other cases?
4  A.    Wait a minute.  This litigation --
5  today, you mean in this particular case we're doing
6  today?
7  Q.    Let me back up.  I'm trying to make
8  this simple.  Let's back up.
9  A.    Yeah, I'd appreciate that.
10  Q.    Have you ever met and helped prepare
11  Ms. Nicholson or Ms. Musco for their testimony?
12  A.    The answer to that question is, yes.
13  Ms. -- Dr. Nicholson I spoke to last year and she
14  asked me a question and I -- or some questions and I
15  explained a little bit of background, yeah.
16  Q.    Let's read this answer a little bit
17  further.  "Defendant sources of talc were selected
18  for their lack of contaminants and further testing
19  was performed over a significant number of years by
20  outside laboratories which verified the talc sources
21  did not contain asbestos or tremolite."
22      Did I read that right?
23  A.    Yes, you read what was written.
24  Q.    That's entirely wrong, isn't it?
25  A.    Yeah, and, you know, I'm not going to

1  explain or speculate on whether she understood
2  asbestos in tremolite or did it mean asbestos
3  tremolite, yeah.
4  Q.    Let's see what she says about how she
5  got these answers.  She says, "I'm employed by
6  Johnson & Johnson Consumer Companies, Inc."
7      THE COURT:  Where are you reading
8  from, Counsel?
9      MR. PANATIER:  The same -- sorry, the
10  interrogatories, your Honor.
11      THE COURT:  Thank you.
12      MR. PANATIER:  This is the same
13  exhibit.  I was reading from before, the 2000
14  Krishinsky Exhibit 3173.
15  BY MR. PANATIER:
16  Q.    "The foregoing Answers to
17  Interrogatories were prepared with the assistance
18  and advice of Counsel for JJCI and upon whose advice
19  and information JJCI and I relied."
20      So the lawyers helped her put this together,
21  right?
22  A.    They used the word "Counsel," did
23  they?
24  Q.    Yes.
25  A.    Counsel, that was...

Page 146

1    Q.    That's lawyers, right?
2    A.    Yes. It says "Counsel," yes.
3    Q.    Okay. So Ms. Musco with the help of
4  the J&J lawyers said that there had never been
5  tremolite in Johnson & Johnson's source ore and
6  that's false, correct?
7    A.    No, we know that there is tremolite,
8  has been reported in the Italian talc many, many
9  times, yes.
10    Q.    And we know that the extensive
11  testing they refer to showed the tremolite to be
12  there, right?
13    A.    Yes, I'm not disputing that.
14    Q.    And these answers were provided to
15  someone who is representing someone with a disease,
16  correct?
17    A.    Well, the interrogatory is what it
18  is.
19    Q.    Right.
20    A.    It states what it is.
21    Q.    And you understand that people rely
22  upon those statements that are made by the company,
23  correct?
24    A.    Yes.
25    Q.    When they are trying to decide do I

Page 147

1  have a case, they're relying on your answers, you
2  know that, right?
3    A.    Yeah, and she did say or the person
4  who wrote it said, no asbestos.
5    Q.    Right. And no tremolite?
6    A.    And they said that as well.
7    Q.    And those -- that verification, that
8  is done under oath, correct?
9    A.    Well, it is what it is. It says what
10  it says. It says, no asbestos or tremolite.
11    Q.    You have answered interrogatories,
12  have you not?
13    A.    Yes.
14    Q.    And those were under oath, you know
15  it's just like being here?
16    A.    Yes.
17    Q.    I have good news. I am going to skip
18  some Battelle stuff. We've done a lot of that.
19        Let's go to December 4, 1978. It
20  should be in the -- it may be in the third binder
21  that I haven't given you yet.
22        MR. PANATIER: Here you go.
23    Q.    Yeah, here's 78.
24        Okay, last binder. Here you go.
25        MR. PANATIER: Your Honor, here you

Page 148

1  go.
2        THE COURT: Thank you.
3  BY MR. PANATIER:
4    Q.    Now, some of the tabs you'll see are
5  just marked 78, because there's no other date given.
6  But this one does have a date. This is one is
7  December 4, 1978.
8    A.    Okay.
9    Q.    Okay. And do you see, sir, that this
10  is a letter from George Lee, the Director of Applied
11  Science -- where is he? There he is. Director of
12  Applied Research, sorry, December 4th, 1978. And
13  he's writing to NIOSH, correct?
14    A.    Yes. Yes.
15        MR. PANATIER: And, your Honor, I'll
16  offer this into evidence.
17        THE COURT: What's the marking on it?
18        MR. PANATIER: 3624, your Honor.
19        MS. SULLIVAN: No objection.
20        THE COURT: So admitted. Proceed.
21        (Plaintiff's Exhibit 3624 was moved
22      into evidence.)
23    Q.    Okay. Doctor, it says, "Dear Dr.
24  Rose," who was at NIOSH. "It was a privilege to
25  serve as the American Industrial Hygiene Association

Page 149

1  reviewer for the working draft of the criteria for a
2  recommended standard occupational exposure to talc.
3  Please find enclosed my comments and reply to the
4  list of questions furnished by NIOSH."
5        So NIOSH asked some questions and this
6  fellow from Johnson & Johnson answered them,
7  correct?
8    A.    Yes.
9    Q.    Really all I want to talk about is
10  the next page. He discusses asbestos. Know the
11  terms non-asbestiform and asbestiform, as they have
12  been used through the criteria document, are
13  technically imprecise and were further confused by
14  interchangeable use of terms such as fibrous talc,"
15  et cetera, et cetera.
16        Here's what I want to get to.
17        "If the ultimate purpose is to
18  categorize the tac bearing mineral dust according to
19  associated health affects, the following grouping
20  should be made on the basis of knowledge of their
21  compositions: High purity grade of talcs, cosmetic
22  and pharmaceutical grades, which do not contain
23  detectable asbestos and do not contain detectable
24  quartz according to present commercial analytical
25  methods," and it has an asterisk, right?

38 (Pages 146 - 149)

Page 150

1     A.     Uh-huh.
2     Q.     And then he gives the definition of
3 asbestos, correct?
4     A.     Yes.
5     Q.     "Asbestos is defined as the finally
6 fibrous form of serpentine known as chrysotile and
7 five fibrous forms of the amphibole group amosite,
8 anthophyllite, crocidolite, tremolite and
9 actinolite." Did I read that right?
10     A.     You did, yes.
11     Q.     Okay. And so the definition of
12 asbestos that Johnson & Johnson gives to NIOSH
13 doesn't say anything about how it grew in the
14 ground, just that it is fibrous, correct?
15     A.     It talks about the fibrous form means
16 it's asbestos.
17     Q.     Right, if it's fibrous, true?
18     A.     As opposed to the broad form.
19     Q.     Yes. Right, it says if it's fibrous,
20 it's asbestos, right?
21     A.     That's what that definition says,
22 yes.
23     Q.     Okay. So that's Exhibit 3624. Now,
24 let's look at -- this is January 10, '94, yeah.
25          MR. PANATIER: This is already in

Page 151

1 evidence, your Honor. This is Exhibit 2729.
2 BY MR. PANATIER:
3     Q.     And, sir, I'll just show you this
4 one. It will be a little quicker, because it's
5 already in evidence.
6          January 10, '94, do you see that? You can
7 look on the screen if it's easier or struggle to
8 find the right binder.
9     A.     It's a different binder.
10     Q.     Yes.
11     A.     Okay.
12     Q.     You see this where it says, "Summary
13 of raw material and finished product testing for
14 baby powder talc," right?
15     A.     Yes.
16     Q.     So this is the testing protocol, what
17 they do for the different things they're testing for
18 as of '94, right?
19     A.     Yes.
20     Q.     Okay. And we're going to turn to
21 this page. And you can see this is the
22 specification -- at this time Cyprus owned the mine
23 that Johnson & Johnson used to own, correct?
24     A.     Yes.
25     Q.     And, by the way, Windsor 66, that's

Page 152

1 baby powder, right?
2     A.     Yes.
3     Q.     Okay. They define asbestos again
4 under CTFA J4 and TM7024. So one of those is
5 XRD/optical and one of those electro microscope,
6 right?
7     A.     Yes.
8     Q.     Right?
9          They say, it has to be none detected, true?
10     A.     Yes.
11     Q.     And then they define it, "Asbestos is
12 defined to be the fibrous serpentine chrysotile and
13 the fibrous forms of the amphibole group as
14 represented by amosite, anthophyllite, crocidolite,
15 tremolite and actinolite," right?
16     A.     Yes.
17     Q.     They don't say anything about having
18 a geologist tell you how it grew in the ground, do
19 they?
20     A.     No, they describe whether it's
21 fibrous or not fibrous.
22     Q.     So I took those two documents and I
23 made us a poster, because we're going to start
24 looking through some documents probably at the
25 break -- after the break and we're going to compare

Page 153

1 what those documents say to the definitions that
2 Johnson & Johnson has provided, okay? Do you see
3 those?
4     A.     Yes.
5     Q.     Can you read them okay?
6     A.     Well, let me get my driving glasses.
7     Q.     Because I want to double-check with
8 you that these are what we just looked at before we
9 go into a series of documents.
10          Are those quotations accurate from what we
11 just looked at?
12     A.     Those are from two documents, yes.
13 One is the specification and the other is a
14 memorandum written by an employee to NIOSH.
15     Q.     To NIOSH. The one we looked at just
16 before this, true?
17     A.     Yes.
18     Q.     Okay. So Johnson & Johnson
19 internally has defined asbestos as the fibers of any
20 of these minerals, chrysotile, amosite,
21 anthophyllite, crocidolite, tremolite or actinolite,
22 correct, sir?
23     A.     No. The fibrous form, not "fibers,"
24 fibrous form need to be -- that's what you've
25 written on the yellow highlight, "fibrous form."

Page 154

1     Q.     Is a fiber fibrous, sir?
2     A.     It may or may not be.  It depends on
3 the -- on the -- how the microscopist is defining
4 it.  So, for constancy, we should use the word
5 fibrous.  There's a definition for fibrous.
6     Q.     Well, let me just ask you.
7      Is a fiber fibrous?
8     A.     It can be.  But it may not be.
9     Q.     So you can have a fiber that is
10 fibrous and a fiber that's not fibrous?
11     A.     Yes.  And that's -- you have to talk
12 to geologist and microscopist to explain the fibrous
13 form of those minerals is the asbestos form.
14     Q.     Okay.  Hold on.  Let's see how --
15 let's see how Johnson & Johnson defines fiber then,
16 one second, and then we'll take a break.
17           This will be 1995, sir.
18           (There is a discussion off the
19     record.)
20     Q.     Have you found it?
21     A.     I'm sorry, what is the year?
22     Q.     1995.
23     A.     I thought you were going to put it on
24 the screen.
25     Q.     Yep.  It just says 1995 on it because

Page 155

1 that's the only date that's on the document.
2           (There is a discussion off the
3     record.)
4     Q.     Okay.  This is in evidence already as
5 Plaintiff's Exhibit 2736.  And I'll just show it to
6 you since it's already in evidence.
7     A.     Okay.  I was to have found it
8 otherwise.
9     Q.     This here is Johnson & Johnson's
10 TM7024, correct?
11     A.     Yes.
12     Q.     This is the test method that Johnson
13 & Johnson had for electron microscopy, the testing
14 of powder talc, right?
15     A.     Yes.
16     Q.     For asbestiform minerals, true?
17     A.     Yes.
18     Q.     If we go to how they define it,
19 definition of a fiber, "any elongated particle with
20 parallel sides and an aspect ratio greater than or
21 equal 3-to-1," right?
22     A.     The definition may vary with needs of
23 the client, yes.
24     Q.     Right.  So the only definition of
25 fiber that Johnson & Johnson has given us using

Page 156

1 their documents is a particle with parallel sides
2 and an aspect ratio greater or equal to three times
3 as long as it is wide, right?
4     A.     Well, that's a definition.
5     Q.     That is "the" definition that they've
6 given in their very method --
7     A.     That is a definition in that
8 particular methodology.
9     Q.     This was always their definition in
10 7024, correct?
11     A.     Yes.
12     Q.     In fact, it's the definition today,
13 isn't it?
14     A.     That is the same test effort today,
15 yes.
16     Q.     And that is an individual fiber that
17 is being described, correct?
18     A.     It is, yes.
19     Q.     Okay.
20           MR. PANATIER:  Your Honor, this is
21 probably a good time to break.
22           THE COURT:  Okay.  Members of the
23 Jury, we're going to take the lunch break now.
24 Please be ready to come back upstairs at 1:30.
25 Remember to wear your juror badges where they are

Page 157

1 visible.
2           No discussions with regard to this case,
3 including the testimony you just heard.  No research
4 of any kind whatsoever.
5           Enjoy your lunch.  You can please
6 leave your notebooks here.  At 1:30 be ready to come
7 back upstairs.
8           (Jury exits.)
9           THE COURT:  And we're off the record.
10           (Lunch recess taken 12:26 p.m. to
11     1:28 p.m.)
12           (Jury enters.)
13           THE COURT:  Please be seated.  Make
14 sure cell phones are turned off.  Whenever you are
15 ready you may continue.
16           MR. PANATIER:  Thank you, your Honor.
17 Good afternoon, everybody.
18 BY MR. PANATIER:
19     Q.     Okay.  Dr. Hopkins, let's come back
20 to BabyCenter.com.  Do you remember we started to
21 talk about that earlier this morning?
22     A.     Yes.
23     Q.     And you said that was a website that
24 Johnson & Johnson owned, right?
25     A.     It's a domain name, yes.

40 (Pages 154 - 157)

1     Q.    Is that their only involvement?
2     A.    As far as I know, they're not
3 responsible for the content, the written content.
4     Q.    Do you recall in October of 2018 when
5 I questioned you about Baby Center and we went over
6 a Johnson & Johnson press release about trying to
7 reach millennial moms?
8     A.    Yes.
9     Q.    And do you recall in that press
10 release where Johnson & Johnson said we're going to
11 use Baby Center as the engine to get our word out?
12        Do you recall that?
13    A.    I do, yes.
14    Q.    Okay.  Let me know if you need to see
15 it.  But what we went over was someone named at
16 Alison Lewis at J&J had said digital -- let's see.
17 "Digital marketing and communications will play an
18 important role in the relaunch and the company will
19 use its Baby Center On-line Parenting Community as
20 the engine.  Alison Lewis, the Global Chief
21 Marketing Officer at J&J told analysts earlier this
22 month."
23        Do you recall that?
24    A.    Yes.  They use the on-line community,
25 yes.

1     Q.    It's Baby Center as the engine,
2 correct?
3     A.    Read that again, because it's
4 important.  They talk about the on-line community.
5     Q.    Sure.  "Digital marketing and
6 communications will play an important role in the
7 relaunch and the company will use its Baby Center
8 On-Line Parenting Community as the engine.  Alison
9 Lewis the Global Chief Marketing Officer at J&J
10 consumer told analysts earlier this month."
11        Is that what you wanted to hear again?
12    A.    Yes, the on-line community, yes, yes.
13    Q.    Okay.
14        (There is a discussion off the
15        record.)
16        MR. PANATIER:  This will be 3695-23.
17    Q.    Do you see that this is a Power Point
18 entitled "Leadership and Insight" dated 2007 Johnson
19 & Johnson Baby GBU?
20    A.    Yes.
21        MR. PANATIER:  Okay.  And, your
22 Honor, at this time we offer this exhibit into
23 evidence.
24        MS. SULLIVAN:  Your Honor, it looks
25 like it stops at Page 4 and goes to Page 31.  So I'm

1 not sure where the rest of it is.
2        MR. PANATIER:  It's an excerpt for
3 just this purpose.
4        THE COURT:  Okay.  Subject to -- hold
5 on.  Sidebar.
6        MS. SULLIVAN:  I'm sorry.
7        (Sidebar.)
8        THE COURT:  Okay.  So it's
9 incomplete.  You say it's an excerpt.  What else?
10        MS. SULLIVAN:  This is -- it's not
11 relevant and proper for (INAUDIBLE) on its message
12 on its face and it has this little Trump summation
13 to baby powder, the financial numbers.
14        MR. PANATIER:  I'm not going to use
15 that.  I'm only going to use this page, this page
16 about Baby Center.  So we'll redact that.
17        MS. SULLIVAN:  Okay.
18        THE COURT:  And subject to then the
19 entire document unless, of course, there's other
20 issues with the rest of it, we'll deal with it at
21 sidebar.
22        MS. SULLIVAN:  No objection.  Thank
23 you.
24        (Sidebar ends.)
25        THE COURT:  So that's admitted into

1 evidence subject to the Court's specific ruling.
2        MR. PANATIER:  Thank you, your Honor.
3        (Plaintiff's Exhibit 3695-23 was
4        moved into evidence.)
5 BY MR. PANATIER:
6     Q.    Alright.  So here's our Power Point
7 and you see here this would be on the page marked 31
8 which is the last page, "Johnson's CRM efforts."  Do
9 you know what "CRM" means?
10    A.    No, sorry, no.
11    Q.    I didn't either until I saw right
12 down here; customer relationship marketing, right?
13    A.    Well, there you go then.
14    Q.    Right?  You see where it says,
15 "Johnson CRM efforts."  And the first one is
16 reaching 90 percent of mommies through Baby Center.
17 Do you see that?
18    A.    Yes.
19    Q.    And do you see where they say they
20 own BabyCenter.com?
21    A.    That's what they said, they own --
22 yeah, that's a website name, BabyCenter.com.
23    Q.    Right.  They run their consumer
24 customer relationship marketing through Baby Center
25 as well as other on-line places, correct?

41 (Pages 158 - 161)

Page 162

1      A.      Yes, they say -- they say they sent
2 6.7 million e-mails in 2007.
3      Q.      The fact that they own
4 BabyCenter.com, the fact that the director of
5 marketing said, we're going to use that as an engine
6 to get out information about our products and this
7 together, sir, can you accept the fact that Johnson
8 & Johnson is active in Baby Center and does control
9 it?
10      A.      They're certainly "active" in it.
11 But the point I made was that they were not
12 responsible for every text that's written on the
13 website.
14      Q.      So are you saying that even though
15 they own this website that they actively use to try
16 to promote their products, that they just ignore the
17 content, they don't vet the content; is that what
18 they're saying?
19      A.      That is true, they do not vet the
20 content.  There are things on there that may or may
21 not agree, but they do not vet it.  It's written by
22 external pediatricians and others who play a role in
23 putting the text together.
24      Q.      So they don't actually vet what goes
25 on this website that they own?  Doesn't that sound

Page 163

1 irresponsible?
2           MS. SULLIVAN:  Objection, your Honor,
3 that's argument.
4           THE COURT:  Objection sustained.
5           Please rephrase.
6 BY MR. PANATIER:
7      Q.      So they don't vet anything that goes
8 on this domain name they own, Johnson & Johnson?
9      A.      They don't -- they don't control it.
10 They don't say, take that off, whatever.  They may
11 have a dialogue.  But it sounds difficult to explain
12 and it is difficult to explain, but they don't fully
13 own the text that goes on there.
14      Q.      So let's explore -- let's vet, if you
15 will, some of your foundation for these statements,
16 okay?
17      A.      Yes.
18      Q.      When was BabyCenter.com purchased by
19 Johnson & Johnson?
20      A.      Several years ago.  I don't remember
21 the exact year.  It was maybe early 2000s from my
22 recollection.
23      Q.      Early 2000s?
24      A.      I think it was the early 2000s.
25      Q.      Who runs it?

Page 164

1      A.      It's run by an external organization.
2      Q.      What are they called?
3      A.      I don't know what they're called.
4      Q.      Who at Johnson & Johnson is the
5 liaison with this third party?
6      A.      Again, I do not know who that
7 individual is.  It is run as an external system for
8 educating moms with babies.
9      Q.      What meetings did you go to about
10 BabyCenter.com?
11      A.      I personally have not been to
12 meetings with -- about BabyCenter.com.
13      Q.      What pamphlets or information did you
14 receive about what they vet; what they don't vet;
15 how much control they exercise over it?
16      A.      I have not received pamphlets as to
17 what they vet or do not vet.
18      Q.      What about any correspondence?
19      A.      Well, I've not seen correspondence in
20 the recent years.
21      Q.      Can you point to one thing you've
22 actually seen that can back up what you're telling
23 the jury today about how they have no control over
24 the content, over BabyCenter.com?
25      A.      Yes.  I've discussed this with --

Page 165

1           MR. PANATIER:  Your Honor, I'm going
2 to object to hearsay.
3           THE COURT:  Objection sustained.
4           The question was, have you seen
5 anything?
6 BY MR. PANATIER:
7      Q.      Have you seen anything?
8      A.      No.
9           MR. PANATIER:  Your Honor, at this
10 time we're going to ask to put up BabyCenter.com on
11 its current form on the Internet.
12           MS. SULLIVAN:  And, you Honor, I'm
13 just going to object to all the hearsay statements
14 from outside of J&J.
15           MR. PANATIER:  They own it, your
16 Honor.
17           THE COURT:  Objection overruled.
18           You can go right ahead.
19           What's the marking for that?
20           MR. PANATIER:  We would print this
21 out and we would make it 3695-24.
22           THE COURT:  Thank you.
23           MR. PANATIER:  Whenever you shut your
24 laptop, you have to go back on-line.
25           (There is a discussion off the

42 (Pages 162 - 165)

1      record.)
2 BY MR. PANATIER:
3      Q.   Let's see if I'm on-line.  There we
4 go.  It looks like it.  Can you see Baby Center up
5 there?
6      A.   Yes.
7      Q.   Okay.  Let's go to babies.  Let's see
8 -- there we go.  Okay.  We'll go down here.  Let's
9 see here.  Diaper, diapering and bottom care.
10 That's probably where we will find baby powder,
11 right?  Right above "poop 101"?
12     A.   Yes, it's a good place as any.
13     Q.   Let's go to "diaper rash."  Alright.
14 Let's see here.  "Diaper rash," let's click on this
15 article.
16          It actually says here that --
17 underneath there it says, "written by Baby Center
18 staff, reviewed by Baby Center Medical Advisory
19 Board updated February 2017," right?
20     A.   Yes.
21     Q.   So it is, certainly, vetted by the
22 Board as referenced right there, correct?
23     A.   Well, the Baby Center Medical
24 Advisory Board is what I was talking about, the
25 external advisors, medical physicians and others,

1 nurses.
2      Q.   How do you know that's who you were
3 talking about?  When I asked you who you were
4 talking about, you said, I didn't know.
5      A.   I thought I did.  I thought I said it
6 was an external group.
7      Q.   And you're telling us now that's the
8 group?
9      A.   Well, that's one of the names of it,
10 yes.
11     Q.   So let's look and see what they say
12 about diaper rashes.  Let's go to how do I -- let's
13 see.  How do I treat it?  Let's see if that works.
14          There we go.  You see this right
15 here?  "Don't use powders or cornstarch because the
16 particles can be harmful to a child's lungs if
17 inhaled.  Also some experts think cornstarch can
18 make a yeast diaper rash worse."  Do you see that?
19     A.   Yes.
20     Q.   And I've shown you that before,
21 haven't I?
22     A.   You have, yes.  And I don't disagree
23 with it.
24     Q.   So Baby Center, the website that
25 Johnson & Johnson owns says that you shouldn't use

1 powder or cornstarch at all on children,
2 specifically, because the particles can be harmful
3 to their lungs, right?
4      A.   If inhaled, yes.  And we talked about
5 that.  If you look on the pack, it talks about
6 avoiding tipping a powder on your face and blocking
7 your nose.
8      Q.   So the only way that a baby inhales
9 powder is if you dump it in their face?
10     A.   No.  But that's the one that causes
11 most concern is if a baby grabs a carton of baby
12 powder, tips it on its face, blocks the nose and
13 mouth, that's dangerous.
14     Q.   This doesn't say that, though, does
15 it?
16     A.   It's only saying it in a -- five
17 words in a sentence.
18     Q.   Right.  It says, "don't use it."
19 Pretty simple, right?
20     A.   That's what it says.
21     Q.   And let me ask, does Johnson &
22 Johnson on its baby powder that it sells say, don't
23 use this on your children?
24     A.   No, it's baby powder.
25     Q.   It still doesn't have anything but

1 the twisty lid, right?
2      A.   If you look at the cap.
3      Q.   Just can you just answer that
4 question?
5      A.   It has a twist --
6          MS. SULLIVAN:  Your Honor --
7      A.   What am I about to say --
8          THE COURT:  Wait, wait.  Hold on.  I
9 can't have three people talking at the same time.
10         The question was?
11     Q.   All that the bottle currently has is
12 the twist lid at the top that opens and shuts the
13 holes, correct?
14     A.   It has twist lid which opens and
15 closes holes which are around the perimeter which
16 retard or reduce the amount of powder that can come
17 out and cause a nasal blockage.
18     Q.   As opposed to just taking off and
19 having the full mouth of the container?
20     A.   Well, they've never had the full
21 mouth of the container.  They always had a series of
22 ten or seven holes in there.
23     Q.   Alright.  So we were talking about
24 tremolite earlier today.  Do you recall that?
25     A.   Yes, yes.

Page 170

1    Q.    I'm sure you do.
2    A.    Yes.
3    Q.    One of the documents that we saw last
4  week from defense Counsel was Defense Exhibit 7044.
5  It's in evidence. That's this document right here.
6        And this is Fred Pooley, right? We've
7  talked about Fred Pooley, you and I already, haven't
8  we?
9    A.    Yes.
10    Q.    And Fred Pooley in 1972 he reported
11  that he had looked at some samples going back to
12  1949 as well as in the 00000 talc, that's the
13  Italian, right?
14    A.    Yes.
15    Q.    And you can see he says that, "No
16  chrysotile was found at the mine or in samples
17  taken. Some tremolite was located but was not
18  asbestiform in character and has not been detected
19  in 00000 talc imported into Great Britain for the
20  past year nor in shipments dating back to 1949."
21        When Johnson & Johnson received this,
22  did they send to Dr. Pooley all of those Battelle
23  memorial reports that you and I had showing
24  tremolite again and again and again in the Italian
25  talc?

Page 171

1    A.    I don't know. But I can tell you
2  that Dr. --
3        MR. PANATIER: Your Honor, I would
4  object as to nonresponsive.
5    A.    I don't know then.
6        THE COURT: Just -- thank you, thank
7  you.
8        MR. PANATIER: This will be
9  Exhibit 3127.
10    Q.    This is dated March 3rd, '72. So it
11  should be in your first binder. Does that one go to
12  March 3rd, '72?
13    A.    Give me a second.
14    Q.    Sure.
15    A.    Yep.
16    Q.    Yep, you found it.
17    A.    Yep.
18    Q.    Okay, great.
19        Do you see that this is a Johnson & Johnson
20  memo. It is from, I believe, it's from Mr. Russell.
21  Yes, R.S. Russell dated March 3rd, 1972?
22    A.    Yes.
23    Q.    And the subject is "domestic talc
24  sources 101, North Carolina"?
25    A.    Yes.

Page 172

1    Q.    Now, Johnson & Johnson would from
2  time to time vet other talc sources, correct?
3    A.    I wouldn't use the word "vet." This
4  Project 101 was to look at some like 50 different
5  talc sources in the United States as options for
6  when the Vermont mine ran of talc.
7    Q.    Okay.
8    A.    So they looked at that particular
9  mine, yes.
10    Q.    They looked at alternative sources?
11    A.    They looked at about 50 different
12  mines.
13    Q.    Right. North Carolina never ended up
14  being a source that they used, right?
15    A.    They never ever use any source other
16  than in Vermont.
17    Q.    Now, if you will turn to the page
18  that he signed, the page marked three. Do you see
19  that?
20    A.    Yes.
21    Q.    Right. They decided not to use the
22  North Carolina, correct?
23    A.    Yes, correct.
24    Q.    Right. And you see under
25  "conclusions" they've got some complaints. One they

Page 173

1  said it's badly off color, but they say, also the
2  presence of tremolitic amphibole is "bad," right?
3    A.    That's what is written, yes.
4    Q.    We know that tremolitic amphibole was
5  all throughout the Italian and in Vermont, correct?
6    A.    We know that tremolite is present in
7  the Italian talc, yes.
8    Q.    Literally tremolitic amphibole is
9  present --
10    A.    Well, amphibole is a --
11    Q.    Let me finish the question first.
12  Sorry.
13        Tremolitic amphibole is in the Vermont and
14  the Italian talc, correct?
15    A.    There was amphibole in the Italian
16  and Vermont talc, which can be in the form of
17  tremolite.
18    Q.    Okay. And that's what he's saying
19  here. They decide not to use it for two reasons,
20  the color and the fact that there's tremolitic
21  amphibole?
22    A.    Yes, it's unpleasant on the skin. If
23  you have a lot, it's very prickly.
24    Q.    Oh, that's why, because it doesn't
25  feel good on the skin?

44 (Pages 170 - 173)

1    A.    It, certainly, does not. If it's
2  needlelike and prickly, it does not feel good on the
3  skin.
4    Q.    Let's take a peak at it. Go ahead
5  and look at the second page where it says,
6  "tremolitic amphibole." "The amphibole appears to
7  be tremolitic and occurs in columnar bundles and
8  individual long, thin prismatic crystals," correct?
9    A.    Yes.
10    Q.    And we know that that description,
11  right, if you have long thin, whatever you want to
12  call it, bundles or prismatic crystals, that's going
13  to meet the definition that Johnson & Johnson has
14  set out for asbestos, correct?
15    A.    No. To meet the definition for
16  asbestos, it has to be what's called asbestiform.
17  That's a geological and mineralogical definition.
18    Q.    Hold on. Let us step back to Johnson
19  & Johnson's own definitions. That's the
20  asbestiform?
21    A.    No, but I did.
22    Q.    Yeah, I know you did. Did J&J?
23    A.    They talk about the fibrous forms of
24  those minerals.
25    Q.    Is that the asbestiform?

1    A.    No, it's defining asbestos.
2    Q.    Right.
3    A.    Which has to be the asbestiform
4  version.
5    Q.    Wait. Okay. I don't want to keep
6  going back and forth. But the reason I put these up
7  here was so we can see exactly how J&J defines them.
8  And you keep saying "asbestiform."
9      That word doesn't appear in Johnson &
10  Johnson's own definition, does it?
11    A.    It doesn't appear on those
12  definitions. It does appear in other definitions on
13  the specification of the product.
14    Q.    It appears -- right, in 7024 the word
15  "asbestiform" appears, correct?
16    A.    The word "asbestiform" appears where
17  it's used to describe a mineral in the -- of the
18  asbestos character.
19    Q.    Right. And it describes it as a
20  fiber that's 3-to-1, doesn't it?
21    A.    Well, that's one definition.
22    Q.    That's the only definition in 7024.
23    A.    But geologists give a bigger -- okay.
24    Q.    Just try to -- just answer the
25  question.

1      MR. SULLIVAN: Your Honor, I'm just
2  going to object. Counsel keeps interrupting Dr.
3  Hopkins.
4      MR. PANATIER: I'm going to object.
5      THE COURT: Okay. The Court Reporter
6  can't take multiple people speaking at the same
7  time.
8      Dr. Hopkins you are not answering the
9  question. The objection is overruled.
10      MR. PANATIER: I'll move to strike,
11  your Honor.
12      THE COURT: Stricken.
13      The Jury is not to consider that last
14  response.
15      One more time.
16  BY MR. PANATIER:
17    Q.    Dr. Hopkins, testing method 7024 put
18  together by J&J, right, they're TEM method, defines
19  asbestiform as a fiber of 3-to-1, does it not?
20    A.    The definition of fiber is 3-to-1.
21  Yes, we saw that this morning.
22    Q.    And they don't say anything about
23  what it means from a geological perspective or what
24  it might mean from a commercial perspective, do
25  they?

1    A.    Not in that short sentence version,
2  no.
3    Q.    But that's the protocol that people
4  are supposed to use to determine whether asbestos is
5  present when they test J&J talc by TEM, right?
6    A.    People who test it use that protocol,
7  correct.
8    Q.    Okay. So let's go back to this
9  document. He finds some "long thin prismatic
10  crystals of tremolitic amphibole," correct?
11    A.    You read what is written.
12    Q.    Right? And he says it's "bad."
13      Now you said, well, it's bad because it
14  feels prickly on the skin, right?
15    A.    It does feel prickly on the skin.
16  You wouldn't simulate nice soft baby powder, which
17  is prickly.
18    Q.    You know that Johnson & Johnson
19  actually admits in documents that I've shown you
20  that that was never the case? You know that, right?
21      MS. SULLIVAN: Objection, your Honor,
22  foundation and argumentative.
23      MR. PANATIER: I'm just asking if he
24  knows.
25      THE COURT: Objection is overruled.

45 (Pages 174 - 177)

1        You can answer.
2        A.    No, I don't -- I stand by my answer,
3    that if you've got prickly particles, it doesn't
4    feel good on the skin.
5        Q.    I would agree, generally, with you.
6    Right, if something is prickly, you don't want that
7    on your skin?
8        A.    Yeah, and, therefore, you consider it
9    "bad," as he said.
10       Q.    Does he mention that at all as the
11   reason they didn't want tremolite?
12       A.    Not in that letter, no.
13       Q.    And, in fact, sir, by '72, Johnson &
14   Johnson was well into the issue of asbestos in talc,
15   correct?
16       A.    The company was fully aware of the
17   controversy and the discussions on asbestos in talc
18   by '72.
19            MR. PANATIER:  We offer this document
20   into evidence, 3127, your Honor.
21            MS. SULLIVAN:  No objection.
22            THE COURT:  Okay.  So admitted.
23            (Plaintiff's Exhibit 3695-27 was
24       moved into evidence.)
25   BY MR. PANATIER:

1        Q.    He doesn't say anything about skin,
2    true?
3        A.    No, it's a very short memo talking
4    about a particular mine in the State of North
5    Carolina.
6        Q.    The question I asked is, does he say
7    anything about tremolite being "bad" because of how
8    it feels on the skin?
9        A.    He does not specify that, no.
10       Q.    Alright.  So here's a thing I wanted
11   to talk to you about, which is when you were at
12   Johnson & Johnson up until 2000, at some point were
13   you an executive there?
14       A.    Yes.
15       Q.    An executive, I guess, did you have
16   your own desk?
17       A.    Yes.
18       Q.    Okay.  And on your desk, I guess,
19   part of this era was an e-mail era and part of it
20   was probably in the more analog era, correct?
21       A.    Yes.
22       Q.    So we think inbox/outbox now as being
23   e-mail, but did you, actually, have an inbox and an
24   outbox on your desk where people would bring you
25   documents or you might send something out?

1        A.    Paper, paper, letters you mean?
2        Q.    Paper, yeah.
3        A.    No, I tended to use the phone and
4    e-mail but, yeah, the idea of using paper, no.  I
5    didn't have an inbox and outbox.  I mean, I would
6    have seen documents.  But I, personally, avoided
7    writing letters on paper when I could pick up the
8    phone.
9        Q.    You know what an inbox in?
10       A.    Yes, I do recollect that.
11       Q.    When something comes in, it goes in
12   the inbox, right?
13       A.    Yes.  It's like on my e-mail.
14       Q.    Right.  Outbox would be the reverse,
15   it is where something goes out, right?
16       A.    Yes.
17       Q.    So, as we go forward, what I want to
18   do is, I want to kind of examine what was in Johnson
19   & Johnson's inbox, okay, what information they were
20   receiving and then what information was in their
21   outbox, what they were sending out to people, okay?
22       A.    Sure.
23       Q.    Alright.  And so we can kind of keep
24   this organized, I actually made an inbox, you see,
25   right?

1        Okay.  And what we're going to put in this
2    inbox is any information --
3            MS. SULLIVAN:  I'm sorry, Counsel,
4    can I just see what you put in there?
5            MR. PANATIER:  Yeah.
6    BY MR. PANATIER:
7        Q.    Any information to Johnson & Johnson
8    about asbestos fibers, needles or amphiboles, okay.
9    And so we're going to put -- we'll put the inbox
10   right there.
11           And then so we can evaluate what
12   Johnson & Johnson sent out to other people, we have
13   an outbox, okay.  And this one says, out to
14   customers, nurses, doctors, regulators, employees
15   and the public, okay?  Is that okay with you?
16       A.    If that's the game you want to play.
17           THE COURT:  Can you show it to
18   Counsel.
19           MR. PANATIER:  Yeah.
20           MS. SULLIVAN:  Okay.
21   BY MR. PANATIER:
22       Q.    I'm sorry, if that's "the game" I
23   want to play?
24       A.    Yeah.
25       Q.    You think it's a "game"?

46 (Pages 178 - 181)

Page 182

1    A.    Well, it's a lot of props there.
2    Q.    Well, if you think inbox and outbox
3  are "props," do you have an objection to us
4  demonstrating?
5    A.    No, I have no objection.  I have no
6  objection.  You carry on with your demonstration.
7    Q.    Do you have an objection showing the
8  jury what Johnson & Johnson had at its disposal
9  about what might be in the talc it was selling for
10  babies?  Do you have any objection to that?
11    A.    None whatsoever.
12    Q.    Do you have an objection to my
13  showing the jury what Johnson & Johnson told other
14  people about what was in their products, such as
15  nurses, doctors, regulators and their own employees
16  and the public?
17    A.    None whatsoever.
18    Q.    Alright.  So our first entry into the
19  outbox is going to be those interrogatories that we
20  went over for the year 2000 earlier this morning
21  that Ms. Musco signed.  Do you remember that?
22    A.    Yes.  I do, yes.
23    Q.    Where they said, after decades and
24  decades, they said no tremolite, right?
25    A.    Yes.

Page 183

1    Q.    What they had in the inbox, of
2  course, was lots of tremolite from Battelle,
3  correct?
4    A.    Yes.  There's never been any denial
5  of that.
6    Q.    Except for right here?
7    A.    Well, I think she made a mistake
8  there, by the way.
9    Q.    Well, it would have to be not just
10  she making a mistake, right, because she answered
11  the questions based on help from the lawyers, right?
12    A.    Well, we saw the word "Counsel," yes.
13    Q.    Right.  So let me ask you this
14  question.
15    At this time do you remember the millions of
16  documents you and I have talked about, have they
17  been released by Johnson & Johnson in 2000?
18    A.    I don't know.
19    Q.    Had Johnson & Johnson released those
20  Battelle studies before 2016?
21    A.    I don't know.
22    Q.    Because what you said was, yes, it's
23  wrong, but I don't know whether it was intentional.
24  That would have to be, at least, assuming only one
25  lawyer, at least, two people, right, if you have

Page 184

1  Musco and Counsel?
2    A.    Yeah.
3    Q.    Anyway, we know this is what was said
4  publically, correct?
5    A.    It was said in an interrogatory, yes.
6    Q.    Right.  In a lawsuit, correct?
7    A.    I believe so.
8    Q.    Okay.  We talked this morning about
9  how Dr. Langer maintained that there was asbestos in
10  the baby powder, correct?
11    A.    That's what he said, yeah.
12    THE COURT:  Counsel, if you are
13  placing documents in certain categories, you need to
14  specify for the record that cannot see what you're
15  doing.
16    MR. PANATIER:  Okay.  I will say it.
17  I will say it.
18    THE COURT:  Thank you.
19  BY MR. PANATIER:
20    Q.    In the Russell memo, "tremolite is
21  bad" we're going to put that in the inbox, too.
22  So let's come back to this concept of
23  the use of Johnson's Baby Powder and how people will
24  use it.
25    Johnson & Johnson recommended all sorts of

Page 185

1  uses for the baby powder outside of just putting it
2  on babies, right?
3    A.    Well, you need to be a bit more
4  specific.  I'm happy to comment, if I have some
5  sentence to comment on.
6    Q.    I can do that.
7    A.    Thank you.
8    MR. PANATIER:  This will be
9  Exhibit 3695-25.  Here you go, your Honor.
10    THE COURT:  Thank you.
11  BY MR. PANATIER:
12    Q.    There you go, sir.
13    A.    Thank you.
14    Q.    Sir, do you see that this is a memo
15  with the Johnson's baby logo at the top?
16    A.    Yes.
17    Q.    And you see that it has Johnson's
18  Baby Oil, Johnson's Baby Powder and then a series of
19  uses for these products, correct, that are
20  recommended?
21    A.    You're showing me a memo, but it
22  doesn't say whose written it or when it was written.
23  What was this done by a press release agency or is
24  this from Johnson & Johnson?
25    Q.    Well, that's a great question, but I

47 (Pages 182 - 185)

Page 186

1 got the documents from you. So this one is not --
2 this one is not dated, but this is a Johnson &
3 Johnson -- for the record, it's Bates range J&J Talc
4 000628263 produced by Johnson & Johnson.
5          MS. SULLIVAN: I'll just note,
6 Counsel, the one you gave me has no Bates number on
7 it. It is J&J ine.
8          MR. PANATIER: It was produced in
9 native format, your Honor. I had to go look up the
10 Bates range?
11 Is there anything else.
12          MS. SULLIVAN: I don't know why he
13 can't use the Bates numbers.
14          THE COURT: Sidebar.
15          (Sidebar.)
16          MR. PANATIER: If Counsel doesn't
17 understand how their own production works, I can't
18 work with that. This is -- they produced a certain
19 number of documents in their, quote, unquote,
20 "native" format, which means, not a copy of the
21 document, it's in the actual -- like, for instance,
22 in a Power Point, they would produce the actual
23 Power Point, not a copy of the Power Point.
24          THE COURT: So they never Bates
25 range?

Page 187

1          MR. PANATIER: So they don't Bates
2 range native documents.
3          THE COURT: So how did J&J Bates
4 numbers become created?
5          MR. PANATIER: I have to go look up
6 on the document management software what Bates label
7 they gave to the native. But when you print the
8 native because it's native and they don't want it
9 messed with, it doesn't print with the Bates Stamp.
10 It's not on the native. But I am telling the Court
11 that this is the correct Bates number for this
12 document.
13          THE COURT: JJ0006286 what was after
14 that?
15          MR. PANATIER: Three.
16          MS. SULLIVAN: Your Honor, just for
17 the record, we have given Bates numbers to every
18 single document we've produced. In every other
19 trial people are using the Bates stamp numbers so we
20 can tell whose file it comes from. I'm not sure why
21 Counsel can't just use the Bates numbers.
22          MR. PANATIER: This is not a Bates
23 stamped document. Counsel can go look at her own
24 documents.
25          THE COURT: So I'm trying to

Page 188

1 understand this.
2          MR. PANATIER: Yeah.
3          THE COURT: When you go and print out
4 these documents that are produced, quote, unquote,
5 in their "native" --
6          MR. PANATIER: Right.
7          THE COURT: -- whatever that
8 terminology is --
9          MR. PANATIER: Right.
10          THE COURT: -- A Bates number does
11 not come out?
12          MR. PANATIER: Correct. That's a
13 Power Point, an Excel spreadsheet, a Word document,
14 if they produce them in native, they're not going to
15 add a Bates stamp to the original file. Now, if
16 they produce -- for instance, a lot of these memos
17 are old, old memos, they are photocopies, they put
18 the Bate Stamp right on them. So they produce them
19 in two ways.
20          MS. SULLIVAN: Counsel has the Bates
21 numbers. They've been given them. I don't know why
22 he just doesn't use them.
23          THE COURT: He's indicated now what
24 the Bates number is. I would ask your office to
25 verify this information, if you're concerned.

Page 189

1          MR. PANATIER: I'd like to come back
2 to it. If they want to verify it, it's not a big
3 deal.
4          MS. SULLIVAN: I mean, I just don't
5 know if it's from a third party. I have no idea
6 where it's coming from.
7          MR. PANATIER: How about this. I'll
8 set it aside, if Counsel wants to check and verify,
9 if they have issues with it, that's fine, I'll just
10 come back to it.
11          THE COURT: Okay. Definitely, that's
12 what we'll do.
13          MR. PANATIER: We'll come back to
14 this.
15 BY MR. PANATIER:
16     Q.   Okay. You should have a document
17 that has a tab that says "1985" on it. So, if you
18 go into that range, it's probably the second or
19 third notebook.
20          (There is a discussion off the
21     record.)
22     Q.   You found that, sir?
23     A.   Yes.
24     Q.   Okay, great. This will be
25 Exhibit 2064.

48 (Pages 186 - 189)

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

Page 190

1   And do you see, Doctor, that is a
2 document called "Technological Forecast Powders"?
3 Do you see that?
4   A.   Yes.
5   MR. PANATIER:  Okay.  Your Honor, at
6 this time I would offer this into evidence.
7   THE COURT:  Any objection?
8   MS. SULLIVAN:  A second, your Honor,
9 until I look at it.  No objection.
10   THE COURT:  So admitted.
11   (Plaintiff's Exhibit 2064 was
12   moved into evidence.)
13   THE COURT:  What does the cover sheet
14 say on that, Counsel?
15   MR. PANATIER:  "Technological
16 Forecast."
17   THE COURT:  From 1984.  Okay,
18 proceed.
19 BY MR. PANATIER:
20   Q.   Okay.  Sure.
21   Alright.  So this is the type of
22 document that a company will do to talk about how
23 their products are doing, what they forecast them to
24 doing in coming years, correct?
25   A.   Yes.

Page 191

1   Q.   If we go to the third page under
2 "Safety Factors."  Can you see that, sir?
3   A.   Yes.
4   Q.   "Safety of cosmetic powders has been
5 a concern especially among health professionals.
6 They have decided that powders provide no health
7 benefit.  Therefore, the potential for harm from
8 respirables or accidental overexposure should be
9 avoided.  Mothers are now being advised not to use
10 baby powder especially talc baby powders."
11   Okay.  Did I read that right?
12   A.   You did, yes.
13   Q.   Okay.  If you'll turn please, sir, to
14 the page marked eight.  They have a section called
15 "Market Dynamics."  You can see there it says,
16 "Second, baby care professionals now sometimes
17 recommend against the use of talcum or cornstarch
18 powders" -- and then they give some statistics --
19 "because perceived risk exists that there are no
20 health benefits."
21   Now you've confirmed for us, there are no
22 health benefits, correct?
23   A.   Well, there are no medical benefits,
24 yeah.
25   Q.   And then they have, at least, for

Page 192

1 this year which, I believe, is '84, '85, they have
2 Johnson's Baby Powder and they have the amount of
3 money.  They have market share and then the ounces,
4 total ounces sold.  Do you see that?
5   A.   Yes.
6   Q.   So, if you look at the talc and
7 cornstarch section that they have there, the market
8 share for that was 115 million; is that right?
9 Right here.
10   A.   I see, yeah, yeah, yeah.
11   Q.   And they got, approximately, oh, 41
12 percent of that, right?
13   A.   Yes.
14   Q.   Okay.  And they got about -- they got
15 218 million ounces out of the 564 million ounces
16 sold, true?
17   A.   Yes.
18   Q.   Under "Major Issue," "Major Issue is
19 the future of a category under a safety cloud and
20 without an alternate reason for being."
21   Okay.  Now, when you got to the
22 company in '76 -- right, that was when you got
23 there?
24   A.   Yes.
25   Q.   At some point did you have a

Page 193

1 responsibility for evaluating the safety of the baby
2 powder?
3   A.   Yes.
4   Q.   In fact, it became -- by the '90s,
5 were you the head person in charge of the safety of
6 the baby powder?
7   A.   In the UK, certainly, yes, until I
8 moved here to the US in '90 -- end of '94.
9   Q.   Okay.  And at the end of '94, did you
10 continue in that same role here?
11   A.   Yes.
12   Q.   Alright.  So what do they mean when
13 they say "a safety cloud"?
14   A.   Well, because if you -- and I'm sure
15 you're going to show it.  There are -- there have
16 been in the early '70s a number of reports, later
17 shown to be erroneous, were people claimed they
18 found asbestos in the product.  And that like a bad
19 smell, it doesn't blow away, that was kind of
20 hanging around.  So there was an issue, although, in
21 reality the company was confident that there was no
22 asbestos.  But there is that cloud.
23   Q.   When you say, that were later -- what
24 did you say later disproven?
25   A.   Yeah.

49 (Pages 190 - 193)

1    Q.    We're not talking about Dr. Langer,
2  though, right?
3    A.    Yes, Dr. Langer published a paper
4  back in '76 with Dr. Rolle.
5    Q.    Are you just going to ignore what he
6  said six months ago?
7        MS. SULLIVAN:  Objection, your Honor,
8  that's argument.
9        THE COURT:  Overruled.
10       You can answer.
11   A.    What he said is what he said, but it
12  was not what he wrote in a peer reviewed published
13  literature of scientific literature.
14   Q.    You're aware that he tested more than
15  two bottles of baby powder ever, correct?
16   A.    Yes, he tested a lot of bottles.
17   Q.    Then you see here it says, "It is
18  possible to hypothesize that pursuit of technologies
19  which would create talc based powders of higher
20  interest than JPB to adults could be profitable.
21  Major effort should be expended to prove a health
22  benefit for cosmetic dusting powders," right?
23   A.    Well, that's what someone has written
24  they're suggesting, yeah.
25   Q.    "Someone" at Johnson & Johnson,

1  correct?
2    A.    Well, that's why I'm puzzled, because
3  I'm not sure who wrote this.
4    Q.    Are you saying that someone else is
5  doing all this analysis and writing about all these
6  issues other than Johnson & Johnson in a document
7  with a Johnson & Johnson Bates Stamp that you
8  produced to us?
9    A.    I don't know.  But what I'm saying is
10  there is no author.  So I don't know -- you asked me
11  who wrote it or who the -- if it was a Johnson &
12  Johnson, but I said there's no author.  But the
13  document speaks to itself.  I'm not disputing what
14  is written.
15       (There is a discussion off the
16        record.)
17   Q.    So they said they wanted to try to
18  provide a health benefit, right?
19   A.    Well, the person who is writing this
20  document, whoever he or she is, is going down that
21  route, yeah.
22       (There is a discussion off the
23        record.)
24   Q.    Alright.  This document is
25  Exhibit 2614 and it is dated July 30, 1971.

1        MR. PANATIER:  Here's your copy.  I'm
2  using the July 30th and then I'll use that one.
3        MS. SULLIVAN:  I don't see an exhibit
4  number.
5        MR. PANATIER:  This will be
6  Exhibit 2614.
7  BY MR. PANATIER:
8    A.    Well, there you go, because I'm not
9  sure which volume that is in.
10   Q.    Probably -- this one, July 30, '71.
11   A.    Yeah, here it is.
12   Q.    Okay.  So that's a memo from
13  Hildick-Smith.  There is a stamp over his name on
14  the bottom, but that's from Hildick-Smith received
15  by Nashed and it's to Dr. Fuller regarding a
16  conversation with Dr. Clark Cooper at the School of
17  Public Health University of California, right?
18   A.    Yes.
19   Q.    Okay.  1971, true?
20   A.    Yes.
21   Q.    Okay.
22       MR. PANATIER:  I offer this into
23  evidence, your Honor, Exhibit 2614.
24       MS. SULLIVAN:  No objection.
25       THE COURT:  So admitted.

1        (Plaintiff's Exhibit 2614 was
2         moved into evidence.)
3  BY MR. PANATIER:
4    Q.    He says, "At Dr. Crowley's
5  suggestion, conversation was held with Dr. Clark
6  Cooper of the School of Public Health University of
7  California Berkeley.  Dr. Cooper had worked at the
8  National Center for Urban and Industrial Health and
9  later moved to the School of Public Health at
10  Berkeley.  Dr. Cooper was chairman of the National
11  Research Council, review of asbestos and its
12  potential health hazards which published an
13  excellent review on the subject.  Dr. Cooper was
14  called in the hope that he might be able to attend
15  the FDA meeting on August 3rd.  He is in a position
16  to oversee epidemiological studies, conduct
17  analytical studies on talc and allied materials and
18  conduct animal studies on appropriate materials.  He
19  would be pleased to discuss this area at anytime.
20       In asking Dr. Cooper his thoughts concerning
21  the asbestos content of talc and the use of talcs
22  for cosmetics, he indicated that in his opinion
23  there is no place for asbestos in cosmetic talcs and
24  would withdraw from the market any talcs that
25  contained asbestos."

50 (Pages 194 - 197)

Page 198

1      First of all -- let me stop there.
2      Johnson & Johnson agrees that if the baby
3 powder has asbestos, it should be withdrawn from the
4 market immediately, correct?
5      A.    It wouldn't be sold in the first
6 place.
7      Q.    Can you answer my question?
8      A.    So the answer would be, yes.
9      Q.    Right?  It is possible that a company
10 could sell a product and then discover a problem at
11 which point they would need to recall it, right?
12     A.    That's the normal operation, yes.
13     Q.    It continues that Dr. Cooper said
14 that he did not believe that there was a low level
15 of asbestos content in talc which would be
16 acceptable for cosmetic ore.
17     And Johnson & Johnson agrees with that, the
18 acceptable level of asbestos in cosmetic talc zero,
19 right?
20     A.    Yes.
21     Q.    Okay.  So this is another
22 third-party.  This person at Berkeley, who has
23 opined that asbestos in cosmetic talc to Johnson &
24 Johnson would be a hazard, correct?
25     A.    Yes.

Page 199

1      Q.    Okay.  I'll put that in the inbox.
2      Let's look at the next document,
3 which is April 13, 1976.  So, if you'll turn to
4 April 13, 1976.  And, actually, this tab just says
5 "1976," so it will likely be the first 1976 document
6 that you have.  Keep going back.
7      A.    Okay.  It's March.
8      Q.    Keep going back.  Yeah.  It's
9 probably -- it's one of those.  Okay.  So go ahead
10 and turn the page.  It's one of those three there.
11 So let's go to the next one there.  Yeah, keep
12 going.  Next one.  That's it.
13     Okay.  Sorry about that.
14     Okay.  You see this is a memo from
15 D.R. Petterson to D.D. Johnston, right?
16     A.    It is, yes.
17     Q.    Now, D.D. Johnston was President of
18 the Baby Products Company, true?
19     A.    I think he was at that time, yes,
20 yes.
21     Q.    Petterson, medical director, right?
22     A.    He was, yes.
23     (Continuation of the day's
24 proceedings in Volume 2.)
25

Page 200

1            CERTIFICATION
2
3      I, SILVIA P. WAGE, C.S.R., License Number
4 30X100182700, a Certified Court Reporter in and for
5 the State of New Jersey, do hereby certify the
6 foregoing to be prepared in full compliance with the
7 current Transcript Format for Judicial Proceedings
8 and is a true and accurate non-compressed transcript
9 to the best of my knowledge and ability.
10
11
12 SILVIA P. WAGE              JULY 22, 2019
13 CERTIFIED COURT REPORTER        DATE
14 MIDDLESEX COUNTY COURTHOUSE
15
16
17
18
19
20
21
22
23
24
25

51 (Pages 198 - 200)

## &

**&**   3:3,15,18,20,21
5:21 7:8,12 9:22
9:24,25 10:1,11,11
11:4 12:15,16,22
13:2,7,9,11,11
14:13,14,18 15:11
15:13 16:5 17:8
17:21 18:7,15
19:22 20:2,5,11,18
20:19 21:4,13,23
22:5,10,25 25:2,9
25:11 26:24 29:16
30:1,12,22 31:6
32:2,5,10,12 33:5
33:11,14,22 34:3,7
35:18 38:19 39:12
39:15,19,20,24
40:3,7,10,13,18,20
41:14,17,23 42:14
42:24 43:3,11,18
45:1,15,20,22 46:7
46:10 47:15,16
48:7,19 49:5 50:9
50:19 51:11 53:25
55:19 56:7,13
58:21 60:19,20
61:1,2,12,18,20
62:15,25 63:2,6,18
67:4 70:21 71:4
73:1 74:15,19
85:20 90:24 92:2
93:11 96:17 99:13
100:3 102:10
103:7,9,17,19,23
104:9 105:14
109:3,10 114:2,7
120:20 121:10,11
121:17 124:13
127:10 129:13
134:11,21 136:22
137:6 138:1,10
139:21 140:3,5
141:1,6,22 142:5
145:6 146:5 149:6
150:12 151:23
153:2,18 154:15
155:9,13,25
157:24 158:6,10
159:19 162:8
163:8,19 164:4
167:25 168:21
170:21 171:19
172:1 174:13,19
175:9 177:18
178:13 179:12
180:19 181:7,12
182:8,13 183:17
183:19 184:25
185:24 186:2,4
194:25 195:6,7,11
198:2,17,23

## 0

**00000**   19:12
170:12,19
**00001**   50:3
**000628263**   186:4
**07039**   2:23
**07102**   3:20
**07701**   3:4
**08542**   3:16
**08903**   2:3
**0932-17as**   1:9

## 1

**1**   1:6 2:5,6 12:9
26:23 27:14 49:6
91:13 101:5
122:12,14 126:9
126:15,18 127:19
128:2,5,6,6 130:7
130:19,23 131:5
131:10 132:16,16
155:21 175:20
176:19,20
**1,037**   64:16
**10**   21:21 22:17
27:2,9 28:18 29:5
30:5 50:6 115:21
118:3,25 131:1
150:24 151:6
**10,000**   27:13 29:3
**100**   3:19
**10022**   3:7
**101**   166:11 171:24
172:4
**1037**   64:16 65:12
66:7
**107**   4:7
**108**   46:14 47:2,21
47:22 48:18
**10:50**   86:25
**11**   72:13 130:17
**111**   4:15
**115**   192:8
**118**   4:17
**11:12**   86:25
**11:38**   113:15
**11:40**   113:15
**11th**   3:6
**12**   4:3 93:1,16
115:13
**1201**   3:9
**121**   4:7
**127**   3:3
**12:26**   157:10
**13**   24:7 82:3 199:3
199:4
**139**   4:17
**14**   83:5,8 131:4
**148**   4:18
**15**   35:9 86:15

**15,000**   21:21 22:18
27:2,10 28:18
29:5 30:5
**16**   54:10 57:3 82:3
**161**   4:21
**17**   3:15 53:19
54:10 56:12 57:3
57:3 64:14 103:5
120:17 139:18
**178**   4:21
**17th**   111:16
**18**   15:15 24:2
46:17 47:2,24
53:19
**1800s**   15:14
**1809-17as**   1:2
**1890s**   103:20,22
**1894**   15:15
**19**   79:14
**190**   4:6
**1930s**   32:13
**1940s**   129:20
**1941**   16:19
**1949**   170:12,20
**1954**   52:13
**1955**   51:4,8,11
52:4 55:19
**1958**   126:21 127:1
131:22 132:2
136:23
**1959**   119:20,21
120:1,17 124:9
133:15,19 134:24
**1960**   136:8,12
137:1
**1960s**   16:4 33:6
**1964**   18:8
**1966**   103:5 104:13
107:20 109:5
110:7 124:16

**1967**   16:13 17:25 18:18,24
**1968**   32:21
**197**   4:15
**1970s**   17:9,15 96:17
**1971**   195:25 196:19
**1972**   170:10 171:21
**1976**   23:2 110:6,7 110:16 113:1,5,25 124:24 199:3,4,5,5
**1978**   147:19 148:7 148:12
**1979**   19:7,8
**1980**   18:25 19:3,9
**1984**   190:17
**1985**   189:17
**1989**   19:23
**199**   4:6,8,8,9,9,10 4:10,11,11,12,12 4:13,13,14,14,18 4:20
**1995**   154:17,22,25
**1996**   70:20,24 71:1 72:9 83:21 84:19 87:8 94:12
**1:28**   157:11
**1:30**   156:24 157:6

**2**

**2**   1:6 2:5 110:8 122:11,14 126:7,7 126:17,18 127:14 127:17,22 128:5 130:6,7,17,23 131:6,9 199:24
**2,000**   137:13,14
**20**   84:18 101:5
**200**   2:6

**2000**   13:2,4 138:14 140:4 145:13 179:12 182:20 183:17
**2000s**   101:23 163:21,23,24
**2003**   18:18 19:15 58:1,10,11
**2005**   91:20
**2007**   159:18 162:2
**201**   3:16
**2012**   20:1,7
**2016**   79:11,17,22 81:1,9,11,14,17 83:3 84:19 87:19 88:6 89:13 94:12 183:20
**2017**   24:8,10 34:18 35:8,9,9 37:14 49:19 64:13,14 69:14 81:10 85:13 87:23 166:19
**2018**   40:2,7 79:13 115:13 117:3 118:21 158:4
**2018-10-23**   23:22 23:24
**2019**   2:4 9:21 43:18 200:12
**2064**   4:6 189:25 190:11
**211**   5:21
**218**   192:15
**22**   2:4 9:21 47:3 47:24 51:11 72:9 110:7,16 200:12
**22nd**   51:8
**23**   126:21,25 138:14
**2304**   4:6

**2343**   131:24
**2344**   126:23
**2345**   4:7 121:1,5
**2346**   133:17
**2349**   135:1
**2350**   136:9
**2360**   4:7 104:18 107:8,11
**2364**   4:8
**2367**   4:8
**2368**   4:9
**2374**   4:9
**2381**   4:10
**2382**   4:10
**2385**   4:11
**2390**   4:11
**2391**   4:12
**2393**   4:12
**24**   66:5
**2403**   4:13
**2412**   4:13
**2413**   4:14
**2434**   4:14
**25**   35:4,15 73:22
**2594**   4:15 111:3,6
**2614**   4:15 195:25 196:6,23 197:1
**2729**   151:1
**2736**   155:5
**2738**   4:16 71:24 72:5,7
**28**   88:6
**2836**   4:16 89:7,8 90:16
**29**   71:1
**290**   2:22

**3**

**3**   127:17 132:17 155:21 175:20 176:19,20

**30**   142:14 195:25 196:10
**300**   13:17
**30s**   16:14
**30th**   196:2
**30x100182700**   200:4
**31**   159:25 161:7
**311**   92:17
**312**   92:17,18,25 93:14
**3127**   171:9 178:20
**3162**   4:17 118:7,16
**3173**   4:17 138:22 139:14 145:14
**31st**   133:15,19 134:24 135:6
**32**   134:5
**33**   46:3
**3378**   4:18
**3400**   3:9
**3624**   4:18 148:18 148:21 150:23
**3695-14**   4:19 82:22,25
**3695-15**   4:19 59:6 59:12
**3695-22**   4:20
**3695-23**   4:21 159:16 161:3
**3695-24**   165:21
**3695-25**   185:9
**3695-27**   4:21 178:23
**3695-8**   4:20 51:16 51:24
**3rd**   171:10,12,21 197:15

**4**

**4** 58:1,2,4 70:25
  79:22 126:4 129:9
  130:6,11 147:19
  148:7 159:25
**4/11/2018** 46:14
**40** 138:17
**403** 105:5
**40s** 16:14,25 17:18
  17:20
**41** 192:11
**43** 129:9
**45** 16:19
**48** 129:9
**4th** 148:12

**5**

**5** 129:9 130:16
**5.2** 75:25 76:1
**50** 17:15 172:4,11
**51** 4:20
**512** 5:21
**558** 5:21
**56** 2:2
**564** 192:15
**58** 136:24
**59** 4:19 135:6

**6**

**6** 24:4,5 115:21
  118:3,24 142:14
**6-10** 115:18
**6.7** 162:2
**60** 35:12
**602** 8:14
**6040-17as** 1:19
**60s** 18:11 23:8
**66** 34:23 124:22
  151:25
**67** 16:7 17:21
  18:11 35:3

**68** 18:24

**7**

**7** 130:16
**701** 5:15 6:2,12
  8:14
**7024** 156:10
  175:14,22 176:17
**7044** 170:4
**7049-16as** 1:14
**70s** 23:8,8,14 98:5
  117:7 193:16
**71** 114:25 115:1
  196:10
**718** 2:23
**72** 4:16 171:10,12
  178:13,18
**75270** 3:10
**76** 98:6 111:16
  192:22 194:4
**78** 147:23 148:5

**8**

**8** 65:16 66:3,5
  67:17 92:19,25
  93:16 136:19
**8-17** 64:13
**8/15** 34:18 35:9
**8/15/17** 46:3
**8/15/2017** 92:17
**800** 3:6
**81** 19:4
**82** 4:19
**84** 192:1
**85** 192:1
**8th** 136:8,12

**9**

**90** 4:16 161:16
  193:8
**90s** 193:4
**94** 150:24 151:6,18
  193:8,9

**96** 127:16
**97** 127:16
**983-1234** 2:23
**990,000** 27:17 28:7
  29:2 63:10
**9932** 200:11
**9:24** 2:5
**9:32** 9:10
**9th** 131:22 132:3

**a**

**a.m.** 2:5 9:10
  86:25
**a1** 131:14
**a2** 131:14
**abandoned** 108:13
**ability** 200:9
**able** 7:23 79:15
  197:14
**abroad** 74:13
**absence** 50:14
**absolutely** 116:25
  119:5 134:11
**academy** 31:20
**accept** 119:8 162:7
**acceptable** 198:16
  198:18
**acceptance** 52:14
**accepted** 74:7
**accepts** 82:20
**accessory** 128:12
  128:19 129:7
  132:11,19 135:22
**accidental** 191:8
**accommodate**
  10:22
**accurate** 153:10
  200:8
**acicular** 132:5,5
  134:1,2
**acknowledgment**
  80:9 81:24

**actinolite** 76:7
  83:13 95:12 150:9
  152:15 153:21
**active** 162:8,10
**actively** 162:15
**actual** 57:8 60:10
  60:17 186:21,22
**add** 109:10 129:9
  135:25 188:15
**addition** 52:9
  107:23
**additional** 5:12
  70:6
**address** 17:20
  105:7
**adjustment** 97:18
**administered**
  11:11
**administration**
  26:17 74:18
**admissibility** 7:13
**admission** 81:5,17
  82:20,21
**admit** 6:10 90:7
**admits** 177:19
**admitted** 51:23
  59:11 72:2 90:14
  107:9 111:5
  117:12 118:6
  121:4 139:12
  148:20 160:25
  178:22 190:10
  196:25
**adults** 38:13
  194:20
**adverse** 104:25
**advertisements**
  61:21
**advertising** 62:19
**advice** 145:18,18

[advised - approach]

**advised** 8:11 191:9
**advising** 124:5
**advisors** 166:25
**advisory** 166:18
  166:24
**affairs** 98:25
  104:14
**affiliate** 88:13
**affirmed** 112:15
**afternoon** 157:17
**age** 38:8 56:14,17
**agencies** 74:6
**agency** 185:23
**agent** 121:12
**aggregates** 132:4
**ago** 24:21 48:2
  94:9 163:20 194:6
**agree** 36:4 37:18
  39:14 41:4 43:16
  45:5 47:4,6 49:3
  63:22 73:11 75:5
  131:18 162:21
  178:5
**agreed** 112:14
**agreement** 41:21
**agrees** 43:18 46:8
  46:10 198:2,17
**ahead** 42:6,8 47:9
  59:4 64:12,19
  66:8,24 110:6
  123:8 139:6
  165:18 174:4
  199:9
**air** 105:4
**al** 1:7,12,17,22
  98:8
**alison** 158:16,20
  159:8
**allied** 197:17
**allow** 6:2 8:18
  42:4 47:9 84:25

106:8 117:13,24
  143:3
**allowed** 7:6 8:13
  44:13,16
**allowing** 81:17
**alright** 12:21
  13:15,24 18:21
  24:4 38:19 49:5
  50:8,19 61:25
  62:14 63:13 71:22
  83:9 86:14 96:10
  96:10 97:22,23
  102:8 104:17
  120:11,16 127:5
  132:1 161:6
  166:13 169:23
  179:10 180:23
  182:18 190:21
  193:12 195:24
**alternate** 88:8,17
  192:20
**alternative** 17:15
  59:16 172:10
**altitudes** 95:23
**america** 1:7,12,17
  1:22
**american** 31:11
  107:21 109:1
  121:12 124:19
  148:25
**amosite** 150:7
  152:14 153:20
**amount** 44:11,13
  110:1 169:16
  192:2
**amounts** 72:25
**amphibole** 63:19
  63:23 67:8,9,11,14
  68:25 76:8,23
  77:11,13 82:9
  83:14 84:6 85:22

85:22,25 89:24
  91:14,21 92:2,4,6
  94:13,15,24 95:7,8
  95:9,12 129:18
  132:9,10,19,22
  150:7 152:13
  173:2,4,8,10,13,15
  173:21 174:6,6
  177:10
**amphiboles** 63:23
  66:23 67:19 72:16
  76:3,6 77:4,7
  83:11 87:8,24
  181:8
**ana** 2:12
**analog** 179:20
**analysis** 195:5
**analysts** 158:21
  159:10
**analytical** 100:25
  149:24 197:17
**ancient** 116:7
  117:20
**animal** 197:18
**answer** 20:25
  24:10,22 25:4,18
  25:22,23 26:5,8
  27:12 28:20 29:4
  31:5 35:22 36:1,3
  47:4,19,24 48:14
  48:17,22 57:12
  64:3 67:21 68:6
  69:22,25 78:14
  87:17 92:10,12
  93:12 94:7,21
  96:8 137:23 140:9
  141:18,21 143:7
  143:17 144:12,16
  169:3 175:24
  178:1,2 194:10
  198:7,8

**answered** 29:7
  138:11 147:11
  149:6 183:10
**answering** 130:3
  176:8
**answers** 7:8,9
  138:2 143:20
  145:5,16 146:14
  147:1
**anthophyllite** 76:7
  83:13 95:9 150:8
  152:14 153:21
**anxious** 123:24
**anybody** 17:19
  38:14 141:14
**anymore** 30:9
**anytime** 67:19
  95:17 197:19
**anyway** 184:3
**apatite** 132:11
  135:22 136:5
**apologize** 11:13
  59:19 118:15
**appear** 76:11
  83:16 132:13
  175:9,11,12
**appearances** 10:2
**appeared** 107:20
**appears** 126:10
  174:6 175:14,15
  175:16
**appellate** 1:2 5:20
  6:6
**appendix** 131:13
**applied** 99:20
  148:10,12
**appraised** 23:4
**appreciate** 144:9
**apprised** 23:6
**approach** 9:17

**appropriate**
197:18
**approval**  88:8,17
**approved**  17:17
18:10 41:22
**approximately**
13:2 18:18 192:11
**april**  199:3,4
**area**  8:9 197:19
**areas**  6:15 55:17
**argue**  68:19
101:21
**argued**  106:6
**argument**  5:7,12
5:13 37:9,9 41:7
68:17 69:17 81:16
117:19 163:3
194:8
**argumentative**
177:22
**arguments**  5:8
**arthur**  111:18
**article**  106:18
107:19 108:6,9
115:9 116:3,9
117:6 118:13,20
166:15
**asbestiform**  67:15
73:7 149:11,11
155:16 170:18
174:16,20,25
175:3,8,15,16
176:19
**asbestos**  20:13
21:20 32:3,9,13,19
33:3,7,12,15,20,23
34:1 38:23,25
39:4 42:16,25
43:5,12,19,22 44:4
44:7,9,12,16,19,22
45:3,5,10,12,21,22

45:25 46:8 47:15
47:17 48:4,8,12,20
49:7 50:1,14
63:20 73:6 74:23
74:25,25 75:2,7
76:16,17 77:16,17
83:19 85:22 86:3
89:24 91:14,21
95:20 96:4 97:9
100:17 112:3,6,13
112:22 113:11
114:2,4,8,12,21
115:4,7 116:24
119:4,14 139:25
140:6 144:21
145:2,2 147:4,10
149:10,23 150:3,5
150:12,16,20
152:3,11 153:19
154:13 174:14,16
175:1,18 177:4
178:14,17 181:8
184:9 193:18,22
197:11,21,23,25
198:3,15,18,23
**ashton**  71:8 72:10
73:11 74:20 75:1
81:19 96:21 97:23
**aside**  133:13 189:8
**asked**  24:5 31:24
46:17 47:3,14
48:3,18 52:6
65:12 69:13,15,23
70:3 77:25 93:5
94:5,23 96:7
112:3 139:22
144:14 149:5
167:3 179:6
195:10
**asking**  30:8,9 31:4
45:11 68:2 124:21

141:10,12 143:22
177:23 197:20
**asks**  137:22
**aspect**  155:20
156:2
**asphyxiated**  105:3
**asphyxiation**
105:1,24
**aspiration**  107:15
108:7
**aspiring**  109:14
**asserting**  61:11
**assistance**  145:17
**assistant**  100:24
**associated**  32:13
128:12 149:19
**association**  31:11
71:12,16 80:13
108:12 148:25
**assume**  48:15
**assuming**  183:24
**asterisk**  149:25
**atmosphere**  37:20
**attached**  52:12
72:13 107:18
116:6
**attend**  197:14
**attended**  74:15,17
**attorney**  29:21
142:12,16
**attorneys**  3:10,20
23:12 24:18
**august**  24:7 35:9
64:14 136:24
197:15
**authentic**  52:14
**authentication**
61:12,23
**author**  195:10,12
**authored**  88:11

**avenue**  2:22 3:3,6
**avoided**  180:6
191:9
**avoiding**  168:6
**aware**  26:11 32:2
32:12 33:3,6 63:7
103:1 106:22
109:4 113:21
178:16 194:14

| **b** |

**b**  4:4 142:14
**babies**  42:19,22
102:11 106:7
108:13 112:5
113:6 164:8 166:7
182:10 185:2
**baby**  15:12,14,23
16:5 18:10 19:16
20:9 34:2,11,12,12
36:16 37:24 38:5
38:12,13,15,22,24
39:5,6,8,10,12
40:3 42:11,15
43:5,12,19 44:5,21
44:22 45:5,9
46:11 49:8,12
52:10 53:9,13,21
54:14 55:2,10,16
55:24 56:8 58:17
58:22 62:23 86:10
90:2 92:3 94:7
96:3 98:21 99:23
100:21,25 103:8
103:24 104:2,4
107:14,21,22
108:3 109:5,11
110:19 112:23
113:22 114:5,22
115:8 116:24
119:4,14 124:5,11
124:19 127:10,20

[baby - blow]                                                                 Page 6

139:24 140:1,6
151:14 152:1
158:5,11,19 159:1
159:7,19 160:13
160:16 161:16,24
162:8 166:4,10,17
166:18,23 167:24
168:8,11,11,22,24
177:16 184:10,23
185:1,15,18,18
191:10,10,16
192:2 193:1,6
194:15 198:2
199:18
**baby's** 34:15 37:5
37:5
**babycenter.com**
39:16,21 40:5
161:20 162:4
163:18 164:10,24
165:10
**babycenter.com.**
42:1 157:20
161:22 164:12
**babysitters** 53:23
54:18
**back** 10:17 17:18
19:11 23:14 32:3
37:14 42:11 61:14
63:13 69:14 72:9
79:21 86:19 92:15
113:16 129:19,20
144:7,8 156:24
157:7,19 164:22
165:24 170:11,20
174:18 175:6
177:8 184:22
189:1,10,13 194:4
199:6,8
**background**
144:15

**bad** 38:20,25
50:10,15 95:19
110:10 129:14
173:2 177:12,13
178:9 179:7
184:21 193:18
**badges** 156:25
**badly** 173:1
**balcizone** 121:12
**ball** 55:16
**bandage** 15:19
**bank** 3:4
**barden** 1:4 3:11
9:22
**bardens** 10:7
57:20
**barring** 83:2
**based** 6:3,9 7:4
42:2 66:22 72:23
81:18 90:4,6
113:7,9 117:12
140:22 183:11
194:19
**basic** 108:21
**basis** 89:18,23
90:10 91:9,20
142:4 149:20
**batch** 72:15 76:24
84:7
**bate** 188:18
**bates** 60:6,16,18
61:5,13 186:3,6,10
186:13,24 187:1,3
187:6,9,11,17,19
187:21,22 188:10
188:15,20,24
195:7
**bath** 55:8
**bathe** 53:13 56:8
56:18

**bathing** 52:9
55:21
**battel** 95:23,24
96:1
**battelle** 122:4
127:5 133:18
135:4,5 138:18
147:18 170:22
183:2,20
**bearing** 149:18
**bearings** 15:11
80:2 102:9 111:12
122:5
**beauty** 58:17
**bed** 58:23
**beg** 47:22
**began** 5:7
**beginning** 92:23
**behalf** 10:10
**belief** 68:7 69:2
77:23
**believe** 7:15 8:10
8:14 17:10 23:16
27:1 33:17 40:7
49:21 52:23 74:17
91:25 98:14
112:16 116:10
138:23 140:23
142:7 171:20
184:7 192:1
198:14
**believed** 45:2
**beneficiation**
136:11
**benefit** 102:12
107:1 191:7
194:22 195:18
**benefitiate** 137:2
**benefits** 102:17,25
103:2 191:20,22
191:23

**berkeley** 197:7,10
198:22
**best** 22:8 140:4
200:9
**better** 127:23,25
**bible** 11:20
**big** 31:6 100:16
103:5 119:20
126:21 189:2
**bigger** 175:23
**bill** 71:7 72:10,12
73:11 74:20 75:1
75:19 81:19 96:21
97:23
**billions** 49:9
**bills** 13:17 14:10
**binder** 11:23 12:2
12:2,5 51:2 58:1,2
58:4 70:25,25
79:22 92:16 103:5
110:8,10 115:14
126:21 137:14,15
147:20,24 151:8,9
171:11
**binders** 23:9 24:11
24:23 25:2 26:19
26:19
**birchfield** 52:5
**birth** 38:6
**bit** 15:11 52:5
53:16 80:2 95:22
144:15,16 185:3
**black** 23:16
**block** 44:17
129:16
**blockage** 169:17
**blocking** 105:4,24
107:16 168:6
**blocks** 168:12
**blow** 193:19

[blurred - changed]

**blurred** 93:17,19
93:24
**board** 33:17
166:19,22,24
**boats** 16:17,22,22
16:23
**bob** 133:6
**body** 55:17 108:14
**bookmark** 42:12
**born** 52:19
**bottle** 37:1,3,4
49:7 50:5 55:4
169:11
**bottles** 114:24
194:15,16
**bottom** 34:16 35:4
37:5 55:13 113:5
115:18,18 132:15
166:9 196:14
**bought** 107:25
**break** 86:12,15,20
152:25,25 154:16
156:21,23
**breathe** 37:19
38:9,16,17,17
109:8
**breathing** 107:15
**brenntag** 1:7,12
1:17,22
**briefly** 17:14,20
64:19 120:4 132:2
**brightness** 55:13
**bring** 9:8 58:2,4
142:20 179:24
**brings** 123:11
**britain** 71:19
170:19
**british** 87:9
**broad** 150:18
**brochure** 53:10

**brochures** 53:9
**brother** 54:9
56:19 57:23
111:24
**brothers** 50:25
53:21 54:1,14,22
55:20,25 56:2,6,9
**brought** 96:21
105:14 114:7
**bruce** 101:9
110:17 111:13
**brunswick** 2:3
20:12
**building** 140:23
**bullet** 91:6
**bunch** 131:14
**bundles** 174:7,12
**business** 33:12
38:21,25 125:13
125:17
**buy** 45:9,13,16

**c**

**c** 2:12 3:1,17 83:3
102:2
**c.s.r.** 200:3
**calcium** 73:4
128:17
**calculation** 50:2
**california** 16:15
16:24 17:3 196:17
197:7
**call** 10:25 11:3
20:20 102:19
111:8,24 174:12
**called** 14:7 18:5,13
19:23 20:3 39:16
56:8 71:20 73:5
74:22 75:2 111:18
131:19 164:2,3
174:16 190:2
191:14 197:14

**cancer** 32:14,20
105:1,25 106:24
**cap** 109:13 169:2
**capacity** 14:20
15:2
**car** 6:5,8,9
**carbonate** 128:17
128:18 132:10,19
**carbonates** 128:14
129:4
**carcinogen** 45:23
46:8,11 47:5,6,17
48:4
**care** 55:2,24 166:9
191:16
**carolina** 171:24
172:13,22 179:5
**carry** 182:6
**carton** 168:11
**case** 5:18 6:21
7:14,19,20 27:25
36:9 57:8 60:19
68:8 70:19 81:12
86:16 89:15 95:23
105:18 138:5
141:10 144:2,5
147:1 157:2
177:20
**cases** 6:18 24:19
109:7 142:6 144:3
**cast** 97:6
**categories** 184:13
**categorize** 149:18
**category** 192:19
**cause** 32:19 45:25
47:17 129:14
169:17
**causes** 45:23,25
168:10
**caveat** 97:9

**ccr** 2:21
**cell** 9:13 87:3
157:14
**center** 3:19 40:3
42:11 158:5,11,19
159:1,7 160:16
161:16,24 162:8
166:4,17,18,23
167:24 197:8
**central** 100:19
**century** 32:4
**ceramic** 74:13
**certain** 89:21 91:7
109:25 110:2
184:13 186:18
**certainly** 23:11
24:14 31:8 42:14
53:25 128:22
137:1 162:10
166:21 174:1
193:7
**certification** 
138:10 200:1
**certified** 140:16
140:17 200:4,13
**certify** 200:5
**cetera** 61:22 76:8
83:13 149:15,15
**chaffing** 102:19,21
102:24
**chair** 6:20,21 7:20
**chairman** 101:3
197:10
**chairperson** 101:7
101:8
**chalk** 128:15
**chalmers** 116:21
119:1
**change** 79:1 83:3
**changed** 79:17
112:23

**changeovers** 60:7
**character** 170:18 175:18
**characteristics** 136:15
**characters** 97:6
**charge** 193:5
**charging** 13:16
**charles** 1:8 3:11 102:1 121:11,13 121:23
**chart** 52:11,12 53:21 54:14
**check** 13:13 153:7 189:8
**chemically** 73:4
**chief** 111:9 121:25 158:20 159:9
**child** 35:20 37:15 38:5,15 55:24
**child's** 167:16
**childcare** 53:23 54:18,23 55:3,24 56:16,21
**children** 39:13 48:12,21 49:1 50:21 55:21 56:25 57:1 107:21 108:7 108:11 109:2,7,13 168:1,23
**china** 19:17,19
**chisone** 16:10,11 19:12 122:9 123:10,20
**choked** 105:3 109:7
**chris** 3:8 10:6,6
**christian** 111:19
**christopher** 3:2
**chronological** 51:3

**chrysotile** 50:3 95:14,17,18 150:6 152:12 153:20 170:16
**chunks** 65:8 126:6 126:8,16
**cincinnati** 111:17
**citing** 5:19
**claim** 114:21
**claimed** 114:11 115:10 193:17
**clare** 98:2
**clarification** 72:22
**clarified** 69:6
**clark** 196:16 197:5
**classes** 52:8
**classic** 6:4
**clear** 7:13 40:17 50:12 56:2 89:6 106:15 143:21
**clearly** 6:13 57:2 61:6
**cleavage** 76:12 77:16 83:18
**clerk** 11:14
**click** 166:14
**client** 29:21 142:12,16 155:23
**clients** 53:1
**clinics** 52:8
**closed** 19:3
**closer** 139:4
**closes** 169:15
**cloud** 192:19 193:13,22
**clouds** 36:20
**coarse** 126:8,10,14
**cohen** 3:3
**colleague** 113:1
**colmer** 107:20

**color** 173:1,20
**columnar** 174:7
**come** 8:3,6,11,23 12:4,19 17:18 23:11 37:7 42:11 61:14 62:20 63:13 68:10 86:19 97:5 156:24 157:6,19 169:16 184:22 188:11 189:1,10 189:13
**comes** 122:10 136:1 180:11 187:20
**comet** 109:8
**coming** 8:5,8 122:14,22,25 123:5 130:23 189:6 190:24
**comment** 75:20 125:25 185:4,5
**commentary** 6:11 6:13
**commented** 108:25
**commenting** 106:18
**comments** 27:5 149:3
**commercial** 149:24 176:24
**committee** 79:7,10 101:3,6
**common** 6:15 76:8 83:14
**commonly** 76:11 83:17
**communication** 71:7
**communications** 71:6 158:17 159:6

**community** 158:19,24 159:4,8 159:12
**companies** 13:8 20:16,22 145:6
**company** 7:24 8:15 13:17,19,20 13:20 14:7,9 18:5 18:6,12 19:23 20:3,15,16 23:2 29:24 33:6,13,19 38:3 41:15 50:10 50:11,12 70:20 74:11 98:22 100:2 100:4 121:11,14 122:1 123:10 129:20 141:22 146:22 158:18 159:7 178:16 190:22 192:22 193:21 198:9 199:18
**compare** 77:21 152:25
**complaints** 172:25
**completed** 10:21
**completely** 116:9
**completeness** 112:10
**completion** 73:18
**complex** 26:14
**compliance** 200:6
**component** 132:22
**compositions** 149:21
**compound** 47:8
**compressed** 200:8
**comprise** 76:12 83:17
**compton** 10:19

[conceded - correct]

conceded 41:18
concept 184:22
concern 168:11
191:5
concerned 65:24
125:6 188:25
concerning 197:20
conclusion 108:10
conclusions
172:25
conduct 197:16,18
conducting 52:8
confident 193:21
confines 8:14
confirm 64:20
confirmed 191:21
conflict 72:23
confused 7:3
149:13
consider 176:13
178:8
considered 24:18
consist 89:23
91:13
consistent 5:16
7:23 77:5,9 82:5
84:1,18 134:12
consists 132:18
constancy 154:4
constitute 112:8
consultant 12:24
13:5,5 141:21
consumer 3:21
10:11 12:16 13:12
20:20 76:20 84:3
145:6 159:10
161:23
contain 38:24
42:16 76:11 83:17
144:21 149:22,23

contained 38:23
46:11 127:16
140:6 197:25
container 50:6
169:19,21
containing 33:15
33:23
contains 132:16
contaminant 76:9
77:1 83:14 84:9
contaminants 76:6
83:12 126:11,12
132:5,17 140:1
144:18
contamination
112:7 132:18
content 40:4,12,12
41:21 158:3,3
162:17,17,20
164:24 197:21
198:15
context 107:16
continuation
199:23
continue 24:13
64:9 87:4 113:18
157:15 193:10
continues 198:13
continuing 124:2
132:8 139:7
contract 61:7
control 40:23,24
41:3,18 162:8
163:9 164:15,23
controls 40:20
123:19
controversy 73:21
178:17
conversation
125:2 142:21
196:16 197:5

cool 102:18
cooper 196:16
197:6,7,10,13,20
198:13
cooperate 123:24
cooperative
111:15
coordinator
100:18
copied 27:23 28:1
28:15,25 120:9
copies 27:24 28:4
29:22
copy 28:3 94:3
133:2,10 186:20
186:23 196:1
cornerstone 104:2
107:22 108:3
cornstarch 167:15
167:17 168:1
191:17 192:7
corporate 7:11
11:4 12:15 20:11
106:19 142:5,11
correct 9:15 12:16
12:19,20,22,23,25
13:3,21 14:11,18
14:24 15:6,14,24
16:2,10,15,25
17:22 18:19,20,22
19:1,18,24 20:9,14
20:23 21:7,8,14,17
21:25 22:7 30:16
30:19 31:20 32:4
32:14,21 33:7,15
34:7,9,13,21 36:17
38:23 40:21 41:19
43:1,6,9,13,16,20
43:22 44:5,7,9,14
45:10,23 46:1,8,12
47:25 48:8,13,16

48:21,23 49:1,2,10
49:14 50:6,22
54:22 55:21 58:23
62:16 63:21 64:24
65:5,6,8 67:5,6,23
68:7,9,24 69:2,21
69:22 70:1,9,9
71:4,8,13,20 72:20
74:23 75:3,13
77:8 78:1,6,20
84:20 85:22,22
86:5 87:8,20,25
88:12,19 91:1,4,11
91:15,21 92:3
93:11 94:8,10,16
95:15,20,24 96:3
96:11,15,19 97:16
97:25 98:9,22
99:17,24 100:11
101:4,10,18
103:17,24 104:3
104:15 105:21
108:1,7,18 110:19
110:22 111:10
114:9,25 117:10
120:18 121:14,23
122:20,23 125:8
125:11 127:11,20
128:9,13,20 130:8
130:24 131:2,10
132:6 133:19,23
134:8,13,22 135:9
135:15 137:8
140:10,12,14,15
140:19 146:6,16
146:23 147:8
148:13 149:7
150:3,14 151:23
153:22 155:10
156:10,17 159:2
161:25 166:22

169:13 172:2,22
172:23 173:5,14
174:8,14 175:15
177:7,10 178:15
179:20 183:3
184:4,6,10 185:19
187:11 188:12
190:24 191:22
194:15 195:1
198:4,24
**corrected** 111:20
**correctly** 25:5
115:3
**correspondence**
26:17 63:7 100:19
164:18,19
**cosmetic** 19:20
71:12 72:15 76:24
79:23 80:12 82:11
84:7 88:8,18
90:23 112:16
149:21 191:4
194:22 197:23
198:16,18,23
**cosmetics** 71:16
197:22
**cotton** 55:16
**council** 197:11
**counsel** 5:12 8:11
8:21 9:23 12:2,4
46:4 59:17 60:19
61:1,11 65:15,21
73:15 82:1 86:12
105:13 106:6
112:10 145:8,18
145:22,25 146:2
170:4 176:2 181:3
181:18 183:12
184:1,12 186:6,16
187:21,23 188:20
189:8 190:14

**counted** 49:15
**country** 90:9
**county** 1:1 2:2
63:24 92:5 138:3
200:14
**couple** 25:10
**course** 50:20
105:5 128:11
129:24 132:25
136:21 160:19
183:2
**court** 1:1 5:1,6,11
5:22 6:1,7 7:21
8:2,18,25 9:3,6,12
9:18 10:9,17 11:9
11:19,25 12:7
25:23 29:12 37:10
41:9 42:4,9 44:3
46:23,25 47:7
51:20,23 52:1
57:11 58:6 59:8
59:11,17,24 60:2
60:11 61:10,20
62:5,11 64:6
65:25 66:3,6,8,21
68:18 69:18 72:2
72:6 73:14 78:14
80:6 81:2,4,15,25
82:12,17,19,20
85:1,3,6 86:11,14
86:22 87:2,18
89:1,4,6,9,18 90:6
90:13 92:11,23
93:2 94:25 95:5
96:9 104:21,23
105:11,20,22
106:8,15 107:4,9
111:5 113:14,16
115:25 116:20
117:4,8,11,12,12
117:13,17,24

118:4,14,18 120:6
120:11 121:4
126:24 130:4
138:25 139:3,6,10
139:12 141:17,25
142:24 143:2,7,19
145:7,11 148:2,17
148:20 156:22
157:9,13 160:4,8
160:18,25 163:4
165:3,17,22 169:8
171:6 176:5,5,12
177:25 178:22
181:17 184:12,18
185:10 186:14,24
187:3,10,13,25
188:3,7,10,23
189:11 190:7,10
190:13,17 194:9
196:25 200:4,13
**court's** 118:5
161:1
**courthouse** 2:2
200:14
**courtroom** 137:24
**courts** 7:5 74:10
**cover** 33:17 36:11
75:19 190:13
**covered** 29:11
**cow** 104:6
**cpta** 75:19
**crazy** 41:1,5,8
**create** 194:19
**created** 187:4
**credibility** 81:18
**criteria** 149:1,12
**crm** 161:8,9,15
**crocidolite** 150:8
152:14 153:21
**cross** 8:4,12 62:6

**crowley's** 197:4
**crr** 2:21
**crystallographic**
73:5
**crystals** 174:8,12
177:10
**ctfa** 71:15 152:4
**ctpa** 71:20 72:13
75:11,13 76:22
77:2 78:24 79:23
80:14 81:20 83:3
84:5 87:8,19
94:12 101:2
**curative** 103:1,2
**cure** 102:16
**current** 72:13
78:23 79:3,4
101:20 165:11
200:7
**currently** 12:21
14:13 169:11
**customer** 161:12
161:24
**customers** 43:8
181:14
**cutoff** 56:14
**cyprus** 19:24
151:22

**d**

**d** 4:1
**d'angela** 1:14 3:11
9:24 57:22 59:1
**d.d.** 199:15,17
**d.h.** 111:9
**d.r.** 100:21 110:18
199:15
**dallas** 3:10
**dangerous** 124:7
168:13
**darlene** 1:9 3:11
9:23

[data - discussed]                                                    Page 11

data  21:10 26:4
  108:22 114:14
database  25:12
date  2:4 23:22
  75:17 126:24
  148:5,6 155:1
  200:13
dated  51:11 79:22
  104:13 110:16
  159:18 171:10,21
  186:2 195:25
dating  54:12 89:14
  170:20
daughter  53:18
david  1:8 9:24
  52:20 57:5 98:2
day  122:25
day's  199:23
dd  98:21
de  69:4
deal  160:20 189:3
deals  56:8
dear  148:23
deaths  108:15
decades  35:19
  182:23,24
december  19:2,7,8
  88:6 115:13
  118:21 134:24
  135:6 147:19
  148:7,12
decide  146:25
  173:19
decided  94:22
  172:21 191:6
decision  5:20
decisions  20:13,17
defect  6:24
defendant  10:10
  144:17

defendant's  140:4
defendants  1:7,13
  1:18,23 3:20
defense  12:4 170:4
  170:4
define  152:3,11
  155:18
defined  150:5
  152:12 153:19
defines  154:15
  175:7 176:18
defining  154:3
  175:1
definitely  189:11
definition  74:24
  150:2,11,21 154:5
  155:19,22,24
  156:4,5,7,9,12
  174:13,15,17
  175:10,21,22
  176:20
definitions  73:9
  153:1 174:19
  175:12,12
delivering  110:10
demonstrating
  96:14 182:4
demonstration
  182:6
denial  183:4
department  32:6,8
  32:16 33:10 133:7
depends  129:1
  154:2
depo  81:10
deposed  24:7
  85:13 90:4
deposition  7:12
  23:23 35:11 39:3
  64:17 92:16,16
  141:9 142:2,22

depositions  7:13
  57:7,14 64:13
  141:2,7,12,15
describe  139:22
  152:20 175:17
described  156:17
describes  175:19
description  4:5
  76:4 83:10 174:10
descriptor  64:1
design  6:19 7:20
  7:22
designate  142:14
designated  126:7
  126:9
designating
  142:10
designed  6:22
designers  6:19
desire  125:13
desk  179:16,18,24
detail  139:22
detect  44:1
detectable  149:23
  149:23
detected  43:23
  76:23 82:10 84:6
  116:24 119:3
  152:9 170:18
detecting  69:20
  78:1
detection  64:21
detects  87:24
determine  177:4
detry  107:19
develop  101:3
  108:23
developed  127:15
developing  115:2
dialogue  110:21
  163:11

diane  3:14 10:15
diaper  38:6,7
  56:19 166:9,13,14
  167:12,18
diapering  50:21
  50:24 55:21 166:9
diapers  38:7
different  10:23
  28:14 47:23 48:5
  56:22 62:18 95:14
  112:4 114:24,24
  123:4 128:25
  151:9,17 172:4,11
difficult  163:11,12
diffraction  64:21
  67:10 76:23 77:11
  82:10 84:6 85:16
  85:25 129:22,23
digital  158:16,17
  159:5
dimensions  76:21
  84:4
direct  4:3 12:10
  66:15
director  23:3
  98:24 99:19,23
  100:13,21,24
  101:12,14 104:14
  110:17,19 148:10
  148:11 162:4
  199:21
dis  15:19
disagree  36:18
  48:10 167:22
disapproved  41:23
discover  198:10
discuss  113:4
  126:4 197:19
discussed  112:14
  133:16 164:25

**discusses**  149:10

**discussing**  93:6
   108:6

**discussion**  5:9
   6:17 63:15 70:13
   79:19 85:18
   113:12 119:7
   143:5 154:18
   155:2 159:14
   165:25 189:20
   195:15,22

**discussions**  86:16
   157:2 178:17

**disease**  32:3
   102:16 103:2
   109:1 146:15

**diseases**  107:21

**displeased**  123:22

**disposal**  182:8

**disproven**  193:24

**dispute**  61:5

**disputing**  146:13
   195:13

**disregard**  64:7

**dissatisfaction**
   124:3

**disseminated**
   33:13

**distinction**  66:23

**division**  1:1 6:6
   33:25

**division's**  5:20

**docket**  1:2,2

**doctor**  47:14
   82:16 92:11 93:5
   96:9 111:9 113:21
   143:8 148:23
   190:1

**doctor's**  105:16

**doctors**  43:9 109:4
   109:6 124:4,10,19

**document**  27:25
   28:15,25 42:8
   50:17 51:4,11
   52:3 53:13 56:3,7
   59:20 60:1,15,20
   60:22 61:1,6 62:3
   80:15 82:19 87:11
   87:11 88:11 89:12
   89:17 90:1,6,13,20
   93:6 98:18 104:12
   110:13 116:7
   117:20 118:5
   119:19 149:12
   155:1 160:19
   170:5 177:9
   178:19 186:21
   187:6,12,18,23
   188:13 189:16
   190:2,22 195:6,13
   195:20,24 199:2,5

**document's**  90:5

**documentation**
   23:9 26:13 87:7

**documents**  21:17
   21:21,24 22:9,15
   22:17,20,23,24
   24:9,11,15 25:12
   26:3,7,23 27:13,17
   28:13,17 29:2,17
   29:20,23,25 30:12
   30:22 40:2 60:14
   60:23,25 63:10
   97:5,20 101:22
   104:10 152:22,24
   153:1,9,12 156:1
   170:3 177:19
   179:25 180:6
   183:16 184:13
   186:1,19 187:2,24
   188:4

**doing**  52:7 58:25
   106:14 127:6
   144:5 184:15
   190:23,24 195:5

**dollars**  123:11

**dolomite**  135:24

**domain**  39:19,24
   40:9,11,22 41:2,18
   41:19 157:25
   163:8

**domestic**  16:14,16
   16:20 17:16 18:17
   171:23

**door**  106:12

**double**  128:22,24
   153:7

**doubt**  28:4 32:6

**douglas**  1:4 3:10
   9:22

**dozen**  28:14

**dozens**  128:19,21

**dr**  5:1 7:15 9:19
   10:19,21 11:7,11
   12:3,5 23:3,10
   25:24 41:13 52:3
   63:18 74:14 75:11
   75:12 78:4,18
   83:2 86:23 87:6
   87:18 89:20 95:6
   100:11 110:11,13
   111:18 112:20,21
   112:22,25 113:1,5
   113:21 114:4
   115:6 116:14,14
   116:15,21 119:1
   119:13 120:12,16
   121:10,19 142:3,6
   142:20 144:13
   148:23 157:19
   170:22 171:2
   176:2,8,17 184:9

**doing**  (cont.)
   194:1,3,4 196:15
   196:16 197:4,5,7
   197:10,13,20
   198:13

**draft**  75:15,16,18
   75:19,22,24,24,24
   78:7,22,22 149:1

**dressings**  33:25

**driving**  96:25
   153:6

**drs**  107:19

**drug**  26:17 74:18

**dry**  102:19 103:2

**dump**  168:9

**duplicates**  27:21
   28:8,11,21,22 29:2

**dust**  36:20 37:7,19
   37:23 38:16 124:7
   149:18

**dusting**  194:22

**dusty**  36:16,18

**dynamics**  191:15

**e**

**e**  2:24 3:1,1 4:1,4
   162:2 179:19,23
   180:4,13

**earlier**  114:6,8,11
   157:21 158:21
   159:10 169:24
   182:20

**earliest**  23:23

**early**  15:22 16:4
   17:14 23:8,8
   52:13 96:17
   119:22 163:21,23
   163:24 193:16

**easier**  151:7

**editor**  117:6

**educate**  142:15

**educating**  164:8

educational 52:7
effort 156:14
   194:21
efforts 161:8,15
eight 28:1,2,5,14
   49:12 191:14
either 45:16 68:14
   70:8 108:22
   161:11
electro 152:5
electromicroscopy
   77:1 84:9
electron 86:1
   155:13
eliminate 76:19
   84:2 139:25
elizabeth 1:19
   3:12 10:1
elm 3:9
elongated 155:19
embodiment 25:8
emphasize 5:14
employ 13:22,25
employed 145:5
employee 7:21,25
   14:13 153:14
employees 141:6,6
   141:23 181:14
   182:15
enclosed 149:3
ended 172:13
ends 9:5 47:12
   62:12 67:2 82:14
   90:12 107:7 118:1
   139:11 143:4
   160:24
engagement
   101:18
engine 158:11,20
   159:1,8 162:5

england 31:14
   75:13
english 3:18
enjoy 86:20 157:5
enjoyed 52:14
enters 9:11 87:1
   157:12
enthusiasm 80:14
entire 160:19
entirely 144:24
entitled 79:23 97:8
   159:18
entry 182:18
envelopes 9:14
environment
   108:11
epidemiological
   197:16
equal 155:21
   156:2
equipment 64:25
equivalent 142:14
era 179:19,19,20
erroneous 193:17
error 6:7
especially 38:15
   48:12,21 49:1
   122:17 191:5,10
esq 2:18 3:2,5,8,14
   3:14,17,18
essential 58:17
establish 42:5
established 125:7
   125:9 132:22
establishes 72:17
estimate 49:16
et 1:7,12,17,22
   61:22 76:7 83:13
   149:15,15
etheridge 1:8,9
   3:11,11 9:24

52:19 57:4,5,15
etheridges 10:7
ethridge 52:20
europe 19:14 23:6
evaluate 181:11
evaluated 17:8,14
evaluating 193:1
evaluation 26:15
everybody 12:11
   41:15 157:17
evidence 5:15
   17:12 20:24 21:1
   21:9,11,12 27:11
   48:15 51:16,25
   59:6,13 61:5
   71:25 72:8 80:25
   82:23 88:25 89:25
   90:7,14,17 104:18
   107:10,12 111:3,7
   118:6,8 121:2,6
   126:23 131:23
   133:16 135:1
   136:8 138:22
   139:13,15 148:16
   148:22 151:1,5
   155:4,6 159:23
   161:1,4 170:5
   178:20,24 190:6
   190:12 196:23
   197:2
evoking 142:13
exact 43:14 47:3
   82:4 142:7 163:21
exactly 83:20
   175:7
examination 4:3
   8:4,12 12:10 62:6
   72:17 76:25 84:8
examine 180:18
example 6:5 33:3

exceed 90:8
excel 188:13
excellent 123:23
   197:13
exception 7:6
   117:3 122:11
exceptions 8:8
excerpt 160:2,9
exchanged 20:22
exclude 25:6
executive 99:17
   179:13,15
exercise 164:15
exhale 37:22
exhibit 4:6,6,7,7,8
   4:8,9,9,10,10,11
   4:11,12,12,13,13
   4:14,14,15,15,16
   4:16,17,17,18,18
   4:19,19,20,20,21
   4:21 12:5 51:2,16
   51:24 59:6,12
   71:24 72:7 82:22
   82:25 84:13 90:16
   104:18 107:11
   111:6 118:7 121:1
   121:5 126:23
   131:24 135:1
   138:22 139:14
   145:13,14 148:21
   150:23 151:1
   155:5 159:22
   161:3 170:4 171:9
   178:23 185:9
   189:25 190:11
   195:25 196:3,6,23
   197:1
exhibits 12:4
existed 30:24
existence 139:25

**exists** 191:19

**exits** 86:21 157:8

**expectation** 45:15

**expended** 194:21

**experience** 5:17
7:24

**experiments**
114:11

**expert** 6:16,25 8:6
8:7 54:11 98:1
111:22

**experts** 22:22
26:16 167:17

**explain** 69:13
91:17,24 145:1
154:12 163:11,12

**explained** 70:10
88:1 124:2 125:5
125:12 144:15

**explanation** 84:16
84:22,24 85:11,12
85:14 87:13

**explore** 108:21
163:14

**exposed** 17:19

**exposure** 48:8,12
48:20 81:13,16
112:16 149:2

**expression** 103:25
104:7

**extensive** 52:9
96:13 146:10

**extent** 31:1 67:17

**external** 162:22
164:1,7 166:25
167:6

**extremely** 36:16

**f**

**face** 14:14 110:1
160:12 168:6,9,12

**faces** 106:7 109:14

**facilitate** 76:22
84:5

**fact** 5:16 14:23
15:16 21:11 48:17
90:5 105:16
129:22 156:12
162:3,4,7 173:20
178:13 193:4

**factors** 191:2

**failed** 85:23 86:2

**fails** 86:9

**fair** 13:13,14

**fairly** 119:22

**fairness** 101:22

**false** 140:9,12,14
146:6

**familiar** 7:22 17:6
64:22 95:24 110:4

**families** 53:24
54:4

**family** 38:5 123:17

**far** 22:6 103:16
105:9 129:20
158:2

**fast** 6:5,8

**fat** 119:20

**father** 45:9

**fault** 120:3

**favorably** 127:14

**fda** 197:15

**february** 19:4,10
51:8,11 120:17
166:19

**federal** 142:14

**feel** 8:21 173:25
174:2 177:15
178:4

**feels** 177:14 179:8

**fellow** 149:6

**felt** 108:5 112:7

**fiber** 43:4,13
45:10 76:3,21
84:4 154:1,7,9,10
154:15 155:19,25
156:16 175:20
176:19,20

**fibers** 49:9 50:6
65:8 76:11,12
83:17,18 153:19
153:23 181:8

**fibrous** 72:18,18
73:5,6 74:8,21,21
74:22 75:2,8 76:9
77:2,4,15 82:7
83:15 84:10
127:17 132:8
149:14 150:6,7,14
150:15,17,19
152:12,13,21,21
153:23,24,25
154:1,5,5,7,10,10
154:12 174:23

**fight** 81:9,9

**figures** 128:22,24

**file** 23:13 28:16
60:10,18 62:4
187:20 188:15

**filed** 138:2

**files** 109:9

**fill** 69:6

**filled** 67:23

**film** 52:10

**final** 114:20 137:4
137:8,14

**finally** 150:5

**financial** 160:13

**find** 43:24 77:11
92:4,6 110:11
114:13 115:7,11
115:14 128:5

130:6,16 131:17
131:19 133:24,25
134:9,17,19
135:15 136:16,21
142:20 149:3
151:8 166:10

**finding** 58:9 115:4
129:12 133:22
134:7

**finds** 177:9

**fine** 15:21 61:14
62:11 66:13 86:13
126:6,12 134:1
189:9

**fines** 126:16

**finish** 173:11

**finished** 10:18
151:13

**firm** 60:5

**firms** 61:21 62:15
62:19,20

**first** 23:2 24:6,7
27:13 29:3 34:3
34:18 39:3 46:3,7
52:12 55:22 75:15
75:16,21,24 78:22
80:3 83:20 85:12
92:16 99:7 100:6
103:7 104:4 105:6
109:10 111:20
116:12 161:15
171:11 173:11
182:18 198:1,5
199:5

**five** 24:12 27:23
48:1 86:20 125:14
150:7 168:16

**flagship** 103:24

**flaherty** 3:18

**flexible** 77:15

**float** 137:2
**floatation** 127:8,9
  127:15 133:22
**floated** 127:25
  131:11
**floating** 127:22
**floor** 3:6
**focus** 129:3
**focused** 129:8
**follow** 7:19 24:20
  71:10
**followed** 85:16,25
**following** 149:19
**followup** 48:25
**fontana** 16:11
  130:25
**food** 26:17 74:18
**force** 80:14 101:3
**forecast** 190:2,16
  190:23
**foregoing** 145:16
  200:6
**foreign** 108:14
**forgotten** 100:7
**form** 44:12,18,20
  44:24,24,25 57:9
  63:20 74:9 75:8,8
  76:9 77:14,14,17
  83:15 129:16,16
  140:7 150:6,15,18
  153:23,24,25
  154:13,13 165:11
  173:16
**format** 186:9,20
  200:7
**formation** 76:5
  83:11
**former** 141:6
**forms** 82:7 150:7
  152:13 174:23

**forth** 142:15 175:6
**fortunes** 123:12
**forward** 97:19
  102:9 180:17
**forwarding**
  107:19
**fought** 74:9
**found** 35:16 96:1,4
  96:5,7,12 114:12
  114:21 118:3
  119:14 123:21
  127:3 128:1 135:8
  154:20 155:7
  170:16 171:16
  189:22 193:18
**foundation** 42:5
  61:23 163:15
  177:22
**founder** 99:15
**four** 3:19 18:3
  24:12,23 27:22
  33:22 49:7 56:18
  131:1
**fourth** 55:9
**fragments** 76:12
  83:18
**fragrances** 71:16
**frame** 18:24 80:5
  89:15
**franchise** 104:2
  107:23 108:4
**fred** 70:16,18
  72:14 170:6,7,10
**free** 30:23 44:7,9
**freedom** 25:11
  89:23 91:14
**freely** 20:22
**friday** 5:7 10:20
**front** 103:6 118:21
  119:21

**full** 11:14 14:2,3,6
  26:14 60:25 131:9
  169:19,20 200:6
**fuller** 196:15
**fully** 18:9 163:12
  178:16
**function** 6:16
**furnished** 149:4
**further** 69:13 82:3
  144:17,18 149:13
**futile** 123:19
**future** 192:19

**g**

**game** 181:16,22,25
**garde** 3:17
**gas** 32:23,25
**gateway** 3:19
**gavin** 98:24
  104:13
**gbu** 159:19
**general** 99:4,5,5,6
  99:11
**generally** 98:6
  178:5
**gentleman** 142:11
**geological** 63:25
  174:17 176:23
**geologist** 98:1
  152:18 154:12
**geologists** 175:23
**george** 1:14 3:12
  5:20 99:19 148:10
**germanasca**
  123:19
**getting** 21:4 27:21
  36:20 56:21 78:17
  109:25
**giant** 15:19
**girl** 54:9 56:12,20
**give** 6:14 9:14
  11:24 22:4 35:5

46:5 62:21 70:6
84:17,22 85:12
87:12 93:23 120:6
138:17 171:13
175:23 191:18
**given** 21:6,13 26:8
29:22 85:14
147:21 148:5
155:25 156:6
187:17 188:21
**gives** 150:2,12
**giving** 15:16
**glasses** 96:25
153:6
**global** 20:16 88:18
89:23 90:10 91:9
91:10,20 94:13,17
94:18 158:20
159:9
**go** 25:11 37:14
42:6 46:2,2,14
47:9 48:18 55:7
55:12,14,14 56:18
58:1 59:4 64:12
66:8,24 68:3
69:12 72:9 79:5
80:7 91:6 97:18
97:19 100:19,20
110:8 113:14,16
115:21 118:24
120:2,12 121:7
122:7 123:8
130:13 134:5,24
135:11 136:7,14
138:8,8 139:6
147:19,22,24
148:1 153:9
155:18 161:13
164:9 165:18,24
166:4,7,8,8,13
167:12,14 171:11

174:4 177:8
180:17 185:9,12
186:9 187:5,23
188:3 189:18
191:1 196:8 199:9
199:11
**goes** 6:24 40:9,17
40:23,25 41:3
105:7,15 106:9
123:12 159:25
162:24 163:7,13
180:11,15
**going** 6:6,8 8:3,6
8:10,20,21 10:23
12:9 14:23 16:18
20:20,25 25:20
29:7,9 32:3 35:3
38:16 42:4 43:25
55:20,24 62:1,3
64:19,20 70:24
73:17 80:4 86:8
86:15 87:14 89:12
90:7 92:8,20
94:19 98:16,17,19
103:4 104:17
106:8 112:20
116:6,8,18 120:4
121:19 122:3
129:25 130:13
132:1 133:8
134:17 136:5
140:11 142:8
144:25 147:17
151:20 152:23,25
154:23 156:23
158:10 160:14,15
162:5 165:1,10,13
170:11 174:12
175:6 176:2,4
181:1,9 182:19
184:21 188:14

193:15 194:5
195:20 199:6,8,12
**good** 5:1,3 9:12,20
10:5,5,14,14,16
11:7,8,9 12:11
50:10,15 86:11
95:19 129:13
147:17 156:21
157:17 166:12
173:25 174:2
178:4
**gotschal** 3:15
**goudie** 98:8
**grabs** 168:11
**grade** 19:20 72:25
122:8,10,11,12,14
126:7,7,9,15,17,18
126:18 149:21
**grades** 90:23
149:22
**grandson** 99:15,16
**grantham** 17:5,7
17:10,13,17
**granules** 132:9
**great** 71:19 80:1
99:16 102:5 106:1
170:19 171:18
185:25 189:24
**greater** 124:6
155:20 156:2
**greek** 134:3
**greenstone** 3:8
**grew** 150:13
152:18
**grit** 132:3
**groth** 111:9,22
113:5
**ground** 34:6,9
126:6 150:14
152:18

**grounded** 126:9
**grounds** 66:18
69:23 78:2,5,19
87:24
**group** 39:23 40:19
116:23 119:3
150:7 152:13
167:6,8
**grouping** 149:19
**groups** 74:7,10
**grows** 53:10
**growth** 125:2,3
**guangxi** 19:17,19
**guess** 20:25 21:22
179:15,18
**guidance** 88:13
**guide** 72:14 75:13
75:20 79:23 81:20

**h**

**h** 4:4 11:17,18,18
102:2
**habits** 73:5
**hair** 77:16
**half** 24:5,6 28:14
**hallucinating** 37:7
**hand** 34:15 36:24
55:5 122:13,17
**hands** 36:19 37:4
**hanging** 193:20
**happen** 110:1
**happens** 34:20
36:2,3
**happy** 84:17,22
87:12 91:17,23
185:4
**harm** 191:7
**harmful** 64:1
167:16 168:2
**harmless** 44:17
63:25 64:5 67:14
74:9 77:13 129:16

**hazard** 33:7 74:8
76:13,20 83:19
84:2 106:21
108:24 198:24
**hazards** 197:12
**head** 8:16 71:11
97:23 193:5
**health** 20:12,21
21:4,12 74:6
76:13 102:17,25
106:25 110:25
149:19 191:5,6,20
191:22 194:21
195:18 196:17
197:6,8,9,12
**healthy** 32:24 33:4
**hear** 66:6 139:4
159:11
**heard** 22:21 30:15
58:24,25 62:23,24
62:25 63:5 64:20
70:18 71:15 86:17
95:22 104:7 157:3
**hearsay** 6:11 8:7
42:3 60:5,22
105:5,7,7 106:3,4
106:4,17,18 116:7
117:2,19 165:2,13
**heat** 34:1
**heeded** 105:16
**held** 5:22 6:7 7:21
69:5 197:5
**help** 50:22 55:21
56:6 58:9 96:23
97:6 102:8,21
119:22 141:1,5
143:1,12 146:3
183:11
**helped** 141:13
144:10 145:20

**helper** 53:22
**helpers** 54:17
**helpful** 83:6
**helping** 54:2 56:9
**helps** 79:8 102:18
**herford** 36:8
**hi** 10:14
**hiding** 54:7
**high** 19:20 72:25 122:8,10 149:21
**higher** 194:19
**highlight** 153:25
**highlighted** 125:5
**hildick** 98:24 104:14 196:13,14
**hired** 61:21 62:15
**historical** 103:18
**history** 23:4,7 92:2
**hold** 34:25 51:20 59:24 67:20 77:12 82:17 85:1 94:1 115:14 154:14 160:4 169:8 174:18
**holds** 123:18
**holes** 109:17,18,24 110:2 169:13,15 169:22
**home** 53:22 54:15 56:7,10
**hon** 2:12
**honor** 5:4,15,25 7:18 8:24 9:2,4 10:4,13 11:2,8,22 11:24 25:20,25 29:6,9 37:8 41:6 42:2 44:2 46:19 47:10 51:15,17,22 58:3,5 59:5,10,20 60:4 61:15 64:2

64:10 65:19 66:20 67:1 68:16 69:16 71:23 72:5 73:13 78:9 80:4,24 81:12 82:6,9,24 85:9 87:5,14 88:24 89:2,11 90:1,11,18 92:8 94:19 96:6 104:18 104:19 106:22 107:5,8 110:9 111:2 112:10 115:23 116:2,11 117:3,18 118:17 120:9,13,25 126:22 130:1,2 131:24 135:2 138:21,23 139:2,8 141:16,20 142:2 142:12 145:10 147:25 148:15,18 151:1 156:20 157:16 159:22,24 161:2 163:2 165:1 165:9,12,16 169:6 171:3 176:1,11 177:21 178:20 185:9 186:9 187:16 190:5,8 194:7 196:23
**hope** 197:14
**hopkins** 4:2 5:2 7:15 9:19 11:5,7 11:11,16 12:5,13 25:24 41:13 52:3 63:18 74:14 80:20 83:2 86:23 87:6 87:18 89:21 90:20 95:6 110:11,13 116:15 120:12,16 142:3 157:19

176:3,8,17
**hopkins's** 12:3
**horizontally** 136:1
**hospitals** 15:24 43:9
**hour** 13:16,18
**huge** 41:15
**hughes** 107:20
**huh** 23:17 31:16 55:11 64:18 127:4 150:1
**hulfish** 3:15
**human** 77:16
**hundred** 96:3,10 103:10 136:1
**hundreds** 24:21 49:13,22 50:5
**hygiene** 148:25
**hypothesize** 194:18

**i**

**ian** 71:11
**idea** 180:4 189:5
**ideas** 62:21
**identical** 28:3
**identified** 111:13
**ignore** 162:16 194:5
**ii** 17:4 99:6
**illness** 108:17
**immediately** 198:4
**impeach** 81:6 117:22
**impeaching** 66:10 66:11,13 81:18
**impeachment** 65:24 66:15,20,22 81:23 82:8,12 117:25
**important** 21:5 103:8,16 108:5

121:8 158:18 159:4,6
**imported** 121:16 170:19
**imprecise** 149:13
**improper** 116:9
**improving** 123:23
**inadmissible** 116:10
**inaudible** 5:13 46:20 65:23 89:13 106:19 116:8,10 160:11
**inbox** 179:22,23 180:5,9,12,19,24 181:2,9 182:2 183:1 184:21 199:1
**inches** 24:12,23
**include** 76:7 83:12 129:6
**includes** 91:10
**including** 17:17 72:25 86:16 90:3 157:3
**incomplete** 160:9
**inconsistent** 66:10 82:7 92:21
**incorporated** 10:12
**incorrect** 97:16
**independent** 39:23
**indicated** 188:23 197:22
**individual** 27:24 33:16 91:24 104:8 156:16 164:7 174:8
**individuals** 9:16 32:15 33:9 140:25

**indonesia** 88:14
91:25
**indonesian** 89:14
**industrial** 86:8
127:11 148:25
197:8
**industries** 74:13
**ine** 186:7
**infant** 35:20
**information** 20:21
21:5,13 26:8
27:20,21 28:20
61:8 62:16 70:7
100:14 145:19
162:6 164:13
180:19,20 181:2,7
188:25
**informed** 112:13
**inhalation** 32:19
112:6 113:11
**inhale** 34:12 35:20
35:23 37:15,21,21
124:7
**inhaled** 167:17
168:4
**inhales** 168:8
**initial** 37:14 64:3,7
**initiate** 108:21
**innova** 14:7
**innovant** 14:8
80:22
**inquire** 111:18
**insight** 159:18
**instance** 6:6 13:10
20:19 52:19
186:21 188:16
**institute** 110:24
**institution** 116:22
119:2
**intended** 140:12

**intentional** 183:23
**interchangeable**
149:14
**interest** 112:10
117:21 194:20
**interested** 116:17
**internally** 45:2
153:19
**internet** 165:11
**interpret** 76:21
84:4
**interrogatories**
7:8,10 137:19,21
138:2,11 143:21
145:10,17 147:11
182:19
**interrogatory**
146:17 184:5
**interrupting** 25:21
176:2
**interruption** 29:10
85:5
**interview** 116:20
118:25 119:9,12
125:10
**interviewed** 121:8
**introduce** 12:12
89:19
**introduction**
133:1
**invariably** 63:25
**investment** 107:24
108:4
**involved** 6:19 57:8
62:20 76:5 83:10
97:9 141:8
**involvement** 158:1
**involves** 7:20
**ironing** 33:17
**irresponsible**
163:1

**irritation** 15:20
**issue** 8:3 72:13
81:21 89:15,16
104:20,24 105:2,5
105:20 106:9,19
109:17 178:14
192:18,18 193:20
**issues** 7:23 23:8
160:20 189:9
195:6
**italian** 16:6,8
18:12,22 19:12
96:2,14 120:22
121:16 123:14
127:14,19 128:5
130:7,7,17,17,19
130:23,23 131:5,6
131:8 132:16
134:10,13 136:11
146:8 170:13,24
173:5,7,14,15
**italy** 16:9,18 19:10
120:21

## j

**j** 3:8 11:18 107:19
**j&j** 10:15 59:20,25
60:6 69:24 77:7
77:10 90:1 97:8
98:3,8,21 111:12
123:25 125:12
127:19,23 146:4
158:16,21 159:9
165:14 174:22
175:7 176:18
177:5 186:3,7
187:3
**j&j's** 38:21
**j.s.c.** 2:12
**j4** 152:4
**j4-1** 101:3

**jack** 3:14 10:15
**january** 19:9 71:1
72:9 150:24 151:6
**jbp** 112:13
**jersey** 1:1 2:3,23
3:4,16,20 20:15
140:22 200:5
**jj0006286** 187:13
**jjci** 20:20 21:6,14
145:18,19
**job** 1:25 23:1
**john** 3:17,18 4:2
11:4,16 12:13,13
80:20 90:20 101:2
**johnson** 3:20,20
3:21,21 7:8,9,12
7:12 9:22,23,24,24
9:25,25 10:1,1,11
10:11,11,11 11:4,4
12:15,15,16,16,22
12:22 13:2,2,7,7,9
13:9,11,11,11,12
14:13,13,14,14,18
14:18 15:11,11,13
15:13 16:5 17:8,8
17:21,21 18:7,7,15
18:15 19:22,22
20:2,3,5,5,11,11
20:18,19,19,19
21:4,4,13,13,23,23
22:5,6,10,10,25,25
25:2,2,9,9,11
26:24,24 29:16,16
30:1,11,12,22 31:6
31:6 32:2,2,5,5,10
32:10,12,12 33:5,5
33:11,11,14,14,22
33:22 34:3,3,7,7
35:18,18 38:19,19
39:12,12,15,15,19
39:19,20,20,24,24

40:3,3,7,8,10,10
40:13,13,18,18,20
40:20 41:14,14,17
41:17,23,23 42:14
42:14,24,24 43:3,3
43:11,11,18,18
45:1,1,15,20,20,22
45:22 46:7,8,10,10
47:15,15,16,16
48:7,7,19,19 49:5
49:5 50:9,9,19,19
51:11,12 53:25,25
55:19,19 56:7,7,13
56:13 58:21,21
60:19,19,20,20
61:1,1,2,2,12,12
61:18,18,20,20
62:15,15,25,25
63:2,2,6,6,18,18
67:4 70:21,21
71:4,4 73:1 74:15
74:15,19,19 85:20
85:20 90:24,24
92:2 93:11,11
96:17,18 99:4,12
99:13,13,13 100:2
100:3 102:10,10
103:7,7,9,9,16,17
103:19,19,23,23
104:9,9 105:14,14
109:3,3,10,10
114:1,2,7,7 120:20
120:21 121:10,10
121:17,17 124:13
124:14 127:10,10
129:13,13 134:11
134:11,21,21
136:22,22 137:6,6
138:1,10,10
139:21,21 140:3,3
140:5 141:1,1,6,6

141:22,22 142:5,5
145:6,6 146:5
149:6,6 150:12,12
151:23,23 153:2,2
153:18,18 154:15
154:15 155:9,12
155:13,25,25
157:24,24 158:6,6
158:10,10 159:18
159:19 161:15
162:7,8 163:8,8,19
163:19 164:4,4
167:25,25 168:21
168:22 170:21,21
171:19,19 172:1,1
174:13,13,18
175:9 177:18,18
178:13,14 179:12
179:12 180:18
181:7,7,12,12
182:8,8,13,13
183:17,17,19,19
184:25,25 185:24
185:24 186:2,3,4,4
194:25,25 195:6,6
195:7,7,11,12
198:2,2,17,17,23
198:24

**johnson's** 15:23
16:5 19:16 20:8
25:12 30:1,22
37:24 38:15 39:4
43:5 45:15 46:11
49:7,12 58:17
59:16 67:4 73:1
90:2 92:2 94:7
96:2 107:14 109:9
112:23 113:2,22
114:2,22 115:4,8
116:24 119:4
138:2 139:24

140:1,6 146:5
155:9 161:8
174:19 175:10
180:19 184:23
185:15,17,18
192:2

**johnston** 98:21
199:15,17

**joined** 23:2

**journal** 31:11,14
107:21 109:1
114:21 124:19

**journals** 31:10

**jpb** 194:20

**judicial** 200:7

**july** 2:4 9:21
133:15,19 195:25
196:2,10 200:12

**jump** 64:19

**june** 103:5 107:20

**juror** 156:25

**jurors** 9:6,9,15
10:14

**jury** 9:11 10:18
11:8 28:10 30:22
41:14 54:8 64:7
86:15,21 87:1
117:8 156:23
157:8,12 164:23
176:13 182:8,13

**k**

**k** 11:17,18 102:2
**keep** 50:16 97:6
102:9 175:5,8
180:23 199:6,8,11
**keeps** 102:18
176:2
**kentucky** 14:24
**kept** 50:18
**kids** 50:24 105:3

**kin** 36:25
**kind** 5:23 8:11
67:14 86:18
100:18 122:25
135:12 157:4
180:18,23 193:19
**kits** 15:17,23
**knew** 100:9
134:11,21 137:6
**know** 5:11 17:2
20:1 21:23 22:6
24:8,16 26:12,22
27:2,3,7,16 29:4
29:18,19,25 30:3
30:11,16,17,23
41:21 44:15 49:8
50:8 52:18,19,22
53:5 56:17 57:6
59:1 63:4 69:10
70:16,17 74:14
75:17,23 77:10
78:23 79:2 85:20
86:6 89:14 93:9
93:20 96:1 99:9
100:5,7 101:20
102:4,23 111:21
114:6,23 121:20
123:14 130:22
136:25,25 137:15
137:18 141:21
144:25 146:7,10
147:2,14 149:10
158:2,14 161:9
164:3,6 167:2,4
171:1,5 173:4,6
174:10,22 177:18
177:20 180:9
183:18,21,23
184:3 186:12
188:21 189:5
195:9,10

**knowledge** 6:15
    7:1,4,17,24 8:1,18
    8:23 31:4 32:9,16
    32:19 33:11 140:5
    149:20 200:9
**known** 32:20
    48:11,23 150:6
**knows** 39:12 41:15
    45:20,22 47:15,17
    48:7,19 60:20
    63:2 177:24
**koch** 5:21
**konigsberg** 2:18
    3:5
**krishinsky** 138:5
    145:14

**l**

**l** 1:9,14,19
**label** 187:6
**laboratories**
    144:20
**lack** 144:18
**lacks** 7:16
**lancet** 31:17
**langer** 111:18,19
    111:21,22 112:14
    112:21,21,22,25
    113:21 115:6
    116:14,15,21
    119:1,8,13 125:7
    184:9 194:1,3
**language** 81:20
**laptop** 165:24
**large** 15:19 33:6
    49:10 55:17 74:12
    107:23 108:4
    109:25
**largely** 134:1
**latches** 7:21
**late** 23:8 129:20

**latest** 23:23 80:15
**law** 1:1 7:14
    121:10,22
**lawsuit** 137:22
    184:6
**lawsuits** 139:8
**lawyer** 22:3 37:9
    41:7 183:25
**lawyers** 22:23,25
    25:3 116:5 145:20
    146:1,4 183:11
**lay** 5:15 6:3
**lead** 111:21
**leader** 101:18
**leadership** 159:18
**lear** 116:6,19
**learned** 114:12
    115:3 122:9,11
**learning** 55:2
**leave** 157:6
**lee** 99:19 148:10
**left** 76:15
**legs** 37:5
**lest** 123:20
**letter** 75:19 83:21
    117:6 148:10
    178:12
**letterhead** 51:12
**letters** 180:1,7
**level** 48:8,10,11,20
    48:23 112:7
    198:14,18
**levels** 112:16
**levy** 2:18 3:5
**lewis** 158:16,20
    159:9
**liability** 5:18 6:17
**liaison** 164:5
**library** 31:7,8
**license** 200:3

**lid** 109:11,12,16
    109:21 169:1,12
    169:14
**light** 67:13,24 68:1
    68:11 85:16 86:1
**lightly** 55:16
**likewise** 127:14
**limine** 104:20,23
**limited** 14:8 71:13
**linda** 57:4
**line** 20:6 24:4,5
    29:17 30:1,12,23
    31:2 35:4,15 46:4
    46:17 47:2,24
    65:14,16 66:3,5
    67:17 73:18 92:19
    92:25 93:15,16
    113:5 139:8
    158:19,24 159:4,8
    159:12 161:25
    165:24 166:3
**lines** 52:7 112:11
**link** 39:18
**list** 50:15 96:24
    149:4
**listed** 80:16
**listen** 92:12 95:5
**literally** 173:8
**literature** 194:13
    194:13
**litigation** 21:19,20
    21:25 26:25
    140:18 141:2
    143:12,15,16,18
    143:25 144:1,4
**little** 15:10,11 52:4
    53:16 55:7 80:2
    95:22 98:20
    109:17 125:4
    144:15,16 151:4
    160:12

**livingston** 2:23
**llp** 3:15
**located** 170:17
**logic** 126:9
**logo** 185:15
**london** 35:10
    89:12
**long** 64:17 156:3
    174:8,11 177:9
**longer** 20:5 142:13
**look** 25:12,16 28:6
    28:12 36:11 42:1
    49:18 53:20 62:10
    65:9,11 67:10,16
    68:22,22 75:10
    76:1 77:18 79:6
    79:11,13,16,16
    83:4,5 84:12
    88:23 94:3 104:12
    118:21 119:11
    120:4 126:20
    128:2,4 129:21
    130:14 132:2,25
    134:6,16 150:24
    151:7 167:11
    168:5 169:2 172:4
    174:5 186:9 187:5
    187:23 190:9
    192:6 199:2
**looked** 22:9,14,16
    22:17 24:8,10,15
    24:16,16 26:7,23
    27:1,10,18 28:9,22
    63:11 79:2 122:5
    153:8,11,15
    170:11 172:8,10
    172:11
**looking** 6:11 16:21
    26:16 33:25 51:3
    78:4 90:9 106:20
    115:5 118:12

152:24
**looks** 53:17,19
54:10 56:12 65:3
77:15,17 127:6
129:2 159:24
166:4
**lorena** 101:17
**lost** 78:17
**lot** 67:19 68:4,23
70:18 85:21,23
86:5,6,9 147:18
173:23 182:1
188:16 194:16
**lots** 67:18 183:2
**love** 97:16
**low** 198:14
**lubricant** 102:19
103:3
**lunch** 156:23
157:5,10
**lung** 32:20
**lungs** 35:21
167:16 168:3

**m**

**magnesium**
128:17
**mail** 2:24 179:19
179:23 180:4,13
**mails** 162:2
**maimon** 2:18 3:5
5:24 6:2 9:1,4
10:4,6 89:25
142:10
**maintained** 89:22
91:8 115:7 184:9
**maintains** 125:8
**major** 192:18,18
194:21
**making** 61:1
183:10

**management**
55:24 187:6
**manges** 3:15
**manner** 111:20
**manufacture**
139:24 140:5
**manufacturer**
7:22
**manufacturing**
32:24 123:2
**maple** 3:3
**march** 110:7,16
111:16 136:8,12
171:10,12,21
199:7
**mark** 97:17 98:17
98:20 116:18
135:15,17,18
**marked** 23:22
115:18 119:19
137:13,14 142:22
148:5 161:7
172:18 191:14
**market** 125:20,24
191:15 192:3,7
197:24 198:4
**marketed** 42:22
**marketing** 158:17
158:21 159:5,9
161:12,24 162:5
**marking** 118:15
148:17 165:19
**martin** 116:5
**mask** 32:24
**masks** 33:1
**massey** 121:9
123:25 125:12
**massive** 76:10
83:15
**matches** 82:10

**material** 33:4 52:8
67:15,15 92:7
151:13
**materials** 34:1
197:17,18
**maternity** 15:17
15:23
**math** 50:7
**matter** 9:21 124:3
**matters** 6:14
**matthew** 121:11
121:11,13,23
**mccarter** 3:18
**mccarthy** 99:22
**mcneill** 1:14 3:12
9:25 10:8 57:22
59:2
**md** 99:1,2,3
101:11 121:10
**mean** 8:21 29:20
36:2 49:25 54:2
60:11 64:1 103:13
134:4,16 136:5
144:5 145:2
176:24 180:1,5
189:4 193:12
**means** 43:22 44:1
44:9 60:16 107:15
108:17 122:24
132:6 134:2
150:15 161:9
176:23 186:20
**meant** 36:23,24
142:9
**mechanisms**
108:23
**medical** 23:3 31:6
31:11 32:6,7,8,16
32:17 33:10 98:25
100:21 101:12
102:5 104:14

110:17,19 111:23
166:18,23,25
191:23 199:21
**medically** 33:9
**medicinal** 102:12
102:13,23 108:13
**medicine** 31:14
**meet** 50:14 90:24
143:12 174:13,15
**meeting** 197:15
**meetings** 74:10,15
74:18 164:9,12
**meets** 8:8 74:24
117:21
**members** 10:17
80:13 86:14
156:22
**memo** 71:3,4
74:20 81:19
110:17 120:17
121:8 171:20
179:3 184:20
185:14,21 196:12
199:14
**memorandum**
153:14
**memorial** 95:23
170:23
**memos** 188:16,17
**mention** 178:10
**mentioned** 93:8
**merely** 123:22
**mesothelioma**
32:20 45:23 46:1
47:18 53:3 105:2
105:25
**message** 160:11
**messed** 187:9
**met** 23:2 140:20
140:24,25 144:10

**method**  155:12 156:6 176:17,18
**methodologies** 115:2
**methodology** 85:15 156:8
**methods**  85:17 114:13 127:15 129:21 149:25
**microbial**  90:25
**microscope**  64:24 76:11 77:18,19 83:16 85:17 152:5
**microscopist** 154:3,12
**microscopy**  67:13 85:16 86:1,2 129:21 155:13
**mid**  1:2,9,14,19 18:11 23:14 101:23
**middle**  23:25 25:21
**middlesex**  1:1 2:2 138:3 200:14
**millennial**  158:7
**miller**  100:1
**milling**  126:14,15
**million**  21:24 22:16 27:4,8,14 28:17 29:23 50:6 162:2 192:8,15,15
**millions**  49:9 123:11 183:15
**mills**  122:8
**mind**  100:8 125:1 143:10
**mine**  16:9,11,12 17:2,5,5,7,7,17,22 18:4,6,13,25 19:3 19:9,19,20,23 34:8

34:8 93:23 107:24 108:1,5 120:7,21 122:8,10,12,23,24 123:1,6 126:5,6,8 126:12,14,16 128:14 129:1 130:22,25 136:11 151:22 170:16 172:6,9 179:4
**mined**  34:5,9 100:3
**mineral**  34:4,5 44:17 63:19 65:2 67:6,7,7,8 68:24 69:21 72:18,24 73:3 78:1,19 93:10,21 94:16 95:15 128:9,10 131:19 134:12 149:18 175:17
**mineralogical** 76:4 83:10 90:25 174:17
**mineralogically** 127:18
**minerals**  18:5,9,14 50:14 66:13 67:19 76:3 89:24 91:14 91:21 92:2,5 94:14 100:2 123:21 128:12,12 128:19,25 129:7 132:11,13,20 134:14 135:22 136:6 153:20 154:13 155:16 174:24
**miners**  123:20
**mines**  17:15 172:12

**minimum**  89:22 91:8
**mining**  100:4 125:13,16
**minor**  132:19
**minute**  24:21 65:20 86:15 105:11 144:4
**minutes**  48:2 94:9
**misleading**  61:17
**missing**  51:6
**mistake**  183:7,10
**mistaken**  115:11 116:17
**mistakenly**  113:10 114:11
**misunderstanding** 113:8,9
**modern**  123:18
**mom**  54:2
**mom's**  15:20
**moment**  5:24
**momentarily** 11:11
**mommies**  161:16
**moms**  158:7 164:8
**monday**  2:4
**money**  103:13 192:3
**month**  158:22 159:10
**months**  19:4 24:7 194:6
**morbidity**  108:15 108:17
**morning**  5:1,3 9:1,2,20 10:5,5,14 10:14,16 11:8,8,9 12:11 157:21 176:21 182:20 184:8

**moshe**  2:18 3:5 10:5
**mother**  45:8 52:8 53:17 57:23
**mother's**  53:22 54:17
**mothers**  191:9
**motion**  18:10 36:22
**mount**  2:22 114:7
**mouth**  168:13 169:19,21
**move**  10:23 29:12 42:8 48:6 54:8 62:8 64:3 87:15 92:9 96:6 102:9 130:1 176:10
**moved**  51:24 59:13 72:7 82:22 90:16 107:11 111:6 118:7 121:5 139:14 148:21 161:4 178:24 190:12 193:8 197:2,9
**moving**  97:19
**mulberry**  3:19
**multiple**  176:6
**musco**  138:11 140:17,20 141:14 142:6 143:13 144:11 146:3 182:21 184:1

| **n** |
| --- |

**n**  3:1 4:1 11:17,18 11:18
**n.j.**  5:21
**name**  11:14,15 39:19,24 40:9,11 40:22 41:2,18,19 52:6 99:7 100:6

111:19 157:25
161:22 163:8
196:13
**named** 158:15
**names** 167:9
**nancy** 138:11
140:17,20 142:6
**nasal** 169:17
**nashed** 100:5,11
196:15
**national** 110:24
197:8,10
**native** 60:8,12,16
186:9,20 187:2,7,8
187:8,10 188:5,14
**natively** 60:9
**natra** 101:23
**natural** 132:18
**navarro** 5:20 6:20
7:19
**nazi** 16:17
**nazis** 16:21,23
**near** 103:6
**necessarily** 23:1
126:13 129:19
**necessary** 85:17
**need** 26:4 40:6
58:9 61:10,12,22
61:23 72:22 76:21
84:3 96:25 125:1
153:24 158:14
184:13 185:3
198:11
**needlelike** 132:6
134:2 174:2
**needles** 44:13,20
181:8
**needs** 55:8 155:22
**neither** 117:21
**never** 17:8 33:19
39:4 43:4,12,19

58:25 62:22 85:21
140:6,20 146:4
169:20 172:13,15
177:20 183:4
186:24
**new** 1:1 2:3,3,23
3:4,7,7,16,20
20:11,15 31:14,20
52:8 88:8,17
115:10 116:4,12
116:15 117:5
118:12,20 119:7,9
119:12 125:10
140:22 200:5
**newark** 3:20
**news** 110:10
129:13,14 147:17
**newspaper** 111:17
**nice** 177:16
**nicholson** 141:14
142:6,20 143:14
144:11,13
**nick** 121:9
**nickel** 111:18
**night** 96:22
**niosh** 110:22,24
111:25 113:5
124:25 148:13,24
149:4,5 150:12
153:14,15
**nj3446610** 1:25
**nolan** 3:14 10:15
10:16
**non** 43:23 44:1
64:4 72:18 73:6,7
78:10 127:25
136:3 149:11
200:8
**nonasbestos** 44:24
92:4,6

**nonexpert** 6:14
**nonresponse** 29:7
**nonresponsive**
87:15 94:20,22
130:1 171:4
**nope** 70:25
**normal** 198:12
**north** 1:7,12,17,22
121:11 171:24
172:13,22 179:4
**nose** 107:16 109:8
168:7,12
**note** 107:19 134:1
186:5
**notebook** 23:16
64:13 189:19
**notebooks** 157:6
**noted** 109:9
**notes** 142:21
**notice** 105:8,23
106:9
**number** 49:10
56:22 60:6 61:6
113:22 115:19
144:19 186:6,19
187:11 188:10,24
193:16 196:4
200:3
**numbering** 72:3
**numbers** 160:13
186:13 187:4,17
187:19,21 188:21
**numerous** 14:21
25:10 96:18
131:17
**nurses** 43:8 167:1
181:14 182:15

**o**

**o** 11:17,18,18
**oath** 11:12 29:1
137:23,24 142:2

147:8,14
**object** 25:21 29:7
29:10 59:23 60:4
60:22 62:3 78:10
80:5 82:8 85:4
87:15 89:12,17
92:21 94:20
129:25 165:2,13
171:4 176:2,4
**objection** 29:10
37:8 41:6,9 42:3
44:2 46:19 51:21
57:9 59:7,9 64:6
68:16,18 69:16
72:1 80:6 89:1
93:2 111:4 121:3
130:4 139:8
148:19 160:22
163:2,4 165:3,17
176:9 177:21,25
178:21 182:3,5,6,7
182:10,12 190:7,9
194:7 196:24
**objections** 37:11
41:10
**objective** 125:19
126:1
**observation** 6:15
**obtain** 108:22
**obviously** 20:8
99:8
**occasion** 26:2
**occasional** 52:11
**occasionally**
134:19
**occasions** 14:21
**occupational**
110:25 149:2
**occur** 44:23
**occurs** 44:24 73:4
76:9 82:6 83:14

| | | | |
|---|---|---|---|
| 132:4 174:7 | 55:7 56:1,5 60:2 | 177:8 178:22 | 135:9 137:7 146:5 |
| **october**  40:1 158:4 | 61:10 62:11,22 | 179:18 180:19,21 | 198:16 |
| **offer**  7:8,9,11,14 | 63:14 64:14 66:6 | 181:1,8,13,15,15 | **ores**  93:10 127:7 |
| 7:16 51:15 59:6 | 66:25 67:17 68:3 | 181:20 184:8,16 | **organization** |
| 71:24 80:24 88:24 | 70:10,23 71:3 | 189:11,16,24 | 11:23 164:1 |
| 104:18 111:3 | 72:12 73:3,9 74:4 | 190:5,17,20 | **organizations** |
| 117:15 121:1 | 75:5,21 79:12,17 | 191:11,13 192:14 | 121:9 |
| 138:21 148:16 | 79:18 80:1 81:15 | 192:21 193:9 | **organized**  180:24 |
| 159:22 178:19 | 83:5,8,24 85:3 | 196:12,19,21 | **oriented**  74:6 |
| 190:6 196:22 | 88:3,11,21 89:9 | 198:21 199:1,7,9 | **original**  188:15 |
| **offered**  82:20 89:7 | 91:13 93:5,17 | 199:13,14 | **originally**  15:18 |
| 90:21 | 94:4,12 95:9 | **old**  56:18,19 57:3 | **ounce**  49:7 |
| **office**  23:14 24:23 | 96:23 97:3,6,20,21 | 57:3,4 134:3 | **ounces**  49:12 |
| 26:20 188:24 | 98:16 99:2 100:16 | 188:17,17 | 192:3,4,15,15 |
| **officer**  6:8 9:14 | 101:24,25 102:5,8 | **older**  53:17 54:9 | **outbox**  179:22,24 |
| 11:19 102:5 | 102:22 104:12,14 | 54:10 56:24 57:1 | 180:5,14,21 |
| 158:21 159:9 | 106:8 108:20 | **once**  140:21 | 181:13 182:2,19 |
| **offices**  114:7 | 109:3,3 110:16 | **ones**  27:22 135:23 | **outside**  8:22 23:5 |
| **official**  50:10 | 112:2 115:15 | **open**  106:12 | 40:19 90:9 144:20 |
| **officials**  90:4 | 118:11,24 119:17 | **opening**  105:14 | 165:14 185:1 |
| **oh**  37:1 59:5,21 | 120:8,24 121:7 | 106:5,11 109:14 | **overall**  105:9,13 |
| 67:25 75:16 130:9 | 122:3 123:3 | **opens**  169:12,14 | **overexposure** |
| 141:11 173:24 | 124:16 126:3,18 | **operation**  126:10 | 191:8 |
| 192:11 | 127:13 128:24 | 198:12 | **overlap**  18:21 |
| **oil**  58:16 59:15 | 130:13 131:21 | **opined**  198:23 | **overlooked**  126:13 |
| 185:18 | 133:2,8,13,25 | **opining**  64:4 | **overruled**  44:3 |
| **oils**  124:6 | 134:5,20,20 | **opinion**  5:15 6:3 | 57:11 69:18 80:6 |
| **okay**  8:2,25 12:14 | 135:19 136:2,14 | 6:16,23,24,25,25 | 93:2 130:4 165:17 |
| 13:15 14:9,12 | 136:25 138:1,5,20 | 7:1 112:24 197:22 | 176:9 177:25 |
| 16:24 17:18 18:4 | 139:10 142:24 | **opinions**  6:14 7:16 | 194:9 |
| 18:25 22:5,23 | 146:3 147:24 | **opponent**  7:6 | **oversee**  197:16 |
| 23:20,21,25 24:1 | 148:8,9,23 150:11 | **opposed**  74:8 75:8 | **owned**  18:13 |
| 24:13 25:14 26:22 | 150:23 151:11,20 | 150:18 169:18 | 19:22 39:19 100:3 |
| 27:16 32:25 34:11 | 152:3 153:2,5,18 | **optical**  76:25 84:8 | 151:22 157:24 |
| 34:12 35:15 38:2 | 154:14 155:4,7 | 129:21 152:5 | **owner**  121:22 |
| 39:11 41:17 42:9 | 156:19,22 157:19 | **options**  172:5 | **owners**  122:8 |
| 42:11 43:17 46:7 | 158:14 159:13,21 | **order**  10:22 23:22 | **owns**  20:5,8 39:15 |
| 46:14,17,25 48:19 | 160:4,8,17 163:16 | 76:19 84:2 | 39:20 40:10,20 |
| 49:18,24 50:8 | 166:7,8 171:18 | **ordered**  2:17 | 41:17 167:25 |
| 51:10,14,19 52:15 | 172:7 173:18 | **ore**  96:15 126:6,14 | |
| 52:18 54:11,25 | 175:5,23 176:5 | 126:16 130:24 | |

**p**

**p**  2:21 3:1,1,14
  11:17,18 200:3,12
**p.m.**  113:15
  157:10,11
**p1steno**  2:24
**pack**  168:5
**page**  4:2,5 23:21
  24:2 34:23,24
  35:3,4,12 36:12
  46:3,14,25 47:20
  47:21,23 48:18
  53:12 59:14 64:15
  65:12 71:7 72:13
  80:3 82:3,3 83:5,8
  92:17,18,18,25
  93:13,14 115:17
  115:19 118:3,22
  118:24 123:8
  126:4 130:6,9,9,11
  130:14,16 131:1,4
  133:1,14 134:5
  135:11 138:9
  149:10 151:21
  159:25,25 160:15
  160:15 161:7,8
  172:17,18 174:5
  191:1,14 199:10
**pages**  2:6
**paid**  12:19 13:5,11
**pamphlets**  164:13
  164:16
**panatier**  3:8,8 4:3
  8:24 10:6 11:2,22
  12:1,8,10 29:6,14
  34:25 35:2 37:12
  41:8,12 42:7,10
  46:5,6,22 47:2,10
  47:13 51:15 52:2
  57:13 58:3,7,8
  59:5,21 60:8,13,23

61:7,13 62:1,9,13
63:17 64:2,10,11
65:16,17,21 66:5,7
66:12,17 67:3
68:21 69:19 70:15
71:23 72:5 73:16
73:19,20,24 74:2,5
76:17,18 78:9,12
80:8,24 81:6,13
82:2,9,15,18,24
83:1 85:9,10
86:13 87:5,14
88:24 89:8,20
90:18,19 92:8,25
93:4 94:19,23
95:4 96:6 104:17
105:6,13,21 106:1
106:5,13,21,25
107:6,8 110:9
111:2 113:19,20
116:11 117:1,10
117:15,22 118:2
118:10,16,19
120:8,14,25
122:19 126:22,25
127:2 129:25
130:5 131:23,25
134:25 135:3
138:21 139:16,17
142:25 143:11,23
145:9,12,15
147:22,25 148:3
148:15,18 150:25
151:2 156:20
157:16,18 159:16
159:21 160:2,14
161:2,5 163:6
165:1,6,9,15,20,23
166:2 171:3,8
176:4,10,16
177:23 178:19,25

181:5,6,19,21
184:16,19 185:8
185:11 186:8,16
187:1,5,15,22
188:2,6,9,12 189:1
189:7,13,15 190:5
190:15,19 196:1,5
196:7,22 197:3
**paper**  112:25
  114:1 180:1,1,2,4
  180:7 194:3
**paragraph**  55:23
  73:25 74:3 125:4
**parallel**  155:20
  156:1
**parameters**  89:21
  91:7
**pardon**  47:22
**parent**  20:16 38:4
**parentheses**  98:17
**parenting**  158:19
  159:8
**parents**  50:20
**parse**  140:13
**part**  14:2,4,6 16:6
  23:1 27:7 28:17
  32:17 33:18 39:23
  40:13 54:6 75:14
  81:8 142:4 179:19
  179:19
**particle**  155:19
  156:1
**particles**  49:14,22
  50:4 102:20
  126:13 132:8
  134:1 167:16
  168:2 178:3
**particular**  16:12
  17:2,3 109:6
  136:6 141:9 144:5
  156:8 172:8 179:4

**particularly**  5:17
**parties**  60:24 61:8
**party**  7:5 164:5
  189:5 198:22
**pass**  9:15
**pastore**  1:9 3:11
**pat**  55:16
**patented**  33:14,16
  33:22
**patents**  33:22
**paterson**  2:2
**pathology**  111:9
**pays**  14:10
**peak**  53:8 107:13
  174:4
**pediatricians**
  162:22
**peer**  114:3,20
  194:12
**pen**  134:4
**pencil**  75:9
**pending**  85:7
**people**  6:18 7:4
  13:22,24 27:22,23
  28:1,5,15,16,24
  30:2 32:6,23 33:3
  33:24 40:12 45:21
  47:16 50:25 54:12
  55:23 57:8 58:21
  62:23 63:2,4,7
  75:14 96:22,24
  97:8 101:5 141:13
  146:21 169:9
  176:6 177:3,6
  179:24 180:21
  181:12 182:14
  183:25 184:23
  187:19 193:17
**people's**  28:3
**perceived**  191:19

Case 3:16-md-02738-MAS-RLS   Document 16133   Filed 12/22/20   Page 361 of 435 PageID: 123572

**percent** 26:23 27:3
27:14 49:6 50:3
127:16,17 128:6
131:9,10 132:16
132:17 161:16
192:12
**perception** 6:4 7:2
**performed** 139:23
144:19
**perfume** 71:12
**perfumery** 80:13
**perimeter** 169:15
**period** 8:16 44:5
89:16
**permit** 5:23
**permitted** 5:16
**person** 22:8 25:8,9
80:16 105:12
111:13 121:13
124:14 137:22
138:10 141:25
143:13 147:3
193:5 195:19
198:22
**person's** 7:3
**personal** 7:3,16
8:1,5,17,23 123:12
**personally** 164:11
180:6
**persons** 121:8
**perspective**
176:23,24
**pertinent** 22:18
30:6
**petterson** 100:21
110:18,18 199:15
199:21
**pharmaceutical**
149:22
**phased** 18:11,12
18:23,24

**phenomenon**
108:22
**philipson** 71:11
**phone** 110:21
111:8,24 140:21
142:8 143:13
180:3,8
**phoned** 111:15
**phones** 9:13 87:3
157:14
**phonetic** 116:6
**phoning** 111:14
**photocopies**
188:17
**photograph** 54:7
**phraseology** 43:15
**physician** 98:8,11
98:20
**physicians** 166:25
**pick** 68:25 180:7
**picked** 86:3 129:3
**picking** 126:11
**picture** 55:1 56:11
56:15,19 57:2
116:5
**pictures** 116:18
**piece** 64:25 77:18
**pilot** 136:10
**place** 2:2 55:8
166:12 197:23
198:6
**placed** 67:20
108:14
**places** 161:25
**placing** 184:13
**placitella** 3:2,3
7:25 10:6 142:1
142:19
**plaintiff** 1:5,15
**plaintiff's** 4:6,6,7
4:7,8,8,9,9,10,10

4:11,11,12,12,13
4:13,14,14,15,15
4:16,16,17,17,18
4:18,19,19,20,20
4:21,21 51:24
59:12 71:24 72:7
82:22 90:16
107:11 111:6
118:7 121:1,5
139:14 148:21
155:5 161:3
178:23 190:11
197:1
**plaintiffs** 1:10,20
3:10 10:3,25 11:3
51:16 52:24 116:5
**plant** 136:10
**platy** 127:17 136:3
136:3
**play** 158:17 159:6
162:22 181:16,23
**pleasant** 2:22
111:14
**please** 9:12,18
10:2 11:10,15,21
11:25 12:12 24:1
34:17 37:10 51:1
51:18 65:12 68:20
70:23 78:14 86:19
87:2 92:12,15
95:5 103:4 115:12
139:19 143:21
149:3 156:24
157:5,13 163:5
191:13
**pleased** 197:19
**point** 15:22 60:18
61:16 87:6 91:7
100:19 101:13
106:1,20 107:25
159:17 161:6

162:11 164:21
179:12 186:22,23
186:23 188:13
192:25 198:11
**pointed** 106:11
**pointing** 143:20
**points** 60:9
**poisonous** 123:21
**polarized** 67:12,24
68:1,11 85:16,25
**police** 6:8
**policy** 20:12 42:25
45:2 50:10,12,12
67:5 87:7,19
**pooley** 70:16,18
72:14 75:11,12
78:4,18 170:6,7,10
170:22
**poop** 166:11
**portion** 117:13
**portions** 118:5
**position** 123:18
125:24 197:15
**positive** 67:11,18
68:4,23 72:15
77:22
**possibility** 35:23
35:25 36:7 112:6
113:11
**possible** 34:14,16
34:20 63:9,12
76:6 83:12 108:21
194:18 198:9
**post** 89:14
**poster** 152:23
**posting** 40:4
**potential** 129:7
191:7 197:12
**potty** 38:7
**poured** 106:7

pouring 109:14
powder 15:12,14
　15:23 16:5 19:16
　20:9 34:2,11,15
　35:19 36:16 37:24
　38:15,22,24 39:5,6
　39:8,10,12 42:15
　43:6,13,19 44:5,21
　44:23 45:5,9
　46:12 49:8,13
　55:10,16 58:16,17
　58:22 59:15,16
　62:23 63:21 86:10
　90:2 92:3 94:7
　96:3 100:25 103:8
　103:24 105:4
　107:14,22 108:10
　108:12,16 109:5,8
　109:11 112:23
　113:2,6,22 114:5
　114:22 116:24
　119:4,14 125:20
　126:2 127:11,20
　139:24 140:2,6
　151:14 152:1
　155:14 160:13
　166:10 168:1,6,9
　168:12,22,24
　169:16 177:16
　184:10,23 185:1
　185:18 191:10
　192:2 193:2,6
　194:15 198:3
powder's 108:4
powdered 38:9,14
powdering 53:6
　57:5
powders 38:5
　113:3 115:5,8
　167:15 190:2
　191:4,6,10,18

194:19,22
power 60:8,17
　159:17 161:6
　186:22,23,23
　188:13
pr 61:21 62:15
premium 123:1
preparation
　142:17
prepare 61:21
　141:1,5,13,23
　143:1,13 144:10
prepared 142:4
　145:17 200:6
preparing 80:15
presence 63:19
　66:12 67:6 69:21
　72:16 77:6 78:5
　78:19 85:21 87:23
　173:2
present 50:1 63:23
　65:2 72:24 74:19
　76:13 83:18 93:10
　125:20 128:20
　134:13,15 149:24
　173:6,9 177:5
presentation
　58:16
presently 124:4
　143:24
president 98:2,21
　100:1 199:17
press 158:6,9
　185:23
presumably 22:3
pretty 92:5 129:10
　136:1,4 168:19
prevent 109:11,13
previous 60:15
　84:12

previously 8:4,13
prickly 173:23
　174:2 177:14,15
　177:17 178:3,6
primarily 72:24
　126:8,14
princeton 3:16
principle 43:15,16
print 61:22 92:18
　93:17,19 165:20
　187:7,9 188:3
printout 60:17
prior 12:3 16:13
　17:11,24 36:4
　117:19
priority 2:22
prismatic 73:6
　74:9 174:8,12
　177:9
privilege 142:12
　142:16 148:24
privileged 29:21
　141:23 143:2
probably 28:22
　30:5 31:21 36:10
　93:8 97:11 128:22
　130:14 137:13
　142:20 152:24
　156:21 166:10
　179:20 189:18
　196:10 199:9
problem 68:11
　69:7 108:23 112:4
　112:17 124:3
　198:10
procedure 46:20
procedures 139:23
proceed 52:1 80:7
　85:8 90:15 93:3
　148:20 190:18

proceedings
　199:24 200:7
process 88:7,15,16
　127:9 137:3
processes 76:5
　83:10 139:22
produce 60:13
　61:8 125:19 126:1
　186:22 188:14,16
　188:18
produced 52:12
　60:9,17,19,24 61:4
　61:11 186:4,8,18
　187:18 188:4
　195:8
produces 126:14
producing 60:17
product 5:17,18
　6:24 8:16 15:20
　20:2,6 27:11
　36:17 38:2 45:12
　103:8,18,24 104:4
　105:15,18 122:13
　122:18 126:15
　136:22 137:4,8
　141:24 151:13
　175:13 193:18
　198:10
production 186:17
products 6:17,20
　20:13 21:5 33:15
　33:20,23 38:22
　90:24 98:21 99:24
　100:22,25 104:2
　107:23 110:19
　127:11,16,18
　136:16 162:6,16
　182:14 185:19
　190:23 199:18
profession 32:24

**professionals** 191:5,16

**profitable** 194:20

**project** 172:4

**promote** 162:16

**pronounced** 102:3

**proper** 82:8 160:11

**properly** 114:13

**props** 182:1,3

**protocol** 81:8,11 151:16 177:3,6

**prove** 194:21

**provide** 26:4 27:10 191:6 195:18

**provided** 12:2 24:17 146:14 153:2

**provides** 28:19

**providing** 6:21 52:7,10

**public** 29:17 43:4 60:5,21 61:17,18 62:17,19 181:15 182:16 196:17 197:6,9

**publically** 184:4

**publication** 114:4 114:20

**published** 56:7 112:25 114:1,14 114:19 194:3,12 197:12

**pull** 62:2,4

**purchased** 17:22 17:24 18:6,8 163:18

**pure** 112:15

**purer** 126:15

**purity** 91:1 124:6 149:21

**purpose** 81:4 149:17 160:3

**purposes** 81:7,17 82:13 102:12 117:25 118:11

**pursuit** 194:18

**put** 29:16 30:1,12 30:18 31:2 34:15 36:19,24 37:4 42:15,18 50:9 60:15 62:15 77:12 98:17,19 99:2 106:6 145:20 154:23 165:10 175:6 176:17 181:1,4,9,9 184:21 188:17 199:1

**putting** 15:22 62:23 114:18 162:23 185:1

**puzzled** 195:2

**q**

**quackenboss** 52:6

**qualification** 88:7 88:17

**qualified** 33:9

**qualify** 66:21

**quality** 50:13

**quantities** 52:11

**quartz** 149:24

**question** 22:2 24:19,20 25:1,7,18 25:24 26:5 27:12 28:20 29:15 31:5 35:24 37:14 42:13 46:18 47:3,5,8,8 47:14 48:4,5,19,25 62:15 65:13 68:3 69:14 75:21 78:15

78:17 85:6 90:22 92:10,12,13 93:6 94:15 95:2,6 98:20 130:3 139:18,21 141:4 142:25 143:8 144:12,14 165:4 169:4,10 173:11 175:25 176:9 179:6 183:14 185:25 198:7

**questioned** 158:5

**questions** 22:21 26:9 31:25 45:24 137:21,22 144:14 149:4,5 183:11

**quicker** 130:15 151:4

**quite** 63:25 112:12

**quotations** 153:10

**quote** 44:12 116:17 186:19 188:4

**quoted** 116:15,16

**quotes** 75:10 108:9

**r**

**r** 3:1 98:2 133:4

**r&d** 99:23

**r.s.** 133:2 171:21

**ran** 18:2,4 19:9 172:6

**range** 186:3,10,25 187:2 189:18

**rare** 74:7 122:11 132:19

**rarely** 76:9 82:6 83:14

**rash** 166:13,14 167:18

**rashes** 167:12

**rate** 13:15

**ratio** 155:20 156:2

**raw** 151:13

**ray** 64:21 67:10 76:23 77:11 82:10 84:6 85:15,24 129:22,23

**reach** 55:9 158:7

**reaching** 161:16

**reactivate** 59:22

**reactive** 58:16 59:15,18

**read** 25:5 30:5 57:7,14,15 73:7,18 73:24 74:2 84:10 88:22 97:3,4 108:8 109:2 112:11,17 119:11 125:6 140:7,8 144:16,22,23 150:9 153:5 159:3 177:11 191:11

**reading** 145:7,13

**reads** 72:15 90:7

**ready** 65:22 86:19 113:18 133:14 156:24 157:6,15

**reality** 193:21

**realize** 59:20

**really** 8:11 35:24 61:17 71:6 102:11 141:3 149:9

**reason** 6:22 45:8 105:17 111:14 175:6 178:11 192:20

**reasonable** 45:19

**reasons** 70:11 173:19

**recall** 10:18 142:3
142:19 158:4,9,12
158:23 169:24
198:11
**recalled** 111:15
**receive** 25:2
164:14
**received** 133:11
134:21 164:16
170:21 196:14
**receiving** 180:20
**recess** 9:10 86:25
113:15 157:10
**reckon** 22:17
**recollect** 15:15
50:24 98:6 180:10
**recollection**
163:22
**recommend** 112:5
191:17
**recommendations**
89:15
**recommended**
149:2 184:25
185:20
**recommending**
109:4 124:10
**record** 5:10 26:14
63:16 70:14 79:20
85:19 86:22 93:9
93:21 94:6,10
95:1 113:13,14,17
143:6 154:19
155:3 157:9
159:15 166:1
184:14 186:3
187:17 189:21
195:16,23
**red** 3:4
**redact** 160:16

**redaction** 117:16
**reduce** 108:23
139:25 169:16
**redundant** 28:8
**refer** 77:3 99:11
146:11
**reference** 35:6
95:18 107:18
**referenced** 166:22
**referencing** 81:20
**referred** 103:23
104:1,5 111:22
**referring** 34:22
78:7 117:6
**refers** 103:7
**refresh** 125:1
**refute** 108:22
**regard** 8:9 20:13
86:16 117:5
142:16 157:2
**regarded** 97:24
**regarding** 196:15
**regardless** 112:6
**regards** 88:18
**region** 16:10,12
**regularly** 23:4
**regulators** 43:9
181:14 182:15
**reiterated** 116:23
119:3
**reject** 67:5,11 69:5
70:11,12 77:12
87:7
**rejected** 66:14
68:5,9 69:1,3,4,4
70:5 72:16 77:7
77:23 85:21 86:4
86:5,7 129:17
**rejection** 66:18
68:10 69:24 78:2
78:6,20 87:25

**relations** 60:5,22
61:17,19 62:17,20
**relationship**
161:12,24
**relative** 5:8 66:22
81:19
**relatively** 44:17
103:13
**relaunch** 158:18
159:7
**release** 158:6,10
185:23
**released** 183:17,19
**relevant** 24:18
27:4,7,17 89:16
160:11
**relied** 142:23
145:19
**rely** 146:21
**relying** 147:1
**remain** 11:10,12
**remember** 8:15
31:21 35:11 40:1
40:5 43:14 99:8
99:10 156:25
157:20 163:20
182:21 183:15
**remind** 40:6
**remove** 11:20
**removed** 108:11
126:11
**repeat** 143:9
**rephrase** 37:10
78:16 163:5
**replicates** 27:21
**reply** 149:3
**report** 114:1,4
127:5 136:20
**reported** 146:8
170:10

**reporter** 111:24
176:5 200:4,13
**reporting** 124:9
135:21,23
**reports** 96:18
170:23 193:16
**representation**
38:21 61:2
**representative**
7:12 11:4 12:15
142:5,11
**represented** 121:9
152:14
**representing** 61:4
146:15
**represents** 107:22
**reprinted** 52:13
**reputation** 103:17
**requires** 85:15
**research** 14:8
80:22 86:17 99:20
100:25 101:14
116:23 119:2
133:7 148:12
157:3 197:11
**resistant** 34:1
**respect** 77:2
**respirables** 191:8
**responded** 127:14
**responding** 109:7
**response** 64:8
66:22 90:22 94:25
117:13 176:14
**responsibility**
40:8,18 41:24
193:1
**responsible** 23:6
158:3 162:12
**responsive** 64:4
78:10

rest 84:1 160:1,20
restricted 6:18
result 67:11 131:5
resulted 108:16
results 20:18,21
  112:22 113:2
  114:16 126:20
  129:24 131:2
  134:7 135:9
retard 169:16
retracted 112:22
  114:15
retraction 114:17
reuters 116:3,12
reverse 125:20
  180:14
reversible 5:22
review 197:11,13
reviewed 21:16,20
  23:10 28:19 114:3
  114:20 166:18
  194:12
reviewer 149:1
revision 80:15
right 13:5,8 15:17
  16:6 17:25 18:5
  18:15 19:11 20:3
  20:6 21:3 22:3,10
  23:14 27:14 28:23
  30:16 31:7,12,15
  31:19 34:20 35:25
  36:9 37:16,25
  39:5,16,21 40:10
  40:14 41:15 42:21
  42:22 45:14,17
  48:18 49:1,3
  52:25 53:18,20
  54:2,2,19 55:5,10
  55:17 56:3,10,23
  58:13,14 63:3
  65:1,3,11 66:17

67:9 69:15 70:16
70:21 71:17 72:10
73:1,7 74:16,21,23
75:6 77:24 79:21
80:22 84:10 89:20
90:21 95:10 97:10
97:12 100:22
101:15 102:6,12
103:9,14 104:6,9
107:15 111:25
112:18 113:6,23
115:15,16,18
116:17,19 117:4
118:21 119:15,20
120:2,22 123:25
124:17 125:14,17
125:21 127:6,7,9
127:24 128:9
129:4,7,18,18
130:7,17,20
131:15 132:23
133:11 134:2,16
136:12,17,23
137:4,19,24 138:3
138:15,18 140:7
140:13 141:11
142:25 144:22
145:21 146:1,12
146:19 147:2,5
149:25 150:9,17
150:19,20 151:8
151:14,18 152:1,6
152:8,15 155:14
155:21,24 156:3
157:24 161:11,12
161:14,23 165:18
166:11,11,19,22
167:14 168:3,18
168:19 169:1
170:5,6,13 172:13
172:14,21,24

173:2 174:11
175:2,14,19
176:18 177:5,12
177:14,20 178:6
180:12,14,15,25
181:10 182:24
183:6,10,11,13,25
184:6 185:2 188:6
188:9,18 191:11
192:8,9,12,22
194:2,22 195:18
196:17 198:9,11
198:19 199:15,21
risk 112:8 191:19
robert 100:24
  133:4
robust 92:1 93:9
  93:21 94:6,10
rock 44:17 95:19
  95:19
rocks 50:10,10,15
  50:15
rod 44:24 75:8
  77:14,16 129:16
roger 100:1
role 8:15,18,22
  100:16 158:18
  159:6 162:22
  193:10
rolle 100:24 113:1
  114:4 194:4
ronning 1:19 3:12
  10:1
ronnings 10:7
  57:18
room 37:20,24
rosalyn 1:4 3:11
  9:22
rose 148:24
roth 3:3

route 195:21
routine 76:22 84:5
rt 74:11,16,17
rule 5:15 6:2,12
  7:13 142:13
ruled 8:4 138:24
  139:9
ruling 118:5 161:1
run 13:20 24:24
  34:15 39:22,23
  122:12,24 123:1
  126:5,6,8,14,16
  131:14 136:11
  161:23 164:1,7
runs 39:20 163:25
russell 133:3,4,5,6
  133:8 171:20,21
  184:20
russell's 133:1
rutile 132:10
  136:5

s

s 3:1 4:4 11:17,18
  102:2
sacred 104:6
safe 27:11 48:7,9
  48:11,20,23
  105:15
safety 8:16 20:12
  20:21 21:4,12
  22:20 23:7 102:5
  105:10,13 109:11
  109:12,13,21
  110:25 112:15,17
  191:2,4 192:19
  193:1,5,13
sake 81:16
sample 52:11
  136:22
samples 114:9,24
  114:24 136:6

[samples - show]                                                                          Page 31

170:11,16
**save** 97:19
**saw** 87:19 124:16
124:18,21,24
138:18 161:11
170:3 176:21
183:12
**saying** 27:9 28:18
37:13 41:5 56:13
56:17 61:3 63:1
66:10 78:18,21
84:19,21 113:25
114:10,15,19
116:15,16 162:14
162:18 168:16
173:18 175:8
195:4,9
**says** 42:16,19
54:13 55:15 58:13
59:15 66:14 72:12
74:20,21 75:1
76:4 80:12 82:4,6
83:9 84:15 90:23
93:20 107:14
111:13 113:5
118:25 119:21
120:1 121:8,24
122:2,7 123:10
126:1 132:3,15,21
133:1,10 135:13
136:7 145:4,5
146:2 147:9,10,10
148:23 150:19,21
151:12 154:25
161:14 166:16,17
167:25 168:18,20
170:15 174:5
177:12 181:13
189:17 191:15
194:17 197:4
199:4

**scenario** 28:6
**scenarios** 56:23
**schedule** 10:23
**scheltz** 101:2
**scheme** 123:23
**school** 196:16
197:6,9
**science** 74:10
97:23 100:13
148:11
**sciences** 31:20
**scientific** 71:11
79:9 101:18 114:3
114:20 194:13
**scientist** 98:10,15
98:19 133:6,9
**scientists** 48:9
**screen** 84:13 151:7
154:24
**screening** 76:22
84:5
**seat** 9:19
**seated** 9:13,23
11:10,13,21 87:2
157:13
**second** 35:1 41:11
46:5 51:18 75:24
82:17 105:9
116:14 154:16
171:13 174:5
189:18 190:8
191:16
**section** 75:25
111:10 191:14
192:7
**see** 24:22 28:13
29:17 30:2,13,23
31:24 51:10 52:3
53:9,10,14,17 54:9
55:8,9,14,15 58:15
58:18 61:5 67:13

67:16 79:16 80:9
81:22 84:1,13
88:20 94:2 95:17
96:23 98:18
115:18 118:25
119:5,6 127:13
128:1,4 132:21
133:25 135:5,12
136:10 137:18
138:6,9,12,13,25
145:4 148:4,9
151:6,12,21 153:2
154:14,15 158:14
158:16 159:17
161:7,14,17,19
166:3,4,7,9,14
167:11,13,13,14
167:18 170:15
171:19 172:18,24
175:7 180:24
181:4 184:14
185:14,17 190:1,3
191:2,15 192:4,10
194:17 196:3
199:14
**seeking** 81:5 89:19
**seen** 20:24 21:1,9
21:11 37:6 41:20
50:11,17 52:16
60:14 63:6,9
103:25 117:9
164:19,22 165:4,7
180:6
**selected** 122:13,17
144:17
**sell** 16:1,1 198:10
**selling** 15:13
105:18 182:9
**sells** 74:12 168:22
**semple** 23:3,10
101:9 110:17

111:13
**send** 27:25 170:22
179:25
**sending** 180:21
**senior** 97:23
**sense** 123:20
**sent** 162:1 181:12
**sentence** 168:17
177:1 185:5
**separate** 39:23
43:17
**series** 40:2 96:22
153:9 169:21
185:18
**serpentine** 95:15
95:16 150:6
152:12
**serve** 53:22 54:17
148:25
**served** 14:20
**serves** 108:14
**services** 71:11
**set** 18:10 133:13
174:14 189:8
**seven** 35:13
124:17 169:22
**shape** 76:21 84:4
134:4
**shards** 132:9
**share** 192:3,8
**shed** 126:11
**sheet** 190:13
**sheets** 58:22 62:23
**shelf** 136:22
**shelley** 101:14
**shipments** 16:18
170:20
**short** 177:1 179:3
**show** 34:22 56:11
56:15 77:13 81:25
116:18 151:3

[show - specification]

155:5 181:17 193:15
showed 68:11 75:19 81:23 114:8 146:11
shower 19:16,17 20:1,2,6,6 43:6,6
showing 170:23 182:7,13 185:21
shown 48:9 72:19 76:6 83:11 117:14 129:15 167:20 177:19 193:17
shows 77:1 84:9
shut 165:23
shuts 169:12
sibling 38:4
siblings 50:21
sick 45:21 47:16
sickness 108:17
sidebar 5:5,6 8:23 9:5 46:23,24 47:12 60:2,3 62:12 66:1,2 67:2 73:15 81:2,3 82:14 89:3,10 90:12 104:21,22 107:7 115:24 116:1 118:1 138:25 139:1,11 141:16,19 143:4 160:5,7,21,24 186:14,15
sides 155:20 156:1
signature 200:11
signed 138:14 172:18 182:21
significant 144:19
silicate 73:4
silvia 2:21 200:3 200:12

similar 71:19
similarly 10:20
simon 3:8
simple 144:8 168:19
simply 25:16
simulate 177:16
sinai 114:8
single 43:4,13 85:21 136:16 187:18
sinking 16:17,22 16:23
sir 24:2 32:18 34:17,19 35:7,15 35:18 36:14 37:13 37:13 38:10 39:11 48:21 51:1,5 58:15 59:15 64:12 64:23 65:12 67:4 68:22,24 70:23 71:3 74:23 80:10 84:13,18 92:15 95:22 102:10,25 103:4 107:13 115:12 118:3,4 123:9 126:3 127:3 128:4 131:21 132:1 133:13,21 135:8 137:12,18 139:18 148:9 151:3 153:22 154:1,17 162:7 178:13 185:12,14 189:22 191:2,13
sister 53:5 54:10 57:15
sisters 50:25 53:22 54:1,15,22 55:20 55:25 56:2,6,9

situation 8:20 27:20
six 27:23 28:1,2,4 28:14 194:6
size 109:17 110:2
skin 36:19 102:18 102:19 103:2 173:22,25 174:3 177:14,15 178:4,7 179:1,8
skip 110:6 112:2 147:17
slide 102:20
slightly 48:5 126:15
slipped 100:8
small 135:12
smell 193:19
smith 98:24 104:14 196:13,14
society 122:8
soft 177:16
software 187:6
sold 15:18 19:17 19:23 20:2 21:6 33:19,19 39:6,9 103:10 192:4,16 198:5
sole 121:11
somebody 7:2 38:5 41:19
somewhat 6:23
son 121:10,22
sons 5:21
soon 53:24
sorry 5:21 11:12 19:6,8 26:6 34:24 34:25 35:3,5,16 57:10 59:8,21 65:19 67:7,25 72:4 73:13,16

78:11 82:18 85:2 92:10,17,23 93:13 93:17 103:21 118:14 120:9,16 145:9 148:12 154:21 160:6 161:10 173:12 181:3,22 199:13
sorts 184:25
sound 17:5 41:4,8 162:25
sounds 41:1 163:11
source 16:20 17:16 18:10 88:8 88:18 94:6 96:2 130:24 137:7 146:5 172:14,15
sourced 18:16 19:10,16
sources 92:7 144:17,20 171:24 172:2,5,10
speaking 37:11 41:10 103:14 116:4 176:6
speaks 195:13
spearheaded 74:11
special 52:11
specific 30:10 161:1 185:4
specifically 5:19 42:21 56:9 102:11 122:13,16 168:2
specification 50:13 69:25 77:2 77:10 78:3,24 79:3,4,8 85:24 88:19 90:2 94:13 94:17,18 151:22

153:13 175:13
**specified** 90:10
**specify** 179:9
184:14
**speculate** 45:11
86:8 140:11 145:1
**speculation** 45:19
50:23 56:5
**speculative** 45:18
**speed** 23:11 96:23
**speeding** 6:9
**spell** 11:15
**spoke** 116:22
119:1 125:10
142:3 144:13
**spoken** 140:21
**spokesperson**
106:19
**spread** 36:24 37:5
**spreads** 36:19
**spreadsheet**
188:13
**sprinkle** 55:16
58:22
**square** 55:8
**squeeze** 36:22
37:2
**squeezing** 36:22
**staff** 166:18
**stamp** 60:16,18
61:14 187:9,19
188:15,18 195:7
196:13
**stamped** 187:23
**stand** 11:6 30:18
116:24 119:4
178:2
**standard** 89:13,22
91:8 149:2
**standards** 90:25

**standing** 11:5,12
**stands** 119:15
**starches** 124:6
**start** 12:9 53:24
54:4 152:23
**started** 10:19
15:13 53:5 57:5
157:20
**starting** 24:4
92:18
**state** 11:14 108:6
179:4 200:5
**stated** 42:24 43:11
44:19 89:21 119:9
**statement** 105:15
106:11 117:20,23
**statements** 6:9 7:7
117:20 146:22
163:15 165:13
**states** 18:17 23:5
26:18 63:24 71:17
90:3 91:10 92:6
146:20 172:5
**statistics** 191:18
**stefano** 121:10,20
**steinberg** 104:13
108:5
**step** 9:8 67:9,12
86:23 174:18
**stewardship** 99:24
**stick** 38:2
**stockholder**
121:25
**stockholders**
123:13
**stop** 102:21 124:7
198:1
**stopped** 105:17
**stops** 159:25
**story** 26:14,15

**straight** 73:10
97:15
**street** 2:2 3:9,15
3:19
**strengthen** 125:23
**stricken** 94:25
176:12
**strike** 19:1,9 64:3
87:16 92:9 96:7
130:1 176:10
**stringent** 77:3
**strongly** 108:10
**structured** 109:25
**struggle** 151:7
**students** 53:21
54:14,16,21 55:23
56:16,21
**studies** 113:2
122:4,4 129:15
135:5 138:18
183:20 197:16,17
197:18
**study** 127:8
133:18 135:4
**studying** 53:23
54:18,23 127:7
**stuff** 122:25
130:19 147:18
**subject** 107:14
117:16 118:4
160:4,18 161:1
171:23 197:13
**subjects** 62:18
**subscriptions**
31:10
**subsequent** 72:17
76:25 84:8
**subsidiary** 18:7,13
**suffices** 27:24
**suggesting** 194:24

**suggestion** 72:14
197:5
**suite** 3:9,16
**sullivan** 3:14 5:14
7:18 9:2 10:13,15
25:20 29:9 30:16
30:17,18,21 34:24
37:8 41:6 42:2
44:2 46:4,19
47:11 51:17,21
57:9 59:7,9,19,23
59:25 60:4,21
61:3,15 65:14,19
65:23 66:9,16,19
66:25 68:16 69:16
72:1 73:13,17,23
74:1,4 76:15 80:4
81:1,11,22 82:5
85:4 89:2,5,11
90:11 92:20 94:21
104:19,25 105:19
105:23 106:3,23
107:2,5 111:4
112:9 115:23
116:2 117:2,7,18
121:3 122:15
130:2 138:23
139:2,5,7 141:16
141:20 142:17
148:19 159:24
160:6,10,17,22
163:2 165:12
169:6 176:1
177:21 178:21
181:3,20 186:5,12
187:16 188:20
189:4 190:8 194:7
196:3,24
**sullivan's** 106:11
**summary** 151:12

summation 160:12
super 5:21
superior 1:1
  125:20 126:1
  127:18
support 22:20
supposed 177:4
supposedly 123:1
supreme 6:7
sure 6:1 9:13 19:5
  28:21 32:10,15
  33:8 46:21 55:4
  58:7 73:19 87:3
  89:4 113:19
  115:25 121:20
  128:21 129:23
  139:5 141:5,17
  143:10 157:14
  159:5 160:1 170:1
  171:14 180:22
  187:20 190:20
  193:14 195:3
  196:9
surgical 33:25
surprised 112:12
suspect 111:21
sustained 41:9
  64:6 68:18 163:4
  165:3
swap 93:25
sworn 11:18 140:9
synopsis 122:7
system 164:7

t

t 4:4
t.h. 101:14
tab 34:17,18 51:4
  51:5 70:24 88:4,6
  115:13,16 120:2
  189:17 199:4

table 128:2 130:6
  130:16 136:18,19
tables 136:15
tabs 148:4
tac 149:18
take 15:19 35:10
  41:24 42:1 53:8
  62:5 83:5 86:15
  107:13 138:17
  154:16 156:23
  163:10 174:4
  176:6
taken 9:10 86:25
  113:15 137:24
  157:10 170:17
talc 16:4,6,15,21
  16:22,24 17:3,16
  18:10,12,16,17,22
  18:22 19:12,13,15
  19:20 20:13 21:19
  22:20 23:7,7,7
  26:15 34:4,5,13
  35:19,21,23,23
  37:15,20 38:9,22
  42:15 43:5 45:21
  47:15 50:13,13
  67:5,18 72:15
  74:12 76:5,24
  79:23 80:14 83:11
  84:7 86:8 88:9,18
  90:23 92:3,7 94:6
  97:9,24,25 100:3
  100:17 102:11,20
  107:15,24 108:5,7
  109:15 112:5,15
  120:22 121:16
  122:10 123:21,23
  124:5,11,20
  125:21,24 127:7
  127:14,17,17,19
  128:13,20 129:3,4

129:22 131:8,11
  132:4,4,9,13
  134:10,13,15
  135:24 136:11,15
  137:2 139:23
  140:5 144:17,20
  146:8 149:2,14
  151:14 155:14
  170:12,19,25
  171:23 172:2,5,6
  173:7,14,16 177:5
  178:14,17 182:9
  186:3 191:10
  192:6 194:19
  197:17,21 198:15
  198:18,23
talco 122:9
talcs 16:14 72:25
  149:21 197:21,23
  197:24
talcum 108:10,12
  108:16 113:6
  191:17
talk 15:10 27:4
  34:2 56:16,20,22
  91:18 95:18
  111:19 121:19
  122:3 149:9
  154:11 157:21
  159:4 174:23
  179:11 190:22
talked 27:6 40:14
  168:4 170:7
  183:16 184:8
talking 22:19 30:6
  37:23,24 40:4
  107:1 111:23
  166:24 167:3,4
  169:9,23 179:3
  194:1

talks 54:3,3 55:23
  150:15 168:5
task 80:14 101:2
taught 32:23
team 116:23 119:3
technically 149:13
technique 64:22
  115:3
techniques 65:10
technological
  190:2,15
technologies
  194:18
teenager 55:2
teens 56:20
tell 22:1,8 30:21
  31:2,23 65:3,7
  83:5 152:18 171:1
  187:20
telling 31:3 164:22
  167:7 187:10
tells 26:14 37:3,4
  65:1
telofski 101:17
tem 176:18 177:5
ten 28:14,24
  115:19 169:22
tended 180:3
tendering 12:4
tens 49:13,22 50:5
term 123:2
terminology 188:8
terms 41:20 46:20
  49:25 103:17
  106:17 149:11,14
test 20:21 69:5
  85:15,24 114:13
  126:20 155:12
  156:14 177:5,6
tested 67:18
  113:22 114:25

115:1 194:14,16
**testified** 15:1
  32:18 77:6 107:3
  117:5 142:2
**testify** 7:23 12:19
  28:10 142:4
**testifying** 8:22
**testimony** 5:23 6:3
  8:5,6,7,13,19
  10:19,20,21 11:23
  12:3 23:19 29:1
  31:24 36:5 39:2
  41:13 42:3 49:19
  81:18 86:17 87:22
  115:6 142:23
  143:14 144:11
  157:3
**testing** 7:22 20:18
  67:21 96:13
  133:21 139:23
  144:18 146:11
  151:13,16,17
  155:13 176:17
**tests** 86:2,9 131:14
  134:21 142:8
**texas** 3:10
**text** 40:8 162:12
  162:23 163:13
**thank** 9:3,4 10:4,9
  10:13 11:2,7,21
  12:7 29:12 37:11
  47:10,11 58:6
  62:11 64:10 66:25
  72:6 80:13 82:13
  82:24 85:9 86:24
  87:5,18 89:5
  90:11,18 96:9
  105:22 107:4,5,6
  117:25 118:18
  120:8,13,15
  122:19 139:10,16

143:3 145:11
148:2 157:16
160:22 161:2
165:22 171:6,6
184:18 185:7,10
185:13
**theme** 56:24
**theoretically**
  34:14,16,20
**therapeutic**
  102:13
**thick** 24:12,24
  76:12 83:17
**thin** 115:13 174:8
  174:11 177:9
**thing** 55:13 77:12
  82:4 84:15,19,21
  142:7 164:21
  179:10
**things** 151:17
  162:20
**think** 5:7 7:2 18:8
  21:20 26:20 49:15
  58:1 62:2 66:19
  70:10,25 88:4,14
  98:14,18 102:3
  115:10 133:2
  140:21 163:24
  167:17 179:22
  181:25 182:2
  183:7 199:19
**thinking** 88:14
**third** 3:6 60:24
  61:8 124:4,10
  147:20 164:5
  189:5,19 191:1
  198:22
**thought** 111:16
  113:10 154:23
  167:5,5

**thoughts** 197:20
**thousand** 26:7
**thousands** 21:16
  24:11,15,21,22,25
  26:3
**three** 18:3 19:3
  27:22 38:8 86:9
  108:15 124:18
  129:2,3,8 156:2
  169:9 172:18
  187:15 199:10
**tim** 99:22
**time** 8:16 11:3
  13:17 14:2,2,3,4,6
  14:6,10 16:13,16
  16:19 18:24 19:14
  41:11 47:7 52:10
  60:25 61:8 71:24
  78:10 80:5,14
  85:12 86:11 87:15
  89:14,16 92:14
  93:7 95:3 97:19
  98:4 101:24
  105:12 111:3
  115:2 121:1
  129:24 141:25
  151:22 156:21
  159:22 165:10
  169:9 172:2,2
  176:7,15 183:15
  190:6 199:19
**times** 15:2,6 25:10
  52:13 96:3,11
  113:22 115:10
  116:4,13,16,21
  117:5 118:13,20
  119:1,7,9,12
  125:10 131:18
  146:9 156:2
**tiny** 110:2

**tipped** 110:1
**tipping** 168:6
**tips** 168:12
**titanite** 132:10
  135:23
**title** 88:7,16,20
  101:19,20,23
**titles** 121:9
**tm7024** 152:4
  155:10
**today** 9:20 14:16
  22:19 43:18 85:12
  109:22 116:25
  119:5,15 144:5,6
  156:12,14 164:23
  169:24
**toiletries** 71:16
**toiletry** 71:12
  80:12
**told** 7:4 21:21 29:5
  30:22 43:3,8
  116:21 119:1
  123:22 158:21
  159:10 182:13
**tolerance** 42:25
  45:2
**tom** 111:19
**ton** 103:13
**tonnage** 74:12
**top** 55:8 126:4
  143:10 169:12
  185:15
**topic** 22:19 30:6
**total** 192:4
**totally** 28:7
**toxicologist** 23:5
  32:22
**toxicology** 32:7,9
  99:23 111:23
**trace** 72:25 111:23
  128:6 131:7 134:9

135:14,15,16,17
**track** 97:6
**traditional** 108:12
**trained** 38:6,7
**training** 32:7,7,17
**transcript** 2:17
200:7,8
**transmission** 86:1
**treat** 102:16
167:13
**tremolite** 44:12,15
44:16,16,20,23,23
72:24 73:3,6 74:8
74:21,22,22,25
75:2,7 76:7,8,10
77:14 82:6 83:12
83:13,16 93:8,10
94:6,11,15,23 95:7
95:8 96:2,4,5,5,7
96:12,14,18 128:7
128:8,10 129:4,12
129:15 130:7,16
131:2,5,7,17,20
132:23 133:22,24
134:7,9,12 135:9
135:10,24 136:16
136:20 137:2,7,9,9
140:1,7 144:21
145:2,3 146:5,7,11
147:5,10 150:8
152:15 153:21
169:24 170:17,24
173:6,17 178:11
179:7 182:24
183:2 184:20
**tremolitic** 173:2,4
173:8,13,20 174:6
174:7 177:10
**trend** 125:20
**trial** 1:4 9:21
14:14 15:2,5

187:19
**tried** 40:16 81:9
**trillion** 50:4
**trillions** 49:8,13
49:17,22
**trimellitic** 74:12
**trip** 120:20
**true** 15:3 39:11
69:24 91:3 99:20
100:14,25 104:10
109:5 110:14,25
114:2 121:17
122:1 124:11,14
124:25 125:14,24
129:8 131:6
132:13 135:16
150:17 152:9
153:16 155:16
162:19 179:2
192:16 196:19
199:18 200:8
**trump** 160:12
**truth** 92:1
**try** 42:5 162:15
175:24 195:17
**trying** 81:9 144:7
146:25 158:6
187:25
**turn** 23:15,21 24:1
32:3 34:17 51:1
53:12 57:25 59:4
59:14 64:12 70:23
80:2 88:3 92:15
103:4 110:2,7
115:12,17 119:19
123:8 126:3 131:1
131:4,13,21
133:14 137:12
139:18 151:20
172:17 191:13
199:3,10

**turned** 9:13 21:24
26:24 51:5 55:13
87:3 88:5 157:14
**tv** 61:22
**twist** 169:5,12,14
**twisty** 110:3 169:1
**two** 14:2,3,5 20:22
33:8 38:8 39:3
56:19 60:14 71:6
73:4 112:11
114:23,24 124:18
127:15 152:22
153:12 173:19
183:25 188:19
194:15
**type** 95:14 135:12
190:21
**typical** 55:2
**typifies** 55:1

## u

**u** 16:17 102:2
**uh** 23:17 31:16
55:11 64:18 127:4
150:1
**uk** 23:14 26:20
193:7
**ultimate** 149:17
**un** 69:4 70:5,12
**unacceptable**
76:24 82:11 84:7
**underneath**
166:17
**undersized** 6:21
**understand** 14:15
14:17 53:2 81:23
137:10 141:3
146:21 186:17
188:1
**understanding**
17:1 22:18 26:10
41:2 45:4 49:25

118:12
**understands** 34:3
49:6 55:20 102:10
**understood** 9:1
35:19 38:20 50:20
54:1 58:21 63:19
145:1
**unequivocally**
137:7
**unique** 123:18
**united** 18:17 23:5
26:18 63:24 90:3
91:10 92:5 172:5
**university** 196:17
197:6
**unknown** 108:15
**unnecessary** 112:8
**unpleasant** 173:22
**unquote** 186:19
188:4
**updated** 166:19
**upstairs** 86:19
156:24 157:7
**urban** 197:8
**urged** 108:10
**usage** 58:16 59:15
**use** 8:5 37:3 42:19
52:9 61:24 63:8
76:24 84:7 90:8
102:11 109:4
112:16 124:5,20
149:14 154:4
158:11,19,24
159:7 160:14,15
162:5,15 167:15
167:25 168:18,23
172:3,15,21
173:19 177:4,6
180:3 184:23,24
186:13 187:21
188:22 191:9,17

196:2 197:21
**uses** 59:16 82:11
93:11 101:23
185:1,19
**usurp** 6:16

**v**

**v** 1:6,11,16,21 5:20
**val** 16:10,11 19:12
122:9 123:10,20
**valeant** 20:3
**validated** 68:10
**valley** 123:19
**value** 108:13
**vanderbilt** 74:11
74:16,17
**varieties** 76:10
83:15
**variety** 132:23
**various** 26:16
**vary** 155:22
**vehicle** 6:10
**verification** 147:7
**verified** 140:4
144:20
**verify** 188:25
189:2,8
**veritext.com** 2:24
**vermont** 17:22
18:16,22 19:1,22
96:15 100:3 108:1
172:6,16 173:5,13
173:16
**versa** 21:14
**version** 71:20
79:11,14 175:4
177:1
**versus** 9:22,24,25
10:1
**vet** 162:17,19,21
162:24 163:7,14
164:14,14,17,17

172:2,3
**vetted** 166:21
**vice** 21:14
**view** 74:7 76:22
84:5
**villa** 123:15,15,16
123:17
**virtually** 103:15
**viscomi** 2:12
**visible** 157:1
**visit** 130:22
**visited** 27:5 122:9
**visual** 53:21 54:14
**volume** 1:6 2:5
12:9 196:9 199:24
**volumes** 12:9
**volunteered** 68:15

**w**

**w** 100:5 102:2
**w.b.** 52:5
**w.h.** 104:13
**wage** 2:21 200:3
200:12
**wait** 60:11 73:14
73:14,14 105:11
139:3,3,3 143:19
143:19 144:4
169:8,8 175:5
**waived** 142:12,15
**wajsczuk** 102:3
**want** 21:3 31:24
56:1 62:7 81:25
91:18 106:15
115:17 121:20
122:5 143:10
149:9,16 153:7
174:11 175:5
178:6,11 180:17
180:18 181:16,23
187:8 189:2

**wanted** 5:12 49:24
125:23 159:11
179:10 195:17
**wants** 189:8
**war** 16:17 17:3,4
32:23 99:6
**warning** 42:15,18
**warnings** 105:17
106:6
**way** 6:22 7:7
11:23 32:20 36:8
41:14 67:21 73:22
109:25 135:13
151:25 168:8
183:8
**ways** 60:14 188:19
**we've** 64:20 70:18
71:15 126:18
147:18 170:6
187:18
**wealthy** 123:17
**wear** 156:25
**web** 39:18,18,19
**webber** 10:21
**website** 39:15,17
40:17,21,23,25
41:3,18,22,25 79:5
157:23 161:22
162:13,15,25
167:24
**wednesday** 111:16
**week** 14:23 22:22
27:6 133:16 170:4
**weight** 49:6
**weil** 3:15
**welcome** 10:17
**went** 19:11 23:9
40:2 158:5,15
182:20
**west** 2:22

**whatsoever** 17:12
86:18 157:4
182:11,17
**wide** 52:14 156:3
**widely** 33:12
**wife** 13:21 14:1,4
14:5 121:25
**william** 1:19 3:12
9:25
**window** 16:20
**windsor** 18:5,8,13
100:2 151:25
**wishes** 80:13
**withdraw** 197:24
**withdrawn** 198:3
**withheld** 21:2,10
**witness** 4:2 5:3 6:4
6:5 8:12 9:17
10:24 11:1,5,16
25:21,25 68:19
78:11 81:7,19
85:2 86:24 117:5
118:9 120:6,13
143:9,20
**witness's** 117:23
**witnesses** 5:16
10:22 142:18
**woman** 111:16
**word** 56:2 59:17
114:17 134:3
145:22 154:4
158:11 172:3
175:9,14,16
183:12 188:13
**words** 14:18 22:19
90:8 114:18
168:17
**work** 12:18,21
22:5 72:23 108:21
141:23 186:18

[worked - zoom]                                                           Page 38

**worked**   13:1 32:8
  32:23 140:18
  197:7
**working**   9:7 31:9
  149:1
**works**   167:13
  186:17
**world**   17:4 32:23
  90:3 91:3 92:7
  99:6 123:18
**worldwide**   16:2
  32:11 60:22
**worried**   123:20
**worry**   119:23
**worse**   167:18
**write**   91:22 98:19
**writes**   108:20,24
**writing**   75:12,15
  148:13 180:7
  195:5,19
**written**   40:12
  41:22,24 75:4
  100:9 108:8 109:1
  116:3 119:6,12
  122:21 124:12,15
  124:19 140:8
  144:23 153:14,25
  158:3 162:12,21
  166:17 173:3
  177:11 185:22,22
  194:23 195:14
**wrong**   130:9
  144:24 183:23
**wrote**   91:16,17,19
  91:20,23,24 96:22
  109:2 115:9 125:9
  140:3 147:4
  194:12 195:3,11

### x

**x**   4:1,4 64:21
  67:10 76:23 77:11
  82:10 84:6 85:15
  85:24 129:22,23
**xrd**   64:21,24
  67:19 68:4,23,25
  69:20 77:7,23,25
  78:5 87:23 152:5

### y

**yeah**   27:15 28:24
  32:1,22 33:18
  36:10 38:17 43:23
  45:7 48:1,10 49:4
  49:20 51:9,9
  53:19,19,19 54:5
  54:16 56:11 58:24
  58:25 65:16 68:8
  74:24 75:18 78:16
  82:2 83:8 93:18
  93:20,20,25 94:3,8
  94:8 96:16 97:1
  97:14,14 99:1,9
  101:11,16,25
  102:7 105:4 108:8
  109:2,19,20 110:5
  110:5,18,20
  113:10 115:25
  125:3 127:8 128:3
  128:17 131:8
  133:24,24 134:4
  134:19 135:7,10
  135:17,20 136:3
  137:11,17 138:16
  144:9,25 145:3
  147:3,23 150:24
  161:22 174:22
  178:8 180:2,4
  181:5,19,24 184:2
  184:11 188:2

191:24 192:10,10
  192:10 193:25
  194:24 195:21
  196:11 199:8,11
**year**   13:1 15:1,5,8
  24:5,6 56:18,19
  57:3,3 116:3
  123:11 144:13
  154:21 163:21
  170:20 182:20
  192:1
**years**   18:3 25:11
  39:3 73:22 84:18
  103:11 124:17
  125:14 138:17
  144:19 163:20
  164:20 190:24
**yeast**   167:18
**yellow**   125:5
  153:25
**yep**   31:16 115:15
  154:25 171:15,16
  171:17
**yielded**   127:16
**york**   3:7,7 31:20
  115:10 116:4,13
  116:16 117:5
  118:13,20 119:7,9
  119:12 125:10
**younger**   50:24

### z

**z**   102:2
**zero**   42:25 43:13
  43:22 44:9 45:2
  198:18
**zircon**   132:10
**zoom**   52:4 53:16

Exhibit 5

**JOHNSON & JOHNSON BABY POWDER
QUESTIONS AND ANSWERS**

— LIST OF NEW/CHANGED QUESTIONS —
OCTOBER, 1985

**New Questions:**

II.   Talc — Inhalation

     Qs: 7, 8  (page 12)

III. Talc — Translocation

     Qs: 2, 3, 4, 5  (pages 15 — 17)

IV.  Talc — Misuse

     Qs: 7, 8  (page 23)

IX.  Baby Cornstarch

     Q: 3  (page 36)

X.   Test Market — Baby Powder with Cornstarch

     Qs: 1 — 8 (New Section, pages 39 — 41)

**Changed Questions:**

II.   Talc — Inhalation

     Q: 4  (page 10)

III. Talc — Translocation

     Qs: 1, 6, 9  (pages 15, 17, 18)

IV.  Talc — Misuse

     Q: 6  (page 23)

VI.  Baby Powder Manufacturing

     Q: 3  (page 28)

JNJ 000011777

# JOHNSON & JOHNSON BABY POWDER

## QUESTIONS AND ANSWERS

CONFIDENTIAL

October, 1985

JNJ 000011778

The attached Question and Answer document has been developed for limited internal distribution in response to the need for clarification of issues relating to baby powder and talc. Specifically, its sole purpose at this time is to provide designated company spokespersons with answers to questions which could be raised by the press. It is <u>not</u> meant for distribution to anyone other than the individuals who will act as company spokespersons as necessary. Those recommended as spokespersons are:

James Murray, Assistant Director, Corporate Public Relations

James Utaski, President, Johnson & Johnson Baby Products Co.

Tom Gardner, Vice President, General Manager

Jim Dettre, Director of Communications

The 82 answers in the document were written in anticipation of potential questions. Many questions and answers were intentionally developed as versions of others already in the document in an effort to anticipate all angles of questioning and to prepare the spokespersons with responses which

1) Stand on their own as reflective of the corporate position.

2) Reflect and reinforce the approved communications objectives developed during a media training session. These communications objectives are:

JNJ 000011779

a) Johnson & Johnson Baby Powder, used properly, is safe. Extensive, scientifically documented evidence supports this claim as does the Food and Drug Administration (FDA).

b) No one knows more about safe, high quality baby care than the Johnson & Johnson Baby Products Company. To ensure continued confidence in our baby powder, we will conduct research as needed to reconfirm the safety of the product.

The Q & A document will be revised and updated as events or new research findings impact on the scope of potential questions or on existing responses.

October, 1985

JNJ 000011780

# JOHNSON'S BABY POWDER

## Questions and Answers

|       |                                                           | Page |
|-------|-----------------------------------------------------------|------|
| I.    | Talc – Cancer                                             | 1    |
| II.   | Talc – Inhalation                                         | 9    |
| III.  | Talc – Translocation                                      | 14   |
| IV.   | Talc – Misuse                                             | 20   |
| V.    | Baby Powder – Benefits and Uses                           | 25   |
| VI.   | Baby Powder – Manufacturing                               | 28   |
| VII.  | Baby Powder – General                                     | 32   |
| VIII. | Medicated Talcs                                           | 34   |
| IX.   | Baby Cornstarch                                           | 36   |
| X.    | Test Market – Baby Powder with Cornstarch                 | 39   |
| XI.   | Johnson & Johnson Policy and General Questions            | 43   |
| XII.  | Index of Questions                                        | 49   |

October, 1985

JNJ 000011781

**I.   TALC – CANCER**

**October, 1985**

JNJ 000011782

1.  Q: Does talc cause cancer?

    A: Extensive research in both animals and humans has not shown talc to be carcinogenic nor to have any potential for causing cancer.

2.  Q: Dr. Daniel Cramer in the journal _Cancer_ has linked the use of talcum powder to ovarian cancer. Could you comment?

    A: Thorough research and testing by the FDA, the medical community and Johnson & Johnson does not support Cramer's hypothesis of such a link. The most recent study in this area contradicts Dr. Cramer's findings. In an October 14, 1983 JAMA letter to the editor, a team of doctors (McGowan et al) from the National Institutes of Health (NIH) and George Washington University in Washington, D.C. conducted research that supports existing studies that show no overall association between talc use and risk of ovarian cancer. Dr. Cramer's study is an epidemiological one, which merely examined factors which might be associated with the disease. The author of the study has himself acknowledged that the evidence is rather tenuous. It does not show a cause and effect relationship. As a retrospective study, it relied on individuals' memories to recall events and habits that took place over a 20-year period.

October, 1985

JNJ 000011783

3.   Q: We know that asbestos causes cancer, do we not?

    A: We are not experts on asbestos, but there is strong evidence that very heavy exposure to asbestos fibers can cause cancer, especially in those people that smoke.


4.   Q: Haven't they found traces of asbestos in talcum powders?

    A: Not in JOHNSON'S Baby Powder.  Since the 1940's, when the testing technology first became available, Johnson & Johnson has regularly tested its talc to insure no asbestos contamination.  Years ago, before quality controls were in place, some talcum powders could have contained asbestiform particles.  Since 1976, however, the FDA has been conducting tests on a regular basis and has declared all talc-based baby powders to be free of such particles.  Johnson & Johnson's quality control techniques ensure that JOHNSON'S Baby Powder is made from the purest, safest talc.


5.   Q: If your own studies should link talc to ovarian cancer, will you pull Baby Powder off the market?

    A: If our tests confirmed a cause and effect relationship, naturally we would remove it.  The consumer and the safety of our products are our primary concerns.


October, 1985

JNJ 000011784

6.   Q: **Why didn't you find this link in your own testing?**

     A: This link is a hypothesis and is contradicted by the fact
        that independent scientists, the FDA as well as Johnson &
        Johnson have tested the chemical properties of our talc
        and found no evidence of carcinogenicity.

7.   Q: **When did you first become aware of the carcinogenic
        properties of your product?**

     A: Research shows there are none.  Our product, JOHNSON's
        Baby Powder has been thoroughly tested.  Our research, as
        well as that of the government and the medical community,
        confirms its safety.

8.   Q: **In 1976, scientists found asbestos in 10 of 19 baby
        powders tested.  How is that possible?**

     A: Prior to 1976, when strict quality control was initiated,
        some talcum powders contained asbestiform particles, not
        JOHNSON's Baby Powder, however.  The FDA has since been
        conducting tests on a regular basis and has declared talc
        available, Johnson & Johnson has regularly tested its
        talc to insure that it is not contaminated with asbestos.
        Johnson & Johnson's talc is a pure, fine grade talc, safe
        for proper use among infants and adults.

October, 1985

JNJ 000011785

- 5 -

9.  Q: **What is the relationship between talc and ovarian cancer?**

    A: There is no scientific evidence which shows that talc causes any form of cancer.  In fact, the weight of extensive scientific evidence shows that talc is safe. As recently as October 14, 1983 in a letter to the editor of JAMA, evidence questioning such a link came to light. In that letter, a team of doctors (McGowan et al) from the National Institutes of Health (NIH) and George Washington University in Washington, D.C. state that their research reveals "no overall association between talc use and risk of ovarian cancer."  Time and again research undertaken by the medical community, the government and by Johnson & Johnson confirms the safety of talc.

10.  Q: **Don't you test for those sorts of things?**

    A: Yes, we do.  Johnson & Johnson is deeply concerned with the safety of its products and is continously testing them for safety.  Extensive research to date reaffirms our confidence in the safety of baby powder.

11.  Q: **Are you presently conducting tests for this?**

    A: Yes, Johnson & Johnson sells only talc that is thoroughly tested for safety.  We are committed to on-going testing.

October, 1985

JNJ 000011786

12. **Q: What kinds of tests does Johnson & Johnson conduct?**

A: First, to ensure the talc is free from other elements or impurities, it is cleansed and tested at the mining site, The testing for purity and safety has been ongoing since the 1940's and includes a specific microscopic examination. This process is repeated during packaging at the factory. The result is the purest, finest grade talc used in JOHNSON 's Baby Powder.

Moreover, over the years, Johnson & Johnson has joined independent researchers, and the government in extensive research which has not shown talc to be a carcinogen.

13. **Q: Dr. Cramer's study indicates that women who use talc have three times the risk of contracting ovarian cancer than those who do not use it. As a manufacturer, how do you respond to this?**

A: Thorough research and testing by the FDA, the medical community and Johnson & Johnson has not shown talc to be carcinogenic. The most recent study in this area contradicts Dr. Cramer's findings. In an October 14, 1983 JAMA letter to the editor, a team of doctors (McGowan et al) from the National Institutes of Health (NIH) and George Washington University in Washington, D.C. conducted research that supports existing studies showing no overall association between talc use and risk

October, 1985

JNJ 000011787

of ovarian cancer.  Dr. Cramer's study is an epidemio-
logical one, which merely examined factors which <u>might</u> be
associated with the disease.  The author of the study
himself acknowledged that the evidence is rather tenuous.
It does not show a cause and effect relationship.  As a
retrospective study, it depended on individuals' memories
to recall events and habits that took place over a 20-
year period.

14.   Q: Talc is closely related to asbestos.  Isn't it likely
         that the two react in the same way?

      A: Talc and asbestos are two chemically distinct minerals
         which can be found close together in geologic formations.
         J&J talc source was selected because it is rich in talc
         and free of asbestos.  We own the talc mine which gives
         us complete control ever the quality of talc used in our
         products.  Since 1976 the FDA has been conducting tests
         on a regular basis and declared talc safe.  Furthermore,
         medical testing shows that talc and asbestos act very
         differently in human tissues, and has not shown talc to
         be carcinogenic.

October, 1985

JNJ 000011788

15.  Q: What other studies have been done to determine the
        validity of this link between talc and cancer?

     A: There are no studies confirming such a link.  On the
        contrary, the FDA and many other independent scientists
        have confirmed that there is no evidence linking pure
        talc to cancer.  JOHNSON'S Baby Powder does not contain
        asbestos, and we ourselves conduct exhaustive quality
        testing to assure its purity and safety.

October, 1985

JNJ 000011789

## II.   TALC – INHALATION

October, 1985

JNJ 000011790

1.   Q: **How about the allegations that talc can cause granulomas in the lungs?**

     A: These allegations result from rare reports of unusually large exposures not found in normal use of baby powder.


2.   Q: **What exactly are granulomas?**

     A: Talc granulomas are nodules of fibrous or scar tissue.


3.   Q: **Have studies been done linking disease to the miners of talc?**

     A: Studies indicate that talc dust exposure to millers of cosmetic grade talc is not injurious to health, whereas miners of industrial talcs may contract lung scarring because of the mixed dusts they are exposed to.


4.   Q: **Describe the kind of testing Johnson & Johnson has done on the safety of Baby Powder?**

     A: First, to ensure the talc is free from other elements or impurities, it is cleansed and tested at the mining site. The testing for purity and safety has been ongoing since the 1940's and includes electron microscopic examination. This process is repeated during packaging at the factory. The result is the finest grade talc used to give JOHNSON's Baby Powder its purest protection quality.


October, 1985

JNJ 000011791

Moreover, Johnson & Johnson, as well as the medical community and the government have been conducting research on talc for over 40 years to reaffirm its safety under various animal, laboratory and human conditions.  A study involving the inhalation of exaggerated levels of cosmetic talc during the life of hamsters showed no exposure-related problems.  A subsequent inhalation study with hamsters found no translocation of talc to the liver, kidneys, ovaries or other parts of the body. A recent study (Battelle, Pacific Northwest Laboratories, 1984) shows that even massive doses of talc placed in the vaginas of monkeys did not migrate to the ovaries. Johnson & Johnson is committed to ongoing research for its talc products.

5.   Q: Isn't it dangerous to inhale talc?
     A: Our research has shown that exposure to talc during normal cosmetic use is safe; however inhaling large quantities of any dust or dust-like particles could cause a medical problem.

6.   Q: What is "normal" use?
     A: By normal use we mean, for instance, powdering after diapering, a shower or bath.

October, 1985

JNJ 000011792

7.   Q: **Why don't you put labels on your product to warn parents about "abnormal" use of talc?**

A: Several years ago the FDA was asked to impose such labeling. At the time we agreed with their decision that warning labels were neither necessary or effective. Today, however, studies show that consumers are more apt to read package labeling.  Given this environment, J&J has decided to modify our package label, and are in the process of developing more detailed instructional and cautionary information.

8.   Q: **You're now test marketing J&J Baby Powder with cornstarch.  Why does that product package have a warning label and not Baby Powder with talc, which is more dangerous?**

Our research has shown that normal use of cosmetic talc is safe.  As you said, J&J Baby Powder with cornstarch is in the test market stage, and does offer instructional and cautionary labeling.  We are in the process of developing this kind of labeling for J&J Baby Powder.

October, 1985

JNJ 000011793

9.    Q: **Don't talc particles stay in your lungs?**

A: The air we normally breathe contains alot of dust and our lungs are able to clear themselves very effectively.  It takes very heavy exposures to overburden this normal clearing ability.  Normal cosmetic use is hundreds of times less than exposure to animals that have not produced any talc-related effects.

10.   Q: **How long does it take to clear your lungs of talc?**

A: Research has shown that even with huge exposures, most talc is removed within 8 days, with the remainder being cleared within 3 months.

*in animals*

11.    Q: **Could talc cause emphysema?**

A: Emphysema, a degenerative disease of the lungs caused by breakdown of the normal air sacks, has not been associated with talc under normal cosmetic use conditions.

October, 1985

JNJ 000011794

- 14 -

III.   TALC – TRANSLOCATION

October, 1985

JNJ 000011795

1.  **Q: Can talc migrate from the external environment into the body?**

    A: Numerous scientific studies have supported what we have always known as the inherent, biological implausibility of translocation of talc to the liver, kidneys, ovaries, and other parts of the body.

    Studies on hamsters found that after massive inhalation of talc, there was no translocation of talc to the liver, kidneys, ovaries or other parts of the body.  Studies in rabbits show that talc, placed in the vagina, does not migrate to the ovaries.

    And further evidence was provided by a 1984 study (performed by Battelle, Pacific Northwest Laboratories) using monkeys, which shows that talc, placed in the vagina, does not translocate to the oviducts or ovaries.

2.  **Q: If there is no evidence for translocation of talc, why has it become an issue?**

    A: Some scientists theorize that talc is able to translocate to parts of the body.  The fact is, however, that the weight of scientific evidence falls heavily against this hypothesis.

                                          October, 1985

JNJ 000011796

3.   Q: **What studies have been done to disprove translocation of talc?**

A: Numerous scientific studies show that talc does not translocate to the ovaries, liver, kidneys, or other parts of the body.

Studies on hamsters found that after massive inhalation of talc, no translocation occurred.  Studies in rabbits show that talc, placed in the vagina, does not migrate to the ovaries.

And further evidence was provided in a 1984 study (performed by Battelle, Pacific Northwest Laboratories) using monkeys, which shows that talc, when placed in the vagina, does not translocate to the oviducts or ovaries.

4.   Q: **But haven't there been studies proving translocation of talc?**

A: We are not aware of any studies that proved such a theory.  Numerous scientific studies show that talc does not translocate.  Most recently, in fact, a study (performed by Battelle, Pacific Northwest Laboratories, 1984) shows that talc, when placed in the vagina, does not translocate to the oviducts or ovaries.

October, 1985

JNJ 000011797

5.   Q: **What about the study by Egli & Newton that proved translocation of talc to the ovaries?**

     A: The 1961 Egli & Newton study, which used carbon black particles, did not prove translocation of talc to the ovaries.  Moreover, a study by Battelle, Pacific Northwest Laboratories (1984) followed closely the procedures used in the 1961 study, and found that talc does not translocate to the ovaries -- despite a number of controls added to make translocation easier.

     In this study, neutron-activated talc -- as well as the carbon black particles used in the 1961 study -- were deposited in the vaginas of monkeys.  Neutron-activated talc is easier to monitor, and reduces the problem of contamination from the environment.  Carbon is one of the most common air pollutants, and this could easily account for the carbon particles found in the 1961 study.

6.   Q: **Explain the process by which talc moves from the outside of the body to the ovaries.**

     A: This is a hypothesis only, and it is hard to imagine that the body's natural protective mechanisms would permit it.  Moreover, the weight of scientific evidence falls heavily against this hypothesis.  In fact, a recent study (Battelle, Pacific Northwest Laboratories, 1984) shows that even massive doses of talc placed in the vaginas of monkeys does not migrate to the ovaries.

                                                      October, 1985

JNJ 000011798

7.  Q: Does talc cause pelvic inflammatory disease?

    A: Talc like any other foreign matter, will be irritating if
       introduced in unusual quantities into body cavities or
       tissues.  There is no scientific evidence that talc can
       migrate to those cavities and tissues from normal
       everyday use of talcum baby powder.

8.  Q: What is "normal" use?

    A: By normal use we mean, for instance, powdering after
       diapering, a shower or bath.

9.  Q: Describe the kind of testing Johnson & Johnson has done
       on the safety of baby powder?

    A: First, to insure the talc is safe and free from other
       elements or impurities, it is cleansed and tested at the
       mining site.  The testing process is repeated during
       packaging at the factory.  The result is the purest,
       finest grade talc used in J&J Baby Powder.

       Johnson & Johnson, as well as the medical community and
       the government have been testing talc for over 40 years
       to reaffirm its safety in various animal, laboratory and
       human tests.  A study involving the inhalation of
       exaggerated levels of cosmetic talc during the life of

                                              October, 1985

JNJ 000011799

hamsters showed exposure-related problems.  A subsequent inhalation study with hamsters found no translocation of talc to the liver, kidneys, ovaries or other parts of the body.

A recent study (Battelle, Pacific Northwest Laboratories, 1984) shows that even massive doses of talc placed in the vaginas of monkeys does not migrate to the ovaries.

A survey of 150 people who had talc placed around a lung to stabilize it against recurrent lung collapse showed this talc did not cause any increased cancer even with this severe direct exposure which had taken place 14-42 years previously.

October, 1985

JNJ 000011800

**IV.  TALC — MISUSE**

October, 1985

JNJ 000011801

1.   Q: In Nassau County, in the first six months of 1980, there were 40 cases of babies who ingested or inhaled various baby powders.  How serious is this?

   A: By any standard this is serious and unfortunate, but these cases represent the misuse of various baby powders which, fortunately, did not have any long-term effects. Large amounts of any small particle entering the nose or mouth can overwhelm the normal defenses and form a physical barrier to breathing.  Parents must remember these products are not toys, and must exercise care around infants.  In this time period there were more than 4,200 cases of accidental ingestions of various household products.  This underscores the need for proper parental supervision of infants and children.

2.   Q: How many suffocation deaths have there been?

   A: We are not aware of any such deaths over the past 20 years.  The deaths recorded in the scientific literature prior to then occurred when the entire contents of a container were accidentally emptied into a baby's mouth, causing actual physical obstruction.

3.   Q: Aren't medicated powders even more dangerous?

   A: This would depend upon the nature and potential toxicity of the medicating ingredient.

October, 1985

JNJ 000011802

4.  Q: Why haven't you changed the shape of your bottle, since
       it looks like a nurser and babies are prone to suck on
       it?

    A: We have looked into incidents of misuse carefully and
       have concluded that the shape of the bottle is not the
       cause of accidents, since babies will tend to put almost
       anything in their mouths.  The problem is in misuse --
       parents who give the bottle to infants or leave it within
       the grasp of infants.  We do not feel that changing the
       shape of our bottle will eliminate the rare incidents of
       mishandling or of parental negligence.  Reports of
       inhalation due to misuse, though very unfortunate, are
       rare.  With reasonable parental care, inhalation
       accidents can be prevented.

5.  Q: Why are there no safety caps on J&J Baby Powder?

    A: To try to prevent misuse, which is really the issue here,
       we provide extensive information along with our product
       on its proper usage.  The best way to prevent acute,
       i.e., one-time massive, inhalation by dumping in a baby's
       mouth is to keep the product out of the reach of babies,
       as indicated in our proper use information --
       advertising, booklets, and packaging.

                                        October, 1985

JNJ 000011803

6.    Q: **If accidents are occuring, why aren't you warning parents about accidents in your labeling?**

A: Several years ago the FDA was asked to impose such labeling. At the time we agreed with their decision that warning labels were neither necessary or effective. Today, however, studies show that consumers are more apt to read package labeling. Given this environment, J&J has decided to modify our package label, and are in the process of developing more detailed instructional and cautionary information. We have recently introduced J&J Baby Powder with cornstarch in test markets in California, and the product package has this kind of detailed labeling.

7.    Q: **You're now test marketing J&J Baby Powder with cornstarch. Why does that product package have a warning label and not Baby Powder with talc?**

A: As you said, J&J Baby Powder with cornstarch is in the test market stage, and does offer instructional and cautionary labeling. We are in the process of developing this kind of labeling for J&J Baby Powder.

8.    Q: **Why do you have to caution consumers about these products? Are they unsafe?**

A: Of course these products are safe. As a responsible

October, 1985

JNJ 000011804

company, we feel that any time we can provide consumers
with valuable information about the proper use of our
products, we should do so.  In the current environment
where consumers are more apt than ever before to read
package labeling, we could provide yet another
value-added service to consumers.

October, 1985

JNJ 000011805

V.   BABY POWDER – BENEFITS AND USES

October, 1985

JNJ 000011806

1.   Q: **Baby Powder** is no longer being used in hospitals.  **Why not?**

A: This is not true of all hospitals.  Given the frequency of diaper changing in a hospital -- to help keep the skin dry and prevent diaper rash -- there is less dependence on a drying agent like talc or corn starch.

B: Baby Powder is used in hospitals for general bed care. Nursery use of talc is limited and probably always has been limited because the frequency of diaper changing helps keep the skin dry and prevents diaper rash.  There is, therefore, less dependence on a drying agent like talc or corn starch.

2.   Q: **There's no medical benefit to baby powder, is there?**

A: Talc is not presented as having a medical benefit, it is not a drug.  Baby powder is a dry lubricant for use after a shower, exercise or a diaper change.  The flat platelike talc particles slide easily over one another to provide lubricity.  J&J Baby Powder is moisture repellent and has been proven effective in reducing friction and providing cool, dry comfort for nearly 100 years.  For infants, the use of baby powder can encourage parental touching and caressing which fulfills documented psychological needs for "touching and bonding."

October, 1985

JNJ 000011807

3.    Q: Does baby powder prevent diaper rash?

    A: Talc is a dry lubricant and a moisture repellent to be used after a diaper change.  Its lubricity has been proven effective in reducing friction and its moisture repellent action helps protect skin from the irritation of wet diapers.

4.    Q: <u>The Lancet</u>, a leading British medical journal says: "There is no reason to believe that normal exposure to talc in the past led to cancer."  What constitutes "normal" exposure?

    A: Normal exposure is the reasonable, everyday use of baby powder.  This means application after a shower, exercise or after a diaper change.

October, 1985

JNJ 000011808

VI.  BABY POWDER - MANUFACTURING

October, 1985

JNJ 000011809

1.  Q: **Where does talc come from?**

    A: It is a mineral, occurring naturally in the earth.  Talc is from deposits around the world.  Johnson & Johnson's own talc mine is located in Vermont.

2.  Q: **How is it mined?**

    A: Johnson & Johnson mines only the highest grade talc.  It is ground, then "washed" and purged of impurities.  It is then transported to the manufacturing plant in specially sanitized containers.  Before packaging, again it is tested for impurities.  Johnson & Johnson uses the utmost care and responsibility in bringing the highest possible quality baby powder to market.

3.  Q: **Describe the kind of testing Johnson & Johnson has done on the safety of baby powder?**

    A: J&J Baby Powder consists of pure talc.  To insure the talc is safe and free from other elements or impurities, it is washed and tested at the mining site.  The testing for purity and safety has been ongoing since the 1940's and includes a specific microscopic examination.  The testing process is repeated during packaging at the factory.  The result is the purest, finest grade talc used in J&J Baby Powder.

October, 1985

Moreover, Johnson & Johnson, as well as the medical community and the government have been testing talc for over 40 years to reaffirm its safety under various animal, laboratory and human conditions.  A study involving the inhalation of exaggerated levels of cosmetic talc during the life of hamsters showed no exposure related problems.  A subsequent inhalation study with hamsters found no translocation of cosmetic talc to the liver, kidneys, ovaries or other parts of the body.

A recent study (Battelle, Pacific Northwest Laboratories, 1984) shows that even massive doses of talc placed in the vaginas of monkeys does not migrate to the ovaries.

A survey of 150 people who had talc placed around a lung to stabilize it against recurrent lung collapse showed this talc did not cause any increased cancer even with this severe direct exposure which had taken place 14-42 years previously.

4.   Q: Mineral talc and asbestos are often found in the same mines.  What safety controls do you have to maintain purity of product?

A: Johnson & Johnson is one of the few consumer product companies in the U.S. that owns its own talc mine.  This allows us to have complete control over the quality of

October, 1985

JNJ 000011811

talc used in our product.  The mine was chosen because of the absence of asbestos deposits and the veins from which our talc is mined are specially and carefully selected. This selected high purity talc ore undergoes an extensive cleansing process to remove impurities and scientific analysis and microscopic examination to confirm the absence of asbestos.  The process selects the platy form of talc for superior lubricity.  The selection process is especially effective in eliminating non-platy shapes. The talc is shipped to our plant in specially sanitized containers to maintain this purity.  Before packaging, it is once more scientifically tested to insure this purity.

October, 1985

JNJ 000011812

## VII.   BABY POWDER — GENERAL

October, 1985

JNJ 000011813

1.   Q: **If your wife asked how safe baby powder is for your own baby, what would you tell her?**

   A: I would tell her that J&J Baby Powder is safe and I would assure her that nearly 100 years of use and extensive scientific evidence supports this.  Johnson & Johnson is recognized around the world as an extraordinarily responsible company, concerned first with the safety of our products and the health of the consumer.

2.   Q: **What's in J&J Baby Powder?**

   A: J&J Baby Powder contains pure, high grade talc, a naturally occurring mineral, and a very small amount of perfume (the most recognized smell in the world!)

3.   Q: **Is there any difference between mineral talc and cosmetic dusting powder?**

   A: Mineral talc is the naturally occuring element; cosmetic dusting powder is a particularly platy grade of mineral talc carefully processed with fragrances added.

4.   Q: **Is baby powder safe?**

   A: J&J Baby Powder, nearly 100 years on the market, can be used properly with confidence by consumers.  Thorough testing, undertaken by the scientific community, the Food and Drug Administration and by Johnson & Johnson has continuously reaffirmed the safety of baby powder.

October, 1985

JNJ 000011814

VIII.   MEDICATED TALCS

October, 1985

JNJ 000011815

1.   Q: **Isn't it better to use medicated talc?**

A: If the skin is irritated and requires a medicine to help in its treatment, a physician should be consulted, particularly if there is persistent or recurring irritation of the skin.


2.   Q: **Are there toxic elements in medicated talcs?**

A: Medicated talcs contain drugs to treat minor skin irritations.  As with all drugs, safety and effectiveness depend on following the directions for its intended use. All talcs, including medicated ones, are for external skin applications only.

**October, 1985**

JNJ 000011816

- 36 -

# IX.   BABY CORNSTARCH

October, 1985

JNJ 000011817

1. Q: **Why did you introduce a cornstarch powder?**

   A: While talc provides a moisture repellent barrier on the skin, Cornstarch absorbs moisture to make skin feel dry. It was found that some consumers preferred it, and we wanted to provide them with a superior cosmetic grade cornstarch.

2. Q: **Isn't it because it is safer?**

   A: Not at all. First, the safety of talcum powder has been continuously re-affirmed by Johnson & Johnson, the medical community and by the government. And, we are always conducting research to ensure its safety. For some consumers who prefer the absorbency effect of cornstarch, we have J&J Baby Cornstarch. For the consumer who prefers more softness and lubricity, there is J&J Baby Powder.

3. Q: **What's in J&J Baby Cornstarch?**

   A: J&J Baby Cornstarch consists of pure cornstarch (99%), tricalcium phosphate, and fragrance. It is the highest quality cornstarch available.

October, 1985

JNJ 000011818

4.  Q: What is tricalcium phosphate?  What is it used for?

    A: It's a very safe food grade material.  It is added in small amounts to cornstarch to enable it to flow easily out of the container.

5.  Q: When did you introduce your cornstarch product?

    A: 1980.

6.  Q: Surgeons who used to dust their gloves with talc now use cornstarch.  Do they know something we don't?

    A: Cornstarch is a biodegradable substance which is better for use in surgical procedures where some of the powder on the surgeon's gloves could be left in the body cavity or tissues.

October, 1985

JNJ 000011819

- 39 -

**X.  TEST MARKET -- BABY POWDER WITH CORNSTARCH**

October, 1985

JNJ 000011820

1.   Q: **What is J&J Baby Powder with cornstarch?**

     A: J&J Baby Powder with cornstarch is a baby powder for consumers who prefer the absorbency of cornstarch. For the consumer who prefers more softness and lubricity, there is J&J Baby Powder with talc. J&J Baby Powder with cornstarch is the highest quality cornstarch available. It consists of pure cornstarch (99%), tricalcium phosphate, and fragrance.

     J&J Baby Powder with cornstarch is currently in the test market stage. It is being test marketed in Los Angeles, San Francisco and Las Vegas. Our intent at this point is to take it national some time in 1986.

2.   Q: **What is tricalcium phosphate? What is it used for?**

     A: It's a very safe food grade material. It is added in small amounts to cornstarch to enable it to flow easily out of the container.

3.   Q: **Why is baby powder cornstarch offered only in a few parts of the country?**

     A: J&J Baby Powder with cornstarch is currently in the test market stage. It is being test marketed in Los Angeles, San Francisco and Las Vegas. Our intent at this point is to take it national some time in 1986.

                                             October, 1985

JNJ 000011821

4.    Q: **Why is J&J changing its flagship product to contain cornstarch?**

A: We are not changing our flagship product.  J&J Baby Powder has been on the market nearly 100 years and it remains the baby powder preferred by consumers.  We are expanding the product line to offer consumers a choice. For some consumers who prefer the absorbency of cornstarch, there will be J&J Baby Powder with cornstarch.  For the consumer who prefers more softness and lubricity, there is J&J Baby Powder with talc.

5.    Q: **What's the purpose of changing the name but not the product?**

A: It is a marketing decision.  Our cornstarch product has proven it is worthy of the name of J&J Baby Powder.

6.    Q: **Are you putting cornstarch in J&J Baby Powder because you think talc is not safe?**

A: The safety of talcum powder continuously has been re-affirmed by Johnson & Johnson, the medical community, and by the government.  Consumers who prefer more softness and lubricity will be able to continue to use J&J Baby Powder with talc.  For those who prefer the absorbency of cornstarch, there will be J&J Baby Powder with cornstarch.

October, 1985

JNJ 000011822

7.    Q: **When are you going to discontinue using talc in J&J Baby Powder?**

      A: We are not changing J&J Baby Powder.  We are expanding the product line to offer consumers a choice.  For some consumers who prefer the absorbency of cornstarch, there will be J&J Baby Powder with cornstarch.  For those who prefer more softness and lubricity, there is J&J Baby Powder with talc.

8.    Q: **Why is there a warning label on J&J Baby Powder with cornstarch and not on J&J Baby Powder?**

      A: J&J Baby Powder with cornstarch is in a test market.  We are in the process of including similar labelling on J&J Baby Powder.

October, 1985

JNJ 000011823

– 43 –

XI.   JOHNSON & JOHNSON POLICIES AND GENERAL QUESTIONS

October, 1985

JNJ 000011824

1.   Q: Why are so many products being tested for safety today?

A: As scientific techniques are becoming more and more advanced, researchers are able to conduct even more rigorous studies on chemicals and products and reaffirm their safety.  J&J Baby Powder has been on the market for more than 90 years.  It has been examined again and again, and all the evidence continues to say that it's a safe product for normal cosmetic use.

2.   Q: How has the Tylenol incident affected Johnson & Johnson Baby Products?

A: The whole country now understands that Tylenol was subject to criminal tampering.  It has reaffirmed my faith that Johnson & Johnson will only market the safest product possible and will always keep consumers' interests above all others.

3.   Q: If your own studies link talc to ovarian cancer, will you pull your talc products off the market?

A: If such tests prove a cause and effect relationship, yes we would remove our talc products.  Johnson & Johnson would never place baby powder users at unacceptable risk. The safety of the consumer is our primary concern.

October, 1985

JNJ 000011825

4.    Q: **You've had a lot of problems at Johnson & Johnson.  How
many other products are under investigation?**

A: Talc is not under investigation, except to the extent
that it like many products, is continually tested for
safety.  Johnson & Johnson's primary responsibilities are
to the consumer and as such we sell only the highest
quality baby care products.  We also investigate our
medical products thoroughly, including post-marketing
surveillance after they have FDA approval.


5.    Q: **Will Johnson & Johnson pull its baby powder from the
market if these allegations that baby powder causes
ovarian cancer are true?**

A: If removal from the market were required to protect the
public, yes.  The consumer has been and will continue to
be our concern, and our actions will reflect this
philosophy in all decisions.  At Johnson & Johnson, the
effectiveness and safety of Baby Powder have been proven
for nearly 100 years.  As recently as October 14, 1983 in
a letter to the editor of JAMA, a team of doctors
(McGowan et al) from the National Institutes of Health
(NIH) and George Washington University in Washington,
D.C. state that their research reveals "no overall
association between talc use and ovarian cancer."  We at
Johnson & Johnson, along with the scientific community


October, 1985

JNJ 000011826

and the government, have vast knowledge and understanding of talc.  This extensive research shows that Baby Powder, properly used, is safe.

6.   Q: **How are you people handling the crisis?**

   A: There is no crisis involving baby powder.  The tremendous body of evidence attesting to the safety of talc remains valid.  We would just like to inform consumers that J&J Baby Powder, a product nearly 100 years old, is safe and that we are always conducting research to affirm this. We have always placed the consumer's safety above all else and will continue to do so.

7.   Q: **When were you first aware of the problems with baby powder?**

   A: In examining all the research undertaken on baby powder we are not aware of problems with it.  Extensive research indicates that baby powder, used properly, is safe.  We do see an opportunity to clear up some public misunderstanding about our product and its use so it's a pleasure to talk to you about Johnson's Baby Powder.

October, 1985

JNJ 000011827

8.   Q: In light of all this controversy, when will you be
        pulling Baby Powder off the market?

     A: The safety and effectiveness of Baby Powder have been
        proven for nearly 100 years.  At Johnson & Johnson,
        concern for the consumer's safety and health is our
        priority.  As always, we will continue to act
        accordingly, reflecting this philosophy in all decisions.

9.  .Q: What other products does Johnson & Johnson Baby Products
        Division manufacture?

     A: Johnson & Johnson has a long history as a leading
        supplier of quality baby care products.  Besides Baby
        Powder and Cornstarch, we also have Baby Cream, Baby Oil,
        Baby Lotion and Baby Shampoo.  We also sell J&J wash
        cloths, cotton swabs, gift sets, baby bath, soap, Sundown
        sun screen, Affinity Shampoo and Johnson & Johnson Child
        Development Toys.

10.   Q: Do you anticipate problems with those products in the
         future?

      A: We have no reason to believe there are problems with any
         of our products.  All are thoroughly tested for safety
         before they are introduced, and on a continuing basis
         thereafter.  Johnson & Johnson is deeply committed to
         continuing to provide its customers with the highest
         quality and safest baby products.

                                              October, 1985

JNJ 000011828

11.  Q: **Are you conducting any tests right now to reassure your Baby Powder users?**

   A: To reaffirm the existing and extensive evidence supporting the safety of Baby Powder, Johnson & Johnson conducts tests on an ongoing basis.  For instance, since the 1940's, we have been testing our talc to ensure that it is free from other elements or impurities.  After a thorough cleansing process at the mine site, Johnson & Johnson talc undergoes a specific microscopic examination.  This process is repeated during packaging at the factory.  The result is the purest, finest grade talc used in J&J Baby Powder.

October, 1985

JNJ 000011829

## XII.   INDEX

October, 1985

JNJ 000011830

- 50 -

## INDEX OF QUESTIONS

Page

I.  **TALC — CANCER**

1. Does talc cause cancer?............................. 2

2. Dr. Daniel Cramer in the journal Cancer has linked the use of talcum powder to ovarian cancer. Could you comment?...................................... 2

3. We know that asbestos causes cancer, do we not?..... 3

4. Haven't they found traces of asbestos in talcum powders?........................................... 3

5. If your own studies should link talc to ovarian cancer, will you pull Baby Powder off the market?... 3

6. Why didn't you find this link in your own testing?........................................... 4

7. When did you first become aware of the carcinogenic properties of your product?............ 4

8. In 1976, scientists found asbestos in 10 of 19 baby powders tested. How is that possible?......... 4

9. What is the relationship between talc and ovarian cancer?................................... 5

10. Don't you test for those sorts of things?.......... 5

11. Are you presently conducting tests for this?........ 5

12. What kinds of tests does Johnson & Johnson conduct?........................................... 6

13. Dr. Cramer's study indicates that women who use talc have three times the risk of contracting ovarian cancer than those who do not use it. As a manufacturer, how do you respond to this?......... 6

14. Talc is closely related to asbestos. Isn't it likely that the two react in the same way?.......... 7

15. What other studies have been done to determine the validity of this link between talc and cancer?........................................... 8

October, 1985

JNJ 000011831

                                                                    Page

II.  TALC – INHALATION

     1. How about the allegations that talc can cause
        granulomas in the lungs........................... 10

     2. What exactly are granulomas?...................... 10

     3. Have studies been done linking disease to the
        miners of talc?................................... 10

     4. Describe the kind of testing Johnson & Johnson
        has done on the safety of Baby Powder?............ 10

     5. Isn't it dangerous to inhale talc?................ 11

     6. What is "normal" use?............................. 11

     7. Why don't you put labels on your product to warn
        parents about "abnormal" use of talc?............. 12

     8. You're now test marketing J&J Baby Powder
        with cornstarch.  Why does that product package have
        a warning label and not Baby Powder with talc,
        which is more dangerous?.......................... 12

     9. Don't talc particles stay in your lungs?.......... 13

    10. How long does it take to clear your lungs of talc... 13

    11. Could talc cause emphysema?....................... 13


III. TALC – TRANSLOCATION

     1. Can talc migrate from the external environment
        into the body?................................... 15

     2. If there is no evidence for translocation of talc,
        why has it become an issue?...................... 15

     3. What studies have been done to disprove
        translocation of talc?........................... 16

     4. But haven't there been studies proving
        translocation of talc?........................... 16

     5. What about the study by Egli & Newton that proved
        translocation of talc to the ovaries?............ 17

     6. Explain the process by which talc moves from the
        outside of the body to the ovaries............... 17

                                                October, 1985

JNJ 000011832

Page

**III. (con't)**

7. Does talc cause pelvic inflammatory disease?........ 18

8. What is "normal" use?............................... 18

9. Describe the kind of testing Johnson & Johnson has done on the safety of Baby Powder?.............. 18

**IV.   TALC — MISUSE**

1. In Nassau County, in the first six months of 1980 there were 40 cases of babies who ingested or inhaled various baby powders.  How serious is this?............................................ 21

2. How many suffocation deaths have there been?........ 21

3. Aren't medicated powders even more dangerous?....... 21

4. Why haven't you changed the shape of your bottle, since it looks like a nurser and babies are prone to suck on it?..................................... 22

5. Why are there no safety caps on J&J Baby Powder?.... 22

6. If accidents are occurring, why aren't you warning parents about accidents in your labeling?........... 23

7. You're now test marketing J&J Baby Powder with cornstarch.  Why does that product package have a warning label and not Baby Powder with talc?...... 23

8. Why do you have to caution consumers about these products?  Are they unsafe?........................ 23

**V.   BABY POWDER — BENEFITS AND USES**

1. Baby Powder is no longer being used in hospitals any more.  Why not?................................ 26

2. There's no medical benefit to Baby Powder, is there?............................................ 26

3. Does baby powder prevent diaper rash?.............. 27

4. The Lancet, a leading British medical journal, says: "There is no reason to believe that normal exposure to talc in the past led to cancer." What constitutes "normal" exposure?................. 27

October, 1985

JNJ 000011833

Page

**VI.   BABY POWDER – MANUFACTURING**

   1. Where does talc come from?......................... 29

   2. How is it mined?.................................... 29

   3. Describe the kind of testing Johnson & Johnson
      has done on the safety of Baby Powder?.............. 29

   4. Mineral talc and asbestos are often found in the
      same mines.  What safety controls do you have to
      maintain purity of product?........................ 30

**VII. BABY POWDER – GENERAL**

   1. If your wife asked how safe Baby Powder is for
      your own baby, what would you tell her?............. 33

   2. What's in J&J Baby Powder?......................... 33

   3. Is there any difference between mineral talc and
      cosmetic dusting powder?........................... 33

   4. Is Baby Powder safe?............................... 33

**VIII. MEDICATED TALCS**

   1. Isn't it better to use medicated talc?............. 35

   2. Are there toxic elements in medicated talcs?....... 35

**IX.   BABY CORNSTARCH**

   1. Why did you introduce a cornstarch powder?......... 37

   2. Isn't it because it is safer?...................... 37

   3. What's in J&J Baby Cornstarch?..................... 37

   4. What is tricalcium phosphate?  What is it used
      for?............................................... 38

   5. When did you introduce your cornstarch product?..... 38

   6. Surgeons who used to dust their gloves with talc
      now use cornstarch.  Do they know something we
      don't?............................................. 38

October, 1985

JNJ 000011834

Page

**X.    TEST MARKET -- BABY POWDER WITH CORNSTARCH**

1. What is J&J Baby Powder with cornstarch?........... 40

2. What is tricalcium phosphate?  What is it used
for?........................................... 40

3. Why is baby powder cornstarch offered only in a
few parts of the country?..................... 40

4. Why is J&J changing its flagship product to
contain cornstarch?........................... 41

5. What's the purpose of changing the name but
not the product?.............................. 41

6. Are you putting cornstarch in J&J Baby Powder
because you think talc is not safe?.............. 41

7. When are you going to discontinue using talc
in J&J Baby Powder?........................... 42

8. Why is there a warning label on J&J Baby Powder
with cornstarch and not on J&J Baby Powder?........ 42

**XI.   JOHNSON & JOHNSON POLICIES AND GENERAL QUESTIONS**

1. Why are so many products being tested for safety
today?........................................ 44

2. How has the Tylenol incident affected Johnson &
Johnson Baby Products?........................ 44

3. If your own studies link talc to ovarian cancer,
will you pull your talc products off the
market?....................................... 44

4. You've had a lot of problems at Johnson & Johnson.
How many other products are under investigation?.... 45

5. Will Johnson & Johnson pull its Baby Powder from
the market if these allegations that Baby Powder
causes ovarian cancer are true?.................. 45

6. How are you people handling the crisis?............ 46

7. When were you first aware of the problems
with Baby Powder?............................. 46

8. In light of all this controversy, when will you
be pulling Baby Powder off the market?............. 47

October, 1985

JNJ 000011835

Page

**XI.   (con't)**

9.  What other products does Johnson & Johnson Baby
    Products Division manufacture?...................... 47

10. Do you anticipate problems with those products in
    the future?......................................... 47

11. Are you conducting any tests right now to reassure
    your Baby Powder users?............................. 48

October, 1985

D/00/02

JNJ 000011836