# Exhibit 6

**Johnson&Johnson**

201960

*New Brunswick, N. J.*

November 3, 1964

**Subject:** Pure Food Powdered Corn Starch
          A. E. Staley Manufacturing Company

Mr W. H. Ashton:

About two weeks ago I discussed with you a proposed visit
by representatives of the A. E. Staley Manufacturing Company
to this office. It was indicated these representatives wanted
to talk about the possibility of substituting corn starch in
our Baby Powder to replace all or a portion of the talc. You
indicated at that time you would like to have a small sample
of the corn starch Staley proposed for our use, and also price
information on this starch.

A sample of the Pure Food Powdered Starch is on its way into
us, and as soon as received will be sent to you. The current
price is $6.73 per cwt. delivered to New Brunswick in 100 lb.
paper bags in carload quantities of 50,000 lbs. minimum.

A. E. Staley Manufacturing Company states their Pure Food
Powdered Starch is a fine powdered form of unmodified corn
starch. They process it by flash-drying to a bulk density
(loose) of 32-33 pounds per cubic foot. It is then densified
to approximately 45 pounds per cubic foot. They state this
gives them a product of approximately 10% moisture that is
free flowing and with less dust than a micro-pulverized product.
The particle size specification is 0.05% maximum on a 10XX silk.
They claim virtually all of the product will pass through a U.S.
325 mesh screen.

This supplier further points out there are two possible advantages
of starch in Baby Powder. One is its ability to hold more than
50% water, and the second the fact that starch can be absorbed
into the body, tending not to cause severe granuloma as may
be the case with talc.

                                        M. R. Stalker

am

J&J-0161396

JNJ 000331979

Exhibit 7



# MATERIAL DATA SAFETY SHEET
# TALC

## Section 1.   Product and Company Identification

| Product Names | IMPERIAL 200 USP | IMPERIAL 500 USP | OLYMPIC H USP | GRADE 25 USP |
| --- | --- | --- | --- | --- |
| | IMPERIAL 250 USP | IMPERIAL 700 FCC | SUPREME H USP | |
| | IMPERIAL 400 USP | SUPRA H USP | SUPRAFINO H USP | |

| Synonyms | Talcum powder, Soapstone, Steatite | | | |
| --- | --- | --- | --- | --- |
| Chemical Name | Talc ; Hydrous magnesium silicate | CAS# | 14807-96-6 | Chemical Family   Phyllosilicates |
| Manufacturer | Luzenac America, Inc.<br>345 Inverness Drive South<br>Centennial, CO  80112<br>Toll-free  800–325-0299 | Emergency Health<br>Information (24 hrs)<br>303-623-5716 | | |

## Section 2.   Composition/Information on Ingredients

| Substance | CAS# | % by Weight | TLV - TWA |
| --- | --- | --- | --- |
| Talc | 14807-96-6 | 98-100 | 2 mg/m3 respirable fraction (ACGIH) |
| Dolomite | 16389-88-1 | 0-2 | Use Talc TLV for total exposure measurements |

## Section 3.   Health Hazards Identification and Emergency Overview

| Emergency Overview | Under normal conditions of use, this product is not expected to create any unusual emergency hazards. This product is **NOT** flammable, **NOT** reactive, **NOT** explosive, has **NO** flash point, and poses **NO** special hazards in the presence of fire. |
| --- | --- |

**Potential Health Effects from Acute and Chronic Occupational Exposures to Talc**
**TARGET ORGANS**

**LUNGS, RESPIRATORY SYSTEM**

| Inhalation | ACUTE: Exposure to a large concentration of air-born dust of this material may cause mechanical irritation of the mucous membranes and respiratory tract.<br>CHRONIC: Repeated or prolonged inhalation of air-born dust of this material may cause scarring of the lungs (pulmonary fibrosis), with shortness of breath, chronic cough, and respiratory assisted heart failure. Prolonged exposure  to talc can produce symptomatic talc pneumoconiosis (talcosis). |
| --- | --- |
| Skin Contact | ACUTE: Direct contact may cause dryness, or may cause mild irritation if an allergic predisposition exists.<br>CHRONIC: Prolonged contact may cause dryness of the skin, or may cause mild irritation if an allergic pre-disposition exists |
| Eye Contact | ACUTE: Direct contact with dust may cause mechanical irritation of the eyes.<br>CHRONIC: Repeated exposure may cause conjunctivae inflammation. |
| Ingestion | ACUTE: This material is considered to be harmless and inert when ingested.<br>CHRONIC: Repeated ingestion of large doses of talc for 13 and 10 successive days by rabbits and mice revealed negative teratogenic and carcinogenic results. |

Luzenac America, Inc.
MSDS Group USP
Issued 07/01/2006

Talc
CAS #14807-96-6
Page 1 of 5

Protected Document – Subject to Protective Order

IMERYS 081218

| Section 4. | First Aid Measures |
|---|---|
| Inhalation | Remove from exposure area to fresh air.  If breathing has stopped, perform artificial respiration and get medical attention immediately.  Keep person warm and at rest.  Treat symptomatically and supportively. |
| Skin Contact | Apply common skin moisturizers to relieve dryness.  Irritations are uncommon; however, if irritation or redness develops, seek medical attention.  Broken skin can be cleansed with mild soap and water. |
| Eye Contact | Wash eyes with large amounts of water or normal saline solution.  If irritation or redness develops, seek medical attention. |

| Section 5. | Fire Fighting Measures |
|---|---|
| Flammability | This product is **NOT** flammable, **NOT** reactive, **NOT** explosive, has **NO** flash point, and poses **NO** special hazards in the presence of fire.  Firefighters require **NO** special protective equipment or precautions. |

| Section 6. | Accidental Release Measures |
|---|---|
| Small Spill | Use vacuum to clean up spillage.  Place in sealed container. |
| Large Spill | For large spills, shovel or sweep up (while keeping dispersion of dust in air to a minimum) and place into suitable sealed containers for reclamation or later disposal.  Residue should be cleaned up using a high-efficiency particulate filter vacuum.  The use of water wash-down is not recommended.  Wet material can cause a surface used for walking to become extremely slippery.  Talc is not considered a hazardous waste by RCRA criteria (40 CFR 261). |

| Section 7. | Handling and Storage |
|---|---|
| Handling & Storage | Handle in ways to minimize the creation of dust.  Preserve product in sealed containers. |

| Section 8. | Exposure Controls & Personal Protection |
|---|---|
| Personal Protection | Use NIOSH approved dust respirator.  Use safety glasses or dust tight goggles. No special skin protection is usually required, but gloves should be worn by workers susceptible to skin irritation. |
| Controls | Provide local exhaust or process enclosure ventilation to meet published exposure limits (TLV). |

| Section 9. | Physical & Chemical Properties |
|---|---|
| Appearance | White to grayish-white powder |
| Odor | Slight earthy odor. |
| Flammability | This product is **NOT** flammable, **NOT** reactive, **NOT** explosive, has **NO** flash point. |
| Specific Gravity | 2.8 (water = 1.0) |
| Melting Point | None |
| pH | Slightly basic (10% slurry in water) |
| Solubility | Water: <1 mg/mL @ 21 C          Acetone : <1 mg/mL @ 21 C |

Luzenac America, Inc.  
MSDS Group USP  
Issued 07/01/2006  

**Talc**  
**CAS #14807-96-6**  
Page 2 of 5  

Protected Document – Subject to Protective Order

IMERYS 081219

| Ethanol: <1 mg/mL @ 21 C | Cold acids: Insoluble | Alkalies: Insoluble |
|---|---|---|

## Section 10.  Stability & Reactivity Data

| Stability | This product is stable, non-reactive, and non-corrosive. |
|---|---|
| Incompatibility with various substances | Non reactive/none known. |

## Section 11.  Toxicological Information

| Toxicology | NIOSH Registry Number: WW2710000 |
|---|---|

SAX Toxicity Evaluation: THR: Not available

Carcinogenic Status:

    IARC: (2006 in preparation) Has concluded that perineal use of talc-based body powder is possibly carcinogenic to humans (Group 2B).  This is not a route of exposure relevant for workers and applies to one specific use of talc only.

    IARC: (2006 in preparation) Inhaled talc not containing asbestos or asbestiform fibres not classifiable as a human carcinogen (Group 3)

    OSHA: Not listed.

    ACGIH: A4 – Not Classifiable as a Human Carcinogen

    NTP: Not listed.  A 2-year inhalation study demonstrated clear evidence of carcinogenic activity in female rats at exposure levels of 18 mg/m3.  Some evidence of carcinogenic activity was observed in male rats at the same level.  No evidence of carcinogenic activity was found in mice (NTP TR-421).

Tumorigenic Data:

    TCLo: ihl-rat 11 mg/m3/1Y-I

    TDLo: imp-rat 200 mg/kg

Other Toxicity Data:

    Skin and Eye Irritation Data: skn-hmn 300 ug/3D-I MLD

Teratogenicity (Reproductive Effects Data): Not available.

Mutation Data: Not available.

## Section 12.  Ecological Information

Ecological Data

| Species Test | Alga ((*Selenastrum capricornutum*)) Growth inhibition | *Daphnia Magna* Acute immobilization | *Daphnia Magna* Reproduction |
|---|---|---|---|
| Endpoint | Growth rate 48hr-EC50  48hr-NOEC AUG 72hr-EC50  72hr-NOEC | 48hr-EC50 | 21 day-EC50  21 day-NOEC |
| Conc. (mg/L) | | | |
| FY | | | |
| References | | | |

*AUG=Area Under Growth curve

## Section 13.  Disposal Considerations

| Waste Disposal Information | Talc is not considered a hazardous waste by RCRA criteria (40 CFR 261).  Dry material can usually be land-filled.  State and Local regulations/restrictions are complex and may differ from Federal regulations.  Responsibility for proper waste disposal is with the owner of the waste. |
|---|---|

Luzenac America, Inc.  
MSDS Group USP  
Issued 07/01/2006

**Talc**  
**CAS #14807-96-6**  
Page 3 of 5

Protected Document – Subject to Protective Order  IMERYS 081220

| Section 14. | Transport Information |
|---|---|
| Transport Information | U.S. Department of Transportation - DOT: No classification assigned<br>CANADIAN Transportation of Dangerous Goods: No classification assigned<br>LAND Transport - ADR/RID: No classification assigned<br>AIR Transport - IATA/ICAO: No classification assigned (International Air Transport<br>    Association/International Civil Aviation Organization)<br>MARITIME Transport - IMDG: No classifications assigned International Maritime Dangerous Goods)<br>HARMONIZED Tariff Code: Talc – crushed or powdered. 2526.20.00. (Stat. Suffix 00)<br>EPA TSCA 12(B) Export Notification: Not listed |

| Section 15. | Regulatory Information | |
|---|---|---|
| Chemical Inventories | EPA TSCA Status: Listed (CAS # 14807-96-6)<br>CEPA Domestic Substance List – DSL: Listed<br>AICS (Australian – NICNAS<br>SWISS (Giftliste No: G-6939)<br>ENCS/MITI (Japan) – Talc exempt | EINECS (European No: 238-877-9)<br>CEPA Non-domestic substance List – NDSL: Not listed<br>ECL (Korean No: KE-32773)<br>PICCS (Philippines)<br>IECSC (China): Listed |
| Other Pertinent Classifications/ Regulations | CALIFORNIA PROP 65 Status:  Talc not listed<br>STATE RIGHT-TO-KNOW: Talc listed – Illinois; Massachusetts; New Jersey; Pennsylvania; Florida<br>CLEAN AIR ACT – Ozone Depleting Chemicals (ODC's): None<br>CONEG Approved Packaging: Yes<br>NFPA RATINGS: (Scale 0-4) Health = 1, Fire = 0, Reactivity = 0<br><br>NPCA:  National Paint and Coatings Association – Hazardous Material Identification System<br>HMIS)<br><br>        HEALTH:  1* (Chronic Potential)<br>        FLAMMABILITY:  0<br>        PHYSICAL:  0<br>        PERSONAL PROTECTION:  dust respirator, glasses or goggles, gloves | |

| Section 16. | Other Information |
|---|---|
| Label Hazard Warning | **CAUTION - PROLONGED EXCESSIVE INHALATION MAY CAUSE LUNG INJURY** |
| Label Precautions | **UTILIZE DUST RESPIRATOR AND EXHAUST VENTILATION.  REFER TO MSDS FOR COMPLETE DETAILS** |



TYPICAL APPERANCE OF PRODUCT  LABEL

| Primary References | ACGIH - Documentation of TLV's 2001<br>OSHA - Chemical Sampling Information: Talc (Containing no asbestos) (Revised 1/15/1999) |
|---|---|

Protected Document – Subject to Protective Order

IMERYS 081221

| for Key Data | OSHA - TALC (Containing no asbestos). OSHA comments from the June 19, 1988 Final Rule on Air Contaminants Project extracted from 54FR2324 *et. seq.* |
|---|---|
| | OSHA - Compliance Interpretation Letter dated August 22, 2000 regarding talc products containing less than 1% quartz. |
| | OSHA - Guidelines for Employer Compliance (Advisory) 1910.1200 App E |
| | NIOSH - Pocket Guide to Chemical Hazards. Talc (containing no asbestos and less than 1% quartz). |
| | NIOSH - REL's and General Recommendations for Safety and Health. [TALC (containing no asbestos). |
| | AIHA - Hygienic Guides Series – Talc (1982) |
| | IARC - Talc Vol.: 42 (1987) (p.185) 5. Summary of Data Reported and Evaluation; Supplement 7: (1987) (p.349)  Talc Not Containing Asbestiform Fibers (Group 3). |
| | CCOHS – Database MSDS FTSS. Network Version 2002. |
| | NTP – RoC/NIEHS Database. Network Version 2002. |
| Glossary | ACGIH – American Conference of Governmental Industrial Hygienists |
| | AIHA – American Industrial Hygiene Association |
| | CCOHS – Canadian Centre for Occupational Health and Safety |
| | IARC – International Agency for Research on Cancer |
| | NIOSH – National Institute of Occupational Safety and Health |
| | NTP – National Toxicological Program |
| | OSHA – Occupational Safety and Health Association |
| | PEL – Permissible Exposure Level |
| | TLV – Threshold Limit Value |
| | TWA – Time Weighted Average |
| Important Notice | Luzenac America, Inc. provides the information contained herein in good faith but makes no representation as to its comprehensiveness or accuracy. This document is intended only as a guide to the appropriate precautionary handling of the material by a properly trained person using this product. Individuals receiving the information must exercise their independent judgment in determining its appropriateness for a particular purpose. |
| Issued by | Richard J. Zazenski |
| | Regulatory Affairs Manager |
| | E-mail: rich.zazenski@america.luzenac.com |
| | Phone: 1-303-643-0404          Fax: 1-303-643-0446 |

Luzenac America, Inc.
MSDS Group USP
Issued 07/01/2006

**Talc**
**CAS #14807-96-6**
Page 5 of 5

Protected Document – Subject to Protective Order

Exhibit 8

JOHNSON'S® Baby Powder | Johnsons Baby                                    Page 1 of 1





Sign Up for
JOHNSON'S® BY YOUR
SIDE™

☐   SHARE

### JOHNSON'S® Baby Powder

Keeps skin feeling soft, fresh and comfortable

It's a classic. JOHNSON'S® Baby Powder helps to eliminate friction while keeping skin cool and comfortable. It's made of millions of tiny slippery plates that glide over each other to help reduce the irritation caused by friction.

- Helps eliminate friction
- Clinically proven to be safe, gentle and mild
- Allergy and dermatologist-tested
- Clean, classic scent

For skin that feels soft, fresh and comfortable, apply JOHNSON'S® Baby Powder close to the body, away from the face. Shake powder into your hand and smooth onto skin.

### Ingredients

Talc, Fragrance

### When to Use

Use anytime you want skin to feel soft, fresh and comfortable. For baby, use after every bath and diaper change.

### Safety

For external use only. Keep out of reach of children. Close tightly after use. Do not use on broken skin. Avoid contact with eyes. Keep powder away from child's face to avoid inhalation, which can cause breathing problems.

Contact Us    FAQ    Where to Buy    Legal    Privacy Policy    Site Map    Healthcare Professionals

© Johnson & Johnson Consumer Companies, Inc. 1998-2011. This site is published by Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc. which is solely responsible for its content. It is intended for visitors from the U.S.

This site contains links to websites to which our Privacy Policy does not apply. We encourage you to read the privacy policy of every website you visit.

**Plaintiff's Exhibit No.**

**P-121**

SHOWER to SHOWER® Absorbent Body Powder

Page 1 of 1



    





© Johnson & Johnson Consumer Companies, Inc. 2007 - 2010 . This site is published by Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc. which is solely responsible for its content. It is intended for visitors from the U.S. This site may contain links to websites to which our Privacy Policy does not apply. We encourage you to read the privacy policy of every website you visit.

Legal Notice | Privacy Po



© Johnson & Johnson Consumer Companies, Inc. 2007 - 2010 . This site is published by Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc. which is solely responsible for its content. It is intended for visitors from the U.S. This site may contain links to websites to which our Privacy Policy does not apply. We encourage you to read the privacy policy of every website you visit.

Legal Notice | Privacy Po

SHOWER to SHOWER® Absorbent Body Powder

Page 1 of 1

     

 

© Johnson & Johnson Consumer Companies, Inc. 2007 - 2010 . This site is published by Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc. which is solely responsible for its content. It is intended for visitors from the U.S. This site may contain links to websites to which our Privacy Policy does not apply. We encourage you to read the privacy policy of every website you visit.

Legal Notice  |  Privacy Po

SHOWER to SHOWER® Absorbent Body Powder



© Johnson & Johnson Consumer Companies, Inc. 2007 - 2010 . This site is published by Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc. which is solely responsible for its content. It is intended for visitors from the U.S. This site may contain links to websites to which our Privacy Policy does not apply. We encourage you to read the privacy policy of every website you visit.

Legal Notice  |  Privacy Po

     

## The Power of Powder



A sprinkle a day helps keep odor away. And that's not the only benefit of SHOWER to SHOWER®. Here are some more!

- Your body perspires in more places than just under the arms. Use SHOWER to SHOWER® to feel dry, fresh and comfortable throughout
- Pamper yourself with a soft touch and light fragrance.
- No more stained clothes - powder provides invisible wetness protection
- With powder on, clothes glide on like a breeze and won't cling.

**Get active:**
Use before (or after) a workout or hitting the dance floor for a just-showered fresh feeling.

**Keep shoes smelling fresh:**
Just sprinkle a little powder into your shoes, boots, or sneakers to help them fresh and keep your feet dry.

**Leave sand at the beach:**
Sprinkle powder generously anywhere wet sand is clinging to your skin, then brush the sand away!

**Tame your mane:**
No time to shower? Use a sprinkle of powder in your hair between washes t excess oil and add a hint of fresh fragrance.

**Stay cool:**
When the heat of summer turns up, a sprinkle of SHOWER to SHOWER® h cool you down all over!

**Feel smooth:**
Add powder to your skin after applying lotion to quickly absorb the stickines

**Soothe your skin:**
Sprinkle on problem areas to soothe skin that has been irritated from friction after a bikini wax to help reduce irritation and discomfort.

**Relax:**
Lightly dust your sleepwear or sheets to make bedtime peaceful and luxurio

SHOWER to SHOWER®

© Johnson & Johnson Consumer Companies, Inc. 2007 - 2010 . This site is published by Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc, which is solely responsible for its content. It is intended for visitors from the U.S. This site may contain links to websites to which our Privacy Policy does not apply. We encourage you to read the privacy policy of every website you visit.

Legal Notice  |  Privacy Po

JOHNSON'S® Our Products | Johnsons Baby

*Johnson's*

☐ SHARE

Sign Up for
JOHNSON'S® BY YOUR
SIDE™

## Clinically proven to be pure, mild and gentle

From baby's first hospital bath through every special milestone, moms and healthcare professionals alike trust JOHNSON'S® baby products to provide the "best in care."

## Our Products

**Our products have stood the test of time.**

Whether you're purchasing one of our timeless classics or a newer release, with JOHNSON'S® you're always getting the clinically proven gentle formulas that have made us the most trusted name in baby care for more than 100 years.

**category**
baby's skin
bathtime
bedtime
playtime
natural

**life stage**
newborn
baby
toddler
mother

**baby care need**
cleanse
moisturize
hair care
diaper care
sun protection
nursing

View All

### JOHNSON'S® Baby Powder

Keeps skin feeling soft, fresh and comfortable

It's a classic. JOHNSON'S® Baby Powder helps to eliminate friction while keeping skin cool and comfortable. It's made of millions of tiny slippery plates that glide over each other to reduce the irritation caused by friction.

- Helps eliminate friction
- Clinically proven to be safe, gentle and mild
- Allergy and dermatologist-tested
- Clean, classic scent

**The JOHNSON'S® Difference**
For skin that feels soft, fresh and comfortable, apply JOHNSON'S® Baby Powder close to the body, away from baby's face. Shake a little into your hand and smooth onto s...

READ MORE

Contact Us    FAQ    Where to Buy    Legal    Privacy Policy    Site Map    Healthcare Professionals

© Johnson & Johnson Consumer Companies, Inc. 1998-2011. This site is published by Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc, which is solely responsible for its content. It is intended for visitors from the U.S.

This site contains links to websites to which our Privacy Policy does not apply. We encourage you to read the privacy policy of every website you visit.

Baby's Skin | Johnsons Baby

*Johnsons*

Sign Up for
JOHNSON'S® BY YOUR
SIDE™

SHARE

## Add a layer of gentle, loving protection

You put your baby's safety first, and so do we. All of our baby products are formulated to cover your baby from top to toe with pure and gentle protection.

### Skin Science

- Your baby's skin is more susceptible to irritants and to changes in temperature and humidity.

- While your baby's skin is naturally more hydrated than your own, during the first 12 months of life, it also loses water more quickly.

- Your baby's skin requires more protection to keep it clean and moisturized.

**See more on the JOHNSON'S® Brand Difference**



### Newborn Skin Care

Learn about her delicate skin. Your newborn's skin is a unique and an essential shield that offers protection from the outside world.

Read more



Basics of Baby Skin



Sun Protection



Benefits of Infant Massage



Preventing Diaper Rash



Your Baby's Changing Skin



Understanding Baby Skin

Contact Us    FAQ    Where to Buy    Legal    Privacy Policy    Site Map    Healthcare Professionals

© Johnson & Johnson Consumer Companies, Inc. 1998-2011. This site is published by Johnson & Johnson Consumer Products Company Division of Johnson & Johnson Consumer Companies, Inc. which is solely responsible for its content. It is intended for visitors from the U.S.

This site contains links to websites to which our Privacy Policy does not apply. We encourage you to read the privacy policy of every website you visit.

Exhibit 9

SHOWER to SHOWER® Task Force- BP Brainstorm
July 14, 2004

**Challenge #1: Powder Category Decline**
- Explore needs states: pregnancy, menopause, "chubbiness", diabetes
- Advertise through mass transit
    - Subway reminders and subway maps
    - Retail tie-in
    - Sampling
    - Coupons on Metro Cards
- Use Duane Reade for PR – on the street or in-store with displays and jingle playing
- Radio ads – geo-targeted, radio personalities?
- Helps runners with chafing
    - Could do promotions around running events (pre-marathon bags)
    - Include in training kits they can buy
- Race for the Cure promotions
- Education to younger consumers

**Challenge #2: STS Share Decline**
- Education is key. Get people back into a daily powder routine by telling them how valuable our product is.
    - Surround Sound
    - Need to answer: Why use powder?
    - Possibly go beyond current benefits and look at anti-itch and foot care (more like GOLD BOND®)
- "Soup to nuts" account specific program is most effective; surround sound; start over explaining benefits of powder
- Redefine who our targets are (what do we mean by women 35+?)
    - Can look at men, Redacted        women, heavy women
- Go beyond JOHNSON'S® Baby Powder and fragrance; they can't do things like Sport or Shimmer
- We have higher standards of talc that Private Label does not
    - Do we have to keep these higher cost standards?
    - Need to make it worth the extra cost
- Account specific programs? Maybe spot TV tied with specific markets
- Make 1 oz. more available for sale
- Vacationers more willing to try new routines/products
    - Possibly target cruises, the beach, camping, outdoors
- Potential in women's sports markets
- Make scent names more current
- Turn powder into daily regimen by partnering with other products such as women's health or even tooth brushes, something everyone sees as being used daily


Plaintiff's Exhibit
No.
P-125

- Celebrity endorsements: someone professional but would get the idea away from "Grandma's powder"
  - Limo drivers handing out samples to get celebrities to try it
  - Make Patti LaBelle or Aritha Franklin spokeswomen
  - Send out celebrity mailings to anyone who might get hot while they work. This could also go to anchormen, like Katie Couric for example.
  - Ideally we would get the reaction that Purpose saw when Dr. Phil's wife mentioned it
  - Could also get beauty personalities to promote it, especially with the new shimmer
- Maybe get product placed in more high-end retailers than just the Mass COT. More attention from places like Bath and Body Works and Ulta.
- Alternative forms of powder and different placements could be key
- On pack attachments for different delivery: powder puffs and brushes
- Could also attach unrelated items for different messages. For example coupons for greeting cards around Mother's Day promotes family values and relationships.
- Message that it's time to "grow up to adult powder"
- Direct mailings with powder samples
- In-book sampling
- Fragrance scratch-n-sniff on FSI
- Scratch and sniff labels
- Floor mats to get customers to actually look for Shower at the retailer. Might need to put them in other spots to get younger potential users down the aisle.
  - Could possibly go in personal care if the idea is that you want something to keep you fresh and clean
  - Partner with Carefree, or Catalina (same idea of our product will bring freshness)
  - Would also reinforce how everyday powder should be
- Sampling/tie-in to Weight Watchers
- We know that people usually purchase Shower on their stock up store trips, not just milk and bread runs
- Hang tags on gym bags or sneakers (or coupons) and could also cross merchandise with seasonal wear
- 101 uses: approximately 50 beauty uses? 50 sport uses? Others:
  - Play up seasonality more: use it at the beach to take off the sand
  - Takes squeaks out of hardwood floors (find interesting uses)
- Wal-Mart market basket data (Nancy f/u)
- X merchandising within J&J
  - Viactiv, Tylenol pairing up with Shower because women trust these brands
- Position to menopause specifically: "heat reliever"; "cools hot flashes"; this way lots of PR would follow

- Harris Interactive Study for PR: i.e. what do you want when you're hot? (for example: powder, a fan, a cool drink, etc., to cool you down)
- More interesting packaging, possibly a more unique cylinder shape so that customers are more willing to spend more money
- Work with bowling alleys (put powder in shoes)
- Baseball gloves, swim caps
- Menopause survival kit
  - o Advertise as helping with night sweats and hot flashes
- Obesity platform
  - o Focus on Redacted       women and obesity
  - o What makes her comfortable and confident?
- Create loyalty through frequent buyer program
- Try starting a completely unique and account specific program
- Create STS website and make connections with online retailers
- Make dollar stores better opportunity
- Can we improve our claims beyond time released fragrance?

## Challenge #3: Aging Users, How Bring New/Younger Users

- NASCAR displays, signage and any brand linkage
  - o Did this 1996-1998 and it did well
- Seasonal approach and alternate usages (PR)
- Rally around specific dates/times of the year and relationships
- Sampling at vacation spots
- Try to market the values of a mother/daughter relationship around powder as well as father/son around Sport
- Teens could be a market because they are more concerned with fragrance and freshness than messiness
- Look at the KY model - think about a correlation between Shower and closeness among people
- Maybe look into more of a beauty focus

Redacted

- Atlanta test results?
  - o Grass roots efforts effective?
- SMSI: do they market with Anderson?  How leverage this org.?
  Redacted

- Make writing a new jingle into a competition
  - o For example: A&W recent contest or like American Idol where the consumer or radio audience can select the one they like the best, with winner being put in commercial for STS

JNJ 000058762

Pltf_JNJ_00000168

- Hospitals
  - o Could be giveaways to patients, sampling
  - o Sell in hospitals – patients would be willing to buy from hospital shop if you can't shower for an extended period of time; chafing/bed sores
  - o More comfortable with name brand so willing to pay a little more better than hospital brand
- Get in on the college bus tour? While girls are learning about skincare guys could also be hearing the benefits of Sport powder.
- Better placement, can we get our line placed in baby or foot care?
- Partner with lower end shoe store like Payless to promote powder usage in shoes
- Product Ideas:
  - o Invisible powder
  - o Tinted powder
  - o Tinted hair powder (already in Europe, can Beatrice get for us?)
  - o Bronzer powder
  - o Talk to Alexandra – learn European trends
  - o Liquid powder in tubes (could also lead to different sampling mediums)
- STS conversion:
  Redacted

  - o General Market needs motivation to buy STS
  Redacted
- Jingle revival event, contest, casting call; make it more relevant to new market
- Promote at teen events, sporting events
- Decrease sample size so that they can still use it but not have a short term supply; need to get the consumer to go buy more after trying
  - o Salt and pepper packets
  - o Ketchup packet sized
- Different shape: try unique powder cylinder (differentiate from P/L)
- Lots of Sport potential:
  - o Promos on shoes or athletic gear
  - o Sporting event sampling (exit/entrance samples)
  - o Channel breaker display
  - o Buy celebrity sponsorship
  - o ESPN radio
  - o Talk to Jack Weekly for sport connections
- Target brides; under stress so they need powder
  - o Ads in bride magazines
- Link with a manicure/pedicure chain, beauty product
  - o If it will become a beauty product, what is the message?
- Sampling at retailers like BJs, Costco, Sam's
- Education to younger consumers is important

JNJ 000058763

Pltf_JNJ_00000168

- Times Square Billboard
- Play jingle in subway stations, hire people to look like street performers singing about Shower
- Arena signage
- Talk radio personality endorsements (like Gold Bond)
    - o Can go for sports casters or even weather forecast
    - o "Weather forecast brought to you by SHOWER to SHOWER®"
    - o Set it up to do the weather on hot, humid days
- Weather Channel, either on line or on TV
- Other publicity styles: Vitamin water and the NY post
- Regis and Kelly samples (always under hot lights)
- Ellen DeGeneres Show – product placement/integration
    - o Really "big finish" – tie-in
    - o She might need it after her dancing segment
    - o Help re-write the jingle
- Oxygen TV sampling, sponsorship
- Reality TV – product placement?
    - o Survivor
    - o Queer Eye
    - o The Amazing Race
- Figure out best radio spot timing: morning or night reminders?
- "Flip book" advertising next to train lines
- Stress platform: how to keep cool under pressure
    - o Promos with political campaigns
    - o Tiger Woods
    - o Martha Stewart
- Fashion dos and don'ts, before and after shots, what Shower will do for you
- I-com database – f/u with Jean
- New potential for wipes?
- Do a deeper dive into finding out what is important to Redacted women and the younger ones in particular
- Ulta has created edible powder, sells for about $25/bottle and actually sells out
- Involvement with military – could be big market
- Packaging - make it gender neutral
- Sampling at men's health clubs

Protected Document--Subject to Protective Order

Exhibit 10



**Plaintiff's Exhibit No.**

**P-49**

**Page 1 of 1**          Pltf_MISC_00000033

18 4RB

**We love babies.**
And we understand how to soothe
and relieve baby soft skin. That's why
JOHNSON'S® Baby Powder is designed to
gently absorb excess moisture helping skin
feel comfortable. Our incredibly soft,
hypoallergenic, dermatologist and
allergy-tested formula glides over skin to
leave it feeling delicately soft and dry
while providing soothing relief.

**WARNING: Keep powder
away from child's face to
avoid inhalation, which can
cause breathing problems.
Avoid contact with the eyes.
For external use only.**

**To Use:**
1. Shake powder directly into
your hand, away from the
face, before smoothing onto
the skin.

2. Close tightly after use, store
in a cool, dry place.

**SAFETY TIP: Keep out
of reach of children.**
Do not use if quality seal is broken.
Ingredients: Talc, Fragrance

**Our Babies Will Inherit Our Planet.®**
Please Recycle.

US/Canada, 866-JNJ-BABY;
Outside US & Canada,
dial collect 215-273-8755
www.johnsonsbaby.com

Distributed in the U.S. by:
**JOHNSON & JOHNSON
CONSUMER PRODUCTS
COMPANY**
Division of Johnson &
Johnson Consumer Companies, Inc.
Skillman, NJ 08558-9418

©J&J CCI 2012

Talc Made in China

8137-003014 0

30019243

Exhibit 11







Pltf_MISC_00000034

Exhibit 12

*Johnson&Johnson*

202002

**New Brunswick, N. J.**
February 21, 1964

**Subject:** Cornstarch Development

Memo for File:

Report on Meeting:  February 21, 1964

Present:  R. E. Faust (2)          R. G. Schoel (2)
          R. L. Sundberg          W. H. Ashton

Consumer Research Test - Staleys CREAM vs. JOHNSON'S
                          Baby Powder

It was agreed that we will prepare the 440 samples
R. Schoel requested earlier (1/2/64).  The test is to
determine a preference rating of our regular JOHNSON'S
Baby Powder vs. the Staley product CREAM Brand corn-
starch baby powder.

One of the four items requested was 110 units of the
Staley product repackaged in our own new plastic con-
tainer.  Dr. Faust directed that this request cannot
be carried out since the embossed copy declares the
contents are talc.  It was agreed that this problem can
be eliminated if special labels declare the contents to
read "talc and/or cornstarch."  Mr. Schoel will finalize
all labels with Dr. Faust.

Ashton will determine whether sufficient plain plastic
packages or unembossed varieties are available in J&J
for this test.  Failing that, the supplier's inventory
will be checked.  In the event no suitable plastic
packages are available, then metal containers will be
acquired for this small test only.

Product Development

A) Mr. Schoel requested we immediately undertake the
formulation and development of a cornstarch product
which is inexpensive and free-flowing.  This was dis-
cussed in some detail and the following decisions were
reached:

CENTRAL FILE

APR 2 0 1972

RECEIVED

JNJ 000265536

Memo for File          -2-          February 21, 1964

1) The product will use our standard perfume, P-5. It will be compounded at a level which gives an aroma match to our standard talc article.

2) The product will not contain an antiseptic.

3) The raw material cost of the Staley product is estimated to be 6.7¢/lb. of product plus perfume.

4) We will develop such a product which either equals or exceeds Staley's characteristics.

5) No buffer action is considered.

B) The formulation will be developed with either of National Starch Products U.S.P. grades of cornstarch. The regular variety runs $5.95/100 wt. whereas the bleached variety runs $6.50/100 wt. f.o.b. Indianapolis. Additives which are believed to impart fluidity appear in the price range of $14.00 to $20.60 per 100 wt. Thus we optimistically expect to be able to evolve a formulation closely competitive to the Staley article, plus perfume cost.

Additives to be explored within the formulation and product character parameters are:

1) Dry Flo - A low substituted Al salt of mildly treated cornstarch.

2) $MgCO_3$ - This is the Staley fluidizer.

3) MgO

4) Tricalcium Phosphate

5) Cab-O-Sil

6) Any other which comes to attention.

JNJ 000265537

Memo for File          -3-         February 21, 1964

Of these additives, the Dry Flo has very appealing tone
because it would open the door to a merchandising advan-
tage which could refer to an all starch product, i.e.,
a blend of it with U.S.P. Cornstarch would have no
added inorganics.

Since the meeting, Ashton established the largest com-
mercial uses of Dry Flo are in Vitamin A manufacture
(5% in finished product) and as a condom lubricant where
it replaced talc because it was found to be absorbed
safely in the vagina whereas, of course, talc was not.

C) Programming - The necessary raw materials will be
ordered immediately and the work begun in line with a
program chart which was presented.

*W. H. Ashton/pg*

W. H. Ashton

sg

JNJ 000265538

## JNJ000265536

## Metadata

| | | |
|---|---|---|
| **AttachCount** | 0 | ORIGINAL |
| **BegAttach** | JNJ 000265536 | ORIGINAL |
| **Confidentiality** | N | ORIGINAL |
| **Custodian** | Legacy 1 | ORIGINAL |
| **DateMod** | 02/21/1964 12:00 AM | ORIGINAL |
| **DocExt** | TIF | ORIGINAL |
| **EndAttach** | JNJ 000265538 | ORIGINAL |
| **FileName** | K000135321.TIF - K000135323.TIF | ORIGINAL |
| **FileSize** | 0.00 | ORIGINAL |
| **OtherCustodians** | Miscellaneous | ORIGINAL |
| **PgCount** | 3 | ORIGINAL |
| **ProdVol** | TALC_GLOBAL_002 | ORIGINAL |
| **Relative FilePath Append** | \ | ORIGINAL |
| **Replacement** | Yes | ORIGINAL |
| **Score_adjusted** | 416880523.7 | ORIGINAL |
| **Tag Name** | and Heavy Metals Contamination/Testing | ORIGINAL |
| **Text Path** | TEXT\0273\JNJ 000265536.txt | ORIGINAL |
| **Trial_Ex_Number** | Pltf_JNJ_00039857 | ORIGINAL |

Exhibit 13

Page 1

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: MIDDLESEX COUNTY
DOCKET NO.  MID-L-00598-18 AS

LORETTA SELVAGGIO,            DEPOSITION UNDER
                          ORAL EXAMINATION
    Plaintiff,         OF
                       NANCY MUSCO
    vs.
BRENNTAG NORTH AMERICA, et al.,
    Defendants.

      TRANSCRIPT of the deposition of the witness,
called for Oral Examination in the above-captioned
matter, said deposition being taken pursuant to
Superior Court Rules of Practice and Procedure by
and before MARC BRODY, a Notary Public and Certified
Shorthand Reporter of the State of New Jersey, at the
law offices of FOX ROTHSCHILD, 997 Lenox Drive,
Lawrenceville, New Jersey, on Wednesday, November 28,
2018, commending at approximately 10:00 in the forenoon.

      BRODY DEPOSITION SERVICES
      235 East Broad Street, Suite 1
      Westfield, New Jersey 07090
      Phone:  908.789.2000
      Fax:  908-789-2007

---

Page 2

1  A P P E A R A N C E S :
2
3  COHEN, PLACITELLA & ROTH, P.C.
4  127 Maple Avenue
5  Red Bank, New Jersey 07701
6  732-747-9003
7  BY: CHRISTOPHER PLACITELLA, ESQ.
8  Attorneys for Plaintiff
9
10  RAWLE & HENDERSON, LLP
11  401 Route 73 North, Suite 200
12  Marlton, New Jersey 08053
13  856-596-4800
14  BY: SEBASTIAN A. GOLDSTEIN, ESQ.
15  Attorneys for Defendents, Cyprus Amax,
16  Imerys Talc America
17
18  ORRICK, HERRINGTON & SUTCLIFFE, LLP
19  51 West 52nd Street
20  New York, New York 10019
21  212-506-3604
22  BY: PAIGE PAVONE, ESQ. AND KATHY O'CONNOR, ESQ.

---

Page 3

1  A P P E A R A N C E S (Cont'd):
2
3  HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
4  40 Paterson Street
5  New Brunswick, New Jersey 08903
6  732-545-4717
7  BY: AMIE C. KALAC, ESQ.
8  Attorneys for Defendant, Whittaker, Clark and Daniels
9
10
11  ALSO PRESENT:    Ray Moore, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1                    I N D E X
2  WITNESS                              PAGE
3  NANCY MUSCO
4     Direct by Mr. Placitella           6
5     Cross by Ms. O'Connor            204
6     Redirect by Ms. Placitella       214
7
8
9
10
11
12
13
14
15
16
17
18
21
22
23
24
25

Page 5

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| Musco-1 | Handwritten document | 91 |
| Musco-2 | Binder of documents | 131 |
| Musco-3 | Five pages legal size Chart | 136 |
| Musco-4 | List of J&J employees | 202 |

Page 6

1    THE VIDEOGRAPHER:  We are on the record my
2    name is Ray Moore representing Dynamic Evidence.  The
3    date today is November 28, 2018.  The time is approximately
4    10:02 a.m.  The name of the witness is Nancy Musco.
5    At this time the attorneys present in the room
6    will identify themselves and the parties they represent.
7    MR. PLACITELLA:  Chris Placitella on
8    behalf of the plaintiffs.
9    MS. KALAC:  Amie Kalac from Hoagland, Longo
10   on behalf of Whittaker, Clark and Daniels.
11   MR. GOLDSTEIN: Sebastian Goldstein from
12   Rawle and Henderson on behalf of Cyprus Amax.
13   MS. O'CONNOR: Kathy O'Connor from Orrick,
14   Herrington & Sutcliffe on behalf of Johnson and Johnson.
15   MS. PAVONE: Paige Pavone from Orrick also
16   on behalf of Johnson and Johnson.
17   The court reporter will now swear in the
18   witness.
19   N A N C Y   M U S C O,
20   13 Mershon Lane, Plainsboro, New Jersey, sworn.
21   DIRECT EXAMINATION BY MR. PLACITELLA:
22   Q   Ms. Musco, how are you?
23   A   Good morning, I'm fine.
24   Q   We are here for purposes of taking your
25   deposition.  Have you ever had your deposition taken

Page 7

1    before?
2    A   Yes.  Once before.
3    Q   What kind of case was that?
4    A   That was Johnson's Baby Oil.
5    MR. PLACITELLA:  Before we get
6    started, is the witness here testifying as Nancy
7    Musco, a former employee of Johnson and Johnson that
8    I subpoenaed, or as a representative of Johnson and
9    Johnson?
10   MS. O'CONNOR:  You are asking me
11   that question?
12   MR. PLACITELLA:  Yes.  The reason I
13   ask is because I got an email from counsel for
14   Johnson and Johnson that said that Ms. Musco was
15   being produced here today as a representative for
16   Johnson and Johnson.
17   MS. O'CONNOR:  I think that was not
18   what was intended.  She is here in her personal
19   capacity as a former employee of Johnson and
20   Johnson.  She is not here on behalf of the
21   company as a person most knowledgeable.
22   MR. PLACITELLA:  That's fine.  I
23   wanted to make sure.
24
25   Q   Ms. Musco, are you represented by counsel

Page 8

1    here today?
2    A   I'm with counsel representing that is
3    Johnson and Johnson.
4    MS. O'CONNOR:  As well as the
5    witness.
6    Q   And are you paying for your
7    representation?
8    A   No.
9    Q   Is counsel to your left your lawyer or
10   only for purposes of this deposition?
11   A   Only for purposes of the deposition.
12   Q   When did you retain her?
13   A   I guess it would be about a month ago.
14   Q   What were the terms of that retainer?
15   A   The terms were to prepare for this
16   deposition and to do the deposition.
17   MS. O'CONNOR:  I want to be careful.
18   We are getting close to privilege.
19   Q   Your current job is what?
20   A   I'm retired now, but I work for Dress for
21   Success, Central, New Jersey as program manager.
22   Q   Do you have any ongoing relationship with
23   Johnson and Johnson?
24   A   Not at this time, only retiree.
25   Q   You currently live in Plainsboro?

Page 9

1     A   Yes.
2     Q   And where is that?
3     A   That is in Central New Jersey.
4     Q   The address?
5     A   13 Mershon Lane.
6     Q   You went to school at the University of
7  Bridgeport?
8     A   That's correct.
9     Q   Is that where you got your nursing degree?
10    A   Yes.
11    Q   And you graduated when?
12    A   1974.
13    Q   At some point in time you went to the
14 Wharton School for a management certificate.  Is
15 that fair?
16    A   Yes.
17    Q   Any other education besides that?
18    A   No.
19    Q   When did you leave Johnson and Johnson?
20    A   2011.
21    Q   And you began when?
22    A   1981.
23    Q   Can you trace for me the job
24 responsibilities that you had at Johnson and Johnson
25 through your employment, and I may stop you along

Page 10

1  the way?
2     A   My main responsibilities were
3  communicating with consumers about our products.
4     Q   What was the first job title you had at
5  Johnson and Johnson, if you recall?
6     A   Medical services assistant.
7     Q   What specifically was your job
8  responsibility as medical services assistant?
9     A   To respond to consumer contacts about any
10 medical or safety issues.
11    Q   How long did you have that job?
12    A   That would be -- it is hard to remember a
13 long time ago.  Approximately six or seven years.
14    Q   Who did you report to when you worked
15 there?
16    A   The person I reported to, I can't think of
17 last name.  Her first name was Fran.
18    Q   Was that for Johnson and Johnson itself or
19 some subsidiary?
20    A   That was for Johnson and Johnson Baby
21 Products.
22    Q   Where was that?  Where did you work out
23 of?  What location?
24    A   At that time the initial part was in
25 Raritan, New Jersey.

Page 11

1     Q   Around 1986 or so you changed jobs?
2     A   Changed departments.  Still had some of
3  the same responsibility.
4     Q   What department did you move to then?
5     A   I moved to the marketing department then.
6     Q   What was your job title?
7     A   It was still medical services.  I was
8  medical services manager at the time.
9     Q   What were your jobs responsibilities as
10 medical services manager?
11    A   The same, to respond to consumers for
12 medical and safety issues, and at that time I had a
13 team of nurses working with me.
14    Q   The first job you had, what products were
15 you responsible for or did you have interaction
16 with?
17    A   The first job was all for Johnson's Baby
18 Products.
19    Q   What products did that include?
20    A   A lot of products.
21    Q   The primary ones.
22    A   Johnson's Baby Shampoo, Johnson's Baby
23 Lotion, Johnson's Baby Wash and Johnson's Baby
24 Powder, Johnson's Baby Powder Corn Starch, Johnson's
25 Baby Oil.

Page 12

1     Q   And the second job you had when you
2  changed departments in 1986, what products were you
3  involved with?
4     A   All of the same products.  About that
5  time, or a little bit later, we became consumer
6  products, so I was responsible for our world care
7  products and our oral products.
8     Q   You took this job in approximately 1986,
9  and what part of Johnson and Johnson were you
10 working for?
11    A   At that time, 1986, I was in the marketing
12 department.
13    Q   What division?
14    A   That was Johnson's, I think, Consumer
15 Products at that time.
16    Q   Where was that located?
17    A   That was located in Skillman, New Jersey.
18    Q   Were you responsible in part for Johnson's
19 Baby Powder during that period of time?
20    A   Yes, I was.
21    Q   What specifically was your role as it
22 related to Johnson's Baby Powder?  Let me ask you
23 this question first, how long did you keep that job
24 you took on in 1986 in Skillman for Consumer
25 Products?

Page 13

1    A   Pretty much until mid 2000s.
2    Q   And who were your supervisors?
3    A   A lot of different ones.  Tom Demusio was
4  one, Richard Chase was another.  That's all I
5  remember right now.
6    Q   During that periods of time did you have
7  responsibility in the capacity you were working for
8  Johnson's Baby Powder?
9    A   Yes, I did.
10    Q   What geographic locations were you
11  responsible for?  Was it the U.S., beyond or what,
12  for Johnson's Baby Powder?
13    A   At that time?
14    Q   Yes, Ma'am.
15    A   At that time it was U.S.
16    Q   During that period of time from 1986 to
17  2001?
18    A   Approximately.
19    Q   Did you have interaction with other
20  departments within Johnson and Johnson as it related
21  to Johnson's Baby Powder?
22    A   Yes, definitely.
23    Q   What departments?
24    A   I interacted with many different
25  departments, but it would have been Quality

Page 14

1  Assurance Department, Research and Development,
2  Regulatory, Marketing, Packaging, just about every
3  department in the company.
4    Q   What specifically was your department
5  called?
6    A   At that time my department was called
7  Medical Services, I believe.
8    Q   The function of Medical Services
9  Department was what?
10    A   To respond to consumers for medical and
11  safety issues.
12    Q   Now, in 2001, did your job change?
13    A   I believe 2000, maybe a little bit later
14  than that.  It is hard to remember.  It is a long
15  time.
16    Q   Your best estimate?
17    A   Yes, but I think it was the latter part.
18  Maybe 2005.
19    Q   So in approximately 2005 your job changed?
20    A   Part of my responsibilities changed, yes.
21    Q   Did you work for a different department at
22  that point in time?
23    A   I was then working for the Research and
24  Development, Scientific and Medical Affairs.
25    Q   You actually went to work for the R and D

Page 15

1  department at Johnson and Johnson?
2    A   Yes.
3    Q   What were your job responsibilities?
4    A   The same, to respond to consumers for
5  medical and safety issues.
6    Q   Why were you moved from one department to
7  the other?
8    A   I can't really say.  It was organizational
9  changes.
10    Q   And what division of Johnson and Johnson
11  did you work for when you worked in R and D?
12    A   At that time it would have been Consumer
13  Products.
14    Q   What specifically was your job title and
15  responsibility?
16    A   My job title would have been still medical
17  services manager, and my responsibilities would have
18  been to respond to consumers for medical and safety
19  issues.
20    Q   Other than responding to consumers, did
21  you ever respond to physicians?
22    A   Yes, from time to time.
23    Q   What about the people in the U.S.
24  Government, did you ever respond to people in the
25  U.S. Government?

Page 16

1    A   No, that was not my role.
2    Q   And you held that position in R&D from
3  2005 or 6 until when?
4    A   Until I left in 2012.
5    Q   Why did you leave in 2012?
6    A   The company was downsizing.
7    Q   At the time you left in 2012, what was
8  your annual salary?
9    A   I don't remember.
10    Q   Did you leave with a pension?
11    A   Yes.  I eventually retired.  I left in
12  April when I officially retired, I guess, September
13  or October.
14    Q   After 2012, did you do any other work for
15  Johnson and Johnson as an outside contractor?
16    A   Yes, I did.
17    Q   What did you do?
18    A   I worked on product claims, substantiation
19  of product claims.
20    Q   What does that mean?
21    A   Ensuring that any claims that were made on
22  our product had the proper substantiation, whether
23  it be testing, research, et cetera.
24    Q   Did you work for a company, for yourself
25  at that point in time when you became a contractor?

Page 17

1    A  I worked for a company.
2    Q  What company?
3    A  It was called Med Global.
4    Q  How long did you have that job?
5    A  About a year and a half, maybe two years.
6    Q  Then what did you do?
7    A  Well, at that time I was working for Dress
8  for Success also, and I continued to do that.
9    Q  When is the last time you worked for
10  Johnson and Johnson, you did work for Johnson and
11  Johnson?
12    A  The last time I worked directly for
13  Johnson and Johnson would have been 2012.
14    Q  When you were working as a private
15  contractor for Johnson and Johnson after you
16  retired, who at Johnson and Johnson did you interact
17  with primarily?
18    A  The Research Department.
19    Q  Who specifically?
20    A  Specifically Nina Turney.
21    Q  Let me back up for one second.  When you
22  worked in R and D, who did you report to?
23    A  When I worked as a consultant?
24    Q  No, when you worked for Johnson and
25  Johnson in the R and D, who did you report to?

Page 18

1        MS. O'CONNOR:  Objection to the form.
2  You can answer.
3    A  I reported to director -- one of the
4  directors in R and D.
5    Q  Who was that?
6    A  Ellen Kurtz.
7    Q  When you worked as a private contractor
8  after retiring, who was the person that you reported
9  to?
10    A  Nina Turney
11    Q  You say your job was to substantiate the
12  claims concerning product safety?  I'm not sure I
13  understood what you did as a private contractor.
14  Could you give me some more detail about what you
15  did day-to-day?
16        MS. O'CONNOR:  Objection to the form.
17  Mischaracterizes her testimony.
18        MR. PLACITELLA:  I'm not trying to.
19        MS. O'CONNOR:  Understood.
20    A  My job was --
21    Q  I'll let you know when I'm doing that.
22    A  My job was to ensure there was
23  substantiation for any claims that were made on the
24  products.
25    Q  So, for example, if I -- What products,

Page 19

1  by the way?
2    A  All consumer products.
3    Q  All consumer products?
4    A  Yes.
5    Q  Would that include Johnson's Baby Powder?
6    A  Yes.
7    Q  Would it include Johnson and Johnson
8  Shower to Shower?
9    A  Yes.
10    Q  When you had to make sure that the claims
11  were -- you were able to back up what you were
12  saying basically?  Is that what you are saying?
13        MS. O'CONNOR:  Objection to the form.
14  You can answer.
15    Q  Scientifically?
16        MS. O'CONNOR:  Same objection.
17    A  Yes.  My role was to ensure that there was
18  substantiation, or backup, as you called it, on
19  file -- for whatever claims were made on the
20  products.
21    Q  For example, if a claim was being made
22  that Johnson and Johnson Baby Powder never killed
23  a child, you would have substantiation for that?
24        MS. O'CONNOR:  Objection to the form.
25  You can answer.

Page 20

1    A  Well, --
2    Q  No child ever lost his life as a result of
3  using Johnson and Johnson Baby Powder, you would
4  make sure that was an accurate statement?
5        MS. O'CONNOR:  Objection to the form.
6    A  We are talking about claims on a product
7  and what the product does.  That's what the
8  substantiation was for.
9    Q  Claims on a product.  If a claim was made
10  by Johnson and Johnson that no child ever -- let
11  me go this way.
12        If a claim was made that there was X
13  ingredient in Johnson and Johnson's Baby Powder, you
14  would make sure that was the case?
15    A  Yes.
16        MS. O'CONNOR:  Objection to the form.
17    Q  What records would you have access to to
18  make sure that was, in fact, the case?
19    A  There were many different records.  I
20  would work, again, with a team.  Mainly the team in
21  research and development for these kinds of things.
22    Q  Did you ever have a similar responsibility
23  when you actually worked directly for Johnson and
24  Johnson?
25    A  Not for product claims, no.

Page 21

1    Q   If a claim was made that testing was done
2  of a specific Johnson and Johnson product, you would
3  be provided access to all the testing and look at it
4  yourself?
5        MS. O'CONNOR: Objection, vague and
6  ambiguous. Mischaracterizes the testimony. You can
7  answer.
8    A   No, I would rely on the team members for
9  that.
10   Q   So you would not personally review the
11 testing documents, you would speak to someone and
12 they would provide you with information. Is that
13 fair?
14   A   I would speak to the appropriate members
15 of the team, yes.
16   Q   With no disrespect, how was it that you
17 were qualified to do that, to substantiate claims
18 related to, for example, product safety?
19       MS. O'CONNOR: Objection to the form
20 of the question. Vague and ambiguous,
21 Mischaracterizes the testimony. You can answer.
22   A   Again, when I was doing substantiating, or
23 ensuring there was substantiation for the claims,
24 they were product claims, not safety claims. They
25 were product claims.

Page 22

1    Q   What is the difference?
2    A   One has to do, by the example you gave,
3  ingredients in a product, what the product does,
4  things like that.
5        I did not substantiate them, I relied
6  on people within the team and mainly the research
7  and development team.
8    Q   Do you know why Johnson and Johnson
9  subcontracted that function out to you versus doing
10 it themselves?
11       MS. O'CONNOR: Objection, ambiguous,
12 calls for speculation.
13   A   No.
14   Q   Did you have responsibility for
15 substantiating product safety claims?
16   A   Again, I didn't substantiate them, I
17 insured that there was substantiation by relying on
18 the members of the team.
19   Q   So, for example, if a claim was made by
20 Johnson and Johnson that baby powder was safe for
21 babies, what would you go through? What process
22 would you go through in order to fulfill your
23 function?
24   A   There's a process that every product goes
25 through to ensure the safety. That is what would be

Page 23

1  provided. We know every product goes through the
2  same process.
3        So we would review any testing. I
4  wouldn't review it, I would rely on my team members
5  to review it, and that would substantiate whatever
6  we were saying on the label.
7    Q   This is what I'm trying to understand.
8  There are people at Johnson and Johnson that -- they
9  have the information about the claims that are being
10 made concerning the product, correct?
11   A   Correct.
12   Q   They are people in R and D primarily?
13   A   That's part of the team, yes.
14   Q   Who else?
15   A   Regulatory.
16   Q   Okay.
17   A   It may be pretty much regulatory and the
18 development people who are part of research and
19 development.
20   Q   So you have people in regulatory, you have
21 people who have the actual knowledge, correct?
22 Those are the people in R and D?
23   A   Correct.
24   Q   They have actual, either personal
25 knowledge or access to the testing that verifies the

Page 24

1  claim, correct?
2    A   They would have some of it, yes. We would
3  have, our quality assurance department might have
4  some. Depending on what it is, there's a lot of
5  people involved.
6    Q   What I'm trying to understand is if all
7  that knowledge is within Johnson and Johnson, with
8  all due respect, why do they need you?
9    A   To ensure that we had all that knowledge
10 really in one place.
11   Q   But there's nobody in Johnson and Johnson
12 that knew it was all in one place?
13   A   It is not a question of knowing it is in
14 one place, it was documented that we have it and
15 putting it in one place. What do you mean by one
16 place?
17   Q   If a claim is made about, for example,
18 Johnson's Baby Powder, how did you document it as
19 part of your function in that job capacity as an
20 outside contractor?
21   A   Well, after working with the various team
22 members we had a computer system where we would
23 document the information, where it could be found.
24 We didn't have it all in there. It was too long
25 to put in that particular system.

Page 25

1    Q   When you say we had a computer system, was
2  that Johnson and Johnson's computer system or your
3  company's computer system?
4    A   It was Johnson and Johnson's system.
5    Q   So you, as an outside contractor, you had
6  direct access to Johnson and Johnson's computer
7  system?
8         MS. O'CONNOR:  Objection to the form
9  of the question.
10   A   At that time, yes.
11   Q   What was the name of that computer system
12 or that computer program?
13   A   I don't remember.
14   Q   Who was the person in charge of it?  Was
15 it Tom Cox?  Did you know Tom Cox?
16   A   No.
17   Q   Who was the person in charge of
18 administering that computer program?
19   A   I don't remember.
20   Q   Am I correct that you, just so we go
21 through this, you have no expertise in interpreting
22 epidemiology?
23   A   That's correct.
24   Q   You have no expertise in interpreting
25 toxicology?

Page 26

1    A   That is correct.
2    Q   You have no expertise in testing methods
3  for contaminants in Johnson's Baby Powder?
4    A   That's correct.
5    Q   You have no expertise in how to construct
6  a proper warning in order to reflect the information
7  that's known about the product?
8    A   I'm not an expert, but I'm knowledgeable
9  and would take information from all the valid
10 resources.
11   Q   Have you ever had any training or
12 education in the subject of what a proper warning
13 should look like?
14   A   No.
15   Q   Do you know, for example, what the
16 difference is in warning theory between a caution
17 and a warning and when you would use each?
18   A   Again, I'm knowledgeable.  I'm not an
19 expert.  That would really fall under regulatory's
20 role.
21   Q   Who at regulatory is the person who was
22 specifically knowledgeable about that issue?
23   A   There were a lot of people in regulatory.
24 I don't know who.  I could say specifically one of
25 the people I worked with was Nadine Harrison.

Page 27

1    Q   In preparation for today's deposition, did
2  you review any documents?
3    A   No.
4    Q   Did you review any sworn testimony by any
5  witness?
6    A   No.
7    Q   Did you speak to anybody, other than
8  counsel?
9    A   No.
10   Q   How many times did you meet with counsel?
11   A   Twice.
12   Q   For how long and when?
13   A   One day last week and Monday of this week.
14   Q   For how long last week and how long on
15 Monday?
16   A   About six hours each day.
17   Q   In those meetings, you never looked at any
18 documents that would help you refresh your memory
19 concerning events that happened while you were
20 there?
21   A   No, I did not.
22   Q   Did you ever testify for Johnson and
23 Johnson in any trials?
24   A   No, I did not.
25   Q   When you met with counsel for Johnson and

Page 28

1  Johnson, were you paid for your time?
2    A   No, I was not.
3    Q   Are you being paid for your time today?
4    A   I received $2 with my subpoena.
5    Q   If this goes well, I'll raise it a dollar
6  fifty.
7         Did you ever have any prior
8  involvement on behalf of Johnson and Johnson in
9  litigation related to Johnson's Baby Powder?
10   A   Yes.
11   Q   What was that involvement?
12   A   Preparing information or delivering
13 information to Johnson and Johnson's legal
14 department.
15   Q   When was that?
16   A   I couldn't tell you specifically.  I don't
17 remember.
18   Q   Was it the '80s, the '90s, 2000s?  Do you
19 have any clue?  How many times did that happen?
20   A   I'm going to say the '80s, but I really
21 don't remember the specific dates.
22   Q   Was that part of your ongoing role, to
23 interact with the lawyers at Johnson and Johnson in
24 cases involving Johnson's Baby Powder?
25   A   Yes, I was a point person.

Page 29

1        Q   When you say point person, what does that
2   mean?
3        A   There's so many departments and so many
4   different people at Johnson and Johnson that really
5   I was the person who could help direct whatever
6   question or whatever information was needed.
7        Q   For example, if a specific question was
8   posed in a lawsuit, you would be the person that
9   gathered the information to answer that question?
10          MS. O'CONNOR:   Objection to the form.
11       A   I would again go to the appropriate
12   department to supply that answer or direct the
13   attorney to that department.
14       Q   If there was a question in a lawsuit that
15   said, or you were directed to secure all the testing
16   information that Johnson and Johnson has so to
17   whether the Johnson's Baby Powder ever contained
18   asbestos, that would be part of your function?
19          MS. O'CONNOR:   Objection to the form.
20   You can answer.
21       A   Again, I would direct our attorneys to the
22   appropriate department for that.
23       Q   You would, for example, then say to the
24   lawyers, you should go talk to Mr. Jones in R and D
25   and Mrs. McGillicutty in quality assurance, that

Page 30

1   kind of thing?
2          MS. O'CONNOR:   Objection to the form.
3   You can answer the question.
4       A   Yes.
5       Q   Did you have actual knowledge concerning
6   the records that were available in the various
7   departments that were used to support or answer
8   questions for litigation?
9          MS. O'CONNOR:   Objection, vague,
10   ambiguous.   You can answer.
11       A   I knew of them.
12       Q   Did you actually ever review the records
13   yourself to determine whether they were accurate and
14   complete in assisting in a litigation support role?
15          MS. O'CONNOR:   Objection.   Vague and
16   ambiguous.   You can answer.
17       A   I did not review them.
18       Q   Did you actually ever take physical
19   control of the records and transfer them to legal?
20       A   I don't remember, no.
21       Q   So you would -- your function would be to
22   tell legal you need to speak to Dr. Ashton about
23   this subject, and he will have the records, for
24   example?
25          MS. O'CONNOR:   Objection.

Page 31

1        Q   Did that ever happen?
2          MS. O'CONNOR:   Objection to the
3   mischaracterization.
4       A   That may have happened, yes.
5       Q   How many cases over the years that you
6   worked for Johnson and Johnson were you involved in
7   that related to Johnson's Baby Powder?
8       A   I don't remember.
9       Q   Was it more than one?
10       A   Yes.   I would say more than one.
11       Q   Did you ever work on any cases related to
12   the Shower to Shower product?
13       A   Not that I remember, no.
14       Q   In the cases you worked on related to
15   Johnson's Baby Powder, do you know what injuries
16   were being alleged by the people suing Johnson and
17   Johnson?
18       A   Yes.   There have been allegations of lung
19   disease.
20       Q   When you say lung disease, what do you
21   mean by that?
22       A   Allegations of lung cancer or any
23   breathing diseases.
24       Q   Did that include claims for talcosis?
25       A   It may have.   I don't remember

Page 32

1   specifically.
2       Q   Do you know what talcosis is?
3       A   Yes.
4       Q   What is it?
5       A   It is an inflammation.
6       Q   Related to the inhalation of what?
7       A   Of talc.
8       Q   Did you ever defend cases or help defend
9   cases involving ovarian cancer?
10          MS. O'CONNOR:   Objection to the form.
11   You can answer.
12       A   I may have, again, in my role as point
13   person, may have provided or directed information.
14       Q   What about mesothelioma?
15       A   Specifically, no.
16       Q   Now, in order to perform the jobs you had
17   properly, did you need to understand how the various
18   products you were working on were applied to the
19   human body?
20       A   Yes.
21       Q   Did you need to understand how the
22   products were being advertised?
23       A   I did not need to understand, but that was
24   part of it.
25       Q   It was part of your job to understand

Page 33

1  or --
2    A   To be aware.
3    Q   To be aware and knowledgeable?
4    A   Yes, to be aware.
5    Q   I want to focus a little bit now
6  specifically on Johnson's Baby Powder, okay?
7        Am I correct that Johnson and Johnson
8  had recommended the liberal application of Johnson's
9  Baby Powder to babies for many decades?
10       MS. O'CONNOR: Objection to the form
11 of the question.  Vague and ambiguous.  You can
12 answer it.
13   A   Johnson's Baby Powder has been in existence
14 for many decades, yes.  I'm not sure what you mean
15 by liberal application.
16   Q   Did you actually ever see Johnson and
17 Johnson's advertisements historically where they
18 recommended or indicated that the baby powder should
19 be applied liberally?
20       MS. O'CONNOR: Same objection.  You
21 can answer.
22   A   No, I don't remember seeing anything that
23 said that.
24   Q   I'm going to hand you what's been marked
25 388.  I'll put it up on the screen.

Page 34

1        This is an advertisements for
2  Johnson's Baby Powder.  Do you see that?
3    A   Yes. I see that.
4    Q   In the upper left hand corner where it
5  talks about liberal application of Johnson's Baby
6  Powder will do wonders.  Do you see that?
7    A   Yes, I see that.
8    Q   So, in this advertisement, Johnson and
9  Johnson is actually promoting the liberal
10 application of Johnson's Baby Powder, correct?
11       MS. O'CONNOR: Objection to the form.
12 You can answer.
13   A   What it says here, liberal application
14 will do wonders.
15   Q   This particular advertisement goes all the
16 way back to the '40s, correct?
17   A   It looks like it says 1942.
18   Q   And there was a time in your career where
19 you actually went back and looked at historical
20 advertisements so you could provide information
21 about how the baby powder product was actually being
22 used historically, correct?
23   A   No.  I didn't go back and look at
24 historical advertisements.
25   Q   I'll show you what's been marked exhibit

Page 35

1  389.  All the documents, unless I tell you otherwise
2  today, are documents that were given to us by
3  Johnson and Johnson.
4        This a document dated October 13,
5  1971 from a Mr. Kulkarni.  Do you have any idea who
6  he was?
7    A   No, I do not.
8    Q   Do you recognize any of the people who are
9  cc'd on this document?
10   A   I recognize two names.
11   Q   Which names do you recognize?
12   A   The second one, Jim Dettre and the second
13 to the last, Dr. Sawchuck.
14   Q   What was your understanding of Mr. Dettre's
15 job?
16   A   I don't know because, as you said, this
17 was dated 1971.
18   Q   What did he do when you knew him?  What
19 was his job?
20   A   I believe he worked with professionals at
21 the time when I first knew him, but that was a long
22 time ago.  I don't know exactly what his title was.
23   Q   What about Dr. Sawchuk, what was his job,
24 if you know?
25   A   Again I don't know what his job was in

Page 36

1  1971, so I can't say.
2    Q   What job did he have when you knew him?
3    A   I don't know what his title was.
4    Q   Do you see in the second paragraph, it
5  talks about applying Johnson Baby powder liberally
6  to the diaper for extra protection?
7    A   I see that, yes.
8    Q   Is that consistent with what your
9  understanding was as to how the products was being
10 applied?
11       MS. O'CONNOR: Objection, vague,
12 ambiguous.
13   A   I don't know.  Again, this is 1971, so I
14 don't know.
15   Q   That's a period of time now of thirty
16 years.  You had an advertisement from 1942 that
17 talks about liberal application, and now you have an
18 internal document that talks about liberal
19 application in 1972, correct?  1971, correct?
20       MS. O'CONNOR: Objection.  You can
21 answer.
22   A   Repeat the question.
23   Q   You have seen here is an advertisement
24 from 1952 that talked about liberal application and
25 an internal Johnson and Johnson document still,

Page 37

1    thirty years later, also talking about liberal
2    application, correct?
3              MS. O'CONNOR:  Objection.
4    Mischaracterization of the document.  You can
5    answer.
6         A    Again, I can't say anything about these,
7    but it appears the one from 1971 is talking about
8    applying the powder on the diaper.
9         Q    Liberally.
10        A    They use the world liberal, yes.
11        Q    Now, by the way, if you know, who was Maria
12   Pilar Garcia Villacorte?
13        A    I don't know.
14        Q    Do you know who Christine Sanchez was?
15        A    No.
16        Q    I'm going to show you exhibits 408.  This
17   is from 2001.  You were working at Johnson and
18   Johnson in 2001, correct?
19        A    Yes.
20        Q    Have you ever seen this particular Power
21   Point before?  Take a quick look at it.
22        A    No.
23             MS. O'CONNOR:  There are dates on
24   this document that I don't think were on the
25   original.  I think it is a print date.

Page 38

1              MR. PLACITELLA:  That's us.  Go
2    ahead.
3         A    This does not seem familiar to me, no.
4         Q    I put up on the screen a page from the
5    Power Point that states, "Areas of the body where
6    powder is commonly used on adults."  Do you see
7    there?
8         A    That's what is says, yes.
9         Q    Is this consistent with your understanding
10   about where Johnson's Baby Powder was commonly used
11   on adults?
12             MS. O'CONNOR:  Objection to the
13   mischaracterization of the document.
14        A    Yes, I would agree with that.
15        Q    If you go to the next page, I also put up
16   on the screen areas of the body where baby powder is
17   commonly used on a baby.  Do you see that?
18        A    Yes, I do.
19        Q    It shows the neck, the underarms, the
20   folds in the skin and the diaper area, correct?
21        A    Yes.
22        Q    Is that consistent with your understanding
23   about where the product was commonly used on
24   babies?
25        A    Yes.

Page 39

1         Q    As I read in some documents that you
2    actually had some personal experience with this with
3    your own kids, right?
4         A    Yes.  I commonly used Johnson's Baby
5    Powder on both my children.
6         Q    Is this consistent with what you did with
7    your kids?
8         A    Yes, it is.
9         Q    When you used the baby powder on your
10   kids, and you were finished using it, where would
11   you typically put it down?  Near the head or near
12   the feet?
13        A    Near the feet.
14        Q    Near the feet?
15        A    Yes.
16        Q    Did you have any concerns that the child
17   might kick it over?
18        A    I may have thought of that.  I don't know.
19   I usually closed it after using it.
20        Q    In a child under the age of six months,
21   what is the furthest point from the mouth that the
22   baby powder would be used on a child in your
23   experience?
24        A    It could be used on the legs, behind the
25   knees, on the feet.

Page 40

1         Q    Is that usually, what, within a foot of
2    the mouth?
3         A    No.
4         Q    What is the farthest point from the mouth
5    in your estimation on a child that the baby powder
6    would be applied in terms of distance?
7         A    Depends on the length of the baby.  As I
8    said, it would be on their foot, behind their knees.
9         Q    What is the closest point to the mouth and
10   nose?
11        A    Under the neck folds.
12        Q    I wrote down a question on this piece of
13   paper, and the question is, and this is my
14   handwriting by the way.  Can you see it up on your
15   screen?
16        A    Yes.
17        Q    "Did the talc that was used in any J and J
18   Baby Powder product ever contain any amounts of
19   asbestos?"  Do you see that?
20        A    I see that.
21        Q    That was a question that, or questions
22   like that that you were called upon to answer as
23   part of your job at Johnson and Johnson, correct?
24        Q    And that question was raised over and over

Page 41

1   again by people outside of Johnson and Johnson from
2   almost the time you started working there, correct?
3           MS. O'CONNOR:  Objection to form
4   of the question.  You can answer.
5       A   I know it was a question that we received,
6   yes.
7       Q   And part of your job was to answer that
8   question repeatedly on an ongoing basis, correct?
9           MS. O'CONNOR:  Objection to the form.
10  Vague and ambiguous.
11      A   We provided that information when the
12  consumers asked it, yes.
13      Q   Now, even when you were dealing with your
14  own child in the hospital, that issue was raised to
15  you specifically by health care providers in the
16  hospital lot, correct?
17          MS. O'CONNOR:  Objection to the form
18  of the question.  Vagues and ambiguous.  You can
19  answer.
20      A   Yes.  One nurse did say that.
21      Q   What do you recall about that exchange?
22      A   Going back a few years to when my daughter
23  was born.  The nurse in the post partum, after birth
24  area, said, "Oh, don't use baby powder."  And I
25  asked her why, and she said, "It is dangerous,"

Page 42

1   but she didn't know why.
2       Q   Your response was what?
3       A   That it was not dangerous.
4       Q   Now, did you actually communicate that
5   exchange within Johnson and Johnson?
6       A   Yes, I believe I did.
7       Q   I'm going to show you a memo January 2,
8   1986, and ask you to take a look at it.  And while
9   you are doing that, I'm going to go over this
10  question that in we went over in black pen so
11  everybody can read it.
12          Exhibit 325 is a June January 2, 1986
13  memo that you wrote and the re is Johnson's Baby
14  Powder, correct?
15      A   That is correct.
16      Q   Do you see that?  It says to distribution.
17  What does that mean?
18      A   I would -- I don't remember, but that
19  would be a group of people who routinely copied on
20  or sent information about specific issues.
21      Q   Distribution, did that go beyond your
22  department?
23      A   Yes.
24      Q   What other departments would get it?
25      A   I don't know for sure, but I would say our

Page 43

1   regulatory, our marketing, different people in
2   research and probably quality assurance, but I don't
3   know for sure.
4       Q   In this particular document, which was
5   1986, I'll blow up the paragraph, you said, and this
6   is about the conversation you had with the nurse at
7   the hospital, correct?
8       A   Yes.
9       Q   And the nurse raised the issue about
10  whether baby powder could cause cancer or lung
11  disease?
12      A   That's what she was questioning.
13      Q   You told her what your position was at
14  Johnson and Johnson, according to this, right?
15      A   That's what it says, yes.
16      Q   And you said that you had studies
17  disputing the statement that talc causes lung
18  disease, correct?
19      A   I said we have studies.
20      Q   What studies were you referring to?  Do
21  you know?
22      A   I don't know specifically.
23      Q   It says, and it also talks about ovarian
24  cancer.  Was the subject of ovarian cancer discussed
25  with the nurse back in 1986?

Page 44

1       A   It is looks like that was brought up.  I
2   don't remember what was specifically -- other than
3   what's here.
4       Q   Was the subject of asbestos also brought
5   up in the context of your conversation with the
6   nurse?
7       A   I don't remember the conversation and I
8   don't see anything about asbestos here with that
9   nurse.
10      Q   So if I go to the next page, you document
11  that the nurse told you that somebody from Johnson
12  and Johnson told her specifically that the baby
13  powder was being taken off the market because it
14  contained asbestos, right?
15      A   That's what it says here, that the nurse
16  said, the second nurse.
17      Q   You said you immediately responded that
18  the product did not contain asbestos, correct?
19      A   That's correct.
20      Q   So you discussed with the nurse in 1986
21  the subject of asbestos, cancer, ovarian cancer and
22  lung disease, correct?
23      A   Two different nurses I had a conversation
24  with, yes.
25      Q   So there were two different nurses at this

Page 45

1  hospital who both raised the issue about whether
2  Johnson's Baby Powder was capable of causing lung
3  disease and cancer, correct?
4      A   The first nurse did question, according to
5  the notes here, cancer and lung disease.  And the
6  the second nurse, yes.
7      Q   When you were making statements that the
8  product doesn't contain asbestos, had you actually
9  seen testing results showing that the product
10 doesn't contain asbestos, or were you relying upon
11 someone else for that information?
12     A   I would rely on members of my team who
13 were experts in that field.
14     Q   And who specifically at that time?
15     A   At that time I don't remember too many
16 names.  It may have Don Hicks in quality assurance.
17 I don't remember a lot of names 30 years ago.
18     Q   That is fair enough.
19         I'm going to show you Exhibit 358 and
20 ask you to take a look at that.  358 is another memo
21 that was authored by you on the same date, correct?
22     A   Yes.
23     Q   It was about Johnson's Baby Powder and you
24 sent it to the distribution list, correct?
25     A   That's what it says, yes.

Page 46

1      Q   On the re it says redacted personal
2  information.  What kind of personal information
3  would you put on a re about Johnson's Baby Powder
4  that no one is allowed to see?
5          MS. O'CONNOR:  Objection to the form
6  of the question.  Argumentative and ambiguous.  You
7  can answer.
8      A   I didn't redact it, so I don't know what
9  that is.
10     Q   You state that on December 26, 1985, you
11 spoke with, and then it is whited out, concerning.
12         MS. O'CONNOR:  Redacted.
13     Q   Redacted, concerning the safety of
14 Johnson's Baby Powder.  Then it is redacted and it
15 says, "Claims he heard a new report on WINS Radio
16 stating that Johnson's Baby Powder contains
17 particles of asbestos and children with weak trachea
18 could die from its use."  Do you see that?
19     A   I see that, yes.
20     Q   Do you know who you spoke to?
21     A   No.
22     Q   It says, "I began my conversation by
23 informing" -- was this somebody inside the company
24 that you are writing about or outside the company?
25     A   I'm going to assume it was outside the

Page 47

1  company.
2      Q   "Johnson's Baby Powder does not contain
3  asbestos.  I explained we own our talc mines and
4  have complete control over the product."  Do you see
5  that?
6      A   Yes.
7      Q   What was the source of that information
8  that you conveyed to this person?
9      A   What do you mean, the source?
10     Q   You say we have complete control of our
11 talc mines.  Control over the product.  What is the
12 source of that information?
13     A   That would have been information from
14 manufacturing and quality assurance.
15     Q   Who specifically, if you remember?
16     A   As I said earlier, I don't remember.  One
17 one name I remember Don hicks.
18     Q   Was it also part of your function, in
19 addition to responding to consumers, to respond to
20 the media as it related to safety of the products
21 you were involved with?
22     A   Yes, it was.
23     Q   I'm going to show you Exhibit 410.  I'll
24 tell you this is not from Johnson and Johnson's
25 files, but you would be happy to know that Nancy

Page 48

1  Musco lives on on the internet.  We pulled this off
2  the internet.
3          This is an article entitled:
4  "Asbestos has not been found in talcum powder, firm
5  says," and the date is June 4, 1987.  Do you see
6  that?
7      A   Yes, I see that.
8      Q   Do you recall the circumstances of this
9  article?
10     A   No, I do not.
11     Q   It states here, "Nancy Musco, a registered
12 nurse and manager of Johnson and Johnson Medical
13 Services, assures us that her company's source of
14 talc since the 1920s, chosen for its purity has been
15 Italy and later Vermont, and the same sources are
16 used today.  When the asbestos issue arose in 1970,
17 the company started formally testing for asbestos
18 with the claim that non ever was found."  Do you see
19 that?
20     A   Yes, I do.
21     Q   Do you know what the source of that
22 information was as you relate it in this news story
23 in 1987?
24     A   A long time ago, but it would have been
25 manufacturing and quality.

Page 49

1      Q   Is the only person you can recall Mr.
2   Hicks?
3      A   Yes.  One other gentleman, Sam Jiwrajka.
4   Those are the only names I remember.
5      Q   But am I correct that you had no personal
6   knowledge of this testing.  You never spoke to
7   anyone who did the testing and never reviewed any of
8   the tests yourself?
9      A   No, that was not my role.
10      Q   So no, it never happened?
11      A   Correct.
12      Q   401 I'm going to give to you, and I'll put
13   it up on the screen.  401 is a document with the
14   handwriting on the top, paper number 3.  Do you see
15   that?
16      A   Yes.
17      Q   According to the production by Johnson and
18   Johnson, this document came from your file.  Do you
19   recognize this document?
20      A   No, I do not.
21      Q   It states on the top, "This information
22   was from CPI."  Do you see that?
23      A   Yes.
24      Q   Do you know what CPI was?
25      A   Consumer Products, Inc.

Page 50

1      Q   So when it said the information came from
2   CPI, Consumer Products, Inc., was that a different
3   part of the company or part of the company you
4   worked for?
5      A   I don't know what year this was or where
6   this was from.
7      Q   I want to ask you about some parts of it
8   and see if it will help.
9          Under synopsis, it says, "Johnson and
10   Johnson Baby Powder does not contain asbestos.
11   Asbestos has never been found in Johnson's Baby
12   Powder and it never will."  Do you see that?
13      A   Yes, I do.
14      Q   Is that consistent with what you were
15   relating to consumers and the media during the time
16   that you worked on Johnson's Baby Powder?
17      A   Yes, that's true.  Johnson's Baby Powder
18   does not contain asbestos.
19      Q   It never did and never will?
20      A   That's correct.
21      Q   And that was related to you and when you
22   made those statements, you relied upon others to be
23   truthful in all respects in giving you that
24   information, correct?
25      A   Yes, I relied on the experts.

Page 51

1      Q   On the bottom, in the middle it talks
2   about 1976.  It says, "Prior to 1976, some powders
3   were found to contain very minute traces of
4   asbestos."  Do you see that?
5      A   Yes.
6      Q   Did you know that?
7      A   Well, the point is Johnson's Baby Powder
8   did not.
9      Q   And what you were telling people is that
10   no matter what was found in other people's baby
11   powder, none was ever found in Johnson's Baby
12   Powder, correct?
13      A   No.  What I was telling people is
14   Johnson's Baby Powder does not contain asbestos.
15      Q   Never did and never will?
16      A   Correct.
17      Q   Now, on the bottom, there's a note that
18   says, "Note, if asked questions, you should speak to
19   the positive J and J story.  For example, has
20   asbestos ever been found in any baby powders?  And
21   the suggested response is I can assure you asbestos
22   has never been found in Johnson's Baby Powder and
23   never will."  Correct?
24      A   That is correct.
25      Q   That is exactly what you told people?

Page 52

1      A   Yes.
2      Q   And that's similar to the question I wrote
3   down when we started the deposition, correct?
4      A   Yes.  Johnson's Baby Powder does not
5   contain asbestos.
6      Q   Did the talc that was used in any
7   Johnson's Baby Powder product ever contain any
8   amount of asbestos, and the answer always was, never
9   did, never will, correct?
10      A   Correct.
11      Q   Exhibit 360 is an email with a bunch of
12   emails, a string below it.  Do you see that?
13      A   Yes.
14      Q   Just for purposes of identification, the
15   primary email on top is dated May 25, 2000 and it is
16   from John McKeegan, M C K E E G A N.  Do you see
17   that?
18      A   Yes.
19      Q   Who is John McKeegan?
20      A   John was corporate public relations.
21      Q   What was his job in corporate public
22   relations?
23      A   I can't tell you the exact
24   responsibilities of his job.
25      Q   It is to Katherine Murphy.  Who is

Page 53

1    Katherine Murphy?
2        A    A marketing person.
3        Q    So she was in marketing?
4        A    Yes.
5        Q    And then to yourself, correct?
6        A    Yes.
7        Q    To Jeffrey Lebaw, L E B A W.
8        A    He was corporate also.
9        Q    When you any corporate, what do you mean
10   by that?
11       A    Public relations.
12       Q    And then there's a Gary Noble?
13       A    Yes.
14       Q    And who is he?
15       A    I believe he was R and D, research.
16       Q    The below that are some other people who
17   are identified and we will get them while we are
18   sitting here.  Veronica Rubio, who way she?
19       A    I don't know.
20       Q    How about Ray Gregiore?
21       A    I don't know him.
22       Q    How about Michael Chudkowski,
23   C H U D K O W S K I?
24       A    A research and development person.
25       Q    And all of these emails have a parenthesis

Page 54

1    -- Some of them say in parenthesis JJCUS.  What did
2    that stand for?
3        A    It the specific Johnson and Johnson
4    company.  I don't know what all the letters are for.
5             I think it is Johnson and Johnson
6    Corporate, U.S.  That's the designation of which
7    Johnson and Johnson division.
8        Q    For example, for John McKeegan it says
9    JJCUS, that's corporate?
10       A    Correct.
11       Q    And then for yourself it says CPCUS.  What
12   does that stand for?
13       A    Consumer Products Company.
14       Q    And the email starts on the bottom at that
15   time from Mr. Gregiore saying, "Vernonica, Long's
16   Drug would like information on Johnson's Baby Powder
17   specifically as it applies to any relationship of
18   talc to asbestos as reported in local Bay Area
19   media," Correct?
20       A    That's what it says, yes.
21       Q    So you are involved not only in dealing
22   with the media and consumers, but even distributors
23   of the Johnson Baby Powder product, correct.
24            MS. O'CONNOR:  Objection to the form.
25       A    I have to read the whole thing, but as you

Page 55

1    noted, I was only copied and was copied after the
2    fact as an FYI.
3        Q    Right.  You were being told what happened
4    leading up to why you got the email, correct?
5             MS. O'CONNOR:  Objection, vague and
6    ambiguous.
7        A    It was an FYI.  They were telling me about
8    it, I guess.
9        Q    The email back involved people who worked
10   in your part of the company, correct?  CPCUS.
11       A    They worked in Consumer Products, yes.
12       Q    Is says, "I'm now working on Johnson's
13   Baby Powder and Oil and received the attached email.
14   I'm assuming that we had a standard corporate
15   response that addresses the concern below."  Correct?
16       A    That's what it says, yes.
17       Q    And the concern below is whether there was
18   asbestos in Johnson's Baby Powder, correct?
19       A    Not having written, I can only assume
20   that's what he was referring to.
21       Q    And the response back is that the answer
22   is simple, there's no asbestos in our product, never
23   has been and never will.  Correct?
24       A    That's correct.
25       Q    Then again it is talks about the mines we

Page 56

1    used for talc are carefully selected and constantly
2    tested to ensure the purity of the raw material,
3    correct?
4        A    That's correct.
5        Q    In other words, no asbestos in mine
6    either, so how could there be in baby powder, right?
7        A    That's not what it says, no.
8        Q    Did you have an understanding that there
9    was asbestos in the mine where the baby powder came
10   from?
11            MS. O'CONNOR:  Objection to the form.
12            MR. GOLDSTEIN:  Join.
13            MS. O'CONNOR:  You can answer.
14       A    No.  What it says here that the mine we
15   used are carefully collected and then we test to
16   insure the raw material is pure and did not contain
17   asbestos.
18       Q    What was told to you by people inside of
19   Johnson and Johnson?  Did they tell you that none of
20   the mines they used contained asbestos or that it
21   did contain asbestos?
22       A    We did not discuss the mines.  The
23   important thing was that the cosmetic talc used was
24   free of asbestos.
25       Q    But you, at some point in time, actually

1  related that the mine did not contain asbestos,
2  correct?
3      A   The talc was tested to ensure that it did
4  not contain asbestos.
5      Q   So you never made a representation
6  anywhere that the maintenance from which the talc
7  came did not contain asbestos?
8          MS. O'CONNOR:  Objection.
9  Mischaracterizes the testimony.  You can answer.
10     A   I can't speak to the mine.  It is the
11 finished product, the talc used in our product.
12     Q   By the way, this is not an endurance test,
13 so any time you need to take a break.
14         MS. O'CONNOR:  We can take a break.
15         MR. PLACITELLA:  Let me finish this
16 one document.
17     Q   This document is an email dated 6-1-2000.
18 The subject is talc and asbestos.  You are one of
19 the recipients on this email, correct?
20     A   Yes.
21     Q   And it is from John McKeegan in Corporate,
22 correct?
23     A   Correct.
24     Q   One of the people he sent it to is Owen
25 Rankin.  Do you know who Owen Rankin was?

1      A   Yes.  Owen Rankin was the President of
2  Baby Products.
3      Q   It states, "Just to let you know, I still
4  haven't heard back from the Seattle Post
5  Intelligencer."
6          Do you recall an exchange with the
7  Seattle Post Intelligencer about Johnson's Baby
8  Powder and talc and asbestos?
9      A   No, I do not.
10     Q   And here, and I highlighted it, McKeegan
11 says to you and the president of your company, that
12 he kept impressing upon the reporter that there's no
13 asbestos in our product and never has been, correct?
14     A   That's what it says here, yes.
15         MR. PLACITELLA:  This is a good time
16 to take a break.
17         THE VIDEOGRAPHER:  The time is now
18 11:19 a.m. and we are going off the record.
19         (Recess taken)
20
21         THE VIDEOGRAPHER:  The time is now
22 11:34 a.m.  We are back on the record.
23 BY MR. PLACITELLA:
24     Q   So, I have my pad again.  By the way, it
25 says Drinker, Biddle, so I don't discriminate.

1          My pad says the question, "Did the
2  talc that was used in any J and J Baby Powder
3  product ever contain any amount of asbestos," and I
4  think I want to see if this characterizes your
5  testimony correctly.  There is no evidence that
6  Johnson's Baby Powder contained any amount of
7  asbestos and there never was?
8      A   That's correct.
9      Q   And that's what you were telling people?
10     A   Yes, that's correct.
11     Q   I want to talk a little bit about -- I
12 guess I should add, or will be.  Is what the
13 document said, never was and never will be?
14     A   There never will be.
15     Q   Now I want to talk about the basis for
16 that statement.  Is your understanding that tests
17 were actually done to verify that statement?
18     A   That's correct.
19     Q   And who did those tests?
20     A   They would have been performed at the
21 manufacturing sites.  I don't know specifically who
22 did them, no.
23     Q   You never actually saw the tests yourself,
24 correct?
25     A   Correct.

1      Q   You relied upon the people that you went
2  to to tell you the entire truth, and nothing but the
3  entire truth, correct?
4      A   Yes.  I know these people didn't lie.
5  They were scientists.  They were valid.
6      Q   When you say they were done at
7  manufacturing, what manufacturing facilities are you
8  talking about?
9      A   I don't know, because that was not my
10 role.  I didn't deal with this specifically.  I
11 don't know.
12     Q   Do you know whether the testing was ever
13 done if the mines itself?
14     A   I don't know.
15     Q   Do you know whether they ever outsourced
16 the testing?
17     A   I don't know.
18     Q   Who specifically did you rely upon for
19 making the statement that there's no evidence that
20 Johnson's Baby Powder contained any amount of
21 asbestos, and there never was and there never will
22 be?  Who specifically did you rely upon?
23     A   That would have been one of my team
24 members in quality assurance.
25     Q   It would be important to have a name.  Who

1  do you recall?
2      A   Sam Jiwrajka and Don Hicks are the too
3  names.
4      Q   Sam, can you give me the spelling of his
5  last name?  That's a tough one?
6      A   I'll try.  J I W R A J K A, I think.
7      Q   What was his job?
8      A   He was and the head of quality assurance.
9      Q   And Don Hicks, his job was what?
10     A   Director of Quality Assurance.
11     Q   Now, so we are clear, you never read any
12 testing reports, summary reports or anything before
13 making these statements to patients -- I'm sorry,
14 consumers or the media, correct?
15     A   That is correct.
16     Q   Is it your understanding then that Johnson
17 and Johnson never received any reports indicating
18 there was asbestos in Johnson's Baby Powder?
19     A   That is correct.  There's no asbestos in
20 Johnson's Baby Powder.
21     Q   When you had these conversations, for
22 example, with the mothers and the consumers, your
23 intent was to convey to them there was zero chance
24 of exposing their families to asbestos at any level
25 using Johnson's Baby Powder, correct?

1      A   My job was to reassure them they could
2  feel safe and comfortable using Johnson''s Baby
3  Powder because it does not contain asbestos.
4      Q   So there was zero chance of exposing their
5  families to asbestos by using Johnson's Baby Powder.
6  That was your in intent to convey to them, correct?
7      A   That is correct.
8      Q   And that was the corporate party line from
9  the time you arrived at Johnson and Johnson until
10 the time you left, correct?
11         MS. O'CONNOR:  Objection to the form
12 of the question.  You can answer.
13     A   No, I don't think of it as a party line.
14 I think of it as the truth.
15     Q   That was the corporate position taken by
16 Johnson and Johnson from the time you joined until
17 the time you left, correct?
18     A   That was the true information, yes.
19     Q   You understood, I assume, that there is no
20 safe level of asbestos exposure, correct?
21         MS. O'CONNOR:  Objection to the form
22 of the question.
23     Q   You knew that?
24         MS. O'CONNOR:  Objection to the form
25 of the question.

1      A   I'm not an asbestos expert, so I can't say
2  one way or the other.
3      Q   You are a nurse, you have some health care
4  background, correct?
5      A   I'm a nurse and I have health care
6  background, but not in asbestos.
7      Q   Did you understand it was the position
8  internally at Johnson and Johnson that there's no
9  safe level of asbestos exposure?
10         MS. O'CONNOR:  Objection to the form
11 of the question.
12     Q   Did you know that?
13         MS. O'CONNOR:  Objection.
14     A   Again, I'm not an expert on asbestos,
15 so I can't talk about that specifically, no.
16     Q   So you didn't know internally at Johnson
17 and Johnson that the official position was that
18 there is no safe level of asbestos exposure?
19         MS. O'CONNOR:  Asked and
20 answered.  You can answer it again.
21     A   What I do know, did and do know is that
22 the pure cosmetic talc used in Johnson's Baby Powder
23 is free from asbestos.
24     Q   Do you know in your experience in working
25 at Johnson and Johnson, and as a nurse, that the

1  only known cause of mesothelioma is asbestos
2  exposure?
3          MS. O'CONNOR:  Can I hear the
4  question back.
5          (The above question is read)
6          MS. O'CONNOR:  Objection to the form
7  of the question.  You can answer.
8
9      A   Could you rephrase that?
10     Q   Did you understand that the only way you
11 could develop mesothelioma was from exposuer to
12 asbestos?
13     A   No.  I don't know that.
14     Q   One way or the other?
15     A   I don't know of causes of mesothelioma.
16     Q   Did you know that asbestos exposure was
17 linked to mesothelioma?
18     A   Yes, I know is has been linked to it, yes.
19     Q   Were you aware that there were many mom's
20 who were diagnosed with mesothelioma where the
21 doctors could not figure out what the source of
22 their asbestos exposure was?
23         MS. O'CONNOR:  Objection to the form
24 of the question.
25     A   No, I'm not aware of that.

Page 65

1    Q   Did you know that asbestos exposure was
2  linked to lung cancer?
3    A   There have been theories, allegations,
4  yes.
5    Q   And you knew, for example, that asbestos
6  exposure could cause ovarian cancer, correct?
7        MS. O'CONNOR: Objection to the form
8  of the question.  You can answer it.
9    A   It was the same thing.  We don't know what
10  causes cancer.
11    Q   You know that asbestos exposure in the
12  medical literature was lined to ovarian cancer,
13  correct?
14        MS. O'CONNOR: Same objection.  Asked
15  and answered.  You can answer again.
16    A   No, I don't know that.
17    Q   You never discussed the relationship
18  between ovarian cancer and asbestos exposure in your
19  job at Johnson and Johnson?
20    A   No, I didn't.
21    Q   Does smoking cause lung cancer?
22    A   It is thought to, yes.
23    Q   Does asbestos cause lung cancer?
24    A   I don't know.
25    Q   So in making statements about the safety

Page 66

1  of the Johnson's Baby Powder, you did not know what
2  diseases were associated with exposure to talc that
3  contained asbestos.  Is that fair?
4        MS. O'CONNOR: Objection to the form
5  of the question.  Vague, ambiguous.  You can answer.
6    A   Could you rephrase that?
7    Q   I'll withdraw it.
8        If you were wrong and there was
9  evidence of asbestos in Johnson's Baby Powder, you
10  would be exposing millions of people, including
11  babies, to asbestos, correct?
12        MS. O'CONNOR: Objection to the form.
13  You can answer.
14    A   But there is no asbestos in Johnson's Baby
15  Powder.
16    Q   My question is as follows, please.  It is
17  a yes or no answer.
18        If you were wrong, and there was
19  evidence of asbestos in Johnson's Baby Powder, you
20  would be exposing millions of people, including
21  babies, to asbestos, correct?
22        MS. O'CONNOR: Objection to the form
23  of the question.  Asked and answered.  You can
24  answer again.
25    A   It is a hypothetical.  There isn't

Page 67

1  asbestos in Johnson's Baby Powder.  I don't know the
2  right way to answer that because there isn't
3  asbestos in the baby powder.
4    Q   What I want you to assume for the moment
5  that there is evidence of asbestos in Johnson's Baby
6  Powder.  Would you agree, if there was evidence of
7  asbestos in Johnson's Baby Powder, you would be
8  potentially exposing millions of people, including,
9  babes, to asbestos.  Yes or no?
10        MS. O'CONNOR: Same objection.  Calls
11  for speculation.  Vague, ambiguous, asked and
12  answered.  You can answer again.
13    A   I don't want to assume.
14    Q   Ma'am, can an honest and forthright
15  witness provide a simple answer to a simple
16  question?
17        MS. O'CONNOR: Objection,
18  argumentative.
19    Q   Ma'am?
20        MS. O'CONNOR: Please don't do that
21  Mr. Placitella.  Do you have a question?
22    Q   Can you answer my question?  Do you
23  believe an honest and forthright witness can provide
24  a simple answer to a simple question?
25        MR. GOLDSTEIN: Objection.

Page 68

1        MS. O'CONNOR: Objection.
2    A   Yes, to a simple question.
3    Q   So I'll ask you again.  If the proof
4  demonstrates that there was, in fact, asbestos in
5  Johnson's Baby Powder, then Johnson and Johnson
6  would have exposed millions of people, including
7  babies, to asbestos, correct?
8        MS. O'CONNOR: Objection to the form.
9  Vague and ambiguous, calls for speculation, asked
10  and answered multiple times.
11        MR. PLACITELLA: I want to say one
12  thing.  I know you are pro hoc.  Asked and answered
13  is not a proper objection in our jurisdiction.
14        Can you read my question, please, and
15  I would like an answer.
16        MS. O'CONNOR: She answered your
17  question.
18        MR. PLACITELLA: Please don't do
19  that.  Please don't do that.
20        MS. O'CONNOR: It is argumentative
21  and threatening to the witnesses.
22        MR. PLACITELLA: I'm not threatening
23  anyone.  I'm going to make a phone call if you keep
24  making objection outside of court rules, and I'm ask
25  the lawyer from Drinkle, Biddle to come sit in the

Page 69

1    room if that is required.  So please follow the
2    rules.
3              Can you read my question back.
4              (The above question is read)
5              MS. O'CONNOR:  Same objection.
6
7         A   It is an assumption, yes.  There would
8    be -- depends on how much asbestos you found
9    Circumstances.  But we are talking about pure grade
10   cosmetic talc, there's no asbestos in the product.
11        Q   We are going to get to that.  Do you agree
12   with me that no child should needlessly be exposed
13   to asbestos?
14        A   Yes.
15        Q   Do you agree with me that no adult should
16   needlessly be exposed to asbestos?
17        A   Yes.
18        Q   Do you agree with me that when you were at
19   Johnson and Johnson it was your understanding that
20   safety questions about products must be answered
21   fully and honestly?
22        A   Yes, absolutely.
23        Q   Do you agree with me that if there was
24   asbestos in Johnson's Baby Powder, Johnson and
25   Johnson had a duty to find it?

Page 70

1         A   Well, Johnson and Johnson did test to see
2    if there was asbestos in the product.
3         Q   Here is my question.  Do you agree with me
4    if there is asbestos in the Johnson's Baby Powder,
5    Johnson and Johnson had a duty to find it?
6              MS. O'CONNOR:  Objection to the form
7    of the question.
8         A   They fulfilled that duty by testing for
9    asbestos.
10        Q   You don't know anything about the testing
11   methods that were used, correct?
12        A   No.  That was not my role.
13        Q   Am I correct you don't know anything about
14   whether the testing methods used by Johnson and
15   Johnson were capable of providing the same
16   guarantees you were giving mothers that there was
17   zero chance of asbestos being in Johnson's Baby
18   Powder?
19             MS. O'CONNOR:  Objection to the form.
20   I would object to Mr. Placitella's tone.  You are
21   really starting to cross the line here.
22             MR. PLACITELLA:  Stop it.  We
23   will show the judge the video and --
24             MS. O'CONNOR:  I'll be happy to show
25   the judge the tone of your voice.

Page 71

1              MR. PLACITELLA:  We will her see the
2    whole video and let her decide.
3         Q   Am I correct that -- and I apologize if
4    you think the tone is offensive.  I'll try to dial
5    it down slightly, okay?
6              Am I correct you don't know whether
7    the testing methods used by Johnson and Johnson were
8    capable of providing the same guarantees you were
9    giving mothers that there was zero chance of
10   asbestos being in Johnson Baby Powder?
11             MS. O'CONNOR:  Objection to the form
12   of the question.  You can answer.
13        A   As I said, I'm not an expert in the
14   testing, so I can't speak to the testing.
15        Q   So the answer would be you don't know?
16        A   I don't know.  That's not my role.
17        Q   Do you agree with me that Johnson and
18   Johnson should have used the most sensitive test
19   possible that would work in determining whether
20   there was asbestos in the Johnson's Baby Powder?
21             MS. O'CONNOR:  Objection to the form
22   of the question.  Vague and ambiguous.
23        Q   Let me ask the question this way.  Do you
24   agree with me that Johnson and Johnson had a
25   responsibility to do everything possible to make

Page 72

1    sure there was no asbestos in the talc that was used
2    in their products?
3              MS. O'CONNOR:  Objection to the form.
4    Vague and ambiguous.
5         A   Yes, and I believe that Johnson and
6    Johnson did everything possible.
7         Q   Okay.  And you agree with me that the
8    question of whether there was asbestos or not in
9    products that Johnson and Johnson was selling is a
10   matter of life and death?
11        A   Can you rephrase that question?
12        Q   Yes.  Do you agree with me the question of
13   whether there was asbestos in the Johnson and
14   Johnson talc product is a matter of life and death?
15   Sub.
16             MR. GOLDSTEIN:  Objection to the
17   form.
18             MS. O'CONNOR:  Same objection.
19        A   Again, there's no asbestos in the
20   products.  It is hard for me to answer that.
21        Q   Now, do you have a recollection of working
22   on a case called Krushinski?
23        A   No.
24        Q   Do you recall actually swearing under oath
25   that there was no asbestos in the Johnson's Baby

Page 73

1    Powder?
2        A   I don't recall that, no.
3        Q   Do you recall swearing under oath that
4    there was no asbestos in any of the mines where the
5    baby powder came from?
6        A   I don't recall that, no.
7        Q   Do you recall swearing under oath that
8    there was no Tremolite in any of the mines where the
9    baby powder came from?
10       A   I don't recall that.
11       Q   Do you know what Tremolite is?
12       A   A mineral.
13       Q   Do you know it is a form of asbestos?
14           MS. O'CONNOR:  Objection to the form.
15   You can answer.
16       A   No, I don't know that.
17       Q   Okay.  I'm going to show you what's been
18   marked 277 and ask you to take a look at this.  277,
19   while you're looking at it, is a set of
20   Interrogatories submitted by Johnson and Johnson in
21   the Law Division of Middlesex County in a case
22   called Krushinski versus Johnson and Johnson.  Do you
23   see that?
24       A   Yes.
25       Q   And if you flip to the last page, the last

Page 74

1    page is a certification dated May 23, 2000, correct?
2        A   Yes.
3        Q   And that's your signature?
4        A   Yes, it is.
5        Q   And you signed the certification under
6    penalty of perjury, correct?
7        A   Yes.
8        Q   What you state is that you are employed by
9    Johnson and Johnson Consumer Companies, correct?
10       A   Correct.
11       Q   That you looked at the interrogatory
12   answers that were prepared, correct?
13           MS. O'CONNOR:  I'm going to object.
14           MR. PLACITELLA:  Let me read it and
15   I'll trying to shortcut it.
16       Q   "The foregoing Answers to Interrogatories
17   were prepared with the assistance and advice of
18   counsel for JJCCI upon whose advice and information
19   JJCCI and I relied."  Correct?
20       A   That is what it says.
21       Q   "The foregoing answers are true and
22   correct to the best of my knowledge, information and
23   belief.  If any of the foregoing statements made by
24   me are willfully false, I may be subject to
25   punishment."  Do you see that?

Page 75

1        A   Yes.
2        Q   Now, before think signing this, did you
3    review these Answers to Interrogatories?
4        A   I have to look and see what it is.
5        Q   Please take a minute.
6        A   Okay.
7        Q   And the answer to my question is?
8        A   What was the question?
9        Q   Did you review these answers before
10   signing the certification?
11       A   I would have provided this information to
12   our legal department and reviewed it with our legal
13   department, yes.
14       Q   So, can you tell me what did you do to
15   verify that the information contained in these
16   Interrogatory answers was true and accurate, as you
17   certified?
18           MS. O'CONNOR:  Objection to the
19   form.  You can answer.
20       A   I relied upon the experts, and as it even
21   says here, that the answers were compiled, are from
22   numerous sources, so, again, I was the point person
23   to accumulate the information from the valid
24   sources.
25       Q   So you collected the various documents and

Page 76

1    handed them to the lawyers?  How did it work?
2        A   I don't remember exactly.  This is 17
3    years ago.  My process would have been to identify
4    the appropriate people to answer these and then they
5    would, or maybe the three of us, would have a
6    conversation with our legal department and then it
7    would be compiled, put together.
8        Q   And who were the people that you relied
9    upon to answer these questions, to help you answer
10   these questions?
11       A   Again, departments.  It would be a lot of
12   manufacturing, a lot of quality assurance, looks
13   like pretty much and then they would have
14   information.
15       Q   What people?
16       A   I don't remember the people I dealt with.
17   One person's name is mentioned here and I know he
18   was quality assurance, Randy Quarter.  A long time
19   ago, but I don't remember any names.
20       Q   Did you actually take possession and look
21   at documents before you signed this?
22       A   No.  That wouldn't have been my role to do
23   that, no.
24       Q   So if you didn't physically look at the
25   documents that were being relied upon, how would you

Page 77

1  know they were true, the answers were true?
2       MS. O'CONNOR:  Objection to the form.
3    A   This was done with our attorneys, so the
4  whole process done through the advice of the
5  attorney, too.
6    Q   But with all due respect, it says this is
7  true and accurate to the best of my knowledge, and
8  my question is what specifically did you do to
9  assure yourself that it was true and accurate?  You
10  never looked at a single document
11    A   No.
12       MS. O'CONNOR:  Objection to the form
13  of the question.  You can answer.
14    A   I was relying on the experts.
15    Q   The experts that you relied upon, you
16  don't remember who they were?
17    A   No.  Seventeen years ago.
18    Q   I'm just asking a question.
19    A   No.
20    Q   It says you also relied upon your lawyers.
21  What lawyers?
22    A   It would have been, I think at this time,
23  John O'Shaughnessy, but I'm not sure of the time frame
24  because I don't remember this.
25    Q   Had you executed certifications similar to

Page 78

1  this in other cases?
2    A   Not that I remember.
3    Q   I want to go to a couple.  I'm not going
4  to go through all these questions, but I want to
5  go through a few of them.
6        If you could look on page 5.  By the
7  way, do you remember what this case was about?
8    A   No.
9    Q   Do you know what the injury was that was
10  being claimed?
11    A   Other than what is here, I have no memory
12  of it.
13    Q   What is here?
14    A   Something about talcosis.
15    Q   In 11 you respond referencing medical
16  literature concerning talc and talc companies.  Do
17  you see that?
18    A   I see number 11.
19    Q   Page 5, you also say that you provided
20  studies to the plaintiffs.  Where did you get those
21  studies?
22       MS. O'CONNOR:  Objection to the form.
23    A   I don't know.
24    Q   Can you go to 17 and 18 and I'll blow it
25  up.  Are you with me?

Page 79

1    A   Yes.
2    Q   In 17 you state, "To the best of
3  defendant's knowledge, talc used in the manufacture
4  of Johnson and Johnson Baby Powder never
5  contained asbestos in any form or Tremolite.
6  Defendant's sources of talc were selected for
7  their lack of contaminants and further
8  testing was performed over a significant number of
9  years by outside laboratories, which verified that
10  defendant's talc sources did not contain asbestos or
11  Tremolite."
12        Do you see that?
13    A   Yes, I do.
14    Q   What is the basis of that statement?
15       MS. O'CONNOR:  Objection to the form
16  of the question.  You can answers.
17    A   Again, this would be information that was
18  obtained from the appropriate department.
19    Q   Who gave you that information?
20    A   It would have been either manufacturing or
21  quality assurance.
22    Q   But you don't remember?
23    A   No.  Seventeen years ago, no.
24    Q   It talks about studies and testing done by
25  outside laboratories indicating that the sources did

Page 80

1  not contain asbestos or Tremolite.  Do you see that?
2    A   Yes.
3    Q   Have you ever seen any of that testing
4  information?
5    A   No.
6    Q   Down below it says, number 18, "Over a
7  number of years, defendant had an ongoing process of
8  testing its source talc for Johnson and Johnson's
9  Baby Powder for asbestos, Tremolite or other
10  contaminants"  Do you see that?
11    A   Yes.
12    Q   When you say source talc, you mean the
13  mines, correct?
14       MS. O'CONNOR:  Objection to the form
15  of the question.  You can answer.
16    A   To me that means the talc used in
17  Johnson's Baby Powder.
18    Q   It came from the mines.
19       MS. O'CONNOR:  Same objection.
20    A   Originally.
21    Q   That's talc sources.
22    A   That's the source of the talc.  The source
23  talc is the talc that is used in the powder.  That
24  is the way I interpret that.
25    Q   I want to go back to that in a second.

Page 81

```
1              It says, "It never had asbestos,
2    Tremolite or any other contaminant."  Correct?
3        A   That is correct.
4        Q   And that included heavy metals like
5    arsenic, things like that?
6        A   We are talking about other contaminants
7    and specifically asbestos and Tremolite here.
8        Q   Did you ever have information or were you
9    ever provided information indicating that testing
10   showed that the talc that was used in Johnson's Baby
11   Powder contained arsenic?
12       A   No.
13       Q   How about nickel?
14       A   No.
15       Q   How about Cadmium?
16       A   No.
17       Q   How about chromium?
18       A   No.
19       Q   If that testing existed, is that something
20   you would want to have seen before making the
21   representations to consumers and in sworn Answers to
22   Interrogatories?
23           MS. O'CONNOR:  Objection to the form
24   of the question.  You can answer.
25       A   If there were significant amounts, then we
```

Page 82

```
1    would address it.
2        Q   What does that mean, significant amounts?
3        A   It is, again, one of those things if, if.
4    It is an assumption, so it is hard for me to
5    address.
6        Q   It says in 18, "The testing was performed
7    by outside laboratories, both McCrone and R.J.
8    Lee."  Do you see that?
9        A   Yes.
10       Q   Did you, before signing these, ever see
11   any of the testing results from McCrone and R.J.
12   Lee?
13       A   No.
14       Q   You say in answer to number 17, "The
15   testing that was performed verified that the
16   defendant's talc sources did not contain asbestos or
17   Tremolite."  What does that mean, talc sources?
18       A   It says the Johnson's Baby Powder never
19   contained, and it says the source of talc was
20   selected for the lack of contaminants, but then it
21   was further tested.
22       Q   It says, let's read it.  "Defendants
23   sources of talc."  That is where they got it, right?
24       A   Correct.
25       Q   "Were selected for their lack of
```

Page 83

```
1    contaminants, and further testing was performed over
2    a significant number of years by outside
3    laboratories which verified that the defendant's
4    talc sources did not contain asbestos or tremolite."
5    It doesn't say baby powder, it says talc sources.
6            I'm asking you what did you mean by
7    talc sources?
8        A   Again, that's not my expertise, so I
9    didn't choose those words.  But the important thing
10   here is that it was tested for years and it did not
11   contain asbestos.
12       Q   I understand, but respectfully, you
13   verified these as true and accurate to the best of
14   your knowledge.  You must have known what you meant
15   when you stated it.  My question is what did you
16   mean by talc sources?
17           MS. O'CONNOR:  Objection to the form
18   of the question.
19       A   This was information that was given by the
20   experts in this part of the business, manufacturing
21   and quality assurance.
22       Q   Would the talc source include the mine
23   where the talc came from?
24       A   I didn't write those words, so I don't
25   know what they meant.
```

Page 84

```
1        Q   You have no idea in answering the
2    Interrogatories what you meant when you verified
3    that the talc sources did not have asbestos or
4    tremolite?
5            MR. GOLDSTEIN:  Objection.
6            MS. O'CONNOR:  Objection,
7    mischaracterizes the testimony.
8        A   I relied on the experts and this is the
9    information that they provided.
10       Q   And you are not able to identify for me
11   what experts?
12           MS. O'CONNOR:  Objection to the form.
13   You can answer.
14       A   I've given you names I remember.
15   Seventeen years ago.  I don't remember them all.
16       Q   When these Interrogatories were verified,
17   where were the documents located that backed up
18   these answers?
19           MS. O'CONNOR:  Objection to the form
20   of the question.  You can answer.
21       A   I don't know where they physically were
22   located.  Only the departments and the experts I
23   dealt with for the information.
24       Q   You never physically saw or touched any of
25   the documents that were the basis for these answers?
```

Page 85

1      MR. GOLDSTEIN:  Objection.
2      MS. O'CONNOR:  Objection to the form.
3  You can answers.
4      A   That is correct, I didn't.
5      Q   So if we wanted to find out where the
6  documents were that served as the basis for these
7  sworn responses, how would we find that out?  Who
8  would we talk to?
9      MS. O'CONNOR:  Objection on the form
10  of the question.
11      A   I would direct you to manufacturing or
12  quality assurance, whoever is responsible for that
13  now.
14      Q   Can you look at number 19.  Number 19 asks
15  for prior lawsuits and any testimony, witnesses, et
16  cetera, from prior lawsuits involving Johnson's Baby
17  Powder, and I'm paraphrasing.  You can look at it to
18  make sure I'm doing it correctly.
19      A   Yes, I see that.
20      Q   Is that accurate?
21      A   What this is asking for if there were any
22  claims or allegations of talcosis or pulmonary
23  fibrosis through exposure to Johnson's Baby Powder.
24      Q   Right.  If people testified in those
25  cases, give us the testimony.  Isn't that what it

Page 86

1  asks for?
2      A   Yes.
3      Q   You list here two cases that were filed in
4  Middlesex County, one from 1983 and one from -- one
5  case in Middlesex county in 1983 and another case in
6  California in 1993.  Do you see that?
7      A   Yes.
8      Q   Where did that information come from?
9      A   The legal department.
10      Q   The legal department had possession of
11  these files at the time you answered these
12  Interrogatories.  Is that your understanding?
13      MS. O'CONNOR:  Objection to the form
14  of the question.  You can answer.
15      A   I don't remember, but that would have been
16  the process, yes.
17      Q   So when you listed the Selby case and the
18  Gambino case, that information came directly from
19  documents that were in the possession of the legal
20  department, from your understanding, correct?
21      MS. O'CONNOR:  Objection to the form
22  of the question.  You can answer.
23      A   That there would have been the process,
24  yes.
25      Q   At the time you answered these

Page 87

1  Interrogatories, were the files from the Selby and
2  Gambino case made available to you?
3      A   I don't remember.
4      Q   When you were working --By the way, do you
5  recall working any of these two cases?
6      A   No.
7      Q   When you were working on litigation
8  related to baby powder for Johnson and Johnson, what
9  is your recollection of where the files were being
10  stored that related to that litigation?
11      A   Of anything relating to litigation, would
12  have been stored with the legal department.
13      Q   Do you understand what a litigation hold
14  is?
15      A   Yes.
16      Q   What is a litigation hold?
17      A   My understanding is that once a litigation
18  has been declared, or served, any information that
19  any department has concerning that particular case,
20  should not -- should be given to the law department
21  and/or held until further information.
22      Q   So for example, and you are not allowed to
23  get rid of that, correct?
24      A   Correct.
25      Q   You have to save it in perpetuity.  Am I

Page 88

1  correct?
2      MS. O'CONNOR:  Objection.  Calls for
3  a legal conclusion.  You may answer.
4      A   Untilyou hear further
5      Q   Is it your understanding that a litigation
6  hold would have then been put on the Gambino case
7  back in 1993?
8      MS. O'CONNOR:  Objection.  Calls for
9  speculation.  Calls for a legal conclusion.  You can
10  answer.
11      A   I don't remember.
12      Q   I guess here is my question.  How do we
13  know that the information that was available to you
14  when you were swearing to these Interrogatories in
15  2000 was the same information that was made
16  available in the Gambino case back in 1983?  How do
17  we know?
18      MS. O'CONNOR:  Objection to the form
19  of the question.  Vague, ambiguous, calls for
20  speculation.
21      A   I don't know.  I can't say.  I don't know
22  what was given or done.  I don't know what the
23  Gambino case was about.
24      Q   Well, it involved Johnson's Baby Powder.
25  That's what you stated.

Page 89

```
 1        A   Yes.  I don't know.
 2        Q   Is it your understanding from your
 3   understanding of corporate policy, that everything
 4   from the Gambino case, for example, would have been
 5   preserved under a litigation hold and available to
 6   you when answering discovery in the crush case?
 7            MS. O'CONNOR:  Objection to the form
 8   of the question.  Vague and ambiguous, calls for a
 9   legal conclusion.
10        A   If there were a legal hold, I would abide
11   by the rules of that legal hold.
12        Q   I'm not pointing fingers at you.  What I'm
13   asking you is, it your understanding that whatever
14   information was available in the Gambino case should
15   have been available you to in the Krushinski case?
16            MS. O'CONNOR:  Objection.  Vague and
17   ambiguous, calls for speculation, calls for a legal
18   conclusion.  You may answer.
19        A   I really don't know because other than the
20   fact they may be the same product, I don't know what
21   the case was about, sorry to say.
22        Q   We would have to ask legal to look at the
23   files inside of legal.  Is that fair, too?
24            MS. O'CONNOR:  Objection to the form.
25   Calls for speculation.
```

Page 90

```
 1        A   They would have the files, yes.
 2        Q   I'm looking at the interrogatories that
 3   you answered, and I want to write down something
 4   else.
 5            This is what I'm going to write down
 6   and I want to make sure I ask you first.  According
 7   to the sworn answers you provided, the talc sources
 8   used by Johnson and Johnson to make Johnson's Baby
 9   Powder did not contain any asbestos or Tremolite.
10   Fair?
11            MS. O'CONNOR:  Objection to the form
12   of the question.  You can answer.
13        A   As per the information provided to me by
14   the experts, yes.
15        Q   So that's what I want to write.  I want to
16   rip this off and ask you to look at it and tell me
17   if it is accurate, and if it is, I'm going to have it
18   be marked.
19            MS. O'CONNOR:  Objection.  Vague,
20   ambiguous.  Objection to the creation of the
21   exhibit.  I don't know what you are asking.
22        Q   Does that accurately reflect what you
23   testified to?
24            MS. O'CONNOR:  Same objection.  You
25   may answer.
```

Page 91

```
 1        A   The talc was tested and it was determined
 2   that it did not contain any asbestos or Tremolite.
 3            MS. O'CONNOR:  Mark that Musco-1.
 4            (The above document is marked
 5   Musco-1.)
 6
 7        Q   Am I correct that you and Johnson and
 8   Johnson, when I say you, I mean Johnson and Johnson,
 9   not you personally, knew that the talc used in
10   Johnson's Baby Powder could be inhaled by human
11   beings?
12        A   Yes.  Anything can be inhaled.
13        Q   You knew that the talc that could be
14   inhaled from Johnson's Baby Powder would reach or
15   could reach deep into the lung.  You knew that,
16   correct?
17            MS. O'CONNOR:  Objection to the form.
18   You can answer it.
19        A   Yes.
20        Q   You knew that the talc, once inhaled, the
21   baby powder once inhaled, could travel all the way
22   to a woman's ovary, correct?
23            MS. O'CONNOR:  Objection to the form
24   of the question.  Vague, ambiguous.  You can answer
25   it.
```

Page 92

```
 1        A   No, I didn't know that.
 2        A   But you knew that there was a serious
 3   issue, at the very least, concerning whether the
 4   talc that was inhaled from Johnson's Baby Powder
 5   could reach a woman's ovary, correct?  You knew that
 6   was a serious issue?
 7            MS. O'CONNOR:  Objection.  Vague,
 8   same ambiguous, outside the scope of this case, but
 9   you can answer.
10        A   No.  There was allegations, but no facts.
11        Q   Well, it was a subject that was discussed
12   in a very serious way inside of Johnson and Johnson,
13   whether the talc that would be inhaled could reach
14   all the way to a woman's ovary, correct?
15            MS. O'CONNOR:  Objection to the form
16   of the question.  You can answer.
17        A   Yes, it was discussed in a very serious
18   way because we took any allegations serious.  We
19   didn't ignore anything, whether it came through,
20   from an individual or a group.  So, yes, it was
21   discussed seriously.
22        Q   In fact, it was discussed that -- you
23   discussed whether studies should be done to in fact
24   verify whether that was the case, correct?
25        A   It was discussed whether there was any
```

Page 93

1    truth or any scientific evidence to these
2    allegations, and the best way for us to address
3    them.
4        Q    And discussed was in a serious way,
5    whether a study should actually be conducted by
6    Johnson and Johnson to prove or disprove whether
7    talc inhaled would reach all the way to a woman's
8    ovary, correct?
9            MS. O'CONNOR: Objection to the form
10   of the question. Vague, ambiguous, compound. You
11   can answer.
12       A    I don't remember. I don't know.
13       Q    And in fact, you were part of those
14   discussions, weren't you?
15       A    I was part of the team that would look at
16   the allegations.
17       Q    When it was suggested that a study be done
18   to determine whether inhaled talc could reach all
19   the way to a woman's ovary, that was rejected
20   because it wouldn't be good for Johnson and Johnson
21   to find out the truth, correct?
22           MS. O'CONNOR: Objection to the form
23   of the question. Argumentative, vague, ambiguous.
24   You may answer.
25       A    As I said earlier, I don't remember the

Page 94

1    specific studies that may have been tested -- or
2    discussed. But the important thing is we did take
3    it seriously, and if there was any solid, scientific
4    evidence, we would address that.
5        Q    And it was seriously discussed and it was
6    rejected because it might actually show results that
7    Johnson and Johnson would not have answers to,
8    correct?
9            MS. O'CONNOR: Objection to the form
10   of the question. You can answer.
11       A    That's what you are saying. I don't agree
12   with that.
13       Q    By the way, there was a time when part of
14   your function involved something known as the
15   National Toxicology Program. Do you recall that?
16           MS. O'CONNOR: Objection to the form
17   of the question. Vague and ambiguous.
18       A    It wasn't part of my function.
19       Q    It was something you dealt with in your
20   role?
21           MS. O'CONNOR: Objection to the form.
22   Vacate, ambiguous. You may answer.
23       A    I was part of a team.
24       Q    And who was on that team?
25       A    Would have had toxicology, research and

Page 95

1    development, regulatory, legal. That's as much as I
2    can remember.
3        Q    One of the things you were worried about
4    was whether the National Toxicology Program was
5    going to declare that talc was a carcinogen,
6    correct?
7        A    Yes. Just like I said before, we take all
8    that very seriously.
9        Q    And it is in that context that it was
10   suggested within Johnson and Johnson that we might
11   as well just find out, does inhaled talc reach all
12   the way to a woman's ovary, right?
13           MS. O'CONNOR: Objection to the form.
14   Vague, ambiguous, calls for speculation.
15       A    Those are your words. I don't recall
16   that.
17       Q    I'm going to show you what's been marked
18   262. 262, the Bates number is 576314. We are going
19   to go to the screen now.
20           The top email is dated May 7, 2001,
21   and is from John Hopkins to a whole bunch of people,
22   including yourself, correct?
23       A    Yes.
24       Q    One of the people who gets it is Helen
25   Han Hsu. What was her job?

Page 96

1        A    Toxicology.
2        Q    And this was from John Hopkins. What was
3    his job?
4        A    He was an outside consultant.
5        Q    His email -- he doesn't haven't a Johnson
6    and Johnson email. It is Zoom Company U.K.
7    Correct?
8            MS. O'CONNOR: Objection to the form.
9        Q    Did you know John Hopkins when he worked
10   at Johnson and Johnson?
11       A    No, I did not.
12       Q    So you never had any interaction with John
13   Hopkins? Did you know he worked at Johnson and
14   Johnson?
15       A    No.
16       Q    Your sole interaction with John Hopkins is
17   when he was an outside consultant, correct?
18           MS. O'CONNOR: Objection to the form.
19   You may answer.
20       A    Yes, that is correct.
21       Q    What was his role?
22       A    I cannot say specifically. I don't know.
23       Q    So then the other person this was sent to
24   was Lorena Telofski. Who was she?
25       A    An R and D person.

Page 97

1    Q   Within your division, correct?
2    A   Correct.
3    Q   Owen Rankin we talked about.
4        Fritz Grutzner, who was that?
5    A   Vice-President of the baby company, Baby
6   Products Company.
7    Q   Vice-President of the whole company?
8    A   Of the Baby Division.
9    Q   Then you have the corporate lawyer, John
10   O'Shaughnessy?
11   A   Correct.
12   Q   Then you have Clayton Paterson.  Who was
13   that?
14   A   Regulatory attorney.
15   Q   So he is a lawyer for regulations?
16   A   Yes.
17   Q   Then you have Kathleen Dittman.  Who is
18   she?
19   A   She was a global marketing person.
20   Q   Do you have Sarah Colamarino.  Who was
21   she?
22   A   Communications.
23   Q   Michael Chudkowski you talked about before?
24   A   Yes.
25   Q   Marjorie McTernan?

Page 98

1    A   Regulatory.
2    Q   A lawyer?
3    A   No.
4    Q   Robert Armstrong, he was a doctor?
5    A   Yes.
6    Q   In your division?
7    A   Yes.
8    Q   And Michael Connors, who was he?
9    A   Marketing.
10   Q   Then you have Neal Matheson.  Who is he?
11   A   The head of the R and D.
12   Q   So getting this email from Hopkins is the
13   Vice-President, the head of R and D, the head
14   lawyer, people from regulatory, the head of
15   marketing, all interested in this issue, correct?
16       MS. O'CONNOR:  Objection to the form
17   of the question.  You can answer.
18   A   Yes.
19   Q   If we go down a little further, this
20   starts with an email from Helen, correct?  Actually
21   it starts with an email from Lorena Telofski,
22   correct?
23   A   Yes.
24   Q   Which is then followed by a response from
25   from Helen, correct?

Page 99

1    A   Yes.
2    Q   Helen, it is raised as part of the
3   discussion, whether you are going to share with the
4   federal government the information you have
5   concerning Oral lavage data and the response when
6   someone is exposed to Johnson's Baby Powder,
7   correct?
8        MS. O'CONNOR:  Objection to the form
9   of the question.  You can answer.
10   A   I have to read this.
11   Q   Sure.  Take your time.
12   A   What is the question?
13   Q   It talks about exchanges or information
14   being provided by Johnson and Johnson to the
15   National Toxicology Program, correct?
16   A   Yes.
17   Q   And Helen writes, "For your information,
18   although I did receive the 4-29 meeting minutes
19   recommending the inclusion of the oral lavage data
20   data and the response, I elect not to do so for the
21   reasons below."  Are you with me?
22   A   I see that, yes.
23   Q   It says one.  "I don't know what the oral
24   data would add to the argument we put forth in the
25   document.  NTP, that's at the National Toxicology

Page 100

1   Program, right?
2    A   Correct.
3    Q   "Has not made any connections with oral
4   ingestion of talc.  Why would we want to draw to
5   their attention."  Do you see that?
6    A   Yes.
7    Q   "Two, the purpose of doing an oral study
8   with labeled talc is to understand the kinetics of
9   talc after oral ingestion.  The data would be more
10   important when considering the role talc plays as an
11   excipient."
12   A   That's what it says.
13   Q   And then you asked for comments.  She
14   asked for comments, not you.
15   A   She asked.
16   Q   It is not your role to comment at this
17   point.  That fair?
18   A   That's fair.
19   Q   You are just there to figure out what to
20   tell people once the decisions are made?
21       MS. O'CONNOR:  Objection to the form
22   of the question.
23   A   My role is to explain best whatever
24   the information is it to the consumer.
25   Q   And then the response comes back from John

Page 101

1    Hopkins, right?
2        A    That is what looks like, yes.
3        Q    What I'm trying to understand is to start,
4    why is Johnson and Johnson relying upon an outside
5    consultants for some issue as important as this?  Do
6    you know?
7            MS. O'CONNOR:  Objection.  Called for
8    speculation.  You can answer.
9        A    No, I don't know.
10       Q    Hopkins writes, "I would agree with
11   Helen."  What is her position again?
12       A    Toxicology.
13       Q    He is a toxicologist.  "That including the
14   results of an old oral study, may create issues that
15   do not yet exist."  Correct?
16       A    That's what it says.
17       Q    So he is saying, let's not give that to the
18   federal government, right?
19           MS. O'CONNOR:  Objection to the
20   characterization.
21       A    That is your interpretation.
22       Q    Well, is there was any other why to
23   interpret it?
24           MS. O'CONNOR:  Objection.
25       A    I didn't write it.

Page 102

1        Q    But you were there.  Do you know what the
2    intent was?
3        A    No.
4        Q    It says, "As far as doing a new oral study
5    with radio label."  Do you know what radio label
6    means?
7        A    No.
8        Q    "This is not really good value for money
9    since, although it may show that orally ingested
10   talc can find its way to the ovary, it can raise
11   problems that we don't have answers to."
12           That is what is written to the
13   Vice-President of the company, the head of
14   toxicology and the head lawyer about what
15   information should be provided to the federal
16   government concerning whether talc can reach a
17   woman's ovary, correct?
18           MS. O'CONNOR:  Objection to the form
19   of the question.  Compound, vague.
20       A    That's what it said, what you just read.
21       Q    Am I correct that study was never done?
22       A    I don't know that.
23       Q    Well, do you have any information that
24   that study was ever done?
25       A    No, I don't.

Page 103

1        Q    Do you have any information that the
2    information that Johnson and Johnson had in its
3    possession concerning the ability of talc to reach
4    the ovary discussed in the emails was ever
5    communicated to the federal government?
6            MS. O'CONNOR:  Objection to the form
7    of the question.  You may answer.
8        A    I don't know that.
9            THE VIDEOGRAPHER:   The time is now
10   12:44 p.m.  We are going off the record.
11           (Luncheon recess taken)
12
13
14           THE VIDEOGRAPHER:  The time is 1:34 and we
15   are back on the video record.
16
17   BY MR. PLACITELLA:
18
19       Q    I'm going to spend a few minutes,
20   hopefully not too long, asking about specific
21   information and whether it was shared with you.
22           J & J-8 is an April 15, 1969,
23   J and J memo to William Ashton.  Do you know who
24   William Ashton is?
25       A    I knew of him, yes.

Page 104

1        Q    Did you ever meet him?
2        A    I met him once.
3        Q    The memo is from Dr. Thompson.  Do you
4    know who he was?
5        A    No.
6        Q    Did you know he was at one point the
7    medical director at Johnson and Johnson?
8        A    The name is not familiar to me.
9        Q    The memo starts out that, "Over the years,
10   I have reviewed literature of the hazards related to
11   the inhalation of talc particles on several
12   different occasions.  In your memorandum you
13   indicate Tremolite does have needle type crystals
14   and that our position has been that these can
15   penetrate the skin and cause irritation."  Do you
16   see that?
17       A    Yes, I see there.
18       Q    Then it goes on In the middle, next
19   paragraph it says, "There are reports in the
20   literature concerning talcosis, which, as you know,
21   is a form of pneumocomiosis attributed to the talc."
22           Then if you go down a couple more
23   sentences, "Furthermore, we have occasionally
24   received inquiries from various individuals,
25   including General Johnson and several pediatricians

1   expressing concern over the possibility of the
2   adverse effects of the lungs of babies or mothers
3   who might inhale any substantial amounts of our talc
4   formulations."
5       Were you aware in as far back as 1969
6   the doctors within Johnson and Johnson were
7   discussing risks to babies who might inhale talc
8   from your products?
9       MS. O'CONNOR:  Objection to the form
10  of the question.  You can answer.
11      A   I was not aware of anything written here.
12      Q   It goes down a little further and says,
13  "Obviously, if we do include tremolite, in more than
14  unavoidable trace amounts, this sort of negation of
15  such inquires could no longer pertain."  Do you see
16  that?
17      A   Yes.
18      Q   When you answered the Interrogatories
19  saying there was no evidence of Tremolite, were
20  you aware of this information?
21      MS. O'CONNOR:  Objection to the form
22  of the question.  You may answer.
23      A   This is the first I've seen this.
24      Q   We will go to the next page, please.
25      Dr. Thompson further states, "Since

1   pulmonary disease, including inflammatory
2   fibroplastic and neoplastic types, appear to be on
3   the increase, it would seem to be prudent to limit
4   any possible content of Tremolite in our powder
5   formulations to an absolute minimum."  Do you see
6   that?
7       A   Yes.
8       Q   Were you ever told there was Tremolite in
9   the baby powder formulation?
10      A   Not to my knowledge.
11      Q   It goes on to say a further down, "It is
12  conceivable that a similar situation might eventually
13  arise if it became known that our talc formulations
14  contained any significant amount of Tremolite.  Since
15  the usage of this product is so widespread and the
16  existence of pulmonary disease is increasing, it is
17  not inconceivable that we could become involved in
18  litigation in which pulmonary fibrosis and other
19  lung changes might be, rightfully or wrongfully,
20  attributed to the inhalation of our powder
21  formulations.  It might be that someone in the law
22  department should be consulted with regard to the
23  defensibility of our position in the event such a
24  situation could ever arise."
25      Was this information ever made known

1   you to when you were answering Interrogatories on
2   behalf of Johnson and Johnson?
3       A   I have never seen anything in this memo
4   before.
5       Q   Was this document made available you to to
6   produce for the plaintiffs in the case that you were
7   certifying answers to Interrogatories?
8       MS. O'CONNOR:  Objection to the form.
9   Mischaracterizes her testimony, calls for a legal
10  conclusion.  You may answer.
11      A   I don't remember seeing this.
12      Q   399 is a document that was produced from
13  the files of Johnson and Johnson.  It is entitled
14  Pulmonary Talcosis as a Result of Massive Aspiration
15  of Baby Powder.  Do you see that?
16      A   I see the title, yes.
17      Q   Have you ever seen this document before?
18      A   No.
19      Q   You see that it is from a study from
20  May 1977 and in the published medical literature?
21      A   I see that date, yes.
22      Q   If you go to the next page under
23  discussion, it says, "The major ingredients in most
24  brands of baby powder is talc and we believe our
25  patient had talc pneumoconiosis.  This disease is

1   encountered as an occupational hazard in mining."  Do
2   you see that?
3       MS. O'CONNOR:  Objection to the form.
4       MR. PLACITELLA:  Maybe I read it
5   wrong.
6       Q   "As an occupational hazard in the mining
7   and processing of talc as well as in numerous
8   industries in which talc is used."  Do you see that?
9       A   I see that, yes.
10      Q   And then if you go to the last page, it
11  talks about a case of talc pneumoconiosis being
12  reported by Nam and Gracey in 1972.  Do you see
13  that?
14      A   I see that, yes.
15      Q   "The patient had developed extensive
16  talcosis as a result of liberal use of cosmetic
17  talcum powder over a period of 20 years."  Correct?
18      MS O'CONNOR:  Objection.  You are
19  reading only parts of it.
20      Q   I'll read the whole thing.  "One of the
21  most bizarre cases of talc pneumoconiosis was
22  reported by the Nam and Gracey in 1972.  Although
23  death was from an unrelated disease, the patient had
24  developed extensive talcosis as a result of liberal
25  use of cosmetic talcum powder over a period of

Page 109

1    twenty years." Do you see that?
2        A   I see it says that, yes.
3        Q   Now, when you were telling patients, or
4    consumers, that Johnson and Johnson wasn't aware of
5    any injury resulting from the use of cosmetic talcum
6    powder, were you ever made aware of this article?
7            MS. O'CONNOR:  Objection to the form
8    of the question.
9        A   This is the first I've seen this article,
10   yes.
11       Q   Now, do you still have 408?
12       A   Right.
13       Q   There's a section of the Power Point
14   entitled Disadvantages of Using Powder and Ways of
15   Copying.  I put it up on the screen.  Do you see
16   that?
17       A   I see it on the screen.  I didn't get to
18   it yet.  All right.
19       Q   It says Disadvantages of Using Powder.
20   One, dangers of powder inhalation.  Two, mess,
21   residue on floor, bathmat, dresser.  Do you see
22   that?
23       A   Yes, I see it.
24       Q   So at the time that you were interacting
25   with consumes and the media, did the people at

Page 110

1    Johnson and Johnson tell you that they had
2    determined that were one of the disadvantages of
3    using Johnson's Baby Powder was the dangers of
4    inhalation?
5            MS. O'CONNOR:  Objection to the form
6    of the question.  You may play answer it.
7        A   I don't know that's what this is saying.
8    I don't know the purpose of this document.
9        Q   The title of the document is Baby Powder
10   Usage and Observation Study.  October, November
11   2001.  Correct?
12       A   Yes.
13       Q   That's when you were interacting with
14   consumers and the media about Johnson's Baby Powder,
15   correct?
16       A   That's correct.
17       Q   My question to you is were you aware that
18   it was being discussed at that point in time inside
19   of Johnson and Johnson that there was a danger to
20   using baby powder because of inhalation?
21           MS. O'CONNOR:  Objection to the form
22   of the question.  Vague, ambiguous.
23       A   Again, I don't know the source of this
24   document because it is not mine, nor was I copied on
25   any of it.  So I don't know what the discussion was

Page 111

1    preceding this or after this.
2        Q   I was asking what was communicated to you
3    were you ever told that it was being discussed
4    within Johnson and Johnson that it was dangerous for
5    babies to be around baby powder because of the
6    danger of inhalation?
7        A   No, because I don't believe it is
8    dangerous to be around when it is used properly.
9        Q   We will get to that.
10           If you go a little bit further down,
11   there's a page entitled Insights and Implications.
12   Do you see that?  A few pages down.
13       A   Okay.
14       Q   It says, "Insights.  Powder is messy to
15   use.  Let's out a cloud of dust when you put the
16   bottle down.  Goes everywhere.  Can't aim it where
17   you when you want it.  Difficult to control the
18   amount that comes out."  Did I read that correctly?
19       A   That is what is written there.
20       Q   It says, "Spills when bottle is knocked
21   over."  Correct?
22       A   That's what it says here, yes.
23       Q   There was a point in time when you were
24   actually brought into the discussion at Johnson and
25   Johnson concerning what the risks of inhalation were

Page 112

1    from using baby powder, correct?
2        A   I don't know what you are referring to,
3    brought into the discussion.
4        Q   Did you ever have conversations with the
5    doctors and the scientists at Johnson and Johnson
6    concerning what the risks were to babies who inhaled
7    Johnson's Baby Powder?
8        A   We had many conversations about the
9    product.  As I told you we took any allegations very
10   seriously or any concerns anybody raised.  There
11   were many discussions because of that.
12       Q   Including the poisoning of babies?
13           MS. O'CONNOR:  Objection to the form
14   of the question.
15       A   We did not poison babies.
16       Q   Did you discuss with the doctors at
17   Johnson and Johnson that the inhalation of Johnson
18   Baby Powder would go deep into the lungs of babies
19   and other human beings?
20           MS. O'CONNOR:  Objection to the form
21   of the question.  You can answer.
22       A   No, we didn't have discussions that it
23   would go deep into the lungs, no.
24       Q   I give you a document marked 393, which
25   you look on the very last page, was produced from

Page 113

1    your file.
2        I'm referring to, if you look at the
3    second page -- by the way, you got this document.
4    It says you got it.  Up here, front page, Nancy Musco,
5    confidential.
6        A  It is from me on the top part.
7        Q  There's a string of emails below?
8        A  I assume I got it.
9        Q  If you go to the second page there's an
10   email from Dr. Chase, who worked in your department.
11   The subject is Q and A, regarding baby powder.
12   Importance, high, sensitivity, confidential.  Do you
13   see that?
14       A  I see that, yes.
15       Q  It talks about questions being posed to
16   the doctor.  Do you see that?
17           MS. O'CONNOR:  Objection to the form
18   of the question.
19       A  He has questions.
20       Q  Right.  What is referenced is a file
21   called, "What are the risks of inhalation?"  Do you
22   see that?
23       A  I see that, yes.
24       Q  394 is the next in the collective Bates
25   numbers, and the title is:  What are the Risks of

Page 114

1    Inhalation."  Do you see that?
2        A  Yes.
3        Q  Do you recall this discussion, now looking
4    at this document?
5        A  No, I don't.
6        Q  Do you see where it talks about the risks
7    of inhalation related to the amount of baby powder
8    inhaled?
9            MS. O'CONNOR:  Objection to the form
10   of the question.
11       A  I see what it says here.
12       Q  It says, "The first method of inhalation
13   is that which occurs naturally as with the
14   administration of any powder.  Upon the
15   administration of a minute amount of the powder will
16   be aerosolized and may be inhaled."  Do you see
17   that?
18       A  That's what it says, yes.
19       Q  In your interface with consumers, the
20   media, the federal government, did you ever
21   communicate that you knew that the baby powder would
22   be aerosolized during normal usage and inhaling?
23           MS. O'CONNOR:  Objection to the
24   characterize of the testimony.  Vague and ambiguous.
25       A  No, I don't say that.

Page 115

1        Q  Then right below it it says, "In theory,
2    some particles could, and then there's crossed out,
3    find their way, go lower in the pulmonary
4    system and attach to the lower bronchial tree or
5    even reach the alveolus."  Correct?
6            MS. O'CONNOR:  Objection to the form
7    of the question.  You can answer.
8        A  That is what it says here.  I don't know
9    who wrote this or where it is came from.
10       Q  Talking about that's deep in the lung,
11   isn't it?
12           MS. O'CONNOR:  Objection to the form.
13       Q  It doesn't get any deeper than that.
14           MS. O'CONNOR:  Same objection.
15       A  As I said, I've never seen this before and
16   I don't know who wrote it.
17       Q  It was attached to the email you got.
18           MS. O'CONNOR:  Objection to the form.
19   You can answer.
20       A  If you look, I'm the last one on this
21   email chain and the I was not copied on the latter
22   part of it.
23       Q  They have kept this from you?
24           MS. O'CONNOR:  Objection to the form.
25       A  No, I don't know that I got it.  Maybe I

Page 116

1    did, but I don't remember.
2        Q  Did they ever communicate to you that the
3    doctors within Johnson and Johnson were writing
4    papers indicating that people would inhale
5    baby powder and under normal use and theory, some of
6    that powder would reach the lower bronchial tree and
7    even the alveolus of the lung?
8            MS. O'CONNOR:  Objection to the form.
9    Compound, vague, ambiguous.  You may answer.
10       A  I don't know who wrote this.
11       Q  It also talks about, "Two other ways that
12   the Johnson's Baby Powder could be inhaled,
13   including a method of inhalation which would entail
14   a small amount of talcum being expressed directly
15   from the container into proximity of the know or
16   mouth, or potentially larger amount being expressed
17   intentionally or unintentionally and having a child
18   play with the powder."  Do you see that?
19       A  That is what is says here.
20       Q  It talks about, "That creating a deep
21   inspiration and an inflammatory response that could
22   theoretically lead to gas exchange issues at the
23   level of the alveolus."  Correct?
24       A  No.  It talks about it leading to coughing
25   or sneezing, which are natural measures.

1     Q   It says, "Deep inspiration of a small
2   amount of talcum, as with any powder, would lead to
3   coughing or sneezing, both natural measures against
4   foreign bodies entering the respiratory tract.  A
5   minute amount could be breathed more deeply is
6   unlikely to have a deleterious effect, however,
7   although theoretically, with cross outs,
8   inflammatory responses could theoretically lead to
9   gas exchange issues at the level of the alveolus."
10  Do you see that?
11        MS. O'CONNOR:  Objection to the form
12  of the question.
13    A   I see that it says that here, yes.
14    Q   Was this information ever shared with you?
15    A   This is the first I've ever seen this
16  paper.
17    Q   It goes on to say there's a third way
18  inhalation occur.  It says, "More severe inhalation
19  of large amounts of powder is the third process.  As
20  it relates to this product, this would entail
21  removal of the top of the container and multiple
22  grams of material entering the nose and/or mouth."
23  Do you see that?
24    A   Yes.  That is what it says.
25    Q   Was this information ever shared with you?

1     A   This is the first I've seen this paper.
2     Q   Go back to 393, please, which attaches the
3   paper, "What are the Risks of Inhalation."
4         Now, this is from David Chase, a
5   doctor, correct?
6     A   He is the PhD.
7     Q   A PhD?
8     A   Yes.
9     Q   What he says after reviewing the paper is,
10  "This strikes me as being a fairly complete
11  analysis.  I took the liberty of making a few
12  suggestions concerning wording.  I also have a few
13  larger questions.  Will this document be reviewed by
14  legal, for example, John O'Shaughnessy, who has had a
15  great deal of experience with talc issues over the
16  years."
17        Then he says, "Will it be reviewed by
18  external advisers with experience in talc issues."
19        What is PR advisers, do you know?
20    A   Stands for public relations.
21    Q   So you had external public relation
22  advisers to determine what information you can
23  provide to the public?
24        MS. O'CONNOR:  Objection to the form.
25    Q   Or to help determine?

1         MS. O'CONNOR:  Objection.
2     A   I didn't say this.  I can't guess what
3   David Chase meant.
4     Q   It goes only to say, "Should it include
5   emperical information on levels of exposure, on
6   levels of exposure, know to be likely from the
7   normal use of the product, according to
8   instructions, and on the magnitude of those levels,
9   compared to amounts of exposure needed to induce
10  cancer or any other adverse effects in animal
11  studies."  Do you see that?
12    A   Yes.
13    Q   "I understand that such information is
14  available and has been made available in previous
15  talc PR cases."
16        What is he talking about when he
17  says, "Previous talc PR cases?"
18    A   I don't know.
19    Q   Was it ever communicated to you that
20  Johnson and Johnson had emperical information on
21  just how much exposure would occur from its normal
22  use of Johnson's Baby Powder?
23        MS O'CONNOR:  Objection to the form.
24  You can answer.
25    A   I don't know what David Chase is referring

1   to here.
2     Q   Did they ever discuss with you this issue
3   of the magnitude of levels needed to induce cancer?
4   Was that ever communicated to you?
5     A   The specifics of the tests were not
6   communicated here.  This is a scientist who was
7   asking for specific information, and I don't know
8   what he is referring to.
9     Q   Let me ask you this.  You were in charge
10  of interacting with the public, with consumers, with
11  the media.  Did this Q and A, or did this paper ever
12  see the light of day?  Did you ever see it?
13        MS. O'CONNOR:  Objection to the form
14  of the question.  Vague, ambiguous, compound.  You
15  can answer.
16    A   I don't remember the specific paper, no.
17    Q   Was there any information like this ever
18  provided to consumers, patients, doctors, anybody to
19  your knowledge?
20        MS. O'CONNOR:  Objection.  Compound,
21  vague and ambiguous.  You can answer it.
22    A   What do you mean, information like this?
23    Q   The information that's contained in this
24  document and the attachments.  Was any of this
25  information ever provided to your knowledge to any

1    doctor, media outlet or consumer?
2         MS. O'CONNOR:  Same Objection.
3    A   Information was provided telling the
4    consumers the best way to use the product and that
5    the product was safe.
6    Q   Maybe I wasn't clear in my question.
7         The information concerning the
8    dangers of inhalation and the ability of the product
9    to get deep into the lungs, was that ever
10   communicated to consumers, doctors or the media by
11   you as the person who was the spokesperson for
12   Johnson and Johnson on such issues?
13        MS. O'CONNOR:  Objection to the form
14   of the question, compound, vague, ambiguous.  You
15   can answer.
16   A   The safety of the product and normal use
17   was related to the consumers.
18   Q   Ma'am, that wasn't my question.  My
19   question was did you ever communicate to the
20   consumer, a doctor or the media, the information
21   concerning the risks of inhalation in this document
22   we just went over?
23        MS. O'CONNOR:  Same objection, same
24   answer.
25   A   I would have to answer the same way.  What

1    we talked to consumers and doctors about was the way
2    to use the product and the safety and normal use of
3    the product.
4    Q   Did you ever talk to doctors about the
5    risk of inhalation and the ability of someone during
6    normal use of Johnson's Baby Powder having that
7    powder reach the inner parts of the lung?  Did you
8    ever have that conversation?
9         MS. O'CONNOR:  Objection to the form.
10   Ambiguous, compound.  You can answer.
11   A   We didn't feel there was any danger in
12   normal use of the product.
13   Q   Let's just be clear and then I'll move on.
14   None of the information that was included in the
15   documents we just went over entitled, What are the
16   Risks of Inhalation, was ever communicated by you to
17   any consumer, to any doctor or to anybody else,
18   true?
19        MS. O'CONNOR:  Objection to the form
20   of the question.  You can answer.
21   A   We relayed the safety of the product
22   product when used as intended in normal use.
23   Q   You just refuse to answer my question?
24        MS. O'CONNOR:  Objection.
25   Q   Was that the question I asked you?  I

1    asked you specifically, it is a simple yes or no
2    answer.  Did you provide the information to any
3    doctor, to any consumer, to any media outlet that is
4    contained in the document we went over called What
5    are the Risks of Inhalation?  Did you ever do that?
6         MS. O'CONNOR:  Same objection.  Over
7    broad, vague, ambiguous, compound.  You may answer.
8    A   My answer would have to be the same.  We
9    talked about the normal use and the best way to
10   use the products.  We didn't talk about exaggerated
11   studies or anything like that.  It was the normal
12   use.
13   Q   The answer to my question is no, you never
14   provided this information, correct?
15        MS. O'CONNOR:  Same objection.
16   A   We provided safety information based on
17   the normal use.
18   Q   So the answer to my question is no, you
19   never provided the information and the inhalation
20   risks documents we went through, correct?  You
21   really refuse to answer the question?
22        MS. O'CONNOR   objection.
23   Mischaracterizing --
24   Q   Let me ask you this question.  You met
25   with counsel 16 hours?

1         MS. O'CONNOR:  Again,
2    mischaracterizing the testimony.
3    A   Not 16, 12.
4    Q   12, and you didn't get paid for that,
5    right?
6    A   No.
7    Q   So why did you take 12 hours of your busy
8    lie to meet with counsel rather just come in answer
9    the questions completely and without coaching?
10        MS. O'CONNOR:  Objection.
11   Argumentative.
12   A   I wouldn't call it coaching.
13        MS. O'CONNOR:  Please make sure you
14   don't discuss anything we discussed in our meetings.
15   A   I took the time without getting paid
16   because it is something I care very deeply about.
17   Q   You wanted to help Johnson and Johnson?
18        MS. O'CONNOR:  Don't interrupt her
19   answer, please.  Continue your answer.
20   A   As I said, I care very deeply about the
21   products.  I truly believe in the sincerity of
22   Johnson and Johnson.  We are not going to go and
23   market a product that is going to kill people that's
24   ridiculous.
25        I really care and I care that

Page 125

1  misinformation has been given to the public.  That's
2  why I spend my time volunteering.
3      Q    You wanted to help Johnson and Johnson
4  depends itself, right?
5          MS. O'CONNOR:  Objection.
6  Mischaracterizes the testimony, argumentative.  You
7  can answer.
8      A    I want to make sure the right, correct
9  information reaches consumers.
10     Q    Even if you weren't provided the right,
11 correct information yourself, correct?
12         MS. O'CONNOR:  Objection to the form.
13 You can answer.
14     A    As I said, I wanted to make sure the right
15 information reaches them.
16     Q    We are going to spend some time and with
17 your permission I'll put this deposition up on the
18 internet and you will have your answer.  How about
19 that?
20         MS. O'CONNOR:  Wildly inappropriate,
21 argumentative.  You don't have to answer that
22 question.
23     Q    Am I correct that Johnson and Johnson
24 never told you that it had no idea what the exact
25 particle size were of the baby powder in evaluating

Page 126

1  how much of it can reach the lungs of babies and
2  other human beings?
3          MS. O'CONNOR:  Objection to the form.
4  You you may answer.  Is there a question there?
5      A    Rephrase it, please.
6      Q    Sure.  Am I correct that Johnson and
7  Johnson did not know, and never studied, what the
8  size range of particles were in Johnson's Baby
9  Powder in order to estimate correctly just how much
10 talc would reach the lungs of a human being?
11         MS. O'CONNOR:  Objection to the form
12 of the question.  Compound, vague and ambiguous.
13 You may answer.
14     A    I don't know the specific study.  That
15 would have been in the field of microbiology.
16     Q    392 starts with an email from David Chase
17 to Mathew Noble and other people in your
18 department, including yourself, correct?
19         MS. O'CONNOR:  Objection to the form
20 of the question.  You may answer.
21     A    It is a long thing.
22     Q    Let's get the title of the first email and
23 then we will go backwards.
24     May 22, 2009 from
25 Charlie Wajszczuk to Dr. David Chase, Mathew Noble,

Page 127

1  yourself and a number of other people, correct?
2      A    Yes.  I'm copied on this.
3      Q    The subject is talc particle size
4  distribution.  Do you see that?
5      A    That's what it says, yes.
6      Q    It starts out, there's an earlier memo
7  dated May 21, 2009 to yourself from Charles
8  Wajszczuk, and I'll pull it up so we are all on the
9  same page.
10         MS. O'CONNOR:  Can we have your
11 question?
12     Q    Charles Wajszczuk, subject talc particle
13 size distribution, and he asks -- by the way, he is
14 a doctor, right?
15     A    That's correct.
16     Q    He worked in your department?
17         MS. O'CONNOR:  Objection to the form.
18 You can answer.
19     A    He worked in research and development,
20 yes.
21     Q    He asks, "Do we have an actual size of our
22 talc particles?  Specifically how many, or what
23 percentage in the final product are less than point
24 one micrometer or greater than point one micrometer,
25 but less than point one micrometer or one to five

Page 128

1  micrometers, but greater than five, but less than
2  ten micrometers."  Do you see that?
3      A    Yes.
4      Q    And in one of the responses from Katharine
5  Martin on the page before -- who is Katherine
6  Martin, by the way?
7      A    She was the director of research and
8  development.
9      Q    She was head of R and D?
10         MS. O'CONNOR:  Objection.
11     Q    That's different?
12     A    One of the directors.
13     Q    She writes, "Do we have the ability to run
14 particle size distribution internally or access this
15 from our suppliers?  We need for our powders
16 globally, including talc and corn starch.  Any
17 thoughts."  Did I read that correctly?
18     A    That's what it says.
19     Q    Before that, Charles says he needs this
20 information vital to your argument, correct?
21     A    He says this may well be vital.
22     Q    Right.  Then if you go to the very front
23 page, Dr. Chase responds by saying he would be in
24 favor of finding out what the particle size
25 specifications are for cosmetic grade talc, right?

Page 129

1    A   That's what it says.
2    Q   Who is Mathew Noble?  What was his job?
3    A   I believe he was Global R and D director.
4    Q   He was in charge of or he was a director
5    for of R and D on a global basis?
6    A   One of them, yes.
7    Q   Who was Euen Gunn?
8    A   He was also an R and D director.
9    Q   Who was they Delores Santora?
10   A   Development person.
11   Q   When it says it has the designation JJISG
12   for Mathew Noble, what does that stand for?
13   A   Whatever country he was from.
14   Q   He wasn't in the U.S.?
15   A   No.
16   Q   Dr. Chase writes, "He would be in favor of
17   finding out what particle size specifications are
18   for cosmetic grade talc."  Do you see that's?
19   A   That's what it says, yes.
20   Q   As of May 22, 2009, the people on this
21   email, they don't have any idea what the particle
22   size is for all of the cosmetic grade talc, do they?
23       MS. O'CONNOR:  Objection to the
24   characterization of the document.  You may answer.
25   A   It appears they are asking for it.

Page 130

1    Q   The response is, and you got a copy of
2    this from Charles Wajszczuk, "The size does matter.
3    As to the particle's ability to reach the alveolus.
4    There are two issues that make bronchoscopy
5    necessary.  Mechanical obstruction or physiologic
6    interference with blood gas exchange.  The first
7    seems to be the issue with talc.  Particles
8    accumulate and form a material blockage in the
9    bronchial tree."  Do you see that?
10   A   Yes.
11   Q   Then the next paragraph talks about the
12   inherent bias of powder reaching the aveoli is
13   probably what accounts for the former years have
14   been many more bronchoscopies."  Do you see that?
15   A   That's what it says, yes.
16   Q   So apparently you did know that Johnson's
17   Baby Powder had the ability to reach deep into the
18   lungs, didn't you?
19       MS. O'CONNOR:  Objection to the form
20   of the question.  You may answer.
21   A   I don't remember this.
22   Q   Was any of this information that you don't
23   really know as of 2009, what has size of the
24   particles were inside the can of Johnson's Baby
25   Powder?  Was that information ever communicated to

Page 131

1    any consumer?
2        MS. O'CONNOR:  Objection to the form
3    of the question.  Compound, vague, ambiguous.  You
4    may answer.
5    A   I don't see what that has to do with what
6    a consumer's question may have been.  I don't know
7    if that was ever given.  I don't know.
8    Q   How about any doctor?  Certainly a doctor
9    would want to know this, don't you think?
10       MS. O'CONNOR:  Objection to the form.
11   A   I don't know.
12   Q   Did you ever give that information to any
13   doctors?
14       MS. O'CONNOR:  Objection.
15   A   I personally didn't, no.
16   Q   Do you have any evidence as you sit here
17   today that this information was ever communicated by
18   Johnson and Johnson to any doctors?
19       MS. O'CONNOR:  Objection to the form.
20   You may answer it.
21   A   I don't know.
22       MR. PLACITELLA:  Mark this Musco-2.
23       (The above document is marked
24   Musco-2.)
25

Page 132

1    Q   I'm not going to do all of that.  That's
2    the good news.
3        I'm going to tell you what that is.
4    Those are all the tests that I marked at a
5    deposition of John Hopkins when he was testifying on
6    behalf of Johnson and Johnson about whether or not
7    there was asbestos ever found in Johnson's Baby
8    Powder or the mines that the baby powder came from.
9    I want you to just quickly glance through that.
10       Tell me whether you have ever seen
11   any of those tests.
12   A   That's a lot of tests.
13   Q   You can flip through them.  I'm assuming
14   the answer is no, because you told me you saw
15   nothing else.
16   A   I don't want to flip through anything.  I
17   wouldn't have seen tests.  It would not be anything
18   I would deal with.
19   Q   When you answered the Interrogatories
20   under oath in the Krushinski case, do you have any
21   evidence that you turned any of what's in there over
22   to the plaintiff's lawyers?
23       MS. O'CONNOR:  Objection to the form of
24   the question.  That is not what she attested to.
25   Calls for a legal conclusion.  You may answer.

Page 133

1      A   What I provided was input into information
2  that was on those pages, and anything that was given
3  to the lawyers would have been between the lawyers.
4      Q   You never saw physically any of the
5  testing documents, so as you sit here today, you
6  can't really testify under oath that there were no
7  testing documents showing there was asbestos in
8  Johnson's Baby Powder or the mines from which it
9  came, because you never looked at the documents
10  yourself, correct?
11          MS. O'CONNOR:   Objection, vague,
12  ambiguous compound.   You can answer.
13      A   My job was not to look at and review the
14  study.   I was part of a team.   I relied on that team
15  for the expertise of that team.   Just like a nurse
16  taking care of my patients.   I am not privy to
17  everything about them, but I'm the communicator.
18      Q   I understand that, Ma'am, but you actually
19  certified under oath about what information was
20  available and I didn't see anything in the
21  Interrogatories that you certified about any tests
22  showing that was asbestos in either Johnson's Baby
23  Powder at any point in time, or in any of the mines
24  that were used to supply that powder.   Do you agree
25  with me?

Page 134

1          MS. O'CONNOR:   Objection to the form.
2  Compound, vague, ambiguous, calls for a Legal
3  conclusion.   You can answer.
4      A   What I answered were the direct questions
5  asked.   Any testing provided, again, was from the
6  lawyers.
7      Q   So the lawyers made the determination as
8  to what was going to be communicated and what was
9  not going to be communicated.   It was not you.   Is
10  that fair?
11          MS. O'CONNOR:   Objection to the form
12  of the answer.
13      A   Since it was a legal matter, they were the
14  appropriate person to make the final decisions.
15      Q   If there was information that was
16  withheld, that was done by the lawyers, not you?
17          MS. O'CONNOR:   Objection to the form
18  of the question.   Vague, ambiguous calls for
19  speculation.   You may answer.
20      A   The appropriate information was given.
21      Q   What do you mean by that?
22      A   It was what was determined appropriate for
23  the particular question.
24      Q   Was it appropriate if you had information
25  in your possession showing that there was asbestos

Page 135

1  testing showing asbestos in the mines, would that
2  have been appropriate information to supply in the
3  Interrogatory answers that you certified as true and
4  accurate?
5          MS. O'CONNOR:   Objection to the form
6  of the question.   Vague, ambiguous, mischaracterizes
7  the testimony
8      A   Again, what was provided was answers to
9  those questions as determined by legal counsel.
10      Q   So your role was just to sign it without
11  ever reviewing anything, just relying on whatever
12  the lawyers told you?
13          MS. O'CONNOR:   Objection,
14  argumentative.
15      Q   Right?   That's what happened here?
16          MS. O'CONNOR:   I don't know how many
17  times you are going to mischaracterize documents.
18      A   I was the point person.   I provided the
19  names or departments of the correct people who could
20  give the information and the final say of that was a
21  legal matter.
22      Q   But you did nothing other than to talk to
23  the lawyers to verify whether the information you
24  supplied in Interrogatories was the truth and the
25  whole truth, correct?

Page 136

1          MS. O'CONNOR:   Objection to the form.
2  Argumentative, calls for speculation.   You can
3  answer.
4      A   No,  what I did is to make sure the
5  correct people were provided the appropriate
6  information.
7      Q   You never verified that information
8  yourself, correct?
9      A   That was not my job.
10      Q   That was not your job?
11          MS. O'CONNOR:   Objection.
12          MR. PLACITELLA:   Mark this Musco-3.
13          (The above document is marked
14  Musco-3.)
15
16      Q   You have in front of you a that was marked
17  at Dr. Hopkins's deposition that was created during
18  his deposition, which we have now marked as Musco-3.
19  I ask you to take a look at that.   You have never
20  seen this chart before, correct?
21      A   No.
22      Q   Although you spent somewhere around twelve
23  hours with the lawyers preparing for this
24  deposition, they never shared this chart with you,
25  correct?

Page 137

1      A   This is the first I've seen it.
2      Q   As you will see the chart goes in
3  chronological order.
4      A   It starts in 1967.  It seems to be, yes.
5      Q   We can put it up on the screen and do it
6  easier.
7          This chart, as you see, has the date,
8  the testing entity, the author, the purpose, the
9  method, the mine, what was tested, the precautions
10  and what the tests revealed.  Do you see that?
11     A   Yes.
12     Q   No one ever shared with you the tests from
13  1971 done by Johnson and Johnson on baby powder
14  production where the revelation was Tremolite and
15  Actinolite, correct?  That was never shared with
16  you?
17         MS. O'CONNOR:  Objection to the form.
18  You can answer.
19     A   No.
20     Q   No one ever shared with you the test from
21  1971 done by McCrone.  McCrone is one of the
22  companies you actually list in the Answers to
23  Interrogatories you signed, correct?
24     A   I remember that name was there.
25     Q   They did a test of Shower to Shower and

Page 138

1  found traces of chrysotile in one of the additives.
2  That was never shared with you, correct?
3      A   This is the first I've seen it.
4      Q   Did you ever see a test from August 1972
5  done by Johnson and Johnson of Shower to Shower
6  finding about one fiber rod or needle for every 500
7  particles, approximately one-third being Tremolite.
8  Have you seen that?
9          MS. O'CONNOR:  Objection to the form.
10  You can answer.
11     A   I've not seen it, no.
12     Q   Did you ever see a test from 1972 done by
13  Sperry Rand on Shower to Shower where the document
14  indicated asbestos fibers could be detected in the
15  sample report on chrysotile.  Did you ever see that?
16         MS. O'CONNOR:  Objection to the form.
17     A   No.
18     Q   How about 10-27-72, done by McCrone of
19  Johnson Baby Powder batch saying both samples
20  containing insignificant amount of Tremolite.  Do
21  you see that?
22     A   No, I didn't see anything about
23  insignificant amount.
24     Q   Your interrogatory answers say there was
25  never tremolite, right?

Page 139

1          MS. O'CONNOR:  Objection to the form
2  of the question.
3      A   I'm not familiar with this.  I didn't read
4  the exact testing.  This the first I've seen it.
5      Q   Here is my issue.  You are looking into
6  the camera saying you believe everything was done
7  right and you say that, but you haven't seen any of
8  the tests on this chart to make that evaluation for
9  yourself, right?
10         MS. O'CONNOR:  Objection to the form.
11  Argumentative, vague, ambiguous.  You can answer.
12     A   My role was not to read or assess the
13  studies done.
14     Q   How about the test that was done by
15  Johnson and Johnson on Johnson's Baby Powder in 1973
16  that showed Tremolite or Actinolite.  You haven't
17  seen there either, right?
18     A   Again, my role was not to look at the
19  tests.
20     Q   And you never saw the tests on baby powder
21  from 4-27-73, correct?
22     A   No.
23     Q   You never saw the test on Shower to Shower
24  done by the FDA in September 1973, correct?
25         MS. O'CONNOR:  Objection to the form.

Page 140

1  You may answer.
2      A   No, I did not.
3      Q   Is it fair to say you want to look at it
4  again, that you have never seen any of the tests set
5  forth on this spreadsheet that was created with the
6  assistance of Johnson and Johnson's corporate
7  representative under oath?
8          MS. O'CONNOR:  Objection to the form.
9  You may answer.
10     A   I would not have seen this.
11     Q   Open the book to the number 19.  Do you
12  have it in front of you?
13     A   Which one are you specifically referring
14  to?
15     Q   I put it up there a July 29, 1971, memo
16  from Nashed to Mr. Foster on Johnson and Johnson
17  letterhead.  Do you see that?
18     A   Yes, I do.
19     Q   It states the talc used in Johnson's Baby
20  Powder is obtained from a selected mine in Vermont
21  where the ore consists of mainly of platy talc with
22  only trace amounts of fibrous minerals, that's
23  Tremolite slash actinolite, do you see that?
24     A   That's what it says, yes.
25     Q   When you swore under oath in the

Page 141

1  interrogatory answers that tremolite was never found
2  in the mines or sources form Johnson's Baby Powder,
3  this information was never shared with you, correct?
4      MS. O'CONNOR:  Objection to the form
5  of the question.  Misstates her testimony
6  and the document.  You may answer.
7      A   As I explained earlier, my role was not to
8  assess the results of studies.  My role was to
9  communicate and I worked with all the experts and
10  provided the information to the consumers they told
11  me.
12      Q   Whatever they told you.  So the
13  information you provided was only as good as what
14  they told you, correct?
15      MS. O'CONNOR:  Objection to the
16  form.
17      A   No.  I trusted the experts I worked with
18  through the years.  That's one thing I always
19  valued.
20      Q   When you swore under oath under penalty of
21  perjury that tremolite was never found in any of the
22  sources for Johnson's Baby Powder, was the
23  information in the documents in front of you ever
24  conveyed to you?
25      MS. O'CONNOR:  Objection to the form.

Page 142

1  You may answer.
2      A   This the first I've seen this.
3      Q   Look at tab 26.  It is all in there.  We
4  can just go by those and make your life easier.
5          26 is a memo from the desk of Mr.
6  Nashed.  Do you know who he was?
7      A   No.
8      Q   Do you know who Dr. Gowdy was?
9      A   No.
10      Q   Do you see where it talks about trace
11  amounts of the tremolite being found and that this
12  was nothing new in that it was found by both
13  McCrone and Bill Ashton?
14      A   Yes, I see that.  The levels are extremely
15  low.
16      Q   This information was not provided to you
17  when you swore under oath in interrogatory answers
18  that tremolite was never found in any of the sources
19  for Johnson's Baby Powder, correct?
20      MS. O'CONNOR:  Objection
21  Mischaracterization.  You may answer.
22      A   This is the first I've seen it.
23      Q   Do you know who Alice Blount is?
24      A   No.
25      Q   Do you know she was a geologist that

Page 143

1  worked for Rutgers and was paid by Johnson and
2  Johnson?
3      A   I don't know the name.
4      Q   Do you know that she worked as a
5  consultant to Johnson and Johnson to assist them in
6  litigation?
7      A   I never hear the name.
8      MS. O'CONNOR:  Objection to the form.
9      Q   Do you know that she told Johnson and
10  Johnson before you ever swore under oath that there
11  was no evidence of asbestos in Johnson's Baby
12  Powder, that she actually tested the baby powder and
13  found asbestos.  Did you know that?
14      A   Could you rephrase the question?
15      Q   Sure look at 220.  This is a letter from
16  Alice Blount, mineralogist, to the lawyers for
17  Johnson and Johnson dated April 23, 1998.  Do you
18  see that?
19      A   That is what it says her, yes.
20      Q   In here she talks about the studies she
21  did on Johnson and Johnson's Baby Powder, correct?
22      A   I have to read it.
23      Q   Sure.  Take your time.  Dr. Blount says,
24  "Although my papers report an improved method for
25  analysis, the determination for the samples labeled

Page 144

1  I, Johnson and Johnson Vermont Talc, have been done
2  by the traditional methods as well."
3          Then she goes on to say, "as I told
4  you, I believe that Johnson and Johnson's Vermont
5  talc contains trace amounts of asbestos which are
6  well below those specified by OSHA."  Do you see
7  that?
8      A   Yes.
9      Q   First time you ever heard this?
10      MS. O'CONNOR:  Objection to the form.
11  You can answer.
12      A   This is the first I've seen it.
13      Q   218 is a March 16, 1998 letter to John
14  O'Shaughnessy, correct?
15      A   Yes.
16      Q   John O'Shaughnessey is the same lawyer that
17  was copied on all these emails we went through this
18  morning, right?
19      A   His name was on a lot of them, yes.
20      Q   And he knew when you were answering
21  Interrogatories in the crush case.  He was part of
22  that process, correct?
23      A   To the best of my knowledge, he was the
24  lawyer, yes.
25      Q   And this letter is written by one of the

Page 145

1  lawyers at Mahaffey and Weber to Mr. O'Shaughnessy
2  concerning the company's Coker case.  Do you see
3  that?
4      A  I would have to read all this.
5      Q  It is important so why don't you take a
6  second and look at it.
7          Bates number on that last page 64591
8  and 65492.  Now, this letter to Mr O'Shaughnessy
9  states that the lawyers spoke with Alice Blount and
10 the possibility of retaining her as an expert.  Do
11 you see that?
12     A  Yes.
13     Q  She is a geologist and mineralogist who
14 has written extensively on talc and asbestos
15 contamination in commercial talc preparations,
16 correct?
17     A  That's what it says yes.
18     Q  She was a former professor at Rutgers,
19 right?
20     A  That's what it says.
21     Q  The next page says she was actually a
22 consultant to Johnson and Johnson, right?
23     A  Yes.  That's what it says.
24     Q  She said, what they state is, although dr.
25 Blount seemed less than ecstatic about the idea of

Page 146

1  testifying in a legal proceeding, she agreed to
2  consult in the case if we desired her to do so.  But
3  stated that, "In her opinion, commercial talcum
4  powder preparations, including Johnson and Johnson's
5  Baby Powder, contain trace amounts of asbestos."  Did
6  I read that correctly?
7      A  That's what it says here, correct.
8      Q  That's the first time you ever heard that?
9          MS. O'CONNOR:  Objection to the form.
10     A  I've never seen this before.
11     Q  When you swore under oath in the crush
12 case that there was no evidence of asbestos in the
13 Johnson Baby Powder, no one gave you this document
14 or told you anything about Alice Blount, correct?
15         MS. O'CONNOR:  Objection to the form
16 of the question.  You may answer.
17     A  This is the first I've hear of her, but
18 when you go on to read, she talks about it being a
19 well below limits.
20     Q  Yes, Ma'am, but what you stated, and I
21 have it here this is what you told everybody from
22 1981 until the day you left, there is no evidence
23 that Johnson's Baby Powder contained any amounts of
24 asbestos and that there never was and there never
25 will be.

Page 147

1          This document is absolutely
2  inconsistent with that representation, is it not?
3          MS. O'CONNOR:  Objection to the form.
4  Argumentative, vague, ambiguous.  You can answer.
5      A  This is the first I heard of this Dr.
6  Blount.  First I've seen this, so I can't comment on
7  it.
8      Q  If you had this information in your
9  possession, would you have signed sworn Answers to
10 Interrogatories under oath saying that there is no
11 evidence?
12         MS. O'CONNOR:  Objection to the form
13 of the question.  You are mischaracterizing a
14 document she signed.
15     Q  Let me ask you this.  Would you have told
16 patients, doctors, the media outlet, that there is
17 no evidence whatsoever that Johnson's Baby Powder
18 contained any amounts of asbestos and there never
19 was and there never will be, if this information was
20 you provided to you?
21         MS. O'CONNOR:  Objection to the form.
22 You can answer.
23     A  I think it is important to read everything
24 that it said here and not to take things out of
25 context so that the consumer has the information.

Page 148

1      Q  But you never told consumers about any of
2  this, right?
3          MS. O'CONNOR:  Objection to the form.
4      A  As I stated earlier, this the first I've
5  hear of this woman and the first I've seen it, so i
6  can't comment.
7      Q  Is it shocking to you?
8          MS. O'CONNOR:  Objection to the form.
9  Vague, ambiguous.
10     A  No.
11     Q  It is not shocking to you that you sat
12 with the lawyer for twelve hours in preparation for
13 this deposition and they had this information in
14 their possession, along with everything in that book
15 and they never showed it to you and they let you
16 come in here and testify?  That's not shocking to
17 you?
18         MS. O'CONNOR:  Objection to the form.
19 Argumentative, inappropriate.
20     Q  It is not shocking to you?
21     A  It doesn't shock me, no.
22     Q  Now, at some point in time you actually
23 took control and possession of all of the toxicology
24 files related to talc in Johnson's Baby Powder,
25 didn't you?

Page 149

1      A   No.  That belonged with the toxicology
2  department.
3          MS. O'CONNOR:  Wait for a question.
4      Q   Did you ever review the toxicology file
5  related to talc in Johnson's Baby Powder?
6      A   No, I did not.
7      Q   Who is Steve Mann?
8      A   One of the toxicologists.
9      Q   Who is Rachel Grossman?
10     A   One of the medical directors.
11     Q   Medical directors of who?
12     A   Medical director of Johnson and Johnson
13 Consumer Products.
14     Q   Let me show you 390.  390 is a January 7,
15 2002 email from Stephen Mann that mentions you,
16 correct?
17     A   My name is here, yes.
18     Q   And the first email in the string is from
19 you, correct?  January 2, 2002.
20     A   Yes.
21     Q   You sent that email to the medical
22 director and one of the head toxicologists at
23 Johnson and Johnson, correct?
24     A   Yes  One of the toxicologists, yes.
25     Q   And you write, "Steve, Mike Chudkowski

Page 150

1  left all of the talc corn starch slash CPSC files."
2  What does that mean?
3      A   Consumer Products.  I'm not sure of the
4  other.
5      Q   "In my office when he retired.  These
6  approximately five boxes, all seem to be full of
7  toxicology data."  Do you see that?
8      A   I do.
9      Q   How did you know they were full of
10 toxicology data?
11     A   They seemed to be full.
12     Q   Did you look in the boxes?
13     A   I looked in the boxes.  I don't remember
14 doing this, but I'm sure I gave it a cursory look.
15     Q   Once you had this information in your
16 possession, did you ever actually look at it before
17 you continued to tell consumers, doctors, media
18 people that Johnson's Baby Powder is perfectly safe?
19          MS. O'CONNOR:  Objection to the form.
20 Compound, vague and ambiguous
21     A   I don't remember.  These were apparently
22 kept in my office and I passed them on to
23 toxicology.
24     Q   Did you disclose any of these files when
25 you were the point person in the crush case, since

Page 151

1  they related to the toxicology of talc and corn
2  starch?  Did you disclose any of these files?
3          MS. O'CONNOR:  Objection to the form.
4  Mischaraterizes the document.  Vague, ambiguous.
5      A   No.  As I stated earlier, I didn't
6  physically handle the studies.
7      Q   Although you were the point person that's
8  what you told us, so all those when you were the
9  point person, none of this information was
10 ultimately turned over in the crush case, was it?
11          MS. O'CONNOR; Objection to the form.
12 Calls for speculation.
13     A   No, I didn't say that.  The point person
14 was ensuring that the correct and appropriate person
15 was answering the questions.
16     Q   To your knowledge this information was
17 never identified by you and turned over in the Krushinski
18 case, correct?
19          MS. O'CONNOR:  Objection to the form.
20     A   As I said, I didn't handle any copies of
21 studies or anything.
22     Q   The follow up email says that the boxes
23 were taken from you and placed near Paul Sterchele.
24 Who is Paul Sterchele?
25     A   A toxicologist.

Page 152

1      Q   And Mann says that he also has five
2  binders that Mike Chudkowski left that are in his
3  office, correct?
4      A   That's what it says.
5      Q   And were those binders ever turned over in
6  the course of litigation up to this point?
7          MS. O'CONNOR:  Objection to the form.
8  Calls for speculation, calls for a legal conclusion,
9  ambiguous, vague.
10     A   I don't know what specifically was given
11 lawyer to lawyer.
12     Q   Did you ever identify, as the point
13 person, binders related to talc that were in Mike
14 Chudkowski's office when you were responding to
15 helping to respond to discovery in the talc related
16 lawsuits?
17          MS. O'CONNOR:  Again, mischaracterizes
18 the testimony.
19          MR. PLACITELLA:  I'm asking a
20 question.  I'm not mischaracterizing.
21          MS. O'CONNOR:  You are.  You are
22 building into your question a characterization of
23 her testimony that she told you she wasn't.  But you
24 can continue to do it and I'll continue to object.
25     Q   Let me ask the question differently.  I

Page 153

1    don't want your lawyer to get mad at me.
2       Q   Before when you were answering discovery
3    responses, and swearing under oath as to the
4    accuracy of those responses, were you aware of the
5    binders referenced in this email?
6          MS. O'CONNOR:  Objection to the form.
7    Vague, ambiguous, compound.  You can answer.
8       A   I can't remember whether I was aware of
9    them.  They were certainly toxicology information.
10   It is up to the toxicologist.  I don't know that I
11   knew they had it or not.
12      Q   Were you aware that there was a whole file
13   on five boxes of toxicology information at the time
14   you swore under oath in the Krushinski case?
15          MS.O'CONNOR: Objection to the form.
16   You may answer it.
17      A   I don't know that I knew there were five
18   boxes or ten boxes.  I knew every department had
19   information.
20      Q   Do you know what ultimately happened to
21   this information, these boxes and the binders?
22      A   They are in the toxicology department.
23      Q   That's where you would expect them to be?
24      A   If they were toxicology reports, yes.
25      Q   Because by this time there was definitely

Page 154

1    a litigation hold and they weren't allowed to get
2    rid of them, right?
3          MS. O'CONNOR:  Objection to the form.
4    Calls for a legal conclusion.  You can answer.
5       A   I don't know if there was a hold at this
6    time or not.
7          MS. O'CONNOR:  I need to interpose an
8    objection on exhibit 218 and request you not
9    question the witness further about this document.  I
10   think this is privileged.
11          MR. PLACITELLA:  It has never been
12   used in a trial?
13          MS. O'CONNOR:  I don't know if this
14   version has.  I need to check on this.
15          MR. PLACITELLA:  I won't ask anymore
16   questions then.  I don't want to get myself in
17   trouble or anybody else.
18          THE VIDEOGRAPHER:  The is now 2:52
19   p.m. and we are going off the record.
20
21          THE VIDEOGRAPHER:  The time is 3:06
22   and we are back on the video record.
23
24      Q   As the spokesperson for Johnson and
25   Johnson related to products, baby powder, was it

Page 155

1    part of your responsibility never to misrepresent to
2    the public who you were and who you worked for?
3          MS. O'CONNOR: Objection to the form
4    of the question.  You can answer.
5       A   Could you rephrase that?
6       Q   In other words, when you were talking to
7    the public or to the media, you would not
8    misrepresent who you were and who you worked for,
9    correct?
10          MS. O'CONNOR:  Objection to the form.
11   You can answer.
12      A   When I spoke to the consumers I identified
13   myself and the same thing with the media, yes.
14      Q   It would be contrary to the business
15   ethics followed by Johnson and Johnson for you to
16   misrepresent yourself to the media in terms of who
17   you were, correct?
18          MS. O'CONNOR:  Objection to the form
19   of the question, you can answer.
20      A   Whenever there was a media question, I
21   would identify myself, yes.
22      Q   So when you were dealing with the issue of
23   asbestos in the Johnson and Johnson talc, why would
24   you misrepresent yourself to radio stations as to
25   whether or not you worked for Johnson and Johnson?

Page 156

1    Why would you do that?
2          MS. O'CONNOR:  Objection to the form
3    of the question.  You can answer.
4       A   I don't remember that I did.
5       Q   That would have been totally wrong to do,
6    right?
7          MS. O'CONNOR:  Objection to the form.
8    You can answer.
9       A   I don't know what you mean by misrepresent
10   myself.
11      Q   You told them you were a consumer and you
12   were trying to find out information from them.  Not
13   telling them you worked for Johnson and Johnson,
14   would be a mission representation about who you were
15   and who you worked for, correct?
16          MS. O'CONNOR: Objection to the
17   form. Vague, ambiguous.  You can answer.
18
19      A   Well, I am a consumer.
20      Q   But as part of the business ethics of
21   Johnson and Johnson, when you are out there working
22   for Johnson and Johnson, you are supposed to
23   identify yourself as the spokesperson for Johnson
24   and Johnson.  You are not supposed to mislead
25   anyone, correct?

Page 157

1        MS. O'CONNOR:  Objection to the form.
2    Compound, vague, ambiguous.  You can answer.
3        A    Would you reask that again?  There's a lot
4    in there.
5        Q    This memo we marked before, 358, that you
6    sent to everybody in the company on January 2, 1986,
7    about your conversations and your reassurance that
8    Johnson's Baby Powder doesn't contain asbestos.
9        A    Which document?
10       Q    358.  I put it up there.  Do you remember
11   this?
12       A    Yes.
13       Q    You told everybody at Johnson and Johnson
14   that you called the radio station and identified
15   yourself as a consumer and asked information
16   whatever they had on the dangers of baby powder?
17       MS. O'CONNOR:  Objection to the form
18   of the question.  You can answer.
19       A    Yes, that's what it says.
20       Q    You told that to everybody on the list?
21       A    The distribution list was, yes.
22       Q    You never identified yourself as being
23   from Johnson and Johnson, correct?
24       A    That's what I said.
25       Q    Who is Todd True?

Page 158

1        A    I think he was packaging, but I'm not
2    sure.  I remember the name.
3        Q    Did you have any dealings with him?
4        A    The name is familiar, but I cannot say
5    specifically what he did.
6        Q    Do you know what his job was in packaging?
7        A    No.  That's what I mean.  I remember the
8    name, but I'm not really sure what he did.
9        Q    He had a much different perspective on
10   whether you should be selling baby powder for use on
11   babies than you did.  Am I correct?
12       MS. O'CONNOR:  Objection to the form.
13       A    Again, I remember the name, but I don't
14   remember him or anything about him.
15       Q    Did you ever know that while you were
16   working at Johnson and Johnson there was this raging
17   internal debate about whether you should be selling
18   baby powder at all to babies?
19       MS. O'CONNOR:  Objection to the form.
20       Q    For use on babies.  Obviously, babies
21   aren't buying it.
22       A    There was no raging debate.
23       Q    382.  I think we talked about this before.
24   This is a memo involving Christina Geist and she
25   worked in your department, right?

Page 159

1        A    I don't remember her name.
2        Q    It says CPCUS, that means she worked
3    within the same division you did, right?
4        A    Means she worked for consumer products.
5        Q    That's what you worked for?
6        A    Yes.  There were a lot of people.
7        Q    What about Frederick Tewell, T E W E L L?
8        A    I don't remember that name.
9        Q    Here Todd True writes to Frederick Tewell
10   and a copy goes to Christina Geist who is part of
11   the global strategic design office for Johnson and
12   Johnson, correct?
13       A    That's what her signature says.
14       Q    And what True says is, "The reality that
15   talc is unsafe for use on slash around babies is
16   disturbing.  I don't mind selling talc.  I just
17   don't think we can continue to call it baby powder
18   and keep it in the baby aisle.  Have we done any
19   research to determine the potential negative impact
20   to our brand or best for babies strategy by
21   maintaining this ingredient.  Have we looked at
22   replacing talc with cornstarch for our base powder,
23   as other brands have?  What is the value in
24   maintaining talc under baby while our competitors
25   have moved away?"

Page 160

1        You weren't aware of this debate
2    going on within Johnson and Johnson while you were
3    talking about how safe baby powder was?
4        MS. O'CONNOR:  Objection to the form
5    of the question.  You can answer.
6        A    I was not aware of this conversation with
7    these people, no.
8        Q    383 is an April 18, 2008 email from Todd
9    True, subject, powder, to Fred Kobema, who in a
10   somebody who worked in your division, correct?
11       A    I believe he worked in quality assurance.
12       Q    He says, "Todd, I can give you the powder
13   background that I know.  Lorena Telofski in R and D
14   or Michael are the best Johnson historians.  But
15   Tammy would be the best person to address the
16   questions that you pose."  Do you know who Tammy is?
17       A    No.
18       Q    He states that, "My understanding is that
19   we introduced the cornstarch variant as an
20   alternate for talc for use on babies due to the talc
21   issue and some and doctors recommending for moms
22   not to use powder on their babies, we don't promote
23   powder to moms."  Is that true?
24       MS. O'CONNOR:  Objection to the form.
25   You can answer.

Page 161

1      A   No, and I don't know -- Fred wrote this.
2  I don't know where that came from.
3      Q   Do you know what he is talking about, the
4  talc issue and doctors recommending to moms not to
5  use it?  Were you aware of that as a somebody
6  actually in charge of responding to these kind of
7  inquiries?
8      A   Yes.  I was aware some physicians feel
9  that way, yes.
10     Q   Did you know that inside Johnson and
11 Johnson the discussion was that the talc was not
12 being sold to mothers?
13         MS. O'CONNOR:  Objection.  You can
14 answer.  Vague and ambiguous.
15     A   These are just the words that Fred says.
16 Not being it is widespread.
17     Q   Is there any reason to disbelieve or do
18 you have any issues with the voracity with which he
19 speaks on a regular basis?  He must have gotten it
20 from somewhere the idea that because of the talc
21 issue, you weren't marketing baby powder for use on
22 babes, right?  Where did he get that from?
23     A   Well, it is not true, so I don't know what
24 made him say this.  I can't speculate on this.
25     Q   Now we have two people that disagree with

Page 162

1  you about whether babies, the talc should be used
2  around babies.  We have the person dealing with the
3  packaging and we have somebody directly in your
4  department, right?
5          MS. O'CONNOR:  Objection to the form
6  of the question.  You can answer.
7      A   I don't interpret this as Fred saying he
8  doesn't agree.  He is talking about there are some
9  doctors out there.  He is not giving his personal
10 opinion.
11     Q   What he is saying is he understands that
12 you are using corn starch instead and that you are
13 not marketing baby powder for babies anymore and he
14 worked in your same department.
15         MS. O'CONNOR:  Objection to the form.
16 You can answer.
17     A   Again, I don't know the background for
18 Fred saying this.
19     Q   Did you know it was the mission of people
20 at Johnson and Johnson to get talc, while you were
21 out there promoting it, to get talc removed entirely
22 from the supermarkets in the baby aisle?
23         MS. O'CONNOR:  Objection to the form.
24 Mischaracterizes the testimony.  You can answer.
25     A   Not true.  There was not a mission to get

Page 163

1  rid of talc.
2      Q   Who is Christopher Hacker?
3      A   Again, I remember the name, but I don't
4  remember specifically what his department or
5  responsibilities were.
6      Q   What about Michael Rosolowsky?  Did we go
7  over that one?
8      A   Mike was market research.
9      Q   I have up here on the screen 384, which
10 starts with an email from Todd True to Christopher
11 Hacker and says that -- looks like Todd True
12 actually works in your division, CPCUS, right?
13     A   That means he worked for Consumer
14 Products.  There's many different departments in
15 Consumer Products.  I didn't know everyone.
16     Q   Hacker worked for JJCUS.  What is that?
17     A   I don't know exactly what the initials
18 would stand for.
19     Q   Rosolowsky worked in your department,
20 according to this?
21         MS. O'CONNOR:  Objection to the form.
22     A   He worked for consumer products.
23     Q   You worked for consumer products, too,
24 right?
25     A   Yes, along with a lot of other people.

Page 164

1      Q   What is stated here is, "I want to give
2  you a heads up that I am on a bit of a mission to
3  strongly consider moving talc from the baby aisle.
4  I sent notes to Paul Serbiak and Fred Tewell as well
5  as one to Fred K below.  Who is Paul Serbiak?
6      A   Paul was the head of the R and D
7  department.
8      Q   So he was head of R and D and he was also
9  privy to the mission to remove talc entirely from
10 the baby aisle, right?
11         MS. O'CONNOR:  Objection.  Calls for
12 speculation.  You can answer.
13     Q   According to this.
14     A   According to this email, he was privy to
15 one person's opinion.
16     Q   Then they state on the bottom, "I
17 understand this is a 70 million dollar business in
18 the U.S. alone unsupported.  So any changes are
19 risky.  However, given a number of other ingredient
20 issues we are facing, this seems like an easy fix
21 and win.  I know this will be controversial and will
22 need to work hard to justify the cost implications.
23 I also see great positives associated with it in our
24 challenge to maintain mom's trust and deliver on our
25 baby expertise."  I read that correct?

1    A   Yes.  That's what it says.
2    Q   None of this information was shared with
3  you, this debate that was going on about whether
4  babies should even been around baby powder while you
5  were supposed to be the person who was supposed to
6  be the spokesperson?
7        MS. O'CONNOR:  Objection to the form
8  of the question.  You can answer.
9    Q   Is that right?
10   A   I've seen of this email.
11   Q   Do you remember back in 2000 when there
12 was an issue about whether the talc without
13 asbestos was going to be classified as a human
14 carcinogen by the National Toxicology Project?  Do
15 you recall that?
16   A   Yes.
17   Q   Did anyone ever tell you that Johnson and
18 Johnson had a standby statement ready to go from a
19 PR respective that if somebody determined that the
20 talc was carcinogenic they were ready to switch to
21 cornstarch on a moment's notice?  Did you know
22 that?
23       MS. O'CONNOR:  Objection to the form.
24 Misstates the evidence, ambiguous.
25   A   Part of our process would be if the NTP

1  determined the ingredient was carcinogenic, as a
2  company we would do the responsible thing and have a
3  response.
4    Q   So that was pretty highstakes stuff,
5  because if the NTP found there was any carcinogens
6  in the Johnson's Baby Powder, you would have pulled
7  the product from the market right then and there,
8  right?
9    A   The important thing is they did not find
10 it to be a carcinogen.
11   Q   That's because you leaned on them really
12 hard.  We will do that on another day, and you got
13 them to change your vote, right?
14   A   That's not correct.
15   Q   You didn't get them to change the vote
16 from like 13 to 2 to something different?  That
17 never happened?
18       MS. O'CONNOR:  Objection to the form.
19   A   The NTP is made up of all different kinds
20 of scientists, government agencies as well as
21 independent toxicologists and they made their
22 decision based on the science.
23   Q   They also made their decision based on
24 people that you hired that you never told them were
25 representing you, right?

1        MS. O'CONNOR:  Objection to the form
2  of the question.
3    A   They were well aware of the people that
4  were providing the evidence.
5    Q   So they were well aware you were hiring
6  people -- let's not go there.  That's a whole other
7  day.
8        You agree with me that you had a
9  standby statement ready to go to pull the Johnson's
10 Baby Powder with talc from the market if you lost
11 the battle before the National Toxicology Project,
12 right?
13       MS. O'CONNOR:  Objection to the form
14 If you have a document, show her the document.
15       MR. PLACITELLA:  I'm asking her what
16 she knows.
17   A   In the normal course of business it was
18 proven to have something ready.
19   Q   Let me show you 411.  411 is a November 9
20 2000 memo from Kate Triggs.  Do you know who Kate
21 Triggs is?
22   A   No.
23   Q   How about Sarah Colamarino?
24   A   Yes.  She was director of communications.
25   Q   What does that mean, director of

1  communications?
2    A   She would be responsible for the ultimate
3  overall communications of any issue that had to be
4  communicated.
5    Q   If you look at the last page it states
6  Johnson and Johnson Consumer NTP Talc Draft Holding
7  Statement.  It starts out, "Johnson and Johnson
8  intends to discontinue its use of talc in all of its
9  consumer products in the U.S. beginning December 1,
10 2000.  The company's U.S. manufacturing operations
11 will switch to cornstarch."
12       Did I read that correctly?
13   A   That's what it says, yes.
14   Q   That never happened, right?
15   A   No, because the NTP did not determine talc
16 to be a carcinogen.
17   Q   We will do that on another day.
18       MS. O'CONNOR:  Objection to the
19 colloquy.
20       MR. PLACITELLA:  I want to finish
21 this part today.
22   Q   At some point in time you became involved
23 in what kind of warnings or caution statements
24 should be used on Johnson's Baby Powder products,
25 correct?

1      A   Correct.
2      Q   And you became involved, but you had no
3   formal training in this regard and no expertise in
4   this regard, correct?
5          MS. O'CONNOR:  Objection to the form.
6   You can answer.
7      A   I was involved as a member of the team.
8      Q   To your knowledge has the use of Johnson
9   Baby Powder ever resulted in the death of any human
10  being?
11         MS. O'CONNOR:  Objection to the form
12  of the question. You can answer.
13     A   To my knowledge, no.
14     Q   Was the risk of asphyxiation to babies who
15  were exposed to Johnson's Baby Powder known within
16  Johnson and Johnson?
17         MS. O'CONNOR:  Objection to the form
18  of the question.  You can answer.
19     A   Like we talked about earlier, normal use
20  of the product is fine.  It is safe to use.
21         We took very seriously we had a
22  responsibilities to address the use, misuse and the
23  abuse of a product.
24     Q   Let me ask the question.  Was the risk of
25  asphyxiation to babies who were exposed to Johnson

1   and Johnson Baby Powder known within Johnson and
2   Johnson?
3          MS. O'CONNOR:  Objection to the form
4   of the question.  You can answer.
5      A   With the normal use of the product, no.
6      Q   You say normal use.  What does that mean?
7      A   Used in a diapering situation, applying it
8   to the hand and then the body.  Not giving it to a
9   child to play with.
10     Q   But you knew that could happen?
11     A   We advised against it.
12     Q   But you knew that could happen, correct?
13         MS. O'CONNOR:  Objection to the form
14  of the question.
15     A   Yes, because we know babies grab things.
16  That's why we addressed the situation.
17     Q   And you actually made the product to look
18  like a bottle, right?
19         MS. O'CONNOR:  Objection to the form
20  of the question.
21     A   No.
22     Q   You could have put it in big square box,
23  but you put made it white and put it in a bottle,
24  right?
25         MS. O'CONNOR:  Objection to the form

1   of the question.
2      A   What was the question?
3      Q   You created a package that resembled in
4   form a baby bottle.
5      A   Baby bottles come in all sizes and shapes
6   and colors.  It does not look like a baby bottle.
7      Q   You are not aware of any information
8   within Johnson and Johnson where there was a
9   discussion about the packaging reassembling a baby
10  bottle?
11         MS. O'CONNOR:  Objection to the form
12  of the question.
13     A   Yes, I'm aware there was an allegation
14  that it did.
15     Q   You said there was allegations about
16  packaging for the baby powder reassembling a baby
17  bottle.  What did you mean by that?
18     A   I remember -- I don't remember where it
19  came from.  I remember it was early.  Probably in
20  the '80s, but there was an allegation that because
21  of that, babies would grab it.  Babies grab
22  anything.
23     Q   Did the allegation originate outside the
24  company or inside the company?
25     A   Outside the company.

1      Q   What was done in response to that concern?
2      A   Well, like any concern that comes in, as I
3   said, we take things very seriously and look at
4   this.  But knowing the behavior of babies, as I
5   said, they will grab anything.
6          We advise parents to keep the baby
7   powder and all products out of reach of babies.
8      Q   But it was not unforeseeable that babies
9   would grab the bottle of baby powder, correct?
10         MS. O'CONNOR:  Objection to the form.
11  Vague, ambiguous, calls for a legal conclusion.  You
12  can answer.
13     A   Yes.  Babies grabbing things, anything.
14  That is why we advised parents to keep things out of
15  their reach.
16     Q   I'm going to blow up 402.  402 is an email
17  from yourself to a bunch of people.
18         MS. O'CONNOR:  Is this the entirety
19  of the document?
20         MR. PLACITELLA:  As far as I know,
21  yes.  We will do a piece at a time, so it is bigger.
22     Q   It is from yourself to a bunch of people.
23  There's some new people on this.  There's a
24  Katherine Rockwell.  Who is Katherine Rockwell?
25     A   I don't remember.

Page 173

1    Q    Who is the CPC copy approval baby?
2    A    That's an internal process.
3    Q    That's just a group, or something?
4    A    Yes.
5    Q    Then you have Lorena Telofski, Michelle
6  Turk, Clayton Paterson.  Who is Clayton Paterson?
7    A    He is the regulatory attorney.
8    Q    Who is Michelle Turk?
9    A    Regulatory.
10    Q    Who is Scott Beaudry?
11    A    R and D.
12    Q    Mary Estocin?
13    A    Marketing.
14    Q    And Tammy Jones?
15    A    I don't remember.
16    Q    Your email talks about a warning being put
17  on Johnson's Baby Powder?
18        MS. O'CONNOR:  Objection to the form
19  of the question.  You can answer.  Really hard to do
20  without the document.
21    A    I'm talking about labels on both Johnson's
22  Baby Oil and Johnson's Baby Powder.
23    Q    And on the oil you recommended warning --
24  I see.  On baby powder you recommended a warning,
25  correct?

Page 174

1        MS. O'CONNOR:  Objection to the form.
2  You can answer.
3    A    Yes.
4    Q    And the warning you recommended was, for
5  baby powder, keep powder away from face to avoid
6  inhalation which could cause breathing problems.
7  Avoid contact with eyes.  For external use only.
8  Close tightly after use.
9        You say all this should have been bold,
10  right?
11    A    Correct.
12    Q    But that was rejected?
13        MS. O'CONNOR:  Objection to the form.
14    Q    According to this it says not approved at
15  this time.
16        MS. O'CONNOR:  This is why we need
17  the document.  It is unfair to question a witness.
18        MR. PLACITELLA:  I'll email name it
19  to you, how is that?
20        MS. O'CONNOR:  We need a hard copy.
21        MR. PLACITELLA:  I'll email it to
22  you.  You can have it printed out.  Sorry.  I made a
23  mistake.  There's a lot of documents.
24        MS. O'CONNOR:  I understand.  I don't
25  work here.  We can do this on a break.  It is not

Page 175

1  fair to do this right now.  If you want to ask the
2  witness --
3        MR. PLACITELLA:  It is only one page.
4  That's all I got.  One page.
5    Q    My question is, do you recall your
6  recommendation for a warning on baby powder being
7  not approved?  You say Kate, not approved at
8  this time?
9        MS. O'CONNOR:  Objection to the form.
10    Q    What happened?
11    A    What I meant was the way it was presented
12  to me in the system was not approved.  So I'm
13  telling them to make sure that it says the
14  following.
15    Q    I'm not sure I understand.  You say the
16  way it came to you, not approved.  What does that
17  mean?
18    A    The copy approval process was a
19  computerized process.  And the graphics would come
20  to us for approval, the team.
21        I was referring to the number as
22  written there, and I was saying that was not
23  approved and I told them what to put on it.
24    Q    And did that happen?
25    A    I'm going to assume so.  I don't know.

Page 176

1    Q    Didn't you have to run this by the
2  lawyers, and what did the lawyers --
3    A    I wouldn't have approved it personally
4  without them.
5    Q    Who is Lara Kegley?
6    A    She managed the approval process.
7        MR. PLACITELLA:  I'll make a copy so
8  we have it as part of the record.
9    Q    385 is an email from yourself to David
10  Chase, Katherine Martin, forwarding another email,
11  correct?
12    A    Yes.
13        MS. O'CONNOR:  I ask that you not
14  question the witness about that and we can take it
15  off line and address it.
16        MR. PLACITELLA:  Bates number is
17  2918, et cetera.  I won't ask about the highlighted
18  section, but we may have to deal with it a different
19  day.
20    Q    Involved in this process about what
21  warnings should go on the product, was yourself and
22  Todd True, correct?
23    A    He is copied on the original.
24    Q    You obviously interacted with Todd True on
25  what was appropriate labeling for the baby powder

1    product?
2        A   We were both copied on this memo.
3
4            MR. PLACITELLA:  I'll say this.  I
5    can have information to that effect.  It is curious
6    that it would be an issue since there are redactions
7    on the document.
8            MS. O'CONNOR:  I understand.  I have
9    the same thought.
10            MR. PLACITELLA:  I don't want to get
11    in a bad place.
12            MS. O'CONNOR:  I understand.  I
13    appreciate that.
14            MR. PLACITELLA:  Although you have
15    just knocked out fifteen minutes of my deposition.
16            MS. O'CONNOR:  You saved all of us.
17
18        Q   At one point in time you wanted to
19    actually put an X over the baby's nose and mouth on
20    the packaging.  Do you recall that?
21        A   Yes.
22        Q   That was met with some resistance.  Is
23    that fair?
24            MS. O'CONNOR:  Objection to the form.
25    You can answer.

1        A   It was open for discussion.  There were a
2    lot of things that needed to be on a label and we
3    wanted to make sure that we were addressing
4    everybody we could with a limited amount of space.
5        Q   Who is Steven Bramwell?
6        A   I don't remember.
7        Q   Diane Brokaw?
8        A   I don't remember her either.
9        Q   Pamela Walsh?
10        A   Pam Walsh was responsible for the copy
11    approval process.
12        Q   Christine Geist we talked about.
13        A   Yes.
14        Q   Did you know that once you made this
15    recommendation there were private meetings within
16    Johnson and Johnson that said we can't put the X
17    over the mouth because it is too dramatic and it is
18    going to cause us problems?  Did you know that?
19            MS. O'CONNOR:  Objection to the form
20    of the question.  You can answer.
21        A   I'm not aware of that, no.
22        Q   This is 391 is a May, 21, 2009 email from
23    Bramwell to other people in your department.  Do you
24    see that?
25        A   I see it, yes.

1        Q   And they specifically did not copy you,
2    correct?
3            MS. O'CONNOR:  Objection to the form.
4    You can answer.
5        A   I'm not copied on this, no.
6        Q   Who is Lee Grace?
7        A   I don't remember.
8        Q   The objection is stated here.  We tried
9    initially placing the X over the illustrated baby's
10    mouth and nose and it was not optimal.  It began to
11    look like the baby was participating in an anti
12    something demonstration or was about to enter some
13    type of nuclear fallout area.  That's why we decided
14    to place it on the cheek instead.
15        A   I see that.
16        Q   Did anybody ever tell you what was going
17    on?
18            MS. O'CONNOR:  Objection to the form.
19    You can answer.
20        A   I'm not copied on this, but I had final
21    approval for what went on the label.
22        Q   Some people within the organization really
23    didn't want that X over the baby's mouth.  Is that
24    fair?
25        A   For the reasons stated here.  Looks

1    like it, yes.
2        Q   That's May 21, 2009, right?
3        A   That's what it says.
4        Q   And then the very next day, I gave you
5    392, the very next day is when there was a
6    discussion with the Vice-President, legal, everybody
7    else was up there in your division about we don't
8    know what the size of the particles are that the
9    baby is going to inhale, right?  The very next day.
10            MS. O'CONNOR:  Objection to the form
11    of the question.  You can answer.
12        A   The date does follow, yes.
13        Q   What was Project Oracle?
14        A   That was a project to help ensure global
15    safety labeling.
16        Q   What was your role?
17        A   Facilitator to help ensure that we had
18    consistent labeling on the baby products throughout
19    the regions.
20        Q   Did you have anything to do with the
21    labeling that went to the people who were actually
22    putting the product in the bottles?
23            MS. O'CONNOR:  Objection to the form.
24    You can answer.
25        A   I don't understand the question.

Page 181

```
 1        Q   Did you know that in certain parts of the
 2   world Johnson and Johnson was warning its own
 3   employees about the risk of cancer from exposure to
 4   talc that had asbestos that was used for baby
 5   powder?
 6            MS. O'CONNOR:  Objection to the form
 7   of the question.
 8        A   No, we don't believe that there was a
 9   danger to develop cancer using Johnson's Baby
10   Powder.
11        Q   I'll show you 317.  317 is product
12   material safety data sheet for Johnson's Baby Powder
13   Blossom.  Do you see that?  I believe this was used
14   actually in Singapore, but came out of something
15   known as a Johnson's Fact Book.  Do you know what a
16   fact book is?
17        A   Yes.
18        Q   What is a fact book?
19        A   A fact book is an R and D document that
20   has the information on products.
21        Q   In this document, if you go to the Bates
22   number ending 601, the top is entitled Johnson's
23   Baby Blossom Powder.  Do you see that?
24        A   Yes.
25        Q   Do you see down at the bottom under
```

Page 182

```
 1   toxicity and irritation.  Under carcinogen, talc
 2   containing asbestiform fibers, see asbestos?
 3        A   I see it says that, yes.
 4        Q   Did you know that people who were involved
 5   at Johnson's Baby Powder in other parts of the world
 6   were being warned about the cancer risk from talc
 7   that contained asbestos?
 8            MS. O'CONNOR:  Objection to the form
 9   of the question.
10        A   I don't know how to interpret the way this
11   information is given.  Underneath it says talc
12   not containing asbestos.  One says containing and
13   one says it doesn't.  I think -- I don't know how to
14   interpret this.
15        Q   So clearly Johnson and Johnson recognizes
16   if the talc contains asbestos, it could cause
17   cancer, right?
18            MS. O'CONNOR:  Objection to the form.
19   You can answer.
20        Q   That's what it says on there own material
21   safety data sheet.
22            MS. O'CONNOR:  Objection.
23        A   I don't know how to interpret this.
24        Q   This information was never conveyed to you
25   as part of Project Oracle in terms of making sure
```

Page 183

```
 1   the warnings were the same throughout the world as
 2   it related to baby powder, correct?
 3        A   No, because this doesn't pertain to the
 4   normal use of the product.
 5        Q   It pertains to the people who were filling
 6   the product with the baby powder, doesn't it?
 7            MS. O'CONNOR:  Objection to the form.
 8        A   It seems to, yes.
 9        Q   Now, here is 397.  397 starts at the top.
10   It is an email from Charles Wajszczuk.  How do you
11   say that correctly?
12        A   You won't.  We never got it right.  We
13   called him Dr. Charles.
14        Q   Okay, Dr. Charles.  An email from Dr.
15   Charles to yourself and a number of other people.
16   Do you see that?
17        A   Yes.
18        Q   I want to work backwards and understand
19   something.  If I go to the last page, there's an
20   email from Kyle Schadler.  Do you know who that is?
21        A   No.
22        Q   To a Miriam Martinez.  Who is Miriam
23   Martinez?
24        A   I don't know.
25        Q   It talks about a consumer who had ovarian
```

Page 184

```
 1   cancer in her family and she is asking questions
 2   about talc.  Is that fair?
 3        A   That's what it seems to be, yes.
 4        Q   And on the page above that there's a memo
 5   from Miriam Martinez to yourself?
 6        A   Where?
 7        Q   Just go --
 8        A   Yes.
 9        Q   The first is the memo from you and it
10   says, "There's nothing additional to add to this
11   information.  The study and analysis of the
12   literature was done on talc, not a specific product.
13   You may want to give her dates of reports and
14   suggest she discuss with her doctor.  I do not have
15   readily available copy."  What reports and
16   literature are you talking about?
17        A   I don't remember.
18        Q   Miriam Martinez is who?
19        A   I don't know.
20        Q   Mark Demu.  Do you know who that is?
21        A   No.
22        Q   The response back is "Nancy, I agree with
23   you.  This information can answer any concern
24   regarding talc and ovarian cancer.  However,
25   consumer wasn't satisfied because her main question
```

Page 185

1    is why talc is still used in this product and was
2    removed from all of the J and J baby products."  Do
3    you see that?
4        A   I see that here, yes.
5        Q   Then if you go to Bates number 1285, they
6    talk about, or you say that you suggest that Dr.
7    Charles, Charlie, that is Dr. Charles?
8        A   Correct.
9        Q   Respond in writing, right?
10       A   Correct.
11       Q   And then we can go to the front page, the
12   very first page.
13       A   On October 5, 2011, you write to a couple
14   of people and you say, "As manager of product safety
15   and education, I apologize if this issue has been
16   going around and around and around.  I'm not sure
17   why the call center or Dr. Wajszczuk cannot respond
18   to this consumer writing.  However, if Dr. Wajszczuk
19   feels he cannot answer it," -- you don't think you
20   should be the one to answer it, right?
21       A   Correct.
22       Q   That's not your job?
23       A   At that time, 2011, it was not my job to
24   speak directly to consumers.
25       Q   Whose job was it?

Page 186

1        A   The call center or the doctor.
2        Q   The doctor then says to you, "It is not my
3    job either.  That's not a medical question or a
4    scientific question.  That's a business PR
5    question."  Right?
6        A   That's what he says.
7        Q   According to the doctor, the issue about
8    whether talcum products should still be on the
9    market is not one for him, it is for the business
10   people, right?
11           MS. O'CONNOR:  Objection to the form.
12   You can answer the question.
13       A   I just know what it says here.
14       Q   That's the import of what the doctor says.
15   He is the senior director, medical safety officer,
16   correct?
17       A   That's the title, yes.
18       Q   He is saying don't ask me, ask the
19   business people.  I can't answer that question.
20           MS. O'CONNOR:  Objection to the
21   form.  You can answer.
22       A   He didn't feel he was the appropriate
23   person to answer this.
24       Q   Did you ever have a conversation with the
25   doctor about his opinions about whether the product

Page 187

1    should still be on the market or not?
2        A   No.
3        Q   After this issue was raised, and it was
4    the discussed with the medical safety officer
5    director, there was no discussion within Johnson and
6    Johnson about whether it was time to take the baby
7    powder with talc off the market?
8            MS. O'CONNOR:  Objection to the form
9    of the question.  You can answer it.
10       A   No.  Not that I know of, no.
11       Q   Do you know who James Mulieri,
12   M U L I E R I is?
13       A   He was part of the call center.
14       Q   Diana Boghicev, B O G H I C E V?
15       A   No.
16       Q   Sandra Cerrea, C E R R E A?
17       A   No.
18       Q   Joseph Greco, G R E C O?
19       A   Research and development.
20       Q   Dawn Miles.  Who is that?
21       A   Marketing.
22       Q   David Mays?
23       A   Director of the Global Scientific and
24   Professional Engagement.
25       Q   Vicky Cox Vogt?

Page 188

1        A   R and D.
2        Q   Am I correct that as far as you are aware,
3    the warnings on baby powder never mentioned anything
4    about the hazard presented by the product being
5    aerosolized in normal application?
6            MS. O'CONNOR:  Objection to the form.
7    You can answer.
8        A   No, we didn't use those words.  We talked
9    about the safe way to use the product.
10       Q   The warning never talked about peroneal
11   use of the product near the vagina?
12       A   No.
13       Q   The warning never said anything about
14   cancer, correct?
15       A   Correct.
16       Q   Never said anything about asbestos?
17       A   Correct.
18       Q   Never said anything about heavy metals?
19       A   Correct.
20       Q   Never said anything about risks to adults?
21           MS. O'CONNOR:  Objection to the form.
22   You can answer.
23       A   Not specifically to adults, no.
24       Q   Did it ever say anything about a risk of
25   serious injury?

Page 189

1    A    If used incorrectly, yes.
2    Q    What is that?
3    A    It could cause breathing issues.
4         MR. PLACITELLA:  I think this is a
5    good place a break.
6         THE VIDEOGRAPHER:  The time is now
7    4:05 p.m.  We are going off the record.
8
9         THE VIDEOGRAPHER:  The time is now
10   4:21 p.m.  We are back on the record.
11
12   Q    I just want to go back and spend a few
13   minutes on this, since you brought it up.  Your role
14   for Johnson and Johnson, as it related to the issue
15   with the National Toxicology Project, was what
16   specifically?
17   A    Probably more of a project manager
18   facilitator.
19   Q    What does that mean?
20   A    Ensuring that the right people were in the
21   room, that any documents that we discussed that were
22   needed would be addressed.  That we were all on the
23   same page, I guess.
24   Q    Who way the person in charge of making
25   sure that all of the information that would tell the

Page 190

1    whole story would be communicated to the federal
2    government and in the National Toxicology Program?
3         MS. O'CONNOR:  Objection to the form
4    of the question.
5    Q    Who was person at Johnson and Johnson?
6         MS. O'CONNOR:  Objection to the form
7    of the question.  You can answer.
8    A    That communicator would be Helen Han Hsu,
9    who was the toxicologist.
10   Q    So she would be the one to make sure all
11   of the documents, the good and the bad, were
12   forwarded to the project, correct?
13        MS. O'CONNOR:  Objection to the form,
14   foundation, vague and ambiguous.  You can answer.
15   A    She was the one who would communicate with
16   whoever, the agency itself, or the different people
17   involved.
18   Q    I'm going to hand you 404.  404 starts out
19   on the top with memo from yourself dated April 29,
20   2001 to Lorena Tolefski.  She was the toxicologist?
21   A    No.  Lorena is in R and D.
22   Q    R and D.  I'm sorry.
23   I want to do this in order.  So prior
24   to your email, there's another email that you wrote
25   on April 25th at 11:56 p.m.  Do you see that?

Page 191

1    A    Yes.
2    Q    11:56 p.m.  Really?
3    A    I'm a night person.
4    Q    It is to a whole bunch of people, right?
5    A    Yes.
6    Q    And it talks about a meeting, the talc
7    meeting that is going to occur on 4-30-01.  Do you
8    see that?
9    A    Yes.
10   Q    You attached the latest information
11   received from the National Toxicology Project,
12   correct?
13   A    Yes.
14   Q    On the next page, like the fifth
15   photograph down, I'll blow it up, the statement is
16   made, "The presence of talc on the list ends years
17   of controversy.  Many people have believed for
18   decades that talc powder results in increased cancer
19   risk, and studies are confirmed this connection.
20   Studies have shown increased incidents of alveolar
21   bronchiolar carcinomas of the lung in female rats.
22   Recently published epidemiology studies suggest talc
23   exposure among pottery workers associated with lung
24   and ovarian cancer in woman."  Do you see that?
25   A    Yes, I do.

Page 192

1    Q    What you state is that, "The latest report
2    should be a topic of discussion."  Correct?
3    A    That is what I said, yes.
4    Q    "Mike Chudkowski will have some comments
5    on this as well as from the perspective from the
6    CPFA"  Did you have a role as it related to the CPFA
7    within Johnson and Johnson?
8    A    No.  That was toxicology.
9    Q    You were totally out of it?
10   A    Yes.
11   Q    It says, "Mike will also give a status on.
12   transfer of talc files upon his retirement in June."
13   Do you see that?
14   A    Yes.
15   Q    Do you remember anything about that?
16   A    No.
17   Q    There's another email from you up above
18   and it says that, "Helen has been in contact with
19   the CPFA concerning the subject."  Correct?
20   A    Yes.  That's what it says, yes.
21   Q    Do you know what the CPFA's role was as it
22   relates to the National Toxicology Program?
23   A    I can't say specifically, no.
24   Q    I'm going to show you 405, which is an
25   email from Richard Zazenski.  Do you know who

Page 193

1    Richard Zazenski is?
2        A.  No.
3        Q.  And it is to -- it says here:  Richard
4    Zazenski is from Luzenac, correct?
5        A.  That is what it says.
6        Q.  Did you know who Luzenac was?
7        A.  I believe they are a talc supplier.
8        Q.  For Johnson's Baby Powder?
9        A.  Yes.
10       Q.  The email is sent to Michael Chudkowski in
11   your division, correct?
12       A.  He worked for Consumer Products, yes.
13       Q.  He says, the subject is winning hand.  Do
14   you see that?
15       A.  That's what it says.
16       Q.  "Mike, Bill.  I'll let me you guys read
17   this for now, but it is for your eyes only until we
18   finalize.  It is the winning hand in getting talc
19   without asbestos dismissed from the NTP nonsense.
20   For now, I'll graciously accept one hundred percent
21   of the credit finding CRE, convincing them to get
22   involved and developing the Fatal Flaw Strategy
23   single handedly saving the talc business from
24   certain ruin."  Do you see that?
25       A.  That's what it says.

Page 194

1        Q.  Do you know what the CRE is?
2        A.  No.
3        Q.  Do you know what the Fatal Flaw Strategy
4    is?
5        A.  No.
6        A.  I have a document I gave you that was
7    marked LUZ-1 and it is a narrative from the Talc NTP
8    Regulatory Challenge, and it starts out by, "Good
9    morning everyone.  My name is Steve Jarvis."  Do you
10   know who Steve Jarvis is?
11       A.  No.
12       Q.  I'm going to ask you some questions about
13   what is mention here and see if you know anything.
14           On page two he states, "You might be
15   interested to know that we produce all the baby
16   powder for Johnson and Johnson, including the talc
17   for their popular adult product Shower to Shower."
18   Did you know that?
19       A.  I knew they were a supplier, yes.
20       Q.  He goes on to say, "In slide 2, the NTP
21   was authorized by the Unites States Congress to
22   coordinate interagency toxicological testing and to
23   publish the formal report on carcinogens, which comes
24   out about every 18 to 24 months."  Do you see that?
25       A.  I see that.

Page 195

1        Q.  Was that consistent with your
2    understanding you don't know?
3        A.  I'm not familiar, no.
4        Q.  He states on the next page, "In early
5    2000, NTP listed talc for possible listing in the
6    ROC because back in the early 1990s, NTP published
7    the results of a two year talc inhalation study on
8    rats and mice and concluded that talc caused lung
9    tumors in female rats."  Were you aware of that?
10       A.  No.
11       Q.  Go to the next slide.  It says, "Now,
12   realistically, there are some health issues with
13   talc.  For near 20 years epidemiologists have been
14   finding a weak, but persistent statistical link
15   between the hygienic use of talc and ovarian
16   cancer."  Were you aware of that?
17           MS. O'CONNOR:  Objection to the form.
18   You can answer.
19       A.  There's been a hypothesis that there was a
20   lin, yes.
21       Q.  No.  "A week, but persistent statistical
22   link."  Were you aware of that?
23       A.  No.
24           MS. O'CONNOR:  Objection to the form.
25       A.  Not in those words, no.

Page 196

1        Q.  If you go to page 5, it states at the top
2    that, "Talc and asbestos are similar."  Were you
3    aware that that was communicated?  Let me read the
4    whole thing.
5           "Finally, there's a long held public
6    perception that all talc contains asbestos, and even
7    if it doesn't, they are so similar chemically that
8    talc probably behaves like asbestos."  Are you aware
9    that was the position or opinions of your talc
10   supplier?
11           MS. O'CONNOR:  Objection to the
12   form.
13       A.  No.  He is talking about a public
14   perception, not his.
15       Q.  On slide 5 it says, "But then in
16   October 2000, NTP issues their draft report on talc
17   and announces that the first two formal reviews
18   resulted in votes to list talc as a carcinogen.  The
19   combined vote was 13 to 2 to list."  Were you aware
20   of that?
21       A.  I was aware of a recommendation.  I don't
22   remember the numbers.
23       Q.  You didn't know 13 to 2 was the
24   recommendation?
25       A.  No.

Page 197

1    Q   Go to page 7.  At the bottom it talks
2    about a public meeting in December the BSC, if
3    you go to the next page, the subcommittee voted 7 to
4    3 not to list the talc.  Do you see that?
5    A   Yes.
6    Q   Then he states, "And make no mistake about
7    it, they knew if they proceeded with a listing,
8    nomination for talc Luzenac America was going to
9    challenge them in court."  Did you know that?
10   A   No.
11   Q   If then it talks about what their
12   successful strategy was.  On slide 6 he says, "Our
13   successful defense strategy was three fold.  First,
14   to continue to work through the auspices of the
15   CPFA, the Washington based trade association for the
16   cosmetics industry.  As you might imaging Luzenac
17   and Johnson and Johnson wield considerable influence
18   on the talc subcommittee."  Were you aware of that?
19   A   No.
20   Q   Then he says, "Secondly, and this was our
21   secret weapon.  Engage the services of a Washington
22   Based Center for Regulatory Effectiveness, the CRE."
23   Do you see that?
24   A   Yes.
25   Q   Does that refresh your recollection as to

Page 198

1    who the CRE was?
2    A   I see what it stands for.
3    Q   Did you know that they were secretly
4    engaged in order to fight talc and cancer before the
5    National Toxicology Project?
6         MS. O'CONNOR:  Objection to the form.
7    You can answer.
8    A   I don't know they were secretly engaged.
9    Q   Do you know whether they eve -- I'm
10   assuming you don't know that they never disclosed
11   who they were representing before the national
12   Toxicology Project?
13   A   I don't know that.
14   Q   He states at the bottom, "We send emails,
15   faxes, overnight letters and even telephone calls to
16   keep players in the battle right up until the hours
17   before the final executive committee meeting."  Did
18   you know that?
19   A   No.
20   Q   Do you know what role Johnson and Johnson
21   played in that effort?
22   A   No.
23   Q   He talks about on the next page. "One of
24   the issues we plan to focus on is demonstrating to
25   the NTP, National Toxicology Project, that virtually

Page 199

1    all of the epidemiology studies they previously used
2    must be declared invalid for use in assessing talc
3    not containing asbestos.  This will be an expansion
4    of the Fatal Flaw Defense Luzenac employed in the
5    first review on talc."  Do you see that?
6    A   Yes, I see that.
7    Q   Did you have any understanding that the
8    defense, the Fatal Flaw Defense that was
9    communicated by Luzenac to Johnson and Johnson, was
10   that the talc did not contain asbestos?
11        MS. O'CONNOR:  Objection to the form
12   of the question.  You can answer.
13   A   I was not familiar with the Fatal Flaw
14   Defense.
15   Q   So you were not familiar with the fact
16   that are the whole premise before the National
17   Toxicology Project, or one of the premises in not
18   having talc declared a carcinogen was the
19   representations that were made that the talc that
20   was used in baby powder never contained asbestos.
21   You didn't know that?
22        MS. O'CONNOR:  Objection to the form
23   of the question.  Compound, vague and ambiguous.
24   You may answer.
25   A   Could you rephrase the question?

Page 200

1    Q   Did you know that one of the ways that
2    Johnson and Johnson and Luzenac were fighting the
3    talc issue before the National Toxicology Project
4    was by taking the position that the talc used in
5    Johnson's Baby Powder never contained asbestos?
6         MS. O'CONNOR:  Same objections.  You
7    may answer.
8    A   I know there were discussions about
9    industrial type of talc and cosmetic talc, and the
10   efforts were to concentrate on cosmetic talc, which
11   is found in Johnson's Baby Powder.
12   Q   My question to you was, did you know that
13   one of the primary bases for battling the issue of
14   talc before the National Toxicology Project was the
15   position asserted that there was never any evidence
16   of asbestos in the talc used in Johnson's Baby
17   Powder?
18        MS. O'CONNOR:  Objection to the form
19   of the question.
20   Q   I'm just asking if you know.  It is not
21   for a fight.
22        MS. O'CONNOR:  It is a hard question
23   to follow.  You can answer.
24   A   Well, the basis was that there's no
25   asbestos in the talc used in Johnson's Baby Powder.

Page 201

1      Q   So you knew that's what was being asserted
2  before the National Toxicology Project?
3      A   The question about the NTP was whether it
4  was a carcinogen.  That's what the discussions were.
5      Q   Did you know Johnson and Johnson, or do
6  you know whether or not Johnson and Johnson took the
7  position before the National Toxicology Project that
8  there was never any evidence of asbestos in the talc
9  used in Johnson's Baby Powder?
10     A   The position was that the cosmetic talc
11  used in Johnson's Baby Powder was not a carcinogen.
12     Q   You knew that was what was being related
13  to the National Toxicology Project?
14     A   Yes.
15     Q   Okay.  If that turned out to be wrong,
16  then the entire premise for what was communicated to
17  the federal government would be false, correct?
18         MS. O'CONNOR:  Objection to the form
19  of the question.
20     Q   Is that correct?
21     A   We presented evidence, suppliers presented
22  evidence, experts presented evidence.  We did not
23  feel that the products was a carcinogen.
24     Q   What evidence did you provide to the
25  National Toxicology Project proving that there was

Page 202

1  never asbestos in the talc used in Johnson's Baby
2  Powder?
3      A   What the question was, was whether or not
4  talc was a carcinogen.  That's what all the
5  discussions were about.
6      Q   My question is different.  What evidence
7  did you, Johnson and Johnson, present to the
8  National Toxicology Project concerning whether there
9  was asbestos ever found in the talc used in
10  Johnson's Baby Powder, if you know?
11         MS. O'CONNOR:  Objection to the form
12  of the question.  Over broad.
13     A   No.  Everything concentrated on whether or
14  not talc was a carcinogen and that was the evidence
15  that was presented.  I don't know any specifics.
16     Q   As you sit here today you don't know what
17  evidence was provided or not provided to the
18  National Toxicology Project concerning whether there
19  was asbestos in Johnson's Baby Powder at any point
20  in time.  Is that fair?
21     A   I don't know specific studies presented,
22  no.
23         MR. PLACITELLA:  Mark this as
24  Musco-4.
25         (The above document is marked

Page 203

1  Musco-4.)
2
3      Q   We mentioned a lot of names during the
4  course of the deposition.  I asked Leah, as we were
5  going through, to write down the name and what the
6  person did, so if anybody reads this transcript they
7  can try to make sense of what is here.
8         Would you take a minute and look at
9  that and see if there are any corrections that need
10  to be made.
11         MS. O'CONNOR:  To the best of your
12  recollection.
13         MR. PLACITELLA:  Right.
14     A   I made some changes.
15     Q   Are you satisfied that that is accurate?
16     A   To the best of my knowledge, yes.
17     Q   I don't think I have any other questions.
18  Thank you for your time.
19         I do apologize.  I was told by
20  counsel I got frisky at one point.  Italians have a
21  hard time with that.
22         THE VIDEOGRAPHER:  The time is now
23  5:00 p.m.  We are back on the record.
24
25

Page 204

1  CROSS EXAMINATION BY MS. O'CONNOR:
2      Q   Good afternoon, Ms. Musco, we know each
3  other.  I'm Kathy O'Connor and I would like to ask
4  you a few questions.
5         So we have been here for a while, but
6  I would like to know a little bit more about you and
7  your background.  Where did you grow up?
8      A   I grew up in New Jersey.
9      Q   Where in New Jersey grow up?
10     A   Bergen County, North Arlington.
11     Q   Did you go to high School?
12     A   Yes, Queen of Peace on North Arlington.
13     Q   Let's do that again.  Where did you go to
14  high school?
15     A   Queen of Peace High School in North
16  Arlington.
17     Q   Did you work or volunteer when you were in
18  high school?
19     A   Yes.  I was a candy striper pretty much in
20  my second year of high school all the way through.
21     Q   What is a candy striper?  I know what
22  those are, but not everyone does.
23     A   A candy striper is a volunteer in a
24  hospital.  It got their name from the striped
25  pinafore we used to wear.

1          These are volunteers who assist with
2   giving patient mail, giving out visiting cards, et
3   cetera, in a hospital.
4      Q   Why did you volunteer as a candy striper?
5      A   Because I wanted to be a nurse.  I
6   couldn't wait to get in the hospital.
7      Q   Why did you want to be a nurse?
8      A   I wanted to be a nurse ever since I was
9   about three years old.  A friend had given us, or
10  given me a nurse's uniform complete with cape and
11  cap.  I thought it was the greatest thing in the
12  world.  I wanted to be the one who knew what to do
13  in an emergency.
14     Q   Did you graduate high school and go on to
15  study nursing?
16     A   Yes.  I graduated high school and I went
17  to the University of Bridgeport in Connecticut.
18     Q   Did you major in nursing?
19     A   I majored in nursing.
20     Q   Did you work while you were in college?
21     A   Yes.  I worked as an LPN, a licensed the
22  practical nurse.  At that time after a year, year
23  and a half of nursing study you could take your
24  practical nurse test, which I did, and I passed.
25          So I was able to work in the summers

1   as a licensed practical nurse.  I worked in
2   Riverview Hospital in Red Bank.  Them I also worked
3   in Hackensack Hospital in Hackensack, New Jersey.
4      Q   What types of patients did you work with
5   while you were an LPN in college?
6      A   I took care of a myriad of different
7   patients.  What really stuck out in my mind was in
8   Hackensack there was an explosion nearby and the
9   hospital received a lot of burn victims.
10         They were looking for volunteers to
11  help take care of them.  So I was interested.  This
12  will be interesting.  I volunteered to take care of
13  one of the patients.
14     Q   What did you find interesting about
15  working with burn patients?
16     A   It was the ultimate challenge for me.
17  That actually sparked my interest in nursing.  I
18  knew that's what I wanted to do because it involved
19  the entire body, every system, everything could go
20  wrong.
21     Q   Did you go on to become a nurse in a burn
22  unit?
23     A   Yes.  After I graduated and passed my
24  registered nurse license, I went to St. Barnabas
25  Medical Center in Livingston, New Jersey.  There was

1   not a burn new unit at the time, but there was going
2   to be one.  So I wanted to be able to be in the
3   hospital.
4          I first worked in orthopedics and
5   then I worked in cardiac care.  After a little while
6   we were able to start our intensive training and I
7   was one of the first, or one of the ten first nurses
8   to open the burn unit.
9      Q   What were your responsibilities as a nurse
10  in the burn unit?
11     A   Everything and anything.  We were
12  responsible pretty much one on one to the patients
13  for their entire care, physical and emotional,
14  educational.
15         There was a lot to be done because
16  the patients were with us for an average of probably
17  two months.  So we not only had to care for them
18  in during the intensive period, but we had to
19  prepare them to go home, educate their families.
20         I started the burn clinic in an
21  educational program.  Sometimes we will go out to
22  different groups in the area.  If a child had been
23  burned, sometimes I went to their school and taught
24  his or her classmates what to expect when the child
25  came back.  A lot of teaching involved.

1      Q   When you said you participated in
2   education, was it just the patient, did it involve
3   the family?
4      A   The entire process.  Again, because the
5   patients were with us so long, and it was such a
6   catastrophic trauma that happened to them, their
7   entire family was involved and affected.
8          So we were educating both the
9   patients themselves and the family and the care of
10  the patient and what to expect.
11     Q   For how long were you a burn unit nurse?
12     A   About seven years all together.
13     Q   At some point you stopped being a burn
14  unit nurse.  Why did you do that?
15     A   It is a lot to do emotionally.
16     Q   What does that mean?
17     A   I think it is one of the worse things that
18  can happen to a human being because it involves not
19  only the physical trauma, but the emotional trauma
20  because it reflects how they look to the world, and
21  with the one on one, we as nurses, bore a lot of
22  those emotions for the patients.
23         We had to hurt them in order to make
24  them better, and that's not something you can do
25  easily day after day.  It was time for me to change.

Page 209

1      Q    Time for you to change.  What did you
2  decide to do?
3      A    Well, because I thought working in the
4  burn unit to me was the ultimate in patient care in
5  a hospital, I decided to look outside.
6          I enjoyed the teaching part so much.
7  I liked teaching my patients.  I wanted to continued
8  that in some form or another.
9      Q    Did you continue to teach people in some
10  form after you left the burn unit?
11      A    Yes.  I was lucky enough to earn a
12  position in Johnson and Johnson, Johnsn's Baby
13  Products at the time, where I was responsible for
14  speaking to consumers, which were mainly new
15  parents.
16          I not only talked to them about the
17  products, but got to talk to them about how to care
18  for their there babies?
19      Q    What made you choose Johnson and Johnson?
20      A    From New Jersey, and Johnson and Johnson
21  is one of the most respected companies in the world,
22  and certainly in our area.  In fact, to be honest, I
23  didn't even first look at Johnson and Johnson
24  because I thought they were too special and maybe
25  they wouldn't hire me, but it definitely is one

Page 210

1  of the best.
2          My brother had worked there.  I just
3  knew it was one of the best companies to work with.
4      Q    How long did you work at Johnson and
5  Johnson?
6      A    Thirty years.
7      Q    When did you leave?
8      A    2012.
9      Q    Why did you leave?
10      A    We were downsizing, departments were
11  changing and I'm now officially retired.
12      Q    So now that you are officially retired,
13  what do you do to fill your days?
14      A    I work for Dress for Success in Central
15  New Jersey.  I'm a program manager.
16      Q    And what does a program manager do?
17      A    Well, Dress for Success not only provides
18  clothes for people, but we provide a network of
19  support and job development and life skill workshops
20  for woman who are unemployed.  I'm the one who
21  designs and facilitates the workshops.
22      Q    How do you get your clients at Dress for
23  Success?  Where do they come from?
24      A    All our clients are referred to us from
25  the many social agencies in the area.  We are

Page 211

1  responsible for seven counties in New Jersey,
2  Central New Jersey.  You can imagine it is a wide
3  spread area.
4          We get them from a lot of domestic
5  violence centers, we get them from the county
6  unemployment and we also get them from homeless
7  shelters.
8      Q    What kind of work do you do with them?
9      A    Helping them find their goals, where they
10  need to go in life, helping them identify their
11  journey and what they would like to accomplish so
12  they could get meaningful employment.
13      Q    How do you help them identify their goals?
14      A    One of the biggest things I do is I lead a
15  program called Designing Your Future, which is a
16  nine week program where we meet weekly.  We start
17  off with goals and objective and we discuss
18  emotional intelligence, healthy living as well as
19  resumes and interviewing.
20      Q    Do any of your clients go on to work in
21  nursing?
22      A    Yes.  As a matter of fact, I recently had
23  a client and one of the things I was asking the
24  first day is if they could be anything they wanted
25  to be, never mind money, education, location, or

Page 212

1  whatever, what would they be.
2          Sometimes I get some crazy things.
3  This one particular woman said she wanted to be a
4  nurse.  I said I'm a nurse.  We will have to talk.
5          She said to me actually, I want to be
6  a burn nurse.  I situated that's pretty specific.
7      Q    Did she know you were a burn nurse?.
8      A    She didn't even know I was a nurse was a
9  pretty specific thing to say.  I said we have to
10  talk.
11          I went up to her on a break.  We
12  started talking.  I'm going to get the chills every
13  time I talk about this.  It turns out when she was
14  three years old she had been severely burned by
15  accidently pulling a pot of boiling water over on
16  herself.  Her parents were not paying attention to
17  her.  She had a rough life.
18          She was severely burned and she was
19  taken to St. Barnabas.  When I told her what I did,
20  she started crying, I started crying.  She said she
21  has been looking to thank the nurses who saved her
22  life.  Quite a story.  I went on to mentor her.  We
23  worked very close.
24          She now has her high school diploma
25  She didn't at the time.  She got out of her domestic

Page 213

1   violence situation and in January she starts her
2   nursing course.
3        Q    That's a remarkable story.  Do you have
4   children of your own?
5        A    Two children, a boy and a girl.  They are
6   all grown now.
7        Q    Mr. Placitella asked you a lot of
8   questions about the safety of Johnson's Baby Powder
9   with talc.  Did you ever use Johnson's Baby powder
10  with talc in your house?
11       A    I used it on both my children.  I even
12  used it on my elderly mother and from time to time
13  used it on myself.
14       Q    Do you still believe in the safety of
15  Johnson's Baby Powder with talc?
16       A    Absolutely.  We use Johnson's Baby Powder
17  with talc.  It's safe.
18       Q    Thank you for your time.
19            THE VIDEOGRAPHER:  The time is now
20  5:12 p.m.  We are off the record.
21            THE VIDEOGRAPHER:  The time is now
22  5:13 p.m.  We are back on the record.
23
24
25

Page 214

1   REDIRECT EXAMINATION BY MR. PLACITELLA:
2        Q    A couple of questions.  One, thank you for
3   your kindness.
4        A    You're welcome.
5        Q    I'm assuming that your kids and your mon
6   are all healthy and they don't suffer any ill
7   effects at this point?
8        A    My children are very healthy.  My mother
9   is deceased now.  She died when she was 99.
10       Q    Oh, great.  So you've got good genes.  You
11  tried to do the best job you could when you were at
12  Johnson and Johnson.  Is that fair?
13       A    Absolutely.
14       Q    And because you were the person dealing
15  with the public, your ability to do your job
16  correctly and appropriately was only as good as the
17  information that you were provided about the
18  products.  Is that fair?
19       A    Partly, but I think that I also was able
20  to do a good job because I was able to draw on my
21  nursing experience.  That was part of why I was
22  hired.  I had the ability to speak to people.  Again,
23  meet them where they are in a way they could understand.
24       Q    I understand.  Part of it was you were the
25  kind of person that Johnson and Johnson believed

Page 215

1   people trusted.  Is that fair?
2        A    Yes.
3        Q    You were one of those kinds of people?
4        A    I hope so.
5        Q    When they had you go out and speak to
6   people, they kind of knew that about you, that you
7   were one of those people that people kind of liked
8   and would trust if they told them something about
9   the product.  Is that fair?
10            MS. O'CONNOR:  Objection to the form.
11  You can answer.
12       A    Again, I hope people do trust me, yes.
13       Q    So if you were given information about the
14  product, the information that you are providing is
15  only as good as the information that had been
16  provided to you, correct?
17       A    Yes.  From our scientists I believe and
18  trust their expertise, yes.
19       Q    And while you were there, even though you
20  were in charge of communicating with the public
21  about Johnson and Johnson's Baby Powder, no one ever
22  told you about any of the tests where they found
23  asbestos in the mines that were the source of
24  Johnson' Baby Powder, correct?
25            MS. O'CONNOR:  Objection to the form

Page 216

1   of the question.  You can answer.
2        A    What I do know is there's no asbestos in
3   Johnson's Baby Powder.
4        Q    That wasn't my question, Ma'am, with all
5   due respect.  When you were making the statements,
6   no one at Johnson and Johnson ever told you anything
7   about any of the tests where asbestos was found in
8   the mines that were the source of the Johnson's Baby
9   Powder, correct?
10            MS. O'CONNOR:  Objection to the form.
11  You can answer.
12       A    I'm not familiar with any of those tests.
13       Q    No one ever told you?
14            MS. O'CONNOR:  Objection.
15       A    I'm not familiar.
16       Q    And can you put your plant on that black
17  book right there.  And no one ever told you about
18  any of the tests that were in that block book,
19  right?
20            MS. O'CONNOR:  Objection to the form.
21  You may answer.
22       A    I've not seen these, no.
23       Q    Although you met with your attorney for
24  almost twelve hours, your attorney never showed you
25  any of the tests in that black book, correct?

Page 217

```
 1              MS. O'CONNOR:  Objection to the form.
 2      A   Yes, that is correct .
 3      Q   Johnson and Johnson trusted you.  Is that
 4  fair?
 5      A   I would like to think that, yes.
 6      Q   And you trusted Johnson and Johnson?
 7      A   Absolutely.
 8      Q   And you tried to convince people to trust
 9  Johnson and Johnson?
10              MS. O'CONNOR:  Objection to the form.
11  You may answer.
12      A   I trusted the company and tried to convey
13  their trust, yes.
14      Q   And whether that trust was justified or
15  not only goes so far as to whether the information
16  that you were provided was true and accurate in all
17  respects, correct?
18      A   I believe that trust was deserved.
19      Q   It only went so far as the
20  information you were providing was true, complete
21  and accurate in all respects, correct?
22              MS. O'CONNOR:  Objection to the form.
23      A   Trust is based on information, but it is
24  also based on reputation.  It is a company made up
25  of people.
```

Page 218

```
 1      Q   And there are very good people at Johnson
 2  and Johnson, right?
 3      A   Absolutely.
 4      Q   But there are people who had discussions
 5  about the powder, the baby powder, as we saw in the
 6  documents during the course of this deposition that
 7  they didn't even tell you about, and you were the
 8  person in charge of going and talking to the public,
 9  right?
10              MS. O'CONNOR:  Objection to the form.
11  Vague and ambiguous.  Over broad.
12      A   I didn't see every document, no.
13      Q   And they had discussions outside of your
14  presence about the dangers or problems associated
15  with baby powder and those were never communicated
16  to you as the person who was in charge of dealing
17  with the public as it relates to baby powder, right?
18              MS. O'CONNOR:  Same objection.
19  Compound, vague, ambiguous.  You can answer.
20      A   There may have been conversations that I
21  was not privy to, yes.
22      Q   That's all the questions I have.  Thank
23  you.
24              THE VIDEOGRAPHER:  The time is now
25  5:19 p.m. and this concludes today's deposition.  We
```

Page 219

```
 1  are going off the record.
 2              (The deposition is concluded.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 220

```
 1          C E R T I F I C A T E
 2
 3          I, MARC BRODY, Notary Public and
 4  Certified Shorthand Reporter of the State
 5  of New Jersey, do hereby certify that prior
 6  to the commencement of the examination
 7  the witness was duly sworn by me to
 8  testify the truth, the whole truth and
 9  nothing but the truth.
10          I DO FURTHER CERTIFY that the
11  foregoing is a true and accurate transcript
12  of the testimony as taken stenographically
13  by and before me at the time, place and on
14  the date hereinbefore set forth.
15          I DO FURTHER CERTIFY that I am neither
16  a relative of nor employee nor attorney nor
17  counsel for any of the parties to this
18  action, and that I am neither a relative
19  nor employee of such attorney or counsel,
20  and that I am not financially interested in
21  the action.
22
23
24      Notary Public of the State of New Jersey
25
```

55  (Pages 217 to 220)

Exhibit 14

*The Journal of Obstetrics and Gynaecology of the British Commonwealth*
March 1971. Vol. 78. pp. 266–272.

# TALC AND CARCINOMA OF THE OVARY AND CERVIX

BY

W. J. HENDERSON, *Electron Microscopist*
*Tenovus Institute for Cancer Research*

C. A. F. JOSLIN, *Consultant Radiotherapist*
*Velindre Memorial Centre for Cancer Research*

A. C. TURNBULL, *Professor of Obstetrics and Gynaecology*
*Welsh National School of Medicine*

AND

K. GRIFFITHS, *Director*
*Tenovus Institute for Cancer Research, Welsh National School of Medicine, Cardiff*

## Summary

An extraction-replication technique was used to examine tissue from patients with ovarian and cervical tumours. In both conditions talc particles were found deeply embedded within the tumour tissue. The close association of talc to the asbestos group of minerals is of interest.

THE development in this laboratory of an extraction-replication technique (Henderson, 1969) for the study of foreign particles within tissues has allowed the *in situ* identification of crocidolite asbestos within the tissue of various mesotheliomas (Henderson *et al.*, 1969) removed from patients who had been concerned with the manipulation of asbestos in industry. This technique has now been applied to the study of tissue from ovarian and cervical carcinoma.

### MATERIALS AND METHODS

*Tissue*

The tissue studied was obtained from patients with cancer of either the ovary or the cervix, and was first prepared as paraffin sections for normal routine histological examination but was unstained. Sections were then stained for histological assessment in the usual manner, and adjacent unstained tissue prepared for electron microscopy.

*Replication Technique*

The extraction-replication procedure has been described (Henderson, 1969). Sections of tissue were immersed in xylene and in ethanol, and the dehydrated tissue was then embedded by impressing the section on to the surface of a thin sheet of acetone-softened cellulose acetate, mounted on a glass slide, and left to harden. On removing the slide, the embedded tissue was left in the cellulose acetate. The tissue was then outlined with thin strips of Scotch tape to form a shallow well, and a 10 per cent (v/v) polyvinyl alcohol (PVA) solution applied. When the PVA had hardened it was stripped from the section providing a replica of the tissue surface. Foreign particles associated with the tissue are often removed with the PVA during this stripping process.

A complete sequential examination through the embedded tissue is possible by taking successive strippings. These surface replicas were then preshadowed with platinum, a carbon film deposited for strength, and the PVA removed by floating the replica in a hot water bath. Replicas were mounted on electron microscope grids for examination, using the AEI-6B microscope.

### RESULTS

No asbestos particles were found in any of the tissue studied. Particles of talc were identified in approximately 75 per cent (10 of 13) of the

266

Plaintiff's Exhibit No.

P-1

Pltf_MedLit_00000121



FIG. 1

Typical decoration pattern on a particle of natural talc. Numerous crystal lattice planes are shown (a). (×30 000.) Scale refers to $1 \cdot 0 \mu$.



FIG. 2

Commercial talc preparations illustrating the decoration pattern. (×40 000.)

Pltf_MedLit_00000121

Case 3:16-md-02738-MAS-RLS   Document 16133-1   Filed 12/22/20   Page 95 of 747 PageID: 123741



FIG. 3

Micrograph of tissue from a serous papillary cystadeno-carci-
noma of the ovary removed from a 27-year-old female. No
previous abdominal operations had been carried out. The
decoration pattern and lattice planes are shown. (×30 000.)

ovarian tumours. Using the replication technique identification of talc is possible because of the characteristic "decoration pattern" induced by the evaporation of platinum *in vacuo* on the crystal surface. Figure 1 shows this pattern on a particle of *natural* talc and the distinctive lattice planes of the crystals. Anthophyllite asbestos, which is known to be converted naturally to talc, is the only crystalline material which is at present indistinguishable from talc by using the replication technique. The decoration pattern on material from a commercial talc preparation is also demonstrated in Figure 2.

Material found within the ovarian tumours and identified as talc is illustrated in Figure 3. The talc particles were found deep within the tumour tissue. Some were as small as 1000Å in size but they were generally within a range from 1000Å to 2 $\mu$.

Talc particles were also found embedded within tumours of the cervix. Figure 4 shows one such particle embedded in a capillary wall within the tumour, and Figure 5 illustrates the decoration pattern of the particle at a higher magnification. Crystals as large as 5 $\mu$. were found in tissue from the cervical tumours and were generally larger than those seen in the ovarian tumours. Talc crystals were found in

Pltf_MedLit_00000121

Case 3:16-md-02738-MAS-RLS   Document 16133-1   Filed 12/22/20   Page 96 of 747 PageID: 123742



FIG. 4

Micrograph of tissue from a squamous-cell carcinoma of the cervix from a 62-year-old female. C—capillary, R—red cell. The particle of talc can be seen in the wall of the capillary. (×3500.)



FIG. 5

A higher magnification of the talc particles outlined in Fig. 4. The typical decoration pattern is shown. (×40 000.)

Pltf_MedLit_00000121



FIG. 6

Talc particles found in tissue from a pneumo-coniotic lung. (×30 000.)



FIG. 7

Micrograph from the deepest part of an extensive papillary adenocarcinoma entirely replacing the endometrium in a 58-year-old woman, 8 years postmenopausal. Both ovaries were enlarged by hilar metastases, showing histological features similar to the primary endometrial lesion. Numerous talc particles were found in the primary endometrial carcinoma, but none in the metastatic ovarian tumours. (×26 000.)

Pltf_MedLit_00000121

approximately 50 per cent of the cervical tumours examined (12 of 21) but it must be realized that these particles are extremely minute, often with the dimensions of viruses, and only small regions of the tumour tissue could be studied. Approximately ten replication "strippings" for electron-microscope examination are usually taken from each thin section of the tissue. Figure 6 illustrates the use of the technique in the examination of pneumoconiotic lung tissue from a patient whose industrial history indicated long exposure to Norwegian talc.

Many particles of talc were found concentrated in the deeper layers of a primary carcinoma of the endometrium (Fig. 7) whereas extensive studies of a secondary tumour in the ovary in the same patient did not show the presence of talc. Application of the technique to "normal" ovarian tissue removed from patients with breast cancer has also shown talc particles in 5 of 12 such tissues studied. Extensive study at high magnification with the electron microscope is, however, required for evaluation of a replica and particles could easily be missed.

The application of electron-microscope microanalysis (EMMA-AEI, Harlow, England) to the particles extracted by the replication technique has provided preliminary evidence that the crystals contain magnesium and silicon, talc being a magnesium silicate.

## DISCUSSION

The possibility that the increasing incidence of carcinoma in western society may be related to a corresponding increase in the use of asbestos (Graham and Graham, 1967) is of interest, especially with regard to pleural and peritoneal mesotheliomas in workers exposed to crocidolite asbestos in industry (Wagner et al., 1960; Elwood and Cochrane, 1964). There have been a number of reports about the relationship between asbestos and carcinogenesis (Smith et al., 1965; Jacob and Anspach, 1965). However, the identification of asbestos fibres within tissue is extremely difficult. Fine particles embedded within tumour tissue are usually beyond the limits of resolution of the optical microscope, and tissue incineration, followed by electron microscopy of the isolated particles, may be unreliable if chemical changes are induced by the procedure. Using normal light microscopy, identification of asbestos particles is based on the presence of characteristic ferritin bodies on some of the fibres, although these cannot easily be distinguished from similar bodies around elastin fibres (Henderson et al., 1970). This procedure may not, however, be as unreliable as the use of polarized light for the demonstration of brightly illuminated "birefringent crystals of asbestos".

The replication technique (Henderson, 1969) failed to show asbestos fibres in the ovarian neoplasms studied. On the other hand, there was good evidence for the presence of talc, often indistinguishable from anthophyllite asbestos, within the ovarian tissue. (Anthophyllite is converted naturally to talc.) The talc particles were found localized deep within tumour tissues, and not universally dispersed throughout the tumour. The talc particles in the ovary were generally much smaller than those found in the tissue from the tumours of the cervix.

The relationship between asbestos and mesotheliomas appears well established, and the replication technique has provided unequivocal evidence for the presence of fibres within such tumours. This technique has also produced evidence for the presence of talc in tissue from pneumoconiotic lungs of a patient with an industrial history of exposure to Norwegian talc (Henderson et al., 1970). The presence of mica, kaolin and asbestos fibres were also identified in tissue from these pneumoconiotic lung tissue.

Although it is impossible to incriminate talc as a primary cause of carcinomatous changes within either the cervix or the ovary on the preliminary observations described here, the possibility that talc may be related to other predisposing factors should not be disregarded and further investigations are obviously required.

## ACKNOWLEDGEMENTS

The authors gratefully acknowledge the generous financial support of the Tenovus Organization. They also thank Dr. J. W. Dobbie, Department of Pathology, Royal Infirmary, Glasgow, for supplying a number of tissue sections, and also Mr. D. E. Evans, Department of Geology, National Museum of Wales, for the natural minerals required for reference purposes.

272    HENDERSON, JOSLIN, TURNBULL AND GRIFFITHS

### REFERENCES

Elwood, P. C., and Cochrane, A. L. (1964): *British Journal of Industrial Medicine*, 21, 304.

Graham, J., and Graham, R. (1967): *Environmental Research*, 1, 115.

Henderson, W. J. (1969): *Journal of Microscopy*, 89, 369.

Henderson, W. J., Gough, J., and Harse, J. (1970): *Journal of Clinical Pathology*, 23, 104.

Henderson, W. J., Harse, J., and Griffiths, K. (1969): *European Journal of Cancer*, 5, 621.

Jacob, G., and Anspach, M. (1965): *Annals of New York Academy of Sciences*, 132, 536.

Keal, E. E. (1960): *Lancet*, 2, 1211.

Smith, W. E., Miller, L., Elsasser, R. E., and Hubert, D. D. (1965): *Annals of New York Academy of Sciences*, 132, 456.

Wagner, J. C., Sleggs, C. A., and Marchand, P. (1960): *British Journal of Industrial Medicine*, 12, 260.

Pltf_MedLit_00000121

Exhibit 15



# MOUNT SINAI SCHOOL OF MEDICINE
## of The City University of New York
FIFTH AVENUE AND 100TH STREET·NEW YORK, N.Y. 10029



Department of Community Medicine

₌ 9 SEP 1971

August 22, 1971

Mr. W.J.Henderson
Tenovus Institute for Cancer Research
The Welsh National School of Medicine
Heath
Cardiff, Wales
Great Britain

Dear Mr. Henderson:

My colleagues and I have read with great interest the recent report "Talc and Carcinoma of the Ovary" in the British Journal of OB-GYN. You and your associates are to be congratulated on a very good and important piece of work.

Dr. Hildick-Smith, medical director for Johnson and Johnson Company, forwarded to our laboratory a block of tissue from the Tenovus collection. We have studied the material and have confirmed your observations. We have also found other particles of interest. We feel these new observations are worthy of report to the scientific community here in the United States.

Would you or your colleagues object to our reporting these additional findings? We will certainly acknowledge your work, findings, and the origin of the tissue.

We shall be looking forward to hearing from you concerning this matter.

Sincerely,

Arthur M. Langer
Associate Professor of Mineralogy

AML/lh

Exhibit 16

# Migration of a Particulate Radioactive Tracer from the Vagina to the Peritoneal Cavity and Ovaries

P. F. VENTER, M. ITURRALDE

## SUMMARY

In this report we describe a radionuclide procedure designed to evaluate the migration of a particulate radioactive tracer from the vagina to the peritoneal cavity and ovaries, as well as the determination of the patency of the pathways between these two extremes of the female reproductive system.

$^{99m}$Tc-labelled human albumin microspheres ($^{99m}$Tc-HAM) were deposited in the posterior fornices of 24 patients a day before they were to undergo different gynaecological operations. During this period sequential images were obtained during and after the operation radioactivity levels in the removed organs and tissues were counted with a scintillation detector.

In 14 out of 21 cases, the ovaries and fallopian tubes were counted separately from the uterus. Nine were positive (radioactivity levels were sufficiently high in the tubes and ovaries) and 5 were negative (no substantial radioactivity levels could be detected in either the tubes or the ovaries). The 5 negative results all occurred in patients with proved tubal damage as a result of previous infection.

All the results were either true positive or true negative, providing evidence of migration, or obstruction, of $^{99m}$Tc-HAM from the vagina through the uterus and tubes to the peritoneal cavity and ovaries.

S. Afr. med. J., 55, 917 (1979).

In the female, the peritoneal cavity is linked with the outside via the fallopian tubes, the uterus and the vagina, and there is evidence of migration of different substances in either direction. For example, malignant cells from ovarian carcinoma can be demonstrated in the posterior fornix of the vagina.[1] After menstruation the gonococcus can penetrate the cervix and gain access through the uterus and tubes to the peritoneal cavity and ovaries.[2] For pregnancy to occur, spermatozoa have to move up the uterus and the ova down the tube. Retrograde menstruation is also a well-known phenomenon. After insufflation, air and gases pass easily from the vagina into the peritoneal cavity up to the diaphragm. Radio-opaque contrast media are introduced with great ease through the uterus and

tubes into the peritoneal cavity, and tubal patency is easily demonstrated during peritoneoscopy by injection of a dye through the cervix and into the tubes.[3]

Does this also hold for inert chemical substances? Will a chemical substance deposited in the vagina later appear in the peritoneal cavity? Such migration could well explain the aetiological role of chemical substances in certain gynaecological diseases. It has already been suggested that talcum powder is one of these potentially dangerous inert chemical products. Electron micrographic slides of removed human ovaries have shown asbestos particles resting on them, and there is evidence that these particles originated from talc used to dust condoms.[4]

To demonstrate the upward migration of chemical substances we made use of radionuclide imaging and counting techniques.

## MATERIAL AND METHODS

The subjects of this study were 24 adult women, both Blacks and Whites, from the Academic Hospitals of the University of the Orange Free State in Bloemfontein. All had been admitted to hospital for elective gynaecological surgical operations (Table I). The radionuclide procedure was explained and the necessary consent obtained

### TABLE I. SURGICAL INDICATION AND OPERATIVE PROCEDURE

| Number of patients | Surgical indication | Operative procedure |
|---|---|---|
| 4 | Sterilization | Fimbriectomy |
| 7 | Ca. breast stage III | Bilateral salpingo-oöphorectomy |
| 1 | Ca. breast stage III | Hysterectomy and bilateral salpingo-oöphorectomy |
| 2 | Postmenopausal bleeding | Dilatation and curettage |
| 2 | Postmenopausal bleeding | Hysterectomy and bilateral salpingo-oöphorectomy |
| 3 | Menorrhagia | Dilatation and curettage |
| 4 | Menorrhagia | Hysterectomy and bilateral salpingo-oöphorectomy |
| 1 | Pelvic infection | Hysterectomy and bilateral salpingo-oöphorectomy |

## Procedure

The patient was placed in the supine position with the buttocks slightly elevated. The cervix and posterior fornix were exposed with a Cusco vaginal speculum and between 10 and 15 mCi of $^{99m}$Tc-labelled human albumin microspheres (HAM) in a volume of less than 3 ml was

Department of Obstetrics and Gynaecology, University of the Orange Free State and Academic Hospitals, Bloemfontein
P. F. VENTER, M.MED. (O. & G.), F.R.C.O.G., Professor

Department of Nuclear Medicine, University of the Orange Free State and Academic Hospitals, Bloemfontein
M. ITURRALDE, M.D., D.M., Professor and Head

Date received: 22 November 1978.
Reprint requests to: Professor M. Iturralde, Dept of Nuclear Medicine, University of the Orange Free State, PO Box 339 (M. 27), Bloemfontein, RSA.

Case 3:16-md-02738-MAS-RLS    Document 16133-1    Filed 12/22/20    Page 103 of 747 PageID: 123749

JNJ 000005093

918      SA MEDIESE TYDSKRIF      2 Junie 1979

deposited in the posterior fornix. The patient was kept in this position for about 2 hours. The vulva was covered with a sanitary towel, and the legs were pressed together to prevent the radionuclide solution streaming from the vagina and thus lowering count levels.

In a few cases images were obtained, 4 and 24 hours after deposition of the radioactive tracer, with a Nuclear Chicago Pho/Gamma III scintillation camera (Figs 1 and 2). In most cases a count was performed on removed surgical specimens as a whole or separately on the uterus

and adnexae, for 1 000 seconds in a 12,7-cm well scintillation detector. In one case a piece of the anterior peritoneum, fluid from the pouch of Douglas and blood were also included in the count, to determine the possibility of reabsorption into the bloodstream from the vaginal mucosa.

Radiation exposure to the patients was low owing to the short half-life of $^{99m}$Tc (6 hours), and in most cases it was almost negligible since the target organs had been surgically removed.



**Fig. 1.** Scintiphotographs showing positive $^{99m}$Tc-HAM migration: A — from the vagina to the uterus (4 hours after deposition); B — in both tubes (6 hours after deposition); C — reaching the peritoneal cavity and ovaries 24 hours after deposition (markers in the anterior superior iliac spines).



**Fig. 2.** Scintiphotographs showing negative $^{99m}$Tc-HAM migration: A — in the left tube (4 hours after deposition); the right tube is patent; B — in both tubes; 24 hours after deposition radioactivity remains in the uterus (markers in the anterior superior iliac spines).

JNJ 000005094

Case 3:16-md-02738-MAS-RLS   Document 16133-1   Filed 12/22/20   Page 105 of 747 PageID: 122751

## RESULTS

A total of 24 patients were examined. Because radionuclide material streamed away from the vagina in 3 patients, these cases were considered technically defective and were not included in the final analysis.

Of the remaining 21 cases 16 were positive, that is sufficiently high radioactivity levels were obtained as evidence of migration of the radioactive tracer to the uterus or the tubes and ovaries. The results were negative in 5 cases; in 2 of them the radioactive microspheres did not pass from the vagina to the uterus and in the other 3 there was no migration to the adnexae or fimbria. In the latter, it was impossible to determine radioactivity levels in the uterus because the latter was not removed.

### TABLE II. SUMMARY OF RESULTS

| Patient | Tissue examined | Radioactivity present (+) or absent (−) |
|---|---|---|
| 1 | Organ imaging fimbria | Uterus, adnexa, fimbria + |
| 2 | Organ imaging | Uterus and adnexa + |
| 3 | Organ imaging fimbria | Uterus, adnexa, fimbria + |
| 4 | Organ imaging adnexa | Uterus +, adnexa + |
| 5 | Uterus and adnexa | Uterus +, adnexa − |
| 6 | Endometrium | Endometrium − |
| 7 | Organ imaging endometrium | Uterus and endometrium + |
| 8 | Organ imaging endometrium | Uterus and endometrium − |
| 9 | Endometrium | Endometrium + |
| 10 | Uterus and adnexa | Uterus and adnexa + |
| 11 | Adnexa | Adnexa + |
| 12 | Uterus and adnexa | Uterus and adnexa + |
| 13 | Uterus and adnexa | Uterus, adnexa + |
| 14 | Endometrium | Endometrium + |
| 15 | Uterus and adnexa | Uterus +, adnexa − |
| 16 | Adnexa | Adnexa + |
| 17 | Adnexa | Adnexa + |
| 18 | Fimbria | Fimbria − |
| 19 | Uterus and adnexa | Uterus and adnexa + |
| 20 | Adnexa | Adnexa − |
| 21 | Adnexa | Adnexa − |

In 14 out of 21 cases it was possible to measure radioactivity levels in the adnexa separately from the uterus. Nine of these showed marked radioactivity in the tubes and ovaries, while in 5 the radioactivity levels were not much higher than the background. In all 5 of these patients, severe tubal occlusion due to previous infection was confirmed by study of the removed specimens (Table II).

In 1 case, radioactivity levels in blood were not much higher than in the background, which indicated that radioactive tracer had not reached the adnexa through the blood supply owing to local reabsorption in the vaginal mucosa.

## DISCUSSION

Evidence is available for migration of different substances in either direction within the female reproductive system between the peritoneal cavity and ovaries via the tubes, uterus and vagina, and the outside. Various living organisms actively follow this pathway in both directions. Gases, fluids, dyes and contrast media can easily be introduced from the vagina into the peritoneal cavity. If transit can take place so easily, it is probably the same for many chemical substances used for hygienic, cosmetic or medicinal purposes, many of which may have potential carcinogenic or irritating properties.

To prove this would be of great practical value, because migration of certain chemical substances could play an important aetiological role in gynaecological diseases and especially in carcinoma of the ovary.

We found the use of a particulate radioactive agent such as $^{99m}$Tc-HAM with a size range of 30 - 50 $\mu$m to be a suitable and safe means of imaging and evaluating tubal patency and demonstrating the possibility of transit of particles from the vagina to the peritoneal cavity and ovaries.

Results obtained by this technique correlated with findings in the surgically removed specimens, thus demonstrating the accuracy of this radionuclide procedure.

REFERENCES

1. Graham, R. and Graham, R. C. (1967): Brit. J. Obstet. Gynaec., 74, 371.
2. Schwartz, R. H. in Monet, G. R. G., ed. (1974): Diseases in Obstetrics and Gynaecology, pp. 381 - 395. London: Harper & Row.
3. Jordan, J. A. (1974): Clinics Obstet. Gynaec., 1, 395.
4. News and Comment (1978): S. Afr. med. J., 54, 14.

JNJ 000005095

Exhibit 17

# Ovarian Cancer and Talc

## A Case-Control Study

DANIEL W. CRAMER, MD,*†‡ WILLIAM R. WELCH, MD,§ ROBERT E. SCULLY, MD,‖
AND CAROL A. WOJCIECHOWSKI, RN‡

Opportunities for genital exposure to talc were assessed in 215 white females with epithelial ovarian cancers and in 215 control women from the general population matched by age, race, and residence. Ninety-two (42.8%) cases regularly used talc either as a dusting powder on the perineum or on sanitary napkins compared with 61 (28.4%) controls. Adjusted for parity and menopausal status, this difference yielded a relative risk of 1.92 ($P < 0.003$) for ovarian cancer associated with these practices. Women who had regularly engaged in both practices had an adjusted relative risk of 3.28 ($P < 0.001$) compared to women with neither exposure. This provides some support for an association between talc and ovarian cancer hypothesized because of the similarity of ovarian cancer to mesotheliomas and the chemical relation of talc to asbestos, a known cause of mesotheliomas. The authors also investigated opportunities for potential talc exposure from rubber products such as condoms or diaphragms or from pelvic surgery. No significant differences were noted between cases and controls in these exposures, although the intensity of talc exposure from these sources was likely affected by variables not assessed in this study. *Cancer* 50:372–376, 1982.

THE POSSIBILITY that ovarian cancer may be caused by exposure to certain hydrous magnesium silicates such as talc and asbestos has been raised by several researchers.[1-3] The lack of epidemiologic studies regarding this hypothesis prompted us to investigate talc exposure in a case-control study of ovarian cancer.

From the Departments of *Obstetrics, †Gynecology, and §Pathology, Boston Hospital for Women, Division of the Brigham and Women's Hospital, the ‡Department of Epidemiology, Harvard School of Public Health and the ‖Department of Pathology, Massachusetts General Hospital, Harvard Medical School, Boston, Massachusetts.

Supported by Grant Number 5-RO1 CA24209, awarded by the National Institutes of Health, DHEW.

Address for reprints: Dr. Cramer, Department of Obstetrics and Gynecology, Brigham and Women's Hospital, Boston, MA 02115.

This study could not have occurred without the generous participation of many clinicians and institutions in the greater Boston area including: Dr. Emanuel Friedman of the Beth Israel Hospital, Drs. Robert Knapp and Thomas Griffiths of the Brigham and Women's Hospital and Sidney Farber Cancer Institute, Dr. Arthur Hassett of the Brockton Hospital, Dr. Joel Rankin of the Framingham Union Hospital, Dr. Edward Copenhaver of the Lahey Clinic Foundation, Dr. James Nelson of the Massachusetts General Hospital, Dr. Clement Yahia of the New England Deaconess Hospital, Dr. Lalita Gandbhir of the Pondville Hospital, Dr. James Whelton of Saint Elizabeth's Hospital, Dr. Stephen Alpert of the Salem Hospital, Dr. Richard Hunter of the University of Massachusetts Medical School. The superb clerical and technical assistance of Ms. Eileen McManus, Ms. Sally Cassells, and Ms. Christine Peters is also gratefully acknowledged.

Accepted for publication December 29, 1981.

## Methods

The cases studied were women with ovarian cancer, diagnosed between November 1978 and September 1981 and identified through the pathology logs or tumor boards of twelve participating hospitals in the Greater Boston area. The study was restricted to English-speaking residents of Massachusetts ranging in age from 18 to 80 years. During the study period, 297 eligible cases were identified. Physicians denied permission to contact their patients in 13 instances. Fourteen patients declined to participate, and 14 other patients had died or moved before they could be contacted.

For each of the 256 interviewed cases, slides of the surgical specimens were reviewed by two authors (W.R.W. or R.E.S.). Eighteen cases were excluded as nonovarian primaries. Each ovarian tumor was classified according to the Histological Classification of Ovarian Tumors of the World Health Organization.[4] The present analysis was restricted to 215 white women with epithelial cancers, including 39 with tumors of borderline malignancy and their matched controls.

Control cases were identified through the Massachusetts Town Books, annual publications that list residents by name, age, and address. Controls were selected randomly from those women who matched cases by precinct of residence, race, and age within two years. Additionally, it was required that a subject be excluded

0008-543X/82/0715/0372 $0.75 © American Cancer Society

JNJ 000020733

as a control if she had had a bilateral salpingo-oopho-rectomy, but subjects were not excluded because of prior hysterectomy or other types of pelvic operations. Women who had had pelvic operations were generally confident in their knowledge of whether their ovaries had been removed, but the nature of the operations could not be verified by hospital records in each instance. Women whose statements could not be verified were included or excluded on the basis of their recollection of the surgery. The 215 controls in this study were eventually obtained from a total of 475 potential controls identified through the Town Books. Fifty-six (12%) of the total could not be reached because they had moved, died, or had disconnected or unlisted phones. Twenty-nine (6%) of the total were ineligible because of a history of bilateral salpingo-oophorectomy, while 20 (4%) were of the wrong age or race or did not speak English. Of the total potential controls, 155 (33%) refused to participate. If the 215 cases are characterized as to ease of matching, 121 (56%) cases were matched with no refusals, 58 (27%) were matched after one refusal, and 36 (17%) were matched only after two or more refusals.

Interviews were conducted personally to assess a number of factors from the menstrual and reproductive history, medical and family history, and environmental exposures. This report will deal only with the results of several questions related to potential or definite talc exposure by way of contraceptive practices, operations, or perineal hygiene. Subjects were stratified by potential confounders described below, and adjusted relative risks associated with these exposures were calculated by the Mantel-Haenszel procedure as adapted by Rothman and Boice.[5] To accommodate other confounders as well as the matched design in the data collection, logistic analysis for matched data as described by Breslow et al.[6] was also employed.

## Results

The average age (and standard error of the mean, SEM) for cases was 53.2 (1.0) years and for controls,

TABLE 1.   Characteristics of Cases and Controls

| Characteristic | Cases (Total = 215) | | Controls (Total = 215) | |
|---|---|---|---|---|
| | No. | % | No. | % |
| Educational level (completed college) | 48 | 22.3 | 49 | 22.8 |
| Religion (Roman Catholic) | 126 | 58.6 | 128 | 59.5 |
| Marital status (never married) | 46 | 21.4 | 24 | 11.2 |
| Nulliparous | 78 | 36.3 | 39 | 18.1 |
| Menopausal status (postmenopausal*) | 137 | 63.7 | 129 | 60.0 |

* Postmenopausal at time of diagnosis for cases or for interview for controls.

53.5 (1.0) years. Table 1 shows other characteristics of subjects. Controls were comparable to cases in educational level and religion. Cases and controls differed significantly in marital status and parity with parity being the more important discriminator between them. Sixty-four percent of the cases were postmenopausal at the time of diagnosis, whereas 60% of controls were postmenopausal. Of these, 15 cases and 20 controls had had an artificial menopause. Parity and menopausal status were considered important potential confounders in this analysis and were adjusted for as described above.

Relative risks associated with potential talc exposure from contamination on rubber products are explored in Table 2. Although surgical gloves of recent vintage are dusted with starch, talc contamination may still be found.[7] Thus, a history of pelvic operations (appendectomy, cesarean section, hysterectomy, and other operations on internal genital organs other than bilateral salpingo-oophorectomy) was determined in cases and controls. Excluding operations associated with the diagnosis or treatment of the ovarian cancer among the cases, no excess in the occurrence of pelvic operations was noted. The greatest opportunity for talc exposure from surgery occurred before 1950, when talc was the

TABLE 2.   Relative Risks (RR) for Common Epithelial Ovarian Cancers Associated with Potential Talc Exposure from Contamination on Rubber Products

| Exposure | Cases | | Controls | | Crude RR | Adjusted RR* | 95% Confidence limits |
|---|---|---|---|---|---|---|---|
| | Total | No. (%) with exposure | Total | No. (%) with exposure | | | |
| Pelvic surgery | 215 | 78 (36.3) | 215 | 75 (34.9) | 1.06 | 1.17 | (0.76–1.79) |
| Pelvic surgery (prior to 1950) | 215 | 51 (23.7) | 215 | 48 (22.3) | 1.08 | 1.12 | (0.69–1.82) |
| Use of condoms† | 169 | 19 (11.2) | 191 | 30 (15.7) | 0.68 | 0.77 | (0.41–1.44) |
| Use of diaphragm† | 169 | 37 (21.9) | 191 | 35 (18.3) | 1.24 | 1.19 | (0.69–2.05) |

* Adjusted for parity (nulliparous, parous) and menopausal status (pre- and postmenopausal).

† Restricted to subjects who had ever been married.

JNJ 000020734

Case 3:16-md-02738-MAS-RLS   Document 16133-1   Filed 12/22/20   Page 109 of 747 PageID: 123755

TABLE 3.  Relative Risks (RR) Associated with Using Talc for Storage Among Diaphragm Users* by Duration of Use of Diaphragm

| | | Cases | | Controls | | | | |
| Duration of diaphragm use | Total | No. (%) who used talc on diaphragm | Total | No. (%) who used talc on diaphragm | Crude RR | Adjusted RR† | 95% Confidence limits |
|---|---|---|---|---|---|---|---|
| Total diaphragm use less than five years | 13 | 6 (46.2) | 21 | 8 (38.1) | 1.39 | 1.82 | (0.42–8.00) |
| Total diaphragm use five or more years | 27 | 16 (59.3) | 19 | 11 (57.9) | 1.06 | 1.23 | (0.36–4.17) |
| All users | 40 | 22 (55.0) | 40 | 19 (47.5) | 1.35 | 1.56 | (0.62–3.88) |

* Includes all women who used diaphragm regardless of marital status.

† Adjusted for parity and menopausal status.

predominantly used dusting powder for surgical gloves. However, no significant excess of pelvic operations prior to 1950 was observed for cases.

The patients (cases) who, at sometime, had been married, chose condoms less frequently and diaphragms more frequently for contraception than the control group, but neither difference was statistically significant. Condom use is not necessarily associated with talc exposure. Not all brands of condoms are dusted with talc, and lubricants could affect the shedding of talc from the condom. Unfortunately, details on specific brands of condoms were not obtained. Similarly, talc exposure is not a necessary consequence of diaphragm use. We inquired specifically about the practice of dusting the diaphragm with talc for storage after use (Table 3). Among all subjects who had used a diaphragm, there was no significant excess of cases who regularly stored their diaphragm using talc, nor was any greater risk associated with this practice observed among women who had used the diaphragm for longer durations. Before the risk from this exposure can be adequately assessed, greater detail is needed including frequency of use and whether the powder was washed off prior to use. Furthermore, contraceptive jellies used with the diaphragm could affect the transport of talc in the genital tract.

Hygienic practices involving talc were also studied. Specifically, we inquired whether women had regularly used talc as a dusting powder on the perineum or regularly dusted sanitary napkins with talc (Table 4). Ninety-two (42.8%) of the cases had talc exposure by either or both of these routes compared with 61 (28.4%) of the controls. The adjusted relative risk was 1.92 ($P < 0.003$) with 95% confidence limits of 1.27–2.89 compared to subjects who had neither exposure. Sixty (27.9%) cases and 48 (22.3%) controls had either used talc for dusting or on napkins but not both. This difference yielded an adjusted relative risk of 1.55, which was of borderline significance ($P = 0.06$). The greatest risk occurred in women who had both exposures (use on the perineum and on napkins) compared to women who had neither exposure. Thirty-two (14.9%) of cases were in this category compared with 13 (6.0%) controls, for an adjusted relative risk of 3.28 ($P < .001$) and 95% confidence limits of 1.68–6.42. The histologic characteristics of tumors developing in women with perineal exposure to talc did not differ significantly from those in women without perineal exposure to talc (Table 5). In addition, the proportion of cases with tumors of borderline malignancy was identical among those with and without perineal exposure to talc. Twenty-two (18%) of 123 cases without the exposure had tumors of bor-

TABLE 4.  Relative Risks (RR) for Common Epithelial Ovarian Cancers Associated with Talc Exposure in Perineal Hygiene

| | | | Types of perineal exposure | | |
| | No perineal exposure | Any perineal exposure | As dusting powder but not on napkins | On napkins but not as dusting powder | Both on napkins and as dusting powder |
|---|---|---|---|---|---|
| Cases (Total = 215) | 123 (57.2%) | 92 (42.8%) | 43 (20.0%) | 17 (7.9%) | 32 (14.9%) |
| Controls (Total = 215) | 154 (71.6%) | 61 (28.4%) | 34 (15.8%) | 14 (6.5%) | 13 (6.0%) |
| Crude rr | 1 | 1.89 | 1.58 | 1.52 | 3.08 |
| Adjusted RR* | — | 1.92 | 1.55 | | 3.28 |
| 95% confidence limits | — | (1.27–2.89) | (0.98–2.47) | | (1.68–6.42) |

* Adjusted for parity and menopausal status.

JNJ 000020735

derline malignancy compared to 17 (18%) of 92 with the talc exposure.

## Discussion

The argument linking talc and ovarian cancer includes four elements: the chemical relationship between talc and asbestos, asbestos as a cause of pleural and peritoneal mesotheliomas, the possible relation between epithelial ovarian cancers and mesotheliomas, and the ability of talc to enter the pelvic cavity. The mineral talc is a specific hydrous magnesium silicate chemically related to several asbestos group minerals and occurring in nature with them. Generic "talc" is seldom pure and may be contaminated with asbestos, particularly in powders formulated prior to 1976.[8,9]

Epidemiologic studies have clearly linked lung cancer and pleural and peritoneal mesotheliomas with asbestos exposure.[10] An excess of similar pulmonary lesions has been reported in talc workers and seems to be correlated with the amount of asbestos contamination in the talc deposits worked.[11] Graham and Graham[1] were able to induce ovarian neoplasms in guinea pigs with asbestos and suggested that ovarian cancer could be related to asbestos exposure, noting the similarity between mesotheliomas and ovarian cancers. Parmley and Woodruff[12] further emphasized this similarity and popularized the pelvic contamination theory, which proposed that environmental carcinogens might enter the pelvic cavity via the genital tract. Years earlier it had been observed that inert carbon particles placed in the vagina immediately prior to hysterectomy could be recovered from the fallopian tubes.[13] Although greeted with skepticism, the finding of talc particles embedded in normal and abnormal ovaries suggests that talc is a substance that can enter the pelvic cavity via the vagina.[2]

Although no consensus concerning the risks of talc has emerged from letters, editorial and articles,[3,14-16] participants in the discussion have agreed upon the need for epidemiologic studies of ovarian cancer and talc exposure. In this case-control study of ovarian cancer of the epithelial variety, we investigated several sources of potential talc exposure. Among these, the only significant finding was an association between ovarian cancer and hygienic practices involving the use of talc on the perineum. It is especially notable that women who regularly had both dusted their perineum with talc and had used it on sanitary napkins had more than a threefold increase in risk compared to women with neither exposure. Several potential biases must be considered in interpreting this association.

The observation by Wynder et al.[17] that menstrual characteristics may differ between women with ovarian cancer and controls might suggest that such differences may confound the association between perineal use of

TABLE 5.   Characteristics of Ovarian Cancer in Women with and without Perineal Exposure to Talc

| | No perineal use of talc | Any perineal use of talc |
|---|---|---|
| | No. (%) | No. (%) |
| Serous | 66 (53.7) | 45 (48.9) |
| Mucinous | 16 (13.0) | 14 (15.2) |
| Endometrioid and clear cell | 32 (26.0) | 24 (26.1) |
| Other and undifferentiated | 9 (7.3) | 9 (9.8) |
| Total | 123 (100) | 92 (100) |

talc and ovarian cancer. We found that menstrual characteristics of cases and controls were virtually identical in this study. Fifty-three (24.7%) cases complained of moderate or severe dysmenorrhea compared to 56 (26.0%) controls. Twenty-five (11.6%) cases complained of irregular periods compared to 32 (14.9%) controls. The average numbers (and SEM) of days of flow and cycle length were, respectively, 4.9 (0.1) and 28.9 (0.3) days for cases and 4.9 (0.1) and 29.6 (0.3) days for controls.

Since entry of talc into the pelvic cavity is prevented by hysterectomy or tubal ligation, it might also be argued that the inclusion of subjects with pelvic surgery in the analysis may obviate any association between talc and ovarian cancer. It should be noted that such surgery generally occurred near the end of reproductive life for both cases and controls, probably after most significant talc exposure had already occurred. The exclusion of such subjects from the analysis did not substantially alter the observed associations. For example, the adjusted relative risk for the use of talc both on the perineum and sanitary napkins was 2.79 ($P < 0.003$) in the group without pelvic surgery compared to 3.28 observed for the entire group.

In terms of other confounders, the association persisted after adjustment for menopausal status and parity. We also applied multivariate logistic regression for paired observations.[6] The maximum likelihood estimate of relative risk associated with any perineal use of talc was 1.61 ($P = 0.03$) with 95% confidence limits of 1.04–2.49 after simultaneous adjustment for religion, marital status, educational level, ponderal index, age at menarche, exact parity, oral contraceptive or menopausal hormone use, and smoking.

Our sample of cases represents more than 50% of ovarian cancer cases diagnosed in Boston residents in the study period. Therefore, it is difficult to conceive of a plausible bias in the selection of cases that would yield this excess use of talc. There is reason for concern that the high refusal rate among the controls may have introduced a selection bias among the controls. But,

JNJ 000020736

when we restricted the analysis to the 121 cases who were matched without a control refusal, we again found a significant association between talc use and ovarian cancer. For women who had used talc both in dusting and on the perineum we found an adjusted relative risk of 2.44 ($P < 0.05$). Interviewer bias is also unlikely to explain the association. Of the 18 women who were initially interviewed as ovarian cancer cases but later excluded as having metastatic tumors to the ovary, only one (5.6%) had both perineal and napkin exposure as compared with 15% in cases and 6% in controls.

Experimental data which might bear on the carcinogenicity of talc come primarily from models using pleural implantation of various minerals in rats.[18] These data suggest that carcinogenicity is dependent primarily upon the shape of the particles with long thin fibers such as those occurring in crocidolite asbestos being most carcinogenic. Talc consists primarily of plates but may contain fibers, although voluntary guidelines to limit the content of asbestisiform fibers in consumer talcums were proposed by the cosmetics industry in 1976.[19]

If talc is involved in the etiology of ovarian cancer, it is not clear whether this derives from the asbestos content of talc or from the uniqueness of the ovary which might make it susceptible to carcinogenesis from both talc and other particulates. With ovulation entrapment of the surface epithelium of the ovary into the ovarian stroma occurs. If present, talc or other particulates might be incorporated into these inclusion cysts. Apparently implantation of foreign bodies into the lumens of epithelial lined organs provides a favorable environment for carcinogenesis.[20] Alternatively, talc might serve to stimulate entrapment of the surface epithelium and act in the same way that "incessant ovulation" has been proposed as an etiologic factor for ovarian cancer.[21] Given the histologic and clinical diversity of ovarian cancer, talc exposure is unlikely to be the only cause. Undoubtedly, reproductive experiences such as pregnancies and, perhaps, oral contraceptive use play a role in its etiology.[21-23] The possibility that talc exposure interacts with these variables deserves further investigation.

It is hoped that this report will stimulate further study of talc exposure in relation to ovarian cancer. Animal studies would be helpful to determine whether and under what circumstances ovarian tumors may be induced by various talc preparations. Epidemiologic studies should focus on opportunities for excessive vaginal contamination with talc such as when it is repeatedly used in perineal dusting powders or sprays and in or on tampons, sanitary napkins, or other products intended for intravaginal use. More precise details on the exact nature and frequency of the exposure and the amount and specific brand of powder used are essential. Opportunities for talc exposure are widespread and pervasive,[24] but that should not discourage epidemiologists from studying this potentially important exposure in relation to ovarian cancer.

## REFERENCES

1. Graham J, Graham R. Ovarian cancer and asbestos. *Environ Res* 1967; 1:115–128.
2. Henderson WJ, Joslin CAF, Turnbull AC, Griffiths K. Talc and carcinoma of the ovary and cervix. *J Obstet Gynaecol Br Commonw* 1971; 78:266–272.
3. Longo DL, Young RC. Cosmetic talc and ovarian cancer. *Lancet* 1979; ii:349–351.
4. Serov SF, Scully RE, Sobin LH. International Histological Classification of Tumours, No. 9. Histological Typing of Ovarian Tumours. Geneva, World Health Organization, 1973.
5. Rothman KJ, Boice JD. Epidemiologic analysis with a programmable calculator. NIH Publication No. 79-1649, 1979.
6. Breslow NE, Day NE, Halvorsen KT, Prentice RL, Sabai C. Estimation of multiple relative risk functions in matched case-control studies. *Am J Epidemiol* 1978; 108:299–307.
7. Henderson WJ, Hamilton TC, Griffiths K. Talc in normal and malignant ovarian tissue. *Lancet* 1979; i:499.
8. Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo RM. Fibrous and mineral content of cosmetic talcum products. *Am Ind Hyg Assoc J* 1968; 350–354.
9. Rohl AN, Langer AM, Selikoff IJ, Tordini A, Klimentidis R. Consumer talcums and powders: Mineral and chemical characterization. *J Toxicol Environ Health* 1976; 2:255–284.
10. Selikoff IJ, Hammond EC (eds.). Health hazards of asbestos exposure. *Ann NY Acad Sci.* 1979; 330:1–179.
11. Kleinfeld M, Messite J, Zaki MH. Mortality experiences among talc workers: A follow-up study. *J Occup Med* 1974; 16:345–349.
12. Parmley TH, Woodruff JD. The ovarian mesothelioma. *Am J Obstet Gynecol* 1974; 120:234–241.
13. Egli GE, Newton M. The transport of carbon particles in the human female reproductive tract. *Fertil Steril* 1961; 12:151–155.
14. Anonymous. Cosmetic talc powder. *Lancet* 1977; i:1348.
15. Newhouse ML. Cosmetic talc and ovarian cancer. *Lancet* 1979; ii:528.
16. Roe FJC. Controversy: Cosmetic talc and ovarian cancer. *Lancet* 1979; ii:744.
17. Wynder EL, Dodo H, Barber HRK. Epidemiology of cancer of the ovary. *Cancer* 1969; 23:352–370.
18. Stanton MF, Layard M, Tegeris A, *et al.* Relation of particle dimension to carcinogenicity in amphibole asbestoses and other fibrous minerals. *J Natl Cancer Institute* 1981; 67:965–975.
19. C.T.F.A. Specification. Talc, cosmetic: Cosmetic, toiletry, and fragrance association, Inc. Issue 10–17, 1976.
20. Brand KG, Johnson KH, Buoen LC. Foreign body tumorigenesis. *CRC Crit Rev Toxicol* 1976; 4(Oct):353–394.
21. Casagrande JT, Pike MC, Ross RK, Louie EW, Roy S, Henderson BE. Incessant ovulation and ovarian cancer. *Lancet* 1979; ii:170–172.
22. Newhouse ML, Pearson RM, Fullerton JM, Boesen EAM, Shannon HS. A case control study of carcinoma of the ovary. *Br J Prev Soc Med* 1977; 31:148–153.
23. McGowan L, Parent L, Lednar W, Norris HJ. The woman at risk for developing ovarian cancer. *Gynecol Oncol* 1979; 7:325–344.
24. Blejer JP, Arlon R. Talc: A possible occupational and environmental carcinogen. *J Occup Med* 1973; 15:92–97.

JNJ 000020737

Exhibit 18

*Copy to*
*Alan/Lisa*
*(By Noon)*

## - JOHNSON'S BABY POWDER -
*8/5/92*

### Major Opportunities

1. **Continue to fully leverage the diaper rash claim against JBP cornstarch.**
   - Current household usage on Johnson's Baby Powder Pure Cornstarch has declined from 13% in 1989 to 8% in 1991. Continue to support diaper rash claim in order to rebuild product usage.

2. **Investigate** Redact (Redacted _____ Redacted ) **opportunities to grow the franchise.**
   - Johnson's Baby Powder has a high usage rate among Redacted (52.0%) and among Redacted (37.6%). Additionally usage indices are high for Redacted and Redacted females for JBP talc (139 and 101 respectively). Redacted females also have a high index (151) against JBP cornstarch. The brand can increase volume in 1993 by targeting these groups.
   *The brand will institute an adult* Redacted *media program and potentially launch an adult* Redacted *print effort.*

### Major Obstacles

1. **The franchise faces weakness on several key skus in factory sales and in consumption.**

   | | YTD % +/- YAG | |
   |---|---|---|
   | | JBP | JBP/CS |
   | 9 OZ | -35.6% | -26.4% |
   | 14 OZ | -9.7% | +6.3% |
   | 24 OZ | -14.8% | -31.2% |

   - JBP 4 OZ is down -6% in all outlets; Drug distribution down 5 points versus YAG.
   - JBP 9 OZ is down -13% due to Food and Drug outlets; Drug distribution down 3 points versus YAG.
   - JBP 14 OZ is down -11% due to declines in Food and Drug outlets.
   - JBP 24 OZ is up +1%; a -10% decline in Drug has been offset by a +9% gain in Mass; Drug distribution is down 7 points versus YAG.
   - JBPCS 9 OZ is down -8% due to declines in Food and Drug

Protected Document--Subject to Protective Order



**1 of 2**

JNJ 000021093

Pltf_JNJ_00000862

- JBPCS 24 OZ is down -7% due to declines in Drug and Mass; Mass distribution is down 9 points.

- To correct this trend, renewed focus is needed on 9 oz and 24 oz sizes of the franchise. (Focus on building distribution in Drug and making these skus part of 1993 Ring Club.)

2.  <u>Negative publicity from the health community on talc (inhalation, dust, negative doctor endorsement, cancer linkage) continues.</u>
    - Investigate the addition of an additive to reduce dust.
    - Encourage the reduction of dust in use by developing advertorial copy and media strategy to promote proper way to powder and diaper a baby.

3.  <u>Little differentiation on JBP talc and cornstarch versus private label.</u>
    - Implement temporary price roll-backs on JBP and JBPCS (using BSP funds) to achieve merchandisable price points and attack private label in the absence of value added news long term. (Pd5, Pd8)
    - Investigate JBP medicated line extension as news for second half 1993/1994.
    - Evaluate "time release" formula and /or oatmeal as second half 1993 news.

4.  <u>Mennen competitive coupon pressures strong YTD.</u>
    - Participate in broad based infant coupon programs to combat pressure from Mennen (Period 2 FSI).

5.  <u>Talc is adult focussed business in baby focussed line.</u>
    - Longer term, investigate moving brand to a different franchise.
    - Short term, supplement infant plan with periodic adult promotional support
        - Period 5 "Adult" FSI

Exhibit 19

Alice M. Blount, Ph.D.

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI


GAIL LUCILLE INGHAM        )
and ROBERT INGHAM, et      )
al.,                       )
                           )
            Plaintiffs,    )   Case Number:
                           )   1522-CC10417-01
v.                         )
                           )
JOHNSON & JOHNSON, et      )
al.,                       )
                           )
            Defendants.    )


FRIDAY, APRIL 13, 2018

- - -

Videotaped deposition of Alice M. Blount, Ph.D., held at the Best Western Hotel, 5 Best Western Place, Rutland, Vermont, commencing at 9:23 a.m., on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, Illinois, California & Texas Certified Shorthand Reporter, Missouri & Kansas Certified Court Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672
deps@golkow.com

Alice M. Blount, Ph.D.

Page 2

```
 1      A P P E A R A N C E S:
 2
        LANIER LAW FIRM, P.C.
 3      BY:  W. MARK LANIER, ESQUIRE
             wml@lanierlawfirm.com
 4      6810 FM 1960 West
        Houston, Texas 772690-1448
 5      (713) 659-5200
 6
 7      LANIER LAW FIRM, P.C.
        BY:  RACHEL LANIER, ESQUIRE
 8           rachel.lanier@lanierlawfirm.com
        126 East 56th Street, Sixth Floor
 9      New York, New York 10022
        (212) 421-2800
10      Counsel for Plaintiffs
11
12
        ORRICK, HERRINGTON & SUTCLIFFE LLP
13      BY: MORTON DUBIN, ESQUIRE
             mdubin@orrick.com
14           KEVIN H. HYNES, ESQUIRE
             khynes@orrick.com
15      51 West 52nd Street
        New York, New York 10019
16      (212) 506-3742
        Counsel for Defendant Johnson &
17      Johnson
18
19
        SANDBERG, PHOENIX & VON GONTARD, P.C.
20      BY:  MARK A. PROST, ESQUIRE
             mprost@sandbergphoenix.com
21      600 Washington Street, 15th Floor
        St. Louis, Missouri  63101
22      (314) 446-4226
        Counsel for Imerys Talc America
23
24
25
```

Page 3

```
 1      BLITZ, BARDGETT, & DEUTSCH, L.C.
        BY:  GLENN A. NORTON, ESQUIRE
 2           gnorton@bbdlc.com
        120 South Central Avenue, Suite 1500
 3      St. Louis, Missouri  63105
        (314) 863-1500
 4      Court-Appointed Special Master
 5
 6      ALSO PRESENT:
        Jayne Conroy, Simmons Hanly Conroy
 7      Ella Fassler, Lanier Law Firm
        Jonathan Cooper, Tucker Ellis
 8
 9
        V I D E O G R A P H E R:
10      CHRIS COUGHLIN,
        Golkow Litigation Services
11
                    - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                      INDEX
 2                              PAGE
        APPEARANCES...................................  2
 4      EXAMINATIONS
 5      BY MR. LANIER............................    8
 6      BY MR. DUBIN............................   43
 7      BY MR. PROST............................   80
 8      BY MR. LANIER............................   86
 9      BY MR. DUBIN............................   99
10      BY MR. LANIER............................  105
11      BY MR. DUBIN............................  106
12      BY MR. LANIER............................  107
13
14              EXHIBITS
15      No.   Description                     Page
16      1    Alice M. Blount résumé             8
17      2    Blount optical microscope         17
             photograph
18
        3    Blount optical microscope         17
19           photograph
20      4    Photograph of Alice M. Blount     19
             microscope
21
        5    Blount optical microscope         20
22           photograph
23      6    Blount optical microscope         20
             photograph
24
        7    OSHA Polarized Light Microscopy of   26
25           Asbestos printout
```

Page 5

```
 1      8    April 23, 1998 letter from Alice M.   35
             Blount to M. Raymond Hatcher,
 2           J&J-0049150
 3      9    "The Facts About Talc Safety"        40
             printout
 4
10      10   Lanier's handwritten demonstrative   42
 5           notes
 6      11   "Process Mineralogy IX:              50
             Applications to Mineral
 7           Beneficiation, Metallurgy, Gold,
             Diamonds, Ceramics, Environment and
 8           Health"
 9      12   "Amphibole Content of Cosmetic and   52
             Pharmaceutical Talcs," AM Blount
10
        13   April 9, 2018 letter to Richard      54
11           Meadow from Richard T. Bernardo
12      14   Bottle of Johnson & Johnson's baby   58
             powder supplied by Alice M. Blount
13
        15   E-mail from Jonathan Cooper to       60
14           Alice Blount
15      16   "Occupational Exposures to           70
             Non-Asbestiform Talc in Vermont,"
16           Boundy, et al.
17      17   May 21, 1987 McCrone Associates      72
             letter from Ian M. Stewart to
18           Donald M. Benniger,
             J&J-0044868
19
        18   November 19, 1975 letter from Gene   93
20           R. Grieger to Vernon Zeitz,
             J&J-0123236
21
        19   Letter about asbestos from Rio       94
22           Tinto Minerals
23      20   Luzenac America Technical Report,    97
             Julie Pier,
24           IMERYS422289 - IMERYS422290
25           (Exhibits attached to the deposition.)
```

2 (Pages 2 to 5)

Alice M. Blount, Ph.D.

Page 6

1    CERTIFICATE...................................108
2    ACKNOWLEDGMENT OF DEPONENT...................110
3    ERRATA......................................111
4    LAWYER'S NOTES..............................112
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          VIDEOGRAPHER:  We are now on
2    the record.
3          My name is Chris Coughlin, and
4    I'm a videographer for Golkow
5    Litigation Services.
6          Today's date is April 13, 2018,
7    and the time is 9:23 a.m.
8          This video deposition is being
9    held in Rutland, Vermont, in the
10   matter of Gail Lucille Ingham and
11   Robert Ingham, et al., plaintiffs,
12   versus Johnson & Johnson, et al.,
13   defendants, in the Circuit Court of
14   the City of St. Louis, State of
15   Missouri, Case Number 1522-CC10417-01.
16         The deponent is Alice Blount,
17   Ph.D.
18         Will counsel please identify
19   yourselves and state whom you
20   represent.
21         MR. LANIER:  My name is Mark
22   Lanier, and I represent the ladies and
23   families affected by the ovarian
24   cancer in this trial.
25         MR. DUBIN:  My name is Morton

Page 8

1    Dubin.  I represent Johnson & Johnson.
2          MR. PROST:  May my name is Mark
3    Prost, and I represent Imerys Talc
4    America, Inc.
5          JUDGE NORTON:  I'm Glenn
6    Norton.  I'm the special master
7    appointed by the judge in these cases.
8          VIDEOGRAPHER:  All others will
9    appear on the stenographic record.
10         The court reporter is Carrie
11   Campbell, and she will now swear in
12   the witness.
13
14         ALICE M. BLOUNT, Ph.D.,
15   of lawful age, having been first duly sworn
16   to tell the truth, the whole truth and
17   nothing but the truth, deposes and says on
18   behalf of the Plaintiffs, as follows:
19
20         (Blount Exhibit 1 marked for
21   identification.)
22
23         DIRECT EXAMINATION
24   QUESTIONS BY MR. LANIER:
25     Q.    Good morning, Dr. Blount.

Page 9

1     A.    Good morning.
2     Q.    The jury knows me by now.  My
3    name is Mark Lanier, and we're playing a
4    videotape right now to the jury because
5    you're not live at the trial.  So this is
6    what we call a deposition.
7          Thank you for taking time this
8    morning.  I'm going to ask you some
9    questions, and then the other lawyers will
10   ask you some questions as well.  I'll
11   probably come back and ask you a few more,
12   and we'll try and move through this with all
13   speed.
14         Okay?
15     A.    Okay.
16     Q.    I've written your name down on
17   this sheet, and you can see down at the end,
18   Dr. Alice Blount.
19         Can you -- make sure I'm
20   pronouncing it right.  How do you say Blount?
21     A.    I say Blount, the same as you.
22     Q.    All right.  Very good.
23     A.    I'm not a southerner.
24     Q.    You're not a southerner.
25         No, you're from Illinois?

3  (Pages 6 to 9)

Alice M. Blount, Ph.D.

Page 10

```
 1       A.    Yeah, that's not southern.
 2       Q.    Okay.  That's not southern.
 3  Fair enough.
 4            Dr. Blount, I want to ask you
 5  two important questions, and then we're going
 6  to dig into some information behind your
 7  answers.
 8            Okay?
 9       A.    Uh-huh.
10       Q.    The first question is this:
11  Have you tested Johnson & Johnson baby powder
12  for asbestos?
13       A.    Yes.
14       Q.    And then the important
15  follow-up question:  Does Johnson & Johnson
16  baby powder, or did it when you tested it,
17  have asbestos?
18            MR. DUBIN:  Object to form.
19            THE WITNESS:  Yes.
20  QUESTIONS BY MR. LANIER:
21       Q.    Now, because of your answers to
22  those questions, I want to ask you some
23  background information so the jury knows who
24  you are, and I want to ask you a little bit
25  about the asbestos you found.
```

Page 11

```
 1            You are what we've listed in
 2  this trial as a fact witness, so I'm not
 3  asking you to give me expert opinions outside
 4  of; just what you did and what you understand
 5  from your actual actions.
 6            Okay?
 7       A.    Uh-huh.
 8       Q.    All right.  So let's start out
 9  with who you are.
10            Now, I've had the benefit --
11  and we'll get into this in a little more
12  detail later.  I've had the benefit of
13  meeting with you I think on about three
14  different times.  Three or four; is that
15  right?
16       A.    That's about right.
17       Q.    I know that on two of three of
18  those times we talked for about 20 or
19  30 minutes about this information over a cup
20  of coffee --
21       A.    Yes.
22       Q.    -- at the bakery.
23       A.    (Witness nods head.)
24       Q.    And then last night we had
25  dinner with your husband, Jack, at a
```

Page 12

```
 1  delightful place, though I don't really think
 2  we talked about this at all.
 3       A.    No.
 4       Q.    All right.  Dr. Blount, I want
 5  the jury to get the benefit of knowing your
 6  background, so let's start out talking about
 7  that a little bit.
 8            Where did you grow up as a
 9  girl?
10       A.    I grew up in Carbondale,
11  Illinois.
12       Q.    Carbondale, Illinois.  That's
13  on the other side of the Mississippi River
14  from St. Louis where we're trying this case.
15       A.    Not that far.  We used to go
16  into St. Louis all the time.
17       Q.    That was the big city for you,
18  maybe.
19       A.    Yes, close.
20       Q.    Carbondale, Illinois.
21            And you brought with you some
22  papers today, and among those papers was a
23  résumé that you did when you were trying
24  to -- or when you were getting ready for a
25  position or something at Rutgers, I think.
```

Page 13

```
 1            Is that right?
 2       A.    Yes, Rutgers in Newark, Newark
 3  branch of Rutgers.
 4       Q.    Okay.  We'll get to you and
 5  Rutgers in a minute.
 6            By the way, just for grins,
 7  tell the jury where you live now and why
 8  we're having to do this by a deposition
 9  instead of you just driving in from
10  Carbondale.
11            Where are we today?
12       A.    We're in Rutland, Vermont.
13       Q.    Rutland, Vermont.
14            And I know you still do some
15  consulting work, but basically --
16       A.    We came up here because I had a
17  job up here.
18       Q.    All right.  Very good.
19            And then your husband's
20  retired, I think?
21       A.    Yes.
22       Q.    All right.  So let's just grab
23  a couple of things off of your résumé to make
24  sure that we've got everything right.
25            This is a résumé that you did
```

4 (Pages 10 to 13)

Alice M. Blount, Ph.D.

Page 14

1  back when you were at the Department of
2  Geological Sciences at Rutgers in Newark,
3  New Jersey; is that right?
4      A.   That's right.
5      Q.   And your experience was you had
6  been working with the asbestos problem since
7  1972, specifically with how the FDA proposed
8  an optical method for detecting and
9  quantifying amphiboles and chrysotile in talc
10 used in food and drugs.
11         Is that right?
12     A.   So we're talking about 1972 --
13     Q.   Yes, ma'am.
14     A.   -- it was -- wasn't that --
15 that was when the Food and Drug came out with
16 this regulation for the pharmaceutical
17 industry, and my husband was working for the
18 pharmaceutical industry.  He was a chemist,
19 and he took -- he was in charge of that
20 department, and they put out this regulation
21 that nobody could understand.
22     Q.   Ah.
23     A.   And so the person in quality
24 control said, "Dr. Blount's wife is a
25 mineralogist," and so that's why I got

Page 15

1  involved in 1972, '73, in that region, yeah.
2      Q.   Okay.  Fantastic.
3          And the jury's got this from
4  other people, but would you just tell us what
5  an amphibole is?
6          Is that -- what is an
7  amphibole?
8      A.   It's a mineral.
9      Q.   It's a mineral?
10     A.   It's a mineral.
11     Q.   All right.  Now, the jury has
12 heard that asbestos can be an amphibole
13 asbestos or a chrysotile asbestos.
14     A.   Uh-huh.
15     Q.   Is that -- are we right on
16 that?
17     A.   (Witness nods head.)
18     Q.   Okay.  Now, before we go any
19 further, let's look at the education here.
20         You got your bachelor of
21 science with honors in geology in 1964 at the
22 University of Missouri; is that right?
23     A.   That's right.
24     Q.   Is that in Columbia, Missouri?
25     A.   Uh-huh, yes.

Page 16

1      Q.   And then you went to the
2  University of Wisconsin where you got a
3  master's of science in geology and a Ph.D. in
4  geology in 1970; is that right?
5      A.   That's right.
6      Q.   Now, you also got -- if I
7  remember the story correct, you also got a
8  husband at the University of Wisconsin?
9      A.   Yes, that's right.
10     Q.   It's not on your résumé.
11         How did you find your husband
12 when you were looking at rocks?
13     A.   Well, he was getting a Ph.D.
14 there, and I needed a computer program that
15 he had.  He was very good at writing computer
16 programs.  So I went over to the chemistry,
17 and I got this computer program from him, and
18 that's the whole story.
19     Q.   And you got the love of your
20 life.
21         You and I were talking about
22 this in doing the math.  You-all have been
23 married -- this year makes 50 years you-all
24 have been married?
25     A.   Yeah.

Page 17

1      Q.   That's incredible.
2          All right.  Your experience at
3  the time of this résumé back then, you were
4  curator of earth science at the Newark museum
5  and a research associate professor and member
6  of the graduate faculty for the Department of
7  Geological Sciences at Rutgers since 1972.
8          Is that right?
9      A.   That's right.
10     Q.   And you would actually teach
11 courses in optical mineralogy on a graduate
12 level at Rutgers?
13     A.   Right.
14     Q.   Can you tell us what optical
15 mineralogy is?
16     A.   Well, optical mineralogy is
17 what I would be doing on these samples that
18 I'm looking at to see if there's asbestos.
19 You take a glass slide, and you put your
20 sample on the glass slide, and then you use a
21 microscope so that you can really see what's
22 there.  And you can do some tests on -- when
23 they're on the slide, and that makes -- so
24 you can actually identify exactly what it is.
25         (Blount Exhibits 2 and 3 marked

5 (Pages 14 to 17)

Alice M. Blount, Ph.D.

Page 18

1     for identification.)
2     QUESTIONS BY MR. LANIER:
3         Q.    You brought some pictures, and
4     we'll go into more detail later, but two of
5     the pictures that we'll label -- let's get
6     these labels caught up.  We're going to label
7     your résumé as Exhibit Number 1 so the jury
8     can see it.  We'll put a number 1 on it.
9             And then we're going to label
10    these pictures as Exhibits Number 2 and 3 so
11    that we've got them as well.
12            And I'll put these up so the
13    jury can see them and the lawyers can see
14    them.
15            But I've put Exhibit 2 --
16    there's the 2 number.  I've put Exhibit 2 up
17    for the jury to see.
18            Is this something you took with
19    an optical microscope?
20        A.    You have a picture of the
21    microscope somewhere, I think.
22        Q.    Yes, you gave me a picture of
23    the microscope.  That's a good point.  I
24    should use that.  We'll mark it as Exhibit
25    Number 4.

Page 19

1         (Blount Exhibit 4 marked for
2         identification.)
3     QUESTIONS BY MR. LANIER:
4         Q.    What is Exhibit Number 4?
5     What's this picture we're looking at?
6         A.    That's my pictographic
7     microscope that I have at home.  It's my
8     microscope, yeah.
9         Q.    So this is your microscope you
10    have at home?
11        A.    Yeah.
12        Q.    An Olympus, looks like a BH2 --
13        A.    Yeah.
14        Q.    -- or an EH2?
15        A.    I think it's a BH2, yeah, with
16    a lot of accessories on it.
17        Q.    Yeah, I started to say, this
18    doesn't look like what we had in high school.
19        A.    No.
20        Q.    Is this what you used to take
21    this picture that we've got as Exhibit 2?
22        A.    Maybe you better show the
23    picture with the gray background.
24        Q.    Oh, gray background picture?
25    All right.

Page 20

1         A.    Yeah, because it's easier to
2     explain.
3         Q.    Yes.  Yes.
4             (Blount Exhibits 5 and 6 marked
5         for identification.)
6     QUESTIONS BY MR. LANIER:
7         Q.    We'll mark the gray background
8     picture as Exhibit Number 5.  So let's start
9     with that one.
10        A.    Is that the right -- is that
11    the right -- I have an arrow here.  Do you
12    have -- can you see the arrow at the side?
13        Q.    Yes.  Here's the arrow.  Does
14    that mean to point it out?
15        A.    Yeah, that's the right
16    direction.
17        Q.    Okay.  Now let me expand it so
18    that we've got a better view.
19            All right.
20        A.    And then you got the red one to
21    go with it, too.
22        Q.    I'm sorry?
23        A.    You got a red one that goes
24    with that, too.
25        Q.    Okay.  That would be -- this

Page 21

1     would be this one.
2         A.    Yeah, there should be -- the
3     arrow should be going -- yeah, that's good.
4         Q.    Okay.  So here, I'll put them
5     both up here together.
6         A.    So I -- first I have -- on the
7     right I have a picture through the microscope
8     without any filters or anything, but to tell
9     which direction is what we call the fast
10    direction or the slow direction, you have to
11    put the filter in.  So that's what I've done
12    on the left, I've put the filter in.  And it
13    makes the background look red, but it gives a
14    yellow tint to that fiber there.
15        Q.    All right.  So this that my
16    finger's drawing here, I'll put a circle
17    around it.  This is what you're calling a
18    fiber; is that right?
19        A.    I call it -- yes, I call that a
20    fiber.
21        Q.    Okay.  And so that's on Exhibit
22    Number 5?
23        A.    Uh-huh.
24        Q.    On Exhibit Number 6, it looks
25    like the same type thing, but it's all red on

6 (Pages 18 to 21)

Alice M. Blount, Ph.D.

Page 22

1    the background.
2        A.    Yes.
3        Q.    Is this the one where you --
4        A.    You put a filter in sort of the
5    middle part of the microscope, and it's the
6    color of the -- if it's yellow, then we know
7    what -- you know, we know it's an asbestos
8    fiber.  If it was blue, then it wouldn't be.
9    So that's why we have these colors here.
10       Q.    Ah, so that's what tells you
11   that that sphere-looking thing is asbestos?
12       A.    (Witness nods head.)
13       Q.    Okay.
14       A.    That's why we put the color in
15   there.
16       Q.    All right.  By the way, where
17   did you get this asbestos from that's in
18   these pictures?
19       A.    From Johnson & Johnson baby
20   powder.
21       Q.    All right.  Now, you actually
22   taught the graduate students how to use these
23   microscopes and do this work?
24       A.    Yes, we did -- yes, I taught
25   that.

Page 23

1        Q.    Okay.  And that's in addition
2    to supervising graduate thesis research and
3    teaching undergraduate courses as well?
4        A.    Yes.
5        Q.    And did you also consult with
6    several major industrial minerals companies
7    doing this very kind of work --
8        A.    Yeah.
9        Q.    -- identifying and counting
10   asbestos-type materials in industrial mineral
11   products?
12             Is that you?
13       A.    Yes, that's me.
14       Q.    All right.  Well, we've got a
15   list here of your publications at the time,
16   your references.  We'll set that aside for a
17   moment, though I did get two of your
18   publications from you.
19             I got the "Amphibole Content of
20   Cosmetic and Pharmaceutical Talcs" you
21   published in 1991; is that correct?
22       A.    Yeah, it looks like it.
23       Q.    And I made you sign it.  I got
24   an autographed copy, didn't I?
25       A.    That's right, you did.

Page 24

1        Q.    And I've also got your paper
2    from 1983 that I had kind of an original set
3    of, and I got you to sign that one as well,
4    didn't I?
5        A.    You did.
6        Q.    All right.  Well, I'd like to
7    make sure that -- so on your background we've
8    got your work at Rutgers, where you've got a
9    Ph.D. in mineralogy and geology; is that
10   right?
11       A.    Yes.
12       Q.    I can't spell mineralogy.
13   Mineralogy.
14             It's something like that.  I
15   can do geology.  Geology.
16             Okay.  And then you went to
17   Rutgers where you did some teaching and
18   research, and then you've also done
19   consulting for companies, all to -- not all,
20   but including to identify asbestos.
21             Is this fair?
22       A.    That's fair.
23       Q.    All right.  Now, I want to
24   change to a new subject here, so with that
25   being it, you've got your microscope.

Page 25

1             Where did you get the asbestos
2    from that you've put -- that we've seen here
3    in Exhibit 5 and 6?
4             You said you got it from the
5    Johnson & Johnson baby powder, but where did
6    the baby powder come from?
7        A.    Where the baby powder -- I
8    bought it off the shelf, I think in
9    New Jersey, but I'm not --
10       Q.    So you just bought it off the
11   shelf?
12       A.    Yeah.
13       Q.    Very good.
14             You've also got these two
15   pictures that I've marked as Exhibit 2 and 3.
16   And Exhibit 2, it looks like the -- is this
17   sphere-looking thing still the fiber?
18       A.    Yes.
19       Q.    Okay.  In one picture it's
20   yellow, and in the other picture it's blue
21   and it's going the opposite direction.
22             How is that?  Can you explain
23   that to me?
24       A.    Well, it's blue because it's
25   oriented in the opposite direction.  It will

7 (Pages 22 to 25)

Alice M. Blount, Ph.D.

Page 26

1    change color from yellow to blue if you
2    rotate it. So we rotated it.
3        Q.    Ah, so that's just you rotating
4    the slide around?
5        A.    Uh-huh.
6        Q.    And that changes the color?
7        A.    Yeah.
8        Q.    Why is that?
9        A.    Because the light -- the light
10   coming through the sample is polarized, and
11   so it's -- it has a different value as you
12   move it.
13       Q.    When I was asking you about
14   this over coffee, you showed me this OSHA
15   paper that -- this OSHA polarized light
16   microscopy of asbestos.
17       A.    Uh-huh.
18       Q.    And we'll mark this as Exhibit
19   Number 7 so everybody's got an ability to use
20   it and the jury gets to see it, I hope.
21           (Blount Exhibit 7 marked for
22           identification.)
23   QUESTIONS BY MR. LANIER:
24       Q.    Now, in that you pointed me to
25   this chart.

Page 27

1        A.    Uh-huh.
2        Q.    And this chart says --
3        A.    Uh-huh. But you need to look
4    at this set with this chart.
5        Q.    Oh, I need to look at --
6        A.    Yeah, with the polarized, yeah.
7        Q.    With these two or with these
8    two? Whoops. We got to do some zoom work
9    here.
10           Oh, I see. I've mixed this up.
11       A.    You mixed it up.
12       Q.    I need do it this way. Right.
13           So I'm going to put Exhibit 3,
14   the blue one on the left, and Exhibit 2, the
15   yellow one on the right.
16           Now, let's do that and have the
17   jury think of that while I show this.
18       A.    Yeah, let me think of that,
19   too. I really did it for the other set that
20   you have.
21       Q.    Oh, for the other set. Okay.
22           Well, let me do this. Let me
23   read it first, and then we'll put the set up
24   here.
25       A.    Uh-huh.

Page 28

1        Q.    "Birefringent fibers will
2    change color as the microscope stage is
3    rotated."
4        A.    Uh-huh.
5        Q.    "Asbestos fibers, except
6    crystallite" --
7            That's one kind of asbestos,
8    right?
9        A.    Uh-huh.
10       Q.    -- "will show colors as shown
11   here except under the condition of crossed
12   polars and a first order red compensator."
13           So pointed this way is blue;
14   that way is yellow.
15           I see in Exhibit --
16       A.    Wait a minute.
17       Q.    -- 3 blue and yellow; is that
18   right, or do I have it wrong?
19       A.    Can I see the -- can I see the
20   white paper?
21       Q.    Here, I'm going to give you all
22   of this.
23       A.    See the white paper.
24           It says crocidolite, which is
25   shown here. So crocidolite -- oh, let's see.

Page 29

1        Q.    Here we go.
2        A.    Okay. So you see here that
3    this goes this way -- these -- I have them
4    marked this way so you can see. And you see
5    that this is yellow now.
6        Q.    Uh-huh. I see. I see.
7        A.    But they're separate. They're
8    not this way, this way. You have separate
9    views, but you can see here now it's yellow,
10   which means that --
11       Q.    Ah, so that's your flipped
12   view. So it's Exhibit Number 6 with
13   number 5. And if we put Exhibit Number 6 up
14   here, it's going to be right here. I've
15   outlined it in red, but that's hard to see.
16   Let me do black.
17       A.    Uh-huh, yeah, that's it.
18       Q.    All right. So -- and then I'm
19   going to kind of fold it up just to give the
20   jury a chance to see.
21           Right next to the chart, that
22   yellow that we're looking at is the asbestos?
23       A.    Uh-huh.
24       Q.    Okay. And you're nodding your
25   head and saying "uh-huh," but she's going to

8 (Pages 26 to 29)

Alice M. Blount, Ph.D.

Page 30

1  type this up as well.  And uh-huhs, even with
2  the great Carrie Campbell, can sometimes read
3  like huh-uhs, so I need to make sure I've got
4  a yes or no out loud, if you don't mind.
5       A.    Okay.  Yes.
6       Q.    All right.  So that is -- the
7  yellow like that is the asbestos; is that
8  right?
9       A.    That shows us, yes, that --
10  because of the -- the light goes through at
11  different rates going this way or this way,
12  so that makes a difference when you put this
13  filter in.  You can tell the difference
14  between the fast ray and the slow ray.
15       Q.    Super.  Super.
16            Now, you wrote up papers, and I
17  know in your 1991 paper you actually talked
18  about the fact that there was asbestos in the
19  baby powder.  It looks to me like you -- and
20  the jury will have a chance to read this in
21  more detail and see that Sample I, talc
22  Sample I, is actually Johnson & Johnson baby
23  powder.  And nobody's fussing that.  The
24  company's got those records and --
25            MR. DUBIN:  Object to form.

Page 31

1  QUESTIONS BY MR. LANIER:
2       Q.    -- and everything else.  So
3  just accept that with me right now.
4            "Percent amphiboles in each
5  aspect ratio group for talc Sample I left and
6  M right compared with tremolite asbestos and
7  tremolite non-asbestiform."
8            So let me ask you as we zoom in
9  on the Johnson & Johnson.  Is the asbestos
10  that you found a tremolite asbestos?
11       A.    Yes.
12       Q.    And you can see this form of
13  it?  Is that the dotted line?
14       A.    Yes, that's what it -- what
15  the -- what they found out about it.
16       Q.    And if we look at your counts
17  in these talcs on an earlier page and we look
18  at that Sample I, which I think the record
19  shows is the Johnson & Johnson baby powder --
20            MR. DUBIN:  Objection.  Form.
21  QUESTIONS BY MR. LANIER:
22       Q.    -- these particles per
23  milligram, is that how many particles you
24  were finding of the asbestos?
25       A.    That's what it's finding on the

Page 32

1  slides, yeah.
2       Q.    Needles and fibers?
3       A.    But can we go back just a
4  little bit there?
5       Q.    Yes, tell me --
6       A.    The reason that I plot them up
7  like you show there is that it's very
8  difficult sometimes when you look at
9  something to know whether it's a needle or a
10  fiber or, you know, it's something that you
11  have to count or not.
12            But if you have a population --
13  and we know what the population is because
14  you just marked it.  And when I go through
15  and mine line up with that population, then I
16  know it's asbestos.  But if it doesn't line
17  up -- it might line up over here with the
18  other side, and then I would know it's not
19  asbestos.
20       Q.    Ah, okay.  So the other side,
21  because of the sizes and all, is more
22  nonasbestiform, but this is asbestiform, or
23  asbestos, because you've got this ratio down
24  here that's so big; is that it?
25       A.    Uh-huh.  That's the way --

Page 33

1  that's --
2       Q.    Okay.
3       A.    -- their population.
4       Q.    All right.  So this is -- this
5  is asbestiform asbestos that you were finding
6  in the Johnson & Johnson baby powder that you
7  pulled off the shelf?
8       A.    Uh-huh.
9       Q.    And you weren't doing this
10  because anybody was paying you money to do
11  it, or were you getting paid to do it?
12       A.    No, I wasn't.
13            Well, I had some students
14  working on some talc projects, I guess, so it
15  may -- you know, I may have bought it then to
16  show the students what it looked like, you
17  know.
18       Q.    All right.  Part of your
19  teaching?
20       A.    Yeah.
21       Q.    Okay.  Very good.
22            I've got some more questions I
23  can ask you that I want to ask you, but I
24  think at this point I'm going to pause and
25  let the other lawyers go because I'm going to

9 (Pages 30 to 33)

Alice M. Blount, Ph.D.

Page 34

1    save these questions and come back with them
2    in a little bit.
3           So I'm going to pause at this
4    point -- no, let me go ahead and ask you a
5    couple more.  Bluff.  Sorry.
6           MR. DUBIN:  I was going to
7    object, but I was waiting.
8           MR. LANIER:  Bluff.
9    QUESTIONS BY MR. LANIER:
10          Q.    So you live in Vermont and you
11   still test things for asbestos; is that
12   right?  Do you still?
13          A.    I do -- not much anymore, but a
14   lot of what I did was only I had -- I had
15   property around the world, and we had to test
16   them -- their stuff for asbestos just like we
17   had to test here.  So we were doing the
18   testing for all of North America, South
19   America and Pacific Rim.
20          And these companies -- the
21   plants themselves would send the samples to
22   us, and that's -- I spent a lot of time doing
23   that.
24          Q.    All right.  I've had a chance
25   to look at some representations that Johnson

Page 35

1    & Johnson has made to -- in courts through
2    their lawyers, and just recently in
3    New Jersey, for example, January 29th of
4    1918 -- of 2018.  Yeah, real recent.  It was
5    a century ago.
6           January 29th of 2018, the
7    Johnson & Johnson lawyer made this
8    representation.  Said that "cosmetic talc
9    locations are not favorable for the
10   development of asbestos," and then went on to
11   talk about how asbestos needs "hard surfaces
12   that are cracked to develop, but talc is the
13   softest mineral on earth," so it's in soft
14   places.
15          Based upon your experience and
16   the facts that you've developed, is that
17   true, that cosmetic talc locations are not
18   favorable for the development of asbestos?
19          MR. DUBIN:  Objection to form.
20          MR. PROST:  Object to form.
21          THE WITNESS:  No, I wouldn't
22   say.  I wouldn't agree with that, no.
23          (Blount Exhibit 8 marked for
24   identification.)
25

Page 36

1    QUESTIONS BY MR. LANIER:
2           Q.    All right.  And then there's
3    one other letter that I've found interesting,
4    and we'll mark this as Exhibit Number 8.  And
5    I'm looking specifically at a letter that you
6    wrote, Alice M. Blount, Ph.D., mineralogist.
7           Is that you?
8           A.    Uh-huh, that's me.
9           Q.    And is that your signature?
10          A.    Yes, that is.
11          Q.    In fact, you signed your name
12   in 1998 just about exactly the same way you
13   signed your name for me at the bakery, coffee
14   shop in Rutland, Vermont, when I had you
15   autograph your article.
16          A.    Yeah, well...
17          Q.    That's 20 years.  You sign your
18   name the same way.
19          A.    Uh-huh.
20          Q.    All right.  So we've got your
21   letter here.
22          A.    Yeah.
23          Q.    And you wrote this letter to a
24   law firm that did asbestos work, Mehaffy and
25   Weber in Beaumont.

Page 37

1           Do you see that?
2           A.    Uh-huh.
3           Q.    You said, "Dear Mr. Hatcher,
4    according to your letter of March 31, 1998,
5    I've written and enclosed a report on the
6    occurrence, regulation and up-to-date
7    scientific views of asbestos, amphiboles and
8    intermediate fibers.  I've also enclosed
9    copies of my 1990 and '91 papers, one of
10   which I'm sure you already have."
11          Do you see where I'm reading?
12          A.    Uh-huh.
13          Q.    Now, you said this: "The 1991
14   paper was written because I became aware it
15   was a common opinion among industrial
16   hygienists that industrial talcs were better
17   than pharmaceutical and cosmetic talcs
18   because there was a regulation for the former
19   and not the latter.  I knew this was not the
20   case and wanted to set the record straight."
21          Do you see where I'm reading?
22          A.    Uh-huh.
23          Q.    "Although my papers report an
24   improved method for analysis" --
25          And for the jury, we call that

10  (Pages 34 to 37)

Alice M. Blount, Ph.D.

Page 38

1  the Blount method, but I'm not -- they can
2  read the paper if they want to see that.
3          -- "the determinations for the
4  sample labeled I, Johnson & Johnson's Vermont
5  talc, have been done by the traditional
6  methods as well."
7          So in addition to your Blount
8  method, did you test it by traditional means?
9      A.   Uh-huh, yes.
10     Q.   "As I told you, I believe that
11 Johnson & Johnson's Vermont talc contains
12 trace amounts of asbestos which are well
13 below those specified by OSHA."
14     A.   Uh-huh.
15     Q.   That's what you said, isn't it?
16     A.   Uh-huh.
17     Q.   "It should be noted that the
18 proposed FDA regulation, which was never
19 finalized, also specified the same .1 percent
20 limit for amphibole asbestos as OSHA."
21         Now, you are not a
22 toxicologist; is that fair?
23     A.   That's fair, yes.
24     Q.   So you don't know what level is
25 safe or unsafe, and you haven't done studies

Page 39

1  on the health effects; you just know asbestos
2  when you see it.
3          Is that right?
4      A.   That's right.  That's right.
5  Right.
6          MR. DUBIN:  Object to form.
7  QUESTIONS BY MR. LANIER:
8      Q.   Excellent.
9          And did you let the lawyers
10 know about the Johnson & Johnson talc having
11 these trace amounts of asbestos in this
12 letter?
13     A.   Did I tell who?
14     Q.   Yeah.
15         Yeah, you didn't hide it, did
16 you?
17     A.   No.
18     Q.   All right.  And by the way, we
19 know that also because down in the corner of
20 this letter -- see, here's the letter.  Down
21 in the corner it's got these numbers,
22 J&J-049150.
23         Do you see that?
24     A.   Uh-huh.
25     Q.   I'll highlight it.

Page 40

1          That means we got this document
2  from Johnson & Johnson; not from you.
3          MR. DUBIN:  Object to form.
4  QUESTIONS BY MR. LANIER:
5      Q.   Have you even seen this
6  document before I showed it to you?
7          Had you seen this document
8  since you wrote it?
9      A.   I don't think so.
10         (Blount Exhibit 9 marked for
11 identification.)
12 QUESTIONS BY MR. LANIER:
13     Q.   All right.  So if we look, for
14 example, at representations made by the
15 company, here's one on their website.  I'll
16 label it as Exhibit Number 9.  It talks about
17 the facts about talc safety.
18         February 24, 2016, this is just
19 on the website, blogj&j.com.  "Baby powder
20 made from cosmetic talc is one of Johnson's
21 oldest products and a long-time part of baby
22 care ritual."
23         This is the stuff used on
24 babies, right?
25         MR. DUBIN:  I'm going to object

Page 41

1  to form on that question and have a
2  subsequent objection with the document
3  with this witness.
4  QUESTIONS BY MR. LANIER:
5      Q.   Do you see where I'm reading?
6      A.   I see that.
7      Q.   And all I'm doing is setting up
8  a context here for the statement I'm going to
9  ask you about.
10         "Johnson's baby powder
11 continues to be popular with adults as well,
12 and in many parts of the world, it remains an
13 essential part of makeup and skin care
14 routines."
15         Do you see where it says that?
16     A.   Uh-huh.
17     Q.   Now, if you look at the very
18 first bullet point here, zoom in a little
19 bit, "A frequent misperception is that
20 Johnson's baby powder contains talc made with
21 asbestos, a substance classified as
22 cancer-causing.  Since the 1970s, talc used
23 in consumer products has been required to be
24 asbestos-free."
25         Do you see where I'm reading

11  (Pages 38 to 41)

Alice M. Blount, Ph.D.

Page 42

```
1    that?
2        A.    Yes.
3        Q.    Dr. Blount, based upon what you
4    know from what you did and your expertise,
5    was Johnson & Johnson's baby powder in the
6    19 -- since the 1970s asbestos-free or did it
7    have asbestos in it?
8            MR. DUBIN:  Objection.  Form.
9            THE WITNESS:  It had asbestos.
10           MR. LANIER:  Okay.  Thank you.
11       I'll pass the witness.  Let's
12    go off the record.
13           VIDEOGRAPHER:  Going off the
14    record.  The time is 9:59.
15      (Off the record at 9:59 a.m.)
16           (Blount Exhibit 10 marked for
17    identification.)
18           MR. LANIER:  I told Mr. Dubin
19    before we started I have told
20    Dr. Blount that we would compensate
21    her for her time.  I know that the
22    geologist fact witness for the company
23    was charging -- Pooley charged around
24    $400 an hour I think he said.  So
25    we're going to be paying her that
```

Page 43

```
1    time.  I don't know what her time is.
2    I don't know how much time she's got
3    in it.  Whatever it is, we're going to
4    be paying that, and I don't want the
5    other side not to be aware of that.  I
6    told Mr. Dubin but not Mr. Prost or
7    the judge.  Put that on the record.
8            JUDGE NORTON:  When Mr. Prost
9    comes back in, I'll mention to him
10    if you've started or whatever.
11           MR. LANIER:  Thank you.
12           VIDEOGRAPHER:  Back on the
13    record.  The time 10:05.
14           CROSS-EXAMINATION
15    QUESTIONS BY MR. DUBIN:
16       Q.    Hi, Dr. Blount.  How are you?
17       A.    I'm fine.
18       Q.    Okay.  During the break, just
19    to address first, counsel who is here with
20    you, Mr. Lanier, indicated that you're being
21    paid for your time and for the time that you
22    met with Mr. Lanier previously; is that
23    correct?
24       A.    That's correct.
25       Q.    Okay.  And prior to your giving
```

Page 44

```
1    testimony this morning, had you set or
2    decided on any particular rate by which you
3    would be paid?
4        A.    Yes.
5        Q.    Okay.  When did you make that
6    decision?  What rate were you going to be
7    paid?
8        A.    $400 an hour or something like
9    that.
10           MR. LANIER:  Yeah.
11    QUESTIONS BY MR. DUBIN:
12       Q.    And when was that rate decided
13    on?
14       A.    I don't really know --
15           MR. LANIER:  Yeah.  Yeah, I met
16       with her a week ago.  So it would have
17       been a week ago, probably.
18    QUESTIONS BY MR. DUBIN:
19       Q.    But the actual rate, was that
20    just decided during the break that we've had
21    in between your testimony for Mr. Lanier?
22       A.    No.
23       Q.    Okay.  So you're representing
24    that the rate was decided on weeks ago?
25           MR. LANIER:  No, about a week
```

Page 45

```
1    ago when I met her, I told her that
2    whatever Pooley had charged is what
3    we'd -- we'd pay her that hourly rate
4    that you-all set for the geologist.
5    QUESTIONS BY MR. DUBIN:
6        Q.    All right.  Let's start with
7    some basic concepts.
8            There have been some words that
9    were used, if we can turn on the Elmo.
10           All right.  Amphibole.  What is
11    an amphibole?
12       A.    It's a silicate mineral.
13       Q.    Does amphibole mean asbestos?
14       A.    Not -- not always.  I think
15    there's some that are not considered
16    asbestos.  It's a group -- amphibole is a
17    group of mineral.  So, yeah.
18       Q.    So there are asbestos
19    amphiboles and there are non-asbestos
20    amphiboles, right?
21       A.    (Witness nods head.)
22       Q.    And another word that we were
23    talking a good bit about is tremolite?
24       A.    Uh-huh.
25       Q.    Now, is there also asbestos
```

12 (Pages 42 to 45)

Alice M. Blount, Ph.D.

Page 46

1    tremolite and non-asbestos tremolite?
2         A.   Yes, I would say so.
3    They're -- because sometimes it's sort of
4    blocky and other times it is a definite
5    fiber.  So you have -- you have to make a
6    decision when you see it.
7             And that's why I did that graph
8    he showed earlier.  You can see which ones
9    had an asbestiform form shape and which ones
10   don't.  That's what you have to do to make
11   sure that you're getting one that's actually
12   asbestos or not.
13        Q.   Right.
14            And so, for example, there's
15   another term that's also used.
16        A.   Cleavage, yeah.
17        Q.   Fragments, right?
18        A.   Yeah.
19        Q.   Cleavage fragments, right?
20            Is that a term that you're
21   familiar with?
22        A.   Yes.
23        Q.   And what is a cleavage
24   fragment?
25        A.   That's the way the mineral will

Page 47

1    actually break if you hammer it or something
2    so that you can -- you know, you break it.
3    It'll break along these cleavage lines, which
4    is an inherent structure of the crystal to
5    start out with.
6         Q.   And is it fair to say that a
7    cleavage fragment of tremolite is not
8    asbestos?
9         A.   I would say so, although there
10   are others that do not -- some people don't
11   say that.  Some people count everything.
12        Q.   Right.
13        A.   But if there's a cleavage
14   fragment, I would not count it as asbestos.
15        Q.   Okay.  And so if I understand
16   your testimony correctly, your sample that --
17   Sample I that you mentioned, you're saying
18   that that was a -- bought from a bottle of
19   Johnson & Johnson's baby powder?
20        A.   Yeah.  Baby powder, yeah.
21        Q.   Okay.  So when did you purchase
22   that bottle?
23        A.   I think I purchased it right
24   before I left New Jersey, which would be
25   1996.

Page 48

1         Q.   1996.
2              Okay.  And then presumably you
3    took some out of that bottle to do your
4    analysis of Sample I?
5         A.   Uh-huh.
6         Q.   And the first analysis that you
7    have of Sample I -- I think we looked at this
8    document a little bit a second ago.  Okay.
9              So this was the letter that
10   Mr. Lanier showed you to Mr. Hatcher --
11        A.   Uh-huh.
12        Q.   -- and it attaches a paper,
13   "The Detection and Quantification of Asbestos
14   and Other Trace Minerals."
15            And that's from -- is that
16   1990?
17        A.   I can't see it from here.
18        Q.   There's a date on the bottom.
19            MR. LANIER:  I can't see it.
20   QUESTIONS BY MR. DUBIN:
21        Q.   Well, do you still have a copy
22   of the document that --
23        A.   With everything --
24            MR. COOPER:  It's in the bottom
25   right corner.

Page 49

1              THE WITNESS: 1990, yeah.
2    QUESTIONS BY MR. DUBIN:
3         Q.   And so we'll go into this a
4    little bit in depth, but why is it that you
5    remember the timing of when you bought that
6    Johnson & Johnson bottle?
7              What brings to mind when you
8    did it?
9         A.   Because we were about ready to
10   come up here and move -- we were about ready
11   to move up here, and I remember I got it
12   right before we moved up here.
13        Q.   So when did you move up here?
14        A.   1996.
15        Q.   Okay.  And so one of the things
16   about this paper -- and I'm sorry for people
17   I'm making seasick with the Elmo -- you have
18   an analysis that we talked about a little bit
19   before of Sample I.
20            Do you see that?
21        A.   I, yeah.
22        Q.   All right?
23        A.   Uh-huh.
24        Q.   And now that Sample I, did
25   you -- did you -- you've done other studies

13 (Pages 46 to 49)

Alice M. Blount, Ph.D.

Page 50

1    that involve Sample I, right?
2        A.    Uh-huh.  I think so.
3        Q.    Okay.  And was Sample I always
4    the same material, as far as you know, or did
5    you switch it around?
6        A.    It was the same material.
7        Q.    Okay.  So let's look at -- I'm
8    going to hand you -- I'll mark this
9    separately.
10           MR. DUBIN:  What number are we
11   on?
12           (Blount Exhibit 11 marked for
13   identification.)
14   QUESTIONS BY MR. DUBIN:
15       Q.    Mark this as 11.
16           And do you recognize what I've
17   marked -- and I'll just put it up here -- as
18   Exhibit 11?
19           If you look at this, do you
20   recognize this paper?  It's the same thing
21   that you have in front of you.
22       A.    Same thing I have...
23       Q.    The next page is a paper by
24   you.
25       A.    Yes, I see that.

Page 51

1        Q.    Called "Detection and
2    Quantification of Asbestos and Other Trace
3    Materials {sic}."
4           You looked at the front page of
5    that before?
6        A.    Uh-huh.
7        Q.    And it indicates that this was
8    presented at a proceedings of International
9    Symposium of Applied Mineralogy in 1989,
10   correct?
11       A.    (Witness nods head.)
12       Q.    And the date on this paper, we
13   were trying to see it before, but now that
14   you have your own copy, is it a little easier
15   to see at the bottom of page 557 what the
16   date is?
17       A.    Uh-huh.  1990, yeah.
18       Q.    Okay.  And you'll see, for
19   example, there's analysis.  If you turn to
20   Table 2 on 567, there's analysis of a
21   Sample I.
22           Do you see that?
23       A.    Sample.
24       Q.    Under the comparison of values
25   obtained by traditional 1 milligram 100 field

Page 52

1    of view -- I'll point to it on the...
2        A.    Which one?
3        Q.    Do you see Sample I?
4        A.    I.  I.  Okay.  Uh-huh.
5        Q.    And so there were no fibers
6    detected in that Sample I by the traditional
7    methods, right?
8        A.    Uh-huh.
9        Q.    Okay.  But one thing we know
10   then is that Sample I can't be the Johnson &
11   Johnson baby powder that you said you bought
12   in 1996, right?
13       A.    That seems so.
14           (Blount Exhibit 12 marked for
15   identification.)
16   QUESTIONS BY MR. DUBIN:
17       Q.    And the same way we know this
18   paper that we've all been talking about --
19   I'm going to mark this next, Exhibit 12.
20       A.    Oh, we're doing this a
21   different way.
22       Q.    Just showing you --
23       A.    We're doing this one a
24   different way.  This is a centrifuge way;
25   this one's not.

Page 53

1    QUESTIONS BY MR. DUBIN:
2        Q.    And also here we have this
3    paper that -- the other paper Mr. Lanier
4    asked you about, "Amphibole Content of
5    Cosmetic and Pharmaceutical Talcs," by AM
6    Blount.
7           This is the paper you wrote,
8    you talked about earlier?
9        A.    Uh-huh.
10       Q.    And this paper is dated 1991,
11   correct?
12       A.    Uh-huh.
13       Q.    So whatever we're claiming --
14   seeing in Sample I here can't be an analysis
15   of the baby powder that you purchased in
16   1996, correct?
17       A.    That was -- this one has --
18   what was the date you said?
19       Q.    This is 1991.
20       A.    1991.  Well, yeah, I guess
21   that's right.
22       Q.    Okay.  So do you know -- now,
23   let me also ask you:  You maintained the
24   samples that you've looked at in these papers
25   for many years, right?

14 (Pages 50 to 53)

Alice M. Blount, Ph.D.

Page 54

1      A.    Some of them, yeah, but not all
2  of them.
3      Q.    For example, not very long ago
4  I believe that you gave certain samples to
5  Dr. Mickey Gunter that you had maintained,
6  including Sample I, correct?
7      A.    I said it was Sample I.
8      Q.    And just so we have it in the
9  record, I'll mark this as next in order.
10         (Blount Exhibit 13 marked for
11     identification.)
12  QUESTIONS BY MR. DUBIN:
13     Q.    I know you're not aware of
14  this, but those samples have been made
15  available for testing by both plaintiff and
16  defense experts in this case.
17         MR. LANIER:  No.
18         MR. DUBIN:  You haven't seen
19     that letter?
20         MR. LANIER:  Oh, I've seen the
21     letter, but you-all have not made them
22     available to us yet.
23         MR. DUBIN:  Okay.  We can --
24     the letter will speak for itself.
25         THE WITNESS:  But I -- that

Page 55

1      sample's not the same one as this
2      other one.
3  QUESTIONS BY MR. DUBIN:
4      Q.    So that I is not the same I?
5      A.    No.
6      Q.    So what is that I?
7      A.    What's that I?  It's a Vermont
8  talc, but I don't know where it came from.
9      Q.    So is that the I that was
10  studied in the 1991 paper, the I that you've
11  provided for testing?
12     A.    You mean with the -- that we
13  plotted out, you mean?
14     Q.    Right.
15         Is the I that's described in
16  the 1991 paper same I that you provided
17  to Dr. Gunter?
18     A.    Huh-uh, no.
19     Q.    So when did you obtain that
20  Sample I?
21     A.    Most recent?
22         Can't tell you.  I don't know.
23  I'd have to look at my records.
24     Q.    Do you know whether you
25  obtained that Sample I before the 1991 paper

Page 56

1  was published?
2      A.    No, it would have to be after
3  that.
4      Q.    Why is that?
5      A.    Because -- well, my
6  recollection is that the older sample was
7  obtained in New Jersey before I came up here.
8         The I that you're talking about
9  is something that I collected up here.
10     Q.    Why did you label it then
11  Sample I?
12     A.    Well, that's a good question.
13         What I usually did when I
14  was -- when I was collecting samples up here
15  is I usually just gave them a letter rather
16  than any other information on there
17  because -- and I put the number on the
18  bottom, a letter on the bottom, because when
19  I ran them, I didn't want to know who's they
20  were or where they came from.  I just wanted
21  to look at them.
22         So, unfortunately, some of the
23  things ended up with a letter that I'd
24  already -- that had already been used before.
25  So that's why I have two letter I's.

Page 57

1      Q.    Well, the other samples that
2  you gave to Dr. Gunter, did those letters
3  correspond to the correct samples back from
4  the 1991 paper?
5      A.    No, because they'd have to
6  be -- they were collected up here.
7      Q.    So was it -- do you still have
8  samples of other materials back from the 1991
9  papers?
10     A.    I don't think so.
11     Q.    So what were all those samples
12  that you gave to Dr. Gunter?
13     A.    They were samples I collected
14  after I had moved up here.
15     Q.    Weren't they from areas other
16  than Vermont?
17     A.    They may be because I had some
18  graduate students, and I may have had some
19  talc from them, too.
20     Q.    But didn't they all have
21  identification letters that corresponded to
22  the 1991 paper samples?
23     A.    I'm not sure.
24     Q.    Okay.  Now, why did you
25  maintain -- why do you maintain samples?  Why

15 (Pages 54 to 57)

Alice M. Blount, Ph.D.

Page 58

1    is it your practice to maintain samples?
2        A.   I don't know.  I like samples.
3        Q.   What did the container of
4    Johnson & Johnson that you remember look
5    like -- that you remember using look like?
6        A.   You want it?  It's in my purse.
7            MR. LANIER:  Sure.
8            MR. DUBIN:  All right.  We'll
9    mark that as the next exhibit in
10   order.
11           (Blount Exhibit 14 marked for
12   identification.)
13   QUESTIONS BY MR. DUBIN:
14       Q.   Okay.
15       A.   It has some kind of number on
16   the bottom.  I don't know if it means
17   anything.
18       Q.   Let me see --
19           MR. LANIER:  The bottom is
20   stamped 231 D2, if that helps you.
21           MR. DUBIN:  It's stamped
22   231 D2.  There's a number on the side
23   that says --
24           THE WITNESS:  It's a cast
25   number.  It just says it's talc.  The

Page 59

1        computer tells you it's talc and
2        what -- if it's dangerous or not, and
3        that's what that number...
4            MR. DUBIN:  It says, "Baby
5        products company, Skillman,
6        New Jersey, 08558, at J&J PPC."  It's
7        got number 3011 DR.
8    QUESTIONS BY MR. DUBIN:
9        Q.   And so this is the bottle that
10   you remember purchasing in 1996 before you
11   came up here, correct?
12       A.   Uh-huh.
13       Q.   Prior to 1996, had you obtained
14   talc from the Windsor area from any other
15   source that you can remember?
16       A.   I don't remember.
17       Q.   But it's fair to say that if
18   you had obtained talc from the Windsor,
19   Vermont, area prior to 1996, you don't know
20   what the source is, correct?
21       A.   That's right.
22       Q.   Trying to cut down a little
23   time, so moving around a little.
24           Do you recall sometime last
25   fall that an attorney, Jonathan Cooper, from

Page 60

1    Johnson & Johnson e-mailed you to ask you
2    some questions?
3        Q.   Do you recall that at all?
4        A.   Huh-uh.
5            (Blount Exhibit 15 marked for
6    identification.)
7    QUESTIONS BY MR. DUBIN:
8        Q.   Okay.  See if this refreshes
9    your recollection.
10           Do you recall talking to -- do
11   you recall talking to Mr. Cooper in
12   connection with that e-mail?
13           MR. PROST:  At some point I'd
14   like to take a look at it, too.
15   QUESTIONS BY MR. DUBIN:
16       Q.   Do you recall reviewing a
17   report by Dr. Longo and then talking to
18   Mr. Cooper about what your views were about
19   it?
20       A.   No.
21       Q.   Do you recall receiving any
22   sort of report of an analysis of baby powder
23   by Dr. Longo?
24       A.   Huh-uh.
25       Q.   So you don't recall telling

Page 61

1    Mr. Cooper that you thought what he was
2    looking at wasn't asbestos?
3        A.   (Witness shakes head.)
4        Q.   So fair to say, though, to the
5    extent you've looked at Johnson & Johnson
6    baby powder, you've looked at one bottle?
7        A.   No, I looked at -- over time
8    I -- every now and then I get one just to see
9    what it's looking like.
10       Q.   Do you have any results of
11   other analysis that you can provide?
12       A.   That I can dig out?
13           It would take a long time to
14   find it.  Would you like to pay me for...
15           MR. LANIER:  I'll make them pay
16   you for that.
17   QUESTIONS BY MR. DUBIN:
18       Q.   At least in none of your
19   meetings for Mr. Lanier did he ask you to go
20   find any of that data, right?
21       A.   No, he did not.  He did not.
22       Q.   Is it fair to say, though, that
23   if somebody claims to find, for example, one
24   tremolite structure, right, that happens to
25   be 3 to 1, that doesn't mean that they're

16  (Pages 58 to 61)

Alice M. Blount, Ph.D.

Page 62

```
 1    finding asbestos necessarily, right?
 2        A.    Right.
 3        Q.    You would want to go and do
 4    additional analysis beyond seeing one
 5    tremolite particle to determine whether it
 6    was really asbestos or not, right?
 7        A.    Right.
 8        Q.    Okay.  And you were asked about
 9    whether you had views on health effects,
10    so -- but you're aware that there aren't
11    studies showing that the nonasbestiform
12    tremolites cause cancer, right?
13        A.    Right.
14        Q.    And is it your view that the
15    nonasbestiform forms of tremolite do not
16    cause cancer?
17            MR. LANIER:  I want to put an
18        objection to form.  We are not
19        offering her as an expert.  I don't
20        think anyone has.
21            MR. DUBIN:  I think you've
22        referred multiple times to her
23        expertise in your questions, but we'll
24        resolve it.
25
```

Page 63

```
 1    QUESTIONS BY MR. DUBIN:
 2        Q.    Again, you're of the opinion
 3    that nonasbestiform tremolite does not cause
 4    cancer, right?
 5        That's been your opinion?
 6        A.    I don't know.
 7        Q.    Okay.  But certainly you can't
 8    just come in and say that every tremolite
 9    particle that's over 3 to 1 that you find,
10    that's asbestos, right?
11        A.    (Witness nods head.)
12        Q.    That wouldn't be a proper
13    methodology?
14        A.    I mean -- I mean, I've been to
15    conference and conference of geologists
16    arguing about what is asbestos and what is
17    not asbestos.  So, I mean, geologists have
18    not really reached a final conclusion on this
19    either.
20            The ASTM meetings I've been to,
21    I don't know how many of them, and this is
22    always the discussion, you know.
23        Q.    Okay.  And to be fair, I know
24    you don't recall, but that e-mail suggests
25    that we did at some point ask you to take a
```

Page 64

```
 1    look at Dr. Longo's report, right, the e-mail
 2    from Mr. Cooper?
 3        Do you see that?
 4        A.    E-mail from Mr. Cooper?
 5        Q.    Well, let me ask you:  Did
 6    Mr. Lanier ever ask you to look at an
 7    expert's report called -- an individual,
 8    Dr. Longo, to see what your thoughts were
 9    about it?
10        A.    I don't remember.
11        Q.    Okay.  And if somebody was to
12    say that they didn't do an analysis by
13    optical microscopy, by PLM, PCM, because you
14    just can't see asbestos with it, would that
15    be correct or incorrect?
16        A.    That's incorrect.
17        Q.    Okay.  And in your 1992 --
18    sorry, '91 article, you listed out the
19    densities of various materials so that you
20    could -- because you were using a heavy
21    density liquid separation technique, correct?
22        A.    Yes.
23        Q.    So, for example, this is what
24    we're talking about, this 1991 paper.
25            Now, before I ask you that,
```

Page 65

```
 1    first, did you consider at the time this
 2    method to be experimental in nature?
 3        A.    No.
 4        Q.    The page here, you have various
 5    densities for materials -- I know it's hard
 6    to see, I'll try to zoom in -- including
 7    anthophyllite, tremolite, actinolite and
 8    talc, right?
 9        A.    Uh-huh.
10        Q.    Was this method that you
11    developed capable of separating out and
12    detecting anthophyllite if it was there?
13        A.    Should be.
14        Q.    Okay.  So if someone were to
15    say that using your method, even if there was
16    anthophyllite in a sample, they couldn't see
17    it, that would be wrong, correct?
18        A.    It depends how they do the
19    method.  Because I -- to do this, I had to go
20    through each mineral, and I had to find out
21    its density.
22        Q.    Right.
23        A.    And I had to know what liquid
24    to use, what density liquid.  So it depends
25    on what you're running together, and once you
```

17 (Pages 62 to 65)

Alice M. Blount, Ph.D.

Page 66

1    know that, you can figure out what liquid to
2    use.
3        You just can't take what's
4    written here and just do it that -- you know,
5    with that -- with those numbers.
6        Q.   Right.  Precisely.
7        You chose a liquid density that
8    would allow you to see not only tremolite but
9    other forms of amphibole, correct?
10       A.   And I tested them out to see
11   what their density was, and then I had to
12   purchase a heavy liquid that fit right
13   between talc and these other ones so that I
14   could separate them out in -- what would come
15   to the bottom when I centrifuged it.  And
16   then I took a little tiny pipette and I
17   removed those things from the bottom, and
18   that's what went onto my glass slides.
19       Q.   Okay.  And so if somebody
20   decides to use a different density liquid,
21   they're not using the same method you were?
22       A.   Or if they're doing a different
23   density mineral, they would have to go
24   through that and decide which -- what liquid
25   they need to use.

Page 67

1        Q.   And so if somebody, for
2    example, selected a density of liquid that
3    didn't allow them to see anthophyllite, they
4    could make that decision, but then it would
5    be a different method?
6        A.   Uh-huh.
7        Q.   Right?
8        A.   Uh-huh.
9        Q.   And you don't know what
10   method --
11       A.   I don't know what --
12       Q.   -- Dr. Longo used in this case?
13       A.   I don't know the density of
14   anthophyllite right off my head either.
15       Q.   Do you have an opinion on the
16   comparative ability of the TEM, transmission
17   electron microscopy, and something like
18   optical microscopy to resolve asbestos fibers
19   or see asbestos fibers?
20       A.   TEM I would not do until after
21   I had done this, if I really want to look at
22   those, because sometimes when you get fibers,
23   you get them -- they're bundles.  So that's
24   when we go to the TEM or -- to see those
25   fibers.  Otherwise, I wouldn't be using them

Page 68

1    for -- in this method.
2        Q.   So you agree then that when
3    you're analyzing talc for asbestos, it's best
4    to start with an optical microscopy method
5    like PLM?
6        A.   Right.
7        Q.   And then you can take another
8    step, potentially, and also look at something
9    like transmission electron microscopy?
10       A.   If you wanted to get a real
11   close-up view of that.  But TEM is not good
12   for identifying lots of times.  It's just
13   looking for the structures.
14       Q.   Right.
15       PLM, one of the things that
16   it's better at than TEM is identifying
17   whether you're really looking at asbestos or
18   not as opposed to look -- just focusing on
19   something that may be a non-asbestos
20   amphibole, right?
21       A.   Uh-huh.
22       Q.   And so if you skip the PLM
23   stage, you're missing out on a lot of
24   important information that helps you tell
25   whether you're really looking at asbestos or

Page 69

1    not, correct?
2        A.   Uh-huh.
3        Q.   And in your view, in general,
4    to determine whether or not something is
5    asbestos or not, you don't want to just look
6    at one single structure; you want to look at
7    the characteristics of the population of the
8    fibers, right?
9        A.   Uh-huh.
10       Q.   Okay.  And ignoring the
11   characteristics of the population of the
12   fibers is not, I take it, good science in
13   your view?
14       A.   I don't think so, yeah.
15       Q.   All right.  And again,
16   Mr. Lanier didn't share with you any of the
17   reports or opinions of the experts like
18   Dr. Longo or Dr. Compton that he intends to
19   offer to the jury in this case, correct?
20       A.   I didn't see any.
21       Q.   Okay.  And are you aware that a
22   number of other researchers over time have
23   looked at Johnson & Johnson material to
24   determine whether or not they believe that it
25   has asbestos in it?

18 (Pages 66 to 69)

Alice M. Blount, Ph.D.

Page 70

```
 1        A.    Oh, I assume they have.
 2        Q.    Okay.  And let me just ask you
 3   whether you're familiar with some of them
 4   or -- at the time.  I'll mark this as next in
 5   order.
 6            (Blount Exhibit 16 marked for
 7            identification.)
 8   QUESTIONS BY MR. DUBIN:
 9        Q.    Is this a paper that you're
10   familiar with?
11        A.    No.
12        Q.    Occupational Exposures.  I'll
13   put it up here.
14            So this is not something --
15   when you were asked this morning by
16   Mr. Lanier about the presence of asbestos in
17   Johnson & Johnson products, it's not
18   something that you had had an opportunity to
19   consider before expressing any views you have
20   about that, right?
21        A.    Say that again?
22        Q.    Well, you were asked this
23   morning by Mr. Lanier about whether there's
24   asbestos in Johnson & Johnson baby powder,
25   but this isn't something, this paper isn't
```

Page 71

```
 1   something, that you were -- had considered in
 2   expressing any views you have about that,
 3   right, because you haven't read it?
 4        A.    No, I haven't read it.  No.
 5        Q.    For example, this is
 6   individuals, Maryanne Boundy, William
 7   Burgess, John Dement, who is at NIOSH.  And
 8   did you know that they went in to do a study
 9   of the Vermont mill and mine that made --
10   that provided the source talc for Johnson &
11   Johnson baby powder?
12        A.    Huh-uh.
13        Q.    And that they did -- they took
14   product samples and they took air samples and
15   that they analyzed those using techniques
16   like PLM, optical microscopy and transmission
17   electron microscopy?
18        A.    Huh-uh.
19        Q.    And that their conclusion was
20   that there was no asbestos?
21            You haven't seen that before?
22        A.    No.
23            But I guess my question here
24   is:  I've been to so many asbestos
25   conferences, and I have never heard of these
```

Page 72

```
 1   people, so why is that?
 2        Q.    Do you know who John Dement is
 3   at -- was it NIOSH now?
 4        A.    But he never comes to meetings
 5   or anything that we're having on asbestos.
 6        Q.    Okay.  Are you familiar with an
 7   organization McCrone, McCrone Industries?
 8        A.    Uh-huh.
 9        Q.    And you've cited to some of
10   their work over time analyzing asbestos?
11        A.    Uh-huh.
12        Q.    Were you aware that McCrone was
13   doing routine analysis of Johnson & Johnson
14   talc for asbestos by transmission electron
15   microscopy?
16        A.    Huh-uh.
17            (Blount Exhibit 17 marked for
18            identification.)
19   QUESTIONS BY MR. DUBIN:
20        Q.    I know you haven't had an
21   opportunity, I assume, to look at --
22   Mr. Lanier didn't show you this document when
23   he was preparing you to testify today,
24   correct?
25            MR. LANIER:  Objection.  Form.
```

Page 73

```
 1            THE WITNESS:  Yes.
 2   QUESTIONS BY MR. DUBIN:
 3        Q.    Okay.  And so this is a letter
 4   from McCrone -- McCrone Industries.
 5        A.    Yeah, I know of them.
 6        Q.    Yeah, McCrone Associates,
 7   sorry.
 8        A.    Go ahead.
 9        Q.    1987.  And it's talking about
10   something with the EPA.  It says, "The
11   Illinois EPA wrote to Windsor Minerals to the
12   effect that they were satisfied that
13   Windsor's product is free of asbestos.  That
14   has always been our opinion and continues to
15   be our opinion based on over 15 years of
16   closely examining this product."
17            And again, this was not
18   something that you read or were shown by
19   Mr. Lanier to talk about your views today,
20   correct?
21            MR. LANIER:  Objection.  Form.
22   QUESTIONS BY MR. DUBIN:
23        Q.    Right?
24        A.    Right.
25        Q.    And are you aware that the FDA
```

19 (Pages 70 to 73)

Alice M. Blount, Ph.D.

Page 74

1    has done testing of talc for the presence of
2    asbestos?
3              Have you seen those testing
4    results?
5        A.    Huh-uh.
6        Q.    Okay.  And you didn't look for
7    purposes of your 1991 paper at any Chinese
8    talc, correct?
9        A.    No, I don't think so.
10       Q.    And you did look, though --
11   some of the other samples that you looked at
12   for your paper were raw ore samples from talc
13   from Vermont and ore samples from talc in
14   Italy, correct?
15       A.    Well, it's -- raw samples?
16       Q.    Well, what did you look at --
17   what else did you look at from Vermont?
18   Sorry, I apologize.
19       A.    Only what's in the talc
20   business.  And I was working for them and
21   I -- and I analyzed those.  And those were
22   coming in from Newfane and a Troy deposit.
23   And they were being processed in Chester and
24   in -- what's -- Johnson mills, and they came
25   to us.  And then I had to analyze them

Page 75

1    completely before they were -- became
2    products that the company would sell.
3              So I haven't had a chance to
4    look at those.
5        Q.    So let's start first with just
6    Italian.
7              Did you look in the 1991 paper
8    also at Italian talc?
9        A.    I think one of them was.
10       Q.    And was your conclusion that
11   there was not asbestos in the Italian talc?
12       A.    Do we have that paper?  I think
13   I did.  I'm not sure.
14       MR. LANIER:  1991?
15       MR. DUBIN:  Yeah.
16   QUESTIONS BY MR. DUBIN:
17       Q.    Is Italian talc H?
18       A.    Let's see.  Yes, something like
19   that.  Let's see.
20             Well, in this paper it says
21   cleavages and needles.
22       Q.    So your conclusion -- that was
23   not one of the samples that you identified
24   asbestos in, correct?
25       A.    I guess I would have to look

Page 76

1    further, but cleavages and needles which --
2    could be.  Could be.
3        Q.    Well, let's look at the
4    front -- let's look at the front of the
5    paper.
6        A.    Uh-huh.
7        Q.    You say, "Only one of the
8    samples was found to contain an amphibole
9    particle size distribution typical of
10   asbestos," correct?
11             Do you see that in the
12   abstract?  "Only one"?
13       A.    Oh, in the abstract.  Okay.
14             "Only one found to contain
15   amphibole particles of size distribution of
16   typical asbestos."
17             Yeah, I agree.
18       Q.    So that means the rest of the
19   samples, other than I, did not contain a
20   particle size distribution of amphibole
21   typical of asbestos, right?
22       A.    Yeah, we've done this kind of
23   a -- we would have done this to see what the
24   distribution was.
25       Q.    And that would include the

Page 77

1    Italian talc that you looked at and other
2    Vermont talcs that you looked at, correct?
3        A.    Some -- I don't know if all of
4    them, but some of them are.
5              These were pretty much the ones
6    we were running to check our own deposits
7    that -- only its own deposits.
8        Q.    Right.  And so --
9        A.    But I know there was an
10   Italian, I remember that being there, but I
11   can't tell you right now which one it was.
12       Q.    But fair to say that for the
13   Italian talc that you looked at, you didn't
14   find an amphibole particle size distribution
15   typical of asbestos, right?
16       A.    Uh-huh.
17       Q.    And you also, for the other
18   Vermont samples that you looked at, whatever
19   they are, you didn't find an amphibole
20   particle size distribution typical of
21   asbestos, right?
22       A.    Yes, I think that's right.
23       Q.    And just to clarify also, the
24   photos that Mr. Lanier showed of Sample I, do
25   you have other photos also, or are those all

20  (Pages 74 to 77)

Alice M. Blount, Ph.D.

Page 78

1    the photos that you have from that process?
2        A.   I don't think so.  I don't
3    think I have -- we had -- we had -- the
4    problem was that when we moved its
5    headquarters to Cincinnati, they got a new
6    director to track that lab, and he threw out
7    practically everything we had down here in
8    Vermont.  So a lot of that stuff was lost,
9    and I'm afraid there's no way I can get it
10   back.
11       Q.   So where did you get these
12   photos?
13       A.   These were ones I already had,
14   already printed out and, you know, I had
15   those.  But I have done a lot more work since
16   then, and that does not exist anymore.
17       Q.   Okay.  Did Mr. Lanier ask you
18   to try to find any other photos that you had
19   from your work or just those photos that you
20   brought today?
21       A.   Well, I was looking through to
22   see what I had, but knowing pretty much the
23   timeline, I know at one point the new
24   director decided to throw all of that stuff
25   out, so...

Page 79

1        Q.   All right.  And one of the
2    things that you note in your conclusion
3    section here is, "High grade talc powders are
4    uniformly low in amphibole content.  Indeed,
5    talc from some districts appears to be
6    completely free of such minerals."
7        Do you see that?
8        A.   Uh-huh.
9        Q.   So if an expert for the
10   plaintiffs was to testify there is no such
11   thing as asbestos-free talc, is that true?
12       A.   There's no such thing...
13       Q.   If their experts would say it
14   doesn't exist, there's no such thing as
15   asbestos-free talc, is that true?
16       A.   No.
17       MR. DUBIN:  Okay.  Let's take a
18   five-minute break.  I'll check my
19   notes and see if I have anything else;
20   otherwise, I'll pass back.
21       VIDEOGRAPHER:  Going off the
22   record.  The time is 10:50.
23       (Off the record at 10:50 a.m.)
24       VIDEOGRAPHER:  Back on the
25   record.  The time is 10:54.

Page 80

1        CROSS-EXAMINATION
2    QUESTIONS BY MR. PROST:
3        Q.   Good morning, Dr. Blount.  My
4    name is Mark Prost, and I represent a company
5    called Imerys Talc America.
6        A.   Uh-huh.
7        Q.   Nice to meet you.
8        A.   Hi.
9        Q.   Now, you and I have never met
10   or talked before; is that right?
11       A.   Right.
12       Q.   And I have not had coffee with
13   you or had dinner with you, and I haven't
14   sent you any information or e-mails or
15   anything like that, have I?
16       A.   That's right, you haven't.
17       Q.   And has anyone from Imerys
18   contacted you or tried to talk to you before
19   the deposition?
20       A.   I don't think so.
21       Q.   All right.  And I will say I
22   would like to maybe have coffee with you,
23   because I lived in Carbondale, Illinois, just
24   like you did.  I went to law school there.
25   So maybe after the deposition we can catch up

Page 81

1    a little bit.
2        Now, with the materials that
3    Mr. Lanier showed you, did he show you any
4    testing materials that my company, Imerys,
5    had done regarding Vermont talc?
6        A.   I don't think so.
7        Q.   So there's going to be a woman
8    from Imerys named Julie Pier who will
9    testify, and the jury will hear about her,
10   but she's going to talk about the testing
11   that Imerys did.
12       Are you aware of any of the
13   testing that Imerys did or the results of
14   that testing of Vermont talc?
15       A.   No.
16       Q.   You would agree it's a good
17   thing for a talc company to test its talc to
18   see if there is asbestos there, right?
19       A.   Right.
20       Q.   And would you expect a talc
21   company to test for all kinds of asbestos
22   such as tremolite and chrysotile?
23       A.   Uh-huh, yeah.
24       Q.   Now, your method, as I
25   understand it, is designed to test for

21 (Pages 78 to 81)

Alice M. Blount, Ph.D.

Page 82

1   amphiboles but not chrysotile asbestos; is
2   that right?
3        A.    I think you could do both.
4   Depends on, you know, which one it is, yeah.
5        Q.    But as I understand it, your
6   heavy liquid density testing is designed such
7   that chrysotile is not going to be found
8   after that -- after the preparation is done.
9   They're not as likely to be found; is that
10  right?
11       A.    Yeah, that's probably right.
12       Q.    So if a talc company wanted to
13  test its talc to see if there's chrysotile
14  asbestos, it probably wouldn't be a good idea
15  to use your preparation method; is that --
16       A.    You just have to recalibrate
17  for whatever you are -- whatever mineral you
18  are interested in.
19       Q.    All right.  Now, my
20  understanding is the reason you developed
21  your technique was so you could test the talc
22  faster.  Is that a fair way to describe it?
23       Why did you develop your
24  method?
25       A.    I developed my method because I

Page 83

1   wanted to be able to find the asbestos in
2   there, and most of the time there was so much
3   talc you couldn't find anything.  And also
4   the asbestos fibers sometimes hid underneath
5   the talc particles, so I wanted to separate
6   them so I could see them and measure them.
7   And I couldn't do in its original condition.
8        Q.    Now, there is an older way of
9   testing talc for asbestos that people were
10  doing before your method that took a lot
11  longer to do; is that true?  Because of the
12  problems you just described?
13       A.    I don't know how they did it.
14       Q.    So, but one of the problems you
15  were coming across and why you tried to
16  develop your method was that when you were
17  testing pharmaceutical or cosmetic-grade
18  talc, there was such extremely low levels of
19  amphiboles that it was taking too much time
20  to do it, and you wanted to find a faster
21  method; is that fair?
22       A.    No, I wanted to be able to find
23  it.  You can't find it if you've got all of
24  that talc covering over what you're looking
25  for.  So that's why I separate them, and then

Page 84

1   I can look at the stuff I'm interested in and
2   the talc won't bother me, won't be in my way
3   so I can't find things.
4        Q.    All right.  When you developed
5   your method, was it your intention for it to
6   be used by lawyers or experts in litigation
7   to try to prove that asbestos was causing
8   someone's cancer?
9        A.    No, I did it because only I
10  needed to know whether they had good talc or
11  not.  And in fact, the two deposits that they
12  had at that time they no longer have because
13  they know what's in there, and that's what
14  they needed to know.
15       Q.    And the two talc deposits, what
16  are you referring to?
17       A.    I'm referring to Troy and
18  Newfane.
19       Q.    Do you have any idea if Imerys
20  has ever mined talc from those two deposits?
21       A.    I don't know.
22       MR. PROST:  Ma'am, those are
23  all the questions that I have right
24  now, but I might have some later and I
25  might come back.  Thank you.

Page 85

1        VIDEOGRAPHER:  Going off the
2   record --
3        MR. LANIER:  We don't need to
4   go off the record.  We're going to
5   move.
6        MR. DUBIN:  Should I have a
7   running objection to form or you want
8   me to make them all the time?
9        JUDGE NORTON:  No, you don't
10  have to.  I'll let Mr. Lanier tell me
11  if he wants to change that.
12       You know, I see the objections
13  to form being made primarily so that
14  if the counsel had asked a question
15  was to call you out and say what's
16  wrong with the form, that's the only
17  way to make sure -- if he doesn't
18  care --
19       MR. LANIER:  I don't care.
20       JUDGE NORTON:  -- then they're
21  all preserved.
22       MR. DUBIN:  All right.  That's
23  great.  That's what I figured.
24       JUDGE NORTON:  So much easier.
25  I appreciate that.

22 (Pages 82 to 85)

Alice M. Blount, Ph.D.

Page 86

1        REDIRECT EXAMINATION
2  QUESTIONS BY MR. LANIER:
3        Q.   All right.  Dr. Blount, I want
4  to ask you some questions to clarify what's
5  been asked by the lawyers for Johnson &
6  Johnson and Imerys.
7              Okay?
8        A.   Uh-huh.
9        Q.   First of all, the Johnson &
10 Johnson lawyer asked you, are there different
11 kinds of amphiboles in tremolite, and you
12 said yes.
13             Remember that?
14       A.   Uh-huh.
15       Q.   My question, the important one,
16 is did you find tremolite asbestos in an
17 asbestiform in Johnson & Johnson baby powder?
18             Did you?
19       A.   Yeah.
20       Q.   Next subject.  I was having
21 trouble understanding about 1996, 1991, 1989,
22 purchase of baby powder.
23             Did you test Johnson & Johnson
24 baby powder more than once?
25       A.   Yes.

Page 87

1        Q.   And you may have written it up
2  once in a paper, but over the process of
3  however many times you tested it, did you
4  consistently find asbestos in it?
5             MR. DUBIN:  Objection to form.
6             THE WITNESS:  Yes.
7  QUESTIONS BY MR. LANIER:
8        Q.   Now, you noticed when Mr. Dubin
9  handed you a different paper than the one you
10 and I had discussed -- it was a book
11 chapter --
12       A.   Uh-huh.
13       Q.   -- you said that was a
14 different method, it was done at different
15 times.
16             I guess this goes back to the
17 other.  Have you done these tests more than
18 once?
19       A.   Which tests are we talking
20 about?
21       Q.   Tests to see if there's
22 asbestos in Johnson & Johnson baby powder.
23       A.   Yeah.
24       Q.   All right.  And then each time
25 you did it, if you had enough samples, you

Page 88

1  would have a letter I or maybe a letter A or
2  a letter B or a letter C for the different
3  samples, but would you change it each time?
4        A.   Would I change it?
5        Q.   Yeah.  In other words, I
6  thought -- explain this to the jury.
7             You were telling Mr. Dubin you
8  assigned the letters so that it would be
9  blind.
10       A.   Uh-huh.
11       Q.   What does that mean?  Explain
12 to the jury what you meant.
13       A.   Because I didn't want to know
14 which company it was from.  I wanted to --
15 you know, because I think you might get bias
16 that way and I didn't want to.  I wanted to
17 be fair.
18       Q.   So if Mr. Dubin thought that
19 you would always give an I to Johnson &
20 Johnson, then it wouldn't be blind at all,
21 would it?
22       A.   That's right.
23       Q.   So would your I -- sometimes it
24 might be Johnson & Johnson --
25       A.   Uh-huh.

Page 89

1        Q.   -- sometimes not; is that fair?
2        A.   Yes, that's fair.
3        Q.   That's how you make it blind,
4  right?
5        A.   Right.
6        Q.   All right.  Next section, next
7  area, topic.  Different methods of different
8  experts.
9             Now, Mr. Dubin put his own spin
10 into how he asked these questions --
11             MR. DUBIN:  Objection to form.
12 QUESTIONS BY MR. LANIER:
13       Q.   -- and I want to make sure that
14 we're clear.
15             Before you criticize other
16 people and decide whether their science is
17 good or bad, would you want time to actually
18 look at what they did and understand it?
19       A.   Uh-huh.
20       Q.   Is it important to you to study
21 what they did and why they did it before you
22 criticize them?
23       A.   Yeah.
24       Q.   Thank you.
25             And in that same vein, if

23 (Pages 86 to 89)

Alice M. Blount, Ph.D.

Page 90

1  different methods are used by different
2  experts, would you agree that companies
3  should use the best method that actually
4  finds asbestos if they want to find it?
5      A.   Yes.
6      Q.   Is that important?
7      A.   That's important.
8      Q.   I mean, the company shouldn't
9  be playing -- okay.  I got a 20-month-old
10  granddaughter.
11      MR. DUBIN:  Object to form.
12  QUESTIONS BY MR. LANIER:
13      Q.   And she's at the age now where
14  she likes to play hide and seek.
15      A.   Uh-huh.
16      Q.   And she'll play hide and seek
17  by pulling a napkin over her head at the
18  table, and I pretend I can't see her.  And
19  she believes me when she drops the napkin
20  down and wants me to exclaim "there you are!"
21      Are you with me?
22      A.   Uh-huh.
23      Q.   I mean, a company should not be
24  playing hide and seek.  A company should
25  really try to look for asbestos.

Page 91

1      Would you agree with that?
2      A.   Yeah.
3      MR. DUBIN:  Objection.  Form.
4  QUESTIONS BY MR. LANIER:
5      Q.   Now, next topic.  A lot of
6  questions were asked by Mr. Dubin, and I
7  think even one by Mr. Prost, about what I
8  showed you, when Mr. Lanier and Mr. Dubin
9  said this -- this is lawyer questioning:
10  "When Mr. Lanier prepared to you testify."
11  Ma'am, I didn't prepare you to
12  testify in the sense of anything other than
13  just explain to you what a deposition is and
14  ask you to tell the truth; is that right?
15      A.   That's right.
16      Q.   And I didn't show you things,
17  you showed me things, because I just wanted
18  to know what you knew; is that fair?
19      MR. DUBIN:  Objection.  Form.
20      THE WITNESS:  Uh-huh.
21  QUESTIONS BY MR. LANIER:
22      Q.   I wanted to know what you did,
23  and that's all we talked about.  I didn't
24  talk to you about what McCrone did, what
25  Julie Pier did or any of that, did I?

Page 92

1      MR. DUBIN:  Objection.  Form.
2      THE WITNESS:  No, you didn't.
3  QUESTIONS BY MR. LANIER:
4      Q.   So, for example, when the
5  lawyers start asking you about this and they
6  talked about -- Mr. Dubin talked about what
7  McCrone said, I didn't even remotely get into
8  you about what Mr. McCrone -- or what McCrone
9  would say for J&J or for another company or
10  whatever versus what the truth is.
11  You and I never talked about
12  McCrone's testing, did we?
13      A.   No, but he's dead anyway.
14      Q.   He's dead anyway.
15      Is truth important in science?
16      A.   Yes.  Yes.  Yes.
17      Q.   Is it important that companies
18  tell the truth?
19      A.   Yeah.
20      MR. DUBIN:  Objection.  Form.
21  QUESTIONS BY MR. LANIER:
22      Q.   And so if, for example, we see
23  the Exhibit 16 that you were asked about
24  where -- or as Mr. Dubin showed from the
25  McCrone letterhead this comment that

Page 93

1  "Windsor's product is free of asbestos.
2  That's always been our opinion and continues
3  to be our opinion based over 15 years of
4  closely examining this product."
5      Do you see that?
6      A.   Uh-huh.
7      Q.   That's what was shown to you
8  just now by Mr. Dubin.
9      What Mr. Dubin never showed you
10  is what I'll mark as Exhibit Number 18.
11      (Blount Exhibit 18 marked for
12  identification.)
13  QUESTIONS BY MR. LANIER:
14      Q.   Exhibit Number 18 is from that
15  same McCrone, the people who told everybody
16  that it's free of asbestos, that it's always
17  been their opinion after 15 years of closely
18  examining -- you can go back 12 years before
19  that, and that same McCrone says to Windsor,
20  the mine company, "We've analyzed your latest
21  series of 24 talc ore samples for asbestiform
22  minerals.  In our entire series, we found
23  only two asbestiform fibers, both
24  amphiboles."
25      They made this with a

24 (Pages 90 to 93)

Alice M. Blount, Ph.D.

Page 94

1  transmission electron microscope.  So they
2  found two in that sample that they did that
3  day.
4       Do you see that?
5       A.   Right.
6       Q.   And yet they'll tell everyone
7  else that it's free of asbestos, Windsor's
8  product is free of asbestos, always been our
9  opinion.
10      Is it important that what you
11  tell the world be the truth that you actually
12  know?
13      Is that important?
14      A.   Yeah.
15      Q.   I mean, would you say if you
16  analyzed something, and in these 24 samples
17  that you got on this day you found a couple
18  of asbestiform fibers that were amphiboles --
19      MR. DUBIN:  Objection.  Form.
20  QUESTIONS BY MR. LANIER:
21      Q.   -- would you say that it's
22  asbestos-free?
23      A.   No.
24      MR. DUBIN:  Objection.  Form.
25      (Blount Exhibit 19 marked for

Page 95

1  identification.)
2  QUESTIONS BY MR. LANIER:
3       Q.   All right.  By the same token,
4  I'll show you Exhibit Number 18 which is from
5  the mine company.  19.
6       Let me mark that as Exhibit 18.
7       Let me show you Exhibit
8  Number 19.  Here's a copy for you.
9       Exhibit Number 19.  And again,
10 I didn't show you these things because I was
11 asking you about what facts you knew, right?
12      A.   Uh-huh.  Right.
13      Q.   All right.  But now if they
14 want me to show you these things, here's
15 another one about an article on asbestos, and
16 this is from within the company that's now --
17 it's Rio Tinto Minerals at the time.  It's
18 now known as Imerys.
19      But in the process of this,
20 they say on the second page, "I'd seen and
21 read this article, and my first reaction was,
22 'Who really wrote this paper for John's
23 signature?'  I know John, he's a fairly
24 technical person, but excuse me, he would not
25 write such an article and cite 129

Page 96

1  references.  The answer is obvious on who
2  wrote it.  Regardless, I cannot agree with
3  the position.  We just don't have enough
4  facts.  Geologically, it doesn't make sense
5  to me you can have a mineral deposit that
6  just contains nonasbestiform tremolite.  I
7  believe the USGS study of talc from Death
8  Valley, California, nailed it correctly.  If
9  a deposit contains nonasbestiform tremolite,
10 there is also asbestiform tremolite naturally
11 present as well."
12      Would you agree with that?
13      In other words, if you've got
14 non --
15      A.   If you have -- I'm trying to --
16      Q.   Oh, I'm sorry.
17      A.   So he said nonasbestiform
18 tremolite...
19      Q.   I'll tell you what, I'm going
20 to move on in the interest of time.  And
21 because I have not designated you as an
22 expert, I'm not sure that's a fair question
23 for me to ask.
24      A.   Okay.
25      Q.   Then the last thing I need to

Page 97

1  talk to you about in regards to what the
2  lawyers asked you is the lawyer from Imerys
3  asked you about Julie Pier's tests and
4  accused me of not showing you those.
5       I'm going to show you one of
6  those so that nobody feels I shorted you.
7  We'll mark this as Exhibit Number 20.
8       (Blount Exhibit 20 marked for
9  identification.)
10 QUESTIONS BY MR. LANIER:
11      Q.   This is Julie Pier, Luzenac,
12 May of 2002, and this is her analysis of
13 fibrous material from the Argonaut waste
14 rock.
15      So this is rock that is left
16 over from their mining at Argonaut that
17 they're thinking about putting on our roads.
18      A.   Uh-huh.
19      Q.   It says -- and Argonaut, by the
20 way, that's Vermont; is that right?
21      A.   Uh-huh, that's right.
22      Q.   -- "a sample of fibrous
23 material from the waste rock on the west side
24 of the south end of the Argonaut, Vermont,
25 mine was submitted to the technical center

25 (Pages 94 to 97)

Alice M. Blount, Ph.D.

Page 98

1  for identification. Result: The fibrous
2  material is tremolite. This was examined by
3  polarizing light microscopy using the
4  dispersion staining technique."
5        That's yours, isn't it?
6        A.   Uh-huh, that's the one we were
7  using, yeah.
8        Q.   "Tremolite was preliminarily
9  identified by this method. Subsequent
10 analysis by scanning electron microscope and
11 transmission electron microscopy confirmed
12 the tremolite identification."
13       If we want to know if Julie
14 Pier thought there was asbestos in the
15 Vermont mines, I could have shown you this,
16 couldn't I?
17       MR. DUBIN: Objection. Form.
18       THE WITNESS: Uh-huh.
19 QUESTIONS BY MR. LANIER:
20       Q.   I just didn't because I wanted
21 to know what you found.
22       MR. DUBIN: Objection. Form.
23 QUESTIONS BY MR. LANIER:
24       Q.   Is that fair?
25       A.   Yes, that's fair.

Page 99

1        Q.   And, ma'am, has your opinion
2  changed at all? Did you find asbestos in the
3  Johnson & Johnson baby products sold on the
4  shelves on multiple occasions?
5        A.   I did.
6        MR. LANIER: Thank you.
7        Pass the witness.
8        RECROSS-EXAMINATION
9  QUESTIONS BY MR. DUBIN:
10       Q.   Hey, how are you? We're almost
11 done. Don't worry about it.
12       Okay. So first, I didn't quite
13 understand your -- one thing that you were
14 talking about with Mr. Lanier, so I just want
15 to clarify it, this idea of blinding samples.
16       So as I understand it, if you
17 have a Sample I -- and, for example, let's
18 say that's a Johnson & Johnson product --
19 then the next time you don't want that
20 Sample I necessarily to be Johnson & Johnson
21 because then you'll know what the results are
22 before you start, right?
23       A.   I don't want to -- let me -- I
24 won't know -- even if I put "I" there, I
25 wouldn't know -- I want the letters to be

Page 100

1  different each time so -- in different order
2  so that I don't -- have no idea which one's
3  which when I'm running it so I'm not biased
4  subconsciously, because that could happen.
5  So that's why I put these numbers.
6        Unfortunately, I didn't make a
7  good enough record, and I think some of them
8  got a little mixed up.
9        Q.   And so I don't know if you
10 still have the exhibits with you; otherwise I
11 can mark something different.
12       But -- so we see -- can I turn
13 the Elmo back on, sir?
14       So this is -- we looked at this
15 before. It was Exhibit 8. And here you're
16 talking about how -- you're writing to the
17 lawyers for Johnson & Johnson and you're
18 saying, "Johnson & Johnson, I've looked at it
19 as labeled -- sample labeled I by traditional
20 methods. See Table 2, 567 in the 1990
21 paper," right?
22       A.   Uh-huh.
23       Q.   So this is the 1990 paper we
24 talked about that had some results for
25 Johnson & Johnson.

Page 101

1        A.   Uh-huh.
2        Q.   So the next time you look at
3  Johnson & Johnson, though -- the next time
4  you have a Sample I, that's not going to be
5  Johnson & Johnson anymore, right?
6        A.   Yeah, probably not.
7        Q.   And so when you do your
8  analysis for your 1991 paper, "Amphibole
9  Content of Cosmetic and Pharmaceutical
10 Talcs," and you've got results for Sample I,
11 because you've randomly blinded this, it's
12 likely that I isn't going to be Johnson &
13 Johnson again, right?
14       A.   Yeah, it may not be.
15       Q.   Okay. And a couple other
16 questions.
17       So was this -- you were asked
18 about how many times you've looked at Johnson
19 & Johnson.
20       Was the bottle that we've got
21 as Exhibit 14, was that the first one that
22 you bought to analyze?
23       A.   I bought that one last -- in
24 New Jersey. It may not have been the first
25 one.

26 (Pages 98 to 101)

Alice M. Blount, Ph.D.

Page 102

1    Q.   Do you have any results of any
2  analysis that you did on any other bottles
3  than this one?
4    A.   I'll have to look.  I don't
5  know.
6    Q.   Okay.  And fair to say, though,
7  you've kept this bottle for now -- somebody
8  help me with the math -- 23?  22 years,
9  right?
10   A.   22 years.
11   Q.   And if you had tested other
12 bottles of Johnson & Johnson, any reason that
13 you wouldn't have maintained those also?
14   A.   I don't know.
15   Q.   Okay.  But at least sitting
16 here today, there's no results of any other
17 testing that I can take a look at that we
18 have with us, right?
19   A.   With us today, don't think so.
20   Q.   And one of the things you were
21 asked a little bit about was a document
22 pertaining to McCrone, some McCrone analysis
23 in the 1970s Mr. Lanier showed you, right?
24   A.   Uh-huh.
25   Q.   Do you even know whether the

Page 103

1  samples that were being analyzed in that --
2  in that document were samples of talc that
3  would have gone into Johnson & Johnson baby
4  powder?
5    A.   I don't think so.
6    Q.   You don't know that, right?
7    A.   Do you have that -- do you have
8  that thing to look at?
9    Q.   Well, he gave you the document
10 before.
11        Well, for example, do you know
12 what the code HC means in that context?
13   A.   HC?  No.
14   Q.   Do you know whether it could be
15 an industrial talc?
16        You just don't know how Johnson
17 & Johnson used those numbers, right?  Or
18 letters, sorry.  H is a letter.
19   A.   No, I don't.
20   Q.   And you were asked a little bit
21 about waste rock.
22        Is it fair to say that when you
23 look at a large talc deposit, there may be
24 geological diversity in that deposit?  Right?
25   A.   More than likely.

Page 104

1    Q.   In particular, for example,
2  there may be areas towards the edges of talc
3  deposits where the talc comes into contact
4  with things like country rock, or you call it
5  black rock, or the like, right?
6    A.   Uh-huh.
7    Q.   And so at those edges of those
8  deposits, if you sample over there, you might
9  be more likely to find asbestos because it's
10 in conjunction with that harder rock mineral,
11 and there's also different minerals that can
12 come into play because of where it is
13 geologically, right?
14   A.   Yes, they are not really
15 homogeneous, most deposits.
16   Q.   And so it's important to
17 consider, when you're looking at a result of
18 a talc sample, where that talc sample was
19 actually taken from in a deposit, right?
20   A.   Right.
21   Q.   Okay.  And you were asked a
22 little bit about hide and seek and all the
23 like.
24        First, do you agree that an
25 expert should not change their testing

Page 105

1  methodology just based on who is paying them
2  in a litigation?
3    A.   Right.
4    Q.   Right?
5        And do you agree that if you're
6  trying to answer the question whether there's
7  asbestos in a material, you should use
8  methods that help you distinguish between
9  asbestiform and nonasbestiform amphiboles,
10 right?
11        If that's the -- if the
12 question you're being asked is, is there
13 asbestos, you should use the right methods to
14 answer that question, right?
15   A.   Right.
16        MR. DUBIN:  No further
17 questions.
18        MR. PROST:  No questions.
19    FURTHER REDIRECT EXAMINATION
20 QUESTIONS BY MR. LANIER:
21   Q.   Dr. Blount, after all these
22 questions are said and done, after everything
23 that's been discussed, just based on what you
24 did in your work, in your life, never
25 dreaming lawyers would contact you, can you

27 (Pages 102 to 105)

Alice M. Blount, Ph.D.

| Page 106 |
| --- |

1  affirm that for decades, in the '80s and the
2  '90s, at least, into the 2000s, Johnson &
3  Johnson baby powder sold on the shelves had
4  asbestos and asbestiform in it?
5       MR. DUBIN:  Objection.  Form.
6       THE WITNESS:  Yes.
7       MR. LANIER:  Thank you.  That's
8  all we've got.
9     FURTHER RECROSS-EXAMINATION
10  QUESTIONS BY MR. DUBIN:
11    Q.   You were asked a very general
12  question by Mr. Lanier.
13       Do you agree that the best way
14  to determine whether or not there was
15  asbestos in these products is to look at the
16  actual testing results?
17    A.   Look at test -- yeah.
18    Q.   Right.
19       And so other than whatever we
20  have in your papers that you brought here
21  today, we have none of these test results
22  that you're supposedly relying on for
23  opinions in the '70s, '80s, '90s about
24  Johnson & Johnson talc to look at today,
25  right?

| Page 107 |
| --- |

1    A.   Yes.
2     FURTHER REDIRECT EXAMINATION
3  QUESTIONS BY MR. LANIER:
4    Q.   But you're the one who did the
5  work, aren't you?
6    A.   Yes.
7    Q.   So these are your test results
8  you're talking about.  We don't need a sheet
9  of paper, do we?
10    A.   We're using kind of concept
11  method anyway.
12       MR. LANIER:  Okay.  Thank you.
13       MR. DUBIN:  We can do this
14  forever, I suppose.  All right.  Let's
15  quit.
16       MR. LANIER:  Thank you,
17  Dr. Blount.
18       VIDEOGRAPHER:  This concludes
19  the April 13, 2018 deposition of
20  Dr. Blount.  Going off the record.
21  The time is 11:25.
22  (Deposition concluded at 11:25 a.m.)
23      - - - - - - -
24
25

| Page 108 |
| --- |

1
2
3     CERTIFICATE
4     I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
of the examination, Alice M. Blount, Ph.D.,
was duly sworn by me to tell the truth,
the whole truth and nothing but the truth.
7     I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth, to the best of my
ability.
10
11     I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.
14
15
17     _____
        CARRIE A. CAMPBELL,
        NCRA Registered Diplomate Reporter
18     Certified Realtime Reporter
        California Certified Shorthand
19     Reporter #13921
        Missouri Certified Court Reporter #859
20     Illinois Certified Shorthand Reporter
        #084-004229
21     Texas Certified Shorthand Reporter #9328
        Kansas Certified Court Reporter #1715
22     Notary Public
23     Dated:  April 13, 2018
24
25

| Page 109 |
| --- |

1     INSTRUCTIONS TO WITNESS
2
3     Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8     After doing so, please sign the
9  errata sheet and date it.  You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13     It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you.  If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25

28 (Pages 106 to 109)

Alice M. Blount, Ph.D.

Page 110

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4          I,_____, do
   hereby certify that I have read the foregoing
 5 pages and that the same is a correct
   transcription of the answers given by me to
 6 the questions therein propounded, except for
   the corrections or changes in form or
 7 substance, if any, noted in the attached
   Errata Sheet.
 8
 9
10
11
12 _____
   Alice M. Blount, Ph.D.          DATE
13
14
15 Subscribed and sworn to before me this
16 _____ day of _____, 20 _____.
17 My commission expires: _____
18
19 Notary Public
20
21
22
23
24
25
```

```
 1          _ _ _ _ _ _ _
            LAWYER'S NOTES
 2          _ _ _ _ _ _ _
 3 PAGE  LINE
 4 ____  ____  _____
 5 ____  ____  _____
 6 ____  ____  _____
 7 ____  ____  _____
 8 ____  ____  _____
 9 ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
25
```

```
 1          _ _ _ _ _ _
            E R R A T A
 2          _ _ _ _ _ _
 3 PAGE  LINE  CHANGE
 4 ____  ____  _____
 5   REASON: _____
 6 ____  ____  _____
 7   REASON: _____
 8 ____  ____  _____
 9   REASON: _____
10 ____  ____  _____
11   REASON: _____
12 ____  ____  _____
13   REASON: _____
14 ____  ____  _____
15   REASON: _____
16 ____  ____  _____
17   REASON: _____
18 ____  ____  _____
19   REASON: _____
20 ____  ____  _____
21   REASON: _____
22 ____  ____  _____
23   REASON: _____
24 ____  ____  _____
25   REASON: _____
```

29 (Pages 110 to 112)

Alice M. Blount, Ph.D.

## A

**ability** 26:19 67:16
  108:9
**able** 83:1,22
**abstract** 76:12,13
**accept** 31:3
**accessories** 19:16
**accurate** 109:18
**accused** 97:4
**acknowledgment**
  6:2 110:1
**actinolite** 65:7
**action** 108:12,13
**actions** 11:5
**actual** 11:5 44:19
  106:16
**addition** 23:1 38:7
**additional** 62:4
**address** 43:19
**adults** 41:11
**affirm** 106:1
**afraid** 78:9
**age** 8:15 90:13
**ago** 35:5 44:16,17
  44:24 45:1 48:8
  54:3
**agree** 35:22 68:2
  76:17 81:16 90:2
  91:1 96:2,12
  104:24 105:5
  106:13
**ah** 14:22 22:10 26:3
  29:11 32:20
**ahead** 34:4 73:8
**air** 71:14
**al** 1:4,7 5:16 7:11
  7:12
**alice** 1:12 4:16,20
  5:1,12,14 7:16
  8:14 9:18 36:6
  108:5 110:12
**allow** 66:8 67:3
**america** 2:22 5:23
  8:4 34:18,19 80:5
**amounts** 38:12
  39:11

**amphibole** 5:9 15:5
  15:7,12 23:19
  38:20 45:10,11,13
  45:16 53:4 66:9
  68:20 76:8,15,20
  77:14,19 79:4
  101:8
**amphiboles** 14:9
  31:4 37:7 45:19
  45:20 82:1 83:19
  86:11 93:24 94:18
  105:9
**analysis** 37:24 48:4
  48:6 49:18 51:19
  51:20 53:14 60:22
  61:11 62:4 64:12
  72:13 97:12 98:10
  101:8 102:2,22
**analyze** 74:25
  101:22
**analyzed** 71:15
  74:21 93:20 94:16
  103:1
**analyzing** 68:3
  72:10
**answer** 96:1 105:6
  105:14
**answers** 10:7,21
  110:5
**anthophyllite** 65:7
  65:12,16 67:3,14
**anybody** 33:10
**anymore** 34:13
  78:16 101:5
**anyway** 92:13,14
  107:11
**apologize** 74:18
**appear** 8:9
**appearances** 4:2
**appears** 79:5
**applications** 5:6
**applied** 51:9
**appointed** 8:7
**appreciate** 85:25
**appropriate** 109:6
**april** 1:10 5:1,10
  7:6 107:19 108:23

**area** 59:14,19 89:7
**areas** 57:15 104:2
**arent** 62:10 107:5
**argonaut** 97:13,16
  97:19,24
**arguing** 63:16
**arrow** 20:11,12,13
  21:3
**article** 36:15 64:18
  95:15,21,25
**asbestiform** 32:22
  33:5 46:9 86:17
  93:21,23 94:18
  96:10 105:9 106:4
**asbestos** 4:25 5:21
  10:12,17,25 14:6
  15:12,13,13 17:18
  22:7,11,17 24:20
  25:1 26:16 28:5,7
  29:22 30:7,18
  31:6,9,10,24
  32:16,19,23 33:5
  34:11,16 35:10,11
  35:18 36:24 37:7
  38:12,20 39:1,11
  41:21 42:7,9
  45:13,16,18,25
  46:12 47:8,14
  48:13 51:2 61:2
  62:1,6 63:10,16
  63:17 64:14 67:18
  67:19 68:3,17,25
  69:5,25 70:16,24
  71:20,24 72:5,10
  72:14 73:13 74:2
  75:11,24 76:10,16
  76:21 77:15,21
  81:18,21 82:1,14
  83:1,4,9 84:7
  86:16 87:4,22
  90:4,25 93:1,16
  94:7,8 95:15
  98:14 99:2 104:9
  105:7,13 106:4,15
**asbestosfree** 41:24
  42:6 79:11,15
  94:22

**asbestostype** 23:10
**aside** 23:16
**asked** 53:4 62:8
  70:15,22 85:14
  86:5,10 89:10
  91:6 92:23 97:2,3
  101:17 102:21
  103:20 104:21
  105:12 106:11
**asking** 11:3 26:13
  92:5 95:11
**aspect** 31:5
**assigned** 88:8
**associate** 17:5
**associates** 5:17
  73:6
**assume** 70:1 72:21
**astm** 63:20
**attached** 5:25
  109:11 110:7
**attaches** 48:12
**attorney** 59:25
  108:11,12 109:15
**autograph** 36:15
**autographed** 23:24
**available** 54:15,22
**avenue** 2:21 3:2
**aware** 37:14 43:5
  54:13 62:10 69:21
  72:12 73:25 81:12

## B

**b** 88:2
**babies** 40:24
**baby** 5:12 10:11,16
  22:19 25:5,6,7
  30:19,22 31:19
  33:6 40:19,21
  41:10,20 42:5
  47:19,20 52:11
  53:15 59:4 60:22
  61:6 70:24 71:11
  86:17,22,24 87:22
  99:3 103:3 106:3
**bachelor** 15:20
**back** 9:11 14:1 17:3
  32:3 34:1 43:9,12

**asbestostype** 23:10
**57:**3,8 78:10
  79:20,24 84:25
  87:16 93:18
  100:13
**background** 10:23
  12:6 19:23,24
  20:7 21:13 22:1
  24:7
**bad** 89:17
**bakery** 11:22 36:13
**bardgett** 3:1
**based** 35:15 42:3
  73:15 93:3 105:1
  105:23
**basic** 45:7
**basically** 13:15
**bbdlc** 3:2
**beaumont** 36:25
**behalf** 8:18
**believe** 38:10 54:4
  69:24 96:7
**believes** 90:19
**beneficiation** 5:7
**benefit** 11:10,12
  12:5
**benniger** 5:18
**bernardo** 5:11
**best** 1:13,14 68:3
  90:3 106:13 108:9
**better** 19:22 20:18
  37:16 68:16
**beyond** 62:4
**bh2** 19:12,15
**bias** 88:15
**biased** 100:3
**big** 12:17 32:24
**birefringent** 28:1
**bit** 10:24 12:7 32:4
  34:2 41:19 45:23
  48:8 49:4,18 81:1
  102:21 103:20
  104:22
**black** 29:16 104:5
**blind** 88:9,20 89:3
**blinded** 101:11
**blinding** 99:15
**blitz** 3:1

Alice M. Blount, Ph.D.

Page 114

**blocky** 46:4
**blogj** 40:19
**blount** 1:13 4:16,17
4:18,20,21,23 5:1
5:9,12,14 7:16
8:14,20,25 9:18
9:20,21 10:4 12:4
17:25 19:1 20:4
26:21 35:23 36:6
38:1,7 40:10 42:3
42:16,20 43:16
50:12 52:14 53:6
54:10 58:11 60:5
70:6 72:17 80:3
86:3 93:11 94:25
97:8 105:21
107:17,20 108:5
110:12
**blounts** 14:24
**blue** 22:8 25:20,24
26:1 27:14 28:13
28:17
**bluff** 34:5,8
**book** 87:10
**bother** 84:2
**bottle** 5:12 47:18
47:22 48:3 49:6
59:9 61:6 101:20
102:7
**bottles** 102:2,12
**bottom** 48:18,24
51:15 56:18,18
58:16,19 66:15,17
**bought** 25:8,10
33:15 47:18 49:5
52:11 101:22,23
**boundy** 5:16 71:6
**branch** 13:3
**break** 43:18 44:20
47:1,2,3 79:18
**brings** 49:7
**brought** 12:21 18:3
78:20 106:20
**bullet** 41:18
**bundles** 67:23
**burgess** 71:7
**business** 74:20

## C

**c** 2:1,2,7,19 3:1
88:2
**california** 1:18
96:8 108:18
**call** 9:6 21:9,19,19
37:25 85:15 104:4
**called** 51:1 64:7
80:5
**calling** 21:17
**campbell** 1:16 8:11
30:2 108:3,17
**cancer** 7:24 62:12
62:16 63:4 84:8
**cancercausing**
41:22
**cant** 24:12 48:17,19
52:10 53:14 55:22
63:7 64:14 66:3
77:11 83:23 84:3
90:18
**capable** 65:11
**carbondale** 12:10
12:12,20 13:10
80:23
**care** 40:22 41:13
85:18,19
**carefully** 109:4
**carrie** 1:16 8:10
30:2 108:3,17
**case** 1:5 7:15 12:14
37:20 54:16 67:12
69:19
**cases** 8:7
**cast** 58:24
**catch** 80:25
**caught** 18:6
**cause** 62:12,16 63:3
**causing** 84:7
**center** 97:25
**central** 3:2
**centrifuge** 52:24
**centrifuged** 66:15
**century** 35:5
**ceramics** 5:7
**certain** 54:4

**certainly** 63:7
**certificate** 6:1
108:1
**certified** 1:17,19,20
108:3,4,18,18,19
108:20,21,21
**certify** 108:4,7,10
110:4
**chance** 29:20 30:20
34:24 75:3
**change** 24:24 26:1
28:2 85:11 88:3,4
104:25 111:3
**changed** 99:2
**changes** 26:6
109:10 110:6
**chapter** 87:11
**characteristics**
69:7,11
**charge** 14:19
**charged** 42:23 45:2
**charging** 42:23
**chart** 26:25 27:2,4
29:21
**check** 77:6 79:18
**chemist** 14:18
**chemistry** 16:16
**chester** 74:23
**chinese** 74:7
**chose** 66:7
**chris** 3:10 7:3
**chrysotile** 14:9
15:13 81:22 82:1
82:7,13
**cincinnati** 78:5
**circle** 21:16
**circuit** 1:1 7:13
**cite** 95:25
**cited** 72:9
**city** 1:1 7:14 12:17
**claiming** 53:13
**claims** 61:23
**clarify** 77:23 86:4
99:15
**classified** 41:21
**clear** 89:14
**cleavage** 46:16,19

46:23 47:3,7,13
**cleavages** 75:21
76:1
**close** 12:19
**closely** 73:16 93:4
93:17
**closeup** 68:11
**code** 103:12
**coat** 102:7
**coffee** 11:20 26:14
36:13 80:12,22
**collected** 56:9 57:6
57:13
**collecting** 56:14
**color** 22:6,14 26:1
26:6 28:2
**colors** 22:9 28:10
**columbia** 15:24
**com** 1:22 2:3,8,13
2:14,20 3:2 40:19
**come** 9:11 25:6
34:1 49:10 63:8
66:14 84:25
104:12
**comes** 43:9 72:4
104:3
**coming** 26:10
74:22 83:15
**commencement**
108:4
**commencing** 1:15
**comment** 92:25
**commission** 110:17
**common** 37:15
**companies** 23:6
24:19 34:20 90:2
92:17
**company** 40:15
42:22 59:5 75:2
80:4 81:4,17,21
82:12 88:14 90:8
90:23,24 92:9
93:20 95:5,16
**companys** 30:24
**comparative** 67:16
**compared** 31:6
**comparison** 51:24
**compensate** 42:20

**compensator** 28:12
**completely** 75:1
79:6
**compton** 69:18
**computer** 16:14,15
16:17 59:1
**concept** 107:10
**concepts** 45:7
**concluded** 107:22
**concludes** 107:18
**conclusion** 63:18
71:19 75:10,22
79:2
**condition** 28:11
83:7
**conference** 63:15
63:15
**conferences** 71:25
**confirmed** 98:11
**conjunction** 104:10
**connection** 60:12
**conroy** 3:6,6
**consider** 65:1
70:19 104:17
**considered** 45:15
71:1
**consistently** 87:4
**consult** 23:5
**consulting** 13:15
24:19
**consumer** 41:23
**contact** 104:3
105:25
**contacted** 80:18
**contain** 76:8,14,19
**container** 58:3
**contains** 38:11
41:20 96:6,9
**content** 5:9 23:19
53:4 79:4 101:9
**context** 41:8
103:12
**continues** 41:11
73:14 93:2
**control** 14:24
**cooper** 3:7 5:13
48:24 59:25 60:11

Alice M. Blount, Ph.D.

60:18 61:1 64:2,4
copies 37:9
copy 23:24 48:21
51:14 95:8
corner 39:19,21
48:25
correct 16:7 23:21
43:23,24 51:10
53:11,16 54:6
57:3 59:11,20
64:15,21 65:17
66:9 69:1,19
72:24 73:20 74:8
74:14 75:24 76:10
77:2 110:5
corrections 109:4,7
110:6
correctly 47:16
96:8
correspond 57:3
corresponded
57:21
cosmetic 5:9 23:20
35:8,17 37:17
40:20 53:5 101:9
cosmeticgrade
83:17
coughlin 3:10 7:3
couldnt 65:16 83:3
83:7 98:16
counsel 2:10,16,22
7:18 43:19 85:14
108:11,12
count 32:11 47:11
47:14
counting 23:9
country 104:4
counts 31:16
couple 13:23 34:5
94:17 101:15
courses 17:11 23:3
court 1:1,20 7:13
8:10 108:19,21
109:19
courtappointed 3:4
courts 35:1
covering 83:24

cracked 35:12
criticize 89:15,22
crocidolite 28:24
28:25
crossed 28:11
crossexamination
43:14 80:1
crystal 47:4
crystallite 28:6
cup 11:19
curator 17:4
cut 59:22

**D**

d 1:13 3:9 7:17
8:14 16:3,13 24:9
36:6 108:5 110:12
d2 58:20,22
dangerous 59:2
data 61:20
date 1:16 7:6 48:18
51:12,16 53:18
108:8 109:9
110:12
dated 53:10 108:23
day 94:3,17 110:16
days 109:15
dead 92:13,14
dear 37:3
death 96:7
decades 106:1
decide 66:24 89:16
decided 44:2,12,20
44:24 78:24
decides 66:20
decision 44:6 46:6
67:4
deemed 109:18
defendant 2:16
defendants 1:8
7:13
defense 54:16
definite 46:4
delightful 12:1
dement 71:7 72:2
demonstrative 5:4
densities 64:19

65:5
density 64:21 65:21
65:24 66:7,11,20
66:23 67:2,13
82:6
department 14:1
14:20 17:6
depends 65:18,24
82:4
deponent 6:2 7:16
110:1
deposes 8:17
deposing 109:14
deposit 74:22 96:5
96:9 103:23,24
104:19
deposition 1:12
5:25 7:8 9:6 13:8
80:19,25 91:13
107:19,22 109:3
109:12,16,17
deposits 77:6,7
84:11,15,20 104:3
104:8,15
deps 1:22
depth 49:4
describe 82:22
described 55:15
83:12
description 4:15
designated 96:21
designed 81:25
82:6
detail 11:12 18:4
30:21
detected 52:6
detecting 14:8
65:12
detection 48:13
51:1
determinations
38:3
determine 62:5
69:4,24 106:14
deutsch 3:1
develop 35:12
82:23 83:16

developed 35:16
65:11 82:20,25
84:4
development 35:10
35:18
diamonds 5:7
didnt 23:24 24:4
39:15 56:19 57:20
64:12 67:3 69:16
69:20 72:22 74:6
77:13,19 88:13,16
91:11,16,23 92:2
92:7 95:10 98:20
99:12 100:6
difference 30:12,13
different 11:14
26:11 30:11 52:21
52:24 66:20,22
67:5 86:10 87:9
87:14,14 88:2
89:7,7 90:1,1
100:1,1,11 104:11
difficult 32:8
dig 10:6 61:12
dinner 11:25 80:13
diplomate 1:17
108:3,17
direct 8:23
direction 20:16
21:9,10,10 25:21
25:25
director 78:6,24
discussed 87:10
105:23
discussion 63:22
dispersion 98:4
distinguish 105:8
distribution 76:9
76:15,20,24 77:14
77:20
districts 79:5
diversity 103:24
document 40:1,6,7
41:2 48:8,22
72:22 102:21
103:2,9
doesnt 19:18 32:16

61:25 79:14 85:17
96:4
doing 16:22 17:17
23:7 33:9 34:17
34:22 41:7 52:20
52:23 66:22 72:13
83:10 109:8
donald 5:18
dont 12:1 30:4
38:24 40:9 43:1,2
43:4 44:14 46:10
47:10 55:8,22
57:10 58:2,16
59:16,19 60:25
62:19 63:6,21,24
64:10 67:9,11,13
69:5,14 74:9 77:3
78:2,2 80:20 81:6
83:13 84:21 85:3
85:9,19 96:3
99:11,19,23 100:2
100:9 102:4,14,19
103:5,6,16,19
107:8
dotted 31:13
dr 8:25 9:18 10:4
12:4 14:24 42:3
42:20 43:16 54:5
55:17 57:2,12
59:7 60:17,23
64:1,8 67:12
69:18,18 80:3
86:3 105:21
107:17,20
drawing 21:16
dreaming 105:25
driving 13:9
drops 90:19
drug 14:15
drugs 14:10
dubin 2:13 4:6,9,11
7:25 8:1 10:18
30:25 31:20 34:6
35:19 39:6 40:3
40:25 42:8,18
43:6,15 44:11,18
45:5 48:20 49:2

Alice M. Blount, Ph.D.

50:10,14 52:16
53:1 54:12,18,23
55:3 58:8,13,21
59:4,8 60:7,15
61:17 62:21 63:1
70:8 72:19 73:2
73:22 75:15,16
79:17 85:6,22
87:5,8 88:7,18
89:9,11 90:11
91:3,6,8,19 92:1,6
92:20,24 93:8,9
94:19,24 98:17,22
99:9 105:16 106:5
106:10 107:13
**duly** 8:15 108:5

**E**

**e** 2:1,1 3:9,9 111:1
**earlier** 31:17 46:8
53:8
**earth** 17:4 35:13
**easier** 20:1 51:14
85:24
**east** 2:8
**edges** 104:2,7
**education** 15:19
**effect** 73:12
**effects** 39:1 62:9
**eh2** 19:14
**either** 63:19 67:14
**electron** 67:17 68:9
71:17 72:14 94:1
98:10,11
**ella** 3:7
**ellis** 3:7
**elmo** 45:9 49:17
100:13
**email** 5:13 60:12
63:24 64:1,4
**emailed** 60:1
**emails** 80:14
**employee** 108:11
108:12
**enclosed** 37:5,8
**ended** 56:23
**entire** 93:22

**environment** 5:7
**epa** 73:10,11
**errata** 6:3 109:6,9
109:11,14 110:7
**esquire** 2:3,7,13,14
2:20 3:1
**essential** 41:13
**et** 1:3,7 5:16 7:11
7:12
**everybody** 93:15
**everybodys** 26:19
**exactly** 17:24 36:12
**examination** 8:23
86:1 105:19 107:2
108:5
**examinations** 4:4
**examined** 98:2
**examining** 73:16
93:4,18
**example** 35:3 40:14
46:14 51:19 54:3
61:23 64:23 67:2
71:5 92:4,22
99:17 103:11
104:1
**excellent** 39:8
**exclaim** 90:20
**excuse** 95:24
**exhibit** 8:20 18:7
18:15,16,24 19:1
19:4,21 20:8
21:21,24 25:3,15
25:16 26:18,21
27:13,14 28:15
29:12,13 35:23
36:4 40:10,16
42:16 50:12,18
52:14,19 54:10
58:9,11 60:5 70:6
72:17 92:23 93:10
93:11,14 94:25
95:4,6,7,9 97:7,8
100:15 101:21
**exhibits** 4:14 5:25
17:25 18:10 20:4
100:10
**exist** 78:16 79:14

**expand** 20:17
**expect** 81:20
**experience** 14:5
17:2 35:15
**experimental** 65:2
**expert** 11:3 62:19
79:9 96:22 104:25
**expertise** 42:4
62:23
**experts** 54:16 64:7
69:17 79:13 84:6
89:8 90:2
**expires** 110:17
**explain** 20:2 25:22
88:6,11 91:13
**exposures** 5:15
70:12
**expressing** 70:19
71:2
**extent** 61:5
**extremely** 83:18

**F**

**fact** 11:2 30:18
36:11 42:22 84:11
**facts** 5:3 35:16
40:17 95:11 96:4
**faculty** 17:6
**fail** 109:17
**fair** 10:3 24:21,22
38:22,23 47:6
59:17 61:4,22
62:23 77:12 82:22
83:21 88:17 89:1
89:2 91:18 96:22
98:24,25 102:6
103:22
**fairly** 95:23
**fall** 59:25
**familiar** 46:21 70:3
70:10 72:6
**families** 7:23
**fantastic** 15:2
**far** 12:15 50:4
**fassler** 3:7
**fast** 21:9 30:14
**faster** 82:22 83:20

**favorable** 35:9,18
**fda** 14:7 38:18
73:25
**february** 40:18
**feels** 97:6
**fiber** 21:14,18,20
22:8 25:17 32:10
46:5
**fibers** 28:1,5 32:2
37:8 52:5 67:18
67:19,22,25 69:8
69:12 83:4 93:23
94:18
**fibrous** 97:13,22
98:1
**field** 51:25
**figure** 66:1
**figured** 85:23
**filter** 21:11,12 22:4
30:13
**filters** 21:8
**final** 63:18
**finalized** 38:19
**financially** 108:13
**find** 16:11 61:14,20
61:23 63:9 65:20
77:14,19 78:18
83:1,3,20,22,23
84:3 86:16 87:4
90:4 99:2 104:9
**finding** 31:24,25
33:5 62:1
**finds** 90:4
**fine** 43:17
**fingers** 21:16
**firm** 2:2,7 3:7
36:24
**first** 8:15 10:10
21:6 27:23 28:12
41:18 43:19 48:6
65:1 75:5 86:9
95:21 99:12
101:21,24 104:24
**fit** 66:12
**fiveminute** 79:18
**flipped** 29:11
**floor** 2:8,21

**fm** 2:4
**focusing** 68:18
**fold** 29:19
**follows** 8:18
**followup** 10:15
**food** 14:10,15
**foregoing** 108:7
110:4
**forever** 107:14
**form** 10:18 30:25
31:12,20 35:19,20
39:6 40:3 41:1
42:8 46:9 62:18
72:25 73:21 85:7
85:13,16 87:5
89:11 90:11 91:3
91:19 92:1,20
94:19,24 98:17,22
106:5 110:6
**former** 37:18
**forms** 62:15 66:9
**forth** 108:9
**found** 10:25 31:10
31:15 36:3 76:8
76:14 82:7,9
93:22 94:2,17
98:21
**four** 11:14
**fragment** 46:24
47:7,14
**fragments** 46:17,19
**free** 73:13 79:6
93:1,16 94:7,8
**frequent** 41:19
**friday** 1:10
**front** 50:21 51:4
76:4,4
**further** 15:19 76:1
105:16,19 106:9
107:2 108:7,10
**fussing** 30:23

**G**

**g** 3:9
**gail** 1:3 7:10
**gene** 5:19
**general** 69:3

Alice M. Blount, Ph.D.

106:11
**geological** 14:2
  17:7 103:24
**geologically** 96:4
  104:13
**geologist** 42:22
  45:4
**geologists** 63:15,17
**geology** 15:21 16:3
  16:4 24:9,15,15
**getting** 12:24 16:13
  33:11 46:11
**girl** 12:9
**give** 11:3 28:21
  29:19 88:19
**given** 110:5
**gives** 21:13
**giving** 43:25
**glass** 17:19,20
  66:18
**glenn** 3:1 8:5
**gnorton** 3:2
**go** 12:15 15:18 18:4
  20:21 29:1 32:3
  32:14 33:25 34:4
  42:12 49:3 61:19
  62:3 65:19 66:23
  67:24 73:8 85:4
  93:18
**goes** 20:23 29:3
  30:10 87:16
**going** 9:8 10:5 18:6
  18:9 21:3 25:21
  27:13 28:21 29:14
  29:19,25 30:11
  33:24,25 34:3,6
  40:25 41:8 42:13
  42:25 43:3 44:6
  50:8 52:19 79:21
  81:7,10 82:7 85:1
  85:4 96:19 97:5
  101:4,12 107:20
**gold** 5:7
**golkow** 1:21,22
  3:10 7:4
**gontard** 2:19
**good** 8:25 9:1,22

13:18 16:15 18:23
  21:3 25:13 33:21
  45:23 56:12 68:11
  69:12 80:3 81:16
  82:14 84:10 89:17
  100:7
**grab** 13:22
**grade** 79:3
**graduate** 17:6,11
  22:22 23:2 57:18
**granddaughter**
  90:10
**graph** 46:7
**gray** 19:23,24 20:7
**great** 30:2 85:23
**grew** 12:10
**grieger** 5:20
**grins** 13:6
**group** 31:5 45:16
  45:17
**grow** 12:8
**guess** 33:14 53:20
  71:23 75:25 87:16
**gunter** 54:5 55:17
  57:2,12

---

### H

**h** 3:9 75:17 103:18
**hammer** 47:1
**hand** 50:8
**handed** 87:9
**handwritten** 5:4
**hanly** 3:6
**happen** 100:4
**happens** 61:24
**hard** 29:15 35:11
  65:5
**harder** 104:10
**hatcher** 5:1 37:3
  48:10
**havent** 38:25 54:18
  71:3,4,21 72:20
  75:3 80:13,16
**hc** 103:12,13
**head** 11:23 15:17
  22:12 29:25 45:21
  51:11 61:3 63:11

67:14 90:17
**headquarters** 78:5
**health** 5:8 39:1
  62:9
**hear** 81:9
**heard** 15:12 71:25
**heavy** 64:20 66:12
  82:6
**held** 1:13 7:9
**help** 102:8 105:8
**helps** 58:20 68:24
**hereinbefore** 108:9
**heres** 20:13 39:20
  40:15 95:8,14
**herrington** 2:12
**hes** 92:13,14 95:23
**hey** 99:10
**hi** 43:16 80:8
**hid** 83:4
**hide** 39:15 90:14,16
  90:24 104:22
**high** 19:18 79:3
**highlight** 39:25
**home** 19:7,10
**homogeneous**
  104:15
**honors** 15:21
**hope** 26:20
**hotel** 1:14
**hour** 42:24 44:8
**hourly** 45:3
**houston** 2:4
**huhuh** 55:18 60:4
  60:24 71:12,18
  72:16 74:5
**huhuhs** 30:3
**husband** 11:25
  14:17 16:8,11
**husbands** 13:19
**hygienists** 37:16
**hynes** 2:14

---

### I

**ian** 5:17
**id** 24:6 55:23 56:23
  60:13 95:20
**idea** 82:14 84:19

99:15 100:2
**identification** 8:21
  18:1 19:2 20:5
  26:22 35:24 40:11
  42:17 50:13 52:15
  54:11 57:21 58:12
  60:6 70:7 72:18
  93:12 95:1 97:9
  98:1,12
**identified** 75:23
  98:9
**identify** 7:18 17:24
  24:20
**identifying** 23:9
  68:12,16
**ignoring** 69:10
**ill** 9:10 18:12 21:4
  21:16 39:25 40:15
  42:11 43:9 50:8
  50:17 52:1 54:9
  61:15 65:6 70:4
  70:12 79:18,20
  85:10 93:10 95:4
  96:19 102:4
**illinois** 1:18 9:25
  12:11,12,20 73:11
  80:23 108:20
**im** 7:4 8:5,6 9:8,19
  9:23 11:2 17:18
  20:22 25:9 27:13
  28:21 29:18 33:24
  33:25 34:3 36:5
  37:10,11,21 38:1
  40:25 41:5,7,8,25
  43:17 49:16,17
  50:7 52:19 57:23
  75:13 78:9 84:1
  84:17 96:15,16,19
  96:22 97:5 100:3
  100:3
**imerys** 2:22 8:3
  80:5,17 81:4,8,11
  81:13 84:19 86:6
  95:18 97:2
**imerys422289** 5:24
**imerys422290** 5:24
**imperative** 109:13

**important** 10:5,14
  68:24 86:15 89:20
  90:6,7 92:15,17
  94:10,13 104:16
**improved** 37:24
**include** 76:25
**including** 24:20
  54:6 65:6
**incorrect** 64:15,16
**incredible** 17:1
**index** 4:1
**indicated** 43:20
**indicates** 51:7
**individual** 64:7
**individuals** 71:6
**industrial** 23:6,10
  37:15,16 103:15
**industries** 72:7
  73:4
**industry** 14:17,18
**information** 10:6
  10:23 11:19 56:16
  68:24 80:14
**ingham** 1:3,3 7:10
  7:11
**inherent** 47:4
**instructions** 109:1
**intends** 69:18
**intention** 84:5
**interest** 96:20
**interested** 82:18
  84:1 108:13
**interesting** 36:3
**intermediate** 37:8
**international** 51:8
**involve** 50:1
**involved** 15:1
**isnt** 38:15 70:25,25
  98:5 101:12
**italian** 75:6,8,11,17
  77:1,10,13
**italy** 74:14
**itll** 47:3
**ive** 9:16 11:10,12
  18:15,16 21:11,12
  24:1 25:15 27:10
  29:14 30:3 33:22

Alice M. Blount, Ph.D.

34:24 36:3 37:5,8
50:16 54:20 63:14
63:20 71:24
100:18
**ix** 5:6

---

**J**

**j** 5:2,18,20 39:22
40:19 59:6,6 92:9
92:9
**j0044868** 5:18
**j0049150** 5:2
**j0123236** 5:20
**j049150** 39:22
**jack** 11:25
**january** 35:3,6
**jayne** 3:6
**jersey** 14:3 25:9
35:3 47:24 56:7
59:6 101:24
**job** 13:17
**john** 71:7 72:2
95:23
**johns** 95:22
**johnson** 1:7,7 2:16
2:17 5:12 7:12,12
8:1,1 10:11,11,15
10:15 22:19,19
25:5,5 30:22,22
31:9,9,19,19 33:6
33:6 34:25 35:1,7
35:7 38:4,11
39:10,10 40:2,2
42:5 47:19 49:6,6
52:10,11 58:4,4
60:1,1 61:5,5
69:23,23 70:17,17
70:24,24 71:10,11
72:13,13 74:24
86:5,6,9,10,17,17
86:23,23 87:22,22
88:19,20,24,24
99:3,3,18,18,20
99:20 100:17,17
100:18,18,25,25
101:3,3,5,5,12,13
101:18,19 102:12

102:12 103:3,3,16
103:17 106:2,3,24
106:24
**johnsons** 5:12 38:4
38:11 40:20 41:10
41:20 42:5 47:19
**jonathan** 3:7 5:13
59:25
**judge** 8:5,7 43:7,8
85:9,20,24
**julie** 5:23 81:8
91:25 97:3,11
98:13
**jury** 9:2,4 10:23
12:5 13:7 15:11
18:7,13,17 26:20
27:17 29:20 30:20
37:25 69:19 81:9
88:6,12
**jurys** 15:3

---

**K**

**kansas** 1:20 108:21
**kept** 102:7
**kevin** 2:14
**khynes** 2:14
**kind** 23:7 24:2 28:7
29:19 58:15 76:22
107:10
**kinds** 81:21 86:11
**knew** 37:19 91:18
95:11
**know** 11:17 13:14
22:6,7,7 30:17
32:9,10,13,16,18
33:15,17 38:24
39:1,10,19 42:4
42:21 43:1,2
44:14 47:2 50:4
52:9,17 53:22
54:13 55:8,22,24
56:19 58:2,16
59:19 63:6,21,22
63:23 65:5,23
66:1,4 67:9,11,13
71:8 72:2,20 73:5
77:3,9 78:14,23

82:4 83:13 84:10
84:13,14,21 85:12
88:13,15 91:18,22
94:12 95:23 98:13
98:21 99:21,24,25
100:9 102:5,14,25
103:6,11,14,16
**knowing** 12:5
78:22
**known** 95:18
**knows** 9:2 10:23

---

**L**

**l** 3:1
**lab** 78:6
**label** 18:5,6,9 40:16
56:10
**labeled** 38:4 100:19
100:19
**labels** 18:6
**ladies** 7:22
**lanier** 2:2,3,7,7,8
3:7 4:5,8,10,12
7:21,22 8:24 9:3
10:20 18:2 19:3
20:6 26:23 31:1
31:21 34:8,9 36:1
39:7 40:4,12 41:4
42:10,18 43:11,20
43:22 44:10,15,21
44:25 48:10,19
53:3 54:17,20
58:7,19 61:15,19
62:17 64:6 69:16
70:16,23 72:22,25
73:19,21 75:14
77:24 78:17 81:3
85:3,10,19 86:2
87:7 89:12 90:12
91:4,8,10,21 92:3
92:21 93:13 94:20
95:2 97:10 98:19
98:23 99:6,14
102:23 105:20
106:7,12 107:3,12
107:16
**lanierlawfirm** 2:3

2:8
**laniers** 5:4
**large** 103:23
**latest** 93:20
**law** 2:2,7 3:7 36:24
80:24
**lawful** 8:15
**lawyer** 35:7 86:10
91:9 97:2
**lawyers** 6:4 9:9
18:13 33:25 35:2
39:9 84:6 86:5
92:5 97:2 100:7
105:25 112:1
**left** 21:12 27:14
31:5 47:24 97:15
**letter** 5:1,10,17,19
5:21 36:3,5,21,23
37:4 39:12,20,20
48:9 54:19,21,24
56:15,18,23,25
73:3 88:1,1,2,2
103:18
**letterhead** 92:25
**letters** 57:2,21 88:8
99:25 103:18
**level** 17:12 38:24
**levels** 83:18
**life** 16:20 105:24
**light** 4:24 26:9,9,15
30:10 98:3
**likes** 90:14
**limit** 38:20
**line** 31:13 32:15,16
32:17 111:3 112:3
**lines** 47:3
**liquid** 64:21 65:23
65:24 66:1,7,12
66:20,24 67:2
82:6
**list** 23:15
**listed** 11:1 64:18
**litigation** 1:21 3:10
7:5 84:6 105:2
**little** 10:24 11:11
12:7 32:4 34:2
41:18 48:8 49:4

49:18 51:14 59:22
59:23 66:16 81:1
100:8 102:21
103:20 104:22
**live** 9:5 13:7 34:10
**lived** 80:23
**llp** 2:12
**locations** 35:9,17
**long** 54:3 61:13
**longer** 83:11 84:12
**longo** 60:17,23 64:8
67:12 69:18
**longos** 64:1
**longtime** 40:21
**look** 15:19 19:18
21:13 27:3,5
31:16,17 32:8
34:25 40:13 41:17
50:7,19 55:23
56:21 58:4,5
60:14 64:1,6
67:21 68:8,18
69:5,6 72:21 74:6
74:10,16,17 75:4
75:7,25 76:3,4
84:1 89:18 90:25
101:2 102:4,17
103:8,23 106:15
106:17,24
**looked** 33:16 48:7
51:4 53:24 61:5,6
61:7 69:23 74:11
77:1,2,13,18
100:14,18 101:18
**looking** 16:12
17:18 19:5 29:22
36:5 61:2,9 68:13
68:17,25 78:21
83:24 104:17
**looks** 19:12 21:24
23:22 25:16 30:19
**lost** 78:8
**lot** 19:16 34:14,22
68:23 78:8,15
83:10 91:5
**lots** 68:12
**loud** 30:4

Alice M. Blount, Ph.D.

**louis** 1:1 2:21 3:3
  7:14 12:14,16
**love** 16:19
**low** 79:4 83:18
**lucille** 1:3 7:10
**luzenac** 5:23 97:11

**M**

**m** 1:12,15 2:14
  4:16,20 5:1,1,12
  5:17,18 7:7 8:14
  31:6 36:6 42:15
  79:23 107:22
  108:5 110:12
**maam** 14:13 84:22
  91:11 99:1
**maintain** 57:25,25
  58:1
**maintained** 53:23
  54:5 102:13
**major** 23:6
**makeup** 41:13
**making** 49:17
**march** 37:4
**mark** 2:3,20 7:21
  8:2 9:3 18:24
  20:7 26:18 36:4
  50:8,15 52:19
  54:9 58:9 70:4
  80:4 93:10 95:6
  97:7 100:11
**marked** 8:20 17:25
  19:1 20:4 25:15
  26:21 29:4 32:14
  35:23 40:10 42:16
  50:12,17 52:14
  54:10 58:11 60:5
  70:6 72:17 93:11
  94:25 97:8
**married** 16:23,24
**maryanne** 71:6
**master** 3:4 8:6
**masters** 16:3
**material** 50:4,6
  69:23 97:13,23
  98:2 105:7
**materials** 23:10

**math** 16:22 102:8
**matter** 7:10
**mccrone** 5:17 72:7
  72:7,12 73:4,4,6
  91:24 92:7,8,8,25
  93:15,19 102:22
  102:22
**mccrones** 92:12
**mdubin** 2:13
**meadow** 5:11
**mean** 20:14 45:13
  55:12,13 61:25
  63:14,14,17 88:11
  90:8,23 94:15
**means** 29:10 38:8
  40:1 58:16 76:18
  103:12
**meant** 88:12
**measure** 83:6
**meet** 80:7
**meeting** 11:13
**meetings** 61:19
  63:20 72:4
**mehaffy** 36:24
**member** 17:5
**mention** 43:9
**mentioned** 47:17
**met** 43:22 44:15
  45:1 80:9
**metallurgy** 5:7
**method** 14:8 37:24
  38:1,8 65:2,10,15
  65:19 66:21 67:5
  67:10 68:1,4
  81:24 82:15,24,25
  83:10,16,21 84:5
  87:14 90:3 98:9
  107:11
**methodology** 63:13
  105:1
**methods** 38:6 52:7
  89:7 90:1 100:20
  105:8,13
**mickey** 54:5
**microscope** 4:17,18

**4**:20,21,23 17:21
  18:19,21,23 19:7
  19:8,9 21:7 22:5
  24:25 28:2 94:1
  98:10
**microscopes** 22:23
**microscopy** 4:24
  26:16 64:13 67:17
  67:18 68:4,9
  71:16,17 72:15
  98:3,11
**middle** 22:5
**mill** 71:9
**milligram** 31:23
  51:25
**mills** 74:24
**mind** 30:4 49:7
**mine** 32:15 71:9
  93:20 95:5 97:25
**mined** 84:20
**mineral** 5:6 15:8,9
  15:10 23:10 35:13
  45:12,17 46:25
  65:20 66:23 82:17
  96:5 104:10
**mineralogist** 14:25
  36:6
**mineralogy** 5:6
  17:11,15,16 24:9
  24:12,13 51:9
**minerals** 5:22 23:6
  48:14 73:11 79:6
  93:22 95:17
  104:11
**mines** 98:15
**mining** 97:16
**minute** 13:5 28:16
**minutes** 11:19
**misperception**
  41:19
**missing** 68:23
**mississippi** 12:13
**missouri** 1:1,19
  2:21 3:3 7:15
  15:22,24 108:19
**mixed** 27:10,11
  100:8

**moment** 23:17
**money** 33:10
**morning** 8:25 9:1,8
  44:1 70:15,23
  80:3
**morton** 2:13 7:25
**move** 9:12 26:12
  49:10,11,13 85:5
  96:20
**moved** 49:12 57:14
  78:4
**moving** 59:23
**mprost** 2:20
**multiple** 62:22 99:4
**museum** 17:4

**N**

**n** 2:1
**nailed** 96:8
**name** 7:3,21,25 8:2
  9:3,16 36:11,13
  36:18 80:4
**named** 81:8
**napkin** 90:17,19
**naturally** 96:10
**nature** 65:2
**ncra** 108:17
**necessarily** 62:1
  99:20
**necessary** 109:4
**need** 27:3,5,12 30:3
  66:25 85:3 96:25
  107:8
**needed** 16:14 84:10
  84:14
**needle** 32:9
**needles** 32:2 75:21
  76:1
**needs** 35:11
**neither** 108:11,12
**never** 38:18 71:25
  72:4 80:9 92:11
  93:9 105:24
**new** 2:9,9,15,15
  14:3 24:24 25:9
  35:3 47:24 56:7
  59:6 78:5,23

**101**:24
**newark** 13:2,2 14:2
  17:4
**newfane** 74:22
  84:18
**nice** 80:7
**night** 11:24
**niosh** 71:7 72:3
**nobodys** 30:23
**nodding** 29:24
**nods** 11:23 15:17
  22:12 45:21 51:11
  63:11
**non** 96:14
**nonasbestiform**
  5:15 31:7 32:22
  62:11,15 63:3
  96:6,9,17 105:9
**nonasbestos** 45:19
  46:1 68:19
**north** 34:18
**norton** 3:1 8:5,6
  43:8 85:9,20,24
**notary** 108:22
  110:19
**note** 79:2
**noted** 38:17 109:10
  110:7
**notes** 5:5 6:4 79:19
  112:1
**noticed** 87:8
**november** 5:19
**number** 1:5 7:15
  18:7,8,10,16,25
  19:4 20:8 21:22
  21:24 26:19 29:12
  29:13,13 36:4
  40:16 50:10 56:17
  58:15,22,25 59:3
  59:7 69:22 93:10
  93:14 95:4,8,9
  97:7
**numbers** 39:21
  66:5 100:5 103:17

**O**

**o** 3:9

object 10:18 30:25
  34:7 35:20 39:6
  40:3,25 90:11
objection 31:20
  35:19 41:2 42:8
  62:18 72:25 73:21
  85:7 87:5 89:11
  91:3,19 92:1,20
  94:19,24 98:17,22
  106:5
objections 85:12
obtain 55:19
obtained 51:25
  55:25 56:7 59:13
  59:18
obvious 96:1
occasions 99:4
occupational 5:15
  70:12
occurrence 37:6
offer 69:19
offering 62:19
oh 19:24 27:5,10,21
  28:25 52:20 54:20
  70:1 76:13 96:16
okay 9:14,15 10:2,8
  11:6 13:4 15:2,18
  20:17,25 21:4,21
  22:13 23:1 24:16
  25:19 27:21 29:2
  29:24 30:5 32:20
  33:2,21 42:10
  43:18,25 44:5,23
  47:15,21 48:2,8
  49:15 50:3,7
  51:18 52:4,9
  53:22 54:23 57:24
  58:14 60:8 62:8
  63:7,23 64:11,17
  65:14 66:19 69:10
  69:21 70:2 72:6
  73:3 74:6 76:13
  78:17 79:17 86:7
  90:9 96:24 99:12
  101:15 102:6,15
  104:21 107:12
older 56:6 83:8

oldest 40:21
olympus 19:12
once 65:25 86:24
  87:2,18
ones 46:8,9 52:25
  66:13 77:5 78:13
  100:2
opinion 37:15 63:2
  63:5 67:15 73:14
  73:15 93:2,3,17
  94:9 99:1
opinions 11:3
  69:17 106:23
opportunity 70:18
  72:21
opposed 68:18
opposite 25:21,25
optical 4:17,18,21
  4:23 14:8 17:11
  17:14,16 18:19
  64:13 67:18 68:4
  71:16
order 28:12 54:9
  58:10 70:5 100:1
  ore 74:12,13 93:21
organization 72:7
oriented 25:25
original 24:2 83:7
  109:14
orrick 2:12,13,14
osha 4:24 26:14,15
  38:13,20
outlined 29:15
outside 11:3
ovarian 7:23

────────────

          P

p 2:1,1,2,7,19 3:9
pacific 34:19
page 4:2,15 31:17
  50:23 51:4,15
  65:4 95:20 111:3
  112:3
pages 110:5
paid 33:11 43:21
  44:3,7
paper 24:1 26:15

28:20,23 30:17
  37:14 38:2 48:12
  49:16 50:20,23
  51:12 52:18 53:3
  53:3,7,10 55:10
  55:16,25 57:4,22
  64:24 70:9,25
  74:7,12 75:7,12
  75:20 76:5 87:2,9
  95:22 100:21,23
  101:8 107:9
papers 12:22,22
  30:16 37:9,23
  53:24 57:9 106:20
part 22:5 33:18
  40:21 41:13
particle 62:5 63:9
  76:9,20 77:14,20
particles 31:22,23
  76:15 83:5
particular 44:2
  104:1
parties 108:11
parts 41:12
pass 42:11 79:20
  99:7
pause 33:24 34:3
pay 45:3 61:14,15
paying 33:10 42:25
  43:4 105:1
pcm 64:13
people 15:4 47:10
  47:11 49:16 72:1
  83:9 89:16 93:15
percent 31:4 38:19
person 14:23 95:24
pertaining 102:22
ph 1:13,22 7:17
  8:14 16:3,13 24:9
  36:6 108:5 110:12
pharmaceutical
  5:9 14:16,18
  23:20 37:17 53:5
  83:17 101:9
phoenix 2:19
photograph 4:17
  4:19,20,22,23

photos 77:24,25
  78:1,12,18,19
pictographic 19:6
picture 18:20,22
  19:5,21,23,24
  20:8 21:7 25:19
  25:20
pictures 18:3,5,10
  22:18 25:15
pier 5:23 81:8
  91:25 97:11 98:14
piers 97:3
pipette 66:16
place 1:14 12:1
  108:8
places 35:14
plaintiff 54:15
plaintiffs 1:5 2:10
  7:11 8:18 79:10
plants 34:21
play 90:14,16
  104:12
playing 9:3 90:9,24
please 7:18 109:3,8
plm 64:13 68:5,15
  68:22 71:16
plot 32:6
plotted 55:13
point 18:23 20:14
  33:24 34:4 41:18
  52:1 60:13 63:25
  78:23
pointed 26:24
  28:13
polarized 4:24
  26:10,15 27:6
polarizing 98:3
polars 28:12
pooley 42:23 45:2
popular 41:11
population 32:12
  32:13,15 33:3
  69:7,11
position 12:25 96:3
potentially 68:8
powder 5:12 10:11
  10:16 22:20 25:5

25:6,7 30:19,23
  31:19 33:6 40:19
  41:10,20 42:5
  47:19,20 52:11
  53:15 60:22 61:6
  70:24 71:11 86:17
  86:22,24 87:22
  103:4 106:3
powders 79:3
ppc 59:6
practically 78:7
practice 58:1
precisely 66:6
preliminarily 98:8
preparation 82:8
  82:15
prepare 91:11
prepared 91:10
preparing 72:23
presence 70:16
  74:1
present 3:6 96:11
presented 51:8
preserved 85:21
presumably 48:2
pretend 90:18
pretty 77:5 78:22
previously 43:22
primarily 85:13
printed 78:14
printout 4:25 5:3
prior 43:25 59:13
  59:19 108:4
probably 9:11
  44:17 82:11,14
  101:6
problem 14:6 78:4
problems 83:12,14
proceedings 51:8
process 5:6 78:1
  87:2 95:19
processed 74:23
product 71:14
  73:13,16 93:1,4
  94:8 99:18
products 23:11
  40:21 41:23 59:5

**professor** 17:5
**program** 16:14,17
**programs** 16:16
**projects** 33:14
**pronouncing** 9:20
**proper** 63:12
**property** 34:15
**proposed** 14:7
  38:18
**propounded** 110:6
**prost** 2:20 4:7 8:2,3
  35:20 43:6,8
  60:13 80:2,4
  84:22 91:7 105:18
**prove** 84:7
**provide** 61:11
**provided** 55:11,16
  71:10
**public** 108:22
  110:19
**publications** 23:15
  23:18
**published** 23:21
  56:1
**pulled** 33:7
**pulling** 90:17
**purchase** 47:21
  66:12 86:22
**purchased** 47:23
  53:15
**purchasing** 59:10
**purposes** 74:7
**purse** 58:6
**put** 14:20 17:19
  18:8,12,15,16
  21:4,11,12,16
  22:4,14 25:2
  27:13,23 29:13
  30:12 43:7 50:17
  56:17 62:17 70:13
  89:9 99:24 100:5
**putting** 97:17

70:17 75:2 99:3
  106:15

**Q**

**quality** 14:23

**quantification**
  48:13 51:2
**quantifying** 14:9
**question** 10:10,15
  41:1 56:12 71:23
  85:14 86:15 96:22
  105:6,12,14
  106:12
**questioning** 91:9
**questions** 8:24 9:9
  9:10 10:5,20,22
  18:2 19:3 20:6
  26:23 31:1,21
  33:22 34:1,9 36:1
  39:7 40:4,12 41:4
  43:15 44:11,18
  45:5 48:20 49:2
  50:14 52:16 53:1
  54:12 55:3 58:13
  59:8 60:2,7,15,19
  61:17 62:23 63:1
  70:8 72:19 73:2
  73:22 75:16 80:2
  84:23 86:2,4 87:7
  89:10,12 90:12
  91:4,6,21 92:3,21
  93:13 94:20 95:2
  97:10 98:19,23
  99:9 101:16
  105:17,18,20,22
  106:10 107:3
  110:6
**quit** 107:15
**quite** 99:12

**R**

**r** 2:1 3:9,9 5:20
  111:1,1
**rachel** 2:7,8
**ran** 56:19
**randomly** 101:11
**rate** 44:2,6,12,19
  44:24 45:3
**rates** 30:11
**ratio** 31:5 32:23
**raw** 74:12,15
**ray** 30:14,14

**raymond** 5:1
**reached** 63:18
**reaction** 95:21
**read** 27:23 30:2,20
  38:2 71:3,4 73:18
  95:21 109:3 110:4
**reading** 37:11,21
  41:5,25
**ready** 12:24 49:9
  49:10
**real** 35:4 68:10
**really** 12:1 17:21
  27:19 44:14 62:6
  63:18 67:21 68:17
  68:25 90:25 95:22
  104:14
**realtime** 1:18 108:3
  108:18
**reason** 32:6 82:20
  102:12 109:5
  111:5,7,9,11,13
  111:15,17,19,21
  111:23,25
**recalibrate** 82:16
**recall** 59:24 60:3
  60:10,11,16,21,25
  63:24
**receipt** 109:15
**receiving** 60:21
**recognize** 50:16,20
**recollection** 56:6
  60:9
**record** 7:2 8:9
  31:18 37:20 42:12
  42:14,15 43:7,13
  54:9 79:22,23,25
  85:2,4 100:7
  107:20
**records** 30:24
  55:23
**recrossexaminati...**
  99:8 106:9
**red** 20:20,23 21:13
  21:25 28:12 29:15
**redirect** 86:1
  105:19 107:2
**references** 23:16

96:1
**referred** 62:22
**referring** 84:16,17
**refreshes** 60:8
**regarding** 81:5
**regardless** 96:2
**regards** 97:1
**region** 15:1
**registered** 1:17
  108:3,17
**regulation** 14:16
  14:20 37:6,18
  38:18
**relative** 108:11,12
**relying** 106:22
**remains** 41:12
**remember** 16:7
  49:5,11 58:4,5
  59:10,15,16 64:10
  77:10 86:13
**remotely** 92:7
**removed** 66:17
**report** 5:23 37:5,23
  60:17,22 64:1,7
**reporter** 1:17,18,19
  1:20 8:10 108:3,4
  108:4,17,18,19,19
  108:20,21,21
**reports** 69:17
**represent** 7:20,22
  8:1,3 80:4
**representation**
  35:8
**representations**
  34:25 40:14
**representing** 44:23
**required** 41:23
**research** 17:5 23:2
  24:18
**researchers** 69:22
**resolve** 62:24 67:18
**rest** 76:18
**result** 98:1 104:17
**results** 61:10 74:4
  81:13 99:21
  100:24 101:10
  102:1,16 106:16

106:21 107:7
**retired** 13:20
**return** 109:13
**reviewing** 60:16
**richard** 5:10,11
**right** 9:4,20,22
  11:8,15,16 12:4
  13:1,18,22,24
  14:3,4,11 15:11
  15:15,22,23 16:4
  16:5,9 17:2,8,9,13
  19:25 20:10,11,15
  20:19 21:7,15,18
  22:16,21 23:14,25
  24:6,10,23 27:12
  27:15 28:8,18
  29:14,18,21 30:6
  30:8 31:3,6 33:4
  33:18 34:12,24
  36:2,20 39:3,4,4,5
  39:18 40:13,24
  45:6,10,20 46:13
  46:17,19 47:12,23
  48:25 49:12,22
  50:1 52:7,12
  53:21,25 55:14
  58:8 59:21 61:20
  61:24 62:1,2,6,7
  62:12,13 63:4,10
  64:1 65:8,22 66:6
  66:12 67:7,14
  68:6,14,20 69:8
  69:15 70:20 71:3
  73:23,24 76:21
  77:8,11,15,21,22
  79:1 80:10,11,16
  80:21 81:18,19
  82:2,10,11,19
  84:4,23 85:22
  86:3 87:24 88:22
  89:4,5,6 91:14,15
  94:5 95:3,11,12
  95:13 97:20,21
  99:22 100:21
  101:5,13 102:9,18
  102:23 103:6,17
  103:24 104:5,13

Alice M. Blount, Ph.D.

Page 122

104:19,20 105:3,4
105:10,13,14,15
106:18,25 107:14
**rim** 34:19
**rio** 5:21 95:17
**ritual** 40:22
**river** 12:13
**roads** 97:17
**robert** 1:3 7:11
**rock** 97:14,15,23
103:21 104:4,5,10
**rocks** 16:12
**rotate** 26:2
**rotated** 26:2 28:3
**rotating** 26:3
**routine** 72:13
**routines** 41:14
**running** 65:25 77:6
85:7 100:3
**rutgers** 12:25 13:2
13:3,5 14:2 17:7
17:12 24:8,17
**rutland** 1:14 7:9
13:12,13 36:14
**résumé** 4:16 12:23
13:23,25 16:10
17:3 18:7

**S**

**s** 2:1
**safe** 38:25
**safety** 5:3 40:17
**sample** 17:20 26:10
30:21,22 31:5,18
38:4 47:16,17
48:4,7 49:19,24
50:1,3 51:21,23
52:3,6,10 53:14
54:6,7 55:20,25
56:6,11 65:16
77:24 94:2 97:22
99:17,20 100:19
101:4,10 104:8,18
104:18
**samples** 17:17
34:21 53:24 54:4
54:14 55:1 56:14

57:1,3,8,11,13,22
57:25 58:1,2
71:14,14 74:11,12
74:13,15 75:23
76:8,19 77:18
87:25 88:3 93:21
94:16 99:15 103:1
103:2
**sandberg** 2:19
**sandbergphoenix** 2:20
**satisfied** 73:12
**save** 34:1
**saying** 29:25 47:17
100:18
**says** 8:17 27:2
28:24 41:15 58:23
58:25 59:4 73:10
75:20 93:19 97:19
**scanning** 98:10
**school** 19:18 80:24
**science** 15:21 16:3
17:4 69:12 89:16
92:15
**sciences** 14:2 17:7
**scientific** 37:7
**seasick** 49:17
**second** 48:8 95:20
**section** 79:3 89:6
**see** 9:17 17:18,21
18:8,13,13,17
20:12 26:20 27:10
28:15,19,19,23,25
29:2,4,4,6,6,9,15
29:20 30:21 31:12
37:1,11,21 38:2
39:2,20,23 41:5,6
41:15,25 46:6,8
48:17,19 49:20
50:25 51:13,15,18
51:22 52:3 58:18
60:8 61:8 64:3,8
64:14 65:6,16
66:8,10 67:3,19
67:24 69:20 75:18
75:19 76:11,23
78:22 79:7,19

81:18 82:13 83:6
85:12 87:21 90:18
92:22 93:5 94:4
100:12,20
**seeing** 53:14 62:4
**seek** 90:14,16,24
104:22
**seen** 25:2 40:5,7
54:18,20 71:21
74:3 95:20
**selected** 67:2
**sell** 75:2
**send** 34:21
**sense** 91:12 96:4
**sent** 80:14
**separate** 29:7,8
66:14 83:5,25
**separately** 50:9
**separating** 65:11
**separation** 64:21
**series** 93:21,22
**services** 1:21 3:10
7:5
**set** 23:16 24:2 27:4
27:19,21,23 37:20
44:1 45:4 108:9
**setting** 41:7
**shakes** 61:3
**shape** 46:9
**share** 69:16
**sheet** 9:17 107:8
109:6,9,11,14
110:7
**shelf** 25:8,11 33:7
**shell** 90:16
**shelves** 99:4 106:3
**shes** 29:25 43:2
81:10 90:13
**shop** 36:14
**shorted** 97:6
**shorthand** 1:19
108:4,18,20,21
**shouldnt** 90:8
**show** 19:22 27:17
28:10 32:7 33:16
72:22 81:3 91:16
95:4,7,10,14 97:5

**showed** 26:14 40:6
46:8 48:10 77:24
81:3 91:8,17
92:24 93:9 102:23
**showing** 52:22
62:11 97:4
**shown** 28:10,25
73:18 93:7 98:15
**shows** 30:9 31:19
**sic** 51:3
**side** 12:13 20:12
32:18,20 43:5
58:22 97:23
**sign** 23:23 24:3
36:17 109:8
**signature** 36:9
95:23
**signed** 36:11,13
**signing** 109:9
**silicate** 45:12
**simmons** 3:6
**single** 69:6
**sir** 100:13
**sitting** 102:15
**sixth** 2:8
**size** 76:9,15,20
77:14,20
**sizes** 32:21
**skillman** 59:5
**skin** 41:13
**skip** 68:22
**slide** 17:19,20,23
26:4
**slides** 32:1 66:18
**slow** 21:10 30:14
**soft** 35:13
**softest** 35:13
**sold** 99:3 106:3
**somebody** 61:23
64:11 66:19 67:1
102:7
**someones** 84:8
**sorry** 20:22 34:5
49:16 64:18 73:7
74:18 96:16
103:18
**sort** 22:4 46:3

60:22
**source** 59:15,20
71:10
**south** 3:2 34:18
97:24
**southern** 10:1,2
**southerner** 9:23,24
**space** 109:6
**speak** 54:24
**special** 3:4 8:6
**specifically** 14:7
36:5
**specified** 38:13,19
**speed** 9:13
**spell** 24:12
**spent** 34:22
**spherelooking**
22:11 25:17
**spin** 89:9
**st** 1:1 2:21 3:3 7:14
12:14,16
**stage** 28:2 68:23
**staining** 98:4
**stamped** 58:20,21
**start** 11:8 12:6 20:8
45:6 47:5 68:4
75:5 92:5 99:22
**started** 19:17 42:19
43:10
**state** 1:1 7:14,19
109:5
**statement** 41:8
**stenographic** 8:9
**stenographically**
108:8
**step** 68:8
**stewart** 5:17
**story** 16:7,18
**straight** 37:20
**street** 2:8,15
**structure** 47:4
61:24 69:6
**structures** 68:13
**students** 22:22
33:13,16 57:18
**studied** 55:10
**studies** 38:25 49:25

Alice M. Blount, Ph.D.

62:11
**study** 71:8 89:20
  96:7
**stuff** 34:16 40:23
  78:8,24 84:1
**subconsciously**
  100:4
**subject** 24:24 86:20
  109:10
**submitted** 97:25
**subscribed** 110:15
**subsequent** 41:2
  98:9
**substance** 41:21
  110:7
**suggests** 63:24
**suite** 3:2
**super** 30:15,15
**supervising** 23:2
**supplied** 5:12
**suppose** 107:14
**supposedly** 106:22
**sure** 9:19 13:24
  24:7 30:3 37:10
  46:11 57:23 58:7
  75:13 85:17 89:13
  96:22
**surfaces** 35:11
**sutcliffe** 2:12
**swear** 8:11
**switch** 50:5
**sworn** 8:15 108:5
  110:15
**symposium** 51:9

---

**T**
**t** 5:11 111:1
**table** 51:20 90:18
  100:20
**take** 17:19 19:20
  60:14 61:13 63:25
  66:3 68:7 69:12
  79:17 102:17
**taken** 104:19 108:8
**talc** 2:22 5:3,15 8:3
  14:9 30:21 31:5
  33:14 35:8,12,17

38:5,11 39:10
40:17,20 41:20,22
55:8 57:19 58:25
59:1,14,18 65:8
66:13 68:3 71:10
72:14 74:1,8,12
74:13,19 75:8,11
75:17 77:1,13
79:3,5,11,15 80:5
81:5,14,17,17,20
82:12,13,21 83:3
83:5,9,18,24 84:2
84:10,15,20 93:21
96:7 103:2,15,23
104:2,3,18,18
106:24
**talcs** 5:9 23:20
31:17 37:16,17
53:5 77:2 101:10
**talk** 35:11 73:19
80:18 81:10 91:24
97:1
**talked** 11:18 12:2
30:17 49:18 53:8
80:10 91:23 92:6
92:6,11 100:24
**talking** 12:6 14:12
16:21 45:23 52:6
56:8 60:10,11,17
64:24 73:9 87:19
99:14 100:16
107:8
**talks** 40:16
**taught** 22:22,24
**teach** 17:10
**teaching** 23:3
24:17 33:19
**technical** 5:23
95:24 97:25
**technique** 64:21
82:21 98:4
**techniques** 71:15
**tell** 8:16 13:7 15:4
17:14 21:8 30:13
32:5 39:13 55:22
68:24 77:11 85:10
91:14 92:18 94:6

94:11 96:19
**telling** 60:25 88:7
**tells** 22:10 59:1
**tem** 67:16,20,24
68:11,16
**term** 46:15,20
**test** 34:11,15,17
38:8 81:17,21,25
82:13,21 86:23
106:17,21 107:7
**tested** 10:11,16
66:10 87:3 102:11
**testify** 72:23 79:10
81:9 91:10,12
108:5
**testimony** 44:1,21
47:16 108:8
**testing** 34:18 54:15
55:11 74:1,3 81:4
81:10,13,14 82:6
83:9,17 92:12
102:17 104:25
106:16
**tests** 17:22 87:17
87:19,21 97:3
**texas** 1:19 2:4
108:21
**thank** 9:7 42:10
43:11 84:25 89:24
99:6 106:7 107:12
107:16
**thats** 10:1,2 11:16
12:12 14:4,25
15:23 16:5,9,18
17:1,9 18:23 19:6
20:15 21:3,11,21
22:9,10,14,17
23:1,13,25 24:22
26:3 28:7 29:11
29:15,17 31:14,25
32:24,25 33:1
34:22 36:8,17
38:15,23 39:4,4
43:24 46:7,10,11
46:15,25 48:15
53:21 55:15 56:12
56:25 59:3,21

63:5,9,10 64:16
66:18 67:23 77:22
80:16 82:11 83:25
84:13 85:16,22,23
88:22 89:2,3 90:7
91:15,23 93:2,7
95:16 96:22 97:20
97:21 98:5,6,25
99:18 100:5 101:4
105:11,23 106:7
**theres** 17:18 18:16
36:2 45:15 46:14
47:13 48:18 51:19
51:20 58:22 70:23
78:9 79:12,14
81:7 82:13 87:21
102:16 104:11
105:6
**thesis** 23:2
**theyll** 94:6
**theyre** 17:23 29:7,7
46:3 61:25 66:21
66:22 67:23 82:9
85:20 97:17
**thing** 21:25 22:11
25:17 50:20,22
52:9 79:11,12,14
81:17 96:25 99:13
103:8
**things** 13:23 34:11
49:15 56:23 66:17
68:15 79:2 84:3
91:16,17 95:10,14
102:20 104:4
**think** 11:13 12:1,25
13:20 18:21 19:15
25:8 27:17,18
31:18 33:24 40:9
42:24 45:14 47:23
48:7 50:2 57:10
62:20,21 69:14
74:9 75:9,12
77:22 78:2,3
80:20 81:6 82:3
88:15 91:7 100:7
102:19 103:5
**thinking** 97:17

**thirty** 109:15
**thought** 61:1 88:6
88:18 98:14
**thoughts** 64:8
**three** 11:13,14,17
**threw** 78:6
**throw** 78:24
**time** 7:7 9:7 12:16
17:3 23:15 34:22
42:14,21 43:1,1,2
43:13,21,21 59:23
61:7,13 65:1
69:22 70:4 72:10
79:22,25 83:2,19
84:12 85:8 87:24
88:3 89:17 95:17
96:20 99:19 100:1
101:2,3 107:21
108:8
**timeline** 78:23
**times** 11:14,18 46:4
62:22 68:12 87:3
87:15 101:18
**timing** 49:5
**tint** 21:14
**tinto** 5:22 95:17
**tiny** 66:16
**today** 12:22 13:11
72:23 73:19 78:20
102:16,19 106:21
106:24
**todays** 7:6
**token** 95:3
**told** 38:10 42:18,19
43:6 45:1 93:15
**topic** 89:7 91:5
**toxicologist** 38:22
**trace** 38:12 39:11
48:14 51:2
**track** 78:6
**traditional** 38:5,8
51:25 52:6 100:19
**transcript** 108:7
109:16,17
**transcription** 110:5
**transmission** 67:16
68:9 71:16 72:14

Alice M. Blount, Ph.D.

94:1 98:11
**tremolite** 31:6,7,10
45:23 46:1,1 47:7
61:24 62:5,15
63:3,8 65:7 66:8
81:22 86:11,16
96:6,9,10,18 98:2
98:8,12
**tremolites** 62:12
**trial** 7:24 9:5 11:2
**tried** 80:18 83:15
**trouble** 86:21
**troy** 74:22 84:17
**true** 35:17 79:11,15
83:11
**truth** 8:16,16,17
91:14 92:10,15,18
94:11 108:5,6,6
**try** 9:12 65:6 78:18
84:7 90:25
**trying** 12:14,23
51:13 59:22 96:15
105:6
**tucker** 3:7
**turn** 45:9 51:19
100:12
**two** 10:5 11:17 18:4
23:17 25:14 27:7
27:8 56:25 84:11
84:15,20 93:23
94:2
**type** 21:25 30:1
**typical** 76:9,16,21
77:15,20

**U**

**uhhuh** 10:9 11:7
15:14,25 21:23
26:5,17 27:1,3,25
28:4,9 29:6,17,23
29:25 32:25 33:8
36:8,19 37:2,12
37:22 38:9,14,16
39:24 41:16 45:24
48:5,11 49:23
50:2 51:6,17 52:4
52:8 53:9,12

59:12 65:9 67:6,8
68:21 69:2,9 72:8
72:11 76:6 77:16
79:8 80:6 81:23
86:8,14 87:12
88:10,25 89:19
90:15,22 91:20
93:6 95:12 97:18
97:21 98:6,18
100:22 101:1
102:24 104:6
**uhhuhs** 30:1
**undergraduate**
23:3
**underneath** 83:4
**understand** 11:4
14:21 47:15 81:25
82:5 89:18 99:13
99:16
**understanding**
82:20 86:21
**unfortunately**
56:22 100:6
**uniformly** 79:4
**university** 15:22
16:2,8
**unsafe** 38:25
**uptodate** 37:6
**use** 17:20 18:24
22:22 26:19 65:24
66:2,20,25 82:15
90:3 105:7,13
**usgs** 96:7
**usually** 56:13,15

**V**

**v** 1:6 3:9
**valley** 96:8
**value** 26:11
**values** 51:24
**various** 64:19 65:4
**vein** 89:25
**verbatim** 108:7
**vermont** 1:15 5:15
7:9 13:12,13
34:10 36:14 38:4
38:11 55:7 57:16

59:19 71:9 74:13
74:17 77:2,18
78:8 81:5,14
97:20,24 98:15
**vernon** 5:20
**versus** 7:12 92:10
**video** 7:8
**videographer** 7:1,4
8:8 42:13 43:12
79:21,24 85:1
107:18
**videotape** 9:4
**videotaped** 1:12
**view** 20:18 29:12
52:1 62:14 68:11
69:3,13
**views** 29:9 37:7
60:18 62:9 70:19
71:2 73:19
**von** 2:19

**W**

**w** 2:3
**wait** 28:16
**waiting** 34:7
**want** 10:4,22,24
12:4 24:23 33:23
38:2 43:4 56:19
58:6 62:3,17
67:21 69:5,6 85:7
86:3 88:13,16
89:13,17 90:4
95:14 98:13 99:14
99:19,23,25
**wanted** 37:20 56:20
68:10 82:12 83:1
83:5,20,22 88:14
88:16 91:17,22
98:20
**wants** 85:11 90:20
**washington** 2:21
**wasnt** 14:14 33:12
61:2
**waste** 97:13,23
103:21
**way** 13:6 22:16
27:12 28:13,14

29:3,4,8,8 30:11
30:11 32:25 36:12
36:18 39:18 46:25
52:17,21,24,24
78:9 82:22 83:8
84:2 85:17 88:16
97:20 106:13
**weber** 36:25
**website** 40:15,19
**wed** 45:3,3
**week** 44:16,17,25
**weeks** 44:24
**went** 16:1,16 24:16
35:10 66:18 71:8
80:24
**west** 2:4,15 97:23
**western** 1:13,14
**weve** 11:1 13:24
18:11 19:21 20:18
23:14 24:7 25:2
36:20 44:20 52:18
76:22 93:20
101:20 106:8
**whats** 17:21 19:5
55:7 66:3 74:19
74:24 84:13 85:15
86:4
**white** 28:20,23
**whoops** 27:8
**whos** 56:19
**wife** 14:24
**william** 71:6
**windsor** 59:14,18
73:11 93:19
**windsors** 73:13
93:1 94:7
**wisconsin** 16:2,8
**witness** 8:12 10:19
11:2,23 15:17
22:12 35:21 41:3
42:9,11,22 45:21
49:1 51:11 54:25
58:24 61:3 63:11
73:1 87:6 91:20
92:2 98:18 99:7
106:6 109:1
**wml** 2:3

**woman** 81:7
**wont** 84:2,2 99:24
**word** 45:22
**words** 45:8 88:5
96:13
**work** 13:15 22:23
23:7 24:8 27:8
36:24 72:10 78:15
78:19 105:24
107:5
**working** 14:6,17
33:14 74:20
**world** 34:15 41:12
94:11
**worry** 99:11
**wouldnt** 22:8 35:21
35:22 63:12 67:25
82:14 88:20 99:25
102:13
**write** 95:25
**writing** 16:15
100:16
**written** 9:16 37:5
37:14 66:4 87:1
**wrong** 28:18 65:17
85:16
**wrote** 30:16 36:6
36:23 40:8 53:7
73:11 95:22 96:2

**X**

**Y**

**yeah** 10:1 15:1
16:25 19:8,11,13
19:15,17 20:1,15
21:2,3 23:8,22
25:12 26:7 27:6,6
27:18 29:17 32:1
33:20 35:4 36:16
36:22 39:14,15
44:10,15,15 45:17
46:16,18 47:20,20
49:1,21 51:17
53:20 54:1 69:14
73:5,6 75:15
76:17,22 81:23

Alice M. Blount, Ph.D.

82:4,11 86:19
  87:23 88:5 89:23
  91:2 92:19 94:14
  98:7 101:6,14
  106:17
**year** 16:23
**years** 16:23 36:17
  53:25 73:15 93:3
  93:17,18 102:8,10
**yellow** 21:14 22:6
  25:20 26:1 27:15
  28:14,17 29:5,9
  29:22 30:7
**york** 2:9,9,15,15
**youall** 16:22,23
  45:4 54:21
**youll** 51:18 99:21
**youre** 9:5,24,25
  21:17 29:24 43:20
  44:23 46:11,20
  47:17 54:13 56:8
  62:10 63:2 65:25
  68:3,17,23,25
  70:3,9 83:24
  100:15,16,17
  104:17 105:5,12
  106:22 107:4,8
**youve** 24:8,18,25
  25:2,14 32:23
  35:16 43:10 49:25
  53:24 55:10 61:5
  61:6 62:21 72:9
  83:23 96:13
  101:10,11,18
  102:7

**————— Z —————**
**zeitz** 5:20
**zoom** 27:8 31:8
  41:18 65:6

**————— 0 —————**
**05** 43:13
**084004229** 108:20
**08558** 59:6

**————— 1 —————**

**1** 4:16 8:20 18:7,8
  38:19 51:25 61:25
  63:9
**10** 5:4 42:16 43:13
  79:22,23,25
**100** 51:25
**10019** 2:15
**10022** 2:9
**105** 4:10
**106** 4:11
**107** 4:12
**108** 6:1
**11** 5:6 50:12,15,18
  107:21,22
**110** 6:2
**111** 6:3
**112** 6:4
**12** 5:9 52:14,19
  93:18
**120** 3:2
**126** 2:8
**129** 95:25
**13** 1:10 5:10 7:6
  54:10 107:19
  108:23
**13921** 108:19
**14** 5:12 58:11
  101:21
**15** 5:13 60:5 73:15
  93:3,17
**1500** 3:2
**1522cc1041701** 1:5
  7:15
**15th** 2:21
**16** 5:15 70:6 92:23
**17** 4:17,18 5:17
  72:17
**1715** 108:21
**18** 5:19 93:10,11,14
  95:4,6
**19** 4:20 5:19,21
  42:6 94:25 95:5,8
  95:9
**1918** 35:4
**1960** 2:4
**1964** 15:21
**1970** 16:4

**1970s** 41:22 42:6
  102:23
**1972** 14:7,12 15:1
  17:7
**1975** 5:19
**1983** 24:2
**1987** 5:17 73:9
**1989** 51:9 86:21
**1990** 37:9 48:16
  49:1 51:17 100:20
  100:23
**1991** 23:21 30:17
  37:13 53:10,19,20
  55:10,16,25 57:4
  57:8,22 64:24
  74:7 75:7,14
  86:21 101:8
**1992** 64:17
**1996** 47:25 48:1
  49:14 52:12 53:16
  59:10,13,19 86:21
**1998** 5:1 36:12 37:4

**————— 2 —————**

**2** 4:2,17 17:25
  18:10,15,16,16
  19:21 25:15,16
  27:14 51:20
  100:20
**20** 4:21,23 5:23
  11:18 36:17 97:7
  97:8 110:16
**2000s** 106:2
**2002** 97:12
**2016** 40:18
**2018** 1:10 5:10 7:6
  35:4,6 107:19
  108:23
**20monthold** 90:9
**21** 5:17
**212** 2:9,16
**22** 102:8,10
**23** 1:15 5:1 7:7
  102:8
**231** 58:20,22
**24** 40:18 93:21
  94:16

**25** 107:21,22
**26** 4:24
**29th** 35:3,6

**————— 3 —————**

**3** 4:18 17:25 18:10
  25:15 27:13 28:17
  61:25 63:9
**30** 11:19 109:15
**3011** 59:7
**31** 37:4
**314** 2:22 3:3
**3377** 1:22
**35** 5:1
**370** 1:22

**————— 4 —————**

**4** 4:20 18:25 19:1,4
**40** 5:3
**400** 42:24 44:8
**42** 5:4
**4212800** 2:9
**43** 4:6
**4464226** 2:22

**————— 5 —————**

**5** 1:14 4:21 20:4,8
  21:22 25:3 29:13
**50** 5:6 16:23 79:22
  79:23
**5063742** 2:16
**51** 2:15
**52** 5:9
**52nd** 2:15
**54** 5:10 79:25
**557** 51:15
**567** 51:20 100:20
**5672** 1:22
**56th** 2:8
**58** 5:12
**59** 42:14,15
**591** 1:22

**————— 6 —————**

**6** 4:23 20:4 21:24
  25:3 29:12,13
**60** 5:13

**600** 2:21
**63101** 2:21
**63105** 3:3
**6595200** 2:5
**6810** 2:4

**————— 7 —————**

**7** 4:24 26:19,21
**70** 5:15
**70s** 106:23
**713** 2:5
**72** 5:17
**73** 15:1
**7726901448** 2:4

**————— 8 —————**

**8** 4:5,16 5:1 35:23
  36:4 100:15
**80** 4:7
**80s** 106:1,23
**859** 108:19
**86** 4:8
**8631500** 3:3
**877** 1:22

**————— 9 —————**

**9** 1:15 5:3,10 7:7
  40:10,16 42:14,15
**90s** 106:2,23
**91** 37:9 64:18
**917** 1:22
**93** 5:19
**9328** 108:21
**94** 5:21
**97** 5:23
**99** 4:9

Exhibit 20

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE EASTERN DISTRICT OF NEW JERSEY
3   - - -
4

IN RE:  JOHNSON &         :
5   JOHNSON TALCUM POWDER     :
    PRODUCTS MARKETING,       :
6   SALES PRACTICES, AND      :   NO. 16-2738
    PRODUCTS LIABILITY        :   (FLW) (LHG)
7   LITIGATION                :
                              :
8   THIS DOCUMENT RELATES     :
    TO ALL CASES              :
9

                VOLUME I
10

                - - -
11

        August 16, 2018
12

                - - -
13
14          Videotaped deposition of
    JOHN HOPKINS, Ph.D., taken pursuant to
15   notice, was held at the law offices of
    Orrick, LLP, 51 West 52nd Street,
16   Philadelphia, Pennsylvania, beginning at
    9:39 a.m., on the above date, before
17   Michelle L. Gray, a Registered
    Professional Reporter, Certified
18   Shorthand Reporter, Certified Realtime
    Reporter, and Notary Public.
19
20                - - -
21

        GOLKOW LITIGATION SERVICES
22   877.370.3377 ph | 917.591.5672 fax
            deps@golkow.com
23
24

John Hopkins, Ph.D.

```
 1    APPEARANCES:
 2
      COHEN, PLACITELLA & ROTH PC
 3    BY:  CHRISTOPHER M. PLACITELLA, ESQ.
      127 Maple Avenue
 4    Red Bank, New Jersey 07701
      (732) 747-9003
 5    cplacitella@cprlaw.com
 6       - and -
 7    BEASLEY ALLEN, P.C.
      BY:  P. LEIGH O'DELL, ESQ.
 8    234 Commerce Street
      Montgomery, Alabama 36103
 9    (334) 269-2343
      leigh.odell@beasleyallen.com
10
         - and -
11
      ASHCRAFT & GEREL, LLP
12    BY:  MICHELLE A. PARFITT, ESQ.
      BY:  JAMES F. GREEN, ESQ.
13    4900 Seminary Road, Suite 650
      Alexandria, Virginia 22311
14    (703) 931-5500
      mparfitt@ashcraftlaw.com
15    jgreen@ashcraftlaw.com
      Representing the Plaintiffs'
16    Steering Committee
17
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
18    BY:  PETER A. BICKS, ESQ.
      BY:  C. ANNE MALIK, ESQ.
19    51 West 52nd street
      New York, New York 10019
20    (212) 506-3767
      pbicks@orrick.com
21    amalik@orrick.com
      Representing the Defendant, Johnson
22    & Johnson entities
23
24
```

John Hopkins, Ph.D.

```
 1        APPEARANCES:   (Cont'd.)
 2

          GORDON & REES, LLP
 3        BY: MICHAEL KLATT, ESQ.
          816 Congress Avenue, Suite 1510
 4        Austin Texas 78701
          (512) 391-0197
 5        Mklatt@grsm.com
 6           - and -
 7        COUGHLIN DUFFY L.L.P.
          BY: MARK K. SILVER, ESQ.
 8        350 Mount Kemble Avenue
          Morristown, New Jersey 07962
 9        (973) 267-0058
          msilver@coughlinduffy.com
10        Representing the Defendant, Imerys
          Talc America, Inc.
11

12        SEYFARTH SHAW, LLP
          BY:  THOMAS T. LOCKE, ESQ.
13        975 F Street, NW
          Washington, D.C. 20004
14        (202) 463-2400
          tlocke@seyfarth.com
15        Representing the Defendant, PCPC
16

          TUCKER ELLIS, LLP
17        BY:  SANDRA J. WUNDERLICH, ESQ.
          100 South Fourth Street, Suite 600
18        Saint Louis, Missouri 63102
          (314) 256-2550
19        Sandra.wunderlich@tuckerellis.com
          Representing the Defendant, PTI
20        Royston LLC and PTI Union LLC
21

22

23

24
```

John Hopkins, Ph.D.

```
 1        APPEARANCES:  (Cont'd.)

 2

 3        VIDEOTAPE TECHNICIAN:
              Henry Marte

 4

 5

          ALSO PRESENT:

 6

              Lea Callahan

 7            (Paralegal  - Cohen Placitella)

 8            David Egilman, M.D.

 9            Triet Tran
              Alicia Rocha

10            (Research analysts for
              Dr. Egilman)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

John Hopkins, Ph.D.

```
1                        -   -   -
2                    I N D E X
3                        -   -   -
4
     Testimony of:          JOHN HOPKINS, Ph.D.
5
           By Mr. Placitella          28
6
7
8
                        -   -   -
9
                 E X H I B I T S
10
                        -   -   -
11
12   NO.             DESCRIPTION          PAGE
13   Hopkins-1       Second Amended       28
                     Notice of Deposition
14
     Hopkins-2       Letter 2/8/73        104
15                   Subject, Powder Grind
                     Test
16                   Pltf_JNJ_00063528
17   Hopkins-3       Handwritten Document 190
                     By Placitella
18                   Entitled Limits in
                     Johnson Baby Powder
19
     Hopkins-4       John Hopkins         238
20                   Deposition
                     True/False
21
     J&J-1           Talc Physical        257
22                   Properties Progress
                     Report
23
24
```

John Hopkins, Ph.D.

```
 1                     -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                     -  -  -
 4
 5   NO.            DESCRIPTION            PAGE
 6   J&J-2          Progress Report        262
                    Battelle Memorial
 7                  5/23/58
                    JNJNL61_000000134
 8
     Imerys-5       TEM Asbestos           417
 9                  Analysis of Argonaut
                    Product Composites
10                  Summary Report
                    8/8/18
11                  (No Bates)
12   J&J-4          Document Entitled      104
                    6. Cosmetics
13                  JNJH29W_000003708-12
14   J&J-9          Colorado School of     268
                    Mines, Letter, 12/4/70
15                  To Ashton
                    Geology and Ore Reserves
16                  Hammondsville Mine
17   J&J-17         Meeting with           337
                    Dr. Langer on
18                  July 9 Concerning
                    Analytical Analysis
19                  Of Talc
                    JNJAZ55_000005743-48
20
     J&J-19         Letter, 7/29/71        285
21                  Subject, Talc/Asbestos
                    JNJMX68_000004646-47
22
     J&J-23         Letter, 10/12/71       363
23                  To Dr. Goudie
                    JNJAZ55_000005957-66
24
```

John Hopkins, Ph.D.

```
 1                    -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
 5     NO.            DESCRIPTION              PAGE
 6     J&J-28         Letter, 8/3/72           309
                      To Dr. Weissler
 7                    (No Bates)
 8     J&J-29         Letter, 8/24/72          322
                      Subject, Talc/Asbestos
 9                    Shower to Shower Talc
                      Pltf_JNJ-00034176-77
10
       J&J-33         University of            331
11                    Minnesota Space
                      Science Center
12                    JOJO-MA2546-01282-14
13     J&J-34         Examination of           365
                      J&J's Baby Powder
14                    10/27/72
                      Pltf_JNJ_00068450-52
15
       J&J-35         Letter, 10/27/72         192
16                    Project C10704
                      JNJNL61_000007139-40
17
       J&J-36         Examination of           366
18                    J&J's Baby Powder
                      10/27/72
19                    "Do Not Use This
                      Report, Replaced by
20                    Another Version
                      Pltf_JNJ_00060833-35
21
       J&J-44         Letter, 4/26/73          410
22                    JNJMX68_000013464-66
23
24
```

```
 1                      -  -  -
 2             E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5     NO.              DESCRIPTION              PAGE
 6     J&J-47           Memo, 6/6/73              304
                        From Petterson
 7                      (No Bates)
 8     J&J-49           Letter, 6/21/73           305
                        From Stewart
 9                      JOJO-MA2546-00163-84
10     J&J-57           New Reagent               371
                        Systems Plant Trial
11                      At Windsor Minerals, Inc.
                        JNJMX68_000017401-36
12
       J&J-58 D         Dartmouth College         313
13                      March 1974
                        Subject analysis
14                      of Talc Products and
                        Ores for Asbestiform
15                      Amphiboles
16     J&J-65           Examination of            383
                        Talc Samples
17                      Argonaut Ore Body
                        4/24/74
18                      JNJMX68_000002666-73
19     J&J-69           Johnson's Baby             64
                        Powder Fact Book
20                      Supplement 7/1974
                        IMERYS 209320-387
21
       J&J-74           Letter, 10/10/74          389
22                      To Zeitz
                        (No Bates)
23
24
```

John Hopkins, Ph.D.

```
 1                      -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5      NO.              DESCRIPTION              PAGE
 6      J&J-89           Letter, 7/1/75          390
                         To Zeitz
 7                       JNJMX68_000012745-49
                         JNJMX68_000019698-99
 8
        J&J-92           Letter, 9/9/75          343
 9                       Subject, A.M. Langer
                         Analysis of Talcum
10                       JNJNL61_000064366-67
11      J&J-93           Letter, 4/28/76         148
                         JNJ 000237049-55
12
        J&J-100          Colorado School of      290
13                       Mines, Mineralogical
                         Examination of Five
14                       Talc Samples
                         2/26/73
15                       JNJNL61_000008084-89
16      J&J-121          Letter, 7/16/76         115
                         Subject, Johnson's
17                       Baby Powder
                         JNJMX68_000008964-65
18
        J&J-141          Letter, 1/25/77         307
19                       From Pooley to Rolle
                         (No Bates)
20
        J&J-142          Letter, 1/28/77         159
21                       From Ashton to Arnold
                         JNJ 000325493-94
22
23
24
```

John Hopkins, Ph.D.

```
 1                       -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                       -   -   -
 4
 5     NO.              DESCRIPTION            PAGE
 6     J&J-154          Memo, 8/3/71           192
                        Subject, X-ray
 7                      Investigations of
                        Standard Materials
 8                      JNJAZ65_000006108-09
 9     J&J-157          Memo, 10/8/77          162
                        Subject, Relative
10                      Talc Exposure
                        (No Bates)
11
       J&J-158          Cosmetic Talc           93
12                      Mining Sources for
                        Johnson & Johnson
13                      (No Bates)
14     J&J-159          Letter, 2/23/78        215
                        From Lee to Roger
15                      JNJ 000285031-38
16     J&J-164          Handwritten            414
                        Letter, 2/9/79
17                      (No Bates)
18     J&J-169          Letter, 11/6/80        398
                        From Ellis to Grayson
19                      (No Bates)
20     J&J-177          MSHA Visit, 5/3/84     349
                        CAMC-Herford-000119-25
21
       J&J-179          Letter, 11/2/84        399
22                      From Palenik to Miller
                        (No Bates)
23
24
```

John Hopkins, Ph.D.

```
1                        -   -   -

2              E X H I B I T S  (Cont'd.)

3                        -   -   -

4

5      NO.              DESCRIPTION            PAGE

6      J&J-182          Letter, 4/29/86        212
                        From Kremer
7                       To Miller
                        (No Bates)
8

       J&J-185          Letter, 3/30/87        412
9                       Subject, Windsor
                        Minerals Raw Talc
10                      Submissions
                        JNJMX68_000003728-29
11                      JNJMX68_000011720-26

12     J&J-194          Analysis of            176
                        Powdered Talc for
13                      Asbestiform Minerals
                        By TEM
14                      JNJNL61_000043150-54

15     J&J-198          Letter, 11/26/90       232
                        From Sprague to Keener
16                      JNJMX68_000012851-60

17     J&J-200          Interoffice            172
                        Correspondence
18                      3/25/92
                        Pltf_IMERYS_00057875
19

       J&J-201          Authorization for      117
20                      Interim Specification
                        Subject, Cyprus
21                      Windsor Minerals
                        Corporation Grade 66
22                      Talc
                        JNJMX68_000000439-42
23

24
```

John Hopkins, Ph.D.

```
 1                      -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5     NO.              DESCRIPTION            PAGE
 6     J&J-207          Process Specification 88
                        Subject, Shower to
 7                      Shower Medicated
                        Powder Formula 2118-114
 8                      JNJ 000057833-43
 9     J&J-211          Letter, 1/5/96         118
                        From Hicks to Wilkes
10                      IMERYS 117597-04
11     J&J-213          Letter, 1/31/96        112
                        Subject, Pilot
12                      Flotation Study on
                        Argonaut Ore at West
13                      Windsor
                        IMERYS 006748-54
14
       J&J-224          E-mail Thread          194
15                      6/7/01
                        Subject, Talc
16                      Specification
                        (No Bates)
17
       J&J-228          Fax from Marc          404
18                      Monseau
                        2/24/04
19                      JNJAZ55_000001220
20     J&J-234          Development of         198
                        a New ASTM Method
21                      For the Analysis
                        Of Cosmetic and
22                      Pharmaceutical
                        Talc for Asbestos
23                      Johnson Conference
                        7/2011 (No Bates)
24
```

John Hopkins, Ph.D.

```
 1                    -  -  -
 2            E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5    NO.              DESCRIPTION            PAGE
 6    J&J-241          Chapman v BASF         94
                       Catalysts
 7                     Interrogatories
                       (No Bates)
 8
      J&J-252          PowerPoint Rio Tinto  188
 9                     Talc:  Asbestos
                       Issues and Management
10                     (No Bates)
11    J&J-255          Letter, 5/14/71       406
                       From Ashton to
12                     Hildick-Smith
                       Pltf_JNJ_00049891
13
14    J&J-256          X-ray Diffraction     282
                       Comparison of
15                     Vermont Talc
                       Products
16                     (No Bates)
17    J&J-257          Italian, Medicated    360
                       Grantham Talc
18                     JNJAZ55_000008893-02
19    J&J-258          Project Title         327
                       Asbestos and Other
20                     Contaminants in Talc
                       9/6/73
21                     (No Bates)
22
23
24
```

John Hopkins, Ph.D.

```
1                   -   -   -

2         E X H I B I T S  (Cont'd.)

3                   -   -   -

4

5    NO.              DESCRIPTION              PAGE

6    J&J-263          Colorado School of       295
                      Mines, A Procedure
7                     To Examine Talc for
                      The Presence of
8                     Chrysotile and
                      Tremolite-Actinolite
9                     Fibers
                      57-0198-211
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

John Hopkins, Ph.D.

```
 1                    -   -   -
 2          DEPOSITION SUPPORT INDEX
 3                    -   -   -
 4
 5    Direction to Witness Not to Answer
 6    PAGE    LINE
      None.
 7
 8    Request for Production of Documents
 9    PAGE    LINE
      53      9
10    70      4
      90      22
11    156     16
12

      Stipulations
13
      PAGE    LINE
14    None.
15

      Questions Marked
16
      PAGE    LINE
17    None.
18
19
20
21
22
23
24
```

John Hopkins, Ph.D.

1                  -  -  -

2            MR. SILVER:  Good morning,

3       everyone.  This is Mark Silver on

4       behalf of Imerys.  I notice in the

5       room today there is a Dr. Egilman

6       who is not counsel of record.

7            It is Imerys' position that

8       this is a violation of CMO 11 to

9       have him present.  This is J&J's

10      dep, and I will allow them to

11      determine whether or not they ask

12      him to leave, but Imerys objects.

13      In Imerys depositions, we will not

14      allow non-counsel to be present.

15           Also to the extent that

16      Imerys and Dr. Egilman are having

17      disputes in other jurisdictions as

18      to what is determined to be a

19      confidential document, we will

20      remind the PSC that if Imerys

21      confidential documents are to be

22      used in this deposition, they are

23      subject to a protective order and

24      disclosure and will be -- remedies

John Hopkins, Ph.D.

1      will be sought if they are

2      disclosed.  That's it.

3              MR. LOCKE:  PCPC joins.

4              MR. BICKS:  This is Peter

5      Bicks for Johnson & Johnson.  I

6      guess I would ask -- is it

7      Mr. Placitella?  You're taking the

8      deposition?

9              MR. PLACITELLA:  I am.

10             MR. BICKS:  It was brought

11     to my attention that there is a

12     Case Management Order Number 11

13     that I gather the parties have

14     agreed to that defines who may be

15     present at the deposition.

16             And it specifically lists

17     who those -- who may be at this

18     deposition.  I guess I'm just

19     asking your position on the

20     presence of Dr. Egilman within the

21     confines of the court order,

22     because I don't want to be in a

23     position of in any way violating

24     any court order.  And I'm happy to

John Hopkins, Ph.D.

1    show you the provision if you

2    haven't seen it.

3         MR. PLACITELLA:  I think I

4    know what you're talking about.

5    But you can read into the record

6    whatever you think is appropriate.

7         MR. BICKS:  Right.  So this

8    is Case Management Order Number

9    11, and it's Paragraph 3.  It

10   says, "Who may be present at the

11   deposition."

12        And it says, "Unless

13   otherwise ordered under Federal

14   Civ Pro 26(c) or otherwise agreed

15   to by the PSC or defense lead or

16   liaison counsel, depositions may

17   be attended in person only by

18   counsel of record in this MDL or

19   state court talc counsel of record

20   and employees of their firms who

21   are assisting in the litigation

22   and whose presence is reasonably

23   required by the attorney,

24   attorneys especially engaged by a

John Hopkins, Ph.D.

1          party for purposes of the

2          deposition, the parties or the

3          representative of a party,

4          including inhouse counsel, court

5          reporters, videographers, the

6          deponent and counsel for the

7          deponent.

8               "Upon application and for

9          good cause shown, the Court may

10         permit attendance by a person who

11         does not fall within any of the

12         categories set forth in the

13         preceding sentence.

14              "While the deponent is being

15         examined under any stamped

16         confidential document or the

17         confidential information contained

18         therein, persons to whom

19         disclosure is not authorized under

20         an MDL 2592 protective order shall

21         be excluded from the deposition."

22              That's what this order says.

23         I have seen orders in other cases

24         where experts, consultants are

John Hopkins, Ph.D.

1    allowed in depositions.  It's just

2    that the order that the parties

3    and the court has in place here

4    doesn't have that provision that

5    I've seen in other cases.  And I

6    don't want to be somebody

7    violating a federal court order.

8         So I assume you've looked at

9    this, know all about it, and

10    there's something that explains

11    it.  But I -- this is what the

12    order says.

13         MR. PLACITELLA:  Well, I'll

14    let Ms. Parfitt address that.  But

15    this is what I understand.  Two

16    days ago we gave notice that

17    Dr. Egilman would be here as our

18    consultant.

19         There was an exchange

20    yesterday with Susan Sharko

21    specifically about his attendance.

22    She asked in what capacity was he

23    coming.  We indicated that he was

24    coming as our consultant, and no

John Hopkins, Ph.D.

1    objection was raised.

2        Based on the fact that no

3    objection was raised until two

4    minutes ago, Dr. Egilman traveled

5    here from Providence, and I guess

6    unless you're now raising an

7    objection that should have been

8    raised before, we're ready to

9    proceed.

10        MR. SILVER:  For the record,

11    are you representing that the

12    notification went to me?

13        MR. LOCKE:  Or to me?

14        MS. O'DELL:  Well, those

15    communications were to Ms. Sharko

16    and you were on those e-mails.

17        MR. BICKS:  Yeah, that was

18    yesterday.

19        MS. PARFITT:  Yesterday

20    morning.

21        MR. BICKS:  Right.

22        MS. O'DELL:  And trusting

23    that Susan would convey that to

24    you.

John Hopkins, Ph.D.

1          MR. BICKS:  Right.

2          MS. O'DELL:  Our position is

3     that there could be an agreement

4     of the parties for a person to

5     attend.  And to the degree that

6     the order requires protective

7     order being signed, Dr. Egilman

8     has done that.  There's compliance

9     in that regard.

10          MS. PARFITT:  Susan has been

11     notified.  If there's a change in

12     the deposition, someone has taken

13     the lead from J&J to communicate

14     or Imerys.  And Mark has always

15     taken the lead of circulating

16     information.  I suspect what

17     happened here is that was not done

18     by Susan.

19          MR. LOCKE:  I guess I'm

20     often in the dark about changes.

21     So for the future, if you have

22     something that affects all the

23     parties, and most of it this does,

24     including who attends a

John Hopkins, Ph.D.

 1          deposition, you should give notice

 2          to everyone.  It's not that hard.

 3          Just two or three names on an

 4          e-mail.

 5                  MR. PLACITELLA:  Fair

 6          enough.  If you'll have a real

 7          issue about me asking a question

 8          using an Imerys document, we can

 9          address it at that time.

10                  And if you have a problem

11          with it, we'll ask Dr. Egilman to

12          leave the room if you really have

13          a problem with it when I ask him

14          about an Imerys document, if

15          that's a problem, which I think

16          there are about eight in my box of

17          250.

18                  MR. SILVER:  I put my

19          objection on the record.  We

20          can -- I'm not going to stop the

21          dep.  We'll go forward, and we'll

22          deal with Imerys documents as they

23          come.

24                  MR. PLACITELLA:  All right.

John Hopkins, Ph.D.

1        I don't want to have an issue.

2              MR. LOCKE:  Same for the

3        Personal Care Products Council.

4              MR. PLACITELLA:  If I find a

5        document of yours during the dep,

6        I'll make the same offer.  I'm not

7        sure there's one in that box.  But

8        maybe you've got a few over there

9        that we can talk about.

10             MR. BICKS:  The

11       representation was made on the

12       record that Dr. Egilman has signed

13       the confidentiality order in the

14       case.  May I have a copy of that,

15       please.

16             MS. O'DELL:  I don't have it

17       with me.

18             MR. BICKS:  But you made a

19       representation on the record that

20       it's already been signed.

21             MS. O'DELL:  That's my

22       understanding.

23             MR. PLACITELLA:  If there is

24       an issue, he'll re-sign it now.

John Hopkins, Ph.D.

1            MR. BICKS:  I think we
2       should have it signed --
3            MR. PLACITELLA:  He agrees
4       to be bound.
5            MR. BICKS:  -- and
6       completed.  Okay.  And we can just
7       have it completed, that would be
8       wonderful.
9            MR. PLACITELLA:  No problem.
10           MR. BICKS:  Thank you.
11           MR. PLACITELLA:  We can sign
12      it during the break, so we don't
13      have to.
14           MR. BICKS:  But you've
15      already said it's been signed.
16           MS. O'DELL:  That's my
17      understanding.  I don't have a
18      copy with me.  If you want him to
19      sign it again.  I would just need
20      some help filling it out.
21           MR. PLACITELLA:  We can do
22      it now if you want.
23           MR. BICKS:  Let's go.  You
24      said it's already been signed.

John Hopkins, Ph.D.

1     MR. PLACITELLA:  Yeah, but
2     in case somebody made a mistake, I
3     don't want to have an issue.  So
4     if you want to take two minutes
5     and let him sign.
6          MR. KLATT:  Y'all agree that
7     he's bound by it.  As far as I'm
8     concerned, he can just produce one
9     at the next break.
10         MR. PLACITELLA:  All right.
11    But all I'm saying if there is a
12    mistake and he signed all the
13    state ones and not the federal
14    ones, I don't want to have an
15    issue.  If you want him to sign it
16    before we start, let him sign it.
17         MR. KLATT:  Look, your
18    counsel has represented that he
19    signed it.  Whether he has or not,
20    you all agree he's bound by it.  I
21    think we're good to go till the
22    next break.
23              -  -  -
24         THE VIDEOGRAPHER:  We are

John Hopkins, Ph.D.

1              now on the record.  My name is

2              Henry Marte.  I'm a videographer

3              with Golkow Litigation Services.

4                   Today's date is August 16,

5              2018.  And the time is 9:39 a.m.

6                   This videotaped deposition

7              is being held at 51 West 52nd

8              Street, New York, New York, in the

9              matter of talcum powder

10             litigation.

11                  The deponent today is John

12             Hopkins.

13                  All appearances will be

14             noted on the stenographic record.

15                  Will the court reporter

16             please administer the oath to the

17             witness.

18                   -   -   -

19                  ... JOHN HOPKINS, Ph.D.,

20             having been first duly sworn, was

21             examined and testified as follows:

22                   -   -   -

23                  EXAMINATION

24                   -   -   -

John Hopkins, Ph.D.

```
1    BY MR. PLACITELLA:

2          Q.    Good morning, Dr. Hopkins.

3          A.    Good morning.

4          Q.    Nice to see you again.

5                We're here for purposes of

6    your -- taking your deposition, you're --

7    have been designated as the corporate

8    representative of Johnson & Johnson in

9    these cases.

10               You're aware of that?

11         A.    I am indeed, yes.

12         Q.    Okay.  You have in front of

13   you a notice of deposition that was

14   served in this case and that you are

15   testifying pursuant to.

16               (Document marked for

17               identification as Exhibit

18               Hopkins-1.)

19   BY MR. PLACITELLA:

20         Q.    Do you want to show it to

21   your counsel?

22         A.    Yes, I have seen this.

23         Q.    Okay.  And you understand

24   that you're here to address the topics
```

John Hopkins, Ph.D.

1    that are listed in that notice?

2         A.    I do, yes.

3         Q.    Okay.  You understand that,

4    just to go brief -- go over briefly, in

5    this deposition you're here to address,

6    on behalf of Johnson & Johnson, the

7    composition of Johnson & Johnson's talcum

8    powder products, correct?

9         A.    Correct.

10        Q.    That would include the

11   identity of Johnson & Johnson's talcum

12   powder products, correct?

13        A.    Yes.

14        Q.    The formulas and composition

15   of Johnson & Johnson's talcum powder

16   products?

17        A.    Yes.

18        Q.    Correct?

19              The suppliers and mines that

20   are responsible for the Johnson & Johnson

21   talcum powder products, correct?

22        A.    Correct, yes.

23        Q.    You are here to testify

24   concerning the entities responsible for

John Hopkins, Ph.D.

1    the composition and purity testing and

2    standards relating to those products?

3            A.    Yes, correct.

4            Q.    The location and owner of

5    the talc lines that supply the J&J talc?

6            A.    Yes.

7            Q.    The talc composition and

8    purity testing and processing entities?

9            A.    Yes.

10           Q.    The allowable amounts of

11   non-talc constituents in J&J talcum

12   powder products?

13           A.    Yes.

14           Q.    The testing of talc intended

15   for use in the talcum powder products?

16           A.    Yes.

17           Q.    That would include

18   sensitivity and specificity testing?

19           A.    Yes.

20           Q.    The testing for asbestos and

21   other contaminants?

22           A.    Yes, correct.

23           Q.    The identity of testing

24   methodologies that were available, both

John Hopkins, Ph.D.

1    used and not used?

2            A.     Yes.

3            Q.     Testing protocols?

4            A.     Yes.

5            Q.     Testing performed by

6    nonparties at J&J's direction?

7            A.     Yes.

8            Q.     And the sampling and

9    protocols relating to the sampling of

10   those products, correct?

11           A.     Yes.

12           Q.     Now, you have been

13   designated as the person most qualified

14   to address those issues, correct?

15           A.     That is my understanding,

16   yes.

17           Q.     Okay.  Why are you the one

18   most qualified?

19           A.     I have a lot of experience

20   with Johnson & Johnson.  I joined the

21   company in 1976.  And was involved in

22   many aspects of what we've been talking

23   about for many, many years.

24           Q.     And what did you do to

John Hopkins, Ph.D.

1  prepare for today's deposition?

2          A.    I've read a significant

3  amount of documentation in the past week

4  and in the previous week.

5              In addition to that, I have

6  been involved in other litigation issues,

7  and I have read documentation for those

8  litigation issues in addition.

9          Q.    What specifically did you

10  review in preparation for this

11  deposition?

12          A.    I believe I've read pretty

13  well all of the documentation that would

14  support being able to give an answer to

15  each of those topics that you raised in

16  the last few minutes.

17          Q.    Okay.  And is there a

18  compendium of documents, a book of

19  documents that you looked at?

20          A.    I understand that all of the

21  documents that I've read are being

22  submitted to the court and have already

23  been made available to the court.

24          Q.    No, I understand that.  But

John Hopkins, Ph.D.

1    are the documents all gathered in one

2    place that you've taken a look at?

3              A.    Yes.

4              Q.    And where are they?

5              A.    I don't have them.  The

6    attorneys will have those.

7              Q.    Were they in a book, a

8    binder?

9              A.    A book -- a binder.

10             Q.    And what was it labeled?

11             A.    It was labeled with this --

12   with this heading for this litigation,

13   this deposition.

14             Q.    Okay.

15             MR. BICKS:  Counsel, I

16        think -- and you can tell me if I

17        have this wrong, the collection

18        and compendium of documents are

19        typically viewed as work product.

20             It's my understanding in

21        this court, and if I have an

22        incorrect understanding, I'd like

23        you to -- I'm happy to discuss

24        that with you.  But that's my

John Hopkins, Ph.D.

 1      typical understanding.  I can tell

 2      you that you're aware of all the

 3      documents and you have them.

 4  BY MR. PLACITELLA:

 5      Q.    Okay.  How many binders were

 6  there?

 7      A.    Four.

 8      Q.    All right.  Who did you

 9  speak with, other than counsel in order

10  to prepare for today's deposition?

11      A.    No one other than counsel

12  for this deposition.

13      Q.    Having had the opportunity

14  to review the documents that you thought

15  were important, what questions remain

16  unanswered in your mind that are the

17  subject of the notice of this deposition?

18          MR. BICKS:  No foundation.

19      Go ahead.

20          THE WITNESS:  I wasn't aware

21      there were new documents that I

22      had not seen before.  And I was

23      not aware of any issues that

24      have -- that remained unanswered.

John Hopkins, Ph.D.

```
 1    BY MR. PLACITELLA:
 2            Q.    Okay.  Now, you understand
 3    that we're here to find out what
 4    information Johnson & Johnson has or had
 5    relevant to the topics of this
 6    deposition, correct?
 7            A.    That's my understanding,
 8    yes.
 9            Q.    We would -- in this
10    deposition we'll be asking for -- we'd
11    want to know what the source of the
12    information is, correct?
13            A.    Yes.
14            Q.    Okay.  We would want to know
15    what specifically was related to Johnson
16    & Johnson or discussed by Johnson &
17    Johnson.  Do you understand that?
18            A.    I do.  Yes.
19            Q.    Okay.  And what we're
20    looking for here is what Johnson &
21    Johnson knew or was advised of and
22    whether you're aware of information that
23    supports that contemporaneously with
24    those advices.
```

John Hopkins, Ph.D.

1                    Do you understand that?

2          A.    I do, yes.

3          Q.    Do you understand that

4    you're not here as an expert witness,

5    correct?

6          A.    I do understand that, yes.

7          Q.    We're not looking for any

8    opinions from you.

9                    Do you understand that?

10         A.    I understand that, yes.

11         Q.    Okay.  We're not asking you

12   to interpret the information that we're

13   here to find out in terms of what was

14   related to or discussed at Johnson &

15   Johnson.

16                    Do you understand that?

17         A.    I do, yes.

18         Q.    Do you understand that we're

19   not here to debate the science and the

20   methodology of the testing that's

21   discussed, correct?

22         A.    Correct.  Yes.

23         Q.    Okay.  We're not here to

24   debate -- so I just want to make sure

John Hopkins, Ph.D.

1   we're all on the same page.

2          What we're here to find out

3   is what Johnson & Johnson knew and what

4   information you had that

5   contemporaneously supports that

6   information.

7          You got that?

8          A.    Okay.

9          MR. BICKS:   Counsel, I only

10          object in the sense that it's a

11          30(b)(6) deposition, and you

12          recited all the categories that

13          we're here to talk about.

14   BY MR. PLACITELLA:

15          Q.    Okay.  Now, you've testified

16   before in litigation involving Johnson &

17   Johnson talc and injuries related to that

18   talc, correct?

19          A.    Correct, yes.

20          Q.    How many times?

21          A.    In the past year including

22   deposition and trial witness, this would

23   be number eight.

24          Q.    And how many trials?  Am

John Hopkins, Ph.D.

```
1    I -- am I correct that it's three at this

2    point?

3            A.     This year?

4            Q.     Yes.

5            A.     Yes.

6            Q.     And have you covered in

7    those trials and the other depositions

8    any -- well, strike that.

9                   Is any of the topics that --

10                  MR. PLACITELLA:  God bless

11          you.

12   BY MR. PLACITELLA:

13          Q.     Any of the topics that you

14   were asked to address here today not

15   covered in your prior testimony?

16                  MR. BICKS:  Objection to the

17          form.

18                  THE WITNESS:  Yeah, it

19          depends on how we interpret what

20          you'd like me to talk about today.

21          Certainly some of the questions

22          that may be asked in previous

23          testimony may be phrased

24          differently.  But substantially,
```

John Hopkins, Ph.D.

1           we're talking about information

2           held in Johnson & Johnson's files.

3    BY MR. PLACITELLA:

4           Q.    Okay.  You understand that

5    in testifying today, your testimony will

6    bind Johnson & Johnson, correct?

7           A.    I understand that, yes.

8           Q.    You're like all the

9    executives at Johnson & Johnson rolled

10   into one?

11          A.    How nice.

12          Q.    Okay.  Now, you're currently

13   a resident of Great Britain?

14          A.    That is correct, yes.

15          Q.    Okay.  And you have never

16   been a U.S. citizen, correct?

17          A.    No.

18          Q.    Do you have a bachelor of

19   chemistry and biochemistry from the

20   University of Saint Andrews in Scotland?

21          A.    I do, yes.

22          Q.    And am I correct that you

23   started with Johnson & Johnson in the UK

24   in 1976?

John Hopkins, Ph.D.

1          A.     I did, yes.

2          Q.     And you kept that position

3   until 1994?

4          A.     Yes.

5          Q.     And during that time, you

6   worked in the medical department?

7          A.     Yes.

8          Q.     You worked in safety and

9   toxicology?

10         A.     Yes, I did.  Yes.

11         Q.     And you were head of R&D in

12  the UK for Johnson & Johnson?

13         A.     Up until '94, yes.  End of

14  '94, yes.

15         Q.     And in 1995 you came to the

16  United States?

17         A.     I did, yes.

18         Q.     And after you relocated to

19  the United States, you continued to work

20  for Johnson & Johnson?

21         A.     Yes, yes.  I was based in

22  the United States.

23         Q.     Okay.  And when you came to

24  the United States, you were responsible

John Hopkins, Ph.D.

1  for R&D for baby products worldwide; is

2  that fair?

3          A.    That is correct, yes.

4          Q.    And you left Johnson &

5  Johnson in 1998?

6          A.    No.  At the end of 1998, I

7  left the United States --

8          Q.    Okay.

9          A.    -- and I moved to Johnson &

10  Johnson France for 1999 until April, May

11  2000.

12          Q.    Okay.  And at that point in

13  time, you left the formal employ of

14  Johnson & Johnson?

15          A.    In April, May 2000.  Yes.

16          Q.    Now, after 2000 you remained

17  as a consultant to Johnson & Johnson

18  until approximately 2011?

19          A.    I didn't think it was as

20  late as 2011.  I think it was more like

21  2007, '8 I did some consulting work for

22  the European countries, yes.

23          Q.    So your consulting work for

24  Johnson & Johnson terminated in 2008?

John, Hopkins, Ph.D.

1      A.    Approximately, yes.  As I
2 recollect, yes.
3      Q.    During what period of time
4 did you work for Johnson & Johnson as a
5 litigation consultant concerning talc?
6      A.    I did -- it was a trial in
7 South Dakota in 2012.  That was -- that
8 was one I did there.  And then there have
9 been several since then.
10     Q.    Am I correct that you worked
11 on litigation related to talc from 19 --
12 for Johnson & Johnson from 1995 all the
13 way to the present?
14     A.    I have -- if I've been asked
15 for an opinion, a litigation opinion,
16 I've endeavored to provide that opinion,
17 yes.
18     Q.    Okay.  Now, you are not a
19 geologist, correct?
20     A.    That is correct.
21     Q.    You are not a microscopist.
22 You know what I mean by microscopist?
23     A.    Yes, I do.
24     Q.    What do I -- what is your

John Hopkins, Ph.D.

1    understanding?

2         A.    Someone who has hands-on

3    experience day after day with a

4    microscope.

5         Q.    And you've never looked at,

6    under a microscope, for -- at Johnson &

7    Johnson talc for contaminants, correct?

8         A.    Personally, no, I've not.

9         Q.    Okay.  One of the topics

10   that you're here to talk about are the

11   formulas as they relate to the Johnson &

12   Johnson baby power -- Baby Powder and

13   Shower to Shower products, correct?

14        A.    Yes.

15        Q.    Okay.  What's the difference

16   in your mind between a formula and a

17   specification as it relates to Johnson &

18   Johnson?

19        A.    Okay.  A formula describes

20   the components that go into a product.

21   So if you take Johnson's Baby Powder,

22   it's over 99 percent talc, and a little

23   bit of fragrance.  So that's the formula,

24   just two components.

John Hopkins, Ph.D.

1                Some formulas in some

2     products would have three or four

3     different ingredients.  There may be

4     cornstarch, baking soda, fragrance, et

5     cetera.

6                Specification describes the

7     properties of a product.  What it looks

8     like, smells like, feels like, are there

9     any microbes present.  It could measure

10    the properties such as any trace

11    elements.  So the specification lists

12    those points and sets a limit as to what

13    that quality of those products are.  So

14    the two are quite different.

15         Q.    And is it your understanding

16    now that Johnson & Johnson no longer

17    claims that the formulas for its Baby

18    Powder products or its products related

19    to Baby Powder are confidential?

20         A.    I have not seen any

21    documentation to say that they are or are

22    not.  Like I said, they are pretty simple

23    products.

24         Q.    Are you aware that you now

John Hopkins, Ph.D.

1   have on your website the declaration that

2   the formulas for the baby -- the products

3   from the Baby Powder company are no

4   longer considered confidential?

5        A.    I wasn't aware of that, but

6   I'll accept that.

7        Q.    We'll find it later and make

8   sure we're all on the same page.

9             Now, are the formulas for

10  the Johnson & Johnson Baby Powder and

11  Shower to Shower patented?

12       A.    No.

13       Q.    Okay.  And where are the

14  actual formulas stored?  Are there

15  formula cards for these products?

16       A.    The formula is part of a

17  manufacturing process.  If you have -- if

18  you're going to manufacture Baby Powder,

19  the people manufacturing it will have the

20  formulation, and they -- they're give

21  that information.  So it will be in the

22  manufacturing facility.  Obviously there

23  will also be copies in the research

24  facility.

John Hopkins, Ph.D.

1    Q.    Okay.  Have you actually
2  seen -- is it a formula card, is it --
3  what is it?
4    A.    I'm sure these days it's
5  electronic.
6    Q.    Okay.
7    A.    But there is a formula --
8  all products, whether it's baby lotion,
9  baby shampoo, they all have a formula.
10  And that formula is disclosed to the
11  manufacturing facility.  And copies are
12  held within the research facility in a
13  file.  Basically there's a file for baby
14  shampoo, file for baby bath, file for
15  Baby Powder.  So that file will hold the
16  formula.
17    Q.    And have you reviewed the
18  current formula for Baby Powder?
19    A.    I've seen the current
20  formula.  Yes.
21    Q.    And have you reviewed the
22  historical formulas for Baby Powder?
23    A.    I've -- I've seen a broad
24  overview of the historical formulas.

John Hopkins, Ph.D.

1   They have varied slightly over the years

2   with -- back in the 1920s, '30s, there

3   were -- various additives were included

4   and then excluded.

5          Q.    And is that all in one

6   place, all in one file, the historical

7   formulas for Baby Powder?

8          A.    I don't have the answer to

9   that question.  But certainly within the

10  company, there's -- there's a history of

11  formulations for Baby Powder, yes.  I

12  don't have that with me.

13         Q.    So who would I go to, if not

14  you, if I wanted to see all of the

15  historical formulas for Baby Powder?

16         A.    My advice would be to talk

17  to the current research facility who

18  would have at least an element of that,

19  and should have as much as possible.

20         Q.    And who would that person

21  be, the person in charge?

22         A.    It would be the research

23  manager of the baby products area.

24         Q.    And who is that?

John Hopkins, Ph.D.

1          A.    I don't know his or her name

2    today.

3          Q.    Okay.  And does the same

4    go -- is the same true for the Shower to

5    Shower product?

6          A.    Well, the Shower to Shower

7    brand was sold by the company a few years

8    back.  So my understanding would be that

9    the formulas and the information would

10   have gone to the new owner of that

11   business.  So I don't know whether that

12   information is still available in

13   Johnson & Johnson.

14         Q.    So you don't know whether

15   Johnson & Johnson maintains somewhere a

16   historical file all the formulas for

17   Shower to Shower that it sold?

18         A.    I don't -- I don't know

19   where they are, is what I'm saying, is

20   there was a file for the formula of

21   Shower to Shower.  There's no reason to

22   suspect that it's not available today.

23   It's a pretty simple product.  But it has

24   changed over the years.  Initially it was

John Hopkins, Ph.D.

1   just talc and fragrance.  And then it was

2   blended out with cornstarch and also

3   baking soda.

4        Q.    Okay.  And who would be the

5   person we would ask the question to,

6   where is that stuff?

7        A.    That information would be

8   held within the research facility at

9   Johnson & Johnson.

10       Q.    Okay.  Included in the

11  formula for Baby Powder and Shower to

12  Shower, is it my understanding that there

13  are fragrances?

14       A.    Yes.

15       Q.    Okay.  And are you aware

16  specifically of the chemical composition

17  of the fragrances historically for

18  these -- both of these products?

19       A.    That's -- a typical

20  fragrance comprises about 100 or even

21  slightly more different ingredients.

22  They're mostly obtained from botanical

23  extracts, flower extracts, et cetera.

24            That information is held in

John Hopkins, Ph.D.

1    confidence by the fragrance supplier.

2    That's not usually disclosed to Johnson &

3    Johnson.  The information is given to us,

4    this is fragrance P, whatever it may be.

5    It's given a reference ID, and that

6    information is held in confidence by the

7    supplier of the fragrance.

8         Q.    So who was the supplier of

9    the fragrances, to your knowledge, that

10   were used in Johnson & Johnson Baby

11   Powder historically?

12        A.    The suppliers over the years

13   have changed because they were usually

14   bought out by other major suppliers.

15             I believe, I'm not sure who

16   the current owner is.  But it --

17   certainly at one time it was a company

18   called Belmay.

19        Q.    But --

20        A.    Belmay, B-E-L-M-A-Y.  But I

21   think they were bought out by other

22   companies over the years.  And that

23   company was also bought out.  So I'm not

24   sure who the current supplier's name is.

John Hopkins, Ph.D.

1        Q.    Well, if we wanted to find

2   out who the supplier of the fragrances

3   were for the Johnson & Johnson Baby

4   Powder and the Shower to Shower product

5   historically, how would we find that out?

6        A.    Again --

7        Q.    Who would we ask?

8        A.    Again, same answer.  The

9   research facility would be expected to

10  have that information.  Okay.  You'd have

11  to go -- we'd have to go back to the

12  specification and details back to many,

13  many years.  But that information should

14  be held on file.

15       Q.    All right.  So what would I

16  ask for specifically, so when we go back

17  and do it, we don't make people do

18  unnecessary work?

19       A.    Well, what would you like to

20  know?

21       Q.    We would like to know who

22  the suppliers were of the fragrances that

23  were used in Johnson & Johnson Baby

24  Powder and Shower to Shower historically,

John Hopkins, Ph.D.

1    say from 1960 forward.

2         A.    Okay.  That -- simply just,

3    I would say, ask that question.  Who are

4    the suppliers or who were the suppliers

5    of the fragrances used in Baby Powder,

6    Shower to Shower from that period -- time

7    period forward.

8         Q.    Okay.  But I thought you

9    were the guy that I was supposed to ask

10   that question to.

11        A.    What I said to you was

12   that's not information I hold in my head.

13   I did give the name of one of the

14   suppliers of fragrance that I recollect.

15              But I'm also aware that, as

16   with many industries, our fragrance

17   suppliers are being bought by other

18   fragrance company, and another company

19   has bought them.  So I'm not quite sure

20   who is the current name of the

21   fragrance -- the fragrance -- same

22   fragrance generally, but from a different

23   owner.

24        Q.    Will you be able to make a

John Hopkins, Ph.D.

1    phone call or something overnight and get

2    that information, because you were the

3    guy that was supposed to bring it.

4                 MR. BICKS:  Can I -- just as

5          a matter of edification for me, I

6          gather there was some chart that

7          was under discussion or am I

8          mixing something up?

9                 MR. PLACITELLA:  You guys

10          were supposed to bring a chart.

11                 MR. BICKS:  And that was

12          supposed to be here today?

13                 MR. PLACITELLA:  That was my

14          understanding.

15                 MR. BICKS:  I didn't know

16          the timing.

17                 MS. MALIK:  I think that was

18          already produced.

19                 MR. BICKS:  I'll check on

20          the chart.  I don't --

21                 MR. PLACITELLA:  I mean, I

22          don't want to belabor it.  We can

23          come back to it tomorrow.

24                 MR. BICKS:  Right.

John Hopkins, Ph.D.

1          MR. PLACITELLA:  But I

2      thought he was here to tell us who

3      the suppliers of the fragrances

4      were.

5          THE WITNESS:  I've given you

6      one name.  But like I say, the

7      fragrance suppliers tend to be

8      bought out by other larger

9      companies over the years.

10 BY MR. PLACITELLA:

11      Q.   I know, but you don't

12 actually know who to ask.  I was supposed

13 to ask you.  There's supposed to be a

14 chart.  I'm kind of lost.

15      A.   I know.  What --

16      Q.   Give me some guidance.

17      A.   What I'm saying is that

18 we'll ask the attorneys if they will ask

19 the R&D folks for that information.

20      Q.   Okay.  Now, you indicated

21 that the actual chemical formula of the

22 fragrances was something that was never

23 disclosed to Johnson & Johnson.  Is that

24 a fair statement?

John Hopkins, Ph.D.

1        A.    That's a fair statement.

2   And that's -- that applies to any

3   product, whether it's an adult shampoo or

4   an adult body wash.  The fragrance is

5   proprietary information to the fragrance

6   company.

7        Q.    But you said that that could

8   be made up of up to how many chemicals?

9        A.    Typically, a good fragrance

10  is typically 100 or more different

11  ingredients.

12       Q.    Well, who tests the

13  fragrance to make sure it's safe to use

14  on people?

15       A.    People, okay.  Simple answer

16  there is that there are two aspects of

17  that.  One, the fragrance company, and

18  there are about 3,000 different

19  ingredients that fragrance companies can

20  use to create a fragrance.  That's why,

21  you know, your aftershave smells

22  different than your wife's cologne.  They

23  use different ingredients.

24              The testing is done based on

John Hopkins, Ph.D.

1    an approved list of about 3,000

2    ingredients.  And that list of approved

3    ingredients is from a group called the

4    International Fragrance Research

5    Association, IFRA.  And they set

6    standards.  They set a limit as to what

7    can be used, where it can be used.  They

8    have different categories for fragrance

9    that are used on the face, the body,

10   rinse-off products.  And so a fragrance

11   house or fragrance company can create a

12   fragrance that meets that standard.

13             Then once the product is

14   received by a company like Johnson &

15   Johnson, Johnson & Johnson would then do

16   additional studies.  You'd look at

17   checking that the fragrance didn't cause

18   skin irritation, skin sensitization,

19   allergy studies.  So they'd be done on

20   the fragrance in the product.

21        Q.    So I just want to be clear.

22   Johnson & Johnson puts into its products

23   chemicals that it has no idea what the

24   chemical composition is?

John Hopkins, Ph.D.

1        A.     That's not entirely true.
2   The fragrance is tested by the fragrance
3   house and Johnson & Johnson.
4              I said that there is a list
5   of 3,000 -- approximately 3,000
6   ingredients that are -- we're fully aware
7   of the safety of those ingredients.
8   They've been evaluated in extensive
9   clinical studies, animal studies, to
10  ensure that they are safe and they meet
11  all the legal requirements by the
12  international fragrance research
13  association, IFRA.
14             So we know what the 3,000
15  are.  We can -- we can look at that list.
16  That list is available from the
17  International Fragrance Research
18  Association.
19      Q.     But you put in the product
20  specifically a group of chemicals, and
21  you do not know what those chemicals are
22  specifically, correct?
23      A.     I'm not aware that the
24  company has ever broken down the

John Hopkins, Ph.D.

1   constituents of that 100, or whatever it

2   may be, different ingredients.  As I say,

3   the majority are created from flower

4   extracts, botanical extracts.  And that's

5   well established as to what they are.

6   They're natural materials.

7             And they're the same type of

8   ingredients that go into the shampoos and

9   body washes that we all in this room use

10  every day, underarm deodorants or

11  colognes.  They're all the same kind of

12  ingredients used in different ratios to

13  get a different fragrance.

14       Q.    Well, are the testing for

15  the fragrances done one at a time or in

16  combination?  How is it tested?

17       A.    The testing is done on each

18  of the ingredients one at a time, as you

19  say.

20            So for example, if there

21  were a lemon extract, that's being tested

22  in extensive studies in humans, animal

23  studies, patch tests, photology studies.

24  So those are one at a time, yes.

John, Hopkins, Ph.D.

1      Q.    But you don't know what --

2   if they're never tested when you put one

3   chemical with the other, they don't test

4   to see what the interaction is between

5   the chemicals?

6      A.    No, you -- let's go back a

7   step.  When a fragrance house creates a

8   fragrance with a blend of maybe 100

9   different ingredients, that fragrance

10  house formulates their product in a way

11  that is specified by the International

12  Fragrance Research Association to ensure

13  that the product is safe.  They are the

14  experts in safety -- creating safe

15  products.

16     Q.    So Johnson & Johnson Baby

17  Powder, is there lemon extract in there?

18     A.    Not in the Baby Powder.  I'm

19  pretty sure there is not in the Baby

20  Powder.  I just used that as an example.

21     Q.    Is there -- so what

22  chemicals are in the fragrances that are

23  in the Baby Powder?

24     A.    There are extracts of

John Hopkins, Ph.D.

1  certain flowers that -- like lavender,

2  for example, one way you could -- if

3  you've got a lavender fragrance, you

4  might have a little bit of lavender

5  extract.  There could be extracts of

6  other botanical plants.

7      Q.    So you gave me lavender.

8  What's the other 99?

9      A.    As I said, that is

10  confidential with the fragrance company.

11  That is, the only way we find that out is

12  to -- two things:  One, in theory, I

13  suppose is that you could break it down

14  and get an understanding of that from

15  very sophisticated studies; or you would

16  have to get that from the fragrance

17  company.

18          But it's not something that

19  Johnson & Johnson holds.  The fragrance

20  company supplies the fragrance that meets

21  the regulatory guidelines for a safe

22  fragrance.

23      Q.    When they -- when you say

24  "safe fragrance," have they tested it for

John Hopkins, Ph.D.

1    carcinogenicity on an long-term basis

2    with an appropriate latency period, all

3    100 chemicals that go into the fragrance?

4         A.    The fragrance, as I said --

5    I'll go back again.  The fragrance

6    ingredients, there are 3,000 that are

7    approved.  That approval is based on the

8    safety of each of ingredients.  That will

9    include extensive testing for allergy,

10   irritation, systemic testing.

11        There's a phenomenal amount

12   of work that goes on within the fragrance

13   industry to ensure that the products are

14   safe.

15        Q.    Okay.  What was my question?

16        A.    You asked had they tested

17   for carcinogenicity.

18        Q.    All right.  And what's the

19   answer?

20        A.    And I said, well, that is

21   something that the fragrance companies

22   would have tested to their own protocols.

23   And I don't know what tests they've done

24   for each and every 3,000 ingredients.

John Hopkins, Ph.D.

1   But their approval is based on their

2   toxicologists stating they are safe based

3   on the data that they have.

4        Q.   So you don't know as you sit

5   here today -- you cannot testify under

6   oath that the chemicals that are used in

7   the fragrances used in the Baby Powder

8   and Johnson & Johnson Shower to Shower

9   were tested for carcinogenicity?  You

10  can't testify to that under oath,

11  correct?

12       A.   Correct.

13       Q.   Okay.  Now -- and does the

14  consumer know that Johnson & Johnson has

15  no idea what chemicals it's putting in

16  its Baby Powder in order to make them

17  just smell good?

18            MR. SILVER:  Objection to

19       form.

20            MR. BICKS:  Argumentive.

21  BY MR. PLACITELLA:

22       Q.   Do you have information from

23  anything that you've looked at to

24  indicate that the consumer has ever been

John Hopkins, Ph.D.

```
 1   advised that Johnson & Johnson has no
 2   idea what specific chemicals are being
 3   put into the Baby Powder or Shower to
 4   Shower to make them smell good?
 5             MR. SILVER:  Object to the
 6        form.
 7             MR. BICKS:  Object to the
 8        form.
 9             THE WITNESS:  I'd refute the
10        point to say that they have no
11        idea.
12             The understanding I have is
13        that with a typical fragrance, you
14        have what's called a certain note,
15        a woody note or a floral note, et
16        cetera.
17             And certainly the fragrance
18        houses will tell you some of the
19        main ingredients that give you
20        that particular note, that
21        particular -- for example, there's
22        a chemical found in a number of
23        floral extracts, called Hedione or
24        Hedione, H-E-D-I-O-N-E.  And I
```

John Hopkins, Ph.D.

1       know that's in -- certainly in

2       some of Johnson's baby products,

3       is a part of the fragrance.

4              So we're aware that there

5       are certain fragrance which are in

6       the formula.  I don't know every

7       one of the 100 and whatever it may

8       be.

9              But certainly we're aware of

10      the type of fragrance note that

11      gives you the baby-type smell.

12  BY MR. PLACITELLA:

13      Q.    Well, assuming -- and --

14  well, I'll get to it later so we don't

15  have to hold things up.

16             MR. PLACITELLA:  Can you

17      give me Exhibit 69.

18             (Document marked for

19      identification as Exhibit

20      J&J-69.)

21  BY MR. PLACITELLA:

22      Q.    I'll give you what's been

23  marked Exhibit 69.

24             (Whereupon, a discussion was

John Hopkins, Ph.D.

1       held off the record.)

2           THE VIDEOGRAPHER:  The time

3       is 10:15 a.m.  We are going off

4       the record.

5           (Short break.)

6           MR. SILVER:  During the

7       break, two more individuals that

8       are not counsel have entered the

9       room.  I'd like their names put on

10      the record for their appearance.

11         DR. EGILMAN:  Triet Tram and

12      Alicia Rocha.

13         MR. SILVER:  And I need a

14      representation of who these

15      individuals are.

16         MS. PARFITT:  I understand

17      that they are research assistants

18      for Dr. Egilman.

19         MR. SILVER:  Imerys'

20      objection is continuing and

21      ongoing as to the presence of

22      these two individuals.  Again,

23      it's J&J's dep.  So we're not

24      going to -- to let it go on.  But

John, Hopkins, Ph.D.

1       again, we believe it's a

2       continuing violation of CMO 11 in

3       that we believe that the PSC needs

4       our consent for it to go forward.

5            That being said, do I have a

6       representation from the PSC that,

7       if they have not at the moment,

8       they are going to sign the

9       confidentiality order?

10           MS. PARFITT:  My

11      understanding is they are signing

12      it momentarily.  We're having to

13      print it out.

14           MR. PLACITELLA:  I'm not

15      going to let them sit here until

16      they sign it.

17           MR. SILVER:  If they are

18      going to sign it, I'm not

19      really --

20           MR. PLACITELLA:  I

21      understand your point.  I

22      understand your point.

23           MR. SILVER:  With that,

24      Imerys has made its record.

John Hopkins, Ph.D.

1           MR. LOCKE:  PCPC joins in

2      Imerys's objection.

3           THE VIDEOGRAPHER:  The time

4      is 10:20 a.m.  Back on the record.

5  BY MR. PLACITELLA:

6      Q.   All right.  You have in

7  front of you Exhibit 69, which I put up

8  on the screen so everybody can see it.

9           It is the Johnson & Johnson

10  Baby Powder Formula Number 499, Fact Book

11  Supplement dated July 1974.

12           Do you see that?

13      A.   I do, yes.

14      Q.   And you've seen this before,

15  correct?

16      A.   Yes.

17      Q.   What is a fact book as it

18  relates to a formula, to your knowledge?

19      A.   Well, the fact book, there

20  are many different kinds of fact book.

21  As this -- it relates to this one,

22  relates to -- this is a supplement to the

23  main fact book.  The fact book itself is

24  a story of formula.  It's how it's

John, Hopkins, Ph.D.

1    developed, research, testing.  It would

2    probably include safety testing, et

3    cetera.  So all that gets put into a fact

4    book, so it's all available in one place

5    at one time.

6                This is a supplement

7    relating to a project which, as I read

8    this, is a process to clean the talc via

9    flotation.

10        Q.    Okay.  So when I did a

11   search of the database, I'm not saying

12   that I'm the best at this, but I didn't

13   see the original fact book.  Have you

14   ever seen the fact book for Formula 499

15   which is the -- for Johnson Baby Powder?

16                MR. BICKS:  Objection to the

17        form.

18                THE WITNESS:  No, I've not

19        particularly seen the original

20        fact book.  This is a supplement

21        to the fact book.

22   BY MR. PLACITELLA:

23        Q.    Right.  So there must be

24   something that came before it, correct?

John Hopkins, Ph.D.

1         A.     Well, that's speculation.
2    But it's likely, yes.
3         Q.     Okay.  So it's likely
4    speculation?
5         A.     Yes.
6         Q.     So in preparation for in
7    your deposition and all the times that
8    you've ever testified, you've never seen
9    the actual fact book related to the
10   formulas for the Baby Powder?
11              MR. BICKS:  Foundation.
12              THE WITNESS:  No, that's not
13         true.  I've seen fact books for
14         Baby Powder.  You asked me about
15         this one with a reference to
16         Formula 499.  But like I say, I
17         couldn't put my finger on 499.
18         But there is certainly a fact book
19         for Johnson's Baby Powder.
20   BY MR. PLACITELLA:
21         Q.     And you've seen that?
22         A.     I have seen that when I was
23   based here in New -- in New Jersey.
24         Q.     So when is the last time

John Hopkins, Ph.D.

1    that you saw that fact book?

2         A.     When I was based in New

3    Jersey in 1998.

4              MR. PLACITELLA:  Now, this

5         fact book supplement, to the

6         extent that it has not been

7         produced, and I haven't seen it, I

8         would make a request for the fact

9         book that's been identified by the

10        witness.

11   BY MR. PLACITELLA:

12        Q.     This is for Formula 499,

13   correct?

14        A.     Yes.

15        Q.     How many different formulas

16   was there for Johnson's Baby Powder?  I

17   thought 499 was the formula number.

18        A.     That was the designation in

19   1974.  Yes.  Yes.

20        Q.     Okay.  And had it changed

21   over time, the number?

22        A.     I don't believe the formula

23   has changed since 1974.  It's -- there

24   may have been very slight changes to the

John Hopkins, Ph.D.

1  perfume over the years.  There can be

2  very slight changes.  But it's

3  essentially a blend of over 99 percent

4  talc and a little bit of fragrance.

5      Q.    But Formula 499 is the

6  formula designation for Johnson's Baby

7  Powder, correct?

8      A.    It is in -- in this document

9  dated 1974, yes.

10      Q.    Was it ever known by some

11  other number?

12      A.    I don't have the answer to

13  that, because the product has been on the

14  market since 1920s.  There have been a

15  Johnson's Baby Powder on the market since

16  the 1920s.  And in some of those early

17  formulas, there were additional

18  ingredients back in the 1920s, boric

19  acid.  There was a small amount of boric

20  acid.

21          There has also been at times

22  a small amount of a -- what's called a

23  free float agent to stop the talc from

24  clogging in the holes in the -- in the

John Hopkins, Ph.D.

1    bottle.   Sodium sesquicitrate which has

2    been used at some time or another.   So

3    there have been minor changes.   And when

4    you make a minor change, you give a

5    different formula reference.

6              Q.    So the number changes?

7              A.    The number would change,

8    yes.

9              Q.    So where would I go to find

10   all the formula numbers for Baby Powder

11   or Shower to Shower and the fact books

12   related to those numbers?

13             MR. BICKS:   No foundation.

14        Go ahead.

15             THE WITNESS:   I can only say

16        that the first port of call to ask

17        the question -- whether they are

18        instantly available, I do not

19        know -- would be the research

20        group.   And whether they go back

21        to 1926, I would speculate

22        possibly may -- may not.

23   BY MR. PLACITELLA:

24             Q.    How far back do they go?   Do

John Hopkins, Ph.D.

1    you know?

2         A.    I don't know how far the

3    fact books go back, no.

4         Q.    And is that something that

5    we can figure out today or tomorrow.  Can

6    you make a phone call?

7         A.    I don't have the answer to

8    that.  I don't know.

9         Q.    Okay.  What is typically

10   included in a fact book as it relates to

11   the formulas for the products that we're

12   here to address?

13            MR. BICKS:  No foundation.

14        Go ahead.

15            THE WITNESS:  A typical fact

16        book would include the formula,

17        the percentages of each of the

18        ingredients.  It would describe

19        what the ingredients were, where

20        they were sourced from, who the

21        supplier was, fragrance supplier,

22        et cetera.

23            It would describe at least

24        the basis of how products were

John Hopkins, Ph.D.

1          mixed together.  It would describe

2          the specification or

3          specifications, color, appearance,

4          odor, the content of various

5          impurities, et cetera.

6               So those would all be listed

7          as part of the fact book.  The

8          fact book would also give an

9          indication of any safety testing

10         on -- or clinical testing on the

11         finished formula.

12              And so that's -- that's all

13         part of the story of the product

14         that's put together into a fact

15         book.

16    BY MR. PLACITELLA:

17         Q.   So if I wanted to know the

18    real story of the product, it would be

19    essential for me to see the fact book,

20    correct?

21              MR. BICKS:  Objection to the

22         form.

23              THE WITNESS:  The story of a

24         product is in the fact book.

John Hopkins, Ph.D.

1           MR. PLACITELLA:  Okay.  Can

2      you guys tell me, have you ever

3      produced the fact books for the

4      Johnson & Johnson Baby Powder or

5      Shower to Shower?  I haven't seen

6      them.  I'm not saying you haven't.

7      But I've done a pretty exhaustive

8      search.  Can you tell me whether

9      you've ever produced them?

10          MR. BICKS:  I can't speak to

11     the well over millions of pages of

12     documents that have been produced.

13          MR. PLACITELLA:  Yeah, but

14     this is not some pages of

15     document.  This is the

16     quintessential document that gives

17     the history of the product.

18          Can we, during a break,

19     figure out whether we were ever

20     given the fact books and if you

21     can produce them here.

22          MR. BICKS:  We'll figure out

23     whether that's something that we

24     can do.  But as you know, there's

John Hopkins, Ph.D.

1          masses of materials that you all

2          have, and combing through is a

3          very --

4                    MR. PLACITELLA:  If you

5          can -- if you can tell me what the

6          Bates number is for the fact book,

7          we'll go find it.  But I spent a

8          couple hours searching through the

9          database, and I couldn't find it.

10                   That doesn't mean that I'm

11         good at it.  But I would --

12                   What are you -- what are you

13         laughing at?

14                   But that's something that I

15         think we need to get to.  All

16         right.

17  BY MR. PLACITELLA:

18         Q.    So let me ask you about this

19  supplement to the fact book.

20                   If I go to the Bates Number

21  9324.  I'll blow it up for you.  It gives

22  me all of the people who are involved in

23  this supplement, correct?

24         A.    Yes.

John Hopkins, Ph.D.

1    Q.    Okay.  And --

2    A.    The people who are copied in

3  on it, yes.

4    Q.    Right.  And these are all

5  the top people involved in the testing

6  for the Johnson's Baby Powder in 1974, or

7  most of the top people?

8    A.    They were key people in the

9  research department in 1974.  Yes.

10   Q.    Okay.  And it says all these

11  people have copies -- got copies of this

12  fact book supplement.

13        Do you see that?

14   A.    It does say that.  Yes.

15   Q.    And it also says that the

16  fact book supplement went to a central

17  file.

18        Do you see that?

19   A.    That's what is written, yes.

20   Q.    Where was that central file

21  kept?

22   A.    In 1974, that was in New

23  Brunswick in the research department in

24  New Brunswick.

John Hopkins, Ph.D.

1          Q.    Okay.  The -- now, I notice

2    that, if you look down at the bottom,

3    this actually has an Imerys Bates stamp.

4    So it doesn't look like we got it from

5    you.  So did you give the fact book to

6    your suppliers as well?

7               MR. BICKS:  Did we what?

8    BY MR. PLACITELLA:

9          Q.    When you put together the

10   fact book, did you distribute it to your

11   suppliers?

12         A.    No.  No.  Imerys was not a

13   supplier in 1974.

14         Q.    Do you have any idea how

15   Imerys got your fact book?

16         A.    No.

17         Q.    Okay.  Now, in the fact book

18   supplement on 9327, there is a formula.

19               Do you see that?  I put it

20   up on the screen.

21         A.    Yes.

22         Q.    It says, "Windsor" --

23   "Ingredients:  Windsor 66 talc."  And it

24   gives a percentage by weight.

John Hopkins, Ph.D.

1          Do you see that?

2     A.    I see that, yes.

3     Q.    And it also lists Synfleur

4  Perfume P.

5          Do you see that?

6     A.    Yes, Perfume P.  Yes.

7     Q.    Okay.  And who is the

8  supplier of Synfleur Perfume P, if you

9  know?

10     A.    In 1974 it could have -- I

11  think there was a company called

12  Synfleur.  Yes.

13     Q.    Okay.  And what went into

14  Synfleur Perfume P?

15     A.    That's what we talked about

16  a few minutes ago.  As I said, a typical

17  fragrance, and it's not radically changed

18  in many, many years, is a blend of a

19  significant number of extracts from

20  flowers, plant extracts, and they're put

21  together by the fragrance company to

22  create the fragrance that people

23  recognize as Johnson's Baby Powder

24  fragrance.

John Hopkins, Ph.D.

1          Q.    So as you sit here today,

2     you cannot tell me, based upon records

3     that you've reviewed, what chemicals went

4     into Synfleur Perfume P in 1974, correct?

5               MR. BICKS:  Objection.  No

6          foundation.

7               THE WITNESS:  No.  As I said

8          a few minutes ago, that

9          information is held as

10         confidence -- in confidence by the

11         fragrance supplier.

12    BY MR. PLACITELLA:

13         Q.    Okay.  What testing did

14    Johnson & Johnson do in 1974 to make sure

15    that the chemicals in Synfleur Perfume P

16    could not cause cancer?

17         A.    You don't have to do testing

18    to ensure that it won't cause cancer.

19    The fragrance supplier uses an approved

20    list of materials which have been shown

21    to be safe, both systemically and to the

22    skin, to the dermis, to avoid skin

23    irritation and sensitization and to avoid

24    chemicals that are regarded as likely to

John, Hopkins, Ph.D.

1  cause cancer.

2       Q.    So the answer to my -- I'll

3  ask the question a different -- a

4  different way.

5            Johnson & Johnson did not do

6  any testing in 1974 to determine whether

7  the chemicals used in Synfleur Perfume P

8  contained -- were carcinogenic, correct?

9       A.    Johnson & Johnson did not,

10 no.  That was the responsibility of the

11 fragrance supplier.  And at that time

12 there were, and still are, tests that

13 will predict whether a material will

14 cause cancer.  They're called

15 genotoxicity tests.  And they are part of

16 the test program that are used by

17 fragrance suppliers when they're

18 evaluating raw materials.

19      Q.    Johnson & Johnson did no

20 tests to determine whether the chemicals

21 that were part of the perfume from 1974

22 forward could cause cancer, correct?

23      A.    Johnson & Johnson did not.

24 It was the responsibility of the

John Hopkins, Ph.D.

1   fragrance company to ensure that that

2   standard was met.

3           Q.    But doesn't -- in terms of

4   safety, doesn't the buck stop with

5   Johnson & Johnson, Dr. Hopkins?

6           A.    You're asking me to

7   speculate.  And what I'm saying is that

8   as far as safety is concerned, the

9   fragrance house, the fragrance company,

10  has the responsibility to provide a safe

11  fragrance.

12          Q.    I'm not asking you to

13  speculate.  Doesn't the buck, in terms of

14  safety of the product that's being sold

15  by Johnson & Johnson, stop with Johnson &

16  Johnson?

17                MR. BICKS:  Objection to the

18          form.

19                THE WITNESS:  Again, it's an

20          odd question.

21                The responsibility for

22          safety is Johnson & Johnson's.

23          And they will achieve that role by

24          talking with the supplier and

John Hopkins, Ph.D.

1            ensuring that the supplier sends

2            or provides a fragrance that is

3            safe and suitable for its end use.

4    BY MR. PLACITELLA:

5            Q.    Did Johnson & Johnson get

6    letters from -- or certifications from

7    its suppliers indicating that the

8    chemicals that were used in the perfumes

9    for its Baby Powders had passed

10    carcinogenic testing?

11            A.    I don't know the answer to

12    that question.

13            Q.    How would we find that out?

14            A.    Again, I don't know how you

15    would find that out.

16                What I'm saying though,

17    again, is the fragrance company has the

18    role and responsibility to provide

19    fragrances that are safe.  And that role

20    is handed to the fragrance company and

21    then they provide a fragrance that is

22    safe for its end use.

23            Q.    So the safety of your

24    product is only as good as the fragrance

John Hopkins, Ph.D.

1      company that you select?

2                  MR. BICKS:  Objection to the

3            form.

4                  THE WITNESS:  Again, the

5            fragrance companies, they all

6            operate to a standard.  The IFRA

7            standard, International Fragrance

8            Research Association standard.

9                  And that standard requires

10           that for each of the ingredients

11           that are composed in a fragrance,

12           they meet certain safety

13           standards, minimum safety

14           standards to ensure that the

15           fragrance ingredient is not

16           harmful.

17     BY MR. PLACITELLA:

18           Q.    Well, did you ever visit the

19     laboratories of the fragrance companies

20     to see that they were actually doing the

21     testing correctly?

22           A.    I personally have not

23     visited the labs of the fragrance

24     companies.

John Hopkins, Ph.D.

1      Q.    What about Johnson &

2  Johnson, did they do any due diligence to

3  make sure that the fragrance companies

4  were conducting the appropriate testing

5  or did they just take their word for it,

6  that they were testing whatever they were

7  supposed to test?

8      A.    You're using the word

9  testing.  Let me be clear.  It is not

10  normal to test each and every fragrance

11  every time.

12           If you are operating from a

13  palate of say 3,000 ingredients, those

14  ingredients have already been evaluated

15  by the International Fragrance Research

16  Association, IFRA, to ensure that they

17  are safe.  The fragrance company can then

18  use those ingredients to the permitted

19  amounts to create a safe fragrance.  You

20  don't need to test them again.  They've

21  already been tested.

22      Q.    And IFRA is a trade group?

23      A.    IFRA is a trade group.  And

24  it takes its information from RIFM,

John Hopkins, Ph.D.

1    R-I-F-M, which is the Research Institute

2    For Fragrance Materials.  And that group

3    is supported by the fragrance industry.

4              And they spend millions

5    every year to do safety testing on each

6    of those ingredients.

7         Q.    Is Johnson & Johnson part of

8    that trade group?

9         A.    To my knowledge it's not

10   part of RIFM, no.  It's a fragrance

11   companies group.

12        Q.    So Johnson & Johnson relies

13   upon the supplier who they can't identify

14   as they sit here today who relies upon a

15   trade group that Johnson & Johnson is not

16   a part of, and that's how they know the

17   products that are used and their products

18   are safe.  That's what you're saying?

19             MR. BICKS:  Objection to the

20        form.

21             THE WITNESS:  I think you

22        are misconstruing and

23        misrepresenting.  I'm going to say

24        it again, if I may, is that the --

John Hopkins, Ph.D.

```
 1              each of those ingredients that go
 2              in to make a fragrance has been
 3              independently evaluated by the
 4              Research Institute on Fragrance
 5              Materials.  And they will approve
 6              the use of each of those fragrance
 7              ingredients to be used by a
 8              fragrance manufacturing company to
 9              create a fragrance that is safe.
10    BY MR. PLACITELLA:
11              Q.    In the formula, you don't
12    seem -- you don't list anywhere particle
13    size.  Is that listed somewhere else in
14    the fact book?
15              A.    Particle size of what?  The
16    talc?
17              Q.    Yes.
18              A.    The specification for the
19    talc would include what's called a mesh
20    size.  I need to look at this book again.
21    Mesh size relates to the ability of the
22    talc to pass through a certain mesh.  And
23    that limits the size.
24              Q.    Okay.  So the size of the
```

John Hopkins, Ph.D.

1   particles is not part of the formula.

2   That's something that goes in a

3   specification?  Is that your testimony?

4        A.   It's part of the

5   specification for the talc, the raw

6   material talc, yes.

7        Q.   Now, in this, under the name

8   Johnson & Johnson -- Johnson's Baby

9   Powder, you have an asterisk.  Do you

10  know what that asterisk is for?

11       A.   Yes.  It's something the

12  company -- the corporation uses, and has

13  done right up until today.  It just

14  indicates that it's trademarked.  It

15  means that other companies cannot use the

16  word Johnson's, if it's got the asterisk

17  there.  It's trademarked.

18            (Document marked for

19       identification as Exhibit

20       J&J-207.)

21  BY MR. PLACITELLA:

22       Q.   I'm going to show you what's

23  been marked 207.

24            MR. SILVER:  Do you have

John Hopkins, Ph.D.

1          copies?

2                    MR. PLACITELLA:  No.  But

3          I'll put it up.

4    BY MR. PLACITELLA:

5          Q.    You've seen 207 before?

6          A.    Yes.

7          Q.    What is it?

8          A.    It's a document describing

9    the process specification for a new

10   Shower to Shower medicated formula.  It's

11   a variant on Shower to Shower.  It's

12   dated '94, '95.

13         Q.    And if you go to the Bates

14   Number 57835, which I put up on the

15   screen, it lists the quantitative

16   formula.

17                    Do you see that?

18         A.    Yes, I do see that.  Yes.

19                    MR. SILVER:  Since there's

20         no copies, can you -- and pursuant

21         to the protocol, just read into

22         the record the first Bates number

23         on the first page?

24                    MR. PLACITELLA:  Sure.  The

John Hopkins, Ph.D.

1        first Bates number would be 833.

2                MR. SILVER:  Can you read

3        the full one in just -- into the

4        record, or I'll do it.  JNJ --

5                MR. PLACITELLA:

6        JNJ000057834.

7                MR. SILVER:  Thank you.

8    BY MR. PLACITELLA:

9        Q.    Okay.  So this lists the

10   ingredients for Shower to Shower?

11       A.    It lists the ingredients for

12   Shower to Shower Formula 2118-114.

13       Q.    Did that formula ever change

14   to your knowledge?

15       A.    It has changed over the

16   years, yes.

17       Q.    Okay.  And was there a fact

18   book for the Shower to Shower formula as

19   well, similar to the Baby Powder?

20       A.    That is my understanding,

21   yes.

22               MR. PLACITELLA:  Again, I

23       make the request for the fact

24       books related to the Shower to

John Hopkins, Ph.D.

1        Shower.

2   BY MR. PLACITELLA:

3        Q.    It lists here in Item Number

4   5, Fragrance Creation L94-173.

5              Do you see that?

6        A.    Yes, I do.

7        Q.    Who is the supplier for

8   fragrance creation L94-173?

9        A.    I think the name gives it

10  away.  I believe Creation Aromatique,

11  which is a fragrance company.

12       Q.    Okay.  And they are located

13  where?

14       A.    They have a U.S. office.

15  I'm not sure where it is.

16       Q.    And for how long or during

17  what period of time were they the

18  supplier of the fragrance for Shower to

19  Shower, if you know?

20       A.    I don't know.

21       Q.    Okay.  Would all this

22  information be in the fact book?

23       A.    I would expect it to be.

24       Q.    Okay.  Now, and if I asked

John Hopkins, Ph.D.

1   you all the same questions here about the

2   fragrance that I asked you about the Baby

3   Powder, your answers would be the same?

4        A.    Yes.

5        Q.    Okay.  I'm going to change

6   gears now.  I want to talk to you about

7   the supply of the talc for use in the

8   Johnson & Johnson's Baby Powder and

9   Shower to Shower.  Okay?

10       A.    Yes.

11       Q.    Okay.  Now, as a compliment

12  to Mr. Bicks, I put up his slide from a

13  recent trial.

14            Have you ever seen this

15  slide before?

16       A.    Yes.

17       Q.    And do you see the slide is

18  entitled "Cosmetic Talc Mining Sources

19  For Johnson & Johnson"?

20            Do you see that?

21       A.    Yes.

22       Q.    And listed are three

23  sources:  Windsor, Vermont --

24            I have a copy if you want

John Hopkins, Ph.D.

```
 1   it.

 2              MR. PLACITELLA:   I marked it

 3        at 158.

 4              (Document marked for

 5        identification as Exhibit

 6        J&J-158.)

 7   BY MR. PLACITELLA:

 8        Q.    1964 to 2003.

 9              Val Chisone, Italy, 1926 to

10   1973.  And I'm not going to butcher the

11   name of China.

12              What's that town?

13        A.    Guangxi.

14        Q.    Thank you.  China, 2003 to

15   the present, correct?

16        A.    Yes.

17        Q.    Now, that's a general

18   statement, correct, that there are

19   nuances to that supply, right?

20        A.    Yes.

21              MR. PLACITELLA:  Okay.  So

22        can you give me 241.

23              (Document marked for

24        identification as Exhibit
```

John Hopkins, Ph.D.

1        J&J-241.)

2    BY MR. PLACITELLA:

3        Q.    I'm going to show you --

4    Exhibit 241 is a set of interrogatory

5    answers from Johnson & Johnson in

6    Middlesex County.

7              Do you see that?

8              I'm going to go to one

9    specific answer, which is Answer Number

10   83, and I've tabbed it for you.  And I've

11   put it up on the screen so we're all on

12   the same page.

13       A.    Yes.

14       Q.    In this interrogatory

15   answer, Johnson & Johnson provides what

16   it believes were the source, the specific

17   source of talc for Johnson's Baby Powder.

18   Do you see that?

19       A.    Yes.

20       Q.    And it gives the mine and

21   the supplier, correct?

22       A.    It does, yes.

23       Q.    Does this accurately

24   reflect -- accurately reflect what your

John, Hopkins, Ph.D.

1   understanding is concerning the sources

2   from 1946 to 1992?

3          A.     We're talking about the

4   table, are we?

5          Q.     Yes.

6          A.     Yes, I believe that is

7   correct.  Yes.

8          Q.     Okay.  And then I'm just

9   going to go to the next page.

10          The next page lists the

11   sources from 1992 to the present,

12   correct?

13          A.     It lists sources, yes.  The

14   only comment that I would make is that my

15   understanding is that on the 2003-2009,

16   as far as the United States is concerned,

17   my understanding is that only the Zhizhua

18   quarry supplied to the United States.

19   Some of those other quarries are approved

20   by Luzenac and may be used -- may have

21   been used by other overseas J&J

22   affiliates.  But my understanding is that

23   as far as the United States is concerned,

24   that 2003 issue is the Zhizhua quarry.

John Hopkins, Ph.D.

1          Q.    I'm going to give you an A

2    for pronunciation no matter what happens

3    in this deposition.

4               The -- so --

5               MR. BICKS:  I don't think

6          it's -- and you'll know, but I

7          think the time frames have been

8          divided up on some of these topics

9          with Mr. Hicks, I think, who

10         covered all the China.

11              MR. PLACITELLA:  I'm not

12         going into -- 2006 is where I'm --

13         I'll stop for today.

14   BY MR. PLACITELLA:

15         Q.    So let's just -- for the

16   record, because if someone is reading

17   this, they are not going to be able to

18   see the chart.  So why don't you just go

19   through quickly what the chart reflects

20   in terms of time frame and supplier, for

21   the record?

22              MR. BICKS:  You want him to

23         read the chart?

24              THE WITNESS:  You want me to

John Hopkins, Ph.D.

1           read the chart?

2     BY MR. PLACITELLA:

3           Q.    If you can.

4           A.    1946 to 1964, it was from

5     the Val Chisone mine in Italy, Italian

6     00000 grade.  And supplier to the U.S.

7     agent was Charles Mathieu.

8                 1964 to 1966, it was the

9     beginning of the Hammondsville, Vermont

10    mine and the supplier was Eastern

11    Magnesia Talc Company.  And that was

12    running in parallel with the Italian Val

13    Chisone source as the new mine was being

14    phased in.  So they were running two

15    together.  Sometimes there's a blend.

16                By 1966 onwards to 1979, it

17    was the Hammondsville mine, again

18    supplied by Windsor Minerals, because

19    that was the new owner.

20                1976 to '79, again,

21    Hammondsville was supplying it to J&J by

22    Windsor Minerals.

23                In 1980 it was mostly

24    supplied by the Hammondsville mine,

John Hopkins, Ph.D.

1    Windsor Minerals.  But because there was
2    a mine strike in the end of
3    December-January-February time period,
4    '79-'80, a small quantity of the Italian
5    talc was brought in to supplement the
6    stocks.
7                   And then back in 1981 to
8    1988, it was the Hammondsville mine in
9    Vermont, supplied by Windsor Minerals.
10                  1989 to 1990 it was the
11   Hammondsville mine.  And the supplier
12   there is Cyprus Minerals, who took
13   ownership at that point.  And they also
14   used the Argonaut and the Rainbow mine at
15   some point.
16                  And likewise 1990 to 1992,
17   Cyprus Minerals, the Hammondsville mine,
18   the Argonaut and a little bit of Rainbow.
19   But because Hammondsville was pretty well
20   worked out, it was the introduction of
21   the Hamm mine in that time period.
22                  And then turning over to
23   1992 to 2000, again Hammondsville,
24   Argonaut, Rainbow, and the Hamm mine, and

John Hopkins, Ph.D.

1    supplier there is Luzenac who took over

2    ownership from Cyprus Minerals.

3              2000 to 2001, the Argonaut

4    mine, the Rainbow mine, and the Hamm

5    mine.  Again the supplier, Luzenac.

6              2001 to 2002 and 2002 to

7    2003, it's the Argonaut mine.  Supplier

8    is Luzenac.

9         Q.    Now, in terms of the Val

10   Chisone, the Italian mines, do you know

11   what mill was used for the talc that came

12   out of that mine?

13        A.    Would you --

14        Q.    Where it was processed?

15        A.    Oh, where it was processed.

16   It was processed, actually at the Fontane

17   mine, the mill was at the Fontane mine.

18   And that was where it was processed and

19   bagged for shipment.

20        Q.    Okay.  And do you know

21   specifically for the Val Chisone mines,

22   what shafts were being used during the

23   period of time that Val Chisone was the

24   supplier for the Johnson's Baby Powder?

John Hopkins, Ph.D.

1          A.    I don't know the names of

2     the shafts, no.

3          Q.    Where -- do you have any

4     idea where we could get that information?

5     Well, let me ask a question.  Maybe it's

6     not as important.  Is the geology pretty

7     much all the same between the shafts so

8     that we don't have to really be

9     concerned?

10         A.    That is my understanding,

11    yes.  I mean, we go back to Professor

12    Pooley who did a thorough interrogative

13    review of that mine.  He spent several

14    days down that mine back as far back as

15    in 1971, '72.  He wrote up a big story of

16    the geology of that mine or that mining

17    area.  And we know that it is a very

18    clean mine, and it doesn't change, at

19    least the area where it's been mined for

20    the last many, many decades.  It is

21    pretty well the same.

22         Q.    So for example, if they did

23    a test in one shaft and they found X

24    results, you could pretty much say, well,

John Hopkins, Ph.D.

1    that would be indicative of what would go

2    on in the another -- in the other shafts

3    in the same mine; is that fair?

4              MR. BICKS:  Objection to the

5         form.

6              THE WITNESS:  Again, I'm not

7         a mining engineer or a geologist.

8         My understanding of the geology is

9         that it is pretty well the same in

10        that area in that Fontane mine.

11   BY MR. PLACITELLA:

12        Q.    Now, in terms of the Vermont

13   mines, other than the time that Eastern

14   Magnesia owned the mines, those mines

15   were all ultimately owned by Johnson &

16   Johnson correct?

17        A.    They were -- they were owned

18   by a subsidiary company of Johnson &

19   Johnson, called Windsor Minerals.

20        Q.    And where was the talc

21   processed for the Vermont mines for

22   Johnson's Baby Powder?

23        A.    There was a mill, a talc

24   mill at the Hammondsville -- at the

John Hopkins, Ph.D.

1  Hammondsville facility, yes.

2        Q.    And it was always

3  Hammondsville?

4        A.    That is my understanding,

5  yes.

6        Q.    Okay.  Did the Hammondsville

7  mine, the Hammondsville -- scratch that.

8            Did the Windsor mill process

9  both commercial and cosmetic talc at the

10 same time?

11       A.    At the same time?  What do

12 you mean by at the same time?

13       Q.    During the same time

14 periods?

15       A.    The industrial talc has been

16 processed in the Hammondsville mill.  Not

17 at the same time.  But it has been

18 processed at different times.  Yes.

19       Q.    Did it use the same

20 equipment?

21       A.    I don't have the answer to

22 that.  I don't know.

23       Q.    Now, in your prior

24 deposition with Mr. Panatier -- do you

John Hopkins, Ph.D.

1    remember him?

2         A.    Yes.

3         Q.    You probably can't forget

4    him, right?

5         A.    I got on okay with

6    Mr. Panatier.

7         Q.    Okay.  You had a discussion

8    with Mr. Panatier about the Johnson mine

9    that was owned by Eastern Magnesia.

10              Do you recall that?

11        A.    Yes, it was owned by Eastern

12   Magnesia, yes.

13        Q.    And you told Mr. Panatier

14   that it was a serpentine mine that was

15   owned by Eastern Magnesia for a few

16   years.  Do you recall that?

17        A.    I believe that is the case,

18   yes.

19        Q.    Okay.  And that in the

20   Johnson mine they had a higher level of

21   amphiboles than in the Hammondsville

22   mine; is that fair?

23        A.    That is -- that is my

24   recollection, yes.

John Hopkins, Ph.D.

```
 1            Q.    Now, for a short period of

 2    time, do you understand that the Johnson

 3    mine was actually supplying talc for

 4    cosmetic Baby Powder?

 5            A.    That's not my understanding,

 6    no.

 7                  MR. PLACITELLA:  Can you

 8            give me Exhibit 4.

 9                  (Document marked for

10            identification as Exhibit

11            J&J-4.)

12                  (Document marked for

13            identification as Exhibit

14            Hopkins-2.)

15    BY MR. PLACITELLA:

16            Q.    I'll show you what's been

17    marked as Exhibit 4.

18                  MR. PLACITELLA:  I know I'm

19            going to be asked what's the first

20            page on the Bates number.

21                  I'll tell that you.  It's

22            JNJH29W_000003709.  So the first

23            one will be 3708.

24    BY MR. PLACITELLA:
```

John Hopkins, Ph.D.

1          Q.    But I'm focusing on 3709.

2    Do you see where it says, "Eastern

3    Magnesia Talc Company, a Johnson &

4    Johnson company"?

5               Do you see that?

6          A.    That's what it says in the

7    top line, yes.

8          Q.    Okay.  Do you see where it

9    says, "Application:  As a base for

10   perfumed baby powder, dusting powder foot

11   powder and pressed cake, packed face

12   powder."

13              Do you see that?

14         A.    Yes, you've read what was

15   written.  Yes.

16         Q.    Okay.  And did you

17   understand that the word EMTal stands

18   store Eastern Magnesia Talc Company?

19         A.    I do, yes.

20         Q.    Do you see on the bottom it

21   says, "EMTal is for cosmetics"?  And it

22   says, "The following grades priced f.o.b.

23   the Vermont plants are sold in the

24   cosmetic industry"?

John Hopkins, Ph.D.

1           Do you see that?

2      A.    It does say they are sold in

3  the cosmetic industry, yes.

4      Q.    All right.  Do you see where

5  it says -- and it has the EMTal, and it

6  has the number.

7           Do you see that?

8      A.    Yes.

9      Q.    It lists Windsor, West

10  Windsor as the plant?

11     A.    Yes.

12     Q.    And it also lists Johnson

13  Vermont as a plant.

14          Do you see that?

15     A.    It does, yes.

16     Q.    And it gives the Johnson --

17  it gives the EMTal number for the Johnson

18  Vermont used for Baby Powder as 500 and

19  549.

20          Do you see that?

21     A.    It does, yes.

22     Q.    Okay.  And if you go to the

23  next page, if you go to Page 3 where it

24  talks about tomorrow's market.

John Hopkins, Ph.D.

1          Do you see that?

2     A.    Yes.

3     Q.    On the bottom under 5, it

4 says, "EMTCO," which is Eastern Magnesia

5 Talc Company, "working to replace Johnson

6 EMTals with West Windsor EMTals when and

7 if Johnson cosmetic grades are eliminated

8 due to arsenic content."

9          Do you see that?

10    A.    You read what was written.

11 Yes.

12    Q.    So is today the first time

13 you learned that the Johnson mine

14 actually supplied cosmetic talc for

15 Johnson & Johnson for a short period of

16 time?

17         MR. BICKS:  Objection.  No

18    foundation.

19         THE WITNESS:  My

20    understanding is that the Johnson

21    mine never supplied cosmetic talc

22    for Johnson's Baby Powder.

23 BY MR. PLACITELLA:

24    Q.    That's not what this

John Hopkins, Ph.D.

1    document says, though, is it?

2         A.    I don't see anywhere where

3    it says that Johnson's Baby Powder is

4    supplied from this Johnson mine.

5         Q.    All right.  Do you see if we

6    go backwards where it says, "Application:

7    B, as a base for Baby Powder"?

8         A.    Again, this is a

9    hypothetical document.  It's saying we

10   have this cosmetic industry, and we have

11   talc which has an application, a

12   potential application, I would read that,

13   as a base for Baby Powder.

14              There's no -- there's no

15   date on this as to when this was.  So...

16        Q.    And it says -- it doesn't

17   say hypothetically, right?  It says, this

18   is a Johnson & Johnson document.  "The

19   following grades priced f.o.b. the

20   Vermont plants are sold in the cosmetic

21   industry," correct?

22        A.    It says they're sold in the

23   cosmetic industry.  But nowhere does it

24   say that they are sold as Johnson's Baby

John Hopkins, Ph.D.

1   Powder.

2          Q.    Okay.  Well, we would know

3   that if we had the fact book going back

4   that far, right?

5          A.    What we do know is that

6   the -- part of the talc in Baby Powder in

7   1964 was the phase-in of the Italian talc

8   on the talc from the Hammondsville mine.

9   There's no -- absolutely no evidence that

10  Johnson's Baby Powder ever used talc from

11  a Johnson mine.

12         Q.    Well, you are saying no

13  evidence, but here is evidence.

14         A.    No, it isn't.

15               This says that someone is

16  proposing that an application could be

17  used as a base for baby powder.  There's

18  nowhere that it was ever used in any of

19  the specifications.

20         Q.    Just so -- just so -- so I

21  don't want to quarrel with you about

22  this.  Just so the record is clear, this

23  talks about an application for baby

24  powder and that the Johnson Vermont talc

John Hopkins, Ph.D.

```
1   is being sold to the cosmetic industry in
2   the very same document, correct?
3        A.    It says it's being sold
4   as -- someone has written that it's a
5   potential, I read that as potential, they
6   use the word potential in 4 above.  Item
7   1-4.  So it just says it's possible
8   application in baby powder.  Nowhere does
9   it say it's Johnson's powder.
10       Q.    Okay.  So --
11       A.    The company supplied talc,
12  both industrial and cosmetic talc, to
13  other suppliers, in particular industry
14  talc.
15       Q.    So Johnson & Johnson owns a
16  mine that's -- and they sell baby powder
17  and they're selling their talc to others
18  who are making baby powder?  That's what
19  you're saying?
20       A.    No.  Nowhere does this say
21  we're actually selling it as baby powder.
22  They're saying that this is -- this is a
23  review document.  It talks about the
24  potential market share, how many tons are
```

John Hopkins, Ph.D.

1    available, what the EMTal -- EMTCO's

2    shipments or how many plants they've got,

3    and it talks about the business and the

4    business, saying we have the talc, which

5    an application is a base for perfumed

6    baby powder.

7              It doesn't say that they're

8    actually selling it as that.  They're

9    saying it's an application.

10             MR. BICKS:  For purposes of

11        accuracy, because I think you

12        know, but I think that if you ask,

13        the Johnson mine, I think was only

14        owned by Johnson & Johnson for a

15        very, very brief period of time.

16        So it's important to keep track of

17        the time frame here.

18             MR. PLACITELLA:  So how

19        would you like to testify?

20             MR. BICKS:  I'm trying to

21        help you out for accuracy because

22        I assume you know this.

23             MR. PLACITELLA:  I know a

24        little bit about the Johnson mine.

John Hopkins, Ph.D.

1    BY MR. PLACITELLA:

2         Q.    So you know -- who is Roger

3    Miller?

4         A.    He was president of Windsor

5    Minerals, the company that owned the

6    mine, the Hammondsville mine.

7         Q.    And you know that he

8    testified under oath while he was working

9    for Johnson & Johnson that the Johnson

10   mine sold cosmetic grade talc, correct?

11        A.    I didn't know that.  But I

12   believe you if you tell me.

13        Q.    Okay.  Do I need to show it

14   to you?

15        A.    No, I believe you.  I said

16   that.  I believe if Roger Miller made a

17   statement, then he made a statement.

18             MR. PLACITELLA:  Okay.  Can

19        you give me 213.

20             (Document marked for

21        identification as Exhibit

22        J&J-213.)

23   BY MR. PLACITELLA:

24        Q.    By the way, I want to focus

John Hopkins, Ph.D.

1  now a little bit on the Hammondsville

2  mine.  Okay.  There's no question that

3  that was used for cosmetics, correct?

4       A.    That's correct.  That was

5  used to suppliers cosmetics, yes.

6       Q.    And you'll remember the last

7  time we were here together we went

8  through that before it became the

9  Hammondsville mine it was actually known

10 as the Reading Asbestos and Talc Mine?

11 Remember that?

12      A.    I wasn't aware of that, no,

13 no.

14      Q.    Do you remember -- you

15 testified about that last time?

16      A.    I do not recollect

17 testifying that it was an asbestos mine,

18 no.

19      Q.    Okay.  You don't recall you

20 and I spending some time going over that

21 the last time we were together?

22      A.    I do not recollect

23 describing it as a Reading Asbestos mine.

24           MR. BICKS:  How are you

John Hopkins, Ph.D.

1          holding up?

2               THE WITNESS:  What time is

3          it?

4               MR. PLACITELLA:  Do you want

5          to take a break?  Totally up to

6          you.  Do you want to take five?

7          Your stamina is great.

8               THE WITNESS:  We'll go to

9          half past.  We'll go to 11:30.

10    BY MR. PLACITELLA:

11         Q.    Exhibit 213 is a January 31,

12    1996 memo entitled "Pilot Flotation Study

13    on Argonaut Ore on West Windsor."

14               Do you see that?

15         A.    Yes.

16         Q.    Okay.  And I'm going to

17    refer you to Bates Number 6749.  That

18    states that, "In 1989/90 the plant

19    replaced its existing conventional

20    multi-cell flotation system with three

21    stages of column flotation."  It said it

22    never worked.  It goes on to say, "Then

23    in 1990/91 the Hammondsville mine ran out

24    of ore and was completely replaced by the

John Hopkins, Ph.D.

1   Hamm mine."

2            Is that consistent with your

3   understanding?

4        A.    Yes.

5        Q.    Okay.  And of course you

6   know that they were having an arsenic

7   problem during this period of time,

8   correct?

9        A.    Who is "they"?

10       Q.    People running the Hamm

11  mine.

12            MR. BICKS:  Objection to the

13       form.

14            THE WITNESS:  It says in the

15       next sentence that there was --

16       arsenic was worse.  Yes, they were

17       having to avoid the arsenic areas,

18       certainly.

19            MR. PLACITELLA:  Now, can

20       you give me 121.

21            (Document marked for

22       identification as Exhibit

23       J&J-121.)

24  BY MR. PLACITELLA:

John Hopkins, Ph.D.

1          Q.    J&J-121 is a July 16, 1976,
2    memo from Alan Marks to Mr. Marshall.
3    Who is Mr. Marks, if you know?
4          A.    I believe he was the
5    marketing manager on the business side.
6          Q.    Okay.  And does this
7    document indicate that in 1976 the
8    Argonaut mine was approved as an
9    alternate source for Johnson's Baby
10   Powder?
11              MR. BICKS:  Objection.  No
12         foundation.
13              THE WITNESS:  Talc from the
14         Argonaut mine was approved as an
15         alternative source, yes.
16   BY MR. PLACITELLA:
17         Q.    In 1976?
18         A.    It had been approved, and it
19   was parked, if you like, because there's
20   plenty of mine supply from the
21   Hammondsville mine.
22         Q.    And this Argonaut mine was
23   used for cosmetics, will you agree?
24         A.    Argonaut talc has been used

John Hopkins, Ph.D.

```
 1    for cosmetics, yes.  In '75 onwards.

 2                 MR. PLACITELLA:  Can you

 3         give me 201.

 4                 (Document marked for

 5         identification as Exhibit

 6         J&J-201.)

 7    BY MR. PLACITELLA:

 8         Q.    201 is the specification for

 9    Grade 66 for Cyprus Windsor Minerals

10    Corporation.

11                 Do you see that?

12         A.    Yes.

13         Q.    Okay.  And if you go to

14    Bates Number 441.  I think I tagged it

15    for you to make it easy.

16         A.    Yes.

17         Q.    That indicates that as of

18    the time this document in 1992 was

19    written, that the following mines are

20    qualified and approved to provide ore for

21    Grade 66 talc.  And it lists the

22    Hammondsville mine, the Argonaut mine,

23    the Rainbow mine, and the Hamm mine

24    correct?
```

John Hopkins, Ph.D.

1          A.    You read what was written.

2                MR. PLACITELLA:  Give me

3          211.

4                (Document marked for

5          identification as Exhibit

6          J&J-211.)

7    BY MR. PLACITELLA:

8          Q.    J&J-211 is dated January 5,

9    1996.  You've seen this before, correct?

10   It's a letter to Carol Wilkes of

11   Johnson & Johnson?

12         A.    Yes.  I have seen this, yes.

13         Q.    And if you go to Bates

14   Number 598, it also discusses the fact

15   that the Argonaut mine was qualified by

16   J&J to supply cosmetic talcum powder in

17   1975, correct?

18         A.    That's what is written, yes.

19         Q.    And contained in this is a

20   July 17, 1995 letter.  Do you see that?

21   It's the -- the Bates number is cut off

22   at the bottom.  But it's a letter to a

23   Doug Baker from Johnson & Johnson.

24                Do you see that?

John Hopkins, Ph.D.

1        A.    Yes, I do.  Yes.

2        Q.    Okay.  And as of this point

3   in time, it indicates that Johnson &

4   Johnson has signed off on Argonaut

5   providing 50 percent of the talc used for

6   Johnson immediately, correct?

7        A.    Yes.  That's what's written.

8        Q.    And is it your understanding

9   that by 2000, the Hammondsville mine had

10  totally run out of ore?

11       A.    It hadn't actually run out.

12  It was liable to flooding, and so it

13  was -- it wasn't being used.

14            MR. PLACITELLA:  That's 222.

15  BY MR. PLACITELLA:

16       Q.    Now, for the mines that were

17  owned in Vermont that were owned by

18  Johnson & Johnson, have you ever seen any

19  of the drill core logs.  Do you know what

20  a drill core log is?

21       A.    Yes, I do.

22       Q.    What is that?

23       A.    Well, it's a -- well, a

24  drill core is where you take a diamond

John Hopkins, Ph.D.

1  drill and drill down into the ground to

2  look at the quality of the material that

3  you're going to be mining so you know

4  where to go and where to avoid.  And so

5  the geologist can identify where the talc

6  is and where it isn't.

7       Q.    Okay.  And have you seen

8  drill core logs or have you reviewed

9  drill core logs for all of the mines that

10 were owned by Johnson & Johnson?

11      A.    I have seen drill core logs.

12 I'm not sure I've seen all of them.

13 Probably certainly not seen all of them.

14 That's the responsibility of the

15 geologist to define where the talc is and

16 where it isn't.  And from that data, you

17 can then move forward to mine good

18 quality talc.  But I have seen drill core

19 logs, yes.

20      Q.    Do you know whether the

21 drill core logs were all stored in the

22 same place for all the mines that Johnson

23 & Johnson owned?

24      A.    I don't know where they were

John Hopkins, Ph.D.

1    stored.  I do not know that, the answer

2    to that.

3           Q.    Do you know whether

4    Johnson & Johnson still has the drill

5    core logs for the various mines that it

6    owned historically?

7           A.    My understanding is that

8    the -- all that information would have

9    been passed over to Cyprus Minerals who

10   purchased the mining area in that time

11   frame, 1979, '80.

12          Q.    So Johnson & Johnson did not

13   retain any of that information?  They

14   just handed it all over?

15          A.    It became part of the sale

16   of the mine along with the mine logs.

17                MR. BICKS:  He said '79,

18          '80.  I think he -- '89.

19                THE WITNESS:  Sorry, '89.

20          Yeah.

21   BY MR. PLACITELLA:

22          Q.    That's fine.  What about

23   the -- what's a mineralogic map?

24          A.    Mineralogic map is something

John Hopkins, Ph.D.

1    that you can create once you've got your

2    information from the diamond core drills,

3    you can find out where certain minerals

4    are and where you can avoid certain areas

5    and where, basically if you're looking

6    for talc, you look for where the talc is

7    and where -- where it isn't.

8           Q.    Okay.  Did Johnson & Johnson

9    maintain mineralogic maps for the mines

10   that it owned historically?

11          A.    My understanding, that that

12   was the outcome of the core drilling.

13   You'd then be able to create a

14   mineralogic map, yes.

15          Q.    Whose responsibility was it

16   to maintain those maps at Johnson &

17   Johnson?

18          A.    The maps were part of the

19   mining operation in Vermont.  And they

20   were -- would be the responsibility of

21   the mine operators, which I said was run

22   as a separate operating company.  Windsor

23   Minerals Inc. was a separate subsidiary.

24   Although owned by Johnson & Johnson, it

John Hopkins, Ph.D.

1   was a separate company.

2          Q.     Were copies of those maps

3   provided to Johnson & Johnson?

4          A.     I personally have not seen

5   copies of those maps.  Like I say, the

6   responsibility for mining and going to

7   the mining areas where you're looking for

8   talc is the responsibility of the mining

9   company.  And that would -- that should

10  be with the mining company.

11         Q.     So Johnson & Johnson has

12  never had possession, physical possession

13  of those maps.  Is that what you're

14  saying?

15         A.     I don't know the answer to

16  that question, whether they had some of

17  the maps or were able to obtain some.

18  But they're very much part of Windsor

19  Minerals' property, that they would have

20  that, because if you were mining in an

21  area in another state -- I mean, Vermont

22  is quite some distance away from New

23  Jersey -- then that's where you'd expect

24  to have that information.

John Hopkins, Ph.D.

1    Q.    Have you ever seen the
2  mineralogic maps yourself?
3    A.    I have not seen -- I have
4  seen a mineralogic map, one or two of
5  these.  I reviewed them this past week.
6  I think I've seen certainly one.  But for
7  the main mines, no, I have not.
8    Q.    When you say main mines,
9  what do you mean by that?
10    A.    Well, you mentioned the
11  mine -- the Hamm mine, the Argonaut mine,
12  the Hammondsville mine, the Rainbow mine.
13  Those -- those would be part of the
14  mining operation.
15    Q.    Before we break, just going
16  back to the Johnson mine, you know that
17  the Johnson mine was owned by Johnson &
18  Johnson, correct, at one point in time?
19    A.    It was probably the Eastern
20  Magnesia Talc Company, and Johnson owned
21  that for a very short period of time.  I
22  don't know if it was months.  I believe
23  it was months, but not for a long period
24  of time.

John Hopkins, Ph.D.

1      Q.    Why did they get rid of that

2   mine?

3      A.    I don't know.  I do not want

4   to speculate.  It was something going

5   back, I don't know, 50 years now.

6      Q.    I'm just asking if you know.

7      A.    I do not know, no.

8            MR. PLACITELLA:  Okay.  This

9       would be a good time if you want.

10           MR. BICKS:  Okay.

11           THE VIDEOGRAPHER:  All

12      right.  Stand by.  Remove your

13      microphones.  The time is

14      11:23 a.m.  Going off the record.

15           (Short break.)

16           THE VIDEOGRAPHER:  Okay.  We

17      are back on the record.  The time

18      is 11:43 a.m.

19           MR. BICKS:  Before we start

20      Mr. Placitella, let me just let

21      you know that during this short

22      period of time in response to your

23      comments about this fact book, I

24      believe that certain fact books

John Hopkins, Ph.D.

1    have been produced to you and we

2    will try to make a good faith

3    effort to try to help you find

4    materials that I think you have

5    access to.

6           But I can tell you that just

7    very quickly doing very basic

8    computer searches, that we

9    identified materials that I think

10   are the ones that you were

11   alluding to.

12          MR. PLACITELLA:  I wasn't

13   saying that anyone was holding

14   anything back.  I just couldn't

15   find it.  So if you give me the

16   fact books, then I'll ask him

17   questions about it.

18          MR. BICKS:  Right.  I wanted

19   to respond to that, because there

20   is a question whether you had

21   them, whether they were produced.

22          MR. PLACITELLA:  Yeah, I

23   couldn't find them.  That's all.

24          MR. BICKS:  Right, right.

John Hopkins, Ph.D.

1          MR. PLACITELLA:  So whatever

2      you have, you can bring it.

3          MR. BICKS:  I wanted to let

4      you know that.

5          MR. PLACITELLA:  I

6      appreciate that.

7          Okay.  Let me know.  We're

8      ready.

9          THE VIDEOGRAPHER:  We're on

10      the record.

11          MR. PLACITELLA:  We're

12      ready?  Oh, we're on the record.

13      Okay.

14  BY MR. PLACITELLA:

15      Q.    I wrote down some names of

16  things I found in documents.  The first

17  name is benzyl acetate.  Do you know what

18  that is?

19      A.    It's a chemical, yes.

20      Q.    And by trade, you're a

21  toxicologist?

22      A.    Yes.

23      Q.    Okay.  Do you know whether

24  benzyl acetate has ever been incriminated

John Hopkins, Ph.D.

1  as a carcinogen?

2       A.    I know that benzyl acetate

3  is a food flavor material.  It's approved

4  for food flavors.  I'm not aware that

5  it's ever been listed is as a carcinogen.

6  But it's certainly -- it's used as food

7  flavoring.

8       Q.    So you don't know whether it

9  was -- do you know whether it was listed

10  as a known or suspected carcinogen?

11       A.    Well, if it's approved as a

12  food ingredient, a food flavor for candy

13  or what have you, then it's highly,

14  highly unlikely that it would be

15  implicated as a carcinogen.

16       Q.    Do you know whether that

17  product was ever used in Johnson's Baby

18  Powder?

19       A.    Well, again, the answer is

20  that without having a disclosure of the

21  fragrance, I do not know.  You've listed

22  an ingredient which is used in flavors.

23  It's used in fragrances.  It's used in

24  foods and candies and things like that.

John, Hopkins, Ph.D.

1         So it gets used -- but

2    whether it was ever in Johnson Baby

3    Powder fragrance.

4         Q.    What candies, because I'm

5    not going to eat them anymore?  Do you

6    know what candy?

7         A.    I don't.  It is approved as

8    a food ingredient, food flavor.

9         Q.    I don't want my kids eating

10   that.  The next document, the next name,

11   by the way is what?

12        A.    It says benzaldehyde.

13        Q.    What's that?

14        A.    Again, that's another

15   chemical -- it's one that smells and

16   tastes of almonds.  It's the almond smell

17   basically.  It's an almond smell.  Again,

18   that's -- that is used in food flavoring

19   as well.

20        Q.    And do you know if that's

21   ever been incriminated as a known or

22   suspected carcinogen?

23        A.    Again, if it's approved in

24   food flavorings, then the intention must

John Hopkins, Ph.D.

1  be that it was never regarded as a

2  carcinogen.  It is a food flavoring

3  ingredient.  So it should not be.  You

4  would not -- the agencies that approve

5  food flavorings are not going to approve

6  carcinogens.

7          Q.    That's okay.  You can eat

8  that stuff.

9          A.    The science of toxicology

10  relates to how much dose.  There are

11  many, many ingredients that are hazardous

12  at high levels, and at safe levels, the

13  body metabolizes them, excretes them, and

14  they're safe.  So it all depends on dose.

15          Q.    Just yes or no.  Has this

16  chemical ever been incriminated as a

17  known or suspected carcinogen, if you

18  know?

19              MR. LOCKE:  Objection.

20              THE WITNESS:  Again, I don't

21          have that information in front of

22          me.  I'm not aware that it has.

23          But I don't have that information

24          to give you 100 percent definitive

John Hopkins, Ph.D.

```
1              answer.
2    BY MR. PLACITELLA:
3         Q.    All right.  So if for
4    example your supplier was giving you that
5    and they were keeping it secret from you,
6    you wouldn't know that?
7              MR. BICKS:  Objection to the
8         form.
9              THE WITNESS:  Again, you're
10        asking me to speculate.  What I've
11        said is that when a supplier
12        provides a fragrance, the supplier
13        does so from a list of fragrance
14        ingredients that are recognized as
15        safe.  They use that as a basis to
16        move ahead and formulate their
17        fragrance --
18   BY MR. PLACITELLA:
19        Q.    Well, whose --
20        A.     -- using it as a fragrance.
21        Q.    Just so we're clear,
22   recognized as safe from their own trade
23   association?
24        A.    No. There is a --
```

John, Hopkins, Ph.D.

1        Q.    Correct?

2        A.    No.  There's a designation,

3   GRAS, generally recognized as safe.  And

4   that designation is given by the EEA.  It

5   comes under auspices of the Food and Drug

6   Administration for many ingredients, many

7   flavors.  Specifically, its GRAS

8   status -- GRAS status.  So --

9        Q.    So it's your testimony that

10  these two chemicals that we've gone

11  through so far have been recognized by

12  the FDA as safe?

13       A.    No, that's not my testimony

14  at all.  Without doing extensive research

15  into looking at the safety profile of

16  those ingredients and where they're used

17  and how they are used, I couldn't answer

18  that question.

19       Q.    Okay.

20       A.    Again, it's speculative.

21  And without having done the extensive

22  research to look at -- I mean, there are

23  three thousand different fragrance

24  ingredients.  I could not remember every

John Hopkins, Ph.D.

1    single toxicology profile that's ever --

2          Q.    I'm not asking you to, sir.

3    I want to know what you know, or what J&J

4    knows.

5                The next chemical, what's

6    that?

7          A.    Citral.

8          Q.    What is that?

9          A.    Citral is a simple chemical.

10   It's main constituent of oranges and

11   lemons.  It's certainly an orange peel

12   lemon peel.  Again, that's widely used in

13   candy flavors, food flavors.  It's a

14   simple naturally occurring molecule.

15         Q.    Do you know whether that's

16   ever been incriminated as a known or

17   suspected carcinogen at any level?

18         A.    I do not know if it has been

19   implicated as a known carcinogen.  It

20   is -- again, it is -- we eat it every

21   day.  If you eat jam or marmalade made

22   from oranges, then you're eating quite a

23   lot of citral.

24         Q.    Okay.  I'm learning

John Hopkins, Ph.D.

1  something.  I'm going to change my diet

2  after this dep.  Coumarin, what is that?

3          A.    Coumarin is -- again,

4  it's -- it is a flavor.  It has a

5  particular note that's used in some

6  flavors and fragrance.

7          Q.    Has it ever been implicated

8  as a known or suspected carcinogen?

9          A.    I don't believe coumarin

10  has.  There are derivatives of coumarin.

11  I think one is 7-hydroxy-coumarin, which

12  is a suspect material.  But coumarin is

13  used in fragrance, and it's used in

14  flavors.

15          Q.    Okay.  The next one, give me

16  the right pronunciation.

17          A.    Limonene.  Or D-limonene.

18  Again, limonene is -- it's exactly the

19  same as citral.  If you eat orange jam or

20  orange marmalade or those products, it is

21  a main constituents of citrus peel.

22          Q.    Do you know if that's ever

23  been incriminated as a known or suspected

24  carcinogen?

John Hopkins, Ph.D.

1        A.     I do not believe it has.

2               We're eating -- well, if you

3    eat oranges or orange marmalade or orange

4    jam.  There are many, many chemicals.

5        Q.     I want to make sure, if I

6    don't eat the peel I'm not eating this

7    stuff, right?  I want to get something

8    out of this deposition.

9        A.     There will be -- there will

10   be some limonene in the fruit, in the

11   actual orange itself.  Yes.

12       Q.     Okay.  And the last one?

13       A.     Eugenol.  Yeah, eugenol

14   is -- again, that's used in flavors and

15   fragrances.  It's also used in dentistry

16   as a packing material in a cavity if you

17   have a cavity, dentist will put some

18   eugenol in as a base for the filler

19   material, restorative material.  It's

20   been used -- eugenol a natural material.

21   It's found in many, many flower extracts.

22       Q.     Has that ever been

23   implicated as a known or suspected

24   carcinogen?

John, Hopkins, Ph.D.

1          A.     Not to my knowledge, no.

2          Q.     Do you know as you sit here

3     today whether any of these chemicals that

4     I've highlighted were ever put in

5     Johnson's Baby Powder?

6          A.     I don't have the answer to

7     that.  They may or may not have been part

8     of the fragrance or fragrances.  Like I

9     said, if you have a lemon peel extract or

10    an orange peel extract, they could well

11    contain some citral or limonene.

12         Q.     But you don't know as you

13    sit here today?

14         A.     I don't, because as we said

15    earlier, the formulation for the

16    fragrance is proprietary to the fragrance

17    company.

18         Q.     Right.  It was kept secret

19    by them from you?

20         A.     And that's standard

21    throughout the whole -- whether you're

22    fragrance is a body wash or shampoo or

23    what have you.

24         Q.     Okay.  So you have

John Hopkins, Ph.D.

1    previously testified, am I correct, that

2    Johnson & Johnson had a no tolerance

3    policy for carcinogens in the Johnson's

4    Baby Powder, correct?

5        A.    Yes.

6        Q.    Okay.  And you testified in

7    the Herford trial that if you found out

8    that the product contained a carcinogen,

9    you would pull it from the market,

10   correct?

11       A.    Yes.  If a product was

12   carcinogenic, you wouldn't sell it.  It

13   would actually be illegal, I think.

14       Q.    No, if the Johnson's Baby

15   Powder or Shower to Shower contained a

16   carcinogen and you found out about it,

17   you would pull it from the market,

18   correct?

19       A.    If the product was

20   carcinogenic, you would pull it from the

21   market.

22       Q.    Okay.  Now, is there a safe

23   level, to your knowledge, for exposure or

24   ingestion of nickel?

John Hopkins, Ph.D.

1              Well, let me ask the

2    question --

3         A.    Okay.  As a toxicologist --

4    can I answer as a toxicologist?

5         Q.    Well, let me ask you the

6    question this way.

7              Is -- has nickel been

8    implicated as a known or suspected

9    carcinogen?

10        A.    There are -- I think there

11   are about 200 different kind of nickel

12   salts.  Certain nickel salts, some of

13   those are implicated as carcinogens.  On

14   the other hand, nickel is recognized by

15   nutritionist as what's known as a

16   micronutrient.  In other words, we need a

17   small amount of nickel to metabolize

18   carbohydrates.  It's probably nanograms

19   per day.  But along with several other

20   micronutrients like cobalt, and others,

21   it is regarded as part of our diet.  And

22   certainly nickel is found in many, many

23   foods.

24        Q.    Has nickel been implicated

John Hopkins, Ph.D.

1    as a carcinogen, yes or no?

2         A.    Okay.  Nickel fumes, where

3    nickel or nickel ores are roasted in

4    smelting operations where mine work --

5    sorry, workers are manufacturing

6    stainless steel from nickel alloys, there

7    is indications -- there is an I-A-R-C,

8    IARC, review which indicates that, in

9    those circumstances, nickel can be a

10   carcinogen.

11            But it's also -- as I said,

12   it's also part of our diet.  And like

13   iron and magnesium, we take it in every

14   day.

15        Q.    But the answer to my

16   question is, nickel is considered a

17   carcinogen?

18        A.    Nickel is considered by the

19   International Agency For Research on

20   Cancer as a carcinogen to employees,

21   workers, exposed to high levels of nickel

22   fumes in those circumstances.  So the

23   answer to that part of the question is

24   yes.

John Hopkins, Ph.D.

1          Q.    Okay.  Is chromium

2     considered a carcinogen?

3                    MR. SILVER:  Objection to

4          form.

5                    THE WITNESS:  Similar story.

6          I mean, I take a chromium

7          supplement every week.  It's

8          chromium picolinate.  Chromium is

9          again one of those micronutrients

10         that we need in our diet to help

11         metabolize glucose.

12                   There are dozens and dozens

13         of different chromium salts.  The

14         international agency for research

15         on cancer has identified what are

16         called hexavalent chromium as a

17         carcinogen.  But that's quite

18         different from the chromium that

19         we have in our diet.

20    BY MR. PLACITELLA:

21         Q.    So the answer to my question

22    is chromium is considered a carcinogen?

23                   MR. SILVER:  Objection to

24         form.

John Hopkins, Ph.D.

1              THE WITNESS:  Certain

2         chromium salts in what are called

3         a hexavalent form are considered

4         by the International Agency For

5         Research on Cancer as potentially

6         carcinogenic at those appropriate

7         dose levels.  There are many

8         chromium salts which are reviewed

9         and not considered as

10         carcinogenic.

11    BY MR. PLACITELLA:

12         Q.    What about cobalt?  Is that

13    considered a carcinogen?

14              MR. SILVER:  Objection to

15         form.

16              THE WITNESS:  No, without

17         cobalt we'd die.  Cobalt is the

18         center of the -- there's a vitamin

19         B12 that we take in our diet or we

20         take as a supplement, and every

21         molecule of vitamin B12 has cobalt

22         at its center.

23              So cobalt in its nutritional

24         state is not a carcinogen.

John Hopkins, Ph.D.

1    BY MR. PLACITELLA:

2         Q.    Okay.   What about in its

3    non-nutritional state?   Is it a

4    carcinogen?

5         A.    Well, there are -- again, as

6    with nickel and many others, there are

7    many, many different salts.   I think the

8    overview is that cobalt, you're unlikely

9    to be exposed to much cobalt.   It's just

10   not -- it's only present in parts per

11   million in the soil; and therefore, it's

12   in most of our diet, in grains, juices,

13   fruits, various things we eat.   So at

14   certain dose levels that we take in our

15   diet, it's an essential requirement.

16              Whether taking vast amounts

17   would be carcinogenic, I don't know.   I'm

18   not aware that anyone has ever exposed

19   themselves to extremely large amounts.

20        Q.    So let me ask you this.

21   With respect to Johnson Baby Powder or

22   Shower to Shower, was there a limit of

23   the amount of nickel that would be

24   permitted to be included in the product?

John Hopkins, Ph.D.

1        A.    Yes.   The specification for

2   the talc has a specification where it

3   sets a limit for nickel.

4        Q.    What is that?

5        A.    Let me think.   Let me think.

6   Is it .5 parts per million.   I haven't

7   got the document in front of me.   I don't

8   want to get into a memory test.   There is

9   a specification.   That has been provided.

10  And it lists out the limits for things

11  like heavy metals at 10 parts per

12  million, arsenic at between 2 and 3 parts

13  per million.

14       Q.    Okay.   Let's go through

15  that.

16            So -- and if it turns out

17  that you're wrong, you're wrong.   We'll

18  fix it.   Arsenic, you think the limit is

19  what?   Let's write them down so we have

20  it.

21       A.    Arsenic reflects the

22  specification of the United States

23  Pharmacopeia for talc.   The limit

24  currently, I believe, is 2 parts per

John Hopkins, Ph.D.

1  million.  It has varied between 2 and 3,

2  but it's always been within the limits of

3  the United States Pharmacopeia.

4          Q.    Okay.  So one, nickel,

5  .5 parts per million?

6          A.    Again, I would need -- this

7  is not a memory test.  I would need to

8  look.  And you have the specification of

9  products.  We can look it up at any

10  point.

11          Q.    Well, if you have something

12  that you want to look at, please let me

13  know.

14          A.    No, I've only got what

15  you've given me.  I don't have it here.

16          Q.    Okay.  Well, if you want to

17  take a break and look, that's fine.

18                Arsenic?

19          A.    Again, it meets the United

20  States Pharmacopeia, which currently --

21  which currently the J&J talc one is 2

22  parts per million.

23          Q.    Okay.

24          A.    At times varied between 2

John, Hopkins, Ph.D.

1    and 3.

2         Q.    2 parts per million.

3              Okay.  What about cobalt?

4         A.    Again, I can't remember it.

5    It's the -- if it's -- whatever isn't the

6    United States the Pharmacopeia limit, the

7    company has chosen to adopt either the

8    European Pharmacopeia or the

9    International Pharmacopeia.

10             And again, I cannot remember

11   what it is, but there is a specification

12   for cobalt which meets the -- any of

13   the -- the best of the international

14   standards.

15        Q.    You don't know what it is?

16        A.    Without looking it up, no, I

17   don't.  You have that data in the -- in

18   the files as a specification.

19        Q.    Okay.  Well, you have the

20   data too, don't you?  I got it from you.

21        A.    Yeah, I didn't bring it with

22   me.

23        Q.    Okay.  But you did look --

24   you did look at it, right?

John Hopkins, Ph.D.

1     A.     You've got it -- you've got

2  it right there.

3     Q.     Okay.  All right.  What

4  about lead?

5     A.     Yes.  There's a limit for

6  lead.

7     Q.     How much?

8     A.     I believe it's currently 10

9  parts per million.  Again, not just in

10  the United States Pharmacopeia.

11     Q.     Okay.  And what about

12  chromium?

13     A.     Did we do chromium?  I can't

14  remember.  Again, it matches whatever the

15  best of the International or United

16  States Pharmacopeias.

17     Q.     What's the best?

18     A.     Again, I can't remember

19  without checking the -- checking the

20  specification.

21     Q.     Okay.

22     A.     But you have that

23  information.

24          MR. PLACITELLA:  Okay.  Can

John Hopkins, Ph.D.

1          you give me Exhibit 93.

2     BY MR. PLACITELLA:

3          Q.    I know I've gone through

4     this with you before.  But Mr. William

5     Ashton, we know who he is?

6          A.    Yes.

7          Q.    Who -- what was his role at

8     Johnson & Johnson?

9          A.    He was a senior research

10    scientist involved with talc.

11         Q.    Okay.  Was he politely known

12    as Mr. Talc?

13         A.    Yes.  I've seen that

14    descriptor.  And he was an expert in

15    talc.

16         Q.    And who is Mr. G. Lee?

17         A.    George Lee, he was a senior

18    scientist in the baby products division.

19         Q.    And what about D.R.

20    Petterson, who was he?

21         A.    Petterson with two Ts?

22         Q.    Mm-hmm.

23         A.    He was -- he was -- I think

24    he was a research director at some point.

John Hopkins, Ph.D.

1   P-E-T-T.  Yes.

2          Q.    And how about Dr. Semple?

3   Who was he?

4          A.    He was a medical director.

5   He's M.D. qualified.  At one point he

6   also became research director in the

7   1980s.

8          Q.    So he was the medical

9   director for the whole company?

10         A.    For the baby products

11  company.

12         Q.    I'm going to show you

13  Exhibit 93.

14              MR. PLACITELLA:  I have a

15         bunch of copies.  If they're

16         short, we made a lot.

17              MR. BICKS:  Some of them you

18         highlighted.

19              MR. PLACITELLA:  Yeah, I

20         highlighted on purpose.

21              MR. BICKS:  What?

22              MR. PLACITELLA:  I -- that's

23         my highlighting.

24              (Document marked for

John Hopkins, Ph.D.

1          identification as Exhibit

2          J&J-93.)

3    BY MR. PLACITELLA:

4          Q.    So you have in front of you

5    Exhibit 93 which is an April 28, 1976

6    confidential memo from Mr. Ashton

7    entitled "Trace Metals in Talc."

8               Do you see that?

9          A.    I see that, yes.

10         Q.    And Mr. Ashton starts out

11   saying, "There's a wide variety of trace

12   metals in talc at the levels of parts per

13   million and below.  Our Vermont talc

14   contains more different metals than do

15   other high grade talcs in the number of

16   metals and the content of those metals."

17              Do you see that?

18         A.    Yes.

19         Q.    And you've seen this

20   document before?

21         A.    I believe I have.  Yes.

22         Q.    Okay.  He then goes on to

23   say, in terms of limits, "Our talc is

24   produced under a spec of a maximum of 2

John Hopkins, Ph.D.

1  parts per million for arsenic and 10

2  parts per million for heavy metals,

3  reported like lead," correct?

4       A.    Yes.   That is what is

5  written, yes.

6       Q.    Okay.   And he talks about an

7  analysis that was done of your product,

8  correct?

9       A.    Yes.

10      Q.    Okay.   And in that analysis

11 he says -- he talks about iron, nickel,

12 copper, magnesium, aluminum, silicon,

13 calcium, titanium, chromium, manganese,

14 and zinc, correct?

15      A.    Yes.

16      Q.    Okay.   And he states on the

17 first page that using the x-ray

18 florescence methodology, he normally sees

19 metals above 15 or 20 parts per million

20 inside and outside of the talc lattice,

21 correct?

22      A.    Yes.   You read what he

23 wrote.

24      Q.    That's higher than all the

John Hopkins, Ph.D.

1   numbers that you just gave me, right?

2        A.    Well, that's inside and

3   outside, the talc lattice.  The numbers

4   that I gave you related to those metals

5   which would be available.  If it's

6   trapped inside the talc lattice, it is

7   trapped.  It will never come out.

8        Q.    Well, it says inside and

9   outside, doesn't it?

10       A.    Yes.  And he's combined the

11  two.

12       Q.    So clearly he believes some

13  of it's getting out or he wouldn't have

14  wrote it that way?

15            MR. BICKS:  Objection to

16        form.

17            THE WITNESS:  No, it

18        can't -- it won't get out if it's

19        trapped in the lattice.

20  BY MR. PLACITELLA:

21       Q.    So there's some outside, and

22  there's some inside?

23       A.    That would be the inference.

24       Q.    Okay.  On the next page when

John Hopkins, Ph.D.

1    it comes to nickel, he says, "It's normal

2    to find about 1,500 parts per million in

3    Vermont 66, and over the past few years

4    it has ranged from 1,000 parts per

5    million to 3,000 parts per million,"

6    correct?

7           A.    Yes.   That's -- that, as we

8    said two minutes ago, is the material

9    that is -- and he talks about it on the

10   next page, Page 3, which is evidence that

11   it's tied up in the lattice.  It will not

12   come out.  It is part of the structure of

13   the inside of the talc particle.  It's

14   not soluble.  It's part of the crystal

15   structure.

16          Q.    Okay.   What was my question?

17          A.    You said what was there.   I

18   said yes, I agreed with what you had

19   written, up to 3,000 parts per million.

20          Q.    Up to 3,000 parts per

21   million.

22          A.    Yes, and I --

23          Q.    And that compares -- and you

24   told me that the permissible level for

John Hopkins, Ph.D.

1  nickel was .5 parts per million.  So how

2  many more times -- it looks to me that

3  would be like 6,000 times more reported

4  than you say was allowable?

5          A.    No.  You're comparing apples

6  with pears.  The test method to measure

7  the allowable limit is the amount that

8  will actually come out when you do the

9  test.  In other words, what could be

10  available to be on the -- be onto the

11  skin.  If something is trapped inside,

12  then it's trapped inside.  It will never

13  come out.  So it's important when we look

14  at the test method, when we set a limit,

15  that test method measures what is

16  actually available and what can come out

17  into -- out from the product.

18          Q.    Why are you testing all this

19  stuff if you don't care about it?

20          A.    That's not true.  We do care

21  about it.  What you're testing is to

22  assure that the amount that may be

23  available to come out and contact the

24  skin is within the limits that you've

John Hopkins, Ph.D.

1    set.

2          Q.     Well, you understand that

3    biologically, even if it's within the

4    talc lattice, once it gets into the body,

5    it will be processed and some of that

6    will become available to human tissue,

7    correct?

8          A.     No, it's not correct.

9    There's no enzyme in the human body which

10   will dissolve a talc molecule or

11   particle.

12         Q.     Okay.  So it's your

13   testimony that the 3,000 parts per

14   million was within the permissible range

15   of nickel in your talc?

16         A.     Permissible range relates to

17   the material that's available.  And

18   that -- the talc specification specifies

19   a limit.  And we are talking clearly

20   apples and pears.  If you are talking

21   about the 2- to 3,000 parts per million,

22   that is not available, and that's not

23   measured.  It's only measured when you

24   use a particular form of analysis, atomic

John Hopkins, Ph.D.

1   absorption spectroscopy, which looks

2   right inside the talc molecule, talc

3   particle.

4            Q.    So no one was worried about

5   this back then?  They were just writing

6   it down?

7            MR. BICKS:  Objection to the

8        form.

9            THE WITNESS:  People were

10       interested to know the full

11       structure of the -- atomic

12       structure of the talc particle.

13       And, therefore, by using atomic

14       absorption, you're able to say,

15       hey, there's actually 2- to

16       3,000 parts per million of nickel

17       trapped inside.

18            But because we've done the

19       appropriate tests according to

20       United States Pharmacopeia and

21       other Pharmacopeias, we know that

22       that is not biologically

23       available.

24   BY MR. PLACITELLA:

John Hopkins, Ph.D.

1      Q.    Can you show me what tests
2   you conducted specifically
3   contemporaneous with this report that
4   would indicate that none of the nickel
5   reported in this 3,000 parts per million
6   came outside the talc lattice?
7      A.    Okay.   I have reviewed that
8   document the last couple of days.   There
9   is a study which used iron probe analysis
10  to look at that.   And further studies
11  using simulated gastric juice to see if
12  you could dissolve it out.   Those
13  studies, I'm 110 percent sure were given
14  to yourselves.   That's part of the
15  document depo.
16     Q.    Well, can you produce that
17  document for me?   Do you have it
18  somewhere?   You said you relied upon it.
19  It's part of your testimony?
20     A.    I've seen it this week, yes.
21  I don't have it in front of me, but it is
22  available.
23     Q.    You can get it at a break
24  and give it to me?

John Hopkins, Ph.D.

1          A.    It's already been made

2     available to you as well.

3          Q.    Okay.  But you'll give it to

4     me so I can ask you questions?

5               MR. BICKS:  Direct those

6          questions to me rather than to

7          him, the materials that you have

8          that you can't find.

9     BY MR. PLACITELLA:

10         Q.    Okay.  The next listing says

11    that you found cobalt up to 90 parts per

12    million, correct?

13         A.    By -- by that test method of

14    atomic absorption, yes, that's right,

15    yes.

16         Q.    And that you found chromium

17    in your product from 100 to 300 parts per

18    million, correct?

19         A.    By that particular test

20    method, yes.

21         Q.    Okay.  Now, can you go to

22    the next page where it talks about

23    nickel.  It talks about heavy metals in

24    the Vermont talc, Vermont 66.

John Hopkins, Ph.D.

1          Do you see that?

2     A.    Yes.

3     Q.    And it says, "We have firm

4  documentation that the nickel in our talc

5  is tied up in the talc lattice."

6          Do you see that?  That's

7  what you just said, right?

8     A.    Yes.

9     Q.    Okay.  Then it says, "The

10 documentation supports recent statements

11 to the media.  The documentation does not

12 mean that all the nickel in our talc

13 concentrate is tied up in the lattice.

14 It is very likely that it's not all tied

15 up in the talc."

16          Correct?

17    A.    Yes.  You read what is

18 written.  And that is correct.

19    Q.    Now, go to the -- Page 4,

20 under general comments, Mr. Ashton

21 states, "Although the recent adverse talc

22 publicity only alluded to the presence of

23 nickel and cobalt in a few places, we

24 must prepare for the inevitable

John Hopkins, Ph.D.

```
1    probability that investigators other than
2    Mount Sinai will be taking deeper looks
3    into trace metals in talcs."
4              Do you see that?
5         A.   Yes, that's what he wrote.
6         Q.   And he states, "The data
7    attached gives a picture of our
8    vulnerability compared to some body
9    dusting powder talcs in the U.S.A.
10             Also included is data I have
11   just developed on key trace metals in our
12   head feed, the tailings, and their
13   concentrate, V 66?"
14             Then he concludes, "I'm not
15   too happy with the implications,
16   particularly since I have high degree of
17   confidence in the reliability of the
18   data," correct?
19        A.   You read what he wrote in
20   1976, yes.
21             MR. PLACITELLA:  Give me
22        142.
23             (Document marked for
24        identification as Exhibit
```

John Hopkins, Ph.D.

1          J&J-142.)

2     BY MR. PLACITELLA:

3          Q.    142 is a January 28, 1977,

4     another letter from Mr. Ashton.

5               Do you see that?

6          A.    Yes.

7          Q.    To a Mr. Arnold Netherwood.

8     What was his job?

9          A.    He was a scientist in the UK

10    company.

11         Q.    Okay.  And in this document,

12    Mr. Ashton documents that chromium can

13    exist in your talc in the United States

14    between 100 parts per million and up to a

15    thousand parts per million?

16         A.    That's what he wrote at that

17    time, yes.

18         Q.    On the next page he talks

19    about the methods that are available for

20    testing, correct?  It says depending on

21    what test you use, that will dictate how

22    much chromium you'll find, right?

23         A.    What he actually said --

24    let's be clear -- a good analyst will get

John, Hopkins, Ph.D.

1   almost zero for chromium content in talc

2   using acid leach recipe but might find up

3   to 1,000 parts per million with atomic

4   absorption.

5          Q.    Right, so --

6          A.    As I said earlier, atomic

7   absorption is the system whereby you can

8   look at what's trapped inside the crystal

9   lattice.  It is not the same as what

10  might be biologically available by being

11  leached out or washed out or get onto

12  body tissues.

13         Q.    Well, atomic absorption is

14  used for testing what's both inside and

15  outside, correct?

16         A.    Yes.

17                MR. PLACITELLA:  Okay.  Give

18         me 144.  Oh, I'm sorry.

19                Give me 157.

20                (Document marked for

21         identification as Exhibit

22         J&J-157.)

23  BY MR. PLACITELLA:

24         Q.    157 is a memo from

John Hopkins, Ph.D.

1  Mr. Sherman to George Lee.  Who is

2  Mr. Sherman?

3          A.    I think he was in the

4  formulation department of the baby

5  products company.  1977, yes.

6          Q.    And -- and in this document,

7  what Mr. Sherman does is he tries to

8  calculate just how much nickel someone

9  would inhale use -- who came in

10  connection with the Baby Powder, correct?

11          A.    He's made a -- he's made a

12  calculation which is in this letter, yes.

13  He's made a calculation.

14          Q.    And in this calculation he

15  states that by his information,

16  .48 percent of the total nickel in the

17  talc can be leached out, correct?

18          A.    By conditions of a

19  particular test with human serum and

20  gastric juice.

21          Q.    Human serum meaning what's

22  in the body?

23          A.    Well, it's in the blood,

24  circulating in the blood, yes.

John Hopkins, Ph.D.

1      Q.   All right.  So by what's

2   circulating in the blood and by the

3   gastric juices in the human body, he

4   states that almost half of the nickel

5   will be leached out, correct?

6      A.   No.  No.  He's saying

7   0.4 percent of the nickel can be leached

8   out using serum and gastric juice,

9   .50 percent, 0.48 percent.

10      Q.   So what happens is when

11   somebody inhales the Johnson's Baby

12   Powder, he's calculating just how much

13   nickel will be absorbed into the human

14   body, correct?

15      A.   No.  Again, I'll say that

16   this gentleman was not -- is not a

17   toxicologist.  And he's done a

18   back-of-the-envelope calculation.  But

19   when we inhale particles like talc,

20   pretty well all of it, we breathe in --

21      Q.   Sir, I'm not asking for your

22   opinion.  I'm asking for what's been

23   stated here.

24      A.   Well --

John Hopkins, Ph.D.

1          Q.    What he states in this memo

2     is his calculation about what happens in

3     the human body when the talc is breathed

4     in, correct?

5          A.    He's used human serum, which

6     is the blood.  He's used gastric juice,

7     which is the stomach, and said that no

8     more than .48 of 1 percent could be

9     leached, no more than that could be

10    leached under those conditions in a

11    laboratory test.

12         Q.    And he copied this memo to

13    the entire head on the medical side of

14    your company, correct?

15         A.    He's copied it to the

16    medical director, Bruce Semple, yes.

17         Q.    Okay.  Now, you're aware

18    that -- would you say that arsenic -- is

19    it your testimony by the way that arsenic

20    is trapped within the talc lattice?

21         A.    No.  That's not my

22    testimony.  No.  Arsenic can be free, and

23    certainly when the miners are mining the

24    talc, they can see the arsenic, because

John Hopkins, Ph.D.

1  it's bright yellow in the mine.  So they

2  avoid that.  But it is free arsenic

3  salts, yeah.

4       Q.    Okay.  And that historically

5  was a problem for Johnson & Johnson in

6  terms of the Vermont 66 product, correct,

7  arsenic?

8       A.    The area -- one of the

9  mines -- I believe it was Rainbow mine --

10  I'm sorry, the Argonaut mine, had areas

11  of arsenic.  And the whole point of the

12  mine mapping was to know where those

13  areas were and to avoid that problem.  If

14  the miners came across that

15  yellow-stained areas, they would avoid

16  that.  I believe the direction was to

17  keep one shovelful away -- a shovel is

18  eight feet wide -- to avoid those areas.

19            So a theoretical problem.

20  But by adopting sensible mining

21  procedures, you -- you avoided a problem.

22       Q.    So you could just see it,

23  and it would never become -- it would

24  never be in your product; is that right?

John Hopkins, Ph.D.

1    Is that what you're saying?

2         A.    You can see arsenic

3    compounds stained yellow against the

4    white of the talc.  If there's veins of

5    arsenic compounds, you can avoid those.

6    And so you're able to ensure that the

7    product met the specification as given in

8    the United States Pharmacopeia of either

9    2 or 3 parts per million.

10        Q.    So arsenic never ended up in

11   the Vermont 66 processed product above 2

12   parts per million.  Is that your

13   testimony?

14        A.    The specification varied

15   between 2 and 3 parts per million.

16        Q.    Let's say 3.

17        A.    Okay, 3.  So that was the

18   specification.  And that is the

19   requirement for the talc.

20        Q.    That wasn't my question.  My

21   question was, so the arsenic never

22   exceeded 3 parts per million in the

23   Vermont 66 processed talc?  Is that your

24   testimony?

John Hopkins, Ph.D.

1          A.     I'm aware, having read

2     through the documentation, that there was

3     one batch where there was what's called a

4     deviation from the specification, where I

5     believe it was 3.1 or 3.2 percent.  And

6     that had to go to the medical division to

7     be approved.  But that was one -- just

8     one batch over many, many decades.

9                The limit has varied between

10    2 and 3 parts per million of arsenic.

11         Q.     So your testimony here under

12    oath is if we go back and we look at all

13    the tests, there was only one time where

14    the arsenic limit was exceeded in Vermont

15    66 talc, right?  That's your testimony?

16         A.     I'm only aware of -- I'm

17    only aware of one.  And whenever any

18    material is what's called out of

19    specification, it is prevented from going

20    further until there's an approval through

21    what's called a deviation system.  And a

22    whole bunch of people, the medical

23    department, scientist department, have to

24    sign off to approve that deviation.

John Hopkins, Ph.D.

1          I'm certainly aware of one.

2     Maybe there were others.  I don't know.

3     But as a general rule, the specification

4     for arsenic was either 2 or 3 parts per

5     million which matched that of the United

6     States Pharmacopeia.

7          Q.    Okay.  And if it ever

8     exceeded 2 or 3 parts per million, that

9     product should absolutely not be sold,

10    correct?

11         A.    No.  What I said was -- and

12    this is a common thread to any product

13    whether it's shampoo and the pH is

14    slightly different.  It's held and

15    bonded, and it cannot be moved forward

16    unless a whole bunch of people sign off

17    and say that it's safe and acceptable.

18         Q.    So you can sell it above 3

19    parts per million?

20         A.    If the senior medical

21    division people, the toxicologists say

22    3.1, we believe that's acceptable, that's

23    up to them.  So I believe there's

24    certainly maybe one case over many

John, Hopkins, Ph.D.

1    decades where that was the case.  But

2    it's -- it isn't just automatic.  It has

3    to be approved.

4         Q.    Okay.  So this is important.

5    So only one time you're aware of that the

6    product was sold with arsenic above 3

7    parts per million?

8         A.    I'm only aware of one time.

9         Q.    Okay.  Now, you know they

10   had arsenic problems in the Argonaut mine

11   too, right?

12        A.    Yes, I did actually mention

13   Argonaut three minutes ago.  That was the

14   one where when you do the mine mapping,

15   you can look at the arsenic salts, which

16   give out yellow stain, and the people

17   doing the mining are shown how to avoid

18   that area by a shovelful width away from

19   it.

20        Q.    Okay.  And you're aware that

21   there was also arsenic in the Rainbow

22   mine, correct?

23        A.    Yes.  You can get -- again,

24   the mine mapping will show may be areas

John, Hopkins, Ph.D.

1    that you have to avoid.  We look at many

2    square miles here in some cases.  So you

3    can look to avoid areas where you want to

4    avoid arsenic.

5         Q.    Well, you had arsenic in the

6    Rainbow mine up to a thousand parts per

7    million, correct?

8         A.    In the mine or in the talc?

9         Q.    In the mine.

10        A.    Yes.  That's what I said.

11   There are going to be areas where it's

12   clear that there are arsenic areas that

13   have to be avoided.  The whole point of

14   mine mapping and doing the core drilling

15   to create a mine map is to identify the

16   areas that are to be avoided.

17             And in this particular case,

18   the areas were identified as

19   arsenic-bearing rock and you avoid

20   arsenic bearing rock.  So you don't get

21   the product contaminated by arsenic.

22        Q.    Yeah, but the problem was,

23   even as of 1992, you still weren't

24   regularly monitoring the arsenic content

John Hopkins, Ph.D.

1    in your mines, right?

2          A.    You monitor the arsenic

3    content in the finished product.

4                The arsenic is very -- the

5    arsenic salts are very, very visible.

6    They are bright yellow in color.  And the

7    mining people are trained to avoid those

8    areas in the same way that they'd avoid

9    other areas that aren't clearly not talc.

10               MR. PLACITELLA:  Can you

11         read my question back, please.

12               (Whereupon, the court

13         reporter read back the requested

14         portion of testimony.)

15               THE WITNESS:  You monitor

16         the arsenic content by the

17         material you're pulling out of the

18         mine.  You can carry on doing core

19         drilling, holes, and looking at

20         where it was in the mine.  But the

21         other way of monitoring the

22         content of the mine, to answer

23         that question specifically, is to

24         monitor what you're taking out of

John Hopkins, Ph.D.

1        the mine.

2                MR. PLACITELLA:  Can you

3        give me 200, please.

4                (Document marked for

5        identification as Exhibit

6        J&J-200.)

7                MR. PLACITELLA:  The Bates

8        number is 219720.

9                MR. LOCKE:  When you get an

10       exhibit number like 200, is that

11       an exhibit number for this

12       deposition?

13               MR. PLACITELLA:  Correct.

14               MR. LOCKE:  It's marked that

15       way?

16               MR. PLACITELLA:  Correct.

17       It's otherwise Imerys 219720.

18   BY MR. PLACITELLA:

19       Q.    Have you seen this document

20   before, Dr. Hopkins?

21       A.    No, I'm sorry.  I'm reading

22   it to actually familiarize to it.  I've

23   not seen this before.  This appears to be

24   an Imerys document, so I've not seen this

John Hopkins, Ph.D.

1    one before, no.

2            Q.    Okay.  And here it says,

3    "Arsenic iron sulfides."

4                 And what's that next word?

5            A.    Where are you reading?

6            Q.    Under arsenic.

7            A.    "Arsenic iron sulfides,

8    arsenopyrite."  Pyrite is an iron salt.

9            Q.    All right.  And then do you

10   see where it says, second line, "Total

11   arsenic as analyzed in the Ludlow Rainbow

12   deposit averages generally less than

13   100 parts per million, but with some

14   small zones in excess of 1,000 parts per

15   million.  No apparent major effort is

16   underway to regularly monitor or

17   completely assess the total arsenic

18   content of ores, tailing solids, and

19   waste, although the distribution of

20   sulfides and arsenates in a talc ore

21   system is generally understood."

22                 Do you see that?

23           A.    Yes.

24           Q.    Okay.  Now, in reviewing --

John Hopkins, Ph.D.

1    I want to spend a little time now

2    focusing on the issue of -- and we'll

3    come back to some of this later, but on

4    the issue of asbestos in the products

5    that were sold by Johnson & Johnson.

6    Okay?

7            A.    I'm listening.

8            Q.    Okay.  So let's -- I want to

9    see if we can start out definitionally on

10   the same page.  Okay.

11                MR. PLACITELLA:  Can you

12          give me 193 and 201?

13   BY MR. PLACITELLA:

14           Q.    Do you have 201 over there?

15   Do you have 201 with you?

16           A.    What's it look like?

17                211.  Let's go back to some

18   of these others.

19                MR. BICKS:  What's the other

20          one?

21                MR. PLACITELLA:  They are

22          the same.  It's fine.

23   BY MR. PLACITELLA:

24           Q.    If you look at the Bates

John Hopkins, Ph.D.

1    number that ends in 440 in this group,

2    it's the material specification for

3    Windsor 66 talc.

4         A.    Yes.

5         Q.    And in defining asbestos it

6    says asbestos is defined to be the

7    fibrous serpentine chrysotile and the

8    fibrous forms of the amphibole group as

9    represented by amosite, anthophyllite,

10   crocidolite, tremolite, and actinolite."

11              Do you see that?

12        A.    That is what is written,

13   yes.

14        Q.    That is the definition that

15   was recognized by Johnson & Johnson,

16   correct?

17        A.    Yes.  For those test

18   methods, yes.  Yes.

19        Q.    And that applies to Johnson

20   & Johnson Baby Powder and Shower to

21   Shower, correct?

22        A.    Yes.

23        Q.    Okay.

24              (Document marked for

John Hopkins, Ph.D.

1          identification as Exhibit

2          J&J-194.)

3    BY MR. PLACITELLA:

4          Q.    194 is the analysis of

5    powdered talc Test Method 7024 for

6    Johnson & Johnson baby products.

7               Do you see that?

8          A.    I do, yes.

9          Q.    For TEM.  Okay.

10              And if you go to 7922, for

11   purposes of this specification, they

12   define what a fiber is, correct?

13         A.    They do, yes.

14         Q.    There's an elongated

15   particle with parallel sides and an

16   aspect ratio of greater than 3 to 1,

17   correct?

18         A.    Yes.  It says, "The

19   definition employed may vary with the

20   needs of the client."  Yes.

21         Q.    Okay.  Now, what's -- now I

22   just want to talk to you a few minutes

23   about testing methods to determine

24   whether there was asbestos in the

John Hopkins, Ph.D.

1    Johnson & Johnson talc as defined by your

2    specification that we just went through.

3    Okay?

4         A.    Yes.

5         Q.    Okay.  Now, a test method

6    involves a number of things.  Would you

7    agree with that?

8         A.    Yes.

9         Q.    All right.  It involves what

10   equipment you would use, correct?

11        A.    Yes.

12        Q.    It involves how the samples

13   are prepared, correct?

14        A.    Yes.  That's correct.

15        Q.    It involves how much is

16   tested?

17        A.    Yes.

18        Q.    How often it's tested?

19        A.    Yes.

20        Q.    How the tests are carried

21   out?

22        A.    Yes.

23        Q.    What the output is, correct?

24        A.    How do you mean -- how do

John Hopkins, Ph.D.

1    you define output?

2        Q.    What the product is from the

3    test, whether it's a photomicrograph --

4        A.    Okay, yes.

5        Q.    -- diffraction patterning?

6        A.    Yes.

7        Q.    Right.  And am I correct

8    that, generally speaking, no one size

9    fits all when it comes to test methods to

10   be used for finding asbestos in the

11   Johnson talc?

12           MR. BICKS:  Objection to the

13       form.

14           THE WITNESS:  Well, I'm

15       not -- I'm not quite sure I

16       understand the question.

17   BY MR. PLACITELLA:

18       Q.    I'll rephrase it.  Bad

19   question.  Bad question.

20       A.    Okay.

21       Q.    Was one -- let's just focus

22   for a second on the equipment that was

23   used.  A polarized light microscope was

24   used, correct?

John Hopkins, Ph.D.

1          A.     It's one of the equipment,

2   yes, PLM.

3          Q.     X-ray diffraction was

4   another?

5          A.     X-ray diffraction with

6   selected area diffraction, yes.

7          Q.     Okay.  So what we are

8   talking about here, I borrowed this one

9   from Mr. Bicks again.  We have up here on

10  this slide x-ray diffraction piece of

11  equipment, correct?

12         A.     Yeah.  That's an x-ray

13  diffractometer, yes.

14         Q.     Right.  Polarized light

15  microscope?

16         A.     Yes.

17         Q.     Right?

18         A.     It is, yes.

19         Q.     TEM?

20         A.     Transmission electron

21  microscope, yes.

22         Q.     Correct.  All of those were

23  equipment that was used by Johnson &

24  Johnson or its consultants for testing

John Hopkins, Ph.D.

1  whether the Johnson & Johnson talc

2  contained asbestos, correct?

3          MR. BICKS:  Objection to the

4      form.

5          THE WITNESS:  Those -- those

6      items of equipment have been used

7      by J&J internally and by the

8      consultants to follow the method,

9      to confirm the absence of

10     asbestos, asbestos minerals in the

11     talc.

12  BY MR. PLACITELLA:

13     Q.   Now, what are the, from your

14  perspective, well -- strike that.

15          What did Johnson & Johnson

16  consider the limitations to be for a

17  polarized light microscope using a

18  polarized light microscope in determining

19  whether there was a asbestos in the talc

20  samples that they were testing?

21     A.   Okay.  Let's step back a

22  point on that.

23          The test methodology J-4-1

24  required initially to use x-ray

John Hopkins, Ph.D.

1    diffraction.  X-ray diffraction will pick

2    up amphibole if it's present or not.

3          Q.    Excuse me.  I didn't ask you

4    that.  All right.  Let's just stick to my

5    question.

6              My question was, what were

7    the limitations that were understood by

8    Johnson & Johnson in terms of the ability

9    of the polarized light microscope to find

10   asbestos in the talc specimens that were

11   being tested?

12         A.    Okay.  What I was trying to

13   explain was that you would not use

14   polarized light as the first port.  You

15   would do it with x-ray diffraction first.

16         Q.    I'm not asking that.  That's

17   process.

18         A.    Okay.

19         Q.    I'm asking, what is the

20   limitation for that particular piece of

21   equipment and test?  What can it not do?

22             MR. BICKS:  Just if we can

23         refrain from interrupting the

24         witness.

John Hopkins, Ph.D.

1          MR. PLACITELLA:  If the

2      witness would answer my question,

3      I wouldn't interrupt him.

4          THE WITNESS:  My

5      understanding is that, assuming

6      that you've got a positive

7      indication of amphibole from x-ray

8      diffraction, you then go on to use

9      polarized light microscopy --

10     microscopy, and you would use high

11     magnification.

12         You would expect to see at

13     least -- at least .1 percent or

14     below for a level of assurance.

15 BY MR. PLACITELLA:

16     Q.    So you couldn't use a

17 polarized light microscope as a first

18 level test for determining whether there

19 was asbestos in the talc that you were

20 testing, correct?

21         MR. BICKS:  Objection to the

22     form.

23         THE WITNESS:  No.  To answer

24     your question, you'd have -- the

John, Hopkins, Ph.D.

1          process requires that you use

2          x-ray diffraction as the first --

3          first test.  And then if you've

4          got an indication, you then do

5          polarized light microscopy.

6     BY MR. PLACITELLA:

7          Q.    Let me ask the question a

8     different way.  If you use a polarized

9     light microscope alone, that would not be

10    definitive as to whether the talc sample

11    contained asbestos, correct?

12         A.    Well, you wouldn't use it

13    alone.

14         Q.    I'm asking you the question,

15    sir.

16         A.    It's a hypothetical

17    question.

18         Q.    It's not a hypothetical

19    question.  I'm just asking you the

20    question.

21              If you took a sample and put

22    it under a polarized light microscope,

23    you could not tell by looking at that

24    sample without any other testing whether

John Hopkins, Ph.D.

1    that sample contained asbestos, correct?

2                MR. BICKS:  Objection to the

3          hypothetical.

4                THE WITNESS:  Again, I'm not

5          a microscopist.  We ascertained

6          that a couple of hours ago.  And

7          my understanding, speaking from my

8          knowledge, is that you would not

9          do that.  You would not get an

10         answer just by doing polarized

11         light microscopy alone.

12               So to answer your question,

13         you wouldn't do that, and

14         therefore you wouldn't get that

15         answer.

16   BY MR. PLACITELLA:

17         Q.    So a polarized light

18   microscope itself is not capable of

19   telling you whether what you're looking

20   at in that microscope contains asbestos,

21   fair?

22               MR. BICKS:  Objection to the

23         form.  Asked and answered.

24               THE WITNESS:  It will tell

John Hopkins, Ph.D.

1          you.   It depends on the quantity.

2          And that was the point that I was

3          trying to make.   There will be a

4          level of quantification that a

5          polarized light microscope,

6          following on from x-ray

7          diffraction, will enable you to

8          get a quantification and a

9          qualitative identification as

10         well.

11              So I'm not -- you know, I

12         think you're asking the wrong

13         question.   But it's a difficult

14         question to answer.   On its own,

15         you would not -- you would not use

16         a polarized light microscope.

17    BY MR. PLACITELLA:

18         Q.    If the only thing you had in

19    your laboratory was a polarized light

20    microscope, and you put a sample on it,

21    it's not going to give you the

22    information necessary to determine

23    whether there's asbestos in the talc,

24    right?

John Hopkins, Ph.D.

1           MR. BICKS:  Objection to the

2      form.  Asked and answered.

3           THE WITNESS:  If -- if there

4      were a lot of asbestos, the answer

5      is it would find it.  It would see

6      it.  It depends on the quantity,

7      the amount.

8  BY MR. PLACITELLA:

9      Q.    How much?

10      A.    Again, I'm not a

11  microscopists.  But a polarized light

12  microscope is -- some of them can be very

13  sophisticated, give a very high

14  magnification.

15           And if you have large

16  bundles of asbestos there, you could

17  quite easily see them and get

18  quantification.  But on its own it's

19  not -- it's not the first choice.  It's

20  not the first port of call.

21      Q.    Okay.  And what is the --

22  when it's used in conjunction with x-ray

23  diffraction, am I correct that the

24  detection limit is about 1 percent?

John Hopkins, Ph.D.

1          A.     No.   X-ray diffraction,

2    modern x-ray diffraction of selected area

3    of electron diffraction scanning will go

4    down to .1, .2 percent.

5          Q.     No, sir, I'm asking you

6    polarized light microscope.  The limit of

7    detection is about 1 percent, correct?

8               MR. BICKS:  You said when it

9          was used with x-ray diffraction.

10              MR. PLACITELLA:  After.

11              MR. BICKS:  That was the

12         question that you asked.

13              MR. PLACITELLA:  I'll

14         rephrase it so we're clear.

15   BY MR. PLACITELLA:

16         Q.     The limit of detection on a

17   polarized light microscope is about 1

18   percent, correct?

19         A.     Again, I don't want to

20   speculate.  I'm not a microscopist.  It's

21   probably that order between .1 and 1.

22              MR. BICKS:  When you want to

23         take a break and have lunch, we're

24         fine to do that.

John Hopkins, Ph.D.

1             MR. PLACITELLA:  Can you

2        give me 252.

3             (Document marked for

4        identification as Exhibit

5        J&J-252.)

6    BY MR. PLACITELLA:

7        Q.    I tagged for you -- this is

8    a document provided to us in discovery,

9    J&J-252.

10            And I've -- if you opened to

11   the tagged page, it's a PowerPoint put

12   together by Rio Tinto.  Who is Rio Tinto?

13            MR. BICKS:  Can I have one

14       of them if you have --

15            MR. PLACITELLA:  I only have

16       one.  I'll take a break if you

17       want to look at it.

18            THE WITNESS:  It is --

19       was -- it was still in existence,

20       the company that owned the

21       business before Luzenac.

22   BY MR. PLACITELLA:

23       Q.    Okay.  They were your

24   supplier?

John Hopkins, Ph.D.

1    A.    They owned the mine after

2  Cyprus, yes.

3    Q.    Okay.  And according to this

4  PowerPoint, the detection limit for a PLM

5  or the polarized light microscope is

6  about 1 percent, correct?

7    A.    That was the case when this

8  was written, which would have been, I

9  guess, the late 19 -- or early -- late

10  1980s.  Yeah.

11    Q.    Now, you mentioned

12  before --

13        MR. PLACITELLA:  I don't

14      care.  If you want to take a

15      break, that's fine.  It's

16      1 o'clock.  How long do you want

17      to take?

18        MR. BICKS:  Do you want to

19      come back.  It's 10 to 1:00 --

20      1:30?

21        MR. PLACITELLA:  1:30 is

22      fine.

23        THE WITNESS:  Yeah, sounds

24      good.  Whatever you want.

John Hopkins, Ph.D.

1          THE VIDEOGRAPHER:  Okay.

2      Stand by, please.  The time is

3      12:52 p.m.  Going off the record.

4                -   -   -

5            (Lunch break.)

6                -   -   -

7          THE VIDEOGRAPHER:  We are

8      back on the record.  The time is

9      1:32 p.m.

10                -   -   -

11          EXAMINATION (Cont'd.)

12                -   -   -

13  BY MR. PLACITELLA:

14      Q.    Okay.  I handed you

15  Hopkins-3, which was the list we went

16  over, the handwritten list before.

17            (Document marked for

18      identification as Exhibit

19      Hopkins-3.)

20  BY MR. PLACITELLA:

21      Q.    As I understand it, that was

22  to the best of your recollection, but

23  you've reserved the right to look at it

24  overnight and see if the numbers are

John Hopkins, Ph.D.

1    correct?

2         A.    Yes.

3         Q.    Correct?

4         A.    Yes.

5         Q.    Okay.  I want to talk now

6    about x-ray diffraction.

7              MR. PLACITELLA:  Give me

8         154.

9              (Document marked for

10        identification as Exhibit

11        J&J-154.)

12   BY MR. PLACITELLA:

13        Q.    The Colorado School of Mines

14   was a consultant to Johnson & Johnson on

15   the issue of asbestos testing in the

16   Johnson & Johnson talc, correct?

17        A.    Yes.  This was back in 1971.

18   Yes.

19        Q.    What I have given you is

20   marked as Exhibit 154, is an August 3rd,

21   1971 memo generated by the Colorado

22   School of Mine, and the subject is "X-ray

23   Investigation."

24              Do you see that?

John Hopkins, Ph.D.

```
 1          A.      Yes.

 2          Q.      Okay.

 3          A.      Yes.

 4          Q.      And we're -- go to the last

 5   paragraph.  In this last paragraph, the

 6   Colorado School of Mines indicates that

 7   the limit of detection for the x-ray

 8   diffraction is about 1 percent for

 9   fibrous materials, correct?

10                  MR. BICKS:  It says the

11          limit of recognition.

12   BY MR. PLACITELLA:

13          Q.      Limit of recognition of

14   constituents is probably on the order of

15   1 percent for fibrous materials, correct?

16          A.      That's what was written.

17   And that was probably the case in 1971.

18                  (Document marked for

19          identification as Exhibit

20          J&J-35.)

21   BY MR. PLACITELLA:

22          Q.      I'm showing you what's been

23   marked as Exhibit 35.

24                  This is a 1972 document
```

John Hopkins, Ph.D.

1    generated by the Colorado School of

2    Mines.  And it went to a Dr. Al Goudie in

3    Edison, New Jersey.  Who is he?

4         A.    He was a research director

5    in the baby products company.

6         Q.    Okay.  For Johnson &

7    Johnson?

8         A.    For Johnson & Johnson, yes.

9         Q.    Right.  And according --

10             MR. SILVER:  Chris, the

11        Bates number?

12             MR. PLACITELLA:  Oh, yeah.

13        The Bates number is

14        JNJL61-50714 -- no, 7139 it would

15        be.

16   BY MR. PLACITELLA:

17        Q.    And what the Colorado School

18   of Mines tells Johnson & Johnson is that

19   x-ray diffraction can tell if the sample

20   contains serpentine, but it can't tell

21   whether it contains chrysotile, correct?

22        A.    Yes, that's what he's

23   written, yes.

24        Q.    Okay.  And who -- by the

John Hopkins, Ph.D.

1    way, do you know who Rich Zazenski is?

2        A.    He was employed by Luzenac

3    back in the 1990s, as I recollect.

4        Q.    Okay.  What was his job, if

5    you know?

6        A.    I have met him.  Let me

7    think.  He was -- he was involved in

8    research R&D.

9        Q.    Okay.  Somebody with

10   knowledge of testing methods?

11       A.    I wouldn't know that level

12   of detail.  I did meet him once.

13       Q.    And Luzenac was your

14   supplier of talc in the '90s, and into

15   the 2000s?  I'm not allowed to go beyond

16   2006.

17       A.    Yeah, Luzenac was the

18   supplier who owned the mine in Vermont up

19   until it was -- became Imerys.

20       Q.    And they were testing the

21   talc that was sold to Johnson & Johnson

22   for asbestos content, correct?

23       A.    That would have been part of

24   their responsibility, yes.

John Hopkins, Ph.D.

1           (Document marked for

2           identification as Exhibit

3           J&J-224.)

4    BY MR. PLACITELLA:

5           Q.    Let me show you 224.  Now,

6    you had -- 224 is a correspondence from

7    Donna Dennis to Rich Zazenski.  Do you

8    know who Donna Dennis is?

9               MR. SILVER:  Chris, I'm

10           sorry.

11              MR. PLACITELLA:  I'll get

12          it.  I'll get to it.

13              THE WITNESS:  No, I do not

14          know.  No, I've not met that name,

15          seen that name.  It looks like --

16              MR. BICKS:  You said it's

17          from Donna Dennis.

18              MR. PLACITELLA:  I'm sorry.

19          You're correct.  From Zazenski to

20          Donna Dennis.

21   BY MR. PLACITELLA:

22          Q.    And here Zazenski states --

23   he's talking about the specification for

24   testing asbestos using TEM.

John Hopkins, Ph.D.

1          Do you see that?

2     A.    Yes.

3     Q.    And he states that everyone

4  in the company recognizes that XRD, PCM

5  and PLM are simply not sensitive enough

6  to provide complete assurance that the

7  talc is free of detectable asbestos,

8  correct?

9          MR. BICKS:  Objection to the

10         form.

11         THE WITNESS:  Yeah, what he

12         states, "I think we all recognize

13         that XRD, PCM and PLM are simply

14         not sensitive enough to provide

15         complete assurance that talc is

16         free of detectable asbestos."

17 BY MR. PLACITELLA:

18    Q.    And that was known and

19 understood by Johnson & Johnson at the

20 time, correct?

21    A.    Yeah.  And that's why they

22 had been using TEM since 1972, '73 time

23 frame.

24    Q.    That was known -- XRD, PCM

John Hopkins, Ph.D.

1  and PLM, it was known by Johnson &

2  Johnson that it wasn't sensitive enough

3  to provide complete assurance that the

4  talc is free of detectable asbestos,

5  true?

6          MR. LOCKE:  Objection.

7          THE WITNESS:  You read what

8      Mr. Zazenski wrote in 2001.

9          He made that statement that

10     it is not simply enough to

11     detect -- to provide complete

12     assurance that the talc is free

13     from detectable asbestos.

14  BY MR. PLACITELLA:

15      Q.    And Johnson & Johnson

16  understood that to be the case, correct?

17      A.    Yes, and as I said, that's

18  why since 1972-3 time frame, Johnson &

19  Johnson had used TEM as part of the

20  process.

21      Q.    Sir, did I ask you about

22  TEM?

23      A.    No.

24      Q.    I'll repeat my question.

John Hopkins, Ph.D.

1      A.     No, no --

2      Q.     Johnson & Johnson understood

3   from 1972 forward that XRD, PCM, and PLM

4   was not sensitive enough to provide

5   complete assurance that talc is free from

6   detectable asbestos.  True or false?

7              MR. BICKS:  Objection to the

8         form of the question.

9              THE WITNESS:  Well, you read

10        what Mr. Zazenski wrote.  And I

11        would agree that Johnson & Johnson

12        was of the opinion that those test

13        methods on their own would not be

14        necessarily sensitive enough to

15        provide complete assurance that

16        the talc is free from detectable

17        asbestos.

18   BY MR. PLACITELLA:

19      Q.     Thank you.  Now, you just

20   mentioned TEM.  So I want to talk about

21   that for a second.

22              MR. PLACITELLA:  Can you

23        give me or does he have 234.

24              (Document marked for

John Hopkins, Ph.D.

1        identification as Exhibit

2        J&J-234.)

3    BY MR. PLACITELLA:

4        Q.    Do you have 234 there

5    already?  I think you do.

6              234 is a PowerPoint for the

7    development of a new ASTM method for the

8    analysis of cosmetic and pharmaceutical

9    talc for asbestos.  Do you see that?

10       A.    That is the title of this

11   PowerPoint, yes.

12       Q.    And it's authored in part by

13   Julie Pier who worked for one of your

14   suppliers correct?

15       A.    Yes.

16            MR. BICKS:  Can I just --

17            because it doesn't have Bates

18            stamps on it, do you know where

19            this came from?

20            MR. PLACITELLA:  Not as I

21            sit here.

22   BY MR. PLACITELLA:

23       Q.    Now, if you go to where I

24   tabbed for you, "TEM option method

John Hopkins, Ph.D.

1    highlights"?

2         A.    I see that.

3         Q.    Okay.  She states, "TEM is

4    definitive for chrysotile versus

5    non-asbestiform serpentine, not

6    necessarily definitive for

7    amphibole-asbestos versus amphibole

8    cleavage fragments."

9              Do you understand that to be

10   the case?

11             MR. SILVER:  Objection to

12        form.

13   BY MR. PLACITELLA:

14        Q.    Did Johnson & Johnson

15   understand that to be the case?

16             MR. BICKS:  No foundation.

17             MR. SILVER:  Objection.

18             THE WITNESS:  This is

19        something that a microscopist

20        contributed to.

21             I don't know if she was the

22        only person who contributed.

23        There were other mineral people

24        there.

John Hopkins, Ph.D.

1    So do Johnson & Johnson

2    accept that's the case?  To be

3    honest, I don't -- I don't know if

4    they would accept that's the case.

5    Johnson & Johnson takes its

6    lead from experts in microscopy

7    and microanalysis.  And certainly

8    the author would have expertise

9    that would not necessarily be

10   present in Johnson & Johnson.

11   So it's a reasonable

12   statement I think that she's made

13   or he's made, whoever wrote this.

14   BY MR. PLACITELLA:

15   Q.    Did Johnson & Johnson

16   understand that TEM was definitive in

17   terms of testing for chrysotile, but not

18   necessarily definitive for amphibole

19   testing?

20   MR. BICKS:  Objection to the

21   form.  No foundation.

22   THE WITNESS:  Again, I'm not

23   an expert in that particular

24   field.  It is a statement that's

John Hopkins, Ph.D.

1       made on a PowerPoint presentation.

2               Whether or not Johnson &

3       Johnson had that inhouse expertise

4       to agree or disagree is something

5       that I just don't have the answer

6       to.

7   BY MR. PLACITELLA:

8       Q.    Okay.  Well, you're the

9   person that has the most knowledge,

10  everybody all rolled up into one.

11              MR. BICKS:  Objection to the

12      form.

13  BY MR. PLACITELLA:

14      Q.    So you don't know.  That

15  means that Johnson & Johnson doesn't

16  know?

17      A.    No, what I'm saying is there

18  are areas of expertise that the company

19  buys in and wherever it's needed.  And in

20  this particular case, if we are looking

21  at analysis of talc using transmission

22  electron microscopy, the company uses

23  outside experts with a great skill set

24  and many, many years of experience and

John Hopkins, Ph.D.

1    expertise.  And the results of that

2    expertise becomes part of Johnson &

3    Johnson's opinion as to whether or not

4    the product contains asbestos or not.

5         Q.    As you sit here today, you

6    can't say one way or the other whether

7    Johnson & Johnson knows whether TEM is

8    definitive for finding amphibole fiber in

9    its talc?

10              MR. BICKS:  Asked and

11        answered.

12              THE WITNESS:  Again, I

13        cannot say, because I'm not a

14        microscopy expert.  And we

15        ascertained that a couple of hours

16        ago, that I don't claim to be.

17              And the expertise, if you

18        like, has always been outside of

19        the company in this area where

20        we're looking at very

21        sophisticated techniques and

22        ongoing research.  This is dated

23        2011, which someone has made this

24        comment.  And it's a comment

John Hopkins, Ph.D.

1          that's being made in a PowerPoint

2          presentation.  I'm not in a

3          position to agree or to disagree.

4     BY MR. PLACITELLA:

5          Q.    Well, you told me that

6     you've been using TEM since 1972,

7     correct?

8          A.    The company has been using

9     TEM in the '72-'73 time frame.

10         Q.    And although you've been

11    using it since 1972, you don't know

12    whether TEM is capable of finding

13    amphibole asbestos in its talc --

14         A.    No, that --

15         Q.    -- in Johnson & Johnson

16    talc?

17         A.    That's not true.  The -- the

18    companies who have done the TEM testing,

19    people like McCrone, RJ Lee, EMB

20    Associates.  Those people have their own

21    inhouse skill sets and people who will

22    give a definitive answer as to whether or

23    not asbestos is present.

24         Q.    But, sir, the specification

John Hopkins, Ph.D.

1    for testing your talc is a Johnson &

2    Johnson specification, correct?

3        A.    Yes.

4        Q.    And you specify that TEM is

5    one of the test methods that should be

6    used, correct?

7        A.    Correct.

8        Q.    But you have nobody at

9    Johnson & Johnson that knows what the

10   limitations are of TEM in terms of

11   testing for amphibole asbestos?  Is that

12   what you're saying?

13       A.    No, I'm not saying that at

14   all.

15            There was a lady who retired

16   not that long ago, Ms. Gallagher, who was

17   an expert in this area, inhouse.  And she

18   had a skill set to understand the results

19   of this.  And to understand the

20   capabilities otherwise of TEM.

21            So there are people that

22   have got that expertise inhouse or had

23   that expertise inhouse.

24       Q.    Yeah, but you're here to

John Hopkins, Ph.D.

1    talk on behalf of the company.  You're

2    supposed to be addressing this issue.

3    And what I'm asking you is, as you sit

4    here as a representative of Johnson &

5    Johnson, are you able to say one way or

6    the other whether TEM is capable to

7    definitively find amphibole asbestos in

8    your talc?

9              MR. BICKS:  I just also

10         object as that's not really a fair

11         characterization of what he's here

12         to talk about, that you just

13         described it, as your notice

14         defines it.  And you've made a big

15         deal in the beginning pointing out

16         that he's not an expert.

17              MR. PLACITELLA:  Is this a

18         speaking objection or --

19              MR. BICKS:  Well, but it's

20         just --

21              MR. PLACITELLA:  It's not a

22         form objection.  So I'm trying to

23         understand what you're doing.  If

24         you want to testify, why don't you

John Hopkins, Ph.D.

1        just switch seats.

2              MR. BICKS:  I don't want to

3        testify.  But I want it to be

4        fair.

5              MR. PLACITELLA:  I'm being

6        fair.

7              MR. BICKS:  I don't want you

8        to --

9              MR. PLACITELLA:  I'm not the

10       one who brought up TEM.  He did.

11             MR. BICKS:  -- skate all

12       over the space.

13             MR. PLACITELLA:  I'm not

14       spraying it all over the place.

15  BY MR. PLACITELLA:

16       Q.    Sir, as you sit here today,

17  as a representative of Johnson & Johnson,

18  is it your testimony that Johnson &

19  Johnson does not know whether the TEM

20  method that it specified for testing its

21  talc is capable of definitively

22  determining whether the talc contained

23  amphibole asbestos?

24       A.    To answer your question, no

John Hopkins, Ph.D.

1  that is not Johnson & Johnson's position.

2  The position has always been that TEM was

3  capable of detecting asbestiform --

4  asbestiform amphibole asbestos.

5        Q.    Including amphibole

6  asbestos?

7        A.    Yeah.  Well, that's what I

8  said.  Amphibole asbestos.

9        Q.    At any level?

10        A.    TEM will go down to the

11  parts per million level, 10 parts per

12  million.  In fact, some of the modern TEM

13  is capable of going down to the parts per

14  billion level.

15        Q.    So Johnson & Johnson

16  disagrees with Julie Pier when she says

17  that TEM is not definitive for

18  determining whether there's amphibole

19  asbestos in a sample?

20              MR. BICKS:  This is not --

21              MR. SILVER:  Objection to

22        form.

23              MR. BICKS:  It says not

24        necessarily --

John Hopkins, Ph.D.

1    BY MR. PLACITELLA:

2          Q.    Correct?

3          A.    I was going to say that.

4    What was written in this -- and we're

5    looking at, probably what would have

6    probably been a two-hour presentation,

7    PowerPoint presentation.  And you've

8    selected out two lines.

9                And what -- what is

10   highlighted here was not necessarily

11   definitive for amphibole asbestos versus

12   amphibole cleavage fragments.

13               And the point I made is that

14   Johnson & Johnson's position has always

15   been that TEM was capable of detecting

16   amphibole asbestos where it be present.

17         Q.    So why bother with XRD?

18         A.    It's a history that when the

19   test methods were being developed back in

20   the early 1970s, you look at XRD as step

21   one.  And you get a big picture.  You

22   have a larger sample of material.  You

23   get a big picture of the -- of the talc.

24   You can look at about 100,000 particles.

John Hopkins, Ph.D.

```
1    And you get the big picture.  Then you
2    focus down through polarized light, and
3    then through transmission microscopy.  So
4    you look at all three.  It's a belt and
5    suspenders approach.
6              Q.    Sir, you're aware, are you
7    not, that your own specifications state
8    that for certain sampling procedures you
9    don't use TEM, you only use XRD?  You
10   know that, correct?
11             A.    The -- that's not entirely
12   true.
13             The requirements of the ore
14   testing is TEM.  That's the first part.
15   When you're testing the ore.
16             When you go on to test the
17   floated product, you look at XRD and PLM
18   if necessary.  And then there's a backup,
19   a Level 3 protocol, where you look at TEM
20   on the finished product on a regular
21   basis.
22             Q.    Well, if we have time we'll
23   do some more of that.  But as we sit
24   here, the -- you understand that the
```

John Hopkins, Ph.D.

1    detection limit for TEM for chrysotile

2    was about .001 percent by weight?

3            MR. BICKS:  Objection to the

4        form.  No foundation.

5            MR. PLACITELLA:  Give me

6        182.

7            (Document marked for

8        identification as Exhibit

9        J&J-182.)

10            MR. BICKS:  And vague as to

11        time.

12   BY MR. PLACITELLA:

13        Q.    You have in front of you

14   Exhibit 182 which is a January 1976 --

15        A.    '86.

16        Q.    -- '86 letter.

17        A.    Hang on.

18            MR. BICKS:  This is

19        April 1986, what we have.

20            MR. PLACITELLA:  No.  Do you

21        have 182?

22            MR. BICKS:  Right.

23            THE WITNESS:  Yes.

24            MR. PLACITELLA:  Look at the

John Hopkins, Ph.D.

```
1              second page.  Here's the second
2              page.  They're attached.
3                       MR. SILVER:  The Bates
4              number?
5                       MR. PLACITELLA:  That's
6              right.  Bates number.  There must
7              have -- I don't know.  There is no
8              Bates number.
9    BY MR. PLACITELLA:
10             Q.    The April 29, 1986, do you
11   see that?
12                      MR. BICKS:  I think it's
13             '87, right?
14                      MR. PLACITELLA:  It says
15             April 29, 1986.
16                      MR. BICKS:  Yeah, but look
17             when it's received.  Because you
18             can see there's a typo on what
19             we've got here.  Or are you on the
20             second page?
21                      MR. PLACITELLA:  I'm on the
22             first page.
23   BY MR. PLACITELLA:
24             Q.    Do you see that?  We are --
```

John Hopkins, Ph.D.

1    let me see yours.  We are on the same

2    page.  April 29, 1986.

3         A.    Yes.

4         Q.    Are you with me?

5         A.    Yes.

6         Q.    Okay.  And you go to the

7    second page of that document, which is

8    January 28th, from McCrone.

9         A.    Yes, that was nine months

10   later.

11        Q.    Right.  And you see where

12   McCrone says the limit of detection is

13   .001 --

14             MR. SILVER:  Objection.

15   BY MR. PLACITELLA:

16        Q.    -- weight percent?

17        A.    That's what they've written

18   in that particular case.  It was below

19   .001 percent by weight.

20        Q.    Right.  That's the limit of

21   detection.  That's what it states,

22   correct?

23        A.    That's what they stated in

24   1987.

John Hopkins, Ph.D.

1    Q.    Right.  And you have

2  testified, have you not, that at

3  .001 percent you could still have

4  millions of fibers per gram?

5    A.    I don't recollect testifying

6  that you could still have millions of

7  fibers per gram.  But what we've got here

8  is the limited detection on that

9  particular time frame, they claim to be

10  .001 percent by weight.

11    Q.    Sir, you understand that

12  even at .001, could still be millions of

13  fibers per gram, correct?

14    A.    If they were present you

15  would still have fibers, yes.  If they

16  were present.  But as I say, they found

17  no quantifiable amounts.

18    Q.    But I'm talking in general.

19  Even at .001 or below, you could have

20  millions of fibers per gram, correct?

21    A.    Well, it's -- I'm not going

22  to speculate because you need to see this

23  in the context of other test methods that

24  were being used.  That's what -- that's

John Hopkins, Ph.D.

1   the point I make.

2          Q.   Sir, did you testify under

3   oath in a trial that at .001 percent, you

4   could still have millions of fibers per

5   gram of asbestos fibers?

6          A.   If they were there, if they

7   were present, in theory, you could.  If

8   they were there.

9               MR. PLACITELLA:  Now, give

10         me 159.

11             (Document marked for

12         identification as Exhibit

13         J&J-159.)

14   BY MR. PLACITELLA:

15         Q.   I'm going to show you what's

16   been marked 159.  This is a February 23,

17   1978, Johnson & Johnson document,

18   correct?

19         A.   Yes, it is.  Yes.

20         Q.   Okay.  If you go to Page 2,

21   it talks about the sampling that's being

22   done.

23               Do you see that?

24         A.   Yes.

John Hopkins, Ph.D.

1          Q.    And it talks about the

2    ground ore being testified -- being

3    tested by TEM, correct?

4          A.    That is -- yes.  7024 is

5    TEM.  Yes.

6          Q.    Right.  And it talks about

7    the composite samples being tested for by

8    the J-4-1 method and the 7019 method,

9    correct?

10         A.    Yes.

11         Q.    Okay.  The composite samples

12   it doesn't state that you were using TEM,

13   does it?

14         A.    Not -- not on those

15   composite samples at that point, no.

16         Q.    Okay.

17         A.    The flash dry is tested

18   later.

19         Q.    All right.  And according to

20   your requirements underneath, it says the

21   J-4-1 method was for finding fibrous

22   amphibole forms, correct?

23         A.    Yes.

24         Q.    But that had a limit of

John Hopkins, Ph.D.

1    .5 percent, correct?  We went over that.

2         A.    Yeah, around about 70, 80,

3    it was around that point in time.  .1, to

4    .2 with more modern equipment.

5         Q.    And 7019 was for determining

6    whether there was serpentine minerals,

7    correct?

8         A.    That's a differential

9    thermal analysis, yes.

10        Q.    Right.  It could not tell,

11   7019, whether the serpentine materials

12   was asbestos or not, correct?

13        A.    It would pick up serpentine

14   material at .5 percent.

15        Q.    And underneath it where it

16   says "asbestiform minerals," you list

17   your spec for 7024, correct?

18        A.    Yes.

19        Q.    All right.  So when you were

20   testing the weekly composites according

21   -- at least at this time, according to

22   this document, you were not using

23   electron microscopes, were you?

24        A.    No, it was the biweekly

John Hopkins, Ph.D.

1    composites that were using electron TEM.

2    Yes.

3         Q.    Twice a month, you would use

4    the TEM on ore, correct?

5         A.    Right.  There's a little bit

6    of detail on that.  The --

7         Q.    Is that what it says, sir?

8    Does it say that twice a month you would

9    be using the TEM on the ore?

10            MR. BICKS:  Ground ore.

11   BY MR. PLACITELLA:

12        Q.    On the ground ore?

13        A.    The ground ore.  But that is

14   a composite of samples taken on a regular

15   basis during the manufacturing shift each

16   day, day after day, and they are mixed

17   combined together.  And then that

18   composite sample is evaluated every two

19   weeks.

20        Q.    Correct.

21        A.    So -- but it is on data

22   production runs for that two-week period,

23   then it's mixed together, and then

24   evaluated every two weeks by TEM.

John Hopkins, Ph.D.

1      Q.    So you use TEM to look at

2  the ore, correct?

3      A.    Yes.

4      Q.    All right.  You use XRD to

5  look at the flash-dried talc, the

6  finished product, right?  That's what

7  this says?

8      A.    J-4-1 is XRD followed, if

9  there is an indication of amphibole, by

10  polarized light.  And then in this case

11  followed by TM 7019, which is

12  differential thermal analysis.

13      Q.    Right.  So when you're

14  looking at the weekly composites of the

15  finished product, you don't use a method

16  that can find chrysotile asbestos, do

17  you?

18          MR. BICKS:  Just so -- when

19      you keep saying "we," you're

20      talking about Windsor here as

21      distinct from Johnson & Johnson.

22          MR. PLACITELLA:  Well, this

23      is a Johnson & Johnson

24      specification, isn't it?

John Hopkins, Ph.D.

1           MR. BICKS:  No.

2           MR. PLACITELLA:  Could you

3      please not do that?  You know, to

4      be fair.

5  BY MR. PLACITELLA:

6      Q.    Okay.  So let me just go

7  further.

8           Let's go down to the next

9  page.  Do you see where it talks about

10  standard test method.

11      A.    Have we turned the page?

12      Q.    The next page, sir.

13      A.    Yes.

14      Q.    And that is a standard test

15  method by Johnson & Johnson Baby products

16  company and it lists 7019 as the method,

17  correct?

18      A.    That was the differential

19  thermal analysis, DTA, that was used in

20  1977 there.  Yes.

21      Q.    Right.  And what they did

22  there, is they -- part of the process is

23  where they actually heated the sample up,

24  right?

John Hopkins, Ph.D.

1          A.    Yes.  DTA requires you to

2    heat the sample, cool it, and measure

3    certain changes through an instrument

4    that will tell you whether or not you

5    have serpentine minerals present.

6          Q.    Right.  This is not TEM,

7    correct?

8          A.    No.  This is DTA.

9          Q.    Okay.  And if you look a

10   little bit further down.  And I'll blow

11   it up.

12          It states that you can use

13   this method to detect the presence of

14   serpentine material, including chrysotile

15   asbestos, correct?

16          A.    Yes.

17          Q.    That's what it says?

18          A.    It does, yes.

19          Q.    Okay.  And then when it says

20   interferences, it talks about what's

21   going to interfere with finding trace

22   levels, correct?

23          A.    Yeah, what it says is, "No

24   mineral is commonly found as trace

John Hopkins, Ph.D.

1    contaminants in cosmetic talc are known

2    to exhibit thermal transitions," which

3    would interfere with the detection of a

4    serpentine mineral by DTA.

5          Q.    Right.  And then if you go

6    to the next page where it goes to

7    sensitivity, it says that the sensitivity

8    is .5 percent, correct?

9          A.    Yes.  That's -- that's

10   correct.

11         Q.    So you are not going to even

12   find serpentine using this method under

13   .5 percent, correct?

14         A.    That method on its own, no.

15   You'd -- you had done your x-ray

16   diffraction to see if you have an

17   amphibole mineral.  That would exclude

18   the tremolite type.  And with the TEM,

19   you then look at -- you need to do the

20   TEM part to see if you've got a

21   serpentine.

22         Q.    All right.  And what it says

23   here, "This method is not specific as to

24   any variety of serpentine mineral, that

John Hopkins, Ph.D.

1    is, whether it's antigorite chrysotile or

2    lizardite," correct?

3         A.    That's what it says.

4         Q.    So you can't use this method

5    to determine whether the talc sample

6    contains chrysotile, correct?  It won't

7    tell you?

8         A.    Well, that's not entirely

9    true.  If it contained chrysotile it

10   would pick it up as a serpentine mineral.

11   You might get a false positive if it

12   didn't contain chrysotile but contained

13   some antigorite.

14        Q.    Right.  You can't tell the

15   difference?

16        A.    You'd get a false positive.

17        Q.    Right.  So you can't rely

18   upon this method to tell you whether you

19   have chrysotile in the sample, correct,

20   alone?

21        A.    No.  If there's chrysotile

22   present, the method would pick it up.

23   What the method -- what the author said

24   in terms of sensitivity, is if there were

John Hopkins, Ph.D.

1  antigorite present, it would also pick it

2  up.  But it would still pick it up if

3  there were chrysotile present.

4       Q.    And it can tell the

5  difference between chrysotile and

6  antigorite?

7       A.    No, but --

8       Q.    That's my point.  My point

9  here is that you can't use this method to

10  definitively find chrysotile, because you

11  won't know whether it's chrysotile,

12  antigorite, or lizardite, if they are all

13  present, correct?

14       A.    I'll try and say that again.

15  If there were chrysotile there, it would

16  pick it up.  But also it would also pick

17  it up, if it were present, antigorite or

18  lizardite.  That's what they're --

19       Q.    And if there are all three,

20  it can't tell you what is present, right?

21       A.    But it would show that --

22  well, if they are there.  If you were

23  looking for chrysotile and you got a

24  positive response with this method, it

John Hopkins, Ph.D.

1   would flag up that there was a serpentine

2   there, which could include chrysotile.

3          Q.    This states, "This method is

4   not" -- I don't want to fight with you.

5              "This method is not specific

6   as to the variety of serpentine mineral

7   present?"  Does it state that?

8          A.    It does.

9          Q.    Okay.  So now, going back to

10  the page, two pages before.  According to

11  this letter from Johnson & Johnson,

12  Mr. Lee, who you told me was a senior

13  scientist, correct?

14         A.    That's correct, yes.

15         Q.    Okay.  According to this

16  letter, TEM, which you say is definitive

17  for determining whether there is asbestos

18  in talc, is never used, according to this

19  letter, on the finished product, correct?

20             MR. BICKS:  Objection to the

21         form.

22             THE WITNESS:  According to

23         that letter, that would be the

24         inference.

John Hopkins, Ph.D.

1              But what I did tell you is

2         that there is what I call a belts

3         and suspenders approach whereby --

4    BY MR. PLACITELLA:

5         Q.    Sir -- sir --

6         A.    -- TEM is used --

7         Q.    Sir, I'm asking you what's

8    reflected in this letter, not your

9    opinions.  Remember when we started

10   saying I said I didn't want your

11   opinions.  I wanted the facts.  Okay.

12   And unless you have some contemporaneous

13   document to document what you're saying,

14   let's stick to the facts.

15              According to this letter --

16              MR. LOCKE:  Objection.

17   BY MR. PLACITELLA:

18        Q.    According to this letter,

19   TEM is not used to test the finished

20   product, correct?

21              MR. BICKS:  Objection to the

22         form.

23              THE WITNESS:  It is used to

24         test the ground ore but not the

John Hopkins, Ph.D.

1          ore after it's been washed and

2          dried.

3                    MR. PLACITELLA:  Okay.

4          Let's go to 194.

5     BY MR. PLACITELLA:

6          Q.    194 is the specification we

7     went through before for TEM, correct?

8          A.    Yes.

9          Q.    Okay.  And if you go to

10    Page 3 under sample preparation, we said

11    that was part of methodology?

12         A.    Yes, that's correct.

13         Q.    It says you take, in order

14    to prepare the sample, 30 to

15    50 milligrams of talc powder to start,

16    correct?

17         A.    Yes.  That's what's written.

18         Q.    That is very, very little,

19    correct?

20         A.    It's a small sample, yes.

21         Q.    Okay.  Like, I don't know,

22    could you even see it if I put it under

23    the Elmo here, 30 to 50 milligrams?

24         A.    Oh, yeah.

John Hopkins, Ph.D.

1    Q.    You could?

2    A.    Yeah.

3    Q.    So can you go to Page 5.

4    When it talks about calculating the

5    detect -- calculation of a detection

6    limit.

7         Do you see that?

8    A.    I do.

9    Q.    It says a minimum

10   quantifiable mass of asbestos fibers

11   based upon the detection of five fibers.

12        Do you see that?

13   A.    Yes.

14   Q.    So until you hit -- even if

15   you see fibers, until you hit five fibers

16   according to this method, it's not

17   quantifiable, correct?

18   A.    The term "quantifiable"

19   means what weight, what percent, et

20   cetera.  And what it -- if you saw one

21   fiber, you'd say, "I've seen one fiber."

22   I've seen two fibers.  But to get a

23   quantity, a quantifiable amount in

24   percent, .0001 percent, what it says is

John Hopkins, Ph.D.

1  that you would need to see five fibers,

2  knowing how much you put under your

3  microscope.

4         Q.    All right.  So in order to

5  say you found asbestos, you'd have at

6  least five fibers of one type, correct?

7         A.    No.  Quantifiable, as I

8  said, relates to how do you create a

9  percentage.  How do you say it's .0001

10  percent.  You need five fibers to do that

11  math.

12            But you will certainly see

13  one fiber under the -- under the

14  microscope, and you would report if you

15  saw one fiber.

16         Q.    So you would put in the

17  report that you saw one fiber, even if it

18  was not quantifiable?  That's what you'd

19  put in the report?

20            MR. BICKS:  Objection to the

21       form.

22            Who is the "you" here?

23            MR. PLACITELLA:  Johnson &

24       Johnson.

John Hopkins, Ph.D.

1          THE WITNESS:  The facilities

2     that have done the testing have

3     always reported if they found a

4     fiber, even one fiber.

5          This is a separate question

6     as to whether you can quantify it

7     in terms of percentages.

8          And to do that, the math of

9     this is that you'd need to see

10    five fibers based on the amount

11    that you had used your

12    50 milligrams to get a percentage

13    number.  But you can certainly see

14    one fiber under the TEM.

15 BY MR. PLACITELLA:

16    Q.    So what happens if you find

17 four fibers of tremolite, four fibers of

18 actinolite.  Four fibers of chrysotile.

19 And four fibers of something else?

20          As long as it doesn't hit

21 five fibers, you can have up to 16, 20

22 fibers as long as you don't hit the

23 number five, you can say it's not

24 quantifiable?

John Hopkins, Ph.D.

```
1              MR. BICKS:  Objection to

2         form.

3              THE WITNESS:  No, no, that's

4         not true.  It uses a generic term,

5         "quantifiable mass of asbestos

6         fibers."

7    BY MR. PLACITELLA:

8         Q.    So you can mix and match?

9         A.    If there were -- if there

10   were -- that's what this document reads.

11   That if in theory you had actinolite or

12   for a -- a serpentine fiber, you'd count

13   that, whether it was four, five, six,

14   whatever.  You'd still count them with

15   that number.

16        Q.    So as soon as you hit five,

17   no matter what the fibers were, you would

18   say it was quantifiable?

19             MR. BICKS:  Asked and

20        answered.

21             THE WITNESS:  If they were

22        asbestos fibers --

23   BY MR. PLACITELLA:

24        Q.    Right.
```

John Hopkins, Ph.D.

1          A.    -- you could quantify it in

2    terms of percentage knowing that the

3    figure started with the 50 milligrams

4    that would allow you to work out a

5    percentage.  But you'd still see, even if

6    it was just one asbestos fiber there, you

7    would still see it with transmission

8    microscopy.

9               MR. PLACITELLA:  Okay.  Now,

10         get me 198.

11              (Document marked for

12         identification as Exhibit

13         J&J-198.)

14    BY MR. PLACITELLA:

15         Q.    I've shown you Exhibit 198

16    which is a November 26, 1990 letter from

17    McCrone to Windsor Chemical -- Windsor

18    Minerals.  And in here, McCrone states

19    that they found no quantifiable amounts

20    of asbestiform minerals.

21              Do you see that?

22         A.    Yes.

23         Q.    How many fibers did they

24    report here?

John Hopkins, Ph.D.

1     A.    I haven't read this report.

2     Q.    Well, right here on this

3  letter, how many fibers are they

4  reporting?  I mean, wouldn't the

5  layperson look at this and say there's no

6  asbestos?

7     A.    It says we found no

8  quantifiable amounts.

9     Q.    Right.  So how many fibers

10  did they find here and what kind?

11     A.    Well, based on that first

12  page, it doesn't give the answer to your

13  question.  You'd need to read the whole

14  report, or at least I would need to read

15  the whole report.

16     Q.    Go to Bates Number 7797.

17     A.    Yes.

18     Q.    Here it says they found

19  anthophyllite?

20     A.    Anthophyllite usually occurs

21  in its non-asbestos form.

22     Q.    But does it say that?

23     A.    Well, no, but they phrased

24  it differently.  They found no

John Hopkins, Ph.D.

1   asbestiform minerals.

2         Q.    Where -- where does it say

3   no asbestiform?

4         A.    Page --

5         Q.    I thought it said -- can you

6   just look at this for a second.  If it's

7   a fiber, then it's asbestiform, right,

8   sir?

9         A.    Usually, yes.  Unless -- it

10  depends on how we're defining fiber.

11        Q.    So do you see the part where

12  in notes it says "fibers"?  I blew it up.

13        A.    I can see the word "fibers,"

14  but I can't read the second word.

15        Q.    Okay.  And do you see on

16  that same page they found anthophyllite?

17        A.    Yes.

18        Q.    Okay.  That's not reported

19  on this page, is it?

20        A.    Well, they claim not to have

21  found any asbestos.

22        Q.    Well, no.  It says, "We

23  found no quantifiable amounts of

24  asbestiform."  But they found

John Hopkins, Ph.D.

1    anthophyllite, correct?

2         A.    They found anthophyllite.

3    But from that, without more detail and

4    without more information, it doesn't tell

5    us whether they were an asbestiform.

6         Q.    Yeah, sure, it does.  It

7    says fibers, right?  Somebody didn't make

8    that up.  Let's go to another one.  How

9    about --

10             MR. BICKS:  Can I just make

11        sure I see this right?

12             MR. PLACITELLA:  No.

13             MR. BICKS:  No, no, hold on

14        a minute.  This is the exhibit

15        that you just put in front of him.

16             MR. PLACITELLA:  Mm-hmm.

17             MR. BICKS:  And you're

18        suggesting that that attachment

19        that you're reading that chart is

20        part of this letter dated

21        November 26th.

22             MR. PLACITELLA:  I'm not

23        saying it's part.  I'm not saying

24        it's part of it.  All right.

John Hopkins, Ph.D.

1          Let's go back.

2    BY MR. PLACITELLA:

3          Q.    Do you see the numbers here?

4               MR. BICKS:  Because the

5          enclosure is with a different

6          document.

7               MR. PLACITELLA:  9028, 9029,

8          9030.

9               THE WITNESS:  That says

10         client ID.  The client has to be

11         Windsor Minerals or Cyprus

12         Minerals.

13   BY MR. PLACITELLA:

14         Q.    All right.  Do you see here

15   where it's the same numbers, 90, 90 and

16   90, September 1990?

17               MR. BICKS:  That's the year.

18   BY MR. PLACITELLA:

19         Q.    CWM 90, 28, 29 and 30.  28,

20   29 and 30, correct?

21         A.    Correct.  What it doesn't

22   tell us is what this is.  Cyprus Minerals

23   had a major manufacturing operation for

24   industrial talcs.  That's nothing here

John Hopkins, Ph.D.

1   that says this is Johnson's Baby Powder

2   talc.

3           Q.    I didn't ask you that

4   question, sir?

5           A.    It's giving a designation.

6           Q.    Does -- by the way, can you

7   go to 7803?

8           A.    Yes.

9           Q.    Here they find chrysotile?

10          A.    They reported a chrysotile

11  fiber, yes.

12          Q.    Okay.  Is that reported by

13  McCrone in their report?

14          A.    On this report, no.  But

15  again, what is this to do with Johnson's

16  Baby Powder?

17          Q.    Well, you tell me, sir.

18          A.    Well, what I can tell you is

19  that Cyprus Minerals when they took over

20  the operation from Windsor Minerals,

21  carried on mining and manufacturing

22  industrial talcs, which were quite

23  separate from the talcs that were used in

24  Baby Powder.  And the point I'm making is

John Hopkins, Ph.D.

1  that without proper identification as to

2  what this is and what it related to,

3  there's no tie or link to Johnson's Baby

4  Powder.

5          Q.    Okay.  But that wasn't any

6  of my questions, was it?  My question was

7  McCrone is listing as not quantifiable,

8  no asbestos, in this report to Windsor,

9  yet they found asbestos, correct?

10              MR. BICKS:  No foundation.

11              THE WITNESS:  Well, they

12         reported they found a chrysotile

13         fiber and an anthophyllite

14         material.

15  BY MR. PLACITELLA:

16          Q.    All right.  So let's see if

17  I can abbreviate this deposition a little

18  bit.  You tell me, true or false, the

19  answer to these questions.  You have it

20  in front of you -- why don't we mark that

21  first.

22              (Document marked for

23         identification as Exhibit

24         Hopkins-4.)

John Hopkins, Ph.D.

1    BY MR. PLACITELLA:

2         Q.    Hopkins-4.  True or false:

3              Johnson & Johnson is aware

4    of test results indicating that asbestos

5    was found in Vermont talc mines used to

6    make Johnson's Baby Powder?

7         A.    Asbestos was found in the

8    mines used to make Johnson's Baby Powder.

9    (Reading aloud).

10              I'm not aware that asbestos

11   has ever been found in the mines that we

12   used to make Johnson's Baby Powder, i.e.,

13   Hammondsville mine, Hamm mine, Argonaut

14   mine.

15        Q.    So can you circle false

16   then?

17        A.    No, I've got a pen.

18        Q.    Johnson & Johnson -- next.

19              Johnson & Johnson is aware

20   of test results indicating that fibrous

21   tremolite was found in the Vermont talc

22   mines used to make Johnson's Baby Powder.

23   True or false?

24              MR. SILVER:  Objection to

John Hopkins, Ph.D.

```
1              the form.
2                   MR. BICKS:  Objection to the
3              true/false, but go ahead.
4                   THE WITNESS:  It isn't
5              always possible to give a true or
6              false answer.  You need to
7              actually give a bit more detail.
8              The Vermont talc mines cover --
9              Vermont is a darn big state.
10             There are dozens of talc mines in
11             Vermont.  But the mines used to
12             make Johnson's Baby Powder do not
13             contain asbestos tremolite.
14        BY MR. PLACITELLA:
15             Q.    Johnson & Johnson is aware
16        of test results -- I didn't ask that
17        question.
18                  Johnson & Johnson is aware
19        of test results indicating that fibrous
20        tremolite was found in the Vermont talc
21        mines used to make Johnson's Baby Powder.
22        True or false?
23                  MR. SILVER:  Objection.
24                  THE WITNESS:  Again, this is
```

John Hopkins, Ph.D.

```
 1              a question where there isn't an
 2              easy answer.  Fibrous tremolite
 3              is, if it's asbestos, so the
 4              answer would be false.
 5    BY MR. PLACITELLA:
 6         Q.   So the answer is false?
 7         A.   That is my opinion, yes.
 8         Q.   Okay.  Okay.  False.
 9              Next.  Johnson & Johnson is
10    aware of test results indicating --
11              THE VIDEOGRAPHER:  Put your
12         microphone on.
13              MR. PLACITELLA:  I'm sorry.
14    BY MR. PLACITELLA:
15         Q.   -- indicating that fibrous
16    amphiboles were found in the Vermont talc
17    mines used to make Johnson's Baby Powder.
18    True or false?
19              MR. SILVER:  Objection to
20         form.
21              THE WITNESS:  Again, my
22         answer is that that is false.
23         There is no fibrous amphiboles, if
24         they are equivalent to asbestos,
```

John Hopkins, Ph.D.

1          in the Johnson's Baby Powder.

2   BY MR. PLACITELLA:

3          Q.    So you're not aware of any

4   test results.  We'll make it false.

5                 Okay.  Next.  Johnson &

6   Johnson is aware of test results

7   indicating that fibrous actinolite was

8   found in the Vermont talc mines used to

9   make Johnson's Baby Powder.

10                MR. SILVER:  Objection to

11          the form.

12  BY MR. PLACITELLA:

13         Q.    True or false?

14                MR. BICKS:  Object to the

15          form.

16                THE WITNESS:  Again, it's a

17          question that, how do you define

18          fibrous actinolite.  If you're

19          saying, is it the asbestos

20          actinolite, form of actinolite,

21          then the answer is false.

22  BY MR. PLACITELLA:

23         Q.    No, I'm using your

24  definition, sir.  Fibrous actinolite.  Is

John Hopkins, Ph.D.

1  Johnson & Johnson aware of test results

2  indicating that fibrous actinolite was

3  found in the Vermont talc mines that was

4  used to make Baby Powder?

5       A.    I'm not aware, speaking for

6  Johnson & Johnson, of test results

7  indicating that that was the case.  So

8  the answer again I'm going to give is

9  false.

10       Q.    False.  Okay.

11            Next.  Johnson & Johnson is

12  aware of test results indicating that

13  fibrous talc was found in the Vermont

14  talc mines used to make Johnson's Baby

15  Powder.  True or false?

16            MR. SILVER:  Objection to

17       form.

18            THE WITNESS:  You need to

19       define what is meant by "fibrous

20       talc."

21            Talc can occur -- pure talc

22       can occur in a fibrous form if

23       it's -- or a shard or a split from

24       talc.  And it would appear as a

John Hopkins, Ph.D.

```
 1            fiber.  And so the answer is that

 2            you can get fibrous talc in

 3            Vermont talc mines.

 4    BY MR. PLACITELLA:

 5            Q.    So the answer is true?

 6            A.    It could be true.  But it

 7    depends -- and this is the key thing with

 8    this whole dialogue.  It depends on how

 9    you define these materials.

10            Q.    I'm using your definition,

11    sir.

12            A.    I --

13            Q.    The definition that we

14    started out with.

15            A.    I've never seen --

16            Q.    The definition articulated

17    by Johnson & Johnson.

18                  MR. BICKS:  I don't think we

19            had fibrous talc.

20                  THE WITNESS:  I don't

21            believe I've ever seen the word

22            fibrous talc in a definition.

23    BY MR. PLACITELLA:

24            Q.    We'll get there.  So is this
```

John Hopkins, Ph.D.

1    false or true or you don't know?

2           A.    I would say, yeah, because

3    we don't have a definition --

4           Q.    Okay.  Put a question mark.

5    You don't know.

6           A.    I'll put an asterisk in the

7    middle.

8           Q.    Well, okay.  Well, I'm going

9    to put a question mark because you don't

10   know.  Okay.

11               Next.  Johnson & Johnson is

12   aware of test results indicating that

13   asbestos was found in the processed

14   Vermont talc used to make Johnson's Baby

15   Powder.

16               MR. SILVER:  Objection to

17        form.

18               THE WITNESS:  Again, I'm not

19        aware of any finding of asbestos

20        in Vermont talc.

21   BY MR. PLACITELLA:

22          Q.    False?

23          A.    That's my opinion, yes.

24          Q.    I don't want your opinion.

John Hopkins, Ph.D.

1    I'm asking you --

2         A.    Yes that's my statement on

3    behalf of Johnson & Johnson --

4         Q.    Okay.

5         A.    -- that that, I believe, is

6    false.

7         Q.    All right.  Johnson &

8    Johnson is aware of test results

9    indicating that fibrous talc was found in

10   the processed Vermont talc used to make

11   Johnson's Baby Powder.  True or false?

12               MR. SILVER:  Objection to

13          form.

14               THE WITNESS:  Again, this is

15          very similar to the question --

16          the previous -- the previous one,

17          two before, where we talk about

18          what is fibrous talc.

19               It is talc that may occur by

20          being processed into a fiber.  You

21          can get a fibrous talc.  It's

22          still talc.  It's not harmful.

23               So I'm not sure we've ever

24          measured fibrous talc.  You're

John Hopkins, Ph.D.

1          talking about test results.  I've

2          not seen test results for fibrous

3          talc.

4     BY MR. PLACITELLA:

5          Q.    So false?

6          A.    Well, I don't have the

7     answer to that because fibrous talc is

8     not a parameter that's measured as a

9     routine quality control process.

10         Q.    And you've -- and Johnson &

11    Johnson has never seen any test results

12    indicating whether there was fibrous talc

13    in the mines that were used to make Baby

14    Powder.  That's the question.  You said

15    you don't know.

16         A.    I'll say I don't know.

17         Q.    Is fibrous talc harmful by

18    the way?

19         A.    No.

20         Q.    Okay.  Johnson & Johnson --

21    next.  Johnson & Johnson is aware of test

22    results indicating that fibrous tremolite

23    was found in the processed Vermont talc

24    used to make Johnson's Baby Powder.  True

John Hopkins, Ph.D.

1   or false?

2              MR. SILVER:  Objection to

3        the form.

4              MR. BICKS:  Object to the

5        form.

6              THE WITNESS:  Again, fibrous

7        tremolite, if it were asbestos

8        tremolite, then the answer would

9        be false.

10  BY MR. PLACITELLA:

11       Q.    No, sir.  I'm not asking you

12  to interpret or give an opinion.

13              The question is:  Johnson &

14  Johnson is aware of test results

15  indicating that fibrous tremolite was

16  found in the processed Vermont talc used

17  to make Johnson's Baby Powder.  True or

18  false?

19              MR. SILVER:  Same objection.

20  BY MR. PLACITELLA:

21       Q.    You are either aware or

22  you're not.

23       A.    I'm going to give I don't

24  know because you've not defined fibrous

John Hopkins, Ph.D.

1    tremolite.  It's a geologist's

2    description.

3           Q.    Sir, I'm using your

4    definition.

5           A.    That case --

6           Q.    You say asbestos that is --

7    tremolite that is fibrous is asbestos.

8    Isn't that your definition?

9           A.    The definition of asbestos

10   is more than just a fiber.  It relates to

11   surface charge, flexibility, length.

12          Q.    Sir --

13          A.    There's a lot more to it

14   than --

15          Q.    That's not in your

16   definition, with all due respect, that we

17   started with, is it?

18          A.    Not with that definition

19   that you have back in the 1970s.

20          Q.    And that was the Johnson &

21   Johnson definition, correct?

22          A.    That was the definition --

23          Q.    Okay.

24          A.    -- which is written in the

John Hopkins, Ph.D.

1    specification --

2         Q.    All right.  So using the

3    definition that's written in your

4    specification of asbestos and fibrous

5    tremolite, Johnson & Johnson is aware of

6    test results indicating that fibrous

7    tremolite was found in the processed

8    Vermont talc used to make Johnson's Baby

9    Powder.  True or false?

10                MR. BICKS:  Object to the

11         form.

12                MR. SILVER:  Objection.

13                THE WITNESS:  And my answer

14         is false.

15    BY MR. PLACITELLA:

16         Q.    Okay.  False.

17                Next.  Johnson & Johnson is

18    aware of test results indicating that

19    fibrous actinolite was found in the

20    processed Vermont talc used to make

21    Johnson's Baby Powder.  True or false?

22                MR. SILVER:  Objection to

23         form.

24                THE WITNESS:  Again, it's

John Hopkins, Ph.D.

1          the same -- it's the same answer.

2          I've not seen test results for

3          Johnson's Baby Powder which

4          contained fibrous actinolite.

5     BY MR. PLACITELLA:

6          Q.    That's not what this asks.

7          A.    So -- no, I've said -- you

8     said are you aware of test results.  And

9     I'm saying I'm not aware of test results.

10         Q.    Okay.  So false?

11         A.    That's my --

12         Q.    Okay.

13         A.    -- opinion, yes.

14         Q.    Okay.  Next.  Johnson &

15    Johnson is aware of test results

16    indicating that chrysotile was found in

17    the processed Vermont talc used to make

18    Johnson's Baby Powder.  True or false?

19              MR. SILVER:  Object to form.

20              THE WITNESS:  Again, same

21         answer.  It's false.

22    BY MR. PLACITELLA:

23         Q.    False.  Next.  Johnson &

24    Johnson is aware of test results

John Hopkins, Ph.D.

1  reporting that asbestos was found in the

2  Vermont talc mines used to make Johnson's

3  Baby Powder.  True or false?

4            MR. SILVER:  Object to form.

5            THE WITNESS:  I'm not aware

6       that asbestos has ever been found

7       in the mines that are used to

8       provide Johnson's Baby Powder.

9  BY MR. PLACITELLA:

10       Q.    False?

11       A.    So the answer would be

12  false.

13       Q.    Next.  Johnson & Johnson is

14  aware of test results reporting fibrous

15  tremolite was found in the Vermont talc

16  mines used to make Johnson's Baby Powder.

17            MR. SILVER:  Object to form.

18            THE WITNESS:  We had that

19       question already.

20  BY MR. PLACITELLA:

21       Q.    It's a different question.

22       A.    Okay.  Again, the answer is

23  no, I've not seen results that there was

24  fibrous tremolite.

John Hopkins, Ph.D.

```
1            Q.    Okay.  Next.  Johnson &
2     Johnson is aware of test results
3     reporting that fibrous amphiboles were
4     found in the Vermont talc mines used to
5     make Johnson's Baby Powder.
6                    MR. SILVER:  Object to form.
7                    THE WITNESS:  Again, the
8            same question.  It is -- or a very
9            similar question.  So I'm not
10           aware of results that report
11           fibrous amphiboles in the mines
12           used to make Johnson's Baby
13           Powder.
14    BY MR. PLACITELLA:
15           Q.    Okay.  False.
16                    Next, Johnson & Johnson is
17    aware of test results reporting that
18    fibrous actinolite was found in the
19    Vermont mines used to make Johnson's Baby
20    Powder.
21                    MR. SILVER:  Object to form.
22                    THE WITNESS:  Again, I've
23           not seen results that report that.
24    BY MR. PLACITELLA:
```

John Hopkins, Ph.D.

1    Q.    Okay.  False.  Johnson &

2  Johnson is aware of test results

3  reporting that fibrous talc was found in

4  the Vermont talc mines used to make

5  Johnson's Baby Powder?

6              MR. SILVER:  Object to form.

7              THE WITNESS:  Again, same

8        story.  I've not seen reports on

9        fibrous talc in the talc mines.

10  BY MR. PLACITELLA:

11    Q.    Okay.  We're almost done.

12              Johnson & Johnson is aware

13  of test results reporting that asbestos

14  was found in the processed Vermont talc

15  used to make Johnson's Baby Powder?

16              MR. SILVER:  Object to form.

17              THE WITNESS:  Again, I'm

18        saying false.  That's a false

19        statement.

20  BY MR. PLACITELLA:

21    Q.    Next.  Johnson & Johnson is

22  aware of test results reporting that

23  fibrous talc was found in the processed

24  Vermont talc used to make Johnson's Baby

John Hopkins, Ph.D.

1    Powder?

2                    MR. SILVER:  Object to form.

3                    THE WITNESS:  Again, I've

4          not seen test results reporting

5          fibrous talc in Baby Powder.

6    BY MR. PLACITELLA:

7          Q.    Next.  Johnson & Johnson is

8    aware of test results reporting that

9    fibrous tremolite was found in the

10   processed Vermont talc used to make

11   Johnson's Baby Powder?

12                   MR. SILVER:  Object to form.

13                   THE WITNESS:  Again, I am

14         not aware of any test results that

15         report fibrous tremolite --

16   BY MR. PLACITELLA:

17         Q.    False?

18         A.    -- in the ore, so in talc.

19   So I'm saying false.

20         Q.    Next.  Johnson & Johnson is

21   aware of test results reporting that

22   fibrous actinolite was found in the

23   processed Vermont talc used to make

24   Johnson's Baby Powder.

John Hopkins, Ph.D.

1                    MR. SILVER:  Object to form.

2                    MR. BICKS:  Object to the

3           form.

4                    THE WITNESS:  Again, I'm not

5           aware of test results that report

6           fibrous actinolite in the talc --

7     BY MR. PLACITELLA:

8           Q.    So false?

9           A.    -- relating to Baby Powder.

10    Yes.

11          Q.    Okay.  Last one.  Johnson &

12    Johnson is aware of test results

13    reporting that chrysotile was found in

14    processed Vermont talc used to make

15    Johnson's Baby Powder?

16                   MR. SILVER:  Object to form.

17                   THE WITNESS:  Again, I've

18          not seen results that indicate

19          that chrysotile is in the talc.

20                   MR. PLACITELLA:  Can you

21          give me Exhibit 1?

22                   MR. LOCKE:  Before we move

23          on, what's happening with these

24          slides?  Are they --

John Hopkins, Ph.D.

1          MR. PLACITELLA:  It's been

2     marked, and he's marked them.  And

3     it's marked as an exhibit.

4          MR. LOCKE:  When you're

5     saying he's marked them.

6          MR. PLACITELLA:  It's been

7     marked, and he's been circling

8     them.  Yes.

9          (Document marked for

10     identification as Exhibit

11     J&J-1.)

12 BY MR. PLACITELLA:

13     Q.    Exhibit J&J-1 is a progress

14 report from the Battelle Field of

15 Research dated May 9, 1958.  You've seen

16 this document before, correct?

17     A.    Correct.

18          MR. BICKS:  I think you

19     pronounce it Battelle.

20          THE WITNESS:  Yes, I have

21     seen it some time ago, yes.

22          MR. PLACITELLA:  Okay.

23     Actually my aunt who is off the

24     boat, she says Battelle.  That's

John Hopkins, Ph.D.

```
 1            how you know.  So I'll use

 2            whatever you want.

 3                 MR. SILVER:  This is a

 4            different Exhibit 1 than the other

 5            Exhibit 1?

 6                 MR. PLACITELLA:  That was

 7            Hopkins-1.

 8    BY MR. PLACITELLA:

 9            Q.    If you go to Page 3 --

10                 MR. SILVER:  What was the

11            first Bates again?

12                 MR. PLACITELLA:  Oh, you

13            need a Bates number.

14            JNJAZ55_000000906.  Okay.  If you

15            go to Bates number 912.  I gave

16            the date.

17    BY MR. PLACITELLA:

18            Q.    This states that the Italian

19    Talc Number 1 contains from less than 1

20    percent to about 3 percent of

21    contaminants.

22                 Do you see that?

23            A.    That's what's written, yes.

24            Q.    And it indicates that the
```

John Hopkins, Ph.D.

1   amphibole component that they found was

2   tremolite, correct?

3         A.    Yes.  Yes, it does say, yes.

4   A variety of tremolite, yes.

5         Q.    And then if you go to the

6   next page, there's a bunch of charts that

7   talk about the percent of tremolite that

8   was found.

9               Do you see that?

10        A.    What table is this?  Which

11  table?

12        Q.    Table 1.  And then Table 2.

13  Do you see that?  Table 1 is titled --

14        A.    Yeah, I'm just reading -- it

15  doesn't say what the contaminants were.

16  It describes them as 1 percent or -- yes,

17  okay.

18        Q.    All right.  And you see that

19  this was testing that was done actually

20  not in Italy, but in the plant in

21  Cranford, New Jersey.

22              Do you see that?

23        A.    Yes.

24        Q.    So I guess Battelle is okay.

John Hopkins, Ph.D.

1                    And you see on Table 2 where

2    it talks about the mineral contaminants?

3         A.    Yes.

4         Q.    And do you see where it says

5    tremolite?

6         A.    Yes, I do.

7         Q.    And it talks about basically

8    from zero to trace amounts, correct?

9         A.    It does.

10        Q.    What's trace-1 mean, if you

11   know?

12        A.    I don't know.

13        Q.    Okay.

14        A.    The limit of detection, I

15   would guess.

16        Q.    If you go to Page 17 of the

17   report, it clearly states that the talc

18   contains tremolite.  Can we agree?

19                    MR. SILVER:  Objection to

20         form.

21                    THE WITNESS:  Yes.  Trace.

22         Zero to trace.  Yes.

23   BY MR. PLACITELLA:

24        Q.    Okay.  And then a little bit

John Hopkins, Ph.D.

1    further down on Page 28 -- I'm sorry, go

2    to Page 31.  I'll cut this short.

3              It talks about keeping the

4    amphiboles less than 1 percent, correct?

5              MR. BICKS:  Where?  Where

6         are we?

7              THE WITNESS:  It says, "The

8         following are the recommendation

9         requirements for beneficiation

10        products to be equivalent of

11        Number 1 talc."

12   BY MR. PLACITELLA:

13        Q.   All right.  So I want to try

14   to keep these as we go through them.  So

15   I'm going to ask Lea to actually make a

16   chart.

17             MR. PLACITELLA:  Can we take

18        J&J-1.  Can you put that up?

19   BY MR. PLACITELLA:

20        Q.   I made some columns.  The

21   date, the exhibit number, the entity, the

22   author, the recipients, the purpose of it

23   stated, the test method, the mines, what

24   was tested, any special preparations,

John Hopkins, Ph.D.

1  what the test showed.  And we'll leave

2  the last one for another day.

3            MR. PLACITELLA:  Can you

4       fill that in, Lea?

5  BY MR. PLACITELLA:

6       Q.    Is that a fair assessment of

7  what the document states, what's on the

8  screen now?

9       A.    I believe so.

10       Q.    Okay.

11            MR. PLACITELLA:  Give me

12       J&J-2.

13            (Document marked for

14       identification as Exhibit

15       J&J-2.)

16  BY MR. PLACITELLA:

17       Q.    J&J-2 is another progress

18  report from Battelle Memorial institute.

19  This is this is dated May 23, 1958.  The

20  Bates number, JNJNL61, a bunch of zeros,

21  134.

22            Do you see that?

23       A.    Yes.

24       Q.    Okay.  It's by Brown Smith &

John Hopkins, Ph.D.

1    MacDonald.

2              Do you see that?

3         A.    Yes.

4         Q.    And in the introduction it

5    says, "Johnson & Johnson is obtaining raw

6    material for Baby Powder talcum from

7    Italian deposits.  The talc is regarded

8    as very good quality."  Correct?

9         A.    Yes.

10        Q.    Okay.  And you understand

11   that this -- you've seen this report.

12   This report is a test for what's in the

13   talc that's going into the baby powder,

14   correct?

15        A.    Well, that's one aspect of

16   it.  The point of the report is to

17   understand and develop a process for

18   beneficiation, how to -- washing of the

19   talc, cleaning it up, and getting the

20   particles you want, the large platy ones

21   to rise to the top of the vessel so that

22   you can use those to make the baby

23   powder.  So it's a manufacturing process.

24        Q.    Sure.  Fair enough.

John Hopkins, Ph.D.

1        If you go to Page 4 of the

2  report under samples tested.  It talks

3  about Italian Number 1 and Italian Number

4  2 talc tested?

5        A.    Yes.  They are -- Battelle

6  are looking at those two talcs in their

7  investigation for beneficiation.

8        Q.    And they find that

9  approximately 6 percent of the talc in

10  the Number 2 talc is fibrous and 8 to

11  10 percent of the talc in the Number 1

12  talc is fibrous, correct?

13        A.    That's what's reported in

14  this report.

15        Q.    Okay.  And they here report

16  tremolite, correct?

17        A.    The word "trace" appears,

18  yes.

19        Q.    Well, they have trace and

20  then they have a Number 1?

21        A.    A one, yes.

22        Q.    What's one mean?

23        A.    I don't know.

24        Q.    Okay.  Now, on Page 5, they

John Hopkins, Ph.D.

```
1    state, "Non-platy talc contained in the
2    Italian samples is mostly fibrous or
3    acicular in form.  It is difficult to
4    distinguish acicular talc from remnants
5    of platelets and tremolite in sizes
6    similar" -- "smaller than 10 microns,"
7    correct?  That's what it says?
8         A.    Yes, you read what was
9    written --
10        Q.    And it then says --
11        A.    -- yes, in talc, yes.
12        Q.    -- "Table 2 includes, for
13   comparison, the composition of the
14   Italian Number 1 grade, which is the raw
15   material" -- "raw material currently used
16   in Johnson & Johnson Baby Powder.  The
17   minute logical difference between Number
18   1 and 2 grades is almost insignificant,
19   correct?
20        A.    You read what was written.
21   Yes.
22        Q.    Okay.  Go down to Page 14 to
23   Table 15.  Table 15 is where they compare
24   the testing for the Italian Number 1 and
```

John Hopkins, Ph.D.

1    Number 2 talc, correct?

2         A.    Yes.

3         Q.    And they find that in the

4    raw talc there is fibrous talc, correct?

5         A.    That's what they reported.

6    Yes.

7         Q.    And after they do the

8    beneffection (sic) process where they

9    float it to try to separate out the

10   contaminants, they still find fibrous

11   talc, correct?

12             MR. BICKS:   It's

13        beneficiation.

14             THE WITNESS:   Beneficiation

15        is the process of trying to

16        achieve the larger particles that

17        you want.  You try to get more of

18        those.

19   BY MR. PLACITELLA:

20        Q.    And after that process, on

21   the finished product they still find

22   fibrous talc, correct?

23        A.    Yes.

24        Q.    And in all the samples they

John Hopkins, Ph.D.

1    find tremolite, some a lot lower than

2    others, correct?

3           A.    They report tremolite, yes.

4           Q.    So can we go to -- back to

5    our chart.  I had Lea put up while you

6    were testifying the date, the exhibit.

7    They looked at the processed talc and

8    they found tremolite, and 6 to 10 percent

9    fibrous talc.

10               MR. PLACITELLA:  You have to

11          put a space.  You can't make that

12          tremolite 6 to 10 percent.  You've

13          got to take that out.

14          Different -- different line.

15          Semicolon.  Let's make sure we got

16          it right.  Okay.

17    BY MR. PLACITELLA:

18          Q.    Is that fair?

19               MR. LOCKE:  Can we put that

20          on a different line?

21               MR. PLACITELLA:  I'm sorry?

22               MR. LOCKE:  Can we put it on

23          a different line, 6 to 10 percent

24          fibrous talc.

John Hopkins, Ph.D.

1    BY MR. PLACITELLA:

2         Q.    How is that?  Is that fair?

3         A.    I think that's representing

4    what was in that report in 1958.

5         Q.    Okay, great.

6               MR. PLACITELLA:  So give me

7         nine.

8               (Document marked for

9         identification as Exhibit

10        J&J-9.)

11   BY MR. PLACITELLA:

12        Q.    I'll show you what's been

13   marked Exhibit 9.  I think you've seen

14   this before, in reading your testimony.

15              Exhibit 9 is a report from

16   the Colorado School of Mines, dated

17   December 4, 1970, for Johnson & Johnson,

18   concerning the geology and ore reserves

19   of the Hammondsville mine, correct?

20        A.    It is, yes.

21        Q.    And it states -- and it

22   states, "The attached report completes

23   our work on the nature and magnitude of

24   our ore body in Vermont from which we

John Hopkins, Ph.D.

```
 1    manufacture baby powder talc," correct?

 2         A.    Yes.

 3         Q.    And you've seen this before?

 4         A.    I believe so, yes.

 5         Q.    Okay.  And in the

 6    introduction, it talks about how you

 7    engaged the Colorado School of Mines to

 8    conduct the study, correct?

 9         A.    Yes.

10         Q.    And it was authorized and

11    accepted by Mr. Talc himself, William

12    Ashton, correct?

13         A.    It says, "The study was

14    authorized by letter from William Ashton,

15    June 1970.

16         Q.    Okay.  And what it states on

17    Page 13 is that they looked at 38 core

18    samples, correct?

19         A.    Page?

20         Q.    13.

21         A.    13.

22         Q.    On the bottom.  I blew it

23    up.

24         A.    Oh, yes.
```

John Hopkins, Ph.D.

1        Q.    Hopefully I'll highlight it

2    for you.  Make it easier.

3        A.    Okay.

4        Q.    And on Page 19, it says that

5    the method that was used was an x-ray

6    examination and petrographic, correct?

7        A.    Yes.

8        Q.    And if you go to Table 1

9    which would be on Page 20, they found

10   tremolite, correct?

11            MR. SILVER:  Mr. Placitella,

12        can I ask you to -- for my

13        colleague, can you blow up the

14        Bates number, so he can --

15            MR. PLACITELLA:  Sure.

16   BY MR. PLACITELLA:

17        Q.    They find tremolite on Table

18   1, correct?

19        A.    They reported a peak height

20   with tremolite.  Yes.

21        Q.    Okay.  And on the next page,

22   they continued to report tremolite,

23   correct?

24        A.    Yes they report that.  The

John Hopkins, Ph.D.

1    interval 223A as part of their core

2    drilling.

3         Q.    Okay.  And they also

4    report -- well, what they do here is they

5    basically go down different levels of the

6    mine, correct, and they take samples and

7    test them at different levels, correct?

8         A.    Yeah.  So you know where to

9    go, where the talc is and where it isn't.

10        Q.    Right.  And they use a

11   diamond drill like you said.  And they

12   use XRD, correct?

13        A.    They --

14        Q.    And they found --

15        A.    They did.  Yes.

16        Q.    -- tremolite and actinolite,

17   right?

18        A.    They reported that in one of

19   the holes, yes.

20        Q.    So when they say 2.5, does

21   that mean 2.5 percent?

22        A.    My understanding is no.

23   It's -- the x-ray diffraction peak

24   heights in centimeters, so I don't

John Hopkins, Ph.D.

1    believe that translates to percentages.

2          Q.    Okay.  But if you look a

3    little further down, they're talking

4    about fibrous talc in the mine that was

5    used to make Baby Powder, and it says 10

6    percent correct?

7                MR. BICKS:  Objection to the

8          form.

9                THE WITNESS:  Where are you

10         reading 10 percent?

11   BY MR. PLACITELLA:

12         Q.    Table 2.  Look at Bates

13   Number 184.

14         A.    Okay, you've gone 14 pages

15   ahead.

16         Q.    Yeah I'm trying to move this

17   through so we can get done.

18         A.    Okay.  This is a different

19   table.

20         Q.    Right.

21         A.    Yes, and -- yes, they've

22   given percentages here, which is

23   different from the peak heights.

24         Q.    And they found 10 percent

John Hopkins, Ph.D.

1    fibrous talc in the mine that was used to

2    make Johnson's Baby Powder, true?

3                MR. SILVER:  Object to form.

4                MR. BICKS:  Object to form.

5                THE WITNESS:  Well, they

6         found -- when they were doing the

7         diamond drilling, there are

8         certain areas where they found

9         fibrous talc, yes.

10   BY MR. PLACITELLA:

11        Q.    Okay.

12        A.    But that does not

13   necessarily mean the areas where the

14   product was mined to make Johnson's Baby

15   Powder.

16        Q.    Okay.  Go to Table 3, next

17   page, ends with 185.  Percentage of

18   fibrous talc, depending on what level,

19   ranges from five to 20 percent, correct?

20        A.    Yeah.  Again, this is

21   diamond drill hole number 6-67H, and they

22   reported that they found fibrous talc

23   10 -- you know, various holes, 10,

24   20 percent, 10, yes, 5 percent.  Yeah on

John Hopkins, Ph.D.

1    those particular drill holes.

2         Q.    Okay.  Let's just do one

3    more and we'll go to the next document.

4    Look at Table 11.

5         A.    What page, Bates number?

6         Q.    197.

7         A.    Okay.

8         Q.    They're still finding 5 to

9    10 percent fibrous talc, correct?

10        A.    Yes.  In diamond drill hole

11   40-67-H --

12        Q.    Okay.

13        A.    -- they have found that over

14   their best study -- the study.

15        Q.    And they found tremolite

16   repeatedly right?  I mean, I could --

17   Table 13 they found tremolite.

18             MR. BICKS:  Objection to

19        form.

20   BY MR. PLACITELLA:

21        Q.    Table 16 they found

22   tremolite.  Table 14 they found

23   tremolite?

24        A.    The tables report what they

John Hopkins, Ph.D.

1    find.

2         Q.    Right.   And if you go to

3    Bates Number 260.   They actually start to

4    describe each of the specimens that

5    they -- well, let me ask you the question

6    this way to cut it short.   Do you agree

7    with me that they found both tremolite

8    and fibrous talc throughout the

9    Hammondsville mine when they did this

10   testing?

11             MR. BICKS:   Objection to the

12        form.

13             THE WITNESS:   Now that

14        you're phrasing that in a way that

15        is prejudicial, the whole point of

16        doing testing and diamond

17        drilling, you go over many acres,

18        you drill down to find where you

19        can mine and where you don't mine.

20             So they obviously found

21        areas where those materials they

22        didn't want.   And there are areas,

23        the vast number of core drills

24        which didn't report those features

John Hopkins, Ph.D.

1          and those findings, so --

2     BY MR. PLACITELLA:

3          Q.    So --

4          A.    So the whole point is that

5     you need to know where you're going.  And

6     the whole point is that you're doing a

7     mine mapping to create that picture of

8     where the good stuff is and where it

9     isn't.

10         Q.    And this is all in a diamond

11    mined section, right?

12         A.    They do lots of drills,

13    many, many drills over many acres to --

14    to get an understanding of where you can

15    mine and where you don't mine.

16         Q.    All right.  So I'm trying to

17    understand.  So the camera is on me,

18    right?

19              So you drill straight down

20    and you find tremolite here, fibrous talc

21    here, nothing here, tremolite here,

22    fibrous talc here.  And you say they kind

23    of maneuver around that and they only

24    pull out that little piece and that's

John Hopkins, Ph.D.

1  what they take and put in the Baby

2  Powder, right?

3              MR. LOCKE:  Objection.

4              MR. BICKS:  Objection to the

5        form.

6              THE WITNESS:  Well, that's a

7        bit --

8  BY MR. PLACITELLA:

9        Q.    That's what I'm trying to

10  understand.

11        A.    No, that's a bit theatrical.

12        Q.    Well, I'm theatrical because

13  it is important.

14        A.    It is important.  But the

15  whole point I'm trying to make at this

16  point is that when you do diamond core

17  samples over many acres, you get a

18  picture of what the mining area can do

19  and what it cannot do.

20              So it allows you to operate

21  in those areas that will give you the

22  product you want.  It allows you to avoid

23  those areas that you don't want.  That's

24  the whole point of diamond core drilling.

John Hopkins, Ph.D.

1   You're going to get results which you

2   say, wow, we're not going to drill there,

3   thank you.

4            MR. BICKS:  Chris, we've

5        been going about an hour and a

6        half.

7            MR. PLACITELLA:  One more

8        question, and then we'll stop.

9            MR. BICKS:  Yeah.

10           MR. PLACITELLA:  Or two,

11       because we're going to have to

12       switch.

13   BY MR. PLACITELLA:

14       Q.    But the purpose of this was

15   to look at the geology of the ore

16   reserves for the Hammondsville mine that

17   was going in the Baby Powder, right?

18       A.    Yes.  You're looking at the

19   big picture.

20           MR. PLACITELLA:  All right.

21       Can you -- Lea, did you type it

22       in?  All right.  Can you switch

23       over?

24   BY MR. PLACITELLA:

John Hopkins, Ph.D.

```
 1          Q.     So the third entry,

 2   12/4/1970, XRD and petrographic.  The

 3   author, here we have Ashton and Miller.

 4   Got it.  Hammondsville mine.  38 core

 5   samples.  Tremolite actinolite fibrous

 6   talc, correct?

 7                  MR. LOCKE:  Objection.

 8                  MR. BICKS:  Objection.

 9   BY MR. PLACITELLA:

10          Q.     Is that fair?

11          A.     That's not accurate.

12          Q.     Okay.  Tell me what to take

13   out.

14          A.     You described it as "the

15   mine" as being the whole area where the

16   company has been mining for Baby Powder.

17          Q.     No, I just said where they

18   took it, the Hammondsville mine.

19          A.     Yes, and what I'm saying to

20   you is that you put the word

21   "Hammondsville," which covers a large

22   acreage.  And that would include areas

23   that are not mined.

24          Q.     How do you want me to change
```

John Hopkins, Ph.D.

1    it?  How do you want to change it?

2         A.    I think it's not very

3    relevant anyway.  But I think what you

4    need to do to give it a bit more clarity

5    is to say the whole picture, and you

6    can't just put that in one word.  The

7    whole picture here is that you've got

8    large acreage, some of which you are

9    going to use for mining baby powder, and

10   others that you will say we'll avoid it.

11            And what -- what we've done

12   here with this report is to identify

13   those areas that you can avoid, having

14   done your diamond drilling, to actually

15   say, well, we can find the pure talc for

16   Baby Powder.

17        Q.    Well, that's your

18   interpretation.  Do you have any

19   contemporaneous documents to back up what

20   you say?

21            MR. LOCKE:  Objection.

22            MR. BICKS:  Argumentive.

23   BY MR. PLACITELLA:

24        Q.    I mean, do you?

John Hopkins, Ph.D.

1          A.    The whole point of diamond

2     core drilling over many acres is to

3     understand the total geology of the

4     picture.

5          Q.    Okay.  Let's just look at

6     this entry.

7                All I'm saying is they

8     looked in the Hammondsville mine and they

9     found tremolite, actinolite and fibrous

10    talc.

11         A.    No, they looked in the

12    Hammondsville area, the mine -- the mine

13    wasn't actually in that area at that

14    time.  The mining area is bigger than

15    just the Hammondsville mine.

16         Q.    Wait, wait, wait a second.

17         A.    In 1970 it was operating --

18         Q.    It states, "The report deals

19    entirely with the geology and ore

20    reserves of the Hammondsville mine."

21                It doesn't talk about area.

22         A.    Yeah, but the Hammondsville

23    mine is -- covers an area that you're

24    going to use and some that you're not

John Hopkins, Ph.D.

1    going to use.

2            Q.    It says, "The Hammondsville

3    mine."  That's the only thing that I put

4    up on the list.  Hammondsville.  Tell me

5    how you want me to change the words.

6            A.    I wouldn't put that up in

7    the first place.

8                  The point that I'm trying to

9    make is that it's identifying areas in

10   the mine that you can use and you could

11   avoid.

12           Q.    Well, you already said that.

13               MR. PLACITELLA:  All right.

14       Let's take a break.

15               THE VIDEOGRAPHER:  Stand by.

16       Please remove your microphones,

17       please.  The time is 3:06 p.m.

18       going off the record.

19               (Short break.)

20               THE VIDEOGRAPHER:  We are

21       book on the record.  The time is

22       3:21 p.m.

23               (Document marked for

24       identification as Exhibit

John Hopkins, Ph.D.

```
1              J&J-256.)
2    BY MR. PLACITELLA:
3         Q.    I'm going to give you what's
4    been marked as 256.  I don't know why
5    these don't have Bates numbers.
6              This is -- I'm going to
7    refer you to the third page of the
8    document, which is a June 30th, 1971
9    letter from Pattengill to Ashton.
10             Do you see that?
11        A.    Yes, yes.
12        Q.    Okay.  And in this letter,
13   Pattengill, he's with the Colorado
14   School, correct?
15        A.    Yes.
16        Q.    He -- he tells Ashton, that
17   based upon x-ray defraction and
18   microscopical analysis of Vermont
19   finished product -- product plant run
20   sample, that they found trace amounts of
21   tremolite and actinolite, correct?
22        A.    Yes.  It said sample 344-L,
23   and six monthly, only trace amounts of
24   tremolite and actinolite.  It's actually
```

John Hopkins, Ph.D.

1   a hyphen, not "and."

2          Q.    Okay.  And it says, "No

3   other forms of non-talc minerals

4   approaching asbestos types were

5   identified," correct?

6          A.    That is what is written.

7          Q.    Okay.  If you go to --

8   scroll down a little bit to the May 19,

9   1971.  Here, I can do it for you.  Let me

10  do it for you.

11         A.    We don't have a --

12         Q.    Yeah, I know.  This is how

13  it was produced.  I have no idea why

14  there's no Bates number.

15               This is a letter from

16  Pattengill to Ashton, May 19, 1971.  And

17  he says, "The following are the results

18  of x-ray diffraction analysis on six of

19  the monthly plant" -- "plant run talc

20  samples."

21               Do you see that?

22         A.    Yes.

23         Q.    And they find

24  tremolite-actinolite in five of the six

John Hopkins, Ph.D.

1    samples, correct?

2         A.    They reported, yes, they

3    reported that on five samples.

4         Q.    Okay.

5              MR. PLACITELLA:  So can you

6         put that up, Exhibit 256.

7              Are you ready or should we

8         do one and come back.

9              Okay.  We'll come back to

10        that.

11             Give me Exhibit 19.

12             (Document marked for

13        identification as Exhibit

14        J&J-19.)

15   BY MR. PLACITELLA:

16        Q.    Exhibit 19 is a memo on

17   Johnson & Johnson's letterhead from a

18   Mr. Nashed.  Who's he?

19        A.    He was a senior research

20   scientist --

21        Q.    Mr. Foster.  Who is he?

22        A.    Mr. Foster was in the -- in

23   corporate headquarters in New Brunswick.

24        Q.    All right.  And --

John Hopkins, Ph.D.

1        A.     He was not a scientist.

2        Q.     Okay.  Mr. Nashed knows what

3    he's talking about, correct?

4        A.      Mr. Nashed was a scientist,

5    yes.

6        Q.     Right.  And he states, "The

7    talc used in Johnson's Baby Powder is

8    obtained from a selected mine in Vermont

9    where the ore consists mainly of platy

10   talc with only trace amounts of fibrous

11   minerals (tremolite/actinolite)."

12   Correct?

13       A.     You read what was written.

14       Q.     Okay.  He further says that

15   three separate laboratories found fibrous

16   minerals in the Vermont mine, correct?

17       A.     Which?

18            MR. BICKS:  I'm sorry.

19            THE WITNESS:  I can't see

20        that paragraph.

21   BY MR. PLACITELLA:

22       Q.     See where it says, "The ore

23   undergoes a careful purifying process"?

24       A.     Yes.

John Hopkins, Ph.D.

1    Q.    Okay.  Then he says, "The
2  resulting talc has been shown by three
3  independent consulting laboratories to
4  contain negligible traces of fibrous
5  minerals and no chrysotile fibers,"
6  correct?
7    A.    Yes.  Negligible traces of
8  fibrous minerals, yeah.
9    Q.    So he reports here that
10  three separate independent laboratories
11  all found fibrous minerals in the talc
12  used in Johnson's Baby Powder, correct?
13    A.    He describes those fibrous
14  minerals.  Yes.
15            MR. PLACITELLA:  Okay.  Can
16        we go back and put 256 in and 19.
17            (Document marked for
18        identification as Exhibit
19        J&J-256.)
20  BY MR. PLACITELLA:
21    Q.    So 256 outlines the testing
22  entity was Colorado, the test method was
23  XRD and PLM.  It was six monthly plant
24  run samples.  And reported was five of

John Hopkins, Ph.D.

1    six show tremolite/actinolite.  And then

2    I put in quotes from the document, "No

3    other forms of non-talc minerals

4    approaching asbestos types were

5    identified."  Fair?

6             A.    That is what is written in

7    the cover letters.

8             Q.    Okay.  And then on 19, also

9    from the Colorado -- well, we have

10   Colorado school of mines.  Is that the

11   testing entity?  It doesn't really say.

12            A.    It does.  It actually says

13   the resulting talc has been shown by

14   three independent laboratories, asterisk,

15   and then the asterisk is Colorado School

16   of Mines -- turn the page -- McCrone, and

17   Dartmouth College.

18            Q.    Okay.  So Colorado school of

19   mines.  Then we have to put McCrone and

20   Dartmouth.  And I put trace amounts of

21   fibrous minerals, tremolite -- it should

22   be not slash, but dash actinolite.

23                  MR. PLACITELLA:  Lea.

24   BY MR. PLACITELLA:

John Hopkins, Ph.D.

1          Q.    Correct.  No, it's slash.

2    You're right.

3          A.    Yeah, it did say slash.  But

4    that doesn't matter.  I think the point

5    is that we talk about three independent

6    laboratories.  The Dartmouth College

7    report's finding of no tremolite.  And

8    I'm not sure what McCrone reports.  It

9    doesn't say.

10         Q.    We --

11         A.    But what they actually say

12   in the text, and that's important, is

13   that they contain negligible traces of

14   fibrous minerals.  It doesn't actually

15   define them as actinolite-tremolites.

16         Q.    Well, on the first one it

17   does, the first paragraph?

18         A.    The first paragraph it does,

19   yes.

20         Q.    Okay.

21         A.    But then when it goes on to

22   talk about the three independent

23   laboratories, it just describes as

24   negligible traces of fibrous minerals.

John Hopkins, Ph.D.

1      Q.    Okay.  So how do you want me

2  to put it in there?

3      A.    I think that's separate.

4          MR. PLACITELLA:  Okay.  Put

5      a semi colon and put that

6      separate, Lea.

7  BY MR. PLACITELLA:

8      Q.    Give me 100.

9          (Document marked for

10     identification as Exhibit

11     J&J-100.)

12  BY MR. PLACITELLA:

13     Q.    100 is another memo written

14  from the Colorado School of Mines to

15  Mr. Ashton, correct?

16     A.    Yes.

17     Q.    Okay.  It talks about

18  testing talc ore, five talc samples.

19     A.    Yes.

20     Q.    Okay.  And they use an x-ray

21  diffraction and a separation method,

22  correct?

23     A.    Yes, they were evaluating a

24  heavy liquid concentration method.

John Hopkins, Ph.D.

1     Q.     Right.  And that was using a

2  centrifuge, correct?

3     A.     That is my understanding,

4  yes.

5     Q.     Okay.  That's -- and the

6  purpose of that is really not that

7  different in principle than the

8  benefaction (sic) process, right?  What

9  the benefaction process does is it takes

10  out -- it separates out contaminants, and

11  this just further separates out

12  contaminants, correct?

13     A.     No.  I think that's an

14  oversimplification.  Beneficiation, the

15  point of that is to not be concerned

16  about the contaminants, is to achieve a

17  talc that has large clean plates that are

18  large and smooth --

19     Q.     Okay.

20     A.     -- and remove the bits, the

21  dust, the sand that you don't want.

22     Q.     Well, what the Colorado

23  School of Mines did here is, they used a

24  separation technique using a centrifuge

John Hopkins, Ph.D.

1    right?

2         A.    They did, yes, yes.

3         Q.    And what they found was

4    tremolite, actinolite, they say slight

5    traces, correct?

6         A.    They use that word, yes.

7         Q.    Okay.  They find

8    anthophyllite, correct, on the second

9    page?

10        A.    They report that.  Well,

11   with a question mark.  They weren't sure.

12        Q.    Okay.  And then on the

13   bottom where they say, "Relative to

14   possible asbestos minerals, the above

15   table shows that Samples 31-7-S and

16   30-B-71-S contain slight traces of

17   tremolite/actinolite minerals," correct?

18        A.    That's what they wrote in

19   1973.

20        Q.    In the context of asbestos

21   type minerals, correct?

22        A.    That's what they wrote, yes,

23   in 1973.

24        Q.    And they also say that

John Hopkins, Ph.D.

1    sample 32-71-S is suspected to contain

2    very minor amounts of serpentine which

3    may be chrysotile, correct?

4          A.    That's what they wrote.  But

5    it was -- I'm trying to find that.

6    Sample, slight trace -- yeah.  It's

7    suspected.  And they go on to say more

8    studies need to be made.  So they don't

9    confirm it.  They say, if we want to

10   confirm it, you have to do more studies.

11         MR. PLACITELLA:  All right.

12         So can we put that one in, Lea.

13         Can you put it up.  Make sure

14         we're on the same page.  I'll do

15         one more from Colorado after this.

16   BY MR. PLACITELLA:

17         Q.    Here we have Colorado School

18   of Mines, processed talc.  They used a

19   centrifuge.  Tremolite-actinolite, slight

20   trace of anthophyllite and "asbestos-type

21   materials."

22         A.    And I think in the interest

23   of balance, they have used a question

24   mark after anthophyllite because they

John Hopkins, Ph.D.

```
 1    weren't sure.
 2              MR. PLACITELLA:  Okay.
 3         We'll put a question mark.  We're
 4         good.  It's there already.
 5              THE WITNESS:  On the
 6         serpentine in the text, they
 7         actually say -- they don't really
 8         know.  It may be.  They've used
 9         the word "may," and it's
10         recommended to conduct further
11         studies --
12    BY MR. PLACITELLA:
13         Q.    Okay.
14         A.    -- on that particular sample
15    to confirm the presence.
16              So, again, it has to be a
17    question mark.
18         Q.    So should I leave out
19    chrysotile or put a chrysotile with a
20    question mark?
21         A.    I don't mind.
22              MR. PLACITELLA:  Put
23         chrysotile with a question mark.
24              THE WITNESS:  They've
```

John Hopkins, Ph.D.

1           described it as a serpentine.

2           They don't actually use the

3           word -- oh, they say it may be

4           chrysotile.  It is a serpentine

5           but it may be chrysotile.  But

6           it's questionable.

7     BY MR. PLACITELLA:

8           Q.    Okay.  Last one for

9     Colorado, and we'll go to a different

10    place.

11               MR. PLACITELLA:  263.

12               (Document marked for

13          identification as Exhibit

14          J&J-263.)

15    BY MR. PLACITELLA:

16          Q.    263 is another Colorado

17    School of Mines Research Institute

18    document.  And the second page talks

19    about a procedure to examine talc for the

20    presence of chrysotile and

21    tremolite-actinolite fibers.

22               Do you see that?

23          A.    Yes.

24          Q.    And the date of this is

John Hopkins, Ph.D.

1    December 27th, 1973.

2          A.    Yes.

3          Q.    Do you see that?

4          A.    It is, yes.

5          Q.    Okay.  And here they're

6    talking about -- that the proposal is to

7    use this pre-concentration method because

8    without it, according to your advisors,

9    it's like looking for a needle in a

10   haystack, right?

11         A.    Well, as with any research

12   establishments, they often come with a

13   proposal and say we'd like to do this.

14   Here's a proposal.

15         Q.    Okay.  And they said on Page

16   1 in the introduction, the reason that

17   they were going to do that is because

18   without it, it would be like looking for

19   a needle in a haystack, right?

20               MR. BICKS:  Objection to

21         form.

22               THE WITNESS:  That's what

23         they wrote back in 1973.

24   BY MR. PLACITELLA:

John Hopkins, Ph.D.

1    Q.    Okay.  And the objective was

2  to develop a procedure to screen talc for

3  the presence of chrysotile and/or

4  tremolite-actinolite asbestos minerals,

5  correct?

6    A.    Yeah.  They are trying to

7  evolve a method and procedure which does

8  a pre-concentration.

9    Q.    Right.  And method was again

10  on Bates Number 204 using a centrifuge,

11  correct?

12    A.    Yes.

13    Q.    All right.  And what they

14  report on 211, is they sent a letter to

15  Mr. Ashton on December 21, 1973, where

16  they identify chrysotile in the Vermont

17  talc, correct?

18    A.    Now, I need to read the

19  report first.

20    Q.    Sure.

21    A.    I don't see where they

22  identified it in the -- in the Vermont

23  talc.  They are doing the study where

24  they claim to find it.  But the normal

John Hopkins, Ph.D.

1    process is that you deliberately add 1

2    percent or 2 percent or whatever to see

3    if you can find it.

4          Q.    Well, look at -- look at

5    Bates Number 211.  I highlighted it for

6    you?  Here it says, "A letter report

7    dated December 21, 1973, from WP Reid to

8    WH Ashton.  On the examination of Italian

9    and Vermont talc, identified chrysotile

10   at a level of less than 10 parts per

11   million in the Vermont sample."  Correct?

12         A.    Okay.  Where are you

13   reading, which line or -- the top half of

14   the page?

15         Q.    I blew it up, right in the

16   middle.

17         A.    I see it.  Let me read it

18   now.

19         Q.    Sure.

20         A.    That's what's written there.

21   Whether that was ever a validated or

22   proven, it certainly -- they claim it was

23   less than 10 parts per million.

24         Q.    But that's what was

John Hopkins, Ph.D.

1    reported?

2         A.    If they found it at all, it

3    would be less than 10 parts per million.

4         Q.    I'm not saying if they found

5    it at all.  That's what's written as

6    reported, correct?

7         A.    I need to see that letter

8    again to -- do we have that letter.  We

9    just looked at that letter?

10         Q.    Well, that's -- that's kind

11    of the problem.  I can't find the letter.

12    I'm looking at the report.  I mean,

13    that's what's reported in the report?

14         A.    Okay.  Let's take a step

15    back.  When you're developing a method

16    it's not unusual to deliberately spike

17    your product, in this case talc, with --

18         Q.    Excuse me, sir, I don't mean

19    to cut you off.  But there's no question

20    about that.  All I'm asking you is

21    reported here states that they found

22    chrysotile in Vermont talc at less than

23    ten parts per million.  That's what's

24    stated.  It doesn't say anything about

John Hopkins, Ph.D.

1    spiking, correct?

2           A.     It does not, no.

3           Q.     Okay.

4           A.     It says, "Identified at a

5    level of less than 10 parts per million."

6           Q.     Okay.  Thank you.  Now, when

7    you testified recently in St. Louis, do

8    you remember that experience?

9           A.     I remember testifying in St.

10   Louis, yes.

11          Q.     Mr. -- do you remember

12   Mr. Lanier.  He was asking you questions?

13          A.     I remember him, yes.

14          Q.     He -- you testified in

15   St. Louis, that a Dutch consumer group

16   found asbestos in baby powder.  Do you

17   recall that?

18          A.     I remember there was a

19   document presented which claimed that a

20   Dutch consumer group claimed that they'd

21   found asbestos in baby powder.

22          Q.     And you saw that in front of

23   the jury on the witness stand, correct?

24          A.     I do remember seeing that,

John Hopkins, Ph.D.

1    yes.

2          Q.    I couldn't find it.  That's

3    why I was asking you the question.

4                MR. PLACITELLA:  Can we go

5          back and put 263 in.  And -- did

6          you put that in already?  And how

7          about just "Dutch consumer group

8          found asbestos," and we'll give it

9          to Mr. Lanier.  How's that?

10               THE WITNESS:  The Dutch

11         consumer claimed to have found

12         asbestos.

13               MR. PLACITELLA:  Oh, we'll

14         put -- so let's just go to the

15         first one.  263.  Colorado School

16         of Mines, Vermont talc samples,

17         they used a centrifuge.  And it

18         states, "Identified chrysotile at

19         a level of less than ten parts per

20         million in the Vermont sample."

21   BY MR. PLACITELLA:

22         Q.    That's a quote, correct?

23         A.    It is a quote.  But in

24   isolation, it doesn't tell us whether it

John Hopkins, Ph.D.

1   had been deliberately added as part of

2   the method development when you were

3   looking to see how effective that method

4   could be.  Okay.  That's the point I'm

5   making.  Is that --

6           Q.   But --

7           A.   -- on its -- -

8           Q.   But that's your opinion,

9   sir.  There's nothing -- there's no

10  contemporaneous document that you can

11  point to to say that's just you injecting

12  your opinion to try to change the facts,

13  right?

14           MR. LOCKE:  Objection.

15           MR. SILVER:  Objection.

16           MR. BICKS:  I mean, I take

17       it you're telling us you haven't

18       looked at this underlying document

19       when you're asking those

20       questions.

21           MR. PLACITELLA:  I'm

22       saying -- I'm asking you what's

23       reported here.

24  BY MR. PLACITELLA:

John Hopkins, Ph.D.

1      Q.    Have you seen this document,

2    sir?

3      A.    I have seen this document.

4      Q.    Right.

5      A.    When I look at this

6    document --

7      Q.    I'm talking about the

8    December 21st, 1973 report to Mr. Ashton.

9    It doesn't say anything here in this

10   report about injecting asbestos or

11   spiking or anything else.

12     A.    But in --

13     Q.    You know what, I'm not going

14   to fight with you.  I'll withdraw the

15   question.

16     A.    Okay.

17          MR. PLACITELLA:  Okay.  Can

18     we put in the next line --

19   BY MR. PLACITELLA:

20     Q.    Just leave it blank.  Do you

21   know about what time the Dutch consumers

22   found -- do you remember what year it

23   was?

24     A.    I can't remember.

John Hopkins, Ph.D.

```
 1              MR. PLACITELLA:  So we'll
 2         just leave it blank.  Put testing
 3         entity, Dutch consumers.  We'll
 4         put -- and put over on test
 5         revealed, put Baby Powder as the
 6         product.  That was the product.
 7         That's it.  And just put asbestos.
 8              MR. BICKS:  Objection.
 9              THE WITNESS:  I think in the
10         interest of fairness, it should be
11         claimed to have found asbestos.
12              MR. PLACITELLA:  Claimed to
13         have found asbestos.
14              THE WITNESS:  Thank you.
15    BY MR. PLACITELLA:
16         Q.    Okay.  Now give me 47.
17              (Document marked for
18         identification as Exhibit
19         J&J-47.)
20              (Document marked for
21         identification as Exhibit
22         J&J-49.)
23    BY MR. PLACITELLA:
24         Q.    Exhibit 47 --
```

John Hopkins, Ph.D.

1           MR. PLACITELLA:  Okay.

2      Exhibit 47 -- oh, somebody is

3      going to ask me what the Bates

4      number is.  I -- it's covered.

5      Sorry.

6  BY MR. PLACITELLA:

7      Q.    This is a June 6, 1973,

8  Johnson & Johnson letter to Mortimer,

9  Miller.  Is that Roger Miller?

10     A.    It's a guess.  It's more

11 than likely to be Roger Miller.

12     Q.    R. Miller.  And cc'd is

13 Mr. Ashton?

14     A.    Yes.

15     Q.    And it's from a

16 Mr. Petterson at Johnson & Johnson,

17 correct?

18     A.    Yes.

19     Q.    All right.  And he talks

20 about the concentration technique that

21 your consultant Dr. Pooley was using,

22 correct?

23     A.    He's written that in the

24 letter, yes.

John Hopkins, Ph.D.

1      Q.    All right.  And the

2  concentration technique that Dr. Pooley

3  was using was not unlike that was used by

4  Colorado, which is he used a centrifuge,

5  correct?

6      A.    He's used more than one

7  looking back through the correspondence,

8  he had more than one test methodology.

9  He was using a flotation method at one

10 point and centrifuging.  Another

11 technique he had was to use a cationic

12 material that would -- a positively

13 charged chemical.

14          And so he's done more than

15 one type.  So I'm not sure which one --

16 which test method it is.  But it's

17 described as a concentration technique.

18     Q.    Okay.  So, and he states

19 that Shelley -- who is Shelley?

20     A.    He was a research scientist

21 in baby products company.

22     Q.    "Shelley reports that Pooley

23 found actinolite in our Vermont talc

24 using his concentration technique,"

John Hopkins, Ph.D.

1    correct?

2         A.    That's what is written in

3    this memo, yes.

4              MR. PLACITELLA:  Put that

5         in.  That's Exhibit 47.

6    BY MR. PLACITELLA:

7         Q.    We have 1973, the testing

8    entity was Cardiff, correct?

9         A.    Yes.

10        Q.    The author is Dr. Pooley,

11   right?

12        A.    Yes.

13        Q.    He used a concentration

14   technique and he found actinolite,

15   correct?

16        A.    That is what is written in

17   that memo.

18        Q.    Okay.

19             MR. PLACITELLA:  Can you put

20        in as a recipient, Ashton.

21   BY MR. PLACITELLA:

22        Q.    He's one of the recipients,

23   correct?

24        A.    Yes.

John Hopkins, Ph.D.

1              MR. PLACITELLA:  Okay.  Give

2       me 141.

3              (Document marked for

4       identification as Exhibit

5       J&J-141.)

6  BY MR. PLACITELLA:

7       Q.    141 is another report -- I

8  shouldn't say another report.

9              A report from the University

10 of Cardiff dated January 25th, 1977,

11 correct?

12      A.    Yes.

13      Q.    And it's authored by

14 Dr. Pooley, correct?

15      A.    Yes.

16      Q.    He was working for you at

17 the time, correct?

18      A.    Well, he's -- he is a

19 university professor.  He did contract

20 projects, yes.

21      Q.    Right.  And what he did is

22 he tested a composite sample that you

23 supplied to him, correct?

24      A.    Yes.

John Hopkins, Ph.D.

1       Q.    From Vermont, correct?

2       A.    Well, it's a composite

3  sample.  I don't know where it came

4  from --

5       Q.    Yeah, well, look at the

6  bottom here.

7       A.    -- if it's from this --

8       Q.    I'll blow it up.

9       A.    Unless there's more detail.

10      Q.    Do you see where it says

11  Vermont composite sample?  I blew it up

12  for you.

13      A.    Okay.  Yes, I can see that

14  now.

15      Q.    And what he found was fibers

16  of antigorite, correct?

17      A.    That's what he wrote, yes.

18          MR. PLACITELLA:  Okay.  Can

19      we put that up, Lea.

20  BY MR. PLACITELLA:

21      Q.    Okay.  And here we have Dr.

22  Pooley, Cardiff, he used XRD for Vermont

23  composite.  He found fibers of

24  antigorite, correct?

John Hopkins, Ph.D.

1          A.    He has reported that in this

2    memo.

3                MR. PLACITELLA:  Okay.  Give

4          me 28.

5                (Document marked for

6          identification as Exhibit

7          J&J-28.)

8    BY MR. PLACITELLA:

9          Q.    I know you've seen some of

10   these before, but I'm sorry.  I have to

11   go through it.  This one is an August 3,

12   1972 letter from Dr. Lewin.

13               You know that Dr. Lewin was

14   a consultant hired by the Federal Food

15   and Drug Administration, correct?

16         A.    Yes.

17         Q.    Okay.  And you've seen this

18   document before?

19         A.    Yes.

20         Q.    Okay.  And you know that

21   Dr. Lewin reported to the Food and Drug

22   Administration that he found chrysotile

23   asbestos in Shower to Shower, correct?

24         A.    He claimed to have found it,

John Hopkins, Ph.D.

1    although that was not confirmed later,

2    but that's what he wrote in this memo.

3             Q.    All I'm going to is what he

4    reported.

5             A.    He reported in this memo,

6    his 19 -- sorry, 1972 memo, he reported

7    his findings.

8                   MR. PLACITELLA:  Can we put

9             that in, Lea, please.

10   BY MR. PLACITELLA:

11            Q.    I have here that he worked

12   for NYU at the time, correct?

13            A.    Yes.  New York University.

14            Q.    You have the author as

15   Dr. Weissler.

16                  MR. PLACITELLA:  That's not

17            correct.  It should be flipped.

18   BY MR. PLACITELLA:

19            Q.    Used XRD, Shower to Shower,

20   5 percent chrysotile, correct?

21            A.    That's what he claimed.

22                  MR. PLACITELLA:  Okay.  Now

23            give me 58.

24                  (Document marked for

John Hopkins, Ph.D.

1            identification as Exhibit

2            J&J-58.)

3    BY MR. PLACITELLA:

4            Q.    58 you have seen before.

5    It's a March 1974 report?

6            A.    I remember.  I've seen that.

7            Q.    Concerning Dartmouth

8    College, correct?

9            A.    Yes, I've seen this before.

10   Yes.

11           Q.    And the subject is analysis

12   of talc products and ores for asbestiform

13   amphiboles, correct?

14           A.    That is the subject, yes.

15           Q.    All right.  And the purpose

16   of the study, according to this, is to

17   develop methods for measuring the

18   concentration of asbestiform amphiboles

19   in fine-grained talc products and ores,

20   correct?

21           A.    Yes, it was an experiment

22   that they were doing in 1974.

23           Q.    Similar to the Colorado

24   School of Mines, they were urging you to

John Hopkins, Ph.D.

1    use a pre-concentration method that

2    included a centrifuge, correct?

3              MR. BICKS:  Objection to the

4         form.

5              THE WITNESS:  I don't

6         believe they're urging the

7         company.  What they're offering is

8         a study to develop methods and

9         methodologies that can be

10        evaluated.

11   BY MR. PLACITELLA:

12        Q.    And according to Page 2, the

13   method they're proposing is using a

14   centrifuge, correct?

15        A.    Yes.

16        Q.    Okay.  And what they looked

17   at was talc ore that was provided by

18   Windsor Minerals, correct?  Ground talc

19   product from the talc ore, correct?

20   Actually they looked at the talc product

21   and the talc ore, correct?

22        A.    They looked at talc ores and

23   talc property, yes.  Yes.

24        Q.    Okay.  On Page 6 -- scratch

John Hopkins, Ph.D.

1   that.  Let me just go to the next page.

2   What they found in their conclusions was

3   that the ore sample contained 2,300 parts

4   per million actinolite and the talc

5   product contained 170 parts per million

6   actinolite, correct?

7        A.    Well, that's because they

8   added it.  It says on Page 5, "In

9   addition talc ore was spiked with known

10  amounts of actinolite ground in size."

11  And then they they've got to see if they

12  can find it having spiked the talc.

13       Q.    What they reported in their

14  conclusions is the ore contains

15  2,300 parts per million actinolite and

16  the talc product contains 170 parts per

17  million actinolite, correct, that's what

18  they report in their conclusion?

19            MR. SILVER:  Objection.

20            THE WITNESS:  Yes, but they

21       deliberately added on Page 5 --

22       that's my read of this that they

23       added known amounts of actinolite.

24       And that's a standard process when

John Hopkins, Ph.D.

1           you're looking -- see could you

2           find actinolite, you add it and

3           see if you can find it.  That, to

4           my mind, when I read this, that

5           appears to be what they did.

6    BY MR. PLACITELLA:

7           Q.    Sir, remember --

8           A.    They were able to find it.

9           Q.    Remember I told you that I

10   don't want your expert opinions.  You're

11   not an expert.  I want to know what was

12   reported.  Give me what was reported.

13              MR. BICKS:  He can read the

14          document.  You just flashed it up

15          there highlighted it, and took it

16          down.

17              MR. PLACITELLA:  Read to

18          me -- I won't take it down.

19   BY MR. PLACITELLA:

20          Q.    "Conclusions, the ore

21   samples contain 2,300 parts per million

22   actinolite.  And the talc product

23   contains 170 parts per million

24   actinolite.  3, actinolite is the

John Hopkins, Ph.D.

1    dominant fiber-form amphibole in the ore

2    and talc product provided by Windsor

3    Minerals.  Small amounts of anthophyllite

4    may be present.  That's what they report

5    here, correct?

6           A.    You can't just take one

7    conclusion sentence in isolation.

8                 The whole point of this

9    report, if we look at it in its full

10   context, talks about how -- in the

11   results, samples were spiked with

12   actinolite, were separated and analyzed.

13   Then they present the results.  And then

14   the results, as you read out, was that

15   yes, they found it.

16          Q.    And what they said, they

17   found it in the ore that was -- and the

18   product that was provided by Windsor

19   Minerals, correct?  That's what they

20   said?

21                MR. SILVER:  Objection.

22                THE WITNESS:  The ore in the

23         product was provided by Windsor

24         Minerals.  And as it says in the

John Hopkins, Ph.D.

1          results, just the top of Page 6,

2          "Samples of ore, an ore spiked

3          with actinolite, were analyzed and

4          described above."  So they showed

5          they can find it when they

6          deliberately added it.

7    BY MR. PLACITELLA:

8          Q.    Sir, I'm not going to debate

9    the science with you.  You know what

10   happens here.  What they do is they add

11   in a product, and then they see what

12   percentage -- you know that that's not

13   what happened here.  So let's just talk

14   about what is reported.  And we'll fight

15   about, at trial, what it means.

16              MR. SILVER:  Objection.

17   BY MR. PLACITELLA:

18         Q.    What they report here, sir,

19   is that in the Windsor product and ore,

20   they found fiber-form amphibole, which

21   was actinolite.  That's what it states,

22   correct?

23              MR. LOCKE:  Objection.

24              MR. BICKS:  Objection to the

John Hopkins, Ph.D.

1           form.

2    BY MR. PLACITELLA:

3           Q.    That's what it states?

4           A.    Conclusion 2.  "The other

5    samples contain 2,300 parts per million

6    of actinolite.  And the talc product

7    contains 170 parts per million

8    actinolite.

9           Q.    Conclusion 3, read

10   Conclusion 3?

11          A.    "Actinolite is the dominant

12   fiber-form amphibole in the ore in the

13   talc product provided by Windsor

14   Minerals."  But what I'm trying --

15          Q.    But -- but -- sir --

16          MR. BICKS:  You just want us

17   to read it.

18   BY MR. PLACITELLA:

19          Q.    You read it.

20          A.    I read it.

21          Q.    That's fine.  Thank you.

22          MR. PLACITELLA:  Can you go

23   to the chart.  I want to put a

24   note next to it, okay, so we are

John Hopkins, Ph.D.

1          all on the same page.

2   BY MR. PLACITELLA:

3          Q.     Dartmouth College.  "The

4   purpose was to develop methods for

5   measuring the concentration of

6   asbestiform amphiboles, it was a talc

7   product and ore.  There was ore in the

8   product.  They used a centrifuge and they

9   reported actinolite and talc products

10  contains 170 parts per million

11  actinolite, small amounts of

12  anthophyllite may be present.

13              MR. PLACITELLA:  And we'll

14          put next to it, put in the next

15          category, "Dr. Hopkins has issues

16          with spiking in terms of

17          conclusions."

18  BY MR. PLACITELLA:

19          Q.    Is that fair?

20              MR. BICKS:  Objection to the

21          form.

22              MR. LOCKE:  Objection.

23  BY MR. PLACITELLA:

24          Q.    Tell me what you want me to

John Hopkins, Ph.D.

1    write there?

2         A.    I have issues with the

3    conclusions in the context that the study

4    involved spiking.

5              MR. PLACITELLA:  Okay.  So

6         let's just put he has issues with

7         the conclusions.

8              THE WITNESS:  With the

9         reason, please.

10   BY MR. PLACITELLA:

11        Q.    Okay.  So you believe, just

12   so we know, that the conclusions mean

13   that it was spiked and never found in the

14   ore?

15        A.    That was not clear from the

16   report.

17        Q.    Okay.

18        A.    The whole purpose of that

19   report was to develop methodologies.  And

20   when you develop methodologies, it is the

21   usual, to deliberately add 1 percent or

22   whatever it may be, to say can I find it.

23              That is not clear from that

24   conclusion.  It doesn't say we added 1

John Hopkins, Ph.D.

1    percent and we found it.  It's a study

2    where they deliberately spike, and then

3    they say we found it in the conclusion.

4         Q.    Okay.

5         A.    So it's not entirely clear.

6         Q.    Okay.  But it certainly

7    doesn't say we found anthophyllite --

8    actinolite -- fibrous actinolite because

9    we spiked it.  It doesn't say that right?

10   We know that's not what it says?

11                MR. LOCKE:  Objection.

12                MR. BICKS:  Object to the

13         form.

14                THE WITNESS:  It doesn't --

15   BY MR. PLACITELLA:

16        Q.    Now, they spiked this with 1

17   percent, right?

18        A.    I don't know.  Does it say

19   one percent?

20        Q.    Isn't that what you said?

21        A.    What I said is it's often

22   usual to spike with 1 percent, or

23   whatever it may be.

24        Q.    You don't know how much they

John Hopkins, Ph.D.

1    spiked it with?

2         A.    It doesn't make it clear in

3    that report.  I need to look at it in

4    great detail.  But they do say they spike

5    it.  So that was the point that I'm

6    making, is that when we have a

7    conclusion, we need to see it in the

8    total context.

9         Q.    I understand that.

10        A.    Total context is, are they

11   measuring what they spiked or were they

12   not measuring what they spiked.  It's not

13   clear.

14        Q.    Okay.  Nowhere in the

15   conclusion does it say that when we found

16   the fibrous actinolite, we found it

17   because it was spiked, that's absent from

18   the conclusion, correct?

19        A.    It's absent from the

20   conclusion.

21        Q.    Okay.  Thank you.

22        A.    But you've got to see the

23   whole context of the whole report.

24             MR. PLACITELLA:  Okay.  Give

John Hopkins, Ph.D.

1       me 29.

2              (Document marked for

3         identification as Exhibit

4         J&J-29.)

5   BY MR. PLACITELLA:

6         Q.    29 is an August 24, 1972 --

7              MR. PLACITELLA:  Sorry, did

8         I give you have a copy?  Sorry.  I

9         apologize.

10  BY MR. PLACITELLA:

11        Q.    -- memo from Mr. Nashed to

12  Mr. Fuller.  And the title is,

13  "Talc/asbestos Shower to Shower talc,"

14  correct?

15        A.    Yes.

16        Q.    Okay.  And on the back,

17  you -- it's copied to a whole bunch of

18  scientists and executives at Johnson &

19  Johnson, correct?

20        A.    Yes, there are.

21        Q.    And what this document talks

22  about is the testing that was done

23  initially by Dr. Lewin, correct?

24        A.    Yes.  It's a follow-up.

John Hopkins, Ph.D.

1    Yeah.

2              Q.    And what happened then was

3    that after Dr. Lewin ran the test, the

4    FDA sent out the test to another

5    laboratory known as Sperry Rand, correct?

6              A.    Well, I don't know whether

7    FDA sent the sample.  But Sperry Rand

8    reported on it, yes.

9              Q.    All right.  And what's

10   reported here by your senior scientist is

11   as follows:

12                   "The report from Sperry Rand

13   was that asbestos fibers could be

14   detected in the sample."  Correct?

15             A.    That is what is written.

16             Q.    "Dr. Weissler" -- he's from

17   the FDA, correct?

18             A.    He is, yes.

19             Q.    -- "said that he has in

20   front of him photographs of six fields at

21   12,000X magnification showing fibers with

22   length, width -- width and length

23   ratios."

24                   Do you see that?

John Hopkins, Ph.D.

1      A.    Yes.

2      Q.    Okay.  The next paragraph

3  talks about a conversation that

4  Mr. Nashed had with Dr. Weissler at the

5  FDA.

6            Do you see that?

7      A.    Yes.

8      Q.    And what Dr. Weissler told

9  Mr. Nashed is Sperry Rand is experienced,

10  and they do a lot of work with

11  chrysotile, correct?

12      A.    That's what he stated.

13      Q.    Right and he says, "The man

14  at the FDA reported to Mr. Nashed that

15  the scientists at Sperry Rand are

16  conservative and would not have reported

17  chrysotile unless he was true" -- "unless

18  he was sure."  Correct?

19      A.    You read what was written.

20      Q.    All right.  He said, "I

21  asked him if he was" -- "if he has

22  assured himself that the fibers were not

23  tremolite which could be present in trace

24  amounts.  He said the fibers are

John Hopkins, Ph.D.

1   characteristic of chrysotile and not

2   tremolite."

3            Did I read that correctly?

4        A.    You read what was written.

5        Q.    Okay.  And that's what was

6   reported to all these executives at

7   Johnson & Johnson in August 1972,

8   correct?

9        A.    That's -- that's reported to

10  those people, yes.

11       Q.    Okay.  So I put down there

12  "8/24/1972, Sperry Rand hired by the FDA.

13  The author of this memo was Mr. Nashed.

14  FDA submits Lewin sample.  It's Shower to

15  Shower.  Asbestos fibers could be

16  detected in the sample, reported

17  chrysotile."

18            That's what it states,

19  correct?

20       A.    It does, except I'm not sure

21  that FDA hired Sperry Rand.  I don't see

22  that here, sir.

23            MR. PLACITELLA:  Okay.

24  We'll take out hired.

John Hopkins, Ph.D.

1                    THE WITNESS:  Yeah.

2                    MR. PLACITELLA:  Okay.  Give

3          me 71.

4                    Give me 258.

5                    (Document marked for

6          identification as Exhibit

7          J&J-258.)

8     BY MR. PLACITELLA:

9          Q.    258.  I'll put it up.

10                   MR. BICKS:  Do you have a

11         copy of it?

12                   MR. PLACITELLA:  It's big so

13         I didn't -- I'm happy to come back

14         to it if you need time to look at

15         it.  I'll do another one.  Totally

16         up to you.

17                   Just make a note, Lea.

18         We'll come back to that.  Give

19         that one to Peter because he's --

20                   MR. BICKS:  No, I'm familiar

21         with it.

22                   MR. PLACITELLA:  Okay.  He

23         knows it.  Let's deal with it.

24    BY MR. PLACITELLA:

John, Hopkins, Ph.D.

1    Q.    So 258 is a September 6,

2   1973 project from a project manager, a

3   John Stuart.  Who is John Stuart?

4    A.    My read of this is it's

5   someone at FDA.

6    Q.    Okay.

7    A.    But I'm not sure.

8    Q.    Okay.  Have you ever seen

9   this before?

10    A.    I've seen something similar.

11   I think this is an FDA document.

12    Q.    Right.  And the objective

13   here is, "To develop one or several

14   methods of sufficient sensitivity and

15   reliability, which will permit the

16   determination of asbestos and other

17   contaminants in talc-containing

18   products."

19          Do you see that?

20    A.    I do, yes.

21    Q.    Because they may

22   potential -- present a potential hazard,

23   right?

24    A.    That was the discussion back

John Hopkins, Ph.D.

1    in '73, yes.

2           Q.    Right.

3           A.    Test methods.

4           Q.    And what he did is he went

5    and he got the samples that were tested

6    by Dr. Lewin, correct?

7           A.    Without reading the whole

8    report, if you can point me to which --

9           Q.    So it's the, "200 commercial

10   cosmetic talc samples will be tested for

11   asbestos by refraction."  He talks about

12   testing the Lewin samples right under the

13   description of work.

14          A.    Yes, he does.

15          MR. SILVER:  Note Imerys'

16          continuing objection.  I have a

17          standing objection.  This document

18          says it's for aerosols and air

19          preparations.

20          The scope of this deposition

21          is supposed to be related to

22          Johnson's Baby Powder.

23          MR. PLACITELLA:  I'm going

24          to get there.

John Hopkins, Ph.D.

1          MR. SILVER:  Okay.

2  BY MR. PLACITELLA:

3          Q.    And if you go to -- where it

4  says Project Number 0069.

5          A.    Yes.

6          Q.    Okay.  And you see on the

7  bottom?

8          MR. BICKS:  00679.

9  BY MR. PLACITELLA:

10          Q.    Right.  That it the project

11  manager signature is John Stuart.

12          Do you see that?

13          A.    Yes.

14          Q.    And the program manager is

15  Heinz Eirmann.  He worked for the FDA,

16  correct?

17          A.    He did, yes.

18          Q.    Okay.  And on the next page

19  he talks about looking at Sample 84 from

20  the Lewin samples.

21          Do you see that?

22          A.    Yes.

23          Q.    You know Sample 84 was a

24  Johnson & Johnson product, correct, from

John Hopkins, Ph.D.

1    the Lewin samples?  You remember that?

2          A.    Yeah, I don't remember it.

3    But I'll take your word for it.

4          Q.    Okay.  It was in Exhibit 28.

5    Do you see where it says example

6    number -- "Sample Number 84 contained

7    fibers of tremolite/actinolite"?

8          A.    Yeah, I can read what is

9    written.  Yes.  Okay.  What they are

10   quoting is Dr. Lewin's report though, as

11   of 12/21/73.  Samples, Dr. Lewin's

12   identification.  And then he describes

13   what my read of that is, what Dr. Lewin

14   found.

15         Q.    Okay.

16         A.    He's reporting Dr. Lewin's

17   comments, not FDA's comments.

18         Q.    Okay.  And the process that

19   they are examining here is again a

20   pre-concentration process, correct?

21         A.    I'm aware they were working

22   on a concentration method, yes.

23   Certainly aware of that.

24                MR. PLACITELLA:  Can you

John Hopkins, Ph.D.

1           give me Exhibit 33, please.

2                (Document marked for

3           identification as Exhibit

4           J&J-33.)

5    BY MR. PLACITELLA:

6           Q.    Exhibit 33 is a report from

7    the University of Minnesota Space Science

8    Center.  You've seen this before,

9    correct?

10          A.    Yes.

11          Q.    And the University of

12   Minnesota is that someone that Johnson &

13   Johnson hired to look at the samples that

14   were tested by Dr. Lewin, correct?

15          A.    No.  Not correct, no.  My

16   understanding is that they were requested

17   by, I think it was RJ Lee to maybe

18   McCrone -- McCrone, sorry -- to examine.

19   But it was not Johnson & Johnson.

20          Q.    All right.  Well, you hired

21   McCrone, and McCrone hired them, right?

22          A.    Well, McCrone asked them for

23   some input.

24          Q.    Right.  And they issued this

John Hopkins, Ph.D.

1    report, which eventually made it to your

2    headquarters, correct?

3                    MR. BICKS:  Objection to the

4            form.

5                    THE WITNESS:  Obviously if

6            it's in the J&J files, then it

7            would have made it to Johnson &

8            Johnson.

9    BY MR. PLACITELLA:

10           Q.    Okay.  And what they did is,

11   if you look at the very beginning, is

12   they looked at specimens of powdered talc

13   that were received from you and McCrone

14   and did an analysis to determine whether

15   the samples contained chrysotile

16   asbestos, correct?

17           A.    They -- they reported their

18   findings on x-ray diffraction.  I think

19   it was here.  They reported their

20   findings.

21           Q.    All right.  And --

22           A.    I need to read this to find

23   out what processes they used, what

24   methods they used.

John Hopkins, Ph.D.

1          Q.    Well, go to Page 3 of the

2   report.

3          A.    Well, they used scanning

4   electron microscope.

5          Q.    They also used TEM, correct?

6          A.    They used TEM, yes.

7          Q.    Right.  And when they looked

8   at your samples using TEM, they found

9   numerous examples of fibrous material,

10  correct?

11         A.    They found -- three examples

12  of fibers, which upon examination by

13  electron diffraction could be classified

14  as likely candidates of chrysotile

15  asbestos.

16              So it was -- it's -- the

17  wording is a little nebulous.  It could

18  be classified, but it's what is written.

19         Q.    In the Shower to Shower

20  material, correct?

21         A.    They say "candidates that

22  could be classified."

23         Q.    So in the Shower to Shower

24  material and the Lewin material, correct?

John Hopkins, Ph.D.

1  So they looked at your samples, and they

2  looked at Lewin's samples and they --

3  under TEM, and they said that they were

4  likely candidates for chrysotile

5  asbestos, correct?

6           MR. BICKS:  Objection.

7           THE WITNESS:  Well, I don't

8      know whether they looked -- I

9      don't know whose they looked at.

10     It just says that they looked at

11     the Lewin samples.

12  BY MR. PLACITELLA:

13     Q.    No.  Look at it.  It says,

14  "Of the large number of grids examined,

15  three examples of fiber upon which

16  examination by electron diffraction could

17  be classified as likely candidates for

18  chrysotile asbestos in the Shower to

19  Shower material and one example was found

20  in the Lewin material," correct?

21     A.    You read what was written.

22  Yes.

23     Q.    Okay.  And then on the next

24  page.  They report that the electron

John Hopkins, Ph.D.

1   micrographs showed a typical appearance

2   of chrysotile asbestos, correct?

3          A.   Well, that's what they've

4   written.  But they don't have the ability

5   to spell chrysotile properly.  But

6   they've written electron micrographs show

7   the typical appearance of chrysotile

8   asbestos.

9          Q.   Well, they do more than

10   that.  They say, do they not, "It is

11   felt, therefore, that chrysotile asbestos

12   does exist in the specimens of Shower to

13   Shower and Lewin supplied to this

14   laboratory," correct?

15          A.   That is what is written.

16   Yes.

17              MR. PLACITELLA:  Can we --

18       go to the next one, yep.

19   BY MR. PLACITELLA:

20          Q.   Here we have University of

21   Minnesota, Shower to Shower, chrysotile,

22   "Chrysotile asbestos does exist in the

23   specimens of Shower to Shower."  Correct?

24   That's what's reported?

John Hopkins, Ph.D.

1          A.     You read what is written in

2    that Minnesota report.

3          Q.     Okay.   In 1971, are you

4    aware that Dr. Langer tested Johnson's

5    Baby Powder and found chrysotile

6    asbestos?

7          A.     He claimed to have found

8    chrysotile asbestos by the methods he was

9    using at the time.   Yes.

10          Q.     So let me ask the question

11    this way.

12              In 1971, Dr. Langer of the

13    Mount Sinai School of Medicine reported

14    to Johnson & Johnson that the Johnson's

15    Baby Powder contained chrysotile

16    asbestos, correct?

17              MR. BICKS:   Objection to the

18         form.

19              THE WITNESS:   I would need

20         to see the actual report.

21              MR. PLACITELLA:   Give me 17.

22         I was trying to speed this up.

23         But I guess not.

24              (Document marked for

John Hopkins, Ph.D.

1          identification as Exhibit

2          J&J-17.)

3    BY MR. PLACITELLA:

4          Q.    Exhibit 17 is a -- it's JNJ

5    and it ends with 6743.

6                It discusses a meeting that

7    you had with Dr. Langer on July 9th,

8    1971, correct?

9          A.    It does, yes.

10         Q.    Okay.  And what Dr. Langer

11   was asked to do was to look at tissue

12   samples from a study that was done in

13   Europe where they found talc in the

14   women's ovaries?

15         A.    It said uterus -- it says

16   uterus here.

17         Q.    Right.

18         A.    It's -- yeah.

19         Q.    And that was something that

20   he was actually doing for you, right?  I

21   mean, you know this story.

22               MR. BICKS:  Langer?

23          Dr. Langer.

24               MR. PLACITELLA:  Yeah.

John Hopkins, Ph.D.

1    BY MR. PLACITELLA:

2        Q.    Right.

3              MR. BICKS:  Objection to the

4        form.

5              THE WITNESS:  I don't know

6        who -- whether he was doing it --

7        whether he was doing it for the

8        operation, the Tenovus Institute

9        which is in Wales.  They are the

10       ones who found it.

11             My reading here is that --

12       it says, "The express purpose was

13       to observe the preparation of

14       tissue from the Tenovus Institute

15       for electron microscope

16       examination."

17             So that doesn't exclude the

18       possibility that the Tenovus

19       Institute, the scientists there,

20       were dealing directly with

21       Dr. Langer.

22   BY MR. PLACITELLA:

23       Q.    Okay.  So how did you get a

24   meeting then with Dr. Langer then if he

John Hopkins, Ph.D.

1    was dealing with them?

2          A.    Well, I think the answer is

3    if you go onto the next section, he's

4    looking at Johnson's Baby Powder.  That's

5    on Page Bates Number 45.

6          Q.    Right.  So he was, one,

7    looking at the women's ovaries, correct?

8          A.    It says uterus here.

9          Q.    And what he did is he found

10   chrysotile asbestos in the -- in the

11   uterus, right?

12         A.    I don't see it actually says

13   he found -- found that.  It talks about

14   his test methods, his methodologies.  I

15   can't see the conclusion where it says he

16   found asbestos.

17               Oh, it does, yeah.  It says

18   he could identify -- "Dr. Langer claimed

19   to identify as chrysotile.  This method

20   is based on the experience observing

21   fibers of chrysotile under similar

22   experimental conditions."

23         Q.    And then he used an electron

24   microscope and a light microscope to

John Hopkins, Ph.D.

1   actually look at the Johnson's Baby

2   Powder, correct?

3        A.    That was his test

4   methodology, yes.

5        Q.    Right.  And he worked for

6   Dr. Selikoff at Mount Sinai, correct?

7        A.    He did, yes.

8        Q.    And Dr. Selikoff was

9   considered one of the foremost

10  authorities in the world on asbestos,

11  correct?

12       A.    Yes, that is correct.  On

13  asbestos, on health issues to employees

14  from that aspect, yes.

15       Q.    And what Dr. Langer found

16  was that when he looked at the Baby

17  Powder, he found asbestos, right?

18       A.    Well, he -- he uses the

19  words -- In Johnson's product, he

20  estimated particles to be fibrotic, in

21  which some could be 'asbestos.'

22             So he's not actually saying

23  they were asbestos, but they could be

24  asbestos, in quotes.

John Hopkins, Ph.D.

1    Q.    Oh, really, because I'm

2    looking at the page that says -- and I

3    blew it up here.  "Using electron

4    microscopy, Dr. Langer has demonstrated

5    to me" -- that's the person who met with

6    him, correct?

7        A.    Yes.

8        Q.    The Johnson & Johnson

9    executive that went up to his laboratory

10   to see what he's up to?

11       A.    That is the read, yes.

12       Q.    Okay.  It says, "Dr. Langer

13   has demonstrated to me the presence of

14   some very fine fibers at moderately high

15   magnification which he identifies as

16   chrysotile asbestos by the typical

17   tubular appearance of the fiber."

18            Correct?

19       A.    That is -- that is what is

20   written.  Yes.  That's what he wrote in

21   1972.

22       Q.    And in the conclusion, in

23   the summary that was written by your

24   scientists, they put, in the fourth

John Hopkins, Ph.D.

1  conclusion in the summary, "Electron

2  microscopy" -- that's what you had

3  specified, right, 7024, using electron

4  microscope.  I'll withdraw that question.

5          "Electron microscopy at high

6  magnification shows a few fibers to be

7  present in Johnson's Baby Powder, which

8  can be identified with chrysotile

9  asbestos according to Dr. Langer,"

10  correct?

11      A.    You read -- you read what

12  was written.  Yes.

13      Q.    Okay.  Can we put that up,

14  please.  We have here 1971.  Mount Sinai,

15  Dr. Langer, TEM, Johnson's Baby Powder,

16  chrysotile asbestos.

17      A.    You said TEM.  It doesn't

18  specify whether it was TEM or SEM.  It

19  just says -- at least that's my read.  It

20  says electron microscopy.

21          MR. PLACITELLA:  Okay.

22      Let's just say -- let's just

23      change it to electron microscopy.

24      I want to be exact.

John Hopkins, Ph.D.

```
 1              THE WITNESS:  Again, in the
 2       interest of accuracy, it does say
 3       "which can be identified with
 4       chrysotile."  It doesn't -- in my
 5       read, that doesn't confirm it
 6       110 percent.
 7              MR. BICKS:  Do I see 1971 on
 8       it?
 9              THE WITNESS:  No, I thought
10       this was '71.  It doesn't say.
11              MR. PLACITELLA:  July 9th.
12       I guess we'll figure out -- figure
13       out we'll make sure the date is
14       right overnight.
15              Now, do you have 92?
16              (Document marked for
17       identification as Exhibit
18       J&J-92.)
19              MR. BICKS:  The author can't
20       be Langer, right?
21              MR. PLACITELLA:  No, it's
22       you guys.
23              MR. BICKS:  Okay.  Because
24       the author that you have on the
```

1        chart is Langer.

2                MR. PLACITELLA:   Change

3        that.

4                MR. BICKS:  Do we know who

5        wrote it?

6   BY MR. PLACITELLA:

7        Q.    I'm just going to show you

8   Exhibit 92.  You've seen this before.

9   I'm sorry.

10               By the way, in that last

11   document, can you help figure out

12   overnight actually who wrote it?  Because

13   I couldn't tell.

14               MR. BICKS:  I know

15        Dr. Egilman is coaching you.

16               MR. PLACITELLA:  No, he was

17        not really.  No actually he was

18        asking me -- he was asking me

19        where we were going to dinner

20        tonight.  How's that?

21               MR. BICKS:  We're not

22        going --

23               MR. PLACITELLA:  He wants to

24        know if I'm buying him dinner.

John Hopkins, Ph.D.

1          MR. BICKS:  We're not going

2      to do assignments for you tonight.

3          THE WITNESS:  If I knew I'd

4      tell you today.

5  BY MR. PLACITELLA:

6          Q.    Okay.  Great?

7          A.    I don't know, and I'm

8  probably never going to find out, because

9  a number of J&J scientists met with

10  people like Langer.  That's part of the

11  thing.  Scientists talk to each other.

12  And I don't know who that scientist was.

13          Q.    Now, Dr. Langer told you,

14  actually on more than one occasion doing

15  different sampling that he found asbestos

16  in your products, correct?

17          A.    He -- well, this letter

18  actually uses the words that I was going

19  to.  "Langer's claiming that he's

20  detected chrysotile and amphiboles."

21          Q.    You're talking about the --

22  now we are on the September 9, 1975

23  letter, correct?

24          A.    We are, yes.

John Hopkins, Ph.D.

1      Q.    And this is a letter from

2  Mr. Lee, copying Mr. Ashton and a bunch

3  of other people, correct?

4      A.    Yes.

5      Q.    And he's talking about a

6  telephone call he received from

7  Dr. Pooley, correct?

8      A.    The telephone call was from

9  Bob Dean, who was research director in

10  the UK.

11      Q.    To report a call he got from

12  Bob -- from Pooley?

13      A.    From Dr. -- Professor

14  Pooley, yes.

15      Q.    Because what happened was

16  that Pooley and Langer were supposed to

17  publish a -- to give a talk on what they

18  found when they looked at Johnson's Baby

19  Powder.  Do you remember that?

20      A.    I'm aware of that, yes.

21      Q.    But Johnson & Johnson kind

22  of got in the way of that and stopped

23  that from happening, right?

24          MR. BICKS:  Objection to

John Hopkins, Ph.D.

1          form.

2              THE WITNESS:  No, that's

3          not -- that's not correct.

4          Professor Pooley was in

5          disagreement with Dr. Langer.

6      BY MR. PLACITELLA:

7          Q.     You sure you had nothing to

8      do with it?  No input?  Are you sure that

9      you had nothing to do with Dr. Pooley and

10     interfering with the publication of the

11     paper?

12         A.     Professor Pooley is a man

13     that you would not want to cross.  He

14     would tell you where to go if he thought

15     you were trying to interfere.

16         Q.     Actually, I thought the last

17     time we were here when I was deposing

18     you, he was very nice.  He told me where

19     the bathroom was.  He didn't tell me

20     where to go.  So now, and I think

21     Mr. Bicks was in the other room with

22     Mr. Lanier.

23             So I'm looking at this

24     letter.  And I just want to know what was

John Hopkins, Ph.D.

1    reported.

2              And what's reported is that

3    Langer has looked at your products and

4    found chrysotile and amphiboles, correct?

5         A.   Well, the letter says Langer

6    is claiming that he's detected chrysotile

7    and amphiboles.  And he's detected

8    tremolite and anthophyllite in Baby

9    Powder.  That's what Langer is claiming.

10        Q.   Right.  I'm asking -- I'm

11   telling you, or we're discussing here

12   what was reported to Johnson & Johnson.

13        A.   Yeah.  That was what was

14   reported.

15        Q.   What was reported was that

16   Langer was going to give a talk that,

17   based upon his examination of the

18   Johnson's Baby Powder, he found tremolite

19   and anthophyllite asbestos and chrysotile

20   in your products, correct?

21        A.   And that was -- the word is

22   he claimed that he had found it back in

23   '75, yes.

24        Q.   Right.  Okay.  Now --

John Hopkins, Ph.D.

```
 1                    MR. PLACITELLA:  Hold that.
 2           We'll do two at the same time.
 3           Give me 177.
 4                    (Document marked for
 5           identification as Exhibit
 6           J&J-177.)
 7    BY MR. PLACITELLA:
 8           Q.    177 is a May 3, 1984 memo
 9    entitled "MSHA Visit"?
10                    Do you see that?
11                    MR. SILVER:  Objection to
12           form.
13                    MR. PLACITELLA:  And I'm
14           going to give you the Bates number
15           or the -- it's marked on the
16           bottom Herford 119.  Do you see
17           that, on the bottom?
18                    THE WITNESS:  Yes.
19                    MR. PLACITELLA:  Okay.
20                    MR. SILVER:  Chris, just for
21           the record I think you said it is
22           a May 3 document.  I think it's a
23           May 15 document.
24                    MR. PLACITELLA:  Correct.
```

John Hopkins, Ph.D.

1           I'm sorry.

2   BY MR. PLACITELLA:

3           Q.    It's a May 15, 1984

4   describing a visit of May 3, 1984.

5                 Do you see that?

6           A.    Yes.

7           Q.    Okay.  And the MSHA is the

8   Mine Safety and Health Administration,

9   correct?

10          A.    Yes.

11          Q.    And you've seen this

12  document before, correct?

13          A.    I believe I have, yes.

14          Q.    Right.  And what happened

15  was at the mine safety and health

16  administration actually visited the

17  facility in South Plainfield where the

18  talc that was used in Baby Powder was

19  being processed, correct?

20                MR. LOCKE:  Objection.

21                THE WITNESS:  It says the

22          people are monitored by the Mine

23          Safety and Health Admin, yes.

24  BY MR. PLACITELLA:

John Hopkins, Ph.D.

1          Q.    Right.  And what they

2     actually did is they went in to see were

3     the people who were working in that

4     facility at some kind of health risk,

5     correct?

6          A.    Yes, yes.

7          Q.    And what was reported was

8     that there was 71.2 percent fibrous talc,

9     5.8 percent anthophyllite, which was

10    concluded to be an asbestiform amphibole,

11    correct?

12               MR. SILVER:  Objection to

13         form.

14               THE WITNESS:  We're talking

15         about the filters, the personal

16         air filters that people were

17         wearing --

18    BY MR. PLACITELLA:

19         Q.    Correct.

20         A.    -- themselves.

21               This is written by, I don't

22    know who K.W. Olson, Ph.D., is in this.

23    But that is what is reported, that they

24    found that.  And this individual has

John Hopkins, Ph.D.

1  described the anthophyllite as an

2  asbestiform amphibole. But I have not

3  seen that in the MSHA results.

4       Q.   Then it says in 3, "In the

5  case of CIMC's sample."

6            Do you see that, where it

7  talks about what they looked at?

8       A.   Yes.

9       Q.   They say they found -- they

10 actually count the fibers. And they say

11 they found fibrous talc, and that's where

12 they get the percentage of fibers.

13           Do you see that?

14      A.   Yes.

15      Q.   And do you see where they

16 say they found anthophyllite asbestos?

17      A.   I read that, yes. Although

18 what this doesn't say is which -- which

19 mine they visited. Which facility.

20      Q.   Well, it says the South

21 Plainfield facility, doesn't it? Right

22 at the top, the South Plainfield mill,

23 the very first sentence?

24      A.   It does say that. But I

John Hopkins, Ph.D.

1   don't know whether that was an industrial

2   mill or how far away that is from the

3   Hammondsville mine and milling operation.

4       Q.    You didn't know that they

5   processed your Baby Powder right here in

6   New Jersey in South Plainfield?

7       A.    What I want to say is I

8   don't know whether that was the -- that

9   particular mill was operating as Baby

10  Powder, I don't know, or was it a mill

11  that was looking at industrial talcs.  I

12  don't know.

13      Q.    You don't know, but somebody

14  knows?

15      A.    Well, this was 40 years ago,

16  30 years ago, yes.

17      Q.    Okay.  And if you go on the

18  next page, it talks about who did the

19  tests, right?  And that they sent -- and

20  they took photographs of the patterns to

21  document what they found, right?

22      A.    Yes.

23      Q.    Okay.  If you go down to the

24  report under where it says trip report.

John Hopkins, Ph.D.

1          Do you see that?

2     A.    Which Bates page?

3     Q.    When they are actually

4  analyzing how complete this study

5  actually was.

6     A.    Which page, please?  Bates

7  number?

8     Q.    Bates Number 121?

9     A.    121.  Thank you.

10    Q.    First, if you go to 121, and

11 they say the analysis was very complete,

12 and that the testing scheme he used had

13 actually already been tested in court,

14 correct?

15    A.    Yeah, that's what's written,

16 yes.

17    Q.    They say, according to the

18 federal government, a false positive

19 analysis for asbestos was not possible

20 using this scheme, correct?

21    A.    That is what is written.

22 But again, I'm coming back to this

23 question as to how on earth does this tie

24 into Johnson's Baby Powder.  I am just

John Hopkins, Ph.D.

1    not aware of any milling operation in

2    South Plainfield.

3            Q.    Well, you know that they

4    were looking at Italian talc when they

5    did this?

6            A.    Who is they?

7            Q.    The Mine Safety and Health

8    Administration.  Do you know that they

9    used Italian talc here?

10           MR. BICKS:  Objection to

11           form.  No foundation.

12   BY MR. PLACITELLA:

13           Q.    Did you know that?

14           A.    Well, it mentions Italian

15   talc.  But this is a Cyprus Mineral

16   report or a report to a Cyprus Mineral

17   facility.  And the point that I'm making

18   here is that J&J was not using Italian

19   talc in Baby Powder in 1984.

20           Q.    Well, did the mine change

21   somehow from when you were using it?  I

22   thought you said the geology was all the

23   same?

24           A.    Italian talc.

John, Hopkins, Ph.D.

```
 1          Q.    Yeah.  Why would this be any
 2    different than the talc you were buying?
 3               MR. BICKS:  Objection to the
 4          form.
 5               MR. SILVER:  Objection to
 6          the form.
 7               THE WITNESS:  I'm not aware
 8          that we were buying Italian talc
 9          in 1984.
10    BY MR. PLACITELLA:
11          Q.    But you were buying it in
12    1980, right?
13          A.    We bought in 1980 for a
14    period of two months.  I think January,
15    February 1980.  Possibly December 1979
16    during the mine strike, a small quantity
17    of Italian talc was used for about
18    12 weeks.
19          Q.    Okay.  So in terms of the
20    man's credentials who did this testing,
21    if you go to 122, this is what your
22    supplier that you relied upon said about
23    the man's credentials.
24               "He is a certified
```

John Hopkins, Ph.D.

1  technician, an experienced microscopist,

2  and has served as an expert witness and a

3  friend of the court during the

4  various" -- "course of various

5  litigations."  Right?

6      A.    Yes, that's what's written.

7      Q.    So he obviously knew what

8  the heck he was talking about, right?

9          MR. BICKS:  Objection to

10         form.

11         THE WITNESS:  Again, it

12         comes around to the question of

13         what's the connection with

14         Johnson's Baby Powder from a mill,

15         a Cyprus mill in South Plainfield.

16  BY MR. PLACITELLA:

17      Q.    Well, we'll connect that up

18  at a different point in time?

19      A.    I don't even know which

20  South Plainfield this is.  Is it in New

21  Jersey or is it another South Plainfield?

22      Q.    Okay.

23         MR. LOCKE:  Can we take a

24         quick break.

John Hopkins, Ph.D.

1          MR. PLACITELLA:  Yeah, sure.

2          THE VIDEOGRAPHER:  Stand by

3      please.  The time is 4:42 p.m.  We

4      are going off the record.

5          (Short break.)

6          THE VIDEOGRAPHER:  The time

7      is 4:56 p.m.  We are back on the

8      record.

9  BY MR. PLACITELLA:

10         Q.    Okay.  Just the last entry

11  on this chart, the Mine Safety and Health

12  Administration analysis for asbestiform

13  materials was Italian talc, air samples

14  at Cyprus South Plainfield, 71.2 percent

15  fibrous talc, and 5.8 percent

16  anthophyllite and asbestiform amphibole.

17            And I understand and the

18  record reflects that your point is that

19  at this point we don't know if that was

20  the actual talc that went into the

21  Johnson Baby Powder, correct?

22         A.    That is my point.  And the

23  point being that there are many different

24  Italian talcs.

John Hopkins, Ph.D.

1            MR. PLACITELLA:  So give me

2       257.

3            (Document marked for

4       identification as Exhibit

5       J&J-257.)

6  BY MR. PLACITELLA:

7       Q.    257.  I'm sorry.  Did I say

8  257?  Yeah.  257 is a report with the

9  Bates number ending -- 8893.

10           And it is entitled "Italian,

11  medicated, Grantham talc from R. Rolle

12  files."  Who is R. Rolle?

13      A.    That would Bob Rolle or

14  Robert Rolle, who is a scientist in the

15  baby product company.

16      Q.    Okay.  And if we can go --

17  and the next page is a cover letter from

18  McCrone Associates dated September 3rd,

19  1971.  "Enclosing a report on the

20  Grantham ore and Shower to Shower and

21  medicated powders."

22           Do you see that?

23      A.    Yes.

24      Q.    Okay.  And if you go to Page

John Hopkins, Ph.D.

1  2 of the report itself, McCrone reports

2  that in the medicated powder, we found

3  one fiber of chrysotile.

4          Do you see that?

5      A.    He said he's examined the

6  G-11 sample, which is the Grantham ore

7  sample, it is my understanding.

8          Q.    No, no.  Up further,

9  Dr. Hopkins.

10         A.    Which page are you on, 2?

11         Q.    Same page, up where it says,

12  "In the medicated powder."

13         A.    Sorry.  Are you on Page 1?

14         Q.    No, Page 2.

15         A.    Bates number 95?

16         Q.    98.

17         A.    98.  That helps.

18         Q.    Okay.  Sorry.

19         A.    Yes.

20         Q.    In the medicated powder they

21  found one fiber of chrysotile, correct?

22         A.    That's what they reported.

23  That's what they wrote, yes.

24         Q.    And in the Shower to Shower

John Hopkins, Ph.D.

1  sample, they say they found several

2  fibers and they feel very strongly that

3  they may be chrysotile, but at a very low

4  percentage, correct?

5       A.   Well, it says they found

6  several fibers, which do not show the

7  coring typical of chrysotile.  Chrysotile

8  fibers under microscope look like a core,

9  like a tube.  They may be finding fibers

10  of talc.

11            "We're unable to obtain the

12  diffraction pattern but feel strongly it

13  may be chrysotile.  Again, very low."

14            So they are hedging their

15  bets on that one.

16       Q.   Right.  But what they say is

17  on one method, you know, we don't see it.

18  We use another method.  But we feel

19  pretty strongly it's chrysotile, right?

20       A.   They say it may be

21  chrysotile.

22       Q.   And they spell chrysotile

23  correct?

24       A.   They do indeed.  They appear

John Hopkins, Ph.D.

1    to know what they are talking about.

2            But they say in the first

3    sentence -- first part of that sentence,

4    it doesn't show the coring of chrysotile.

5    And then they go onto say, well, this is

6    fiber, it may be chrysotile.

7            Q.    Okay.  Now, going to --

8            MR. PLACITELLA:  Give me 23,

9        and then we'll do two together.

10   BY MR. PLACITELLA:

11       Q.    Seven months later, they

12   look at the medicated powder and Shower

13   to Shower, right?

14           (Document marked for

15       identification as Exhibit

16       J&J-23.)

17   BY MR. PLACITELLA:

18       Q.    This is Walter McCrone on

19   October 12, 1971.

20           Do you see that?

21       A.    Yes.  One month later.

22       Q.    If you go to Page 3 under

23   Shower to Shower, they say, "The fiber

24   content of Shower to Shower is quite

John Hopkins, Ph.D.

1   low," correct?

2            A.    That is what is written.

3            Q.    Okay.  On the next page he

4   says, "We have, however, found traces of

5   chrysotile in G-11."

6                  Do you see that?

7            A.    Yes.

8            Q.    And G-11 is from the

9   Grantham mine?

10           A.    Yes.  That was -- that was a

11  mine that was never actually used.  But

12  it was being evaluated as an option at a

13  point as a case, or as of when

14  Hammondsville ran out of talc.  It was an

15  evaluation project.

16           Q.    Well, it says here, one of

17  the additives to Shower to Shower?

18           A.    Oh, in that case -- are we

19  talking about Grantham ore or the

20  additives.

21           Q.    G-11.

22           A.    I thought you said Grantham.

23  G-11 is an additive, yes.

24           Q.    When you say additive, what

John Hopkins, Ph.D.

1    do you mean by that?

2          A.    I'm not sure what that was.

3    It could have been an antiseptic or

4    whatever the -- there is an additive

5    G-11.

6          Q.    So you had additives that

7    went into the Shower to Shower?

8          A.    Yeah.  Sodium -- baking

9    soda, it could have well been baking

10   soda.  Baking soda was one of the

11   additives in Shower to Shower.

12         Q.    So they found traces of

13   chrysotile in one of the additives that

14   were put into Shower to Shower in

15   addition to the talc?

16         A.    Well, I'm not sure that's

17   clear from this report.

18         Q.    Well, it says, "We have

19   however found traces of chrysotile in

20   G-11, one of the additives to Shower to

21   Shower."  Right?

22         A.    Well, that's what they

23   wrote.  They looked at something called

24   G-11.

John Hopkins, Ph.D.

 1              (Document marked for

 2         identification as Exhibit

 3         J&J-34.)

 4              MR. PLACITELLA:  Now, give

 5         me 36.

 6              (Document marked for

 7         identification as Exhibit

 8         J&J-36.)

 9    BY MR. PLACITELLA:

10         Q.    36 is another report

11    authored by McCrone.  This is dated

12    October 27, 1972.

13              Do you see that?

14         A.    It is, yes.

15         Q.    And we went through this

16    last time, right?  This is the one that's

17    stamped --

18         A.    This is the preliminary

19    report stamped.

20         Q.    "Do not use this report"?

21         A.    Replaced by another version.

22         Q.    Right.  We'll do some of

23    this tomorrow.  But what happens is J&J

24    didn't like the way this report was

John Hopkins, Ph.D.

1   written, right?

2            MR. BICKS:   Objection to the

3       form.

4            THE WITNESS:   No.   I have no

5       evidence that J&J commented on

6       this report.

7            The second report, the one

8       that was used was issued by

9       McCrone based on their review and

10      evaluation a second time of the

11      talc sample.

12  BY MR. PLACITELLA:

13       Q.    And what this report was,

14  was looking at the samples of Baby Powder

15  that Dr. Lewin looked at, that we talked

16  about before, for the FDA, correct?

17       A.    This was -- yes, 108T and

18  109T.   Yes.

19       Q.    Right.   And what McCrone

20  found was tremolite in those samples,

21  correct?

22       A.    Yes.   It says, "A few

23  tremolite rods were observed in both

24  samples, but at a level of less than

John Hopkins, Ph.D.

1    .05 percent.  No chrysotile detected."

2         Q.    Well, actually it says --

3    okay, 0.5 percent.

4         A.    Yeah.

5         Q.    So they found tremolite in

6    the samples that Lewin looked at?

7         A.    Tremolite rods, yes.

8              MR. PLACITELLA:  Okay.

9         Let's just go up to -- so we don't

10        get ahead of ourselves.

11             We're going to get a faster

12        way to do this tomorrow.  They

13        promised.  Hopefully they won't

14        keep doing it.

15   BY MR. PLACITELLA:

16        Q.    The last two entries for J&J

17   257, we have a report by McCrone.  They

18   looked at --

19             MR. PLACITELLA:  Oh, we

20        didn't really go over Grantham.

21        So take out Grantham.

22             And take that out.

23   BY MR. PLACITELLA:

24        Q.    Okay.  And what they found

John Hopkins, Ph.D.

1    here was?

2              MR. PLACITELLA:  And take

3         out all the references to

4         Grantham, because we didn't go

5         over that.

6    BY MR. PLACITELLA:

7         Q.    That's a mine, you've told

8    me, by the way, that you believe never

9    actually went into operation?

10        A.    Yeah.  It was one that was

11   being evaluated as a possible, but it

12   never got anywhere.

13        Q.    Okay.

14        A.    Yeah.

15        Q.    So does the entry now in

16   what the test revealed in those quotes,

17   is that consistent with what you saw

18   before?

19              MR. BICKS:  Objection to the

20        form.

21   BY MR. PLACITELLA:

22        Q.    "Fiber of chrysotile were

23   very clear, medicated powder.  We found

24   one fiber of chrysotile, Shower to

John Hopkins, Ph.D.

1    Shower.  We feel strongly it may be

2    chrysotile.  Chrysotile is very low."

3                Is that fair?

4                MR. BICKS:  Objection to

5         form.

6                THE WITNESS:  Yeah.  May be.

7         It's important to state that they

8         were not definitive.

9    BY MR. PLACITELLA:

10        Q.    Well, I put an exact --

11   exact quote?

12        A.    Yes.  May.  Yes.

13        Q.    Then the next entry, also by

14   McCrone, Shower to Shower, traces of

15   chrysotile in one of the additives.

16                Is that fair?

17        A.    That's what they claim to

18   have seen.

19        Q.    Okay.

20        A.    Yes.

21        Q.    And then in --

22        A.    Again, not confirmed.

23        Q.    And in J&J 36, both samples

24   contained an insignificant amount of

John Hopkins, Ph.D.

1    tremolite.

2                    Is that fair?

3         A.    They described it as a few

4    tremolite rods were observed.  Is that --

5    is that the last one?

6         Q.    Well, actually it says,

7    "Both samples contain an insignificant

8    amount of tremolite, less than

9    .5 percent."

10        A.    Okay.  I was reading from

11   the conclusion, which said, "A few

12   tremolite rods were observed, less

13   than .5 percent."

14        Q.    Okay.  So we're okay with

15   that one?

16        A.    They use the word "rods,"

17   because that's important, tremolite rods.

18               MR. PLACITELLA:  Okay.  Add

19        to the -- semicolon, tremolite

20        rods.

21               Now give me 57.

22               (Document marked for

23        identification as Exhibit

24        J&J-57.)

John Hopkins, Ph.D.

1   BY MR. PLACITELLA:

2           Q.     57 is a confidential memo

3   called "New agent systems plant trial"

4   Windsor Minerals with G. Lee being on the

5   front.  We've seen this before, correct?

6           A.     We have, yes.

7                  MR. BICKS:  Do you have

8           another copy of it?

9                  MR. PLACITELLA:  I don't.

10          But I'll come back to it if you

11          need time.  My problem is I came

12          in with three boxes.  I came to

13          New York.  I carried all I could.

14          It was this high.  I couldn't do

15          anymore.

16                 So I -- anything that was

17          more than 30 pages, I had to make

18          a choice.  But I'll put it up.

19  BY MR. PLACITELLA:

20          Q.     So in this document.  Why

21  don't you just describe for the record

22  what this document is briefly.

23          A.     All right.  We said earlier

24  that part of a processing of talc is to

John Hopkins, Ph.D.

1    get it clean with large plate sizes.  So

2    you get the nice white lubricious silky

3    feel.  So beneficiation is a process

4    that's used to wash the talc.  And a

5    wetting agent, like a dish wash liquid

6    type material is added so the talc floats

7    atop of the vessel, the bath.  And it

8    sticks to the bubbles.  You then scrape

9    the bubbles off and wash them.

10              Do that about 30, 36 times.

11   And you get a pure clean talc.  And the

12   small bits of stuff, anything that's

13   small or particles that you don't want,

14   the small plates fall to the bottom and

15   can be discarded.  So what this is

16   looking at are alternative washing

17   systems to cleanup the talc, to wash it.

18        Q.    Can you go to Page 5 of the

19   document where it talks about the

20   asbestiform analysis done by Walter

21   McCrone?

22        A.    Yes.

23        Q.    Here, it indicates that

24   Walter McCrone did an analysis as part of

John Hopkins, Ph.D.

1  this process and used TEM and electron

2  diffraction, correct?

3        A.    Yes.

4        Q.    All right.  And they found

5  very low levels of chrysotile, correct?

6        A.    Where are we reading?

7        Q.    Right in that paragraph,

8  where it says, "Asbestiform analysis were

9  performed."

10       A.    Yes.  It says results are

11 questionable due to extremely low levels

12 present.

13       Q.    Okay.  It says they found

14 extremely low levels of chrysotile,

15 correct?

16       A.    Yes.  But part of this study

17 was that they deliberately added 3

18 percent chrysotile to see if they could

19 find it.  That's -- we see that near the

20 end of the summary table on Bates 355.

21       Q.    Well, I'll get to that.

22             And what they say is that,

23 the reason they are doing this is they're

24 trying to get the chrysotile out of --

John Hopkins, Ph.D.

1  make sure they don't have any chrysotile

2  in the product because of the health

3  hazard associated with chrysotile,

4  correct?

5          A.    Well, it was one of the side

6  benefits that you could look at mines,

7  certainly industrial mines that may

8  contain chrysotile.  If there was a way

9  of removing chrysotile, this was an

10  experiment to see if that could be done.

11          It doesn't say it was in the

12  Baby Powder product.  The company

13  certainly at that time were looking at --

14  and we mentioned the Grantham mine

15  earlier -- at alternative mine sources

16  that may have contained chrysotile.  And

17  if you can find a way of removing it,

18  this experiment was just one of many

19  experiments that were done to -- to look

20  at, as they described, depression of

21  chrysotile asbestos.

22          Q.    And what they say is, "The

23  use of systems" -- "these system, which

24  is" -- "is strongly urged by this writer

John Hopkins, Ph.D.

1    to provide the protection against of what

2    are currently considered to be materials

3    presenting a severe health hazard and are

4    potentially present in all talc ores in

5    use at this time," correct?

6         A.    He uses the word

7    "potentially present."  It doesn't say it

8    is present.  The whole point of using --

9    of getting talc mines -- that's suitable

10   for cosmetic talc, is to avoid those

11   areas of mineralogy that you don't want,

12   including asbestos, but he's using the

13   word potentially present.

14        Q.    Okay.

15        A.    And as I said, I think that

16   this is in the context of the company

17   looking at that time for alternative

18   mines that would possibly be available,

19   either as industrial talcs or cosmetic

20   talcs.

21        Q.    What was my question?

22        A.    I think you asked me what he

23   said.  And I said, yes, I agree with what

24   is written.

John Hopkins, Ph.D.

1        Q.    Okay.  So you agree that

2    what he says is they're running the tests

3    because of severe potential health

4    hazards, right?

5        A.    That's what he wrote.  There

6    is a potential --

7        Q.    He didn't write any of that

8    other stuff that you spent the last

9    35 seconds talking about?

10              MR. LOCKE:  Objection.

11              MR. BICKS:  All right.

12        Objection.  Argumentive.

13    BY MR. PLACITELLA:

14        Q.    Okay.  Now --

15        A.    I was setting in context.

16    But that's what he wrote, "potentially

17    present."

18        Q.    And then he has a Table 15,

19    correct?

20        A.    Yes.  Here it is.

21        Q.    All right.  Table 15 says,

22    "Asbestiform fiber counts by Walter C.

23    McCrone Associates."  And on the second

24    one it says 66-U product.  And it says

John Hopkins, Ph.D.

1    "probably chrysotile," correct?

2         A.    Yes, this is a result of --

3         Q.    Sir, I'm just asking you --

4         A.    Yes, that's what -- that's

5    what's written --

6         Q.    -- if I'm -- if that's

7    what's written.

8         A.    -- on this Table 15.  It

9    does say that, yes.

10        Q.    All right.  And then when it

11   goes down to 66-A product, there is a

12   zero.  So on that one they didn't find

13   any chrysotile, correct?

14        A.    They didn't, no.

15        Q.    And when they looked at the

16   66-U ore they didn't find any chrysotile,

17   correct?

18        A.    Correct.

19        Q.    All right.  When they looked

20   at the 66-AC ore, they found chrysotile

21   in the ore, correct?  Not probably.  They

22   found chrysotile.

23        A.    Well, it had been added.  So

24   they did find it, yes.

John Hopkins, Ph.D.

1       Q.    Did they add it in the 66-U

2  ore because that came up zero?

3       A.    Well, that's because the

4  washing process had obviously been quite

5  successful in removing it.

6       Q.    Okay.  Sir, it doesn't say

7  anything here about adding, right?  It

8  just gives the fiber counts in a table,

9  correct?

10       A.    Table --

11       Q.    Let me just go back through

12  this again.  Okay.  Table 15.

13  "Asbestiform fiber counts by Walter

14  McCrone."  In the 66-U product, that's

15  the end product, they found probably

16  chrysotile, correct?  That's what it

17  states.

18       A.    After they washed it, they

19  found one.

20       Q.    It doesn't say that, sir.

21  It says probably chrysotile, correct?

22       A.    It says probably chrysotile,

23  yes.

24       Q.    Right.  And in the ore under

John Hopkins, Ph.D.

1    66-AC, it says they found chrysotile,

2    correct?

3         A.    Yes.

4         Q.    And then on the same product

5    that was made from that ore, they found

6    chrysotile, correct?

7         A.    Yes.  Again, this is

8    measuring, per the legend below, after

9    washing, yes.  They found it after

10   washing.

11        Q.    Sir, there's nothing on here

12   that says after washing, correct?

13        A.    But legends, the word

14   "legend" below.

15        Q.    It shows washing?  Show me.

16   I blew it up.

17        A.    You need to read the whole

18   presentation.  They used ultrawet DS in

19   category U.  They used N-butanol to wash

20   category A.  And AC, they used butanol

21   and citric acid.

22        Q.    Right.  What they did is

23   they used a process to try to take the

24   chrysotile out, and they were somewhat

John Hopkins, Ph.D.

1   successful.  So for example in the ore
2   they found a lot of chrysotile in the AC
3   ore, and after they put it through the
4   process, they found less chrysotile.
5   Right?  That's what it says.
6           A.    No, they deliberately added
7   it.  Table 13 explains that they had put
8   in that certain level of chrysotile.
9           Q.    So they put the exact same
10  level in?
11          A.    Yeah.  3 percent, 3 percent,
12  3 percent in the ore.  And between 1 --
13  between .1 and .2 percent in the product,
14  the ground ore.
15          Q.    I don't see it, sir, but
16  we'll let an expert figure it out.  Let's
17  just talk about what's reported.  Why are
18  you smiling at me?
19          MR. BICKS:  Dr. Egilman is
20      smiling at me.
21          MR. PLACITELLA:  You two
22      smile at each other.  Date.
23      Whatever you want.  Let me finish
24      what I'm doing.

John Hopkins, Ph.D.

1           MR. BICKS:  When you say an

2      expert will figure it out.  You're

3      showing portions of it.  And he's

4      showing you pretty clear portions

5      demonstrate that the questions are

6      misleading to put it mildly.

7           MR. PLACITELLA:  That's not

8      nice.  That's not nice.

9           MR. BICKS:  It's true.

10          MR. PLACITELLA:  That's

11     really not nice.

12  BY MR. PLACITELLA:

13      Q.   Haven't you previously

14  testified, sir, that chrysotile asbestos

15  was found in association with the

16  Hammondsville ore body?

17      A.   Have I previously testified

18  that it was?

19      Q.   Yes.

20      A.    I'm not aware that

21  chrysotile is in the Hammondsville ore

22  that's used in Baby Powder, the actual

23  talc that's used in Baby Powder.

24      Q.    We'll do that tomorrow.  The

John Hopkins, Ph.D.

1    Frostbite mine, was that ever used for

2    Baby Powder?

3           A.    I believe that was an

4    industrial mine.  I don't believe that

5    was ever used in Baby Powder.  There were

6    several industrial mines that are some

7    distance away.

8           Q.    Did that have asbestos in

9    it?

10          A.    I don't know.

11          Q.    The Frostbite mine?

12          A.    I'm not familiar with it.  I

13   know the name Frostbite.  There were

14   several mines that we used from Windsor

15   Minerals for industrial purposes.

16                MR. PLACITELLA:  Give me 63.

17                Give me 65.

18                (Document marked for

19          identification as Exhibit

20          J&J-65.)

21   BY MR. PLACITELLA:

22          Q.    65 is a report from Walter

23   McCrone concerning talc samples from the

24   Argonaut ore body.  You've seen this

John Hopkins, Ph.D.

1    before, correct?

2         A.    Yes, I think I've seen this

3    before.

4         Q.    Okay.  And on the next -- on

5    the first full page.  It talks about the

6    examination of 38 core samples, correct?

7         A.    Yes.

8         Q.    Okay.  And this is what

9    we've got, we went through before,

10   correct?

11        A.    Yes.  Core sampling is what

12   you do when you open a new mining area.

13        Q.    Right.  And if you go to

14   Page 4 it states what McCrone found in

15   the Argonaut ore body was chrysotile

16   asbestos and fibrous tremolite, correct?

17        A.    Yeah.  Two of the core --

18   two of the core samples, which they

19   reference the numbers, they showed

20   chrysotile asbestos.  So they know where

21   the chrysotile would be.

22        Q.    And fibrous tremolite?

23        A.    And fibrous tremolite.  And

24   again that would indicate where you would

John Hopkins, Ph.D.

1    not go and do any mining.

2        Q.    And do you have any

3    contemporaneous proof, sir, that Windsor

4    Minerals specifically never went to those

5    areas that were set forth here and did

6    any work whatsoever?

7                MR. LOCKE:  Objection.

8                MR. SILVER:  Objection.

9                THE WITNESS:  The

10          specification requires absence of

11          asbestos.  So it doesn't require a

12          rocket scientist to say that why

13          go where you think there may be

14          asbestos when you have plenty of

15          areas to go that you know is no

16          asbestos.

17   BY MR. PLACITELLA:

18        Q.    Well, let me ask the

19   question a different way, sir.  You don't

20   have any contemporaneous evidence or

21   documents to indicate that Johnson &

22   Johnson or Windsor Minerals was

23   specifically avoiding this area of the

24   mine, correct?

John Hopkins, Ph.D.

1          A.     To achieve the

2     specification, you would have to avoid

3     it.  One is a follow-on from the other.

4     But do I have documentation to say, oh,

5     we didn't go where we drilled core sample

6     2-R-72 and 54368?  No, I don't have that.

7     But to achieve a specification, you would

8     avoid those areas.

9          Q.     Okay.  So can you go to

10    Table 2.  Table 2 is the analysis that

11    was done of the core samples by McCrone,

12    correct?

13         A.     Yes.  That's the -- that's

14    the analysis by electron microscopic

15    analyses of core samples.

16         Q.     That was in accordance with

17    your specification, correct?

18         A.     Yes.

19         Q.     Okay.  And McCrone found, by

20    my count, chrysotile asbestos 15 times

21    out of 38?

22         A.     Well, what you're measuring

23    is the depth, as you go down the drill.

24    If you look at the second one down

John Hopkins, Ph.D.

1    2-R-72, they go from 131 feet down to

2    167 feet.  And they find chrysotile all

3    the way down to 268 feet.  So that's

4    really one core sample.  That was an area

5    that they would avoid.  So it's not 15.

6    It's one, two, three, four, five six, on

7    those six core samples.

8         Q.    Let's just go a little bit

9    on that.  And I don't want to spend a lot

10   of time on it because we have a lot to

11   do.

12        So for example, they found

13   chrysotile asbestos from 131 feet all the

14   way down to 268 feet in the 2-R-72 drill,

15   correct?

16        A.    Yes.  That drill is an area

17   where they hit chrysotile.

18        Q.    Right.  And then not far

19   away they found chrysotile in four of the

20   five samples they looked at from 92 feet

21   to 184 feet?

22        A.    Well, when you say not far

23   away, I don't think that's evident from

24   this.  But on a different sample rated,

John Hopkins, Ph.D.

1    which one are you looking at?  9-R-72?

2    They found three out of four as they

3    drilled down.

4           Q.    No, four out of five.

5           A.    So which one are you on?

6    Which core sample?

7           Q.    A little technology glitch.

8    But we will be back.  In this analysis of

9    the Argonaut mine, there's no question

10   that McCrone found chrysotile asbestos in

11   the Argonaut mine multiple times,

12   correct, and at multiple levels?

13              MR. BICKS:  Objection to the

14         form.

15              THE WITNESS:  You've used

16         the word "mine," Argonaut mine.

17              The Argonaut deposit, which

18         covered quite some considerable

19         acreage, had areas where there was

20         asbestos found, chrysotile found.

21         Equally there are areas where

22         there was no evidence whatsoever

23         of chrysotile.

24              So that's the mining area

John Hopkins, Ph.D.

1           where there's -- you go to that

2           area and avoid the area where you

3           found chrysotile.  That's the

4           whole point of doing core

5           sampling.

6    BY MR. PLACITELLA:

7           Q.    Okay.  So it would be a lie

8    if someone ever said under oath that

9    there was never any asbestos in any

10   Vermont mine, correct?

11               MR. SILVER:  Objection.

12               THE WITNESS:  It depends on

13          how you're defining mine.  As I've

14          said before, if you're mining from

15          an area where there's no asbestos,

16          then it is not a lie.

17               It would be incorrect though

18          to actually say well, we went into

19          an area where we knew there was

20          asbestos and started mining that.

21          But that's not the mine.

22               The core is where you drill

23          down with a diamond drill and see

24          what you find.  You are not mining

John Hopkins, Ph.D.

1          that.  You're drilling down to see

2          where you don't mine.

3   BY MR. PLACITELLA:

4          Q.    Okay.  We'll get to that

5   tomorrow.

6                MR. PLACITELLA:  Give me 74.

7                (Document marked for

8          identification as Exhibit

9          J&J-74.)

10   BY MR. PLACITELLA:

11          Q.    October 10, 1974, this is a

12   report provided by Walter McCrone to

13   Windsor Minerals, correct?

14          A.    It is, yes.

15          Q.    And they found chrysotile

16   fibers in one of the samples?

17          A.    Well, the samples were sent

18   by Windsor Minerals, yes.

19          Q.    And -- okay.

20                MR. PLACITELLA:  Give me 89.

21                (Document marked for

22          identification as Exhibit

23          J&J-89.)

24                MR. PLACITELLA:  This is 90.

John Hopkins, Ph.D.

1    BY MR. PLACITELLA:

2          Q.    89 is another report from

3    McCrone to Windsor Minerals.

4          A.    Yes.  We've seen this

5    before.  Yes.

6          Q.    And this is a report of an

7    electron microscopy that was done from

8    the Windsor mineral ore body, correct?

9          A.    It was done from -- let's

10   read this very carefully.  Because from

11   my recollection some of these relate to

12   industrial talc from the industrial mines

13   owned by Windsor Minerals.

14         Q.    What it says is "from your

15   ore body," correct?  It's the Windsor

16   mineral ore body?

17         A.    Yeah, it doesn't describe it

18   here, but there are ore bodies owned by

19   Windsor Minerals, which are used for

20   industrial talcs, Clifton mine and

21   several others, were industrial mines.

22         Q.    In Vermont?

23         A.    The Clifton mine is in

24   Vermont, yes, industrial mine.

John Hopkins, Ph.D.

1    Q.    And the industrial mines had

2    asbestos in them?

3    A.    Well, I don't know.  What

4    I'm saying is, if you are talking here

5    about Baby Powder, what I'm saying is

6    there's no evidence that these related to

7    Baby Powder.

8    Q.    I didn't ask you those

9    questions yet.  All right.  Let me ask

10   you the questions, and you can respond,

11   okay.  It says they kept a running

12   tabulation of the asbestos which they

13   could find, correct?

14   A.    Yes, it does say that.

15   Q.    Okay.  And it was from the

16   Windsor mineral talc, correct?

17   A.    It was from talc supplied by

18   Windsor Minerals.

19   Q.    And in Table 1 they actually

20   list the confirmed -- where they found

21   and confirmed asbestos, correct?

22   A.    They report those particular

23   batches that were claimed to contain

24   asbestos, yes.

John Hopkins, Ph.D.

1       Q.    Right.  What is sediment, by

2  the way, when testing is done?  What

3  do -- what do they mean when they say

4  sediment?

5       A.    Where are you --

6       Q.    Table 2, sample content of

7  the sediment.

8       A.    I don't know.  I mean, the

9  cover letter says, "Some of the samples

10  showed extreme amounts of sedimentation

11  at the bottom of the test tube when we

12  prepared these samples."

13       Q.    In Table 2 they show all the

14  places they found fibers and where they

15  confirmed asbestos, correct?

16       A.    They list headings of

17  asbestos and fibers and organics.  That's

18  the stuff when you are drilling down with

19  a core, you go through tree roots and all

20  sorts of rubbish.

21       Q.    And more than half of the

22  samples they looked at they found fibers,

23  correct, in the sediment?

24       A.    Yes.  I mean, the very fact

John Hopkins, Ph.D.

1    that they contain organics screams out to

2    me that these were quite possibly core

3    samples.  But it doesn't say that.  But

4    organic material consisted of bacteria,

5    amorphous structures, which seemed to be

6    organic in nature, general crud which you

7    find in some of the samples.

8              So what they're looking at

9    here implies that it's not talc that's

10   used in baby products.

11        Q.    It doesn't say that

12   anywhere, does it, sir?

13        A.    No, it says it contains

14   large amounts of organic matter, which is

15   the kind of thing that you get when you

16   do a core drilling sample.  You go

17   through soil, tree roots, all sorts of

18   rubbish.

19        Q.    It doesn't say anything

20   about it's not used in Baby Powder.

21   That's just your editorializing.

22        A.    It does not say.

23        Q.    Okay.

24        A.    It does not say we're -- the

John Hopkins, Ph.D.

1  company is putting tree roots in Baby

2  Powder, no.

3          Q.   So there's nothing in here

4  that says it's not used in Baby Powder,

5  correct?

6          A.   There's nothing that says

7  that it was not used.  No.

8              MR. PLACITELLA:  Okay.  Can

9      we go back to the chart to make

10      sure we're staying current.

11  BY MR. PLACITELLA:

12          Q.   24, McCrone.  Where are we?

13              MR. PLACITELLA:  Where are

14      we?  57.

15  BY MR. PLACITELLA:

16          Q.   57 was the Dartmouth study.

17  Chrysotile fibrous suppression as

18  indicated.  We didn't go over arsenic.

19  So take arsenic out.  You'll recall

20  Dartmouth found amphiboles at 100 to

21  200 parts per million in the ore and

22  3,000 in the ore.  Do you recall that?

23              And McCrone found chrysotile

24  in the ore in the finished product.  Do

John Hopkins, Ph.D.

1    you remember that?

2              MR. BICKS:  Objection to the

3         form.

4              THE WITNESS:  Yeah.  What

5         you read, Table 13 says that there

6         were 3,000 PPM, parts per million,

7         of amphibole in the ore in A, B

8         and C.

9              And what I'm saying is that

10        from my knowledge of people I've

11        spoken with, this is the -- this

12        is the process that's done to

13        actually -- you add it

14        deliberately and then see if you

15        can find it.

16   BY MR. PLACITELLA:

17        Q.   Sir, I'm just asking what's

18   reported.  I'm not asking for your

19   opinions.  I'm just asking what is

20   reported.

21        A.   It was --

22        Q.   Do you remember that was the

23   instruction when we started?  What was

24   reported.

John Hopkins, Ph.D.

1          MR. LOCKE:  Objection.

2          THE WITNESS:  Yes, and it is

3      reported that the ore contained --

4      when they were doing the study

5      3,000 parts per million for ore A,

6      ore B, and ore C.

7  BY MR. PLACITELLA:

8      Q.    Then the next exhibit, 65

9  was a McCrone report.  And that's where

10  the TEM found chrysotile fibers and

11  tremolite, correct?

12          MR. BICKS:  Objection to the

13      form.

14          THE WITNESS:  Which exhibit

15      number?

16  BY MR. PLACITELLA:

17      Q.    65.

18      A.    Let's read this again.  Yes,

19  these are diamond core drillings to see

20  where the talc was and where you'd avoid

21  it.

22      Q.    Okay.

23      A.    So they did find areas that

24  they would avoid trace of chrysotile.

John Hopkins, Ph.D.

1          Q.     And fibrous tremolite?

2          A.     Well --

3          Q.     74.  This is another McCrone

4    report, it was of a product.  They found

5    fibrous asbestiform material chrysotile

6    fibers, correct?

7          A.     Yeah.  These were samples.

8    Again, it doesn't specify whether they

9    were diamond core drill samples.  But in

10   amongst those, they claim to have found

11   asbestiform fibers.

12         Q.     Next 89, what we just went

13   through, confirmed asbestos low to

14   medium, correct?

15         A.     Again, along with tree roots

16   and what they describe as crud, which --

17         Q.     I'm not asking about whether

18   they found tree roots.  I'm asking you

19   whether they found asbestos.  They found

20   asbestos in that testing, correct?

21         A.     In that testing, yes.

22              MR. PLACITELLA:  Okay.  Now,

23         give me 169, please.

24   BY MR. PLACITELLA:

John Hopkins, Ph.D.

1        Q.    I'm sorry.  Did we talk

2   about the Rainbow mine?  That was used in

3   Baby Powder, correct?

4        A.    It was used for a short

5   period of time, yes.

6             (Document marked for

7             identification as Exhibit

8             J&J-169.)

9   BY MR. PLACITELLA:

10       Q.    And this is a November 6,

11  1980 report.  This is a report from

12  McCrone, again to Windsor Minerals,

13  correct?

14       A.    Yes.

15       Q.    And here they found

16  chrysotile asbestos in a sample.  And

17  they said it's probably not a

18  contaminant, correct?

19       A.    They describe the talc

20  samples labeled W. Gregg XR.  I don't

21  know which mine that is from.

22             In that letter, the author

23  states that he found chrysotile asbestos

24  in the sample.  Yeah.  But what W. Gregg

John Hopkins, Ph.D.

1    XR sample is, I don't know.

2              MR. PLACITELLA:  Give me

3         179, please.

4              (Document marked for

5         identification as Exhibit

6         J&J-179.)

7              MR. PLACITELLA:  This is

8         180.  Sorry.  There's only one

9         copy.  I apologize.

10   BY MR. PLACITELLA:

11        Q.    179 is from 1984 from

12   McCrone to Roger Miller, correct?

13        A.    We have two.

14              Yes.

15        Q.    And what they did here is

16   they actually went and then looked at air

17   samples, correct?

18        A.    Yes.  Roger Miller submitted

19   four air filter samples.

20        Q.    Right.

21        A.    And they reported the --

22        Q.    Air filter means --

23        A.    It's a personal --

24        Q.    -- what's in the air where

John Hopkins, Ph.D.

1  people are doing the work in the mine,

2  right?

3          A.    Yes.  It's a filter that you

4  wear when you're working.

5          Q.    And they found in all four

6  of these samples, chrysotile asbestos

7  fibers, correct?

8          A.    They report that, although

9  it doesn't say which mine or which source

10 it was.  They report that they found

11 fibers on the filters.

12         Q.    Well, what mine was Windsor

13 Minerals using in 1984?  I thought we

14 went over them all.  Do you know which

15 one it was?  Well, your testimony will

16 speak for itself.  We don't have to do

17 that?

18         A.    No, I don't know which one

19 it was.  But the company owned industrial

20 mines as well as cosmetic mines.  So what

21 I said is I don't know which mine this

22 relates to.

23         Q.    Okay.  But for example here

24 it says they found chrysotile fibers

John Hopkins, Ph.D.

1   6x104.  That's what 6,000 fibers.

2        A.    Yes.

3        Q.    6,000 fibers?

4        A.    On a filter.

5        Q.    On the filter.  On one

6   single filter, they found 6,000 fibers of

7   chrysotile asbestos, correct?

8        A.    Well, that's what's written

9   in this memo, yes.

10        Q.    Okay.

11        A.    But like I say, which mine

12   this was, we have no idea.  The company

13   owned mines in California as well as

14   Vermont.

15        Q.    So you think this is from a

16   California mine?

17        A.    I have no idea.  I'm

18   certainly not going to speculate.

19        Q.    How would we find out where

20   this came from?

21        A.    I don't know.

22        Q.    I mean, these are documents

23   that you gave us responsive to our

24   discovery request.

John Hopkins, Ph.D.

1        A.     Yeah.

2        Q.     So if they didn't pertain to

3   the Johnson's Baby Powder, what did you

4   give them to us for?

5               MR. BICKS:  Argumentive.

6               MR. SILVER:  Objection.

7   BY MR. PLACITELLA:

8        Q.     Well, I didn't ask you for

9   documents that didn't pertain to Baby

10  Powder or Shower to Shower.  Reportedly

11  you only gave us the documents that

12  related to Johnson's Baby Powder, right?

13       A.     Again --

14              MR. BICKS:  Objection.

15       Argumentative.

16  BY MR. PLACITELLA:

17       Q.     I mean, you didn't give me

18  Japan documents, Australia documents,

19  Brazil documents.  You gave me Windsor

20  Mineral documents?

21       A.     That's correct.  Windsor

22  Minerals documents related to the United

23  States.

24       Q.     Okay.  Now, do you know

John Hopkins, Ph.D.

1    where the codes are that go with this?

2          A.    There are no codes.

3          Q.    I'm looking down here?

4          A.    Sample 28911.

5          Q.    I'm looking down here

6    Reference 4055.

7                Do you see that down at the

8    bottom?

9          A.    I don't know -- I have no

10   idea what that means, Reference 4055.

11         Q.    That's the general file with

12   all the test results for the Vermont

13   mines, right?

14         A.    I have no idea.

15         Q.    You don't know?

16         A.    No, I don't know that.

17         Q.    Okay.  Can we figure that

18   out maybe overnight?

19               Okay.  So --

20               MR. PLACITELLA:  Give me

21         182.  Oh, great.

22               Give me 228.

23               (Document marked for

24         identification as Exhibit

John Hopkins, Ph.D.

1          J&J-228.)

2    BY MR. PLACITELLA:

3          Q.    You've seen 228 before.

4    This is a report from 2004 concerning the

5    testing of Johnson's Baby Powder.

6          A.    Is this the -- is this the

7    TV station?

8          Q.    Yeah, the TV station got

9    ahold of your Baby Powder and hired an

10   independent laboratory that did a test.

11   You know what this is, right?

12         A.    Yes.  I recollect this, yes.

13         Q.    The company they hired was

14   called Maywood Laboratories, correct?

15         A.    Yes, it was.

16         Q.    And Maywood Laboratories

17   used TEM and looked at your Baby Powder,

18   correct?

19         A.    They -- yes.  TEM, yes.

20   They did use TEM.

21         Q.    And they found asbestos,

22   correct?

23         A.    Well, they claimed to have

24   done, although that was never confirmed

John Hopkins, Ph.D.

1    when it was evaluated elsewhere.

2          Q.    All I'm saying is, reported

3    to you in this point in time was an

4    independent laboratory, looked at your

5    Baby Powder, and found asbestos, correct?

6          A.    They claim to have found

7    asbestos.

8          Q.    Well, they wrote it down in

9    a report from a certified laboratory, and

10   you got a copy, correct?

11              MR. BICKS:  Objection to the

12         form.

13              THE WITNESS:  Well, there's

14         a copy.  And this is it.  Yes.

15   BY MR. PLACITELLA:

16         Q.    Okay.  Give me 255.

17              (Document marked for

18         identification as Exhibit

19         Hopkins-255.)

20   BY MR. PLACITELLA:

21         Q.    By the way, did you -- you

22   testified in the Herford trial that

23   asbestiform minerals were found in

24   Johnson Baby Powder by Bowling Green

John Hopkins, Ph.D.

1  University.

2           Do you recall that?

3        A.    That's documentation which

4  was presented on the Elmo.  I've

5  certainly seen that report from Bowling

6  Green.  They were two students, two

7  summer holiday students who were doing a

8  project.  So yes, we have seen that.

9        Q.    All I know is -- and that

10  was reported to Johnson & Johnson,

11  correct?

12        A.    It was indeed, yes.

13        Q.    Okay.  Now, 255 is a memo

14  from Mr. Ashton to Dr. Hildick-Smith.

15  Who is Dr. Smith?

16        A.    He was an M.D. qualified --

17  he was head of a medical department back

18  in the early '70s, Gavin Hildick-Smith.

19  Yes, I have met him.

20        Q.    Okay.  And you've seen this

21  memo before, right?

22        A.    I have seen it.

23        Q.    This is about testing that

24  was done of a production batch for

John Hopkins, Ph.D.

1    Johnson's Baby Powder, correct?

2         A.    This is a bit more of the

3    Mount Sinai Dr. Langer story.

4         Q.    Right.  And what --

5    Mr. Ashton says that if -- in his

6    opinion, that if the Baby Powder is

7    tested, it's going to show needle-like

8    fibers of tremolite, correct?

9              MR. BICKS:  Objection to

10            form.

11             THE WITNESS:  Well, what he

12            says is that we considered free

13            non-talc needles for the trace.

14            And he goes on to say, "If such an

15            assay were to be run by

16            microscopists" -- I cannot read

17            the word, something with the --

18            maybe it's -- "aware of the

19            differences between fibrous talc

20            and broken talc plates and

21            tremolite, they would expect them

22            to report 5.5 percent needles by

23            count."  Because they were

24            overestimating the needles,

John Hopkins, Ph.D.

1          mistaking them for broken talc.

2     BY MR. PLACITELLA:

3          Q.    And what he says is that he

4     ran a test and it showed that the

5     minerals were present and that there was

6     tremolite/actinolite in the samples, in

7     the production samples, right?  Dr.

8     Ashton or Mr. Ashton found it himself.

9     That's what it says?

10              MR. BICKS:  Objection to the

11         form.

12              THE WITNESS:  What he wrote

13         is I touched on it -- I touched --

14         I run an x-ray diffractograph on

15         the batch," whatever that batch

16         was.  "It showed that the minerals

17         are present," and talc is,

18         chlorite -- mica, chlorite,

19         tremolite/actinolite and

20         magnesite.  Might be some

21         carbonate.

22    BY MR. PLACITELLA:

23         Q.    So Johnson & Johnson ran

24    their own tests and found tremolite and

John, Hopkins, Ph.D.

1  actinolite in the talc used in Johnson's

2  Baby Powder, correct?  That's what it

3  states?

4            MR. LOCKE:  Objection to

5       form.

6            THE WITNESS:  He reports

7       that he found

8       tremolite/actinolite -- dash

9       actinolite.

10           MR. PLACITELLA:  Can you

11      give me 19?

12  BY MR. PLACITELLA:

13      Q.    You have 19.  Do you have 19

14  in front of you?

15      A.    Do I?

16      Q.    Yeah.  You should.  It's a

17  July 29, 1971 Johnson & Johnson memo.  We

18  did that.  We did this.  We don't have to

19  do it again.

20           MR. PLACITELLA:  Give me 44.

21           (Document marked for

22      identification as Exhibit

23      J&J-44.)

24  BY MR. PLACITELLA:

John Hopkins, Ph.D.

1      Q.    44 is an April 26, 1973,
2  memo from Petterson copied to Miller and
3  Ashton.  It's sent directly to DD
4  Johnston.  Who is that?
5      A.    I don't know.  I don't know
6  that I ever met DD Johnston.
7      Q.    And you've seen this before
8  many times, correct?
9      A.    Bear with me.  Yes.
10      Q.    And it starts out by saying,
11  "It is our joint conclusion that we
12  should not rely on the clean mine
13  approach as a protective device for Baby
14  Powder in the current asbestos or
15  asbestiform controversy."
16          Do you see that?
17      A.    Yes.  That was a fair
18  comment in 1973.
19      Q.    Okay.  And on the next page
20  when he talks about Baby Powder, do you
21  see that?
22      A.    Yes.
23      Q.    And he states, when he's
24  talking about Baby Powder, that there

John Hopkins, Ph.D.

1   will occasionally be sub-trace quantities

2   of tremolite or actinolite that can be

3   classified as asbestos fiber, correct?

4          A.    That's what he wrote in

5   1973.

6               MR. PLACITELLA:  Now give me

7          185.

8               (Document marked for

9          identification as Exhibit

10         J&J-185.)

11  BY MR. PLACITELLA:

12         Q.    185 is a March 30, 1987,

13  letter to Roger Miller, correct, from

14  Johnson & Johnson?

15         A.    Yes.

16         Q.    Okay.  And in that report

17  you detail the amphibole particles that

18  were found, correct?

19              MR. BICKS:  Objection to the

20         form.

21              THE WITNESS:  It says, "The

22         accompanying table reports the

23         amphibole particles per slide of

24         27 samples, submitted March 1987.

John Hopkins, Ph.D.

1          No fibrous forms observed."

2    BY MR. PLACITELLA:

3          Q.    And below there, you

4    actually detail all of the amphiboles

5    that you find, correct?

6          A.    Yes.  They are broken down

7    into the different mining operational

8    areas from what is described as tails,

9    concentrates, middlings.

10         Q.    All over the mine?

11         A.    Well, no.  This is a

12   process.  They are looking at the various

13   samplings during the processing of talc.

14         Q.    Okay.  And if you go to

15   Bates Number 44325.

16              Do you see that?

17         A.    I do, yes.

18         Q.    When they refer to

19   tremolite, they refer to it as being in

20   free needle form, correct?

21         A.    "Tremolite in 6 volume

22   percent is free" -- "free needles in the

23   loose grain mounts."

24              Yes, they've used that word.

John Hopkins, Ph.D.

1      Q.    So they found 6 percent of

2  what they were looking at to be free

3  needles of tremolite, correct?

4              MR. BICKS:  Objection to

5         form.

6              THE WITNESS:  I'm not sure.

7         It says 6 percent.  This relates

8         to --

9  BY MR. PLACITELLA:

10     Q.    6 volume percent, it says?

11     A.    Yeah, but I'm not sure what

12  it is that they are measuring.  When we

13  look at that, it's something on a

14  microscope slide.

15     Q.    But when they are

16  characterizing the tremolite, they're

17  characterizing it as needles, correct?

18     A.    They use that word back at

19  that time, yes.  They used that word.

20              MR. PLACITELLA:  Okay.  Can

21         you give me 229, please.

22              We did this one.  Yeah, we

23         did this one.

24              Give me 164.

John Hopkins, Ph.D.

```
 1                    (Document marked for

 2              identification as Exhibit

 3              J&J-164.)

 4      BY MR. PLACITELLA:

 5              Q.    164 is a handwritten note

 6      dated February 9, 1979.  Do you see that?

 7              A.    It is, yes.

 8              Q.    And it has the name Harold

 9      Cohen.  Do you know who he is?

10              A.    I don't think I ever met

11      Mr. Cohen, no.  It says baby products

12      quality control.

13              Q.    And it says they did

14      analytical research and found massive

15      amphiboles in the 66 composite sample on

16      November 6th and 10th.

17                    Do you see that?

18              A.    Yes.

19              Q.    And the sample was then

20      forwarded to George Lee's group where the

21      presence of amphiboles was confirmed, and

22      they identified those amphiboles as

23      tremolite and actinolite, correct?

24              A.    That is what is written.
```

John Hopkins, Ph.D.

1        Q.    And so in 1979 it was
2   reported that in the Vermont 66 talc,
3   there was tremolite and actinolite both
4   by Johnson & Johnson itself and its
5   outside consultant RJ Lee, correct?
6                MR. BICKS:  Objection to the
7        form.
8                THE WITNESS:  I don't see RJ
9        Lee mentioned on this.
10  BY MR. PLACITELLA:
11       Q.    Or George Lee.  Isn't that
12  RJ Lee?
13       A.    No, no George Lee is a
14  scientist in Johnson & Johnson --
15       Q.    Oh, so you have two
16  different -- I'm sorry.  Then I was
17  mistaken.  So two different people in
18  Johnson & Johnson found tremolite and
19  actinolite?
20       A.    Well, I don't see George Lee
21  mentioned in this memo.  It's a note.
22       Q.    Well, it says the sample was
23  forwarded to George Lee's group?
24       A.    Okay, or George --

John Hopkins, Ph.D.

1        Q.     Where the presence --

2        A.     Fine.

3        Q.     -- of amphiboles was

4    confirmed, correct?

5        A.     George -- George Lee was a

6    scientist in baby products company.

7        Q.     Okay.

8        A.     Nothing to do with RJ Lee.

9        Q.     Okay, good.  I'm glad you

10   cleared that up.

11              Now, give me Imerys-7.

12              MR. PLACITELLA:  You don't

13         have that one.

14              How about 6?  I guess we

15         have to do this tomorrow.  You

16         don't have a 6.  What's going on.

17         Give me 5.

18              (Document marked for

19         identification as Exhibit

20         J&J-5.)

21              MR. SILVER:  The Bates

22         number, Chris?

23              MR. PLACITELLA:  This is

24         something that was just produced.

John Hopkins, Ph.D.

 1          I don't think it has a Bates

 2     number.

 3               MR. SILVER:  There's no

 4     document in the MDL that doesn't

 5     have a number.

 6               MR. PLACITELLA:  Michelle --

 7     or, I mean, Lea will tell you.

 8     She --

 9               MS. O'DELL:  It was provided

10     through --

11               THE COURT REPORTER:  I can't

12     hear you.  I'm sorry.

13               (Discussion held off the

14     record.)

15               MR. SILVER:  I just wanted

16     to know what the statement was if

17     wasn't produced with a Bates

18     number for some reason.

19               MS. O'DELL:  Well, the point

20     was, to be clear, it was produced

21     in a native file.  And the file

22     name has a Bates number and...

23  BY MR. PLACITELLA:

24          Q.   This was just sent to us.

John Hopkins, Ph.D.

1    It's labeled TEM asbestos analysis of

2    Argonaut product composites.

3              Do you see that?  Have you

4    ever seen this before?

5         A.    No, this is -- this is

6    summary dated last week, August 8, 2018.

7         Q.    Yeah.  But do you see that

8    it refers to samples dating back to 2004

9    and 2005?

10        A.    Yes.  Although at that

11   point, Johnson's Baby Powder was no

12   longer being sourced from this operation.

13   It was sourced from China.

14        Q.    In 2004, 2005, you were only

15   getting it from China?

16        A.    From 2003 onwards.

17        Q.    Well, when in 2003?

18        A.    I believe the beginning of

19   2003.  But I'm not sure.  I think it was

20   Quarter 1.

21        Q.    Okay.  Well, how about in

22   2002?  Were you still getting it from the

23   Argonaut mine?

24        A.    Yes.

John Hopkins, Ph.D.

1          Q.    Okay.  If we go to Page 4,

2    do you see where in 2002 they found

3    chrysotile asbestos on September 2002 in

4    the float feed?

5          A.    I see that.  In the float

6    feed.  Yes, I see it.

7          Q.    And --

8          A.    One structure reported, yes.

9          Q.    And then in June, May, if

10   you go to the next page, April, they

11   found chrysotile asbestos in the Ludlow

12   mine, correct?

13         A.    Yeah, what -- what isn't

14   clear to me is that, although it's headed

15   "Asbestos TEM Analysis of Argonaut

16   Product Composites," we've used -- the

17   author of this used the word "Ludlow."

18   And that is not the word that I've seen

19   described in the Argonaut.  Ludlow is a

20   location, an area.  And --

21         Q.    Well --

22         A.    I don't believe that's where

23   the Argonaut mine is, but --

24         Q.    Well, this was provided to

John Hopkins, Ph.D.

1    us in discovery and it details chrysotile

2    being found, according to this, in the

3    Argonaut product composites, in 2002,

4    2003, 2004, 2005, and 2006, correct?

5              MR. LOCKE:  Objection.

6              MR. SILVER:  Objection to

7         form.

8              THE WITNESS:  Well, it's

9         described as Ludlow.  Ludlow fine,

10        Ludlow coarse.  Ludlow fine,

11        Ludlow coarse.  And obviously this

12        is still being used, or at least

13        was being used up until 2005.

14             And the point that I'm

15        making is my understanding of the

16        description that Johnson's powders

17        were used up until 2003 was from

18        the Argonaut mine, the Argonaut

19        pit.  And this mentions Ludlow.

20   BY MR. PLACITELLA:

21        Q.    So -- right.  So if this

22   is --

23        A.    Confused.

24        Q.    If this is from composite

John Hopkins, Ph.D.

1  samples at the Argonaut mine, it is

2  indicative of the fact that they were

3  finding chrysotile from product that was

4  being generated from the Argonaut mine,

5  correct?

6         MR. SILVER:  Objection to

7     form.

8         MR. BICKS:  Objection to

9     form.  You are speculating.

10         THE WITNESS:  No, we're

11     speculating.  I mean, what is

12     interesting, if you look at Page 5

13     of six, the very last item, it

14     does actually specify the grade

15     that was used in Baby Powder, as

16     opposed to something that wasn't.

17         Grade 66 is specified.

18     There wasn't mention -- there's no

19     mention of chrysotile.

20         So, you know, that's the

21     point that I'm making, is that

22     this -- this is not clear that

23     this ever was Johnson's Baby

24     Powder.

John Hopkins, Ph.D.

1    BY MR. PLACITELLA:

2        Q.    I guess we have to take

3    the -- when it says "float," by the way,

4    that's what goes into Johnson's Baby

5    Powder, correct?

6                MR. SILVER:  Objection to

7        form.

8                THE WITNESS:  The float feed

9        goes into the flotation process

10       which is the washing process.  And

11       the process that cleans up the

12       talc, washes the particles, and

13       dries them.

14   BY MR. PLACITELLA:

15       Q.    Right.  And the float feed

16   is what ends up in the product, correct?

17               MR. SILVER:  Objection to

18       form.

19               THE WITNESS:  No, no, no.

20       Only some of the float feed ends

21       up in the product.

22   BY MR. PLACITELLA:

23       Q.    Okay.  And in the float

24   feed, they found from the Argonaut mine

John Hopkins, Ph.D.

1    chrysotile asbestos, correct?

2              MR. SILVER:  Objection to

3         form.  Misstates the document.

4              THE WITNESS:  Well, again,

5         what this says, it doesn't say the

6         Argonaut mine.  Each of those

7         identities relates to the Ludlow.

8         Ludlow coarse, Ludlow fine.  Only

9         one of them at the bottom, Page 5,

10        it actually says Grade 66, which

11        is an identifier for the material

12        that's used in Baby Powder.

13   BY MR. PLACITELLA:

14        Q.    So what period of time were

15   you using the Ludlow mine for Baby

16   Powder?

17        A.    I'm not aware the Ludlow

18   mine was used.  I mean, it's -- I don't

19   know what the descriptor is for Ludlow

20   mine versus Argonaut.  The descriptor

21   that I've seen for talc usage up to this

22   point would be the Argonaut mine.  What

23   the Ludlow fine and Ludlow coarse is, I

24   have no idea.

John Hopkins, Ph.D.

1        Q.      Okay.  So we have to ask

2   Imerys those questions.  Fair?

3        A.      I think that's reasonable.

4   Yes.

5        Q.      Okay.  Now, I know you've

6   been asked this many times, but I have to

7   create a record.  You're aware that

8   Johnson & Johnson hired Alice Blount as a

9   consultant at some point in time?

10       A.      She was one of many, many

11  people who have been hired, if that's the

12  right word to provide opinion advice.

13       Q.      All right.  And she worked

14  for Rutgers University at the time that

15  you hired her, correct?

16       A.      I believe that is the case,

17  yes.

18       Q.      And you're aware that

19  Dr. Blount in or about 1991 tested your

20  Baby Powder and found asbestos, correct?

21            MR. BICKS:  Objection to the

22       form.

23  BY MR. PLACITELLA:

24       Q.      That's what she reported?

John Hopkins, Ph.D.

1          A.     She reported a finding.   Her
2     publication did not specify that she
3     found asbestos in Johnson's Baby Powder.
4     There is a handwritten annotation stapled
5     to that report whereby a product
6     designated "I", letter I, was claimed to
7     be Johnson's Baby Powder.
8          Q.     Yeah, but she told you
9     privately that it was Johnson's Baby
10    Powder that she found asbestos in,
11    correct?
12               MR. BICKS:  Objection to the
13          form.
14               THE WITNESS:  Again, I've
15          not seen any private
16          correspondence.  What I have seen
17          is her deposition in a recent case
18          whereby it was quite apparent that
19          she was really quite confused as
20          to what she had been looking at.
21          She used the designation "I" for
22          things other than Baby Powder.
23    BY MR. PLACITELLA:
24          Q.     Sir, did I ask you anything

John Hopkins, Ph.D.

1    about her deposition?

2         A.    No, you didn't.

3         Q.    What was my question?

4         A.    You said that she told --

5    told the company privately.

6         Q.    Right.

7         A.    And what I said was I don't

8    have that information privately.

9         Q.    You don't know that

10   privately, Alice Blount told the company

11   that she found asbestos in the Johnson's

12   Baby Powder?

13            MR. BICKS:  Objection to the

14            form.

15            THE WITNESS:  If there is a

16            document, then we can say, yes,

17            this is what she wrote.  But I

18            don't have any documentation.  I

19            have not seen that private

20            documentation.

21   BY MR. PLACITELLA:

22         Q.    Are you sure about that?

23         A.    Well, I've seen, as you've

24   said, many -- 10-, 20,000 documents.  I

John Hopkins, Ph.D.

1    don't recollect seeing that one.  But I'm

2    happy to comment if such a private --

3              Q.    I'm just asking what you

4    know.

5              A.    No.   In that case then, I've

6    not seen a private communication from Dr.

7    Blount.

8                    MR. PLACITELLA:  Can you

9         give me --

10                   MR. SILVER:  Can I have a

11        time check, please.

12                   THE VIDEOGRAPHER:  We are at

13        six hours and 57 minutes.

14                   MR. PLACITELLA:  I've got

15        three more minutes.  We'll see you

16        tomorrow.

17                   THE WITNESS:  You sure?

18                   MR. PLACITELLA:  Yes.

19                   THE WITNESS:  Okay.

20                   MR. PLACITELLA:  I've got

21        three more minutes.

22                   THE WITNESS:  Sleep well.

23                   MR. PLACITELLA:  Have a

24        drink.

John Hopkins, Ph.D.

1                THE VIDEOGRAPHER:  Off the

2         record, right?  Stand by, please.

3         The time is 6:12 p.m.  Going off

4         the record.

5                (Excused.)

6                (Adjourned at approximately

7         6:12 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

John Hopkins, Ph.D.

1

2                        CERTIFICATE

3

4

5              I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

              It was requested before
8  completion of the deposition that the
   witness, JOHN HOPKINS, Ph.D., have the
9  opportunity to read and sign the
   deposition transcript.

10

11

            _____

12            MICHELLE L. GRAY,
              A Registered Professional
13            Reporter, Certified Shorthand
              Reporter, Certified Realtime
14            Reporter and Notary Public
              Dated:  August 20, 2018

15

16

17              (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)

22

23

24

John Hopkins, Ph.D.

```
1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4   over carefully and make any necessary

5   corrections.  You should state the reason

6   in the appropriate space on the errata

7   sheet for any corrections that are made.

8              After doing so, please sign

9   the errata sheet and date it.

10             You are signing same subject

11  to the changes you have noted on the

12  errata sheet, which will be attached to

13  your deposition.

14             It is imperative that you

15  return the original errata sheet to the

16  deposing attorney within thirty (30) days

17  of receipt of the deposition transcript

18  by you.  If you fail to do so, the

19  deposition transcript may be deemed to be

20  accurate and may be used in court.

21

22

23

24
```

John Hopkins, Ph.D.

```
1                      –    –    –    –    –    –

                          E  R  R  A  T  A

2                      –    –    –    –    –    –

3

4    PAGE   LINE   CHANGE

5    _____   _____   _____

6         REASON: _____

7    _____   _____   _____

8         REASON: _____

9    _____   _____   _____

10        REASON: _____

11   _____   _____   _____

12        REASON: _____

13   _____   _____   _____

14        REASON: _____

15   _____   _____   _____

16        REASON: _____

17   _____   _____   _____

18        REASON: _____

19   _____   _____   _____

20        REASON: _____

21   _____   _____   _____

22        REASON: _____

23   _____   _____   _____

24        REASON: _____
```

John Hopkins, Ph.D.

```
 1

 2              ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do

 5      hereby certify that I have read the

 6      foregoing pages, 1 - 434, and that the

 7      same is a correct transcription of the

 8      answers given by me to the questions

 9      therein propounded, except for the

10      corrections or changes in form or

11      substance, if any, noted in the attached

12      Errata Sheet.

13

14

15      _____

16       JOHN HOPKINS, Ph.D.              DATE

17

18

19      Subscribed and sworn
        to before me this

20      _____ day of _____, 20_____.

21      My commission expires:_____

22

        _____

23      Notary Public

24
```

John Hopkins, Ph.D.

```
 1                      LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____
```

Exhibit 21

# Battelle Memorial Institute

5 0 5    K I N G    A V E N U E    C O L U M B U S   I,   O H I O

**April 12, 1960**

Mr. H. L. Warner
Office of General Counsel
Johnson and Johnson
New Brunswick, New Jersey

Dear Mr. Warner:

This letter report covers the flotation studies made in our laboratory in connection with the preparation of the patent application "Platy Talc Beneficiation".

All of the experiments discussed in this report were made using Italian No. 2 talc. The first five experiments were made to determine whether anionic surface active agents other than the Aerosols, 18 or OT, were effective in selective flotation of platy talc. Four anionic reagents were selected for the study. These are listed in Table 1.

### TABLE 1.  ANIONIC REAGENTS STUDIED

| Trade Name | Class or Formula | Main Uses |
|---|---|---|
| Duponal ME | Sodium lauryl sulfate | Detergent, dispersant, emulsifying agent |
| Anatron L215 | Alkyl amide sulfonate | Detergent |
| Tergitel P28 | Sodium di (2-ethyl hexyl) phosphate | Wetting agent, emulsifying agent |
| Igepon T | A substituted amide $C_{17}H_{33}CON(CH_3)C_2H_4SO_3Na$ | Detergent |

Based on the available flotation literature, it appears that two of the reagents, Anatron L215 and Igepon T, have the same formula. The difference between them is that they are marketed as powders at different concentrations, Anatron L215 at 16 per cent and Igepon T at 33 per cent.

The results of the experiments in the current program, as well as the results of seven previously reported experiments, are presented in Table 2.

Protected Document--Subject to Protective Order

TABLE 2.  SUMMARY OF FLOTATION EXPERIMENTS WITH SURFACE ACTIVE REAGENTS

| | Feed | | | Flotation Reagents, lb/ton of flotation feed | | Results, Float 1(a) | | | | | | |
| | Solids % | pH | HCl | Dowfroth 250 | Other Reagents | Weight Per Cent(b) | Platy Talc | Nonplaty Talc | Dolomite | Tremolite | Others | Per Cent Dolomite(c) |
| Experiment | | | | | | | | Mineral Count, per cent | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 163(d) | 7.2 | 6.8 | — | — | | 36.3 | 95(e) | >4(e) | trace | trace | trace | 0.4 |
| 162(d) | 7.2 | 6.4 | 1.79 | — | | 34.4 | 96 | 4 | trace | trace | trace | 0.2 |
| 96(f) | 8.4 | 7.5 | 1.75 | — | 0.07 – Dowfroth 200 | 64.8 | 98 | 1 | — | <1 | trace | 0.5 |
| 134(f) | 8.0 | 6.7 | 1.77 | 0.07 | | 59.0 | 98 | 1 | — | <1 | trace | 0.3 |
| 197(d) | 7.5 | | — | — | 1.32 – Aerosol OT | 69.7 | >97 | >2 | trace | trace | trace | 0.9 |
| 185(d) | 7.4 | 6.8 | 1.73 | 0.04 | 0.74 – Aerosol 18 | 70.8 | <99 | >1 | trace | trace | trace | 0.4 |
| 189(d) | 7.0 | 6.8 | 1.80 | 0.04 | 0.62 – Aerosol 18 | 70.4 | >98 | >1 | trace | trace | trace | 0.6 |
| 328 | 8.6 | 7.2 | 1.38 | 0.05 | 0.47 – Sodium Lauryl Sulfate – Anionic | 93.0 | >97 | 2 | <1 | trace | trace | 0.8 |
| 329 | 8.7 | 7.0 | 1.37 | 0.05 | 0.058 – Sodium Lauryl Sulfate – Anionic | 70.8 | >98 | <1 | <1 | trace | trace | 0.3 |
| 330 | 8.4 | 7.2 | 1.42 | 0.05 | 0.48 – Alkyl Amide Sulfonate – Anionic | 56.5 | >98 | <1 | trace | trace | trace | 0.2 |
| 331 | 8.4 | 7.1 | 1.42 | 0.05 | 0.18 – Sodium di (2-ethyl hexyl) Phosphate – Anionic | 69.3 | >98 | <1 | trace | trace | trace | 0.2 |
| 332 | 8.7 | 7.2 | 1.37 | 0.05 | 0.46 – Substituted Amide $C_{17}H_{3g}CON(CH_3)C_2H_4SO_3Na$ – Anionic | 70.8 | >98 | >1 | trace | trace | trace | 0.3 |
| 334 | 8.6 | 6.9 | 1.35 | 0.04 | 0.46 – Trimethyl-n-dodecyl ammonium chloride – Cationic | 71.0 | >98 | >1 | trace | trace | trace | 0.3 |
| 335 | 8.8 | 7.4 | 1.35 | 0.04 | 0.46 – Trimethyl-n-dodecyl ammonium chloride – Cationic | 75.6 | 98 | >1 | trace | trace | trace | 0.3 |
| 336 | 8.8 | 7.6 | 1.31 | 0.04 | 0.45 – Octylamine – Cationic | 88.1 | 96 | >3 | <1 | trace | trace | 0.7 |
| 337 | 9.0 | 7.5 | 1.32 | 0.04 | 0.11 – Octylamine – Cationic | 70.2 | >97 | >2 | <1 | trace | trace | 0.3 |
| 338 | 8.9 | 7.3 | 1.36 | 0.05 | 0.117 – Hexadecyl Dimethyl Amine – Cationic | 71.9 | 99 | trace | trace | trace | trace | 0.3 |
| 339 | 8.8 | 6.8 | 1.36 | 0.05 | 0.46 – Sorbitan Monolaurate – Nonionic | 77.2 | 99 | trace | trace | trace | trace | 0.3 |
| 340 | 8.6 | 7.2 | 1.39 | 0.05 | 0.47 – Sorbitan Monolaurate Polyoxyethylene Derivative – Nonionic | 72.8 | <99 | <1 | trace | trace | trace | 0.2 |
| 341 | 8.6 | 6.7 | 1.39 | 0.05 | 0.47 – Secondary Amide of Lauric Acid – Nonionic | 72.9 | 99 | trace | trace | trace | trace | 0.2 |
| 342 | 9.0 | 7.0 | 1.32 | 0.04 | 0.45 – Nonyl Phenyl Polyethylene Glycol Ether – Nonionic | 82.6 | >98 | 1 | <1 | trace | trace | 0.5 |
| 343 | 9.0 | 6.6 | 1.31 | 0.04 | 0.44 – Oleic Acid Plus Sodium Oleate – Anionic Collector | 78.5 | <95 | 4 | 1 | trace | trace | 0.9 |

(a) Float 1 is froth removed in five minutes.
(b) Based on flotation feed
(c) Calculated from CO2 assay.
(d) See "The Physical Concentration of Italian No. 2 Talc by Flotation—Investigation of Flotation Reagents", Battelle Progress Report, January 31, 1960.
(e) This is a corrected figure.  The figure shown in the January 31, 1960, report was 92 per cent.  A recount (in duplicate) was made of the product and showed it to be 95 per cent platy.
(f) See "The Physical Concentration of Talc Ores—Flotation of Italian No. 2 Talc", Battelle Progress Report, July 31, 1959.

Protected Document--Subject to Protective Order

# Battelle Memorial Institute

Mr. H. L. Warner                                    3                            April 12, 1960
Page_____

The results of Experiments 328 to 332, inclusive, revealed that three of the four anionic reagents tested were about as effective as the Aerosols; the data for the fourth were not conclusive.

The only reagent that did not give results as good as the Aerosols was Anatron L219, Experiment 330. It appears that the low recovery of 56.5 per cent may have been due to an insufficient amount of the reagent. Recoveries equal to that obtainable with the Aerosols were achieved with the other reagents, and in addition the dolomite content was lower. Had the anionic surface active agents been ineffective, it would have strengthened the patent application for the Aerosols.

When the results from the experiments using anionic reagents were available, Mr. Warburton transmitted this information to you by telephone. The decision was made to proceed with a limited amount of additional laboratory work in order to obtain some idea of the scope to be included in the application.

Since the experimental work previously described was limited to anionic surface active agents, it was decided to broaden the field. Therefore, cationic and nonionic surface active reagents, as well as one fatty acid type collector, were selected for the new investigations. Eight reagents were chosen, primarily because of their definite composition and availability; these are shown in Table 3.

TABLE 3.  CATIONIC, NONIONIC, AND ANIONIC REAGENTS STUDIED

| Trade Name | Class or Formula | Type | Main Uses |
|---|---|---|---|
| Arquad 12 | Trimethyl-n-dodecylammonium chloride | Cationic | Wetting agent, detergent |
| Armeen 8D | Octylamine | " | Collector |
| Armeen 16D | Hexadecyl dimethyl amine | " | Collector |
| Span 20 | Sorbitan monolaurate | Nonionic | Emulsifying agent |
| Tween 21 | Sorbitan monolaurate polyoxy-ethylene derivative | " | Wetting agent, dispersant |
| Wetsyn | A secondary amide of lauric acid | " | Wetting agent, detergent |
| Tergitol NPX | Nonyl phenyl polyethylene glycol ether | " | Wetting agent |
| --- | Oleic acid-sodium oleate emulsion | Anionic | Collector |

Protected Document–Subject to Protective Order

Battelle Memorial Institute

Mr. N. L. Warner                    Page____4____                    April 12, 1960

     Experiments 334 to 342 gave results not only equal to that obtainable with the Aerosols, 18 or OT, but better.  In Experiment 342, a weight recovery of 82.6 per cent of the flotation feed with a platy talc content of 98 to 99 per cent, and a dolomite assay of 0.5 per cent was obtained in the standard 5-minute period designated Float 1.  In Experiment 182, in which Aerosol 18 was used, the weight recovery in Float 1 was 70.8 per cent.

     The only experiment in this series in which the results were not satisfactory was 343.  In it, an emulsion of oleic acid and sodium oleate was used.  The froth product from Experiment 343 contained almost 1 per cent dolomite and contained thick chunklike particles of talc, which definitely could not be classed as platy.

     The conclusions from this work are as follows:

   (1)  Eleven more reagents have been found, and there may be many more, that can be used to float platy talc selectively, i.e., when the starting feed is 90 per cent platy talc.

   (2)  The reagents tried and shown to be successful in this study of the Italian No. 2 talc should now be tried on lower grade talc ores such as the Henderson run-of-mine talc where the magnitude of the upgrading is so much greater.

   (3)  These reagents should be tried in the absence of any Dowfroths.  This was not done in Experiments 328 to 343, inclusive, because the bulk of the previously reported work, and likewise the best experiments, were carried out using a combination of the Aerosols, either 18 or OT, and Dowfroth.

   (4)  These reagents should now be considered for use in any new pilot-plant run.

   (5)  The experiments should be confirmed by duplicate tests.

   (6)  The best reagents should be evaluated with relation to their cost per ton of feed.

     A portion of the closing remarks in the Battelle report, "The Physical Concentration of Italian No. 2 Talc by Flotation---Investigation of Flotation Reagents", January 31, 1960, are also applicable to this letter report and are repeated below.

Protected Document--Subject to Protective Order                    JNJNL61_000001483

Battelle Memorial Institute

Mr. M. L. Warner               Page___5___               April 12, 1960

    "This report fulfills the commitment for the evaluation of additional reagents for the flotation of platy talc; undoubtedly, other reagents neither investigated nor considered might do as well or even better. However, to uncover them would require a much more comprehensive program."

    The original notes on the laboratory work described in this report are recorded in Battelle Laboratory Record Book No. 16565, pages 6 to 30, inclusive.

    We would be pleased to answer any questions that you may have regarding this work.

                Very truly yours,

                W. E. Chase

WEC:lb
In duplicate
cc:  Mr. W. H. Ashton (2)

Exhibit 22



PROGRESS REPORT

MEMORIAL INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000001032



BATTELLE FIELD RESEARCH

JNJAZ55_000001033

PROGRESS REPORT

on

STUDIES OF THE PHYSICAL PROPERTIES
OF TALC, THEIR MEASUREMENT,
AND COMPARISON

to

JOHNSON AND JOHNSON

October 15, 1957

by

W. L. Smith

BATTELLE MEMORIAL INSTITUTE
505 King Avenue
Columbus 1, Ohio

Protected Document--Subject to Protective Order

K-3262-2        OK'd by O. F. Tangel and A. C. Richardson before typing.
cc: O. F. Tangel (3)    A. C. Richardson    R. D. Macdonald    W. L. Smith (3)
R. H. Nagel

# Battelle Memorial Institute

505   KING   AVENUE   COLUMBUS 1, OHIO

October 25, 1957

Dr. W. H. Lycan
Director of Research
Johnson and Johnson
New Brunswick, New Jersey

Dear Dr. Lycan:

This letter transmits six copies of our report "Studies of the Physical Properties of Talc, Their Measurement, and Comparison".

At the present stage of this investigation it can be seen that the lubricity of the Italian talc is closely related to its purity, crystalline habit, and particle-size distribution and is expressed in bulk density, surface area, porosity, and average diameter measurements. The acceptable Italian talc was found to fall within a small range of physical measurements. Lubricity was found to be controlled by the shape of the relatively small content of comparatively larger particles in the otherwise finer mixture.

It appears feasible that the slip of the Italian talc may be improved by the removal of the coarser mineral contaminants.

Your comments on the findings of this investigation will be appreciated.

Very truly yours,

W. L. Smith

W. L. Smith
Principal Geologist
Minerals Beneficiation Division

WLS:rr
Enc. (6)

Protected Document--Subject to Protective Order

JNJAZ55_000001035

TABLE OF CONTENTS

|  | Page |
|---|---|
| SUMMARY | 1 |
| INTRODUCTION | 1 |
| DISCUSSION OF LUBRICITY | 2 |
| THE ROLE OF MINERALOGICAL PURITY IN LUBRICITY | 3 |
| THE ROLE OF THE CRYSTALLOGRAPHIC HABIT OF TALC IN LUBRICITY | 3 |
| THE MEASUREMENT OF LUBRICITY | 4 |
| Discussion | 4 |
| The Lubricity Board | 4 |
| The Lubricity of Talc Samples | 7 |
| THE RELATIONSHIP OF LUBRICITY TO PARTICLE-SIZE DISTRIBUTION | 9 |
| Discussion | 9 |
| Particle-Size Distribution in Italian Talc | 9 |
| Correlation of Lubricity With Particle-Size Distribution Data | 11 |
| MOISTURE CONTENT | 15 |
| MEASUREMENT AND CORRELATION OF OTHER PHYSICAL PROPERTIES RELATED TO LUBRICITY | 15 |
| Surface Area Determinations by Nitrogen Adsorption | 15 |
| Average Diameter of Particles | 15 |
| Specific Surface Calculated From Average Diameter | 17 |
| Porosity | 18 |
| Bulk Density | 20 |
| CONCLUSIONS | 21 |
| BIBLIOGRAPHY | 23 |

APPENDIX A

| DESCRIPTION OF LUBRICITY BOARD AND TECHNIQUE OF OPERATION | A-1 |
|---|---|

APPENDIX B

| PROCEDURE FOR PARTICLE-SIZE ANALYSIS | B-1 |
|---|---|

LIST OF FIGURES

| Figure 1. | The Lubricity Board, Showing Descent of Steel Puck | 5 |
|---|---|---|
| Figure 2. | Underside of Lubricity Board, Showing Microswitches and Electric Timer Connected to Lock-in Relay | 6 |
| Figure B-1. | Standard Flowsheet for Sizing of Talc Samples | B-2 |

LIST OF TABLES

| Table 1. | Typical Data From Lubricity-Board Measurement of Italian Talc Sample (Cranford, 12/22/56) | 7 |
|---|---|---|
| Table 2. | Lubricity-Board Measurements and Per Cent Contamination of Talc Sampled at Cranford, New Jersey Showing Relation of Lubricity to Purity of Sample | 8 |

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

LIST OF TABLES
(Continued)

| | | Page |
|---|---|---|
| Table  3. | Lubricity-Board Data on Flotation Products of Italian Talc, Showing Deleterious Effect of Contamination on Lubricity . . . . . . . . . . . . | 8 |
| Table  4. | Previously Reported Particle-Size Distribution Data on Italian Talc . . . . . . . . | 10 |
| Table  5. | Particle-Size Distribution of Three Samples of Italian Talc . . . . . . . . . | 10 |
| Table  6. | Particle-Size Distribution of Talc Sampled at Cranford Plant . . . . . . . | 12 |
| Table  7. | Deviation in Particle-Size Distribution in Weight Per Cent of Talc Sampled at the Cranford Plant . . . . | 13 |
| Table  8. | Relationship of Lubricity to Particle Size . . . . . . . . . . | 13 |
| Table  9. | The Lubricity of Mixtures of Coarse and Fine Sizes of Talc, Demonstrating the Control to be in the Coarse Fractions . . . . . . . . . . | 14 |
| Table 10. | Lubricity Measurements of Italian Talc Samples From Which Specific Particle-Size Fractions Have Been Removed . . . . . . . . . | 14 |
| Table 11. | Surface Area Measurements of Italian Talc, Compared With Lubricity-Board Measurements . . . . . | 15 |
| Table 12. | Comparison of Theoretical Average-Diameter Measurements and Specific Surface to Lubricity-Board Measurements of Cranford Samples . . . . . . | 16 |
| Table 13. | Relationship of Lubricity-Board Measurements to Theoretical Average Diameters on Sized Fractions of Italian Talc . . . . . . | 17 |
| Table 14. | Correlation of Specific Surface and Lubricity-Board Measurements of Sized Fractions of Italian Talc . . . | 18 |
| Table 15. | Porosity, Bulk Density, and Lubricity of Cranford Samples . . . . . . | 19 |
| Table 16. | Correlation of Porosity and Lubricity-Board Measurements of Sized Fractions of Italian Talc . . . . . | 20 |
| Table 17. | The Relationship of Bulk Density to Lubricity-Board Measurements of Sized Fractions of Italian Talc | 20 |
| Table 18. | Summary of Physical Properties of Sized Fractions of Italian Talc . . . . . . | 22 |

BATTELLE    MEMORIAL    INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000001037

# STUDIES OF THE PHYSICAL PROPERTIES OF TALC, THEIR MEASUREMENT, AND COMPARISON

by

W. L. Smith

## SUMMARY

In order to improve the physical properties of talc it is necessary to be able to measure the differences in talc and to establish a basis for the determination of improvement.  To study the lubricous property of talc, an experimental lubricity measuring device was built, and the behavior of different talc samples was compared with their other physical properties.  The comparative physical measurements were made upon sized fractions and whole samples of Italian talc with conventional laboratory devices.  It was found that the acceptable Italian talc fell within a small range of the physical measurements and that the samples with the more desirable slip have the greater surface area, the smaller average particle diameter, the greater ratio of voids to total volume, and the lesser bulk density.  Lubricity was found to be controlled by the shape of the relatively small content of comparatively larger particles in an otherwise finer mixture.  At the present stage of the investigation, the improvement of the slip of the Italian talc appears feasible by the removal of the coarser mineral contaminants.

## INTRODUCTION

The talc currently used by Johnson and Johnson, obtained from Pinerolo, Italy, is believed to be a blend of five or more different grades of ore which gives a high quality, lubricous powder.  In a proposal for research on the improvement of the properties of talc, dated June 4, 1956, it was proposed to study the basic properties of the acceptable Italian talc and to determine if and how the quality might be improved.  The development of objective tests which might serve in the evaluation of talc was recommended, with the initial work to be done upon the product now used by Johnson and Johnson.

In order to determine improvement in the quality of talc, however, it is necessary to measure the apparently small differences between acceptable talc and talc of lower quality.  Previously, measurements have been made by subjective methods only, which were thought to be of insufficient precision to measure small differences.  The development and correlation of physical measurements has been undertaken to permit the measurement of improvement.  The measurements of the physical properties of acceptable talc, and their range, have been made upon a series of one kilogram samples of grade "EGT Extra 00000" taken at weekly intervals from the conveyor at the Cranford, New Jersey, plant just before the talc enters the ribbon blendors.  An additional large sample of talc was obtained for tests requiring larger volumes of material.

As a test for the comparative lubricity of talc samples, a lubricity board was constructed.  This device, though not providing absolute values, gives reproducible

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000001038

relative figures, with which the other physical properties, which can be more easily measured, may be correlated. This study, when coupled with proposed work on abrasiveness and other properties, should indicate the course to follow in beneficiation, the primary work on which Battelle reported in a letter dated June 12, 1957. The flotation work to date has been a laboratory expedient of producing talc of superior quality for physical tests.


## DISCUSSION OF LUBRICITY


This report deals with lubricity and other physical properties including particle-size distribution and surface area, which are pertinent to lubricity. The desirable quality in talc, however, is only partly a matter of lubricity. That is, talc with the desired "feel" (as sensed subjectively) is not determined either by very high or very low lubricity (diminution of friction) but by a balance of physical properties which produces a particular sensory effect. This quality is referred to in this report as slip. The primary determining factor is the platiness of fine grained particles sliding over one another under slight pressure — not being lubricous in the sense of bearings which cut down friction by transmitting the moving forces to the rolling of an intermediate body, producing point friction; not being lubricous in the sense of a viscous fluid which buffers contact; but being lubricous in the sense of a series of leaves which impart the relative movement of two bodies along several planes parallel to the contact, producing the sensation of softness of surface contact.

The nature of the sliding of the platelets is a matter of kinetics, the changes in types of motion produced by applied forces. A certain intensity of force is required to maintain sliding between any two surfaces, and this varies with the nature of the surfaces. When the applied force is distributed along numerous planes rather than between two surfaces, the resistance to relative motion between the two bodies is distributed among a series of translation movements rather than in a rotational movement or in the overcoming of inertia in one plane. Inasmuch as the coefficient of sliding friction is apparently much less between talc platelets than between talc and flesh, the total friction resulting from the sum of translation movements is necessarily less than that of flesh in contact with flesh, and thus the lubricous property is sensed. The force producing the relative motion of two bodies is applied to the several planes of free moving talc platelets, which orient their greatest surfaces normal to the force applied; the contact of this series of parallel talc planes with flesh produces the silky or smooth sensation desirable in high quality talcum powder.

Grit (granular and acicular particles), where present, introduces point friction as in bearings, or plowing and thus is the primary objectionable contaminant in talcum powder.

The lubricousness or slip of talcum powder is determined by its mineralogical purity, the crystallographic habit of the talc, the size distribution of the powder, its moisture content, and the nature of the contaminants. Most of these factors must be determined petrographically, often on separated fractions of the powder. Other physical properties, such as surface area, average diameter, porosity, and bulk density, may be measured mechanically. Such physical measurements have been made, and the data have been correlated to determine which properties are significant in ground talc which has the desired slip. Measurements have been made to establish the

Protected Document--Subject to Protective Order

JNJAZ55_000001039

optimum limits of many of the properties relevant to lubricity. Data relevant to color, reflectance, moisture content, alkalinity, and abrasiveness will appear in a subsequent report.

## THE ROLE OF MINERALOGICAL PURITY IN LUBRICITY

The Italian talc contains from about 97 to more than 99 per cent pure mineral talc. The predominant contaminant is carbonate, which is present in all size fractions, being slightly more abundant in the fines. Among other contaminants, present in trace amounts, are amphiboles, rutile, zircon, apatite, and titanite. The Italian talc is essentially free of opaques. The contaminants are generally prismatic or angular particles which act as grit and introduce point friction. A few such equidimensional or acicular particles present in an otherwise platy talcum, particularly if the grit is present in the coarser sizes, may be easily noticed subjectively. They diminish the lubricous feeling by the introduction of plowing, bearing-like particles, and the disruption of the lamellar movement of the talc particles. Inasmuch as the contaminants generally have diameters considerably greater than the thickness of talc platelets, their removal would improve the slip of any platy talc in which they occur in an effective amount. The small percentage of contamination in the Italian talc is an effective amount, as demonstrated by lubricity tests on a sample upgraded by froth flotation.

Further discussion of the nature of the impurities of talc was reported in earlier Battelle reports to Johnson and Johnson dated May 11, 1955[1]*, February 29, 1956[2], May 28, 1957[3], and July 25, 1957[4].

## THE ROLE OF THE CRYSTALLOGRAPHIC HABIT OF TALC IN LUBRICITY

Platy talc is the most desirable for the purposes of the Sponsor. Whereas acicular and granular talc particles plow or roll, producing point friction, platy particles slide over one another producing the soft lubricous sensation desirable in talcum powder. The Italian talc averages about 10 per cent fibrous or acicular particles and about 90 per cent platelets. The amount of granular talc particles is negligible. Fibrous and granular particles of talc, though physically softer than the foreign mineral contaminants of talc ore, are none the less undesirable — if to a lesser degree. Such particles are most undesirable when present in the larger grain sizes where these crystals or aggregates may act as bearings or irritants.

Whereas different minerals may be separated from one another by physical processes, such as the removal of carbonates from talc by flotation, more difficulty is involved in separating particles of monomineralic, impalpable powder on the basis of their crystallographic habit, except where the crystal types concentrate in specific size fractions. Until beneficiation procedures for concentrating talc with the desired crystallographic habit are developed, talc which has the crystallographic habit preferred must be obtained by selective mining.

A detailed discussion of the various crystallographic habits of talc appears in a Battelle report to Johnson and Johnson dated February 29, 1956[2].

* References are given on page 23.

**B A T T E L L E   M E M O R I A L   I N S T I T U T E**

Protected Document--Subject to Protective Order

JNJAZ55_000001040

# THE MEASUREMENT OF LUBRICITY

## Discussion

Although the desired property of talc, the slip or optimum balance of size distribution and friction is only partly a matter of lubricity, it is correlative within certain limits of lubricity.  A standard method of objectively measuring the lubricousness of talc has not been devised previously.  The lubricity has been determined comparatively by feeling a pinch of powder between the fingers.  People experienced in so testing talc subjectively are able to distinguish fine differences in quality.  Since the desirable and undesirable qualities of talc are a subjective matter, it is likely that subjective testing is preferable.  However, since the subjective tests are a matter of sensation, involving human reaction to several physical properties, such tests are of little help in devising methods of improving the physical properties of talc or of measuring small differences in particular properties.  Because of this it was necessary to build a device to objectively test and measure lubricity, apart from the other properties which contribute to the desirability of talc.

It is not to be inferred that an objective test can replace the subjective test or that pleasantness of sensation is mechanically measurable; however, the physical properties which contribute to the unctuousness of talc can be measured and their optimum limits can be determined.  Thus the means of improvement of talcs can be visualized.  The figures obtained on the lubricity-board experiments are compared with the more easily made measurements of other physical properties in order to determine if there is a correlation and to establish the desirable limits of particular properties in acceptable Italian talc.

## The Lubricity Board

In order to obtain quantitative measurements of talc samples, against which the measurements of other physical properties could be compared, a simple machine was constructed with a minimum of interacting physical factors.  This device consists of a wooden plane inclined at 25 degrees, which is covered with talc (Figure 1).  The lubricity is determined by measuring the time it takes a 226-gram steel puck to slide over two microswitches spaced 5 feet apart (Figure 2).  The microswitches actuate an electric timer.

The lubricity board was designed as a preliminary device in making lubricity experiments; however, a routine method of measurement has been established and the device has demonstrated a reproducibility with an accuracy of more or less 1 per cent. Although more precise machines might be built, the lubricity board has proven to be an adequate means of measuring the comparative lubricity of talc samples and to be adequately precise for the comparison of data from other physical measurements.  The measurements made on the lubricity board are presented in terms of .xxx second, the figures representing the average of fifty readings.  A typical set of figures is shown in Table 1.  A description of the lubricity board and the technique of its operation comprises Appendix A.

Protected Document--Subject to Protective Order

JNJAZ55_000001041

5



N40207

FIGURE 1.   THE LUBRICITY BOARD, SHOWING DESCENT OF STEEL PUCK

B A T T E L L E   M E M O R I A L   I N S T I T U T E

   JNJAZ55_000001042



N40208

FIGURE 2.  UNDERSIDE OF LUBRICITY BOARD, SHOWING MICROSWITCHES AND
ELECTRIC TIMER CONNECTED TO LOCK-IN RELAY

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

TABLE 1.   TYPICAL DATA FROM LUBRICITY-BOARD MEASUREMENT
OF ITALIAN TALC SAMPLE (CRANFORD, 12/22/56)

| | | Measurement in Seconds | | |
|---|---|---|---|---|
| Series 1 | Series 2 | Series 3 | Series 4 | Series 5 |
| 0.96[a] | 0.97 | 0.98 | 0.97 | 0.97 |
| 0.98 | 0.96 | 0.97 | 0.96 | 0.97 |
| 0.95 | 0.96 | 0.97 | 0.96 | 0.96 |
| 0.95 | 0.95 | 0.97 | 0.98 | 0.95 |
| 0.97 | 0.96 | 0.96 | 0.98 | 0.96 |
| 0.97 | 0.95 | 0.96 | 0.97 | 0.94 |
| 0.96 | 0.96 | 0.97 | 0.96 | 0.97 |
| 0.95 | 0.97 | 0.98 | 0.98 | 0.98 |
| 0.97 | 0.96 | 0.97 | 0.97 | 0.95 |
| 0.94 | 0.97 | 0.97 | 0.99 | 0.97 |
| | | Average 0.965 second | | |

(a)  Lubricity board newly covered for each series of ten slides.

Contrary to preconceived ideas about the behavior of solid lubricants, the puck was found to slide faster on poorer grades of talc than on cleaner samples with better slip.  The controlling factor is the presence of contaminants or equidimensional particles which act as bearings while purer talc, within the limits of the particular size distribution, presents a surface composed of flat platelets, producing more friction and slowing the descent of the puck.

It is not suggested at this time that Johnson and Johnson conduct similar experiments on a lubricity board.  Until the lubricity studies are completed, it is intended that the lubricity board serve only as a basis for comparison with other measurements by which the physical properties which control lubricity can be evaluated.


The Lubricity of Talc Samples


Lubricity-board measurements were made on 15 samples of talc obtained from the Cranford plant of Johnson and Johnson, collected at regular intervals from August 10 to December 22, 1956.  Table 2 lists the figures obtained for each sample.  The readings ranged from 0.936 second for the sample which permitted the fastest descent of the puck to 1.083 seconds for that sample which most slowed the descent.

To test the hypothesis that the faster descents were due to bearing-like contaminants, the lubricity figures were compared to those of the percentage of contamination.  Table 2 lists the amount of contamination as compared to the lubricity of the samples.  The contamination figures represent microscopically identifiable particles and do not include the impalpable fines.  Although correlation was not perfect, the relationship of contamination to lubricity is clear in the extreme instances.  The talc containing the greater amount of contaminants permitted the faster descents on the lubricity board.  The slight differences in contamination were not discernible subjectively.


B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000001044

TABLE 2.  LUBRICITY-BOARD MEASUREMENTS AND PER CENT
CONTAMINATION OF TALC SAMPLED AT CRANFORD,
NEW JERSEY, SHOWING RELATION OF LUBRICITY TO
PURITY OF SAMPLE

| Date Sampled | Contamination[a], per cent | Lubricity-Board Measurements, seconds |
|---|---|---|
| 9-6-56 | <1 | 1.083 (slowest) |
| 11-6-56 | 1 | 1.053 |
| 9-12-56 | <1 | 1.030 |
| 9-19-56 | <1 | 1.028 |
| 10-18-56 | 1 | 1.025 |
| 8-10-56 | 1 | 1.021 |
| 9-27-56 | 1 | 1.017 |
| 8-28-56 | 2 | 1.007 |
| 10-29-56 | 1-2 | 1.006 |
| 10-4-56 | 1-2 | 0.982 |
| 8-20-56 | 2 | 0.971 |
| 10-12-56 | 2-3 | 0.968 |
| 12-22-56 | 2 | 0.965 |
| 11-30-56 | 2-3 | 0.952 |
| 11-15-56 | 2 | 0.936 (fastest) |

(a) Determined petrographically.

Inasmuch as the contamination figures were small, were close together, and could be prejudiced, the contaminants were removed from a sample of talc by froth flotation and the products were tested on the lubricity board.  The test results, which are also noticeable subjectively, are given in Table 3.

TABLE 3.  LUBRICITY-BOARD DATA ON FLOTATION PRODUCTS
OF ITALIAN TALC, SHOWING DELETERIOUS EFFECT
OF CONTAMINATION ON LUBRICITY

| Product | Lubricity-Board Measurement, seconds |
|---|---|
| Starting sample | 0.990 |
| Float product[a] | 1.046 (superior) |
| Nonfloat product[b] | 0.873 (inferior) |

(a) Essentially pure talc, representing 90 per cent of starting sample.
(b) 85 per cent talc, 15 per cent contaminants, representing 10 per cent of starting sample.

The essentially pure talc product produced a slower descent of the steel puck than did the unseparated sample, and the flotation tailings permitted a descent considerably faster than did the unseparated sample.  It may be concluded, on the basis of several experiments on the lubricity board, that the purer talc with the better slip requires a longer time for the puck to slide, while the samples more contaminated with granular "bearings" permit faster descents.  Although the details of practical beneficiation of this talc by froth flotation have yet to be worked out, the amenability of the talc to

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000001045

flotation and the obvious improvement in the purity and slip of the product indicate that beneficiation is a feasible consideration for the improvement of the Italian talc.

## C   THE RELATIONSHIP OF LUBRICITY TO PARTICLE-SIZE DISTRIBUTION

### Discussion

The desirable slip in talcum powder does not depend alone on the physical lubricity of the mineral but on numerous interdependent physical properties, one of the more important being particle-size distribution. The relative amount of grains in different size fractions, the extreme sizes, and the crystalline habit of grains of different sizes play a major role in lubricity. Comparatively larger grains in an otherwise fine powder may roll like bearings, plow, or act as barriers to the free movement of smaller platelets. Too large an amount of very fine grains may behave as "flour" despite their particle shape and may disrupt or may clog the movements of larger platelets.

Size distribution is reflected in bulk density, porosity, surface area, and average diameter measurements. The samples of Italian talc were found to have physical properties which fall within a small range of many of these measurements and which can be related to lubricity in some instances. Too many variable properties exist in talc to assess specific requirements for many physical measurements; however, in testing for acceptable talcs, those ores with properties similar to the Italian talc should also be expected to have measurements within or close to the range of those obtained on the Italian talc. The measurements should be a useful guide in the blending of talcs and for the rejection of inferior grades.

Battelle wishes to emphasize that immediate conclusions should not be drawn from the following physical measurements alone, inasmuch as they represent but half of the story. A forthcoming report which will deal further with lubricity and other physical properties such as whiteness, abrasiveness, and moisture content, will expand the list of the properties required for an acceptable talc. Although many talcs may be rejected because they fail to meet certain physical requirements presented here, acceptability involves additional factors.

### Particle-Size Distribution in Italian Talc

In a previous report to Johnson and Johnson[2], Battelle reported a dry screen analysis and a particle-size distribution of Italian talc based on both dry screening and sedimentation in water. These findings are repeated in Table 4. Further, extensive particle-size distribution studies were made showing that three replicate analyses of a large sample of Italian talc were closely reproducible and in close agreement with the earlier analyses, although obtained from a separate sample (Table 5). Appendix B contains a description of the procedure for particle-size analysis.

B A T T E L L E    M E M O R I A L    I N S T I T U T E

Protected Document--Subject to Protective Order

TABLE 4.   PREVIOUSLY REPORTED PARTICLE-SIZE
DISTRIBUTION DATA[2] ON ITALIAN TALC

**a.   Dry Screen Analysis**

| Tyler Mesh Size | Weight Per Cent |
|---|---|
| +150 | 0.1 |
| -150+200 | 1.8 |
| -200+270 | 2.1 |
| -270+325 | 13.5 |
| -325 | 82.5 |
| | 100.0 |

**b.   Approximate Particle-Size Distribution Based on Dry
Screening and Sedimentation in Water**

| Size | Approximate Weight Per Cent |
|---|---|
| -100+200 Mesh | 2 |
| -200+325 Mesh | 16 |
| -325 Mesh + 15 Microns | 62 |
| -15 Microns + 10 Microns | 9 |
| -10 Microns | 11 |
| | 100 |

TABLE 5.   PARTICLE-SIZE DISTRIBUTION OF THREE SAMPLES
OF ITALIAN TALC

| Size | Average Weight Per Cent | Per Cent Deviation From Mean |
|---|---|---|
| +200 mesh[a] | 1 | 0.12 |
| -200 mesh + 325 mesh | 10 | 0.97 |
| -325 mesh + 400 mesh (38 microns) | 7 | 1.3 |
| -38 microns + 30 microns | 57 | 5.18 |
| -30 microns + 15 microns | 12 | 0.8 |
| -15 microns | 13 | 3.1 |
| | 100 | |

(a) Tyler.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

11

To check the variation in particle-size distribution of the talc samples from Cranford, a series of measurements by dry screening and sedimentation were made on 12 samples. Table 6 lists the weight per cent of each size fraction. One of the samples, Cranford 10/4/56, might be eliminated statistically from the sample population; however, the variation is real and its data are included in the weight per cent deviation from the mean (Table 7). The effect of the variant sample shows clearly in the measurements of average particle size, specific surface, bulk density, and porosity (Tables 12, 15). The cause of the variation is not obvious petrographically, the sample being similar to the others except in size distribution. This variant sample demonstrates that the Pinerolo product is not uniform. Also, since the larger coarse fraction does not cause the expected effect on the lubricity measurement as do variations within the normal size distribution population, it shows that the matter of lubricity is more complex than is indicated by variations within a small range in particle-size distribution.

The Cranford samples have minor variations in particle-size distribution. In all of the samples, however, the -400 mesh (38 micron) + 30 micron fraction constitutes about one-half of the sample, with minor amounts in the smaller and larger fractions. This distribution should be kept in mind should platy talcs of other distributions be considered. Inasmuch as the size distribution may be as much a matter of the grinding and blending of ores as of the physical nature of the ore, fabrication of acceptable talcum powder from lower grade ore might be accomplished by a proper blend of sized fractions of platy talc.

## Correlation of Lubricity With Particle-Size Distribution Data

In order to correlate the particle-size distribution and lubricity data, a large sample of Italian talc was sized and the size fractions were tested on the lubricity board. Experiments clearly showed that the coarser fractions permitted a faster descent of the puck while the finer fractions produced a slower descent. This is apparently due to the more equidimensional bearing-like particles in the coarser fractions. Table 8 demonstrates the relationship of particle size to lubricity, showing the larger, more desirable, lubricity figures for the fines, the lower for the coarser, gritty fraction.

Inasmuch as the lubricity of talc involves the physical properties of material of various grain sizes, lubricity measurements were made on various proportional mixtures of specific particle-size fractions and on powders from which specific particle-size fractions were removed. In order to determine if the over-all lubricity was controlled by the coarse or by the fine sizes, a series of lubricity measurements was made on proportional mixtures of the fine (-400 mesh) and coarse (+250 mesh) sizes. Table 9 clearly shows that the control is in the relative amount of coarser to finer grains. That is, a small amount of coarse particles added to an otherwise fine powder has a pronounced adverse effect on lubricity, whereas a similar percentage addition of fine particles to an otherwise coarse grained powder has comparatively little effect on lubricity. It may be concluded from this study that the removal of the coarser particles, which tend to be more equidimensional, will improve the slip. On the other hand, the addition of fines to gritty or granular powders makes comparatively little improvement.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

TABLE 6.   PARTICLE-SIZE DISTRIBUTION OF TALC SAMPLED AT CRANFORD PLANT

| Date Collected | Weight Per Cent of Size Fractions | | | | | |
|---|---|---|---|---|---|---|
| | +200 Mesh | -200 Mesh +325 Mesh | -325 Mesh +400 Mesh | -400 Mesh +30 Microns | -30 Microns +15 Microns | -15 Microns |
| 9-6-56 | 0.47 | 5.44 | 6.83 | 65.72 | 10.76 | 10.78 |
| 11-6-56 | 0.51 | 5.13 | 7.75 | 56.66 | 16.49 | 13.46 |
| 9-12-56 | 0.92 | 8.30 | 7.85 | 60.76 | 10.23 | 11.94 |
| 9-19-56 | 0.84 | 5.54 | 7.65 | 55.79 | 16.42 | 13.88 |
| 10-18-56 | 0.96 | 7.86 | 7.27 | 58.07 | 13.32 | 12.52 |
| 9-27-56 | 0.59 | 4.48 | 6.77 | 56.52 | 15.93 | 15.71 |
| 8-28-56 | 0.50 | 4.34 | 6.89 | 56.39 | 16.18 | 15.71 |
| 10-4-56(a) | 1.22 | 6.38 | 9.36 | 40.02 | 31.74 | 11.28 |
| 8-20-56 | 0.65 | 6.08 | 7.98 | 57.53 | 16.64 | 11.12 |
| 12-22-56 | 0.88 | 3.42 | 12.30 | 52.27 | 20.01 | 11.12 |
| 11-30-56 | 0.72 | 6.38 | 10.33 | 57.86 | 11.21 | 13.50 |
| 11-15-56 | 0.88 | 6.93 | 9.91 | 48.72 | 22.08 | 11.48 |

(a) See comment under "Particle-Size Distribution in Italian Talc".

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000001049

TABLE 7.   DEVIATION IN PARTICLE-SIZE DISTRIBUTION IN WEIGHT PER CENT OF TALC SAMPLED AT THE CRANFORD PLANT

| Size | Deviation, weight per cent (Excluding Sample 10/4/56) | Deviation, weight per cent (Including Sample 10/4/56) |
|---|---|---|
| +200 mesh[a] | 0.26 | 0.39 |
| -200 mesh + 325 mesh | 2.44 | 2.44 |
| -325 mesh + 400 mesh (38 microns) | 1.78 | 1.78 |
| -38 microns + 30 microns | 8.50 | 12.85 |
| -30 microns + 15 microns | 5.42 | 10.75 |
| -15 microns | 3.72 | 3.72 |

(a) Tyler.

TABLE 8.   RELATIONSHIP OF LUBRICITY TO PARTICLE SIZE

| Tyler Mesh Size | Lubricity-Board Measurement, seconds |
|---|---|
| Unseparated | 0.990 |
| +200 | 0.889 |
| -200+250 | 0.951 |
| -250+270 | 0.980 |
| -270+325 | 1.030 |
| -325+400 | 1.043 |
| -400 | 1.099 |

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000001050

TABLE 9.   THE LUBRICITY OF MIXTURES OF COARSE AND FINE SIZES OF TALC, DEMONSTRATING THE CONTROL TO BE IN THE COARSE FRACTIONS

| Per Cent Fines (-400 Mesh) | Per Cent Coarse (+250 Mesh) | Lubricity-Board Measurement, seconds | Difference in Lubricity |
|---|---|---|---|
| 0 | 100 | 0.951 | |
| | | | .000 |
| 10 | 90 | 0.951 | |
| | | | .009 |
| 25 | 75 | 0.960 | |
| | | | .010 |
| 50 | 50 | 0.970 | |
| | | | .016 |
| 75 | 25 | 0.986 | |
| | | | .052 |
| 90 | 10 | 1.038 | |
| | | | .061 |
| 100 | 0 | 1.099 | |

Further measurements of the effect of particle-size distribution on lubricity were made by testing whole powder from which different size fractions had been removed. The measurements, Table 10, demonstrate that removal of the fines decreases the quality of the powder, whereas removal of the coarse fractions improves it. It would have to be determined by further tests of beneficiation products whether it is most advisable to remove entire size fractions or merely the small percentage of coarse contaminants.

TABLE 10.   LUBRICITY MEASUREMENTS OF ITALIAN TALC SAMPLES FROM WHICH SPECIFIC PARTICLE-SIZE FRACTIONS HAVE BEEN REMOVED

X Represents Fractions Removed From Whole Powder
U Represents Fractions Tested

| Tyler Mesh Size | Lubricity-Board Measurement of[a] Size Fractions | Test 1 | Test 2 | Whole Powder | Test 3 | Test 4 |
|---|---|---|---|---|---|---|
| +200 | 0.889 | U | U | U | X | X |
| -200+250 | 0.951 | U | U | U | X | X |
| -250+270 | 0.980 | U | U | U | U | X |
| -270+325 | 1.030 | X | U | U | U | U |
| -325+400 | 1.043 | X | U | U | U | U |
| -400 | 1.099 | X | X | U | U | U |
| Lubricity-Board Measurement | | 0.945 | 0.963 | 0.990 | 1.038 | 1.068 |
| | | | | Increase in slip ⟶ | | |
| Approximate Weight Per Cent of Fractions Removed | | 97. | 82. | 0. | 2. | 3. |

(a)  Repeated from Table 8 for comparative purposes.

B A T T E L L E     M E M O R I A L     I N S T I T U T E

JNJAZ55_000001051

## MOISTURE CONTENT

Of considerable importance to the lubricity of talc is its moisture content. This topic is more thoroughly treated in a forthcoming report. It is important, however, to note here that an increase in moisture content slows the descent of the puck on the lubricity board and falsely indicates superior lubricity. All of the Italian talc was found to contain a moisture content in the hundredths of one per cent. Analyses of various size fractions show that the moisture content is higher in the fine sizes, possibly due to adsorption on the greater surface area.

## MEASUREMENT AND CORRELATION OF OTHER PHYSICAL PROPERTIES RELATED TO LUBRICITY

### Surface Area Determinations by Nitrogen Adsorption

The relationship of lubricity to particle-size distribution has been shown to be a matter of friction and surface area, the finer platelets having the greater surface area per unit of weight.

Four samples of Italian talc from Cranford were measured for their surface area using the Brunauer, Emmett, Teller technique of nitrogen adsorption at liquid nitrogen temperatures (Table 11).

TABLE 11. SURFACE AREA MEASUREMENTS OF ITALIAN TALC, COMPARED WITH LUBRICITY-BOARD MEASUREMENTS

| Cranford Sample Date | Lubricity-Board Measurement, seconds | BET Surface Area Measurement, $m^2/g$ |
|---|---|---|
| 9-6-56 | 1.083 | 3.57 |
| 9-12-56 | 1.030 | 3.18 |
| 9-19-56 | 1.028 | 2.93 |
| 10-4-56 | 0.982 | 2.26 |

The tests show a relationship between surface area and lubricity, the samples with the greater surface area also having the larger lubricity measurements. The values are believed to be accurate to within 5 per cent.

### Average Diameter of Particles

An easily operated instrument for rapid particle-size determinations is the Fisher Subsieve Sizer. The instrument measures average particle size by determining the resistance to the flow of air by a weighed sample of powder under standard packing conditions. On the basis of the principle that a fluid meets less resistance to flow while

BATTELLE  MEMORIAL  INSTITUTE

Protected Document--Subject to Protective Order

TABLE 12.  COMPARISON OF THEORETICAL AVERAGE-DIAMETER MEASUREMENTS AND SPECIFIC SURFACE TO LUBRICITY-BOARD MEASUREMENTS OF CRANFORD SAMPLES

| Cranford Collection Date | Lubricity-Board Measurement, seconds | Theoretical Average[b] Particle Diameter | Specific Surface, $cm^2/g$ |
|---|---|---|---|
| 9-6-56 | 1.083 | 2.60 | 8392 |
| 11-6-56 | 1.053 | 2.65 | 8233 |
| 9-12-56 | 1.030 | 2.60 | 8392 |
| 9-19-56 | 1.028 | 2.45 | 8905 |
| 10-18-56 | 1.025 | 2.60 | 8392 |
| 8-10-56 | 1.021 | 2.80 | 7792 |
| 9-27-56 | 1.017 | 2.80 | 7792 |
| 8-28-56 | 1.007 | 2.75 | 7934 |
| 10-29-56 | 1.006 | 2.80 | 7792 |
| 10-4-56[a] | 0.982 | 3.30 | 6612 |
| 8-20-56 | 0.971 | 2.90 | 7524 |
| 10-12-56 | 0.968 | 2.90 | 7524 |
| 12-22-56 | 0.965 | 3.10 | 7038 |
| 11-30-56 | 0.952 | 3.30 | 6612 |
| 11-15-56 | 0.936 | 3.20 | 6818 |

(a) See comment under "Particle Size Distribution in Italian Talc".
(b) Determined on Fisher Subsieve Sizer.

B A T T E L L E    M E M O R I A L    I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000001053

penetrating a bed of coarse particles than while penetrating a bed of fine particles, a figure is derived which disregards the shape of the individual grains, porosity, size distribution and other variables. Inasmuch as the average diameter figure represents a theoretical sphere, the data are of relative rather than actual value. Average diameter measurements made on the Fisher Subsieve Sizer are shown in comparison with lubricity measurements (Table 12), demonstrating the correlation of small average diameters to talc with the larger lubricity measurement and larger average diameters to talc with the lower, less desirable, lubricity measurements. A clear-cut correlation of the theoretical average-particle-diameter measurements with the lubricity-board measurements is shown in Table 13.

### TABLE 13. RELATIONSHIP OF LUBRICITY-BOARD MEASUREMENTS TO THEORETICAL AVERAGE DIAMETERS ON SIZED FRACTIONS OF ITALIAN TALC

| Tyler Mesh Size | Lubricity-Board Measurements, seconds | Theoretical Average Particle Diameter, microns[a] |
|---|---|---|
| Unseparated | 0.990 | 2.60 |
| +200 | 0.889 | 7.40 |
| -200+250 | 0.951 | 3.60 |
| -250+270 | 0.980 | 2.50 |
| -270+325 | 1.030 | 2.35 |
| -325+400 | 1.043 | 2.25 |
| -400 | 1.099 | 2.10 |

(a) Determined on Fisher Subsieve Sizer.

### Specific Surface Calculated From Average Diameter

The average particle diameter as determined on the Fisher Subsieve Sizer may, by use of a simple equation, * be expressed in terms of specific surface in square centimeters per gram of dry powder. This is a simpler, less expensive method than nitrogen adsorption. Specific surfaces, as calculated from the average-particle-diameter measurements, are presented in Table 12 in comparison with lubricity. The calculated specific-surface figures, because of their derivation from average-particle-diameter measurements, are inversely correlative with particle size. The samples with the greater specific surfaces are those which impede the slide of the puck on the lubricity board, and which have better slip, while the samples with the smaller specific surfaces, those containing the larger particles, are the samples permitting faster descents of the puck on the lubricity board.

As in the case of the average particle-diameter measurement, the specific-surface calculations represent theoretical spheres which, since the powder is composed of platelets, are of relative rather than exact value. Whereas the surface area as determined by gas adsorption is relatively exact, the value of the surface-area figures derived from the theoretical average-particle-diameter measurements is purely comparative.

*Specific surface (cm$^2$/g) = $\dfrac{6 \times 10^4}{\text{average diameter } (\mu) \times \text{specific gravity of talc}}$ .

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_00001054

The relationship of specific surface to the lubricity of sized fractions of Italian talc is presented in Table 14, which shows that the fractions with the better lubricity also have the greater surface areas.

TABLE 14.   CORRELATION OF SPECIFIC SURFACE AND
LUBRICITY-BOARD MEASUREMENTS OF
SIZED FRACTIONS OF ITALIAN TALC

| Tyler Mesh Size | Lubricity-Board Measurements, seconds | Specific Surface, $cm^2/g$ |
|---|---|---|
| Unseparated | 0.990 | 8392 |
| +200 | 0.889 | 2948 |
| -200+250 | 0.951 | 6061 |
| -250+270 | 0.980 | 8727 |
| -270+325 | 1.030 | 9284 |
| -325+400 | 1.043 | 9697 |
| -400 | 1.099 | 10390 |

## Porosity

A measurement of porosity, independent of the other measurements, may be made on the Fisher Subsieve Sizer. The porosity figure represents the ratio of voids to the total volume of the packed sample, in a range of 0.40 to 0.80. Inasmuch as part of the test involves a manual operation, the results are subject to a human error. The porosity figures, however, are reproducible through the second decimal place. The range in porosity, 0.448 to 0.490, determined on the Cranford samples, is a relatively small range and should, by its close limits alone, be of assistance in evaluating Italian talc (Table 15). The more porous powders, those with the greatest amount of asymmetrical, platy grains, are also those with the larger lubricity-board measurements, hence the better slip. Correspondingly, the samples with the lower porosity, those containing the greater amount of equidimensional grains, are the powders which have the lower lubricity-board measurements.

Table 16 shows the porosity of sized fractions of Italian talc as compared with its lubricity-board measurements. The porosity is clearly shown to be less in the coarser fractions with the poorer slip and greater in the finer fractions.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

TABLE 15. POROSITY, BULK DENSITY, AND LUBRICITY OF CRANFORD SAMPLES

| Cranford Collection Date | Porosity Ratio | Bulk Density, lb/cu ft | Lubricity-Board Measurements, seconds |
|---|---|---|---|
| 9-6-56 | 0.490 | 22.942 | 1.083 |
| 11-6-56 | 0.480 | 22.958 | 1.053 |
| 9-12-56 | 0.475 | 23.259 | 1.030 |
| 9-19-56 | 0.456 | 23.437 | 1.028 |
| 10-18-56 | 0.452 | 22.860 | 1.025 |
| 8-10-56 | 0.460 | 23.528 | 1.021 |
| 9-27-56 | 0.464 | 23.096 | 1.017 |
| 8-28-56 | 0.470 | 22.642 | 1.007 |
| 10-29-56 | 0.461 | 22.491 | 1.006 |
| 10-4-56[a] | 0.475 | 24.061 | 0.982 |
| 8-20-56 | 0.460 | 23.756 | 0.971 |
| 10-12-56 | 0.455 | 23.429 | 0.968 |
| 12-22-56 | 0.452 | 22.616 | 0.965 |
| 11-30-56 | 0.448 | 22.725 | 0.952 |
| 11-15-56 | 0.450 | 22.583 | 0.936 |

(a) See comment under "Particle-Size Distribution in Italian Talc".

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000001056

TABLE 16.    CORRELATION OF POROSITY AND LUBRICITY-
BOARD MEASUREMENTS OF SIZED FRACTIONS
OF ITALIAN TALC

| Tyler Mesh Size | Lubricity-Board Measurements, seconds | Porosity Ratio |
|---|---|---|
| Unseparated | 0.990 | 0.448 |
| +200 | 0.889 | 0.401 |
| -200+250 | 0.951 | 0.426 |
| -250+270 | 0.980 | 0.439 |
| -270+325 | 1.030 | 0.446 |
| -325+400 | 1.043 | 0.442 |
| -400 | 1.099 | 0.455 |

## Bulk Density

The bulk density of ground talc may be measured on a Scott Volumeter. The Cranford talc samples were found to have bulk densities ranging between 22 and 25 pounds per cubic foot. Table 15 lists the bulk densities of the Cranford talc samples. The bulk-density measurement is not precise enough to accurately compare small differences but is valuable in establishing a range of acceptability. When sized fractions are tested, the bulk density is seen to have inverse relationships with porosity and specific surface and to have a direct relationship with average particle size. Thus, as shown in Table 17, bulk density is inversely correlative with lubricity as a function of particle size. The coarser fractions, with poorer slip have the higher bulk density; the finer fractions having the lower bulk density. The relationship of bulk density, moisture content, and lubricity is presented in a forthcoming report.

TABLE 17.    THE RELATIONSHIP OF BULK DENSITY TO
LUBRICITY-BOARD MEASUREMENTS OF
SIZED FRACTIONS OF ITALIAN TALC

| Tyler Mesh Size | Lubricity-Board Measurements, seconds | Bulk Density, lb/cu ft |
|---|---|---|
| Unseparated | 0.990 | 23.030 |
| +200 | 0.889 | 34.261 |
| -200+250 | 0.951 | 26.645 |
| -250+270 | 0.980 | 20.721 |
| -270+325 | 1.030 | 19.335 |
| -325+400 | 1.043 | 19.139 |
| -400 | 1.099 | 16.894 |

B A T T E L L E    M E M O R I A L    I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000001057

## CONCLUSIONS

Because this study represents but part of the picture of evaluating acceptable talc by means of its physical properties, it is not possible to state final conclusions without qualifications. Several relationships between physical properties, however, have been established for acceptable Italian talc and the range of their variations have been measured. A forthcoming report including studies of other physical properties will add to the picture and will indicate the course to follow for beneficiation of the Italian talc in order to improve its physical properties.

The physical properties of the Italian talc samples have been measured and the following ranges in values were obtained:

(1)  Contamination: from less than 1 to more than 3 per cent.

(2)  Crystallographic habit: more or less constantly 90 per cent platy, 10 per cent fibrous.

(3)  Lubricity-board measurement: from 0.936 to 1.083 seconds.

(4)  The ratio of voids to total volume: from 0.45 to 0.49.

(5)  Theoretical average particle diameter: from 2.45 to 3.30 microns.

(6)  Bulk density: from 22.49 to 24.06 lbs/cu. ft.

(7)  Specific surface: from 6612 to 8905 $cm^2/g$.

(8)  Moisture content: hundredths of one per cent.

(9)  Particle-size distribution:

| | |
|---|---|
| +200 mesh | 0.47 to 1.22 per cent |
| -200+325 mesh | 3.42 to 8.30 |
| -325+400 mesh (38 microns) | 6.77 to 10.33 |
| -38 microns + 30 microns | 40.02 to 65.72 |
| -30 microns + 15 microns | 10.23 to 22.08 |
| -15 microns | 10.78 to 18.23. |

Physical measurements on sized fractions of Italian talc showed the coarser particle fractions to have lower, less desirable, measurements on the lubricity board and the finer fractions to have the larger, more desirable, measurements. The sized fractions with the preferable lubricity were found to have the higher porosity and specific surface and the smaller particle size and bulk density (Table 18).

Lubricity-board studies on Italian talc fabricated to particular size distributions show that the lubricity is controlled by the relatively small amount of comparatively larger grains in an otherwise finer mixture. Lubricity-board studies also show that the lubricity of the Italian talc may be improved by the removal of the coarser size fractions. This is not a simple matter, however, as it involves the variation in size of the abrasive particles.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

TABLE 18.   SUMMARY OF PHYSICAL PROPERTIES OF SIZED FRACTIONS OF ITALIAN TALC

| Tyler Mesh Size | Lubricity-Board Measurements, seconds | Average Diameter, microns | Specific Surface, cm$^2$/g | Porosity Ratio | Bulk Density, lb/cu ft |
|---|---|---|---|---|---|
| Unseparated | 0.990 | 2.60 | 8392 | 0.448 | 23.030 |
| +200 | 0.889 | 7.40 | 2948 | 0.401 | 34.261 |
| -200+250 | 0.951 | 3.60 | 6061 | 0.426 | 26.645 |
| -250+270 | 0.980 | 2.50 | 8727 | 0.439 | 20.721 |
| -270+325 | 1.030 | 2.35 | 9284 | 0.446 | 19.335 |
| -325+400 | 1.043 | 2.25 | 9697 | 0.442 | 19.139 |
| -400 | 1.099 | 2.10 | 10390 | 0.455 | 16.894 |

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000001059

23 and 24

Measurements on flotation products show that the removal of the small per cent of contaminants improves the lubricity of the talc .

The physical properties of the Italian talc can be improved, with the least possible loss of sample, by removing the mineral contaminants from either the coarse fractions or from the sample as a whole.  This appears to be one clear cut course to follow in improving the Italian talc.

(The original notes on the laboratory work described in this report are in Battelle Laboratory Record Books No. 12667, pages 1 through 71, and No. 13034, pages 1 through 77.  The work was done in the period from November 7, 1956, to September 30, 1957.)

## BIBLIOGRAPHY

(1)  Sclar, C. B., et al., "A Review and Appraisal of the Literature on Talc Deposits of the United States", Battelle Report to Johnson and Johnson (May 11, 1955).

(2)  Sclar, C. B., et al., "An Investigation of Selected Talc Deposits of the United States", Battelle Report to Johnson and Johnson (February 29, 1956).

(3)  Smith, W. L., and Snider, R. H., "Investigation of the Salgada and Casa Nova Talc Deposits of Brazil", Battelle Report to Johnson and Johnson (May 28, 1957).

(4)  Smith, W. L., Letter Report to Johnson and Johnson on the Talc Deposits of Madoc, Canada (July 25, 1957).

WLS:rr

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

APPENDIX A


DESCRIPTION OF LUBRICITY BOARD
AND TECHNIQUE OF OPERATION


BATTELLE    MEMORIAL    INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000001061

A-1 and A-2

# APPENDIX A

## DESCRIPTION OF LUBRICITY BOARD
## AND TECHNIQUE OF OPERATION

The experimental device described as the lubricity board in this report consists of a wooden plane inclined at 25 degrees, which is lightly, but completely, covered with talc. The lubricity is determined by measuring the time it takes a steel puck to slide over two microswitches which actuate an electric timer.

The inclined plane is made of 6-ply birch plywood, 3/4 inch thick, 6 inches wide, and 6 feet long. The even-grained wood was sanded smooth to prevent the grain from influencing the descent of the puck. Twenty-five degrees was selected as the inclination from horizontal after much experimentation which showed it to be the minimum angle at which a sustained slide could be made on all of the Italian talc samples.

The microswitches are located 6 inches from each end of the slide, in the middle of the board, making the measured path a length of 5 feet. The microswitches are connected to a double-pole, 115-volt, Struthers-Berm lock-in relay which actuates a Standard Electric Time Company electric timer. The steel puck weighs 226 grams, is 3/4 inch by 2-1/2 inches, has rounded edges, and presents a circular sliding surface of 1-3/4 inches diameter. Such are obtainable from amusement equipment distributors as a piece used in the game of American Shuffleboard. One flat surface of the puck was ground smooth and polished for the lubricity experiments.

The talc is applied to the lubricity board from a 9-ounce Johnsons' Baby Powder can until a thin even layer is present over the measured path. The puck is manually released from a dead start from the top of the slide, 6 inches above the first microswitch. For purposes of eliminating errors of freak descents, lubricity is measured as the average of 50 runs. The board is newly covered with talc after each 10 runs, although no difference in lubricity measurements could be accounted for between those early and late in a series. The puck was washed in warm water and thoroughly dried between runs.

**B A T T E L L E   M E M O R I A L   I N S T I T U T E**

Protected Document--Subject to Protective Order

# APPENDIX B

## PROCEDURE FOR PARTICLE-SIZE ANALYSIS

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

B-1

## APPENDIX B

## PROCEDURE FOR PARTICLE-SIZE ANALYSIS

In a previous report to Johnson and Johnson from Battelle[2] a procedure for sizing Italian talc was outlined. For purposes of the present investigation, the following procedure was developed by D. A. Jacobs of the Battelle staff.

One hundred grams of talc is wet screened at 325 mesh with water. The +325 mesh product is dried and dry screened on a Ro-Tap for 30 minutes producing +200, 200 x 325, and -325 mesh fractions. The -325 mesh fraction of the dry screening is combined with the -325 mesh product of the wet screening. A suspension of -325 mesh material is allowed to settle through a 10-centimeter column in a 4-liter beaker to which sodium silicate has been added in the amount of 1 pound per ton, and agitated for a period of 10 minutes. The sodium silicate is added to the first 30-minute settling of each sample only. At the end of the first 30-minute cycle, the supernatant column of liquid is siphoned off. This liquid contains the -15 micron fraction. Four cycles are required to remove the -15 micron fraction entirely. Another series of 4 cycles with settling times of 5 minutes produces the 15 x 30-micron fraction, which is siphoned off, plus sands of 30 microns x 325 mesh. The sands are dried and dry screened at 400 mesh on a Ro-Tap for 30 minutes, producing 325 x 100 mesh and 400 mesh x 30 micron fractions. The sizing flowsheet is presented as Figure B-1.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000001064

B-2

100-gram talc sample

Wet screen at 325 mesh with water

+325 mesh  ·  −325 mesh

Dry

Dry screen (Ro-Tap 30 minutes)

+200 mesh   200 x 325 mesh   −325 mesh

Add 1 pound of sodium silicate per ton and agitate for 10 minutes

Sedimentation in water, 4 cycles, column depth 10 centimeters

Settle for 30 minutes, 4 cycles

Supernatant, −15 microns   Sands

Settle for 5 minutes, 4 cycles

Supernatant, 15 x 30 microns   Sands, 30 microns x 325 mesh

Dry

Dry screen at 400 mesh (Ro-Tap for 30 minutes)

325 x 400 mesh

400 mesh x 30 microns (38 microns)

FIGURE B-1.  STANDARD FLOWSHEET FOR SIZING OF TALC SAMPLES

B A T T E L L E     M E M O R I A L     I N S T I T U T E

Protected Document--Subject to Protective Order

Exhibit 23

# PROGRESS REPORT



BATTELLE



Protected Document--Subject to Protective Order

PROGRESS REPORT

on

THE PHYSICAL CONCENTRATION
OF TALC ORES — FLOTATION

to

JOHNSON AND JOHNSON

May 23, 1958

by

W. E. Brown, W. L. Smith, and R. D. Macdonald

BATTELLE MEMORIAL INSTITUTE
505 King Avenue
Columbus 1, Ohio

*Battelle is not engaged in research for advertising, sales promotion, or publicity
purposes, and this report may not be reproduced in full or in part for such purposes.*

Protected Document--Subject to Protective Order

Battelle has always had a policy that its name and its reports could not be used for advertising, sales promotion, or publicity purposes. Provision has been made for this in all of our research agreements and we have found that our sponsors have respected and accepted this position. This did not, of course, interfere in any way with any use the sponsor might make of the information in the report, as long as our name was not used, nor did it interfere with the use of the report within the sponsor's organization for conveying information to all of those concerned with the research project.

We have found on a few occasions that use of our reports in connection with an advertising program has occurred, probably inadvertently, because the individual using the report was unaware of this agreed-upon provision, even though his company had accepted our agreement. Furthermore, there may be people who see and use our reports with the sponsor's approval who are not necessarily connected with the sponsor who had agreed to our provisions. We may have been remiss in not indicating on our reports the provisions that govern their use. Henceforth, the following statement will be included with each of our research reports, as is shown on the title page of this report:

"Battelle is not engaged in research for advertising, sales promotion, or publicity purposes, and this report may not be reproduced in full or in part for such purposes."

rotected Document--Subject to Protective Order

JNJNL61_000001344

# Battelle Memorial Institute

5 0 5    K I N G    A V E N U E    C O L U M B U S    I,    O H I O

May 28, 1958

Dr. W. H. Lycan
Director of Research
Johnson and Johnson
New Brunswick, New Jersey

Dear Dr. Lycan:

We are transmitting herewith six copies of our Progress Report on "The Physical Concentration of Talc Ores -- Flotation", by W. E. Brown, W. L. Smith, and R. D. Macdonald.

The data in this report show that it is possible to make from Italian No. 2 grade, by flotation, a talc product that is superior to the Italian No. 1 grade. We now have enough laboratory data to design either a pilot plant to produce larger quantities of this material for critical evaluation, or a commercial plant to produce a nominal 50 tons of beneficiated talc per day.

The data in this report indicate that it may be possible to produce a superior talc by flotation from any raw talc which contains an appreciable percentage of platy talc. We do not, however, have enough data as yet to prove this point. Additional experimental work is required to show whether by flotation one can make an acceptable product from other raw materials, such as Indian talc.

After you have reviewed this report, we would be pleased to discuss it with you or to answer any questions which may arise.

Sincerely yours,

*O. F. Tangel*

O. F. Tangel, Chief
Minerals Beneficiation Division

OFT:dpc
Enc. (6)

D E D I C A T E D    T O    T H E    A D V A N C E M E N T    O F    S C I E N C E

rotected Document--Subject to Protective Order

## TABLE OF CONTENTS

|  | Page |
|---|---|
| SUMMARY | 1 |
| INTRODUCTION | 3 |
| EXPERIMENTAL WORK | 4 |
|     Samples Tested | 4 |
|         Sample From the Oasis Mine | 5 |
|         Sample From the Stone Creek Mine | 9 |
|         Italian No. 2 Talc | 10 |
|         Detailed Flotation Experiments on Italian No. 2 Talc | 11 |
| CONCLUSIONS | 15 |
| FUTURE WORK | 16 |

APPENDIX A

| DETAILS OF FLOTATION WORK | A-1 |
|---|---|

APPENDIX B

| FROTH FLOTATION | B-1 |
|---|---|

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJNL61_000001346

# PHYSICAL CONCENTRATION OF TALC ORES — FLOTATION

by

W. E. Brown, W. L. Smith, and R. D. Macdonald

## SUMMARY

This report contains data for the physical concentration of talc ores by flotation methods.

Flotation experiments were made on two talc samples from the United States and one from Italy. Most of the tests were made on the Italian talc because it was considered to be of the most immediate importance.

The principal objective of the program was to obtain a product containing a high percentage of platy talc. The results of the tests show that each of the three different samples can be treated to yield a float product that is significantly improved in its content of platy talc. Table 1 summarizes the best results obtained and compares the raw flotation feed with the beneficiated product.

Table 1 shows that both the Oasis and Stone Creek samples were improved in grade. The original Oasis sample contained 48 per cent platy talc and the Float 1 product contained 83 per cent platy talc. The Stone Creek sample contained 30 per cent platy talc and the Float 1 product contained 85 per cent platy talc. Although these flotation products show a substantial improvement in platy-talc content, they lack about 5 per cent of being equivalent to the 88 to 90 per cent platy-talc content of Italian No. 1 grade which is currently being used by Johnson and Johnson as the raw material for baby powder.

Although the desired grade of at least 88 to 90 per cent platy talc was not attained on either the Oasis or Stone Creek samples, a substantial improvement was obtained as the result of relatively few tests. It is expected that a suitable method can be developed, through additional work, to yield a satisfactory product from the Oasis and Stone Creek talcs.

Italian No. 2 talc likewise responded favorably to flotation. Two methods were developed which yielded products that contained 96 to 97 per cent platy talc and 2 to 3 per cent of fibrous talc. Mineralogically, these products are superior to the Italian No. 1 talc which is being used by Johnson and Johnson for baby powder.

The flotation experiments established that the nonplaty talc can be depressed by using the proper amounts of either Dextrin* or hydrochloric acid. When Dextrin was used the froth of the float products was very voluminous and persistent which probably would create handling and filtering problems in full scale operations. When hydrochloric acid was used the character of the froth appeared normal and rapid filtration was obtained.

---

* Dextrin is made by the hydrolysis of starch and is manufactured by Clinton Foods Incorporated, under the name of Dextrin 603.

Protected Document--Subject to Protective Order

TABLE 1.  SUMMARY OF FLOTATION RESULTS

| Sample | Product | Weight Per Cent of Flotation Feed | Mineral Count, per cent | | | | Effective Reagent |
|---|---|---|---|---|---|---|---|
| | | | Platy Talc | Nonplaty Talc | Carbonates | Tremolite | |
| Oasis | Feed | 100.0 | 48 | 43 | 5 | 4 | --- |
| Oasis | Float 1 | 34.6 | 83 | 16 | <1 | 1 | Dextrin |
| Stone Creek | Feed | 100.0 | 30 | 67 | 1 | 2 | --- |
| Stone Creek | Float 1 | 29.9 | 85 | 12 | 1 | 2 | None |
| Italian No. 2 | Feed | 100.0 | 90 | 6 | 3 | 1 | --- |
| Italian No. 2 | Float 1 | 83.9 | 96 | 3 | <1 | <1 | Dextrin |
| Italian No. 2 | Float 1, 2 and scavenger | 82.7 | 97 | 2 | <1 | 1 | Hydrochloric acid |
| Italian No. 1 | Not treated | 100.0 | 88-90 | 8-10 | <2 | Trace | --- |

Note:  Italian No. 1 is included for comparison.

BATTELLE  MEMORIAL  INSTITUTE

Protected Document--Subject to Protective Order

JNJNL61_0000013

3

One objection to the use of Dextrin, other than the unsatisfactory frothing properties, would be the possibility of fungus growth on the talc particles if it were not washed out completely or destroyed by heat during the drying operations.


## INTRODUCTION


Johnson and Johnson is interested in a broad program which includes investigating the important talc deposits in the world, the measurement of the physical properties of talc, and the physical beneficiation of talc. The purpose of these investigations is to insure Johnson and Johnson of the least expensive and most reliable raw-material source and also to develop methods for further improving the properties of the talc used in baby powder.

At present, Johnson and Johnson is obtaining raw material for baby-powder talcum from Italian deposits. This talc is regarded as very good quality. Some additional improvement in quality is desirable, however, and may be possible by physical beneficiation methods. None of the known domestic talc deposits can compare in quality with the Italian talc, and part of this program is devoted to processing talcs from the more suitable domestic sources in order to obtain a product that is comparable in quality with the Italian talcs.

This Progress Report discusses information obtained on methods of improving the properties of talc. This work is identified on the over-all program being conducted at Battelle as Phase 3 — Physical Concentration of Talc Ores.

The specific objectives of Phase 3 are:

(1) To obtain a product which consists essentially of talc platelets

(2) To reject talc particles which are of a size and shape that create unpleasant dusting while dispensing talc from a container

(3) To obtain a talc product with an obvious sheen in order to convey to the consumer the immediate impression that the talc is of the highest quality.

In addition to achieving the foregoing objectives, it is desirable that the finished product will meet the following specifications.

Moisture: Not more than 0.15 per cent.

Solubility in Hydrochloric Acid: Not more than 6 per cent.

Fineness: Not less than 99.7 per cent through a 100-mesh sieve.
Not less than 98.5 per cent through a 200-mesh sieve.

Microscopic Structure: Shall be platelets, and show no acicular or excessive granular crystals.


BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

4

| Bulk Density: | Not less than 22 nor more than 27 pounds per cubic foot, when tested by the Scott Volumeter. |

In further keeping with the standards of production, it is desirable that the finished talc product have essentially the same whiteness as that currently being marketed by Johnson and Johnson.  Another objective is to reduce the alkalinity of the raw material so that the pH value of a moistened sample will approximate neutrality, or a pH of 7.

Products obtained from physical beneficiation experiments can be evaluated by microscopic examination and other physical measurements.   These other physical measurements and their meaning are related to the properties of an accepted standard talcum product.  A Progress Report on "Studies of the Physical Properties of Talc, Their Measurement and Comparison", October 15, 1957, by W. L. Smith, has been submitted to Johnson and Johnson on this subject and a second and summarizing one is in preparation.

The only method of physical beneficiation employed so far has been flotation.  This is because one of the outstanding properties of talc, from the standpoint of physical beneficiation, is its natural floatability.

This report is composed principally of results from froth-flotation experiments. For this reason a short discussion of the froth-flotation process is included as Appendix B in the hope that it may be helpful in understanding the experiments.

## EXPERIMENTAL WORK

### Samples Tested

Three samples from separate sources were used for the beneficiation experiments. Two of these are from the United States and one from Italy.  These samples have a wide variety of purity with respect to degree of platiness and the contained impurities, and probably are typical of what may be expected in talc deposits of potential interest.

Table 2 shows the composition of these samples as determined by microscopic count.

TABLE 2.  MINERALOGICAL COMPOSITION OF SAMPLES INVESTIGATED

| | Mineral Count, per cent | | | | |
| Sample | Platy Talc | Nonplaty Talc | Carbonates | Tremolite | Grind |
|---|---|---|---|---|---|
| Oasis Mine (Nevada) | 48 | 43 | 5 | 4 | Minus 65 mesh (dry) |
| Stone Creek Mine (Montana) | 30 | 67 | 1 | 2 | Minus 65 mesh (dry) |
| Italian No. 2 | 90 | 6 (fibrous) | 3 | 1 | Minus 200 mesh (as received) |
| Italian No. 1 | 88-90 | 8-10 (fibrous) | <2 | Trace | Minus 200 mesh (as received) |

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJNL61_0000013

The mineral count given in Table 2 is made solely on the basis of incidence.  No emphasis is given to the size of the particle encountered in the incidence, so the method of evaluation may at first seem questionable.  However, repeated counts made on different fields of the same sample and different samples of the same material give surprisingly consistent percentages, and the percentages of carbonate present agree with chemical determinations of acid solubility.  Because of this consistency, the method was accepted as sufficiently accurate for most of the investigations.

Particles in Table 2 which are identified as nonplaty talc may be composed of acicular, fibrous, granular, or cryptocrystalline aggregates of tiny platelets which resemble granules.

Nonplaty talc contained in the Italian samples is mostly fibrous or acicular in form.  It is difficult to distinguish acicular talc from remnants of platelets and tremolite in sizes smaller than 10 microns.

Table 2 includes, for comparison, the composition of the Italian No. 1 grade which is the raw material currently used in Johnson and Johnson baby powder.  The mineralogical difference between the No. 1 and No. 2 grades is almost insignificant.  Italian No. 1 talc, however, costs several dollars more per ton.  The Oasis and Stone Creek Mine samples were selected to determine whether talc of a low platy content could be improved sufficiently to compare favorably with the Italian talc and, if so, what recovery might reasonably be expected.  Data on the beneficiation of various talcs would provide information that would permit an estimate of the tonnage of material necessary to supply the production requirements of Johnson and Johnson.  Information could also be developed for the probable cost of beneficiation.

Ten exploratory experiments were made to observe the general response of the minerals during flotation and to learn the relative complexity of the problem.  The summarized results of these experiments were contained in our letter report of January 24, 1958, to Dr. W. H. Lycan.


Sample From the Oasis Mine

The Oasis Mine sample came from Nevada and was supplied by the Sierra Talc and Clay Company.  This material was available because it had been previously investigated by Battelle[1] for Johnson and Johnson as a potential raw talc source.  The material on hand had been roll-crushed and then ground in a disc pulverizer through 65 mesh.

This sample, which contained about 48 per cent platy talc and 43 per cent granular talc, was selected for part of the investigation specifically because of its intermediate platy-talc content.  It was believed that any significant improvement made on the ore would be more readily detected on low-grade materials than on high-grade materials.

Table 3 shows the flotation results obtained from five tests made on the Oasis sample and Table 4 gives the test operating conditions.

The results given in Tables 3 and 4 show that the Oasis talc in Test 1 was floated without any reagents and the platiness of the talc was increased from 48 per cent to 77 per cent.  This definitely establishes that platy talc is more readily floated than granular

---

(1) Battelle Summary Report, February 29, 1956.

Protected Document--Subject to Protective Order

JNJNL61_000001351

TABLE 3.  SUMMARY OF FLOTATION RESULTS ON OASIS TALC SAMPLE (MINUS 65 MESH)

| Test | Product | Weight Per Cent | Platy | Nonplaty | Carbonates | Tremolite | Reagents Used |
|------|---------|-----------------|-------|----------|------------|-----------|----------------|
| | | | Approximate Mineral Count, per cent | | | | |
| 1 | Float 1 | 32.2 | 77 | 20 | 1 | 3 | None |
| | Float 2 | 27.0 | 45 | 50 | 2 | 3 | Dowfroth 200 |
| 2 | Float 1 | 32.4 | 75 | 24 | < 1 | < 1 | None |
| | Float 2 | 36.4 | 45 | 45 | | 10 | Dowfroth 200 |
| 3 | Cleaner float | 31.6 | 80 | 18 | 1 | 1 | Dowfroth 200 |
| 5a | Float 1 | 34.6 | 83 | 16 | < 1 | 1 | Dextrin |
| 8 | Float 1 | 26.9 | 82 | 15 | 1 | 2 | Dextrin |
| | Float 2 | 56.3 | 60 | 35 | 1 | 4 | |
| | Flotation feed | 100.0 | 48 | 43 | 5 | 4 | |

TABLE 4.  TEST CONDITIONS USED TO OBTAIN RESULTS ON OASIS TALC SAMPLE

| Test | Product | Wetting | Conditioning | Floating | Pulp pH | Per Cent Solids in Feed | Reagent, pound per ton of flotation feed |
|------|---------|---------|--------------|----------|---------|--------------------------|-------------------------------------------|
| | | Time, minutes | | | | | |
| 1 | Float 1 | 10 | 0 | 5 | 8.6 | 13.0 | None |
| | Float 2 | 0 | 0 | 5 | | | Dowfroth 200, 0.17 |
| 2 | Float 1 | 10 | 0 | 5 | 8.6 | 6.8 | None |
| | Float 2 | 0 | 0 | 5 | | | Dowfroth 200, 0.34 |
| 3 | Cleaner float | 2 | 10 | 5 | | 9.0 | None |
| 5a | Float 1 | 5 | 5 | 5 | 8.6 | 13.0 | Dextrin, 0.54 |
| 8 | Float 1 | 5 | 5 | 5 | 8.6 | 13.0 | Dextrin, 0.94 |

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJNL61_0000013

talc.  The only requirement was agitation and aeration of the pulp.  Additional recovery of talc was obtained by using Dowfroth 200 (a frothing and collecting reagent for talc) but the float product was essentially the same quality as the feed.  Carbonates in the Float 1 product were reduced from 5 per cent to 1 per cent or less.  Tremolite was more difficult to reject although less than 1 per cent was observed in the Float 1 product of Test 2.  Tremolite rejection was accomplished by reducing the per cent solids in the flotation feed from 13 per cent to 6.8 per cent.  Test 3 was made by refloating the combined Float 1 and Float 2 products of Test 1.  This yielded a product which was 80 per cent platy talc and contained 31.6 per cent of the original feed weight.

Because platy talc is more readily floated than nonplaty talc, it was believed that the addition of a talc depressant such as Dextrin might have a selective depressing action on the nonplaty talc forms which had appeared in the Float 1 products.  Dextrin was used in Tests 5a and 8, and the results show that Dextrin in the amount of 0.54 pound per ton of flotation-feed solids was effective and helped to produce a Float 1 product that was about 83 per cent platy talc.  Dextrin in this amount appeared to be effective in causing a small increase in recovery.  In Test 8, the Dextrin added was increased to 0.94 pound per ton of flotation-feed solids.  The quality of the Float 1 product was essentially the same as in Test 5a, but the weight recovery decreased to 26.9 per cent compared with 34.6 per cent when the lesser amount of Dextrin was used.

The results of the five tests on the Oasis talc show that although none of the products obtained were mineralogically equivalent to the Italian talc, substantial improvement had been obtained.  The best results were obtained from Test 5a which yielded a product containing 83 per cent platy talc.  A comparison of the Oasis Float 1 product with the Italian samples is given in Table 5.

TABLE 5.  COMPARISON OF OASIS FLOAT 1 WITH ITALIAN NO. 1 AND NO. 2 TALCS

| | Weight Per Cent | Mineral Count, per cent | | | | |
| | | Platy Talc | Fibrous Talc | Granular Talc | Carbonates | Tremolite |
|---|---|---|---|---|---|---|
| Test 5a, Float 1 | 34.6 | 83 | 2 | 14 | <1 | 1 |
| Italian No. 1 | 100.0 | 88-90 | 8-10 | 0 | <2 | Trace |
| Italian No. 2 | 100.0 | 90 | 6 | 0 | 3 | 1 |

The quality of the Float 1 product approaches that of the Italian No. 1 talc, and it is not unreasonable to expect that an equivalent grade might be developed after further investigations.

The products of Test 8, which gave results of the same order as Test 5a were examined microscopically in considerable detail.  Each flotation product was sized on a 200-mesh sieve and the oversize and undersize evaluated.  These results are shown in Table 6.

The data given in Table 6 show that in the Float 1 product the plus 200-mesh talc is 61 per cent platy talc but the minus 200-mesh talc is 87 per cent platy talc.  It is implied that better over-all results would have been obtained by grinding the Oasis sample all through 200 mesh before floating.  This was not tried, and if necessary it can be done at a later stage in the program.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJNL61_000001353

8.

TABLE 6.  RESULTS OF MICROSCOPIC EVALUATION OF FLOTATION
PRODUCTS FROM OASIS TALC, TEST 8

| | | Mineral Count, per cent | | | |
|---|---|---|---|---|---|
| | Weight Per Cent | Platy Talc | Nonplaty Talc | Carbonates | Tremolites |
| Flotation Feed | | | | | |
| -65+200 mesh | 30 | 45 | 45 | 4-5 | 4 |
| -200 mesh | 70 | 49-50 | 40-43 | 4-5 | 3-4 |
| All-200 mesh[a] | 100 | 48 | 43 | 4-5 | 3-4 |
| Float 1 | | | | | |
| -65+200 mesh | 29 | 61 | 37 | <1 | 2 |
| -200 mesh | 71 | 87 | 10 | <1 | 2 |
| All-200 mesh[a] | (26.9) | 82 | 15 | <1 | 2 |
| Float 2 | | | | | |
| -65+200 mesh | 50 | 24 | 71 | 1 | 4 |
| -200 mesh | 50 | 70 | 25 | 1 | 4 |
| All-200 mesh[a] | (56.3) | 60 | 35 | 1 | 4 |
| Underflow | | | | | |
| -65+200 mesh | 18 | 20 | 54 | 18 | 8 |
| -200 mesh | 82 | 22 | 54 | 15 | 9 |
| All-200 mesh[a] | (16.8) | 25 | 51 | 16 | 8 |

(a) Some of the plus 200-mesh particles that appear to be nonplaty are actually aggregates of minute platelets which become discrete platelets when ground finer than 200 mesh.  A more accurate mineral count is obtained by grinding the entire product and then evaluating with the microscope.  In addition to this, a minus 200-mesh product has a narrower range of sizes than a minus 65-mesh product which increases the accuracy of a microscopic count and finally, the minus 200-mesh product has a size range similar to the Italian talcs discussed in detail later in the report.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJNL61_0000013

Sample From the Stone Creek Mine

The Stone Creek mine sample came from Montana and was supplied by the Southern California Minerals Company.  This material was available because it also had been previously investigated by Battelle[1] for Johnson and Johnson as a potential raw talc source.  The material on hand had been prepared to minus 65-mesh size in the same manner as the Oasis sample.

This sample contained 30 per cent platy talc and 67 per cent nonplaty talc.

Two flotation tests were made, and the results are given in Table 7.  Table 8 lists the operating conditions during the tests.

TABLE 7.  SUMMARY OF FLOTATION RESULTS ON STONE CREEK TALC SAMPLES (MINUS 65 MESH)

| Test | Product | Weight Per Cent | Approximate Mineral Count, per cent | | | |
|------|---------|------|-------|----------|------------|-----------|
| | | | Platy | Nonplaty | Carbonates | Tremolite |
| 4 | Float 1 | 29.9 | 85 | 12 | 1 | 2 |
| | Float 2 | 13.1 | 30 | 60 | 10 | |
| 6 | Float 1 | 25.5 | 86 | 10 | 2 | 2 |
| | Flotation feed | 100.0 | 30 | 67 | 1 | 2 |

TABLE 8.  TEST CONDITIONS USED TO OBTAIN RESULTS ON STONE CREEK SAMPLE

| Test | Product | Time, minutes | | | Pulp pH | Per Cent Solids in Feed | Reagent, pounds per ton of flotation feed |
|------|---------|---------|--------------|----------|------|------|------|
| | | Wetting | Conditioning | Floating | | | |
| 4 | Float 1 | 10 | 0 | 3 | 9.0 | 13 | None |
| | Float 2 | 0 | 0 | 3 | | | None |
| 6 | Float 1 | 5 | 5 | 5 | 8.8 | | Dextrin, 0.54 $Na_2SiO_3$, 1.08 |

Test 4 shows that about 30 per cent of the talc is recovered in a float product containing 85 per cent platy talc.  No reagents were used, which illustrates again that platy talc is more readily floated than nonplaty talc.  Test 6 yielded a float product that contained 86 per cent platy talc and 10 per cent nonplaty talc.  Dextrin and sodium silicate were used to reject the nonplaty talc but the effect, from the amounts used, was not pronounced.

The quality of the Float 1 products approaches that of the Italian No. 1 talc which is 85-90 per cent platy talc.  Through additional experimentation a method probably can be developed, to treat the Stone Creek talc, which will yield a product of quality equivalent to Italian No. 1 talc.

(1) Battelle Summary Report, February 29, 1956.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJNL61_000001355

Italian No. 2 Talc

Three tests were made on Italian No. 2 talc as part of the exploratory program, and the results are given in Table 9. Tests 10 and 11 were made at 6.8 and 13.0 per cent solids, respectively, using the same reagent combination in each, to determine the weight recovery obtained at low and intermediate per cent of feed solids. The results show that at 6.8 per cent feed solids the weight recovery was 75.3 per cent while at 13.0 per cent solids the weight recovery was 85.9 per cent. Test 12 was made at 13.0 per cent solids, without any reagents, to compare with Test 11. The results show that the Float 1 product was no better than the flotation feed and also only 59.9 per cent of the weight was floated. In Test 10 the froth of the Float 1 product was broken down easily, but in Test 11 the froth was very difficult to break down and filter. Undoubtedly this would present handling difficulties in a plant.

A summary of these results indicates that:

(1)  Better recoveries are possible when using 13.0 per cent feed solids compared with 6.8 per cent feed solids.

(2)  Dextrin is effective in reducing the amount of nonplaty (fibrous) talc in the Float 1 product.

(3)  Dowfroth 200 is needed to obtain good weight recovery.

(4)  The froth of the float products is easy to break down when the per cent feed solids is low. However, the lower per cent feed solids results in a lower yield of Float 1.

Following these exploratory experiments, a program was started to improve the froth characteristics without sacrificing the platiness of the Float 1 product and to maintain or raise the per cent of weight recovery. Forty-four flotation tests were made, all on Italian No. 2 talc.

TABLE 9. SUMMARY OF PRELIMINARY FLOTATION RESULTS ON ITALIAN NO. 2 TALC

| Test | Product | Weight Per Cent | Approximate Mineral Count, per cent | | | |
| | | | Platy | Nonplaty | Carbonates | Tremolite |
|------|---------|-----------------|-------|----------|------------|-----------|
| 10 | Float 1 | 75.3 | 96 | 3 | < 1 | < 1 |
| 11 | Float 1 | 85.9 | 96 | 3 | < 1 | < 1 |
| 12 | Float 1 | 59.9 | 89 | 8 | 2 | 1 |
| | Flotation feed | 100.0 | 90 | 6 | 3 | 1 |

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJNL61_0000013

TABLE 10.  TEST CONDITIONS USED TO OBTAIN RESULTS OF TESTS 10, 11, and 12

| Test | Product | Wetting | Time, minutes Conditioning | Floating | Pulp pH | Per Cent Solids in Feed | Reagent, pounds per ton of flotation feed |
|------|---------|---------|------------|----------|---------|---------|---------|
| 10 | Float 1 | 5 | 5 | 10 | 8.7 | 6.8 | Dextrin, 0.94 Dowfroth 200, 0.34 |
| 11 | Float 1 | 5 | 5 | 10 | 9.0 | 13.0 | Dextrin, 0.94 Dowfroth 200, 0.34 |
| 12 | Float 1 | 10 | 0 | 10 | 8.9 | 13.0 | None |

## Detailed Flotation Experiments on Italian No. 2 Talc

The methods considered in these tests called for trying various quantities of Dextrin and Dowfroth 200, replacing or supplementing Dextrin with Guartec (a guar gum), using an intermediate per cent of feed solids, stage addition of reagents, regulation of pulp pH during the flotation period, and dewatering and refloating the flotation underflow.

The complete tabulation of these results and the operational data of these tests are given in Appendix A.  The more significant information contained in these tests has been abstracted and is given in the following tables.

Table 11 contains the results obtained from experiments relating to the effect that the quantity of frother used has on the amount of talc recovered.

TABLE 11.  ITALIAN NO. 2 TALC INFLUENCE OF QUANTITY OF FROTHER ON WEIGHT RECOVERY OF TALC BY FLOTATION

| Test | Float Product Weight Recovery, per cent | Dowfroth[a], pounds per ton of feed solids | Good | Character of Froth Fair | Poor | Platy Talc, per cent |
|------|------|------|------|------|------|------|
| 36 | 51.0 | None | x | | | Mostly fines |
| 37 | 70.4 | 0.17 | | x | | 96 |
| 35 | 83.3 | 0.34 | | | x | 96 |
| 35 | 91.0 | 0.68 | | | x | 94 |

(a)  Chemical composition is discussed in Appendix A.

Each of the tests reported in Table 11 was made at 10 per cent feed solids and included Dextrin[1] in the equivalent amount of 0.47 pound per ton of flotation feed solids.  The pH of the pulp was 8.6.

The results of these tests illustrate the natural floatability of the talc and the additional collecting properties of the frother.  Test 36 shows that 51.0 per cent of the talc

(1)  Chemical composition is discussed in Appendix A.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJNL61_000001357

floats without any frother.  The amount of talc floated increases according to the amount of frother added.  However, an increase in the amount of frother added resulted in froths more difficult to handle.  When 0.34 pound of frother was added, the froth was composed of a large quantity of very fine bubbles that resisted defrothing.  Addition of frother in increments of less than 0.17 pound per ton of feed might lead to better froth control, and this can be tried at a later date if suitable results are not obtained by other methods.

Tests 35 and 37 both yielded a float product that was 96 per cent platy talc.  However, the recovery of talc was increased from 70.4 in Test 37 up to 83.3 per cent in Test 35 by the addition of twice as much Dowfroth, although the higher recovery was characterized by a less suitable froth.

A series of experiments was made to determine the effect of per cent of solids in the flotation feed on the amount of talc recovered in the float product.  The results of these experiments are shown in Table 12.

TABLE 12.  ITALIAN NO. 2 TALC INFLUENCE OF FEED PER CENT SOLIDS
ON WEIGHT RECOVERY OF TALC BY FLOTATION

| Test | Float Product Weight Recovery, per cent | Feed Solids, per cent | Character of Froth | | | Play Talc, per cent |
|------|------|------|------|------|------|------|
| | | | Good | Fair | Poor | |
| 10 | 75.3 | 6.8 | | x | | 96 |
| 21-24 | 83.9 | 13 | | | x | 96 |

In each of these tests the reagents added were Dextrin 0.94 and Dowfroth 0.34 pound per ton of solids.  The pH of the pulp was 8.6.

The data of Table 9 show that a higher weight recovery is obtained when a higher per cent of feed solids is employed.  At 6.8 per cent solids, 75.3 per cent of the weight is recovered, and of 13 per cent solids, 83.9 per cent of the weight is recovered.  This is a substantial difference considering that the same degree of platiness in the float product is obtained by either approach.  However, the froth produced from a feed of 13 per cent solids was difficult to handle.

The amount of Dextrin used has a marked influence on the platiness of the talc floated and a slight influence on the weight of talc recovered.  Tests that illustrate the magnitude of these factors are given in Table 13.

TABLE 13.  ITALIAN NO. 2 TALC INFLUENCE OF QUANTITY OF DEXTRIN
ON WEIGHT RECOVERY OF TALC BY FLOTATION

| Test | Float Product Weight Recovery, per cent | Dextrin, pounds per ton of feed solids | Mineral Count | | Froth |
|------|------|------|------|------|------|
| | | | Platy Talc, per cent | Fibrous Talc, per cent | |
| 12 | 81.7 | 0 | 89 | 8 | Good |
| 26 | 82.5 | 0.16 | 90 | 8 | Poor |
| 21-24 | 83.9 | 0.94 | 96 | 3 | Poor |
| Flotation feed | 100.0 | -- | 90 | 6 | -- |

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJNL61_0000013

Each test was made at 13 per cent solids, and 0.34 pound of Dowfroth was added per ton.  The pH of the pulp was 8.6.

Data given in Table 13 show that Dextrin has a tendency, although slight, to increase the weight of talc recovered.  More significantly, the data show that when no Dextrin was used, the talc floated was only 89 per cent in the platy form, which is essentially the same purity as the flotation feed.  When the equivalent of 0.94 pound of Dextrin was added, the float product was 96 per cent platy talc.

It is indicated that Dextrin is not a talc depressant in every sense.  More specifically, Dextrin acts as a depressant for nonplaty talc and a mild activator for platy talc. The distinction is not sharp, but it is evident.  The separation of platy talc fron nonplaty talc may be patentable, and the Battelle Patent Section is conducting a novelty and art search on the subject.

Guartec (trade name of guar gum distributed by General Mills) is also known as a talc depressant and froth modifier.  Tests were made with various quantities of Guartec to determine whether it would selectively depress nonplaty talc and also whether any improvement in the quality of the froth might be expected.  The summarized results of these tests are given in Table 14.

### TABLE 14.   ITALIAN NO. 2 TALC INFLUENCE OF QUANTITY OF GUARTEC ON TALC WEIGHT RECOVERY, PLATINESS AND FROTHING PROPERTIES

| Test | Guartec, pounds per ton of feed solids | Feed Solids Per Unit | Float Product Weight Recovery, per cent | Platy Talc, per cent | Froth |
|------|------|------|------|------|------|
| 17 | 0.47 | 13 | 87.6 | 94 | Fair |
| 16 | 0.94 | 13 | 71.0 | 94 | Good |
| 34 | 0.94 | 20 | 77.3 | 91 | Good |

In each of the tests reported in Table 14, 0.34 pound of Dowfroth was added, and the initial pH of the pulp was 8.6.  No Dextrin was used.

Guartec, in the amounts used, did not aid in producing a float product that was as good as that obtained with Dextrin.  When Dextrin was used, a product containing 96 per cent platy talc was obtained, but the best product obtained using Guartec was only 94 per cent platy talc.  The type of froth produced with Guartec was much easier to handle, although this is not significant if satisfactory improvement in quality cannot be obtained.

The foregoing discussion describes the most significant data obtained regarding the floatability of talc when Dextrin and Guartec were used.  The best results were obtained from Tests 21-24 when 83.9 per cent of the talc was recovered in a float product that was 96 per cent platy talc, 3 per cent fibrous talc, and less than 1 per cent each of dolomite and tremolite.  The froth obtained by this method would be difficult to manage.

A comparison of the physical properties of raw Italian No. 1 and No. 2 talcs, and the froth flotation product from No. 2 talc, is made in Table 15.

B A T T E L L E    M E M O R I A L    I N S T I T U T E

Protected Document--Subject to Protective Order

TABLE 15.   COMPARISON OF PHYSICAL PROPERTIES OF RAW AND FLOATED TALC (ITALIAN NO. 1 AND NO. 2)

| | Italian No. 1 | Italian No. 2 | |
| | Raw | Raw | Floated |
|---|---|---|---|
| Bulk Density, lb per cu ft | 23.7 | 21.5 | 23.6 |
| Acid Solubility, per cent[a] | 1.9 | 2.2 | 1.2 |
| pH Alkalinity | 9.2 | 8.8 | 8.7 |
| Relative Lubricity[b] | 0.935-0.990 | 0.926 | 1.017-1.051 |
| Relative Abrasion[c] | 0.00214 | 0.00259 | 0.00132 |
| Weight Per Cent of Raw Talc | 100.0 | 100.0 | 80-86 |
| Mineral Count, per cent | | | |
|     Platy Talc | 88-90 | 90 | 96 |
|     Fibrous Talc | 9 | 5 | 3 |
|     Dolomite | <2 | 3 | <1 |
|     Tremolite | <1 | 2 | <1 |

(a)  The figures for acid solubility are at variance with information submitted unofficially in a similar table to Johnson and Johnson by R. D. Macdonald.  The acid solubility as shown above is considered accurate, and a description of the method of analysis and the reason for using it will be discussed in a forthcoming report.

(b)  The larger the number, the more lubricious the talc.  See Battelle Progress Report to Johnson and Johnson "Studies of the Physical Properties of Talc, Their Measurement and Comparison", by W. L. Smith, October 15, 1957.

(c)  The implication of these numbers will be discussed in a forthcoming report.  The more abrasive material produces the highest number.

Table 15 shows that the floated Italian No. 2 talc has a more desirable mineral composition than the raw talc, less acid-soluble constituents (dolomite equivalent), better lubricity, and is about one-half as abrasive.

Although the possibilities of further improvement of quality, recovery, and froth properties were far from exhausted when using Dextrin or Guartec, a different approach seemed advisable for two reasons.  First, Dextrin and Guartec, although not toxic, might be objectionable because they are organic compounds that may cause rancidity or fungus growth if not thoroughly removed or destroyed during the process.  This, of course, would be undesirable for baby powder.  The second reason for a different approach is that a more controllable froth is desirable.  In nonmetallic flotation processes, excessive frothing is not uncommon when the operation takes place in pulps having a high pH value.  Most of the foregoing tests were made at a pH of about 8.6, and while this is not considered extremely high, investigation of lower pH values appeared to be worth while.  In order to lower the pH to approximately neutral, it was decided to use an inorganic acid, such as hydrochloric, and complete the flotation before the acid was neutralized by the dolomite in the pulp and before the pH began to rise noticeably.

A series of tests was made using hydrochloric acid as a pulp modifier with some encouraging results.  Data obtained from these experiments are shown in Table 16.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJNL61_0000013

TABLE 16.  FLOTATION RESULTS OBTAINED USING HCl AS A PULP MODIFIER AND VARIOUS
AMOUNTS OF DOWFROTH AS A TALC COLLECTOR (ITALIAN NO. 2 TALC)

| Test | Dowfroth, pounds per ton of feed solids | Feed Solids, per cent | Float Product Weight Recovery, per cent | Platy Talc, per cent | Froth |
|------|------|------|------|------|------|
| 43-46 | None | 10 | 60.2 | 98 | Good |
| 52-55 | 0.04 | 10 | 57.8 | 98 | Good |
| 39 | 0.11 | 10 | 71.1 | 97 | Good |
| 43-46 | 0.13 | 10 | 74.5 | 97 | Good |
| 52-55 | 0.17 | 10 | 76.6 | 97 | Good |
| 41 | 0.22 | 10 | 77.6 | 95 | Fair |
| 40 | 0.21 | 10 | 76.7 | 94 | Poor |
| 50 | 0.17 | 13 | 77.1 | 96 | Good |
| 51 | None | 3 | 53.0 | 97 | Good |

In each test the equivalent of 0.09 pound of HCl per ton of ore was added, and the pulp pH was about 7.6-7.8.  The wetting time before reagent addition was 5 minutes, and the conditioning time with HCl before flotation was 2-3 minutes.

The results given in Table 16 show that a float product containing at least 97 per cent platy talc and having acceptable frothing properties is readily obtained.

Increasing the amount of frother increased the weight recovered, but it was noted during this series of tests that 0.11 pound of Dowfroth was about the maximum that could be added to obtain the Float 1 product without encountering frothing problems.  The float products all filtered rapidly but the underflow products filtered slowly.  This suggests that the solids in the underflow are much finer than the float products.

The size distributions of the products obtained from Tests 43-46 were determined. These were discussed in a letter report dated April 1, 1958, to Dr. W. H. Lycan.  The data show that the flotation feed was 13.5 per cent finer than 4.7 microns but the flotation underflow was 26.7 per cent finer than 4.7 microns.  Although the Float 1 product contained only 9.7 per cent of the weight finer than 4.7 microns, it is our belief, as judged from handling of the product, that flotation alone did not remove enough particles of dust-forming size to be acceptable.  Elimination of those sizes which create air borne talc particles probably will require a cyclone type of treatment, and a number of experiments are planned to determine what factors are involved and whether hydraulic or pneumatic cyclone treatment is the more feasible.


CONCLUSIONS


Data and observations obtained from the flotation tests to date have established that:

(1)  Platy talc floats more readily than nonplaty talc.

(2)  A frothing agent, such as Dowfroth 200 is helpful in obtaining reasonable talc recovery.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

(3) About 13 per cent solids is the optimum feed pulp density for treating Italian No. 2 talc.

(4) Either Dextrin or hydrochloric acid is an effective reagent for rejecting nonplaty talc.

(5) When Dextrin is used to depress nonplaty talc, the froths produced are voluminous and difficult to handle. When hydrochloric acid is used to regulate the pulp pH and depress nonplaty talc, the froths produced are normal and will filter rapidly.

(6) Italian No. 2 talc can be floated to yield a product which is mineralogically superior to Italian No. 1 talc.

(7) Oasis and Stone Creek types of ores can be floated to yield products that approximate the quality of Italian No. 1 talc. It is believed that methods can be developed for these types of talc which will yield satisfactory products.

(8) Flotation will reject some of the objectionable fine talc, but more complete removal of the fines probably will require classification by hydraulic or pneumatic cyclones.


## FUTURE WORK


Future experiments would have as an objective a higher recovery of platy talc. Such experiments would be based on the use of hydrochloric acid to control the pulp pH and thereby the rejection of nonplaty talc while using different techniques of frother addition for improved recovery.

Flotation alone does not reject a sufficient amount of the particles which are potential dust; therefore, experiments would be made to remove these sizes by hydraulic cyclones.

After optimum beneficiation conditions have been obtained, it would be planned to produce enough product for various physical measurements and also enough product to send to Johnson and Johnson for their subjective appraisal.

We propose to investigate the feasibility of nearly complete removal of dolomite by leaching the float products with an inorganic acid. Nearly complete removal of dolomite would be necessary if it is important to obtain a talc product having a neutral pH.

Flotation tests would be made on samples of Italian No. 2 talc which represent different lots or shipments in order to establish that the beneficiation process is applicable to any potential differences in source material.

The original notes on the laboratory work described in this report are in Battelle Laboratory Record Book No. 14265, pages 1 to 100, inclusive; and also in Laboratory Record Book No. 14668, pages 1 to 33, inclusive. The work was done in the period from December 11, 1957, to May 12, 1958.

WEB:WLS:RDM/dpc

BATTELLE  MEMORIAL  INSTITUTE

Protected Document--Subject to Protective Order

JNJNL61_0000013

APPENDIX A

DETAILS OF FLOTATION WORK

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

A-1 and A-2

### TABLE A-1. DETAILED RESULTS OBTAINED FROM FLOTATION OF ITALIAN NO. 2 TALC

| Test | Product | Weight Per Cent | Platy | Nonplaty | Dolo-mite | Tremo-lite | Feed, solids per cent | Flota-tion Time, min | Dextrin | Guartec | HCl | Dowfroth 200 | Other | Good | Fair | Poor | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Flotation Feed | Italian No. 2 | 100.0 | 90 | 6 | 3 | 1 | | | | | | | | | | | |
| 11 | Float 1 | 85.9 | 96 | 3 | <1 | <1 | 13 | 10 | 0.94 | 0 | 0 | 0.34 | 0 | | | x | |
| 12 | Float 1 | 59.9 | 89 | 8 | 2 | 1 | 13 | 10 | 0 | 0 | 0 | 0 | 0 | x | | | Same purity as feed |
| | Float 2 | 21.8 | | | | | | 5 | 0 | 0 | 0 | 0.34 | 0 | x | | | |
| | Float 3 | 7.3 | Not determined | | | | | 5 | 0 | 0 | 0 | 0.17 | 0 | x | | | |
| 13 | Float 1 | 87.2 | 93 | 6 | 1 | <1 | 13 | 10 | 0.94 | 0 | 0 | 0.34 | 0 | | | x | Tap water used to pulp solids |
| 14 | Float 1 | 84.4 | Not determined | | | | 13 | 10 | 0.94 | 0 | 0 | 0 | 0.34(a) | | | x | |
| 15 | Float 1 | 64.4 | 95 | 4 | <1 | <1 | 13 | 5 | 0.94 | 0 | 0 | 0.17 | 0 | | x | | |
| | Float 2 | 16.6 | 92 | 6 | 1 | 1 | | 5 | 0 | 0 | 0 | 0.17 | 0 | | x | | |
| 16 | Float 1 | 71.0 | 94 | ND | ND | ND | 13 | 5 | 0 | 0.94 | 0 | 0.34 | 0 | x | | | Filtered quickly |
| | Float 2 | 15.0 | Not determined | | | | | 5 | 0 | 0 | 0 | 0.34 | 0 | x | | | |
| 17 | Float 1 | 87.6 | 94 | 5 | <1 | <1 | 13 | 5 | 0 | 0.47 | 0 | 0.34 | 0 | | x | | |
| | Float 2 | 7.3 | 91 | 6 | 2 | 1 | | 5 | 0 | 0 | 0 | 0.34 | 0 | x | | | Same purity as feed |
| 18 | Re-cleaner | 36.0 | 96 | 3 | <1 | 1 | 13 | 15 | 0 | 0.47 | 0 | 0.34 | 0 | | | x | Float 1 refloated twice |
| 19 | Cleaner | 56.5 | Not determined | | | | 13 | 15 | 0.47 | 0.11 | 0 | 0.34 | 0 | | | x | Float 1 refloated once |
| 20 | Float 1 | 66.6 | Not determined | | | | 13 | 5 | 0.94 | 0.61 | 0 | 0.34 | 0 | | x | | |
| | Float 2 | 10.7 | Not determined | | | | 13 | 5 | 0.47 | 0 | 0 | 0.17 | 0 | x | | | |
| 21-24 | Float 1 | 83.9 | 96 | 3 | <1 | <1 | 13 | 10 | 0.94 | 0 | 0 | 0.34 | 0 | | | x | Duplication of Test 11; average of four tests |
| 25 | | Discarded because of contamination | | | | | | | | | | | | | | | |
| 26 | Float 1 | 82.5 | 90 | 8 | <2 | <1 | 13 | 10 | 0.16 | 0 | 0 | 0.34 | 0 | | | x | |
| 27 | Float 1 | 75.0 | Not determined | | | | 13 | 10 | 0.16 | 0 | 0 | 0.17 | 0 | | x | | |
| 28-32 | | Discarded because reagents had deteriorated | | | | | | | | | | | | | | | |
| 33 | Float 1 | 68.1 | 92 | 5 | 1 | 2 | 13 | 5 | 0 | 0.94 | 0 | 0.34 | 0 | x | | | |
| | Float 2 | 20.7 | 87 | 6 | 3 | 4 | | 5 | 0 | 0 | 0 | 0.34 | 0 | x | | | |
| 34 | Float 1 | 77.3 | 91 | 6 | 2 | 1 | 20 | 5 | 0 | 0.94 | 0 | 0.34 | 0 | x | | | |
| | Float 2 | 12.9 | Not determined | | | | | | | | | | | | | | |
| 35 | Float 1 | 83.3 | 96 | 2 | <1 | 1 | 10 | 10 | 0.47 | 0 | 0 | 0.34 | 0 | | | x | |
| | Float 2 | 7.7 | 91 | 7 | 1 | 1 | | 5 | 0 | 0 | 0 | 0.34 | 0 | x | | | |
| 36 | Float 1 | 51.0 | Not determined | | | | 10 | 10 | 0.47 | 0 | 0 | 0 | 0 | x | | | Predominantly fine particles |
| | Float 2 | 27.6 | Not determined | | | | | 5 | 0.47 | 0 | 0 | 0.34 | 0 | x | | | Contains coarse-platelets and contaminants |
| 37 | Float 1 | 70.4 | 96 | 2 | <1 | 1 | 10 | 10 | 0.47 | 0 | 0 | 0.17 | 0 | | x | | |
| | Float 2 | 16.3 | Not determined | | | | | 5 | 0.94 | 0 | 0 | 0.85 | 0 | x | | | |
| 38 | Float 1 | 83.1 | Not determined | | | | 10 | 10 | 0 | 0 | 0 | 0 | 0.50(b) | x | | | |
| 39 | Float 1 | 52.5 | 99 | <1 | <1 | <1 | 10 | ND | 0 | 0 | 0.9 | 0 | 0 | x | | | Exceptionally good grade; at end of test pH of pulp was 7.4 |
| | Float 2 | 18.6 | 96 | 3 | <1 | <1 | | ND | 0 | 0 | 0 | 0.11 | 0 | x | | | |
| 40 | Float 1 | 76.7 | 94 | 4 | 2 | 1 | 10 | | 0 | 0 | 0.09 | 0.21 | 0 | | | x | |
| 41 | Float 1 | 68.3 | 96 | 2 | <1 | 1 | 10 | 7 | 0 | 0 | 0.09 | 0.11 | 0 | | x | | |
| | Float 2 | 9.3 | 93 | 4 | <1 | <2 | | 5 | 0 | 0 | 0 | 0.11 | 0 | x | | | |
| 42 | | Discarded because of contamination | | | | | | | | | | | | | | | |
| 43-46 | Float 1 | 60.2 | 98 | 1 | <1 | <1 | 10 | 10 | 0 | 0 | 0.09 | 0 | 0 | x | | | Filtered rapidly |
| | Float 2 | 14.3 | 96 | 2 | 1 | 1 | 5 | 0 | 0 | 0 | 0 | 0.13 | 0 | x | | | Filtered rapidly |
| | Under-flow | 25.5 | 67 | 21 | 6 | 6 | | | | | | | | | | | pH of pulp was 7.6, filtered slowly |
| 47 | | Discarded because of contamination | | | | | | | | | | | | | | | |
| 48 | Float 1 | 58.0 | Not determined | | | | 10 | 10 | 0 | 0 | 0 | 0 | 0.30(c) | x | | | Reagent 620 produced buff-colored products |
| | Float 2 | 14.2 | Not determined | | | | | 3 | 0 | 0 | 0.09 | 0.11 | 0 | x | | | |
| 49 | Float 1 | To be repeated, results questionable | | | | | | 10 | 0 | 0. | 0.09 | 0 | 0 | x | | | Flotation feed source was obtained from cyclone underflow |
| | Float 2 | | | | | | | 5 | 0 | 0 | 0.13 | 0 | 0 | x | | | |
| 50 | Float 1 | 62.8 | 97 | 2 | Trace | Trace | 13 | 10 | 0 | 0 | 0.09 | 0 | 0 | x | | | |
| | Float 2 | 14.3 | 94 | 5 | <1 | 1 | | 8 | 0 | 0 | 0 | 0.17 | 0 | x | | | |
| 51 | Float 1 | 53.0 | 97 | 2 | <1 | <1 | 3 | 10 | 0 | 0 | 0.09 | 0 | 0 | x | | | |
| 52-55 | Float 1 | 57.8 | 98 | <2 | <1 | <1 | 10 | 5 | 0 | 0 | 0.09 | 0.04 | 0 | x | | | |
| | Float 2 | 18.8 | 96 | 3 | <1 | <1 | | 5 | 0 | 0 | 0 | 0.13 | 0 | x | | | |
| 56(a) | Scav-enger | 6.1 | 95 | 3 | <1 | 1 | 7 | 10 | 0.89 | 0 | 0.13 | 0.11 | 0 | . | x | | Underflow from Tests Nos. 52-55 was cycloned and cyclone under-flow used as flotation feed |

Note: Some tests are not evaluated mineralogically because of unsatisfactory froth characteristics or because weight recovery was too low.

Reagents used: Dextrin is made by hydrolysis of starch and manufactured by Clinton Foods Incorporated, under the name of Dextrin 603.
Guartec is the General Mills trade name for guar gum.
HCl is reported as pounds per ton of reagent grade hydrochloric acid which is about 38 per cent of HCl.
Dowfroth 200 is a water-soluble frothing agent manufactured by the Dow Chemical Company. The chemical formula is $CH_3\text{-}CH\text{-}CH_2\text{-}O\text{-}C_3H_6\text{-}O\text{-}C_3H_6\text{-}O\text{-}CH_3$.
$\qquad\qquad\qquad\qquad\qquad\qquad OH$

(a) Dowfroth 250.
(b) Ultrawet "K".
(c) Reagent 620.
(d) Test 56 was made on the underflow product of Tests 52-55, and recovery of 6.1 per cent refers to the original feed for Tests 52-55.

BATTELLE  MEMORIAL  INSTITUTE

Protected Document--Subject to Protective Order

JNJNL61_000001364

APPENDIX B

FROTH FLOTATION

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

B-1

# APPENDIX B

## FROTH FLOTATION

Froth flotation is a process of material separation for solid particles, usually finer than about 200 microns in size. The separation takes place in an air-water mixture, and is a result of the adhesion of certain particles to air bubbles and the wetting of other particles by the water phase. Whether a particle will adhere to the air phase and be floated, or be wetted by the water phase and sink depends on the character of its surface.

Materials that either ionize or hydrate in water are nonfloaters, and most minerals are in this group. Sulphur, graphite, and talc are exceptions and are called natural floaters. Materials with a hydrocarbon surface, such as solid paraffin, are not wetted by water and will adhere to air bubbles. A material normally water wettable and nonfloatable can be made nonwettable and readily floatable by coating it with a mono-molecular film of a paraffin-type chemical (collector), which presents a surface to the air-water mixture essentially the same as solid paraffin. The polar part of the chemical causes the hydrocarbon chain (nonpolar group) to stick to the surface of the mineral.

The reagents employed in flotation, grouped according to their function, are frothers, collectors, and modifiers. In the flotation of talc, however, collectors play no part and are not discussed here because talc has a naturally nonwettable surface.

## Frothers

Frothers reduce the surface tension of the water and stabilize the air bubbles. The frother molecule is heteropolar: one part of the molecule has an affinity for water and the other has an affinity for air. The most widely used frothers are pine oils, cresylic acid, and various aliphatic alcohols. Substances with structures similar to alcohols, phenols, ketones, or aldehydes are most suitable, but many other organic compounds are potential frothers.

Frothers usually have only slight collecting properties, that is, they do not adsorb on minerals in such a way as to make the surface nonwettable. Some outstanding exceptions are that certain frothers aid in the collection of talc, graphite, molybdenite, sulphur, and coal, and this fact has been used in the work done on Italian talc.

## Modifiers

Modifiers are chemicals which can be used to affect the wettability or nonwettability of a surface. They are used most commonly in connection with collecting reagents, to modify the degree of surface action, so that species of minerals may be separated with greater selectivity. Modifiers also affect the surface characteristics of naturally nonwettable minerals such as talc, and can be used to increase the quantity of talc which will float under a given set of conditions or the quantity of waste material which can be prevented from floating.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJNL61_000001366

B-2

Modifiers usually are inorganic reagents, but some organic ones are used also. Some of the common ones are hydroxides, oxides, silicates, carbonates, and phosphates of sodium or calcium, mineral acids, short-chain organic acids, starch, dextrin, gums, and glues.

## Flotation Variables

Every ore contains at least a small quantity of soluble salts, and the water used for milling, regardless of its purity, contains many kinds of ions. This means that every flotation system, before the addition of any reagents, contains literally dozens of ions which are capable of competing for a place on the surface of mineral particles. After the addition of collecting, frothing, and modifying reagents, this situation is further complicated, and when the air is introduced, the oxygen and carbon dioxide of the air take their turn at altering the pulp conditions.

In addition to the chemical variables, there are physical and mechanical variables in a flotation system, such as particle size, water to solid ratio, speed of agitation, flotation time, place of reagent addition, type of machine used, temperature, cell arrangement, and sequence of mineral flotation. The kind and quantity of slime present in a flotation pulp are also factors of importance.

The combination of these chemical, physical, and mechanical variables results in a heterogeneous system of such complexity that it defies the time-honored method of scientific investigation, which is, to change one variable while holding all others constant. The change of any one variable simultaneously changes many others. For example, a change in acidity (pH) by the addition of hydrochloric acid will not only change the concentration of hydrogen, hydroxyl, and chloride ions present in accordance with the laws of mass action, but it may change the concentration of nearly every ion present in the pulp, and any one of these concentrations may be critical to successful flotation. In addition the change in acidity will affect the ability of the frother to produce a stable froth.

## Flotation as an Art

It is because of this inherent complexity that flotation is often referred to as an art rather than a science. Successful results on any ore are obtained only by an "artistic balance" of the many variables. Actually, the picture is not so bad as might be supposed, for the majority of the variables usually are of minor importance and only five or ten must be studied closely.

This brief discussion of flotation variables is included to stress the point that each ore presents its own intricate system, and that the set of conditions which gives optimum results for one ore may require modification for another.

## Laboratory Flotation Procedure

The flotation equipment used for these experiments is the standard Fagergren Laboratory Flotation Cell of 500 gram solids nominal capacity. It is a batch machine, but it is known that the results obtained with this type of equipment can be translated reasonably well in terms of large-scale continuous commercial operation. The

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJNL61_0000013

B-3 and B-4

Fagergren cell is made up of a cylindrical glass bowl which will hold about 1.75 liters of pulp. The pulp is agitated by a rotor which is placed concentrically inside a stator, both of which are made up of multiple stainless steel rods in a rotunda configuration. As the rotor spins in the pulp, a partial vacuum is created directly beneath it which draws air through a concentric shaft and discharges it at the bottom of the cell. As the air enters the pulp, it is expelled with great shearing force between the rotor and stator and becomes diffused in the form of minute bubbles in the pulp.

The general laboratory procedure used for the flotation of talc samples was as follows:

Pulverized talc and water were added to the flotation cell in the proportions that would give the desired per cent of solids. The rotor was started and the pulp agitated until the solids were wetted. Selected reagents were then added and the pulp conditioned for a few minutes. The air was turned on and the flotation period started. The mineralized froth which forms on the surface of the pulp was skimmed off with a paddle for a specified time or until no more froth formed. Additional reagents were added, if desired, for increased recovery of talc. During the test, records were kept to show the type of water used, per cent solids, pH, quantity and kind of reagents, time allowed for conditioning and flotation, and other significant observations.

If the froth, or float product, was not of the desired purity, some of the standard methods for improvement were:

(1) To decrease the rate of aeration, which decreases the rate of froth overflow

(2) To decrease the per cent solids in the flotation feed

(3) To use less powerful frothing reagents

(4) To use a more effective depressant

(5) To refloat the froth in a second-stage operation

(6) To make the separation at another pH level

(7) To decrease the time of froth collection.

Some of the methods used to increase the recovery of high-grade platy talc were:

(1) To increase the rate of aeration

(2) To increase the per cent solids in the pulp

(3) To dewater the underflow and repeat the test on the unfloated solids and at a relatively high per cent solids.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

otected Document--Subject to Protective Order

Exhibit 24



Protected Document--Subject to Protective Order



Protected Document--Subject to Protective Order

JNJAZ55_000000841

PROGRESS REPORT

on


THE PHYSICAL CONCENTRATION OF TALC ORES--
FLOTATION OF ITALIAN NO. 2 TALC

to

JOHNSON AND JOHNSON

July 31, 1959


by


W. E. Brown


BATTELLE MEMORIAL INSTITUTE
505 King Avenue
Columbus 1, Ohio


*Battelle is not engaged in research for advertising, sales promotion, or publicity purposes, and this report may not be reproduced in full or in part for such purposes.*

Protected Document--Subject to Protective Order

JNJAZ55_000000842

# Battelle Memorial Institute

5 0 5    K I N G    A V E N U E    C O L U M B U S   I,   O H I O

July 31, 1959

Mr. W. H. Ashton
Research Department
Johnson and Johnson
New Brunswick, New Jersey

Dear Mr. Ashton:

    We are sending you six copies of our Progress Report, "The Physical Concentration of Talc Ores—Flotation of Italian No. 2 Talc", by W. E. Brown. This report presents most of the data on which our current pilot operation is based. It includes laboratory work done before May 15, 1959. Some additional laboratory data will be given in a later report.

    A similar report, concerning the flotation of Italian run-of-mine talc is in preparation. It is planned to include in this report a discussion of flotation factors which are common to both dry-ground and wet-ground talc.

    We would be pleased to have your comments on this report.

Sincerely yours,

R. D. Macdonald

RDM:lb
Enc. (6)
cc: Dr. W. H. Lycan
    Mr. C. V. Swank

D E D I C A T E D   T O   T H E   A D V A N C E M E N T   O F   S C I E N C E

Protected Document--Subject to Protective Order

TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| SUMMARY--ITALIAN NO. 2 TALC . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| METHOD OF EVALUATION OF PRODUCTS. . . . . . . . . . . . . . . . . . . . . | 5 |
| EXPERIMENTAL WORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
|     Cycloning (Hydraulic Classification) . . . . . . . . . . . . . . . . . . . | 11 |
|     Flotation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
|         Results Obtained When Fines Were Removed After Flotation. . . . | 28 |
|         Results Obtained When Fines Were Removed Before Flotation . . . | 29 |
|         Effect of the Amount of HCl Added in Flotation. . . . . . . . . | 34 |
|         Comparison of HCl with $H_2SO_4$ as Flotation Reagents. . . . . . | 34 |
|         Effect of Different Types of Water on Quality and Recovery | |
|           of Finished Product . . . . . . . . . . . . . . . . . . | 37 |
|         Effect of Feed Pulp Density on Quality and Recovery of | |
|           Finished Product. . . . . . . . . . . . . . . . . . . . | 39 |
|         Effect of Amount and Type of Frother Added. . . . . . . . . . | 42 |
|     Drying of Flotation Froth Products . . . . . . . . . . . . . . . . . | 44 |
|     Filtration of Test Products. . . . . . . . . . . . . . . . . . . . . . | 46 |
| PROPOSED PILOT-PLANT FLOWSHEET. . . . . . . . . . . . . . . . . . . . . | 50 |
| CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52 |
| FUTURE WORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 54 |

APPENDIX

SUMMARIZED RESULTS OF ALL FLOTATION TESTS MADE ON ITALIAN NO. 2 TALC

B A T T E L L E    M E M O R I A L    I N S T I T U T E

Protected Document--Subject to Protective Order

PROGRESS REPORT

on

THE PHYSICAL CONCENTRATION OF TALC ORES—
FLOTATION OF ITALIAN NO. 2 TALC

to

JOHNSON AND JOHNSON

from

BATTELLE MEMORIAL INSTITUTE

by

W. E. Brown

July 31, 1959

## INTRODUCTION

The First Progress Report on the Physical Concentration of Talc Ores—
Flotation was issued to Johnson and Johnson May 23, 1958.

The objectives of the investigations are:

(1) To obtain a product which consists essentially of talc plate-
lets.

(2) To reject talc particles which are of a size and shape that
create unpleasant dusting while dispersing talc from a con-
tainer.

(3) To obtain a talc product with an obvious sheen in order to
convey to the consumer the immediate impression that the talc
is of the highest quality.

In addition to achieving the foregoing objectives, it is desirable
that the finished product will meet the following specifications:

BATTELLE    MEMORIAL    INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000845

Moisture:  Not more than 0.15 per cent

Solubility in Hydrochloric Acid:  Not more than 6 per cent

Fineness:  Not less than 99.7 per cent through a 100-mesh sieve
Not less than 98.5 per cent through a 200-mesh sieve

Microscopic Structure:  Shall be platelets, and show no acicular or
excessive granular crystals

Bulk Density:  Not less than 22 nor more than 27 pounds per cubic foot,
when tested by the Scott Volumeter.

In further keeping with the standards of production, it is desirable that the finished talc product have essentially the same whiteness as that currently being marketed by Johnson and Johnson.  Another objective is to reduce the alkalinity of the raw material so that the pH value of a moistened sample will approximate neutrality, or a pH of 7.

The only methods of physical beneficiation employed in work covered in the First Progress Report was flotation.  Froth products obtained were 60.2 per cent of the original weight and contained 98 per cent platy talc.  The product contained less than 1 per cent each of nonplaty (fibrous) talc, dolomite, and tremolite.  A sample of this product was given to Johnson and Johnson, who approved of it and agreed that it was a highly improved talc, and preliminary discussions of a pilot plant were started.

However, the above-mentioned improved talc containing 98 per cent platy talc and having a 60.2 per cent yield contained about 25 per cent of minus 10-micron particles which are potential dust.  Although there was an appearance of a refined product, Johnson and Johnson desired to have a talcum powder exhibiting a more pronounced luster.

The future work that was suggested, most of which is covered in this Second Progress Report, included investigations for:

(1)  Increasing the weight recovery of talc without decreasing the
quality.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000846

(2)  Removing dust-forming particles from the finished talc.

(3)  Producing enough improved talc for certain physical properties measurements and also for Johnson and Johnson's subjective appraisal.

(4)  Removing the residual dolomite from the beneficiated product by acid leaching.

During the experimental program discussed in this report, Johnson and Johnson requested that more emphasis be placed on obtaining a product with a high luster and to make supplemental investigations that would provide data as a basis for the design, construction, and operations of a pilot plant.

### SUMMARY--ITALIAN NO. 2 TALC

Italian No. 2 talc contains 27.2 per cent of its weight finer than 9.7 microns. This is objectionable because of excessive dust and because the presence of fines is detrimental to good flotation results.

Single-step hydraulic cycloning in a 30-mm-diameter cyclone was effective in removing up to 83.9 per cent of the minus 10-micron size particles.

Data obtained from the experiments showed that ranges of satisfactory results would be obtained depending on operating conditions. Cyclone underflows, which comprise the flotation feed, were obtained containing from 6.5 to 8.1 per cent of the weight finer than 10 microns. The amount of original weight recovered as cyclone underflow varied between 64.7 and 70.6 per cent.

Flotation products containing 97 to 99 per cent of platy talc were obtainable without cycloning. Such products contained almost 25 per cent of their weight finer than 10 microns.

B A T T E L L E    M E M O R I A L    I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000000847

Flotation products containing 97 to 99 per cent of platy talc were also obtained from a cycloned product. Such products of flotation contained only 6.6 per cent of the weight finer than 10 microns.

Hydrochloric acid added in the correct quantity, between 1.13 and 2.30 pounds per ton of feed solids, was effective in maintaining the purity of finished talc at 97 to 98 per cent platy particles. This amount of acid created a pulp pH ranging between 6.9 and 7.8 during flotation.

Sulphuric acid was not a satisfactory substitute for hydrochloric acid when added in similar amounts and with similar pulp pH levels.

Deionized water, as a talc slurrying agent, gave better flotation products than soft or tap water and tap water gave better results than soft water.

Deionized and tap water yielded flotation products containing 97 to 98 per cent platy talc with recoveries approaching 60 per cent of the feed weight. When soft water was used, the Float-1 product was 93 to 95 per cent platy talc and the recoveries dropped to about 40 per cent.

Pulp density of flotation feed is important to froth control and purity of the froth product. Flotation experiments made at feed densities of about 10 per cent solids gave voluminous froths carrying as much as 1.2 per cent of dolomite although the platy content was 97 to 98 per cent. When the pulp density was lowered to about 8 per cent solids, the froth properties were satisfactory and the float product contained only 0.3 per cent of dolomite.

Only completely water-soluble frothers were used in the flotation experiments. The maximum amount of frother which would yield good froth products in the Float-1 step is about 0.08 pound per ton of feed solids. More than this amount creates a troublesome froth and a decrease in platy talc content. Dowfroth 250 is a stronger promoter for flotation of talc than Dowfroth

BATTELLE    MEMORIAL    INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000848

200, but there is no basis for ranking one over the other without further study.

Flotation products dried at temperatures below 1100 F were not affected by the heat. Above 1100 F the particles began to change to a tan or creamy color and become gritty.

No flotation products were made from Italian No. 2 talc that had what would be classified as high or outstanding luster. Products showing 98 or 99 per cent platy talc frequently did not exhibit much more luster than those which were only 95 or 96 per cent platy talc.

Techniques which Battelle believes are important in maintaining the luster or effecting a slight improvement in luster are:

(1)  Removal of minus 10-micron particles.

(2)  Complete washing of the filter cake to remove dissolved mineral salts and flotation reagents.

(3)  Using deionized water as a slurry agent for the entire process.

(4)  Drying the talc at temperatures below 1100 F.

Removal of the minus 10-micron talc alone will cause the talc to have a refined appearance and although the luster is improved slightly it is not an outstanding feature.

The summarized conclusions are that Italian No. 2 talc was satisfactorily beneficiated in the laboratory to the extent that the results warranted the construction of a pilot plant to establish that the talc could be processed on a continuous basis in a commercial manner.


METHOD OF EVALUATION OF PRODUCTS


Johnson and Johnson, at the outset of the talc beneficiation program, had set as one of the principle objectives the production of a talc product

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000000849

-6-

consisting essentially of talc platelets. This is because platy talc is nonirritating and imparts a pleasant feeling when applied to the skin. Mineral particles which are acicular, blocky, gritty, or excessively fine impart an unpleasant feel or produce an irritating effect. Unfortunately, this is a subjective evaluation and the relative amount of pleasant or unpleasant feeling will not be the same for all people, particularly when the true differences are relatively slight.

Nontalc particles in a powder, such as dolomite, can be determined accurately by chemical analyses or approximated from a microscope count. Nontalc particles of gritty or abrasive nature can also be assigned relative values by certain measurements obtained from lubricity board[a] and abrasion pellet tests[b]. However, investigations with the lubricity board and abrasion testing apparatus were not carried far enough to determine whether the information obtained from them is useful in evaluating powders in terms of platy talc versus fibrous talc. At this time, the only satisfactory method of accounting for the proportions of platy talc and fibrous talc in a powder is by making an actual count of the particles observed in the field of a microscope.

A talc sample to be evaluated is dusted onto a glass slide which has been spotted with oil having a refractive index of 1.520. The dust is dispersed in the oil by stirring with a fine probe. The oiled sample is then covered with a glass cover plate and placed in the field of a polarizing microscope with the objectives selected for about 75X.

---

(a) Battelle Progress Report, Studies of the Physical Properties of Talc, Their Measurement and Comparison, by W. L. Smith, October 15, 1957.

(b) Battelle Progress Report, Further Studies on the Measurement and Correlation of the Physical Properties of Talc, by W. L. Smith, May 9, 1958.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

Light is then adjusted to reflect upward through the sample to the eyepiece. The eyepiece having two crosshairs fixed at 90 degrees to each other is focused on the field. Particles which coincide with the crosshairs are counted and classified as platy talc, fibrous talc, dolomite, or tremolite and sometimes accessory minerals.

Statistically, the more particles counted the higher will be the accuracy providing the identifications are accurate and the sampling reliable.

The probably sources of error in counting are:

(1) Failure to count enough particles

(2) Sample not representative

(3) Improper identification of particles

(4) Personal element of unintentional prejudice arising from the examiners foreknowledge of the approximate quality of the product

(5) Quality of product being examined.

A discussion of each of these errors follows:

## Failure to Count Enough Particles

By trial and comparison, it was established that a minimum of 250 to 300 particles should be counted. Counting less than this amount may give erratic results. An example of an evaluation made on a product in which counts of 300, 600, and 900 particles were made shows:

| Number of Particles Counted | Platy Talc Content | |
|---|---|---|
| | Direct, per cent | Cumulative, per cent |
| First  300 | 98.7 | 98.7 |
| Second 300 | 99.7 | 99.2 |
| Third  300 | 98.3 | 98.9 |

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_00000851

The foregoing data show a maximum deviation of 1.4 percentage points for individual counts of 300 particles. The amount of platy talc, computed after counting 300 particles was 98.7 per cent and the result of counting 900 particles showed the sample contained 98.9 per cent or a difference of 0.2 per cent from the first 300 count of 98.7 per cent. It would seem from this information that ordinarily a count of 300 particles would be sufficiently accurate when evaluating talc powder of this approximate purity. Acceptable accuracy as related to quality of product examined is discussed in subsequent sections of this report.

Sample Not Representative

All samples to be evaluated should be completely dry to obtain a uniform dispersion in the oil. Also, all samples should be screened at the known limiting size at which the sample had been originally prepared. Finally, the sample should be well mixed so that segregation of sizes is avoided.

Even with these precautions, there will be occasions when sample specimens will appear much different than duplicate specimens of the same sample. This is not always readily explainable and must be guarded against. Usually the person who made the product will spot an anomaly at once and a closer examination is requested on a new specimen.

Improper Identification of Particles

Nearly whole and large platelets are rarely improperly identified. Small particles become more difficult to identify if hurriedly examined. The mineralogy of Italian No. 2 talc is such that most of the nonplaty talc and tremolite are finer than the major part of the powder. Dolomite usually is fine but some relatively large particles do appear. However, dolomite is

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000000852

-9-

quite distinctive and not easily misjudged. Some caution must be used in distinguishing between nonplaty talc, shards of platelets, and transitional talc-tremolite. Occasionally a platy talc particle will be oriented so that the cross section only is visible. When this condition exists, it is easily mistaken as nonplaty talc or tremolite. After the rest of the field has been counted, locate this particle again. Gently tap the glass cover plate with a pencil a few times to see if the particle is on edge and when moved if it will fall over and exhibit a platy surface. At other times, when the light passing through a particle happens to strike at just the right angle, one may get the impression of a piece of fibrous talc when actually the light is only accentuating the edge of a large platelet.

## Personal Element in Evaluations

The same bias has been observed here as frequently is encountered in ore sampling. There are some psychological aspects involved which will tend to influence a person's decision when there are choices to be made, especially if the person making the count has a knowledge of the background of the sample. Naturally, the best way to avoid this is to have the sample evaluated by an examiner totally unfamiliar with the source of the sample. This may not always be practicable or desirable because a nonrepresentative sample is quickly spotted by a person who knows its approximate content and who, too, may observe other characteristics such as unusual fineness or coarseness of the whole sample or of certain mineral species.

A comparison of mineral count obtained from three different competent examiners on the same specimen should not differ more than 2 and at the most 3 percentage points of platy content especially when considering materials having a platy content in excess of about 85 to 90 per cent.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000853

## Quality of Product Being Examined

Experience has shown that, when the number of particles counted is limited to about 300, the variations in results are smaller for high purity than for low purity products. Samples having a true platy content of 98 per cent may be expected to be counted as high as 99 or as low as 97, rarely 96. Samples having a true platy content of about 40 per cent may be counted as high as 50 and may be as low as 30, unless a very large count is made. Therefore, it would seem advisable that low-quality talc products be evaluated by more than one examiner and perhaps that the amount of particles counted be increased to 1000 or more, using an average of the results as an acceptable count.

The question may arise as to what deviation in count is significant and what range of difference is allowable. To a large degree, this is related to the importance attached to the product being considered. It is almost impossible to determine subjectively whether the particles are 99 per cent platy talc and 1 per cent fibrous talc or whether they are 97 per cent platy talc and 3 per cent nonplaty talc. On the other hand, it is believed possible that some question may arise as to whether 95 per cent platy talc looks and feels as good as 97 or 99 per cent platy talc. It is conceivable that some people could make this distinction by feel and visual appearance. It is rather likely that there would be a visual distinction owing to a decrease in luster.

No physical or objective method has been devised that will make an unquestioned distinction between small differences in platy and nonplaty talc content. The microscope is still accepted as the best means for identification.

BATTELLE    MEMORIAL    INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_00000854

In the microscopic evaluation of results given in this report, not much significance has been attached to the difference in products reported as 99, 98, or 97 per cent platy talc. However, a figure of 97 compared with 99 may indicate a trend and be a warning to be observant and thoroughly investigate any changes reported outside of this range. A change in processing technique that yields a product containing 99 per cent talc and which formerly had been reported as 95 or 96 per cent definitely would be classed as significant.

## EXPERIMENTAL WORK

### Cycloning (Hydraulic Classification)

Johnson and Johnson had expressed a desire that objectionable dust be removed from the talc, although no set specification was given concerning the objectionable size that should be removed.

A few experiments were made by dispensing baby talcum powder from a can into the air. The particles still suspended in the air, a few seconds after dispensing, were collected on a wetted glass microscope slide. The particles were then measured microscopically and found to have a maximum size of about 12 microns. These particles, 12 microns and finer, would be typical of what might be inhaled and cause discomfort. A reference in the cosmetic literature was found which states, "The pore is not wider than 10 microns in diameter."(a). Hence, the particle sizes which could easily be objectionable are finer than about 10 or 12 microns (about 0.0004 inch).

_____

(a) Cosmetics Science and Technology, Edward Sagarin, Editor, Interscience Publishers, Inc., New York, 1957. Chapter "Physiology and Pharmocology of Sweating", page 1194.

B A T T E L L E    M E M O R I A L    I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000000855

-12-

In addition to the objection to fine particles from a physiological standpoint, there also is an objection from a mineral processing standpoint. It is generally acknowledged that a large amount of particles finer than 5 or 10 microns make selective flotation difficult. Such particles tend to float nonselectively, promote froths which are difficult to handle, and consume excessive amounts of reagents.

Therefore, the removal of particles finer than about 10 microns would be a distinct advantage from both viewpoints.

Hydraulic cyclones are widely used in the mineral and chemical industry for particle size classification (separation) over a large range of sizes. For the coarser sizes, about 35 mesh, there are other types of classifying devices. For the finer sizes, such as 10 microns and smaller, cyclones are preferred rather than thickeners operated as hydroseparators because the thickeners require extremely large settling areas, water requirements, and capital outlay. Cyclones have high capacity, yield equally good or better classification results, require less water and dispersing agents, and many times less capital outlay than conventional classifiers.

Because of the foregoing reasons, cyclones were selected for classification in these investigations.

Because of the importance of cycloning, in the process developed for talc beneficiation, it is advisable to discuss briefly the characteristics of a cyclone.

Figure 1 is a sketch of a typical cyclone showing the principal parts and the movement of the pulp. The pump, containing the mixed solids which are to be classified by size, is introduced tangentially to the cyclone chamber. The high entrance velocity and centrifugal forces developed form two vortices inside the chamber and conical section. The coarser and heavier particles are

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order



FIGURE 1.   TYPICAL CYCLONE, SHOWING PRINCIPAL PARTS AND
INTERNAL MOVEMENT OF THE PULP

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_00000857

-14-

forced to the wall of the chamber and the downward moving vortex, of fluid and solids, is discharged as underflow at the apex. The inner vortex, containing the fine particles, spirals upward along the vertical axis of the cyclone and is discharged as overflow through the vortex finder.

The cyclone is a very simple device but the hydraulic dynamics can be very complex and are beyond the scope of this report.

The diameter of the cyclone probably has the most influence on the size at which the classification is made. The smaller the particle size at which a separation is required, the smaller should be the diameter of the cyclone. For instance, a 3-inch-diameter cyclone may be satisfactory for a 200-mesh separation but a 1- or 2-inch-diameter cyclone may be more suitable for 10- or 15-micron separations. Other factors which influence size of separation are: per cent of solids in the cyclone feed, cyclone inlet and outlet pressures, rate of feed in gallons per minute, and diameter of cyclone apex and vortex orifices.

For the separations desired, it appeared that a 30-millimeter-diameter (1.181 inch) cyclone would be suitable when the right combination of operating conditions were known.

In order to know the amount of material that must be rejected as fines from the cyclone overflow, a sedimentation test was made. The size distribution of Italian No. 2 talc is given in Table 1.

Table 1 shows that 27.2 per cent of the weight of the Italian No. 2 talc is finer than 9.7 microns, most of which should be removed.

B A T T E L L E     M E M O R I A L     I N S T I T U T E

Protected Document--Subject to Protective Order

-15-

TABLE 1.   SIZE DISTRIBUTION OF ITALIAN NO. 2 TALC

| Equivalent Spherical Particle Diameter, microns | Weight Per Cent Finer Than Particle Diameter |
|---|---|
| 31.4 | 77.2 |
| 13.9 | 39.8 |
| 9.7 | 27.2 |
| 6.7 | 18.9 |
| 4.7 | 13.5 |
| 3.9 | 11.1 |
| 2.9 | 8.3 |
| 2.4 | 7.0 |
| 1.3 | 3.5 |

There are no commercial classifiers that make a "hair-line" cut-off on size separations.  Cyclones probably are as efficient as other devices; but in practice, as the removal of any given size approaches 100 per cent some of the neighboring sizes will also be removed.  On the other hand, cyclones can usually be adjusted so that the overflow is nearly 100 per cent finer than a given size, but a significant amount of that same size will be found in the cyclone underflow.

Therefore, the operating conditions for the cyclone, without in-volved cycloning by stages in closed circuits, require adjustment of the equip-ment to overflow several per cent more than the theoretical 27.2 per cent.  As mentioned above, this necessitates the loss of some talc particles larger than 10 microns.

A number of experiments were made using a 30-mm-diameter laboratory glass cyclone.  The effect of different operating conditions on cyclone per-formance were investigated.  The conditions investigated were:

Effect of diameter of cyclone vortex
Effect of per cent solids in the cyclone feed.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000000859

-16-

Table 2 shows results of three cyclone experiments which give preliminary information for changes in operating conditions that were needed to obtain the desired particle size classification.

TABLE 2.   PRELIMINARY CYCLONE TESTS USING A VORTEX
FINDER DIAMETER OF 4.1 mm

|  | Distribution, per cent | | Per Cent Solids in Product | Flow Rate, gpm |
|---|---|---|---|---|
|  | Pulp Volume | Solids Weight | | |
| **Test C-8** | | | | |
| Overflow | 68.0 | 13.4 | 1.0 | 1.1 |
| Underflow | 32.0 | 86.6 | 12.5 | 0.5 |
| Total Feed | 100.0 | 100.0 | 4.9 | 1.6 |
| **Test C-9** | | | | |
| Overflow | 67.4 | 18.6 | 2.7 | 1.1 |
| Underflow | 32.6 | 81.4 | 21.5 | 0.6 |
| Total Feed | 100.0 | 100.0 | 9.4 | 1.7 |
| **Test C-10** | | | | |
| Overflow | 67.3 | 21.7 | 4.7 | 1.1 |
| Underflow | 32.7 | 78.3 | 29.6 | 0.6 |
| Total Feed | 100.0 | 100.0 | 13.8 | 1.7 |

Test Conditions:
Cyclone diameter           30 mm
Feed inlet diameter         6.0 mm
Vortex finder diameter     4.1 mm
Apex diameter               2.9 mm
Feed pressure               14.7 psi

Tests C-8, C-9, and C-10 show that the weight of the fine solids rejected in the cyclone overflow reached a maximum of 21.7 per cent when the feed density was 13.7 per cent solids. It was shown previously by sedimentation that at least 27 per cent of the weight must be removed to obtain the desired separation. Therefore, none of the operating conditions were suitable

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000860

for near-complete fines rejection. As the per cent solids in the feed increased, the per cent of weight reporting to the overflow increased. The data from the tests indicate that the desired weight directed to the overflow could be obtained by increasing the per cent solids in the feed. Ordinarily this would accomplish the objective. However, when particle size classifications in the 10-micron size range are being attempted, it is advisable to operate with the per cent feed solids as low as is practicable. As the per cent of feed solids is increased the sharpness of separation decreases rapidly. The tendency is for oversize particles to be crowded into the overflow and undersize particles to be forced into the underflow. Therefore, it is better to change some other conditions, if possible. Increasing the vortex finder diameter in the overflow will accomplish the same purpose and usually improve the properties of the underflow.

In the experiments shown in Table 2, the cyclone vortex finder diameter was 4.1 mm. It appeared that a larger diameter vortex finder would yield the desired results, if all other conditions were held constant. A vortex diameter of 6.1 mm was installed in the cyclone and Tests C-11, C-12, and C-13 were made at different feed densities. The results are given in Table 3.

The data in Table 3 show that the increased vortex finder diameter was a step in the right direction. At 4.9 per cent solids in the feed (Test C-11) the cyclone overflow contained 23.0 per cent of the feed weight compared with only 13.4 per cent when the 4.1 mm vortex finder was used. The overflow of Test C-12 contained 30.6 per cent of the weight of the feed, which is about the proper weight. Examination of this product with the microscope showed that although most of the minus 10-micron talc had been removed, a significant amount still remained. A larger diameter vortex finder appeared advisable to

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

obtain a cyclone underflow product containing fewer particles in the minus 10-micron sizes.

TABLE 3.   CYCLONE TESTS USING A VORTEX FINDER
DIAMETER OF 6.1 mm

| | Distribution, per cent | | Per Cent Solids in Product | Flow Rate, gpm |
|---|---|---|---|---|
| | Pulp Volume | Solids Weight | | |
| **Test C-11** | | | | |
| Overflow | 88.9 | 23.0 | 1.3 | 1.7 |
| Underflow | 11.1 | 77.0 | 28.3 | 0.2 |
| Total Feed | 100.0 | 100.0 | 4.9 | 1.9 |
| **Test C-12** | | | | |
| Overflow | 86.5 | 30.6 | 3.5 | 1.7 |
| Underflow | 13.5 | 69.4 | 38.9 | 0.3 |
| Total Feed | 100.0 | 100.0 | 9.4 | 2.0 |
| **Test C-13** | | | | |
| Overflow | 84.4 | 39.5 | 6.7 | 1.7 |
| Underflow | 15.6 | 60.5 | 42.7 | 0.3 |
| Total Feed | 100.0 | 100.0 | 13.7 | 2.0 |

Test Conditions:
Cyclone diameter            30 mm
Feed inlet diameter         6.0 mm
Vortex finder diameter      6.1 mm
Apex diameter               2.9 mm
Feed pressure               14.7 psi

Tests C-14, C-15, and C-16 were made using a cyclone with a vortex finder diameter of 8.4 mm.  Results of these experiments are in Table 4. Test C-14 shows that the overflow product contains 36.5 per cent of the weight of the cyclone feed.  Overflow products obtained from Test C-15 and C-16 contained too much weight and, therefore, must contain an excessive amount of particles larger than 10 microns.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

8

TABLE 4. CYCLONE TESTS USING A VORTEX
DIAMETER OF 8.4 mm

| | Distribution, per cent | | Per Cent Solids in Product | Flow Rate, gpm |
|---|---|---|---|---|
| | Pulp Volume | Solids Weight | | |
| **Test C-14** | | | | |
| Overflow | 93.2 | 32.6 | 2.0 | 2.2 |
| Underflow | 6.8 | 67.4 | 35.1 | 0.2 |
| Total Feed | 100.0 | 100.0 | 4.8 | 2.4 |
| **Test C-15** | | | | |
| Overflow | 91.5 | 47.2 | 4.9 | 2.1 |
| Underflow | 8.5 | 52.8 | 44.4 | 0.2 |
| Total Feed | 100.0 | 100.0 | 9.3 | 2.3 |
| **Test C-16** | | | | |
| Overflow | 90.0 | 57.8 | 9.1 | 2.1 |
| Underflow | 10.0 | 42.2 | 45.0 | 0.2 |
| Total Feed | 100.0 | 100.0 | 13.7 | 2.3 |

Test Conditions:
Cyclone diameter          30 mm
Feed inlet diameter       6.0 mm
Vortex finder diameter    8.4 mm
Apex diameter             2.9 mm
Feed pressure             14.7 psi

The overflow and underflow products of Test C-14 were examined microscopically and found to be relatively free of misplaced particles.

A sedimentation fractionation of the products of Test C-14 was made and the results are given in Table 5.

Protected Document--Subject to Protective Order
JNJAZ55_000000863

-20-

TABLE 5.   SEDIMENTATION AT 10-MICRON PARTICLE SIZE ON
PRODUCTS OF CYCLONE TEST C-14

| Particle Size in Product | Weight Per Cent in Product | Weight Per Cent of Cyclone Feed |
|---|---|---|
| Cyclone Overflow | | |
| +10 Micron | 29.3 | 9.6 |
| -10 Micron | 70.7 | 23.0 |
| Total | 100.0 | 32.6 |
| Cyclone Underflow | | |
| +10 Micron | 93.4 | 63.0 |
| -10 Micron | 6.6 | 4.4 |
| Total | 100.0 | 67.4 |

The data given in Table 5 show that the cyclone underflow contained 67.4 per cent of the weight of the cyclone feed and that the underflow had only 6.6 per cent of particles finer than 10 microns.  The original Italian No. 2 talc sample, which is the same as the cyclone feed, contained 27.2 per cent of the weight in particles 10 microns and finer.  From a classification standpoint, the cyclone underflow product is nearly perfect.  The cyclone overflow had 29.3 per cent of the weight of the particles larger than 10 microns, or 9.6 per cent of all the plus 10-micron particles in the original feed. It also contained 83.9 per cent of the minus 10-micron particles in the original feed.

The cyclone products were evaluated with the microscope to determine the mineral composition.  These results are given in Table 6.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000864

TABLE 6. MINERAL COMPOSITION OF TEST C-14 CYCLONE PRODUCTS

| Cyclone Product | Weight Per Cent | Mineral Count, per cent | | | | Mineral Distribution, per cent | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Platy | Nonplaty | Dolomite | Tremolite | Platy | Nonplaty | Dolomite | Tremolite |
| Overflow | 32.6 | 79 | 15 | 5 | 1 | 29 | 79 | 58 | 33 |
| Underflow | 67.4 | 95 | 2 | 2 | 1 | 71 | 21 | 42 | 67 |
| Feed | 100.0 | 90 | 6 | 3 | 1 | 100 | 100 | 100 | 100 |

It is shown in Table 6 that the cyclone overflow was composed of 79 per cent platelets. In Table 5, it is shown that 29.3 per cent of this product is larger than 10 microns. Therefore, the total loss of useful plates represents about (32.6 x .79 x .293 = 8.46) 8.5 per cent. Said in another way, if all the plus 10-micron platelets had been recovered, the cyclone underflow would represent 67.4 ÷ 8.5 = 75.9 per cent of the feed weight.

Another important result shown in Table 6 is that the cyclone underflow product contained 95 per cent platy talc compared with 90 per cent in the feed. The mineral distribution shows that cycloning rejected 79 per cent of all the nonplaty talc.

In summation, the cyclone underflow was 95 per cent platy talc and contained only 6.6 per cent of particles finer than 10 microns. This should be an ideal feed for flotation.

Because of the impending pilot plant, it was necessary to discuss with the cyclone manufacturers (Dorr-Oliver Inc.) what equipment was available and if the equipment would be suitable for particle size classification in the minus 10-micron size range. Cyclones were available in the 30-mm-diameter size, but the manufacturer was not able to provide the vortex finder

BATTELLE MEMORIAL INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000865

and apex with diameters of the same dimensions as used in the C-14 test.  It was believed, however, that the equipment available would give classification results in the same order and with some advantages.  The cyclones available had a vortex finder diameter of 11 mm and an apex diameter of 5.5 mm.  Such dimensions would provide increased cyclone capacity and lessen the possibility of oversize material plugging the apex outlet.

The laboratory glass cyclone was fitted with outlets of the same dimensions as Dorr-Oliver could provide and experiments were made for comparative purposes.  These results are given in Table 7.

Table 7 shows that the size distribution of the underflow products was essentially the same when the apex diameter was increased from 2.9 to 5.5 mm.  Both underflow products contained about 6.5 per cent of minus 10-micron particles.  Increasing the diameter of the vortex finder resulted in the loss of more of the plus 10-micron particles in the overflow as the total amount of plus 10-micron increased from 9.6 to 12.1 per cent.  In order to decrease this loss, the feed pressure was raised from 14.7 psig to 23 psig, as shown in Test C-127.  The results show that the increased pressure lowered the amount of plus 10-micron material in the overflow from 12.1 to 7.7 per cent.  However, the fines reporting to the underflow were increased from 6.5 to 8.1 per cent.

Flotation experiments were made on cyclone underflow products from each of the different test conditions reported in Table 7.  The results of these flotation tests are discussed in the following flotation section.

The over-all results of the cyclone experiments show that it was possible to treat the original Italian No. 2 talc in a cyclone and obtain a product containing only about 6.5 per cent of minus 10-micron particles.  About 10 to 12 per cent of the plus 10-micron material is lost to the overflow.  Increasing the cyclone pressure recovered some of the plus 10-micron talc but was accompanied by more of the objectionable minus 10-micron talc reporting to the underflow.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000000866

-23-

TABLE 7.  COMPARISON OF CYCLONE PRODUCTS SHOWING EFFECT OBTAINED WITH DIFFERENT DIAMETER OUTLETS AND INCREASED FEED PRESSURE

| Particle Size in Cyclone Product | Test C-14 | | Test C-135 | | Test C-127 | |
|---|---|---|---|---|---|---|
| | Weight Per Cent in Product | Weight Per Cent of Feed | Weight Per Cent in Product | Weight Per Cent of Feed | Weight Per Cent in Product | Weight Per Cent of Feed |
| Overflow | | | | | | |
| +10 Micron | 29.3 | 9.6 | 34.3 | 12.1 | 26.1 | 7.7 |
| -10 Micron | 70.7 | 23.0 | 65.7 | 23.2 | 73.9 | 21.7 |
| Total | 100.0 | 32.6 | 100.0 | 35.3 | 100.0 | 29.4 |
| Underflow | | | | | | |
| +10 Micron | 93.4 | 63.0 | 93.5 | 60.5 | 91.9 | 64.9 |
| -10 Micron | 6.6 | 4.4 | 6.5 | 4.2 | 8.1 | 5.7 |
| Total | 100.0 | 67.4 | 100.0 | 64.7 | 100.0 | 70.6 |
| Test Conditions: | | | | | | |
| Cyclone diameter, mm | 30 | | 30 | | 30 | |
| Cyclone inlet diameter, mm | 6 | | 6 | | 6 | |
| Cyclone vortex finder diameter, mm | 8.4 | | 11 | | 11 | |
| Cyclone apex diameter, mm | 2.9 | | 5.5 | | 5.5 | |
| Feed pressure, psig | 14.7 | | 14.7 | | 23 | |
| Feed rate, gpm | 2.4 | | 2.7 | | 3.3 | |

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000867

## Flotation

At the close of the experimental program covered in the Progress Report of May 23, 1958, a simple method of processing the talc had been developed that yielded a flotation product containing 98 per cent or more of platy talc.

This method, first reported in Test 39[a], consisted of briefly conditioning the Italian No. 2 talc with 0.9 pound of hydrochloric acid per ton of feed and making a Float-1 product containing 99 per cent platy talc. A small amount of frother (0.11 pound per ton of feed) was then added and a Float-2 product was made containing 96 per cent platy talc. The two products combined contained 71.1 per cent of the original feed weight and 98 per cent platy talc. The pH of the pulp during Float-1 was 7.4 and the feed pulp was about 10 per cent solids. A total flotation time of 15 minutes, plus 7 minutes for wetting and conditioning, was used. The unmanageable froth, prevalent in all previous experiments, was not quite as noticeable.

Before Test 39 was made, all froths were overly voluminous and 96 per cent platy talc was the best that had been obtained. The flotation methods had consisted of the addition of various amounts of Dextrine or Guartec as depressants for nonplaty and/or fine talc. Both of these reagents are subject to bacteriological decay, forming objectionable mould and fungus, and if not completely removed sometime after the flotation step, they might create an unpleasant odor and appearance to the finished talc. Hence, another type of reagent seemed necessary.

_____

(a)  See First Progress Report, Appendix A.

B A T T E L L E    M E M O R I A L    I N S T I T U T E

Protected Document--Subject to Protective Order

Hydrochloric acid was selected because it offered the following possible advantages:

(1) It would permit pH control during flotation.

(2) It would, to some extent, solubilize and loosen carbonate particles which may be coating talc particles.

(3) HCl forms no insoluble salts which could enter the froth product as by-product contaminants.

(4) HCl is inorganic and not subject to decay.

(5) HCl does not produce an objectionable odor.

(6) HCl does not contribute objectionable color.

(7) Salts of the reacting acid are easily washed out in a filtration step.

(8) HCl should aid in solubilizing and wetting the dolomite particles to promote their exclusion from the froth.

The Float-1 product from Test 39, although highly improved mineralogically, contained too much fine talc to be fully acceptable. Tests 43 to 46, inclusive, were made, all in the same manner, to provide enough weight of products for a more thorough examination, particularly of particle size distribution. Flotation results are given in Table 8 with the test conditions.

The data in Table 8 show essentially the same results as in Test 39 except that the weight recovery in Float-1 plus Float-2 is 74.5 per cent as compared with 71.1 in Test 39.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000869

TABLE 8.  FLOTATION RESULTS OF TESTS 43-46

| Product | Weight Per Cent | Mineral Count, per cent | | | |
|---------|-----------------|-------|----------|----------|-----------|
| | | Platy | Nonplaty | Dolomite | Tremolite |
| Float-1 | 60.2 | 98 | 1 | 0.7 | <1 |
| Float-2 | 14.3 | 96 | 2 | 1.4 | 1 |
| Underflow | 25.5 | 67 | 21 | 6.0 | 6 |
| Total | 100.0 | 90 | 6 | 2 | 2 |
| Feed | 100.0 | 90 | 6 | 3 | 1 |

### Flotation Test Conditions

| Operation | Reagents Added, lb/ton of feed | | Time, min | Solids Per Cent | pH | Water |
|-----------|-----|-------------|-----------|-----------------|------|-------|
| | HCl | Dowfroth 200 | | | | |
| Wetting | 0 | 0 | 5 | 20 | | |
| Conditioner | 0.09 | 0 | 2 | 10.3 | 7.6 | Distilled |
| Float-1 | 0 | 0 | 10 | 10.3 | 7.8 | Distilled |
| Float-2 | 0 | 0.13 | 5 | -- | 7.6 | Distilled |

Note:  Float-1
     Bulk Density    23.7 lb/ft$^3$
     pH            8.7
     +200 Mesh    2 per cent

All the products from Tests 43 to 46, inclusive, were treated by sedimentation to determine the particle size distribution.  These results are given in Table 9.

Table 9 shows that the flotation feed and the Float-1 product are similar to particle size distribution down to about 6.7 microns.  Below this size more of the fine particles show up in greater percentages in the underflow product.  In the column titled Distribution of Sizes, it is seen that 33.6 per cent of all the minus 6.7 plus 4.7-micron particles are in the underflow, 45.8 per cent of all the minus 4.7 plus 3.9-micron particles are in the underflow, and so on.  This high rejection of the fine particles to tne underflow and out of the froth undoubtedly accounts for the less voluminous froth and hence the higher grade product.

B A T T E L L E    M E M O R I A L    I N S T I T U T E

Protected Document--Subject to Protective Order

TABLE 9. SIZE DISTRIBUTION OF FLOTATION TEST PRODUCTS OBTAINED BY FLOTATION WITHOUT PRIOR CYCLONING FOR REMOVAL OF FINES (-10 MICRON PARTICLES)

| Particle Size, microns | Flotation Feed, weight per cent | | Float-1, weight per cent | | Float-2, weight per cent | | Underflow, weight per cent | | Distribution of Sizes, per cent | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | In Size | Cumulative | In Size | Cumulative | In Size | Cumulative | In Size | Cumulative | Float-1 | Float-2 | Underflow |
| +31.4 | 22.8 | 22.8 | 24.8 | 24.8 | 20.0 | 20.0 | 14.3 | 14.3 | 69.6 | 13.3 | 17.1 |
| -31.4+13.9 | 37.3 | 60.1 | 37.5 | 62.3 | 33.5 | 53.5 | 28.4 | 42.7 | 65.3 | 13.8 | 20.9 |
| -13.9+ 9.7 | 12.7 | 72.8 | 13.2 | 75.5 | 15.7 | 69.2 | 13.5 | 56.2 | 57.8 | 16.4 | 25.8 |
| - 9.7+ 6.7 | 8.3 | 81.1 | 10.1 | 85.6 | 9.6 | 78.8 | 9.4 | 65.6 | 61.7 | 13.9 | 24.4 |
| - 6.7+ 4.7 | 5.4 | 86.5 | 4.7 | 90.3 | 7.3 | 86.1 | 7.7 | 73.3 | 48.6 | 17.8 | 33.6 |
| - 4.7+ 3.9 | 2.4 | 88.9 | 1.1 | 91.4 | 2.2 | 88.3 | 3.2 | 76.5 | 36.9 | 17.3 | 45.8 |
| - 3.9+ 2.9 | 2.8 | 91.7 | 2.5 | 93.9 | 3.1 | 91.4 | 4.7 | 81.2 | 48.9 | 13.7 | 37.4 |
| - 2.9+ 2.4 | 1.3 | 93.0 | 1.6 | 95.5 | 1.3 | 92.7 | 2.1 | 83.2 | 56.8 | 11.2 | 32.0 |
| - 2.4+ 1.3 | 3.5 | 96.5 | 1.6 | 97.1 | 3.5 | 96.2 | 7.1 | 90.4 | 29.4 | 15.3 | 55.3 |
| - 1.3 | 3.5 | 100.0 | 2.9 | 100.0 | 3.8 | 100.0 | 9.6 | 100.0 | 36.9 | 11.4 | 51.7 |
| Total | 100.0 | | 100.0 | | 100.0 | | 100.0 | | | | |
| Per Cent Weight of Total | 100.0 | | 60.2 | | 14.3 | | 25.5 | | | | |

Note: These data obtained from Tests 43-46 using HCl and Dowfroth 200 as the only reagents. (See also Table 8.)

Protected Document--Subject to Protective Order

JNJAZ55_000000871

Although this was an encouraging development, the Float-1 product was only 75.5 per cent coarser than 9.7 microns, which also means that it contained 24.5 per cent of particles finer than 9.7 microns, and this is much too fine, as was suspected.

At this point, it was known that it was possible to obtain an improved talc by a relatively simple process. A pilot plant could be designed to process the ore but complete data were lacking that would give the information for obtaining optimum results consistently.

More information was required on what improvements were possible by modifying the process and also what unfavorable results might appear if the modifications exceeded certain limits. The following subjects were investigated to obtain the data for the most efficient plant design and operation:

(1)  Results obtained when fines were removed after flotation

(2)  Results obtained when fines were removed before flotation

(3)  Effect of the amount of HCl added in flotation

(4)  Comparison of HCl with $H_2SO_4$ as flotation reagents

(5)  Effect of different types of water on quality and recovery of finished product

(6)  Effect of pulp density on quality and recovery of finished product

(7)  Effect of amount and type of frother added.

Results Obtained When Fines Were Removed After Flotation

Although a method for increasing the platy talc content was known, the finished float product still contained 24.5 per cent of fine talc. The logical method of removing the fines was by hydraulic classification or

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000000872

cycloning. Flotation Tests 52-55[a] were made to prepare enough froth product for cycloning.

Float-1 and 2 of Tests 52-55 were combined and given two stages of cyclone treatment. The resulting product was examined microscopically, and it was obvious that the minus 10-micron size particles had not been sufficiently removed.

The reason for incomplete removal of the fines is not certain, and although it is probable that a prolonged investigation would lead to a satisfactory method of classification this approach was discontinued. A more direct approach was decided upon which consisted of cycloning to remove the fines before flotation.

Results Obtained When Fines Were Removed Before Flotation

A sample of Italian No. 2 talc was cycloned according to Test C-12 procedure (Table 3) and the cyclone underflow was used as the feed for flotation Test 58.

The Float-1 product contained 98 per cent platy talc and 51.0 per cent of the weight of the flotation feed.

Over-all results of cycloning and flotation are given in Table 10, including the flotation conditions.

Table 10 shows that 51.0 per cent of the weight of the flotation feed was recovered in a product that was 98 per cent platy talc. However, it was only 35.4 per cent of the weight of the original ore (cyclone feed).

Examination of the Float-1 product subjectively by hand, and under the microscope, showed that, although improved in quality, it still contained

_____

(a)  See First Progress Report, Appendix A.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

TABLE 10. RESULTS OBTAINED WHEN FINES ARE REMOVED BEFORE FLOTATION

| | Weight Per Cent in Test | Weight Per Cent of Original Ore | Mineral Count, per cent | | | | Remarks |
|---|---|---|---|---|---|---|---|
| | | | Platy | Nonplaty | Dolomite | Tremolite | |
| Cyclone* | | | | | | | |
| Overflow | 30.6 | 30.6 | Not determined | | | | Largely fine, acicular particles |
| Underflow | 69.4 | 69.4 | 92 | 3 | 4 | 1 | |
| Total | 100.0 | 100.0 | | | | | |
| Feed | | | 90 | 6 | 3 | 1 | |
| Flotation Test 58 | | | | | | | |
| Float-1 | 51.0 | 35.4 | 98 | 2 | <1 | <1 | Too much minus 10-micron talc |
| Float-2 | 23.8 | 16.5 | Not determined | | | | |
| Underflow | 25.2 | 17.5 | Not determined | | | | |
| Total | 100.0 | 69.4 | | | | | |
| Feed | | | 92 | 3 | 4 | 1 | |

Flotation Test Conditions

| Operation | Reagents Added, lb/ton of feed | | Time, min | Solids, per cent | pH | Water | Remarks |
|---|---|---|---|---|---|---|---|
| | HCl | Dowfroth 200 | | | | | |
| Conditioner | 1.13 | 0 | 2 | 11.2 | 7.8 | Distilled | Float-1 froth voluminous but easily broken down |
| Float-1 | 0 | 0 | 5 | 11.2 | 8.1 | Distilled | |
| Float-2 | 0 | 0.13 | 5 | — | 8.1 | Distilled | |

* C-12, Table 3.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_00000874

an excess of dust-forming particles. However, it was much improved over any product made up to that time. A sample of the Float-1 product was given to Dr. W. H. Lycan in May, 1958, at a conference with Messers. R. D. Macdonald and O. F. Tangel of Battelle. It was agreed that the Float-1 product was superior in quality to that being marketed by Johnson and Johnson at that time.

Further improvement in over-all cyclone and flotation results, by a more efficient rejection of fines, was necessary. This was obtained by re- vising the cyclone procedure to conform to the method of cycloning described as C-14 procedure, which is reported in Table 7, and floating the cyclone underflow. Tests 63 to 66, inclusive, were made in this manner and the com- plete results are given in Table 11. Examination of the flotation underflow showed that there was valuable talc which had not been recovered. This pro- duct was treated by a scavenger cyclone and the underflow was given a scavenger float. In other words, the original flotation underflow was repro- cessed as would be done in a continuous operation.

Table 11 gives the results of the complete processing and represents what could reasonably be expected from a pilot-plant operation. Test conditions are given in Table 11a.

In the summary given in Table 11, it is seen that by combining the Float-1 and Float-2 with the scavenger float product, an improved talc which is 97 per cent platy was obtained in 59.6 per cent of the original weight of the ore.

The pilot plant now being erected was designed principally from data developed from these combinations of experiments. The final flowsheet of the pilot plant incorporates optional circuits which may permit a slight improve- ment in quality of finished product by retreating the Float-2 and scavenger float products.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000875

TABLE 11.  RESULTS OBTAINED FROM TESTS 63-66 USING COMBINED CYCLONING AND FLOTATION INCLUDING A SCAVENGER TREATMENT FOR ADDITIONAL RECOVERY

| Product | Distribution of Weight, per cent | | Mineral Count, per cent | | | | Remarks |
|---|---|---|---|---|---|---|---|
| | In Process | Of Original Ore | Platy | Nonplaty | Dolomite | Tremolite | |
| Original Ore | 100.0 | 100.0 | 90 | 6 | 3 | 1 | Contains 27.2 per cent of minus 10-micron particles |
| **Cyclone** | | | | | | | |
| Overflow(a) | 32.6 | 32.6 | 79 | 15 | 5 | 1 | Cyclone Test C-14 Potential by-product |
| Underflow | 67.4 | 67.4 | 25 | 2 | 2 | 1 | Contains 6.6 per cent of minus 10-micron particles |
| Total | 100.0 | 100.0 | 90 | 6 | 3 | 1 | |
| **Flotation** | | | | | | | |
| Float-1 | 54.9 | 37.0 | 98 | 1 | 0.5(b) | <1 | Flotation Tests 63-66 |
| Float-2 | 24.6 | 16.6 | 97 | <2 | 0.9(b) | <1 | Float-1 contains 5 per cent of minus 10-micron particles |
| Underflow(a) | 20.5 | 13.8 | 85 | 4 | 8.3(b) | 2 | |
| Total | 100.0 | 67.4 | 95 | 2 | 2.2 | 1 | |
| **Scavenger Cyclone** | | | | | | | |
| Overflow(a) | 17.6 | 2.4 | 74 | 15 | 5 | 6 | Cyclone Test C-17 Potential by-product |
| Underflow | 82.4 | 11.4 | 87 | 3 | 9 | 1 | |
| Total | 100.0 | 13.8 | 85 | 4 | 8.3 | 2 | |
| **Scavenger Flotation** | | | | | | | |
| Float | 53.0 | 6.0 | 95 | 3 | <1 | <1 | Flotation Test 77C17 |
| Underflow(a) | 47.0 | 5.4 | 77 | 4 | 18 | 1 | Potential by-product |
| Total | 100.0 | 11.4 | 87 | 3 | 9 | 1 | |
| **Summary** | | | | | | | |
| **Float Products** | | | | | | | |
| Float-1 | 54.9 | 37.0 | 98 | 1 | 0.5(b) | <1 | Float-1 bulk density 29.3 lb/ft3 and 1.3 per cent coarser than 200 mesh |
| Float-2 | 24.6 | 16.6 | 97 | <2 | 0.9(b) | <1 | |
| Scavenger Float | 53.0 | 6.0 | 25 | 3 | <1 | <1 | |
| Composite | | 59.6 | 97 | <2 | <1 | <1 | |

(a)  Mineral count is calculated from material balance.

(b)  Dolomite content was determined by chemical analysis for $CO_2$ and converting to $MgCa(CO_3)_2$.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_00000876

TABLE 11a.  TEST CONDITIONS USED TO OBTAIN RESULTS GIVEN IN TABLE 11

| Cycloning | Test C-14 | Test C-17 |
|---|---|---|
| Cyclone Diameter, mm | 30 | 30 |
| Cyclone Feed Inlet, mm | 6 | 6 |
| Cyclone Vortex Finder, mm | 8.4 | 8.4 |
| Cyclone Apex, mm | 2.9 | 2.9 |
| Feed, per cent solids | 4.9 | 1.0 |
| Feed Pressure, psi | 14.7 | 14.7 |
| Feed, Flow Rate, gpm | 2.4 | 2.4 |

| Flotation | Tests 63-66 | Test 77C17 |
|---|---|---|
| Feed, per cent solids | 8.3 | 8.1 |
| pH during Float-1 | 7.6 | 8.4 |
| pH during Float-2 | 7.8 | Not determined |
| HCl Added for Float-1, lb/ton of flotation feed | 1.75 | 0 |
| Dowfroth 200 Added, lb/ton of flotation feed | | |
| Float-1 | 0.07 | 0.17 |
| Float-2 | 0.28 | Float-2 not made |
| Flotation Time, minutes | | |
| Float-1 | 5 | 5 |
| Float-2 | 5 | Float-2 not made |

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000877

-34-

## Effect of the Amount of HCl Added in Flotation

Tests 58, 59, 60, 78, and 79 in Table 12 are presented to compare the results obtained by changing the amount of hydrochloric acid used in the tests.

Data given in Table 12 show that, with HCl additions up to 2.3 pounds per ton of feed, the Float-1 product contains not less than 97 or 98 per cent platy talc. When 6.82 pounds of HCl was added, the Float-1 product dropped to 95 per cent platy talc and the weight per cent recovered was only 46.6 per cent (Test 60).

Tests 78 and 79 show that the Float-1 products contained about 97 to 98 per cent platy talc with a weight recovery of about 59 to 60 per cent. Hydrochloric acid up to 2.3 pounds per ton of feed would appear to be justified only if it were effective in inhibiting the inclusion of fine talc in the froth and aiding in froth control.

The quantity of acid used is less significant than the pH of the flotation feed. The flotation process should be controlled by using that quantity of acid necessary to obtain the pH which gives good results. According to the experiments shown in Table 12, a pH range of 6.9 to 7.8 will give a Float-1 product containing 97 to 98 per cent platy talc.

In milling practice, the mill water and the ore may vary in chemical properties so that if a fixed amount of acid is used there will be no control over the flotation feed pH.

## Comparison of HCl with $H_2SO_4$ as Flotation Reagents

Comparative experiments were made to determine whether sulfuric acid, which is less expensive, could be used in place of hydrochloric acid. The results are given in Table 13.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000878

TABLE 12.  EFFECT OF HCl ON FLOTATION RESULTS

| Test No. | Weight Per Cent | Mineral Count, per cent | | | | Pounds Reagent Added Per Ton of Feed | | Pulp, pH |
| | | Platy | Nonplaty | Dolomite | Tremolite | HCl | Dowfroth 200 | |
|---|---|---|---|---|---|---|---|---|
| Test 58 (11.2 per cent feed solids) | | | | | | | | |
| Float-1 | 51.0 | 98 | <2 | < | < | 1.13 | 0 | 7.8 |
| Float-2 | 23.8 | | | | | 0 | 0.13 | 8.1 |
| Underflow | 25.2 | | | | | – | – | |
| Total | 100.0 | | | | | | | |
| Test 59 (11.5 per cent feed solids) | | | | | | | | |
| Float-1 | 50.3 | 97 | < | < | < | 2.26 | 0 | 6.9 |
| Float-2 | 28.5 | | | | | 0 | 0.13 | 8.1 |
| Underflow | 21.2 | | | | | – | – | |
| Total | 100.0 | | | | | | | |
| Test 60 (10.6 per cent feed solids) | | | | | | | | |
| Float-1 | 46.6 | 95 | 2 | 1 | 2 | 6.82 | 0 | 6.2 |
| Float-2 | 26.7 | | | | | 4.26 | 0.13 | 3.7 |
| Underflow | 26.7 | | | | | – | – | |
| Total | 100.0 | | | | | | | |
| Test 78 (10.6 per cent feed solids) | | | | | | | | |
| Float-1 | 59.3 | 98 | 1 | 1.1 | 0 | 2.30 | 0.07 | 7.5 |
| Float-2 | 25.1 | | | | | 0 | 0.25 | |
| Underflow | 15.6 | | | | | – | – | |
| Total | 100.0 | | | | | | | |
| Test 79 (10.0 per cent feed solids) | | | | | | | | |
| Float-1 | 60.4 | 96 | 2 | 1.2 | 0 | 0 | 0.09 | 8.7 |
| Float-2 | 24.1 | | | | | 0 | 0.33 | |
| Underflow | 15.5 | | | | | – | – | |
| Total | 100.0 | | | | | | | |

Note: The feed for each test above was the cyclone underflow from a C-12 or C-14 type treatment.

BATTELLE  MEMORIAL  INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_00000879

TABLE 13.  COMPARISON OF HCl WITH $H_2SO_4$ AS A FLOTATION REAGENT

| | Weight Per Cent | Mineral Count, per cent | | | | Reagents Added, lb/ton of flotation feed | | | Pulp, pH | Feed, % solids |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Platy | Nonplaty | Dolomite | Tremolite | $H_2SO_4$ | HCl | Dowfroth 200 | | |
| **Test 61** | | | | | | | | | | |
| Float-1 | 57.4 | 98 | 1 | 0.6 | <1 | 0 | 1.75 | 0.07 | 7.2 | 8.3 |
| Float-2 | 20.8 | 97 | 2 | 1.1 | <1 | 0 | 0 | 0.20 | 7.6 | - |
| Underflow | 21.8 | Not evaluated | | | | - | - | - | | |
| Total | 100.0 | | | | | | | | | |
| **Test 87** | | | | | | | | | | |
| Float-1 | 45.2 | 96 | 2 | 1 | <1 | 2.5 | 0 | 0.07 | 7.2 | 8.0 |
| Float-2 | 32.7 | Not evaluated | | | | 0 | 0 | 0.20 | 7.8 | - |
| Underflow | 22.1 | Not evaluated | | | | - | - | - | | |
| Total | 100.0 | | | | | | | | | |

Note:  Flotation feed was the cyclone underflow.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000880

Tests 61 and 87, made under almost identical conditions, show that $H_2SO_4$ is not a good substitute for HCl. When using $H_2SO_4$ the Float-1 product contained 96 per cent platy talc in 45.2 per cent of the weight compared with Test 61 using HCl which yielded 98 per cent platy talc in 57.4 per cent of the weight. In both of these tests Dowfroth 200 was used as the frothing agent.

### Effect of Different Types of Water on Quality And Recovery of Finished Product

Most laboratory flotation tests are made with either distilled or soft water. The reason for this is that certain anions and cations generally present in tap water will activate or depress certain minerals. The number of variables involved during an experimental program can be minimized by using distilled or soft water. Because talc is such a sensitive floater, distilled water, containing virtually no stray ions, was used in all preceding investigations.

From a commercial standpoint, distilled water is expensive and deionized or demineralized water is usually a satisfactory alternative. However, it is more expensive than soft water which in turn is more expensive than tap water.

Because the intended pilot plant and any commercial operation would use a substantial amount of water, it was necessary to determine what problem the different types of water might contribute to the process.

A comparison of the results obtained from the use of tap, deionized, soft, and distilled waters is given in Table 14.

Table 14 shows that soft water gave only 42.7 per cent weight recovery and 93 to 95 per cent platy talc content in the float product. Ordinarily soft water, as a mineral slurrying agent, is beneficial in nonmetallic

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_00000881

TABLE 14, COMPARISON OF FLOTATION RESULTS OBTAINED FROM THE USE OF TAP, DEIONIZED, SOFT, AND DISTILLED WATER

| Test No. | Product | Water Used | Weight Per Cent | Mineral Count, per cent | | | | Pulp, pH | Reagents Added, lb/ton of flotation feed | | Remarks |
| | | | | Platy | Non-platy | Dolomite(a) | Tremolite | | HCl | Dowfroth 200 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 100 | Float-1 | Tap | 60.9 | 97 | 1 | 0.9 | <1 | 7.3 | 1.75 | 0.07 | Dull luster |
| 98 | Float-1 | Tap | 60.9 | 97 | 2-3 | 0.8 | <1 | 8.6 | 0 | 0.06 | Dull luster |
| 115 | Float-1 | Deionized | 56.3 | 97 | <2 | 0.5 | <1 | 6.9 | 1.57 | 0.06 | Good luster |
| 116 | Float-1 | Deionized | 60.6 | 96 | 2 | 0.8 | 1 | 7.1 | 0 | 0.07 | Good luster |
| 119 | Float-1 | Soft | 42.7 | 93 | 4 | 0.6 | 2 | 7.2 | 1.63 | 0.06 | Medium luster |
| 120 | Float-1 | Soft | 42.6 | 95 | 3 | 1.1 | 1 | 7.7 | 0 | 0.07 | Medium luster |
| 102 | Float-1 | Distilled | 54.7 | 97 | 2 | 0.6 | <1 | 6.8 | 1.74 | 0.07 | Good luster |
| 101 | Float-1 | Distilled | 62.2 | 98 | 1 | 0.6 | <1 | 7.1 | 0 | 0.07 | Good luster |

(a) Per cent dolomite is calculated from chemical analysis of $CO_2$.

Note: All tests were made with all conditions, except the water, as nearly the same as possible.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000882

flotation processes. Although reasonable guesses can be made for the cause of this effect, not enough tests were made to establish conclusive evidence. The Float-1 products obtained when tap, deionized, or distilled waters were used were mineralogically the same, about 97 to 98 per cent platy talc. The Float-1 products obtained when tap water was used had a dull luster. It was decided on this basis that deionized water, being cheaper than distilled water would be the most practical water to use.

The deionized water used in the tests had a resistance of about 140,000 ohms per cubic centimeter of water. Columbus tap water had a total hardness of 92 ppm and contained 261 ppm of total solids with a pH of 10.1 and a resistance of about 5000 ohms per cubic centimeter. The zeolite softened water used in the experiments had a resistance of 3750 ohms per cubic centimeter.

Effect of Feed Pulp Density on Quality and
Recovery of Finished Product

The effect of flotation pulp density on the froth product is important to the process. The higher the pulp density that can be used, the higher the capacity of the equipment, or the higher the rate of production.

Ordinarily high feed pulp densities tend to yield high weight recovereis but this advantage is usually offset by an intermediate quality froth product.

When considering ores in general, an average pulp density for flotation feed is about 25 to 30 per cent solids. The amount or weight of mineral floated is usually less than 25 per cent of the feed weight and the specific surface area is low, as compared with platy minerals such as talc. These conditions do not exist with talc of the Italian No. 2 type and, therefore, some modifications in normal procedure are required.

Protected Document--Subject to Protective Order

JNJAZ55_000000883

In the first place, the potential weight of mineral floated may be as high as 90 per cent of the feed weight because the platy talc content is 90 per cent in the feed. Because of the platelet type of mineral structure, as opposed to the blocky type, the specific surface of the material is high which means that there are many more particles per unit of weight than with the blocky type of mineral. Finally, when a mineral as soft as talc is crushed and ground, a significant proportion of the weight is unavoidably ground to a particle size finer than 10 or 15 microns. Particles this fine are always troublesome in flotation circuits because they are large reagent consumers, and when they enter the froth it becomes voluminous, highly stable, and almost invariably results in the entrapment of unwanted particles which ordinarily would not be floated.

Observations made during many of the early flotation experiments indicated that pulp densities in excess of about 10 to 13 per cent solids created excessively voluminous froths, when testing materials of a high platy content such as Italian No. 2 talc.

If a substantial amount of the minus 10-micron particles are removed, as by a C-14 type cyclone method, before flotation, the froth is not unmanageable.

The results of experiments made at different feed densities are given in Table 15. The feed for each experiment was a cyclone underflow containing about 8 per cent of minus 10-micron particles.

Table 15 shows that 97 to 98 per cent platy talc was made from feed pulps ranging between 10.6 and 8.0 per cent solids.

It was observed during the investigation that, as the per cent of solids in the feed was decreased, the froth became less persistent. Table 15 also shows that, as the percentage of solids was dropped from 10.6 to 8.0, the dolomite trapped in the froth dropped from 1.1 down to 0.3 per cent.

Protected Document--Subject to Protective Order

JNJAZ55_000000884

-41-

TABLE 15.  FLOTATION RESULTS OBTAINED AT DIFFERENT PER CENT SOLIDS OF FEED

| Test | Product | Weight Per Cent | Feed Solids, Per Cent | Mineral Count, per cent | | | | Reagents Added, lb/ton of flotation feed | | |
|------|---------|-----------------|------------------------|-------|----------|----------|----------|-----|----------|----------|
| | | | | Platy | Nonplaty | Dolomite | Tremolite | HCl | Dowfroth 200 | Dowfroth 250 |
| 78 | Float-1 | 59.3 | 10.6 | 98 | 1 | 1.1(a) | 0 | 2.3 | 0.07 | |
| 79 | Float-1 | 60.4 | 10.0 | 97 | 2 | 1.2(a) | 0 | 0 | 0.09 | |
| 115 | Float-1 | 56.3 | 8.9 | 97 | <2 | 0.5(a) | <1 | 1.57 | 0.06 | |
| 63-76 | Float-1 | 54.9 | 8.3 | 98 | 1 | 0.5(a) | <1 | 1.75 | 0.07 | |
| 134 | Float-1 | 59.0 | 8.0 | 98 | 1 | 0.3(a) | <1 | 1.77 | | 0.07 |

(a)  Dolomite assays calculated from $CO_2$ analyses.

BATTELLE    MEMORIAL    INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000885

At 10.6 per cent feed solids the weight recovery was 59.3 per cent and dropped to 54.9 per cent when the feed solids was 8.3 per cent.

Test 134 gave a weight recovery of 59.0 per cent but a stronger frother, Dowfroth 250, was used.

Effect of Amount and Type of Frother Added

Two types of water-soluble frothers were investigated. The original choice of frother for the investigations was Dowfroth 200 made by the Dow Chemical Company, Midland, Michigan. Chemically, it is a polypropylene glycol methyl ether having the general formula $CH_3-(O-C_3H_6)_x-OH$ with an average molecular weight of 200. It is 100 per cent water soluble.

The amount of frother used regulates, to a large extent, the weight recovery. An excess of frother will promote voluminous froths resulting in a loss of selectivity in addition to creating material-handling problems.

Experiment 58, using hydrochloric acid and no frother, shows that a 98 per cent platy talc could be produced. Experiments were made with the addition of frother up to about 0.10 pound per ton of feed before the froth product began to become mineralogically degraded. Therefore, a test procedure was established that limited the amount of frother added to the Float-1 step at about 0.08 pound per ton of feed. Table 16 shows some comparative results obtained in this range of operation.

A stronger frother, Dowfroth 250, having the same general formula as Dowfroth 200 but with a molecular weight of 250, was also investigated, but not extensively. Results of these tests for comparative purposes are included in Table 16.

BATTELLE    MEMORIAL    INSTITUTE

Protected Document--Subject to Protective Order

TABLE 16. FLOTATION RESULTS OBTAINED USING DIFFERENT AMOUNTS OF FROTHER AND ALSO A STRONGER FROTHER

| Test | Product | Weight Per Cent | Reagents Added, lb/ton of flotation feed | | | Mineral Count, per cent | | | |
| | | | HCl | Dowfroth 200 | Dowfroth 250 | Platy | Nonplaty | Dolomite | Tremolite |
|---|---|---|---|---|---|---|---|---|---|
| 58 | Float-1 | 51.0 | 1.13 | 0 | 0 | 98 | <2 | <1 | <1 |
| 63-76 | Float-1 | 54.9 | 1.75 | 0.07 | 0 | 98 | 1 | 0.5(a) | <1 |
| 110 | Float-1 | 61.6 | 0 | 0.08 | 0 | 97 | 2 | <1 | <1 |
| 138 | Float-1 | 52.2 | 2.02 | 0 | 0.03 | 97 | 2 | 0.4(a) | 1 |
| 133 | Float-1 | 53.3 | 1.59 | 0 | 0.06 | 98 | 1 | 0.4(a) | <1 |
| 134 | Float-1 | 59.0 | 1.77 | 0 | 0.07 | 98 | 1 | 0.3(a) | <1 |

(a) Per cent dolomite is calculated from chemical analysis of $CO_2$.

BATTELLE MEMORIAL INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000887

-44-

Table 16 shows that as the amount of frother is increased, the per cent of weight recovered increases. When no frother was used the weight recovery was 51.0 per cent and increased to 61.6 per cent when 0.08 pound of Dowfroth 200 was used per ton of feed.

When 0.03 pound of Dowfroth 250 was used per ton the weight recovered was 52.2 per cent. This was increased to 59.0 per cent by using 0.07 pound per ton of feed.

A good comparison of the relative strength of the two frothers is noted by comparing Tests 63-76 with Test 134. The results show that Dowfroth 250 floated 4.1 per cent more talc than Dowfroth 200 when 0.07 pound per ton was used.

All of the flotation experiments made on Italian No. 2 talc are not discussed in the text of this report. A complete tabulation of the experiments made, showing the pertinent data, is presented in the Appendix.

## Drying of Flotation Froth Products

All froth products from the flotation experiments were filtered and washed, and dried in a gas-fired oven at about 350 F. However, in a commercial drying operation, such as spray drying, the temperature might be up to about 1000 F for instantaneous periods in the inlet zone of the drier.

Samples of flotation froths were obtained and treated at various temperatures to find the maximum temperature that could be used without damaging the desirable surface properties and appearance of talc. The results are shown in Table 17.

BATTELLE    MEMORIAL    INSTITUTE

Protected Document--Subject to Protective Order

TABLE 17.  OBSERVATIONS ON THE CHANGE OF PHYSICAL PROPERTIES
OF TALC AT ELEVATED TEMPERATURES

| Temperature, F | Remarks |
|---|---|
| 350 | No change in physical appearance |
| 650 | Ditto |
| 725 | " |
| 975 | " |
| 1100 | " |
| 1200 | Surfaces become tinted |
| 1300 | Surfaces definitely tinted |
| 1400 | Surfaces definitely tinted |
| 1550 | Surfaces creamy color, gritty, beginning to show crystallographic change |

From the data in Table 17, it was apparent that about 1100 F was the highest, safe, drying temperature.  Temperatures in excess of 1100 F began to produce discoloration and perhaps crystallographic changes.  At 1550 F, the talc particles began to take on the appearance of tremolite.

These data indicate that it would be safe to operate a spray drier at a maximum operating temperature of 1100 F without damage to the product, but 1000 F would probably be a safer limiting temperature.

Drying by vacuum and infra-red were considered.  Vacuum drying has one advantage in that temperatures only slightly above room temperature can be used.  This would minimize the chances of particle deterioration because of temperature.  The vacuum-drying process is not continuous and requires considerable capital outlay.

Infra-red heating using electric or gas-fired light wave generators is another possible method of drying the talc product.  Because no commercial application of this method for drying of talc or similar materials was known, it was decided not to undertake a unit-process development at this point.

Protected Document--Subject to Protective Order

JNJAZ55_000000889

Drying of powders in rotary kilns is widely practiced but it too has some shortcomings. Auxiliary dust collecting equipment is required, the powder is easily contaminated, and localized overheating in the kiln can ruin the product.

A large sample of Italian No. 2 talc was treated by sedimentation to obtain a split at 10-micron particle size for spray drying tests at Bowen Engineering, Incorporated, North Branch, New Jersey. The minus 10-micron portion was prepared to simulate the cyclone overflow product and the plus 10-micron portion was prepared to simulate the flotation froth product. After separating at the proper size, the density of the slurry was adjusted to that anticipated from the pilot-plant thickeners and filters.

The experiments were made in a laboratory spray drier and showed that completely dry products could be obtained on a continuous basis.

Test results showed that the rate of drying in the laboratory spray drier on the plus 10-micron talc could be expected to be about 0.6 to 1.0 pound per minute. The minus 10-micron talc was dried at a rate of about 0.8 pound per minute. The spray drier had a maximum inlet temperature of 1000 F and outlet temperature of 590 F. Recovery of minus 10-micron talc was 81 to 94 per cent and recovery of the plus 10-micron talc was 93 to 96 per cent. The optimum conditions of drying could be established only after a lengthy testing program so these initial results were accepted as suitable for determining the approximate size of pilot-plant equipment.

## Filtration of Test Products

It was realized that all of the products obtained from the several beneficiation processes had a potential value and that their recovery was important.

Protected Document--Subject to Protective Order

JNJAZ55_000000890

The cyclone overflow, although containing about 70 per cent minus 10-micron particles was 79 per cent platy talc, and probably would be a valuable by-product. Furthermore, only unique circumstances would permit wasting this material to a settling pond, as it could be a public nuisance.

Experiments made in the laboratory established that the cyclone overflow would not settle in a thickener in a practical length of time without the aid of a flocculating agent. Experiments made using Dow Separan 2610, a commercial flocculating agent at about 0.05 pound per ton of solids were successful in creating fast settling flocs of the fine talc.

Samples of the cyclone overflow were treated with Separan 2610 and settled to a pulp density of 16 per cent solids. The flocculated slurry was then tested with an Eimco Test Filter Kit to obtain data on filtering rates. These data are given in Table 18.

Table 18 shows that the maximum rate of filtration was 36.9 pounds of dry cake per square foot of filter cloth per hour. Increasing the drying time (air drying by pulling air only through the filter cake) resulted in very small changes in the residual cake moisture content. When 30 seconds drying time was used, the cake had a moisture content of 44.0 per cent. When 90 seconds of drying time was used, the moisture content dropped to 42.3 per cent. The maximum thickness of cake, 9/32 inch, was obtained with 1-1/2 to 2 minutes forming time. However, this did not result in the highest filtration rate.

The highest filtration rate would probably be obtained by using a 45-second forming time and a 30-second drying time. The calculated filter capacity under these conditions would be about 41 pounds of dry filter cake per square foot of filter cloth area per hour.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_00000891

TABLE 18.   FILTRATION RATES OF FLOCCULATED CYCLONE OVERFLOW

| Forming Time, seconds | Vacuum, in Hg | Drying Time, seconds | Filtrate Volume, ml | Cake Thickness, inches | Weight Cake, grams Wet | Weight Cake, grams Dry | Moisture, per cent | Filtration Rate, lb/ft2 of filtering area/hr |
|---|---|---|---|---|---|---|---|---|
| 60 | 21 | 30 | 225 | 7/32 | 75.2 | 41.9 | 44.0 | 36.9 |
| 60 | 19 | 60 | 230 | 7/32 | 79.9 | 43.4 | 45.6 | 28.7 |
| 30 | 19 | 60 | 175 | 5/32 | 59.9 | 32.4 | 45.9 | 28.5 |
| 45 | 21 | 60 | 195 | 6/32 | 70.9 | 38.7 | 45.4 | 24.0 |
| 120 | 18 | 90 | 325 | 9/32 | 115.2 | 61.2 | 45.3 | 23.1 |
| 90 | 18 | 90 | 265 | 9/32 | 99.9 | 53.7 | 44.4 | 23.7 |
| 60 | 18 | 90 | 215 | 8/32 | 91.8 | 49.7 | 43.8 | 26.3 |
| 30 | 18 | 90 | 90 | 4/32 | 47.9 | 25.9 | 42.3 | 17.1 |

Filter Cloth Type: TF-204, 2/2 twill, multifilament, thread count 75 x 70; airflow 1410 cfm.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000892

Filtration experiments were also made on the combined Float-1 and Float-2 flotation products in a similar manner, except that Separan 2610 was not needed nor desired as a flocculating agent.

A single experiment using 15 inches of Hg vacuum, 15 seconds forming time and 90 seconds drying time, a product was obtained containing 30 per cent moisture at an equivalent rate of 44.5 pounds of dry cake per square foot of filter cloth area per hour. The rate of filtration could be increased by decreasing the amount of drying time to 30 seconds. Later investigations showed that it was necessary to wash the filter cake to remove most of the soluble salts, if the luster of the talc was to be preserved after drying.

Experiments were made to determine how much washing of the filter cake was necessary. The Float-1 product, as obtained from Test 115, was placed in a Büchner filter and the filtrate, containing 500 milliliters of liquid, showed a resistance of 10,500 ohms per ml. The filter cake was washed the first time with 13.5 milliliters of fresh deionized water at 125,000 ohms and the filtrate measured 27,800 ohms. The filter cake was washed the second time with 135 ml of fresh deionized water and the filtrate measured 53,000 ohms. The filter cake was washed a third time with 135 ml of fresh deionized water and the filtrate measured 50,000 ohms. Therefore, two washes were necessary to reach a constant filtrate condition of about 50,000 ohms, indicating that most of the soluble salts were removed. The drop in electrical resistance from 125,000 to 50,000 ohms represents the constant of solubility of the remaining dolomite in the filter cake. The weight of the filter cake being washed was 93.4 grams. This means that 270 milliliters of water were required for 93.4 grams of talc, which is equivalent to 0.35 gallon of deionized water to wash 1.0 pound of talc during filtration.

Protected Document--Subject to Protective Order

JNJAZ55_000000893

## PROPOSED PILOT-PLANT FLOWSHEET

Figure 2 shows the proposed pilot-plant flowsheet for treating Italian No. 2 talc.

This flowsheet was developed from data obtained from experiments with laboratory equipment, and more specifically from results of cyclone and flotation tests up through cyclone Test C-14 and flotation Test 76.

In the flowsheet shown in Figure 2, several waste products are indicated. These are from the thickener overflows, filtrate from the filters, and the slurry from the dust collectors. The filtrate will be a clear water containing no solids. Thickener overflow will contain some submicron size particles and perhaps some small amount of valuable particles. However, it is estimated that these losses will be negligible. The product obtained as a slurry from the dust collectors should be finer than 2 or 3 microns, and in the pilot plant will be discarded as waste. The amount produced will be weighed and examined for physical properties. If it is found to be significant, it can be combined with the by-product material. The plan is to recover only part of the potential by-product for use as a market survey material. According to the flowsheet the by-product is made up of the primary and scavenger cyclone overflows and the scavenger flotation underflow. Each of these products has distinctively different properties but will be combined in the pilot plant because of economy and simplicity of operation. The primary cyclone overflow should contain about 70 per cent of minus 10-micron particles, 2 to 3 per cent dolomite, and represent about 35 per cent of the plant feed. The scavenger flotation tailing may contain 10 to 15 per cent of minus 10-micron particles, 8 to 10 per cent dolomite, and represent 15 to 20 per cent of the plant feed. Provisions will be made in the pilot plant to collect these products separately, as well as combined, so that they can be evaluated as individual by-products.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order                    JNJAZ55_000000894



| Estimated contents of pilot plant products | | | |
|---|---|---|---|
| | Feed | By-product | Superior talc |
| Weight per cent | 100 | 40-50 | 50-60 |
| Pounds per hour | 500 | 200-250 | 250-300 |
| Platy talc, per cent | 90 | 70-80 | 97-99 |
| Minus 10 Micron, per cent | 27 | 65-70 | 5-7 |

C-33058

FIGURE 2.   PROPOSED PILOT PLANT FLOWSHEET

Optional circuits -----------

B A T T E L L E    M E M O R I A L    I N S T I T U T E

JNJAZ55_000000895

The Superior Talc is obtained by passing the spray drier product through a finishing screen.

The flowsheet shows a provisional circuit for shunting all or part of the Float-2 product to the Float-1. This will be done if the Float-2 quality is equal to the Float-1, which would be a very desirable condition. Some experiments indicated that this may be possible.

Also shown in Figure 2 is a step for leaching out the residual dolomite in the Float-1 product after removal from the thickener. At the time of this report, complete data are lacking on an ideal method to do this. Preliminary tests were made showing that it was impractical to thicken and leach simultaneously. The reason for this is probably because good mixing and intimate acid-solid contact is not obtained in the gentle action in a thickener.

By cycloning and flotation it was possible to decrease the dolomite content from slightly over 2 per cent in the original ore to 0.2 to 0.3 per cent in the Float-1 froth product. This is a tenfold reduction, but still not enough to yield a nonalkaline powder; some buffering agent would be required to obtain complete neutralization of the finished product unless successful leaching is employed.


CONCLUSIONS


Data and observations obtained from the cyclone and flotation experiments to date have established that:

(1) Italian No. 2 talc can be beneficiated by flotation alone to give a product which contains about 98 per cent platy talc.

(2) Flotation alone, which gives a high-purity product, does not remove or reject a sufficient amount of the fine talc and dolomite to make a satisfactory product.


BATTELLE    MEMORIAL    INSTITUTE

Protected Document--Subject to Protective Order

(3)  Flotation of feed, after removal of the minus 10-micron particles by hydraulic cycloning, yields a superior talc product containing 97-99 per cent platy talc with less than 7 per cent of the weight finer than 10 microns.

(4)  The highest quality products were obtained when the flotation feed pulp pH was between 6.8 and 7.8.

(5)  Feed pulp densities in excess of about 8 per cent solids yield voluminous froths and give poor rejection of dolomite, although this is offset somewhat by improved weight recovery.

(6)  Hydrochloric acid is helpful in the flotation step as a depressant for fine talc and nonplaty minerals.

(7)  Water-soluble frothers such as Dowfroth 200 and Dowfroth 250 are good promoters for the flotation of platy talc. Dowfroth 250 is a stronger promoter than Dowfroth 200. About 0.08 pound of frother per ton of flotation feed solids was the maximum amount added to produce a Float-1 product, otherwise the platy content of the froth product is lowered.

(8)  Sulphuric acid is not a satisfactory substitute for hydrochloric acid for pulp pH control.

(9)  Deionized water is probably the best water to use to form the talc slurry. Tap water gives products with a dull luster, although the platy content is about 97 per cent. Soft water gives products with a medium luster, but the recovery is low and the platy content is not improved over the feed material. Talc processed with deionized water gives the good luster and good recovery.

BATTELLE  MEMORIAL  INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000897

-54-

(10)   Drying beneficiated products at temperatures up to 1100 F does not alter the surface properties of the talc. Above 1100 F the talc begins to discolor and become gritty.

(11)   In order to retain a good luster on the flotation product, it is necessary to wash out, during filtration, the soluble salts contained in the slurry. The amount needed in the laboratory experiments was about 0.35 gallon of water per pound of talc.

Table 19 shows a comparison of the Sponsor's specifications with Italian No. 1 talc, which is their current raw talc source, and also with the beneficiated talc produced from Italian No. 2 as a raw material.

This table shows an improvement in all categories except that of fitting into the specified bulk density range of 22 to 27 pounds per cubic foot. The probable reason for this is that there is a relationship between the bulk density and the particle shape and size distribution of the powder. Within certain limits, removal of the fines will result in an increase in bulk density. Hence, any beneficiated product with all the 10-micron particles removed should have a higher bulk density than the whole mixture.

## FUTURE WORK

Further work is in progress to evaluate additional commercial alcohol frothers, as well as certain flotation modifiers such as the Aerosols.

Undoubtedly, certain problems unknown at this time will become evident during the pilot-plant operation, and some additional laboratory work may be necessary to solve them.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

TABLE 19.   COMPARISON OF SPECIFICATIONS OF ITALIAN NO. 1 WITH
ITALIAN NO. 2 BENEFICIATED TALC

| Physical Property Control | Specification | Italian No. 1 | Beneficiated Italian No. 2(a) |
|---|---|---|---|
| Moisture: | <0.15 per cent | 0.05 | <0.05 per cent |
| Solubility in HCl: | <6 per cent | 2.10-2.81 | <0.75 per cent |
| Fineness: | Not less than 98.5 per cent through 200 mesh | 99.8 per cent | 99.5 per cent <0.5 ÷ 200 mesh |
| Bulk Density: | Not less than 22 nor more than 27 lb/ft³ | 23.0 | 28.8 |
| Microscopic Structure: | Platelet showing no acicular nor excessive granular crystals | 88-90% Platy 8% Nonplaty <2% Carb Trace tremolite | 97-99% Platy 1-2% Nonplaty <1% Carb Trace tremolite |
| Desirable | | | |
| Dust, minus 10 micron | Low | 25-30 | 5-7% |
| Luster | High | Fair | Good (better than Italian No. 1) |
| Dolomite | <0.05 per cent | <2 per cent | <0.5 per cent |
| pH | 7.0-7.5 | 9.0-9.3 | 8.1-8.3 |
| Lubricity Index | >1.05 | 1.01 | 1.10 |

(a)  Beneficiated talc obtained from procedure similar to Flotation Tests 63-76.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000000899

The original notes on the laboratory work described in this report are in Battelle Laboratory Record Books 14265, 14668, 15042, 15190, 15456, and 15662.  The work was done in the period from May 12, 1958, to May 15, 1959.  Some of the discussions on flotation refer back to data presented in the First Progress Report of May 23, 1958, on the Physical Concentration of Talc Ores--Flotation.

WEB:lb

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000000900

APPENDIX

<u>SUMMARIZED RESULTS OF ALL FLOTATION TESTS</u>
<u>MADE ON ITALIAN NO. 2 TALC</u>

B A T T E L L E     M E M O R I A L     I N S T I T U T E

Protected Document--Subject to Protective Order

# APPENDIX

SUMMARIZED RESULTS OF ALL FLOTATION TESTS MADE ON ITALIAN NO. 2 TALC

| Test | Product | Weight Per Cent | Platy | Nodularly | Dolomite | Tremolite | Per Cent Dolomite(A) | Feed Solids, per cent | Pulping Water | pH of Float | HCl | Dowtherm 200 | 250 | Other | Feed Preparation Cyclone Pressure, psi | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 57 | Float-1 | 51.0 | 98 | <2 | <1 | <1 | | 11.2 | Distilled | 7.8 | 1.13 | | 0.13 | | 14.7 | Discarded because of contamination |
| 58 | Float-2 | 23.8 | 81 | | <1 | <1 | | 11.5 | Distilled | 8.1 | | | | | | Submitted to and approved by J & J, 5-7-59 |
| 59 | Float-1 | 50.3 | 97 | 2-3 | <1 | 2 | | 10.6 | Distilled | 6.9 | 2.26 | | 0.13 | | 14.7 | |
|  | Float-2 | 28.5 | 55 | | | | | | Distilled | 8.1 | | | | | | |
| 60 | Float-1 | 66.6 | 55 | 2 | <1 | | 0.6 | 8.3 | Distilled | 6.2 | 6.82 | | 0.13 | | 14.7 | |
|  | Float-2 | 26.7 | | | | | 1.1 | | Distilled | 3.7 | 6.25 | | 0.13 | | | |
| 61 | Float-1 | 57.4 | 98 | 1 | <1 | <1 | 0.6 | 8.3 | Distilled | 7.2 | 1.75 | | 0.07 | | 14.7 | |
|  | Float-2 | 20.8 | 97 | | | | | | Distilled | 7.6 | | | 0.20 | | | |
| 62 | Float-1 | 52.2 | 98 | <1 | | | | 5.1 | Distilled | 10.0 | | | 0.06 | | 14.7 | |
|  | Float-2 | 22.7 | 99 | 1 | | | 0.5 | | Distilled | 8.4 | | | 0.18 | | | |
| 63-76 | | 54.9 | 97 | <2 | | | 0.9 | | Distilled | 7.6 | 1.75 | | 0.16 | 0.25(c), 0.25(c) | | Bulk density:29.3 lb/ft3 |
| Underflow | | 24.6 | 84 | | <1 | <1 | 8.3 | | Distilled | 7.8 | | | 0.28 | | | |
| | | 20.5 | 85 | | | | | | Distilled | | | | | | | |
| 77C17 | Scavenger Float(b) | 53.0 | 95 | 3 | <1 | | | 8.1 | Distilled | 8.4 | | | 0.17 | | 14.7 | |
| 78 | Float-1 | 59.3 | 93 | 3 | 1 | <1 | 1.1 | 10.6 | Distilled | 7.5 | 2.3 | | 0.07 | | 14.7 | |
|  | Float-2 | 25.1 | | | | Trace | | | Distilled | | | | 0.25 | | | |
| 79 | Float-1 | 60.4 | 97 | 2 | Trace | 1 | 1.2 | 10.0 | Distilled | 8.7 | | | 0.09 | 0.13(d) | 14.7 | |
|  | Float-2 | 24.1 | | | | | | | Distilled | | | | 0.33 | | | |
| 80 | Float-1 | 51.8 | 96 | 3 | <1 | | | 10.6 | Distilled | 8.1 | 1.05 | | 0.15 | | Not cycloned | Feed washed with distilled water for removal of soluble salts; froth not satisfactory |
|  | Float-2 | 15.4 | | | | | | | Distilled | | | | | | Not cycloned | |
| 81 | Float-1 | 71.2 | | Not evaluated(e) | | | | 3.2 | Distilled | | 1.6 | | 0.20 | | Not cycloned | Froth poor, unmanageable |
|  | Float-2 | 8.6 | | | | | | | Distilled | | | | | | Not cycloned | |
| 82 | Float-1 | Discarded | | | | | | 8.2 | Distilled | | 1.6 | | 0.20 | 2.0(d) | Not cycloned | Free-running froth difficult to break down |
|  | Float-2 | Discarded | | | | | | | Distilled | | | | | | Not cycloned | |
| 83 | Float-1 | Discarded | | | | | | 3.2 | Distilled | | 1.6 | | 0.20 | 6.5(d) | Not cycloned | Free running, stable froth, not satisfactory |
|  | Float-2 | Discarded | | | | | | 3.2 | Distilled | | 3.5 | | | 5.2(d) | Not cycloned | Feed to flotation — prewashed and filtered |
| 84 | Float-1 | Discarded | | | | | | 3.2 | Distilled | | 2.25 | | 0.35 | | Not cycloned | |
| 85 | | 60.0 | | Not evaluated | | | | | Distilled | | | | | | | |
| 86 | Float-1 | 19.9 | 96 | 2 | | <1 | | 3.0 | Distilled | 6.8 | | | 0.07 | 2.0(d) | 14.7 | Used $H_2SO_4$ in place of HCl (see also tests 143-146 inclusive) |
| 87 | Float-2 | 32.7 | | | | | | | Distilled | | | | 0.20 | | | |
| 55 | Float-1 | 57.3 | | Demonstration test, not evaluated | | | | | Distilled | | | | | | | |
|  | Float-2 | 30.3 | | | | | | | Distilled | | | | | | | |
| 96 | Float-1 | 64.8 | 98 | 3 | <1 | <1 | 0.5 | 8.4 | Soft | 7.5 | 1.75 | | 0.07 | | 14.7 | Water not soft, test invalid |
|  | Float-2 | 21.1 | 93 | 4 | | <1 | 2.5 | | Soft | 7.8 | | | 0.26 | | | |
| Underflow | | 14.1 | | | | | 8.1 | | Soft | | | | | | | |
| 97 | Float-1 | 63.7 | 96 | 4 | <1 | | 0.5 | 7.9 | Soft | 8.0 | | | 0.06 | | 14.7 | Water not soft, test invalid |
|  | Float-2 | 22.4 | 91 | 6 | 1-2 | <1 | 2.9 | | Soft | 8.0 | | | 0.25 | | | |
| 98 | Float-1 | 60.6 | 92 | 5 | 2 | 1 | 0.8 | 7.7 | Tap | 8.6 | | | 0.07 | | 14.7 | Dull luster |
|  | Float-2 | 27.4 | 93 | 3 | <1 | | 2.2 | | Tap | 7.1 | 1.75 | | 0.25 | | | |
| 99 | Float-1 | 48.2 | 92 | 2 | | <1 | 0.4 | 8.1 | Tap | 7.1 | | | 0.07 | | 14.7 | Dull luster |
|  | Float-2 | 33.6 | | | | | 1.5 | | Tap | 7.4 | | | 0.07 | | | |
| 100 | Float-1 | 60.9 | 97 | | 2 | <1 | 0.9 | 8.0 | Tap | 7.3 | 1.75 | | 0.28 | | 14.7 | Dull luster |
|  | Float-2 | 19.5 | 93 | 4 | 1 | <1 | 2.3 | | Tap | 7.0 | | | 0.07 | | | |
| 101 | Float-1 | 62.2 | 93 | 4 | 2 | <1 | 0.6 | 8.1 | Distilled | ND | | | 0.26 | | 14.7 | |
|  | Float-2 | 26.6 | 95 | 2 | Trace | <1 | 3.1 | | Distilled | | | | 0.07 | | | |
| 102 | Float-1 | 54.7 | 97 | 2 | <1 | <1 | 0.6 | 8.3 | Distilled | 6.8 | 1.74 | | 0.07 | | 14.7 | |
|  | Float-2 | 30.6 | 96 | 2 | <1 | | 1.4 | | Distilled | | | | 0.26 | | | |
| Underflow | | 14.7 | | | | | 8.9 | | Distilled | | | | | | | |
| 107 | Float-1 | 57.7 | 98 | 2 | <1 | | | 8.0 | Soft | 8.4 | 1.45 | | 0.06 | | 14.7 | Quality of water in doubt, dull luster |
|  | Float-2 | 24.6 | 92 | 6 | <1 | | | | Soft | | | | 0.22 | | | |
| 108 | Float-1 | 60.7 | 95 | 3 | <1 | | | 7.0 | Soft | 7.1 | 3.36 | | 0.06 | | 14.7 | Quality of water in doubt, dull luster |
|  | Float-2 | 25.2 | 92 | 7 | <1 | | | | Soft | 7.8 | | | 0.24 | | | |
| 109 | Float-1 | 63.5 | 95 | 2 | <1 | | | 7.0 | Deionized | 7.1 | 2.00 | | 0.08 | | 14.7 | 6.5 per cent minus 10 microns |
|  | Float-2 | 23.5 | | | | | | | Deionized | 7.0 | | | 0.30 | | | |
| 110 | Float-1 | 63.6 | 97 | 2 | <1 | | | 6.5 | Deionized | 8.6 | | | 0.08 | | 14.7 | 6.4 per cent minus 10 microns |
|  | Float-2 | 24.2 | | | | | | | Deionized | 7.3 | | | 0.32 | | | |

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

SUMMARIZED RESULTS OF ALL FLOTATION TESTS MADE ON ITALIAN NO. 2 TALC
(Continued)

| Test | Product | Weight Per Cent | Platy | Rugosity | Dolomite | Tremolite | Per Cent Dolomite(A) | Feed Solids, per cent | Pulping Water | pH of Float | HCl | 200 | 250 | Other | Feed-Preparation Cyclone Pressure, psi | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 111 | Float-1 | 47.7 | Not evaluated, see remarks | | | | | 7.5 | Soft | 7.1 | 1.90 | 0.07 | | | 14.7 | Softness of water in doubt, test rerun later (see Tests 117-120 inclusive) |
|  | Float-2 | 36.6 | | | | | | | Soft | 7.4 | | 0.78 | | | | |
| 112 | Float-1 | 45.9 | Not evaluated, see remarks | | | | | 8.4 | Soft | 8.4 | | 0.06 | | | 14.7 | Softness of water in doubt, test rerun later (see Tests 117-120 inclusive) |
|  | Float-2 | 39.4 | | | | | | | Soft | 6.8 | 1.71 | 0.25 | | | | |
| 113 | Float-1 | 52.2 | Not evaluated, see remarks | | | | | 8.2 | Soft | 7.1 | | 0.06 | | | 14.7 | Softness of water in doubt, test rerun later (see Tests 117-120 inclusive) |
|  | Float-2 | 35.2 | | | | | | | Soft | 8.3 | | 0.07 | | | | |
| 114 | Float-1 | 55.4 | Not evaluated, see remarks | | | | | 7.6 | Soft | 7.2 | | 0.28 | | | 14.7 | Softness of water in doubt, test rerun later (see Tests 117-120 inclusive) |
|  | Float-2 | 30.5 | | | | | | | Soft | | | | | | | |
| 115 | Float-1 | 56.3 | 97 | <2 | <1 | <1 | 0.6 | 8.9 | Deionized | 6.8 | 1.57 | 0.06 | | | 14.7 | |
|  | Float-2 | 30.8 | 96 | 2 | >2 | 2 | 2.0 | | Deionized | 7.0 | | 0.23 | | | | |
| 116 | Float-1 | 60.5 | 96 | 2 | <1 | 2 | 0.8 | 8.0 | Deionized | 7.1 | | 0.07 | | | 14.7 | |
|  | Float-2 | 27.6 | 93 | 6 | 2 |  | 2.6 | | Deionized | | | 0.27 | | | | |
| 117 | Float-1 | 39.8 | 94 | 3 | 2 | 1 | | 8.6 | Soft | 6.7 | 1.63 | 0.06 | | | 14.7 | |
|  | Float-2 | 45.5 | 93 | 2 | 2 | 1 | | | Soft | | | 0.25 | | | | |
| 118 | Float-1 | 38.4 | 93 | 6 |  |  | | 7.7 | Soft | 8.2 | | 0.07 | | | 14.7 | |
|  | Float-2 | 47.0 | 93 | 4 | 2 | 2 | 0.6 | | Soft | 7.3 | 1.63 | 0.27 | | | | |
| 119 | Float-1 | 40.4 | 93 | 4 | <1 |  | 2.2 | 8.6 | Soft | 7.6 | | 0.06 | | | 14.7 | |
|  | Float-2 | 40.4 | | | | | | | Soft | 7.4 | | 0.24 | | | | |
|  | Float-3 | 9.2 | | | | | | | Soft | 7.7 | | 0.15 | | | | |
| 120 | Float-1 | 42.6 | 95 | 3 | 1 | 1 | 1.1 | 7.9 | Soft | 7.7 | | 0.07 | | | 14.7 | |
|  | Float-2 | 43.5 | 95 | 3 | <1 |  | 2.3 | | Soft | 7.6 | 1.62 | 0.27 | | 0.03 | | |
| 127 | Float-1 | 40.8 | 98 | 2 | <1 | <1 | 0.3 | 8.7 | Deionized | 6.7 | | 0.28 | | 0.28 | 23.0 | |
|  | Float-2 | 54.3 | 97 | 2 | <1 | <1 | 0.4 | 9.5 | Deionized | 6.9 | 1.46 | 0.06 | | 0.06 | 23.0 | |
| 128 | Float-1 | 31.5 | 98 | 2 | <1 | 1 | | 6.6 | Deionized | 6.6 | | 0.29 | | 0.25 | 23.0 | |
|  | Float-2 | 53.3 | 98 | 1 | <1 | 1 | 0.4 | 8.9 | Deionized | 6.9 | 1.59 | 0.06 | | 0.25 | 23.0 | |
| 133 | Float-1 | 32.0 | 98 | 1 |  |  | | | Deionized | 6.7 | | 0.07 | | 0.07 | 23.0 | |
|  | Float-2 | 59.0 | 98 | 1 | <1 | <1 | 0.3 | 8.0 | Deionized | 6.8 | 1.77 | 0.28 | | 0.28 | 14.7 | |
| 134 | Float-1 | 25.6 | 97 | 1 | <1 |  | | | Deionized | 7.0 | | 0.07 | | 0.27 | 14.7 | |
|  | Float-2 | 58.0 | 97 | 1 | 1 |  | | 8.2 | Deionized | 6.8 | 1.72 | 0.07 | | 0.07 | 14.7 | |
| 135 | Float-1 | 27.1 | 96 | 2 | <1 | <1 | | | Deionized | 7.0 | | 0.07 | | 0.28 | 14.7 | |
|  | Float-2 | 55.0 | 96 | 3 |  |  | 0.3 | 8.0 | Deionized | 6.4 | 1.77 | 0.28 | | 0.07 | 14.7 | |
| 136 | Float-1 | 33.0 | 97 | 2 | <1 | 1 | | | Deionized | 7.2 | | 0.27 | | 0.05 | 14.7 | |
|  | Float-2 | 54.0 | 97 | 2 | <1 | <1 | 0.4 | 8.4 | Deionized | 6.5 | 2.02 | 0.05 | | 0.03 | 14.7 | |
| 137 | Float-1 | 38.1 | 97 | 2 | 1 | 1 | | | Deionized | 6.4 | | 0.03 | | 0.30 | 14.7 | |
|  | Float-2 | 52.2 | 96 | 2 | <1 | <1 | 0.3 | 8.5 | Deionized | 6.7 | 2.00 | 0.30 | | 0.07 | 14.7 | |
| 138 | Float-1 | 32.4 | 97 | 2 | <1 | 1 | | | Deionized | 6.2 | | 0.07 | | 0.27 | 14.7 | |
|  | Float-2 | 46.2 | 96 | 2 |  |  | 0.4 | 8.2 | Deionized | 5.5 | 2.40 | 0.27 | | | 14.7 | |
| 139 | Float-1 | 38.1 | 95 | 2 | <1 | <1 | | | Deionized | 6.2 | 0.36 | | | | 14.7 | |
|  | Float-2 | 53.2 | 96 | 3 | <1 | 1 | 0.3 | 8.2 | Deionized | 6.7 | | 0.06 | 0.26 | | 14.7 | |
| 140 | Float-1 | 49.3 | 96 | 3 |  |  | 0.2 | 8.4 | Deionized | 6.7 | | | 0.07 | 2.41(f) | 14.7 | Used H2SO4 in place of HCl |
|  | Float-2 | 31.1 | 55 | 2 | <1 | 1 | 0.2 | | Deionized | 6.1 | | | | | 14.7 | |
| 143 | Float-1 | 58.2 | 95 | 5 |  |  | 0.3 | 9.0 | Deionized | 6.5 | | 0.06 | 0.07 | 2.35(f) | 23.0 | Used H2SO4 in place of HCl |
|  | Float-2 | 26.2 | 95 | 4 | <1 | 1 | 0.3 | | Deionized | 6.5 | | 0.29 | 0.27 | | 23.0 | |
| 144 | Float-1 | 52.9 | 95 | 3 | <1 | <1 | 0.2 | 8.9 | Deionized | 6.4 | | | 0.07 | 2.17(f) | 14.7 | Used H2SO4 in place of HCl |
|  | Float-2 | 28.3 | 97 | 3 | <1 | <1 | 0.2 | | Deionized | 6.7 | 1.57 | 0.04 | 0.27 | | 14.7 | |
| 145 | Float-1 | 55.5 | 93 | 5 |  |  | 0.2 | 7.0 | Deionized | 7.3 | | 0.31 | 0.04 | 2.11(f) | 23.0 | Used H2SO4 in place of HCl |
|  | Float-2 | 28.6 | 55 | 4 | <1 | <1 | 0.3 | 7.0 | Deionized | 7.5 | | 0.04 | 0.37 | | 23.0 | |
| 146 | Float-1 | 47.0 | 95 | 3 |  |  | 0.3 | 7.0 | Deionized | 6.3 | 1.79 | 0.36 | 0.04 | | 23.0 | |
|  | Float-2 | 38.0 | 95 | 1 | <1 | <1 | 0.5 | 7.0 | Deionized | 6.7 | | 0.04 | 0.36 | | 23.0 | |
| 149 | Float-1 | 43.0 | 98 | 2 |  | <1 | | 7.1 | Deionized | 6.4 | 1.80 | 0.35 | 0.07 | | 23.0 | 7.0 per cent minus 10 microns |
|  | Float-2 | 51.3 | | | | | | | Deionized | 6.4 | | | | | | 9.0 per cent minus 10 microns |
| 150(a) | Float-1 | 43.3 | 97 | 2 | <1 |  | 0.4 | 7.0 | Deionized | 6.7 | 1.83 | 0.30 | 0.32 | | 23.0 | 8.4 per cent minus 10 microns |
|  | Float-2 | 45.5 | | | | | | | Deionized | | | | 0.08 | | | 9.0 per cent minus 10 microns |
| 150(d) | Float-1 | 35.6 | | | | | | | | | | | | | | 8.0 per cent minus 10 microns |
|  | Float-2 | 47.8 | | | | | | | | | | | | | | 10.5 per cent minus 10 microns |
| 150(g) | Float-1 | 31.8 | | | | | | | | | | | | | | 8.3 per cent minus 10 microns |
|  | Float-2 | 56.1 | | | | | | | | | | | | | | 9.4 per cent minus 10 microns |
| 155 | Float-1 | 25.8 | | | | | | | | | | | | | | |

Footnotes appear on the following page.

BATTELLE   MEMORIAL   INSTITUTE

Protected Document--Subject to Protective Order

JNJAZ55_000000903

Footnotes For Table on Preceding Page.

(a) Per cent dolomite is calculated from chemical analysis of $CO_2$.

(b) $Na_2CO_3$.

(c) $Na_2P_4O_7$.

(d) Flotation underflows from Tests 63-72 were composited and cycloned. The cyclone underflow was used as the scavenger feed.

(e) Aerosol OT was added to improve froth and depress fines. Neither objective obtained. Products not mineralogically evaluated.

(f) $H_2SO_4$ was used in place of HCl.

(g) The platy-talc content of the float products from these tests is lower than expected and not consistent with results obtained in similar tests. There is no satisfactory explanation. The tests were intended to establish the effect of HCl for depressing minus 10-micron particles.

B A T T E L L E   M E M O R I A L   I N S T I T U T E

Protected Document--Subject to Protective Order

JNJAZ55_000000904

Exhibit 25

# SUMMARY REPORT





BATTELLE MEMORIAL INSTITUTE

d Document--Subject to Protective Order





# BATTELLE FIELDS OF RESEARCH

AERONAUTICAL ENGINEERING
AGRICULTURAL SCIENCES
AIR AND STREAM POLLUTION CONTROL
ANALYTICAL CHEMISTRY
BIOCHEMISTRY
BIOPHYSICS
CERAMICS
CHEMICAL ENGINEERING
CORROSION TECHNOLOGY
ECONOMICS
ELECTRICAL ENGINEERING
ELECTROCHEMICAL ENGINEERING
ELECTROCHEMISTRY
ELECTRONICS
EXTRACTIVE METALLURGY
FOOD AND FOOD PROCESSING
FOREST PRODUCTS
FOUNDRY PRACTICE
FUELS AND COMBUSTION
GRAPHIC ARTS TECHNOLOGY
HIGH-TEMPERATURE METALLURGY
INDUSTRIAL PHYSICS
INFORMATION PROCESSING
INORGANIC CHEMISTRY

INSTRUMENTATION
LIGHT ALLOYS AND RARE METALS
MECHANICAL ENGINEERING
METALLURGY
MINERALS PROCESSING
NONDESTRUCTIVE INSPECTION
NUCLEONICS
OPERATIONS RESEARCH
ORGANIC CHEMISTRY
ORGANIC COATINGS
PETROLEUM ENGINEERING
PHYSICAL CHEMISTRY
PROCESS METALLURGY
PRODUCTION ENGINEERING
PULP AND PAPER
RADIOISOTOPES AND RADIATION
REACTOR TECHNOLOGY
RUBBER AND PLASTICS
SOLID STATE DEVICES
SYSTEMS ENGINEERING
TEXTILES AND FIBERS
THEORETICAL AND APPLIED MECHANICS
THERMODYNAMICS
WELDING TECHNOLOGY

Protected Document--Subject to Protective Order

JNJNL61_000001370

# BUSINESS CONFIDENTIAL

SUMMARY REPORT

on

ULTRASONIC COMMINUTION OF TALC

to

JOHNSON AND JOHNSON RESEARCH

August 31, 1959

by

J. N. Antonevich, W. E. Chase, and L. E. Walkup

BATTELLE MEMORIAL INSTITUTE
505 King Avenue
Columbus 1, Ohio

*Battelle is not engaged in research for advertising, sales promotion, or publicity purposes, and this report may not be reproduced in full or in part for such purposes.*

# BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order

# BUSINESS CONFIDENTIAL

# Battelle Memorial Institute

5 0 5    K I N G    A V E N U E    C O L U M B U S   I,   O H I O

October 8, 1959

Mr. W. H. Ashton
Research Department
Johnson and Johnson
New Brunswick, New Jersey

Dear Mr. Ashton:

Work on the project "Ultrasonic Comminution of Talc" has been terminated, as requested during your July 27, 1959, phone conversation with Mr. Macdonald of our Minerals Beneficiation Division.

We are submitting a report on the work done. On the basis of incomplete data, it appears that the ultrasonic comminution of talc can be developed into a useful process for producing high-quality powder. The data are not sufficient as yet, however, to define all the parameters that influence the ultrasonic grinding process. We would be glad to undertake this further work if Johnson and Johnson should decide on the basis of this report to reopen the study. The adaptability of various transducers to determine minimum equipment and operating costs for processing talc with vibratory energy also should be included in any further work.

We enjoyed working on this project. If there are any questions concerning the report, we would be glad to answer them.

Very truly yours,

*Lewis E. Walkup*

Lewis E. Walkup, Chief
Applied Physics Division

LEW:mar
Enc. (6)

cc: Dr. W. H. Lycan
    Mr. C. V. Swank

# BUSINESS CONFIDENTIAL

D E D I C A T E D   T O   T H E   A D V A N C E M E N T   O F   S C I E N C E

Protected Document--Subject to Protective Order

JNJNL61_000001372

# BUSINESS CONFIDENTIAL

## TABLE OF CONTENTS

                                                                    Page

SUMMARY . . . . . . . . . . . . . . . . .   1

INTRODUCTION . . . . . . . . . . . . . . .   1

EXPERIMENTAL PROCEDURE . . . . . . . . . .   2

EXPERIMENTAL RESULTS . . . . . . . . . . .   4

DISCUSSION . . . . . . . . . . . . . . . .   11

CONCLUSIONS AND RECOMMENDATIONS . . . . . .   12

### LIST OF FIGURES

Figure 1.  Assembly for Comminuting Talc With 20-Kc Vibrations . . . . .   3

Figure 2.  Relationship Between Amount of Minus 10-Mesh Talc Comminuted to
           Minus 200 Mesh, and Treatment Time at Various Ultrasonic
           Power Levels . . . . . . . . . . . . . . . . . . . .   5

Figure 3.  Relationship Between Comminution Rate and Solids Content of a Minus
           10-Mesh Talc Slurry Exposed to 20-Kc Vibrations . . . . . . .   5

Figure 4.  Relationship Between Comminution Rate and Ultrasonic Power for
           Batch Grinding of 10-Mesh Talc to Minus 200-Mesh Talc . . . . .   6

Figure 5.  Relationship Between Comminution Rate and Ultrasonic Power for
           Grinding a Simulated Recirculating Load of 10-Mesh Talc to Minus
           200-Mesh Talc . . . . . . . . . . . . . . . . . . . .   6

Figure 6.  Relationship Between Exposure Time to Reach Equilibrium and
           Ultrasonic Power When Grinding a Simulated Recirculating Load of
           10-Mesh Talc to 200-Mesh Talc . . . . . . . . . . . . .   6

Figure 7.  Photomicrograph of Minus 200-Mesh Plus 10-Micron Fraction of
           Ultrasonically Ground Talc . . . . . . . . . . . . . .   10

### LIST OF TABLES

Table 1.  Size Distribution of Comminuted Talc When Treated With 1.28 Kw
          per 50-Gram Load . . . . . . . . . . . . . . . . .   7

Table 2.  Distribution of Particle Sizes in Flotation Feed Obtained From Com-
          minuted Talc When Treated With 1.28 Kw per 50-Gram Load . . . .   7

Table 3.  Flotation Results Obtained From Ultrasonically Comminuted Talc . .   8

Table 4.  Particle-Size Distribution of Series I and Series II Samples . . . .   9

Table 5.  Mineral Character of Series I and Series II Samples . . . . . . .   9

BATTELLE   MEMORIAL   INSTITUTE

# BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order

JNJNL61_000001373

# BUSINESS CONFIDENTIAL

## ULTRASONIC COMMINUTION OF TALC

by

### J. N. Antonevich, W. E. Chase, and L. E. Walkup

## SUMMARY

A study was made of the process parameters affecting ultrasonic comminution of plus 200 minus 10-mesh talc to plus 10-micron minus 200-mesh talc. It was found that the rate of comminution in a batch process and a process in which the oversize fraction was recirculated increases linearly with ultrasonic power. At a given power level, the process using a recirculating load was three times more efficient than the batch process. A talc slurry having approximately 40 per cent solids appeared to give optimum comminution rates.

On the basis of line power consumed by the magnetostrictive transducer assembly used in this study, having an over-all efficiency of approximately 15 per cent, the total energy required to grind 1 pound of minus 10-mesh talc to minus 200-mesh talc ranged from 3 to 4 kwhr. The use of fluid dynamic transducers can possibly reduce total energy requirements by a factor of 10.

Ultrasonic grinding appears to be selective in producing platy talc preferentially; the ground plates appear to be thinner than those produced by conventional grinding methods, and about 80 per cent of the individual plates have rounded corners.

There is an indication that some of the impurities in platy talc, although not the carbonate, are finely ground during ultrasonic grinding and can be rejected by simple classification. In one instance a product prepared in this way contained 98 per cent platy talc.

The application of ultrasonic or sonic energy to grinding talc into a high-quality powder appears to be technically feasible. Additional studies will be needed to define the practical limitations of the process.

## INTRODUCTION

Prior to this project, exploratory experiments had been conducted using ultrasonic techniques to comminute talc. They indicated that plus 200 minus 10-mesh talc can be comminuted to minus 200 mesh at a power rate of 1800 kwhr/ton. Microscopical examinations of the ultrasonically ground talc showed a high-quality talc, in that individual talc platelets were intact having rounded corners and appearing to be in the thinnest possible platelet form. There appeared to be some degree of selective comminution, i. e., only talc appeared to be comminuted — other minerals in the raw ore were not appreciably broken down.

### BATTELLE   MEMORIAL   INSTITUTE

# BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order

JNJNL61_000001374

# BUSINESS CONFIDENTIAL

2

The apparent high quality of the ultrasonically comminuted talc and the reasonable power cost estimate of 1 cent per pound (on the basis of 1 cent per kwhr for power) warranted further investigation.  On April 1, 1959, an investigation was undertaken on the effects of frequency, power level, and initial particle size on the comminution rate and final particle size of talc exposed to vibratory energy.

This report describes the work done toward establishing the important process parameters affecting the comminution of plus 200 minus 10-mesh talc to plus 10-micron minus 200-mesh high-quality talc.

### EXPERIMENTAL PROCEDURE

Investigations were made into the process parameters affecting ultrasonic comminution of plus 200 minus 10-mesh talc to plus 10-micron minus 200-mesh high-quality talc.  These process parameters include the solids content of the talc slurry, and the ultrasonic power level as they influence the ultrasonic comminution of talc in a batch process and in a process in which the oversize fraction is recirculated.

A Sheffield-Cavitron Model 1000 A power oscillator and 20-kc transducer (Sheffield Corp., Dayton, Ohio) were used to generate ultrasonic power.  Figure 1 shows the experimental arrangement used for most of the experiments.  It consists of a stainless steel chamber 4 inches deep, having an inside diameter of 1-3/4 inches.  This chamber was inserted within a coil of 1/4-inch copper tubing, and was restrained and gasketed within a steel enclosure constructed about the coil.  The temperature of the talc slurry was maintained constant by running tap water through the copper tubing.  This eliminated the possibility of temperature influencing the comminution rate.  The chamber assembly was fitted over a standard double-cylinder mechanical transformer or horn (Sheffield No. 35-258) having a 1-1/2-inch-diameter radiating face.  An O-ring was used as a seal between the cylindrical chamber and the horn.

Relative power supplied to the transducer was monitored by an ammeter in the plate circuit of the power oscillator driving the transducer.  It was assumed that the power output of the oscillator was directly proportional to the plate current, and that the oscillator was 50 per cent efficient.  With these assumptions, maximum power delivered to the transducer would be 1 kw, the rating of the transducer-oscillator combination.  The total maximum power consumed from the line would be 2 kw.

Slurries of desired solids content, composed of plus 200 minus 10-mesh talc and deionized water, were placed in the chamber to form a column 3 inches deep.  This depth was chosen as it appeared to produce a resonant column with 20-kc vibrations at any concentration of talc investigated.  A resonant column is desired for maximum energy transfer from the transducer to the slurry.

The natural agitation accompanying the ultrasonic treatment of low talc concentration was sufficient to obtain reproducible comminution results.  At high solids content, results were not consistent.  To obtain consistent results, a stirring motor had to be used to keep talc from settling on the vibrating face of the double-cylinder mechanical transformer.

### BATTELLE   MEMORIAL   INSTITUTE

# BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order

# BUSINESS CONFIDENTIAL

3



FIGURE 1.   ASSEMBLY FOR COMMINUTING TALC WITH 20-KC VIBRATIONS

Protected Document--Subject to Protective Order

JNJNL61_000001376

# BUSINESS CONFIDENTIAL

4

The criterion used for comminution was the weight of talc ground sufficiently to pass through a 200-mesh sieve. In the case of batch treatments, the talc was exposed to 20-kc vibrations for 5, 15, and 35 minutes. At the end of each exposure, the talc was sieved, dried, and weighed to determine the amount of talc reduced to minus 200 mesh. In the case of recirculating-load treatments, a given concentration of plus 200 minus 10-mesh talc was given a series of 5-minute treatments. At the end of each 5-minute period, the fines passing through a 200-mesh screen were collected, dried, and weighed. An amount equal to the fines removed was added to the remaining talc to maintain a constant concentration of talc for each time period of treatments.

## EXPERIMENTAL RESULTS

A series of experiments was made to determine the comminution characteristics of talc treated in batches. Figure 2 shows the relationship between the amount of a 25-gram talc load comminuted to minus 200 mesh and the time of treatment at various power levels.

A series of experiments also was made to determine the influence of solids content on the ultrasonic comminution of talc. Figure 3 shows the relationship between comminution rate and the solids content for a fixed time of exposure and power level. For the experimental arrangement used, a talc slurry having a 40 per cent solids content appeared to be best. At other power levels and stirring conditions, it is possible that other concentrations would be found better. An ideal arrangement would be one in which the energy density and particle distribution throughout the slurry is uniform. Under such conditions, the rate of comminution might be directly proportional to the solids content as indicated by work reported on the ultrasonic dispersion of Progesterone*.

Figure 4 shows the relationship between maximum batch-comminution rate and electrical power used in processing the talc. The relationships shown are linear for talc loads having 20 and 35 per cent solids content.

A series of experiments also was made to establish the comminution characteristics of talc when a recirculating load was exposed to ultrasonic vibrations. Conditions of a recirculating load were approximated by treating the load for 5-minute periods, removing fines and adding an equal amount of coarse talc at the end of each time period, until the amount of fines removed was constant.

Figure 5 shows the relationship obtained between comminution rate and electrical power for a simulated recirculating load. Figure 6 shows the approximate time required to reach equilibrium in the simulated circulating load at various power levels.

Twelve pounds of minus 10-mesh talc was batch treated using an equivalent of 1.28 kw per 50-gram load in the experimental arrangement. Each batch, or charge,

---

*Misek, B., and Skaven, D. M., "A Study of Dispersion with Ultrasound", J. Am. Pharm. Assoc., Scientific Edition, XLVII, (1) (Jan. 1958), reprinted in Ultrasonic News, 2 (7), 13-16 (1958).

**B A T T E L L E   M E M O R I A L   I N S T I T U T E**

# BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order

# BUSINESS CONFIDENTIAL

5



FIGURE 2.  RELATIONSHIP BETWEEN AMOUNT OF MINUS 10-MESH TALC COMMINUTED TO MINUS 200 MESH, AND TREATMENT TIME AT VARIOUS ULTRASONIC POWER LEVELS

Frequency of vibration, 20 kc; weight of talc, 25 grams; solids content of slurry, 19 per cent; transducer rating, 1 kw



FIGURE 3.  RELATIONSHIP BETWEEN COMMINUTION RATE AND SOLIDS CONTENT OF A MINUS 10-MESH TALC SLURRY EXPOSED TO 20 KC VIBRATIONS

Exposure time, 15 minutes; transducer driven at 50 per cent rated power; volume of slurry, 118 cm$^3$; talc ground to minus 200 mesh

BATTELLE   MEMORIAL   INSTITUTE

## BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order



FIGURE 4.   RELATIONSHIP BETWEEN COMMINUTION RATE AND ULTRASONIC
POWER FOR BATCH GRINDING OF 10-MESH TALC TO MINUS 200-
MESH TALC

Transducer rating is 1 kw.



FIGURE 5.   RELATIONSHIP BETWEEN COMMINUTION RATE AND ULTRASONIC
POWER FOR GRINDING A SIMULATED RECIRCULATING LOAD OF
10-MESH TALC TO MINUS 200-MESH TALC

Transducer rating is 1 kw.   The solids content of the talc slurry is
33 per cent.   Exposure of load was made in 5-minute increments.



FIGURE 6.   RELATIONSHIP BETWEEN EXPOSURE TIME TO REACH EQUILIBRIUM
AND ULTRASONIC POWER WHEN GRINDING A SIMULATED
RECIRCULATING LOAD OF 10-MESH TALC TO MINUS 200-MESH TALC

Transducer rating is 1 kw and the solids content of the circulating slurry
is 33 per cent

BATTELLE   MEMORIAL   INSTITUTE

BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order

JNJNL61_0000013

# BUSINESS CONFIDENTIAL

7

was treated for 5 minutes to obtain an ultrasonically processed talc that could be used for preliminary beneficiation experiments.

A screen and sedimentation analysis of the 12 pounds of ultrasonically ground talc was made. Results were obtained as shown in Table 1.

TABLE 1.   SIZE DISTRIBUTION OF COMMINUTED
TALC WHEN TREATED WITH 1.28 KW
PER 50-GRAM LOAD

| Size Fractions | Weight Per Cent |
|---|---|
| Plus 200 mesh | 42.8 |
| Minus 200 mesh plus 10 micron | 45.8 |
| Minus 10 micron | 11.4 |
| | 100.0 |

Table 1 shows that by the particular experimental arrangement used on the 12 pounds of talc, about 46 per cent of the talc was produced in the desired size range of minus 200 mesh plus 10 microns. The plus 200-mesh fraction accounts for over 42 per cent of the feed. This portion should be removed by screening to be returned and blended with new feed. By this procedure a closed grinding circuit can be simulated.

Information on how the ultrasonically ground talc responds to flotation was obtained from a few preliminary flotation experiments on the 12-pound batch. The ultrasonically ground product was wet screened to remove the 200-mesh oversize. Based on the figures obtained on the screen and sedimentation work, the size distribution of the flotation feed was calculated after the plus 200-mesh fraction was removed.

Table 2 shows the calculated values.

TABLE 2.   DISTRIBUTION OF PARTICLE SIZES IN
FLOTATION FEED OBTAINED FROM
COMMINUTED TALC WHEN TREATED
WITH 1.28 KW PER 50-GRAM LOAD

| Size Fraction | Weight Per Cent |
|---|---|
| Minus 200 mesh plus 10 micron | 80.1 |
| Minus 10 micron | 19.9 |

**BATTELLE   MEMORIAL   INSTITUTE**

# BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order

# BUSINESS CONFIDENTIAL

8

The minus 200-mesh fraction was then cycloned and the resulting minus 200-mesh plus 10-micron fraction was floated. Five flotation experiments were made. The first flotation experiments showed that acicular particles of talc floated with the platelets. Therefore, modifications in the beneficiation procedure were made in an attempt to eliminate these acicular particles. These modifications consisted of using greater dilution during cycloning and in using smaller quantities of reagents during flotation.

Table 3 shows the best flotation separation obtained with talc ground ultrasonically.

### TABLE 3.   FLOTATION RESULTS OBTAINED FROM ULTRASONICALLY COMMINUTED TALC

| Product | Weight Per Cent | Microscopic Count, per cent | |
| --- | --- | --- | --- |
| | | Platy | Nonplaty (Mostly Acicular) |
| Cyclone overflow | 33.0 | (a) | (a) |
| Float 1 | 39.2 | 97-98 | 2-3 |
| Float 2 | 11.6 | 96 | 4 |
| Flotation underflow | 16.2 | (a) | (a) |
| Total | 100.0 | | |

It is emphasized that neither the grind nor the flotation conditions were considered as being optimum in these five exploratory experiments.

Two other ultrasonically ground samples were submitted to Battelle's Minerals Beneficiation Division for flotation experiments.

These two samples, Series I and II, were made in a simulated recirculating ultrasonic grinding circuit using 90 and 46 per cent of the rated power of the ultrasonic transducer, respectively.

A representative fraction of each of the two samples was treated by sedimentation to determine the amount of minus 10-micron material present. Table 4 shows the distribution of sizes in these fractions.

Table 4 shows that the Series II samples contained 32.4 per cent of the material finer than 10 microns, compared with 43.9 per cent finer than 10 microns in the Series I samples. The lower energy level produced fewer minus 10-micron particles.

The sedimentation products were examined under the petrographic microscope to determine the mineral character. Table 5 summarizes these observations.

Protected Document--Subject to Protective Order   JNJNL61_0000013

# BUSINESS CONFIDENTIAL

9

TABLE 4.   PARTICLE-SIZE DISTRIBUTION OF SERIES I
AND SERIES II SAMPLES

| Product | Weight Per Cent |
|---|---|
| Series I; minus 200 mesh plus 10 micron | 56.1 |
| Series I; minus 10 micron | 43.9 |
| Total | 100.0 |
| | |
| Series II; minus 200 mesh plus 10 micron | 67.6 |
| Series II; minus 10 micron | 32.4 |
| Total | 100.0 |

TABLE 5.   MINERAL CHARACTER OF SERIES I
AND SERIES II SAMPLES

| Product | Sedimentation Products, per cent | | | |
|---|---|---|---|---|
| | Platy Talc | Nonplaty Talc | Carbonate | Tremolite |
| Series I; minus 200 mesh plus 10 micron | 98 | ±1 | +1 | Trace |
| Series II; minus 200 mesh plus 10 micron | 98 | <1 | +1 | Trace |
| Series I; minus 10 micron | None | 72 fines and shards | <1 | ±4 |
| Series II; minus 10 micron | None | 70 fines and shards 25 nonplaty | <1 | ±5 |

Protected Document--Subject to Protective Order

JNJNL61_000001382

# BUSINESS CONFIDENTIAL

10

Microscopic examination showed that both minus 200-mesh plus 10-micron samples (Series I and II) were excellent products.  Each contained a large proportion of well-developed platelets, i.e., thin, flat, circular, or rounded.  Figure 7 shows a photomicrograph of Series I sedimentation products.



75X                                                             N61292

Plane-Polarized Light

FIGURE 7.  PHOTOMICROGRAPH OF MINUS 200-MESH PLUS 10-
MICRON FRACTION OF ULTRASONICALLY
GROUND TALC

Recirculating load exposed to 46 per cent of rated
power of ultrasonic transducer.

Attention is directed to the data of Table 5, which show that talc of very high platy content was obtained simply by sedimentation of the ultrasonically ground talc.  The carbonate content of these products, however, is still greater than 1 per cent.  A flotation step would be required to eliminate it.  These limited experiments should not be taken as conclusive, but there is an indication that at this power level the nonplaty talc is broken down to the minus 10-micron range preferentially by ultrasonic grinding.  If further experimental work verifies this trend, it might be possible to produce a high-grade finished talc product from a low-carborate feed simply by grinding and classification for removal of fines, without the necessity of introducing a beneficiation step such as froth flotation.  This same trend has been shown in ball-mill grinding, but to a lesser extent.  For instance, the classification for removal of fines from the Italian No. 2 talc, which has been carried out in the talc pilot plant, has increased the platy content from 90 to 95 per cent.  This is the same talc on which the ultrasonic grinding

BATTELLE    MEMORIAL    INSTITUTE

# BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order                                                    JNJNL61_0000013

# BUSINESS CONFIDENTIAL

11

was done.  There is no instance however, where talc of 98 per cent platy quality has been produced without the use of flotation, other than the data of Table 5.

No cyclone or flotation experiments were made on the Series I or II samples, because the development work was curtailed as requested by the Sponsor.

## DISCUSSION

Assuming that the conditions used to obtain the above data on the ultrasonic comminution of a circulating load of talc are optimum and that electrical power costs are 1 cent per kwhr, the cost of comminuting 1 pound of 10-mesh talc to minus 200-mesh talc would be from 3 to 4 cents.  Therefore, the power cost to process a pound of talc would be almost constant if an electrical generator, such as a rotary generator having low standby losses, could be used.  It is estimated that the over-all efficiency of power transformation from electrical to 20-kc vibratory power of the experimental assembly was 15 per cent.  In general, the efficiency of electrical power oscillators of the type used is about 50 per cent, and for the type of ultrasonic transducer used 30 per cent. It is conceivable that systems for comminuting talc can be designed with higher over-all efficiencies.  This would reduce processing costs.  For example, if sonic frequencies are used, in particular 15 kc, then an over-all efficiency in the neighborhood of 30 per cent might be obtained, halving processing costs.  A more promising approach would be to use fluid dynamic transducers, which in general have reduced the cost of ultrasonic processes, when applicable, by a factor of 10.  A simple experiment had been performed using a blender (230-watt Osterizer, John Oster Mfg. Co., Milwaukee, Wis.) to determine this possibility.  Rough estimates indicated that a batch of 10-mesh talc could be ground to 200-mesh talc by this method at a power expenditure of 1 kwhr per pound.  It can be assumed that for a circulating load the power expended per pound of processed talc would be much less.

The quality of ultrasonically processed talc appears to be a function of the vibratory energy level to which it is exposed.  Observations made of talc-water suspensions after various ultrasonic comminution conditions indicated that batch samples exposed to power levels above 440 watts for any time period produced a colloidal suspension of some of the particles.  In general, as the time of exposure or power level increased, the amount of particles colloidally suspended increased.  It was also observed that particles other than talc found in the suspension were not notably fractured at any of the energy levels used.  Although work was interrupted before a relationship between initial talc particle size and its ultrasonic comminution rate could be determined, the literature indicates that the smaller the initial particle size the smaller will be the size of the suspended particles after ultrasonic treatment for a given time period.  The literature appears to substantiate the possibility of controlled comminution by the ultrasonic process.  In the ultrasonic dispersion of Progesterone it was found that the extent of dispersion was directly related to the ultrasonic intensity applied, and that the extent of dispersion was a function of time of application and initial particle size.  In a closed-flow circuit ultrasonic comminution process the minimum particle size can be controlled through the rate of flow of talc slurry and the rate of comminution by the ultrasonic intensity or power.

**BATTELLE   MEMORIAL   INSTITUTE**

# BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order

## BUSINESS CONFIDENTIAL

12

## CONCLUSIONS AND RECOMMENDATIONS

Ultrasonic comminution appears to be a promising method of producing talc powder of a high and controllable quality.  The power required to comminute 1 pound of plus 200-mesh talc minus 10-mesh talc to minus 200-mesh talc is estimated at 3.5 kw using magnetostrictive transducers.  The applicability of fluid dynamic transducers would be expected to reduce processing costs by a factor of 10 or more.

The minus 200-mesh plus 10-micron talc produced by an ultrasonic comminution is unique in that almost 80 per cent of the platelets are rounded.  Other grinding procedures such as roller or pebble milling yield only a few per cent rounded platelets.

Ultrasonic comminution, at the energy levels and the laboratory techniques tried, produced a minimum of 33 per cent of the weight finer than 10 microns when comminution was carried to the point where all the material passed a 200-mesh sieve.  Part of the objective of obtaining a small amount of minus 10-micron particles was not obtained. It is believed that standard grinding methods can be controlled to produce less than 20 per cent of the weight finer than 10 microns, but the particles larger than 10 microns do not contain more than a few per cent of rounded platelets.

A 98 per cent platy talc representing 67 per cent of the original weight was obtained by ultrasonic comminution followed by sedimentation for removal of minus 10-micron particles.  This product contained 0.69 per cent $CO_2$ (1.44 per cent dolomite) as the principal contaminant.  If elimination of dolomite is important, acid leaching or flotation would be effective.

It is recommended that Johnson and Johnson consider continuing this work to complete studies on the effect of initial particle size of talc and frequency of vibration on the comminution rate of talc.  These studies would establish the upper practical limit of particle sizes that can be ground ultrasonically and indicate the practicability of using high-efficiency lower frequency transducers in producing high-quality talc.  Work also should be continued to complete the analysis of talc ground under various grinding conditions to definitely establish its quality as compared with talc powder produced by conventional grinding processes.

JNA: WEC: LEW/mar

**BATTELLE   MEMORIAL   INSTITUTE**

## BUSINESS CONFIDENTIAL

Protected Document--Subject to Protective Order

JNJNL61_0000013

Protected Document--Subject to Protective Order

JNJNL61_000001386