Exhibit 83

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: MIDDLESEX COUNTY

IN RE:

| | |
|---|---|
| FOLEY V. AVON PRODUCTS, INC. ET AL. | MID-L-3095-18 AS |
| FRACE V. BRENNTAG NORTH AMERICA, ET AL. | MID-L-600-18 AS |
| GATMAITAN V. IMERYS TALC AMERICA, ET AL. | MID-L-4252-18 AS |
| GRABOWSKI V. BRENNTAG NORTH AMERICA, ET AL. | MID-L-6805-16 AS |
| GREENE V. BRENNTAG NORTH AMERICA, ET AL. | MID-L-2456-18 AS |
| GRIFFIN V. CYPRUS AMAX MINERALS COMPANY, ET AL. | MID-L-4826-18 AS |
| HODJERA V. BORGWARNER MORSE TEC, LLC, ET AL. | MID-L-5368-17 AS |
| MCNEILL-GEORGE V. BRENNTAG NORTH AMERICA, ET AL. | MID-L-7049-16 AS |
| SELVAGGIO V. BRENNTAG NORTH AMERICA, ET AL. | MID-L-598-18 AS |
| WENDOWSKI V. IMERYS TALC AMERICA, INC., ET AL. | MID-L-6635-17 AS |


VIDEOTAPE DEPOSITION OF SUSAN NICHOLSON, MD


        Transcript of the deposition of the witness,
called for Oral Examination in the above-captioned
matter, said deposition being taken pursuant to
Superior Court Rules of Practice and Procedure by and
before MARC BRODY, a Notary Public and Certified
Court Reporter of the State of New Jersey, at the law
offices of DRINKER, BIDDLE & REATH, 105 College Road East,
Princeton, New Jersey, on Tuesday, February 19, 2019,
commencing at approximately 10:00 in the forenoon.


BRODY DEPOSITION SERVICES
235 East Broad Street, Suite 1
Westfield, New Jersey 07090

Phone: 908-789-2000  Fax: 908-789-2007

Page 2  (Pages 2-5)

| Page 2 |
|---|

1    APPEARANCES:
2
3    COHEN, PLACITELLA & ROTH, P.C.
4    127 Maple Avenue
    Red Bank, New Jersey 07701
    732-747-9003
5    BY: CHRISTOPHER PLACITELLA, ESQ.
    AND: DENNIS GEIER, ESQ.
6    Attorneys for Plaintiff
7
8    RAWLE & HENDERSON, LLP     (Via speakerphone)
    1339 Chestnut Street, 16th floor
9    Philadelphia, Pennsylvania 19107
    215-575-4200
10    BY: ANISHA S. ABRAHAM, ESQ.
    Attorneys for Defendants, Imerys Talc,
11    Cyprus Amax Minerals
12
13    McGIVNEY, KLUGER & COOK, P.C.     (Via speakerphone)
    18 Columbia Turnpike, 3rd floor
14    Florham Park, New Jersey 07932
    973-822-1110
15    BY: ELIZABETH BARNA, ESQ.
    Attorneys for Defendant, Whittaker, Clark &
16    Daniels
17
18    BLANK ROME, LLP
    One Logan Square
19    Philadelphia, Pennsylvania 19103
    215-569-5397
20    BY: REBECCA D. WARD, ESQ.
    AND: JAMES T. SMITH, ESQ.
21    Attorneys for Defendant, Johnson & Johnson
22
23
24
25

| Page 3 |
|---|

1    APPEARANCES (Cont'd):
2
3    O'TOOLE, FERNANDEZ, WEINER &     (Via speakerphone)
    VAN LIEU
4    14 Village Park Road
    Cedar Grove, New Jersey 07009
5    973-239-5700
    BY: LESLIE LOMBARDY, ESQ.
6    Attorneys for Defendant, Colgate-Palmolive
7
8
9
10
11    ALSO PRESENT:
12    Carolyn McNelis, Paralegal, Cohen Placitella & Roth, PC
13    Erik Davidson, Videographer, Dynamic Evidence
14
15
16
17
18
19
20
21
22
23
24
25

| Page 4 |
|---|

1        INDEX
2    WITNESS        PAGE
3    SUSAN NICHOLSON, MD
4    Direct by Mr. Placitella     5
5
6
7
8
9
10
11        EXHIBITS
12    NO.     DESCRIPTION     PAGE
13    P-1     Deposition Notice     5
14    P-2     5 pages of notes by S. Nicholson     10
15    P-3     Notebook of J&J Documents     54
16    P-4     Notebook of J&J Documents     54
17    P-5     Notebook of J&J Documents     54
18
19
20
21
22    Note: ALL DOCUMENTS REFERRED TO DURING DEPOSITION
      ARE LISTED ON PAGES 201-202.
23
24
25

| Page 5 |
|---|

1    MR. PLACITELLA: Mark this P-1.
2    (The above notice is marked P-1.)
3
4    THE VIDEOGRAPHER: We are now on the
5    record. My name is Erik Davidson representing
6    Dynamic Evidence. The date is Tuesday, February 19,
7    2019 and the time is approximately 10:00 a.m. The
8    appearances will be noted on the stenographic
9    record.
10    Our court reporter, Marc Brody, will now
11    swear in the witness.
12
13    SUSAN NICHOLSON, sworn.
14
15    DIRECT EXAMINATION BY MR. PLACITELLA:
16
17    Q    Good morning, Dr. Nicholson, how are you?
18    A    Good thanks. Good morning.
19    Q    You are a doctor by training. Is that
20    correct?
21    A    Yes, a medical doctor.
22    Q    When did you graduate medical and from
23    where?
24    A    1992 from the University of
25    Pittsburgh.

Page 6

1    Q   Am I correct that you have never, as a
2  medical doctor, you have never seen any actual
3  patients?
4    A   That's not correct.
5    Q   When is the last time you actually saw a
6  patient as a medical doctor?
7    A   I don't have a precise date.  For ten
8  years I was a rounding consulting physician at
9  Cornell New York Hospital in New York City, and my
10  activities petered out -- I probably haven't seen a
11  patient in ten years.
12    Q   You started at Johnson and Johnson in
13  2006.  Is that correct?
14    A   That's correct.
15    Q   In what capacity?
16    A   As a senior director in clinical research
17  in our pharmaceutical division.
18    Q   Did you ever have any personal interaction
19  with the FDA concerning the issue of asbestos and
20  talc?
21    A   No, I didn't.
22    Q   Am I correct you have no training in
23  geology?
24    A   That's correct.
25    Q   And you are not an expert in testing talc

Page 7

1  for asbestos?
2    A   I'm not.
3    Q   You have in front of you P-1, which is the
4  deposition notice for today.  The deposition notice
5  calls for Johnson and Johnson to produce a corporate
6  representative with the most knowledge concerning
7  testing information provided to the Food and Drug
8  Administration by Johnson and Johnson concerning the
9  asbestos content of cosmetic talc, and any responses
10  from the FDA in relation thereto.  Do you see that?
11    A   Yes, I do.
12    Q   Why are you the person most qualified?
13    A   I'm the person most qualified because I've
14  reviewed all of the documents related to the
15  communications back and forth between the FDA
16  starting in the late '60s up until the present.
17     I have interviewed and interacted
18  with the individuals who currently do the testing,
19  people who are involved historically with the
20  testing, so I understand what was communicated and
21  how the testing methodology evolved over time.
22    Q   Any people still work for Johnson and
23  Johnson who were involved in communicating with the
24  FDA concerning the testing for asbestos in talc?
25    A   Not that I'm aware of, no.

Page 8

1    Q   And the documents you reviewed,
2  specifically are what?
3    A   I reviewed documents specifically going
4  back and forth between Johnson and Johnson to the
5  FDA, the FDA back to Johnson and Johnson and
6  documents from the industry group CTFA, now PCPC
7  relating to talc and asbestos testing as they were
8  acting on behalf of the industry as general
9  background, and also some of the contextual
10  documents for those decades.  It has been 50 years
11  of communications and an evolution of science, so
12  some contextual documents were necessary to
13  understand the context.
14    Q   Am I correct that those documents are with
15  you today?
16    A   They are.
17    Q   We will mark them at a break so not to
18  take up any time.
19     Am I correct that you are not the
20  author or the recipient of any of the documents in
21  these books?
22    A   I'm not specifically, no.
23    Q   So you were the person designated on
24  behalf of the Johnson and Johnson to speak for the
25  company, but you have no personal knowledge of any

Page 9

1  of the evidence you brought with you today?
2    A   That's not correct.  I didn't say that.  I
3  was involved in more contemporary communications and
4  discussions about communications with the FDA, but
5  your question previously was about whether or not
6  they were to me specifically or from me
7  specifically.  That answer is no.
8     But I was involved in discussions
9  related to the communications.
10    Q   Have you communicated yourself with the
11  FDA either in writing or verbally?
12    A   I was at a meeting in June of last year
13  with a group of individuals from Johnson and Johnson
14  and the FDA to discuss the quality systems and
15  methods for testing asbestos.
16    Q   June 19, 2018?
17    A   Correct.
18    Q   You said you interviewed.  By the way, who
19  made the determination as to what documents you were
20  going to review in preparation for today's
21  deposition?
22    A   The attorneys assisted in searching the
23  database.  It is quite a large and extensive
24  database for FDA communications related to the
25  request for today.

Page 10

1    Q   So the lawyers made the decision what
2  documents you were going to review?
3    A   The actual communications, yes.  With
4  regard to context, we discussed that and
5  collaborated on which documents were most relevant.
6    Q   Now, you said you interviewed people in
7  connection with today's deposition.  Who was that?
8    A   I'm going to refer to my notes here, if
9  you don't mind.
10   Q   Sure.
11       MR. PLACITELLA:  Why don't we just
12 mark your notes as P-2.
13       (Dr. Nicholson's notes are marked
14 P-2.)
15   Q   Why don't you describe what P-2 is.
16   A   P-2 are a number of notes during
17 preparation for today.  It is a lot of information
18 and I wanted to organize my thinking by decades,
19 '60s, '70s, '80s, '90s, 2000s and 2010 to current.
20       In addition, I made some notations
21 about individuals that I would speak to about
22 various topics, and just some contextual notes for
23 my own -- a memoir, if you will.
24   Q   So who are the people you spoke with?
25   A   That's what where I was headed.  I spoke

Page 11

1  to Linda Szczepaniak.
2    Q   Spell that for the reporter and me.
3    A   I wish I could.  S C Z and the rest is we
4  will have to -- P H O N I K, maybe.
5    Q   What was her job?
6    A   Global head of regulatory affairs for our
7  consumer division.
8    Q   For what period of time?
9    A   I don't know when she started.  At least
10 four years.
11   Q   Currently?
12   A   That's correct.  Currently.
13   Q   Who else?
14   A   Bobbette Williams.
15   Q   Bobbette?
16   A   Williams.
17   Q   And what is her job?
18   A   She's Vice-President in our quality group.
19   Q   Okay.  Who else?
20   A   I spoke to Tim McCarthy who has been with
21 the company a number of years.  He is a
22 toxicologist.
23   Q   Is he still with the company?
24   A   He is.
25   Q   Who else?

Page 12

1    A   Previous conversations I've had with John
2  Hopkins and Don Hicks.  Don Hicks is a director of
3  quality.  He since retired.
4    Q   Did John Hopkins have any dealing with the
5  FDA to your knowledge?
6    A   Yes.  He started with the company in 1976
7  and retired in 2000.
8    Q   You know for a fact he spoke with the FDA
9  about the issue of asbestos and testing?
10   A   He and I discussed communications back and
11 forth.  I don't know that he actually was the person
12 speaking on any given case, but he had the
13 historical knowledge.
14   Q   But do you know whether or not he had any
15 personal involvement with the FDA?
16   A   I believe he did, yes.
17   Q   Now, anybody else?
18   A   Not that I recall.
19   Q   I want to talk to you about what Johnson
20 and Johnson understands or understood historically
21 its role was as it related to communications with
22 the FDA.
23       Am I correct that Johnson and Johnson
24 understands that cosmetic talc does not require
25 premarket approval from the FDA?

Page 13

1    A   Yes.
2    Q   Am I correct that the FDA promulgated
3  regulations that remain in effect today followed by
4  Johnson and Johnson that require each ingredient
5  used in cosmetic product, any finished cosmetic
6  product be adequately substantiated for safety prior
7  to marketing?
8       MR. SMITH:  Objection.
9    A   Yes, we are aware of that.
10   Q   And is Johnson and Johnson further aware
11 that the regulations state that any ingredient or
12 product whose safety is not adequately substantiated
13 prior to marketing, is misbranded unless it contains
14 the following conspicuous statement on the principal
15 display panel.  "Warning, the safety of this product
16 has not been determined."
17       MR. SMITH:  Objection.
18   Q   Are you aware of that?
19       MR. SMITH:  Could I just ask you to
20 put a little pause in there before you answer so I
21 can pipe in once in a while and earn my fee?
22   A   Yes.
23   Q   Johnson and Johnson understood that a
24 manufacturer who has not adequately substantiated
25 the safety of their cosmetic product or their

Page 14

1  ingredients cannot ship their product in interstate
2  commerce?
3       MR. SMITH:  Objection.
4       A   Yes.
5       Q   In addition, a manufacturer of a cosmetic
6  product must assure that the cosmetic label shall
7  bear a warning statement whenever necessary or
8  appropriate to prevent a health hazard that may be
9  associated with the product?
10       MR. SMITH:  Objection.
11       A   Yes.
12       Q   Johnson and Johnson understands that the
13  regulations require that an ingredient or product
14  having a history of use in or as a cosmetic may at
15  any time have its safety brought into question by
16  new information that in and of itself is not
17  conclusive?
18       MR. SMITH:  Objection.
19       A   I don't know what that means.
20       Q   It is not proven beyond more probable than
21  not.  Just the risk is there.
22       A   Can you repeat?
23       Q   Sure the regulations require that an
24  ingredient or product having a history of use as a
25  cosmetic may at any time have its safety brought

Page 15

1  into question by new information that in itself is
2  not conclusive?
3       MR. SMITH:  Objection.
4       Q   You understood that?
5       A   I understand that.  I didn't understand.  I
6  hear you, but that last piece, I'm not sure what
7  that means.
8       But let me just say we do understand
9  that the safety of products are overseen on a
10  continuous basis, and if there's new information
11  that comes in, that calls into question the safety
12  of a product that, yes, we are obligated to research
13  that, understand it, determine if there's been any
14  change in the safety profile that's actionable, if
15  that's your question, yes.
16       MR. SMITH:  While there's no question
17  bending, let me put on the record my understanding,
18  as we discussed before we started the deposition
19  with opposing counsel, placing the word objection on
20  the record preserves all bases?
21       MR. PLACITELLA:  You could say
22  objection to form, if that is your objection.
23       MR. SMITH:  I'm objecting to beyond
24  the scope.  This witness is here as a 30(b)6.  She
25  is being asked questions that in my view are outside

Page 16

1  the scope.
2       MR. PLACITELLA:  You can make that
3  objection.  I think it is not proper, but you can
4  make it.  If you have a form objection, that's what
5  is permitted.  You can raise scope with the judge.
6  I think it is clearly within the scope.
7       MR. SMITH:  Again, I know we are not
8  going to figure that out today.  I want to make sure
9  we are all on the same page.  Do you want me to put
10  the basis for the objection on the record?
11       MR. PLACITELLA:  That's fine, the way
12  you are --
13       MR. SMITH:  Just objection preserves
14  everything so we can keep --
15       MR. PLACITELLA:  Fair enough.
16
17       Q   Johnson and Johnson understands that a
18  cosmetic is considered adulterated if it bears or
19  contains any poisonous or deleterious substance
20  which may render it injurious to users?
21       MR. SMITH:  Objection.
22       A   Yes.
23       Q   Johnson and Johnson understands that
24  information provided to the FDA concerning the
25  testing of Johnson and Johnson talc is voluntary,

Page 17

1  correct?
2       MR. SMITH:  Objection.
3       A   Yes.
4       Q   Johnson and Johnson understands that
5  without a regulation, the FDA has no authority to
6  require information on safety testing related to
7  talc from Johnson and Johnson, correct?
8       MR. SMITH:  Objection.
9       A   I'm not sure that's correct.  If the FDA
10  has a concern about safety and they ask us for
11  information, I believe we are obligated to give it
12  to them.
13       Q   Okay.  Johnson and Johnson understands now
14  and historically that the FDA only has very limited
15  resources to commit to cosmetic product review,
16  monitoring or safety?
17       MR. SMITH:  Objection.
18       A   I can't speak to the resources of the FDA.
19       Q   Have you looked at documents that in fact
20  indicate that the FDA has limited resources on the
21  issue of talc testing and asbestos?  You are aware
22  of that, aren't you?
23       A   I know there's one document that makes
24  reference to that at a point in time about a very
25  extensive testing program that was discussed.  I

Page 18

1  don't think that's a general statement that's
2  applicable to the FDA.
3      Q   So it is your position that the FDA has
4  more than adequate resources to do its own testing
5  of the Johnson and Johnson talc for asbestos?
6          MR. SMITH:  Objection.
7      A   I'm not in a position to comment on the
8  FDA's resources.
9      Q   Does Johnson and Johnson agree that the
10 FDA regulatory authority over cosmetics is less
11 comprehensive than over food and drugs?
12         MR. SMITH:  Objection.
13     A   I'm aware of that, yes.
14     Q   Does Johnson and Johnson understand that
15 in its oversight of the cosmetic industry, the FDA
16 must rely on part on voluntary industry cooperation?
17         MR. SMITH:  Objection.
18     A   Yes, I understand that.
19     Q   Does Johnson and Johnson understand that
20 the FDA does not have authority to require Johnson
21 and Johnson to do safety testing and provide injury
22 reports concerning its talc?
23         MR. SMITH:  Objection.
24     A   I can't agree that we understand that in
25 totality.  If the FDA made a specific request for

Page 19

1  information, I believe we would be obligated to
2  respond to it.
3          We don't regularly and routinely
4  share safety information with the FDA, unless it is
5  required, or we feel that it is important and
6  helpful.
7      Q   Does Johnson and Johnson agree that a
8  cosmetic manufacturer has a responsibility to
9  substantiate the safety of their product or they
10 must warn consumers the safety of the product has
11 not been determined?
12         MR. SMITH:  Objection.
13     A   Yes.
14     Q   Does Johnson and Johnson understand that
15 if there's a health hazard associated with the product,
16 it must include a warning on that product?
17         MR. SMITH:  Objection.
18     A   Yes.
19     Q   Do you know what the Cosmetic Ingredient
20 Review or CIR is?
21     A   Yes.
22     Q   What is that?
23     A   The Cosmetic Ingredient Review is a
24 process and a system essentially of reviewing the
25 safety of cosmetic ingredients.

Page 20

1      Q   And is that something that was established
2  by the cosmetic trade association as far back as
3  1976?
4      A   I don't remember the specific historical
5  details.
6      Q   You don't know who was responsible for
7  forming the CIR?
8      A   Exactly.
9      Q   Or what entity?
10     A   Exactly, no, I'm not.
11     Q   Do you know that the CIR is an industry
12 funded panel that reviews the safety of ingredients
13 used in cosmetic talc?
14         MR. SMITH:  Objection.
15     A   I know they get funding from the industry,
16 yes.
17     Q   Am I correct that the purpose of the CIR
18 is to determine cosmetic ingredients for which
19 there's reasonable certainty in the judgment of
20 competent scientists that the ingredient is safe
21 under the conditions of use?
22         MR. SMITH:  Objection.
23     A   Yes.
24     Q   Has the CIR in fact stated that safe or
25 safety means there's no evidence in the available

Page 21

1  information that demonstrates or suggests reasonable
2  grounds to suspect a hazard to the public under the
3  conditions of use that are now current or that might
4  reasonably be expected in the future?
5          MR. SMITH:  Objection.
6      A   I can't answer that because I haven't
7  reviewed CIR's definitions as of the recent
8  past.
9      Q   How much work did you do in reference to
10 the CIR to prepare for today's deposition?
11     A   None.
12     Q   None at all?
13     A   No.
14     Q   Does Johnson and Johnson agree that it has
15 a responsibility to assure that there's reasonable
16 certainty there's no evidence to suspect that their
17 cosmetic talc products may cause any harm to the
18 consumer?
19         MR. SMITH:  Objection.
20     A   Could you repeat that?
21     Q   Does Johnson and Johnson recognize it has
22 a responsibility to assure that there's reasonable
23 certainty that there is no evidence to suspect that
24 their cosmetic talc products may cause harm to the
25 consumer?

Page 22

1    MR. SMITH:  Objection.
2    A   Yes.
3    Q   Does Johnson and Johnson recognize that if
4  there is evidence that there are reasonable grounds
5  to suspect that the cosmetic talc product may cause
6  harm for the proposed use, such product does not
7  meet industry standards for safety?
8    MR. SMITH:  Objection.
9    A   Yes.
10    Q   Does Johnson and Johnson recognize that
11  talc with asbestiform fibers are recognized as known
12  human carcinogens?
13    MR. SMITH:  Objection.
14    A   Asbestos is a known carcinogen, yes.
15    Q   And Johnson and Johnson recognizes that if
16  asbestos or asbestiform fibers are found in the
17  talcum powder products, those products would be
18  adulterated under the Federal Food Drug and Cosmetic
19  Act?
20    MR. SMITH:  Objection.
21    A   To clarify, if there's asbestos in talc,
22  yes, I would agree.
23    Q   Am I correct, and I asked you this before,
24  but I want to tease it out a little bit.  Is it
25  Johnson and Johnson's position that it is not aware

Page 23

1  that FDA has limited resources when it comes to
2  testing cosmetic talc for asbestos?
3    MR. SMITH:  Objection.
4    A   I can't speak to the FDA'S resources.
5    Q   Do you know who John Stuart is, who worked
6  at the FDA?
7    A   I don't recall off the top of my head, no.
8  The name sounds familiar, but I don't remember
9  exactly.
10    Q   Do you know that John Stuart left the FDA
11  in 1976?
12    A   No.
13    Q   Do you know that when John Stuart left the
14  FDA, there was no one at FDA any experience in
15  testing talc for asbestos?
16    MR. SMITH:  Objection.
17    A   I can't speak to FDA'S expertise or
18  resources.
19    Q   D-12 is a document from 1975 that was
20  provided to me by Dr. Hopkins at his deposition.
21  Has Dr. Hopkins shared this document with you?
22    A   I don't recall seeing this.  It refers to
23  aerosols and hair preparations.
24    MR. SMITH:  Counsel, while there's no
25  question pending, this document doesn't have Bates

Page 24

1  numbers.
2    MR. PLACITELLA:  It was given to me
3  by Dr. Hopkins in his deposition.  It was marked
4  at his deposition as D-12, so that's your issue.
5    Q   Do you see where it talks about a program,
6  the first thing says cosmetics.  Do you see that?
7    A   Yes.
8    Q   If you flip through it, you see that it
9  refers to multiple years and multiple projects.  Do
10  you see that?
11    A   I do.
12    Q   I'm going to refer you to the entry for
13  1976.  I'll blow it up for you.  Under the project
14  titled Determination of Asbestos in Talc.  Do you
15  see that?
16    MR. SMITH:  What page are we on,
17  Counsel?
18    A   I need to look at it.
19    Q   Your pages aren't numbered, unfortunately.
20    MR. SMITH:  Some are.
21    Q   Project number 00679.
22    MR. SMITH:  There are multiple pages
23  with that project.
24    Q   There are multiple pages and I'm on the
25  page that talks about description of this quarter's

Page 25

1  activities, and the first paragraph stating, the
2  purpose of this project is to develop one or several
3  methods for sufficient sensitivity and reliability
4  which will permit the determination of asbestos and
5  other contaminants in talc-containing products with
6  the necessary degree of accuracy and at a
7  concentration at which such contaminants present a
8  potential health hazard.  Do you see that?
9    MR. SMITH:  I don't.
10    A   Yes.
11    Q   When you met with, when you spoke with Dr.
12  Hopkins, he didn't discuss any of these reports with
13  you, even though they refer directly to the FDA --
14    MR. SMITH:  Objection.
15    Q   In testing of asbestos?
16    A   Let me point out, number one, that this
17  starts with aerosols and hair preparations.  Number
18  two, this doesn't look like a communication to or
19  from Johnson and Johnson to the FDA, so I did not
20  review that in preparation for today.  And this is a
21  bit of a confusing document.  I'm not exactly sure
22  what we are supposed to focus on since every page
23  seemed to be marked project 679.
24    Q   What we are focusing on the page that
25  talks about the determination of asbestos in talc.

Page 26

1  A   Yes, I realize that.
2  Q   And what is listed in this document, and
3  this came from Johnson and Johnson. I didn't get it
4  on my own. You understand that, right?
5  A   That's fair. I'm just trying to find the
6  page you are on.
7       MR. SMITH: In fairness, I don't know
8  that it came from Johnson and Johnson.
9       MR. PLACITELLA: You don't know?
10      MR. SMITH: It doesn't have Johnson
11 and Johnson Bates numbers on it.
12      MR. PLACITELLA: Mr. Hicks is the one
13 who brought it to a deposition and went over it.
14      MR. SMITH: I don't quarrel. It may
15 have come from the FDA. I don't know.
16  Q   Do you see where it says, "Due to
17 separation of John Stuart from government service,
18 no methods development investigations were done
19 during the first quarter of 1976." Do you see that?
20  A   I do see that.
21  Q   If you go to the next page, it states,
22 "Due to lack of specialized personnel in certain
23 necessary instrumentation, no significant work was
24 done on methods developments during the second
25 quarter of '76." Do you see that?

Page 27

1  A   I do.
2  Q   Do you see where it says, "Because of
3  limited resources and in regard to instrumentation
4  and trained personnel, the only project plan
5  relating to the methods development and sample
6  enrichment floatation in order to detect lower
7  levels of certainty by DPA." Do you see that?
8  A   I do.
9  Q   Now, you are aware, are you not, that the
10 FDA has done no testing on Vermont talc since 1979
11 itself? You know that, correct?
12      MR. SMITH: Objection.
13  A   I don't know the exact dates of testing
14 that's been done, but there are multiple
15 publications and test reports related to the Vermont
16 mines.
17  Q   I'm asking you whether you know from your
18 preparation and review of the documents in your
19 possession that the FDA had itself its own
20 personnel, has done no testing on any Vermont talc
21 since 1979?
22      MR. SMITH: Objection.
23  A   I'm not aware of what dates they did
24 Vermont testing.
25  Q   Do you know if the FDA ever did any

Page 28

1  testing itself on Vermont talcs?
2  A   Well, I'm aware of FDA doing testing
3  multiple times. Several times during the '70s, in
4  the '80s, 2009 testing cosmetic talc products,
5  including testing of raw materials, and some of
6  those would have been from the Vermont mines.
7       The exact dates of when they tested
8  materials that came from the Vermont mines, I cannot
9  speak to that exactly.
10  Q   So you don't know when the last time the
11 FDA personnel was involved in testing talc from the
12 Vermont mine?
13      MR. SMITH: Objection.
14  Q   Correct?
15  A   What I just said, if there's material that
16 came out of Vermont and was some in some of those
17 cosmetic talcs that were tested several times
18 in the '70s, in the '80s and 2009. I don't know
19 that there was an exact date that FDA stopped
20 testing Vermont talc because I don't know if there's
21 Vermont talc in those samples that were tested in
22 2009.
23  Q   As you sit here today, you can't point to
24 a single test done by the FDA itself on Vermont talc
25 after 1979, correct?

Page 29

1       MR. SMITH: Objection.
2  A   So again, there was a survey of cosmetic
3  talcs done in 2009. Multiple samples that were
4  used. I don't know the origin of all of those
5  cosmetic products. They not Johnson and Johnson
6  products. It is possible they may have been from of
7  the Vermont mine, but I can't speak to that
8  directly.
9  Q   What was my question?
10      MR. SMITH: Objection.
11  A   Your question was when was the last date
12 did FDA test Vermont talc after 1979. And as I
13 said, they tested in the '80s, and again in 2009.
14 It is possible some of that material came from the
15 Vermont mine.
16  Q   Ma'am, here is my question, please. As
17 you sit here today, you have no evidence in front of
18 you to indicate that the FDA itself ever did any
19 testing of talc from the Vermont mine after 1979,
20 correct?
21  A   As I --
22      MR. SMITH: Objection.
23  A   As I said, there are multiple surveys that
24 were done.
25  Q   I'm not asking you about multiple surveys.

Page 30

1  Please, I'm asking you specifically --
2         MR SMITH:  You can't talk over the
3  witness.
4         MR. PLACITELLA:  I can talk over the
5  witness if she refuses to answer the question.
6         MR. SMITH:  She is not refusing to
7  answer the question.
8         MR. PLACITELLA:  I'll withdraw the
9  question.
10        MR. SMITH:  Okay.  Question
11 withdrawn.
12    Q   Do you believe an honest and forthright
13 witness can provide a simple answer to a simple
14 question?
15        MR. SMITH:  Objection.
16    A   If there's a simple answer, yes.  If
17 there's not a direct answer to your question, I'll
18 give you the related information.
19    Q   Ma'am, can you show me in any of the books
20 that you have in front of you today any testing done
21 by the FDA of Vermont source talc after 1979?  Show
22 it to me.
23    A   I would be happy to review the results
24 from the 1986 survey that was done by FDA and I'll
25 be happy to review the 2009 results from the FDA.

Page 31

1         As I said, I don't know the source of
2  that talc.  It is not all Johnson and Johnson talc.
3  It may have come from Vermont.
4    Q   But you don't know?
5    A   As I said, I don't know specifically if
6  those cosmetic products tested in '86 and 2009
7  came from the Vermont mine, but testing was done by
8  FDA in those two periods.
9         You asked me did the FDA test after
10 1979.  Maybe.  I don't know the provenance of those
11 cosmetic samples that came from those other
12 companies.
13    Q   Ma'am, with all due respect, as you sit
14 here today, you can't point me to any evidence that
15 demonstrates that the FDA tested Vermont talc after
16 1979, can you?
17        MR. SMITH:  Objection.
18    Q   True?
19        MR. SMITH:  Objection.
20    A   As I said, the FDA has tested in '86 and
21 again in 2009.  I don't know if that cosmetic
22 material that came from other companies was from
23 Vermont or not, but FDA did do testing.
24        So again, I don't know if they tested
25 from the Vermont mines or not because I don't know

Page 32

1  the provenance of the samples they tested in 1986
2  and in 2009.
3    Q   So you don't know as you sit here today
4  that the FDA ever performed any tests on Vermont
5  mines after 1979?  You don't know that, true?
6         MR. SMITH:  Objection.
7    A   What I know is the FDA did testing in 1986
8  and in 2009.  I don't know the provenance of those
9  cosmetic samples because they are not J and J
10 samples of cosmetic material.  They may have come
11 from the Vermont mine.  I don't know for sure.  They
12 are not Johnson and Johnson products.
13    Q   Let me ask you the question this way.  Do
14 you have any evidence as you sit here today that the
15 FDA ever tested a Johnson and Johnson product after
16 1979 that was sourced from the Vermont mine?
17    A   Well, I'll have to check and see when we
18 sourced material from the Vermont mine.
19    Q   Yes, Ma'am.  Go ahead.
20    A   Maybe we can go to the 1986 test results.
21        MR. SMITH:  Go to whatever you need
22 to go to.
23    Q   Can you tell me what exhibit you are
24 looking at first?
25    A   This will be the 1986.

Page 33

1    Q   The marking on the exhibit for the folder.
2    A   It says D-237.  I don't know what you mean
3  by the marking.
4    Q   The binder is marked with an exhibit
5  number, it is not?  Look at these and we will mark
6  them at a break.
7    A   This is 1984.  November 15, 1984, the
8  Food Additives Valuation Branch did an assessment
9  and review of talcum powder used for cosmetics,
10 which included any relationship to any potential
11 asbestos contamination.
12        I'm looking to see if there's a list
13 here that can tell us what samples -- where the
14 samples came from.
15    Q   Why don't we do this.  Take a look during
16 the break and we will have everything marked and we
17 will get back to that.
18    A   Okay.
19    Q   So we are not wasting time.  Put a sticker
20 on that so you know to go back to it.
21    A   I know exactly where it is.  No sticker
22 needed.
23    Q   Am I correct that even when Johnson and
24 Johnson provided information to the FDA, Johnson and
25 Johnson controlled what the public could know about

Page 34

1  the product safety testing?
2       MR. SMITH:  Objection.
3       A    Johnson and Johnson is responsible for
4  whatever is on the packaging of the cosmetic talc
5  products, if that's what you mean, in compliance
6  with the FDA regulations.
7       Q    No, Ma'am.  What I'm asking you is when
8  you gave testing information or reports on your talc
9  to the FDA, you, Johnson and Johnson, were in
10 control of what the FDA could release to the public,
11 correct?
12      MR. SMITH:  Objection.
13      A    Well, our communications with the FDA,
14 that's a privileged proprietary information.  So
15 that would not be generally publically available.
16      I understand people can make a
17 request through the Freedom of Information Act to
18 get redacted information.  I don't know the exact
19 process and procedures, but certainly any citizen
20 can make that request.
21      Q    But whether or not the information is
22 released by the FDA to the citizen making that
23 request is totally within the control of Johnson and
24 Johnson, correct?
25      MR. SMITH:  Objection.

Page 35

1       A    I don't know that that's true, no.
2       Q    Do you know that Johnson and Johnson
3  actually stopped information on asbestos testing
4  that it provided to the FDA from being released to
5  the public.  You know that, correct?
6       MR. SMITH:  Objection.
7       A    I don't know what you are referring to.
8  I'm happy to look at whatever documents you are
9  referring to.
10      Q    I'm not asking if you are happy to look at
11 documents.  You are Johnson and Johnson.  I'm asking
12 you, Johnson and Johnson.  You, Johnson and Johnson,
13 know that you were controlling exactly what the
14 public could see that you gave to the FDA.  You know
15 that you were doing that, correct?
16      MR. SMITH:  Objection.
17      A    That's not correct.
18      Q    Okay.  465 is a memo from Mr. Nashed to
19 D.E. Johnston on June 7, 1973, with subject matter
20 talc asbestos, correct?
21      A    Yes.
22      Q    Who are these people, Nashed and Johnston?
23      A    Dr. Nashed is a J and J employee in our
24 research and development group at this time.
25      Q    Who is D.E. Johnston?

Page 36

1       A    Mr. Johnston, I don't know.
2       Q    And Mr. Nashed writes to Mr. Johnston,
3  "Dr. A. Weisler of the Division of Colors and
4  Cosmetics, FDA, informed me today by phone that Dr.
5  Zeitz of the Nader Group has asked him to provide
6  him with information available to them on the talc
7  asbestos question."  Do you see that?
8       A    Yes.
9       Q    And Dr. Weisler said that Johnson and
10 Johnson had submitted reports at various times, most
11 of them under a confidentiality statement which are
12 not subject to release to the public under the
13 Freedom of Information Act.  Do you see that?
14      A    Yes.
15      Q    Then he goes on to talk about what he told
16 the FDA.  He said, "I told Dr. Weisler that Johnson
17 and Johnson will be happy to discuss release of
18 information if it is deemed helpful to the FDA.
19 However, since our reports include correspondence
20 and opinions from experts, we have submitted such
21 reports with the understanding that they are the
22 exclusive use of the FDA."  Do you see that?
23      A    Yes.
24      Q    He goes on to state, does he not, that
25 "Unless permission is given, all reports should be

Page 37

1  held in confidence by the FDA."  Correct?
2       A    I see that, yes.
3       Q    466 is a November 7, 1973 memo from D.R.
4  Pederson.  Who is that?
5       A    I'm not sure.
6       Q    It is on Johnson and Johnson letterhead?
7       A    Yes, it is.
8       Q    What Mr. Pederson writes is, "I want you
9  to be aware that certain material previously
10 provided to the FDA will be released from our
11 confidential disclosure.  At that time information
12 was given to the FDA in confidence.  We have decided
13 to release that data pertinent to Shower to Shower
14 and Johnson's Medicated Powder, which would dispute
15 the information presented in the Lewin report,
16 recently released by the FDA.  We have decided not
17 to release the data either on the Italian mine or on
18 Johnson's Baby Powder and Vermont 66 Talc."
19 Correct?
20      A    I see that, yes.
21      Q    And you understand that one of the missions
22 of Johnson and Johnson, when it was dealing with the
23 FDA, was to submit rebuttals every time an
24 allegation was made that there was asbestos in the
25 Johnson and Johnson talc, correct?

Page 38

1    A   Not correct.
2    Q   And Johnson and Johnson, internally what
3  they said they were doing was actually putting out
4  fires, right?  You have seen that document, correct?
5    A   You have to show me the document.  I don't
6  know which document you are referring to.
7    Q   I'm going to show you what's been marked
8  462, and it is entitled Historical Review.  Have you
9  ever seen this document before?
10   A   I need a minute to look at it.
11       Okay.
12   Q   I'm looking at the paragraph on the second
13 page that talks about when the Food and Drug
14 Administration brought talc issue to a head.
15 Approximately two years ago, their consultant, Dr.
16 Lewin, strongly asserted he had found asbestos in
17 Johnson and Johnson powder.
18       Johnson and Johnson quickly reacted
19 with consultants of their own and after several
20 meetings in Washington, Dr. Lewin's original report
21 was later amended and he retracted his statements on
22 the occurrence of asbestos in Johnson and Johnson
23 powder.
24       In addition, we have transmitted to
25 the FDA formidable rebuttals of any question of the

Page 39

1  Occurrence of chrysotile in Johnson and Johnson
2  powder.  Do you see that?
3    A   I do.
4    Q   Do you see on the next page where it talks
5  about Johnson and Johnson is putting out fires with
6  respect to the specific question of asbestos in
7  talc?
8    A   I see that.
9    Q   Now, am I correct that Johnson and Johnson
10 had intimate access to FDA officials when product
11 safety issues arose concerning talc?
12   A   So the documents you are showing me are
13 from the '70s.
14   Q   That's not my question.  I'm not asking
15 about these documents.  I'm asking you another
16 question.  So listen to it.
17       MR. SMITH: Objection to the
18 question.  If you are not withdrawing it, she is
19 going to finish her answer.
20       MR. PLACITELLA: No, I'll withdraw it
21 and I'll ask it again.
22   Q   I'm not asking you about the documents
23 we just went through.  I'm asking you a different
24 question.
25       Johnson and Johnson had intimate

Page 40

1  access to FDA officials when safety issues arose
2  concerning talc and asbestos, correct?
3    A   I never heard the term intimate used in
4  relation to our relationship with the FDA.
5    Q   You agree that Johnson and Johnson had a
6  far greater access to FDA officials when it came to
7  asbestos and talc than an ordinary citizen, correct?
8    A   That is correct.
9    Q   And in fact, Johnson and Johnson had a
10 greater access than the medical community that was
11 in charge of caring for patients hurt by Johnson and
12 Johnson when it came to issues of product safety,
13 correct?
14       MR. SMITH:  Objection.
15   A   Johnson and Johnson did not hurt any
16 individuals, so I object to the basis of that
17 question.
18   Q   Let me ask you.  Do you agree with me that
19 Johnson and Johnson had far greater access to the
20 general medical community on issues of asbestos in
21 talc, correct?
22       MR. SMITH:  Objection.
23   A   Greater access to the medical community?
24 I don't know what the question is.
25   Q   Johnson and Johnson had far greater access

Page 41

1  to the FDA officials in dealing with issues of
2  asbestos in talc than the general medical community
3  did, correct?
4        MR. SMITH:  Objection.
5    A   Now I understand your question.  Yes, we
6  are regulated by the FDA, so of course, we have
7  regular and structured interactions with the FDA.
8    Q   You are aware that FDA officials have left
9  government service and went to work for Johnson and
10 Johnson, correct?
11       MR. SMITH:  Objection.
12   A   Yes, I'm aware of that.
13   Q   And you are aware the FDA officials have
14 left government service and went to work for the
15 industry trade organization that you are a member
16 of, correct?
17       MR. SMITH:  Objection.
18   A   Yes, I'm aware of that.
19   Q   And can you tell me as you sit here today
20 which government, former government officials you
21 are aware of that went to work for Johnson and
22 Johnson, former FDA officials?
23       MR. SMITH:  Objection.
24   A   The ones the pops into my mind is Dr. Sam
25 Maldonado, who leads our Pediatric Center of

Page 42

1  Excellence.
2     Q   Any other?
3     A   Michelle McMurry is a physician in our
4  clinical group in our Device Sector.
5     Q   Any others?
6     A   I'm sure there's a long list, but I don't
7  know the list.
8     Q   You are also aware that former executives
9  for Johnson and Johnson went to work for the FDA,
10  correct?
11        MR. SMITH:  Objection.
12     A   Yes.
13     Q   Which former executives of Johnson and
14  Johnson are you aware of that went to work for the
15  FDA?
16     A   Again, I think Sam Maldonado went to the
17  FDA and then came back to Johnson and Johnson and it
18  is common in the industry for people who work at the
19  FDA for a period of time during their career.
20     Q   You actually had former executives who
21  worked at Johnson and Johnson and then went to work
22  at the FDA specifically on the issue of talc safety,
23  correct?
24        MR. SMITH:  Objection.
25     A   I'm not aware of that, no.

Page 43

1     Q   You are not aware that you had former
2  executives who went to work at the FDA on the issue
3  of asbestos in Johnson and Johnson's powder?
4        MR. SMITH:  Objection.
5     A   No.
6     Q   Take a look at 465.  Remember 465 is the
7  memo that talks about Johnson and Johnson giving the
8  FDA permission to release certain information under
9  the Freedom of Information Act.  Do you remember
10  that?
11        MR. SMITH:  Objection.
12     A   Yes.
13     Q   Can you look at the bottom paragraph where
14  Mr. Nashed states, "He added that Dr. Eiermann is now
15  on deck and will be taking over as Director of the
16  Division of Cosmetics and that he, himself is
17  phasing out of the area."  Do you see that?
18     A   Yes, I see that.
19     Q   Did you know Dr. Eiermann was a former
20  Johnson and Johnson executive?
21        MR. SMITH:  Objection.
22     A   No, I did not.
23     Q   So you didn't know in preparing for
24  today's deposition that a former Johnson and Johnson
25  executive actually took control, or was one of the

Page 44

1  leading officials at the FDA involved with the issue
2  of asbestos and talc?  You didn't know that?
3        MR. SMITH:  Objection.
4     A   I was asked to look at the communications
5  between Johnson and Johnson and the FDA on asbestos
6  testing and talc safety.  I didn't look into the
7  background of Mr. Eiermann, so no, I was not aware of
8  that.
9     Q   So when you were looking at all these
10  documents, you saw documents referencing Mr. Eiermann,
11  correct?
12     A   Yes, I did.
13     Q   When you looked at all these documents, no
14  one in all of Johnson and Johnson told you, hey, that
15  guy used to work for us?
16        MR. SMITH:  Objection.
17     Q   In fact, was he was one of our executives?
18  No one ever told you that?
19        MR. SMITH:  Objection.
20     A   No, and I wouldn't expect that because we
21  were looking at these documents based on the facts
22  and the scientific merit and the context of the
23  documents, not where people came from.  That's not
24  relevant.
25     Q   So it wasn't relevant that the FDA and

Page 45

1  Johnson and Johnson had a revolving door in terms of
2  executives and people working on safety issues?
3  That wasn't relevant to you?
4        MR. SMITH:  Objection.
5     A   I disagree with the context of that
6  question.
7     Q   Well, Ma'am, you didn't think it was
8  important to know that the person who was one of the
9  people in charge of talc safety and asbestos at the
10  FDA was your former executive?  You didn't think
11  that was important?
12        MR. SMITH:  Objection.
13     A   I don't know the scope of Mr. Eiermann's
14  job at FDA or the scope of his job at Johnson and
15  Johnson, and there certainly is no revolving door.
16  I really can't speak to that history and what you
17  are implying with your question.
18     Q   Ma'am, you know that when citizens raised
19  product safety issues with the FDA concerning talc,
20  the first thing the FDA did was pick up the phone
21  and call Johnson and Johnson to give them a heads
22  up.  You knew that, right?
23        MR. SMITH:  Objection.
24     A   I don't know what you are referring to
25  specifically.

Page 46

1  Q   Do you know as a general matter that any
2  time a safety issue was raised concerning Johnson
3  and Johnson talc, somebody at the FDA picked up the
4  phone and called Johnson and Johnson to give them a
5  heads up.  You know that happened, correct?
6          MR. SMITH:  Objection.
7  A   Well, Johnson and Johnson cosmetics are
8  under the regulatory authority of the FDA, so if
9  somebody brought up a safety issue concerning one of
10 our products, it would be appropriate that they
11 reach out to us directly.
12         I don't know if they called or sent
13 an email or a letter, but absolutely Johnson and
14 Johnson should be notified.
15 Q   Right.  But they didn't send a letter
16 saying we got this complaint, how do you respond?
17 What they did, your relationship at the FDA was such
18 that if you got a complaint, they picked up the
19 phone and they told you about it first thing, right?
20 That's what happened.
21         MR. SMITH:  Objection.
22 Q   That's what happened.
23         MR. SMITH:  Objection.
24 A   I don't know that's true.
25 Q   In fact, you kept a file at Johnson and

Page 47

1  Johnson that was dedicated entirely to phone calls
2  that the FDA gave you in order to give you a heads
3  up, correct?
4          MR. SMITH:  Objection.
5  A   Well, I don't agree with the
6  characterization that there's a heads up phone call
7  file, but of course, it would have been in the
8  natural course of business that we would have kept
9  track of memos related to the content of
10 conversations we had with the FDA.  That would have
11 been standard procedure, absolutely.
12 Q   There was an FDA call file, correct?
13 A   I don't know if that's what they called
14 it, but any communication with the FDA we absolutely
15 should be keeping that as a record.
16 Q   Did you review the Johnson and Johnson
17 call file in preparation for today's deposition?
18 A   I have numerous memos from Johnson and
19 Johnson related to calls with FDA.  I don't know
20 that they specifically came out of this file you are
21 calling the call file, but, yes, I have memos.
22 Q   Ma'am, that's not my question.  Did you
23 review the Johnson and Johnson call file in
24 preparation for today's deposition?
25 A   I have not seen a file characterized as

Page 48

1  such, but I have memos related to calls between
2  Johnson and Johnson and the FDA.
3  Q   So in preparing for today's deposition the
4  lawyers never gave you access to the FDA call file,
5  correct?
6          MR. SMITH:  Objection.
7  A   You are characterizing a file as a call
8  file.  I have not heard that terminology.
9  Q   Can you look at 491, please.  491 is a
10 memo on Johnson and Johnson letterhead dated January
11 4, 1984 and the memo is to the FDA call file.  Do
12 you see that?
13 A   Yes.
14 Q   And the re: is talc, correct?
15 A   Yes.
16 Q   So I'm asking you again, in preparing for
17 today's deposition, the lawyers for Johnson and
18 Johnson, or anybody else at Johnson and Johnson,
19 never gave you access to the complete FDA call file,
20 correct?
21         MR. SMITH:  Objection.
22 A   So we don't -- you are asking if I had
23 access to something called a call file.  All of the
24 documents are no longer in paper files.  They are in
25 digital form in a database, and they were searched

Page 49

1  for FDA communications to us, Johnson and Johnson
2  communications to FDA, and they would have included
3  documents related to the phone calls.
4  Q   What you are saying is all the paper
5  was destroyed?
6          MR. SMITH:  Objection.
7  A   I don't know how our records are kept.
8  Q   You said it is only digital, so what
9  happened to the FDA paper call file?
10         MR. SMITH:  Objection.
11 A   I don't know what our retention procedures
12 are, so I can't speak to that.
13 Q   You understand you didn't have the right
14 or authority to destroy any paper, because you were
15 already sued in talc cases in 1984.  You knew that,
16 right?
17         MR. SMITH:  Objection.
18 A   I don't know about suits in 1984 and I
19 don't know about our retention policy related to
20 talc, so I really can't speak to that.
21 Q   Let me ask you the question again.  In
22 preparation for today's deposition, you never were
23 provided access, nor did you review, the FDA call
24 file, true?
25         MR. SMITH:  Objection.

Page 14  (Pages 50-53)

Page 50

1    A    Our documents are in digital form.  We no
2    longer have physical folders, physical files that
3    you are referring to.  So I reviewed documents that
4    were pulled out of our digital files based on a
5    search related to the communications with the FDA
6    and I do have memos and documents related to those
7    communications that I have reviewed.
8        There's not a physical form of a file
9    that you are referring to, so I wouldn't have had it
10   in my hands.  So your characterization doesn't match
11   up with the way we currently maintain the records.
12   Q    What was my question?
13   A    Your question was about the FDA call file.
14   Q    What was my question?
15   A    You can read the question again.
16   Q    Do you have any idea what my question was?
17       MR. SMITH:  Objection.
18   A    I have answered your question.
19   Q    What was it, if you know you answered the
20   question?
21       MR. SMITH:  Objection.
22   A    Did I review documents from the FDA call
23   file.
24   Q    That wasn't the question.  Look at January
25   4, 1984.  Did you review this document in

Page 51

1    preparation for today's deposition?
2        MR. SMITH:  Objection.
3    A    I don't recall seeing this specific
4    document.
5    Q    Although this came from the FDA call file
6    and related directly to the issue of asbestos in
7    talc, this was not provided to you, fair?
8        MR. SMITH:  Objection.
9    A    I don't recall seeing this specific memo,
10   but I have many other memos that I reviewed.
11   Q    Ma'am, I'm not the asking you about other
12   memos.  We will do that later.  I'm saying in
13   preparation for today's deposition, you were never
14   provided with this memo from the FDA call file
15   related to asbestos talc testing, correct?
16   A    I don't recall seeing this specific memo.
17   Q    So the answer to my question is you were
18   never provided it, correct?
19       MR. SMITH:  Objection.
20   A    So the answer to your question is I don't
21   recall seeing this specific memo.
22   Q    So you did get it, you just don't
23   remember?
24       MR. SMITH:  Objection.
25   A    If I don't remember, how can I tell you if

Page 52

1    I -- I don't recall.
2    Q    Is this memo in any of the documents you
3    brought with you today?
4    A    No.  We brought the substantive documents
5    of the content of exchanges between Johnson and
6    Johnson and the FDA.
7    Q    Okay.
8    A    This is not a substantive document.
9    Q    What this document says is, "In 1984 at
10   9:10 a.m. I received a telephone call from John
11   Weidinger, Deputy Director, Cosmetic Technology
12   Division of FDA.  Mr. Weidinger informed me that FDA
13   had received a citizen petition from a Philip
14   Durelay of Stony Brook, New York requesting a warning
15   statement against asbestos contamination in baby
16   powder.  John called to request an a copy of an
17   article referenced in the petition."
18       Do you see that?
19   A    Yes.
20   Q    Am I correct that Johnson and Johnson
21   knew, and was aware, that when need be, it could
22   bypass FDA staff and go directly to the FDA
23   commissioner if it wanted to.
24       MR. SMITH:  Objection.
25   A    So there's a process to escalate to the

Page 53

1    commissioner if there's an issue of sufficient
2    import and merit.
3    Q    And when it came to Johnson's Baby Powder,
4    Johnson and Johnson had both the power and the
5    access to bypass FDA staff and go directly to the
6    FDA commissioner, if it wanted to, correct?
7        MR. SMITH:  Objection.
8    A    As I said, for topics of significant
9    import, absolutely we could escalate to the
10   commissioner as needed.
11   Q    No citizen or doctor had that kind of
12   access, correct?
13       MR. SMITH:  Objection.
14   A    I believe the citizens' petition process
15   is the mechanism by which citizens can approach the
16   FDA when they have certain concerns apropos the memo
17   you showed me.
18   Q    So you think an average citizen can just
19   bypass the FDA staff and go right to the
20   commissioner when it has issue?  That's what you
21   believe?
22       MR. SMITH:  Objection.
23   Q    Just like Johnson and Johnson can?
24       MR. SMITH:  Objection.
25   A    We don't bypass.  We escalate, meaning if

Page 54

1  there's an issue that's been discussed with the FDA
2  staff members as appropriate to preview a topic and
3  there's some issue that arises that needs a higher
4  level of interaction, those issues can be escalated,
5  but we do not bypass the communication process.
6       MR. SMITH: While there is no
7  question pending, can we have a bathroom break?
8       THE VIDEOGRAPHER: The time is
9  approximately 11:03 a.m and we are going off the
10 record.
11      (Recess taken)
12      (Notebooks are marked P-3, 4 and 5.)
13
14      THE VIDEOGRAPHER: We are back on the
15 record. The time is approximately 11:14 a.m.
16
17 BY MR. PLACITELLA:
18
19      Q   Dr. Nicholson, before we broke you talked
20 about the ability to escalate an issue to the
21 commissioner. What was the process for doing that?
22      A   I don't know the exact process.
23      Q   What kind of issues got escalated to the
24 commissioner?
25      MR. SMITH: Objection.

Page 55

1       Q   By Johnson and Johnson.
2       A   I think escalations were extremely rare.
3  If there's a discussion about a specific topic at a
4  certainly level of management, whether it be with
5  the director of the cometic division, then that
6  could be escalated to the commissioner.
7       Q   Does the ordinary citizen have the ability
8  to do that?
9       A   An ordinary citizen would use the citizen
10 petition process to interact with the FDA.
11      Q   So the ordinary citizen has no ability to
12 get directly to the FDA commissioner like Johnson
13 and Johnson does, correct?
14      A   I don't know if they can or cannot reach
15 the commissioner.
16      Q   What about medical doctors who are
17 concerned about the safety and health of their
18 patients? Do they have direct access to the
19 commissioner?
20      MR. SMITH: Objection.
21      A   I don't know.
22      Q   What about members of Congress, can they
23 just call up the commissioner and demand access to
24 the commissioner?
25      MR. SMITH: Objection.

Page 56

1       A   I don't know.
2       Q   Now, when Johnson and Johnson feels like
3  it is suffering from adverse public relations
4  concerning the safety of its products, is that the
5  type of thing they escalate to the commissioner of
6  the FDA?
7       MR. SMITH: Objection.
8       A   No. Public relations has nothing to do
9  with FDA interactions and what things would
10 escalate.
11      Q   Well, you did understand and consider
12 escalating the issues related to the safety of baby
13 powder and asbestos to the commissioner, correct?
14      MR. SMITH: Objection.
15      A   Not the safety of asbestos and baby
16 powder. The issue was testing of asbestos in baby
17 powder, and the fact that there was incorrect
18 testing results and people were making significant
19 decisions based on incorrect testing methods.
20      Q   And it was Johnson and Johnson's position
21 that they needed to go directly to the commissioner
22 and voice their position, correct?
23      MR. SMITH: Objection.
24      A   No. That's not correct.
25      Q   I'm not correct? What is correct?

Page 57

1       MR. SMITH: Objection.
2       A   Johnson and Johnson deals directly with
3  the individuals responsible for the oversight of
4  cosmetics. If there's some issue that needs to be
5  escalated based on various considerations of the
6  importance and impact, that could be escalated to
7  the commissioner.
8       Q   Well, Johnson and Johnson took the
9  position that it had access to the commissioner on
10 the issue of whether asbestos was in baby powder,
11 correct?
12      A   Incorrect.
13      Q   476 is an addendum to memorandum from
14 March 23, 1972. Have you seen this before?
15      A   I need one minute to look at it.
16      Q   Sure.
17      A   I have seen communications related to this
18 topic. I don't know if I've seen this exact
19 addendum. Without seeing the rest of the documents,
20 it is hard to tell.
21      Q   It is not part of the information you
22 reviewed in preparation for today's deposition?
23      MR. SMITH: Objection.
24      A   I didn't say that. I reviewed -- if I
25 reviewed it, I reviewed the whole letter. You only

Page 58

1 gave me a page.
2    Q   Do you have the whole letter, because I
3 don't have it?
4    A   I may.  If you would like, I'll take time
5 to look through.
6    Q   Let's make a note of things we want to
7 look at during the break.
8        Do you see here it talks about a call
9 with the Deputy Director, Bureau of Foods?  Do you
10 see that?
11    A   Yes.
12    Q   About Johnson's Baby Powder.
13    A   I see that.
14    Q   Do you see it says, "I reviewed further
15 with Mr. Bernard the advisability of Johnson and
16 Johnson going to the commissioner to inform him of
17 our data regarding our baby powder being free of
18 asbestos so that he will be prepared to allay the
19 panic of the mothers which may result from the
20 consumer initiated publicity."
21    A   Yes.
22    Q   Do you see that?
23    A   Yes.
24    Q   Did that ever happen?
25    A   That they discussed with the commissioner.

Page 59

1 I believe there was a discussion with the
2 commissioner.
3    Q   Now when the FDA is responding to citizens
4 concerns about the safety of baby powder, it, in
5 fact, relied upon Johnson and Johnson for research
6 and support in order to respond to those concerns.
7 Is that true?
8        MR. SMITH:  Objection.
9    A   In 1972, there was a lot of work being
10 done around asbestos testing and incorrect test
11 results coming out.  Johnson and Johnson's Baby
12 Powder is free of asbestos.  So there were some
13 concerns about incorrect information being
14 attributable to our products.
15    Q   That wasn't my question.  My question was
16 when the FDA is responding to citizens concerns
17 about the safety of Johnson's Baby Powder, it
18 actually relied upon Johnson and Johnson to help
19 write and respond to the citizens concerns, correct?
20        MR. SMITH:  Objection.
21    A   I'm not sure I agree with that
22 characterization, but I'll say that Johnson and
23 Johnson was very involved in the technologic
24 methodological development of asbestos testing because
25 we had significant expertise in this area.

Page 60

1    Q   When the FDA made a decision how they were
2 going to respond to citizens raising questions about
3 the safety of baby powder, they actually went to
4 Johnson and Johnson and said, can you give us the
5 research to support our decision, correct?
6        MR. SMITH:  Objection.
7    Q   Even after they made the decision,
8 correct?
9        MR. SMITH:  Objection.
10    A   I'm sorry, I'm confused by your question.
11    Q   When the FDA was responding to concerns
12 that were raised by citizens about the safety of
13 baby powder, it actually went to Johnson and Johnson
14 and said, this is what we decided, but we need you to
15 give us the backup for our analysis.  That's what
16 happened, right?
17        MR. SMITH:  Objection.
18    Q   That's how intimate the connection was
19 between the two of you.
20        MR. SMITH:  Objection.
21    Q   Correct?
22    A   No.  I disagree with your
23 characterization.
24    Q   497 is correspondence from Craig Bernard
25 dated November 3, 2008, subject, meeting with J and

Page 61

1 J.  Do you see that?
2    A   Yes, I do.
3    Q   It states, "Hi, Mark.  You recall a couple
4 of months ago we met with Bill Casalarius' office
5 and spoke about the citizens petition with the FDA
6 that is requesting to have warning labels placed on
7 products containment.  Here is an update on that
8 activity.  Kathy Willie,"  do you know who Kathy
9 Willie is?
10    A   She's a former Johnson and Johnson
11 employee.
12    Q   What was her job?
13    A   I don't recall her exact title.
14    A   "Kathy Willie at Johnson and Johnson
15 informed me that at a recent science meeting in
16 Washington, D.C. she had a side conversation with a
17 key figure from the FDA cosmetic group that is
18 responsible for responding to the citizens
19 petition."
20        Do you know anything about a side
21 conversation?
22    A   I'm reading this here.
23        MR. SMITH:  Objection.
24    A   I'm looking at this here.  This is an
25 Imerys document.

Page 62

1    Q   Do you know anything about the side
2    conversation that you, Johnson and Johnson, had with
3    the FDA official in 2008 referenced here?
4        MR. SMITH:  Objection.
5    A   This is the only reference I've seen to
6    that conversation. I'll point out, again, this is
7    an Imerys document.
8    Q   But it is their business record about a
9    meeting it had with you, Johnson and Johnson.
10   Right?
11       MR. SMITH:  Objection.
12   A   It is an e-mail from one person to another
13   with an Imerys referring to some conversation that
14   was had, that's correct.
15   Q   With Johnson and Johnson?
16   A   Correct.
17   Q   He indicated the "FDA would rule against
18   the petition and would not require a warning label
19   on cosmetic products, but the FDA is looking for
20   scientific support from industry that will help
21   justify their position." Do you know anything about
22   that?
23   A   I don't know about this side conversation,
24   but I'm reading down further and I know what they
25   are referring to with regard to development of a review

Page 63

1    article related to talc safety.
2    Q   But you don't know anything about the side
3    conversation with the FDA asking Johnson and Johnson
4    for support in order to deny the citizen's petition.
5    Do you know about that side conversation?
6        MR. SMITH:  Objection.
7    A   I'm reading this along with you and
8    I see the FDA had already made their decision about
9    the petition and they were looking for some
10   scientific support, and supposedly that was part of
11   this conversation that you are pointing out in this
12   memo that is an Imerys memo.
13   Q   That's exactly my point. So even after
14   the FDA had made its decision, it went to Johnson
15   and Johnson and said, can you give us some support
16   for we are about to say. That's what happened,
17   according to this memo.
18       MR. SMITH:  Objection.
19   Q   Right?
20   A   I believe in your question you are
21   implying they had scientific support, but they were
22   going to rule against it. I think that's an
23   incorrect characterization.
24       I'm well aware of the Muscat and
25   Huncharek epidemiologic review of talc safety that was

Page 64

1    done and that was a review of the scientific
2    literature related to a specific safety concern,
3    which was prepared and available to the FDA.
4        Q   Ma'am, what I'm asking you is do you know
5    anything about these side conversations that Johnson
6    and Johnson executives were having with people at
7    the FDA asking for support for denying citizen
8    petitions. That's all I'm asking.
9        Do you know anything, since you are
10   here on behalf of Johnson and Johnson and the
11   communications it had with the FDA. Do you know
12   anything about those side conversations?
13       MR. SMITH:  Objection. This witness
14   is here about communications.
15       MR. PLACITELLA:  Please don't do
16   this.
17       MR. SMITH:  Regarding testing for
18   asbestos. That's why she is here.
19   Q   Do you know anything about the side
20   conversation, Ma'am?
21   A   I only know what's written here in this
22   Imerys document. I have not seen this before and it
23   is not related to asbestos testing.
24   Q   It says on the bottom, I'll highlight it
25   for you.

Page 65

1        "We also know the FDA is looking to
2    include in their comments that talc does not contain
3    asbestos, and thus talc use would not cause a
4    concern from this risk perspective. We know this
5    because FDA asked Personal Care Products Council for
6    their updated specifications for talc, which the
7    council in turn asked J and J and RTM for assistance
8    with." Do you see that?
9    A   Yes.
10   Q   So this document does talk about asbestos
11   testing and information available from
12   Johnson and Johnson, correct?
13       MR. SMITH:  Objection.
14   A   That's not correct. It says that the talc
15   does and they are making reference to the industry
16   specification they are getting, not from Johnson and
17   Johnson, but the Personal Care and Product Council.
18   Q   Who went to Johnson and Johnson and asked
19   for help, correct?
20       MR. SMITH:  Objection.
21   A   I can't follow who went to what for whom.
22   There are probably four different people mentioned
23   in that sentence.
24   A   Says counsel in turn asked Johnson and
25   Johnson for assistance. Is it that hard to read?

Page 66

1      MR. SMITH: Objection.
2      A  I hear your question.  They are referring
3  to the J41 specification for cosmetic talc that you
4  get off of internet, so I don't see they would need
5  J and J's assistance to Google it and print it out.
6      Q  Ma'am, did I ask you anything about Google
7  or J41?
8      A  You did.
9      Q  I didn't.
10     A  You asked about this updated specification
11 for talc.
12     Q  Ma'am, all I asked you was, does this memo,
13 in fact, reference asbestos testing and the issue of
14 asbestos in talc.  That was my question.
15     A  This memo specifically said talc, not
16 containing asbestos in the current product
17 specifications, which would go to the fact that this
18 is talc not containing asbestos.
19         I'm well aware of this time period
20 and the topic at hand, and it is not about asbestos
21 testing.
22     Q  Let me read it for the record and then
23 I'll move on.  "We also know the FDA is looking
24 to include in their comments that talc does not
25 contain asbestos, and thus talc use would not cause

Page 67

1  a concern from this risk perspective."  That's what
2  it says, correct?
3      A  That's what it says, yes.
4      Q  I want to talk a minute about potential
5  hazards related to talc that were known and
6  discussed inside Johnson and Johnson relevant to
7  whether talc was misbranded under FDA regulations.
8  Okay?  Are you with me?
9      A  Yes.
10     Q  Am I correct, and can we agree, that
11 Johnson and Johnson was concerned about the medical
12 effect of tremolite for decades prior to the 2008
13 petitions?
14         MR. SMITH: Objection.
15     A  Not for the decades prior to 2008.
16     Q  Can we agree that as far back as 1969 the
17 Johnson and Johnson medical director expressed
18 concern about the medical effects of tremolite?
19         MR. SMITH:
20     A  In the late '60S and early '70s there were
21 questions about tremolite and that was dealt with
22 with some preclinical animal studies.
23     Q  Am I correct as far back as 1969 the
24 medical director of Johnson and Johnson was
25 concerned about the health effects of tremolite?

Page 68

1      A  That is correct.  In the late '60s and
2  early '70s, people were talking about the health
3  effects of tremolite and those issues were dealt
4  with with preclinical animal testing.
5      Q  I didn't ask you about animal testing.
6  I'm asking you a very specific question.  Am I
7  correct that as far back as 1969, Johnson and
8  Johnson's medical director had concerns about the
9  health effects related to tremolite, that's my
10 question.
11         MR. SMITH: Objection.
12     Q  Not what you did in response.  I'll ask
13 that as a separate question.  Do you understand
14 that?
15         MR. SMITH: Objection.
16     A  I understand your question.  The way you
17 are phrasing it is misleading, and it implies that
18 for many years starting in 1969, people were
19 concerned about tremolite, and that's incorrect.
20 It was a very small period of time people were
21 concerned and that scientific question was dealt
22 with in the early '70s with preclinical animal
23 testing.
24     Q  And it was totally resolved from Johnson
25 and Johnson's perspective in the early '70s, the

Page 69

1  potential health effects from tremolite.  Is that
2  what you are saying?
3         MR. SMITH: Objection.
4      A  Yes.
5      Q  Can we agree that Johnson and Johnson's
6  Baby Powder products contained tremolite and
7  actinolite that were classified as fiber by federal
8  regulations?
9         MR. SMITH: Objection.
10     A  That is a compound question that you are
11 asking.  Tremolite and actinolite are not asbestos.
12     Q  Ma'am, that's not my question.  My
13 question is can we agree that talc baby products
14 that contained tremolite and actinolite were
15 classifiable as fiber under federal regulations?
16         MR. SMITH: Objection.
17     A  You have to show me the regulations you
18 are referring to.
19     Q  J44 is an April 26, 1973 memo to Mr.
20 Johnston on Johnson and Johnson letterhead,
21 correct?
22     A  Yes.
23     Q  This was after the time you say Johnson
24 and Johnson hadn't resolved the issue of whether
25 there was a danger related to tremolite, correct?

Page 70

1       MR. SMITH: Objection.
2    A   That's correct, in preclinical animal
3  testing.
4    Q   You are familiar with this document?
5    A   I've seen this document, yes.
6    Q   In this document it talks about a visit to
7  the mine by Mr. Ashton and Mr. Miller and Mr.
8  Zeitz, correct?
9    A   Yes.
10    Q   And it says, "It is our joint conclusion
11  that we should not rely on the clean mine approach
12  as a protective device for baby powder in the
13  current asbestos or asbestiform controversy. We
14  believe this mine to be very clean, however, we are
15  also confident that fiber forming or fiber type
16  materials could be found. Usefulness of the clean
17  mine approach for asbestos only is over."  Do you
18  see that?
19    A   Yes.
20    Q   When you go to the second page, the reason
21  I'm asking you this because it is about the FDA. It
22  says, "if the FDA Food Division, which is moving
23  more rapidly than the cosmetic division, publishes a
24  standard, it will be probably to ban an asbestiform
25  or fibrous material in talc. That could eliminate

Page 71

1  the current uses of talc in packaging materials.
2  These talc contained wildly varying amounts of
3  tremolite or fibrous talc. Our Baby Powder contains
4  talc fragments classifiable as fiber. Occasionally
5  subtrace quantities of tremolite or actinolite are
6  identifiable on the microscope and these might be
7  classified as asbestos fibers." Did I read that
8  correctly?
9    A   You did.
10    Q   Now, you understand that it was, and can
11  we agree that the FDA's position was that "non
12  asbestiform tremolite could be ground up so that it
13  conformed to the definition of fiber requiring
14  regulation and that it would be as indistinguishable
15  from asbestos tremolite." You, Johnson and Johnson,
16  knew that, correct?
17       MR. SMITH: Objection.
18    A   You are showing me documents from the
19  early '70s, so I need to know what documents you are
20  referring to because whatever was done before 1976
21  is during methods developments, so any definitive
22  statements during that time around the
23  characterization of asbestos are probably incorrect.
24    Q   Ma'am, that's not my question, please. My
25  question is, it was the position of the FDA that

Page 72

1  non-asbestiform tremolite, as of at least 1974, could
2  be ground up and satisfy the definition of
3  asbestiform tremolite, correct?
4       MR. SMITH: Objection.
5    A   I don't recall that specific statement,
6  but I'll restate anything before 1976 with the J41
7  standard is likely to be confused and incorrect with
8  regard to the characterization of asbestos.
9    Q   We are going to get to that, I promise
10  you.
11       364 is a memo from the FDA dated May
12  14, 1974. You have seen this, correct?
13    A   I need one minute to look at it, please.
14  Go ahead.
15    Q   In this memo, the FDA states, "Tremolite
16  is the commonest asbestos mineral found as a
17  contaminant of talc. It occurs in asbestiform and
18  non-asbestiform varieties. This sample is a chunky
19  tremolite, not the asbestiform variety. But when it
20  is ground, it produces some thin, straight particles
21  which conform to the definition of fibers in the
22  method which our distinguishable produced by
23  asbestiform tremolite on grinding."
24       That is something that Johnson and
25  Johnson understood as of this time, correct?

Page 73

1       MR. SMITH: Objection.
2    A   That is correct. This in the context of
3  developing methods. They are not saying tremolite
4  is asbestos. They are trying to figure out what is
5  the right method to use to distinguish between other
6  particles and the type of asbestos that could be
7  harmful.
8    Q   Ma'am, I know you have a story to tell and
9  you can do it when your lawyer asks you questions.
10  But I would ask you, please, to just answer my
11  question.
12       My question was not -- didn't ask for
13  a long explanation. You understand that, right?
14       MR. SMITH: Let me state for the
15  record, Dr. Nicholson, just ignore those insulting
16  comments. Just ignore them. Okay. You are here.
17  Listen to the question, answer it.
18       The gratuitous comments we can't
19  stop. I'm told this is how he behaves at a
20  deposition, but just ignore it, okay?
21    A   Yes. Could you restate your question,
22  please?
23    Q   Sure. In this memo, the FDA is stating a
24  position concerning tremolite. That's all I'm
25  asking you, correct?

Page 74

1  A   That's incorrect.  In this memo the FDA is
2  talking about methods to distinguish asbestos, real
3  asbestos using different microscopic techniques.
4  This is not a declaration of a position, it is a
5  discussion of methods.
6  Q   Can you show me, Ma'am, in any of the
7  materials you brought with you today where the FDA
8  changed its position concerning non-asbestiform
9  tremolite being -- and if you can tag that, we will
10  do that after lunch can you do that?
11      MR. SMITH:  Objection to the form.
12  Q   Let me ask you this question.  Am I
13  correct, and can we agree that five to eight percent
14  of the Johnson and Johnson talc, talc sold by
15  Johnson and Johnson, contained particles that are
16  capable of damaging the lungs of human beings?
17      MR. SMITH:  Objection.
18  A   No.
19  Q   467 is an August 13, 1971 memo on Johnson
20  and Johnson letterhead, the subject being talc.  I'm
21  going to refer you to Section G.  It states, "It is
22  generally accepted that the lung damaging particles
23  of minerals are below ten microns.  Roughly we have
24  about five to eight percent of such in our talc."
25  Did I read that correctly?

Page 75

1  A   You did read that correctly, but we don't
2  know this refers to cosmetic talc.  We have to go
3  back and review the beginning of the document.
4  Absolutely incorrect for our cosmetic talc and has
5  always been true.
6  Q   So it has been true for your industrial
7  talc, but not your cosmetic talc.  Is that what you
8  are saying?
9  A   What I'm saying is I'll need to go back
10  and look because cosmetic talc does not contain
11  particles.
12  Q   Okay.  Go back and look.  Let me help you.
13  Look at Section C.  It says the, Bureau of Mines
14  expert who testified at the behest of the FDA
15  commented on the poor grade talc in our Windsor
16  Mine, but mentioned the ore next to the outlying
17  rock contained asbestos.  It is imperative that
18  careful selection of the ore be maintained at the
19  mines.  It is always possible that the FDA may
20  inspect the mines and our records."  Do you see
21  that?
22  A   Yes.
23  Q   What they are talking about, and when you
24  look at B, they are talking about the Shower to
25  Shower and your medicated product, correct?

Page 76

1  A   Let me review the document.  There are
2  multiple points in here, not necessarily related.
3  Okay.  Go ahead.  Your question,
4  please.  Please ask the question again.
5  Q   This particular document talks about talc
6  that was being mined and sold by Johnson and
7  Johnson, correct?
8  A   That is correct, from Windsor Minerals,
9  which contain industrial talc as well as cosmetic
10  talc, and it is very difficult to see what they are
11  referring to in different points.  There's a
12  mixture.
13  Q   You understand that both the industrial
14  talc and the cosmetic talc sold by Johnson and
15  Johnson came out of the exact same Hammondsville
16  mine.  You know that, correct?
17  A   That is not correct.  There were different
18  mines, mine shafts and geographic locations for
19  cosmetic versus industrial talc.
20  Q   That wasn't my question.  Do you
21  understand, Ma'am, that the cosmetic and industrial
22  talc sold by Johnson and Johnson came out of the
23  Hammondsville mine, correct?
24      MR. SMITH:  Objection.
25  Q   You know that?

Page 77

1  A   That wasn't your question before.  You
2  said the exact same mine.  They come from different
3  mine shafts, different quality of talc, just to be
4  clear.
5  Q   Can we agree, Ma'am, that the cosmetic
6  talc and industrial talc that was sold by Johnson
7  and Johnson came out of the Hammondsville mine owned
8  by Johnson and Johnson?
9      MR. SMITH:  Objection.
10  A   I don't know the names of all the mines.
11  I don't believe Hammondsville was the only source of
12  talc, so I can't answer that specifically.  But I
13  know that cosmetic talc did not come from the
14  same geologic formations.
15  Q   How do you know that?
16  A   I've read many documents, spoken to many
17  experts in the field including John Hopkins and
18  other consultants that we have.  They are expert
19  geologists.
20  Q   So let's just be clear where we are.  Are
21  you saying that the cosmetic talc and the industrial
22  talc sold by Johnson and Johnson did not come from
23  the Hammondsville mine?
24      MR. SMITH:  Objection.
25  A   I didn't say that.

Page 78

1    Q   So my question was, according to Johnson
2  and Johnson, it is generally accepted that lung
3  damaging particles of minerals are below ten microns
4  and that according to Johnson and Johnson, you had
5  about five to eight percent of such minerals in your
6  talc as of 1971, correct?
7         MR. SMITH: Objection.
8    A   I'm reading the statement here as you are.
9  That's what it says.
10    Q   Now, am I correct that the talc in Johnson
11  and Johnson products is capable of reaching, when
12  inhaled, is capable of reaching deep into the human
13  organs?
14         MR. SMITH: Objection.
15    A   I'm not an inhalation toxicology expert.
16    Q   Do you agree with me that inhaled talc
17  could reach deep into the lungs?
18         MR. SMITH: Objection.
19    A   I'm not an inhalation toxicology expert.
20    Q   You don't know that?  You, Johnson and
21  Johnson, don't know that?
22         MR. SMITH: Objection.
23    A   I'm not -- I personally am not an
24  inhalation toxicology expert, so I can't comment on
25  that.

Page 79

1    Q   Do you know whether Johnson and Johnson
2  ever related to the FDA that inhaling its talc could
3  reach deep into the lungs?
4         MR. SMITH: Objection.
5    A   Since I'm not an expert in that area, I
6  would not recall specifics of that information.
7    Q   So as you sit here today, you, Johnson and
8  Johnson, don't know whether you ever told the FDA
9  that inhaled talc could reach deep into the lungs?
10         MR. SMITH: Objection.
11    A   I'm not an inhalation toxicology expert.
12  I can't comment on that.
13    Q   I'm not asking whether you are an expert.
14  I'm asking about what information Johnson and
15  Johnson had that was related to the FDA.
16         As you sit here today, you, Johnson
17  and Johnson, have no evidence that you ever told the
18  FDA that inhaled talc could reach deep into the
19  lungs, correct?
20         MR. SMITH: objection.
21    A   My scope for today was information about
22  asbestos testing communications between the FDA and
23  Johnson and Johnson.  Your question is outside of
24  the scope.
25    Q   With all due respect, you are not a

Page 80

1  lawyer.  I'm asking you to answer my question.
2         As you sit here today you no evidence
3  that Johnson and Johnson ever revealed to the FDA
4  that it was of the opinion that inhaled talc could
5  reach deep into the lungs, correct?
6         MR. SMITH: Objection.
7    A   I have not reviewed the inhalation
8  communications between the FDA and Johnson and
9  Johnson.
10    Q   Now, am I correct, or can we agree that
11  Johnson and Johnson internally acknowledged that
12  very low levels of chrysotile asbestos found as a
13  contaminant in talc pose a severe health hazard?
14         MR. SMITH: Objection.  Can you read
15  that question back.
16         (The above question is read.)
17         MR. SMITH: Note my objection.
18    A   I didn't understand the question.
19    Q   Can we agree internally at Johnson and
20  Johnson that you acknowledged that very low levels
21  of exposure to chrysotile asbestos found as a
22  contaminant in talc, pose a severe health hazard?
23         MR. SMITH: Objection.
24    A   No.
25    Q   69 is the Johnson and Johnson Baby Powder

Page 81

1  fact book, July 1974.  I'm going to refer you -- who
2  is Vernon Zeitz?  Do you know?
3    A   I don't know Vernon Zeitz.
4    Q   And I'm going to refer you to page 5,
5  under summary and remarks.  It states, "The use of
6  citric acid in the depression of chrysotile asbestos
7  and other mineral species has been developed at
8  Windsor Minerals in response to the potential need
9  for means to exclude extremely local levels of these
10  contaminants from the finished product of the
11  benefaction process.  The use of these systems is
12  strongly urged by the writer to provide the
13  protection against what are currently considered to
14  be materials presenting a severe health hazard and
15  are potentially present in all talc ores in use at
16  this time."  Did I read that correctly?
17    A   You did.
18    Q   Did you ever see this before?
19    A   I haven't.  This document is called a
20  floatation method and so it would take some review
21  and discussion with an expert to really understand
22  what this is about, what it is referring to.
23    Q   So you never saw this document at any time
24  in preparation for testimony you have given
25  anywhere?

Page 82

1      MR. SMITH:  Objection.
2      A  I don't recall seeing it before.  I may
3  have, but I certainly did not review it in detail
4  for today.
5      Q  Can we agree that Johnson and Johnson
6  those and acknowledges that talc containing
7  asbestiform fibers is a known human carcinogen?
8      MR. SMITH:  Objection.
9      A  Can you read that again?  There was a bit
10 confusing to me.
11     Q  Yes.  Can we agree that you, Johnson and
12 Johnson, acknowledge that talc containing
13 asbestiform fibers is a known human carcinogen?
14     MR. SMITH:  Objection.
15     A  We know that asbestos is a carcinogen, if
16 that's your question.
17     Q  My question is, talc containing
18 asbestiform fibers is a known human carcinogen.
19 That's something you know at Johnson and Johnson,
20 correct?
21     MR. SMITH:  Objection.
22     A  That is correct, that asbestos is a
23 carcinogen.  If it were any of our products, it
24 would still be a carcinogen.
25     Q  Now, Johnson and Johnson, can we agree

Page 83

1  that Johnson and Johnson knows and acknowledges
2  people can development the disease mesothelioma from
3  non occupational exposure to asbestos?
4      MR. SMITH:  Objection.
5      A  Yes.
6      Q  Can we agree that studies that Johnson and
7  Johnson were aware of demonstrate that both talc and
8  asbestos have been found in women who are non
9  occupationally exposed to asbestos?
10     MR. SMITH:  Objection.
11     A  Yes.
12     Q  Can we agree that tremolite and
13 anthophyllite are known contaminants of talc?
14     MR. SMITH;  Objection.
15     A  They can be.  They are not asbestos.
16     Q  Can we agree that talc, contaminated talc,
17 has been implicated as a cause of mesothelioma in
18 women?
19     MR. SMITH:  Objection.
20     A  Contaminated talc.  You have to be more
21 specific.
22     Q  Talc contaminated with asbestos has been
23 implicated as a cause of mesothelioma in women.
24     MR. SMITH:  Objection.
25     A  What do you mean by implicated, please?

Page 84

1  Can you clarify?
2      Q  Sure.  Let me ask you.  Maybe that was a
3  bad question.
4      Can we agree that were reports in the
5  scientific literature indicating that talc
6  contaminated with asbestos is a cause of
7  mesothelioma in women?
8      MR. SMITH:  Objection.
9      A  I'm not aware of that literature.
10     Q  Am I correct that, and can we agree, that
11 Johnson and Johnson internally has acknowledged that
12 because tremolite and anthophyllite are known
13 contaminants of talc, date suggests that rare cases
14 of mesothelioma among women with no other
15 identifiable exposure might be related to exposure
16 to cosmetic talc?
17     MR. SMITH:  Objection.
18     A  No.
19     Q  216 is a memo from 1977 entitled
20 Mesothelioma Talc Medical Research.  Do you see
21 that?
22     A  Yes.
23     Q  With Johnson and Johnson Bates number on
24 it.  Do you see that?
25     A  Yes.

Page 85

1      Q  If we go to the section of the memo on
2  talc, it states, "However, in several mesothelioma
3  patients studied both talc fibers and tremolite were
4  detected.  In fact, the majority of asbestos bodies
5  isolated from the lungs of women in the general
6  population have tremolite or anthophyllite, and
7  because tremolite and anthophyllite are known
8  contaminants of talc, this data suggests that rare
9  cases of mesothelioma among women with no other
10 identifiable exposure might be related to exposure
11 to cosmetic talc."  Did I read that correctly?
12     A  You read that correctly, but I disagree
13 with that conclusion.
14     Q  I wasn't asking you what you agree with.
15 I was asking you whether this was information in the
16 possession of Johnson and Johnson.
17     A  This is information in the possession of
18 Johnson and Johnson, but there are rare cases with
19 no identifiable, might be related.  It is not
20 scientific data, it is a hypothesis.
21     Q  Ma'am, I'm just asking whether the
22 information contained in this Johnson and Johnson
23 document was information known to Johnson and
24 Johnson, at least in 1997.  That's all I wanted to
25 know.

Page 86

1      MR. SMITH: Objection.
2      A   It is written down here on this piece of
3   paper. That's what I can agree to.
4      Q   So the answer to my question is yes?
5      MR. SMITH: Objection.
6      A   I say it is written down on this piece of
7   paper. This is not a sort of factual acknowledgment
8   that this association was something Johnson and
9   Johnson thought was scientific, rigorous, robust and
10   legitimate.
11      Q   My question to you was, the information in
12   this Johnson and Johnson document was information as
13   of 1997 that Johnson and Johnson looked at and
14   considered and was part of its business records,
15   correct?
16      MR. SMITH: Objection.
17      A   This was written down on a Johnson and
18   Johnson document. That, I can degree to.
19      Q   Can we agree that Johnson and Johnson is
20   required to be honest and forthright when dealing
21   with government agencies on product safety?
22      MR. SMITH: Objection?
23      A   Yes.
24      Q   Can we agree that when relating
25   information to the FDA on product safety, the whole

Page 87

1   truth is required and not just part of the truth.
2   Can we have agree to that?
3      A   The truth related to whatever the issue at
4   hand is, yes, I'll agree to that.
5      Q   And it is considered a crime to
6   intentionally mislead a government agency. Do you
7   understand that?
8      MR. SMITH: Objection.
9      A   Yes, I do.
10      Q   Now, am I correct whether there was
11   asbestos in the Johnson and Johnson talc products
12   was raised repeatedly by the FDA beginning in the
13   early '70s?
14      A   It was raised. I don't know what that
15   means.
16      Q   The issue was -- the question came up over
17   and over again beginning in the 1970s and was posed
18   to Johnson and Johnson, whether any Johnson and
19   Johnson talc product contained asbestos. Can we
20   agree with that?
21      MR. SMITH: Objection.
22      A   That's correct, and Johnson and Johnson
23   talc never contained asbestos.
24      Q   We will get to that part. All I'm asking
25   you, Ma'am, at this point is whether there was

Page 88

1   asbestos in Johnson and Johnson talc products, was a
2   question that was repeatedly raised by the FDA
3   beginning at least in the early '70s, correct?
4      A   The way you are saying it implies it was a
5   specific question about Johnson and Johnson talc
6   powders. It was not. It was about cosmetic talc in
7   general.
8      Johnson and Johnson was not
9   questioning specifically about the integrity of our
10   products per se by your question.
11      Q   So, is your testimony today that Johnson
12   and Johnson -- excuse me, that the FDA never raised
13   the issue with Johnson and Johnson as to whether
14   there was any evidence of asbestos in any Johnson
15   and Johnson products?
16      A   I didn't say that. The FDA asked us in
17   the '70s, or we offered in the '70s, information on
18   our testing of our products around the issue of
19   asbestos.
20      Q   Did the FDA ask you whether there was any
21   evidence of any amount of asbestos in any Johnson
22   and Johnson cosmetic talc product?
23      A   I'm sure there was some question to that
24   effect asked.
25      Q   And the answer by Johnson and Johnson was

Page 89

1   always the same, correct, that is there is no
2   evidence of any asbestos of -- scratch that.
3      The answer provided by Johnson and
4   Johnson was always the same, there's no evidence of
5   any amount of any asbestos in any of Johnson and
6   Johnson cosmetic products, correct?
7      A   There was no asbestos in Johnson and
8   Johnson products, correct.
9      Q   Now, Johnson and Johnson specifically told
10   the FDA that there was no asbestos or tremolite in
11   Johnson's Baby Powder, correct?
12      A   Can you repeat that question?
13      Q   Yes, Ma'am. Johnson and Johnson told the
14   FDA that there was no asbestos or tremolite in any
15   Johnson's Baby Powder, correct?
16      A   I don't recall seeing that, no.
17      Q   464. So you have in front of you a memo
18   from July 27, 1971, about the special talc project
19   and it memorializes a meeting that was held with
20   Johnson and Johnson and the FDA, correct?
21      A   Yes.
22      Q   And you reviewed this in preparation for
23   today's deposition?
24      A   Yes.
25      Q   The memo says a Dr. Weisler worked for the

Page 24  (Pages 90-93)

Page 90

1  FDA, correct?
2      A   Yes.
3      Q   Wanted to know if tremolite or fibrous
4  talc was found.  We stated that our information is
5  that no asbestos was found and that we will have a
6  full, detailed report on the findings in about a
7  week, correct?
8      A   Yes.
9      Q   Now, as a follow up to that, you, Johnson
10  and Johnson told the FDA had that you had conclusive
11  proof that there was no asbestos in Johnson's Baby
12  Powder, correct?
13      A   I don't recall those exact words, but we
14  did send extensive reports to the FDA about the
15  testing qualification of the materials.
16      Q   474 is a memo a couple weeks later,
17  September 21, 1971, from Johnson and Johnson to the
18  FDA.  Do you see that?
19      A   Yes.
20      Q   And what you state on the second page is,
21  "It is seen that the data conclusively proves that
22  Johnson's Baby Powder is free of asbestos," correct?
23      A   Yes.
24      Q   And that you further told the FDA that
25  there was not ever a shred of evidence that there

Page 91

1  was asbestos in either Johnson's Baby Powder or
2  Shower to Shower, correct?
3      A   That sounds familiar.
4      Q   Do I need to show you that document?
5      A   Sure, go ahead.
6      Q   483.  This is a memo concerning a meeting
7  you had with the FDA in 1972, correct?
8      A   Yes.
9      Q   And what you told the FDA was that there
10  wasn't a shred of evidence to support the idea that
11  either Johnson and Johnson's Baby Powder or Shower
12  to Shower contained any chrysotile asbestos,
13  correct?
14          MR. SMITH:  Objection.
15      A   Correct.
16      Q   Not a shred of evidence?
17          MR. SMITH:  Objection.
18      A   Yes.
19      Q   You told the FDA that there was absolutely
20  no evidence of asbestos in any of the mines the baby
21  powder came from using every method of analysis.
22  You told them that, correct?
23          MR. SMITH:  Objection.
24      A   I don't recall saying that about the
25  maintenance per se.

Page 92

1      Q   475 is another letter from 1973 written by
2  Johnson and Johnson to the FDA, correct?
3      A   Yes.
4      Q   And it talks about Shower to Shower as a
5  product, correct?
6      A   Yes.
7      Q   And what you state on the second page of
8  your letter to the FDA is, "It should be noted that
9  the talc in our medicated powder is from our Vermont
10  mine source which has been exhaustively studied and
11  reported on in various previous submissions.  It was
12  shown to be free of detectable asbestos by all
13  available methods of analysis."  Correct?
14      A   That is correct.  This says it is from the
15  mine source.  It doesn't stay it is a mine survey.
16  That's where your question before was a little bit
17  confusing.
18      Q   Johnson and Johnson told the FDA that "the
19  source of the talc used in the powder from their
20  Vermont mine was free of any detectable asbestos by
21  all available analysis and methods."  Correct?
22      A   You are misstating that.  It says, "It
23  should be noted that talc in our medicated powder is
24  from our Vermont mine which has been exhaustively
25  studied.  It was shown to be free of detectable

Page 93

1  asbestos by all methods of analysis."
2          It is unclear to me whether that's
3  referring to the mine or the medicated powder.  We
4  have to go to the Pooley reports to determine what
5  exactly was done in the Vermont mines.
6      Q   You don't know what this refers to as you
7  sit here?
8      A   I'm saying I'm not sure of the "it."  It
9  is sentence structure whether the it refers to the
10  powder or the mine.
11          If we are going to talk about the
12  mine, I would say that we should look specifically
13  at the report of the mine.
14      Q   I'm going to do that later today.  I want
15  to know what you told the FDA and you represented.
16  You understand that part of the purpose today is to
17  determine whether Johnson and Johnson told the FDA
18  the whole truth.  You understand that, correct?
19          MR. SMITH:  Objection.
20      A   Yes, I do understand it.  That's why I'm
21  referring to that more comprehensive mine survey
22  that was done.
23      Q   All I want to know now is exactly what
24  Johnson and Johnson represented to the FDA.  Then we
25  will get to what they actually told the FDA.  Do you

Page 94

1  follow me?
2      A   No, I don't know the differences between
3  represented and told.
4      Q   Let's focus on what Johnson and
5  Johnson represented in terms of whether the talc mine or any
6  of the products contained asbestos.  That is what
7  I'm focusing on, okay?
8      A   Okay.
9      Q   We are on the same page?
10     A   Um-hum.
11     Q   Is it your testimony that Johnson and
12  Johnson told the FDA that there might be asbestos in
13  the Vermont mines that it owned?
14     A   So we will have to go to the Pooley report
15  to look at the mine.  The products made from ore
16  that came out of the Vermont mines is free of
17  asbestos, based on the limits of detection of the
18  methodology used.  You are mixing two things,
19  product and mines.
20     Q   No, I'm not mixing anything.  You are
21  mixing it in your answer.  I'm asking you
22  specifically did Johnson and Johnson represent to
23  the FDA that the mines that it owned, that the talc
24  came from, that was used in its products, did it tell
25  the FDA that those mines were free of asbestos?

Page 95

1      MR. SMITH:  Objection.
2      A   We sent the report from Dr. Pooley of the
3  Italian mines and Vermont mines to the FDA.  We will
4  have to go to those reports to see exactly what it
5  says.  I have those here, I'm happy to pull those
6  out.
7      Q   Ma'am, I'm asking you a very specific
8  question.  Did Johnson and Johnson represent to the
9  FDA that the mines that were used to make Johnson's
10  Baby Powder or Shower to Shower were free of
11  asbestos?  That is my question.  Did you make that
12  representation?
13     A   I don't recall any specific statement to
14  that effect, but I do know that we sent
15  comprehensive surveys of the mines that were used to
16  the FDA and I have those here and I'm happy to review
17  them.
18     Q   I'm going to do that with you.  All I want
19  to know, the only thing I'm focusing on is what you
20  told the FDA about whether the mines that you own
21  that were used for baby powder and Shower to Shower,
22  whether you ever told them they had asbestos anywhere
23  in the mine, and your answer is what?
24     MR. SMITH:  Objection.
25     Q   You don't know?

Page 96

1      MR. SMITH:  Objection.
2      A   My honest answer is we have a very
3  comprehensive report here that we can look at and
4  see exactly what was said, and that was sent to the
5  FDA.
6      Q   Other than looking at the report, which we
7  are going to get to, you don't know, you, Johnson
8  and Johnson, don't know as you sit here today
9  whether you ever represented to the FDA specifically
10  that there's no evidence of asbestos in the mines
11  used to manufacture baby powder or Shower to Shower?
12     MR. SMITH:  Objection.
13     A   I don't know what -- I keep giving, you
14  have the answer, which is in the report that
15  went to the FDA, and we can look at that point and
16  see exactly what it says.
17     Q   Does the report, Ma'am, as you sit here
18  today, do you have any evidence, do you have any
19  recollection of seeing a report to the FDA that
20  admitted that there was asbestos in any of the mines
21  used to manufacture baby powder or Shower to Shower?
22     MR. SMITH:  Objection.
23     A   Would you like to look at the report?
24     Q   I'm asking you what you know, Ma'am.  We will
25  get to the reports later.  Do you have any

Page 97

1  independent memory?
2      A   I have an independent memory that reports
3  are complex and they have multiple testing in them
4  and you have to go to the conclusion to see what the
5  report said to understand the meaning of what was
6  communicated between J and J and the FDA.
7      Q   Do we agree, as you sit here, you don't
8  have any independent knowledge of what was
9  represented to the FDA about whether the mine that
10  was used to manufacture baby powder or Shower to
11  Shower had asbestos in it?
12     MR. SMITH:  Objection.
13     Q   You have no independent recollection?
14     MR. SMITH:  Objection.
15     A   My recollection is based on the report
16  that was sent to the FDA, which I would be very
17  happy to review with you.
18     Q   Without looking at that report, what is
19  your recollection?
20     A   My recollection is it is a very complex
21  report, but that material there comes out of that
22  mine that is used to make baby powder does not
23  contain asbestos.
24     MR. SMITH:  What time do we want to
25  break for lunch?

**Page 98**

MR. PLACITELLA:  Why don't you give me another fifteen minutes and then we can break.

Q    Am I correct you told the FDA that there isn't a single instance where a test result showed there was chrysotile asbestos in any Johnson and Johnson product?

A    No product released to the market ever contained chrysotile asbestos.

Q    My question is, did you affirmatively represent to the FDA that there is not a single instance, not a single report of chrysotile in any of the Johnson and Johnson products?

A    We have said over and over again there's no asbestos in our products, so I would say that includes chrysotile asbestos.

Q    A single instance?  Not one?

A    No product has been released to the market there contains a single instance of asbestos.

Q    Now, you understand that tremolite is something known as an amphibole?

A    Yes.

Q    Did you represent specifically to the FDA that there are no amphiboles or serpentine materials ever detected in a Johnson and Johnson product?

**Page 99**

A    No, because that wouldn't be correct.

Q    Exhibit 60 is the submission that your trade association gave to the FDA, which included a letter from Johnson and Johnson, correct?

A    It is a little hard to read.  It is so tiny.  I'm looking.  Give me one minute, please.  Yes, I've seen this.

Q    And can you go to the part of the submission that is authored by Johnson and Johnson, the March 19, 1976 letter.

A    I see March 14th.  Hold on.

Q    March 15th.

A    March 15th.  You said 19th.

Q    Okay.  And what you say to the FDA, no amphibole materials have been detected, correct?

A    That's what it says beginning in October 1973 to whatever date in 1976.

Q    Right.  Now, I'll show you 492.  492 is your March 17, 2016 letter to the FDA on Johnson and Johnson letterhead, correct?

A    Yes.

Q    And in that letter, what you did is in the face of lawsuits and verdicts, you went back to the FDA and told them, again, that from the perspective of Johnson and Johnson, no asbestos structures have

**Page 100**

been found in any testing ever.  Correct?

MR. SMITH:  Objection.

A    This refers to -- hold on, let me find the page.  This refers to the worldwide survey for body powders.  This is off the shelf Johnson and Johnson body powders that are collected all over the world and tested for asbestos and that's correct, that no asbestos has ever been found in those materials.

Q    Ever?

A    Referring specifically to the worldwide surveys of Johnson and Johnson baby powders that are taken off the shelf and tested for asbestos, and during that program no asbestos has be detected in materials that is out for consumers to buy.

Q    So no matter where they got the asbestos anywhere in the world, it is Johnson and Johnson's position that there's never been a single test showing that there's asbestos in the Johnson and Johnson products, correct?

MR. SMITH:  Objection.

A    So you said we went around the world to get asbestos?  We went around the world to get Johnson and Johnson baby products off the shelf, test for asbestos and those have not shown asbestos

**Page 101**

in that material that is out on the shelf for consumers to buy.

Q    That's my question.  It is your position that no matter where you go in the world, if you tested the Johnson Baby Powder, it has no evidence of asbestos and never did.  That's your position, correct?

MR. SMITH:  Objection.

A    That is the facts related to this worldwide survey we shared with the FDA in March of 2016.

Q    It had no asbestos and never did, correct?

A    It says no asbestos was found in that worldwide survey.

Q    And never did?

A    It does not say never did.

Q    Well, was it ever?

A    Was it ever what?

Q    Found asbestos in any Johnson's Baby Powder?

A    Not production product that's on the shelf for consumers to buy, no.

Q    So it is Johnson and Johnson's position as we are sit here today that no testing ever showed any amounts of any asbestos in any Johnson and

Page 102

1  Johnson consumer product, correct?
2        MR. SMITH: Objection.
3     A   When you refer to Johnson and Johnson
4  consumer product, that is product that has been
5  released to the market. No, there's not been
6  asbestos in that product that has been tested by
7  legitimate means.
8     Q   When you stay legitimate means, what do
9  you mean by that?
10    A   Some individuals have bought products off
11 of Ebay and other sources and tested them and
12 claimed to have found asbestos, and I believe that
13 is incorrect methodology and unreliable test
14 results.
15    Q   And you are competent to testify about the
16 methodology used by experts testing asbestos?
17    A   No, but I'm competent to testify if you
18 buy something on Ebay that's been opened in an
19 environment that is uncontrolled, you cannot rely on
20 those results.
21    Q   What about testing products that are in
22 Johnson and Johnson's historical files? Is that a
23 legitimate methodology?
24    A   It is a legitimate source of material, but
25 the methodology is another issue.

Page 103

1     Q   One more and we will break for lunch.
2        498 comes from an advertisement that
3  you ran in December of last year all over the United
4  States. You have seen this before, correct?
5     A   Yes.
6     Q   You say, "We know that we have always
7  cooperated fully and openly with the FDA and other
8  regulators and have given them full access to our
9  testing, our talc testing results." Do you see
10 that?
11    A   Yes.
12    Q   That means you gave them all the test
13 results in your possession?
14    A   Full access. We have not sent them every
15 single test result. I don't think they would
16 appreciate that very much.
17    Q   So who decided what test results were
18 going to be sent to the FDA and which ones were not?
19 Who made that decision?
20    A   Full access means that if there's any
21 issue to be discussed where test results would be
22 helpful, they absolutely would share those results
23 with the FDA.
24    Q   Did you ever tell the FDA that we have
25 other test results we didn't send you, but you are

Page 104

1  happy, welcome to come look at them? Did you ever
2  tell them that?
3     A   In effect, we have.
4     Q   And who did you tell specifically that?
5  And who said that?
6     A   Until June of this past year a number of
7  individuals, myself included, met with the FDA and
8  discussed test results and asbestos testing in our
9  quality assurance system that starts qualifying of
10 the mines and goes through multiple testing to the
11 finished products, and that they are more than
12 welcome to see any of those tests.
13        They didn't want to see the tests.
14 They wanted our specifications and our methodology
15 and so forth, all of which was sent to them.
16    Q   So before -- did you say this year?
17    A   You asked me if we ever had --
18    Q   I want to get the date right. This year?
19    A   2018.
20    Q   So before June of 2018, have you ever made
21 all of your test results available for inspection by
22 the FDA?
23    A   The FDA can inspect us at any time and we
24 would have certainly worked with them and cooperated
25 to make whatever tests results they wanted

Page 105

1  available to them.
2     Q   Ma'am, before June of 2018, had you ever
3  told the FDA that you had test results related to
4  asbestos in talc that you did not provide them?
5     A   No, not that I know of.
6     Q   You also say in your advertisement, "We
7  know that we did not hide anything. Our openness and
8  collaboration with the FDA and regulatory agencies
9  is well documented." Correct?
10    A   Correct.
11    Q   The books you have in front of you, let's
12 identify them and we will go take a break for lunch
13 and I'll look at them at lunchtime. Okay?
14        So tell me what is in each of the
15 books generally that you have in front of you.
16    A   So P-3 is volume 1 and contains
17 communications back and forth between Johnson and
18 Johnson and the FDA and some other contextual
19 documents are included as well.
20        Volume 2 is the March 2016
21 communication that we sent to the FDA and all of the
22 associated attachments. In addition, there's a
23 July 2018 communication in volume number 2.
24        Volume 3 are contextual documents
25 that indicate what was going on at different points

Page 106

1 in time during the history of talc and asbestos
2 starting in the late '60s up until present day,
3 giving you context for understanding the development
4 of asbestos testing, citizens petitions and other
5 related events.
6    Q   That's it?
7    A   That's it.
8    Q   In these three volumes, does that include
9 all the information that you provided to the FDA
10 concerning the testing of Johnson and Johnson talc
11 for asbestos?
12    A   As far as I'm aware, yes, it does.
13       MR. PLACITELLA:  This is a good place
14 to take a break.
15       THE VIDEOGRAPHER:  The time is
16 approximately 12:32 p.m.  We are going off the
17 record.
18       (Luncheon recess taken)
19
20       THE VIDEOGRAPHER:  We are back on the
21 record.  The time is approximately 1:12 p.m.
22
23 CONTINUED DIRECT BY MR. PLACITELLA:
24
25    Q   Dr. Nicholson, I asked this morning, and I

Page 107

1 know you looked it over at a break, I asked you
2 questions about the FDA itself testing for
3 Vermont sourced products, and you said you believe
4 there was testing in the '84, '86, but you weren't
5 sure what they tested for.  Did you find what you
6 were referencing?
7    A   I found three different things, and so one
8 is a 1986 FDA petition denial, which is more
9 mathematical analysis of some theoretical exposure
10 limits.
11       So the one thing of importance was
12 around the exposure risk assessment.
13    Q   I'm familiar with that document, but that
14 had nothing to do with the physical testing of a
15 Johnson and Johnson product for asbestos, correct?
16    A   That is correct.  Then there was the
17 Boundy Study, which did review --
18    Q   That's on what tab and what exhibit?
19    A   This is tab 9 of P-5.  This refers to
20 NIOSH, which is the National -- I don't remember
21 what NIOSH stands for.
22       This is from Maryanne Boundy and
23 others from Environmental Health Sciences from
24 Harvard.  This is in the late '70s.  They looked at
25 bulk Vermont talc.

Page 108

1    Q   There's no testing done on Johnson and
2 Johnson Baby Powder related to the 1980s, correct?
3    A   Correct.  Then there's -- one last
4 document, which is tab 13, which is the McCrone
5 letter that says that for the previous fifteen
6 years, and this letter is dated May 1987, that they
7 had been testing routinely material for a number of
8 companies, including Johnson and Johnson over the
9 years, and have the product is free of asbestos,
10 second to the last line.  That is not FDA, but
11 that's an independent organization testing talc for
12 industry.
13    Q   Right.  But they were paid by Johnson and
14 Johnson.
15    A   They were.
16    Q   So my question this morning was, you don't
17 have any evidence, as you sit here today, of any
18 test run by the FDA of Johnson talc products from a
19 Vermont source after 1979, correct?
20    A   Correct.  The FDA didn't do their own
21 testing.  They, too, used outside sources.
22    Q   But there was no testing by any outside
23 source hired by the FDA of Vermont based products
24 after 1979, correct?
25    A   That is correct.  We have a calculations

Page 109

1 by FDA and the McCrone letter saying talc is
2 free from asbestos for fifteen years.  But you are
3 correct, FDA, not until 2009, did a survey of
4 cosmetic talc.
5    Q   And when the FDA did their survey of
6 cosmetic talc in 2009, Johnson and Johnson was no
7 longer using a Vermont mine as the source for its
8 cosmetic talc, correct?
9    A   That's correct.  In 2003 we switched to
10 China.
11    Q   So from 1979 until any time thereafter,
12 the FDA never did a test to determine whether the
13 Johnson and Johnson talc contained asbestos that was
14 sourced from a Vermont mine, true?
15       MR. SMITH:  Objection.
16    A   So FDA did not do a test of Johnson and
17 Johnson product.  That is correct, but Johnson and
18 Johnson was testing their product, McCrone was
19 testing the product.
20       We know it was free of asbestos, but
21 you are correct, Johnson and Johnson did not test
22 the product that I'm aware of.
23    Q   So without everything else stuffed in, all
24 I want to know is as we sit here today can we agree
25 that there was no testing done by the FDA of any

Page 110

1  Johnson and Johnson product that came from a Vermont
2  mine after 1979?
3      A   Not that I'm aware of that we have
4  evidence in these documents.
5      Q   So any time after 1979, any test results
6  that were considered by the FDA were done for
7  Johnson's Baby Powder, were done by Johnson and
8  Johnson or the experts that it hired, correct?
9      A   I can't speak to others outside of that
10 circle, for example, academics that did testing on
11 product that would have been Johnson and Johnson
12 product.  But in the documents prepared for today, I
13 have just the McCrone letter saying free from
14 asbestos and that includes Vermont talc.
15     Q   So from your perspective in the FDA
16 assessing the safety of the Johnson and Johnson
17 product in terms of whether it ever contained
18 asbestos, the only test result you can point to
19 after 1979 is the McCrone letter that you
20 referenced?
21     A   Well, we have internally thousands and
22 thousands of test results.
23     Q   That wasn't my question, Ma'am.  My
24 question was test results considered by the FDA and
25 assessing the safety of the Johnson and Johnson's

Page 111

1  talc products, the only test results that you have
2  that was supplied to the FDA and considered by the
3  FDA after 1979 was the McCrone 1987 letter, true?
4      A   So I'm confused by your question because
5  it was the 2009 survey that included Johnson and
6  Johnson baby products and raw materials.
7      Q   Let me rephrase it then.  It is my fault.
8          From 1979 forward, the FDA had no
9  information in its possession that you are aware of
10 concerning Johnson's talc products sourced from a
11 Vermont mine on the issue of asbestos content, other
12 than the McCrone letter from 1987, correct?
13     A   Well, they had information we would have
14 been following the J41 standard that basically
15 required us to test everything for asbestos.  So we
16 were in compliance with the standard and therefore,
17 testing regularly for asbestos.
18     Q   Ma'am, my question to you is after 1979,
19 the only document that you gave to the FDA to
20 support the proposition that Vermont sourced talc
21 products were asbestos free was the McCrone letter
22 from 1987, true?
23     A   That I recall related to Vermont talc.
24     Q   So the answer is yes?
25     A   You put so many qualifications in there,

Page 112

1  I'm trying to be very specific in my answer.
2      Q   The answer is that for Vermont talc, the
3  only test you gave to the FDA and that you
4  understand was considered by the FDA was the 1987
5  McCrone letter in terms of whether the Johnson
6  product was asbestos free, correct?
7      A   That the FDA had, that's correct, but
8  again, we were following the J41 standard.
9      Q   We will get to that.  Let me ask you some
10 more questions about the binder before we get to the
11 standard.
12         The binder, I don't know which one it
13 was, had an expert report from a lawsuit from a Mr.
14 Bailey.  You gave that to the FDA?
15     A   No.  The reason we included that, you
16 recall I explained about the binders is that this
17 was also to create context so those communications
18 and why would we been talking about any given thing
19 would be understood.
20         Dr. Bailey gave a very comprehensive
21 review of what was done and how things progressed
22 from the '60s through to more recent times.  That's
23 why it was included.
24     Q   But his report was never given to the FDA?
25     A   Not that I'm aware of.

Page 113

1      Q   So if we wanted to be very specific now,
2  as to what scientific information you provided to
3  the FDA on the issue of whether there was ever
4  asbestos found in any Johnson and Johnson talc
5  product, they are included in what binder?
6      A   They are in this binder.
7      Q   When you say this binder, be specific.
8      A   Volume 1, P-3.
9      Q   So we don't have to worry ourselves, binder
10 2 or 3 on this specific topic of testing information
11 that you gave to the FDA concerning asbestos and
12 Johnson talc, correct?
13     A   Except volume 2 contains the entirety of
14 the two most recent communications to the FDA.
15     Q   So let me be specific then.  Other than
16 the communications you had with the FDA after 2017,
17 all of the scientific information that you provided
18 to the FDA concerning whether the Johnson's Baby
19 Powder contained asbestos at any point in time, or
20 Shower to Shower, is contained in volume 1.  Is that
21 fair?
22     A   Yes.
23     Q   Except you said 2017, not 2016.
24     Q   2016.  Okay.
25         Now, 457 is a document, looks like

Page 114

1  from 1977, listing all of the information you
2  supplied to the FDA as of 1977.  Is that true?
3      A  That's true.  And this is contained in
4  this binder.
5          MR. SMITH:  Which binder?
6      A  Volume 1, P-3.
7      Q  So everything that is on that list is
8  contained in binder number 1?
9      A  Everything we could find in our records is
10 contained herein.  There are some documents that we
11 can note that we couldn't find that were referenced in
12 other material with the original documents was not
13 in our records and could not be located.
14     Q  Did somebody go back and look for the
15 paper and see if there was a paper file of the
16 original document?
17     A  Yes.
18     Q  That doesn't exist?
19     A  Not that we have found.
20     Q  Can we agree that no one at the FDA knew
21 more about the flaws or shortcomings in the asbestos
22 testing methods than Johnson and Johnson and the
23 experts that it hired?
24         MR. SMITH:  Objection.
25     A  I can't speak to what the FDA knew or

Page 116

1  1973, attended by Johnson and Johnson.  If you go to
2  the page where you see where it says, meeting of talc
3  group March 21, 1973 and it says Dr. Ashton from
4  Johnson and Johnson was present?
5      A  Yes.
6      Q  It talks about what Dr. Ashton discussed
7  at the meeting on the third page.  It says Dr.
8  W.H. Ashton, J and J, began discussion of
9  methodology for determining asbestos or fibers by
10 reviewing J and J experience with different
11 instruments.  Least sensitive is optical microscope.
12         Next in order of increasing
13 sensitivity and cost and difficulty to run are x-ray
14 scan, x-ray step scan, electron scan, electron
15 differential scan and DPA differential thermal
16 atomizer.  Do you see that?
17     A  Yes.
18     Q  And what Johnson and Johnson ultimately
19 urged the FDA to adopt what was the two worst in
20 this list, right, the least sensitive, the optical
21 microscope the X-ray diffraction, correct?
22         MR. SMITH:  Objection.
23     A  You are mischaracterizing that.  You are
24 looking at them as individual tests, and it has been
25 discussed in numerous documents that using multiple

Page 115

1  didn't know.
2      Q  Do you understand that in the process of
3  trying to come up with a way to reliably test for
4  asbestos, that the FDA wanted a method that had a
5  sensitivity greater than 1 percent.  You know that,
6  correct?
7          MR. SMITH:  Objection.
8      A  At one point of the discussions that
9  one percent number was contemplated.  The actual
10 sensitivity is significantly lower than that.
11     Q  Am I correct that Johnson and Johnson
12 recommended to the FDA a testing method that Johnson
13 and Johnson knew would not find amphiboles,
14 including tremolite, at low levels?
15     A  I don't know what you are referring to.
16     Q  Well, am I correct that of all the testing
17 methods that were available for the determination of
18 whether there was asbestos or tremolite in Johnson
19 and Johnson talc, Johnson and Johnson urged the FDA
20 to pick the two worst methods for figuring that out?
21     A  That is not correct.
22         MR. SMITH:  Objection.
23     Q  489.  I want to show you a document marked
24 April 18, 1973, business records of Whittaker, Clark
25 and Daniels memorializing a meeting of March 21,

Page 117

1  tests, the correct multiple tests together, is what
2  gives you the best results.  So you are
3  mischaracterizing what is being stated.
4      Q  I'm not.  All I'm asking you is ultimately
5  the two tests in combination that Johnson and
6  Johnson recommended that the FDA use were the two
7  least sensitive tests, according to Dr. Ashton, that
8  is, the optical microscope and the X-ray diffraction
9  method, right?
10     A  Wrong.  You are mischaracterizing that.
11 You have said in combination and then in combination
12 they are the best method.  That's why they are in
13 the J41.
14     Q  What Johnson and Johnson recommended was
15 first you use the X-ray diffraction and then, if
16 that comes up positive, then you use the optical
17 microscope, correct?
18     A  That's how you figure out if you have
19 asbestos in your sample.  A step one screening.
20     Q  They used the two least sensitive methods
21 as articulated by Dr. Ashton in this document,
22 correct?
23     A  Not correct.  You are totally
24 misunderstanding what is being said.
25     Q  I don't think so.  We are going to get to

Page 118

1  that.
2        130 is the J41 method we have been
3  discussing, correct?
4     A   Yes.
5     Q   What it does is, it uses X-ray diffraction
6  and the optical microscope, correct?
7     A   Yes.
8     Q   And it acknowledges that the other tests
9  available are more sensitive for finding amphibole
10  minerals, but for economic reasons, they
11  weren't recommended, right?  That's what it says?
12    A   Where are you looking?
13    Q   Is says, "The method which has been
14  adopted for the detection of amphibole minerals in
15  cosmetic talc is generally accepted method of x-ray
16  diffraction.  Methods which appear in the literature
17  for the detection of fibers amphibole, such as
18  transmission electron microscope, diffraction and
19  electron microbe have also been considered since
20  they are capable of a lower level of detection than
21  by x-ray diffraction."  Did I read that correctly?
22    A   You did, but the next sentence says they
23  suffer from drawbacks and the amount of material
24  they look at is quite small.
25        You have to measure sensitivity and

Page 119

1  specificity and combine methods to get the right
2  answer.
3     Q   What it says is, "The time for analysis
4  the expertise required and the expense of the
5  equipment."  Correct?
6     A   That's what it says.
7     Q   So, the J41 method selected was a
8  combination of x-ray diffraction first, correct?
9     A   Correct.
10    Q   Intended to find amphiboles, not
11  chrysotile asbestos, correct?
12    A   You can rule out amphiboles with x-ray
13  diffraction.  That's correct.
14    Q   This was the method that J and J urged the
15  FDA to adopt, correct?
16    A   That is correct.
17    Q   When Johnson and Johnson ran this method
18  on samples known to have asbestos in them, the
19  method did not find asbestos, correct?
20    A   Not correct.
21    Q   148 are minutes from your trade
22  association from May 1977, which is after you came
23  up with the J41 specification, correct?
24    A   Correct.
25    Q   And present at that meeting was George

Page 120

1  Lee, from your office, correct?
2     A   That is correct.
3     Q   And what is concluded at the bottom is
4  test and verified CTFA method J 41 for this purpose,
5  assurance that method is accurate, reliable and
6  practical.  He then reported the objectives have not
7  been achieved.  Do you see that?
8     A   I see he reported that, yes.
9     Q   If you look at the second page, it talks
10  about using the CTFA method with spiked tremolite.
11  In other words, they actually put the tremolite in
12  the -- they actually put tremolite and spiked it.
13  Do you see that?
14    A   I don't see that.
15    Q   Do you see where it says CTFA tremolite
16  spiked talc where they took the talc and spiked it
17  with tremolite?
18    A   Tremolite is an asbestos.  That's what I'm
19  trying to understand here.
20    Q   Ma'am, I'm saying to you that the J41
21  method failed to find amphiboles including tremolite
22  that was known to be tremolite by your own testing,
23  correct?
24    A   If you give me a second to review the
25  whole document.  I think it is easy to misinterpret

Page 121

1  if you only look at a line or two.  I would prefer a
2  minute to look at the entire document.
3     Q   You didn't look at that in preparation for
4  today?
5     A   I've seen this before.
6     Q   Okay.
7     A   I would like to look at, if you don't
8  mind.
9        MR. SMITH:  You can.
10    A   Go ahead.
11    Q   So let's go back to the front page.  It
12  talks about the purpose of the test was to determine
13  whether or not any 1976 production of major
14  commercial talc products contained asbestiform
15  amphibole contaminants.  Test and verify CTFA method
16  J41 for this purpose.  Assurance that the method is
17  accurate, reliable and practical.
18        The report is that the objectives
19  were not reached, and immediately after that, are
20  the test results, correct?
21    A   That is correct.
22    Q   It says that they took tremolite, which
23  was a talc, talc which was spiked with tremolite and
24  talc that was spiked with anthophyllite and they let a
25  number of different laboratories to run tests on

Page 122

1  that. Do you see that?
2      A  I do.
3      Q  What it shows is from looking for
4  tremolite, only one laboratory found tremolite using
5  the CTFA method and six did not. Do you see that?
6      A  I do.
7      Q  That was tremolite that was spiked, in
8  other words, they put the tremolite in the talc,
9  correct, so you could see if they could find it,
10  right?
11      A  That is correct.
12      Q  When they used the CTFA method, six out of
13  seven couldn't find it using the CTFA method,
14  correct?
15      A  Six out of seven reported a negative test.
16  That's correct.
17      Q  Now, you are aware, are you not, that
18  internally Johnson and Johnson actually wrote down
19  that the CFTA method was not good enough and not
20  sensitive enough to find low levels of tremolite.
21  You are aware of that, right?
22      MR. SMITH: Objection.
23      A  Are we still talking about this document?
24      Q  No, I'm asking you another question.
25      A  Okay.

Page 123

1      Q  You are aware that internally Johnson and
2  Johnson had discussions where they acknowledged that
3  the CFTA, J41 method was not good enough for the
4  detection of low levels of tremolite, correct?
5      A  It is the CTFA, not the CTFA and we always
6  use transmission electron microscopy adjunct, so that
7  may have been discussed and perhaps validated while
8  we continue to this day to use test TEM, which is
9  the most sensitive method.
10      Q  You didn't recommend to the FDA to use
11  TEM, your recommendation to the FDA was for the J41
12  method, correct?
13      A  The Cosmetics Toiletry and Fragrance
14  Association recommended the J41. We continued to do
15  TEM.
16      One of the major limitations at the
17  time is that TEM was not universally available.
18  We, however, had that equipment. We used all of
19  that equipment all the time.
20      Q  That wasn't my question, please. We've
21  got to finish this deposition, so if you could just
22  answer my question.
23      My question is this, that Johnson and
24  Johnson did not recommend to the FDA that TEM be
25  used for the testing to determine whether asbestos

Page 124

1  was in cosmetic talc, correct?
2      MR. SMITH: Objection.
3      A  So TEM was discussed extensively during
4  the meeting and we are going back to that document
5  you just showed me. But practical, reliable and
6  sensitive. So if people did not have the machine for
7  the testing, it could not be suggested and adopted
8  as a universal standard for the industry.
9      Q  Yes, Ma'am. The answer to my question is
10  Johnson and Johnson did not recommend to the FDA
11  that the standard that should be adopted for testing
12  talc for asbestos was TEM, correct?
13      A  I can't answer that question because it
14  was a scientific discussion of many methods and
15  there were multiple participants in the
16  conversation.
17      Johnson and Johnson wasn't in a
18  position to have a definitive recommendation, but
19  rather come to a consensus agreement with FDA and
20  the industry partners.
21      So you are asking me if they had
22  a separate opinion. I have not seen any
23  documents to that effect, but I've seen other
24  documents discuss all of the various methods that
25  were available, like the one we talked about a

Page 125

1  minute ago.
2      Q  What was recommended by Johnson and
3  Johnson and its trade association for the analysis
4  of asbestos in talc was the CFTA J41 method,
5  correct?
6      MR. SMITH: Objection.
7      A  It is the CTFA J41 method, and the
8  document you showed me a minute ago, the industry
9  was continuing to look at that method and refining
10  it to make sure it was accurate, reliable and
11  practical.
12      So not at that time did we definitively
13  say this is the one and only standard, we are not
14  going to evolve our thinking. This was something
15  being actively tested and refined in 1977 and has
16  been revisited since then. So I'm not sure what you
17  are implying with the question.
18      Q  You were still using it in 1995, right?
19      A  Who is we?
20      Q  The CTFA Method. Johnson and Johnson.
21      A  We used that method. It is an industry
22  standard and in addition, we do TEM testing.
23      Q  And internally you acknowledge, did you
24  not, that the CTFA method was not sensitive enough
25  to find low levels of tremolite. You acknowledge

Page 126

1 that.
2    A  That's true. Every test method has a limit
3 of detection, but we still use TEM, which increases
4 our abilities in sensitivity of our testing.
5    Q  Ma'am, all I'm asking you is internally
6 you acknowledged, you, Johnson and Johnson, that the
7 CTFA J41 method was not sensitive enough to find low
8 levels of tremolite, correct?
9         MR. SMITH: Objection.
10    A  Every test method, combination of test
11 methods has their limits of detection, so that would
12 have been acknowledged by FDA, CTFA, Johnson and
13 Johnson and many others.
14    Q  So the answer to my question is internally
15 Johnson and Johnson acknowledged that the CTFA J41
16 method was not sensitive enough to find low levels
17 of tremolite when testing the powder, correct?
18    A  First of all, tremolite is not asbestos.
19 Second of all, the CTFA method, every method of
20 detection does have its limits. So everyone would
21 have acknowledged that, including J and J.
22    Q  In fact, when you were testing your
23 products in Great Britain, you specifically rejected
24 using the CTFA method, didn't you?
25    A  I have not reviewed that topic in

Page 127

1 preparation for today.
2    Q  You spoke to Dr. Hopkins, correct?
3    A  We didn't discuss that particular issue.
4    Q  Dr. Hopkins never told that you he
5 actually wrote a memo indicating that in Great
6 Britain they recommended against using the CTFA
7 method because it wasn't sensitive enough?
8    A  I haven't reviewed that to prepare for
9 today's deposition.
10    Q  Did Dr. Hopkins ever tell you that he was
11 of the opinion, and expressed it to Johnson and
12 Johnson in written form, that tremolite in any form
13 should not be allowed in cosmetic talc products?
14    A  I have not discussed that with Dr.
15 Hopkins.
16    Q  357 is a December 21, 1995 memo from
17 John Hopkins entitled CTPA talc monograph. Do you
18 know what the CTPA was?
19    A  I think it is a toiletry fragrance group
20 in Britain, but I'm not positive.
21    Q  It is the British counterpart to the CTFA
22 in the United States, correct?
23    A  I don't know. I'm not familiar with them
24 as an organization.
25    Q  You mentioned Dr. Pooley. There's a

Page 128

1 forward in this written by Dr. Pooley?
2    A  Yes.
3    Q  Do you see it actually says, and I blew it
4 up so you can read it. In the second paragraph,
5 "Incidents of disease among talc workers has been
6 closely linked to the mineralogic impurities found in
7 raw material such as asbestos minerals and quartz."
8 Do you see that?
9    A  I do.
10    Q  Was that fact ever discussed with Dr.
11 Hopkins by you internally at Johnson and Johnson?
12    A  No, because there's not asbestos contained
13 in any of the cosmetic talc mines that went into our
14 cosmetic products.
15    Q  We will get to that. Do you see in Dr.
16 Hopkins' memo, 5.2 fibrous amphiboles, where
17 he states, "the inhalation hazards of fibrous minerals
18 have long been recognized. The CTPA view is that
19 fibrous minerals should not be detectable in
20 cosmetic talc by state of the art methods."
21         And then he goes on to say, "However,
22 in order to eliminate any hazards to the consumer,
23 which might arise from the need to interpret fiber
24 and shape dimensions and to facilitate routine
25 screening, the CTPA view is that if an amphibole is

Page 129

1 detected by x-ray diffraction, that batch of talc is
2 unacceptable for cosmetic use, whether or not
3 subsequent examination by optical or electron
4 microscopy shows the contaminant is not fibrous."
5 Were you aware that was being discussed at Johnson
6 and Johnson?
7    A  This isn't Johnson and Johnson. This is
8 the industry group in Britain. So they are just
9 saying take the first step of the J41 and no need to
10 do the second step.
11    Q  What they are basically saying is once you
12 are find tremolite, that's it. Don't use it.
13 That's what Dr. Hopkins says.
14    A  That is not what this says. This says
15 unacceptable for cosmetic use. And the reason they
16 are doing this is to make sure that it is a cheap,
17 basically quick way to do it. But you are going to
18 throw a lot of material out potentially without any
19 hazard to humans.
20    Q  Whether or not subsequent examination by
21 optical or electron microscope shows the
22 contamination is not fibrous. That is what he says,
23 correct?
24    A  That is correct.
25    Q  What does he say about whether Johnson and

Page 130

1 Johnson should be using this CTFA method in Great
2 Britain?
3     A   I haven't seen this document before, so I
4 haven't reviewed it. I don't know what he said.
5     Q   Go to Bates number 77498. Do you see
6 where I blew it up, he talks about the detection
7 limits for the J41 method and he says, "You should
8 use another method called the step scanning method."
9 Correct? What he states is you should use a method
10 beyond the J41 method, and he states the increased
11 sensitivity is critical for better detection of
12 amphiboles, which otherwise using XRD procedures
13 alone would go undetected. Members urged strongly
14 to use this increased sensitivity, if at all
15 possible, particularly in light of the various new
16 foreign talcs that are emerging in the marketplace."
17 Correct?
18     A   I don't see exactly where you pointed to.
19     Q   Right where I have the -- I even pulled a
20 lateral for you.
21     A   I see that.
22     Q   So in Great Britain Dr. Hopkins was saying
23 use something more sensitive than the XRD. Did you
24 ever recommend to the FDA, and did you ever let the
25 FDA know that internally you were using a method in

Page 131

1 Great Britain that you were not recommending to the
2 FDA?
3     A   I'll go back and say we have always used
4 transmission electron microscopy, in addition to the
5 J41.
6         So with regard to the sensitivity of
7 Johnson and Johnson's methods, we are very confident
8 with the sensitivity, even more sensitive than what
9 Dr. Hopkins notes here.
10        I have not reviewed this document
11 before. I've not discussed it with Dr. Hopkins, so
12 I really don't know the context in which this was
13 discussed.
14    Q   In Great Britain Johnson and Johnson was
15 recommending an XRD procedure that was more
16 sensitive than the one that they were recommending
17 to the FDA, correct?
18    A   Again, I haven't had the opportunity to
19 discuss this with Dr. Hopkins. I had not seen this
20 before today.
21        As we were talking about FDA
22 communications between Johnson and Johnson and FDA
23 regarding asbestos testing, and the J41 was a method
24 that was developed in the early '70s, based upon
25 what was practical and reliable at the time.

Page 132

1        This is a 1995 document. I would
2 have to review it to really understand what the
3 context for this was.
4     Q   Let me show you a document from 2001
5 marked Exhibit 361, identified as a memo from Rich
6 Zazenski to Donna Dennis, subject talc
7 specification. Luzenac, this is a Luzenac business
8 record. Am I correct that Luzenac was one of your
9 suppliers of talc?
10        MR. SMITH: Objection.
11    A   Luzenac was the predecessor, I think, of
12 Imerys.
13    Q   They were a part of the trade association
14 that you were a member of, the CTFA?
15    A   Yes.
16    Q   They were part of the group that made
17 recommendations as to what testing methods should be
18 used to the FDA?
19        MR. SMITH: Objection.
20    A   Whoever the supplier was at that time was
21 participating.
22    Q   Do you see where they state, "Additionally
23 we can discuss an asbestos specification option
24 which required that cosmetic talc does not contain
25 detectable asbestos when analyzed by a transmission

Page 133

1 electron microscopy TEM. I think we all recognize
2 XRD, PCM and PLM are simply not sensitive enough to
3 provide complete assurance that talc is free of
4 detectable asbestos." Do you see that?
5     A   Yes, I do.
6     Q   Johnson and Johnson was aware of that,
7 correct?
8         MR. SMITH: Objection.
9     Q   That "the XRD, PCM and PLM methods are
10 simply not sensitive enough to provide complete
11 assurance that talc is free of detectable asbestos."
12        MR. SMITH: Objection.
13    A   If you look at the method, the J41 and the
14 sensitivity of that method, and it is covered in
15 that 1986 response to the citizen petition, it is
16 more sensitive, it can pick up asbestos even more
17 sensitive than what is in the environment.
18        In other words, if you find any
19 asbestos using those methods, it is more likely to
20 come from the air than it is from that sample.
21        So I see what it is saying about
22 increased sensitivity using different methodologies,
23 and that's why the would be important for me to
24 speak to Dr. Hopkins to understand the context.
25 What are they looking for there, when you have an

## Page 134

1 environmental level that's many, many times higher
2 than what your sensitivity is you that are striving
3 for. It is a strange line of discussion, so I think
4 the context is critical.
5     Q   What was my question Ma'am?
6         MR. SMITH: Objection.
7     A   Did I know there was more sensitivity than
8 what was currently being used to pick up asbestos.
9     Q   No. That's not what I asked. I move to
10 strike your entire statement, Ma'am. Please answer
11 this question. This is the question I'm asking
12 you.
13         Was Johnson and Johnson aware that
14 the XRD and the PLM method are not sensitive enough
15 to provide complete assurance that talc is free of
16 detectable asbestos? Was Johnson and Johnson aware
17 of that?
18         MR. SMITH: Objection.
19     A   I'm going to disagree that is it a correct
20 statement based on what I've seen in the 1986 FDA
21 response to the citizens petition. So why would you
22 get more sensitive testing than would be -- more
23 sensitive than what's in the environment?
24         That's the part that doesn't make
25 sense.

## Page 135

1     Q   You do not agree with this statement?
2     A   The method may be -- there may be a more
3 sensitive method, but if the ambient air and the
4 water and everything, there's more asbestos in the
5 environment than you are trying to find here with a
6 testing method. It doesn't make sense to me.
7 That's what I'm saying.
8     Q   Ma'am, respectfully again, I move to
9 strike your testimony. You testified in the
10 beginning of this deposition that you are not a
11 geologist and you are not an expert in asbestos
12 testing.
13         All I'm asking you, Johnson and
14 Johnson, is whether you agreed that the SRD and PLM
15 are not sensitive enough to give complete assurance
16 that talc is free of detectable asbestos. If you
17 don't agree, say it. If you do agree, say it. We
18 don't need a speech.
19         MR. SMITH: Objection, ignore those
20 comments.
21     A   I appreciate that you don't like my answer
22 because we don't need a more sensitive method and
23 that's covered very specifically in that 1986
24 response to the citizens petition that I made
25 reference to earlier.

## Page 136

1         We don't need a more sensitive method
2 based on that analysis. That is why I would like to
3 talk to Dr. Hopkins and understand the context for
4 this discussion.
5     Q   So you are not able to testify here today
6 without having another conversation with Dr.
7 Hopkins. Is that what you are saying?
8         MR. SMITH: Objection.
9     A   I have provided you with the document I'm
10 making reference to.
11     Q   I'm going to get to that, I promise you.
12         MR. SMITH: Don't talk over the
13 witness.
14     Q   I promise you. I'm asking you, Ma'am, do
15 you need to speak to Dr. Hopkins again before I talk
16 to you more about this document?
17         MR. SMITH: Were you finished with
18 your last answer?
19     A   I don't recall.
20         MR. SMITH: Can you read back where
21 she was in her last answer before opposing counsel
22 talked over her.
23         MR. PLACITELLA: I'm going to
24 withdraw that question and ask you this question.
25     Q   Ma'am, in order to answer any more

## Page 137

1 questions about detection methods, do you need to
2 speak with Dr. Hopkins? That is all I'm asking.
3     A   No.
4     Q   Can we agree that Johnson and Johnson and
5 the CTFA understood that the J41 method was not
6 sensitive enough for testing for chrysotile
7 asbestos?
8         MR. SMITH: Objection.
9     Q   Can we agree to that?
10         MR. SMITH: Objection.
11     A   No.
12     Q   266. I'm going to show you what's been
13 marked October 31, 1972 on Johnson and Johnson
14 letterhead.
15         MR. SMITH: I think you misspoke.
16     Q   October 31, 1972?
17         MR. SMITH: This document has been
18 marked Exhibit 266.
19         MR. PLACITELLA: You are correct.
20         MR. SMITH: It is a letter.
21         MR. PLACITELLA: You are correct.
22 266.
23     Q   The subject is analysis of Johnson's Baby
24 Powder for chrysotile asbestos. Do you see that?
25     A   Yes.

Page 138

1    Q   It talks about using the X-ray diffraction
2  method, correct?
3    A   Yes.
4    Q   What Johnson and Johnson says is that
5  method has been demonstrated that it was possible to
6  detect chrysotile and talc at a level of 2 to 3
7  percent by weight, correct?
8        MR. SMITH: Objection.
9    A   Yes.
10    Q   Am I correct that the FDA wanted to
11  regulate chrysotile asbestos, but Johnson and
12  Johnson took the position that was no reason to do
13  so because there was never no evidence ever that
14  there was asbestos chrysotile in Johnson's talc?
15        MR. SMITH: Objection.
16    A   That's correct, because chrysotile is an
17  industrial asbestos. It is not found with talc in
18  the cosmetic mines.
19    Q   So what Johnson and Johnson told the FDA
20  was there's no reason for you to regulate it
21  because there was no chrysotile ever found in any
22  mine that was the source of Johnson's Baby Powder,
23  correct?
24        MR. SMITH; Objection.
25    A   Chrysotile is an environmental issue. So

Page 139

1  it is an EPA regulated material. So that's correct,
2  it should not be regulated by the FDA.
3    Q   I know from reading your prior testimony
4  you have been asked questions about the methodology
5  that Johnson and Johnson considered called the
6  pre-concentration method. Do you know what I'm
7  talking about?
8    A   Yes.
9    Q   And do you understand that at one point in
10  time the FDA was considering using the
11  pre-concentration method for testing for asbestos in
12  talc, correct?
13    A   Correct.
14    Q   And that NIOSH actually recognized the
15  viability of that methodology, correct. You knew
16  that?
17    A   No, I wasn't aware of that. And Johnson
18  and Johnson's own experts recommended that it adopt
19  or use the pre-concentration method for determining
20  whether there was asbestos in Johnson and Johnson
21  talc, correct?
22        MR. SMITH: Objection.
23    A   I don't know that, but I do know that
24  Johnson and Johnson offered to explore the
25  concentration method with the group during the '70s

Page 140

1  when they were working out this industry standard
2  for asbestos testing.
3    Q   You know that what Johnson and Johnson
4  ultimately did was try to discourage the FDA from
5  using that method, right?
6    A   I'm not aware of that.
7    Q   You are not aware as you sit here today
8  that Johnson and Johnson's own experts recommended
9  to them repeatedly that the pre-concentration method
10  be been used by Johnson and Johnson?
11    A   No. I'm not aware of that.
12        MR. SMITH: Objection.
13    Q   You have in front of you a memo from
14  February 26, 1973 to Mr. Ashton at Johnson and
15  Johnson from the Colorado School of mines. Do you
16  see that?
17    A   Yes.
18    Q   Have you ever seen this document before?
19    A   I don't specifically recall that I have.
20    Q   The Colorado School of Mines is one of the
21  entities that you relied upon when you were
22  communicating with the FDA concerning the testing of
23  asbestos in baby powder, correct?
24    A   Yes.
25    Q   Do you see at the top it talks about

Page 141

1  sample grounded talc ore separated using a
2  centrifuge? I colored it so you can see.
3    A   Yes.
4    Q   That's a pre-concentration method,
5  correct?
6    A   I don't know that is specifically the
7  pre-concentration method. It is a concentration
8  method, yes.
9    Q   And when they did that, if you go to the
10  page that references February 26, 1973, according to
11  this document when that method was used, the
12  Colorado School of Mines found tremolite and
13  actinolite. Do you see that?
14    A   Yes.
15    Q   Do you see where it says relative to
16  possible asbestos type minerals the above table
17  shows that samples 3071S contained slight traces of
18  tremolite, actinolite minerals. Sample 3271S
19  suspected to contain very minor amount of
20  serpentine, which may be chrysotile? Do you see
21  that?
22    A   I do.
23    Q   Is this the first time you learned that
24  the Colorado School of Mines was using the
25  centrifuge method and found tremolite asbestos and

Page 142

1 chrysotile in their testing?
2     A   I'm looking at this document and I don't
3 think this has anything to do with cosmetic testing
4 of talc. So the fact that they use a concentration
5 method is completely unrelated to cosmetic testing.
6         And I know that if you look at the
7 table on page 8087 you can see at one where 41.6
8 percent weight of major magnesite -- it is just the
9 members here do not look like cosmetic talc. I
10 don't know what they were testing and why they were
11 using that method.
12     Q   But you are not an expert in the testing
13 methods, right?
14     A   I understand the general methodology, but
15 I'm not an -- I'm looking at this and telling you
16 this isn't cosmetic testing.
17     Q   Well, that wasn't the point of my
18 question. My question was whether this methodology
19 was recommended for the testing of asbestos by
20 Colorado School of Mines to Johnson and Johnson, and
21 that was the focus of my question.
22     A   The answer to your question is no, because
23 this has nothing to do with cosmetic testing.
24     Q   Well, let's go to 263. 263 is a report
25 from the Colorado School of Mines, and the title is,

Page 143

1 A Procedure to Examine Talc for the Presence of
2 Chrysotile and Tremolite, Actinolite Fibers, Johnson
3 and Johnson. Do you see that?
4     A   Yes.
5     Q   Go to the introduction. It says the
6 purpose of this document is to report the methods
7 used at Colorado School of Mines Institute for the
8 detection of chrysotile and/or tremolite actinolite
9 in samples predominantly composed of talc. Do you
10 see there?
11     A   Yes.
12     Q   It goes on to say, "As the impurity level
13 becomes very low, less than one percent, it is
14 necessary to examine increasingly larger amounts of
15 sample in order to detect the impurity. As a result
16 of requirement to detect the proverbial needle in a
17 haystack, we have evolved a procedure which
18 pre-concentrates the impurities prior to
19 examination." Do you see that?
20     A   Yes.
21     Q   And what they did is they again used a
22 centrifuge, correct?
23     A   Yes.
24     Q   And that was a method that was discussed
25 with Johnson and Johnson, the pre-concentration

Page 144

1 method when you have to find something like a needle
2 in a haystack, correct?
3         MR. SMITH: Objection.
4     A   They are not specifically saying this is a
5 a pre-concentration method, but they use a radiant
6 separation method and again, nothing in here that I
7 could see, although this is the first time I've seen
8 this, has anything about cosmetic testing and new
9 standards.
10     Q   You don't think this is about the
11 pre-concentration method?
12         MR. SMITH: Objection.
13     A   The pre-concentration method, that's a
14 very specific method.
15     Q   Can you go to where it says objective?
16 "The objective of the work was to develop a
17 procedure to screen for the talc for the presence of
18 chrysotile and tremolite and actinolite asbestos
19 minerals. Based on past experience with detecting
20 and identifying minerals when present at low levels
21 a concentration of the phases could be detected, was
22 considered essential to the success of any suggested
23 the procedure." Do you see that?
24     A   I do.
25         MR. PLACITELLA: Let's take a break

Page 145

1 now.
2         THE VIDEOGRAPHER: The time is
3 approximately 2:11. We are going off the record.
4         (Recess taken)
5
6         THE VIDEOGRAPHER: We are back on the
7 record. The time is approximately 2:23 p.m.
8 BY MR. PLACITELLA:
9     Q   Okay. Before you had referenced a couple
10 of times Dr. Pooley. Do you remember that?
11     A   Yes.
12     Q   You are aware, or can we agree, that Dr.
13 Pooley also recommended to Johnson and Johnson they
14 use of the pre-concentration method when using X-ray
15 diffraction?
16         MR. SMITH: Objection.
17     A   No, I'm not aware of that.
18     Q   You are not aware of that?
19     A   No.
20     Q   45 is a memo from May 16, 1973 on Johnson
21 and Johnson letterhead. Do you see that?
22     A   Yes.
23     Q   I assume you have seen this before?
24     A   I don't believe I have.
25     Q   Do you know who T.H. Shelley is?

---

**Page 146**

1    A    No.
2    Q    Who is Dr. A.J. Goudie?
3    A    I don't know.
4    Q    Do you see where it says Dr. T. Shelley is
5    going to go to England on May 25th?
6    A    Yes.
7    Q    That is where Dr. Pooley was, correct?
8    A    Yes.
9    Q    And it says that "England is considering
10    method of pre-concentrating the asbestos so as to be
11    able to analyze by x-ray." Do you recall see that?
12    A    Yes.
13    Q    It says, "They find no asbestos by doing
14    this with Italian talc." Do you see that?
15    A    Yes.
16    Q    It says they find Pooley, Dr. Pooley,
17    right?
18    A    Yes.
19    Q    Point zero five percent of a tremolite in
20    Vermont, correct?
21    A    I see that, yes.
22    Q    Is this the first time you learned that
23    Dr. Pooley used a pre-concentration method on
24    Vermont talc and found tremolite?
25    MR. SMITH: Objection.

---

**Page 147**

1    A    We know that there can be tremolite in
2    association with talc. It doesn't say asbestos. So
3    that's news.
4    Pre-concentration method, is not
5    recommending -- this in 1973. The J41 was developed
6    and published in '76. How he used it and when he
7    used it and why he used, it is not immediately
8    apparent on this sheet.
9    Q    But it say he used a pre-concentration
10    method and the .05 percent and when they were talking
11    about -- let's just read it. "England is
12    considering method of pre-concentrating the asbestos
13    so as to be able to analyze by x-ray." Correct?
14    A    Yes.
15    Q    And they find no asbestos, in quotes, by
16    doing this with the Italian talc. They find, that
17    is Pooley, .05 percent of a tremolite type in
18    Vermont." Correct?
19    A    Yes.
20    Q    Now, 46 is the follow up memo dated June
21    4, 1973. The re: is talc. Do you see that?
22    A    Yes.
23    Q    It states, it is to Dr. Robert F. Rolle.
24    Do you know who that is?
25    A    He was in Johnson and Johnson, I believe,

---

**Page 148**

1    in the research and development group.
2    Q    It says, "The British Toiletry Preparation
3    Federation is in the process of drafting
4    specifications on talc. These will involve density
5    concentration techniques followed by x-ray analysis.
6    Fred Pooley has developed the methods and checked
7    the Italian talc for chrysotile and other asbestos
8    contaminants. He found none. However, I'm
9    concerned that our Vermont talc will from time to
10    time show traces of tremolite." Do you see that?
11    A    I do.
12    Q    Have you ever seen this before?
13    A    No. Tremolite is not asbestos.
14    Q    My question is have you ever seen this
15    document before?
16    A    Yes, I understand.
17    Q    Did you know before today that Dr. Pooley
18    was involved in putting specifications together for
19    Great Britain that recommended the concentration
20    technique for testing?
21    MR. SMITH: Objection.
22    A    I was not, and I have not seen the full
23    recommendation on the specification.
24    Q    Today is the first time you learned that
25    Dr. Pooley was working on the concentration method

---

**Page 149**

1    in Great Britain and that was found in the Johnson
2    and Johnson documents, the first time you knew that?
3    MR. SMITH: Objection.
4    A    It is not the first time I knew that.
5    Johnson and Johnson knew about the concentration
6    method, was willing to discuss it with the FDA, so
7    this is not -- I was not aware Pooley specifically
8    had been working on it for the British Toiletry
9    Association. That was your question. The answer
10    was no.
11    Q    47. Did you know that Dr. Pooley ran the
12    concentration method on Vermont talc and found
13    actinolite?
14    MR. SMITH: Objection.
15    A    No.
16    Q    You have in front of you a June 6, 1973
17    memo on Johnson and Johnson stationery. I blew up
18    the right portion. It says, it talks about the note
19    from June 4th. Do you remember that, we just went
20    through it?
21    A    Yes.
22    Q    It says, "Note the concentration
23    techniques in the drafted specification for analysis
24    of asbestos." Do you see that?
25    A    Yes.

Page 39  (Pages 150-153)

Page 150

1   Q   Then it goes on and says, "Shelley reports
2   that Pooley had found actinolite in our Vermont talc
3   by his concentrating technique."  Do you see that?
4   A   I do.  Actinolite is not asbestos.
5   Q   All I asked you was, do you see that.
6   A   I do see it.
7   Q   Okay.  Is today the first time you learned
8   that Pooley found actinolite in the Vermont talc
9   using the concentration method?
10      MR. SMITH:  Objection.
11  A   Yes, but actinolite is not asbestos.
12  Q   Ma'am, I'm asking you a simple question.
13  Is today the first time you learned that Pooley
14  found actinolite in Vermont talc using the
15  concentration method?
16  A   Yes, and actinolite is not asbestos.
17  Q   Ma'am, did I ask you whether your opinion
18  was whether it was asbestos or not?  What can you
19  tell me?  Tell me everything you know about
20  actinolite.
21  A   We can go to the 1986 --
22  Q   No, Ma'am.  I want to know everything you
23  know about actinolite.  I don't want you to refer to
24  anything.  Tell me everything you know about
25  actinolite.

Page 151

1       MR. SMITH:  Let me say that you can't
2   do that.
3       MR. PLACITELLA:  Yes, I can do that,
4   and I will call the judge.
5       MR. SMITH:  You can't --
6       MR. PLACITELLA:  I will call the
7   judge.
8       MR. SMITH:  If you want to call the
9   judge, call the judge.  You can't in the middle of
10  an answer just talk over the witness.
11      MR. PLACITELLA:  I can when the
12  witness will not answer the question, Counsel.
13      MR. SMITH:  The witness -
14  Q   I'll withdraw the last question and the
15  ask the question again.  Tell me everything you know
16  from your own knowledge without reference to any
17  documents, everything you know about actinolite?
18  A   Because the specificity of words are
19  critical here, and very easy to confuse individuals,
20  whether they know this area or not, with language.
21  Using documents and referring to tables and decision
22  treatises, very nicely outlined in the 1986 FDA had
23  response to the citizens petition, is the right way
24  to review this subject, not shooting from hip.
25      So when you mention tremolite, you

Page 152

1   mention actinolite, the complication I hear and how
2   you ask the question, that is asbestos, which it is
3   not.  The clarification is important.
4       Q   Ma'am, move to strike your testimony, with
5   all due respect.  My question to you is tell me
6   everything that you, Dr. Nicholson, know from your
7   own mind, without reference to any documents about
8   actinolite.  Tell me everything you know.
9       MR. SMITH:  Objection.
10  A   Extremely rare asbestos.
11  Q   And based on what reference, besides the
12  1986 report that you are talking about?
13  A   The 1986 report contains multiple
14  documents.  One of them is a document called The
15  Misclassification of Asbestos.  An excellent
16  reference that talks about all of the 1970s and of
17  the confusion and misrepresentation of various
18  finding by different microscopic techniques.  It is
19  an excellent reference that clarifies many of the
20  things that you are pointing out today.
21  Q   My question was what?
22      MR. SMITH:  Objection.
23  Q   What was my question?
24  A   Repeat your question.
25  Q   Do you have any idea what my question was?

Page 153

1   A   Well, sometimes I don't, but if you repeat
2   it I will.
3   Q   Because you are going to wind up and say
4   whatever you are going to say regardless of my
5   question, right?
6       MR. SMITH:  Objection.
7   A   Incorrect.
8   Q   Ma'am, can an honest and forthright
9   witness provide a simple answer to a simple
10  question?
11  A   If it is asked clearly, yes, I can.
12      MR. SMITH:  Excuse me.  If we are
13  going to go down this trail, we are going to stop.
14      MR. PLACITELLA:  You can stop at any
15  time you want.  We will go to the judge.  We will
16  let her read the transcript and she will decide
17  whether the witness is being responsive.  If you
18  want to stop the deposition, stop the deposition,
19  otherwise I'm asking my questions.
20      MR. SMITH:  You can't insult people.
21      MR. PLACITELLA:  No one is being
22  insulted.
23      MR. SMITH:  She is being insulted.
24      MR. PLACITELLA:  No she isn't.
25      MR. SMITH:  Yes, she is.  You can't

Brody Deposition Services

Page 154

1 do that.
2 　　　MR. PLACITELLA: No, she isn't.
3 　　　MR. SMITH: You can't do that. You
4 can't cut witnesses off in the middle of an answer.
5 You have got to stop that. If you want to keep it
6 up, if you are saying you have a right to do that
7 and you have a right to make insulting comments,
8 then we will stop and we will give the transcript to
9 the judge.
10 　　　MR. PLACITELLA: You know what, you
11 stop the transcript any time you need to do it.
12 　　　MR. SMITH: I'm asking you to stop
13 insulting the witness.
14 　　　MR. PLACITELLA: I'm not insulting
15 the witness.
16 　　　MR. SMITH: Stop cutting her off in
17 the middle of an answer. That's all I'm asking you
18 to do. Ask her a question, she answers it and if
19 you think she is not responsive, you move to strike.
20 You don't insult her. You don't talk over her.
21 　　　MR. PLACITELLA: Are you done with
22 your speech?
23 　　　MR. SMITH: But I'm asking you to
24 just behave like that.
25 　　　MR. PLACITELLA: I'm asking you to

Page 155

1 just let me ask my questions, and if the witness
2 will respond to the questions, we will get through
3 the deposition.
4 　　　MR. SMITH: The witness is responding
5 to the questions.
6 　　Q　Ma'am --
7 　　　MR. SMITH: If she wants to refer to
8 a document, she is allowed to do that.
9 　　　MR. PLACITELLA: She can when you ask
10 her questions. If I don't refer her to a document,
11 then she can't.
12 　　　MR. SMITH: She's here as a corporate
13 representative. She brought these documents to help
14 refresh her recollection.
15 　　　MR. PLACITELLA: This is not form
16 objection. You are way out of bounds here.
17 　　　MR. SMITH: No, you are out of
18 bounds.
19 　　　MR. PLACITELLA: You are way out of
20 bounds. I'm asking you not to do it.
21 　　　MR. SMITH: I'm happy to take this
22 transcript to the judge, if that is what you want
23 want to do.
24 　　　MR. PLACITELLA: Let's keep going.
25 　　　MR. SMITH: Not if you keep talking

Page 156

1 over her.
2 　　Q　Ma'am, do you agree with me that an honest
3 and forthright witness can provide a simple answer
4 to a simple question?
5 　　　MR. SMITH: Objection. I'm
6 instructing you not to answer. That question is
7 just to harass her and we are not doing that.
8 　　Q　Ma'am, did Dr. Pooley find actinolite
9 using the pre-concentration method in Vermont talc?
10 　　　MR. SMITH: Objection.
11 　　Q　Yes or no?
12 　　　MR. SMITH: Objection.
13 　　Q　Yes or no? Can you not answer my question
14 yes or no, Ma'am? Why don't we ask that question
15 first. Answer my question, yes or no, did Dr. Pooley
16 find actinolite using the pre-concentration method
17 in Vermont talc? Can you answer that question, yes
18 or no?
19 　　　MR. SMITH: Objection.
20 　　A　Yes, but he did not specify whether or not
21 it was asbestiform or not.
22 　　Q　I just asked you whether you could answer
23 it yes or no. I didn't ask you anything more. Are
24 you able to answer my question yes or no, whether
25 Dr. Pooley found actinolite in Vermont talc using

Page 157

1 the pre-concentration method?
2 　　　MR. SMITH: Objection.
3 　　Q　Can you answer that question yes or no?
4 　　　MR. SMITH: Objection.
5 　　A　I cannot answer it without misleading the
6 jury.
7 　　Q　Did you rely upon Dartmouth College as one
8 of the authorities for your submissions to the FDA
9 on the issue of asbestos and Johnson's Baby Powder?
10 　　　MR. SMITH: Objection.
11 　　A　Yes.
12 　　Q　Are you aware that Dartmouth College used
13 and recommended the concentration method when
14 testing Johnson's talc?
15 　　　MR. SMITH: Objection.
16 　　A　I would have to go back and look at the
17 exact documents to review their methods.
18 　　Q　The question is are you aware, as you sit
19 here today, whether they did that or not?
20 　　A　I would have to go back and look at the
21 documents to verify the testing methods.
22 　　Q　As you sit here today, you don't know
23 whether Dartmouth College ever used the
24 concentration method in assessing whether there was
25 asbestos in Vermont talc?

Page 158

1    MR. SMITH: Objection.
2    A   I prefer to refer to the actual report to
3  be sure of what I'm answering, so I'll not answer
4  until I've had a chance to look at it.
5    Q   Find any document you want. Go ahead and
6  look.
7    A   They did use centrifugation. Just on a
8  quick glance I can't tell if all of their testing
9  used centrifugation or not.
10   Q   Did any of their testing find -- do you
11 know whether any of the Dartmouth College testing
12 ever found actinolite in the Vermont talc?
13   A   Based on the conclusion I see here, I
14 don't see actinolite mentioned, but I do see no
15 amphibole or garnet or asbestos impurities were
16 observed.
17   Q   In terms of the information that was
18 conveyed by Johnson and Johnson concerning the tests
19 that were done by Dartmouth College, the FDA was
20 never told one way or the other whether actinolite
21 or they found no actinolite. What is the answer?
22   A   I'm looking at the conclusions and I don't
23 see any reference to actinolite.
24   Q   Does it say no amphiboles were found,
25 regardless of whether they are asbestiform?

Page 159

1    A   Yes.
2    Q   I'll show you J and J 58. Did you provide
3  J and J 58 to the FDA at any point in time?
4    A   That document I was just looking is dated
5  June 28, 1971. I see numerous documents from March
6  of 1974, but I don't see that specific document.
7    Q   This document is entitled, from Dartmouth
8  College, Confidential, by the way, Analysis of Talc
9  Products and Ores for Asbestiform Amphiboles. Do you
10 see that?
11   A   Yes.
12   Q   And Dartmouth College is one of the
13 experts that you relied upon in your submissions to
14 the FDA, correct?
15   A   At least in 1971, yes.
16   Q   And again in 1976?
17   A   Perhaps. I would have to go through this
18 and see.
19   Q   In this document dated March 1974, it
20 states, "The purpose of the study is to develop
21 methods for measuring the concentration of
22 asbestiform amphiboles in fine grain talc products.
23 Do you see that?
24   A   Yes.
25   Q   You see on the second page it talks about

Page 160

1  using the concentration technique because it brings
2  amphiboles into a reasonable concentration range and
3  it says that is mandatory?
4    A   Yes, but it is important to look before
5  that. There's a whole discussion about how you can't
6  tell -- you could do grain counts, but you can't see
7  the specificity of the grain whether or not it is an
8  amphibole without concentrating.
9    Q   I'm fine with that. It say the reasons
10 stated, as you just stated, a concentration
11 technique is mandatory because it brings the
12 amphiboles into a reasonable concentration range for
13 optical and other methods of analysis, correct?
14   A   That is what it says.
15   Q   And if you go to page 6 where it says
16 results, and now they are testing for asbestiform
17 minerals. Do you recall that? It says, "Two gram
18 samples of ore and ore spiked with actinolite
19 were separated and analyzed as described above." Do
20 you see that?
21   A   Yes.
22   Q   Then it talks about results are in table
23 2. It says table 3 shows concentrations of heavy
24 fractions, mostly carbonite and actinolite and talc
25 ore and talc product. Do you see that?

Page 161

1    A   Yes.
2    Q   So you see that here they are actually
3  using the concentration method and recommending it
4  in order to determine whether amphiboles are in the
5  Vermont product, correct?
6      MR. SMITH: Objection.
7    A   What I've seen, and again I'm not an
8  expert in all the methodology from just what you
9  have shown me, is that they needed it for this
10 specific methodology.
11      I don't know that you can universally
12 say you have to use the concentration method with
13 this optical microscopic technique. That's what
14 they are saying.
15   Q   What they are saying to Johnson and
16 Johnson is that it is mandatory. Isn't that their
17 words?
18   A   You can't take that out of context though.
19 It is mandatory when using the optical microscopic
20 technique they are using, not for every method
21 available.
22   Q   It talks about on page 7 when they use
23 the concentration method, they found ore samples
24 contain 2300 parts per million actinolite and the
25 talc product contains 170 parts per million

Page 162

1  actinolite.  Actinolite is the dominant fiber form
2  amphibole in the ore and talc product provided by
3  Windsor Minerals.  Small amounts of anthopyllite
4  might be present.
5          That is what they wrote, correct?
6     A   I see that.  I'll say that that does not
7  mean it is asbestos.
8     Q   Ma'am, I'm just asking if that's what they
9  wrote.
10    A   Yes, I understand.  I don't want the
11  answer to be misleading.
12    Q   When up told the FDA that there was no
13  amphibole of any sort ever found in a Johnson and
14  Johnson talc product, you did not include this
15  report, correct?
16    A   I didn't see the report here, so I can't
17  say that we had sent it for sure.  And I don't know
18  what the sample was that they tested, so I would
19  have to go back and verify that to answer your
20  question definitively.
21    Q   You never even saw this report until as
22  you are sitting here right now, right?
23    A   Well, I've looked at a lot of reports and
24  they are kind of technical.  So you have to really
25  look at them very carefully.  I don't recall this

Page 163

1  one specifically, but again, I have not dug through
2  again to see if this matches up to the one I have.
3     Q   And it is not in that book in front of you
4  of test results given to the FDA, correct?
5     A   I didn't see it there.
6     Q   352.  Are you aware that after Johnson and
7  Johnson got this report they actually discussed it
8  internally and verified the method?
9     A   No, I was not aware of.
10    Q   You have in front you 3-11-74, March 11,
11  1974 memo on Johnson and Johnson letterhead.  The
12  subject, method of concentration of asbestos in
13  talc.  Do you see that?
14    A   Yes.
15    Q   It talks about the procedure used by Dr.
16  Reynolds from Dartmouth, correct?
17    A   Yes.
18    Q   What you write internally is, "The
19  procedure for heavy fibers actinolite and tremolite
20  permit the detection of asbestos at original
21  concentration as low as .02 percent by weight while
22  the existing procedures, step scanning, X-ray
23  diffraction, are effective to .02 percent.  The
24  dispersion staining technique of optical microscopy
25  was employed to detect tremolite fibers in the

Page 164

1  concentrate.  The method is straightforward and
2  rapid requiring about 20 minutes of operator time
3  and about one hour overall.  If removal of
4  carbonates is desired, these times may become 30
5  minutes to two hours respectively."  Do you have see
6  that?
7     A   Yes.
8     Q   To be fair to you, you had never seen this
9  before today, correct?
10    A   No, but I can -- I see it now and I've
11  read through it.
12    Q   We are going to be back here again, so
13  I'll ask you more questions when you have some
14  time to digest.
15    A   I don't need time.  I can see what it
16  means.
17    Q   Am I correct that internally, as a follow
18  up to this, Johnson and Johnson actually
19  acknowledged that the concentration method was the
20  best method?
21          MR. SMITH:  Objection.
22    A   I doubt that because this basically says
23  it is a very difficult method and hard to quantify.
24  It sounds like it is extremely difficult to
25  execute.

Page 165

1     Q   Johnson and Johnson, after having
2  discussions about the concentration method with Dr.
3  Pooley, Dartmouth University and Colorado School of
4  Mines, after having all those discussions, fought
5  against the FDA using that method, didn't
6  they?
7          MR. SMITH:  Objection.
8     A   I don't think we fought against anybody.
9     Q   Did you actually conclude, Johnson and
10  Johnson, that adoption of a pre-concentration method
11  by the FDA would be disturbing and troublesome for
12  Johnson and Johnson?
13    A   Well, based on the documents you just gave
14  me, I would not be surprised if that was a
15  recommendation, but it sounds like it is very
16  difficult to do, hard to repeat, technically
17  intense, so probably not the kind of thing that most
18  individuals could execute.
19    Q   Ma'am, I'm asking you whether internally
20  you, Johnson and Johnson, determined that you were
21  going to oppose adopting the pre-concentration
22  method by the FDA because it was disturbing and
23  troublesome to Johnson and Johnson?
24          MR. SMITH:  Objection.
25    A   I don't think it would be disturbing and

Page 166

1  troublesome to Johnson and Johnson.  As I just said,
2  it sounds like it is a very difficult method to
3  execute.
4    Q   471 is a memo from Mr. Ashton dated
5  November 24, 1976. Do you see that? Have you ever
6  seen this document before?
7    A   I don't believe I have.
8    Q   Here it says, Mr. Ashton, by the way, was
9  known inside of Johnson and Johnson as Mr. Talc,
10 correct?
11   A   I don't know.
12   Q   Do you see where it says Mr. Ashton writes
13 to George Lee, "Attached is a copy of a disturbing
14 proposal request which the FDA has currently made
15 available to qualified bidders.  The scope of the
16 work is the separation of asbestos and food, drugs
17 and talc for Identification and determination." Do
18 you see that?
19   A   Yes.
20   Q   369.  And Johnson and Johnson, actually
21 after hearing recommendations from their own
22 experts, came to the conclusion that using the
23 concentration method was not in the interest of
24 Johnson and Johnson, correct?
25       MR. SMITH:  Objection.

Page 167

1    A   Are you looking at this document that you
2  just gave me?
3    Q   No, I'm asking a different question.
4    A   Can you please repeat that?
5    Q   Yes, Ma'am. After getting advice from
6  your experts about the viability of the
7  concentration method and its usefulness.  Johnson
8  and Johnson came to the conclusion that the adoption
9  would not be in the interest of Johnson and Johnson
10 worldwide, correct?
11       MR. SMITH:  Objection.
12   A   I don't know what you are looking at, but
13 I would accept that's true because of the other
14 documents you have gave me that is a technically
15 difficult method to execute.
16   Q   You have in front of you 369?
17   A   Yes.
18   Q   This is a memo from 1975, again, on
19 Johnson and Johnson letterhead?
20   A   Yes.
21   Q   And it talks about Dr. Pooley again and
22 his recommendations?  Correct?
23   A   Yes, I see that.
24   Q   And what you say is we deliberately have
25 not included a concentration technique as we felt it

Page 168

1  would not be in the worldwide company interest to do
2  this, correct?
3        MR. SMITH:  Objection.
4    A   Yes.
5    Q   And what you ultimately determined was
6  that you wanted to avoid using this technique at all
7  costs and keep it quiet, right?
8        MR. SMITH:  Objection.
9    A   No.
10   Q   353.  I'm going to show you what's been
11 marked February 28, 1975, on Johnson and Johnson
12 letterhead.  Subject, review of CTFA methodology for
13 the detection of asbestos in talc as well as
14 comments on PPF methodology.  Do you see that?
15   A   Yes.
16   Q   It goes through here the methodology that
17 Johnson and Johnson wants adopted, correct?
18   A   This looks like a proposed methodology.
19   Q   And how Johnson and Johnson concludes the
20 memo is, "We really want to exclude concentration
21 techniques in any proposed analytical procedure and
22 are really looking at this method very quietly.  So
23 that we will be well informed and up to date with
24 this technology.  We want to avoid promotion of
25 this approach." Did you ever see that before?

Page 169

1        MR. SMITH:  Objection.
2    A   I have not, but I've seen in documents
3  noting that discussions where Johnson and Johnson
4  has said we will be happy to discuss this method.
5    Q   This document says you want to avoid the
6  promotion of this approach, doesn't it, when it
7  talks about your methodologies?
8        MR. SMITH:  Objection.
9    Q   That's what it says.
10   A   That's what it says, but it doesn't mean
11 we were trying to suppress it.  It means we weren't
12 promoting it.
13   Q   You didn't want it adopted.
14   A   You showed me documents just a minute ago
15 that showed it was technically intense and difficult
16 to execute.
17   Q   You say you wanted to keep this very
18 quiet.  That is what the document says, right?
19       MR. SMITH:  Objection.
20   A   So, my experience dealing with the FDA,
21 especially when there are multiple other companies,
22 if you raise an issue, everybody starts talking
23 about it and it can be real conversations.
24       We did say very explicitly to the
25 FDA, if you would like to discuss it we would be

Page 44  (Pages 170-173)

Page 170

1 happy to talk to you about it. We were not
2 oppressing it, but we didn't think it was a good
3 methodology, and you just showed me a document that
4 says it was technically difficult to perform. So it
5 wouldn't be in a standard methodology that others
6 perhaps could not get and repeat consistently.
7     Q   But your experts did it multiple times
8 over, didn't they?
9         MR. SMITH:  Objection.
10    A   They are experts.
11    Q   That is the point, Ma'am, isn't it?
12 Experts in the testing could use the methodology and
13 in fact your experts did and were successful in
14 using it, true?
15        MR. SMITH:  Objection.
16    A   In the discussion of the developments of
17 methodologies, correct.
18    Q   But even though your expert used the
19 methodology and recommended it, it was your position
20 that you wanted to look at it very quietly and avoid
21 promotion, correct?
22        MR. SMITH:  Objection.
23    Q   That was your position, Johnson and
24 Johnson's position?
25        MR. SMITH:  Objection.

Page 171

1     A   So I'll say again. I'm reading this and I
2 see this, and based on the other information that we
3 have seen, it makes sense to me we would not want it
4 to it to become a prominent part of the discussion
5 because it is a technically difficult method to
6 execute, and when people who are not experts try to
7 reproduce it, even people in Johnson and Johnson's
8 labs, they were getting variable results. You
9 showed me that document a couple minutes ago.
10        MR. PLACITELLA:  This is a good time
11 to take a break.
12        THE VIDEOGRAPHER:  The time is
13 approximately 3:00 p.m. and we are going off the
14 record.
15        (Recess taken)
16
17        THE VIDEOGRAPHER:  The time is
18 approximately 3:13 p.m. and we are back on the
19 record.
20
21 BY MR. PLACITELLA:
22    Q   I assume that you are aware that Johnson
23 and Johnson hired experts to test Johnson's Baby
24 Powder that used the concentration technique and
25 found asbestos?

Page 172

1         MR. SMITH:  Objection.
2     A   I'll have to look at what you are
3 referring to.
4     Q   Are you aware of that as you sit here
5 today?
6     A   No, I'm not. Not in production material,
7 talcum powder.
8     Q   So you are not, as you sit here, just so
9 we are clear, you are not aware of any test done for
10 Johnson and Johnson on Johnson's Baby Powder using
11 the concentration technique that found asbestos?
12    A   No.
13    Q   If you are not aware of it, you certainly
14 didn't provide it to the FDA. Is that fair?
15    A   Yes.
16    Q   I want to focus a little bit, at least get
17 some background on the Lewin report and the
18 exchanges with the FDA by Johnson and Johnson on the
19 Lewin report, okay?
20    A   Yes.
21    Q   Hopefully we won't get too much
22 controversy over this.
23        Is it your understanding that Dr.
24 Lewin tested a series of talc based products in the
25 early 1970s for the FDA? You are aware of that?

Page 173

1     A   Yes.
2     Q   And you are aware that Dr. Lewin,
3 according to his analysis, found asbestos in some of
4 those products?
5     A   Thought he found asbestos in some of those
6 products, yes.
7     Q   Do you know if he issued a report -- let's
8 make sure we are on the same page, August 3, 1972.
9 You have seen that, correct?
10    A   Yes.
11    Q   I'll put it on the screen. August 3,
12 1972, a letter from Lewin to the FDA enclosing his
13 final analytical results, correct?
14    A   Yes.
15    Q   Is this report one of the results he had
16 was that in this analysis he found chrysotile
17 asbestos in Johnson's Baby Powder, correct?
18    A   He thought he did. That's what he said,
19 later refuted.
20    Q   Ma'am, I'm just asking you. I didn't what
21 ask you what he thought. I said in this analysis as
22 reported in this particular document, he found
23 asbestos in the Johnson's Baby Powder, correct?
24        MR. SMITH:  Objection. Let me ask,
25 were you in the middle of your answer?

Page 174

1    A  I'm okay.
2    Q  I'm not asking you whether he changed
3  later on.  We will get to that.  I'm giving you every
4  opportunity.
5       I'm saying in this report, what he
6  reported in his analysis was finding asbestos in the
7  Johnson and Johnson product, correct?
8    A  He thinks he found asbestos.  So that is
9  what he said, but his methods were not sufficient to
10  say that.
11    Q  In this report does it say anything about
12  his methods not being efficient to say that?
13    A  He didn't know that at the time.
14    Q  All I'm asking you, please, is in this
15  report what he reported in his analysis was that he
16  found asbestos in Johnson Baby Powder, correct?
17    A  He reported he thought he found asbestos.
18  That's correct.
19    Q  And after that report came down, Johnson
20  and Johnson had conversations with the FDA about the
21  report, correct?
22    A  Yes.
23    Q  And in those conversations the FDA
24  promised Johnson and Johnson not to release the
25  Lewin Report publically until Johnson and Johnson

Page 175

1  had a chance to review it, fair?
2    A  Yes, that's correct.
3    Q  347 in this report, in this particular
4  letter dated August 29, 1972, Johnson and Johnson
5  writes on the subject of talc in asbestos in Shower
6  to Shower brand body powder, correct?
7    A  Yes.
8    Q  What is reported is that the author spoke
9  with the FDA on two different occasions, correct?
10    A  Yes.
11    Q  And brought them up to speed on the
12  findings of Professor Pooley, correct?
13    A  Yes.
14    Q  That no chrysotile was found in the
15  Italian talc, correct?
16    A  Yes.
17    Q  Not reflected anywhere in here is the
18  findings of Professor Pooley finding actinolite in
19  the Vermont talc, correct?
20    A  That is correct.
21    Q  It goes on to say that Dr. Schaffner at the
22  FDA agreed not to release the Lewin Report until
23  after Johnson and Johnson had a chance to go over
24  it, fair?
25    A  Yes.

Page 176

1    Q  Right about that time Johnson and Johnson
2  found out that the FDA had hired a second contractor to
3  test the talc products, that being Sperry-Rand, correct?
4    A  Where would I see that in this document?
5    Q  I'm asking whether you know that.
6    A  I know that multiple people tested the talc.
7  Sperry-Rand, I don't remember the name specifically.
8    Q  I'm talking about who the FDA hired.  Do
9  you know that they hired Sperry-Rand to test the
10  Johnson and Johnson talc?
11    A  I know they hired an outside group to do
12  that.  I don't remember the exact name, if it is
13  Sperry-Rand or somebody else.
14    Q  Have you seen any of the reports by
15  Sperry-Rand?
16    A  I've seen the reports of the FDA testing
17  or their contracted testing of the Lewin samples, if
18  that is what you are referring to.
19    Q  Sperry-Rand is -- I'm sorry.  29 is an
20  August 24, 1972 memo entitled Talc Asbestos Shower
21  to Shower Talc.  Have you seen this before?
22    A  I don't recall this specific document.
23    Q  And apparently, and this document was not
24  provided at any time to the FDA, correct?
25    A  Not that I recall specifically.

Page 177

1    Q  What this does, and we will go through it
2  slowly, since you haven't seen it.  It says, "Dr.
3  Weisler, Director, Division of Cosmetics, FDA,
4  called us this afternoon to report they had
5  submitted a sample of Shower to Shower previously
6  examined by Dr. Lewin to the Sperry-Rand scanning
7  electronic microscopy this afternoon."  Do you see
8  that?
9    A  Yes.
10    Q  Does that refresh your memory?
11    A  Yes.  I'm familiar with another master
12  table that was not Sperry-Rand of retesting for the
13  Lewin samples.  That's why it took me a minute.
14    Q  Are you aware of this and did you
15  investigate this conversation that Johnson and
16  Johnson had with the Director at the FDA concerning
17  the Sperry-Rand testing?
18    A  No, because I was looking at this January
19  7, 1976 Lewin retest document.
20    Q  We are going to get there.  I promise.
21  Right now I'm focusing on the conversations that
22  Johnson and Johnson had with the FDA concerning the
23  Shower to Shower Sperry-Rand testing.  Are you with
24  me?
25    A  Yes.

Page 178

1   Q   It states, "Report from Sperry-Rand was
2   that asbestos fibers could be detected in the
3   sample. Dr. Weisler said that he has in front of
4   him photographs of six fields at 12,000 X
5   magnification showing fibers with length to width
6   ratios of 10 to 1, to 50 to 1.  One of them
7   appearing on the top talc plate." Do you see that?
8   A   Yes.
9   Q   It goes on to say that, "Johnson and
10  Johnson asked the FDA if Sperry-Rand handles
11  minerals, and the response was that they do a lot of
12  work with chrysotile."  Correct?
13  A   Yes.
14  Q   The FDA further told Johnson and Johnson
15  that they believed that, "the man who did the work is
16  conservative and he would not have reported
17  chrysotile unless he was sure."  Correct?
18  A   Yes.
19  Q   And Johnson and Johnson asked, "if he has
20  assured himself, that is the FDA, that the fibers
21  were not tremolite, which could be present in trace
22  amounts."  And the response was, "He said the fibers
23  are characteristic of chrysotile and not tremolite."
24  Do you see that?
25  A   Yes.

Page 179

1   Q   Do you have any knowledge of this conversation?
2   A   I don't, but I'm not concerned because
3   chrysotile is an industrial asbestos fiber and not
4   found in talc material, so this speaks to me of
5   laboratory contamination.
6   Q   Ma'am there's nothing in here about
7   laboratory contamination.  I'm just asking if you
8   know anything about the conversation.
9   A   I know what you are asking me, and I just
10  want to make sure you understand that chrysotile
11  does not occur in talc materials unless it is an
12  environmental contaminant.
13  Q   Ma'am. did I ask you that question?
14  A   No.  But I thought it might be helpful to
15  your understanding.
16  Q   I'm not asking you to help me with my
17  understanding.  I'm asking you to answer questions
18  that are posed.
19      My question is, do you have any
20  information in your investigation about this
21  conversation that Johnson and Johnson had with the
22  FDA where the FDA related their contractor
23  found chrysotile asbestos in the Johnson and Johnson
24  products?  That's all I'm asking.
25  A   Not specifically, no, but I'm not

Page 180

1   surprised again, because chrysotile would not be
2   found in talc.
3   Q   Did I ask you that Ma'am, whether you were
4   surprised or not?  Do you really want me to have a
5   judge read this and make a determination of whether
6   you are truly being responsive?
7       MR. SMITH:  Objection.
8   Q   Are we really going to do this?
9       MR. SMITH:  Objection.  Just ignore
10  those comments.
11  Q   Are we really going to do this?
12      MR. SMITH:  Please don't do that.
13  Please don't do that.  It is not helpful.
14  Q   Do you know anything about this conversation?
15  A   Not until you showed it to me today.
16  Q   It goes on to say that, "That information
17  is completely at variance with Johnson and Johnson's
18  information," correct?
19  A   Specifically from McCrone, and we have a
20  letter here that says that 1971 through '76 McCrone
21  never found any asbestos in our talc material, so
22  yes, I'm well aware of that.
23  Q   As you stand here as the witness for
24  Johnson and Johnson, let's be very clear.  Are you
25  telling this jury that from 1971 to 1976 McCrone

Page 181

1   never found asbestos in any Johnson and Johnson talc
2   material?  Is that what you are saying?
3   A   Our production material, tested by McCrone,
4   did not have asbestos in it from 1971 to 1976.
5   Q   I'm asking you Ma'am, are you telling this
6   jury, because it is important, that no test by
7   McCrone ever found asbestos from 1971 to 1976 in
8   Johnson and Johnson talc?  Is that what you are saying?
9       MR. SMITH:  Objection.
10  A   There were two instances that were
11  referred to in that letter I mentioned that was
12  written in 1976 referring to 1971 to 1976.  They
13  said in the last five years, and we have the letter
14  here that we can look at, and they did mention, I
15  believe, or maybe it was in a later letter, that
16  they had two instances of asbestos contamination
17  from external sources and they were able to verify
18  where those asbestos materials came from.
19  Q   What was my question?
20  A   You asked me if they never found any
21  asbestos, and there were some contaminant events.
22  I'm answering your question.
23  Q   Your answer to the question is but for two
24  contamination events, McCrone never found any
25  evidence of asbestos when testing Johnson and

Page 182

1 Johnson talc. Is that what you are saying?
2   A  That is my understanding of talc cosmetic powders.
3   Q  Did McCrone ever find asbestos when testing
4 the talc mine sources that were used for Johnson
5 and Johnson cosmetic talc products?
6      MR. SMITH:  Objection.
7   A  We would have to look at those reports.
8 There are extensive surveys of the shafts that are
9 used for cosmetic talc and they are complex
10 documents that need to be looked at specifically to
11 go through that.
12   Q  Ma'am, I'm just asking whether you know,
13 as the representative of Johnson and Johnson,
14 whether McCrone ever tested talc that was used in
15 the Johnson and Johnson cosmetic talc products and
16 found asbestos.  That is my question.
17      MR. SMITH:  Objection.
18   A  I think you have changed the question.
19   Q  That is my question.  Can you answer that
20 question?
21   A  Did McCrone ever find asbestos in cosmetic
22 talc products.  That was your question.
23   Q  No, Ma'am.  My question was, did McCrone
24 ever find asbestos in the talc that was used to
25 manufacture -- I'll make it easier.  I'll start over.

Page 183

1     Did McCrone ever find asbestos in
2 any form in the source of the talc that was used for
3 Johnson's cosmetic talc products?
4   A  They never found asbestos in the material
5 that was used to make Johnson's Baby Powder.
6   Q  And that is what you told the FDA, you,
7 Johnson and Johnson, correct?
8   A  That's correct.
9   Q  And you have actually met with the FDA and
10 told them, in reviewing the Lewin reports, that
11 there was never even a trace of chrysotile asbestos
12 found in any Johnson and Johnson cosmetic talc
13 product, true?
14   A  True.
15      MR. SMITH:  Objection.
16   Q  At some point you sat down with the FDA
17 and actually discussed that issue about the Lewin
18 results, correct?
19   A  Yes.
20   Q  And what you arranged at Johnson and
21 Johnson was a private meeting with the FDA that you
22 would have with the officials at the FDA and then
23 you could agree with the FDA who would be allowed to
24 speak at the meeting involving people other than
25 Johnson and Johnson, correct?

Page 184

1   A  I recall, and I have read documents,
2 minutes from the meeting where the FDA came to
3 Johnson and Johnson to discuss testing.  I know
4 there were other individuals there. I don't recall
5 any conditions of who was going to speak, but I'm
6 not surprised that there was a very specific agenda
7 agreed to, if that's what you are referring to.
8   Q  Well, you know that before you had the
9 meeting with other industry members, you had a
10 private meeting with the FDA about the Lewin
11 results, true?
12   A  Yes, and that is not unusual, if we are
13 talking about our specific products.
14   Q  You, Johnson and Johnson, actually got an
15 advanced copy of the Lewin Report before it was ever
16 made available to any consumers or doctors or
17 members of Congress, correct?
18      MR. SMITH:  Objection.
19   A  Yes.
20   Q  When you met with the FDA, you assured the
21 FDA that you gave them your entire background file
22 on asbestos testing as it related to your
23 cosmetic talc products, correct?
24   A  I don't know that specifically.  I would
25 have to go back and look at those documents to see

Page 185

1 what exactly was given.
2   Q  Exhibit 40 is a December 13, 1972 memo
3 that discusses the meeting that you had with the FDA
4 on November 1, 1972, correct?
5   A  Yes.
6   Q  What you indicated is that you pointed out
7 and provided information and ordered your complete
8 background files concerning talc and asbestos, correct?
9   A  Yes.
10   Q  Did you actually provide the FDA with your
11 complete background files?
12   A  In November 29, 1972, we sent a number of
13 documents.  These are reports of retained samples
14 from two lots that were examined by multiple
15 different organizations.
16   Q  At that point in time did you provide the
17 FDA with all of the asbestos testing evidence you
18 had related to your cosmetic talc products?
19      MR. SMITH:  Objection.
20   A  What I show here is we sent a number of
21 different reports, testing of certainly lots.
22 That's what I show that we sent to the FDA.
23   Q  That wasn't my question.
24      MR. PLACITELLA:  Are you able to read
25 my question back.

Page 186

1    (The above question is read.)
2    MR. SMITH: Note my objection.
3    A   So, I as I said, November 29, 1972, as
4  pointed out in this December 13th memo, I pointed out
5  providing information, offered our complete
6  background files. Not all the tests have
7  backgrounds files, to the administration prior to
8  public disclosure, et cetera, and I have that here.
9  It was provided to you in binder P-3.
10   Q   Can you identify the letter that you are
11 referring to by date?
12   A   Tab C, November 29, 1972 letter.
13   Q   So on November 29, 1972, it is your
14 testimony here under oath that Johnson and Johnson
15 provided the FDA with all the testing evidence that
16 it had related to whether there was asbestos in
17 Johnson and Johnson cosmetic talc products, correct?
18   MR. SMITH: Objection.
19   A   As I corrected you before, not all of the
20 testing information, complete background files.
21 This is one, two, three, four, five different sets
22 of documents around testing, and it refers to two
23 specific lots.
24   So you are saying all of the
25 extensive testing. I don't know if there's other

Page 187

1  testing that would fall under the umbrella you are
2  putting up. This is what was sent to the FDA and it
3  is comprehensive related to these two lots.
4    Q   So everything you sent to the FDA is in
5  that binder?
6    A   That is correct.
7    Q   In your meeting you express your concern
8  to the FDA about the Lewin results, correct?
9    A   Yes.
10   Q   And you actually got the FDA official to
11 agree not to release the Lewin results. I think he
12 actually said, "Over my dead body will I release
13 them." Is that right?
14   MR. SMITH: Objection.
15   A   Yes, he did say that.
16   Q   At that point in time was your former
17 executive working at the FDA?
18   A   I'm sorry?
19   Q   Your former executive who worked on talc,
20 was he working at the FDA at that point in
21 time?
22   MR. SMITH: Objection.
23   A   I don't know which executive you are
24 referring to.
25   Q   Dr. Eiermann. Yes or no?

Page 188

1    A   I don't know.
2    Q   And ultimately was a letter generated from
3  the FDA summarizing the information and a product of
4  what your discussions were and the input you provided?
5    A   From FDA?
6    Q   Yes, Ma'am.
7    A   There was a letter from the FDA.
8    Q   I'll show you what's been marked Exhibit
9  50. 50 is a July 31, 1973 memo, a letter from the
10 FDA talking about a summary and comments on
11 Professor Lewin's analytical results for asbestos,
12 correct?
13   A   Yes.
14   Q   You have seen that before?
15   A   Yes.
16   Q   That was part and parcel of the product of
17 the discussion and submissions that you had given to
18 the FDA on this subject, true?
19   A   This is from the FDA, not from us.
20   Q   No, we are talking this was the product
21 of, in part, of the discussions you had with the
22 FDA and the submissions you gave them.
23   A   That's correct.
24   Q   And in fact, the FDA notes on the second
25 page of the document that you dispute the findings

Page 189

1  of Lewin using your own analysis and that no
2  chrysotile was found, right?
3    A   Yes.
4    Q   38. So we are all on the same page, I
5  think this is what you referenced. I'm going to
6  give you what's been marked J and J 38, and J and J
7  38 is your letter to the FDA enclosing various
8  expert testing results, correct?
9    A   Yes.
10   Q   And those included reports from McCrone,
11 correct?
12   A   Yes.
13   Q   They included reports from Dr. Brown at
14 Princeton?
15   A   Yes.
16   Q   Correct? They included reports from the
17 Colorado School of Mines?
18   A   Yes.
19   Q   Your notes that have been marked as P-2, I
20 don't really see anything in your notes related to,
21 I'll call it the Lewin related testing, correct?
22   A   All in the binders here.
23   Q   I'm asking whether it is in your notes.
24   A   Not that I remember. Something about the
25 1971 EPA State of New York symposia that it leads to

Page 190

1  Lewin testing.
2      Q   What do you know about that?
3      A   Just what I wrote down.
4      Q   That's all you know?
5      A   No.  There was a 1971 meeting and the
6  issue of asbestos testing and talc came up.  Dr.
7  Lewin was hired by FDA to do some testing and that
8  led to the test results we have been discussing.
9      Q   I'm looking at your notes, on the second
10  page it talks about, it says on page 2, "Reuters
11  article lays out the theme."  What does that mean?
12      A   There was a recent Reuters article written
13  about talc, Johnson and Johnson and talcum powder,
14  and some of the legal activities.
15      Q   That's something you read in preparation
16  for today's deposition?
17      A   I did.  I reread it.
18      Q   And then it says pivot back to.  What do
19  you mean by pivot back to?
20      A   I would have to look at the notes there.
21  This refers to the fact that when you are talking
22  about testing, you could easily pick out one
23  document and present that as if it told the whole
24  story of what people understood about asbestos
25  testing and talc, and that is not correct.  That

Page 191

1  there's years of discussion and scientific debate
2  about what is the appropriate testing for talc.  And
3  what is the right methodology, and Lewin really
4  opened that up.  And you see that laid out over a
5  number of years leading to the J41.
6          And so pivot back to a framework that
7  lays out the context in which these documents lie so
8  that nobody is misled to something that may not be true.
9      Q   I want to make sure we are -- you say
10  Reuters articles lays out the theme.  Pivot back to.
11          Then you say, "We are not playing
12  games with language.  Go to McCrone letters."  What
13  does that mean?
14      A   That means when you say Tremolite, that
15  does not mean asbestos.  When you say actinolite,
16  that does not mean asbestos.  You say amphibole,
17  that does not mean asbestos.
18          It is very easy to confuse individuals
19  by using a lot of geologic, numerology, nameology,
20  and so just in plain speak, asbestos is what asbestos
21  is, and you have to understand that.  It is a disease
22  causing febrile formations that are of concern that
23  we have to make sure are not in our products.
24  That's the bottom line.
25      Q   But we are going to the Reuters article

Page 192

1  and the response is pivot back to.  We are not
2  playing games with language.  We are not
3          MR. SMITH:  Objection.
4      A   We are talking about asbestos.  That's
5  what I mean.
6      Q   It says, "No documentation validated
7  positive test for asbestos.  Then that material was
8  used.  That's why we use standards."  That is your
9  response to the Reuters article?
10      A   As we have done here today, you can pick
11  out a little note here and a note there and imply
12  that reflects that Johnson and Johnson products are
13  contaminated with asbestos.
14          There's no evidence to show that we
15  ever released product to market that contained
16  asbestos.  And that's just a fact, and the McCrone
17  letters in 1986 and 1976 refer to many, many years
18  of negative testing of production material of
19  Johnson's Baby Powder and Shower to Shower.
20      Q   I'm just trying to understand your notes.
21      A   I think they are good notes.  Thanks for
22  bringing it up.
23      Q   I was curious why, in preparation for
24  today's deposition, you were talking about pivoting
25  from the Reuters article.

Page 193

1          Did you think I was going to ask you
2  about the Reuters article?
3      A   No, but I think the Reuters article picked
4  up on some flashy facts and to make a story, and
5  those facts were taken out of context of the
6  framework of what's been going on in the last 50
7  years around understanding asbestos testing and
8  talcum powder.
9      Q   Were there discussions inside of Johnson
10  and Johnson that you were a party to that were in
11  response to the Reuters article?
12      A   Many people have asked me about talc
13  safety in light of the Reuters article.
14      Q   When you say many people, I'm talking
15  about inside of Johnson and Johnson.
16      A   Yes.
17      Q   Did you have a conversation with the
18  CEO about it?
19      A   No.
20      Q   Who did you speak to inside of Johnson and
21  Johnson about the response to the Reuters article?
22      A   Well, many people in the company know that
23  that I have been -- number one, I was essentially
24  the chief safety officer for our consumer group for
25  three years and did a lot of work on talc safety.

Page 194

1  So many individuals and regular
2  employees, including security guards, asked me what
3  I think, and I tell them.
4  Q  What executives did you discuss the
5  Reuters article with?  What Johnson and Johnson
6  executives?
7  A  Outside of our legal team, only the
8  individuals that I mentioned earlier today.
9  Q  That being, so we clear, we are not
10  talking about security guards?
11  A  We are talking Lynn Szczepaniak, Bobbette
12  Williams.  Individuals in our quality organization.
13  Don Hicks, who is responsible for talc safety for
14  many years.
15  Q  Did you talk to any PR people?
16  MR. SMITH:  Objection.
17  A  I did talk to our communications people.
18  They were asking for my help and advice.
19  Q  Who was that?
20  A  Ernie Knewitz.
21  Q  Ernie Knewitz works for Johnson and Johnson?
22  A  Yes.
23  Q  Were you involved in any way in shaping
24  the message that was put forth by Johnson and
25  Johnson in response to the Reuters article?

Page 195

1  MR. SMITH:  Objection.
2  A  No.  They asked me to fact check.
3  Q  Fact check what?
4  A  References to scientific literature, how
5  things were discussed to make sure that the language
6  was appropriate and scientifically correct.
7  Q  Who asked you to do that fact check?
8  A  Ernie.
9  Q  So we are clear, Ernie --
10  A  Knewitz.
11  Q  And his job specifically was what?
12  A  Communications.
13  Q  Did Johnson and Johnson actually hire outside
14  consultants to help them with this public relations?
15  MR. SMITH:  Objection.
16  A  I wouldn't know that.
17  Q  That was something we would have to ask
18  Ernie Knewitz?
19  A  Correct.
20  Q  Just so the record is clear, going back to
21  the Lewin scenario and what you gave to the FDA, up
22  on the screen is a November 29, 1972 submission,
23  correct?  That is what you have in front of you?
24  A  Yes.
25  Q  And again, we have McCrone, Colorado

Page 196

1  school, Gordon Brown, Professor Pooley and Johnson
2  and Johnson, correct?
3  A  Yes.
4  Q  Now, 265.  265 is a report on the Johnson
5  and Johnson's Baby Powder that Gordon Brown
6  provided you, correct?
7  A  Yes.
8  Q  And that was the report that you gave to
9  the FDA, correct?
10  A  It looks to be, yes.
11  Q  And the methodology that Gordon Brown used
12  in analyzing the baby powder was X-ray diffraction,
13  correct?
14  A  Yes.
15  Q  And he concluded that there was no
16  evidence of chrysotile or tremolite found using that
17  technique, correct?
18  A  Yes.
19  Q  But you, Johnson and Johnson, knew that
20  the X-ray diffraction was not going to find
21  chrysotile under 2 or 3 percent, correct?  We went
22  through that.
23  A  We did, but this is in 1972.  So these are
24  early days in asbestos testing.
25  Q  Yes, Ma'am.  And you also knew that the

Page 197

1  x-ray diffraction was not going to find low levels of
2  tremolite, correct?
3  A  Yes.
4  Q  35 is an October 27, 1972 report to
5  Johnson and Johnson from the Colorado School of
6  Mines, correct?
7  A  Yes.
8  Q  And that, again, was the report you gave
9  to the FDA, correct?
10  A  Yes.
11  Q  Again, the Colorado School of Mines used
12  X-ray diffraction as the testing method at the
13  request of Johnson and Johnson.  That's what it
14  says, right?
15  A  No.  X-ray diffraction step scanning,
16  which is a more sensitive X-ray diffraction.
17  Q  That's what was used?
18  A  Yes.
19  Q  And based upon the x-ray diffraction test,
20  the Colorado School of Mines didn't find any
21  chrysotile asbestos, correct?
22  A  They didn't find serpentine, so, yes,
23  chrysotile would fall into that category.
24  Q  They did not use the preconcentration
25  method that they were recommending in performing

Page 198

1   these tests, correct?
2       A   Well, in a different context.  They were
3   looking -- Lewin said there was 3 percent chrysotile
4   in there.  So you would not need a concentration
5   method to detect that level of chrysotile.
6       Q   You would need it if you wanted to go
7   lower than that.
8       A   You would.
9       Q   And they did not use the concentration
10  method in analyzing these samples, correct?
11      A   Correct.
12      Q   461.  Now, 461 is a subsequent submission
13  that Johnson and Johnson made to the FDA concerning
14  the Lewin samples.  Is that fair?
15      A   Yes.
16      Q   Dated May 25, 1973?
17      A   That is correct.
18      Q   And that was by a Martin J. Borger (ph.) or
19  Burger?
20      A   I don't know.  However you say it is fine
21  with me.
22      Q   What you used was X-ray diffraction,
23  correct?
24      A   Yes.
25      Q   And using X-ray diffraction, he didn't

Page 199

1   find any chrysotile, fair?
2       A   That is correct.
3       Q   Or tremolite?
4       A   Or any number of, they list a whole bunch
5   of things he didn't find.
6       Q   And he did not also apply the
7   concentration method, correct?
8       A   Right.  Again, it would be unnecessary
9   since Lewin was suggesting 2 and 3 percent of
10  chrysotile.
11      Q   But if you wanted to find out if there was
12  any asbestos in there, you would use the
13  concentration method.  You were just trying to
14  disprove Dr. Lewin.  Is that what was going on?
15      A   Actually, that was what was going on
16  because his methods were flawed.
17      MR. PLACITELLA:  It is 3:58.  I have
18  other things, but I think this is a place to stop
19  since we are about to change subjects.  So why don't
20  we end for today and consult our calendars.
21      MR. SMITH:  Fine.
22      THE VIDEOGRAPHER:  The time is
23  approximately 3:59 p.m.  This concludes today's
24  portion of the deposition.
25      (The deposition is adjourned.)

Page 200

1              C E R T I F I C A T E
2
3       I, MARC BRODY, Notary Public and
4   Certified Shorthand Reporter of the State
5   of New Jersey, do hereby certify that prior
6   to the commencement of the examination
7   the witness was duly sworn by me to
8   testify the truth, the whole truth and
9   nothing but the truth.
10      I DO FURTHER CERTIFY that the
11  foregoing is a true and accurate transcript
12  of the testimony as taken stenographically
13  by and before me at the time, place and on
14  the date hereinbefore set forth.
15      I DO FURTHER CERTIFY that I am neither
16  a relative of nor employee nor attorney nor
17  counsel for any of the parties to this
18  action, and that I am neither a relative
19  nor employee of such attorney or counsel,
20  and that I am not financially interested in
21  the action.
22
23
24      Notary Public of the State of New Jersey
25

Page 201

1           D O C U M E N T   L I S T
2   NO.          DESCRIPTION          PAGE
3   J&J-491   J&J memo, 1/4/84         48
4   J&J-476   Addendum to memo, 3/23/72      57
5   J&J-497   J&J memo, 11/3/08        60
6   J&J-44    J&J memo, 4/26/73        69
7   J&J-364   Memo, FDA, 5/14/74       72
8   J&J-464   J&J memo, 8/13/71        74
9   J&J-69    J&J Baby Powder Fact Book,
            July, 1974              81
10
    J&J-216   Memo, Mesothelioma Talc
11            Medical Research, 1997      84
12  J&J-467   J&J memo, 7/27/71        89
13  J&J-474   J&J memo, 9/21/71        90
14  J&J-483   J&J memo, 1972, Nicholson to FDA      91
15  J&J-475   Letter, J&J to FDA, 1973      92
16  J&J-60    J&J memo, FDA, 7/31/73       99
17  J&J-492   Letter, J&J to FDA, 3/17/16      99
18  J&J-498   J&J advertisement       103
19  J&J-457   List, J&J to FDA, 1971-1977      114
20  J&J-489   Meeting of Talc Group, 3/21/73      116
21  J&J-148   J&J Trade Association Minutes,
            May, 1977               119
22
    J&J-357   Memo, John Hopkins, 12/21/95      127
23
    J&J-361   Memo, Rich Zazenski, 2001      132
24
    J&J-266   J&J memo, 10/31/72      137
25

Page 52  (Pages 202-202)

Page 202

D O C U M E N T   L I S T

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| J&J-263 | Report, Colorado School of Mines | 142 |
| J&J-45 | J&J memo, 5/16/73 | 145 |
| J&J-46 | J&J memo, 6/4/73 | 147 |
| J&J-58 | Analysis of Talc, Dartmouth College, 3/74 | 159 |
| J&J-352 | J&J memo, 3/11/74 | 163 |
| J&J-471 | J&J memo, 11/24/76 | 166 |
| J&J-369 | J&J memo, 1975 | 167 |
| J&J-353 | Letter, J&J, 2/28/75 | 168 |
| J&J-347 | Report, 8/29/72 | 175 |
| J&J-29 | J&J memo, 8/24/72 | 176 |
| J&J-40 | J&J memo, 12/13/72 | 185 |
| J&J-50 | J&J memo, 7/31/73 | 188 |
| J&J-38 | Letter, J&J, 11/29/72 | 189 |
| J&J-265 | Report, 1972 | 196 |
| J&J-35 | Report, 10/27/72 | 197 |
| J&J-461 | J&J Submission to FDA, 5/25/73 | 198 |

Brody Deposition Services

Page 53

| A | | | | |
|---|---|---|---|---|
| | 126:15, 126:21 164:19 | 105:22, 125:22 131:4 | ago 38:15, 61:4 125:1, 125:8 169:14, 171:9 | amended 38:21 |
| A.J 146:2 | acknowledges | Additionally | agree 18:9 | AMERICA 1:3 1:4, 1:4, 1:5, 1:6 1:7, 1:7 |
| abilities 126:4 | 82:6, 83:1 | 132:22 | 18:24, 19:7 | amount 88:21 |
| ability 54:20 55:7, 55:11 | 118:8 | Additives 33:8 | 21:14, 22:22 40:5, 40:18 | 89:5, 118:23 141:19 |
| able 136:5 146:11, 147:13 156:24, 181:17 185:24 | acknowledgment 86:7 | adequate 18:4 adequately 13:6 13:12, 13:24 | 47:5, 59:21 67:10, 67:16 69:5, 69:13 | amounts 71:2 101:25, 143:14 162:3, 178:22 |
| | Act 22:19, 34:17 36:13, 43:9 | adjourned 199:25 | 71:11, 74:13 77:5, 78:16 | |
| above-captioned 1:11 | acting 8:8 | adjunct 123:6 | 80:10, 80:19 82:5, 82:11 | amphibole 98:21, 99:15 118:9, 118:14 |
| ABRAHAM 2:10 | actinolite 69:7 69:11, 69:14 | administration 7:8, 38:14 | 82:25, 83:6 83:12, 83:16 | 118:17, 121:15 128:25, 158:15 |
| absolutely 46:13 | 71:5, 141:13 141:18, 143:2 | 186:7 | 84:4, 84:10 85:14, 86:3 | 160:8, 162:2 162:13, 191:16 |
| 47:11, 47:14 53:9, 75:4 | 143:8, 144:18 149:13, 150:2 | admitted 96:20 adopt 116:19 | 86:19, 86:24 87:2, 87:4 | amphiboles 98:24, 115:13 |
| 91:19, 103:22 | 150:4, 150:8 150:11, 150:14 | 119:15, 139:18 adopted 118:14 | 87:20, 97:7 109:24, 114:20 | 119:10, 119:12 120:21, 128:16 |
| academics 110:10 | 150:16, 150:20 150:23, 150:25 | 124:7, 124:11 168:17, 169:13 | 135:1, 135:17 135:17, 137:4 | 130:12, 158:24 159:9, 159:22 |
| accept 167:13 | 151:17, 152:1 | adopting 165:21 | 137:9, 145:12 | 160:2, 160:12 |
| accepted 74:22 78:2, 118:15 | 152:8, 156:8 156:16, 156:25 | adoption 165:10 167:8 | 156:2, 183:23 187:11 | 161:4 analysis 60:15 |
| access 39:10 40:1, 40:6 | 158:12, 158:14 158:20, 158:21 | adulterated 16:18, 22:18 | agreed 135:14 175:22, 184:7 | 91:21, 92:13 92:21, 93:1 |
| 40:10, 40:19 40:23, 40:25 | 158:23, 160:18 160:24, 161:24 | advanced 184:15 | agreement 124:19 | 107:9, 119:3 125:3, 136:2 |
| 48:4, 48:19 48:23, 49:23 | 162:1, 162:1 163:19, 175:18 | adverse 56:3 advertisement | ahead 32:19 72:14, 76:3 | 137:23, 148:5 149:23, 159:8 |
| 53:5, 53:12 55:18, 55:23 | 191:15 | 103:2, 105:6 201:18 | 91:5, 121:10 158:5 | 160:13, 173:3 173:16, 173:21 |
| 57:9, 103:8 103:14, 103:20 | action 200:18 200:21 | advice 167:5 194:18 | air 133:20 135:3 | 174:6, 174:15 189:1, 202:6 |
| accuracy 25:6 | actionable 15:14 | advisability 58:15 | AL 1:3, 1:3, 1:4 1:4, 1:5, 1:5, 1:6 | analytical 168:21, 173:13 |
| accurate 120:5 121:17, 125:10 200:11 | actively 125:15 activities 6:10 | aerosols 23:23 25:17 | 1:6, 1:7, 1:7 allay 58:18 | 188:11 analyze 146:11 |
| achieved 120:7 | 25:1, 190:14 | affairs 11:6 | allegation 37:24 | 147:13 |
| acid 81:6 | activity 61:8 | affirmatively | allowed 127:13 | analyzed 132:25 |
| acknowledge 82:12, 125:23 | actual 6:2, 10:3 115:9, 158:2 | 98:10 afternoon 177:4 | 155:8, 183:23 Amax 1:5, 2:11 | 160:19 analyzing |
| 125:25 | added 43:14 | 177:7 | ambient 135:3 | 196:12, 198:10 |
| acknowledged 80:11, 80:20 | addendum 57:13, 57:19 | agencies 86:21 105:8 | | and/or 143:8 |
| 84:11, 123:2 126:6, 126:12 | 201:4 addition 10:20 14:5, 38:24 | agency 87:6 agenda 184:6 | | |

**animal** 67:22
68:4, 68:5
68:22, 70:2
**ANISHA** 2:10
**answer** 9:7
13:20, 21:6
30:5, 30:7
30:13, 30:16
30:17, 39:19
51:17, 51:20
73:10, 73:17
77:12, 80:1
86:4, 88:25
89:3, 94:21
95:23, 96:2
96:14, 111:24
112:1, 112:2
119:2, 123:22
124:9, 124:13
126:14, 134:10
135:21, 136:18
136:21, 136:25
142:22, 149:9
151:10, 151:12
153:9, 154:4
154:17, 156:3
156:6, 156:13
156:15, 156:17
156:22, 156:24
157:3, 157:5
158:3, 158:21
162:11, 162:19
173:25, 179:17
181:23, 182:19
**answered** 50:18
50:19
**answering**
158:3, 181:22
**answers** 154:18
**anthophyllite**
84:12, 85:6
85:7, 121:24
**anthopyllite**
83:13, 162:3
**anybody** 12:17
48:18, 165:8

**apparent** 147:8
**apparently**
176:23
**appear** 118:16
**appearances** 5:8
**appearing** 178:7
**applicable** 18:2
**apply** 199:6
**appreciate**
103:16, 135:21
**approach** 53:15
70:11, 70:17
168:25, 169:6
**appropriate**
14:8, 46:10
54:2, 191:2
195:6
**approval** 12:25
**approximately**
1:15, 5:7, 38:15
54:9, 54:15
106:16, 106:21
145:3, 145:7
171:13, 171:18
199:23
**April** 69:19
115:24
**apropos** 53:16
**area** 43:17
59:25, 79:5
151:20
**arises** 54:3
**arose** 39:11
40:1
**arranged**
183:20
**art** 128:20
**article** 52:17
63:1, 190:11
190:12, 191:25
192:9, 192:25
193:2, 193:3
193:11, 193:13
193:21, 194:5
194:25
**articles** 191:10

**articulated**
117:21
**asbestiform**
22:11, 22:16
70:13, 70:24
71:12, 72:3
72:17, 72:19
72:23, 82:7
82:13, 82:18
121:14, 156:21
158:25, 159:9
159:22, 160:16
**asbestos** 6:19
7:1, 7:9, 7:24
8:7, 9:15, 12:9
17:21, 18:5
22:14, 22:16
22:21, 23:2
23:15, 24:14
25:4, 25:15
25:25, 33:11
35:3, 35:20
36:7, 37:24
38:16, 38:22
39:6, 40:2, 40:7
40:20, 41:2
43:3, 44:2, 44:5
45:9, 51:6
51:15, 52:15
56:13, 56:15
56:16, 57:10
58:18, 59:10
59:12, 59:24
64:18, 64:23
65:3, 65:10
66:13, 66:14
66:16, 66:18
66:20, 66:25
69:11, 70:13
70:17, 71:7
71:15, 71:23
72:8, 72:16
73:4, 73:6, 74:2
74:3, 75:17
79:22, 80:12
80:21, 81:6

82:15, 82:22
83:3, 83:8, 83:9
83:15, 83:22
84:6, 85:4
87:11, 87:19
87:23, 88:1
88:14, 88:19
88:21, 89:2
89:5, 89:7
89:10, 89:14
90:5, 90:11
90:22, 91:1
91:12, 91:20
92:12, 92:20
93:1, 94:6
94:12, 94:17
94:25, 95:11
95:22, 96:10
96:20, 97:11
97:23, 98:6
98:9, 98:15
98:16, 98:19
99:25, 100:7
100:8, 100:13
100:14, 100:16
100:19, 100:23
100:25, 100:25
101:6, 101:12
101:13, 101:19
101:25, 102:6
102:12, 102:16
104:8, 105:4
106:1, 106:4
106:11, 107:15
108:9, 109:2
109:13, 109:20
110:14, 110:18
111:11, 111:15
111:17, 111:21
112:6, 113:4
113:11, 113:19
114:21, 115:4
115:18, 116:9
117:19, 119:11
119:18, 119:19
120:18, 123:25

124:12, 125:4
126:18, 128:7
128:12, 131:23
132:23, 132:25
133:4, 133:11
133:16, 133:19
134:8, 134:16
135:4, 135:11
135:16, 137:7
137:24, 138:11
138:14, 138:17
139:11, 139:20
140:2, 140:23
141:16, 141:25
142:19, 144:18
146:10, 146:13
147:2, 147:12
147:15, 148:7
148:13, 149:24
150:4, 150:11
150:16, 150:18
152:2, 152:10
152:15, 157:9
157:25, 158:15
162:7, 163:12
163:20, 166:16
168:13, 171:25
172:11, 173:3
173:5, 173:17
173:23, 174:6
174:8, 174:16
174:17, 175:5
176:20, 178:2
179:3, 179:23
180:21, 181:1
181:4, 181:7
181:16, 181:18
181:21, 181:25
182:3, 182:16
182:21, 182:24
183:1, 183:4
183:11, 184:22
185:8, 185:17
186:16, 188:11
190:6, 190:24
191:15, 191:16

191:17, 191:20
191:20, 192:4
192:7, 192:13
192:16, 193:7
196:24, 197:21
199:12
**Ashton** 70:7
116:3, 116:6
116:8, 117:7
117:21, 140:14
166:4, 166:8
166:12
**asked** 15:25
22:23, 31:9
36:5, 44:4, 65:5
65:7, 65:18
65:24, 66:10
66:12, 88:16
88:24, 104:17
106:25, 107:1
134:9, 139:4
150:5, 153:11
156:22, 178:10
178:19, 181:20
193:12, 194:2
195:2, 195:7
**asking** 27:17
29:25, 30:1
34:7, 35:10
35:11, 39:14
39:15, 39:22
39:23, 48:16
48:22, 51:11
63:3, 64:4, 64:7
64:8, 68:6
69:11, 70:21
73:25, 79:13
79:14, 80:1
85:14, 85:15
85:21, 87:24
94:21, 95:7
96:24, 117:4
122:24, 124:21
126:5, 134:11
135:13, 136:14
137:2, 150:12

153:19, 154:12
154:17, 154:23
154:25, 155:20
162:8, 165:19
167:3, 173:20
174:2, 174:14
176:5, 179:7
179:9, 179:16
179:17, 179:24
181:5, 182:12
189:23, 194:18
**asks** 73:9
**asserted** 38:16
**assessing** 110:16
110:25, 157:24
**assessment** 33:8
107:12
**assistance** 65:7
65:25, 66:5
**assisted** 9:22
**associated** 14:9
19:15, 105:22
**association** 20:2
86:8, 99:3
119:22, 123:14
125:3, 132:13
147:2, 149:9
201:21
**assume** 145:23
171:22
**assurance** 104:9
120:5, 121:16
133:3, 133:11
134:15, 135:15
**assure** 14:6
21:15, 21:22
**assured** 178:20
184:20
**atomizer** 116:16
**Attached**
166:13
**attachments**
105:22
**attended** 116:1
**attorney** 200:16
200:19

**attorneys** 2:6
2:10, 2:15, 2:21
3:6, 9:22
**attributable**
59:14
**August** 74:19
173:8, 173:11
175:4, 176:20
**author** 8:20
175:8
**authored** 99:9
**authorities**
157:8
**authority** 17:5
18:10, 18:20
46:8, 49:14
**available** 20:25
34:15, 36:6
64:3, 65:11
92:13, 92:21
104:21, 105:1
115:17, 118:9
123:17, 124:25
161:21, 166:15
184:16
**Avenue** 2:3
**average** 53:18
**avoid** 168:6
168:24, 169:5
170:20
**AVON** 1:3
**aware** 7:25
13:9, 13:10
13:18, 17:21
18:13, 22:25
27:9, 27:23
28:2, 37:9, 41:8
41:12, 41:13
41:18, 41:21
42:8, 42:14
42:25, 43:1
44:7, 52:21
63:24, 66:19
83:7, 84:9
106:12, 109:22
110:3, 111:9

112:25, 122:17
122:21, 123:1
129:5, 133:6
134:13, 134:16
139:17, 140:6
140:7, 140:11
145:12, 145:17
145:18, 149:7
157:12, 157:18
163:6, 163:9
171:22, 172:4
172:9, 172:13
172:25, 173:2
177:14, 180:22

---

**B**

**baby** 37:18
52:15, 53:3
56:12, 56:15
56:16, 57:10
58:12, 58:17
59:4, 59:11
59:17, 60:3
60:13, 69:6
69:13, 70:12
71:3, 80:25
89:11, 89:15
90:11, 90:22
91:1, 91:11
91:20, 95:10
95:21, 96:11
96:21, 97:10
97:22, 100:12
100:24, 101:5
101:19, 108:2
110:7, 111:6
113:18, 137:23
138:22, 140:23
157:9, 171:23
172:10, 173:17
173:23, 174:16
183:5, 192:19
196:5, 196:12
201:9
**back** 7:15, 8:4

8:5, 12:10, 20:2
33:17, 33:20
42:17, 54:14
67:16, 67:23
68:7, 75:3, 75:9
75:12, 80:15
99:23, 105:17
106:20, 114:14
121:11, 124:4
131:3, 136:20
145:6, 157:16
157:20, 162:19
164:12, 171:18
184:25, 185:25
190:18, 190:19
191:6, 191:10
192:1, 195:20
**background** 8:9
44:7, 172:17
184:21, 185:8
185:11, 186:6
186:20
**backgrounds**
186:7
**backup** 60:15
**bad** 84:3
**Bailey** 112:14
112:20
**ban** 70:24
**Bank** 2:4
**BARNA** 2:15
**based** 44:21
50:4, 56:19
57:5, 94:17
97:15, 108:23
131:24, 134:20
136:2, 144:19
152:11, 158:13
165:13, 171:2
172:24, 197:19
**bases** 15:20
**basically** 111:14
129:11, 129:17
164:22
**basis** 15:10
16:10, 40:16

| | | | | |
|---|---|---|---|---|
| **batch** 129:1 | 114:8, 186:9 | **brings** 160:1 | **call** 45:21, 47:6 | **case** 12:12 |
| **Bates** 23:25 | 187:5 | 160:11 | 47:12, 47:17 | **cases** 49:15 |
| 26:11, 84:23 | **binders** 112:16 | **Britain** 126:23 | 47:21, 47:23 | 84:13, 85:9 |
| 130:5 | 189:22 | 127:6, 127:20 | 48:4, 48:7 | 85:18 |
| **bathroom** 54:7 | **bit** 22:24, 25:21 | 129:8, 130:2 | 48:11, 48:19 | **category** 197:23 |
| **bear** 14:7 | 82:9, 92:16 | 130:22, 131:1 | 48:23, 49:9 | **cause** 21:17 |
| **bears** 16:18 | 172:16 | 131:14, 148:19 | 49:23, 50:13 | 21:24, 22:5 |
| **began** 116:8 | **BLANK** 2:18 | 149:1 | 50:22, 51:5 | 65:3, 66:25 |
| **beginning** 75:3 | **blew** 128:3 | **British** 127:21 | 51:14, 52:10 | 83:17, 83:23 |
| 87:12, 87:17 | 130:6, 149:17 | 148:2, 149:8 | 55:23, 58:8 | 84:6 |
| 88:3, 99:16 | **blow** 24:13 | **Broad** 1:22 | 151:4, 151:6 | **causing** 191:22 |
| 135:10 | **Bobbette** 11:14 | **Brody** 1:13 | 151:8, 151:9 | **Cedar** 3:4 |
| **behalf** 8:8, 8:24 | 11:15, 194:11 | 1:22, 5:10 | 189:21 | **Center** 41:25 |
| 64:10 | **bodies** 85:4 | 200:3 | **called** 1:11, 46:4 | **centrifugation** |
| **behave** 154:24 | **body** 100:4 | **broke** 54:19 | 46:12, 47:13 | 158:7, 158:9 |
| **behaves** 73:19 | 100:6, 175:6 | **Brook** 52:14 | 48:23, 52:14 | **centrifuge** 141:2 |
| **behest** 75:14 | 187:12 | **brought** 9:1 | 81:19, 130:8 | 141:25, 143:22 |
| **beings** 74:16 | **book** 81:1 | 14:15, 14:25 | 139:5, 152:14 | **CEO** 193:18 |
| **believe** 12:16 | 163:3, 201:9 | 26:13, 38:14 | 177:4 | **certain** 26:22 |
| 17:11, 19:1 | **books** 8:21 | 46:9, 52:3, 52:4 | **calling** 47:21 | 37:9, 43:8 |
| 30:12, 53:14 | 30:19, 105:11 | 74:7, 155:13 | **calls** 7:5, 15:11 | 53:16 |
| 53:21, 59:1 | 105:15 | 175:11 | 47:1, 47:19 | **certainly** 34:19 |
| 63:20, 70:14 | **Borger** 198:18 | **Brown** 189:13 | 48:1, 49:3 | 45:15, 55:4 |
| 77:11, 102:12 | **BORGWARN...** | 196:1, 196:5 | **capable** 74:16 | 82:3, 104:24 |
| 107:3, 145:24 | 1:6 | 196:11 | 78:11, 78:12 | 172:13, 185:21 |
| 147:25, 166:7 | **bottom** 43:13 | **bulk** 107:25 | 118:20 | **certainty** 20:19 |
| 181:15 | 64:24, 120:3 | **bunch** 199:4 | **capacity** 6:15 | 21:16, 21:23 |
| **believed** 178:15 | 191:24 | **Bureau** 58:9 | **carbonates** | 27:7 |
| **bending** 15:17 | **bought** 102:10 | 75:13 | 164:4 | **Certified** 1:13 |
| **benefaction** | **bounds** 155:16 | **Burger** 198:19 | **carbonite** | 200:4 |
| 81:11 | 155:18, 155:20 | **business** 47:8 | 160:24 | **certify** 200:5 |
| **Bernard** 58:15 | **Boundy** 107:17 | 62:8, 86:14 | **carcinogen** | 200:10, 200:15 |
| 60:24 | 107:22 | 115:24, 132:7 | 22:14, 82:7 | **cetera** 186:8 |
| **best** 117:2 | **Branch** 33:8 | **buy** 100:15 | 82:13, 82:15 | **CFTA** 122:19 |
| 117:12, 164:20 | **brand** 175:6 | 101:2, 101:22 | 82:18, 82:23 | 123:3, 125:4 |
| **better** 130:11 | **break** 8:17, 33:6 | 102:18 | 82:24 | **chance** 158:4 |
| **beyond** 14:20 | 33:16, 54:7 | **bypass** 52:22 | **carcinogens** | 175:1, 175:23 |
| 15:23, 130:10 | 58:7, 97:25 | 53:5, 53:19 | 22:12 | **change** 15:14 |
| **bidders** 166:15 | 98:2, 103:1 | 53:25, 54:5 | **Care** 65:5 | 199:19 |
| **BIDDLE** 1:14 | 105:12, 106:14 | | 65:17 | **changed** 74:8 |
| **Bill** 61:4 | 107:1, 144:25 | | **career** 42:19 | 174:2, 182:18 |
| **binder** 33:4 | 171:11 | **C** | **careful** 75:18 | **characteristic** |
| 112:10, 112:12 | **BRENNTAG** | | **carefully** 162:25 | 178:23 |
| 113:5, 113:6 | 1:3, 1:4, 1:5, 1:6 | **calculations** | **caring** 40:11 | **characterization** |
| 113:7, 113:9 | 1:7 | 108:25 | **Carolyn** 3:12 | 47:6, 50:10 |
| 114:4, 114:5 | **bringing** 192:22 | **calendars** | **Casalarius** 61:4 | 59:22, 60:23 |
| | | 199:20 | | |

63:23, 71:23
72:8
**characterized**
47:25
**characterizing**
48:7
**charge** 40:11
45:9
**cheap** 129:16
**check** 32:17
195:2, 195:3
195:7
**checked** 148:6
**Chestnut** 2:8
**chief** 193:24
**China** 109:10
**CHRISTOPH...**
2:5
**chrysotile** 39:1
80:12, 80:21
81:6, 91:12
98:6, 98:9
98:12, 98:16
119:11, 137:6
137:24, 138:6
138:11, 138:14
138:16, 138:21
138:25, 141:20
142:1, 143:2
143:8, 144:18
148:7, 173:16
175:14, 178:12
178:17, 178:23
179:3, 179:10
179:23, 180:1
183:11, 189:2
196:16, 196:21
197:21, 197:23
198:3, 198:5
199:1, 199:10
**chunky** 72:18
**CIR** 19:20, 20:7
20:11, 20:17
20:24, 21:10
**CIR's** 21:7
**circle** 110:10

**citizen** 34:19
34:22, 40:7
52:13, 53:11
53:18, 55:7
55:9, 55:9
55:11, 64:7
133:15
**citizen's** 63:4
**citizens** 45:18
53:14, 53:15
59:3, 59:16
59:19, 60:2
60:12, 61:5
61:18, 106:4
134:21, 135:24
151:23
**citric** 81:6
**City** 6:9
**claimed** 102:12
**clarification**
152:3
**clarifies** 152:19
**clarify** 22:21
84:1
**Clark** 2:15
115:24
**classifiable**
69:15, 71:4
**classified** 69:7
71:7
**clean** 70:11
70:14, 70:16
**clear** 77:4
77:20, 172:9
180:24, 194:9
195:9, 195:20
**clearly** 16:6
153:11
**clinical** 6:16
42:4
**closely** 128:6
**Cohen** 2:3, 3:12
**Colgate-Palmol...**
3:6
**collaborated**
10:5

**collaboration**
105:8
**collected** 100:6
**College** 1:14
157:7, 157:12
157:23, 158:11
158:19, 159:8
159:12, 202:6
**Colorado**
140:15, 140:20
141:12, 141:24
142:20, 142:25
143:7, 165:3
189:17, 195:25
197:5, 197:11
197:20, 202:3
**colored** 141:2
**Colors** 36:3
**Columbia** 2:13
**combination**
117:5, 117:11
117:11, 119:8
126:10
**combine** 119:1
**come** 26:15
31:3, 32:10
77:2, 77:13
77:22, 104:1
115:3, 124:19
133:20
**comes** 15:11
23:1, 97:21
103:2, 117:16
**cometic** 55:5
**coming** 59:11
**commencement**
200:6
**commencing**
1:15
**comment** 18:7
78:24, 79:12
**commented**
75:15
**comments** 65:2
66:24, 73:16
73:18, 135:20

154:7, 168:14
180:10, 188:10
**commerce** 14:2
**commercial**
121:14
**commissioner**
52:23, 53:1
53:6, 53:10
53:20, 54:21
54:24, 55:6
55:12, 55:15
55:19, 55:23
55:24, 56:5
56:13, 56:21
57:7, 57:9
58:16, 58:25
59:2
**commit** 17:15
**common** 42:18
**commonest**
72:16
**communicated**
7:20, 9:10, 97:6
**communicating**
7:23, 140:22
**communication**
25:18, 47:14
54:5, 105:21
105:23
**communications**
7:15, 8:11, 9:3
9:4, 9:9, 9:24
10:3, 12:10
12:21, 34:13
44:4, 49:1, 49:2
50:5, 50:7
57:17, 64:11
64:14, 79:22
80:8, 105:17
112:17, 113:14
113:16, 131:22
194:17, 195:12
**community**
40:10, 40:20
40:23, 41:2
**companies**

31:12, 31:22
108:8, 169:21
**company** 1:5
8:25, 11:21
11:23, 12:6
168:1, 193:22
**competent**
20:20, 102:15
102:17
**complaint** 46:16
46:18
**complete** 48:19
133:3, 133:10
134:15, 135:15
185:7, 185:11
186:5, 186:20
**completely**
142:5, 180:17
**complex** 97:3
97:20, 182:9
**compliance** 34:5·
111:16
**complication**
152:1
**composed** 143:9
**compound**
69:10
**comprehensive**
18:11, 93:21
95:15, 96:3
112:20, 187:3
**concentrate**
164:1
**concentrating**
150:3, 160:8
**concentration**
25:7, 139:25
141:7, 142:4
144:21, 148:5
148:19, 148:25
149:5, 149:12
149:22, 150:9
150:15, 157:13
157:24, 159:21
160:1, 160:2
160:10, 160:12

161:3, 161:12
161:23, 163:12
163:21, 164:19
165:2, 166:23
167:7, 167:25
168:20, 171:24
172:11, 198:4
198:9, 199:7
199:13
**concentrations**
160:23
**concern** 17:10
64:2, 65:4, 67:1
67:18, 187:7
191:22
**concerned**
55:17, 67:11
67:25, 68:19
68:21, 148:9
179:2
**concerning** 6:19
7:6, 7:8, 7:24
16:24, 18:22
39:11, 40:2
45:19, 46:2
46:9, 56:4
73:24, 74:8
91:6, 106:10
111:10, 113:11
113:18, 140:22
158:18, 177:16
177:22, 185:8
198:13
**concerns** 53:16
59:4, 59:6
59:13, 59:16
59:19, 60:11
68:8
**conclude** 165:9
**concluded** 120:3
196:15
**concludes**
168:19, 199:23
**conclusion**
70:10, 85:13
97:4, 158:13

166:22, 167:8
**conclusions**
158:22
**conclusive**
14:17, 15:2
90:10
**conclusively**
90:21
**conditions**
20:21, 21:3
184:5
**confidence** 37:1
37:12
**confident** 70:15
131:7
**confidential**
37:11, 159:8
**confidentiality**
36:11
**conform** 72:21
**conformed**
71:13
**confuse** 151:19
191:18
**confused** 60:10
72:7, 111:4
**confusing** 25:21
82:10, 92:17
**confusion**
152:17
**Congress** 55:22
184:17
**connection** 10:7
60:18
**consensus**
124:19
**conservative**
178:16
**consider** 56:11
**considerations**
57:5
**considered**
16:18, 81:13
86:14, 87:5
110:6, 110:24
111:2, 112:4

118:19, 139:5
144:22
**considering**
139:10, 146:9
147:12
**consistently**
170:6
**conspicuous**
13:14
**consult** 199:20
**consultant**
38:15
**consultants**
38:19, 77:18
195:14
**consulting** 6:8
**consumer** 11:7
21:18, 21:25
58:20, 102:1
102:4, 128:22
193:24
**consumers**
19:10, 100:15
101:2, 101:22
184:16
**Cont'd** 3:1
**contain** 65:2
66:25, 75:10
76:9, 97:23
132:24, 141:19
161:24
**contained** 69:6
69:14, 71:2
74:15, 75:17
85:22, 87:19
87:23, 91:12
94:6, 98:9
109:13, 110:17
113:19, 113:20
114:3, 114:8
114:10, 121:14
128:12, 141:17
192:15
**containing**
66:16, 66:18
82:6, 82:12

82:17
**containment**
61:7
**contains** 13:13
16:19, 71:3
98:19, 105:16
113:13, 152:13
161:25
**contaminant**
72:17, 80:13
80:22, 129:4
179:12, 181:21
**contaminants**
25:5, 25:7
81:10, 83:13
84:13, 85:8
121:15, 148:8
**contaminated**
83:16, 83:20
83:22, 84:6
192:13
**contamination**
33:11, 52:15
129:22, 179:5
179:7, 181:16
181:24
**contemplated**
115:9
**contemporary**
9:3
**content** 7:9
47:9, 52:5
111:11
**context** 8:13
10:4, 44:22
45:5, 73:2
106:3, 112:17
131:12, 132:3
133:24, 134:4
136:3, 161:18
191:7, 193:5
198:2
**contextual** 8:9
8:12, 10:22
105:18, 105:24
**continue** 123:8

**continued**
106:23, 123:14
**continuing**
125:9
**continuous**
15:10
**contracted**
176:17
**contractor**
176:2, 179:22
**control** 34:10
34:23, 43:25
**controlled** 33:25
**controlling**
35:13
**controversy**
70:13, 172:22
**conversation**
61:16, 61:21
62:2, 62:6
62:13, 62:23
63:3, 63:5
63:11, 64:20
124:16, 136:6
177:15, 179:1
179:8, 179:21
180:14, 193:17
**conversations**
12:1, 47:10
64:5, 64:12
169:23, 174:20
174:23, 177:21
**conveyed**
158:18
**COOK** 2:13
**cooperated**
103:7, 104:24
**cooperation**
18:16
**copy** 52:16
166:13, 184:15
**Cornell** 6:9
**corporate** 7:5
155:12
**correct** 5:20, 6:1
6:4, 6:13, 6:14

| | | | | |
|---|---|---|---|---|
| 6:22, 6:24, 8:14 | 82:20, 82:22 | 124:1, 124:12 | 195:23, 196:2 | 118:15, 124:1 |
| 8:19, 9:2, 9:17 | 84:10, 86:15 | 125:5, 126:8 | 196:6, 196:9 | 127:13, 128:13 |
| 11:12, 12:23 | 87:10, 87:22 | 126:17, 127:2 | 196:13, 196:17 | 128:14, 128:20 |
| 13:2, 17:1, 17:7 | 88:3, 89:1, 89:6 | 127:22, 129:23 | 196:21, 197:2 | 129:2, 129:15 |
| 17:9, 20:17 | 89:8, 89:11 | 129:24, 130:9 | 197:6, 197:9 | 132:24, 138:18 |
| 22:23, 27:11 | 89:15, 89:20 | 130:17, 131:17 | 197:21, 198:1 | 142:3, 142:5 |
| 28:14, 28:25 | 90:1, 90:7 | 132:8, 133:7 | 198:10, 198:11 | 142:9, 142:16 |
| 29:20, 33:23 | 90:12, 90:22 | 134:19, 137:19 | 198:17, 198:23 | 142:23, 144:8 |
| 34:11, 34:24 | 91:2, 91:7 | 137:21, 138:2 | 199:2, 199:7 | 182:2, 182:5 |
| 35:5, 35:15 | 91:13, 91:15 | 138:7, 138:10 | **corrected** | 182:9, 182:15 |
| 35:17, 35:20 | 91:22, 92:2 | 138:16, 138:23 | 186:19 | 182:21, 183:3 |
| 37:1, 37:19 | 92:5, 92:13 | 139:1, 139:12 | **correctly** 71:8 | 183:12, 184:23 |
| 37:25, 38:1 | 92:14, 92:21 | 139:13, 139:15 | 74:25, 75:1 | 185:18, 186:17 |
| 38:4, 39:9, 40:2 | 93:18, 98:4 | 139:21, 140:23 | 81:16, 85:11 | **cosmetics** 18:10 |
| 40:7, 40:8 | 99:1, 99:4 | 141:5, 143:22 | 85:12, 118:21 | 24:6, 33:9, 36:4 |
| 40:13, 40:21 | 99:15, 99:20 | 144:2, 146:7 | **correspondence** | 43:16, 46:7 |
| 41:3, 41:10 | 100:1, 100:8 | 146:20, 147:13 | 36:19, 60:24 | 57:4, 123:13 |
| 41:16, 42:10 | 100:20, 101:7 | 147:18, 159:14 | **cosmetic** 7:9 | 177:3 |
| 42:23, 44:11 | 101:12, 102:1 | 160:13, 161:5 | 12:24, 13:5 | **cost** 116:13 |
| 46:5, 47:3 | 103:4, 105:9 | 162:5, 162:15 | 13:5, 13:25 | **costs** 168:7 |
| 47:12, 48:5 | 105:10, 107:15 | 163:4, 163:16 | 14:5, 14:6 | **council** 65:5 |
| 48:14, 48:20 | 107:16, 108:2 | 164:9, 164:17 | 14:14, 14:25 | 65:7, 65:17 |
| 51:15, 51:18 | 108:3, 108:19 | 166:10, 166:24 | 16:18, 17:15 | **counsel** 15:19 |
| 52:20, 53:6 | 108:20, 108:24 | 167:10, 167:22 | 18:15, 19:8 | 23:24, 24:17 |
| 53:12, 55:13 | 108:25, 109:3 | 168:2, 168:17 | 19:19, 19:23 | 65:24, 136:21 |
| 56:13, 56:22 | 109:8, 109:9 | 170:17, 170:21 | 19:25, 20:2 | 151:12, 200:17 |
| 56:24, 56:25 | 109:17, 109:21 | 173:9, 173:13 | 20:13, 20:18 | 200:19 |
| 56:25, 57:11 | 110:8, 111:12 | 173:17, 173:23 | 21:17, 21:24 | **counterpart** |
| 59:19, 60:5 | 112:6, 112:7 | 174:7, 174:16 | 22:5, 22:18 | 127:21 |
| 60:8, 60:21 | 113:12, 115:6 | 174:18, 174:21 | 23:2, 28:4 | **counts** 160:6 |
| 62:14, 62:16 | 115:11, 115:16 | 175:2, 175:6 | 28:17, 29:2 | **COUNTY** 1:1 |
| 65:12, 65:14 | 115:21, 116:21 | 175:9, 175:12 | 29:5, 31:6 | **couple** 61:3 |
| 65:19, 67:2 | 117:1, 117:17 | 175:15, 175:19 | 31:11, 31:21 | 90:16, 145:9 |
| 67:10, 67:23 | 117:22, 117:23 | 175:20, 176:3 | 32:9, 32:10 | 171:9 |
| 68:1, 68:7 | 118:3, 118:6 | 176:24, 178:12 | 34:4, 52:11 | **course** 41:6 |
| 69:21, 69:25 | 119:5, 119:8 | 178:17, 180:18 | 61:17, 62:19 | 47:7, 47:8 |
| 70:2, 70:8 | 119:9, 119:11 | 183:7, 183:8 | 66:3, 70:23 | **court** 1:1, 1:12 |
| 71:16, 72:3 | 119:13, 119:15 | 183:18, 183:25 | 75:2, 75:4, 75:7 | 1:13, 5:10 |
| 72:12, 72:25 | 119:16, 119:19 | 184:17, 184:23 | 75:10, 76:9 | **covered** 133:14 |
| 73:2, 73:25 | 119:20, 119:23 | 185:4, 185:8 | 76:14, 76:19 | 135:23 |
| 74:13, 75:25 | 119:24, 120:1 | 186:17, 187:6 | 76:21, 77:5 | **Craig** 60:24 |
| 76:7, 76:8 | 120:2, 120:23 | 187:8, 188:12 | 77:13, 77:21 | **create** 112:17 |
| 76:16, 76:17 | 121:20, 121:21 | 188:23, 189:8 | 84:16, 85:11 | **crime** 87:5 |
| 76:23, 78:6 | 122:9, 122:11 | 189:11, 189:16 | 88:6, 88:22 | **critical** 130:11 |
| 78:10, 79:19 | 122:14, 122:16 | 189:21, 190:25 | 89:6, 109:4 | 134:4, 151:19 |
| 80:5, 80:10 | 123:4, 123:12 | 195:6, 195:19 | 109:6, 109:8 | **CTFA** 8:6 |

120:4, 120:10
120:15, 121:15
122:5, 122:12
122:13, 123:5
123:5, 125:7
125:20, 125:24
126:7, 126:12
126:15, 126:19
126:24, 127:6
127:21, 130:1
132:14, 137:5
168:12
**CTPA** 127:17
127:18, 128:18
128:25
**curious** 192:23
**current** 10:19
21:3, 66:16
70:13, 71:1
**currently** 7:18
11:11, 11:12
50:11, 81:13
134:8, 166:14
**cut** 154:4
**cutting** 154:16
**Cyprus** 1:5
2:11

**D**

**D-12** 23:19, 24:4
**D-237** 33:2
**D.C** 61:16
**D.E** 35:19
35:25
**D.R** 37:3
**damaging** 74:16
74:22, 78:3
**danger** 69:25
**Daniels** 2:16
115:25
**Dartmouth**
157:7, 157:12
157:23, 158:11
158:19, 159:7
159:12, 163:16

165:3, 202:6
**data** 37:13
37:17, 58:17
85:8, 85:20
90:21
**database** 9:23
9:24, 48:25
**date** 5:6, 6:7
28:19, 29:11
84:13, 99:17
104:18, 168:23
186:11, 200:14
**dated** 48:10
60:25, 72:11
108:6, 147:20
159:4, 159:19
166:4, 175:4
198:16
**dates** 27:13
27:23, 28:7
**Davidson** 3:13
5:5
**day** 106:2, 123:8
**days** 196:24
**dead** 187:12
**dealing** 12:4
37:22, 41:1
86:20, 169:20
**deals** 57:2
**dealt** 67:21
68:3, 68:21
**debate** 191:1
**decades** 8:10
10:18, 67:12
67:15
**December** 103:3
127:16, 185:2
186:4
**decide** 153:16
**decided** 37:12
37:16, 60:14
103:17
**decision** 10:1
60:1, 60:5, 60:7
63:8, 63:14
103:19, 151:21

**decisions** 56:19
**deck** 43:15
**declaration** 74:4
**dedicated** 47:1
**deemed** 36:18
**deep** 78:12
78:17, 79:3
79:9, 79:18
80:5
**Defendant** 2:15
2:21, 3:6
**Defendants** 2:10
**definition** 71:13
72:2, 72:21
**definitions** 21:7
**definitive** 71:21
124:18
**definitively**
125:12, 162:20
**degree** 25:6
86:18
**deleterious**
16:19
**deliberately**
167:24
**demand** 55:23
**demonstrate**
83:7
**demonstrated**
138:5
**demonstrates**
21:1, 31:15
**denial** 107:8
**Dennis** 2:5
132:6
**density** 148:4
**deny** 63:4
**denying** 64:7
**deposition** 1:9
1:11, 1:12, 1:22
4:13, 4:22, 7:4
7:4, 9:21, 10:7
15:18, 21:10
23:20, 24:3
24:4, 26:13
43:24, 47:17

47:24, 48:3
48:17, 49:22
51:1, 51:13
57:22, 73:20
89:23, 123:21
127:9, 135:10
153:18, 153:18
155:3, 190:16
192:24, 199:24
199:25
**depression** 81:6
**Deputy** 52:11
58:9
**describe** 10:15
**described**
160:19
**description** 4:12
24:25, 201:2
202:2
**designated** 8:23
**desired** 164:4
**destroy** 49:14
**destroyed** 49:5
**detail** 82:3
**detailed** 90:6
**details** 20:5
**detect** 27:6
138:6, 143:15
143:16, 163:25
198:5
**detectable** 92:12
92:20, 92:25
128:19, 132:25
133:4, 133:11
134:16, 135:16
**detected** 85:4
98:25, 99:15
100:14, 129:1
144:21, 178:2
**detecting**
144:19
**detection** 94:17
118:14, 118:17
118:20, 123:4
126:3, 126:11
126:20, 130:6

130:11, 137:1
143:8, 163:20
168:13
**determination**
9:19, 24:14
25:4, 25:25
115:17, 166:17
180:5
**determine** 15:13
20:18, 93:4
93:17, 109:12
121:12, 123:25
161:4
**determined**
13:16, 19:11
165:20, 168:5
**determining**
116:9, 139:19
**develop** 25:2
144:16, 159:20
**developed** 81:7
131:24, 147:5
148:6
**developing** 73:3
**development**
26:18, 27:5
35:24, 59:24
62:25, 83:2
106:3, 148:1
**developments**
26:24, 71:21
170:16
**device** 42:4
70:12
**differences** 94:2
**different** 39:23
65:22, 74:3
76:11, 76:17
77:2, 77:3
105:25, 107:7
116:10, 121:25
133:22, 152:18
167:3, 175:9
185:15, 185:21
186:21, 198:2
**differential**

116:15, 116:15
**difficult** 76:10
164:23, 164:24
165:16, 166:2
167:15, 169:15
170:4, 171:5
**difficulty**
116:13
**diffraction**
116:21, 117:8
117:15, 118:5
118:16, 118:18
118:21, 119:8
119:13, 129:1
138:1, 145:15
163:23, 196:12
196:20, 197:1
197:12, 197:15
197:16, 197:19
198:22, 198:25
**digest** 164:14
**digital** 48:25
49:8, 50:1, 50:4
**dimensions**
128:24
**direct** 4:4, 5:15
30:17, 55:18
106:23
**directly** 25:13
29:8, 46:11
51:6, 52:22
53:5, 55:12
56:21, 57:2
**director** 6:16
12:2, 43:15
52:11, 55:5
58:9, 67:17
67:24, 68:8
177:3, 177:16
**disagree** 45:5
60:22, 85:12
134:19
**disclosure** 37:11
186:8
**discourage**
140:4

**discuss** 9:14
25:12, 36:17
124:24, 127:3
131:19, 132:23
149:6, 169:4
169:25, 184:3
194:4
**discussed** 10:4
12:10, 15:18
17:25, 54:1
58:25, 67:6
103:21, 104:8
116:6, 116:25
123:7, 124:3
127:14, 128:10
129:5, 131:11
131:13, 143:24
163:7, 183:17
195:5
**discusses** 185:3
**discussing** 118:3
190:8
**discussion** 55:3
59:1, 74:5
81:21, 116:8
124:14, 134:3
136:4, 160:5
170:16, 171:4
188:17, 191:1
**discussions** 9:4
9:8, 115:8
123:2, 165:2
165:4, 169:3
188:4, 188:21
193:9
**disease** 83:2
128:5, 191:21
**dispersion**
163:24
**display** 13:15
**disprove** 199:14
**dispute** 37:14
188:25
**distinguish** 73:5
74:2
**distinguishable**

72:22
**disturbing**
165:11, 165:22
165:25, 166:13
**division** 1:1
6:17, 11:7, 36:3
43:16, 52:12
55:5, 70:22
70:23, 177:3
**doctor** 5:19
5:21, 6:2, 6:6
53:11
**doctors** 55:16
184:16
**document** 17:23
23:19, 23:21
23:25, 25:21
26:2, 38:4, 38:5
38:6, 38:9
50:25, 51:4
52:8, 52:9
61:25, 62:7
64:22, 65:10
70:4, 70:5, 70:6
75:3, 76:1, 76:5
81:19, 81:23
85:23, 86:12
86:18, 91:4
107:13, 108:4
111:19, 113:25
114:16, 115:23
117:21, 120:25
121:2, 122:23
124:4, 125:8
130:3, 131:10
132:1, 132:4
136:9, 136:16
137:17, 140:18
141:11, 142:2
143:6, 148:15
152:14, 155:8
155:10, 158:5
159:4, 159:6
159:7, 159:19
166:6, 167:1
169:5, 169:18

170:3, 171:9
173:22, 176:4
176:22, 176:23
177:19, 188:25
190:23
**documentation**
192:6
**documented**
105:9
**documents** 4:15
4:16, 4:17, 4:22
7:14, 8:1, 8:3
8:6, 8:10, 8:12
8:14, 8:20, 9:19
10:2, 10:5
17:19, 27:18
35:8, 35:11
39:12, 39:15
39:22, 44:10
44:10, 44:13
44:21, 44:23
48:24, 49:3
50:1, 50:3, 50:6
50:22, 52:2
52:4, 57:19
71:18, 71:19
77:16, 105:19
105:24, 110:4
110:12, 114:10
114:12, 116:25
124:23, 124:24
149:2, 151:17
151:21, 152:7
152:14, 155:13
157:17, 157:21
159:5, 165:13
167:14, 169:2
169:14, 182:10
184:1, 184:25
185:13, 186:22
191:7
**doing** 28:2
35:15, 38:3
54:21, 129:16
146:13, 147:16
156:7

**dominant** 162:1
**Don** 12:2, 12:2
194:13
**Donna** 132:6
**door** 45:1, 45:15
**doubt** 164:22
**DPA** 27:7
116:15
**Dr** 5:17, 10:13
23:20, 23:21
24:3, 25:11
35:23, 36:3
36:4, 36:9
36:16, 38:15
38:20, 41:24
43:14, 43:19
54:19, 73:15
89:25, 95:2
106:25, 112:20
116:3, 116:6
116:7, 117:7
117:21, 127:2
127:4, 127:10
127:14, 127:25
128:1, 128:10
128:15, 129:13
130:22, 131:9
131:11, 131:19
133:24, 136:3
136:6, 136:15
137:2, 145:10
145:12, 146:2
146:4, 146:7
146:16, 146:23
147:23, 148:17
148:25, 149:11
152:6, 156:8
156:15, 156:25
163:15, 165:2
167:21, 172:23
173:2, 175:21
177:2, 177:6
178:3, 187:25
189:13, 190:6
199:14
**drafted** 149:23

drafting 148:3
drawbacks 118:23
DRINKER 1:14
Drug 7:7, 22:18 38:13
drugs 18:11 166:16
due 26:16, 26:22 31:13, 79:25 152:5
dug 163:1
duly 200:7
Durelay 52:14
Dynamic 3:13 5:6

**E**

e-mail 62:12
earlier 135:25 194:8
early 67:20 68:2, 68:22 68:25, 71:19 87:13, 88:3 131:24, 172:25 196:24
earn 13:21
easier 182:25
easily 190:22
East 1:14, 1:22
easy 120:25 151:19, 191:18
Ebay 102:11 102:18
economic 118:10
effect 13:3 67:12, 88:24 95:14, 104:3 124:23
effective 163:23
effects 67:18 67:25, 68:3 68:9, 69:1

efficient 174:12
Eiermann 43:14 43:19, 44:7 44:10, 187:25
Eiermann's 45:13
eight 74:13 74:24, 78:5
either 9:11 37:17, 91:1 91:11
electron 116:14 116:14, 118:18 118:19, 123:6 129:3, 129:21 131:4, 133:1
electronic 177:7
eliminate 70:25 128:22
ELIZABETH 2:15
email 46:13
emerging 130:16
employed 163:25
employee 35:23 61:11, 200:16 200:19
employees 194:2
enclosing 173:12, 189:7
England 146:5 146:9, 147:11
enrichment 27:6
entire 121:2 134:10, 184:21
entirely 47:1
entirety 113:13
entities 140:21
entitled 38:8 84:19, 127:17 159:7, 176:20
entity 20:9

entry 24:12
environment 102:19, 133:17 134:23, 135:5
environmental 107:23, 134:1 138:25, 179:12
EPA 139:1 189:25
epidemiologic 63:25
equipment 119:5, 123:18 123:19
Erik 3:13, 5:5
Ernie 194:20 194:21, 195:8 195:9, 195:18
escalate 52:25 53:9, 53:25 54:20, 56:5 56:10
escalated 54:4 54:23, 55:6 57:5, 57:6
escalating 56:12
escalations 55:2
especially 169:21
ESQ 2:5, 2:5 2:10, 2:15, 2:20 2:20, 3:5
essential 144:22
essentially 19:24, 193:23
established 20:1
et 1:3, 1:3, 1:4 1:4, 1:5, 1:5, 1:6 1:6, 1:7, 1:7 186:8
events 106:5 181:21, 181:24
everybody 169:22
evidence 3:13 5:6, 9:1, 20:25

21:16, 21:23 22:4, 29:17 31:14, 32:14 79:17, 80:2 88:14, 88:21 89:2, 89:4 90:25, 91:10 91:16, 91:20 96:10, 96:18 101:5, 108:17 110:4, 138:13 181:25, 185:17 186:15, 192:14 196:16
evolution 8:11
evolve 125:14
evolved 7:21 143:17
exact 27:13 28:7, 28:19 34:18, 54:22 57:18, 61:13 76:15, 77:2 90:13, 157:17 176:12
exactly 20:8 20:10, 23:9 25:21, 28:9 33:21, 35:13 63:13, 93:5 93:23, 95:4 96:4, 96:16 130:18, 185:1
examination 1:11, 5:15 129:3, 129:20 143:19, 200:6
examine 143:1 143:14
examined 177:6 185:14
example 110:10
Excellence 42:1
excellent 152:15 152:19
exchanges 52:5

172:18
exclude 81:9 168:20
exclusive 36:22
excuse 88:12 153:12
execute 164:25 165:18, 166:3 167:15, 169:16 171:6
executive 43:20 43:25, 45:10 187:17, 187:19 187:23
executives 42:8 42:13, 42:20 43:2, 44:17 45:2, 64:6 194:4, 194:6
exhaustively 92:10, 92:24
exhibit 32:23 33:1, 33:4, 99:2 107:18, 132:5 137:18, 185:2 188:8
exist 114:18
existing 163:22
expect 44:20
expected 21:4
expense 119:4
experience 23:14, 116:10 144:19, 169:20
expert 6:25 75:14, 77:18 78:15, 78:19 78:24, 79:5 79:11, 79:13 81:21, 112:13 135:11, 142:12 161:8, 170:18 189:8
expertise 23:17 59:25, 119:4
experts 36:20

| | | | | |
|---|---|---|---|---|
| 77:17, 102:16 | 188:24, 190:21 | 28:11, 28:19 | 60:11, 61:5 | 107:8, 108:10 |
| 110:8, 114:23 | 192:16, 195:2 | 28:24, 29:12 | 61:17, 62:3 | 108:18, 108:20 |
| 139:18, 140:8 | 195:3, 195:7 | 29:18, 30:21 | 62:17, 62:19 | 108:23, 109:1 |
| 159:13, 166:22 | 201:9 | 30:24, 30:25 | 63:3, 63:8 | 109:3, 109:5 |
| 167:6, 170:7 | **facts** 44:21 | 31:8, 31:9 | 63:14, 64:3 | 109:12, 109:16 |
| 170:10, 170:12 | 101:9, 193:4 | 31:15, 31:20 | 64:7, 64:11 | 109:25, 110:6 |
| 170:13, 171:6 | 193:5 | 31:23, 32:4 | 65:1, 65:5 | 110:15, 110:24 |
| 171:23 | **factual** 86:7 | 32:7, 32:15 | 66:23, 67:7 | 111:2, 111:3 |
| **explained** | **failed** 120:21 | 33:24, 34:6 | 70:21, 70:22 | 111:8, 111:19 |
| 112:16 | **fair** 16:15, 26:5 | 34:9, 34:10 | 71:25, 72:11 | 112:3, 112:4 |
| **explanation** | 51:7, 113:21 | 34:13, 34:22 | 72:15, 73:23 | 112:7, 112:14 |
| 73:13 | 164:8, 172:14 | 35:4, 35:14 | 74:1, 74:7 | 112:24, 113:3 |
| **explicitly** | 175:1, 175:24 | 36:4, 36:16 | 75:14, 75:19 | 113:11, 113:14 |
| 169:24 | 198:14, 199:1 | 36:18, 36:22 | 79:2, 79:8 | 113:16, 113:18 |
| **explore** 139:24 | **fairness** 26:7 | 37:1, 37:10 | 79:15, 79:18 | 114:2, 114:20 |
| **exposed** 83:9 | **fall** 187:1 | 37:12, 37:16 | 79:22, 80:3 | 114:25, 115:4 |
| **exposure** 80:21 | 197:23 | 37:23, 38:25 | 80:8, 86:25 | 115:12, 115:19 |
| 83:3, 84:15 | **familiar** 23:8 | 39:10, 40:1 | 87:12, 88:2 | 116:19, 117:6 |
| 84:15, 85:10 | 70:4, 91:3 | 40:4, 40:6, 41:1 | 88:12, 88:16 | 119:15, 123:10 |
| 85:10, 107:9 | 107:13, 127:23 | 41:6, 41:7, 41:8 | 88:20, 89:10 | 123:11, 123:24 |
| 107:12 | 177:11 | 41:13, 41:22 | 89:14, 89:20 | 124:10, 124:19 |
| **express** 187:7 | **far** 20:2, 40:6 | 42:9, 42:15 | 90:1, 90:10 | 126:12, 130:24 |
| **expressed** 67:17 | 40:19, 40:25 | 42:17, 42:19 | 90:14, 90:18 | 130:25, 131:2 |
| 127:11 | 67:16, 67:23 | 42:22, 43:2 | 90:24, 91:7 | 131:17, 131:21 |
| **extensive** 9:23 | 68:7, 106:12 | 43:8, 44:1, 44:5 | 91:9, 91:19 | 131:22, 132:18 |
| 17:25, 90:14 | **fault** 111:7 | 44:25, 45:10 | 92:2, 92:8 | 134:20, 138:10 |
| 182:8, 186:25 | **Fax** 1:24 | 45:14, 45:19 | 92:18, 93:15 | 138:19, 139:2 |
| **extensively** | **FDA** 6:19, 7:10 | 45:20, 46:3 | 93:17, 93:24 | 139:10, 140:4 |
| 124:3 | 7:15, 7:24, 8:5 | 46:8, 46:17 | 93:25, 94:12 | 140:22, 149:6 |
| **external** 181:17 | 8:5, 9:4, 9:11 | 47:2, 47:10 | 94:23, 94:25 | 151:22, 157:8 |
| **extremely** 55:2 | 9:14, 9:24, 12:5 | 47:12, 47:14 | 95:3, 95:9 | 158:19, 159:3 |
| 81:9, 152:10 | 12:8, 12:15 | 47:19, 48:2 | 95:16, 95:20 | 159:14, 162:12 |
| 164:24 | 12:22, 12:25 | 48:4, 48:11 | 96:5, 96:9 | 163:4, 165:5 |
| | 13:2, 16:24 | 48:19, 49:1 | 96:15, 96:19 | 165:11, 165:22 |
| **F** | 17:5, 17:9 | 49:2, 49:9 | 97:6, 97:9 | 166:14, 169:20 |
| | 17:14, 17:18 | 49:23, 50:5 | 97:16, 98:4 | 169:25, 172:14 |
| **face** 99:23 | 17:20, 18:2 | 50:13, 50:22 | 98:11, 98:23 | 172:18, 172:25 |
| **facilitate** 128:24 | 18:3, 18:10 | 51:5, 51:14 | 99:3, 99:14 | 173:12, 174:20 |
| **fact** 12:8, 17:19 | 18:15, 18:20 | 52:6, 52:12 | 99:19, 99:24 | 174:23, 175:9 |
| 20:24, 40:9 | 18:25, 19:4 | 52:12, 52:22 | 101:10, 103:7 | 175:22, 176:2 |
| 44:17, 46:25 | 23:1, 23:6 | 52:22, 53:5 | 103:18, 103:23 | 176:8, 176:16 |
| 56:17, 59:5 | 23:10, 23:14 | 53:6, 53:16 | 103:24, 104:7 | 176:24, 177:3 |
| 66:13, 66:17 | 23:14, 25:13 | 53:19, 54:1 | 104:22, 104:23 | 177:16, 177:22 |
| 81:1, 85:4 | 25:19, 26:15 | 55:10, 55:12 | 105:3, 105:8 | 178:10, 178:14 |
| 126:22, 128:10 | 27:10, 27:19 | 56:6, 56:9, 59:3 | 105:18, 105:21 | 178:20, 179:22 |
| 142:4, 170:13 | 27:25, 28:2 | 59:16, 60:1 | 106:9, 107:2 | 179:22, 183:6 |

183:9, 183:16
183:21, 183:22
183:23, 184:2
184:10, 184:20
184:21, 185:3
185:10, 185:17
185:22, 186:15
187:2, 187:4
187:8, 187:10
187:17, 187:20
188:3, 188:5
188:7, 188:10
188:18, 188:19
188:22, 188:24
189:7, 190:7
195:21, 196:9
197:9, 198:13
201:7, 201:14
201:15, 201:16
201:17, 201:19
202:19
**FDA's** 18:8
23:4, 23:17
71:11
**febrile** 191:22
**February** 1:14
5:6, 140:14
141:10, 168:11
**federal** 22:18
69:7, 69:15
**Federation**
148:3
**fee** 13:21
**feel** 19:5
**feels** 56:2
**felt** 167:25
**FERNANDEZ**
3:3
**fiber** 69:7, 69:15
70:15, 70:15
71:4, 71:13
128:23, 162:1
179:3
**fibers** 22:11
22:16, 71:7
72:21, 82:7

82:13, 82:18
85:3, 116:9
118:17, 143:2
163:19, 163:25
178:2, 178:5
178:20, 178:22
**fibrous** 70:25
71:3, 90:3
128:16, 128:17
128:19, 129:4
129:22
**field** 77:17
**fields** 178:4
**fifteen** 98:2
108:5, 109:2
**figure** 16:8
61:17, 73:4
117:18
**figuring** 115:20
**file** 46:25, 47:7
47:12, 47:17
47:20, 47:21
47:23, 47:25
48:4, 48:7, 48:8
48:11, 48:19
48:23, 49:9
49:24, 50:8
50:13, 50:23
51:5, 51:14
114:15, 184:21
**files** 48:24, 50:2
50:4, 102:22
185:8, 185:11
186:6, 186:7
186:20
**final** 173:13
**financially**
200:20
**find** 26:5, 100:3
107:5, 114:9
114:11, 115:13
119:10, 119:19
120:21, 122:9
122:13, 122:20
125:25, 126:7
126:16, 129:12

133:18, 135:5
144:1, 146:13
146:16, 147:15
147:16, 156:8
156:16, 158:5
158:10, 182:3
182:21, 182:24
183:1, 196:20
197:1, 197:20
197:22, 199:1
199:5, 199:11
**finding** 118:9
152:18, 174:6
175:18
**findings** 90:6
175:12, 175:18
188:25
**fine** 16:11
159:22, 160:9
198:20, 199:21
**finish** 39:19
123:21
**finished** 13:5
81:10, 104:11
136:17
**fires** 38:4, 39:5
**first** 24:6, 25:1
26:19, 32:24
45:20, 46:19
117:15, 119:8
126:18, 129:9
141:23, 144:7
146:22, 148:24
149:2, 149:4
150:7, 150:13
156:15
**five** 74:13, 74:24
78:5, 146:19
181:13, 186:21
**flashy** 193:4
**flawed** 199:16
**flaws** 114:21
**flip** 24:8
**floatation** 27:6
81:20
**floor** 2:8, 2:13

**Florham** 2:14
**focus** 25:22
94:4, 142:21
172:16
**focusing** 25:24
94:7, 95:19
177:21
**folder** 33:1
**folders** 50:2
**FOLEY** 1:3
**follow** 65:21
90:9, 94:1
147:20, 164:17
**followed** 13:3
148:5
**following** 13:14
111:14, 112:8
**food** 7:7, 18:11
22:18, 33:8
38:13, 70:22
166:16
**Foods** 58:9
**foregoing**
200:11
**foreign** 130:16
**forenoon** 1:15
**form** 15:22
16:4, 48:25
50:1, 50:8
74:11, 127:12
127:12, 155:15
162:1, 183:2
**formations**
77:14, 191:22
**former** 41:20
41:22, 42:8
42:13, 42:20
43:1, 43:19
43:24, 45:10
61:10, 187:16
187:19
**formidable**
38:25
**forming** 20:7
70:15
**forth** 7:15, 8:4

12:11, 104:15
105:17, 194:24
200:14
**forthright** 30:12
86:20, 153:8
156:3
**forward** 111:8
128:1
**fought** 165:4
165:8
**found** 22:16
38:16, 70:16
72:16, 80:12
80:21, 83:8
90:4, 90:5
100:1, 100:8
101:13, 101:19
102:12, 107:7
113:4, 114:19
122:4, 128:6
138:17, 138:21
141:12, 141:25
146:24, 148:8
149:1, 149:12
150:2, 150:8
150:14, 156:25
158:12, 158:21
158:24, 161:23
162:13, 171:25
172:11, 173:3
173:5, 173:16
173:22, 174:8
174:16, 174:17
175:14, 176:2
179:4, 179:23
180:2, 180:21
181:1, 181:7
181:20, 181:24
182:16, 183:4
183:12, 189:2
196:16
**four** 11:10
65:22, 186:21
**FRACE** 1:3
**fractions** 160:24
**fragments** 71:4

**fragrance** 123:13, 127:19
**framework** 191:6, 193:6
**Fred** 148:6
**free** 58:17
59:12, 90:22
92:12, 92:20
92:25, 94:16
94:25, 95:10
108:9, 109:2
109:20, 110:13
111:21, 112:6
133:3, 133:11
134:15, 135:16
**Freedom** 34:17
36:13, 43:9
**front** 7:3, 29:17
30:20, 89:17
105:11, 105:15
121:11, 140:13
149:16, 163:3
163:10, 167:16
178:3, 195:23
**full** 90:6, 103:8
103:14, 103:20
148:22
**fully** 103:7
**funded** 20:12
**funding** 20:15
**further** 13:10
58:14, 62:24
90:24, 178:14
200:10, 200:15
**future** 21:4

**G**

**games** 191:12
192:2
**garnet** 158:15
**GATMAITAN** 1:4
**GEIER** 2:5
**general** 8:8
18:1, 40:20

41:2, 46:1, 85:5
88:7, 142:14
**generally** 34:15
74:22, 78:2
105:15, 118:15
**generated** 188:2
**geographic** 76:18
**geologic** 77:14
191:19
**geologist** 135:11
**geologists** 77:19
**geology** 6:23
**George** 119:25
166:13
**getting** 65:16
167:5, 171:8
**give** 17:11
30:18, 45:21
46:4, 47:2, 60:4
60:15, 63:15
98:1, 99:6
120:24, 135:15
154:8, 189:6
**given** 12:12
24:2, 36:25
37:12, 81:24
103:8, 112:18
112:24, 163:4
185:1, 188:17
**gives** 117:2
**giving** 43:7
96:13, 106:3
174:3
**glance** 158:8
**Global** 11:6
**go** 26:21, 32:19
32:20, 32:21
32:22, 33:20
52:22, 53:5
53:19, 56:21
66:17, 70:20
72:14, 75:2
75:9, 75:12
76:3, 85:1, 91:5
93:4, 94:14

95:4, 97:4, 99:8
101:4, 105:12
114:14, 116:1
121:10, 121:11
130:5, 130:13
131:3, 141:9
142:24, 143:5
144:15, 146:5
150:21, 153:13
153:15, 157:16
157:20, 158:5
159:17, 160:15
162:19, 175:23
177:1, 182:11
184:25, 191:12
198:6
**goes** 36:15
36:24, 104:10
128:21, 143:12
150:1, 168:16
175:21, 178:9
180:16
**going** 8:3, 9:20
10:2, 10:8, 16:8
24:12, 38:7
39:19, 54:9
58:16, 60:2
63:22, 72:9
74:21, 81:1
81:4, 93:11
93:14, 95:18
96:7, 103:18
105:25, 106:16
117:25, 124:4
125:14, 129:17
134:19, 136:11
136:23, 137:12
145:3, 146:5
153:3, 153:4
153:13, 153:13
155:24, 164:12
165:21, 168:10
171:13, 177:20
180:8, 180:11
184:5, 189:5
191:25, 193:1

193:6, 195:20
196:20, 197:1
199:14, 199:15
**good** 5:17, 5:18
5:18, 106:13
122:19, 123:3
170:2, 171:10
192:21
**Google** 66:5
66:6
**Gordon** 196:1
196:5, 196:11
**Goudie** 146:2
**government** 26:17, 41:9
41:14, 41:20
41:20, 86:21
87:6
**GRABOWSKI** 1:4
**grade** 75:15
**graduate** 5:22
**grain** 159:22
160:6, 160:7
**gram** 160:17
**gratuitous** 73:18
**Great** 126:23
127:5, 130:1
130:22, 131:1
131:14, 148:19
149:1
**greater** 40:6
40:10, 40:19
40:23, 40:25
115:5
**GREENE** 1:5
**GRIFFIN** 1:5
**grinding** 72:23
**ground** 71:12
72:2, 72:20
**grounded** 141:1
**grounds** 21:2
22:4
**group** 8:6, 9:13
11:18, 35:24

36:5, 42:4
61:17, 116:3
127:19, 129:8
132:16, 139:25
148:1, 176:11
193:24, 201:20
**Grove** 3:4
**guards** 194:2
194:10
**guy** 44:15

**H**

**hair** 23:23
25:17
**Hammondsville** 76:15, 76:23
77:7, 77:11
77:23
**hand** 66:20
87:4
**handles** 178:10
**hands** 50:10
**happen** 58:24
**happened** 46:5
46:20, 46:22
49:9, 60:16
63:16
**happy** 30:23
30:25, 35:8
35:10, 36:17
95:5, 95:16
97:17, 104:1
155:21, 169:4
170:1
**harass** 156:7
**hard** 57:20
65:25, 99:5
164:23, 165:16
**harm** 21:17
21:24, 22:6
**harmful** 73:7
**Harvard** 107:24
**haystack** 143:17
144:2
**hazard** 14:8

19:15, 21:2
25:8, 80:13
80:22, 81:14
129:19
**hazards** 67:5
128:17, 128:22
**head** 11:6, 23:7
38:14
**headed** 10:25
**heads** 45:21
46:5, 47:2, 47:6
**health** 14:8
19:15, 25:8
55:17, 67:25
68:2, 68:9, 69:1
80:13, 80:22
81:14, 107:23
**hear** 15:6, 66:2
152:1
**heard** 40:3, 48:8
**hearing** 166:21
**heavy** 160:23
163:19
**held** 37:1, 89:19
**help** 59:18
62:20, 65:19
75:12, 155:13
179:16, 194:18
195:14
**helpful** 19:6
36:18, 103:22
179:14, 180:13
**HENDERSON**
2:8
**hereinbefore**
200:14
**hey** 44:14
**Hi** 61:3
**Hicks** 12:2, 12:2
26:12, 194:13
**hide** 105:7
**higher** 54:3
134:1
**highlight** 64:24
**hip** 151:24
**hire** 195:13

**hired** 108:23
110:8, 114:23
171:23, 176:2
176:8, 176:9
176:11, 190:7
**historical** 12:13
20:4, 38:8
102:22
**historically** 7:19
12:20, 17:14
**history** 14:14
14:24, 45:16
106:1
**HODJERA** 1:6
**hold** 99:11
100:3
**honest** 30:12
86:20, 96:2
153:8, 156:2
**Hopefully**
172:21
**Hopkins** 12:2
12:4, 23:20
23:21, 24:3
25:12, 77:17
127:2, 127:4
127:10, 127:15
127:17, 128:11
128:16, 129:13
130:22, 131:9
131:11, 131:19
133:24, 136:3
136:7, 136:15
137:2, 201:22
**Hospital** 6:9
**hour** 164:3
**hours** 164:5
**human** 22:12
74:16, 78:12
82:7, 82:13
82:18
**humans** 129:19
**Huncharek**
63:25
**hurt** 40:11
40:15

**hypothesis**
85:20

**I**

**idea** 50:16
91:10, 152:25
**identifiable** 71:6
84:15, 85:10
85:19
**Identification**
166:17
**identified** 132:5
**identify** 105:12
186:10
**identifying**
144:20
**ignore** 73:15
73:16, 73:20
135:19, 180:9
**Imerys** 1:4, 1:7
2:10, 61:25
62:7, 62:13
63:12, 64:22
132:12
**immediately**
121:19, 147:7
**impact** 57:6
**imperative**
75:17
**implicated**
83:17, 83:23
83:25
**implies** 68:17
88:4
**imply** 192:11
**implying** 45:17
63:21, 125:17
**import** 53:2
53:9
**importance**
57:6, 107:11
**important** 19:5
45:8, 45:11
133:23, 152:3
160:4, 181:6

**impurities**
128:6, 143:18
158:15
**impurity** 143:12
143:15
**Incidents** 128:5
**include** 19:16
36:19, 65:2
66:24, 106:8
162:14
**included** 33:10
49:2, 99:3
104:7, 105:19
111:5, 112:15
112:23, 113:5
167:25, 189:10
189:13, 189:16
**includes** 98:16
110:14
**including** 28:5
77:17, 108:8
115:14, 120:21
126:21, 194:2
**incorrect** 56:17
56:19, 57:12
59:10, 59:13
63:23, 68:19
71:23, 72:7
74:1, 75:4
102:13, 153:7
**increased**
130:10, 130:14
133:22
**increases** 126:3
**increasing**
116:12
**increasingly**
143:14
**independent**
97:1, 97:2, 97:8
97:13, 108:11
**indicate** 17:20
29:18, 105:25
**indicated** 62:17
185:6
**indicating** 84:5

127:5
**indistinguishable**
71:14
**individual**
116:24
**individuals** 7:18
9:13, 10:21
40:16, 57:3
102:10, 104:7
151:19, 165:18
184:4, 191:18
194:1, 194:8
194:12
**industrial** 75:6
76:9, 76:13
76:19, 76:21
77:6, 77:21
138:17, 179:3
**industry** 8:6
8:8, 18:15
18:16, 20:11
20:15, 22:7
41:15, 42:18
62:20, 65:15
108:12, 124:8
124:20, 125:8
125:21, 129:8
140:1, 184:9
**inform** 58:16
**information** 7:7
10:17, 14:16
15:1, 15:10
16:24, 17:6
17:11, 19:1
19:4, 21:1
30:18, 33:24
34:8, 34:14
34:17, 34:18
34:21, 35:3
36:6, 36:13
36:18, 37:11
37:15, 43:8
43:9, 57:21
59:13, 65:11
79:6, 79:14
79:21, 85:15

85:17, 85:22
85:23, 86:11
86:12, 86:25
88:17, 90:4
106:9, 111:9
111:13, 113:2
113:10, 113:17
114:1, 158:17
171:2, 179:20
180:16, 180:18
185:7, 186:5
186:20, 188:3
**informed** 36:4
52:12, 61:15
168:23
**ingredient** 13:4
13:11, 14:13
14:24, 19:19
19:23, 20:20
**ingredients** 14:1
19:25, 20:12
20:18
**inhalation** 78:15
78:19, 78:24
79:11, 80:7
128:17
**inhaled** 78:12
78:16, 79:9
79:18, 80:4
**inhaling** 79:2
**initiated** 58:20
**injurious** 16:20
**injury** 18:21
**input** 188:4
**inside** 67:6
166:9, 193:9
193:15, 193:20
**inspect** 75:20
104:23
**inspection** 104:21
**instance** 98:5
98:12, 98:17
98:19
**instances** 181:10, 181:16

**Institute** 143:7
**instructing** 156:6
**instrumentation** 26:23, 27:3
**instruments** 116:11
**insult** 153:20
154:20
**insulted** 153:22
153:23
**insulting** 73:15
154:7, 154:13
154:14
**integrity** 88:9
**Intended** 119:10
**intense** 165:17
169:15
**intentionally** 87:6
**interact** 55:10
**interacted** 7:17
**interaction** 6:18
54:4
**interactions** 41:7, 56:9
**interest** 166:23
167:9, 168:1
**interested** 200:20
**internally** 38:2
80:11, 80:19
84:11, 110:21
122:18, 123:1
125:23, 126:5
126:14, 128:11
130:25, 163:8
163:18, 164:17
165:19
**internet** 66:4
**interpret** 128:23
**interstate** 14:1
**interviewed** 7:17, 9:18, 10:6
**intimate** 39:10
39:25, 40:3

60:18
**introduction** 143:5
**investigate** 177:15
**investigation** 179:20
**investigations** 26:18
**involve** 148:4
**involved** 7:19
7:23, 9:3, 9:8
28:11, 44:1
59:23, 148:18
194:23
**involvement** 12:15
**involving** 183:24
**isolated** 85:5
**issue** 6:19, 12:9
17:21, 24:4
38:14, 42:22
43:2, 44:1, 46:2
46:9, 51:6, 53:1
53:20, 54:1
54:3, 54:20
56:16, 57:4
57:10, 66:13
69:24, 87:3
87:16, 88:13
88:18, 102:25
103:21, 111:11
113:3, 127:3
138:25, 157:9
169:22, 183:17
190:6
**issued** 173:7
**issues** 39:11
40:1, 40:12
40:20, 41:1
45:2, 45:19
54:4, 54:23
56:12, 68:3
**Italian** 37:17
95:3, 146:14

147:16, 148:7
175:15

**J**

**J&J** 4:15, 4:16
4:17, 201:3
201:5, 201:6
201:8, 201:9
201:12, 201:13
201:14, 201:15
201:16, 201:17
201:18, 201:19
201:21, 201:24
202:4, 202:5
202:7, 202:9
202:10, 202:11
202:13, 202:14
202:15, 202:16
202:19
**J&J-148** 201:21
**J&J-216** 201:10
**J&J-263** 202:3
**J&J-265** 202:17
**J&J-266** 201:24
**J&J-29** 202:13
**J&J-347** 202:12
**J&J-35** 202:18
**J&J-352** 202:7
**J&J-353** 202:11
**J&J-357** 201:22
**J&J-361** 201:23
**J&J-364** 201:7
**J&J-369** 202:10
**J&J-38** 202:16
**J&J-40** 202:14
**J&J-44** 201:6
**J&J-45** 202:4
**J&J-457** 201:19
**J&J-46** 202:5
**J&J-461** 202:19
**J&J-464** 201:8
**J&J-467** 201:12
**J&J-471** 202:9
**J&J-474** 201:13
**J&J-475** 201:15

**J&J-476** 201:4
**J&J-483** 201:14
**J&J-489** 201:20
**J&J-491** 201:3
**J&J-492** 201:17
**J&J-497** 201:5
**J&J-498** 201:18
**J&J-50** 202:15
**J&J-58** 202:6
**J&J-60** 201:16
**J&J-69** 201:9
**J's** 66:5
**J41** 66:3, 66:7
72:6, 111:14
112:8, 117:13
118:2, 119:7
119:23, 120:20
121:16, 123:3
123:11, 123:14
125:4, 125:7
126:7, 126:15
129:9, 130:7
130:10, 131:5
131:23, 133:13
137:5, 147:5
191:5
**J44** 69:19
**JAMES** 2:20
**January** 48:10
50:24, 177:18
**Jersey** 1:1, 1:13
1:14, 1:23, 2:4
2:14, 3:4, 200:5
200:24
**job** 11:5, 11:17
45:14, 45:14
61:12, 195:11
**John** 12:1, 12:4
23:5, 23:10
23:13, 26:17
52:10, 52:16
77:17, 127:17
201:22
**Johnson** 2:21
2:21, 6:12, 6:12
7:5, 7:5, 7:8, 7:8

| | | | | |
|---|---|---|---|---|
| 7:22, 7:23, 8:4 | 37:22, 37:25 | 55:13, 56:2 | 79:15, 79:16 | 93:24, 94:4 |
| 8:4, 8:5, 8:5 | 37:25, 38:2 | 56:2, 56:20 | 79:17, 79:23 | 94:4, 94:11 |
| 8:24, 8:24, 9:13 | 38:2, 38:17 | 57:2, 57:2, 57:8 | 79:23, 80:3 | 94:12, 94:22 |
| 9:13, 12:19 | 38:17, 38:18 | 57:8, 58:15 | 80:3, 80:8, 80:9 | 94:22, 95:8 |
| 12:20, 12:23 | 38:18, 38:22 | 58:16, 59:5 | 80:11, 80:11 | 95:8, 96:7, 96:8 |
| 12:23, 13:4 | 38:22, 39:1 | 59:5, 59:11 | 80:19, 80:20 | 98:6, 98:7 |
| 13:4, 13:10 | 39:1, 39:5, 39:5 | 59:18, 59:18 | 80:25, 80:25 | 98:13, 98:13 |
| 13:10, 13:23 | 39:9, 39:9 | 59:22, 59:23 | 82:5, 82:5 | 98:25, 98:25 |
| 13:23, 14:12 | 39:25, 39:25 | 60:4, 60:4 | 82:11, 82:12 | 99:4, 99:4, 99:9 |
| 14:12, 16:17 | 40:5, 40:5, 40:9 | 60:13, 60:13 | 82:19, 82:19 | 99:9, 99:19 |
| 16:17, 16:23 | 40:9, 40:11 | 61:10, 61:10 | 82:25, 82:25 | 99:20, 99:25 |
| 16:23, 16:25 | 40:12, 40:15 | 61:14, 61:14 | 83:1, 83:1, 83:6 | 99:25, 100:5 |
| 16:25, 17:4 | 40:15, 40:19 | 62:2, 62:2, 62:9 | 83:7, 84:11 | 100:5, 100:12 |
| 17:4, 17:7, 17:7 | 40:19, 40:25 | 62:9, 62:15 | 84:11, 84:23 | 100:12, 100:17 |
| 17:13, 17:13 | 40:25, 41:9 | 62:15, 63:3 | 84:23, 85:16 | 100:19, 100:20 |
| 18:5, 18:5, 18:9 | 41:10, 41:21 | 63:3, 63:14 | 85:16, 85:18 | 100:24, 100:24 |
| 18:9, 18:14 | 41:22, 42:9 | 63:15, 64:5 | 85:18, 85:22 | 101:5, 101:23 |
| 18:14, 18:19 | 42:9, 42:13 | 64:6, 64:10 | 85:22, 85:23 | 101:25, 102:1 |
| 18:19, 18:20 | 42:14, 42:17 | 64:10, 65:12 | 85:24, 86:8 | 102:3, 102:3 |
| 18:21, 19:7 | 42:17, 42:21 | 65:12, 65:16 | 86:9, 86:12 | 102:22, 105:17 |
| 19:7, 19:14 | 42:21, 43:3 | 65:17, 65:18 | 86:12, 86:13 | 105:18, 106:10 |
| 19:14, 21:14 | 43:7, 43:7 | 65:18, 65:24 | 86:13, 86:17 | 106:10, 107:15 |
| 21:14, 21:21 | 43:20, 43:20 | 65:25, 67:6 | 86:18, 86:19 | 107:15, 108:1 |
| 21:21, 22:3 | 43:24, 43:24 | 67:6, 67:11 | 86:19, 87:11 | 108:2, 108:8 |
| 22:3, 22:10 | 44:5, 44:5 | 67:11, 67:17 | 87:11, 87:18 | 108:8, 108:13 |
| 22:10, 22:15 | 44:14, 44:14 | 67:17, 67:24 | 87:18, 87:18 | 108:14, 108:18 |
| 22:15, 22:25 | 45:1, 45:1 | 67:24, 68:7 | 87:19, 87:22 | 109:6, 109:6 |
| 25:19, 25:19 | 45:14, 45:15 | 68:24, 69:5 | 87:22, 88:1 | 109:13, 109:13 |
| 26:3, 26:3, 26:8 | 45:21, 45:21 | 69:20, 69:20 | 88:1, 88:5, 88:5 | 109:16, 109:17 |
| 26:8, 26:10 | 46:2, 46:3, 46:4 | 69:23, 69:24 | 88:8, 88:8 | 109:17, 109:18 |
| 26:11, 29:5 | 46:4, 46:7, 46:7 | 71:15, 71:15 | 88:11, 88:12 | 109:21, 109:21 |
| 29:5, 31:2, 31:2 | 46:13, 46:14 | 72:24, 72:25 | 88:13, 88:13 | 110:1, 110:1 |
| 32:12, 32:12 | 46:25, 47:1 | 74:14, 74:14 | 88:14, 88:15 | 110:7, 110:8 |
| 32:15, 32:15 | 47:16, 47:16 | 74:15, 74:15 | 88:21, 88:22 | 110:11, 110:11 |
| 33:23, 33:24 | 47:18, 47:19 | 74:19, 74:20 | 88:25, 88:25 | 110:16, 110:16 |
| 33:24, 33:25 | 47:23, 47:23 | 76:6, 76:7 | 89:3, 89:4, 89:5 | 110:25, 111:5 |
| 34:3, 34:3, 34:9 | 48:2, 48:2 | 76:14, 76:15 | 89:6, 89:7, 89:8 | 111:6, 112:5 |
| 34:9, 34:23 | 48:10, 48:10 | 76:22, 76:22 | 89:9, 89:9 | 113:4, 113:4 |
| 34:24, 35:2 | 48:17, 48:18 | 77:6, 77:7, 77:8 | 89:13, 89:13 | 113:12, 114:22 |
| 35:2, 35:11 | 48:18, 48:18 | 77:8, 77:22 | 89:20, 89:20 | 114:22, 115:11 |
| 35:11, 35:12 | 49:1, 49:1, 52:5 | 77:22, 78:1 | 90:9, 90:10 | 115:11, 115:12 |
| 35:12, 35:12 | 52:6, 52:20 | 78:2, 78:4, 78:4 | 90:17, 90:17 | 115:13, 115:18 |
| 35:12, 36:9 | 52:20, 53:4 | 78:10, 78:11 | 91:11, 92:2 | 115:19, 115:19 |
| 36:10, 36:16 | 53:4, 53:23 | 78:20, 78:21 | 92:2, 92:18 | 115:19, 116:1 |
| 36:17, 37:6 | 53:23, 55:1 | 79:1, 79:1, 79:7 | 92:18, 93:17 | 116:1, 116:4 |
| 37:6, 37:22 | 55:1, 55:12 | 79:8, 79:14 | 93:17, 93:24 | 116:4, 116:18 |

| | | | | |
|---|---|---|---|---|
| 116:18, 117:5 | 158:18, 158:18 | 182:4, 182:5 | 173:17, 173:23 | 114:25, 115:13 |
| 117:6, 117:14 | 161:15, 161:16 | 182:13, 182:13 | 180:17, 183:3 | 139:15, 149:2 |
| 117:14, 119:17 | 162:13, 162:14 | 182:15, 182:15 | 183:5, 192:19 | 149:4, 149:5 |
| 119:17, 122:18 | 163:6, 163:7 | 183:7, 183:7 | 196:5 | 196:19, 196:25 |
| 122:18, 123:1 | 163:11, 163:11 | 183:12, 183:12 | **Johnston** 35:19 | **Knewitz** 194:20 |
| 123:2, 123:23 | 164:18, 164:18 | 183:20, 183:21 | 35:22, 35:25 | 194:21, 195:10 |
| 123:24, 124:10 | 165:1, 165:1 | 183:25, 183:25 | 36:1, 36:2 | 195:18 |
| 124:10, 124:17 | 165:9, 165:10 | 184:3, 184:3 | 69:20 | **know** 11:9, 12:8 |
| 124:17, 125:12 | 165:12, 165:12 | 184:14, 184:14 | **joint** 70:10 | 12:11, 12:14 |
| 125:3, 125:20 | 165:20, 165:20 | 186:14, 186:14 | **judge** 16:5 | 14:19, 16:7 |
| 125:20, 126:6 | 165:23, 165:23 | 186:17, 186:17 | 151:4, 151:7 | 17:23, 19:19 |
| 126:6, 126:12 | 166:1, 166:1 | 190:13, 190:13 | 151:9, 151:9 | 20:6, 20:11 |
| 126:13, 126:15 | 166:9, 166:9 | 192:12, 192:12 | 153:15, 154:9 | 20:15, 23:5 |
| 126:15, 127:11 | 166:20, 166:20 | 193:9, 193:10 | 155:22, 180:5 | 23:10, 23:13 |
| 127:12, 128:11 | 166:24, 166:24 | 193:15, 193:15 | **judgment** 20:19 | 26:7, 26:9 |
| 128:11, 129:5 | 167:7, 167:8 | 193:20, 193:21 | **July** 81:1, 89:18 | 26:15, 27:11 |
| 129:6, 129:7 | 167:9, 167:9 | 194:5, 194:5 | 105:23, 188:9 | 27:13, 27:17 |
| 129:7, 129:25 | 167:19, 167:19 | 194:21, 194:21 | 201:9 | 27:25, 28:10 |
| 130:1, 131:7 | 168:11, 168:11 | 194:24, 194:25 | **June** 9:12, 9:16 | 28:18, 28:20 |
| 131:14, 131:14 | 168:17, 168:17 | 195:13, 195:13 | 35:19, 104:6 | 29:4, 31:1, 31:4 |
| 131:22, 131:22 | 168:19, 168:19 | 196:1, 196:2 | 104:20, 105:2 | 31:5, 31:10 |
| 133:6, 133:6 | 169:3, 169:3 | 196:4, 196:19 | 147:20, 149:16 | 31:21, 31:24 |
| 134:13, 134:13 | 170:23, 171:7 | 196:19, 197:5 | 149:19, 159:5 | 31:25, 32:3 |
| 134:16, 134:16 | 171:22, 171:23 | 197:5, 197:13 | **jury** 157:6 | 32:5, 32:7, 32:8 |
| 135:13, 135:14 | 172:10, 172:10 | 197:13, 198:13 | 180:25, 181:6 | 32:11, 33:2 |
| 137:4, 137:4 | 172:18, 172:18 | 198:13 | **justify** 62:21 | 33:20, 33:21 |
| 137:13, 137:13 | 174:7, 174:7 | **Johnson's** 22:25 | | 33:25, 34:18 |
| 138:4, 138:4 | 174:16, 174:19 | 37:14, 37:18 | **K** | 35:1, 35:2, 35:5 |
| 138:11, 138:12 | 174:20, 174:24 | 43:3, 53:3 | | 35:7, 35:13 |
| 138:19, 138:19 | 174:24, 174:25 | 56:20, 58:12 | **Kathy** 61:8 | 35:14, 36:1 |
| 139:5, 139:5 | 174:25, 175:4 | 59:11, 59:17 | 61:8, 61:14 | 38:6, 40:24 |
| 139:17, 139:20 | 175:4, 175:23 | 68:8, 68:25 | **keep** 16:14 | 42:7, 43:19 |
| 139:20, 139:24 | 175:23, 176:1 | 69:5, 89:11 | 96:13, 154:5 | 43:23, 44:2 |
| 139:24, 140:3 | 176:1, 176:10 | 89:15, 90:11 | 155:24, 155:25 | 45:8, 45:13 |
| 140:3, 140:8 | 176:10, 177:15 | 90:22, 91:1 | 168:7, 169:17 | 45:18, 45:24 |
| 140:10, 140:10 | 177:16, 177:22 | 91:11, 95:9 | **keeping** 47:15 | 46:1, 46:5 |
| 140:14, 140:15 | 177:22, 178:9 | 100:17, 101:19 | **kept** 46:25, 47:8 | 46:12, 46:24 |
| 142:20, 142:20 | 178:10, 178:14 | 101:23, 102:22 | 49:7 | 47:13, 47:19 |
| 143:2, 143:3 | 178:14, 178:19 | 110:7, 110:25 | **key** 61:17 | 49:7, 49:11 |
| 143:25, 143:25 | 178:19, 179:21 | 111:10, 113:18 | **kind** 53:11 | 49:18, 49:19 |
| 145:13, 145:13 | 179:21, 179:23 | 131:7, 137:23 | 54:23, 162:24 | 50:19, 54:22 |
| 145:20, 145:21 | 179:23, 180:17 | 138:14, 138:22 | 165:17 | 55:14, 55:21 |
| 147:25, 147:25 | 180:24, 180:24 | 139:18, 140:8 | **KLUGER** 2:13 | 56:1, 57:18 |
| 149:1, 149:2 | 181:1, 181:1 | 157:9, 157:14 | **knew** 45:22 | 61:8, 61:20 |
| 149:5, 149:5 | 181:8, 181:8 | 170:24, 171:7 | 49:15, 52:21 | 62:1, 62:21 |
| 149:17, 149:17 | 181:25, 182:1 | 171:23, 172:10 | 71:16, 114:20 | 62:23, 62:24 |

63:2, 63:5, 64:4
64:9, 64:11
64:19, 64:21
65:1, 65:4
66:23, 71:19
73:8, 75:2
76:16, 76:25
77:10, 77:13
77:15, 78:20
78:21, 79:1
79:8, 81:2, 81:3
82:15, 82:19
85:25, 87:14
90:3, 93:6
93:15, 93:23
94:2, 95:14
95:19, 95:25
96:7, 96:8
96:13, 96:24
103:6, 105:5
105:7, 107:1
109:20, 109:24
112:12, 115:1
115:5, 115:15
127:18, 127:23
130:4, 130:25
131:12, 134:7
139:3, 139:6
139:23, 139:23
140:3, 141:6
142:6, 142:10
145:25, 146:3
147:1, 147:24
148:17, 149:11
150:19, 150:22
150:23, 150:24
151:15, 151:17
151:20, 152:6
152:8, 154:10
157:22, 158:11
161:11, 162:17
166:11, 167:12
173:7, 174:13
176:5, 176:6
176:9, 176:11
179:8, 179:9

180:14, 182:12
184:3, 184:8
184:24, 186:25
187:23, 188:1
190:2, 190:4
193:22, 195:16
198:20
**knowledge** 7:6
8:25, 12:5
12:13, 97:8
151:16, 179:1
**known** 22:11
22:14, 67:5
82:7, 82:13
82:18, 83:13
84:12, 85:7
85:23, 98:21
119:18, 120:22
166:9
**knows** 83:1

## L

**label** 14:6, 62:18
**labels** 61:6
**laboratories**
121:25
**laboratory**
122:4, 179:5
179:7
**labs** 171:8
**lack** 26:22
**laid** 191:4
**language** 151:20
191:12, 192:2
195:5
**large** 9:23
**larger** 143:14
**late** 7:16, 67:20
68:1, 106:2
107:24
**lateral** 130:20
**law** 1:1, 1:13
**lawsuit** 112:13
**lawsuits** 99:23
**lawyer** 73:9

80:1
**lawyers** 10:1
48:4, 48:17
**lays** 190:11
191:7, 191:10
**leading** 44:1
191:5
**leads** 41:25
189:25
**learned** 141:23
146:22, 148:24
150:7, 150:13
**led** 190:8
**Lee** 120:1
166:13
**left** 23:10, 23:13
41:8, 41:14
**legal** 190:14
194:7
**legitimate** 86:10
102:7, 102:8
102:23, 102:24
**length** 178:5
**LESLIE** 3:5
**letter** 46:13
46:15, 57:25
58:2, 92:1, 92:8
99:4, 99:10
99:19, 99:22
108:5, 108:6
109:1, 110:13
110:19, 111:3
111:12, 111:21
112:5, 137:20
173:12, 175:4
180:20, 181:11
181:13, 181:15
186:10, 186:12
188:2, 188:7
188:9, 189:7
201:15, 201:17
202:11, 202:16
**letterhead** 37:6
48:10, 69:20
74:20, 99:20
137:14, 145:21

163:11, 167:19
168:12
**letters** 191:12
192:17
**level** 54:4, 55:4
118:20, 134:1
138:6, 143:12
198:5
**levels** 27:7
80:12, 80:20
81:9, 115:14
122:20, 123:4
125:25, 126:8
126:16, 144:20
197:1
**Lewin** 37:15
38:16, 172:17
172:19, 172:24
173:2, 173:12
174:25, 175:22
176:17, 177:6
177:13, 177:19
183:10, 183:17
184:10, 184:15
187:8, 187:11
189:1, 189:21
190:1, 190:7
191:3, 195:21
198:3, 198:14
199:9, 199:14
**Lewin's** 38:20
188:11
**lie** 191:7
**LIEU** 3:3
**light** 130:15
193:13
**limit** 126:2
**limitations**
123:16
**limited** 17:14
17:20, 23:1
27:3
**limits** 94:17
107:10, 126:11
126:20, 130:7
**Linda** 11:1

**line** 108:10
121:1, 134:3
191:24
**linked** 128:6
**list** 33:12, 42:6
42:7, 114:7
116:20, 199:4
201:19
**listed** 4:22, 26:2
**listen** 39:16
73:17
**listing** 114:1
**literature** 64:2
84:5, 84:9
118:16, 195:4
**little** 13:20
22:24, 92:16
99:5, 172:16
192:11
**LLC** 1:6
**LLP** 2:8, 2:18
**local** 81:9
**located** 114:13
**locations** 76:18
**Logan** 2:18
**LOMBARDY**
3:5
**long** 42:6, 73:13
128:18
**longer** 48:24
50:2, 109:7
**look** 24:18
25:18, 33:5
33:15, 35:8
35:10, 38:10
43:6, 43:13
44:4, 44:6, 48:9
50:24, 57:15
58:5, 58:7
72:13, 75:10
75:12, 75:13
75:24, 93:12
94:15, 96:3
96:15, 96:23
104:1, 105:13
114:14, 118:24

120:9, 121:1
121:2, 121:3
121:7, 125:9
133:13, 142:6
142:9, 157:16
157:20, 158:4
158:6, 160:4
162:25, 170:20
172:2, 181:14
182:7, 184:25
190:20
**looked** 17:19
44:13, 86:13
107:1, 107:24
162:23, 182:10
**looking** 32:24
33:12, 38:12
44:9, 44:21
61:24, 62:19
63:9, 65:1
66:23, 96:6
97:18, 99:6
116:24, 118:12
122:3, 133:25
142:2, 142:15
158:22, 159:4
167:1, 167:12
168:22, 177:18
190:9, 198:3
**looks** 113:25
168:18, 196:10
**lot** 10:17, 59:9
129:18, 162:23
178:11, 191:19
193:25
**lots** 185:14
185:21, 186:23
187:3
**low** 80:12, 80:20
115:14, 122:20
123:4, 125:25
126:7, 126:16
143:13, 144:20
163:21, 197:1
**lower** 27:6
115:10, 118:20

198:7
**lunch** 74:10
97:25, 103:1
105:12
**Luncheon**
106:18
**lunchtime**
105:13
**lung** 74:22, 78:2
**lungs** 74:16
78:17, 79:3
79:9, 79:19
80:5, 85:5
**Luzenac** 132:7
132:7, 132:8
132:11
**Lynn** 194:11

## M

**Ma'am** 29:16
30:19, 31:13
32:19, 34:7
45:7, 45:18
47:22, 51:11
64:4, 64:20
66:6, 66:12
69:12, 71:24
73:8, 74:6
76:21, 77:5
85:21, 87:25
89:13, 95:7
96:17, 96:24
105:2, 110:23
111:18, 120:20
124:9, 126:5
134:5, 134:10
135:8, 136:14
136:25, 150:12
150:17, 150:22
152:4, 153:8
155:6, 156:2
156:8, 156:14
162:8, 165:19
167:5, 170:11
173:20, 179:6

179:13, 180:3
181:5, 182:12
182:23, 188:6
196:25
**machine** 124:6
**magnesite** 142:8
**magnification**
178:5
**maintain** 50:11
**maintained**
75:18
**maintenance**
91:25
**major** 121:13
123:16, 142:8
**majority** 85:4
**making** 34:22
56:18, 65:15
136:10
**Maldonado**
41:25, 42:16
**man** 178:15
**management**
55:4
**mandatory**
160:3, 160:11
161:16, 161:19
**manufacture**
96:11, 96:21
97:10, 182:25
**manufacturer**
13:24, 14:5
19:8
**Maple** 2:3
**Marc** 1:13, 5:10
200:3
**March** 57:14
99:10, 99:11
99:12, 99:13
99:19, 101:10
105:20, 115:25
116:3, 159:5
159:19, 163:10
**mark** 5:1, 8:17
10:12, 33:5
61:3

**marked** 5:2
10:13, 24:3
25:23, 33:4
33:16, 38:7
54:12, 115:23
132:5, 137:13
137:18, 168:11
188:8, 189:6
189:19
**market** 98:8
98:18, 102:5
192:15
**marketing** 13:7
13:13
**marketplace**
130:16
**marking** 33:1
33:3
**Martin** 198:18
**Maryanne**
107:22
**master** 177:11
**match** 50:10
**matches** 163:2
**material** 28:15
29:14, 31:22
32:10, 32:18
37:9, 70:25
97:21, 101:1
102:24, 108:7
114:12, 118:23
128:7, 129:18
139:1, 172:6
179:4, 180:21
181:2, 181:3
183:4, 192:7
192:18
**materials** 28:5
28:8, 70:16
71:1, 74:7
81:14, 90:15
98:24, 99:15
100:9, 100:15
111:6, 179:11
181:18
**mathematical**

107:9
**matter** 1:12
35:19, 46:1
100:16, 101:4
**McCarthy**
11:20
**McCrone** 108:4
109:1, 109:18
110:13, 110:19
111:3, 111:12
111:21, 112:5
180:19, 180:20
180:25, 181:3
181:7, 181:24
182:3, 182:14
182:21, 182:23
183:1, 189:10
191:12, 192:16
195:25
**McGIVNEY**
2:13
**McMurry** 42:3
**MCNEILL-GE...**
1:6
**McNelis** 3:12
**MD** 1:9, 4:3
**mean** 33:2, 34:5
83:25, 102:9
162:7, 169:10
190:11, 190:19
191:13, 191:15
191:16, 191:17
192:5
**meaning** 53:25
97:5
**means** 14:19
15:7, 20:25
81:9, 87:15
102:7, 102:8
103:12, 103:20
164:16, 169:11
191:14
**measure** 118:25
**measuring**
159:21
**mechanism**

53:15
**medical** 5:21
5:22, 6:2, 6:6
40:10, 40:20
40:23, 41:2
55:16, 67:11
67:17, 67:18
67:24, 68:8
84:20, 201:11
**medicated**
37:14, 75:25
92:9, 92:23
93:3
**meet** 22:7
**meeting** 9:12
60:25, 61:15
62:9, 89:19
91:6, 115:25
116:2, 116:7
119:25, 124:4
183:21, 183:24
184:2, 184:9
184:10, 185:3
187:7, 190:5
201:20
**meetings** 38:20
**member** 41:15
132:14
**members** 54:2
55:22, 130:13
142:9, 184:9
184:17
**memo** 35:18
37:3, 43:7
48:10, 48:11
51:9, 51:14
51:16, 51:21
52:2, 53:16
63:12, 63:12
63:17, 66:12
66:15, 69:19
72:11, 72:15
73:23, 74:1
74:19, 84:19
85:1, 89:17
89:25, 90:16

91:6, 127:5
127:16, 128:16
132:5, 140:13
145:20, 147:20
149:17, 163:11
166:4, 167:18
168:20, 176:20
185:2, 186:4
188:9, 201:3
201:4, 201:5
201:6, 201:7
201:8, 201:10
201:12, 201:13
201:14, 201:16
201:22, 201:23
201:24, 202:4
202:5, 202:7
202:9, 202:10
202:13, 202:14
202:15
**memoir** 10:23
**memorandum**
57:13
**memorializes**
89:19
**memorializing**
115:25
**memory** 97:1
97:2, 177:10
**memos** 47:9
47:18, 47:21
48:1, 50:6
51:10, 51:12
**mention** 151:25
152:1, 181:14
**mentioned**
65:22, 75:16
127:25, 158:14
181:11, 194:8
**merit** 44:22
53:2
**mesothelioma**
83:2, 83:17
83:23, 84:7
84:14, 84:20
85:2, 85:9

201:10
**message** 194:24
**met** 25:11, 61:4
104:7, 183:9
184:20
**method** 72:22
73:5, 81:20
91:21, 115:4
115:12, 117:9
117:12, 118:2
118:13, 118:15
119:7, 119:14
119:17, 119:19
120:4, 120:5
120:10, 120:21
121:15, 121:16
122:5, 122:12
122:13, 122:19
123:3, 123:9
123:12, 125:4
125:7, 125:9
125:20, 125:21
125:24, 126:2
126:7, 126:10
126:16, 126:19
126:19, 126:24
127:7, 130:1
130:7, 130:8
130:8, 130:9
130:10, 130:25
131:23, 133:13
133:14, 134:14
135:2, 135:3
135:6, 135:22
136:1, 137:5
138:2, 138:5
139:6, 139:11
139:19, 139:25
140:5, 140:9
141:4, 141:7
141:8, 141:11
141:25, 142:5
142:11, 143:24
144:1, 144:5
144:6, 144:11
144:13, 144:14

145:14, 146:10
146:23, 147:4
147:10, 147:12
148:25, 149:6
149:12, 150:9
150:15, 156:9
156:16, 157:1
157:13, 157:24
161:3, 161:12
161:20, 161:23
163:8, 163:12
164:1, 164:19
164:20, 164:23
165:2, 165:5
165:10, 165:22
166:2, 166:23
167:7, 167:15
168:22, 169:4
171:5, 197:12
197:25, 198:5
198:10, 199:7
199:13
**methodological**
59:24
**methodologies**
133:22, 169:7
170:17
**methodology**
7:21, 94:18
102:13, 102:16
102:23, 102:25
104:14, 116:9
139:4, 139:15
142:14, 142:18
161:8, 161:10
168:12, 168:14
168:16, 168:18
170:3, 170:5
170:12, 170:19
191:3, 196:11
**methods** 9:15
25:3, 26:18
26:24, 27:5
56:19, 71:21
73:3, 74:2, 74:5
92:13, 92:21

93:1, 114:22
115:17, 115:20
117:20, 118:16
119:1, 124:14
124:24, 126:11
128:20, 131:7
132:17, 133:9
133:19, 137:1
142:13, 143:6
148:6, 157:17
157:21, 159:21
160:13, 174:9
174:12, 199:16
**Michelle** 42:3
**microbe** 118:19
**microns** 74:23
78:3
**microscope** 71:6
116:11, 116:21
117:8, 117:17
118:6, 118:18
129:21
**microscopic**
74:3, 152:18
161:13, 161:19
**microscopy**
123:6, 129:4
131:4, 133:1
163:24, 177:7
**MID-L-2456-18**
1:5
**MID-L-3095-18**
1:3
**MID-L-4252-18**
1:4
**MID-L-4826-18**
1:5
**MID-L-5368-17**
1:6
**MID-L-598-18**
1:7
**MID-L-600-18**
1:3
**MID-L-6635-17**
1:7
**MID-L-6805-16**

1:4
**MID-L-7049-16**
1:6
**middle** 151:9
154:4, 154:17
173:25
**MIDDLESEX**
1:1
**Miller** 70:7
**million** 161:24
161:25
**mind** 10:9
41:24, 121:8
152:7
**mine** 28:12
29:7, 29:15
29:19, 31:7
32:11, 32:16
32:18, 37:17
70:7, 70:11
70:14, 70:17
75:16, 76:16
76:18, 76:23
77:2, 77:3, 77:7
77:23, 92:10
92:15, 92:15
92:20, 92:24
93:3, 93:10
93:12, 93:13
93:21, 94:5
94:15, 95:23
97:9, 97:22
109:7, 109:14
110:2, 111:11
138:22, 182:4
**mined** 76:6
**mineral** 72:16
81:7
**mineralogic**
128:6
**minerals** 1:5
2:11, 74:23
76:8, 78:3, 78:5
81:8, 118:10
118:14, 128:7
128:17, 128:19

141:16, 141:18
144:19, 144:20
160:17, 162:3
178:11
**mines** 27:16
28:6, 28:8
31:25, 32:5
75:13, 75:19
75:20, 76:18
77:10, 91:20
93:5, 94:13
94:16, 94:19
94:23, 94:25
95:3, 95:3, 95:9
95:15, 95:20
96:10, 96:20
104:10, 128:13
138:18, 140:15
140:20, 141:12
141:24, 142:20
142:25, 143:7
165:4, 189:17
197:6, 197:11
197:20, 202:3
**minor** 141:19
**minute** 38:10
57:15, 67:4
72:13, 99:6
121:2, 125:1
125:8, 169:14
177:13
**minutes** 98:2
119:21, 164:2
164:5, 171:9
184:2, 201:21
**misbranded**
13:13, 67:7
**mischaracterizi...**
116:23, 117:3
117:10
**Misclassification**
152:15
**misinterpret**
120:25
**mislead** 87:6
**misleading**

68:17, 157:5
162:11
**misled** 191:8
**misrepresentat...**
152:17
**missions** 37:21
**misspoke**
137:15
**misstating**
92:22
**misunderstand...**
117:24
**mixing** 94:18
94:20, 94:21
**mixture** 76:12
**monitoring**
17:16
**monograph**
127:17
**months** 61:4
**morning** 5:17
5:18, 106:25
108:16
**MORSE** 1:6
**mothers** 58:19
**move** 66:23
134:9, 135:8
152:4, 154:19
**moving** 70:22
**multiple** 24:9
24:9, 24:22
24:24, 27:14
28:3, 29:3
29:23, 29:25
76:2, 97:3
104:10, 116:25
117:1, 124:15
152:13, 169:21
170:7, 176:6
185:14
**Muscat** 63:24

| N |

**Nader** 36:5
**name** 5:5, 23:8

176:7, 176:12
**nameology**
191:19
**names** 77:10
**Nashed** 35:18
35:22, 35:23
36:2, 43:14
**National** 107:20
**natural** 47:8
**necessarily** 76:2
**necessary** 8:12
14:7, 25:6
26:23, 143:14
**need** 24:18
32:21, 38:10
52:21, 57:15
60:14, 66:4
71:19, 72:13
75:9, 81:8, 91:4
128:23, 129:9
135:18, 135:22
136:1, 136:15
137:1, 154:11
164:15, 182:10
198:4, 198:6
**needed** 33:22
53:10, 56:21
161:9
**needle** 143:16
144:1
**needs** 54:3, 57:4
**negative** 122:15
192:18
**neither** 200:15
200:18
**never** 6:1, 6:2
40:3, 48:4
48:19, 49:22
51:13, 51:18
81:23, 87:23
88:12, 100:18
101:6, 101:12
101:15, 101:16
109:12, 112:24
127:4, 138:13
158:20, 162:21

164:8, 180:21
181:1, 181:20
181:24, 183:4
183:11
**new** 1:1, 1:13
1:14, 1:23, 2:4
2:14, 3:4, 6:9
6:9, 14:16, 15:1
15:10, 52:14
130:15, 144:8
189:25, 200:5
200:24
**news** 147:3
**nicely** 151:22
**Nicholson** 1:9
4:3, 4:14, 5:17
54:19, 73:15
106:25, 152:6
201:14
**Nicholson's**
10:13
**NIOSH** 107:20
107:21, 139:14
**non** 71:11, 83:3
83:8
**non-asbestiform**
72:1, 72:18
74:8
**NORTH** 1:3
1:4, 1:5, 1:6, 1:7
**Notary** 1:13
200:3, 200:24
**notations** 10:20
**note** 4:22, 58:6
80:17, 114:11
149:18, 149:22
186:2, 192:11
192:11
**Notebook** 4:15
4:16, 4:17
**Notebooks**
54:12
**noted** 5:8, 92:8
92:23
**notes** 4:14, 10:8
10:12, 10:13

| | | | | |
|---|---|---|---|---|
| 10:16, 10:22 | 16:3, 16:4 | 60:20, 61:23 | 144:3, 144:12 | 137:13, 137:16 |
| 131:9, 188:24 | 16:10, 16:13 | 62:4, 62:11 | 145:16, 146:25 | 197:4 |
| 189:19, 189:20 | 16:21, 17:2 | 63:6, 63:18 | 148:21, 149:3 | **offered** 88:17 |
| 189:23, 190:9 | 17:8, 17:17 | 64:13, 65:13 | 149:14, 150:10 | 139:24, 186:5 |
| 190:20, 192:20 | 18:6, 18:12 | 65:20, 66:1 | 152:9, 152:22 | **office** 61:4 |
| 192:21 | 18:17, 18:23 | 67:14, 68:11 | 153:6, 155:16 | 120:1 |
| **notice** 4:13, 5:2 | 19:12, 19:17 | 68:15, 69:3 | 156:5, 156:10 | **officer** 193:24 |
| 7:4, 7:4 | 20:14, 20:22 | 69:9, 69:16 | 156:12, 156:19 | **offices** 1:14 |
| **notified** 46:14 | 21:5, 21:19 | 70:1, 71:17 | 157:2, 157:4 | **official** 62:3 |
| **noting** 169:3 | 22:1, 22:8 | 72:4, 73:1 | 157:10, 157:15 | 187:10 |
| **November** 33:7 | 22:13, 22:20 | 74:11, 74:17 | 158:1, 161:6 | **officials** 39:10 |
| 37:3, 60:25 | 23:3, 23:16 | 76:24, 77:9 | 164:21, 165:7 | 40:1, 40:6, 41:1 |
| 166:5, 185:4 | 25:14, 27:12 | 77:24, 78:7 | 165:24, 166:25 | 41:8, 41:13 |
| 185:12, 186:3 | 27:22, 28:13 | 78:14, 78:18 | 167:11, 168:3 | 41:20, 41:22 |
| 186:12, 186:13 | 29:1, 29:10 | 78:22, 79:4 | 168:8, 169:1 | 44:1, 183:22 |
| 195:22 | 29:22, 30:15 | 79:10, 79:20 | 169:8, 169:19 | **okay** 11:19 |
| **number** 10:16 | 31:17, 31:19 | 80:6, 80:14 | 170:9, 170:15 | 17:13, 30:10 |
| 11:21, 24:21 | 32:6, 34:2 | 80:17, 80:23 | 170:22, 170:25 | 33:18, 35:18 |
| 25:16, 25:17 | 34:12, 34:25 | 82:1, 82:8 | 172:1, 173:24 | 38:11, 52:7 |
| 33:5, 84:23 | 35:6, 35:16 | 82:14, 82:21 | 180:7, 180:9 | 67:8, 73:16 |
| 104:6, 105:23 | 39:17, 40:14 | 83:4, 83:10 | 181:9, 182:6 | 73:20, 75:12 |
| 108:7, 114:8 | 40:22, 41:4 | 83:14, 83:19 | 182:17, 183:15 | 76:3, 94:7, 94:8 |
| 115:9, 121:25 | 41:11, 41:17 | 83:24, 84:8 | 184:18, 185:19 | 99:14, 105:13 |
| 130:5, 185:12 | 41:23, 42:11 | 84:17, 86:1 | 186:2, 186:18 | 113:24, 121:6 |
| 185:20, 191:5 | 42:24, 43:4 | 86:5, 86:16 | 187:14, 187:22 | 122:25, 145:9 |
| 193:23, 199:4 | 43:11, 43:21 | 86:22, 87:8 | 192:3, 194:16 | 150:7, 172:19 |
| **numbered** | 44:3, 44:16 | 87:21, 91:14 | 195:1, 195:15 | 174:1 |
| 24:19 | 44:19, 45:4 | 91:17, 91:23 | **objective** 144:15 | **once** 13:21 |
| **numbers** 24:1 | 45:12, 45:23 | 93:19, 95:1 | 144:16 | 129:11 |
| 26:11 | 46:6, 46:21 | 95:24, 96:1 | **objectives** 120:6 | **ones** 41:24 |
| **numerology** | 46:23, 47:4 | 96:12, 96:22 | 121:18 | 103:18 |
| 191:19 | 48:6, 48:21 | 97:12, 97:14 | **obligated** 15:12 | **opened** 102:18 |
| **numerous** 47:18 | 49:6, 49:10 | 100:2, 100:21 | 17:11, 19:1 | 191:4 |
| 116:25, 159:5 | 49:17, 49:25 | 101:8, 102:2 | **observed** 158:16 | **openly** 103:7 |
| | 50:17, 50:21 | 109:15, 114:24 | **Occasionally** | **openness** 105:7 |
| | 51:2, 51:8 | 115:7, 115:22 | 71:4 | **operator** 164:2 |
| **O** | 51:19, 51:24 | 116:22, 122:22 | **occasions** 175:9 | **opinion** 80:4 |
| | 52:24, 53:7 | 124:2, 125:6 | **occupational** | 124:22, 127:11 |
| **O'TOOLE** 3:3 | 53:13, 53:22 | 126:9, 132:10 | 83:3 | 150:17 |
| **oath** 186:14 | 53:24, 54:25 | 132:19, 133:8 | **occupationally** | **opinions** 36:20 |
| **object** 40:16 | 55:20, 55:25 | 133:12, 134:6 | 83:9 | **opportunity** |
| **objecting** 15:23 | 56:7, 56:14 | 134:18, 135:19 | **occur** 179:11 | 131:18, 174:4 |
| **objection** 13:8 | 56:23, 57:1 | 136:8, 137:8 | **occurrence** | **oppose** 165:21 |
| 13:17, 14:3 | 57:23, 59:8 | 137:10, 138:8 | 38:22, 39:1 | **opposing** 15:19 |
| 14:10, 14:18 | 59:20, 60:6 | 138:15, 138:24 | **occurs** 72:17 | 136:21 |
| 15:3, 15:19 | 60:9, 60:17 | 139:22, 140:12 | **October** 99:16 | **oppressing** |
| 15:22, 15:22 | | | | |

Page 75

170:2
**optical** 116:11
116:20, 117:8
117:16, 118:6
129:3, 129:21
160:13, 161:13
161:19, 163:24
**option** 132:23
**Oral** 1:11
**order** 27:6, 47:2
59:6, 63:4
116:12, 128:22
136:25, 143:15
161:4
**ordered** 185:7
**ordinary** 40:7
55:7, 55:9
55:11
**ore** 75:16, 75:18
94:15, 141:1
160:18, 160:18
160:25, 161:23
162:2
**ores** 81:15
159:9
**organization**
41:15, 108:11
127:24, 194:12
**organizations**
185:15
**organize** 10:18
**organs** 78:13
**origin** 29:4
**original** 38:20
114:12, 114:16
163:20
**outlined** 151:22
**outlying** 75:16
**outside** 15:25
79:23, 108:21
108:22, 110:9
176:11, 194:7
195:13
**overall** 164:3
**overseen** 15:9
**oversight** 18:15

57:3
**owned** 77:7
94:13, 94:23

**P**

**P-1** 4:13, 5:1
5:2, 7:3
**P-2** 4:14, 10:12
10:14, 10:15
10:16, 189:19
**P-3** 4:15, 54:12
105:16, 113:8
114:6, 186:9
**P-4** 4:16
**P-5** 4:17, 107:19
**P.C** 2:3, 2:13
**p.m** 106:16
106:21, 145:7
171:13, 171:18
199:23
**packaging** 34:4
71:1
**page** 4:2, 4:12
16:9, 24:16
24:25, 25:22
25:24, 26:6
26:21, 38:13
39:4, 58:1
70:20, 81:4
90:20, 92:7
94:9, 100:4
116:2, 116:7
120:9, 121:11
141:10, 142:7
159:25, 160:15
161:22, 173:8
188:25, 189:4
190:10, 190:10
201:2, 202:2
**pages** 4:14, 4:22
24:19, 24:22
24:24
**paid** 108:13
**panel** 13:15
20:12

**panic** 58:19
**paper** 48:24
49:4, 49:9
49:14, 86:3
86:7, 114:15
114:15
**paragraph** 25:1
38:12, 43:13
128:4
**Paralegal** 3:12
**parcel** 188:16
**Park** 2:14, 3:4
**part** 18:16
57:21, 63:10
86:14, 87:1
87:24, 93:16
99:8, 132:13
132:16, 134:24
171:4, 188:16
188:21
**participants**
124:15
**participating**
132:21
**particles** 72:20
73:6, 74:15
74:22, 75:11
78:3
**particular** 76:5
127:3, 173:22
175:3
**particularly**
130:15
**parties** 200:17
**partners** 124:20
**parts** 161:24
161:25
**party** 193:10
**patient** 6:6, 6:11
**patients** 6:3
40:11, 55:18
85:3
**pause** 13:20
**PC** 3:12
**PCM** 133:2
133:9

**PCPC** 8:6
**Pederson** 37:4
37:8
**Pediatric** 41:25
**pending** 23:25
54:7
**Pennsylvania**
2:9, 2:19
**people** 7:19
7:22, 10:6
10:24, 34:16
35:22, 42:18
44:23, 45:2
45:9, 56:18
64:6, 65:22
68:2, 68:18
68:20, 83:2
124:6, 153:20
171:6, 171:7
176:6, 183:24
190:24, 193:12
193:14, 193:22
194:15, 194:17
**percent** 74:13
74:24, 78:5
115:5, 115:9
138:7, 142:8
143:13, 146:19
147:10, 147:17
163:21, 163:23
196:21, 198:3
199:9
**perform** 170:4
**performed** 32:4
**performing**
197:25
**period** 11:8
42:19, 66:19
68:20
**periods** 31:8
**permission**
36:25, 43:8
**permit** 25:4
163:20
**permitted** 16:5
**person** 7:12

7:13, 8:23
12:11, 45:8
62:12
**personal** 6:18
8:25, 12:15
65:5, 65:17
**personally**
78:23
**personnel** 26:22
27:4, 27:20
28:11
**perspective** 65:4
67:1, 68:25
99:24, 110:15
**pertinent** 37:13
**petered** 6:10
**petition** 52:13
52:17, 53:14
55:10, 61:5
61:19, 62:18
63:4, 63:9
107:8, 133:15
134:21, 135:24
151:23
**petitions** 64:8
67:13, 106:4
**ph** 198:18
**pharmaceutical**
6:17
**phases** 144:21
**phasing** 43:17
**Philadelphia**
2:9, 2:19
**Philip** 52:13
**phone** 1:24
36:4, 45:20
46:4, 46:19
47:1, 47:6, 49:3
**photographs**
178:4
**phrasing** 68:17
**physical** 50:2
50:2, 50:8
107:14
**physician** 6:8
42:3

Brody Deposition Services

**pick** 45:20 115:20, 133:16 134:8, 190:22 192:10
**picked** 46:3 46:18, 193:3
**piece** 15:6, 86:2 86:6
**pipe** 13:21
**Pittsburgh** 5:25
**pivot** 190:18 190:19, 191:6 191:10, 192:1
**pivoting** 192:24
**place** 106:13 199:18, 200:13
**placed** 61:6
**placing** 15:19
**Placitella** 2:3 2:5, 3:12, 4:4 5:1, 5:15, 10:11 15:21, 16:2 16:11, 16:15 24:2, 26:9 26:12, 30:4 30:8, 39:20 54:17, 64:15 98:1, 106:13 106:23, 136:23 137:19, 137:21 144:25, 145:8 151:3, 151:6 151:11, 153:14 153:21, 153:24 154:2, 154:10 154:14, 154:21 154:25, 155:9 155:15, 155:19 155:24, 171:10 171:21, 185:24 199:17
**plain** 191:20
**Plaintiff** 2:6
**plan** 27:4
**plate** 178:7
**playing** 191:11 192:2
**please** 29:16 30:1, 48:9 64:15, 71:24 72:13, 73:10 73:22, 76:4 76:4, 83:25 99:6, 123:20 134:10, 167:4 174:14, 180:12 180:13
**PLM** 133:2 133:9, 134:14 135:14
**point** 17:24 25:16, 28:23 31:14, 62:6 63:13, 87:25 96:15, 110:18 113:19, 115:8 139:9, 142:17 146:19, 159:3 170:11, 183:16 185:16, 187:16 187:20
**pointed** 130:18 185:6, 186:4 186:4
**pointing** 63:11 152:20
**points** 76:2 76:11, 105:25
**poisonous** 16:19
**policy** 49:19
**Pooley** 93:4 94:14, 95:2 127:25, 128:1 145:10, 145:13 146:7, 146:16 146:16, 146:23 147:17, 148:6 148:17, 148:25 149:7, 149:11 150:2, 150:8 150:13, 156:8 156:15, 156:25 165:3, 167:21 175:12, 175:18 196:1
**poor** 75:15
**pops** 41:24
**population** 85:6
**portion** 149:18 199:24
**pose** 80:13 80:22
**posed** 87:17 179:18
**position** 18:3 18:7, 22:25 56:20, 56:22 57:9, 62:21 71:11, 71:25 73:24, 74:4 74:8, 100:18 101:3, 101:6 101:23, 124:18 138:12, 170:19 170:23, 170:24
**positive** 117:16 127:20, 192:7
**possession** 27:19, 85:16 85:17, 103:13 111:9
**possible** 29:6 29:14, 75:19 130:15, 138:5 141:16
**potential** 25:8 33:10, 67:4 69:1, 81:8
**potentially** 81:15, 129:18
**powder** 22:17 33:9, 37:14 37:18, 38:17 38:23, 39:2 43:3, 52:16 53:3, 56:13 56:16, 56:17 57:10, 58:12 58:17, 59:4 59:12, 59:17 60:3, 60:13 69:6, 70:12 71:3, 80:25 89:11, 89:15 90:12, 90:22 91:1, 91:11 91:21, 92:9 92:19, 92:23 93:3, 93:10 95:10, 95:21 96:11, 96:21 97:10, 97:22 101:5, 101:20 108:2, 110:7 113:19, 126:17 137:24, 138:22 140:23, 157:9 171:24, 172:7 172:10, 173:17 173:23, 174:16 175:6, 183:5 190:13, 192:19 193:8, 196:5 196:12, 201:9
**powders** 88:6 100:5, 100:6 100:12, 182:2
**power** 53:4
**PPF** 168:14
**PR** 194:15
**practical** 120:6 121:17, 124:5 125:11, 131:25
**Practice** 1:12
**pre-concentrates** 143:18
**pre-concentrati...** 146:10, 147:12
**pre-concentrati...** 139:6, 139:11 139:19, 140:9 141:4, 141:7 143:25, 144:5 144:11, 144:13 145:14, 146:23 147:4, 147:9 156:9, 156:16 157:1, 165:10 165:21
**precise** 6:7
**preclinical** 67:22, 68:4 68:22, 70:2
**preconcentration** 197:24
**predecessor** 132:11
**predominantly** 143:9
**prefer** 121:1 158:2
**premarket** 12:25
**preparation** 9:20, 10:17 25:20, 27:18 47:17, 47:24 49:22, 51:1 51:13, 57:22 81:24, 89:22 121:3, 127:1 148:2, 190:15 192:23
**preparations** 23:23, 25:17
**prepare** 21:10 127:8
**prepared** 58:18 64:3, 110:12
**preparing** 43:23 48:3, 48:16
**presence** 143:1 144:17
**present** 3:11 7:16, 25:7 81:15, 106:2 116:4, 119:25 144:20, 162:4 178:21, 190:23
**presented** 37:15

| | | | | |
|---|---|---|---|---|
| **presenting** 81:14 | 13:15, 13:25 14:1, 14:6, 14:9 | 82:23, 87:11 88:1, 88:10 | 168:24, 169:6 170:21 | 34:10, 35:5 35:14, 36:12 |
| **preserves** 15:20 16:13 | 14:13, 14:24 15:12, 17:15 | 88:15, 88:18 89:6, 89:8, 94:6 | **promulgated** 13:2 | 56:3, 56:8 186:8, 195:14 |
| **prevent** 14:8 | 19:9, 19:10 | 94:15, 94:24 | **proof** 90:11 | 200:3, 200:24 |
| **preview** 54:2 | 19:15, 19:16 | 98:13, 98:15 | **proper** 16:3 | **publically** 34:15 |
| **previous** 12:1 | 22:5, 22:6 | 100:20, 100:24 | **proposal** 166:14 | 174:25 |
| 92:11, 108:5 | 32:15, 34:1 | 102:10, 102:21 | **proposed** 22:6 | **publications** |
| **previously** 9:5 | 39:10, 40:12 | 104:11, 107:3 | 168:18, 168:21 | 27:15 |
| 37:9, 177:5 | 45:19, 65:17 | 108:18, 108:23 | **proposition** | **publicity** 58:20 |
| **Princeton** 1:14 | 66:16, 75:25 | 111:1, 111:6 | 111:20 | **published** 147:6 |
| 189:14 | 81:10, 86:21 | 111:10, 111:21 | **proprietary** | **publishes** 70:23 |
| **principal** 13:14 | 86:25, 87:19 | 121:14, 126:23 | 34:14 | **pull** 95:5 |
| **print** 66:5 | 88:22, 92:5 | 127:13, 128:14 | **protection** | **pulled** 50:4 |
| **prior** 13:6 | 94:19, 98:7 | 159:9, 159:22 | 81:13 | 130:19 |
| 13:13, 67:12 | 98:8, 98:18 | 172:24, 173:4 | **protective** 70:12 | **purpose** 20:17 |
| 67:15, 139:3 | 98:25, 101:21 | 173:6, 176:3 | **proven** 14:20 | 25:2, 93:16 |
| 143:18, 186:7 | 102:1, 102:4 | 179:24, 182:5 | **provenance** | 120:4, 121:12 |
| 200:5 | 102:4, 102:6 | 182:15, 182:22 | 31:10, 32:1 | 121:16, 143:6 |
| **private** 183:21 | 107:15, 108:9 | 183:3, 184:13 | 32:8 | 159:20 |
| 184:10 | 109:17, 109:18 | 184:23, 185:18 | **proverbial** | **pursuant** 1:12 |
| **privileged** 34:14 | 109:19, 109:22 | 186:17, 191:23 | 143:16 | **put** 13:20, 15:17 |
| **probable** 14:20 | 110:1, 110:11 | 192:12 | **proves** 90:21 | 16:9, 33:19 |
| **probably** 6:10 | 110:12, 110:17 | **Professor** | **provide** 18:21 | 111:25, 120:11 |
| 65:22, 70:24 | 112:6, 113:5 | 175:12, 175:18 | 30:13, 36:5 | 120:12, 122:8 |
| 71:23, 165:17 | 160:25, 161:5 | 188:11, 196:1 | 81:12, 105:4 | 173:11, 194:24 |
| **procedure** 1:12 | 161:25, 162:2 | **profile** 15:14 | 133:3, 133:10 | **putting** 38:3 |
| 47:11, 131:15 | 162:14, 174:7 | **program** 17:25 | 134:15, 153:9 | 39:5, 148:18 |
| 143:1, 143:17 | 183:13, 188:3 | 24:5, 100:14 | 156:3, 159:2 | 187:2 |
| 144:17, 144:23 | 188:16, 188:20 | **progressed** | 172:14, 185:10 | |
| 163:15, 163:19 | 192:15 | 112:21 | 185:16 | |
| 168:21 | **production** | **project** 24:13 | **provided** 7:7 | **Q** |
| **procedures** | 101:21, 121:13 | 24:21, 24:23 | 16:24, 23:20 | |
| 34:19, 49:11 | 172:6, 181:3 | 25:2, 25:23 | 33:24, 35:4 | **qualification** |
| 130:12, 163:22 | 192:18 | 27:4, 89:18 | 37:10, 49:23 | 90:15 |
| **process** 19:24 | **products** 1:3 | **projects** 24:9 | 51:7, 51:14 | **qualifications** |
| 34:19, 52:25 | 15:9, 21:17 | **prominent** | 51:18, 89:3 | 111:25 |
| 53:14, 54:5 | 21:24, 22:17 | 171:4 | 106:9, 113:2 | **qualified** 7:12 |
| 54:21, 54:22 | 22:17, 25:5 | **promise** 72:9 | 113:17, 136:9 | 7:13, 166:15 |
| 55:10, 81:11 | 28:4, 29:5, 29:6 | 136:11, 136:14 | 162:2, 176:24 | **qualifying** 104:9 |
| 115:2, 148:3 | 31:6, 32:12 | 177:20 | 185:7, 186:9 | **quality** 9:14 |
| **produce** 7:5 | 34:5, 46:10 | **promised** | 186:15, 188:4 | 11:18, 12:3 |
| **produced** 72:22 | 56:4, 59:14 | 174:24 | 196:6 | 77:3, 104:9 |
| **produces** 72:20 | 61:7, 62:19 | **promoting** | **providing** 186:5 | 194:12 |
| **product** 13:5 | 65:5, 69:6 | 169:12 | **public** 1:13 | **quantify** 164:23 |
| 13:6, 13:12 | 69:13, 78:11 | **promotion** | 21:2, 33:25 | **quantities** 71:5 |
| | | | | **quarrel** 26:14 |

quarter 26:19
26:25
quarter's 24:25
quartz 128:7
question 9:5
14:15, 15:1
15:11, 15:15
15:16, 23:25
29:9, 29:11
29:16, 30:5
30:7, 30:9
30:10, 30:14
30:17, 32:13
36:7, 38:25
39:6, 39:14
39:16, 39:18
39:24, 40:17
40:24, 41:5
45:6, 45:17
47:22, 49:21
50:12, 50:13
50:14, 50:15
50:16, 50:18
50:20, 50:24
51:17, 51:20
54:7, 59:15
59:15, 60:10
63:20, 66:2
66:14, 68:6
68:10, 68:13
68:16, 68:21
69:10, 69:12
69:13, 71:24
71:25, 73:11
73:12, 73:17
73:21, 74:12
76:3, 76:4
76:20, 77:1
78:1, 79:23
80:1, 80:15
80:16, 80:18
82:16, 82:17
84:3, 86:4
86:11, 87:16
88:2, 88:5
88:10, 88:23

89:12, 92:16
95:8, 95:11
98:10, 101:3
108:16, 110:23
110:24, 111:4
111:18, 122:24
123:20, 123:22
123:23, 124:9
124:13, 125:17
126:14, 134:5
134:11, 134:11
136:24, 136:24
142:18, 142:18
142:21, 142:22
148:14, 149:9
150:12, 151:12
151:14, 151:15
152:2, 152:5
152:21, 152:23
152:24, 152:25
153:5, 153:10
154:18, 156:4
156:6, 156:13
156:14, 156:15
156:17, 156:24
157:3, 157:18
162:20, 167:3
179:13, 179:19
181:19, 181:22
181:23, 182:16
182:18, 182:19
182:20, 182:22
182:23, 185:23
185:25, 186:1
questioning
88:9
questions 15:25
60:2, 67:21
73:9, 107:2
112:10, 137:1
139:4, 153:19
155:1, 155:2
155:5, 155:10
164:13, 179:17
quick 129:17
158:8

quickly 38:18
quiet 168:7
169:18
quietly 168:22
170:20
quite 9:23
118:24
quotes 147:15

## R

radiant 144:5
raise 16:5
169:22
raised 45:18
46:2, 60:12
87:12, 87:14
88:2, 88:12
raising 60:2
ran 103:3
119:17, 149:11
range 160:2
160:12
rapid 164:2
rapidly 70:23
rare 55:2, 84:13
85:8, 85:18
152:10
ratios 178:6
raw 28:5, 111:6
128:7
RAWLE 2:8
reach 46:11
55:14, 78:17
79:3, 79:9
79:18, 80:5
reached 121:19
reaching 78:11
78:12
reacted 38:18
read 50:15
65:25, 66:22
71:7, 74:25
75:1, 77:16
80:14, 80:16
81:16, 82:9

85:11, 85:12
99:5, 118:21
128:4, 136:20
147:11, 153:16
164:11, 180:5
184:1, 185:24
186:1, 190:15
reading 61:22
62:24, 63:7
78:8, 139:3
171:1
real 74:2
169:23
realize 26:1
really 45:16
49:20, 81:21
131:12, 132:2
162:24, 168:20
168:22, 180:4
180:8, 180:11
189:20, 191:3
reason 70:20
112:15, 129:15
138:12, 138:20
reasonable
20:19, 21:1
21:15, 21:22
22:4, 160:2
160:12
reasonably 21:4
reasons 118:10
160:9
REATH 1:14
REBECCA
2:20
rebuttals 37:23
38:25
recall 12:18
23:7, 23:22
51:3, 51:9
51:16, 51:21
52:1, 61:3
61:13, 72:5
79:6, 82:2
89:16, 90:13
91:24, 95:13

111:23, 112:16
136:19, 140:19
146:11, 160:17
162:25, 176:22
176:25, 184:1
184:4
received 52:10
52:13
recess 54:11
106:18, 145:4
171:15
recipient 8:20
recognize 21:21
22:3, 22:10
133:1
recognized
22:11, 128:18
139:14
recognizes
22:15
recollection
96:19, 97:13
97:15, 97:19
97:20, 155:14
recommend
123:10, 123:24
124:10, 130:24
recommendation
123:11, 124:18
148:23, 165:15
recommendati...
132:17, 166:21
167:22
recommended
115:12, 117:6
117:14, 118:11
123:14, 125:2
127:6, 139:18
140:8, 142:19
145:13, 148:19
157:13, 170:19
recommending
131:1, 131:15
131:16, 147:5
161:3, 197:25
record 5:5, 5:9

15:17, 15:20
16:10, 47:15
54:10, 54:15
62:8, 66:22
73:15, 106:17
106:21, 132:8
145:3, 145:7
171:14, 171:19
195:20
**records** 49:7
50:11, 75:20
86:14, 114:9
114:13, 115:24
**Red** 2:4
**redacted** 34:18
**refer** 10:8
24:12, 25:13
74:21, 81:1
81:4, 102:3
150:23, 155:7
155:10, 158:2
192:17
**reference** 17:24
21:9, 62:5
65:15, 66:13
135:25, 136:10
151:16, 152:7
152:11, 152:16
152:19, 158:23
**referenced**
52:17, 62:3
110:20, 114:11
145:9, 189:5
**references**
141:10, 195:4
**referencing**
44:10, 107:6
**referred** 4:22
181:11
**referring** 35:7
35:9, 38:6
45:24, 50:3
50:9, 62:13
62:25, 66:2
69:18, 71:20
76:11, 81:22

93:3, 93:21
100:11, 115:15
151:21, 172:3
176:18, 181:12
184:7, 186:11
187:24
**refers** 23:22
24:9, 75:2, 93:6
93:9, 100:3
100:4, 107:19
186:22, 190:21
**refined** 125:15
**refining** 125:9
**reflected** 175:17
**reflects** 192:12
**refresh** 155:14
177:10
**refuses** 30:5
**refusing** 30:6
**refuted** 173:19
**regard** 10:4
27:3, 62:25
72:8, 131:6
**regarding** 58:17
64:17, 131:23
**regardless**
153:4, 158:25
**regular** 41:7
194:1
**regularly** 19:3
111:17
**regulate** 138:11
138:20
**regulated** 41:6
139:1, 139:2
**regulation** 17:5
71:14
**regulations** 13:3
13:11, 14:13
14:23, 34:6
67:7, 69:8
69:15, 69:17
**regulators**
103:8
**regulatory** 11:6
18:10, 46:8

105:8
**rejected** 126:23
**related** 7:14, 9:9
9:24, 12:21
17:6, 27:15
30:18, 47:9
47:19, 48:1
49:3, 49:19
50:5, 50:6, 51:6
51:15, 56:12
57:17, 63:1
64:2, 64:23
67:5, 68:9
69:25, 76:2
79:2, 79:15
84:15, 85:10
85:19, 87:3
101:9, 105:3
106:5, 108:2
111:23, 179:22
184:22, 185:18
186:16, 187:3
189:20, 189:21
**relating** 8:7
27:5, 86:24
**relation** 7:10
40:4
**relations** 56:3
56:8, 195:14
**relationship**
33:10, 40:4
46:17
**relative** 141:15
200:16, 200:18
**release** 34:10
36:12, 36:17
37:13, 37:17
43:8, 174:24
175:22, 187:11
187:12
**released** 34:22
35:4, 37:10
37:16, 98:8
98:18, 102:5
192:15
**relevant** 10:5

44:24, 44:25
45:3, 67:6
**reliability** 25:3
**reliable** 120:5
121:17, 124:5
125:10, 131:25
**reliably** 115:3
**relied** 59:5
59:18, 140:21
159:13
**rely** 18:16
70:11, 102:19
157:7
**remain** 13:3
**remarks** 81:5
**remember** 20:4
23:8, 43:6, 43:9
51:23, 51:25
107:20, 145:10
149:19, 176:7
176:12, 189:24
**removal** 164:3
**render** 16:20
**repeat** 14:22
21:20, 89:12
152:24, 153:1
165:16, 167:4
170:6
**repeatedly**
87:12, 88:2
140:9
**rephrase** 111:7
**report** 37:15
38:20, 90:6
93:13, 94:14
95:2, 96:3, 96:6
96:14, 96:17
96:19, 96:23
97:5, 97:15
97:18, 97:21
98:12, 112:13
112:24, 121:18
142:24, 143:6
152:12, 152:13
158:2, 162:15
162:16, 162:21

163:7, 172:17
172:19, 173:7
173:15, 174:5
174:11, 174:15
174:19, 174:21
174:25, 175:3
175:22, 177:4
178:1, 184:15
196:4, 196:8
197:4, 197:8
202:3, 202:12
202:17, 202:18
**reported** 92:11
120:6, 120:8
122:15, 173:22
174:6, 174:15
174:17, 175:8
178:16
**reporter** 1:13
5:10, 11:2
200:4
**reports** 18:22
25:12, 27:15
34:8, 36:10
36:19, 36:21
36:25, 84:4
90:14, 93:4
95:4, 96:25
97:2, 150:1
162:23, 176:14
176:16, 182:7
183:10, 185:13
185:21, 189:10
189:13, 189:16
**represent** 94:22
95:8, 98:11
98:23
**representation**
95:12
**representative**
7:6, 155:13
182:13
**represented**
93:15, 93:24
94:3, 94:5, 96:9
97:9

**representing** 5:5
**reproduce** 171:7
**request** 9:25
18:25, 34:17
34:20, 34:23
52:16, 166:14
197:13
**requesting** 52:14, 61:6
**require** 12:24
13:4, 14:13
14:23, 17:6
18:20, 62:18
**required** 19:5
86:20, 87:1
111:15, 119:4
132:24
**requirement** 143:16
**requiring** 71:13
164:2
**reread** 190:17
**research** 6:16
15:12, 35:24
59:5, 60:5
84:20, 148:1
201:11
**resolved** 68:24
69:24
**resources** 17:15
17:18, 17:20
18:4, 18:8, 23:1
23:4, 23:18
27:3
**respect** 31:13
39:6, 79:25
152:5
**respectfully** 135:8
**respectively** 164:5
**respond** 19:2
46:16, 59:6
59:19, 60:2

**155:2**
**responding** 59:3
59:16, 60:11
61:18, 155:4
**response** 68:12
81:8, 133:15
134:21, 135:24
151:23, 178:11
178:22, 192:1
192:9, 193:11
193:21, 194:25
**responses** 7:9
**responsibility** 19:8, 21:15
21:22
**responsible** 20:6
34:3, 57:3
61:18, 194:13
**responsive** 153:17, 154:19
180:6
**rest** 11:3, 57:19
**restate** 72:6
73:21
**result** 58:19
98:5, 103:15
110:18, 143:15
**results** 30:23
30:25, 32:20
56:18, 59:11
102:14, 102:20
103:9, 103:13
103:17, 103:21
103:22, 103:25
104:8, 104:21
104:25, 105:3
110:5, 110:22
110:24, 111:1
117:2, 121:20
160:16, 160:22
163:4, 171:8
173:13, 173:15
183:18, 184:11
187:8, 187:11
188:11, 189:8
190:8

**retained** 185:13
**retention** 49:11
49:19
**retest** 177:19
**retesting** 177:12
**retired** 12:3
12:7
**retracted** 38:21
**Reuters** 190:10
190:12, 191:10
191:25, 192:9
192:25, 193:2
193:3, 193:11
193:13, 193:21
194:5, 194:25
**revealed** 80:3
**review** 9:20
10:2, 17:15
19:20, 19:23
25:20, 27:18
30:23, 30:25
33:9, 38:8
47:16, 47:23
49:23, 50:22
50:25, 62:25
63:25, 64:1
75:3, 76:1
81:20, 82:3
95:16, 97:17
107:17, 112:21
120:24, 132:2
151:24, 157:17
168:12, 175:1
**reviewed** 7:14
8:1, 8:3, 21:7
50:3, 50:7
51:10, 57:22
57:24, 57:25
57:25, 58:14
80:7, 89:22
126:25, 127:8
130:4, 131:10
**reviewing** 19:24
116:10, 183:10
**reviews** 20:12
**revisited** 125:16

**revolving** 45:1
45:15
**Reynolds** 163:16
**Rich** 132:5
201:23
**right** 26:4, 38:4
45:22, 46:15
46:19, 49:13
49:16, 53:19
60:16, 62:10
63:19, 73:5
73:13, 99:18
104:18, 108:13
116:20, 117:9
118:11, 119:1
122:10, 122:21
125:18, 130:19
140:5, 142:13
146:17, 149:18
151:23, 153:5
154:6, 154:7
162:22, 162:22
168:7, 169:18
176:1, 177:21
187:13, 189:2
191:3, 197:14
199:8
**rigorous** 86:9
**risk** 14:21, 65:4
67:1, 107:12
**Road** 1:14, 3:4
**Robert** 147:23
**robust** 86:9
**rock** 75:17
**role** 12:21
**Rolle** 147:23
**ROME** 2:18
**Roth** 2:3, 3:12
**Roughly** 74:23
**rounding** 6:8
**routine** 128:24
**routinely** 19:3
108:7
**RTM** 65:7
**rule** 62:17

63:22, 119:12
**Rules** 1:12
**run** 108:18
116:13, 121:25

**S**

**safe** 20:20
20:24
**safety** 13:6
13:12, 13:15
13:25, 14:15
14:25, 15:9
15:11, 15:14
17:6, 17:10
17:16, 18:21
19:4, 19:9
19:10, 19:25
20:12, 20:25
22:7, 34:1
39:11, 40:1
40:12, 42:22
44:6, 45:2, 45:9
45:19, 46:2
46:9, 55:17
56:4, 56:12
56:15, 59:4
59:17, 60:3
60:12, 63:1
63:25, 64:2
86:21, 86:25
110:16, 110:25
193:13, 193:24
193:25, 194:13
**Sam** 41:24
42:16
**sample** 27:5
72:18, 117:19
133:20, 141:1
141:18, 143:15
162:18, 177:5
178:3
**samples** 28:21
29:3, 31:11
32:1, 32:9
32:10, 33:13

| | | | | |
|---|---|---|---|---|
| 33:14, 119:18 | 146:4, 146:9 | 16:1, 16:5, 16:6 | 84:20, 84:24 | **seeing** 23:22 |
| 141:17, 143:9 | 146:13, 146:16 | 45:13, 45:14 | 90:18, 95:4 | 51:3, 51:9 |
| 160:18, 161:23 | 148:2, 149:18 | 79:21, 79:24 | 96:4, 96:16 | 51:16, 51:21 |
| 176:17, 177:13 | 149:22, 150:1 | 166:15 | 97:4, 99:11 | 57:19, 82:2 |
| 185:13, 198:10 | 160:3, 160:14 | **scratch** 89:2 | 103:9, 104:12 | 89:16, 96:19 |
| 198:14 | 160:15, 160:17 | **screen** 144:17 | 104:13, 114:15 | **seen** 6:2, 6:10 |
| **sat** 183:16 | 160:23, 164:22 | 173:11, 195:22 | 116:2, 116:16 | 38:4, 38:9 |
| **satisfy** 72:2 | 166:8, 166:12 | **screening** | 120:7, 120:8 | 47:25, 57:14 |
| **saw** 6:5, 44:10 | 169:5, 169:9 | 117:19, 128:25 | 120:13, 120:14 | 57:17, 57:18 |
| 81:23, 162:21 | 169:10, 169:18 | **se** 88:10, 91:25 | 120:15, 122:1 | 62:5, 64:22 |
| **saying** 46:16 | 170:4, 177:2 | **search** 50:5 | 122:5, 122:9 | 70:5, 72:12 |
| 49:4, 51:12 | 180:20, 190:10 | **searched** 48:25 | 128:3, 128:8 | 90:21, 99:7 |
| 69:2, 73:3, 75:8 | 190:18, 192:6 | **searching** 9:22 | 128:15, 130:5 | 103:4, 121:5 |
| 75:9, 77:21 | 197:14 | **second** 26:24 | 130:18, 130:21 | 124:22, 124:23 |
| 88:4, 91:24 | **scan** 116:14 | 38:12, 70:20 | 132:22, 133:4 | 130:3, 131:19 |
| 93:8, 109:1 | 116:14, 116:14 | 90:20, 92:7 | 133:21, 137:24 | 134:20, 140:18 |
| 110:13, 120:20 | 116:15 | 108:10, 120:9 | 140:16, 140:25 | 144:7, 145:23 |
| 129:9, 129:11 | **scanning** 130:8 | 120:24, 126:19 | 141:2, 141:13 | 148:12, 148:14 |
| 130:22, 133:21 | 163:22, 177:6 | 128:4, 129:10 | 141:15, 141:20 | 148:22, 161:7 |
| 135:7, 136:7 | 197:15 | 159:25, 176:2 | 142:7, 143:3 | 164:8, 166:6 |
| 144:4, 154:6 | **scenario** 195:21 | 188:24, 190:9 | 143:10, 143:19 | 169:2, 171:3 |
| 161:14, 161:15 | **Schaffner** | **section** 74:21 | 144:7, 144:23 | 173:9, 176:14 |
| 174:5, 181:2 | 175:21 | 75:13, 85:1 | 145:21, 146:4 | 176:16, 176:21 |
| 181:8, 182:1 | **school** 140:15 | **Sector** 42:4 | 146:11, 146:14 | 177:2, 188:14 |
| 186:24 | 140:20, 141:12 | **security** 194:2 | 146:21, 147:21 | **selected** 119:7 |
| **says** 24:6, 26:16 | 141:24, 142:20 | 194:10 | 148:10, 149:24 | **selection** 75:18 |
| 27:2, 33:2, 52:9 | 142:25, 143:7 | **see** 7:10, 24:5 | 150:3, 150:5 | **SELVAGGIO** |
| 58:14, 64:24 | 165:3, 189:17 | 24:6, 24:8 | 150:6, 158:13 | 1:7 |
| 65:14, 65:24 | 196:1, 197:5 | 24:10, 24:15 | 158:14, 158:14 | **send** 46:15 |
| 67:2, 67:3 | 197:11, 197:20 | 25:8, 26:16 | 158:23, 159:5 | 90:14, 103:25 |
| 70:10, 70:22 | 202:3 | 26:19, 26:20 | 159:6, 159:10 | **senior** 6:16 |
| 75:13, 78:9 | **science** 8:11 | 26:25, 27:2 | 159:18, 159:23 | **sense** 134:25 |
| 89:25, 92:14 | 61:15 | 27:7, 32:17 | 159:25, 160:6 | 135:6, 171:3 |
| 92:22, 95:5 | **Sciences** 107:23 | 33:12, 35:14 | 160:20, 160:25 | **sensitive** 116:11 |
| 96:16, 99:16 | **scientific** 44:22 | 36:7, 36:13 | 161:2, 162:6 | 116:20, 117:7 |
| 101:13, 108:5 | 62:20, 63:10 | 36:22, 37:2 | 162:16, 163:2 | 117:20, 118:9 |
| 116:2, 116:3 | 63:21, 64:1 | 37:20, 39:2 | 163:5, 163:13 | 122:20, 123:9 |
| 116:7, 118:11 | 68:21, 84:5 | 39:4, 39:8 | 164:5, 164:10 | 124:6, 125:24 |
| 118:13, 118:22 | 85:20, 86:9 | 43:17, 43:18 | 164:15, 166:5 | 126:7, 126:16 |
| 119:3, 119:6 | 113:2, 113:17 | 48:12, 52:18 | 166:12, 166:18 | 127:7, 130:23 |
| 120:15, 121:22 | 124:14, 191:1 | 58:8, 58:10 | 167:23, 168:14 | 131:8, 131:16 |
| 128:3, 129:13 | 195:4 | 58:13, 58:14 | 168:25, 171:2 | 133:2, 133:10 |
| 129:14, 129:14 | **scientifically** | 58:22, 61:1 | 176:4, 177:7 | 133:16, 133:17 |
| 129:22, 130:7 | 195:6 | 63:8, 65:8, 66:4 | 178:7, 178:24 | 134:14, 134:22 |
| 138:4, 141:15 | **scientists** 20:20 | 70:18, 75:20 | 184:25, 189:20 | 134:23, 135:3 |
| 143:5, 144:15 | **scope** 15:24 | 76:10, 81:18 | 191:4 | 135:15, 135:22 |

136:1, 137:6
197:16
**sensitivity** 25:3
115:5, 115:10
116:13, 118:25
126:4, 130:11
130:14, 131:6
131:8, 133:14
133:22, 134:2
134:7
**sent** 46:12, 95:2
95:14, 96:4
97:16, 103:14
103:18, 104:15
105:21, 162:17
185:12, 185:20
185:22, 187:2
187:4
**sentence** 65:23
93:9, 118:22
**separate** 68:13
124:22
**separated** 141:1
160:19
**separation**
26:17, 144:6
166:16
**September**
90:17
**series** 172:24
**serpentine**
98:24, 141:20
197:22
**service** 26:17
41:9, 41:14
**SERVICES**
1:22
**set** 200:14
**sets** 186:21
**seven** 122:13
122:15
**severe** 80:13
80:22, 81:14
**shafts** 76:18
77:3, 182:8
**shape** 128:24

**shaping** 194:23
**share** 19:4
103:22
**shared** 23:21
101:10
**sheet** 147:8
**shelf** 100:5
100:13, 100:24
101:1, 101:21
**Shelley** 145:25
146:4, 150:1
**ship** 14:1
**shooting** 151:24
**shortcomings**
114:21
**Shorthand**
200:4
**show** 30:19
30:21, 38:5
38:7, 69:17
74:6, 91:4
99:18, 115:23
132:4, 137:12
148:10, 159:2
168:10, 185:20
185:22, 188:8
192:14
**showed** 53:17
98:5, 101:24
124:5, 125:8
169:14, 169:15
170:3, 171:9
180:15
**Shower** 37:13
37:13, 75:24
75:25, 91:2
91:2, 91:11
91:12, 92:4
92:4, 95:10
95:10, 95:21
95:21, 96:11
96:11, 96:21
96:21, 97:10
97:11, 113:20
113:20, 175:5
175:6, 176:20

**176:21, 177:5**
177:5, 177:23
177:23, 192:19
192:19
**showing** 39:12
71:18, 100:19
178:5
**shown** 92:12
92:25, 100:25
161:9
**shows** 122:3
129:4, 129:21
141:17, 160:23
**shred** 90:25
91:10, 91:16
**side** 61:16
61:20, 62:1
62:23, 63:2
63:5, 64:5
64:12, 64:19
**significant**
26:23, 53:8
56:18, 59:25
**significantly**
115:10
**simple** 30:13
30:13, 30:16
150:12, 153:9
153:9, 156:3
156:4
**simply** 133:2
133:10
**single** 28:24
98:5, 98:11
98:12, 98:17
98:19, 100:18
103:15
**sit** 28:23, 29:17
31:13, 32:3
32:14, 41:19
79:7, 79:16
80:2, 93:7, 96:8
96:17, 97:7
101:24, 108:17
109:24, 140:7
157:18, 157:22

**172:4, 172:8**
**sitting** 162:22
**six** 122:5
122:12, 122:15
178:4
**slight** 141:17
**slowly** 177:2
**small** 68:20
118:24, 162:3
**SMITH** 2:20
13:8, 13:17
13:19, 14:3
14:10, 14:18
15:3, 15:16
15:23, 16:7
16:13, 16:21
17:2, 17:8
17:17, 18:6
18:12, 18:17
18:23, 19:12
19:17, 20:14
20:22, 21:5
21:19, 22:1
22:8, 22:13
22:20, 23:3
23:16, 23:24
24:16, 24:20
24:22, 25:9
25:14, 26:7
26:10, 26:14
27:12, 27:22
28:13, 29:1
29:10, 29:22
30:2, 30:6
30:10, 30:15
31:17, 31:19
32:6, 32:21
34:2, 34:12
34:25, 35:6
35:16, 39:17
40:14, 40:22
41:4, 41:11
41:17, 41:23
42:11, 42:24
43:4, 43:11
43:21, 44:3

**44:16, 44:19**
45:4, 45:12
45:23, 46:6
46:21, 46:23
47:4, 48:6
48:21, 49:6
49:10, 49:17
49:25, 50:17
50:21, 51:2
51:8, 51:19
51:24, 52:24
53:7, 53:13
53:22, 53:24
54:6, 54:25
55:20, 55:25
56:7, 56:14
56:23, 57:1
57:23, 59:8
59:20, 60:6
60:9, 60:17
60:20, 61:23
62:4, 62:11
63:6, 63:18
64:13, 64:17
65:13, 65:20
66:1, 67:14
67:19, 68:11
68:15, 69:3
69:9, 69:16
70:1, 71:17
72:4, 73:1
73:14, 74:11
74:17, 76:24
77:9, 77:24
78:7, 78:14
78:18, 78:22
79:4, 79:10
79:20, 80:6
80:14, 80:17
80:23, 82:1
82:8, 82:14
82:21, 83:4
83:10, 83:14
83:19, 83:24
84:8, 84:17
86:1, 86:5

86:16, 86:22
87:8, 87:21
91:14, 91:17
91:23, 93:19
95:1, 95:24
96:1, 96:12
96:22, 97:12
97:14, 97:24
100:2, 100:21
101:8, 102:2
109:15, 114:5
114:24, 115:7
115:22, 116:22
121:9, 122:22
124:2, 125:6
126:9, 132:10
132:19, 133:8
133:12, 134:6
134:18, 135:19
136:8, 136:12
136:17, 136:20
137:8, 137:10
137:15, 137:17
137:20, 138:8
138:15, 138:24
139:22, 140:12
144:3, 144:12
145:16, 146:25
148:21, 149:3
149:14, 150:10
151:1, 151:5
151:8, 151:13
152:9, 152:22
153:6, 153:12
153:20, 153:23
153:25, 154:3
154:12, 154:16
154:23, 155:4
155:7, 155:12
155:17, 155:21
155:25, 156:5
156:10, 156:12
156:19, 157:2
157:4, 157:10
157:15, 158:1
161:6, 164:21

165:7, 165:24
166:25, 167:11
168:3, 168:8
169:1, 169:8
169:19, 170:9
170:15, 170:22
170:25, 172:1
173:24, 180:7
180:9, 180:12
181:9, 182:6
182:17, 183:15
184:18, 185:19
186:2, 186:18
187:14, 187:22
192:3, 194:16
195:1, 195:15
199:21
**sold** 74:14, 76:6
76:14, 76:22
77:6, 77:22
**somebody** 46:3
46:9, 114:14
176:13
**sorry** 60:10
176:19, 187:18
**sort** 86:7
162:13
**sounds** 23:8
91:3, 164:24
165:15, 166:2
**source** 30:21
31:1, 77:11
92:10, 92:15
92:19, 102:24
108:19, 108:23
109:7, 138:22
183:2
**sourced** 32:16
32:18, 107:3
109:14, 111:10
111:20
**sources** 102:11
108:21, 181:17
182:4
**speak** 8:24
10:21, 17:18

23:4, 23:17
28:9, 29:7
45:16, 49:12
49:20, 110:9
114:25, 133:24
136:15, 137:2
183:24, 184:5
191:20, 193:20
**speakerphone**
2:8, 2:13, 3:3
**speaking** 12:12
**speaks** 179:4
**special** 89:18
**specialized**
26:22
**species** 81:7
**specific** 18:25
20:4, 39:6, 51:3
51:9, 51:16
51:21, 55:3
64:2, 68:6, 72:5
83:21, 88:5
95:7, 95:13
112:1, 113:1
113:7, 113:10
113:15, 144:14
159:6, 161:10
176:22, 184:6
184:13, 186:23
**specifically** 8:2
8:3, 8:22, 9:6
9:7, 30:1, 31:5
42:22, 45:25
47:20, 66:15
77:12, 88:9
89:9, 93:12
94:22, 96:9
98:23, 100:11
104:4, 126:23
135:23, 140:19
141:6, 144:4
149:7, 163:1
176:7, 176:25
179:25, 180:19
182:10, 184:24
195:11

**specification**
65:16, 66:3
66:10, 119:23
132:7, 132:23
148:23, 149:23
**specifications**
65:6, 66:17
104:14, 148:4
148:18
**specificity** 119:1
151:18, 160:7
**specifics** 79:6
**specify** 156:20
**speech** 135:18
154:22
**speed** 175:11
**Spell** 11:2
**Sperry-Rand**
176:3, 176:7
176:9, 176:13
176:15, 176:19
177:6, 177:12
177:17, 177:23
178:1, 178:10
**spiked** 120:10
120:12, 120:16
120:16, 121:23
121:24, 122:7
160:18
**spoke** 10:24
10:25, 11:20
12:8, 25:11
61:5, 127:2
175:8
**spoken** 77:16
**Square** 2:18
**SRD** 135:14
**staff** 52:22, 53:5
53:19, 54:2
**staining** 163:24
**stand** 180:23
**standard** 47:11
70:24, 72:7
111:14, 111:16
112:8, 112:11
124:8, 124:11

125:13, 125:22
140:1, 170:5
**standards** 22:7
144:9, 192:8
**stands** 107:21
**start** 182:25
**started** 6:12
11:9, 12:6
15:18
**starting** 7:16
68:18, 106:2
**starts** 25:17
104:9, 169:22
**state** 1:13, 13:11
36:24, 73:14
90:20, 92:7
128:20, 132:22
189:25, 200:4
200:24
**stated** 20:24
90:4, 117:3
160:10, 160:10
**statement** 13:14
14:7, 18:1
36:11, 52:15
72:5, 78:8
95:13, 134:10
134:20, 135:1
**statements**
38:21, 71:22
**states** 26:21
43:14, 61:3
72:15, 74:21
81:5, 85:2
103:4, 127:22
128:17, 130:9
130:10, 147:23
159:20, 178:1
**stating** 25:1
73:23
**stationery**
149:17
**stay** 92:15
102:8
**stenographic**
5:8

**stenographically** 200:12
**step** 116:14
117:19, 129:9
129:10, 130:8
163:22, 197:15
**sticker** 33:19
33:21
**Stony** 52:14
**stop** 73:19
153:13, 153:14
153:18, 153:18
154:5, 154:8
154:11, 154:12
154:16, 199:18
**stopped** 28:19
35:3
**story** 73:8
190:24, 193:4
**straight** 72:20
**straightforward** 164:1
**strange** 134:3
**Street** 1:22, 2:8
**strike** 134:10
135:9, 152:4
154:19
**striving** 134:2
**strongly** 38:16
81:12, 130:13
**structure** 93:9
**structured** 41:7
**structures** 99:25
**Stuart** 23:5
23:10, 23:13
26:17
**studied** 85:3
92:10, 92:25
**studies** 67:22
83:6
**study** 107:17
159:20
**stuffed** 109:23
**subject** 35:19
36:12, 60:25
74:20, 132:6

137:23, 151:24
163:12, 168:12
175:5, 188:18
**subjects** 199:19
**submission** 99:2
99:9, 195:22
198:12, 202:19
**submissions**
92:11, 157:8
159:13, 188:17
188:22
**submit** 37:23
**submitted** 36:10
36:20, 177:5
**subsequent**
129:3, 129:20
198:12
**substance** 16:19
**substantiate**
19:9
**substantiated**
13:6, 13:12
13:24
**substantive** 52:4
52:8
**subtrace** 71:5
**success** 144:22
**successful**
170:13
**sued** 49:15
**suffer** 118:23
**suffering** 56:3
**sufficient** 25:3
53:1, 174:9
**suggested** 124:7
144:22
**suggesting**
199:9
**suggests** 21:1
84:13, 85:8
**Suite** 1:22
**suits** 49:18
**summarizing**
188:3
**summary** 81:5
188:10

**Superior** 1:1
1:12
**supplied** 111:2
114:2
**supplier** 132:20
**suppliers** 132:9
**support** 59:6
60:5, 62:20
63:4, 63:10
63:15, 63:21
64:7, 91:10
111:20
**supposed** 25:22
**supposedly**
63:10
**suppress** 169:11
**sure** 10:10
14:23, 15:6
16:8, 17:9
25:21, 32:11
37:5, 42:6
57:16, 59:21
73:23, 84:2
88:23, 91:5
93:8, 107:5
125:10, 125:16
129:16, 158:3
162:17, 173:8
178:17, 179:10
191:9, 191:23
195:5
**surprised**
165:14, 180:1
180:4, 184:6
**survey** 29:2
30:24, 92:15
93:21, 100:4
101:10, 101:14
109:3, 109:5
111:5
**surveys** 29:23
29:25, 95:15
100:12, 182:8
**SUSAN** 1:9, 4:3
**suspect** 21:2
21:16, 21:23

22:5
**suspected**
141:19
**swear** 5:11
**switched** 109:9
**sworn** 5:13
200:7
**symposia**
189:25
**system** 19:24
104:9
**systems** 9:14
81:11
**Szczepaniak**
11:1, 194:11

| **T** |
| --- |

**T.H** 145:25
**tab** 107:18
107:19, 108:4
186:12
**table** 141:16
142:7, 160:22
160:23, 177:12
**tables** 151:21
**tag** 74:9
**take** 8:18, 33:15
43:6, 58:4
81:20, 105:12
106:14, 129:9
144:25, 155:21
161:18, 171:11
**taken** 1:12
54:11, 100:13
106:18, 145:4
171:15, 193:5
200:12
**talc** 1:4, 1:7
2:10, 6:20, 6:25
7:9, 7:24, 8:7
12:24, 16:25
17:7, 17:21
18:5, 18:22
20:13, 21:17
21:24, 22:5

22:11, 22:21
23:2, 23:15
24:14, 25:25
27:10, 27:20
28:4, 28:11
28:20, 28:21
28:24, 29:12
29:19, 30:21
31:2, 31:2
31:15, 34:4
34:8, 35:20
36:6, 37:18
37:25, 38:14
39:7, 39:11
40:2, 40:7
40:21, 41:2
42:22, 44:2
44:6, 45:9
45:19, 46:3
48:14, 49:15
49:20, 51:7
51:15, 63:1
63:25, 65:2
65:3, 65:6
65:14, 66:3
66:11, 66:14
66:15, 66:18
66:24, 66:25
67:5, 67:7
69:13, 70:25
71:1, 71:2, 71:3
71:4, 72:17
74:14, 74:14
74:20, 74:24
75:2, 75:4, 75:7
75:7, 75:10
75:15, 76:5
76:9, 76:10
76:14, 76:14
76:19, 76:22
77:3, 77:6, 77:6
77:12, 77:13
77:21, 77:22
78:6, 78:10
78:16, 79:2
79:9, 79:18

| | | | | |
|---|---|---|---|---|
| 80:4, 80:13 | 146:24, 147:2 | 93:11, 136:3 | **techniques** 74:3 | 110:5, 110:18 |
| 80:22, 81:15 | 147:16, 147:21 | 136:12, 136:15 | 148:5, 149:23 | 110:22, 110:24 |
| 82:6, 82:12 | 148:4, 148:7 | 151:10, 154:20 | 152:18, 168:21 | 111:1, 111:15 |
| 82:17, 83:7 | 148:9, 149:12 | 170:1, 194:15 | **technologic** | 112:3, 115:3 |
| 83:13, 83:16 | 150:2, 150:8 | 194:17 | 59:23 | 120:4, 121:12 |
| 83:16, 83:20 | 150:14, 156:9 | **talked** 54:19 | **technology** | 121:15, 121:20 |
| 83:22, 84:5 | 156:17, 156:25 | 124:25, 136:22 | 52:11, 168:24 | 122:15, 123:8 |
| 84:13, 84:16 | 157:14, 157:25 | **talking** 68:2 | **telephone** 52:10 | 126:2, 126:10 |
| 84:20, 85:2 | 158:12, 159:8 | 74:2, 75:23 | **tell** 32:23, 33:13 | 126:10, 163:4 |
| 85:3, 85:8 | 159:22, 160:24 | 75:24, 112:18 | 41:19, 51:25 | 171:23, 172:9 |
| 85:11, 87:11 | 160:25, 161:25 | 122:23, 131:21 | 57:20, 73:8 | 176:3, 176:9 |
| 87:19, 87:23 | 162:2, 162:14 | 139:7, 147:10 | 94:24, 103:24 | 181:6, 190:8 |
| 88:1, 88:5, 88:6 | 163:13, 166:9 | 152:12, 155:25 | 104:2, 104:4 | 192:7, 197:19 |
| 88:22, 89:18 | 166:17, 168:13 | 169:22, 176:8 | 105:14, 127:10 | **tested** 28:7 |
| 90:4, 92:9 | 172:24, 175:5 | 184:13, 188:10 | 150:19, 150:19 | 28:17, 28:21 |
| 92:19, 92:23 | 175:15, 175:19 | 188:20, 190:21 | 150:24, 151:15 | 29:13, 31:6 |
| 94:5, 94:23 | 176:3, 176:6 | 192:4, 192:24 | 152:5, 152:8 | 31:15, 31:20 |
| 103:9, 105:4 | 176:10, 176:20 | 193:14, 194:10 | 158:8, 160:6 | 31:24, 32:1 |
| 106:1, 106:10 | 176:21, 178:7 | 194:11 | 194:3 | 32:15, 100:7 |
| 107:25, 108:11 | 179:4, 179:11 | **talks** 24:5, 24:25 | **telling** 142:15 | 100:13, 101:5 |
| 108:18, 109:1 | 180:2, 180:21 | 25:25, 38:13 | 180:25, 181:5 | 102:6, 102:11 |
| 109:4, 109:6 | 181:1, 181:8 | 39:4, 43:7, 58:8 | **TEM** 123:8 | 107:5, 125:15 |
| 109:8, 109:13 | 182:1, 182:2 | 70:6, 76:5, 92:4 | 123:11, 123:15 | 162:18, 172:24 |
| 110:14, 111:1 | 182:4, 182:5 | 116:6, 120:9 | 123:17, 123:24 | 176:6, 181:3 |
| 111:10, 111:20 | 182:9, 182:14 | 121:12, 130:6 | 124:3, 124:12 | 182:14 |
| 111:23, 112:2 | 182:15, 182:22 | 138:1, 140:25 | 125:22, 126:3 | **testified** 75:14 |
| 113:4, 113:12 | 182:24, 183:2 | 149:18, 152:16 | 133:1 | 135:9 |
| 115:19, 116:2 | 183:3, 183:12 | 159:25, 160:22 | **ten** 6:7, 6:11 | **testify** 102:15 |
| 118:15, 120:16 | 184:22, 184:23 | 161:22, 163:15 | 74:23, 78:3 | 102:17, 136:5 |
| 120:16, 121:14 | 185:8, 185:18 | 167:21, 169:7 | **term** 40:3 | 200:8 |
| 121:23, 121:23 | 186:17, 187:19 | 190:10 | **terminology** | **testimony** 81:24 |
| 121:24, 122:8 | 190:6, 190:13 | **team** 194:7 | 48:8 | 88:11, 94:11 |
| 124:1, 124:12 | 190:25, 191:2 | **tease** 22:24 | **terms** 45:1, 94:5 | 135:9, 139:3 |
| 125:4, 127:13 | 193:12, 193:25 | **TEC** 1:6 | 110:17, 112:5 | 152:4, 186:14 |
| 127:17, 128:5 | 194:13, 201:10 | **technical** 162:24 | 158:17 | 200:12 |
| 128:13, 128:20 | 201:20, 202:6 | **technically** | **test** 27:15, 28:24 | **testing** 6:25, 7:7 |
| 129:1, 132:6 | **talc-containing** | 165:16, 167:14 | 29:12, 31:9 | 7:18, 7:20, 7:21 |
| 132:9, 132:24 | 25:5 | 169:15, 170:4 | 32:20, 59:10 | 7:24, 8:7, 9:15 |
| 133:3, 133:11 | **talcs** 28:1, 28:17 | 171:5 | 98:5, 100:18 | 12:9, 16:25 |
| 134:15, 135:16 | 29:3, 130:16 | **technique** | 100:25, 102:13 | 17:6, 17:21 |
| 138:6, 138:14 | **talcum** 22:17 | 148:20, 150:3 | 103:12, 103:15 | 17:25, 18:4 |
| 138:17, 139:12 | 33:9, 172:7 | 160:1, 160:11 | 103:17, 103:21 | 18:21, 23:2 |
| 139:21, 141:1 | 190:13, 193:8 | 161:13, 161:20 | 103:25, 104:8 | 23:15, 25:15 |
| 142:4, 142:9 | **talk** 12:19, 30:2 | 163:24, 167:25 | 104:21, 105:3 | 27:10, 27:13 |
| 143:1, 143:9 | 30:4, 36:15 | 168:6, 171:24 | 108:18, 109:12 | 27:20, 27:24 |
| 144:17, 146:14 | 65:10, 67:4 | 172:11, 196:17 | 109:16, 109:21 | 28:1, 28:2, 28:4 |

| | | | | |
|---|---|---|---|---|
| 28:5, 28:11 | 176:17, 177:17 | 127:19, 132:11 | 145:7, 146:22 | 199:20 |
| 28:20, 29:19 | 177:23, 181:25 | 133:1, 134:3 | 148:9, 148:10 | **today's** 9:20 |
| 30:20, 31:7 | 182:3, 184:3 | 137:15, 142:3 | 148:24, 149:2 | 10:7, 21:10 |
| 31:23, 32:7 | 184:22, 185:17 | 144:10, 154:19 | 149:4, 150:7 | 43:24, 47:17 |
| 34:1, 34:8, 35:3 | 185:21, 186:15 | 165:8, 165:25 | 150:13, 153:15 | 47:24, 48:3 |
| 44:6, 51:15 | 186:20, 186:22 | 170:2, 182:18 | 154:11, 159:3 | 48:17, 49:22 |
| 56:16, 56:18 | 186:25, 187:1 | 187:11, 189:5 | 164:2, 164:14 | 51:1, 51:13 |
| 56:19, 59:10 | 189:8, 189:21 | 192:21, 193:1 | 164:15, 171:10 | 57:22, 89:23 |
| 59:24, 64:17 | 190:1, 190:6 | 193:3, 194:3 | 171:12, 171:17 | 127:9, 190:16 |
| 64:23, 65:11 | 190:7, 190:22 | 199:18 | 174:13, 176:1 | 192:24, 199:23 |
| 66:13, 66:21 | 190:25, 191:2 | **thinking** 10:18 | 176:24, 185:16 | **toiletry** 123:13 |
| 68:4, 68:5 | 192:18, 193:7 | 125:14 | 187:16, 187:21 | 127:19, 148:2 |
| 68:23, 70:3 | 196:24, 197:12 | **thinks** 174:8 | 199:22, 200:13 | 149:8 |
| 79:22, 88:18 | **tests** 32:4 | **third** 116:7 | **times** 28:3, 28:3 | **told** 36:15 |
| 90:15, 97:3 | 104:12, 104:13 | **thought** 86:9 | 28:17, 36:10 | 36:16, 44:14 |
| 100:1, 101:24 | 104:25, 116:24 | 173:5, 173:18 | 112:22, 134:1 | 44:18, 46:19 |
| 102:16, 102:21 | 117:1, 117:1 | 173:21, 174:17 | 145:10, 164:4 | 73:19, 79:8 |
| 103:9, 103:9 | 117:5, 117:7 | 179:14 | 170:7 | 79:17, 89:9 |
| 104:8, 104:10 | 118:8, 121:25 | **thousands** | **tiny** 99:6 | 89:13, 90:10 |
| 106:4, 106:10 | 158:18, 186:6 | 110:21, 110:22 | **title** 61:13 | 90:24, 91:9 |
| 107:2, 107:4 | 198:1 | **three** 106:8 | 142:25 | 91:19, 91:22 |
| 107:14, 108:1 | **thanks** 5:18 | 107:7, 186:21 | **titled** 24:14 | 92:18, 93:15 |
| 108:7, 108:11 | 192:21 | 193:25 | **today** 7:4, 8:15 | 93:17, 93:25 |
| 108:21, 108:22 | **theme** 190:11 | **throw** 129:18 | 9:1, 9:25, 10:17 | 94:3, 94:12 |
| 109:18, 109:19 | 191:10 | **Tim** 11:20 | 13:3, 16:8 | 95:20, 95:22 |
| 109:25, 110:10 | **theoretical** | **time** 5:7, 6:5 | 25:20, 28:23 | 98:4, 99:24 |
| 111:17, 113:10 | 107:9 | 7:21, 8:18, 11:8 | 29:17, 30:20 | 105:3, 127:4 |
| 114:22, 115:12 | **thereto** 7:10 | 14:15, 14:25 | 31:14, 32:3 | 138:19, 158:20 |
| 115:16, 120:22 | **thermal** 116:15 | 17:24, 28:10 | 32:14, 36:4 | 162:12, 178:14 |
| 123:25, 124:7 | **thin** 72:20 | 33:19, 35:24 | 41:19, 52:3 | 183:6, 183:10 |
| 124:11, 125:22 | **thing** 24:6 | 37:11, 37:23 | 74:7, 79:7 | 190:23 |
| 126:4, 126:17 | 45:20, 46:19 | 42:19, 46:2 | 79:16, 79:21 | **top** 23:7, 140:25 |
| 126:22, 131:23 | 56:5, 95:19 | 54:8, 54:15 | 80:2, 82:4 | 178:7 |
| 132:17, 134:22 | 107:11, 112:18 | 58:4, 66:19 | 88:11, 93:14 | **topic** 54:2, 55:3 |
| 135:6, 135:12 | 165:17 | 68:20, 69:23 | 93:16, 96:8 | 57:18, 66:20 |
| 137:6, 139:11 | **things** 56:9 | 71:22, 72:25 | 96:18, 101:24 | 113:10, 126:25 |
| 140:2, 140:22 | 58:6, 94:18 | 81:16, 81:23 | 108:17, 109:24 | **topics** 10:22 |
| 142:1, 142:3 | 107:7, 112:21 | 97:24, 104:23 | 110:12, 121:4 | 53:8 |
| 142:5, 142:10 | 152:20, 195:5 | 106:1, 106:15 | 127:1, 131:20 | **totality** 18:25 |
| 142:12, 142:16 | 199:5, 199:18 | 106:21, 109:11 | 136:5, 140:7 | **totally** 34:23 |
| 142:19, 142:23 | **think** 16:3, 16:6 | 110:5, 113:19 | 148:17, 148:24 | 68:24, 117:23 |
| 144:8, 148:20 | 18:1, 42:16 | 119:3, 123:17 | 150:7, 150:13 | **toxicologist** |
| 157:14, 157:21 | 45:7, 45:10 | 123:19, 125:12 | 152:20, 157:19 | 11:22 |
| 158:8, 158:10 | 53:18, 55:2 | 131:25, 132:20 | 157:22, 164:9 | **toxicology** 78:15 |
| 158:11, 160:16 | 63:22, 103:15 | 139:10, 141:23 | 172:5, 180:15 | 78:19, 78:24 |
| 170:12, 176:16 | 117:25, 120:25 | 144:7, 145:2 | 192:10, 194:8 | 79:11 |

trace 178:21
183:11
traces 141:17
148:10
track 47:9
trade 20:2
41:15, 99:3
119:21, 125:3
132:13, 201:21
trail 153:13
trained 27:4
training 5:19
6:22
transcript 1:11
153:16, 154:8
154:11, 155:22
200:11
transmission
118:18, 123:6
131:4, 132:25
transmitted
38:24
treatises 151:22
tremolite 67:12
67:18, 67:21
67:25, 68:3
68:9, 68:19
69:1, 69:6
69:11, 69:14
69:25, 71:3
71:5, 71:12
71:15, 72:1
72:3, 72:15
72:19, 72:23
73:3, 73:24
74:9, 83:12
84:12, 85:3
85:6, 85:7
89:10, 89:14
90:3, 98:20
115:14, 115:18
120:10, 120:11
120:12, 120:15
120:17, 120:18
120:21, 120:22
121:22, 121:23

122:4, 122:4
122:7, 122:8
122:20, 123:4
125:25, 126:8
126:17, 126:18
127:12, 129:12
141:12, 141:18
141:25, 143:2
143:8, 144:18
146:19, 146:24
147:1, 147:17
148:10, 148:13
151:25, 163:19
163:25, 178:21
178:23, 191:14
196:16, 197:2
199:3
troublesome
165:11, 165:23
166:1
true 31:18, 32:5
35:1, 46:24
49:24, 59:7
75:5, 75:6
109:14, 111:3
111:22, 114:2
114:3, 126:2
167:13, 170:14
183:13, 183:14
184:11, 188:18
191:8, 200:11
truly 180:6
truth 87:1, 87:1
87:3, 93:18
200:8, 200:8
200:9
try 140:4, 171:6
trying 26:5
73:4, 112:1
115:3, 120:19
135:5, 169:11
192:20, 199:13
Tuesday 1:14
5:6
turn 65:7, 65:24
Turnpike 2:13

two 25:18, 31:8
38:15, 60:19
94:18, 113:14
115:20, 116:19
117:5, 117:6
117:20, 121:1
160:17, 164:5
175:9, 181:10
181:16, 181:23
185:14, 186:21
186:22, 187:3
type 56:5, 70:15
73:6, 141:16
147:17

## U

ultimately
116:18, 117:4
140:4, 168:5
188:2
Um-hum 94:10
umbrella 187:1
unacceptable
129:2, 129:15
unclear 93:2
uncontrolled
102:19
understand
7:20, 8:13, 15:5
15:5, 15:8
15:13, 18:14
18:18, 18:19
18:24, 19:14
26:4, 34:16
37:21, 41:5
49:13, 56:11
68:13, 68:16
71:10, 73:13
76:13, 76:21
80:18, 81:21
87:7, 93:16
93:18, 93:20
97:5, 98:20
112:4, 115:2
120:19, 132:2

133:24, 136:3
139:9, 142:14
148:16, 162:10
179:10, 191:21
192:20
understanding
15:17, 36:21
106:3, 172:23
179:15, 179:17
182:2, 193:7
understands
12:20, 12:24
14:12, 16:17
16:23, 17:4
17:13
understood
12:20, 13:23
15:4, 72:25
112:19, 137:5
190:24
undetected
130:13
unfortunately
24:19
United 103:3
127:22
universal 124:8
universally
123:17, 161:11
University 5:24
165:3
unnecessary
199:8
unrelated 142:5
unreliable
102:13
unusual 184:12
update 61:7
updated 65:6
66:10
urged 81:12
115:19, 116:19
119:14, 130:13
use 14:14, 14:24
20:21, 21:3
22:6, 36:22

55:9, 65:3
66:25, 73:5
81:5, 81:11
81:15, 117:6
117:15, 117:16
123:6, 123:8
123:10, 126:3
129:2, 129:12
129:15, 130:8
130:9, 130:14
130:23, 139:19
142:4, 144:5
145:14, 158:7
161:12, 161:22
170:12, 192:8
197:24, 198:9
199:12
usefulness 70:16
167:7
users 16:20
uses 71:1, 118:5

## V

validated 123:7
192:6
Valuation 33:8
VAN 3:3
variable 171:8
variance 180:17
varieties 72:18
variety 72:19
various 10:22
36:10, 57:5
92:11, 124:24
130:15, 152:17
189:7
varying 71:2
verbally 9:11
verdicts 99:23
verified 120:4
163:8
verify 121:15
157:21, 162:19
181:17
Vermont 27:10

27:15, 27:20
27:24, 28:1
28:6, 28:8
28:12, 28:16
28:20, 28:21
28:24, 29:7
29:12, 29:15
29:19, 30:21
31:3, 31:7
31:15, 31:23
31:25, 32:4
32:11, 32:16
32:18, 37:18
92:9, 92:20
92:24, 93:5
94:13, 94:16
95:3, 107:3
107:25, 108:19
108:23, 109:7
109:14, 110:1
110:14, 111:11
111:20, 111:23
112:2, 146:20
146:24, 147:18
148:9, 149:12
150:2, 150:8
150:14, 156:9
156:17, 156:25
157:25, 158:12
161:5, 175:19
**Vernon** 81:2
81:3
**versus** 76:19
**viability** 139:15
167:6
**Vice-President**
11:18
**Videographer**
3:13, 5:4, 54:8
54:14, 106:15
106:20, 145:2
145:6, 171:12
171:17, 199:22
**VIDEOTAPE**
1:9
**view** 15:25

128:18, 128:25
**Village** 3:4
**visit** 70:6
**voice** 56:22
**volume** 105:16
105:20, 105:23
105:24, 113:8
113:13, 113:20
114:6
**volumes** 106:8
**voluntary** 16:25
18:16

**W**

**W.H** 116:8
**want** 12:19
16:8, 16:9
22:24, 37:8
58:6, 67:4
93:14, 93:23
95:18, 97:24
104:13, 104:18
109:24, 115:23
150:22, 150:23
151:8, 153:15
153:18, 154:5
155:22, 155:23
158:5, 162:10
168:20, 168:24
169:5, 169:13
171:3, 172:16
179:10, 180:4
191:9
**wanted** 10:18
52:23, 53:6
85:24, 90:3
104:14, 104:25
113:1, 115:4
138:10, 168:6
169:17, 170:20
198:6, 199:11
**wants** 155:7
168:17
**WARD** 2:20
**warn** 19:10

**warning** 13:15
14:7, 19:16
52:14, 61:6
62:18
**Washington**
38:20, 61:16
**wasting** 33:19
**water** 135:4
**way** 9:18, 68:11
32:13, 50:11
68:16, 88:4
115:3, 129:17
151:23, 155:16
155:19, 158:20
159:8, 166:8
194:23
**We've** 123:20
**week** 90:7
**weeks** 90:16
**Weidinger**
52:11, 52:12
**weight** 138:7
142:8, 163:21
**WEINER** 3:3
**Weisler** 36:3
36:9, 36:16
89:25, 177:3
178:3
**welcome** 104:1
104:12
**WENDOWSKI**
1:7
**went** 26:13
39:23, 41:9
41:14, 41:21
42:9, 42:14
42:16, 42:21
43:2, 60:3
60:13, 63:14
65:18, 65:21
96:15, 99:23
100:22, 100:23
128:13, 149:19
196:21
**Westfield** 1:23
**Whittaker** 2:15

115:24
**width** 178:5
**wildly** 71:2
**Williams** 11:14
11:16, 194:12
**Willie** 61:8, 61:9
61:14
**willing** 149:6
**wind** 153:3
**Windsor** 75:15
76:8, 81:8
162:3
**wish** 11:3
**withdraw** 30:8
39:20, 136:24
151:14
**withdrawing**
39:18
**withdrawn**
30:11
**witness** 1:11
4:2, 5:11, 15:24
30:3, 30:5
30:13, 64:13
136:13, 151:10
151:12, 151:13
153:9, 153:17
154:13, 154:15
155:1, 155:4
156:3, 180:23
200:7
**witnesses** 154:4
**women** 83:8
83:18, 83:23
84:7, 84:14
85:5, 85:9
**word** 15:19
**words** 90:13
120:11, 122:8
133:18, 151:18
161:17
**work** 7:22, 21:9
26:23, 41:9
41:14, 41:21
42:9, 42:14
42:18, 42:21

43:2, 44:15
59:9, 144:16
166:16, 178:12
178:15, 193:25
**worked** 23:5
42:21, 89:25
104:24, 187:19
**workers** 128:5
**working** 45:2
140:1, 148:25
149:8, 187:17
187:20
**works** 194:21
**world** 100:7
100:17, 100:22
100:23, 101:4
**worldwide**
100:4, 100:11
101:10, 101:14
167:10, 168:1
**worry** 113:9
**worst** 115:20
116:19
**write** 59:19
163:18
**writer** 81:12
**writes** 36:2
37:8, 166:12
175:5
**writing** 9:11
**written** 64:21
86:2, 86:6
86:17, 92:1
127:12, 128:1
181:12, 190:12
**Wrong** 117:10
**wrote** 122:18
127:5, 162:5
162:9, 190:3

**X**

**x-ray** 116:13
116:14, 116:21
117:8, 117:15
118:5, 118:15

118:21, 119:8
119:12, 129:1
138:1, 145:14
146:11, 147:13
148:5, 163:22
196:12, 196:20
197:1, 197:12
197:15, 197:16
197:19, 198:22
198:25
**XRD** 130:12
130:23, 131:15
133:2, 133:9
134:14

**Y**

**year** 9:12, 103:3
104:6, 104:16
104:18
**years** 6:8, 6:11
8:10, 11:10
11:21, 24:9
38:15, 68:18
108:6, 108:9
109:2, 181:13
191:1, 191:5
192:17, 193:7
193:25, 194:14
**York** 6:9, 6:9
52:14, 189:25

**Z**

**Zazenski** 132:6
201:23
**Zeitz** 36:5, 70:8
81:2, 81:3
**zero** 146:19

**0**

**00679** 24:21
**02** 163:21
163:23
**05** 147:10

147:17
**07009** 3:4
**07090** 1:23
**07701** 2:4
**07932** 2:14

**1**

**1** 1:22, 105:16
113:8, 113:20
114:6, 114:8
115:5, 178:6
178:6, 185:4
**1/4/84** 201:3
**1:12** 106:21
**10** 4:14, 178:6
**10/27/72** 202:18
**10/31/72** 201:24
**10:00** 1:15, 5:7
**103** 201:18
**105** 1:14
**11** 163:10
**11/24/76** 202:9
**11/29/72** 202:16
**11/3/08** 201:5
**11:03** 54:9
**11:14** 54:15
**114** 201:19
**116** 201:20
**119** 201:21
**12,000** 178:4
**12/13/72** 202:14
**12/21/95** 201:22
**12:32** 106:16
**127** 2:3, 201:22
**13** 74:19, 108:4
185:2
**130** 118:2
**132** 201:23
**1339** 2:8
**137** 201:24
**13th** 186:4
**14** 3:4, 72:12
**142** 202:3
**145** 202:4
**147** 202:5

**148** 119:21
**14th** 99:11
**15** 33:7
**159** 202:6
**15th** 99:12
99:13
**16** 145:20
**163** 202:7
**166** 202:9
**167** 202:10
**168** 202:11
**16th** 2:8
**17** 99:19
**170** 161:25
**175** 202:12
**176** 202:13
**18** 2:13, 115:24
**185** 202:14
**188** 202:15
**189** 202:16
**19** 1:14, 5:6
9:16, 99:10
**19103** 2:19
**19107** 2:9
**196** 202:17
**1969** 67:16
67:23, 68:7
68:18
**197** 202:18
**1970s** 87:17
152:16, 172:25
**1971** 74:19, 78:6
89:18, 90:17
159:5, 159:15
180:20, 180:25
181:4, 181:7
181:12, 189:25
190:5
**1971-1977**
201:19
**1972** 57:14, 59:9
91:7, 137:13
137:16, 173:8
173:12, 175:4
176:20, 185:2
185:4, 185:12

186:3, 186:12
186:13, 195:22
196:23, 197:4
201:14, 202:17
**1973** 35:19, 37:3
69:19, 92:1
99:17, 115:24
116:1, 116:3
140:14, 141:10
145:20, 147:5
147:21, 149:16
188:9, 198:16
201:15
**1974** 72:1, 72:12
81:1, 159:6
159:19, 163:11
201:9
**1975** 23:19
167:18, 168:11
202:10
**1976** 12:6, 20:3
23:11, 24:13
26:19, 71:20
72:6, 99:10
99:17, 121:13
159:16, 166:5
177:19, 180:25
181:4, 181:7
181:12, 181:12
192:17
**1977** 84:19
114:1, 114:2
119:22, 125:15
201:21
**1979** 27:10
27:21, 28:25
29:12, 29:19
30:21, 31:10
31:16, 32:5
32:16, 108:19
108:24, 109:11
110:2, 110:5
110:19, 111:3
111:8, 111:18
**198** 202:19
**1980s** 108:2

**1984** 33:7, 33:7
48:11, 49:15
49:18, 50:25
52:9
**1986** 30:24, 32:1
32:7, 32:20
32:25, 107:8
133:15, 134:20
135:23, 150:21
151:22, 152:12
152:13, 192:17
**1987** 108:6
111:3, 111:12
111:22, 112:4
**1992** 5:24
**1995** 125:18
127:16, 132:1
**1997** 85:24
86:13, 201:11
**19th** 99:13

**2**

**2** 105:20, 105:23
113:10, 113:13
138:6, 160:23
190:10, 196:21
199:9
**2/28/75** 202:11
**2:11** 145:3
**2:23** 145:7
**20** 164:2
**2000** 12:7
**2000s** 10:19
**2001** 132:4
201:23
**2003** 109:9
**2006** 6:13
**2008** 60:25, 62:3
67:12, 67:15
**2009** 28:4, 28:18
28:22, 29:3
29:13, 30:25
31:6, 31:21
32:2, 32:8
109:3, 109:6

111:5
**2010** 10:19
**201-202** 4:22
**2016** 99:19
  101:11, 105:20
  113:23, 113:24
**2017** 113:16
  113:23
**2018** 9:16
  104:19, 104:20
  105:2, 105:23
**2019** 1:14, 5:7
**21** 90:17, 115:25
  116:3, 127:16
**215-569-5397**
  2:19
**215-575-4200**
  2:9
**216** 84:19
**23** 57:14
**2300** 161:24
**235** 1:22
**24** 166:5, 176:20
**25** 198:16
**25th** 146:5
**26** 69:19, 140:14
  141:10
**263** 142:24
  142:24
**265** 196:4, 196:4
**266** 137:12
  137:18, 137:22
**27** 89:18, 197:4
**28** 159:5, 168:11
**29** 175:4, 176:19
  185:12, 186:3
  186:12, 186:13
  195:22

| 3 |
|---|

**3** 60:25, 105:24
  113:10, 138:6
  160:23, 173:8
  173:11, 196:21
  198:3, 199:9

**3/11/74** 202:7
**3/17/16** 201:17
**3/21/73** 201:20
**3/23/72** 201:4
**3/74** 202:6
**3:00** 171:13
**3:13** 171:18
**3:58** 199:17
**3:59** 199:23
**30** 164:4
**30(b)6** 15:24
**3071S** 141:17
**31** 137:13
  137:16, 188:9
**3-11-74** 163:10
**3271S** 141:18
**347** 175:3
**35** 197:4
**352** 163:6
**353** 168:10
**357** 127:16
**361** 132:5
**364** 72:11
**369** 166:20
  167:16
**38** 189:4, 189:6
  189:7
**3rd** 2:13

| 4 |
|---|

**4** 48:11, 50:25
  54:12, 147:21
**4/26/73** 201:6
**40** 185:2
**41** 120:4
**41.6** 142:7
**45** 145:20
**457** 113:25
**46** 147:20
**461** 198:12
  198:12
**462** 38:8
**464** 89:17
**465** 35:18, 43:6
  43:6

**466** 37:3
**467** 74:19
**47** 149:11
**471** 166:4
**474** 90:16
**475** 92:1
**476** 57:13
**48** 201:3
**483** 91:6
**489** 115:23
**491** 48:9, 48:9
**492** 99:18, 99:18
**497** 60:24
**498** 103:2
**4th** 149:19

| 5 |
|---|

**5** 4:4, 4:13, 4:14
  54:12, 81:4
**5.2** 128:16
**5/14/74** 201:7
**5/16/73** 202:4
**5/25/73** 202:19
**50** 8:10, 178:6
  188:9, 188:9
  193:6
**54** 4:15, 4:16
  4:17
**57** 201:4
**58** 159:2, 159:3

| 6 |
|---|

**6** 149:16, 160:15
**6/4/73** 202:5
**60** 99:2, 201:5
**60s** 10:19
  67:20, 68:1
  106:2, 112:22
**66** 37:18
**679** 25:23
**69** 80:25, 201:6

| 7 |
|---|

**7** 35:19, 37:3
  161:22, 177:19
**7/27/71** 201:12
**7/31/73** 201:16
  202:15
**70s** 10:19, 28:3
  28:18, 39:13
  67:20, 68:2
  68:22, 68:25
  71:19, 87:13
  88:3, 88:17
  88:17, 107:24
  131:24, 139:25
**72** 201:7
**732-747-9003**
  2:4
**74** 201:8
**76** 26:25, 147:6
  180:20
**77498** 130:5

| 8 |
|---|

**8/13/71** 201:8
**8/24/71** 202:13
**8/29/72** 202:12
**8087** 142:7
**80s** 10:19, 28:4
  28:18, 29:13
**81** 201:9
**84** 107:4, 201:11
**86** 31:6, 31:20
  107:4
**89** 201:12

| 9 |
|---|

**9** 107:19
**9/21/71** 201:13
**9:10** 52:10
**90** 201:13
**908-789-2000**
  1:24
**908-789-2007**

1:24
**90s** 10:19
**91** 201:14
**92** 201:15
**973-239-5700**
  3:5
**973-822-1110**
  2:14
**99** 201:16
  201:17

Exhibit 84

| | |
|---|---|
| **From:** | Musco, Nancy [CPCUS] |
| **Sent:** | Wednesday, May 27, 2009 7:25 PM |
| **To:** | Chase, David J. (Dr.) [CPCUS]; Martin, Katharine [CPCUS]; Telofski, Lorena [CPCUS] |
| **Subject:** | FW: Q&A Baby Powder |
| **Attachments:** | What are the risks of inhalation.doc |
| | |
| **Sensitivity:** | Confidential |

All,

Who provided the data from the American Association of Poison Control ? This is the information that i spent last week collecting and was putting in table form along with the J&J data. Perhaps I misunderstood my assignment but this represents much duplicate effort.

Thanks,

Nancy

_____

From: Chase, David J. (Dr.) [CPCUS]
Sent: Wednesday, May 27, 2009 1:32 PM
To: Telofski, Lorena [CPCUS]
Cc: Wajszczuk, Charles [CPCUS]; Martin, Katharine [CPCUS]; Musco, Nancy [CPCUS]
Subject: FW: Q&A Baby Powder
Sensitivity: Confidential

Lorena,

Do you know where we could find data of the type I mentioned in my item # 3 (2 e-mails down)? Complete reports would be good, but brief summaries of the reports or statements based on the reports used by the company in the past would probably be more useful acutely.

Thanks,

David

<<What are the risks of inhalation.doc>>

_____

From: Wajszczuk, Charles [CPCUS]
Sent: Wednesday, May 27, 2009 1:16 PM
To: Chase, David J. (Dr.) [CPCUS]; Costabel-Farkas, Margit [CONDE]; Martin, Katharine [CPCUS]
Cc: Ries, Gerd [CONDE]; Giernoth, Judith [CONDE]; Kuijpers, Harold [CONDE]; Andresen, Edda [CONDE]
Subject: RE: Q&A Baby Powder
Sensitivity: Confidential

David and All,

I'll leave determination regarding questions 1 and2 below to you all. The information referred to in #3 would be of value. For #4, I don't know if anything other than sales data for ALL talc baby powder would be of value. These are numbers for all talc, but I'm guessing (since the info is not available) that most exposures are to baby powder. Chances of having

1

**EXHIBIT
J&J-393**

21 years of sales in the USA might be hard to find. It might be worth stating that the cases with no outcome may represent inquiries, not exposures, but we don't have that info either.

Charlie

Charlie

---

From: Chase, David J. (Dr.) [CPCUS]
Sent: Wednesday, May 27, 2009 12:59 PM
To: Wajszczuk, Charles [CPCUS]; Costabel-Farkas, Margit [CONDE]; Martin, Katharine [CPCUS]
Cc: Ries, Gerd [CONDE]; Giernoth, Judith [CONDE]; Kuijpers, Harold [CONDE]; Andresen, Edda [CONDE]
Subject: RE: Q&A Baby Powder
Importance: High
Sensitivity: Confidential

This strikes me as being a fairly complete analysis. I took the liberty of making a few suggestions concerning wording.

I also have a few larger questions:

1.     Will this document be reviewed by legal, for example, John O'Shaughnessy, who has had a great deal of experience with talc issues over the years?

2.     Will it be reviewed by external PR advisors with experience in talc issues?

3.     Should it include empirical information on levels of exposure (inhalation) known to be likely from normal use of the product according to instructions, and on the magnitude of those levels compared to amounts of exposure needed to induce cancer or other adverse effects in animal studies? I understand that such information is available and has been made available in previous talc PR cases.

4.     Is there any comparison that could/should be made between the AAPCC data and the data reported by the poison centers in Germany, Austria, and Switzerland? If so, should that be included?

David

 << File: What are the risks of inhalation.doc >>

---

From: Wajszczuk, Charles [CPCUS]
Sent: Wednesday, May 27, 2009 8:17 AM
To: Costabel-Farkas, Margit [CONDE]; Chase, David J. (Dr.) [CPCUS]; Martin, Katharine [CPCUS]
Cc: Ries, Gerd [CONDE]; Giernoth, Judith [CONDE]; Kuijpers, Harold [CONDE]; Andresen, Edda [CONDE]
Subject: RE: Q&A Baby Powder

All, << File: What are the risks of inhalation.doc >> Please see the write up. I think it addresses most of teh issues.

Charlie

---

From: Costabel-Farkas, Margit [CONDE]
Sent: Monday, May 25, 2009 8:57 AM

2

Protected Document--Subject to Protective Order

To: Wajszczuk, Charles [CPCUS]; Chase, David J. (Dr.) [CPCUS]; Martin, Katharine [CPCUS]
Cc: Ries, Gerd [CONDE]; Giernoth, Judith [CONDE]; Kuijpers, Harold [CONDE]; Andresen, Edda [CONDE]
Subject: RE: Q&A Baby Powder
Importance: High

Dear all,

please find attached the draft answers to the questions provided by B-M, prepared by Edda, Judith and me.

Charlie, David, Katharine, could you maybe add any info on consequences or treatment of powder inhalation (two parts highlighted in yellow)?

It would be great to have your input as soon as possible, in order to share the draft with B-M for a final review by tomorrow.

Many thanks and best regards,

Margit

    << File: Baby Powder Questions_QA draft May 22.doc >>


Margit Costabel-Farkas
EAME Regulatory Affairs Wipes & Baby / Kids Toiletries
Tel.    +49 (0)2137/936-2188

mob.: +49 (0) 163 4305 482

_____
From: Andresen, Edda [CONDE]
Sent: Freitag, 22. Mai 2009 12:00
To: Costabel-Farkas, Margit [CONDE]
Cc: Ries, Gerd [CONDE]
Subject: Q&A Baby Powder

Hallo Margit,

ich habe angefangen, die Antworten einzufügen. Kannst du die gesundheitlichen Risiken ausführen und über den Rest drüberschauen?
Viele Grüße

Edda


    << File: Baby Powder Questions_QA draft May 22.doc >>

3

Protected Document--Subject to Protective Order

JNJTALC000319190

**JNJTALC000319188**

## Metadata

| | | |
|---|---|---|
| **Custodian** | Martin, Katharine | ORIGINAL |
| **DateCreated** | 04/03/2010 12:00 AM | ORIGINAL |
| **DateMod** | 05/27/2009 12:00 AM | ORIGINAL |
| **FileName** | FW: Q&A Baby Powder | ORIGINAL |
| **From** | "Musco, Nancy [CPCUS] [/O=JNJ/OU=CPCUSSK/CN=RECIPIENTS/CN=NMUSCO]" | ORIGINAL |
| **ProdVol** | TALC_PROD_033 | ORIGINAL |
| **Subject** | FW: Q&A Baby Powder | ORIGINAL |
| **To** | "Chase, David J. (Dr.) [CPCUS];Martin, Katharine [CPCUS];Telofski, Lorena [CPCUS]" | ORIGINAL |

Exhibit 85

# TALC

## 1. Chemical and Physical Data

### 1.1 Synonyms and trade names

*CAS Registry No.*: 14807-96-6

*Chem. Abstr. Name*: Talc

*Synonyms*[1]: Soapstone; steatite; talcum

*Trade names*[1]: Agalite; Asbestine; B9 Finntalc P40; B13; B13 (mineral); Beaver White 200; CP 10-40; CP 38-33; Crystalite CR 6002; Desertalc 57; Emtal 500; Emtal 549; Emtal 596; Emtal 599; Fibrene C 400; French Chalk; FW-XO; HSDB 830; IT Extra; LMR 100; Microneeca K1; Micro White 5000A; Microtalco IT Extra; Mistron; MP 25-38; MP 40-27; MP 45-26; MST; MT 12-50; Mussolinite; NCI-CO6018; Nytal 200; Nytal 400; Pk-C; Pk-N; Polytal 4641; Polytal 4725; Potstone; Snowgoose; Steawhite; Supreme; Supreme dense; Talcan PK-P; Talcron CP 44-31

### 1.2 Structure of typical mineral

Molecular formula: $Mg_3Si_4O_{10}(OH)_2$

The original X-ray spectra of talc (Gruner, 1934; Hendricks, 1938) indicated that the mineral had a monoclinic structure. Later investigations (Rayner & Brown, 1966; Ross *et al.*, 1968) demonstrated that many if not all talcs are triclinic (Table 1). The basis of the talc structure is characterized by a hexagonal sheet arrangement of $SiO_4$ tetrahedral groups linked in a common plane. Each $SiO_4$ tetrahedron shares three planar oxygen atoms with its neighbouring tetrahedra; the fourth oxygen, the apex of the tetrahedron, is not shared. Two such sheets are orientated so that unshared apical oxygen atoms face each other. The sheets are bonded by magnesium atoms, which are coordinated by two oxygens and one hydroxyl group from each sheet, which form a brucite layer. This structural arrangement results in a double-sheet structure in which the valency demands of the constituent atoms are completely satisfied. Crystals of talc are made up of stacks of these double-sheet units held together by the weakest of chemical bonds — the Van der Waal's forces. As the individual sheets cannot be bonded together, they can be separated by slight forces, causing slippage of the individual sheets along a perfect cleavage direction in the basal plane (Rohl *et al.*, 1976; Pooley & Rowlands, 1977).

---

[1]These synonyms and trade names cover talc, talc-containing materials and talc contaminated with other minerals as admixtures.

—185—

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

**Table 1. Lattice parameters and crystallographic axes of talc**

| Lattice parameters (nm) | | | Crystallographic axes | | | System | Reference |
|---|---|---|---|---|---|---|---|
| a | b | c | $\alpha$ | $\beta$ | $\gamma$ | | |
| 0.526 | 0.910 | 1.881 | 90°00′ | 100°00′ | 90°00′ | Monoclinic | Gruner (1934) |
| 0.527 | 0.913 | 1.888 | 90°00′ | 100°15′ | 90°00′ | Monoclinic | Hendricks (1938) |
| 0.528 | 0.915 | 1.89 | 90°00′ | 100°15′ | 90°00′ | Monoclinic | Roberts et al. (1974) |
| 0.5255 | 0.9137 | 0.9448 | 90°46′ | 98°55′ | 90°00′ | Triclinic | Ross et al. (1968) |
| 0.5293 | 0.9179 | 0.9496 | 90°57′ | 98°91′ | 90°03′ | Triclinic | Ross (1984) |

## 1.3 Chemical and physical properties

From Roberts *et al.* (1974)

(*a*)   *Hardness*: 1 on Mohs' scale

(*b*)   *Density*: 2.58-2.83

(*c*)   *Cleavage*: (001) perfect

(*d*)   *Colour*: Pale-green to dark-green or greenish-grey; also white, silvery-white, grey, brownish; translucent; pearly, greasy or dull

(*e*)   *Description*: Commonly thin tabular crystals, up to 1 cm in width. Usually massive, fine-grained, compact; also as foliated or fibrous masses or in globular stellate groups

## 1.4 Technical products and impurities

The chemistry of talc shows little variation, indicating that only a limited substitution of ions takes place in the mineral lattice. When expressed in the standard oxide form, the ideal chemical composition is: 31.7% MgO, 63.5% $SiO_2$, 4.8% $H_2O$ (Pooley & Rowlands, 1977). Small amounts of aluminium and titanium may substitute to some extent for silicon, and it is common to find iron, nickel, manganese or chromium substituting to some extent for magnesium. Iron and nickel substitute for magnesium in the greatest amounts (Pooley & Rowlands, 1977), and a talc with almost complete substitution of magnesium by iron, called minnesotaite, is abundant in the iron formations of Minnesota, USA (Deer *et al.*, 1971). One major talc deposit in the eastern USA contains substantial amounts of nickel — up to 0.2% (Rohl *et al.*, 1976). Nickel-substituted talcs are also associated with serpentine bodies, at up to 0.5% by weight (Pooley & Rowlands, 1977). Table 2 gives examples of the mineral composition of talcs (Deer *et al.*, 1971).

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018821

TALC                                                                                187

**Table 2. Bulk chemical analysis of talcs (%)[a]**

| Component | Talc[b] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| $SiO_2$ | 62.61 | 62.67 | 62.47 | 62.16 | 60.06 | 60.02 | 60.88 | 61.07 | 51.29 |
| $TiO_2$ | – | – | – | – | – | – | 0.10 | – | 0.04 |
| $Al_2O_3$ | – | 0.38 | 0.47 | 0.88 | 1.60 | 1.88 | 1.98 | 2.42 | 0.61 |
| $Fe_2O_3$ | – | 0.68 | – | – | – | – | 0.83 | 1.49 | 2.00 |
| FeO | 2.46 | 0.65 | 0.79 | 1.41 | 1.74 | 1.51 | – | – | 33.66 |
| MnO | 0.01 | – | 0.00 | – | – | – | – | – | 0.12 |
| MgO | 30.22 | 29.95 | 31.76 | 30.86 | 30.83 | 30.39 | 31.18 | 29.13 | 6.26 |
| CaO | – | 1.35 | 0.00 | – | 0.40 | 1.00 | 0.14 | 0.75 | 0.00 |
| $Na_2O$ | – | – | – | – | – | – | – | – | 0.08 |
| $K_2O$ | – | – | – | – | – | – | – | – | 0.03 |
| $H_2O^+$ | 4.72 | 5.05 | 4.70 | 4.92 | 5.02 | 5.37 | 4.98 | 4.82 | 5.54 |
| $H_2O^-$ | – | – | 0.06 | – | – | 0.32 | – | – | 0.24 |

[a]From Deer et al. (1971)

[b]1, talc, altered periodotite, Muruhatten, northern Sweden; 2, talc, Shabrov, Urals, USSR; 3, talc, Murphy, North Carolina, USA; 4, light-green talc, Malangen, Norway; 5, green talc, altered serpentine, Parma district, Appenines, Italy; 6, black talc, with carbonaceous material derived from a bluish-grey rock, Parma, Appenines, Italy; 7, talc, Mount Fitton, South Australia; 8, talc, altered tremolite, Yellandu Warangal district, Hyderabad, India; 9, greenish-grey iron talc (minnesotaite), East Mesabi range, Minnesota, USA

     Since talc is formed by alteration or metamorphosis of rocks, it is found associated with many types of minerals. Rohl et al. (1976) listed the following minerals as commonly occurring in talc deposits: calcite, dolomite, magnesite, tremolite, anthophyllite, antigorite, quartz, pyrophyllite, micas and chlorites. Chrysotile and lizardite were noted as 'uncommon' constituents. When mined, talc ore may contain several of the minerals noted in Table 3.

    In one study of Vermont (USA) talc, the mined and milled ore contained 20–100% each of talc and magnesite, a small amount of chlorite (5–20%) and minor amounts (<5%) of dolomite, calcite, quartz, phlogopite and biotite (Boundy et al., 1979). An analysis of samples of mined and milled talc from New York (USA) yielded the following concentrations of minerals: talc, 12–50%; tremolite, 30–55%; anthophyllite, 3–35%; serpentine, 1–8%; calcite, <1–4%; and quartz, <0.1–20% (Schepers & Durkan, 1955a). A more recent examination of talc from Texas (USA) showed the presence of fibrous tremolite and antigorite (Gamble et al., 1982). Rohl et al. (1976) showed that some US talcum powders marketed prior to 1975 contained chlorite, phlogopite, calcite, dolomite, quartz, kaolin, tremolite, anthophyllite, chrysotile, pyrophyllite and rutile. One French talc (Luzenac 15MOO) has been reported to contain 90% talc, 8% chlorite, 1% dolomite and no asbestos fibre (Talcs de Luzenac, 1982). An Italian talc (grade 00000) was reported to contain 92% talc, 3% chlorite, 1% carbonates and 0.5–1% quartz and no tremolite or chrysotile asbestos (Wagner et al., 1977).

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018822

188                                    IARC MONOGRAPHS VOLUME 42

**Table 3. Minerals that occur commonly in talcs[a]**

| Mineral group | Phase | Formula |
|---|---|---|
| Carbonates | Calcite | $CaCO_3$ |
| | Dolomite | $CaMg(CO_3)_2$ |
| | Magnesite | $MgCO_3$ |
| Amphiboles | Tremolite[b] | $Ca_2Mg_5Si_8O_{22}(OH)_2$ |
| | Anthophyllite[b] | $(FeMg)_7Si_8O_{22}(OH)_2$ |
| Serpentine | Antigorite | $Mg_3Si_2O_5(OH)_4$ |
| | Chrysotile (uncommon) | $Mg_3Si_2O_5(OH)_4$ |
| | Lizardite (uncommon) | $Mg_3Si_2O_5(OH)_4$ |
| Others | Quartz | $SiO_2$ |
| | Mica, e.g., phlogopite | $K_2(Mg,Fe)_6[Si_6Al_2O_{20}](OH)_4$ |
| | Chlorite, e.g., penninite | $(Mg,Al,Fe)_{12}[(Si,Al)_8O_{20}](OH)_{16}$ |
| | Pyrophyllite | $Al_4[Si_8O_{20}](OH)_4$ |

[a]From Rohl et al. (1976)

[b]Occurring as nonasbestiform and asbestiform varieties

Technical products of talc are sold in a multitude of grades, which have functional or physical characteristics especially suited for certain applications. Clifton (1985) outlined the following guidelines for talc specifications by end use:

*Ceramics*: Uniform chemical and physical properties are required. Manganese and iron are usually objectionable. For high frequency insulators, no more than 0.5% calcium oxide, 1.5% iron oxide and 4% aluminium oxide can be tolerated.

*Paints*: Impurities that grind to colours other than white are highly objectionable. To yield the desired smooth paint film, at least 98.5% must pass through a 325-mesh screen.

*Roofing*: A low-grade, off-colour, impure talc is acceptable.

*Insecticides*: Requirements are chemical inertness with respect to toxicants, satisfactory bulk density and low abrasive characteristics.

*Rubber*: Many synthetic rubbers include ground talc as fillers in compounding formulations.

*Cosmetics and pharmaceuticals*: Talc must be grit free, finely sized, chemically pure and pleasing in colour. For cosmetics, talc must have good dry-slip characteristics.

*Paper*: Requirements include chemical inertness, softness, freedom from grit, satisfactory ink acceptance, brightness and dispersibility in water.

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018823

TALC                                                                    189

# 2. Production, Use, Occurrence and Analysis

## 2.1 Production and use

### (a) Production

Talc-containing rocks were first used in prehistoric times for utensils and ornaments (Roe & Olson, 1983); the term 'talc' was first applied to this mineral in 869 AD (Kužvart, 1984). The abundance of talc and the facility with which it can be mined, combined with its many desirable functional properties, have made it an important industrial mineral. Mining of talc for commercial purposes probably began several hundred years ago when talc blocks were used for building materials and cooking utensils (Clifton, 1985).

The world reserve base of talc and the related aluminium silicate, pyrophyllite, is estimated to be 1200 million tonnes (Clifton, 1985; Table 4).

**Table 4. Worldwide reserve base of talc and pyrophyllite[a]**

| Region | Million tonnes |
|---|---|
| Africa | 18 |
| North America | 580 |
| South America | 18 |
| Asia and Oceania | 362 |
| Europe | 172 |

[a]From Clifton (1985); talc and pyrophyllite are not distinguished.

The first talc-grinding mill in the USA began operation in about 1880, suggesting the first large-scale US production of ground talc products. US production for many years continued to include both ground talc products and carved items (Clifton, 1985). 'Soapstone' blocks were first produced in open-pit operations, and the vast majority of world talc mining operations continue to rely on open-cast mining methods. Notable exceptions are in Austria and Italy, where necessity or the prospect of high-grade talc in deeper deposits has made underground mining an economically viable operation (Clarke, 1979). Talc sold in blocks is generally removed using hand tools; talc for grinding is mined by drilling and blasting methods (Clifton, 1985).

Practices for refining talc ores vary widely. In some operations, such as those of one mine in France, talc is initially sorted by hand to supply cosmetic talcs of different colour and physical characteristics (Clarke, 1979). Since most uses of talc have not required highly pure products, beneficiation and sophisticated milling and other processing techniques have not been used before shipping. Early talc mills were used to process both talc and cereal grains, the final product in both cases being a coarse powder (Roe & Olson, 1983).

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018824

The latest technology in talc refining employs flotation separation, drying of the filtered powder cake, and sizing or further grinding before shipping (Roe & Olson, 1983; Clifton, 1985). Flotation techniques are especially prevalent in North American, Norwegian and Finnish operations (Sinha, 1982).

Talc is mined in over 40 countries and is used in numerous manufacturing industries in over 60 countries (Roe & Olson, 1983; Harben & Bates, 1984). Commercial talc production figures in 1950-1983 are listed by region in Table 5.

**Table 5. Talc production by world region, 1950-1983 (1000 tonnes)[a]**

| Region/ country | Important producers | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 1950 | 1960 | 1970 | 1980 | 1981 | 1982 | 1983 |
| Africa | Egypt, South Africa | 8 | 9 | 14 | 14 | 11 | 18 | 10 |
| Asia | China, Republic of Korea | 7 | 181 | 354 | 1312 | 1280 | 1248 | 1290 |
| Australia | | 9 | 16 | 48 | 160 | 75 | 143 | 150 |
| Europe | France, Italy, Austria, Finland, Norway | 344 | 553 | 820 | 1180 | 1153 | 1195 | 1140 |
| India and Pakistan | | 25 | 95 | 161 | 379 | 380 | 348 | 292 |
| Japan | | 12 | 50 | 138 | 148 | 120 | 106 | 85 |
| North America | USA | 475 | 585 | 891 | 1124 | 1218 | 1035 | 998 |
| South America | Brazil, Argentina | 13 | 50 | 118 | 380 | 376 | 354 | 371 |
| USSR | | – | 250 | 380 | 490 | 500 | 510 | 510 |

[a]From Colonial Geological Surveys (1957); Institute of Geological Sciences (1967, 1978); British Geological Survey (1985). Figures are given for 'talc', although sometimes figures were not provided separately for talc production and pyrophyllite production.

Although the largest producers of talc are typically net exporters, notably Australia, Austria, China, France and the USA, several import talc in large quantities as well. Japan is by far the most important world market for talc, importing over 615 200 tonnes in 1983. Canada, the Federal Republic of Germany, Mexico, the UK, the USA and the USSR account for most of the remainder of talc imports (British Geological Survey, 1985).

*(b)   Use*

Talc is one of the most versatile inorganic substances available to industry (Roe & Olson, 1983). Since its uses are dependent on the mineral character of the refined ore, more than many other industrial minerals, talc ores are often referred to by physical type, and used according to their functional characteristics. Although use patterns vary substantially from region to region, four major applications may be highlighted.

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018825

Case 3:16-md-02738-MAS-RLS   Document 16133-5   Filed 12/22/20   Page 104 of 148 PageID: 125166

### Ceramics

In the USA, 35%, and in Europe, nearly 10%, of native or imported talcs is used in ceramics (Anon., 1982; Clifton, 1985). Talc is especially useful in ceramics for its colour, fast-firing and low shrinkage properties. It has been used in floor- and wall-tiles, china, glazes, electrical porcelains, sanitary ware, kiln furniture and pottery (Clifton, 1985). Some china contains 15% talc by weight, while some pottery contains 40%. Up to 80% talc has been used in ceramic insulators (Roe & Olson, 1983).

### Paper

The most important use of talc in Europe and Japan and the fastest-growing use in the USA is in the coating and filling of paper (Anon., 1982; Roe & Olson, 1983). The largest talc importer, Japan, uses 80% of its imports in the paper industry (Clarke, 1979). This statistic, combined with the 50% consumption pattern of talc for paper in Europe (Anon., 1982), makes this the predominant use of talc in the world (Clarke, 1979).

### Plastics and building materials

In 1983, about 165 000 tonnes of talc were used in the plastics, rubber and roofing industries in the USA, representing 20% of the total consumption (Clifton, 1985). Talc has become an important component of many types of US plastics, as a stabilizer, reinforcer and filler used at up to 70% w/w. In roofing materials, talc is added at 10-35% to asphalt in composite shingling materials, to impart stability and weather resistance (Roe & Olson, 1983).

### Paints

Approximately 15-25% of the talc used in most industrialized nations is as a pigment extender and filler in paints (Anon., 1982). As with the paper application, fineness of grade and colour are most important to the functional characteristics of the compound. US consumption of talc for use in paints was 213 000 tonnes in 1979 (Roe & Olson, 1983) and 150 000 tonnes in 1983 (Clifton, 1985).

### Other uses

A significant, although less commercially important use of talc is in cosmetics. In the USA and Europe, approximately 5% of native and imported ores are used for this purpose (Anon., 1982; Clifton, 1985). Talc is directly available to consumers as facial cosmetics and talcum powders. US talcum powders marked prior to 1973 contained up to 95% by weight talc mineral; however, some commercial talcum powders contained no talc (e.g., starch was used). Mineral impurities such as amphibole minerals (tremolite, anthophyllite) and quartz were found in concentrations up to 14 and 35% by weight, respectively (Rohl et al., 1976). Talc is also used as an excipient in pharmaceuticals and as a filler in toothpastes and soaps (Rohl & Langer, 1979; Kužvart, 1984).

Other uses of talc are as a cereal grain polisher (especially rice), as an ingredient in floor waxes and shoe polishes, as a carrier and diluent for pesticides, as a textile component, as an oil absorber, as a lubricant and in spackling and patching compounds (Rohl & Langer, 1979; Roe & Olson, 1983; Clifton, 1985).

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018826

(c)    *Regulatory status and guidelines*

Occupational exposure limits in various countries are listed in Table 6.

### Table 6. Occupational exposure limits for talc (mg/m³)[a]

| Country | Year | Total dust (mg/m³) | Respirable dust (mg/m³) |
|---|---|---|---|
| Australia | 1978 | 2.5 | |
| Czechoslovakia | 1976 | 6 | |
| Finland | 1981 | 5[b] | |
| France | 1985 | | 2[b] |
| Italy | 1978 | 5 | 1.6 |
| Norway | 1981 | 6 | |
| United Kingdom | 1985 | 10 | 1 |
| USA | | | |
| ACGIH | 1986 | | 2[b] |
| OSHA | 1983 | (20 mppcf)[b,c] | |
| USSR | 1976 | 4 | |
| Yugoslavia | 1971 | 12 | 4 |

[a]From International Labour Office (1980); Direktoratet för Arbeidstilsynet (1981); Työsuojeluhallitus (1981); US Occupational Safety and Health Administration (OSHA) (1983); Health and Safety Executive (1985); Institut National de Recherche et de Sécurité (1985); American Conference of Governmental Industrial Hygienists (ACGIH) (1986)

[b]Asbestos fibre standards are used for fibrous forms

[c]Containing <1% quartz

## 2.2 Occurrence

(a)    *Natural occurrence*

Talc rocks are formed by several complex geological processes reacting upon many chemically diverse preexisting rock types. Hydrothermal alteration of magnesia- and silica-rich ultramafic rocks, under a range of low-to-moderate temperatures and pressures, may produce talc. Thermal metamorphosis of silica-rich dolomite will also produce talc. These processes, however, also commonly result in the formation of a number of other coexisting mineral phases — predominantly hydrous magnesium silicates. Some of these — for example, anthophyllite, tremolite and serpentine minerals (including chrysotile) — may occur as microscopic intergrowths with talc, as macroscopic nodules, or even as discrete zones within or adjacent to talc. Talc rock is therefore often a mixture of minerals varying in kind and quantity (Rohl & Langer, 1974; Rohl et al., 1976; Clifton, 1985).

Fibre intergrowths are often such that even extensive beneficiation may not yield a pure product. Thus, where fine-grained intergrowths of talc and tremolite occur, the processed product will probably contain residual tremolite (Rohl et al., 1976).

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018827

*(b)   Occupational exposure*

Talc-milling processes do not usually alter the mineral composition of the talc mixture delivered to the mill, but rather produce a talc with different physical properties dependent on particle size. Exposure to talc dust occurs during mining, crushing, separating, bagging, loading and in end-use facilities, such as rubber dusting and addition of talcs to ceramic clays and glazes. Since industrial talc is a mixture of various associated minerals, occupational exposure is to a mixture of mineral dusts.

Studies that provide information on occupational exposures to talc are summarized in Table 7 and described in more detail below. As with most industrial dust exposures, nearly all measurements made prior to approximately 1970 were done by collecting particles in an impinger and counting them by optical microscopy. Concentrations are thus expressed as millions of particles per cubic foot of air (mppcf).

In Georgia, USA, average dust exposures for miners using jackhammer drills were 1440 mppcf and those for millers 52 mppcf. The talc was reported to contain 45% tremolite and 45% talc, with little or no free silica (Dreessen, 1933). Average dust concentrations in a talc mine were reported to range from 32-855 mppcf (six samples), whereas average mill exposures ranged from 17-1672 mppcf (14 samples). The dust was reported to contain 70% talc, 20-30% dolomite and 10% tremolite, and no free silica except for occasional fragments; its morphology was described as 'bladed crystals'. Highest dust exposures were in bagging operations (Dreessen & DallaValle, 1935).

Occupational exposures to talc dust in mines and mills in New York State, USA, have been studied extensively (Siegal *et al.*, 1943; Kleinfeld *et al.*, 1955; Messite *et al.*, 1959; Kleinfeld *et al.*, 1967, 1974; Dement & Zumwalde, 1979; Dement *et al.*, 1980). Talc deposits in the state have been found to differ significantly in mineral composition, depending on location. Siegal *et al.* (1943) reported that talc produced in St Lawrence County contained tremolite, anthophyllite and only traces of quartz, and described the particle morphology as straight, needle-like fibres with a maximum length of 15 $\mu$m. Kleinfeld *et al.* (1973) also reported the major fibrous components of these talcs to be tremolite and anthophyllite, based on detailed electron microscopic observations. Bulk talc samples from another mine and mill in upper New York State were analysed for mineral content by optical petrographic microscopy, electron microscopy and X-ray diffraction. The mineral composition (by weight) of the talc bulk samples was 14-48% talc, 37-59% tremolite (including both fibrous and nonfibrous habits), 4.5-15% anthophyllite (including both fibrous and nonfibrous habits, 0.25-2.6% free silica, 0.0-1% calcite, 0.5-1% dolomite and 10-15% serpentine (largely lizardite and antigorite) (Dement & Zumwalde, 1979; Dement *et al.*, 1980).

Talc dust and fibre exposures in mining and milling operations in St Lawrence County, NY, for the period 1945-1972 are summarized in Table 8. Prior to dust control measures, such as wet drilling, average exposures to mine dust ranged from 120-818 mppcf; after 1945, these were reduced to 5-19 mppcf. Exposures in mills prior to 1945 ranged from 69-278 mppcf; average exposures in 1972 ranged from 7-36 mppcf. In 1972, optical fibre counts, using membrane-filter sampling and analyses, revealed that exposures in mines were low

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018828

## Table 7. Studies of occupational exposures to talc

| Reference | Industry studied | Location of talc deposit | Date of exposure measurements | Measurement method employed | Other minerals present in talc studied |
|---|---|---|---|---|---|
| Dreessen (1933) | Mining/Milling | Georgia, USA | Pre 1933 | Impinger | Tremolite |
| Dreessen & DallaValle (1935) | Mining/Milling | Georgia, USA | Pre 1935 | Impinger | Tremolite, dolomite |
| Siegal et al. (1943) | Mining | New York, USA | 1940-1941 | Impinger | Tremolite, anthophyllite, traces of free silica |
| Kleinfeld et al. (1955); Messite et al. (1959); Kleinfeld et al. (1967, 1974) | Mining/Milling | New York, USA | Pre 1945-1972 | Impinger | Tremolite, anthophyllite, carbonates, traces of free silica |
| Kleinfeld et al. (1973) | Mining/Milling | New York, USA | 1954-1970 | Impinger, optical fibre counts | Tremolite, anthophyllite |
| Dement & Zumwalde (1979); Dement et al. (1980) | Mining/Milling | New York, USA | 1975 | Gravimetric, optical and electron microscopy fibre counts | Tremolite, calcite, anthophyllite, dolomite, serpentines, silica |
| Rubino et al. (1976) | Mining/Milling | Piedmont, Italy | 1920-1975 | Impinger | Small amounts of tremolite |
| Boundy et al. (1979) | Mining/Milling | Vermont, USA | 1975-1976 | Optical and electron microscopy fibre counts | Dolomite, calcite, magnesite, chlorite, traces of other minerals |
| Greife (1980); Gamble et al. (1982) | Mining/Milling | Montana, Texas and North Carolina, USA | 1977-1980 | Gravimetric | Varied by location studied |
| Hogue & Mallette (1949) | Rubber dusting | Vermont, USA | 1943-1948 | Impinger | Stated to be 'pure talc' |
| Dement & Shuler (1972) | Rubber dusting | Not stated (USA) | 1972 | Gravimetric, optical fibre counts | 2-3% free silica |
| Fine et al. (1976) | Rubber dusting | Vermont, USA | 1972-1974 | Gravimetric | Trace of silica (<1%), <2 fibres/cm³ |

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018829

Table 8. Average dust and fibre concentrations in St Lawrence County, NY, talc mining and milling operations, pre-1945-1972[a]

| Exposure | Dust exposure (mppcf) | | | | Fibres[b] |
|---|---|---|---|---|---|
| | Before 1945 | 1946-1965 | 1966-1969 | 1972 | 1972 |
| *Mining* | | | | | |
| Drilling | 818 | 5 | 19 | 7 | 3 |
| Mucking | 120 | 5 | 9 | 3 | 2 |
| *Milling* | | | | | |
| Crushing | 180 | 42 | 28 | 35 | 62 |
| Screening | 69 | 37 | — | — | — |
| Milling | 92 | 25 | 40 | 7 | 25 |
| Garnering and separating | 278 | 27 | — | 13 | 27 |
| Pulverizing | — | 28 | — | — | — |
| Bagging | 151 | 27 | 29 | 27 | 47 |
| Box car and lorry loading | — | 73 | 43 | 36 | 24 |

[a]From Kleinfeld *et al.* (1974)

[b]Number of fibres/cm³ >5 μm in length (by phase-contrast microscopy)

(2-3 fibres >5 μm/cm³), whereas exposures in mills ranged from 25-62 fibres/cm³ (Kleinfeld *et al.*, 1974). [The Working Group noted that the fibre counts represent optical counts of all fibres with a 3:1 aspect ratio and longer than 5 μm, with no further mineral identification.]

Data on time-weighted-average exposures to respirable dust and airborne fibres in the mine and mill studied by Dement *et al.* are shown in Table 9. Time-weighted average exposures to respirable dust ranged from 0.23-1.29 mg/m³ in the mine and 0.25-2.95 mg/m³ in the mill. Due to the low free silica content of this talc, exposure to respirable free silica did not exceed 0.025 mg/m³ in the mine and 0.028 mg/m³ in the mill. Airborne fibre levels measured by optical microscopy gave mean exposures in the mine and mill of 4.5 and 5.0 fibres >5 μm/cm³, respectively, with peak values as high as 29.1 fibres/cm³ in the mill. Further analyses of the airborne fibre samples by electron microscopy showed that 65% of the fibres greater than 5 μm in length were anthophyllite and 7% were tremolite. The authors concluded that the most important fibrous component of this talc deposit was anthophyllite (Dement & Zumwalde, 1979; Dement *et al.*, 1980).

Concentrations of respirable dust in mass samples from three Vermont talc mines and mills surveyed in 1975-1976 are given in Table 10. Geometric mean exposures to respirable dust ranged from 0.5 to 5.1 mg/m³ in the mines and from 0.5 to 2.9 mg/m³ in the mills; however, exposures in the mills were generally higher than those in the mines. Optical fibre counts of as much as 60 fibres/cm³ were reported. Subsequent analyses of these samples by scanning electron microscopy demonstrated rolled talc and elongated talc particles. X-ray diffraction analyses of bulk samples from these mines and mills showed that talc and magnesite were the major (20-100%) mineral components, chlorite and dolomite minor (5-20%) components, and that dolomite, calcite, quartz, biotite, ankerite, chromite,

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018830

**Table 9. Respirable dust exposures and airborne fibre (longer than 5 $\mu$m) concentrations[a] in a New York state talc mine and mill[b]**

| Operation | Respirable dust | | | | Airborne fibres | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | No. of samples | Time-weighted average[c] (mg/m³) | | Highest peak[d] (mg/m³) | No. of samples | Time-weighted average[c] (fibres >5 $\mu$m/cm³) | | | Highest peak[d] (fibres >5 $\mu$m/cm³) |
| | | Mean | Range | | | Mean | Median | Range | |
| Mine | 14 | 0.86 | 0.23-1.29 | 1.72 | 54 | 4.5 | 4.4 | 0.8-9.8 | 18.2 |
| Mill | 29 | 0.86 | 0.25-2.95 | 4.64 | 168 | 5.0 | 4.3 | 0.2-16.0 | 29.1 |

[a]By optical microscopy
[b]From Dement and Zumwalde (1979)
[c]Full shift determinations
[d]Based on highest concentration observed in a single sample

**Table 10. Respirable dust concentrations (mg/m³) in Vermont talc mines and mills[a]**

| Company | Area | Summer 1975 | | Winter 1976 | |
|---|---|---|---|---|---|
| | | No. of samples | Geometric mean (mg/m³) | No. of samples | Geometric mean (mg/m³) |
| A | Underground mine | 18 | 0.6 | 16 | 0.5 |
| | Mill (1st shift) | 4 | 1.7 | 13 | 1.7 |
| | Mill (2nd shift) | 6 | 0.5 | 3 | 1.5 |
| B | Underground mine | 15 | 1.5 | 23 | 0.9 |
| | Mill (1st shift) | 22 | 1.8 | 42 | 1.8 |
| | Mill (2nd shift) | 12 | 2.9 | 16 | 1.9 |
| C | Underground mine | 12 | 0.5 | 19 | 0.7 |
| | Walk-in mine | 7 | 1.2 | | |
| | Walk-in mine | | | 6 | 1.7 |
| | Open-pit mine | 2 | 5.1 | — | — |
| | Mill # 1 (1st shift) | 12 | 0.9 | 20 | 1.1 |
| | Mill # 1 (3rd shift) | 3 | 0.8 | 4 | 1.4 |
| | Mill # 2 (1st shift) | 11 | 1.0 | 8 | 0.5 |
| | Mill # 2 (2nd shift) | 13 | 0.8 | 3 | 1.1 |

[a]From Boundy et al. (1979)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018831

phlogopite and oligoclase were present in smaller amounts (<5%). Trace amounts of free silica were found in 15% of the samples (Boundy et al., 1979). One closed mine was reported to contain tremolite microinclusions, but its fibrosity was not documented (Selevan et al., 1979).

A cross-sectional study of occupational exposures in US talc mines and mills was conducted by the National Institute for Occupational Safety and Health; the results are summarized in Table 11. Bulk samples from each region were analysed by transmission electron microscopy: no fibre was found in any sample of Montana talc; fibrous tremolite and antigorite were reported in Texan talcs (0.5-3.0 $\mu$m in diameter, 4-30 $\mu$m in length); and talcs from North Carolina contained acicular cleavage fragments with particle length: diameter ratios as high as 100:1, with some <0.1 $\mu$m in diameter (Greife, 1980; Gamble et al., 1982).

Table 11. Respirable dust concentrations in 275 samples from talc mines and mills located in Montana, Texas and North Carolina, USA[a]

| Samples | Geometric mean (mg/m³) | | |
|---|---|---|---|
| | Montana | Texas | North Carolina |
| From mines | 0.66 (0.47-0.92)[b] | 0.45 (0.18-0.71) | 0.14 (0.07-0.31) |
| From mills | 1.1  (0.85-1.41) | 1.56 (0.96-2.54) | 0.26 (0.13-0.51) |
| Bulk talc samples (% free silica) | <0.8 | 2.23 | 1.45 |

[a]Adapted from Greife (1980) and Gamble et al. (1982)

[b]In parentheses, 95% frequency interval

Analysis of 362 personal samples of respirable dust collected over a full shift by the Mine Safety and Health Administration from talc mines and mills in the USA showed the median dust exposure to be 1.20 mg/m³; 90% of all exposures were to less than 2.78 mg/m³ (National Institute for Occupational Safety and Health, 1979).

Prior to adoption of technical preventive means in 1950, exposures in the talc operation in the Germanasca and Chisone Valley (Piedmont), Italy, were reported to be to approximately 800 mppcf in the mines and to 25 mppcf in the mills. Exposures in both areas were reduced to less than 10 mppcf after 1965. Mineralogical analyses of these talcs demonstrated that they contained quartz, muscovite, chlorite, garnet, calcite, magnesite and small quantities of other minerals. In a few specimens, a small amount of tremolite was detected, but no other type of amphibolic asbestos or chrysotile was reported. The free silica content of powdered talc specimens was generally below the detection limits of X-ray diffraction (Rubino et al., 1976). [The Working Group noted that the analytical methods were not described in detail, and the relative fibrosity of the tremolite was not documented.]

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018832

Only limited information is available about exposures in secondary industries in which talc is used or processed further. Personal air samples collected in a rubber band production plant, where housekeeping, ventilation and work practices were poor and in which talc was used as an antistick agent, had time-weighted average respirable dust concentrations of 2.5-7.8 mg/m³ (average, 4.8 mg/m³) for extruders, 5.3 and 6.1 mg/m³ for vulcanizers and 0.9 and 1.3 mg/m³ for cutters. Total dust exposures were found to range from 5.4-199 mg/m³. The talc was reported to contain 2-3% free silica. Fibre exposures, as measured by phase-contrast optical microscopy, ranged from 4.7-19.2 fibres >5 $\mu$m/cm³ (Dement & Shuler, 1972). [The Working Group noted that no electron microscopic analysis was conducted to confirm the identity of the fibres; however, most of the fibres were probably not asbestos.]

Respirable dust concentrations in two rubber manufacturing plants where Vermont talc was used as an antistick agent are shown in Table 12. Eighteen of 21 samples analysed for free silica contained less than 1% by weight. In 12 samples analysed for fibres, using optical microscopic techniques for asbestos, all concentrations were less than 2 fibres >5 $\mu$m/cm³. No electron microscopic fibre analysis was reported (Fine et al., 1976). Hogue and Mallette (1949) found an average dust concentration of 15-50 mppcf talc in two rubber plants using Vermont talc. Tube machine operators had an average exposure of 20 mppcf; tube 'bookers', 35 mppcf; tube cure men, 15 mppcf; and 'line rerollers', 50 mppcf.

**Table 12. Respirable dust concentrations in rubber processing plants using talc**[a]

| Location | No. of samples | Average dust concentration (mg/m³) |
|---|---|---|
| *Plant A* | | |
| Lorry and bus inner tubes (splicer) | 7 | 0.60 |
| Lorry and bus inner tubes (cureman) | 6 | 1.41 |
| 'Tuber operator' | 3 | 0.47 |
| 'Booker' | 3 | 0.74 |
| Farm service inner tubes (splicer) | 6 | 0.82 |
| Farm service inner tubes (cureman) | 2 | 0.91 |
| *Plant B* | | |
| Rubber band area | 6 | 3.55 |
| Gum engraving room | 6 | 0.64 |
| Hose extruding | 4 | 0.51 |
| Curing heavy duty flaps | 3 | 1.29 |
| 'Dust room' | 2 | 0.59 |

[a]From Fine et al. (1976)

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018833

Case 3:16-md-02738-MAS-RLS   Document 16133-5   Filed 12/22/20   Page 112 of 148 PageID: 125174

### 2.3 Analysis

Because talc is frequently contaminated with a number of other mineral phases, some known to be biologically active, an analytical protocol is often required that can distinguish among these phases.

Phase-contrast optical microscopy is a conventional technique for the identification of minerals. A microscope equipped with bright-field illumination and polarized light optics may be used to analyse talc powders (Hamer *et al.*, 1976; Boundy *et al.*, 1979; Rohl & Langer, 1979). The limitations of the technique for this purpose are discussed by Rohl *et al.* (1976).

The characteristic lines of X-ray powder diffraction pattern are 0.934, 0.468, 0.456, 0.343, 0.3115, 0.2632 and 0.2598 nm (Ross, 1984). Quantitative mineralogical analyses of bulk samples are sensitive to about 1-2% of talc (Pooley & Rowlands, 1977). The application of X-ray diffraction analysis, both continuous and step-scan modes, for quantitative determination of contaminating minerals in talc has been described, including the selection of talc and reference materials, the preparation of standard dilutions of fibres in talc to ensure sensitivity and reproducibility, the selection of characteristic X-ray reflections to be scanned, and instrumental technique. Tremolite, chrysotile and anthophyllite impurities in talc can be determined at levels as low as 0.1-2% (Rohl & Langer, 1974; Rohl *et al.*, 1976).

Morphological, structural and chemical information on single particles of talc and associated minerals can be obtained by analytical electron microscopy and selected-area electron diffraction (Rohl *et al.*, 1976).

## 3. Biological Data Relevant to the Evaluation of Carcinogenic Risk to Humans

### 3.1 Carcinogenicity studies in animals[1]

The Working Group noted that in most of the studies of 'talc' described below, no or limited characterization of the mineralogy of the sample employed was given, and, in particular, there was a lack of information on fibre content or particle size.

#### (a) Oral administration

*Rat*: Groups of 25 male and 25 female Wistar rats, ten weeks of age, received about 50 mg/kg bw per day commercial talc [characteristics unspecified] in the diet or standard diet for life (average survival, 649 days). No significant difference in tumour incidence was found in comparison with controls (Gibel *et al.*, 1976).

A group of 16 male and 16 female Wistar-derived rats, 21-26 weeks of age, were exposed to 100 mg Italian talc (grade 00000; ready milled; mean particle size, 25 $\mu$m; containing

---

[1]The Working Group was aware of studies in progress in mice and rats by inhalation (IARC, 1986) and in rats by subcutaneous and intraperitoneal injection (Maltoni *et al.*, 1982).

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018834

92% talc, 3% chlorite, 1% carbonate minerals and 0.5-1% quartz) per day per rat in the diet for five months and then maintained on basal diet for life (average survival, 614 days). A control group of 16 rats was fed basal diet. No difference in tumour incidence was found between the two groups (Wagner *et al.*, 1977). [The Working Group noted the limited exposure period and the advanced age of the animals at the start of exposure.]

(b)   *Inhalation exposure*

*Rat*: A group of 24 male and 24 female Wistar-derived rats, six to eight weeks of age, was exposed by inhalation to a mean respirable dust concentration of 10.8 mg/m$^3$ Italian talc (grade 00000; ready milled; mean particle size, 25 $\mu$m; containing 92% talc, 3% chlorite, 1% carbonate minerals and 0.5-1% quartz) for 7.5 h per day on five days a week for six (24 rats) or 12 (24 rats) months (cumulative exposures, 8200 and 16 400 mg/m$^3$ × h, respectively). Ten days after the end of each exposure period, six rats in each group were killed; a further four rats were killed in each group one year later. Within 28 months of the start of the study, a further 12 animals in each group had died. No lung tumour was observed in rats exposed to talc for six months, while one lung adenoma occurred among those exposed for 12 months. No lung tumour was found in 24 male or 24 female controls (Wagner *et al.*, 1977). [The Working Group noted the limited number of animals allowed to survive longer than 12 months after the end of each exposure period.]

*Hamster*: Three groups of 50 male and 50 female Syrian golden hamsters, four weeks old, were exposed to an aerosol of talc baby powder, prepared from Vermont talc by flotation (95% w/w platy talc with trace quantities of magnesite, dolomite, chlorite and rutile), for 3, 30 or 150 min per day on five days a week for 30 days. The mean total aerosol concentration was 37.1 mg/m$^3$, with a mean respirable fraction of 9.8 mg/m$^3$ and a mass median aerodynamic diameter of 4.9 $\mu$m. Two further groups of hamsters, seven weeks old, were exposed to talc aerosol for 30 or 150 min per day for 300 days or until death. The mean total aerosol concentration was 27.4 mg/m$^3$, with a mean respirable fraction of 8.1 mg/m$^3$ and a mass median aerodynamic diameter of 6 $\mu$m. Two control groups of 25 males and 25 females were sham exposed. No primary neoplasm was found in the respiratory system of any hamster. The incidence of alveolar-cell hyperplasia was 25% in the groups exposed to aerosol for 30 or 150 min per day for 300 days, compared with 10% in the control group (Wehner *et al.*, 1977a, 1979). [The Working Group noted the inadequate duration of the study.]

(c)   *Intratracheal administration*

*Hamster*: Groups of 24 male and 24 female Syrian golden hamsters, nine weeks old, received 18 weekly intratracheal injections of 3 mg talc (United States Pharmacopeia grade; 93.3% below 25 $\mu$m) in 0.2 ml saline, with or without 3 mg benzo[*a*]pyrene, or 0.2 ml saline only, or were untreated. The animals were allowed to live out their lifespan (average 50% survival, 46-55 weeks). No respiratory-tract tumour was observed in animals exposed to talc alone or in saline-treated or untreated controls. In hamsters exposed to talc with benzo[*a*]pyrene, 33/45 animals had benign and malignant tumours of the respiratory tract

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018835

(larynx to lung) (Stenbäck & Rowland, 1978). [The Working Group noted that no group received benzo[a]pyrene alone and that the survival in all groups was relatively short.]

### (d)   Subcutaneous administration

*Mouse*: Fifty female R3 mice, three to six months of age, were given single subcutaneous injections of 0.2 ml of a mixture of 8 g talc [unspecified] and 20 g peanut oil [dose, about 80 mg] and observed for life (average 50% survival, 596 days). No local tumour was observed (Neukomm & de Trey, 1961).

In a study reported in an abstract, female Marsh mice, three months old, received single subcutaneous injections of 20 mg USP talc and were observed for 18-21 months. No tumour developed at the injection site in 26 treated animals or in 24 saline-injected controls (Bischoff & Bryson, 1976).

### (e)   Intraperitoneal administration

*Mouse*: In a study reported in an abstract, female Marsh mice, three months old, received single intraperitoneal injections of 20 mg USP talc and were observed for 18-21 months. Intraperitoneal lymphoid tumours occurred in 5/22 treated animals and in 6/28 saline-treated controls (Bischoff & Bryson, 1976).

Forty Swiss albino mice [sex unspecified], six weeks of age, received single intra-peritoneal injections of 20 mg ground commercial talc [unspecified] in saline. Before six months, 16 animals had died. In the 24 survivors allowed to live out their normal lifespan [unspecified], three peritoneal mesotheliomas were observed, compared with 3/46 in saline-treated controls (Özesmi *et al.*, 1985). [The Working Group noted the inadequate reporting of the study.]

*Rat*: A group of 40 female Wistar rats, eight to 12 weeks of age, received four intraperitoneal injections of 25 mg granular talc in 2 ml saline at weekly intervals. A group of 80 female rats injected with saline served as controls. The rats were observed until spontaneous death or sacrifice (average survival time after injection, 602 days). A mesothelioma was observed in 1/36 talc-exposed rats after 587 days compared with none in 72 controls (Pott *et al.*, 1974, 1976a,b).

In a study reported in an abstract, three-month-old female Evans rats received single intraperitoneal injections of 100 mg USP talc and were observed for 18-21 months. Of the treated rats, 3/27 developed tumours (one lymphosarcoma, one reticulum-cell sarcoma in the peritoneal cavity, one cystadenoma of the liver), compared with none in 26 saline-treated controls (Bischoff & Bryson, 1976).

### (f)   Intrapleural and intrathoracic administration

*Mouse*: In a study reported in an abstract, male Marsh mice, three months old, received single intrathoracic injections of 10 mg USP talc. After 18-21 months, 5/47 treated mice had tumours (two adenocarcinomas and three lymphoid tumours of the lung), compared with none of 48 saline-injected controls (Bischoff & Bryson, 1976).

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018836

*Rat*: In a study reported in an abstract, female Evans rats, three months old, received single intrathoracic injections of 50 mg USP talc. After 18-21 months, intrathoracic reticulum-cell sarcomas or lymphomas were observed in 7/30 talc-treated rats, in 8/32 saline-treated animals and in 7/28 untreated controls (Bischoff & Bryson, 1976).

A group of 24 male and 24 female Wistar-derived rats, eight to 14 weeks old, received single intrapleural injections of 20 mg Italian talc (grade 00000; ready milled; mean particle size, 25 $\mu$m; containing 92% talc, 3% chlorite, 1% carbonate minerals and 0.5-1% quartz). The mean survival time of the treated rats (655 days) was similar to that of 24 male and 24 female controls (691 days) injected with saline. No mesothelioma was detected in either group; one small pulmonary adenoma was found in one rat that died 25 months after injection (Wagner *et al.*, 1977).

Groups of 30-50 female Osborne-Mendel rats, 12-20 weeks old, received single intrapleural implantations of 40 mg of one of seven grades of refined commercial talc from separate sources in hardened gelatin. The rats were followed for two years, at which time survivors were killed. The incidences of pleural sarcomas were: talc 1, 1/26; talc 2, 1/30; talc 3, 1/29; talc 4, 1/29; talc 5, 0/30; talc 6, 0/30; talc 7, 0/29; compared with 3/491 in untreated controls, 17/615 in controls receiving implants of 'nonfibrous' materials described by the authors as 'noncarcinogenic' and 14/29 in rats receiving UICC crocidolite asbestos (Stanton *et al.*, 1981).

### 3.2 Other relevant biological data

#### (a) *Experimental systems*

*Toxic effects*

A review of the literature prior to 1978 on the biological effects of talc is available (Lord, 1978).

The Working Group noted that in most of the studies of 'talc' described below, no or limited characterization of the mineralogy of the sample employed was given, and, in particular, there was a lack of information on fibre content or particle size.

##### (i) *Lethality*

The $LD_{50}$ of talc has not been established unequivocally.

Significant mortality was observed in guinea-pigs after two or three intravenous injections of 25 mg talc in saline (Dogra *et al.*, 1977). In contrast, there was no treatment-related death in rabbits injected intravenously daily for two weeks with 100 mg talc in saline (Puro *et al.*, 1966), in rabbits receiving twice-weekly intravenous injections of 50 mg talc for ten weeks or in rats receiving twice-weekly intravenous injections of talc over a nine-week period (total dose, 100 mg) (Schepers & Durkan, 1955b). Three of 11 rats died within one day following injection of 1400 mg/kg bw talc into the lower pole of the spleen (Eger & Da Canalis, 1964).

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018837

Case 3:16-md-02738-MAS-RLS   Document 16133-5   Filed 12/22/20   Page 116 of 148 PageID: 125178

In most of the studies described below, no acute mortality was observed in several species of animals following administration of high doses of talc by ingestion, inhalation or intratracheal, intrapleural, intraperitoneal or subcutaneous injection.

In rats fed 100 mg talc per day for 101 days, no significant depression of mean lifespan was observed (Wagner et al., 1977).

Several studies of exposure to talc via inhalation have been reported; but, until recently (see Hanson et al., 1985), the primary technical problem associated with inhalation experiments has been a lack of methods to determine accurately the amount of talc inhaled by exposed animals. The acute mortality observed in rats exposed to a 'very dense' cloud of talc (particle size, $<5\,\mu$m) for 3 h per day for up to 12 days may have been due to suffocation (Policard, 1940). None of a group of rats exposed to 30-383 mg/m³ 'technical'- or 'pharmaceutical'-grade talc for 6 h per day on six days per week for up to nine months died as a specific consequence of exposure (Bethge-Iwańska, 1971). No effect was observed on the survival of hamsters exposed by inhalation to 8 mg/m³ respirable 'baby talc' for up to 150 min per day on five days per week for 300 days (Wehner et al., 1977a, 1979).

A 79% mortality rate was reported in rats receiving a single intratracheal injection of 50 mg/ml talc in water. Subsequently, it was found that rats could tolerate the dose if they were given two injections of 25 mg/0.5 ml at weekly intervals (Lüchtrath & Schmidt, 1959). A 40% mortality was observed in rats injected intratracheally with 25 mg tremolitic talc/ml water (Gross et al., 1970). Low mortality (2/14) was reported in chinchillas given five intratracheal injections of 40 mg talc in saline (both deaths occurred after the first injection) (Trautwein & Helmboldt, 1967).

No significant mortality was observed following intrapleural injection of 20 mg talc in saline into rats (Wagner et al., 1977). Increased mortality was reported in mice six months after intraperitoneal injection of 20 mg 'commercial' talc in saline (Özesmi et al., 1985), but no increased mortality was observed in rats injected intraperitoneally with 100 mg talc in saline (Pott et al., 1976a). No acute toxicity was observed after a single injection of 10 mg into the bursa of rats (Hamilton et al., 1984) or after suprascapular subcutaneous injection of 600 mg into mice (Carson & Kaltenbach, 1973). Transient convulsions were observed in rabbits following cisternal injection of 1 ml of a 1:9 or 1:4 suspension of talc in saline (Oppenheimer & Riester, 1953).

(ii)   *Chronic toxicity*

Mild to marked arterial endothelial cell proliferation with cellular encroachment into the lumen and the occurrence of occasional foreign-body giant cells within the endothelial masses were observed after daily intravenous injections of 100 mg talc for two weeks to rabbits (Puro et al., 1966). After three intravenous doses of 25 mg talc in saline to guinea-pigs, mild proliferation of the endothelial cells and moderate thickening of the intra-alveolar septa of the lungs were observed 150 days after injection (Dogra et al., 1977). In contrast, no effect on the rat lung was observed after intravenous injection of talc (Schepers & Durkan, 1955b). Talc granulomas were observed in the region of Glisson's capsule following intrasplenic injection of 1400 mg/kg talc to rats (Eger & Da Canalis, 1964). After cisternal injection of talc to rabbits, no permanent neurological disorder was

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018838

seen. Microscopic examination revealed a phagocytic, histiocytic response, with some fibroblastic proliferation and dense adhesions between the membranes (Oppenheimer & Riester, 1953).

No chronic pathological effect was associated with oral administration of talc to rats (Wagner et al., 1977). Intratracheal injections of talc (total dose, 150 mg) to guinea-pigs induced perivascular and peribronchiolar focal accumulations of histiocytes, fibrocytes, plasma cells and eosinophils within one month; by eight months, some fibrosis, with fibrocellular sclerosis of the pleural surface, was observed. After two years, the dominant effects were bronchiolectasia, bronchiolitis and marked fibrosis (Schepers & Durkan, 1955b).

No evidence of lung fibrosis or lymph node abnormality was observed in rats given a single intratracheal injection of 50 mg 'pure' talc in water; however, rats that received the same dose of 'calcined' (1000-1100°C) talc developed lung and lymph node fibrosis after 13 months (Lüchtrath & Schmidt, 1959). Proliferative inflammation of the smaller bronchi and bronchioles was observed in rats four days after intratracheal injection of 25 mg talc (containing tremolite; fibres, 0.1-0.2 $\mu$m in diameter) in water; within a few months, collagenous tissue had been formed (Gross et al., 1970).

Chinchillas receiving a single or several intratracheal injections of 40 mg 'purified' talc in saline exhibited chronic pulmonary irritation and proliferative pneumonia, with giant-cell granulomas and adjacent metaplasia of the alveolar epithelium. The hyperplastic cells subsequently transformed into cuboid cells that formed a continuous lining of the affected alveoli and finally acquired an adenomatous appearance (Trautwein & Helmboldt, 1967).

Exposure by inhalation to a 'heavy dosing' of talc was badly tolerated by rats, causing severe dyspnoea. However, no histological change was observed within 20 days, and talc particles were trapped by alveolar macrophages (Policard, 1940). Rats exposed to dust clouds of 30-383 mg/m³ 'industrial'- or 'pharmaceutical'-grade talc for nine months developed chronic inflammatory changes, including thickening of the pulmonary arteries walls and, eventually, emphysema (Bethge-Iwańska, 1971).

In rats exposed by inhalation to 10.8 mg/m³ Italian talc (grade 00000; ready milled; mean particle size, 25 $\mu$m) for three months, minimal fibrosis was observed, the degree of which did not change during the post-exposure period. Animals exposed for one year had minimal to slight fibrosis, the degree of which had increased to moderate within one year after cessation of exposure (Wagner et al., 1977). In contrast, Syrian golden hamsters exposed to 8 mg/m³ talc aerosols for up to 150 min per day on five days per week for 30 days showed no histopathological change in the lungs, heart, liver, renal tissues, stomach or uterus (Wehner et al., 1977a, 1979; Wehner, 1980).

Injection of 10 mg talc (containing some asbestos fibres) into the pleural cavity of mice has been reported to produce granulomas, some of which were firmly attached to the surface of the lungs or other chest contents and, occasionally, to the lung lobes (Davis, 1972). Two years after injection of 20 mg Italian talc (see above) into the right pleural cavity of rats, granulomas at the injection site were common, and one small pulmonary adenoma was observed, but no other relevant pathology was observed in the lungs (Wagner et al., 1977).

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018839

Guinea-pigs received single intraperitoneal injections of 200 mg of one of seven 'industrial'-grade talcs (up to 52% talc, up to 82% tremolite, traces of quartz). Nodules consisting of macrophages and giant cells were first observed at ten days on the ventral parietal surface and over a 15-month period became smaller. Fibroblastic proliferation was pronounced in the early phases (Schulz & Williams, 1942).

Six months after intraperitoneal injection of approximately 400 mg of a talcum powder used on surgical gloves, laparotomized albino rats exhibited typical granulomas with numerous foreign-body giant cells (Blümel *et al.*, 1962). These findings were confirmed in rats implanted with suture material dusted with talc or talc pellets, which resulted in a chronic inflammatory process with persistent granuloma formation (Sheikh *et al.*, 1984).

(iii) *Toxicity* in vitro

The concentration of talc (99% pure) required to cause 50% haemolysis of red-blood cells was 65 mg/ml, which is more than 50 fold that of chrysotile (Woodworth *et al.*, 1982).

Mouse peritoneal macrophages were exposed to seven different specimens of talc (only one of which contained amphibole fibres); all seven were found to be 'modestly' cytotoxic, as determined by the release of lactate dehydrogenase and β-glucuronidase, to a degree ten-fold less than quartz. No statistical difference was reported for the effects of the different talc samples (Davies *et al.*, 1983). The phagocytosis of talc by rabbit lung fibroblasts has been reported (Henderson *et al.*, 1975a).

A concentration of 0.1 mg/ml talc (99% pure) caused 35% release of $^{51}$Cr from Syrian hamster tracheal epithelial cells labelled with sodium chromate; the concentration is two-fold that required for chrysotile (Woodworth *et al.*, 1982).

A concentration of >50 μg/ml Italian talc caused a 50% reduction in the colony-forming efficiency of Chinese hamster V79-4 lung cells (Chamberlain & Brown, 1978).

*Effects on reproduction and prenatal toxicity*

Talc was found to produce nonspecific abnormalities in chicken eggs, at an incidence similar to that induced by thalidomide and sulphadimethoxine (Carter, 1965; Yang, 1977).

No teratological effect was observed in hamsters, rats, mice or rabbits following oral administration of talc. The doses used were 1600 mg/kg bw to rats and mice on days 6-15 of gestation; 1200 mg/kg bw per day to hamsters on days 6-10 of gestation; and 900 mg/kg bw to rabbits on days 6-18 of gestation (Food and Drug Research Laboratories, 1973).

*Deposition, retention and clearance*

The deposition, translocation and clearance of talc in hamsters was followed by giving them a single nose-only inhalation exposure for 2 h to 40-75 mg/m³ neutron-activated talc (median diameter based on radioactivity measurements, 6.4-6.9 μm). High-grade cosmetic talc was used, consisting of 95% (w/w) platy talc mineral. Alveolar deposition was approximately 20-80 μg, representing 6-8% of the inhaled amount. The biological half-life of the talc deposited in the alveoli was seven to ten days, and alveolar clearance was reported to be essentially complete four months after exposure. [The Working Group noted that the unusually short clearance time may relate to limitations in the sensitivity of the detection

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018840

methods and the large size of the particles used.] No translocation of talc to liver, kidneys, ovaries or other parts of the body was found (Wehner *et al.*, 1977a,b).

In rats exposed to aerosols (mean respirable dust, 10.8 mg/m$^3$) of Italian talc (see above), the mean amounts of talc retained in the lung were 2.5, 4.7 and 12.2 mg per rat following exposures for three, six and 12 months, respectively. These levels were roughly proportional to the cumulative exposures (Wagner *et al.*, 1977). In rats exposed for 6 h per day on five days per week for four weeks to 2.3, 4.3 and 17 mg/m$^3$ respirable talc, the amounts retained in the lung at the end of exposure were 77, 187 and 806 $\mu$g talc per g lung, respectively (Hanson *et al.*, 1985).

Talc, like other foreign particles, has been found to depress the clearance of 3,4-benzo[*a*]pyrene from the lungs of hamsters (Pelfrene, 1976).

Guinea-pigs were given a single intraperitoneal injection of 200 mg of one of seven commercial talc samples (containing 3-52% talc, the rest being serpentines, carbonate, quartz and tremolite; 82% tremolite in one sample) and were examined at intervals up to 15 months. Because of differences in solubility, there was relative enrichment of the sample with talc. Talc particles were found mainly on the ventral parietal surface of the peritoneum within macrophages and giant cells (Schulz & Williams, 1942).

In studies in rats, mice, guinea-pigs and hamsters using radioactive tracer techniques, no intestinal absorption or translocation of ingested talc to the liver and kidneys was detected (Wehner *et al.*, 1977c; Phillips *et al.*, 1978). No translocation of talc into the ovaries was detected after single or multiple intravaginal applications to rabbits (Phillips *et al.*, 1978).

*Mutagenicity and other short-term tests*

Talc was not mutagenic to *Salmonella typhimurium* TA1530 or *his* G46 or to *Saccharomyces cerevisiae* D3 *in vitro* [full details not given] or in host-mediated assays in mice (30-5000 mg/kg bw) (Litton Bionetics, 1974).

Chromosomal aberrations were not induced in human WI38 cells treated with talc at 2-200 $\mu$g/ml, and neither chromosomal aberrations nor dominant lethal mutations were induced in rats following oral administration of 30-5000 mg/kg bw talc (Litton Bionetics, 1974).

Single intraperitoneal injections of 20 mg talc plus 2 mg particulate prednisolone acetate in saline into mice induced significant numbers of multinucleated giant cells within 48 h. Neither compound alone induced this response. The multinucleate cells arose by cell fusion, and the resultant polykarions exhibited severe structural chromosomal abnormalities (bridges, acentrics and dispersed chromosomes). Prednisone in combination with talc also elicited the formation of multinucleated giant cells. Polykarions were not observed when talc was injected in combination with cortexone acetate, cortisone or testosterone isobutyrate (Dreher *et al.*, 1978).

*(b) Humans*

*Toxic effects*

The toxic effects of talc are dependent on the route, dose and properties of the talc

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018841

involved. In addition, talc commonly contains other minerals (see section 1.3), including in some instances several forms of asbestos and silica.

Talc pneumoconiosis is somewhat more prevalent and severe among people exposed to talc containing asbestiform minerals than among those exposed to talc without such impurities (Schepers & Durkan, 1955a; Kleinfeld et al., 1963). The form of the pneumoconiosis varies widely, from an asymptomatic simple type (Buus-Hansen et al., 1950; Vallyathan & Craighead, 1981) to disabling conglomerate pneumoconiosis (Jaques & Benirschke, 1952; Hunt, 1956; Graham & Gaensler, 1965; Fristedt et al., 1968; Miller et al., 1971). Mixed-dust pneumoconiosis is frequently seen, including silicosis, asbestosis and occasionally other forms (Porro et al., 1942; Schepers & Durkan, 1955a; Kleinfeld et al., 1963; Mark et al., 1979).

Several early reports describe 'talcum powder granuloma' arising from the use of talc on surgical gloves (Antopol, 1933; Fienberg, 1937; German, 1943; Eiseman et al., 1947; Diffenbaugh, 1953; Henderson et al., 1975b). Subsequent cases have been reported which document a variety of surgical complications, including adhesions, pseudotumours and sinus tracts attributable to talc exposure (Lichtman et al., 1946; Pruvost, 1946; Eiseman et al., 1947; Saxén & Tuovinen, 1947; Enderlin et al., 1959). Both skin granulomas and talc pneumoconiosis have been reported after liberal use of talc on the body (Tye et al., 1966; Nam & Gracey, 1972; Wells et al., 1979; Tukiainen et al., 1984).

Respiratory distress syndrome, which can be fatal, has been described in children following massive accidental inhalation of talcum powder (Cless & Anger, 1954; Molnar et al., 1962; Gouvěa et al., 1966; Hughes & Kalmer, 1966; Lund & Feldt-Rasmussen, 1969; Niemann et al., 1971; Gould & Barnardo, 1972). Acute bronchitis and bronchiolitis were found in a 22-month-old boy who died following accidental inhalation of talc (Molnar et al., 1962).

A variety of pathological effects arise from intravenous use of talc containing drugs by addicts. These include micronuclear pulmonary opacities (Krainer et al., 1962; Hopkins & Taylor, 1970; Szwed, 1970; Arnett et al., 1976; Smith et al., 1978; Waller et al., 1980; Tao et al., 1984), angiothrombotic pulmonary hypertension (Wendt et al., 1964; Bainborough & Jericho, 1970; Zientara & Moore, 1970; Arnett et al., 1976; Paré et al., 1979; Waller et al., 1980) and conglomerate pulmonary lesions (Sieniewicz & Nidecker, 1980; Crouch & Churg, 1983). Reduced pulmonary function has also been observed (Paré et al., 1979). In addition, retinopathy, cerebral microembolization and granulomas of the liver, lymph nodes and kidneys have been reported (Lee & Sapira, 1973; Min et al., 1974; Paré et al., 1979; Carman, 1985).

Two studies by the US Public Health Service (Dreessen, 1933; Dreessen & DallaValle, 1935) of talc containing tremolite showed a high prevalence of pneumoconiosis in workers in talc mines and mills, which appeared to be related to dust concentration and duration of exposure. A variety of pneumoconiotic effects was seen, which did not appear to be related to differences in tremolite content. A series of cross-sectional studies reported from the New York State Department of Labor (Kleinfeld et al., 1955; Messite et al., 1959; Kleinfeld et al., 1963, 1964a,b, 1973) have documented a high prevalence of talc pneumoconiosis in talc miners and millers, especially among tremolitic talc workers. The cases were associated

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

with pleural plaques, restrictive or obstructive breathing disorders and decreased vital capacity. The prevalence of disease was lower among those with lower cumulative dust exposure and among those processing granular rather than fibrous talc. A large, well-controlled, industry-wide study of miners and millers in four talc deposits in the USA (Gamble *et al.*, 1979a,b; Dement *et al.*, 1980; Gamble *et al.*, 1982) revealed associations between talc containing tremolite and anthophyllite and increased prevalence of bilateral pleural thickening, which was also associated with significant reductions in lung function.

A series of cross-sectional studies describing talc pneumoconiosis in workers in talc mining, milling and manufacture in Italy (Rubino *et al.*, 1963; Tronzano *et al.*, 1965) found that the prevalence was related to extent and duration of exposure and that talcs contaminated with tremolite, serpentine and quartz were associated with significant pneumoconiosis. Similarly, in studies in Egypt (El Ghawabi *et al.*, 1970; Emara *et al.*, 1984), a high prevalence of pneumoconiosis was associated with heavy exposure to talc during milling and in the cosmetics industry; obstructive and restrictive pulmonary impairment were seen among persons with pneumoconiosis.

One reasonably large, representative, well-controlled study of exposure in the rubber industry to Vermont talc, reported to have a low content of silica and fibres, showed significantly increased respiratory symptoms and impaired ventilatory function but no radiographic abnormality (Fine *et al.*, 1976).

*Effects on reproduction and prenatal toxicity*

No data were available to the Working Group.

*Deposition, retention and clearance*

Talc particles have been found at autopsy in the lungs of cases of 'talc pneumoconiosis' (Schepers & Durkan, 1955a; Seeler *et al.*, 1959; Kleinfeld *et al.*, 1963; Berner *et al.*, 1981; Vallyathan & Craighead, 1981). Talc, in the form of platy or elongated particles, has been found at autopsy in the lungs of urban residents, farmers, asbestos miners and drug addicts (Seeler *et al.*, 1959; Langer *et al.*, 1971; Pooley, 1976; Abraham & Brambilla, 1979; Gylseth *et al.*, 1984). It has been reported to be concentrated in lung scar tissue (Yao *et al.*, 1984).

Churg and Wiggs (1985) analysed by transmission electron microscopy and energy dispersive X-ray spectroscopy the total fibrous and nonfibrous mineral content of the lungs of a series of 14 male smokers with lung cancer but with no history of occupational dust exposure, and of a series of 14 control men matched by age, smoking history and general occupational class. The average concentrations of mineral fibres and nonfibrous particles were 3.8 and 2.0 times higher in the group with cancer. Kaolinite, talc, mica, feldspars and crystalline silica comprised the majority of fibrous and nonfibrous particles in both groups.

Talc particles were found in stomach tumours from Japanese men (Henderson *et al.*, 1975c), possibly due to ingestion of talc-treated rice (Merliss, 1971a,b). Talc particles, but apparently no other insoluble particle, were found in the subserosal stroma of hernia sacs, possibly due to ingestion of medications in which talc is present as a filler (Pratt *et al.*, 1985).

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018843

Talc is used as a filler in some materials that drug addicts inject, resulting in wide dissemination of talc particles to the lung (Groth *et al.*, 1972; Lamb & Roberts, 1972; Farber *et al.*, 1981; Crouch & Churg, 1983), spleen, kidney, liver, brain, heart, adrenal and thyroid (Groth *et al.*, 1972) and even the retina (AtLee, 1972). In lung, most of the talc particles are seen within the vessels of the alveolar walls, and are almost invariably associated with marked foreign body granulomas (Crouch & Churg, 1983). The talc particles found in the lung are larger after intravenous injection than after inhalation (Abraham & Brambilla, 1979).

*Mutagenicity and chromosomal effects*
No data were available to the Working Group.

### 3.3  Case reports and epidemiological studies of carcinogenicity to humans

(a)  *Case reports and case series*

Individual case reports of cancer include a lung adenocarcinoma two years following talc pleurodesis (Jackson & Bennett, 1969) and a pleural mesothelioma following occupational exposure to talc (Chahinian *et al.*, 1982; Barz & Beck, 1983; Barnes & Rogers, 1984). [The Working Group noted that either these cases were associated with evidence of asbestos exposure or insufficient environmental data were available to determine whether asbestos exposure had occurred (Chahinian *et al.*, 1982).]

Four cases of mesothelioma reported to the tumour registry of the Cancer Control Bureau, New York Department of Health, USA, were associated with exposure to talc mining. Talc mines in St Lawrence County, New York, contain high levels of fibrous tremolite, the suggested etiological agent (Vianna *et al.*, 1981).

A survey of the long-term effects of talc and kaolin pleurodesis was reported by the Research Committee of the British Thoracic Association and the Medical Research Council Pneumoconiosis Unit (1979). No increase in the number of lung cancer deaths was observed, and no case of mesothelioma was reported. [The Working Group noted that there are several methodological limitations, including the fact that the duration of follow-up was less than 15 years, no data were available on smoking, and no specific information was given on the type or source of talc used.]

(b)  *Epidemiological studies*

Kleinfeld *et al.* (1967, 1974) reported two studies on New York talc miners and millers, the results of which are substantially the same; the more complete 1974 results are reported here. Men employed in 1940, who had accumulated 15 or more years of exposure to commercial talc dust as well as those who achieved a minimum of 15 years of such exposure between 1940 and 1969, were included in this study. The cohort totalled 260 workers and was believed to represent the total work force meeting the exposure criteria. Proportionate mortality was calculated utilizing US white male mortality for the year 1955, the median year of the 108 deaths observed. Environmental exposure was reported to be predominantly to talc containing tremolite and anthophyllite (asbestiform and nonasbestiform habits),

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018844

carbonate dusts and a small amount of free silica. Further dust counts were provided for the years 1966-1969: mines had median counts ranging from 9-19 mppcf, and mills, 20-24 mppcf; dust counts and fibre counts reported for the year 1972 ranged from 3-7 mppcf and 2-3 fibres/cm³ in mines and 7-28 mppcf and 24-62 fibres/cm³ in mills. Mortality from lung and pleural cancer showed a three-fold overall increase: observed, 12%; expected, 3.7%. No significant excess was found for gastrointestinal cancers. One peritoneal mesothelioma was noted. [The Working Group noted that, as for the previously reported proportionate mortality study (Kleinfeld et al., 1967), no data were available on smoking or on cumulative dose in individual workers; nor were further data given about the distribution of workers among the several mines and mills from which these records were extracted.]

A cohort mortality study was conducted of 398 white men initially employed between 1 January 1947 and 31 December 1959 in mining and milling talc in the Governeur Talc District of Upper New York State (St Lawrence County) (Brown et al., 1979; Dement et al., 1980). In addition to talc, the product contained tremolite, anthophyllite and serpentine minerals, some of which were asbestiform. [Further details of the exposure are reported in section 2.2(b).] Vital status was ascertained as of 1975. Fifty percent of the workers had been employed less than one year and 27% for ten years or more. Statistically significant excesses in mortality were observed for all malignant neoplasms (19 observed, 10.6 expected; standardized mortality ratio [SMR], 180), for neoplasms of the respiratory system (10/3.5; SMR, 290), for bronchogenic cancer (9/3.3; SMR, 270) and for all nonmalignant respiratory disease (8/2.9; SMR, 277). Evidence of an exposure-response relationship was observed by latency for bronchogenic cancer. The authors concluded that tremolite and anthophyllite are the prime suspected etiological factors associated with the observed increase in bronchogenic cancer and nonmalignant respiratory disease in this cohort. No data on smoking were available. A possible confounding factor in this study was previous exposures at other mines in the area; however, exposures to amphibole fibre in all these regional talc operations were reported to be substantially the same.

Stille and Tabershaw (1982) conducted a cohort mortality study on the same mine and mill studied by Brown et al. (1979). The composition of their cohorts was somewhat different, the current study including 655 employees who had ever worked for the company between 1 January 1948 and 31 December 1977, after exclusion of 35 women office workers and 53 workers for whom birth dates or other significant data were not available. Cause-specific mortality rates were based on 113 deaths as of December 1978. The SMR for all sites of cancer was 122 (25 observed/20.5 expected); 11 cases were respiratory cancers, and ten of those were lung cancer, with SMRs of 163 and 157, respectively. The cohort was then divided according to whether an individual had been employed elsewhere before coming to work at the particular mine and mill under investigation. Those few who had worked only at the company in question were found to have very low mortality from lung cancer (two observed, 2.6 expected). [The Working Group noted a number of methodological problems, including selection bias, lack of statistical testing, small numbers of person-years of exposure, and no analysis with respect to exposure.]

Rubino et al. (1976) studied 1514 miners and 478 millers employed for at least one year between 1921 and 1950 in talc mines and mills in the Germanasca and Chisone valleys

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018845

TALC                                                                                                211

(Piedmont) in Italy. The talc in those mines is described as quite pure, with only some tremolite microinclusions; no other fibrous mineral was reportedly found. [Further details of the exposure are reported in section 2.2(*b*).] Significant increases in specific cause of death among miners were found for silicosis (62 observed/30.9 expected) and for silico-tuberculosis (18/9.1). Significant deficits in cause-specific mortality were reported for malignant neoplasms (100/129.5), malignant neoplasms of the lung, bronchus and trachea (9/19.7) and malignant neoplasms at other sites (23/39.9). Two cases of pleural mesothelioma and a high occurrence of silicosis and silico-tuberculosis were found in the comparison group. [The Working Group noted that the method used to derive the number of expected deaths is not adequately described. It was considered that the lack of comparability between the worker and comparison groups could be the main explanation for the mortality increases and deficits observed in this study.]

Selevan *et al.* (1979) carried out a study of talc exposures in five companies (two of which ceased operations in 1952 and 1960) in three regions in Vermont, USA. Analysis of airborne dust samples and talc bulk samples revealed no asbestos, either by X-ray diffraction or analytical electron microscopy. Levels of respirable free silica were below 0.25% in nearly all ore and product samples, and free silica was only occasionally detectable in air samples. Insufficient information was available to estimate cumulative exposures, but the authors stated that past exposure levels for miners and millers far exceeded the present standard for nonfibrous talc of 20 mppcf. They considered it probable that dust exposures for millers were higher than those for miners. In one mine, which had closed by the time of the study, 'cobblestones' of highly tremolitic serpentine rock were present but were avoided or discarded as far as possible prior to milling. The cohort consisted of all white male talc workers who had been radiographed as part of annual voluntary surveys of the Vermont Health Department, who were employed in the Vermont talc industry between 1 January 1940 and 31 December 1969, and who had worked in the industry for at least one year. [Because of the voluntary nature of the survey, the cohort may not have been representative (Davis *et al.*, 1983).] There were 90 deaths among the 392 members of this cohort; vital status was not established for four. For nonmalignant respiratory disease and respiratory cancer, Vermont rates were used for comparison, because they are higher than national rates; for other causes of death, US rates were used. [The Working Group noted this unconventional analytical approach.] While some increase was noted for malignant neoplasms, and specifically for respiratory neoplasms (6 observed/3.69 expected), these were not found to be significant. [The Working Group noted that the results were not analysed by latency.] The excess of respiratory cancer occurred only among miners (5/1.15; $p < 0.05$), and the significant excess for nonmalignant respiratory disease occurred only among millers (7/1.72; $p < 0.01$). Most of those dying with nonmalignant respiratory disease had radiographic evidence of pneumoconiosis (rounded opacities). Miners were also exposed to radon daughters at mean levels ranging up to 0.12 working levels, with single peaks of 1.0 working level. [The Working Group noted that no data on smoking were available.]

In a short communication, Léophonte *et al.* (1983) reported on the mortality of talc workers in Luzenac, France. The talc in this region is said to contain no asbestos and levels of quartz varying from 0.5 to 3%. The cohort comprised those who left employment between

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018846

1 January 1945 and 31 December 1981 having worked for at least one year. Of 470 workers available for study, 256 were living, 209 had died and five were lost to follow-up; 192/204 with known occupational exposure had worked only at Luzenac. When compared with the regional population, the median age of death was not found to be influenced by dust exposure. There was no significant excess in cancer mortality in general, and, specifically, mortality from respiratory and digestive cancers was not increased. A significant increase in mortality was found for nonmalignant respiratory disease, especially for pneumoconiosis and obstructive lung disease. [The Working Group noted the unconventional definition of the cohort, that no data on smoking habits were available, and that causes of death were obtained for cases from local doctors, hospitals or families but for controls from regional or national records.]

Katsnelson and Mokronosova (1979) reported a study of mortality among workers in a talc mining and processing plant in the USSR. Very high mortality ratios were found. [The Working Group noted that the deaths observed among exposed workers included current and past workers but that the denominator comprised only currently employed persons.]

It has been suggested on the basis of ecological studies that the practice of coating rice with talc, which may be contaminated with asbestos, may play a causal role in the relatively high rate of stomach cancer in Japan (Merliss, 1971a,b; Blejer & Arlon, 1973; Matsudo et al., 1974); however, this hypothesis has not been supported by case-control studies.

Cramer et al. (1982) reported a case-control study of ovarian cancer and talc exposure in the Boston, Massachusetts, USA, area between November 1978 and September 1981. Two-hundred-and-fifteen women with pathologically-confirmed epithelial ovarian cancers were identified and matched randomly by residence, race and age. Ninety-two (42.8%) cases regularly used talc either as a dusting powder on the perineum or on sanitary napkins compared with 61 (28.4%) controls. Adjusted for parity and menopausal status, this difference yields a relative risk of 1.9 ($p < 0.003$). Women who had regularly engaged in both practices had an adjusted relative risk of 3.3 ($p < 0.001$) compared to women with neither exposure. [The Working Group noted that while this study suggests an association between talc use and ovarian cancer, information was not available regarding the asbestos content of the talcs, levels of exposure or whether the interviews were conducted by people who were unaware of the case referent status of the person being interviewed.]

## 4. Summary of Data Reported and Evaluation

### 4.1 Exposure data

Talc occurs in various geological settings around the world but is usually formed by alteration of ultramafic rocks or dolomites. Talc deposits may contain various other minerals, including carbonates, free silica and serpentines (including chrysotile) and amphibole minerals (asbestiform and nonasbestiform). Occupational exposures occur during mining, milling, processing and in a wide variety of secondary industries (e.g.,

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018847

TALC                                                                          213

ceramics, paper, rubber and paint production). Exposure of the general population occurs through use of products such as cosmetics.

### 4.2 Experimental data

Talc of different grades was tested for carcinogenicity in mice by subcutaneous, intraperitoneal and intrathoracic injection, in rats by oral administration, inhalation exposure and intraperitoneal, intrathoracic and intrapleural injection, and in hamsters by inhalation exposure and intratracheal instillation. The majority of these studies were inadequate. Tumour incidence was not increased following either the administration of single doses of various talcs to rats by intrapleural administration or administration of talc by four intraperitoneal injections. A single subcutaneous injection of talc in mice did not produce local tumours. No tumour was produced by administration of talc in the diet of rats. In most of the above studies, characterization of the talc was insufficient to determine whether it contained asbestiform fibres.

No teratogenic effect was observed in rats, mice, hamsters or rabbits following oral administration of talc.

Talc was not mutagenic to *Salmonella typhimurium* or *Saccharomyces cerevisiae* in host-mediated assays. It did not induce chromosomal aberrations in cultured human cells or in rats *in vivo* or dominant lethal mutations in rats.

**Overall assessment of data from short-term tests: Talc[a]**

| | Genetic activity | | | Cell transformation |
|---|---|---|---|---|
| | DNA damage | Mutation | Chromosomal effects | |
| Prokaryotes | – | | | |
| Fungi/Green plants | – | | | |
| Insects | | | | |
| Mammalian cells (*in vitro*) | | | – | |
| Mammals (*in vivo*) | | | – | |
| Humans (*in vivo*) | | | | |
| Degree of evidence in short-term tests for genetic activity: **Inadequate** | | | | Cell transformation: No data |

[a]The groups into which the table is divided and the symbol '–' are defined on pp. 19-20 of the Preamble; the degrees of evidence are defined on pp. 20-21.

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018848

214                    IARC MONOGRAPHS VOLUME 42

### 4.3 Human data

Case reports have suggested an association between exposure to talc containing asbestiform fibres and mesothelioma.

Proportionate mortality studies of miners and millers of talc containing asbestiform tremolite and anthophyllite showed an excess of lung cancer and one case of mesothelioma. A cohort study of workers in one company revealed significant excess mortality from lung cancer and from nonmalignant respiratory disease. Mortality from lung cancer increased with latency.

In several mortality studies, cancer risk was assessed among miners and millers of talc that was reported to contain no more than trace amounts of asbestiform minerals. A cohort mortality study of talc miners and millers showed an excess of lung cancer in underground miners but not in millers; a contributory etiological role of radon daughters to the lung cancer risk in miners could not be excluded. Three other studies suffered from methodological limitations and could not be interpreted.

A case-control study suggested an approximate doubling of the risk for ovarian cancer among women after perineal use of talc.

### 4.4 Evaluation[1]

There is *inadequate evidence* for the carcinogenicity of talc to experimental animals.

There is *inadequate evidence* for the carcinogenicity to humans of talc not containing asbestiform fibres, while there is *sufficient evidence* for the carcinogenicity to humans of talc containing asbestiform fibres.

## 5. References

Abraham, J.L. & Brambilla, C. (1979) Particle size for differentiation between inhalation and injection pulmonary talcosis (Abstract). *Am. Rev. respir. Dis., 119*, 196

American Conference of Governmental Industrial Hygienists (1986) *TLVs. Threshold Limit Values and Biological Exposure Indices for 1985-86*, 2nd ed., Cincinnati, OH, p. 35

Anon. (1982) Talc: stability in a soft market. *Ind. Miner., 183*, 59-73

Antopol, W. (1933) Lycopodium granuloma. Its clinical and pathologic significance together with a note on granuloma produced by talc. *Arch. Pathol., 16*, 326-331

Arnett, E.N., Battle, W.E., Russo, J.V. & Roberts, W.C. (1976) Intravenous injection of talc containing drugs intended for oral use. A cause of pulmonary granulomatosis and pulmonary hypertension. *Am. J. Med., 60*, 711-718

[1]For definition of the italicized terms, see Preamble, pp. 18 and 22.

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018849

AtLee, W.E., Jr (1972) Talc and corn starch emboli in eyes of drug abusers. *J. Am. med. Assoc., 219*, 49-51

Bainborough, A.R. & Jericho, K.W.F. (1970) Cor pulmonale secondary to talc granulomata in the lungs of a drug addict. *Can. med. Assoc. J., 103*, 1297-1298

Barnes, R. & Rogers, A.J. (1984) Unexpected occupational exposure to asbestos. *Med. J. Austr., 140*, 488-490

Barz, H. & Beck, B. (1983) Pleural mesotheliomas, asbestosis and silicosis after long-term exposure to talc (Ger.). *Z. Erkrank. Atm. Org., 160*, 167-172

Berner, A., Gylseth, B. & Levy, F. (1981) Talc dust pneumoconiosis. A case report. *Acta pathol. microbiol. scand., Sect. A, 89*, 17-21

Bethge-Iwańska, J. (1971) Pathomorphological changes of respiratory system in experimental talcosis (Czech.). *Med. Prac., 22*, 45-57

Bischoff, F. & Bryson, G. (1976) Talc at the rodent intrathoracic, intraperitoneal, and subcutaneous sites (Abstract No. 1). *Proc. Am. Assoc. Cancer Res., 17*, 1

Blejer, H.P. & Arlon, R. (1973) Talc: a possible occupational and environmental carcinogen. *J. occup. Med., 15*, 92-97

Blümel, G., Piza, F. & Zischka-Konorsa, W. (1962) Animal experimental studies of tissue reaction to starch and talcum powder after intraperitoneal administration (Ger.). *Wien. klin. Wochenschr., 74*, 12-13

Boundy, M.G., Gold, K., Martin, K.P., Jr, Burgess, W.A. & Dement, J.M. (1979) *Occupational exposure to non-asbestiform talc in Vermont.* In: Lemen, R. & Dement, J.M., eds, *Dusts and Disease,* Park Forest South, IL, Pathotox, pp. 365-378

British Geological Survey (1985) *World Mineral Statistics, 1979-83, Production: Exports: Imports,* London, Her Majesty's Stationery Office, pp. 231-234

Brown, D.P., Dement, J.M. & Wagoner, J.K. (1979) *Mortality patterns among miners and millers occupationally exposed to asbestiform talc.* In: Dement, J.M. & Lemen, R., eds, *Dusts and Disease,* Park Forest South, IL, Pathotox, pp. 317-324

Buus-Hansen, A., Frost, J. & Georg, J. (1950) Talcosis pulmonum (Abstract). *Ugeskr f. Laeger., 112*, 1691-1697 [*Bull. Hyg.* (1951), *25*, 402]

Carman, C.R. (1985) Talc retinopathy. *J. Am. Optom. Assoc., 56*, 129-130

Carson, S. & Kaltenbach, J.P. (1973) Murine immunoglobulin response to sterile talc injection. *Exp. mol. Pathol., 18*, 18-25

Carter, S.B. (1965) *Problems in interpreting teratogenic effects in eggs.* In: Vuysje, P., ed., *Proceedings of the European Society for the Study of Drug Toxicity,* Vol. V, *Advances in Toxicological Methodology,* Amsterdam, Elsevier, pp. 142-149

Chahinian, A.P., Pajak, T.F., Holland, J.F., Norton, L., Ambinder, R.M. & Mandel, E.M. (1982) Diffuse malignant mesothelioma. Prospective evaluation of 69 patients. *Ann. intern. Med., 96*, 746-755

Chamberlain, M. & Brown, R.C. (1978) The cytotoxic effects of asbestos and other mineral dust in tissue culture cell lines. *Br. J. exp. Pathol., 59*, 183-189

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

Churg, A. & Wiggs, B. (1985) Mineral particles, mineral fibers, and lung cancer. *Environ. Res.*, *37*, 364-372

Clarke, G.M. (1979) Talc: destiny in diversity. *Ind. Miner.*, *144*, 23-58

Cless, D. & Anger, R. (1954) Death from suffocation after aspiration of baby powder (Ger.). *Kinderarztl. Prax.*, *22*, 506-508

Clifton, R.A. (1985) Talc and pyrophyllite. In: *Mineral Facts and Problems 1985 (Bulletin 675)*, Washington DC, US Bureau of Mines, US Department of the Interior, pp. 799-810

Colonial Geological Surveys (1957) *Statistical Summary of the Mineral Industry, Production, Exports and Imports, 1950-1955*, London, Her Majesty's Stationery Office, pp. 317-319

Cramer, D.W., Welch, W.R., Scully, R.E. & Wojciechowski, C.A. (1982) Ovarian cancer and talc. A case-control study. *Cancer*, *50*, 372-376

Crouch, E. & Churg, A. (1983) Progressive massive fibrosis of the lung secondary to intravenous injection of talc. A pathologic and mineralogic analysis. *Am. J. clin. Pathol.*, *80*, 520-526

Davies, R., Skidmore, J.W., Griffiths, D.M. & Moncrieff, C.B. (1983) Cytotoxicity of talc for macrophages *in vitro*. *Food Chem. Toxicol.*, *21*, 201-207

Davis, J.M.G. (1972) The fibrogenic effects of mineral dusts injected into the pleural cavity of mice. *Br. J. exp. Pathol.*, *53*, 190-201

Davis, L.K., Wegman, D.H., Monson, R.R. & Froines, J. (1983) Mortality experience of Vermont granite workers. *Am. J. ind. Med.*, *4*, 705-723

Deer, W.A., Howie, R.A. & Zussman, J. (1971) *Rock-forming Minerals, Sheet Silicates*, London, Longman, pp. 121-130

Dement, J. & Shuler, P. (1972) *Talc Dust and Industrial Hygiene Survey, Plymouth Rubber Company, Canton, MA (Report No. IWS-036.11A)*, Cincinnati, OH, National Institute for Occupational Safety and Health

Dement, J.M. & Zumwalde, R.D. (1979) *Occupational exposures to talcs containing asbestiform minerals*. In: Lemen, R. & Dement, J.M., eds, *Dusts and Disease*, Park Forest South, IL, Pathotox, pp. 287-305

Dement, J.M., Zumwalde, R.D., Gamble, J.F., Fellner, W., DeMeo, M.J., Brown, D.P. & Wagoner, J.K. (1980) *Occupational Exposure to Talc Containing Asbestos (DHEW (NIOSH) Publ. No. 80-115)*, Cincinnati, OH, National Institute for Occupational Safety and Health

Diffenbaugh, W.G. (1953) Talc granulomata occurring in the peritoneal cavity. *Gastroenterology*, *25*, 296-299

Direktoratet för Arbeidstilsynet (Directorate for Labour Inspection) (1981) *Administrative Norms for Pollution in Work Atmosphere, 1981 (No. 361)* (Norw.), Oslo, p. 23

Dogra, R.K.S., Iyer, P.K.R., Shanker, R. & Zaidi, S.H. (1977) Effect of talc injected intravenously in guinea pigs. *Toxicology*, *7*, 197-206

Dreessen, W.C. (1933) Effects of certain silicate dusts on the lungs. *J. ind. Hyg.*, *15*, 66-78

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018851

Dreessen, W.C. & DallaValle, J.M. (1935) The effects of exposure to dust in two Georgia talc mills and mines. *Publ. Health Rep., 50*, 131-143

Dreher, R., Keller, H.U., Hess, M.W., Roos, B. & Cottier, H. (1978) Early appearance and mitotic activity of multinucleated giant cells in mice after combined injection of talc and prednisolone acetate. A model for studying rapid histiocytic polykarion formation *in vivo. Lab. Invest., 38*, 149-156

Eger, W. & Da Canalis, S. (1964) Organ — especially liver — alterations resulting from a single injection of quartz, asbestos or talc into the portal circulation of the rat (Ger.). *Beitr. Silikose-Forsch., 81*, 12-42

Eiseman, B., Seelig, M.G. & Womack, N.A. (1947) Talcum powder granuloma: a frequent and serious postoperative complication. *Ann. Surg., 126*, 820-832

El-Ghawabi, S.H., El-Samra, G.H. & Mehasseb, H. (1970) Talc pneumoconiosis. *J. Egypt. med. Assoc., 53*, 330-340

Emara, A., Amr, M.M., Abou Ali, A.N., El Ashker, M. & Abd El Karim, A.H. (1984) *Talc pneumoconiosis in cosmetic industry.* In: *Proceedings of the VIth International Conference on Pneumoconiosis, Bochum, 1983*, Vol. 2, Geneva, International Labour Office, pp. 1306-1327

Enderlin, F., Meier, A.L. & Scheidegger, S. (1959) Primary peritoneal carcinoma after chronic foreign body peritonitis (talc) (Ger.). *Helv. chir. Acta, 26*, 488-492

Farber, H.W., Fairman, R.P. & Glauser, F.L. (1981) Bronchoalveolar lavage: a new technique for the diagnosis of talc granulomatosis (Abstract). *Chest, 80*, 342

Fienberg, R. (1937) Talcum powder granuloma. *Arch. Pathol., 24*, 36-42

Fine, L.J., Peters, J.M., Burgess, W.A. & Di Berardinis, L.J. (1976) Studies of respiratory morbidity in rubber workers: IV. Respiratory morbidity in talc workers. *Arch. environ. Health, 31*, 195-200

Food and Drug Research Laboratories (1973) *Teratologic Evaluation of FDA 71-43 (Talc) (PB-223 828)*, Washington DC, National Technical Information Service

Fristedt, B., Mattsson, S.B. & Schütz, A. (1968) Talcosis (Swed.). *Nord. hyg. Tidsk., 49*, 66-71

Gamble, J., Fellner, W. & DiMeo, M.J. (1979a) *Respiratory morbidity among miners and millers of asbestiform talc.* In: Dement, J.R. & Lemen, R., eds, *Dusts and Diseases*, Park Forest South, IL, Pathotox, Inc., pp. 307-316

Gamble, J.F., Fellner, W. & DiMeo, M.J. (1979b) An epidemiologic study of a group of talc workers. *Am. Rev. respir. Dis., 119*, 741-753

Gamble, J., Greife, A. & Hancock, J. (1982) An epidemiological-industrial hygiene study of talc workers. *Ann. occup. Hyg., 26*, 841-859

German, W.M. (1943) Dusting powder granulomas following surgery. *Surg. Gynecol. Obstet., 76*, 501-507

Gibel, W., Lohs, K., Horn, K.-H., Wildner, G.P. & Hoffmann, F. (1976) Experimental study of the carcinogenic activity of asbestos fibres (Ger.). *Arch. Geschwulsforsch., 46*, 437-442

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

JNJ 000018852

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

Gould, S.R. & Barnardo, D.E. (1972) Respiratory distress after talc inhalation. *Br. J. Dis. Chest*, *66*, 230-233

Gouvêa, F.P., Gonsalves, P.E., Lebrun, E. & Ferraz de Faria, M. (1966) Acute aspiration of talc and other powders: therapy for bronchial clearance (Port.). *Rev. Hosp. Clín. Fac. Med. S. Paulo*, *21*, 49-55

Graham, W.G.B. & Gaensler, E.A. (1965) Talco-silicosis in a rubber worker. *Med. Thorac.*, *22*, 590-604

Greife, A. (1980) *Preliminary findings of an epidemiologic study of talc workers (industrial hygiene portion).* In: Kraybill, H.F., Blackwood, I.C. & Freas, N.B., eds, *Proceedings of the First NCI/EPA/NIOSH Collaborative Workshop: Progress on Joint Environmental and Occupational Cancer Studies*, Morgantown, WV, National Institute for Occupational Safety and Health, pp. 229-240

Gross, P., deTreville, R.T.P., Cralley, L.J., Granquist, W.T. & Pundsack, F.L. (1970) The pulmonary response to fibrous dusts of diverse compositions. *Am. ind. Hyg. Assoc. J.*, *31*, 125-132

Groth, D.H., Mackay, G.R., Crable, J.V. & Cochran, T.H. (1972) Intravenous injection of talc in a narcotics addict. *Arch. Pathol.*, *94*, 171-178

Gruner, J.W. (1934) The crystal structures of talc and pyrophyllite. *Zeit. Krist.*, *88*, 412-419

Gylseth, B., Stettler, L., Mowé, G., Skaug, V. & Lexow, P. (1984) A striking deposition of mineral particles in the lungs of a farmer: a case report. *Am. J. ind. Med.*, *6*, 231-240

Hamer, D.H., Rolle, F.R. & Schelz, J.P. (1976) Characterization of talc and associated minerals. *Am. ind. Hyg. Assoc. J.*, *37*, 296-304

Hamilton, T.C., Fox, H., Buckley, C.H., Henderson, W.J. & Griffiths, K. (1984) Effects of talc on the rat ovary. *Br. J. exp. Pathol.*, *65*, 101-106

Hanson, R.L., Benson, J.M., Henderson, T.R., Carpenter, R.L., Pickrell, J.A. & Brown, S.C. (1985) Method for determining the lung burden of talc in rats and mice after inhalation exposure to talc aerosols. *J. appl. Toxicol.*, *5*, 283-287

Harben, P.W. & Bates, R.L. (1984) *Geology of the Nonmetallics*, New York, Metal Bulletin, pp. 336-346

Health and Safety Executive (1985) *Occupational Exposure Limits* (*Guidance Note EH 40/85*), London, Her Majesty's Stationery Office, p. 19

Henderson, W.J., Blundell, G., Richards, R., Hext, P.M., Volcani, B.E. & Griffiths, K. (1975a) Ingestion of talc particles by cultured lung fibroblasts. *Environ. Res.*, *9*, 173-178

Henderson, W.J., Melville-Jones, C., Griffiths, K. & Barr, W.T. (1975b) Talc contamination of surgical gloves. *Lancet*, *i*, 1419

Henderson, W.J., Evans, D.M.D., Davies, J.D. & Griffiths, K. (1975c) Analysis of particles in stomach tumours from Japanese males. *Environ. Res.*, *9*, 240-249

Hendricks, S.B. (1938) On the crystal structure of talc and pyrophyllite. *Z. Krist.*, *99*, 264-274

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018853

Hogue, W.L, Jr & Mallette, F.S. (1949) A study of workers exposed to talc and other dusting compounds in the rubber industry. *J. ind. Hyg.*, *31*, 359-364

Hopkins, G.B. & Taylor, D.G. (1970) Pulmonary talc granulomatosis. A complication of drug abuse. *Am. Rev. respir. Dis.*, *101*, 101-104

Hughes, W.T. & Kalmer, T. (1966) Massive talc aspiration. Successful treatment with dexamethasone. *Am. J. Dis. Child*, *111*, 653-654

Hunt, A.C. (1956) Massive pulmonary fibrosis from the inhalation of talc. *Thorax*, *11*, 287-294

IARC (1986) *Information Bulletin on the Survey of Chemicals Being Tested for Carcinogenicity*, No. 12, Lyon, p. 261

Institute of Geological Sciences (1967) *Statistical Summary of the Mineral Industry, World Production, Exports and Imports, 1960-1965*, London, Her Majesty's Stationery Office, pp. 360-362

Institute of Geological Sciences (1978) *World Mineral Statistics, 1970-74, Production: Exports: Imports*, London, Her Majesty's Stationery Office, pp. 170-172

Institut National de Recherche et de Sécurité (National Institute for Research and Safety) (1985) *Limit Values for Concentrations of Dangerous Substances in the Work Environment* (*ND 1555-121-85*), Paris, p. 504

International Labour Office (1980) *Occupational Exposure Limits for Airborne Toxic Substances*, 2nd (rev.) ed. (*Occupational Safety and Health Series No. 37*), Geneva, pp. 243-266

Jackson, J.W. & Bennett, M.H. (1969) Chest wall tumour following iodized talc pleurodesis. *Thorax*, *28*, 788-793

Jaques, W.E. & Benirschke, K. (1952) Pulmonary talcosis with involvement of the stomach and the heart. *Arch. ind. Hyg. occup. Med.*, *5*, 451-463

Katsnelson, B.A. & Mokronosova, K.A. (1979) Non-fibrous mineral dusts and malignant tumors. An epidemiological study of mortality. *J. occup. Med.*, *21*, 15-20

Kleinfeld, M., Messite, J. & Tabershaw, I.R. (1955) Talc pneumoconiosis. *Arch. ind. Health*, *12*, 66-72

Kleinfeld, M., Giel, C.P., Majeranowski, J.F. & Messite, J. (1963) Talc pneumoconiosis. *Arch. environ. Health*, *7*, 101-115

Kleinfeld, M., Messite, J., Kooyman, O. & Shapiro, J. (1964a) Pulmonary ventilatory function in talcosis of lung. *Dis. Chest*, *46*, 592-598

Kleinfeld, M., Messite, J., Shapiro, J., Kooyman, O. & Swencicki, R. (1964b) Lung function in talc workers. A comparative physiologic study of workers exposed to fibrous and granular talc dusts. *Arch. environ. Health*, *9*, 559-566

Kleinfeld, M., Messite, J., Kooyman, O. & Zaki, M.H. (1967) Mortality among talc miners and millers in New York State. *Arch. environ. Health*, *14*, 663-667

Kleinfeld, M., Messite, J. & Langer, A.M. (1973) A study of workers exposed to asbestiform minerals in commercial talc manufacture. *Environ. Res.*, *6*, 132-143

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018854

220                          IARC MONOGRAPHS VOLUME 42

Kleinfeld, M., Messite, J. & Zaki, M.H. (1974) Mortality experiences among talc workers: a
    follow-up study. *J. occup. Med.*, *16*, 345-349

Krainer, L., Berman, E. & Wishnick, S.D. (1962) Parenteral talcum granulomatosis: a
    complication of narcotic addiction (Abstract). *Lab. Invest.*, *11*, 671

Kužvart, M. (1984) *Industrial Minerals and Rocks* (*Developments in Economic Geology
    18*), Amsterdam, Elsevier, pp. 252-262

Lamb, D. & Roberts, G. (1972) Starch and talc emboli in drug addicts' lungs. *J. clin.
    Pathol.*, *25*, 876-881

Langer, A.M., Selikoff, I.J. & Sastre, A. (1971) Chrysotile asbestos in the lungs of persons in
    New York City. *Arch. environ. Health*, *22*, 348-361

Lee, J. & Sapira, J.D. (1973) Case report. Retinal and cerebral microembolization of talc in
    a drug abuser. *Am. J. med. Sci.*, *265*, 75-77

Léophonte, P., Basset, M.F., Pincemin, J., Louis, A., Pernet, P. & Delaude, A. (1983)
    Mortality of talc workers in France. Retrospective epidemiological study (Fr.). *Rev. fr.
    Mal. respir.*, *11*, 489-490

Lichtman, A.L., McDonald, J.R., Dixon, C.F. & Mann, F.C. (1946) Talc granuloma. *Surg.
    Gynecol. Obstet.*, *83*, 531-546

Litton Bionetics (1974) *Mutagenic Evaluation of Compound FDA-71-43; Talc* (*PB-245
    458*), Washington DC, National Technical Information Service

Lord, G.H. (1978) The biological effects of talc in the experimental animal: a literature
    review. *Food Cosmet. Toxicol.*, *16*, 51-57

Lüchtrath, H. & Schmidt, K.G. (1959) Talc and steatite, their relation to asbestos and their
    effects in intratracheal experiments in rats (Ger.). *Beitr. Silikose-Forsch.*, *61*, 1-60

Lund, J.S. & Feldt-Rasmussen, M. (1969) Accidental aspiration of talc. Report of a case in a
    two-year-old child. *Acta paediatr. scand.*, *58*, 295-296

Maltoni, C., Minardi, F. & Morisi, L. (1982) The relevance of the experimental approach in
    the assessment of the oncogenic risks from fibrous and non-fibrous particles. The
    ongoing project of the Bologna Institute of Oncology. *Med. Lav.*, *73*, 394-407

Mark, G.J., Monroe, C.B. & Kazemi, H. (1979) Mixed pneumoconiosis. Silicosis,
    asbestosis, talcosis, and berylliosis. *Chest*, *75*, 726-730

Matsudo, H., Hodgkin, N.M. & Tanaka, A. (1974) Japanese gastric cancer. Potentially
    carcinogenic silicates (talc) from rice. *Arch. Pathol.*, *97*, 366-368

Merliss, R.R. (1971a) Talc-treated rice and Japanese stomach cancer. *Science*, *173*,
    1141-1142

Merliss, R.R. (1971b) Talc and asbestos contaminant of rice. *J. Am. med. Assoc.*, *216*, 2144

Messite, J., Reddin, G. & Kleinfeld, M. (1959) Pulmonary talcosis, a clinical and
    environmental study. *Arch. ind. Health*, *20*, 408-413

Miller, A., Teirstein, A.S., Bader, M.E., Bader, R.A. & Selikoff, I.J. (1971) Talc
    pneumoconiosis. Significance of sublight microscopic mineral particles. *Am. J. Med.*,
    *50*, 395-402

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018855

Min, K.-W., Gyorkey, F. & Cain, G.D. (1974) Talc granulomata in liver disease in narcotic addicts. *Arch. Pathol., 98,* 331-335

Molnar, J.J., Nathenson, G. & Edberg, S. (1962) Fatal aspiration of talcum powder by a child. Report of a case. *New Engl. J. Med., 266,* 36-37

Nam, K. & Gracey, D.R. (1972) Pulmonary talcosis from cosmetic talcum powder. *J. Am. med. Assoc., 221,* 492-493

National Institute for Occupational Safety and Health (1979) *Mining Surveillance: Potentially Toxic Occupational Exposures,* Morgantown, WV

Neukomm, S. & de Trey, M. (1961) Study of possible carcinogenic and/or co-carcinogenic brightening agents (Fr.). *Med. exp., 4,* 298-306

Niemann, N., Vidailhet, M., Kiffer, B., Crance, J.-P. & André, J.-L. (1971) Accidental inhalation of talc in infants (Fr.). *Pédiatrie, 26,* 81-84

Oppenheimer, J.H. & Riester, W.H. (1953) Influence of cortisone on leptomeningeal reaction induced by talc. *Proc. Soc. exp. Biol. Med., 83,* 844-847

Özesmi, M., Patiroglu, T.E., Hillerdal, G. & Özesmi, C. (1985) Peritoneal mesothelioma and malignant lymphoma in mice caused by fibrous zeolite. *Br. J. ind. Med., 42,* 746-749

Paré, J.A.P., Fraser, R.G., Hogg, J.C., Howlett, J.G. & Murphy, S.B. (1979) Pulmonary 'mainline' granulomatosis: talcosis of intravenous methadone abuse. *Medicine, 58,* 229-239

Pelfrene, A.F. (1976) Experimental evaluation of the clearance of 3,4-benzo($a$)pyrene in association with talc from hamster lungs. *Am. ind. Hyg. Assoc. J., 37,* 706-710

Phillips, J.C., Young, P.J., Hardy, K. & Gangolli, S.D. (1978) Studies on the absorption and disposition of $^3$H-labelled talc in the rat, mouse, guinea-pig and rabbit. *Food Cosmet. Toxicol., 16,* 161-163

Policard, A. (1940) Effect of talc dusts on lungs. Experimental study (Fr.). *Arch. Mal. prof., 2,* 530-539

Pooley, F.D. (1976) An examination of the fibrous mineral content of asbestos lung tissue from the Canadian chrysotile mining industry. *Environ. Res., 12,* 281-298

Pooley, F.D. & Rowlands, N. (1977) *Chemical and physical properties of British talc powders.* In: Walton, W.H. & McGovern, B., eds, *Inhaled Particles,* Vol. IV, Part 2, Oxford, Pergamon Press, pp. 639-646

Porro, F.W., Patton, J.R. & Hobbs, A.A., Jr (1942) Pneumoconiosis in the talc industry. *Am. J. Roentgenol. Radium Ther., 47,* 507-524

Pott, F., Huth, F. & Friedrichs, K.H. (1974) Tumorigenic effect of fibrous dusts in experimental animals. *Environ. Health Perspect., 9,* 313-315

Pott, F., Friedrichs, K.-H. & Huth, F. (1976a) Results of animal experiments on the carcinogenic effect of fibrous dusts and their interpretation with regard to carcinogenesis in humans (Ger.). *Zbl. Bakt. Hyg. I. Abt. Orig. B, 162,* 467-505

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018856

Pott, F., Dolgner, R., Friedrichs, K.-H. & Huth, F. (1976b) Oncogenic effect of fibrous dusts. Animal experimentation and its relation to human carcinogenesis (Fr.). *Ann. Anat. pathol.*, *21*, 237-246

Pratt, P.C., George, M.H., Mastin, P.J. & Roggli, V.L. (1985) Crystalline foreign particulate material in hernia sacs. *Hum. Pathol.*, 1141-1146

Pruvost, M.D. (1946) Pseudo-tumoral talcosis (Fr.). *Bull. Acad. Méd. Paris*, *130*, 202-204

Puro, H.E., Wolf, P.L., Skirgaudas, J. & Vazquez, J. (1966) Experimental production of human 'blue velvet' and 'red devil' lesions. *J. Am. med. Assoc.*, *197*, 1100-1102

Rayner, J.H. & Brown, G. (1966) Triclinic form of talc. *Nature*, *212*, 1352-1353

Research Committee of the British Thoracic Association and the Medical Research Council Pneumoconiosis Unit (1979) A survey of the long-term effects of talc and kaolin pleurodesis. *Br. J. Dis. Chest*, *73*, 285-288

Roberts, W.L., Rapp, G.R., Jr & Weber, J. (1974) *Encyclopedia of Minerals*, New York, Van Nostrand Reinhold, p. 601

Roe, L.A. & Olson, R.H. (1983) *Talc*. In: LéFond, S.J., ed., *Industrial Minerals and Rocks (Nonmetallics Other Than Fuels)*, 5th ed., Vol. 2, New York, Society of Mining Engineers of the American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., pp. 1275-1301

Rohl, A.N. & Langer, A.M. (1974) Identification and quantitation of asbestos in talc. *Environ. Health Perspect.*, *9*, 95-109

Rohl, A.N. & Langer, A.M. (1979) *Fibrous mineral content of consumer talc-containing products*. In: Lemen, R. & Dement, J.M., eds, *Dusts and Diseases*, Park Forest South, IL, Pathotox, pp. 393-403

Rohl, A.N., Langer, A.M., Selikoff, I.J., Tordini, A., Klimentidis, R., Bowes, D.R. & Skinner, D.L. (1976) Consumer talcums and powders: mineral and chemical characterization. *J. Toxicol. environ. Health*, *2*, 255-284

Ross, M. (1984) *A definition for talc*. In: Levadie, B., ed., *Definitions for Asbestos and Other Health-related Silicates (ASTM STP 834)*, Philadelphia, PA, American Society for Testing and Materials, pp. 193-197

Ross, M., Smith, W.L. & Ashton, W.H. (1968) Triclinic talc and associated amphiboles from Gouverneur mining district, New York. *Am. Miner.*, *53*, 751-767

Rubino, G.F., Maranzana, P., Pettinati, L. & Scansetti, G. (1963) Aetio-pathological and clinical aspects of talc pneumoconiosis (Ital.). *Med. Lav.*, *54*, 496-506

Rubino, G.F., Scansetti, G., Piolatto, G. & Romano, C.A. (1976) Mortality study of talc miners and millers. *J. occup. Med.*, *18*, 186-193

Saxén, A. & Tuovinen, P.I. (1947) Experimental and clinical observations on granulomas caused by talc and some other substances. *Acta chir. scand.*, *96*, 131-151

Schepers, G.W.H. & Durkan, T.M. (1955a) The effects of inhaled talc-mining dust on the human lung. *Arch. ind. Health*, *12*, 182-197

Schepers, G.W.H. & Durkan, T.M. (1955b) An experimental study of the effects of talc dust on animal tissue. *Arch. ind. Health*, *12*, 317-328

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018857

Schulz, R.Z. & Williams, C.R. (1942) Commercial talc animal and mineralogical studies. *J. ind. Hyg. Toxicol.*, *24*, 75-79

Seeler, A.O., Gryboski, J.S. & MacMahon, H.E. (1959) Talc pneumoconiosis. *Arch. ind. Health*, *19*, 392-402

Selevan, S.G., Dement, J.M., Wagoner, J.K. & Froines, J.R. (1979) *Mortality patterns among miners and millers of non-asbestiform talc: preliminary report.* In: Lemen, R. & Dement, J.M., eds, *Dusts and Diseases*, Park Forest South, IL, Pathotox, pp. 379-388

Sheikh, K.M.A., Duggal, K., Relfson, M., Gignac, S. & Rowden, G. (1984) An experimental histopathologic study of surgical glove powders. *Arch. Surg.*, *119*, 215-219

Siegal, W., Smith, A.R. & Greenburg, L. (1943) The dust hazard in tremolite talc mining, including roentgenological findings in talc workers. *Am. J. Roentgenol. Radium Ther.*, *1*, 11-29

Sieniewicz, D.J. & Nidecker, A.C. (1980) Conglomerate pulmonary disease: a form of talcosis in intravenous methadone abusers. *Am. J. Roentgenol.*, *135*, 697-702

Sinha, R.K. (1982) *Industrial Minerals*, New Delhi, Oxford & IBH Publishing, pp. 418-429

Smith, R.H., Graf, M.S. & Silverman, J.F. (1978) Successful management of drug-induced talc granulomatosis with corticosteroids. *Chest*, *73*, 552-554

Stanton, M.F., Layard, M., Tegeris, A., Miller, E., May, M., Morgan, E. & Smith, A. (1981) Relation of particle dimension to carcinogenicity in amphibole asbestoses and other fibrous minerals. *J. natl Cancer Inst.*, *67*, 965-975

Stenbäck, F. & Rowland, J. (1978) Role of talc and benzo(a)pyrene in respiratory tumor formation. An experimental study. *Scand. J. respir. Dis.*, *59*, 130-140

Stille, W.T. & Tabershaw, I.R. (1982) The mortality experience of upstate New York talc workers. *J. occup. Med.*, *24*, 480-484

Szwed, J.J. (1970) Pulmonary angiothrombosis caused by 'blue velvet' addiction. *Ann. intern. Med*, *73*, 771-774

Talcs de Luzenac (1982) *Talc Luzenac 15 M00 (Polymeres/ F 533/82)*, Toulouse

Tao, L.-C., Morgan, R.C. & Donat, E.E. (1984) Cytologic diagnosis of intravenous talc granulomatosis by fine needle aspiration biopsy. A case report. *Acta cytol.*, *28*, 737-739

Trautwein, G. & Helmboldt, C.F. (1967) Experimental pulmonary talcum granuloma and epithelial hyperplasia in the chinchilla. *Pathol. vet.*, *4*, 254-267

Tronzano, L., Coscia, G.C. & Capellaro, F. (1965) Exposure and risk in the process of grinding talc (Ital.). *Med. Lav.*, *54*, 744-745

Tukiainen, P., Nickels, J., Taskinen, E. & Nyberg, M. (1984) Pulmonary granulomatous reaction: talc pneumoconiosis or chronic sarcoidosis? *Br. J. ind. Med.*, *41*, 84-87

Tye, M.J., Hashimoto, K. & Fox, F. (1966) Talc granulomas of the skin. *J. Am. med. Assoc.*, *198*, 120-122

Työsuojeluhallitus (National Finnish Board of Occupational Safety and Health) (1981) *Airborne Contaminants in the Workplace (Safety Bull. 3)* (Finn.), Tampere, p. 24

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018858

224                    IARC MONOGRAPHS VOLUME 42

US Occupational Safety and Health Administration (1983) Toxic and hazardous substances. *US Code fed. Regul.*, *29*, Part 1910.1000, p. 604

Vallyathan, N.V. & Craighead, J.E. (1981) Pulmonary pathology in workers exposed to nonasbestiform talc. *Hum. Pathol.*, *12*, 28-35

Vianna, N.J., Maslowsky, J., Roberts, S., Spellman, G. & Patton, R.B. (1981) Malignant mesothelioma. Epidemiologic patterns in New York State. *New York State J. Med.*, *April*, 735-738

Wagner, J.C., Berry, G., Cooke, T.J., Hill, R.J., Pooley, F.D. & Skidmore, J.W. (1977) *Animal experiments with talc.* In: Walton, W.H. & McGovern, B., eds, *Inhaled Particles*, Vol. IV, Part 2, Oxford, Pergamon Press, pp. 647-654

Waller, B.F., Brownlee, W.J. & Roberts, W.C. (1980) Structure-function correlations in cardiovascular and pulmonary diseases (CPC). Self-induced pulmonary granulo-matosis. A consequence of intravenous injection of drugs intended for oral use. *Chest*, *78*, 90-94

Wehner, A.P. (1980) *Effects of inhaled asbestos, asbestos plus cigarette smoke, asbestos-cement and talc baby powder in hamsters.* In: Wagner, J.C., ed., *Biological Effects of Mineral Fibres (IARC Scientific Publications No. 30)*, Vol. 1, Lyon, International Agency for Research on Cancer, pp. 373-376

Wehner, A.P., Zwicker, G.M., Cannon, W.C., Watson, C.R. & Carlton, W.W. (1977a) Inhalation of talc baby powder by hamsters. *Food Cosmet. Toxicol.*, *15*, 121-129

Wehner, A.P., Wilkerson, C.L., Cannon, W.C., Buschbom, R.L. & Tanner, T.M. (1977b) Pulmonary deposition, translocation and clearance of inhaled neutron-activated talc in hamsters. *Food Cosmet. Toxicol.*, *15*, 213-224

Wehner, A.P., Tanner, T.M. & Buschbom, R.L. (1977c) Absorption of ingested talc by hamsters. *Food Cosmet. Toxicol.*, *15*, 453-455

Wehner, A.P., Stuart, B.O. & Sanders, C.L. (1979) Inhalation studies with Syrian golden hamsters. *Prog. exp. Tumor Res.*, *24*, 177-198

Wells, I.P., Dubbins, P.A. & Whimster, W.F. (1979) Pulmonary disease caused by the inhalation of cosmetic talcum powder. *Br. J. Radiol.*, *52*, 586-588

Wendt, V.E., Puro, H.E., Shapiro, J., Mathews, W. & Wolf, P.L. (1964) Angiothrombotic pulmonary hypertension in addicts. 'Blue velvet' addiction. *J. Am. med. Assoc.*, *188*, 755-757

Woodworth, C.D., Mossman, B.T. & Craighead, J.E. (1982) Comparative effects of fibrous and nonfibrous minerals on cells and liposomes. *Environ. Res.*, *27*, 190-205

Yang, T.-S. (1977) Studies on sulfonamide-induced anomalies in chick embryos (2). *Jpn. J. Steril.*, *22*, 32-40

Yao, Y.-T., Wang, N.-S., Michel, R.P. & Poulsen, R.S. (1984) Mineral dusts in lungs with scar or scar cancer. *Cancer*, *54*, 1814-1823

Zientara, M. & Moore, S. (1970) Fatal talc embolism in a drug addict. *Hum. Pathol.*, *1*, 324-327

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018859

Exhibit 86

to be informed promptly and effectively of important new knowledge regarding nutritional and health benefits of food. Third, these amendments to this health claim will ensure that scientifically sound nutritional and health information regarding the benefits of fruit and vegetable intake and reduction of CHD risk can be provided to consumers as soon as possible. The past few editions of the DGA have been moving away from a focus on total fat and have instead communicated to consumers the need to focus on type of fat consumed instead of total amount of fat. Recent editions of the DGA have also encouraged increased intake of fruits and vegetables for a healthful diet. Prompt issuance of an interim final rule that reflects the current recommendations is necessary for consumers to be able to have the most current information on nutrition and diet. Consumers will be better able to construct healthful diets if they have prompt access to information that is consistent with the current recommendations on fat content and on consumption of fruits and vegetables. Therefore, we are using the authority in section 403(r)(7)(A) of the FD&C Act to issue an interim final rule amending the general requirements for the health claim for dietary saturated fat and cholesterol and risk of CHD and to make the interim final rule effective immediately.

This regulation is effective upon publication in the **Federal Register**. We invite public comment on this interim final rule. We will consider modifications to this interim final rule based on comments made during the comment period. We will address comments and confirm or amend the interim final rule in a final rule.

## X. References

The following references are on display in the Division of Dockets Management (see **ADDRESSES**) and are available for viewing by interested persons between 9 a.m. and 4 p.m., Monday through Friday; they are also available electronically at *http:// www.regulations.gov*. FDA has verified the Web site addresses, as of the date this document publishes in the **Federal Register**, but Web sites are subject to change over time.

1. Liu, S., J.E. Manson, I.M. Lee, et al. "Fruit and Vegetable Intake and Risk of Cardiovascular Disease: The Women's Health Study." *The American Journal of Clinical Nutrition,* 72: 922–928, 2000.

2. Appel, L.J., T.J. Moore, E. Obarzanek, et al. "A Clinical Trial of the Effects of Dietary Patterns on Blood Pressure." DASH Collaborative Research Group. *The New England Journal of Medicine,* 336: 1117–1124, 1997.

3. U.S. Department of Health and Human Services and U.S. Department of Agriculture. "Dietary Guidelines for Americans, 2010. 7th Edition," 2010. Available at *http://health.gov/ dietaryguidelines/2010/*.

4. "Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III) final report." *Circulation,* 106: 3143–3421, 2002.

5. U.S. Department of Health and Human Services and U.S. Department of Agriculture. "2015–2020 Dietary Guidelines for Americans, 8th Edition," December 2015. Available at *http:// health.gov/dietaryguidelines/2015/ guidelines/*.

6. U.S. Department of Health and Human Services and U.S. Department of Agriculture. "Nutrition and Your Health, Dietary Guidelines for Americans," 2000. Available at *http:// health.gov/dietaryguidelines/2000.asp*.

7. U.S. Department of Health and Human Services and U.S. Department of Agriculture. "Dietary Guidelines for Americans, 2005. 6th Edition," 2005. Available at *http://health.gov/dietary guidelines/dga2005/document/ default.htm*.

8. Institute of Medicine (IOM) of the National Academies. "Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients)." Chapter 8, "Dietary Fats: Total Fat and Fatty Acids," 2002.

9. FDA/CFSAN, Food Labeling: Health Claims; Dietary Saturated Fat and Cholesterol and Risk of Coronary Heart Disease, Regulatory Impact Analysis, FDA–2013–P–0047.

## List of Subjects in 21 CFR Part 101

Food labeling, Nutrition, Reporting and recordkeeping requirements.

Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs, 21 CFR part 101 is amended as follows:

## PART 101—FOOD LABELING

■ 1. The authority citation for part 101 continues to read as follows:

**Authority:** 15 U.S.C. 1453, 1454, 1455; 21 U.S.C. 321, 331, 342, 343, 348, 371; 42 U.S.C. 243, 264, 271.

■ 2. Section 101.75 is amended by revising paragraphs (c)(1) and (c)(2)(ii) to read as follows:

## § 101.75   Health claims: dietary saturated fat and cholesterol and risk of coronary heart disease.

\* \* \* \* \*

(c) \* \* \*

(1) All requirements set forth in § 101.14 shall be met, except § 101.14(e)(6) with respect to a raw fruit or vegetable.

(2) \* \* \*

(ii) *Nature of the food.* (A) The food shall meet all of the nutrient content requirements of § 101.62 for a "low saturated fat" and "low cholesterol" food.

(B) The food shall meet the nutrient content requirements of § 101.62 for a "low fat" food, unless it is a raw fruit or vegetable; except that fish and game meats (*i.e.,* deer, bison, rabbit, quail, wild turkey, geese, and ostrich) may meet the requirements for "extra lean" in § 101.62.

\* \* \* \* \*

Dated: December 9, 2016.

**Leslie Kux,**

*Associate Commissioner for Policy.*

[FR Doc. 2016–29997 Filed 12–16–16; 8:45 am]

**BILLING CODE 4164–01–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

### 21 CFR Parts 878, 880, and 895

**[Docket No. FDA–2015–N–5017]**

**RIN 0910–AH02**

### Banned Devices; Powdered Surgeon's Gloves, Powdered Patient Examination Gloves, and Absorbable Powder for Lubricating a Surgeon's Glove

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA or Agency) has determined that Powdered Surgeon's Gloves, Powdered Patient Examination Gloves, and Absorbable Powder for Lubricating a Surgeon's Glove present an unreasonable and substantial risk of illness or injury and that the risk cannot be corrected or eliminated by labeling or a change in labeling. Consequently, FDA is banning these devices.

**DATES:** This rule is effective on January 18, 2017.

**ADDRESSES:** For access to the docket to read background documents or comments received, go to *https:// www.regulations.gov* and insert the docket number found in brackets in the

heading of this final rule into the "Search" box and follow the prompts, and/or go to the Division of Dockets Management, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.

**FOR FURTHER INFORMATION CONTACT:** Michael J. Ryan, Center for Devices and Radiological Health, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 66, Rm. 1615, Silver Spring, MD 20993, 301–796–6283, email: *michael.ryan@fda.hhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
    A. Purpose and Coverage of the Final Rule
    B. Summary of the Major Provisions of the Final Rule
    C. Legal Authority
    D. Costs and Benefits
II. Background
    A. Need for the Regulation/History of This Rulemaking
    B. Summary of Comments to the Proposed Rule
    C. General Overview of Final Rule
    D. Clarifying Changes to the Rule
III. Legal Authority
IV. Comments on the Proposed Rule and FDA's Responses
    A. Introduction
    B. Description of General Comments and FDA Response
    C. Description of Comments That Oppose the Regulation and FDA Response
    D. Description of Comments on Scope of Ban and FDA Response
    E. Description of Other Specific Comments and FDA Response
V. Effective Date
VI. Economic Analysis of Impacts
    A. Introduction
    B. Summary of Costs and Benefits
VII. Analysis of Environmental Impact
VIII. Paperwork Reduction Act of 1995
IX. Federalism
X. References

## I. Executive Summary

### A. Purpose and Coverage of the Final Rule

Medical gloves play a significant role in the protection of both patients and health care personnel in the United States. Health care personnel rely on medical gloves as barriers against transmission of infectious diseases and contaminants when conducting surgery, as well as when conducting more limited interactions with patients. Various types of powder have been used to lubricate gloves so that wearers could don the gloves more easily. However, the use of powder on medical gloves presents numerous risks to patients and health care workers, including inflammation, granulomas, and respiratory allergic reactions.

A thorough review of all currently available information supports FDA's conclusion that powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove should be banned. FDA has concluded that the risks posed by powdered gloves, including health care worker and patient sensitization to natural rubber latex (NRL) allergens, surgical complications related to peritoneal adhesions, and other adverse health events not necessarily related to surgery, such as inflammatory responses to glove powder, are important, material, and significant in relation to the benefit to public health from their continued marketing. FDA has carefully evaluated the risks and benefits of powdered gloves and the risks and benefits of the state of the art, which includes viable non-powdered alternatives that do not carry any of the risks associated with glove powder, and has determined that the risk of illness or injury posed by powdered gloves is unreasonable and substantial. Further, FDA believes that this ban would likely have minimal economic and shortage impact on the health care industry. Thus, a transition to alternatives in the marketplace should not result in any detriment to public health.

This rule applies to powdered patient examination gloves, powdered surgeon's gloves, and absorbable powder for lubricating a surgeon's glove. This includes all powdered medical gloves except powdered radiographic protection gloves. Because we are not aware of any powdered radiographic protection gloves that are currently on the market, FDA lacks the evidence to determine whether the banning standard would be met for this particular device. The ban does not apply to powder used in the manufacturing process (*e.g.,* former-release powder) of non-powdered gloves, where that powder is not intended to be part of the final finished glove. Finished non-powdered gloves are expected to include no more than trace amounts of residual powder from these processes, and the Agency encourages manufacturers to ensure finished non-powdered gloves have as little powder as possible. In our 2008 Medical Glove Guidance Manual (Ref. 1), we recommended that non-powdered gloves have no more than 2 milligrams (mg) of residual powder and debris per glove, as determined by the Association for Testing and Materials (ASTM) D6124 test method (Ref. 2). The Agency continues to believe this amount is an appropriate maximum level of residual powder. The ban also does not apply to powder intended for use in or on other medical devices, such as condoms. FDA has not seen evidence that powder intended for use in or on other medical devices, such as condoms, presents the same public health risks as that on powdered medical gloves.

### B. Summary of the Major Provisions of the Final Rule

In this final rule, FDA is banning the following devices: (1) Powdered surgeon's gloves, (2) powdered patient examination gloves, and (3) absorbable powder for lubricating a surgeon's glove. Because the classification regulations for these device types do not distinguish between powdered and non-powdered versions, FDA is amending the descriptions of these devices in the regulations to specify that the regulations for patient examination and surgeon's gloves will apply only to non-powdered gloves while the powdered version of each type of glove will be added to the listing of banned devices in the regulations.

Many comments requested that FDA revise the scope of the ban to include all NRL gloves. Many comments from industry requested that the proposed effective date be extended beyond 30 days after the date of publication of the final rule. Of the comments that do not support the ban, commenters noted the need for powdered gloves to aid in donning gloves and tactile sense and the reduced risks associated with current powdered gloves that have less powder. The remaining comments are not clearly in support or opposition to the proposal.

### C. Legal Authority

Powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove are defined as devices under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the FD&C Act) (21 U.S.C. 321(h)). Section 516 of the FD&C Act (21 U.S.C. 360f) authorizes FDA to ban a device if it finds, on the basis of all available data and information, that the device presents substantial deception or unreasonable and substantial risks of illness or injury, which cannot be corrected by labeling or a change in labeling. This rule amends 21 CFR 878.4460, 878.4480, 880.6250, 895.102, 895.103, and 895.104. FDA's legal authority to modify §§ 878.4460, 878.4480, 880.6250, 895.102, 895.103, and 895.104 arises from the device and general administrative provisions of the FD&C Act (21 U.S.C. 352, 360f, 360h, 360i, and 371).

## D. Costs and Benefits

The final rule is expected to provide a positive net benefit (estimated benefits minus estimated costs) to society. Banning powdered glove products is not expected to impose any costs to society, but is expected to reduce the number of adverse events associated with using powdered gloves. The primary public health benefit from adoption of the rule would be the value of the reduction in adverse events associated with using powdered gloves. The Agency estimates maximum total annual net benefits to range between $26.8 million and $31.8 million.

## II. Background

### A. Need for the Regulation/History of the Rulemaking

On March 22, 2016, FDA issued a proposed rule to ban powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove (81 FR 15173). Section 516(a)(1) of the FD&C Act authorizes FDA to ban a device intended for human use by regulation if it finds, on the basis of all available data and information, that such a device "presents substantial deception or an unreasonable and substantial risk of illness or injury." For a more detailed discussion of the banning standard, we refer you to the preamble of the proposed rule. FDA issued the proposed regulation because it determined that powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove present an unreasonable and substantial risk of illness or injury and that the risk cannot be corrected or eliminated by labeling or a change in labeling.

The preamble to the proposed rule describes the history of powdered gloves and the citizen petitions received by the Agency that request a ban on powdered gloves. We refer readers to that preamble for information about the development of the proposed rule. The level and types of risk presented by powdered gloves varies depending on the composition and intended use of the glove. In aggregate, the risks of powdered gloves include severe airway inflammation, hypersensitivity reactions, allergic reactions (including asthma), allergic rhinitis, conjunctivitis, dyspnea, as well as granuloma and adhesion formation when exposed to internal tissue. We refer readers to the preamble of the proposed rule for details on the level and types of risks presented by powdered gloves. The benefits of powdered gloves appear to only include greater ease of donning

and doffing, decreased tackiness, and a degree of added comfort, which FDA believes are nominal when compared to the risks posed by these devices.

The state of the art of both surgeon's and patient examination gloves includes non-powdered alternatives that provide similar performance as the various powdered glove types do. That is, there are many non-powdered gloves available that have the same level of protection, dexterity, and performance. Thus, based on a careful evaluation of the risks and benefits of powdered gloves and the risks and benefits of the current state of the art, which includes readily available alternatives that carry none of the risks posed by powdered gloves, FDA has determined that the standard to ban powdered gloves has been met, and that it is appropriate to issue this ban.

Finally, as discussed in the proposed rule, FDA also determined the ban should apply to devices already in commercial distribution and devices already sold to the ultimate user, as well as to devices that would be sold or distributed in the future (see 21 CFR 895.21(d)(7)). This means that powdered gloves currently being used in the marketplace would be subject to this ban and adulterated under section 501(g) of the FD&C Act (21 U.S.C. 351(g)), and thus subject to enforcement action.

### B. Summary of Comments to the Proposed Rule

The Agency requested public comments on the proposed rule, and the comment period closed on June 20, 2016. The Agency received approximately 100 comment letters on the proposed rule by the close of the comment period, each containing one or more comments on one or more issues. We received comments from a cross-section of patients and consumers, medical professionals, device manufacturers, and professional and trade associations. A majority of the comments supported the objectives of the rule in whole or in part, while a minority of the comments opposed the objectives of the rule. Some comments suggested changes to specific elements of the proposed rule or requested clarification of matters discussed in the proposed rule. See Section IV for the description of comments on the proposed rule and FDA's responses.

### C. General Overview of the Final Rule

FDA published a proposed rule to ban powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove, because FDA

determined that these devices present an unreasonable and substantial risk of illness or injury and that the risk cannot be corrected or eliminated by labeling or a change in labeling (81 FR 15173).

In this final rule, FDA is banning the following devices: (1) Powdered surgeon's gloves (21 CFR 878.4460), (2) powdered patient examination gloves (21 CFR 880.6250), and (3) absorbable powder for lubricating a surgeon's glove (21 CFR 878.4480). Because the classification regulations for these device types do not distinguish between powdered and non-powdered versions, FDA is amending the descriptions of these devices in the regulations to specify that the regulations for surgeon's gloves (21 CFR 878.4460) and patient examination gloves (21 CFR 880.6250) will apply only to non-powdered gloves while the powdered version of each type of glove will be added to 21 CFR part 895, subpart B—Listing of Banned Devices.

### D. Clarifying Changes to the Rule

While FDA believes that the preamble to the proposed rule was clear that the proposed ban would apply to all powdered surgeon's gloves and all powdered patient examination gloves, in reviewing the terminology used in the proposed additions to 21 CFR part 895, FDA determined that the term "synthetic latex" would not cover every type of non-NRL material that is used to manufacture powdered gloves. It was not FDA's intent to limit the ban to only powdered NRL and powdered synthetic latex gloves, and we believe that this intent was clear from the content of the preamble to the proposed rule, which stated that the ban "would apply to all powdered gloves except powdered radiographic protection gloves." As such, FDA has now revised the identification in this final rule to clarify that the ban applies to all powdered surgeon's gloves and powdered patient examination gloves without reference to the type of material from which they are made. Additionally, the identification of non-powdered surgeon's gloves and non-powdered patient examination gloves is also being revised to remove reference to material.

### III. Legal Authority

Powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove are defined as medical devices under section 201(h) of the FD&C Act (21 U.S.C. 321). Section 516 of the FD&C Act (21 U.S.C. 360f) authorizes FDA to ban a device if it finds, on the basis of all available data and information, that the device

presents substantial deception or unreasonable and substantial risks of illness or injury, which cannot be corrected by labeling or a change in labeling. This rule amends §§ 878.4460, 878.4480, 880.6250, 895.102, 895.103, and 895.104. FDA's legal authority to modify §§ 878.4460, 878.4480, 880.6250, 895.102, 895.103, and 895.104 arises from the device and general administrative provisions of the FD&C Act (21 U.S.C. 352, 360f, 360h, 360i, and 371).

## IV. Comments on the Proposed Rule and FDA's Responses

### A. Introduction

We received approximately 100 comment letters on the proposed rule by the close of the comment period, each containing one or more comments on one or more issues. We received comments from a cross-section of patients and consumers, medical professionals, device manufacturers, and professional and trade associations. A majority of the comments supported the objectives of the rule in whole or in part, while a minority of the comments opposed the objectives of the rule. Some comments suggested changes to specific elements of the proposed rule or requested clarification of matters discussed in the proposed rule.

We describe and respond to the comments in section IV.B through E. We have numbered each comment to help distinguish between different comments. We have grouped similar comments together under the same number, and, in some cases, we have separated different issues discussed in the same comment and designated them as distinct comments for purposes of our responses. The number assigned to each comment or comment topic is purely for organizational purposes and does not signify the comment's value or importance or the order in which comments were received.

### B. Description of General Comments and FDA Response

Many comments made general remarks supporting or opposing the proposed rule without focusing on a particular proposed provision. In the following paragraphs, we discuss and respond to such general comments.

(Comment 1) Many comments support the proposed ban on powdered patient examination gloves and powdered surgeon's gloves. These comments from individual consumers, health care professionals, academia, and industry highlight several risks of the continued use of powdered gloves, including, among others, allergic reactions, post-

operative adhesions, and delayed wound healing.

(Response 1) FDA agrees with these comments. After further review of all available information and the comments submitted to the proposed rule, FDA has concluded that the public's exposure to the risks of powdered gloves is unreasonable and substantial in relation to the nominal public health benefit derived from the continued marketing of these devices, especially when considering the benefits and risks posed by readily available alternative devices. Therefore, FDA has determined that the standard for a ban on these devices has been met.

### C. Description of Comments That Oppose the Regulation and FDA Response

FDA received some comments that oppose the proposed ban on powdered patient examination gloves and powdered surgeon's gloves for various reasons. We address each of these reasons for opposition in this section. After reviewing these comments, FDA has determined that the standard to ban powdered gloves has been met, and that it is appropriate to issue this ban. We are finalizing the ban with only clarifying changes.

(Comment 2) Comments oppose the proposed ban on powdered patient examination gloves and powdered surgeon's gloves because of difficulty donning or doffing non-powdered gloves. Two commenters specifically discuss hyperhidrosis with claims that it can add to the difficulty donning and doffing non-powdered gloves. One commenter has asserted that double-gloving is more difficult when using non-powdered gloves.

(Response 2) As described in the preamble of the proposed rule, we have concluded that the benefit of ease of donning or doffing powdered gloves is generally nominal (Ref. 3) in comparison to the risks posed by the continued marketing of powdered gloves, which, among others, include severe airway inflammation, hypersensitivity reactions, and allergic reactions (including asthma). Also, as noted in the proposed rule, a study of various brands of powdered and non-powdered NRL gloves by Cote et al. found that there are non-powdered latex gloves that are easily donned with wet or dry hands with relatively low force compared to the forces required to don powdered latex examination gloves (Ref. 3). Thus, FDA has considered ease of donning and doffing as a benefit as it applies within the banning standard, and has determined that the standard is met.

(Comment 3) Comments oppose the proposed ban on powdered patient examination gloves and powdered surgeon's gloves because of difficulty donning non-powdered gloves, leading to greater propensity of non-powdered gloves to tear. Some of these comments express concern that the reduced ability to separate the opening of a non-powdered glove or the greater propensity of non-powdered gloves to tear could potentially lead to a higher degree of contamination and post-procedure infections.

(Response 3) FDA disagrees with the assertion that non-powdered gloves have a higher propensity to tear and thus disagrees that use of non-powdered gloves presents a greater risk of contamination, post-procedure infections, or exposure of the user to blood. FDA does not believe there is compelling evidence to support the assertion that non-powdered gloves have a higher propensity to tear. Korniewicz, et al., determined that the presence of powder did not affect the durability of gloves or enhance glove donning (Ref. 4). Although Kerr, et al., identified a statistically significant difference in the durability of non-powdered vinyl gloves compared to powdered vinyl gloves, this difference may be attributed to glove type, manufacturer, and the fingernail length of users rather than the presence or absence of powder (Ref. 5). This study also found that vinyl gloves in general are less durable and have a greater propensity to tear compared to nitrile, neoprene, and latex gloves. Furthermore, as discussed in the response to comment 4, several studies have found that alternatives to non-powdered NRL gloves, such as nitrile and neoprene gloves, offer the same level of protection against contamination and exposure to blood as powdered NRL gloves (Refs. 5, 6, 7, 8, 9, and 10). Therefore, FDA has determined that suitable alternatives to powdered gloves are readily available in the marketplace.

(Comment 4) Commenters oppose the proposed ban on powdered patient examination gloves and powdered surgeon's gloves because the fit of powdered gloves is more comfortable than non-powdered gloves. Some of these comments assert that the reduced fit of non-powdered gloves inhibits the tactile sensation necessary to perform medical procedures.

(Response 4) FDA disagrees with the assertion that non-powdered gloves inhibit the tactile sensation necessary to perform medical procedures. The ban does not include non-powdered NRL gloves, which offer the same

performance characteristics of powdered NRL gloves, and several studies have found that alternatives, such as nitrile and neoprene gloves, offer the same level of protection, dexterity, and performance as NRL gloves (Refs. 5, 6, 7, 8, 9, and 10). Furthermore, the numerous risks posed by the continued marketing of powdered gloves outweigh the benefit of whatever additional level of comfort is provided from using powdered gloves instead of the non-powdered alternatives that carry none of these risks.

(Comment 5) Some comments oppose the proposed ban on powdered patient examination gloves and powdered surgeon's gloves, citing a lack of scientific evidence that gloves with reduced powder content, as those in use today, have the same risks as previously used gloves that had higher powder content.

(Response 5) FDA agrees that the maximum residual level of powder on powdered gloves is less than earlier types of powdered gloves. Historically, powdered medical gloves contained powder levels ranging from 50 to over 400 mg of powder per glove. Effective in 2002, the ASTM International recommended limits on powder levels is 15 mg per square decimeter for surgical gloves (ASTM D3577–2001) (Ref. 11) and 10 mg per square decimeter for patient examination gloves (ASTM D3578) (Ref. 12). As a result, FDA believes that gloves in use after 2002 follow these recommended limits and generally have lower powder content than earlier types of powdered gloves. Even so, several studies indicate that gloves with reduced powder levels continue to present unreasonable and substantial risks to patients and health care workers. For instance, a study conducted on the incidence of skin reactions for Greek endodontists from 2006 to 2012 found that glove powder accounted for the majority of skin reactions, and the replacement of powdered NRL gloves with non-powdered gloves resolved the majority of the adverse reactions (Ref. 13). Similarly, the risks of powdered gloves persist in non-clinical studies using gloves with reduced powder content, as demonstrated by the 2013 finding that surgeries performed with powdered gloves increased the number, density, and fibrotic properties of peritoneal adhesions in rats compared with surgeries performed with non-powdered gloves (Ref. 14). Also, the reduction in cases of NRL-induced occupational contact urticaria coincided with French hospitals transitioning to non-powdered gloves after 2004–2005 (Ref. 13).

Finally, FDA is not aware of any report in the literature that supports the assertion that currently marketed powdered gloves with lower powder content reduce the risks presented by powdered gloves (Ref. 15). In summary, FDA concludes that the risks of powder continue to be unreasonable and substantial for currently marketed powdered gloves despite lower powder content than previous generations of powdered gloves.

(Comment 6) Two comments oppose the proposed ban on powdered patient examination gloves and powdered surgeon's gloves, because the commenters believe a warning on the risks of powdered gloves is sufficient to mitigate the risks posed by these devices.

(Response 6) As described in Section IV of the proposed rule, FDA has determined that no change in labeling could correct the risk of illness or injury presented by the continued use of these devices. Powdered gloves have additional or increased risks to health compared to non-powdered gloves related to the spread of powder, and the fact that powder-transported contaminants such as NRL allergens can become aerosolized. Exposure to powder or latex allergens presents significant risks to health care workers and patients when inhaled or when exposed to internal tissue during oral, vaginal, gynecological, and rectal exams. Although labeling can raise awareness of these risks, we conclude that labeling cannot effectively mitigate these risks because it cannot prohibit the spread of glove powder or powder-transported contaminants. In addition, an important aspect of these devices is their ability to affect persons other than the individual who decides to wear or use them. For example, patients often do not know the type of gloves being worn by the health care professional treating them, but are still exposed to the potential dangers. Similarly, glove powder's ability to aerosolize and carry NRL proteins exposes individuals to harm via inhalation or surface contact. Thus, some of the risks posed by glove powder can impact persons completely unaware or unassociated with its employment and without the opportunity to consider the devices' labeling. Because of this inherent quality, adequate directions for use or warnings cannot be written that would provide reasonable assurance of the safe and effective use of these devices for all persons that might come in contact with them.

Due to the ability of powder to affect people who would not have an opportunity to read warning labels, and

because potential warning labels would raise awareness of the risks, but would not eliminate the risks posed by glove powder, FDA has determined no label or warning can correct the risks posed by these devices.

(Comment 7) One comment opposes the proposed ban on powdered patient examination gloves and powdered surgeon's gloves, because the solvent used to remove powder during the manufacture of non-powdered gloves may cause adverse reactions to the glove user.

(Response 7) FDA is not aware of any report in the literature that supports the assertion of widespread adverse reactions to solvent used in the manufacturing process. Non-powdered patient examination and surgeon's gloves require premarket notification (510(k)) submissions prior to marketing. During the review of these submissions, FDA evaluates the final finished glove, including manufacturing solvents that are present on the final glove. FDA recommends that manufacturers conduct and submit skin irritation and dermal sensitization studies in these submissions to evaluate potential issues with components, including manufacturing solvents (Ref. 1). Although individual hypersensitivity reactions to different materials may occur, FDA has been unable to find evidence in the literature of hypersensitivity to typical glove manufacturing materials other than glove powder or NRL. However, Palosuo, et al., reports that the use of hand sanitizers containing isopropyl alcohol prior to donning gloves could cause dermatitis reaction if the gloves are donned before the alcohol dries (Ref. 16). The occurrence of this reaction is unrelated to the manufacture of non-powdered gloves and unrelated to the use of non-powdered gloves as an alternative to powdered gloves. Given the lack of evidence of adverse reactions to solvents used in the manufacturing of non-powdered gloves, and the established evidence demonstrating the risks of powdered glove use, FDA continues to believe that powdered gloves and glove powder meet the banning standard.

(Comment 8) Several comments oppose the proposed ban on powdered patient examination gloves and powdered surgeon's gloves due to the expectation that users will ultimately have to pay more for medical gloves once the ban is finalized, because the cost of non-powdered gloves is currently higher than the cost of powdered gloves.

(Response 8) We do not find any evidence to support the claims that

current prices of non-powdered gloves are significantly higher than powdered gloves. As we stated in the preliminary regulatory impact analysis (PRIA), extensive searches of glove distributor pricing indicate that non-powdered gloves have become as affordable as powdered gloves. Our searches also revealed that the market is saturated with alternatives to powdered gloves, resulting in downward pressure on the prices of non-powdered gloves. In addition, the share of powdered medical gloves sales has been declining since at least 2000 while total sales of all disposable medical gloves have increased (Ref. 17). We would not expect this trend to be occurring without regulatory action if users of disposable medical gloves faced significantly higher prices for switching to non-powdered gloves. We therefore do not find it necessary to update our analysis based on these comments.

(Comment 9) We received one comment that disagrees with our determination that the availability of examination and surgical gloves would not be reduced.

(Response 9) We do not find any evidence to support these claims. As we stated in the PRIA, research shows only 7 percent of total sales of examination and surgical gloves to medical workers were projected to be from powdered gloves in 2010 (Ref. 17). Global Industry Analysts (GIA) projected the share of powdered disposable medical gloves sales to decrease to 2 percent in 2015, while total sales of all disposable medical gloves continue to increase (Ref. 17). We would not expect this trend to be occurring without regulatory action if there were a reduction in the availability of disposable examination and surgical gloves. We therefore do not find it necessary to update our analysis based on these comments.

(Comment 10) Commenters suggest there would be a loss in consumer utility due to the preference some medical workers may have for powdered gloves due to comfort and ease of use.

(Response 10) We stated in the PRIA that the remaining 7 percent continuing to use these powdered gloves may experience utility loss from the removal of powdered gloves from the market (Ref. 17). The potential loss in consumer utility would be due to the perceived loss in comfort from powdered gloves users switching to non-powdered gloves. However, as the GIA report shows, there has been a downward trend in total sales of powdered gloves since at least the year 2000 while total sales of all disposable medical gloves has increased (Ref. 17). We would not

expect this trend to be occurring without regulatory action if the loss in consumer utility to current medical workers were substantial. Korniewicz et al. reported no loss in consumer satisfaction in a sample of operating room staff switching to non-powdered surgical gloves (Ref. 4). We have not estimated this potential burden, but the evidence described here suggests that any burden would not be substantial. Further, even having considered that some degree of consumer comfort may be lost by banning powdered gloves, FDA continues to believe that this benefit is considerably outweighed by the numerous risks posed by powdered gloves.

(Comment 11) One comment opposes the proposed ban on powdered patient examination gloves and powdered surgeon's gloves, because the risks identified for powdered gloves are due to contaminants, such as pesticides and herbicides, in the powder that would not be present if the powder were manufactured in the United States.

(Response 11) FDA disagrees with the assertion that contaminated powder is the source of the risks identified for powdered gloves. FDA's proposal to ban powdered gloves and glove powder is based on various studies on the risks of powdered gloves due to the properties of the powder itself. Powdered gloves have additional or increased risks to health compared to non-powdered gloves. For example, powder on NRL gloves can aerosolize latex allergens, resulting in sensitization to latex and allergic reactions. Latex sensitization and allergic reactions are unrelated to any potential presence of manufacturing contaminants, such as pesticides and herbicides. Additional risks of powdered gloves include severe airway inflammation, conjunctivitis, dyspnea, as well as granuloma and adhesion formation when exposed to internal tissue. FDA's assessment of the available literature and information indicates that these risks are attributable to the powder itself, as opposed to any potential presence of manufacturing contaminants, such as pesticides and herbicides.

In addition, the powder used on powdered gloves is required to comply with FDA's Quality System regulation, which includes requirements for quality and inspection for the final finished gloves that protect against the introduction of contaminated devices into commerce. Among other requirements, device manufacturers must establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an

adverse effect on product quality (21 CFR 820.70(e)). FDA's Quality System regulation applies to gloves and glove powder sold in the United States, regardless of the manufacturing location.

## D. Description of Comments on Scope of Ban and FDA Response

FDA received several comments requesting revision of the scope of the ban. The scope of the proposed ban includes powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove. The glove types include all powdered patient examination and surgeon's gloves, including NRL and synthetic latex gloves. In the following paragraphs, we discuss and respond to comments requesting revision of the scope of the ban. We are finalizing the ban without change to the scope, but clarifying that all powdered patient examination gloves and powder surgical gloves are banned, regardless of the material from which they are made.

(Comment 12) Several comments identify risks that result from the use of powdered and non-powdered NRL gloves. These comments request FDA to extend the ban to all NRL gloves, both powdered and non-powdered.

(Response 12) Unlike with powdered latex gloves, which have the ability to aerosolize glove powder and carry allergenic proteins, FDA believes the risk of allergic reaction to non-powdered NRL gloves, which affects the user and patients in direct contact with the glove, is adequately mitigated through already-required labeling that alerts users to this risk. NRL gloves must include a statement to alert users to the risk of allergic reactions caused by NRL (21 CFR 801.437). Further, several studies have indicated that the use of non-powdered NRL gloves reduces the risk of sensitization to allergenic NRL proteins and the number of allergic reactions experienced by those who are already sensitized (Refs. 18, 19, and 20). FDA believes that these study results, when considered alongside the risk mitigation that follows from FDA's required labeling for NRL products, demonstrates that non-powdered latex gloves can be safely used with appropriate caution for latex-sensitive patients and health care workers. Therefore, FDA has determined not to ban the use of all NRL gloves.

(Comment 13) Several comments raise the issue of life threatening latex allergy events that result from various uses of NRL gloves including food preparation and food service. Several of these comments assert that the Agency should broaden the scope of the ban to cover all

NRL gloves for all uses including food preparation and food service.

(Response 13) We have concluded that it is not appropriate to address a proposal to ban gloves used for food preparation because these gloves do not meet the definition of a device under section 201(h) of the FD&C Act and are thus not subject to section 516 of the FD&C Act (21 U.S.C. 360f), which provides the statutory authority to ban devices within FDA's authority to regulate such products.

(Comment 14) One comment asserts that the ban on powdered gloves should not apply to dental practice, because the risks are not applicable to dental practice.

(Response 14) FDA disagrees with the assertion that the risks of powdered gloves are not applicable to dental practice. Dentists and dental patients face the same risks as other medical practices in terms of the potential for powder exposure to open cavities or open wounds, and for powder, if used with NRL gloves, to carry protein allergens. Several studies documenting the risks of powdered gloves in dental practices have been conducted, including Saary, et al., which identified that changing to low-protein and non-powdered NRL gloves reduced NRL allergy in dental students (Ref. 18). In addition, Charous et al., reported in 2000 that a dental office was able to reduce airborne NRL antigen levels to undetectable levels with the exclusive use of non-powdered NRL gloves, permitting a highly sensitized staff member to continue to work there (Ref. 21). These studies, among others (Refs. 13 and 22), indicate that the risks of powdered medical gloves apply to dental practice. Therefore, FDA has determined that the scope of the ban on powdered medical gloves should continue to include powdered gloves used in dental practice.

*E. Description of Other Specific Comments and FDA Response*

Many comments made specific remarks requesting clarification or revision to the proposed rule. In the following paragraphs, we discuss and respond to such specific comments.

(Comment 15) A number of comments request extension of the effective date of the ban. The proposed rule included a proposed effective date of 30 days after publication of the final rule for all devices, including those already in commercial distribution. The comments suggest a range of effective dates of 90 days to 18 months after publication of the final rule and assert that a longer transition period is necessary to allow existing inventory to flow through the supply chain to providers and patients.

(Response 15) FDA is not extending the effective date of the ban for devices already in commercial distribution. We have concluded that powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove present an unreasonable and substantial risk of illness or injury and that the risk cannot be corrected or eliminated by labeling or a change in labeling. The continued marketing of these devices beyond the 30 day effective date would allow for the continued sale and purchase of devices that FDA has determined present an unreasonable and substantial risk to patients and health care workers. Therefore, FDA does not believe that it is in the best interest of the public health to extend the effective date for devices already in commercial distribution. In order to minimize the risk of continued exposure of health care workers and patients to these devices, the effective date for devices remains 30 days after the date of publication of this final rule.

(Comment 16) One comment requests that FDA not extend the effective date of the ban to allow companies to deplete their inventory of the devices.

(Response 16) As described in the response to comment 15, FDA agrees that it is in the best interest of the public health to not extend the effective date of the ban for devices already in commercial distribution. Therefore, the effective date of the ban for devices already in commercial distribution remains at 30 days after the date of publication of the final rule.

(Comment 17) A few comments request recommendations on the means of disposal or recycling of powdered gloves.

(Response 17) FDA recommends that unused inventories of powdered medical gloves remaining at domestic manufacturing and distribution locations be disposed of in accordance with standard industry practices. Unused supplies at hospitals, outpatient centers, clinics, medical and dental offices, other service delivery points (nursing homes, etc.), and in the possession of end users, will need to be disposed of according to established procedures of the local community's solid waste management system. Established procedures for these materials typically involve disposal in landfills or incineration. FDA has concluded that this final rule will not have a significant impact on the human environment. (See Section VII. Analysis of Environmental Impact.)

(Comment 18) One comment requests clarification on whether after the effective date of the ban the Agency will permit a manufacturer to export powdered medical gloves that are already physically located at distribution centers in the United States.

(Response 18) After the effective date of this final rule, manufacturers will not be allowed to import powdered medical gloves. However, while powdered medical gloves will be banned in the United States on the effective date of this final rule, manufacturers may export existing inventory of powdered gloves to a foreign country if the device complies with the laws of that country and has valid marketing authorization by the appropriate authority, as described in section 802 of the FD&C Act (21 U.S.C. 382)). If eligible for export under section 802 of the FD&C Act, a device intended for export will not be deemed adulterated or misbranded if it

(A) accords to the specifications of the foreign purchaser,

(B) is not in conflict with the laws of the country to which it is intended for export,

(C) is labeled on the outside of the shipping package that it is intended for export, and

(D) is not sold or offered for sale in domestic commerce.

**V. Effective Date**

This rule is effective January 18, 2017. The effective date of this rule applies to devices already in commercial distribution and those already sold to the ultimate user, as well as to devices that would be sold or distributed in the future. All powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's gloves must be removed from the market upon the effective date of this final rule. Section 501(g) of the FD&C Act (21 U.S.C. 351(g)) deems a device to be adulterated if it is a banned device.

**VI. Economic Analysis of Impacts**

*A. Introduction*

We have examined the impacts of the final rule under Executive Order 12866, Executive Order 13563, the Regulatory Flexibility Act (5 U.S.C. 601–612), and the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4). Executive Orders 12866 and 13563 direct us to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety,

and other advantages; distributive impacts; and equity). We have developed a comprehensive Economic Analysis of Impacts that assesses the impacts of the final rule. We believe that this final rule is not a significant regulatory action as defined by Executive Order 12866.

The Regulatory Flexibility Act requires us to analyze regulatory options that would minimize any significant impact of a rule on small entities. Because this rule imposes no new burdens, we certify that the final rule will not have a significant economic impact on a substantial number of small entities.

The Unfunded Mandates Reform Act of 1995 (section 202(a)) requires us to prepare a written statement, which includes an assessment of anticipated costs and benefits, before issuing "any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any one year." The current threshold after adjustment for inflation is $146 million, using the most current (2015) Implicit Price Deflator for the Gross Domestic Product. This final rule would not result in an expenditure in any year that meets or exceeds this amount.

*B. Summary of Costs and Benefits*

The final rule prohibits marketing of powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating surgeon's gloves. The rule does not cover or include powdered radiographic gloves.

The final rule is expected to provide a positive net benefit (estimated benefits minus estimated costs) to society. Banning powdered glove products is not expected to impose any costs to society. Extensive searches of glove distributor pricing indicate that improvements to non-powdered gloves have made these products as affordable as powdered gloves. The ban is expected to reduce the adverse events associated with using powdered gloves. The Agency estimates maximum total annual net benefits to range between $26.8 million and $31.8 million. The present discounted value of the estimated benefits over 10 years ranges from $228.9 million to $270.8 million at a 3 percent discount rate and from $188.5 million to $223 million at a 7 percent discount rate.

FDA has examined the economic implications of the rule as required by the Regulatory Flexibility Act. If a rule will have a significant economic impact on a substantial number of small

entities, the Regulatory Flexibility Act requires us to analyze regulatory options that would lessen the economic effect of the rule on small entities. This rule will not impose any new burdens on small entities, and thus will not impose a significant economic impact on a substantial number of small entities.

The full discussion of the economic impacts of the rule, which includes a list of changes made in the final regulatory impact analysis, in accordance with Executive Order 12866, Executive Order 13563, the Regulatory Flexibility Act, and the Unfunded Mandates Reform Act is available at *https://www.regulations.gov* under the docket number (FDA–2015–N–5017) for this rule and at *http://www.fda.gov/ AboutFDA/ReportsManualsForms/ Reports/EconomicAnalyses/ default.htm#* (Ref. 23).

## VII. Analysis of Environmental Impact

FDA has carefully considered the potential environmental effects of this final rule and of possible alternative actions. In doing so, the Agency focused on the environmental impacts of its action as a result of disposal of unused powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove that will need to be handled after the rule is finalized.

The environmental assessment (EA) considered each of the alternatives in terms of the need to provide maximum reasonable protection of human health without resulting in a significant impact on the environment. The EA considered environmental impacts related to landfill and incineration of solid waste at municipal solid waste (MSW) facilities nationwide. The selected action, if finalized, will result in an initial batch disposal of unused powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove from user facilities to MSW facilities nationwide, followed by a rapid decrease in the rate of disposal of these devices, as supplies are depleted. The selected action does not change the ultimate disposition of these devices but expedites their rate of disposal and ceases future production. Overall, given the limited number of powdered surgeon's gloves, powdered patient examination gloves, and absorbable powder for lubricating a surgeon's glove, currently in commercial distribution, the selected action is expected to have no significant impact on MSW and landfill facilities and the environment in affected communities.

The Agency has carefully considered the potential environmental effects of this action. FDA has concluded that the action will not have a significant impact on the human environment, and that an environmental impact statement is not required. The Agency's finding of no significant impact and the evidence supporting that finding, contained in an EA, may be seen in the Division of Dockets Management (see **ADDRESSES**) between 9 a.m. and 4 p.m., Monday through Friday (Ref. 24).

## VIII. Paperwork Reduction Act of 1995

This final rule contains no collection of information. Therefore, FDA is not required to seek clearance by Office of Management and Budget under the Paperwork Reduction Act of 1995.

## IX. Federalism

We have analyzed this final rule in accordance with the principles set forth in Executive Order 13132. FDA has determined that the rule does not contain policies that have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Accordingly, we conclude that the rule does not contain policies that have federalism implications as defined in the Executive order and, consequently, a federalism summary impact statement is not required.

## X. References

The following references are on display in the Division of Dockets Management (see **ADDRESSES**) and are available for viewing by interested persons between 9 a.m. and 4 p.m., Monday through Friday; they are also available electronically at *https:// www.regulations.gov*. FDA has verified the Web site addresses, as of the date this document publishes in the **Federal Register,** but Web sites are subject to change over time.

1. "Guidance for Industry and FDA Staff: Medical Glove Guidance Manual," January 22, 2008, available at: *http:// www.fda.gov/downloads/ MedicalDevices/DeviceRegulation andGuidance/GuidanceDocuments/ UCM428191.pdf.*
2. "ASTM D6124 Standard Test Method for Residual Powder on Medical Gloves," 2011, available at: *http://www.astm.org/ Standards/D6124.htm.*
3. Cote, S.J., M.D. Fisher, J.N. Kheir, et al., "Ease of donning commercially available latex examination gloves," *Journal of Biomedical Matererials Research,* 43(3):331–337, 1998, available at: *http://*

*www.ncbi.nlm.nih.gov/pubmed/ 9730072.*

4. Korniewicz, D.M., M.M. El-Masri, J.M. Broyles, et al., "A laboratory-based study to assess the performance of surgical gloves," *AORN Journal*, 77(4):772–779, 2003, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 12705733.*

5. Kerr, L.N., M.P. Chaput, L.D. Cash, et al., "Assessment of the durability of medical examination gloves," *Journal of Occupational and Environmental Hygiene*, 1(9):607–612, 2004, available at: *http://www.ncbi.nlm.nih.gov/ pubmed/15559332.*

6. Fisher, M.D., V.R. Reddy, F.M. Williams, et al., "Biomechanical performance of powder-free examination gloves," The *Journal of Emergency Medicine*, 17(6):1011–1018, 1999, available at: *http://www.ncbi.nlm.nih.gov/pubmed/ 10595890.*

7. Korniewicz, D.M., M. El-Masri, J.M. Broyles, et al., "Performance of latex and nonlatex medical examination gloves during simulated use," *American Journal of Infection Control*, 30(2):133–138, 2002. available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 11944004.*

8. Patel, H.B., G.J. Fleming, and F.J. Burke, "Puncture resistance and stiffness of nitrile and latex dental examination gloves," *British Dental Journal*, 196(11):695–700; discussion 685; quiz 707, 2004, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 15192735.*

9. Rego, A. and L. Roley, "In-use barrier integrity of gloves: latex and nitrile superior to vinyl," *American Journal of Infection Control*, 27(5):405–410, 1999, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 10511487.*

10. Sawyer, J. and A. Bennett, "Comparing the level of dexterity offered by latex and nitrile SafeSkin gloves," *Annals of Occupational Hygiene*, 50(3):289–296, 2006, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 16357028.*

11. ASTM, "ASTM D3577–01a Standard Specification for Rubber Surgical Gloves," 2001.

12. ASTM, "ASTM D3578–01a Standard Specification for Rubber Examination Gloves," 2001.

13. Zarra, T. and T. Lambrianidis, "Skin reactions amongst Greek endodontists: a national questionnaire survey," *International Endodontic Journal*, 48(4):390–398, 2015, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 24889504.*

14. Aghaee, A., H. Parsa, M. Nassiri Asl, et al., "Comparison of the Effects of Powdered and Powder-free Surgical Gloves on Postlaparotomy Peritoneal Adhesions in Rats," *Iranian Red Crescent Medical Journal*, 15(5):442–443, 2013, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 24349737.*

15. Bensefa-Colas, L., M. Telle-Lamberton, S. Faye, et al., "Occupational contact urticaria: lessons from the French National Network for Occupational Disease Vigilance and Prevention (RNV3P)," *British Journal of Dermatology*, 173(6):1453–1461, 2015, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 26212252.*

16. Palosuo, T., I. Antoniadou, F. Gottrup, et al., "Latex medical gloves: time for a reappraisal," *International Archives of Allergy and Immunology*, 156(3):234–246, 2011, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 21720169.*

17. GIA, Global Industry Analysts, Inc., "Disposable Medical Gloves: A Global Strategic Business Report," 2008.

18. Saary, M.J., A. Kanani, H. Alghadeer, et al., "Changes in rates of natural rubber latex sensitivity among dental school students and staff members after changes in latex gloves," *Journal of Allergy and Clinical Immunology*, 109(1):131–135, 2002, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 11799379.*

19. Tarlo, S.M., A. Easty, K. Eubanks, et al., "Outcomes of a natural rubber latex control program in an Ontario teaching hospital," *Journal of Allergy and Clinical Immunology*, 108(4):628–633, 2001, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 11590392.*

20. Allmers, H., J. Schmengler, and C. Skudlik, "Primary prevention of natural rubber latex allergy in the German health care system through education and intervention," *Journal of Allergy and Clinical Immunology*, 110(2):318–323, 2002, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 12170275.*

21. Charous, B.L., P.J. Schuenemann, and M.C. Swanson, "Passive dispersion of latex aeroallergen in a healthcare facility," *Annals of Allergy, Asthma and Immunology*, 85(4):285–290, 2000, available at: *http:// www.ncbi.nlm.nih.gov/pubmed/ 11061471.*

22. Dave, J., M.H. Wilcox, and M. Kellett, "Glove powder: implications for infection control," *Journal of Hospital Infection*, 42(4):283–285, 1999, available at: *http://www.ncbi.nlm.nih.gov/ pubmed/10467541.*

23. "Final Regulatory Impact Analysis, Final Regulatory Flexibility Analysis, and Final Unfunded Mandates Reform Act Analysis for Banned Devices; Proposal to Ban Powdered Surgeon's Gloves, Powdered Patient Examination Gloves, and Absorbable Powder for Lubricating a Surgeon's Glove," available at: *http:// www.fda.gov/AboutFDA/Reports ManualsForms/Reports/Economic Analyses/default.htm#.*

24. FDA, "Finding of No Significant Impact (FONSI) and Environmental Analysis for Banned Devices; Proposal to Ban Powdered Surgeon's Gloves, Powdered Patient Examination Gloves, and Absorbable Powder for Lubricating a Surgeon's Glove."

## List of Subjects

*21 CFR Parts 878 and 880*

Medical devices.

*21 CFR Part 895*

Administrative practice and procedure, Labeling, Medical devices.

Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs, 21 CFR parts 878, 880, and 895 are amended as follows:

## PART 878—GENERAL AND PLASTIC SURGERY DEVICES

■ 1. The authority citation for part 878 continues to read as follows:

**Authority:** 21 U.S.C. 351, 360, 360c, 360e, 360j, 360l, 371.

■ 2. Amend § 878.4460 by revising the section heading and paragraph (a) to read as follows:

### § 878.4460   Non-powdered surgeon's glove.

(a) *Identification.* A non-powdered surgeon's glove is a device intended to be worn on the hands of operating room personnel to protect a surgical wound from contamination. A non-powdered surgeon's glove does not incorporate powder for purposes other than manufacturing. The final finished glove includes only residual powder from manufacturing.

\*    \*    \*    \*    \*

### § 878.4480   [Removed]

■ 3. Remove § 878.4480.

## PART 880—GENERAL HOSPITAL AND PERSONAL USE DEVICES

■ 4. The authority citation for part 880 continues to read as follows:

**Authority:** 21 U.S.C. 351, 360, 360c, 360e, 360j, 371.

■ 5. Amend § 880.6250 by revising the section heading and paragraph (a) to read as follows:

### § 880.6250   Non-powdered patient examination glove.

(a) *Identification.* A non-powdered patient examination glove is a disposable device intended for medical purposes that is worn on the examiner's hand or finger to prevent contamination between patient and examiner. A non-powdered patient examination glove does not incorporate powder for purposes other than manufacturing. The final finished glove includes only residual powder from manufacturing.

\*    \*    \*    \*    \*

## PART 895—BANNED DEVICES

■ 6. The authority citation for part 895 continues to read as follows:

**Authority:** 21 U.S.C. 352, 360f, 360h, 360i, 371.

■ 7. Add § 895.102 to read as follows:

### § 895.102   Powdered surgeon's glove.

(a) *Identification.* A powdered surgeon's glove is a device intended to be worn on the hands of operating room personnel to protect a surgical wound from contamination. A powdered surgeon's glove incorporates powder for purposes other than manufacturing.

(b) [Reserved]

■ 8. Add § 895.103 to read as follows:

### § 895.103   Powdered patient examination glove.

(a) *Identification.* A powdered patient examination glove is a disposable device intended for medical purposes that is worn on the examiner's hand or finger to prevent contamination between patient and examiner. A powdered patient examination glove incorporates powder for purposes other than manufacturing.

(b) [Reserved]

■ 9. Add § 895.104 to read as follows:

### § 895.104   Absorbable powder for lubricating a surgeon's glove.

Absorbable powder for lubricating a surgeon's glove is a powder made from cornstarch that meets the specifications for absorbable powder in the United States Pharmacopeia (U.S.P.) and that is intended to be used to lubricate the surgeon's hand before putting on a surgeon's glove. The device is absorbable through biological degradation.

Dated: December 13, 2016.

**Leslie Kux,**

*Associate Commissioner for Policy.*

[FR Doc. 2016–30382 Filed 12–16–16; 8:45 am]

**BILLING CODE 4164–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

### 21 CFR Part 880

**[Docket No. FDA–2015–N–0701]**

### General Hospital and Personal Use Devices: Renaming of Pediatric Hospital Bed Classification and Designation of Special Controls for Pediatric Medical Crib; Classification of Medical Bassinet

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA) is issuing a final rule to rename pediatric hospital beds as pediatric medical cribs and establish special controls for these devices. FDA is also establishing a separate classification regulation for medical bassinets, previously under the pediatric hospital bed classification regulation, as a class II (special controls) device. In addition, this rule continues to allow both devices to be exempt from premarket notification and use of the device in traditional health care settings and permits prescription use of pediatric medical cribs and bassinets outside of traditional health care settings.

**DATES:** This order is effective on January 18, 2017.

**FOR FURTHER INFORMATION CONTACT:** Michael J. Ryan, Center for Devices and Radiological Health, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 66, Rm. 1615, Silver Spring, MD 20993–0002, 301–796–6283.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
  A. Purpose and Coverage of the Final Rule
  B. Summary of the Major Provisions of the Final Rule
  C. Legal Authority
  D. Costs and Benefits
II. Background
  A. Need for the Regulation/History of This Rulemaking
  B. Summary of Comments to the Proposed Rule
  C. General Overview of Final Rule
III. Legal Authority
IV. Comments on the Proposed Rule and FDA Response
  A. Introduction
  B. Specific Comments and FDA Response
  C. Clarifying Changes to the Rule
V. Effective/Compliance Dates
VI. Economic Analysis of Impacts
VII. Analysis of Environmental Impact
VIII. Paperwork Reduction Act of 1995
IX. Federalism
X. References

## I. Executive Summary

### A. Purpose and Coverage of the Final Rule

Pediatric medical cribs that meet the definition of a device in section 201(h) of the Federal Food, Drug, and Cosmetic Act (the FD&C Act) (21 U.S.C. 321(h)) (referred to as pediatric medical cribs or cribs intended for medical purposes) (product code FMS) are regulated by FDA and will have to comply with the special controls identified in this rule for pediatric medical cribs. Cribs that do not meet the device definition (referred to as cribs for non-medical purposes) must meet the Consumer Product Safety Commission's (CPSC's) regulations and guidelines.

In the **Federal Register** of December 28, 2010 (75 FR 81766), the CPSC issued a final rule prohibiting the use of the drop-side rail design for non-medical cribs in consumer households as of June 28, 2011. CPSC's rule established new standards for full-size and non-full-size cribs intended for non-medical purposes, which effectively prohibited the manufacture or sale of cribs intended for non-medical purposes with a drop-side rail design in households, child care facilities, family child care homes, and places of public accommodation. This rule did not affect pediatric medical cribs regulated by FDA, which typically contain a drop-side rail design that includes movable and latchable side and end rails. Although drop-side cribs intended for non-medical purposes are now prohibited, there is still a need for pediatric medical cribs with drop-side rails inside and outside of traditional health care settings. Pediatric medical cribs with drop-side rails are extremely helpful for patient care in hospital settings and even outside of traditional health care settings, such as day care centers caring for infants and children with disabilities, because they allow parents and care givers easy access to children to perform routine and emergency medical procedures, including, but not limited to, cardiopulmonary resuscitation (CPR), blood collection, intravenous (IV) insertion, respiratory care, and skin care. These drop-side rail cribs also make it easier for hospital staff to facilitate safe patient transport and reduce the chance of care giver injury.

Over the last 5 years, FDA has received over 500 adverse event reports, or Medical Device Reports (MDRs), associated with open pediatric medical cribs, through the Agency's Manufacturer and User Facility Device Experience (MAUDE) database. There were adverse event reports of serious injuries, including reports of entrapment, which were predominantly entrapments of extremities (legs or arms). The majority of MDRs for medical cribs were for malfunctions such as drop-side rails not latching or lowering, brakes not holding, wheels or casters breaking, and where applicable, scales not reading correct weights. As a result of the risks to health and need for continued use of pediatric medical cribs in traditional health care settings and non-traditional settings, FDA is revising the identification for § 880.5140 (21 CFR 880.5140) to include only pediatric