Exhibit 107

'97-09-18 00:34 A.P.                                                                    P.1

ALFRED P. WEHNER, D.M.D., Sc.D., Cand. Med.
Diplomate, Academy of Toxicological Sciences
312 Saint Street
Richland, Washington 99352

9/17/97

Mr.Michael R.Chudkowski
Manager, Preclinical Toxicology
J&J Consumer Products,Inc.
Skillman, NJ 08558-9418

Dear Mike:

There is a German saying which translates as follows:

"A true friend is not he who beguiles you with flattery
but he who discloses to you your mistakes
before your enemies discover them."

In this spirit I would like to volunteer a critique of the
three CTFA response statements which you faxed me on September
11.  Some of the wording leaves CTFA wide open to counter-
attack.  The most harmless response statement of the three is
the one dated July 1,1992.  It does not give the names of the
authors and the title of the paper to which the response is
being made.  More important, I believe that different and/or
additional more powerful statements along the lines of my cri-
tique faxed to Jerry McEwen, as far as applicable to the situa-
tion in 1992, would have put CTFA in a more advantageous tact-
ical position.  Several investigators have independently report-
ed talc particles in ovarian tissue.  Simply citing the Battelle
study and stating that it "demonstrated that talc does not trans-
late (sic!) through the cervix to the uterine cavity and beyond"
does not address the problem, does not refute these findings,
and therefore does not serve CTFA's best interest.  All in all,
in my opinion an inept response.

The problem with the response statement dated July 8,1992, is
more serious.  The last sentence in the second paragraph states:
"Finally, human studies on talc and cancer in industrial settings
have shown that industrial exposure to talc, both by skin contact
and inhalation, even at levels thousands of times higher than
lifetime consumer exposure, presents no significant risk."
This statement is outright false.  All an Epstein, a Kennedy,
or one of their aides knowledgeable in matters talc, would have
to do at a hearing (or any occasion, at that) to demolish the
credibility of the talc industry is to refer to the studies
by Kleinfeld et al, Thomas, and Thomas and Stewart!

Referring in a 1992 statement to a 1977 editorial in defense
of one's position is not a very persuasive argument.  Much can
happen in 15 years.

509/375-0873   Fax 509/375-5693

Plaintiff's Exhibit
No.

P-20

J&J-0115053

Protected Document--Subject to Protective Order                                    JNJ 000040596

1 of 2                                        Pltf_JNJ_00007977

'97-09-18 00:35 A.P.                                              P.2

Here, too, I believe that more powerful and better defendable arguments could and should have been made on behalf of the industry.

The response statement dated November 17, 1994, is just as bad. The second sentence in the third paragraph reads: "The workshop concluded that, although some of these studies suggested a weak association might exist, when taken together the results of the studies are insufficient to demonstrate any real association." This statement is also inaccurate, to phrase it euphemistically. At that time there had been about 9 studies (more by now) published in the open literature that did show a statistically significant association between hygienic talc use and ovarian cancer. Anybody who denies this risks that the talc industry will be perceived by the public like it perceives the cigarette industry: denying the obvious in the face of all evidence to the contrary. This would be a particularly tragic misperception in view of the fact that the industry does have powerful, valid arguments to support its position.

The workshop did not conclude that "the results of the studies are insufficient to demonstrate any real association." As pointed out above, a "real" statistically significant association has been undeniably established independently by several investigators, which without doubt will be readily attested to by a number of reputable scientists/clinicians, including Bernard Harlow, Debra Novotny, Candace Sue Kasper, Debra Heller, and others. What the workshop panel did conclude was that (1) the results of the studies were ambiguous, inconsistent, contradictory and therefore inconclusive, (2) therefore hygienic use of cosmetic talc does not present a risk to the consumer. So why not use these powerful and irrefutable arguments (plus some of those along the lines of my fax to Rich) instead of questionable mush that leaves one vulnerable to counterattack? The following sentence states: "In addition there is no basis to conclude that talc is capable of migrating to the ovaries...". I submit that several reports, independently describing talc particles in/on ovarian tissue, along with other suggestive evidence (questionable as some of it might be) does provide a basis for just such a conclusion. My point is that such a complex and vexing issue cannot be credibly dismissed with one sweeping statement without any documenting references.

Mike, I realize that CTFA is not J&J. However, I believe that a defeat or embarrassment of CTFA also negatively affects J&J to some extent. As a consultant on a retainer I feel obligated to proactively act in the best interest of my client at all times, not only when I am approached with a specific assignment. This consideration alone motivated me to spend the time to bring my thoughts on this matter to your attention. I trust that in the process I did not step on anybody's toes.

Best regards

*Al*

J&J-0115054

Protected Document--Subject to Protective Order                JNJ 000040597

Pltf_JNJ_00007977

Exhibit 108

# C·T·F·A

*Representing the personal care products industry*

E. Edward Kavanaugh
*President*

**DRAFT MINUTES**

**TALC INTERESTED PARTY TASK FORCE**

CTFA
Main Conference Room
1101 17th Street, N.W., Suite 300
Washington, DC 20036



Plaintiff's Exhibit
No.

**P-14**

July 21, 1993

A meeting of the Talc Interested Party Task Force was held at CTFA on Wednesday, July 21, 1993 beginning at 10:00 a.m. Those in attendance were:

    Dr. Laureen MacEachern - **COLGATE-PALMOLIVE**
    Ms. Kate Trammell - **MAYBELLINE**
    Mr. William Ashton - **JOHNSON & JOHNSON (Guest)**
    Mr. Mike Chudkowski - **JOHNSON & JOHNSON**
    Mr. Richard Zazenski - **LUZENAC AMERICA**
    Dr. Martin Roddy - **NOXELL**
    Ms. Marjorie McTernan - **JOHNSON & JOHNSON (Guest)**
    Dr. Stephen Gettings - **CTFA (Liaison)**

I.   **OPENING REMARKS**

    1.   SGettings opened the meeting and apologized for calling it at such short notice. He noted that the purpose of the meeting was to discuss the outcome of a meeting SGettings held with members of the Planning Committee of the International Society of Regulatory Toxicology & Pharmacology (ISRTP), held at the ToxForum meeting on July 14th, 1993. The minutes of the last meeting were approved with no changes.

II.  **INFORMATION EXCHANGE/GENERAL DISCUSSION**

    1.   SGettings noted that ISTRP have been asked by FDA to organize a 1-2 day symposium on talc safety and related issues (93-TA-10). The Task Force was alerted as to this possibility in February, 1993 (93-TA-07).

    2.   At the ISRTP Planning Committee meeting SGettings was

*The Cosmetic, Toiletry, and Fragrance Association*
*1101 17th Street, N.W. • Suite 300 • Washington, D.C. 20036-4702 • (202) 331-1770 • Fax (202) 331-1969*

Protected Document--Subject to Protective Order

JNJ 000011708

Pltf_JNJ_00001141

apprised of the following:

The intended target audience are regulatory specialists, toxicologists, food/drug/cosmetic/medical device manufacturers, academicians and medical professionals. At least 100 attendees are anticipated.

From the meeting, FDA hope to gain insight into the relevance of recent toxicological and epidemiological studies to the safety of regulated products. FDA would like participants to address not only the validity of experimental approach but also risk "under conditions of use." FDA does not anticipate that they will be able to develop a regulatory decision from this program alone.

The meeting will be held in the Washington, DC area, possibly at the NIH auditorium. It will be scheduled for late fall (probably November) or for early 1994 (January).

The symposium will relate principally to ingredient use and safety as it applies to consumer products. (FDA anticipate that scientific studies relating to occupational uses of talc will contribute to the program as it relates to consumer products). Relative to OTC drug use of talc, FDA feel that someone from USP should at least serve on the panel for discussion and possibly make a presentation on USP specifications. Apparently, the OTC group thinks there should be a discussion of product labeling as it applies to OTC products, i.e., diaper rash could be discussed for adequacy and possible suggestions. FDA feel that this portion of the program would be useful in assessing whether or not the current USP specifications are adequate.

The proceedings of the symposium will probably be published (probably as a meeting summary, by rapporteurs).

FDA is budgeting $10,000 as financial contribution to the effort; industry has been asked to contribute $20,000; the remainder will be provided by ISRTP.

The anticipated format is to have some sort of "expert panel" in attendance throughout the meeting. FDA suggest that someone from industry (possibly a member of the CIR Expert Panel) and a consumer representative be invited to sit on the panel. Following the presentations, FDA would like to have ample time for discussions from the floor. The discussion will be led by members of the panel.

3. The following agenda has been proposed following discussions between ISRTP and FDA:

Protected Document--Subject to Protective Order

**DAY 1 -** The first day of the symposium will concentrate on inhalation health considerations, and will take the following format:

<u>Introduction</u> - introduce the topic, present the reasons for holding the symposium and provide some background about studies conducted on the safety of talc (historical perspective).  ISRTP have been asked to identify someone who can serve in this capacity.

<u>Manufacture of talc</u> - To discuss (1) how, and where, it is obtained (mineral sources), (2) specifications for talc as used in different products, and (3) quality control including steps to control and monitor asbestos contamination.  FDA stress that it is important for this presentation to describe the "specifications" for the material that is actually used in different products (i.e., particle size, impurities, etc).  CTFA has been asked to identify a suitable speaker.

<u>Uses of talc in different FDA-regulated products</u> - Specifically, what are the requirements for the use of talc in foods, drugs, cosmetics and medical devices and why they are critical.  (FDA suggest that this presentation may be combined with the previous one).

<u>Regulatory status of talc in the different product categories</u> - This topic will be discussed by one (or more) FDA officials.

<u>Health Perspectives</u> - Presentation and critique of the NTP inhalation study by various presenters (eg., Oberdorster, Goodman etc).

<u>Panel/Floor discussion</u>


**DAY 2 -** The second day will primarily cover ovarian cancer and talc, but epidermatology as it relates to inhalation exposure with will also be discussed.

<u>Introduction</u> - historical overview of the various epidemiology studies on talc (possibly in 2 parts):

a.   Epidemiology studies of occupational exposures (inhalation).

b.   Epidemiology studies on ovarian cancer.

<u>Risk factors in ovarian cancer</u>

<u>Harlow's Epidemiology studies of ovarian cancer and perineal exposure.</u>

Protected Document--Subject to Protective Order

<u>Meta-Analysis</u> - Discussion of the pros and cons of meta-analysis as a general statistical tool in measuring correlations in epidemiology studies.

<u>Panel/Floor discussion</u>

<u>Moderator wrap-up and close</u>

## III. <u>ACTION/NEXT STEPS</u>

1.  The Task Force agreed that it was clear that the ISTRP meeting will be held irrespective of industry input, but that such input was important.  The Task Force agreed that it was important that, as industry's representative, SGettings continue to participate at the ISRTP Planning Committee meetings and to offer advice and suggestions as outlined by the Task Force.

2.  The Task Force agreed that the level of sponsorship requested by industry was not prohibitive.  CTFA will send out commitment forms requesting <u>total</u> sponsorship from the Task Force of $20,000 (depending upon the number of participants, as low as $1,000 per company).

3.  The Task Force agreed that Dr. Bruce Semple (formerly of J&J, now with P&G) should be approached and asked to represent industry on the Panel (both days of the meeting).

4.  The Task Force agreed that a representative of one of the talc suppliers should make a presentation on (1) the production, processing and quality control of talc manufacturer; and (2) particle size and specifications for different product applications.  RZazenski agreed to provide a presentation outline and a suggested speaker within the next few days.  The Task Force agreed that all speakers will be representing the industry and that the Task Force will approve the contact of each industry presentation.

5.  The Task Force agreed that a representative of a finished-product manufacturers should make a presentation on consumer use/risk assessment of cosmetic products containing talc.  SGettings will get clarification on whether other speakers will address similar issues as they relate to other talc uses.  The Task Force suggested that BSemple would again be the most appropriate industry representative.    The Task Force agreed to begin assembling data which might form the basis of such a presentation.  It was noted that some of this information (on particle size and product notices) had previously been requested by FDA and that the Task Force had not been successful in collecting such information.  WAshton

JNJ 000011705

Pltf_JNJ_00001141

agreed to review, in particular, J&J's published data on exposure to talc.  RZazenski noted that a lot of useful information could be derived from the report prepared by JKalse for the Task Force.  LMacEachern noted the presentation should reference recent studies on talc (93-TA-12).  LMacEachern noted that the presentation should emphasize the safety of talc use.

6.   The Task Force agreed to review available information on occupational exposure from inhalation, and to discuss this issue at a follow-up meeting.

7.   The Task Force agreed that both Dr. Oberdorster and Dr. Wehner (both co-authors of the BEC Report) should be proposed as speakers (on lung overload mechanisms and the biological implausibility of ovarian cancer from talc exposure, respectively).  The Task Force agreed that industry should arrange for their attendance (at cost), ever if they are not selected as speakers.  It was also suggested that the Task Force may wish to arrange for the attendance of other consultants if necessary.

## IV.   ADJOURNMENT/NEXT MEETING

1.   It was noted that SGettings next meets with ISRTP in early August.  The Task Force agreed to hold a follow-up conference call within the next few days and to arrange a Task Force meeting in early September.

2.   There being no further business, the meeting was adjourned.

Respectfully submitted,

*Formulate Questions/answers regarding anything on TALC*

Stephen D. Gettings, Ph.D., D.A.B.T.
CTFA

*— literature survey in publication —*

*IAcc — inadequate evidence to show carcinogenicity —*

*ISRP — Industry FRIENDly*

*Expanse data into presentation — Consumer/user*

*Scripts questions from panel or audience, need experts to address questions.*

*Larger IARC comm. Brooklyn Coll.*

*— 3 wks for search*

*— Press release comment —*
*— Noach Rose (Geological Survey)*

*Silica — issue cosmetic Talc (B.P.) that contain crystalline silica that (0.1%? that is a carcinogen, industrial use — labeling req't if > 0.1% silica concentrate ↓*

JNJ 000011704

Pltf_JNJ_00001141

Exhibit 109

FEB 13 '98  02:37PM CTFA1                                    , P.1/3

# C T F A

THE COSMETIC, TOILETRY, AND FRAGRANCE ASSOCIATION

# MEMORANDUM

E. EDWARD KAVANAUGH
P R E S I D E N T

**DATE:**  February 13, 1998

**TO:**  **TALC INTERESTED PARTY TASK FORCE**

**FROM:**  Pandora Dennis
Administrative Assistant - Science

Please deliver this and the following page(s) to the corresponding individual in your company.
Thank you.

Ms. Debra Ambrose/**POLAR MINERALS**/(812) 838-4744
Mr. William Ashton/**JOHNSON & JOHNSON**/(908) 874-1254
Ms. Donna Beach/**COSMAIR**/(908) 499-2929
Dr. Daniel Briggs/**PROCTER & GAMBLE**/(513) 626-4399
Mr. Michael Chudkowski/**JOHNSON & JOHNSON**/(908) 874-1254
Mr. Shawn Hays/**POLAR MINTERALS**/(404) 934-4376
Dr. John Hopkins/**JOHNSON & JOHNSON**/(908) 874-1155
Mr. Daniel Johnson/**COMBE INCORPORATED**/(914) 694-1585
Mr. John Kelse/**RT VANDERBILT COMPANY**/(203) 853-1452
Mr. Louis Kotyuk/**WHITTAKER, CLARK & DANIELS**/(800) 833-8139
Mr. Mike Larson/**MINERALS TECHNOLOGIES**/(212) 878-1804
Dr. Laurie Pan/**MARY KAY COSMETICS**/(214) 905-6799
Dr. Steve Pennisi/**COMBE INCORPORATED**/(914) 694-1585
Mr. Thomas Pallone/**ALBERTO-CULVER**/(708) 450-3067
Dr. Thomas Re/**BRISTOL-MYERS**/(908) 851-6250
Ms. Janice Rogers/**GILLETTE**/(301) 590-1535
Dr. Bruce Semple/**PROCTER & GAMBLE**/ (513) 626-2977
Dr. Tracey Spriggs/**COLGATE-PALMOLIVE**/ (908) 878-7844
Ms. Elaine Stern/**HELENE CURTIS**/(312) 384-3539
Ms. Joan Thomas/**CTPA**/(011) 441714938061
Dr. Maureen Toulon/**AVON**/(914) 369-2898
Mr. Richard Zazenski/**LUZENAC AMERICA**/(303) 643-0446

H:\SCIENCE\LJL\DATA\WPDOCS\TALC\FAXCOVER.2

1101 17TH ST., N.W., SUITE 300   WASHINGTON, D.C. 20036-4702
202.331.1770    FAX 202.331.1969
http://www.ctfa.org
SECURING THE INDUSTRY'S FUTURE SINCE 1894

Protected Document – Subject to Protective Order

LUZ011963

Plaintiff's Exhibit
No.
**P-83**

1 of 1

Pltf_LUZ_00005093

Exhibit 130



TITLE:    Talc IP - Revenue Received
GENERAL LEDGER ACCOUNT:    #25078
DATE INITIATED: 08/17/92

| PARTICIPANTS: | 1992 | 1993 | 1994 | 1997 | 2000 | 2001 | 2005 | 2008 | 2009 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Alberto-Culver | | | | 500 | | | | | | 500 |
| Avon Products | 5,000 | 2,000 | 894 | | 10,000 | 2,000 | | | | 19,894 |
| Bristol-Myers / Clairol | | | | 500 | 6,000 | 1,500 | | | | 8,000 |
| Carter-Wallace, Inc. | 5,000 | | | | | | | | | 5,000 |
| Colgate-Palmolive | 5,000 | 2,000 | 894 | 500 | | | | | | 8,394 |
| Combe Inc. | | | | 500 | | | | | | 500 |
| Cosmair, Inc. | 5,000 | 1,500 | 894 | 500 | 1,000 | | | | | 8,894 |
| Estee Lauder, Inc. | 5,000 | | | | | | | | | 5,000 |
| Helene Curtis / Unilever | 5,000 | 1,500 | 894 | 500 | 31,000 | 6,500 | | | | 45,394 |
| Johnson & Johnson | 5,000 | 2,000 | 9,310 | 500 | 151,000 | 7,500 | 15,000 | | | 190,310 |
| L'Oreal | | | | | 10,000 | 2,500 | | | 2,500 | 15,000 |
| Luzenac America | 5,000 | 2,000 | 894 | 500 | 31,000 | 7,500 | | | 2,500 | 49,394 |
| Mary Kay Cosmetics | 5,000 | 1,000 | 894 | 500 | 1,000 | 500 | | | | 8,894 |
| Maybelline, Inc. | 5,000 | 1,500 | 894 | | | | | | | 7,394 |
| Pfizer/Minerals Tech. | 5,000 | 1,500 | 1,126 | | | 500 | | | | 8,626 |
| Polar Minerals | | | | 500 | 1,000 | 500 | | | | 2,000 |
| Procter & Gamble (incl Noxell) | 5,000 | 2,000 | 894 | 500 | 1,000 | | | | | 9,394 |
| Schering-Plough Corp. | 5,000 | 1,500 | 894 | | | | | | | 7,394 |
| US Cosmetics Corp. | 5,000 | | | 500 | | | | | | 5,500 |
| R. T. Vanderbilt | 5,000 | 1,500 | 894 | 500 | 1,000 | | | | | 8,894 |
| Whittaker, Clark & Dan. | 5,000 | 1,000 | 894 | 500 | 1,000 | | | | | 8,394 |
| American Westmin | 5,000 | 1,000 | 894 | | | | | | | 6,894 |
| Mary Kay Cosmetics | | | | | | | | 2,500 | | 2,500 |
| Procter & Gamble | | | | | | | | 2,500 | | 2,500 |
| Revlon | | | | | | | | 2,500 | | 2,500 |
| The Dial Corp | | | | | | | | | 2,500 | 2,500 |
| | 85,000.00 | 22,000.00 | 21,164.00 | 7,500.00 | 245,000.00 | 29,000.00 | 15,000.00 | 7,500.00 | 7,500.00 | 439,664.00 |

Exhibit 111

## Luzenac America

### Profile

- 4 Talc Mines & 8 Mills in North America
- 500,000 TPY
- $85 MM Sales
- Primary Markets
  - Paper
  - Polymers
  - Paint & Coatings
  - Personal Care (i.e. J&J Baby Powder)

Protected Document – Subject to Protective Order

–1

LUZ022044

Pltf_LUZ_00008793

JNJTALC000249618



Protected Document – Subject to Protective Order

—2

LUZ022045

Pltf_LUZ_00008793

JNJTALC000249619

## NTP Listing Consequences

- Immediate Loss of Personal Care Market
  - $10,000,000 in Year 1
- Deterioration of all Markets due to Labeling
  - 20 to 50% of remaining sales year 3
- Regulated as a Carcinogen Worldwide

- Talc Litigation likely to Proliferate

--3

Protected Document – Subject to Protective Order

LUZ022046

**3 of 7**

**Pltf_LUZ_00008793**

JNJTALC000249620

## Talc Health Issues

- Risk Factor in Ovarian Cancer
  - Perineal dusting by women
  - No causal explanation
- 1992 NTP Rodent Study
  - Lung tumors in female rats
  - Lung overload phenomenon
- Association with Asbestos
  - Long-held public perception
  - Chemical similarity

Protected Document – Subject to Protective Order

–4

LUZ022047

Pltf_LUZ_00008793

JNJTALC000249621

## NTP Talc Review Summary

- Review Group 1 voted 6-1 *to List* Talc
  - Cited ovarian studies and NTP Rodent study
- Review Group 2 voted 7-1 *to List* Talc
  - Cited ovarian studies and NTP Rodent study
- BSC Subcommittee Voted 7-3 *Not to List* Talc
  - Influenced by industry comments and criticisms of NTP Report on Talc
- NTP Exe. Committee Defers Vote on Talc
  - Remands issue back to NTP reviewers

--5

Protected Document -- Subject to Protective Order

LUZ022048

Pltf_LUZ_00008793

JNJTALC000249622

## Luzenac Defense Strategies

- Unite Behind the Cosmetic, Toiletry & Fragrance Association (CTFA)

- Engage Services of the "Center for Regulatory Effectiveness (CRE)"

- Aggressive Corporate Position

—6

Protected Document -- Subject to Protective Order

LUZ022049

Pltf_LUZ_00008793

JNJTALC000249623

## OUTLOOK

- Deferral Due to "Fatal Flaws" in Draft Report
- Temporary "Reprieve" for 2-3 Years
- Insist Upon the Need for Additional Studies
- Updates on Gertig et al. Study of 76,630 U.S. Women - No Increased Risk with Talc Usage
- Re-examine Prior Epidemiology Studies - Negative Dose Response?
- IARC Re-examination of Talc a Possibility

—7

Protected Document – Subject to Protective Order

LUZ022050

**7 of 7**

**Pltf_LUZ_00008793**

JNJTALC000249624

Exhibit 112



92-SE-328

92-SAC-24

*E. Edward Kavanaugh*
President

## MEMORANDUM

TO:        Scientific Advisory Committee

FROM:    G.N. McEwen, Jr., Ph.D., J.D.
           Vice President - Science

DATE:     July 17, 1992

SUBJ:     TALC SAFETY INTERESTED PARTY

The conclusions in two recent studies question the safety of cosmetic grade talc. A draft report of one study, involving daily, lifetime inhalation of massive amounts of talc in rats and mice, concludes there is clear evidence that talc is a carcinogen for female rats, and some evidence that it is a carcinogen for male rats. There was no evidence of carcinogenicity in male or female mice. The other study concludes that there is an association between talc use in the perineal area and ovarian cancer in women. CTFA will provide copies of these reports upon request.

Although CTFA is convinced that these studies do not suggest any hazard from normal use or foreseeable misuse of personal-care products or cosmetics containing talc, such reports may have wide implications for classification and characterization of talc by various regulatory agencies, including OSHA, FDA, and California's Office of Environmental Health Hazard Assessment, responsible for listing substances for Proposition 65.

CTFA has instituted an Interested Party Task Force to address these studies. The Task Force is developing a strategy to defend the continued safe use of talc, and is open to those companies willing to provide financial support for this activity. For further information on how to join the Task Force, please contact Dr. Stephen Gettings, Director, Toxicology, CTFA.

GNM/pcl
cc:    Scientific Advisory
        Executive Committee

*The Cosmetic, Toiletry, and Fragrance Association*
*1101 17th Street, N.W. • Suite 300 • Washington, D.C. 20036 • (202) 331-1770 • Fax (202) 331-1969*

**Plaintiff's Exhibit No.**

**P-122**

Protected Document--Subject to Protective Order

JNJ 000021035

Pltf_JNJ_00000609

Exhibit 113

CALL REPORT
Luzenac America

Date: __11/8/93__      Regional Manager: __J. A. Tracy_____
Date of Call: __11/8/93__      Accompanied By: _____

Cust Name: __Carter Wallace_____      Cust#: __05258/0000____
City & State: __Trenton, NJ_____      Industry Code: ___05:001_____
Contacts: __Deborah Richardson, Purchasing Agent_____

Prod#: __11234____   Descrip: __Vertal 1500USP__ Qty: __200TPY___   Price: ____

Comp#1: __DeGussa____   Prod: __Hydrated silica__ Qty: _____   Price: _____
Comp#2: _____   Prod: _____   Qty: _____   Price: _____

PRODUCT APPLICATION: Dusting of latex rubber condoms.

OBJECTIVE: Find out the status of the replacement of talc, and discuss the Johnson plant closing.

SUMMARY:  Debbie said that they have switched from talc to hydrated silica that they get from DeGussa.  Huber is another approved supplier.  She said that the silica is so light and fluffy that they have built a closed dusting system to contain the dust.  I asked her if they were not concerned about the use of silica.  She said they were, but felt that the only problem was with respirable silica.  Their closed system they feel is sufficient protection for their workers.

She said that they were pleased with the performance of talc, but were concerned because a CTFA report in July 1992 said that there was suspicion that talc could cause ovarian cancer.  Although the report didn't say that it was a cause, Carter Wallace is concerned about future litigation.

Debbie said that if silica becomes a problem, they might look at talc again.

ACTION REQUIRED:  No action required.

Protected Document - Subject to Protective Order

IMERYS-A_0006056

Exhibit 114

January 2, 2002

**Principal Argument for Adopting Luzenac America's NTP Strategy**

We engaged the council of the Center for Regulatory Effectiveness ("CRE") in November 2000 for the purpose of providing us direct assistance in developing a business strategy to challenge the NTP talc review. CRE 'knows' NTP. CRE knows many of the individuals personally – most importantly, the key decision-makers. They know how NTP operates, both technically and politically. CRE knows how NTP 'values' the significance of published human and animal studies CRE knows the influential people from the other agencies who get involved in the review process. Simply put, CRE possesses the knowledge and experience to help us effectively mount a strategic challenge to the NTP talc review.

From the beginning, CRE has recommended that we adopt an aggressive (professional) approach with NTP. Our technical (and legal) arguments have alternated between Luzenac and CRE letterhead  - designed to maximize the intended effect.

Presently, CRE believes the request for by Dr. Olden (NTP Director) presents us with an opportunity to 'proactively' submit a detailed literature research paper that not only directly addresses the unresolved issues (mineralogy), but also other controversial issues that we anticipate will (or should) resurface (epidemiology, causation, consistency of results). It affords us the opportunity to initiate the agenda for discussions with NTP.

To reject their recommendations in this important process would be unwise.

**For the Record**

In November 2000, Luzenac discovered the "fatal flaw" in the NTP report. With the help of CRE we exploited this issue with NTP which ended in the deferral decision by the NTP Executive Committee.

The public record will reflect that Luzenac America was the only talc-interested-party who recognized this fatal flaw (and winning strategy).

> Meli to NTP; Nov. 30, 2000
> "A critical error in the fundamental logic of the NTP's own line of argument **categorically invalidates the NTP conclusion**….proposed by RG1 and RG2 that "Talc not containing asbestiform fibers is reasonably anticipated to be a human carcinogen."
>
> 'It is also recommended that the Board of Scientific Counselors Subcommittee notify Review Groups 1 & 2 that their conclusion relative to talc not containing asbestos fibers is not supported by the data. The arguments and assumptions made by the reviewers in the text of the Draft Background Document **unquestionably contradict their own conclusion**…"
>
> "It is clear that the premise on which NTP has assessed the literature and safety issues relating to all forms of talc is **seriously faulted and cannot be used** as a reasonable basis for nomination as an anticipated human carcinogen."
>
> Harris to NTP; May 1, 2001
> "..and if they (RG1 and RG2 recommendations) were to be submitted to the Director of NTP and the Secretary as valid recommendations, a final decision to list talc not containing asbestiform fibers in the Report would be **arbitrary** and **capricious**, an **abuse of discretion**, or otherwise **not in accordance with law**, and **would be set aside by the Federal courts** pursuant to the Administrative Procedure Act."

Protected Document – Subject to Protective Order

IMERYS 179104

**KEY POINTS**

1. Joachim Roeser must understand that it was the strategy and actions of Luzenac America (not Luzenac Group or Eurotalc) that led to the talc deferral decision (in order for him to respect our current recommendations). Inexplicably, despite the soundness of our strategy, Luzenac Group repeated opposed our intended actions throughout the process.

2. CTFA and the talc interested parties have been minimally effective during this NTP review. It is a management problem. They have not demonstrated the leadership necessary to coordinate a diligent, on-going defense of talc. In the spirit of "Either lead, follow, or get out of the way", I recommend Luzenac America (with "CRE") advance our agenda with an invitation to others to follow. I do not favor the "committee approach" to NTP where no one is formally in charge.

3. I am not at all concerned about angering CTFA or any of its members who might be customers. With our entire business literally at stake, we have the "standing" to do what we feel is necessary in this battle for survival. As an aside, only J&J and possibly one other company expressed interest in further funding of the consultants utilized by CTFA last December.

4. We have every right to employ scientific reasoning and logic to the evaluation of health studies involving talc (outside of mineralogy issues). If we bring to light questionable conclusions or flaws in a published study, other experts can then be asked to forward their opinions on the issues. At a minimum, the NTP reviewers would be obligated to discuss and debate our points of contention (e.g., talc detected in ovarian tissue).

Protected Document – Subject to Protective Order

Exhibit 115

## NARRATIVE
## TALC – NTP REGULATORY CHALLENGE

Good morning everyone. My name is Steve Jarvis and I am responsible for Health, Safety, and Environmental matters for Luzenac America.

This morning…it is my distinct pleasure to present to you a summary of our most recent regulatory challenge involving the National Toxicology Program and their review of talc for potential listing in the 10th Report on Carcinogens.

But first….for those who may not know exactly what we do …..I'd like to introduce you to Luzenac America.

### SLIDE 1

Luzenac America is part of the Luzenac Group of Companies. Headquartered in France, Luzenac Group is the world largest commercial producer of talc products.

In North America…….. Luzenac America operates 4 talc mines and 8 talc milling operations…….We have large operations based in Ontario, Vermont, and Montana. ………… Luzenac America is

1

**Plaintiff's Exhibit No.**

**P-12**

headquartered in Denver Colorado where we also have our Research and Development Center.

Luzenac America mines and processes around a half-a-million tons per year generating approximately <sup>Redacted</sup>         in sales.

Our major markets are talc sales to paper, polymers and paint markets……. and to a lesser degree, personal care products………

You might be interested to know that we produce all the baby powder for Johnson & Johnson – including the talc for their popular adult product, Shower-to-Shower.  As an interesting aside, would you believe that Luzenac talc also goes into Cipro??  It's True!………….

## SLIDE 2

Our major regulatory challenge……… a challenge I might add that Luzenac absolutely could not afford to lose ……………….came from the NTP.

The NTP was authorized by the United States Congress to coordinate interagency toxicological testing and to publish the formal "Report on Carcinogens" which comes out about every 18-24 months……….  To be listed in the RoC can be

2

devastating to a substance because of mandatory labeling requirements by OSHA and Proposition 65 in California.

In early 2000, NTP nominated talc for possible listing in the RoC because back in the early 1990's, the NTP published the results of a 2-year talc inhalation study on rats and mice and concluded that talc caused lung tumors in female rats………

More on that in a minute.

## SLIDE 3

A listing of talc in the RoC would have devastating consequences for the talc market worldwide.

First of all……we would see a virtual immediate loss of our sales to the personal care market – around $10 Million in sales in the first year.

Secondly…….because of the carcinogenic labeling requirements, we would likely suffer a deterioration of sales in all markets….perhaps anywhere from 20% to 50% of all remaining sales by year-three.

Additionally, a listing in the U.S. by NTP would likely trigger a carcinogenic status for talc in Europe and the Far East.

3

And finally……. because of our consumer product exposure, civil litigation would likely skyrocket.

As I mentioned, simply devastating consequences.

## SLIDE 4

Now realistically….. there are some health issues with talc.  For nearly 20 years, epidemiologists have been finding a weak, but persistent statistical link between the hygienic use of talc and ovarian cancer.  However……. the studies are weakened by no one being able to offer any feasible "causal" explanations as to how and why talc would cause ovarian cancer……..but not a multitude of other cancers in the human anatomy.

As I mentioned, there is the 1992 rodent study by NTP, which found lung tumors in female rats.  However, many other leading experts discount this finding claiming the tumors were a result of lung overload  - simply too much inert dust in the lungs triggering an traumatic auto-immune response from the rats.

And finally, there is the long-held public perception that all talc contains asbestos.  And even if it

4

doesn't, they are so similar chemically, that talc probably behaves like asbestos.

So these are some of the primary issues and concerns that served as the backdrop for the NTP review.

## **SLIDE 5**

Okay….so here's what happened.

NTP announces in early 2000 that talc is going to be review.  While this announcement catches us off guard, we are not alarmed.

But then, in October of 2000, NTP issues their draft report on talc and announces that the first two formal reviews resulted in votes to list talc as a carcinogen.  The combined vote was 13-2 to list.

The entire talc industry, as well as companies like J&J were absolutely, positively, unquestionably, flabbergasted………. We simply could not believe it.

But now we had only two months to prepare for the third NTP review meeting……… a public meeting of the influential Board of Scientific Counselors Subcommittee.   This occurred in December of last

5

Protected Document - Subject to Protective Order

IMERYS-A_0021925

**Pltf_IMERYS_00044439**

year and we achieved a very dramatic turnaround. The BSC subcommittee voted 7-3 *not* to list talc.

And finally……we fast-forward to this past June for the fourth and final review process.  We see the NTP Executive Committee took the unprecedented action to actually *"stop"* the review process on talc and send it back to the beginning.  They did this by deferring a final vote on talc.

And make no mistake about it, they knew if they proceeded with a listing nomination for talc, Luzenac America was going to challenge them in Federal Court……and as the facts lay out, NTP would likely lose.  Of that we are fairly certain!

## <u>SLIDE 6</u>

Our successful defense strategy was threefold.

First…………we continued to work through the auspices of the CTFA – the Washington based trade association for the cosmetics industry.  As you might imagine, Luzenac and Johnson & Johnson wield considerable influence on the talc subcommittee.

Secondly…….and this was our secret weapon, engage the services of the Washington based

6

IMERYS-A_0021926

**Pltf_IMERYS_00044439**

Center for Regulatory Effectiveness, CRE.  Since its formation in 1996 by several ex-high ranking officials in the OMB, CRE has grown into a nationally recognized…and relatively respected… regulatory watchdog organization.  Federal agencies frequently come to them for assistance. CRE has also taken NTP to court.

And thirdly, we decided to be aggressive.  This was a fight we simply could not lose.  As such, we retained expert legal counsel to ensure we would have a solid foundation for a legal challenge if necessary…….it was the same firm which assisted CRE in their court battle with NTP……..and we also became very aggressive in our communication with NTP and other federal agencies.  When didn't let the windows of "formal comment periods" become restrictive.  We sent e-mails, faxes, overnight letters, and even telephones calls to key players in this battle….right up until hours before the final Executive Committee meeting.

And we believe these strategies paid-off.

7

Protected Document - Subject to Protective Order

IMERYS-A_0021927

Pltf_IMERYS_00044439

## SLIDE 7

While we certainly would have preferred a total victory – where NTP declared talc was not a human carcinogen……..we were relieved to at least get the review process "derailed" for now……….at least we have some "breathing space" to prepare a thorough, scientific defense of talc.

One of the issues we plan to focus on is demonstrating to NTP that virtually all of the epidemiology studies they previously used must be declared invalid for use in assessing talc "not containing asbestos".   This will be an expansion of the "Fatal Flaw" defense Luzenac employed in the first review on talc.

Additionally, we believe the latest epidemiology study which IS valid with regard to talc quality….it's called the Gertig study……..and which also happens to be the largest study as well….. shows no increased risk of ovarian cancer.  The significance of this study must be more heavily weighted than prior studies.

Any predictions at this point?   Hard to say…but our hard fought victory this past year has given us some confidence and direction.

8

One last point……..lest we get complacent..
………regardless of what happens with NTP, we also have to keep an eye out for IARC.  IARC reviewed talc back in 1986 and concluded there was insufficient evidence of talc carcinogencity in humans.  We are hoping that this NTP activity doesn't stimulate IARC conduct an "end-run" around NTP declare talc a possible human carcinogen…………..because I think you all know, we do not have the ability to become an active participant in that relatively "closed" process.

Thank you for your time.

9

Protected Document - Subject to Protective Order

IMERYS-A_0021929

Pltf_IMERYS_00044439

Exhibit 116

MAR.26.2002   7:38AM   LUZENAC                                    NO.610   P.1



**FACSIMILE**

| | | | |
|---|---|---|---|
| DATE: | March 26, 2002 | FROM: | **Richard J. Zazenski**<br>Director Product Safety |
| **TO:** | **Bill Ashton**<br>**J&J** | PHONE | 303-643-0404 |
| | | e-MAIL | rzazensk@luzenac.com |
| | | FAX: | 303-799-8926 |
| cc: | | Number<br>of Pages:<br>(including<br>Cover Sheet) | **13 pages** |

## *CONFIDENTIAL*

Redacted



**Plaintiff's Exhibit
No.

P-27**

Protected Document--Subject to Protective Order                        JNJ 000000636

**Pltf_JNJ_00003682**

MAR.26.2002   7:38AM   LUZENAC                                    NO.610   P.2

Redacted

**One other note** – We've been successful thus far in fending off the NTP classification of talc as being a potential human carcinogen.  But we must also keep an eye out for IARC.  If they decide to re-review the status of talc because of all the ovarian epidemiology studies that have been published **since 1986**, IARC can surprise us all and decide to list "talc" as a potential human carcinogen.  IARC reviews are not a public debate.  Unlike NTP, IARC is answerable to no one politically (they are headquartered in Lyon, France of all places).  As part of the World Health Organization, they act very independently to protect the citizens of this planet from "preventable" diseases.  Their threshold for required medical evidence is predictably quite minimal.

You might want to counsel your management on this potential (and not to be too complacent about the status of talc).

_____

**Attached with this fax:**
1 page on IARC (who they are).
2 pages on IARC's 1986 review of talc.
8 pages on their 1996 re-review of all forms of silica.

If any pages are unclear, please contact us.

**luzenac group**

JNJ 000000637

**2 of 3**

**Pltf_JNJ_00003682**

**HP OfficeJet G Series G85**
**Personal Printer/Fax/Copier/Scanner**

**Fax-History Report** for
TECHNICAL ASSURANCE
(908)874-1126
Mar 26 2002 8:16am

## Last Fax

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Mar 26 | 8:15am | Sent | 918593924202 | 1:06 | 1 | OK |

Result:
  OK - black and white fax
  Okay color - color fax

Protected Document--Subject to Protective Order

JNJ 000000638

Pltf_JNJ_00003682

Exhibit 117



**Luzenac** AMERICA
DENVER TECHNICAL CENTER
8985 E. NICHOLS AVE. • ENGLEWOOD, CO 80112 • USA

**INTEROFFICE MEMORANDUM**

DATE:     September 12, 2000

TO:       R. Bernstein; J. Gauntt; R. Meli

CC:

FROM:     Carl E. Kollmar

**SUBJECT:   Cosmetics Consultant Update**

Richard Dodwell has filed his Progress Report. At this stage of the project he has completed all fax and telephone surveys and interviewed Luzenac's salespeople. At this time, there appears to be two problems with the market survey. First, several major body powder players have chosen not to respond to the surveys. This is an issue we need to consider. Second, Luzenac's major cosmetics distributor, WC&D, has not been interviewed. This is because Tom Grunstra, their in-house talc expert, has been out sick for several weeks.

Although we are missing input from several major players, I think there are some basic facts coming to light:
- Health is an issue to large body powder customers - a non-issue in other segments.
- The large volume body powder segment is not growing, although the decline of the past few years appears to have bottomed out. There is some growth in other segments.
- Other than soap bars, there appear to be limited growth opportunities (new markets/new products) for talc.

In my opinion, the large volume body powder portion of this business is not growing, it is price sensitive, there is aggressive competition (supplier and customer) and the omen of health concerns/liabilities hangs over it. This does not appear to be a market of opportunity for Luzenac at this time. Opportunities for growth appear to be limited to the soap bar segment -- but the health/liability concerns remain.

In the details of Dodwell's report he identifies six major areas of interest: customer concerns, market growth, pricing, health concerns, competition and responsiveness to the survey.

EXHIBIT
24

Protected Document – Subject to Protective Order

LUZ006507

**Pltf_LUZ_00001067**

JNJTALC000716846

## Customer Concerns

There are three major concerns expressed by customers:

- The closing of a Montana mine has caused some disruption in the market. I assume they are referring to the closing of the Beaverhead Mine and the subsequent discontinuance of the Supreme and Olympic products. Some customers are still using old stockpiled material and have either not found or tested a suitable alternate.
- The technical service from Luzenac has declined, but the rest of the service package (quality, delivery, etc.) is well regarded.
- The health issue is taken seriously by large users (mainly body powder customers), and mostly ignored by the smaller segments and packagers.

## Market Growth

- The market is growing in many sectors, but remaining static in the body powder applications. It appears that business in the body powder segment is merely shifting around, particularly amongst the packagers.
- There are no new applications for talc, except some work in soap bars. One soap bar company, P&G, appears ready to move to customer trials and market testing.
- Surface treated talcs hold some promise, but more application research by the talc suppliers is needed to demonstrate the merits.

## Pricing

- Pricing is an issue to the large volume consumers, but not an issue with the smaller higher value segments where quality, technical service and product performance are the key requirements expected of a supplier.

## Health Concerns

- Some companies label their products "Talc Free", but this is more for advertising and sales promotion than to address health concerns.
- The general public is not aware of any health issues regarding talc.

## Competition

- Most of the decline in talc usage has occurred during the past 5 years and has bottomed out.
- There are no serious replacement threats to talc. "Wheat", "Oat Flour" and "Corn Starch" are not direct threats to talc since they were introduced under the "natural" and "organic" banners. Although they have replaced some talc, they have proved to be less than ideal and are now more often used in blends with talc.

Protected Document – Subject to Protective Order

LUZ006508

Pltf_LUZ_00001067

JNJTALC000716847

- Not many customers expressed a preference for a talc supplier, but those that did mentioned Luzenac.

**Responsiveness to Survey**

Several companies would not respond unless the survey sponsor was revealed – this was the over-riding concern of those that did not respond to the surveys. In addition, large body powder users were reluctant to respond to this survey because of health liability concerns and, to a lesser extent, because their companies have a policy against revealing confidential information.

At this point, Dodwell has contacted 96 companies and achieved a level of response slightly above 35% - I think this is better than expected.

- Twenty-one companies were called twice with no response and appear to use their voice mail as a screening tool. They include Coty, Kolmar Labs, Maybelline, Revlon (NJ), Colgate Palmolive and Amway.
- Eleven companies generally refused to participate in the survey. This group included J&J, MK Packaging, Thornton, Lancome/Cosmair, Lander, Estee Lauder and Revlon (NC).

Obviously, we are missing an input from several of the major players. To get their input we would have to either reveal the survey sponsor and/or raise their level of interest to respond. Their level of interest can be raised by appealing to their self-interest – "if I don't respond to this survey it may affect my supply of talc". In either case, a personal visit may be required. As I mentioned during my update at the last Management Meeting, revealing the sponsor or raising their level of interest is a double-edged sword – it either brings forth the desired response out of self-interest, or it generates a concern over the supplier's viability and loyalty to the market. It could cause them to consider other talcs or talc alternatives. At this point, I would recommend that Dodwell make no further extraordinary efforts to pursue those who are not responding. This can be a topic of discussion when Dodwell presents his findings at the October 5th meeting in Denver.

Protected Document – Subject to Protective Order

Exhibit 118

*Johnson & Johnson*
CONSUMER PRODUCTS. INC.
SKILLMAN, NJ 08558-9418

August 3, 1992

**CONFIDENTIAL**

SUBJECT:     TALC FRANCHISE

TO:             C. D. SIMONDS

Consumer confidence in talc has been slowly eroding, but among health care professionals, trust in its safety and benefits is poor. And, for the first time in over a decade, the FDA is now requiring reassurance. We have enjoined "risky" research with talc in the past - inhalation toxicity, translocation from the lungs, and genital migration studies. The time is ripe for some good news to definitively quieten theorizing critics.

My summary recommendations are as follows to re-establish our leadership in the talc category and rebuild its franchise:

1.      Control any potential for inhalation by adding a small amount of lanolin oil to trap the respirables. This will also add a point of difference and improve both skin feel and benefits.

2.      As rapidly as possible, underline(complete) the autopsy study of the mineral particle distribution in the organs of men versus women.

We should discuss this as soon as possible.

ADDENDUM

This morning I received your note attached to the new Cramer study. Our discussion earlier touched on this.

In summary:

1)      A CTFA Task Force will fund a critical review of this paper, plus all other similar epidemiological studies to defuse the potential of anyone publishing a meta-analysis of all of them. You approved an expenditure for this effort.

2)      The same CTFA Task Force will seek an evaluation of the NTP Inhalation Study which showed cancer in rodents. This refutation is critical to prevent the study results appearing on MSDS forms. You also approved our financial contribution to this effort.

3)      At the first meeting of the Task Force, it was clear that "industry" agrees that a refutation of the ovarian cancer hypothesis based solely on discrediting existing publications, is only a "finger-in-the-dyke". I believe that they would be supportive of completing the autopsy study discussed above because it is the only way to finally put this issue to rest.

B. Semple

/cls

JNJTALC000224218

*Johnson & Johnson*

| Office Of | NEW BRUNSWICK, N.J. |
| GENERAL COUNSEL | |

December 5, 1994

SUBJECT: <u>RITTER V. CYPRUS (WINDSOR MINERALS)</u>

William Ashton
Donald Jones

**Redacted: Attorney-Client Privilege and Work Product**

John C. O'Shaughnessy

JCO:jcm
Enc.
cc:    R. Miller

JNJTALC000224218_00001

Exhibit 119

Mark Pollak

```
1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEW JERSEY

3

4    ------------------------------x

5    IN RE JOHNSON & JOHNSON         ) MDL No.

6    TALCUM POWDER PRODUCTS          ) 16-2738 (FLW)(LHG)

7    MARKETING SALES PRACTICES,      )

8    AND PRODUCTS LIABILITY          )

9    LITIGATION                      )

10                                   )

11   THIS DOCUMENT RELATES TO        )

12   ALL CASES                       )

13   ------------------------------x

14

         VIDEOTAPED 30(b)(6) DEPOSITION OF DEFENDANT

15          PERSONAL CARE PRODUCTS COUNCIL,

       by and through its Designated Representative,

16

                     MARK POLLAK

17

                  WASHINGTON, D.C.

18

              WEDNESDAY, AUGUST 29, 2018

19

                     9:30 A.M.

20

21

22

23

24   Reported by: Leslie A. Todd
```

Mark Pollak

1         Deposition of MARK POLLAK, held at the offices

2     of:

3

4

5              SEYFARTH SHAW LLP

6              975 F Street, N.W.

7              Washington, DC 20004

8

9

10

11

12        Pursuant to notice, before Leslie Anne Todd, Court

13    Reporter and Notary Public in and for the District of

14    Columbia, who officiated in administering the oath to

15    the witness.

16

17

18

19

20

21

22

23

24

Mark Pollak

```
 1                    A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFFS:

 4         RICHARD M. GOLOMB, ESQUIRE

 5         GOLOMB & HONIK

 6         1835 Market Street

 7         Suite 2900

 8         Philadelphia, Pennsylvania 19103

 9         (215) 985-9177

10

11         P. LEIGH O'DELL, ESQUIRE

12         RYAN BEATTIE, ESQUIRE

13         BEASLEY ALLEN LAW FIRM

14         218 Commerce Street

15         Montgomery, Alabama 36103-4160

16         (800) 898-2034

17

18         MICHELLE PARFITT, ESQUIRE

19         ASHCRAFT & GEREL, LLP

20         4900 Seminary Road, Suite 650

21         Alexandria, Virginia 22311

22         (703) 997-1774

23

24
```

Mark Pollak

```
 1    APPEARANCES (Continued):

 2    ON BEHALF OF PCPC AND THE WITNESS:

 3         THOMAS LOCKE, ESQUIRE

 4         SEYFARTH SHAW LLP

 5         975 F Street, NW

 6         Washington, DC 20004

 7         (202) 463-2400

 8

 9    ON BEHALF OF JOHNSON & JOHNSON DEFENDANTS:

10         JACK N. FROST, JR., ESQUIRE

11         DRINKER BIDDLE & REATH, LLP

12         600 Campus Drive

13         Florham Park, New Jersey 07932-1047

14         (973) 549-7338

15

16         SANDRA J. WUNDERLICH, ESQUIRE

17         TUCKER ELLIS, LLP

18         100 South 4th Street

19         Suite 600

20         St. Louis, Missouri 63102

21         (314) 256-2544

22

23

24
```

Mark Pollak

```
 1    APPEARANCES (Continued):

 2

 3    ON BEHALF OF THE IMERYS DEFENDANTS:

 4         JONATHAN F. DONATH, ESQUIRE

 5         COUGHLIN DUFFY, LLP

 6         350 Mount Kemble Avenue

 7         Morristown, New Jersey 07962

 8         (973) 267-0058

 9

10         CATHERINE SLAVIN, ESQUIRE

11         GORDON & REES SCULLY MANSUKHANI, LLP

12         Three Logan Square

13         1717 Arch Street, Suite 610

14         Philadelphia, Pennsylvania 19103

15         (215) 717-4006

16

17    ALSO PRESENT:

18         EMILY H. MANOSO, Staff Counsel, PCPC

19         THOMAS F. MYERS, Staff Counsel, PCPC

20

21         DANIEL HOLMSTOCK (Videographer)

22         JONATHAN VADERS (Technical Support)

23         ZACH HONE (Technical Support)

24
```

Mark Pollak

```
 1                  C O N T E N T S

 2   EXAMINATION OF MARK POLLAK                PAGE

 3       By Mr. Golomb                          8

 4

 5

 6

 7                  E X H I B I T S

 8              (Attached to transcript)

 9   POLLAK DEPOSITION EXHIBITS                PAGE

10   No. 1     The Plaintiffs' Steering Committee's

11             Second Amended Notice of the

12             30(b)(6) Deposition of Defendant

13             Personal Care Products Council       30

14   No. 2     PCPC Organizational Chart            33

15   No. 3     Document with title "Talc IP -

16             Revenue Received"                    61

17   No. 4     Document entitled "Payments to

18             Entities Identified in Plaintiffs'

19             Notice of Deposition"               112

20   No. 5     CTFA Mission Statement, Bates

21             PCPC0052417                         127

22   No. 11    Bates IMERYS 118791                  93

23   No. 12    Bates IMERYS 118792                 132

24
```

Mark Pollak

```
 1              P R O C E E D I N G S

 2              -------------------

 3              THE VIDEOGRAPHER:  We are now on the

 4   record.  My name is Daniel Holmstock.  I am the

 5   videographer for Golkow Litigation Services.

 6   Today's date is August 29th, 2018, and the time is

 7   9:30 a.m.

 8              This video deposition is being held in

 9   the law offices of Seyfarth Shaw, LLP, at 975

10   F Street, Northwest, in Washington, D.C., in the

11   matter of In Re: Johnson & Johnson Talc-Based

12   Powder Products Marketing, Sales Practices, and

13   Products Liability Litigation.  It is pending

14   before the United States District Court for the

15   District of New Jersey, MDL No. 16-2738.

16              The deponent today is Mr. Mark Pollak.

17              Counsel will be noted on the

18   stenographic record.  The court reporter is

19   Leslie A. Todd, who will now administer the oath.

20                   MARK POLLAK,

21       and having been first duly sworn,

22       was examined and testified as follows:

23       EXAMINATION BY COUNSEL FOR PLAINTIFFS

24   BY MR. GOLOMB:
```

Mark Pollak

```
1         Q    Good morning, Mr. Pollak.  My name is

2    Richard Golomb.  We met several years ago when I

3    took your deposition in -- in another one of these

4    cases.

5              Do you recall that?

6         A    Yes, I recall.

7         Q    And if you could keep your --

8         A    Yeah.

9         Q    -- voice up so everybody --

10        A    Yes, I recall.

11        Q    -- in the room can hear you.

12             And in preparation for your deposition

13   here today, did you have a chance to read your

14   deposition transcript from that prior deposition?

15        A    Yes, I did.

16        Q    All right.  Let me just mention a couple

17   of things.  As you -- I assume that you have seen

18   the notice of deposition which requires your

19   attendance here today.

20        A    Yes.

21        Q    All right.  And we'll -- we'll go

22   through that in a little bit more detail.

23             As you may know, the -- this deposition,

24   unlike the prior deposition, is limited to some
```

Mark Pollak

```
 1   topics that we have agreed to cover with you

 2   while other topics will be covered with Dr. Loretz

 3   and perhaps some other people from PCPC.

 4          Do you understand?

 5   A    Yes.

 6   Q    All right.  And your role in this

 7   deposition is a little bit different than the

 8   deposition previously.  Do you understand that?

 9   A    Yes.

10   Q    So that you understand that your

11   deposition -- and you certainly don't need to know

12   the rule, but it's under rule -- federal

13   Rule 30(b)(6).  Have you heard that term before?

14   A    I don't recall.

15   Q    Okay.  But you do understand that the --

16   the topics that are in the notice are the topics

17   that I'm going to be questioning you here today.

18   A    Yes.

19   Q    All right.  And those topics have been

20   limited as a result of an order of the Special

21   Master who's been appointed in this case.  Do you

22   understand that?

23   A    Yes.

24   Q    All right.  And so you understand that
```

Mark Pollak

```
 1    it may be later on in this litigation that you may

 2    be required to give yet another deposition.  I

 3    know you're looking forward to that, but you may

 4    have to.

 5              Do you understand that?

 6        A     Okay.  Yes.

 7        Q     All right.  Let -- let me also ask you

 8    about -- you signed a verification to some answers

 9    to interrogatories recently.  Do you recall that?

10        A     Yes, on Monday.

11        Q     All right.  And let me just -- we're

12    going to go through some of these answers in a

13    little bit more detail later.  But let me just

14    show you page 31.  There's a verification dated

15    August 27, 2018, and it has your signature on it.

16              Is that your signature?

17        A     Yes, it is.

18        Q     And did you in fact sign that on

19    August 27th?

20        A     Yes, I did.

21        Q     And when did you first see the

22    questions, the interrogatories?

23        A     I may have just seen them on that

24    Monday.  Some of them I may have seen previously,
```

Mark Pollak

```
 1   but I can't -- I can't be sure.
 2            MR. GOLOMB:  Okay.  I just want to just
 3   say for the record that we received the answers to
 4   these interrogatories -- interrogatories on
 5   August 27th, 2018, at 4:45 p.m.  There was an
 6   agreement of counsel that these would be supplied
 7   a week in advance of this deposition.  Obviously
 8   they weren't.  So we -- we may -- after we look at
 9   the interrogatory answers in more detail and
10   compare them to some records, we may be required
11   to come back and take another day of deposition on
12   this 30(b)(6) notice.
13            You don't need to respond to that.  I
14   just wanted to let you know that that's -- that's
15   a possibility.
16   BY MR. GOLOMB:
17        Q    When did you first find out that you
18   were going to be deposed?
19        A    In this particular case?
20        Q    Yeah.
21        A    I would -- a few months ago, I would
22   think.
23        Q    And have you been deposed in any other
24   cases other than the deposition I took of yours --
```

Mark Pollak

1      A      No.

2      Q      -- several years ago?

3      A      No.

4      Q      All right.  And how did you learn that

5   you were going to be deposed?

6      A      I think Tom Myers, our in-house counsel,

7   shared with me the fact and may have -- may have

8   forwarded the notice.  I don't recall.

9      Q      Okay.  And since you learned that you

10  were going to be deposed again, I -- I assume that

11  you met with Mr. Myers in-house?

12     A      Right.  As well as Tom Locke.

13     Q      Okay.  Did you have any meetings with

14  Mr. Myers alone?

15     A      I don't think so.

16     Q      Did you speak to any other employees of

17  PCPC from the time that you -- you received notice

18  that you were going to be deposed until today?

19     A      Not regarding the substance of the

20  deposition.

21     Q      Were you aware that Linda Loretz was

22  deposed?

23     A      Yes, I was.

24     Q      How did you become aware that Linda

Mark Pollak

1    Loretz was deposed?

2         A    Because I think I was copied on the

3    e-mail stream of trying to find mutually agreeable

4    dates for both of our depositions.

5         Q    Okay.  And before Ms. Loretz was

6    deposed, did you have any conversation with her

7    about her upcoming deposition?

8         A    No, I did not.

9         Q    And since she's been deposed, did you

10   have any conversation with her about her

11   deposition?

12        A    No, I have not.

13        Q    So you've never discussed with Linda

14   Loretz the content of either yours or her

15   depositions?

16        A    Correct.

17        Q    Did you read your deposition transcript?

18        A    Yes, I did.

19        Q    Did you read Linda Loretz's deposition

20   transcript?

21        A    No.

22        Q    So you didn't read the deposition

23   transcript that I -- of the deposition that I took

24   of Linda Loretz several years ago?

Mark Pollak

```
 1          A     That I can't recall.

 2          Q     You may have?

 3          A     But not -- but not in context of

 4     preparing for this.

 5          Q     Okay.  What -- if not for preparing for

 6     this, why else would you read Linda --

 7          A     I don't --

 8          Q     Let me --

 9          A     I don't recall reading it.

10          Q     Let me just give you one instruction.

11                You're doing fine, but if you will allow

12     me to finish my question, I will allow you to

13     finish your answer.  That way --

14          A     Sure.

15          Q     -- neither one of us gets in trouble

16     with the court reporter.  Okay?  Okay?

17          A     Yes.

18          Q     And you also have to give a verbal

19     response.

20          A     Yes.

21          Q     All right.  In what other context would

22     you read the deposition if not -- if not to either

23     prepare for this deposition or to have a

24     conversation with somebody?
```

Mark Pollak

```
 1          A     I can't think of any other context.  I

 2    know in preparation for this, I did -- I had read

 3    the transcript of my original deposition whenever

 4    the transcript became available last time, and I

 5    think I -- I noted there were a few errors in the

 6    transcription, and I did review that.  And so in

 7    preparation for today, I did read over that

 8    deposition last week.

 9               I did not read Linda's and I have no

10    recollection that I have, but I don't want to say

11    definitely that I didn't.  It was

12    two-and-a-half -- more than two-and-a-half years

13    ago.

14          Q     And when you say there were errors in

15    the transcription, what do you mean?

16          A     There were -- they ask you to fill out a

17    form on different words the transcriber got wrong.

18          Q     Okay.

19          A     And that was filed with the deposition.

20          Q     Was there any -- any errors in the

21    substance of what you said?

22          A     I would say most of it was minor.

23          Q     And is there anything that you read in

24    that deposition that you would now -- when you
```

Mark Pollak

```
 1   read it you said, That wasn't right, or, Boy, I

 2   wish I hadn't said that?

 3        A    No.

 4        Q    Anything like that?

 5        A    Nothing.

 6        Q    So whatever you said to -- whatever your

 7   answer was to whatever my question was at that

 8   earlier deposition, you stand by those answers?

 9        A    Yes.

10        Q    When -- when did you learn that you were

11   going to be deposed?

12        A    In this particular instance?

13        Q    Yeah.

14        A    I think in June or July.

15        Q    And the meeting that you had -- well,

16   strike that.

17             You said you found out from Tom Myers.

18   Was that in person?

19        A    It probably was on -- being copied on an

20   e-mail string.

21        Q    And did you have a conversation with Tom

22   Myers?

23        A    I -- I possibly did about this.  I -- I

24   don't recall.  I talk to him about lots of things,
```

Mark Pollak

1  so --

2       Q    Okay.  Well, have you ever had --

3  since -- since you received notice in June or July

4  of 2018 that you were going to be deposed here

5  today, have you ever had a one-on-one conversation

6  with Tom Myers about the fact that you were being

7  deposed here today?

8       A    I probably did in terms of the

9  logistics.

10      Q    Okay.  Did you have any conversation

11 with Tom Myers about the substance?

12      A    I don't think I did.  Any conversation

13 would have been in the presence of Tom Locke.

14      Q    And did you have any conversation

15 again -- I'm only restricting my questions to any

16 one-on-one meetings that you may have had with Tom

17 Myers.

18           Did you have any meeting, telephone

19 call, e-mail exchanges with Tom Myers about the --

20 about either, A, the substance of your deposition

21 here today or, B, how to prepare for the

22 deposition?

23      A    Well, I think we did have a conversation

24 about how to prepare because we agreed that we

Mark Pollak

1    would meet with Tom Locke to review it.

2         Q    Okay.  And when was the first

3    communication that you had with Tom Locke after

4    you learned that you were going to be deposed here

5    today?

6         A    Well, I met with him for the first time

7    in preparation for this last week.

8         Q    Okay.  So you had no conversation with

9    Tom Locke in June?

10        A    I don't think so.  I think it was all

11   through e-mails trying to find mutually agreeable

12   dates.

13        Q    And the -- you had no communications

14   with Tom Locke other than the logistics of the

15   deposition in July?

16        A    That's -- that's my recollection.

17        Q    And -- and your testimony here today is

18   that the first time that you met with Tom Locke to

19   discuss your preparation for this deposition was

20   last week?

21        A    That's correct.

22        Q    Okay.  And when last week was that?

23        A    I'm not even sure which day.  Possibly

24   Tuesday or Wednesday.  I don't recall.

Mark Pollak

1          Q     So either August 22nd or August --

2    either August 21st or 22nd?

3          A     I think so, yeah.

4          Q     And is that the first communication of

5    any kind you had with Tom Locke other than

6    logistics of when to meet since you received

7    notice of the -- received notice that you would be

8    deposed?

9          A     I'm fairly certain.

10         Q     And how long did your meeting last on

11   Monday or Tuesday of last week?

12         A     I think it was three hours or less.

13         Q     Okay.  And without telling me about any

14   conversation that you may have had with Mr. Locke,

15   because that's a privileged communication, tell me

16   what you did during that three hours.

17         A     We reviewed some potential questions and

18   some of the topics, what -- some of it was really

19   to refresh my memory on the whole process and what

20   to expect today and what I was expected to cover.

21         Q     And was -- and is -- at that time did

22   you also review the deposition notice with -- that

23   included the topics?

24         A     I actually don't recall.

Mark Pollak

```
 1        Q    Did you review any documents during that
 2   three-hour period?
 3        A    I don't think so.
 4        Q    Did you review any documents to prepare
 5   yourself before you had that meeting last week
 6   with Tom Locke?
 7        A    I reviewed a few things in the office to
 8   refresh my memory because there were topics that
 9   were discussed in the last deposition, and I
10   wanted to be fresher on them.
11        Q    Okay.  What did -- what did you review?
12        A    For example, the Cosmetic Ingredient
13   Review procedures that are online.
14        Q    And specifically what is it that you
15   wanted to refresh your memory about as it relates
16   to the CIR?
17        A    So there were some topics in the -- in
18   the last deposition that involved CIR, and I
19   wanted to be -- and I knew also some of the
20   procedures had changed in the last year, and I
21   wanted to be fresher on them.
22        Q    What procedures changed in the last
23   year?
24        A    There were a few updates and elimination
```

Mark Pollak

1   of redundancies, a couple of things that they

2   hadn't done in 20 or more years that they felt

3   were no longer...

4        Q    Give me an example of what you're

5   talking about.

6        A    I -- I can't even tell you off the top

7   of my head.  They were really all pretty minor.

8        Q    Okay.

9        A    The CIR steering committee met in early

10  June to review the proposed changes to the

11  procedures and approve them then, and then they

12  were updated on our website.

13       Q    And in June of 2018?

14       A    Correct.

15       Q    Okay.  And do you know why those --

16  those procedures were changed?

17       A    Because they -- a few of the things were

18  no longer necessary or practical and were

19  outdated.  I think the procedures hadn't been

20  changed in ten or more years.

21       Q    And were -- were those changes made at

22  all because of the talc litigation?

23       A    Nothing related to talc.

24       Q    Okay.  So before you met with Tom Locke

Mark Pollak

```
 1    last Monday or Tuesday, what other documents did

 2    you review to help prepare yourself?

 3          A     He shared --

 4          Q     No, before you met.

 5          A     I don't think I reviewed anything before

 6    I met with him.

 7          Q     Other than the CIR review?

 8          A     Right, and that was subsequent to our

 9    meeting.

10          Q     Okay.  So then let's just be clear, then

11    you find out about the -- the deposition in June

12    or July.  You have some conversation about

13    logistics with Mr. Myers.  Don't have any

14    conversations with Tom Locke.  You may have had an

15    exchange of e-mails to discuss logistics.  You

16    finally agreed on a date to meet, which was early

17    to mid last week, and up until that time of that

18    meeting, you didn't review anything to assist you

19    in the preparation for today's deposition.

20          A     Correct.

21          Q     And then you -- you go to meet with

22    Mr. Locke, and you review some questions and some

23    potential answers to your deposition, but again,

24    on that particular day in the three-hour meeting,
```

Mark Pollak

1   you don't review any documents.  Is that your

2   testimony?

3       A    Yes.

4       Q    Okay.  And so who else was in the room

5   when you met for three hours with Mr. Locke?

6       A    Tom Myers and Emily Manoso, who's our --

7   who also is a lawyer for the council.

8       Q    Okay.  And is that somebody who works --

9       A    Right, she --

10      Q    -- with Mr. Myers?

11      A    Yes.  She's in the room today.

12      Q    Okay.  Anybody else in the room?

13      A    No.

14      Q    Anybody from Mr. Locke's office in the

15  room?

16      A    No.

17      Q    And in -- at what time of day did this

18  meeting take place?

19      A    In the morning.

20      Q    And what time did it end?

21      A    By 12:30.

22      Q    And did you have any -- after you met

23  with Mr. Locke that day, did you discuss what

24  happened at that meeting with -- with Mr. Myers?

Mark Pollak

```
1          A    No, I don't think I did.

2          Q    Did you have any -- any homework

3    assignment, if you will, on what you should do

4    next to help yourself prepare for the deposition?

5          A    No, and I don't remember the sequence of

6    events, whether I reviewed the transcript before

7    or after that meeting.

8          Q    Okay.  But you reviewed the transcript

9    of the prior deposition.

10         A    Correct.

11         Q    But you did not review the deposition of

12   Linda Loretz.

13         A    Not -- not recently.  I -- again, I'm

14   not sure whether I did two or more years ago.

15         Q    Okay.  And when you -- when you left

16   Mr. Locke after that three-hour meeting, had you

17   scheduled your next meeting?

18         A    No, we hadn't.

19         Q    Did you have a next meeting?

20         A    Yes.

21         Q    When was the next meeting?

22         A    Yesterday.

23         Q    Okay.  And so -- and what time was that

24   meeting yesterday?
```

Mark Pollak

```
 1          A    It was also in the morning.

 2          Q    And how long did that meeting last?

 3          A    Two, two-and-a-half hours maximum.

 4          Q    Okay.  And other than the possibility

 5    that you may have read your -- your deposition

 6    transcript from the prior deposition in that week

 7    or so intervening period of time, did you review

 8    any other documents?

 9          A    So we went over the document that --

10          Q    Let me -- I'm sorry.  Let me be clear

11    about my question.

12               You had told us that you read the --

13    your deposition transcript from the prior

14    deposition, but you weren't sure if it was before

15    or after that first meeting with Mr. Locke,

16    correct?

17          A    Yes.

18          Q    All right.  And -- and so when you left

19    that meeting, you then scheduled another meeting

20    with Mr. Locke a week or so later, which would

21    have been two days ago, correct?

22          A    We actually left it open whether we were

23    going to meet, but we decided we would.

24          Q    Okay.  But ultimately you decided to
```

Mark Pollak

```
 1    meet on Monday.

 2         A    No.  Yesterday was Tuesday.

 3         Q    Yesterday.  And that was the first -- is

 4    that the first conversation you had with Mr. Locke

 5    since you left his office back on the 21st or

 6    22nd?

 7         A    Yes.

 8         Q    And so my -- my -- going back to my

 9    earlier question, from the time that you left

10    Mr. Locke's office on the 21st or 22nd until the

11    time you saw him yesterday, did you -- other than

12    the possibility that you may have read that prior

13    transcript, did you read any -- any -- did you

14    look at any documents?

15         A    Well, again, because I signed the

16    interrogatories on Monday, I did read them.

17         Q    Okay.  I'm talking about before you met

18    with Mr. Locke on Monday.

19         A    Well, I -- I reviewed the document and

20    signed it on Monday.  I met with Mr. Locke on

21    Tuesday.

22         Q    Okay.  My question is, from the time

23    that you left Mr. Locke's office last week until

24    the time that you saw Mr. Locke this week, okay,
```

Mark Pollak

1    did you review any other documents?

2        A    Not besides the interrogatories.

3        Q    Okay.  How did you receive the answers

4    to the -- the answers to interrogatories?

5        A    Electronically, and then we printed them

6    out.

7        Q    Okay.  And when did you get those?

8        A    On Monday.

9        Q    And -- and you were in your office when

10   you received them?

11       A    Yes.

12       Q    And you reviewed them in your office?

13       A    Yes.

14       Q    And were the -- did you have any

15   conversation with Mr. Locke about those answers

16   before you received them electronically on Monday?

17       A    No.

18       Q    Okay.  So just to be clear, that your --

19   in your office on Monday, at that point you had

20   never seen the -- the set of interrogatories.  Am

21   I correct?

22       A    This particular set, yes.

23       Q    Right.  And then you -- you get a set of

24   interrogatories that are both questions and

Mark Pollak

```
 1   answers.  The answers are already provided for

 2   you.  You're sitting in your office, you get them

 3   electronically, you review them, and you sign the

 4   verification.

 5        A    Yes.

 6        Q    And did you make any changes to the

 7   answers?

 8        A    No.

 9        Q    Did you have any conversation with --

10   with Mr. Locke about those answers before you

11   signed the verification?

12        A    No.

13        Q    Did you have any conversation with

14   Mr. Myers before you signed the verification?

15        A    I think I may have said to him, These

16   look fine.

17        Q    Okay.  So it's fair to say you didn't

18   have any input into the answers?

19             MR. LOCKE:  Objection.

20             THE WITNESS:  I -- these interrogatories

21   were similar in substance to many interrogatories

22   I've signed or reviewed in the past few years.

23   BY MR. GOLOMB:

24        Q    Okay.  In this set you didn't have any
```

1    input into the answers.  Am I correct?

2              MR. LOCKE:  Objection.

3              THE WITNESS:  Correct.

4    BY MR. GOLOMB:

5         Q    Okay.  So the -- the -- did you only

6    have one meeting with Mr. Locke before -- this

7    week before today?

8         A    I had one meeting last week, one meeting

9    yesterday.

10        Q    I understand.  So -- so this week

11   your -- other than today, this week your sole

12   meeting was yesterday?

13        A    Yes.

14        Q    All right.  And when did that meeting

15   start, what time of day?

16        A    9:30.

17        Q    And when did that meeting end?

18        A    It ended I think by 12 o'clock.

19        Q    Okay.  And did you review any other

20   documents during that three-hour period of time?

21        A    He may --

22             MR. LOCKE:  It's just a "yes" or "no."

23             THE WITNESS:  Yes.

24   BY MR. GOLOMB:

1   Q  What did you review?

2     MR. LOCKE:  Well, I'm not going to --

3  our selection of documents that I might have

4  showed the witness, that reflects our work

5  product.  So he's not going to answer that

6  question.  If you show him a document, you can ask

7  him if he reviewed it.

8  BY MR. GOLOMB:

9   Q  Approximately how many documents did you

10  review?

11   A  Two or three.

12   Q  Well, let's -- let's go to the -- to the

13  notice for a second.

14     Mr. Pollak, for the record, we're going

15  to mark this as Pollak No. 1, and you can see

16  there's a red flag, and we will go right for

17  page 12, where the red flag is.

18     (Pollak Exhibit No. 1 was marked

19     for identification.)

20  BY MR. GOLOMB:

21   Q  And you can see what I've done is I've

22  highlighted specifically the -- the topics that

23  you're noticed here today to answer.  Okay?

24   A  Yes.

Mark Pollak

```
 1        Q    And so let's start with under

 2   subsection 3, "Issues relating to influence and

 3   bias."  Do you see that?

 4        A    Yes.

 5        Q    And under 3.1, PCPC, so you are here

 6   today to answer my questions concerning the

 7   purpose, function, responsibilities and missions

 8   of PCPC.  And you're also here to talk about

 9   PCPC's structure, membership, dues system,

10   assessments, budgeting committees, and funding,

11   including entities funded in whole or in part by

12   PCPC, and financial contributions made to PCPC.

13             Do you feel you're prepared to answer

14   those questions today?

15        A    Yes.

16        Q    If we go to the next page, page 13 of

17   that document, under number 2:  You are also here

18   to answer questions about PCPC's relationship with

19   J&J and J&JCI, including formal and informal J&J

20   and J&JCI representatives and J&JCI or J&J

21   financial contributions to PCPC, including to

22   committees and/or subcommittees.

23             You feel you're prepared to answer

24   questions about that today?
```

Mark Pollak

```
 1        A    Yes.

 2        Q    Under subsection 3, under Imerys, you're

 3   here to answer questions about PCPC's relationship

 4   with Imerys, including formal and informal

 5   representatives, and financial contributions to

 6   the PCPC, including to committees and/or

 7   subcommittees.

 8             Do you feel like you're prepared to

 9   answer questions about that today?

10        A    Yes.

11        Q    If you go to page 15 of the document.

12             It's entitled "National Cancer

13   Institute" under subsection 7.  Do you see that?

14        A    Yes.

15        Q    Under subsection (b), you're here to

16   talk about the knowledge concerning financial

17   support to NCI and the persons who make

18   recommendations to NCI within the -- within and

19   outside the organization.

20             Do you feel like you're prepared to

21   answer those questions?

22        A    Yes.

23        Q    And under subsection 10, on page 16 --

24   you'll see on page 15 it says "The cosmetic
```

Mark Pollak

1  industry review," and subsection (d) is:  "PCPC's

2  relationship with CIR, including funding,

3  staffing, membership, formal and informal

4  meetings, committees and/or subcommittees."

5          Do you feel like you're prepared to

6  answer questions on those topics today?

7      A    Yes.

8      Q    Okay.

9          MR. GOLOMB:  Let's mark this as No. 2.

10  There's some extra copies there.  This will be

11  marked as Plaintiffs' Exhibit 2.

12          (Pollak Exhibit No. 2 was marked

13          for identification.)

14  BY MR. GOLOMB:

15      Q    While Mr. Locke is circulating that,

16  Mr. Pollak, you understand, do you not, that your

17  answers here today as a 30(b)(6) deponent are

18  binding on PCPC?

19      A    Yes.

20      Q    So you're not just here in your own

21  personal capacity.  You understand that, correct?

22      A    I'm a corporate representative.

23          MR. GOLOMB:  Now, I'm going to show him

24  the document.

Mark Pollak

```
 1                MR. LOCKE:  Oh, okay.  Do you want to

 2   mark this?

 3                MR. GOLOMB:  Yeah, this one is marked.

 4   Why don't you give me that one back.  Thanks.

 5   BY MR. GOLOMB:

 6        Q    Now, you're familiar with this document,

 7   are you not?

 8        A    Yes.

 9        Q    This is an organizational chart.  In

10   fact, it's an organizational chart that you

11   supplied to me right before the last deposition.

12   Do you recall that?

13        A    Yes.

14        Q    Is this an organizational chart that

15   you -- that you yourself prepared, or is this

16   something that was previously prepared that you

17   brought with you at that prior deposition?

18        A    I actually don't recall.

19        Q    Okay.  Is this something -- whether or

20   not it was specifically for that deposition or

21   not, is this something that you prepared?

22        A    I would have reviewed it.  I don't

23   recall that I would have prepared it at the time.

24        Q    Okay.  What -- what's your title?
```

Mark Pollak

```
 1        A    So I'm on this as senior executive
 2   vice president.  At the time it was strategic
 3   initiatives membership and marketing.  It's now
 4   changed to senior executive vice president, chief
 5   operating officer.
 6        Q    Okay.  And this was previously marked on
 7   February 18, 2016, the date of our prior
 8   deposition, correct?
 9        A    Well, here it's marked today's date.  So
10   I -- I wouldn't know.
11        Q    Okay.  Well, let me show you the prior
12   copy where -- you see?
13        A    Okay.  Yes.
14        Q    Is that consistent with your
15   recollection of when the prior deposition was?
16        A    Yes.
17        Q    And you've got a change of title since
18   then.  Do you have -- is your job description
19   different?
20        A    It's fairly similar.
21        Q    How would you -- what's your job
22   description?
23        A    I am the -- the chief operating officer
24   responsible for working with all the senior staff
```

Mark Pollak

1    on providing -- in coordinating our policies and

2    our approach so we can best represent the industry

3    and be responsive to our board of directors.

4         Q    And is it -- you're not a scientist,

5    correct?

6         A    Correct.

7         Q    And is it fair to say that your -- your

8    job is more kind of internal administrative than,

9    you know, scientific or public relations or

10   political?

11        A    Yes, but it involves all those

12   components because I have to work with all the

13   EVPs on -- on the major issues.

14        Q    And let's just go through this, if we

15   could, because I think what this does is it gives

16   us the -- kind of the different departments within

17   the organization, correct?

18        A    Yes.

19        Q    How many current employees are there at

20   PCPC?

21        A    I think the count is around 56.

22        Q    All right.  And first of all, looking at

23   page 1 of Exhibit 2, is Lezlee Westine -- is it

24   Westin (phonetic)?

Mark Pollak

```
 1          A     Westine.

 2          Q     Westine.  Is she still the president and

 3     CEO?

 4          A     Yes, she is.

 5          Q     And just as we quickly go through the

 6     employees on the bottom of the page, are they all

 7     the same or have there been changes?

 8          A     So there are two changes.  The first one

 9     is Elizabeth Anderson is no longer there.  Tom

10     Myers is EVP, legal and general counsel.

11          Q     What's the other change?

12          A     And the other one is the EVP Science,

13     Beth Lange, is no longer there and her replacement

14     is Alexandra Kowcz.

15          Q     Alexandra?

16          A     Right.

17          Q     Couch?

18          A     K-O-W-C-Z.

19          Q     And why did Elizabeth Anderson leave?

20          A     She retired.

21          Q     And why did Beth Lange leave?

22          A     She relocated with her husband to Utah.

23          Q     If we go to the next page of the

24     exhibit.  Looking at the legal department, any
```

Mark Pollak

```
 1   changes?

 2       A    Right.  So Farah Ahmed has also left,

 3   and Emily Manoso has taken her slot.

 4       Q    And why did Farah Ahmed leave?

 5       A    She left for another job.

 6       Q    And do you know where that is?

 7       A    Yes.  The organization changed to -- its

 8   name is Fragrance Creators.  It's a trade

 9   association representing fragrance ingredient

10   manufacturers.

11       Q    The next department is Government

12   Affairs department.  First of all, tell me

13   generally what Government Affairs department does.

14       A    So that would be the closest to lobbying

15   federal and state relations, representing the

16   industry before different state regulatory bodies

17   and federal.

18       Q    Okay.  Any -- any changes in that

19   department since the last deposition?

20       A    No.

21       Q    On the next page, Public Affairs and

22   Communications.

23       A    So there -- Lisa Powers is still there.

24   The other two people have left.  Jewel Jones has
```

Mark Pollak

```
 1    taken Hayley McConnell's position, and Jamie Kirk

 2    has taken Lauren Brady's position.

 3         Q    What does Public Affairs and

 4    Communications department do?

 5         A    So they work with our members to present

 6    the industry's viewpoint to the media, monitor how

 7    the industry is being covered by the media, and

 8    work on external communications materials for the

 9    organization.

10         Q    And when you say "external materials,"

11    what do you mean?

12         A    For example, our annual report.  We're

13    in the process of redoing our website, and they're

14    working on the website redesign.

15         Q    And why did Hayley McConnell leave?

16         A    I think she decided to stay home with

17    her children.

18         Q    And why did Lauren Brady leave?

19         A    I think she got a better job.

20         Q    Where is she?

21         A    I don't recall.

22         Q    What does Global Strategies department

23    do?

24         A    So that's our international department.
```

Mark Pollak

1   We monitor and advise our members on a lot of

2   international cosmetic regulations, and they're

3   the department that handles that.  It also works

4   to get uniform regulation worldwide of cosmetics

5   and represent the industry's viewpoint on trade

6   negotiations.

7        Q    And when you say "works to get uniform

8   regulation worldwide of cosmetics," what do you

9   mean?

10       A    So that the -- for example, the

11   regulations in the European Union would be

12   compatible with FDA regulation so that companies

13   who sell their products in numerous markets do not

14   have to comply with inconsistent regulations.

15       Q    And have any of the employees within the

16   Global Strategies department changed?

17       A    Yes.  Tonya Kemp is no longer there, and

18   Natalie Obermann, I think is her last name, has

19   replaced her.

20       Q    Why did Tonya Kemp leave?

21       A    She left for a better job.

22       Q    Where did she go?

23       A    She's working for Amway.

24       Q    And Finance and Administration, what --

Mark Pollak

1   what do they do?

2        A    So that is the accounting, human

3   resources, information technology, things like

4   that.

5        Q    Is that where -- did you come up -- in

6   the company come up through finance and

7   administration?

8        A    Not really.  It was a separate

9   department from that.

10       Q    What department did you come up through?

11       A    It's no longer a separate department.

12  At the time it was member relations.

13       Q    Okay.  Any changes in Finance and

14  Administration?

15       A    Yes.  So we no longer have a

16  vice president of finance, and -- he retired.  And

17  we have -- the person who took his place, Al Fox,

18  I actually don't know -- don't recall his new

19  title, but he is higher than an accounting manager

20  but he's not a vice president.

21       Q    Okay.  Any other changes for Finance and

22  Administration?

23       A    So we no longer have a receptionist who

24  is an employee of the council.  We have somebody

Mark Pollak

1    from a temp agency.  And there are -- there's a

2    new staff accountant.

3         Q    Who is that?

4         A    Dan, and I can't remember his last name.

5         Q    Now, on this -- on this document it says

6    "Accounting manager, vacant," and you described Al

7    Fox as the accounting manager.  Is that --

8         A    No, he's higher than an accounting

9    manager.  So what would be here, the VP finance

10   accounting manager and staff accountant, we

11   currently are handling with two full-time

12   employees, and then it's supplemented by a --

13   either a part-time or a temporary accounting

14   employee, who is just there two or two-and-a-half

15   days a week.

16        Q    And then on -- you also have the Science

17   department.  What does the Science department do?

18        A    So the Science department works with our

19   member companies on -- to monitor the -- the

20   latest information on science data, ingredient

21   safety relating to our products.  There are a

22   number of committees.  We have international

23   nomenclature that's handled through a committee in

24   the Science department that forms the platform for

Mark Pollak

```
1    the database services that we have for our

2    members, and we do a variety of science and

3    technical publications that are based on this

4    nomenclature and other...

5         Q    Give me an example of a standing

6    committee.

7         A    So the pharmacology and toxicology

8    committee.

9         Q    Now, there are a number of interested

10   party task forces, correct?

11        A    Yes.

12        Q    And as an example, we know that there is

13   a Talc Interested Party Task Force, correct?

14        A    Yes.

15        Q    And is -- first of all, is the Talc

16   Interested Party Task Force considered a standing

17   committee?

18        A    No.

19        Q    What's -- what is it considered?

20        A    It's a -- it's a task force, so a task

21   force would be of limited interest to the broad

22   membership.

23        Q    Okay.

24        A    A standing committee would be a concern
```

Mark Pollak

```
 1    or a topic that's much more common among them.

 2         Q    And do task forces kind of come and go

 3    depending on the issue of the day as it relates to

 4    that particular task force?

 5         A    Some of them do.  Some of them are

 6    around for a long time.

 7         Q    Okay.  How would you describe -- in that

 8    context, how would you describe the Talc

 9    Interested Party Task Force?

10         A    It's obviously been in existence for

11    quite a while.

12         Q    And when was it started?

13              MR. LOCKE:  Well, objection.  It's

14    beyond the scope.

15              You can answer if you can.

16              THE WITNESS:  I don't recall.  I think

17    probably in the 1980s.

18    BY MR. GOLOMB:

19         Q    And why was it started?

20              MR. LOCKE:  Objection.  Beyond the

21    scope.

22              THE WITNESS:  I don't know.  I mean,

23    I -- I think it started before I came there.

24    BY MR. GOLOMB:
```

Mark Pollak

```
 1        Q    When -- when did you come to the
 2  company?
 3        A    In 1983.
 4        Q    Okay.  And so the Talc Interested Party
 5  Task Force was started obviously before 1983.
 6        A    I think so.
 7        Q    Okay.  Are you aware one way or the
 8  other as to whether or not the Talc Interested
 9  Party Task Force was started in response to Dr.
10  Dan Cramer's study back in 1982?
11             MR. LOCKE:  Objection.  Beyond the
12  scope.
13             THE WITNESS:  I don't know who Dr. Dan
14  Cramer is.
15  BY MR. GOLOMB:
16        Q    Okay.  So in terms of the standing
17  committees, approximately how many of them are
18  there?
19        A    Maybe 25.  I think we provided a -- the
20  committee roster and description.
21        Q    And in terms of the interested party
22  task forces, approximately how many of them are
23  there?
24        A    There could be 10 to 20.  Some of them
```

Mark Pollak

 1   are not particularly active.  They're more contact

 2   lists.

 3         Q    Give me an example of a -- of the

 4   currently active task force other than talc.

 5         A    Sunscreen.

 6         Q    All right.  Looking at the Science

 7   committee on this document, any changes?

 8         A    We already noted Beth Lange.  John

 9   Krowka has retired.  And Carmela Wingfield has

10   left.

11         Q    Did somebody take Beth Lange's place?

12         A    Right.  Alex Kowcz.  Couch (phonetic).

13   I always get this messed up.

14         Q    Did somebody take John Krowka's place?

15         A    Yes.  Dan, and I don't remember his last

16   name.

17         Q    Anybody take Carmela Wingfield's place?

18         A    No.

19         Q    If we go to the next page, Strategic

20   Initiatives, what is that?

21         A    So that was from my old title, and then

22   they had Marketing and Member Services as a

23   separate department.

24         Q    What is Strategic Initiatives?

Mark Pollak

1        A      So, again, it was, you know, working on

2    the major program initiatives for the association

3    and working with the board of directors to

4    implement policies and --

5        Q      When you say "program initiatives," what

6    do you mean?

7        A      You know, different -- whether it's in

8    the sustainability area or animal testing,

9    alternatives, things like that.

10       Q      Marketing and Member Services, any

11   changes?

12       A      So Jennifer Harwell has left for another

13   job.  Catherine McDonald was promoted and is

14   handling membership as well as meetings.  Huyen

15   Tran has retired.  And Ashley Hilton has left, and

16   Carmela Douglas, who was the former receptionist,

17   has taken over her slot.

18       Q      So Carmela --

19       A      -- Douglas, who is on the organ- -- this

20   organization chart as the receptionist.

21       Q      So are you --

22       A      Carmen.

23       Q      On this chart that you've provided to us

24   in February of 2016, it identifies you as the

Mark Pollak

1    senior EVP membership and marketing.

2          Do you still maintain that title?

3      A    No.  It has -- it has both titles, and

4    I -- I don't know why.

5      Q    Do you still maintain that job function?

6      A    They were -- I sort of absorbed that job

7    function into my current job.

8      Q    Okay.  And did anybody take over

9    Catherine McDonald's position?

10     A    No, she's still there.  She got promoted

11   and has taken over Jennifer Harwell's position.

12     Q    Okay.  Anybody take over Jennifer

13   Harwell's position?

14     A    No.  That's vacant.

15     Q    Anybody take over as operations manager?

16     A    We have a part-time employee who is

17   handling what Mr. Huyen did.

18     Q    And what's that person's name?

19     A    Mr. Xu.

20     Q    Okay.  If we look at the next page, it's

21   got the organizational chart for the Personal Care

22   Products Council Foundation.  What is that?

23     A    So it is a separate entity that runs our

24   Look Good Feel Better program for women undergoing

Mark Pollak

1    cancer treatment.

2         Q     And what is the Look Good Feel Better

3    program?

4         A     We provide makeover sessions for women

5    undergoing cancer treatment to help them deal with

6    the side effects of chemotherapy and radiation.

7         Q     And what is the approximate revenue base

8    for that?

9         A     So that is entirely based on

10   contributions and proceeds from fundraising

11   activities and cause marketing programs.

12        Q     And approximately how much revenue per

13   year is in that program?

14        A     I think it's close to $2 million.

15        Q     Where does the money come from?

16        A     I just said contributions, cause

17   marketing agreements.

18        Q     Contributions from -- from who?

19        A     From women who've undergone the program,

20   other people in the cancer community, but it's

21   more the proceeds from fundraising events and

22   cause marketing programs.

23        Q     And these seven people who are

24   identified as employees of the Personal Care

Mark Pollak

1    Products Council Foundation, are they also

2    considered employees of the Personal Care Products

3    Council?

4         A    Yes.  So they're part of our personnel

5    system and salary and benefits, but the -- the

6    money to pay them and their benefits and a

7    percentage of the overhead comes from the

8    foundation.

9         Q    And these seven people, have that --

10   have there been any changes since?

11        A    Yes.  This Alexandra is no longer there,

12   and she's been replaced by Shayma, and I can't

13   remember her last name.

14        Q    Okay.  In addition to the individual

15   contributions that you were just talking about, do

16   you get any contributions into the foundation from

17   any of the PCPC members?

18        A    So the -- the member companies, yes, do

19   provide a lot of the funding indirectly because of

20   this major fundraising event called the DreamBall

21   that's held in September in New York.  Until this

22   year, we had done it in partnership with the

23   American Cancer Society.  So the companies buy

24   tables, and most of these -- many of them are

Mark Pollak

1  member companies, and then there are other

2  fundraising activities associated with the event.

3       Q    Okay.  Is it fair to say that the --

4  that the DreamBall fundraiser is your number one

5  fundraiser for the foundation?

6       A    Yes.

7       Q    And does -- is J&J -- J&J, are they a

8  sponsor of the DreamBall?

9       A    They're certainly a participant, yes.

10      Q    And do you know -- can you tell me

11  approximately how much on an annual basis they

12  contribute to the foundation?

13      A    I can't tell you exactly.  They may buy

14  a table, and it may be something in the -- it's

15  twenty, $25,000.

16      Q    And does -- Imerys is a member of the

17  PCPC, correct?

18      A    They have been.  I actually didn't check

19  whether they were a member this year.

20      Q    All right.  And have they been a

21  contributor to the DreamBall?

22      A    Not that I know of.

23      Q    Have they been a contributor in some

24  other way to the foundation?

Mark Pollak

```
 1          A     Not that I know of.

 2          Q     The -- the employees of the foundation,

 3   do they -- whether they get paid on a weekly or

 4   biweekly basis, do they get paid by PCPC?

 5          A     Right.  So they're part -- they're part

 6   of our ADP payroll system and the same benefit

 7   plans, but the money is allocated to come from

 8   their separated funds from the donations.

 9          Q     Okay.  But their check comes from PCPC.

10          A     Yes.

11          Q     And their office is in the PCPC space?

12          A     Yes.

13          Q     And whether it's you or somebody else,

14   somebody -- some executive in administration for

15   PCPC oversees kind of the administrative things

16   for the foundation.

17          A     Yes.

18          Q     Okay.  Next on your list is the Cosmetic

19   Ingredient Review.  Have there been any changes

20   here?

21          A     So the executive director, Lillian Gill,

22   retired.  Bart Heldreth, who's listed as chemist,

23   was promoted to executive director.  Monice is --

24   I think her title is deputy, or she's the
```

Mark Pollak

```
 1    equivalent.  I don't know her exact title.  Ivan

 2    Boyer, senior toxicologist, has left.  Lillian

 3    Becker is no longer there, and so then three new

 4    employees have been hired to fill these slots.

 5         Q    Who hires these new employees?

 6         A    The director of -- the executive

 7    director of CIR.

 8         Q    And is there input from PCPC?

 9         A    There's some input on salary range.  I

10    may have met one or two of them.

11         Q    Are you the -- are you the final decider

12    on how much an employee of Cosmetic Ingredient

13    Review gets paid?

14         A    Me and others.

15         Q    Who are the others?

16         A    Kris Bogenrief, who is our CF chief

17    financial officer, would have input on that also.

18    We have salary ranges and they have a budget

19    and --

20         Q    Okay.  But -- so just to be clear, when

21    you're talking about you, Mark Pollak, and others

22    that have the final say on the cosmetic -- the

23    salaries on the Cosmetic Ingredient Review, the

24    others are employees of the PCPC, correct?
```

Mark Pollak

```
 1        A    Correct.

 2        Q    And the checks that the people from

 3   Cosmetic Ingredient Review receive are PCPC

 4   checks?

 5        A    Yes.

 6        Q    And they -- do you use a --

 7        A    Payroll service?

 8        Q    -- payroll service?

 9        A    Yes.

10        Q    And do they get paid through the same

11   payroll service?

12        A    Yes.

13        Q    And is there somebody at PCPC that is

14   responsible for -- first, let me strike that.

15             Do you get paid on a weekly basis,

16   biweekly basis, monthly --

17        A    Biweekly.

18        Q    Okay.  And is there somebody at PCPC

19   that is responsible for calling in the numbers to

20   the payroll service?

21        A    Right, the accounting department.

22        Q    And that would be the accounting

23   department of PCPC?

24        A    Correct.  They don't have any admin- --
```

Mark Pollak

1    CIR would not have that internal function.

2         Q    Right.  So the -- the employees of PCPC

3    are calling in the payrolls of the employees of

4    PCPC council, PCPC Foundation, and CIR, correct?

5         A    Yes.

6         Q    And you and other employees of PCPC are

7    the ones who have the final say-so on how much an

8    employee of Cosmetic Ingredient Review gets paid?

9         A    Yes.

10        Q    And when you gave me the numbers

11   earlier, I think -- correct me if I'm wrong, I

12   think you said there was something like 53 or 56

13   employees.  Were you counting PCPC, foundation and

14   CIR?

15        A    Yes.

16        Q    Okay.  So how many specific employees

17   are there on the PCPC council?

18        A    I think it's approximately 40.

19        Q    And on the foundation?

20        A    So the foundation has six or seven, and

21   CIR has seven or eight.

22        Q    All right.  On the Cosmetic Ingredient

23   Review, who took over as senior toxicologist?

24        A    He has an Asian name that I can't

Mark Pollak

1  pronounce.  Sorry.

2      Q    Who took over as chemist for Bart

3  Heldreth?

4      A    So that -- that slot, I think is Alison,

5  and again, I don't remember her last name.

6      Q    Who took over as scientific analyst for

7  Monice?

8      A    Well, we didn't fill that slot.  She

9  just got a promotion.  It would be the replacement

10  for Lillian Becker, and it's a woman, Priya, and I

11  don't -- don't recall her last name.

12      Q    And everybody else remains the same?

13      A    Yes.

14      Q    Does PCPC do performance reviews of its

15  employees?

16      A    Most -- most departments do.

17      Q    Okay.  Tell me how that -- generally how

18  it works.

19      A    So it's an annual system.  There's a

20  template that's provided by human resources that's

21  distributed I think in January or February, and

22  the supervisor prepares a write-up and meets with

23  the people that he or she supervises, and then a

24  copy is provided to human resources.

Mark Pollak

```
 1        Q    Okay.  So let's take a look at the

 2   Science department as an example, okay?  And let's

 3   just take the senior environmental scientist, Iain

 4   Davis.

 5             So the template of a -- of the review

 6   would be provided to his supervisor?

 7        A    Correct, Alex.  Yeah, the senior -- the

 8   EVP for Science would be responsible.  She

 9   basically supervises the team.  I think you'll

10   find lower down that some of the managers are

11   supervising people below them.  She doesn't have

12   nine direct reports.  She probably has four or

13   five.

14        Q    Okay.  But is -- is the EVP in each

15   department ultimately responsible for the

16   performance review of each employee in their

17   department?

18        A    Yes.

19        Q    Okay.  And is that true of the PCPC

20   Foundation?

21        A    Yes.

22        Q    So Louanne Roark in this case would be

23   the -- be doing the performance reviews of the

24   other six people in the foundation?
```

Mark Pollak

```
1        A    Yes.

2        Q    And then once those performance reviews

3   are completed, they go where?

4        A    To our personnel department, human

5   resources.

6        Q    Okay.  And would the same be true of

7   Cosmetic Ingredient Review, that is now --

8        A    Yes.

9        Q    -- Bart Heldreth would do the

10  performance reviews of everybody within the CIR,

11  and then they would go to human resources at PCPC.

12       A    Right.

13       Q    And what generally do you do with those

14  performance reviews?

15       A    I think they go in the employee's file.

16       Q    Okay.  And so in terms of the process,

17  it's pretty much the same for the PCPC

18  employees --

19       A    Right, they're subject to all --

20       Q    Let me just finish the question.

21            It's pretty much the same for the PCPC

22  employees, the foundation employees and the CIR

23  employees?

24       A    Yes.
```

Mark Pollak

```
 1        Q    All right.  And the -- these people in

 2   the foundation, they -- I think you had told us

 3   previously that they have offices within the PCPC

 4   offices, correct?

 5        A    Yes.  We're all on the same floor.

 6        Q    Right.  And the same is true of the CIR?

 7        A    Yes.

 8        Q    And so the foundation is completely

 9   funded by PCPC.

10        A    No.

11             MR. LOCKE:  Objection.

12   BY MR. GOLOMB:

13        Q    Other than the outside -- the outside

14   funding that we talked about before, the

15   fundraisers, the contributions from individuals.

16        A    We don't fund them at all.  All the

17   money of the -- we are reimbursed by the

18   foundation, you know, even for every square foot

19   of space they occupy.

20        Q    Okay.  And the --

21        A    I think they're a (c)(3).  We're a

22   (c)(6).

23        Q    Okay.  The CIR is completely funded by

24   the PCPC?
```

Mark Pollak

```
 1        A    Yes.

 2        Q    There's no reimbursement there?

 3        A    No.

 4        Q    There's no outside funding there?

 5        A    No.

 6        Q    So the -- the CIR employees get paid by

 7   PCPC, correct?

 8        A    Yes.

 9        Q    Their office space is paid for by PCPC?

10        A    Yes.

11        Q    Their office supplies are paid for by

12   PCPC?

13        A    Yes.

14        Q    If they have -- if they have an office,

15   they're told where to sit by somebody at PCPC?

16        A    I wouldn't go that far, but it would be

17   the director -- the executive director of CIR,

18   right.

19        Q    Well, when a new employee comes in and

20   they're told, This is going to be your office,

21   it's the final --

22        A    He would make --

23        Q    -- the final decision of the PCPC.

24        A    Indirectly.
```

Mark Pollak

1      Q    What do you mean "indirectly"?

2      A    The executive director would make that

3    kind of decision on the space allocation.

4      Q    Okay.  Do you -- are there -- are there

5    regular hours at the PCPC?

6      A    There's a basic workday, but there is --

7    we are supportive of flexible schedules.

8      Q    Okay.  And is that -- the basic workday,

9    is that in a manual for -- some sort of procedures

10   manual?

11     A    We have an employee handbook, and I

12   actually don't recall whether it says -- it

13   probably does say the basic workday is 9:00 to

14   5:00.

15     Q    And the -- the employee handbooks covers

16   the employees of the Cosmetic Ingredient Review?

17     A    Yes.

18          MR. GOLOMB:  Let's mark this No. 3.

19          (Pollak Exhibit No. 3 was marked

20          for identification.)

21   BY MR. GOLOMB:

22     Q    I'm going to show you a document which

23   is marked as Pollak No. 3.

24          You've seen that before, correct?

Mark Pollak

```
 1        A    I think I have.

 2        Q    In fact, I think, if my memory serves me

 3   right, you told me at the last deposition that you

 4   prepared this.

 5        A    No, I wouldn't have.  The accounting

 6   department would have prepared it.  It's possible

 7   I reviewed it, but I wouldn't have the capability

 8   of preparing it.

 9        Q    Okay.  Did they prepare it at your

10   request after I asked Dr. Loretz some questions

11   about it, and she was unable to answer it, and so

12   you took it upon yourself to have this prepared?

13   Does that sound familiar?

14        A    I don't recall the sequence of events.

15        Q    All right.  In any event, this is a -- a

16   general ledger which shows the contributions

17   between 1992 and 2009 into the Talc Interested

18   Party Task Force, correct?

19        A    Yes.

20        Q    And there's -- the numbers total just

21   under $440,000, correct?

22        A    Yes.

23        Q    More than half of which came from

24   Johnson & Johnson and Luzenac America, which we
```

Mark Pollak

```
 1    know is now Imerys, correct?

 2         A    Yes.

 3         Q    By far the largest being Johnson &

 4    Johnson, correct?

 5         A    Yes.

 6         Q    Now, I had asked you some questions

 7    before about the interested party task forces

 8    generally and how they kind of come and go.  Some

 9    come and go dependent on the issue of the day as

10    it relates to that subject, correct?

11         A    Yes.

12         Q    And so would it be fair to conclude from

13    this ledger that the Talc Interested Party Task

14    Force was active in 1992, '93, '94, and '97, 2000,

15    2001, 2005, 2008, and 2009?

16         A    Yes.  However, sometimes when there are

17    contributions made, it's just because there are

18    funds that are depleted in the account.  It

19    doesn't mean there's a big activity at that

20    particular time, but...

21         Q    Well, by far the largest activity on

22    this was in -- 1992 was one of the most active

23    years, correct?

24         A    Yes.
```

Mark Pollak

1        Q    And --

2        A    For solicitation of funds.

3        Q    Okay.  And are you aware that 1992 was a

4    year that Dr. Cramer authored and reported his

5    second study on the relationship between talc and

6    ovarian cancer?

7             MR. LOCKE:  Objection.  Beyond the

8    scope.

9             THE WITNESS:  No.

10   BY MR. GOLOMB:

11       Q    So you don't know one way or the other

12   as to whether it's just a coincidence that the

13   second most active year was the year that

14   Dr. Cramer's study came out?

15            MR. LOCKE:  Objection.  Beyond the

16   scope.

17            THE WITNESS:  I -- I don't know.

18   BY MR. GOLOMB:

19       Q    Okay.  And you know you're aware -- you

20   know what the NTP is?

21       A    Yes.

22       Q    Okay.  And is it just a coincidence that

23   the year in which more than half of the funds over

24   the last -- over the 17 years was in the year that

Mark Pollak

```
 1    the NTP was evaluating whether or not to report
 2    out talc as a carcinogen?
 3              MR. LOCKE:  Objection to form and beyond
 4    the scope.
 5              THE WITNESS:  Again, I wouldn't have any
 6    independent knowledge.
 7    BY MR. GOLOMB:
 8        Q    Okay.  So you haven't spoken to anybody
 9    or reviewed any documents to prepare for your
10    deposition here today which would show that the --
11    by far the largest expenditures from the Talc
12    Interested Party Task Force were to defend itself
13    in the NTP review?
14              MR. LOCKE:  Objection to form and beyond
15    the scope.
16              THE WITNESS:  No, I didn't.
17    BY MR. GOLOMB:
18        Q    Okay.  Do you know where the money that
19    was accumulated in 2000 went?
20        A    I actually do not.
21        Q    Do you know who Dr. Josh Muscat is?
22        A    No.
23        Q    Do you know who Dr. Huncharek is?
24        A    No.
```

Mark Pollak

```
 1            Q    Do you know who the Weinberg Group is?

 2            A    Yes.

 3            Q    Who is the Weinberg Group?

 4            A    They're a consulting group in Washington

 5      that I know we've worked with.

 6            Q    Okay.  And do you know whether or not

 7      the Weinberg Group was retained by the PCPC to

 8      defend its members in the NTP review?

 9                 MR. LOCKE:  Objection to form and beyond

10      the scope.

11                 THE WITNESS:  I know the Weinberg Group

12      was involved with helping with the presentation

13      for NTP.

14      BY MR. GOLOMB:

15            Q    And do you know how much of the $245,000

16      and the $29,000 that was collected by the task

17      force in 2000 and 2001 went to the Weinberg Group?

18            A    No, I don't.

19            Q    Do you know, and correct me if -- I may

20      get the name wrong, but there's a crisis

21      management company called Nichols-Denzenhall.

22            A    Dezenhall, yeah.

23            Q    Okay.  Do you know who they are?

24            A    Yes.
```

Mark Pollak

1        Q     Who are they?

2        A     So they're a crisis management and

3    public relations firm in Washington.

4        Q     What is a crisis management firm?

5        A     So we had started working with them

6    earlier.  They help organizations if there's a --

7    if there's a lot of media attention focus on a

8    particular safety issue, for example.

9        Q     And had Dezenhall ever been hired by the

10   PCPC before 2000?

11       A     Yes.

12       Q     For what issues?

13       A     There was a big issue in -- earlier in

14   the '90s about multiple chemical sensitivity

15   involving fragrances.

16       Q     Anything related to talc?

17       A     I know he made a proposal for doing some

18   work on talc, and I don't recall where that went

19   or how.

20       Q     Okay.  So do you know if or how much of

21   the money collected by the Talc Interested Party

22   Task Force went to the Dezenhall group as a -- for

23   crisis management fees in 2000 and 2001?

24             MR. LOCKE:  Objection.  Form, beyond the

Mark Pollak

```
 1    scope.

 2                  THE WITNESS:  And I don't know.

 3    BY MR. GOLOMB:

 4        Q    And none of the documents that you

 5    reviewed to prepare for your deposition here today

 6    assisted you in that way?

 7        A    So, again, I -- if I recall,

 8    Nichols-Dezenhall was involved perhaps with a

 9    focus group.  I know they had some involvement

10    with the issue and made a proposal, but I...

11        Q    Okay.  If you assume for the purpose of

12    my question that both the Weinberg Group and

13    Nichols-Dezenhall were both hired around the time

14    of -- in 2000 when the NTP was reviewing whether

15    or not to include talc as a carcinogen, I want you

16    to assume that to be true for the purposes of my

17    question.

18                  So as you sit here today, you've never

19    read the Weinberg report as it relates to talc?

20                  MR. LOCKE:  Objection.  Beyond the

21    scope.

22                  THE WITNESS:  I don't recall ever seeing

23    it.

24    BY MR. GOLOMB:
```

Mark Pollak

1        Q    And you haven't reviewed the Dezenhall

2    report as it relates to talc?

3              MR. LOCKE:  Objection.  Beyond the

4    scope.

5              THE WITNESS:  I don't even know if there

6    is a report.

7    BY MR. GOLOMB:

8        Q    Okay.  Is it -- if Dezenhall or Weinberg

9    had been hired to -- to do their work in -- with

10   respect to some other ingredient that may affect

11   some other member, in the scope and course of your

12   employment, is that something that you would see?

13       A    Possibly at the time, but it's so long

14   ago, I can't recall what I did read and I didn't

15   read.  I mean, we had previous relationships with

16   both organizations on -- on other matters.

17       Q    Okay.  So, as you sit here today, you

18   just don't recall one way or the other as to

19   whether or not you read those reports as they

20   relate to the association between talc and ovarian

21   cancer?

22             MR. LOCKE:  Objection.  Beyond --

23   BY MR. GOLOMB:

24       Q    Is that correct?

Mark Pollak

```
1                    MR. LOCKE:  Beyond the scope.

2                    THE WITNESS:  I may -- I probably would

3      not have read a report that would be -- or a

4      submission to the NTP at that time.

5      BY MR. GOLOMB:

6           Q    Would you -- would you -- as part of

7      your job, would you have known how much these

8      entities were paid?

9           A    At the time I would have known it, but I

10     don't recall now this many years later what --

11     what was discussed.

12          Q    Okay.  What's the purpose of the PCPC?

13          A    So we are the national trade association

14     that represents cosmetic, toiletry and fragrance

15     manufacturers and distributors in the U.S., and

16     providing them with technical reg- -- and

17     regulatory information to represent them on

18     government affairs, public affairs, and to work to

19     obtain international uniformity on cosmetic

20     regulation.

21          Q    Now, does either you or somebody at the

22     PCPC have regular dealings with the FDA?

23          A    Yes.

24          Q    Now, just looking at your list of
```

Mark Pollak

```
 1    members, they're all -- they're all cosmetic

 2    companies of one -- one form or another, correct?

 3         A    Right.  The -- yes.

 4         Q    And many of them are, in addition to

 5    manufacturing and distributing cosmetics, they

 6    also manufacture and distribute pharmaceuticals,

 7    correct?

 8         A    Some do, yes.

 9         Q    Right.  As an example, Johnson &

10    Johnson.

11         A    Yes.

12         Q    Right.  And you're aware, are you not,

13    that the -- the FDA requirements as they relate to

14    pharmaceuticals are different than the FDA

15    requirements --

16         A    Yes.

17         Q    -- as they relate to cosmetics, correct?

18              MR. LOCKE:  Objection.  Beyond the

19    scope.

20              THE WITNESS:  But I -- I'm aware of

21    that, yes.

22    BY MR. GOLOMB:

23         Q    Just very generally, what -- based on

24    your many years of working at PCPC, how would you
```

Mark Pollak

1   explain the difference?

2            MR. LOCKE:  Objection.

3   BY MR. GOLOMB:

4       Q    Between the role of the FDA as they

5   relate to cosmetics versus pharmaceuticals.

6            MR. LOCKE:  Objection.  Beyond the

7   scope.

8            THE WITNESS:  Pharmaceuticals are much

9   more -- there's a lot more regulation, and there's

10  premarket approval of pharmaceuticals.  There's

11  not premarket approval of cosmetics.

12  BY MR. GOLOMB:

13      Q    Is it fair to say that cosmetics are

14  self-regulated?

15           MR. LOCKE:  Objection.  Beyond the

16  scope.

17           THE WITNESS:  One -- one could say that,

18  but there are FDA -- a number of FDA regulations

19  involving packaging, labeling, ingredient

20  substantiation.

21  BY MR. GOLOMB:

22      Q    Okay.  And if you had read some of the

23  same documents that I read in preparation for the

24  deposition here today, it is -- as it relates to

Mark Pollak

1  regulation, it is the goal of the PCPC to maintain

2  that self-regulatory status, correct?

3          MR. LOCKE:  Objection to form and beyond

4  the scope.

5          THE WITNESS:  We would have earlier said

6  that, but now we feel that our -- the goal is to

7  modernize regulation.  People have accepted a

8  larger role for government agencies.

9  BY MR. GOLOMB:

10      Q    What do you mean by that?

11      A    I think there's a consumer expectation,

12  and we -- until perhaps ten years ago, we did use

13  the term "self-regulated" a lot.  But we felt that

14  was no longer appropriate and that we needed to

15  work on modernizing regulation.  For example, the

16  Food, Drug and Cosmetic Act which governs

17  cosmetics hasn't been changed since 1938.

18      Q    Well, have you been on your website?

19      A    Yes.

20      Q    Have you been on your website to look at

21  it to prepare for your deposition here today?

22      A    No.

23      Q    Would it surprise you to see that on

24  your -- on your website they still refer to

Mark Pollak

1   self-regulation as a -- as a goal and a mission of

2   the PCPC as it relates to cosmetics?

3              MR. LOCKE:  Objection to form.

4              THE WITNESS:  That's -- I mean it's

5   possible.  We're actually -- as I said earlier,

6   we're in the process of updating the website

7   anyway.

8   BY MR. GOLOMB:

9         Q    Okay.  So --

10        A    But that probably is one area that's

11   being addressed.

12        Q    So the -- the thinking as to the

13   self-regulatory status of the company began about

14   ten years ago, you said, but you just haven't

15   gotten to the website yet?

16             MR. LOCKE:  Objection to form and beyond

17   the scope.

18             THE WITNESS:  I -- I think, though, we

19   talk about modern -- you know, the goal of

20   modernizing government regulation.

21   BY MR. GOLOMB:

22        Q    And -- and what do you mean by that?

23        A    Updating federal regulation.  We believe

24   in a strong regulatory process.  FDA regulations

Mark Pollak

```
1    should be the gold standard, and we're hoping that

2    other regulatory bodies worldwide will model

3    themselves on FDA.

4         Q    Well, and is that because the FDA

5    doesn't regulate cosmetics?

6              MR. LOCKE:  Objection to form and beyond

7    the scope.

8              THE WITNESS:  As I said, they -- there

9    is regulation, you know, involving how companies

10   have to label and package and disclose their

11   ingredients.

12   BY MR. GOLOMB:

13        Q    Okay.  What is your understanding of how

14   the FDA regulates labeling?

15             MR. LOCKE:  Objection to -- beyond the

16   scope.

17             THE WITNESS:  There's the Fair Package

18   Labeling Act, but it's really not my area of

19   responsibility.  I'm just telling you what --

20   what -- more common knowledge.

21   BY MR. GOLOMB:

22        Q    Okay.  And -- well, is the -- is the

23   common knowledge based on what the employees of

24   the PCPC and its members would like it to be or is
```

Mark Pollak

```
 1   it based on the actual regulation?

 2        A    It's based on the actual regulation.

 3        Q    Okay.  Well, when was the last time you

 4   looked at the actual regulation?

 5             MR. LOCKE:  Objection.

 6             THE WITNESS:  I don't recall.

 7             MR. LOCKE:  Beyond the scope.

 8   BY MR. GOLOMB:

 9        Q    But you agree that whatever the

10   regulation is under the CFR is what's -- what is

11   binding on the company members --

12        A    Yes.

13        Q    -- of the PCPC, correct?

14        A    Yes.

15             MR. LOCKE:  Objection.  Beyond the

16   scope.

17             MR. GOLOMB:  Want to take about a

18   ten-minute break?

19             MR. LOCKE:  Sure.

20             THE VIDEOGRAPHER:  The time is

21   10:45 a.m., and we're going off the record.

22             (Recess.)

23             THE VIDEOGRAPHER:  The time is

24   11:01 a.m., and we're back on the record.
```

Mark Pollak

```
 1   BY MR. GOLOMB:

 2        Q    Mr. Pollak, do you have Pollak No. 3

 3   in front of you there?  This is the --

 4        A    Yes.

 5        Q    -- the ledger of the --

 6        A    Yes.

 7        Q    -- contributions.

 8             Before I was asking you some questions

 9   about whether or not certain entities received

10   payment, and you didn't know the answer to that.

11             And so my question to you is, who -- who

12   would know?

13        A    Well, I assume Linda Loretz is covering

14   this, and the accounting department that produced

15   the document.

16        Q    Okay.  So your assumption is if I asked

17   her about the same people, Dr. Muscat,

18   Dr. Huncharek, Weinberg Group, et cetera, the

19   people I asked you about, and there's some

20   additional ones, that Ms. Loretz would be the one

21   to say, you know, in 2000 we received $245,000 in

22   contributions from various task force members, and

23   I think Dr. Loretz would know the answer to how

24   much went to each of these individual entities; is
```

Mark Pollak

```
 1    that correct?

 2         A    I assume so, yes.

 3         Q    Okay.  We were also -- let's just talk

 4    about -- you were saying about this -- although

 5    the website hasn't been updated, this ten-year

 6    transition going into self-regulatory based on

 7    what the consumer wants.

 8              First of all, who -- who -- which of the

 9    employees that we talked about -- employee or

10    employees that we talked about on that

11    organizational chart would be the one who would be

12    most often liaisoning with the FDA?

13         A    So it would depend on the issue.  Tom

14    Myers on a lot of regulatory issues would -- or

15    Emily would be the primary --

16         Q    Do you have -- I'm sorry.  Do you have

17    the organizational chart in front of you?

18         A    Sure.  So some of it would be through

19    Science, some of it would be through legal, and

20    then some of it would be through government

21    relations, depending on the issue.

22         Q    Okay.  Let's -- let's talk about legal.

23         A    Okay.

24         Q    As it relates to the issue of talc, who
```

Mark Pollak

```
 1    would be the person who would be the -- most often

 2    liaisoning with the FDA?

 3         A    So I -- I don't think anyone from the

 4    legal department did.

 5         Q    Okay.  What about Government Affairs?

 6         A    They definitely did not.

 7         Q    You described for me before the

 8    Government Affairs department as lobbying.  So

 9    you're saying that your lobbyists are not talking

10    to the FDA as it relates to talc?

11         A    Correct.

12         Q    And how is it that you're so sure about

13    that?

14         A    I would have -- the government would be

15    more in the context of proposed regulation or

16    mainly for Government Affairs involving proposed

17    legislation.

18         Q    Okay.  And as -- as this ten-year

19    transition has been undergoing, have there -- has

20    there been legislation proposed?

21         A    Yes.

22         Q    Okay.  And tell me about the

23    legislation.

24         A    So this has started perhaps in 2008, an
```

Mark Pollak

```
 1    effort to update and modernize the Food, Drug and

 2    Cosmetic Act, to make some provisions of the

 3    Voluntary Cosmetic Reporting Program mandatory, to

 4    have FDA promulgate good manufacturing practices

 5    for cosmetics, to formalize the Adverse Event

 6    Experience Reporting System, things like that, and

 7    then an ingredient review program.

 8         Q    Adverse event reporting for cosmetics?

 9         A    Mm-hmm.  That's -- had initially been

10    part of the Voluntary Cosmetic Reporting Program,

11    so then that was eliminated around 1999.

12         Q    Who was it that -- who is it at PCPC

13    that is responsible for that legislation?

14         A    Well, there are a number of people who

15    work on it, but it would be John Hurson is the

16    EVP.

17         Q    And he's EVP of what department?

18         A    Govern -- Government Affairs.

19         Q    Now, so you're -- you're saying that

20    John person -- I mean, John Hurson is -- is

21    responsible for this legislation, but he does not

22    have contact with the FDA?

23         A    He has contact in the FDA.  We've had

24    meetings regarding -- not recently, but regarding
```

Mark Pollak

1    the proposed legislation and what FDA -- how they

2    would handle it or how they would view it and what

3    would be acceptable to them.

4        Q    And is the proposed legislation in

5    print?

6        A    Yes.  There's a -- it's been introduced

7    in the Senate.

8        Q    Who has it been introduced by?

9        A    Senators Feinstein and Collins.

10       Q    That's SB what?

11       A    I don't recall.

12       Q    When was it first introduced?

13       A    2016, is it -- but within the last two

14   years.

15       Q    And how did -- was it Mr. Hurson who got

16   Senators Feinstein and Collins aboard?

17       A    Well, it was a broader effort, but yes.

18       Q    Broader effort by who?

19       A    Well, Lezlee Westine would have been

20   involved.

21       Q    Was there involvement by some of your

22   members?

23       A    Possibly, but I wouldn't -- I mean,

24   Senators Feinstein and Collins introduced the bill

Mark Pollak

```
 1    on their own.  We had been working with FDA on a

 2    proposal that ended up in a stalemate, and then

 3    Senator Feinstein decided to take the lead.

 4         Q    Does PCPC make contributions to

 5    individual congressional members' campaigns?

 6         A    So there is a political action committee

 7    and contributions would be made through that.

 8         Q    What's the name of the political action

 9    committee?

10         A    I think it's the PCPC Political Action

11    Committee.

12         Q    And are they run out of the PCPC office?

13         A    Yes.

14         Q    And who is responsible for the day to

15    day of the PCPC PAC?

16         A    So the federal PAC would be John Hurson.

17         Q    So the same person who is responsible

18    for the proposed legislation is also responsible

19    for the PAC that maintains a political action

20    committee that makes contributions, in this case

21    to Senator Feinstein and Senator Collins?

22              MR. LOCKE:  Objection to form.

23              THE WITNESS:  Possible- -- I don't know

24    if -- I think --
```

Mark Pollak

```
 1   BY MR. GOLOMB:

 2        Q    Are there -- are there separate

 3   documents, financial documents for the PCPC PAC

 4   that are maintained --

 5        A    Yes.

 6        Q    -- within the PCPC?

 7        A    Yes.

 8        Q    And is John Hurson the person that would

 9   know the most about who contributed what to whom

10   and how much the PCPC contributed to which

11   legislators?

12        A    Right.  And there are annual filings

13   that I think are public.

14        Q    And do you know what committee -- well,

15   strike that.

16             Do you know what -- what is the status

17   of the bill?

18        A    Well, it's -- it's being considered in

19   the Senate Health, Education, Labor and Pensions

20   Committee.

21        Q    Who's the chairman of that committee?

22        A    Lamar Alexander.

23        Q    Who is the minority leader?

24        A    I don't recall.
```

Mark Pollak

1      Q    Do you know who else --

2      A    Maybe Patty Murray.  I don't recall.

3      Q    Do you know approximately when it --

4   approximately when it went to the Senate Health

5   Committee?

6      A    So this is -- this year they're looking

7   at a draft.

8      Q    And do you know which senators while

9   this is -- while this is pending before the

10  Senate, do you know which members received funds

11  from the PCPC PAC in the way of contributions?

12     A    No, I don't.

13          MR. LOCKE:  Objection.  Beyond the

14  scope.

15  BY MR. GOLOMB:

16     Q    Do you know the names of any of the

17  sponsors to the bill?

18     A    No.

19     Q    Are there -- are there written reports

20  from Mr. Hurson from time to time about the status

21  of the legislation?

22     A    Yes.  We -- we report on it at our board

23  meetings.

24     Q    How often are your board meetings?

Mark Pollak

```
 1        A    Three times a year.

 2        Q    When was the last time you had a board

 3   meeting?

 4        A    May 31.

 5        Q    And did you receive a status of the

 6   bill?

 7        A    Yes.

 8        Q    What was the status at that time?

 9        A    Approximately what I told you in the

10   last few minutes.  It's being considered in -- in

11   the Senate Health Committee, and they're -- we're

12   hoping that Senator Feinstein and Senator

13   Alexander will get together and reach agreement,

14   and so far they haven't.

15        Q    What -- is Senator Feinstein on the

16   Senate Health Committee?

17        A    I think so, but I -- I don't know.

18        Q    Okay.  Do you know whether she's the --

19   the minority leader on that --

20        A    I don't think she is.

21        Q    -- committee?

22             Do you know why it is that Mr. Hurson

23   went to Senator Feinstein for -- to seek

24   co-sponsorship?
```

Mark Pollak

```
 1        A    He --

 2             MR. LOCKE:  Objection to form.

 3             THE WITNESS:  He didn't.  As I said,

 4   she -- she decided to introduce it on her own.

 5   BY MR. GOLOMB:

 6        Q    Okay.  And does the PCPC hire outside

 7   lobbyists from time to time?

 8        A    Yes.

 9        Q    And do they hire outside lobbyists to

10   handle certain issues?

11        A    We have a lobbying firm on retainer.

12        Q    Who is that?

13        A    Mehlman Vogel Castagnetti Thomas or --

14   they may have changed the name, but that's --

15        Q    I'm sorry, Melvin?

16        A    Mehlman.

17        Q    Mehlman.

18        A    M-E-H-L-M-A-N.

19        Q    Mark Mehlman?

20        A    No, Bruce Mehlman.  No relation.

21        Q    What was the second name?

22        A    Well, they -- I know David Castagnetti

23   is one of the other named partners.  They changed

24   their name, and I don't want to give you the
```

Mark Pollak

1   wrong --

2        Q    Okay.  And do you know who is on the --

3   from the outside lobbying team that is responsible

4   for this senate bill?

5             MR. LOCKE:  Objection to form and beyond

6   the scope.

7             THE WITNESS:  I -- I wouldn't say the

8   person -- we work with Bruce Mehlman and get his

9   advice.

10  BY MR. GOLOMB:

11       Q    When was the last time you spoke with

12  Bruce Mehlman about this bill?

13       A    I saw him at a meeting in the last few

14  weeks.

15       Q    And did you talk about this bill?

16       A    Yes.

17       Q    Was that the purpose of the meeting?

18       A    Yes.

19       Q    Okay.  When you say you have them on

20  retainer, how much is the retainer?

21       A    I think it is $25,000 a month.

22       Q    And where does the money come from?

23       A    From our general operating budget.

24       Q    Are outside lobbyists hired from time to

Mark Pollak

1   time to deal with specific issues related to a

2   specific task force?

3        A    I wouldn't say a specific task force.

4   Sometimes it's a specific piece of legislation.

5        Q    Are there -- are there times when the

6   funding of the outside lobbyists, like in the case

7   of Mehlman and his $25,000 a month, are there

8   times when the money would come from an individual

9   task force rather than the operating?

10       A    I don't think so.

11       Q    What do you hope to accomplish through

12  the passage of this bill?

13            MR. LOCKE:  Objection.  Beyond the

14  scope.

15            THE WITNESS:  As I said, you know, the

16  goal is modernize federal regulation and make

17  mandatory a number of things that are currently

18  voluntary; have GMPs as part of the mandatory

19  regulation so that the FDA is considered the gold

20  standard as far as cosmetic regulation.

21  BY MR. GOLOMB:

22       Q    Give me an example of something that is

23  currently now mandatory that you want to make -- I

24  mean that is now voluntary that you want to make

Mark Pollak

1   mandatory as part of this bill.

2            MR. LOCKE:  Objection.  Beyond the

3   scope.

4            THE WITNESS:  Currently, companies --

5   there's a voluntary program to -- for companies to

6   provide locations of their manufacturing

7   facilities as well as ingredient -- the formulas

8   for cosmetic products, and they do register those

9   with FDA, but it's not mandatory.

10  BY MR. GOLOMB:

11       Q    And why do you want that to be mandatory

12  for your members?

13            MR. LOCKE:  Objection.  Beyond the

14  scope.

15            THE WITNESS:  Because we think it's a

16  stronger regulatory system.

17  BY MR. GOLOMB:

18       Q    Okay.  Well, on your website you refer

19  to the need to maintain a self-regulatory system,

20  so which common sense-wise doesn't seem to jibe.

21            So tell me -- I mean you mentioned to me

22  before that there's been this ten-year transition,

23  but it's still on your website.

24       A    Right.  We still -- for example, the

Mark Pollak

1   Cosmetic Ingredient Review program is the linchpin

2   of our self-regulatory philosophy.  So -- and

3   we're not -- we're not disavowing that.  That's

4   going to be a key.

5        Q    And when you say that's the linchpin of

6   your self-regulatory process, what do you mean?

7        A    Currently there's no FDA premarket

8   review of cosmetics or cosmetic ingredients.  The

9   proposed legislation would have set up an

10  ingredient review process, but we have this

11  self-regulatory program for 40 years where we

12  review the -- the data on the safety of cosmetic

13  ingredients, and the expert panel makes

14  recommendations as far as determination of the

15  safety category.

16       Q    So in part, are you saying that you --

17  you have this CIR, number one, to maintain

18  independence from the PCPC and while at the same

19  time strengthening the self-regulatory process?

20            MR. LOCKE:  Objection to form.

21            THE WITNESS:  I'm not sure I would

22  characterize the legislation as strengthening the

23  self-regulatory process.

24  BY MR. GOLOMB:

Mark Pollak

```
1          Q    I -- I didn't say -- I'm sorry.

2          A    Okay.

3          Q    I didn't say anything about the -- I'm

4     talking about the CIR.

5          A    Okay.

6          Q    You said it's the linchpin of your

7     self-regulatory process, and my question to you

8     was, do you -- you've -- this linchpin of the

9     self-regulatory process, you review that as

10    some -- something independent from the PCPC?

11              MR. LOCKE:  Objection to form.

12              THE WITNESS:  Yes.  I mean, the -- the

13    expert panel is totally separate.

14    BY MR. GOLOMB:

15         Q    The expert panel which is selected by

16    employees of the PCPC, correct?

17         A    No.

18         Q    You have -- there's a CIR board of

19    directors?

20         A    No.

21         Q    There -- is there a CIR board of some

22    sort?

23         A    No, there's a CIR steering committee

24    that's in the procedures that are on their
```

Mark Pollak

1   website, and the CIR expert panel members are --

2   there's a nominating process.  Anybody -- any

3   member of the public can nominate someone for --

4   to be considered for an expert panel member.

5   There are other ways of soliciting nominations,

6   and the ultimate determination is made by the

7   steering committee.

8        Q    How many members of the steering

9   committee are there?

10       A    Seven.

11       Q    And is there a chairman of the steering

12   committee?

13       A    Yes.

14       Q    And who is the chairman of the steering

15   committee?

16       A    So the chairman of the steering

17   committee is the CEO of PCPC.

18       Q    All right.  And so that's your -- that's

19   your view of independence, to have the -- the --

20   the chairman of the company that's funding the

21   organization, in this case the CIR, be the

22   chairman of what it is they're funding?

23            MR. LOCKE:  Objection to form.

24            THE WITNESS:  The steering committee

Mark Pollak

 1   also includes a representative from the Society of

 2   Toxicology, the American Academy of Dermatology,

 3   there's a representative from the Consumer

 4   Federation of America.  It's, you know, all -- all

 5   the stakeholders involved with -- in the program

 6   have a say.

 7   BY MR. GOLOMB:

 8        Q    Yeah.  And all those stakeholders are --

 9   are selected to serve as members of the steering

10   committee by executives from PCPC, correct?

11              MR. LOCKE:  Objection.  Form.

12              THE WITNESS:  No.  The -- in fact, we

13   just -- we're in the process of getting a new

14   toxicologist, and there is -- you know, the

15   Society of Toxicologists is putting forth some

16   recommendations on people, and it will be

17   considered at the next steering committee meeting.

18   BY MR. GOLOMB:

19        Q    Okay.  Can we go to Exhibit 11, please.

20              MR. DONATH:  11?

21              MR. GOLOMB:  11.

22              (Pollak Exhibit No. 11 was marked

23              for identification.)

24   BY MR. GOLOMB:

Mark Pollak

1        Q    What you have in front of you is Imerys

2    document 118791, and if you look at the bottom

3    half, it says:  "Part B.  The Cosmetic Ingredient

4    Review Steering Committee and Staff."

5        A    Mm-hmm.

6        Q    Are you familiar with this document?

7        A    Yeah.  I mean it's -- it's an old

8    version of the procedures.

9        Q    Okay.  And when you say old, how old is

10   it?

11       A    Well, it's at least a few years old

12   because it still has on -- on there 1101 17th

13   Street, and we moved four-and-a-half years ago.

14       Q    Okay.  Well, if you look at Section 10,

15   it's defined as "Organization of the Cosmetic

16   Ingredient Review, "and look at (a)(1) through

17   (6) --

18       A    Mm-hmm.

19       Q    -- other than the address, has any of

20   that changed substantively?

21       A    Yeah, so the only other change would be

22   in (a)(1), the president and CEO can designate the

23   chief operating officer as the chair of the

24   steering committee.

Mark Pollak

```
1          Q     Okay.  And so for the record, this is

2     the organization of the Cosmetic Ingredient

3     Review.  And it says:  "The general policy and

4     direction for Cosmetic Ingredient Review shall be

5     given by a steering committee.  A quorum of the

6     steering committee shall consist of five members.

7     Any member before the steering committee shall be

8     decided by a majority vote of the CIR members

9     present at the time, except where otherwise

10    specifically provided in these procedures.  The

11    steering committee shall consist of the following

12    members."

13              First of all, did I read that correctly

14    so far?

15         A     Yes.

16         Q     And is this document, is this from the

17    PCPC or from the Cosmetic Ingredient Review?

18              MR. LOCKE:  Objection.  Just to the

19    extent to -- I want to state for the record this

20    is an old version.  We have and can give you a

21    current version if you want.

22              You can answer the question.

23              THE WITNESS:  Right.  So as he said, I

24    mean I reviewed the procedures on their website
```

Mark Pollak

```
 1    yesterday.

 2    BY MR. GOLOMB:

 3         Q    Is this -- what you have in front of

 4    you, is this a procedure from the CIR or a

 5    procedure from the PCPC?

 6         A    It's on the -- it's on the CIR website.

 7         Q    Okay.  And is the CIR website distinct

 8    from the PCPC website?

 9         A    Yes.

10         Q    And who -- who actually -- who is the

11    webmaster of the CIR website?

12         A    So that would be both Bart and Kevin

13    Fries, who is on their organization chart.

14         Q    Okay.  On the organization chart of the

15    CIR?

16         A    Yes.

17         Q    And they -- they're both paid employees

18    of the PCPC, correct?

19         A    Yes.

20         Q    All right.  And so this lists six

21    members of the steering committee.  "The president

22    and CEO of the council" -- by that it means the --

23    the PCPC council, correct?

24         A    Yes.
```

Mark Pollak

```
1        Q    -- "who shall serve as the chair of the

2   steering committee."  Right?

3        A    Yes.

4        Q    So the chair of the steering committee

5   for the CIR is the president and CEO of PCPC.

6        A    Right.  And the revision is that the

7   chief operating officer can serve as the chair.

8        Q    In addition to the president and CEO or

9   instead of?

10       A    Instead of.

11       Q    And then it says:  "A dermatologist who

12  shall represent the American Academy of

13  Dermatology."

14       A    Mm-hmm.

15       Q    Correct?

16       A    Yes.

17       Q    And how is that person selected?

18       A    Well, the American Academy of

19  Dermatology nominated Dr. Wilma Bergfeld, who

20  serves as the chair of the expert panel also.

21       Q    And does --

22       A    She's the former president.

23       Q    Does the -- does the CIR have final say

24  on whether -- who that member of the American
```

Mark Pollak

```
 1    Academy of Dermatology may be?

 2         A    Well, the steering committee does.

 3         Q    Right.  The steering committee that's

 4    chaired by the --

 5         A    Right.

 6         Q    -- president and CEO or COO of --

 7         A    Correct.

 8         Q    -- the PCPC.

 9              And is the same true of the

10    toxicologists, that is that the PCPC has the final

11    say?

12              MR. LOCKE:  Objection to form.

13              THE WITNESS:  The steering committee

14    does.

15    BY MR. GOLOMB:

16         Q    All right.  And the -- the chair of

17    the -- it says:  "(4)  The chair of the council's

18    CIR Science and Support Committee."  Who is that?

19         A    So I actually -- the position may be in

20    transition.  The person before was -- was Jack

21    Linard, but I don't know if we consider him --

22    it's the vice chair of SAC Exec, Espe Troyano from

23    Proctor & Gamble.

24         Q    Okay.  Well, whoever the individual is,
```

Mark Pollak

```
 1    the chair of the council's CIR Science and Support

 2    Committee are PCPC employees, correct?

 3         A    No.

 4         Q    Who are they?

 5         A    I just said she's Espe Troyano from

 6    Procter & Gamble.

 7         Q    Okay.  And they are a member of the -- a

 8    dues paying member of the PCPC?

 9         A    Yes.

10         Q    And the council executive vice president

11    for Science --

12         A    Right.

13         Q    -- when you refer to the council, you're

14    referring to the PCPC?

15         A    Yes.

16         Q    Okay.  An employee of the PCPC is the

17    fifth member of this steering committee.

18         A    Yes.

19         Q    And then a consumer representative who

20    shall represent the Consumer Federation of

21    America, how is that person selected?

22         A    The Consumer Federation of America

23    nominates someone.

24         Q    And then this steering committee has the
```

Mark Pollak

```
 1    final say on who that will be?

 2         A    Mm-hmm.

 3         Q    Yes?

 4         A    Yes.

 5         Q    And from time to time is the person who

 6    is actually appointed to the committee some --

 7    somebody who is different than the consumer

 8    representative that may be nominated by the

 9    Consumer Federation of America?

10         A    Most of the time it's the same person.

11         Q    But you said "most of the time."  Not

12    all the time.

13         A    There may have been -- I don't know in

14    the past whether there's ever been someone

15    different.  It probably has always been the same

16    one, but it doesn't have to be.

17         Q    Okay.  You -- you referred to -- when I

18    was asking you about the legislation before, you

19    talked about board meetings that were held three

20    times a year, the most recent one was May 31st.

21         A    Yes.

22         Q    Those are board meetings of the PCPC?

23         A    Yes.

24         Q    And are there minutes of those board
```

Mark Pollak

1   meetings?

2        A    Yes.

3        Q    Who maintains those minutes?

4        A    I do.

5        Q    Did you review those -- any of those

6   minutes to help prepare you for your deposition

7   today?

8        A    No.

9        Q    Where are those board meetings held?

10       A    Most of the time they're in New York

11   City.  We have a board meeting in conjunction with

12   our annual meeting, which is usually held in

13   Florida.  So two of the three are in New York.

14       Q    Let's talk about the PCPC relationship

15   with -- with J&J.  We've already talked about

16   their contributions to the task force.

17            They're also a member of the PCPC,

18   correct?

19       A    Correct.

20       Q    And as I understand from your website,

21   there are approximately 600 members?

22       A    Right, including the associate members

23   who are the suppliers.

24       Q    Now, is -- has that number been updated

Mark Pollak

1   over the last ten years or is that a ten-year-old

2   number?

3        A    It's approximately the same.  I mean, in

4   a given year we may be higher than 600 or lower --

5   but it's -- it's approximately the same over

6   the --

7        Q    And does the website get updated --

8        A    Yes.

9        Q    -- on an annual basis to -- to show the

10  numbers?

11       A    We -- we don't put an exact number

12  because at any given time during the year, the

13  number may be higher or lower.  Sometimes we have

14  608, sometimes we have 592.  So that's why we say

15  approximately 600.

16       Q    Okay.  And I would imagine that there's

17  information on your website that changes more than

18  once a year.

19       A    Oh, yeah.

20       Q    Okay.  And -- and when information

21  becomes -- when there's new information that may

22  be relevant to the website, the website is

23  updated?

24       A    Yes.

Mark Pollak

1          Q     And so -- I'm sorry, I may have asked

2    you this already, but the -- who is the -- kind of

3    the webmaster of the PCPC website?

4          A     So currently it's Natasha Clover.  But

5    we are -- as part of the website redesign process,

6    Jamie Kirk, who is in Public Affairs, will also be

7    working with her on updating features on the

8    website.

9          Q     And does the website have -- is there a

10   blog on the website?

11         A     No.

12         Q     Is there information on the website that

13   changes or is added on a weekly basis?

14         A     Could be, because we have different

15   meetings and events posted that way.  And then if

16   we do a press release, but the -- the press

17   releases wouldn't be -- most of the time wouldn't

18   be more than once a month.

19         Q     And the -- the -- is there a roster of

20   the members of the PCPC somewhere on the website?

21         A     Yes.

22         Q     And I imagine that changes from time to

23   time?

24         A     Yes.

Mark Pollak

```
 1          Q     And when -- when -- when that roster

 2    changes from time to time, is it changed on the

 3    website?

 4          A     Yes.

 5          Q     What other kinds of things are changed

 6    on a, you know, regular, weekly, monthly,

 7    bimonthly basis on the website?

 8          A     So on the public website, that -- that's

 9    the majority of it would be involving meetings and

10    upcoming events, webinars.

11          Q     Okay.  So as I understand it from your

12    previous deposition, there are two different kinds

13    of members; is that correct?

14          A     Right.

15          Q     And what are they?

16          A     Active members are manufacturers and/or

17    distributors of finished products.  Associate

18    members are the suppliers to them.

19          Q     Okay.  And so for our purposes, J&J is

20    an active member?

21          A     Yes.

22          Q     And Imerys --

23          A     Would be an --

24          Q     -- if they're still a member --
```

Mark Pollak

```
1         A    Right, would be an associate.

2         Q    -- is an associate member.

3              And how -- how's their dues structure

4    determined?

5         A    Okay.  So for active members, dues are

6    on a sliding scale based on their U.S. sales of

7    cosmetics, toiletries and fragrances.

8              The associate members has different

9    ways -- for Imerys, for an ingredient supplier, it

10   is a sliding scale based on their U.S. sales of

11   ingredients to the cosmetics industry.

12        Q    So --

13        A    With a -- with a cap on what they would

14   pay.

15        Q    Okay.  And so what did -- what did J&J

16   pay for membership last year?

17        A    If I recall, it was a little -- it was

18   in the $490,000 range.

19        Q    Is there any company that pays more than

20   them?

21        A    Yes.

22        Q    Who?

23        A    Well, it's considered confidential

24   information we tell companies on the dues form.
```

Mark Pollak

```
 1    There are at least five companies that pay more.

 2         Q    And out of those five companies, what --

 3    what's the highest dues amount?

 4         A    I think the -- our largest member is

 5    paying over 1.1 million a year now.  The second

 6    largest would be 900-something, and then two

 7    companies in the 700s and one in the 600s.

 8         Q    And has J&J been a member at least since

 9    you've been with the company?

10         A    Yes.

11         Q    And again, that's how many years?

12         A    Thirty-five.

13         Q    And if we looked at a -- if we looked at

14    a graph over the last 35 years, approximately how

15    much on an annual basis does J&J pay?

16              MR. LOCKE:  Do you mean by percentage?

17              MR. GOLOMB:  No.  He gave me --

18              THE WITNESS:  So they -- they --

19    BY MR. GOLOMB:

20         Q    I'm sorry, let me be clear.

21              You gave me an amount of $490,000 for

22    last year, and so if we look back 35 years, has

23    that been a pretty steady number?  Has it gone --

24    has it fluctuated?
```

Mark Pollak

1        A    It's gone up substantially.

2        Q    From what to what?

3        A    I think they -- in the '80s they

4    probably paid in the $40,000 range -- forty,

5    50,000.  They were a much smaller -- much smaller

6    company in this space, and during that time they

7    acquired a lot of other major brands that they pay

8    dues on.  For example, Neutrogena cosmetics,

9    Aveeno, Listerine mouthwash, et cetera.

10       Q    And when did that change?

11       A    A different -- different year.  I don't

12   know which acquisition was which year.

13       Q    But you said in the '80s, they were

14   paying about forty to $50,000 a year, and --

15       A    Right.  And starting in the '90s, they

16   had -- there were a series of acquisitions.

17       Q    And were they -- so what were they

18   paying?  Just generally, and we're not holding you

19   to --

20       A    And, again, there have -- there have

21   been some dues rate increases.  But I would say

22   ten years ago, they were probably paying two, 250.

23       Q    Okay.  And in the last ten years?

24       A    I think their dues have gone up because

Mark Pollak

```
 1  they're -- the -- the number of brands they're

 2  paying on has increased in the U.S.

 3      Q    Is it fair to say that over the last 30

 4  years that, just using your kind of loose range of

 5  numbers, that J&J has paid in excess of $15

 6  million in -- in dues?

 7      A    I think that's --

 8      Q    Does that sound about right?

 9      A    I think that's probably on the high

10  side.

11      Q    Well, what would you say?

12      A    If -- I would say the average would be

13  no higher than $200,000 a year, and probably less.

14  So for 30 years, doesn't that put us below

15  6 million?

16      Q    And then that doesn't cover what they

17  paid into the task force, correct?

18      A    Yes.  That's separate.

19      Q    Right.  And -- and any other task force

20  they may be contributing into that we haven't

21  talked about.

22      A    Right.

23      Q    And do we know whether or not there are

24  other task forces that they're involved in?
```

Mark Pollak

1       A    Yes, there are.

2       Q    How many?

3       A    I don't know how many, but I know they

4   would have made substantial contributions to the

5   sunscreen task force because that's a major

6   category for them.

7       Q    When you say "major contribution," how

8   much are we talking about?

9       A    100,000, 200,000.  I don't recall.

10      Q    And how long has that been active --

11      A    Sunscreen task force?

12      Q    Yeah.

13      A    I'd say 20 years.

14      Q    And have they been paying a hundred to

15  $200,000 --

16      A    No, it's not --

17      Q    -- for 20 years?

18      A    It's not an annual assessment.  Again,

19  it's as needed to fund the activities, and there

20  are not solicitations every year.

21      Q    How many active years have there been

22  over the last 20 years for the sunscreen

23  committee?

24      A    I really don't know off the top of my

Mark Pollak

```
1    head.

2          Q    Is it more than half?

3          A    Probably.

4          Q    Okay.  Who is the person -- if you know,

5    who is the person from J&J who is the main contact

6    with the task -- the Talc Interested Party Task

7    Force?

8               MR. LOCKE:  Objection.  Beyond the

9    scope.

10              THE WITNESS:  I don't know.

11   BY MR. GOLOMB:

12         Q    Let's talk a little bit about Imerys and

13   their -- their contributions, both to the task

14   force as well as to the PCPC.

15              Have they been members as long as

16   you've -- whether or not it was Imerys, Luzenac,

17   Rio Tinto, have they been members since you've

18   been around?

19              MR. DONATH:  Objection to the form.

20              THE WITNESS:  Probably, but I -- I don't

21   have independent knowledge.  I did not check that.

22   BY MR. GOLOMB:

23         Q    Okay.  And how much in dues did they pay

24   last year?
```

Mark Pollak

```
1          A    I would -- it was certainly under

2     $10,000, and it may have been a few thousand.

3          Q    And that is exclusive of whatever amount

4     they may have contributed to the task force?

5          A    Yes.

6          Q    And has their -- their -- their dues

7     structure been pretty straight --

8          A    Again, there's been some dues rate

9     increases, but it's not dramatically different

10    over the years.

11         Q    What -- what would it have been on the

12    low end?

13         A    2,000.  I don't know.

14         Q    Okay.  And you know who the National

15    Cancer Institute is, correct?

16         A    Yes.

17         Q    And does the PCPC have communications

18    from time to time with the National Cancer

19    Institute?

20         A    Not that I'm aware of.  We may be on a

21    distribution list that we receive something from

22    them, but I'm not aware of any particular

23    relationship.

24         Q    Okay.  If --
```

Mark Pollak

```
 1                 MR. LOCKE:  Let me just -- we prepared a
 2   document based on some of the questions for the
 3   entities that were listed on the notice, and so we
 4   just put the financial portion, which is what
 5   Mr. Pollak would be testing -- testifying about
 6   on here.
 7                 MR. GOLOMB:  All right.  What exhibit
 8   are we up to, putting 11 aside?
 9                 THE REPORTER:  Four.
10                 MR. GOLOMB:  Four?  Okay, 4.
11                 (Pollak Exhibit No. 4 was marked
12                 for identification.)
13                 MR. GOLOMB:  Does he have a copy to --
14                 MR. LOCKE:  I'll give you a copy.
15                 I tell you what, just so we keep the
16   record clear, why don't you give him that copy,
17   and I'll give you this copy.
18                 MR. GOLOMB:  Yeah, okay.
19   BY MR. GOLOMB:
20        Q    Okay.  Are you familiar with this
21   document that's in front of you, Exhibit 4?
22        A    Yeah.  Tom Locke showed it to me this
23   morning.
24        Q    Okay.  Do you know who prepared this
```

Mark Pollak

1   document?

2       A    I actually don't.

3       Q    Have you ever -- do you know what --

4   what information or documents was used to prepare

5   this?

6       A    I assumed he consulted with our

7   accounting department to get the information.

8       Q    Okay.  So Mr. Locke would be

9   communicating with your accounting department

10  without your knowledge?

11      A    Or it may have been with the knowledge

12  of Tom Myers, but it wasn't specifically through

13  me.

14      Q    Okay.  And you saw this for the first

15  time when?

16      A    This morning.

17      Q    Okay.  And what does this document

18  purport --

19      A    I know the -- the information was

20  covered in the interrogatories, and that they

21  had -- in order to respond to the interrogatories,

22  they had to put together this information.

23      Q    Okay.  Well, if this information was in

24  the answers to interrogatories, then why would we

Mark Pollak

```
 1    need a separate document?

 2              MR. LOCKE:  I can answer it, because

 3    your notice is broader than the interrogatories,

 4    and we wanted to cover all the information.  And

 5    also based on some questions that were asked to

 6    Ms. Loretz about non-talc-related contributions to

 7    entities.

 8    BY MR. GOLOMB:

 9        Q    And -- and so do you know what this

10    document purports to be?

11        A    Yes.

12        Q    What?

13        A    Pay- -- any payments we would have

14    made -- that PCPC would have made to these

15    organizations.

16        Q    Okay.

17        A    And I think there -- there were only --

18    our accounting system only has records

19    electronically or whatever back to 2002.

20        Q    Well, let -- let's go through this, and

21    that -- so does the PCPC have a relationship other

22    than a financial relationship with the National

23    Academy of Sciences?

24        A    No, I don't even think we have a
```

Mark Pollak

```
 1   financial relationship.

 2        Q    Well, that wasn't my question.  My

 3   question was --

 4        A    No, no relationship.

 5        Q    Okay.  And does the -- if we assume for

 6   the sake of discussion that these numbers are

 7   accurate, it says with respect to these various

 8   organizations that there have been no talc-related

 9   payments, correct?

10        A    Yes.

11        Q    Okay.  There -- there are some other

12   payments that have been made, and it says "i.e.,

13   charity and dues."  Do you see that?

14        A    Yes.

15        Q    So as an example, $90,700 of other

16   payments made to the American Cancer Society.  Do

17   you know what those payments were made for?

18        A    So it would be a mixture of things

19   because the American Cancer Society is a partner

20   with the Look Good Feel Better foundation on

21   producing -- on running the Look Good Feel Better

22   program.  Also they had shared the proceeds of the

23   DreamBall.

24              So there may have been a reconciliation
```

Mark Pollak

1  of funds after the event, and there are different

2  things in our partnership agreement which, you

3  know, identifies who pays for certain printing

4  things, and I assume it was to reconcile accounts

5  per the agreement.  There also may have been -- we

6  may have purchased seats at the DreamBall,

7  DreamBall tickets for certain staff members over

8  the years.

9       Q    And the -- under the Consumer

10 Federation -- federal --

11      A    So it should be Consumer Federation of

12 America.

13      Q    Right.  There were no talc-related

14 payments, but there were 367,000 and change of

15 other payments made between 2002 and 2018,

16 correct?

17      A    Yes.

18      Q    Okay.  You would agree with me, would

19 you not, that you could have a relationship with

20 one or more of these companies that has nothing to

21 do with finances?

22      A    Yes.

23      Q    All right.  And so do you know one way

24 or the other whether or not the PCPC has such a

Mark Pollak

1   relationship with the National Cancer Institute?

2       A    I'm not aware of any, and it's never

3   come up.

4       Q    All right.  Who -- if such a

5   relationship existed, who would know that?

6       A    I assume someone in the Science

7   department.

8       Q    Okay.  Linda Loretz, perhaps?

9       A    Perhaps.

10       Q    Okay.  Because I would assume, correct

11   me if I'm wrong, that, as an example, the National

12   Cancer Institute may -- may be circulating

13   information through a study, through periodicals,

14   through their website that may have effect on some

15   of your members.

16            MR. LOCKE:  Objection.  Beyond the

17   scope.  And form.

18            THE WITNESS:  I -- it's possible.  I

19   don't know.

20   BY MR. GOLOMB:

21       Q    Okay.  Let's go back to the cosmetic

22   industry review, the CIR.

23            We talked a lot about the administration

24   of the CIR, we talked a lot about the funding of

Mark Pollak

1    the CIR, the management of the CIR in terms of the

2    steering committee.

3            How are -- how are issues that get in

4    front of the CIR determined?  Is it determined by

5    the -- by the -- by the steering committee?

6            MR. LOCKE:  Objection.  Beyond the

7    scope.

8            THE WITNESS:  So I'm not sure what you

9    mean by issues.  If you mean what ingredients are

10   they reviewing?

11   BY MR. GOLOMB:

12       Q    Right.

13       A    So there is a priority list that is

14   developed, and I think that's actually noted in

15   the procedures also.  If not, it's explained on

16   their website.  The priority list is based on

17   the -- how often an ingredient is used based on

18   the voluntary reporting program data on cosmetic

19   ingredient -- formulations and ingredients.

20       Q    I know you answered this before, but

21   just refresh my memory, when was it that the CIR

22   was formulated?

23       A    I think in 1976.

24       Q    And why was it formulated?

Mark Pollak

```
 1          A    It was at a time where there was a lot

 2    of legislation being considered in Congress that

 3    would have mandatory, more stringent oversight of

 4    the industry, and so we got together with Consumer

 5    Federation of America and others and came up with

 6    a -- with a voluntary reporting program, the idea

 7    of international nomenclature, for uniform

 8    nomenclature for cosmetic ingredients, and then a

 9    review program for cosmetic ingredients that was

10    modeled on the FDA OTC drug review process.

11          Q    Okay.  And how -- how was it determined

12    what -- what ingredients will be reviewed by the

13    CIR?

14               MR. LOCKE:  Objection.  Form, beyond the

15    scope.

16               THE WITNESS:  So that's where we go back

17    to the priority list based on indications of use

18    by what companies are filing with the FDA under

19    the voluntary program.  Also there's a way for FDA

20    to petition and ask CIR to review ingredients, and

21    I think there's a consumer -- you know, an outside

22    group can come in and petition for review.

23    BY MR. GOLOMB:

24          Q    Okay.  And that petition could be either
```

Mark Pollak

```
 1   accepted or denied, correct?

 2        A    Correct.

 3        Q    And so -- and ultimately those decisions

 4   are made by the CIR steering committee.

 5        A    Right.  And the steering committee

 6   publishes the priority lists and everything is

 7   transparent.  And the meetings are open.

 8        Q    Okay.  When you say "the meetings are

 9   open," are there -- there are meetings to

10   determine what -- what ingredients will be

11   reviewed and what ingredients will not be

12   reviewed?

13        A    So the actual meetings where they're

14   reviewing the literature and making the

15   determinations are open.  When the priority list

16   is developed, I think it is presented at -- I

17   think they present the priority list for the year,

18   and I think that is subject to comment by anybody

19   in attendance at the meeting.

20        Q    Okay.  And are there minute -- minutes

21   of these meetings?

22        A    Yes.

23        Q    And how often do these minutes --

24   meetings occur?
```

Mark Pollak

```
1        A    Four times a year.

2        Q    And where are these meetings?

3        A    Washington, D.C.

4        Q    And who is specifically invited to these

5   meetings?

6        A    They're open to the public, and they --

7   per the procedures, there is a notice put out and

8   posted on their website and circulated in the

9   trade.

10       Q    Listed on the CIR website?

11       A    Yes.

12       Q    When is the next meeting?

13       A    September 24th, I think.

14       Q    Where?

15       A    Washington -- they're held at hotels.

16       Q    Okay.  Where's that particular meeting

17  being held?

18       A    I don't remember if it's the Madison

19  Hotel or not.  That's where the last one was.

20       Q    Okay.  And since its inception, do you

21  have any idea of how many ingredients have been

22  reviewed by the CIR?

23            MR. LOCKE:  Objection.  Beyond the

24  scope.
```

Mark Pollak

```
 1                    THE WITNESS:  Several thousand.

 2   BY MR. GOLOMB:

 3        Q    Would you be surprised to know that the

 4   number is -- is somewhere north of 5,000?

 5        A    No, I --

 6        Q    And out of those 5,000 or so ingredients

 7   that have been reviewed, would you surprise -- be

 8   surprised to know that 13 of them have been

 9   concluded to be unsafe?

10                    MR. LOCKE:  Objection to form and beyond

11   the scope.

12                    THE WITNESS:  Yeah, that sounds

13   approximately right.

14   BY MR. GOLOMB:

15        Q    Okay.  So the -- the CIR, which is

16   maintained by the PCPC, has found that less than

17   .0025 percent of the ingredients that it has

18   reviewed to be unsafe for consumer use; is that

19   correct?

20                    MR. LOCKE:  Objection to form and beyond

21   the scope.

22                    THE WITNESS:  Well, I haven't done the

23   math.

24   BY MR. GOLOMB:
```

Mark Pollak

```
1          Q    Okay.  If I told you I have done the

2   math, would you trust me?

3               MR. LOCKE:  Objection to the form.

4               (Laughter.)

5   BY MR. GOLOMB:

6          Q    Let's take a look at some documents.

7               Now, you told us that in the -- that the

8   last -- well, first of all -- strike that.

9               You -- and this is a little confusing to

10  me, so maybe you can help me out.  You told us on

11  the one hand that over the last ten years or so

12  that the PCPC and its members are transitioning

13  from this desire to be self-regulatory to no

14  longer being self-regulatory.

15              In the simplest terms, is that what you

16  told me?

17              MR. LOCKE:  Objection to form and beyond

18  the scope.

19              THE WITNESS:  So I think that's a little

20  bit of a mischaracter- -- characterization.

21              I think the -- the movement is towards a

22  little more mandatory regulation, but it's based

23  on consumer research that consumers are looking

24  for that, have that expectation.
```

Mark Pollak

1    BY MR. GOLOMB:

2         Q    Okay.  Well, I'm wondering, were you --

3    since -- I don't know if you -- if you know this,

4    but because you told us that you didn't review --

5    sorry, you did not review the website in

6    preparation for your deposition.

7              So I wonder if you agree or disagree

8    with the statement that says:  "The CTFA strongly

9    opposes the attempt to remove the self-regulatory

10   status of the cosmetic industry."

11             Is that an accurate statement?

12        A    We wouldn't have used --

13             MR. LOCKE:  Objection.  Form and beyond

14   the scope.

15             Go ahead.

16             THE WITNESS:  If we're saying CTFA, then

17   it's a very outdated document because the name

18   changed.

19   BY MR. GOLOMB:

20        Q    When did the name change from CTFA

21   change to -- to PCPC?

22        A    January 1, 2008.

23        Q    Okay.  So it's at the time -- around the

24   time that the CTFA changed its name to the PCPC

Mark Pollak

1   was around the time that the -- they were

2   transitioning from this group that -- that

3   strongly opposed anything other than a -- a

4   self-regulatory status, that's a quote, of the

5   cosmetic industry to being more of a mandatory

6   regulation?

7          A    I would say that was --

8               MR. LOCKE:  Hang on.

9               Objection to form, beyond the scope.

10              THE WITNESS:  That was part of it.  It

11  was part of the same consumer -- the reason we

12  changed the name was also based on consumer

13  research.

14  BY MR. GOLOMB:

15         Q    Consumer research done by who?

16         A    Different outside groups, not any of the

17  groups involved with this.

18         Q    And you're familiar with Proposition 65?

19         A    Yes.

20         Q    What is Proposition 65?

21              MR. LOCKE:  Objection.  Beyond the

22  scope.

23              THE WITNESS:  It's a -- it's a

24  California ballot initiative that was passed that

Mark Pollak

```
 1   requires warning labels on various consumer

 2   products that are -- have any association with the

 3   possibility of being a carcinogen.

 4   BY MR. GOLOMB:

 5        Q    Okay.  And you're aware, are you not,

 6   that when that was voted on by the voters of

 7   California back in 1986 that the PCPC and its

 8   members spent over $600,000 to defeat that bill,

 9   correct?

10             MR. LOCKE:  Objection to form, beyond

11   the scope.

12             THE WITNESS:  I -- I know we opposed it.

13   I -- I don't know how much we spent on that.

14   BY MR. GOLOMB:

15        Q    Okay.  So then, am I to then understand

16   your testimony here today that if that same

17   initiative was -- was seeking passage, that the

18   PCPC position with respect to Proposition 65 would

19   be different?

20             MR. LOCKE:  Objection to form, beyond

21   the scope.

22             THE WITNESS:  No.

23   BY MR. GOLOMB:

24        Q    It would be the same?
```

Mark Pollak

```
 1        A     Yeah.

 2        Q     They would want defeat of that bill?

 3              MR. LOCKE:  Objection to form and beyond

 4   the scope.

 5   BY MR. GOLOMB:

 6        Q     Correct?

 7        A     Probably.

 8        Q     Okay.

 9              MR. GOLOMB:  What are we -- around 5?

10   Exhibit 5.

11              (Pollak Exhibit No. 5 was marked

12              for identification.)

13   BY MR. GOLOMB:

14        Q     This is a PCPC document 52417, which

15   we've marked as Exhibit 5, and it is a CTFA

16   Mission Statement.  And there's a -- it's a

17   composite document that we will look at some of

18   the pages of.

19              Have you seen this before?

20              MR. LOCKE:  Objection to form.

21              THE WITNESS:  I'm sure I have, but

22   again, it's at least ten years old.

23   BY MR. GOLOMB:

24        Q     Do you know when this document was
```

Mark Pollak

1  created?

2      A   Not specifically, but I would imagine

3  between 2005 and 2007.

4      Q   Okay.  And certainly before that time,

5  the issue of talc and ovarian cancer was -- was an

6  issue of concern for the CFTA, correct?

7      A   For CTFA?

8      Q   CTFA.

9      A   But it was one of many.

10     Q   Well, I understand, but --

11     A   Yeah.

12     Q   -- it was -- I mean, in fact, sunscreen

13  was another one at that time that was an issue --

14  it was one of many, but it was an issue to --

15     A   Mm-hmm.

16     Q   -- its members, particularly Imerys and

17  J&J.

18     A   Mm-hmm.

19         MR. DONATH:  Objection.

20         MR. LOCKE:  You need to say --

21         THE WITNESS:  Yes.

22  BY MR. GOLOMB:

23     Q   Do you know who Dr. Alfred Wehner is?

24     A   No.

Mark Pollak

```
1        Q    Do you know who the Biomedical

2   Environmental Consultants are?

3        A    No.

4        Q    Okay.  So you -- you haven't seen any of

5   the communications between the CTFA and -- well,

6   you know who Stephens -- strike that.

7             You know who Stephen Gettings is, right?

8        A    Yes.

9        Q    So you haven't seen any of the documents

10  and the communications between Stephen Gettings

11  and Dr. Wehner beginning in 1993?

12       A    It's possible I did in preparation for

13  the last deposition.  I looked at a lot more

14  documents.  But in -- since it's been almost three

15  years, I can't recall specifically which documents

16  I looked at.

17       Q    Okay.  And so you're unaware of the

18  retention of Dr. Wetting -- Dr. Wehner by

19  Dr. Gettings to deal with the talc/ovarian cancer

20  issue?

21            MR. LOCKE:  Objection to form and beyond

22  the scope.

23            THE WITNESS:  I'm familiar with the

24  name.  I know the name has come up, but more than
```

Mark Pollak

1    that, I can't be sure.

2    BY MR. GOLOMB:

3         Q    Okay.  And when you say you know that

4    it's come up, how do you know that?

5         A    The name is familiar from the earlier

6    preparation, but as far as what his role was, I

7    don't recall exactly.

8         Q    Okay.  And do you know who the

9    International Society of Regulatory Toxicology and

10   Pharmacology is?

11        A    In a very general sense, yes.

12        Q    What's -- what's your understanding as

13   to who they are?

14        A    Well, our -- certain members of the

15   Science department I know participate in meetings

16   of different professional societies and outside

17   organizations involved in toxicology, and they may

18   have gone to meetings of this group.

19        Q    Okay.  And are -- are you aware that

20   with the coordination again of Stephen Gettings --

21   who was the director of toxicology at one time,

22   correct?

23        A    Yes, sounds right.

24        Q    When -- when did he leave?

Mark Pollak

```
 1          A    I think he left in the late '90s.

 2          Q    Okay.  You're aware, are you not, that

 3   with the coordination of Dr. Gettings at the ISRTP

 4   held meetings looking at, -- as far back as 1994,

 5   looking at the association of talc and ovarian

 6   cancer?

 7               MR. LOCKE:  Objection to form and beyond

 8   the scope.

 9   BY MR. GOLOMB:

10          Q    Were you aware of that?

11          A    Not specifically.

12          Q    Okay.  And were you aware that the CTFA

13   contributed $20,000 towards that, quote/unquote,

14   workshop?

15          A    Not -- not specifically.

16          Q    So I asked you earlier about the

17   Weinberg Group.

18          A    Mm-hmm.

19          Q    I assume from your answers you either

20   haven't or don't recall reviewing the Weinberg

21   Group report.

22          A    Again, it's so long ago, it's possible I

23   read it at the time.  I -- I can't be sure.

24          Q    Okay.  Well, the report was authored in
```

Mark Pollak

```
 1    October of 2000, weeks before the NTP

 2    presentation.  Does that help refresh your

 3    recollection at all?

 4         A    Not really.  I mean...

 5              MR. GOLOMB:  Exhibit 12.

 6              (Pollak Exhibit No. 12 was marked

 7              for identification.)

 8    BY MR. GOLOMB:

 9         Q    This is Exhibit 12, and just to put this

10    into context, this is the page that follows --

11         A    Right.

12         Q    -- Exhibit 11.

13         A    Mm-hmm.

14         Q    Which I asked you some questions about

15    before, the organization of the CIR.

16         A    Mm-hmm.

17         Q    And if we go to section 12 on page 5.

18         A    Mm-hmm.  Right.  So -- so there would be

19    one monitor --

20         Q    Let me just -- let me ask you a

21    question.

22              Under Section 12, "Director.  (a) the

23    director shall be appointed by the chair of the

24    steering committee."  Correct?
```

Mark Pollak

1    A    So as -- so it's the current title is

2    executive director.

3    Q    Okay.

4    A    And, yes, the executive director is

5    formally appointed by the chair of the steering

6    committee.

7    Q    And the -- in this case the director as

8    well as the chair of the steering committee are

9    both PCPC employees.

10   A    Yes.

11   Q    Okay.  And then under (b):  "The

12   director" -- again, who is a PCPC employee --

13   "shall hire and direct the activities of the CIR

14   staff."

15        So you've got the executives of the PCPC

16   are directing the activities of the CIR staff --

17   A    No, no.

18   Q    -- in order to implement these

19   procedures effectively and efficiently, correct?

20   A    No.

21   Q    Is that not what it says?

22   A    No, it's the exec- --

23   Q    Did I read that incorrectly?

24   A    Remember it's the executive director who

Mark Pollak

```
 1    is the CIR employee.  The executive director of

 2    CIR is directing the activities of the CIR staff.

 3         Q    Okay.  Appointed by the chair of the

 4    steering committee, which is the PCPC executive.

 5         A    Yes.

 6         Q    Okay.  So -- and the chairman of the

 7    steering committee -- under (b)(2), "The chairman

 8    of the steering committee shall periodically

 9    review CIR expenditures."  Correct?

10         A    Yes.

11         Q    So -- and these are a number of the

12    expenditures that we talked about before, like

13    salaries, office supplies, office space --

14         A    Mm-hmm.

15         Q    -- travel to meetings --

16         A    Yes.

17         Q    -- all of those things that we talked

18    about previously.

19         A    Yes.

20         Q    They're all directed by the PCPC

21    ultimately, correct?

22              MR. LOCKE:  Objection to form.

23              THE WITNESS:  At a minimum, reviewed,

24    yes.  I mean they have a budget and every
```

Mark Pollak

```
 1    department is --

 2    BY MR. GOLOMB:

 3         Q    Right.  And the --

 4         A    -- supposed to keep within their budget.

 5         Q    And the executives of the PCPC approve

 6    that budget and can approve overexpenditures or

 7    not at its sole discretion.

 8         A    Yes.

 9         Q    And then as we go further down under

10    (a)(3), "All CIR contracts and capital

11    expenditures shall be reviewed and approved by the

12    chairman of the steering committee prior to

13    execution."

14              So when the CIR enters into a contract,

15    like they did with Dr. Josh Muscat or they did

16    with Dr. Alfred Wehner or like they did with

17    Dr. Huncharek, all those contracts have to be

18    approved by the chairman of the steering committee

19    who was an executive at the PCPC, correct?

20              MR. LOCKE:  Objection to form.

21              THE WITNESS:  Yes, we would have to

22    approve the contracts.  I'm not familiar with

23    those specific contracts, though.

24    BY MR. GOLOMB:
```

Mark Pollak

```
 1         Q    Understood.  But if -- if I told you
 2    that those are various scientists that were hired
 3    for the purposes of defending the -- the PCPC and
 4    its interested members, any contract with those
 5    people would first have to be approved by the
 6    PCPC.
 7              MR. LOCKE:  Objection.  Are you talking
 8    about CIR or PCPC?
 9              MR. GOLOMB:  CIR.
10              THE WITNESS:  So, no, that wouldn't be
11    the purpose of the CIR contract.
12    BY MR. GOLOMB:
13         Q    Okay.  Have you seen the -- the CIR
14    study on the association of talc and ovarian
15    cancer?
16              MR. LOCKE:  Objection.  Beyond the
17    scope.
18              THE WITNESS:  I -- I don't recall.
19    Again, that's possible in preparation for the last
20    deposition I did see it, but I don't know.
21    BY MR. GOLOMB:
22         Q    Okay.  Do you know one way or the other
23    as to whether or not one exists?
24         A    Yeah.  No, I know they reviewed it,
```

Mark Pollak

1    so...

2        Q    And you know that based on everything

3    that we've talked about this morning, based on

4    these two documents, 11 and 12, if there was such

5    a -- if there was such a study, and it was paid

6    for, it would have to be -- it would have to first

7    be approved by the chairman of the steering

8    committee that happens to be an executive with the

9    PCPC, correct?

10              MR. DONATH:  Objection.

11              MR. LOCKE:  Objection to form.

12              THE WITNESS:  Right.  But the purpose of

13   the contract would be to develop additional data

14   to meet the request of the expert panel members.

15   It isn't to defend particular ingredients.  It's

16   to try to develop more information.

17   BY MR. GOLOMB:

18        Q    And -- but this CIR contract would first

19   have to be approved by an executive of the PCPC.

20        A    Yes.

21        Q    And that executive of the PCPC gets

22   his -- his -- his salary from the operating

23   expenses of the PCPC.  Correct?

24        A    Yes.

Mark Pollak

1       Q    And the PCPC operating expenses comes

2   from the industry members, like J&J, like Imerys.

3       A    Yes.

4       Q    Right.  And do you know one way or the

5   other as to whether or not before -- after such a

6   contract is entered into and after a report is

7   issued under this contract, whether or not those

8   members who are paying dues to the PCPC, who are

9   then paying for the research that's done by the

10  CIR, whether or not they have an opportunity to

11  review those studies before they get circulated?

12            MR. LOCKE:  Objection.

13            MR. DONATH:  Objection.  Beyond the

14  scope.

15            MR. LOCKE:  And to form.

16            THE WITNESS:  And they -- and they

17  wouldn't have an opportunity.

18  BY MR. GOLOMB:

19      Q    They wouldn't?

20      A    No.

21      Q    And you know that how?

22      A    If the CIR is doing a contract for a

23  study, it would go back to the CIR expert panel

24  members.  It wouldn't be going out to the members

Mark Pollak

1   as part of the process.

2       Q    So you would --

3       A    If it was -- and if it was being made

4   available publicly, it would be made available to

5   everyone.

6       Q    Okay.  So you would agree with me that

7   had the -- the CIR before publishing their study

8   on the association between talc and ovarian

9   cancer, if they had circulated a draft report or

10  more than one draft report to its members, like

11  Johnson & Johnson, like Imerys, that that would be

12  an inappropriate thing to do?

13          MR. LOCKE:  Objection.

14          MR. DONATH:  Objection.  This is all

15  beyond the scope of the notice.

16          THE WITNESS:  Well --

17          MR. LOCKE:  Wait.  Objection.  Beyond

18  the scope and to form.

19          THE WITNESS:  The members are not

20  members of the CIR.  It's a separate thing.

21  BY MR. GOLOMB:

22      Q    Well, I understand that.

23          But would you agree with me that had the

24  CIR contracted out to do a study, like they did in

Mark Pollak

 1    this case, to look at the association between talc

 2    and ovarian cancer -- one of the things that you

 3    told me last time and that you told me again today

 4    is it is important for the CIR to be independent.

 5    Correct?

 6        A    Yes.

 7             MR. LOCKE:  Objection.  It's compound,

 8    assumes facts not in evidence, and incorrect.  And

 9    beyond the scope.

10             MR. GOLOMB:  Anything else you want to

11    object to?

12             MR. LOCKE:  Well, your -- the

13    fundamental premise of your whole argument is --

14             MR. GOLOMB:  No, no, no, don't --

15             MR. LOCKE:  You asked --

16             MR. GOLOMB:  No, no.

17             MR. LOCKE:  You asked me if there is

18    anything else.

19             MR. GOLOMB:  No, no, no.  No speaking

20    objections.  You made your objection.

21             MR. LOCKE:  But you asked me.

22             MR. GOLOMB:  No -- no, I didn't really.

23             MR. LOCKE:  You said if there was

24    anything else.  I'm explaining to you.

Mark Pollak

1          MR. GOLOMB:  Yeah.  And I appreciate

2    that.

3    BY MR. GOLOMB:

4          Q    You -- you have made a point, as have

5    others, on the last deposition and this deposition

6    that -- that it's important for the CIR to

7    maintain its independence, correct?

8          A    Yes.

9          Q    Okay.  And would you -- you would agree

10   with me, would you not, that in maintaining one's

11   independence, credibility is very important?

12   Would you agree with that?

13         A    Yes.

14         Q    And would you agree with me that in a

15   case where the CIR has -- is contracting out to,

16   in this case, Dr. Huncharek to write a report,

17   that you lose credibility if you're now -- if he

18   is providing a draft back to not only the PCPC but

19   the members of the Talc Interested Party Task

20   Force.

21         MR. LOCKE:  Objection to form --

22         MR. DONATH:  Objection to form, beyond

23   the scope of the notice.

24         MR. LOCKE:  -- and beyond the scope.

Mark Pollak

```
 1   BY MR. GOLOMB:

 2        Q    Would you agree?

 3        A    I have no knowledge of what really the

 4   study did or what the protocols were and who --

 5   who it was shared with.

 6        Q    Well, my -- I'm sorry, to interrupt you.

 7   I want to wait and make sure you've answered your

 8   question.

 9             You would agree with me under my

10   hypothetical, if that was done, you've got a

11   credibility problem.

12             MR. DONATH:  Objection.

13             MR. LOCKE:  Objection to form and beyond

14   the scope.

15             THE WITNESS:  I think it's beyond my

16   area of expertise.  I don't know what the normal

17   protocol is in these studies.

18   BY MR. GOLOMB:

19        Q    Okay.  Well, you were the one before who

20   said that they didn't do that.  How do you know

21   that they didn't do that?

22             MR. LOCKE:  Objection.  Didn't do what?

23   BY MR. GOLOMB:

24        Q    Didn't provide the draft reports to not
```

Mark Pollak

```
 1    only the PCPC but to -- to members of the

 2    interested party task force.

 3              MR. LOCKE:  Objection to form, beyond

 4    the scope.

 5    BY MR. GOLOMB:

 6         Q    You were the one who said it.

 7         A    I --

 8              MR. DONATH:  Objection.

 9              MR. LOCKE:  Again, same objection.

10              THE WITNESS:  I -- you know, I don't

11    know -- I would think that that would not be under

12    the procedures the way it would be handled.

13              MR. LOCKE:  Can -- can we take a break

14    to see if lunch is here?

15              MR. GOLOMB:  Sure.  You know, if you

16    want to take a five-minute break before doing

17    that, and don't move, we may not need a break.

18              MR. LOCKE:  Okay.  Can I just -- can the

19    witness -- can we just take a break so the witness

20    can go out and go to the bathroom and come back,

21    and the rest of us just stay here?

22              MR. GOLOMB:  Sure.

23              THE VIDEOGRAPHER:  The time is

24    12:12 p.m., and we're going off the record.
```

Mark Pollak

```
1                    MR. LOCKE:  Let me wait until the

2     witness leaves and then suggest one thing.

3                    I don't want to in any way influence

4     what the witness is saying or not.  You can ask

5     all your questions.  There is no document that

6     indicates CIR ever contracted with Huncharek,

7     Muscat or any other expert.

8                    If you've got it, that's great, show it

9     to the witness, but I don't think any of us have

10    seen it, and if you want to confer with your

11    co-counsel, I suspect they will tell you the same

12    thing.

13                   MR. GOLOMB:  Okay.  Anything else?

14                   MR. LOCKE:  No, I'm just --

15                   MR. GOLOMB:  Thanks.

16                   (Recess.)

17                   THE VIDEOGRAPHER:  The time is

18    12:32 p.m.  We're back on the record.

19                   MR. GOLOMB:  First of all, I just want

20    to -- I just want to -- I did check with my

21    colleagues, and, Mr. Locke, you're correct, I

22    misstated the author of the CIR report.  It's

23    Monice Fiume.

24    BY MR. GOLOMB:
```

Mark Pollak

1      Q    Is that your understanding?

2      A    I have no -- no knowledge of it.

3      Q    Okay.  I just don't remember, is she

4    still with the --

5      A    Yeah, she is.

6      Q    Okay.  But in any event, if she's the

7    author of the study, you would agree that it would

8    be inappropriate to provide that study to both the

9    PCPC and PCPC members to edit and review for

10   comment before it went and got -- it actually got

11   published?

12          MR. LOCKE:  Objection to form and beyond

13   the scope.

14          THE WITNESS:  I think there's a

15   possibility that the -- somebody looked at it to

16   make sure it was what the panel was expecting or

17   that the language, you know, was concise and

18   understandable, but I -- I really don't know.

19   BY MR. GOLOMB:

20     Q    Okay.  Before when we were -- if you

21   remember, I was asking you some questions about

22   the -- the Dezenhall group and --

23     A    Yes.

24     Q    -- their crisis management work that

Mark Pollak

```
 1    they were doing at around the time of the NTP, and

 2    you had mentioned that -- that the PCPC had

 3    retained Dezenhall on a -- on a previous occasion

 4    on some fragrance issues.

 5              Do you remember what you -- when you

 6    told me?

 7        A     Yes, I do.

 8        Q     What were you referring to?

 9        A     Multiple chemical sensitivity.  There

10    was a whole campaign against the industry by

11    people who claimed when they were exposed to other

12    people wearing fragrances, they experienced

13    multiple chemical sensitivity.

14        Q     And -- and what was Dezenhall's role?

15        A     So we worked with them on, I guess,

16    communications materials.  I -- I don't recall if

17    there was any research done or how it was more

18    media related.

19        Q     Okay.  By the way, you had mentioned to

20    us earlier that the -- I had asked you when the

21    next board meeting was of the -- the

22    September 24th board meeting was --

23        A     No, that's the CIR expert panel meeting.

24        Q     Yeah.
```

Mark Pollak

```
 1        A    The board meeting is October 3rd.

 2        Q    Okay.  But you told us that the CIR

 3    meeting was open to the public.

 4        A    Correct.

 5        Q    Right.  And you also told us that it

 6    would be on the CIR website.

 7        A    It should be.  They post the meeting

 8    announcements.

 9        Q    Okay.  We -- we checked the CIR website

10    during the break, and it's not on there.  So do

11    you know when it will be posted?

12             MR. LOCKE:  Objection.  Form.

13             THE WITNESS:  I don't.

14    BY MR. GOLOMB:

15        Q    Do you know what the agenda is for that

16    meeting?

17        A    No.

18        Q    Do you know whether or not -- how -- how

19    is the agenda for a CIR meeting like that

20    selected --

21             MR. LOCKE:  Object --

22    BY MR. GOLOMB:

23        Q    -- and finalized?

24             MR. LOCKE:  Objection.  Beyond the
```

Mark Pollak

```
 1   scope.

 2              You can answer.

 3              THE WITNESS:  I think Linda Loretz is in

 4   a better position to -- to discuss that.

 5   BY MR. GOLOMB:

 6        Q    Okay.  But you don't know -- sitting

 7   here today, you don't know generally what the

 8   issues are and specifically whether or not --

 9        A    Well, I know --

10        Q    Let me just finish the question.

11              -- and specifically whether or not the

12   association of talc and ovarian cancer is on that

13   agenda?

14        A    I -- the agenda would be the tentative

15   final and final reports that are ready for

16   presentation to the expert panel, and I'm not

17   aware of anything involving talc coming up.

18        Q    Okay.  Let me just ask you, is -- is

19   Whitaker Clark Daniels, are they a member of the

20   PCPC?

21        A    I think so.  I mean they have been in

22   the past.

23        Q    Brenntag Specialties?

24        A    I'm not familiar with them.
```

Mark Pollak

```
 1          Q     Cyprus Amax?

 2          A     I -- the -- Cyprus Minerals I'm familiar

 3    with.  I assume it's the same company.

 4          Q     Rio Tinto?

 5          A     I don't know.

 6          Q     Do you know who Crowell & Moring is?

 7          A     Yes, a law firm.

 8          Q     Okay.  Are they a member?

 9          A     I don't think so.  We do have a few law

10    firms who are members for marketing purposes.

11          Q     What do you mean "for marketing

12    purposes"?

13          A     They made a decision to be a sponsor at

14    a legal conference, and to, you know, basically

15    to -- business development, so they joined the

16    association as an associate member.

17          Q     Okay.  But you don't know one way or the

18    other whether or not Crowell & Moring is one of

19    them?

20          A     They may be.  I know there are eight to

21    ten law firms who are members, and I -- I'm just

22    not familiar with them, who they all are.

23          Q     You have the revenue chart for the task

24    force?
```

Mark Pollak

1      A      Mm-hmm.

2      Q      Yes?  You have to --

3      A      No. 3 -- Exhibit No. 3?

4      Q      Yeah.  The -- on that -- on that

5   sheet -- now, my understanding is that that sheet

6   was prepared shortly before your 2016 deposition.

7   And if that's correct, does that mean that there

8   have not been any contributions to the interested

9   party task force since 2009?

10      A      I would presume so.  That's what it

11   indicates.

12      Q      Okay.  Well, how can we -- how can we

13   find out for sure whether or not -- I mean I --

14   I'm assuming that also because that document was

15   prepared in 2016, and I would assume, you correct

16   me if I'm wrong, that if contributions were made

17   in 2010, 2011 through 2016, that it would be on

18   that sheet.

19      A      I agree.

20      Q      Okay.  So if we -- if we assume it's

21   true that no funds have been received from the

22   members of the interested party task force since

23   2009, and we know that the CIR report came well

24   after 2009, how was it paid for?

Mark Pollak

```
1          A     So the -- I think there are two ways

2     that it can be paid for.  CIR has some money in

3     their budget for reports or research that are

4     requested by the expert panel members.  And,

5     again, I don't know the specifics of this -- of

6     this particular report that you're talking about,

7     and there have been other instances where there --

8     the panel wants more information, and some company

9     agree -- some companies agree to fund it.

10         Q     So --

11         A     But I -- again, this is just general.  I

12    have no idea what applies in this.

13         Q     Right.  So, hypothetically, it may be

14    the case that not only did member groups have an

15    opportunity to comment and edit on the report but

16    also pay for it?

17              MR. LOCKE:  Objection to form and beyond

18    the scope.

19              THE WITNESS:  Possibly.  I don't know

20    how this was set up.

21    BY MR. GOLOMB:

22         Q     Do you know who the Health Research

23    Group is?

24         A     No.
```

Mark Pollak

```
 1          Q    Do you know who the --

 2          A    So is --

 3          Q    -- Consumer Research Group is?

 4          A    Excuse me.  So is this on -- should I

 5    look at this list?

 6          Q    Sure.  If that helps.

 7          A    Yeah.  No, they're off.

 8          Q    Are they on there?

 9          A    No.

10          Q    Do you know who the Consumer Research

11    Group is?

12          A    No.

13               MR. GOLOMB:  I don't have any further

14    questions.

15               Can I see the --

16               THE WITNESS:  Exhibit 4.

17    BY MR. GOLOMB:

18          Q    Yeah, this is Exhibit 4 we're looking

19    at, and you've got the -- it says "Consumer

20    Federal," but we agree it's the Consumer

21    Federation --

22          A    Right.

23          Q    -- of America, right?

24               And they made payments of $367,000
```

Mark Pollak

1   between 2002 and 2018.  I guess my question is

2   why?

3          A    So I would assume it's for --

4               MR. LOCKE:  Let me object to form.  I

5   think that shows payments that PCPC made to these

6   other entities.

7               MR. GOLOMB:  You're correct.

8   BY MR. GOLOMB:

9          Q    Why?

10         A    So -- I think there are two -- two

11  areas.  Number one, the Consumer Federation of

12  America has an annual fundraising dinner and they

13  feature prominent speakers, and I think for years

14  we've been buying a table at the event.  It's

15  probably five or 10,000.

16              Plus the -- the liaison from Consumer

17  Federation of America is entitled -- the liaison

18  to the CIR expert panel is entitled to

19  reimbursement for his or her preparation time, and

20  the time that he or she spends at the expert panel

21  meeting at the same rate the other expert

22  panels -- expert panel members are entitled to

23  reimbursement.  And I think in this case they --

24  the individual can't have the check made out to

Mark Pollak

```
 1   them.  They have it made out to Consumer

 2   Federation of America.

 3        Q    You also mentioned earlier in the -- in

 4   the deposition, I was asking you about the -- we

 5   were talking about this transition from the desire

 6   to be self-regulatory to having some mandatory

 7   regulation to be consistent internationally,

 8   correct?

 9            Do you remember that --

10        A    Mm-hmm.

11        Q    -- those series of questions?

12        A    Yes.

13        Q    You mentioned in the course of one of

14   your answers that you had hired some outside

15   consumer research groups to help you through that

16   transition.  Who did you use?

17            MR. LOCKE:  Objection to form and beyond

18   the scope.

19            You can answer.

20            THE WITNESS:  Frank Luntz and Michael

21   Maslansky.

22   BY MR. GOLOMB:

23        Q    Frank Luntz.  And what did you use Frank

24   Luntz to do?
```

Mark Pollak

1                    MR. LOCKE:  Same objection.

2                    THE WITNESS:  And again, some of this

3     may have been subcontracted.  You know, before we

4     changed the name, they did, you know, I guess

5     online surveys, possibly focus groups on how

6     different names -- the, you know, favorability

7     ratings by different brackets of consumers and

8     other stakeholders, and probably on some of the --

9     you know, consumer awareness of different issues

10    in the cosmetic media space.

11    BY MR. GOLOMB:

12         Q    And was it based on that research, at

13    least in part, why the name was changed from the

14    CTFA to PCPC?

15         A    Partially, yes.

16         Q    Okay.  And if -- if somebody, you know,

17    at a cocktail party asked you and said, Why did

18    the CTFA change their name to PCPC -- I understand

19    there are some boring cocktail parties in D.C.

20    where they would have such conversations -- what

21    would your answer be, why?

22         A    Mainly because the term "toiletry" was

23    archaic, and people didn't really know what it

24    meant anymore, and we had to get away from using

Mark Pollak

1    that.

2         Q    Okay.  And did you -- were there any

3    other consumer research groups that you -- outside

4    consumer research groups that you used?

5         A    No.

6         Q    For any other issues?

7         A    There may have been at the time, but

8    I -- I wouldn't have been involved in the name

9    change.

10              MR. GOLOMB:  Okay.  I don't have

11   anything further, unless my colleagues have

12   something.  Michelle always has something.

13              (Counsel conferring.)

14              MR. GOLOMB:  We'll only be another hour

15   or so.

16              (Laughter.)

17              MR. GOLOMB:  Can I see the

18   organizational chart again?

19   BY MR. GOLOMB:

20        Q    First of all, to your knowledge, whether

21   it was Frank Luntz or some other consumer research

22   group, were there any other -- were there any

23   outside consumer research groups that was hired by

24   PCPC to deal with any talc issue that you're aware

Mark Pollak

```
 1   of?

 2              MR. LOCKE:  Objection.  Beyond the

 3   scope.

 4              THE WITNESS:  So, again, are you

 5   referring to the time of the name change or --

 6   BY MR. GOLOMB:

 7        Q    No, at any time.  We -- we talked

 8   about --

 9        A    I don't think -- I don't think a public

10   affairs firm -- you know, I know that

11   Nichols-Dezenhall made a pitch, but I don't think

12   we did anything with it.  And other than that, I'm

13   not aware of any other firm.

14        Q    Okay.  So let me just be clear about

15   that, because the -- you used the term "consumer

16   research group" when we were talking much earlier

17   about the name change, and then I talked -- I just

18   asked you about Frank Luntz.  At least that was

19   part of your answer.

20              My -- my -- so using your terminology of

21   "consumer research group," do you consider

22   Nichols-Dezenhall a consumer research group?

23        A    Not really.  I mean Nichols-Dezenhall is

24   much more focused on media relations.
```

Mark Pollak

```
 1        Q    Right.

 2        A    What I meant by consume- -- a group that

 3   does research on consumer attitudes.

 4        Q    Okay.  And my question to you is, has

 5   the PCPC, to your knowledge, hired any such

 6   consumer research group to deal with talc issues?

 7             MR. LOCKE:  Objection.  Beyond the

 8   scope.

 9             THE WITNESS:  Again, not that I'm aware

10   of.

11   BY MR. GOLOMB:

12        Q    Okay.  And my last question is related

13   to Monice -- how do you pronounce her last name?

14        A    Fiume.

15        Q    Is she still -- on the chart it has her

16   as scientific analyst.

17        A    So she got a promotion, and I -- whether

18   it's senior scientific or deputy director,

19   she's -- she's at a higher level than on that

20   organization chart.

21        Q    Okay.  And have her duties and

22   responsibilities changed or just her title?

23        A    So the reason she got the promotion is

24   because she has a fair amount of responsibility of
```

Mark Pollak

```
 1   reviewing the draft reports that the other science

 2   writers prepare there, as well as doing her own

 3   reports.

 4        Q    And when did her promotion take place?

 5        A    Last year.

 6        Q    When last year?

 7        A    Probably -- approximately a year ago,

 8   sometime during the summer, when the previous

 9   executive director Lillian Gill retired, and we

10   made the determination to promote Bart, and then

11   we did promote Monice also.

12        Q    Okay.  And did somebody do a performance

13   review of Monice?

14        A    I assume that Bart did.

15        Q    Okay.  And do you know whether or not

16   her -- her promotion had anything to do with the

17   publication of the CIR report?

18        A    Of the specific report or --

19        Q    Yeah.

20        A    No.  I mean, in general, she would --

21   you know, the -- the staff writers have reports

22   that are part of the normal processes.  There are

23   different layers of review and editing to make

24   sure the -- the language is accurate and precise.
```

Mark Pollak

1      Q      Would it -- would a -- a performance

2   evaluation -- the last performance evaluation of

3   an employee before they were promoted tell us

4   anything about the reasons why they were promoted?

5      A      Possibly.

6      Q      Okay.  And so if -- if Monice was

7   promoted because of her involvement in a -- in a

8   CIR report concerning talc and the association

9   with ovarian cancer, would it be reasonable to

10  assume that that may be part of her performance

11  review?

12     A      I would be very surprised that one

13  particular report would be cited that way.

14     Q      Has there been any additional research,

15  whether it's CIR or retained by somebody that PCPC

16  hired, on the association of talc and ovarian

17  cancer since the CIR report, to your knowledge?

18             MR. LOCKE:  Objection.  Beyond the

19  scope.

20             THE WITNESS:  Not to my knowledge.

21             MR. GOLOMB:  Okay.  I have no further

22  questions.  You should -- you should probably run

23  before somebody starts handing me more notes.

24             MR. LOCKE:  Does anyone else have any

Mark Pollak

```
 1   questions?

 2           No questions.

 3           THE VIDEOGRAPHER:  Okay.  The time is

 4   12:51 p.m., August 29th, 2018.  We are going off

 5   the record, completing the videotaped deposition.

 6           (Whereupon, the deposition of

 7           MARK POLLAK was concluded

 8           at 12:51 p.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Mark Pollak

```
 1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2        The undersigned Certified Shorthand Reporter

 3   does hereby certify:

 4        That the foregoing proceeding was taken before

 5   me at the time and place therein set forth, at

 6   which time the witness was duly sworn; That the

 7   testimony of the witness and all objections made

 8   at the time of the examination were recorded

 9   stenographically by me and were thereafter

10   transcribed, said transcript being a true and

11   correct copy of my shorthand notes thereof; That

12   the dismantling of the original transcript will

13   void the reporter's certificate.

14        In witness thereof, I have subscribed my name

15   this date:  August 30, 2018.

16

17                    _____

18                    LESLIE A. TODD, CSR, RPR

19                    Certificate No. 5129

20   (The foregoing certification of

21   this transcript does not apply to any

22   reproduction of the same by any means,

23   unless under the direct control and/or

24   supervision of the certifying reporter.)
```

Mark Pollak

```
1                INSTRUCTIONS TO WITNESS

2        Please read your deposition over carefully and

3    make any necessary corrections.  You should state

4    the reason in the appropriate space on the errata

5    sheet for any corrections that are made.  After

6    doing so, please sign the errata sheet and date

7    it.

8        You are signing same subject to the changes

9    you have noted on the errata sheet, which will be

10   attached to your deposition.  It is imperative

11   that you return the original errata sheet to the

12   deposing attorney within thirty (30) days of

13   receipt of the deposition transcript by you.  If

14   you fail to do so, the deposition transcript may

15   be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24
```

Mark Pollak

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4   PAGE LINE CHANGE

 5   _____ _____ _____

 6   REASON: _____

 7   _____ _____ _____

 8   REASON: _____

 9   _____ _____ _____

10   REASON: _____

11   _____ _____ _____

12   REASON: _____

13   _____ _____ _____

14   REASON: _____

15   _____ _____ _____

16   REASON: _____

17   _____ _____ _____

18   REASON: _____

19   _____ _____ _____

20   REASON: _____

21   _____ _____ _____

22   REASON: _____

23   _____ _____ _____

24   REASON: _____
```

Mark Pollak

```
 1

 2              ACKNOWLEDGMENT OF DEPONENT

 3       I,_____, do hereby

 4   certify that I have read the foregoing pages, and

 5   that the same is a correct transcription of the

 6   answers given by me to the questions therein

 7   propounded, except for the corrections or changes

 8   in form or substance, if any, noted in the

 9   attached Errata Sheet.

10

11   _____

12   MARK POLLAK                    DATE

13

14

15   Subscribed and sworn to

16   before me this

17   _____day of_____,20____.

18   My commission expires:_____

19   _____

20   Notary Public

21

22

23

24
```

Exhibit 120

Page 379

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY


------------------------------x

IN RE JOHNSON & JOHNSON          ) MDL No.

TALCUM POWDER PRODUCTS           ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,       )

AND PRODUCTS LIABILITY           )

LITIGATION                       )

                                 )

THIS DOCUMENT RELATES TO         )

ALL CASES                        )

------------------------------x


V O L U M E   I I

VIDEOTAPED 30(b)(6) DEPOSITION OF DEFENDANT
PERSONAL CARE PRODUCTS COUNCIL
by and through its Designated Representative,

LINDA LORETZ, Ph.D.

WASHINGTON, D.C.

MONDAY, OCTOBER 1, 2018

9:09 A.M.




Reported by: Leslie A. Todd

Linda Loretz, Ph.D.

| Page 380 | Page 382 |
|---|---|
| 1    Deposition of LINDA LORETZ, Ph.D., held at the | 1    APPEARANCES (CONTINUED): |
| 2    offices of: | 2 |
| 3 | 3      MICHELLE A. PARFITT, ESQUIRE |
| 4 | 4      ASHCRAFT & GEREL, LLP |
| 5      SEYFARTH SHAW LLP | 5      4900 Seminary Road, Suite 650 |
| 6      975 F Street, N.W. | 6      Alexandria, Virginia 22311 |
| 7      Washington, DC 20004 | 7      (703) 997-1774 |
| 8 | 8 |
| 9 | 9      NICHOLAS J. KOHRS, ESQUIRE |
| 10 | 10      LUNDY, LUNDY, SOILEAU & SOUTH, LLP |
| 11      Pursuant to notice, before Leslie Anne Todd, | 11      501 Broad Street |
| 12    Court Reporter and Notary Public in and for the | 12      Lake Charles, Louisiana 70601 |
| 13    District of Columbia, who officiated in | 13      (337) 439-0707 |
| 14    administering the oath to the witness. | 14 |
| 15 | 15    ON BEHALF OF PCPC AND THE WITNESS: |
| 16 | 16      THOMAS T. LOCKE, ESQUIRE |
| 17 | 17      SEYFARTH SHAW LLP |
| 18 | 18      975 F Street, NW |
| 19 | 19      Washington, DC 20004 |
| 20 | 20      (202) 463-2400 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

| Page 381 | Page 383 |
|---|---|
| 1      A P P E A R A N C E S | 1    APPEARANCES (CONTINUED): |
| 2 | 2 |
| 3    ON BEHALF OF THE PLAINTIFFS: | 3    ON BEHALF OF JOHNSON & JOHNSON DEFENDANTS: |
| 4      CHRISTOPHER V. TISI, ESQUIRE | 4      KATHLEEN FRAZIER, ESQUIRE |
| 5      LEVIN PAPANTONIO THOMAS MITCHELL | 5      SHOOK, HARDY & BACON, LLP |
| 6      RAFFERTY & PROCTOR, PA | 6      600 Travis Street |
| 7      316 S. Baylen Street, Suite 600 | 7      Suite 3400 |
| 8      Pensacola, Florida 32502 | 8      Houston, Texas 77002-2926 |
| 9      (850) 436-6250 | 9      (713) 227-8008 |
| 10 | 10 |
| 11      RICHARD M. GOLOMB, ESQUIRE | 11    ON BEHALF OF THE IMERYS DEFENDANTS: |
| 12      BENJAMIN ISSER, ESQUIRE | 12      JONATHAN F. DONATH, ESQUIRE |
| 13      GOLOMB & HONIK, P.C. | 13      COUGHLIN DUFFY, LLP |
| 14      1835 Market Street, Suite 2900 | 14      350 Mount Kemble Avenue |
| 15      Philadelphia, Pennsylvania 19103 | 15      Morristown, New Jersey 07962 |
| 16      (215) 985-9177 | 16      (973) 267-0058 |
| 17 | 17 |
| 18      TED MEADOWS, ESQUIRE | 18      CATHERINE SLAVIN, ESQUIRE |
| 19      P. LEIGH O'DELL, ESQUIRE | 19      GORDON & REES SCULLY MANSUKHANI, LLP |
| 20      RYAN BEATTIE, ESQUIRE | 20      Three Logan Square |
| 21      BEASLEY, ALLEN, CROW, METHVIN, PORTIS & | 21      1717 Arch Street, Suite 610 |
| 22      MILES, P.C. | 22      Philadelphia, Pennsylvania 19103 |
| 23      218 Commerce Street | 23      (215) 717-4006 |
| 24      Montgomery, Alabama 36104 | 24 |
| 25      (334) 269-2343 | 25 |

2 (Pages 380 to 383)

Linda Loretz, Ph.D.

| | Page 384 |
| --- | --- |

1   APPEARANCES (CONTINUED):

2

3   ON BEHALF OF PTI:

4       JAMES W. MIZGALA, ESQUIRE

5       TUCKER ELLIS, LLP

6       233 South Wacker Drive

7       Suite 6950

8       Chicago, Illinois 60606-9997

9       (312) 624-6307

10

11   ALSO PRESENT:

12

13       KATIE TUCKER (Paralegal - Beasley Allen)

14       EMILY H. MANOSO, Staff Counsel, PCPC

15       THOMAS F. MYERS, Staff Counsel, PCPC

16

17       DANIEL HOLMSTOCK (Videographer)

18       JONATHAN VADERS (Technical Support)

19

20

21

22

23

24

25

| | Page 385 |
| --- | --- |

1           C O N T E N T S

2   EXAMINATION OF LINDA LORETZ, Ph.D.        PAGE

3       By Mr. Tisi                           392

4       By Mr. Golomb                         643

5

6

7

8

9           E X H I B I T S

10          (Attached to transcript)

11   LORETZ DEPOSITION EXHIBITS               PAGE

12   No. 41   Timeline (with handwritten entries) 401

13   No. 42   Petition Seeking a Cancer Warning on

14          Cosmetic Talc Products           404

15   No. 43   Letter to FDA from PCPC, Bates

16          P1.0164 to P1.0164.39            410

17   No. 44   Radiation Oncology Fax Transmittal

18          Form, Bates P1.004.1 to P1.004.9  430

19   No. 45   Article entitled "Perineal talc use

20          and ovarian cancer risk: A case

21          Study of scientific standards in

22          environmental epidemiology," Bates

23          P2.0007 to P2.0007.7             436

24

25

| | Page 386 |
| --- | --- |

1           E X H I B I T S

2           (Attached to transcript)

3   LORETZ DEPOSITION EXHIBITS               PAGE

4   No. 46   E-mail re Response to Citizen's

5          Petition on Talc / Latest Review

6          of the Data, Bates JNJ 000426011   452

7   No. 47   Draft Minutes Talc Interest Party

8          Task Force, April 12, 1994, Bates

9          JNJTALC000376526 to 000376528     462

10   No. 48   Letter to Mary Wolfe from CTFA,

11          Bates IMERYS 137977 to 137978     468

12   No. 49   Federal Register/Vol. 70, No. 200,

13          Bates MUSCAT000004007 to 000004013  470

14   No. 50   E-mail re Rothman Proposal for

15          Updating CTFA Submission of Comments

16          to the NTP, Bates JNJ 000391715 to

17          000391716                        474

18   No. 51   Article entitled "Use of cosmetic

19          talc on contraceptive diaphragms and

20          risk of ovarian cancer: A meta-

21          analysis of nine observational

22          studies," Bates JNJ 000375876 to

23          000375883                        479

24

25

| | Page 387 |
| --- | --- |

1           E X H I B I T S

2           (Attached to transcript)

3   LORETZ DEPOSITION EXHIBITS               PAGE

4   No. 52   Article entitled "Perineal talc

5          use and ovarian cancer: A critical

6          review," Bates IMERYS 154013 to

7          154020                           479

8   No. 53   Screenshot from regulations.gov,

9          Personal Care Products Council -

10          Comment                          483

11   No. 54   Letter to Samuel Epstein from

12          Department of Health and Human

13          Services, FDA, Bates P1.0154 to

14          P1.0154-7                        486

15   No. 55   E-mail re Notes from Meeting with

16          FDA on Talc, Bates PCPC0005505 to

17          0005507                          491

18   No. 56   Memorandum of Meeting, May 8, 2009,

19          Bates IMERYS 266294 to 266295     495

20   No. 57   E-mail re Meeting with J&J, Bates

21          IMERYS 250983 to 250984          512

22   No. 58   E-mail re Talc Citizen's Petition -

23          Next Steps, Bates JNJ 000488256 to

24          000488257                        521

25

3 (Pages 384 to 387)

Linda Loretz, Ph.D.

Page 388

EXHIBITS
(Attached to transcript)

LORETZ DEPOSITION EXHIBITS                    PAGE

No. 59   E-mail re IARC Dr. Huncharek
         comment, Bates JNJTALC000109051 to
         000109060                            577
No. 60   Letter to Jill Cashen, Cancer
         Prevention Coalition, from John E.
         Bailey, Bates BCAL-BAILEY-00000518  592
No. 61   Article entitled "A Meta-Analytical
         Approach Examining the Potential
         Relationship Between Talc Exposure
         and Ovarian Cancer," Bates JNJ
         000018452 to 000018466              603
No. 62   Memorandum re Meta Analysis, Bates
         PCPC_MDL00026152 to 00026194        603
No. 63   American Health Foundation Grant
         Application, Bates JNJ 000023366 to
         000023392                           615
No. 64   Draft letter never sent (in
         handwriting,) Bates JNJ 000024880   620

Page 389

EXHIBITS
(Attached to transcript)

LORETZ DEPOSITION EXHIBITS                    PAGE

No. 65   Article entitled "Perineal
         Application of Cosmetic Tac and Risk
         of Invasive Epithelial Ovarian Cancer
         A Meta-Analysis of 11,933 Subjects
         from Sixteen Observational Studies,"
         Bates JNJ 000018732 to 000018737    625
No. 66   Defendants Personal Care Products
         Council's Second Supplemental
         Responses and Objections to
         Plaintiffs' Interrogatories         630
No. 67   Article entitled "Perineal Powder
         Exposure and the Risk of Ovarian
         Cancer," Bates IMERYS 146545 to
         146551                              631
No. 68   (Retained by counsel.)             633
No. 69   Overview of Potential New Projects
         Examining the Talc/Ovarian Cancer
         Relationship, Bates IMERYS 272247
         to 272250                           639
No. 70   PowerPoint presentation, Bates
         PCPC0052415 to 0052507              660

Page 390

EXHIBITS
(Attached to transcript)

LORETZ DEPOSITION EXHIBITS                    PAGE

No. 71   Code of Federal Regulations,
         Title 21, Chapter 1, Subchapter G,
         Part 740                            672
No. 72   Article entitled "Ovarian Cancer
         Prevention (PDQ): Prevention -
         Patient Information (NCI)"           678
No. 73   E-mail string re missed Kelly phone
         call, Bates MBS-CRE000271 to 000272 682
No. 74   Article entitled "Ovarian Cancer
         Prevention (PDQ): Prevention -
         Patient Information (NCI)            687
No. 75   Ovarian Cancer Prevention screenshot 688
No. 76   Ovarian Cancer Prevention screenshot 690
No. 77   "A Snapshot of Ovarian Cancer"      693
No. 78   "A Snapshot of Ovarian Cancer"      696
No. 79   "A Snapshot of Ovarian Cancer"      697
No. 80   Minutes, Ad Hoc Talc Task Force,
         Bates JNJ 000089586                 713
No. 81   Memorandum re Publication of Meta
         Analysis by Alan Gross, Bates
         JNJ 000011723                       724

Page 391

EXHIBITS
(Attached to transcript)

LORETZ DEPOSITION EXHIBITS                    PAGE

No. 82   Letter to Stephen Gettings from
         Alfred Wehner, Bates PCPC_MDL
         00028675                            731
No. 83   Draft Minutes, Talc Interested Party
         Task Force, January 11, 1994        734
No. 84   Letter to Alan Gross from M.
         Chudkowski, May 5, 1994, Bates
         JNJ 000023357                       748
No. 85   Memorandum re CTFA Response to
         Citizens Petition, January 11,
         1995, Bates Pltf_PCPC_00002387      753

4 (Pages 388 to 391)

Linda Loretz, Ph.D.

Page 392

PROCEEDINGS
------------------

1    THE VIDEOGRAPHER:  The time is 9:09 a.m.
2    on October 1st, 2018.  This is video 1, Volume II,
3    in the continued deposition of Dr. Linda Loretz.
4        A reminder to the witness, she is still
5    under oath.
6            CROSS-EXAMINATION
7    BY MR. TISI:
8        Q   Good morning, Dr. Loretz.
9        A   Good morning.
10       Q   Just to remind the jury, what is --
11   please state your name, please.
12       A   Linda Loretz.
13       Q   Okay.  And you are a toxicologist?
14       A   Yes.
15       Q   Okay.  And you're here represented by
16   counsel?
17       A   Yes.
18       Q   My name is Chris Tisi.  I represent
19   women with ovarian cancer who claim that talcum
20   powder products like Johnson & Johnson baby powder
21   and Shower to Shower powder caused or contributed
22   to their ovarian cancer.
23           Do you understand that?

---

Page 392

1            PROCEEDINGS
2            ------------------
3            THE VIDEOGRAPHER:  The time is 9:09 a.m.
4    on October 1st, 2018.  This is video 1, Volume II,
5    in the continued deposition of Dr. Linda Loretz.
6        A reminder to the witness, she is still
7    under oath.
8            CROSS-EXAMINATION
9    BY MR. TISI:
10       Q   Good morning, Dr. Loretz.
11       A   Good morning.
12       Q   Just to remind the jury, what is --
13   please state your name, please.
14       A   Linda Loretz.
15       Q   Okay.  And you are a toxicologist?
16       A   Yes.
17       Q   Okay.  And you're here represented by
18   counsel?
19       A   Yes.
20       Q   My name is Chris Tisi.  I represent
21   women with ovarian cancer who claim that talcum
22   powder products like Johnson & Johnson baby powder
23   and Shower to Shower powder caused or contributed
24   to their ovarian cancer.
25           Do you understand that?

Page 393

1        A   Yes.
2        Q   Okay.  And by the terms "talcum powder
3    products," you understand that I mean cosmetic
4    talc used in those products?
5        A   Yes.
6        Q   Okay.  And if I had a bottle of either
7    Shower to Shower here or Johnson's Baby Powder,
8    what I'm referring to is everything that's in the
9    bottle.
10           Do you understand that?
11       A   Okay, yes.
12       Q   That includes fragrance, it includes
13   whatever is mined from the -- from the mine,
14   whatever is in that bottle.
15           Do you understand?
16       A   Okay.
17       Q   I'm not talking about pure crystalline
18   talc.
19       A   Okay.
20       Q   Okay?  Unless I say otherwise.
21           Have we ever met before?
22       A   I don't believe so.
23       Q   Okay.  You know this is a continuation
24   of a 30(b)(6) deposition that we -- we propounded
25   on the Personal Care Products Council?

Page 394

1        A   Yes.
2        Q   Okay.  And a 30(b)(6) deposition, just
3    to get rid of all the legalese there, is a
4    deposition where the company puts forward a
5    witness to testify on behalf of the company.
6            You understand that?
7        A   Yes.
8        Q   And you understand that your testimony
9    is binding on the company?
10       A   Yes.
11       Q   Okay.  And you're speaking not only as
12   Dr. Loretz, but you're speaking on behalf of the
13   Personal Care Products Council?
14       A   Yes.
15       Q   And by the Personal Care Products
16   Council, you understand that we also mean an
17   organization called CTFA?
18       A   Correct.
19       Q   Okay.  And that's the predecessor name
20   for the Personal Care Products Council, and I
21   guess it was the Cosmetic Toiletry and
22   Fragrance --
23       A   Association.
24       Q   -- Association, correct?
25       A   Correct.

Page 395

1        Q   Yeah.  And you understand your testimony
2    is also binding on them as well?
3        A   Yes.
4        Q   Okay.  You also understand that you are
5    under oath, and your testimony -- testimony may be
6    played for the court or jury to consider amongst
7    all the other evidence in the case?
8        A   I do.
9        Q   Okay.  I'm going to hand you what I
10   would like to have marked as -- well, that has
11   been marked as Exhibit 1 to your prior deposition.
12   We don't have those exhibits here, but I do have a
13   copy of it.  I don't have a copy for all counsel.
14           You are here pursuant to that Second
15   Amended Notice of Deposition?
16       A   Okay, yes.
17       Q   Okay.  All right.
18           I'd like to talk to you a bit about what
19   was done to prepare for this portion of your
20   deposition.  Your deposition -- this is a
21   continuation of a deposition that happened I
22   believe in July.
23       A   Yes.
24       Q   Okay.  Between July and now, have you
25   interviewed or spoken to any other people -- let's

5 (Pages 392 to 395)

Linda Loretz, Ph.D.

Page 396

1   put your counsel aside for a moment -- any other
2   either employees, current or former employees, of
3   Personal Care Products Council?
4       A   No, just counsel.  Just my counsel
5   and --
6       Q   Have you spoken to any third-party
7   witnesses in this case, people -- for example,
8   employees of Johnson & Johnson, employees of -- of
9   Imerys, outside researchers?
10      A   Not about this case, no.
11      Q   Okay.  What additional work have you
12  done to prepare yourself or further prepare
13  yourself to testify to the topics contained in
14  that notice of deposition?
15      A   I met with my attorney for several days
16  reviewing records, minutes, e-mails, documents
17  related.
18      Q   Have you spoken to John Bailey at all?
19      A   No.
20      Q   Have you spoken to John Bailey at all
21  since -- you know who John Bailey is?
22      A   Yes.
23      Q   Have you spoken to John Bailey at all
24  since -- at any time in this process, including
25  before your first deposition?

Page 397

1       A   No.
2       Q   Have you spoken to any lawyers not your
3   own?
4       A   The PCPC lawyers, Tom Myers and Emily
5   Manoso, but beyond that, no.
6       Q   Okay.  Have you reviewed the notice of
7   deposition that I placed before you, Exhibit
8   No. 1, to refamiliarize yourself with the topics
9   we're here to discuss today?
10      A   I've reviewed it before.  I haven't
11  reviewed it very, very recently, but --
12      Q   Okay.  Is there any topic or topics in
13  that notice for which you have been designated
14  that you do not feel comfortable testifying to
15  today?  In other words, that you are not -- your
16  investigation is not complete and you don't have
17  information about the topics.
18      A   I mean, I guess I would just note that
19  obviously I wasn't here in the '80s, so I can only
20  go by the records that I have seen.  But beyond
21  that, no.
22      Q   I guess what I'm asking you, and this is
23  a process that is a little bit of a give and take
24  between you and me, and I -- I just want to ask
25  you, are there any categories there that you're

Page 398

1   not prepared to testify to today as -- fully?
2       A   Categories, I would say no.
3       Q   Okay.  Now, I'm going to ask you some
4   questions today relating to specific categories,
5   and I'll list them.
6           1(e), which is dissemination of medical
7   and scientific information on talcum powder and
8   ovarian cancer, 1(f), 1(g), 4(a), 4(c), and
9   categories 8 through 22.
10          I'm just doing that for the record, but
11  broadly they fall into two broad categories, and
12  I'm going to separate my questions to you into two
13  broad categories.  Okay?
14      A   Okay.
15      Q   And the broad categories are this:
16  Communications with the Food and Drug
17  Administration about talcum power products and
18  ovarian cancer, including, for example, the
19  Citizen's Petition issue.
20      A   Okay.
21      Q   Okay?
22      A   Yes.
23      Q   The one area that I will not cover that
24  will be covered by one of my colleagues is the CIR
25  report.

Page 399

1       A   Okay.
2       Q   So you won't hear CIR from me.
3           But other than that, the communications
4   with the FDA will be issues I'll be asking you
5   about.
6       A   Okay.
7       Q   The second part of it is -- will be
8   about consultants and studies, people with whom
9   you consulted and studies that were performed or
10  not performed at the direction of or with the
11  cooperation with PCPC.
12      A   Okay.
13      Q   Okay.  So just broadly speaking, the two
14  categories are communications with FDA except for
15  CIR, and consultants and -- and studies.
16      A   Okay.
17      Q   Okay?
18      A   Yes.
19      Q   All right.  So let's get started.
20          I want to talk about first
21  communications with the FDA, and I'd like to use
22  as kind of a fulcrum of our discussions the
23  Citizen's Petition, and you know what I mean by
24  the "Citizen's Petition"?
25      A   Yes.

6  (Pages 396 to 399)

Linda Loretz, Ph.D.

| Page 400 | Page 402 |
|---|---|

**Page 400**

1    Q   Okay.  To help us really understand
2  this, I prepared a timeline --
3         MR. LOCKE:  Counsel, can I just ask, I
4  mean there were a number of Citizen's Petitions.
5  Can you --
6         MR. TISI:  I'm going to be clear.
7         MR. LOCKE:  Okay.
8         MR. TISI:  I'm giving a timeline here,
9  and we'll --
10        MR. LOCKE:  Okay.
11        MR. TISI:  -- we'll do that.
12  BY MR. TISI:
13       Q   So to begin, I'm going to start with the
14  most recent Citizen's Petition, the one that was
15  filed in 2008.
16       A   Yes, mm-hmm.
17       Q   And you're familiar with that, correct?
18       A   Yes.
19       Q   And to help us understand the context in
20  which that Citizen's Petition was filed and what
21  it is, and we haven't explained it to the jury yet
22  and we will, I've prepared a little bit of a
23  timeline here.  And we're going to kind of mark
24  some things so that everybody understands the
25  historical context in which that petition was

**Page 401**

1  actually filed.
2         And I'm going to give a copy to counsel,
3  and we're going to hopefully fill this out
4  together, and you correct me if I'm wrong on
5  any -- on anything I write on here.
6         And we're going to mark this as Exhibit
7  No. 41.
8         (Exhibit No. 41 was marked for
9         identification.)
10  BY MR. TISI:
11       Q   And we may come back to this during the
12  course -- back and forth to this during the
13  deposition, so I'm going to ask you to kind of --
14  we'll kind of put it aside and bring it back and
15  all that.
16         And just for the members of the jury,
17  we've marked on here, we started with 1994, and
18  there's a reason why I've done that, which will
19  become apparent, and then there's the National
20  Toxicology Program 10th Report on Carcinogens
21  that's in the year 2000.
22         You know what I'm talking about?
23       A   Yes.
24       Q   Okay.  The IARC review which was 2005.
25  Correct?

**Page 402**

1    A   2006, no?
2    Q   2006.  Excuse me.
3    A   Yes.
4    Q   Yeah.  And the Cancer Coalition
5  Prevention citizens filed with the FDA, and that's
6  in 2008.
7    A   Yes.
8    Q   Okay.  And there were other things.
9  Those are already on the chart.  You agree with
10  those?
11   A   Yes.
12   Q   Okay.  Let's talk for a moment what your
13  understanding -- first of all, in the course of
14  your work with the PCPC, have you had occasions to
15  deal with Citizen's Petitions before, or is this
16  the only time that this happened?
17   A   Before this, this was probably the first
18  one.  I mean we -- we filed a Citizen's Petitions
19  ourselves that came after this.  Nothing to do
20  with talc.
21   Q   Right.  And so you're familiar with the
22  process?
23   A   Yes.
24   Q   Okay.  So would you tell the members of
25  the jury a little bit about what a Citizen's

**Page 403**

1  Petition is to the best of your understanding.
2    A   It's -- it's --
3         MR. LOCKE:  Objection.
4         THE WITNESS:  It's going to be a very
5  simple thing, because I -- I --
6  BY MR. TISI:
7    Q   Simple is -- simple is always better.
8    A   -- I have a lot of details.  I mean
9  it's -- it's -- someone can petition FDA to
10  request something through a process.  I believe
11  the process is probably spelled out in the Code of
12  Federal Regulations.  They can request something
13  to FDA, and then FDA has, I believe, an obligation
14  to respond within a certain amount of time,
15  although they can -- they can respond by saying
16  we've gotten it and we're reviewing it, and then
17  they need to eventually respond to it.
18   Q   And are there opportunities for other
19  interested parties to file comments to that
20  petition?
21   A   Yes.
22   Q   Okay.  And PCPC has on occasion actually
23  filed Citizen's Petitions themselves.
24   A   Yes.
25   Q   And we're aware that the -- a Citizen's

7 (Pages 400 to 403)

Linda Loretz, Ph.D.

Page 404

1  Petition was filed by a group called the Cancer
2  Prevention Coalition seeking a cancer warning on
3  cosmetic talc products in 2008.  Correct?
4      A   Yes.
5      Q   Okay.  And that was actually filed --
6  that was actually filed in May of 2008?
7      A   I don't remember.
8      Q   Okay.  Let's see if I can help you here.
9          (Exhibit No. 42 was marked for
10         identification.)
11 BY MR. TISI:
12     Q   I'm going to hand you what I've had
13 marked as Exhibit No. 42.
14         Do you recognize this?
15     A   Yes.
16     Q   Okay.  Is this the Citizen's -- is this
17 a Citizen's Petition that was filed on behalf of
18 the Cancer Prevention Coalition with the Food and
19 Drug Administration in -- on May 13th, 2008?
20     A   That's what it looks to be, yes.
21     Q   Okay.  And you're familiar with that
22 document?
23     A   Yes.
24     Q   And --
25         MR. TISI:  Can we bring this document

Page 405

1  up.
2  BY MR. TISI:
3      Q   The document in front of you, it was
4  filed by a Dr. Epstein.  Do you know that?
5      A   Yes.
6      Q   Has anyone with PCPC ever sought to meet
7  with Dr. Epstein, if you know?
8      A   Not that I'm aware.
9      Q   And he was a professor of occupational
10 and environmental medicine at the University of
11 Illinois Chicago Medical Center.  That's in the
12 first paragraph.
13         MR. LOCKE:  Objection.
14         THE VIDEOGRAPHER:  Counsel, can we go
15 off the record?
16         The time is 9:23 a.m.  We're going off
17 the record.
18         (Technical difficulties.)
19         THE VIDEOGRAPHER:  The time is 9:27
20 a.m., and we're back on the record.
21 BY MR. TISI:
22     Q   Just to reask the question, if you look
23 at the first paragraph, this Dr. Epstein
24 identifies himself as the professor emeritus of
25 occupational and environmental medicine,

Page 406

1  University of Illinois at Chicago School of Public
2  Health.
3      A   Correct.  That's what it says.
4      Q   And he filed a petition, and it's
5  actually at the very top, it says: "A petition
6  seeking a cancer warning on cosmetic talc
7  products."  Do you see that?
8      A   Yes.
9      Q   Okay.  And is this -- and I think you
10 had indicated that nobody from Personal Care
11 Products Council had ever contacted Dr. Epstein to
12 talk to him about the basis for his petition.
13     A   Not that I'm aware.
14     Q   Okay.  And in this document, he was --
15 and you're familiar with this document, right?
16     A   Yes.
17     Q   Okay.  And Dr. Epstein, if I could
18 summarize, was writing about the potential link
19 between ovarian cancer and -- talcum powder
20 products and ovarian cancer, correct?
21     A   Right.
22     Q   And this issue was not a new issue, was
23 it?
24     A   No.
25     Q   Okay.  The issue of the connection

Page 407

1  between talcum powder products and ovarian cancer
2  was one that went back into the 1970s, correct?
3      A   I think the '80s.  I thought it was the
4  first paper published in 1982 that I'm aware of.
5      Q   Okay.  Then that's what -- we'll use
6  that.
7          And if we can go back to our timeline,
8  if I wrote on top of here that -- concerns that --
9          MR. TISI:  Off the record?
10         (A discussion was held off the record.)
11         MR. TISI:  We do need to see that.
12         THE VIDEOGRAPHER:  The time is 9:30 a.m.
13 We're going off the record.
14         (Pause in the proceedings.)
15         THE VIDEOGRAPHER:  The time is 9:31 a.m.
16 We're back on the record.
17 BY MR. TISI:
18     Q   And, Dr. Loretz, I'm sorry for the
19 technical difficulties we're having here.  I took
20 the break to write down what I think we agreed.
21         Beginning in about 1982, concerns were
22 raised that talcum powder products may cause or
23 contribute to ovarian cancer; is that correct?
24     A   That's correct.
25     Q   Okay.  And starting in 1982, that issue

8 (Pages 404 to 407)

Linda Loretz, Ph.D.

Page 408

1  was an issue that was one that wasn't just one
2  that was raised and forgotten, it was an issue
3  that was persistently discussed in the medical and
4  scientific literature from that point forward.
5  Fair?
6      A   Yes.
7      Q   Okay.  So it was discussed in the '80s,
8  '90s, 2000s, and in fact, it's still being
9  discussed today.
10     A   Yes.
11     Q   And by 2008, which would have been about
12 20 -- two decades plus since those initial
13 reports, the Cancer Prevention Coalition filed a
14 petition to the FDA that asked the FDA to mandate,
15 require, that all talcum powder products have some
16 kind of warning for ovarian cancer.  True?
17     A   That's what the petition says, yes.
18     Q   Okay.  And so if you go to page 2 of the
19 letter.
20         MR. TISI:  Can you please go back?
21 BY MR. TISI:
22     Q   Section A, it says:  "Agency action
23 requested," and point number 1, it says:
24 "Immediately require cosmetic talcum powder
25 products to bear labels with a prominent warning

Page 409

1  such as 'Frequent talc application in the female
2  genital area is responsible for major risks of
3  ovarian cancer.'"
4         Do you see that?
5      A   Yes.
6      Q   Did I read that correctly?
7      A   That's what it says.
8      Q   Okay.  And Dr. Epstein also asked to be
9  heard by the FDA on this petition, correct?
10     A   That's what it says, yes.
11     Q   Okay.  So not only did he file a letter
12 requesting that the -- a warning be added to
13 talcum powder products, but he also wanted to meet
14 with them, correct?
15     A   That's what it says, yes.
16     Q   All right.  You became -- the Personal
17 Care Products Council became aware of this
18 petition -- do you remember when it became aware
19 of this petition?
20     A   I really don't.
21     Q   Okay.  Do you remember the circumstances
22 under which it became aware of this petition?
23     A   I don't remember the details, no.  I'm
24 sure it was -- I'm sure it was soon after it was
25 filed, but I don't remember the details.

Page 410

1      Q   Okay.  So taking off your hat of
2  Dr. Loretz and putting on your hat as Personal
3  Care Products Council, can you tell us when the
4  Personal Care Products Council first became aware
5  of this petition?
6      A   I'm sure it was soon after it was filed.
7      Q   So it was filed in May of 2008.  It
8  would have been approximately May of 2008.
9      A   Yes.  I believe so.
10     Q   All right.  Let's put that aside for a
11 moment.  We'll come back to that.
12         Now, in July of 2009, did the Personal
13 Care Products Council file a white paper with the
14 FDA or comments with the FDA opposing the Cancer
15 profession -- Prevention Coalition petition?
16     A   Yes.
17     Q   And that was filed on July 21st, 2009.
18 Correct?
19     A   I don't recall.
20     Q   Let me see if I can provide you with
21 what I have marked as Exhibit No. 43.
22         (Exhibit No. 43 was marked for
23         identification.)
24 BY MR. TISI:
25     Q   Is that the PCPC -- I'm sorry.

Page 411

1         Is this the response of the Personal
2  Care Products Council to the Epstein petition to
3  add a warning?
4      A   Yes.
5      Q   Okay.  Now, is it fair to say, and if
6  you go to the -- the position of the Personal Care
7  Products Council is the addition of a warning
8  label on products such as Johnson & Johnson's baby
9  powder and Shower to Shower would be inappropriate
10 and unnecessary?
11     A   You're reading that somewhere?
12     Q   It's the very last -- second to last
13 paragraph at the end.
14     A   Yes.
15     Q   And so just to make sure that we're kind
16 of 2000 -- at 30,000 feet, the petition was filed
17 asking for a warning.  The petition of the
18 Personal Care Products Council was no warning was
19 necessary.
20     A   That's correct.
21     Q   In this petition did the Personal Care
22 Products Council lay out the standard for when a
23 warning is appropriate, if you know?
24     A   I believe our response to the petition
25 was to look at the science on talcum powder and

9 (Pages 408 to 411)

Linda Loretz, Ph.D.

Page 412

1  ovarian cancer.
2      Q   Okay.  But the question that I asked is
3  a different one.
4          The standard of when a warning is
5  required is a standard that you're familiar with?
6      A   That sounds more like a legal concept,
7  so I'm not sure that I am.
8      Q   Well, does the Personal Care Products
9  Council provide a labeling manual for its members?
10     A   We do, but it's -- it's -- yes, it's a
11 summary of existing labeling requirements,
12 regulatory requirements.
13     Q   Right.  Does this petition --
14 Dr. Epstein asked for a label to be added,
15 correct?
16         MR. LOCKE:  Objection.
17         THE WITNESS:  Yes.
18 BY MR. TISI:
19     Q   And this opposes the addition of a
20 label, correct?
21         MR. LOCKE:  Objection.
22         THE WITNESS:  Yes.
23 BY MR. TISI:
24     Q   Did the Personal Care Products Council
25 in any way analyze or -- or discuss the standard

Page 413

1  for providing when a label -- to add a warning on
2  a cosmetic product is required?
3          MR. LOCKE:  Objection.
4          THE WITNESS:  We -- as I say, what we
5  did was we reviewed the science on ovarian cancer,
6  talcum powder, and our position is that there is
7  not evidence of a causative role, and therefore we
8  did not believe a -- a label is necessary.
9          MR. TISI:  Okay.  Move to strike.
10 BY MR. TISI:
11     Q   My question was a different one.
12         Does this opposition that was filed in
13 July of 2009 contain any discussion of what the
14 standard is?
15         MR. LOCKE:  Objection.
16         THE WITNESS:  No, it addresses the
17 science.
18 BY MR. TISI:
19     Q   Okay.  Do you know whether or not the
20 standard requires that causation be proven before
21 a warning be added?
22     A   I -- I think that sounds like a legal
23 question.  I -- I --
24     Q   I'm asking you since this was filed
25 on -- you're -- you're speaking here not as Linda

Page 414

1  Loretz.  You're speaking here as a -- as the
2  organization.
3      A   Okay.
4      Q   And the organization is responding to a
5  request to add a warning.  Right?
6      A   Yes.
7      Q   And the -- presumably -- I mean, maybe I
8  should ask you the question:  Did PCPC consult
9  with the requirements for adding a warning before
10 responding to this petition?
11         MR. LOCKE:  Objection.
12         THE WITNESS:  I -- I mean, we don't
13 agree with the petitioner's rationale for adding a
14 warning.
15 BY MR. TISI:
16     Q   I understand you -- you have a
17 difference in the weight of the evidence that
18 would support or not support a warning.
19         My question is, did you understand at
20 the time the standard for what -- what would
21 require a warning or not?
22         MR. LOCKE:  Objection.
23         THE WITNESS:  I think it was our
24 understanding this would not require a warning.
25 BY MR. TISI:

Page 415

1      Q   Well, what was the standard?
2          MR. LOCKE:  Objection.
3          THE WITNESS:  I'm not sure I understand
4  that question.
5  BY MR. TISI:
6      Q   Okay.  Did the standard require that --
7  and if you don't know the answer, you don't know
8  the answer, okay?
9          But does the standard for providing a
10 warning require that causation be proven, be
11 unequivocal?
12         MR. LOCKE:  Objection.  That's beyond
13 the scope.
14         You can answer in your personal
15 capacity.
16         THE WITNESS:  I'm not sure what you mean
17 by the standard for requiring a warning.
18 BY MR. TISI:
19     Q   Well, this is -- this is a response to a
20 request that a warning be added.
21     A   Correct.  Which FDA later said it
22 doesn't require a warning.
23     Q   That's not --
24         MR. TISI:  Move to strike.
25 BY MR. TISI:

10 (Pages 412 to 415)

Linda Loretz, Ph.D.

Page 416

1   Q   Okay.  My -- my -- my question is, did
2   the PCPC consult what the legal -- what the legal
3   standard was for when a warning is required?
4           MR. LOCKE:  Objection.
5           THE WITNESS:  I mean, I -- I -- I think
6   it's fair to say we have a lot of lawyers at PCPC,
7   and if they felt this were inappropriate from a
8   legal standpoint to have this position, we would
9   not have that position.
10  BY MR. TISI:
11      Q   Did they set out what the standard is in
12  the letter?  Is there anything in this letter --
13  first of all, who drafted this cover letter?
14      A   It was either myself or John Bailey.
15      Q   Okay.  Did you consult with -- either
16  one of you consult with what the standard is for
17  when a warning is required before writing this
18  letter?
19          MR. LOCKE:  Objection.
20          THE WITNESS:  I'm -- again, I'm not
21  quite sure when what you mean "when a warning was
22  required."  By whom?
23  BY MR. TISI:
24      Q   Well, you -- you know -- do you know
25  that warnings are added when a cosmetic product

Page 417

1   may cause -- there's evidence that they may cause
2   a potential harm?
3           MR. LOCKE:  Objection.  Beyond the
4   scope.
5           You can answer in your personal
6   capacity.
7           THE WITNESS:  I'm sorry.  What's the
8   question?
9   BY MR. TISI:
10      Q   Do you know that warnings can be added
11  voluntarily when there's evidence that the product
12  may cause a potential harm?
13          MR. LOCKE:  Same objection, and to form.
14          THE WITNESS:  And as our position being
15  that there was not support for that harm, we would
16  not have supported adding a voluntary label.
17  BY MR. TISI:
18      Q   I -- I understand.
19      A   We would not have said, yes, this should
20  be labeled.
21      Q   But should -- do you not understand what
22  the standard is for a label?
23          MR. LOCKE:  Objection.
24  BY MR. TISI:
25      Q   What is -- what is the -- what is the

Page 418

1   level of evidence that's required before a label
2   is added?
3           MR. LOCKE:  Objection.  Beyond the
4   scope.
5   BY MR. TISI:
6       Q   If you don't know, you don't know.
7       A   Yeah, I -- I guess I would say I don't
8   know, but I --
9       Q   That's fine.  But you wrote this letter
10  anyway, you or Dr. Bailey wrote this letter to the
11  FDA responding to requests for requiring a label.
12      A   Again, I would say certainly there was
13  awareness within PCPC, and it was felt that this
14  was appropriate as a response.
15      Q   Right.  And there was -- but there was
16  no discussion about what the standard is under the
17  Code of Federal Regulations in this -- in this
18  letter, correct?
19          MR. LOCKE:  Objection.
20          THE WITNESS:  And again, I would just
21  say our -- our view was that -- that there was not
22  a need for warning because of the lack of
23  evidence.
24  BY MR. TISI:
25      Q   Okay.  Well, as -- as we discussed

Page 419

1   before, this issue was one that was debated in the
2   medical and scientific community for almost 25
3   years before this petition was filed, correct?
4       A   It was a topic, yes.
5       Q   All right.  And some epidemiologists
6   looking at the evidence felt that there -- there
7   was sufficient evidence to raise a causal
8   inference, correct?
9           MR. LOCKE:  Objection.
10  BY MR. TISI:
11      Q   Including Dr. Epstein.
12          MR. LOCKE:  Objection.
13          THE WITNESS:  Dr. Epstein did, but I
14  think the literature, as we point out and as we
15  had our epidemiologists point out, that there is a
16  lot of inconsistency.
17  BY MR. TISI:
18      Q   Understood.  My -- I understand that's
19  your position.
20          My question, though, is a different one,
21  Dr. Loretz.  There were epidemiologists and -- and
22  scientists in the medical and scientific
23  communication who disagreed with the PCPC's view
24  of the sufficiency of the evidence.  This was an
25  active debate, correct?

11 (Pages 416 to 419)

Linda Loretz, Ph.D.

Page 420

1    MR. LOCKE: Objection.
2    THE WITNESS: That's probably fair to
3 say, and certainly Dr. Epstein disagreed.
4 BY MR. TISI:
5    Q   Right.  And there were others.  I mean
6 Dr. Cramer, another -- another doctor who you are
7 familiar with, wrote and published -- and
8 published in the literature several -- several of
9 the studies.  You know that he felt and published
10 that there was an inference of causation, true?
11    MR. LOCKE: Objection.
12    THE WITNESS: I believe that would be
13 true, and then the -- there were epidemiologists
14 who did not agree with that.
15 BY MR. TISI:
16    Q   Fine.  Okay.  And that kind of
17 illustrates a point that I think is important to
18 make here.
19    Looking at the evidence that -- some of
20 which was summarized in this letter, reasonable --
21 scientists looking at the evidence could reach
22 different conclusions looking at that evidence,
23 and in fact, did reach different conclusions,
24 correct?
25    MR. LOCKE: Objection.

Page 421

1    THE WITNESS: Yeah, there were different
2 opinions.
3 BY MR. TISI:
4    Q   Okay.  And there were different opinions
5 based upon the evidence, correct?
6    A   I don't want to go to what the -- what
7 the thoughts were, but I mean, there's a body of
8 scientific literature, yes.
9    Q   Right.  And that's not unusual.  You've
10 been in this business for -- for a while.
11 Scientists and doctors look at -- look at the
12 evidence, and some -- they can often disagree
13 about evidence, correct?
14    A   That's true.
15    Q   All right.  All right.  So let's put
16 this opposition to the Citizen's Petition on our
17 timeline here, and this was --
18    MR. TISI: Maybe we can switch back to
19 this.
20    THE VIDEOGRAPHER: It is.  It's in
21 process.
22    MR. TISI: If I can see if I can write
23 it.
24 BY MR. TISI:
25    Q   This would be "PCPC opposition to

Page 422

1 Citizen's Petition," and that would be July 2009.
2 Okay?
3    A   Yes.
4    MR. LOCKE: I'm just going to object.  I
5 mean it says "Comments" on it.  It doesn't say
6 "opposition to," but --
7 BY MR. TISI:
8    Q   But I think -- I think the testimony was
9 this was in opposition to adding a warning,
10 correct?
11    A   Yes.  We did not think a warning was
12 necessary.
13    Q   Okay.  So let's put that aside for a
14 moment.
15    Oh, I'm sorry, before -- before we leave
16 this document, if you go to page 4 of 39 of this
17 document, you attach a report.
18    A   Yes.
19    Q   PCPC attaches a report.  And this is a
20 report by a group called the Meta-Analysis
21 Research Group.  Correct?
22    A   Yes.
23    Q   Okay.  And that's a group that you're
24 familiar with?
25    A   Yes.

Page 423

1    Q   Okay.  And it was prepared by a
2 Dr. Michael Huncharek?
3    A   Yes.
4    Q   And a Dr. Joshua Muscat?
5    A   Correct.
6    Q   And they both identify themselves as
7 being with the Meta-Analysis Research Group.
8    A   As well as other affiliations, but yes.
9    Q   All right.  And we'll get into this in a
10 minute, but this report was initially written for
11 Johnson & Johnson, correct?
12    A   Yes.
13    Q   And it was then -- in fact, earlier
14 versions of this have "Prepared for Johnson &
15 Johnson."  This version that was submitted to the
16 FDA says "Prepared for the Personal Care Products
17 Council."  Correct?
18    A   That could be, yes.
19    Q   Okay.  And it was actually prepared for
20 Johnson & Johnson, but --
21    A   Originally.
22    Q   Originally.  It was not prepared for or
23 initiated by the Personal Care Products Council,
24 correct?
25    A   We took it over, though, yes.

12 (Pages 420 to 423)

Linda Loretz, Ph.D.

Page 424

1    Q   Right.
2    A   I mean, and submitted it, yes.
3    Q   All right.  But J&J did not submit the
4  report.  The Personal Care Products Council did.
5    A   Correct.
6    Q   Now, I think in your prior deposition
7  you said you had met Dr. Huncharek and Dr. Muscat
8  before, correct?
9    A   I'm not sure if I ever met
10  Dr. Huncharek.  I know I met Dr. Muscat once upon
11  a time.
12    Q   Okay.  Had you had occasion to
13  communicate with them either on teleconferences or
14  by e-mail?
15    A   I had spoken to Dr. Huncharek.
16    Q   Okay.  How often?
17    A   Once or twice.
18    Q   Okay.  Now, on page 6 of this document
19  is an introduction.  Do you see that?
20    A   Yes.
21    Q   It identifies -- the second paragraph
22  identifies this report as "an independent review
23  of the relevant data."  Do you see that?
24    A   Sorry, where?
25    Q   Second -- second paragraph, second to

Page 425

1  last sentence.
2    A   Okay.
3    Q   It identifies this as "an independent
4  review of the relevant data."
5    A   Okay.
6    Q   Do you see that?
7    A   Yes.
8    Q   Okay.  This was not an independent
9  review of the relevant data, was it?
10    MR. LOCKE:  Objection.
11    THE WITNESS:  I think it depends how you
12  define "independent."  I mean these -- the
13  epidemiologists that were retained -- I mean,
14  first of all, this was on behalf of our members,
15  not just J&J.  They initiated the contact and got
16  the report writing started.
17    I think independent in the sense that
18  these were the conclusions of these
19  epidemiologists.
20  BY MR. TISI:
21    Q   Right.  But this report was written with
22  Johnson & Johnson and Imerys's input, correct?
23    A   We probably had all of our members who
24  were interested are allowed -- you know, would
25  review it, but that doesn't mean we change the

Page 426

1  conclusions at all.  That's a --
2    Q   Right.  And in fact, these -- these
3  doctors, Meta-Analysis Research Group, had been
4  consultants to the talc industry before this,
5  correct?
6    A   They had --
7    MR. LOCKE:  Objection.
8  BY MR. TISI:
9    Q   I'm sorry.  You may answer the question.
10    A   They had, yes.  Or Dr. Muscat had
11  reviewed for NTP.
12    Q   Okay.  And you were aware through
13  Crowell & Moring that they were both retained to
14  provide information on NTP for the 12 -- 12th
15  review on carcinogens, correct?
16    MR. LOCKE:  Objection.
17    THE WITNESS:  I'm not sure if --
18  BY MR. TISI:
19    Q   You ever heard of Crowell & Moring?
20    A   I've heard of them, yes.
21    Q   Okay.  Do you know -- did you
22  communicate with them through Crowell & Moring?
23    A   Communicate with?
24    Q   Huncharek and Muscat.
25    A   Oh, no.  No.

Page 427

1    Q   Did you -- and you know that they
2  appeared as an industry representative for --
3  Dr. Muscat appeared at the IARC proceedings as an
4  industry member?
5    A   I do know that.
6    MR. LOCKE:  Well, wait -- wait one
7  second.  When you say "they appeared," who are you
8  referring to?
9    MR. TISI:  I said Dr. Muscat.
10    MR. LOCKE:  Okay.
11  BY MR. TISI:
12    Q   Are you aware of that?
13    A   I'm aware of that, yes.
14    Q   You know who Robert Glenn is, don't you?
15    A   I know who he is.
16    Q   Okay.  You know he is with Crowell &
17  Moring?
18    A   Yes.
19    Q   And you received e-mails from him,
20  correct?
21    A   Well, not in relation to this.
22    Q   Well, with relation to Huncharek and
23  Muscat, correct?
24    A   Only -- the only -- the only thing I
25  believe I received e-mails from him, just as a --

13 (Pages 424 to 427)

Linda Loretz, Ph.D.

Page 428

1  being copied was related to the IARC review.
2      Q   Okay.  And you also understand -- we'll
3  talk about this in a moment -- they let you know
4  that there were publications that were being
5  planned by Huncharek and Muscat, true?
6          MR. LOCKE:  Objection.
7          THE WITNESS:  I'm not sure.  I may have
8  known.
9  BY MR. TISI:
10     Q   Okay.  We'll talk about those.  We'll
11 talk about those.
12         But -- but the bigger picture, Doctor,
13 is that Huncharek and Muscat were people who had
14 been in communication with the talc industry going
15 back to at least 2000 and perhaps before.
16         MR. LOCKE:  Objection.
17         THE WITNESS:  Muscat in 2000, I'm
18 certainly aware of that.
19 BY MR. TISI:
20     Q   And you said you had spoken to Huncharek
21 as well.
22     A   I spoke to him I believe around the time
23 of this, I think.  I spoke to him once, I know
24 that, and I can't remember exactly when it was.
25     Q   Okay.  Now, prior to the talc -- prior

Page 429

1  to this publication, had you ever heard of the
2  Meta-Analysis Research Group ever?
3          MR. LOCKE:  When you refer to "this
4  publication," you mean Exhibit 43?
5          MR. TISI:  Correct.
6  BY MR. TISI:
7      Q   Let me -- let me rephrase the question,
8  because -- to be clear.
9          Prior to these comments that were
10 submitted to the FDA in July of 2009 under the
11 letterhead of Meta-Analysis Research Group, had
12 you ever had occasion to come across Meta-Analysis
13 Research Group before then?
14     A   I honestly don't know.  I believe
15 Dr. Muscat's affiliation was not that in 2000.
16     Q   It was American Health Foundation.
17     A   That's what I remember as well.
18     Q   Okay.  So my question is, did you --
19 prior to submitting this independent report on
20 behalf of the industry by a group called
21 Meta-Analysis Research Group, did PCPC do any due
22 diligence as to who Meta-Analysis Research Group
23 is and what their focus was?
24     A   I -- I think the assumption was that
25 they were doing meta-analysis, which I know is

Page 430

1  what Dr. Huncharek did.
2      Q   Okay.  Do you know whether or not they
3  were an organization that was a contract research
4  organization?  For example, do you know whether or
5  not they were litigation consultants?  Do you know
6  whether or not they were -- you know, what they
7  were?
8          MR. LOCKE:  Objection.
9          THE WITNESS:  I mean I think we were
10 familiar with them from doing this.  This to me --
11 so we know they did this kind of meta-analysis,
12 which again was something I know that both
13 Dr. Huncharek and Dr. Muscat did.  So...
14         MR. TISI:  I'm going to -- I'm going to
15 actually move to strike.
16 BY MR. TISI:
17     Q   My question was, do you know -- or did
18 you do any due diligence as to what Meta-Analysis
19 Research Group was?
20         MR. LOCKE:  Objection.
21         THE WITNESS:  No, because we knew who
22 the authors were.
23         (Exhibit No. 44 was marked for
24         identification.)
25 BY MR. TISI:

Page 431

1      Q   Okay.  I'm going to show you Exhibit
2  No. 44.
3          And I'm not concerned with the front
4  pages of it.  But with an attachment.
5          Here you go.
6          MR. TISI:  I'm sorry?  Oh, Tom, I'm
7  sorry, here you go.
8          MR. LOCKE:  Thank you.
9          MR. TISI:  Yep.
10 BY MR. TISI:
11     Q   And if you go to the last -- and I'll
12 just represent to you, this is a proposal from
13 Dr. Huncharek to Bob Glenn to do certain papers
14 and research on behalf of Imerys in 2004.
15         But attached to it --
16         MR. LOCKE:  Let's let the witness just
17 read it first a second, just flip through the
18 pages.
19         MR. TISI:  Oh, she can certainly do
20 that, Tom.
21 BY MR. TISI:
22     Q   And I'm going to ask you on the -- about
23 the brochure that's attached on page 5.
24     A   (Peruses document.)
25     Q   Since you took the time to read it, let

14 (Pages 428 to 431)

Linda Loretz, Ph.D.

| | Page 432 |
|---|---|

1  me just ask you the question.  Do you see that
2  this is a proposal to write two papers, one on
3  meta-analysis on diaphragms and one a critical
4  review of the talc literature?
5      A   Yes.
6      Q   Okay.  You know that they did publish
7  two articles relating to that very specific --
8  those two specific topics, correct?
9      A   I believe so, yes.
10     Q   Okay.  And so this is a proposal by --
11  by Dr. Huncharek to write such articles to
12  Mr. Glenn, who I will represent to you was with
13  the lawyers for Crowell & Moring for Imerys.
14     A   Okay.
15     Q   Okay.  Attached to that is a brochure
16  from the Meta-Analysis Research Group.  Do you see
17  that?
18     A   I guess this is --
19         MR. LOCKE:  Page 5.
20         THE WITNESS:  Okay.  Okay.
21  BY MR. TISI:
22     Q   Okay.  This is a brochure.  Did you
23  ever -- I think I -- I asked you before, but did
24  you ever ask -- first of all, the report that was
25  filed on behalf of the FDA, I believe your answers

| | Page 433 |
|---|---|

1  to interrogatories said it cost about $50,000.
2      A   I think that's correct, yeah.
3      Q   Okay.  Did PCPC pay that or did J&J?
4      A   I believe we did.
5      Q   Okay.  "We" meaning PCPC?
6      A   I'm sorry.  PCPC.
7      Q   On behalf of the talc industry?
8      A   Yes.
9      Q   And one of the things that the
10  Meta-Analysis Research Group identifies in the
11  first paragraph that they do is they assist major
12  pharmaceutical companies and other clients in,
13  quote, deciphering often complex, seemingly
14  contradictory, data using rigorous meta-analysis
15  methods.
16         Do you see that?
17     A   Yes.
18     Q   Do you see on the next page that it also
19  provides medical and legal consulting in
20  litigation?
21     A   That's what it says, yes.
22     Q   The expert witnesses.  Do you see that?
23     A   Yes.
24     Q   Do you know that both Dr. Huncharek and
25  Dr. Muscat became expert witnesses in talc

| | Page 434 |
|---|---|

1  litigation?
2      A   I'm not sure.  I knew that Dr. Muscat
3  was deposed, but I don't -- I don't think that's
4  the same as what you're asking.
5      Q   And so my question to you is, did it
6  matter to you when you were submitting this on
7  behalf of -- to the FDA as to whether or not these
8  consultants who -- were basically people who would
9  be involved in litigation?
10         MR. LOCKE:  Objection.  Do you mean --
11  BY MR. TISI:
12     Q   Did you think about that?
13         MR. LOCKE:  Do you mean -- when you say
14  "this," you're referring to Exhibit 43, the
15  comments?
16         MR. TISI:  Correct, in 2009.
17  BY MR. TISI:
18     Q   Did you want to know -- did you even
19  think to know whether or not these witnesses,
20  Dr. Huncharek and Dr. Muscat, would be considered
21  or groomed for being experts in litigation?
22         MR. LOCKE:  Objection.
23         THE WITNESS:  That's not --
24         MR. LOCKE:  Objection.  Did you mean to
25  say "these witnesses"?

| | Page 435 |
|---|---|

1          MR. TISI:  These -- yes, these doctors.
2          THE WITNESS:  We hired them for their
3  epidemiological expertise, and they're -- they
4  were not always favorable to us.  I mean they
5  also -- Dr. Huncharek published on hair dyes, and
6  it was -- it was not favorable.  So we -- we
7  consider them to be fair, and their scientist
8  arguments would stand.
9  BY MR. TISI:
10     Q   Okay.  Had you ever heard discussed --
11  now I'm asking you as Linda Loretz -- had you ever
12  discussed that if this case went into litigation
13  that Drs. Huncharek and Muscat would be
14  consultants or experts?
15         MR. LOCKE:  Objection.
16         THE WITNESS:  No.
17  BY MR. TISI:
18     Q   Okay.  Do you know that Meta-Analysis
19  Research Group went out of business shortly after
20  this --
21     A   I don't know.  I did not know that.
22     Q   Do you know that they became paid
23  litigation experts in 2010?
24     A   No.
25     Q   Now, are you aware that in 2011, after

Linda Loretz, Ph.D.

Page 436

1    the filing of this report to PCPC, that they took
2    their analysis that was paid for by PCPC and then
3    made some modifications, but for the most part,
4    published it as it was in the -- in the
5    literature?
6         MR. LOCKE:  Objection.
7         THE WITNESS:  I'm -- I think I'm aware
8    that there was a publication, but, no, I did not
9    know that was happening until after the fact -- we
10   did not know that that was happening until after
11   the fact.
12        (Exhibit No. 45 was marked for
13        identification.)
14   BY MR. TISI:
15        Q   I'm going to show you what I've had
16   marked as Exhibit No. 45.
17        And this is a --
18        (Phone interruption.)
19   BY MR. TISI:
20        Q   This is an article that I will represent
21   to you is very close to, if not identical in many
22   paragraphs, to the report that was filed on behalf
23   of PCPC.  Have you seen this before?
24        A   I've -- yes.
25        Q   It was published in 2011.  Correct?

Page 437

1         A   Accepted April 2011, so -- yes.
2         Q   Do you know -- do you know that there
3    was a -- actually a proposal to -- made to Imerys
4    that -- to turn this paper, "this" meaning the
5    report that was submitted by PCPC in July of 2009,
6    into a publication?
7         A   No.  We were not involved.
8         Q   Okay.  If you look at the back of the
9    article, do you know -- does it acknowledge PCPC
10   as having paid for this report?
11        A   No.
12        Q   Is there anything in that acknowledgment
13   that would indicate that at the time that this
14   article was published that they were paid
15   litigation experts for the lawyers representing
16   Johnson & Johnson?
17        MR. LOCKE:  Objection.
18        THE WITNESS:  No, not any
19   acknowledgments.
20   BY MR. TISI:
21        Q   So let's put this on our timeline here,
22   2011.  And I'll put "H&M publication, 2011."
23        Now, let's go back to the report that
24   was filed with the FDA.  And I would like to go
25   back to the Introduction section that we started

Page 438

1    talking about before.
2         And it's on page 3 of the report,
3    page 6 -- 6 of 9 of the letter.  Do you see that?
4         A   Yes.
5         Q   Okay.  The Introduction says:  "On
6    May 13th, 2008, Samuel Epstein, MD, chairman of
7    the Cancer Prevention Coalition, submitted a
8    Citizen's Petition to the Commissioner of the Food
9    and Drug Administration seeking placement of a
10   cancer warning label on talc products.  The
11   petition requests the Commissioner of the Food and
12   Drug require that all talcum powders bear labels
13   with warnings such as 'Frequent application of
14   talcum powder in the female genital area
15   substantially increases the risk of ovarian
16   cancer.'"
17        Did I read that correctly?
18        A   That's what it says.
19        Q   Okay.  The second paragraph -- so that
20   just -- and that's true, that that's -- that
21   paragraph is true, that's what Epstein did.
22        A   I would say yes.
23        Q   Okay.  Second paragraph is -- is your
24   response or the summary of your response.
25        "Given the multiple implications of such

Page 439

1    warning labels, the Personal Care Products Council
2    sought an evaluation of the validity of the
3    scientific facts underlying this request.  The
4    Meta-Analysis Research Group was retained to
5    provide an independent review of the relevant
6    data.  Below are the findings of that review."
7         Do you see that?
8         A   Yes.
9         Q   I'm curious about the statement saying
10   "the multiple implications of such warning
11   labels."  Do you see that?
12        A   Yes.
13        Q   Can you tell us on behalf of the PCPC
14   what the multiple implications of the warning
15   labels are that you were referring to?
16        MR. LOCKE:  Objection.  Obviously this
17   was written by doctors --
18        MR. TISI:  I'm -- I'm -- I am --
19   BY MR. TISI:
20        Q   What are the multiple implications that
21   were being considered there?
22        A   Again, this -- this was written not by
23   us.  I mean, I think it's pretty obvious that that
24   would have -- could have an impact -- I mean,
25   again, we didn't think a label was -- should be

16 (Pages 436 to 439)

Linda Loretz, Ph.D.

Page 440

1  required because we -- because of the science
2  behind it we believe was not supported, but
3  obviously would have an impact on -- on the
4  product if -- if it were.
5      Q   Okay.  The "impact on the product," what
6  do you mean?
7      A   Well, we -- we -- I mean it --
8      Q   Well, let me ask --
9      A   We don't think it should have a warning
10 if it's -- if we don't believe that it --
11     Q   Let me ask you some -- I didn't mean to
12 interrupt you.  Go finish, if you'd like.
13     A   No, just that if -- because we didn't --
14 we don't believe that the science shows causation,
15 we just did not believe you have a warning to
16 scare people off of something if it's not real.
17     Q   Okay.  So let me ask you -- I understand
18 your position that you did not think the evidence
19 supported a causal inference.
20         Putting that issue aside, the company
21 through its consultants assert -- make an
22 assertion that warnings labels would have
23 implications.  Do you see that?
24     A   Yes.
25     Q   And not only implications, have multiple

Page 441

1  implications.  Correct?
2      A   That's what it says.
3      Q   Okay.  And I'm curious as to what those
4  implications were from your perspective, from the
5  PCPC's perspective.
6          Was there concern ever expressed that
7  adding a warning would have an impact on the
8  members of the PCPC?  You've heard that, correct?
9      A   Yeah, again --
10     Q   Okay.
11     A   -- I think the reason that -- we would
12 not want that, though, is because we do believe
13 the science doesn't support the need for a
14 warning.
15     Q   I -- I understand.
16     A   It has to be part of the context of my
17 answer.
18     Q   I'm going -- Doctor, I'm going to ask
19 you a lot about this document, okay?  And we're
20 going to go through it probably more than you want
21 to.  Okay?
22     A   Sure.
23     Q   But before we do, I want to understand
24 the context in which it's written.  Okay?
25         And in the very first paragraph, other

Page 442

1  than stating what Dr. Epstein did, the first --
2  first sentence of that paragraph, you say that
3  the -- that your consultants on your behalf say:
4  "Given the multiple implications on such a warning
5  label, the Personal Care Products Council sought
6  an evaluation of the validity of the scientific
7  facts underlying this request."
8          So this statement is the predicate of
9  why the PCPC got this report in the first place,
10 correct?
11     A   Sure.
12     Q   Okay.  And so the predicate was that
13 there were multiple implications of that warning,
14 of a warning, should it be required.  And this, to
15 be clear, is a request that warning labels be
16 mandated.  Correct?
17     A   Correct.
18     Q   And you were aware that companies can
19 and in fact have voluntarily added a warning,
20 correct?
21     A   Sure.
22     Q   Okay.  So this is different than that.
23 I mean companies can voluntarily add a warning.
24     A   Yes.
25     Q   But this is in the absence of a company

Page 443

1  voluntarily adding a warning, they're going right
2  to the FDA and saying, The companies are not doing
3  it, and we're going to ask you -- require you to
4  do it.  Correct?
5      A   Yes.
6      Q   All right.  And the PCPC, as a predicate
7  for opposing that requirement, laid out that there
8  are multiple implications to requiring that
9  warning.  Correct?
10         MR. LOCKE:  Objection.
11         THE WITNESS:  That's what it says, yes.
12 BY MR. TISI:
13     Q   All right.  And the multiple -- the
14 implications are -- I mean let's -- let's I'm
15 going to lay out some for you and ask you whether
16 they were things that were discussed at the time.
17         Was one of the implications that it
18 would affect the commercial interests of the
19 members of the PCPC?
20     A   With the context being that we did not
21 believe that it truly had this risk, you do not
22 want to affect sales and so forth without --
23     Q   Okay.
24     A   -- if it's -- if there's no reason for
25 having a warning.

17 (Pages 440 to 443)

Linda Loretz, Ph.D.

Page 444

1      Q   Understood.  We're going to talk about
2  the reasons.
3      A   Okay.
4      Q   I just want to know the implications.
5      A   Okay.
6      Q   Right?
7      A   Yep.
8      Q   So the first implication would be -- and
9  I will write it on here, "Implications of
10 warnings.  1.  Sales."
11         Had you ever heard in the context --
12 since there were multiple implications, had you
13 ever heard in the context that providing a warning
14 after this being in the medical literature for 25
15 years would open up members to the potential --
16 for the reason why we're all here today, potential
17 lawsuits?
18     A   No.
19     Q   You never heard that?
20         MR. LOCKE:  Objection.
21         THE WITNESS:  We never talked about
22 that.
23 BY MR. TISI:
24     Q   Never talked about that at all?
25     A   No.

Page 445

1      Q   You never heard that -- that adding a
2  warning might -- might raise -- might cause people
3  to bring claims such as this?
4      A   We just talked about the science.
5      Q   I'm not -- I'm going to talk about the
6  science in a moment, okay?  We're going to get to
7  the science.
8          But oftentimes -- you're aware as a
9  scientist that oftentimes the reason why we do
10 disclosures in medical and scientific literature
11 is so that people could understand the biases or
12 potential biases or potential conflicts of
13 interest that the authors might have, correct?
14         MR. LOCKE:  Objection.
15         THE WITNESS:  Say it one more time.
16 BY MR. TISI:
17     Q   Medical articles oftentimes come with
18 disclosures about affiliations, conflicts of
19 interest.
20     A   Sure.
21     Q   And the reason why we do that --
22     A   Yes.
23     Q   -- is so that people reading those
24 articles can understand why -- perhaps biases that
25 the authors bring to the table, correct?

Page 446

1      A   Yes.
2      Q   All right.  And so what I'm trying to
3  explore with you is what potential -- and I'll put
4  it right on the table -- what potential biases
5  might have been present when this opposition was
6  sent to the FDA.  Okay?
7      A   Okay.
8      Q   All right.  So we'll talk about the
9  science and we'll talk -- but before we talk about
10 the science, I want to talk about the prism
11 through which you looked at the science.  Okay?
12     A   Okay.
13     Q   And one of the things that was a concern
14 to the members, we talked about sales.  Had you
15 ever heard of any concerns about litigation?
16     A   I can tell you that was not something we
17 ever discussed.
18     Q   Okay.  Is it something you understood?
19     A   Sure.  At some level, of course.
20     Q   Okay.  And if sales -- people stop
21 selling talc, and use corn starch, for example,
22 instead of talc, that may impact the membership of
23 the PCPC as well, correct?
24         MR. LOCKE:  Objection.
25         THE WITNESS:  I mean I didn't -- no,

Page 447

1  that's not -- that's not what I thought.  I mean
2  to me that -- that wouldn't really make sense.  I
3  mean if you have a product that's corn starch
4  instead of talc, it's still a product.  So I don't
5  think that's really relevant.
6  BY MR. TISI:
7      Q   Right.  But Imerys -- Imerys doesn't
8  manufacture corn starch, do they?
9      A   No, but I -- I guess --
10     Q   So they would fall out of the -- they
11 might fall out of the PCPC, correct?
12     A   I don't -- no, I never thought about,
13 and I don't think -- I never ever heard anybody
14 mention that.
15     Q   Any of the -- any other -- since there
16 were multiple implications, any other implications
17 you could think of as to why you sought to get
18 this independent evaluation to submit to the FDA
19 in opposition to letting women know there was a
20 potential for ovarian cancer based upon the
21 literature?
22     A   I think given --
23         MR. LOCKE:  Objection.
24         THE WITNESS:  -- given our position that
25 we don't believe there is a causal role, I don't

18 (Pages 444 to 447)

Linda Loretz, Ph.D.

Page 448

1  think you want to put warnings on products
2  suggesting that there's some harm when there's
3  not, scaring people or having people think that
4  some harm that they've experienced has something
5  to do with this when in fact it doesn't.
6  BY MR. TISI:
7      Q    So you were concerned about scaring
8  people.  With baby powder.
9      A    Yeah, a warning is --
10     Q    Okay.
11     A    -- is a scary thing, sure.
12     Q    And if -- if a woman was told that --
13  that talcum powder products, and we talked about
14  this for 25 years that was being discussed in the
15  medical literature, if they were concerned by
16  that, there were other alternatives on -- on the
17  shelves, right?  There was corn starch, correct?
18         MR. LOCKE:  Objection.
19         THE WITNESS:  Yeah, again, the context
20  to me is that if we did not believe that it was a
21  real risk, that's where you don't want to warn.
22  BY MR. TISI:
23     Q    And -- well, but that's my reason why I
24  asked you before what the standard was.  If the
25  standard was -- is the standard for warning that

Page 449

1  you have to be convinced of a real risk?
2         MR. LOCKE:  Objection.
3  BY MR. TISI:
4      Q    Or that there may be a risk.  What is
5  the standard for a warning, and did you even know
6  at the time you sent this to the FDA?
7         MR. LOCKE:  Objection.
8         THE WITNESS:  Again, I would just say
9  there were people within -- within PCPC who know a
10  lot more on this topic than I do, and --
11  BY MR. TISI:
12     Q    Did they --
13     A    -- the awareness of --
14     Q    Did you send this to the lawyers at the
15  PCPC, this letter?
16     A    This -- I can't recall exactly who read
17  it, but I can tell you that certainly, you know,
18  everything that -- when things like this happen,
19  they are -- it's known without the associate --
20  throughout the association at the higher levels.
21     Q    Now, prior to this time, did the PCPC
22  ever discuss either with the FDA or whether or not
23  it's members should voluntary add a warning or
24  precaution or informational statement about
25  cosmetic talc and the current state of the

Page 450

1  literature on ovarian cancer?
2      A    No.
3      Q    Okay.  Since 2009, did PCPC ever discuss
4  with its members whether or not its members should
5  voluntarily add an informational label or warning
6  label about perineal dusting with talcum powder
7  products?
8      A    No.
9      Q    Do you know that some talcum powder
10  products have in fact voluntarily added warnings
11  or information about the potential risk of talcum
12  powder products?
13     A    I didn't know that, but --
14     Q    Are you familiar with a company called
15  Belk -- Belcam Inc.?
16     A    No.
17     Q    Greenbriar?
18     A    No.
19     Q    Assured?
20     A    No.
21     Q    Okay.  There are members -- there are
22  people who actually manufacture talcum powder
23  products that are not members of the PCPC,
24  correct?
25     A    I would assume so.

Page 451

1      Q    Are you aware that some manufacturers
2  have stopped selling talcum powder products
3  altogether and use -- and just have decided to use
4  corn starch, correct?  Do you know that?
5         MR. LOCKE:  Objection.
6         THE WITNESS:  I guess I don't know that,
7  but I could find it plausible.
8  BY MR. TISI:
9      Q    Okay.  Let's get back to the response to
10  the Citizen's Petition.
11         Do you know -- we mentioned before, and
12  I just want to make sure that we understand, this
13  PCPC response was actually commissioned by
14  Johnson & Johnson in 2008, correct?
15     A    I believe they started the process
16  rolling, yes.
17     Q    Well, it's more than starting the
18  process.  The report was actually written for J&J.
19     A    I -- I -- yeah, I think when we got it,
20  it was -- it was --
21     Q    It was pretty --
22     A    The report had been -- was in pretty
23  good shape, yes.
24     Q    It was -- it was pretty much written by
25  the time you got it.

19 (Pages 448 to 451)

Linda Loretz, Ph.D.

Page 452

1    A   I believe so, yes.
2    Q   Did you understand this was a
3  collaborative response by J&J and Imerys
4  primarily?
5    A   I'm not sure that I did.
6    Q   Did other manufacturers -- there are
7  other manufacturers of talcum powder products,
8  correct?
9    A   There are certainly other people on our
10 Talc Task Force or the people with an interest in
11 talc.
12   Q   Do you know --
13   A   Other companies, rather.
14   Q   Do you know that -- whether they had
15 input into this PCPC response, or was it primarily
16 a J&J, with the assistance of Imerys, production?
17   A   I believe we would have sent it to other
18 people with interest.  I mean, that's our normal
19 process.
20   Q   Do you know whether that was happening?
21   A   I mean, I don't, but that would be our
22 normal process.
23       (Exhibit No. 46 was marked for
24       identification.)
25 BY MR. TISI:

Page 453

1    Q   So I'm going to show you what I've had
2  marked as Exhibit No. 46.  And it's a date -- and
3  you're not on this, but I'm doing this just to
4  kind of see if I can hone in the time frame.
5       This is an e-mail from Kathleen Wille.
6  Do you know who Kathleen Wille is?
7    A   Yes.
8    Q   Okay.  She works with J&J?
9    A   Yeah, I'm not sure if she's still there,
10 but yes.
11   Q   And it's entitled "Response to Citizens
12 Petition on Talc, Latest Review of the Data," and
13 its attachment is a J&J report.  Do you see that?
14   A   Yes.
15   Q   Okay.  And it says:  "This is the report
16 that we will -- that we will submit to FDA in
17 response to the Citizen's Petition.  We originally
18 commissioned the work; however, the trade
19 association will be the submitter."
20       Is that an accurate statement of what
21 happened?
22   A   I don't know, but I'm -- well, yes, they
23 commissioned it, and we -- we submitted it, that's
24 correct, yes.
25   Q   Okay.  Now, going back to the actual FDA

Page 454

1  submission, this was submitted by a PCPC employee
2  by the name of John Bailey.  I want to talk to you
3  a little bit about who John Bailey is and was.
4    A   Okay.
5    Q   Who is John Bailey?
6    A   He -- at the time of this, he was the
7  vice president of science -- the science
8  department.  He was my boss -- or, rather, the
9  executive vice president of the science department
10 at PCPC.
11   Q   Okay.  He previously worked at the FDA,
12 didn't he?
13   A   He did.
14   Q   And in fact, he was hired directly from
15 the FDA by PCPC.
16   A   That's correct.
17   Q   Okay.  And at the time that he left the
18 FDA in December of 2001, he was with what
19 division, do you know?
20   A   Office of Cosmetics and Colors.
21   Q   And at that time in 2001, the NTP had
22 actually deferred consideration of talc as a -- a
23 carcinogen, correct?
24   A   Yes.
25   Q   Okay.  And when we say "deferred," I

Page 455

1  want to stop and pause on that for a moment
2  because it -- I just want to make absolutely
3  clear, and we'll talk about this in a moment.
4       They deferred the question, they did not
5  decide the question.
6    A   That's what -- that was under the
7  official, what they did, yes.
8    Q   Okay.  And so in that context, PCPC just
9  immediately following that -- well, when it was
10 deferred, there was an understanding that the
11 issue might come up again.
12   A   Yes.
13   Q   And in fact, it did come up again,
14 correct?
15   A   Kind of.
16   Q   It came up with IARC?
17   A   Oh, it came up in other contexts, sure.
18   Q   Came up in IARC?
19   A   Yes.
20   Q   This issue -- and again, it bears
21 repeating because I want to make sure -- at all
22 times on this continuum, on this timeline, the
23 issue of talcum powder products causing or
24 contributing to ovarian cancer was an active
25 debate.  Sometimes more active, sometimes less

20 (Pages 452 to 455)

Linda Loretz, Ph.D.

Page 456

1  active. But this was something that was a concern
2  to your members throughout the entire time of this
3  timeline.
4        MR. LOCKE: Objection. Form.
5        THE WITNESS: It was being talked about
6  by someone.
7  BY MR. TISI:
8     Q   Right. And so in the context of hiring
9  Dr. Bailey, he was hired by -- by PCPC from the
10  division of the FDA, the Office of colors --
11  Cosmetics and Colors --
12    A   Cosmetics and Colors.
13    Q   -- that would interact with the cosmetic
14  industry on talc issues, correct?
15    A   As well as many other issues, yes.
16    Q   Right. And the person who took over was
17  a Dr. Katz?
18    A   Yes.
19    Q   And Dr. Katz worked for Dr. -- had
20  worked for Dr. Bailey at the time, correct?
21    A   I actually don't know that.
22    Q   All right. And he was the director of
23  that office, correct?
24    A   That's correct, yes.
25    Q   And when he left FDA in December of

Page 457

1  2001, he became -- he was hired in January of 2002
2  by PCPC.
3     A   I couldn't confirm those dates, but --
4     Q   Okay. And he interacted with the -- and
5  we're going to talk about this -- he's writing the
6  response to this petition that would go to the
7  very same division, the Office of Cosmetics and
8  Colors, that actually he ran while he was at the
9  FDA.
10    A   Yes, although I think the heart of our
11  submission is the scientific analysis.
12    Q   Right.
13    A   Not the cover letter, but the --
14    Q   But the cover letter -- the cover
15  letter -- well, let's -- let's call it what it is.
16  He actually sent the letter and he actually met
17  with you -- with you at the Office of Cosmetics
18  and Colors before this was filed in July.
19    A   Oh --
20    Q   There was a meeting at the FDA --
21    A   Correct.
22    Q   -- where you and Dr. Bailey went to the
23  FDA, previewed this document that Dr. Huncharek
24  and Muscat had provided, and then filed it
25  subsequently, correct?

Page 458

1        MR. LOCKE: Objection.
2        THE WITNESS: Yes.
3  BY MR. TISI:
4     Q   And he was -- he was going to the very
5  same office that he ran, correct?
6     A   In -- at that meeting there was more
7  than just the Office of Cosmetics and Colors.
8     Q   Well, we're going to talk about that.
9  But -- but the people who were -- the vast
10  majority of the people at that FDA employees were
11  people from the Office of Cosmetics and Colors.
12    A   I'm not sure about the vast majority,
13  but certainly there were people there, and that --
14  that may well be right.
15    Q   Including Dr. Katz.
16    A   Dr. Katz was there.
17    Q   And I want to put this on a timeline in
18  a moment, but Dr. Bailey left PCPC after this
19  petition -- this opposition was -- was correct,
20  filed?
21    A   He's -- he left, yes. I'm not sure
22  exactly -- the exact year, but yes.
23    Q   About 2011 -- 2010, 2011?
24    A   That sounds roughly right.
25    Q   Okay. So before we discuss the science

Page 459

1  that was provided by PCPC, and I told you we would
2  do that, let's see if we can pause here and put
3  together -- fill out our timeline a little bit
4  about the context of everything that happened.
5        First of all, we talked about the fact
6  that talcum powder products may cause or
7  contribute to ovarian cancer was a concern since
8  the early 1980s and it was debated throughout the
9  entire time, correct?
10       MR. LOCKE: Objection.
11       THE WITNESS: There were ongoing
12  happenings related to that topic, yes.
13  BY MR. TISI:
14    Q   Okay. Can we say -- can we use the word
15  "consistent" here? It was a consistent topic of
16  discussion in the medical and scientific
17  community?
18    A   There were a number of publications, but
19  I mean not every --
20    Q   I mean I'm not saying you woke up in the
21  morning and discussed it. I'm saying that within
22  this topic was a topic that was -- it wasn't just
23  a flash in the pan. It was something that was
24  discussed over the -- over this 25 years
25  represented by this chart.

21 (Pages 456 to 459)

Linda Loretz, Ph.D.

Page 460

1          MR. LOCKE:  Objection.
2          THE WITNESS:  Again, with the
3    understanding that there were publications, but
4    not all of them showed any sort of association --
5    BY MR. TISI:
6      Q    And some did.
7      A    -- and some did and some -- and some did
8    and some -- but there were a lot of weaknesses in
9    the --
10     Q    Well, I mean, my question is that was an
11   active debate, correct, what those studies meant?
12         MR. LOCKE:  Objection.
13         THE WITNESS:  I guess that's fair to
14   say.
15   BY MR. TISI:
16     Q    Okay.  So can we write "Active debate
17   between scientists."  Is that okay?
18     A    Okay.
19         MR. LOCKE:  Objection.
20   BY MR. TISI:
21     Q    Is that accurate?
22         MR. LOCKE:  Same objection.
23         THE WITNESS:  I -- I suppose.
24   BY MR. TISI:
25     Q    Okay.  All right.  So, for example, some

Page 461

1    like Dr. Cramer or Dr. Epstein on one hand thought
2    there was -- that there was evidence of a causal
3    association, and some people like Huncharek and
4    Muscat thought there was not.
5          MR. LOCKE:  Objection.
6          THE WITNESS:  There were different
7    opinions, yes.
8    BY MR. TISI:
9      Q    Based on the same literature.
10     A    Yes.
11     Q    Okay.  Now, another point before we put
12   things on a timeline, the PCPC knew that the FDA
13   had been concerned about the issue since at least
14   the 1990s, correct?
15         MR. LOCKE:  Objection.
16         THE WITNESS:  They responded before,
17   yes.
18   BY MR. TISI:
19     Q    But they were concerned about the issue.
20         MR. LOCKE:  Objection.
21         THE WITNESS:  I -- I guess, yes.  I
22   mean --
23   BY MR. TISI:
24     Q    Well, I mean don't guess.
25     A    Well --

Page 462

1      Q    I'll show you a document, if I -- if I
2    could, but that was an issue that PCPC knew and
3    understood that the FDA was concerned about.
4      A    They --
5          MR. LOCKE:  Objection.
6          THE WITNESS:  They had an interest and a
7    concern with, okay.
8          (Exhibit No. 47 was marked for
9          identification.)
10   BY MR. TISI:
11     Q    I'm going to show you a document that
12   I've marked as Exhibit No. 47, and it's draft
13   minutes of the CTFA talc force.
14         And we're going to talk about this
15   later, but this is Exhibit No. -- I said 47?
16         MR. LOCKE:  Yes.
17   BY MR. TISI:
18     Q    Now you see why I used 1994 is on my --
19     A    Mm-hmm.
20     Q    -- on my timeline here.
21     A    Yes, right, but the -- the workshop,
22   yes.
23     Q    Okay.  And this was a workshop dated
24   April 12th, 1994, correct?
25     A    Yes.

Page 463

1      Q    Okay.  It's actually written by a
2    Stephen Gettings?
3      A    Yes.
4      Q    Who is Dr. Gettings?
5      A    Dr. Gettings was my predecessor.
6      Q    All right.  And this is a report of a
7    meeting amongst -- this is the Talc Interested
8    Party Task Force.  Among other things, Johnson &
9    Johnson and the predecessor for Luzenac were
10   there.
11     A    Yes.
12     Q    Okay.  And I'm going to come back to
13   this in a minute when I talk about the second area
14   which we talked about, which is studies.
15     A    Okay.
16     Q    But -- but I'm just concerned with point
17   number 1.  It says:  "It was noted that the FDA
18   still appears to be concerned with the issue of
19   ovarian cancer as evidenced by their contact with
20   the NTP."
21         Do you see that?
22     A    Yes.
23     Q    Okay.  So at least as of this date,
24   you're aware that the FDA had some concerns about
25   talc and ovarian cancer.

22 (Pages 460 to 463)

Linda Loretz, Ph.D.

Page 464

1    A   Okay.
2    Q   Is that accurate?
3    A   I'm going to say yes.
4    Q   Okay.  So let's put this on our timeline
5    here, 1994.  And this would be "Task force with
6    the FDA, concern about ovarian cancer."
7        By the way, ovarian cancer, this is not
8    a trivial issue, is it?
9    A   No.
10   Q   And ovarian cancer is a -- ovarian
11   cancer is -- affects 20 -- 20,000 -- 20,000 women
12   a year get diagnosed with ovarian cancer, correct?
13   A   Yes.
14   Q   It has a high mortality rate.  Correct?
15   A   Yes.  Yes.
16   Q   Very serious.
17   A   Absolutely.
18   Q   And by contrast, baby powder is not a
19   necessary pharmaceutical, correct?
20       MR. LOCKE:  Objection.
21   BY MR. TISI:
22   Q   Is it fair to say you can live without
23   baby powder?
24       MR. LOCKE:  Objection.  Beyond the
25   scope.

Page 465

1    BY MR. TISI:
2    Q   Talcum powder.
3    A   Yes.
4    Q   Now, in 2000, we have the NTP 10th
5    Report on Carcinogen, and we talk about the word
6    "defer."
7        And I want to write that clearly because
8    my handwriting is terrible.
9        Okay.  And they deferred the question.
10   A   They did.  They did vote.  They voted,
11   but then they deferred.
12   Q   Right.
13   A   But they voted against listing seven to
14   three, but then they deferred.
15   Q   Well, there were different -- okay.
16   Since you raised that, let's -- you knew this was
17   going to happen.  I was not going to get into it,
18   but let's -- let's -- there were three committees
19   that looked at the -- looked at this, correct?
20   A   Mm-hmm.
21   Q   Two of them voted in favor of listing.
22   A   That's correct.
23   Q   And one voted against, correct?
24   A   Yes.
25   Q   Okay.  And that's kind of the issue I

Page 466

1    was talking before, people can look at the same
2    evidence and come to different conclusions,
3    correct?
4    A   I think there was some different
5    evidence.  I think it really was bringing forth
6    some things that were mistaken in the draft
7    report, particularly regarding mineralogy and --
8    and so forth.
9    Q   Right.  And one of the things -- one of
10   the things that was the basis of the deference is
11   that there was not a clear understanding of what
12   at that time was in talcum powder products.
13       MR. LOCKE:  Objection.
14       THE WITNESS:  I think there wasn't
15   also -- there was not a clear definition of -- in
16   fact, when they wanted to look at it again or
17   considered looking at it again, they changed the
18   name of what they were going to look at, because
19   it was hard -- it was not clear what they were
20   trying to look at, and that was something that got
21   discussion at the NTP, and I think that made a
22   difference and explains part of why there were
23   different conclusions from the first two review
24   groups.
25   BY MR. TISI:

Page 467

1    Q   All right.  And the third review group
2    was not unanimous, was it?
3    A   They -- they did do a vote.  I -- I've
4    been calling it seven to three against listing,
5    and then they -- and then they decided to defer
6    because there were --
7    Q   And again, that's -- that's -- that's
8    the kind of example that I'm talking about of even
9    if it was seven to three against listing talc,
10   there were three people who thought that it should
11   be listed, correct?
12   A   Sure.
13   Q   So this is -- this is kind of
14   crystalizing what we've been talking about, which
15   is different scientists can look at the evidence
16   and reach different conclusions, true?
17   A   Yes.
18   Q   And in fact, did reach different
19   conclusions, correct?
20   A   Yes.
21   Q   All right.  Okay.  So we put that on our
22   timeline here.
23       Now, prior to that last discussion --
24   prior to that deferral, that last meeting, the
25   PCPC actually drafted or commissioned a report,

23 (Pages 464 to 467)

Linda Loretz, Ph.D.

Page 468

1    correct?
2        A    You mean -- to be submitted to the
3    NTP --
4        Q    Yes.
5        A    -- for the meeting?  Yes.
6        Q    Yeah.  And I'm just going to identify
7    it because I don't want to go into it, but -- but
8    here is a copy of the actual letter, Exhibit
9    No. 48.
10            (Exhibit No. 48 was marked for
11            identification.)
12   BY MR. TISI:
13       Q    And one of the things that the -- and
14   this would have been -- we'll put it on our
15   timeline, this would have been December of 2000
16   and -- 2000.  So we will put "PCPC CFTA
17   submission."
18            And the only reason I bring this up is
19   Dr. Muscat is the very same doctor who --
20   Dr. Muscat wrote a report that was submitted to
21   NTP, correct?
22       A    That's correct.
23       Q    All right.  And it's the very same
24   Dr. Muscat that wrote the report with -- which was
25   a Citizen's Petition with Dr. Huncharek.

Page 469

1        A    It is.
2        Q    Okay.  So we're going to put "Muscat"
3    there.  Okay.
4            Now, Dr. Muscat was actually recommended
5    to the PCPC by Johnson & Johnson, correct?  Back
6    in 2000.
7        A    I think that's correct.
8        Q    So I don't have to use a document.  Is
9    that correct?  I'm happy to use the document,
10   but --
11       A    Okay.  Then I'm going to say I think --
12   yes, I believe that's correct.
13       Q    Okay.  We just cut ourselves five
14   minutes, so --
15       A    Yea.
16       Q    All right.  And just to kind of put it
17   again on our timeline, when did the -- when did
18   the NTP defer the issue of whether or not talc was
19   a carcinogen?
20       A    I believe they actually did it at their
21   actual meeting, which was in December of 2000.
22       Q    2000.  And -- you became aware of the
23   actual deferral in the CFR?  The Code of Federal
24   Regulations actually lists it as being --
25       A    Yeah, I mean I -- I thought they said

Page 470

1    that at the actual meeting, but I -- that's what I
2    recall.  I think we walked away knowing where they
3    came out, but I -- I could be wrong on that, but,
4    yes, it was confirmed then.  Certainly.
5            (Exhibit No. 49 was marked for
6            identification.)
7    BY MR. TISI:
8        Q    Okay.  And I'm going to hand you Exhibit
9    No. 40 -- 49.  And this is the Code of Federal
10   Regulations dated 2005.  But if you look at the
11   back, the last page with a 12 Bates stamp at the
12   end.
13       A    Okay.
14       Q    And it says the basis was the NTP
15   deferred -- do you see that "Basis for
16   nomination"?
17       A    Yes.
18       Q    It says:  "The NTP deferred
19   consideration of listing talc asbestiform and
20   non-asbestiform talc in the 10th RoC because its
21   2000 review of talc found that there's been
22   considerable confusion over the mineral nature and
23   consequences of talc, both containing asbestiform
24   fibers and not containing asbestiform fibers."
25            Do you see that?

Page 471

1        A    Yes.
2        Q    It further says:  "It became evident
3    that the literature on both forms of talc with few
4    exceptions provide inadequate characterization of
5    the adequate material under study," and you see --
6    and it just continues from there.
7            Do you see that?
8        A    Yes.
9        Q    Okay.  And so the question at that point
10   was deferred because there was a question as to
11   what was cosmetic talc.
12       A    Well, I mean this is where it was
13   withdrawn.
14       Q    No, withdrawn --
15       A    This is 2005.
16       Q    2005.  But in the basis for -- it talks
17   about what happened in the --
18       A    Oh, the deferral that they're referring
19   to, yes, correct.
20       Q    Okay.  All right.  And then in 12, in
21   the -- it was renominated in 2004, correct?
22       A    Right.
23       Q    Right.  And so I'm going to put year
24   "2004," I'm going to put "renominated NTP."  NTP.
25   My handwriting is terrible.

24 (Pages 468 to 471)

Linda Loretz, Ph.D.

Page 472

1       And -- but at that time it -- the IARC
2   had also taken up the issue, correct?
3       A    I'm not sure when I learned about IARC
4   taking up the issue, but I think they -- I mean,
5   so I'm not sure.
6       Q    Okay.  And IARC is what?
7       A    International Agency for Research on
8   Cancer.
9       Q    Is it a reputable organization?
10      A    It's an arm of the World Health
11  Organization.
12      Q    Is it one that in your view is one that
13  is -- does good science?
14      A    They have -- I mean, it's --
15      Q    You may disagree with them on occasion,
16  but do they do good science?
17      A    It's a closed process, and I think
18  they're considered reputable.  It is a very closed
19  process.
20      Q    When you say "closed," they don't have
21  people from industry who come in and -- and
22  participate, correct?
23      A    Well --
24      Q    People affiliated with industry cannot
25  sit on the panels, correct?  There are limitations

Page 473

1   into who can sit, correct?
2       MR. LOCKE:  Objection.
3       THE WITNESS:  That is true, but it's
4   also closed in the sense basically they decide on
5   a working group and that's the working group.  So
6   are those the best people always?  I mean, I think
7   there's that -- there's that question of -- you
8   know, it's like any process, it's --
9   BY MR. TISI:
10      Q    Have you ever seen an unqualified person
11  on an IARC panel?
12      A    I -- I mean, I really can't answer that.
13  You know.
14      Q    Okay.  All right.  So IARC review was in
15  2006, correct?
16      A    Yes.
17      Q    Okay.  And they considered the issue,
18  and they found that cosmetic talc would be a
19  possible carcinogen.  They looked at the evidence,
20  right?
21      MR. LOCKE:  Objection.
22      THE WITNESS:  They said limited
23  evidence.
24  BY MR. TISI:
25      Q    Okay.  But they categorized it as

Page 474

1   possible, correct?  To be.
2       A    Yes.
3       Q    Now, in 2005, you know that Dr. Muscat
4   and Huncharek were retained by Imerys and a law
5   firm to write a meta-analysis and a review paper
6   on talc, correct?
7       MR. LOCKE:  Objection.
8       THE WITNESS:  I don't think I knew that,
9   no.
10      MR. TISI:  Okay.  Let me show you what I
11  would like to have marked as Exhibit No. 50.
12      (Exhibit No. 50 was marked for
13      identification.)
14  BY MR. TISI:
15      Q    And I'm not concerned with the top
16  e-mail because that's not to you, but the bottom
17  e-mail is to you, correct?
18      A    Yes.
19      Q    Okay.  It's from Robert Glenn?
20      MR. LOCKE:  Let's let --
21      MR. TISI:  I'm going to.  I'm just going
22  to --
23      MR. LOCKE:  -- the witness just read it.
24      MR. TISI:  I'm going to have to -- I'm
25  just going to direct her to what it is before we

Page 475

1   do it, because if she didn't get it, then I'm not
2   going to go there.
3   BY MR. TISI:
4       Q    This is an e-mail to you from Robert
5   Glenn.
6       A    Okay.
7       Q    Do you see that?
8       A    Yes.
9       Q    And it's dated August 3rd, 19 -- 2005.
10      A    Okay.
11      Q    Okay.  And it's entitled "Rothman
12  Proposal for Updating CTFA Submission on Comments
13  to NTP."  Correct?
14      A    I'm sorry, where are you?
15      Q    It's the subject matter.
16      A    Yes.
17      Q    Okay.  And it's by Crowell & Moring LLP.
18  That's the law firm.
19      A    Okay.
20      Q    Do you see that?
21      A    Yes.
22      Q    So why don't you follow Mr. Locke's
23  advice and take a look at it, and I'll ask you
24  some questions.
25      A    (Peruses document.)

25 (Pages 472 to 475)

Linda Loretz, Ph.D.

Page 476

1      MR. TISI:  Actually, would this be a
2  good time for a break?
3      MS. FRAZIER:  Yes.
4      MR. TISI:  For you, I will do almost
5  anything.
6      THE VIDEOGRAPHER:  All right.  Off the
7  record, Counsel?
8      MS. FRAZIER:  Thank you.
9      THE VIDEOGRAPHER:  The time is 10:43
10 a.m.  We're going off the record.
11     (Recess.)
12     THE VIDEOGRAPHER:  The time is 10:58
13 a.m., and we are back on the record.
14 BY MR. TISI:
15     Q   Dr. Loretz, have you had an opportunity
16 to look at Exhibit No. 50, the e-mail from
17 Mr. Glenn at Crowell & Moring?
18     A   Yes.
19     Q   And Mr. Glenn worked for Crowell &
20 Moring, but you know that he's a toxicologist,
21 correct?
22     A   I probably knew that at the time.
23     Q   Okay.  And do you know that he was
24 also -- previous to working for the law firm
25 representing Imerys, do you know that he was also

Page 477

1  a prior president of the Industrial Minerals
2  Association of North America?
3      A   I don't -- that doesn't sound familiar.
4      Q   Okay.  So it talks to Mark Ellis at IMA
5  North America and to yourself.
6          And I'm interested in the first
7  paragraph.  The first paragraph says:  "As you may
8  know, we represent Luzenac America in assisting
9  them in preparation of comments to the NTP and
10 IARC regarding carcinogen classification of talc.
11 They have sponsored projects with Drs. Huncharek
12 and Muscat related to reviewing the literature on
13 talc and ovarian cancer, and conducting a
14 meta-analysis of talc and ovarian cancer."
15         Do you see that?
16     A   Yes.
17     Q   Okay.  So two different things,
18 reviewing the literature on talc and conducting a
19 meta-analysis.
20         Do you see that?
21     A   Yes.
22     Q   Okay.  It says:  "Both are nearing
23 completion, and in short, the results of the
24 meta-analysis do not find a relationship for usage
25 of talc on contraceptive diaphragms and ovarian

Page 478

1  cancer."
2          Do you see that?
3      A   Yes.
4      Q   Okay.  So it's talking about two
5  different papers, right?
6      A   Yes.
7      Q   Okay.  So does this refresh your
8  recollection as to whether or not you were aware
9  in the 2000s that Huncharek and Muscat were
10 actually consultants for the law firm representing
11 Imerys, which is -- is Luzenac.
12     A   I would say this would refresh my
13 memory, yes.
14     Q   Okay.  So we have on our chart here in
15 2005 -- 2006 is IARC review, 2005 -- and I'm going
16 to try to write real -- because on a break folks
17 told me my handwriting was abysmal.  So we have
18 "Huncharek, Muscat, two papers."  One a review
19 and, two, diaphragm.
20         Is that correct?  That's what that
21 document says?
22     A   What year are you putting that --
23     Q   2005.
24     A   Or it looks those -- yeah, I don't know
25 when -- the publication date, though.

Page 479

1      Q   Right.  The publications, actually you
2  know that they -- they actually published two
3  articles bearing on the very same topic
4  subsequently.
5      A   Yes, exactly.
6      Q   Okay.  And I'm going to identify them
7  again to put on our timeline.
8      A   Okay.
9          (Exhibit No. 51 was marked for
10         identification.)
11 BY MR. TISI:
12     Q   I'm going to attach Exhibit No. 51,
13 which is a meta-analysis on diaphragms.
14         Is that -- and that's dated 2006.  I'm
15 sorry, it's dated 2007.  Correct?
16     A   Correct.
17     Q   And I'm going to start using below the
18 line, so it's 2007.  And diaphragm publication,
19 I'll write "Huncharek and Muscat."
20         And what exhibit is that?  I wrote
21 that --
22     A   51.
23         (Exhibit No. 52 was marked for
24         identification.)
25 BY MR. TISI:

26 (Pages 476 to 479)

Linda Loretz, Ph.D.

Page 480

1    Q   Okay.  And then we have Exhibit No. 52
2   is a critical review article that they wrote.
3        And you're familiar with that article,
4   right?
5    A   Yes.
6    Q   And when I say you reviewed, you -- you
7   were familiar with it, you were familiar with it
8   at the time, right?
9    A   At the time of its --
10   Q   Publication.
11   A   I assume --
12   Q   Or shortly thereafter.
13   A   Yeah, I assume so, yes.
14   Q   So 2008, this is the critical review,
15  talc and ovarian cancer.  And this is 2008.  And
16  this is Exhibit 52.  And that's Huncharek and
17  Muscat.
18       Okay.  And so far we have Dr. Muscat
19  appearing in 2000.  Correct?
20   A   Yes.
21   Q   We have him working on papers in 2005
22  for the lawyers representing Imerys, correct?
23   A   Yes.
24   Q   Which you were aware of.
25       2007, they write a publication.  And

Page 481

1   then in 2008, they write a publication.  And
2   2009 -- '8 and '9, they're filing the petition --
3   they're drafting the response to the petition as
4   a, quote, independent review.  Right?
5    A   Yes.
6    Q   But the truth of the matter is, as we
7   showed on our timeline, is they had been a
8   consistent consultant not only for PCPC but for
9   other members of the PCPC throughout the 2000s,
10  correct?
11       MR. LOCKE:  Objection.
12       THE WITNESS:  I mean, they're -- they're
13  filing -- the filing that we did came through us.
14  That was very clear.
15  BY MR. TISI:
16   Q   Okay.  That's a different question.
17  Okay.  You identified this as an independent
18  review, right?
19   A   That -- yes.
20   Q   Okay.  But when I asked you before are
21  you sure they're independent, these -- these two
22  scientists had been paid consultants for not only
23  PCPC but the industry for at least 15 years before
24  this was filed, correct?
25       MR. LOCKE:  Objection.

Page 482

1        THE WITNESS:  And I guess I would again
2   say that independent in the sense that these are
3   their conclusions, but -- and submitted on behalf
4   of us, which was clear.
5   BY MR. TISI:
6    Q   Right.
7    A   On behalf of industry.
8    Q   But they had been long-time consultants
9   for the industry.  Correct?
10   A   They had been consulting before then,
11  yes.
12   Q   Okay.  For at least 15 -- on talc for at
13  least 15, 18 years, correct?
14       MR. LOCKE:  Objection.
15       THE WITNESS:  Where did you come up with
16  that?  2000 --
17  BY MR. TISI:
18   Q   2000 to 2008 -- I'm sorry.  2000 --
19   A   2009.
20   Q   Okay.  Let's say nine years, you're
21  right.  You're right.
22       All right.  So now let's move forward.
23  We talked about IARC.
24       So -- now, I want to again fill out the
25  timeline so the jury understands what's going on.

Page 483

1        2008, Dr. Epstein for the Cancer
2   Prevention Coalition files -- asks that warnings
3   be mandated, correct?
4    A   Correct.
5    Q   Your organization files an opposition to
6   that in July of 2009, correct?
7        MR. LOCKE:  Objection.
8        THE WITNESS:  Right.  We filed saying we
9   didn't think those warnings should be mandated.
10  BY MR. TISI:
11   Q   With the FDA.
12   A   Correct.
13   Q   Filed -- signed by Dr. Bailey, who used
14  to work at the FDA in the very division that would
15  be considering the petition, correct?
16   A   That's correct.
17   Q   Okay.  And do you know whether or not
18  any other organizations were even aware of this
19  petition to weigh in on it?  In other words, are
20  you aware of anybody else who filed a response to
21  the FDA -- I mean to the Citizen's Petition?
22   A   I may have known at the time, but I
23  don't recall now.
24       (Exhibit No. 53 was marked for
25       identification.)

27 (Pages 480 to 483)

Linda Loretz, Ph.D.

Page 484

1 BY MR. TISI:
2     Q   All right.  I went to the FDA website
3 and pulled a copy -- Exhibit 53, I pulled a copy
4 of it, and as I read it, the only comment that was
5 actually provided was by the PCPC.
6         Does that refresh your recollection?
7     A   As I say, I can't remember, but I have
8 no reason not to think that's true.
9     Q   Okay.  And just to kind of fill out a
10 timeline because I want to make it clear that I
11 don't want to hide anything from the jury here, in
12 2015, the petition was denied.
13     A   That's correct.
14     Q   So write "2005, FDA," and --
15         MR. TISI:  Do you have a copy of the
16 denial?  I'll attach that in a moment.
17 BY MR. TISI:
18     Q   And so from the outside, what the FDA
19 had before it was the Epstein petition and the
20 PCPC response.  Is that -- and then some four
21 years later or five years later, it denied the
22 petition.
23         MR. LOCKE:  Objection.
24         THE WITNESS:  Okay.
25 BY MR. TISI:

Page 485

1     Q   Is that -- is that correct?
2         MR. LOCKE:  Objection.
3         THE WITNESS:  As far as I know, yes.  As
4 I say --
5 BY MR. TISI:
6     Q   All right.  Is there anything -- do you
7 know why it took the FDA five years or six years
8 to actually act on this petition?
9     A   I don't.  I know that it typically takes
10 them years to respond to petitions, but I couldn't
11 say anything specific about this one.
12     Q   Well, petitions related to cosmetics, on
13 the scheme of things -- I mean you work with the
14 FDA, you know the FDA does a lot of different
15 things.  It deals with pharmaceutical drugs, it
16 deals with over-the-counter drugs, it deals with
17 the blood supply, it deals with a lot of different
18 things, correct?
19     A   Not the Office of Cosmetics and Colors,
20 but other parts of the FDA, sure.
21     Q   Right.  But the -- but the FDA as a --
22 as a whole -- I mean would it be fair to say that
23 on a scale of things, cosmetics are not as heavily
24 regulated or looked at as is, for example,
25 pharmaceutical drugs or over-the-counter drugs?

Page 486

1     A   That's true.
2         MR. LOCKE:  Objection.  Beyond the
3 scope.
4 BY MR. TISI:
5     Q   That's true, correct?
6     A   Yes.
7         MR. LOCKE:  Objection.
8 BY MR. TISI:
9     Q   And just for clarity of the record, the
10 denial letter from the FDA dated April 2014 -- I'm
11 sorry, it's dated 2014.
12     A   Yeah, it's '14.  I wasn't sure about
13 that.
14     Q   I stated 2015.  You know, you're
15 correct.  You're correct.  It's Exhibit No. 54.
16         (Exhibit No. 54 was marked for
17         identification.)
18 BY MR. TISI:
19     Q   Now, I want to talk about -- now that we
20 have our timeline out of the way, I want to talk
21 about the Citizen's Petition and the arguments you
22 made in them and the circumstances surrounding its
23 actual filing.  Okay?
24     A   Yes.
25     Q   Now, prior to the actual filing of

Page 487

1 the -- the opposition to this Citizen's Petition,
2 we'll just -- can I just call it "the opposition,"
3 and we know we're talking about something
4 containing the opposition to the Citizen's
5 Petition?
6     A   Yes.
7     Q   Prior to filing the PCPC's opposition in
8 July, and we looked at this earlier, you and --
9 when I say "you," I mean you personally -- you and
10 your colleagues at the PCPC and the companies
11 represented by the lawyers on this table went and
12 met with the FDA about the Citizen's Petition,
13 correct?
14         MR. LOCKE:  When?
15         THE WITNESS:  One other company as well.
16 BY MR. TISI:
17     Q   Unilever.
18     A   Unilever.
19     Q   Okay.  But certainly Johnson & Johnson
20 is by far the biggest contributor to -- in terms
21 of resources to the Talc Task Force, correct, in
22 terms of money?
23         MS. FRAZIER:  Objection.
24         MR. LOCKE:  Objection.
25         THE WITNESS:  I think what I've seen,

28 (Pages 484 to 487)

Linda Loretz, Ph.D.

| Page 488 | Page 490 |
|---|---|

**Page 488**

1  they're the biggest contributor.
2  BY MR. TISI:
3    Q   I mean by a factor of a lot, correct?
4        MS. FRAZIER: Object to form.
5  BY MR. TISI:
6    Q   I mean, it's a big -- they're the --
7  they're the major funder of the Talc Task Force,
8  correct?
9        MS. FRAZIER: Object to form.
10       THE WITNESS: But they're not the only
11 funder.
12 BY MR. TISI:
13   Q   And in the top two or three is Imerys as
14 well, correct?
15   A   That's correct.
16   Q   Okay.  So -- while there may be many
17 other members of the -- that have an interest in
18 talc, the two big gorillas in the room are J&J,
19 the manufacturer of talcum powder products like
20 Johnson & Johnson's baby powder and Shower to
21 Shower, and the mining company who provides that
22 talc for use in the product, correct?
23       MR. LOCKE: Objection.
24       MS. FRAZIER: Objection to form.
25       THE WITNESS: I mean we have --

**Page 489**

1        THE REPORTER: Counsel, we can't hear
2  you down here.
3        MS. FRAZIER: No, it's okay.  I was
4  just objecting to being called a gorilla.
5        MR. TISI:  I'll call you a gorilla, but
6  let's rephrase the question.  Okay?
7  BY MR. TISI:
8    Q   If you were to rank all of the -- I mean
9  I've seen lists somewhere between 20 and 30 people
10 who make or have an interest in talcum powder
11 products.  Correct?
12   A   Yes.
13   Q   Okay.  The major ones if you were to
14 rank them are going to be Johnson & Johnson,
15 correct?
16   A   It certainly is one of the companies
17 that has a major interest.  There are other
18 companies and they get their say on calls and
19 meetings, et cetera.
20   Q   All right.  Would it surprise you that
21 between the two of them, they provide -- Imerys
22 and Johnson & Johnson provide between 65 and 70
23 percent of the funding for the talc-related
24 activities of the PCPC?
25       MR. DONATH: Objection to form.

**Page 490**

1        THE WITNESS:  That sounds roughly right
2  from the numbers I've seen.
3  BY MR. TISI:
4    Q   Okay.  And so the PCPC and Johnson &
5  Johnson and Imerys and Unilever went to go meet
6  with the FDA about the Citizen's Petition,
7  correct?
8    A   Yeah, I'm not sure if it was set up
9  specifically about the Citizen's Petition, but I
10 know that certainly got discussed.  So yes.
11   Q   Well, we'll talk -- we're going to talk
12 about -- have you reviewed those -- those memos
13 before today?
14   A   I think I -- I reviewed the memo.  I'm
15 not sure what all the discussion went into setting
16 up that meeting, but --
17   Q   Okay.  Well, did you --
18   A   -- I didn't disagree with that.
19   Q   But did you try to investigate that?
20 Because that's an important point.  How did that
21 meeting get set up?
22   A   I know Dr. Bailey set it up.
23   Q   Dr. Bailey, the guy who used to work at
24 the division --
25   A   Correct.

**Page 491**

1    Q   -- called the division he used to work
2  for to see if he could set up a meeting?
3    A   Yes.
4    Q   And that meeting occurred in May of
5  2009, correct?
6    A   I don't recall, but that sounds about
7  right.
8    Q   Okay.  So the office -- there was a
9  meeting at the Office of Cosmetics and Colors set
10 up by Dr. Bailey who used to run that division,
11 correct?
12   A   Yes.
13   Q   And you were at that meeting?
14   A   Yes.
15   Q   And Dr. Bailey's former subordinate
16 Dr. Katz was at that meeting?
17   A   You've said she used to work for him.
18 I -- I have no reason not to believe you, but,
19 yes, she was there.
20   Q   Okay.  And I'm going to attach
21 Dr. Bailey's report of that meeting, and I think
22 there's an error in it, but I'm going to correct
23 it and see if we can work through it together.
24       This is Exhibit No. 55.
25       (Exhibit No. 55 was marked for

Linda Loretz, Ph.D.

Page 492

1      identification.)
2    BY MR. TISI:
3      Q    And just I can correct the error so we
4    can correct it going forward.  It's from John
5    Bailey from Personal Care Council dated Monday,
6    May 11th, 2009.
7      Do you see that?
8      A    I'm sorry.  The -- oh, yes.
9      Q    The e-mail.
10     A    Right, the e-mail.
11     Q    It's to, among other things, you?
12     A    Yes.
13     Q    Okay.  And it's a -- meeting notes from
14   the meeting of the FDA on talc.
15     A    Yes.
16     Q    Okay.  And it says: "All:  Below are my
17   attached notes from the FDA meeting on Friday."
18   Correct?
19     A    Yes.
20     Q    Okay.  And these were recounting a
21   note -- notes that happened that prior Friday,
22   correct?
23     A    Yes.
24     Q    And so the meeting with the FDA says
25   May 8th, 2008.  Do you see that?

Page 493

1      A    Yes.
2      Q    Okay.  Do you agree with me that it's
3    likely to be May 8th, 2009?
4      A    I do agree with you.
5      Q    Okay.  Okay.  And in other iterations of
6    this I see 2009, but just for the record and for
7    our timeline going back to it, the meeting
8    happened -- so I'm going to put "FDA meeting."
9    And I'm going to do that in red.
10     In 2000 -- in May of 2009, right?
11     A    Yes.
12     Q    "May '09."
13     And when I mentioned attendance for the
14   FDA, the Acting Commissioner was there.  Do you
15   see that?
16     A    Yes.
17     Q    Okay.  And the director for the Food
18   Safety and Applied Nutrition was there.  Correct?
19     A    Yes.
20     Q    But all the other people there,
21   including people that he didn't recognize, were
22   from the Office of Cosmetics and Colors?
23     A    That's what it says, yes.
24     Q    All right.  So when I asked you before
25   whether or not this was the primary -- the

Page 494

1    predominant number of people at this -- at this
2    meeting were from the office that Dr. Bailey ran,
3    the Office of Cosmetics and Colors, I was correct?
4      A    I would say you were correct, yes.
5      Q    Thank you.  I like being correct.
6      And you attended that meeting?
7      A    I did.
8      Q    Okay.  Have you seen the final -- now,
9    this is a fairly lengthy, several single-spaced
10   pages of notes about what happened at that
11   meeting?
12     A    Okay.  Yes.
13     Q    Do you see that?
14     A    Yes.
15     Q    Okay.  Have you seen the FDA version
16   of -- of that?
17     A    I think I have in my preparation for
18   this.
19     Q    Well, it says:  The action items from
20   the meeting.  "The FDA has to prepare notes of the
21   meeting."  It's at the very end, the last
22   paragraph.
23     A    Mm-hmm.
24     Q    The FDA notes I'm going to show you are
25   Exhibit 56.

Page 495

1      (Exhibit No. 56 was marked for
2      identification.)
3    BY MR. TISI:
4      Q    And the FDA meeting notes is like a
5    paragraph and two action items, correct?
6      A    Yes.
7      Q    Okay.  So the notes that we have of this
8    meeting are much more fulsome as recorded by
9    Dr. Bailey?
10     A    Yes.
11     Q    There's a lot more detail in them.
12     A    So it appears, yes.
13     Q    Okay.  And I asked you before whether or
14   not the purpose of this meeting was to discuss the
15   Citizen's Petition.  Do you remember that?
16     A    Yes.
17     Q    Okay.  And the first bullet point, it
18   says: "A petition has been submitted by the FDA
19   requesting a warning and hearing."
20     Do you see that?
21     A    Yes.
22     Q    And the first paragraph, full paragraph
23   says: "Dr. Katz opened the meeting."
24     And Dr. Katz at that point was the
25   director of the FDA Division of Cosmetics and

Linda Loretz, Ph.D.

Page 496

1    Colors at that point, correct?
2        A   Yes.
3        Q   Okay.  By saying that:  "Counsel had
4    requested the meeting, but she wanted to make the
5    point that the FDA would not talk about the
6    Citizen's Petition on talc as it was still under
7    review."
8            Do you see that?
9        A   Actually, I'm sorry, where are you
10   exactly?  Oh, there we go.  Okay.
11       Q   Do you see that?
12       A   Yes.
13       Q   Okay.  Do you remember that
14   specifically, that she started out saying, you
15   know, Great you're all here, but we don't want to
16   discuss the Citizen's Petition?
17       A   I don't remember it, but I -- I accept
18   that is what happened.
19       Q   Okay.  But then Dr. Bailey corrected
20   her, and said -- "Dr. Bailey pointed out the
21   agenda that was provided was to discuss the
22   information related in the petition."
23           MR. LOCKE:  Objection.
24   BY MR. TISI:
25       Q   Correct?

Page 497

1            MR. LOCKE:  Objection to form.
2            THE WITNESS:  Well, that's what it says,
3    yes.
4    BY MR. TISI:
5        Q   All right.  And in fact, you brought
6    with you Dr. Muscat and Dr. Huncharek's
7    opposition, the opposition that had not yet been
8    filed?
9        A   It was -- right, it was talked about.
10       Q   It was talked about, and it was
11   summarized for the FDA?
12       A   Yes, that's what it says.
13       Q   So the FDA says, We're not going to talk
14   about it, but then talked about it.
15           MR. LOCKE:  Objection.
16           THE WITNESS:  Well, it says that she
17   then -- Dr. Katz then clarified to say that you
18   can talk about it, but we're not going to discuss
19   its status.
20   BY MR. TISI:
21       Q   Okay.  So my question to you is, was
22   anybody from the --
23           Now, this meeting was set up by the --
24   by Dr. Bailey at the PCPC, correct?
25       A   Yes.  Or requested, yes.

Page 498

1        Q   It was requested.  An agenda was
2    provided to the FDA, correct?
3        A   I think that's what it says.  I don't
4    recall that, but --
5        Q   Have you seen the agenda in connection
6    with your preparation today?
7        A   I don't think so.
8        Q   Okay.  I didn't see it either.  It might
9    be -- it might be around, but I just -- maybe I
10   just didn't see it.
11           Was anyone -- since the agenda, as
12   Dr. Bailey pointed out, was -- involved the
13   Citizen's Petition, right?
14       A   That's what it says, yes.
15       Q   I'm curious.  Did Dr. Bailey propose
16   that the guy who wrote the Citizen's Petition be
17   invited to the meeting?
18       A   I don't believe so, no.
19       Q   Do you know whether or not Dr. Epstein
20   or the -- any of the members of the American --
21   the Cancer Prevention Coalition were asked to
22   attend the meeting by the FDA or suggested by
23   PCPC?
24       A   Not that I'm aware.
25       Q   I mean you are interested in a fulsome

Page 499

1    discussion of the science, right?
2        A   I -- I think for this meeting we were --
3    well, I guess the notes speak for themselves.
4        Q   Well -- okay.  My question was, you've
5    talked to me before -- you said before when I was
6    asking you questions about this petition, you
7    said, Well, we didn't think the science supported
8    it.  Correct?
9        A   Support the need for a warning, yes.
10       Q   Right.  But we all agreed that there was
11   a -- a debate in the medical and scientific
12   community about what the science meant, correct?
13       A   Yes.
14       Q   And that had been going on for decades,
15   correct?
16       A   Yes.
17       Q   Okay.  And you had a definite point of
18   view on the issue, correct?
19       A   Yes.
20       Q   On behalf of your members, right?
21       A   Yes.
22       Q   And somebody who had a different point
23   of view presented a petition to the FDA.  Correct?
24       A   Yes.
25       Q   And you asked for a meeting at the FDA

31 (Pages 496 to 499)

Linda Loretz, Ph.D.

Page 500

1  to discuss, among other things, that petition,
2  correct?
3      A   Yes.
4      Q   And you actually submitted an agenda.
5  True?
6      A   That's what it says.
7      Q   And the agenda was clear that you wanted
8  to discuss the petition, correct?
9      A   I would assume so based on what this
10 says on the subject matter.
11     Q   And you walked in prepared to discuss
12 the petition.  You even brought with you
13 Dr. Muscat and Dr. Huncharek's commissioned work
14 on behalf of the industry, correct?
15     A   That seems to be what it says, yes.
16     Q   And -- well, it's not only what it says,
17 it happened, correct?
18     A   Yes.
19     Q   And when you're testifying about PCPC --
20     A   Yes.
21     Q   -- this is one of the topics you were
22 prepared to talk about.
23     A   Okay.
24     Q   Right?
25     A   Yes.

Page 501

1      Q   So you walk in there, and did you say to
2  them, You know, we really want -- this is an
3  important issue, because we agreed that it's an
4  important issue.  Ovarian cancer and talc was an
5  important issue, right?
6      A   Yes.
7      Q   Did you say to them, You know, why don't
8  we get Dr. Epstein to come to this meeting so we
9  can have a fulsome discussion of the pros and cons
10 of what the science means?
11     A   I -- I think this was not a meeting
12 where that was -- this was not that meeting.  I
13 mean we knew where Dr. Epstein stood.
14     Q   Well, they knew where you stood too,
15 but you --
16     A   Right.
17     Q   -- you accepted a meeting anyway or you
18 asked for a meeting anyway to discuss the issues,
19 right?
20     A   Yes.
21         MR. LOCKE:  Objection.  Form.
22         THE WITNESS:  And they could have said
23 no, but they were willing to meet with us.
24 BY MR. TISI:
25     Q   The were willing to meet with you, but

Page 502

1  if you were really interested in the scientific
2  question, why not invite the -- why not say, Maybe
3  we should have Dr. Epstein come?
4      A   I think we knew where Dr. Epstein stood,
5  and we disagreed with him.
6      Q   Right.  So why not have him come to
7  present his position?
8      A   I don't think this was the meeting for
9  that.
10     Q   Okay.  And -- the FDA initially
11 expressed its reservation about the meeting,
12 correct?
13         MR. LOCKE:  Objection.
14 BY MR. TISI:
15     Q   It said -- it said -- initially said
16 that they didn't want to talk about the pending
17 Citizen's Petition, correct?
18         MR. LOCKE:  Objection.
19         THE WITNESS:  And then said that you can
20 talk to us, but we're not going to talk about --
21 BY MR. TISI:
22     Q   Because you were already there.
23     A   Well, they accepted the meeting, though.
24 So if there really was an agenda that -- I'm
25 sure it would have shown that, and they could have

Page 503

1  said -- I mean they would have asked what -- what
2  did we want to talk about.
3      Q   Right.  But the first sentence here
4  indicates a little bit of interpreting it fairly,
5  a little bit initial hesitation --
6      A   Sure.
7      Q   -- by the FDA to discussing a petition
8  with only one party there and without the other.
9  True?
10     A   Well --
11         MR. LOCKE:  Objection.
12 BY MR. TISI:
13     Q   True?
14         MR. LOCKE:  Objection.
15         THE WITNESS:  It's under advisement.  I
16 don't know if it's because --
17 BY MR. TISI:
18     Q   I got -- we got to get the objection in,
19 and then you got to answer.
20     A   Sorry.
21     Q   I'm sorry.  Go ahead.  I'm sorry.
22     A   Just I don't know that -- I think
23 probably their normal policy is they're not going
24 to talk about things that are under advisement.
25 So I don't know that it's because the other party

Linda Loretz, Ph.D.

| Page 504 |
|---|

1  wasn't there or it's just -- we're working this
2  through, so we're not going to -- we're not going
3  to give you -- tell you where we stand right now.
4  You can talk to us.
5      And then later on she asked that we
6  submit, formally submit our information, which we
7  did.
8      Q    All right.  And asked you some follow-up
9  questions, right?
10     A    Yes.
11     Q    Okay.  Which you did?
12     A    Yes.
13     Q    Do you know whether or not the FDA ever
14  reached out to Dr. -- Dr. Epstein or anybody else
15  to say, Look, you know, we would like to get your
16  further input.  We met with -- with the industry
17  and their trade organization.  They raised some
18  issues about dose response, about contamination
19  with talc, about bio -- with asbestos, about
20  biologic plausibility, about all the issues that
21  were in the Citizen's Petition.  What is your
22  response to that?
23     Do you know if that was ever done by the
24  FDA?
25     A    I think some of reaching out to us, and

| Page 505 |
|---|

1  the follow-up questions were ones that were
2  specific to industry, how do you source talc, that
3  kind of thing.  So -- so certainly that -- we have
4  to be the audience for that.
5      Q    Right.  My question is, do you know
6  whether or not in the four or five years between
7  the time that you all were meeting with the FDA
8  and the time they ultimately came down with a
9  conclusion, that anybody from the FDA ever reached
10  out to anybody on the other side of the debate and
11  said, Now we've heard from industry, we met with
12  J&J, we met with Imerys, we had Unilever there, we
13  had PCPC there.  We have some questions as to what
14  this data means too.  What is your response to
15  that?
16     Do you know whether that ever happened?
17     A    No.  But I would say their petition kind
18  of speaks, and then we have a response, and then
19  again some -- a lot of the industry questions were
20  regarding sourcing, the kind of things that were
21  real industry-only questions.
22     Q    But your petition spoke too, right?  You
23  had a -- you put a 30-page response --
24     A    Oh yes.
25     Q    -- by Huncharek and Muscat.

| Page 506 |
|---|

1      A    Yes.
2      Q    Okay.  But you wanted to actually get in
3  the room and actually speak with them, right?
4      A    Yes.
5      Q    Okay.  You know, because -- because this
6  was important to your members, right?
7      A    Yes.
8      Q    Okay.  The American Cancer Coalition was
9  representing consumers, right?
10         MR. LOCKE:  Objection.
11  BY MR. TISI:
12     Q    Patients?
13         MR. LOCKE:  Objection.
14         THE WITNESS:  I'm not sure who they
15  represent, but -- yes.
16  BY MR. TISI:
17     Q    Was there anybody in that room on May 8,
18  2009, that represented patients, doctors,
19  consumers?
20         MR. LOCKE:  Other than the FDA?
21         THE WITNESS:  I was going to say the
22  Commissioner of the FDA, I would --
23  BY MR. TISI:
24     Q    I'm asking you other than the -- the FDA
25  was trying to decide a question.  Correct?

| Page 507 |
|---|

1      A    Yes.
2      Q    A scientific question.  Right?
3      A    Yes.
4      Q    In fact, Dr. -- in here Dr. -- the
5  Acting Commissioner said --
6      A    Sharfstein.
7      Q    -- said he had only heard it because of
8  some Korean issue, Korean talc sourcing, correct?
9         MR. LOCKE:  Objection.
10         THE WITNESS:  I think that's in the
11  minutes.
12  BY MR. TISI:
13     Q    Right.  It was clear to you that -- that
14  they had not been really focused -- at least the
15  Commission had not really been focused on the
16  issue, correct?
17         MR. LOCKE:  You mean the Commissioner?
18         MR. TISI:  I'm asking the Commissioner.
19  BY MR. TISI:
20     Q    You were providing a lot of information
21  that they did not have.
22     A    Again, a lot --
23         MR. LOCKE:  Objection.
24         THE WITNESS:  -- of our information -- I
25  think their questions regarded, again industry,

33 (Pages 504 to 507)

Linda Loretz, Ph.D.

Page 508

1    again sourcing, how do you --
2    BY MR. TISI:
3        Q    That came up too.
4        A    Right, and that's -- you know, that's
5    not a question --
6        Q    But you came in with the epidemiology --
7    the first paragraphs here deal with the
8    epidemiology.
9            For example, it says: "The Council
10   submission and the -- and the Citizen's Petition
11   were briefly summarized.  The response was
12   prepared by two epidemiologists, Dr. Michael
13   Huncharek and Dr. Muscat, with a cover letter from
14   the Council.  In their document Huskarek --
15   Huncharek and Muscat provide a summary of each of
16   the 12 publications cited in the petition."
17           Do you see all that?
18       A    Yes.
19       Q    "It was noted that half the publications
20   are either reviews or do not provide new data or
21   address aspects of ovarian cancer or talc but do
22   not provide a link between the two.  The
23   submission then provides an overall summary of
24   epidemiology relating to talc and ovarian cancer,
25   noting that the excess risk is small and often not

Page 509

1    statistically significant, overall lacks
2    dose-response relationship, or in some cases shows
3    an inverse dose-response relationship, lacks a
4    biological plausible mechanism, and that the
5    exposure data is limited."
6            There was a discussion of all that
7    stuff, right?
8        A    I'm not sure there was a discussion.  I
9    think, as I say, she -- it looks like Dr. Katz
10   said, You can tell us -- you can talk to us, but
11   we're really not going to engage in a discussion.
12           We gave this overall summary, and her
13   response was, Well, submit it, and then we can
14   consider it fully.
15       Q    Right.  But you were in the room and
16   Drs. Epstein and no other doctor who thought on
17   the other side of this debate was in the room.
18           MR. LOCKE:  Objection.
19   BY MR. TISI:
20       Q    Correct?
21       A    That's correct.
22       Q    Okay.  And also in the room was your
23   senior scientific person who knew all of the
24   people who he -- or most of the people at the
25   Office of Colors and Cosmetics with whom he

Page 510

1    previously worked, correct?
2        A    That's true.
3        Q    In fact, that's why you hired him,
4    right?  You hired him because of experience with
5    this particular department.
6        A    We hired him because of his -- I mean,
7    obviously the fact that he had FDA background
8    was -- was considered a good thing.
9        Q    In this department, correct?
10       A    Yes.
11       Q    And you hired him knowing full well that
12   talc was a very important issue that was coming --
13   what that might be dealt with by this department,
14   correct?
15           MR. LOCKE:  Objection.
16           THE WITNESS:  As far as I know, and I
17   had nothing to do with the hiring of Dr. Bailey,
18   it wasn't about a specific issue at all.  It
19   was -- I mean, the general fact was he had a
20   wonderful background with FDA and cosmetics, and
21   that made him a valuable employee to the Council,
22   to CTFA.
23   BY MR. TISI:
24       Q    Now, do you know whether or not prior to
25   this meeting --

Page 511

1        A    This meeting.
2        Q    This meeting, May 9th -- May 8th --
3        A    2009.
4        Q    -- 2009.
5            This was a formal meeting that was set
6    up by Dr. Bailey.  Correct?
7        A    I think you would call it that.
8        Q    Do you know whether this meeting was
9    posted to the website so that other people could
10   know it was happening, like the American -- the
11   Cancer Prevention Coalition?
12       A    I don't know.
13       Q    So they -- they wouldn't even know it
14   was happening so they could say, Hey, we'd like to
15   be in -- we'd like to be in the room?
16           MR. LOCKE:  Objection.
17   BY MR. TISI:
18       Q    Right?
19       A    Again, I don't know if it was posted.  I
20   really don't know.
21       Q    Do you know whether there were any
22   communications with the FDA about this issue
23   before this May meeting?
24       A    I'm not aware.
25       Q    Have you seen any documents that refer

34 (Pages 508 to 511)

Linda Loretz, Ph.D.

Page 512

1  to a call that was made, conversations that had
2  been had?
3      A   From -- related to the petition?
4      Q   Mm-hmm.
5      A   Sometime between when it was filed
6  and --
7      Q   Mm-hmm.
8      A   You can refresh my memory, but
9  nothing -- I'm not thinking of anything, no.
10         (Exhibit No. 57 was marked for
11         identification.)
12  BY MR. TISI:
13      Q   Let me show you Exhibit No. 57.
14         This is not a PCPC document.  I'm seeing
15  whether this refreshes your recollection.
16         Now, at the very bottom, and I -- I'm
17  going to ask you to read it, but I'm just going to
18  kind of set the table for you.
19      A   Very bottom of the second page?
20      Q   So first page.
21      A   Okay.
22      Q   There's an e-mail from Craig Bernard to
23  Mark Zamek at J&J -- I mean at Rio Tinto.  And Rio
24  Tinto is -- is Imerys as well, correct?
25      A   I believe so, yes.

Page 513

1      Q   And it's referring to a meeting with
2  J&J.  Do you see that?
3      A   Yes.
4      Q   Okay.  If you would read it to yourself,
5  please, and then we can --
6      A   Mm-hmm.
7      Q   -- we can go off the record if you want.
8  It doesn't matter to me, but you can read it to
9  yourself.
10         MR. TISI:  We can go off the record.
11         MR. LOCKE:  No.  Let's stay on the
12  record.
13         MR. TISI:  Okay.
14         THE WITNESS:  (Peruses document.)
15  BY MR. TISI:
16      Q   I'm really going to ask you about that
17  first big paragraph.
18      A   Okay.
19      Q   Okay.  First of all, the subject matter
20  is "Meeting with J&J," correct?
21      A   Yes.
22      Q   Okay.  And the first sentence says:
23  "You'll recall a couple of months ago we met with
24  a guy Bob Katsioulenis' office, and spoke about
25  the Citizen's Petition with the FDA that is

Page 514

1  requesting to have a warning label placed on
2  products containing" -- there is no word, but I
3  think it's --
4      A   Right.
5      Q   -- involving talc.
6      A   Right.
7      Q   "Here is an update on that activity.
8  Kathy Wille of J&J informed me that at a recent
9  science meeting in Washington, D.C., she had a
10  side conversation with a key figure from the FDA
11  cosmetic group responsible for responding to the
12  Citizen's Petition.  He indicated that the FDA
13  would rule against the petition and would
14  require -- would not require warning labels on
15  cosmetic products, but the FDA is looking for
16  scientific support from industry that would help
17  justify their position.  She suggested that there
18  be a collective group working to have comments
19  submitted to the FDA.  Principal among these
20  efforts will be comments that Dr. Muscat and
21  Huncharek are co-developing.
22         "In order to orchestrate the completion
23  of these comments, I have been asked by J&J to
24  meet with them, along with Muscat and Huncharek,
25  at their headquarters in New Jersey on Wednesday,

Page 515

1  November 19th, in order to review the comments
2  before being provided to Personal Care Products
3  Council."
4         Do you see that?
5      A   Yes.
6      Q   Okay.  I read that correctly, right?
7      A   I believe so, yes.
8      Q   All right.  This would suggest that
9  there was another informal contact with the office
10  of colors, fragrance and -- I'm sorry.  I'm
11  blanking.  Office of --
12      A   Cosmetic and Colors.
13      Q   -- Cosmetics and Colors.
14         Are you aware of it?  Does this refresh
15  your recollection?
16         MR. LOCKE:  Objection.
17  BY MR. TISI:
18      Q   Does this refresh your recollection?
19      A   No.
20      Q   If there was a side conversation about a
21  Citizen's Petition, in your experience being a
22  liaison with the FDA, would that be inappropriate?
23         MR. LOCKE:  Objection.
24         MS. FRAZIER:  Object to form.
25         MR. LOCKE:  Beyond the scope.

35 (Pages 512 to 515)

Linda Loretz, Ph.D.

Page 516

1    THE WITNESS:  I -- I mean I'm not a
2  liaison with the FDA.  I -- I don't know if this
3  is referring to the meeting that we had with the
4  FDA or a different meeting.
5  BY MR. TISI:
6    Q   Well, the date -- the date of it is
7  November 3rd, 2008, so this would have been a good
8  six months before your meeting --
9    A   Oh, okay.
10    Q   -- with the FDA.
11    A   Oh, I'm sorry.
12    I -- I mean I just can't comment on
13  this.  I don't know if this happened.  I don't
14  know if it was -- you know, if it's characterized
15  correctly.
16    Q   Well, I'm going to ask you this
17  question.  You don't have knowledge of it, I
18  accept you at your word.
19    If this happened, in your experience
20  having side conversations with FDA people about
21  issues that are pending before the FDA, is that
22  appropriate?
23    MR. LOCKE:  Objection.
24    MS. FRAZIER:  Object to form.
25    MR. LOCKE:  And beyond the scope.

Page 517

1    THE WITNESS:  I can't imagine an FDA
2  person saying something like -- I mean that would
3  seem to me --
4  BY MR. TISI:
5    Q   Wrong.
6    A   -- nothing I've ever seen.
7    Q   And it would be wrong, right?
8    MR. LOCKE:  Objection.
9    MS. FRAZIER:  Object to form.
10    MR. LOCKE:  Beyond the scope.
11    THE WITNESS:  Again, I don't know if
12  this is properly characterized or under- -- what
13  the understanding was.
14  BY MR. TISI:
15    Q   Okay.  All right.  Now, before we
16  discuss the FDA meeting any further from May of
17  2009, and the industry interpretation of evidence
18  actually filed in the white paper, when -- let's
19  talk about what happened before.
20    The petition was filed in the spring of
21  2008.  Do you know when it was that Dr. Bailey was
22  first contacted by J&S to participate in this
23  process?
24    MR. LOCKE:  Objection to form.
25    THE WITNESS:  I don't.  I mean, I think

Page 518

1  it was fairly late -- I mean, I think it was
2  reasonably close to when the comments were
3  submitted.
4  BY MR. TISI:
5    Q   Do you know?
6    A   No.
7    Q   Did you investigate that?
8    I mean, one of the categories very
9  specific in our notice of deposition were the
10  circumstances surrounding the Citizen's Petition.
11  Did you -- that's why I asked you in the early --
12    A   Mm-hmm.
13    Q   Did you interview or look specifically
14  at the notes pertaining to the Citizen's Petition
15  and perhaps speak to Dr. Bailey about what
16  happened?
17    A   Did I speak to him at the time?
18    MR. LOCKE:  Objection.  It's a compound
19  question.
20  BY MR. TISI:
21    Q   Okay.  Did you review all the documents
22  at your possession relating to the preparation of
23  the Citizen's Petition?
24    A   In preparation for this?
25    Q   Yes.

Page 519

1    A   I'm not sure.
2    Q   All right.  Did you ask to see the notes
3  from the other defendants that might help you
4  understand better what PCPC's role with respect to
5  the Citizen's Petition was?
6    A   No.
7    Q   Okay.  This is --
8    MR. LOCKE:  Let me just -- I want to
9  clarify, to the extent they were produced.
10  BY MR. TISI:
11    Q   Okay.  Like, for example, that one that
12  we just showed involved the Citizen's Petition.
13  Had you ever seen that before?
14    A   I -- no.
15    Q   Okay.  Did you speak to -- I mean the
16  two people that were involved in the process, as
17  best as I can tell, from PCPC were you and
18  Dr. Bailey.  Right?
19    A   That's probably correct, yes.
20    Q   Did you speak to Dr. Bailey?
21    A   No.
22    Q   So you don't know what -- what
23  communications he had, do you?
24    A   I --
25    MR. LOCKE:  Objection.

36  (Pages 516 to 519)

Linda Loretz, Ph.D.

Page 520

```
 1          THE WITNESS:  I can tell you what I
 2   think my recollection is, that this was not a
 3   longstanding thing.  This was a -- J&J had -- had
 4   worked on having a -- Drs. Muscat and Huncharek
 5   prepare a review, a current review of the
 6   literature, and thought that that would be
 7   appropriate to submit.  And I suspect that all
 8   happened fairly soon before we actually submitted
 9   it.
10   BY MR. TISI:
11       Q    Now, prior to this you had fairly
12   consistent -- on this issue, you were -- as best I
13   can tell from looking at the overall records that
14   were produced in this case, and you can correct me
15   if I'm wrong, as I look at the decade or so prior
16   to this, you were the primary contact on this
17   issue.
18       A    I would say myself and Dr. McEwen.
19       Q    Okay.  Dr. Bailey really wasn't hands on
20   with this issue over the -- as compared to you,
21   correct?
22       A    Well, I guess I think our -- you know,
23   our biggest involvement, PCPC's biggest
24   involvement, biggest effort related to NTP, and
25   Dr. Bailey wasn't there at the time.
```

Page 521

```
 1       Q    Okay.  And the Citizen's Petition as
 2   well.
 3       A    Right, but it -- it wasn't -- we weren't
 4   doing multiple submissions and presenting at
 5   meetings, and that sort of stuff.  So it was --
 6       Q    Right.  But in terms of -- and, you
 7   know, we looked at examples here, but, you know,
 8   you were kept up to date on the IARC issues, you
 9   had been communicating with Bob Glenn at -- at --
10   I mean I've seen a bunch of them, I could pull
11   them out for you.
12           But to the extent that the -- the other
13   defendants in this case, J&J and Imerys, were
14   contacting PCPC about issues related to talc, you
15   were prime -- the primary person that would be
16   their liaison.
17       A    Probably.  That's probably true.
18       Q    Okay.  Until the Citizen's Petition
19   was -- was filed, do you know that they
20   contacted -- they wanted to contact Dr. Bailey?
21           MR. LOCKE:  Objection.
22           THE WITNESS:  No, I didn't.
23           (Exhibit No. 58 was marked for
24           identification.)
25   BY MR. TISI:
```

Page 522

```
 1       Q    So let me show you an e-mail dated --
 2   58, this is May 2008, right after the Citizen's
 3   Petition was filed.  It's an internal -- this
 4   would have been a whole year before the meeting at
 5   the -- at the FDA.
 6           And from Kathleen Wille, and it's an
 7   internal document.  I don't expect that you would
 8   have seen it in realtime.  But it's talking about
 9   the Citizen's Petition and the next steps.
10           Do you see it?
11       A    I'm just reading through now.
12           (Peruses document.)  Okay.
13       Q    Okay.  And so just as you read this,
14   what's happening is the Citizen's Petition is
15   filed by Dr. Epstein, and there's kind of a
16   mobilization of effort in -- in how to respond to
17   that, and it's entitled "Next Steps."  Do you see
18   that?
19       A    I'm not sure where --
20       Q    Second page.
21       A    Yes.
22       Q    Okay.  And underneath that, one of the
23   things they -- two things -- there are three
24   things they identify.  Secure funding and engage
25   experts, and that would be Huncharek and Muscat
```

Page 523

```
 1   that's named here, and PCPC ultimately paid for
 2   that, right?
 3       A    Yes.
 4       Q    Okay.  Number 2, "Engage internal
 5   stakeholders."  Do you know whether or not any
 6   public relations people were -- were contacted in
 7   connection with the Citizen's Petition?
 8       A    I'm not aware --
 9           MR. LOCKE:  Objection.  You're referring
10   to J&J -- you're asking the witness about J&J?
11           MR. TISI:  No, I did not.
12   BY MR. TISI:
13       Q    I asked, are you aware of any public
14   relations people for anybody that was contacted in
15   connection with this Citizen's Petition?
16       A    I guess I could only answer for PCPC,
17   and I'm not aware of any.
18       Q    Okay.  But the third is what I'm most
19   interested in, "Determine level of external
20   support."
21           The first is John Bailey.  It says:
22   "John Bailey of the Personal Care Products Council
23   is out of the office until the next week,
24   June 2nd.  We will ascertain their plans to
25   respond."
```

37 (Pages 520 to 523)

Page 524

1        Do you see that?
2      A   Yes.
3      Q   Okay.  It didn't say, We're contacting
4  Linda Loretz, are they?
5      A   That might be because it's Kathy Wille.
6  I mean it just kind of depends who within
7  Johnson & Johnson is -- is responding.
8      Q   So do you know whether or not in this
9  time frame -- this is a full year before the
10  meeting, more than -- with the FDA and more than a
11  year before the formal response was filed in July
12  of 2009.
13        Do you know whether or not at this time
14  frame, J&J had been able to contact Dr. Bailey,
15  who again had been the prior director of the
16  division?
17      A   Yeah, I don't know what discussions went
18  on with --
19      Q   I don't mean to be factitious about it,
20  but wouldn't it make sense to actually -- if you
21  are here to testify on that issue, to actually
22  speak to Dr. Bailey --
23        MR. LOCKE:  Objection.
24  BY MR. TISI:
25      Q   -- about that issue?

Page 525

1        MR. LOCKE:  Objection.
2        By the way, it also says, "We will then
3  ascertain their plans."
4        MR. TISI:  I understand.
5        THE WITNESS:  I mean, I don't think we
6  did anything on the petition until later, so I
7  kind of read into that that there was not a lot
8  going on at this point.
9  BY MR. TISI:
10      Q   Well, there was -- there's a couple of
11  things, right, that could go on?  Number one is
12  actually responding to the petition.  Number two
13  could actually be speaking to the FDA.
14        Do you know whether or not in this time
15  frame Dr. Bailey had spoken to anybody at the FDA?
16      A   I'm not aware that he had.
17      Q   And you've never taken the time
18  before -- before today, and we've had -- this is
19  the second day of deposition.  You've had
20  depositions in other cases.  You've never spoken
21  to him about this issue?
22      A   No.
23        MR. LOCKE:  You're welcome to show her a
24  document if it -- can refresh her recollection.
25        MR. TISI:  I'm sure I know the rules,

Page 526

1  Counsel.
2        MR. LOCKE:  Okay, good.
3  BY MR. TISI:
4      Q   Tell me everything that you know
5  happened with respect to the development of the
6  response to the Citizen's Petition.
7        I know you said it was initiated by J&J.
8  Do you know that Imerys had some input -- we saw a
9  meeting that -- with Drs. Huncharek and Muscat
10  and -- and Imerys in November.  Were you at that
11  meeting?
12      A   No.
13      Q   You know -- did you know it happened?
14      A   I don't believe so.  If I -- I don't
15  recall it, no.
16      Q   Were you given an opportunity to review
17  the -- the Citizen's Petition that was actually
18  filed on -- on PCPC's behalf?
19      A   I -- I'm sure I was in the sense that
20  obviously if it was something we have had an issue
21  with, we wouldn't have submitted it.  So I'm going
22  to say yes.
23      Q   And so when you say it was -- it was
24  drafted by somebody else, it went out under PCPC's
25  name, and to the extent that you're here as a

Page 527

1  representative of PCPC, you agree with everything
2  that's in that document.
3        MR. LOCKE:  Objection.
4        THE WITNESS:  What I'm saying is -- when
5  you say "drafted by somebody else," I mean it was
6  drafted by epidemiologists.  So --
7  BY MR. TISI:
8      Q   Right.  With the input of Imerys and
9  J&J, correct?
10      A   Well, I think -- I mean they're speaking
11  for themselves.
12      Q   But -- but --
13      A   I take that at face value.
14      Q   But the report was actually --
15        MR. LOCKE:  Let her finish her answer,
16  please.
17  BY MR. TISI:
18      Q   You don't know what happened at the
19  meeting in -- in November when -- when Dr. Muscat
20  and Huncharek went to Skillman, New Jersey, and
21  met with J&J and Imerys, correct?
22      A   Because I wasn't there.  I mean, I can
23  read the -- the submission.  So --
24      Q   Right.  And you don't know what edits
25  were made to the original document, do you?

Linda Loretz, Ph.D.

Page 528

1     MS. FRAZIER: Object to form.
2     THE WITNESS: No.
3  BY MR. TISI:
4     Q   And when a -- when a company -- I mean,
5  when a company commissions a report like this,
6  doesn't the company usually reserve the right to
7  review it and make comments and edits before it's
8  submitted?
9     MR. LOCKE: Objection. Beyond the
10  scope.
11  BY MR. TISI:
12     Q   Typically?
13     A   I mean that --
14     MR. LOCKE: Objection.
15     THE WITNESS: -- that brings up like us
16  doing that, PCPC, you know, talc, other topics,
17  whatever, and yes, but I think when you're hiring
18  reputable people, they're not going to let you
19  change their conclusions. I mean, you might have
20  edits, typos, clarity needed. I mean...
21  BY MR. TISI:
22     Q   Right. Focus.
23     A   Yeah.
24     Q   Right. But -- but -- I mean that
25  presumes that these are reputable people in part,

Page 529

1  don't you think?
2     MR. LOCKE: Objection.
3     THE WITNESS: It does.
4  BY MR. TISI:
5     Q   Did you -- did you do -- I mean that's
6  why I brought the brochure out there. You didn't
7  do any due diligence as to who these people were
8  and what their stake was in this issue, did you?
9     MR. LOCKE: Objection. Mischaracterizes
10  testimony.
11     THE WITNESS: Yeah.
12     MR. TISI: Whose testimony?
13     MR. LOCKE: Hers.
14  BY MR. TISI:
15     Q   Did you do any due diligence into who
16  Meta-Analysis Research Group is and to where they
17  got their major funding?
18     MR. LOCKE: Objection. Asked and
19  answered. We've covered this.
20  BY MR. TISI:
21     Q   Did you do it?
22     A   We had worked with Dr. Muscat before.
23     Q   I -- I didn't ask you that question.
24  This was written on behalf of Meta-Analysis
25  Research Group, correct? It's got the big logo

Page 530

1  that says "Meta-Analysis Research Group" across
2  the top, right?
3     A   Yes.
4     Q   Okay. Did you do any due diligence as
5  to -- as to who Meta-Analysis Research Group was?
6     MR. LOCKE: Objection. Asked and
7  answered.
8     THE WITNESS: We put faith in the
9  epidemiologists as knowledgeable epidemiologists.
10  BY MR. TISI:
11     Q   Okay. Without doing your due diligence.
12     MR. LOCKE: Objection.
13  BY MR. TISI:
14     Q   You did not investigate Dr. Huncharek
15  and Muscat and what their relationship was, where
16  their funding came from, and how much time they
17  spent on these issues, did you?
18     MR. LOCKE: Objection. Mischaracterizes
19  testimony, asked and answered.
20     THE WITNESS: We accepted them because
21  of their epidemiology expertise.
22  BY MR. TISI:
23     Q   Did you have an opportunity to review
24  this before it went in?
25     A   As I say, I'm sure I did.

Page 531

1     Q   Okay. Have you had any -- do you have
2  any dispute that this is PCPC's response, that
3  PCPC agrees with the content?
4     MR. LOCKE: Objection. Asked and
5  answered. The witness testified it was submitted
6  by the two epidemiologists.
7     MR. TISI: I -- I'm not going to ask you
8  to characterize it. Your not under oath, Counsel.
9  I appreciate you schooling me, but honestly.
10  BY MR. TISI:
11     Q   Is this PCPC's document?
12     MR. LOCKE: We're just going to stick
13  with the prior answer then.
14  BY MR. TISI:
15     Q   Is this PCPC's document?
16     MR. LOCKE: Objection. Asked and
17  answered. Let's move on.
18     MR. TISI: No, we're not moving on. I
19  want an answer to that question.
20     MR. LOCKE: You've answered -- she's
21  answered it three times.
22  BY MR. TISI:
23     Q   Do you -- do you -- is this PCPC's -- I
24  mean, for example, we read a sentence at the very
25  beginning in the Introduction section that says,

39 (Pages 528 to 531)

Linda Loretz, Ph.D.

Page 532

1    We --
2         MR. LOCKE:  You're talking about the
3    instruction that was written by the two
4    scientists?
5         MR. TISI:  The -- I don't know if that's
6    written by the two scientists.  That's my
7    question.
8         MR. LOCKE:  Well, it says "prepared" --
9         MR. TISI:  Honestly, Counsel.
10        MR. LOCKE:  No, honestly.
11        MR. TISI:  Honestly, I'm asking the
12   question.  Okay.  There's been a lot of
13   ghostwriting in this case.
14        MR. LOCKE:  Objection.
15   BY MR. TISI:
16   Q    "Given the multiple implications of such
17   warnings, the Personal Care Products Council
18   sought an evaluation of the validity of the
19   scientific facts underlying this request."  Right?
20        Do you know whether or not this
21   document, Exhibit No. 20 -- 43, is the report
22   submitted by PCPC and it is PCPC's position,
23   correct?
24        MR. LOCKE:  Objection.  Compound
25   question.

Page 533

1         THE WITNESS:  I believe this is the
2    document we submitted.
3    BY MR. TISI:
4    Q    Okay.  All right.  Let's talk about it
5    for a moment.
6         The summary provided by Dr. Bailey in
7    the cover letter says:  "The review concludes that
8    the weak epidemiologic association is unlikely to
9    be causal."
10        Do you see that?
11   A    Yes.
12        MR. LOCKE:  What page are you at?
13        MR. TISI:  Page 2, Dr. Bailey's letter.
14        MR. LOCKE:  Okay.
15   BY MR. TISI:
16   Q    Putting aside the characterization of
17   "weak," which we can talk about in a moment, do
18   you believe that there was an epidemiologic
19   association seen across studies?
20   A    It's not --
21        MR. LOCKE:  Objection.  Beyond the
22   scope.
23        THE WITNESS:  Not a hundred percent
24   consistent, no.
25   BY MR. TISI:

Page 534

1    Q    Not a hundred percent consistent, but
2    is --
3    A    But, yes.
4    Q    -- is a hundred percent consistency
5    required?
6    A    No.
7    Q    Okay.  So there was consistency across
8    studies.
9         Now, arguing against causal association,
10   Dr. Bailey, on behalf of the PCPC, which you are
11   here for --
12   A    Yes.
13   Q    -- says:  "There is a lack of a clear
14   dose-response relationship."  Correct?
15   A    Yes.
16   Q    And even posits that some epidemiologic
17   studies suggest an inverse association.  Correct?
18   A    Correct.
19   Q    Now, as a toxicologist, if you see an
20   inverse association with the disease, doesn't it
21   raise the suggestion that this is a protective --
22   may have a protective effect?
23        MR. LOCKE:  Objection.  Beyond the
24   scope, calls for expert testimony.
25   BY MR. TISI:

Page 535

1    Q    I mean there might be reasons why
2    that -- why that is seen, correct?
3         MR. LOCKE:  Same objection.
4         THE WITNESS:  In theory, that's possible
5    if there's consistency.
6    BY MR. TISI:
7    Q    I mean if this was a protective of
8    ovarian cancer, you may have found a miracle,
9    right?
10   A    Well, I would go into the causality.  It
11   would work the same way for protective effect.
12   Q    You didn't believe that there was an
13   inverse -- there was an inverse relationship
14   between ovarian cancer and talc, did you?
15   A    That's not what it says.  Some
16   studies --
17   Q    Suggest that.
18   A    -- showed that.
19   Q    And if that were really something that
20   was seen in some studies, as a toxicologist and as
21   somebody who represents the talc industry, that
22   would be something that would be really an
23   interest to you, wouldn't it?
24   A    I don't read it that way at all.  The
25   point of saying that some studies showed an

40  (Pages 532 to 535)

Linda Loretz, Ph.D.

Page 536

1    inverse relationship cast doubt on the causality.
2        Q   Okay.  Well, there are biases that might
3    suggest that -- why that would occur particularly
4    with a disease like cancer.  Are you familiar with
5    survival bias?  Have you ever heard of that?
6            MR. LOCKE:  Objection.  Beyond the
7    scope.
8            THE WITNESS:  I'm not sure what that
9    phrase means.
10   BY MR. TISI:
11       Q   Okay.  Did you ever -- on behalf of the
12   PCPC, did you ever ask whether or not there would
13   be explanations consistent with causation by which
14   you might see an inverse dose-response
15   relationship?
16       A   I think -- I mean, as far as the
17   scientist- -- the scientific analysis we left to
18   the epidemiologists.
19       Q   Well, I mean, pardon me for being -- for
20   being direct about this.
21           Before this was actually filed, you and
22   all of these -- these companies marched into the
23   FDA on the Citizen's Petition issue on May -- in
24   May of 2009 to talk about the epidemiology in
25   part.  Correct?

Page 537

1        A   I think the talk on that was fairly
2    limited.  I mean, the parts I remember from that
3    meeting had more to do with talking about sourcing
4    and that sort of thing.  I -- and again, as -- as
5    the meeting minutes say, FDA wasn't engaging us in
6    discussion.  They were going to let us say our
7    piece --
8        Q   Right.
9        A   -- and then said, Please submit that so
10   that we can actually read and consider it.
11       Q   And there was no opportunity for
12   doctor -- Dr. Epstein or anybody else to come in
13   and say, You know, okay, we saw that in the -- in
14   the medical literature.  This is a possible
15   explanation as to why that is.
16           MR. LOCKE:  Objection.
17   BY MR. TISI:
18       Q   There was no other opportunity in the
19   four years that this was pending for -- for
20   anybody to come in and say -- and say, You know
21   what, we -- we noted that there's an inverse
22   relationship, but these are possible explanations
23   for that --
24           MR. LOCKE:  Objection.
25   BY MR. TISI:

Page 538

1        Q   -- that are different than the
2    explanation that Drs. Muscat and Huncharek said on
3    the -- on behalf of the industry.
4        A   I think our --
5            MR. LOCKE:  Objection.
6            THE WITNESS:  I think our comments were
7    posted, though, so somebody could see that they
8    were --
9    BY MR. TISI:
10       Q   Do you know whether or not Dr. Epstein
11   or anybody else was contacted and say, These
12   are -- these are the contacts.  Do you want to
13   respond?  Do you know whether they even checked
14   the website?
15       A   Well, I don't, but they had the right to
16   check -- I mean --
17       Q   Right.
18       A   -- the same way as a Citizen Petition
19   would be posted, the comments received would be
20   posted.
21       Q   But not everybody has a former director
22   of the division that considers this work for them
23   like you did, correct?
24           MR. LOCKE:  Objection.
25   BY MR. TISI:

Page 539

1        Q   Do you know whether or not Epstein had
2    any connection with the FDA?
3            I mean, you have to admit having
4    Dr. Bailey is a pretty -- is a pretty important
5    connection to the FDA, don't you think?
6            MR. LOCKE:  Stop.  Which question do you
7    want her to answer?
8            MR. TISI:  That one.
9    BY MR. TISI:
10       Q   That's a pretty important connection to
11   the FDA, having somebody who worked for the
12   division, correct?
13           MR. LOCKE:  Objection.
14           THE WITNESS:  I mean, I think as I said
15   before, he was -- he was hired for his
16   understanding of the FDA, for his experience.
17   BY MR. TISI:
18       Q   Not his contacts?
19       A   For knowing the people, that's -- that's
20   okay.  That doesn't mean they're going to --
21       Q   Right.
22       A   -- do things differently because they
23   know the guy.
24       Q   Do you know -- do you know whether or
25   not Dr. Epstein's group had any similar

41  (Pages 536 to 539)

Linda Loretz, Ph.D.

Page 540

1  relationship with the FDA?
2      A   I -- I do not.
3      Q   So the next thing that Dr. Bailey on
4  behalf of the PCPC says that:  A plausible
5  econom- -- biologic mechanism is lacking to
6  explain a causal relationship."
7          Do you see that?
8      A   Yes.
9      Q   It talks about potential confounding
10  factors, correct?
11      A   Yes.
12      Q   And it talks about -- summarizes all
13  of -- all of the issues?
14      A   Yes.
15      Q   All right.  Now, one of the things that
16  the FDA was very concerned about at the meeting
17  that you attended with them was whether or not
18  cosmetic talc --
19          The stuff that comes in the bottle,
20  right?
21      A   Yes.
22      Q   -- had constituents that might explain
23  the increased relative risks.  They talk about
24  asbestos, correct -- for example, correct?
25      A   I think they talked about purity, yes.

Page 541

1      Q   Okay.  And -- and that's an important
2  issue, don't you think?
3      A   Sure.
4      Q   And one of the things that has made the
5  points that is made by Dr. Bailey on behalf of the
6  PCPC and Dr. Muscat and Huncharek is that there
7  was no biologically plausible mechanism because
8  talc is not known to be a carcinogen, pure talc.
9      A   Okay.
10      Q   Is that true?  I mean, I could point it
11  out.  Let's go to the page -- let's go.  Go to
12  page 25 of the -- of Dr. Huncharek's report --
13  Muscat and Huncharek's report.
14      A   Okay.
15      Q   Could you read -- let's put up the last
16  two paragraphs.
17          Are you there?  It's page 25 of -- 28 of
18  39.
19          Okay.  Now it says here:  "Initially
20  Cramer," and that's --
21      A   What page are you on?
22      Q   Page 20 -- it's 25 on the top.  It says
23  28 of 39.
24      A   28.  Okay.  Got it.
25      Q   And the third paragraph down, it says:

Page 542

1  "An additional limitation on existing literature
2  with the proposed talc/ovarian cancer association
3  is a lack of any known biological mechanism."
4          Do you see that?
5      A   I'm sorry.  Okay.  Now I'm -- on the
6  right paragraph, I think.  Yes.
7      Q   Okay.  Next paragraph down, and feel
8  free to read it if you wish.  I'm not -- I assume
9  you read this before you came in here today,
10  right?
11      A   Yes.
12      Q   Okay.  "He makes the point that
13  initially Cramer, et al.," -- and that's
14  Dr. Cramer we talked about before who published
15  epidemiology -- several epidemiology studies, in
16  fact, right?
17      A   Yes.
18      Q   He's one of the people who looked at the
19  medical literature and thought there was a causal
20  inference, right?
21          MR. LOCKE:  Objection.
22          THE WITNESS:  Yes.
23  BY MR. TISI:
24      Q   Okay.
25          -- "and sought to draw an analogy

Page 543

1  between talc and fibrous asbestos, the latter
2  being a known and well-described carcinogen."
3          First of all, that's true, right?
4      A   I'm sorry.  I'm --
5          MR. LOCKE:  What's your question?
6  BY MR. TISI:
7      Q   I said -- I said asbestos -- "fibrous
8  asbestos is a known and well-described
9  carcinogen."
10      A   Where does it say that?
11      Q   First sentence, the last full paragraph
12  starting "Initially."
13      A   Okay.  Oh, okay it.  Got it.  Sorry.
14  Very first sentence.
15      Q   And you agree with that, right, because
16  you sent that --
17      A   Yes.
18      Q   -- on behalf of the PCPC?  Okay.
19          And he makes the point at the end that:
20  "Prior to the 1970s, some products may have
21  contained some asbestos."  Correct?
22      A   Correct.
23      Q   And that's an argument you've heard over
24  and over and over again, right?
25      A   Yes.

Linda Loretz, Ph.D.

Page 544

1    Q   Okay.  And it says: "Clearly such
2  products could possibly represent a carcinogenic
3  risk secondary to asbestos contamination."
4  Correct?
5    A   That's what it says.
6    Q   Okay.  And so we can agree that asbestos
7  contamination could in fact be a basis of talcum
8  powder products -- a biologically plausible
9  mechanism by which talcum powder products may
10 cause ovarian cancer.  Correct?
11        MR. LOCKE:  Objection.  Beyond the
12 scope.
13        THE WITNESS:  Yeah, I mean, I think what
14 this is actually saying is -- is that's not talc
15 per se.
16 BY MR. TISI:
17   Q   Right.  But we're talking about --
18 that's why I made the point in the very beginning
19 of saying that -- we're talking about what's in
20 the bottle, right?
21   A   Right.
22   Q   And so if talcum powder products have
23 asbestos in it, that would be a biologically
24 plausible mechanism, and Drs. Huncharek and Muscat
25 assumed that there was none.  That was a predicate

Page 545

1  for their statement.
2        Because the next paragraph, it says:
3  "Since the early '70s, the relevant industries
4  voluntarily eliminated asbestos from contamination
5  from talc products."
6        Do you see that?
7    A   Yes.
8    Q   Okay.  So the assumption being that
9  there was no asbestos that had been eliminated,
10 correct?
11   A   That's what it says.
12   Q   Okay.  What does the word "elimination"
13 mean to you?
14        MR. LOCKE:  Objection.
15        THE WITNESS:  Well, it was the '70s when
16 the asbestos issue was raised, and there was a lot
17 of work by the industry to develop a specification
18 that -- that said that there would be no
19 detectable asbestos.
20 BY MR. TISI:
21   Q   Right.  And so the -- but my question
22 is, what does the word "elimination" mean to you?
23        MR. LOCKE:  Objection.
24        THE WITNESS:  I think in this context it
25 means no detectable asbestos.

Page 546

1  BY MR. TISI:
2    Q   Okay.  No detectable asbestos or no
3  asbestos?
4    A   I mean, there is a specification that's
5  no detectable.
6    Q   Different question.
7        My question is, are you representing to
8  the -- is this being represented to the FDA that
9  there is -- that asbestos was eliminated?
10   A   I mean, I think the FDA knows as much
11 about what's going on with asbestos because they
12 were involved in the -- in the specification
13 that --
14   Q   In the 1970s?
15        MR. LOCKE:  Let her --
16        THE WITNESS:  And understand there was a
17 detection limit.
18 BY MR. TISI:
19   Q   Honestly, that -- that's not my
20 question.  Okay?
21        MR. LOCKE:  Let her finish her answer,
22 and then you can ask --
23 BY MR. TISI:
24   Q   My question -- my question is this --
25 this report assumes that asbestos had been

Page 547

1  eliminated from talcum powder products since 1970.
2  True or not true?
3        MR. LOCKE:  Objection.
4        THE WITNESS:  I -- I think it's like
5  anything else, at some detection limit.  I mean
6  every contaminant has a detection limit.  So I
7  think that's implied.
8  BY MR. TISI:
9    Q   Okay.  And if asbestos -- let's assume
10 that you use the right test, right?  I mean, you
11 could use -- you could use a -- if you used the
12 wrong test and you don't -- it may go undetected,
13 right?
14   A   Well, as is true for any analysis.
15   Q   Correct.  Okay.
16        So my quest- -- my question is when you
17 make the -- the statement does not say -- because
18 everybody had an opportunity to look at this
19 before it went in.
20        When this statement is made to the FDA,
21 it says asbestos had been eliminated.  True?
22   A   Again, I think you can argue what
23 that -- what that word -- what is meant by that
24 word here.
25   Q   Okay.  Well, we can agree that if there

43 (Pages 544 to 547)

Linda Loretz, Ph.D.

Page 548

1  was some asbestos in some -- in talcum powder
2  products, that would provide a biologically
3  plausible mechanism which would explain the
4  increased risk, right?
5          MR. LOCKE: Objection. Beyond the
6  scope.
7  BY MR. TISI:
8      Q   And that's what the FDA was asking
9  about, right?
10         MR. LOCKE: Objection.
11 BY MR. TISI:
12     Q   Because on the May 8th -- let me
13 rephrase the question.
14         On the May 8th meeting with -- with you
15 all, and you made the point several times, in
16 addition to the epidemiology, the FDA wanted to
17 know just how pure talcum powder products were.
18     A   They wanted to know -- they raised
19 questions about sourcing and testing and how do
20 you find the mines and -- and that type of stuff.
21     Q   Because they wanted to know how -- well,
22 you knew the -- the reason why they were asking
23 that question because they wanted to know what was
24 in the bottle.
25     A   Yes. They were trying to understand --

Page 549

1  right.
2      Q   Right. This was not pharmaceutical
3  grade talc. This was cosmetic talc, right?
4          MR. LOCKE: Objection.
5          THE WITNESS: I think it's basically the
6  same as pharmaceutical grade talc, but yes.
7  BY MR. TISI:
8      Q   But the point is there -- there are a
9  lot of things -- so -- so what the FDA really
10 wanted to drill down to here is -- I know you guys
11 talked about, you know, talc as a molecule and
12 whether or not it can cause ovarian cancer, and
13 you addressed that issue, but are there other
14 things in the bottle that might explain this
15 increased risk? They asked you that question,
16 right?
17         MR. LOCKE: Objection.
18         THE WITNESS: And they asked us for
19 follow-up information, which -- which we provided.
20 BY MR. TISI:
21     Q   Now, one of the things we learned in
22 this litigation is that these folks down here, the
23 J&J and Imerys, had talc samples available to them
24 for decades.
25         MR. TISI: Objection.

Page 550

1          MS. FRAZIER: Object to form.
2  BY MR. TISI:
3      Q   Did you know that?
4      A   I'm not sure what that means.
5      Q   Meaning that they had talc samples from
6  the mines, from the -- from -- from -- that the
7  grade of talc that was used in the talcum powder
8  products to actual physical bottles that were
9  returned by consumers.
10         Did you know that?
11     A   I guess no, not really.
12     Q   I mean, one of the things -- if the FDA
13 was asking you questions about whether or not what
14 was in the bottle might contain things other than
15 pure talc, were you curious as the entity to say,
16 Hey, guys, do you have any samples around we can
17 test?
18     A   I mean, I --
19         MR. LOCKE: Objection.
20         THE WITNESS: -- think we had -- we had
21 worked with FDA and companies looking at that
22 question, if we're talking about asbestos back in
23 the '70s.
24 BY MR. TISI:
25     Q   Right. And you also made the point that

Page 551

1  some of those specifications were decades old,
2  right? And one of the things that Dr. Bailey
3  said, that they would be willing to look at -- at
4  tightening up those specifications, right?
5          MR. LOCKE: Objection.
6          THE WITNESS: I think he did. I mean,
7  there was always an openness -- obviously, FDA was
8  welcome to do their own specification, but I don't
9  think methodologies had substantially changed.
10 BY MR. TISI:
11     Q   Well, do you know that?
12     A   Yes, actually, I think I could say I do.
13 I think our specification is essentially the same
14 as what the USP uses essentially. And I know like
15 ASTM was looking at it, but they haven't changed
16 anything or promulgated a new specification.
17     Q   So the question -- the question that I
18 have here is, both the FDA and Dr. Bailey noted
19 that the -- that the standards that were adopted
20 in the 1970s were then decades old, correct?
21         MR. LOCKE: Objection.
22         THE WITNESS: Noted where? At the
23 meeting?
24 BY MR. TISI:
25     Q   At the meeting. It says here -- if you

44 (Pages 548 to 551)

Linda Loretz, Ph.D.

Page 552

1  go back to the meeting notes, it says --
2       MR. LOCKE:  Can you tell us which
3  exhibit you're referring to?
4       MR. TISI:  Exhibit No. 55.
5  BY MR. TISI:
6       Q   It says -- if you go to page 2, it says:
7  "Dr. Bailey mentioned that the Council published
8  specifications for talc as well as analytical
9  methodology for asbestos.  These are the ones most
10  often cited for the raw material.  He mentioned
11  these were developed almost 20 -- 20 years ago,
12  and that they would need to be checked for
13  verifications."
14       Do you see that?
15       A   Yes.
16       Q   Okay.  And so one of the things that the
17  FDA and -- and the PCPC were talking about is, are
18  our specifications for testing talc, are they
19  outdated?  Are they as stringent as they ought to
20  be?  Correct?
21       MR. LOCKE:  Object -- objection.
22       THE WITNESS:  That's what he's talking
23  about here, yes, but he's certainly saying that we
24  welcome FDA's --
25  BY MR. TISI:

Page 553

1       Q   Of course.
2       A   -- to weigh in, and --
3       Q   Right.  But the -- but the question is,
4  when these specifications were -- were developed
5  in the 1970s, the epidemiology studies hadn't come
6  out yet, right?  They didn't come out until 1982.
7  You made it clear that it was the early 1980s.
8       A   That's true, yes.
9       Q   Okay.  And so now you had a new
10  potential risk that was really raised by the
11  epidemiology studies, and one of the questions
12  that you had to answer is, are those a
13  biologically plausible mechanism, right?
14       MR. LOCKE:  Objection.
15       THE WITNESS:  Yes.
16  BY MR. TISI:
17       Q   Okay.  And in light of that, did you
18  ever go back and say, Do we need to tighten up our
19  standards and to use a different measurement that
20  would make sure that we had, using your terms in
21  here, "eliminated asbestos"?
22       A   I guess I'm just aware that basically
23  the methods -- methodology used is still what is
24  used today --
25       Q   Right.

Page 554

1       A   -- and is used by USP.
2       Q   Did you go back and see whether or not
3  there are other methods that would guarantee that
4  asbestos had been eliminated -- well, let me
5  rephrase the question for you.
6       Is -- is it a -- would you agree with me
7  that the goal here is to eliminate asbestos from
8  cosmetic talc?  You don't want any asbestos in
9  cosmetic talc.  Would you agree with that?
10       A   That's the ideal.
11       Q   That's the ideal.
12       Particularly since this is a product
13  that honestly there are other -- it's a cosmetic,
14  and there are other alternatives out there, right?
15       MR. LOCKE:  Objection.
16       THE WITNESS:  You don't need talc to
17  live, yes.
18  BY MR. TISI:
19       Q   Right.  And to the extent you do need it
20  to live, there's corn starch, right?
21       MR. LOCKE:  Objection.
22       THE WITNESS:  There's alternatives, yes.
23  BY MR. TISI:
24       Q   Right.  And so the question is, in light
25  of that, you don't want any asbestos, none, zero.

Page 555

1  You want it eliminated.  True?
2       A   You want it to be very low.  My
3  understanding is the methodologies that are used,
4  it's actually gotten lower in detection limits,
5  and we are using what -- again, the equivalent of
6  a USP method.
7       Q   Okay.  All right.  Now, let's talk about
8  other aspects of this report, if we could.
9       First of all, can you -- I asked you
10  whether or not -- on the asbestos issue, whether
11  or not the company had ever gone back and -- the
12  companies that were the primary people here had
13  ever gone back and actually tested samples that it
14  had in its possession that went back decades, and
15  you indicated you didn't even know they had them,
16  right?
17       A   Right.
18       MR. LOCKE:  Objection.
19  BY MR. TISI:
20       Q   Were you able to produce to the FDA any
21  testing records, any -- any literature, any
22  outside audit, anything, that went back and looked
23  at talc being tested to demonstrate the
24  truthfulness of what Drs. Huncharek and Muscat
25  assumed, that asbestos had been eliminated?  Or

45  (Pages 552 to 555)

Linda Loretz, Ph.D.

Page 556

1  did you just make the statement?
2      A   I mean there was a great deal of testing
3  that went on in the early '70s --
4      Q   Right.
5      A   -- to show it was not detectable, and
6  that's what the specification says.
7      Q   Got you. From the 1970s. Now you're
8  meeting with them in -- in May of 2008. They're
9  asking you about asbestos. Right? So now we're
10 the '70s, '80s, '90s, 2000s, it's almost 30 years.
11         Between the 1970s and the 2000s, did you
12 come forward, either on your behalf or did any of
13 these companies come forward and say, Look, we're
14 going to show you proof that our talc from the
15 1970s forward did not have asbestos in it, or was
16 that statement just made?
17     A   I think it -- the basis of the statement
18 was, again, the work that had done -- been done in
19 the '70s to set up the specification. It was the
20 discussions that followed with FDA to talk -- to
21 answer the questions about sourcing and testing.
22     Q   Agreed.
23     A   I think if you're taking "elimination"
24 to mean a literal zero, I can't think of any
25 contaminant that anybody can say is a literal

Page 557

1  zero.
2      Q   So do you know -- did you take into
3  account whether or not talcum -- talcum powder
4  products have fragrances, right?
5      A   Yes.
6      Q   Did you look at the fragrances in there
7  to see whether that provided a biologically
8  plausible mechanism?
9          MR. LOCKE: When you say "look" -- "did
10 you look," are you referring --
11         MR. TISI: PCPC.
12 BY MR. TISI:
13     Q   Did PCPC, when it provided this report
14 to the -- to the -- to the FDA talking about
15 biologic plausibility, there's no way this
16 happens, right? When you said that to the FDA,
17 okay, did you consider whether or not what was in
18 the bottle contained other things that might
19 provide that mechanism?
20         MR. LOCKE: Objection.
21         THE WITNESS: I mean, I -- I think when
22 you're talking about fragrance, which we -- is
23 part of a lot of products, I mean, we do not think
24 of fragrances as being carcinogenic, not to
25 mention the whole thing about translocation, et

Page 558

1  cetera. I mean, the --
2  BY MR. TISI:
3      Q   Well, the FDA on the translocation issue
4  said that that's definitely biologically
5  plausible.
6      A   They did say that.
7      Q   Okay. So let's --
8      A   I'm not sure what their basis was
9  because they didn't reference, but they did say
10 that.
11     Q   Well, but you didn't reference proof
12 that there was -- okay. Let's -- so let's be fair
13 here. Okay.
14         You say the FDA didn't -- didn't
15 reference the support for a translocation. Fine.
16         What is your reference that in the
17 1980s, 1990s and 2000s, there was no contaminants
18 in talc, talcum powder products, that were
19 potentially biologically plausible mechanisms that
20 would explain what we all agree is a trend towards
21 an increased risk seen in the epidemiology
22 studies?
23         MR. LOCKE: Objection.
24         THE WITNESS: I mean there was no
25 evidence for talc itself. As I say, perfume

Page 559

1  fragrance is not regarded --
2  BY MR. TISI:
3      Q   You don't look at it.
4      A   -- as a carcinogen.
5      Q   You don't look at it. Did you?
6      A   We --
7      Q   Has there been a lot of discussion
8  about -- let me --
9      A   Fragrance in general. I mean it's used
10 in body lotion, it's used in -- as fragrance.
11 It's used in --
12     Q   Right, but it doesn't -- it doesn't --
13     A   It's not considered carcinogenic.
14     Q   -- it doesn't -- but is body lotion,
15 does that come in contact with your ovaries,
16 typically? Are there any epidemiology -- are
17 there any epidemiologies that's --
18     A   The components of fragrance are not
19 regarded as --
20     Q   Did you look?
21     A   Look at?
22     Q   Every component that was in the bottle,
23 did you look at each one of them and see whether
24 or not there was things that could be in that
25 bottle that provided a biologically plausible --

46 (Pages 556 to 559)

Linda Loretz, Ph.D.

Page 560

1  or did you look solely at pure talc?
2      A   I guess the -- the main thing I think of
3  is fragrance, and certainly we've been concerned
4  with fragrance and have an understanding of what
5  fragrance materials are, and --
6      Q   Do you know whether or not -- did -- did
7  you ask them whether it contains nickel and
8  chromium and silica or any of those other --
9  talcum powder comes from the ground, right?
10     A   Yes.
11     Q   Okay.  And those are things that are
12  not -- that are not desirable in talc either,
13  right?
14     A   Correct.
15     Q   Okay.  So my question is, your whole
16  premise for this opposition for Citizen's
17  Petition -- Dr. Epstein wanted a warning on talcum
18  powder products, which is everything in the
19  bottle.  Right?
20     A   Yes.
21     Q   Your response focused on talc.  Correct?
22         MR. LOCKE:  Objection.
23         THE WITNESS:  Which makes up the vast
24  majority of the product.
25  BY MR. TISI:

Page 561

1      Q   The vast majority of the product but not
2  all of the product.  Correct?
3      A   I mean, we -- we have other lines of
4  evidence, and our -- and -- and the arguments that
5  we make are -- I mean, we're not alone in this.
6  We're consistent that there is --
7      Q   I understand.  But there are other
8  people who think differently than you, right?  You
9  say you're not alone.  There are other scientists
10  who look at the evidence and think differently
11  than you.
12     A   As -- as we've discussed.
13     Q   And they weren't in the room when you
14  were discussing with the FDA, were they?
15     A   But, again, I -- I don't think we were
16  even having --
17     Q   No, they were -- they were not in the
18  room.
19         MR. LOCKE:  Let her finish the question.
20  BY MR. TISI:
21     Q   They were not -- only you were in the
22  room.  And --
23     A   But we submitted this -- these are our
24  arguments; they get posted on the website.
25     Q   Okay.

Page 562

1      A   If somebody wanted to address our
2  arguments and disagree with them, they could do
3  so.
4      Q   Okay.  So let's talk about -- let's just
5  go here, because I think this will be -- and then
6  we'll just break for lunch.  I think it's lunch.
7  Yeah, we'll break for lunch.
8         If you go to page -- if you go to
9  page 21 of the Introduction.
10     A   This is 21 --
11     Q   I'm sorry, 24 of 39 if you're looking at
12  the --
13     A   24 of 39, okay.
14     Q   So at the very last, it talks about
15  experimental studies and clinical trials.  Do you
16  see that?
17         It says:  "In the contest of human
18  studies, experimental design has come to represent
19  the gold standard of cause and effect relationship
20  as the randomized clinical trial."
21     A   Yes.
22     Q   Okay.  First of all, would you agree
23  with me -- I mean, you've done this for a long
24  time -- you would agree with me that it would be
25  both unfeasible and unethical to conduct a

Page 563

1  clinical trial where the hypothesis was, Let's
2  give people talcum powder products and see whether
3  it causes ovarian cancer.
4      A   Right.  That's not how you do studies.
5      Q   You can't do it.
6      A   Right.
7      Q   So you can't -- so a clinical trial, if
8  anyone were to kind of march on into court and
9  say, You know, there were no clinical trials, you
10  would expect to see clinical trials on this?
11     A   Correct.  That's not how it's done.
12     Q   Right.  So the next question is they
13  have to rely on epidemiology research.  Do you see
14  that?
15     A   Yes.
16     Q   Okay.  And they lay out a methodology
17  here.  It says:  "An epidemiologist must observe
18  observational methods to cause and effect
19  relationship that preclude direct intervention on
20  manipulation of study subjects."
21         That's experiments, right?
22     A   Yes.
23     Q   All right.  "Because of that fact,
24  criteria for establishing cause and effect
25  relationship are inherently different when

47 (Pages 560 to 563)

Linda Loretz, Ph.D.

Page 564

1  utilizing epidemiologic methods versus
2  experimental ones."
3         Do you see that?
4     A   Yes.
5     Q   Okay.  And so what they're saying is,
6  Look, you can't do a clinical trial because it's
7  unworkable, unethical.  You just can't do it.  So
8  you got to do it a different way.
9     A   Yes.
10    Q   Okay.  And one of the ways that they do
11 it, they describe a -- system or framework,
12 okay, and the framework is what we've called the
13 Bradford Hill criteria, and you've seen that
14 before?
15    A   Yes.
16    Q   And as somebody who's a scientist,
17 you're familiar with what that is?
18    A   Yes.
19    Q   Okay.  And just to be clear,
20 Dr. Huncharek and Muscat make it clear, but I want
21 to make clear that from -- PCPC agrees with it as
22 well, these are criteria that are not really
23 criteria.  They're -- they're considerations.
24    A   They're -- right.  Guidelines, I guess,
25 or -- right.

Page 565

1     Q   Right.  They're not things where you
2  kind of -- it's not like a menu where you check
3  off, Okay, we got this one, we got that one, we
4  got this one, right?
5     A   You use it for overall, right,
6  assessment.
7     Q   Right.  And they make that point.  They
8  say:  "The Hill criteria, as they've become known,
9  are not simply a checklist of requirements that
10 must be met in order to determine a cause and
11 effect relationship."
12        And that's true, right?
13    A   Yes.
14    Q   Okay.  And so these factors, and I think
15 they have nine of them here, are factors that are
16 considered, correct?
17    A   Yes.
18    Q   And -- and kind of what we were talking
19 about before that I think is really important to
20 kind of -- why this has been a debate is because
21 different scientists looking at the evidence have
22 come to different conclusions about these
23 different factors.
24    A   Okay.
25    Q   Is that true?

Page 566

1     A   I -- that's reasonable.
2     Q   Okay.  And that's not unusual in
3  science.  Right?
4     A   Correct.  Scientists disagree.
5     Q   I mean, for years there was a debate
6  about whether cigarette smoking causes cancer,
7  right?
8         MR. LOCKE:  Objection.  Beyond the
9  scope.
10        THE WITNESS:  Yeah, before my time.  I
11 think I've always known it, but yes.
12 BY MR. TISI:
13    Q   Right.  But you know that there was a
14 debate for decades on that question.
15        MR. LOCKE:  Same objection.
16        THE WITNESS:  I really don't.  So...
17 BY MR. TISI:
18    Q   You don't know that?
19    A   No.
20    Q   You must be much younger than me.
21        But you do know that -- that it is not
22 unusual for scientists to look at a question,
23 apply these factors, and come out with different
24 conclusions, correct?
25    A   Yes.

Page 567

1     Q   And so these are not criteria so much,
2  these Hill factors, as they are a framework of
3  considerations.
4         MR. LOCKE:  Objection.  Beyond the
5  scope.
6  BY MR. TISI:
7     Q   True?
8     A   "Framework" is what it says here.
9     Q   And you agree with that?
10    A   Yes.
11    Q   They also say something here that I --
12 that I want to see whether you agree with and you
13 agreed with at the time.
14        On page 26 of 29 -- well, one of the
15 things they say here is -- actually, let's go
16 back.
17        It says:  "Overview.  The possibility
18 that perineal talc exposure could be associated
19 with the development of ovarian cancer was
20 initially derived from a case controlled study
21 published in 1982."
22        Do you see that?
23    A   Yes.
24    Q   It's under "Overview."
25    A   Yeah, now I see it.

48  (Pages 564 to 567)

Linda Loretz, Ph.D.

Page 568

1    Q  "Since that time a number of additional
2  reports have addressed this question with most
3  showing odds ratio between 1.0 and 2.0."  Correct?
4    A  Yes.
5    Q  Okay.  That's -- that's between -- if we
6  were to -- and for jurors who don't understand
7  odds ratios, that's basically showing anything
8  from a 1 percent increase to 100 percent increase.
9    A  Correct.
10    Q  Okay.  2.0 would be a doubling of the
11  risk.
12    A  Correct.
13    Q  And that's what they call -- they call
14  this a weak effect.  Correct?
15    A  Yes.
16    Q  So just using the nomenclature that
17  Dr. Muscat and Huncharek used, they would
18  characterize something less than a hundred percent
19  doubling of the risk as being weak.
20    A  Per an epidemiology study, yes.
21    Q  Right.  But in practical reality, if you
22  find something that doubles your risk, that is a
23  clinically -- if it is a true cause, that's
24  clinically significant, correct?
25    A  If it --

Page 569

1    MR. LOCKE:  Objection.
2    THE WITNESS:  -- is a true cause.
3    MR. LOCKE:  Beyond the scope.
4  BY MR. LOCKE:
5    Q  If it is a true cause.  All right.
6    So now the question is, if you go to
7  page 23, they make the point, and they go out of
8  their way to make it, actually, because they say:
9  "It is important to point out that although an
10  association is weak" --
11    MR. LOCKE:  Just wait -- wait one
12  second.  You're referring to 23 at the top --
13    MR. TISI:  I'm sorry.  26 of 39,
14  correct.
15  BY MR. TISI:
16    Q  "It is important" -- it says on the
17  first full paragraph:  "It is important to point
18  out that although an association is weak" -- and
19  as they define "weak," that can include a doubling
20  of the risk, right?
21    A  Up to.
22    Q  Right.
23    -- "this does not rule out a causal
24  connection."  Do you agree with that?
25    A  That's what it says.

Page 570

1    Q  Do you agree with it?
2    MR. LOCKE:  Objection.  Beyond the
3  scope.
4  BY MR. TISI:
5    Q  On behalf of PCPC, is that something
6  that PCPC agreed with when they sent this to the
7  FDA?
8    MR. LOCKE:  Objection.  Beyond the
9  scope.
10    THE WITNESS:  We -- yes.
11  BY MR. TISI:
12    Q  Thank you.
13    Did PC -- they note down here that
14  obviously -- actually, let's skip that.
15    MR. LOCKE:  Is this a good time for a
16  lunch break?
17    MR. TISI:  Yeah, it's a good time to
18  break.
19    THE VIDEOGRAPHER:  The time is
20  12:32 p.m., and we're going off the record.
21    (Lunch recess.)
22    THE VIDEOGRAPHER:  The time is 1:12
23  p.m., and we are back on the record.
24  BY MR. TISI:
25    Q  Dr. Loretz, we were talking about the

Page 571

1  purity of talcum powder products that -- that's in
2  the bottle, and distinguishing it from talc in the
3  mine and et cetera, and before we took a break.
4  Do you remember that --
5    A  Yes.
6    Q  -- session?
7    I have a couple more questions about
8  that and the document, but before I do, the focus
9  of the PCPC response was to focus on the
10  carcinogenic -- carcinogenic -- I'm sorry, let me
11  say it again.
12    The focus of the biologic plausibility
13  aspect of Dr. Muscat and Huncharek's response was
14  focused on two things.  Number one, that talcum
15  powder products had been asbestos-free since
16  1970s, it had been eliminated.
17    Do you remember that?
18    A  Yes.
19    Q  Okay.  Number two is that pure talc did
20  not -- there was no evidence that pure talc was
21  a -- had a mechanism that would lend itself to the
22  suggestion that it was a cause of ovarian cancer.
23  Correct?
24    A  Right.
25    Q  Right.  So you were looking at asbestos,

49  (Pages 568 to 571)

Linda Loretz, Ph.D.

Page 572

1  not there anymore; and talc, not a problem.
2  Right?
3      A   Yes.
4      Q   Okay.  So -- but -- and we talked about
5  the question about whether or not talc really was
6  asbestos-free before the -- the break, and I'm not
7  going to go back into that again, but that was an
8  area of concern from the FDA's perspective, and
9  they raised it at the May meeting, May 2009.
10     A   And -- and I'm sure -- we responded by
11  letting them know that the testing that had been
12  done and continued to be done.
13     Q   Correct.  Using --
14     A   And their own testing as well that they
15  did.
16     Q   Using the 12 -- we'll talk about that in
17  a moment, but using the 20-year-old standards that
18  Dr. Bailey mentioned that they would be willing to
19  update.
20     A   Which --
21         MR. LOCKE:  Objection.
22  BY MR. TISI:
23     Q   Correct?
24     A   Which they -- which, again, are not
25  substantially different from what is used today

Page 573

1  by, for example, USP.
2      Q   Okay.  So we discussed asbestos and
3  talc, and I started getting into the question, but
4  you know what's in the bottle, it's not only
5  asbestos and talc.  Remember we started that
6  discussion before the break.
7      A   Yes.
8      Q   Okay.  And in fact, that had been
9  brought to your attention long before this
10 petition was filed that talcum powder products may
11 contain things that might or might not be
12 carcinogens.
13     A   Okay.
14     Q   Well, is that true?
15     A   I'm not sure what you're referring to.
16     Q   Well, I'm asking you that before I --
17     A   I mean in the specific --
18     Q   -- show you a document --
19     A   In the specification we have some limits
20 set for a few other possible contaminants.
21     Q   Well, had it ever been brought to your
22 attention that talcum -- you mentioned -- we
23 talked about fragrances, we talked about other
24 things.
25         Had it ever been brought to your

Page 574

1  attention that there are potentially other
2  components of talcum powder products, constituents
3  of talcum powder products, that need to be
4  considered when addressing the question as to
5  whether or not talcum powder products are a
6  potential cause of ovarian cancer?
7      A   Are you talking about constituent
8  ingredients or are you talking about constituent
9  impurities?
10     Q   Anything.  Anything in the --
11     A   I mean --
12     Q   You know, honestly, and I'm trying to be
13 -- I'm trying to be as expansive as I can in this
14 question.
15         What I'm saying is, if I go to Walmart
16 and pull a bottle of talcum powder, Johnson's Baby
17 Powder off the shelf, whether they're impurities
18 or whether they're intended ingredients or
19 whatever, there are other constituents in there
20 that have to be considered in the algorithm of
21 whether or not talcum powder products cause
22 ovarian cancer.  True?
23     A   There are impurities that are covered by
24 the specification, for example.
25     Q   Right.  But -- but so my -- my question,

Page 575

1  and I'm probably being inartful, so let me see if
2  I can phrase it.
3          We've previously discussed talcum powder
4  products as kind of this two-dimensional thing,
5  either it has asbestos or it doesn't have
6  asbestos.  Right?  So --
7      A   Okay.
8      Q   So I'm -- I'm kind of moving off that
9  because it's not that simple, is it?
10         MR. LOCKE:  Objection.
11 BY MR. TISI:
12     Q   The question about whether or not there
13 is a biologically plausible mechanism by -- that
14 would explain the epidemiology studies which
15 showed, as Dr. Huncharek and Muscat point --
16 pointed out, a risk between one and -- you know,
17 and a hundred percent, right?  One to two, what
18 you say is called mild.  The question should be
19 looked at comprehensively as to what is in the
20 bottle.
21         MR. LOCKE:  Objection.
22 BY MR. TISI:
23     Q   Right?
24     A   Yes, I'm not aware of anything that --
25     Q   Well, did you look?  I mean, the

50  (Pages 572 to 575)

Linda Loretz, Ph.D.

Page 576

1  question is this -- this report that was sent to
2  the FDA takes a very elemental view of the
3  question.  Prior to 1970, there was potential
4  contamination with asbestos.  It went out, and
5  what's left is talc.
6         MR. LOCKE:  Objection.
7  BY MR. TISI:
8      Q   And talc doesn't cause cancer.  That was
9  the essence of their argument, correct?
10        MR. LOCKE:  Objection.
11        THE WITNESS:  Well, no, I think there's
12  more in their arguments -- I mean --
13  BY MR. TISI:
14     Q   On the biologic plausibility issue, I
15  mean, they talked about dose-response and all that
16  stuff.  But I'm talking about on the biologic
17  plausibility, on the question of whether there is
18  a -- an explanation that makes sense as to why
19  there's this persistent increased risk, they
20  looked basically at asbestos in talc.
21        MR. LOCKE:  Objection.
22        THE WITNESS:  Yeah, I'm not sure what --
23  what other -- what else you wanted to be -- them
24  to address.
25  BY MR. TISI:

Page 577

1      Q   Well, are there other things, either
2  contaminants or intended ingredients, that should
3  be factored into the equation that should be not
4  addressed by their -- had -- let me rephrase the
5  question.  And I'm sorry, I'm not being artful
6  here.
7         Are there other constituents within
8  cosmetic talc that should be -- should have been
9  considered on this biologically plausible
10  mechanism issue that were not?
11     A   I -- I -- no, I'm not aware of --
12     Q   Okay.  But no other constituents were in
13  fact considered, right?
14     A   There's a specification that covers
15  some.
16     Q   Okay.  Were you ever made aware prior to
17  this time that there were other potential
18  constituents that had been classified as a
19  carcinogen other than asbestos?
20     A   No.
21     Q   I'm going to show you what I would like
22  to have marked as Exhibit No. 59.
23        (Exhibit No. 59 was marked for
24        identification.)
25        MR. TISI:  I'm sorry, didn't mean to

Page 578

1  throw it at you.
2  BY MR. TISI:
3      Q   I'm really going to only ask you about
4  the first page.
5      A   Mm-hmm.
6      Q   So just for the record, what this is,
7  this is a document from IMA Europe.  What is IMA?
8      A   Industrial Minerals Association.
9      Q   So it's another trade group like the
10  PCPC?
11     A   Correct.
12     Q   Okay.  It represents talc --
13     A   Mineral manufacturers, and talc is a
14  subset of that.
15     Q   Okay.  And it's to Dr. Muscat, correct?
16     A   Yes.
17     Q   Okay.  Is this the same Dr. Muscat who
18  wrote the report a couple of years later for you?
19     A   Yes.
20     Q   Robert Glenn at Crowell & Moring.  R.
21  Glenn.
22     A   I'm sure it is there.  I don't see it.
23     Q   It's right after Joshua Muscat.
24     A   Yep.  Yes.
25     Q   R. Glenn, Crowell & Moring, that's the

Page 579

1  lawyers for --
2      A   Yes.
3      Q   -- they represent the lawyers for -- for
4  Imerys.
5         Linda Loretz is you?
6      A   Yes.
7      Q   Eric Turner, which is Luzenac, which is
8  Imerys?
9      A   Yes.
10     Q   Jocelyn Ferret, which is Luzenac --
11     A   Yes.
12     Q   -- Imerys?
13        So -- and cc'd was Steve Mann for --
14  from J&J.  You see that?
15     A   Yes.
16     Q   And it's entitled "IARC, Dr. Huncharek
17  Comment."  Do you see that?
18     A   Yes.
19     Q   Okay.  And this is February 13th, 2006.
20  This was during the IARC proceedings?
21     A   Okay.  Yes.
22     Q   Is that right?
23     A   I would assume so, yes.
24     Q   And it's an e-mail from IMA North
25  America to Joshua Muscat, who was the industry

51 (Pages 576 to 579)

Linda Loretz, Ph.D.

Page 580

1    representative at IARC at the time.
2        A   Correct.
3        Q   Yes?
4        A   Yes.
5        Q   And it says: "What should be
6    acknowledged is the difference between cosmetic
7    talc grade, i.e., grade of talc, pure and
8    extremely white, sold by talc producers at the
9    gate of the mine" -- right?
10       A   Yes.
11       Q   -- "and cosmetic baby or body talc
12   powder, i.e., loose powder manufactured by
13   cosmetic manufacturers containing talc or corn
14   starch, and also in the case of other minerals,
15   kaolin, Ti02, and all case additives such as
16   perfumes and biocides, hexachlorophene in the
17   past, a Category 3 IARC carcinogen" -- I won't
18   even pronounce that -- imidazolidinyl urea" -- I
19   don't know how to pronounce that -- "triclosan, et
20   cetera. See documents sent by Jocelyn Ferret this
21   morning."
22       A   Uh-huh.
23       Q   Okay.  And the point that's being made
24   here -- and, first of all, you got this.  The
25   point that's being made here is one of the things

Page 581

1    that really ought to be considered when you're
2    talking about talcum powder products and the risk
3    of ovarian cancer, you need to think about not
4    only what comes out of the mine but what's in the
5    bottle.
6        MR. LOCKE:  Objection.
7    BY MR. TISI:
8        Q   Right?
9        A   Okay.
10       Q   Well, I mean, I'm asking you whether you
11   agree with that or not.
12       A   I can agree with that without thinking
13   that this explains anything.
14       Q   Okay.
15       A   Yes.
16       Q   Okay.
17       A   I mean you think about -- when you think
18   about safety of a product --
19       Q   Well, I'll take it and I'll put it aside
20   then.
21       A   No, I'm just saying when you think about
22   safety of a product, you think about everything in
23   the product.  So...
24       Q   Well, that's right.  And -- and that's
25   kind of where I'm going here.

Page 582

1        When you filed your response to the
2    Citizen's Petition, and addressed the issue of
3    biologically plausible mechanisms, did you ask
4    Dr. Muscat and Huncharek to look at each of the
5    constituents in cosmetic talc sold in talcum
6    powder products and see whether or not they
7    individually or collectively might explain the
8    increased risk?
9        A   I think the other ingredients that are
10   used in talc are not carcinogenic.
11       Q   Well, did you -- what are the other
12   talcs -- did you ask J&J to provide you with a
13   list of -- list of products using talc?
14       A   List of ingredients used in talc?
15       Q   List of ingredients of talc.
16       A   No.
17       Q   Okay.  So how do you know that none of
18   them are carcinogenic?
19       A   We don't use carcinogens in cosmetics.
20       Q   You don't know what was in the talc that
21   you were talking about with -- with the FDA, do
22   you?
23       MR. LOCKE:  Objection.
24   BY MR. TISI:
25       Q   I mean -- I understand that

Page 583

1    aspirationally you don't want to have
2    carcinogen -- carcinogens in the talc that you
3    sell to women who may use them to dust themselves.
4    I -- I understand that that might be an
5    aspiration.
6        But in light of the fact that this issue
7    had been pending for decades, and now was firmly
8    before the FDA in the Citizen's Petition, do you
9    think that it might have been prudent to identify,
10   just as was identified in this document I showed
11   you, Exhibit No. 59, what all the constituents are
12   in order to do a searching analysis of whether or
13   not there was something in the talc that might be
14   responsible for this increased risk?
15       MR. LOCKE:  Objection.
16       THE WITNESS:  I mean, I guess, you know,
17   I can look at this, and I recognize these
18   ingredients, and --
19   BY MR. TISI:
20       Q   Well, these are some of them and there
21   may be others.  I mean you -- what about did you
22   know how much silica was in the -- if any, was in
23   the talcum?
24       A   There's specifications.
25       Q   I understand the specifications.  Apart

52 (Pages 580 to 583)

Linda Loretz, Ph.D.

Page 584

1  from the specifications, do you know how much
2  silica there was?
3     A   No.
4     Q   Do you know how much magnesium there
5  was?
6     A   I'm not sure that's regarded as a
7  carcinogen.
8     Q   What about nickel?
9     A   I know there was at one point, there was
10  a report and it was our understanding, because
11  this is what we were told, that it was bound up in
12  the talc and not free nickel.
13     Q   Well, who told you that?
14     A   I think it was J&J.
15     Q   Okay.  What about -- what about
16  silica -- is nickel a carcinogen?
17     A   I don't believe it's recognized as an
18  ovarian carcinogen, but I'm -- I'm not an expert
19  on nickel cariogenicity.
20     Q   Okay.  If there -- if there was nickel,
21  it would be something that you would want to look
22  at, right?
23     A   I think it depends.
24        MR. LOCKE:  Objection.
25        THE WITNESS:  I mean --

Page 585

1  BY MR. TISI:
2     Q   Well, my -- my larger point here,
3  Doctor -- and, you know, I don't want to belabor
4  the issue -- is when you responded to the FDA, the
5  Citizen's Petition, there is nothing in this
6  response that addresses the potential of any
7  contaminants in the product, even ones that meet
8  specifications.  Is there?
9        MR. LOCKE:  Are you referring solely to
10  biological plausibility?
11  BY MR. TISI:
12     Q   On the biologic plausibility issue,
13  there's no discussion at all, nickel, chromium,
14  silica, asbestos to the extent that's in it since
15  the 1970s, there's no discussion of that, is
16  there?
17     A   Because those weren't recognized as
18  being risks.  Just as I state some of these are
19  not --
20     Q   Okay.  And that's -- it was not part of
21  Dr. Huncharek and -- and Muscat's analysis to the
22  FDA, right?
23        MR. LOCKE:  Objection.
24  BY MR. TISI:
25     Q   They did not mention those other

Page 586

1  constituents, right?
2     A   I believe that's true.
3     Q   And they did not talk about any of the
4  fragrance or any of the other issues that are in
5  there, correct?
6     A   For the same reason.
7     Q   Okay.  Talk about cobalt?
8     A   No.
9     Q   Arsenic?
10     A   There is a specification for arsenic.
11     Q   Right.  But saying something has a
12  specification does not mean that it's absent,
13  correct?
14     A   Right.  I mean there's a specification
15  set, I believe it's 3 parts -- I believe it's 3
16  parts per billion.
17     Q   Right.
18     A   So it could be up to that.
19     Q   So when you say something meets
20  specifications, the specifications are only as
21  good as the sensitivity and specificity of the
22  test that's being used.
23     A   Well, the specifications are designed to
24  set a level that would be acceptable, i.e., safe,
25  and the method that goes with that should be

Page 587

1  designed to --
2     Q   And did --
3     A   -- test at that level.
4     Q   And did you -- because you were involved
5  with working with those standards, right, and
6  helping develop those standards, right?
7     A   Oh, no, that was before my time.
8     Q   Okay.  Well, I didn't mean you.  I meant
9  PCPC.
10     A   PCPC, yeah, absolutely.
11     Q   I was putting the PCPC hat on.
12     A   Okay.  Sorry.  Got it.
13     Q   All of those specifications were
14  developed before the epidemiological studies on
15  ovarian cancer, true?
16     A   Developed but then updated, post.
17     Q   I guess my question is, did any of
18  those -- were any of those specifications, to your
19  knowledge, analyzed by PCPC in the context of
20  looking for biologically plausible mechanisms for
21  ovarian cancer?
22     A   I guess I'd go back to, I can see a
23  listing here that it just --
24     Q   I didn't ask you that question.  You
25  told me that you could answer the question without

53 (Pages 584 to 587)

Linda Loretz, Ph.D.

Page 588

1    looking at that document.
2       A   Okay.
3       Q   So I'm not looking at that document.
4       A   Okay.
5       Q   My question is, did you -- did PCPC in
6    the 2000s, while these epidemiological studies
7    were being published, analyze the specifications
8    for the elimination of these other constituents in
9    light of those epidemiology -- epidemiological
10   studies?
11      A   We -- no, we were not aware of other
12   contaminants and/or ingredients that seemed to
13   offer a biological plausible reason for the cause
14   of ovarian cancer.
15      Q   Well, cobalt might, right?  Did you look
16   at the cobalt -- cobalt standards in connection
17   with ovarian cancer -- your standards?
18      A   I was --
19          MR. LOCKE:  Objection.
20          THE WITNESS:  I would say we had no
21   information that the cobalt contamination was a
22   problem, and I'm not aware that cobalt has been
23   implicated in ovarian cancer, although --
24   BY MR. TISI:
25      Q   Arsenic.

Page 589

1       A   -- I'm not an expert.
2       Q   Arsenic.
3       A   There's a specification for that.
4       Q   Did you analyze that specification in
5    light of the -- the reported epidemiology results
6    of ovarian cancer in talc?
7       A   I feel pretty comfortable saying that
8    the specification would -- would be okay, and I'm
9    not aware that arsenic has been implicated as an
10   ovarian carcinogen.
11      Q   It didn't -- are they carcinogens?
12   Would it be something that would have been to be
13   looked at in light of the epidemiological studies?
14          MR. LOCKE:  Objection.
15          THE WITNESS:  I'm not sure that offers a
16   biologically plausible explanation.
17   BY MR. TISI:
18      Q   So the fact that something -- okay.
19   All right.  One other question.
20          (Counsel conferring.)
21      Q   All right.  Let's go to Exhibit No. --
22   okay.
23          Now, I just want to go back to something
24   I discussed earlier today and see if I can -- this
25   was the document I was having printed.  It's not

Page 590

1    quite here yet.
2       A   Okay.
3       Q   So we'll put it up on the screen and
4    have it.
5          Dr. Epstein had previously filed a
6    Citizen's Petition before the FDA in the 1990s on
7    this issue, correct?
8       A   Yes.
9       Q   And at that time who did that petition
10   go to, do you know?
11      A   John Bailey, I believe.
12      Q   While he was at the FDA?
13      A   I believe so, yes.
14      Q   And did the FDA ever respond to that?
15      A   Yes, they rejected that petition.
16      Q   Well, didn't they -- didn't Dr. Bailey
17   write a letter to Mr. -- to Dr. Epstein that
18   said -- and we'll bring it up here.
19          MR. TISI:  Can we bring it up, please?
20          MR. GOLOMB:  I don't --
21          MR. TISI:  Well, we'll attach it as an
22   exhibit.  No, that's it.  Oh, is that it?  No --
23   yeah.
24   BY MR. TISI:
25      Q   The last -- it's dated July 21st, 1995,

Page 591

1    and that's Dr. Bailey who wrote that --
2          MR. TISI:  Can you make that --
3    BY MR. TISI:
4       Q   -- and his response was --
5          MR. TISI:  Go the second paragraph,
6    please.
7          MR. GOLOMB:  Second one?
8          MR. TISI:  Mm-hmm.
9    BY MR. TISI:
10      Q   "The purpose of this is to advise you,
11   in accordance with 21 CFR 10.30(e)(2), that we
12   have not been able to reach a decision on your
13   petition within the first 180 days of the filing
14   of the petition because of limited availability of
15   resources and other agency priorities."
16          Is that accurate?
17      A   Yes.
18      Q   Okay.  And this Citizen's Petition, the
19   one we've been talking about all day, wasn't
20   responded to for five years.  Correct?
21      A   Yes.
22      Q   And that's the same division that
23   considered the first one, right?
24      A   Well, I'm not sure when the response
25   came to the first one.  I mean the 180 days and

54 (Pages 588 to 591)

Linda Loretz, Ph.D.

Page 592

1  that is -- I think it's pretty typical for
2  petitions that they, I believe, have some
3  obligation to respond, but that response can be to
4  say that we're not -- we're not done yet.
5          (Exhibit No. 60 was subsequently
6          marked for identification.)
7  BY MR. TISI:
8      Q   Okay.  I'm going to mark it as
9  Exhibit No. 60 when we get it.
10         So let me ask you this:  I'm going to go
11  through each year, and I'm going to ask you, you
12  responded to the FDA questions that they asked
13  you, correct, at this May 9th --
14     A   Yes.
15     Q   -- meeting?
16         Did PCPC in 2009, other than this
17  meeting, have any communications directly or
18  indirectly with FDA relating to asbestos in talc
19  other than responding to the questions?
20     A   You can refresh my memory if there's
21  any.  I -- I can't recall any.
22     Q   This is -- you can't recall any.
23         2009, did PCPC have any direct or
24  indirect communications with FDA regarding the
25  issue of talc and ovarian cancer?

Page 593

1          MR. LOCKE:  Other than what we've
2  discussed?
3          MR. TISI:  Other than what we -- I'm
4  sorry, I meant to say 2010.  I'm sorry.
5          THE WITNESS:  That's what I was confused
6  on.  I was trying to --
7  BY MR. TISI:
8      Q   Yeah, I'm sorry.
9      A   -- decide if you --
10     Q   Yeah.  No, no, it was --
11     A   Okay.  Got it.
12     Q   It was a mistake.
13     A   Okay.
14     Q   Just to be clear, let me -- I'm going to
15  go through each year --
16     A   Okay.
17     Q   -- and I want to find out what your
18  communications were in each year.
19     A   That's what I thought you were doing.
20  Okay.
21     Q   So 2010.
22     A   I want to be careful not to forget
23  something.  So the question was anything to do
24  with --
25     Q   Let's -- I want to ask you two separate

Page 594

1  questions.
2      A   Okay.
3      Q   The first question is going to be
4  communications with the FDA on talc and ovarian
5  cancer association or risk.
6          And the second question is going to be
7  on specifications for talc, and particularly with
8  regard to asbestos.  Okay?
9          So the first question, in 2010, do you
10  recall any question or any communications with FDA
11  regarding the issue of ovarian cancer and talc?
12     A   I don't recall any, no.
13     Q   Any communications with the FDA on any
14  specifications for issues relating to asbestos or
15  levels of asbestos in talc?
16     A   Not that I recall.
17     Q   Okay.  2011, same two questions.  If you
18  want, I'll separate them out.
19     A   I'm just trying to make sure I'm not
20  forgetting something.  I don't recall, no.
21     Q   2012?
22     A   And again, the question was on
23  asbestos --
24     Q   It was on the association between
25  ovarian cancer and talc or the asbestos levels or

Page 595

1  specifications for talc.
2      A   And did you say meetings?
3      Q   Any communications directly or
4  indirectly.
5      A   I guess --
6      Q   I guess what I'm trying to do in kind of
7  a summary fashion is to ask you about any
8  communications.  These are the ones that I've been
9  able to find.  I found -- you know, I can go
10  through your answers --
11     A   Mm-hmm.
12     Q   -- to the FDA questions and do that.
13     A   Mm-hmm.
14     Q   Other than that.
15     A   Yeah, and I'm just trying to be careful
16  so I'm being -- being accurate.
17     Q   Yeah.
18     A   And I can say I'm not aware of any.  I
19  know in 2000 -- when FDA, for example, did their
20  sampling plan, could someone in meeting with the
21  FDA on something else asked a question, how's it
22  going, you know, that's possible.  But a meeting
23  specific to that or something -- some deep
24  discussions or work on a specification, not that
25  I'm aware of.

55 (Pages 592 to 595)

Linda Loretz, Ph.D.

Page 596

1      Q   Okay.  Let me see if I can ask it this
2   way, since we got down 2011.
3          When is the next time, if ever, PCPC
4   directly or indirectly spoke to the FDA about talc
5   and ovarian cancer?
6      A   I'm just trying to think if I'm
7   forgetting anything.
8          I'm -- I'm not recalling.  Again, there
9   was the -- FDA did the assessment on the asbestos.
10  There could have been conversations.  I --
11     Q   Anything that you -- that you know of as
12  you sit here right now, anything to -- and are
13  prepared to testify to as a -- as a representative
14  of PCPC?
15     A   Not that I can think of.
16     Q   Okay.  When is the next time you talked
17  about asbestos levels in talcum powder products or
18  asbestos testing in talcum powder products, if
19  ever?
20         MR. LOCKE:  With the FDA?
21         MR. TISI:  With the FDA.
22         THE WITNESS:  Oh, we're aware that FDA
23  did their study, and we're aware, I mean, that our
24  members test in a -- on an ongoing basis.
25  BY MR. TISI:

Page 597

1      Q   Well, okay, let's -- since you raised
2   that issue, FDA did a sampling of -- of certain
3   products bought in the Washington, D.C. area, I
4   think they said five out of nine, they -- there
5   was -- that wasn't a study, was it?  That wasn't a
6   study, correct?
7      A   They -- they --
8          MR. LOCKE:  Objection.
9          THE WITNESS:  Yeah, that's not exactly
10  what they did.  They did -- I think they did from
11  suppliers, and then they did 30-some products off
12  the shelf.
13  BY MR. TISI:
14     Q   Right.  But they -- the FDA admitted
15  that that was not a --
16     A   The FDA said it's not exhaustive.
17     Q   It's not -- they -- they went further
18  than that.  They said it was not -- they could not
19  guarantee that this was a true sampling of talcum
20  powder products out there, correct?
21         MR. LOCKE:  Objection.
22         THE WITNESS:  They said it was not --
23  not a final answer, yes.
24  BY MR. TISI:
25     Q   Right.  And in that context, did you

Page 598

1   discuss with your members whether you had a more
2   fulsome survey that could be conducted either of
3   currently marketed products or of, you know,
4   samples that had been stored over time?
5      A   No, I think our answers -- when we
6   answered FDA to their questions about testing, et
7   cetera, I think -- I mean, that addressed it kind
8   of in an ongoing way.  So --
9      Q   Okay.  You basically said, We tested it
10  as we always did?
11     A   Yeah.
12     Q   So, as I understand it, from -- do you
13  know who Susan Nicholson is from J&J?
14     A   Nettesheim?
15     Q   No, Nicholson.
16     A   Oh, no.
17     Q   I understand that J&J had a meeting with
18  FDA in 2018.  Do you know anything about that?
19     A   That would be this year.
20     Q   That would be this year.
21     A   No.
22     Q   Do you know of any communications that
23  the company had with FDA about the lawsuits that
24  have been pending and verdicts that have been
25  obtained against the manufacturers of talc --

Page 599

1      A   I do not.
2      Q   -- and talc products?
3          MR. LOCKE:  Well, just to clarify, when
4   you say "the company," you're talking about J&J?
5          MR. TISI:  J&J.
6          THE WITNESS:  No.
7   BY MR. TISI:
8      Q   Or -- or Imerys.
9          Are you aware of any communications
10  about the lawsuits that have --
11     A   That those companies have had with FDA?
12     Q   Yes.
13     A   No.
14     Q   Okay.  So other -- the last meeting that
15  you know of that you had that was formally or
16  informally with the FDA on the issues of talcum
17  powder products and ovarian cancer was in May of
18  2008?
19         MR. LOCKE:  '9.
20         THE WITNESS:  '9.
21  BY MR. TISI:
22     Q   '9.  I'm doing what -- what Dr. Bailey
23  did.  Sorry.
24         Just to be clear, the last time that
25  you're aware of that PCPC had any direct contact

56 (Pages 596 to 599)

Linda Loretz, Ph.D.

Page 600

1  with the FDA, either directly or indirectly, was
2  the meeting in May of 2009, and any follow-up to
3  that meeting that was requested by the FDA?
4      A   Something specific to that topic. As I
5  say, it doesn't mean there weren't -- you know,
6  when FDA unveiled their results about talc
7  testing, it doesn't mean somebody didn't ask a
8  question or whatever, but --
9      Q   Well, do you know of any questions they
10 might have asked?
11     A   No, I don't.
12     Q   Okay. Okay.
13     A   But, I mean, we have FDA, for example,
14 presents at kind of our meetings sometimes. I
15 could see a question being asked. I just --
16     Q   But you don't know of any.
17     A   No, I do not.
18     Q   All right. So let's go to the second
19 question, the second area that I said we would
20 cover, which is studies and consultants.
21     A   Okay.
22     Q   I'm kind of done with the Citizens
23 Petitions --
24     A   Okay.
25     Q   -- and contacts with the FDA issue.

Page 601

1      A   Okay.
2      Q   Let's start in the 1990s. I'm going to
3  go back to Exhibit No. 47, which is the notes from
4  April 12th, 1994.
5      A   Okay.
6      Q   And that's the task force document.
7      A   Yes.
8      Q   And just -- you may have mentioned this
9  the last time in your deposition, and I'm sorry,
10 I'm trying not to retread old ground, but can you
11 tell us what the task force was?
12     A   So this is the Talc Interested Party
13 Task Force, so these are specifically people who
14 have an interest in talc and are willing to pay
15 for projects as well when required. And these are
16 just the member companies, again, with an interest
17 in the topic.
18     Q   Okay. And listed on this document are
19 Johnson & Johnson, Luzenac, American Westminster,
20 is that --
21     A   I don't know.
22     Q   I don't know that either.
23         -- Procter & Gamble Company, Cosmair,
24 Colgate Palmolive, Helene Curtis, and then CTFA,
25 which is PCPC.

Page 602

1      A   Correct.
2      Q   Now, if go to page 2, there's a section
3  called "Manuscript Reviews." Do you see that?
4      A   Okay. Yes.
5      Q   And the second bullet point says: "The
6  meta-analysis manuscript -- manuscript prepared by
7  Dr. Gross, "and it has a number, "was discussed.
8  It was agreed on the scientific content of the
9  manuscript was good, but the format lacked
10 clarity," and it goes on and on. Do you see that?
11     A   Yes.
12     Q   Okay. Are you familiar with the study
13 by Dr. Gross?
14     A   I saw the manuscript in my preparation
15 for this deposition.
16     Q   Now, I'm going to show you there was a
17 published article by Gross and Berg. Have you
18 seen that?
19     A   I think that sounds familiar.
20     Q   May I see --
21         (Counsel conferring.)
22 BY MR. TISI:
23     Q   Okay. I'm going to mark this as Exhibit
24 No. 61, and I'm actually going to give you 62,
25 which is I think the manuscript that you just may

Page 603

1  have referred to.
2         (Exhibit Nos. 61 and 62 were
3         marked for identification.)
4         MR. TISI: Here is your copy. And here
5  is 62.
6  BY MR. TISI:
7      Q   Now, 61 is the published article,
8  correct?
9      A   Yes.
10     Q   And 62 is the internal report, right?
11     A   Oh, I'm sorry. I haven't seen 62 yet.
12         Yes.
13     Q   So one is titled -- the memorandum is
14 entitled "Meta-Analysis." Right?
15     A   Yes.
16     Q   Okay. And you all paid, at least in
17 part, for this, right?
18     A   I believe so, yes.
19     Q   And if you go to the back, the draft
20 paper, the one that was not published, and you go
21 to page 33, it says: "Financial support for this
22 study was provided in part by the Cosmetic
23 Toiletry and Fragrance Association."
24     A   Yes.
25     Q   Now --

57 (Pages 600 to 603)

Linda Loretz, Ph.D.

Page 604

1    MR. GOLOMB: Wait, Chris, the document
2  is not up yet.
3  BY MR. TISI:
4    Q   If you go to page --
5    MR. GOLOMB: That's the wrong document.
6    MR. TISI: 62, yeah.
7    Yeah, that's right, go to the very end.
8  It's the Bates 188.
9  BY MR. TISI:
10   Q   And the Acknowledgment section
11 acknowledges what I think you told us in your
12 interrogatories: "The financial support for this
13 study is provided in part by the Cosmetic,
14 Toiletry and Fragrance Association, correct?
15   A   Yes.
16   Q   Okay. Now, the report actually went
17 through peer review, right, and actually was
18 published?
19   A   It looks that way, yes.
20   Q   Yeah. And when it was published, did
21 you ask -- did PCPC ask that their name be taken
22 off the acknowledgment? Because they're not on
23 the acknowledgment of the published paper.
24   A   I see that J&J is.
25   I -- I don't know what happened on that

Page 605

1  funding.
2    Q   Well, let's go to the published paper
3  and see what the published paper says. Okay?
4    A   Mm-hmm.
5    Q   The one that actually went through peer
6  review. Right?
7    A   Yes.
8    Q   Okay. First of all, and this -- so that
9  the jury understands, this is dated 1995.
10   A   Okay.
11   Q   This is some 10 -- 13 years before
12 the -- before the Citizen's Petition.
13   A   Okay.
14   Q   Right?
15   A   Yes.
16   Q   And so this is -- it says: "The concern
17 that use of talc or talc" -- this is the first
18 sentence of the abstract -- "the concern that use
19 of talc or talc-containing substances in the
20 perineal region of women may subject them to an
21 increased risk of ovarian cancer has become an
22 important issue in the study of ovarian cancer."
23   Is that -- did I read that correct?
24   A   That's what it says, yes.
25   Q   And that's true, right?

Page 606

1    A   As we've discussed, yes.
2    Q   And that reflects -- and if you go back
3  to my chart here, my -- my timeline, this reflects
4  the concerns that talcum powder products may cause
5  ovarian cancer, and there was an active debate
6  among scientists. That was the concept we talked
7  about earlier.
8    A   Yes.
9    Q   If you go to page --
10   MR. TISI: I'm sorry?
11   (Counsel conferring.)
12   Q   Okay. Let's go back to -- if you go to
13 page 192 of the study, the Discussion section.
14   A   I'm sorry. Which one?
15   MR. LOCKE: 192.
16   THE WITNESS: I know. Which document?
17 BY MR. TISI:
18   Q   The actual published study.
19   A   Okay.
20   Q   The authors -- and these are people who
21 were hired by -- paid for by you all, right?
22   A   Again, I'm a little confused because it
23 says J&J.
24   Q   Okay. But J&J was actually the -- you
25 know --

Page 607

1    A   Certainly part of, right, industry.
2    Q   Right. So the discussion says:
3  "Existing evidence linking talc exposure to an
4  increased risk of ovarian cancer cannot be viewed
5  as scientifically conclusive based upon the
6  available epidemiological studies." Right?
7    A   Mm-hmm. Yes.
8    Q   Is it your view that the evidence must
9  be conclusive before women are told of the
10 potential risk in a cosmetic product?
11   MR. LOCKE: Objection. Beyond the scope
12 and to form.
13 BY MR. TISI:
14   Q   You may answer the question. Must the
15 evidence be conclusive before women are told of
16 the potential risk?
17   MR. LOCKE: Same objection.
18   THE WITNESS: Yeah, I -- I --
19 BY MR. TISI:
20   Q   You know that the standard is that -- we
21 talked about this early on in the deposition --
22 the standard is warnings should be added when
23 there may be a risk, correct?
24   MR. LOCKE: Objection. Beyond the scope
25 and form.

58 (Pages 604 to 607)

Linda Loretz, Ph.D.

| | Page 608 |
|---|---|

1  BY MR. TISI:
2      Q   You're told -- you know that, right?
3          MR. LOCKE:  Same objection.
4  BY MR. TISI:
5      Q   You actually publish -- PCPC publishes a
6  labeling book for its members, correct?
7          MR. LOCKE:  Objection.
8          THE WITNESS:  The labeling book deals
9  with current labeling requirements.
10  BY MR. TISI:
11      Q   Right.  And you know that warnings
12  should be added when there may be a risk, correct?
13          MR. LOCKE:  Objection.  Beyond the scope
14  and to form.
15          THE WITNESS:  Yeah, that seems like a
16  legal labeling issue that's not anything --
17  BY MR. TISI:
18      Q   But you were responding to a Citizen's
19  Petition regarding labeling, right?  You were
20  responding to that?
21      A   We were responding to the science piece
22  of --
23      Q   Right.  And I asked you what the
24  standard was because doctor -- Dr. Epstein was
25  asking for a label change.  Right?

| | Page 609 |
|---|---|

1          MR. LOCKE:  You're asking her what you
2  asked her?
3  BY MR. TISI:
4      Q   No, I -- you know that Dr. Epstein was
5  asking for a label change to add a warning about a
6  potential risk, right?
7      A   I know that that's what he was asking
8  for, correct.
9      Q   And you responded and opposed that,
10  correct?
11          MR. LOCKE:  Objection.
12          THE WITNESS:  Based on the science.
13  BY MR. TISI:
14      Q   Right.  And I asked you before, did you
15  know the standard, correct?
16      A   And I think I said I didn't, that that
17  was a legal --
18      Q   Okay.  And so you responded to the
19  petition not knowing what the standard was.
20          MR. LOCKE:  Objection.
21          THE WITNESS:  We responded by offering
22  scientific -- expert epidemiologists' opinion on
23  what the epidemiology shows.
24  BY MR. TISI:
25      Q   Now, at the last sentence here, Dr. Berg

| | Page 610 |
|---|---|

1  says: "However, all the meta-analysis arrive at a
2  relative risk rate of 1 with a 95 percent
3  confidence interval excluding the null."
4          That's basically saying that all the
5  meta-analysis done as of that time showed an
6  increased risk, correct?
7          MR. LOCKE:  Objection.
8          THE WITNESS:  Well, that's the
9  meta-analysis.  That's not the individual studies.
10  BY MR. TISI:
11      Q   The purpose of a meta-analysis is to
12  combine studies to increase the power of a study
13  to determine a risk, right?
14          MR. LOCKE:  Objection.
15          THE WITNESS:  I mean I'm not an
16  epidemiologist, but I would say, yes, that's their
17  basic purpose.
18  BY MR. TISI:
19      Q   And the last page on page 193, and this
20  is of a 1995 article funded by you all.
21          MR. LOCKE:  Objection.
22          THE WITNESS:  Oh, yeah, it's -- I'm not
23  sure what happened here.  The authors changed, the
24  things changed, and the -- the acknowledgments
25  changed.  So I -- I don't want to say this was

| | Page 611 |
|---|---|

1  funded by PCPC.  That's not what it says.  And
2  there's definitely a change in authorship here, so
3  things changed.
4  BY MR. TISI:
5      Q   The last sentence says:  "The -- thus,
6  the body of knowledge found in the medical
7  literature does not unequivocally support the
8  hypothesis that talc use puts women at an
9  increased risk of ovarian cancer.  However, the
10  results of this meta-analysis do suggest the
11  possibility of an increased ovarian cancer due to
12  peritoneal -- perineal talc use."
13          Do you see that?
14      A   Yes.
15      Q   And these were the same authors at least
16  that were the people that you all hired to do a
17  meta-analysis, correct?
18      A   Well, I think we hired Dr. Gross, but I
19  don't think we hired Dr. Berg, so that's why I'm
20  saying I'm not sure.
21      Q   And Dr. Berg -- Dr. Berg, I will
22  represent to you, was -- was a doctoral student of
23  Dr. Gross.  And that's made clear in other
24  documents.
25      A   Okay.

Linda Loretz, Ph.D.

| Page 612 | Page 614 |
|---|---|
| 1    Q   He was basically given coauthorship, but<br>2  it was really Dr. Gross.<br>3        So can you say -- these appear to be the<br>4  same.  This one is March 17, 1994.  This<br>5  meta-analysis -- published meta-analysis is 1995.<br>6  One says it's sponsored by J&J, the other one says<br>7  CTFA.<br>8        Do you agree that this is likely the<br>9  same study?<br>10   A   I think it looks like it's related, yes.<br>11   Q   Okay.  So this is one study that you<br>12  authored -- that you were involved with.<br>13       Let's go through another one.<br>14   MR. LOCKE:  Objection.<br>15 BY MR. TISI:<br>16   Q   Let's go back to the task force<br>17  document.  1994.<br>18       The last page, number 4 under the --<br>19  this is under a heading entitled "Future Research<br>20  Needs."  Do you see that?<br>21   A   The last page?<br>22   Q   If you go to page --<br>23   A   I see "Future Research Needs."<br>24   Q   Right.  And if you go to the last page,<br>25  number 4. | 1  that?<br>2    A   Yes.<br>3    Q   And at this time frame, as in others,<br>4  this was an important issue, right?  That's why<br>5  you guys were meeting.<br>6    A   That's what we were talking about, yes.<br>7    Q   And other than the Berg article which we<br>8  just discussed, are you aware of any industry-<br>9  sponsored epidemiological study or meta-analysis<br>10  that actually looked at the question specifically<br>11  of whether ovarian cancer and talc were related?<br>12   A   Industry study, no.<br>13   Q   Given the importance of the issue, don't<br>14  you find that a little odd?<br>15       MR. LOCKE:  Objection.<br>16 BY MR. TISI:<br>17   Q   It was discussed, right, should we do a<br>18  study?<br>19   A   Right.  I don't know what the follow-up<br>20  was, but, I mean, I guess the question is, is it<br>21  going to make a difference and is it going to be<br>22  criticized for being an industry study?<br>23   Q   Well, if the industry study found what<br>24  everyone else said, then everyone would be on the<br>25  same table, right?  They would all -- everyone |

| Page 613 | Page 615 |
|---|---|
| 1    A   Okay.<br>2    Q   Okay.  Do you see that?<br>3    A   Yes.<br>4    Q   It says -- I don't know who MNordhauser<br>5  is, but that seems to be a person, right?<br>6    A   I think it's Mary Ann Nordhauser.<br>7    Q   Okay.  She pointed out: "The importance<br>8  of considering other research directions in which<br>9  the task force should be involved.  Ms. Nordhauser<br>10  suggested the task force consider sponsoring<br>11  further epidemiological studies.  It was noted<br>12  that Dr. Ernst Wynder discussed an outline of such<br>13  a research proposal at the ISRTP symposium.  Mike<br>14  Chudkowski agreed to discuss the developments of<br>15  such a proposal with Dr. Wynder."<br>16       Do you see that?<br>17   A   Yes.<br>18   Q   Okay.  And was it important during the<br>19  1990s for the CTFA and the members of the talc<br>20  task force to do research into the area that we've<br>21  been discussing, ovarian cancer and talc?<br>22   A   I guess I think it was discussed to see<br>23  if -- you know --<br>24   Q   Well, she says: "The importance of<br>25  considering research directions."  Do you see | 1  would all agree.<br>2        MR. LOCKE:  Objection.<br>3  BY MR. TISI:<br>4    Q   Well, let me ask you this:  Are you<br>5  aware that Dr. Wynder did in fact propose a study?<br>6    A   I'm not aware.<br>7    Q   Do you know at the time you mentioned --<br>8  now doctor -- who is Dr. Wynder?<br>9    A   I don't know.<br>10   Q   Do you know Dr. Wynder was with the<br>11  American Health Foundation?<br>12   A   I guess I do now.<br>13   Q   You know the American Health Foundation<br>14  was the same foundation where Dr. Muscat worked?<br>15   A   Yes.<br>16   Q   Do you know that Dr. Muscat proposed an<br>17  epidemiology study to J&J to follow up exactly on<br>18  this issue in 1994, 1995?<br>19   A   No, I don't know that.  I mean, I<br>20  believe that.  I just don't know that.<br>21       (Exhibit No. 63 was marked for<br>22       identification.)<br>23  BY MR. TISI:<br>24   Q   I'm going to show you Exhibit No. 63.<br>25       Now, I'll represent to you, because I |

60 (Pages 612 to 615)

Linda Loretz, Ph.D.

---

Page 616

1  don't like to misrepresent things, that the --
2  that this is a composite exhibit.  Okay.  If you
3  notice the top is a grant application, but if you
4  notice the Bates numbers are -- don't coincide
5  directly with the attachment.
6       We discussed with Dr. Muscat the
7  other day, so there is -- this was a -- he used a
8  grant application to Johnson & Johnson, but the
9  actual proposal is attached.
10     A   Okay.
11     Q   Okay?
12     A   Yes.
13     Q   And you see that this is a proposal from
14  1994?
15     A   Yes.
16     Q   This would have been within six months
17  of the CTFA Talc Interested Party Task Force --
18          MR. DUFFY:  Counsel, can you confirm
19  that what's in these exhibits is a composite
20  exhibit --
21          MR. TISI:  Absolutely.  Absolutely.  It
22  is two documents.  The one is the actual
23  application itself.
24          MS. FRAZIER:  Are there any other copies
25  of that since --

---

Page 617

1          MR. TISI:  Yeah.  Yeah.
2          MR. DUFFY:  This one kind of came apart.
3          MR. TISI:  Okay.  It was testified to by
4  Dr. Muscat the other day, so they refer to the
5  same thing.
6       The first -- and just to be clear for
7  the record, the top exhibit is a grant application
8  entitled "Talcum Powder Use in Ovarian Cancer,
9  Joshua Muscat, Research Scientist," on behalf of
10  the American Health Foundation.
11          There is actually a letter that goes
12  along with it as well, and attached is that actual
13  proposal for case controlled study of talcum
14  powder use and ovarian cancer.
15          MR. DUFFY:  Thank you.
16          MR. TISI:  You're welcome.
17  BY MR. TISI:
18     Q   And I'll represent to you that both of
19  these documents are dated 2000 and -- actually,
20  1994.
21     A   Okay.
22          MR. LOCKE:  Well, one says, not the --
23  January 31st, 1995.
24          MR. TISI:  Okay.  The second one?
25          MR. LOCKE:  Yes.

---

Page 618

1          MR. TISI:  Okay.  I thought it was -- I
2  thought it was December 1994, but okay.
3       So -- and there's a -- there's actually
4  a letter sent to J&J listing this out, and I won't
5  go into detail about it.
6  BY MR. TISI:
7     Q   But my question is this appears to be a
8  follow-up --
9          MR. TISI:  Do you have a copy of that
10  letter?
11          Okay.  Could we take a break for one
12  minute while we get a copy of the letter?
13          THE VIDEOGRAPHER:  The time is 2:06 p.m.
14  We're going off the record.
15          (Recess.)
16          THE VIDEOGRAPHER:  The time is 2:16 p.m.
17  We're back on the record.
18  BY MR. TISI:
19     Q   Doctor, I don't want to belabor the
20  point because I know we've been going a little
21  while, and I've got to turn my time over to other
22  people.
23       But do you know whether or not J&J --
24  first of all, the study that you have in front of
25  you is a case controlled study.

---

Page 619

1     A   Okay.
2     Q   Do you -- well, do you see it?  It's
3  entitled "Proposal for a Case Controlled Study of
4  Talcum Powder Use in Ovarian Cancer."
5          MR. LOCKE:  If you go back to page 78 at
6  the bottom there.
7          THE WITNESS:  This one?  Yep.  Okay.  I
8  see it, yes.
9  BY MR. TISI:
10     Q   So there's a study -- this is actually a
11  study proposal, okay?
12     A   Yes.
13     Q   So just so we have the time frame down,
14  the -- in 1994, you all had a meeting.  There was
15  a suggestion that J&J follow up and see whether or
16  not an additional study could be done by
17  Dr. Wynder's group.  This is Dr. Wynder's group,
18  the American Health Foundation.  They proposed a
19  study, and the study was a case controlled study.
20          Does that appear to be true?
21          MR. LOCKE:  Objection.
22          THE WITNESS:  That appears to be true.
23  BY MR. TISI:
24     Q   Did -- now, the study, if you go back
25  one page, is about a $400,000 study.

---

61 (Pages 616 to 619)

Linda Loretz, Ph.D.

Page 620

 1    A   That's what it says, yes.
 2    Q   All right.  Now, I have a document
 3  here -- first of all, had you ever -- before
 4  coming here today, had you heard about this study
 5  or know anything about it?
 6    A   I don't believe so, no.
 7    Q   Okay.  I'm going to provide you with a
 8  document, page -- it's Exhibit No. 15, and it says
 9  "Draft Never Sent," but I'm curious as to whether
10  or not there was any other documents related to
11  that.
12       (Exhibit No. 64 was marked for
13        identification.)
14       MR. LOCKE:  This is also marked 63.
15       MR. TISI:  Right -- oh, I'm sorry.  Let
16  me -- what number are we at now?
17       MR. LOCKE:  64.
18       MR. TISI:  See without my -- so what's
19  the next one we're at?
20       MR. LOCKE:  64 is the one we're -- that
21  one should -- would be.
22       MR. TISI:  Thank you, Tom.
23  BY MR. TISI:
24    Q   Let me see if this somehow raises a --
25  the specter to you that perhaps maybe this was

Page 621

 1  discussed with Dr. Gettings.  First of all, this
 2  is --
 3       MR. GOLOMB:  Could we just get that
 4  document up on the screen?
 5       MR. TISI:  Yeah, May 5th -- it's 139.
 6  BY MR. TISI:
 7    Q   And it says -- it's a -- it's a letter,
 8  and it says "Draft Never Sent" on top.  So I don't
 9  want to -- I don't know whether you got it or you
10  didn't get it or you got another version of it or
11  whatever.  I haven't seen anything in the records
12  relating to this, but --
13    A   I haven't --
14    Q   -- I don't know whether or not anything
15  in your -- in your travels you may have found
16  something.
17       It says, Dr. Gettings:  "Dear Steve:
18  This provides you with a copy of a talc proposal
19  prepared by Dr. Joshua Muscat and Dr. Ernst Wynder
20  of the American Health Foundation.  They are
21  proposing a new more definitive epidemiology study
22  examining the hypothesized link between hygenic
23  use of cosmetic talcum powder and the incidence of
24  ovarian cancer.  It is a very carefully designed
25  study with special attention paid to -- paid to

Page 622

 1  many possible confounders which had previously
 2  been ignored.  The study will take two and a half
 3  years to complete and cost nearly $400,000."
 4       Did I read that so far?
 5    A   Yes.
 6    Q   "We at J&J have reviewed the proposal
 7  and believe the study could help clarify the many
 8  obvious shortcomings in the previously reported
 9  studies.  For as long as I've been on the Talc
10  Interested Party Task Force, we have discussed
11  ways to improve our understanding of cosmetic talc
12  use.  I think the task force should sponsor the
13  study as an industry initiative.  Would you please
14  poll the members about the idea and put this
15  subject on our upcoming task force meeting and
16  agenda?"
17       Do you see that?
18    A   Yes.
19    Q   And I read that correctly?
20    A   Yes.
21    Q   Okay.  Do you know whether or not J&J
22  ever brought to the attention of the -- the CTFA
23  the $400,000 well-designed, carefully designed
24  study that Dr. Muscat drafted when he was with the
25  American Health Foundation?

Page 623

 1       MS. FRAZIER:  Object to form.
 2       THE WITNESS:  I'm not aware.  I don't
 3  believe I've seen this or seen discussion of it.
 4  BY MR. TISI:
 5    Q   Is this the kind of study that the -- I
 6  mean, we talked about the fact that the CTFA and
 7  PCPC was very interested in the science
 8  surrounding talc.  Right?
 9    A   Yes.
10    Q   And have been interested for decades,
11  right?
12    A   Yes.
13    Q   Do you have any reason to believe that
14  such a study had been brought to the attention of
15  the CFTA that such a study would not have been
16  funded and done?
17    A   I really don't know.  I mean, I think
18  you really would have to -- yeah, I can't say
19  without having had that experience of bringing it
20  and asking who was willing to do the funding.
21    Q   Has anybody -- has J&J ever proposed a
22  study, in all of your experience with them, or
23  proposed an action that CTFA decided it was not
24  going to do, that you can think of?
25    A   We -- we -- I mean just overall, not

62  (Pages 620 to 623)

Linda Loretz, Ph.D.

| Page 624 |
|---|

1  outside of the area of talc, I mean sometimes we
2  talk about studies and people either decide to do
3  them or not.
4      Q   Okay.  So -- but this study that was
5  proposed by Dr. Muscat to help understand the
6  issue was never sent to the members of the task
7  force to the best of your knowledge?
8      A   I'm -- I'm not aware of it.  I don't
9  believe I've seen this before.
10      Q   Do you know why -- I mean in all this
11  time, decades have gone by, and the -- the
12  company -- the companies involved in the task
13  force have never done an epidemiology study to
14  study perineal talc and ovarian cancer?
15      A   I guess I can't answer that.  I mean, I
16  guess the question could be, you know, would it
17  make a difference and would an industry study be
18  taken without it being assumed that it wasn't as
19  good as another study?  I don't know.  But I don't
20  know.
21      Q   Okay.  Well, that doesn't stop you all
22  from doing studies, does it?
23      A   Well, it doesn't, except that it -- I
24  mean it -- it becomes an issue.
25      Q   So you could always hire an outside

| Page 625 |
|---|

1  group to do it, right, and not have any role in
2  the -- in the design of the study, no role in the
3  editing of the study, no role -- no approve --
4  approval or non-approval of the text, right?  I
5  mean there are times when that's done, right?
6      MR. LOCKE:  Objection.
7      THE WITNESS:  I guess I can't think of
8  anywhere we've done a study like that.
9  BY MR. TISI:
10      Q   Right.  Because you always want to know
11  what the authors are saying about a study you fund
12  before you agree that it gets published, right?
13      MR. LOCKE:  Objection.
14      THE WITNESS:  I mean, in general, yes,
15  if we're funding a study, we want to --
16  BY MR. TISI:
17      Q   So you're unaware of this particular
18  study and why it was and was not done.
19      A   Yes.  I don't believe I've seen it.
20      Q   Now, I'm going to show you a study that
21  was done by Dr. Huncharek, Exhibit No. --
22      MR. TISI:  Which exhibit are we on?
23      MR. LOCKE:  65.
24      MR. TISI:  Do you have a sticky?
25      (Exhibit No. 65 was marked for

| Page 626 |
|---|

1      identification.)
2  BY MR. TISI:
3      Q   This is a 2003 study.  And I only have
4  one copy, but since I know it by heart, I'm not
5  going to need it.
6      Do you know whether or not this is a
7  study -- I assume you saw it.  You're familiar
8  with that study, it's a 2003 study by
9  Dr. Huncharek?
10      A   I -- yes.
11      Q   Is that a study that -- were you aware
12  of that study before it was published?
13      A   No.
14      Q   Okay.  Was -- was PCPC in any way made
15  aware of the study before it was published?
16      A   No.
17      Q   Okay.  Did PCPC -- we discussed the two
18  papers from Dr. Huncharek and Muscat that was in
19  the letter from -- the e-mail from Mr. Glenn.
20      A   Yes.
21      Q   I can attach those two studies here.
22      MR. TISI:  Do you have those two
23  studies?
24      (Counsel conferring.)
25      MR. TISI:  51 or 52, if you can get

| Page 627 |
|---|

1  those.
2  BY MR. TISI:
3      Q   Now, other than being aware of them
4  before they were published, was PCPC involved in
5  any way with the review of these articles?
6      MR. LOCKE:  Objection.
7      THE WITNESS:  They were not.
8  BY MR. TISI:
9      Q   Do you know who Brooke Mossman is?
10      A   I have heard the name.  She's at
11  Vermont, and I know it, yes.
12      Q   University at Vermont?
13      A   I think so.
14      Q   Do you know that she was involved in
15  funded studies relating to the cellular response
16  to -- to both asbestos and talc?
17      A   That sounds familiar, yes.
18      Q   Do you know that those studies were
19  funded by IMA North America?
20      A   No.  I mean, I -- I have probably run
21  across that.  I know they were not funded by us,
22  but that --
23      Q   Okay.  And that was my question is, do
24  you know -- were you involved in any discussions
25  about funding any studies by Dr. Mossman?

63 (Pages 624 to 627)

Linda Loretz, Ph.D.

Page 628

1    A  He may have been asked about it. I'm
2  not sure, but we did not fund any.
3    Q  There was a study that Dr. Mossman
4  proposed. Are you familiar with the Shukla paper?
5    A  Not by that name.
6    Q  It's a Mossman -- it's a published
7  Mossman study.
8    A  Okay.
9    Q  Are you aware that Dr. Mossman had
10  proposed a follow-up study that industry declined
11  to fund?
12    A  That sounds familiar.
13    Q  Have you ever understood why a
14  company -- or what do you understand about that
15  study?
16    A  I -- I am hard-pressed to remember what
17  it was about.
18    Q  Do you understand that she wanted to
19  look at different kinds of talc and how it reacted
20  to ovarian cancer cells?
21    A  I -- I just don't remember.
22    Q  Do you know whether or not -- why PCPC
23  decided not to fund that study?
24    A  If that's as I remember, because that's
25  how I remembered, is there was one study, and we

Page 629

1  ask our people and -- if they want to fund, and
2  basically it's -- you know, either they do or they
3  don't, and we would not necessarily know, and nor
4  would -- nor would the reason be the same among
5  companies.
6    Q  Did you ever discuss with either J&J or
7  Imerys why they were not interested in funding
8  that follow-up study by Dr. Mossman?
9      MS. FRAZIER: Object to form.
10      THE WITNESS: Not that I recall.
11  BY MR. TISI:
12    Q  Now, let's go to -- I'd like to go to
13  the answers to interrogatories that were produced,
14  and I'm on my last page here.
15      Your counsel provided to us a set of --
16  a second set of supplemental interrogatories on
17  Friday.
18    A  Okay.
19    Q  Have you seen them?
20    A  I believe so, yes.
21      MR. LOCKE: Actually, I think it was
22  Thursday, but --
23      MR. TISI: Okay. It doesn't matter to
24  me. I worked all weekend anyway.
25      MR. LOCKE: Okay. Thank you.

Page 630

1      (Exhibit No. 66 was marked for
2      identification.)
3  BY MR. TISI:
4    Q  First of all, if you go to page 10, it
5  says -- actually, hold on a second.
6      Okay. On page 12, it says: "Around
7  April 1997, CTFA sought the assistance of
8  consultant epidemiologists to evaluate a study on
9  powder exposure and perineal cancer."
10    A  I'm sorry, page 12?
11    Q  Page 12.
12    A  Oh, second paragraph. Okay.
13    Q  Do you see that?
14    A  Yes.
15    Q  Do you know what study that refers to?
16    A  April '97. I should know.
17    Q  The only study I found is the Cooke
18  study. Does that sound familiar?
19    A  Oh, yeah. I think so.
20    Q  Would that have been the Cooke study?
21    A  I couldn't tell you off the top what
22  year the Cooke study was, but it would be --
23  because I'm not thinking of any other event, I
24  think it would be a single study that --
25    Q  I'm going to show you the Cooke study,

Page 631

1  and it's Exhibit No. 67.
2      (Exhibit No. 67 was marked for
3      identification.)
4  BY MR. TISI:
5    Q  And ask you whether you believe that
6  that's the case that you asked a consultant to
7  look at.
8    A  So again, I think this was before I was
9  at CTFA, which is why I don't know.
10    Q  Right.
11    A  But I know we had a couple of individual
12  studies assessed, so timingwise, I guess this
13  makes sense. So I would --
14    Q  This is my only opportunity --
15    A  That seems plausible.
16    Q  It's my only opportunity to really ask
17  questions of PCPC about this.
18      Do you believe that this is the study?
19    A  I mean, if I -- if I saw that there was
20  a -- if we -- yes. I'm going to go yes.
21    Q  Okay.
22      MR. LOCKE: Just for the record, we do
23  reference a document there that might shed light
24  on it in the interrogatory response.
25      MR. TISI: Yeah, and it's not -- it

64 (Pages 628 to 631)

Linda Loretz, Ph.D.

Page 632

1  wasn't helpful, candidly, but I can go back and
2  figure it out.
3  BY MR. TISI:
4      Q   It sought the assistance of consulting
5  epidemiologists to evaluate the article. Do you
6  know which epidemiologists they were?
7      A   I don't.
8      Q   Do you know whether it was Dr. Muscat?
9      A   I don't think so.
10     Q   Do you know that Dr. Muscat wrote a
11  letter to the editor regarding the Cooke paper?
12     A   No, I don't -- I don't think I knew
13  that. I -- I wasn't aware -- again, I wasn't
14  here, so --
15     Q   I understand. I'm asking you with your
16  hat on as PCPC.
17     A   No, totally agree. I just -- I'm just
18  saying I wasn't aware that we used Dr. Muscat
19  before 2000.
20     Q   Okay. I'm going to show you -- I'm
21  going to put this -- and we will get an exhibit.
22         But here is a letter to the editor on
23  the --
24         MR. TISI: Can you put it up?
25         (Counsel conferring.)

Page 633

1  BY MR. TISI:
2      Q   I'm going to put it up on the screen and
3  we'll just have to substitute it.
4         And this will be Exhibit No. 68.
5         (Exhibit No. 68 was marked for
6          identification.)
7  BY MR. TISI:
8      Q   And here is a letter to the editor in
9  1997 from Dr. Muscat and Dr. Wynder from the
10  American Health Foundation.
11         Do you see that on the screen?
12     A   Sort of, yes.
13     Q   I'm not going to ask you to comment on
14  it.
15     A   Right.
16     Q   I'm asking you do you believe that --
17  that -- I'm trying to understand.
18         Would Dr. Muscat and the American Health
19  Foundation have been the epidemiologists with whom
20  you likely consulted to critique the Cooke paper?
21     A   I guess I just would have to say that's
22  possible.
23         MR. TISI: Okay. Counsel, I'm going to
24  ask you, on behalf of PCPC, if you could clarify
25  that for us, if you don't mind.

Page 634

1         MR. LOCKE: We will see. Okay.
2  BY MR. TISI:
3      Q   Okay. One last couple of questions, and
4  then I'm going to kind of be done with it.
5         I asked you whether or not the industry
6  or CTFA or individually the industry members had
7  done an epidemiology study studying ovarian cancer
8  and talc, and you had indicated that you were
9  unaware of any, correct?
10     A   That's correct.
11     Q   Are you aware of any study in which the
12  company did any toxicology studies on animals and
13  ovarian cancer?
14     A   The -- through CTFA, the -- it was the
15  monkey study was -- I guess two monkey studies or
16  one -- one pre-study, one study on translocation.
17     Q   Okay. But none looking at cellular --
18  whether or not talc or any talc constituent causes
19  cellular changes in ovarian cancer cells in
20  animals?
21     A   I can't think of anything.
22     Q   Okay. And that would be something that
23  certainly could be done, right?
24     A   I mean something --
25         MR. LOCKE: Objection.

Page 635

1         THE WITNESS: Yeah, something could be
2  done, but you'd have to -- I mean, one would need
3  to think about that further as to what could be
4  done, if it would make sense. If it would, you
5  know, really shed any light on --
6  BY MR. TISI:
7      Q   Well, I mean, without being facetious,
8  you all had about 40 years to think about it.
9         The question is, did you ever talk with
10  amongst the members and say, Maybe we ought to do
11  an animal study seeing whether or not talcum
12  powder products or any constituent of those
13  products cause cellular changes in ovaries of any
14  particular animal?
15         MR. LOCKE: Objection.
16         THE WITNESS: I -- I'm not sure there
17  wasn't something done. Not by us, but -- no, we
18  didn't -- we didn't do anything.
19  BY MR. TISI:
20     Q   Okay. Any -- there was a discussion in
21  one of the -- in the e-mail that Mr. Glenn sent
22  you in 2005 asking whether or not CTFA would do a
23  dose-response study, because that was one of the
24  Bradford Hill criteria that you all thought didn't
25  -- didn't support causation, and asked whether you

65 (Pages 632 to 635)

Linda Loretz, Ph.D.

Page 636

1  would fund a study by Rothman or something that
2  could be published on dose-response.
3        Did you all discuss that?
4        MR. LOCKE: Objection.
5        THE WITNESS: We had Dr. Rothman's and
6  Dr. Samet's and Dr. Pastides' paper.
7  BY MR. TISI:
8     Q  From 2000?
9     A  His assessment. And we -- right, he --
10 he did not propose reasonable terms that -- for us
11 to take that forward.
12    Q  Okay. Could you explain that a little
13 more, because I'm not really sure --
14    A  He wanted to charge such an incredible
15 amount, it was far out of the ballpark of being
16 reasonable.
17    Q  Okay. Well, I -- I'm still not
18 understanding. Did he propose to do a follow-up
19 study to look at dose-response?
20    A  No. No, it wasn't -- it wasn't that.
21 He was proposing to turn his -- the submission
22 that he was -- coauthored into a publication.
23    Q  Okay. And how much did he charge -- did
24 he want to charge?
25    A  $100,000.

Page 637

1     Q  And you all decided thanks but no
2  thanks?
3     A  That's not a reasonable number.
4     Q  Okay. And then in 2005, Luzenac came
5  back to you and said, you know, We really think
6  it's important to publish a study on dose-
7  response. Would you consider it?
8        And that was -- we could pull it out,
9  but that was the e-mail we talked about Huncharek
10 and Muscat. Do you remember that?
11    A  Yes.
12    Q  Did you go back to the well and say, you
13 know, Maybe you ought to publish it and do a
14 published study on dose-response?
15       MR. LOCKE: Objection.
16       THE WITNESS: No. Again, we had the
17 assessment done, but we -- no, we did not go
18 forward to have that made into a publication.
19 BY MR. TISI:
20    Q  That publication was never subject to
21 peer review, was it?
22    A  No. I mean it was -- it was a --
23    Q  I'm sorry. Let me rephrase the
24 question.
25    A  Yeah.

Page 638

1     Q  That -- that report that was done by
2  Dr. Rothman and Pastides and Samet was never
3  submitted to a journal for peer review, was it?
4        MR. LOCKE: Just to clarify, you're
5  talking about the 2000 NTP?
6        MR. TISI: Correct.
7        THE WITNESS: Correct. It was submitted
8  to NTP.
9  BY MR. TISI:
10    Q  But it was never submitted for
11 publication in any peer-reviewed journal.
12    A  That's correct.
13    Q  Okay. And you declined to support
14 that -- that submission for cost reasons, correct?
15    A  Only because it was very unreasonable.
16    Q  Okay. Did you ever propose to
17 anybody -- did anyone ever propose to PCPC or
18 anybody else that a dose-response study actually
19 be undertaken?
20    A  I think that was talked about, and I
21 think there was concern that it was something that
22 had been done by somebody else, and should we be
23 doing that. And again, when I say the cost was
24 high, it was just well out of the bounds of what
25 you would expect. I mean it wasn't even close.

Page 639

1     Q  Well, let me ask you this, and I will
2  represent to you -- and I don't have a copy of it
3  right here. Maybe I do.
4        This is Exhibit No. 69.
5        (Exhibit No. 69 was marked for
6        identification.)
7  BY MR. TISI:
8     Q  I will represent to you in 2009,
9  Drs. Huncharek and Muscat proposed all kinds of
10 studies that could be done to further eluciate --
11 elucidate the issue. Smoking and ovarian risks,
12 hysterectomy and tubal ligation, completion and
13 publication of Rothman's dose-response analysis,
14 et cetera, and then they subsequently propose
15 their own dose-response study.
16       Do you know whether any of those were
17 brought -- any of these proposals were brought to
18 the PCPC?
19    A  I'm not aware that they were.
20    Q  Okay. Do you currently have any studies
21 that you are -- have either considered -- well,
22 let me ask you this: Other than the ones we've
23 discussed, can you think of any study that was
24 proposed to the PCPC or by the PCPC relating to
25 the -- any issue relating to ovarian cancer and

66 (Pages 636 to 639)

Linda Loretz, Ph.D.

Page 640

```
 1  talc?
 2      A   I'm sorry, what was the first part of
 3  your question?
 4      Q   Do you know of any study that was either
 5  proposed to the PCPC or by the PCPC relating to
 6  any issue regarding talcum powder products and
 7  ovarian cancer?
 8      A   I mean, I guess the monkey study, and
 9  then --
10      Q   No, that wasn't done.  That was
11  proposed.
12      A   Oh, that wasn't done.
13      Q   Yeah.
14      A   I think not a -- maybe not a hard core
15  -- well, the ones you've talked about, I mean the
16  Mossman.  But again, I'm not sure there's any that
17  came to proposal.  I mean, I guess it's the things
18  we're talking about now, right?
19      Q   Well, I'm asking if there's anything
20  else.
21      A   Right.
22      Q   I mean, I'm trying to understand what
23  you know.  Right?
24          So -- so are there -- I've tried to pull
25  out some things that --
```

Page 641

```
 1      A   Right.
 2      Q   -- I could see from the records.
 3      A   Right.
 4      Q   But I didn't live your life --
 5      A   Right.
 6      Q   -- so I don't know what -- what you
 7  know.
 8      A   Yeah.
 9      Q   So the question I'm asking you is, do
10  you know whether or not, other than the studies
11  we've talked about today, are there any other
12  studies you can think that -- let's take them one
13  at a time -- that were proposed to the PCPC to do
14  that would investigate issues relating to ovarian
15  cancer and talc?
16      A   I would say what I'm aware of is the
17  group talked about kind of a brainstorming
18  session.  So not a proposal, not a fleshed-out
19  proposal, but is there something we can do.
20      Q   And what kind of studies were -- were
21  raised?
22      A   I mean, I think was there epidemiology
23  work that we could do that -- that would help,
24  kind of in a general sense.
25      Q   Okay.  And the answer was?
```

Page 642

```
 1      A   We didn't do -- we didn't do one.  I
 2  mean, there wasn't -- I guess it wasn't thought it
 3  would help or would be seen favorably coming from
 4  the industry or --
 5      Q   Okay.  Any studies relating to the
 6  purity of talc from potential carcinogens,
 7  including asbestos, did you ever sponsor --
 8  discuss any studies about that?
 9      A   I mean, I think that goes back to when
10  the specification was being put in place and all
11  the testing was done, and then from then on, it
12  was an ongoing work that was done by the industry,
13  by the individual companies to --
14      Q   No, I -- you're thinking of something --
15  I'm not talking about testing.  I'm talking about
16  any publications done to validate and study
17  whether or not to test it was effective in
18  removing potential carcinogens, including
19  asbestos?
20      A   Any publication?
21      Q   Yeah.
22      A   I'm not --
23      Q   Or studies.
24      A   -- sure what you mean by publication.
25      Q   Or studies.  Surveys, studies, anything
```

Page 643

```
 1  like that.
 2      A   I think that we relied on --
 3      Q   The tests themselves.
 4      A   Right, that the companies were carrying
 5  out ongoing.
 6          MR. TISI:  All right.  If you want to
 7  take a break, I think I'm done.
 8          THE VIDEOGRAPHER:  The time is 2:44 p.m.
 9  We're going off the record.
10          (Recess.)
11          THE VIDEOGRAPHER:  The time is 2:51 p.m.
12  We're back on the record.
13              CROSS-EXAMINATION
14  BY MR. GOLOMB:
15      Q   Good afternoon, Doctor.  I'm Richard
16  Golomb.  We met twice before.
17      A   Yes.
18      Q   I'm going to start where Mr. Tisi left
19  off, and I'm going to try not to repeat -- repeat
20  anything that he did, but I do want to clarify
21  some things of where he left off.
22          So the Rothman proposal was rejected, as
23  you said, because of the cost of that study,
24  correct?
25      A   I'm not sure really it was a proposal.
```

67 (Pages 640 to 643)

Linda Loretz, Ph.D.

Page 644

1    I think we had gone to them, and they just made it
2    clear that it was going to be very, very expensive
3    if we wanted -- so we didn't carry it as far as to
4    a proposal.
5        Q   Okay.  You said in response to
6    Mr. Tisi's question that it was approximately
7    $100,000.  Where did you get that number if not
8    from a proposal?
9        A   I -- I just -- just kind of a verbal.
10       Q   From who?
11       A   I think J&J actually went back and asked
12   him and -- and got a verbal on it.
13       Q   When -- and when was that?
14       A   It was after the NTP meeting.
15       Q   Okay.  And were you with -- with PCPC at
16   that time?
17       A   Yes.
18       Q   All right.  So that was shortly after
19   you went onboard with PCPC?
20       A   No, I started -- no, that was in 2000 --
21   or probably 2000 -- I'm sure it was 2001.
22       Q   Okay.
23       A   I started PCPC in 1997.
24       Q   All right.  And the Wynder/Muscat
25   proposal, why was that rejected?

Page 645

1        A   I -- I don't believe we ever saw that --
2    PCPC ever saw that.
3        Q   But at least one or more of your members
4    did?
5        A   That's what it -- it looked like that
6    J&J saw it, yes.
7        Q   And do you know why -- from your review
8    of the records, why that proposal was rejected?
9        A   No.  Again, I don't think we ever saw
10   it.
11       Q   Okay.  When you say "we," you say PCPC?
12       A   Sorry, PCPC.  I don't think PCPC ever
13   had that.
14       Q   Okay.  My question was a little bit
15   different.
16           While PCPC may not have seen the
17   proposal, one or more of your members did, and
18   rejected it, correct?
19       A   As far as I know the study didn't
20   happen, so --
21       Q   Right.
22       A   -- that would follow.
23       Q   And my question was, based on your
24   review of the documents that assisted you in your
25   preparation for your deposition today, did you

Page 646

1    learn why it was that one or more of your members
2    rejected the Wynder/Muscat study?
3        A   No.
4        Q   All right.  Now, in -- in addition to
5    Rothman and in addition to Wynder and in addition
6    to Muscat, there's a Dr. Wehner, correct, or
7    Wehner?
8        A   Wehner, yes.
9        Q   And that's spelled W-E-H-N-E-R?
10       A   Correct.
11       Q   All right.  And the Wynder/Muscat
12   proposal was sometime in the early to mid-'90s, is
13   that your understanding?
14       A   Whatever it was that I just saw.  As I
15   say, we never -- we -- PCPC didn't see it, so I
16   would rather look at what it was than try to go by
17   memory.
18       Q   Okay.  Well, let me ask you this:  You
19   have -- and I've asked you before about
20   Dr. Wehner, and you've reviewed some of the
21   documents from him as well, correct?
22       A   Yes.
23       Q   And those documents begin in the early
24   to mid-1990s, correct?
25       A   Dr. Wehner did the study at Battelle, so

Page 647

1    that was in the early '80s.
2        Q   Okay.  Well --
3        A   Or mid-'80s.
4        Q   -- he was --
5        A   Mid-'80s.
6        Q   -- he was retained by the CFTA in the
7    early '90s, correct?
8        A   In addition to doing that study, he was
9    retained in 2000, and he was retained at -- he --
10   I know we paid for his travel to the ISRTP
11   workshop, so that would be the '94.
12       Q   Okay.  And you -- you recall in
13   preparation for your deposition last time, you
14   told me that you reviewed some of the letters from
15   Dr. Wehner, correct?
16       A   Some of the letters?
17       Q   Letters.
18       A   I'm not sure what you mean my letters.
19       Q   Okay.  You don't know what I mean by a
20   letter?  A letter, it was a piece of paper that
21   was -- that came from Dr. Wehner to somebody at
22   the CFTA, do you recall that?
23       A   That was a proposal or --
24       Q   No, any letter.  Do you recall any
25   letter from Dr. Wehner to the CFTA?

68 (Pages 644 to 647)

Linda Loretz, Ph.D.

Page 648

1    A   I mean, we hired him, so we had
2    proposals, I guess.  So, yes, documents.
3    Q   Did -- it's really -- it's not a trick
4    question.  I'm just trying to understand that
5    you -- you in fact saw letters from Dr. Wehner to
6    the CFTA outlining what it is that he was
7    proposing that be done, correct?
8    A   I can think of at least one, yes.
9    Q   Okay.  And included in those letters
10   were also comments from Dr. Wehner about comments
11   that the CFTA -- that Luzenac at that time, the
12   predecessor of Imerys, some of the things that
13   they were going to say publicly about the defense
14   of talc and ovarian cancer, correct?  Do you
15   recall those?
16   A   I'm not sure what you mean.  I'm --
17   Q   Okay.  Do you recall in one of those
18   letters that Dr. Wehner, in addition to
19   Dr. Rothman, in addition to Dr. Wynder, in
20   addition to Dr. Muscat, that Dr. Wehner also
21   recommended that the CFTA and J&J and other
22   members of the CFTA at that time also conduct
23   their own study?
24   A   I'm not recalling specifically which
25   document you're talking about.

Page 649

1    Q   Okay.  Do you -- as you sit here today,
2    do you recall that -- whether or not it was in a
3    document or not, do you recall that Dr. Wehner
4    made a recommendation to the CFTA to do its own
5    study?
6    A   I'm not recalling that right now.
7    Q   And do you recall that in that letter
8    back in 1994 that Dr. Wehner also told the CFTA
9    that it would be easy to do and that the results
10   would be -- would come back within six months?  Do
11   you recall that?  Does that help refresh your
12   recollection?
13   A   Can you -- can you show me the document,
14   because I'm not sure what study you're talking
15   about.
16   Q   Okay.  Do --
17   A   Can you tell me what kind of study
18   he's -- he's --
19   Q   Do you recall Dr. Wehner recommending
20   any kind of study?
21   A   Well, I mean, he did a study for us, and
22   he did various assessments of the data, but I
23   think you're talking about something real
24   specific, and I --
25   Q   Do you recall Dr. Wehner recommending a

Page 650

1    case controlled study?
2    A   Maybe vaguely.
3    Q   Okay.  And do you recall -- does it help
4    refresh your recollection that in that letter
5    dated in 1994, that in addition to recommending
6    the study, Dr. Wehner put some parameters on it
7    and said it would be easy to do and that you could
8    get the results back within six months?
9    A   I think that sounds vaguely familiar,
10   but I don't remember the details of what -- what
11   he was proposing.
12   Q   And that study was never done, correct?
13   A   Again, I would really feel better seeing
14   what it is, so that -- but a study by doctor -- a
15   case controlled study by Dr. Wehner was never
16   done, no.
17   Q   Right.  And so -- and a case controlled
18   study by Dr. Wynder or Dr. Muscat was never done,
19   correct?
20   A   Again, PCPC was not even aware of that
21   proposal.
22   Q   Okay.  Isn't it true that none of these
23   studies were done because PCPC and its members
24   just didn't want to know the results?
25   MR. LOCKE:  Objection.

Page 651

1    THE WITNESS:  No.  I mean, we take the
2    direction of our members, and the members' reasons
3    for not funding would -- I mean, you would have to
4    ask them.
5    BY MR. GOLOMB:
6    Q   Okay.  So sitting here today, you don't
7    know why it is that Rothman, Wynder, Muscat and
8    Wehner were all rejected, their proposals.  Is
9    that what you're telling us?
10   MR. LOCKE:  Objection.
11   THE WITNESS:  I think the only thing I
12   could say would be the Rothman one, because that's
13   one thing we looked at, and we knew that -- again,
14   it's not all costs, but we were hoping for just a
15   reasonable, normal cost, and that I think -- I'm
16   sure we would have gone ahead, but it was in a
17   ballpark that was just not rational.
18   BY MR. GOLOMB:
19   Q   Okay.  And that ballpark was $100,000?
20   MR. LOCKE:  Objection.
21   THE WITNESS:  That -- that's my
22   recollection, yes.
23   BY MR. GOLOMB:
24   Q   All right.  And you are aware, are you
25   not, that -- that before that decision was made,

69 (Pages 648 to 651)

Linda Loretz, Ph.D.

Page 652

1  that Dr. Cramer had published on the association
2  between talc and ovarian cancer, correct?
3      A   In 1982, yes.
4      Q   Right.  He also published in 1992.
5      A   I know he published -- he was a coauthor
6  on the Gertig paper.
7      Q   Right.  And in that paper, in a footnote
8  in that paper he talks about the -- the numbers of
9  women who died from ovarian cancer.  Do you recall
10 that?
11     A   I do not.
12     Q   All right.  Tell me if this sounds
13 familiar: 22,000 women a year had ovarian cancer.
14 Does that sound familiar?
15     A   That sounds like what I heard this
16 morning too.
17     Q   Okay.  And 14,000 women a year die from
18 ovarian cancer.  Does that sound familiar?
19     A   That sounds about a number I would
20 expect from the --
21     Q   Okay.  And in Dr. Cramer's paper in
22 1992, he concludes that 10 percent of those women
23 die from a -- from talc and ovarian cancer.
24         MR. LOCKE:  Object --
25 BY MR. GOLOMB:

Page 653

1      Q   Do you recall that in the paper?
2          MR. LOCKE:  Objection.  Mischaracterizes
3  the paper.
4  BY MR. GOLOMB:
5      Q   Do you recall that?
6      A   I -- I recall something along those
7  lines.  It doesn't mean we agreed with that,
8  though.
9      Q   No, I understand.  But that's -- that
10 is what was reported in 1992 before the decision
11 was made not to do a study that was recommended
12 by Dr. Rothman, Dr. Wynder, Dr. Muscat and
13 Dr. Wehner?
14         MR. LOCKE:  Objection.
15         THE WITNESS:  I mean, I -- if that's
16 what was said in the paper, again, I don't -- I
17 would have to look back, and we didn't agree with
18 that.
19 BY MR. GOLOMB:
20     Q   All right.  So let me ask you about
21 Dr. Huncharek, and I'm not going to go through the
22 study again.  Mr. Tisi did that well.
23         When -- when did PCPC first retain
24 Dr. Huncharek for any reason?
25     A   I believe it was for the answer to the

Page 654

1  Citizen Petition.
2      Q   Which one?
3      A   The 2008, so the 2009 response.
4      Q   So as far as you know, Dr. Huncharek did
5  not do any work for PCPC before 2008?
6      A   I'm just trying to think and make sure
7  I'm not skipping anything.  I think that's
8  correct.
9      Q   Okay.  And how was it that Dr. Huncharek
10 was retained by PCPC or one of its members?
11     A   Again, it was --
12         MR. LOCKE:  Objection.
13         THE WITNESS:  -- J&J that reached out to
14 him first.  And they were familiar with him from
15 various work.
16 BY MR. GOLOMB:
17     Q   Who was it at J&J?
18     A   Who did I talk to at J&J at the time?  I
19 don't remember.
20     Q   Okay.  So in the -- in the deposition
21 notice -- and I hate to tell you we're still on
22 topic 1, there's only 17 more to go -- but it
23 refers to the Weinberg Group.  Do you know who the
24 Weinberg Group is?
25     A   Yes.

Page 655

1      Q   And who is the Weinberg Group?
2      A   Weinberg Group is a consulting group,
3  and we hired them at the time of the NTP report to
4  pull together a binder, organize all the
5  information, and then reach out to consulting
6  epidemiologists.
7      Q   All right.  And that was in 1999, 2000?
8      A   It was in 2000.
9      Q   All right.  And was -- did anybody from
10 the Weinberg Group talk to Dr. Huncharek at that
11 time, do you know?
12     A   Not that I'm aware of.
13     Q   Who did they talk to?
14     A   The people that were hired through the
15 Weinberg Group were Drs. Rothman, Pastides, and
16 Samet, Dr. Samuel Shapiro, and Dr. Muscat.
17     Q   All right.  And they are -- some or all
18 of them were the ones who then wrote the report
19 that was then submitted to the NTP?
20     A   There were three separate reports, and,
21 yes, those are the authors.  Three of them on one
22 and then individuals from Muscat and Shapiro.
23     Q   All right.  And then somebody actually
24 made the report to the NTP, correct?
25     A   Correct.

70 (Pages 652 to 655)

Linda Loretz, Ph.D.

Page 656

1    MR. LOCKE: Objection. This material
2  was covered at length by Mr. Meadows. These
3  questions have been asked and answered.
4    MR. GOLOMB: I don't -- I'm not sure if
5  that's true or not, but I -- I don't -- I only
6  have a couple of minutes on this, so it's not
7  going to take much time.
8    THE WITNESS: Dr. Rothman made a
9  presentation on -- on that that there -- the
10 report that the three of them put together, the
11 review that the three of them put together.
12 BY MR. GOLOMB:
13   Q   Okay. And it was -- you're saying --
14   A   So Dr. Pastides, not Dr. Rothman.
15   Q   Okay. It was not Dr. Rothman, correct?
16   A   That's correct, it was Dr. Pastides.
17   Q   In fact, you recall in your review of
18 the documents that Dr. Rothman was kind of upset
19 that he wasn't able to make the presentation? Do
20 you recall that?
21   A   Not really.
22   Q   Okay. Burson-Marsteller, who is that?
23   A   I think they're a -- I think they do
24 work for PCPC on our website or on our -- perhaps
25 on cosmeticsinfo.org. I think --

Page 657

1    Q   I'm sorry?
2    A   Perhaps on cosmeticsinfo.org.
3    Q   Who -- who are they?
4    A   I think they're people that help prepare
5  information, and they work with our Public Affairs
6  department.
7    Q   Okay.
8    A   I think.
9    Q   And so you're -- you're looking like you
10 don't know too much about them.
11   A   I don't know too much about them.
12   Q   All right. Did you -- you reviewed
13 the -- the notice of deposition before you
14 testified?
15   A   Yes.
16   Q   And so you know under 1(f), it
17 specifically says that we're going to ask
18 questions about Burson-Marsteller?
19   A   Yes.
20   Q   Okay. So did you prepare yourself to
21 answer questions about Burson-Marsteller?
22   MR. LOCKE: Why don't you ask her a
23 question about them.
24   MR. GOLOMB: Well, I did.
25   MR. LOCKE: And she answered.

Page 658

1  BY MR. GOLOMB:
2    Q   Okay. That was an answer?
3    A   Yeah, I think they work on our website.
4  I think they work on putting messages together,
5  and they work with our Public Affairs people.
6    Q   Well, my question was who is
7  Burson-Marsteller?
8    A   It's a company.
9    Q   It's a company. All right. And is that
10 something you learned in your preparation for
11 today's deposition?
12   A   I had heard of them, the name before.
13   Q   All right. Who is Nichols-Dezenhall?
14   A   Nichols-Dezenhall is a public affairs
15 company that did work for CTFA back some many
16 years ago. I'm not sure that we've used them at
17 all in recent years. They did a couple of focus
18 groups around the time of the NTP report on talc.
19 We use them I know for other things.
20   Q   When did you learn about the focus
21 groups?
22   A   In my preparation for this deposition.
23   Q   Okay. Because you recall -- I was the
24 one who asked you about Nichols-Dezenhall before,
25 do you remember that?

Page 659

1    MR. LOCKE: When you say "before," what
2  do you mean?
3    THE WITNESS: Yeah.
4  BY MR. GOLOMB:
5    Q   In your prior deposition in July of
6  2018.
7    A   I -- I couldn't recall who it was, but I
8  do remember being asked about that, and I gave an
9  answer that was not quite accurate, and that's why
10 I made sure I was clarified on that after the
11 fact.
12   Q   All right. So did you review your --
13 your deposition transcript from 2018 to help
14 prepare you today?
15   A   I -- I read over it to see if there were
16 any things that I was confused about and made sure
17 I had answers -- my answers correct.
18   Q   And I deposed you in -- I think it was
19 2016 as well, correct?
20   A   That's correct.
21   Q   Did you review that in preparation for
22 your deposition today?
23   A   Not today, no.
24   Q   I also after your deposition in July of
25 2018 and before today deposed Mr. Pollack. You

71 (Pages 656 to 659)

Linda Loretz, Ph.D.

Page 660

1  know him, correct?
2      A   Yes.
3      Q   And just for the ladies and gentlemen of
4  the jury, can you explain who Mr. Pollack is.
5      A   Mark Pollack is -- I should know his
6  title, but he is an employee of the Personal Care
7  Products Council.  He reports directly to our CEO.
8  He has an executive VP title.  Perhaps it's for
9  membership.  I'm not sure.
10     Q   Okay.  And did you read Mr. Pollack's
11  deposition transcript?
12     A   I did not.
13     Q   All right.  Can we go to document 50 --
14  52415.
15         This was a composite document.  Which
16  has been marked as Exhibit 70.
17         (Exhibit No. 70 was marked for
18         identification.)
19  BY MR. GOLOMB:
20     Q   To me it appears to be a -- it's a PCPC
21  document, and to me it appears to be a PowerPoint
22  of some sort.
23         Have you seen this before?
24     A   I may have seen it in my preparation.
25  I'm not sure.

Page 661

1      Q   Okay.  Can you tell us what it is?
2      A   Well, it looks like it's kind of an
3  introduction to what is -- what is CTFA.
4  Obviously, this is older since we're now PCPC.
5      MR. LOCKE:  And just for the record, I
6  want to note it's missing quite a few pages, and
7  some pages -- well --
8      MR. TISI:  Right.  And for the record,
9  it was about a 50-page document, and the ones I
10  made copies of are the ones I'm asking questions
11  about.
12  BY MR. GOLOMB:
13     Q   Is there anything, based on your review
14  of those documents, that can tell us when this was
15  used?
16     A   No.  That's to say, only from CTFA that
17  tells you something.
18     Q   Right.  So when did CTFA change to PCPC?
19     A   Roughly 2006.
20     Q   Now, did you ever see this document
21  before you were preparing for this deposition?
22     A   I doubt it.
23     Q   So do you know who prepared it?
24     A   No.
25     Q   Let's go to the next document, which is

Page 662

1  52418.
2          Which is part of the same composite,
3  correct?
4      A   Yes, so it appears.
5      Q   And it says:  "Mission accomplished by
6  promoting," and then the first bullet point says:
7  "Voluntary industry self-regulation."
8          Is that still a primary mission of PCPC?
9      A   I guess I would probably say no in the
10  fact that we have been working on getting updated
11  regulations passed for the cosmetic industry for
12  the past 12 years.
13     Q   Well, let's go to the next document,
14  which is PCPC 52424.
15         And it says at the top "Self-regulation
16  Programs," and under the first bullet point it
17  says "CIR," correct?
18     A   Yes.
19     Q   All right.  And CIR is still a
20  self-regulatory program that is funded by the
21  PCPC, correct?
22     A   It is still funded by the PCPC, correct.
23     Q   And it's still a self-regulatory
24  program, correct?
25     A   I guess you could call it that.  I mean,

Page 663

1  we -- we undertook CIR because FDA didn't.  So...
2      Q   The next document in that same
3  PowerPoint is PCPC 52426.
4          Do you see that?
5      A   Yes.
6      Q   And it basically is talking about the --
7  the trade association obviously being at that time
8  CTFA, now PCPC, and some of the -- the member
9  services, correct?
10     A   Yes.
11     Q   And the first bullet point provides
12  current information?
13     A   Yes.
14     Q   The second extends your resources,
15  meaning that you can pull your resources like as
16  in a task force.
17     A   That's one way, yes.
18     MR. LOCKE:  Objection.
19  BY MR. GOLOMB:
20     Q   And then the third bullet point is --
21  allows you to influence industry policy and
22  action.  Correct?
23     A   Yes.
24     Q   And allows you to avoid direct
25  company-government confrontation.

72 (Pages 660 to 663)

Linda Loretz, Ph.D.

Page 664

1  A  That's what it says.
2  Q  Right.  So meaning that PCPC, or at that
3  time CFTA, kind of acted as the intermediary to
4  deal with the government confrontation?
5  A  For example, comments where the
6  companies would -- where we would coordinate
7  and -- and we would submit comments.
8  Q  Correct.  Or as in this case, where
9  the -- the CFTA would put its name on a document
10  so that J -- J&J didn't have to.
11  MR. LOCKE: Objection.
12  THE WITNESS: We were -- we were the
13  face of -- we were serving as the face of the
14  industry.
15  BY MR. GOLOMB:
16  Q  Right.  And in this case, though, you
17  were serving as the face of the industry at the
18  specific request of J&J, who said -- who basically
19  concurred with the report that they reviewed, but
20  suggested that it shouldn't be their name on it,
21  it should be your name on it, correct?
22  MR. LOCKE: Objection.
23  THE WITNESS: We had to agree with the
24  report as well.
25  BY MR. GOLOMB:

Page 665

1  Q  All right.  But that's to allow them to
2  avoid direct company-government confrontation,
3  correct?
4  MR. LOCKE: Objection.
5  THE WITNESS: I'm not sure that would be
6  confrontation, but -- but, yes, we were the face
7  of the industry.
8  BY MR. GOLOMB:
9  Q  All right.  And the next document is
10  52457.
11  This is essentially kind of describes
12  the differences, does it not, between cosmetic and
13  the pharmaceutical?
14  A  In some ways, yes.  And I have to say
15  this -- this is out of date.  I mean, we would not
16  produce something like this today.
17  Q  But it's still holds true, though.  You
18  may not produce it, but it still holds true.
19  A  Well, but -- no, what I'm saying is, for
20  example, in this legislation that we are
21  advocating for -- good manufacturing practices are
22  a part of that, just as an example.  So things
23  change.
24  Q  But one -- one of the things that still
25  holds true is that cosmetics have no prior FDA

Page 666

1  clearance required.
2  A  There's no premarket approval, that's
3  correct.
4  Q  As opposed to a pharmaceutical which
5  does.
6  A  That the active ingredients would be
7  approved, yes.
8  Q  Right.  Cosmetics have less rigorous
9  inspections --
10  A  Yes.
11  Q  -- than a pharmaceutical.
12  And cosmetics have no specific standards
13  for efficacy.
14  A  Well, cosmetics don't have efficacy the
15  same way that drugs do, so that just kind of
16  follows.
17  Q  Correct.  That's part of the
18  self-regulatory standard.
19  A  No, I mean, cosmetics are not -- they
20  don't affect the structure or function of the
21  body.  That's by definition.  So they don't have
22  efficacy in a way that a drug would.
23  Q  Let's turn to 52505.
24  Well, that's it, but it's upside down on
25  the screen.  There you go.

Page 667

1  So when this describes expert panels, it
2  talks about liaison members, and I assume, correct
3  me if I'm wrong, this is liaisoned from the -- at
4  the time the CFTA to various governmental
5  agencies, correct?
6  MR. LOCKE: Objection.
7  THE WITNESS: I'm sorry.  These are --
8  yeah, there's three liaison members that still
9  exist today.  One is from FDA, one is from
10  Consumer Federation of America, and one is
11  representing industry.
12  BY MR. GOLOMB:
13  Q  Right.  And these -- and so there was a
14  lot of talk about John Bailey today.
15  A  Yes.
16  Q  So this is at a time when John Bailey
17  was still at the FDA, correct?
18  A  Correct.
19  Q  And I want to understand the timeline of
20  this.  So with -- specifically with John Bailey.
21  The -- the first Citizens Petition was
22  in 1993, correct?
23  A  Yes.
24  Q  And that was at a time that John Bailey
25  was at the FDA, correct?

73 (Pages 664 to 667)

Linda Loretz, Ph.D.

Page 668

1    A   Yes.
2    Q   And as -- as we saw from the letter,
3  John Bailey at some point, representing the FDA,
4  wrote a letter not rejecting the Citizens Petition
5  but, rather, saying they didn't have the resources
6  to deal with it at that time, correct?
7    A   I think that was just the initial
8  response.
9    Q   The initial response in 1993, that's
10  what I'm talking about.
11    A   Right, which is -- but that's -- I mean,
12  that's how they respond to Citizens Petitions
13  initially, I think almost always.
14    Q   I'm not -- I'm not questioning it one
15  way or the other.  I'm just trying to understand
16  the timeline.
17    A   He wrote that initial letter in
18  response, yes.
19    Q   Right.  When he was -- when he was at
20  the FDA.
21    A   At FDA, Yes.
22    Q   And then he gets hired by the CFTA when?
23    A   Okay.  Let's see.  I started in '97.
24  It's like 2000 and -- let's see.  He took my
25  boss -- old boss's job in 2000 and --

Page 669

1    Q   If you can speak up so that the --
2    A   I'm just ruminating instead of silence.
3    Q   Yeah, I know, but if you're going to
4  ruminate out loud, you have to say it so the court
5  reporter can get it.
6    A   Just trying to figure out -- it would
7  have been roughly 2003, '2.
8    Q   Okay.  And between 1993 and 2002 or
9  2003, when Bailey came from the FDA to the CFTA,
10  there had been no response to the Citizens
11  Petition other than, We don't have the resources,
12  correct?
13    MR. LOCKE:  Objection.
14    THE WITNESS:  I thought there was a
15  response.
16  BY MR. GOLOMB:
17    Q   And what was the response?
18    A   I thought the initial one was rejected.
19    Q   Okay.  And is that something you saw
20  today?
21    A   No, I haven't seen it today.  We just
22  saw the latter one today, the 2008, that was
23  responded to in 2014.
24    Q   Right.  And that was after Bailey had
25  already come from the FDA --

Page 670

1    A   Correct.
2    Q   -- to the CFTA or the PCPC.
3    A   Correct.
4    Q   And that was after -- after he came to
5  the PCPC, and Bailey set up the meeting with the
6  FDA, correct?
7    MR. LOCKE:  Objection.  Asked and
8  answered.
9    THE WITNESS:  Right.  When he came to
10  the -- he eventually set up the meeting in 2009.
11  BY MR. GOLOMB:
12    Q   Right.  And after he set up the meeting
13  with his old subordinates, that's when the -- the
14  Citizens Petition was rejected, correct?
15    MR. LOCKE:  Objection.
16    THE WITNESS:  I think there were other
17  things that went on in the meantime.  For example,
18  the assessment of the talcs -- admittedly not
19  exhaustive, but the assessment of talcs for
20  asbestos.
21  BY MR. GOLOMB:
22    Q   Well, but at that point in 2008, there
23  had been 24 or more studies that already looked at
24  the association between talc and ovarian cancer,
25  and something like 18 of those studies showed a

Page 671

1  statistically significant association between talc
2  and ovarian cancer, correct?
3    MR. LOCKE:  Objection.
4    THE WITNESS:  I would say there were --
5  it's -- it's much more -- it's more complex than
6  that.  I mean, there were other issues, as have
7  been pointed out, of biologic plausibility, of
8  dose-response.  So it's a little -- not as
9  straightforward as that.
10  BY MR. GOLOMB:
11    Q   Well, understood.  I mean, we -- we -- I
12  think we can agree that during this period of time
13  between, you know, 1982 and 2008, that while there
14  were all these other studies that were coming out,
15  more than two dozen studies, most of which showed
16  the statistically significant association, while
17  at the same time Johnson & Johnson and the PCPC
18  were rejecting case controlled studies of their
19  own, but at that -- during that period of time,
20  industry chose, rather than doing its own study,
21  to do a critical analysis of the individual
22  studies, correct?
23    MR. LOCKE:  Objection.
24    THE WITNESS:  We did do critical
25  analyses of the individual studies, yes.

74 (Pages 668 to 671)

Linda Loretz, Ph.D.

Page 672

1   BY MR. GOLOMB:
2       Q   And -- but did not do its own study.
3       A   We did not do an epidemiology study.
4       Q   Mr. Tisi asked you before about the
5   standard, and I've asked you about this before, so
6   I'm not going to go into a lot of detail about it.
7           But it's a document which was previously
8   marked for identification as Plaintiff's Exhibit
9   324 --
10          MR. GOLOMB:  Okay.  That's fine.
11          -- which we will mark as Exhibit 71.
12          (Exhibit No. 71 was marked for
13          identification.)
14  BY MR. GOLOMB:
15      Q   All right.  This is the Code of Federal
16  Regulations, Title 21.  Are you familiar with
17  this?
18      A   Yes.
19      Q   Were you aware of this before I asked
20  you about it?
21      A   I -- I'm not familiar with specifically
22  these labeling requirements, and we don't get into
23  issues of labeling beyond telling our -- helping
24  our companies understand what current labeling
25  requirements are in our labeling manual.

Page 673

1       Q   Okay.  But I -- I've asked you about
2   this before, correct?  Do you recall that?
3       A   I -- I -- I don't recall specifically.
4       Q   All right.  This is the Code of Federal
5   Regulations, Title 21, Section 740.1,
6   "Establishment of Warning Statements."
7           Did I read that correctly?
8       A   Yes.
9       Q   And can you just read subsection (a) for
10  the jury, please.
11      A   "The label of a cosmetic product shall
12  bear a warning statement whenever necessary or
13  appropriate to prevent a health hazard that may be
14  associated with the product."
15      Q   "That may be associated with the
16  product," correct?
17      A   That's what it says.
18      Q   All right.  And that is a determination
19  of whether or not a company is going to label a
20  cosmetic product with a warning statement.  That
21  is a decision to be made by the company, correct?
22      A   That's --
23          MR. LOCKE:  Objection.
24          THE WITNESS:  That's not something --
25          MR. LOCKE:  Beyond the scope.

Page 674

1           THE WITNESS:  Yeah, we don't -- PCPC
2   does not get into labeling.
3   BY MR. GOLOMB:
4       Q   Right.  And as far as you know, the FDA
5   also doesn't tell a company what to put on a
6   label, correct?
7           MR. LOCKE:  Objection.  Beyond the
8   scope.
9           THE WITNESS:  I mean, the FDA opined on
10  the Citizens Petitions.
11  BY MR. GOLOMB:
12      Q   Well, but they don't tell the company
13  when -- when to put a label on and when not to,
14  correct?
15          MR. LOCKE:  Objection.  Beyond the
16  scope.
17          THE WITNESS:  I really don't know.
18  BY MR. GOLOMB:
19      Q   All right.  Did you at any time in
20  preparation for any of these depositions read the
21  testimony of Dr. Bailey?
22      A   I did not.
23      Q   Okay.  Were you aware that Dr. Bailey
24  has testified not in a -- in an ovarian cancer
25  case, but in an asbestos case where he discussed

Page 675

1   very specifically the role of the FDA in
2   cosmetics?
3           MR. LOCKE:  Objection.
4           You can answer.
5           THE WITNESS:  I mean, I knew he
6   testified.  I don't know any specifics beyond
7   that.
8   BY MR. GOLOMB:
9       Q   All right.  I want to move to topic 7,
10  which is the National Cancer Institute.
11          What is the National Cancer Institute?
12      A   It's a governmental agency.  I'm not
13  sure "agency" is the right word.  It's a
14  governmental body that I believe funds cancer
15  research.
16      Q   And what -- what, if any,
17  communications, directly or indirectly, does the
18  PCPC have with the NCI generally?
19      A   I'm not aware of any.
20      Q   At any time?
21      A   I'm not aware of any, no, at any time.
22      Q   All right.  Have you ever -- and I'm
23  not -- when I say "you," I'm talking about anybody
24  at PCPC because that's your role here today --
25      A   Yes.

75 (Pages 672 to 675)

Linda Loretz, Ph.D.

Page 676

1    Q   -- to testify on behalf of PCPC.
2        Have you had any contact with a member
3   organization, be it J&J, Luzenac, Rio Tinto,
4   Imerys, or any other member, where you have
5   learned that they've had contact with the NCI?
6    A   Not that I'm aware of.
7    Q   So when the NCI on a number of occasions
8   on their website identifies talc as a risk of
9   ovarian cancer, and then that was taken off the
10  website, you have no idea why?
11   A   Correct.
12       MR. LOCKE:  Objection.
13  BY MR. GOLOMB:
14   Q   Okay.  Were you -- were you aware of
15  that before I just told you that?
16   A   I was, and I can't remember how I became
17  aware of that.  I'm not sure I was ever aware that
18  it was on.  I was maybe aware that it was off.
19  But I -- I don't recall --
20   Q   Have you ever --
21   A   -- when I learned that.
22   Q   I'm sorry.  I didn't mean to interrupt.
23   A   Oh, no, since I don't -- I'm not aware
24  of when I learned that.  I mean, I just can't
25  remember.

Page 677

1    Q   Okay.  Have you ever looked at the NCI
2   website for any reason?
3    A   I think I looked at that having heard
4   about that.
5    Q   Well, you have a -- my word, not
6   yours -- I know we have previously gone through
7   the organizational chart in great detail, and
8   there was a Public Relations/Communications
9   department, correct?
10   A   On -- on our website?
11   Q   On PCPC.
12   A   We have -- yes.
13   Q   Right.  And in preparation for this
14  deposition, you were asked very specifically about
15  communications, directly or indirectly, with the
16  NCI concerning the risk of ovarian cancer caused
17  by application of talcum powder.
18   A   Okay.  Yes.
19   Q   And so in your role as a 30(b)(6)
20  witness, did you go to any of the employees within
21  the Communications department, Public Relations
22  department, whatever you call it, as well as
23  the -- the -- and again my word, not yours -- the
24  lobbying arm of PCPC to find out if they had any
25  communications with the NCI?

Page 678

1    A   I wouldn't have because I am absolutely
2   certain they would not do that without talking to
3   the Science department.
4    Q   And why do you say that?
5    A   Because that's just the way we work.  I
6   mean, when -- when the Public Affairs, for
7   example, is doing any kind of a science issue,
8   they're consulting with us.  They're not doing
9   that on their own.
10   Q   Let's go to the next document, which
11  we'll mark as Exhibit 72.
12       (Exhibit No. 72 was marked for
13       identification.)
14  BY MR. GOLOMB:
15   Q   And this again is --
16       (Counsel conferring.)
17  BY MR. GOLOMB:
18   Q   Yeah, it's been previously marked for
19  identification as P-72.  It's up on the screen.
20       (Counsel conferring.)
21  BY MR. GOLOMB:
22   Q   Now, this was the NCI website as of
23  September 15th, 2011.  You can see that from the
24  lower right-hand corner.  Do you see that?
25   A   Yes.

Page 679

1    Q   And this is the "Ovarian Cancer
2   Prevention, PDQ, Prevention Patient Information."
3   Do you see that?
4    A   Yes.
5    Q   Now, are you familiar with the PDQ?
6    A   Um --
7    Q   Not this one in particular.  A PDQ
8   generally.
9    A   I'm trying to -- I'm not sure I know
10  what it stands for.  I think, again, because I've
11  seen something along these lines, I --
12   Q   It's a Physician's Data Query.
13   A   Okay.
14   Q   Does that sound familiar?
15   A   Yeah, it does now.  Yeah.
16   Q   Okay.  And so in order to go on to the
17  website and go specifically to the PDQ, you have
18  to be a physician or scientist that has access.
19  Is that consistent with your understanding?
20       MR. LOCKE:  Objection.  Beyond the
21  scope.
22       THE WITNESS:  Yeah, I just wouldn't have
23  known that.
24  BY MR. GOLOMB:
25   Q   Okay.  And that's fine, by the way.  If

76  (Pages 676 to 679)

Linda Loretz, Ph.D.

Page 680

1  you don't know, it's --
2      A   Right.  I don't know.
3      Q   So that if a -- a woman who has ovarian
4  cancer and is claiming that she got her ovarian
5  cancer from the use of talcum powder, she would
6  not, unless she was a physician or a scientist,
7  have access to the PDQ.  Is that consistent with
8  your understanding?
9          MR. LOCKE:  Objection.  Beyond the
10 scope.
11         THE WITNESS:  I think only just from
12 what you just said, that access is limited to
13 physicians, so...
14 BY MR. GOLOMB:
15     Q   Okay.  Well, on the other hand, if
16 anybody went on to the NCI website, and in the
17 search box typed in "ovarian cancer," they would
18 get a -- a Snapshot of Ovarian Cancer.  Is that
19 consistent with your understanding?
20         MR. LOCKE:  Objection.  Beyond the
21 scope.
22         THE WITNESS:  I guess.  Again, I'm not
23 sure.
24 BY MR. GOLOMB:
25     Q   Okay.  So if you take a look at

Page 681

1  Exhibit -- what was it 72? -- if you take a look
2  at Exhibit 72 --
3      A   Okay.
4      Q   -- this is the PDQ on ovarian cancer
5  prevention, correct?
6          MR. LOCKE:  Just to be clear, it's
7  pages 1 and 3 of a seven-page document.
8          MR. GOLOMB:  Correct.  And that was to
9  show the cover page and the portions relevant to
10 talc.
11 BY MR. GOLOMB:
12     Q   So if you go to page 3 of that document,
13 in the middle of the document it refers to talc.
14 Do you see that?
15     A   I do see that.
16     Q   And it says:  "The use of talc may
17 increase the risk of ovarian cancer.  Talcum
18 powder dusted on the perineum, the area between
19 the vagina and the anus, may reach the ovaries by
20 entering the vagina."
21         Do you see that?
22     A   That's what it says, yes.
23     Q   Did I read that correctly?
24     A   Yes.
25     Q   So that was a -- posted on the PDQ of

Page 682

1  the NCI as of September 5th, 2011, correct?
2          MR. LOCKE:  Objection.  Beyond the
3  scope.
4          THE WITNESS:  September 15th, but yes.
5  BY MR. GOLOMB:
6      Q   2011.
7      A   That's -- that's the date of this
8  document, yes.
9      Q   Okay.  Now, let's go to the next
10 document, which is MBS-CRE271.
11         (Exhibit No. 73 was marked for
12         identification.)
13 BY MR. GOLOMB:
14     Q   Have you seen that before?
15     A   I saw it in preparation for this.
16     Q   Okay.  Do you need time to review it now
17 or --
18     A   Yes.
19     Q   -- or are you familiar with it?
20     A   No, I need time to review it.
21     Q   Go ahead.
22     A   (Peruses document.)  Okay.
23     Q   This is an e-mail exchange back in April
24 of 2013 between William Kelly, Jr., and Jim Tozzi,
25 correct?

Page 683

1      A   Correct.
2      Q   Who is William Kelly, Jr.?
3      A   He is with the CRE.
4      Q   And who is Jim Tozzi?
5      A   Also with CRE, I believe.
6      Q   And if you look at the middle e-mail on
7  page 1 of 2, from Jim Tozzi to Bill Kelly,
8  April 15th, 2013, at 11:12 a.m.  Do you see that?
9      A   Yes.
10     Q   It says -- the second -- the last line
11 on that e-mail says:  "Showing that the CIR as
12 unbiased and cleaning up material on the internet
13 is critical if they are going to calm down
14 lawsuits."
15     A   That's what it says.
16     Q   Do you know what he's referring to when
17 he says "cleaning up material on the internet"?
18         MR. LOCKE:  Objection.  Beyond the
19 scope.
20         THE WITNESS:  I don't.  We didn't see
21 this.  We never talked to them about this.
22 BY MR. GOLOMB:
23     Q   And do you know what he means by "calm
24 down lawsuits"?
25         MR. LOCKE:  Same objection.

77 (Pages 680 to 683)

Linda Loretz, Ph.D.

Page 684

1  THE WITNESS:  I mean, obviously he is
2  referring to litigation, I presume.  But --
3  BY MR. GOLOMB:
4  Q  Okay.  Well, are you aware one way or
5  the other as to whether or not there was any
6  litigation in which any of these companies were
7  sued as a result of the -- the relationship
8  between talc and ovarian cancer as of April 13 --
9  April 15th, 2013?
10  MR. LOCKE:  When you say "any of these
11  companies," to whom are you referring?
12  MR. GOLOMB:  J&J and Imerys and their
13  predecessors.
14  MR. LOCKE:  Objection.  Beyond the
15  scope.
16  THE WITNESS:  Yeah, I don't know the
17  dates of lawsuits, and I -- I just don't know.
18  BY MR. GOLOMB:
19  Q  Okay.  The -- on the bottom of the page,
20  there's an e-mail from William Kelly, Jr., to
21  Tozzi on April 15th, 2013, just 24 minutes before,
22  at 12:48 p.m.
23  Do you see that?
24  A  Yes.
25  Q  And if we look at the second paragraph

Page 685

1  that begins:  "The only account I am working on
2  currently is talc."  Do you see that?
3  A  Yes.
4  Q  And that is -- that's William Kelly, Jr.
5  saying that, correct?
6  A  Yes.
7  Q  And in the -- it says:  "The only
8  account I am working on currently is talc.  Of
9  course, I also want to write an article on the IQA
10  during the next six months as well as clean up the
11  Wikipedia entry on the IQA."
12  What is the IQA?
13  A  I have --
14  MR. LOCKE:  Objection.  Beyond the
15  scope.
16  THE WITNESS:  I don't know.
17  BY MR. GOLOMB:
18  Q  And then it refers to somebody named
19  Shripal.  Do you see that?
20  A  Yeah -- yes.
21  Q  Who is that?
22  A  Shripal is somebody at Imerys.
23  Q  Right, that's Shripal Sharma, correct?
24  MR. LOCKE:  Objection.
25  THE WITNESS:  I -- I mean, I would

Page 686

1  assume because it's an unusual name, that's who he
2  is talking about, yes.
3  BY MR. GOLOMB:
4  Q  All right.  And do you know -- do you
5  know Mr. Sharma?
6  A  I may have been on a phone call with him
7  once or twice, but I don't know if I've met him.
8  Q  All right.  Have you ever spoken to him
9  specifically about talc and its association with
10  ovarian cancer?
11  A  As I said, I may have been on a phone
12  call, and I can't remember context, but -- I mean,
13  it'd be on a conference call.  I don't believe
14  I've ever spoken to him one on one.
15  Q  All right.  And if we look at the last
16  sentence going on to the next, the first sentence
17  of the next page, it says:  "Shripal knows that we
18  engineered the CIR report from the outset."
19  Did I read that correctly?
20  A  That's what it says.
21  Q  And that's from one CRE employee to
22  another?
23  A  That's what it looks like.
24  Q  Let -- let's take a look at the next
25  document, which was previously marked for

Page 687

1  identification as Plaintiff's Exhibit P-225.
2  (Exhibit No. 74 was marked for
3  identification.)
4  BY MR. GOLOMB:
5  Q  This is another Ovarian Cancer
6  Prevention PDQ, correct?
7  A  Yes.
8  Q  And you'll see on the bottom right-hand
9  corner it's dated June 12, 2013.
10  A  Yes.
11  Q  Approximately two years after the last
12  one I showed you.
13  A  Approximately.
14  Q  And if you go on to the next page,
15  towards the bottom quarter of the page, it refers
16  to talc, correct?
17  A  I only have page 1.
18  Q  I'm going to hand you my copy and ask
19  you to turn to page 2.
20  Do you see the highlighted area?
21  A  Yes.
22  Q  Can you just read that for the jury,
23  please.
24  A  It says, quote:  "The use of talc may
25  increase the risk of ovarian cancer.  Talcum

78 (Pages 684 to 687)

Linda Loretz, Ph.D.

Page 688

1  powder dusted on the perineum, the area between
2  the vagina and the anus, may reach the ovaries by
3  entering the vagina."
4     Q   Okay.  And that was in June of 2013,
5  after the first of the lawsuits in the -- in these
6  cases were filed.  Are you aware of that?
7        MR. LOCKE:  Objection.  Beyond the
8  scope.
9        THE WITNESS:  I'm not aware of the
10  dates, no.
11  BY MR. GOLOMB:
12     Q   Okay.  Let me show you the next
13  document, which has been marked as P-384.
14        (Exhibit No. 75 was marked for
15        identification.)
16  BY MR. GOLOMB:
17     Q   This is another Ovarian Cancer
18  Prevention PDQ, correct?
19     A   Yes.
20     Q   All right.  And this is a little bit
21  different format taken from the website than
22  previous ones, correct?
23     A   Yes.
24     Q   And do you see the -- the date of this
25  in the bottom of the page?

Page 689

1     A   It's hard to read, but it's, I think,
2  August 18, 2014.
3     Q   And at the top of the page, it says:
4  "The following risk factors may increase the risk
5  of ovarian cancer."  Do you see that?
6     A   I do.
7     Q   And the -- the fifth risk factor there
8  is what?
9     A   It says --
10        MR. LOCKE:  Objection.  Beyond the
11  scope.
12  BY MR. GOLOMB:
13     Q   Is what?
14     A   It says "talc."
15     Q   And from the same document, page 2 of 3,
16  it specifically refers to talc, correct?
17        MR. LOCKE:  Objection.  Beyond the
18  scope.
19        THE WITNESS:  Yes.
20  BY MR. GOLOMB:
21     Q   And can you just read that for the jury,
22  please.
23     A   It says, quote:  "The use of talc may
24  increase the risk of ovarian cancer.  Talcum
25  powder dusted on the perineum, the area between

Page 690

1  the vagina and the anus, may reach the ovaries by
2  entering the vagina."
3     Q   Okay.  Thank you.
4        Let me show you the next document.
5        And this is a document which has been
6  previously marked for identification as P-385.
7        (Exhibit No. 76 was marked for
8        identification.)
9  BY MR. GOLOMB:
10     Q   Have you seen this document before?
11     A   Not that I know of, no.
12     Q   All right.  Now, you'll see at the
13  bottom this document was dated March 19th, 2015.
14  Do you see that?
15     A   Yes.
16     Q   And this is after the IARC report that
17  came out and declared talc a Class 2B carcinogen,
18  correct?
19        MS. FRAZIER:  Object to form.
20        MR. LOCKE:  Objection.  I'm not going to
21  direct the witness not to answer, but she's
22  testified she has not seen these exhibits
23  previously.  I'm -- there's a lack of foundation.
24  It's beyond the scope.
25        You can answer to the extent you can.

Page 691

1        THE WITNESS:  And so what was the
2  question?
3  BY MR. GOLOMB:
4     Q   This document is dated March 19th,
5  2015 --
6     A   Correct.
7     Q   -- which is after the IARC report came
8  out, correct?
9     A   Yes.
10     Q   The IARC report which announced that
11  the -- they concluded that talc was a Class 2B
12  carcinogen, correct?
13        MR. LOCKE:  Objection.
14        THE WITNESS:  Based on limited evidence.
15  BY MR. GOLOMB:
16     Q   And in fact, this Ovarian Cancer
17  Prevention PDQ that we're now referring to refers
18  to the IARC report, correct?
19        MR. LOCKE:  Objection.
20        THE WITNESS:  Yes.
21  BY MR. GOLOMB:
22     Q   And do you see at the bottom third of
23  the page, it says "Perineal Talc Exposure"?
24     A   Yes.
25        MR. LOCKE:  Objection.

79  (Pages 688 to 691)

Linda Loretz, Ph.D.

Page 692

1  BY MR. GOLOMB:
2      Q   Can you just read that for us, please.
3      A   It says, quote: "Based on solid
4  evidence, perineal application of talc is
5  associated with a small increased risk of ovarian
6  cancer. The International Agency for Research on
7  Cancer has concluded that perineal talc is a
8  possible carcinogen."
9      Q   And then it talks about the magnitude of
10  the effects, correct?
11      A   It does.
12      Q   And it says an odds ratio of 1.24,
13  correct?
14          MR. LOCKE: Objection.
15          THE WITNESS: That's what it says.
16  BY MR. GOLOMB:
17      Q   Meaning that there is nearly a 25
18  percent increased risk of harm, correct?
19          MR. LOCKE: Objection.
20          THE WITNESS: Well, there's a confidence
21  interval with that, but that's a -- that's what
22  the odds ratio is.
23  BY MR. GOLOMB:
24      Q   Right. And do you have enough
25  experience in epidemiology to understand that that

Page 693

1  is statistically significant?
2          MR. LOCKE: Objection. Beyond the
3  scope.
4          THE WITNESS: I think it depends --
5          MR. LOCKE: Calls for expert testimony.
6          THE WITNESS: Yeah, it depends on what
7  study you're looking at. And I -- I'm surprised
8  that they say "based on solid evidence," because
9  that was -- this finding was specifically based on
10  limited evidence was the conclusion.
11  BY MR. GOLOMB:
12      Q   Well, the National Cancer Institute
13  wrote "based on solid evidence," correct?
14      A   Yes.
15      Q   And you've never seen this before,
16  correct?
17      A   Yes.
18      Q   So you don't know what the National
19  Cancer Institute is basing their -- their
20  conclusion that it's based on solid evidence?
21      A   Yeah. Actually, you're right. I was
22  looking at the IARC sentence.
23      Q   Okay. Let's go to P-437.
24          (Exhibit No. 77 was marked for
25          identification.)

Page 694

1  BY MR. GOLOMB:
2      Q   Now, just to refresh your recollection
3  before you -- and I'll give you whatever time you
4  need -- when we were talking before about the PDQ,
5  I also referred to the snapshot. Do you recall
6  that?
7      A   Yes.
8      Q   And so this is a Snapshot of Ovarian
9  Cancer from the NCI website. Do you understand
10  that?
11          MR. LOCKE: Objection. Beyond the
12  scope, lack of foundation, form.
13          THE WITNESS: Yes.
14  BY MR. GOLOMB:
15      Q   And that's dated August 8th, 2016,
16  correct?
17          MR. LOCKE: Same objections.
18          THE WITNESS: Yes.
19  BY MR. GOLOMB:
20      Q   Have you -- have you seen this document
21  before?
22      A   Again, I -- well, I think I've seen
23  something from NCI once upon a time. It would
24  be -- I don't know what the date would be, so my
25  answer's going to be no.

Page 695

1      Q   Okay. And --
2          MR. LOCKE: I also want to note this is
3  just one of six pages.
4          MR. GOLOMB: Right. And this is the
5  page that refers to talc.
6  BY MR. GOLOMB:
7      Q   Do you see in the lower half portion of
8  that page, the Snapshot of Ovarian Cancer, under
9  Incidence and Mortality, it has risk factors for
10  ovarian cancer. Do you see that?
11      A   Yes.
12      Q   And if you go down to the fourth line,
13  do you see it says there "The use of talc"?
14      A   Yes.
15      Q   So as of August 8, 2016, on the Snapshot
16  of Ovarian Cancer, the NCI website tells people
17  that the use of talc is a risk factor, correct?
18          MS. FRAZIER: Objection to form.
19          MR. LOCKE: Objection.
20  BY MR. GOLOMB:
21      Q   For ovarian cancer.
22          MR. LOCKE: Lack of scope -- or beyond
23  the scope, lack of foundation, form.
24          THE WITNESS: This says risk factor for
25  ovarian cancer, and it includes in their list use

80 (Pages 692 to 695)

Linda Loretz, Ph.D.

Page 696

1  of talc.
2         MR. GOLOMB:  Okay.  Can we go to the
3  next document, please.
4  BY MR. GOLOMB:
5      Q   And just for the record, this is a
6  document which previously was marked for
7  identification as P-645.
8         (Exhibit No. 78 was marked for
9         identification.)
10  BY MR. GOLOMB:
11      Q   So this is another shot of the
12  website -- of the NCI website, A Snapshot of
13  Ovarian Cancer.  Correct?
14      A   Yes.
15      Q   And if you look at the bottom of the
16  page, it's dated October 14th, 2016, correct?
17      A   Yes.
18      Q   And if you look at the third full
19  paragraph, again it identifies the use of talc as
20  a risk factor, correct?
21         MR. LOCKE:  Objection.
22         THE WITNESS:  Yes.
23         MR. LOCKE:  Lack of foundation, scope,
24  form, and it's one page of six.
25         MS. FRAZIER:  Join.

Page 697

1  BY MR. GOLOMB:
2      Q   Okay.  Let's go to the next document.
3         MR. GOLOMB:  What's the number of this?
4         MR. LOCKE:  79.
5  BY MR. GOLOMB:
6      Q   Okay.  This is Exhibit 79.
7         (Exhibit No. 79 was marked for
8         identification.)
9  BY MR. GOLOMB:
10      Q   Again, this is another Snapshot of
11  Ovarian Cancer, which -- in which it continues to
12  identify the use of talc as a risk factor,
13  correct?
14      A   Along with --
15         MR. LOCKE:  Objection.  Same as before,
16  lack of foundation, form, beyond the scope, and
17  it's one page of six.
18         MS. FRAZIER:  Join.
19  BY MR. GOLOMB:
20      Q   Correct?
21      A   Along with many other factors, yes.
22      Q   Okay.  But the use of talc is a factor?
23      A   It is listed there.
24      Q   Okay.  So I don't think anybody is
25  disputing any of the other risk factors.  Have you

Page 698

1  heard that, that any of those other risk factors
2  are in dispute?
3         MR. LOCKE:  Objection.  Beyond the
4  scope.
5         THE WITNESS:  No.  I -- I've never heard
6  of tall height before, but that's just me.
7  BY MR. GOLOMB:
8      Q   But at least of -- again, this is dated
9  December 13th, 2017, on the Snapshot of Ovarian
10  Cancer, the NCI identifies the use of talc as a
11  risk factor, correct?
12         MR. LOCKE:  Same objection.
13         MR. DUFFY:  Beyond the scope.
14         MS. FRAZIER:  Same objection.
15         THE WITNESS:  That's what it says.
16  BY MR. GOLOMB:
17      Q   And so if I understand your -- your
18  testimony correctly, you have never seen any of
19  these PDQs before, correct?
20      A   I think at some point I probably saw a
21  PDQ.  I can't remember when or -- or what.  Again,
22  we -- we didn't have any contact at all with NCI
23  or any connection, but I know I heard about it at
24  some point.
25      Q   Okay.  And -- and did you -- did you

Page 699

1  learn at some point that after December 13th,
2  2017, that the NCI took the use of talc off of its
3  website?
4      A   I couldn't have told you what the date
5  was, but at some point I did learn that it was not
6  listed there.
7      Q   And how did you learn that?
8      A   I have no recall.  Again, we didn't -- I
9  mean, someone must have mentioned it to me at some
10  point or -- yeah, I don't know.
11      Q   Okay.  And did you learn about -- did
12  you know about its proximity to one of the trials
13  in this case?
14      A   No.
15      Q   Okay.  So until I -- I'm telling you
16  now, you were unaware that the NCI took the use of
17  talc off of its website just days before a trial
18  in one of these cases?
19         MR. LOCKE:  Objection.
20         MS. FRAZIER:  Object to form.
21         MR. LOCKE:  Beyond the scope.
22         And just for the record, PCPC wasn't a
23  defendant in that trial.
24         THE WITNESS:  No, I did not know that.
25  BY MR. GOLOMB:

81 (Pages 696 to 699)

Page 700

```
 1        Q   Okay.  So as you sit here today, you
 2   recall that the NCI removed it from its website.
 3   You don't remember how you -- how you learned
 4   that, and you don't know how that got off the
 5   website.  Is that your testimony?
 6        A   Correct.
 7        Q   Okay.  Let's talk about the Talc
 8   Interested Party Task Force.  And I -- we've
 9   talked a lot about this in the last deposition,
10   and so I'm going to try not to repeat myself.
11            But to be clear, there are various
12   records, some of which -- most of which refer to
13   the Talc Interested Party Task Force, some of
14   which refer to the Interested Party Task Force.
15   They're one and the same; is that correct?
16        A   That's correct.
17        Q   Do you know when the task force was
18   created?
19        A   I believe it was created in 19 -- maybe
20   '71, or early '70s.
21        Q   And why was it created?
22        A   In response to the finding of asbestos
23   or the reporting of asbestos in talc.
24        Q   Okay.  Well, was it the reporting of
25   asbestos or was it the reporting of talc in the
```

Page 701

```
 1   ovarian tissue?
 2        A   I thought it was the reporting of
 3   asbestos.
 4        Q   All right.  You -- you were asked
 5   earlier by Mr. Tisi about the association between
 6   talc and ovarian cancer, and I think -- correct me
 7   if I'm wrong, I think you said that you -- that
 8   "you," meaning PCPC, CFTA -- first learned about
 9   that potential association in 1982 after the
10   Cramer study.  Was that your testimony?
11        A   I believe that's correct, yes.
12        Q   Are you familiar with the Henderson
13   study?
14        A   I do know what you are talking about,
15   yes.
16        Q   And that was in the early '70s, correct?
17        A   That sounds right.
18        Q   All right.  Was the Talc Interested
19   Party Task Force formed in response to the
20   Henderson study?
21        A   I believe it was formed in response to
22   the asbestos finding.
23        Q   All right.  And when you say "asbestos
24   finding," what are you referring to?
25        A   Well, I'm referring to the newspaper
```

Page 702

```
 1   reports, and I know there was some question as to
 2   what was actually found, but there were reports, I
 3   believe in the newspaper, from findings of of --
 4   I think it was Mount Sinai Hospital or -- anyway,
 5   of the finding of asbestos in talc.
 6        Q   And that was -- was that the finding of
 7   asbestos in talc, that talc specifically being
 8   found in the ovarian tissue?
 9        A   No.  I thought it was just talc being
10   found in -- excuse me -- asbestos being found in
11   talcum products.
12        Q   Just generally?
13        A   Yes.
14        Q   All right.  And so you don't have a
15   recollection one way or the other as to what the
16   Henderson study concluded?
17        A   My recollection of the Henderson study
18   is that they were reporting the finding of talc in
19   ovaries, but I believe they also found them in
20   controlled women that hadn't been exposed to talc.
21   So it was --
22        Q   Okay.  And as you sit here today, do you
23   know one way or the other as to whether or not
24   the -- the Talc Interested Party Task Force was
25   created before or after the Henderson study?
```

Page 703

```
 1            MR. LOCKE:  Objection.  Asked and
 2   answered.
 3            THE WITNESS:  As far as I'm aware, it
 4   was created in response to the asbestos issue.
 5   BY MR. GOLOMB:
 6        Q   Okay.  Well, that -- but that wasn't my
 7   question.  My question was, do you know one way or
 8   the other as you sit here today -- because you
 9   don't -- you don't know the chronology of the --
10   the asbestos finding and the Henderson study,
11   correct?
12            MR. LOCKE:  Objection.
13            THE WITNESS:  Yeah, I don't know the
14   year of the Henderson study.
15   BY MR. GOLOMB:
16        Q   Right.  But my question to you is a very
17   specific one, and that is, do you have a
18   recollection one way or the other as to whether or
19   not the Talc Interested Party Task Force was
20   created in response to the Henderson study?
21            MR. LOCKE:  Objection.  Asked and
22   answered.
23            THE WITNESS:  What's the question?  Was
24   it in response --
25            MR. GOLOMB:  Can you read back the
```

Linda Loretz, Ph.D.

Page 704

1  question, please.
2      THE WITNESS:  I believe no.
3  BY MR. GOLOMB:
4      Q   Okay.
5      A   I believe it was created in response to
6  the asbestos issue.
7      Q   And when you say "in response," what was
8  the purpose of it?
9      A   To address -- when there was the
10 finding, it was to look further into that to see
11 if it was real, and then ultimately to come up
12 with a specification so that -- to confirm that
13 there was no asbestos in talc.
14     Q   And -- and how is -- how is a task force
15 like that created?
16     A   So in general, if you -- I mean, if
17 there's a finding, then basically we inform our
18 members, and we look for interest in pursuing some
19 activities related to a -- a particular issue.
20 And in those -- those people again would, on their
21 own, then that would be the group that would
22 decide where do we go from here, what do we do.
23     Q   Okay.  So it comes from you, meaning the
24 PCPC, rather than the members coming to you and
25 saying, you know, I just read something, this may

Page 705

1  be something that we need to create a task force
2  for?
3      A   Oh, no, it depends.  It can go either
4  way.  It can be us finding something.  It's
5  basically -- what our role would be then to
6  disseminate that information to see if there is
7  interest in forming a task force and -- and taking
8  on further activities.
9      Q   Okay.  And in the case of the Talc
10 Interested Party Task Force, was that something
11 where the -- the CFTA went through its members or
12 one of its members came to the CFTA?
13     A   I think I'd have to say I don't know.
14     Q   Did you go back and -- there's minutes
15 of these -- of these meetings, right?
16     A   Yes.
17     Q   So let me ask you generally, when the
18 idea is created to -- to create a task force, how
19 is it then implemented?
20     A   We would go out to -- in general, and
21 this is -- since this was years before, it's going
22 to be a little bit of a different setup than I'm
23 not going to be aware of, but we would go out to
24 committees where we think there might be interest,
25 we would try to spread the word as widely as we

Page 706

1  could where we think we might have members who are
2  interested, should know about this, and then see
3  if they're interested in again, you know, taking
4  on further activities related to a particular
5  topic.
6      Q   And when you say "further activities,"
7  what kind of activities?
8      A   It totally depends on what the task
9  force is.  Like I say, in the case of the talc-
10 asbestos issues, then it was putting together a
11 specification -- or, rather, there was a talc
12 specification, but adding in asbestos -- asbestos
13 to that specification and working on methods to --
14 for protection.
15     Q   And one of the, as you say, further
16 activities is the hiring of scientists, correct?
17     A   Well, it could be.
18     Q   Right.  And it was in the case of the
19 talc -- the talc task force, correct?
20     A   I'm not sure what you mean by "hiring of
21 scientists."
22     Q   Well, at some point in time in the -- in
23 response to the Citizens Petition, in response to
24 the NTP preliminary findings, the members of the
25 PCPC at that time, the CFTA, who were also a

Page 707

1  member of the Talc Interested Party Task Force,
2  funded the hiring of scientists and experts to
3  defend them in front of the NTP and to respond to
4  the -- to the Citizens Petition, correct?
5      A   That can be one of the activities that
6  we undertake, yes.
7      Q   But it's --
8      A   It can be doing a study, it could be
9  hiring a scientist or hiring a consultant, I
10 guess, to look at an issue.
11     Q   Okay.
12     A   It could be any number of things.
13     Q   Okay.  And -- and I think we can agree
14 that the -- the funding of the -- these task
15 force, and the talc task force in particular, is
16 not your bailiwick, so to speak, correct?
17     A   Yes.  I mean -- I mean, I could speak
18 generally to funding of task forces.  I mean,
19 obviously depending on how much funding is
20 available and where people's level of interest in
21 helps define what your future activities are.
22     Q   No, but I -- I understand that.  But my
23 question is, if I were to ask you specific
24 questions about the funding of the talc task
25 force, that is not your bailiwick.

83 (Pages 704 to 707)

Linda Loretz, Ph.D.

Page 708

1     A   That was Mark Pollack.
2     Q   Right. And so were you -- were you ever
3   shown the -- the chart that Mr. Pollack created
4   for us where -- for this litigation which
5   identifies how much was deposited into the account
6   of the Talc Interested Party Task Force over the
7   years?
8     A   I think I've seen that, yes.
9     Q   Okay. And so that was somewhere close
10  to half a million dollars, correct?
11    A   I mean that -- that sounds about right.
12    Q   And about 67 percent of that was funded
13  specifically by J&J and Imerys and the
14  predecessors of Imerys, correct?
15    A   That's what I heard this morning, yes,
16  and that sounds right, consistent.
17    Q   And I think you said something -- that
18  there were something like 18 or 20 different
19  members of the task force.
20    A   I'm not sure there's -- I don't think
21  there was more than that, but there was probably
22  close to that. Fifteen.
23    Q   All right. And so the other 16 or so
24  members of the task force put up a third of the
25  funding, and Imerys and J&J put up the balance?

Page 709

1     A   That -- that could be.
2     Q   Okay. And once the task force is -- is
3   created, what happens next?
4     A   Well, I mean, then they would get
5   together and talk about it, and what activities do
6   we undertake, what do we understand about this,
7   what questions, is there -- you know, what
8   follow-up is needed to understand what the issue
9   is, and where do we go from here. And then if it
10  comes to things that cost money, then it was like
11  going out and getting proposals or -- and seeing
12  what people want to do.
13    Q   Okay. And what happened in this case,
14  in the case of the Talc Interested Party Task
15  Force? When -- when was it first discussed
16  amongst its members?
17    A   Are you talking about 1971 when it was
18  first formed?
19    Q   Well, if that's when it was.
20    A   I mean, then there were discussions
21  ongoing about asbestos, and we need methodologies
22  so we can detect if there's asbestos in talc,
23  and -- and there was a great deal of activity
24  related to that, which included FDA activities as
25  well.

Page 710

1     Q   Well, as you -- as you said in your --
2   your testimony just earlier today, the -- you see
3   this -- whether it was the Henderson study or what
4   you said was that asbestos was found in the talc,
5   that the -- the CFTA then went to its members to
6   determine the level of interest for a task force,
7   correct?
8     A   I said that --
9         MR. LOCKE: Objection.
10        THE WITNESS: Yeah, I said that's how
11  generally it works. I mean, I'm not sure exactly
12  how that happened. But, yes, we -- we would want
13  to inform our members, because that's one of the
14  things we do, inform them what issues might be
15  related to them, and then we would generally
16  spread the word, is there interest, is there
17  something that, you know, we should form a task
18  force for. So I assume that's the way it went
19  there basically.
20  BY MR. GOLOMB:
21    Q   And people you think may be interested
22  are then in some form or fashion contacted?
23    A   Well, we would contact -- now -- now
24  certainly -- again, things were a little different
25  back then, but now we would contact through our

Page 711

1   committees. We have a Safety and Regulatory
2   Toxicology Committee. It's a very large committee
3   with a very large mailing list, so that gets to a
4   lot of people. We have a Scientific Advisory
5   Executive Committee now, it now has a different
6   name, but -- and again, there would be more people
7   we would contact. So we would make sure we spread
8   the word because we're just trying to make sure
9   everybody knows what's going on and see if they
10  have interest.
11    Q   And then at some point, whether it's
12  1971 or the way you do it now, once you assess
13  those responses, you have a meeting of some sort,
14  whether it's in person or telephone. Correct?
15    A   Generally, right, we -- then once we had
16  identified interested people, then we would want
17  to get that group together.
18    Q   Okay. And then the -- those interested
19  parties are identified, some employees of the CFTA
20  at the time are then kind of the ones in charge of
21  having that liaison with the members on that
22  particular task force, correct?
23        MR. LOCKE: Objection.
24        THE WITNESS: Yes. Somebody -- somebody
25  would -- from the association would be involved.

84 (Pages 708 to 711)

Linda Loretz, Ph.D.

Page 712

1  BY MR. GOLOMB:
2      Q   Okay.  And when this -- when this task
3  force was first created, who was that person from
4  the CFTA?
5      A   I believe it was -- at the time I think
6  we only had one science person, so it was Norm
7  Estrin.
8      Q   I'm sorry?
9      A   Norm Estrin, I believe.
10     Q   And then there was -- there was in some
11 form or fashion a meeting held of the prospective
12 interested parties?
13     A   Yes.  I mean, I looked at a lot -- a lot
14 of minutes and there were a lot of meetings held.
15     Q   Okay.  Did you see minutes from the --
16 from back -- dating back to 1971?
17     A   I don't know about '71.
18     Q   Well, when was the first --
19     A   I saw them back to the '70s.
20     Q   Okay.  Because I'll represent to you
21 that the first meeting minutes that we have which
22 refers to the, quote, ad hoc talc task force is
23 1982.
24         Were there minutes before that?
25     A   I know I saw documents relating to

Page 713

1  working on specifications.  I thought they were
2  minutes.  Maybe I'm wrong, but I know I saw
3  documents relating to that.
4      Q   Okay.  And the date of the first task
5  force minutes, which I'll show you in a minute,
6  are dated November 11th, 1982.  Do you recall
7  seeing minutes from November 11th, 1982?
8      A   I wouldn't recall a precise date.  I
9  know that there were minutes going into the '80s,
10 and that would have been after the Cramer study.
11 So...
12     Q   Right.  And that's -- that was my next
13 question.  That is a date which coincides shortly
14 after the Cramer study.
15     A   Okay.
16     Q   So is that consistent with your
17 recollection that there was minutes of the ad hoc
18 talc task force shortly after the Cramer study was
19 published?
20     A   I know that there was definitely -- that
21 the task force got together after the Cramer study
22 was published, yes.
23         (Exhibit No. 80 was marked for
24         identification.)
25 BY MR. GOLOMB:

Page 714

1      Q   Okay.  I'm showing you Exhibit 80, which
2  is the cover page of those minutes.
3          Take -- take whatever time you need just
4  to read that.
5      A   (Peruses document.)  Okay.
6      Q   Okay.  Now, when you have a -- a task
7  force like this, is somebody appointed as a -- as
8  a chairman of sorts of the committee?
9      A   It depends.  Sometimes yes, sometimes
10 no.
11     Q   What does it depend on?
12     A   The nature of the committee, the people
13 who are on it.
14     Q   Okay.  And do you recall in -- in this
15 particular case whether or not a chairman was
16 nominated and then agreed to?
17     A   You know, I recall in the case of going
18 back to the '70s when the specifications was going
19 on, I think there was a chair for that effort
20 around developing methodology.  I think there was
21 also a chair on kind of the more overarching talc,
22 not the -- I know I'm not answering your question.
23 I'm just trying to think here.
24         Do I recall if there was one here?  I
25 guess I'd have to say I don't recall.

Page 715

1      Q   Okay.  Is it -- is it consistent with
2  your recollection that there was maybe some
3  activity surrounding the asbestos issue in 1971,
4  and then no longer activity until 1982, when the
5  Cramer study came out?
6          MR. LOCKE:  Objection.
7          THE WITNESS:  No, there was activity in
8  the '70s relating to the asbestos and development
9  of -- of methodology that went well into the '70s.
10 BY MR. GOLOMB:
11     Q   Okay.  And would there have been various
12 meetings in the '70s, whether they were by
13 telephone or in person?
14     A   I believe that's correct, yes.
15     Q   And are -- whether the meeting is held
16 by telephone or in person, are there minutes of
17 those meetings?
18     A   Again, I'm -- I mean, I've seen things
19 on developments of them.  Were they minutes or
20 were they otherwise memos?  Off the top, I don't
21 know.  I thought they were minutes.  I could be
22 wrong.
23     Q   Okay.  And was a -- was a chairman of
24 this particular committee appointed before
25 November 11th, 1982?

85 (Pages 712 to 715)

Linda Loretz, Ph.D.

Page 716

1    A   Well, if there's a chairman appointed on
2  the asbestos -- on the earlier work, that doesn't
3  mean that would be the same chairman in 1982.
4    Q   Okay.  And do you know who Dr. Bruce
5  Semple is?
6    A   I think I've heard the name.  He's at --
7  I want to say P&G.
8    Q   I'm sorry?
9    A   I want to say Procter & Gamble, but I
10  could be wrong.
11    Q   Okay.  Well --
12    A   Only because I've seen the name.  I
13  don't believe I've met the person because that
14  would have been too long ago.
15    Q   If I told you there's a document that
16  says: "On November 11, 1982, nominations were
17  taken from the committee to elect a chairman.
18  After discussion, the task force agreed to elect a
19  chairman and a vice-chairman.  Dr. Bruce Semple
20  from Johnson & Johnson was unanimously elected
21  chairman.  Dr. Edward Jackson from Knoxville was
22  unanimously elected vice-chairman."
23    Would that refresh your recollection?
24    MR. LOCKE:  Objection.  Let the record
25  reflect that counsel is reading from pages that

Page 717

1  have not been shown to the witness, probably of
2  the very same minutes that we're seeing the cover
3  page of.
4  BY MR. GOLOMB:
5    Q   I will refer you to page 2, subsection 4
6  under Administrative Chairman, and take a look at
7  that and tell me if I read that accurately.
8    A   Yes, you read it accurately.
9    Q   Thank you.
10    Who is H. Joseph Sekerke, Ph.D.?
11    A   He is a -- was a CTFA employee
12  scientist.
13    Q   Okay.  So would he have been that person
14  that liaison that we discussed earlier of this
15  particular committee in 1982?
16    A   I think that would be likely.
17    Q   Okay.  And that's who these minutes were
18  signed by -- he just writes "Joe", Joe Sekerke.
19    A   It makes sense.  I mean, it -- again,
20  the science staff was very small at that point, so
21  that was up from one to two at least.  So that
22  makes sense.
23    Q   Okay.  And you mentioned that in -- in
24  1982, we agree that Dr. Semple was the chairman of
25  this committee, correct?

Page 718

1    A   Yes.
2    Q   All right.  And you -- you told us
3  earlier that you read the various minutes of this
4  committee to prepare for your deposition, correct?
5    A   I read some minutes from this committee,
6  yes, or this task force.
7    Q   All right.  And generally -- I'm sorry?
8    A   Task force, I guess we call it.
9    Q   Right.  And generally, what was the goal
10  of the task force back in November of 1982?
11    A   Well, I think just from the minutes, it
12  was -- the concern was the ovarian cancer issue,
13  just given that the study had come out, the Cramer
14  study.  And I know in minutes I've seen, and this
15  refers to them, a thought of doing a study to look
16  at translocation.  So I think that was certainly
17  one of the big discussion points.
18    Q   Okay.  And when you say "look at
19  translocation," what do you mean?
20    A   Trans -- talc can translocate from the
21  perineum to the ovary.
22    Q   Okay.  And what was -- what was done by
23  the CFTA back in 1982 in conjunction with the task
24  force to address that issue?
25    A   So there were -- I think it was actually

Page 719

1  two studies, although I think one was kind of a
2  beginner study leading to a bigger study with
3  monkeys using radio tracers, I think three
4  different radio tracers, that was implanted in the
5  monkey vaginas, and it was -- then it was assessed
6  whether they could -- the talc would translocate
7  to the ovary.
8    Q   Okay.  And then what was done next by
9  the task force or any of its members?
10    A   I -- I don't know what you mean.
11    Q   Well, do you know one way or the other
12  as to whether or not any of the members were then
13  sent out to go talk to Dr. Cramer about his -- his
14  paper?
15    A   I'm not sure.  If you can show me
16  documents that can refresh my memory.
17    Q   Well, I'm just asking you, based on your
18  understanding as you sit here today whether or not
19  Dr. Semple went to go talk to Dr. Cramer?
20    A   I don't remember.  I mean, I may well
21  have looked at those documents.  I just don't
22  remember.
23    Q   Okay.  And what else in the 1980s did
24  the task force do?
25    A   1980s -- sorry.  I just need to think.

86 (Pages 716 to 719)

Linda Loretz, Ph.D.

Page 720

1      I -- I don't remember.  I mean, I know
2  that was the big study that was done.
3      Q   I'm sorry.
4      A   That was the big study that was done.
5  Again, if you show me documents to refresh my
6  memory, that would be --
7      Q   All right.  And is it fair to say that
8  whether it's the -- the Talc Interested Party Task
9  Force or any other task force, that they don't
10  necessarily meet on a regular basis, but they meet
11  kind of depending on the activity of the -- that
12  would be interesting -- interested to the task
13  force?
14      A   That is correct, particularly with the
15  task force.  We have some standing committees that
16  meet regularly, but task force, almost by
17  definition, are responding to specific issues.
18      Q   Okay.  So do you know one way or on the
19  other as to whether or not there was a meeting of
20  the task force between November 11th, 1982, and
21  September 16th of 1993, which I'll represent to
22  you is the -- I'm sorry -- February 2nd, 1993,
23  which is -- I'll represent to you is the -- the
24  next minutes that we have?
25      MR. LOCKE:  Objection.

Page 721

1      THE WITNESS:  I -- I don't know.
2  BY MR. GOLOMB:
3      Q   All right.  Do you know, based on your
4  recollection of your preparation for this
5  deposition, as to whether or not there was
6  something that was going on between 1982 and 1992
7  that would have interested the task force?
8      A   I mean, I think -- I think there were
9  papers that were looked at, but I couldn't be more
10  specific than that at this point.  Again --
11      Q   Papers looked at by whom?
12      A   I think there may have been ovarian
13  cancer papers that were looked at.  But again, if
14  you can show me something to -- to help my memory,
15  that would be great, but -- I know there were big
16  things going on in '93, but --
17      Q   Okay.  And then as -- as you were
18  questioned earlier today by Mr. Tisi, Dr. Gross
19  was then hired in 1993, correct?
20      A   Was that '93?  Yes.
21      Q   All right.  And that's when he -- he
22  published his meta-analysis, correct?
23      A   Yes.
24      Q   And do you know one way or the other as
25  to whether or not Dr. Gross's paper or draft of

Page 722

1  his paper was circulated to the members of the
2  task force before it was published?
3      A   I believe it was.
4      Q   Okay.  And is it -- is it your -- your
5  experience that that is a -- is an ethical
6  approach to the publication of a paper, to
7  circulate it to people who have a financial
8  interest in the outcome of the paper before it's
9  published in a scientific journal?
10      MR. LOCKE:  Objection to form and beyond
11  the scope.
12      THE WITNESS:  What -- what we -- the
13  comments that we're looking for are typos,
14  clarity.  We can't question the conclusion of the
15  authors, and when we're hiring ethical people,
16  they're not going to let us do that.
17  BY MR. GOLOMB:
18      Q   Okay.  So then -- so you have -- you --
19  the task force meets.  They agree on an approach,
20  in this case the approach is to -- is to contact
21  and retain Dr. Gross, give Dr. Gross kind of his
22  marching orders of what he is going to do.  He
23  goes out and does it.  The -- the money is then
24  funded by the task force comes from your
25  organization.  It's then circulated, and you meet

Page 723

1  to discuss the -- the -- what potential
2  typographical errors.  Is that your testimony?
3      MR. LOCKE:  Objection to form.
4      THE WITNESS:  No, that wasn't my
5  testimony.  I guess it would just be helpful if I
6  could see the documents.
7      I mean, we -- when we -- when we hire a
8  consultant, yes, we do look at -- and there are
9  areas that we have -- industry has knowledge that
10  a consultant may not.  We're hiring -- for
11  example, if we're hiring somebody who is an expert
12  epidemiologist, we can't question his epi- --
13  their epidemiology findings, but we may have more
14  knowledge about how talc is used by a consumer,
15  how -- you know, questions about analysis of talc,
16  purity of talc, mining, mineralogy.
17      So we're reviewing it as -- with some
18  expertise, and as well as saying, you know, if we
19  get a document back and we think there could be
20  more clarity, I mean, I think it's okay to say to
21  an author, Could you clarify a little more what
22  you mean here.
23  BY MR. GOLOMB:
24      Q   Well, does the -- does the document --
25  once the -- once the draft from the outside expert

87 (Pages 720 to 723)

Linda Loretz, Ph.D.

Page 724

1  is -- is written, does that paper then go to the
2  CTFA or does it go to one of the members?
3      A   Typically -- typically it would go -- if
4  CTFA is the one, or PCPC, is arranging that, then
5  it would come back to us, and then we would
6  distribute it to the task force.
7      Q   Okay.  Have you ever seen a situation
8  where an expert was hired and the draft went to an
9  industry member before it went to -- to the CTFA
10 and was circulated to its members?
11     A   Only --
12         MR. LOCKE:  Objection.
13         THE WITNESS:  Only the one we talked
14 about this morning.
15 BY MR. GOLOMB:
16     Q   Which one was that?
17     A   The Huncharek/Muscat review.
18     Q   Okay.  Let me show you the next
19 document.
20         MR. GOLOMB:  This is Exhibit 81.
21         (Exhibit No. 81 was marked for
22         identification.)
23 BY MR. GOLOMB:
24     Q   And for the record, this is a memorandum
25 dated September 22nd, 1993, from Stephen Gettings,

Page 725

1  Ph.D., to the Talc Interested Party Task Force.
2          First of all, let me just ask you for
3  the record, Dr. Gettings was the director of
4  toxicology at that time, correct?
5      A   Yes.
6      Q   And was there overlap between
7  Dr. Gettings being the director of toxicology and
8  the time that you came to the CTFA?
9      A   No.
10     Q   When did Dr. Gettings leave?
11     A   I -- well, I started in October of '97,
12 and he left soon before then.  He had actually
13 moved over to the legal department and was there
14 very briefly, and then he moved on to -- he went
15 to a member company.
16     Q   And who replaced Dr. Gettings?
17     A   I did.
18     Q   All right.  And so have you seen this
19 document before?
20     A   I don't know.  I want to say I don't
21 think so.
22     Q   Okay.  So this is a CF -- CFTA document
23 dated September 22nd, 1993, and you did not see
24 this in your preparation of now Day 3 of a
25 deposition?

Page 726

1      A   I -- I don't know.
2          MR. LOCKE:  Objection.
3  BY MR. GOLOMB:
4      Q   If you just read the second paragraph,
5  you'll see:  "It has been proposed that we arrange
6  for Dr. Gross to publish his analysis."  Do you
7  see that?
8      A   Yes.
9      Q   And then the next sentence says:
10 "Johnson & Johnson will arrange for preparation of
11 a first draft, which will then be reviewed by the
12 task force."  Correct?
13     A   Yes.
14     Q   Okay.  Is that the first time you've
15 ever seen anything like that where a member -- an
16 industry member gets the first draft of -- and
17 then they circulate it?
18         MR. LOCKE:  Objection.
19         MS. FRAZIER:  Object to form.
20         THE WITNESS:  Well, as I say, the one
21 this morning would be the other one, but "will
22 arrange for the preparation," so I guess they're
23 the interface with the consultant.  And then it
24 will go to the task force.  So I'm not sure if J&J
25 is reviewing the draft.  They're arranging for the

Page 727

1  draft to be prepared is how I'm reading this.
2  BY MR. GOLOMB:
3      Q   Okay.  So that -- that's how you read
4  "Johnson & Johnson will arrange for a preparation
5  of a first draft"?
6      A   Probably, yeah.  I don't -- I don't know
7  for sure.
8      Q   So you don't -- as you sit here, you
9  don't know one way or the other as to whether
10 Johnson & Johnson received that first draft?
11     A   No.
12     Q   And if so, you don't know what happened
13 to that first draft once it was reviewed by
14 somebody at Johnson & Johnson and then circulated
15 amongst the task force members, correct?
16         MS. FRAZIER:  Object to form.
17         MR. LOCKE:  Objection.
18         THE WITNESS:  Yeah, I don't know if J&J
19 reviewed the draft, it went straight to the task
20 force.
21 BY MR. GOLOMB:
22     Q   Okay.  And then it says if you -- quote
23 in big -- in capital letters, bold:  "If you DO
24 NOT AGREE with this proposed course of action,
25 please contact me by close of business, COB,

88 (Pages 724 to 727)

Linda Loretz, Ph.D.

Page 728

1    Monday, September 27th, 1993."  Correct?
2        A   That's what it says, yes.
3        Q   And are you aware one way or the other
4    as to whether or not anybody objected to that?
5        A   No, I would not be aware.
6        Q   And is it generally the -- the role at
7    the CFTA at the time that they review any document
8    before it's published?
9        MR. LOCKE:  Objection.
10       THE WITNESS:  I would say we -- we
11   generally review documents before they're
12   published, yes.
13   BY MR. GOLOMB:
14       Q   Okay.  And you told us one of the
15   reasons why you do that is to -- for grammatical
16   errors.  Why else would you -- why else would the
17   CFTA review publications of outside experts before
18   they're published?
19       A   I guess, again, I would just say that
20   there may be some expertise, some -- you know,
21   again, more knowledge of -- if somebody is writing
22   on talc, the industry knows best how it's used.
23   If there is any question of how it's sourced, that
24   kind of thing, whether it came up in this
25   document, I don't know, but there are certain

Page 729

1    areas of expertise.  Yeah, we're hiring them for
2    their epidemiology expertise.
3        Q   And do you -- do you know who it is that
4    paid for Dr. Gross's report?
5        A   I believe we did.
6        Q   When you say "we," you mean the PCPC?
7        A   I'm sorry.  PCPC, yes.
8        Q   At the time CTFA?
9        A   Yes.
10       Q   And that would be out of money that is
11   deposited into the task force account?
12       A   Yes.  That would be typical.
13       Q   The PCPC or its predecessor CTFA
14   wouldn't go out of pocket to pay for something
15   like this, right?  They would ask its members
16   first?
17       A   The activities of the interested
18   parties, that's what they are -- that's what
19   "interested party" refers to, people who are
20   willing to expend money, because you have to do
21   that to get certain things done.
22       Q   Okay.  And that so the -- the task force
23   members agree on a course of action, in this case
24   the course of action was to hire Dr. Gross.
25   Dr. Gross makes a proposal.  The task force then

Page 730

1    gathers in some form or fashion, or maybe there's
2    some leadership to the group, like Dr. Semple and
3    some others, that say, Okay, this is reasonable,
4    go ahead, and then the -- the CTFA can you tell us
5    a check.
6        A   We do a contract, and we would be the
7    ones who would pay, yes.
8        Q   Okay.  Have you ever seen a situation
9    where the -- the industry member pays for it
10   themselves?
11       A   Not in my experience, that's not how
12   it's worked.
13       Q   Okay.  And why do you do it that way?
14   Why do you have -- why is the money deposited into
15   the CTFA, and then a check written from the CTFA
16   to the expert, rather than the industry member pay
17   for it themselves?
18       A   Because it's multiple industry members.
19   So we're -- we're putting the industry resources
20   together, so we're the site where the money is
21   collected, and then we write one check to the
22   consultant.
23       Q   Okay.  Let me show you the next
24   document.
25       This is 82.

Page 731

1        (Exhibit No. 82 was marked for
2        identification.)
3    BY MR. GOLOMB:
4        Q   Now, this is a letter from Dr. Alfred
5    Wehner, correct?
6        A   Yes.
7        Q   And it says it's cc'd to M. Chudkowski,
8    correct?
9        A   Yes.
10       Q   Who is that?
11       A   Michael Chudkowski, he's a J&J person.
12       Q   And is there a reason why Mr. Chudkowski
13   was the sole member of the task force that was
14   copied on a letter from Dr. Wehner to Dr. Gettings
15   in November of 1993?
16       A   I think I need to read it first.
17       Q   Okay.
18       A   (Peruses document.)
19       I don't know.  I don't know if $1400 was
20   the whole amount, and this to me looks like this
21   is not the way we normally do things.  Normally,
22   the -- as I say, we pay them for an interested
23   party.  So I don't know why in this case J&J
24   was -- as asked being to pay.
25       Q   Okay.  Let's be clear about this.  Well,

89 (Pages 728 to 731)

Linda Loretz, Ph.D.

Page 732

1  first of all, based on the letter, J&J was not
2  asked to pay, correct?  J&J volunteered to pay.
3      A   Right.
4          MR. LOCKE:  Objection.  Form.
5  BY MR. GOLOMB:
6      Q   Right.  So it says:  "While you" -- it
7  says:  "I am enclosing" -- meaning Dr. Wehner, "I
8  am enclosing Dr. Gross's invoice in the amount of
9  $1400 for his professional services and expenses.
10  While you mentioned, and Mike Chudkowski
11  confirmed, that J&J would pay the costs for the
12  manuscript preparation, I believe it to be
13  appropriate for BEC to submit the invoice to CTFA
14  because CTFA requested the job."  Correct?
15      A   That's what it says.
16      Q   Right.  So they are -- although J&J has
17  volunteered to pay the full costs, at least of
18  that particular invoice, doctor -- Dr. Wehner is
19  suggesting that the -- that the check be cut by
20  the intermediary, CTFA, rather than coming from
21  Johnson & Johnson itself, correct?
22          MR. LOCKE:  Objection.
23          THE WITNESS:  He's saying he's
24  submitting the invoice to CTFA.  So he felt from
25  where he sat, it should come to CTFA.

Page 733

1  BY MR. GOLOMB:
2      Q   The invoice?
3      A   Because then he says he expects that
4  we're going -- that CTFA is going to forward the
5  invoice to J&J.
6      Q   Well, it says:  "When you forward the
7  invoice to J&J, please have them pay out the check
8  to Alan Gross and send it to them directly."
9          So J&J is paying directly.
10      A   That's what it says, yes.
11      Q   Okay.  And that's why that letter was
12  copied to Mr. Chudkowski, right, because --
13      A   Yes.
14      Q   -- he is with J&J, and J&J volunteered
15  to pay.
16      A   Correct.  So this is not, I would say,
17  the usual way that we pay.
18      Q   In fact, you've never seen it done that
19  way before or since, correct?
20          MR. LOCKE:  Objection.
21          THE WITNESS:  I think that's true.
22  BY MR. GOLOMB:
23      Q   Do you know what the Hankinson study is?
24      A   What year does it refer to?
25      Q   Well, I'm just asking if you know what

Page 734

1  the Hankinson study is.
2      A   I know that Dr. Hankinson was an author
3  on a couple of different studies.  She was -- she
4  was one of the coauthors on the Gertig study, but
5  she was also a coauthor on the Houghton study.
6      Q   Okay.  And which study -- if there was a
7  minutes draft -- draft of the minutes from January
8  of 1994, do you know which Hankinson study it
9  would be referring to?
10      A   I don't.  I'm trying to think what year
11  the Gertig study, and I'm -- I'm blanking on that.
12          (Exhibit No. 83 was marked for
13          identification.)
14  BY MR. GOLOMB:
15      Q   Okay.  Let me show you the Talc
16  Interested Party Task Force.  Now, this is -- it
17  says "Draft Minutes."  I'm not sure that we have
18  the final minutes, but it says "Draft Minutes,"
19  dated January 11th, 1994.
20          Have you seen this before?
21      A   I -- I can't recall exactly which
22  minutes I've seen.  If I read it, it might seem
23  familiar, but...
24      Q   Okay.  Did -- did you read what you
25  thought were all of the minutes of the task force

Page 735

1  to prepare for your deposition?
2      A   I read a lot of them.
3      Q   Okay.
4      A   This is why I thought Bruce Semple was
5  from Procter & Gamble because he moved over to it.
6  I think -- I believe I did read these.
7      Q   Okay.  And attached to that, which is
8  Bates-stamped J&J 15618, which is the second
9  page -- well, it's the second page of this
10  exhibit.  It's the third page of the full
11  document.  The second page just saying
12  "Adjournment" and the signature of Steve Gettings.
13          Do you see it says "Draft" on the next
14  page?
15      A   I'm sorry.  Oh, yes, it says "Draft."
16      Q   First of all, how were -- how were these
17  minutes created?  Why -- why are there draft
18  minutes?
19      A   Again, this is before my time.  I can
20  tell you how we do it now, but I think it was the
21  same then, is generally someone would draft
22  minutes, and then it would go out to the group so
23  people could look, and if they said, You know, I
24  remember this a little differently, or really you
25  should -- we talked about this too, and it doesn't

Linda Loretz, Ph.D.

Page 736

1  seem to be here.  Just so members would have a
2  chance to -- to input so that they were accurate.
3      Q   Okay.  And these minutes are dated
4  January 11th, 1994.  And if you look at page 2,
5  one of the topics that was discussed was ovarian
6  cancer.  Do you see that?
7      A   Yes.
8      Q   And it refers to the recent paper by
9  Dr. Hankinson, correct?
10     A   Yes.
11     Q   And under paragraph 2, it says "M.
12 Chudkowski."  Again, Michael Chudkowski from J&J,
13 correct?
14     A   Yes.
15     Q   It says: "Agreed to contact Dr. Gross
16 to discuss incorporation of the results of the
17 Hankinson study in his meta-analysis manuscript."
18         Do you see that?
19     A   Yes.
20     Q   So in this case you have a -- what
21 was -- what was Mr. Chudkowski's title at J&J?
22     A   Oh, I don't know.
23     Q   Was he -- was he an executive of some
24 sort?
25     A   I don't know.  I think he was a

Page 737

1  scientist.  I remember him being on phone calls,
2  but I'm not sure I ever knew his title.
3      Q   What kind of scientist was he?
4      A   I just know he participated on technical
5  phone calls, so...
6      Q   All right.  So a member of the -- an
7  industry member of the task force saw -- how was
8  the -- first of all -- strike that.
9          How was the Hankinson study distributed
10 amongst the task force members?
11     A   The fact that it says this 94TA03,
12 that's -- that was what we used to use, a system
13 we used to use.  We used to mail them out, so I --
14 that would -- in '94, I think that would probably
15 be correct, and we would number them accordingly
16 sequentially.
17     Q   Okay.  So it would be somebody -- just
18 so we're clear on this, somebody from the CTFA in
19 their role as whatever they do at the CTFA, would
20 see the Hankinson study, and then the Hankinson
21 study would be circulated to the members of the
22 task force?
23     A   It could be that.  It also could be a
24 member bringing something to our attention that we
25 would circulate.

Page 738

1      Q   Okay.  And do you know in this case how
2  the Hankinson study was identified?
3      A   No, I don't.
4      Q   And then there was a conference -- some
5  sort of conversation or communication between the
6  CTFA and the task force members about that study,
7  correct?
8      A   Yes.
9      Q   And Mr. Chudkowski then agreed to
10 contact Dr. Gross, who had been hired and was in
11 the process of drafting a -- essentially a report
12 in defense of the -- the industry from the
13 Citizens Petition that was filed in 1993, correct?
14     A   Yeah, I think that's right.  He was
15 doing a meta-analysis.  So...
16     Q   Okay.  And do -- are you aware one way
17 or the other as to whether or not there were any
18 other studies that were published in that
19 intervening time between the time that Dr. Gross
20 was hired and the time that he finalized this
21 report?
22     A   No, I'm not.
23     Q   Okay.  So you don't know one way or the
24 other as to whether or not there are other
25 reports, other papers other than the Hankinson

Page 739

1  study, which in fact confirm the association
2  between talc and ovarian cancer; is that correct?
3          MR. LOCKE:  Objection.
4          THE WITNESS:  There's also -- there's
5  reference here to another study as well.
6  BY MR. GOLOMB:
7      Q   Okay.  Do you know one way or the other
8  as to whether or not that study confirms the
9  association between talc and ovarian cancer?
10     A   I do not.
11     Q   Okay.  Are you -- are you familiar with
12 the NTP inhalation study?
13     A   Yes.
14     Q   And what did the NTP inhalation study
15 conclude?
16     A   It concluded that talc -- inhaled talc
17 was carcinogenic to female rats, caused lung
18 cancer.  There was no evidence of carcinogenicity
19 in male or female mice, and I believe it was
20 equivocal evidence in male rats.
21     Q   Okay.  And anything else?
22     A   That they concluded?
23     Q   Yeah.
24     A   Well, that was the main point, I guess.
25     Q   When was the last time you reviewed the

Linda Loretz, Ph.D.

Page 740

1    NTP inhalation study?
2        A   I didn't review the report.  I reviewed
3    assessments of it.
4        Q   And did you review Dr. Gross's
5    assessment?
6        A   I don't believe so.
7        Q   Okay.  So just we're -- so we're clear,
8    that study was in the early '90s, correct?
9        A   Yes.
10       Q   And it -- it may or may not have -- have
11   had an effect on Dr. Gross's ultimate conclusions,
12   correct?
13           MR. LOCKE:  Objection.
14           THE WITNESS:  I mean, I don't recall
15   that it did because it's not ovarian cancer.
16   It's -- it's -- the NTP study is an inhalation,
17   and it had to do with lung cancer and it was
18   discussed at length at the ISRTP.  So, I'm not
19   sure that -- Dr. Gross, I believe, was doing on
20   ovarian cancer.
21   BY MR. GOLOMB:
22       Q   Okay.  Is that something you're
23   surmising, or is that something that you reviewed
24   from the records?
25       A   I'm trying to remember about Dr. Gross's

Page 741

1    review, but those are two very separate issues,
2    so --
3        Q   Okay.  Well -- all right.  Have you --
4    you have -- prior to preparing for your
5    deposition, did you -- did you review the Gross
6    paper?
7        A   I reviewed -- I mean, by reviewed it --
8        Q   Read it.
9        A   Read it quickly.  I mean, there were
10   drafts, and I -- I looked at it, and I -- I'm
11   recalling them as being ovarian cancer.
12       Q   Okay.  And did you read it in
13   preparation for your deposition?
14       A   I read it quickly.
15       Q   Okay.  When you say "read it quickly,"
16   what does that mean?
17       A   I just mean there's a ton of papers out
18   there, and I certainly am not claiming to -- as I
19   sit here, that I read each and every one and could
20   recall the details of them.
21       Q   Well, there's -- there's a ton of
22   papers, and I think we -- we've already talked
23   about the numbers.  There are now in excess of 30
24   papers that were -- were written by -- by various
25   scientists to look at the association between talc

Page 742

1    and ovarian cancer, correct?
2        A   That's about right.
3        Q   Right.  But this is a paper, the Gross
4    paper was a paper that was where Dr. Gross was
5    specifically retained by industry members of the
6    CF -- CTFA.  That's a little bit different than
7    those other 30 papers, would you agree?
8        A   It is, yes.
9        Q   Okay.  And so are you -- are you telling
10   us that you looked at the Gross paper, reading it
11   quickly with the same care that you did with the
12   other more -- now more than 30 papers?
13           MR. LOCKE:  Objection.  If you have a
14   question about the Gross paper, ask the question.
15   It's not a memory test.  If you want to give her
16   the paper, go ahead.
17   BY MR. GOLOMB:
18       Q   Can you answer my question?
19       A   Yeah, I'm happy to look at it, because
20   again --
21       Q   Well, it's not a memory test.  I'm just
22   trying to -- my question is a very specific one
23   about the -- not about the content of the paper
24   but about the care in which you read the paper.
25           MR. LOCKE:  What difference does it

Page 743

1    make?
2            MR. GOLOMB:  Well, that's rhetorical.
3            THE WITNESS:  Your question --
4            MR. GOLOMB:  I'm not here to answer
5    questions.
6            THE WITNESS:  Your question, I thought,
7    was about NTP bioassay, which was an inhalation
8    assay looking at where lung tumors were found.
9    The Gross paper was about ovarian cancer.  So I --
10   I don't think it's in there, but if you want to
11   show me the paper and -- where that was opined on
12   as well, maybe it was.  I -- I just don't
13   remember.
14   BY MR. GOLOMB:
15       Q   All right.  Well, you -- you said, and
16   when I refer to "you," I'm referring to the CTFA,
17   because you may not have been around at that
18   point.
19       A   I wasn't.
20       Q   But the -- the draft -- in answer to
21   Mr. Tisi's question earlier today, the draft of
22   the -- the Gross paper was circulated amongst the
23   industry members of the CTFA, correct?
24       A   That's correct.
25       Q   Right.  And then it was reviewed by the

92 (Pages 740 to 743)

Linda Loretz, Ph.D.

Page 744

1    CTFA members, and the CTFA members then forwarded
2    comments. Correct?
3        A   I presume so. I didn't -- have not seen
4    those comments.
5        Q   Okay. Let's take a look at the next
6    exhibit.
7            MR. LOCKE: Why don't we take a break.
8    We've been going for an hour and --
9            MR. GOLOMB: Sure.
10           MR. LOCKE: -- almost 50 minutes. I
11   think we've got about 44 minutes left.
12           MR. GOLOMB: Okay.
13           THE VIDEOGRAPHER: The time is 4:38 p.m.
14   We're going off the record.
15           (Recess.)
16           THE VIDEOGRAPHER: The time is 4:49
17   p.m., and we're back on the record.
18   BY MR. GOLOMB:
19       Q   So we were -- we were talking about the
20   NTP inhalation study. And correct me if I'm
21   wrong, you -- you testified that they -- as far as
22   you know, there would be no reason for that study
23   to be included in the paper and analyzed within
24   the paper.
25           Am I summarizing your testimony

Page 745

1    correctly?
2        A   As I recall, the --
3            MR. LOCKE: Objection.
4            THE WITNESS: The Gross paper, because
5    it dealt with ovarian, and the -- and the NTP was
6    inhalation lung cancer issue.
7    BY MR. GOLOMB:
8        Q   Okay. So then I assume that there
9    would -- then there wouldn't be any reason -- and
10   based on what you told us before about kind of the
11   subjects, how subjects are treated within a paper,
12   and typographical or grammatical errors are edited
13   or whatnot, there wouldn't be any reason for an
14   industry member to tell the scientists what to
15   include in the paper, would there?
16       A   You're talking about a consulting
17   scientist?
18       Q   Yeah.
19       A   And would industry -- I mean, we would
20   obviously up front say, This is what we want you
21   to review.
22       Q   Right.
23       A   Or whatever -- whatever they're
24   preparing it on. So I'm not sure what you mean by
25   tell them --

Page 746

1        Q   Okay. Well, we -- we've already --
2    we've already gone through and -- and have agreed
3    that the consultant is hired, the consultant is
4    given marching orders on what to do, the
5    consultant goes out and does it. The consultant
6    then circulates the paper, whether it goes
7    directly to an industry member, as it did in this
8    case, or to the CTFA. It's then circulated to all
9    the industry members, they edit it.
10           Am I -- do I have it correct so far?
11           MR. LOCKE: Objection to form.
12           THE WITNESS: Well, I mean, they
13   would -- I wouldn't say they edit it. They can
14   comment on it, and then CTFA -- generally the CTFA
15   liaison person or PCPC would compile comments, if
16   that makes sense.
17   BY MR. GOLOMB:
18       Q   Okay. And would those comments include
19   telling the scientists include this or don't
20   include that?
21       A   I mean, in general, no. I mean, if they
22   left off a -- didn't include a paper, for example,
23   or something like that, it could be a -- you know,
24   did you mean to exclude this paper or something
25   like that, but I -- but in general --

Page 747

1        Q   What about -- what about the other --
2    the vice versa of that, where they included a
3    paper and would an industry member say, Huh-uh,
4    take that one out?
5        A   Not -- I mean, not to better the
6    results. You know, only if they included some
7    topic that seemed really off topic. But, again,
8    we're choosing our consultants carefully, so we
9    don't think that's going to happen.
10       Q   Okay. But if -- but if that did happen,
11   that would be a problem, wouldn't it?
12       A   If something were like poorly written or
13   something, I mean, you could see where, of course,
14   you could have a comment, but then you would have
15   chosen your consultant wrong.
16       Q   Okay. But if -- if -- okay.
17           And if -- but if the consultant was
18   said -- told by an industry member, Include this
19   but don't include that --
20       A   No.
21       Q   -- you would see an ethical problem in
22   that if that happened?
23       A   Correct. I mean --
24           MR. LOCKE: Objection. Beyond the
25   scope.

93 (Pages 744 to 747)

Linda Loretz, Ph.D.

Page 748

1    THE WITNESS: Right. If they're looking
2  at a topic, then they -- we would be hiring them
3  for their expertise, and they would be selecting
4  what -- what's relevant.
5    MR. GOLOMB: Okay. Can I have the next
6  document, please.
7    (Exhibit No. 84 was marked for
8    identification.)
9  BY MR. GOLOMB:
10   Q   This is Exhibit 84.
11     This is a letter dated May 5th, 1994,
12  from Michael Chudkowski. Have you seen that
13  letter before?
14   A   I don't think so.
15   Q   So this is a letter on Johnson & Johnson
16  stationery dated May 4th, 1994, from Dr. Alan
17  Gross -- I mean to Dr. Alan Gross from --
18     MS. FRAZIER: Do you have a copy of
19  that?
20     (A discussion was held off the record.)
21  BY MR. GOLOMB:
22   Q   -- from Michael Chudkowski, manager of
23  preclinical evaluations. Do you see that?
24   A   To Michael Chudkowski.
25   Q   Do you see the signature line on the

Page 749

1  bottom of the page?
2   A   Yes, I do.
3   Q   Okay. So it's a letter from Chudkowski
4  to Gross, correct?
5   A   Yes.
6   Q   And on the second full paragraph, it
7  says: "Prior to submission, however, please
8  delete any reference to the NTP inhalation studies
9  conducted in rodents."
10     Did I read that correctly?
11   A   You did. And the reason for that would
12  be this is a paper -- this is exactly what I was
13  saying, that it's on ovarian cancer and talc
14  exposure, that's humans. Apparently he included
15  an inhalation study in rodents. That's really off
16  topic. So it's probably -- it doesn't -- it's not
17  relevant to the conclusion related to ovarian
18  cancer and talc exposure.
19   Q   Well, so you're -- you're saying that
20  only the clinical aspect would be relevant to, in
21  this case, the FDA who is looking at a -- at a
22  Citizens Petition rather than some animal study?
23     MR. LOCKE: Objection. Form.
24  BY MR. GOLOMB:
25   Q   You don't think it would be relevant for

Page 750

1  the FDA to see the results of an animal study?
2   A   Well, I think --
3     MR. LOCKE: Same objection.
4     THE WITNESS: -- the FDA knows the
5  results of the animal study. That's not a
6  mystery. I think this is a publication, which
7  perhaps read poorly because it went over into
8  another totally different area. Nothing to do
9  with ovarian cancer, nothing to do with
10  epidemiology study.
11  BY MR. GOLOMB:
12   Q   Okay. So you never talked to
13  Mr. Chudkowski about this, correct?
14   A   No.
15   Q   And you've never talked to Dr. Gross
16  about this?
17   A   No.
18   Q   So what -- you're surmising that they --
19  he -- doctor -- Mr. Chudkowski wants to take the
20  rodent study out of the paper because it's saving
21  the FDA time --
22     MR. LOCKE: Object --
23  BY MR. GOLOMB:
24   Q   -- because they already know about it?
25     MR. LOCKE: Objection. There's no

Page 751

1  evidence that CTFA saw this at this time.
2     THE WITNESS: And I -- I mean, the Gross
3  paper is not -- I mean, it's being published in a
4  journal. I -- I -- this is why I was asking
5  because I was confused why two, so different
6  topics were in the same paper, and it sounded like
7  that was -- that it read that it would be better
8  to have a focus of your paper.
9  BY MR. GOLOMB:
10   Q   Okay. So the -- but the -- but the
11  Gross paper is being sent to the FDA, and Mr. Tisi
12  went through it in great detail this morning, went
13  to the -- to the FDA to defend the industry
14  members against the Citizens Petition, which --
15  which showed a -- which showed evidence of an
16  association between talc and ovarian cancer,
17  correct?
18     MR. LOCKE: Objection.
19     THE WITNESS: I'm not aware the Gross
20  paper went to the FDA. That was the Huncharek and
21  Muscat document.
22  BY MR. GOLOMB:
23   Q   Okay. What was the purpose of the
24  Gross --
25   A   This was -- this was a publication. It

94 (Pages 748 to 751)

Linda Loretz, Ph.D.

Page 752

1    was being published in the peer-reviewed
2    literature.
3        Q    By -- by industry members?
4        A    It was industry sponsored, yes.
5        Q    Right.  And so prior to the -- and I'm
6    reading this again: "Prior to submission,
7    however, please delete any reference to the NTP
8    inhalation study conducted in rodents."
9        That's what it says, correct?
10       A    Correct.  Because I think they were
11   asked to do a paper on ovarian cancer and talc
12   exposure.
13       Q    Okay.  And so are in vitro or in vivo
14   studies irrelevant to the analysis of the
15   association between talc and ovarian cancer?
16       A    I think it's a different topic, and I
17   think -- again, I'm kind of speculating here, but
18   I think this was a paper that was focused on
19   ovarian cancer -- cancer and talc exposure.
20       Q    In any event, Mr. Chudkowski, the
21   manager of preclinical evaluations from Johnson &
22   Johnson, was essentially telling Dr. Gross to
23   delete any reference to the NTP inhalation in this
24   letter, correct?
25       A    Because it was a very different --

Page 753

1        MR. LOCKE:  Objection.  Lack of
2    foundation, beyond the scope.
3        MS. FRAZIER:  Join.
4        THE WITNESS:  -- a very different type
5    of study, an animal study and an inhalation study.
6    It's very different.
7    BY MR. GOLOMB:
8        Q    Let me show you what's being marked as
9    Exhibit 85.
10       (Exhibit No. 85 was marked for
11       identification.)
12   BY MR. GOLOMB:
13       Q    This is a memorandum on CTFA stationery
14   dated January 11th, 1995, to the Talc Interested
15   Party Task Force from Stephen Gettings, director
16   of toxicology at the CTFA.  The subject is "The
17   CTFA response to the Citizens Petition."
18       Do you see that?
19       A    Yes.
20       Q    And this says "Requires Action."  Do you
21   see that?
22       A    Yes.
23       Q    And by require -- in the context of this
24   memo, "Requires Action" means review it and give
25   us back your comments.  Correct?

Page 754

1        A    It could mean, or it could mean -- no,
2    here it is.  "Review and be prepared to discuss at
3    a meeting."
4        Q    At the --
5        A    At an in-person meeting.
6        Q    At the January 18th, 1995 meeting of the
7    task force, correct?
8        A    Yes.
9        Q    And where -- underneath where it says
10   "Requires Action," it says: "The attached draft
11   document," and that is the report from -- is that
12   -- what paper is this referring to?
13       A    That's -- I would ask you that.  I'm not
14   sure.
15       Q    Okay.
16       A    I mean, this is the earlier --
17       Q    This is 1994.
18       A    Right.
19       Q    This is the same time period in which we
20   were talking about Dr. Gross's paper.
21       A    Right.
22       MR. LOCKE:  Wait.  This is 1995.
23       MR. GOLOMB:  19 -- January 11th, 1995.
24   The previous document that we just referred to was
25   1994.

Page 755

1        MR. LOCKE:  May 5th, 1994.
2        MR. GOLOMB:  Okay.
3    BY MR. GOLOMB:
4        Q    So, in any event, this says: "Subject:
5    CTFA Response to Citizens Petition," correct?
6        A    Yes.
7        Q    Okay.  And as you sit here today, do you
8    know who it was that wrote the response?
9        A    No.  I would need to see what the
10   attachment is.
11       Q    Okay.  It says: "The attached draft
12   document has been prepared by J&J in response to
13   the Citizens Petition by the Cancer Prevention
14   Coalition."  Correct?
15       A    Yes.
16       Q    And then attached to that --
17       MR. LOCKE:  Just for the record, this is
18   a document that says at the bottom "1 of 8," and
19   we only have one page.
20   BY MR. GOLOMB:
21       Q    Which is the cover page to the
22   memorandum that went to the members of the Talc
23   Interested Party Task Force.
24       Is that consistent with your
25   understanding?

Linda Loretz, Ph.D.

Page 756

1          MR. LOCKE:  Objection.
2          THE WITNESS:  That's how I would read
3    it.
4    BY MR. GOLOMB:
5      Q   Have you seen this document before?
6      A   I don't know.  I really need to see the
7    attachment.
8      Q   Okay.  I'm sorry, but I don't have
9    copies of the attachment, but here's the draft.
10     A   (Peruses document.)  Okay.
11         MR. LOCKE:  Since it's a J&J document,
12   I'd like to send it down to their counsel just to
13   see.
14   BY MR. GOLOMB:
15     Q   It's a -- just to be clear, it's a --
16   you've now had an opportunity to see that draft,
17   correct?
18     A   Yes.
19     Q   And have you seen that before?
20     A   I'm not sure.
21     Q   Okay.  Did you see the -- the cover
22   memorandum before?
23     A   If I had seen the cover, I would have
24   seen the document, so I think I'm saying --
25     Q   Okay.  And so --

Page 757

1      A   -- probably not, as I recall.
2      Q   So to be clear, in response to what
3    Mr. Locke just said, the draft is a -- and the
4    memorandum is a document which was produced by
5    J&J, but it's a document on CTFA letterhead,
6    correct?
7      A   Yes.
8      Q   Okay.  But you haven't seen that before?
9          MR. LOCKE:  Well, wait.
10   BY MR. GOLOMB:
11     Q   That you can recall as you sit here.
12         MR. LOCKE:  This has a C -- this has a
13   PCPC document and Bates number on it.  So it came
14   from PCPC's files.  But it says on the cover page,
15   "Prepared by J&J."  That's what I was referring
16   to.
17         MR. GOLOMB:  Okay.  Fair enough.
18         I think we're done for the day.  That's
19   the end of this subject, and we'll pick up
20   tomorrow morning.
21         MR. LOCKE:  Okay.
22         MR. GOLOMB:  Let's go off the record,
23   please.
24         THE VIDEOGRAPHER:  The time is
25   5:03 p.m., October 1st, 2018.  We're going off the

Page 758

1    record.  Completing today's videotaped session.
2          (Whereupon, the deposition of
3          LINDA LORETZ, Ph.D. was adjourned
4          at 5:03 p.m.)

Page 759

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2        The undersigned Certified Shorthand Reporter
3    does hereby certify:
4        That the foregoing proceeding was taken before
5    me at the time and place therein set forth, at
6    which time the witness was duly sworn; That the
7    testimony of the witness and all objections made
8    at the time of the examination were recorded
9    stenographically by me and were thereafter
10   transcribed, said transcript being a true and
11   correct copy of my shorthand notes thereof; That
12   the dismantling of the original transcript will
13   void the reporter's certificate.
14       In witness thereof, I have subscribed my name
15   this date:  October 2, 2018.
16
17       _____
18       LESLIE A. TODD, CSR, RPR
19       Certificate No. 5129
20
21   (The foregoing certification of
22   this transcript does not apply to any
23   reproduction of the same by any means,
24   unless under the direct control and/or
25   supervision of the certifying reporter.)

96  (Pages 756 to 759)

Linda Loretz, Ph.D.

Page 760

```
1              INSTRUCTIONS TO WITNESS
2          Please read your deposition over carefully and
3     make any necessary corrections.  You should state
4     the reason in the appropriate space on the errata
5     sheet for any corrections that are made.
6          After doing so, please sign the errata sheet
7     and date it.
8          You are signing same subject to the changes
9     you have noted on the errata sheet, which will be
10    attached to your deposition.  It is imperative
11    that you return the original errata sheet to the
12    deposing attorney within thirty (30) days of
13    receipt of the deposition transcript by you.  If
14    you fail to do so, the deposition transcript may
15    be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25
```

Page 762

```
1              ACKNOWLEDGMENT OF DEPONENT
2          I,_____, do hereby
3     certify that I have read the foregoing pages, and
4     that the same is a correct transcription of the
5     answers given by me to the questions therein
6     propounded, except for the corrections or changes
7     in form or substance, if any, noted in the
8     attached Errata Sheet.
9
10    _____
11    LINDA LORETZ, Ph.D.            DATE
12
13
14    Subscribed and sworn to
15    before me this
16    _____ day of_____,20___.
17    My commission expires:_____
18    _____
19    Notary Public
20
21
22
23
24
25
```

Page 761

```
1          ------
2          E R R A T A
3          ------
4     PAGE LINE CHANGE
5     ____ ____ _____
6     REASON: _____
7     ____ ____ _____
8     REASON: _____
9     ____ ____ _____
10    REASON: _____
11    ____ ____ _____
12    REASON: _____
13    ____ ____ _____
14    REASON: _____
15    ____ ____ _____
16    REASON: _____
17    ____ ____ _____
18    REASON: _____
19    ____ ____ _____
20    REASON: _____
21    ____ ____ _____
22    REASON: _____
23    ____ ____ _____
24    REASON: _____
25
```

97 (Pages 760 to 762)

Linda Loretz, Ph.D.

**A**

**able** 524:14
555:20 591:12
595:9 656:19
**absence** 442:25
**absent** 586:12
**absolutely** 455:2
464:17 587:10
616:21,21
678:1
**abstract** 605:18
**abysmal** 478:17
**accept** 496:17
516:18
**acceptable**
586:24
**accepted** 437:1
501:17 502:23
530:20
**access** 679:18
680:7,12
**accomplished**
662:5
**account** 557:3
685:1,8 708:5
729:11
**accurate** 453:20
460:21 464:2
591:16 595:16
659:9 736:2
760:15
**accurately** 717:7
717:8
**acknowledge**
437:9
**acknowledged**
580:6
**acknowledges**
604:11
**acknowledgm...**
437:12 604:10
604:22,23
762:1
**acknowledgm...**
437:19 610:24
**act** 485:8

**acted** 664:3
**Acting** 493:14
507:5
**action** 408:22
494:19 495:5
623:23 663:22
727:24 729:23
729:24 753:20
753:24 754:10
**active** 419:25
455:24,25
456:1 460:11
460:16 606:5
666:6
**activities** 489:24
704:19 705:8
706:4,6,7,16
707:5,21 709:5
709:24 729:17
**activity** 514:7
709:23 715:3,4
715:7 720:11
**actual** 453:25
468:8 469:21
469:23 470:1
486:23,25
550:8 606:18
616:9,22
617:12
**ad** 390:20
712:22 713:17
**add** 411:3 413:1
414:5 442:23
449:23 450:5
609:5
**added** 409:12
412:14 413:21
415:20 416:25
417:10 418:2
442:19 450:10
607:22 608:12
**adding** 414:9,13
417:16 422:9
441:7 443:1
445:1 706:12
**addition** 411:7

412:19 548:16
646:4,5,5
647:8 648:18
648:19,20
650:5
**additional**
396:11 542:1
568:1 619:16
**additives** 580:15
**address** 508:21
562:1 576:24
704:9 718:24
**addressed**
549:13 568:2
577:4 582:2
598:7
**addresses**
413:16 585:6
**addressing**
574:4
**adequate** 471:5
**adjourned** 758:3
**Adjournment**
735:12
**administering**
380:15
**Administration**
398:17 404:19
438:9
**Administrative**
717:6
**admit** 539:3
**admitted** 597:14
**admittedly**
670:18
**adopted** 551:19
**advice** 475:23
**advise** 591:10
**advisement**
503:15,24
**Advisory** 711:4
**advocating**
665:21
**affairs** 657:5
658:5,14 678:6
**affect** 443:18,22

666:20
**affiliated** 472:24
**affiliation**
429:15
**affiliations**
423:8 445:18
**afternoon**
643:15
**agencies** 667:5
**agency** 408:22
472:7 591:15
675:12,13
692:6
**agenda** 496:21
498:1,5,11
500:4,7 502:24
622:16
**ago** 513:23
552:11 658:16
716:14
**agree** 402:9
414:13 420:14
493:2,4 527:1
543:15 544:6
547:25 554:6,9
558:20 562:22
562:24 567:9
567:12 569:24
570:1 581:11
581:12 612:8
615:1 625:12
632:17 653:17
664:23 671:12
707:13 717:24
722:19 727:24
729:23 742:7
**agreed** 407:20
499:10 501:3
556:22 567:13
570:6 602:8
613:14 653:7
714:16 716:18
736:15 738:9
746:2
**agrees** 531:3
564:21

**ahead** 503:21
651:16 682:21
730:4 742:16
**al** 542:13
**Alabama** 381:24
**Alan** 390:23
391:9 733:8
748:16,17
**Alexandria**
382:6
**Alfred** 391:5
731:4
**algorithm**
574:20
**Allen** 381:21
384:13
**allow** 665:1
**allowed** 425:24
**allows** 663:21,24
**alternatives**
448:16 554:14
554:22
**altogether** 451:3
**Amended**
395:15
**America** 477:2,5
477:8 579:25
627:19 667:10
**American**
388:17 429:16
498:20 506:8
511:10 601:19
615:11,13
617:10 619:18
621:20 622:25
633:10,18
**amount** 403:14
636:15 731:20
732:8
**analogy** 542:25
**analyses** 671:25
**analysis** 386:21
388:15 390:23
436:2 457:11
536:17 547:14
583:12 585:21

Case 3:16-md-02738-MAS-RLS   Document 16136-2   Filed 12/22/20   Page 315 of 746 PageID: 126509
Linda Loretz, Ph.D.

Page 764

639:13 671:21
723:15 726:6
752:14
**analytical** 552:8
**analyze** 412:25
588:7 589:4
**analyzed** 587:19
744:23
**and/or** 588:12
759:24
**animal** 635:11
635:14 749:22
750:1,5 753:5
**animals** 634:12
634:20
**Ann** 613:6
**Anne** 380:12
**announced**
691:10
**answer** 415:7,8
415:14 417:5
426:9 441:17
473:12 503:19
523:16 527:15
531:13,19
539:7 546:21
553:12 556:21
587:25 597:23
607:14 624:15
641:25 653:25
657:21 658:2
659:9 675:4
690:21,25
742:18 743:4
743:20
**answered**
529:19 530:7
530:19 531:5
531:17,20,21
598:6 656:3
657:25 670:8
703:2,22
**answering**
714:22
**answers** 432:25
595:10 598:5

629:13 659:17
659:17 762:5
**answer's** 694:25
**anus** 681:19
688:2 690:1
**anybody** 447:13
483:20 497:22
504:14 505:9
505:10 506:17
523:14 525:15
537:12,20
538:11 556:25
623:21 638:17
638:18 655:9
675:23 680:16
697:24 728:4
**anymore** 572:1
**anyway** 418:10
501:17,18
629:24 702:4
**apart** 583:25
617:2
**apparent** 401:19
**Apparently**
749:14
**appear** 612:3
619:20
**APPEARAN...**
382:1 383:1
384:1
**appeared** 427:2
427:3,7
**appearing**
480:19
**appears** 463:18
495:12 618:7
619:22 660:20
660:21 662:4
**application**
388:18 389:5
409:1 438:13
616:3,8,23
617:7 677:17
692:4
**Applied** 493:18
**apply** 566:23

759:22
**appointed** 714:7
715:24 716:1
**appreciate**
531:9
**approach**
388:11 722:6
722:19,20
**appropriate**
411:23 418:14
516:22 520:7
673:13 732:13
760:4
**approval** 625:4
666:2
**approve** 625:3
**approved** 666:7
**approximately**
410:8 644:6
687:11,13
**April** 386:8
437:1 462:24
486:10 601:4
630:7,16
682:23 683:8
684:8,9,21
**Arch** 383:21
**area** 398:23
409:2 438:14
463:13 572:8
597:3 600:19
613:20 624:1
681:18 687:20
688:1 689:25
750:8
**areas** 723:9
729:1
**argue** 547:22
**arguing** 534:9
**argument**
543:23 576:9
**arguments**
435:8 486:21
561:4,24 562:2
576:12
**arm** 472:10

677:24
**arrange** 726:5
726:10,22
727:4
**arranging** 724:4
726:25
**arrive** 610:1
**arsenic** 586:9,10
588:25 589:2,9
**artful** 577:5
**article** 385:19
386:18 387:4
388:10 389:4
389:14 390:7
390:12 436:20
437:9,14 480:2
480:3 602:17
603:7 610:20
614:7 632:5
685:9
**articles** 432:7,11
445:17,24
479:3 627:5
**asbestiform**
470:19,23,24
**asbestos** 504:19
540:24 543:1,7
543:8,21 544:3
544:6,23 545:4
545:9,16,19,25
546:2,3,9,11
546:25 547:9
547:21 548:1
550:22 552:9
553:21 554:4,7
554:8,25
555:10,25
556:9,15
571:25 573:2,5
575:5,6 576:4
576:20 577:19
585:14 592:18
594:8,14,15,23
594:25 596:9
596:17,18
627:16 642:7

642:19 670:20
674:25 700:22
700:23,25
701:3,22,23
702:5,7,10
703:4,10 704:6
704:13 706:10
706:12,12
709:21,22
710:4 715:3,8
716:2
**asbestos-free**
571:15 572:6
**ascertain** 523:24
525:3
**ASHCRAFT**
382:4
**aside** 396:1
401:14 410:10
422:13 440:20
533:16 581:19
**asked** 408:14
409:8 412:2,14
432:23 448:24
481:20 493:24
495:13 498:21
499:25 501:18
503:1 504:5,8
514:23 518:11
523:13 529:18
530:6,19 531:4
531:16 549:15
549:18 555:9
592:12 595:21
600:10,15
608:23 609:2
609:14 628:1
631:6 634:5
635:25 644:11
646:19 656:3
658:24 659:8
670:7 672:4,5
672:19 673:1
677:14 701:4
703:1,21
731:24 732:2

752:11
**asking** 397:22
  399:4 411:17
  413:24 434:4
  435:11 499:6
  506:24 507:18
  523:10 532:11
  548:8,22
  550:13 556:9
  573:16 581:10
  608:25 609:1,5
  609:7 623:20
  632:15 633:16
  635:22 640:19
  641:9 661:10
  719:17 733:25
  751:4
**asks** 483:2
**aspect** 571:13
  749:20
**aspects** 508:21
  555:8
**aspiration** 583:5
**aspirationally**
  583:1
**assay** 743:8
**assert** 440:21
**assertion** 440:22
**assess** 711:12
**assessed** 631:12
  719:5
**assessment**
  565:6 596:9
  636:9 637:17
  670:18,19
  740:5
**assessments**
  649:22 740:3
**assist** 433:11
**assistance**
  452:16 630:7
  632:4
**assisted** 645:24
**assisting** 477:8
**associate** 449:19
**associated**

567:18 673:14
673:15 692:5
**association**
  394:23,24
  449:20 453:19
  460:4 461:3
  477:2 533:8,19
  534:9,17,20
  542:2 569:10
  569:18 578:8
  594:5,24
  603:23 604:14
  652:1 663:7
  670:24 671:1
  671:16 686:9
  701:5,9 711:25
  739:1,9 741:25
  751:16 752:15
**assume** 450:25
  480:11,13
  500:9 542:8
  547:9 579:23
  626:7 667:2
  686:1 710:18
  745:8
**assumed** 544:25
  555:25 624:18
**assumes** 546:25
**assumption**
  429:24 545:8
**Assured** 450:19
**ASTM** 551:15
**attach** 422:17
  479:12 484:16
  491:20 590:21
  626:21
**attached** 385:10
  386:2 387:2
  388:2 389:2
  390:2 391:2
  431:15,23
  432:15 492:17
  616:9 617:12
  735:7 754:10
  755:11,16
  760:10 762:8

**attaches** 422:19
**attachment**
  431:4 453:13
  616:5 755:10
  756:7,9
**attend** 498:22
**attendance**
  493:13
**attended** 494:6
  540:17
**attention** 573:9
  573:22 574:1
  621:25 622:22
  623:14 737:24
**attorney** 396:15
  760:12
**audience** 505:4
**audit** 555:22
**August** 475:9
  689:2 694:15
  695:15
**author** 723:21
  734:2
**authored** 612:12
**authors** 430:22
  445:13,25
  606:20 610:23
  611:15 625:11
  655:21 722:15
**authorship**
  611:2
**availability**
  591:14
**available** 549:23
  607:6 707:20
**Avenue** 383:14
**avoid** 663:24
  665:2
**aware** 403:25
  405:8 406:13
  407:4 409:17
  409:18,22
  410:4 426:12
  427:12,13
  428:18 435:25
  436:7 442:18

445:8 451:1
463:24 469:22
478:8 480:24
483:18,20
498:24 511:24
515:14 523:8
523:13,17
525:16 553:22
575:24 577:11
577:16 588:11
588:22 589:9
595:18,25
596:22,23
599:9,25 614:8
615:5,6 623:2
624:8 626:11
626:15 627:3
628:9 632:13
632:18 634:11
639:19 641:16
650:20 651:24
655:12 672:19
674:23 675:19
675:21 676:6
676:14,17,17
676:18,23
684:4 688:6,9
703:3 705:23
728:3,5 738:16
751:19
**awareness**
  418:13 449:13
**a.m** 379:21
  392:3 405:16
  405:20 407:12
  407:15 476:10
  476:13 683:8

——————————
**B**
**B** 385:9 386:1
387:1 388:1
389:1 390:1
391:1
**baby** 392:22
  393:7 411:8
  448:8 464:18

464:23 488:20
574:16 580:11
**back** 401:11,12
401:14 405:20
407:2,7,16
408:20 410:11
421:18 428:15
437:8,23,25
451:9 453:25
463:12 469:5
470:11 476:13
493:7 550:22
552:1 553:18
554:2 555:11
555:13,14,22
567:16 570:23
572:7 587:22
589:23 601:3
603:19 606:2
606:12 612:16
618:17 619:5
619:24 632:1
637:5,12 642:9
643:12 644:11
649:8,10 650:8
653:17 658:15
682:23 703:25
705:14 710:25
712:16,16,19
714:18 718:10
718:23 723:19
724:5 744:17
753:25
**background**
  510:7,20
**BACON** 383:5
**Bailey** 388:9
  396:18,20,21
  396:23 416:14
  418:10 454:2,3
  454:5 456:9,20
  457:22 458:18
  483:13 490:22
  490:23 491:10
  492:5 494:2
  495:9 496:19

496:20 497:24
498:12,15
510:17 511:6
517:21 518:15
519:18,20
520:19,25
521:20 523:21
523:22 524:14
524:22 525:15
533:6 534:10
539:4 540:3
541:5 551:2,18
552:7 572:18
590:11,16
591:1 599:22
667:14,16,20
667:24 668:3
669:9,24 670:5
674:21,23
**Bailey's** 491:15
491:21 533:13
**bailiwick** 707:16
707:25
**balance** 708:25
**ballpark** 636:15
651:17,19
**based** 421:5
447:20 461:9
500:9 607:5
609:12 645:23
661:13 691:14
692:3 693:8,9
693:13,20
719:17 721:3
732:1 745:10
**basic** 610:17
**basically** 434:8
473:4 549:5
553:22 568:7
576:20 598:9
610:4 612:1
629:2 663:6
664:18 704:17
705:5 710:19
**basing** 693:19
**basis** 406:12

466:10 470:14
470:15 471:16
544:7 556:17
558:8 596:24
720:10
**Bates** 385:15,18
385:22 386:6,8
386:11,13,16
386:22 387:6
387:13,16,19
387:20,23
388:5,9,13,15
388:18,21
389:9,16,21,23
390:11,21,23
391:5,10,14
470:11 604:8
616:4 757:13
**Bates-stamped**
735:8
**Battelle** 646:25
**Baylen** 381:7
**BCAL-BAIL...**
388:9
**bear** 408:25
438:12 673:12
**bearing** 479:3
**bears** 455:20
**Beasley** 381:21
384:13
**BEATTIE**
381:20
**BEC** 732:13
**beginner** 719:2
**beginning**
407:21 531:25
544:18
**begins** 685:1
**behalf** 381:3
382:15 383:3
383:11 384:3
394:5,12
404:17 425:14
429:20 431:14
432:25 433:7
434:7 436:22

439:13 442:3
482:3,7 499:20
500:14 526:18
529:24 534:10
536:11 538:3
540:4 541:5
543:18 556:12
570:5 617:9
633:24 676:1
**belabor** 585:3
618:19
**Belcam** 450:15
**believe** 393:22
395:22 403:10
403:13 410:9
411:24 413:8
420:12 427:25
428:22 429:14
432:9,25 433:4
440:2,10,14,15
441:12 443:21
447:25 448:20
451:15 452:1
452:17 469:12
469:20 491:18
498:18 512:25
515:7 526:14
533:1,18
535:12 584:17
586:2,15,15
590:11,13
592:2 603:18
615:20 620:6
622:7 623:3,13
624:9 625:19
629:20 631:5
631:18 633:16
645:1 653:25
675:14 683:5
686:13 700:19
701:11,21
702:3,19 704:2
704:5 712:5,9
715:14 716:13
722:3 729:5
732:12 735:6

739:19 740:6
740:19
**Belk** 450:15
**BENJAMIN**
381:12
**Berg** 602:17
609:25 611:19
611:21,21
614:7
**Bernard** 512:22
**best** 403:1 473:6
519:17 520:12
624:7 728:22
**better** 403:7
519:4 650:13
747:5 751:7
**beyond** 397:5,20
415:12 417:3
418:3 464:24
486:2 515:25
516:25 517:10
528:9 533:21
534:23 536:6
544:11 548:5
566:8 567:4
569:3 570:2,8
607:11,24
608:13 672:23
673:25 674:7
674:15 675:6
679:20 680:9
680:20 682:2
683:18 684:14
685:14 688:7
689:10,17
690:24 693:2
694:11 695:22
697:16 698:3
698:13 699:21
722:10 747:24
753:2
**bias** 536:5
**biases** 445:11,12
445:24 446:4
536:2
**big** 488:6,18

513:17 529:25
718:17 720:2,4
721:15 727:23
719:2
**bigger** 428:12
719:2
**biggest** 487:20
488:1 520:23
520:23,24
**Bill** 683:7
**billion** 586:16
**binder** 655:4
**binding** 394:9
395:2
**bio** 504:19
**bioassay** 743:7
**biocides** 580:16
**biologic** 504:20
540:5 557:15
571:12 576:14
576:16 585:12
671:7
**biological** 509:4
542:3 585:10
588:13
**biologically**
541:7 544:8,23
548:2 553:12
557:7 558:4,19
559:25 575:13
577:9 582:3
587:20 589:16
**bit** 395:18
397:23 400:22
402:25 454:3
459:3 503:4,5
645:14 688:20
705:22 742:6
**blanking** 515:11
734:11
**blood** 485:17
**Bob** 431:13
513:24 521:9
**body** 421:7
559:10,14
580:11 611:6
666:21 675:14

**bold** 727:23
**book** 608:6,8
**boss** 454:8
  668:25
**boss's** 668:25
**bottle** 393:6,9,14
  540:19 544:20
  548:24 549:14
  550:14 557:18
  559:22,25
  560:19 571:2
  573:4 574:16
  575:20 581:5
**bottles** 550:8
**bottom** 474:16
  512:16,19
  619:6 684:19
  687:8,15
  688:25 690:13
  691:22 696:15
  749:1 755:18
**bought** 597:3
**bound** 584:11
**bounds** 638:24
**box** 680:17
**Bradford**
  564:13 635:24
**brainstorming**
  641:17
**break** 407:20
  476:2 478:16
  562:6,7 570:16
  570:18 571:3
  572:6 573:6
  618:11 643:7
  744:7
**briefly** 508:11
  725:14
**bring** 401:14
  404:25 445:3
  445:25 468:18
  590:18,19
**bringing** 466:5
  623:19 737:24
**brings** 528:15
**broad** 382:11

398:11,13,15
**broadly** 398:11
  399:13
**brochure** 431:23
  432:15,22
  529:6
**Brooke** 627:9
**brought** 497:5
  500:12 529:6
  573:9,21,25
  622:22 623:14
  639:17,17
**Bruce** 716:4,19
  735:4
**bullet** 495:17
  602:5 662:6,16
  663:11,20
**bunch** 521:10
**Burson-Marst...**
  656:22 657:18
  657:21 658:7
**business** 421:10
  435:19 727:25

---

**C**

**C** 381:1 385:1
  392:1 757:12
**call** 390:11
  457:15 487:2
  489:5 511:7
  512:1 568:13
  568:13 662:25
  677:22 686:6
  686:12,13
  718:8
**called** 394:17
  404:1 422:20
  429:20 450:14
  489:4 491:1
  564:12 575:18
  602:3
**calling** 467:4
**calls** 489:18
  534:24 693:5
  737:1,5
**calm** 683:13,23

**cancer** 385:13
  385:20 386:20
  387:5 388:7,13
  389:6,16,20
  390:7,12,15,16
  390:17,18,19
  392:21,24
  398:8,18 402:4
  404:1,2,18
  406:6,19,20
  407:1,23
  408:13,16
  409:3 410:14
  412:1 413:5
  438:7,10,16
  447:20 450:1
  455:24 459:7
  463:19,25
  464:6,7,10,11
  464:12 472:8
  477:13,14
  478:1 480:15
  483:1 498:21
  501:4 506:8
  508:21,24
  511:11 535:8
  535:14 536:4
  542:2 544:10
  549:12 563:3
  566:6 567:19
  571:22 574:6
  574:22 576:8
  581:3 587:15
  587:21 588:14
  588:17,23
  589:6 592:25
  594:5,11,25
  596:5 599:17
  605:21,22
  606:5 607:4
  611:9,11
  613:21 614:11
  617:8,14 619:4
  621:24 624:14
  628:20 630:9
  634:7,13,19

  639:25 640:7
  641:15 648:14
  652:2,9,13,18
  652:23 670:24
  671:2 674:24
  675:10,11,14
  676:9 677:16
  679:1 680:4,5
  680:17,18
  681:4,17 684:8
  686:10 687:5
  687:25 688:17
  689:5,24
  691:16 692:6,7
  693:12,19
  694:9 695:8,10
  695:16,21,25
  696:13 697:11
  698:10 701:6
  718:12 721:13
  736:9 739:2,9
  739:18 740:15
  740:17,20
  741:11 742:1
  743:9 745:6
  749:13,18
  750:9 751:16
  752:11,15,19
  752:19 755:13
**candidly** 632:1
**capacity** 415:15
  417:6
**capital** 727:23
**carcinogen**
  454:23 465:5
  469:19 473:19
  477:10 541:8
  543:2,9 559:4
  577:19 580:17
  583:2 584:7,16
  584:18 589:10
  690:17 691:12
  692:8
**carcinogenic**
  544:2 557:24
  559:13 571:10

  571:10 582:10
  582:18 739:17
**carcinogenicity**
  739:18
**carcinogens**
  401:20 426:15
  573:12 582:19
  583:2 589:11
  642:6,18
**care** 379:16
  387:9 389:10
  393:25 394:13
  394:15,20
  396:3 406:10
  409:17 410:3,4
  410:13 411:2,6
  411:18,21
  412:8,24
  423:16,23
  424:4 439:1
  442:5 492:5
  515:2 523:22
  532:17 660:6
  742:11,24
**careful** 593:22
  595:15
**carefully** 621:24
  622:23 747:8
  760:2
**cariogenicity**
  584:19
**carry** 644:3
**carrying** 643:4
**case** 385:20
  395:7 396:7,10
  435:12 520:14
  521:13 532:13
  567:20 580:14
  580:15 617:13
  618:25 619:3
  619:19 631:6
  650:1,15,17
  664:8,16
  671:18 674:25
  674:25 699:13
  705:9 706:9,18

709:13,14
714:15,17
722:20 729:23
731:23 736:20
738:1 746:8
749:21
**cases** 379:12
509:2 525:20
688:6 699:18
**Cashen** 388:7
**cast** 536:1
**categories**
397:25 398:2,4
398:9,11,13,15
399:14 518:8
**categorized**
473:25
**Category** 580:17
**CATHERINE**
383:18
**causal** 419:7
440:19 447:25
461:2 533:9
534:9 540:6
542:19 569:23
**causality** 535:10
536:1
**causation**
413:20 415:10
420:10 440:14
536:13 635:25
**causative** 413:7
**cause** 407:22
417:1,1,12
445:2 459:6
544:10 549:12
562:19 563:18
563:24 565:10
568:23 569:2,5
571:22 574:6
574:21 576:8
588:13 606:4
635:13
**caused** 392:23
677:16 739:17
**causes** 563:3

566:6 634:18
**causing** 455:23
**cc'd** 579:13
731:7
**cells** 628:20
634:19
**cellular** 627:15
634:17,19
635:13
**Center** 405:11
**CEO** 660:7
**certain** 403:14
431:13 597:2
678:2 728:25
729:21
**certainly** 418:12
420:3 428:18
431:19 449:17
452:9 458:13
470:4 487:19
489:16 490:10
505:3 552:23
560:3 607:1
634:23 710:24
718:16 741:18
**certificate** 759:1
759:13,19
**certification**
759:21
**Certified** 759:1
759:2
**certify** 759:3
762:3
**certifying**
759:25
**cetera** 489:19
558:1 571:3
580:20 598:7
639:14
**CF** 725:22 742:6
**CFR** 469:23
591:11
**CFTA** 468:16
623:15 647:6
647:22,25
648:6,11,21,22

649:4,8 664:3
664:9 667:4
668:22 669:9
670:2 701:8
705:11,12
706:25 710:5
711:19 712:4
718:23 725:22
728:7,17
**chair** 714:19,21
**chairman** 438:6
714:8,15
715:23 716:1,3
716:17,19,21
717:6,24
**chance** 736:2
**change** 425:25
528:19 608:25
609:5 611:2
661:18 665:23
761:4
**changed** 466:17
551:9,15
610:23,24,25
611:3
**changes** 634:19
635:13 760:8
762:6
**Chapter** 390:5
**characterizati...**
471:4 533:16
**characterize**
531:8 568:18
**characterized**
516:14 517:12
**charge** 636:14
636:23,24
711:20
**Charles** 382:12
**chart** 402:9
459:25 478:14
606:3 677:7
708:3
**check** 538:16
565:2 730:5,15
730:21 732:19

733:7
**checked** 538:13
552:12
**checklist** 565:9
**Chicago** 384:8
405:11 406:1
**choosing** 747:8
**chose** 671:20
**chosen** 747:15
**Chris** 392:20
604:1
**CHRISTOPH...**
381:4
**chromium** 560:8
585:13
**chronology**
703:9
**Chudkowski**
391:10 613:14
731:7,11,12
732:10 733:12
736:12,12
738:9 748:12
748:22,24
749:3 750:13
750:19 752:20
**Chudkowski's**
736:21
**cigarette** 566:6
**CIR** 398:24
399:2,15
662:17,19
663:1 683:11
686:18
**circulate** 722:7
726:17 737:25
**circulated** 722:1
722:25 724:10
727:14 737:21
743:22 746:8
**circulates** 746:6
**circumstances**
409:21 486:22
518:10
**cited** 508:16
552:10

**Citizen** 538:18
654:1
**citizens** 391:13
402:5 453:11
600:22 667:21
668:4,12
669:10 670:14
674:10 706:23
707:4 738:13
749:22 751:14
753:17 755:5
755:13
**Citizen's** 386:4
387:22 398:19
399:23,24
400:4,14,20
402:15,18,25
403:23,25
404:16,17
421:16 422:1
438:8 451:10
453:17 468:25
483:21 486:21
487:1,4,12
490:6,9 495:15
496:6,16
498:13,16
502:17 504:21
508:10 513:25
514:12 515:21
518:10,14,23
519:5,12 521:1
521:18 522:2,9
522:14 523:7
523:15 526:6
526:17 536:23
560:16 582:2
583:8 585:5
590:6 591:18
605:12 608:18
**claim** 392:21
**claiming** 680:4
741:18
**claims** 445:3
**clarified** 497:17
659:10

Linda Loretz, Ph.D.

**clarify** 519:9
599:3 622:7
633:24 638:4
643:20 723:21
**clarity** 486:9
528:20 602:10
722:14 723:20
**Class** 690:17
691:11
**classification**
477:10
**classified** 577:18
**clean** 685:10
**cleaning** 683:12
683:17
**clear** 400:6
429:8 442:15
455:3 466:11
466:15,19
481:14 482:4
484:10 500:7
507:13 534:13
553:7 564:19
564:20,21
593:14 599:24
611:23 617:6
644:2 681:6
700:11 731:25
737:18 740:7
756:15 757:2
**clearance** 666:1
**clearly** 465:7
544:1
**clients** 433:12
**clinical** 562:15
562:20 563:1,7
563:9,10 564:6
749:20
**clinically** 568:23
568:24
**close** 436:21
518:2 638:25
708:9,22
727:25
**closed** 472:17,18
472:20 473:4

**Coalition** 388:8
402:4 404:2,18
408:13 410:15
438:7 483:2
498:21 506:8
511:11 755:14
**coauthor** 652:5
734:5
**coauthored**
636:22
**coauthors** 734:4
**coauthorship**
612:1
**COB** 727:25
**cobalt** 586:7
588:15,16,16
588:21,22
**Code** 390:4
403:11 418:17
469:23 470:9
672:15 673:4
**coincide** 616:4
**coincides** 713:13
**Colgate** 601:24
**collaborative**
452:3
**colleagues**
398:24 487:10
**collected** 730:21
**collective** 514:18
**collectively**
582:7
**colors** 454:20
456:10,11,12
457:8,18 458:7
458:11 485:19
491:9 493:22
494:3 496:1
509:25 515:10
515:12,13
**Columbia**
380:14
**combine** 610:12
**come** 401:11
410:11 429:12
445:17 455:11

455:13 463:12
466:2 472:21
482:15 501:8
502:3,6 537:12
537:20 553:5,6
556:12,13
559:15 562:18
565:22 566:23
649:10 669:25
704:11 718:13
724:5 732:25
**comes** 540:19
560:9 581:4
704:23 709:10
722:24
**comfortable**
397:14 589:7
**coming** 510:12
620:4 642:3
671:14 704:24
732:20
**comment** 387:10
388:5 484:4
516:12 579:17
633:13 746:14
747:14
**comments**
386:15 403:19
410:14 422:5
429:9 434:15
475:12 477:9
514:18,20,23
515:1 518:2
528:7 538:6,19
648:10,10
664:5,7 722:13
744:2,4 746:15
746:18 753:25
**Commerce**
381:23
**commercial**
443:18
**commission**
507:15 762:17
**commissioned**
451:13 453:18

453:23 467:25
500:13
**Commissioner**
438:8,11
493:14 506:22
507:5,17,18
**commissions**
528:5
**committee** 711:2
711:2,5 714:8
714:12 715:24
716:17 717:15
717:25 718:4,5
**committees**
465:18 705:24
711:1 720:15
**communicate**
424:13 426:22
426:23
**communicating**
521:9
**communication**
419:23 428:14
738:5
**communicatio...**
398:16 399:3
399:14,21
511:22 519:23
592:17,24
593:18 594:4
594:10,13
595:3,8 598:22
599:9 675:17
677:15,21,25
**community**
419:2 459:17
499:12
**companies**
433:12 442:18
442:23 443:2
452:13 487:10
489:16,18
536:22 550:21
555:12 556:13
599:11 601:16
624:12 629:5

642:13 643:4
664:6 672:24
684:6,11
**company** 394:4
394:5,9 440:20
442:25 450:14
487:15 488:21
528:4,5,6
555:11 598:23
599:4 601:23
624:12 628:14
634:12 658:8,9
658:15 673:19
673:21 674:5
674:12 725:15
**company-gove...**
663:25 665:2
**compared**
520:20
**compile** 746:15
**complete** 397:16
622:3
**Completing**
758:1
**completion**
477:23 514:22
639:12
**complex** 433:13
671:5
**component**
559:22
**components**
559:18 574:2
**composite** 616:2
616:19 660:15
662:2
**compound**
518:18 532:24
**comprehensiv...**
575:19
**concept** 412:6
606:6
**concern** 441:6
446:13 456:1
459:7 462:7
464:6 572:8

Linda Loretz, Ph.D.

605:16,18
638:21 718:12
**concerned** 431:3
448:7,15
461:13,19
462:3 463:16
463:18 474:15
540:16 560:3
**concerning**
677:16
**concerns** 407:8
407:21 446:15
463:24 606:4
**conclude** 739:15
**concluded**
691:11 692:7
702:16 739:16
739:22
**concludes** 533:7
652:22
**conclusion**
505:9 693:10
693:20 722:14
749:17
**conclusions**
420:22,23
425:18 426:1
466:2,23
467:16,19
482:3 528:19
565:22 566:24
740:11
**conclusive** 607:5
607:9,15
**concurred**
664:19
**conduct** 562:25
648:22
**conducted** 598:2
749:9 752:8
**conducting**
477:13,18
**conference**
686:13 738:4
**conferring**
589:20 602:21

606:11 626:24
632:25 678:16
678:20
**confidence**
610:3 692:20
**confirm** 457:3
616:18 704:12
739:1
**confirmed** 470:4
732:11
**confirms** 739:8
**conflicts** 445:12
445:18
**confounders**
622:1
**confounding**
540:9
**confrontation**
663:25 664:4
665:2,6
**confused** 593:5
606:22 659:16
751:5
**confusion**
470:22
**conjunction**
718:23
**connection**
406:25 498:5
523:7,15 539:2
539:5,10
569:24 588:16
698:23
**cons** 501:9
**consequences**
470:23
**consider** 395:6
435:7 509:14
537:10 557:17
613:10 637:7
**considerable**
470:22
**consideration**
454:22 470:19
**considerations**
564:23 567:3

**considered**
434:20 439:21
466:17 472:18
473:17 510:8
559:13 565:16
574:4,20 577:9
577:13 581:1
591:23 639:21
**considering**
483:15 613:8
613:25
**considers**
538:22
**consistency**
534:4,7 535:5
**consistent**
459:15,15
481:8 520:12
533:24 534:1
536:13 561:6
679:19 680:7
680:19 708:16
713:16 715:1
755:24
**constituent**
574:7,8 634:18
635:12
**constituents**
540:22 574:2
574:19 577:7
577:12,18
582:5 583:11
586:1 588:8
**consult** 414:8
416:2,15,16
**consultant** 481:8
630:8 631:6
707:9 723:8,10
726:23 730:22
746:3,3,5,5
747:15,17
**consultants**
399:8,15 426:4
430:5 434:8
435:14 440:21
442:3 478:10

481:22 482:8
600:20 747:8
**consulted** 399:9
633:20
**consulting**
433:19 482:10
632:4 655:2,5
678:8 745:16
**consumer**
667:10 723:14
**consumers**
506:9,19 550:9
**contact** 425:15
463:19 515:9
520:16 521:20
524:14 559:15
599:25 676:2,5
698:22 710:23
710:25 711:7
722:20 727:25
736:15 738:10
**contacted**
406:11 517:22
521:20 523:6
523:14 538:11
710:22
**contacting**
521:14 524:3
**contacts** 538:12
539:18 600:25
**contain** 413:13
550:14 573:11
**contained**
396:13 543:21
557:18
**containing**
470:23,24
487:4 514:2
580:13
**contains** 560:7
**contaminant**
547:6 556:25
**contaminants**
558:17 573:20
577:2 585:7
588:12

**contamination**
504:18 544:3,7
545:4 576:4
588:21
**content** 531:3
602:8 742:23
**contest** 562:17
**context** 400:19
400:25 441:16
441:24 443:20
444:11,13
448:19 455:8
456:8 459:4
545:24 587:19
597:25 686:12
753:23
**contexts** 455:17
**continuation**
393:23 395:21
**continued** 382:1
383:1 384:1
392:5 572:12
**continues** 471:6
697:11
**continuum**
455:22
**contraceptive**
386:19 477:25
**contract** 430:3
730:6
**contradictory**
433:14
**contrast** 464:18
**contribute**
407:23 459:7
**contributed**
392:23
**contributing**
455:24
**contributor**
487:20 488:1
**control** 759:24
**controlled**
567:20 617:13
618:25 619:3
619:19 650:1

Linda Loretz, Ph.D.

| | | | | |
|---|---|---|---|---|
| 650:15,17 | 421:13 422:10 | 489:15 490:7 | 634:9,10 638:6 | 721:19,22 |
| 671:18 702:20 | 422:21 423:5 | 490:25 491:5 | 638:7,12,14 | 725:4 726:12 |
| **conversation** | 423:11,17,24 | 491:11,22 | 643:24 645:18 | 727:15 728:1 |
| 514:10 515:20 | 424:5,8 425:22 | 492:3,4,18,22 | 646:6,10,21,24 | 731:5,8 732:2 |
| 738:5 | 426:5,15 | 493:18 494:3,4 | 647:7,15 648:7 | 732:14,21 |
| **conversations** | 427:20,23 | 494:5 495:5 | 648:14 650:12 | 733:16,19 |
| 512:1 516:20 | 429:5 432:8 | 496:1,25 | 650:19 652:2 | 736:9,13 |
| 596:10 | 433:2 434:16 | 497:24 498:2 | 654:8 655:24 | 737:15 738:7 |
| **convinced** 449:1 | 436:25 441:1,8 | 499:8,12,15,18 | 655:25 656:15 | 738:13 739:2 |
| **Cooke** 630:17 | 442:10,16,17 | 499:23 500:2,8 | 656:16 659:17 | 740:8,12 742:1 |
| 630:20,22,25 | 442:20 443:4,9 | 500:14,17 | 659:19,20 | 743:23,24 |
| 632:11 633:20 | 445:13,25 | 502:12,17 | 660:1 662:3,17 | 744:2,20 |
| **cooperation** | 446:23 447:11 | 506:25 507:8 | 662:21,22,24 | 746:10 747:23 |
| 399:11 | 448:17 450:24 | 507:16 509:20 | 663:9,22 664:8 | 749:4 750:13 |
| **coordinate** | 451:4,14 452:8 | 509:21 510:1,9 | 664:21 665:3 | 751:17 752:9 |
| 664:6 | 453:24 454:16 | 510:14 511:6 | 666:3,17 667:2 | 752:10,24 |
| **copied** 428:1 | 454:23 455:14 | 512:24 513:20 | 667:5,17,18,22 | 753:25 754:7 |
| 731:14 733:12 | 456:14,20,23 | 519:19 520:14 | 667:25 668:6 | 755:5,14 |
| **copies** 616:24 | 456:24 457:21 | 520:21 527:9 | 669:12 670:1,3 | 756:17 757:6 |
| 661:10 756:9 | 457:25 458:5 | 527:21 529:25 | 670:6,14 671:2 | 759:11 762:4 |
| **copy** 395:13,13 | 458:19 459:9 | 532:23 534:14 | 671:22 673:2 | **corrected** |
| 401:2 468:8 | 460:11 461:14 | 534:17,18 | 673:16,21 | 496:19 |
| 484:3,3,15 | 462:24 464:12 | 535:2 536:25 | 674:6,14 | **corrections** |
| 603:4 618:9,12 | 464:14,19 | 538:23 539:12 | 676:11 677:9 | 760:3,5 762:6 |
| 621:18 626:4 | 465:19,22,23 | 540:10,24,24 | 681:5,8 682:1 | **correctly** 409:6 |
| 639:2 687:18 | 466:3 467:11 | 543:21,22 | 682:25 683:1 | 438:17 515:6 |
| 748:18 759:11 | 467:19 468:1 | 544:4,10 | 685:5,23 687:6 | 516:15 622:19 |
| **core** 640:14 | 468:21,22 | 545:10 547:15 | 687:16 688:18 | 673:7 681:23 |
| **corn** 446:21 | 469:5,7,9,12 | 551:20 552:20 | 688:22 689:16 | 686:19 698:18 |
| 447:3,8 448:17 | 471:19,21 | 560:14,21 | 690:18 691:6,8 | 745:1 749:10 |
| 451:4 554:20 | 472:2,22,25 | 561:2 563:11 | 691:12,18 | **Cosmair** 601:23 |
| 580:13 | 473:1,15 474:1 | 565:16 566:4 | 692:10,13,18 | **cosmetic** 385:14 |
| **corner** 678:24 | 474:6,17 | 566:24 568:3,9 | 693:13,16 | 386:18 389:5 |
| 687:9 | 475:13 476:21 | 568:12,14,24 | 694:16 695:17 | 393:3 394:21 |
| **correct** 394:18 | 478:20 479:15 | 569:14 571:23 | 696:13,16,20 | 404:3 406:6 |
| 394:24,25 | 479:16 480:19 | 572:13,23 | 697:13,20 | 408:24 413:2 |
| 400:17 401:4 | 480:22 481:10 | 576:9 578:11 | 698:11,19 | 416:25 449:25 |
| 401:25 404:3 | 481:24 482:9 | 578:15 580:2 | 700:6,15,16 | 456:13 471:11 |
| 406:3,20 407:2 | 482:13 483:3,4 | 586:5,13 590:7 | 701:6,11,16 | 473:18 514:11 |
| 407:23,24 | 483:6,12,15,16 | 591:20 592:13 | 703:11 706:16 | 514:15 515:12 |
| 409:9,14 | 484:13 485:1 | 597:6,20 602:1 | 706:19 707:4 | 540:18 549:3 |
| 410:18 411:20 | 485:18 486:5 | 603:8 604:14 | 707:16 708:10 | 554:8,9,13 |
| 412:15,20 | 486:15,15 | 605:23 607:23 | 708:14 710:7 | 577:8 580:6,11 |
| 415:21 418:18 | 487:13,21 | 608:6,12 609:8 | 711:14,22 | 580:13 582:5 |
| 419:3,8,25 | 488:3,8,14,15 | 609:10,15 | 715:14 717:25 | 603:22 604:13 |
| 420:24 421:5 | 488:22 489:11 | 610:6 611:17 | 718:4 720:14 | 607:10 621:23 |

Case 3:16-md-02738-MAS-RLS   Document 16136-2   Filed 12/22/20   Page 323 of 746 PageID: 126517
Linda Loretz, Ph.D.

Page 772

622:11 662:11
665:12 673:11
673:20
**cosmetics**
454:20 456:11
456:12 457:7
457:17 458:7
458:11 485:12
485:19,23
491:9 493:22
494:3 495:25
509:25 510:20
515:13 582:19
665:25 666:8
666:12,14,19
675:2
**cosmeticsinfo....**
656:25 657:2
**cost** 433:1 622:3
638:14,23
643:23 651:15
709:10
**costs** 651:14
732:11,17
**COUGHLIN**
383:13
**Council** 379:16
387:9 393:25
394:13,16,20
396:3 406:11
409:17 410:3,4
410:13 411:2,7
411:18,22
412:9,24
423:17,23
424:4 439:1
442:5 492:5
508:9,14
510:21 515:3
523:22 532:17
552:7 660:7
**Council's**
389:11
**counsel** 384:14
384:15 389:18
392:18 395:13

396:1,4,4
400:3 401:2
405:14 476:7
489:1 496:3
526:1 531:8
532:9 589:20
602:21 606:11
616:18 626:24
629:15 632:25
633:23 678:16
678:20 716:25
756:12
**couple** 513:23
525:10 571:7
578:18 631:11
634:3 656:6
658:17 734:3
**course** 401:12
402:13 446:19
553:1 685:9
727:24 729:23
729:24 747:13
**court** 379:1
380:13 395:6
563:8 669:4
760:15
**cover** 398:23
416:13 457:13
457:14,14
508:13 533:7
600:20 681:9
714:2 717:2
755:21 756:21
756:23 757:14
**covered** 398:24
529:19 574:23
656:2
**covers** 577:14
**co-developing**
514:21
**Craig** 512:22
**Cramer** 420:6
461:1 541:20
542:13,14
652:1 701:10
713:10,14,18

713:21 715:5
718:13 719:13
719:19
**Cramer's**
652:21
**CRE** 683:3,5
686:21
**create** 705:1,18
**created** 700:18
700:19,21
702:25 703:4
703:20 704:5
704:15 705:18
708:3 709:3
712:3 735:17
**criteria** 563:24
564:13,22,23
565:8 567:1
635:24
**critical** 387:5
432:3 480:2,14
671:21,24
683:13
**criticized** 614:22
**critique** 633:20
**CROSS-EXA...**
392:8 643:13
**CROW** 381:21
**Crowell** 426:13
426:19,22
427:16 432:13
475:17 476:17
476:19 578:20
578:25
**crystalizing**
467:14
**crystalline**
393:17
**CSR** 759:18
**CTFA** 386:10
386:15 391:12
394:17 462:13
475:12 510:22
601:24 612:7
613:19 616:17
622:22 623:6

623:23 630:7
631:9 634:6,14
635:22 658:15
661:3,16,18
663:8 717:11
724:2,4,9
725:8 729:8,13
730:4,15,15
732:13,14,20
732:24,25
733:4 737:18
737:19 738:6
742:6 743:16
743:23 744:1,1
746:8,14,14
751:1 753:13
753:16,17
755:5 757:5
**curious** 439:9
441:3 498:15
550:15 620:9
**current** 396:2
449:25 520:5
608:9 663:12
672:24
**currently** 598:3
639:20 685:2,8
**Curtis** 601:24
**cut** 469:13
732:19

**D**

**D** 392:1
**DANIEL** 384:17
**data** 386:6
424:23 425:4,9
433:14 439:6
453:12 505:14
508:20 509:5
649:22 679:12
**date** 453:2
463:23 478:25
516:6,6 521:8
665:15 682:7
688:24 694:24
699:4 713:4,8

713:13 759:15
760:7 762:11
**dated** 462:23
470:10 475:9
479:14,15
486:10,11
492:5 522:1
590:25 605:9
617:19 650:5
687:9 690:13
691:4 694:15
696:16 698:8
713:6 724:25
725:23 734:19
736:3 748:11
748:16 753:14
**dates** 457:3
684:17 688:10
**dating** 712:16
**day** 525:19
591:16 616:7
617:4 725:24
757:18 762:16
**days** 396:15
591:13,25
699:17 760:12
**DC** 380:7
382:19
**deal** 402:15
508:7 556:2
664:4 668:6
709:23
**deals** 485:15,16
485:16,17
608:8
**dealt** 510:13
745:5
**Dear** 621:17
**debate** 419:25
455:25 460:11
460:16 499:11
505:10 509:17
565:20 566:5
566:14 606:5
**debated** 419:1
459:8

Linda Loretz, Ph.D.

**decade** 520:15
**decades** 408:12
  499:14 549:24
  551:1,20
  555:14 566:14
  583:7 623:10
  624:11
**December**
  454:18 456:25
  468:15 469:21
  618:2 698:9
  699:1
**decide** 455:5
  473:4 506:25
  593:9 624:2
  704:22
**decided** 451:3
  467:5 623:23
  628:23 637:1
**deciphering**
  433:13
**decision** 591:12
  651:25 653:10
  673:21
**declared** 690:17
**declined** 628:10
  638:13
**deemed** 760:15
**deep** 595:23
**defend** 707:3
  751:13
**defendant**
  379:16 699:23
**defendants**
  383:3,11
  389:10 519:3
  521:13
**defense** 648:13
  738:12
**defer** 465:6
  467:5 469:18
**deference**
  466:10
**deferral** 467:24
  469:23 471:18
**deferred** 454:22

454:25 455:4
455:10 465:9
465:11,14
470:15,18
471:10
**define** 425:12
  569:19 707:21
**definite** 499:17
**definitely** 558:4
  611:2 713:20
**definition**
  466:15 666:21
  720:17
**definitive**
  621:21
**delete** 749:8
  752:7,23
**demonstrate**
  555:23
**denial** 484:16
  486:10
**denied** 484:12
  484:21
**department**
  387:12 454:8,9
  510:5,9,13
  657:6 677:9,21
  677:22 678:3
  725:13
**depend** 714:11
**depending**
  707:19 720:11
**depends** 425:11
  524:6 584:23
  693:4,6 705:3
  706:8 714:9
**DEPONENT**
  762:1
**deposed** 434:3
  659:18,25
**deposing** 760:12
**deposited** 708:5
  729:11 730:14
**deposition**
  379:16 380:1
  385:11 386:3

387:3 388:3
389:3 390:3
391:3 392:5
393:24 394:2,4
395:11,15,20
395:20,21
396:14,25
397:7 401:13
424:6 518:9
525:19 601:9
602:15 607:21
645:25 647:13
654:20 657:13
658:11,22
659:5,13,22,24
660:11 661:21
677:14 700:9
718:4 721:5
725:25 735:1
741:5,13 758:2
760:2,10,13,14
**depositions**
  525:20 674:20
**derived** 567:20
**describe** 564:11
**describes** 665:11
  667:1
**design** 562:18
  625:2
**designated**
  379:17 397:13
**designed** 586:23
  587:1 621:24
  622:23
**desirable** 560:12
**detail** 495:11
  618:5 672:6
  677:7 751:12
**details** 403:8
  409:23,25
  650:10 741:20
**detect** 709:22
**detectable**
  545:19,25
  546:2,5 556:5
**detection** 546:17

547:5,6 555:4
**determination**
  673:18
**determine**
  523:19 565:10
  610:13 710:6
**develop** 545:17
  587:6
**developed**
  552:11 553:4
  587:14,16
**developing**
  714:20
**development**
  526:5 567:19
  715:8
**developments**
  613:14 715:19
**diagnosed**
  464:12
**diaphragm**
  478:19 479:18
**diaphragms**
  386:19 432:3
  477:25 479:13
**die** 652:17,23
**died** 652:9
**difference**
  414:17 466:22
  580:6 614:21
  624:17 742:25
**differences**
  665:12
**different** 412:3
  413:11 419:20
  420:22,23
  421:1,4 442:22
  461:6 465:15
  466:2,4,23
  467:15,16,18
  477:17 478:5
  481:16 485:14
  485:17 499:22
  516:4 538:1
  546:6 553:19
  563:25 564:8

565:21,22,23
566:23 572:25
628:19 645:15
688:21 705:22
708:18 710:24
711:5 719:4
734:3 742:6
750:8 751:5
752:16,25
753:4,6
**differently**
  539:22 561:8
  561:10 735:24
**difficulties**
  405:18 407:19
**diligence** 429:22
  430:18 529:7
  529:15 530:4
  530:11
**direct** 474:25
  536:20 563:19
  592:23 599:25
  663:24 665:2
  690:21 759:24
**direction** 399:10
  651:2
**directions** 613:8
  613:25
**directly** 454:14
  592:17 595:3
  596:4 600:1
  616:5 660:7
  675:17 677:15
  733:8,9 746:7
**director** 456:22
  493:17 495:25
  524:15 538:21
  725:3,7 753:15
**disagree** 421:12
  472:15 490:18
  562:2 566:4
**disagreed**
  419:23 420:3
  502:5
**disclosures**
  445:10,18

Linda Loretz, Ph.D.

**discuss** 397:9
412:25 449:22
450:3 458:25
495:14 496:16
496:21 497:18
500:1,8,11
501:18 517:16
598:1 613:14
629:6 636:3
642:8 723:1
736:16 754:2
**discussed** 408:3
408:7,9 418:25
435:10,12
443:16 446:17
448:14 459:21
459:24 490:10
561:12 573:2
575:3 589:24
593:2 602:7
606:1 613:12
613:22 614:8
614:17 616:6
621:1 622:10
626:17 639:23
674:25 709:15
717:14 736:5
740:18
**discussing** 503:7
561:14 613:21
**discussion**
407:10 413:13
418:16 459:16
466:21 467:23
490:15 499:1
501:9 509:6,8
509:11 537:6
559:7 573:6
585:13,15
606:13 607:2
623:3 635:20
716:18 718:17
748:20
**discussions**
399:22 524:17
556:20 595:24

627:24 709:20
**disease** 534:20
536:4
**dismantling**
759:12
**dispute** 531:2
698:2
**disputing**
697:25
**disseminate**
705:6
**dissemination**
398:6
**distinguishing**
571:2
**distribute** 724:6
**distributed**
737:9
**District** 379:1,2
380:14
**division** 454:19
456:10 457:7
483:14 490:24
491:1,10
495:25 524:16
538:22 539:12
591:22
**doctor** 420:6
428:12 441:18
468:19 509:16
537:12 585:3
608:24 615:8
618:19 643:15
650:14 732:18
750:19
**doctoral** 611:22
**doctors** 421:11
426:3 435:1
439:17 506:18
**document**
379:11 404:22
404:25 405:3
406:14,15
422:16,17
424:18 431:24
441:19 457:23

462:1,11 469:8
469:9 475:25
478:21 508:14
512:14 513:14
522:7,12
525:24 527:2
527:25 531:11
531:15 532:21
533:2 571:8
573:18 578:7
583:10 588:1,3
589:25 601:6
601:18 604:1,5
606:16 612:17
620:2,8 621:4
631:23 648:25
649:3,13
660:13,15,21
661:9,20,25
662:13 663:2
664:9 665:9
672:7 678:10
681:7,12,13
682:8,10,22
686:25 688:13
689:15 690:4,5
690:10,13
691:4 694:20
696:3,6 697:2
714:5 716:15
723:19,24
724:19 725:19
725:22 728:7
728:25 730:24
731:18 735:11
748:6 751:21
754:11,24
755:12,18
756:5,10,11,24
757:4,5,13
**documents**
396:16 511:25
518:21 580:20
611:24 616:22
617:19 620:10
645:24 646:21

646:23 648:2
656:18 661:14
712:25 713:3
719:16,21
720:5 723:6
728:11
**doing** 398:10
429:25 430:10
443:2 453:3
521:4 528:16
530:11 593:19
599:22 624:22
638:23 647:8
671:20 678:7,8
707:8 718:15
738:15 740:19
760:6
**dollars** 708:10
**DONATH**
383:12 489:25
**dose** 504:18
637:6
**dose-response**
509:2,3 534:14
536:14 576:15
635:23 636:2
636:19 637:14
638:18 639:13
639:15 671:8
**doubles** 568:22
**doubling** 568:10
568:19 569:19
**doubt** 536:1
661:22
**dozen** 671:15
**Dr** 388:4 392:5
392:10 394:12
405:4,7,23
406:11,17
407:18 409:8
410:2 412:14
418:10 419:11
419:13,21
420:3,6 423:2
423:4 424:7,7
424:10,10,15

426:10 427:3,9
429:15 430:1
430:13,13
431:13 432:11
433:24,25
434:2,20,20
435:5 442:1
456:9,17,19,19
456:20 457:22
457:23 458:15
458:16,18
461:1,1 463:4
463:5 468:19
468:20,24,25
469:4 474:3
476:15 480:18
483:1,13
490:22,23
491:10,15,16
491:21 494:2
495:9,23,24
496:19,20
497:6,6,17,24
498:12,15,19
500:13,13
501:8,13 502:3
502:4 504:14
504:14 507:4,4
508:12,13
509:9 510:17
511:6 514:20
517:21 518:15
519:18,20
520:18,19,25
521:20 522:15
524:14,22
525:15 527:19
529:22 530:14
533:6,13
534:10 537:12
538:10 539:4
539:25 540:3
541:5,6,12
542:14 551:2
551:18 552:7
560:17 564:20

Case 3:16-md-02738-MAS-RLS   Document 16136-2   Filed 12/22/20   Page 326 of 746 PageID: 126520
Linda Loretz, Ph.D.

Page 775

| | | | | |
|---|---|---|---|---|
| 568:17 570:25 | 726:6 729:4,24 | due 429:21 | Edward 716:21 | 686:21 717:11 |
| 571:13 572:18 | 729:25 730:2 | 430:18 529:7 | effect 534:22 | employees 396:2 |
| 575:15 578:15 | 731:4,14,14 | 529:15 530:4 | 535:11 562:19 | 396:2,8,8 |
| 578:17 579:16 | 732:7,8,18 | 530:11 611:11 | 563:18,24 | 458:10 677:20 |
| 582:4 585:21 | 734:2 736:9,15 | DUFFY 383:13 | 565:11 568:14 | 711:19 |
| 590:5,16,17 | 738:10,19 | 616:18 617:2 | 740:11 | enclosing 732:7 |
| 591:1 599:22 | 740:4,11,19,25 | 617:15 698:13 | effective 642:17 | 732:8 |
| 602:7,13 | 742:4 748:16 | duly 759:6 | effects 692:10 | engage 509:11 |
| 608:24 609:4 | 748:17 750:15 | dust 583:3 | efficacy 666:13 | 522:24 523:4 |
| 609:25 611:18 | 752:22 754:20 | dusted 681:18 | 666:14,22 | engaging 537:5 |
| 611:19,21,21 | draft 386:7 | 688:1 689:25 | effort 520:24 | engineered |
| 611:23 612:2 | 388:20 391:7 | dusting 450:6 | 522:16 714:19 | 686:18 |
| 613:12,15 | 462:12 466:6 | dyes 435:5 | efforts 514:20 | entering 681:20 |
| 615:5,8,10,14 | 603:19 620:9 | D.C 379:19 | either 393:6 | 688:3 690:2 |
| 615:16 616:6 | 621:8 721:25 | 514:9 597:3 | 396:2 416:14 | entire 456:2 |
| 617:4 619:17 | 723:25 724:8 | | 416:15 424:13 | 459:9 |
| 619:17 621:1 | 726:11,16,25 | **E** | 449:22 498:8 | entitled 385:19 |
| 621:17,19,19 | 727:1,5,10,13 | E 379:15 381:1,1 | 508:20 556:12 | 386:18 387:4 |
| 622:24 624:5 | 727:19 734:7,7 | 385:1,9 386:1 | 560:12 575:5 | 388:10 389:4 |
| 625:21 626:9 | 734:17,18 | 387:1 388:1,8 | 577:1 598:2 | 389:14 390:7 |
| 626:18 627:25 | 735:13,15,17 | 389:1 390:1 | 600:1 601:22 | 390:12 453:11 |
| 628:3,9 629:8 | 735:21 743:20 | 391:1 392:1,1 | 624:2 629:2,6 | 475:11 522:17 |
| 632:8,10,18 | 743:21 754:10 | 761:2 | 639:21 640:4 | 579:16 603:14 |
| 633:9,9,18 | 755:11 756:9 | earlier 423:13 | 705:3 | 612:19 617:8 |
| 636:5,6,6 | 756:16 757:3 | 487:8 589:24 | elect 716:17,18 | 619:3 |
| 638:2 646:6,20 | drafted 416:13 | 606:7 701:5 | elected 716:20 | entity 550:15 |
| 646:25 647:15 | 467:25 526:24 | 710:2 716:2 | 716:22 | entries 385:12 |
| 647:21,25 | 527:5,6 622:24 | 717:14 718:3 | elemental 576:2 | entry 685:11 |
| 648:5,10,18,19 | drafting 481:3 | 721:18 743:21 | eliminate 554:7 | environmental |
| 648:19,20,20 | 738:11 | 754:16 | eliminated | 385:22 405:10 |
| 649:3,8,19,25 | drafts 741:10 | early 459:8 | 545:4,9 546:9 | 405:25 |
| 650:6,15,18,18 | draw 542:25 | 518:11 545:3 | 547:1,21 | epi 723:12 |
| 652:1,21 | drill 549:10 | 553:7 556:3 | 553:21 554:4 | epidemiologic |
| 653:12,12,12 | Drive 384:6 | 607:21 646:12 | 555:1,25 | 533:8,18 |
| 653:13,21,24 | Drs 435:13 | 646:23 647:1,7 | 571:16 | 534:16 564:1 |
| 654:4,9 655:10 | 477:11 509:16 | 700:20 701:16 | elimination | epidemiological |
| 655:16,16 | 520:4 526:9 | 740:8 | 545:12,22 | 435:3 587:14 |
| 656:8,14,14,15 | 538:2 544:24 | easy 649:9 650:7 | 556:23 588:8 | 588:6,9 589:13 |
| 656:16,18 | 555:24 639:9 | econom 540:5 | Ellis 384:5 477:4 | 607:6 613:11 |
| 674:21,23 | 655:15 | edit 746:9,13 | eluciate 639:10 | 614:9 |
| 716:4,19,21 | drug 398:16 | edited 745:12 | elucidate 639:11 | epidemiologies |
| 717:24 719:13 | 404:19 438:9 | editing 625:3 | emeritus 405:24 | 559:17 |
| 719:19,19 | 438:12 666:22 | editor 632:11,22 | Emily 384:14 | epidemiologist |
| 721:18,25 | drugs 485:15,16 | 633:8 | 397:4 | 563:17 610:16 |
| 722:21,21 | 485:25,25 | edits 527:24 | employee 454:1 | 723:12 |
| 725:3,7,10,16 | 666:15 | 528:7,20 | 510:21 660:6 | epidemiologists |

419:5,15,21
420:13 425:13
425:19 508:12
527:6 530:9,9
531:6 536:18
609:22 630:8
632:5,6 633:19
655:6
**epidemiology**
385:22 508:6,8
508:24 530:21
536:24 542:15
542:15 548:16
553:5,11
558:21 559:16
563:13 568:20
575:14 588:9
589:5 609:23
615:17 621:21
624:13 634:7
641:22 672:3
692:25 723:13
729:2 750:10
**Epithelial** 389:6
**Epstein** 387:11
405:4,7,23
406:11,17
409:8 411:2
412:14 419:11
419:13 420:3
438:6,21 442:1
461:1 483:1
484:19 498:19
501:8,13 502:3
502:4 504:14
509:16 522:15
537:12 538:10
539:1 560:17
590:5,17
608:24 609:4
**Epstein's** 539:25
**equation** 577:3
**equivalent** 555:5
**equivocal**
739:20
**Eric** 579:7

**Ernst** 613:12
621:19
**errata** 760:4,6,9
760:11 762:8
**error** 491:22
492:3
**errors** 723:2
728:16 745:12
**ESQUIRE**
381:4,11,12,18
381:19,20
382:3,9,16
383:4,12,18
384:4
**essence** 576:9
**essentially**
551:13,14
665:11 738:11
752:22
**establishing**
563:24
**Establishment**
673:6
**Estrin** 712:7,9
et 489:19 542:13
557:25 571:3
580:19 598:6
639:14
**ethical** 722:5,15
747:21
**Europe** 578:7
**evaluate** 630:8
632:5
**evaluation** 439:2
442:6 447:18
532:18
**evaluations**
748:23 752:21
**event** 630:23
752:20 755:4
**eventually**
403:17 670:10
**everybody**
400:24 538:21
547:18 711:9
**evidence** 395:7

413:7 414:17
417:1,11 418:1
418:23 419:6,7
419:24 420:19
420:21,22
421:5,12,13
440:18 461:2
466:2,5 467:15
473:19,23
517:17 558:25
561:4,10
565:21 571:20
607:3,8,15
691:14 692:4
693:8,10,13,20
739:18,20
751:1,15
**evidenced**
463:19
**evident** 471:2
**exact** 458:22
**exactly** 428:24
449:16 458:22
479:5 496:10
597:9 615:17
710:11 734:21
749:12
**examination**
385:2 759:8
**examining**
388:11 389:20
621:22
**example** 396:7
398:18 430:4
446:21 460:25
467:8 485:24
508:9 519:11
531:24 540:24
573:1 574:24
595:19 600:13
664:5 665:20
665:22 670:17
678:7 723:11
746:22
**examples** 521:7
**exceptions** 471:4

**excess** 508:25
741:23
**exchange** 682:23
**exclude** 746:24
**excluding** 610:3
**excuse** 402:2
702:10
**executive** 454:9
660:8 711:5
736:23
**exhaustive**
597:16 670:19
**exhibit** 395:11
397:7 401:6,8
404:9,13
410:21,22
429:4 430:23
431:1 434:14
436:12,16
452:23 453:2
462:8,12,15
468:8,10 470:5
470:8 474:11
474:12 476:16
479:9,12,20,23
480:1,16
483:24 484:3
486:15,16
491:24,25
494:25 495:1
512:10,13
521:23 532:21
552:3,4 577:22
577:23 583:11
589:21 590:22
592:5,9 601:3
602:23 603:2
615:21,24
616:2,20 617:7
620:8,12
625:21,22,25
630:1 631:1,2
632:21 633:4,5
639:4,5 660:16
660:17 672:8
672:11,12

678:11,12
681:1,2 682:11
687:1,2 688:14
690:7 693:24
696:8 697:6,7
713:23 714:1
724:20,21
731:1 734:12
735:10 744:6
748:7,10 753:9
753:10
**exhibits** 385:11
386:3 387:3
388:3 389:3
390:3 391:3
395:12 616:19
690:22
**exist** 667:9
**existing** 412:11
542:1 607:3
**expansive**
574:13
**expect** 522:7
563:10 638:25
652:20
**expects** 733:3
**expend** 729:20
**expenses** 732:9
**expensive** 644:2
**experience**
510:4 515:21
516:19 539:16
623:19,22
692:25 722:5
730:11
**experienced**
448:4
**experimental**
562:15,18
564:2
**experiments**
563:21
**expert** 433:22
433:25 534:24
584:18 589:1
609:22 667:1

723:25 724:8
730:16
**expertise** 435:3
530:21 723:18
728:20 729:1,2
748:3
**experts** 434:21
435:14,23
437:15 522:25
707:2 728:17
**expires** 762:17
**explain** 540:6,22
548:3 549:14
558:20 575:14
582:7 636:12
660:4
**explained**
400:21
**explains** 466:22
581:13
**explanation**
537:15 538:2
576:18 589:16
**explanations**
536:13 537:22
**explore** 446:3
**exposed** 702:20
**exposure** 388:12
389:15 509:5
567:18 607:3
630:9 691:23
749:14,18
752:12,19
**expressed** 441:6
502:11
**extends** 663:14
**extent** 519:9
521:12 526:25
554:19 585:14
690:25
**external** 523:19
**extremely** 580:8
**e-mail** 386:4,14
387:15,20,22
388:4 390:10
424:14 453:5

474:16,17
475:4 476:16
492:9,10
512:22 522:1
579:24 626:19
635:21 637:9
682:23 683:6
683:11 684:20
**e-mails** 396:16
427:19,25

**F**

**F** 380:6 382:18
383:12 384:15
**face** 527:13
664:13,13,17
665:6
**facetious** 635:7
**fact** 408:8
420:23 423:13
426:2 436:9,11
442:19 448:5
450:10 454:14
455:13 459:5
466:16 467:18
497:5 507:4
510:3,7,19
542:16 544:7
563:23 573:8
577:13 583:6
589:18 615:5
623:6 648:5
656:17 659:11
662:10 691:16
733:18 737:11
739:1
**factitious** 524:19
**factor** 488:3
689:7 695:17
695:24 696:20
697:12,22
698:11
**factored** 577:3
**factors** 540:10
565:14,15,23
566:23 567:2

689:4 695:9
697:21,25
698:1
**facts** 439:3
442:7 532:19
**fail** 760:14
**fair** 408:5 411:5
416:6 420:2
435:7 460:13
464:22 485:22
558:12 720:7
757:17
**fairly** 494:9
503:4 518:1
520:8,11 537:1
**faith** 530:8
**fall** 398:11
447:10,11
**familiar** 400:17
402:21 404:21
406:15 412:5
420:7 422:24
430:10 450:14
477:3 480:3,7
480:7 536:4
564:17 602:12
602:19 626:7
627:17 628:4
628:12 630:18
650:9 652:13
652:14,18
654:14 672:16
672:21 679:5
679:14 682:19
701:12 734:23
739:11
**far** 480:18 485:3
487:20 510:16
536:16 622:4
636:15 644:3
645:19 654:4
674:4 703:3
744:21 746:10
**fashion** 595:7
710:22 712:11
730:1

**favor** 465:21
**favorable** 435:4
435:6
**favorably** 642:3
**Fax** 385:17
**FDA** 385:15
387:13,16
399:4,14,21
402:5 403:9,13
403:13 408:14
408:14 409:9
410:14,14
415:21 418:11
423:16 429:10
432:25 434:7
437:24 443:2
446:6 447:18
449:6,22
453:16,25
454:11,15,18
456:10,25
457:9,20,23
458:10 461:12
462:3 463:17
463:24 464:6
483:11,14,21
484:2,14,18
485:7,14,14,20
485:21 486:10
487:12 490:6
492:14,17,24
493:8,14
494:15,20,24
495:4,18,25
496:5 497:11
497:13 498:2
498:22 499:23
499:25 502:10
503:7 504:13
504:24 505:7,9
506:20,22,24
510:7,20
511:22 513:25
514:10,12,15
514:19 515:22
516:2,4,10,20

516:21 517:1
517:16 522:5
524:10 525:13
525:15 536:23
537:5 539:2,5
539:11,16
540:1,16 546:8
546:10 547:20
548:8,16 549:9
550:12,21
551:7,18
552:17 555:20
556:20 557:14
557:16 558:3
558:14 561:14
570:7 576:2
582:21 583:8
585:4,22 590:6
590:12,14
592:12,18,24
594:4,10,13
595:12,19,21
596:4,9,20,21
596:22 597:2
597:14,16
598:6,18,23
599:11,16
600:1,3,6,13
600:25 663:1
665:25 667:9
667:17,25
668:3,20,21
669:9,25 670:6
674:4,9 675:1
709:24 749:21
750:1,4,21
751:11,13,20
**FDA's** 552:24
572:8
**February**
579:19 720:22
**Federal** 386:12
390:4 403:12
418:17 469:23
470:9 672:15
673:4

**Federation**
667:10
**feel** 397:14
542:7 589:7
650:13
**feet** 411:16
**felt** 416:7 418:13
419:6 420:9
732:24
**female** 409:1
438:14 739:17
739:19
**Ferret** 579:10
580:20
**fibers** 470:24,24
**fibrous** 543:1,7
**Fifteen** 708:22
**fifth** 689:7
**figure** 514:10
632:2 669:6
**file** 403:19
409:11 410:13
**filed** 400:15,20
401:1 402:5,18
403:23 404:1,5
404:6,17 405:4
406:4 408:13
409:25 410:6,7
410:17 411:16
413:12,24
419:3 432:25
436:22 437:24
457:18,24
458:20 481:24
483:8,13,20
497:8 512:5
517:18,20
521:19 522:3
522:15 524:11
526:18 536:21
573:10 582:1
590:5 688:6
738:13
**files** 483:2,5
757:14
**filing** 436:1

481:2,13,13
486:23,25
487:7 591:13
**fill** 401:3 459:3
482:24 484:9
**final** 494:8
597:23 734:18
**finalized** 738:20
**financial** 603:21
604:12 722:7
**find** 451:7
477:24 548:20
568:22 593:17
595:9 614:14
677:24
**finding** 693:9
700:22 701:22
701:24 702:5,6
702:18 703:10
704:10,17
705:4
**findings** 439:6
702:3 706:24
723:13
**fine** 418:9
420:16 558:15
672:10 679:25
**finish** 440:12
527:15 546:21
561:19
**firm** 474:5
475:18 476:24
478:10
**firmly** 583:7
**first** 396:25
399:20 402:13
402:17 405:12
405:23 407:4
410:4 416:13
425:14 431:17
432:24 433:11
441:25 442:1,2
442:9 444:8
459:5 466:23
477:6,7 495:17
495:22 503:3

508:7 512:20
513:17,19,22
517:22 523:21
543:3,11,14
555:9 562:22
569:17 578:4
580:24 591:13
591:23,25
594:3,9 605:8
605:17 617:6
618:24 620:3
621:1 630:4
640:2 653:23
654:14 662:6
662:16 663:11
667:21 686:16
688:5 701:8
709:15,18
712:3,18,21
713:4 725:2
726:11,14,16
727:5,10,13
729:16 731:16
732:1 735:16
737:8
**five** 469:13
484:21 485:7
505:6 591:20
597:4
**flash** 459:23
**fleshed-out**
641:18
**flip** 431:17
**Florida** 381:8
**FLW** 379:6
**focus** 429:23
528:22 571:8,9
571:12 658:17
658:20 751:8
**focused** 507:14
507:15 560:21
571:14 752:18
**folks** 478:16
549:22
**follow** 475:22
615:17 619:15

645:22
**followed** 556:20
**following** 455:9
689:4
**follows** 666:16
**follow-up** 504:8
505:1 549:19
600:2 614:19
618:8 628:10
629:8 636:18
709:8
**Food** 398:16
404:18 438:8
438:11 493:17
**footnote** 652:7
**force** 386:8
390:20 391:8
452:10 462:13
463:8 464:5
487:21 488:7
601:6,11,13
612:16 613:9
613:10,20
616:17 622:10
622:12,15
624:7,13
663:16 700:8
700:13,14,17
701:19 702:24
703:19 704:14
705:1,7,10,18
706:9,19 707:1
707:15,15,25
708:6,19,24
709:2,15 710:6
710:18 711:22
712:3,22 713:5
713:18,21
714:7 716:18
718:6,8,10,24
719:9,24 720:9
720:9,13,15,16
720:20 721:7
722:2,19,24
724:6 725:1
726:12,24

727:15,20
729:11,22,25
731:13 734:16
734:25 737:7
737:10,22
738:6 753:15
754:7 755:23
**forces** 707:18
**foregoing** 759:4
759:21 762:3
**forget** 593:22
**forgetting**
594:20 596:7
**forgotten** 408:2
**form** 385:18
417:13 456:4
488:4,9,24
489:25 497:1
501:21 515:24
516:24 517:9
517:24 528:1
550:1 607:12
607:25 608:14
623:1 629:9
690:19 694:12
695:18,23
696:24 697:16
699:20 710:17
710:22 712:11
722:10 723:3
726:19 727:16
730:1 732:4
746:11 749:23
762:7
**formal** 511:5
524:11
**formally** 504:6
599:15
**format** 602:9
688:21
**formed** 701:19
701:21 709:18
**former** 396:2
491:15 538:21
**forming** 705:7
**forms** 471:3

Case 3:16-md-02738-MAS-RLS   Document 16136-2   Filed 12/22/20   Page 330 of 746 PageID: 126524
Linda Loretz, Ph.D.

Page 779

forth 401:12
  443:22 466:5,8
  759:5
forward 394:4
  408:4 482:22
  492:4 556:12
  556:13,15
  636:11 637:18
  733:4,6
forwarded
  744:1
found 470:21
  473:18 535:8
  595:9 611:6
  614:23 621:15
  630:17 702:2,8
  702:10,10,19
  710:4 743:8
foundation
  388:17 429:16
  615:11,13,14
  617:10 619:18
  621:20 622:25
  633:10,19
  690:23 694:12
  695:23 696:23
  697:16 753:2
four 484:20
  505:6 537:19
fourth 695:12
fragrance
  393:12 394:22
  515:10 557:22
  559:1,9,10,18
  560:3,4,5
  586:4 603:23
  604:14
fragrances
  557:4,6,24
  573:23
frame 453:4
  524:9,14
  525:15 614:3
  619:13
framework
  564:11,12

567:2,8
FRAZIER
  383:4 476:3,8
  487:23 488:4,9
  488:24 489:3
  515:24 516:24
  517:9 528:1
  550:1 616:24
  623:1 629:9
  690:19 695:18
  696:25 697:18
  698:14 699:20
  726:19 727:16
  748:18 753:3
free 542:8
  584:12
Frequent 409:1
  438:13
Friday 492:17
  492:21 629:17
front 465:3
  431:3 618:24
  707:3 745:20
fulcrum 399:22
full 495:22
  510:11 524:9
  543:11 569:17
  696:18 732:17
  735:10 749:6
fully 398:1
  509:14
fulsome 495:8
  498:25 501:9
  598:2
function 666:20
fund 625:11
  628:2,11,23
  629:1 636:1
funded 610:20
  611:1 623:16
  627:15,19,21
  662:20,22
  707:2 708:12
  722:24
funder 488:7,11
funding 489:23

522:24 529:17
  530:16 605:1
  623:20 625:15
  627:25 629:7
  651:3 707:14
  707:18,19,24
  708:25
funds 675:14
further 396:12
  471:2 504:16
  517:16 597:17
  613:11 635:3
  639:10 704:10
  705:8 706:4,6
  706:15
future 612:19,23
  707:21

<hr>

**G**

G 390:5 392:1
Gamble 601:23
  716:9 735:5
gate 580:9
gathers 730:1
general 510:19
  559:9 625:14
  641:24 704:16
  705:20 746:21
  746:25
generally 675:18
  679:8 702:12
  705:17 707:18
  710:11,15
  711:15 718:7,9
  728:6,11
  735:21 746:14
genital 409:2
  438:14
gentlemen 660:3
GEREL 382:4
Gertig 652:6
  734:4,11
getting 573:3
  662:10 709:11
Gettings 391:4
  463:2,4,5

621:1,17
  724:25 725:3,7
  725:10,16
  731:14 735:12
  753:15
ghostwriting
  532:13
give 397:23
  401:2 504:3
  563:2 602:24
  694:3 722:21
  742:15 753:24
given 438:25
  442:4 447:22
  447:24 526:16
  532:16 612:1
  614:13 718:13
  746:4 762:5
giving 400:8
Glenn 427:14
  431:13 432:12
  474:19 475:5
  476:17,19
  521:9 578:20
  578:21,25
  626:19 635:21
go 397:20
  405:14 407:7
  408:18,20
  411:6 421:6
  422:16 431:5,7
  431:11 437:23
  437:24 440:12
  441:20 457:6
  468:7 475:2
  490:5 496:10
  503:21 513:7
  513:10 525:11
  535:10 541:11
  541:11,11
  547:12 552:1,6
  553:18 554:2
  562:5,8,8
  567:15 569:6,7
  572:7 574:15
  587:22 589:21

589:23 590:10
  591:5 592:10
  593:15 595:9
  600:18 601:3
  602:2 603:19
  603:20 604:4,7
  605:2 606:2,9
  606:12,12
  612:13,16,22
  612:24 618:5
  619:5,24
  629:12,12
  630:4 631:20
  632:1 637:12
  637:17 646:16
  653:21 654:22
  660:13 661:25
  662:13 666:25
  672:6 677:20
  678:10 679:16
  679:17 681:12
  682:9,21
  687:14 693:23
  695:12 696:2
  697:2 704:22
  705:3,14,20,23
  709:9 719:13
  719:19 724:1,2
  724:3 726:24
  729:14 730:4
  735:22 742:16
  757:22
goal 554:7 718:9
goes 586:25
  602:10 617:11
  642:9 722:23
  746:5,6
going 395:9
  398:3,12 400:6
  400:13,23
  401:2,3,6,13
  403:4 404:12
  405:16 407:13
  422:4 428:14
  430:14,14
  431:1,22

Linda Loretz, Ph.D.

| | | | | |
|---|---|---|---|---|
| 436:15 441:18 | 643:19 644:2 | 691:3,15,21 | **government** | 433:10 435:19 |
| 441:18,20 | 648:13 653:21 | 692:1,16,23 | 664:4 | 439:4 467:1 |
| 443:1,3,15 | 656:7 657:17 | 693:11 694:1 | **governmental** | 473:5,5 514:11 |
| 444:1 445:5,6 | 669:3 672:6 | 694:14,19 | 667:4 675:12 | 514:18 529:16 |
| 453:1,25 457:5 | 673:19 683:13 | 695:4,6,20 | 675:14 | 529:25 530:1,5 |
| 458:4,8 462:11 | 686:16 687:18 | 696:2,4,10 | **grade** 549:3,6 | 539:25 578:9 |
| 462:14 463:12 | 690:20 694:25 | 697:1,3,5,9,19 | 550:7 580:7,7 | 619:17,17 |
| 464:3 465:17 | 700:10 705:21 | 698:7,16 | **grammatical** | 625:1 641:17 |
| 465:17 466:18 | 705:23 709:11 | 699:25 703:5 | 728:15 745:12 | 654:23,24 |
| 468:6 469:2,11 | 711:9 713:9 | 703:15,25 | **grant** 388:17 | 655:1,2,2,10 |
| 470:8 471:23 | 714:17,18 | 704:3 710:20 | 616:3,8 617:7 | 655:15 704:21 |
| 471:24 474:21 | 721:6,16 | 712:1 713:25 | **great** 496:15 | 711:17 730:2 |
| 474:21,24,25 | 722:16,22 | 715:10 717:4 | 556:2 677:7 | 735:22 |
| 475:2 476:10 | 733:4,4 744:8 | 721:2 722:17 | 709:23 721:15 | **groups** 466:24 |
| 478:15 479:6 | 744:14 747:9 | 723:23 724:15 | 751:12 | 658:18,21 |
| 479:12,17 | 757:25 | 724:20,23 | **Greenbriar** | **guarantee** 554:3 |
| 482:25 489:14 | **gold** 562:19 | 726:3 727:2,21 | 450:11 | 597:19 |
| 490:11 491:20 | **Golomb** 381:11 | 728:13 731:3 | **groomed** 434:21 | **guess** 394:21 |
| 491:22 492:4 | 381:13 385:4 | 732:5 733:1,22 | **Gross** 390:23 | 397:18,22 |
| 493:7,8,9 | 590:20 591:7 | 734:14 739:6 | 391:9 602:7,13 | 418:7 432:18 |
| 494:24 497:13 | 604:1,5 621:3 | 740:21 742:17 | 602:17 611:18 | 447:9 451:6 |
| 497:18 499:14 | 643:14,16 | 743:2,4,14 | 611:23 612:2 | 460:13 461:21 |
| 502:20 503:23 | 651:5,18,23 | 744:9,12,18 | 721:18 722:21 | 461:24 482:1 |
| 504:2,2 506:21 | 652:25 653:4 | 745:7 746:17 | 722:21 726:6 | 499:3 520:22 |
| 509:11 512:17 | 653:19 654:16 | 748:5,9,21 | 729:24,25 | 523:16 550:11 |
| 512:17 513:16 | 656:4,12 | 749:24 750:11 | 733:8 736:15 | 553:22 560:2 |
| 516:16 525:8 | 657:24 658:1 | 750:23 751:9 | 738:10,19 | 564:24 583:16 |
| 526:21 528:18 | 659:4 660:19 | 751:22 753:7 | 740:19 741:5 | 587:17,22 |
| 531:7,12 537:6 | 661:12 663:19 | 753:12 754:23 | 742:3,4,10,14 | 595:5,6 613:22 |
| 539:20 546:11 | 664:15,25 | 755:2,3,20 | 743:9,22 745:4 | 614:20 615:12 |
| 556:14 570:20 | 665:8 667:12 | 756:4,14 | 748:17,17 | 624:15,16 |
| 572:7 577:21 | 669:16 670:11 | 757:10,17,22 | 749:4 750:15 | 625:7 631:12 |
| 578:3 581:25 | 670:21 671:10 | **good** 392:10,11 | 751:2,11,19,24 | 633:21 634:15 |
| 592:8,10,11 | 672:1,10,14 | 451:23 472:13 | 752:22 | 640:8,17 642:2 |
| 593:14 594:3,6 | 674:3,11,18 | 472:16 476:2 | **Gross's** 721:25 | 648:2 662:9,25 |
| 595:22 601:2 | 675:8 676:13 | 510:8 516:7 | 729:4 732:8 | 680:22 707:10 |
| 602:16,23,24 | 678:14,17,21 | 526:2 570:15 | 740:4,11,25 | 714:25 718:8 |
| 614:21,21 | 679:24 680:14 | 570:17 586:21 | 754:20 | 723:5 726:22 |
| 615:24 618:14 | 680:24 681:8 | 602:9 624:19 | **ground** 560:9 | 728:19 739:24 |
| 618:20 620:7 | 681:11 682:5 | 643:15 665:21 | 601:10 | **Guidelines** |
| 623:24 625:20 | 682:13 683:22 | **GORDON** | **group** 404:1 | 564:24 |
| 626:5 630:25 | 684:3,12,18 | 383:19 | 422:20,21,23 | **guy** 490:23 |
| 631:20 632:20 | 685:17 686:3 | **gorilla** 489:4,5 | 423:7 426:3 | 498:16 513:24 |
| 632:21 633:2 | 687:4 688:11 | **gorillas** 488:18 | 429:2,11,13,20 | 539:23 |
| 633:13,23 | 688:16 689:12 | **gotten** 403:16 | 429:21,22 | **guys** 549:10 |
| 634:4 643:9,18 | 689:20 690:9 | 555:4 | 430:19 432:16 | 550:16 614:5 |

Linda Loretz, Ph.D.

**H**

**H** 384:14 385:9
386:1 387:1
388:1 389:1
390:1 391:1
717:10
**hair** 435:5
**half** 508:19
622:2 695:7
708:10
**hand** 395:9
404:12 461:1
470:8 680:15
687:18
**hands** 520:19
**handwriting**
388:21 465:8
471:25 478:17
**handwritten**
385:12
**Hankinson**
733:23 734:1,2
734:8 736:9,17
737:9,20,20
738:2,25
**happen** 449:18
465:17 645:20
747:9,10
**happened**
395:21 402:16
453:21 459:4
471:17 492:21
493:8 494:10
496:18 500:17
505:16 516:13
516:19 517:19
518:16 520:8
526:5,13
527:18 604:25
610:23 709:13
710:12 727:12
747:22
**happening**
436:9,10
452:20 511:10
511:14 522:14

**happenings**
459:12
**happens** 557:16
709:3
**happy** 469:9
742:19
**hard** 466:19
640:14 689:1
**HARDY** 383:5
**hard-pressed**
628:16
**harm** 417:2,12
417:15 448:2,4
692:18
**hat** 410:1,2
587:11 632:16
**hate** 654:21
**hazard** 673:13
**heading** 612:19
**headquarters**
514:25
**health** 387:12
388:17 406:2
429:16 472:10
615:11,13
617:10 619:18
621:20 622:25
633:10,18
673:13
**hear** 399:2
489:1
**heard** 409:9
426:19,20
429:1 435:10
441:8 444:11
444:13,19
445:1 446:15
447:13 505:11
507:7 536:5
543:23 620:4
627:10 652:15
658:12 677:3
698:1,5,23
708:15 716:6
**hearing** 495:19
**heart** 457:10

626:4
**heavily** 485:23
**height** 698:6
**held** 380:1
407:10 712:11
712:14 715:15
748:20
**Helene** 601:24
**help** 400:1,19
404:8 514:16
519:3 622:7
624:5 641:23
642:3 649:11
650:3 657:4
659:13 721:14
**helpful** 632:1
723:5
**helping** 587:6
672:23
**helps** 707:21
**Henderson**
701:11,20
702:16,17,25
703:10,14,20
710:3
**hesitation** 503:5
**hexachloroph...**
580:16
**Hey** 511:14
550:16
**hide** 484:11
**high** 464:14
638:24
**higher** 449:20
**highlighted**
687:20
**Hill** 564:13
565:8 567:2
635:24
**hire** 624:25
723:7 729:24
**hired** 435:2
454:14 456:9
457:1 510:3,4
510:6,11
539:15 606:21

611:16,18,19
648:1 655:3,14
668:22 721:19
724:8 738:10
738:20 746:3
**hiring** 456:8
510:17 528:17
706:16,20
707:2,9,9
722:15 723:10
723:11 729:1
748:2
**historical**
400:25
**hoc** 390:20
712:22 713:17
**hold** 630:5
**holds** 665:17,18
665:25
**HOLMSTOCK**
384:17
**hone** 453:4
**honestly** 429:14
531:9 532:9,10
532:11 546:19
554:13 574:12
**HONIK** 381:13
**hopefully** 401:3
**hoping** 651:14
**Hospital** 702:4
**Houghton** 734:5
**hour** 744:8
**Houston** 383:8
**how's** 595:21
**Huh-uh** 747:3
**human** 387:12
562:17
**humans** 749:14
**Huncharek**
388:4 423:2
424:7,10,15
426:24 427:22
428:5,13,20
430:1,13
431:13 432:11
433:24 434:20

435:5,13
457:23 461:3
468:25 474:4
477:11 478:9
478:18 479:19
480:16 505:25
508:13,15
514:21,24
520:4 522:25
526:9 527:20
530:14 538:2
541:6 544:24
555:24 564:20
568:17 575:15
579:16 582:4
585:21 625:21
626:9,18 637:9
639:9 653:21
653:24 654:4,9
655:10 751:20
**Huncharek's**
497:6 500:13
541:12,13
571:13
**Huncharek/M...**
724:17
**hundred** 533:23
534:1,4 568:18
575:17
**Huskarek**
508:14
**hygenic** 621:22
**hypothesis**
563:1 611:8
**hypothesized**
621:22
**hysterectomy**
639:12
**H&M** 437:22

**I**

**IARC** 388:4
401:24 427:3
428:1 455:16
455:18 472:1,3
472:6 473:11

Linda Loretz, Ph.D.

473:14 477:10
478:15 482:23
521:8 579:16
579:20 580:1
580:17 690:16
691:7,10,18
693:22
**idea** 622:14
676:10 705:18
**ideal** 554:10,11
**identical** 436:21
**identification**
401:9 404:10
410:23 430:24
436:13 452:24
462:9 468:11
470:6 474:13
479:10,24
483:25 486:17
492:1 495:2
512:11 521:24
577:24 592:6
603:3 615:22
620:13 626:1
630:2 631:3
633:6 639:6
660:18 672:8
672:13 678:13
678:19 682:12
687:1,3 688:15
690:6,8 693:25
696:7,9 697:8
713:24 724:22
731:2 734:13
748:8 753:11
**identified**
481:17 583:10
711:16,19
738:2
**identifies** 405:24
424:21,22
425:3 433:10
676:8 696:19
698:10 708:5
**identify** 423:6
468:6 479:6

522:24 583:9
697:12
**ignored** 622:2
**II** 392:4
**Illinois** 384:8
405:11 406:1
**illustrates**
420:17
**IMA** 477:4
578:7,7 579:24
627:19
**imagine** 517:1
**Imerys** 383:11
386:11 387:6
387:19,21
389:16,21
396:9 431:14
432:13 437:3
447:7,7 452:3
452:16 474:4
476:25 478:11
480:22 488:13
489:21 490:5
505:12 512:24
521:13 526:8
526:10 527:8
527:21 549:23
579:4,8,12
599:8 629:7
648:12 676:4
684:12 685:22
708:13,14,25
**Imerys's** 425:22
**imidazolidinyl**
580:18
**immediately**
408:24 455:9
**impact** 439:24
440:3,5 441:7
446:22
**imperative**
760:10
**implanted** 719:4
**implemented**
705:19
**implicated**

588:23 589:9
**implication**
444:8
**implications**
438:25 439:10
439:14,20
440:23,25
441:1,4 442:4
442:13 443:8
443:14,17
444:4,9,12
447:16,16
532:16
**implied** 547:7
**importance**
613:7,24
614:13
**important**
420:17 490:20
501:3,4,5
506:6 510:12
539:4,10 541:1
565:19 569:9
569:16,17
605:22 613:18
614:4 637:6
**improve** 622:11
**impurities** 574:9
574:17,23
**inadequate**
471:4
**inappropriate**
411:9 416:7
515:22
**inartful** 575:1
**incidence**
621:23 695:9
**include** 569:19
745:15 746:18
746:19,20,22
747:18,19
**included** 648:9
709:24 744:23
747:2,6 749:14
**includes** 393:12
393:12 695:25

**including**
396:24 398:18
419:11 458:15
493:21 642:7
642:18
**inconsistency**
419:16
**incorporation**
736:16
**increase** 568:8,8
610:12 681:17
687:25 689:4
689:24
**increased**
540:23 548:4
549:15 558:21
576:19 582:8
583:14 605:21
607:4 610:6
611:9,11 692:5
692:18
**increases** 438:15
**incredible**
636:14
**independent**
424:22 425:3,8
425:12,17
429:19 439:5
447:18 481:4
481:17,21
482:2
**indicate** 437:13
**indicated** 406:10
514:12 555:15
634:8
**indicates** 503:4
**indirect** 592:24
**indirectly**
592:18 595:4
596:4 600:1
675:17 677:15
**individual** 610:9
631:11 642:13
671:21,25
**individually**
582:7 634:6

**individuals**
655:22
**Industrial** 477:1
578:8
**industries** 545:3
**industry** 426:4
427:2,4 428:14
429:20 433:7
456:14 472:21
472:24 481:23
482:7,9 500:14
504:16 505:2
505:11,19
507:25 514:16
517:17 535:21
538:3 545:17
579:25 607:1
614:8,12,22,23
622:13 624:17
628:10 634:5,6
642:4,12 662:7
662:11 663:21
664:14,17
665:7 667:11
671:20 723:9
724:9 726:16
728:22 730:9
730:16,18,19
737:7 738:12
742:5 743:23
745:14,19
746:7,9 747:3
747:18 751:13
752:3,4
**industry-only**
505:21
**inference** 419:8
420:10 440:19
542:20
**influence** 663:21
**inform** 704:17
710:13,14
**informal** 515:9
**informally**
599:16
**information**

Case 3:16-md-02738-MAS-RLS   Document 16136-2   Filed 12/22/20   Page 334 of 746 PageID: 126528
Linda Loretz, Ph.D.

Page 783

390:9,14
397:17 398:7
426:14 450:11
496:22 504:6
507:20,24
549:19 588:21
655:5 657:5
663:12 679:2
705:6
**informational**
449:24 450:5
**informed** 514:8
**ingredients**
574:8,18 577:2
582:9,14,15
583:18 588:12
666:6
**inhalation**
739:12,14
740:1,16 743:7
744:20 745:6
749:8,15 752:8
752:23 753:5
**inhaled** 739:16
**inherently**
563:25
**initial** 408:12
503:5 668:7,9
668:17 669:18
**initially** 423:10
502:10,15
541:19 542:13
543:12 567:20
668:13
**initiated** 423:23
425:15 526:7
**initiative** 622:13
**input** 425:22
452:15 504:16
526:8 527:8
736:2
**inspections**
666:9
**Institute** 675:10
675:11 693:12
693:19

**instruction**
532:3
**INSTRUCTI...**
760:1
**intended** 574:18
577:2
**interact** 456:13
**interacted** 457:4
**interest** 386:7
445:13,19
452:10,18
462:6 488:17
489:10,17
535:23 601:14
601:16 704:18
705:7,24
707:20 710:6
710:16 711:10
722:8
**interested** 391:7
403:19 425:24
463:7 477:6
498:25 502:1
523:19 601:12
616:17 622:10
623:7,10 629:7
700:8,13,14
701:18 702:24
703:19 705:10
706:2,3 707:1
708:6 709:14
710:21 711:16
711:18 712:12
720:8,12 721:7
725:1 729:17
729:19 731:22
734:16 753:14
755:23
**interesting**
720:12
**interests** 443:18
**interface** 726:23
**intermediary**
664:3 732:20
**internal** 522:3,7
523:4 603:10

**International**
472:7 692:6
**internet** 683:12
683:17
**interpretation**
517:17
**interpreting**
503:4
**interrogatories**
389:13 433:1
604:12 629:13
629:16
**interrogatory**
631:24
**interrupt** 440:12
676:22
**interruption**
436:18
**interval** 610:3
692:21
**intervening**
738:19
**intervention**
563:19
**interview**
518:13
**interviewed**
395:25
**introduction**
424:19 437:25
438:5 531:25
562:9 661:3
**Invasive** 389:6
**inverse** 509:3
534:17,20
535:13,13
536:1,14
537:21
**investigate**
490:19 518:7
530:14 641:14
**investigation**
397:16
**invite** 502:2
**invited** 498:17
**invoice** 732:8,13

732:18,24
733:2,5,7
**involved** 434:9
437:7 498:12
519:12,16
546:12 587:4
612:12 613:9
624:12 627:4
627:14,24
711:25
**involvement**
520:23,24
**involving** 514:5
**in-person** 754:5
**IQA** 685:9,11,12
**irrelevant**
752:14
**ISRTP** 613:13
647:10 740:18
**ISSER** 381:12
**issue** 398:19
406:22,22,25
407:25 408:1,2
419:1 440:20
455:11,20,23
461:13,19
462:2 463:18
464:8 465:25
469:18 472:2,4
473:17 499:18
501:3,4,5
507:8,16
510:12,18
511:22 520:12
520:17,20
524:21,25
525:21 526:20
529:8 536:23
541:2 545:16
549:13 555:10
558:3 576:14
577:10 582:2
583:6 585:4,12
590:7 592:25
594:11 597:2
600:25 605:22

608:16 614:4
614:13 615:18
624:6,24
639:11,25
640:6 678:7
703:4 704:6,19
707:10 709:8
715:3 718:12
718:24 745:6
**issues** 399:4
456:14,15
501:18 504:18
504:20 516:21
521:8,14
530:17 540:13
586:4 594:14
599:16 641:14
671:6 672:23
706:10 710:14
720:17 741:1
**items** 494:19
495:5
**iterations** 493:5
**it'd** 686:13
**i.e** 580:7,12
586:24

---

**J**

**J** 382:9 664:10
**Jackson** 716:21
**JAMES** 384:4
**January** 391:8
391:13 457:1
617:23 734:7
734:19 736:4
753:14 754:6
754:23
**Jersey** 379:2
383:15 514:25
527:20
**Jill** 388:7
**Jim** 682:24
683:4,7
**JNJ** 386:6,16,22
387:23 388:13
388:18,21

390:24 391:11
**JNJTALC000...** 388:5
**JNJTALC000...** 386:9
**job** 668:25 732:14
**Jocelyn** 579:10 580:20
**Joe** 717:18,18
**John** 388:8 396:18,20,21 396:23 416:14 454:2,3,5 492:4 523:21 523:22 590:11 667:14,16,20 667:24 668:3
**Johnson** 379:5,5 383:3,3 392:22 392:22 396:8,8 411:8 423:11 423:11,14,15 423:20,20 425:22,22 437:16,16 451:14,14 463:8,9 469:5 469:5 487:19 487:19 488:20 489:14,14,22 489:22 490:4,5 524:7,7 601:19 601:19 616:8,8 671:17,17 716:20,20 726:10,10 727:4,4,10,10 727:14,14 732:21,21 748:15,15 752:21,22
**Johnson's** 393:7 411:8 488:20 574:16
**Join** 696:25

697:18 753:3
**JONATHAN** 383:12 384:18
**Joseph** 717:10
**Joshua** 423:4 578:23 579:25 617:9 621:19
**journal** 638:3,11 722:9 751:4
**Jr** 682:24 683:2 684:20 685:4
**July** 395:22,24 410:12,17 413:13 422:1 429:10 437:5 457:18 483:6 487:8 524:11 590:25 659:5 659:24
**June** 523:24 687:9 688:4
**jurors** 568:6
**jury** 392:12 395:6 400:21 401:16 402:25 482:25 484:11 605:9 660:4 673:10 687:22 689:21
**justify** 514:17
**J&J** 387:20 424:3 425:15 433:3 451:18 452:3,16 453:8 453:13 488:18 505:12 512:23 513:2,20 514:8 514:23 520:3 521:13 523:10 523:10 524:14 526:7 527:9,21 549:23 579:14 582:12 584:14 598:13,17 599:4,5 604:24 606:23,24

612:6 615:17
618:4,23
619:15 622:6
622:21 623:21
629:6 644:11
645:6 648:21
654:13,17,18
664:10,18
676:3 684:12
708:13,25
726:24 727:18
731:11,23
732:1,2,11,16
733:5,7,9,14
733:14 735:8
736:12,21
755:12 756:11
757:5,15
**J&S** 517:22

_____

## K

**kaolin** 580:15
**Kathleen** 383:4 453:5,6 522:6
**Kathy** 514:8 524:5
**KATIE** 384:13
**Katsiouleris** 513:24
**Katz** 456:17,19 458:15,16 491:16 495:23 495:24 497:17 509:9
**Kelly** 390:10 682:24 683:2,7 684:20 685:4
**Kemble** 383:14
**kept** 521:8
**key** 514:10
**kind** 399:22 400:23 401:13 401:14 408:16 411:15 420:16 430:11 453:4 455:15 465:25

467:8,13
469:16 484:9
505:3,17,20
512:18 522:15
524:6 525:7
563:8 565:2,18
565:20 575:4,8
581:25 595:6
598:7 600:14
600:22 617:2
623:5 634:4
641:17,20,24
644:9 649:17
649:20 656:15
661:2 664:3
665:11 666:15
678:7 706:7
711:20 714:21
719:1 720:11
722:21 728:24
737:3 745:10
752:17
**kinds** 628:19 639:9
**knew** 430:21 434:2 461:12 462:2 465:16 474:8 476:22 501:13,14 502:4 509:23 548:22 632:12 651:13 675:5 737:2
**know** 393:23 396:21 399:23 401:22 405:4,7 411:23 413:19 415:7,7 416:24 416:24 417:10 418:6,6,8 420:9 424:10 425:24 426:21 427:1,5,14,15 427:16 428:3 428:23 429:14 429:25 430:2,4

430:5,6,11,12
430:17 432:6
433:24 434:18
434:19 435:18
435:21,21,22
436:9,10 437:2
437:2,9 444:4
447:19 449:5,9
449:17 450:9
450:13 451:4,6
451:11 452:12
452:14,20
453:6,22
454:19 456:21
473:8,13 474:3
476:20,23,25
477:8 478:24
479:2 483:17
485:3,7,9,14
486:14 487:3
490:10,22
496:15 498:19
501:2,7 503:16
503:22,25
504:13,15,23
505:5,16 506:5
508:4 510:16
510:24 511:8
511:10,12,13
511:19,20,21
516:2,13,14,14
517:11,21
518:5 519:22
520:22 521:7,7
521:19 523:5
524:8,13,17
525:14,25
526:4,7,8,13
526:13 527:18
527:24 528:16
532:5,20
537:13,20
538:10,13
539:1,23,24,24
548:17,18,21
548:23 549:10

549:11 550:3
550:10 551:11
551:14 555:15
557:2 560:6
563:9 566:13
566:18,21
572:11 573:4
574:12 575:16
580:19 582:17
582:20 583:16
583:22 584:1,4
584:9 585:3
590:10 595:9
595:19,22
596:11 598:3
598:13,18,22
599:15 600:5,9
600:16 601:21
601:22 604:25
606:16,25
607:20 608:2
608:11 609:4,7
609:15 613:4
613:23 614:19
615:7,9,10,13
615:16,19,20
618:20,23
620:5 621:9,14
622:21 623:17
624:10,16,19
624:20 625:10
626:4,6 627:9
627:11,14,18
627:21,24
628:22 629:2,3
630:15,16
631:9,11 632:6
632:8,10 635:5
637:5,13
639:16 640:4
640:23 641:6,7
641:10 645:7
645:19 647:10
647:19 650:24
651:7 652:5
654:4,23

655:11 657:10
657:11,16
658:19 660:1,5
661:23 669:3
671:13 674:4
674:17 675:6
677:6 679:9
680:1,2 683:16
683:23 684:16
684:17 685:16
686:4,5,7
690:11 693:18
694:24 698:23
699:10,12,24
700:4,17
701:14 702:1
702:23 703:7,9
703:13 704:25
705:13 706:2,3
709:7 710:17
712:17,25
713:2,9,20
714:17,22
715:21 716:4
718:14 719:10
719:11 720:1
720:18 721:1,3
721:15,24
723:15,18
725:20 726:1
727:6,9,12,18
728:20,25
729:3 731:19
731:19,23
733:23,25
734:2,8 735:23
736:22,25
737:4 738:1,23
739:7 744:22
746:23 747:6
750:24 755:8
756:6
**knowing** 470:2
510:11 539:19
609:19
**knowledge**

516:17 587:19
611:6 624:7
723:9,14
728:21
**knowledgeable**
530:9
**known** 428:8
449:19 483:22
541:8 542:3
543:2,8 565:8
566:11 679:23
**knows** 546:10
686:17 711:9
728:22 750:4
**Knoxville**
716:21
**KOHRS** 382:9
**Korean** 507:8,8

---

## L

**L** 379:15
**label** 411:8
412:14,20
413:1,8 417:16
417:22 418:1
418:11 438:10
439:25 442:5
450:5,6 514:1
608:25 609:5
673:11,19
674:6,13
**labeled** 417:20
**labeling** 412:9
412:11 608:6,8
608:9,16,19
672:22,23,24
672:25 674:2
**labels** 408:25
438:12 439:1
439:11,15
440:22 442:15
514:14
**lack** 418:22
534:13 542:3
690:23 694:12
695:22,23

696:23 697:16
753:1
**lacked** 602:9
**lacking** 540:5
**lacks** 509:1,3
**ladies** 660:3
**laid** 443:7
**Lake** 382:12
**large** 711:2,3
**larger** 585:2
**late** 518:1
**Latest** 386:5
453:12
**law** 474:4
475:18 476:24
478:10
**lawsuits** 444:17
598:23 599:10
683:14,24
684:17 688:5
**lawyers** 397:2,4
416:6 432:13
437:15 449:14
480:22 487:11
579:1,3
**lay** 411:22
443:15 563:16
**leadership** 730:2
**leading** 719:2
**learn** 646:1
658:20 699:1,5
699:7,11
**learned** 472:3
549:21 658:10
676:5,21,24
700:3 701:8
**leave** 422:15
725:10
**left** 454:17
456:25 458:18
458:21 536:17
576:5 643:18
643:21 725:12
744:11 746:22
**legal** 412:6
413:22 416:2,2

416:8 433:19
608:16 609:17
725:13
**legalese** 394:3
**legislation**
665:20
**LEIGH** 381:19
**lend** 571:21
**length** 656:2
740:18
**lengthy** 494:9
**Leslie** 379:25
380:12 759:18
**letter** 385:15
386:10 387:11
388:7,20 391:4
391:9 408:19
409:11 416:12
416:12,13,18
418:9,10,18
420:20 438:3
449:15 457:13
457:14,15,16
468:8 486:10
508:13 533:7
533:13 590:17
617:11 618:4
618:10,12
621:7 626:19
632:11,22
633:8 647:20
647:20,24,25
649:7 650:4
668:2,4,17
731:4,14 732:1
733:11 748:11
748:13,15
749:3 752:24
**letterhead**
429:11 757:5
**letters** 647:14,16
647:17,18
648:5,9,18
727:23
**letting** 447:19
572:11

Linda Loretz, Ph.D.

**let's** 395:25
399:19 402:12
404:8 410:10
421:15 422:13
431:16 437:21
437:23 443:14
443:14 451:9
457:15,15
459:2 464:4
465:16,18,18
474:20 482:20
482:22 489:6
513:11 517:18
531:17 533:4
541:11,11,15
547:9 555:7
558:7,12,12
562:4,4 563:1
567:15 570:14
589:21 593:25
597:1 600:18
601:2 605:2
606:12 612:13
612:16 629:12
641:12 661:25
662:13 666:23
668:23,24
678:10 682:9
686:24 693:23
697:2 700:7
731:25 744:5
757:22
**level** 418:1
446:19 523:19
586:24 587:3
707:20 710:6
**levels** 449:20
594:15,25
596:17
**LEVIN** 381:5
**LHG** 379:6
**LIABILITY**
379:8
**liaison** 515:22
516:2 521:16
667:2,8 711:21

717:14 746:15
**liaisoned** 667:3
**life** 641:4
**ligation** 639:12
**light** 553:17
554:24 583:6
588:9 589:5,13
631:23 635:5
**limit** 546:17
547:5,6
**limitation** 542:1
**limitations**
472:25
**limited** 473:22
509:5 537:2
591:14 680:12
691:14 693:10
**limits** 555:4
573:19
**Linda** 379:18
380:1 385:2
392:5,14
413:25 435:11
524:4 579:5
758:3 762:11
**line** 479:18
683:10 695:12
748:25 761:4
**lines** 561:3
653:7 679:11
**link** 406:18
508:22 621:22
**linking** 607:3
**list** 398:5 582:13
582:13,14,15
695:25 711:3
**listed** 467:11
601:18 697:23
699:6
**listing** 465:13,21
467:4,9 470:19
587:23 618:4
**lists** 469:24
489:9
**literal** 556:24,25
**literature** 408:4

419:14 420:8
421:8 432:4
436:5 444:14
445:10 447:21
448:15 450:1
461:9 471:3
477:12,18
520:6 537:14
542:1,19
555:21 611:7
752:2
**litigation** 379:9
430:5 433:20
434:1,9,21
435:12,23
437:15 446:15
549:22 684:2,6
708:4
**little** 397:23
400:22 402:25
454:3 459:3
503:4,5 606:22
614:14 618:20
636:12 645:14
671:8 688:20
705:22 710:24
723:21 735:24
742:6
**live** 464:22
554:17,20
641:4
**LLP** 380:5
382:4,10,17
383:5,13,19
384:5 475:17
**lobbying** 677:24
**Locke** 382:16
400:3,7,10
403:3 405:13
412:16,21
413:3,15
414:11,22
415:2,12 416:4
416:19 417:3
417:13,23
418:3,19 419:9

419:12 420:1
420:11,25
422:4 425:10
426:7,16 427:6
427:10 428:6
428:16 429:3
430:8,20 431:8
431:16 432:19
434:10,13,22
434:24 435:15
436:6 437:17
439:16 443:10
444:20 445:14
446:24 447:23
448:18 449:2,7
451:5 456:4
458:1 459:10
460:1,12,19,22
461:5,15,20
462:5,16
464:20,24
466:13 473:2
473:21 474:7
474:20,23
481:11,25
482:14 483:7
484:23 485:2
486:2,7 487:14
487:24 488:23
496:23 497:1
497:15 501:21
502:13,18
503:11,14
506:10,13,20
507:9,17,23
509:18 510:15
511:16 513:11
515:16,23,25
516:23,25
517:8,10,24
518:18 519:8
519:25 521:21
523:9 524:23
525:1,23 526:2
527:3,15 528:9
528:14 529:2,9

529:13,18
530:6,12,18
531:4,12,16,20
532:2,8,10,14
532:24 533:12
533:14,21
534:23 535:3
536:6 537:16
537:24 538:5
538:24 539:6
539:13 542:21
543:5 544:11
545:14,23
546:15,21
547:3 548:5,10
549:4,17
550:19 551:5
551:21 552:2
552:21 553:14
554:15,21
555:18 557:9
557:20 558:23
560:22 561:19
566:8,15 567:4
569:1,3,4,11
570:2,8,15
572:21 575:10
575:21 576:6
576:10,21
581:6 582:23
583:15 584:24
585:9,23
588:19 589:14
593:1 596:20
597:8,21 599:3
599:19 606:15
607:11,17,24
608:3,7,13
609:1,11,20
610:7,14,21
612:14 614:15
615:2 617:22
617:25 619:5
619:21 620:14
620:17,20
625:6,13,23

| | | | | |
|---|---|---|---|---|
| 627:6 629:21 | 744:10 745:3 | 741:25 742:19 | 485:14,17 | 529:17 |
| 629:25 631:22 | 746:11 747:24 | 744:5 | 488:3 495:11 | **majority** 458:10 |
| 634:1,25 | 749:23 750:3 | **looked** 446:11 | 505:19 507:20 | 458:12 560:24 |
| 635:15 636:4 | 750:22,25 | 465:19,19 | 507:22 525:7 | 561:1 |
| 637:15 638:4 | 751:18 753:1 | 473:19 485:24 | 532:12 545:16 | **male** 739:19,20 |
| 650:25 651:10 | 754:22 755:1 | 487:8 521:7 | 549:9 557:23 | **manager** 748:22 |
| 651:20 652:24 | 755:17 756:1 | 542:18 555:22 | 559:7 667:14 | 752:21 |
| 653:2,14 | 756:11 757:3,9 | 575:19 576:20 | 672:6 700:9 | **mandate** 408:14 |
| 654:12 656:1 | 757:12,21 | 589:13 614:10 | 711:4 712:13 | **mandated** |
| 657:22,25 | **Locke's** 475:22 | 645:5 651:13 | 712:13,14 | 442:16 483:3,9 |
| 659:1 661:5 | **Logan** 383:20 | 670:23 677:1,3 | 735:2 | **manipulation** |
| 663:18 664:11 | **logo** 529:25 | 712:13 719:21 | **lotion** 559:10,14 | 563:20 |
| 664:22 665:4 | **long** 562:23 | 721:9,11,13 | **loud** 669:4 | **Mann** 579:13 |
| 667:6 669:13 | 573:9 622:9 | 741:10 742:10 | **Louisiana** | **Manoso** 384:14 |
| 670:7,15 671:3 | 716:14 | **looking** 419:6 | 382:12 | 397:5 |
| 671:23 673:23 | **longer** 715:4 | 420:19,21,22 | **low** 555:2 | **MANSUKHA...** |
| 673:25 674:7 | **longstanding** | 466:17 514:15 | **lower** 555:4 | 383:19 |
| 674:15 675:3 | 520:3 | 520:13 550:21 | 678:24 695:7 | **manual** 412:9 |
| 676:12 679:20 | **long-time** 482:8 | 551:15 562:11 | **lunch** 562:6,6,7 | 672:25 |
| 680:9,20 681:6 | **look** 405:22 | 565:21 571:25 | 570:16,21 | **manufacture** |
| 682:2 683:18 | 411:25 421:11 | 587:20 588:1,3 | **LUNDY** 382:10 | 447:8 450:22 |
| 683:25 684:10 | 421:11 437:8 | 634:17 657:9 | 382:10 | **manufactured** |
| 684:14 685:14 | 466:1,16,18,20 | 693:7,22 | **lung** 739:17 | 580:12 |
| 685:24 688:7 | 467:15 470:10 | 722:13 743:8 | 740:17 743:8 | **manufacturer** |
| 689:10,17 | 475:23 476:16 | 748:1 749:21 | 745:6 | 488:19 |
| 690:20 691:13 | 504:15 518:13 | **looks** 404:20 | **Luzenac** 463:9 | **manufacturers** |
| 691:19,25 | 520:15 547:18 | 478:24 509:9 | 477:8 478:11 | 451:1 452:6,7 |
| 692:14,19 | 551:3 556:13 | 604:19 612:10 | 579:7,10 | 578:13 580:13 |
| 693:2,5 694:11 | 557:6,9,10 | 661:2 686:23 | 601:19 637:4 | 598:25 |
| 694:17 695:2 | 559:3,5,20,21 | 731:20 | 648:11 676:3 | **manufacturing** |
| 695:19,22 | 559:23 560:1 | **loose** 580:12 | | 665:21 |
| 696:21,23 | 561:10 564:6 | **Loretz** 379:18 | **M** | **manuscript** |
| 697:4,15 698:3 | 566:22 575:25 | 380:1 385:2,11 | **M** 379:15 | 602:3,6,6,9,14 |
| 698:12 699:19 | 582:4 583:17 | 386:3 387:3 | 381:11 391:9 | 602:25 732:12 |
| 699:21 703:1 | 584:21 588:15 | 388:3 389:3 | 731:7 736:11 | 736:17 |
| 703:12,21 | 628:19 631:7 | 390:3 391:3 | **magnesium** | **march** 563:8 |
| 710:9 711:23 | 636:19 646:16 | 392:5,10,14 | 584:4 | 612:4 690:13 |
| 715:6 716:24 | 653:17 680:25 | 394:12 407:18 | **magnitude** | 691:4 |
| 720:25 722:10 | 681:1 683:6 | 410:2 414:1 | 692:9 | **marched** 536:22 |
| 723:3 724:12 | 684:25 686:15 | 419:21 435:11 | **mail** 737:13 | **marching** |
| 726:2,18 | 686:24 696:15 | 476:15 524:4 | **mailing** 711:3 | 722:22 746:4 |
| 727:17 728:9 | 696:18 704:10 | 570:25 579:5 | **main** 560:2 | **mark** 400:23 |
| 732:4,22 | 704:18 707:10 | 758:3 762:11 | 739:24 | 401:6 477:4 |
| 733:20 739:3 | 717:6 718:15 | **lot** 403:8 416:6 | **major** 409:2 | 512:23 592:8 |
| 740:13 742:13 | 718:18 723:8 | 419:16 441:19 | 433:11 488:7 | 602:23 660:5 |
| 742:25 744:7 | 735:23 736:4 | 449:10 460:8 | 489:13,17 | 672:11 678:11 |

| | | | | |
|---|---|---|---|---|
| 708:1 | **MBS-CRE000...** | 528:24 529:5 | 704:16 706:20 | 433:19 444:14 |
| **marked** 395:10 | 390:11 | 531:24 535:1,7 | 707:17,17,18 | 445:10,17 |
| 395:11 401:8 | **MBS-CRE271** | 536:16,19 | 708:11 709:4 | 448:15 459:16 |
| 401:17 404:9 | 682:10 | 537:2 538:16 | 709:20 710:11 | 499:11 537:14 |
| 404:13 410:21 | **McEwen** 520:18 | 539:3,14,20 | 712:13 715:18 | 542:19 611:6 |
| 410:22 430:23 | **MD** 438:6 | 541:10 544:13 | 716:3 717:19 | **medicine** 405:10 |
| 436:12,16 | **MDL** 379:5 | 545:13,22 | 718:19 719:10 | 405:25 |
| 452:23 453:2 | **Meadows** | 546:4,10 547:5 | 719:20 720:1 | **meet** 405:6 |
| 462:8,12 | 381:18 656:2 | 547:10 550:12 | 721:8 723:7,20 | 409:13 490:5 |
| 468:10 470:5 | **mean** 393:3 | 550:18 551:6 | 723:22 729:6 | 501:23,25 |
| 474:11,12 | 394:16 397:18 | 556:2,24 | 740:14 741:7,9 | 514:24 585:7 |
| 479:9,23 | 399:23 400:4 | 557:21,23 | 741:16,17 | 720:10,10,16 |
| 483:24 486:16 | 402:18 403:8 | 558:1,24 559:9 | 745:19,24 | 722:25 |
| 491:25 495:1 | 414:7,12 | 561:3,5 562:23 | 746:12,21,21 | **meeting** 387:15 |
| 512:10 521:23 | 415:16 416:5 | 566:5 573:17 | 746:24 747:5 | 387:18,20 |
| 577:22,23 | 416:21 420:5 | 574:11 575:25 | 747:13,23 | 457:20 458:6 |
| 592:6 603:3 | 421:7 422:5 | 576:12,15 | 748:17 751:2,3 | 463:7 467:24 |
| 615:21 620:12 | 424:2 425:12 | 577:25 581:10 | 754:1,1,16 | 468:5 469:21 |
| 620:14 625:25 | 425:13,25 | 581:17 582:25 | **meaning** 433:5 | 470:1 490:16 |
| 630:1 631:2 | 429:4 430:9 | 583:16,21 | 437:4 550:5 | 490:21 491:2,4 |
| 633:5 639:5 | 434:10,13,24 | 584:25 586:12 | 663:15 664:2 | 491:9,13,16,21 |
| 660:16,17 | 435:4 439:23 | 586:14 587:8 | 692:17 701:8 | 492:13,14,17 |
| 672:8,12 | 439:24 440:6,7 | 591:25 596:23 | 704:23 732:7 | 492:24 493:7,8 |
| 678:12,18 | 440:11 442:23 | 598:7 600:5,7 | **means** 501:10 | 494:2,6,11,20 |
| 682:11 686:25 | 443:14 446:25 | 600:13 610:15 | 505:14 536:9 | 494:21 495:4,8 |
| 687:2 688:13 | 447:1,3 452:18 | 614:20 615:19 | 545:25 550:4 | 495:14,23 |
| 688:14 690:6,7 | 452:21 459:19 | 623:6,17,25 | 683:23 753:24 | 496:4 497:23 |
| 693:24 696:6,8 | 459:20 460:10 | 624:1,10,15,24 | 759:23 | 498:17,22 |
| 697:7 713:23 | 461:22,24 | 625:5,14 | **meant** 460:11 | 499:2,25 501:8 |
| 724:21 731:1 | 468:2 469:25 | 627:20 631:19 | 499:12 547:23 | 501:11,12,17 |
| 734:12 748:7 | 471:12 472:4 | 634:24 635:2,7 | 587:8 593:4 | 501:18 502:8 |
| 753:8,10 | 472:14 473:6 | 637:22 638:25 | **measurement** | 502:11,23 |
| **Market** 381:14 | 473:12 481:12 | 640:8,15,17,22 | 553:19 | 505:7 510:25 |
| **marketed** 598:3 | 483:21 485:13 | 641:22 642:2,9 | **mechanism** | 511:1,2,5,8,23 |
| **MARKETING** | 485:22 487:9 | 642:24 647:18 | 509:4 540:5 | 513:1,20 514:9 |
| 379:7 | 488:3,6,25 | 647:19 648:1 | 541:7 542:3 | 516:3,4,8 |
| **Mary** 386:10 | 489:8 498:25 | 648:16 649:21 | 544:9,24 548:3 | 517:16 522:4 |
| 613:6 | 501:13 503:1 | 651:1,3 653:7 | 553:13 557:8 | 524:10 526:9 |
| **material** 471:5 | 507:17 510:6 | 653:15 659:2 | 557:19 571:21 | 526:11 527:19 |
| 552:10 656:1 | 510:19 512:23 | 662:25 665:15 | 575:13 577:10 | 537:3,5 540:16 |
| 683:12,17 | 516:1,12 517:2 | 666:19 668:11 | **mechanisms** | 548:14 551:23 |
| **materials** 560:5 | 517:25 518:1,8 | 671:6,11 674:9 | 558:19 582:3 | 551:25 552:1 |
| **matter** 434:6 | 519:15 521:10 | 675:5 676:22 | 587:20 | 556:8 572:9 |
| 475:15 481:6 | 524:6,19 525:5 | 676:24 678:6 | **medical** 398:6 | 592:15,17 |
| 500:10 513:8 | 527:5,10,22 | 684:1 685:25 | 405:11 408:3 | 595:20,22 |
| 513:19 629:23 | 528:4,13,19,20 | 686:12 699:9 | 419:2,22 | 598:17 599:14 |

600:2,3 614:5
619:14 622:15
644:14 670:5
670:10,12
711:13 712:11
712:21 715:15
720:19 754:3,5
754:6
**meetings** 489:19
521:5 595:2
600:14 705:15
712:14 715:12
715:17
**meets** 586:19
722:19
**member** 427:4
601:16 663:8
676:2,4 707:1
724:9 725:15
726:15,16
730:9,16
731:13 737:6,7
737:24 745:14
746:7 747:3,18
**members** 401:16
402:24 412:9
425:14,23
441:8 443:19
444:15 446:14
449:23 450:4,4
450:21,23
456:2 481:9
488:17 498:20
499:20 506:6
596:24 598:1
608:6 613:19
622:14 624:6
634:6 635:10
645:3,17 646:1
648:22 650:23
651:2,2 654:10
667:2,8 704:18
704:24 705:11
705:12 706:1
706:24 708:19
708:24 709:16

710:5,13
711:21 719:9
719:12 722:1
724:2,10
727:15 729:15
729:23 730:18
736:1 737:10
737:21 738:6
742:5 743:23
744:1,1 746:9
751:14 752:3
755:22
**membership**
446:22 660:9
**memo** 490:14
753:24
**memorandum**
387:18 388:15
390:22 391:12
603:13 724:24
753:13 755:22
756:22 757:4
**memory** 478:13
512:8 592:20
646:17 719:16
720:6 721:14
742:15,21
**memos** 490:12
715:20
**mention** 447:14
557:25 585:25
**mentioned**
451:11 493:13
552:7,10
572:18 573:22
601:8 615:7
699:9 717:23
732:10
**menu** 565:2
**messages** 658:4
**met** 393:21
396:15 424:7,9
424:10 457:16
487:12 504:16
505:11,12
513:23 527:21

565:10 643:16
686:7 716:13
**meta** 386:20
388:15 390:22
**meta-analysis**
389:7 422:20
423:7 426:3
429:2,11,12,21
429:22,25
430:11,18
432:3,16
433:10,14
435:18 439:4
474:5 477:14
477:19,24
479:13 529:16
529:24 530:1,5
602:6 603:14
610:1,5,9,11
611:10,17
612:5,5 614:9
721:22 736:17
738:15
**Meta-Analytic...**
388:10
**method** 555:6
586:25
**methodologies**
551:9 555:3
709:21
**methodology**
552:9 553:23
563:16 714:20
715:9
**methods** 433:15
553:23 554:3
563:18 564:1
706:13
**METHVIN**
381:21
**mice** 739:19
**Michael** 423:2
508:12 731:11
736:12 748:12
748:22,24
**MICHELLE**

382:3
**mid** 646:12
647:3,5
**middle** 681:13
683:6
**mid-1990s**
646:24
**Mike** 613:13
732:10
**mild** 575:18
**MILES** 381:22
**million** 708:10
**mind** 633:25
**mine** 393:13
571:3 580:9
581:4
**mined** 393:13
**mineral** 470:22
578:13
**mineralogy**
466:7 723:16
**minerals** 477:1
578:8 580:14
**mines** 548:20
550:6
**mining** 488:21
723:16
**minute** 423:10
463:13 618:12
713:5
**minutes** 386:7
390:20 391:7
396:16 462:13
469:14 507:11
537:5 656:6
684:21 705:14
712:14,15,21
712:24 713:2,5
713:7,9,17
714:2 715:16
715:19,21
717:2,17 718:3
718:5,11,14
720:24 734:7,7
734:17,18,18
734:22,25

735:17,18,22
736:3 744:10
744:11
**miracle** 535:8
**Mischaracteri...**
529:9 530:18
653:2
**misrepresent**
616:1
**missed** 390:10
**missing** 661:6
**mission** 662:5,8
**mistake** 593:12
**mistaken** 466:6
**MITCHELL**
381:5
**MIZGALA**
384:4
**mm-hmm**
400:16 462:19
465:20 494:23
512:4,7 513:6
518:12 578:5
591:8 595:11
595:13 605:4
607:7
**MNordhauser**
613:4
**mobilization**
522:16
**modifications**
436:3
**molecule** 549:11
**moment** 396:1
402:12 410:11
422:14 428:3
445:6 455:1,3
458:18 484:16
533:5,17
572:17
**Monday** 379:20
492:5 728:1
**money** 487:22
709:10 722:23
729:10,20
730:14,20

monkey 634:15
  634:15 640:8
  719:5
monkeys 719:3
Montgomery
  381:24
months 513:23
  516:8 616:16
  649:10 650:8
  685:10
Moring 426:13
  426:19,22
  427:17 432:13
  475:17 476:17
  476:20 578:20
  578:25
morning 392:10
  392:11 459:21
  580:21 652:16
  708:15 724:14
  726:21 751:12
  757:20
Morristown
  383:15
mortality
  464:14 695:9
Mossman 627:9
  627:25 628:3,6
  628:7,9 629:8
  640:16
Mount 383:14
  702:4
move 413:9
  415:24 430:15
  482:22 531:17
  675:9
moved 725:13
  725:14 735:5
moving 531:18
  575:8
multiple 438:25
  439:10,14,20
  440:25 442:4
  442:13 443:8
  443:13 444:12
  447:16 521:4

532:16 730:18
Muscat 423:4
  424:7,10
  426:10,24
  427:3,9,23
  428:5,13,17
  430:13 433:25
  434:2,20
  435:13 457:24
  461:4 468:19
  468:20,24
  469:2,4 474:3
  477:12 478:9
  478:18 479:19
  480:17,18
  497:6 500:13
  505:25 508:13
  508:15 514:20
  514:24 520:4
  522:25 526:9
  527:19 529:22
  530:15 538:2
  541:6,13
  544:24 555:24
  564:20 568:17
  571:13 575:15
  578:15,17,23
  579:25 582:4
  615:14,16
  616:6 617:4,9
  621:19 622:24
  624:5 626:18
  632:8,10,18
  633:9,18
  637:10 639:9
  646:6 648:20
  650:18 651:7
  653:12 655:16
  655:22 751:21
Muscat's 429:15
  585:21
MUSCAT000...
  386:13
Myers 384:15
  397:4
mystery 750:6

## N

N 381:1 385:1,1
  392:1
name 392:13,20
  394:19 454:2
  466:18 526:25
  604:21 627:10
  628:5 658:12
  664:9,20,21
  686:1 711:6
  716:6,12
  759:14
named 523:1
  685:18
National 401:19
  675:10,11
  693:12,18
nature 470:22
  714:12
NCI 390:9,14
  675:18 676:5,7
  677:1,16,25
  678:22 680:16
  682:1 694:9,23
  695:16 696:12
  698:10,22
  699:2,16 700:2
nearing 477:22
nearly 622:3
  692:17
necessarily
  629:3 720:10
necessary
  411:19 413:8
  422:12 464:19
  673:12 760:3
need 403:17
  407:11 418:22
  441:13 499:9
  552:12 553:18
  554:16,19
  574:3 581:3
  626:5 635:2
  682:16,20
  694:4 705:1
  709:21 714:3

719:25 731:16
  755:9 756:6
needed 528:20
  709:8
Needs 612:20,23
Nettesheim
  598:14
never 388:20
  444:19,21,24
  445:1 447:12
  447:13 525:17
  525:20 620:9
  621:8 624:6,13
  637:20 638:2
  638:10 646:15
  650:12,15,18
  683:21 693:15
  698:5,18
  733:18 750:12
  750:15
new 379:2
  383:15 389:19
  406:22 508:20
  514:25 527:20
  551:16 553:9
  621:21
newspaper
  701:25 702:3
NICHOLAS
  382:9
Nicholson
  598:13,15
Nichols-Dezen...
  658:13,14,24
nickel 560:7
  584:8,12,16,19
  584:20 585:13
nine 386:21
  482:20 565:15
  597:4
nomenclature
  568:16
nominated
  714:16
nomination
  470:16

nominations
  716:16
non-approval
  625:4
non-asbestifor...
  470:20
Nordhauser
  613:6,9
Norm 712:6,9
normal 452:18
  452:22 503:23
  651:15
normally 731:21
  731:21
North 477:2,5
  579:24 627:19
Nos 603:2
Notary 380:13
  762:19
note 397:18
  492:21 570:13
  661:6 695:2
noted 463:17
  508:19 537:21
  551:18,22
  613:11 760:9
  762:7
notes 387:15
  492:13,17,21
  494:10,20,24
  495:4,7 499:3
  518:14 519:2
  552:1 601:3
  759:11
notice 380:12
  395:15 396:14
  397:6,13 518:9
  616:3,4 654:21
  657:13
noting 508:25
November 515:1
  516:7 526:10
  527:19 713:6,7
  715:25 716:16
  718:10 720:20
  731:15

NTP 386:16
426:11,14
454:21 463:20
465:4 466:21
468:3,21
469:18 470:14
470:18 471:24
471:24 475:13
477:9 520:24
638:5,8 644:14
655:3,19,24
658:18 706:24
707:3 739:12
739:14 740:1
740:16 743:7
744:20 745:5
749:8 752:7,23
null 610:3
number 400:4
408:23 459:18
463:17 494:1
523:4 525:11
525:12 568:1
571:14,19
602:7 612:18
612:25 620:16
637:3 644:7
652:19 676:7
697:3 707:12
737:15 757:13
numbers 490:2
616:4 652:8
741:23
Nutrition
493:18
NW 382:18
N.W 380:6

**O**

O 379:15 385:1
392:1
oath 380:15
392:7 395:5
531:8
object 422:4
488:4,9 515:24

516:24 517:9
528:1 550:1
552:21 623:1
629:9 652:24
690:19 699:20
726:19 727:16
750:22
objected 728:4
objecting 489:4
objection 403:3
405:13 412:16
412:21 413:3
413:15 414:11
414:22 415:2
415:12 416:4
416:19 417:3
417:13,23
418:3,19 419:9
419:12 420:1
420:11,25
425:10 426:7
426:16 428:6
428:16 430:8
430:20 434:10
434:22,24
435:15 436:6
437:17 439:16
443:10 444:20
445:14 446:24
447:23 448:18
449:2,7 451:5
456:4 458:1
459:10 460:1
460:12,19,22
461:5,15,20
462:5 464:20
464:24 466:13
473:2,21 474:7
481:11,25
482:14 483:7
484:23 485:2
486:2,7 487:23
487:24 488:23
488:24 489:25
496:23 497:1
497:15 501:21

502:13,18
503:11,14,18
506:10,13
507:9,23
509:18 510:15
511:16 515:16
515:23 516:23
517:8,24
518:18 519:25
521:21 523:9
524:23 525:1
527:3 528:9,14
529:2,9,18
530:6,12,18
531:4,16
532:14,24
533:21 534:23
535:3 536:6
537:16,24
538:5,24
539:13 542:21
544:11 545:14
545:23 547:3
548:5,10 549:4
549:17,25
550:19 551:5
551:21 552:21
553:14 554:15
554:21 555:18
557:20 558:23
560:22 566:8
566:15 567:4
569:1 570:2,8
572:21 575:10
575:21 576:6
576:10,21
581:6 582:23
583:15 584:24
585:23 588:19
589:14 597:8
597:21 607:11
607:17,24
608:3,7,13
609:11,20
610:7,14,21
612:14 614:15

615:2 619:21
625:6,13 627:6
634:25 635:15
636:4 637:15
650:25 651:10
651:20 653:2
653:14 654:12
656:1 663:18
664:11,22
665:4 667:6
669:13 670:7
670:15 671:3
671:23 673:23
674:7,15 675:3
676:12 679:20
680:9,20 682:2
683:18,25
684:14 685:14
685:24 688:7
689:10,17
690:20 691:13
691:19,25
692:14,19
693:2 694:11
695:18,19
696:21 697:15
698:3,12,14
699:19 703:1
703:12,21
710:9 711:23
715:6 716:24
720:25 722:10
723:3 724:12
726:2,18
727:17 728:9
732:4,22
733:20 739:3
740:13 742:13
745:3 746:11
747:24 749:23
750:3,25
751:18 753:1
756:1
objections
389:12 694:17
759:7

obligation
403:13 592:3
observational
386:21 389:8
563:18
observe 563:17
obtained 598:25
obvious 439:23
622:8
obviously
397:19 439:16
440:3 510:7
526:20 551:7
570:14 661:4
663:7 684:1
707:19 745:20
occasion 403:22
424:12 429:12
472:15
occasions
402:14 676:7
occupational
405:9,25
occur 536:3
occurred 491:4
October 379:20
392:4 696:16
725:11 757:25
759:15
odd 614:14
odds 568:3,7
692:12,22
offer 588:13
offering 609:21
offers 589:15
office 454:20
456:10,23
457:7,17 458:5
458:7,11
485:19 491:8,9
493:22 494:2,3
509:25 513:24
515:9,11
523:23
offices 380:2
official 455:7

**officiated**
380:14
**oftentimes** 445:8
445:9,17
**oh** 422:15
426:25 431:6
431:19 455:17
457:19 471:18
492:8 496:10
505:24 516:9
516:11 543:13
587:7 590:22
596:22 598:16
603:11 610:22
620:15 630:12
630:19 640:12
676:23 705:3
735:15 736:22
**okay** 392:15,17
393:2,6,11,16
393:19,20,23
394:2,11,19
395:4,9,16,17
395:24 396:11
397:6,12 398:3
398:13,14,20
398:21 399:1,6
399:12,13,16
399:17 400:1,7
400:10 401:24
402:8,12,24
403:22 404:5,8
404:16,21
406:9,14,17,25
407:5,25 408:7
408:18 409:8
409:11,21
410:1 411:5
412:2 413:9,19
414:3 415:6,8
416:1,15
418:25 420:16
421:4 422:2,13
422:23 423:1
423:19 424:12
424:16,18

425:2,5,8
426:12,21
427:10,16
428:2,10,25
429:18 430:2
431:1 432:6,10
432:14,15,20
432:20,22
433:3,5 435:10
435:18 437:8
438:5,19,23
440:5,17 441:3
441:10,19,21
441:24 442:12
442:22 443:23
444:3,5 445:6
446:6,7,11,12
446:18,20
448:10 450:3
450:21 451:9
453:8,15,25
454:4,11,17,25
455:8 457:4
458:25 459:14
460:16,17,18
460:25 461:11
462:7,23 463:1
463:12,15,23
464:1,4 465:9
465:15,25
467:21 469:2,3
469:11,13
470:8,13 471:9
471:20 472:6
473:14,17,25
474:10,19
475:6,10,11,17
475:19 476:23
477:4,17,22
478:4,7,14
479:6,8 480:1
480:18 481:16
481:17,20
482:12,20
483:17 484:9
484:24 486:23

487:19 488:16
489:3,6,13
490:4,17 491:8
491:20 492:13
492:16,20
493:2,5,5,17
494:8,12,15
495:7,13,17
496:3,10,13,19
497:21 498:8
499:4,17
500:23 502:10
504:11 506:2,5
506:8 509:22
512:21 513:4
513:13,18,19
513:22 515:6
516:9 517:15
518:21 519:7
519:11,15
520:19 521:1
521:18 522:12
522:13,22
523:4,18 524:3
526:2 530:4,11
531:1 532:12
533:4,14 534:7
536:2,11
537:13 539:20
541:1,9,14,19
541:24 542:5,7
542:12,24
543:13,13,18
544:1,6 545:8
545:12 546:2
546:20 547:9
547:15,25
552:16 553:9
553:17 555:7
557:17 558:7
558:12,13
560:11,15
561:25 562:4
562:13,22
563:16 564:5
564:10,12,19

565:3,14,24
566:2 568:5,10
571:19 572:4
573:2,8,13
575:7 577:12
577:16 578:12
578:15,17
579:19,21
580:23 581:9
581:14,16
582:17 584:15
584:20 585:20
586:7 587:8,12
588:2,4 589:8
589:18,22
590:2 591:18
592:8 593:11
593:13,16,20
594:2,8,17
596:1,16 597:1
598:9 599:14
600:12,12,21
600:24 601:1,5
601:18 602:4
602:12,23
603:16 604:16
605:3,8,10,13
606:12,19,24
609:18 611:25
612:11 613:1,2
613:7,18 616:2
616:10,11
617:3,21,24
618:1,2,11
619:1,7,11
620:7 622:21
624:4,21
626:14,17
627:23 628:8
629:18,23,25
630:6,12
631:21 632:20
633:23 634:1,3
634:17,22
635:20 636:12
636:17,23

637:4 638:13
638:16 639:20
641:25 642:5
644:5,15,22
645:11,14
646:18 647:2
647:12,19
648:9,17 649:1
649:16 650:3
650:22 651:6
651:19 652:17
652:21 654:9
654:20 656:13
656:15,22
657:7,20 658:2
658:23 660:10
661:1 668:23
669:8,19
672:10 673:1
674:23 676:14
677:1,18
679:13,16,25
680:15,25
681:3 682:9,16
682:22 684:4
684:19 688:4
688:12 690:3
693:23 695:1
696:2 697:2,6
697:22,24
698:25 699:11
699:15 700:1,7
700:24 702:22
703:6 704:4,23
705:9 707:11
707:13 708:9
709:2,13
711:18 712:2
712:15,20
713:4,15 714:1
714:5,6,14
715:1,11,23
716:4,11
717:13,17,23
718:18,22
719:8,23

720:18 721:17
722:4,18
723:20 724:7
724:18 725:22
726:14 727:3
727:22 728:14
729:22 730:3,8
730:13,23
731:17,25
733:11 734:6
734:15,24
735:3,7 736:3
737:17 738:1
738:16,23
739:7,11,21
740:7,22 741:3
741:12,15
742:9 744:5,12
745:8 746:1,18
747:10,16,16
748:5 749:3
750:12 751:10
751:23 752:13
754:15 755:2,7
755:11 756:8
756:10,21,25
757:8,17,21
**old** 551:1,20
601:10 668:25
670:13
**older** 661:4
**onboard** 644:19
**once** 424:10,17
428:23 686:7
694:23 709:2
711:12,15
723:25,25
727:13
**Oncology**
385:17
**ones** 489:13
505:1 552:9
564:2 585:7
595:8 639:22
640:15 655:18
661:9,10

688:22 711:20
730:7
**ongoing** 459:11
596:24 598:8
642:12 643:5
709:21
**open** 444:15
**opened** 495:23
**openness** 551:7
**opined** 674:9
743:11
**opinion** 609:22
**opinions** 421:2,4
461:7
**opportunities**
403:18
**opportunity**
476:15 526:16
530:23 537:11
537:18 547:18
631:14,16
756:16
**opposed** 609:9
666:4
**opposes** 412:19
**opposing** 410:14
443:7
**opposition**
413:12 421:16
421:25 422:6,9
446:5 447:19
458:19 483:5
487:1,2,4,7
497:7,7 560:16
**orchestrate**
514:22
**order** 514:22
515:1 565:10
583:12 679:16
**orders** 722:22
746:4
**organization**
394:17 414:2,4
430:3,4 472:9
472:11 483:5
504:17 676:3

722:25
**organizational**
677:7
**organizations**
483:18
**organize** 655:4
**original** 527:25
759:12 760:11
**originally**
423:21,22
453:17
**ought** 552:19
581:1 635:10
637:13
**outcome** 722:8
**outdated** 552:19
**outline** 613:12
**outlining** 648:6
**outset** 686:18
**outside** 396:9
484:18 555:22
624:1,25
723:25 728:17
**ovarian** 385:20
386:20 387:5
388:13 389:6
389:15 390:7
390:12,15,16
390:17,18,19
392:21,24
398:8,18
406:19,20
407:1,23
408:16 409:3
412:1 413:5
438:15 447:20
450:1 455:24
459:7 463:19
463:25 464:6,7
464:10,10,12
477:13,14,25
480:15 501:4
508:21,24
535:8,14
544:10 549:12
563:3 567:19

571:22 574:6
574:22 581:3
584:18 587:15
587:21 588:14
588:17,23
589:6,10
592:25 594:4
594:11,25
596:5 599:17
605:21,22
606:5 607:4
611:9,11
613:21 614:11
617:8,14 619:4
621:24 624:14
628:20 634:7
634:13,19
639:11,25
640:7 641:14
648:14 652:2,9
652:13,18,23
670:24 671:2
674:24 676:9
677:16 679:1
680:3,4,17,18
681:4,17 684:8
686:10 687:5
687:25 688:17
689:5,24
691:16 692:5
694:8 695:8,10
695:16,21,25
696:13 697:11
698:9 701:1,6
702:8 718:12
721:12 736:5
739:2,9 740:15
740:20 741:11
742:1 743:9
745:5 749:13
749:17 750:9
751:16 752:11
752:15,19
**ovaries** 559:15
635:13 681:19
688:2 690:1

702:19
**ovary** 718:21
719:7
**overall** 508:23
509:1,12
520:13 565:5
623:25
**overarching**
714:21
**overlap** 725:6
**Overview**
389:19 567:17
567:24
**over-the-coun...**
485:16,25
**O'DELL** 381:19

| P |
| --- |

**P** 381:1,1,19
392:1
**PA** 381:6
**page** 385:2,11
386:3 387:3
388:3 389:3
390:3 391:3
408:18 422:16
424:18 431:23
432:19 433:18
438:2,3 470:11
512:19,20
522:20 533:12
533:13 541:11
541:12,17,21
541:22 552:6
562:8,9 567:14
569:7 578:4
602:2 603:21
604:4 606:9,13
610:19,19
612:18,21,22
612:24 619:5
619:25 620:8
629:14 630:4,6
630:10,11
681:9,12 683:7
684:19 686:17

687:14,15,17
687:19 688:25
689:3,15
691:23 695:5,8
696:16,24
697:17 714:2
717:3,5 735:9
735:9,10,11,14
736:4 749:1
755:19,21
757:14 761:4
**pages** 431:4,18
494:10 661:6,7
681:7 695:3
716:25 762:3
**paid** 435:22
436:2 437:10
437:14 481:22
523:1 603:16
606:21 621:25
621:25 647:10
729:4
**Palmolive**
601:24
**pan** 459:23
**panel** 473:11
**panels** 472:25
667:1
**PAPANTONIO**
381:5
**paper** 407:4
410:13 437:4
474:5 517:18
603:20 604:23
605:2,3 628:4
632:11 633:20
636:6 647:20
652:6,7,8,21
653:1,3,16
719:14 721:25
722:1,6,8
724:1 736:8
741:6 742:3,4
742:4,10,14,16
742:23,24
743:9,11,22

744:23,24
745:4,11,15
746:6,22,24
747:3 749:12
750:20 751:3,6
751:8,11,20
752:11,18
754:12,20
**papers** 431:13
432:2 478:5,18
480:21 626:18
721:9,11,13
738:25 741:17
741:22,24
742:7,12
**paragraph**
405:12,23
411:13 424:21
424:25 433:11
438:19,21,23
441:25 442:2
477:7,7 494:22
495:5,22,22
513:17 541:25
542:6,7 543:11
545:2 569:17
591:5 630:12
684:25 696:19
726:4 736:11
749:6
**paragraphs**
436:22 508:7
541:16
**Paralegal**
384:13
**parameters**
650:6
**pardon** 536:19
**PARFITT** 382:3
**part** 390:6 399:7
436:3 441:16
466:22 528:25
536:25 557:23
585:20 603:17
603:22 604:13
607:1 640:2

662:2 665:22
666:17
**participate**
472:22 517:22
**participated**
737:4
**particular** 510:5
625:17 635:14
679:7 704:19
706:4 707:15
711:22 714:15
715:24 717:15
732:18
**particularly**
466:7 536:3
554:12 594:7
720:14
**parties** 403:19
711:19 712:12
729:18
**parts** 485:20
537:2 586:15
586:16
**party** 386:7
391:7 463:8
503:8,25
601:12 616:17
622:10 700:8
700:13,14
701:19 702:24
703:19 705:10
707:1 708:6
709:14 720:8
725:1 729:19
731:23 734:16
753:15 755:23
**passed** 662:11
**Pastides** 636:6
638:2 655:15
656:14,16
**Patient** 390:9,14
679:2
**patients** 506:12
506:18
**pause** 407:14
455:1 459:2

**pay** 433:3
601:14 729:14
730:7,16
731:22,24
732:2,2,11,17
733:7,15,17
**paying** 733:9
**pays** 730:9
**PC** 570:13
**PCPC** 382:15
384:14,15
385:15 397:4
399:11 402:14
403:22 405:6
410:25 414:8
416:2,6 418:13
421:25 422:19
429:21 433:3,5
433:6 436:1,2
436:23 437:5,9
439:13 441:8
442:9 443:6,19
446:23 447:11
449:9,15,21
450:3,23
451:13 452:15
454:1,10,15
455:8 456:9
457:2 458:18
459:1 461:12
462:2 467:25
468:16 469:5
481:8,9,23
484:5,20
487:10 489:24
490:4 497:24
498:23 500:19
505:13 512:14
519:17 521:14
523:1,16 527:1
528:16 531:3
532:22 534:10
536:12 540:4
541:6 543:18
552:17 557:11
557:13 564:21

570:5,6 571:9
578:10 587:9
587:10,11,19
588:5 592:16
592:23 596:3
596:14 599:25
601:25 604:21
608:5 611:1
623:7 626:14
626:17 627:4
628:22 631:17
632:16 633:24
638:17 639:18
639:24,24
640:5,5 641:13
644:15,19,23
645:2,11,12,12
645:16 646:15
650:20,23
653:23 654:5
654:10 656:24
660:20 661:4
661:18 662:8
662:14,21,22
663:3,8 664:2
670:2,5 671:17
674:1 675:18
675:24 676:1
677:11,24
699:22 701:8
704:24 706:25
724:4 729:6,7
729:13 746:15
757:10
**PCPC's** 419:23
441:5 487:7
519:4 520:23
526:18,24
531:2,11,15,23
532:22 757:14
**PCPC_MDL**
391:5
**PCPC_MDL0...**
388:16
**PCPC0005505**
387:16

| | | | |
|---|---|---|---|
| **PCPC0052415** | 657:4 658:5 | 393:25 394:13 | 487:1,5,12 | 666:4,11 |
| 389:24 | 695:16 704:20 | 394:15,20 | 490:6,9 495:15 | **Philadelphia** |
| **PDQ** 390:8,13 | 709:12 710:21 | 396:3 406:10 | 495:18 496:6 | 381:15 383:22 |
| 679:2,5,7,17 | 711:4,6,16 | 409:16 410:2,4 | 496:16,22 | **phone** 390:10 |
| 680:7 681:4,25 | 714:12 722:7 | 410:12 411:1,6 | 498:13,16 | 436:18 686:6 |
| 687:6 688:18 | 722:15 729:19 | 411:18,21 | 499:6,23 500:1 | 686:11 737:1,5 |
| 691:17 694:4 | 735:23 | 412:8,24 | 500:8,12 | **phrase** 536:9 |
| 698:21 | **people's** 707:20 | 415:14 417:5 | 502:17 503:7 | 575:2 |
| **PDQs** 698:19 | **percent** 489:23 | 423:16,23 | 504:21 505:17 | **physical** 550:8 |
| **peer** 604:17 | 533:23 534:1,4 | 424:4 439:1 | 505:22 508:10 | **physician** |
| 605:5 637:21 | 568:8,8,18 | 442:5 492:5 | 508:16 512:3 | 679:18 680:6 |
| 638:3 | 575:17 610:2 | 515:2 523:22 | 513:25 514:12 | **physicians** |
| **peer-reviewed** | 652:22 692:18 | 532:17 660:6 | 514:13 515:21 | 680:13 |
| 638:11 752:1 | 708:12 | **personally** 487:9 | 517:20 518:10 | **Physician's** |
| **pending** 502:16 | **performed** | **perspective** | 518:14,23 | 679:12 |
| 516:21 537:19 | 399:9,10 | 441:4,5 572:8 | 519:5,12 521:1 | **Ph.D** 379:18 |
| 583:7 598:24 | **perfume** 558:25 | **pertaining** | 521:18 522:3,9 | 380:1 385:2 |
| **Pennsylvania** | **perfumes** | 518:14 | 522:14 523:7 | 717:10 725:1 |
| 381:15 383:22 | 580:16 | **Peruses** 431:24 | 523:15 525:6 | 758:3 762:11 |
| **Pensacola** 381:8 | **perineal** 385:19 | 475:25 513:14 | 525:12 526:6 | **pick** 757:19 |
| **people** 395:25 | 387:4 389:4,14 | 522:12 682:22 | 526:17 536:23 | **picture** 428:12 |
| 396:7 399:8 | 450:6 567:18 | 714:5 731:18 | 538:18 560:17 | **piece** 537:7 |
| 428:13 434:8 | 605:20 611:12 | 756:10 | 573:10 582:2 | 608:21 647:20 |
| 440:16 445:2 | 624:14 630:9 | **petition** 385:13 | 583:8 585:5 | **place** 442:9 |
| 445:11,23 | 691:23 692:4,7 | 386:5 387:22 | 590:6,9,15 | 642:10 759:5 |
| 446:20 448:3,3 | **perineum** | 391:13 398:19 | 591:13,14,18 | **placed** 397:7 |
| 448:8 449:9 | 681:18 688:1 | 399:23,24 | 605:12 608:19 | 514:1 |
| 450:22 452:9 | 689:25 718:21 | 400:14,20,25 | 609:19 654:1 | **placement** 438:9 |
| 452:10,18 | **period** 671:12 | 403:1,9,20 | 667:21 668:4 | **Plaintiffs** 381:3 |
| 458:9,10,11,13 | 671:19 754:19 | 404:1,17 406:4 | 669:11 670:14 | 389:13 |
| 461:3 466:1 | **peritoneal** | 406:5,12 | 706:23 707:4 | **Plaintiff's** 672:8 |
| 467:10 472:21 | 611:12 | 408:14,17 | 738:13 749:22 | 687:1 |
| 472:24 473:6 | **persistent** | 409:9,18,19,22 | 751:14 753:17 | **plan** 595:20 |
| 489:9 493:20 | 576:19 | 410:5,15 411:2 | 755:5,13 | **planned** 428:5 |
| 493:21 494:1 | **persistently** | 411:16,17,21 | **petitioner's** | **plans** 523:24 |
| 509:24,24 | 408:3 | 411:24 412:13 | 414:13 | 525:3 |
| 511:9 516:20 | **person** 456:16 | 414:10 419:3 | **petitions** 400:4 | **plausibility** |
| 519:16 523:6 | 473:10 509:23 | 421:16 422:1 | 402:15,18 | 504:20 557:15 |
| 523:14 528:18 | 517:2 521:15 | 438:8,11 | 403:23 485:10 | 571:12 576:14 |
| 528:25 529:7 | 613:5 711:14 | 451:10 453:12 | 485:12 592:2 | 576:17 585:10 |
| 539:19 542:18 | 712:3,6 715:13 | 453:17 457:6 | 600:23 668:12 | 585:12 671:7 |
| 555:12 561:8 | 715:16 716:13 | 458:19 468:25 | 674:10 | **plausible** 451:7 |
| 563:2 601:13 | 717:13 731:11 | 481:2,3 483:15 | **pharmaceutical** | 509:4 540:4 |
| 606:20 611:16 | 746:15 | 483:19,21 | 433:12 464:19 | 541:7 544:8,24 |
| 618:22 624:2 | **personal** 379:16 | 484:12,19,22 | 485:15,25 | 548:3 553:13 |
| 629:1 655:14 | 387:9 389:10 | 485:8 486:21 | 549:2,6 665:13 | 557:8 558:5,19 |

559:25 575:13
577:9 582:3
587:20 588:13
589:16 631:15
**played** 395:6
**please** 392:13,13
408:20 513:5
527:16 537:9
590:19 591:6
622:13 673:10
687:23 689:22
692:2 696:3
704:1 727:25
733:7 748:6
749:7 752:7
757:23 760:2,6
**Pltf_PCPC_0...**
391:14
**plus** 408:12
**pocket** 729:14
**point** 408:4,23
419:14,15
420:17 461:11
463:16 471:9
490:20 495:17
495:24 496:1,5
499:17,22
525:8 535:25
541:10 542:12
543:19 544:18
548:15 549:8
550:25 565:7
569:7,9,17
575:15 580:23
580:25 584:9
585:2 602:5
618:20 662:6
662:16 663:11
663:20 668:3
670:22 698:20
698:24 699:1,5
699:10 706:22
711:11 717:20
721:10 739:24
743:18
**pointed** 496:20

498:12 575:16
613:7 671:7
**points** 541:5
718:17
**policy** 503:23
663:21
**poll** 622:14
**Pollack** 659:25
660:4,5 708:1
708:3
**Pollack's** 660:10
**poorly** 747:12
750:7
**portion** 395:19
695:7
**portions** 681:9
**PORTIS** 381:21
**position** 411:6
413:6 416:8,9
417:14 419:19
440:18 447:24
502:7 514:17
532:22
**posits** 534:16
**possession**
518:22 555:14
**possibility**
567:17 611:11
**possible** 473:19
474:1 535:4
537:14,22
573:20 595:22
622:1 633:22
692:8
**possibly** 544:2
**post** 587:16
**posted** 511:9,19
538:7,19,20
561:24 681:25
**potential** 388:11
389:19 406:18
417:2,12
444:15,16
445:12,12
446:3,4 447:20
450:11 540:9

553:10 574:6
576:3 577:17
585:6 607:10
607:16 609:6
642:6,18 701:9
723:1
**potentially**
558:19 574:1
**powder** 379:6
389:14 392:22
392:22,23
393:2,7 398:7
406:19 407:1
407:22 408:15
408:24 409:13
411:9,25 413:6
438:14 448:8
448:13 450:6,9
450:12,22
451:2 452:7
455:23 459:6
464:18,23
465:2 466:12
488:19,20
489:10 544:8,9
544:22 547:1
548:1,17 550:7
557:3 558:18
560:9,18 563:2
571:1,15
573:10 574:2,3
574:5,16,17,21
575:3 580:12
580:12 581:2
582:6 596:17
596:18 597:20
599:17 606:4
617:8,14 619:4
621:23 630:9
635:12 640:6
677:17 680:5
681:18 688:1
689:25
**powders** 438:12
**power** 398:17
610:12

**PowerPoint**
389:23 660:21
663:3
**practical** 568:21
**practices** 379:7
665:21
**precaution**
449:24
**precise** 713:8
**preclinical**
748:23 752:21
**preclude** 563:19
**predecessor**
394:19 463:5,9
648:12 729:13
**predecessors**
684:13 708:14
**predicate** 442:8
442:12 443:6
544:25
**predominant**
494:1
**preliminary**
706:24
**premarket**
666:2
**premise** 560:16
**preparation**
477:9 494:17
498:6 518:22
518:24 602:14
645:25 647:13
658:10,22
659:21 660:24
674:20 677:13
682:15 721:4
725:24 726:10
726:22 727:4
732:12 741:13
**prepare** 395:19
396:12,12
494:20 520:5
657:4,20
659:14 718:4
735:1
**prepared** 398:1

400:2,22 423:1
423:14,16,19
423:22 500:11
500:22 508:12
532:8 596:13
602:6 621:19
661:23 727:1
754:2 755:12
757:15
**preparing**
661:21 741:4
745:24
**present** 384:11
446:5 502:7
**presentation**
389:23 656:9
656:19
**presented**
499:23
**presenting**
521:4
**presents** 600:14
**president** 454:7
454:9 477:1
**presumably**
414:7
**presume** 684:2
744:3
**presumes**
528:25
**pretty** 439:23
451:21,22,24
539:4,4,10
589:7 592:1
**prevent** 673:13
**prevention**
388:8 390:8,8
390:13,13,15
390:16 402:5
404:2,18
408:13 410:15
438:7 483:2
498:21 511:11
679:2,2 681:5
687:6 688:18
691:17 755:13

previewed
457:23
previous 476:24
688:22 754:24
previously
454:11 510:1
575:3 590:5
622:1,8 672:7
677:6 678:18
686:25 690:6
690:23 696:6
pre-study
634:16
primarily 452:4
452:15
primary 493:25
520:16 521:15
555:12 662:8
prime 521:15
Principal 514:19
printed 589:25
prior 395:11
424:6 428:25
428:25 429:9
429:19 449:21
467:23,24
477:1 486:25
487:7 492:21
510:24 520:11
520:15 524:15
531:13 543:20
576:3 577:16
659:5 665:25
741:4 749:7
752:5,6
priorities 591:15
prism 446:10
probably 402:17
403:11 420:2
425:23 441:20
476:22 503:23
519:19 521:17
521:17 575:1
627:20 644:21
662:9 698:20
708:21 717:1

727:6 737:14
749:16 757:1
problem 572:1
588:22 747:11
747:21
proceeding
759:4
proceedings
407:14 427:3
579:20
process 396:24
397:23 402:22
403:10,11
421:21 451:15
451:18 452:19
452:22 472:17
472:19 473:8
517:23 519:16
738:11
Procter 601:23
716:9 735:5
PROCTOR
381:6
produce 555:20
665:16,18
produced 519:9
520:14 629:13
757:4
producers 580:8
product 413:2
416:25 417:11
440:4,5 447:3
447:4 488:22
554:12 560:24
561:1,2 581:18
581:22,23
585:7 607:10
673:11,14,16
673:20
production
452:16
products 379:6
379:8,16
385:14 387:9
389:10 392:22
393:3,4,25

394:13,15,20
396:3 398:17
404:3 406:7,11
406:20 407:1
407:22 408:15
408:25 409:13
409:17 410:3,4
410:13 411:2,7
411:8,18,22
412:8,24
423:16,23
424:4 438:10
439:1 442:5
448:1,13 450:7
450:10,12,23
451:2 452:7
455:23 459:6
466:12 488:19
489:11 514:2
514:15 515:2
523:22 532:17
543:20 544:2,8
544:9,22 545:5
547:1 548:2,17
550:8 557:4,23
558:18 560:18
563:2 571:1,15
573:10 574:2,3
574:5,21 575:4
581:2 582:6,13
596:17,18
597:3,11,20
598:3 599:2,17
606:4 635:12
635:13 640:6
660:7 702:11
profession
410:15
professional
732:9
professor 405:9
405:24
program 401:20
662:20,24
Programs
662:16

projects 389:19
477:11 601:15
prominent
408:25
promoting
662:6
promulgated
551:16
pronounce
580:18,19
proof 556:14
558:11
properly 517:12
proposal 386:14
431:12 432:2
432:10 437:3
475:12 613:13
613:15 616:9
616:13 617:13
619:3,11
621:18 622:6
640:17 641:18
641:19 643:22
643:25 644:4,8
644:25 645:8
645:17 646:12
647:23 650:21
729:25
proposals
639:17 648:2
651:8 709:11
propose 498:15
615:5 636:10
636:18 638:16
638:17 639:14
proposed 542:2
615:16 619:18
623:21,23
624:5 628:4,10
639:9,24 640:5
640:11 641:13
726:5 727:24
proposing
621:21 636:21
648:7 650:11
propounded

393:24 762:6
pros 501:9
prospective
712:11
protection
706:14
protective
534:21,22
535:7,11
proven 413:20
415:10
provide 410:20
412:9 426:14
439:5 471:4
489:21,22
508:15,20,22
548:2 557:19
582:12 620:7
provided 457:24
459:1 484:5
496:21 498:2
515:2 533:6
549:19 557:7
557:13 559:25
603:22 604:13
629:15
provides 433:19
488:21 508:23
621:18 663:11
providing 413:1
415:9 444:13
507:20
proximity
699:12
prudent 583:9
PTI 384:3
public 380:13
406:1 523:6,13
657:5 658:5,14
677:8,21 678:6
762:19
publication
390:22 429:1,4
436:8 437:6,22
478:25 479:18
480:10,25

Case 3:16-md-02738-MAS-RLS   Document 16136-2   Filed 12/22/20   Page 349 of 746 PageID: 126543
Linda Loretz, Ph.D.

Page 798

481:1 636:22
637:18,20
638:11 639:13
642:20,24
722:6 750:6
751:25
**publications**
428:4 459:18
460:3 479:1
508:16,19
642:16 728:17
**publicly** 648:13
**publish** 432:6
608:5 637:6,13
726:6
**published** 407:4
420:7,8,9
435:5 436:4,25
437:14 479:2
542:14 552:7
567:21 588:7
602:17 603:7
603:20 604:18
604:20,23
605:2,3 606:18
612:5 625:12
626:12,15
627:4 628:6
636:2 637:14
652:1,4,5
713:19,22
721:22 722:2,9
728:8,12,18
738:18 751:3
752:1
**publishes** 608:5
**pull** 521:10
574:16 637:8
640:24 655:4
663:15
**pulled** 484:3,3
**pure** 393:17
541:8 548:17
550:15 560:1
571:19,20
580:7

**purity** 540:25
571:1 642:6
723:16
**purpose** 495:14
591:10 610:11
610:17 704:8
751:23
**pursuant** 380:12
395:14
**pursuing** 704:18
**put** 396:1
401:14 410:10
421:15 422:13
437:21,22
446:3 448:1
458:17 459:2
461:11 464:4
467:21 468:14
468:16 469:2
469:16 471:23
471:24 479:7
493:8 505:23
530:8 541:15
581:19 590:3
622:14 632:21
632:24 633:2
642:10 650:6
656:10,11
664:9 674:5,13
708:24,25
**puts** 394:4 611:8
**putting** 410:2
440:20 478:22
533:16 587:11
658:4 706:10
730:19
**P&G** 716:7
**P-225** 687:1
**P-384** 688:13
**P-385** 690:6
**P-437** 693:23
**P-645** 696:7
**P-72** 678:19
**P.C** 381:13,22
**p.m** 570:20,23
618:13,16

643:8,11
684:22 744:13
744:17 757:25
758:4
**P1.004.1** 385:18
**P1.004.9** 385:18
**P1.0154** 387:13
**P1.0154-7**
387:14
**P1.0164** 385:16
**P1.0164.39**
385:16
**P2.0007** 385:23
**P2.0007.7**
385:23

---

## Q

**quarter** 687:15
**Query** 679:12
**quest** 547:15
**question** 405:22
412:2 413:11
413:23 414:8
414:19 415:4
416:1 417:8
419:20 426:9
429:7,18
430:17 432:1
434:5 455:4,5
460:10 465:9
471:9,10 473:7
481:16 489:6
497:21 499:4
502:2 505:5
506:25 507:2
508:5 516:17
518:19 529:23
531:19 532:7
532:12,25
539:6 543:5
545:21 546:6,7
546:20,24,24
547:16 548:13
548:23 549:15
550:22 551:17
551:17 553:3

554:5,24
560:15 561:19
563:12 566:14
566:22 568:2
569:6 572:5
573:3 574:4,14
574:25 575:12
575:18 576:1,3
576:17 577:5
587:17,24,25
588:5 589:19
593:23 594:3,6
594:9,10,22
595:21 600:8
600:15,19
607:14 614:10
614:20 618:7
624:16 627:23
635:9 637:24
640:3 641:9
644:6 645:14
645:23 648:4
657:23 658:6
691:2 702:1
703:7,7,16,23
704:1 707:23
713:13 714:22
722:14 723:12
728:23 742:14
742:14,18,22
743:3,6,21
**questioned**
721:18
**questioning**
668:14
**questions** 398:4
398:12 475:24
499:6 504:9
505:1,13,19,21
507:25 548:19
550:13 553:11
556:21 571:7
592:12,19
594:1,17
595:12 598:6
600:9 631:17

634:3 656:3
657:18,21
661:10 707:24
709:7 723:15
743:5 762:5
**quickly** 741:9,14
741:15 742:11
**quite** 416:21
590:1 659:9
661:6
**quote** 433:13
481:4 687:24
689:23 692:3
712:22 727:22

---

## R

**R** 381:1 392:1
578:20,25
761:2,2
**Radiation**
385:17
**radio** 719:3,4
**RAFFERTY**
381:6
**raise** 419:7
445:2 534:21
**raised** 407:22
408:2 465:16
504:17 545:16
548:18 553:10
572:9 597:1
641:21
**raises** 620:24
**ran** 457:8 458:5
494:2
**randomized**
562:20
**rank** 489:8,14
**rate** 464:14
610:2
**ratio** 568:3
692:12,22
**rational** 651:17
**rationale** 414:13
**ratios** 568:7
**rats** 739:17,20

Linda Loretz, Ph.D.

Page 799

| | | | | |
|---|---|---|---|---|
| **raw** 552:10 | **really** 400:1 | 535:1 638:14 | 694:2 702:15 | 743:16 |
| **reach** 420:21,23 | 409:20 447:2,5 | 651:2 728:15 | 702:17 703:18 | **reference** 558:9 |
| 467:16,18 | 466:5 473:12 | **recall** 410:19 | 713:17 715:2 | 558:11,15,16 |
| 591:12 655:5 | 501:2 502:1,24 | 449:16 470:2 | 716:23 721:4 | 631:23 739:5 |
| 681:19 688:2 | 507:14,15 | 483:23 491:6 | **recommendati...** | 749:8 752:7,23 |
| 690:1 | 509:11 511:20 | 498:4 513:23 | 649:4 | **referred** 603:1 |
| **reached** 504:14 | 513:16 520:19 | 526:15 592:21 | **recommended** | 694:5 754:24 |
| 505:9 654:13 | 535:19,22 | 592:22 594:10 | 469:4 648:21 | **referring** 393:8 |
| **reaching** 504:25 | 549:9 550:11 | 594:12,16,20 | 653:11 | 427:8 434:14 |
| **reacted** 628:19 | 553:10 564:22 | 629:10 647:12 | **recommending** | 439:15 471:18 |
| **read** 409:6 | 565:19 566:16 | 647:22,24 | 649:19,25 | 513:1 516:3 |
| 431:17,25 | 572:5 578:3 | 648:15,17 | 650:5 | 523:9 552:3 |
| 438:17 449:16 | 581:1 612:2 | 649:2,3,7,11 | **record** 398:10 | 557:10 569:12 |
| 474:23 484:4 | 623:17,18 | 649:19,25 | 405:15,17,20 | 573:15 585:9 |
| 512:17 513:4,8 | 631:16 635:5 | 650:3 652:9 | 407:9,10,13,16 | 683:16 684:2 |
| 515:6 522:13 | 636:13 637:5 | 653:1,5,6 | 476:7,10,13 | 684:11 691:17 |
| 525:7 527:23 | 643:25 648:3 | 656:17,20 | 486:9 493:6 | 701:24,25 |
| 531:24 535:24 | 650:13 656:21 | 658:23 659:7 | 513:7,10,12 | 734:9 743:16 |
| 537:10 541:15 | 674:17 735:24 | 673:2,3 676:19 | 570:20,23 | 754:12 757:15 |
| 542:8,9 605:23 | 747:7 749:15 | 694:5 699:8 | 578:6 617:7 | **refers** 630:15 |
| 622:4,19 | 756:6 | 700:2 713:6,8 | 618:14,17 | 654:23 681:13 |
| 659:15 660:10 | **realtime** 522:8 | 714:14,17,24 | 631:22 643:9 | 685:18 687:15 |
| 673:7,9 674:20 | **reask** 405:22 | 714:25 734:21 | 643:12 661:5,8 | 689:16 691:17 |
| 681:23 686:19 | **reason** 401:18 | 740:14 741:20 | 696:5 699:22 | 695:5 712:22 |
| 687:22 689:1 | 441:11 443:24 | 745:2 757:1,11 | 716:24 724:24 | 718:15 729:19 |
| 689:21 692:2 | 444:16 445:9 | **recalling** 596:8 | 725:3 744:14 | 736:8 |
| 703:25 704:25 | 445:21 448:23 | 648:24 649:6 | 744:17 748:20 | **reflect** 716:25 |
| 714:4 717:7,8 | 468:18 484:8 | 741:11 | 755:17 757:22 | **reflects** 606:2,3 |
| 718:3,5 726:4 | 491:18 548:22 | **receipt** 760:13 | 758:1 | **refresh** 478:7,12 |
| 727:3 731:16 | 586:6 588:13 | **received** 427:19 | **recorded** 495:8 | 484:6 512:8 |
| 734:22,24 | 623:13 629:4 | 427:25 538:19 | 759:8 | 515:14,18 |
| 735:2,6 741:8 | 653:24 677:2 | 727:10 | **records** 396:16 | 525:24 592:20 |
| 741:9,12,14,15 | 731:12 744:22 | **recess** 476:11 | 397:20 520:13 | 649:11 650:4 |
| 741:19 742:24 | 745:9,13 | 570:21 618:15 | 555:21 621:11 | 694:2 716:23 |
| 749:10 750:7 | 749:11 760:4 | 643:10 744:15 | 641:2 645:8 | 719:16 720:5 |
| 751:7 756:2 | 761:6,8,10,12 | **recognize** | 700:12 740:24 | **refreshes** 512:15 |
| 760:2 762:3 | 761:14,16,18 | 404:14 493:21 | **recounting** | **regard** 594:8 |
| **reading** 411:11 | 761:20,22,24 | 583:17 | 492:20 | **regarded** 507:25 |
| 445:23 522:11 | **reasonable** | **recognized** | **red** 493:9 | 559:1,19 584:6 |
| 716:25 727:1 | 420:20 566:1 | 584:17 585:17 | **REES** 383:19 | **regarding** 466:7 |
| 742:10 752:6 | 636:10,16 | **recollection** | **refamiliarize** | 477:10 505:20 |
| **real** 440:16 | 637:3 651:15 | 478:8 484:6 | 397:8 | 592:24 594:11 |
| 448:21 449:1 | 730:3 | 512:15 515:15 | **refer** 429:3 | 608:19 632:11 |
| 478:16 505:21 | **reasonably** | 515:18 520:2 | 511:25 617:4 | 640:6 |
| 649:23 704:11 | 518:2 | 525:24 649:12 | 700:12,14 | **region** 605:20 |
| **reality** 568:21 | **reasons** 444:2 | 650:4 651:22 | 717:5 733:24 | **Register/Vol** |

386:12
**regular** 720:10
**regularly** 720:16
**regulated**
485:24
**regulations**
390:4 403:12
418:17 469:24
470:10 662:11
672:16 673:5
**regulations.gov**
387:8
**regulatory**
412:12 711:1
**rejected** 590:15
643:22 644:25
645:8,18 646:2
651:8 669:18
670:14
**rejecting** 668:4
671:18
**related** 396:17
428:1 459:12
477:12 485:12
496:22 512:3
520:24 521:14
612:10 614:11
620:10 704:19
706:4 709:24
710:15 749:17
**RELATES**
379:11
**relating** 398:4
432:7 508:24
518:22 592:18
594:14 621:12
627:15 639:24
639:25 640:5
641:14 642:5
712:25 713:3
715:8
**relation** 427:21
427:22
**relations** 523:6
523:14 677:21
**relationship**

388:12 389:21
477:24 509:2,3
530:15 534:14
535:13 536:1
536:15 537:22
540:1,6 562:19
563:19,25
565:11 684:7
**Relations/Co...**
677:8
**relative** 540:23
610:2
**relevant** 424:23
425:4,9 439:5
447:5 545:3
681:9 748:4
749:17,20,25
**relied** 643:2
**rely** 563:13
**remember** 404:7
409:18,21,23
409:25 428:24
429:17 484:7
495:15 496:13
496:17 537:2
571:4,17 573:5
628:16,21,24
637:10 650:10
654:19 658:25
659:8 676:16
676:25 686:12
698:21 700:3
719:20,22
720:1 735:24
737:1 740:25
743:13
**remembered**
628:25
**remind** 392:12
**reminder** 392:6
**removed** 700:2
**removing**
642:18
**renominated**
471:21,24
**repeat** 643:19

643:19 700:10
**repeating**
455:21
**rephrase** 429:7
489:6 548:13
554:5 577:4
637:23
**replaced** 725:16
**report** 398:25
401:20 422:17
422:19,20
423:10 424:4
424:22 425:16
425:21 429:19
432:24 436:1
436:22 437:5
437:10,23
438:2 442:9
451:18,22
453:13,15
463:6 465:5
466:7 467:25
468:20,24
491:21 527:14
528:5 532:21
541:12,13
546:25 555:8
557:13 576:1
578:18 584:10
603:10 604:16
638:1 655:3,18
655:24 656:10
658:18 664:19
664:24 686:18
690:16 691:7
691:10,18
729:4 738:11
738:21 740:2
754:11
**reported** 379:25
589:5 622:8
653:10
**reporter** 380:13
489:1 669:5
759:1,2,25
**reporter's**

759:13
**reporting**
700:23,24,25
701:2 702:18
**reports** 408:13
568:2 655:20
660:7 702:1,2
738:25
**represent**
392:20 431:12
432:12 436:20
477:8 506:15
544:2 562:18
579:3 611:22
615:25 617:18
639:2,8 712:20
720:21,23
**representative**
379:17 427:2
527:1 580:1
596:13
**represented**
392:17 459:25
487:11 506:18
546:8
**representing**
437:15 476:25
478:10 480:22
506:9 546:7
667:11 668:3
**represents**
535:21 578:12
**reproduction**
759:3
**reputable** 472:9
472:18 528:18
528:25
**request** 403:10
403:12 414:5
415:20 439:3
442:7,15
532:19 664:18
**requested**
408:23 496:4
497:25 498:1
600:3 732:14

**requesting**
409:12 495:19
514:1
**requests** 418:11
438:11
**require** 408:15
408:24 414:21
414:24 415:6
415:10,22
438:12 443:3
514:14,14
753:23
**required** 412:5
413:2 416:3,17
416:22 418:1
440:1 442:14
534:5 601:15
666:1
**requirement**
443:7
**requirements**
412:11,12
414:9 565:9
608:9 672:22
672:25
**requires** 413:20
753:20,24
754:10
**requiring**
415:17 418:11
443:8
**research** 422:21
423:7 426:3
429:2,11,13,21
429:22 430:3
430:19 431:14
432:16 433:10
435:19 439:4
472:7 529:16
529:25 530:1,5
563:13 612:19
612:23 613:8
613:13,20,25
617:9 675:15
692:6
**researchers**

396:9
**reservation**
  502:11
**reserve** 528:6
**resources**
  487:21 591:15
  663:14,15
  668:5 669:11
  730:19
**respect** 519:4
  526:5
**respond** 403:14
  403:15,17
  485:10 522:16
  523:25 538:13
  590:14 592:3
  668:12 707:3
**responded**
  461:16 572:10
  585:4 591:20
  592:12 609:9
  609:18,21
  669:23
**responding**
  414:4,10
  418:11 514:11
  524:7 525:12
  592:19 608:18
  608:20,21
  720:17
**response** 386:4
  391:12 411:1
  411:24 415:19
  418:14 438:24
  438:24 451:9
  451:13 452:3
  452:15 453:11
  453:17 457:6
  481:3 483:20
  484:20 504:18
  504:22 505:14
  505:18,23
  508:11 509:13
  524:11 526:6
  531:2 560:21
  571:9,13 582:1

585:6 591:4,24
592:3 627:15
631:24 637:7
644:5 654:3
668:8,9,18
669:10,15,17
700:22 701:19
701:21 703:4
703:20,24
704:5,7 706:23
706:23 753:17
755:5,8,12
757:2
**responses**
  389:12 711:13
**responsible**
  409:2 514:11
  583:14
**result** 684:7
**results** 477:23
  589:5 600:6
  611:10 649:9
  650:8,24
  736:16 747:6
  750:1,5
**retain** 653:23
  722:21
**retained** 389:18
  425:13 426:13
  439:4 474:4
  647:6,9,9
  654:10 742:5
**retread** 601:10
**return** 760:11
**returned** 550:9
**review** 386:5
  387:6 401:24
  424:22 425:4,9
  425:25 426:15
  428:1 432:4
  439:5,6 453:12
  466:23 467:1
  470:21 473:14
  474:5 478:15
  478:18 480:2
  480:14 481:4

481:18 496:7
515:1 518:21
520:5,5 526:16
528:7 530:23
533:7 604:17
605:6 627:5
637:21 638:3
645:7,24
656:11,17
659:12,21
661:13 682:16
682:20 724:17
728:7,11,17
740:2,4 741:1
741:5 745:21
753:24 754:2
**reviewed** 397:6
  397:10,11
  413:5 426:11
  480:6 490:12
  490:14 622:6
  646:20 647:14
  657:12 664:19
  726:11 727:13
  727:19 739:25
  740:2,23 741:7
  741:7 743:25
**reviewing**
  396:16 403:16
  477:12,18
  723:17 726:25
**reviews** 508:20
  602:3
**rhetorical** 743:2
**Richard** 381:11
  643:15
**rid** 394:3
**right** 395:17
  399:19 402:21
  406:15,21
  409:16 410:10
  412:13 414:5
  418:15 419:5
  420:5 421:9,15
  421:15 423:9
  424:1,3 425:21

426:2 443:1,6
443:13 444:6
446:2,4,8
447:7 448:17
456:8,16,22
457:12 458:14
458:24 460:25
462:21 463:6
465:12 466:9
467:1,21
468:23 469:16
471:20,22,23
473:14,20
476:6 478:5
479:1 480:4,8
481:4,18 482:6
482:21,21,22
483:8 484:2
485:6,21
489:20 490:1
491:7 492:10
493:10,24
497:5,9 498:13
499:1,10,20
500:24 501:5
501:16,19
502:6 503:3
504:3,8 505:5
505:22 506:3,6
506:9 507:2,13
508:4 509:7,15
510:4 511:18
514:4,6 515:6
515:8 517:7,15
519:2,18 521:3
521:6 522:2
523:2 525:11
527:8,24 528:6
528:22,24
530:2 532:19
533:4 535:9
537:8 538:15
538:17 539:21
540:15,20
542:6,10,16,20
543:3,15,24

544:17,20,21
545:21 547:10
547:10,13
548:4,9 549:1
549:2,3,16
550:25 551:2,4
553:3,6,13,25
554:14,19,20
554:24 555:7
555:16,17
556:4,9 557:4
557:16 559:12
560:9,13,19
561:8 563:4,6
563:12,21,23
564:24,25
565:1,4,5,7,12
566:3,7,13
568:21 569:5
569:20,22
571:24,25
572:2 574:25
575:6,17,23
577:13 578:23
579:22 580:9
581:8,24
584:22 585:22
586:1,11,14,17
587:5,6 588:15
589:19,21
591:23 596:12
597:14,25
600:18 603:10
603:14,17
604:7,17 605:6
605:14,25
606:21 607:1,2
607:6 608:2,11
608:19,23,25
609:6,14
610:13 612:24
613:5 614:4,17
614:19,25
620:2,15 623:8
623:11 625:1,4
625:5,10,12

634:23 636:9
639:3 640:18
640:21,23
641:1,3,5
643:4,6 644:18
644:24 645:21
646:4,11 649:6
650:17 651:24
652:4,7,12
653:20 655:7,9
655:17,23
657:12 658:9
658:13 659:12
660:13 661:8
661:18 662:19
664:2,16 665:1
665:9 666:8
667:13 668:11
668:19 669:24
670:9,12
672:15 673:4
673:18 674:4
674:19 675:9
675:13,22
677:13 680:2
685:23 686:4,8
686:15 688:20
690:12 692:24
693:21 695:4
701:4,17,18,23
702:14 703:16
705:15 706:18
708:2,11,16,23
711:15 713:12
718:2,7,9
720:7 721:3,21
725:18 729:15
732:3,6,16
733:12 737:6
738:14 741:3
742:2,3 743:15
743:25 745:22
748:1 752:5
754:18,21
**right-hand**
678:24 687:8

**rigorous** 433:14
666:8
**Rio** 512:23,23
676:3
**risk** 385:20
386:20 389:5
389:15 438:15
443:21 448:21
449:1,4 450:11
508:25 544:3
548:4 549:15
553:10 558:21
568:11,19,22
569:20 575:16
576:19 581:2
582:8 583:14
594:5 605:21
607:4,10,16,23
608:12 609:6
610:2,6,13
611:9 676:8
677:16 681:17
687:25 689:4,4
689:7,24 692:5
692:18 695:9
695:17,24
696:20 697:12
697:25 698:1
698:11
**risks** 409:2
540:23 585:18
639:11
**Road** 382:5
**Robert** 427:14
474:19 475:4
578:20
**RoC** 470:20
**rodent** 750:20
**rodents** 749:9
749:15 752:8
**role** 413:7
447:25 519:4
625:1,2,3
675:1,24
677:19 705:5
728:6 737:19

**rolling** 451:16
**room** 488:18
506:3,17
509:15,17,22
511:15 561:13
561:18,22
**Rothman**
386:14 475:11
636:1 638:2
643:22 646:5
648:19 651:7
651:12 653:12
655:15 656:8
656:14,15,18
**Rothman's**
636:5 639:13
**roughly** 458:24
490:1 661:19
669:7
**RPR** 759:18
**rule** 514:13
569:23
**rules** 525:25
**ruminate** 669:4
**ruminating**
669:2
**run** 491:10
627:20
**RYAN** 381:20

---

**S**

**S** 381:1,7 385:1
385:9 386:1
387:1 388:1
389:1 390:1
391:1 392:1
**safe** 586:24
**safety** 493:18
581:18,22
711:1
**sales** 379:7
443:22 444:10
446:14,20
**Samet** 638:2
655:16
**Samet's** 636:6

**samples** 549:23
550:5,16
555:13 598:4
**sampling** 595:20
597:2,19
**Samuel** 387:11
438:6 655:16
**sat** 732:25
**saving** 750:20
**saw** 526:8
537:13 602:14
626:7 631:19
645:1,2,6,9
646:14 648:5
668:2 669:19
669:22 682:15
698:20 712:19
712:25 713:2
737:7 751:1
**saying** 403:15
439:9 443:2
459:20,21
483:8 496:3,14
517:2 527:4
535:25 544:14
544:19 552:23
564:5 574:15
581:21 586:11
589:7 610:4
611:20 625:11
632:18 656:13
665:19 668:5
685:5 704:25
723:18 732:23
735:11 749:13
749:19 756:24
**says** 406:3,5
408:17,22,23
409:7,10,15
422:5 423:16
433:21 438:5
438:18 441:2
443:11 453:15
463:17 470:14
470:18 471:2
477:7,22

478:21 492:16
492:24 493:23
494:19 495:18
495:23 497:2
497:12,13,16
498:3,14 500:6
500:10,15,16
508:9 513:22
523:21 525:2
530:1 531:25
532:8 533:7
534:13 535:15
540:4 541:19
541:22,25
544:1,5 545:2
545:11 547:21
551:25 552:1,6
552:6 556:6
562:17 563:17
567:8,17
569:16,25
580:5 602:5
603:21 605:3
605:16,24
606:23 607:2
610:1 611:1,5
612:6,6 613:4
613:24 617:22
620:1,8 621:7
621:8,17 630:5
630:6 657:17
662:5,6,15,17
664:1 673:17
681:16,22
683:10,11,15
683:17 685:7
686:17,20
687:24 689:3,9
689:14,23
691:23 692:3
692:12,15
695:13,24
698:15 716:16
726:9 727:22
728:2 731:7
732:6,7,15

Case 3:16-md-02738-MAS-RLS Document 16136-2 Filed 12/22/20 Page 354 of 746 PageID: 126548
Linda Loretz, Ph.D.

Page 803

733:3,6,10
734:17,18
735:13,15
736:11,15
737:11 749:7
752:9 753:20
754:9,10 755:4
755:11,18
757:14
scale 485:23
scare 440:16
scaring 448:3,7
scary 448:11
scheme 485:13
School 406:1
schooling 531:9
science 411:25
413:5,17 440:1
440:14 441:13
445:4,6,7
446:9,10,11
454:7,7,9
458:25 472:13
472:16 499:1,7
499:12 501:10
514:9 566:3
608:21 609:12
623:7 678:3,7
712:6 717:20
scientific 385:21
398:7 408:4
419:2,22 421:8
439:3 442:6
445:10 457:11
459:16 499:11
502:1 507:2
509:23 514:16
532:19 536:17
602:8 609:22
711:4 722:9
scientifically
607:5
scientist 435:7
445:9 536:17
564:16 617:9
679:18 680:6

707:9 717:12
737:1,3 745:17
scientists 419:22
420:21 421:11
460:17 467:15
481:22 532:4,6
561:9 565:21
566:4,22 606:6
706:16,21
707:2 741:25
745:14 746:19
scope 415:13
417:4 418:4
464:25 486:3
515:25 516:25
517:10 528:10
533:22 534:24
536:7 544:12
548:6 566:9
567:5 569:3
570:3,9 607:11
607:24 608:13
673:25 674:8
674:16 679:21
680:10,21
682:3 683:19
684:15 685:15
688:8 689:11
689:18 690:24
693:3 694:12
695:22,23
696:23 697:16
698:4,13
699:21 722:11
747:25 753:2
screen 590:3
621:4 633:2,11
666:25 678:19
screenshot
387:8 390:15
390:16
SCULLY
383:19
se 544:15
search 680:17
searching

583:12
second 389:11
395:14 399:7
411:12 424:21
424:25,25,25
427:7 431:17
438:19,23
463:13 512:19
522:20 525:19
569:12 591:5,7
594:6 600:18
600:19 602:5
617:24 629:16
630:5,12
663:14 683:10
684:25 726:4
735:8,9,11
749:6
secondary 544:3
section 408:22
437:25 531:25
602:2 604:10
606:13 673:5
Secure 522:24
see 404:8 406:7
407:11 409:4
410:20 421:22
424:19,23
425:6 432:1,16
433:16,18,22
438:3 439:7,11
440:23 453:4
453:13 459:2
462:18 463:21
470:15,25
471:5,7 475:7
475:20 477:15
477:20 478:2
491:2,23 492:7
492:25 493:6
493:15 494:13
495:20 496:8
496:11 498:8
498:10 508:17
513:2 515:4
519:2 522:10

522:17 524:1
533:10 534:19
536:14 538:7
540:7 542:4
545:6 552:14
554:2 557:7
559:23 562:16
563:2,10,13
564:3 567:12
567:22,25
575:1 578:22
579:14,17
580:20 582:6
587:22 589:24
596:1 600:15
602:3,10,20
604:24 605:3
611:13 612:20
612:23 613:2
613:16,22,25
616:13 619:2,8
619:15 620:18
620:24 622:17
630:13 633:11
634:1 641:2
646:15 659:15
661:20 663:4
668:23,24
678:23,24
679:3 681:14
681:15,21
683:8,20
684:23 685:2
685:19 687:8
687:20 688:24
689:5 690:12
690:14 691:22
695:7,10,13
704:10 705:6
706:2 710:2
711:9 712:15
723:6 725:23
726:5,7 735:13
736:6,18
737:20 747:13
747:21 748:23

748:25 750:1
753:18,21
755:9 756:6,13
756:16,21
seeing 512:14
635:11 650:13
709:11 713:7
717:2
seeking 385:13
404:2 406:6
438:9
seemingly
433:13
seen 397:20
436:23 473:10
487:25 489:9
490:2 494:8,15
498:5 511:25
517:6 519:13
521:10 522:8
533:19 535:2
535:20 558:21
564:13 602:18
603:11 621:11
623:3,3 624:9
625:19 629:19
642:3 645:16
660:23,24
669:21 679:11
682:14 690:10
690:22 693:15
694:20,22
698:18 708:8
715:18 716:12
718:14 724:7
725:18 726:15
730:8 733:18
734:20,22
744:3 748:12
756:5,19,23,24
757:8
Sekerke 717:10
717:18
selecting 748:3
self-regulation
662:7,15

self-regulatory
    662:20,23
    666:18
sell 583:3
selling 446:21
    451:2
Seminary 382:5
Semple 716:5,19
    717:24 719:19
    730:2 735:4
send 449:14
    733:8 756:12
senior 509:23
sense 425:17
    447:2 473:4
    482:2 524:20
    526:19 576:18
    631:13 635:4
    641:24 717:19
    717:22 746:16
sensitivity
    586:21
sent 388:20
    446:6 449:6
    452:17 457:16
    543:16 570:6
    576:1 580:20
    618:4 620:9
    621:8 624:6
    635:21 719:13
    751:11
sentence 425:1
    442:2 503:3
    513:22 531:24
    543:11,14
    605:18 609:25
    611:5 686:16
    686:16 693:22
    726:9
separate 398:12
    593:25 594:18
    655:20 741:1
September
    678:23 682:1,4
    720:21 724:25
    725:23 728:1

sequentially
    737:16
serious 464:16
services 387:13
    663:9 732:9
serving 664:13
    664:17
session 571:6
    641:18 758:1
set 416:11 490:8
    490:21,22
    491:2,9 497:23
    511:5 512:18
    556:19 573:20
    586:15,24
    629:15,16
    670:5,10,12
    759:5
setting 490:15
setup 705:22
seven 465:13
    467:4,9
seven-page
    681:7
SEYFARTH
    380:5 382:17
shape 451:23
Shapiro 655:16
    655:22
Sharfstein 507:6
Sharma 685:23
    686:5
SHAW 380:5
    382:17
shed 631:23
    635:5
sheet 760:5,6,9
    760:11 762:8
shelf 574:17
    597:12
shelves 448:17
SHOOK 383:5
short 477:23
shortcomings
    622:8
shorthand 759:1

759:2,11
shortly 435:19
    480:12 644:18
    713:13,18
shot 696:11
show 431:1
    436:15 453:1
    462:1,11
    474:10 494:24
    512:13 522:1
    525:23 556:5
    556:14 573:18
    577:21 602:16
    615:24 625:20
    630:25 632:20
    649:13 681:9
    688:12 690:4
    713:5 719:15
    720:5 721:14
    724:18 730:23
    734:15 743:11
    753:8
showed 460:4
    481:7 519:12
    535:18,25
    575:15 583:10
    610:5 670:25
    671:15 687:12
    751:15,15
Shower 392:23
    392:23 393:7,7
    411:9,9 488:20
    488:21
showing 568:3,7
    683:11 714:1
shown 502:25
    708:3 717:1
shows 440:14
    509:2 609:23
Shripal 685:19
    685:22,23
    686:17
Shukla 628:4
side 505:10
    509:17 514:10
    515:20 516:20

sign 760:6
signature
    735:12 748:25
signed 483:13
    717:18
significant
    509:1 568:24
    671:1,16 693:1
signing 760:8
silence 669:2
silica 560:8
    583:22 584:2
    584:16 585:14
similar 539:25
simple 403:5,7,7
    575:9
simply 565:9
Sinai 702:4
single 630:24
single-spaced
    494:9
sit 472:25 473:1
    596:12 649:1
    700:1 702:22
    703:8 719:18
    727:8 741:19
    755:7 757:11
site 730:20
sitting 651:6
situation 724:7
    730:8
six 485:7 516:8
    616:16 649:10
    650:8 685:10
    695:3 696:24
    697:17
Sixteen 389:8
Skillman 527:20
skip 570:14
skipping 654:7
SLAVIN 383:18
small 508:25
    692:5 717:20
smoking 566:6
    639:11
snapshot 390:17

390:18,19
    680:18 694:5,8
    695:8,15
    696:12 697:10
    698:9
SOILEAU
    382:10
sold 580:8 582:5
sole 731:13
solely 560:1
    585:9
solid 692:3
    693:8,13,20
somebody
    499:22 526:24
    527:5 535:21
    538:7 539:11
    562:1 564:16
    600:7 638:22
    647:21 655:23
    685:18,22
    711:24,24
    714:7 723:11
    727:14 728:21
    737:17,18
soon 409:24
    410:6 520:8
    725:12
sorry 407:18
    410:25 417:7
    422:15 424:24
    426:9 431:6,7
    433:6 475:14
    479:15 482:18
    486:11 492:8
    496:9 503:20
    503:21,21
    515:10 516:11
    542:5 543:4,13
    562:11 569:13
    571:10 577:5
    577:25 587:12
    593:4,4,8
    599:23 601:9
    603:11 606:10
    606:14 620:15

630:10 637:23
640:2 645:12
657:1 667:7
676:22 712:8
716:8 718:7
719:25 720:3
720:22 729:7
735:15 756:8
**sort** 460:4 521:5
537:4 633:12
660:22 711:13
736:24 738:5
**sorts** 714:8
**sought** 405:6
439:2 442:5
447:17 532:18
542:25 630:7
632:4
**sound** 477:3
630:18 652:14
652:18 679:14
**sounded** 751:6
**sounds** 412:6
413:22 458:24
490:1 491:6
602:19 627:17
628:12 650:9
652:12,15,19
701:17 708:11
708:16
**source** 505:2
**sourced** 728:23
**sourcing** 505:20
507:8 508:1
537:3 548:19
556:21
**South** 382:10
384:6
**space** 760:4
**speak** 499:3
506:3 518:15
518:17 519:15
519:20 524:22
669:1 707:16
707:17
**speaking** 394:11

394:12 399:13
413:25 414:1
525:13 527:10
**speaks** 505:18
**special** 621:25
**specific** 398:4
432:7,8 485:11
505:2 510:18
518:9 573:17
595:23 600:4
649:24 664:18
666:12 703:17
707:23 720:17
721:10 742:22
**specifically**
490:9 496:14
518:13 601:13
614:10 648:24
657:17 667:20
672:21 673:3
675:1 677:14
679:17 686:9
689:16 693:9
702:7 708:13
742:5
**specification**
545:17 546:4
546:12 551:8
551:13,16
556:6,19
573:19 574:24
577:14 586:10
586:12,14
589:3,4,8
595:24 642:10
704:12 706:11
706:12,13
**specifications**
551:1,4 552:8
552:18 553:4
583:24,25
584:1 585:8
586:20,20,23
587:13,18
588:7 594:7,14
595:1 713:1

714:18
**specificity**
586:21
**specifics** 675:6
**specter** 620:25
**speculating**
752:17
**spelled** 403:11
646:9
**spent** 530:17
**spoke** 428:22,23
505:22 513:24
596:4
**spoken** 395:25
396:6,18,20,23
397:2 424:15
428:20 525:15
525:20 686:8
686:14
**sponsor** 622:12
642:7
**sponsored**
477:11 612:6
614:9 752:4
**sponsoring**
613:10
**spread** 705:25
710:16 711:7
**spring** 517:20
**Square** 383:20
**staff** 384:14,15
717:20
**stake** 529:8
**stakeholders**
523:5
**stamp** 470:11
**stand** 435:8
504:3
**standard** 411:22
412:4,5,25
413:14,20
414:20 415:1,6
415:9,17 416:3
416:11,16
417:22 418:16
448:24,25,25

449:5 562:19
607:20,22
608:24 609:15
609:19 666:18
672:5
**standards**
385:21 551:19
553:19 572:17
587:5,6 588:16
588:17 666:12
**standing** 720:15
**standpoint**
416:8
**stands** 679:10
**starch** 446:21
447:3,8 448:17
451:4 554:20
580:14
**start** 400:13
479:17 601:2
643:18
**started** 399:19
401:17 425:16
437:25 451:15
496:14 573:3,5
644:20,23
668:23 725:11
**starting** 407:25
451:17 543:12
**state** 392:13
449:25 585:18
760:3
**stated** 486:14
**statement** 439:9
442:8 449:24
453:20 545:1
547:17,20
556:1,16,17
673:12,20
**Statements**
673:6
**STATES** 379:1
**stating** 442:1
**stationery**
748:16 753:13
**statistically**

509:1 671:1,16
693:1
**status** 497:19
**stay** 513:11
**stenographica...**
759:9
**Stephen** 391:4
463:2 724:25
753:15
**steps** 387:23
522:9,17
**Steve** 579:13
621:17 735:12
**stick** 531:12
**sticky** 625:24
**stood** 501:13,14
502:4
**stop** 446:20
455:1 539:6
624:21
**stopped** 451:2
**stored** 598:4
**straight** 727:19
**straightforward**
671:9
**Street** 380:6
381:7,14,23
382:11,18
383:6,21
**strike** 413:9
415:24 430:15
737:8
**string** 390:10
**stringent** 552:19
**structure** 666:20
**student** 611:22
**studies** 386:22
389:8 399:8,9
399:15 420:9
460:11 463:14
533:19 534:8
534:17 535:16
535:20,25
542:15 553:5
553:11 558:22
562:15,18

563:4 575:14
587:14 588:6
588:10 589:13
600:20 607:6
610:9,12
613:11 622:9
624:2,22
626:21,23
627:15,18,25
631:12 634:12
634:15 639:10
639:20 641:10
641:12,20
642:5,8,23,25
642:25 650:23
670:23,25
671:14,15,18
671:22,25
719:1 734:3
738:18 749:8
752:14
**study** 385:21
471:5 563:20
567:20 568:20
596:23 597:5,6
602:12 603:22
604:13 605:22
606:13,18
610:12 612:9
612:11 614:9
614:12,18,22
614:23 615:5
615:17 617:13
618:24,25
619:3,10,11,16
619:19,19,19
619:24,25
620:4 621:21
621:25 622:2,7
622:13,24
623:5,14,15,22
624:4,13,14,17
624:19 625:2,3
625:8,11,15,18
625:20 626:3,7
626:8,8,11,12

626:15 628:3,7
628:10,15,23
628:25 629:8
630:8,15,17,18
630:20,22,24
630:25 631:18
634:7,11,15,16
635:11,23
636:1,19 637:6
637:14 638:18
639:15,23
640:4,8 642:16
643:23 645:19
646:2,25 647:8
648:23 649:5
649:14,17,20
649:21 650:1,6
650:12,14,15
650:18 653:11
653:22 671:20
672:2,3 693:7
701:10,13,20
702:16,17,25
703:10,14,20
707:8 710:3
713:10,14,18
713:21 715:5
718:13,14,15
719:2,2 720:2
720:4 733:23
734:1,4,5,6,8
734:11 736:17
737:9,20,21
738:2,6 739:1
739:5,8,12,14
740:1,8,16
744:20,22
749:15,22
750:1,5,10,20
752:8 753:5,5
753:5
**studying** 634:7
**stuff** 509:7
521:5 540:19
548:20 576:16
**Subchapter**

390:5
**subject** 475:15
500:10 513:19
605:20 622:15
637:20 753:16
755:4 757:19
760:8
**subjects** 389:7
563:20 745:11
745:11
**submission**
386:15 454:1
457:11 468:17
475:12 508:10
508:23 527:23
636:21 638:14
749:7 752:6
**submissions**
521:4
**submit** 424:3
447:18 453:16
504:6,6 509:13
520:7 537:9
664:7 732:13
**submitted**
423:15 424:2
429:10 437:5
438:7 453:23
454:1 468:2,20
482:3 495:18
500:4 514:19
518:3 520:8
526:21 528:8
531:5 532:22
533:2 561:23
638:3,7,10
655:19
**submitter**
453:19
**submitting**
429:19 434:6
732:24
**subordinate**
491:15
**subordinates**
670:13

**subscribed**
759:14 762:14
**subsection** 673:9
717:5
**subsequently**
457:25 479:4
592:5 639:14
**subset** 578:14
**substance** 762:7
**substances**
605:19
**substantially**
438:15 551:9
572:25
**substitute** 633:3
**sued** 684:7
**sufficiency**
419:24
**sufficient** 419:7
**suggest** 515:8
534:17 535:17
536:3 611:10
**suggested**
498:22 514:17
613:10 664:20
**suggesting** 448:2
732:19
**suggestion**
534:21 571:22
619:15
**Suite** 381:7,14
382:5 383:7,21
384:7
**summarize**
406:18
**summarized**
420:20 497:11
508:11
**summarizes**
540:12
**summarizing**
744:25
**summary**
412:11 438:24
508:15,23
509:12 533:6

595:7
**supervision**
759:25
**supplemental**
389:11 629:16
**suppliers** 597:11
**supply** 485:17
**support** 384:18
414:18,18
417:15 441:13
499:9 514:16
523:20 558:15
603:21 604:12
611:7 635:25
638:13
**supported**
417:16 440:2
440:19 499:7
**suppose** 460:23
**sure** 409:24,24
410:6 411:15
412:7 415:3,16
416:21 424:9
426:17 428:7
434:2 441:22
442:11,21
445:20 446:19
448:11 451:12
452:5 453:9
455:17,21
458:12,21
467:12 472:3,5
481:21 485:20
486:12 490:8
490:15 502:25
503:6 506:14
509:8 519:1
522:19 525:25
526:19 530:25
536:8 541:3
550:4 553:20
558:8 572:10
573:15 576:22
578:22 584:6
589:15 591:24
594:19 610:23

611:20 628:2
635:16 636:13
640:16 642:24
643:25 644:21
647:18 648:16
649:14 651:16
654:6 656:4
658:16 659:10
659:16 660:9
660:25 665:5
675:13 676:17
679:9 680:23
706:20 708:20
710:11 711:7,8
719:15 726:24
727:7 734:17
737:2 740:19
744:9 745:24
754:14 756:20
**surmising**
740:23 750:18
**surprise** 489:20
**surprised** 693:7
**surrounding**
486:22 518:10
623:8 715:3
**survey** 598:2
**Surveys** 642:25
**survival** 536:5
**Susan** 598:13
**suspect** 520:7
**switch** 421:18
**sworn** 759:6
762:14
**symposium**
613:13
**system** 564:11
737:12

**T**

**T** 382:16 385:1,1
385:9 386:1
387:1 388:1
389:1 390:1
391:1 761:2
**table** 445:25

446:4 487:11
512:18 614:25
**Tac** 389:5
**take** 397:23
475:23 527:13
557:2 581:19
618:11 622:2
636:11 641:12
643:7 651:1
656:7 680:25
681:1 686:24
714:3,3 717:6
744:5,7 747:4
750:19
**taken** 472:2
525:17 604:21
624:18 676:9
688:21 716:17
759:4
**takes** 485:9
576:2
**talc** 385:14,19
386:5,7,19
387:4,16,22
388:12 390:20
391:7 393:4,18
402:20 404:3
406:6 409:1
426:4 428:14
428:25 432:4
433:7,25
438:10 446:21
446:22 447:4
449:25 452:10
452:11 453:12
454:22 456:14
462:13 463:7
463:25 467:9
469:18 470:19
470:20,21,23
471:3,11
473:18 474:6
477:10,13,14
477:18,25
480:15 482:12
487:21 488:7

488:18,22
492:14 496:6
501:4 504:19
505:2 507:8
508:21,24
510:12 514:5
521:14 528:16
535:14,21
540:18 541:8,8
543:1 544:14
545:5 549:3,3
549:6,11,23
550:5,7,15
552:8,18 554:8
554:9,16
555:23 556:14
558:18,25
560:1,12,21
567:18 571:2
571:19,20
572:1,5 573:3
573:5 576:5,8
576:20 577:8
578:12,13
580:7,7,8,11
580:13 582:5
582:10,13,14
582:15,20
583:2,13
584:12 589:6
592:18,25
594:4,7,11,15
594:25 595:1
596:4 598:25
599:2 600:6
601:12,14
605:17,17,19
607:3 611:8,12
613:19,21
614:11 616:17
621:18 622:9
622:11 623:8
624:1,14
627:16 628:19
634:8,18,18
640:1 641:15

642:6 648:14
652:2,23
658:18 670:24
671:1 676:8
681:10,13,16
684:8 685:2,8
686:9 687:16
687:24 689:14
689:16,23
690:17 691:11
691:23 692:4,7
695:5,13,17
696:1,19
697:12,22
698:10 699:2
699:17 700:7
700:13,23,25
701:6,18 702:5
702:7,7,9,18
702:20,24
703:19 704:13
705:9 706:9,11
706:19,19
707:1,15,24
708:6 709:14
709:22 710:4
712:22 713:18
714:21 718:20
719:6 720:8
723:14,15,16
725:1 728:22
734:15 739:2,9
739:16,16
741:25 749:13
749:18 751:16
752:11,15,19
753:14 755:22
**talcs** 582:12
670:18,19
**talcum** 379:6
392:21 393:2
398:7,17
406:19 407:1
407:22 408:15
408:24 409:13
411:25 413:6

438:12,14
448:13 450:6,9
450:11,22
451:2 452:7
455:23 459:6
465:2 466:12
488:19 489:10
544:7,9,22
547:1 548:1,17
550:7 557:3,3
558:18 560:9
560:17 563:2
571:1,14
573:10,22
574:2,3,5,16
574:21 575:3
581:2 582:5
583:23 596:17
596:18 597:19
599:16 606:4
617:8,13 619:4
621:23 635:11
640:6 677:17
680:5 681:17
687:25 689:24
702:11
**talc-containing**
605:19
**talc-related**
489:23
**talc/ovarian**
389:20 542:2
**talk** 395:18
399:20 402:12
406:12 428:3
428:10,11
444:1 445:5
446:8,9,9,10
454:2 455:3
457:5 458:8
462:14 463:13
465:5 486:19
486:20 490:11
490:11 496:5
497:13,18
500:22 502:16

Case 3:16-md-02738-MAS-RLS Document 16136-2 Filed 12/22/20 Page 359 of 746 PageID: 126553
Linda Loretz, Ph.D.

Page 808

| | | | |
|---|---|---|---|
| 502:20,20 | 642:15 648:25 | 731:13 734:16 | 617:3 657:14 | 402:8 433:9 |
| 503:2,24 504:4 | 649:14,23 | 734:25 737:7 | 674:24 675:6 | 443:16 446:13 |
| 509:10 517:19 | 663:6 668:10 | 737:10,22 | 690:22 744:21 | 449:18 461:12 |
| 533:4,17 | 675:23 678:2 | 738:6 753:15 | **testify** 394:5 | 463:8 466:6,9 |
| 536:24 537:1 | 686:2 694:4 | 754:7 755:23 | 396:13 398:1 | 466:10 468:13 |
| 540:23 555:7 | 701:14 709:17 | **technical** 384:18 | 524:21 596:13 | 477:17 485:13 |
| 556:20 562:4 | 744:19 745:16 | 405:18 407:19 | 676:1 | 485:15,18,23 |
| 572:16 586:3,7 | 754:20 | 737:4 | **testifying** 397:14 | 492:11 500:1 |
| 624:2 635:9 | **talks** 471:16 | **TED** 381:18 | 500:19 | 503:24 505:20 |
| 654:18 655:10 | 477:4 540:9,12 | **teleconferences** | **testimony** 394:8 | 522:23,23,24 |
| 655:13 667:14 | 562:14 652:8 | 424:13 | 395:1,5,5 | 525:11 539:22 |
| 700:7 709:5 | 667:2 692:9 | **telephone** | 422:8 529:10 | 540:15 541:4 |
| 719:13,19 | **tall** 698:6 | 711:14 715:13 | 529:12 530:19 | 549:9,14,21 |
| **talked** 444:21,24 | **task** 386:8 | 715:16 | 534:24 674:21 | 550:12,14 |
| 445:4 446:14 | 390:20 391:8 | **tell** 402:24 410:3 | 693:5 698:18 | 551:2 552:16 |
| 448:13 456:5 | 452:10 463:8 | 439:13 446:16 | 700:5 701:10 | 557:18 559:24 |
| 459:5 463:14 | 464:5 487:21 | 449:17 504:3 | 710:2 723:2,5 | 560:11 565:1 |
| 482:23 497:9 | 488:7 601:6,11 | 509:10 519:17 | 744:25 759:7 | 567:15 571:14 |
| 497:10,14 | 601:13 612:16 | 520:1,13 526:4 | **testing** 548:19 | 573:11,24 |
| 499:5 540:25 | 613:9,10,20 | 552:2 601:11 | 552:18 555:21 | 577:1 580:25 |
| 542:14 549:11 | 616:17 622:10 | 630:21 649:17 | 556:2,21 | 610:24 611:3 |
| 572:4 573:23 | 622:12,15 | 652:12 654:21 | 572:11,14 | 616:1 640:17 |
| 573:23 576:15 | 624:6,12 | 661:1,14 674:5 | 596:18 598:6 | 640:25 643:21 |
| 596:16 606:6 | 663:16 700:8 | 674:12 717:7 | 600:7 642:11 | 648:12 658:19 |
| 607:21 623:6 | 700:13,14,17 | 730:4 735:20 | 642:15 | 659:16 665:22 |
| 637:9 638:20 | 701:19 702:24 | 745:14,25 | **tests** 643:3 | 665:24 670:17 |
| 640:15 641:11 | 703:19 704:14 | **telling** 651:9 | **Texas** 383:8 | 707:12 709:10 |
| 641:17 683:21 | 705:1,7,10,18 | 672:23 699:15 | **text** 625:4 | 710:14,24 |
| 700:9 724:13 | 706:8,19 707:1 | 742:9 746:19 | **Thank** 431:8 | 715:18 721:16 |
| 735:25 741:22 | 707:14,15,18 | 752:22 | 476:8 494:5 | 729:21 731:21 |
| 750:12,15 | 707:24 708:6 | **tells** 661:17 | 570:12 617:15 | **think** 406:9 |
| **talking** 393:17 | 708:19,24 | 695:16 | 620:22 629:25 | 407:3,20 |
| 401:22 438:1 | 709:2,14 710:6 | **terms** 393:2 | 690:3 717:9 | 413:22 414:23 |
| 466:1 467:8,14 | 710:17 711:22 | 487:20,22 | **thanks** 637:1,2 | 416:5 419:14 |
| 478:4 487:3 | 712:2,22 713:4 | 521:6 553:20 | **theory** 535:4 | 420:17 422:8,8 |
| 522:8 532:2 | 713:18,21 | 636:10 | **thereof** 759:11 | 422:11 424:6 |
| 537:3 544:17 | 714:6 716:18 | **terrible** 465:8 | 759:14 | 425:11,17 |
| 544:19 550:22 | 718:6,8,10,23 | 471:25 | **thing** 403:5 | 428:23 429:24 |
| 552:17,22 | 719:9,24 720:8 | **test** 547:10,12 | 427:24 448:11 | 430:9 432:23 |
| 557:14,22 | 720:9,12,15,16 | 550:17 586:22 | 505:3 510:8 | 433:2 434:3,12 |
| 565:18 570:25 | 720:20 721:7 | 587:3 596:24 | 520:3 537:4 | 434:19 436:7 |
| 574:7,8 576:16 | 722:2,19,24 | 642:17 742:15 | 540:3 557:25 | 439:23,25 |
| 581:2 582:21 | 724:6 725:1 | 742:21 | 560:2 575:4 | 440:9,18 |
| 591:19 599:4 | 726:12,24 | **tested** 555:13,23 | 617:5 651:11 | 441:11 447:5 |
| 614:6 638:5 | 727:15,19 | 598:9 | 651:13 728:24 | 447:13,17,22 |
| 640:18 642:15 | 729:11,22,25 | **testified** 531:5 | **things** 400:24 | 448:1,3 451:19 |

457:10 466:4,5
466:14,21
469:7,11 470:2
472:4,17 473:6
474:8 483:9
484:8 487:25
490:14 491:21
494:17 498:3,7
499:2,7 501:11
502:4,8 503:22
504:25 507:10
507:25 509:9
511:7 514:3
517:25 518:1
520:2,22 525:5
527:10 528:17
529:1 536:16
537:1 538:4,6
539:5,14
540:25 541:2
542:6 544:13
545:24 546:10
547:4,7,22
549:5 550:20
551:6,9,12,13
556:17,23,24
557:21,23
560:2 561:8,10
561:15 562:5,6
565:14,19
566:11 576:11
581:3,17,17,21
581:22 582:9
583:9 584:14
584:23 592:1
596:6,15 597:4
597:10 598:5,7
602:19,25
604:11 609:16
611:18,19
612:10 613:6
613:22 622:12
623:17,24
625:7 627:13
629:21 630:19
630:24 631:8

632:9,12
634:21 635:3,8
637:5 638:20
638:21 639:23
640:14 641:12
641:22 642:9
643:2,7 644:1
644:11 645:9
645:12 648:8
649:23 650:9
651:11,15
654:6,7 656:23
656:23,25
657:4,8 658:3
658:4 659:18
668:7,13
670:16 671:12
677:3 679:10
680:11 689:1
693:4 694:22
697:24 698:20
701:6,7 702:4
705:13,24
706:1 707:13
708:8,17,20
710:21 712:5
714:19,20,23
716:6 717:16
718:11,16,25
719:1,3,25
721:8,8,12
723:19,20
725:21 731:16
733:21 734:10
735:6,20
736:25 737:14
738:14 741:22
743:10 744:11
747:9 748:14
749:25 750:2,6
752:10,16,17
752:18 756:24
757:18
**thinking** 512:9
581:12 630:23
642:14

**third** 467:1
523:18 541:25
663:20 691:22
696:18 708:24
735:10
**third-party**
396:6
**thirty** 760:12
**THOMAS** 381:5
382:16 384:15
**thought** 407:3
447:1,12 461:1
461:4 467:10
469:25 509:16
520:6 542:19
593:19 618:1,2
635:24 642:2
669:14,18
701:2 702:9
713:1 715:21
718:15 734:25
735:4 743:6
**thoughts** 421:7
**three** 383:20
465:14,18
467:4,9,10
488:13 522:23
531:21 655:20
655:21 656:10
656:11 667:8
719:3
**throw** 578:1
**Thursday**
629:22
**tighten** 553:18
**tightening** 551:4
**time** 392:3
396:24 402:16
403:14 405:16
405:19 407:12
407:15 414:20
424:11 428:22
431:25 437:13
443:16 445:15
449:6,21
451:25 453:4

454:6,17,21
456:2,20 459:9
466:12 472:1
476:2,9,12,22
480:8,9 483:22
505:7,8 518:17
520:25 524:9
524:13 525:14
525:17 530:16
562:24 566:10
567:13 568:1
570:15,17,19
570:22 577:17
580:1 587:7
590:9 596:3,16
598:4 599:24
601:9 610:5
614:3 615:7
618:13,16,21
619:13 624:11
641:13 643:8
643:11 644:16
647:13 648:11
648:22 654:18
655:3,11 656:7
658:18 663:7
664:3 667:4,16
667:24 668:6
671:12,17,19
674:19 675:20
675:21 682:16
682:20 694:3
694:23 706:22
706:25 711:20
712:5 714:3
725:4,8 726:14
728:7 729:8
735:19 738:19
738:19,20
739:25 744:13
744:16 750:21
751:1 754:19
757:24 759:5,6
759:8
**timeline** 385:12
400:2,8,23

407:7 421:17
437:21 455:22
456:3 458:17
459:3 461:12
462:20 464:4
467:22 468:15
469:17 479:7
481:7 482:25
484:10 486:20
493:7 606:3
667:19 668:16
**times** 455:22
531:21 548:15
625:5
**timingwise**
631:12
**Tinto** 512:23,24
676:3
**Tisi** 381:4 385:3
392:9,20 400:6
400:8,11,12
401:10 403:6
404:11,25
405:2,21 407:9
407:11,17
408:20,21
410:24 412:18
412:23 413:9
413:10,18
414:15,25
415:5,18,24,25
416:10,23
417:9,17,24
418:5,24
419:10,17
420:4,15 421:3
421:18,22,24
422:7 425:20
426:8,18 427:9
427:11 428:9
428:19 429:5,6
430:14,16,25
431:6,9,10,19
431:21 432:21
434:11,16,17
435:1,9,17

Linda Loretz, Ph.D.

Page 810

| | | | | |
|---|---|---|---|---|
| 436:14,19 | 530:10,13,22 | 609:3,13,24 | 669:21,22 | 432:8 500:21 |
| 437:20 439:18 | 531:7,10,14,18 | 610:10,18 | 675:24 700:1 | 528:16 736:5 |
| 439:19 443:12 | 531:22 532:5,9 | 611:4 612:15 | 702:22 703:8 | 751:6 |
| 444:23 445:16 | 532:11,15 | 614:16 615:3 | 710:2 719:18 | **totally** 632:17 |
| 447:6 448:6,22 | 533:3,13,15,25 | 615:23 616:21 | 721:18 743:21 | 706:8 750:8 |
| 449:3,11 451:8 | 534:25 535:6 | 617:1,3,16,17 | 755:7 | **toxicologist** |
| 452:25 456:7 | 536:10 537:17 | 617:24 618:1,6 | **today's** 658:11 | 392:15 476:20 |
| 458:3 459:13 | 537:25 538:9 | 618:9,18 619:9 | 758:1 | 534:19 535:20 |
| 460:5,15,20,24 | 538:25 539:8,9 | 619:23 620:15 | **Todd** 379:25 | **toxicology** |
| 461:8,18,23 | 539:17 542:23 | 620:18,22,23 | 380:12 759:18 | 401:20 634:12 |
| 462:10,17 | 543:6 544:16 | 621:5,6 623:4 | **Toiletry** 394:21 | 711:2 725:4,7 |
| 464:21 465:1 | 545:20 546:1 | 625:9,16,22,24 | 603:23 604:14 | 753:16 |
| 466:25 468:12 | 546:18,23 | 626:2,22,25 | **told** 448:12 | **Tozzi** 682:24 |
| 470:7 473:9,24 | 547:8 548:7,11 | 627:2,8 629:11 | 459:1 478:17 | 683:4,7 684:21 |
| 474:10,14,21 | 549:7,20,25 | 629:23 630:3 | 584:11,13 | **tracers** 719:3,4 |
| 474:24 475:3 | 550:2,24 | 631:4,25 632:3 | 587:25 604:11 | **trade** 453:18 |
| 476:1,4,14 | 551:10,24 | 632:24 633:1,7 | 607:9,15 608:2 | 504:17 578:9 |
| 479:11,25 | 552:4,5,25 | 633:23 634:2 | 647:14 649:8 | 663:7 |
| 481:15 482:5 | 553:16 554:18 | 635:6,19 636:7 | 676:15 699:4 | **Trans** 718:20 |
| 482:17 483:10 | 554:23 555:19 | 637:19 638:6,9 | 716:15 718:2 | **transcribed** |
| 484:1,15,17,25 | 557:11,12 | 639:7 643:6,18 | 728:14 745:10 | 759:10 |
| 485:5 486:4,8 | 558:2 559:2 | 653:22 661:8 | 747:18 | **transcript** |
| 486:18 487:16 | 560:25 561:20 | 672:4 701:5 | **Tom** 397:4 | 385:10 386:2 |
| 488:2,5,12 | 566:12,17 | 721:18 751:11 | 431:6,20 | 387:2 388:2 |
| 489:5,7 490:3 | 567:6 569:13 | **Tisi's** 644:6 | 620:22 | 389:2 390:2 |
| 492:2 495:3 | 569:15 570:4 | 743:21 | **tomorrow** | 391:2 659:13 |
| 496:24 497:4 | 570:11,17,24 | **tissue** 701:1 | 757:20 | 660:11 759:10 |
| 497:20 501:24 | 572:22 575:11 | 702:8 | **ton** 741:17,21 | 759:12,22 |
| 502:14,21 | 575:22 576:7 | **title** 390:5 660:6 | **top** 406:5 407:8 | 760:13,14 |
| 503:12,17 | 576:13,25 | 660:8 672:16 | 474:15 488:13 | **transcription** |
| 506:11,16,23 | 577:25 578:2 | 673:5 736:21 | 530:2 541:22 | 762:4 |
| 507:12,18,19 | 581:7 582:24 | 737:2 | 569:12 616:3 | **translocate** |
| 508:2 509:19 | 583:19 585:1 | **titled** 603:13 | 617:7 621:8 | 718:20 719:6 |
| 510:23 511:17 | 585:11,24 | **Ti02** 580:15 | 630:21 662:15 | **translocation** |
| 512:12 513:10 | 588:24 589:17 | **today** 397:9,15 | 689:3 715:20 | 557:25 558:3 |
| 513:13,15 | 590:19,21,24 | 398:1,4 408:9 | **topic** 397:12 | 558:15 634:16 |
| 515:17 516:5 | 591:2,3,5,8,9 | 444:16 490:13 | 419:4 449:10 | 718:16,19 |
| 517:4,14 518:4 | 592:7 593:3,7 | 498:6 525:18 | 459:12,15,22 | **Transmittal** |
| 518:20 519:10 | 596:21,25 | 542:9 553:24 | 459:22 479:3 | 385:17 |
| 520:10 521:25 | 597:13,24 | 572:25 589:24 | 600:4 601:17 | **travel** 647:10 |
| 523:11,12 | 599:5,7,21 | 620:4 641:11 | 654:22 675:9 | **travels** 621:15 |
| 524:24 525:4,9 | 602:22 603:4,6 | 645:25 649:1 | 706:5 747:7,7 | **Travis** 383:6 |
| 525:25 526:3 | 604:3,6,9 | 651:6 659:14 | 748:2 749:16 | **treated** 745:11 |
| 527:7,17 528:3 | 606:10,17 | 659:22,23,25 | 752:16 | **trend** 558:20 |
| 528:11,21 | 607:13,19 | 665:16 667:9 | **topics** 396:13 | **trial** 562:20 |
| 529:4,12,14,20 | 608:1,4,10,17 | 667:14 669:20 | 397:8,12,17 | 563:1,7 564:6 |

Linda Loretz, Ph.D.

699:17,23
**trials** 562:15
563:9,10
699:12
**trick** 648:3
**triclosan** 580:19
**tried** 640:24
**trivial** 464:8
**true** 408:16
420:10,13
421:14 428:5
438:20,21
467:16 473:3
484:8 486:1,5
500:5 503:9,13
504:9 510:2
521:17 541:10
543:3 547:2,2
547:14,21
553:8 555:1
565:12,25
567:7 568:23
569:2,5 573:14
574:22 586:2
587:15 597:19
605:25 619:20
619:22 650:22
656:5 665:17
665:18,25
733:21 759:10
**truly** 443:21
**truth** 481:6
**truthfulness**
555:24
**try** 478:16
490:19 643:19
646:16 700:10
705:25
**trying** 446:2
466:20 506:25
548:25 574:12
574:13 593:6
594:19 595:6
595:15 596:6
601:10 633:17
640:22 648:4

654:6 668:15
669:6 679:9
711:8 714:23
734:10 740:25
742:22
**tubal** 639:12
**TUCKER** 384:5
384:13
**tumors** 743:8
**turn** 437:4
618:21 636:21
666:23 687:19
**Turner** 579:7
**twice** 424:17
643:16 686:7
**two** 398:11,12
399:13 408:12
432:2,7,8
465:21 466:23
477:17 478:4
478:18,19
479:2 481:21
488:13,18
489:21 495:5
508:12,22
519:16 522:23
525:12 531:6
532:3,6 541:16
571:14,19
575:17 593:25
594:17 616:22
622:2 626:17
626:21,22
634:15 671:15
687:11 717:21
719:1 741:1
751:5
**two-dimensio...**
575:4
**type** 548:20
753:4
**typed** 680:17
**typical** 592:1
729:12
**typically** 485:9
528:12 559:16

724:3,3
**typographical**
723:2 745:12
**typos** 528:20
722:13

**U**

**U** 379:15
**Uh-huh** 580:22
**ultimate** 740:11
**ultimately** 505:8
523:1 704:11
**Um** 679:6
**unanimous**
467:2
**unanimously**
716:20,22
**unaware** 625:17
634:9 699:16
**unbiased** 683:12
**underlying**
439:3 442:7
532:19
**underneath**
522:22 754:9
**undersigned**
759:2
**understand**
392:25 393:3
393:10,15
394:6,8,16
395:1,4 400:1
400:19 414:16
414:19 415:3
417:18,21
419:18 428:2
440:17 441:15
441:23 445:11
445:24 451:12
452:2 519:4
525:4 546:16
548:25 561:7
568:6 582:25
583:4,25
598:12,17
624:5 628:14

628:18 632:15
633:17 640:22
648:4 653:9
667:19 668:15
672:24 692:25
694:9 698:17
707:22 709:6,8
**understanding**
402:13 403:1
414:24 455:10
460:3 466:11
517:13 539:16
555:3 560:4
584:10 622:11
636:18 646:13
679:19 680:8
680:19 719:18
755:25
**understands**
400:24 482:25
605:9
**understood**
419:18 444:1
446:18 462:3
628:13 671:11
**undertake** 707:6
709:6
**undertaken**
638:19
**undertook** 663:1
**undetected**
547:12
**unequivocal**
415:11
**unequivocally**
611:7
**unethical** 562:25
564:7
**unfeasible**
562:25
**Unilever** 487:17
487:18 490:5
505:12
**UNITED** 379:1
**University**
405:10 406:1

627:12
**unnecessary**
411:10
**unqualified**
473:10
**unreasonable**
638:15
**unusual** 421:9
566:2,22 686:1
**unveiled** 600:6
**unworkable**
564:7
**upcoming**
622:15
**update** 514:7
572:19
**updated** 587:16
662:10
**Updating**
386:15 475:12
**upset** 656:18
**upside** 666:24
**urea** 580:18
**usage** 477:24
**use** 385:19
386:18 387:5
399:21 407:5
446:21 451:3,3
459:14 469:8,9
488:22 547:10
547:11,11
553:19 565:5
582:19 583:3
605:17,18
611:8,12 617:8
617:14 619:4
621:23 622:12
658:19 680:5
681:16 687:24
689:23 695:13
695:17,25
696:19 697:12
697:22 698:10
699:2,16
737:12,13
**uses** 551:14

USP 551:14
554:1 555:6
573:1
usual 733:17
usually 528:6
utilizing 564:1

---

**V**

V 379:15 381:4
VADERS
384:18
vagina 681:19
681:20 688:2,3
690:1,2
vaginas 719:5
vaguely 650:2,9
validate 642:16
validity 439:2
442:6 532:18
valuable 510:21
value 527:13
various 649:22
654:15 667:4
700:11 715:11
718:3 741:24
vast 458:9,12
560:23 561:1
verbal 644:9,12
verdicts 598:24
verifications
552:13
Vermont 627:11
627:12
versa 747:2
version 423:15
494:15 621:10
versions 423:14
versus 564:1
vice 454:7,9
747:2
vice-chairman
716:19,22
video 392:4
Videographer
384:17 392:3
405:14,19

407:12,15
421:20 476:6,9
476:12 570:19
570:22 618:13
618:16 643:8
643:11 744:13
744:16 757:24
videotaped
379:16 758:1
view 418:21
419:23 472:12
499:18,23
576:2 607:8
viewed 607:4
Virginia 382:6
vitro 752:13
vivo 752:13
void 759:13
Volume 392:4
voluntarily
417:11 442:19
442:23 443:1
450:5,10 545:4
voluntary
417:16 449:23
662:7
volunteered
732:2,17
733:14
vote 465:10
467:3
voted 465:10,13
465:21,23
VP 660:8

---

**W**

W 384:4
Wacker 384:6
wait 427:6,6
569:11,11
604:1 754:22
757:9
walk 501:1
walked 470:2
500:11
Walmart 574:15

want 397:24
399:20 421:6
434:18 441:12
441:20,23
443:22 444:4
446:10 448:1
448:21 451:12
454:2 455:1,2
455:21 458:17
465:7 468:7
482:24 484:10
484:11 486:19
486:20 496:15
501:2 502:16
503:2 513:7
519:8 531:19
538:12 539:7
554:8,25 555:1
555:2 564:20
567:12 583:1
584:21 585:3
589:23 593:17
593:22,25
594:18 610:25
618:19 621:9
625:10,15
629:1 636:24
643:6,20
650:24 661:6
667:19 675:9
685:9 695:2
709:12 710:12
711:16 716:7,9
725:20 742:15
743:10 745:20
wanted 409:13
466:16 496:4
500:7 506:2
521:20 548:16
548:18,21,23
549:10 560:17
562:1 576:23
628:18 636:14
644:3
wants 750:19
warn 448:21

warning 385:13
404:2 406:6
408:16,25
409:12 411:3,7
411:17,18,23
412:4 413:1,21
414:5,9,14,18
414:21,24
415:10,17,20
415:22 416:3
416:17,21
418:22 422:9
422:11 438:10
439:1,10,14
440:9,15 441:7
441:14 442:4
442:13,14,15
442:19,23
443:1,9,25
444:13 445:2
448:9,25 449:5
449:23 450:5
495:19 499:9
514:1,14
560:17 609:5
673:6,12,20
warnings
416:25 417:10
438:13 440:22
444:10 448:1
450:10 483:2,9
532:17 607:22
608:11
Washington
379:19 380:7
382:19 514:9
597:3
wasn't 397:19
408:1 459:22
466:14 486:12
504:1 510:18
520:19,25
521:3 527:22
537:5 591:19
597:5,5 624:18
632:1,13,13,18

635:17 636:20
636:20 638:25
640:10,12
642:2,2 656:19
699:22 703:6
723:4 743:19
way 412:25
464:7 486:20
525:2 535:11
535:24 538:18
557:15 564:8
569:8 596:2
598:8 604:19
626:14 627:5
663:17 666:15
666:22 668:15
678:5 679:25
684:4 702:15
702:23 703:7
703:18 705:4
710:18 711:12
719:11 720:18
721:24 727:9
728:3 730:13
731:21 733:17
733:19 738:16
738:23 739:7
ways 564:10
622:11 665:14
weak 533:8,17
568:14,19
569:10,18,19
weaknesses
460:8
website 484:2
511:9 538:14
561:24 656:24
658:3 676:8,10
677:2,10
678:22 679:17
680:16 688:21
694:9 695:16
696:12,12
699:3,17 700:2
700:5
Wednesday

Linda Loretz, Ph.D.

514:25
week 523:23
weekend 629:24
Wehner 391:5
646:6,7,8,20
646:25 647:15
647:21,25
648:5,10,18,20
649:3,8,19,25
650:6,15 651:8
653:13 731:5
731:14 732:7
732:18
weigh 483:19
553:2
weight 414:17
Weinberg
654:23,24
655:1,2,10,15
welcome 525:23
551:8 552:24
617:16
well-described
543:2,8
well-designed
622:23
went 407:2
435:12,19
457:22 484:2
487:11 490:5
490:15 524:17
526:24 527:20
530:24 547:19
555:14,22
556:3 576:4
597:17 604:16
605:5 644:11
644:19 670:17
680:16 705:11
710:5,18 715:9
719:19 724:8,9
725:14 727:19
750:7 751:12
751:12,20
755:22
weren't 521:3

561:13 585:17
600:5
Westminster
601:19
we'll 400:9,11
401:14 407:5
410:11 423:9
428:2,10,10
446:8,9 455:3
468:14 487:2
490:11 562:6,7
572:16 590:3
590:18,21
633:3 678:11
757:19
we're 397:9
400:23 401:3,6
403:16,25
405:16,20
407:13,16,19
411:15 441:19
443:3 444:1,16
445:6 457:5
458:8 462:14
469:2 476:10
487:3 490:11
497:13,18
502:20 504:1,2
504:2 509:11
524:3 531:12
531:18 544:17
544:19 550:22
556:9,13 561:5
561:6 570:20
592:4,4 596:22
596:23 618:14
618:17 620:19
620:20 625:15
640:18 643:9
643:12 654:21
657:17 661:4
691:17 711:8
717:2 722:13
722:15 723:10
723:11,17
729:1 730:19

730:19,20
733:4 737:18
740:7,7 744:14
744:17 747:8
757:18,25
we've 401:17
403:16 467:14
505:11 525:18
529:19 560:3
561:12 564:12
575:3 591:19
593:1 606:1
613:20 618:20
625:8 639:22
641:11 658:16
700:8 741:22
744:8,11 746:1
746:2
whatnot 745:13
white 410:13
517:18 580:8
widely 705:25
Wikipedia
685:11
Wille 453:5,6
514:8 522:6
524:5
William 682:24
683:2 684:20
685:4
willing 501:23
501:25 551:3
572:18 601:14
623:20 729:20
wish 542:8
withdrawn
471:13,14
witness 380:15
382:15 392:6
394:5 403:4
412:17,22
413:4,16
414:12,23
415:3,16 416:5
416:20 417:7
417:14 418:20

419:13 420:2
420:12 421:1
425:11 426:17
428:7,17 430:9
430:21 431:16
432:20 434:23
435:2,16 436:7
437:18 443:11
444:21 445:15
446:25 447:24
448:19 449:8
451:6 456:5
458:2 459:11
460:2,13,23
461:6,16,21
462:6 466:14
473:3,22 474:8
474:23 481:12
482:1,15 483:8
484:24 485:3
487:15,25
488:10,25
490:1 497:2,16
501:22 502:19
503:15 506:14
506:21 507:10
507:24 510:16
513:14 516:1
517:1,11,25
520:1 521:22
523:10 525:5
527:4 528:2,15
529:3,11 530:8
530:20 531:5
533:1,23 535:4
536:8 538:6
539:14 542:22
544:13 545:15
545:24 546:16
547:4 549:5,18
550:20 551:6
551:22 552:22
553:15 554:16
554:22 557:21
558:24 560:23
566:10,16

569:2 570:10
576:11,22
583:16 584:25
588:20 589:15
593:5 596:22
597:9,22 599:6
599:20 606:16
607:18 608:8
608:15 609:12
609:21 610:8
610:15,22
619:7,22 623:2
625:7,14 627:7
629:10 635:1
635:16 636:5
637:16 638:7
651:1,11,21
653:15 654:13
656:8 659:3
664:12,23
665:5 667:7
669:14 670:9
670:16 671:4
671:24 673:24
674:1,9,17
675:5 677:20
679:22 680:11
680:22 682:4
683:20 684:1
684:16 685:16
685:25 688:9
689:19 690:21
691:1,14,20
692:15,20
693:4,6 694:13
694:18 695:24
696:22 698:5
698:15 699:24
703:3,13,23
704:2 710:10
711:24 715:7
717:1 721:1
722:12 723:4
724:13 726:20
727:18 728:10
732:23 733:21

739:4 740:14
743:3,6 745:4
746:12 748:1
750:4 751:2,19
753:4 756:2
759:6,7,14
760:1
**witnesses** 396:7
433:22,25
434:19,25
**woke** 459:20
**Wolfe** 386:10
**woman** 448:12
680:3
**women** 392:21
447:19 464:11
583:3 605:20
607:9,15 611:8
652:9,13,17,22
702:20
**wonderful**
510:20
**word** 459:14
465:5 514:2
516:18 545:12
545:22 547:23
547:24 675:13
677:5,23
705:25 710:16
711:8
**words** 397:15
483:19
**work** 396:11
402:14 453:18
483:14 485:13
490:23 491:1
491:17,23
500:13 535:11
538:22 545:17
556:18 595:24
641:23 642:12
654:5,15
656:24 657:5
658:3,4,5,15
678:5 716:2
**worked** 454:11

456:19,20
476:19 510:1
520:4 529:22
539:11 550:21
615:14 629:24
730:12
**working** 473:5,5
476:24 480:21
504:1 514:18
587:5 662:10
685:1,8 706:13
713:1
**works** 453:8
710:11
**workshop**
462:21,23
647:11
**World** 472:10
**wouldn't** 447:2
511:13 524:20
526:21 535:23
678:1 679:22
713:8 729:14
745:9,13
746:13 747:11
**write** 401:5
407:20 421:22
432:2,11 444:9
460:16 465:7
474:5 478:16
479:19 480:25
481:1 484:14
590:17 685:9
730:21
**writes** 717:18
**writing** 406:18
416:17 425:16
457:5 728:21
**written** 423:10
425:21 439:17
439:22 441:24
451:18,24
463:1 529:24
532:3,6 724:1
730:15 741:24
747:12

**wrong** 401:4
470:3 517:5,7
520:15 547:12
604:5 667:3
701:7 713:2
715:22 716:10
744:21 747:15
**wrote** 407:8
418:9,10 420:7
468:20,24
479:20 480:2
498:16 578:18
591:1 632:10
655:18 668:4
668:17 693:13
755:8
**Wynder** 613:12
613:15 615:5,8
615:10 621:19
633:9 646:5
648:19 650:18
651:7 653:12
**Wynder's**
619:17,17
**Wynder/Musc...**
644:24 646:2
646:11
**W-E-H-N-E-R**
646:9

_____

**X**
**x** 379:4,13 385:9
386:1 387:1
388:1 389:1
390:1 391:1

_____

**Y**
**Yea** 469:15
**yeah** 395:1
402:4 418:7
421:1 433:2
441:9 448:9,19
451:19 453:9
468:6 469:25
478:24 480:13
486:12 490:8

524:17 528:23
529:11 544:13
562:7 566:10
567:25 570:17
576:22 587:10
590:23 593:8
593:10 595:15
595:17 597:9
598:11 604:6,7
604:20 607:18
608:15 610:22
617:1,1 621:5
623:18 630:19
631:25 635:1
637:25 640:13
641:8 642:21
658:3 659:3
667:8 669:3
674:1 678:18
679:15,15,22
684:16 685:20
693:6,21
699:10 703:13
710:10 727:6
727:18 729:1
738:14 739:23
742:19 745:18
**year** 401:21
458:22 464:12
471:23 478:22
522:4 524:9,11
592:11 593:15
593:18 598:19
598:20 630:22
652:13,17
703:14 733:24
734:10
**years** 419:3
444:15 448:14
459:24 481:23
482:13,20
484:21,21
485:7,7,10
505:6 537:19
552:11 556:10
566:5 578:18

591:20 605:11
622:3 635:8
658:16,17
662:12 687:11
705:21 708:7
**Yep** 431:9 444:7
578:24 619:7
**younger** 566:20

_____

**Z**
**Zamek** 512:23
**zero** 554:25
556:24 557:1

_____

**$**
**$100,000** 636:25
644:7 651:19
**$1400** 731:19
732:9
**$400,000** 619:25
622:3,23
**$50,000** 433:1

_____

**0**
**000004013**
386:13
**000011723**
390:24
**000018452**
388:14
**000018466**
388:14
**000018732**
389:9
**000018737**
389:9
**000023357**
391:11
**000023366**
388:18
**000023392**
388:19
**000024880**
388:21
**000089586**
390:21
**000109060**

388:6
**00026194**
388:16
**000272** 390:11
**00028675** 391:6
**000375876**
386:22
**000375883**
386:23
**000376528**
386:9
**000391715**
386:16
**000391716**
386:17
**000426011**
386:6
**000488256**
387:23
**000488257**
387:24
**0005507** 387:17
**0052507** 389:24
**07962** 383:15
**09** 493:12

___

**1**
**1** 379:20 390:5
392:4 395:11
397:8 408:23
444:10 463:17
568:8 610:2
654:22 681:7
683:7 687:17
755:18
**1st** 392:4 757:25
**1(e)** 398:6
**1(f)** 398:8
657:16
**1(g)** 398:8
**1.0** 568:3
**1.24** 692:12
**1:12** 570:22
**10** 605:11 630:4
652:22
**10th** 401:20

465:4 470:20
**10.30(e)(2)**
591:11
**10:43** 476:9
**10:58** 476:12
**100** 568:8
**11** 391:8,13
716:16
**11th** 492:6 713:6
713:7 715:25
720:20 734:19
736:4 753:14
754:23
**11,933** 389:7
**11:12** 683:8
**12** 386:8 426:14
470:11 471:20
508:16 572:16
630:6,10,11
662:12 687:9
**12th** 426:14
462:24 601:4
**12:32** 570:20
**12:48** 684:22
**13** 605:11 684:8
**13th** 404:19
438:6 579:19
698:9 699:1
**137977** 386:11
**137978** 386:11
**139** 621:5
**14** 486:12
**14th** 696:16
**14,000** 652:17
**146545** 389:16
**146551** 389:17
**15** 481:23
482:12,13
620:8
**15th** 678:23
682:4 683:8
684:9,21
**154013** 387:6
**154020** 387:7
**15618** 735:8
**16** 708:23

**16th** 720:21
**16-2738** 379:6
**17** 612:4 654:22
**1717** 383:21
**18** 482:13
670:25 689:2
708:18
**18th** 754:6
**180** 591:13,25
**1835** 381:14
**188** 604:8
**19** 475:9 700:19
754:23
**19th** 515:1
690:13 691:4
**19103** 381:15
383:22
**192** 606:13,15
**193** 610:19
**1970** 547:1
576:3
**1970s** 407:2
543:20 546:14
551:20 553:5
556:7,11,15
571:16 585:15
**1971** 709:17
711:12 712:16
715:3
**1980s** 459:8
553:7 558:17
719:23,25
**1982** 407:4,21
407:25 553:6
567:21 652:3
671:13 701:9
712:23 713:6,7
715:4,25 716:3
716:16 717:15
717:24 718:10
718:23 720:20
721:6
**1990s** 461:14
558:17 590:6
601:2 613:19
**1992** 652:4,22

653:10 721:6
**1993** 667:22
668:9 669:8
720:21,22
721:19 724:25
725:23 728:1
731:15 738:13
**1994** 386:8
391:8,10
401:17 462:18
462:24 464:5
601:4 612:4,17
615:18 616:14
617:20 618:2
619:14 649:8
650:5 734:8,19
736:4 748:11
748:16 754:17
754:25 755:1
**1995** 391:14
590:25 605:9
610:20 612:5
615:18 617:23
753:14 754:6
754:22,23
**1997** 630:7
633:9 644:23
**1999** 655:7

___

**2**
**2** 408:18 523:4
533:13 552:6
602:2 669:7
683:7 687:19
689:15 717:5
736:4,11
759:15
**2B** 690:17
691:11
**2nd** 523:24
720:22
**2.0** 568:3,10
**2:06** 618:13
**2:16** 618:16
**2:44** 643:8
**2:51** 643:11

**20** 408:12
464:11 489:9
532:21 541:22
552:11,11
708:18 762:16
**20,000** 464:11
464:11
**20-year-old**
572:17
**200** 386:12
**2000** 401:21
411:16 428:15
428:17 429:15
465:4 468:15
468:16 469:6
469:21,22
470:21 480:19
482:16,18,18
493:10 595:19
617:19 632:19
636:8 638:5
644:20,21
647:9 655:7,8
668:24,25
**2000s** 408:8
478:9 481:9
556:10,11
558:17 588:6
**20004** 380:7
382:19
**2001** 454:18,21
457:1 644:21
**2002** 457:1
669:8
**2003** 626:3,8
669:7,9
**2004** 431:14
471:21,24
**2005** 401:24
470:10 471:15
471:16 474:3
475:9 478:15
478:15,23
480:21 484:14
635:22 637:4
**2006** 402:1,2

Linda Loretz, Ph.D.

479:14 579:19
661:19
**2007** 479:15,18
480:25
**2008** 400:15
402:6 404:3,6
404:19 408:11
410:7,8 438:6
451:14 480:14
480:15 481:1
482:18 483:1
492:25 516:7
517:21 522:2
556:8 599:18
654:3,5 669:22
670:22 671:13
**2009** 387:18
410:12,17
413:13 422:1
429:10 434:16
437:5 450:3
481:2 482:19
483:6 491:5
493:10 506:18
511:3,4 517:17
524:12 536:24
572:9 592:16
592:3 600:2
639:8 654:3
670:10
**2010** 435:23
458:23 593:4
593:21 594:9
**2011** 435:25
436:25 437:1
437:22,22
458:23,23
594:17 596:2
678:23 682:1,6
**2012** 594:21
**2013** 682:24
683:8 684:9,21
687:9 688:4
**2014** 486:10,11
669:23 689:2

**2015** 484:12
486:14 690:13
691:5
**2016** 659:19
694:15 695:15
696:16
**2017** 698:9
699:2
**2018** 379:20
392:4 598:18
659:6,13,25
757:25 759:15
**202** 382:20
**21** 390:5 562:9
562:10 591:11
672:16 673:5
**21st** 410:17
590:25
**215** 381:16
383:23
**218** 381:23
**22** 398:9
**22nd** 724:25
725:23
**22,000** 652:13
**22311** 382:6
**227-8008** 383:9
**23** 569:7,12
**233** 384:6
**24** 562:11,13
670:23 684:21
**25** 419:2 444:14
448:14 459:24
541:12,17,22
692:17
**250983** 387:21
**250984** 387:21
**26** 567:14
569:13
**266294** 387:19
**266295** 387:19
**267-0058** 383:16
**269-2343** 381:25
**27th** 728:1
**272247** 389:21
**272250** 389:22

**28** 541:17,23,24
**29** 567:14
**2900** 381:14

---
**3**
---

**3** 438:2 580:17
586:15,15
681:7,12
689:15 725:24
**3rd** 475:9 516:7
**30** 489:9 556:10
741:23 742:7
742:12 760:12
**30(b)(6)** 379:16
393:24 394:2
677:19
**30,000** 411:16
**30-page** 505:23
**30-some** 597:11
**31st** 617:23
**312** 384:9
**316** 381:7
**324** 672:9
**32502** 381:8
**33** 603:21
**334** 381:25
**337** 382:13
**3400** 383:7
**350** 383:14
**36104** 381:24
**39** 422:16
541:18,23
562:11,13
569:13
**392** 385:3

---
**4**
---

**4** 422:16 612:18
612:25 717:5
**4th** 748:16
**4(a)** 398:8
**4(c)** 398:8
**4:38** 744:13
**4:49** 744:16
**40** 470:9 635:8
**401** 385:12

**404** 385:14
**41** 385:12 401:7
401:8
**410** 385:16
**42** 385:13 404:9
404:13
**43** 385:15
410:21,22
429:4 434:14
532:21
**430** 385:18
**436** 385:23
**436-6250** 381:9
**439-0707** 382:13
**44** 385:17
430:23 431:2
744:11
**45** 385:19
436:12,16
**452** 386:6
**46** 386:4 452:23
453:2
**462** 386:9
**463-2400** 382:20
**468** 386:11
**47** 386:7 462:8
462:12,15
601:3
**470** 386:13
**474** 386:17
**479** 386:23
387:7
**48** 386:10 468:9
468:10
**483** 387:10
**486** 387:14
**49** 386:12 470:5
470:9
**4900** 382:5
**491** 387:17
**495** 387:19

---
**5**
---

**5** 391:10 431:23
432:19
**5th** 621:5 682:1

748:11 755:1
**5:03** 757:25
758:4
**50** 386:14
474:11,12
476:16 660:13
744:10
**50-page** 661:9
**501** 382:11
**51** 386:18 479:9
479:12,22
626:25
**512** 387:21
**5129** 759:19
**52** 387:4 479:23
480:1,16
626:25
**521** 387:24
**52415** 660:14
**52418** 662:1
**52424** 662:14
**52426** 663:3
**52457** 665:10
**52505** 666:23
**53** 387:8 483:24
484:3
**54** 387:11
486:15,16
**55** 387:15
491:24,25
552:4
**56** 387:18
494:25 495:1
**57** 387:20
512:10,13
**577** 388:6
**58** 387:22
521:23 522:2
**59** 388:4 577:22
577:23 583:11
**592** 388:9

---
**6**
---

**6** 424:18 438:3,3
**60** 388:7 592:5,9
**600** 381:7 383:6

Linda Loretz, Ph.D.

Page 817

**603** 388:14,16
**60606-9997**
  384:8
**61** 388:10
  602:24 603:2,7
**610** 383:21
**615** 388:19
**62** 388:15
  602:24 603:2,5
  603:10,11
  604:6
**620** 388:21
**624-6307** 384:9
**625** 389:9
**63** 388:17
  615:21,24
  620:14
**630** 389:13
**631** 389:17
**633** 389:18
**639** 389:22
**64** 388:20
  620:12,17,20
**643** 385:4
**65** 389:4 489:22
  625:23,25
**650** 382:5
**66** 389:10 630:1
**660** 389:24
**67** 389:14 631:1
  631:2 708:12
**672** 390:6
**678** 390:9
**68** 389:18 633:4
  633:5
**682** 390:11
**687** 390:14
**688** 390:15
**69** 389:19 639:4
  639:5
**690** 390:16
**693** 390:17
**6950** 384:7
**696** 390:18
**697** 390:19

**7**

**7** 675:9
**70** 386:12
  389:23 489:22
  660:16,17
**70s** 545:3,15
  550:23 556:3
  556:10,19
  700:20 701:16
  712:19 714:18
  715:8,9,12
**703** 382:7
**70601** 382:12
**71** 390:4 672:11
  672:12 700:20
  712:17
**713** 383:9
  390:21
**717-4006** 383:23
**72** 390:7 678:11
  678:12 681:1,2
**724** 390:24
**73** 390:10
  682:11
**731** 391:6
**734** 391:8
**74** 390:12 687:2
**740** 390:6
**740.1** 673:5
**748** 391:11
**75** 390:15
  688:14
**753** 391:14
**76** 390:16 690:7
**77** 390:17
  693:24
**77002-2926**
  383:8
**78** 390:18 619:5
  696:8
**79** 390:19 697:4
  697:6,7

**8**

**8** 387:18 398:9
  481:2 506:17

695:15 755:18
**8th** 492:25 493:3
  511:2 548:12
  548:14 694:15
**80** 390:20
  713:23 714:1
**80s** 397:19 407:3
  408:7 556:10
  647:1,3,5
  713:9
**81** 390:22
  724:20,21
**82** 391:4 730:25
  731:1
**83** 391:7 734:12
**84** 391:9 748:7
  748:10
**85** 391:12 753:9
  753:10
**850** 381:9

**9**

**9** 438:3 481:2
  599:19,20,22
**9th** 511:2 592:13
**9:09** 379:21
  392:3
**9:23** 405:16
**9:27** 405:19
**9:30** 407:12
**9:31** 407:15
**90s** 408:8 556:10
  646:12 647:7
  740:8
**93** 721:16,20
**94** 647:11
  737:14
**94TA03** 737:11
**95** 610:2
**97** 630:16
  668:23 725:11
**973** 383:16
**975** 380:6
  382:18
**985-9177** 381:16
**997-1774** 382:7

Exhibit 121

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF LOS ANGELES

3

4    DEPARTMENT 307           HON. MAREN E. NELSON, JUDGE

5

6    COORDINATION PROCEEDING,        )
     SPECIAL TITLE (RULE 3.55)       )
                                     ) JCCP NO. 4872
7    JOHNSON & JOHNSON TALCUM        )
     POWDER CASES.                   )
8    _____)

9

10                    AFTERNOON SESSION

11         REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS

12                    AUGUST 10, 2017

13

14

15

16

17

18

19

20

21

22

23

24

25

26   Reporter:

27   CAROLYN GREGOR, CSR, CM, RDR, CRR
     Certificate No. 2351
28   Court Reporter Pro Tempore

```
 1   CASE NUMBER:              JCCP 4872
 2   CASE NAME:                JOHNSON & JOHNSON
 3                             TALCUM POWDER CASES
 4   LOS ANGELES, CA           AUGUST 10, 2017
 5   DEPARTMENT 307            HON. MAREN E. NELSON
 6   APPEARANCES:              (AS HERETOFORE NOTED.)
 7   REPORTER:                 CAROLYN GREGOR, CSR 2351
 8   TIME:                     1:23 P.M.
 9                 (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN
10                 COURT OUTSIDE THE PRESENCE OF THE JURY:)
11
12              THE COURT:  Back on the record outside the
13   presence of the jury with all trial counsel here.
14              Mr. Robinson?
15              MR. ROBINSON:  Yes, your Honor.  We're not going
16   to call another live witness, your Honor.  We will read
17   from a depo, but we are offering all of our exhibits in
18   evidence, and defense is objecting to some of our
19   exhibits.  I think they already came in.  I thought they
20   came in with Dr. Godleski.  They are his slides.  But he
21   put them, you know, into evidence.
22                 But I do think we need to have a discussion on
23   these.  I got a list about 10 minutes ago from defense
24   counsel of a list of exhibits that they don't want to --
25   that they are opposing, and I think -- I'm okay with them
26   starting the witnesses, your Honor, and I'm willing to
27   tentatively close our case subject to having the Court --
28   first of all, meeting with counsel on the admissibility
```

```
 1    of our documents, the ones that they are not agreeing to
 2    right now.
 3          And then we can -- we also are going to be
 4    reading in interrogatories, and we have agreed to that as
 5    well.
 6          THE COURT:  And this is also subject to the
 7    stipulation that you reached yesterday about the net
 8    worth arrangements?
 9          MS. ZUKIN:  Yes, your Honor.
10          MR. WILLIAMS:  Correct.  And subject to that
11    agreement, yes, exactly.
12          MR. ROBINSON:  So we have the net worth
13    agreement that we have to read in --
14          THE COURT:  You don't have to read that in.
15    It's on the record.
16          MR. ROBINSON:  It's on the record.
17          And then I told them on these slides I will take
18    out the language on the top of the exhibits.  But I do
19    think we need to have -- I don't want to slow down what
20    they are doing.  We don't intend to put on any more
21    witnesses, your Honor.
22          I think we could conditionally rest with the
23    understanding that these documents that we're still --
24    and we've been -- apparently this has gone on for a
25    couple days now.  We haven't gotten an agreement on the
26    documents, your Honor.  So --
27          MR. WILLIAMS:  May I just explain briefly our
28    position?  May I see that, please?
```

1          MR. ROBINSON:  Yeah, these are them, and there

2     are some others too.

3          MR. WILLIAMS:  The question is whether or not

4     documents come in as fully admitted exhibits that the

5     jury gets in the jury room or whether they are merely for

6     identification.  And, for example, on the literature, the

7     parties did not agree that they would come in to be

8     admitted but rather for identification purposes.

9          The same with the demonstratives, the

10     photographs, for example, used by Dr. Godleski.  Our

11     position is that those were for demonstrative purposes

12     and were not admitted fully.

13          And just for the record, they are Exhibit EE39A,

14     EE39B, EE40A, EE155, and EE39C.  And those were all

15     discussed with Dr. Godleski.

16          We believe they can be shown in closing, they

17     can be discussed, but they shouldn't be fully admitted is

18     our position simply because they were photos that were in

19     his report.  That's our position on that.

20          And with respect -- and we're happy to permit

21     plaintiff to close, subject to the Court ruling on those

22     things, just so we can get things moving.  That's our

23     position on that.

24          With respect to the stipulation, there's one

25     stipulation regarding Exhibit P396 which we'd agreed

26     to --

27          THE COURT:  I saw that.

28          MR. WILLIAMS:  -- and we have no objection to

1    that being read.

2           And with respect to the interrogatories, we

3    tried to reach a stipulation but couldn't reach agreement

4    because there was language added that was not in the

5    interrogatory responses.

6           So I believe the plan is that Ms. Zukin is going

7    to read three interrogatories, the question and then the

8    answer that is the relevant portion of the answer.  And

9    it's Answers to Interrogatories 2, 6, and 17.

10          MS. ZUKIN:  Correct.

11          MR. WILLIAMS:  And they've asked us whether we

12   would agree that -- to permit the Court to give CACI 209,

13   which is the use of interrogatories --

14          THE COURT:  I was just getting out my CACI.

15          MR. WILLIAMS:  And we're fine with the use of

16   that.

17          THE COURT:  Okay.  So we'll just use CACI 209.

18          MS. ZUKIN:  We would request that the Court read

19   it before I read the interrogatories.

20          THE COURT:  All right.

21          MS. ZUKIN:  Thank you.

22          THE COURT:  So what we will do when the jury

23   comes back, then, I think we should settle out this issue

24   about the exhibits later so that we can move on to other

25   things.  But when the jury comes back, I will instruct

26   them on CACI 209, you'll read the interrogatories and the

27   answers to the interrogatories, plaintiff will

28   conditionally rest with the understanding that the

1    stipulation that you received yesterday may allow you to

2    reopen or not, depending upon how we end up on that.

3            And then how do you want to proceed?

4            MR. WILLIAMS:  I would like at that point to

5    make an oral motion, your Honor, once they have closed,

6    conditionally, which will just take me a few moments.

7            THE COURT:  Do you want to do that outside the

8    presence of the jury?

9            MR. WILLIAMS:  Yes.  It will take me three

10   minutes, I think.

11           THE COURT:  Okay.  He needs to make a record.

12           All right.  Let's do that.

13           Do we have the jury back?  Can someone go get

14   the jury?

15           MR. WILLIAMS:  So I guess we will do those few

16   things and then --

17           THE COURT:  And then we will excuse the jury.

18           MR. WILLIAMS:  Thank you.

19           THE COURT:  And then once your motion is heard,

20   I presume you have witnesses you're ready to call?

21           MR. WILLIAMS:  Yes.

22           THE COURT:  Okay.

23           MR. ROBINSON:  Your Honor, we are going to give

24   you Stipulation Number 1.  Mr. Williams and I both signed

25   this.

26           Do you want to read that?

27           MR. WILLIAMS:  Sure.

28           MR. ROBINSON:  May I approach, your Honor?

```
 1              THE COURT:  Sure.  Are you going to read that
 2    into the record or is it just on the exhibit?
 3              MR. ROBINSON:  It's on that one exhibit.
 4              MR. WILLIAMS:  I think it should be read into
 5    the record.
 6              THE COURT:  Do we need to do that in the
 7    presence of the jury?
 8              MR. WILLIAMS:  I don't know that it's necessary.
 9    But whatever is the Court's pleasure.
10              MR. ROBINSON:  I think I'm okay as long as it
11    gets read into the record.
12              THE COURT:  Because the exhibit will go into the
13    jury room and then it will be there.
14              MR. ROBINSON:  Yes, your Honor.
15              MR. WILLIAMS:  That's right.
16              THE COURT:  All right.  So the stipulation of
17    counsel is that Exhibit P396 is a fax dated
18    September 30th, 2004, from Mr. Richard Zazenski,
19    Z-A-Z-E-N-S-K-I, of Imerys to Mr. William Ashton of
20    Johnson & Johnson.
21              Defendant Johnson & Johnson stipulates and
22    agrees that it received Exhibit 396 and has kept the
23    document within its company files since the time it was
24    sent.
25              That's the extent of the stipulation; correct?
26              MR. WILLIAMS:  Yes, your Honor.
27              MR. ROBINSON:  Yes, your Honor.
28              THE COURT:  All right.  And I'll ask the clerk
```

```
 1    to file the stipulation.
 2              MR. ROBINSON:  Then if the Court will read 209.
 3              THE COURT:  And Ms. Zukin is going to read the
 4    interrogatories and the answers to the interrogatories.
 5              Do you have a copy of the interrogatories and
 6    the answers, Ms. Zukin?  Do you have extra copies?
 7              MS. ZUKIN:  Yes.
 8              THE COURT:  You might just give those to the
 9    court reporter.  Sometimes it's handy to have those when
10    somebody is reading something.
11              MS. ZUKIN:  May I?
12              THE COURT:  Yes.
13              THE REPORTER:  Thank you.
14              COURTROOM ATTENDANT:  They are coming, your
15    Honor.
16              THE COURT:  Okay.
17              (A discussion is held off the record.)
18              THE COURT:  And just so I'm keeping up, what's
19    the name of the first witness?
20              MR. WILLIAMS:  Dr. Alan Andersen, S-E-N at the
21    end.  A-L-A-N.
22              (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN
23              COURT IN THE PRESENCE OF THE JURY:)
24              THE COURT:  All right.  Back on the record with
25    all jurors here, both alternates here, all trial counsel
26    here.  Let's proceed.  Good afternoon, everybody.
27              ALL:  Good afternoon.
28              THE COURT:  Mr. Robinson, do you have any other
```

3110

1    witnesses you'd like to call on behalf of the plaintiff?

2            MR. ROBINSON:  At this point, your Honor, with

3    the understanding that there are exhibits to be offered

4    after we -- after the -- after we finish court today, the

5    plaintiff will rest conditionally on the Court ruling on

6    those documents.

7            THE COURT:  Understood.

8            MR. ROBINSON:  And we have to read in also the

9    interrogatory, and the Court's reading in the jury

10   instruction.

11           THE COURT:  Right.  So let me explain to the

12   jury about this piece of it.  So before trial, each party

13   has the right to ask the other party to answer questions,

14   and those are written questions.  And the questions are

15   called interrogatories.  The answers come out in writing

16   and they are given under oath.

17           So Ms. Zukin is going to read the questions and

18   the answers.  You should consider the questions and the

19   answers that are read in court the same as if the

20   questions and answers had been given in court by a

21   witness.

22           Everybody understand that idea?

23   ALL:  Yes.

24   THE COURT:  Okay.  Ms. Zukin.

25   MS. ZUKIN:  Thank you.

26   THE COURT:  Hold on.

27           (A discussion is held off the record.)

28   THE COURT:  Okay.  Are you ready to go?

1     MS. ZUKIN:  Yes.

2         All right.  Good afternoon.  I'm going to read

3     the answers by Johnson & Johnson and Johnson & Johnson

4     Consumer Companies, Inc., sometimes referred to in these

5     answers with the acronym JJCC.

6         The first one:

7         Question:  State the corporate name of

8     defendant, any name under which defendant does business

9     including state of incorporation, date of incorporation,

10    if applicable, the names and addresses of all officers

11    and other principals of your organization and your

12    registered agent.

13        Answer:  In response to the subparts requesting

14    corporate name, trade name, state of incorporation, and

15    date of incorporation, JJCC has been sued under its

16    correct name.  JJCC is incorporated in New Jersey and

17    maintains its principal place of business in New Jersey.

18    JJCC was incorporated on March 23rd, 1967.

19        The second question:  For each product you have

20    manufactured or sold that contained talc, state -- and

21    this is subpart 3 -- the first and last dates of sale of

22    each product.

23        Answer:  In response to subpart 3, Johnson's

24    baby powder debuted in 1893 and remains on the market

25    today.  Shower to Shower debuted in the 1960s and it

26    remains on the market today, although it is now

27    manufactured by Valeant Consumer Products.

28        The third question:  Please describe the

1    business relationship between Johnson & Johnson and

2    Johnson & Johnson Consumer Companies, Inc., and provide a

3    detailed description of the corporate structure of

4    Johnson & Johnson and specifically how it relates to

5    Johnson & Johnson Consumer Companies, Inc.

6           Answer:  JJCC states that it is a wholly owned

7    subsidiary of Johnson & Johnson and has been at all

8    times -- all relevant times.  JJCC is incorporated in New

9    Jersey and maintains its principal place of business in

10   New Jersey.

11          Thank you, your Honor.  That's it.

12          THE COURT:  Thank you.

13          With that read into the record, and subject to

14   the stipulations that we have previously discussed, does

15   the plaintiff rest?

16          MR. ROBINSON:  Subject to those stipulations

17   that we discussed previously, your Honor, plaintiffs

18   rest.

19          THE COURT:  All right.  Thank you.

20          Mr. Williams.

21          MR. WILLIAMS:  Thank you, your Honor.

22          The defense calls Dr. Alan Andersen to the

23   stand.

24          THE COURT:  All right.  Good afternoon, sir.  If

25   you would come up here and watch your step.  After you

26   get your seat, the clerk will give you the oath.

27          THE CLERK:  Sir, do you solemnly state that the

28   testimony you are about to give in the cause now pending

```
1    before this Court shall be the truth, the whole truth,
2    and nothing but the truth, so help you God?
3             THE WITNESS:  I do.
4             THE CLERK:  Thank you, sir.  You may have a
5    seat.
6             Sir, would you please state and spell your name
7    for the record.
8             THE WITNESS:  Alan, A-L-A-N, Andersen,
9    A-N-D-E-R-S-E-N.
10            THE CLERK:  Thank you.
11            MR. WILLIAMS:  Your Honor, may I approach with a
12   binder?
13            THE COURT:  Yes.
14                 * DIRECT EXAMINATION *
15                   *[1:41 P.M.]*
16      Q    BY MR. WILLIAMS:  Good afternoon, Dr. Andersen.
17      A    Good afternoon.
18            MR. WILLIAMS:  Good afternoon, everybody.
19            ALL:  Good afternoon.
20      Q    BY MR. WILLIAMS:  Dr. Andersen, did you
21   previously work at the Food and Drug Administration?
22      A    Yes, I did.
23      Q    And for how long?
24      A    I spent 22 years at FDA.
25      Q    Could you tell the members of the jury what
26   years those were.
27      A    I started at FDA in 1971, and I worked there
28   until 1993.
```

1     Q     After you worked at the FDA, did you work at an

2     organization called the Cosmetic Ingredient Review?

3     A     Yes, I did.

4     Q     Is that also known as the CIR?

5     A     Yes, it's quicker to say.

6     Q     How long did you work at CIR?

7     A     I worked at CIR for 20 years.

8     Q     What were those years?

9     A     From '93, after I had left FDA, until I retired

10    in 2013.

11    Q     Dr. Andersen, were you trained as a scientist?

12    A     I was.

13    Q     Could you describe for the members of the jury

14    briefly your educational background, starting at college.

15    A     Okay.  Well, I went to Muhlenberg College in

16    Allentown, Pennsylvania.  I studied biology, and

17    somewhere along the line I got really super interested in

18    physics, so I kind of parlayed the two.  I got my

19    bachelor of science degree in biology from Muhlenberg

20    College and then went on to graduate school.

21    Q     What year did you graduate from college?

22    A     Oh, now you're asking for memory.  I believe it

23    was '66, 1966.

24    Q     That's what I have, too.

25          And you received a BS or BA?  What was your

26    degree?

27    A     BS degree in biology.

28    Q     After you graduated from Muhlenberg College,

1    what did you study next and where?

2        A    I went further west in Pennsylvania to State

3    College and enrolled in the biophysics program at Penn

4    State.

5        Q    What year did you graduate from the biophysics

6    program at Penn State?

7        A    Well, there were two milestones.  One, in 1969,

8    I received my master's of science degree in biophysics,

9    and then in 1971 I finished my Ph.D. work in biophysics.

10       Q    And where did you go next?

11       A    I got a real job.  I went from Penn State to the

12   U.S. Food and Drug Administration.

13       Q    What was that year?

14       A    1971.

15            MR. WILLIAMS:  Your Honor, can I have a moment?

16   I think I gave counsel my binder accidentally.  I just

17   want to make sure I have the right binder now.

18            Thank you.  Thank you.

19       Q    BY MR. WILLIAMS:  We were talking about your

20   Ph.D. program.  That was at Penn State as well?

21       A    That's correct.

22       Q    And you received your Ph.D. in 1972?

23       A    The ceremony didn't happen until '72, but

24   everything was finished in '71, and earning a salary

25   seemed like a good idea.

26       Q    And the Ph.D. was in what area?

27       A    Biophysics.

28       Q    Can you describe what biophysics is?

1      A    Oh, it's that marriage between biology and

2    physics.  But in a simplified form, just about everything

3    that is biological follows the laws of physics as well.

4    So you can predict a lot about what's going to happen in

5    a biological system by knowing what's going to happen on

6    the physics side of it.

7            Just like hitting the brakes on your car is

8    supposed to stop your car.  What stops an enzyme when

9    it's moving around in a cell?  How does it spin?  All of

10    that is governed by the laws of physics, and what we try

11    to do is to use that to better understand the biology.

12      Q    In your training did you conduct any research on

13    cell mutations as they applied to cancer?

14      A    Yes.

15      Q    What did you focus on?

16      A    Most of my work in graduate school was on the

17    effects of radiation, particularly ionizing radiation,

18    from radioisotopes.  Things that could be incorporated

19    into cells.  And that focus kind of shifted when I got to

20    FDA.

21      Q    Did you go straight to the FDA after you

22    received your Ph.D.?

23      A    I did.

24      Q    What was the first position you held there?

25      A    I was a researcher in the genetics study section

26    of the Division of Biological Effects of the Bureau of

27    Radiological Health.  I can still remember that.

28      Q    While you were at the FDA, did you participate

1   in conducting cell studies?

2       A    Yes.

3       Q    Were you involved in animal studies?

4       A    Yes.

5       Q    Did you supervise researchers who were doing

6   epidemiological studies?

7       A    Yes, I did that too.

8       Q    And in what -- how was it -- or in what way did

9   you supervise researchers who were doing epidemiological

10  studies?

11      A    Okay.  The -- the organization responsible for

12  doing all of the research and testing for

13  radiation-emitting products, X-ray machines, if you will,

14  and all medical products were located within what was

15  called an Office of Science and Technology.

16           And as the director of the Office of Science and

17  Technology, the epidemiology staff had to come to me and

18  convince me the study was well designed, worth doing,

19  before I'd say, "Do it."  So it was a supervisory

20  responsibility over what work they were doing.

21      Q    And approximately how many epidemiologists did

22  you supervise in that way?

23      A    Oh, it usually was a staff of around 10.

24      Q    After you were a researcher in the Division of

25  Biological Effects, what was your next position in FDA?

26      A    Well, from a researcher, I went to supervisory

27  positions within that same organization.  But then

28  finally I was recruited to take over a position at the

1    FDA's Bureau of Medical Devices.

2        Q    What were your responsibilities in that role?

3        A    I ran -- I was asked to run the standards

4    program.  Medical devices are generally classified into a

5    group of regulatory controls, one of which is there

6    should be a standard that this medical device meets in

7    order to assure safety.  In fact, that's most medical

8    devices.

9             I was the associate director of standards

10   responsible for all of those medical devices.

11       Q    Let me move you to another role you had that may

12   have more direct relation to this case.  Did there come a

13   point in time when you became the FDA director of the

14   Office of Science and Technology?

15       A    Yes.

16       Q    Approximately when was that, give or take a few

17   years?

18       A    Give or take a few years.  '89, 1989, 1990 --

19   '89, I think.

20       Q    And what were your responsibilities as the

21   director of the Office of Science and Technology?

22       A    All of the engineering and research --

23   engineering testing, research conducted on both medical

24   devices and radiation-emitting products, microwaves,

25   sunlamps, X-ray machines.  So it included the full range

26   of radiation products and the full range of medical

27   devices.  We didn't do much research on tongue

28   depressors, but computerized tomography and more

 1    technically advanced devices, there was a lot of research
 2    being done.
 3        Q    In that role, did you have any authority over
 4    how to deploy resources within the FDA?
 5        A    Yes.
 6        Q    Were there animal studies or human cell studies
 7    or epidemiological studies involved with any of the work
 8    that you did in that group?
 9        A    All of the above.
10        Q    What types of specialties, that is --
11    specialists -- excuse me.  What type of -- types of
12    specialists did you work with in terms of scientists,
13    physicians?  Can you just describe them to the jury?
14        A    I think I learned very early on that if you were
15    going to do well as a leader of the effort, you got the
16    best expertise working under you.
17            Toxicology was certainly a big part of the
18    staffing.  Engineering because we had the large medical
19    device responsibility.  We still maintained the
20    epidemiology research responsibility, so I had
21    epidemiologists on the staff.  We had an animal care
22    facility so that we could house and work with the animals
23    in the animal studies.
24        Q    Was pharmacology part of the group of
25    specialists underneath you?
26        A    Yes, it was.
27        Q    Were you also the chair of the FDA Regulatory
28    Review Scientist Peer Review Committee?

1      A    Yes, I was.

2      Q    Let me ask you a question about that.  It's a

3  mouthful.  But what is the Regulatory Review Scientist

4  Peer Review Committee all about?

5      A    Okay.  I described the kinds of things I did at

6  FDA, and that was moving through gradually getting

7  promoted in supervisory positions.  And it was more and

8  more management responsibilities kept me going up the

9  ladder.

10          At the same time, there were a lot of FDA

11  scientists who had a benefit to the organization because

12  of their scientific knowledge.  And, frankly, it would

13  have been a waste of their effort to, just for a

14  promotion, take their attention away from that science

15  and have to go manage something.  Let them do what they

16  are good at.  But the system wasn't designed to recognize

17  that.  The system of promotions at FDA was designed to

18  get supervisory responsibility, you get a promotion.

19          So I had, in my own work with scientists under

20  me, gotten a few people around the system, just made a

21  strong enough argument so that the office of personnel

22  bought into it.

23          But the problem was hugely widespread at FDA.

24  So it came to a point where the personnel office and the

25  federal office of personnel management came to me and

26  said, look, you've had some success at doing this.  Can

27  you make this a system?  Define the characteristics of

28  what makes a regulatory scientist really good for FDA and

1    worthy of a promotion without having to take on any
2    supervisory responsibility.
3          And I did that.  I developed that scheme and
4    implemented it.
5     Q    So the gist of it was to figure out a way that
6    scientists could get promoted without necessarily being
7    supervisors?
8     A    That's correct.
9     Q    Did you hold any other positions -- and I'd like
10   to move you to the time when you were about to leave the
11   FDA -- what was the last position that you held there?
12    A    I was the acting director of the Office of
13   Device Evaluation.
14    Q    And what did you do in that role?
15    A    Well, device evaluation is a place where all of
16   the industry submissions of scientific data supporting
17   their whiz-bang new medical device is actually safe and
18   effective.
19          So the Office of Device Evaluation was the group
20   that looked at all of those laboratory studies,
21   pre-clinical data, clinical data, submitted by
22   manufacturers to support the safety of medical devices.
23    Q    How long did you have that role?
24    A    I spent a year as the director of Office of
25   Device Evaluation.
26    Q    So that would have been around 1992, just before
27   you left to go to the CIR?
28    A    That's correct.

1    Q    You went to the CIR or Cosmetic Ingredient

2  Review in 1993?

3    A    That's correct.

4    Q    How did it come about that you went to the CIR

5  after the FDA?

6    A    I was recruited.

7    Q    By whom?

8    A    The -- an old colleague, an ex-FDA chief

9  counsel, Peter Hutt, reached out and wanted to know if I

10  might be interested in -- in a change of scenery.  Peter

11  and Mr. Ed Kavanaugh, who was the president of the

12  Cosmetic Fragrance Association at the time, recruited me

13  to come take over this position.

14        The then director was retiring and they wanted

15  to bring in somebody with FDA regulatory experience to

16  head up this independent review group.

17    Q    The CTFA the jury has heard about, the Cosmetic

18  Toiletry, Fragrance Association, is the CIR a government

19  agency?

20    A    No, it's not; it's separate.

21    Q    Did the FDA participate in the formation of the

22  CTFA?

23    A    Yes, they did.

24    Q    How was the CIR created?

25    A    Well, the creation certainly predated me, but

26  the records are pretty clear.  Circa 1976, the industry,

27  the Food and Drug Administration, and the Consumer

28  Federation of America met to talk about how could we do a

1    better documentation of the safety information that we

2    have regarding the ingredients that are used in

3    cosmetics?  How would we do that?

4              And they looked at a number of alternatives

5    including, well, the FDA should do it.  FDA opined that

6    it didn't have the resources really to do that.

7              Industry said, well, maybe we could support

8    financially creating an independent review group that

9    would look at it.

10             If you can picture the consumer groups at that

11   point saying, well, it has to be sure to be independent

12   because otherwise why would we trust it?

13             So you can see that dynamic going on.

14             In the final analysis, FDA said, if you can

15   create an independent review group to look at these data,

16   that will work.  The Consumer Federation agreed with

17   that, and the industry, I think, swallowed hard because

18   they were going to have to pay for it, but the trade

19   association bought in as well, and CIR was created.

20        Q    What is the mission of the Cosmetic Ingredient

21   Review?

22        A    Well, it's been pretty constant for over 40

23   years now.  Review and assess the safety of ingredients

24   used in cosmetics in an open, unbiased, and expert manner

25   and take the results and publish them in the

26   peer-reviewed scientific literature.

27        Q    After moving to CIR, did you have a chance to

28   continue working with members of the FDA?

1          A     I'm sorry.  Say that again?

2          Q     Sure.  After you moved to the CIR -- and what

3    role did you have at CIR when you went?

4          A     Oh, I was from day one the director of the

5    Cosmetic Ingredient Review.

6          Q     From the time that you became the director of

7    the CIR, did you continue to work from time to time with

8    people who worked at the FDA in any capacity?

9          A     Yes, in several capacities, not the least of

10   which is that, in having bought into this package of

11   creating the Cosmetic Ingredient Review, FDA continued to

12   participate in the process of actually reviewing the

13   safety of cosmetic ingredients by having a liaison

14   representative as part of the process.  So there were

15   interactions on a regular basis with the FDA Office of

16   Cosmetics and Colors for that reason.

17          But, more frankly, the interactions with FDA

18   came from my involvement with the Food and Drug

19   Administration Alumni Association, and that brought me in

20   contact on a regular basis -- excuse me -- with folks

21   from all over the FDA.  Certainly the Center for Food

22   Safety where cosmetics are -- are dealt with, but every

23   other center at FDA.  So my contact level with FDA didn't

24   really decrease when I went to CIR.

25          Q     You mentioned something in your last answer, the

26   Center for Food Safety relating to cosmetics.  Can you

27   describe that?  Because one is food and one is cosmetics.

28   How does that come about?

1        A      There are oddities about how organizations are

2    titled all over the place.  The overarching regulatory

3    authority that FDA works on is called the Food, Drug, and

4    Cosmetic Act.  Cosmetics are in the title of the law.

5    There's no organization at the major breakdown level that

6    has cosmetics in its name.  It was determined long ago,

7    and I don't know the genesis of the decision, that

8    cosmetics were most like foods, and that that's where the

9    organizational citing of the cosmetics program would be.

10   It's still called the Office of Cosmetics and Colors

11   because it has responsibility for ensuring the safety of

12   cosmetics and color additives.  But it's located in the

13   Center for Food Safety and Applied Nutrition.  If you

14   didn't know any better, you would never know that.

15       Q      You mentioned a few minutes ago that Mr. Peter

16   Huff had previously been chief counsel at the FDA and

17   then had moved on to the CIR; is that correct?

18       A      He had moved on to a position of outside counsel

19   with the CTFA.

20       Q      In your professional experience, is it unusual

21   for government employees to leave government and go to

22   work in the private sector or to leave the private sector

23   and to go back to the government?  Does that happen?

24       A      It does.  I haven't gone back the other way yet,

25   but it happens.

26       Q      Is it unusual?

27       A      No.  It's -- it happens.

28       Q      What were your responsibilities as director of

1    the CIR?

2         A    Oh.  Well, as I described to you the mission

3    statement, assess -- review and assess the safety.  That

4    means gather the scientific information that are

5    available, seek out any unpublished scientific

6    information that might help figure out whether this is

7    safe or unsafe, and package that information in a way

8    that it can be reviewed by the members of the CIR expert

9    panel.

10        Q    Let me ask you -- I'm sorry.

11        A    Go ahead.

12        Q    Let me ask you some questions about the

13   structure of the CIR in a minute.

14        A    Okay.

15        Q    But before I get there, in the course of your

16   work at CIR, did you review human cell studies?

17        A    Yes.

18        Q    Did you review animal studies?

19        A    Yes.

20        Q    Epidemiology studies?

21        A    Yes.

22        Q    Did you do that to assess the safety of various

23   substances that are contained in cosmetic products?

24        A    Yes.  Cosmetic ingredients.

25        Q    Approximately how many cosmetic ingredients has

26   the CIR reviewed in its history?

27        A    Over 5,000.

28        Q    During your time as director, which was from

1    1993 -- and I'm sorry, I didn't get the end date --

2        A    2013.

3        Q    From 1993 to 2013, approximately how many

4    cosmetic ingredients did CIR review?

5        A    Probably 3,500 of those 5,000.  Most of them are

6    under my tenure.

7        Q    And after leaving the CIR in 2013, have you

8    continued to work?

9        A    Yes, I have, sparingly.

10       Q    Would you call yourself semi-retired?

11       A    I think I'm fully retired with dipping my foot

12   in occasionally.

13       Q    How often -- strike that.

14            What types of consulting do you do?

15       A    I aligned with a consulting firm in Virginia

16   that provides the administrative support so that I don't

17   have to handle all of the paperwork part of it.

18            But the things that I've done have been working

19   on, advising a developing cosmetic company on how to

20   construct their labeling.  I've done work through the

21   consulting company on a lawsuit concerned about radiation

22   leakage from electron microscopes, harkening back to my

23   radiation protection days.  And I've gotten involved in

24   this litigation.

25       Q    And you're referring to this talc litigation;

26   correct?

27       A    That's correct.

28       Q    So you've been retired since 2013.  So

```
 1    approximately going on four years now; is that right?
 2         A    Boy, it is four, yes.
 3         Q    And those -- you just listed the different
 4    engagements that you had in that time?
 5         A    Yes.  It wasn't my plan to do a lot.  But it's
 6    nice to keep your hand in.
 7         Q    Did Johnson & Johnson retain your services in
 8    this case to discuss, among other things, the policies
 9    and procedures and practices at the Cosmetic Ingredient
10    Review?
11         A    Yes.
12         Q    How much is Johnson & Johnson being charged for
13    your time?
14         A    $695 an hour.
15         Q    Was that always the rate?
16         A    No, it's -- last year it was 650.  I'm not sure
17    what it was the -- well, let's see.  This is 2017.  And I
18    only started in 2016.  So it was 650 in 2016, 695 this
19    year.
20         Q    Have you been asked to provide an opinion
21    regarding an assessment as to whether talc is safe?
22         A    Yes.
23         Q    Have you been asked to do that to a reasonable
24    degree of medical certainty -- or scientific certainty?
25         A    Well, scientific certainty.
26         Q    Excuse me.  I misspoke.  Scientific certainty.
27         A    Yes.
28         Q    Have you been asked to give an opinion -- or to
```

1    describe, rather, the CIR review process that it
2    undertook regarding talc?
3        A    Yes, that's -- that's the how-it-was-done part.
4        Q    I'd like to shift gears and talk about the
5    process that CIR uses to assess or review ingredients in
6    a general way.  And I assume that that general way that
7    it assesses ingredients would apply to talc as well; is
8    that right?
9        A    Yes, there aren't two ways of doing it.  There's
10   a way we do it, and that's how we do it.
11       Q    Did you help to prepare a demonstrative to just
12   show the overall structure of the CIR?
13       A    Yes.
14            MR. WILLIAMS:  Your Honor, we've provided these
15   to counsel.  This would be Slide 2.
16            THE COURT:  Counsel, have you seen the slide?
17            MR. SMITH:  I don't have a problem with Slide 2,
18   your Honor.
19            THE COURT:  All right.  Thank you.
20            MR. WILLIAMS:  If we could publish that,
21   Mr. Bales.
22       Q    BY MR. WILLIAMS:  Over on the left, Doctor, it
23   talks about the steering committee.  And it says "seven
24   members."
25            Could you describe for the members of the jury
26   whether CIR has rules that define the membership of the
27   steering committee, the seven-member committee?
28       A    Yes.  It's spelled out in very great detail in

1    the CIR procedures by which we operate.

2         Q    When were those procedures put in place?

3         A    Oh, they were done in 1976.

4         Q    What is the makeup -- or is there any particular

5    makeup of the seven members of the steering committee?

6         A    Yes, there is.  It's -- most of the positions

7    are organizational.  So, for example, the American

8    Academy of Dermatology, the physicians group in this

9    country that comprises dermatologists, appoints a member

10   to the steering committee.  The Society of Toxicology,

11   one of the U.S -- well, international, really -- groups

12   of professional toxicologists, the Society of Toxicology

13   appoints a member to the steering committee.

14        The Consumer Federation of America -- I didn't

15   really describe them earlier, but the Consumer Federation

16   is an organization of consumer activist organizations

17   from around the country, public interest research groups

18   from all over, that band together to -- in an effort to

19   assure consumer interests are protected.  The Consumer

20   Federation appoints a member to the steering committee.

21        Q    You covered three positions.  Is there a fourth

22   that is always a member of the committee?

23        A    Well, there's the -- the chair of the CIR expert

24   panel was made a part of the CIR steering committee.

25        Q    So you've now listed four different positions.

26   Are there -- of the remaining three members, who sits on

27   the steering committee as the remaining three members?

28        A    Okay.  The other three members, it includes the

1    president now of the Personal Care Products Council,

2    because it changed its name from CTFA.  It includes the

3    vice president for science at the Personal Care Products

4    Council, and it includes -- I think it's always been an

5    industry person, but the companies change -- an industry

6    scientist who chairs the trade association's CIR Science

7    and Support Committee.

8        Q    So there are four -- excuse me, strike that --

9    there are three members from industry, four members from

10   the scientific community?

11       A    That's correct.

12       Q    Is that intentional?

13       A    Very much so.

14       Q    Why?

15       A    The decisions made about any changes in policy

16   direction, decisions made about who should be appointed

17   to the CIR expert panel, if there's a vacancy, those

18   should be made by a group that is mostly not industry.

19       Q    How are the CIR activities funded?

20       A    The Personal Care Products Council pays the

21   bills.

22       Q    Do they fund the salaries of the people who are

23   the full-time employees of the CIR?

24       A    Yes, they pay the salaries.

25       Q    How about the members of the steering committee?

26   Are they paid?

27       A    You know, oddly enough, no.  All the members of

28   the steering committee in their work, they've always done

1    it just because it's a good thing to do.

2         Q    You mentioned that one of the members of the

3    steering committee is also the chairperson of the expert

4    panel.

5         A    That's correct.

6         Q    Could you describe for the members of the jury

7    the membership of the expert panel and how that works.

8         A    Okay.  Well, the panel of experts -- expert

9    panel -- is a group of nine individuals with medical and

10   scientific backgrounds who are charged with looking at

11   the -- the data that are available on each cosmetic

12   ingredient that's being reviewed.  And they do that at

13   meetings several times a year, and then they come back

14   and repeat it again because there's a lot of cosmetic

15   ingredients.

16        Q    How long do the members of the expert panel

17   serve in that capacity?

18        A    The CIR procedures call for a six-year

19   appointment, and the procedures say that's renewable

20   once.  And then it says, after that, we'll look and see.

21        Q    Are the members of the expert panel that works

22   for -- strike that.

23             Are the members of the expert panel, those nine

24   people, are they paid?

25        A    Yes, they are paid.

26        Q    What are they paid?

27        A    They're paid an hourly rate for the work that

28   they do reviewing material in preparation for each panel

1    meeting.  And that's significant because it's, you know,

2    not like somebody handing me this binder.  It's boxes

3    full of scientific material that they are getting to look

4    at in preparation for an upcoming meeting.

5         So they spend their time with that information,

6    reviewing it.  And they keep track of their hours.  And

7    they submit a time sheet to the CIR afterwards.  For each

8    of the days that they spend at the meeting, they also get

9    paid an hourly rate.

10   Q    The CIR and the PCPC offices at the time that

11   you were last working at the CIR, were they in the same

12   office suite or building, or how was the setup?

13   A    Well, it changed while I was there.  When I left

14   in 2013, the CIR suite was on a different floor -- in the

15   same building, but on a different floor -- from the trade

16   association.

17   Q    Did that fact, the fact that they were in the

18   same building on different floors, affect the

19   independence of the CIR in reviewing?

20   A    No.  The CIR procedures specifically flagged the

21   issue of the CIR program is to be an independent program.

22        So I don't know how much of a measure it is of

23   independence, but whenever someone from the trade

24   association visited the CIR offices, they had to sign in

25   and state the purpose of their visit, just like they were

26   any other non-CIR individual.  So it was a way of keeping

27   track of what was happening and help ensure the

28   independence.

1      Q     Other than the sign-in procedures that you just
2   described, did the CIR take any other steps to ensure
3   that the CIR acts independently of industry with respect
4   to conflicts of interest and the like?
5      A     Well, conflicts of interest is -- is a piece
6   that was, again, in the procedures very specifically
7   applied to the members of the expert panel.
8            Panel members are required to not have any
9   conflicts of interest.  They can't consult for cosmetic
10  companies.  They are to have no financial interest in
11  that group of products that are being regulated -- wrong
12  word.  I keep putting on my FDA hat -- that are being
13  evaluated by the Cosmetic Ingredient Review program.  And
14  those -- that information is provided.
15           Thankfully, we stayed away from forms, but panel
16  members are to tell me about what their interests are and
17  certify that they don't do any work for the cosmetics
18  industry.
19     Q     Let's talk about the expert panel, the
20  nine-person panel.  What does the expert panel do?
21     A     Oh, they review that ton of material at each of
22  their meetings and assess what they think it means.
23     Q     Are there any members of industry on the
24  nine-person expert panel?
25     A     No, there aren't.
26     Q     How is the expert panel -- how are the members
27  chosen to be on the expert panel for the CIR?
28     A     Well, at the beginning, and then any time a

1    vacancy occurs, there's an open public process by which

2    nominations are sought.  The word goes out to scientific

3    societies, medical groups, certainly consumer interest

4    groups, "Here's what we're looking for in terms of expert

5    scientists and physicians.  Can you please nominate

6    somebody whom you think would be good to serve in this

7    capacity."

8            And those nominations are collected.  And it's

9    the steering committee that makes the decision on who is

10   to be selected.

11       Q    Did your expert report list the nine members of

12   the expert panel who were sitting in the nominee expert

13   panel at the time that talc was reviewed by the CIR?  Did

14   you list those names in your report?

15       A    In my expert report?  No, I don't think I did,

16   actually.

17       Q    Can you recite the names of those folks?

18       A    Oh, yeah.

19       Q    Did you help us to prepare a slide with the

20   names of the individuals and their photographs?

21       A    Yes.

22            MR. WILLIAMS:  Your Honor, permission to publish

23   Slide 3 from the package that we gave counsel.

24            THE COURT:  Mr. Smith?

25            MR. SMITH:  No objection, your Honor.

26            THE COURT:  Thank you.

27       Q    BY MR. WILLIAMS:  If you would, Dr. Andersen,

28   start with the first person listed here, which is

1    Dr. Wilma Bergfeld, B-E-R-G-F-E-L-D.  And if you would,

2    for the members of the jury, describe the professional

3    background, starting with Dr. Bergfeld.

4        A    Okay.  I can do that.

5            Wilma Bergfeld is a dermatologist.  She's also a

6    dermatopathologist.  She runs the dermatopathology

7    program at the Cleveland Clinic.  Wilma is a practicing

8    dermatologist, the first woman ever to be the president

9    of the American Academy of Dermatology.  She still works

10   two times a week in the pathology lab looking at slides,

11   evaluating and feeding back to the physicians, was this a

12   cancer, not a cancer, benign cancer, malignant cancer.

13   Looking at tissue samples and reporting back is a big

14   part of her responsibility at the Cleveland Clinic.

15       Q    Let me stop you there.  Was Dr. Bergfeld the

16   chairperson of this panel during the time that talc was

17   reviewed?

18       A    Yes, she was.

19       Q    And therefore, was she the person who also sat

20   on the steering committee at the CIR as well?

21       A    That's correct.

22       Q    Could we move now to James Marks, Jr.

23       A    Jim Marks is also a dermatologist.  At the time

24   that the talc safety assessment was done, Jim was the

25   chair of dermatology at the Penn State Medical School in

26   Hershey, Pennsylvania.  Jim's expertise is primarily in

27   contact dermatitis, how the skin reacts to anything that

28   contacts it.

 1          He also is a major force behind the North
 2  American Contact Dermatitis Group, which is a consortium
 3  of high-level physicians across the country that run
 4  essentially a monitoring service of, whoa, what's new in
 5  terms of what we're seeing in the population as far as
 6  upcoming adverse effects on the skin?  So it's a
 7  monitoring effort.  And Jim was very good about keeping
 8  all of us in touch with what the medical community
 9  actually knows currently.
10      Q    Let's move to Donald Belsito, M.D., at Columbia
11  University Medical Center.
12      A    Okay.  Don is also a dermatologist.  His
13  specialty is in immune-related diseases.  Psoriasis would
14  be an example.  And his expertise in terms of both the --
15  looking at human disease that extends beyond just looking
16  at the skin, as some of these diseases go further than
17  just the surface.
18      Q    Next is Daniel Liebler, L-I-E-B-L-E-R, Ph.D.,
19  from Vanderbilt University School of Medicine.
20      A    Okay, Dan is the director of the Ayers Precancer
21  Detection and Treatment Unit that -- at Vanderbilt's
22  School of Medicine.  He's also a college -- professor of
23  pharmacology, biochemistry, and biomedical informatics.
24  His research relates to what are the mechanisms by which
25  things are carcinogenic.
26      Q    Next is Ronald Hill, Ph.D., from the College of
27  Pharmacy at the University of Louisiana at Monroe.  Could
28  you just describe --

1    A    Okay.  Ron is a medicinal chemist.  And that was

2    important to bring onto the panel because CIR had found

3    itself dealing with a large number of cosmetic

4    ingredients that were derived from botanical sources, and

5    that -- those ingredients are almost always mixtures, and

6    it wasn't always clear what was in them.

7         Ron Hill's background in medicinal chemistry was

8    focused on:  Okay, how do I deal with these mixtures?

9    What happens to them when they get in the body?  What

10   kind of transformations do they undergo?  What kind of

11   transformations do they cause?  And that turned out to be

12   a rather important addition to the panel's expertise.

13   It's certainly chemistry but a focus on medicinal

14   chemistry.

15   Q    Next is Curtis Klaassen, K-L-A-A-S-S-E-N, Ph.D,

16   from the School of Medicine at the University of Kansas.

17   A    Okay.  I mean, Curt is overall a toxicologist.

18   I mean, his subspecialties include pharmacokinetics, a

19   question of what does happen and how is it processed once

20   it gets in the body?  But, overall, he's just well

21   recognized as a leader in the toxicology community.

22        You've heard it said that, you know, when you

23   describe somebody's expertise, he wrote the book.  Curt

24   wrote the book -- probably the most widely used

25   toxicology textbook is Curt's textbook.

26   Q    Next is Paul Snyder, DVM.  What does "DVM" stand

27   for?

28   A    Doctor of Veterinary Medicine.

1    Q    And he is a Ph.D. as well?

2    A    That's correct.

3    Q    At the Experimental Pathology Laboratories.  Why

4    a veterinarian on the board?

5    A    Well, all of that bulk of data that the panel

6    receives includes a bunch of animal studies.  And having

7    somebody -- and certainly Paul is a veterinarian but his

8    particular specialty is veterinary pathology.  So his

9    expertise allows him to look at those studies and make

10   evaluations of what -- of how it was done, what the

11   findings are, and what the interpretations legitimately

12   should be.  His Ph.D. was in immunology, which adds a

13   little bit more of that expertise to the CIR expert

14   panel.

15   Q    Two more.  One, Dr. Thomas Slaga -- is that how

16   you pronounce that? -- from the University of Texas.

17   A    Yes.

18   Q    Describe his background.

19   A    We used to call Tom "Mr. Carcinogenesis."  Tom

20   has been involved in studying mechanisms of

21   carcinogenesis for some 50 years now.  He's headed cancer

22   treatment centers.  I don't know what the acronym stands

23   for -- AMC Cancer Research Center in Colorado.  For a

24   while, he headed the cancer treatment center at the

25   University of Texas Health Science Center in San Antonio

26   until he backed off to have more time doing his research.

27        But his background expertise is in the

28   mechanisms by which cancer is caused.  He started the

1    journal Molecular Carcinogenesis so that there was a way

2    to get more of these studies published in the scientific

3    literature.

4         Q    And finally, Ronald Shank, S-H-A-N-K, Ph.D.,

5    he's professor emeritus from the Department of Medicine

6    from UC Irvine.  Can you describe his background.

7         A    Okay.  Ron, about the time when we were working

8    on talc, moved to his emeritus status.  He had been the

9    director of the environmental health sciences program at

10   the department of medicine at UC Irvine.  He created that

11   program.  I'm not sure when it started, but he was the

12   guy that started it as an overarching program to train

13   scientists in how to evaluate any health concerns

14   relating to environmental pollution.  So it included how

15   do you look at human studies?  How do you look at cell

16   studies?

17            His own particular research, like others on the

18   panel, was on actually the mechanisms of carcinogenesis.

19        Q    Great.  Thank you.  So what are the

20   classifications that the CIR uses to reflect its

21   assessment of the safety of ingredients contained in

22   cosmetics?  What are the different categories or

23   classifications that exist?

24        A    Okay.  Well, the -- again, it's all spelled out

25   in --

26        Q    And let me stop you again.  Did you prepare a

27   slide that lists those categories?

28        A    I think we have one, yes.

1        MR. WILLIAMS:  Your Honor, permission to publish
2  Slide 4.
3        MR. SMITH:  No objection.
4        THE COURT:  Thank you.
5     Q    BY MR. WILLIAMS:  If you would, Dr. Andersen,
6  just describe what each of these categories mean.
7     A    Okay.  Well, safe means that, after looking at
8  all of the available information, the panel determined
9  that it was perfectly okay to use this ingredient in
10 cosmetics.  Almost always -- and safe is a one-word way
11 of saying it -- but almost always the panel says safe in
12 the present practices of use and concentration, because
13 the package that they're presented provides a background
14 on how this ingredient is actually used in cosmetics.  Is
15 it used in creams and lotions?  Is it used in sprays?
16 How is it used and at what concentrations?
17       So they have that information at hand and have
18 increasingly over the years -- I think I pushed them in
19 that direction -- have added that statement of "safe" and
20 look at the report to see how it's used and at what
21 levels it's used.  So that's the safe category.
22    Q    Dr. Andersen, are you familiar with the -- you
23 mentioned that there are approximately 5,000 ingredients
24 that have been reviewed in the history of the CIR.
25    A    Yes.
26    Q    Are you familiar with the data that would
27 reflect how many or what percentage of the ingredients
28 that have been reviewed that have fallen into these

1    different categories?

2        A    Yes, I am.

3        Q    How are you familiar with that?

4        A    I get updates from the CIR staff on what the

5    numbers look like.

6        Q    With respect to the category you just described,

7    the safe category, approximately what percentage of the

8    ingredients that have been reviewed have fallen into that

9    category?

10       A    42 percent.

11       Q    Could you describe the next category, "Safe with

12   qualifications."

13       A    Okay.  "Safe with qualifications," well, it is

14   pretty much what that says.  This ingredient, the panel

15   found, can be used safely in cosmetics if -- and then

16   comes the "if."  Many of those ifs are, it's okay to use

17   in a product that's going to be rinsed off, but don't use

18   it in a product that's a leave-on product.

19            Some of those qualifications are, don't use it

20   above a given concentration.  So put a limit on the

21   concentration of the ingredient that can be used.

22            There are qualifications that talk about

23   ensuring that the consumer is alerted to a particular

24   issue.  So you've actually included in -- well, I don't

25   know -- I guess in a couple now -- specific language that

26   said that the qualification should include providing

27   warning information to a user.

28       Q    What percentage of the ingredients that have

1    been reviewed by the CIR have fallen into the "safe with

2    qualifications" category?

3        A    It's virtually -- you know, 56 1/2 percent.

4    Almost -- it's almost all of the rest.

5        Q    And let's talk about the "unsafe" category.

6    Approximately how many ingredients have been identified

7    as unsafe by the CIR based on its review in its history?

8        A    I think CIR's -- I don't think anything new that

9    I can recall.  So we're up to 13 ingredients that have

10   been identified as unsafe for use in cosmetics.  It's

11   about 1 percent.  Let's see, 5,000 -- I can't do the math

12   in my head.

13       Q    Now, 5,000 products reviewed, only 13

14   ingredients found to be unsafe.  To what do you attribute

15   that relatively small number?

16       A    Oh, I -- I don't see it as a small number.

17       Q    Explain.

18       A    The expectation is that ingredients used in

19   cosmetics are safe.  That's kind of the mindset that you

20   ought to have going into this.  And I feel pretty pleased

21   that we were able to identify 13 ingredients that said

22   get them the heck out of cosmetics.  That's an important

23   accomplishment from my standpoint.

24       Q    The final category is "insufficient data."  What

25   does that mean for purposes of the review panel?

26       A    It -- it means that, as much information as we

27   gathered and try as we would, it just isn't enough

28   information on which to make a determination.  And we

1    can't say it's unsafe; we can't say it's safe.  We can't
2    even put a qualification on it.  We just don't know
3    enough.  And --
4        Q    Let me stop you there.  If something is put into
5    the insufficient data category, can it go there forever,
6    or is there any time limit by which something has to be
7    done about it to take it out of the insufficient data
8    category?
9        A    Yes.  I think -- I mean, insufficient data is
10   kind of -- you're left hanging.  So what happens next?
11            The CIR procedures specify that a two-year clock
12   starts.  And within that time frame, any interested
13   party -- I mean, it talks about any interested party.
14   The message is, "Dear industry, provide us the data.
15   It's your ingredient; give us the data."
16            And if, at the end of those two years, the data
17   are not provided, it moves into a category that says
18   "should not be used in cosmetics."
19       Q    And let me stop you there.  In the insufficient
20   data category, I take it that's about 1 percent as well?
21       A    Yeah, it's the remaining.
22       Q    Okay.  What category was talc placed in after
23   the CIR conducted its review of talc?
24       A    Talc is in the safe category.
25       Q    During the -- and that was on the basis of --
26   what -- how long -- from the time talc was first reviewed
27   or put up for review to the time that a CIR report was
28   prepared, how much time elapsed?

1          A      In your question were you referring to
2     preparation of an initial report or a final report?
3          Q      Well, let me be more specific.
4                 I'm going to ask you in a minute how it came to
5     be that talc was reviewed.  But before we get there, from
6     the point in time where talc was put up for review to the
7     point in time when a final report was done by the CIR on
8     talc, how much time elapsed approximately?
9          A      About a year and a half.
10         Q      With respect to the safe evaluation for talc
11    that ultimately occurred, was there -- was this a close
12    call based upon your years of experience?
13         A      That's an interesting question.  It sure didn't
14    seem like it.  The panel was -- was very clear in their
15    evaluation of the data and that it supported the safe in
16    the present practices of use and concentration
17    conclusion.
18         Q      Let me ask you a question about those
19    ingredients that have been rated or categorized over the
20    years in categories other than the safe category, so safe
21    with qualifications or unsafe.
22                In those situations where an ingredient was
23    listed as either safe with qualifications or unsafe, were
24    there industry representatives making comments that they
25    believed the ingredients should be listed as safe?
26         A      It did not occur.  I mean, self-interest is a
27    powerful thing, and folks would make comments.  But the
28    focus of the CIR expert panel discussions is -- is just

1    so uniformly on the science that the opinion issue

2    doesn't really come to play.

3        Q    For each of the products that have been

4    categorized as unsafe -- strike that.

5             For each of the ingredients -- excuse me -- that

6    have been categorized as unsafe or as safe with a

7    qualification, I take it there was an industry behind

8    that ingredient and product that was seeking a safe

9    evaluation?  Would that be accurate?

10       A    My perception of the industry participation over

11   my 20 years is just slightly different spin than you are

12   phrasing it.

13       Q    Please go ahead.

14       A    The industry input is best categorized as

15   wanting to get to the right answer.  I mean, yes, there

16   was self-interest that was expressed at times, saying "I

17   want this to be safe."  But, by far, the tenor of the

18   input over my 20 years there was, let's get to the right

19   answer.

20       Q    Let's move into the review of talc.  Did the CIR

21   specifically review and consider whether talcum powder is

22   safe for use in the perineal area by women?

23       A    Yes, that was part of the safety assessment.

24       Q    Does the CIR have a set procedure for reviewing

25   the safety of an ingredient?

26       A    Yes, we do.

27       Q    Did the CIR apply those rules and procedures to

28   its review of talc?

1      A    Yes.

2      Q    How is it that talc came to be selected for

3  review, and when did that occur?

4      A    Okay.  The CIR expert panel is assigned the

5  responsibility of establishing the priorities for review.

6  Nobody else.  It's -- the panel says, "This is going to

7  be our top priority for review."

8           They use a number of factors in making that

9  determination, but right at the top of the list is how

10  frequently is this ingredient used in cosmetics.  And the

11  panel has that at the top of the list because that's

12  likely an indicator of how many people are going to be

13  exposed.  So that's important.

14      Q    Was the -- was the CIR provided a list of the

15  approximate number of products that contain talc in

16  making the assessment that you just described?

17      A    Yes.  The U.S. Food and Drug Administration

18  maintains a Voluntary Cosmetic Registration Program,

19  VCRP.  And companies submit information on their use of

20  ingredients to FDA, and FDA captures all of that

21  information.  And each time CIR does a safety assessment,

22  FDA provides that information to CIR on the -- on the

23  types of products and the -- the frequency in that

24  product category.

25      Q    Approximately how many products contained talc

26  at the time a decision was made to review talc?

27      A    I couldn't give you that number unless I looked

28  at the table.

1    Q    Okay.  Let me see if I can refresh your memory.

2  Would looking at the CIR report itself help to refresh

3  your memory?

4    A    Okay.  The safety assessment.

5    Q    In that notebook in front of you, there's an

6  exhibit -- it should be marked as Exhibit L384.

7    A    Got it.  Okay.

8    Q    Do you have that there?

9    A    I do.

10   Q    And if you would --

11        And don't publish this, Mr. Bales.  This is just

12  to refresh his memory.

13        If you turn to page 5 of L384, it should have it

14  there.

15   A    Yeah, I've got it.  It's the total number of

16  uses reported was 3,469.

17   Q    Was that 3,469 number of products containing

18  talc the primary factor that pushed the CIR to review the

19  safety of talc?

20   A    Yes, it was.

21   Q    Approximately when was it that CIR decided it

22  would review talc?

23   A    CIR had initially put it as a priority in 2009.

24  And then, unfortunately, I lost a staff person who was

25  working on it, so it went into a bit of a limbo.  And

26  then I assigned it to a new staff person who began work

27  in late 2011.  And she worked on it continuously until

28  its completion.

1    Q    Who was that staff member?

2    A    Monice Fiume.

3    Q    Would you spell that, please?

4    A    M-O-N-I-C-E, F-I-U-M-E.

5    Q    What is Ms. or Dr. Fiume's --

6    A    Ms.

7    Q    -- Ms. Fiume's educational background?

8    A    Bachelor of science degree and a master's

9    degree.  She had worked doing animal testing and research

10   before she came to CIR.

11       Q    Did the decision to review talc by the CIR

12   relate to numbers of claims, publicity, anything of that

13   kind relating to talc?

14       A    No, it didn't.

15       Q    Had talc ever been reviewed before by the CIR?

16       A    No.

17       Q    Have there been occasions where a request has

18   been made to the CIR to have a particular ingredient

19   reviewed?

20       A    Well, yes, there have been.

21       Q    Can you give us an example?

22       A    Probably the most requests for CIR to

23   immediately start something and do a safety assessment

24   have come from FDA.  FDA didn't ask us to review talc,

25   but FDA has asked to review ingredients of --

26   formaldehyde and methylene glycol is used in

27   hair-straightening products.  FDA asked the panel to

28   review alpha hydroxy acids that are used in skin lotions

1    and are supposedly to help smooth out your skin.

2            I would have to go back and see if I can come up

3    with others -- they were --

4        Q    That's all right.

5        A    It's not infrequent, but it's not frequent

6    either.

7        Q    Were there any requests by the FDA or any other

8    organization for a review of talc by the CIR?

9        A    No.

10       Q    Had the CIR ever received requests that a review

11   of talc should be accelerated because of any safety

12   concern for talc?

13       A    No.

14       Q    What's the next step after naming an ingredient

15   to be put on the priority list for review -- what is the

16   next step that has to happen?

17       A    Once it's assigned as a priority ingredient, you

18   begin to gather the data.

19       Q    And how were the scientific data compiled in

20   this case?

21       A    Searching through as many scientific search

22   engines as you can use to find what information has been

23   published.

24            We had the advantage in this circumstance of

25   also involving Dr. Ivan Boyer who was a toxicologist on

26   the CIR staff.  Ivan and Monice worked side by side to --

27   to really harvest the information from whatever source we

28   could find.

1    Q    Is there some formal name that's given to the
2  group of materials that were compiled in this case by
3  Dr. Boyer and Ms. Fiume?
4    A    Yes, CIR calls it a scientific literature
5  review.
6    Q    And what is that?
7    A    Well, it's that collection and description -- I
8  mean, it's a bibliography at the end which says here's
9  what we looked at.  But in the text it describes what
10  each of these studies was, what it did, and what it
11  found.  No value judgments; it just presents what the
12  study was and what the findings were.
13        And it breaks those out into some logical
14  organization.  Cell studies are bunched with cell
15  studies, animal studies with animal studies, epidemiology
16  is with epidemiology.  And that literature review is --
17  we call it published.  I mean, it's put on the website,
18  and the notice is, this is available -- freely available
19  to anybody that wants it for public comment.  There's a
20  60-day public comment period.  So any interested party
21  can review what we came up with for the scientific
22  literature.
23    Q    Let me stop you there.  I'm sorry to cut you
24  off.  Let me just ask a question.
25        Once the scientific literature review package is
26  pulled together, can panel members, members of the review
27  committee -- the nine folks that you listed earlier --
28  can they ask for more information?

1          A     They haven't seen it yet.  So at that stage,

2     they wouldn't be asking for more information.  Their shot

3     comes at the next step.

4          Q     You indicated that the scientific literature

5     review package, that compilation, you said that it's made

6     public.  Can outsiders -- industry, academia, consumer

7     groups -- can others weigh in on the data selection?

8          A     Everybody.

9          Q     Did that happen in the case of talc?

10          A     I mean, not in a substantial way.  We did get

11     input but from a very narrow sector.

12          Q     Was there industry input on the -- the universe

13     of literature that was compiled?

14          A     I think we received from one source a

15     bibliography of here's what we found.  You know, here you

16     are, CIR.

17          Q     Are those submissions made public?

18          A     Yes.

19          Q     Was the entire scientific literature review data

20     made public?

21          A     Yes.  It's the hallmark of the CIR process that

22     everything is going to be made public.

23          Q     And when you say "everything," you're referring

24     in this case to the specific literature review that is

25     the universe of materials?

26          A     The literature review.  Since the comments we

27     receive aren't published anyplace, we make all the

28     comments public.  So it's a process that celebrates the

1   openness.

2       Q     After that 60-day comment period that you

3   referenced, what happens next?

4       A     All of the -- any input that CIR received is

5   incorporated with the original scientific literature

6   review, and what we call a draft report is prepared.

7   It's still really just that presentation of the available

8   science, but it now has added to it anything that -- that

9   we've received.

10          And that draft report, two things happen.  One

11  is that it's published on the website.  So, again, any

12  interested party can look at it.  It's part of the agenda

13  for an upcoming CIR expert panel meeting.

14          And then it goes both to any interested party,

15  because it's on the website, and, in particular, at this

16  point in time, we had just started doing --

17  electronically providing material to the panel.  So they

18  were getting it all at the same time.

19      Q     Let me stop you there.

20          Did the PCPC provide information to -- that was

21  included in the scientific literature review package?

22      A     Not in front of preparing the scientific

23  literature review, but in response to the scientific

24  literature review, we received input from the trade

25  association.

26      Q     Do you remember any specific type of data that

27  they provided, the PCPC?

28      A     Oh, to be honest, most of it reads like typos.

1    But, you know, you'd get a comment that said that you had
2    a guinea pig study that you included in the
3    single-dose-exposure part of your report, but it also
4    looked for cancer, so please also mention it in the
5    cancer section.
6          That's good input.  It helps make sure that, as
7    you read the report, nothing gets mixed.  So that it's
8    either typos or highly technical comments on the science.
9      Q    Do you recall when it was that the scientific
10   literature review was made public?
11     A    August 2012, I think.  The day in August, I
12   don't remember.
13     Q    And you mentioned already the 60-day comment
14   period.  Did there come a point in time when the draft
15   report was prepared?
16     A    Yes.
17     Q    When was that?
18     A    That was November of 2012.
19     Q    Who prepared the draft report?
20     A    Monice Fiume, Ivan Boyer, and Al Andersen.
21     Q    That's you; right?
22     A    Yep.
23     Q    Were there comments received in response to the
24   draft report?
25     A    Yes, I think we did get some comments.
26     Q    And I got ahead of myself.  Was the draft report
27   made public?
28     A    Yes, it was put on the CIR website as a PDF.

1    And anybody that wanted to download it could download it

2    and look at it.

3        Q    When was the first meeting of the actual expert

4    review panel after that draft report was prepared?

5        A    December of 2012.

6             MR. WILLIAMS:  Your Honor, I was about to go

7    into that meeting.  Would this be an appropriate time?

8             THE COURT:  It would.  Let's take a 10-minute

9    recess, stand up and stretch.  Leave your notes here and

10   please take a short recess with the usual admonitions in

11   mind.

12                        *[2:59]*

13           (Jurors excused.)

14           (Brief recess taken.)

15           THE COURT:  All right.  Back on the record with

16   all jurors here, the witness on the stand.

17           Go ahead, Mr. Williams.

18           MR. WILLIAMS:  Thank you, your honor.

19                        *[3:14]*

20       Q    BY MR. WILLIAMS:  Dr. Andersen, just before the

21   break we had moved through time and had just gotten to

22   the point where the first expert panel meeting relating

23   to talc occurred.

24           Do you have that time frame in mind?

25       A    Yes, I do.

26       Q    When was it that the first expert panel meeting

27   took place?

28       A    December of 2012.

1    Q    How often does the expert panel meet each year?

2    A    The panel meets four times a year.

3    Q    And at each one of those meetings, over what

4  period of time does it occur?  One day?  Two days?  Three

5  days?

6    A    Each meeting is a two-day meeting.

7    Q    So there are eight days in a given year that the

8  entire expert panel meets together?

9    A    That's correct.

10   Q    Does the expert panel consider multiple

11 ingredients at a time?

12   A    Yes.

13   Q    Are the expert panel meetings open to the

14 public?

15   A    They are.

16   Q    Are the meetings recorded?

17   A    They are.

18   Q    Could you explain generally how an expert panel

19 meeting is run.

20   A    Yes, I can.

21   Q    Please do.

22   A    On the first day of a CIR expert panel meeting,

23 something I instituted, I break the expert panel into two

24 teams, and they each separately review all of the

25 material.  Scientists can be as competitive as anybody

26 else.  And it's an approach that really pushes each of

27 these two review teams to do their best job they can at

28 assessing the available information.

1          And on day one of the meeting, each of the
2    review teams goes through everything separately.
3        Q    At the conclusion of the first day -- strike
4    that.
5          Do the two teams spend the entire first day in
6    their separate groups?
7        A    Yes.  I mean, sometimes one team will make it
8    until five o'clock.  Another team might actually finish
9    by a little before 4:00.  They work at slightly different
10   paces, but, yeah, they spend the whole day at it.
11       Q    Before the members of the expert review panel
12   come together for those meetings, what types of materials
13   have they received and how long have they had them?
14       A    We usually ask that question in terms of how
15   many boxes that we send them.  It's just -- it's
16   everything.  It's the draft report, which is usually the
17   least of it.
18          Any unpublished data that Monice and Ivan and I
19   had included in that draft report, the panel got the full
20   unpublished data.  The panel developed the practice of
21   telling us, "Don't send us the published studies."
22   Because, frankly, we're all back home here at academic
23   institutions and it's really easy to do one of two
24   things:  either just get on the internet and pull up
25   the study, because our access at the library allows us to
26   just do that; or, we can get a copy printed out from the
27   university library.
28          So they said, "Don't send us the published

1    studies; we'll get those on our own."

2        But we have to send them the unpublished data

3    because they're unpublished.  I mean, nobody else has got

4    them.  So they get all of that to look at.  They get

5    whatever input was provided to CIR from outside -- all

6    those comments on the SLR, the comments themselves were

7    provided to the expert panel so that they could see what

8    was said and, arguably, could act as a quality control on

9    CIR.  So if CIR said, "Well, I don't think this change is

10   needed technically," the panel can look at what was

11   suggested and say, "CIR, make the change."

12       So it provided everybody with all of the

13   information.

14   Q    So taking us back to the meeting, we went

15   through the first -- got through the first day.  What

16   happens at the second day of the meeting?

17   A    The second day, the full panel convenes, all

18   nine people.  And, one by one, they go through the safety

19   assessments that were on the agenda for that meeting.

20   Q    Who presides at that meeting on the second day?

21   A    Dr. Wilma Bergfeld runs the meetings.

22   Q    As CIR director, did you attend the expert panel

23   meetings?

24   A    Yes.

25   Q    And I'm asking relating to talc, of course.  Did

26   you attend --

27   A    Well, I attended every one, talc or not.

28   Q    Did you review all of the material that had been

1    provided to the expert panel?

2        A    Yes.

3        Q    Did you participate in the discussions with the

4    expert panel?

5        A    I did.

6        Q    Did you have a vote?

7        A    No, I don't have a vote, but I get to talk.

8        Q    What happened at the December 2012 expert panel

9    meeting -- I'm directing your attention to the second

10   day -- with respect to talc?

11       A    I can't -- I'd have to really look at the

12   transcript to see which team moved to declare that talc

13   was safe in the present practices of use.  But it's

14   usually one of the team leaders makes a motion and the

15   other team leader seconds it.

16            And then they go into a discussion of anything

17   that they think needs to be said regarding the motion to

18   reach a conclusion.  And that's usually substantial.

19   "Here is what we want to see in the discussion."

20            They don't sit there in the meeting and actually

21   write the discussion, but they do talk about what they

22   want to see in the discussion that supports their

23   decision to reach this tentative conclusion.

24            And in our parlance, that tentative conclusion

25   is an important step.  It's not done.  We're tentatively

26   saying this is what we think the right answer is for this

27   particular ingredient or ingredient group.

28       Q    Is that tentative conclusion that you just

1    referenced something called a tentative safety

2    assessment?

3         A    That's correct.

4         Q    The tentative safety assessment for talc was

5    published approximately when in 2012?

6         A    Ten days after the meeting, so December 18th or

7    so.  I'm not sure I remember the exact day, but it was

8    mid-December of 2012.

9         Q    Is there a comment period after the tentative

10   safety assessment is prepared?

11        A    Yes.  Again, that's part of the procedures.

12   There's an opportunity -- a 60-day comment period for

13   anybody that wants to provide input to CIR.

14        Q    Did the expert panel receive comments on the

15   tentative safety assessment?

16        A    Yes, we did.

17        Q    Did it receive comments from industry?

18        A    Yes.

19        Q    What sorts of comments?

20        A    A lot of comments, most, again, highly

21   technical, relating to how things were organized and what

22   study should be put where.  There were technical comments

23   on one particular study on cocarcinogenesis of a chemical

24   called benzo[a]pyrene.  And in the draft report, the

25   staff and the panel had used a description of the assay

26   involved that was really quite old.

27             And the technical comment came in from the trade

28   association that, in fact, there was newer information

1    available about how you think of this as a potential

2    cocarcinogen.

3            And the trade association recommended that we

4    just delete all reference to that because it was no

5    longer relevant.  That's an example of the kind of input

6    that was received.

7        Q    Did all of the information that the CIR received

8    from industry become available to the public?

9        A    Yes.

10        Q    How, if at all -- or how would you characterize,

11    Dr. Andersen, the impact that industry comments had on

12    the evaluation being conducted by the expert panel?

13        A    On the evaluation, not much.  I mean, it's

14    always useful if somebody can find a technical issue that

15    ought to be fixed or improved.  As I think of it, that

16    doesn't really impact on the actual evaluation; that just

17    improves the quality of the document.  You know, a

18    comment -- another comment I recall we received was, "You

19    should really expand" -- the comment wasn't "expand" --

20    the comment was, "You should change how you describe what

21    talc is."

22            And you know, we read that, and we looked at

23    what they were saying, and, yes, this is another way of

24    describing the structure of talc and explaining why it

25    actually works to reduce friction.  But the -- the

26    chemist on the CIR staff said that's -- that's not the

27    right way to do it and our way was wrong; it's just

28    another way of saying it.

1    So, yeah, it seemed like a good compromise.  But

2    that -- that doesn't rise to the level of saying, did it

3    influence our evaluation?  No, I don't think we received

4    much input that really influenced the evaluation.

5    Q    Was there a final draft report that went to the

6    public?  And, if so, when was it published?

7    A    Okay.  Well, that's -- that's the next step.  So

8    we're in December of 2012, and we've issued this

9    tentative safety assessment with a 60-day clock.  Talc

10    was scheduled to be reviewed at the March 2013 meeting,

11    which, you know, in preparing for the meeting meant that

12    sometime early February, we really wanted to hear from

13    any interested party so we could provide that information

14    to the expert panel.

15    Nobody is ever timely.  We got some -- I mean,

16    not unsubstantial, but we got some input by the deadline

17    we had set, because we got to package this stuff, put it

18    in boxes, and sent it off to the panel again for them to

19    review it.  We got some information that came in very

20    late.  And in the panel's lovely parlance, it developed a

21    life of its own.  There was a wave two package of

22    documents.  And, again, it was a lot easier this time

23    because we were doing everything electronically.  So

24    there was a draft -- you know, I should back up.  I'm not

25    being as clear as I otherwise could have.

26    In response -- we've got the tentative safety

27    assessment.  We receive input.  What Monice and Ivan and

28    I did was take all of that input and prepare a draft

1    final, because that's going to be the next step.  The

2    draft final then is part of this electronic package that

3    goes out to the panel.  All the comments go out to the

4    panel.  And then, wave two, all of the comments that came

5    in late go out to the panel.  But all of that's on the

6    website, the comments.  The panel has it, the public has

7    it.  Nothing is not public.

8        Q    Let me stop you there for a moment.  Is there

9    any point in time when the members of the panel actually

10   provide line edits on any of these draft reports that we

11   have been discussing?

12       A    Oh, they provided line edits at each of the

13   stages.  When we sent them that draft report in December,

14   I could have a red ink franchise for the comments that

15   come back of providing us input.  I mean, it's not

16   negative input.  It's, you know, this is what I think of

17   this study.  This is, you know, my particular expertise.

18           That then occurred on the draft final safety

19   assessment that we sent out in preparation for the March

20   meeting.  Every chance they get, a draft -- a report,

21   they mark it up.

22       Q    So do you remember the date of the March meeting

23   that you just referred to?

24       A    Uh --

25       Q    Sometime in March of 2013.

26       A    Yeah.  No, I don't remember the actual days.

27       Q    And that was the second expert panel meeting

28   relating to talc?

1      A      That's correct.

2      Q      Did -- is there an opportunity for members of

3   the public or industry to speak at that meeting?

4      A      Yes, they're open public meetings.

5      Q      Did industry members speak at that second

6   meeting, the March 2013 meeting?

7      A      Yes, there were industry representatives who

8   spoke.

9      Q      Do you recall who spoke?

10     A      No.

11     Q      Do you recall how long they were given to speak?

12     A      Oh, it turns out that -- at this meeting, there

13  were no formal presentations.  As part of the panel

14  discussions, there were questions about information that

15  the panel had asked to come in from industry, and there

16  was dialogue about what is this we got, what does it

17  mean, et cetera.

18         So industry, as any member of the public, is

19  actually invited to participate in the open panel

20  discussion.  It's not just the panel; it's anybody that

21  wants can participate, preferably after they've raised

22  their hand and asked permission.  But it's a

23  participatory process, and there were some industry

24  inputs during that.

25         Had somebody asked for time to make a formal

26  presentation, that time would have been granted.  And I

27  think I usually recommended that that be no longer than

28  an hour, preferably less.

1        Q     Mr. Bales, could we publish page 3 again, which

2    is the listing of the expert panel members again.

3              Dr. Andersen, did the comments that were

4    received by the expert panel -- either in the first step,

5    the draft report, or the draft final report -- did the

6    comments from industry or members of consumer groups,

7    whatever, in your view, impact the CIR expert panel's

8    evaluation in any way?

9        A     Not in my view.

10       Q     Was there a vote taken ultimately as to the

11   approval for that final report that was prepared?

12       A     Yes, it was unanimous.

13       Q     When was that vote taken?

14       A     The second day of the meeting in March,

15   whichever day that was.

16       Q     After that vote -- strike that.

17             At the time that vote is taken, is the report in

18   a final form or there's work to be done still after the

19   second meeting?

20       A     There's work to be done still.  The panel

21   discussion almost always includes some element of

22   tweaking of the discussion section that they had

23   reviewed, not so much in the body of the report, but the

24   discussion section is just always tweaked to some extent.

25             And each panel member, again, has done their

26   markups of technical comments.  And the routine statement

27   is, "Well, yes, I've made technical comments on the

28   document.  I'm very comfortable.  The CIR staff can just

1    deal with those technical comments.  They aren't anything
2    that we need to discuss as a full panel."
3            Just about everybody goes through that litany.
4    All the panel members make some version of that piece of
5    input.  And then they reserve their time for talking
6    about the things that they actually think are significant
7    to talk about.
8        Q    Was there any discussion at the second meeting,
9    the March meeting from 2013, regarding the use of talc on
10   broken skin?
11       A    Yes, that was a discussion.
12       Q    Can you relate that to the jury.
13       A    Well, from the very beginning, the panel had
14   acknowledged that there is information that suggests that
15   if talc is applied to an open wound, that there is the
16   possibility that a granuloma can form.  The panel didn't
17   consider that a significant finding of concern because
18   talc is just not applied to skin that has got an open
19   wound on it.
20           But the panel really wanted to mention that and
21   they did so.  And they talked about, "Just how do you say
22   it?"  And it turns out it's not as easy to say as you
23   would think it is.  I mean, the concept was if the skin
24   is intact, you're home free.  Now, how do you talk about
25   skin not being intact?
26       Q    Did the final report include the discussion of
27   the language that was ultimately worked out with respect
28   to granulomas?

1     A    That's correct.  It did.

2     Q    When was it that the final report was actually

3  buttoned up and put in final form?

4     A    I think it was about a week and a half, no more

5  than two weeks after the meeting.

6     Q    Let me ask you to take a look at Exhibit L384 in

7  your binder.

8     A    Okay.  That's what we just did, yeah.

9     Q    Is Exhibit L384 the final version of the report?

10    A    It's the final final version.

11    Q    Okay.

12    A    You know, I described earlier the mission of the

13 CIR kind of at the end of it was that phrase "and publish

14 in the peer-reviewed literature."  Well, the CIR safety

15 assessment that was late -- mid-March of 2013 was the

16 final CIR safety assessment.  And that was published on

17 the website.  And anybody who wanted to look at it can

18 look at it.  So the final safety assessment was done.

19 But we have one more step.  And that is the

20 organization's commitment to publishing it in the

21 scientific literature.

22         Not everybody knows to go to the CIR website to

23 get this information.  And we were committed to

24 publishing it so that as many people as possible would

25 have access to it.  That's what this document is.

26    Q    So the final report was published on the website

27 in 2013; am I right?

28    A    That's correct.

```
 1        Q     And the final final, as you've described it, is
 2   the document in front of you, L384, which was published
 3   in 2015?
 4        A     That's correct.
 5        Q     Was it published in the International Journal of
 6   Toxicology?
 7        A     That's correct.
 8        Q     Is that a well-regarded scientific publication?
 9        A     That's a -- I think it's well regarded.  For us,
10   one of the hallmarks of submitting for peer review at the
11   International Journal of Toxicology is the first word,
12   "international."  We really like to get this word out
13   as -- just widely as possible so that anybody who wants
14   can see what we have done and agree, disagree.  But at
15   least we get out this information so that it's widely
16   available.  And international seemed like a really good
17   idea.
18        Q     And take a look at the first page of Exhibit
19   L384.
20              And no need to publish it, Mr. Bales.
21              I just want to establish the authors of the
22   final report.  I see a number of names there.  Can you
23   describe -- you don't have to list the names, but just
24   describe who the people were as -- from categories who
25   are actually listed as authors of the final report.
26        A     Okay.  Well, it's -- it's Monice Fiume and Ivan
27   Boyer who did most of the heavy lifting.  It's all of the
28   members of the CIR expert panel because they put their
```

```
 1    scientific imprimatur on it.  And it's me because I was
 2    orchestrating the whole thing.
 3        Q    And that is it?  It's the seven -- excuse me --
 4    the nine folks who are on the board, the two staff
 5    members, and yourself?
 6        A    Yes.  I hope it adds up to 12.  It's supposed
 7    to.  Nine and three, yes.
 8        Q    Did you help to prepare a demonstrative that
 9    states the conclusion that was set forth in the CIR final
10    report?
11        A    I believe I did.
12            MR. WILLIAMS:  Your Honor, permission to publish
13    Slide 5?
14            THE COURT:  Mr. Smith?
15            MR. SMITH:  Can I take just a second, your
16    Honor?
17            THE COURT:  Yes.
18            MR. SMITH:  Thank you.
19            No objection.
20            THE COURT:  Thank you.
21            MR. WILLIAMS:  If we could publish that,
22    Mr. Bales, Slide 5.
23            No, 5.  This one here.
24            I can use the ELMO.  Just switch over.  My
25    apologies.
26        Q    BY MR. WILLIAMS:  Dr. Andersen, is this the
27    conclusion that was reached by the CIR panel?
28        A    That is the conclusion they reached.
```

1    Q    Could you read your slide.

2    A    "The CIR expert panel concluded that talc is

3    safe for use in the present practices of use and

4    concentration as described in the safety assessment."

5    Q    Do you still have Exhibit L384 in front of you?

6    A    Yes, I do.

7    Q    Could you turn to the end of that document and

8    tell the members of the jury the number of references to

9    literature that are listed there.

10   A    There are 218 citations.

11   Q    Dr. Andersen, in the published report which was

12   published in the International Journal of Toxicology, did

13   the CIR explain its rationale for its conclusion that

14   talc is safe?

15   A    Yes, it did.

16   Q    Did the report set forth in summary fashion

17   the -- its reasoning?

18   A    Yes, it did.

19   Q    Did it do that in bullet point form and in text

20   form?

21   A    It did it both ways, yes.

22   Q    Have you prepared a slide that sets forth in

23   bullet point form the bases for the conclusions?

24   A    Yes, I did.

25        MR. WILLIAMS:  Your Honor, permission to publish

26   page 9 of the slides we provided?

27        THE COURT:  Any objection?

28        MR. SMITH:  No objection.

1              THE COURT:  Thank you.

2       Q    BY MR. WILLIAMS:  And if you would, Mr. Bales,

3    let's pull out the top half if we can, just to make it so

4    it's a little bit bigger, if there's any way to make it

5    bigger.

6              At the top, Dr. Andersen, it says "critical

7    issues that called into question the validity" -- can you

8    folks read that, the top line?

9              THE COURT:  Can everyone see that?

10      Q    BY MR. WILLIAMS:  It says, "critical issues that

11   called into question the validity of the statistically

12   significant associations."

13             What is that referring to?

14      A    The panel had spent page after page after page

15   going through the available epidemiology studies that

16   looked for an association between talc and ovarian

17   cancer.  And this is now, at the end of all of that,

18   "Here is what we think."

19      Q    The first thing that's listed here is "absence

20   of persuasive evidence that talc can migrate from the

21   perineum to the ovaries."

22             And would it be accurate to say that there are

23   some studies that say talc could migrate, some could not?

24   Is that accurate?

25      A    Well, I think that was certainly the sense of

26   the CIR expert panel.  They had the view that --

27             MR. SMITH:  Object, your Honor.  This is

28   hearsay.  I mean, if he wants to state personal

1    knowledge -- I mean, this is the expert panel.  And it

2    says what it says in the report.  Hearsay.

3          THE COURT:  Sustained.

4    Q    BY MR. WILLIAMS:  Let me ask you, based upon the

5    review that you heard and the studies that you saw cited,

6    what is your view on the issue of migration?

7          MR. SMITH:  I'm going to object.  We haven't

8    established that he has gone through and done all the

9    review of migration.  It's the expert panel, he said, did

10   all this.

11         THE COURT:  Sustained.

12   Q    BY MR. WILLIAMS:  Dr. Andersen, did you

13   participate in the discussion of the expert panel with

14   respect to each of the nine bullet points that are

15   appearing on the screen?

16   A    Yes, I did.

17   Q    Did you read the studies that supported all of

18   the discussion that took place at both the initial

19   meeting of the panel and the second meeting?

20   A    Yes.

21   Q    Were you present --

22   A    I do that with every safety assessment.

23   Q    Were you present for all of the discussion as it

24   related to migration that occurred?

25   A    Yes.

26   Q    Did you read studies relating to it?

27   A    Yes.

28   Q    What was your view regarding the issue of

 1   migration?

 2           MR. SMITH:  I'm going to object, your Honor, as

 3   outside the scope of his report.  This is not in his

 4   report.

 5           MR. WILLIAMS:  Actually, this bullet point that

 6   I'm asking Dr. Andersen about is in the report, your

 7   Honor.  I think it's on page --

 8           MR. SMITH:  If he can show it to me, that's

 9   fine.  I don't have a problem.  I could be mistaken.

10           THE COURT:  Bear with us for just a minute,

11   folks.

12           MR. WILLIAMS:  Your Honor, it's on page 54 of 64

13   of Exhibit L384.  It's the very first bullet point.

14           MR. SMITH:  Excuse me.  That's the CIR report?

15           MR. WILLIAMS:  Correct.  It's Exhibit L384.

16           THE COURT:  I think Mr. Smith is making a

17   reference to Mr. Andersen's litigation report.

18           MR. SMITH:  That's correct.

19           MR. WILLIAMS:  Oh, I'm talking about Exhibit

20   384.

21           THE COURT:  I think Mr. Smith is talking about

22   the report that Mr. Andersen wrote.

23           MR. WILLIAMS:  Oh, understood.  I understand.

24           It's Dr. Andersen.

25           THE COURT:  Sorry.

26      Q    BY MR. WILLIAMS:  Dr. Andersen, did you in your

27   report discuss the -- did you incorporate by reference

28   the CIR report in your report?

1    A    Um --

2    Q    In other words, did you reference --

3    A    I talked about it as the basis for -- for my

4    expert report in this -- in this case.

5    Q    Is the CIR report, the final report, attached to

6    your expert report in this case?

7    A    Yes, it was.

8    Q    Does the CIR report that was attached to your

9    report in the case include the bullet points that are set

10   forth on the slide that the jury is viewing now?

11   A    Yes, it did.

12   Q    What was your view regarding the absence of

13   persuasive evidence that talc can migrate from the

14   perineum to the ovaries?

15        MR. SMITH:  And again, your Honor, none of these

16   opinions are expressed in his report, in the four corners

17   of his report.  I understand what the CIR did, but the

18   panel, he expressly said, did the review, not him.  So I

19   object.  This opinion about transmigration is not in his

20   report.

21        THE COURT:  Overruled.

22   Q    BY MR. WILLIAMS:  Go ahead, Doctor.

23   A    It was the sense of the panel that those

24   available data just simply did not reliably demonstrate

25   that talc could move from the outside of the body, at the

26   perineal area, inside the body and end up in the ovaries.

27   And, certainly, part of that was the panel's clear

28   acknowledgment that there's just no data on the first

1   step of that process, of talc going from the outside

2   getting into the vaginal cavity.

3       Q    Let me ask you a separate question.

4           Was the conclusion of the expert panel that talc

5   is safe contingent on a finding that talc -- that talc

6   could not migrate, meaning did the panel conclude that

7   talc is safe but basing that on the notion that there's

8   no way that talc could get to the ovary?

9           MR. SMITH:  Objection, your Honor.  Hearsay.  He

10  said he was not a voting member on the panel.

11          THE COURT:  Sustained as phrased.

12          MR. SMITH:  Thank you.

13      Q    BY MR. WILLIAMS:  Were you present for all of

14  the discussion regarding migration and all of the other

15  issues that are set forth on the board regarding talc?

16      A    Yes, I was.

17      Q    With respect in specific regard to this first

18  bullet point, the issue of whether or not talc can

19  migrate, did you listen to the discussion of the panel

20  members?

21      A    Yes, I did.

22      Q    Did you review the edits that they suggested to

23  the final report before the report was made final?

24      A    Yes.

25      Q    Was it your job to do that?

26      A    That's -- yes.

27      Q    Did you receive edits from members of the panel

28  in preparing the final report which included the bullet

1    points that are on the board right now?

2        A    Yes.

3        Q    With respect to the issue of migration, was the

4    conclusion of the panel that talc was safe contingent on

5    the notion that talc could not migrate?

6        A    Um --

7             MR. SMITH:  Your Honor, I'm going to object

8    again.  It's hearsay.

9             THE COURT:  Overruled.

10            THE WITNESS:  The panel's finding was certainly

11   based on its understanding that it just isn't very likely

12   that talc moves from the outside in the perineal area up

13   to the ovaries.

14       Q    BY MR. WILLIAMS:  Let me refer you to the second

15   bullet here, which is "Lack of consistent statistically

16   significant positive associations across studies."

17            What are the types of studies that this bullet

18   point refers to?

19       A    The CIR safety assessment included available

20   case-control epidemiology studies, cohort studies.  They

21   looked at -- prospectively at large populations and

22   packaged all of that information together into a rather

23   large section presenting the epidemiology data.

24       Q    What was the basis for the conclusion that there

25   was a lack of consistency regarding significant positive

26   associations across the study?

27       A    It -- it wasn't hard.  Some studies showed a

28   positive association between the use of talc and ovarian

1    cancer, and other studies said there isn't an association

2    between the use of talc and ovarian cancers.

3          The panel looked at that and said, there's a

4    lack of consistent positive association across studies.

5    Some do; some don't.

6    Q    Let me direct your attention to the phrase

7    "statistical significance."  Do you have that phrase in

8    mind?

9    A    Yes.

10   Q    With respect to the case-control studies that

11   were available to the panel at the time that you and

12   others drafted the CIR report, do you have any recall

13   regarding the relative number of studies that show a

14   statistically significant association and those that did

15   not have statistically significant findings?

16   A    Yes.  I think it's -- as we talked about this in

17   the panel meetings and at the -- I mean, it's all -- it

18   looks pretty obvious when you package it up.  It's pretty

19   close to half and half.

20   Q    What significance did that have, half

21   statistically significant and half -- half not

22   statistically significant and half of the studies being

23   statistically significant?

24   A    For the panel, it loops back to that sentence at

25   the top ending with a colon.  It calls in to question --

26        MR. SMITH:  Your Honor, excuse me.  I just want

27   to object.  He's speaking on behalf of the panel.  It's

28   clear hearsay.

1          THE COURT:  Overruled.

2          MR. SMITH:  Okay.

3          THE WITNESS:  The lack of consistent

4    statistically significant positive associations was part

5    of what contributed to that view that maybe the

6    statistically significant associations aren't really

7    valid.

8     Q     BY MR. WILLIAMS:  You have significant

9    experience with epidemiological studies?

10    A     Over my career at FDA and during my work at CIR,

11    regular consideration of epi studies.

12    Q     When the results of a study are not

13    statistically significant, what is the significance of

14    that to you?

15          I don't mean to overuse the word, but what does

16    that mean to you?

17    A     Well, it means that you haven't demonstrated

18    what you started out to demonstrate.  In the case of a

19    study that looks at a possible link between the use of

20    talc and ovarian cancer, you haven't made the case that

21    these are linked, that there is an association.

22    Q     Let me direct your attention to the third

23    bullet.  The third bullet says, "Uniformly small risk

24    ratio estimates in studies reporting positive

25    associations."

26          Do you see that?

27    A     Yes, I do.

28    Q     Why the use of the phrase "small risk ratios"?

1      A    Well, that, in all of our discussions, was the
2   way in which the available studies seemed to be best
3   characterized.  These -- where there was a positive
4   association, it -- just for use of a number, it was in
5   the range of 1.3.  And in the discussions, the panel
6   basically referred to that as a -- a small relative risk
7   or odds ratio, whichever way it was captured, a small
8   increase.
9      Q    Let me direct your attention to the fourth
10  bullet.  The fourth bullet says, "Failure to rule out
11  plausible alternative explanations of the statistically
12  significant results including biases, confounding risk
13  factors, and exposure misclassifications."
14            Please describe that section and that point.
15     A    Well, as was talked about at all of the
16  discussions, this is the other shoe, if you will.
17            The previous bullet said that the -- when there
18  was a positive association, it just wasn't that big.  But
19  when it's not that big, you really start to ask the
20  follow-up question:  How could that be wrong?  You know,
21  you accept that there's a positive association, it was
22  statistically significant, but it's not very big.  Why
23  could that be wrong?
24            And what the panel -- I think epidemiology in
25  general looks at is what might the biases be in
26  collecting those data.  Recall bias is a not-uncommon
27  bias to consider in looking at epidemiology data.  How
28  well can you actually remember what happened 15 years

1    ago.

2         Q     When a --

3         A     During the discussion, there was also an

4    acknowledgment that there may be confounding risk

5    factors, other things going on, that might actually be in

6    play, and talc might not be the real association.

7              The panel repeatedly -- I mean the

8    discussions -- repeatedly acknowledged that in each of

9    these case-control studies, most of the women with

10   ovarian cancer had never used talc.

11             So something else other than talc has to be at

12   play here.  So the idea that there would be confounding

13   risk factors was acknowledged, and then finally the

14   possibility of exposure misclassifications.  I mean, it

15   could be as simple as was it talc or was it cornstarch?

16   Do I really remember?

17             And absent a sense of how good those

18   recollections are, it's possible to think that a small

19   statistically significant finding might actually go away

20   if you had better data.

21        Q     Let me direct your attention to the fifth bullet

22   which says, "Absence of statistically significant

23   associations between ovarian cancer and using talc-dusted

24   diaphragms or condoms."

25             Why was that significant?

26        A     During the discussion, it was noted -- this

27   almost refers back to that first bullet -- but the panel

28   was thinking that, you know, if a partner uses a condom

1    that's talc-dusted or the woman herself uses a diaphragm

2    that's talc-dusted, what happens is that the talc is now

3    closer to the ovary.  You don't have that question any

4    longer of does it get inside.  It's already inside.

5              And the panel considered that, okay, that's good

6    to know.  So the ability to get to the ovaries has to be

7    increased.  I mean it's closer.  And when those

8    circumstances didn't lead to an increase in ovarian

9    cancer, the panel and myself included thought that was

10   significant.

11       Q    Let me direct your attention to the sixth bullet

12   point which says, "Overall lack of positive

13   exposure-effect relationships."

14             Does this refer to dose response?

15       A    Yes, that's what we are trying to talk about,

16   the more exposure, the more effect.

17             I'm not sure I know how to amplify on this.

18   It's just the overall view of these positive

19   exposure-effect studies.  Certainly not all of the

20   epidemiology studies provided -- excuse me -- provided

21   information on the extent of the exposure.  Some were

22   just did you ever use talc or you never use talc?  That

23   doesn't tell you much about the extent of exposure.

24             But some studies asked how frequently did you

25   use talc.  Some studies asked over how many years did you

26   use talc.  And those give you some handle on how much

27   exposure might have occurred.  Unfortunately, none of the

28   studies asked how much talc do you use --

1     Q     In terms of quantity --

2     A     -- the third feature.

3     Q     I'm sorry.  I didn't mean to speak over you.

4           You said how much talc is used.  Are you talking

5     there about the sheer quantity of talc that was applied?

6     A     The magnitude, yeah.

7     Q     Are there some studies that were reviewed and

8     available and cited in the report of the CIR that dealt

9     with both the frequency of a woman's use and the duration

10    or number of years of their use?

11    A     Yes, there were some of those in the report.

12    Q     Were those reviewed as well by the panel?

13    A     Yes.

14    Q     Let me direct your attention to the seventh

15    bullet.  The seventh bullet reads:  "Inverse trends for

16    both duration of use and frequency of use in some

17    studies."

18          What did that refer to?

19    A     Well, that's the -- again, the way we captured

20    this, this is the second shoe of the dose-response

21    discussion.  When the data from a study that looked at

22    frequency of applications or duration, total duration of

23    use, when we looked at those -- I mean, I can't say every

24    place, but you would pick a study and look at it and find

25    a higher exposure, more frequent uses, longer duration of

26    use at a lower odds ratio than less frequency of use or

27    shorter total duration.  And it just left us scratching

28    our heads.

1    Q    Why would the notion that longer use or more

2    frequent use having a lower risk ratio cause you and the

3    other panel members to -- and the others who worked on

4    the report to scratch your heads?

5    A    It makes no sense.

6    Q    Could you amplify?

7    A    I'm sorry.  Say again.

8    Q    Could you amplify?

9    A    In whatever probability you think might exist

10   for talc moving from the perineal area through the

11   vagina, past the cervix, through the uterus, up the

12   fallopian tubes, to get to the ovary, if there's more

13   stuff there to do that, then there ought to be more

14   consequence at the end of it, and a more frequent use in

15   concept ought to lead to more of the result.  If you used

16   it over a lifetime, it ought to lead to more of the

17   result.

18        You know, again, unfortunately, the question of

19   how much you applied was just never legitimately captured

20   so that you can add that in.  But then that now comes to

21   the surprise.

22        Wait a minute.  If that should lead to more

23   consequence, it's less.  It just doesn't fit a pattern of

24   what you would expect in a cause-effect relationship.  It

25   just doesn't fit the pattern.

26   Q    Let me direct your attention to the eighth

27   bullet point, which says, "Absence of a plausible

28   biological mechanism."

1          What was the focus of the discussion of the

2    panel members regarding biological mechanism?

3       A    Well, the focus was to turn the thinking around.

4    You know, just clearly the panel is not impressed with a

5    good bit of the data.  That's clear from the bullet

6    points that they have given up to this point.

7          But what could possibly be going on with talc

8    that might actually suggest an ovarian cancer risk?  How

9    biologically could that occur?  What is it that talc

10   would do even if it did get to the ovaries?

11         So the panel really looked at that question.

12   You know, it didn't believe that it would easily get to

13   the ovaries, but they posed that question.  Suppose it

14   did?  What mechanism do we know about that could suggest

15   that?

16         And the -- the view of -- you know, I went

17   through the background of the panel members.  I think it

18   adds up to well over 200 years of research experience in

19   cancer causation.  They looked at it and said, there's no

20   plausible biological mechanism by which we think this

21   could happen.

22      Q    Let me, if I could, for a moment, Doctor --

23         Could you put up the slide again?  I believe it

24   was Slide 3 which is the panel members.

25         I just wanted, for the sake of clarity,

26   Dr. Andersen, to have you point out the members of the

27   review panel who had those combined years of experience

28   in toxicology-type issues.

1      A     Oh.  It's Dan Liebler, Curt Klaassen, Tom Slaga,

2   and Ron Shank have all made their careers on researching

3   the question of cancer causation.

4      Q     Let me ask you if there was any sort of

5   discussion -- if you could go back to the other slide,

6   which was the eighth bullet point there.

7          Was there a discussion of what the studies that

8   were included in the reference materials said about tubal

9   ligation or whether there was any relationship or

10  association found in the studies where women had actually

11  had their tubes tied and any -- whether that affected an

12  association between talc use and ovarian cancer?

13     A     Well, yes, that was part of the discussion.

14         The panel looked at that subset of epidemiology

15  studies that reported results in women who had undergone

16  a tubal ligation.  And at least in concept, the -- the

17  temporal issue of when did they have it, when were they

18  exposed, put that aside for a moment, but tubal ligation

19  ought to prevent talc from getting to the ovaries.

20         And the panel looked then at those studies and

21  it was a mixed bag.  Some of them in which this blockage

22  that should have prevented any exposure to the ovaries,

23  there was some data that suggested there was still a

24  positive association.  It didn't make a lot of sense, but

25  it was what it was.  But there were other studies that

26  showed that, when you blocked this, the odds ratios went

27  down.

28     Q     What does that say -- the phenomenon that you

1    just described in the studies -- what does that say about

2    whether the risk ratios or odds ratios that were then

3    looked at could be viewed as establishing a causal

4    connection between the use of talc and ovarian cancer?

5        A    Well, in the panel's discussion of how these

6    associations between exposure to talc and from the epi

7    studies might be linked to the endpoint of actual ovarian

8    cancer, to assert that talc causes it when a tubal

9    ligation has blocked the passage, seemed to call that

10   into serious question.

11       Q    Let's turn to the final bullet.  The final

12   bullet says, "Lack of credible defensible evidence of

13   carcinogenicity from the results of epidemiological

14   studies of occupational exposures and animal bioassays."

15            My question is this:  Did the panel, the expert

16   panel, review animal studies that had been done in the

17   area of talc in connection with ovarian cancer?

18       A    Yes, they did.

19       Q    Did the panel review studies that dealt with

20   human -- strike that.

21            Did the panel review studies dealing with

22   subjecting human ovarian cells to talcum powder?

23       A    Yes, those cell studies were included.

24       Q    Describe for the jury the level of experience of

25   the people on the expert panel in reviewing animal

26   studies and human cell studies and carcinogenicity.

27       A    Well, I gave you the figure of 200-plus years of

28   research experience in -- in looking at cancer causation.

1    You can add to that the 30 years of research experience

2    from Paul Snyder and the 20 years of research experience

3    from Ron Hill looking at cellular and animal studies.

4        Q    Let me direct your attention to an animal study

5    that has been discussed a lot in this courtroom.

6    Specifically it's the NTP, National Toxicology Program,

7    rat inhalation -- it's actually rat and mice --

8    inhalation study from 1992.

9            Are you familiar with that study?

10       A    Yes, I am.

11       Q    I'll direct your attention in your book to

12   Exhibit L938.

13       A    Yeah, these are in order.  Yeah, there it is.

14           Okay.

15       Q    This is the rather lengthy study relating to rat

16   inhalation; correct?

17       A    Yes, it is.

18       Q    Did the expert panel from CIR review that study

19   in its entirety?

20       A    In depth.

21       Q    Let me represent to you, Dr. Andersen, that one

22   of the experts called on behalf of Ms. Echeverria,

23   Dr. Plunkett, suggested that the rat inhalation study

24   from 1992 was a useful study to see the effects that talc

25   would have on the lungs of the rats at various points in

26   time.

27           Based upon the expert panel's review of that

28   study and comments on that study by other parties, what

1   can you tell the jury regarding the usefulness to the

2   panel of the rat inhalation study?

3            MR. SMITH:  Your Honor, this is not mentioned in

4   his report, and he's not on the expert panel.  I object.

5            THE COURT:  I think the question as phrased is

6   inappropriate.  It's sustained.

7            First of all, it's a narrative; and, secondly,

8   it's one thing to ask him what the panel concluded.  It's

9   another thing to ask whether some of the panel found it

10  useful.

11           MR. WILLIAMS:  I'll rephrase, your Honor.

12      Q    BY MR. WILLIAMS:  Did the expert panel review

13  this study?

14      A    Yes, they did.

15      Q    Was there a discussion of the study in the

16  report that is attached to your report?

17      A    Yes, it was discussed in the CIR safety

18  assessment.

19      Q    This study specifically?

20      A    That's correct.

21      Q    Was the discussion of the report that is

22  reflected in the CIR report that is attached to your

23  expert report in this case express the feelings of the

24  expert panel regarding this study?

25      A    Yes, it did.

26      Q    Were you present for the discussion of the rat

27  study when the CIR met on those occasions?

28      A    Yes, I was.

1        Q     All I'm asking is if you could describe the

2    impact, if any, of the rat inhalation study on the

3    conclusions of the panel.

4             MR. SMITH:  Your Honor, that calls for

5    speculation.

6             THE COURT:  Overruled.

7             THE WITNESS:  The -- the panel discussion was

8    very clear that this study did not demonstrate a lung

9    toxicity for inhaled talc.

10        Q     BY MR. WILLIAMS:  Why?

11        A     Well, there were two primary reasons, both

12    highly technical, and then relating to how the study was

13    done.  The first is the talc exposures that were actually

14    done were done by creating talc in really tiny particles.

15    And the panel I think acknowledged that nobody had a

16    choice but to do that because if they weren't really tiny

17    particles, they weren't going to get into the lungs of

18    the mice or rats.  So there was a logic to why it was

19    done, the panel understood that.

20             But by doing that, the study created an

21    artificial exposure circumstance that, in the view of the

22    panel, just totally overloaded the lungs of the poor

23    animals.  So that was the first point that the panel came

24    to.

25             The second point is -- is more nitpicky but

26    related to the conduct of animal studies.  There were

27    periods during this lifetime exposure, a hundred and some

28    weeks these animals were treated to this insult, and in

1    different periods of time the exposure simply got out of
2    control.  It -- in one case it skyrocketed for seven
3    weeks to well above the level that in parlance of people
4    who do these animal studies call the maximum tolerated
5    dose.
6          And, as a rule, when certainly Paul Snyder
7    jumped in on it in terms of his veterinary pathology
8    expertise, but in general, it's pretty understood, when
9    you exceed the maximum tolerated dose, the effects that
10   you see are not necessarily related to the agent in
11   question.  They relate to having exceeded this dose.
12         So interpreting the findings, which were one of
13   the two species and one of the two sexes had some
14   evidence of cancer, what the panel said is, we can't
15   trust that.  First of all, the exposures were massive.  I
16   think -- I'm not sure it was ever captured in the
17   transcript, but the notes I recall seeing said you could
18   have done this with dust bunnies and gotten the same
19   result.  This doesn't tell you about talc.  It tells you
20   about overloading the ability of the mice and rats to
21   really process this kind of insult.
22         So those were the two factors that the folks who
23   conducted the study acknowledged that this existed.  They
24   just concluded that you can still rely on the findings.
25   Q    Let me stop you there for a moment.
26         The criticism -- that's my word.  Strike that.
27         The view that you just expressed of the NTP rat
28   study that the panel had that we just can't trust -- that

1  was the words you used -- was that view consistent with

2  reference materials that are included in the CIR report

3  regarding what other bodies thought about the NTP rat

4  study?

5      A    Yes.

6      Q    Let me refer you to the exhibit that you've had

7  in front of you, Exhibit L384, which is the final final

8  report that was published in the journal.  Do you have

9  that in front of you?  Again, it's L384.

10     A    Yes.

11     Q    Let me direct your attention to page 58 of

12 Exhibit L384.  Is that one of the pages where the

13 references are listed?

14     A    That's correct.

15     Q    And that's the 218 references you mentioned

16 earlier today?

17     A    That's correct.

18     Q    Let me direct your attention to reference number

19 11 on page 58.  Do you see that?

20     A    Yes, I do.

21     Q    And does that refer to one of the -- strike

22 that.

23          Does that refer to the proceedings of the

24 Bethesda, Maryland, workshop relating to consumer uses

25 and health perspectives on talc?

26     A    Yes.

27     Q    Was that one of the references that was reviewed

28 by the panel?

1      A    Yes, it was.

2      Q    Was the view that you just expressed, the view

3  of the nine members of the panel that you described,

4  consistent or inconsistent with the views of the NTP talc

5  study set forth in Reference Number 11 to the report?

6      A    Yes, it was.

7      Q    One of the studies about which there's been

8  discussion is a study called Hamilton.  Are you familiar

9  with the Hamilton study that was done relating to

10  injecting rats into the ovaries -- strike that --

11  injecting talc into the bursa of rat ovaries?

12      A    Yes, that's part of the safety assessment of

13  which I'm an author.

14      Q    Is that referenced in the references for the

15  final report of CIR?

16      A    Yes, it is.

17      Q    And, again, this is Hamilton 1984?

18      A    I believe that's the date.  I'm...

19      Q    I'd ask you to comment on the notion -- strike

20  that.

21          Are you familiar with the difference between a

22  chronic exposure and an acute exposure to a substance?

23      A    Yes, that's part of how we organize our reports.

24      Q    Is that dichotomy, chronic on the one hand and

25  acute on the other, something that you consider when

26  reviewing the safety of ingredients?

27      A    Yes, it is.

28      Q    You're familiar with the Hamilton study?

1    A    I am.

2    Q    Can you describe or do you recall the

3    methodology of the Hamilton study; that is, how talc was

4    introduced to the rats?

5    A    Yes, I do.

6    Q    Please describe.

7    A    It's not a particularly pleasant experiment.

8         The rats were anesthetized and their abdomens

9    were opened and the ovaries were pulled out external to

10   the body.  It was mentioned that the ovary that's

11   actually in the rat contained an inside and outside sac.

12   And that was truly the case.

13        What the researchers then did was they injected

14   a bolus amount of talc under that outside sac so it

15   didn't have to go through the sac, it went under it,

16   right onto the surface of the ovaries.

17        After they did that, they put the ovaries back

18   in the animal, sewed them up, and put them back in the

19   cage.

20        And as a function of time, after that, they

21   looked -- well, sacrificed is the word.  They killed the

22   animals and looked at what changes had happened in the

23   ovaries.  They look at two weeks, look at four weeks,

24   look at six weeks as a function of time and see what

25   happened as a result of the exposure to talc.  And that's

26   what the study was.

27   Q    And just getting to the point of it, did the

28   study show that there was an increased toxicity over time

1    based upon the exposure of those ovaries to the talc?

2        A    Boy, I really don't like the word "toxicity."

3            What the study found --

4        Q    Use the word that is appropriate.  I'm sorry.

5        A    -- was two things.  They reported that the

6    ovaries were cystic.  Cysts had formed on the surface of

7    the ovaries.  The other thing they reported -- and that

8    wasn't all of the ovaries, just in some of the ovaries

9    they reported that.

10           They also found what they called papillary

11   changes in the surface of the ovary, and that was four

12   out of the ten -- four of ten animals.  And that's what

13   they reported.  So those were the findings.

14       Q    Based upon your review of the Hamilton study,

15   was the type of exposure of the ovaries to talc, based on

16   the methodology there, an acute exposure? chronic

17   exposure?  Where in that dichotomy would you express it?

18       A    I think it defies an easy categorization because

19   the impact of how they did the study was to create a

20   chronic exposure to the ovary.

21       Q    How so?

22       A    Remember talking about that bursa, it is a

23   barrier to stuff getting past it into the ovary?  It's

24   also a barrier to stuff getting out.  So now you have

25   that talc that was put into that space between that sac

26   and the ovary and now it's sitting there, day after day

27   after day.

28           So as I look at it, again, it doesn't fit the

1    normal mode of a chronic study.  Normally a chronic study

2    is that you just keep adding more stuff, more stuff.

3    That's done because classically, whether it's animal or

4    human, you have to add more because they get rid of it.

5    So to keep it going, you have to add more.

6            In this case, it just sat there and exposed the

7    ovary continuously.  That is as close to chronic as I can

8    think of.

9        Q    With respect to the Hamilton study, were the

10   changes, if any, to the ovarian cells cancerous?

11       A    The authors I think specifically noted that they

12   found no cancer in the ovaries.

13       Q    And did that -- strike that.

14           Was that the finding throughout the lifetime of

15   the rats even if it was a rat that was sacrificed near

16   the end of its life?

17       A    I don't -- I would have to go look at the study

18   to remember whether any really reached end of life.  But

19   as long as the study went on, none of the animals

20   developed any cancers.

21                      *[4:47 P.M.]*

22           MR. WILLIAMS:  Your Honor, I was going to shift

23   to another study.  Is this an appropriate time?

24           THE COURT:  I would think so.  All right.  Let

25   me ask counsel a question, and then I will query the

26   jury.

27           Do you have matters to take up in the morning?

28           MR. WILLIAMS:  Could I have one moment to ask,

1    your Honor?

2            THE COURT:  Sure.

3            (A discussion is held off the record.)

4            MR. WILLIAMS:  Your Honor, I think the answer is

5    yes, there is one matter we'd like to take up today, if

6    we could.  But I do think in the morning we've got one or

7    two shorter matters to raise.  So the answer is yes.

8            THE COURT:  So the answer is yes.  So should we

9    ask the jury to be here at 9:30?  Would that be better?

10           MR. WILLIAMS:  That would be fine.

11           THE COURT:  All right.  So 9:30, folks,

12   downstairs.  Thank you very much.  Have a good evening.

13           Leave your notes.  Do not discuss the case.  Do

14   not do any research.  Do not form your opinions until you

15   get into the jury room and have the opportunity to talk

16   to each other.

17           (Jurors excused.)

18           THE COURT:  You are welcome to step down,

19   Doctor.

20           (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN

21           COURT OUTSIDE THE PRESENCE OF THE JURY:)

22           MR. WILLIAMS:  Dr. Andersen, you can step out in

23   the hall.

24           (Dr. Andersen excused from the courtroom.)

25           THE COURT:  Okay.  Standing or sitting, as you

26   wish.  I know everybody has been sitting for a while.

27           MR. SMITH:  You don't mind if we stand?

28           THE COURT:  I do not mind if you stand, and I

1    might do the same in a bit.

2         MR. WILLIAMS:  Thank you, your Honor.

3         At this time, given that the plaintiff has

4    closed, the defense moves for a nonsuit.  And we are

5    prepared to file a memorandum today.  Permit me, if you

6    would, to state the basis for the nonsuit.

7         We seek judgment of nonsuit on the ground that

8    the plaintiff has failed to introduce evidence sufficient

9    to carry her burden of proof, and the allegations fail as

10   a matter of law on the following issues:

11        A.   That defendants had a duty to warn;

12        B.   That the defendants' alleged failure to warn

13   was a substantial factor in causing plaintiff's harm;

14        C.   That defendants engaged in conspiracy or

15   could be liable for public advocacy;

16        D.   That the defendants can be liable for

17   negligence per se, based on FDA regulations or for fraud

18   on the FDA;

19        E.   That defendants can be liable on the basis

20   of general negligence independent from plaintiff's claim

21   for negligent failure to warn.

22        That's the first motion that will be filed.

23        The second motion is a partial nonsuit as to

24   punitive damages.  The basis for that -- and in the

25   alternative, to the relief requested above, the

26   defendants seek partial nonsuit pursuant to Section

27   581(c) subsection (b) on the issue of liability for

28   punitive damages.

1          Finally, the third motion is partial nonsuit as
2    to defendant Johnson & Johnson, the parent company.  We
3    believe that partial nonsuit pursuant to Section 581(c)
4    subsection (b) should be granted as to defendant J&J on
5    the ground that J&J cannot be liable for the alleged
6    conduct of its subsidiary, JJCI.  And plaintiff has not
7    submitted sufficient evidence on which the parent company
8    could be liable.
9          We have the papers to be filed today.  We would
10   ask that we set a hearing for this on, say, Monday --
11   Monday morning, if that would be appropriate for the
12   Court.
13         And I believe that is all I needed to say at
14   this point.
15         THE COURT:  Mr. Robinson?
16         MR. ROBINSON:  I think we're going to have
17   Mr. Wilson just talk briefly.  And if there's going to be
18   a --
19         THE COURT:  Sure.
20         Mr. Wilson?
21         MR. ROBINSON:  If there's going to be a brief,
22   we will wait for the brief.
23         THE COURT:  I'm assuming you would like to file
24   a brief.
25         MR. WILSON:  We can, your Honor, but we will do
26   whatever the Court would prefer.  We could argue it
27   orally if the Court would prefer that right now as well.
28         MR. WILLIAMS:  We'd prefer that counsel and the

1    court read the briefs.

2            THE COURT:  Well, I can't read the briefs today.

3    So if you would prefer to file a written brief, we could

4    do that.  And you tell me when you'd like to do that.  If

5    counsel wants to argue this on Monday, I'm thinking maybe

6    you ought to file your brief by Monday.  And then we

7    could argue this on Tuesday morning.

8            That would be better, I think, because counsel,

9    I presume, has spent more than the last five minutes

10   writing the motion.  And you'd probably like more than

11   tomorrow close of business to file your written response.

12           MR. WILSON:  Mr. Webb and I were in the hallway

13   during the examination of Dr. Andersen.  And I saw two

14   bankers boxes come in with that motion for nonsuit.  I

15   know, traditionally, I believe a motion for nonsuit or

16   opposition has a 15-page limit.  I don't know if the

17   Court is -- wants page limits here.  I don't know what is

18   the specificity.

19           THE COURT:  I haven't seen the motion, but I

20   hope it doesn't exceed the 15-page limit.

21           MR. WILLIAMS:  I personally don't know whether

22   any of the three -- the three different motions --

23           THE COURT:  And it might have the exhibits

24   attached to it.

25           MR. WILSON:  I saw two bankers boxes and I got a

26   little bit scared.

27           MR. WILLIAMS:  If they do exceed, then we would

28   be happy to file -- one of them does, your Honor.  And so

1    we would seek leave to file beyond the limit.

2             THE COURT:  Mr. Webb, how long is the motion?

3             MR. WEBB:  I believe, your Honor -- and I have

4    been here this afternoon, so I haven't seen the final

5    draft, but I believe it's approximately 30 pages.

6             THE COURT:  Okay.

7             MR. WEBB:  But I would add, your Honor, that

8    most of that particular brief would be familiar to all

9    counsel involved because it addresses, in part -- it

10   addresses two things:  one, the failure to demonstrate

11   a duty to warn; and, two, the causation issues that are

12   extremely familiar to all counsel involved in the case.

13            So I don't think the issues presented will be

14   drastically different than what counsel should already be

15   aware of.

16            THE COURT:  Does the plaintiff want 30 pages?

17            MR. WILSON:  Your Honor, it sounds like there's

18   actually three motions, one of which is 30 pages.  And it

19   sounds as if the others are 15.  So I think we're talking

20   more about maybe 60 pages.  I don't know that we want to

21   try and compete on that level with page limits, but

22   whatever the Court prefers.

23            THE COURT:  If you want to file a written brief,

24   you're invited to do that and file it by Monday.  If you

25   want to take 30 pages, that's fine.  If you don't, that's

26   okay too.

27            MR. ROBINSON:  Your Honor, the question, at

28   least I have, is the 30 pages for the three briefs?

1          MR. WEBB:  No, there's one that's approximately
2    30 pages, and then the other two, I believe, are less
3    than 10 pages each.  They are much shorter, the punitives
4    and the Johnson & Johnson corporate structure briefs.
5          THE COURT:  So it's entirely up to plaintiff's
6    counsel how you'd like to proceed in terms of briefing.
7    I will certainly give you leave to file a longer brief.
8          MR. WILSON:  One concern that I have -- and, you
9    know, we've all kind of been thinking about jury
10   instructions and verdict form -- early on, we made a
11   request for the CACI 418 instruction based on negligence
12   per se, with the statute or regulation being 21 CFR
13   740.1(a), with then the language in CACI 418 that says
14   the plaintiff still has to prove causation, causation
15   being defined by what the Court has already identified,
16   CACI 430, or maybe it was 431 or 435, modified a bit.
17         Part of the concern that I personally have in
18   opposing a nonsuit at this point in time is I don't know
19   if that instruction is going to be given.  And so,
20   therefore, I don't even know what claims are on the
21   table.
22         Usually, jury instructions like this are kind of
23   hammered out before this point in time.  So I think it
24   might be helpful if we addressed jury instructions so we
25   could fairly oppose this motion to know what claims are
26   out there.  For example, the CACI 400, general negligence
27   claim, or if it was going to be a CACI 1220 general
28   negligence claim, the 418 claim, as well as the 1222

 1    failure to warn claim.

 2              THE COURT:  Mr. Williams?

 3              MR. WILLIAMS:  That might make sense, your

 4    Honor.  We put the 318 -- because, of course, we don't

 5    know for certain what the Court's pleasure is going to be

 6    on the negligence per se instruction.  That's why the

 7    brief treats that issue separately.

 8              MR. WEBB:  Yes, your Honor.  And, you know, the

 9    proposition that you have to have a finalized set of jury

10    instructions before you can argue or brief a nonsuit

11    motion, I don't think is actually accurate given that the

12    nonsuit always comes at the close of the plaintiff's

13    evidence.

14              And typically the jury instructions aren't

15    finalized until final charging conference just before

16    closing.  So as Mr. Williams alluded to, what we

17    attempted to do in the longer of the briefs that

18    addresses the duty and the causation issues is to

19    address -- and part of the link, frankly, is to address

20    specifically the different arguments and causes of action

21    that plaintiffs have suggested are still in the case.

22              And we, of course, take the position that

23    they've failed to present evidence to permit those causes

24    of action to be in the case, if they were even ever

25    properly in the case to begin with.

26              So that really is the thrust of the longer of

27    the three motions.

28              THE COURT:  So let me suggest the following:

 1   Before we finalize what we're going to do here, why don't
 2   we recess for the afternoon and give plaintiff's counsel
 3   an opportunity to read the brief, and then I'd like to
 4   read it as well.  And then I think in the morning we
 5   would have a better sense of how we should address this
 6   because then you'll have had time to read it.
 7           MR. WILSON:  Thank you, your Honor.
 8           MR. WILLIAMS:  Thank you, your Honor.
 9           MR. WEBB:  Thank you, your Honor.
10           THE COURT:  I think that's what we should do.
11   Did you leave a copy of the brief with the clerk?
12           MR. WEBB:  We are filing it right now, your
13   Honor.
14           MS. ZUKIN:  Has it been served?
15           MR. WEBB:  He's serving it on you right now.
16           THE COURT:  Is it on Case Anywhere?  Is it on
17   Case Anywhere?
18           MR. WEBB:  It will be, your Honor, as soon as we
19   have it filed.  But we're prepared to serve it on Case
20   Anywhere right now.  But we have courtesy copies here for
21   plaintiff's counsel as well.
22           THE COURT:  All right.  So I think we should
23   take this up in the morning.
24           MR. ROBINSON:  What time, your Honor?
25           THE COURT:  Why don't you be here at 8:30, and
26   we'll talk about how to do it.  And you said there were a
27   couple of other things you wanted to take up?
28           MR. WILLIAMS:  There are.  One relates to, I

1    believe, witness Felix.  There's a motion.  There was a
2    motion in limine filed relating to Dr. Felix, so we'd
3    like to take that up if we could.  That's of the shorter
4    variety, I think.
5            MR. CACHAN:  It's two pages or three pages, or
6    something.
7            THE COURT:  When was that filed?
8            MR. CACHAN:  This afternoon, your Honor.
9            THE COURT:  Oh, okay.
10           MR. WILLIAMS:  It has to do with whether certain
11   things can be delved into on cross-examination, and, if
12   so, how much.
13           THE COURT:  And do you have anything else to
14   take up in the morning?
15           MR. WILSON:  I don't think so.
16           MR. CACHAN:  We can take that up at the noon
17   hour, actually, tomorrow.
18           MR. SMITH:  I think we're okay.
19           MR. ROBINSON:  Thank you, your Honor.
20           THE COURT:  Okay.  See everybody at 8:30.
21           (Whereupon an evening adjournment was taken at
22           4:40 P.M. with the matter to be resumed at
23           8:30 A.M. on August 11, 2017.)
24
25
26
27
28

1

2              SUPERIOR COURT OF THE STATE OF CALIFORNIA

3                    FOR THE COUNTY OF LOS ANGELES

4

5     DEPARTMENT 307              HON. MAREN E. NELSON, JUDGE

6
      COORDINATION PROCEEDING,        )
7     SPECIAL TITLE (RULE 3.55)       )
                                      )  JCCP NO. 4872
8                                     )
      JOHNSON & JOHNSON TALCUM        )  REPORTER'S CERTIFICATE
9     POWDER CASES.                   )
      _____)
10

11

12

13

14            I, CAROLYN GREGOR, CSR 2351, pro tem reporter of

15    the Superior Court of the State of California, for the

16    County of Los Angeles, do hereby certify that the

17    foregoing pages, 3103-3204, comprise a full, true and

18    correct transcript of the proceedings and testimony taken

19    in the above-entitled cause on August 10, 2017.

20

21            Dated this 10th day of August, 2017.

22

23

24            _____
              CAROLYN GREGOR, CSR 2351
25            OFFICIAL PRO TEMPORE REPORTER

26

27

28

Exhibit 122

August 11, 2017

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

DEPARTMENT 307                HON. MAREN E. NELSON, JUDGE

COORDINATION PROCEEDING,          )
SPECIAL TITLE (RULE 3.55)         )
                                  ) JCCP NO. 4872
                                  )
JOHNSON & JOHNSON TALCUM          )
POWDER CASES,                     )
_____  )

MORNING SESSION
REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
AUGUST 11, 2017

APPEARANCES:
FOR PLAINTIFFS:  ROBINSON CALCAGNIE, INC.
                 BY:  MARK P. ROBINSON, JR. ESQ.
                      CYNTHIA L. GARBER, ESQ.
                      SCOT D. WILSON, ESQ.
                 19 Corporate Plaza Drive
                 Newport Beach, California  92660
                 949.720.1288

                 KIESEL LAW, LLP
                 BY:  HELEN E. ZUKIN, ESQ.
                 8648 Wilshire Boulevard
                 Beverly Hills, California  90211
                 310.854-4444

                 THE SMITH LAW FIRM, PLLC
                 BY:  ALLEN SMITH, ESQ.
                 681 Towne Center Boulevard, Suite B
                 Ridgeland, Mississippi  39157
                 601.952.1422

Reporter:
Pamela Cotten, CSR, RDR, CRR
Certificate No. 4497
Court Reporter Pro Tempore

August 11, 2017

```
 1    APPEARANCES (CONTINUED):
 2    FOR THE PLAINTIFFS (Continued):
 3        BEASLEY ALLEN LAW FIRM
          BY:  TED G. MEADOWS, ESQ.
 4        218 Commerce Street
          Montgomery, Alabama  36104
 5        800.898.2034
 6        ASHCRAFT & GEREL, LLP
          BY:  MICHELLE A. PARFITT, ESQ.
 7        1825 K Street NW, Suite 700
          Washington, DC  20006
 8        202.783.6400
 9
10    FOR DEFENDANT JOHNSON & JOHNSON:
11        SHOOK, HARDY & BACON, LLP
          BY:  G. GREGG WEBB, ESQ.
12        One Montgomery Street, Suite 2700
          San Francisco, California  94104
13        415.544.1900
14        PROSKAUER ROSE, LLP
          BY:  BART H. WILLIAMS, ESQ.
15            SUSAN L. GUTIERREZ, ESQ.
              MANUEL F. CACHAN, ESQ. (Afternoon Only)
16        2049 Century Park East, Suite 3200
          Los Angeles, California  90067-3206
17        310.557.2900
18        PROSKAUER ROSE, LLP
          BY:  LEE M. POPKIN, ESQ.
19        Eleven Times Square
          New York, New York 10036-8299
20        212.969.3326
21        SIDLEY AUSTIN LLP
          BY:  KIMBERLY A. DUNNE, ESQ.
22        555 West Fifth Street, Suite 4000
          Los Angeles, California  90013
23        213.896.6659
24        SIDLEY AUSTIN LLP
          BY:  PAUL BELONICK, ESQ.
25        555 California Street
          San Francisco, California  94104
26        415.772.7411
27
28
```

August 11, 2017

1              C H R O N O L O G I C A L   I N D E X

2

3

     DEFENSE
4    WITNESSES              DIRECT   CROSS   REDIRECT   RECROSS   VD

5    DR. ALAN ANDERSEN      3248    3257

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

August 11, 2017

```
                                                    Page 3205

 1    CASE NUMBER:                 JCCP 4872

 2    CASE NAME:                   JOHNSON & JOHNSON

 3                                 TALCUM POWDER CASES

 4    LOS ANGELES, CALIFORNIA      AUGUST 11, 2017

 5    DEPARTMENT 307               HON. MAREN E. NELSON

 6    APPEARANCES:                 (AS HERETOFORE NOTED.)

 7    REPORTER:                    PAMELA COTTEN,

 8                                 CSR NO. 4497

 9    TIME:                        8:48 A.M.

10                     MORNING SESSION

11          (The following proceedings were

12      held outside the presence of the jury:)

13          THE COURT:  Good morning, all.

14          MR. WILLIAMS:  Good morning, your Honor.

15          MR. ROBINSON:  Good morning, your Honor.

16          THE COURT:  Good morning.

17          ALL:  Good morning, your Honor.

18          THE COURT:  On the record outside the presence

19    of the jury.  All trial counsel present.  Have a seat,

20    folks.

21          On the motion in limine, I read the motion, I

22    read the opposition regarding Dr. Felix.  I'm not

23    inclined to grant the motion, but I am a little concerned

24    that we are going to have a long detour into lung cancer,

25    which we don't need to have.

26          MR. ROBINSON:  No.  It will be very quick, your

27    Honor.  We're not going to do that.

28          THE COURT:  So let me hear from Mr. Williams and
```

August 11, 2017

Page 3206

1  Mr. Robinson.

2          MR. WILLIAMS:  Well, actually, it was Mr. Cachan
3  who was going to do it, your Honor, and he is not here
4  this morning.  But we just wanted to avoid that detour
5  that the Court is referencing and try to keep that away
6  from the jury because it's not as important what the
7  matters were about as it is the amount of money that he
8  was paid and that type of thing by our client.

9          So to the extent that there are just certain
10  industries that, if you start jumping there, that's
11  unduly prejudicial, in our view.  And so the issue should
12  be related to this case, we think, in the first instance,
13  money is paid by our client, that type of thing.

14          MR. ROBINSON:  Your Honor, when these experts
15  choose to work on a case, that's a part of their
16  background and that's -- look what they brought out with
17  Dr. Plunkett, three million dollars, I mean.  So that's
18  what they've done.  They have an expert who that's what
19  he's worked on before, and it's fair game.  We're not
20  going to go on and drag it out.  We're just going to
21  bring that point out, your Honor.

22          MR. WILLIAMS:  With respect to Dr. Plunkett, you
23  will recall, your Honor, it was the total amount of
24  money.  We didn't go into cell phone, using insects to
25  determine whether there's brain activity damage, and that
26  type of thing, and all of the specific opinions that she
27  has given in other cases.  We didn't talk about the types
28  of other cases.  What we talked about was money.

August 11, 2017

Page 3207

1        MR. ROBINSON:  They talked about plaintiff
2  lawyers and plaintiffs' cases, your Honor.
3        The important thing is this, is that this is
4  what Dr. --
5        MR. WILLIAMS:  Felix.
6        THE COURT:  Felix.
7        MR. ROBINSON:  What he chose to work on.  He has
8  worked on those cases.
9        THE COURT:  I don't have a problem with that,
10  but I am concerned that if we are going to start getting
11  into what his opinions were in other cases --
12        MR. ROBINSON:  No.
13        MR. SMITH:  No.
14        THE COURT:  -- then we're going to be down a
15  long detour about cancer that we don't need to go down.
16        MR. ROBINSON:  We're not, your Honor.
17        MR. WILLIAMS:  And let me be clear, your Honor.
18  Plaintiff/defense, that's absolutely fair game.  The
19  ratio of plaintiff to defense, absolutely.  But to talk
20  about -- to bring up tobacco and say that you've done
21  stuff in tobacco and to say that you've done stuff on
22  asbestos cases, we just think that that's inappropriate.
23        MR. ROBINSON:  We've agreed no asbestos, but we
24  are not going to agree to other cases, your Honor.
25        THE COURT:  I'm not going to grant the motion,
26  but I am going to ask plaintiff's counsel to be mindful
27  about not going down the road of what opinions did he
28  give, why did he give it.  Otherwise we are going to be

August 11, 2017

Page 3208

1    in mini trials on these other cases because we will be

2    hearing all about them.

3              MR. SMITH:  Yes, your Honor.

4              THE COURT:  I know where this will go.

5              MR. SMITH:  Yes, your Honor.

6              THE COURT:  All right.  On the subject of the

7    motion for nonsuit, what does the plaintiff want to do in

8    terms of a schedule?

9              MR. ROBINSON:  Your Honor, I did -- Scot, you

10   want to talk?

11             MR. WILSON:  Your Honor, the motions are not as

12   lengthy as maybe we thought.  I think one is about 30

13   pages, the others are about five and six.

14             If the Court wants written-out positions, we can

15   submit those.  We would prefer to submit those as soon as

16   possible and have the motions argued as soon as possible,

17   but it is totally up to the Court's schedule.

18             THE COURT:  If you can file written oppositions

19   today, I'll rule on them on Monday.  That would probably

20   be the simplest thing to do.

21             MR. WILSON:  I think we can do that, your Honor.

22   Obviously -- the one concern that I have, usually as

23   plaintiffs' lawyers, we get sometimes an oral motion for

24   nonsuit; sometimes we get a motion in writing.  Typically

25   we don't do a written opposition.

26             THE COURT:  You're not required to.  I'm just

27   saying if you want to do one --

28             MR. WILSON:  We will do one.  The only concern

August 11, 2017

Page 3209

1    that I have -- I mean, obviously, I think a lot of time

2    and effort went into citing the record.  We will do our

3    best to provide citations with the understanding that,

4    given the very short time frame, we are not citing every

5    little bit and piece of testimony, but we will try our

6    best.

7              THE COURT:  All right.

8              MR. ROBINSON:  Your Honor, can we have until

9    Saturday?  I do think that Mr. Wilson is here today --

10             THE COURT:  You can have until Saturday.

11             MR. WILSON:  Thank you, your Honor.

12             MR. ROBINSON:   Thank you.

13             THE COURT:  Just put it up on Case Anywhere so I

14   know that it's there.  And it doesn't -- it doesn't need

15   to be elaborate.  The law is very straightforward on this

16   issue.  We needn't brief the law much.  But if you want

17   to cite to certain evidence you think is important for

18   the Court to consider, that's what you need to do.  And

19   you can do that in writing or orally.  But I'll hear this

20   motion on Monday.

21             MR. WILSON:  Thank you, your Honor.

22             MS. ZUKIN:  Your Honor, we do have an issue

23   regarding exhibits and objections to our exhibits that we

24   thought were going to be coming in.  So we just want to

25   know when to carve out time to deal with that.

26             THE COURT:  What are -- we can do that right

27   now.

28             MS. ZUKIN:  Mr. Wilson is ready.

August 11, 2017

Page 3210

1              MR. WILSON:  So we had a very productive

2       discussion with Mr. Webb yesterday.  There's basically

3       four categories -- Jeff, do you mind putting up on the

4       screen --

5              THE COURT:  Mr. Webb, is this your issue?

6       Because if so, please come forward.

7              MR. WILSON:  For all the days and all the

8       different stipulations for each day, at this point we

9       have basically four categories of remaining items that I

10      don't even want to say are disputed but are areas where

11      we do need the Court to weigh in.

12             One relates to the photographs and images of the

13      talc in the tissue that Dr. Godleski took.  We think

14      because a sufficient foundation was laid that he actually

15      took those photographs, looking at them himself on the

16      microscope, that those should be admitted, not just

17      identified.

18             We agree -- everybody agrees, nobody wants the

19      Court to take custody of the actual physical bottles, but

20      the photos of the bottles of talc, both Johnson & Johnson

21      as well as the bottles that we took -- that we showed

22      that have a warning as well as the bottles that Johnson &

23      Johnson introduced that do not have a warning, that the

24      photos of the bottles should be admitted, not just

25      identified.

26             There's an issue regarding certain scientific

27      papers and websites.  For example, the Pycnogenol Horphag

28      Research advertisement, the NCI websites, all these

August 11, 2017

Page 3211

1    different websites, we previously talked about how those

2    under 721(b) would be identified but not admitted.

3    Defendants' counsel would like some of those to be

4    admitted, ironically, taking the position because they

5    are just websites and not scientific publications.  We

6    think those should be identified only.

7            Finally, there are specific portions of the

8    trial transcript where counsel read testimony from the

9    deposition for purposes of impeachment that they want to

10   have admitted.  Traditionally, your Honor, I think

11   there's a rule on point, but no portion of the transcript

12   goes back to the jury.  It is to be read back upon

13   request only.

14           So those are the categories basically, and they

15   can be identified later in specificity.

16           MR. WILLIAMS:  Thank you, your Honor.  I'm going

17   to handle this one.

18           THE COURT:  Okay.

19           MR. WILLIAMS:  With respect to the first

20   category on Dr. Godleski, I mentioned this yesterday.

21   Our position is that those are demonstrative exhibits.

22   They are the images that we used during his direct

23   examination of Dr. Godleski.  He was asked by both sides

24   about it.

25           Our view is they are not exhibits that should be

26   admitted and, therefore, that should go back to the jury.

27   They are used for demonstrative purposes.

28           THE COURT:  But they are a part and parcel of

August 11, 2017

Page 3212

1    his report; correct?

2              MR. ROBINSON:  Yes, your Honor.

3              MS. ZUKIN:  Yes, your Honor.

4              MR. WILLIAMS:  Oh, yes, absolutely.  But there

5    are a lot of things that -- the reports don't go back,

6    the reports themselves are hearsay, the photographs are

7    hearsay.  They are demonstratives that are used for the

8    benefit of the jury.

9              THE COURT:  Well, the photographs actually I

10   don't think are hearsay.  The -- I mean, they are like

11   any other photograph.  If you lay a sufficient foundation

12   to admit them, they can come in.  They are no different

13   than the photos of Ms. Echeverria or lots of other

14   photographs that have been admitted in millions of other

15   cases.  The only -- they are just not hearsay.

16             So the question is, are they -- if we are not

17   admitting the report, should we admit the photos anyway?

18             MR. WILLIAMS:  That's what we think the issue

19   is, your Honor.

20             MR. WILSON:  On that point, your Honor, we agree

21   that the report doesn't go back, the report in its total,

22   but these were Exhibits 39A, B, and C.  They were

23   segregated from the report, and it was made clear in the

24   testimony that these were photos that he took.  It's a

25   lot like an image of an x-ray.

26             THE COURT:  Right.

27             MR. WILSON:  So I think a sufficient foundation

28   was laid.

August 11, 2017

Page 3213

1          MR. WILLIAMS:  Then at a minimum, your Honor, we
2    believe that the headings that were used when
3    Dr. Godleski was on there should be taken off.
4          MR. ROBINSON:  We agree, your Honor.
5          MR. SMITH:  We agree.
6          MR. WILLIAMS:  The arrows that were pointed out
7    that were embedded in the photograph.
8          THE COURT:  Let me stop you a minute.  Do you
9    have clean copies of them without the arrows?
10          MR. ROBINSON:  Your Honor, the arrows were -- he
11    was in deposition, and Mr. Klatt asked him to identify
12    the macrophages with arrows.  And the arrows -- is that
13    what you --
14          THE COURT:  That's what we are talking about.
15          MR. ROBINSON:  No, those arrows were actually
16    done under sworn testimony, under oath, where he was
17    marking where, in his opinion, there was macrophages.
18          THE COURT:  That's the demonstrative part of it.
19          MR. WILLIAMS:  Right.  That's not in the report.
20          THE COURT:  So if you have clean copies, they
21    are the ones that come right out of his --
22          MR. ROBINSON:  His report.
23          THE COURT:  -- his report, that would be fine.
24          MR. ROBINSON:  Could we use, obviously, the
25    arrows in final argument --
26          THE COURT:  You can use the arrows in final
27    argument, sure.
28          MR. WILLIAMS:  No objection to that, your Honor.

August 11, 2017

Page 3214

1         On the second category, we have no objection to
2    the photographs of the bottles for both sides coming into
3    evidence.
4              THE COURT:  Okay.
5              MR. WILLIAMS:  On the third issue on -- there's
6    a distinction between scientific papers and certain
7    websites.  With respect to the scientific papers, those
8    can be used for demonstrative purposes.  We believe they
9    should be --
10             THE COURT:  Hang on a second.
11             MR. WILLIAMS:  -- potentially used in closing
12   argument as demonstratives, but that the scientific
13   reports should not come in.
14        But there's a difference between that and
15   certain of the websites.  The websites that we argue
16   should come into evidence are the ones relating to
17   governmental websites as to which the Court can take
18   judicial notice.  And we can provide briefing on that,
19   your Honor, if there's any issue.
20        But with respect to, for example, the NCI
21   website or Center for Disease Control website, the case
22   law is fairly clear on that -- and, again, we can provide
23   that to the Court -- that those matters are things as to
24   which the Court may take judicial notice of the content
25   of those sites.
26        That's very different from the Pycnogenol
27   website.  We would not seek to have the Pycnogenol
28   website admitted into evidence.  That was a demonstrative

August 11, 2017

Page 3215

1   used through Dr. Plunkett to make a point.  That's a
2   different thing.
3            So there's a difference between scientific
4   papers, certain governmental websites as to which
5   foundation can be laid, and the Pycnogenol ad.  The ad
6   and the scientific papers themselves should not come in.
7   The website shouldn't come in.
8            MR. SMITH:  Your Honor, we have clearly
9   established that the NCI website was not an official
10  statement, the NCI or the National Institutes of Health.
11  It was by those whatever, six, seven, eight people
12  independent.  So it's not -- you can't take judicial
13  notice of something that's not an official statement by
14  the NCI.
15           THE COURT:  So first of all, the scientific
16  papers do not come into evidence.  721(b)(3), the last
17  paragraph, is clear on this.  If admitted, relevant
18  portions of the publication may be read into evidence but
19  may not be received as exhibits.
20           MR. SMITH:  Sure.
21           MR. WILLIAMS:  We are not seeking that, your
22  Honor.
23           THE COURT:  All right.  That's number one.
24           On the websites, if they are governmental
25  websites, FDA, for example, the Court can probably take
26  judicial notice of it.  But I agree with counsel for the
27  plaintiff, the CIR is not a governmental website.
28           MR. WILLIAMS:  Oh, no.  CIR, we are not claiming

August 11, 2017

Page 3216

1   that that -- I thought we were just talking about the NCI

2   website, actually, which is a different website.

3            THE COURT:  Well, NCI -- the NCI website -- NCI

4   is part of DHHS.

5            MR. SMITH:  And the National Institutes of

6   Health.

7            THE COURT:  Right.  I think the Court can take

8   judicial notice of the website.  The fact that it says

9   that the -- I can't remember exactly what the language

10  is, but it's part of a governmental website.

11           MR. ROBINSON:  Your Honor, can Mr. Wilson --

12           THE COURT:  I appreciate there's a disclaimer of

13  some part of it, but it's part of a governmental website.

14           MR. WILSON:  Very briefly, your Honor.

15           With respect to judicial notice, if we look at

16  Evidence Code 452(h), with something like this, we are

17  talking about judicial notice that is permissive.

18           And here with respect to a website, albeit a

19  governmental one, judicial notice to the extent it's

20  appropriate would be as to the existence of the document

21  but not for purpose of its truth.

22           And with respect to the existence, that gets

23  over an authentication hurdle; it doesn't get over the

24  hearsay hurdle.  The document was used totally only as

25  cross-examination.  It's clearly hearsay.  The witness

26  never authenticated it, never established.

27           It was cross-examined.  The vehicle for --

28  pursuant to which cross-examination was permitted was the

August 11, 2017

Page 3217

1   witness was asked, like, you would agree that something

2   on the NCI website was a reliable authority.  So it was

3   clearly trying to be invoked pursuant to 721(b).

4          To now say, well, this is different than 721(b),

5   after the witness is only cross-examined on the document

6   under 721(b), is unfair.

7          I think judicial notice is fine as to the

8   existence but not for purposes of truth.  It should not

9   be an admitted exhibit.

10         THE COURT:  That's probably right.  Let me hear

11  from you.

12         MR. WILLIAMS:  Two different issues, your Honor.

13         721(b) is for purposes of putting it in front of

14  that particular witness trying to establish foundation

15  that the document could be discussed with that individual

16  witness.  It's a totally different analysis than whether

17  or not the court may take judicial notice of the

18  document.

19         We respectfully request the ability to brief it

20  because there are cases directly on point for websites

21  almost identical to this.  And so it's two different

22  things.

23         THE COURT:  I think the question, though, is

24  this:  The Court can take judicial notice of the fact of

25  the website.  The question is whether the Court can take

26  judicial notice of the statements in the website.

27         This is much like we are regularly asked to take

28  judicial notice of court files.  We can take judicial

August 11, 2017

Page 3218

1    notice of the pleading but not of the facts that are

2    stated in the pleading.

3           MR. WILLIAMS:  If I may, your Honor.  Here is

4    the legal distinction, as I understand it, from the cases

5    we saw.  You are quite correct that the statements

6    contained on the website do not come in for the truth of

7    those statements that, in fact, there's inadequate

8    evidence related to talc.  No, that's not what it is.

9           But the fact that that governmental website says

10   that, that has meaning in this case.  It has meaning in

11   terms of the state of mind of our client, it has meaning

12   in terms of reasonableness of their actions, et cetera.

13          So we are not asking the Court to command the

14   jury that this is truth.  That's a very different thing.

15   But -- and the examples that we can give you and the

16   cases make that very point.

17          THE COURT:  It's a subtle distinction.

18          MR. WILSON:  Whether the website says it is a

19   risk factor or says it is not a risk factor, the document

20   is still being offered for its truth and it's being

21   offered for showing the absence of the statement.

22          THE COURT:  But the problem that Mr. Williams is

23   identifying is this:  Plaintiff is asserting a theory

24   that the defendants had an obligation to warn, that there

25   was sufficient information in the community that they

26   should warn.  The fact that a government agency thinks

27   there is not sufficient evidence goes properly to their

28   state of mind.

August 11, 2017

Page 3219

 1          MR. WILSON:  Your Honor, we have heard no
 2    evidence for -- any Johnson & Johnson witness saying that
 3    the reason why we didn't provide a warning is because the
 4    NCI said that talc was not a risk factor.
 5          I think to -- and as Mr. Smith notes, for the
 6    vast majority of the time, up until just about a month
 7    before trial, talc was listed as a risk factor.
 8          THE COURT:  There's an argument to the jury
 9    about that.
10          MR. WILSON:  I think the Court's original
11    analogy pointing to this type of evidence as being like a
12    request for judicial notice as to the truth of what is
13    stated in a court record is directly on point.
14          THE COURT:  Well, if counsel has cases you want
15    me to look at, I'm happy to look at them.  So if you can
16    either file a very, very short brief --
17          MR. WILLIAMS:  We will.
18          THE COURT:  -- that consists only, perhaps, of
19    the names of cases.
20          MR. WILLIAMS:  That's right, your Honor.
21          Finally, on the portions of the transcripts,
22    here is what we are saying there.  Prior inconsistent
23    statements come in for the truth of the matter asserted.
24          Our point was to merely keep track of all of the
25    times that there was impeachment read into the record
26    that consisted of prior inconsistent statements under
27    oath.  We do not seek to have those portions to go back
28    to the jury.

August 11, 2017

Page 3220

1          What we were simply trying to do was to keep
2     track for the Court, counsel, the parties of all of those
3     instances, because if there were to be a request for a
4     readback, they could easily be identified and they could
5     be read back to the jury.  That's all that we were doing
6     by putting those -- chronicling those on the exhibit
7     list.
8          So, to be clear, we're not claiming that they
9     should be copied and go back as exhibits.
10          MR. WILSON:  If that's what they want to do, I
11     think they can make the point in closing argument and
12     they can point to the portion of the transcript.  If the
13     jury thinks it's significant, they can write that down
14     and ask for a readback if they are interested.
15          THE COURT:  Right.  I just don't think the
16     transcripts themselves go back to the jury.
17          MR. WILSON:  Exactly, your Honor.
18          MR. ROBINSON:  Your Honor, I have one question
19     about what we just discussed raises.  So in final
20     argument, both sides would be able to cite from the
21     transcript.
22          THE COURT:  Sure.
23          MR. ROBINSON:  That's fine.
24          MR. SMITH:  In closing statement we can put
25     trial transcript testimony up?
26          THE COURT:  Yeah.
27          MR. SMITH:  Okay.
28          THE COURT:  Let me ask an unrelated question but

August 11, 2017

Page 3221

1   perhaps related.  Have counsel talked about what you want

2   to do on the negligence per se instruction?  I know when

3   we started there was an agreement not to reference the

4   FDA issue in opening.  Has there been further discussion

5   about that?  Because that in part bears on this nonsuit

6   motion.

7           MR. ROBINSON:  Mr. Wilson has a brief on that,

8   your Honor.

9           MR. WILSON:  So, your Honor, we had proposed a

10  CACI 418 instruction modeled after exactly the way the

11  framework of the CACI 418 instruction is set forth in the

12  Judicial Council jury instructions.  Based upon 740.1(a),

13  we believe that it would read something to the effect of

14  "Title 21, Section 740.1(a), the Code of Federal

15  Regulations states" -- and then verbatim provide that

16  regulation.

17          And then this is -- and again, we maybe have to

18  modify this based upon the fact we have two defendants,

19  but the second element, we never really talked about this

20  when we previously talked about negligence per se or

21  740.1(a).

22          There was an argument about how this instruction

23  shouldn't be given because it doesn't have a causation

24  component, but it does, and it is that the violation has

25  to be a substantial factor in bringing about the harm

26  suffered by the plaintiff.  Then you must find the

27  defendant was negligent unless you find the violation was

28  excused.

August 11, 2017

Page 3222

1          It goes on to say that this is -- if you don't
2    find negligence under this theory, you have to still look
3    at the other instructions.
4          THE COURT:  Here's the problem with this
5    instruction.  Everyone tells me that it's reversible
6    error per se not to follow CACI.  Let me remind you that
7    the instructions for CACI say that they should be
8    modified appropriately for a case.
9          The problem with the negligence per se
10   instruction in this context is the substantial factor
11   language because to read the instruction as it is, first
12   of all, the jury might reach the conclusion that there
13   was no warning, Ms. Echeverria used the product, done.
14   There is liability.  That's not the law.
15         MR. WILSON:  I think, your Honor, the other
16   instructions that we have make it clear that that would
17   not be sufficient for the imposition of liability so that
18   the failure to provide the warning is not enough.
19         THE COURT:  Not only is it not enough, but she
20   has to prove that the cancer --
21         MR. WILSON:  Correct, your Honor.  We have the
22   other instructions --
23         THE COURT:  Right.  But you didn't --
24         MR. ROBINSON:  More probable than not could
25   change the concern about substantial factor.
26         THE COURT:  But the problem is that the
27   language -- the violation was a substantial factor is
28   really not sufficient in this context because it's not

August 11, 2017

Page 3223

1    simply the violation.  There also has to be proof that
2    the cancer is caused by the product.
3                MR. SMITH:  Sure.
4                MR. WILSON:  But rather than just saying in
5    light of that modification, that is appropriate, let's
6    not give this instruction at all; let's modify it in a
7    way that I think addresses the Court's concern.
8                THE COURT:  Well, you can take a stab at that.
9    But that's the big problem here, I think.
10               MR. WILSON:  Okay.  Fair enough.  We agree.
11               MR. WILLIAMS:  Your Honor, we have discussed
12   this several times.
13               THE COURT:  We have been around about it.
14               MR. WILLIAMS:  And I just wanted to remind the
15   Court where we were.  And so I thought that this might
16   come up, and so I have a transcript from that which I
17   think crystalizes the issue.  If I may.
18               First of all -- and this is -- for the record,
19   this is the transcript from July 26, 2017.  And this is
20   the comment of the Court.
21               "The law is clear, but there is a
22       question of how it's going to be applied
23       here.  You can talk to counsel for a
24       second.  If he wants to not mention
25       anything about the FDA regulation in his
26       opening statement, and we don't have to
27       think some more about this, that's okay.
28               "But, otherwise, I think the

August 11, 2017

Page 3224

1      defense has the better of the argument

2      here, that the -- that, first of all,

3      it's really not dicta in Valentine, in

4      my view, and it's all a part of what the

5      duty to warn is.

6          "So if you would rather not talk

7      about 740.1 in your opening statement, I

8      understand that.  You've made your

9      record.  I understand the problem.  I

10     think on this -- this set of facts, and

11     particularly with giving this 'may' --

12     giving the 'may' language in 740.1, it

13     has to be crystal clear to the jury that

14     'may' doesn't mean 'possibly.'"

15         THE COURT:  That's the second problem with the

16     instruction.

17         MR. WILLIAMS:  And there was an additional

18     discussion, and the Court made clear -- this at page 617,

19     line 4:

20         "Counsel, you have already said it

21     three times."

22         Addressing plaintiff's counsel.

23         "I appreciate what you say.  I

24     understand the problem.  But I think if

25     you're going to put 740.1 at issue in

26     this case, the jury has to have it --

27     has to have had it made crystal clear to

28     them that 'may' does not mean

August 11, 2017

Page 3225

1        'possibly.'  Valentine addresses that
2        directly."
3              And that followed, your Honor, my argument that
4   it wasn't just opening statement; it was putting it at
5   issue in the case.
6              You continued and said, "You have made your
7   record."
8              But then Mr. Cachan sought clarification about
9   whether the issue was coming in.
10             "And just to clarify, your Honor,
11        this is the issue coming out of the
12        case.  We're not talking about it.  It's
13        not going to be in the opening.  And
14        we're going to hear a little bit later
15        about some mysterious federal regulation
16        unstated, or 740.1, because, if that's
17        the issue, it's different."
18             And the Court said:
19             "The time is now.  The plaintiff
20        has to elect whether they want to" --
21             Then Mr. Robinson spoke up.  He asked for 1222
22   and extra language from Valentine.  And then the Court
23   said:
24             "Here is what counsel is asking,
25        and this is my question as well:  It's
26        not just a question that it's not going
27        to be in opening statement here; there
28        is not going to be any evidence in this

August 11, 2017

Page 3226

1      trial on 740.1.  Yes or no?"

2           "Mr. Robinson:  We'll do it, your Honor.

3           "We'll do what?

4           "We won't go to 740.1, but no

5      Valentine."

6           So that was the issue.  The issue was clear that

7  740.1 --

8           MR. ROBINSON:  No.

9           MR. WILLIAMS:  May I finish, your Honor?

10          THE COURT:  Just a minute.  Let counsel finish,

11  and then you can respond.

12          MR. WILLIAMS:  That 740.1 wasn't going to come

13  in.  And so the Court then asked:

14          "So with that in mind, did counsel

15      want me to preinstruct the jury at all?"

16          Mr. Robinson said:

17          "I don't see any reason."

18          Mr. Cachan said:

19          "We don't either, but with this

20      clarification, your Honor, which is we

21      want to make certain that the fact 740.1

22      is no longer in the case doesn't mean

23      that all of a sudden we're prohibited

24      from bringing up the FDA letter,

25      understanding we're not talking about

26      740.1, but the FDA letter should not be

27      affected."

28          And we asked for clarification.  The Court then

August 11, 2017

Page 3227

1   said:

2          "Right.  That's a whole different

3      issue, but we don't have to give that

4      this morning.  So if you want to do

5      that, I think it's okay.  That's a fair

6      inference from your -- the letter will

7      come in, but I think counsel is entitled

8      to argue that the fact that the FDA does

9      not require a warning because there

10     wasn't inclusive" -- that may have been

11     "conclusive" -- "proof isn't the

12     standard in the state."

13         So our point is 740.1, the statute, the per se

14  instruction that counsel and Mr. Wilson just put up,

15  should not be used.  There was that long argument.  And

16  you'll remember Mr. Cachan saying it either is the same

17  standard as California or it isn't.  If it's the same

18  standard, then it's confusing, for the reasons the Court

19  has said.  If it's a different standard, 740.1 cannot

20  change the law.  That was the thing that we talked about

21  again and again.

22         So I'm doing my best to channel Mr. Cachan, but

23  the point is that the instruction that they're requesting

24  should not be given, in our view.  They made a choice at

25  the beginning of the case whether it was coming in or

26  not.  And they should have to live with that.

27         THE COURT:  Mr. Wilson.

28         MR. WILSON:  Thank you, your Honor.

August 11, 2017

Page 3228

1          Everything that counsel just talked about came

2     up in the context of the preinstructions.  We were

3     talking about what we were going to preinstruct the jury

4     about.  We wanted 418.  We wanted 740.1(a).  They wanted

5     Valentine and the modified CACI 1220.  They got -- what

6     Mr. Robinson was talking about was a tradeoff.  We won't

7     ask for the 740.1 preinstruction if they don't get their

8     modified Valentine 1222.  They got their way.  What they

9     really want now is to have their cake and eat it too.

10    That's what's going on.  We never gave up the right to

11    instruct the jury at a later time on 740.1(a).

12          What the Court, I think -- you know, we were

13    talking about also the Cooper instruction that the Court,

14    I think, was weaving into how to appropriately give

15    740.1(a) in this context, with that Cooper instruction

16    that the Court came up with.  That is an appropriate

17    compromise here.  But to say that we just forfeited the

18    right to ever have the jury instruction on 740.1(a) or to

19    introduce any evidence, that's not what happened.  We

20    were talking about preinstructions.  We wanted some; they

21    wanted some.  They got their way.  They got the ones that

22    they wanted; we got nothing that we wanted.

23          THE COURT:  Well, you could have had a

24    preinstruction, but you didn't want the preinstruction

25    that I was going to give.

26          MR. WILSON:  So we weren't talking about

27    preinstructions at that time, your Honor.

28          MR. WILLIAMS:  Respectfully, your Honor, what I

August 11, 2017

Page 3229

1    just showed the Court was the Court saying that the time
2    was now for the plaintiff to make that decision.  That's
3    what the Court did.  They didn't want to have the
4    preinstruction.  When faced with the decision about
5    whether to use 740.1 and get an instruction for the jury
6    or not, they chose not to do that.  The Court made
7    crystal clear three other places that, if they were to
8    make that choice at that time, the Court was going to
9    give the extra Valentine language in the instruction.
10   They didn't want that.  They made that choice.
11        What they're asking for now is to try to -- I
12   guess, the passage of time and the fading of memory,
13   they're trying to now say that 740.1 is front and center
14   in the case.  That's not what happened.  The Court told
15   them that they had to make a decision.  The decision was
16   made.  The question at the end of the discussion was
17   whether or not 740.1 is coming in the case or not, not
18   just opening statement.
19        MR. WILSON:  Your Honor, we were talking about
20   preinstructions.  They got the preinstruction that they
21   wanted.  We didn't -- 740.1 wasn't preinstructed.  There
22   was never an agreement that it was never going to be
23   instructed at the conclusion of the case.  To call it a
24   centerpiece of the case is not accurate.  It is part of
25   the claims.  It is part of the instructions.  It's part
26   of the evidence in the case.  We're going to hear about
27   it shortly from the witness that's on the stand right
28   now.

August 11, 2017

Page 3230

1          And, you know, we would just ask that we be
2     allowed to permit what we believe is an appropriate set
3     of final jury instructions, including the very CACI -- or
4     the 740.1 instruction, as well as maybe the Cooper issue,
5     to address how to appropriately put this before the jury.
6     To wipe it out when we were clearly having a discussion
7     where we were proposing a tradeoff, "Look, we won't go to
8     740.1 if you don't do this modified 1222, and we won't
9     talk about it in opening."  To say that that's now barred
10    us from including it in the final instructions is not
11    accurate, and it's just not what happened.
12             MR. WILLIAMS:  May I?
13             MR. WILSON:  Sure.
14             MR. WILLIAMS:  One more time, your Honor.  It is
15    what happened.  The transcript doesn't lie.  This is
16    page 620.
17             "The Court:  Mr. Robinson, here is
18        what counsel is asking and this is my
19        question as well:  It's not just a
20        question that it's not going to be in
21        opening statement here.  There is not
22        going to be any evidence in this trial
23        on 740.1.  Yes or no?
24             "Okay, your Honor.  We'll do it,
25        your Honor.
26             "You'll do what?
27             "We won't go to 740.1, but no
28        Valentine."

August 11, 2017

Page 3231

1          The choice was made at that time that 740.1 was
2     in or out of the case.  Counsel just mentioned -- this
3     shows exactly what they planned.  We're not going to talk
4     about 740.1 with Dr. Andersen.  Counsel and Mr. Wilson
5     just mentioned a minute ago that they plan to try to do
6     740.1 with Dr. Andersen.
7          MR. ROBINSON:  Your Honor --
8          MR. WILLIAMS:  That's not in the case.  The
9     choice was made at that time.  The Court gave them a
10    choice.  It was about whether it's coming into the case.
11    It could not be clearer.
12         MR. ROBINSON:  Your Honor, later, the Court --
13    whatever happened here, the Court put the Valentine
14    instruction in.  So all bets were off.
15         THE COURT:  The Court put the Valentine
16    instruction in because Mr. Smith --
17         MR. ROBINSON:  Yes, that was the condition.
18         THE COURT:  That was different.  Mr. Smith made
19    reference in the opening statement, if I recall
20    correctly, to separate -- that causation need not be
21    shown here.  That is why they were preinstructed with the
22    Valentine instruction.
23         MR. ROBINSON:  Your Honor --
24         THE COURT:  That's different.
25         MR. ROBINSON:  But, your Honor, what I'm saying
26    is, that's why I -- whatever the reason was, Valentine
27    was put in.  So I'm just saying that that was the only
28    reason I was saying in my opening statement I wasn't

August 11, 2017

Page 3232

1    going to mention 740.1.  The bottom line is 740.1 is the

2    law -- federal law on this case, your Honor.  And,

3    basically, Valentine was read in.  So I think 740.1 is

4    what should be given to the jury.

5         THE COURT:  All right.  So my recollection has

6    been refreshed about this point.  Thank you.

7         MR. WILSON:  Your Honor -- I'm sorry.  This was

8    a discussion about a tradeoff.

9         THE COURT:  Okay.  Excuse me, Counsel.

10        MR. WILSON:  I'm sorry.

11        THE COURT:  At the very beginning of this, there

12   was a discussion about whether 740.1 was going to be in

13   the case or not in the case.  And if it was -- if it was,

14   what instruction we were going to give the jury at the

15   beginning so that they would understand the context of

16   740.1 and not be under the misimpression that the word

17   "may," as used in this statute, was mandatory or wiped

18   out any "likely/more probably than not" requirement and

19   causation still had to be proven.

20        Plaintiff elected not to go with 740.1.  I read

21   the Valentine instruction later as a curative instruction

22   because of the statements that were made in opening

23   statement.

24        Defense counsel is correct.  I'm not going to

25   instruct on 740.1.  You elected out of it.

26        MR. WILLIAMS:  For clarity, your Honor, it would

27   not be appropriate for Mr. Smith on cross-examination to

28   put 740.1 in front of Dr. Andersen when I'm not going

August 11, 2017

Page 3233

 1   there at all, not raising that at all.  It would be

 2   inappropriate.  740.1 should be out of the case, and the

 3   jury should not be confused on the issue.

 4        MR. SMITH:  Your Honor, it's in his report.  He

 5   relies on it in the four corners of his report.  It's not

 6   like Dr. Plunkett.  I understand why the judge said --

 7   Dr. Plunkett didn't work at the FDA, didn't have specific

 8   knowledge.  He says he knew everything and worked in

 9   every department of the FDA.  He has 740.1(a) quoted in

10   his report, and the basis of his opinions through his

11   deposition are in the four corners of his report.  That

12   is a different story.

13        They elected to bring this witness.  They didn't

14   have to bring him.  But if we're talking about the

15   opinions -- if I've been stuck to the four corners of my

16   experts' reports, what's good for me ought to be good for

17   them.  And they elected to bring this witness, and he

18   relies on it and quotes it in his report.

19        MR. WILLIAMS:  Your Honor, he is giving no

20   opinions regarding 740.1.  We have been -- he's not

21   giving any opinions regarding FDA.  We established that

22   he worked at the FDA.  The opinions that he is giving

23   relate to the CIR and they relate to the safety of talc.

24   We are not giving that opinion.

25        The reason that it was in his report is that we

26   knew that they -- specifically, Dr. Plunkett -- had

27   intended to give all kinds of opinions concerning 740.1.

28   In his report, Dr. Andersen says that he's giving

August 11, 2017

Page 3234

1    responsive opinions.

2              THE COURT:  May I see the report?

3              MR. WILLIAMS:  Sure.

4              MR. SMITH:  Here you go, your Honor.  May I

5    approach?

6              THE COURT:  I don't have a notebook -- let me

7    just -- do you have a complete notebook for Dr. Andersen

8    that the Court can have?  If it's in the notebook, I'll

9    just get it.  Is the report in there?

10             MR. WILLIAMS:  It is.

11             THE COURT:  Okay.

12             MR. WILLIAMS:  Or I believe it is.

13             MR. SMITH:  Further, your Honor, I just want to

14   make another point on this while you're reading to give

15   some context.  He says that all his reliance materials

16   for the basis of his opinion are in his report.  He went

17   and read Mr. Steinberg and Dr. Plunkett's prior

18   deposition testimony and report where it lays out

19   740.1(a), and then he cites it in his report and

20   interprets 740.1(a).

21             I'm not going to ask him to interpret a statute.

22   You said that invades the province of the jury.  But to

23   say somehow that 740.1(a) isn't in here when it's both in

24   Mr. Steinberg's deposition and report, Dr. Plunkett's

25   deposition report -- which he says he relies on -- and

26   then cited and quoted in the four corners of his report,

27   is ridiculous.

28             And, you know, again -- I will say again, your

August 11, 2017

Page 3235

1    Honor, they did not have to call this witness and put
2    this at issue.  Just because they didn't bring it up on
3    cross doesn't erase it that he's relied on it in his
4    reference materials and it's cited in his report.
5              MR. WILLIAMS:  Your Honor, may I walk you
6    through this?
7              THE COURT:  Sure.
8              MR. WILLIAMS:  First of all, at the bottom of
9    page 3, if you have D25 in front of you, your Honor.
10             THE COURT:  I do.
11             MR. WILLIAMS:  At the bottom of page 3, it says:
12             "I anticipate testifying at trial
13          regarding the assessment of the safety
14          of talc as used in cosmetics, the issue
15          of the use of scientific data in making
16          safety assessments in general and the
17          procedures used by the CIR in
18          particular, and the role of
19          manufacturers in such safety
20          assessments.  I also anticipate
21          responding to the opinions and testimony
22          offered by the plaintiff's experts in
23          this case."
24             If you then turn back to the later portion where
25   it references Dr. Plunkett and Mr. Steinberg, and that's
26   on page --
27             THE COURT:  Can you tell me where that is,
28   please?

August 11, 2017

Page 3236

1         MR. WILLIAMS:  If you'll bear with me.
2   Dr. Plunkett is on page 16 of D25, paragraph 10.  What
3   the doctor did, Dr. Andersen, was he went through the CIR
4   report.  He then says that he is going to be responsive
5   to Steinberg and Plunkett.  On paragraph 10 he cites the
6   October 5, 2006, expert report of Dr. Plunkett and all of
7   her statements about 740.1, which you will see on page 17
8   at the top.  You'll see it says up there at the top:
9             "It is informative, therefore, that
10        FDA has denied two petitions," et
11        cetera.
12            So, your Honor, this portion was responsive.  Of
13  course, Dr. Plunkett, the Court kept that out.  So there
14  has been no opinion given by Dr. Plunkett on 740.1.
15  Dr. Andersen was going to respond to those opinions, as
16  we had to have him do, because, in other cases, 740.1 was
17  front and center in the plaintiff's theory.  They tried
18  to make it front and center here.  The Court disagreed
19  and disallowed Dr. Plunkett's testimony in that regard.
20            After that, we had the colloquy that's up on the
21  board right now, where the Court said, "You have to
22  decide" -- plaintiff's counsel -- "whether this is coming
23  in or it is not."  So to simply say that it's in
24  Dr. Andersen's report when it's in his report as a
25  response to potential testimony of the expert on the
26  other side, what were we to do?  The plaintiffs intended
27  to make that argument.  We had to be in a position to
28  respond.

August 11, 2017

Page 3237

1          But that is not the opinions that he has given

2     in this case.  We do not intend to elicit it from him.

3     It would turn the rule on its head to simply say that the

4     fact that we put it in our report responding to what

5     their expert planned to do means that it automatically

6     becomes an issue in the case.  That is what makes no

7     sense, with all due respect to plaintiff's counsel.  It

8     is not simply that the word is in the report.  It was

9     there for a reason.  It was there to respond to

10    Dr. Plunkett.  Dr. Plunkett has not been permitted to

11    make that testimony.

12          THE COURT:  Do you want to make your argument

13    about Mr. Steinberg?  It's the same, I assume.

14          MR. WILLIAMS:  Well, it was the same with

15    Steinberg.  They chose not to call him in the case.

16          So either way you look at it, the fact that this

17    is in the report should not obviate everything that we

18    went through, the weeks of argument on 740.1, where the

19    Court made them make a decision.

20          The sequence was, after the Court made them make

21    a decision, they said no, as you can see up on the board,

22    on line 12, on page 620 of the transcript.  Mr. Smith

23    then injected it again into opening statement,

24    distinguishing "may" language from causation.  The Court,

25    in reaction to that, after having agreed not to give the

26    Valentine instruction, gave the Valentine instruction.

27          So this is of their making; it's not of our

28    making.  Now they're trying to inject it in through this

August 11, 2017

Page 3238

1    witness again when their expert was prevented from doing

2    it.  Ours was simply to be responsive.

3            MR. SMITH:  Your Honor, what's good for the

4    goose is good for the gander.  I mean, I've had to stay

5    within the four corners of my report.  It is cited.  It

6    doesn't matter -- he gives an opinion on it.

7            But beyond even that, he said he relies on, for

8    the basis of his opinions, the report of Mr. Steinberg,

9    the deposition of Mr. Steinberg was exclusively

10   mentioned, and Dr. Plunkett's deposition and her report,

11   which continually talked about it.  It --

12           THE COURT:  Excuse me.

13           MR. SMITH:  I'm sorry.

14           THE COURT:  Can you tell me where in

15   Dr. Andersen's report he relies on Dr. Steinberg or

16   Dr. Plunkett with respect to his opinions regarding the

17   CIR safety assessment?  That's the first part of the

18   report.  And if he tells us what his point of view is

19   about that.

20           MR. SMITH:  I don't think the CIR report is at

21   issue, your Honor, that we are talking about.  I think

22   it's more on page 16 and 17 of his report.

23           THE COURT:  Right.  But that is, as he makes

24   clear on page 3, rebuttal to the opinions and testimony

25   offered by plaintiff's experts in this case.  That's what

26   it says.  That's what the report says.

27           So if your -- since Dr. Plunkett didn't talk

28   about the FDA and Dr. Steinberg -- is it Dr. Steinberg?

August 11, 2017

Page 3239

1          MR. SMITH:  Mr. Steinberg.

2          THE COURT:  Mr. Steinberg wasn't called as a

3  witness.  There's nothing to rebut.  No part of the

4  report really needs to deal with that.

5          MR. SMITH:  Okay.  Give the defense that.

6  That's fine.  But look at Number 2 under page 3, "Other

7  Materials."  He went not just as rebuttal to -- he went

8  and said:

9          "Other materials that he's relied

10     on:  expert report and deposition of

11     David Steinberg; expert report and

12     deposition of Laura Plunkett; the Hill

13     criteria; the FDA website, which has

14     this on it; consent judgment."

15         He went to the FDA website.  It has this 740.1

16  language on it.  "Consent judgment involving the people's

17  claim against defendant Glive [phonetic].  Description of

18  clinical trials."  So it's on the website he also said he

19  went to besides just rebuttal testimony of Steinberg and

20  Dr. Plunkett.

21         THE COURT:  But the information he deals with,

22  the testimony that was anticipated to be given by

23  Dr. Plunkett and Mr. Steinberg, if counsel doesn't bring

24  that out, I don't think it's proper given the scope of

25  plaintiffs.

26         MR. SMITH:  Even though he was at the FDA, he's

27  aware of warnings, he said went to the FDA website, he

28  has reliance materials on his report outside

August 11, 2017

Page 3240

1    Mr. Steinberg or Dr. Plunkett.

2            THE COURT:  The problem, Counsel, is that if he

3    doesn't give an opinion on that issue, there's no -- it's

4    outside the scope of his opinion.

5            MR. SMITH:  Well, the defense counsel just filed

6    a pleading to take judicial notice of the 2014 citizen's

7    petition that has it in it.

8            MR. WILLIAMS:  Your Honor, these are two totally

9    separate issues.  I'm not going to talk about the 2014

10   issue that we just filed the judicial notice on at all

11   with Dr. Andersen.

12           As the Court indicated, and I showed just a few

13   minutes ago, we specifically raised the issue of whether

14   or not 740.1, the fact that that is not coming into the

15   case, would prevent us from putting in the FDA letter.

16   That was this portion of the transcript at page 627 of

17   the transcript on July 26 where Mr. Cachan raised the

18   issue.  And the Court said:

19           "That's a whole different issue,

20       but we don't have to go into that this

21       morning.  If you want to do that, I

22       think it's okay.  That's a fair

23       inference from your -- the letter will

24       come in.  But I think counsel is

25       entitled to argue that the fact that the

26       FDA does not require a warning, because

27       there wasn't inclusive proof" -- that

28       might have been "conclusive" -- isn't

August 11, 2017

Page 3241

1          the standard in the state."

2                   So the point is that the issue of whether or not

3     we separately can put in and have the Court take judicial

4     notice of the fact that the FDA denied a citizen's

5     petition relating to talc, which is a key issue as to our

6     state of mind, as to the state of play we are in talc,

7     that's a different thing from whether or not counsel gets

8     to put 740.1 into the case through a witness where the

9     witness is not giving that testimony.

10                  So to respond directly to what counsel said

11    about listing the references, of course the witness has

12    to list all of the references.  But the references he was

13    pointing to were references in response to Dr. Plunkett

14    and Mr. Steinberg.

15                  MR. SMITH:  The reason we didn't go to 740.1(a)

16    with Dr. Plunkett is because we were under the impression

17    the Court was going to read the statute to the jury, and

18    there was no email interpretation, number one.

19                  Number two, they want to take judicial notice of

20    an FDA letter that spells out 740.1(a) and (b), but then

21    I'm not able to use it.  It makes no sense.

22                  THE COURT:  If you're going to -- well, I'm

23    going to have to take a look at the letter again.  Where

24    is it?

25                  MR. WILLIAMS:  I don't have a copy on me.

26                  MR. SMITH:  I've got a copy.

27                  MR. WILLIAMS:  The letter does not cite 740.1.

28    It uses the language of 740.1, and the writer from the

August 11, 2017

Page 3242

1    FDA says that:

2              "Based on the totality of the

3        evidence that's in front of the FDA, we

4        do not believe that a warning is

5        required on this state of evidence with

6        respect to talc."

7              It does not cite -- and I think it's very

8    intentional that they do not cite the regulation.  They

9    simply use the language -- borrow the language from the

10   regulation in saying what they are finding.

11             So the Court separated the two issues when we

12   discussed this very same thing, said that the letter does

13   come in -- the letter comes in, but this opinion they're

14   trying to elicit through this witness should not.

15             MR. SMITH:  Okay.  Maybe I won't say 740.1(a).

16   But if you'll read the second paragraph, they want to

17   take judicial notice of -- read the second full

18   paragraph, your Honor, please.

19             Can't state it any clearer.

20             THE COURT:  No, you can't.

21             So here's the problem:  The letter that you want

22   the Court to take judicial notice of says the following:

23             "We have carefully considered both

24        of your petitions.  We are committed to

25        the protection of the public health and

26        share your interest in reducing the risk

27        of ovarian cancer.  Current regulations

28        state that cosmetic products shall bear

August 11, 2017

Page 3243

 1    a warning statement whenever necessary
 2    or appropriate to prevent a health
 3    hazard that may be associated with a
 4    product.  FDA may publish a proposal to
 5    establish a regulation prescribing a
 6    warning statement on behalf of a
 7    petitioner if the petition is supported
 8    by adequate scientific basis on
 9    reasonable grounds."
10         MR. SMITH:  That's 740.1(a) and (b).
11         THE COURT:  Okay.
12         "After careful review and
13    consideration of the information stated
14    in your petitions," et cetera --
15         I'm going to skip some of this.
16         -- "FDA did not find that the data
17    submitted presented conclusive evidence
18    of a causal association between the talc
19    use in the perineal area and ovarian
20    cancer.  For this reason and additional
21    reasons described below, FDA is denying
22    your petitions."
23         It goes on.
24         If you're going to put the FDA language before
25    the witness -- well, if you're going to ask the Court to
26    take judicial notice of the fact of the letter, that
27    would be one thing; namely, that there is such a letter.
28    The -- but the letter does state what the position of the

August 11, 2017

Page 3244

1    FDA is about what the regulations state.  So it's
2    conceivable to me, depending on what Dr. Andersen says in
3    his direct, that there will be room to cross him on this.
4    I don't know what he's going to say, but --
5         MR. WILLIAMS:  Dr. Andersen is not giving any
6    opinions regarding warnings.  He is not giving any
7    opinions regarding regulation.  He is not doing any of
8    that.  That was going to be responsive to a possible
9    opinion of Dr. Plunkett.
10        As you know, your Honor -- I'm almost done with
11   him.  And he has talked about the CIR and only about the
12   CIR.  So we're not going to put it in front of him.  To
13   permit them to cross-examine him on it would be
14   inappropriate.
15        The only reason for doing it would be to blur
16   the lines between the language, which you will see there
17   is interpreted as causal, and the "may" language from
18   740.1.  It's exactly the same thing that plaintiff's
19   counsel has done repeatedly, which is why the Court gave
20   the instruction it did at the beginning.
21        The reason why we're here is because -- and the
22   reason Valentine was given was because plaintiff tried to
23   do precisely that by blurring it.  The only reason that
24   counsel would want to put that in front of Dr. Andersen
25   would be to try to blur the line again and to emphasize
26   the "may" language and to try to suggest to the jury that
27   there was some duty to warn because the regulation uses
28   the word "may," which is exactly the vice that the Court

August 11, 2017

Page 3245

1   said should not happen because that's not the law that

2   the jury is supposed to be deciding in this case.

3           So, again, they shouldn't be permitted to inject

4   this into the case.  That is a different question from

5   taking judicial notice of the denial of the citizen's

6   petition.

7           MR. SMITH:  He wants judicial notice of the

8   denial but not what the rest of the language is.  This

9   witness has got up and said "I work at the FDA.  I was in

10  every department.  I'm a labeling expert."  He said

11  "labeling expert."  And for me to be hamstrung now

12  because he has talked about all his experience -- this is

13  not Dr. Plunkett that didn't work at the FDA, didn't say

14  "I worked in every department, that I worked on labeling,

15  and I'm a labeling expert and know all this information."

16  For me not to say "you don't know the information" or

17  "you don't know about the citizen's petition" or what

18  that language says that they want to take judicial notice

19  of, it defies legal logic.

20          THE COURT:  I'm not exactly clear, Mr. Smith, on

21  how you intend to -- what you intend to do here.

22          MR. SMITH:  Can we just take it as it goes and

23  see how it goes?  I mean --

24          THE COURT:  Well, I think we may have to do

25  that.  But the problem I see is two-fold.  If the witness

26  doesn't testify to any FDA warning anything, all he said

27  is "I used to work for the FDA and worked my way up the

28  ladder in these various positions, including the

August 11, 2017

Page 3246

1   labeling," that if you are going to try to cross-examine

2   him on his expertise because he doesn't know about this

3   letter or something, that might be one thing, but --

4   although I have to say I think it's written after he left

5   the FDA --

6          MR. WILLIAMS:  True.

7          THE COURT:  -- so how he would know about it

8   is --

9          MR. SMITH:  Well, he says he stays up with the

10   FDA and talks to his people back all the time.

11          I mean, look, we can take it up as it goes.  If

12   I can't lay the foundation to do it, well, then I'm sure

13   there will be an objection and I can't do it.

14          MR. WILLIAMS:  Well, now, here's the thing, your

15   Honor, that's not fair, because he's duty-bound to give

16   honest answers.

17          If Mr. Smith is permitted to go down this path

18   and to ask him questions about labeling, his experience

19   with labeling, of course he's going to say that he has

20   experience with labeling.  And then Mr. Smith is going to

21   argue that the door has been opened and that he has laid

22   a foundation and go plunging into 740.1.  That's not

23   appropriate.

24          THE COURT:  Let's see where we go here.  But

25   remind the plaintiff's counsel that from what's in the

26   record, you've made this issue on 740.1, you've made your

27   choice.  The Court, I think, has been very, very clear

28   that it is not to be suggested in any way to the jury

August 11, 2017

Page 3247

1   that this FDA regulation or its use of the word "may" is

2   to be interpreted in a way that precludes causation.

3           MR. SMITH:  I agree.  I totally agree.

4           MR. WILLIAMS:  He agrees each time, your Honor,

5   and then he does exactly the opposite.

6           THE COURT:  Mr. Smith, all I can say is that

7   you've heard what I have to say.

8           MR. SMITH:  Yes, your Honor.  Thank you.

9           MR. ROBINSON:  Your Honor, another matter, I

10  think -- in fairness, I think I should be able to make --

11  to clear something up on the record.

12          Originally when we offered Dr. Plunkett to

13  testify regarding 740.1(a), the Court said, "No.  I will

14  read 740.1(a) into the record."

15          Now, the defense then wanted Valentine.  And so

16  in exchange for no Valentine, I said -- we were talking

17  about opening statement, but I said, no, no 740.1(a).

18          And then -- but what happened is the Court then

19  read Valentine.  So now the, you know, the concession

20  that I wanted, no Valentine, was taken away.  I think

21  that automatically puts back 740.1(a) into the case.

22          THE COURT:  Counsel --

23          MR. ROBINSON:  That's why I think it should be a

24  negligence per se issue, your Honor.

25          THE COURT:  I disagree with you.  The reason the

26  Court read Valentine was because in the opening statement

27  plaintiff's counsel suggested to the jury it would not

28  have to make a causation finding.

August 11, 2017

Page 3248

1              Is the jury ready?

2              COURT ASSISTANT:  Yes.

3              (The following proceedings were

4        held in open court in the presence of

5        the jury:)

6              THE COURT:  Good morning everyone.

7              ALL:  Good morning.

8              THE COURT:  Everybody doing okay?

9              ALL:  Yes.

10             THE COURT:  All right.  Good morning.  Let's

11     have a seat.  We have all the jurors here, two

12     alternates, all trial counsel, Dr. Andersen on the stand.

13             Mr. Williams.

14             MR. WILLIAMS:  Thank you, your Honor.

15                  DR. ALAN ANDERSEN,

16     having been previously sworn, resumed the stand and

17     testified further as follows:

18             DIRECT EXAMINATION (Resumed) (9:47 A.M.)

19     BY MR. WILLIAMS:

20        Q    Good morning, Dr. Andersen.

21        A    Good morning.

22             MR. WILLIAMS:  Good morning, everybody.

23             ALL:  Good morning.

24     BY MR. WILLIAMS:

25        Q    Dr. Andersen, at the end of the day -- is the

26     mic working?

27             THE COURT:  I don't think so.

28             MR. WILLIAMS:  I think it is.

August 11, 2017

Page 3249

1    BY MR. WILLIAMS:

2        Q    Dr. Andersen, at the end of the day yesterday,

3    we ended by discussing one of the studies focusing in on

4    the Hamilton study, which was one of the studies cited by

5    the Cosmetic Ingredient Review.

6             Do you remember that?

7        A    Yes.

8        Q    I don't want to take the time to go into the

9    specifics of the following studies, but I do want to just

10   mention them and ask you this question:  Did the Cosmetic

11   Ingredient Review have available to it and review the

12   scientific study known as Buz'Zard, which is

13   Exhibit L131, when it reached its conclusions as set

14   forth in the CIR report?

15       A    Yes, it did.

16       Q    It did?

17            COURT ASSISTANT:  Excuse me, Counsel.  The jury

18   can't hear you.

19            THE COURT:  Thank you.

20            MR. WILLIAMS:  I thought it was working.  Hello.

21            THE COURT:  There you go.  Now it's working.

22            MR. WILLIAMS:  Is that better?  I'll try here,

23   but when I put it on my tie, it rustles a lot.

24            Is this better?

25            THE COURT:  It was there for a second and then

26   it went out again.

27            MR. WILLIAMS:  Hello.

28            THE COURT:  There you go.

August 11, 2017

Page 3250

1          UNKNOWN JUROR:  We hear you.

2          MR. ROBINSON:  Loud and clear.

3   BY MR. WILLIAMS:

4      Q    Okay.  Let me ask that again.  Was the

5   scientific study known as Buz'Zard, which is Exhibit

6   L131, available to and reviewed by the CIR expert review

7   panel at the time they reached their conclusions

8   regarding talc?

9      A    Yes, it was.

10     Q    Was the scientific study known as the Shukla

11  study, L1138 in this case, from 2009, was that scientific

12  study available to and reviewed by the Cosmetic

13  Ingredient Review?

14     A    Yes.  That was part of what we looked at.

15     Q    Let me turn to another couple of studies.

16          Did the CIR consider studies looking at whether

17  talc causes what's known as adverse cellular effects in

18  human cells?

19     A    Yes.  There were several studies that looked at

20  human cells in laboratory culture and looked at the

21  effects.

22     Q    Was one of those studies a study called Nasreen?

23     A    Yes, it was.

24          MR. WILLIAMS:  For the record, your Honor,

25  that's Exhibit L887.

26  BY MR. WILLIAMS:

27     Q    Dr. Andersen, was one of the scientific studies

28  reviewed by the CIR the study called Lee?

August 11, 2017

Page 3251

1      A      Yes.

2      Q      That's Exhibit L741.

3             Did the CIR find that there were any adverse

4      cellular effects relating to talc?

5      A      Not in the cellular studies that were reported.

6      Q      Please go ahead.

7      A      I think the phrase that the panel adopted was

8      the cellular studies were unremarkable.

9      Q      If you could look in your book, the first book,

10     at Exhibit D25.

11     A      I'm sorry, E?

12            THE COURT:  E or D?

13            MR. WILLIAMS:  D as in dog.  D25.

14     BY MR. WILLIAMS:

15     Q      Which is your report, which attaches the --

16     which attaches the study.

17            Do you have that in front of you?

18     A      None of these have a D.

19     Q      I know what it will have.  Why don't you take a

20     look at Exhibit L384, which is the published version of

21     the study.

22     A      Yes.

23     Q      We can use that.

24            Let me direct your attention to page 11 of

25     Exhibit L384.

26     A      Yes.

27     Q      And for the record, we are referring to the

28     final final report of CIR.

August 11, 2017

Page 3252

1           Do you see the heading there on page 11,

2    "Cellular Effects"?

3        A    Yes, I do.

4        Q    And a few moments ago, without the report in

5    front of you, I believe that you used the phrase "No, not

6    remarkable"?

7        A    That's correct.

8        Q    Was this the portion of the report that you were

9    referring to?

10       A    Yes, it was.

11       Q    Can you describe for the members of the jury

12   what the CIR concluded with reference to cellular

13   effects?

14       A    They didn't really inform the discussion about

15   the safety of talc as used in cosmetics.

16       Q    In the report that's in front of you, you see

17   that there are some citations?  There's a reference

18   number at the end of the paragraph on cellular effects?

19       A    Yes.

20       Q    Do you see that it refers to 69 and then 71

21   through 78?

22       A    That's correct.

23       Q    Could you just flip to the back to the

24   references of the studies that were referenced and verify

25   that the Lee and Nasreen studies were among that range of

26   references?

27       A    Yes, they are.

28       Q    Did you prepare a slide that summarized the

August 11, 2017

Page 3253

1    findings of the Nasreen and Lee studies?

2       A    Well, presented a picture of what the results

3    look like, yes.

4       Q    Like this?  Did you do your slide deck?

5       A    Yes.

6       Q    Do you have that in front of you?

7            MR. WILLIAMS:  All right.  Your Honor,

8    permission to publish Slide 9 with the Nasreen and Lee.

9            MR. SMITH:  Again, it's not in the four corners

10   of his report.  Objection.

11           THE COURT:  Overruled.

12   BY MR. WILLIAMS:

13      Q    Now, with respect to the Nasreen study, can you

14   describe what -- there's been some testimony earlier,

15   Doctor, regarding what we've been calling apoptosis, but

16   can you describe what apoptosis is.

17      A    Well, apoptosis is programmed cell death.  For

18   whatever reason, a cell has accumulated some level of

19   insult and, as a result, it dies.

20      Q    With respect to the Nasreen study, what was the

21   conclusion of that study with regard to the impact of

22   talc on human cells?

23      A    Well, the authors were studying in particular

24   the practical aspects of the medical procedure called

25   "pleurodesis" in which talc is actually injected into the

26   area around the lung for a clinical benefit.

27           And in doing the study, they didn't look at

28   people.  They took lung cancer cells in a laboratory in a

August 11, 2017

Page 3254

1    culture dish, and they took normal lung cells in culture

2    in a petri dish in a laboratory, and they exposed them to

3    talc.  And this captures the exposure to talc resulted in

4    an increase in apoptosis in the cancer cells, but it

5    didn't affect the normal cells.

6         Q    With respect to the Lee study, was that a

7    similar type of analysis?

8         A    As I read it, the Lee study was actually a

9    letter to the editor, not a full published -- it was

10   published, but it was just a letter to the editor

11   repeating virtually the same finding, that talc affected

12   the lung cancer cells but didn't affect normal cells.

13        Q    So the effect that the -- did the exposure of

14   talc to human cancerous lung cells result in programmed

15   cell death for the cancerous cells?

16        A    That's what the studies appeared to say, yes.

17        Q    Did the exposure of talc to healthy human cells

18   result in cell death for the healthy cells?

19        A    No, it didn't.

20        Q    The CIR report was finalized in 2013, was it?

21        A    That's correct.

22        Q    And the -- what you called yesterday the final

23   report was put on the website in 2013?

24        A    That's correct.

25        Q    But the publication of the final -- what you

26   called the final final report didn't happen until two

27   years later; correct?

28        A    That's correct.

August 11, 2017

Page 3255

1    Q    You were retained by Johnson & Johnson when?

2    A    Mid 2016.

3    Q    Between the time that you left the CIR in 2013

4    and the time that you prepared your report for this

5    litigation, did you review studies of different types

6    that came out after 2013 when the CIR report was

7    prepared?

8    A    Yes, I did.

9    Q    Could you describe just generally the types of

10   studies you reviewed.

11   A    Well, I think for the most part the data that

12   were newly available were epidemiology studies.

13   Q    Did you review epidemiological studies of both

14   the cohort or prospective type and the retrospective

15   case-control type?

16   A    There were examples of both newly published.  So

17   I looked at them all.

18   Q    In your view, did the studies that you reviewed

19   change the total scientific landscape that you had last

20   studied back in 2013 at the time the CIR report came out?

21   A    It -- no, I don't think they changed my view of

22   what the epidemiology data allows you to conclude.  It

23   looked much more of the same.

24   Q    Based on your review of literature and the

25   analysis that you did both in 2011 through 2013 when the

26   CIR report was prepared, and more recently after you left

27   the CIR and reviewed the studies that you just referred

28   to, Doctor, do you consider talc to be safe in the

August 11, 2017

Page 3256

1   present practices of use and concentration?

2       A    Yes.

3       Q    Does the present practice and use -- strike

4   that.

5            Does the present practice of use and

6   concentration include the perineal use of talc?

7       A    Yes, it does.

8            MR. WILLIAMS:  No further questions, your Honor.

9            THE COURT:  All right.  Thanks.

10           Mr. Smith.

11           MR. SMITH:  Yes, your Honor.  Can I have just a

12   second?

13           THE COURT:  Sure.

14           MR. SMITH:  Thanks.

15           Your Honor.  I have a notebook.  May I approach?

16           THE COURT:  Sure.  That's for the witness?

17           MR. SMITH:  May I approach?

18           THE COURT:  Yes.

19           MR. SMITH:  Thank you.  And I have some for you,

20   your Honor.  Stack them up.

21           THE WITNESS:  Wow.  I assume the bigger one is

22   Volume 1.

23           MR. SMITH:  Yes.  We might not go through all of

24   it.  I just had it here just in case.

25           May I approach, your Honor?

26           THE COURT:  Yes.

27           MR. SMITH:  Thanks, your Honor.

28           Can I switch out Volume 2 with you, Judge?  We

August 11, 2017

Page 3257

1    are going to get this right.  The smaller one.  Thank

2    you.

3              THE COURT:  Thank you.

4              MR. SMITH:  Okay.  Has everybody got a copy?

5              Good morning, all.

6              ALL:  Good morning.

7                      CROSS-EXAMINATION

8    BY MR. SMITH:

9        Q    Hey, Doctor, how are you doing?

10       A    Doing well so far.

11       Q    My name is Allen Smith and I represent

12   Ms. Echeverria.  And we haven't had the pleasure of

13   talking, have we, before?

14       A    I'm sorry?

15       Q    We haven't had the pleasure of talking before,

16   have we?

17       A    No, we haven't.

18       Q    Well, nice to see you.  I just have a few

19   questions for you this morning.  Okay?

20       A    That's fine.

21       Q    I want to start where you just left off with

22   defense counsel on the Lee and Nasreen study, and you

23   talked about how those studies showed that talc caused

24   cancer cells to die.

25             Do you recall that?

26       A    Yes, I do.

27       Q    And you're familiar with radiation, are you not?

28       A    Yes, I am.

August 11, 2017

Page 3258

1    Q    You said you are an expert in that and had very

2  good -- or very familiar with that -- I thought you said

3  you had specialized knowledge regarding radiation in

4  direct.  Did I misunderstand that?

5    A    No, you didn't.  I spent 22 years with radiation

6  protection as part of my responsibilities, so yes.

7    Q    And radiation exposure to humans over a chronic

8  or a long period of time can lead to cancer, can it not?

9    A    It depends.

10   Q    Sure.  But it can; it's possible.  Correct?

11   A    Yes, it's possible.

12   Q    And radiation is used to give to patients like

13 my client to kill cancer cells after surgery; correct?

14   A    Radiation of different types are used as part of

15 cancer therapy, yes.

16   Q    So a similar cancer-causing substance or

17 exposure radiation given chronically over a long period

18 of time can lead to cancer.  They can also be given an

19 acute blast exposure to kill cancer cells.  Is that not

20 true?  It's regularly administered for that.

21   A    It depends on the kind of radiation that you're

22 talking about, but there is a circumstance in which, in

23 particular, ionizing radiation can, when given at high

24 doses, targeted exposure, can effectively treat a tumor,

25 yes.

26   Q    And I've got other examples of that.  HRT.

27 Chemotherapy.  We could go down.  There's a long list of

28 agents that, when given acutely in high doses, can cause

August 11, 2017

Page 3259

1  cancer cells to die and, when given chronically, can lead

2  to adverse medical effects such as cancer; is that right,

3  Doctor?

4      A    The generalization that an exposure that is

5  effective in treating a tumor automatically at low doses

6  has an adverse effect is not a generalization that I'm

7  comfortable with.  Ionizing radiation in particular

8  happens to fit that pattern.  Exposures at low levels to

9  ionizing radiation does present an incremental increase

10  in cancer risk.  So at least ionizing radiation, I'm

11  comfortable that that generalization is true.

12     Q    All right.  We will stick with radiation then.

13          You talked about epidemiological studies since

14  the 2013 CIR report.  Do you recall that?

15     A    Yes.

16     Q    Are you an epidemiologist?

17     A    No, I'm not.

18     Q    Okay.  But you just spoke about the

19  epidemiological data since 2013 when the CIR came out;

20  correct?

21     A    That's correct.

22     Q    Okay.  Are all your opinions contained in your

23  report and all the materials you relied on for your

24  opinions in this case cited in your report?

25     A    I believe so.

26     Q    And earlier with defense counsel, you talked

27  about your time with the FDA.  What years were you there

28  again?  I forgot.

August 11, 2017

Page 3260

1      A      1971 to 1993.

2      Q      So a long period of time?

3      A      It seemed like it.

4      Q      Sure.  And during direct you talked about how

5   you went to all different types of departments, including

6   cosmetics, and were familiar generally with the FDA, how

7   it works, and even talked about labeling at the FDA.  Do

8   you recall that?

9      A      Yes.

10     Q      And so you have -- or you can speak to matters

11  regarding the FDA and its control or lack of control over

12  cosmetics.  You have some familiarity with that, do you

13  not?

14             MR. WILLIAMS:  Beyond -- excuse me, your Honor.

15  Objection.  Beyond the scope.

16             THE COURT:  Overruled.

17  BY MR. SMITH:

18     Q      You have some familiarity with that, do you not?

19     A      I have a familiarity with FDA's regulatory

20  program for cosmetics.

21     Q      Okay.  And that includes warning language that

22  goes on cosmetics; correct?

23     A      Yes, it does.

24     Q      Okay.  What is the warning language or warning

25  regulation of the FDA regarding cosmetics?

26             MR. WILLIAMS:  Your Honor, objection.  Beyond

27  the scope.

28             THE COURT:  Sustained.

August 11, 2017

Page 3261

1  BY MR. SMITH:

2      Q    Did you read -- are you familiar with, since you

3  have issued a report and you said all your materials that

4  you relied on in your report, the 1990 -- 2014 FDA

5  response to the citizen's petition on talc?

6          MR. WILLIAMS:  Same objection, your Honor.

7          THE COURT:  Sustained.

8  BY MR. SMITH:

9      Q    At the FDA, in your tenure there, were you

10  familiar with the language that is included in the

11  regulation regarding cosmetics that you spoke about in

12  your deposition and in your report?

13          MR. WILLIAMS:  Same objection, your Honor.

14          THE COURT:  Sustained.

15  BY MR. SMITH:

16      Q    Are you familiar with the FDA regulations

17  regarding warnings, based on your tenure, your knowledge,

18  and experience at the FDA?

19      A    In a broad sense, yes, I'm familiar with the FDA

20  concept of labeling in general.

21      Q    Could you tell the jury what a voluntary

22  warning -- or paraphrase voluntary warning language

23  regarding the FDA over cosmetics?

24          MR. WILLIAMS:  Objection, your Honor.  Beyond

25  the scope.

26          THE COURT:  Sustained.

27  BY MR. SMITH:

28      Q    Are you familiar with the FDA warning language

August 11, 2017

Page 3262

1    regarding voluntary warnings on cosmetics?

2            MR. WILLIAMS:  Objection.  Asked and answered.

3            THE COURT:  Sustained.

4    BY MR. SMITH:

5        Q    Based on your general knowledge and experience

6    at the FDA, would you agree with me that it is ultimately

7    the companies and manufacturers that are responsible for

8    the safety and labeling of their products?

9            MR. WILLIAMS:  Same objection, your Honor.

10   Beyond the scope.

11           MR. SMITH:  Goes to his knowledge, general

12   knowledge.

13           THE COURT:  No.  Overruled given the testimony

14   that he gave about the formation of the CIR and so on.

15   BY MR. SMITH:

16       Q    Would you agree with me that it is the

17   ultimate -- it's ultimately the companies and

18   manufacturers that are responsible for the safety and

19   labeling of their products, cosmetic products?

20       A    If we could parse that out into the two pieces

21   of your question.  The way Congress set up the Food,

22   Drug, and Cosmetic Act, manufacturers are responsible for

23   ensuring the safety of ingredients used in their

24   products.  That's where the responsibility is assigned.

25           The labeling is also the responsibility of the

26   manufacturer, but those are implemented via regulations

27   as opposed to Congress having opined.

28       Q    And you are familiar with those regulations, as

August 11, 2017

Page 3263

1   you stated before; correct?

2           MR. WILLIAMS:  Asked and answered, your Honor.

3           THE COURT:  Sustained.

4   BY MR. SMITH:

5       Q   So, Doctor, based on your knowledge and general

6   experience at the FDA, a manufacturer of a cosmetic

7   cannot say just because the FDA is not mandating a

8   warning, the company is relieved from placing warnings on

9   its cosmetics products; correct?

10          MR. WILLIAMS:  It's beyond the scope, your

11  Honor.

12          MR. SMITH:  It's based on his general knowledge

13  at the FDA, your Honor.

14          THE COURT:  It is beyond the scope.  Sustained.

15  BY MR. SMITH:

16      Q   Based on your general knowledge at the FDA, are

17  you familiar with adverse incident reports and the like?

18          MR. WILLIAMS:  Same objection, your Honor.

19          THE COURT:  Sustained.

20  BY MR. SMITH:

21      Q   Are you familiar with any voluntary reporting

22  that has to be done by cosmetic companies regarding their

23  products?

24          MR. WILLIAMS:  Same objection, your Honor.

25          THE COURT:  Scope.  Sustained.

26  BY MR. SMITH:

27      Q   While at the FDA, since you said that you dealt

28  in different areas including cosmetics, would you also --

August 11, 2017

Page 3264

1  would the FDA also look to what others in the industry

2  were doing regarding labeling of their cosmetics?

3           MR. WILLIAMS:  Same objection, your Honor.

4           THE COURT:  Sustained.

5           MR. WILLIAMS:  Not been any evidence given.

6  BY MR. SMITH:

7     Q    You said that you were a labeling expert and you

8  had expertise at this at the FDA; correct?

9           MR. WILLIAMS:  Your Honor, may we be heard?

10          THE COURT:  Sustained.  We don't need to be

11  heard further on this.

12          MR. WILLIAMS:  Thank you, your Honor.

13          THE COURT:  Mr. Smith.

14  BY MR. SMITH:

15    Q    Are cosmetics preapproved by the FDA before they

16  go on the market like drugs?

17          MR. WILLIAMS:  Same objection.

18          THE COURT:  Overruled.

19          THE WITNESS:  As you phrased the question, the

20  answer is it depends.

21  BY MR. SMITH:

22    Q    So baby powder has to be preapproved before it

23  goes on the market by the FDA?

24    A    No.

25          MR. WILLIAMS:  That's argumentative, your Honor.

26  Misstates the question.

27          THE COURT:  Sustained.

28  ///

August 11, 2017

Page 3265

1    BY MR. SMITH:

2        Q    Does baby powder have to be preapproved by the

3    FDA before it went on the market?

4        A    No, it does not, unless it contains a color

5    additive.  FDA must approve color additives before they

6    go on the market.

7        Q    Are you aware if Johnson's baby powder contains

8    a color additive?

9        A    I don't know.  I just was telling you what the

10   rules are.

11       Q    If baby powder, I'll represent to you, is

12   99 percent talc and 1 percent fragrance, would that

13   contain a color additive?

14       A    No.

15       Q    Would you agree that the cosmetic industry for

16   the most part is self-regulatory?

17            MR. WILLIAMS:  Same objection, your Honor.

18   Beyond the scope.

19            THE COURT:  Overruled.

20            THE WITNESS:  Not in any regard.

21   BY MR. SMITH:

22       Q    You don't agree with that statement?

23       A    No, I don't.

24            MR. SMITH:  Do you have his deposition?

25   BY MR. SMITH:

26       Q    Give me just a minute, Doctor.  I'm going to

27   pull out my red notebooks.

28            MR. SMITH:  May I approach -- I'll give the

August 11, 2017

Page 3266

```
 1   defendants --
 2             MR. WILLIAMS:  Thank you.
 3             MR. SMITH:  Oh, you need a copy.
 4             THE COURT:  That's okay.
 5             MR. SMITH:  Permission to read page -- let me
 6   get to it, your Honor.  Permission to read line 11
 7   through 19.
 8             THE COURT:  Of what page?
 9             MR. SMITH:  Oh, I'm sorry.  152.
10             THE COURT:  Thank you.
11             MR. SMITH:  May I proceed?
12             MR. WILLIAMS:  May I have a moment?
13             I'm sorry.  What were the line numbers, your
14   Honor?
15             THE COURT:  152, 11 through 19.
16             MR. WILLIAMS:  No objection.
17   BY MR. SMITH:
18        Q    Question to you -- do you remember being deposed
19   under oath?
20        A    Yes.
21        Q    A question was asked to you:
22             "Is the cosmetic industry
23        self-regulated?"
24             Your answer was:
25             "That is their intent.  It is
26        my" --
27             MR. WILLIAMS:  Sorry.  I thought that was a
28   stop.  I apologize, your Honor.  I thought counsel had
```

August 11, 2017

Page 3267

1    stopped.

2             MR. SMITH:  May I continue?

3             THE COURT:  Yes.

4    BY MR. SMITH:

5        Q    Okay.

6             "It is in my own global view as a

7        regulatory scientist with 40 years'

8        experience, it's not entirely true.  The

9        efforts clearly that occur in Europe are

10       not self-regulatory.  Dealing with

11       Prop 65 in California is not

12       self-regulatory.  But the CIR effort is

13       certainly what the trade association

14       touts as their self-regulatory

15       contribution."

16            Did I read that correctly?

17            MR. WILLIAMS:  Actually, it says "being their

18   self-regulatory contribution," your Honor.

19   BY MR. SMITH:

20       Q    Is that correct?

21       A    I think I said that very well.

22       Q    Did you?  I thought you said to me under oath in

23   no way is that correct when I asked if it was

24   self-regulatory.  I thought that was your response.  I

25   can have it read back to you if you would like.

26            MR. WILLIAMS:  There's no question pending, your

27   Honor.

28   ///

August 11, 2017

Page 3268

1    BY MR. SMITH:

2         Q    Do you remember saying that?

3         A    I remember answering your question by saying no.

4         Q    You don't recall saying any more than that?

5         A    I'm lost.

6         Q    Okay.  We'll move on.

7              The FDA does not require, based on your

8    knowledge and experience, cosmetic companies to share

9    safety information with the FDA; is that correct?

10        A    Does not require?  No.  FDA, according to the

11   Food, Drug, and Cosmetic Act, except for color additives,

12   does not require safety data to be submitted.

13        Q    And the FDA cannot require a recall of a

14   cosmetic; is that correct?

15             MR. WILLIAMS:  Your Honor, that's beyond the

16   scope.

17             THE COURT:  Sustained.

18   BY MR. SMITH:

19        Q    Do you have general knowledge about the FDA and

20   what they can and cannot do regarding cosmetics based on

21   what your testimony was on direct?

22             MR. WILLIAMS:  Asked and answered, your Honor.

23             THE COURT:  Overruled.

24   BY MR. SMITH:

25        Q    Doctor?

26        A    Yes, I think I do.

27        Q    And do you know whether or not the FDA, based on

28   your knowledge and experience at the FDA, can require a

August 11, 2017

Page 3269

1   recall of a cosmetic product?

2          MR. WILLIAMS:  That's the same question.  Beyond

3   the scope.

4          THE COURT:  Sustained.

5   BY MR. SMITH:

6      Q    Okay.  Let's talk about Dr. Andersen for a

7   second, because I haven't had the pleasure of meeting

8   you.

9          Have you ever seen or treated Mrs. Echeverria?

10     A    No, I have not.

11     Q    Besides the CIR that you've talked about with

12  defense counsel, have you ever lectured, publicate -- had

13  any publications or studies on talc and ovarian cancer?

14     A    Yes.

15     Q    On talc and ovarian cancer both together besides

16  the CIR?

17     A    Oh, I'm sorry.  Did you put that caveat of

18  besides the CIR?

19     Q    Yes, sir.

20     A    I'm sorry.

21          No, I have not.

22     Q    And while you were at the FDA, did you have any

23  epidemiological data that you reviewed that dealt with

24  talc?

25     A    No, I didn't.

26     Q    You're not an epidemiologist?

27     A    No, I'm not.

28     Q    You're not a toxicologist?

August 11, 2017

Page 3270

1      A    Not by training.

2      Q    What does that mean?  What does "not by

3   training" mean?

4      A    My responsibilities as a regulatory scientist,

5   as a member of FDA senior executive service, was to be

6   knowledgeable about all of the kinds of data:

7   laboratory, animal, included toxicology, clinical

8   studies.  And while I'm not an epidemiologist, frankly, I

9   was responsible for factoring in what's the impact of the

10  findings from epidemiology studies.  That's what a senior

11  FDA official does.

12     Q    And as a senior FDA official, you would be

13  familiar with the regulations regarding warnings on

14  cosmetics; correct?

15     A    I'm aware of the FDA requirements for warnings

16  on products in general.

17     Q    What are they?

18          MR. WILLIAMS:  Your Honor, objection.  That's

19  beyond the scope.

20          THE COURT:  Sustained.

21  BY MR. SMITH:

22     Q    All right.  You talked about toxicology not by

23  trade.  The jury has heard from one of my experts,

24  Dr. Laura Plunkett.  It's the first witness I brought.

25  She's a toxicologist.  She testified about what she had

26  to do to be a certified toxicologist.

27          MR. WILLIAMS:  Objection to the preamble, your

28  Honor.  It's not a question.

August 11, 2017

Page 3271

1          THE COURT:  Sustained.

2          MR. WILLIAMS:  It's argumentative.

3  BY MR. SMITH:

4     Q    Let me ask you this:  Have you gone through the

5  certification as a toxicologist under the American Board

6  of Toxicology?

7     A    No.  I have not, no.

8     Q    Are you a paid expert for the defendants in this

9  case?

10    A    Yes, I am.

11    Q    And what is your hourly rate?

12    A    $695 an hour is what the firm charges for my

13  services.

14    Q    And that firm is EAS Consulting Group; correct?

15    A    Yes.

16    Q    And EA -- excuse me -- that's a

17  tongue-twister -- EAS Consulting Group has a website;

18  correct?  You're familiar with that.

19    A    Familiar would be extending it.  I know that it

20  exists.

21    Q    Sure.

22         MR. SMITH:  And, Jeff, I'd like to go to P940.

23  It's the website of EAS Consulting.

24         May I publish it, your Honor?

25         THE COURT:  Any objection?

26         MR. WILLIAMS:  May I have a moment, your Honor?

27         No objection.

28         THE COURT:  Go ahead, Counsel.

August 11, 2017

Page 3272

1    BY MR. SMITH:

2         Q    All right.  This is EA -- I can't say it -- EAS

3    Consulting Group.  Easy for me to say.

4              And this is where you're a consultant; right?

5         A    I'm an independent consultant associated with

6    the EAS Consulting Group.

7         Q    Well, the defendants write the checks "EAS

8    Consulting"; right?

9         A    I'm sorry?

10        Q    Do the defendants that hired you in this case,

11   do they write them to you personally or EAS Consulting

12   Group?

13        A    To EAS Consulting.

14        Q    Okay.  "Specializing in FDA regulatory matters."

15             Do you see that?

16        A    Yes.

17        Q    Okay.

18             And, Jeff, if we can go down into the gray right

19   here.

20             Can y'all see that?  Everybody can see that?

21             "EAS Consulting Group specializes

22        in FDA regulatory matters.  Our prime

23        focus is to assist domestic and foreign

24        pharmaceutical, medical device, tobacco,

25        food, dietary supplement, and cosmetic

26        firms comply with applicable laws and

27        regulations."

28             Is that what you understand your consulting

August 11, 2017

Page 3273

1   group to do?

2       A     Yes.

3       Q     Okay.  And do you know John Bailey, Dr. Bailey?

4       A     Yes, I do know Dr. Bailey.

5       Q     Do you know him personally and professionally or

6   just professionally?

7       A     It's hard not to be both.

8       Q     Okay.

9             I'd like to go to another part of the website,

10  your Honor.  It's P943.

11            And there he is -- I've printed this off the EAS

12  site -- John Bailey, Ph.D.  And he is an independent

13  adviser, colors and cosmetics.

14            He was formerly at the FDA, was he not?

15            MR. WILLIAMS:  Objection.  Relevance.  Beyond

16  the scope.

17            MR. SMITH:  He said he knew him personally and

18  professionally, your Honor.

19            THE COURT:  Sustained.

20  BY MR. SMITH:

21      Q     Do you know whether or not Dr. Bailey worked at

22  the FDA?

23            MR. WILLIAMS:  Relevance, your Honor.

24            THE COURT:  Sustained.

25  BY MR. SMITH:

26      Q     Regardless, John Bailey works at EAS Consulting;

27  correct?

28      A     That's my understanding.

August 11, 2017

```
                                                    Page 3274
   1      Q     Was Mr. Bailey at the FDA while you were there?
   2            MR. WILLIAMS:  Relevance, your Honor.
   3            THE COURT:  Let me see counsel at sidebar.
   4            (The following proceedings were had
   5      at the sidebar out of the hearing of the
   6      jury:)
   7            THE COURT:  What's your offer of proof as to the
   8   relevance?
   9            MR. SMITH:  He talks about the FDA later on.
  10   I'm going to set up that Mr. Bailey was the one that
  11   responded to the citizen's petition, and he also went to
  12   work for the PCPC when he was working for CIR.  That's
  13   all I'm setting up.  He used to be a former employee of
  14   the FDA.  It says it on his bio.
  15            MR. WILLIAMS:  Your Honor, clearly beyond the
  16   scope.
  17            Secondly, Dr. Bailey did not write the response.
  18   The response came from someone else at FDA to the citizen
  19   petition.
  20            Third, this whole line of questioning, almost
  21   90 percent of what counsel has done is on the area that
  22   is not relevant and beyond the scope of the direct.  And
  23   he's making me have to object over and over and over
  24   again, knowing -- knowing that the Court has ruled that
  25   this is not appropriate.
  26            So it is a total side issue.  He shouldn't be
  27   permitted to just talk about John Bailey and try to
  28   testify to facts that are outside the record through this
```

August 11, 2017

Page 3275

1    witness.

2              MR. SMITH:  Your Honor, the witness is from the

3    FDA where this guy used to work.  I mean, if I'm going to

4    tie it up later -- and this guy also went to work with

5    PCPC.  He is the one that went to meetings with Johnson &

6    Johnson and meetings on the citizen's petition with the

7    federal government.  Now, I'll -- how am I -- I

8    believe -- I think John Bailey worked with him at FDA.

9              THE COURT:  Why is that relevant -- why is his

10   knowledge of John Bailey relevant to anything as an

11   expert witness in this case on the stand?

12             MR. SMITH:  I think it goes to the relevance of

13   the citizen's petition, to which he has intimate

14   knowledge of the FDA's ruling and of the PCPC.

15             THE COURT:  The objection is sustained.

16             (The following proceedings were

17        held in open court in the presence of

18        the jury:)

19   BY MR. SMITH:

20        Q    Okay.  We were at the EAS Consulting Group

21   website.  And I finally said it right.

22             I want to go to a different part of that

23   website.  It's P942.  It's partnerships and affiliates of

24   the consulting group of which you're a consultant.

25             MR. SMITH:  Permission to publish 942, your

26   Honor.

27             THE COURT:  Any objection?

28             MR. WILLIAMS:  May I just have a moment, your

August 11, 2017

Page 3276

1    Honor?

2            No objection.

3    BY MR. SMITH:

4        Q    This is partnerships and affiliates of EAS

5    Consulting Group.

6            And if we could go to the second page, Jeff.

7    You see this -- can you blow that up.

8            Consumer Healthcare Products Association, CHPA.

9    It's a -- Consumer Healthcare Products Association,

10   that's affiliated with the EAS Consulting Group for which

11   you're a consultant.

12           Do you see that?

13           MR. WILLIAMS:  Lacks foundation, your Honor.

14           THE COURT:  The question is does he see it.

15   Overruled.

16   BY MR. SMITH:

17       Q    Do you see that, Doctor?

18       A    Yes.  It's on the screen.

19       Q    Did you know that Johnson & Johnson employees

20   are on the board of director of the CHPA?

21       A    No, I --

22           MR. WILLIAMS:  Assumes facts.  "Did you know"?

23           THE COURT:  Sustained.

24   BY MR. SMITH:

25       Q    Well, let's go to it.  It's P938.

26           MR. SMITH:  Your Honor, I'd like to publish the

27   CHPA board of directors and other directors.

28           MR. WILLIAMS:  Your Honor, relevance.

August 11, 2017

Page 3277

 1            MR. SMITH:  Goes to --

 2            MR. WILLIAMS:  And lacks foundation.

 3            MR. SMITH:  Your Honor, they're -- Johnson &

 4    Johnson is affiliated with this company he's a consultant

 5    with.  I think it's highly relevant.

 6            It's on page 4 of 76 and 6 of 76 in that

 7    document.

 8            MR. WILLIAMS:  Same objection, your Honor.

 9            THE COURT:  Overruled.

10            MR. SMITH:  Thank you.

11            Jeff, can we go to P938.

12    BY MR. SMITH:

13        Q    Here's the CHPA for which the consulting firm

14    that you work for, EAS Consulting Group, which you are a

15    consultant for, is affiliated with the CHPA that we just

16    saw.

17            Do you remember that?

18        A    Yes.

19        Q    And here's the board of directors for 2016 and

20    '17.

21            If we can go to page 4 of whatever, Jeff.  I

22    can't remember now.  4 of something.

23            And it says "Board of Directors."

24            There's Kathleen M. Widmer, J&J Consumer Inc.,

25    McNeil Consumer Healthcare division.

26            Did you realize that J&J Consumer Inc. is a

27    defendant in this case?

28        A    Yes, I guess I did.

August 11, 2017

Page 3278

1     Q    Do you know Kathleen Widmer?

2     A    No, I don't.

3          MR. SMITH:  Can we go to page 6 of whatever

4     page, Jeff.

5     BY MR. SMITH:

6     Q    And it has Educational Foundation Board of

7     Directors.

8          Joy-Lee Pasqualoni -- if I can't say EAS; I'm

9     probably not going to be able to say that -- Johnson &

10    Johnson Consumer Inc.  Is J&J Consumer Inc. a defendant

11    in this case?

12    A    Yes.  What I don't know is what the CHPA

13    Educational Foundation is.

14    Q    But, regardless, the consulting group for which

15    you're a consultant is affiliated with the CHPA where

16    Johnson & Johnson sits on whatever board of directors

17    that I just showed you for 2016 and '17; correct?

18    A    The CHPA Educational Foundation, yes.

19    Q    Okay.

20         Next, I would like to go to your CV.  You

21    issued -- you have a CV, which is just your resume in

22    this case; is that correct?

23    A    Yes.

24    Q    And if we could go to that.

25         MR. SMITH:  It's D5, Jeff.

26         Permission to publish his CV, your Honor.

27         THE COURT:  Any objection?

28         MR. WILLIAMS:  No objection.

August 11, 2017

Page 3279

1          MR. SMITH:  I think it's right in here, Jeff.  I
2   think it's '93 to 2013, I think.
3   BY MR. SMITH:
4      Q     '93 to 2013.  So that's 20 years, if my math is
5   right.
6      A     That's correct.
7      Q     "Director of Cosmetic Ingredient Review."  And
8   that's the CIR that we've been talking about; right?
9      A     Yes.
10     Q     "Recruited to head the Cosmetic Ingredient
11  Review, Food & Drug Administration.  Established in 1976,
12  the then Cosmetic Toiletry and Fragrance Association" --
13  that's known as the CTFA; right?
14     A     Yes.
15     Q     Now the Personal Care Products Council -- which
16  is now known as the PCPC or can be called the PCPC;
17  correct?
18     A     Yes.
19     Q     Okay.
20          "CIR is a unique endeavor by the
21          industry to have the safety of
22          ingredients used in cosmetics thoroughly
23          reviewed and assessed in an open,
24          unbiased, and expert manner."
25          And then it talks about what the director does.
26  And that was you; correct?
27     A     Yes.
28     Q     I want to talk about the CIR for a minute.

August 11, 2017

Page 3280

 1          Thank you, Jeff.

 2          In your deposition -- and I wrote this down; and

 3   correct me if I'm wrong -- you said the interaction

 4   between the CIR and the industry group, the PCPC, you

 5   would only go kicking and screaming regarding the

 6   interaction between the two and that basically the CIR

 7   was completely independent from the PCPC and industry and

 8   you took pride in that.

 9          Do you recall saying something to that effect?

10          MR. WILLIAMS:  Objection to the extent it

11   misstates the testimony.

12          MR. SMITH:  I can get the testimony if we need

13   it.  I just thought we could short-circuit --

14          THE COURT:  I don't have the testimony, so I

15   can't rule on the objection.

16          MR. WILLIAMS:  I'll withdraw it, your Honor.

17   BY MR. SMITH:

18     Q     Do you recall saying something to that effect?

19   And I can pull --

20     A     That sounds like the way I would have responded

21   to that kind of question.

22     Q     And the CIR was created in 1976; is that

23   correct?

24     A     Yes, it was.

25     Q     And, like you said in your CV, so that cosmetic

26   companies could substantiate their safety -- right? -- in

27   part?

28     A     Well, no.

August 11, 2017

Page 3281

1    Q    Okay.  So the CIR does not rule on the safety of
2    cosmetics?
3    A    It does.  It is the word "substantiate" that I'm
4    having a problem with.
5    Q    All right.  Well, maybe I'm not saying --
6    A    CIR reviews and assesses the safety of
7    ingredients used in cosmetics.
8    Q    Okay.  So the CIR was created in 1976; right?
9    A    Yes.
10   Q    And it reviews the safety of cosmetics?
11   A    Yes.
12   Q    Okay.  Now, so that the jury gets a kind of a --
13   what we're talking about here, the PCPC -- so if I say
14   "PCPC," it was formerly known as the CTFA.  So if I say
15   "PCPC," can we have that kind of definition that they
16   were also known as the CTFA prior?
17   A    It would help immensely.
18   Q    Okay.  Thanks.  I don't want to say all those
19   acronyms.
20        But the PCPC totally funds the CIR; correct?
21   A    Yes, it does.
22   Q    And Johnson & Johnson and their supplier of
23   talc, Imerys, formed a Talc Interested Party Task Force
24   for talc issues at the PCPC.  We talked about it in your
25   deposition.  Do you not recall that?
26   A    No, I don't.  I think I may have been aware that
27   such a group existed, but that would have been it.
28   Q    Let me go to my red binder here.

August 11, 2017

Page 3282

 1            MR. SMITH:  Your Honor, permission to read his

 2    sworn deposition testimony, page 195 to, I think, line

 3    16 -- 1 through 16.

 4            MR. WILLIAMS:  May I have the lines, your Honor?

 5            THE COURT:  1 through 16, page 195.

 6            MR. WILLIAMS:  On 195?

 7            Not proper impeachment, your Honor.  He says he

 8    doesn't know what it was.

 9            THE COURT:  Overruled.  Go ahead.

10    BY MR. SMITH:

11       Q    Okay.

12            "Question:  Do you know what the

13       Talc Interested Party Talc Force is?"

14            And your answer was:

15            "Answer:  Not really."

16            And the question was:

17            "Question:  You never heard of

18       that?

19            And your answer:

20            "Answer:  Oh, I've heard of it.  I

21       just -- you asked do I know what it is.

22            "Question:  You've heard of it.  Do

23       you know what it was about?  Do you know

24       anything about it?

25            There was an objection to form.

26            And you answered:

27            "Answer:  I guess in a broad sense

28       I'm aware that the industry trade

August 11, 2017

Page 3283

1    association would gather particular

2    members who had an ax to grind on a

3    particular issue and bring them together

4    to talk about that issue.  I think that

5    was the genesis of the interested party

6    piece of the description.  What they

7    really did, I don't have a clue."

8        Do you recall saying that?

9    A   It sounds exactly like how I would have said it.

10    Q   So the Talc Interested Party Task Force that the

11 two defendants formed under the PCPC had an ax to grind

12 on talc-related issues?

13        MR. WILLIAMS:  Assumes facts and lacks

14 foundation.

15        THE COURT:  Sustained.

16 BY MR. SMITH:

17    Q   Those were your words, were they not?

18        MR. WILLIAMS:  Same objection, your Honor.

19        THE COURT:  Sustained.

20 BY MR. SMITH:

21    Q   Did I just read your testimony correctly?

22    A   Yes, you did.

23    Q   Thank you.

24        THE COURT:  Counsel, may I ask you to do the

25 following for the benefit of the court reporter:  When

26 you read deposition testimony, just slow down a little

27 bit.

28        MR. SMITH:  I've been accused of that.  I get a

August 11, 2017

Page 3284

 1    little fired up, your Honor.  I will slow down.

 2              THE COURT:  Question, answer; question, answer.

 3              MR. SMITH:  Sure.  I apologize.

 4    BY MR. SMITH:

 5       Q    Sir, I want to -- let's do this.

 6              Doctor, I'm going to -- these jurors can't see

 7    it.  I'm going to kind of tilt it back and forth, if

 8    that's okay.

 9       A    Works for me.

10       Q    All right.  So we got the CTFA.  I did this in

11    opening statement for the jury, but I want to remind

12    them.

13              So we have the CTFA -- can you see that?

14       A    Yes.

15       Q    The CTFA.  And it's now called the PCPC.  And

16    that's the trade organization for which these defendants

17    are members of; right?

18       A    Trade association.

19       Q    Trade association; correct?

20       A    That's correct.

21       Q    And they pay dues, these defendants as well as

22    other people that are members -- other cosmetic companies

23    that are members of the PCPC, they pay dues, do they not?

24       A    That's my understanding.

25       Q    And it's your understanding of the PCPC that

26    they pay annual dues based on the size of the company or

27    their income?  It's a proportional payment system?

28       A    I'm not privy to the details, but I think what I

August 11, 2017

Page 3285

1    had heard is that it's -- neither of the two things you

2    said were specific.  It related to sales.

3        Q    Okay.  To sales?

4        A    Yeah.

5        Q    Do you know if Johnson & Johnson does a lot of

6    sales?

7        A    I haven't got a clue.

8        Q    Okay.

9        A    I apologize -- that is my fallback position of

10   sometimes answering questions.

11            No, I don't know.

12       Q    Is Johnson & Johnson, in your opinion, a

13   mom-and-pop organization?

14       A    Boy, I'm not sure I know how to answer that

15   question.  It was at its inception.

16       Q    Sir, I'm --

17       A    I'm just --

18       Q    This is 2017.  I'm not talking about 1893.

19       A    Yeah.  I think it's fair to say that J&J is a

20   large collection of healthcare and consumer products

21   companies.

22       Q    And under the CTFA, these defendants, with their

23   supplier, Imerys, formed the Talc Interested Party Task

24   Force that we just went over in your deposition

25   testimony.

26            Do you recall that?

27            MR. WILLIAMS:  Your Honor, that lacks foundation

28   with this witness.

August 11, 2017

Page 3286

1            THE COURT:  Sustained.

2    BY MR. SMITH:

3        Q     You were aware of a Talc Interested Party Task

4    Force, as testified to in your deposition that we just

5    read; correct?

6        A     I knew it existed.

7        Q     Okay.  And so money is paid here by those

8    defendants, just like we talked about?

9            MR. WILLIAMS:  Excuse me, your Honor.  Objection

10   to the form of the question.  Counsel is drawing and

11   essentially testifying without eliciting testimony from

12   the witness.  It's improper.  It assumes facts not in

13   evidence.

14           MR. SMITH:  It is cross-examination, your Honor.

15   I'm just trying to set up a question.

16           THE COURT:  I appreciate that.

17           Go ahead, Counsel.

18           MR. SMITH:  Thank you.

19           THE COURT:  Keeping in mind what the witness

20   said about what he does and doesn't know.

21           MR. SMITH:  Yes, your Honor.  Thank you.

22   BY MR. SMITH:

23       Q     So CTFA, PCPC, Talc Interested Party Task Force,

24   and then the CIR was created.  And it's funded solely by

25   the PCPC; right?

26       A     If you could back up just a second.  On your

27   chart, you put something in parentheses.

28       Q     Defendants and Imerys --

August 11, 2017

Page 3287

 1      A    And I have no idea what that --

 2      Q    I'm sorry.  That's just meant to be defendants.

 3      A    Ahh, that's delta.

 4      Q    Yes.  I'm sorry.

 5      A    Ahh, okay.

 6      Q    Okay.

 7           MR. WILLIAMS:  Pardon me.

 8           Thank you, your Honor.

 9    BY MR. SMITH:

10      Q    CIR funds, solely funds -- is solely funded by

11    the PCPC; right?  Is that correct?

12      A    Your --

13      Q    I'm sorry?

14      A    Your podium is blocking me from seeing the --

15      Q    Okay.  Let me ask you this.

16           THE COURT:  Counsel --

17    BY MR. SMITH:

18      Q    Does the CIR --

19      A    Okay.

20      Q    Is the CIR funded solely by the PCPC?

21      A    That's my understanding, yes.

22      Q    And then the CIR reviews cosmetics from

23    companies from the CTFA, or PCPC, for safety; correct?

24      A    Yes.

25      Q    Okay.  Forgive my writing.  Okay.

26           MR. WILLIAMS:  Could I just ask -- at least ask

27    counsel to say what he's writing so I don't have to keep

28    walking?  If he can say the words, that would be really

August 11, 2017

Page 3288

1    helpful.
2            MR. SMITH:  Sure.
3            I state -- I have an arrow pointing to PCPC and
4    state that the CIR reviews cosmetics for safety of the
5    PCPC.  That's what I said.
6            MR. WILLIAMS:  Thank you.
7    BY MR. SMITH:
8        Q    Is all that right?
9        A    It's "Reviews" --
10       Q    "Reviews cosmetics for safety from the PCPC."
11       A    I don't understand the "from the PCPC."  We
12   review ingredients for safety.  I'm not sure what the
13   "from the PCPC" means.
14       Q    Okay.  Let me clarify.
15           Reviews cosmetics for safety for companies that
16   are members of the PCPC.
17       A    Ahh.  Okay.  The ingredients that are reviewed
18   for safety, I guess, must be manufactured by somebody,
19   and many of them are members of the PCPC.
20           But as the process works, there really isn't
21   that link.  The PCPC funds it.  The Cosmetic Ingredient
22   Review expert panel is -- has the sole discretion in
23   picking which ingredients are going to be reviewed.
24           So it's that "for the PCPC" that I'm having
25   trouble with.
26       Q    I'm trying to --
27       A    If it is monetary, if that's what you are
28   referring to, yes, all the money comes from PCPC.

August 11, 2017

Page 3289

1        Q     Okay.  And they review cosmetics from companies
2    that are in the PCPC for safety; is that correct?
3              If I'm a member of the PCPC and I'm a cosmetic
4    company, does the CIR review my cosmetics for safety?
5        A     It reviews the ingredients used in your
6    cosmetics for safety.
7        Q     Thank you.
8              Okay.  In your CV, you stated that you worked at
9    the -- as director at CIR -- was it 20 years, '93 to
10   2013?
11       A     That's correct.
12       Q     How much were you paid a year?
13       A     I don't keep that kind of information in my
14   head.
15       Q     How about this.  In your deposition, you said
16   approximately $300,000 a year.  Does that sound about
17   right?
18       A     Yeah, that's a good ballpark to hear.
19       Q     So for about 20 years the PCPC members paid your
20   salary?
21       A     That's correct.
22       Q     And the PCPC members, one of them that pays dues
23   according to sales is the defendants --
24       A     Okay.
25       Q     -- correct?
26       A     That cascade of logic is correct.
27       Q     And I'm not a mathematician, but 20 years times
28   $300,000 equals -- is it 6 million?

August 11, 2017

Page 3290

1     A     Boy, I wish that I had made 300K a year for

2  20 years.

3     Q     Hold on.  Hold on.  I just asked you what you

4  made as director, and you said -- you said in your

5  deposition it was $300,000 a year.

6     A     That's correct.

7     Q     Is 300,000 times 20 years $6 million? is my

8  question.

9     A     Well, that's certainly true.

10    Q     Paid for by members of the PCPC and their dues

11 to the PCPC; is that correct?

12    A     I'm just trying -- I don't think there was any

13 other source of funding for the PCPC.  So the answer is

14 yes.

15    Q     And we talked about the kicking and screaming in

16 your deposition testimony, you used that word about the

17 fierce independence between industry, the PCPC, and the

18 CIR.  Do you recall that?

19    A     Yes.

20    Q     Okay.

21    A     It was part of our way of doing business.

22    Q     Okay.  Well, let's go to -- let me ask you this

23 about that independence.  The PCPC office in Washington,

24 D.C., is it in the same -- on the same street -- or

25 excuse me, in the same city, on the same street, in the

26 same building, on the same floor, and on the same suite

27 as the PCPC?

28    A     Are you talking about when I was there or

August 11, 2017

Page 3291

1    currently?

2        Q    I'm talking about currently.  The CIR and the

3    PCPC, are they in the same city, the same --

4        A    I can short-circuit you.  You don't have to go

5    through it again.

6             I've never been there, but my understanding is

7    they share the same offices.

8        Q    Same suite?

9        A    That's what I said.

10       Q    Okay.  And you talked to defense counsel about

11   the track record of the CIR for the past -- since 1976 --

12   41 years?  '76, is that -- 2017, is that 41 years?

13       A    It's approaching 41 years, yes.

14       Q    41 years.

15       A    Celebrated the 40th anniversary last fall.

16       Q    Congratulations.  41 years, PCPC reviewing

17   cosmetics.

18             You said approximately 5,000 have been reviewed

19   in that time period; correct?

20       A    Yes.

21       Q    And a whopping 13 were unsafe; right?

22             MR. WILLIAMS:  That's argumentative as phrased,

23   your Honor.

24   BY MR. SMITH:

25       Q    Were 13 unsafe during that time period?

26       A    That's the current status, yes.

27       Q    That's 1/5 of 1 percent of the cosmetics that

28   you reviewed in that 41-year period; correct?

August 11, 2017

Page 3292

1       A      I'll trust your math.

2       Q      Okay.  I saw a quote from you in -- is it 2012

3  or '13?  I can't remember.

4              MR. WILLIAMS:  Objection.  Assumes facts, your

5  Honor.  Improper form.

6              MR. SMITH:  I'm just trying to set up the

7  question.

8              THE COURT:  Let's just ask the question.

9  BY MR. SMITH:

10      Q      Have you said that the CIR annual budget is "not

11 a matter of public record"?

12      A      I believe I have said that, yes.

13      Q      Why is it not a matter of public record?

14      A      Because it's not a matter of public record.

15      Q      Why not?

16      A      I -- I'm not sure I know how to answer that.

17      Q      Can you tell me what the annual budget was the

18 last year you left for the CIR?

19      A      No.

20      Q      Why not?

21      A      I just don't remember.

22      Q      Well, you were director for 20 years, sir.  You

23 can't tell me what the budget was when you were there in

24 your last year?  What was that?  How long ago was that?

25 That's four years ago.  You can't give me an

26 approximation?

27      A      No, I can't.

28      Q      So I can't ask you a question so this jury knows

August 11, 2017

Page 3293

1    how much -- the totality of the money that the cosmetic

2    companies contribute to the PCPC and how that money is

3    divvied out and where?

4              MR. WILLIAMS:  Argumentative.

5              THE COURT:  Overruled.

6              You can answer the question, sir.

7    BY MR. SMITH:

8        Q    It is not a matter of public record; correct?

9        A    It relies on me remembering what that budget

10   was, and I just -- it's not a piece of information that

11   really sticks in my mind.  The -- and the explanation for

12   that is that the funding was always adequate to do what

13   the CIR wanted to do.  It wasn't a situation where we had

14   to even justify what the budget was going to be for the

15   coming year.

16             The plan for CIR was to do the scientific

17   review, to have the four meetings a year, to prepare all

18   the review materials for the panel to look at, and the

19   industry funded that.  So the issue of what was the

20   funding level just wasn't an issue I ever had to really

21   deal with.  Whatever we needed, they provided.

22       Q    I have --

23             MR. WILLIAMS:  Your Honor, if I may, could I

24   just ask counsel to say what he just was writing on the

25   board when Dr. Andersen was speaking?

26             MR. SMITH:  I just put his name at the top of

27   that.

28             MR. WILLIAMS:  Thank you.

August 11, 2017

Page 3294

1            THE WITNESS:  Spell it correctly, please.

2            MR. SMITH:  Oh.  How about that.  Is that okay?

3            THE WITNESS:  That's better.  Thank you.

4    BY MR. SMITH:

5        Q    I have no doubt that you were provided what you

6    needed.  My question was, do you know what that budget

7    was?  Can you tell the jury what the budget was the last

8    year you were there?

9        A    I had already answered that.  No, I can't.  It

10   just -- that budget figure never had a place in my memory

11   chips.

12       Q    When you retired after 20 years from the CIR,

13   did you get a retirement package?

14       A    I'm not sure what you mean by retirement

15   package.  There was a retirement plan that I worked

16   under, and it provided a benefit, yearly benefit on

17   retirement.

18       Q    What is that?

19       A    Well, I think it's -- I'm not even sure --

20   93,000 a year.

21       Q    For how long?

22       A    Until I die.

23       Q    So while you are here giving testimony about the

24   safety of the defendants' products in front of this jury,

25   you are paid six million dollars partly by funds from

26   Johnson & Johnson, and you are getting a retirement

27   package of $93,000 a year as we currently sit here based

28   off of that work with the PCPC.

August 11, 2017

Page 3295

1          MR. WILLIAMS:  Argumentative as phrased.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes, I get that retirement

4    benefit.

5    BY MR. SMITH:

6      Q    Let's talk about the CIR on talc.  Okay?  Is

7    that okay?  Sir?

8      A    Yes.

9      Q    Okay.  The CIR did not conduct any independent

10   studies itself when it assessed the study of talc;

11   correct?

12     A    No, it didn't.

13     Q    Okay.  So it gathered information that was in

14   the public domain, brought it together with the process

15   you talked about with defense counsel, and arrived at the

16   opinion that you gave, the CIR gave; correct?

17     A    That's correct.

18     Q    Okay.  And the CIR published its final report,

19   review of talc that you have gone over with defense

20   counsel, in 2013; is that right?

21     A    That's correct.

22     Q    And so that's four years ago.

23          When did the literature search in years stop

24   that went into the 2013 CIR report?  Do you remember?

25     A    I believe it was 2012.

26     Q    2012.  Okay.  So five years ago is when the

27   literature stopped that went into the assessment of the

28   CIR on talc; right?

August 11, 2017

Page 3296

1    A    Yes.

2    Q    Okay.  Industry provided input to the CIR on

3  talc and wrote letters to you both -- well, wrote letters

4  to you with this input; correct?

5    A    Yes.

6    Q    And I would like to go over some of those

7  letters that you went over in your deposition that are to

8  you.

9           And I would like to first post EE572.

10         MR. WILLIAMS:  Objection, your Honor.  It

11  appears to be a draft, if I'm looking at the right one.

12         THE COURT:  Yeah.  I don't have EE572 in my

13  book, I don't think, Mr. Smith.  I have a series of P

14  exhibits, no E exhibits.  And in another book I have D

15  exhibits, P exhibits, but no E exhibits.

16         MR. SMITH:  Do you have it, Doctor?

17         THE COURT:  I don't have it, Counsel.

18         THE WITNESS:  I don't know where I would look.

19         MR. SMITH:  Look in your notebook.

20         Can I approach, your Honor?

21         THE COURT:  Yes.

22         MR. SMITH:  I'm sorry.  Let's get on the same

23  page.  It's here, your Honor.  Just look at 572.  See,

24  here are the tabs, right here.

25         THE WITNESS:  I see it.  You can't see the

26  letters.

27         MR. SMITH:  Yeah.  The letters are blocked,

28  that's the problem.

August 11, 2017

Page 3297

1          Do you see 572, your Honor?

2          THE COURT:  Got it.

3          MR. SMITH:  Okay.  Thank you.

4          THE COURT:  This is a --

5          MR. SMITH:  Can I ask the witness?

6          THE COURT:  Yeah.

7    BY MR. SMITH:

8      Q    Doctor, you have 572 in front of you?

9      A    I do.

10     Q    And you discussed this in your deposition, did

11   you not?  Do you remember being questioned about it?

12         MR. WILLIAMS:  Objection.  May we be heard?

13         THE COURT:  Yes.

14         If you all want to stand up and stretch for a

15   second, please go ahead.

16         (The following proceedings were had

17      at the sidebar out of the hearing of the

18      jury:)

19     MR. WILLIAMS:  Your Honor, my objection is,

20   number one, counsel doesn't have a good faith basis to

21   put this in front of the witness.  It's a draft letter

22   that the witness testified to in deposition that he had

23   no idea, had never seen before.  So for him to pull this,

24   it is an internal Imerys document, a draft, with the

25   Imerys Bates number on it.

26         So, again, it is a question designed to make us

27   have to object, knowing that we will object in front of

28   the jury when counsel has no bases for asking this

August 11, 2017

Page 3298

1    witness about it.

2         The purpose of the deposition is to ask whether

3    a witness has knowledge.  The witness said he didn't have

4    knowledge.  Counsel knows he doesn't have knowledge.

5         It is improper, and we would ask that he not be

6    permitted to do it with any document at this time.

7         MR. SMITH:  If counsel would let -- wait to

8    object until I have laid a foundation and then -- I was

9    then going to ask him has he received it.

10        THE COURT:  Is the answer to the question going

11   to be yes?

12        MR. SMITH:  I don't know.

13        MR. WILLIAMS:  He does know, your Honor, because

14   on page 224 of the deposition he was asked does this

15   appear to be a form letter that would be addressed to you

16   on the PCPC or list others.

17        MR. SMITH:  Okay.  I'll move on.

18        MR. WILLIAMS:  The answer was "I have no idea."

19        MR. SMITH:  I'll move on.

20        MR. WILLIAMS:  Can I have a lavatory break?

21        THE COURT:  Yes.

22        MR. WILLIAMS:  Thank you.

23        (The following proceedings were

24     held in open court in the presence of

25     the jury:)

26        THE COURT:  Folks, we've been going almost an

27   hour and a half.  Why don't we take our morning recess,

28   take ten minutes or so, and then come back.

August 11, 2017

Page 3299

1          The usual admonitions will apply, "admonition"
2     being the fancy word for warning.
3          (Recess taken 10:59 A.M. to 11:15 A.M.)
4          THE COURT:  Back on the record with all counsel
5     here, Dr. Andersen on the stand, all jurors and both
6     alternates here.  Thank you.
7          Mr. Smith.
8          MR. SMITH:  May I proceed, your Honor?
9          THE COURT:  You may.
10         MR. SMITH:  Thank you.
11    BY MR. SMITH:
12        Q    Okay, Doctor, we have about 40 minutes to lunch.
13    I've got a few more questions.  Is that okay?
14        A    Yes.
15        Q    Thank you.
16             We were talking about, before we left for the
17    break, that you said that industry provided input into
18    the CIR on talc, and they actually wrote letters to you
19    with this input.
20             You agreed with me.  Do you recall that?
21        A    Yes.
22        Q    Okay.  And so you received letters from
23    different industry groups while at the CIR on talc during
24    the literature review; correct?  The SLR?
25        A    During the literature --
26        Q    Don't you call it a systematic literature
27    review, SLR?
28        A    Scientific literature review.

August 11, 2017

Page 3300

1      Q      Excuse me.  Scientific literature review?

2      A      When that was completed and published, it had a

3  60-day comment period, and, yes, we got comments back

4  from industry.

5      Q      And so you received letters to that effect.

6             Doctor, I would like you to look at P571.  I

7  mean, excuse me, EE571.

8      A      Ahh.

9      Q      Sorry.  I can't see the letters either.

10            Are you with me?

11     A      Okay.  Can I see that?

12     Q      Is that a letter to you?

13     A      No.

14            MR. WILLIAMS:  EE571, your Honor.

15  BY MR. SMITH:

16     Q      Are you Dr. F. Alan Andersen?

17     A      Yes.

18     Q      It's April 4th, 2009.  You don't see that?  Are

19  we on the same page?  It's a letter from the CRE.

20     A      I'm sorry.  I was still on 572.  I apologize.

21     Q      That's all right.

22     A      Yes, now I do see that.  That is -- yes, I do

23  see it.

24     Q      You received it?  It's entitled -- addressed to

25  you; correct?

26     A      Yes.

27            MR. SMITH:  Permission to publish EE571, your

28  Honor.

August 11, 2017

Page 3301

1        MR. WILLIAMS:  May I have one moment, your

2   Honor?

3        THE COURT:  Yes.

4        MR. WILLIAMS:  No objection.

5        MR. SMITH:  Jeff, can you put up EE571?  Can you

6   blow that up, Jeff?

7   BY MR. SMITH:

8     Q    This is a letter from Center for Regulatory

9   Effectiveness, Bill Kelly, and it's dated August 4, 2009,

10  to you.  And it says right here, "Dr. Andersen" -- well,

11  it's to you at the CIR.  Do you see that?

12    A    Yes.

13             "Dr. Andersen, as promised quite

14        some time ago, I'm hereby providing you

15        with a copy of the talc bibliography

16        that I've been assembling for some time

17        in the hopes that it might prove useful

18        in the CIR review."

19             You received this from the CRE; correct?

20    A    Yes.

21    Q    Do you know who the CRE is?

22    A    As the process went on, we kind of figured out

23  what it was.  When this first came in, I don't think we

24  had a sense of what it was.

25             So, yes, I understand that it is -- appears to

26  be largely an industry advocacy group.

27    Q    Did you have any knowledge that the CRE was

28  hired by the PCPC regarding talc-related issues?

August 11, 2017

Page 3302

1      A    I didn't know that.  Wouldn't have cared.

2      Q    Okay.

3           MR. SMITH:  Go back up to the top, Jeff.

4           MR. WILLIAMS:  I'm sorry, your Honor.  It was a

5  little late.  Objection.  Assumes facts on the last and

6  misstates prior testimony.  Not from this witness, but --

7           MR. SMITH:  I just asked him a question, your

8  Honor.

9           MR. WILLIAMS:  Testimony from the previous

10 witness.

11          MR. SMITH:  He said he didn't know.

12          THE COURT:  He didn't know.  Overruled.

13          MR. SMITH:  May I proceed?

14          MR. WILLIAMS:  Thank you, your Honor.

15          MR. SMITH:  May I proceed, your Honor?

16          THE COURT:  Yes.

17          MR. SMITH:  Thank you.

18 BY MR. SMITH:

19     Q    Bill Kelly wrote you this from the CRE; is that

20 correct?

21     A    That's correct.

22     Q    And you understand that he was an attorney for

23 the CRE?

24     A    No.  I didn't link him with the word "attorney."

25     Q    Okay.  But he wrote you on behalf of the CRE;

26 correct?

27     A    That's correct.  That's what the letterhead

28 says.

August 11, 2017

Page 3303

1    Q    Next, I would like to go to 567, Doctor.   EE567.

2    A    Okay.  Yes, I have that.

3    Q    Is this a letter to you -- a second letter to

4    you from the CRE?

5    A    I have no idea if it's the second letter or not.

6    Q    Is it a --

7    A    It is another letter from the CRE.

8    Q    Is it the second letter we've gone over today

9    from the CRE?

10   A    Yes.

11   Q    How about that?  Is that okay?

12   A    Yes.

13   Q    Okay.  Is it from -- let's go to it, Jeff.

14        MR. SMITH:  Permission to publish 567, your

15   Honor.

16        MR. WILLIAMS:  May I have one moment, your

17   Honor?  It's a lengthy document.

18        No objection.

19        MR. SMITH:  Can we pull it up, Jeff?

20        MR. WILLIAMS:  Your Honor, no objection to the

21   letter itself.  The attachments we may have issues.

22   BY MR. SMITH:

23   Q    Well, Doctor, let me ask this:  You received

24   this letter with attachments; correct?  I mean --

25   A    Yes.

26   Q    Okay.

27   A    At least I hope the attachments were included,

28   but yes.

August 11, 2017

Page 3304

1          MR. SMITH:  If we can blow up the top again,

2     Jeff.

3     BY MR. SMITH:

4          Q    And this is Center for Regulatory Effectiveness.

5     Do you see that, Doctor?

6          A    Yes.

7          Q    And that's the CRE we are talking about?

8          A    Yes, it is.

9          Q    And then right here -- what's the date on that,

10    Jeff, 2012?

11         A    Yes.

12         Q    And if we can go right here, that's you; right?

13    Dr. F. Alan Andersen?

14         A    That's correct.

15         MR. SMITH:  And if we can go below that, Jeff,

16    right here.

17    BY MR. SMITH:

18         Q    Initial Comments on CIR draft Scientific

19    Literature Review."

20         We talked about that, SLR.  We used those terms

21    earlier?

22         A    That's correct.

23         Q    "For 'Talc as Used in Cosmetics' (posted by CIR

24    August 22nd, 2012).

25         It says in the first line here:

26         "Dear Dr. Andersen, we commend CIR

27    staff for the thoroughness of the draft

28    SLR.  We do have a number of comments

August 11, 2017

Page 3305

1       aimed at improving the evaluation."

2               And then he goes on for some comments.

3               MR. SMITH:  And then, Jeff, if we could go to

4       page 19.  It is 19 at the bottom.

5       BY MR. SMITH:

6          Q    And then he says, "Respectfully, William G.

7       Kelly, Jr."

8               He doesn't have a doctor in front of his name,

9       does he?

10         A    No.

11         Q    "Center For Regulatory Effectiveness."

12              Do you see that?

13         A    Yes.

14         Q    And then he has some attachments.  And I would

15      like to go to one of those.  It's --

16              THE COURT:  Let's not publish the attachments

17      until you indicate what they are, please.

18      BY MR. SMITH:

19         Q    Okay.  I would like to go to trial Exhibit

20      567-00029.  It's a newspaper article regarding talcum

21      powder and ovarian cancer.

22              Do you have it in front of you, Doctor?

23         A    Yes.

24         Q    Are you familiar with this document?

25         A    No, not particularly.

26         Q    Are you familiar with this study since you did a

27      systematic review of the literature regarding talc and

28      ovarian cancer?

August 11, 2017

Page 3306

1          MR. WILLIAMS:  Objection.  Vague and ambiguous.

2          THE COURT:  Sustained.

3    BY MR. SMITH:

4      Q    Are you familiar with the epidemiological

5    studies regarding talc and ovarian cancer and the basis

6    of your opinion here today?

7      A    Yes.  We reviewed the epidemiology studies.  We

8    did not review newspaper articles.

9      Q    Okay.  Well, this is a 1982 publication, is it

10   not?

11     A    No.  It's not a publication; it's a newspaper

12   article.

13     Q    Publication/newspaper article.  Okay?  Is it

14   1982?  Is it dated 1982?

15     A    Yes, it's dated 1982.

16     Q    Was there a study published by Dr. Cramer in

17   1982, an epidemiological study from Harvard, that you

18   reviewed?

19     A    Yes.  I'm aware of the Cramer publication on his

20   epi study.

21     Q    And you said you received these attachments to

22   this letter.  It's addressed to you; correct?

23     A    That's correct.

24          MR. SMITH:  Your Honor, permission to publish

25   the article.

26          THE COURT:  Any objection?

27          MR. WILLIAMS:  Yes, we do have an objection.

28   It's hearsay.  We would ask for an offer of proof.

August 11, 2017

Page 3307

1          THE COURT:  Offer the proof, Counsel, at
2    sidebar.
3          MR. SMITH:  Well, I can maybe clear it up with
4    one question.
5    BY MR. SMITH:
6      Q    Do you have any reason to believe that the
7    Baltimore Sun is not a reliable authority?
8          MR. WILLIAMS:  Vague and ambiguous.  Reliable
9    authority for what?
10         THE COURT:  Sustained.
11         MR. SMITH:  I'll move on.
12   BY MR. SMITH:
13     Q    Are you aware of a study in 1982, Doctor, that
14   showed an increased risk of ovarian cancer from genital
15   talc use that was published by Dr. Cramer?
16     A    I remember the Cramer epidemiology study.  I'd
17   have to look at it to see exactly what it said about the
18   odds ratios that they found.
19     Q    You don't remember that the first
20   epidemiological study done in the United States in 1982
21   by Dr. Cramer did or did not show an increased risk of
22   ovarian cancer from genital talc use and whether or not
23   it was statistically significant?
24         MR. WILLIAMS:  Objection.  Misstates the
25   testimony.  Argumentative.
26         THE COURT:  Overruled.
27   BY MR. SMITH:
28     Q    You are not aware of that?

August 11, 2017

Page 3308

1      A    I'm aware of the Cramer study, but it remains
2    the case that the effort that the CIR expert panel did
3    was to look at all the available data.  And, in this
4    case, there is no particular premise given to the first.
5    So I -- no, the first one doesn't strike me as being
6    anything.  There's a whole bunch of them, and we had to
7    look at them all.
8      Q    I'm not saying you didn't have to look at them
9    all; I'm just saying, based on your review -- you said
10   you looked at the epidemiological data for this case in
11   rendering your opinions; correct?
12     A    That's correct.
13     Q    And you can't remember whether or not the first
14   epidemiological study ever done on genital talc use and
15   ovarian cancer by the authors at Harvard, Dr. Cramer,
16   showed a statistical significant increased risk of
17   ovarian cancer from genital talc use?
18     A    I'm telling you exactly that.
19     Q    Okay.  All right.  Let's go to the next
20   document.  It is E573.  And if you'll flip over to the
21   second page of that, that's what I wanted to ask you
22   about.  It's an email to you.
23     A    This is EE573?
24     Q    Yes, sir.
25     A    Got it.
26     Q    And if you can flip over to the second page of
27   that, it's an email exchange.  Do you see down at the
28   bottom?

August 11, 2017

Page 3309

1     A    I'm sorry.  Second page.

2     Q    Yes, sir.  Look down at the bottom.  It's an

3  email to you.

4     A    Yes, I see that.

5     Q    Okay.

6          MR. SMITH:  Permission to publish that portion

7  of EE573, your Honor.

8          MR. WILLIAMS:  Your Honor, no objection to

9  pages 2, 3, and 4.

10         THE COURT:  All right.  Go ahead.

11         MR. WILLIAMS:  No objection to 2, 3, and 4.

12         MR. SMITH:  And, Jeff, if we can just blow this

13  up all down here.

14  BY MR. SMITH:

15     Q    And this is, again, from Bill Kelly that we

16  talked about earlier from the CRE; correct?

17     A    At least -- yes, the first part of it is the

18  email to me.

19     Q    And it has to do with the CIR talc review.  And

20  you're Alan Andersen; correct?

21     A    Yes.

22     Q    And it says:

23         "Dear Dr. Andersen:  I know you are

24     very busy preparing for the September

25     meeting, but the talc producers and

26     users had several questions, which, if

27     possible, they would like answers to as

28     soon as possible because they have an

August 11, 2017

Page 3310

1      annual meeting in San Diego next

2      Thursday.  They are also highly engaged

3      in conversations on how to participate

4      in the review."

5           THE COURT:  Counsel.

6  BY MR. SMITH:

7      Q    Did you receive this email from the CRE, Bill

8  Kelly?

9           THE COURT:  Counsel, I think you inadvertently

10  misread the last sentence.

11          MR. SMITH:  I'm sorry.  I apologize.

12          THE COURT:  Just slow down a little here.

13  BY MR. SMITH:

14     Q    Okay.

15          "They are also actively engaged in

16     conversations on how to participate in

17     the review."

18          THE COURT:  Thank you.

19          MR. SMITH:  I apologize.

20          THE WITNESS:  Yes.  I got that email.

21  BY MR. SMITH:

22     Q    Okay.  And I have several more here.  And I

23  don't want to go waste the jury's time.  But you did

24  receive similar emails, similar letters from other

25  industry groups regarding the SLR -- is that correct? --

26  or comments to it?

27          MR. WILLIAMS:  I'm sorry.  Just vague and

28  ambiguous as to the term "similar."

August 11, 2017

Page 3311

1          THE COURT:  Do you understand the question?

2          THE WITNESS:  Yeah, I think I do.

3          Regarding the SLR, the factual answer is no, we

4   didn't.  This is regarding preparations for the first

5   meeting at which CIR is going to talk about draft

6   reports.  I'm nitpicking, but, yes, we received lots of

7   input from industry.  This one related to scheduling.

8   BY MR. SMITH:

9      Q    Okay.

10     A    Other pieces of input related to -- one we just

11  looked at, the 19-page letter, had technical comments in

12  it.  So we've gotten lots -- we had gotten lots of input.

13     Q    Okay.

14     A    I still say it as if I own it.

15     Q    So you had a lot of input from industry

16  regarding the CIR, as we originally talked about?

17     A    Well, a lot -- we got input from industry.

18     Q    Okay.

19     A    Not as much as we have in other cases and more

20  than in others.

21     Q    Okay.  I would like to go -- you discussed with

22  defense counsel the CIR on talc which came out, your

23  review; correct?

24     A    I'm sorry.  Say again.

25     Q    The CIR on talc --

26     A    Yes.

27     Q    -- you reviewed; correct?  You received it?  I

28  mean, you talked about it with defense counsel?

August 11, 2017

Page 3312

1      A     Oh, yes.  Sorry.

2              MR. SMITH:  Your Honor, permission to publish

3     274, P274.

4              MR. WILLIAMS:  No objection, your Honor.

5              THE COURT:  Go ahead.

6              MR. SMITH:  Thank you.

7              And, Jeff, could we pull that up, please.

8              MR. WILLIAMS:  For the record, your Honor, may I

9     say that that's the same as D368.

10              THE COURT:  All right.  Thank you.

11              MR. SMITH:  If we could go to -- Jeff, if we

12     could go to page 58 of 64.  And could we go to the

13     funding section down here.

14     BY MR. SMITH:

15      Q     This is the CIR final published review of talc;

16     correct?

17      A     Final published review.

18      Q     Yes.  And it says here:

19              "The authors disclosed receipt of

20         the following financial support for the

21         research, author" --

22              Excuse me.  I don't have my glasses.

23              MR. WILLIAMS:  Your Honor, for the record, I

24     misspoke.  This is the same as Exhibit L384.

25              THE COURT:  This is the final published?

26              MR. WILLIAMS:  The final final, yes.

27              THE WITNESS:  The final final.

28     ///

August 11, 2017

Page 3313

1    BY MR. SMITH:

2         Q     Okay.

3               -- "research, authorship, and

4         publication of this article.  The

5         articles in this supplement were

6         sponsored by the Cosmetic Ingredient

7         Review."

8               The Cosmetic Ingredient Review is financially

9    supported by the PCPC; is that correct?

10        A     That's correct.

11        Q     And earlier with defense counsel you went

12   over -- it was the expert panel -- you recall that --

13   actually, you said you sat in the room when we were in

14   the meetings but actually did the voting for talc in this

15   review?

16        A     That's correct.

17        Q     Okay.

18        A     Procedures called for the expert panel members

19   to do the voting.

20              MR. SMITH:  And I have a different number for

21   it, Mr. Williams -- it's P959 -- but it's the same

22   demonstrative that we used.

23              MR. WILLIAMS:  No objection, your Honor.

24              MR. SMITH:  Jeff, can you pull up 959.

25   BY MR. SMITH:

26        Q     All right.  This is the review panel for talc;

27   correct?

28        A     That's correct.

August 11, 2017

Page 3314

1     Q     Expert review panel?

2     A     Yes.

3     Q     Who did you say Wilma Bergfeld was?

4     A     She's professor of dermatology and head of the

5     dermatopathology unit at the Cleveland Clinic Foundation.

6     Q     And who is Donald V. Belsito?

7     A     Don is -- I don't think I said it yesterday,

8     but, because I actually know, he's the Len Harber

9     Professor of Dermatology at Columbia University.

10    Q     Okay.

11    A     I remember that because I knew Len Harber.

12    Q     Okay.  And I was looking at some publications of

13    Wilma Bergfeld.  What did you say her role was now

14    regarding the Cosmetic Ingredient Review and talc?

15    A     Wilma was the chair of the expert panel.

16    Q     So she was the chair.

17          Give me one second, Doctor.

18          And I saw a publication of -- or she was --

19    first of all, do you know if Dr. Bergfeld regularly gives

20    talks and presents at, for instance, the American Academy

21    of Dermatology?  Are you familiar with that?

22    A     Yes.

23    Q     Okay.  And the American Academy of Dermatology,

24    that's a reputable outfit; correct?

25    A     In my view.

26    Q     Okay.

27          MR. SMITH:  Your Honor, permission to publish

28    958 -- P958.

August 11, 2017

Page 3315

1          MR. WILLIAMS:  958 is not in my notebook.

2          MR. SMITH:  It's in the second notebook.  I'm

3    sorry.  Hold on.

4          THE WITNESS:  I have -57 and -59.

5          MR. SMITH:  Hold on.

6          May I approach, your Honor?

7          THE COURT:  Yes.

8          MR. SMITH:  Here you go, your Honor.  You have

9    it?

10          THE COURT:  I do.

11          MR. SMITH:  Permission to publish P958.

12          MR. WILLIAMS:  Lacks foundation to the witness,

13    your Honor.

14          MR. SMITH:  Your Honor, he is familiar with the

15    American Academy of Dermatology and that Dr. Bergfeld

16    would give talks.

17          THE COURT:  Lay a foundation before you publish

18    this.

19          MR. SMITH:  Okay.

20    BY MR. SMITH:

21      Q    Let me ask you this, Doctor:  Any of the expert

22    panel review, do you check them for conflicts of

23    interest?

24      A    That's correct.

25      Q    And so they should not be receiving payments or

26    an expert or have any type of disclosure of a conflict of

27    interest with industry; correct?

28      A    The cosmetics industry, yes.

August 11, 2017

Page 3316

1      Q     And did you check that, or did they voluntarily

2   do that?

3      A     They provide that information to me.

4      Q     Do you double-check it?

5      A     No, I don't really.

6      Q     Okay.  To the best of your knowledge, did any of

7   the expert panel review on talc and ovarian cancer have

8   any conflicts of interest?

9      A     No.

10           MR. SMITH:  Permission to publish 958, your

11   Honor.

12           MR. WILLIAMS:  Still lacks foundation to the

13   witness.

14           THE COURT:  It does, and I don't know what the

15   date of it is, what year it is.

16           MR. SMITH:  Your Honor, to be honest with you,

17   whether it's before or after, I think it has the same

18   effect.

19           THE COURT:  I disagree with that, Counsel.  Lay

20   a foundation for this.  If you don't have a foundation,

21   you may not publish it.

22   BY MR. SMITH:

23      Q     Well, do you have any reason to believe that the

24   American Academy of Dermatology is not a reliable or

25   authoritative source of information?

26           MR. WILLIAMS:  Objection, your Honor.  Lacks

27   foundation to the witness.  Plus irrelevant for this

28   purpose and no foundation for the witness.

August 11, 2017

Page 3317

    1            THE COURT:  Overruled.

    2            MR. SMITH:  Thank you.

    3   BY MR. SMITH:

    4       Q    Do you have any reason to doubt that they are an

    5   authoritative, reliable source of information?

    6       A    No, I don't.

    7            MR. SMITH:  Permission to publish P958, your

    8   Honor.

    9            MR. WILLIAMS:  Same objection.  Relevance hasn't

   10   been laid, your Honor.

   11            THE COURT:  Sustained.

   12   BY MR. SMITH:

   13       Q    If any of the expert panel for the talc and

   14   ovarian cancer for the CIR had any conflict of interest

   15   of working for the defendants or receiving money for the

   16   defendants, is that information that you would know

   17   today?

   18       A    Yes.  That would be information that the -- in

   19   my role as director of CIR I would want to have.

   20            MR. SMITH:  Permission to publish 958, your

   21   Honor.

   22            MR. WILLIAMS:  Lacks foundation, your Honor.

   23            THE COURT:  Sustained.

   24   BY MR. SMITH:

   25       Q    Okay.  Let's go to Donald Belsito.  He was on

   26   the -- Belsito; correct?

   27       A    Belsito, yes.

   28       Q    Belsito.  Do you know whether he was receiving

August 11, 2017

Page 3318

1    any payments from the defendants during the time period

2    that he was sitting on the expert panel for the CIR

3    review for the safety of talc?

4        A    Any payments --

5        Q    Yes.

6        A    Boy, I would have to go back -- I don't have

7    access to.  All of the scientists on the panel on

8    occasion, like Dr. Bergfeld, would give scientific

9    presentations.  And those scientific presentations often

10   were sponsored by industry.  So could Don have made a

11   presentation on his work and been supported by industry?

12   Yes, it's possible.

13           He would have told me about that, and I would

14   have given a thumbs-up or thumbs-down to each of the

15   circumstances, as I had done for Dr. Bergfeld.

16       Q    So you're saying you gave a thumbs-up for

17   Dr. Bergfeld?  Is that what you just said?

18       A    Yes.  The -- if you would focus on -- I don't

19   know.  Can we put that P958 back up.

20       Q    Your counsel didn't want it to be shown.

21           MR. WILLIAMS:  First of all, I'm not his

22   counsel, your Honor.  Second of all, that's an improper

23   statement by counsel.

24           THE COURT:  It is improper, but --

25           MR. SMITH:  Excuse me.

26   BY MR. SMITH:

27       Q    I was not allowed to show the document, Doctor.

28   So I want to ask you.

August 11, 2017

Page 3319

1     A     Oh, I thought you did.  I'm sorry.

2     Q     I was trying to.

3           My question is, so you recall now giving

4     Dr. Bergfeld a thumbs-up regarding a conflict of interest

5     that she had during the CIR review of talc with the

6     defendants Johnson & Johnson?

7     A     As the conduct of CIR business, every seminar

8     that a CIR member gave that involved industry sponsorship

9     or was to an industry group was brought to me and cleared

10    as to whether this actually presented a conflict of

11    interest.  There's no question that the support existed.

12    If you are going to Johnson & Johnson to give a seminar,

13    there's no question it's Johnson & Johnson, but the

14    question of whether this represented a conflict of

15    interest, in my view, it didn't.

16    Q     Okay.  So you were aware that Dr. Bergfeld, the

17    leader of the CIR on the expert panel that had a vote on

18    whether talc was safe or not, you had knowledge had a

19    conflict of interest of receiving money from Johnson &

20    Johnson during the time that she's reviewing it and you

21    said, in your judgment, thumbs-up?

22          MR. WILLIAMS:  Misstates testimony, your Honor.

23          MR. SMITH:  I think it's pretty accurate.

24          THE WITNESS:  No, it's not accurate.  I said it

25    did not represent a conflict of interest.

26    BY MR. SMITH:

27    Q     Correct.  Thumbs-up?

28    A     She went to talk about her research on alopecia,

August 11, 2017

Page 3320

1   hair loss in women.  That's her major area of research.

2   I did not consider that a conflict of interest with the

3   CIR's review of cosmetic ingredients.  She was giving a

4   medical paper.

5       Q    Sir, the lead expert panelist, you had knowledge

6   of, was receiving money from the defendants who -- one of

7   their major products is at issue in the CIR review, and

8   you did not -- is it disclosed anywhere in this review?

9       A    I'm sorry.  Is -- is what disclosed?  The fact

10  that she received that money?

11      Q    Yes, sir.

12      A    No, it's not.

13      Q    Right.  And I'd like to go to 274 to go to the

14  conflicts of interest -- excuse me -- declaration of

15  conflicts of interest.

16          MR. SMITH:  Can we go to 274, Jeff.

17          It has been previously put before the jury, your

18  Honor.

19          MR. WILLIAMS:  Is it P274?

20          MR. SMITH:  Yes.

21          THE COURT:  P274, that's the final CIR report.

22          MR. WILLIAMS:  Thank you.

23          MR. SMITH:  Get my glasses on so I can see what

24  all is going on.

25          All right.  Let's go to the declaration of

26  conflicts of interest, Jeff.

27  BY MR. SMITH:

28      Q    Okay.

August 11, 2017

Page 3321

1          "The authors declare no potential
2      conflicts of interest with respect to
3      research, authorship, and publication of
4      this article."
5      A    That's correct.
6      Q    So there's no mention -- so if this goes out to
7  the general public, we come into court in front of a
8  jury, or any other scientist in the world looks at this
9  paper, they do not know that the lead expert panelist
10  reviewing the safety of talc was receiving money from
11  Johnson & Johnson during the time that this publication
12  is being authored; correct?
13      A    I don't know about the part of your statement
14  relating to "during the period of time."  But I will
15  acknowledge that the existence of financial support for
16  her medical research existed, and I didn't consider that
17  a conflict of interest with the work being done by CIR.
18  And that's how it was captured in the declaration.
19      Q    You didn't consider it a conflict of interest,
20  according to Dr. Andersen, who's on the payroll for
21  $300,000 a year, determined that --
22      A    It was my --
23      Q    -- being funded by them?
24      A    -- responsibility to make that determination,
25  yes.
26      Q    Did you run it by anybody?
27          MR. WILLIAMS:  Objection, your Honor.
28  Argumentative.  I really think it's inappropriate.

August 11, 2017

Page 3322

1          THE COURT:  It's compound.  Which question would
2   you like him to answer?
3          MR. SMITH:  Yes, your Honor.
4   BY MR. SMITH:
5      Q    Did you run it by anybody?
6      A    No.  I was the director of the Cosmetic
7   Ingredient Review.
8      Q    You got paid $300,000 a year partly by these
9   defendants that had the conflict of interest with the
10  head expert panel reviewer?
11         MR. WILLIAMS:  Argumentative.  Assumes facts.
12         THE COURT:  Overruled.
13         THE WITNESS:  My determination was that there
14  wasn't a conflict of interest.
15  BY MR. SMITH:
16     Q    Okay.  Do you think that's information that a
17  scientist, me, the jury, or anybody that's going to look
18  at this paper and not understand all that's going on give
19  to decide what weight I want to give this, don't you
20  think that's important information to put in the
21  declaration of the conflicts of interest?
22     A    No.
23     Q    Okay.  All right.  What about Dr. Donald
24  Belasito?  You said you were aware that he was doing some
25  talks during this time.
26         And can we pull up that expert panel again,
27  Jeff.  What is it?  P -- Jeff, it's P959.
28         All right.  So we talked about the lead -- what

August 11, 2017

Page 3323

 1   was her title again?  The what of the expert panel

 2   review?

 3       A    Wilma Bergfeld was the chair of the CIR expert

 4   panel.

 5       Q    Okay.  And I mispronounced the name.  Sorry.

 6   Donald V. Belsito; is that right?

 7       A    That's correct.

 8       Q    Okay.  What payments were you aware that

 9   Johnson & Johnson was giving him during the time that

10   this expert panel was reviewing the safety of talc for

11   which is the main ingredient in baby powder?

12            MR. WILLIAMS:  Lacks foundation and assumes

13   facts, your Honor.

14            MR. SMITH:  He has already talked about that he

15   was aware of it and he didn't determine it was a conflict

16   of interest, your Honor.

17            THE COURT:  Overruled.

18            MR. SMITH:  Thank you.

19            THE WITNESS:  I don't have a recollection of a

20   specific list or item.  What I do recall is the standard

21   operating practice, which is, on a regular basis, I got

22   requests from the members of the expert panel, "I want to

23   give this seminar."  Many of them were at the Academy of

24   Dermatology meetings and talked about their professional

25   work.  And I would either approve it or not approve it.

26   BY MR. SMITH:

27       Q    Were you aware of payments, like Ms. Bergfeld --

28   excuse me -- Dr. Bergfeld, Dr. Belsito was receiving from

August 11, 2017

Page 3324

1  Johnson & Johnson and their subsidiary Janssen Biotech

2  during the time that he sat on review on the CIR for the

3  safety of talc?  Did you give that a thumbs-up and

4  thumbs-down like you did for Dr. Bergfeld?

5      A    As it would -- again, I don't remember specific

6  details, but, as a pattern, if his medical research was

7  being sponsored, then that was not considered a conflict

8  of interest with his review of cosmetic ingredients.

9      Q    According to Dr. Andersen?

10     A    That's the way I implemented it, yes.

11     Q    Okay.

12          MR. SMITH:  Let's go back to -- Jeff, can we go

13  to P274.

14          Your Honor, it's the safety assessment of talc

15  that we've been talking about, the CIR.  Can I publish

16  some other parts of that, please?

17          THE COURT:  Go ahead.

18          MR. SMITH:  Thank you.

19  BY MR. SMITH:

20     Q    I want to go -- this is a thick document, and

21  it's got a lot of footnotes to scientific literature

22  that's cited in the body of the paper; correct?

23     A    I don't know that there are very many footnotes.

24     Q    Well, I counted 218, whatever it is.  If you

25  want to say that's not many; it is.  It's 218.

26          Do you recall that?

27     A    Those are not footnotes.  I mean, I don't mean

28  to nitpick, but those are reference citations.  I believe

August 11, 2017

Page 3325

1   there was a couple of footnotes on the first page,

2   numbering four.

3        Q    Can we agree there are 218 citations --

4        A    Yes.

5        Q    -- to scientific literature that's in the body

6   of the CIR?

7        A    Yes.

8        Q    Okay.

9             I would like to go to -- can we go to page 63 of

10  64, Jeff, and focus in on Number 177.

11            "W.G. Kelly, initial comments on

12        CIR draft scientific literature review

13        for talc.  Talc as used in cosmetics

14        posted by CIR, Aug. 22, 2012, letter

15        report submitted to Andersen F.A. by

16        Kelly W.G., 2012."

17            Do you see that?

18       A    Yes.

19            MR. SMITH:  Then, Jeff, if we can flip over to

20  where that citation references, which is page 33 of 64.

21  And if we can go to that second paragraph, Jeff, right

22  here.

23  BY MR. SMITH:

24       Q    Okay.

25            "The possibility that using

26        cosmetic talc powder can cause ovarian

27        cancer was suggested when talc particles

28        were found on human ovarian tissues.

August 11, 2017

Page 3326

1          The translocation of talc particles from

2          the perineum to the ovaries would

3          require that these particles pass from

4          the perineum through the vagina and the

5          cervical canal, move across the uterus

6          and against the ciliary motion of the

7          Fallopian tubes across the peritoneal

8          space between the fimbriae and ovaries,

9          escape phagocytosis in the peritoneal

10         space, and attach to the surface of the

11         ovaries to accumulate in the ovaries."

12              And there is the Citation 177; correct?

13    A     And 178.

14    Q     And 178; right?

15    A     Yes, it is.

16    Q     We just went through the letters of Bill Kelly

17   from the CRE to have input into the CIR.  And he's an

18   attorney for the CRE that you're quoting for this

19   scientific conclusion?

20              MR. WILLIAMS:  Assumes facts, your Honor.

21              THE COURT:  Sustained.

22   BY MR. SMITH:

23    Q     Is this not a scientific -- are these not

24   scientific terms and conclusions here that I just read to

25   you?  Are they legal conclusions?

26    A     I'm not sure in -- just exactly how to answer

27   your question.  The CIR expert panel determined that this

28   information should be included in the report.  The

August 11, 2017

Page 3327

1  information came from two different sources.  And, as
2  part of our process, we make even the unpublished data
3  from the CRE available and part of the package.  If the
4  panel concludes that that information is independently
5  verified by itself, then it puts it in.  But because it
6  came from a lawyer -- which I don't think they knew --
7  but whether it did or didn't, it's the information that
8  the panel focuses on, not the source.
9      Q    The source is a lawyer from the CRE who was
10  hired as a consulting group for the PCPC for which these
11  defendants are a member of; correct?
12          MR. WILLIAMS:  Your Honor, assumes facts.
13          THE COURT:  Sustained.
14  BY MR. SMITH:
15      Q    Do you know that to be true?
16      A    Do I know what to --
17      Q    The CRE was an industry trade group that -- we
18  discussed earlier --
19      A    Yes, that, I know.
20      Q    Okay.  They're hired by the PCPC?
21      A    I don't know that they were hired by the PCPC.
22  That part I guess I don't know.
23      Q    Were they consultants for the PCPC?
24      A    I really don't know that.
25      Q    You don't remember the conversation we had
26  earlier about the CRE and Bill Kelly?  We went through
27  the two letters I showed the jury?  Do you not recall
28  that?

August 11, 2017

Page 3328

1      A    I recall looking at a letter from CRE to me
2   and -- giving comments on the SLR.  I recall the email
3   from Bill Kelly on procedures and process.  I'm just
4   not -- I don't recall anything that told me that he was a
5   consultant or that that group was consulting with PCPC.
6   And I could just be misremembering.  I just don't
7   remember that specifically.
8      Q    In any event, he's a --
9      A    But it's an industry group.  There's no
10  question.
11     Q    Okay.  He consulted for an industry group;
12  right?
13     A    Well, CRE is an industry group, yeah.
14     Q    Correct.  Okay.
15          Well, you're not a consulting company in an
16  industry group if you're not consulting for industry;
17  right?
18          All right.  We'll leave it at that.
19          I'll tell you what, Bill Kelly is a lawyer at
20  the CRE who's cited on 177 in the CIR review; correct?
21     A    That's correct.
22          MR. WILLIAMS:  That's mis- --
23          MR. SMITH:  That's all the questions I have at
24  this time -- well, not for this witness, but before
25  lunch, if you want to take a break, your Honor.  I'm
26  getting ready to move to another topic.
27          THE COURT:  Okay.  Maybe this would be a good
28  time for lunch.

August 11, 2017

Page 3329

1          Let's take our recess for the noon hour.

2    Everybody leave your notes here.  Have a good lunch.

3    Don't discuss the case.  Don't do any research.  Wait

4    until you hear all the evidence before you form any

5    opinions.  Have a nice lunch.

6          (Jury leaves the courtroom.)

7          (The following proceedings were

8      held outside the presence of the jury:)

9          THE COURT:  You can step down, sir.  Thank you.

10          Is everybody good until 1:30?

11          MR. SMITH:  Yes, your Honor.

12          MR. WILLIAMS:  Yes.

13          THE COURT:  Okay.

14          (Whereupon, the matter was adjourned for

15      lunch at 11:58 A.M. and to be resumed at

16      August 11, 2017, at 1:30 P.M..)

17

18

19

20

21

22

23

24

25

26

27

28

August 11, 2017

```
 1
 2            SUPERIOR COURT OF THE STATE OF CALIFORNIA
 3                  FOR THE COUNTY OF LOS ANGELES
 4
 5   DEPARTMENT 307            HON. MAREN E. NELSON, JUDGE
 6
 7   COORDINATION PROCEEDING,          )
     SPECIAL TITLE (RULE 3.55)         )
 8                                     ) JCCP NO. 4872
                                       )
 9   JOHNSON & JOHNSON TALCUM          ) REPORTER'S
     POWDER CASES,                     ) CERTIFICATE
10   _____  )
11
12
13
14
15         I, Pamela Cotten, CSR NO. 4497, pro tem reporter of
16   the Superior Court of the State of California, for the
17   County of Los Angeles, do hereby certify that the
18   foregoing pages, 3205 - 3329, comprise a full, true and
19   correct transcript of the proceedings and testimony taken
20   in the above-entitled cause on August 11, 2017.
21
22         Dated this 11th day of August, 2017.
23
24
25         _____
             PAMELA COTTEN, CSR, NO. 4497
26             OFFICIAL PRO TEMPORE REPORTER
27
28
```

Exhibit 123



# MATERIAL DATA SAFETY SHEET
# TALC

## Section 1. Product and Company Identification

| Product Names | | | | |
|---|---|---|---|---|
| | IMPERIAL 200 USP | IMPERIAL 500 USP | OLYMPIC H USP | GRADE 25 USP |
| | IMPERIAL 250 USP | IMPERIAL 700 FCC | SUPREME H USP | |
| | IMPERIAL 400 USP | SUPRA H USP | SUPRAFINO H USP | |

| Synonyms | Talcum powder, Soapstone, Steatite | | | |
|---|---|---|---|---|
| Chemical Name | Talc ; Hydrous magnesium silicate | CAS# 14807-96-6 | Chemical Family | Phyllosilicates |
| Manufacturer | Luzenac America, Inc.<br>345 Inverness Drive South<br>Centennial, CO  80112<br>Toll-free  800–325-0299 | Emergency Health<br>Information (24 hrs)<br>303-623-5716 | | |

## Section 2. Composition/Information on Ingredients

| Substance | CAS# | % by Weight | TLV - TWA |
|---|---|---|---|
| Talc | 14807-96-6 | 98-100 | 2 mg/m3 respirable fraction (ACGIH) |
| Dolomite | 16389-88-1 | 0-2 | Use Talc TLV for total exposure measurements |

## Section 3. Health Hazards Identification and Emergency Overview

| Emergency Overview | Under normal conditions of use, this product is not expected to create any unusual emergency hazards. This product is **NOT** flammable, **NOT** reactive, **NOT** explosive, has **NO** flash point, and poses **NO** special hazards in the presence of fire. |
|---|---|

Potential Health Effects from Acute and Chronic Occupational Exposures to Talc
**TARGET ORGANS**

**LUNGS, RESPIRATORY SYSTEM**

| Inhalation | ACUTE: Exposure to a large concentration of air-born dust of this material may cause mechanical irritation of the mucous membranes and respiratory tract.<br>CHRONIC: Repeated or prolonged inhalation of air-born dust of this material may cause scarring of the lungs (pulmonary fibrosis), with shortness of breath, chronic cough, and respiratory assisted heart failure. Prolonged exposure  to talc can produce symptomatic talc pneumoconiosis (talcosis). |
|---|---|
| Skin Contact | ACUTE: Direct contact may cause dryness, or may cause mild irritation if an allergic predisposition exists.<br>CHRONIC: Prolonged contact may cause dryness of the skin, or may cause mild irritation if an allergic pre-disposition exists |
| Eye Contact | ACUTE: Direct contact with dust may cause mechanical irritation of the eyes.<br>CHRONIC: Repeated exposure may cause conjunctivae inflammation. |
| Ingestion | ACUTE: This material is considered to be harmless and inert when ingested.<br>CHRONIC: Repeated ingestion of large doses of talc for 13 and 10 successive days by rabbits and mice revealed negative teratogenic and carcinogenic results. |

Luzenac America, Inc.
MSDS Group USP
Issued 07/01/2006

Talc
CAS #14807-96-6
Page 1 of 5

Protected Document – Subject to Protective Order

IMERYS 081218

| Section 4. | First Aid Measures |
|---|---|
| Inhalation | Remove from exposure area to fresh air.  If breathing has stopped, perform artificial respiration and get medical attention immediately.  Keep person warm and at rest.  Treat symptomatically and supportively. |
| Skin Contact | Apply common skin moisturizers to relieve dryness.  Irritations are uncommon; however, if irritation or redness develops, seek medical attention.  Broken skin can be cleansed with mild soap and water. |
| Eye Contact | Wash eyes with large amounts of water or normal saline solution.  If irritation or redness develops, seek medical attention. |

| Section 5. | Fire Fighting Measures |
|---|---|
| Flammability | This product is **NOT** flammable, **NOT** reactive, **NOT** explosive, has **NO** flash point, and poses **NO** special hazards in the presence of fire.  Firefighters require **NO** special protective equipment or precautions. |

| Section 6. | Accidental Release Measures |
|---|---|
| Small Spill | Use vacuum to clean up spillage.  Place in sealed container. |
| Large Spill | For large spills, shovel or sweep up (while keeping dispersion of dust in air to a minimum) and place into suitable sealed containers for reclamation or later disposal.  Residue should be cleaned up using a high-efficiency particulate filter vacuum.  The use of water wash-down is not recommended.  Wet material can cause a surface used for walking to become extremely slippery.  Talc is not considered a hazardous waste by RCRA criteria (40 CFR 261). |

| Section 7. | Handling and Storage |
|---|---|
| Handling & Storage | Handle in ways to minimize the creation of dust.  Preserve product in sealed containers. |

| Section 8. | Exposure Controls & Personal Protection |
|---|---|
| Personal Protection | Use NIOSH approved dust respirator.  Use safety glasses or dust tight goggles. No special skin protection is usually required, but gloves should be worn by workers susceptible to skin irritation.<br><br>Dust Respirator      Safety Glasses      Gloves |
| Controls | Provide local exhaust or process enclosure ventilation to meet published exposure limits (TLV). |

| Section 9. | Physical & Chemical Properties |
|---|---|
| Appearance | White to grayish-white powder |
| Odor | Slight earthy odor. |
| Flammability | This product is **NOT** flammable, **NOT** reactive, **NOT** explosive, has **NO** flash point. |
| Specific Gravity | 2.8 (water = 1.0) |
| Melting Point | None |
| pH | Slightly basic (10% slurry in water) |
| Solubility | Water: <1 mg/mL @ 21 C          Acetone : <1 mg/mL @ 21 C |

Luzenac America, Inc.
MSDS Group USP
Issued 07/01/2006

**Talc**
**CAS #14807-96-6**
Page 2 of 5

Protected Document – Subject to Protective Order

IMERYS 081219

| Ethanol: <1 mg/mL @ 21 C | Cold acids: Insoluble | Alkalies: Insoluble |

| Section 10. | Stability & Reactivity Data |
| --- | --- |
| Stability | This product is stable, non-reactive, and non-corrosive. |
| Incompatibility with various substances | Non reactive/none known. |

| Section 11. | Toxicological Information |
| --- | --- |
| Toxicology | NIOSH Registry Number: WW2710000<br>SAX Toxicity Evaluation: THR: Not available<br>Carcinogenic Status:<br>    IARC: (2006 in preparation) Has concluded that perineal use of talc-based body powder is possibly carcinogenic to humans (Group 2B).  This is not a route of exposure relevant for workers and applies to one specific use of talc only.<br>    IARC: (2006 in preparation) Inhaled talc not containing asbestos or asbestiform fibres not classifiable as a human carcinogen (Group 3)<br>    OSHA: Not listed.<br>    ACGIH: A4 – Not Classifiable as a Human Carcinogen<br>    NTP: Not listed.  A 2-year inhalation study demonstrated clear evidence of carcinogenic activity in female rats at exposure levels of 18 mg/m3.  Some evidence of carcinogenic activity was observed in male rats at the same level.  No evidence of carcinogenic activity was found in mice (NTP TR-421).<br>Tumorigenic Data:<br>    TCLo: ihl-rat 11 mg/m3/1Y-I<br>    TDLo: imp-rat 200 mg/kg<br>Other Toxicity Data:<br>    Skin and Eye Irritation Data: skn-hmn 300 ug/3D-I MLD<br>Teratogenicity (Reproductive Effects Data): Not available.<br>Mutation Data: Not available. |

| Section 12. | Ecological Information |
| --- | --- |

Ecological Data

| Species Test | Alga ((Selenastrum capricornutum) Growth inhibition | Daphnia Magna Acute immobilization | Daphnia Magna Reproduction |
| --- | --- | --- | --- |
| Endpoint | Growth rate<br>48hr-EC50  48hr-NOEC<br>AUG<br>72hr-EC50  72hr-NOEC | 48hr-EC50 | 21 day-EC50  21 day-NOEC |
| Conc. (mg/L) | | | |
| FY | | | |
| References | | | |

*AUG=Area Under Growth curve

| Section 13. | Disposal Considerations |
| --- | --- |
| Waste Disposal Information | Talc is not considered a hazardous waste by RCRA criteria (40 CFR 261).  Dry material can usually be land-filled.  State and Local regulations/restrictions are complex and may differ from Federal regulations.  Responsibility for proper waste disposal is with the owner of the waste. |

Luzenac America, Inc.
MSDS Group USP
Issued 07/01/2006

**Talc**
**CAS #14807-96-6**
Page 3 of 5

Protected Document – Subject to Protective Order

IMERYS 081220

| Section 14. | Transport Information |
|---|---|
| Transport Information | U.S. Department of Transportation - DOT: No classification assigned |
| | CANADIAN Transportation of Dangerous Goods: No classification assigned |
| | LAND Transport - ADR/RID: No classification assigned |
| | AIR Transport - IATA/ICAO: No classification assigned (International Air Transport Association/International Civil Aviation Organization) |
| | MARITIME Transport - IMDG: No classifications assigned International Maritime Dangerous Goods) |
| | HARMONIZED Tariff Code: Talc – crushed or powdered. 2526.20.00. (Stat. Suffix 00) |
| | EPA TSCA 12(B) Export Notification: Not listed |

| Section 15. | Regulatory Information |
|---|---|

| Chemical Inventories | EPA TSCA Status: Listed (CAS # 14807-96-6) | EINECS (European No: 238-877-9) |
|---|---|---|
| | CEPA Domestic Substance List – DSL: Listed | CEPA Non-domestic substance List – NDSL: Not listed |
| | AICS (Australian – NICNAS | ECL (Korean No: KE-32773) |
| | SWISS (Giftliste No: G-6939) | PICCS (Philippines) |
| | ENCS/MITI (Japan) – Talc exempt | IECSC (China): Listed |

| Other Pertinent Classifications/ Regulations | CALIFORNIA PROP 65 Status:  Talc not listed |
|---|---|
| | STATE RIGHT-TO-KNOW: Talc listed – Illinois; Massachusetts; New Jersey; Pennsylvania; Florida |
| | CLEAN AIR ACT – Ozone Depleting Chemicals (ODC's): None |
| | CONEG Approved Packaging: Yes |
| | NFPA RATINGS: (Scale 0-4) Health = 1, Fire = 0, Reactivity = 0 |
| | |
| | NPCA:  National Paint and Coatings Association – Hazardous Material Identification System HMIS) |
| | |
| | HEALTH:  1* (Chronic Potential) |
| | FLAMMABILITY:  0 |
| | PHYSICAL:  0 |
| | PERSONAL PROTECTION:  dust respirator, glasses or goggles, gloves |

| Section 16. | Other Information |
|---|---|
| Label Hazard Warning | **CAUTION - PROLONGED EXCESSIVE INHALATION MAY CAUSE LUNG INJURY** |
| Label Precautions | **UTILIZE DUST RESPIRATOR AND EXHAUST VENTILATION.  REFER TO MSDS FOR COMPLETE DETAILS** |



TYPICAL APPERANCE OF PRODUCT  LABEL

| Primary References | ACGIH - Documentation of TLV's 2001 |
|---|---|
| | OSHA - Chemical Sampling Information: Talc (Containing no asbestos) (Revised 1/15/1999) |

| Luzenac America, Inc. | Talc |
|---|---|
| MSDS Group USP | CAS #14807-96-6 |
| Issued 07/01/2006 | Page 4 of 5 |

IMERYS 081221

| | |
|---|---|
| for Key Data | OSHA - TALC (Containing no asbestos).  OSHA comments from the June 19, 1988 Final Rule on Air Contaminants Project extracted from 54FR2324 *et. seq.* |
| | OSHA - Compliance Interpretation Letter dated August 22, 2000 regarding talc products containing less than 1% quartz. |
| | OSHA - Guidelines for Employer Compliance (Advisory) 1910.1200 App E |
| | NIOSH - Pocket Guide to Chemical Hazards. Talc (containing no asbestos and less than 1% quartz). |
| | NIOSH - REL's and General Recommendations for Safety and Health. [TALC  (containing no asbestos). |
| | AIHA - **Hygienic Guides Series – Talc (1982)** |
| | IARC - Talc Vol.: 42 (1987) (p.185) 5. Summary of Data Reported and Evaluation; Supplement 7: (1987) (p.349)  Talc Not Containing Asbestiform Fibers (Group 3). |
| | CCOHS – Database MSDS FTSS. Network Version 2002. |
| | NTP – RoC/NIEHS Database. Network Version 2002. |
| Glossary | ACGIH – American Conference of Governmental Industrial Hygienists |
| | AIHA – American Industrial Hygiene Association |
| | CCOHS – Canadian Centre for Occupational Health and Safety |
| | IARC – International Agency for Research on Cancer |
| | NIOSH – National Institute of Occupational Safety and Health |
| | NTP – National Toxicological Program |
| | OSHA – Occupational Safety and Health Association |
| | PEL – Permissible Exposure Level |
| | TLV – Threshold Limit Value |
| | TWA – Time Weighted Average |
| Important Notice | Luzenac America, Inc. provides the information contained herein in good faith but makes no representation as to its comprehensiveness or accuracy. This document is intended only as a guide to the appropriate precautionary handling of the material by a properly trained person using this product. Individuals receiving the information must exercise their independent judgment in determining its appropriateness for a particular purpose. |
| Issued by | Richard J. Zazenski |
| | Regulatory Affairs Manager |
| | E-mail: rich.zazenski@america.luzenac.com |
| | Phone: 1-303-643-0404          Fax: 1-303-643-0446 |

Protected Document – Subject to Protective Order                     IMERYS 081222

Exhibit 124

## [Letter of proposal to FDA and NIEHS/NIH]

The FDA has legislative responsibility for direct regulation of unsafe ingredients in cosmetics under the Food, Drug and Cosmetic Act. In 1994, as a result of concerns regarding the 1993 NTP animal study and recently published epidemiological studies linking talc and ovarian cancer, the FDA and the International Society for Regulatory Toxicology and Pharmacology co-sponsored a workshop to discuss the issues and to see whether they could arrive at any consensus views on how they should be interpreted. Twenty FDA scientists participated, along with numerous scientists from academia, industry, cancer research institutions, NIEHS, NCI, and other organizations.

At the beginning of the workshop, Dr. John Bailey, Director of FDA's Office of Cosmetics and Colors, presented the "Introduction: Overview - Scope of the Workshop", in which he stated:

> ". . . I think it is reasonable to expect by the end of the workshop to have a discussion or even to reach a consensus of the many scientific and medical experts that are participating in and attending this meeting about the relevance of the recent reports to the safety of talc to human health risks."

At the conclusion of the Workshop, an Executive Summary was prepared by the Rapporteur, Dr. Jelleff Carr (Talc: Consumer Uses and Health Perspectives" in *Reg. Tox. Pharm.* 21(2):211-60 (1995). With regard to the ovarian cancer issue, Dr. Carr explains the consensus that was reached:

> "Following the many issues raised by all presenters, the ensuing discussion generally agreed that while some weak association between talc exposure and ovarian tumors has been reported, it was not sufficient warning for concern."

> "The possibility of an association of talc exposure and ovarian cancer is an important hypothesis of potential public health importance. However, this association remains a research hypothesis whose verification or falsification needs additional study."



Plaintiff's Exhibit No.

**P-341**

"[E]pidemiologic studies have provided weak and conflicting risk signals for this association and it is unlikely that further studies may prove adequate to raise concern at a level sufficient to warrant regulatory or public health measures."

Indeed, the prediction by the panel that additional epidemiology studies on this subject would prove inadequate to clearly define an association between the perineal application of talcum powder and an increased risk of ovarian cancer was accurate. When NTP began their review of non-asbestiform talc in 2000, eight additional epidemiologic studies were published and evaluated by NTP. The eight additional studies continued to provide weak and conflicting risk signals with no consistent trend by duration or frequency of talc use. Appropriately, the NTP Board of Scientific Counselors Subcommittee concluded that the listing of cosmetic talc was not scientifically justified and voted 7-3 not to list talc (not containing asbestiform fibers).

Since the conclusion of NTP review in 2000, only one additional case-control study has been published (Central Valley of California). Not surprisingly, this additional epidemiological study provided no new information of scientific utility.

Given all this scrutiny during the last decade of "cosmetic talc" and its association with ovarian cancer, Luzenac cannot imagine that an additional review by NTP would result in a reversal of consensus about the scientific validity of this hypothesized association. But given the sensitive nature of this very serious women's health issue and the lingering suspicions concerning cosmetic talc as a possible risk factor, Luzenac would like to propose a remedy to FDA and NIEHS/NIH that would eliminate the need for any further debate and review of this issue.

We propose:

1. The talc industry in the United States will voluntarily phase-out the production and sale of all cosmetic talc products used specifically for consumer dusting powders, body powders, baby powders, and any other loose powder products that might reasonably be anticipated to be used by women for perineal application.

Protected Document - Subject to Protective Order

IMERYS 284936

Pltf_IMERYS_00071889

2. In cooperation with domestic cosmetic and pharmaceutical member companies of the CTFA, this product phase-out will occur within XX months of acceptance of these proposals by NTP and FDA.

3. The voluntary withdrawal would not include such products as medicated foot powders where it would not be reasonably anticipated that the product would be used for perineal dusting; nor would the withdrawal include cosmetic talc products sold for make-up, lipstick, eye-shadow and cream foundations where it would not be reasonably anticipated that the product(s) would be used for perineal dusting.

4. The CTFA will assist the FDA in developing an appropriate cosmetic warning label for any dusting or body powders containing talc which are produced or imported after an established date.  The label would warn the consumer the product is not to be used for genital dusting and would report of the possible association between genital dusting and ovarian cancer.  The warning label would be mandatory.

The result of these proposed actions would:

1. In very short order, virtually eliminate the exposure potential in the general population to dusting powders containing talc.  As more and more dusting powders have already been re-formulated with increased levels of cornstarch, the proposed actions would accelerate these product conversions.

2. Eliminating the perineal exposure potential for women suspends the need for NTP to proceed with a review of cosmetic talc.  Given the weakness of the science, it is improbable that a listing recommendation would have resulted – meaning the debate on this theorized association would continue unresolved.  These voluntary actions proposed by the talc industry and CTFA member companies would end the debate and allow researchers to focus on other more plausible risk factors.

IMERYS 284937

Pltf_IMERYS_00071889

# IMERYS284935

## Metadata

| Author | rzazensk | ORIGINAL |
|---|---|---|
| **Custodian** | Zazenski, Rich; | ORIGINAL |
| **DateCreated** | 11/30/2004 9:03 PM | ORIGINAL |
| **OtherCustodians** | Zazenski, Rich; | ORIGINAL |

Exhibit 125

JNJ 000093556



Plaintiff's Exhibit No.

**P-374**

ExhibitSticker.com

Pltf_JNJ_00015498

# JOHNSON'S® Baby Powder

## 2010 Media Recommendation



Protected Document--Subject to Protective Order

1 of 15

# 2010 Powder Program Overview



JNJ 000093557

Pltf_JNJ_00015498

**Objective:**

- Recruit new and younger users by giving them a compelling reason to use JOHNSON'S® Baby Powder

**Key Strategies and Tactics:**

- Target overweight women living in hot climates during key summer season

  - Launch campaign with an insertion in People Magazine within weight loss edit and use Weight Watchers Magazine and Everyday with Rachael Ray to target women who are overweight

  - Utilize local or geo-targeted media in hot markets that have a high percentage of overweight consumers

**Budget:** $555.2M (+12%)

**Timing:** Q2–Q3

**Media Mix:** Print: 47%; Radio/Digital: 53%



2

Protected Document--Subject to Protective Order

JNJ 000093558

Pltf_JNJ_00015498

# 2008/2009 Programs targeted "Women with Curves"

## Historic target exhibited distinct behaviors that allowed JOHNSON'S® to reach her easily

- Print in Weight Watchers Magazine
  - Print out-performed norms for Weight Watchers magazine
  - Advertorials explained alternate usages
- Digital on diet sites
  - Digital banners slightly exceeded benchmarks with a .15% CTR
  - Hub on WeightWatchers.com to increase relevance of messaging vs. brand page, resulted in about 24,000 visits
- Sampling at gyms and walking events



"Women with Curves" =

overweight

fitness conscious

+

uses online resources to trace her diet

reads magazines for weight loss tips

participates in fitness walks

goes to the gym

Protected Document--Subject to Protective Order

3

Exhibit 126



Protected Document - Subject to Protective Order

IMERYS-A_0001298



Protected Document - Subject to Protective Order



Protected Document - Subject to Protective Order



Protected Document - Subject to Protective Order

IMERYS-A_0001301



Protected Document - Subject to Protective Order

IMERYS-A_0001302



Protected Document - Subject to Protective Order

IMERYS-A_0001303

Exhibit 127

## Litigation Issues
### - February 26, 2002 -

## General Stages of a Civil Complaint – United States

### 1. SERVICE OF THE COMPLAINT
    I.     Engage Counsel Licensed in State
    II.    File Formal Response to all Charges with Court

### 2. DISCOVERY PROCESS
    I.     Interrogatories
    II.    Request for Documents
    III.   Depositions
    IV.   Expert Witness Designation & Reports
    V.    Request for Admissions
    VI.   Pre-trial Conference
    VII.  Arbitration/Mediation

### 3. CIVIL TRIAL
    I.     Opening Statements
    II.    Case-in-Chief - (Plaintiff presents evidence)
    III.   Defense - (Defendant presents evidence)
    IV.   Rebuttal - (Plaintiff may have option to call rebuttal witnesses)
    V.    Closing Arguments
    VI.   Jury Deliberates - Renders Decision

## Current Case Status for Luzenac America

- **5** silicosis cases in Texas.  In 2 cases, records show sales of Luzenac talc and chlorite to facility where plaintiff alleges exposure.

- **1** asbestos/silica/talc case in New York.  Records show sales of Windsor unfloated talc to Bondo (body patch).

- **1** asbestos case in Maryland.  Records show sales of Yellowstone talc to facility where plaintiff alleges exposure.

- **1** asbestos case in California.  Rio Tinto companies named in suit. No record of talc usage or exposure.  Plaintiff has died and case is being re-served as a wrongful death case.

1

Protected Document - Subject to Protective Order

# Specific Litigation Issues & Problems

- **Asbestos exposure claims**. Continue to be filed. Jury awards continue to overwhelmingly favor Plaintiffs. Last year, seven Tyler Pipe employees awarded $10 million. Luzenac America was a defendant in original pleadings.

- **Crystalline silica claims**. Gaining in popularity – becoming the next generation "toxic tort industry" for legal community.

- **Luzenac America corporate history**. Complicates the defense and accountability of claims:
  a. 1988 – Cyprus purchases assets of the Vermont Talc company
  b. 1989 – Cyprus purchases stock of Windsor Minerals – Indemnity provisions in Sales Agreement
  c. 1992 – Rio Tinto purchases the stock of Cyprus Talc Company. Sales agreement requires Luzenac to assume responsibility in 1993 for all product liability claims on Cyprus sales (pre–1992)
  d. 1997 – Cyprus acquires Amax Gold
  e. 2000 – Phelps Dodge acquires Cyprus/Amax

- **Multiple ownership changes**. Site closures, personnel changes, etc., have made record and document discoveries extremely difficult. Pre-1992 Cyprus records still under the legal "privileged" umbrella of Cyprus counsel. Fewer and fewer company "historians" available to provide court permitted testimony (in lieu of documentation).

- **"Deep Pockets"**. Traceablilty to Rio Tinto will put/keep Luzenac on many "radar screens". Larger settlement demands will be put upon Luzenac for dismissal.

- **R. T. Vanderbilt**. Publicity on N.Y. State talc/tremolite issues continues to reinforce the talc/asbestos association e.g., the "2000 Crayon controversy – Seattle Post Exposé".

- **NTP Carcinogenic Listing**. Listing of "talc not containing asbestos fibers" could be potentially devastating from a product liability perspective. [*Plaintiffs attorney:* "So Mr. Zazenski, please tell the Court when Luzenac first learned that talc was possibly associated with ovarian cancer?" "When did you first start warning consumers that this association was possible and under study". "Did you not feel a moral and ethical obligation to inform women that the hygienic use of talc may increase their risk for ovarian cancer, or were the profits you were making from mining and selling this potentially dangerous, life-threatening product more important than protecting the health and welfare of the women and children in our society?" Etc. etc. etc.*]

2

IMERYS-A_0013095

Exhibit 128

Exhibit 128, video of Alex Gorsky, can be accessed at:

https://lanierlawfirm.sharefile.com/d-s8ae050614a248fb8

Exhibit 129

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: MIDDLESEX COUNTY

IN RE:

FOLEY V. AVON PRODUCTS, INC. ET AL.                MID-L-3095-18 AS
FRACE V. BRENNTAG NORTH AMERICA, ET AL.            MID-L-600-18 AS
GATMAITAN V. IMERYS TALC AMERICA, ET AL.           MID-L-4252-18 AS
GRABOWSKI V. BRENNTAG NORTH AMERICA, ET AL.        MID-L-6805-16 AS
GREENE V. BRENNTAG NORTH AMERICA, ET AL.           MID-L-2456-18 AS
GRIFFIN V. CYPRUS AMAX MINERALS COMPANY, ET AL.    MID-L-4826-18 AS
HODJERA V. BORGWARNER MORSE TEC, LLC, ET AL.       MID-L-5368-17 AS
MCNEILL-GEORGE V. BRENNTAG NORTH AMERICA, ET AL.   MID-L-7049-16 AS
SELVAGGIO V. BRENNTAG NORTH AMERICA, ET AL.        MID-L-598-18 AS
WENDOWSKI V. IMERYS TALC AMERICA, INC., ET AL.     MID-L-6635-17 AS


VIDEOTAPE DEPOSITION OF SUSAN NICHOLSON, MD
DAY 2


        Transcript of the deposition of the witness,
called for Oral Examination in the above-captioned
matter, said deposition being taken pursuant to
Superior Court Rules of Practice and Procedure by and
before MARC BRODY, a Notary Public and Certified Court
Reporter of the State of New Jersey, at the MIDDLESEX
COUNTY COURTHOUSE, 56 Paterson Street, New Brunswick,
New Jersey, on Wednesday, March 6, 2019, commencing at
approximately 10:00 in the forenoon.


BRODY DEPOSITION SERVICES
235 East Broad Street, Suite 1
Westfield, New Jersey 07090

Phone: 908-789-2000  Fax: 908-789-2007

Page 2 (Pages 204-207)

Page 204

1  A P P E A R A N C E S :
2
3  COHEN, PLACITELLA & ROTH, P.C.
   127 Maple Avenue
4  Red Bank, New Jersey 07701
   732-747-9003
5  BY: CHRISTOPHER PLACITELLA, ESQ.
   AND: DENNIS GEIER, ESQ.
6  Attorneys for Plaintiff
7
8  HAWKINS PARNELL & YOUNG, LLP
   600 Lexington Avenue, 8th floor
9  New York, New York 10022
   646-589-7678
10 BY: MANUEL A. GUEVARA, ESQ.
   Attorneys for Defendant, Revlon
11
12
13 McGIVNEY, KLUGER & COOK, P.C.
   18 Columbia Turnpike, 3rd floor
14 Florham Park, New Jersey 07932
   973-822-1110
15 BY: ELIZABETH BARNA, ESQ.
   Attorneys for Defendant, Whittaker, Clark &
16 Daniels
17
18 BLANK ROME, LLP
   One Logan Square
19 Philadelphia, Pennsylvania 19103
   215-569-5397
20 BY: JAMES T. SMITH, ESQ.
   Attorneys for Defendant, Johnson & Johnson
21
22
23
24
25

Page 206

1  I N D E X
2  WITNESS                      PAGE
3  SUSAN NICHOLSON, MD
4  Continued direct by Mr. Placitella    207
5
6
7
8
9
10
11   ALL EXHIBITS/DOCUMENTS ARE LISTED ON PAGES 356-357
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 205

1  A P P E A R A N C E S   (Cont'd):
2
3  O'TOOLE, FERNANDEZ, WEINER & VAN LIEU
   14 Village Park Road
4  Cedar Grove, New Jersey 07009
   973-239-5700
5  BY: GARY VAN LIEU, ESQ.
   Attorneys for Defendant, Colgate-Palmolive
6
7  McCARTER & ENGLISH, LLP
   Four Gateway Center
8  100 Mulberry Street
   Newark, New Jersey 07102
9  973-622-4444
   BY: JOHN C. GARDE, ESQ.
10 Attorneys for Defendant, Johnson & Johnson
11
12
13 ALSO PRESENT:
14 Carolyn McNelis, Paralegal, Cohen Placitella & Roth, PC
15 Vincent Maggiano, Videographer, Dynamic Evidence
16
17
18
19
20
21
22
23
24
25

Page 207

1   THE VIDEOGRAPHER:  The time is 10:08 a.m.
2  We are now on the video record.  Today's date is
3  March 6, 2019.  This is the videotaped deposition of
4  Susan Nicholson.  Counsel will be noted in the
5  stenographic record.  May the court reporter swear
6  in the witness and then you may proceed.
7
8  S U S A N   N I C H O L S O N, MD, sworn:
9
10 CONTINUED DIRECT EXAMINATION BY MR. PLACITELLA:
11
12  Q   Good morning, Dr. Nicholson, how are you?
13  A   Good morning.  Thank you.
14  Q   As you know that after your last
15 deposition we had a conference with the court?
16  A   Yes.
17  Q   And it was pointed out to me by the court
18 that at certain points in the deposition I could
19 have been a little bit more polite to you, and if I
20 was impolite in any way, I apologize.
21  A   Apology accepted.
22  Q   The court also indicated that there were
23 times when maybe you could have been a little bit
24 more responsive to my questions.  So I told the
25 court we would try to work together to try to get

Page 208

1  this done.  Can we agree?
2    A   Yes.
3    Q   We are here in the courthouse now having
4  the deposition taken in the courtroom of the
5  Honorable Ana Viscomi, and the court will be
6  available should we have any issues that we need to
7  deal with.  Do you understand that?
8    A   Yes.
9    Q   Now, since the last time we were together,
10 did you review any additional materials?
11   A   No.
12   Q   Did you speak to any fact witnesses?
13   A   No.
14   Q   Did you discuss the substance of your
15 prior testimony with counsel?
16   A   No.
17   Q   Has anything happened since the last time
18 we were together and today that would cause you to
19 change any part of your testimony?
20   A   No.
21   Q   Did you spend any additional time between
22 the last deposition and today in preparing for your
23 deposition?
24   A   I just looked over the same documents
25 again briefly.

Page 209

1    Q   In your preparing to begin the deposition,
2  how much time did you spend, approximately, doing
3  that?
4    A   Probably eight hours.
5    Q   So like one full day?
6    A   Well, spread across many days, but eight
7  hours, I would say.
8    Q   You currently are an employee at Johnson
9  and Johnson, right?
10   A   Yes, I am.
11   Q   And your title again is?
12   A   Vice-President Women's Health.
13
14     (PER COUNSEL AGREEMENT, THIS IS THE
15 START OF CONFIDENTIAL PORTION BOUND UNDER
16 SEPARATE TRANSCRIPT.)
17
18   Q   Last time we marked as P-2 your notes.  Do
19 you have copies of your notes with you?
20   A   Yes.
21   Q   What were the circumstances under which
22 you wrote these notes?
23   A   In reviewing the binders of documents that
24 had been provided, I took some notes to create
25 context over time for a number of the events that

Page 210

1  had occurred.
2    Q   Were any of these notes based upon any
3  conversations with anyone?
4    A   The attorneys and I did review these notes
5  together, but these notes are my notes to guide my
6  recollection of the events that occurred.
7    Q   The notes were based solely on a review of
8  documents that were supplied to you.  Is that fair?
9    A   No.  There was mention of the Reuters
10 articles, which was an article I had read and
11 conversations with individuals that we had mentioned
12 previously, some notes related to that.
13   Q   I'm assuming that Prosecco had nothing to
14 do with this particular deposition, other than you
15 probably thought you needed a drink before you got
16 in here?
17   A   No.  I was asked to stop on the way home
18 and made the note.
19   Q   Stop for Prosecco, and I've had witnesses
20 tell me I'm challenging, but usually not that they have
21 to drink before they come to the deposition.
22   A   Certainly not.
23   Q   Let's just walk through your notes so I
24 have a sense of what is in here.  I won't spend very
25 long on it.

Page 211

1       The first thing you say is 1960s, and
2  I'll put them under the Elmo so we are all on the
3  same page.  You say 1960s gras.  Read it and tell me
4  what you mean by that?
5    A   In the 1960s talc was reviewed in May,
6  gras, generally regarded for safe and use in food
7  products.
8    Q   You have here John Bailey, 1968 joined.
9  What does that mean?
10   A   Tab A of, I don't know which binder, the
11 large binder with all the tabs.  I don't know what
12 number it is.  Tab A has an expert report from Dr.
13 John Bailey from the FDA and PCPC.
14       He joined the FDA in 1968 and then he
15 wrote or provided this expert report from his
16 experience starting with the FDA to temporary times.
17   Q   This expert report was is not a Johnson
18 and Johnson document, correct?
19   A   No.
20   Q   Is it an expert report he actually
21 prepared for another defendant in a talc case?
22   A   I don't know the source of this.  I do
23 know that John Bailey wrote it as an expert report
24 related to the topic of talc safety.
25   Q   So how did you get it?

Page 212

1    A   The attorneys gave it to me as part of the
2  file we have related to the take.
3    Q   Is he an expert that you hired to assist
4  you in these litigations?
5    A   I'm not aware that we have hired him and I
6  wouldn't necessarily know the answer to that
7  question.
8    Q   The next thing you have here is 1970s.
9  Could you read what you wrote here and tell me why
10  you wrote it down?
11    A   So 1971, the head of the EPA had a
12  symposium related to asbestos in talc and a number
13  of individuals were invited to that.  That led to
14  Dr. Lewin's testing of a number of cosmetic talc
15  samples and that eventually led to the formation of
16  the J41 standard.
17    Q   Then you have here 1980s.  What is that?
18    A   In 1984 the first citizen petition was
19  filed.  That was denied in 1986.
20    Q   Then you have some notes under that, see
21  figure 2.1 page 5, food additives binder.  What does
22  that mean?
23    A   That means in the binder, the smaller
24  binder, I can't see over there on the desk, but in
25  the smaller binder there's a 1986 response to the

Page 213

1  citizen petition, and they are on page 5, figure
2  2.2.  There's a table that I made notation to make
3  reference to.
4    Q   Okay.
5    A   I would have to look at that to tell you
6  exactly what is in that figure.
7    Q   Then under 1990s, what is that?
8    A   The NTP Rat Study.  That was a study that
9  was the methods in that were -- I shouldn't say the
10  methods, the conduct of that study was flawed.  The
11  machine broke in the midst of doing that study and
12  led to a high stress situation, what's called
13  overload in the animals, and some of those animals
14  did display some pathology.  It was the subject of
15  several documents discussions where experts in the
16  field determined that that rat study did not have
17  any relevance to human health.
18    Q   Was that something that Johnson and
19  Johnson discussed with the FDA?
20    A   That study has been brought up numerous
21  times with the FDA and would have been part of that
22  1994 ISRTP FDA workshop was one that Johnson and
23  Johnson participated in and members of the FDA were
24  present.
25    Q   Then you have 1994 citizen petition,

Page 214

1  asbestos, and I'm assuming that means ovarian
2  cancer?
3    A   Yes.
4    Q   Why did you write that down?
5    A   I would have to look at the citizen
6  petition.  I believe both of those topics were
7  raised in that citizen petition.
8    Q   And then 1995, you have notes for 1995.
9  What is that?
10    A   The CTFA Task Force wrote a letter to the
11  FDA related to that citizen petition.
12    Q   Then off to the left you have FDA tested,
13  and then you have three things.  What is that?
14    A   So as we discussed previously, the FDA did
15  testing in 1976 of cosmetic talc and they did
16  another survey in 2009 and 2010.
17        In 1986, as we discussed in detail
18  last time, the FDA did an extensive analysis of
19  inhalation exposure of talc and other related
20  materials that was put into the response to that
21  1984 citizens petition.
22    Q   I'll ask you about that later.  And
23  underneath that you have 2009, and you have notes
24  under there.  What does that mean?
25    A   There was a new citizen petition in 2008

Page 215

1  that was part of an April 2014 response by the FDA.
2  I was looking at that because the topic for the
3  deposition today was communications between Johnson
4  and Johnson and the FDA.  So I made a note that
5  Kathy Wiley, who was the J & J employee, had spoken
6  to the FDA in that time period, or communicated
7  with, I should say.
8    Q   You have Stanley Milstein emailed John B.
9  What does that mean?
10    A   I would have to go back and look at the
11  documents related to that period of time.  Stanley
12  Milstein wrote an email, probably to John Bailey,
13  but I would have to verify that in the documents
14  that were provided.
15    Q   Then underneath that you say PCPC handling
16  interaction.  Can you read those notes and tell me
17  what they mean?
18    A   So the topic for the deposition is
19  communications between FDA and Johnson and Johnson
20  and Johnson and Johnson and FDA.  Around that event
21  of the 2009, 2010 testing, communications with the
22  FDA was through our trade association PCPC.  So
23  direct communication between Johnson and Johnson and
24  FDA was at a very minimum and that's why I made note
25  of Kathy Wiley above that.

Page 216

1    Q   And who is Kathy Wiley?
2    A   I don't know her exact role.  She's long
3 since left the company.
4    Q   When you say the company, do you mean
5 Johnson and Johnson?
6    A   Yes.
7    Q   Then on the next page, I guess the flip
8 side, you have some notes about December 2009.  What
9 is that?
10   A   Again, the question was if Johnson and
11 Johnson communicated with the FDA, and I found a
12 document that showed that John Lemmo, a Johnson and
13 Johnson employee, attended a meeting with FDA in
14 December 2009.
15   Q   What is that underneath?
16   A   2014, the FDA denied citizen petition.
17   Q   Then you have a single line and you have
18 Reuter's article lays out the theme.  What did you
19 mean by theme, by the way?
20   A   So as we discussed previously, there was a
21 recent article published by Reuters in late 2018
22 that took some of the facts that had been discussed
23 related to talc safety and put them out of context,
24 which made them difficult to understand the
25 implications of.  So this section of my notes really

Page 217

1 takes some of those facts that could be taken out of
2 context and puts them in the historical context of
3 what was happening at that time.
4    Q   What did you mean when you say lays out
5 the theme?
6    A   For instance, this first note says we are
7 not playing games with language.  There was a lot of
8 confusion about asbestos and the misclassification
9 of asbestos historically.  And when people use the
10 term tremolite, they are -- It is sometimes put in a
11 way where it implies that tremolite is asbestos and
12 that is not true.  So the precision of language and
13 implication is critical to understanding the facts
14 and events related to talc safety.
15   Q   So it says Reuters article, later pivot
16 back to.  Why did you write pivot?
17   A   Meaning, if an individual fact, for
18 instance, from some period between 1971 and 1976, if
19 an individual communication is taken out, that
20 almost certainly is misleading because at that time
21 scientists, the FDA, really no one had any agreement
22 on what the appropriate testing was for asbestos.
23         So taking that out of -- pivot back
24 to means provide the context for those individual
25 points to be sure that there's no misleading

Page 218

1 information.
2    Q   You say, for example, we are not playing
3 games with language, and then you say go to McCrone
4 letters.  Is that something you somehow relied upon
5 to prove your point?
6    A   It is not proving a point and provided in
7 the binders are two letters.  One in the '70s and
8 one in the late '80s written by McCrone, who did the
9 testing for our production material of talc and
10 other sort of evaluations of talc for asbestos.
11 And, for instance, I believe it was 1986, McCrone
12 said in the previous fifteen years they never seen
13 asbestos in production material of talc.
14         So whatever discussions had taken
15 place in that 15 years prior, the McCrone testing
16 letter basically says there's no asbestos in Johnson
17 and Johnson talc.
18   Q   And that testing letter you are talking
19 about, that doesn't have any testing results itself
20 in it, does it?
21   A   No.  It is talking about the body of
22 testing that had been done for the previous 15
23 years.
24   Q   We will do some of that later.
25         Here you have under the similar thing,

Page 219

1 no documentation that a validated positive test for
2 asbestos, then that material was used.  Can you
3 tell me what all that is?
4    A   In essence, we have standards, release
5 specifications, certificates of analysis, for
6 instance, that are related to how we manufacture and
7 test our products.  And any lot that is released to
8 make production material needs to pass those
9 standards, and one of those standards is no asbestos
10 detected.
11   Q   And that is something you have personal
12 knowledge of or information you gleaned from looking
13 at documents?
14   A   I'm sorry, I don't really understand the
15 question.  There's two things there.
16   Q   Was it part of your job to do this or is
17 this something you learned in preparation for being
18 a witness?
19         MR. SMITH:  Objection.
20   A   I don't mean to be evasive.  I'm trying to
21 understand the question.  In my prior role as
22 Vice-President Safety Surveillance and Risk
23 Management for the Consumer Products, it was my job
24 to oversee the safety of all products that we make
25 in Consumers.

Page 220

1    So my team, and myself, that was our
2 primary job, and one of those jobs is to ensure that
3 the specifications relevant to medical implications
4 of the use of our products are appropriate.
5    So, yes, understanding those
6 standards was part of my job.  I have looked at
7 those standards, read them, discussed them with our
8 quality engineers, reviewed many, many test results
9 from over the years, so I have first hand knowledge
10 those standards are appropriate and implemented
11 100 percent of the time.
12    Q   We will get to that.  Then you say
13 underneath that, and I assume that means the
14 standards were set such that exposures less than
15 environmental exposures, then you have a bunch of
16 language.  Could you explain that?
17    A   Yes.  So the standards were set between
18 that period of 1971 and 1976, and that was a
19 discussion with many experts in the field and again,
20 it is well described in that 1986 response to the
21 citizen petition.
22    The standards were set such that any
23 exposure someone might theoretically get with the
24 testing limitations that are set by the J41 standard
25 would be -- I think I have to go back, but certainly

Page 221

1 less than a lifetime exposure of asbestos just
2 breathing air.
3    So the calculation and the testing
4 methods were set such that there was no chance that
5 the exposure you would get from using talc would
6 come anywhere close to what you would get in normal
7 day-to-day life.
8    Q   We will spend some time.  I just want to
9 understand your notes.
10    On the next page 3, you say ACP,
11 Langer, Pooley, Lewin.  Tell me what all that is.
12    A   I don't remember what ACP means, but I do
13 know Dr. Langer from Mount Sinai did testing of talc
14 in the early '70s.  He thought he had seen asbestos.
15    Many experts looked at those results
16 and determined that, in fact, he was incorrect, that
17 what he had seen what's called rolled talc and he
18 later retracted saying those were not his results
19 they were preliminary and in effect, he had made
20 a mistake.
21    Q   Okay.
22    A   Dr. Lewin, similarly he was hired in the
23 early '70s by the FDA to test cosmetic talc and he
24 tested more than 100 samples and thought that he had
25 seen many samples that contained asbestos.

Page 222

1    Another scientific group got together
2 with the FDA and Dr. Lewin and determined that Dr.
3 Lewin's testing methods were inadequate and he was
4 misreading largely chlorite for chrysotile asbestos,
5 and he later retracted his results publically.  And
6 Pooley and McCrone were two of the expert groups who
7 looked at those samples and determined that there
8 were not, in fact, asbestos in them.
9    The FDA retested those samples, found
10 there was not, in fact, asbestos in them, and then I
11 make a note here that there are miners and millers
12 that handled the very talc used that was used in
13 these products, and despite many years of
14 occupational exposure to those materials, there was
15 no evidence there was asbestos-related disease in
16 those miners or millers of cosmetic grade talc.
17    Q   Let's go through your notes and we will
18 back and touch on all of these.
19    Next, Boundy study '75, '76.  Tell me
20 what's in your notes.
21    A   I would have to go back and pull the
22 Boundy study.
23    Q   Rachel, no read, Rubin and discuss.  What
24 does that mean?
25    A   Rubino.  This is Rachel Weinstein, who is

Page 223

1 a PhD epidemiologist at Johnson and Johnson.  And
2 Rubino is one of the Miner, Miller studies, and I
3 was interested in understanding if there was any
4 critique of the methods that were used, anything
5 perhaps that I should understand more than I did by
6 reading it myself.
7    We did discuss it and my
8 understanding of the results were what I thought
9 they were.  The other one was just a random note.
10    Q   Email travel dates.  What is July 15th,
11 case starts?  What does that mean?
12    A   I was told there could be a case that they
13 would like me to help prepare for.
14    Q   I'm getting there.  Talk to me about the
15 notes on the next page that I have here starting
16 with Natasha.  Go through your notes for me.
17    A   So Natasha is our head of, and I have to
18 look up her last name, is the head of quality for
19 Consumers.  She started after I left my Consumer
20 role.  She has knowledge of the history of testing
21 of asbestos and I wanted to confirm some of my
22 recollection of our worldwide testing program, and
23 those notes below that are related to the questions
24 that I wanted to get clarification that we have been
25 doing a worldwide testing for asbestos since the

Page 224

1 year 2000 to present where we pull material off the
2 shelves and test for asbestos.
3          Pre 2000 we did -- the redundancy was
4 that not only do J41, but we use electron microscopy
5 sampling and so forth.
6     Q   Here you have 1938 FDCA.  What does that
7 mean?
8     A   Food and Drug Cosmetic Act was adopted in
9 1938.
10    Q   And then you have underneath that a
11 Jifsan.UMD.edu.  What is that all about?
12    A   In the fall of this past year the FDA had
13 a meeting that industry did not participate in to
14 discuss current methodologies for asbestos testing
15 in talc.
16          Some of the individuals who attended
17 that meeting had acted as experts for Johnson and
18 Johnson, which we disclosed to the FDA.  Related to
19 the topic of the deposition, which is communications
20 Johnson and Johnson has with the FDA and FDA has
21 with Johnson and Johnson, we did communicate to them
22 some of those individuals had functioned as experts
23 on this matter for Johnson and Johnson.
24    Q   And who were those individuals?
25    A   I would have to check other notes to

Page 225

1 verify.  I don't know right off the top of my head.
2     Q   Then here it says paid for people to go to
3 meeting.  What does that mean?
4     A   I would have to check.  I understood we
5 had hired those experts previously and they had
6 worked for Johnson and Johnson.  I'm not -- I have
7 not confirmed, in fact, anybody supported the travel
8 of those individuals to the meeting.  I would have
9 to double check that.
10    Q   Why did you write down paid for people to
11 go to meeting?
12    A   These are my notes.  I would call it an
13 aid memoir.  Things to stimulate my memory so that I
14 would, as I was looking through documents, be on the
15 lookout for those things.  So they are not declared
16 as statements per se, but comments to help stimulate
17 my memory as I look through what amounts to many
18 hundreds and hundreds of pages of documents.
19    Q   I get that, but you talk about a meeting
20 in November.  You say that it was not for industry,
21 but then your notes say that you paid for people to
22 go to the meeting.  Why did you write that down?
23    A   So I did not say that we paid for people
24 to go to the meeting.  We have employed as experts
25 some of the individuals that participated in that

Page 226

1 meeting.  I don't know that we supported their
2 travel to that meeting or not.  I would have to
3 verify whether or not that's true.
4     Q   When you took these notes down, where were
5 you and who were you talking to?
6     A   I don't recall.
7     Q   But your notes say, as it relates to the
8 November meeting, "paid for the people to go to
9 meeting."  Correct?  That's what they say?
10    A   I didn't put them in quotations.  That was
11 a note to myself to verify whether or not that was
12 true.  I guess I forgot to put a question mark
13 there.
14          I don't know whether we did or did
15 not pay for individuals to go to the meeting.  But
16 those experts that participated in the meeting were,
17 in fact, people that had worked for Johnson and
18 Johnson as experts on the talc related safety
19 issues.
20    Q   Did they work for Johnson and Johnson as
21 experts in litigation?
22    A   They worked for experts.  I don't recall
23 the exact names of the experts, so I don't know what
24 capacity they might have worked on.  I have not
25 worked directly with any of these experts to my

Page 227

1 recollection.
2     Q   You wrote Mike Fedala worked together.
3 What is all that?
4          MR. SMITH:  Objection.
5     Q   I highlighted it.  What do notes mean?
6     A   So we were -- I was talking to a number of
7 individuals and Tim is Tim McCarthy, trying to
8 understand how we learned about the meeting that FDA
9 was calling on November 28th.
10         So the topic for the deposition was
11 communications between Johnson and Johnson and the
12 FDA and FDA and Johnson and Johnson.  We had met
13 with FDA in June and I was trying to recreate how it
14 is that Johnson and Johnson had gotten
15 communications from the FDA about that meeting.
16         So I asked Tim, and apparently there
17 were a number of people sending emails, and that's
18 how this meeting came about.  Someone named Mike
19 Fedala called Tim who used to work with Stanley
20 Milstein, who is now with the FDA, who sent an
21 email to Tim.
22         Anyway, that's related to how we knew
23 that the FDA was interested in having a discussion.
24    Q   Underneath it you have a star and it says.
25 "How were the three experts selected?"  What did

**Page 228**

1  you mean by that?
2  　　A   So in that meeting in June, the FDA asked
3  us if we had recommendations of experts in asbestos
4  testing.  They specifically said they do not
5  internally have that expertise, and if we had anyone
6  that should be considered as possible participants,
7  that we should submit those names.  And apparently
8  we gave three expert name recommendations, and I was
9  trying to figure out how we selected those
10  particular names.
11  　　Q   Was one of them Ann Wiley?
12  　　A   Not that I recall, but again, I don't
13  remember the exact names of the experts.
14  　　Q   Then you say Lynne --
15  　　A   This is Lynne Szczepaniak.
16  　　Q   Then you have "no."  What does that mean?
17  　　A   I was trying to get -- we mentioned before
18  that one of the people I reached out to was Lynne
19  Szczepaniak, who was our Global Head of Regulatory
20  Affairs for Consumer to ask her if she knew where
21  the three expert names came from and how we picked
22  them.
23  　　Q   What did you find it?
24  　　A   She didn't know.  I asked her if, also
25  related to communications to and from the FDA, if

**Page 229**

1  any FDA had reached out after the Reuters article
2  was published and she said no.
3  　　Q   Then the next thing you have is bold
4  initiative.  What does that mean?
5  　　A   Unrelated to this topic, but it has to do
6  with looking at the talc safety issue and putting
7  together a compendium of scientific information
8  related to that.  That was a topic that Lynne and I
9  also discussed.
10  　　Q   And you have the word briefing book.  What
11  is the briefing book?
12  　　A   There's no briefing book.  This was a
13  discussion around putting a compendium of scientific
14  information that would be similar to a briefing book
15  they might prepare for FDA, for instance.
16  　　Q   And was that prepared?
17  　　A   No, we have not prepared that.
18  　　Q   The last page, page 5, can you just go
19  through that in order and tell me what all this
20  means.  It starts with '60s, Bailey.
21  　　A   So this is redundant.  In the '60s, Bailey
22  had some summary in his expert report that I made
23  reference to earlier.
24  　　　　There are a number of documents about
25  Langer and it points to tab B of this large binder,

**Page 230**

1  page 1.  I spoke to Don Hicks and John Hopkins about
2  these topics.  Then there was a note about something
3  else I was working on at the same time.
4  　　Q   Did you speak to Hicks or Hopkins in
5  reference to this deposition?
6  　　A   Not in reference to this deposition.
7  　　Q   To prior testimony you gave?
8  　　A   Don related to -- Don and I worked
9  together, so we have talked many times about
10  asbestos testing and I made note that either one
11  these two gentlemen would have additional
12  information related to asbestos testing if needed,
13  but I didn't feel after reviewing the documents I
14  needed to discuss with them further.
15  　　Q   The last time we were together one of the
16  things we reviewed were what representations Johnson
17  and Johnson made to the FDA concerning the asbestos
18  content of Johnson and Johnson's cosmetic talc.  Do
19  you recall that?
20  　　A   Yes.
21  　　Q   And I believe you are testified that the
22  issue of whether there was any evidence of asbestos
23  in Johnson and Johnson cosmetic talc was raised
24  repeatedly over the years by the FDA, correct?
25  　　　　MR. SMITH:  Objection.

**Page 231**

1  　　A   Could you please repeat the question?
2  　　Q   Sure.  You testified last time that the
3  issue of whether there was any evidence in asbestos
4  in Johnson and Johnson talc was raised repeatedly by
5  the FDA to Johnson and Johnson over the years,
6  correct?
7  　　　　MR. SMITH:  Objection.
8  　　A   Yes, but it was more around testing, not
9  the presence of asbestos, to clarify your question.
10  　　Q   I'm going to go to your testimony last
11  time at page 87, line 10.  I'm going to play for you
12  your testimony.
13
14  　　　　(Videotape played from previous
15  testimony)
16
17  　　Q   Now, am I correct whether there was
18  asbestos in the Johnson and Johnson talc products
19  was raised repeatedly by the FDA beginning in the
20  early '70s?
21  　　A   It was raised.  I don't know what that
22  means.
23  　　Q   The issue was, the question came up over
24  and over again, beginning in the 1970s, and was
25  posed to Johnson and Johnson, whether any Johnson

Page 232

1 and Johnson talc product contained asbestos. Can we
2 agree with that?
3 　　　MR. SMITH: Objection.
4 　　A  That's correct and Johnson and Johnson
5 talc never contained asbestos.
6 BY MR. PLACITELLA:
7 　　Q  Do you recall giving that testimony?
8 　　A  I do, yes, and --
9 　　Q  That's my question
10 　　　　Do you recall giving
11 that testimony?
12 　　A  Yes.
13 　　Q  Do you recall telling me last time that
14 the answer always was that there was never any
15 evidence of any amount of asbestos in Johnson and
16 Johnson talc?
17 　　A  I would have to understand the context of
18 that answer.
19 　　Q  I'll play your testimony from the last
20 time again.
21 　　　　(Videotape played from previous
22 testimony)
23 　　Q  The answer by Johnson and Johnson was
24 always the same, correct?
25 　　　　That is, there is no evidence of

Page 233

1 any asbestos of any -- strike that.
2 　　　　The answer provided by Johnson and
3 Johnson was always the same.  There is no evidence
4 of any amount of any asbestos in any of Johnson and
5 Johnson cosmetic product, correct?
6 　　A  There was no asbestos in Johnson and
7 Johnson products, correct.
8 　　Q  Do you recall giving that testimony?
9 　　A  Yes.
10 　　Q  Now, today I want to spend some time
11 reviewing exactly what information was provided by
12 Johnson and Johnson to the FDA to support those
13 representations.
14 　　　　We are on the same page?
15 　　A  Yes.
16 　　Q  And I also want to explore what
17 information was in the possession of Johnson and
18 Johnson that was not provided to the FDA.
19 　　　　Are you with me?
20 　　A  I don't know what you are referring to,
21 but I hear what you are saying.
22 　　Q  On the subject of asbestos testing in
23 Johnson and Johnson talc.
24 　　　　We are going to go through
25 that.  Are you with me?

Page 234

1 　　A  I hear what you are saying, yes.
2 　　Q  Ultimately we will let the experts and the
3 court and the jury determine whether what you
4 disclosed or didn't disclose was significant or not.
5 Can we agree?
6 　　　　MR. SMITH: Objection.
7 　　A  That's fine, yes.
8 　　Q  I want to approach you for a second with
9 volume 1.  I'm not being rude here, and as I recall
10 volume 1, which is marked P-3, it is a compendium of
11 everything you ever sent to the FDA, concerning
12 testing of Johnson and Johnson cosmetic talc for
13 asbestos.  Correct?
14 　　A  Not exactly, no.
15 　　Q  What is volume one?
16 　　A  Volume 1 is a representative of the
17 communications that we had back and forth with the
18 FDA.  Substantive documents are here and multiple
19 copies of the same topic are not necessarily
20 included.
21 　　　　If you pull out tab C, which I've
22 done and put over here, there were a number of
23 documents from the early '70s that we could not
24 locate, and so they are not necessarily included in
25 that binder.

Page 235

1 　　Q  Everything you could find in terms of
2 communications with the FDA written is in volume 1,
3 P-3, correct?
4 　　A  Not exactly.  Anything of substance is
5 here that I'm aware of.
6 　　Q  And you have a copy, a duplicate of this
7 in front of you?
8 　　A  Yes, I do.
9 　　Q  So what I want to do now is I want to make
10 sure we are all on the same sheet of music, okay, in
11 terms of what is in this book and what was provided
12 to the FDA.  Okay?
13 　　A  Yes.
14 　　Q  Are you with me?  So what I would like you
15 to do is go through the binder with me and let's
16 just make sure we have a clean record of everything
17 in this binder that was provided to the FDA on the
18 subject of whether any test -- scratch that.  Let me
19 do it again.
20 　　　　Let's go through the binder and make
21 sure we are in agreement on the same sheet of music
22 as to what testing results were provided to the FDA
23 by Johnson and Johnson concerning asbestos in
24 Johnson and Johnson talc products.  Are you with me?
25 　　A  Yes.

Page 236

1    Q   Why don't you start and I'll mark my book
2  at the same time.  Let's walk through the book.
3    A   I'm sorry, what information do you want?
4    Q   I want to go through and mark in the book
5  on the record what testing results you transmitted
6  to the FDA.  You, Johnson and Johnson, for asbestos
7  in cosmetic talc that was sold by Johnson and
8  Johnson.  Okay?
9    A   Okay.  In tab 1 there's a memo here making
10  note of three different reports on talcum powder
11  that was transmitted to the FDA.
12    Q   The memo you are talking about is July 8,
13  1971?
14    A   Correct.
15    Q   That's a correspondence from Johnson and
16  Johnson to the FDA, correct?
17    A   Correct.
18    Q   But those aren't the results themselves.
19  The results are attached, correct?
20    A   Correct.
21    Q   So what are the results?  Let's just talk
22  about the results so we make sure.
23    A   Well, the particle size distribution does
24  not have to do with asbestos, so we can go past
25  there one.  Number 2 is x-ray analysis of 344L,

Page 237

1  which is a representative sample from Vermont.
2    Q   Okay.  Where is that?
3    A   I'm looking.
4    Q   Is that the Dartmouth report?
5    A   The third one is the Dartmouth report.
6    Q   That's June 28, 1971?
7    A   That's correct.
8    Q   Okay.
9    A   And that's attached.  None of the results
10  here mention, that I can see just on a glance, the
11  presence or absence of asbestos, but it talks about
12  a number of other substances that were looked at,
13  for instance, chlorite and such.
14    Q   Well, actually, if you go to page 5 of the
15  report, and we will back to it, it does talk about
16  results on number 10, doesn't it?
17    A   You are correct.  No amphiboles or
18  asbestos were observed.  Thank you.
19    Q   Then am I correct the next set of tests is
20  a July 7, 1971, from the Colorado School of Mines?
21    A   That is correct.  I'm looking for that
22  report.
23    Q   I think it is the very next page.
24    A   Thank you.
25    Q   I'll pull it up here on the screen.

Page 238

1    A   Thank you.  This is x-ray analysis, which
2  has a limit of detection.
3    Q   I'm going to go through each one with you
4  I promise and you can talk about it.  All I want to
5  do is identify and then we will go back through each
6  one.  Okay?
7    A   Okay.
8    Q   I want to make sure we are on the same
9  sheet of music.  Okay?
10    A   Okay.  I'm following.
11    Q   The next test I can find was under 9, tab
12  9A.  Let me know if you see one in between.  There's
13  a reference in July 9, 1971 to the FDA meeting
14  July 8th.  Dr. had shared electron microscopy
15  photographs at a meeting.
16    Q   But there are no test results in that, is
17  there?  Raw results from an expert?
18    A   Well, I believe that electron micrograph
19  would be a test result.  If you can clarify the
20  definition, then maybe we can.
21    Q   I'm looking for the reports that you gave
22  to the FDA concerning the test results related to
23  asbestos in talc.
24    A   So you want only reports?
25    Q   Yes, the solid reports.

Page 239

1    A   Okay .  There are meetings minutes that
2  refer to a number of tests.  I'm looking at 9, as
3  you point out, and there's a reference to a series
4  of reports.  There's the Pooley report, the McCrone
5  report, a letter from the Colorado School of Mines,
6  a report on particle size, another report from Dr.
7  Pooley and some reports from the McCrone folks.
8    Q   Okay.  Let's identify them.  Under 9A you
9  have the Pooley report?
10    A   Yes.
11    Q   I'll put a tab there.  The next report I
12  see is 9D from McCrone.  Is that correct?
13    A   There are other reports related
14  specifically to asbestos testing, I believe is your
15  question.
16    Q   Correct.
17    A   There is a report in tab C that makes
18  reference to numerous different types of evaluations
19  of talc product.
20    Q   Are there any results of the asbestos
21  testing in 9C, because I didn't see them?  Actually,
22  you are correct.  I think this is repeated.  Okay.
23  So 9C.
24    A   In conclusion, it makes reference to
25  testing for asbestos.

Page 240

1  Q   I got it.  Where it says samples 1 through
2  10, right?
3  A   Correct.
4  Q   We will come back to that?
5  A   The next report is from McCrone on 344L
6  sample.
7  Q   That's dated August 19, 1971?
8  A   Yes.
9  Q   I have it up on the screen.  To make sure
10 we are all on the same page.
11 A   Yes.
12 Q   What is the next one?
13 A   This is not results, but in tab E is the
14 methods used by McCrone.
15 Q   They don't contain any results?
16 A   Correct.  1971 to 1976, the methods were a
17 primary focus on testing.
18 Q   I promise I'll give you all the time you
19 need to talk about those things.
20     The next one I have is tab 27.  Mine
21 says 27A, Sperry-Rand.
22 A   Tab 14 makes mention of internal J & J
23 testing of the same samples or samples from the same
24 lots that Professor Lewin had tested.  There's a
25 report, but there's a communication to the FDA, our

Page 242

1  Q   But those actual tests results are here,
2  right, in this book, the McCrone results?
3  A   I would have to track to make sure it is
4  the exact sample they are making reference to.
5  Q   There's no test results on page 2, it is
6  just a summary statement, correct?
7  A   That's the test results were reported to
8  the FDA.  That's what it says.  I thought that's
9  what you were asking.
10 Q   I want to just highlight it.  So you are
11 talking about now tab 16?
12 A   Tab 16.
13 Q   On page 2?
14 A   Yes.  Second paragraph.  Dr. Stewart, from
15 McCrone Associates, reviewed his findings on the
16 Lewin Shower to Shower sample.  He stated all
17 samples were subject to electron microscopy.  No
18 chrysotile present at the end of that paragraph.
19     MR. SMITH:  I want to place my
20 objection to highlighting on the originals.  I
21 object to it.  I don't think you should do it.
22     MR. PLACITELLA:  I'm doing it so we'll
23 have it.  She has got a copy.
24     MR. SMITH:  My copy.
25     MR. PLACITELLA:  Okay.

Page 241

1  test showed no asbestos in samples.
2  Q   I want to make sure I got that.  That's
3  tab 25C?
4  A   This is tab 14 I'm looking at, August 8,
5  1972.
6  Q   My fault.  Sorry.  August 8, 1972?
7  A   Correct.
8  Q   Make sure we have a picture of that.
9  That's it, right?
10 A   Yes.
11 Q   Go ahead.  Keep going.
12 A   There's another mention in the document in
13 15, which is a memorandum of a meeting by the FDA
14 That's on page 3.  It is referencing the same
15 testing results.
16 Q   But the results are on tab 14, correct?
17 A   The same information is conveyed in both
18 of those documents.
19 Q   What is next?
20 A   There's reference in tab 16 that McCrone,
21 in addition to the J & J scientists' role, and one
22 other scientist mentioned in those two previous
23 documents on page 2, there's mention of McCrone also
24 testing the Lewin Shower to Shower sample and
25 finding that there was not asbestos in that sample.

Page 243

1  Q   What is the next document?
2  A   There's some back and forth in August
3  about additional looks at various samples.
4  Q   But no results, no published results,
5  correct?  No reports?
6  A   No, but communication to the FDA regarding
7  reports.
8  Q   I'm going to go through that.  All I'm
9  trying to do now is identify the actual reports that
10 were provided.  Are we on the same page?
11 A   I understand.
12 Q   Okay.  So what is the next actual physical
13 report that's in this binder you provided?
14 A   There's a September memo that makes
15 reference to data shared by Dr. Pooley with the FDA.
16 The actual report is not here, but reference to a
17 communication of test results is made note of.
18 Q   What is the actual report, the next actual
19 report that you provided?
20 A   I realize you are asking for a physical
21 report.  There are multiple communications that
22 reference data that isn't in a specific report, but,
23 forgive me, I'm going page by page to make sure to
24 get what you need.
25 Q   Go ahead.

Page 244

1   A   There's a memo in tab 26, I believe you
2   referenced before, looking at some analyses that
3   were done from McCrone. And there's some scanning
4   electron micrographs included, and I think that
5   might fall under your definition of report.
6   Q   Tell me what you are referring to.
7   A   Tab 26, memo to Ian Stewart from Walter
8   McCrone.
9   Q   I don't see anything on tab 26 itself.
10  I'm sorry. 26. Show me where in tab 26 are you
11  referring to. I have it up on the screen.
12  A   Starting on page 3, there are electron
13  micrographs. I think that might meet your
14  definition of a report.
15  Q   Okay. And that's identified?
16  A   Tab 27, there are multiple reports here on
17  the Italian mine investigation of Shower to Shower
18  included in the tabs following tab 27.
19  Q   Let's identify each one, please.
20  A   October 17, 1972 to Dr. Schaefer.
21  Q   That's the cover letter, correct?
22  A   Correct. The reports are listed there.
23  Q   So A, tab A is a report from Sperry-Rand?
24  correct, dated September 8, 1972?
25  A   Yes.

Page 245

1   Q   Tab B is correspondence, right? Tab C, I
2   have an October 27, 1972 report from Colorado School
3   of Mines. Is that right?
4   A   Yes.
5   Q   The next report I see is a report from
6   McCrone dated 10-27-72 concerning Johnson's Baby
7   Powder?
8   A   That is correct.
9   Q   The next report I see is a report from
10  Gordon Brown concerning an x-ray study of Johnson's
11  Baby Powder, correct?
12  A   Yes.
13  Q   The next report that I see is an October
14  31, 1972 report from Professor Pooley on baby
15  powder. Is that correct?
16  A   Yes. The cover letter is dated in
17  November, but the report itself is October 31.
18  Q   The next report I see is a November 8,
19  1972 report internally from Johnson and Johnson. Is
20  that fair?
21  A   That's what it look looks like, yes.
22  Q   And I don't see any other reports until
23  tab 31. Can you verify that?
24  A   There's reference a report that I don't
25  see here in tab 30. It makes reference to a report

Page 246

1   that was delivered to Dr. Schaffner on February 14,
2   1973. I'm looking at Talc Versus Asbestos in Long
3   Term Animal Studies. The report itself it appears
4   was not retrieved.
5   Q   Okay.
6   A   The next one is -- I don't see the date on
7   the report. The cover letter is dated May 25, 1973.
8   Q   Okay. The next report I was able to
9   identify is in tab 36, but you can verify that for
10  me?
11  A   That's what I find as well, November 9,
12  1973.
13  Q   So there's a cover letter from Johnson and
14  Johnson to Dr. Schaefer and it attaches various
15  reports related to Shower to Shower, correct?
16  A   That is correct.
17  Q   And the first report is from Martin
18  Buerger, October 7, 1972?
19  A   That is correct.
20  Q   The next report is from Gordon Brown?
21  A   That is correct.
22  Q   The next report after that is from McCrone
23  dated June 22, 1973?
24  A   That is correct.
25  Q   The next report is from Colorado School of

Page 247

1   Mines, September 7, 1972, correct?
2   A   That is correct.
3   Q   The next report is from Dr. Pooley dated
4   September 29, 1972, correct?
5   A   That is correct. The next is from Dr.
6   Pollack from Carnegie Mellon.
7   Q   I don't see any results in this. It is
8   just a comment on Lewin's report, right? There's no
9   actual testing results in this one?
10  A   Hold on. That's one interpretation. This
11  person has looked at those results and given their
12  interpretation. Although it is in a cover letter,
13  it is a report of an interpretation.
14  Q   Okay. The next one is an internal report
15  from Johnson and Johnson, September 28, 1972?
16  A   That is correct.
17  Q   Are there any other reports, test results
18  like this after September 28, 1972?
19  A   I'll have to continue to look to verify.
20  There's a report in tab 41.
21  Q   Excuse me?
22  A   Tab 41.
23  Q   Okay.
24  A   There's a report on detection at low
25  levels of chrysotile asbestos by differential

Page 248

1 thermal analysis. So it is a testing methodology
2 that related to our talc product.
3    Q    But no test results.
4    A    Do you mean -- what do you mean?
5    Q    They looked at the Johnson and Johnson
6 talc, they ran a test and this is what they found.
7 With an actual test result. We found asbestos. We
8 didn't find asbestos. We found tremolite. We
9 didn't find tremolite. That's what I'm talking
10 about.
11    A    One minute. I'm looking. This is a
12 methods paper on what the detection limits are. You
13 are right. It doesn't list this talc, this talc and
14 the other talc in the results of the test.
15    Q    It didn't test the specific product and
16 say these are the results, it is just talking about
17 methods, correct?
18    A    It is a methods paper. That's correct.
19    Q    Would this be a good time to take a break
20 and kind of peruse it off the camera to see if
21 there's anything else?
22    A    Sure.
23        THE VIDEOGRAPHER: The time is 11:20.
24 We are going off the video record.
25        (Recess taken)

Page 249

1
2        THE VIDEOGRAPHER: The time is 11:34.
3 We are now back on the video record. Counsel, you
4 may proceed.
5    Q    When we left off you were going through
6 the binder to identify any other testing report
7 related to whether or not there was asbestos in
8 Johnson and Johnson talc. Did you find any others?
9    A    I did.
10    Q    What is the next one you found?
11    A    Tab 45. There's a letter to Arnold
12 Schelz at the FDA dated October 4, 1974.
13        In paragraph 2 it makes reference to
14 a report enclosed, which verifies the presence of
15 non fibrous varieties in talc. No chrysotile. The
16 report is not attached, but it makes reference to a
17 report.
18    Q    But there's no report?
19    A    Right, but you asked me about reports sent
20 to the FDA.
21    Q    I just want to make sure we are on the
22 same page.
23    A    Yes. Then tab 50. There's a note to Dr.
24 Schaffner at the FDA September 12, 1975, and on page 2
25 of the report of samples that were tested for

Page 250

1 asbestos and listed here.
2    Q    Hold on. I have tab 50 as a May 16,
3 1975 --
4    A    I'm sorry. 52.
5    Q    52.
6    A    This is a letter from George Sandlin, who
7 is chairman of FDA Talc subcommittee, Robert Schaffner
8 at the FDA. On page 2 it makes reference to a
9 number of cosmetic products that were tested for the
10 presence of asbestos. J & J products are included
11 in that.
12    Q    The reference to a report by Dr. Pooley,
13 isn't that the earlier report we went over?
14    A    I would -- it says all done by Pooley. I
15 would have to go back and double check they were the
16 same exact ones.
17    Q    But there's no Pooley report.
18    A    Correct. There's no report here, but
19 there's reporting of results to the FDA.
20    Q    There's no analysis?
21    A    I don't know what that means, analysis.
22    Q    It doesn't have -- there's no report from
23 Dr. Pooley. It is somebody relating what they think
24 or believe Dr. Pooley found. There's no report from
25 Dr. Pooley, correct?

Page 251

1    A    These are results being reported from the
2 companies to FDA. So you are right, there isn't a
3 separate report from Dr. Pooley, but the results are
4 reported here.
5    Q    We don't know what that refers to, whether
6 it is an earlier report, a new report. We have no
7 idea --
8    A    To your point a second ago, we could go
9 back and look at the Pooley report. I don't know
10 that this is the exact same results.
11    Q    We will do that. Keep going.
12    A    Tab 52J I believe refers also to those
13 same results, talking about Dr. Pooley and extensive
14 study of samples that offer some clarification of
15 the Pooley results.
16    Q    But again, no official report from Dr.
17 Pooley? You do say on the second paragraph, Dr.
18 Pooley's summary report is attached as attachment B.
19 Where is attachment B?
20    A    There's attachment A that looks like it is
21 the result in Tab K and there's an attachment B in
22 Tab L.
23    Q    So attachment B. But attachment B isn't
24 of any Johnson and Johnson product, correct? It is
25 products from Australia, Brazil, South Korea, China.

Page 252

1  There's no specific test in attachment B related to
2  Johnson and Johnson products.
3     A   In 1975, material was being sourced from
4  Italy and talc origin in Italy, that would refer to
5  the source material for Johnson and Johnson talc.
6     Q   Where does it say that?
7     A   I know that to be true.
8     Q   You were still buying talc from Italy in
9  1975? There's no test results here saying this is a
10 Johnson and Johnson product and this is what we
11 found, correct?
12          MR. SMITH:  Objection.
13    A   Correct.  You asked about results reported
14 to the FDA.  Results reported to the FDA.  These are
15 the supporting documents and actual physical,
16 separate report is not included here.  It may have
17 existed at some time and we don't have it.  I'm
18 doing my very best to give you the information you
19 asked for.
20    Q   Okay.  Keep going.
21    A   Tab 56 makes reference to testing done by
22 a number of companies.  If we cross reference --
23 I'll have to verify it that -- it may be the same
24 data presented on page 2.  It delineates all the
25 reports of talc testing that had been done on

Page 253

1  Johnson and Johnson talc.
2     Q   I think we are not on the same page, which
3  is why I'm going through this.  56 is a May 24, 1976
4  letter from Windsor Minerals to McCrone complaining
5  about asking lawyers for quick answers.
6     A   I'm looking at tab 56 in my book and it is
7  a March 19, 1976 letter.
8     Q   Okay.
9     A   On page 2 there's the cover letter and
10 then a subject memo, asbestos in talc, and then a
11 number of different companies are listed, including
12 Johnson and Johnson, which summarizes reports from
13 the numerous evaluations that have been done.
14    Q   But no actual report itself from a
15 scientist?
16    A   There's not a physical, separate report,
17 but it reports results from numerous different
18 studies that have been done.
19    Q   But there's no report directly authored by
20 a scientist, correct?
21    A   In this tab the source documentation that
22 you are referring to is not included, but there's a
23 listing of results that have been shared with the
24 FDA.
25    Q   I want to make sure we are on the same

Page 254

1  page.  In tab 56 when it talks about tests of
2  Johnson and Johnson product, there is no report,
3  actual report from a scientist either that worked
4  inside of Johnson and Johnson or outside of Johnson
5  and Johnson for Johnson and Johnson.  There's no
6  actual authored reports, correct?
7     A   That's correct.  And for clarity, when we
8  share results of tests with the FDA, sometimes a
9  report is sent, sometimes the results are summarized
10 and communicated to the FDA and if they request the
11 report, we will offer to send the report.
12          Sometimes it is sent and sometimes
13 it doesn't sent.  That's why reporting of the
14 results would be the results whether there's not an
15 attached report.
16    Q   Keep going.
17    A   That's all I could find.
18    Q   Am I correct then that the last report of
19 any results of testing related to asbestos,
20 concerning Johnson and Johnson talc products, was
21 1976 in your book?
22    A   So, no, because there are test results
23 from the 2009 and 2010 survey that was done by FDA,
24 but that was not -- those aren't test results from
25 Johnson and Johnson or a contractor to the FDA.

Page 255

1         Remember 1976, the J41 standard was
2  put in place, so all of the lots of talc would have
3  been tested by that standard and we would have had
4  to pass that standard to be marketed, so the sharing
5  back and forth of test results would have ceased at
6  that point, unless a question was raised.
7     Q   Maybe I wasn't articulate in my question.
8  As you sit here today, you have no evidence that
9  Johnson and Johnson ever supplied the FDA with any
10 test results concerning the talc for the presence of
11 asbestos or tremolite after 1976?
12          MR. SMITH:  Objection.
13    Q   Correct?
14          MR. SMITH:  Objection.
15    A   That is correct.  That's not something we
16 would have shared, so I don't have that.
17    Q   After 1976, the FDA continued to ask
18 Johnson and Johnson whether there was any evidence
19 of asbestos in Johnson and Johnson talc products,
20 correct?
21    A   Yes.  The topic of asbestos in cosmetic
22 talc has come up over the years from time to time.
23    Q   And even though you were asked after 1976,
24 you never supplied the FDA with any test results
25 related to the Johnson and Johnson talc concerning

Page 256

1  asbestos or tremolite after 1976, true?
2     A    That would be true because the only thing
3  we would have had is a certificate of analysis that
4  would have been said no asbestos detected.
5     Q    Are you sure about that?
6     A    To the best of my knowledge.
7     Q    Now, let's go back and let's make sure we
8  are still on the same sheet of music, based on what
9  you testified to so far today.
10          What I'm going to do to make sure we
11  are in agreement is I'm actually going to create a
12  chart of everything you have identified and have you
13  tell me whether that chart is correct or not so we
14  have it all in one place.  You got me?
15     A    Okay.
16     Q    Let me start with the first test you
17  identified, which is the tab 1A, which is the
18  Dartmouth test dated June 28, 1971.  Do you see
19  that?
20     A    Yes.
21     Q    And what they did in the Dartmouth test
22  is they used an optical microscope and x-ray
23  diffraction, correct?
24     A    Yes.
25     Q    And they said the purpose of the study was

Page 257

1  to examine the difference in the talc products that
2  were produced by various milling procedures,
3  correct?
4     A    Yes.
5     Q    And this was done by Dr. Reynolds at
6  Dartmouth?
7     A    On the bottom of the report it would say
8  who did it.
9     Q    He looked at both talc ore and talc
10  products, correct?
11     A    Here it says he looked at x-ray and
12  optical studies in bulk samples.
13     Q    And as it related to asbestos on page 5,
14  correct, and in number 5 he says, "No amphibole,
15  garnet or asbestos impurities were observed during
16  optical studies of the products."  Correct?
17     A    Correct.
18     Q    I created here, to make sure we have this
19  down, is the date of the test -- do you see it?  On
20  your look on your screen.
21     A    Yes.
22     Q    The exhibit number, which is your tab
23  number, who did the test, the testing entity, the
24  author, the recipient, the purpose, the test method,
25  if it was shown, the mine, what was tested and what

Page 258

1  the test revealed.  Do you see that?
2     A    Yes.
3     Q    What I put for the first entry was the
4  date, Dartmouth Reynolds, Miller, studies of ground
5  products, using XRD, PLM and what the test revealed
6  there were no amphibole or asbestos impurities were
7  observed, correct?
8     A    Yes.
9     Q    We are on the same page?
10     A    Yes.
11          MR. SMITH:  Counsel, are we going to
12  mark this as an exhibit?
13          MR. PLACITELLA:  I will when I'm done
14  with it.
15          MR. SMITH:  Do you have a copy for
16  me?
17          MR. PLACITELLA:  I'll give you a copy
18  as I do it, yes.
19          MR. SMITH:  I can't have a copy?
20          MR. PLACITELLA:  I can't give you a
21  copy.  I'm going to keep adding to it.  I'll be
22  making copies.  When I'm done I'll have it printed
23  by the court and I'll give you a copy.
24     Q    The next test I have here is also in 1A
25  and that's on the same next page and this is the

Page 259

1  July 7, 1971 Colorado School of Mines.  Do you see
2  that?
3     A    Yes.
4     Q    It talks about doing an x-ray diffraction
5  analysis of the Vermont products.  Do you see that?
6     A    Yes.
7     Q    And what they found was no
8  anthophyllite --hold on for a second.  What they did
9  is they looked at Vermont talc product 344 L,
10  correct?
11     A    Yes.
12     Q    And they ran x-ray diffraction and the
13  conclusion was they found no anthophyllite and only
14  minor amounts, below one percent of tremolite and
15  actinolite, correct?
16     A    Yes.
17     Q    Can we go back to the chart?  I put on the
18  chart.  Still under tab 1A, Colorado School of
19  Mines.  The report went to Dr. Ashton, correct?
20  They used x-ray diffraction of Vermont talc and we
21  should add no anthophyllite and only minor amounts
22  (below one percent) of tremolite and actinolite were
23  detected.  Is that good?  We are on the same page?
24     A    Yes, we are on the same page.  The
25  tremolite and actinolite should not in any way imply

Page 260

1  asbestos, because they didn't classify.
2      Q    Ma'am, they didn't classify it one way or
3  another, and I'm not going there, okay?
4      A    Okay.
5      Q    We agree they classify it as asbestos or
6  non asbestos?
7      A    Correct.
8      Q    The next tab I have, I believe from you,
9  from is 9A, and that's a report from Dr. Pooley,
10  correct?
11     A    Yes.
12     Q    And it talks about a report of
13  investigations of talc samples supplied by Johnson
14  and Johnson, and then lists laboratory code numbers
15  1 through 10, correct?
16     A    Yes.
17     Q    And it talks about the purpose, which was
18  they did an analysis to establish the presence of
19  asbestos fiber of the chrysotile or amphibole types,
20  correct?
21     A    Yes.
22     Q    They used an electron microscope and x-ray
23  diffraction, correct?
24     A    Yes.
25     Q    What they sampled, if you look on the

Page 261

1  front page, is Windsor 66 talc used in the
2  manufacture of Johnson's Baby Powder.  Do you see
3  that?
4      A    Yes.
5      Q    And what they concluded, or Dr. Pooley
6  concluded, was the samples, 1 through 10, were found
7  to be free of chrysotile asbestos fiber, with the
8  exception of one small chrysotile fiber, and then he
9  goes on to say that that was probably, in his
10  opinion, from background.  Is that fair?
11     A    Not probably.  That is considered
12  background contamination.
13     Q    Then he goes on to say no diffraction
14  patterns were observed, which corresponds to
15  diffraction patterns for amphibole asbestos fibers,
16  right?
17     A    Right.
18     Q    Can we go back to the chart, please.
19          Under 9A we have Dr. Pooley, the
20  purpose I took straight from the report.  Do you see
21  that?
22     A    Yes.
23     Q    They used an electron microscope, x-ray
24  diffraction, Windsor Mine, correct?
25     A    Yes.

Page 262

1      Q    Windsor 66 Talc, correct?
2      A    Yes.
3      Q    And I took the quote directly from the
4  report.  The samples 1-10 were found to be free from
5  chrysotile, with the exception of one small
6  chrysotile fibril.  I should add in parenthesis,
7  can I put in just contamination after that?  Would
8  that satisfy you?
9      A    I prefer if you write considered
10  background contamination.
11     Q    What did you want to put in there, Doctor?
12     A    Considered background contamination.
13     Q    We added the part about no diffraction
14  pattern.  Is that fair?
15     A    Yes.
16     Q    Let's go to, I think the next one you have
17  is 9D.  You also flagged 9C, but that's a repeat of
18  the earlier -- what we just went through, right?  It
19  is the same document?
20     A    Yes.
21     Q    So now 9D is the report to Johnson &
22  Johnson Research Center, Examination of Baby Powder
23  for Johnson and Johnson by McCrone dated August 19,
24  1971.  Do you see that?
25     A    Yes.

Page 263

1      Q    What they tested was Johnson's Baby Powder
2  from batch 344L, correct?
3      A    Yes.
4      Q    What they were looking for was, they say
5  determine whether asbestos was present in the
6  powder, correct?
7      A    What was your question?  I'm sorry.
8      Q    Let me get it for you.  What they used is
9  an optical microscope and an electron microscope,
10  correct?
11     A    Yes.
12     Q    What they concluded was no asbestos or
13  asbestiform materials were identified.  Only one
14  fiber was observed, which could not be identified as
15  rolled or folded flakes, correct?
16     A    Yes.
17     Q    Can we go to the chart.  On the chart
18  under 8-19-1971, 9D, we have the author, McCrone,
19  optical microscope, electron microscope, correct?
20     A    Yes.
21     Q    Johnson's Baby Powder, or JBP I put as an
22  abbreviation, batch 344L, correct?
23     A    Yes.
24     Q    And I put in quotes, no asbestos or
25  asbestiform minerals were identified.

Page 264

1  A   Yes.
2  Q   Are we on the same page?
3  A   Yes.
4  Q   The next one I have is 27A.  27A was part
5  of the cover letter that went to Johnson and
6  Johnson -- I mean to the FDA from Johnson and
7  Johnson on October 17, 1972, correct?
8  A   Can you tell me the tab again?
9  Q   Yes, Ma'am, 27b
10  A   27 B, yes.
11  Q   Actually, I'm looking at the cover letter,
12  which is I think just 27, October 17. 1972?
13  A   I got it, thank you.
14  Q   Okay.
15  A   Yes.
16  Q   And September 8, under A is a report from
17  Sperry-Rand to Dr. Goudie, correct?
18  A   Yes.
19  Q   He says that what he was doing was
20  defining the types of particles which I referred to
21  as asbestiform and which more correctly should be
22  called fiber form.  Do you see that?
23  A   Yes.
24  Q   What he used in his testing method was
25  x-ray diffraction and an SEM microscope, correct?

Page 265

1  A   I don't see where it says that.  Can you
2  point that out, please?
3  Q   Sure.  If you look on the second page, it
4  talks about the scanning electron microscope and the
5  x-ray analyzer.  Do you see that?
6  A   Yes, I see that.  Thank you.
7  Q   And what he says is, "Based on the work
8  I've done with chrysotile from Johnson's mine Quebec
9  form A and C in the drawing have characteristics
10  that would indicate they could very well be
11  chrysotile." Do you see that part?
12  A   Yes.
13  Q   Then he goes on to say, "At the end, the
14  scanning electron microscope and x-ray dispersion
15  and x-ray analyzer are not able to positively
16  identify chrysotile or any form of asbestos.
17  However, these tools are very able to identify fiber
18  forms which may be asbestos." Correct?
19  A   Yes.
20  Q   Can we go back to the chart, please.  Do
21  you see on the chart we have the date, Sperry-Rand,
22  to Dr. Goudie, the purpose, the fact they used SEM
23  and XRD and then the quotes we just went over.
24  Forms A and C could very well be chrysotile.  Then I
25  have an ellipsis, I skipped stuff, and then the

Page 266

1  conclusion, right?
2  A   Yes.
3  Q   We are on the same page?
4  A   Yes.
5  Q   Okay.  The next test I have is in 25C, and
6  that's the October 27, 1972 report from the Colorado
7  School of Mines Research Institute.  Do you see
8  that?
9  A   Yes.
10  Q   It talks about -- it was to Dr. Goudie,
11  correct?
12  A   Yes.
13  Q   And it talks about defining the -- scratch
14  that.  Determining if serpentine, possible
15  chrysotile present.  Correct, for the purpose of
16  determining if serpentine, possibly chrysotile is
17  present?
18  A   Yes.
19  Q   They ultimately determined that, here it
20  says, "It is probable that the contention that the
21  talc samples contain about 3 percent chrysotile is
22  mistakenly based on the magnitude of the 7A
23  chlorite.  If this is so, it could have been avoided
24  by step scanning," correct?
25  A   Yes.

Page 267

1  Q   Can we go back to the chart, please.  So I
2  have under the 10-27, under 25C, use an x-ray
3  diffraction, looking at the Johnson Baby Powder lots
4  108 and 109T, the quote we just went over.  Correct?
5  A   I can't see.
6  Q   "It is probable that the contention that
7  the two talc samples contain about 3 percent
8  chrysotile is mistaken?"
9  A   Yes, that is correct.
10  Q   The next one I have 25, the report from
11  McCrone dated October 27, 1972.  Examination of
12  Johnson & Johnson Baby Powder given to Dr. Goudie,
13  correct?
14  A   Yes.
15  Q   And what they used in this test was x-ray
16  diffraction, a light microscope and an electron
17  microscope, correct?
18  A   Yes.  X-ray diffraction, light and
19  electron, yes.
20  Q   And therefore, the conclusion states, "A
21  few tremolite rods were observed in both samples.
22  No chrysotile has been detected." Correct?
23  A   Yes.
24  Q   Can we go to the chart, please?
25  A   Can I just add right before that it says

Page 268

1 showed material to be substantially free of
2 asbestiform materials.
3    Q   Okay.  I'll add that in.  Shown to be
4 substantially free of asbestiform material.  Right
5 after he says substantially free, he says a few
6 tremolite rods were observed in both samples.  No
7 chrysotile has been detected.  Correct?
8    A   Yes.
9    Q   That's now what is on the chart.  Are you
10 good with that?
11    A   Yes.
12    Q   The next tab I have is the report from
13 Gordon Brown at Princeton concerning Johnson's Baby
14 Powder, lot 108T.
15          MR. SMITH:  What tab?
16    Q   Same thing, 25C
17    A   25C.
18    Q   25C.  Are you with me?
19    A   There's attachment of three reports together.
20    Q   And what he did is he used x-ray
21 diffraction, correct?
22    A   Correct.
23    Q   What he concluded was no evidence of
24 chrysotile or tremolite was found in the x-ray data
25 outlined above, correct?

Page 269

1    A   The conclusion is probably easier.  It
2 says chrysotile and tremolite impurities proved
3 negative for the chart.  If you go down on that page
4 to it is concluded.  The last sentence.
5    Q   A careful search for chrysotile and
6 tremolite impurities proved negative.
7          Are we good with that?
8    A   Yes.
9    Q   The next is that you identified was a
10 report from Dr. Pooley on those same sample lots,
11 correct, October 31, 1972?
12    A   Correct.
13    Q   And he, Dr. Pooley, used x-ray diffraction
14 and differential thermal analysis.  Correct?
15    A   Correct.
16    Q   Are you with me?  It is right on the front
17 page.
18    A   Yes, I got it.
19    Q   He says in his conclusion, "No chrysotile
20 is present in the samples of Johnson's Baby Powder
21 at the minimum level detectable by DTA."  Correct?
22    A   Yes.
23    Q   Back to the chart.  On the chart under
24 10-31-72, by Dr. Pooley, you agree with those
25 entries?

Page 270

1    A   I think the testing entity is College of
2 Cardiff.
3    Q   Can we add that in?  Other than that, we
4 are good?
5    A   Yes.
6    Q   The next test I have was the test that was
7 run by you, Johnson and Johnson, analysis for
8 Johnson's Baby Powder for tremolite asbestos dated
9 September 8, 1972, correct?
10    A   Yes.
11    Q   And that was done by Dr. Schelz?
12    A   Yes.
13    Q   And he used x-ray diffraction with step
14 scanning, correct?
15    A   Yes.
16    Q   And he did the testing on the 108T and
17 109T.  Is that correct?
18    A   Yes.
19    Q   What he concludes is --
20    A   Third to the last lie.  Samples of Johnson
21 and Johnson Baby Powder do not contain tremolite
22 within the limit of detection.
23    Q   Of the x-ray diffraction step scanning.
24 Okay.  Can we now go to the chart the for Schelz.
25 Are you good with that, Doctor, the entry on 25C,

Page 271

1 line 11, "The samples of Johnson's Baby Powder do
2 not contain tremolite within the limit of detection
3 of the x-ray diffraction step scanning technique?"
4    A   Yes.
5    Q   The next entry I have to look at is in tab
6 31, and that's under the cover letter of May 25,
7 1973.  Are you with me?
8    A   Yes.
9    Q   And that attaches a report of baby powder
10 by Dr. Buerger -- I'm sorry, to Shower to Shower,
11 correct?
12    A   Yes.
13    Q   Dr. Buerger did x-ray diffraction
14 in his testing?
15    A   Yes.
16    Q   And he concludes at the end, "The
17 following impurities were determined not to be
18 present in detectable amounts.  Chrysotile asbestos,
19 tremolite, antigorite, Musgravite (ph.), whatever
20 that is, focopite (ph.) quartz and dolomite."  Got that?
21    A   Yes.
22    Q   On the bottom it says a little footnote
23 108T and 109T, correct?
24    A   Yes.
25    Q   Can we go to the chart under 5-25-73 and I

Page 19 (Pages 272-275)

Page 272

1  have the report by Dr. Buerger using x-ray
2  diffraction, looking at Johnson's Baby Powder, 108T
3  and 109T and then the quote is directly from the
4  conclusion. Are you good with that?
5      A   Yes.
6      Q   The next one I have is under tab 36.
7  There's a report from Gordon Brown at Princeton
8  concerning Shower to Shower using x-ray diffraction,
9  correct?
10     A   Correct. There was one before that, the
11 Buerger analysis.
12     Q   Let's finish this one and we will go back.
13     A   Okay.
14     Q   This one says no evidence for chrysotile
15 or tremolite was found, fair?
16     A   Yes.
17     Q   Dr. Buerger was 31. Is that the one I
18 missed?
19     A   Buerger, September 21, 1972.
20     Q   What tab?
21     A   I'm sorry. 36, right before the Gordon
22 Brown report.
23     Q   October 7, 1972?
24     A   Yes.
25     Q   Are there actual results of testing here?

Page 273

1  I didn't see them.
2      A   I think you just re-reviewed Lewin's data.
3      Q   But no new testing?
4      A   I'm checking. This is a review of the
5  other data. It is not additional data. You are
6  correct.
7      Q   Can we go back to tab 36. I want to
8  finish all this before lunch. I promise. Hopefully
9  this afternoon will be less boring.
10         Can we go back to tab 36? Can we go
11 to the chart, please. On 36, 11-9-73 by Brown,
12 x-ray diffraction of Shower to Shower. "No evidence
13 for chrysotile or tremolite in Lewin sample was
14 found," fair?
15     A   Yes.
16     Q   The next report I have, still under 36, is
17 a June 22, 1973 report from McCrone about Shower to
18 Shower, correct?
19     A   Can we go back one second to the Princeton
20 results?
21     Q   Sure.
22     A   On the chart.
23     Q   Which Princeton results?
24     A   The ones we just put into the chart.
25     Q   Okay. Go ahead.

Page 274

1      A   Thank you. I was confused. The SPS, I
2  thought that was supposed to be XRD. I got the two
3  confused.
4      Q   Now we are on this and we are talking
5  about the McCrone Shower to Shower report?
6      A   Yes.
7      Q   That was done by Dr. Stewart and they used
8  a number of methods, including XRD, TEM, PLM and
9  SEM, correct?
10     A   Yes.
11     Q   On page 6 of the report, as support for
12 their conclusions, they quote from a report from
13 Sperry-Rand and one from the University of
14 Minnesota. Do you see that?
15     A   Yes.
16     Q   What they conclude says, "An extensive
17 examination of samples of Johnson and Johnson
18 product, Shower to Shower using x-ray diffraction,
19 light microscopy, scanning electron microscopy,
20 transmission electron microscopy and electron
21 diffraction, has shown this product is free from
22 asbestos or asbestiform minerals. I report that
23 chrysotile was present in a sample from the batch
24 1501Z was erroneous and most likely a
25 misidentification for a form or quota." Do you see

Page 275

1  that?
2      A   Yes.
3      Q   Can we go to the chart, please. On the
4  chart I have the tab 36, they used XRD, TEM and PLM,
5  SEM of Shower to Shower, right? Rather than do the
6  whole thing I just wrote quote Sperry-Rand and
7  University of Minnesota as negative test, correct?
8      A   I'm not sure that's quite right. I think
9  what they are saying is scanning electron microscopy
10 is not an appropriate test.
11     Q   Can I just say quote Sperry-Rand and
12 University of Minnesota and leave it at that?
13     A   If that's of some value.
14     Q   I want to come back to that.
15         Then I went right to the conclusion
16 and took the quote from the conclusion, an extensive
17 examination of the samples has shown. Do you see
18 that?
19     A   Yes.
20     Q   You are good with that?
21     A   Yes.
22     Q   The very next page is September 7, 1972,
23 test result from the Colorado School of Mines
24 Research Institute. Got it?
25     A   Yes.

Page 276

1    Q   They used x-ray diffraction, looking at
2 Shower to Shower, correct?
3    A   Yes.
4    Q   And what they said was, "The above data
5 does not indicate the presence of chrysotile."
6 Correct?
7    A   Yes.
8    Q   Can we go to the chart, please.  Does this
9 accurately reflect what we just went through?
10    A   Yes.
11    Q   Now, lastly in this group, actually two
12 more, there is a test from Dr. Pooley sent to Dr.
13 Goudie dated September 29, 1972, correct?
14    A   Yes.
15    Q   And they looked at Shower to Shower?
16    A   Yes.
17    Q   And Dr. Pooley actually doesn't give any
18 results, right?  What he says is, "The positive
19 identification of chrysotile can only be made with a
20 transmission electron microscope because it is with
21 this instrument that the fiber can be observed and
22 defined."  Correct?
23    A   Yes.
24    Q   Can we go to the chart, please, under
25 9-29-72 for Dr. Pooley.  Does that accurately

Page 277

1 reflect what we just went through?
2    A   Yes, but that's not a result of a test.
3 It is an opinion about the method.
4    Q   Is that good?
5    A   Yes.
6    Q   Under that same tab, 9-28-72 is a testing
7 result by Johnson and Johnson itself, correct?
8    A   You skipped -- I'm a little confused.  You
9 skipped the Carnegie Mellon letter.
10    Q   Okay.  Let's go through that.
11    A   And I say that I don't think it is test
12 results, it is people commenting on Lewin's letter
13 was referencing.
14    Q   What would you like me to put on the chart
15 for Carnegie Mellon?
16    A   I think that Pooley results shouldn't be
17 on the chart.  It is fine the way you put them in
18 now.  Just as Dr. Lewin was wrong, so we can move
19 on.
20    Q   We can skip it?  That's no news.  You
21 always thought he was wrong, right?
22    A   Not what I thought.  He was wrong.
23    Q   9-28-72 is the analysis of Shower to
24 Shower done by Johnson and Johnson, correct?
25    A   Correct.

Page 278

1    Q   And you used x-ray diffraction?
2    A   Yes.  Differential thermal analysis.
3    Q   Differential thermal analysis, and your
4 conclusion was what?
5    A   No chrysotile detected in Shower to
6 Shower.
7    Q   Can we go to that and make sure we have it
8 as Dr. Nicholson stated.
9    A   I'm reading this off of the paper, so I
10 don't think you need to quote me.
11    Q   I want to make sure we get the quote you
12 want.
13        MR. SMITH:  Objection.
14    A   It says no chrysotile by DTA, there was no
15 chrysotile detected in Shower to Shower.
16    Q   Okay.  So let me go to --
17    A   There's the x-ray diffractometer scans of
18 Shower to Shower from the J & J results also say
19 absence of chrysotile in this talc.  Because he used
20 two methods.
21    Q   So we should make sure it says XRD and
22 what?
23    A   On page 2 of the memo at the top it says
24 the continuous x-ray diffractometer scans of Shower
25 to Shower powder exhibited by Dr. Lewin indicate the

Page 279

1 absence of chrysotile in this talc.  This is evident
2 from the lack diffraction, blah, blah, blah.
3        There are saying they are confirming
4 by x-ray diffraction that there's no chrysotile and
5 then below the last three of lines it says by DTA
6 there's no chrysotile detected in Shower to Shower
7 powder at the proposed level of two percent by Dr.
8 Lewin.
9    Q   So let's go to the chart and make sure we
10 have exactly what you want in the chart.  Under
11 method it should say XRD and DTA?
12    A   Yes.
13    Q   And then we have down here the absence of
14 chrysotile in the talc.  What else do you want?
15    A   It says absence by x-ray diffractometer,
16 so XRD, absence of chrysotile.
17        MR. PLACITELLA:  It is 12:30.  Do you
18 want to break for lunch and we will finish up
19 whatever is need to?
20        THE VIDEOGRAPHER:  The time is 12:35.
21 We are going off the video record.
22
23        (Luncheon recess taken)
24
25        THE VIDEOGRAPHER:  The time is

Page 21 (Pages 280-283)

Page 280

1:32 p.m.  We are now back on the video record.
Counselors, you may proceed.

BY MR. PLACITELLA:

Q   Doctor, I'm going to your tab 45.  By the
way, do you know why there are like numbers missing
in this book?

A   No, I don't.

Q   Like there's no 51.  So the record is
clear, not all the numbers are in here, 1 through
whatever?

A   I never noticed that, but you are right,
there are missing tabs.

Q   I wanted to make sure.  So, I'm looking at
tab 45 that you flagged, which is a October 4, 1974,
letter from Schelz to Schultz at the FDA.  This is
about results from round robin test, right?

A   Yes.

Q   Do you recall that the round robin tests
were actually blind tests that different companies
got to test methodology?

A   Yes.

Q   There's no indication here on this
particular document that what this refers to is
actually a Johnson and Johnson product, correct?

Page 281

These were blind tests?

A   I'm sorry, I didn't understand the
question.

Q   Sure.  Blind test, what happened with the
round robin, as I understand it, is there were a
select group of samples that were sent to various
people to do testing, including Johnson and Johnson.
They were blind.  Nobody knew the source of the
samples, other than the person who was handing them
out.  Are you with me?

A   Yes.

Q   So we can't tell from looking at this
report whether the test referred to here is actually
of a Johnson and Johnson product.

A   I only see talcum powder number 3, so I
don't know the exact source of that powder.  That's
correct.

Q   If you figure it out at some point, I'm
happy to put it on the chart.  Right now I'm going
to leave it off, if that's okay with you.

A   That's fine.

Q   The next tab I think these are all
related that you flagged was tab 52, and that was a
September 12, 1975 letter from Bristol Myers to the
FDA.  Are you with me?

Page 282

A   Yes.  The one addition is George Stadlin
from Bristol Myers was actually the chairman of
CTFA talc subcommittee.

Q   And J & J was part of that, right?

A   That is correct.

Q   So where it talks here on the second page,
you pointed out to me Johnson and Johnson, 150
samples all done by Pooley, right?

A   Yes.

Q   Do you see that?

A   Yes.

Q   There's no product here specified as to
what exactly he was testing, right?

A   That is correct.  This is a summary of
what tests had been done.  I believe that's what the
summaries of analyses were sent.  I believe that's
what this letter refers to.

Q   On this particular document we don't know
if any of these tests were of Johnson and Johnson
products, correct?

A   It doesn't explicitly say that, but it
does imply that they are from Johnson and Johnson.
You are correct.  It doesn't list the sample names
and pedigree of those samples.

Q   I'm going to get to that.  It doesn't give

Page 283

the method that was used to do the analysis here,
does it?

A   No, it does not.

Q   I think the answer is a little further
down.  This talks about -- this particular document
talks about various attachments, including the
attachments from Johnson and Johnson, correct?

A   Yes.

Q   It says right underneath it, I have
included the attachments, right?

A   Yes.  They are in the subsequent tabs.

Q   And then you have all the tabs that were
attachments, correct?

A   Yes.

Q   If you go to the attachment under I,
there's a May 20, 1975 letter from Pooley to Johnson
and Johnson, correct?

A   Yes.

Q   What he says is, "In reply to your
question concerning how many talc specimens we have
examined over the past few years, we have arrived at
the following figures, and he talks about getting
it from 30 different geographical sources, correct?

A   Correct.

Q   And he says, "If you put them all

Brody Deposition Services

Page 284

1 together, that would have come up with about 150
2 samples," right?
3     A    Correct.
4     Q    That's the same number that is in the
5 Bristol Myers Squibb letter, correct?
6     A    Yes, correct.
7     Q    Johnson and Johnson didn't get talc for
8 use in the United States from 30 different
9 geographical sources, correct?
10    A    Well, I can't answer that directly because
11 geographical sources could mean different areas of a
12 single mine or different areas of several mines.
13          Dr. Pooley did a survey of both of
14 them, the Vermont mine and Italian mine.  Maybe it
15 is referring to that.
16    Q    I think there's more information that will
17 help us through this.
18          So then if I go to tab J, which is
19 the April 29, 1975 letter from Johnson and Johnson
20 to the CTFA, the man that wrote the letter at
21 Bristol Myers.  Do you see that?
22    A    Yes.
23    Q    What Johnson and Johnson says is, "Our
24 scientists and consultants have conducted numerous
25 studies on the purity level of cosmetic talc grades

Page 285

1 from both domestic and worldwide sources."  Do you
2 see that?
3     A    Yes.
4     Q    Then further down it talks about since
5 1972, and it talks about who did the test.  Do you
6 see that?
7     A    Yes.
8     Q    And some of them include the entities that
9 we have gone through already today, Colorado School
10 of Mines, Professor Brown, Professor Buerger,
11 correct?
12    A    Yes.
13    Q    Then it says on the bottom, "Further
14 details of the country of origin and the method of
15 analysis are described in attachment A."  Do you see
16 that?
17    A    Yes.
18    Q    Then if you go to attachment A, which is
19 tab K, it gives the country of origin and it lists
20 Italy, Indian, USA, Korea, Brazil, Australia,
21 Pakistan, China and Austria, correct?
22    A    Yes.
23    Q    Out of this entire list, the only mine
24 that potentially was a supplier for talc used in the
25 United States was Italy, correct?

Page 286

1     A    Not correct.  Italy and the United States
2 are both listed here.
3     Q    You are right.  I'm sorry.
4     A    We have a worldwide talc business, which
5 could have included mines in these other geographic
6 sites.
7     Q    But you weren't getting talc from Brazil
8 and putting it in talc that was sold in New Jersey,
9 right?
10    A    No.
11    Q    So then if we go to attachment B, which
12 was also referred to in your list, do you see Dr.
13 Pooley's summary report?
14    A    Yes.
15    Q    There's an attachment B.  This is what
16 Pooley did, right?
17    A    Yes.
18    Q    And you remember in the original letter to
19 the FDA it referred to the results of Pooley,
20 correct?
21    A    Yes.
22    Q    Here we say if you want to go to Pooley's
23 report, go to attachment B, correct?
24    A    Yes.
25    Q    If I go to attachment B, Pooley states,

Page 287

1 "Over the past two years we have engaged in an
2 extensive study of samples of cosmetic talc from
3 various parts of the world."  That's consistent,
4 correct?
5     A    Yes.
6     Q    And it says, "A number of these samples
7 are imported at regular intervals into the United
8 Kingdom," correct?
9     A    Yes.
10    Q    Samples have been received and examined
11 from the following countries.  And here he lists
12 Italy, France, India, South Korea, China, Zambia,
13 Austria, Brazil and Pakistan, correct?
14    A    Yes.
15    Q    Again, on the next page he talks about the
16 talcs he is testing were used in the United Kingdom,
17 correct, and he actually states on the bottom, "The
18 mineralogical investigations have come up cosmetic
19 grade talc powders entering the United Kingdom has
20 not been confined to single batch samples.  Many of
21 the patterns have been examined over a period of
22 time from independent shipments."  Do you see that?
23    A    Yes.
24    Q    So Dr. Pooley's report is not about talc
25 that was used necessarily in the United States.  It

Page 23 (Pages 288-291)

---

Page 288

1  was talc that was used in the United Kingdom, right?
2  According to his report.  His report is all about
3  stuff that was used in Great Britain.
4      A   That's what it says.  They were used in
5  the United Kingdom.
6      Q   So when you were referring in 52, when
7  this letter talks about the samples done by Dr.
8  Pooley, which he said were all negative for
9  chrysotile?
10     A   Yes.
11     Q   What he was talking about was the samples
12  that he looked at of talc that was used in the
13  United Kingdom, right?
14     A   Yes.
15     Q   So in terms of testing that I'm going to
16  put on the chart for talc that was used in the
17  United States and sent to places like New Jersey,
18  I'm not going to include that.  Okay?
19         MR. SMITH:  Objection.
20     A   So to go back to the list, Dr. Pooley was
21  in the United Kingdom, so it makes sense he would be
22  using cosmetic talcs shipped to the United Kingdom.
23         I'm looking at the details in the
24  context of your question, but we do have Italy and
25  we know we sourced Italian talc in the U.S. and we

---

Page 289

1  also have U.S. sourced talc.
2         Because it is used in the United
3  Kingdom doesn't mean it is not relevant to the FDA.
4  So whether you want to add it to your chart or not
5  doesn't matter to me.
6      Q   All I want to try to put in the chart is
7  tests that we know were done on cosmetic talc or the
8  source that was definitely used in the United
9  States.  We can't say that for certain from all
10  this.  Do you agree?
11     A   That's true.
12     Q   Then the last reference you had was on tab
13  56, and that was in a March 18, 1976 -- and that was
14  actually a memo that was an internal memo at the
15  FDA, correct?
16     A   That is correct.
17     Q   The subject is asbestos in talc, correct?
18     A   Proposed regulation, yes.
19     Q   Under Johnson and Johnson, it talks about
20  tests that were done in 1972 and 1973.  Did you see
21  that using XRD?
22     A   Yes.
23     Q   And sometimes TEM, correct?
24     A   Yes.
25     Q   And what the FDA says is, "Allegedly every

---

Page 290

1  talc shipment is routinely examined for asbestos.
2  The number of analysis appears low, however."
3  Correct?
4      A   Yes.  That's what it says.
5      Q   Then the next paragraph says, "Johnson and
6  Johnson also reported the analysis of American and
7  British talc products based upon a cooperative study
8  between Dr. Langer and Dr. Pooley.  This study
9  involved 19 samples analyzed by Langer, of which ten
10  samples were implicated to contain asbestos."
11  Correct?
12     A   Yes.
13     Q   Can we tell from looking at this whether
14  these were actually samples of Johnson and Johnson?
15     A   We don't know that for sure, but we know
16  that Langer said they were Johnson and Johnson talc.
17     Q   Okay.  And it says, "Wherever Langer
18  reported tremolite and anthophyllite, Dr. Pooley only
19  found anthophyllite."  Correct?
20     A   Correct.
21     Q   And they go on to say, "That these tests
22  were done on samples and done in 1973."  Correct?
23     A   Yes.
24     Q   So if we were going to go to the chart and
25  we were going to add this one, we would have

---

Page 291

1  3-18-1976, we would say Pooley and Langer, or do you
2  want me to say as reported by?  What do you want me
3  to put as the source?
4         MR. SMITH:  Objection.
5      A   At the source, meaning the source of the
6  samples?
7      Q   Whoever did the test.  Should we put
8  Pooley and Langer?
9      A   Yes.
10     Q   Pooley and Langer, 1973, correct?
11     A   Correct.
12     Q   And I guess we will just quote it so it is
13  clear, right?  It says, "This study involved the 19
14  samples analyzed by Dr. Langer, of which ten samples
15  were implicated to contain asbestos.  Wherever Dr.
16  Langer reported tremolite and anthophyllite, Dr.
17  Pooley only found anthophyllite."
18     A   It says Dr. Pooley did not find --
19     Q   I'm still going.  "Dr. Pooley did not
20  find asbestos in those samples where Dr. Langer
21  determined asbestos at concentrations at less than 5
22  percent i.e, Dr. Pooley implicated only five
23  samples."  Are we good?
24     A   I don't think this is clear at all.  The
25  next sentence says about British talc samples.

---

Brody Deposition Services

Page 292

1 Are they saying it was British talc samples in which
2 they thought they might have seen anthophyllite?  I
3 think the results here are unclear.  I do know that.
4    Q   Why don't we put the whole quote in?
5    A   You can put the whole thing in.  I think
6 it is still not clear.
7    Q   Anthophyllite is asbestos.  We know that,
8 right?
9    A   No, that's not true.
10   Q   Not true?
11   A   No.  You can have non -- most of
12 anthophyllite is not asbestos.
13   Q   But it doesn't say here one way or the
14 another?
15   A   Exactly my point.
16   Q   But what they were testing for was
17 asbestos, right, because the subject here is
18 asbestos in talc, right?
19       MR. SMITH:  Objection.
20   A   Correct, but to really understand the
21 context of this, it is important to know what Langer
22 found and Langer was with Pooley specifically as
23 they were determining what the appropriate methods
24 were.  He was there basically learning from Dr.
25 Pooley.

Page 293

1    Q   I get that.  So should I take this off the
2 chart?  I'll do whatever you want.  Take it off the
3 chart all together or I'll write the quote in and
4 somebody will figure it out later.  How is that?
5       MR. SMITH:  Objection.
6    A   You can do that.  This is very unclear to
7 me.
8    Q   While Carolyn is doing that, if I look at
9 all of the samples, and we have gone through
10 everything now, correct, everything you have tabbed?
11   A   I believe so.
12   Q   So if I look at all of the test results
13 that were provided to the FDA, it would appear that
14 there was no test result on Johnson and Johnson talc
15 that post dated 1973, correct?
16   A   I would have to go back and look at the
17 list, but if I may, during this time much of this
18 analysis was around determining what the appropriate
19 methods were.
20       The J41 standard was being developed.
21 The FDA had proposed their standard,  so --
22   Q   I get all that.  All I'm asking you is the
23 following.  From a review of the book and everything
24 we have gone through now for the better part of the
25 day, according to your records, Johnson and Johnson

Page 294

1 never gave the FDA an asbestos test results
2 concerning the talc after 1973.
3       MR. SMITH:  Objection.
4    A   According to the records here, it does not
5 appear to be.  I would like to look at the table
6 where you put all the dates in, please.
7    Q   As soon as she is done typing we will go
8 through it.
9    A   Whatever the last date on is on here I'm
10 not aware of communications with any other asbestos
11 testing done by Johnson and Johnson that was on
12 Johnson and Johnson's behalf given to the FDA.
13   Q   When you want to see the next screen, let
14 me know.
15   A   Go ahead.  Go down.  That's correct.
16   Q   So Johnson and Johnson never provided the
17 FDA any asbestos test results on the cosmetic talc,
18 according to your records, after 1973.  Correct?
19   A   That is correct.
20   Q   Now, I want to go back and I looked at
21 your notes and your other binders and I want to get
22 -- you keep talking about context.  So I want to
23 talk about context of how and why these tests were
24 done, because I know you want to talk about that.
25       MR. SMITH:  Objection.

Page 295

1    Q   Are you with me?
2    A   I'm with you.  I think it is important to
3 understand the information.
4    Q   In your notes, and I think in the binder
5 you had, you had references to Johnson and Johnson's
6 involvement with Dr. Irving Selikoff and the Mt.
7 Sinai School of Medicine.  Do you recall that?
8    A   Yes, in the early '70s.
9    Q   How that started was that there was a
10 publication by the Tenovus Institute in the open
11 medical literature that found talc in women's
12 ovaries and in the tumors in their ovaries, correct?
13   A   I can't answer that directly because there
14 were several things going on at that time.  I can't
15 say there was a cause and effect of that Tenovus
16 paper.
17   Q   J10 is an article entitled Talc and
18 Carcinoma of the ovary and cervix from the Tenovus
19 Institute for Cancer Research.  Do you see that?
20   A   Yes.
21   Q   You have seen this before, correct?
22   A   Yes.
23   Q   What happened here was they studied tissue
24 that was obtained from patients with cancer of
25 either ovary or the cervix.  Correct?

Page 296

1    A    Correct.
2    Q    In the results they said they didn't find
3 any asbestos particles, but they did find talc in
4 75 percent of the tumors that they looked at,
5 correct?
6    A    Correct, and in approximately half of the
7 normal tissue that they looked at.
8    Q    Okay.  In the article they actually had
9 pictures of the talc they found in the tumors,
10 correct?
11    A    Correct.
12    Q    At the end of the article they -- scratch
13 that.
14         They also raise the issue of
15 asbestos, although they didn't find any in this
16 examination, correct?
17         MR. SMITH:  Objection.
18    A    They do write that in the paper in the
19 discussion.
20    Q    Then what happens is that Johnson and
21 Johnson goes to see Dr. Selikoff at Mount Sinai
22 because of his reputation in the area, and asks for
23 his help in actually looking at the tissue from
24 these woman, correct?
25    A    That's correct.

Page 297

1    Q    When Johnson and Johnson went to see Dr.
2 Selikoff, everything started out friendly, correct?
3    A    I wasn't there, but I assume so.
4    Q    They were there to get Dr. Selikoff's
5 help, correct?
6    A    That is correct.
7    Q    And in this memo from April 30, 1971,
8 which is up on the screen, it is actually a memo
9 concerning the meeting with Dr. Selikoff, right?
10    A    Yes.
11    Q    And it talks about having the meeting with
12 Dr. Selikoff and talking to him about actually doing
13 work on what was found by the Tenovus Cancer
14 Institute in Wales, correct?
15    A    Yes.
16    Q    It talked about the one of the reasons
17 they went to see Dr. Selikoff is because of his
18 expertise and his work with the American Cancer
19 Society and his publications, correct?
20    A    Yes.
21    Q    And what ended up happening at that
22 meeting is that Dr. Selikoff actually agreed to go
23 to work for Johnson and Johnson, correct?
24    A    I wouldn't characterize it like that, but
25 he did agree to look at tissues from the Tenovus

Page 298

1 Institute.
2    Q    It says Dr. Selikoff was prepared to help
3 and you paid him, right?
4    A    I would assume so, yes.
5    Q    So he went to work for you.
6    A    I think that implies he would work for us
7 as opposed to doing scientific work.
8    Q    Fair enough.  And you define in your memo
9 what exactly you are setting out to do.  You say,
10 "You should give serious considerations to
11 initiating appropriate steps to developing
12 scientific information and answer a number of
13 questions raised, including whether talc does indeed
14 get distributed in tissues of people using the
15 products, and then assessing whether the talcs are
16 of the type used in the pharmaceutical industry, and
17 if so, are harmful to tissues."  Correct?
18    A    Yes.
19    Q    Then it talks about paying Dr. Selikoff,
20 right?
21    A    Yes.
22    Q    And copied on the memo to memorialize the
23 meeting are a number of Johnson and Johnson key
24 executives, correct?
25    A    Individuals from Johnson and Johnson.  I

Page 299

1 would not necessarily categorize them as key
2 executives.
3    Q    Doctors, scientists, executives.
4    A    Scientists, research and development
5 professionals.
6    Q    Fair enough.
7    A    And then, somehow, Johnson and Johnson
8 obtained the actual tissue of these women from Great
9 Britain and brought that to the United States.
10 Correct?
11    A    I would disagree with the characterization
12 of that.  The Tenovus Institute agreed to
13 collaborate and share their tissues.  So Dr.
14 Selikoff and Johnson and Johnson could also examine
15 them.
16    Q    Right.
17    A    So we didn't somehow obtain them.  It was
18 a collaboration.  Everybody was quite open about
19 sharing the tissue.
20    Q    How did you get tissue from -- how did you
21 get permission to look at tissue from these women's
22 bodies?  How did you get that?
23    A    I don't know what the process was in 1971,
24 so I couldn't answer that specifically.
25    Q    Didn't you have to get permission from the

Page 300

1  women if you were going to look at what's in their
2  bodies?
3      A   I don't know what the process was in 1971
4  for obtaining consent from women.  I'm sure the
5  folks at Tenovus followed whatever the appropriate
6  processes were.
7      Q   Then what happened was that, however you
8  got the women's tissue to the United States, you
9  made sure it was delivered to Dr. Selikoff, correct?
10     A   It may have been mailed directly to Dr.
11 Selikoff, but I know he received tissue from the
12 Tenovus Institute.
13     Q   That's like a lot of power, right?  You
14 see tissue, talc in somebody's tissue in Great
15 Britain and then all of a sudden would you arrange
16 and have it in a hospital in the United States.  I
17 couldn't do that, could I?
18          MR. SMITH:  Objection.
19     A   I would hope not.  Because this is a
20 scientific exchange and this is common.  If you have
21 something unusual it is very common to have another
22 laboratory, an expert in this case, the world's
23 expert, look at that tissue as well.
24     Q   He was the world's expert, correct?
25     A   At that moment in time in asbestos and

Page 301

1  tissue, yes, he was.
2      Q   And when he looked at the tissue, he found
3  chrysotile asbestos in the tissue of the women that
4  you arranged to have examined by him, correct?
5      A   I'll disagree with your characterization.
6  Firstly, we didn't get the tissue from the women.
7  It was part of a study in the Tenovus Institute.
8          And secondly I'm not aware that he
9  found chrysotile in that tissue, which was also
10 tested at Johnson and Johnson's labs, and there's a
11 lot more to the story than just Dr. Selikoff and
12 them examining the tissue.
13     Q   I'm going to get the whole story out.
14 That's my objective.  If you think I'm missing
15 something, either you tell me or your lawyer will
16 bring it out.  Can we agree?
17     A   Yes.
18     Q   J & J 17 is entitled, Meeting With Dr.
19 Langer on July 9th concerning Analytical Analysis of
20 Talc.  Are you with me?
21     A   Yes.
22     Q   And it talks about Johnson and Johnson
23 visiting with Dr. Langer at Mount Sinai on July 9th,
24 correct?
25     A   Yes.

Page 302

1      Q   And to observe the preparation of the
2  tissue that was received from the Tenovus Institute
3  for an examination with electron microscope,
4  correct?
5      A   Yes.
6      Q   Someone from Johnson and Johnson was
7  actually there observing Dr. Selikoff do his
8  analysis, correct?
9      A   Yes.
10     Q   It says, "The subject of asbestos in
11 Johnson's Baby Powder from Dr. Langer's point of
12 view was also explored."  Do you see that?
13     A   Yes.
14     Q   Then below it it talks about what Johnson
15 and Johnson observed.  They observed the analysis of
16 the Tenovus samples, correct?
17     A   Correct.
18     Q   And the samples were prepared using the
19 method that are was used by Johnson and Johnson's
20 expert, Dr. Pooley, correct?
21     A   Correct.
22     Q   Then after they did this they actually put
23 the tissue under a microscope while Johnson and
24 Johnson was watching, correct?
25     A   That is correct.

Page 303

1      Q   And then it says, "Viewing the grid
2  prepared on Friday, and it gives the magnification,
3  we were unable to find any particles which could
4  obviously be identified as talc.  However, fibrous
5  structures were observed under higher magnification,
6  30,000 and up."  Do you see that?
7      A   Yes.
8      Q   Where it says we did this, it says, "These
9  fibers were identified by Dr. Langer as chrysotile."
10 Do you see that?
11     A   Yes.
12     Q   And it says, "Method of identification is
13 based upon his experiences in observing the fibers
14 of pure chrysotile under similar experimental
15 conditions.  The characteristic density profile
16 across the diameter of the fibers is observed at
17 high magnification and indicates the presence of
18 tubular chrysotile."  Do you see that?
19     A   Yes, I do.
20     Q   There's nothing in this memo where Johnson
21 and Johnson is taking exception to what is being
22 observed while they are standing there, correct?
23     A   I don't see that, no.
24     Q   And so with Johnson and Johnson standing
25 there while Dr. Langer is looking at the tissue

Page 304

1  samples, Dr. Langer identifies chrysotile asbestos
2  in the tissue samples of the women who were studied
3  at the Tenovus Institute, correct?
4      A   It appears he has found chrysotile, but I
5  know Dr. Langer was not able to identify chrysotile
6  in other materials, so I don't know what kind of
7  follow up there was to this memo.
8      Q   All I'm asking you about is this memo.
9  in this memorandum, written by Johnson and Johnson
10  they report while they were standing there, that Dr.
11  Langer found chrysotile asbestos in the tissue of
12  the women, correct?
13      A   Yes.  This says Dr. Langer appears to
14  think he found chrysotile.
15      Q   It doesn't say appears to think he found.
16  It says, "were identified as chrysotile by Dr.
17  Langer." Correct?
18      A   Correct.
19      Q   And then it goes on to state that he also
20  used a light microscopy and an electron microscope
21  looking at Johnson's Baby Powder.  Correct?
22      A   Correct.
23      Q   And what he found, in part, was fibrous
24  content that varied from sample to sample.  That is
25  what you report, correct?

Page 305

1      A   That's what he indicated he observed.
2  That's what is in the memo, correct.
3      Q   And then it states that he used an
4  electron microscope with Johnson and Johnson
5  standing there, correct?
6      A   Correct.
7      Q   And that, "using the electron microscope,
8  Dr. Langer had demonstrated to me the presence of
9  some very fine fibers at moderately high
10  magnification which he identifies as chrysotile
11  material asbestos by the typical tubular appearance
12  of the fiber."  Correct?
13      A   Yes, I see that.
14      Q   And there's nothing in this memo that
15  takes exception to that, correct?
16      A   Not in this memo, but there's a lot of
17  information outside this memo that would call into
18  question Dr. Langer's abilities to identify
19  asbestos.
20      Q   Ma'am, when Johnson and Johnson was
21  sitting there watching Dr. Langer do these tests,
22  and they reported it back to the executives at
23  Johnson and Johnson, nowhere in the memo did they
24  question the findings of Dr. Langer, correct?
25          MR. SMITH:  Objection.

Page 306

1      A   That is correct.
2      Q   And then in the conclusion, in the summary
3  that Johnson and Johnson writes, they state, "In the
4  uterus sample from Tenovus, chrysotile, rather than
5  talc, was found.  2, chrysotile is identified in the
6  electron microscope scope by it is characteristic
7  tubular appearance at high magnification."  Did I
8  read that correctly?
9      A   You did.
10      Q   And then in the fourth paragraph you
11  state, "Electron microscopy at high magnification
12  shows a few fibers to be present in Johnson's Baby
13  Powder, which can be identified with chrysotile
14  asbestos, according to Dr. Langer.  No
15  quantification was performed."  Correct?
16      A   That is what it says, yes.
17      Q   And what happened next was that within a
18  couple of weeks Dr. Selikoff and Dr. Langer reported
19  what they found in the press, correct?
20      A   I believe it was a different results they
21  reported in the press but, yes.
22      Q   These are documents when we got from
23  Johnson and Johnson.  I didn't go out and find them,
24  just so you know.
25          So in here I put up on the screen is

Page 307

1  one of those press articles, correct?
2      A   I don't know.  One of which press
3  articles?
4      Q   Articles that were collected by Johnson
5  and Johnson about statements that were made by Mount
6  Sinai or Dr. Selikoff in the press about what he
7  found.
8          MR. SMITH:  Objection.
9      A   About what he found.  This is a separate
10  topic with Dr. Kretchmer in the Environmental
11  Protection Agency.
12      Q   Okay.  You are right.  This is out of
13  context.  I'll come back to this.
14          (Exhibit J&J-24) After Johnson and
15  Johnson watched Dr. Langer do his test, Dr. Langer
16  wrote to Johnson and Johnson on November 10, 1971
17  and said, "We found asbestos in the tissue that you
18  sent us." Correct?
19      A   Yes.
20      Q   And he said, "We also looked at your
21  samples and we determined that the talc was fibrous
22  and that was chrysotile in your baby powder."
23  Correct?
24      A   Yes.
25      Q   And that upset Johnson and Johnson very

Page 28 (Pages 308-311)

Page 308

1 much, didn't it?

2          MR. SMITH:  Objection.

3     A   I would say yes.  They reacted to this

4 because we know there was not asbestos in our

5 talc.

6     Q   Johnson and Johnson 25 is a letter you

7 sent back to Dr. Langer about the samples, right?

8     A   Yes.  It appears to be.

9     Q   And you documented again that he said he

10 found chrysotile asbestos, correct?

11     A   Could you highlight what you are referring

12 to?

13     Q   Yes, Ma'am.  You observed some chrysotile

14 asbestos to be present in the tissue?

15     A   Yes.  I see that.

16     Q   What you said to Dr. Langer was we don't

17 think you should publish this material, correct?

18          MR. SMITH:  Objection.

19     A   The essence of this letter appears more

20 around the methods and what methods they used,

21 trying to understand that.

22     Q   You state, "It suggests, therefore, that a

23 publication of your observations are on potentially

24 contaminated tissue may have limited scientific

25 value."

Page 309

1     A   That's what is says, yes.

2     Q   So you had issues.  Your position was,

3 well, maybe you found asbestos, but it is possible

4 the tissue was contaminated to begin with.  That was

5 your position, correct?

6          MR. SMITH:  Objection.

7     A   No.  I think the question was around

8 scientific methods, and we asked actually that the

9 tumor sample be returned so that further study could

10 be done.

11     Q   You wanted to get the samples back once he

12 told you that he found asbestos, right?

13     A   No.

14     Q   You asked him for the samples back?

15     A   Correct.

16     Q   And then you paid him $1000, right?

17     A   We paid him for the research he did, yes.

18 That's correct.

19     Q   Now, you were aware that Dr. Selikoff also

20 served as an adviser to the FDA?

21     A   I was not aware of that, no.

22     Q   After Dr. Selikoff found what he found, he

23 was labeled by you not as a friend anymore, but as

24 the attacker, correct?

25          MR. SMITH:  Objection.

Page 310

1     A   I don't recall that characterization.

2     Q   (J&J Exhibit-39).  This is a November 29, 1972

3 memo on Johnson and Johnson letterhead and it was to

4 D.D. Johnston?

5     A   I see that.

6     Q   He was the president of the company at the

7 time?

8     A   I didn't know that.

9     Q   The subject is Antagonistic Personalities

10 in the Talc Story in the U.S., correct?

11     A   Yes.

12     Q   And one of those antagonistic

13 personalities was at one time your friend, Dr.

14 Selikoff, according to this memo, correct?

15     A   That's what it says, yes.

16     Q   And you state that, "The start of the

17 attack on talc originated in England at the Tenovus

18 Research Institute in Cardiff where a technician in

19 microscopy published a paper."  Right?

20     A   Yes.  That's what it says.

21     Q   That was the institute that you were

22 working with, collaborating with, and now they are the

23 attackers?

24          MR. SMITH: Objection.

25     A   This is the paper that we started with,

Page 311

1 the Henderson Paper that they published independently

2 and then we collaborated to follow up and try to

3 understand what their findings were and engaged

4 Dr. Selikoff to look at tissue. (Exhibit J&J-10)

5     Q   Right.  The Institute, the Cancer

6 Institute that you started cooperating with now was

7 part of the attack on you, Johnson and Johnson,

8 right?

9          MR. SMITH:  Objection.

10     Q   According to this.

11     A   It says attack on talc, not Johnson and

12 Johnson.

13     Q   Then it says, "In the USA the leading

14 group who initiated the attack on talc is located in

15 New York City and consists of the following," and

16 then you list Dr. Selikoff, correct?

17          MR. SMITH:  Objection.

18     A   I see that.

19     Q   In the next page on paragraph 6 you talk

20 about, "Although the FDA tries to be impartial in

21 matters concerning drugs and health, there's a Dr.

22 Weisler of the Department of the FDA concerned with

23 food and cosmetics who is seeking recognition within

24 the FDA.  He has retained a consultant, Dr. Lewin,

25 an analytical chemist of New York University for

1  studying commercial talc products and their possible
2  asbestos content.  Dr. Weisler seems particularly
3  anxious to condemn talc."  Do you see that?
4      A   I see that.
5      Q   Dr. Weisler was the person who was working
6  at the FDA before your Dr. Ironman took his job,
7  correct?
8      A   I don't know what the sequence of events
9  were there.
10     Q   And Dr. Lewin was actually also a
11  scientist that was hired by members of your trade
12  institute, correct, before this time?
13         MR. SMITH:  Objection.
14     A   I believe he was hired by the FDA.  I
15  don't recall that he worked for any organizations.
16     Q   You didn't know he was hired by Whittaker,
17  Clark and Daniels who supplied you with talc?
18         MR. SMITH:  Objection.
19     A   I don't recall that, no.
20     Q   So just to review for context, I think you
21  told us this last time, but just for context again,
22  what happened with Dr. Lewin was he was hired by the
23  FDA, and when he tested a whole host of talc, he
24  reported from his perspective that he had found
25  asbestos in Johnson's Baby Powder and Shower to

1  Shower, correct?
2      A   Yes.  He reported numerous samples where
3  he found asbestos and later retracted those results.
4      Q   We are going to get to that.
5          I think we discussed last time that
6  Johnson and Johnson actually received an advanced
7  report of the Lewin results before it was ever made
8  available to any member of Congress or any doctor,
9  correct?
10     A   The FDA, yes, they did send us a copy of
11  the report before any other communications were
12  made.
13     Q   Johnson and Johnson interceded with the
14  FDA and the FDA promised Johnson and Johnson it
15  would not release the Lewin report without Johnson
16  and Johnson's opportunity to review the report,
17  correct?
18     A   I don't know what you mean by interceded.
19     Q   You called them up and said please don't
20  release the report until we can look at it and give
21  our own comments, fair?
22         MR. SMITH:  Objection.
23     A   I don't think that's correct.  I think we
24  said we would like to look at that report before you
25  share it.

1      Q   And the FDA agreed that they wouldn't let
2  the public see it until you had a chance to go over
3  it, correct?
4      A   I don't believe that's exactly what they
5  said, but it is common when results come in for a
6  given product that a company manufacturers, that
7  those results would be sent to them right away for
8  comments, consideration, awareness.
9      Q   I think you told me last time that you had
10  the relationship with the FDA.  The FDA official
11  actually said this report will be released over my
12  dead body.  Do you recall that?
13         MR. SMITH:  Objection.
14     A   I don't know what you mean we had a
15  relationship with them, and this comment that you
16  just made.  I don't understand the connection.  What
17  is the question?
18     Q   The FDA promised Johnson and Johnson that
19  that the report would not be released over the FDA's
20  official "dead body?"
21     A   That was an individual making a comment
22  from the FDA.  I don't think that was a promise to
23  Johnson and Johnson.
24     Q   So you didn't think it was a promise when
25  you wrote it down in a memo and said that you were

1  told that it wouldn't be released, but over the
2  FDA's official dead body?  You didn't consider that
3  a promise?
4      A   No.  That was a comment made by an
5  official at FDA.
6      Q   Is it fair to say that Johnson and
7  Johnson disagreed with Dr. Lewin's findings?
8      A   We did disagree and he later retracted
9  those results, as they were incorrect.
10     Q   I'm just asking you whether you disagreed
11  with the original findings.
12     A   Yes, we did.
13     Q   And what happened was in order to respond
14  to Dr. Lewin's results, you hired a number of
15  experts to look at the same samples, correct?
16     A   That is correct.
17     Q   And those were the experts that are on
18  this chart that we went through this morning,
19  correct?
20     A   That is correct.
21     Q   And, in fact, what the chart reflects
22  mostly is the experts that you hired to look at the
23  Lewin samples and what they found, correct?
24     A   The chart, yes.  There were other -- the
25  FDA also hired an independent lab to look at those

Page 316

1  samples.
2    Q  I'm going to get to that.  I promise.
3        One of the experts, I think we went
4  through them on the chart, that you hired, you,
5  Johnson and Johnson, to refute the Lewin results,
6  was the McCrone Institute, correct?
7    A  That is correct.
8    Q  And I think you testified last time
9  Johnson and Johnson told the FDA McCrone never found
10  asbestos in any material used to make Johnson's Baby
11  Powder, correct?
12    A  Production material, that is correct.
13    Q  And that McCrone never found any form of
14  asbestos in the source of talc used in Johnson's
15  Baby Powder, correct?
16    A  What do you mean, the source of talc?
17    Q  The mines that were used to make the baby
18  powder.
19    A  In the ore that comes out of the mines?
20    Q  Yes, Ma'am.
21    A  That's correct.  We didn't find any
22  asbestos in the ore that was used to make baby
23  powder.
24    Q  Do you have in front of you the report
25  that McCrone did on -- I'm just talking about baby

Page 317

1  powder now.  The report McCrone did on 10-27-72,
2  25C?  25C is the 10-27-1972 report of McCrone
3  concerning the examination of Johnson's Baby Powder,
4  correct?
5    A  Correct.
6    Q  That's the report you gave to the FDA,
7  correct?
8    A  In 1972, yes.
9    Q  Yes, Ma'am.  And that report was the
10  edited report.  Can we agree on that?
11    A  I don't know that it is an edited report.
12    Q  You don't know that there were other
13  versions of this report where the results were
14  edited out and you gave a different report to the
15  FDA?  You never knew that?
16    A  I think every report undergoes editing.
17  We have to look at that specifically to see exactly
18  what you are referring to.
19    Q  Exhibit 36 is a report dated October 27,
20  1972, examination of Johnson and Johnson Baby Powder
21  by McCrone.  Do you see that?
22    A  Yes.
23    Q  And it says, "Do not use this report.
24  Replaced by another version."  Do you see that?
25    A  Yes.

Page 318

1    Q  And is this the first time you have seen
2  this report?
3    A  I may have seen it before, but not in
4  preparation for this deposition.
5    Q  And in this report on page 2 there's a
6  summary, correct?
7    A  Yes.
8    Q  And it actually reports the amount of
9  tremolite that was found by McCrone, correct?
10    A  Correct.
11    Q  When it talks about total tremolite
12  contents on the last page, it talks about .5 percent
13  per 108T and about .2 to .3 for 109T, correct?
14    A  Yes.
15    Q  That's Johnson's Baby Powder, correct?
16    A  Correct.
17    Q  And down at the bottom it says, "A few
18  tremolite rods were observed in both samples at a
19  level less than .5 percent.  No chrysotile was
20  detected," correct?
21    A  Yes.
22    Q  That information never made it into the
23  report that you sent to the FDA, correct?
24    A  That is correct.
25    Q  And Exhibit 34 is another version of the

Page 319

1  report.  Have you seen this version before?
2    A  I don't recall that I have.
3    Q  Do you see in this version under summary
4  they crossed out the amount and instead they write
5  in a few isolated crystals.  Do you see that?
6    A  Yes.
7    Q  And then on the last page under results
8  the total tremolite content is crossed out entirely.
9  Do you see that?
10    A  Yes.
11    Q  And then on the bottom the levels are
12  crossed out, correct?
13    A  Correct.
14    Q  What I put up here, 479, just so the
15  record is clear, shows the original of the
16  information on light microscopy from the original
17  report and the edited report.  Do you see that?
18    A  Yes.
19    Q  Did you ever see this before?
20    A  Not this exact picture, no.
21    Q  The fact that there was tremolite in
22  Johnson's Baby Powder, that was nothing new to
23  Johnson and Johnson, right?  Everybody in the
24  company knew that already?
25        MR. SMITH:  Objection.

Page 320

1    A    Tremolite is not asbestos.  Yes, people
2  were aware there's tremolite in talc.
3    Q    Ma'am, that wasn't my question.  Let me
4  ask it and we will fight over whether tremolite is in
5  asbestos or not before a jury.
6         All I'm asking you now is it was not
7  new news.  Everybody knew there was tremolite in
8  Johnson's Baby Powder, correct?
9         MR. SMITH:  Objection.
10    A    Not correct.  Everyone -- every person
11  obviously wouldn't know, and tremolite is not always
12  found in talc.
13    Q    In front of you is Exhibit 26, and if you
14  go to the second page of 26, do you see where it
15  says, "Revised report, just received?" and it gives
16  the lot numbers?
17    A    That's not what you just handed me.
18    Q    Turn it over.
19    A    Got it.  Sorry.
20    Q    It says, "Revised report just received"
21  108T and 109T, correct?
22    A    Yes.
23    Q    That's the McCrone report, right?
24    A    I have to look at the date.  It says on
25  the front, McCrone.

Page 321

1    Q    Right.  And who is Nashad?
2    A    Nashad was a research and development
3  employee of Johnson and Johnson.
4    Q    He wrote to Dr. Goudie.  Who is Dr.
5  Goudie?
6    A    I don't remember.  Dr. Goudie is another
7  person at Johnson and Johnson.
8    Q    He received a whole bunch of these tests
9  on this chart, right?
10    A    Right.
11    Q    And Nashad writes to Goudie, "I thought
12  tremolite was mistakenly identified in view of
13  similarity to..." and then it gives some name I can't
14  say.  Can you say that name?
15    A    Sesquicitrate.
16    Q    What he writes side back is, "There are
17  trace quantities present confirmed both by McCrone
18  and Bill Ashton."  Correct?
19    A    Yes.
20    Q    This is not new, correct?
21         MR. SMITH:  Objection.
22    A    Yes.
23    Q    Johnson and Johnson, when all this was
24  going on, and this testing was being done of the
25  Johnson Baby Powder samples, the Lewin samples,

Page 322

1  you, Johnson and Johnson, were aware that those
2  samples may not even be representative of Johnson
3  and Johnson talc, correct?
4         MR. SMITH:  Objection.
5    A    No.
6    Q    You, Johnson and Johnson, actually were
7  happy that the Lewin samples were sent out to the
8  FDA before you found actinolite in the Johnson and
9  Johnson Baby Powder, correct?
10         MR. SMITH:  Objection.
11    A    I don't know what you are referring to.
12    Q    Did you know that Johnson and Johnson hid
13  from the FDA that they found actinolite in the talc
14  that was used to make baby powder right around the
15  same time that Lewin was doing all these tests?
16         MR. SMITH:  Objection.
17    Q    Did you know that?
18    A    No.  That sounds incorrect.
19    Q    Okay.  I'm trying to figure out why they
20  would do that.  But let's see if we can figure that
21  out?
22         MR. SMITH:  Objection.
23    Q    368.  368 is a memo from May 8, 1973,
24  entitled Personal, Dr. D. Petterson, the president of
25  the company, correct?

Page 323

1    A    I don't know who was president at that
2  time.
3    Q    It states that, "Your question this
4  morning was how did Lewin assay timing relate to
5  actinolite showings?  Baby Powder lots 108T and 109T
6  were alleged to contain asbestiforms by Lewin.
7  They were produced on April 17 and 18, 1972.  Talc
8  shipments checked by microscope here showed all lots
9  clean just prior to and right after that time."  Do
10  you see that?
11    A    Yes.
12    Q    Then it says, "The first showing of
13  actinolite we know about is October 1972.  The
14  indications are that things were in good shape when
15  Lewin picked up the above two lots for his assays."
16  Correct?
17    A    That's what it says.
18    Q    That was signed by W. A., William Ashton,
19  correct?
20    A    Appears to be, yes.
21    Q    So you never told the FDA, did you, that
22  while Dr, Lewin was running the tests, Johnson and
23  Johnson knew that there was actinolite in the source
24  of talc for its baby powder, correct?
25    A    I didn't quite follow your question, but

Page 324

1 actinolite isn't asbestos and it was a conversation
2 about asbestos and baby powder. So I don't see the
3 relation of the two things.
4    Q   Ma'am, actinolite can be asbestos and it
5 cannot be asbestos. It depends on what the results
6 are, correct?
7    A   That is correct.
8    Q   And here it doesn't say whether it is
9 asbestos or not asbestos, correct?
10    A   It doesn't say it is asbestos. If it is
11 asbestos, you say actinolite asbestos.
12    Q   We are going to get to that.
13       Here what is reported is that there
14 was actinolite in that the characterization by
15 Johnson and Johnson is we are in good shape because
16 that stuff never went to Dr. Lewin, right? That's
17 what the memo says?
18       MR. SMITH: Objection.
19    A   No. That is not what the memo says.
20    Q   Let's just read the memo for the record,
21 and somebody else will make that determination.
22       It says, "The first showing of
23 actinolite we know about is October 1972. The
24 indications are that things were in good shape when
25 Lewin picked up the above two lots for his assays."

Page 325

1 That's what it says, correct?
2       MR. SMITH: Objection.
3    A   That is what it says.
4    Q   Do you have any evidence, as you sit here
5 today, that Johnson and Johnson ever advised the FDA
6 that they knew there was actinolite in the Johnson's
7 Baby Powder?
8    A   No, because actinolite isn't asbestos.
9 There would have been no reason to tell them that.
10    Q   Let me ask you the question again, please.
11 As you sit here today, do you have any evidence to
12 indicate that Johnson and Johnson ever told the FDA
13 that they knew there was actinolite in Johnson's
14 Baby Powder? Yes or no?
15    A   No.
16       MR. PLACITELLA: Let's take a break.
17       THE VIDEOGRAPHER: The time is 2:48.
18 We are going off the record.
19       (Recess taken)
20
21       THE VIDEOGRAPHER: The time is
22 approximately 3:02. We are now back on the video
23 record. Counsel, you may proceed.
24
25       MR. PLACITELLA: We are probably not

Page 326

1 going to go to the end because I promised counsel we
2 are going to deal with some issues at the witness's
3 request?
4       MR. SMITH: Yes.
5    Q   I wanted to shift focus for the remainder
6 of today to the Lewin tests related to Shower to
7 Shower. Okay?
8    A   Yes.
9    Q   I promise you I'm not done. I know you
10 have a lot more to tell us.
11       What is G11? What is the ingredient
12 in G11 that you use in Shower to Shower? What is
13 that for?
14    A   I have no idea what that is.
15    Q   It is not a special designation for some
16 talc additive?
17    A   Not that I'm aware of. I don't know.
18    Q   You never heard the word G11 before?
19    A   Not that I recall, no.
20    Q   I think we went over this morning, but
21 to refresh, Johnson and Johnson cited the tests
22 that McCrone did to the FDA in support of its
23 position that there was no evidence of asbestos
24 in the Shower to Shower product, and that Dr. Lewin
25 was incorrect.

Page 327

1       Is that fair?
2    A   I believe that's correct, yes.
3    Q   In the context of these cases, we sent
4 subpoenas out to McCrone for their records. Have
5 you looked at McCrone's internal records related to
6 the testing of the Shower to Shower product?
7       MR. SMITH: Objection.
8    A   I have not.
9    Q   376, the second page is a draft of notes
10 that were produced by McCrone with the Bates number
11 from this case. Do you see it in the lower right
12 hand corner?
13    A   Yes.
14    Q   The date of this is 11-11-71. The draft
15 is to Dr. Goudie at Johnson and Johnson and it
16 relates to medicated powder and Shower to Shower.
17 Do you see that?
18    A   Yes.
19    Q   As it relates to Shower to Shower, there's
20 a section with a big X through it. Do you see that?
21    A   Yes.
22    Q   It says, "The Shower to Shower appeared to
23 have a few more fibers than the other two samples.
24 However, I think that might be due to possible
25 contamination from the G11. In the G11 we did find

Page 328

1  two positively identified chrysotile fibers and some
2  other fibers which, at first glance, appeared to be
3  chrysotile when you look at the electron diffraction
4  patterns. I believe that most of the fibers in the
5  Shower to Shower, which are suspect, may come from
6  G11."
7         Did you ever see this before?
8         MR. SMITH: Objection.
9     A  No.
10    Q  I guess this wasn't shared with you in
11 preparation for your deposition?
12    A  No. This is a McCrone document. I
13 wouldn't have seen it.
14    Q  Then it says on the bottom, this is from
15 McCrone now, "I left out the comments on G11 from
16 the report because I felt you might want to change
17 your supplier or investigate your supplier. And
18 this would only tend to, and then I guess there's a
19 line, perhaps confuse the issue with the FDA." Do
20 you see that?
21    A  I do.
22    Q  So, is this the first time you found out
23 that McCrone purposely kept information on
24 chrysotile findings in Shower to Shower from the
25 FDA?

Page 329

1         MR. SMITH: Objection.
2     A  I don't know what that is. I don't know
3  what G11 is. I can't comment on that.
4     Q  Do you think it is proper to just edit
5  parts out of reports because you are afraid of what
6  the FDA may think?
7         MR. SMITH: Objection.
8     A  No, and I'm not sure that's what this said
9  G11 could be a non production additive for a
10 product. I really don't know, so I wouldn't jump to
11 conclusions.
12    Q  Did you change your supplier after that so
13 you could get the asbestos out of the Shower to
14 Shower like McCrone said you should?
15    A  I don't know what G11 is.
16       MR. SMITH: Objection.
17    Q  Who should we ask then? It is kind of
18 important.
19       MR. SMITH: Objection.
20    A  I don't know what G11 is. McCrone did the
21 testing. Perhaps they have the answer.
22    Q  Who at job Johnson and Johnson should we
23 ask about G11, and what it was that was kept from
24 the FDA about G11? Who should we ask?
25       MR. SMITH: Objection.

Page 330

1     A  I don't know. I don't know what G11 is.
2  I really have no idea.
3     Q  485 are other handwritten notes that were
4  obtained from McCrone, and these notes are entitled
5  Transmission Electron Microscope, Hutchinson,
6  University of Minnesota. Do you see that?
7     A  Yes.
8     Q  Have you ever seen these notes before?
9     A  No.
10    Q  They were not shared with you in
11 preparation for your deposition?
12    A  No. The scope of the deposition was
13 communications between us and the FDA.
14    Q  The scope was what you knew about and gave
15 to the FDA and what you didn't give to the FDA. You
16 knew that, right? It wasn't just about what you
17 gave, it was about what you didn't give.
18       MR. SMITH: Objection.
19    A  Communications related to asbestos testing
20 in our talc material.
21    Q  Do you see under the section on Lewin?
22    A  Yes.
23    Q  It talks about the TEM test and it says,
24 "Five fibrous particles were found which gave
25 electron diffraction pattern unmistakably chrysotile

Page 331

1  asbestos." Do you see that?
2         MR. SMITH: Objection.
3     A  I do.
4     Q  Is this the first time you found out that
5  McCrone had in its files handwritten notes related
6  to what the University of Minnesota did where they
7  found asbestos in Shower to Shower?
8         MR. SMITH: Objection.
9     A  I don't think you can jump to that
10 conclusion from these notes.
11    Q  You see under the next section Shower to
12 Shower?
13    A  Yes.
14    Q  And do you see where it talks about clear
15 samples found of serpentine material which gave
16 perfect chrysotile patterns? Do you see that?
17    A  I do.
18    Q  Was this information ever transmitted to
19 the FDA?
20       MR. SMITH: Objection.
21    Q  About Shower to Shower?
22    A  I don't know what these notes refer to.
23 If you will recall, there were a number of samples
24 where chrysotile was actually added to the samples
25 to look at the sensitivity of different testing

Page 332

1  methods. So I think you can't jump to conclusions
2  about what this lab book actually reflects in terms
3  of testing.
4     Q   Ma'am, there's nothing in these notes
5  about adding. Take a look. See if there's anything
6  in there about adding chrysotile to Shower to Shower
7  in these notes.
8     A   What I see is it transmission electron
9  microscopy samples and the method for sample
10 preparation are not included in these notes. We
11 couldn't know that.
12    Q   There's nothing in these notes to indicate
13 that somehow somebody added asbestos and then said
14 oh, yes, we found asbestos, right?
15          MR. SMITH: Objection.
16    A   The methods are not included in the notes
17 you gave me, so we have no idea what these samples
18 are.
19    Q   Let's go to the last page where they talk
20 about Shower to Shower. It says, "Total
21 concentration calculation (Shower to Shower).
22 Prints of micrographs were cut to estimate the
23 relative area of asbestos and talc. On both one
24 square contained incontrovertible asbestos." Do you
25 see that?

Page 333

1          MR. SMITH: Objection.
2     A   That's what it looks like.
3     Q   Anything in there about adding asbestos to
4  the baby powder?
5     A   Again, you have not included the methods
6  for how these samples were prepared. You can't jump
7  to the conclusion you are jumping to.
8     Q   I'm not concluding anything. I got this
9  document from McCrone. By the way, where are these
10 micrographs? That would tell us the story, wouldn't
11 it?
12          MR. SMITH: Objection.
13    A   I've not seen these partial notes before
14 and the micrographs aren't included, nor the methods
15 included in what you gave me.
16    Q   Well, where are the micrographs?
17          MR. SMITH: Objection.
18    A   You provided me. I would ask you where
19 the micrographs and the information about how these
20 examples were prepared.
21    Q   If you get a test result that finds
22 asbestos in your baby powder, wouldn't you save the
23 samples and the micrographs?
24          MR. SMITH: Objection.
25    Q   Wouldn't that be normal procedure?

Page 334

1          MR. SMITH: Objection.
2     A   Based on what you have given me, I don't
3  think this says they found asbestos in the samples.
4  You haven't provided the full document.
5     Q   Ma'am, I provided the full document that
6  was given to us by McCrone. You have never been
7  provided this document before this very minute,
8  correct?
9          MR. SMITH: Objection.
10    A   That is correct, but this document is
11 incomplete. I don't think you can jump to
12 conclusions based on this partial experimental
13 document.
14    Q   This document was never shared with you
15 before this very minute, correct?
16    A   That is correct, and it looks like a
17 partial document. There's important parts of this
18 that are missing.
19    Q   You see at the bottom where it is actually
20 signed off on at the end of the document?
21    A   Yes. When you do a lab book like this,
22 the pages are numbered. There are no numbers on
23 these pages. Is this two pages of ten or fifteen or
24 how many? It doesn't say.
25    Q   The person who did the test signed off on

Page 335

1  the test at the end, correct? That's the signature?
2     A   I don't know this is the end. You don't
3  know if this is page nine of ten or where are the
4  other pages?
5     Q   Why don't we do this because we are not
6  going to finish this time. Why don't you go back
7  and find it and tell me where the rest are, okay?
8          MR. SMITH: Objection.
9     A   This is not a J & J document. It is from
10 McCrone. We wouldn't have the source documents.
11    Q   They worked for you. Why wouldn't they
12 give you the source documents?
13          MR. SMITH: Objection.
14    A   You provided the document.
15    Q   Well, you know that the University of
16 Minnesota took this document, this base document and
17 turned it into a formal report that they gave to
18 you, right?
19          MR. SMITH: Objection.
20    Q   You know that, right?
21    A   No, I don't know that. I haven't seen
22 that report.
23    Q   Ma'am, as you sit here today in preparing
24 for today's deposition, about what was given and not
25 given to the FDA, you have no idea that the

Page 35 (Pages 336-339)

Page 336

1  University of Minnesota did a full report on what
2  they found in Johnson's Baby Powder?
3        MR. SMITH:  Objection.
4     A   I don't recall seeing a report from the
5  University of Minnesota.
6     Q   Exhibit 33 is a report from the University
7  of Minnesota Space Science Center.  Have you ever
8  seen this before?
9     A   I might need a minute to look at.
10    Q   Please take your time.
11    A   It doesn't look familiar.
12    Q   Please take your time.
13    A   I may have seen this.  I didn't review it
14  in preparation for the deposition today.
15    Q   Go to the first page.  It is entitled
16  Investigation of Possible Asbestos Contamination in
17  Talc Samples.  Do you see that?
18    A   Yes.
19    Q   It says, "Specimens of powdered talc were
20  received from Johnson and Johnson Company and
21  McCrone Associates."  Do you see that?
22    A   Yes, I do.
23    Q   "Analysis of these samples using the
24  scanning electron microscope was requested in order
25  to determine possible content of fibrous chrysotile

Page 337

1  asbestos contaminated in the talc samples."  Do you
2  see that?
3     A   Yes, I do.
4     Q   Do you see on the next page where they
5  talk about that they are looking at the Lewin Shower
6  to Shower materials?
7        MR. SMITH:  Objection.
8     A   Yes.
9     Q   Do you see on page 3 they have the results
10  of what they did with the transmission electron
11  microscope?  Do you see that?
12    A   Yes, I do see that.
13    Q   And the transmission electron microscope
14  is the microscope that Johnson and Johnson said was
15  the gold standard for finding asbestos in talc,
16  correct?
17    A   Yes.
18    Q   And what the author says here is that he
19  looked at a large number of grids and found numerous
20  examples of fibrous material.  Correct?
21    A   Yes.
22    Q   He goes on to say, "Of the large number of
23  grids examined, three examples of fibers, which upon
24  examination by electron diffraction, could be
25  classified as likely candidates for chrysotile

Page 338

1  asbestos in the Shower to Shower material and one
2  example was found in the Lewin material."  Correct?
3     A   Yes.
4     Q   So he was apparently looking at both the
5  Lewin material and the material you, Johnson and
6  Johnson, gave them of Shower to Shower, correct?
7     A   Yes.
8     Q   And what he says on the very next page is,
9  "In figures 17 and 18, electron micrographs of the
10  transmission type show the typical stranded
11  appearance of chrysotile asbestos."  Correct?
12    A   Yes.  I see that.
13    Q   He goes on to state, "It is felt,
14  therefore, that chrysotile asbestos does exist in
15  the specimens of Shower to Shower and Lewin supplied
16  to this laboratory."  Correct?
17    A   Yes.
18    Q   Then what he attaches are the actual
19  pictures of the photo micrographs that were
20  referenced in the notes that we just went through,
21  correct?
22    A   I cannot make a connection between the
23  document you gave me and these figures.  I don't
24  know that it refers to the same experiment.
25    Q   Do you have any evidence as you sit here

Page 339

1  today that you ever provided a copy of this report
2  to the Food and Drug Administration?
3     A   I don't know that we did.  I do see that
4  it looks like the purpose of this report had to do
5  with scanning electron microscopy versus x-ray
6  dispersion, versus transmission electron microscopy,
7  and I would have to look through the material to see
8  if this is referenced in some way during the
9  discussions of methods developed.
10    Q   Respectfully I move to strike your answer.
11        My question was, do you have any
12  evidence, as you sit here today, that a full copy of
13  this report was ever provided to the FDA?
14    A   That's a different question.
15    Q   Yes, Ma'am.
16    A   A full copy of this report, no, or I would
17  have seen it.  Was the information transmitted in
18  some other context that I'm not aware of, no, I
19  can't answer.
20    Q   You do know that what happened was that
21  McCrone, when they submitted their report to the FDA
22  that you did give to the FDA, took edited pieces of
23  this report, selected pieces to suit its needs,
24  right?  That's what happened.
25        MR. SMITH:  Objection.

Brody Deposition Services

Page 340

1    A   I don't know that's what happened, no.
2    Q   You have tab 36. Tab 36 is the report
3  from McCrone dated June 22, 1973 related to Shower
4  to Shower. Do you have that in front of you?
5    A   My tab 36 is a letter to Dr. Schaffner at
6  the FDA. In here there's a report. Let me dig
7  through here.
8    Q   The letter attaches the McCrone report.
9    A   I'm looking here. There are several
10  reports. I got it.
11    Q   And this is the report that McCrone and
12  Johnson and Johnson told the FDA that an extensive
13  examination of the samples found no asbestos,
14  including TEM, correct, and no chrysotile, right?
15    A   That is what it says.
16    Q   And if I go to page 6 of the report, you
17  actually quote from the Hutchinson report, right?
18        MR. SMITH: Objection.
19    A   Yes, I see that.
20    Q   Are you with me now?
21    A   I am.
22    Q   And the Hutchinson report, you take to the
23  FDA and you actually quote from J & J 33, correct?
24    A   Yes.
25    Q   And you start out quoting the conclusion

Page 341

1  from the report. It says, "The extensive
2  investigation reported here must conclude," right?
3    A   Yes.
4    Q   You have ellipses in your report, right,
5  meaning stuff taken out?
6    A   Yes.
7    Q   And the stuff you took out was about
8  Hutchinson's findings of asbestos, right.
9    A   Yes.
10        MR. SMITH: Objection.
11    A   You hand me another document which refers
12  to those results and it says that the original
13  reports of chrysotile were erroneous and a
14  misidentification of chlorite. Perhaps that's why
15  they took that out of the report.
16    Q   What you did is, and we are going to get
17  to that, what you did is, and that's why I handed it
18  to you so we would have the whole truth here, is
19  that you didn't give the FDA the report. You edited
20  out the parts about asbestos, right? That's what
21  you did?
22        MR. SMITH: Objection.
23    A   No. From what you just handed me it looks
24  like those were incorrect results and those were
25  chlorite. I haven't had a chance to review all

Page 342

1  those documents.
2    Q   You are referring to 49, and I want to put
3  that up. This is what you were referring to, where
4  it says original?
5    A   Yes.
6    Q   The part I'm assuming that you are
7  referring to is the very end which talks about
8  chlorite?
9    A   Yes.
10    Q   Do you see here that's not talking about
11  the Lewin report, right? That's talking about a
12  sample and the batch number 1501Z, correct?
13    A   I'm trying to cross reference the various
14  things here and again, I'm not an expert in chlorite
15  versus asbestos and chrysotile, so I'm doing my best
16  to cross manage.
17    Q   That's not the issue, Ma'am. When it
18  talks about chlorite, it is referring to a specific
19  example, 1501Z, correct, not the Lewin samples,
20  correct?
21        MR. SMITH: Objection.
22    A   I don't know that that's not a Lewin
23  sample. That's what I'm trying to figure out.
24    Q   Ma'am, that same statement is in the
25  report that you gave to the FDA. That is nothing

Page 343

1  new, right?
2        MR. SMITH: Objection.
3    Q   That conclusion is what you gave to the
4  FDA?
5        MR. SMITH: Objection.
6    A   Yes.
7    Q   What you didn't give to the FDA, and what
8  you edited out of the report you gave to the FDA
9  were the findings by Hutchinson of chrysotile
10  asbestos in your baby powder, correct?
11        MR. SMITH: Objection.
12    Q   You didn't give that.
13        MR. SMITH: Objection.
14    A   No, we didn't because in this document you
15  just gave me, and I did find 1501Z. This is listed
16  in the samples. It is the same batch as Lewin that
17  there was mistakenly, and I'm not a microscopist,
18  that they mistook chlorite for chrysotile.
19    Q   So it was the Lewin sample they made the
20  mistake in? Is that your testimony?
21    A   Again, I'm not expert microscopist. I'm
22  reading the document you put in front me. Page 3
23  describes all the samples. 1501Z is the same sample
24  batch that was examined by Professor Lewin. That's
25  what it says.

Page 37 (Pages 344-347)

Page 344

1   Q   So when we go back to the Hutchinson
2   report, and it talks about looking at numerous
3   samples they talk about finding chrysotile in Shower
4   to Shower that was provided by both Lewin and
5   Johnson and Johnson, right?
6           MR. SMITH: Objection.
7   A   Yes.
8   Q   And nowhere did you disclose that
9   Hutchinson found chrysotile asbestos in the samples
10  you gave them that weren't Lewin samples, correct?
11          MR. SMITH: Objection.
12  A   No. Not according to the document you
13  just gave me that says they mistakenly thought
14  chlorite was chrysotile.
15  Q   Ma'am, you told me that was in the Lewin
16  sample. I'm asking you, you never told the FDA that
17  you have gave University of Minnesota other Shower
18  to Shower samples where they found chrysotile
19  asbestos. You never told them that, correct?
20  A   Well, I don't know that that's true as I
21  haven't had the opportunity to cross check these
22  different documents on which samples they are
23  referring to. And again, this was a time when
24  people are making a lot of mistakes in
25  interpretation due to the lack of knowledge of

Page 345

1   methodology.
2   Q   Ma'am, I respectfully move to strike that.
3           You never told the FDA that you gave
4   University of Minnesota samples of Shower to Shower
5   that weren't the Lewin samples where they found
6   chrysotile asbestos, correct?
7   A   It appears so because that was not
8   chrysotile, it was chlorite, according to the
9   document you just showed me.
10  Q   Move to strike, Ma'am.
11          When you sent the report to the FDA,
12  quoting Hutchinson, what you edited out was any
13  reference to asbestos, correct?
14          MR. SMITH: Objection.
15  Q   That's what you did.
16  A   That was left out of the report, yes.
17  Q   And when you look at 478, I put side by
18  side, what you told the FDA on the top and what you
19  edited out on the bottom. Do you see that?
20          MR. SMITH: Objection.
21  A   Yes.
22  Q   What you edited out was transmission
23  electron microscopy showing less than one
24  hundreds of one percent asbestos in the material
25  given to us. That is what you edited out, correct?

Page 346

1           MR. SMITH: Objection.
2   A   That's correct, because it appears they
3   had mistakenly identified chlorite as chrysotile.
4   Q   In the handwritten notes -- scratch that.
5           J & J 58, have you seen this document
6   before, J & J 58?
7   A   I may have.
8   Q   What is your knowledge of J & J 58?
9   A   I don't recall all the specifics, but I
10  see right up front there's the quantifying
11  asbestiform amphiboles in talc products. There was
12  some controversy over the methods used in grain
13  counting versus volume counting.
14  Q   Can you tell me whether in J & J 58 it
15  talks about the purpose of the study dealing with
16  the concentration method? We did the last time,
17  correct? Do you remember we went through this?
18  A   It may be two different things. The
19  concentration method versus concentration of
20  asbestos in talc materials. I think those are two
21  different concepts.
22  Q   Do you recall we did this last time? I
23  don't really want to do this all over again.
24          Let me ask you this maybe I can
25  shortcut it. Do you have any record of this study

Page 347

1   done by Dartmouth ever being transmitted to the FDA?
2   A   I don't think so.
3   Q   I'm going to hand to you what's been
4   marked Musco-2. Do you know who Nancy Musco is?
5   A   No.
6   Q   Did you know she was somebody who
7   testified on behalf of Johnson and Johnson?
8   A   No.
9   Q   In this case? I'm going to show you
10  what's been marked Musco-2. You probably have to
11  move that.
12          MR. SMITH: Maybe I could see the
13  exhibit before you show it to the witness.
14          MR. PLACITELLA: Absolutely I'll do
15  that. No problem.
16          MR. SMITH: This is from the Musco
17  deposition?
18          MR. PLACITELLA: And others.
19          Off the video.
20
21          THE VIDEOGRAPHER: The time is 3:41.
22  We are going off the video.
23          THE VIDEOGRAPHER: The time is 3:45.
24  We are back on the video record.
25

Page 348

1    Q   So you have in front of you first J & J
2  414. Do you see that?
3    A   Yes.
4    Q   I'll represent to you 414 was a chart that
5  was created, just like the chart we did today, at
6  the deposition of Dr. Hopkins. It took three days.
7  Have you had ever seen this chart before?
8    A   No.
9    Q   What we did is you can see the same exact
10  format. We went through all of the tests that were
11  produced and put the date, the exhibit number, the
12  testing entity, the author, the recipient, the
13  purpose, just like we did today. Do you see that?
14    A   Yes.
15    Q   For example, if you look at the entry for
16  3-9-71, for McCrone for Shower to Shower, it is the
17  same information we put on your chart. Do you see
18  that?
19    A   Yes.
20    Q   Just so I'm clear, no one ever shared this
21  chart with you before today?
22    A   No.
23    Q   And what you have is Musco-2 in front of
24  you?
25    A   Yes.

Page 349

1    Q   All the testing results that correspond to
2  that chart. If you want to look at it you can
3  verify the test.
4    A   I see a big stack of paper here. I can't
5  verify that the chart is right.
6    Q   Can you tell me from looking at Musco-2,
7  and we can take time and go off the video if you
8  want, which of the test results that are in Musco-2
9  Johnson and Johnson supplied to the FDA?
10    A   Right off the top of my head I can't do
11  that, but I could provide context for why we sent
12  what we did send to the FDA.
13    Q   All I want to know, Ma'am, we already did
14  that part. I want to know is in the book, Musco-2,
15  which are all the tests results we went over with
16  Dr. Hopkins, who you spoke to, correct?
17    A   I have spoken to Dr. Hopkins, yes.
18    Q   All the tests results we went over with
19  Dr. Hopkins, which of the test results that are in
20  Musco-2 did you provide to the FDA? That's all I
21  want to know.
22    A   The results that we reviewed are on the
23  other table are the results that we supplied to the
24  FDA.
25    Q   I want to just verify, Ma'am, if any of

Page 350

1  the results, and I think there are a couple, you can
2  flip through it quickly, if you have any evidence
3  that you gave any of those results to the FDA at any
4  point in time?
5        MR. SMITH: Objection.
6    Q   We can go off the video and you can take a
7  minute and we will figure out your other issue,
8  okay?
9    A   I can't do this today. There are 370
10  documents here that I would have to look at and
11  cross reference them with other documents.
12    Q   I promise that there's not 370.
13    A   There are hundred 370 tabs.
14    Q   There aren't. There are marks by exhibit
15  number.
16    A   Missing numbers, missing tabs.
17    Q   Just like before.
18    A   I don't believe I can accurately answer
19  your question.
20    Q   We know what you did provide. So all I
21  want to do is verify that you are didn't provide
22  anything that's in that book with one or two
23  exception. That's all and we will be done for the
24  today.
25        MR. SMITH: Objection.

Page 351

1    A   I'm not confident I can answer that
2  question accurately.
3    Q   Let's put it this way. Anything in that
4  book that's after 1973 you didn't provide, right?
5    A   That is correct.
6    Q   So why don't you focus on the documents
7  for 1973 and before and tell me which ones you
8  provided.
9    A   You want my opinion on why we wouldn't
10  wouldn't have provided these?
11    Q   No, Ma'am. All I want to know is I just
12  am trying to get on the same page of what you gave
13  and what you didn't give. That is all I want do do
14  today.
15        MR. SMITH: If I might make a
16  proposal?
17        MR. PLACITELLA: To do what?
18        MR. SMITH: You got eight minutes
19  before we have got to get out of here.
20        MR. PLACITELLA: No, we have to get
21  out of here by 4:14. I promised I'll deal with your
22  issue. I would really like to get this on the
23  record before.
24        MR. SMITH: I thought you said you
25  wanted to be out of here by four o'clock.

Page 352

1    MR. PLACITELLA: I wanted to end by
2 four so I could deal with your issue.
3    MR. SMITH: I got you on that. To
4 end by four, we have eight minutes.
5    MR. PLACITELLA: Let's do our best.
6 The only thing she has to look at are documents
7 before 1973. Everything else, according to her
8 testimony, they never gave to the FDA.
9    MR. SMITH: I'm offering, and she is
10 going to come back. We know that. I could have her
11 look at this between now and then. If you want her
12 her to do it now, then you pick.
13    MR. PLACITELLA: I would like to
14 finish the record today.
15    MR. SMITH: I'm not sure you can.
16    MR. PLACITELLA: For this issue.
17    A   Just in tab 9 there are multiple documents
18 in this tab, so I would have to turn page by page to
19 see what's actually here.
20    Q   Okay. So I'll take your counsel's
21 suggestion so as to not labor and make you do this
22 here and now.
23    Is it fair to say, to close the
24 record for today, that if there's a test in there
25 that post dates 1973, based on the evidence you have

Page 353

1 before you, it was never provided to the FDA?
2    A   Not under the umbrella of asbestos testing
3 of our talc products, no.
4    Q   Now, is it a fair question to ask you
5 which of the test results in there you ever saw
6 before today?
7    A   I would have to flip through the pages and
8 really look at it.
9    Q   Is it fair to say that if the documents
10 are not on the chart, your chart from this morning,
11 which I'm going to mark right now, you didn't
12 provide them to the FDA?
13    A   As far as I know, we didn't.
14    MR. PLACITELLA: What I want to do
15 now is I want to mark this collectively as P-6.
16    (The above document is marked
17 P-6.)
18    Q   P-6 is the chart that we created this
19 morning, correct?
20    A   It appears to be, yes.
21    Q   And that's true and accurate, to the best
22 of your knowledge?
23    A   At this moment as best as I can do, yes.
24    MR. PLACITELLA: Why don't we close
25 the record for today on that and let's have a

Page 354

1 conversation outside how you want to deal with the
2 other issue.
3    THE VIDEOGRAPHER: The time is
4 approximately 3:54. This concludes today's video
5 deposition we are off the video record.
6    (The deposition is adjourned at 3:54 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 355

1    C E R T I F I C A T E
2
3    I, MARC BRODY, Notary Public and
4 Certified Shorthand Reporter of the State
5 of New Jersey, do hereby certify that prior
6 to the commencement of the examination
7 the witness was duly sworn by me to
8 testify the truth, the whole truth and
9 nothing but the truth.
10    I DO FURTHER CERTIFY that the
11 foregoing is a true and accurate transcript
12 of the testimony as taken stenographically
13 by and before me at the time, place and on
14 the date hereinbefore set forth.
15    I DO FURTHER CERTIFY that I am neither
16 a relative of nor employee nor attorney nor
17 counsel for any of the parties to this
18 action, and that I am neither a relative
19 nor employee of such attorney or counsel,
20 and that I am not financially interested in
21 the action.
22
23
24    Notary Public of the State of New Jersey
25

Page 40 (Pages 356-357)

Page 356

D O C U M E N T   L I S T

NO.            DESCRIPTION            PAGE

J&J-17    Meeting with Dr. Langer on
          July 9, Concerning Analytical
          Analysis of Talc            301

J&J-24    Letter, Langer to Smith,
          11/10/71            307

J&J-25    Letter, Smith to Langer, 12/14/71    308

J&J-39    Memo, Smith to Johnston, 11/29/72    310

J&J-10    Talc and Carcinoma of the Ovary
          And Cervix, W.J. Henderson, 3/71    311

J&J-36    Report, McCrone to Goudie,
          10/27/72, "DO NOT USE THIS REPORT"    317

J&J-34    Report, McCrone to Goudie,
          10/27/72            318

J&J-479   Original/Altered Report:
          Light Microscopy            319

J&J-26    Memo, Nashed to Goudie, 2 pp.    320

J&J-368   Memo, Ashton to Petterson, 5/8/73    322

J&J-376   Letter, McCrone to Goudie,
          10/12/71            327

J&J-485   Handwritten Notes, Thomas
          Hutchinson, Univ. of Minnesota    330

J&J-33    Univ. Of Minnesota, Space Science
          Center, Investigation of Possible
          Asbestos Contamination in Talc
          Samples            336

Page 357

D O C U M E N T   L I S T

NO.            DESCRIPTION            PAGE

J&J-49    Letter, McCrone to Goudie, 6/21/73    342

J&J-478   McCrone Manipulation of Hutchinson's
          Asbestos Results            345

J&J-58    Memo, Confidential, Dartmouth
          College to Windsor Minerals, Inc.,
          March, 1974            346

Musco-2   CD of J&J Documents            347

J&J-414   Chart, John Hopkins-28, 11/5/18    348

E X H I B I T S

NO.            DESCRIPTION            PAGE

P-6       Chart, J&J Documents, 3/6/18    353

| **A** | | | | |
|---|---|---|---|---|
| | 262:6, 267:25 | 203:4, 203:4 | **analyzed** 290:9 | **appears** 246:3 |
| | 268:3, 270:3 | 203:5, 203:5 | 291:14 | 290:2, 304:4 |
| **abbreviation** | 289:4, 290:25 | 203:6, 203:6 | **analyzer** 265:5 | 304:13, 304:15 |
| 263:22 | **added** 262:13 | 203:7, 203:7 | 265:15 | 308:8, 308:19 |
| **abilities** 305:18 | 331:24, 332:13 | **alleged** 323:6 | **Animal** 246:3 | 323:20, 345:7 |
| **able** 246:8 | **adding** 258:21 | **Allegedly** | **animals** 213:13 | 346:2, 353:20 |
| 265:15, 265:17 | 332:5, 332:6 | 289:25 | 213:13 | **approach** 234:8 |
| 304:5 | 333:3 | **AMAX** 203:5 | **Ann** 228:11 | **appropriate** |
| **above-captioned** | **addition** 241:21 | **AMERICA** | **answer** 212:6 | 217:22, 220:4 |
| 203:11 | 282:1 | 203:3, 203:4 | 232:14, 232:18 | 220:10, 275:10 |
| **absence** 237:11 | **additional** | 203:4, 203:5 | 232:23, 233:2 | 292:23, 293:18 |
| 278:19, 279:1 | 208:10, 208:21 | 203:6, 203:7 | 283:4, 284:10 | 298:11, 300:5 |
| 279:13, 279:15 | 230:11, 243:3 | 203:7 | 295:13, 298:12 | **approximately** |
| 279:16 | 273:5 | **American** 290:6 | 299:24, 329:21 | 203:15, 209:2 |
| **Absolutely** | **additive** 326:16 | 297:18 | 339:10, 339:19 | 296:6, 325:22 |
| 347:14 | 329:9 | **amount** 232:15 | 350:18, 351:1 | 354:4 |
| **accepted** 207:21 | **additives** 212:21 | 233:4, 318:8 | **answers** 253:5 | **April** 215:1 |
| **accurate** 353:21 | **adjourned** | 319:4 | **antagonistic** | 284:19, 297:7 |
| 355:11 | 354:6 | **amounts** 225:17 | 310:9, 310:12 | 323:7 |
| **accurately** | **Administration** | 259:14, 259:21 | **anthophyllite** | **area** 296:22 |
| 276:9, 276:25 | 339:2 | 271:18 | 259:8, 259:13 | 332:23 |
| 350:18, 351:2 | **adopted** 224:8 | **amphibole** | 290:18, 290:19 | **areas** 284:11 |
| **ACP** 221:10 | **advanced** 313:6 | 257:14, 258:6 | 291:16, 291:17 | 284:12 |
| 221:12 | **advised** 325:5 | 260:19, 261:15 | 292:2, 292:7 | **Arnold** 249:11 |
| **Act** 224:8 | **adviser** 309:20 | **amphiboles** | 292:12 | **arrange** 300:15 |
| **acted** 224:17 | **Affairs** 228:20 | 237:17, 346:11 | **anthopyllite** | **arranged** 301:4 |
| **actinolite** | **afraid** 329:5 | **Ana** 208:5 | 259:21 | **arrived** 283:21 |
| 259:15, 259:22 | **afternoon** 273:9 | **analyses** 244:2 | **antigorite** | **article** 210:10 |
| 259:25, 322:8 | **Agency** 307:11 | 282:16 | 271:19 | 216:18, 216:21 |
| 322:13, 323:5 | **ago** 251:8 | **analysis** 214:18 | **anxious** 312:3 | 217:15, 229:1 |
| 323:13, 323:23 | **agree** 208:1 | 219:5, 236:25 | **anybody** 225:7 | 295:17, 296:8 |
| 324:1, 324:4 | 232:2, 234:5 | 238:1, 248:1 | **anymore** 309:23 | 296:12 |
| 324:11, 324:14 | 260:5, 269:24 | 250:20, 250:21 | **Anyway** 227:22 | **articles** 210:10 |
| 324:23, 325:6 | 289:10, 297:25 | 256:3, 259:5 | **apologize** | 307:1, 307:3 |
| 325:8, 325:13 | 301:16, 317:10 | 260:18, 269:14 | 207:20 | 307:4 |
| **action** 355:18 | **agreed** 297:22 | 270:7, 272:11 | **Apology** 207:21 | **articulate** 255:7 |
| 355:21 | 299:12, 314:1 | 277:23, 278:2 | **apparently** | **asbestiform** |
| **actual** 242:1 | **agreement** | 278:3, 283:1 | 227:16, 228:7 | 263:13, 263:25 |
| 243:9, 243:12 | 209:14, 217:21 | 285:15, 290:2 | 338:4 | 264:21, 268:2 |
| 243:16, 243:18 | 235:21, 256:11 | 290:6, 293:18 | **appear** 293:13 | 268:4, 274:22 |
| 243:18, 247:9 | **ahead** 241:11 | 301:19, 302:8 | 294:5 | 346:11 |
| 248:7, 252:15 | 243:25, 273:25 | 302:15, 336:23 | **appearance** | **asbestiforms** |
| 253:14, 254:3 | 294:15 | 356:4 | 305:11, 306:7 | 323:6 |
| 254:6, 272:25 | **aid** 225:13 | **analytical** | 338:11 | **asbestos** 212:12 |
| 299:8, 338:18 | **air** 221:2 | 301:19, 311:25 | **appeared** | 214:1, 217:8 |
| **add** 259:21 | **AL** 203:3, 203:3 | 356:3 | 327:22, 328:2 | 217:9, 217:11 |

217:22, 218:10
218:13, 218:16
219:2, 219:9
221:1, 221:14
221:25, 222:4
222:8, 222:10
223:21, 223:25
224:2, 224:14
228:3, 230:10
230:12, 230:17
230:22, 231:3
231:9, 231:18
232:1, 232:5
232:15, 233:1
233:4, 233:6
233:22, 234:13
235:23, 236:6
236:24, 237:11
237:18, 238:23
239:14, 239:20
239:25, 241:1
241:25, 246:2
247:25, 248:7
248:8, 249:7
250:1, 250:10
253:10, 254:19
255:11, 255:19
255:21, 256:1
256:4, 257:13
257:15, 258:6
260:1, 260:5
260:6, 260:19
261:7, 261:15
263:5, 263:12
263:24, 265:16
265:18, 270:8
271:18, 274:22
289:17, 290:1
290:10, 291:15
291:20, 291:21
292:7, 292:12
292:17, 292:18
294:1, 294:10
294:17, 296:3
296:15, 300:25
301:3, 302:10

304:1, 304:11
305:11, 305:19
306:14, 307:17
308:4, 308:10
308:14, 309:3
309:12, 312:2
312:25, 313:3
316:10, 316:14
316:22, 320:1
320:5, 324:1
324:2, 324:4
324:5, 324:9
324:9, 324:10
324:11, 324:11
325:8, 326:23
329:13, 330:19
331:1, 331:7
332:13, 332:14
332:23, 332:24
333:3, 333:22
334:3, 336:16
337:1, 337:15
338:1, 338:11
338:14, 340:13
341:8, 341:20
342:15, 343:10
344:9, 344:19
345:6, 345:13
345:24, 346:20
353:2, 356:24
357:4
**asbestos-related**
222:15
**Ashton** 259:19
321:18, 323:18
356:18
**asked** 210:17
227:16, 228:2
228:24, 249:19
252:13, 252:19
255:23, 309:8
309:14
**asking** 242:9
243:20, 253:5
293:22, 304:8
315:10, 320:6

344:16
**asks** 296:22
**assay** 323:4
**assays** 323:15
324:25
**assessing** 298:15
**assist** 212:3
**Associates**
242:15, 336:21
**association**
215:22
**assume** 220:13
297:3, 298:4
**assuming**
210:13, 214:1
342:6
**attached** 236:19
237:9, 249:16
251:18, 254:15
**attaches** 246:14
271:9, 338:18
340:8
**attachment**
251:18, 251:19
251:20, 251:21
251:23, 251:23
252:1, 268:19
283:15, 285:15
285:18, 286:11
286:15, 286:23
286:25
**attachments**
283:6, 283:7
283:10, 283:13
**attack** 310:17
311:7, 311:11
311:14
**attacker** 309:24
**attackers**
310:23
**attended** 216:13
224:16
**attorney** 355:16
355:19
**attorneys** 204:6
204:10, 204:15

204:20, 205:5
205:10, 210:4
212:1
**August** 240:7
241:4, 241:6
243:2, 262:23
**Australia**
251:25, 285:20
**Austria** 285:21
287:13
**author** 257:24
263:18, 337:18
348:12
**authored**
253:19, 254:6
**available** 208:6
313:8
**Avenue** 204:3
204:8
**avoided** 266:23
**AVON** 203:3
**aware** 212:5
235:5, 294:10
301:8, 309:19
309:21, 320:2
322:1, 326:17
339:18
**awareness**
314:8

**B**

**baby** 245:6
245:11, 245:14
261:2, 262:22
263:1, 263:21
267:3, 267:12
268:13, 269:20
270:8, 270:21
271:1, 271:9
272:2, 302:11
304:21, 306:12
307:22, 312:25
316:10, 316:15
316:17, 316:22
316:25, 317:3

317:20, 318:15
319:22, 320:8
321:25, 322:9
322:14, 323:5
323:24, 324:2
325:7, 325:14
333:4, 333:22
336:2, 343:10
**back** 215:10
217:16, 217:23
220:25, 222:18
222:21, 234:17
237:15, 238:5
240:4, 243:2
249:3, 250:15
251:9, 255:5
256:7, 259:17
261:18, 265:20
267:1, 269:23
272:12, 273:7
273:10, 273:19
275:14, 280:1
288:20, 293:16
294:20, 305:22
307:13, 308:7
309:11, 309:14
321:16, 325:22
335:6, 344:1
347:24, 352:10
**background**
261:10, 261:12
262:10, 262:12
**Bailey** 211:8
211:13, 211:23
215:12, 229:20
229:21
**Bank** 204:4
**BARNA** 204:15
**base** 335:16
**based** 210:2
210:7, 256:8
265:7, 266:22
290:7, 303:13
334:2, 334:12
352:25
**basically** 218:16

292:24
**batch** 263:2
263:22, 274:23
287:20, 342:12
343:16, 343:24
**Bates** 327:10
**beginning**
231:19, 231:24
**behalf** 294:12
347:7
**believe** 214:6
218:11, 230:21
238:18, 239:14
244:1, 250:24
251:12, 260:8
282:15, 282:16
293:11, 306:20
312:14, 314:4
327:2, 328:4
350:18
**best** 252:18
256:6, 342:15
352:5, 353:21
353:23
**better** 293:24
**big** 327:20
349:4
**Bill** 321:18
**binder** 211:10
211:11, 212:21
212:23, 212:24
212:25, 229:25
234:25, 235:15
235:17, 235:20
243:13, 249:6
295:4
**binders** 209:23
218:7, 294:21
**bit** 207:19
207:23
**blah** 279:2
279:2, 279:2
**BLANK** 204:18
**blind** 280:20
281:1, 281:4
281:8

**bodies** 299:22
300:2
**body** 218:21
314:12, 314:20
315:2
**bold** 229:3
**book** 229:10
229:11, 229:12
229:14, 235:11
236:1, 236:2
236:4, 242:2
253:6, 254:21
280:7, 293:23
332:2, 334:21
349:14, 350:22
351:4
**BORGWARN...**
203:6
**boring** 273:9
**bottom** 257:7
271:22, 285:13
287:17, 318:17
319:11, 328:14
334:19, 345:19
**BOUND** 209:15
**Boundy** 222:19
222:22
**Brazil** 251:25
285:20, 286:7
287:13
**break** 248:19
279:18, 325:16
**breathing** 221:2
**BRENNTAG**
203:3, 203:4
203:5, 203:6
203:7
**briefing** 229:10
229:11, 229:12
229:14
**briefly** 208:25
**bring** 301:16
**Bristol** 281:24
282:2, 284:5
284:21
**Britain** 288:3

299:9, 300:15
**British** 290:7
291:25, 292:1
**Broad** 203:22
**BRODY** 203:13
203:22, 355:3
**broke** 213:11
**brought** 213:20
299:9
**Brown** 245:10
246:20, 268:13
272:7, 272:22
273:11, 285:10
**Brunswick**
203:14
**Buerger** 246:18
271:10, 271:13
272:1, 272:11
272:17, 272:19
285:10
**bulk** 257:12
**bunch** 220:15
321:8
**business** 286:4
**buying** 252:8

**C**

**calculation**
221:3, 332:21
**call** 225:12
305:17
**called** 203:11
213:12, 221:17
227:19, 264:22
313:19
**calling** 227:9
**camera** 248:20
**cancer** 214:2
295:19, 295:24
297:13, 297:18
311:5
**candidates**
337:25
**capacity** 226:24
**Carcinoma**

295:18, 356:9
**Cardiff** 270:2
310:18
**careful** 269:5
**Carnegie** 247:6
277:9, 277:15
**Carolyn** 205:14
293:8
**case** 211:21
223:11, 223:12
300:22, 327:11
347:9
**cases** 327:3
**categorize** 299:1
**cause** 208:18
295:15
**CD** 357:8
**ceased** 255:5
**Cedar** 205:4
**Center** 205:7
262:22, 336:7
356:23
**certain** 207:18
289:9
**certainly** 210:22
217:20, 220:25
**certificate** 256:3
**certificates**
219:5
**Certified** 203:13
355:4
**certify** 355:5
355:10, 355:15
**cervix** 295:18
295:25, 356:9
**chairman** 250:7
282:2
**challenging**
210:20
**chance** 221:4
314:2, 341:25
**change** 208:19
328:16, 329:12
**characteristic**
303:15, 306:6
**characteristics**

265:9
**characterization**
299:11, 301:5
310:1, 324:14
**characterize**
297:24
**chart** 256:12
256:13, 259:17
259:18, 261:18
263:17, 263:17
265:20, 265:21
267:1, 267:24
268:9, 269:3
269:23, 269:23
270:24, 271:25
273:11, 273:22
273:24, 275:3
275:4, 276:8
276:24, 277:14
277:17, 279:9
279:10, 281:19
288:16, 289:4
289:6, 290:24
293:2, 293:3
315:18, 315:21
315:24, 316:4
321:9, 348:4
348:5, 348:7
348:17, 348:21
349:2, 349:5
353:10, 353:10
353:18, 357:9
357:18
**check** 224:25
225:4, 225:9
250:15, 344:21
**checked** 323:8
**checking** 273:4
**chemist** 311:25
**China** 251:25
285:21, 287:12
**chlorite** 222:4
237:13, 266:23
341:14, 341:25
342:8, 342:14
342:18, 343:18

344:14, 345:8
346:3
**CHRISTOPH...**
204:5
**chrysotile** 222:4
242:18, 247:25
249:15, 260:19
261:7, 261:8
262:5, 262:6
265:8, 265:11
265:16, 265:24
266:15, 266:16
266:21, 267:8
267:22, 268:7
268:24, 269:2
269:5, 269:19
271:18, 272:14
273:13, 274:23
276:5, 276:19
278:5, 278:14
278:15, 278:19
279:1, 279:4
279:6, 279:14
279:16, 288:9
301:3, 301:9
303:9, 303:14
303:18, 304:1
304:4, 304:5
304:11, 304:14
304:16, 305:10
306:4, 306:5
306:13, 307:22
308:10, 308:13
318:19, 328:1
328:3, 328:24
330:25, 331:16
331:24, 332:6
336:25, 337:25
338:11, 338:14
340:14, 341:13
342:15, 343:9
343:18, 344:3
344:9, 344:14
344:18, 345:6
345:8, 346:3
**circumstances**

209:21
**cited** 326:21
**citizen** 212:18
213:1, 213:25
214:5, 214:7
214:11, 214:25
216:16, 220:21
**citizens** 214:21
**City** 311:15
**clarification**
223:24, 251:14
**clarify** 231:9
238:19
**clarity** 254:7
**Clark** 204:15
312:17
**classified**
337:25
**classify** 260:1
260:2, 260:5
**clean** 235:16
323:9
**clear** 280:10
291:13, 291:24
292:6, 319:15
331:14, 348:20
**close** 221:6
352:23, 353:24
**code** 260:14
**Cohen** 204:3
205:14
**Colgate-Palmol...**
205:5
**collaborate**
299:13
**collaborated**
311:2
**collaborating**
310:22
**collaboration**
299:18
**collected** 307:4
**collectively**
353:15
**College** 270:1
357:6

**Colorado**
237:20, 239:5
245:2, 246:25
259:1, 259:18
266:6, 275:23
285:9
**Columbia**
204:13
**come** 210:21
221:6, 240:4
255:22, 275:14
284:1, 287:18
307:13, 314:5
328:5, 352:10
**comes** 316:19
**commencement**
355:6
**commencing**
203:14
**comment** 247:8
314:15, 314:21
315:4, 329:3
**commenting**
277:12
**comments**
225:16, 313:21
314:8, 328:15
**commercial**
312:1
**common** 300:20
300:21, 314:5
**communicate**
224:21
**communicated**
215:6, 216:11
254:10
**communication**
215:23, 217:19
240:25, 243:6
243:17
**communications**
215:3, 215:19
215:21, 224:19
227:11, 227:15
228:25, 234:17
235:2, 243:21

294:10, 313:11
330:13, 330:19
**companies**
251:2, 252:22
253:11, 280:20
**company** 203:5
216:3, 216:4
310:6, 314:6
319:24, 322:25
336:20
**compendium**
229:7, 229:13
234:10
**complaining**
253:4
**concentration**
332:21, 346:16
346:19, 346:19
**concentrations**
291:21
**concepts** 346:21
**concerned**
311:22
**concerning**
230:17, 234:11
235:23, 238:22
245:6, 245:10
254:20, 255:10
255:25, 268:13
272:8, 283:20
294:2, 297:9
301:19, 311:21
317:3, 356:3
**conclude** 274:16
341:2
**concluded** 261:5
261:6, 263:12
268:23, 269:4
**concludes**
270:19, 271:16
354:4
**concluding**
333:8
**conclusion**
239:24, 259:13
266:1, 267:20

269:1, 269:19
272:4, 275:15
275:16, 278:4
306:2, 331:10
333:7, 340:25
343:3
**conclusions**
274:12, 329:11
332:1, 334:12
**condemn** 312:3
**conditions**
303:15
**conduct** 213:10
**conducted**
284:24
**conference**
207:15
**confident** 351:1
**Confidential**
209:15, 357:6
**confined** 287:20
**confirm** 223:21
**confirmed**
225:7, 321:17
**confirming**
279:3
**confuse** 328:19
**confused** 274:1
274:3, 277:8
**confusion** 217:8
**Congress** 313:8
**connection**
314:16, 338:22
**consent** 300:4
**consider** 315:2
**consideration**
314:8
**considerations**
298:10
**considered**
228:6, 261:11
262:9, 262:12
**consistent** 287:3
**consists** 311:15
**consultant**
311:24

**consultants** 284:24
**Consumer**
219:23, 223:19
228:20
**Consumers**
219:25, 223:19
**Cont'd** 205:1
**contain** 240:15
266:21, 267:7
270:21, 271:2
290:10, 291:15
323:6
**contained**
221:25, 232:1
232:5, 332:24
**contaminated**
308:24, 309:4
337:1
**contamination**
261:12, 262:7
262:10, 262:12
327:25, 336:16
356:24
**content** 230:18
304:24, 312:2
319:8, 336:25
**contention**
266:20, 267:6
**contents** 318:12
**context** 209:25
216:23, 217:2
217:2, 217:24
232:17, 288:24
292:21, 294:22
294:23, 307:13
312:20, 312:21
327:3, 339:18
349:11
**continue** 247:19
**continued** 206:4
207:10, 255:17
**continuous**
278:24
**contractor**
254:25

**controversy**
346:12
**conversation**
324:1, 354:1
**conversations**
210:3, 210:11
**conveyed**
241:17
**COOK** 204:13
**cooperating**
311:6
**cooperative**
290:7
**copied** 298:22
**copies** 209:19
234:19, 258:22
**copy** 235:6
242:23, 242:24
258:15, 258:17
258:19, 258:21
258:23, 313:10
339:1, 339:12
339:16
**corner** 327:12
**correct** 211:18
226:9, 230:24
231:6, 231:17
232:4, 232:24
233:5, 233:7
234:13, 235:3
236:14, 236:16
236:17, 236:19
236:20, 237:7
237:17, 237:19
237:21, 239:12
239:16, 239:22
240:3, 240:16
241:7, 241:16
242:6, 243:5
244:21, 244:22
244:24, 245:8
245:11, 245:15
246:15, 246:16
246:19, 246:21
246:24, 247:1
247:2, 247:4

247:5, 247:16
248:17, 248:18
250:18, 250:25
251:24, 252:11
252:13, 253:20
254:6, 254:7
254:18, 255:13
255:15, 255:20
256:13, 256:23
257:3, 257:10
257:14, 257:16
257:17, 258:7
259:10, 259:15
259:19, 260:7
260:10, 260:15
260:20, 260:23
261:24, 262:1
263:2, 263:6
263:10, 263:15
263:19, 263:22
264:7, 264:17
264:25, 265:18
266:11, 266:15
266:24, 267:4
267:9, 267:13
267:17, 267:22
268:7, 268:21
268:22, 268:25
269:11, 269:12
269:14, 269:15
269:21, 270:9
270:14, 270:17
271:11, 271:23
272:9, 272:10
273:6, 273:18
274:9, 275:7
276:2, 276:6
276:13, 276:22
277:7, 277:24
277:25, 280:25
281:17, 282:5
282:14, 282:20
282:23, 283:7
283:13, 283:17
283:23, 283:24
284:3, 284:5

284:6, 284:9
285:11, 285:21
285:25, 286:1
286:20, 286:23
287:4, 287:8
287:13, 287:17
289:15, 289:16
289:17, 289:23
290:3, 290:11
290:19, 290:20
290:22, 291:10
291:11, 292:20
293:10, 293:15
294:15, 294:18
294:19, 295:12
295:21, 295:25
296:1, 296:5
296:6, 296:10
296:11, 296:16
296:24, 296:25
297:2, 297:5
297:6, 297:14
297:19, 297:23
298:17, 298:24
299:10, 300:9
300:24, 301:4
301:24, 302:4
302:8, 302:16
302:17, 302:20
302:21, 302:24
302:25, 303:22
304:3, 304:12
304:17, 304:18
304:21, 304:22
304:25, 305:2
305:5, 305:6
305:12, 305:15
305:24, 306:1
306:15, 306:19
307:1, 307:18
307:23, 308:10
308:17, 309:5
309:15, 309:18
309:24, 310:10
310:14, 311:16
312:7, 312:12

313:1, 313:9
313:17, 313:23
314:3, 315:15
315:16, 315:19
315:20, 315:23
316:6, 316:7
316:11, 316:12
316:15, 316:21
317:4, 317:5
317:7, 318:6
318:9, 318:10
318:13, 318:15
318:16, 318:20
318:23, 318:24
319:12, 319:13
320:8, 320:10
320:21, 321:18
321:20, 322:3
322:9, 322:25
323:16, 323:19
323:24, 324:6
324:7, 324:9
325:1, 327:2
334:8, 334:10
334:15, 334:16
335:1, 337:16
337:20, 338:2
338:6, 338:11
338:16, 338:21
340:14, 340:23
342:12, 342:19
342:20, 343:10
344:10, 344:19
345:6, 345:13
345:25, 346:2
346:17, 349:16
351:5, 353:19
**correctly** 264:21
306:8
**correspond**
349:1
**correspondence**
236:15, 245:1
**corresponds**
261:14
**cosmetic** 212:14

214:15, 221:23
222:16, 224:8
230:18, 230:23
233:5, 234:12
236:7, 250:9
255:21, 284:25
287:2, 287:18
288:22, 289:7
294:17
**cosmetics**
311:23
**counsel** 207:4
208:15, 209:14
249:3, 258:11
325:23, 326:1
355:17, 355:19
**counsel's** 352:20
**Counselors**
280:2
**counting** 346:13
346:13
**countries**
287:11
**country** 285:14
285:19
**COUNTY** 203:1
203:14
**couple** 306:18
350:1
**court** 203:1
203:12, 203:13
207:5, 207:15
207:17, 207:22
207:25, 208:5
234:3, 258:23
**courthouse**
203:14, 208:3
**courtroom**
208:4
**cover** 244:21
245:16, 246:7
246:13, 247:12
253:9, 264:5
264:11, 271:6
**create** 209:24
256:11

**created** 257:18
348:5, 353:18
**critical** 217:13
**critique** 223:4
**cross** 252:22
342:13, 342:16
344:21, 350:11
**crossed** 319:4
319:8, 319:12
**crystals** 319:5
**CTFA** 214:10
282:3, 284:20
**current** 224:14
**currently** 209:8
**cut** 332:22
**CYPRUS** 203:5

**D**

**D.D** 310:4
**Daniels** 204:16
312:17
**Dartmouth**
237:4, 237:5
256:18, 256:21
257:6, 258:4
347:1, 357:6
**data** 243:15
243:22, 252:24
268:24, 273:2
273:5, 273:5
276:4
**date** 207:2
246:6, 257:19
258:4, 265:21
294:9, 320:24
327:14, 348:11
355:14
**dated** 240:7
244:24, 245:6
245:16, 246:7
246:23, 247:3
249:12, 256:18
262:23, 267:11
270:8, 276:13
293:15, 317:19

340:3
**dates** 223:10
294:6, 352:25
**day** 203:9, 209:5
293:25
**day-to-day**
221:7
**days** 209:6
348:6
**dead** 314:12
314:20, 315:2
**deal** 208:7
326:2, 351:21
352:2, 354:1
**dealing** 346:15
**December** 216:8
216:14
**declared** 225:15
**defendant**
204:10, 204:15
204:20, 205:5
205:10, 211:21
**define** 298:8
**defined** 276:22
**defining** 264:20
266:13
**definitely** 289:8
**definition**
238:20, 244:5
244:14
**delineates**
252:24
**delivered** 246:1
300:9
**demonstrated**
305:8
**denied** 212:19
216:16
**DENNIS** 204:5
**density** 303:15
**Department**
311:22
**depends** 324:5
**deposition**
203:9, 203:11
203:12, 203:22

207:3, 207:15
207:18, 208:4
208:22, 208:23
209:1, 210:14
210:21, 215:3
215:18, 224:19
227:10, 230:5
230:6, 318:4
328:11, 330:11
330:12, 335:24
336:14, 347:17
348:6, 354:5
354:6
**described**
220:20, 285:15
**describes**
343:23
**DESCRIPTION**
356:2, 357:2
357:17
**designation**
326:15
**desk** 212:24
**despite** 222:13
**detail** 214:17
**details** 285:14
288:23
**detectable**
269:21, 271:18
**detected** 219:10
256:4, 259:23
267:22, 268:7
278:5, 278:15
279:6, 318:20
**detection** 238:2
247:24, 248:12
270:22, 271:2
**determination**
324:21
**determine** 234:3
263:5, 336:25
**determined**
213:16, 221:16
222:2, 222:7
266:19, 271:17
291:21, 307:21

**determining**
266:14, 266:16
292:23, 293:18
**developed**
293:20, 339:9
**developing**
298:11
**development**
299:4, 321:2
**diameter** 303:16
**difference** 257:1
**different** 236:10
239:18, 253:11
253:17, 280:20
283:23, 284:8
284:11, 284:12
306:20, 317:14
331:25, 339:14
344:22, 346:18
346:21
**differential**
247:25, 269:14
278:2, 278:3
**difficult** 216:24
**diffraction**
256:23, 259:4
259:12, 259:20
260:23, 261:13
261:15, 261:24
262:13, 264:25
267:3, 267:16
267:18, 268:21
269:13, 270:13
270:23, 271:3
271:13, 272:2
272:8, 273:12
274:18, 274:21
276:1, 278:1
279:2, 279:4
328:3, 330:25
337:24
**diffractometer**
278:17, 278:24
279:15
**dig** 340:6
**direct** 206:4

207:10, 215:23
directly 226:25
253:19, 262:3
272:3, 284:10
295:13, 300:10
disagree 299:11
301:5, 315:8
disagreed 315:7
315:10
disclose 234:4
344:8
disclosed 224:18
234:4
discuss 208:14
222:23, 223:7
224:14, 230:14
discussed
213:19, 214:14
214:17, 216:20
216:22, 220:7
229:9, 313:5
discussion
220:19, 227:23
229:13, 296:19
discussions
213:15, 218:14
339:9
disease 222:15
dispersion
265:14, 339:6
display 213:14
distributed
298:14
distribution
236:23
DIVISION
203:1
doctor 262:11
270:25, 280:5
313:8
Doctors 299:3
document
211:18, 216:12
241:12, 243:1
262:19, 280:24
282:18, 283:5

328:12, 333:9
334:4, 334:5
334:7, 334:10
334:13, 334:14
334:17, 334:20
335:9, 335:14
335:16, 335:16
338:23, 341:11
343:14, 343:22
344:12, 345:9
346:5, 353:16
documentation
219:1, 253:21
documented
308:9
documents
208:24, 209:23
210:8, 213:15
215:11, 215:13
219:13, 225:14
225:18, 229:24
230:13, 234:18
234:23, 241:18
241:23, 252:15
306:22, 335:10
335:12, 342:1
344:22, 350:10
350:11, 351:6
352:6, 352:17
353:9, 357:8
357:18
doing 209:2
213:11, 223:25
242:22, 252:18
259:4, 264:19
293:8, 297:12
298:7, 322:15
342:15
dolomite 271:20
domestic 285:1
Don 230:1
230:8, 230:8
double 225:9
250:15
Dr 207:12
211:12, 212:14

221:13, 221:22
222:2, 222:2
238:14, 239:6
242:14, 243:15
244:20, 246:1
246:14, 247:3
247:5, 249:23
250:12, 250:23
250:24, 250:25
251:3, 251:13
251:16, 251:17
257:5, 259:19
260:9, 261:5
261:19, 264:17
265:22, 266:10
267:12, 269:10
269:13, 269:24
270:11, 271:10
271:13, 272:1
272:17, 274:7
276:12, 276:12
276:17, 276:25
277:18, 278:8
278:25, 279:7
284:13, 286:12
287:24, 288:7
288:20, 290:8
290:8, 290:18
291:14, 291:15
291:16, 291:18
291:19, 291:20
291:22, 292:24
295:6, 296:21
297:1, 297:4
297:9, 297:12
297:17, 297:22
298:2, 298:19
299:13, 300:9
300:10, 301:11
301:18, 301:23
302:7, 302:11
302:20, 303:9
303:25, 304:1
304:5, 304:10
304:13, 304:16
305:8, 305:18

305:21, 305:24
306:14, 306:18
306:18, 307:6
307:10, 307:15
307:15, 308:7
308:16, 309:19
309:22, 310:13
311:4, 311:16
311:21, 311:24
312:2, 312:5
312:6, 312:10
312:22, 315:7
315:14, 321:4
321:4, 321:6
322:24, 323:22
324:16, 326:24
327:15, 340:5
348:6, 349:16
349:17, 349:19
356:3
draft 327:9
327:14
drawing 265:9
drink 210:15
210:21
Drug 224:8
339:2
drugs 311:21
DTA 269:21
278:14, 279:5
279:11
due 327:24
344:25
duly 355:7
duplicate 235:6
Dynamic 205:15

## E

earlier 229:23
250:13, 251:6
262:18
early 221:14
221:23, 231:20
234:23, 295:8
easier 269:1

East 203:22
edit 329:4
edited 317:10
317:11, 317:14
319:17, 339:22
341:19, 343:8
345:12, 345:19
345:22, 345:25
editing 317:16
effect 221:19
295:15
eight 209:4
209:6, 351:18
352:4
either 230:10
254:3, 295:25
301:15
electron 224:4
238:14, 238:18
242:17, 244:4
244:12, 260:22
261:23, 263:9
263:19, 265:4
265:14, 267:16
267:19, 274:19
274:20, 274:20
275:9, 276:20
302:3, 304:20
305:4, 305:7
306:6, 306:11
328:3, 330:5
330:25, 332:8
336:24, 337:10
337:13, 337:24
338:9, 339:5
339:6, 345:23
ELIZABETH
204:15
ellipses 341:4
ellipsis 265:25
Elmo 211:2
email 215:12
223:10, 227:21
emailed 215:8
emails 227:17
employed

225:24
**employee** 209:8
215:5, 216:13
321:3, 355:16
355:19
**enclosed** 249:14
**ended** 297:21
**engaged** 287:1
311:3
**engineers** 220:8
**England** 310:17
**ENGLISH**
205:7
**ensure** 220:2
**entering** 287:19
**entire** 285:23
**entirely** 319:8
**entities** 285:8
**entitled** 295:17
301:18, 322:24
330:4, 336:15
**entity** 257:23
270:1, 348:12
**entries** 269:25
**entry** 258:3
270:25, 271:5
348:15
**environmental**
220:15, 307:10
**EPA** 212:11
**epidemiologist**
223:1
**erroneous**
274:24, 341:13
**ESQ** 204:5
204:5, 204:10
204:15, 204:20
205:5, 205:9
**essence** 219:4
308:19
**establish** 260:18
**estimate** 332:22
**ET** 203:3, 203:3
203:4, 203:4
203:5, 203:5
203:6, 203:6

203:7, 203:7
**evaluations**
218:10, 239:18
253:13
**evasive** 219:20
**event** 215:20
**events** 209:25
210:6, 217:14
312:8
**eventually**
212:15
**Everybody**
299:18, 319:23
320:7
**evidence** 205:15
222:15, 230:22
231:3, 232:15
232:25, 233:3
255:8, 255:18
268:23, 272:14
273:12, 325:4
325:11, 326:23
338:25, 339:12
350:2, 352:25
**evident** 279:1
**exact** 216:2
226:23, 228:13
242:4, 250:16
251:10, 281:16
319:20, 348:9
**exactly** 213:6
233:11, 234:14
235:4, 279:10
282:13, 292:15
298:9, 314:4
317:17
**examination**
203:11, 207:10
262:22, 267:11
274:17, 275:17
296:16, 302:3
317:3, 317:20
337:24, 340:13
355:6
**examine** 257:1
299:14

**examined**
283:21, 287:10
287:21, 290:1
301:4, 337:23
343:24
**examining**
301:12
**example** 218:2
338:2, 342:19
348:15
**examples**
333:20, 337:20
337:23
**exception** 261:8
262:5, 303:21
305:15, 350:23
**exchange**
300:20
**Excuse** 247:21
**executives**
298:24, 299:2
299:3, 305:22
**exhibit** 257:22
258:12, 307:14
311:4, 317:19
318:25, 320:13
336:6, 347:13
348:11, 350:14
**Exhibit-39**
310:2
**exhibited**
278:25
**EXHIBITS/DO...**
206:11
**exist** 338:14
**existed** 252:17
**experience**
211:16
**experiences**
303:13
**experiment**
338:24
**experimental**
303:14, 334:12
**expert** 211:12
211:15, 211:17

211:20, 211:23
212:3, 222:6
228:8, 228:21
229:22, 238:17
300:22, 300:23
300:24, 302:20
342:14, 343:21
**expertise** 228:5
297:18
**experts** 213:15
220:19, 221:15
224:17, 224:22
225:5, 225:24
226:16, 226:18
226:21, 226:22
226:23, 226:25
227:25, 228:3
228:13, 234:2
315:15, 315:17
315:22, 316:3
**explain** 220:16
**explicitly**
282:21
**explore** 233:16
**explored** 302:12
**exposure** 214:19
220:23, 221:1
221:5, 222:14
**exposures**
220:14, 220:15
**extensive**
214:18, 251:13
274:16, 275:16
287:2, 340:12
341:1

**F**

**fact** 208:12
217:17, 221:16
222:8, 222:10
225:7, 226:17
265:22, 315:21
319:21
**facts** 216:22
217:1, 217:13

**fair** 210:8
245:20, 261:10
262:14, 272:15
273:14, 298:8
299:6, 313:21
315:6, 327:1
352:23, 353:4
353:9
**fall** 224:12
244:5
**familiar** 336:11
**far** 256:9
353:13
**fault** 241:6
**Fax** 203:24
**FDA** 211:13
211:14, 211:16
213:19, 213:21
213:22, 213:23
214:11, 214:12
214:14, 214:18
215:1, 215:4
215:6, 215:19
215:20, 215:22
215:24, 216:11
216:13, 216:16
217:21, 221:23
222:2, 222:9
224:12, 224:18
224:20, 224:20
227:8, 227:12
227:12, 227:13
227:15, 227:20
227:23, 228:2
228:25, 229:1
229:15, 230:17
230:24, 231:5
231:19, 233:12
233:18, 234:11
234:18, 235:2
235:12, 235:17
235:22, 236:6
236:11, 236:16
238:13, 238:22
240:25, 241:13
242:8, 243:6

243:15, 249:12
249:20, 249:24
250:7, 250:8
250:19, 251:2
252:14, 252:14
253:24, 254:8
254:10, 254:23
254:25, 255:9
255:17, 255:24
264:6, 280:16
281:25, 286:19
289:3, 289:15
289:25, 293:13
293:21, 294:1
294:12, 294:17
309:20, 311:20
311:22, 311:24
312:6, 312:14
312:23, 313:10
313:14, 313:14
314:1, 314:10
314:10, 314:18
314:22, 315:5
315:25, 316:9
317:6, 317:15
318:23, 322:8
322:13, 323:21
325:5, 325:12
326:22, 328:19
328:25, 329:6
329:24, 330:13
330:15, 330:15
331:19, 335:25
339:13, 339:21
339:22, 340:6
340:12, 340:23
341:19, 342:25
343:4, 343:7
343:8, 344:16
345:3, 345:11
345:18, 347:1
349:9, 349:12
349:20, 349:24
350:3, 352:8
353:1, 353:12
**FDA's** 314:19

315:2
**FDCA** 224:6
**February** 246:1
**Fedala** 227:2
227:19
**feel** 230:13
**felt** 328:16
338:13
**FERNANDEZ** 205:3
**fiber** 260:19
261:7, 261:8
263:14, 264:22
265:17, 276:21
305:12
**fibers** 261:15
303:9, 303:13
303:16, 305:9
306:12, 327:23
328:1, 328:2
328:4, 337:23
**fibril** 262:6
**fibrous** 249:15
303:4, 304:23
307:21, 330:24
336:25, 337:20
**field** 213:16
220:19
**fifteen** 218:12
334:23
**fight** 320:4
**figure** 212:21
213:1, 213:6
228:9, 281:18
293:4, 322:19
322:20, 342:23
350:7
**figures** 283:22
338:9, 338:23
**file** 212:2
**filed** 212:19
**files** 331:5
**financially** 355:20
**find** 228:23
235:1, 238:11

246:11, 248:8
248:9, 249:8
254:17, 291:18
291:20, 296:2
296:3, 296:15
303:3, 306:23
316:21, 327:25
335:7, 343:15
**finding** 241:25
337:15, 344:3
**findings** 242:15
305:24, 311:3
315:7, 315:11
328:24, 341:8
343:9
**finds** 333:21
**fine** 234:7
277:17, 281:21
305:9
**finish** 272:12
273:8, 279:18
335:6, 352:14
**first** 211:1
212:18, 217:6
220:9, 246:17
256:16, 258:3
318:1, 323:12
324:22, 328:2
328:22, 331:4
336:15, 348:1
**Firstly** 301:6
**five** 291:22
330:24
**flagged** 262:17
280:15, 281:23
**flakes** 263:15
**flawed** 213:10
**flip** 216:7, 350:2
353:7
**floor** 204:8
204:13
**Florham** 204:14
**focopite** 271:20
**focus** 240:17
326:5, 351:6
**folded** 263:15

**FOLEY** 203:3
**folks** 239:7
300:5
**follow** 304:7
311:2, 323:25
**followed** 300:5
**following**
238:10, 244:18
271:17, 283:22
287:11, 293:23
311:15
**food** 211:6
212:21, 224:8
311:23, 339:2
**footnote** 271:22
**Force** 214:10
**foregoing**
355:11
**forenoon** 203:15
**forgive** 243:23
**forgot** 226:12
**form** 264:22
265:9, 265:16
274:25, 316:13
**formal** 335:17
**format** 348:10
**formation**
212:15
**forms** 265:18
265:24
**forth** 224:5
234:17, 243:2
255:5, 355:14
**found** 216:11
222:9, 248:6
248:7, 248:8
249:10, 250:24
252:11, 259:7
259:13, 261:6
262:4, 268:24
272:15, 273:14
290:19, 291:17
292:22, 295:11
296:9, 297:13
301:2, 301:9
304:4, 304:11

304:14, 304:15
304:23, 306:5
306:19, 307:7
307:9, 307:17
308:10, 309:3
309:12, 309:22
309:22, 312:24
313:3, 315:23
316:9, 316:13
318:9, 320:12
322:8, 322:13
328:22, 330:24
331:4, 331:7
331:15, 332:14
334:3, 336:2
337:19, 338:2
340:13, 344:9
344:18, 345:5
**four** 205:7
351:25, 352:2
352:4
**fourth** 306:10
**FRACE** 203:3
**France** 287:12
**free** 261:7
262:4, 268:1
268:4, 268:5
274:21
**Friday** 303:2
**friend** 309:23
310:13
**friendly** 297:2
**front** 235:7
261:1, 269:16
316:24, 320:13
320:25, 340:4
343:22, 346:10
348:1, 348:23
**full** 209:5, 334:4
334:5, 336:1
339:12, 339:16
**functioned**
224:22
**further** 230:14
283:4, 285:4
285:13, 309:9

355:10, 355:15

**G**

**G11** 326:11
326:12, 326:18
327:25, 327:25
328:6, 328:15
329:3, 329:9
329:15, 329:20
329:23, 329:24
330:1
**games** 217:7
218:3
**GARDE** 205:9
**garnet** 257:15
**GARY** 205:5
**Gateway** 205:7
**GATMAITAN**
203:4
**GEIER** 204:5
**generally** 211:6
**gentlemen**
230:11
**geographic**
286:5
**geographical**
283:23, 284:9
284:11
**George** 250:6
282:1
**getting** 223:14
283:22, 286:7
**give** 240:18
252:18, 258:17
258:20, 258:23
276:17, 282:25
298:10, 313:20
330:15, 330:17
335:12, 339:22
341:19, 343:7
343:12, 351:13
**given** 247:11
267:12, 294:12
314:6, 334:2
334:6, 335:24

**gives** 285:19
303:2, 320:15
321:13
**giving** 232:7
232:10, 233:8
**glance** 237:10
328:2
**gleaned** 219:12
**Global** 228:19
**go** 215:10, 218:3
220:25, 222:17
222:21, 223:16
225:2, 225:11
225:22, 225:24
226:8, 226:15
229:18, 231:10
233:24, 235:15
235:20, 236:4
236:24, 237:14
238:3, 238:5
241:11, 243:8
243:25, 250:15
251:8, 256:7
259:17, 261:18
262:16, 263:17
265:20, 267:1
267:24, 269:3
270:24, 271:25
272:12, 273:7
273:10, 273:10
273:19, 273:25
275:3, 276:8
276:24, 277:10
278:7, 278:16
279:9, 283:15
284:18, 285:18
286:11, 286:22
286:23, 286:25
288:20, 290:21
290:24, 293:16
294:7, 294:15
294:15, 294:20
297:22, 306:23
314:2, 320:14
326:1, 332:19

335:6, 336:15
340:16, 344:1
349:7, 350:6
**goes** 261:9
261:13, 265:13
296:21, 304:19
337:22, 338:13
**going** 231:10
231:11, 233:24
238:3, 241:11
243:8, 243:23
248:24, 249:5
251:11, 252:20
253:3, 254:16
256:10, 256:11
258:11, 258:21
260:3, 279:21
280:5, 281:19
282:25, 288:15
288:18, 290:24
290:25, 291:19
295:14, 300:1
301:13, 313:4
316:2, 321:24
324:12, 325:18
326:1, 326:2
335:6, 341:16
347:3, 347:9
347:22, 352:10
353:11
**gold** 337:15
**good** 207:12
207:13, 248:19
259:23, 268:10
269:7, 270:4
270:25, 272:4
275:20, 277:4
291:23, 323:14
324:15, 324:24
**Gordon** 245:10
246:20, 268:13
272:7, 272:21
**gotten** 227:14
**Goudie** 264:17
265:22, 266:10
267:12, 276:13

321:4, 321:5
321:6, 321:11
327:15, 356:11
356:13, 356:17
356:19, 357:3
**GRABOWSKI**
203:4
**grade** 222:16
287:19
**grades** 284:25
**grain** 346:12
**gras** 211:3
211:6
**Great** 288:3
299:8, 300:14
**GREENE** 203:5
**grid** 303:1
**grids** 337:19
337:23
**GRIFFIN** 203:5
**ground** 258:4
**group** 222:1
276:11, 281:6
311:14
**groups** 222:6
**Grove** 205:4
**guess** 216:7
226:12, 291:12
328:10, 328:18
**GUEVARA**
204:10
**guide** 210:5

**H**

**half** 296:6
**hand** 220:9
327:12, 341:11
347:3
**handed** 320:17
341:17, 341:23
**handing** 281:9
**handled** 222:12
**handling** 215:15
**handwritten**
330:3, 331:5

346:4, 356:21
**happened**
208:17, 281:4
295:23, 300:7
306:17, 312:22
315:13, 339:20
339:24, 340:1
**happening**
217:3, 297:21
**happens** 296:20
**happy** 281:19
322:7
**harmful** 298:17
**HAWKINS**
204:8
**head** 212:11
223:17, 223:18
225:1, 228:19
349:10
**health** 209:12
213:17, 311:21
**hear** 233:21
234:1
**heard** 326:18
**help** 223:13
225:16, 284:17
296:23, 297:5
298:2
**Henderson**
311:1, 356:9
**hereinbefore**
355:14
**Hicks** 230:1
230:4
**hid** 322:12
**high** 213:12
303:17, 305:9
306:7, 306:11
**higher** 303:5
**highlight** 242:10
308:11
**highlighted**
227:5
**highlighting**
242:20
**hired** 212:3

212:5, 221:22
225:5, 312:11
312:14, 312:16
312:22, 315:14
315:22, 315:25
316:4
**historical** 217:2
**historically**
217:9
**history** 223:20
**HODJERA**
203:6
**hold** 247:10
250:2, 259:8
**home** 210:17
**Honorable**
208:5
**hope** 300:19
**Hopefully** 273:8
**Hopkins** 230:1
230:4, 348:6
349:16, 349:17
349:19
**Hopkins-28**
357:9
**hospital** 300:16
**host** 312:23
**hours** 209:4
209:7
**human** 213:17
**hundred** 350:13
**hundreds**
225:18, 225:18
345:24
**Hutchinson**
330:5, 340:17
340:22, 343:9
344:1, 344:9
345:12, 356:21
**Hutchinson's**
341:8, 357:4

**I**

**Ian** 244:7
**idea** 251:7

326:14, 330:2
332:17, 335:25
**identification**
276:19, 303:12
**identified**
244:15, 256:12
256:17, 263:13
263:14, 263:25
269:9, 303:4
303:9, 304:16
306:5, 306:13
321:12, 328:1
346:3
**identifies** 304:1
305:10
**identify** 238:5
239:8, 243:9
244:19, 246:9
249:6, 265:16
265:17, 304:5
305:18
**IMERYS** 203:4
203:7
**impartial**
311:20
**implemented**
220:10
**implicated**
290:10, 291:15
291:22
**implication**
217:13
**implications**
216:25, 220:3
**implies** 217:11
298:6
**imply** 259:25
282:22
**impolite** 207:20
**important**
292:21, 295:2
329:18, 334:17
**imported** 287:7
**impurities**
257:15, 258:6
269:2, 269:6

271:17
**inadequate**
222:3
**include** 285:8
288:18
**included** 234:20
234:24, 244:4
244:18, 250:10
252:16, 253:22
283:10, 286:5
332:10, 332:16
333:5, 333:14
333:15
**including**
253:11, 274:8
281:7, 283:6
298:13, 340:14
**incomplete**
334:11
**incontrovertible**
332:24
**incorrect**
221:16, 315:9
322:18, 326:25
341:24
**independent**
287:22, 315:25
**independently**
311:1
**India** 287:12
**Indian** 285:20
**indicate** 265:10
276:5, 278:25
325:12, 332:12
**indicated**
207:22, 305:1
**indicates** 303:17
**indication**
280:23
**indications**
323:14, 324:24
**individual**
217:17, 217:19
217:24, 314:21
**individuals**
210:11, 212:13

224:16, 224:22
224:24, 225:8
225:25, 226:15
227:7, 298:25
**industry** 224:13
225:20, 298:16
**information**
218:1, 219:12
229:7, 229:14
230:12, 233:11
233:17, 236:3
241:17, 252:18
284:16, 295:3
298:12, 305:17
318:22, 319:16
328:23, 331:18
333:19, 339:17
348:17
**ingredient**
326:11
**inhalation**
214:19
**initiated** 311:14
**initiating**
298:11
**initiative** 229:4
**inside** 254:4
**instance** 217:6
217:18, 218:11
219:6, 229:15
237:13
**institute** 266:7
275:24, 295:10
295:19, 297:14
298:1, 299:12
300:12, 301:7
302:2, 304:3
310:18, 310:21
311:5, 311:6
312:12, 316:6
**instrument**
276:21
**interaction**
215:16
**interceded**
313:13, 313:18

**interested** 223:3
227:23, 355:20
**internal** 240:22
247:14, 289:14
327:5
**internally** 228:5
245:19
**interpretation**
247:10, 247:12
247:13, 344:25
**intervals** 287:7
**investigate**
328:17
**investigation**
244:17, 336:16
341:2, 356:23
**investigations**
260:13, 287:18
**invited** 212:13
**involved** 290:9
291:13
**involvement**
295:6
**Ironman** 312:6
**Irving** 295:6
**isolated** 319:5
**ISRTP** 213:22
**issue** 229:6
230:22, 231:3
231:23, 296:14
328:19, 342:17
350:7, 351:22
352:2, 352:16
354:2
**issues** 208:6
226:19, 309:2
326:2
**Italian** 244:17
284:14, 288:25
**Italy** 252:4
252:4, 252:8
285:20, 285:25
286:1, 287:12
288:24

| **J** | |
|---|---|
| | 215:12, 216:12 |
| | 230:1, 357:9 |
| **J&J** 310:2 | **Johnson** 204:20 |
| 357:8, 357:18 | 204:20, 205:10 |
| **J&J-10** 311:4 | 205:10, 209:8 |
| 356:9 | 209:9, 211:17 |
| **J&J-17** 356:3 | 211:18, 213:18 |
| **J&J-24** 307:14 | 213:19, 213:22 |
| 356:5 | 213:23, 215:3 |
| **J&J-25** 356:7 | 215:4, 215:19 |
| **J&J-26** 356:17 | 215:19, 215:20 |
| **J&J-33** 356:23 | 215:20, 215:23 |
| **J&J-34** 356:13 | 215:23, 216:5 |
| **J&J-36** 356:11 | 216:5, 216:10 |
| **J&J-368** 356:18 | 216:11, 216:12 |
| **J&J-376** 356:19 | 216:13, 218:16 |
| **J&J-39** 356:8 | 218:17, 223:1 |
| **J&J-414** 357:9 | 223:1, 224:17 |
| **J&J-478** 357:4 | 224:18, 224:20 |
| **J&J-479** 356:15 | 224:20, 224:21 |
| **J&J-485** 356:21 | 224:21, 224:23 |
| **J&J-49** 357:3 | 224:23, 225:6 |
| **J&J-58** 357:6 | 225:6, 226:17 |
| **J10** 295:17 | 226:18, 226:20 |
| **J41** 212:16 | 226:20, 227:11 |
| 220:24, 224:4 | 227:11, 227:12 |
| 255:1, 293:20 | 227:12, 227:14 |
| **JAMES** 204:20 | 227:14, 230:16 |
| **JBP** 263:21 | 230:17, 230:18 |
| **Jersey** 203:1 | 230:23, 230:23 |
| 203:13, 203:14 | 231:4, 231:4 |
| 203:23, 204:4 | 231:5, 231:5 |
| 204:14, 205:4 | 231:18, 231:18 |
| 205:8, 286:8 | 231:25, 231:25 |
| 288:17, 355:5 | 231:25, 232:1 |
| 355:24 | 232:4, 232:4 |
| **Jifsan.UMD.edu** | 232:15, 232:16 |
| 224:11 | 232:23, 232:23 |
| **job** 219:16 | 233:2, 233:3 |
| 219:23, 220:2 | 233:4, 233:5 |
| 220:6, 312:6 | 233:6, 233:7 |
| 329:22 | 233:12, 233:12 |
| **jobs** 220:2 | 233:17, 233:18 |
| **John** 205:9 | 233:23, 233:23 |
| 211:8, 211:13 | 234:12, 234:12 |
| 211:23, 215:8 | 235:23, 235:23 |

| | |
|---|---|
| 235:24, 235:24 | 284:19, 284:23 |
| 236:6, 236:6 | 284:23, 289:19 |
| 236:7, 236:8 | 289:19, 290:5 |
| 236:15, 236:16 | 290:6, 290:14 |
| 245:19, 245:19 | 290:14, 290:16 |
| 246:13, 246:14 | 290:16, 293:14 |
| 247:15, 247:15 | 293:14, 293:25 |
| 248:5, 248:5 | 293:25, 294:11 |
| 249:8, 249:8 | 294:11, 294:12 |
| 251:24, 251:24 | 294:16, 294:16 |
| 252:2, 252:2 | 295:5, 296:20 |
| 252:5, 252:5 | 296:21, 297:1 |
| 252:10, 252:10 | 297:1, 297:23 |
| 253:1, 253:1 | 297:23, 298:23 |
| 253:12, 253:12 | 298:23, 298:25 |
| 254:2, 254:2 | 298:25, 299:7 |
| 254:4, 254:4 | 299:7, 299:14 |
| 254:4, 254:5 | 299:14, 301:10 |
| 254:5, 254:5 | 301:22, 301:22 |
| 254:20, 254:20 | 302:6, 302:6 |
| 254:25, 254:25 | 302:14, 302:15 |
| 255:9, 255:9 | 302:19, 302:23 |
| 255:18, 255:18 | 302:24, 303:20 |
| 255:19, 255:19 | 303:21, 303:24 |
| 255:25, 255:25 | 303:24, 304:9 |
| 260:13, 260:14 | 304:9, 305:4 |
| 262:21, 262:22 | 305:4, 305:20 |
| 262:23, 262:23 | 305:20, 305:23 |
| 264:5, 264:6 | 305:23, 306:3 |
| 264:6, 264:7 | 306:3, 306:23 |
| 267:3, 267:12 | 306:23, 307:4 |
| 267:12, 270:7 | 307:5, 307:14 |
| 270:7, 270:20 | 307:15, 307:16 |
| 270:21, 274:17 | 307:16, 307:25 |
| 274:17, 277:7 | 307:25, 308:6 |
| 277:7, 277:24 | 308:6, 310:3 |
| 277:24, 280:25 | 310:3, 311:7 |
| 280:25, 281:7 | 311:7, 311:11 |
| 281:7, 281:14 | 311:12, 313:6 |
| 281:14, 282:7 | 313:6, 313:13 |
| 282:7, 282:19 | 313:13, 313:14 |
| 282:19, 282:22 | 313:14, 313:15 |
| 282:22, 283:7 | 314:18, 314:18 |
| 283:7, 283:16 | 314:23, 314:23 |
| 283:17, 284:7 | 315:6, 315:7 |
| 284:7, 284:19 | 316:5, 316:5 |

| | |
|---|---|
| 316:9, 316:9 | |
| 317:20, 317:20 | |
| 319:23, 319:23 | |
| 321:3, 321:3 | |
| 321:7, 321:7 | |
| 321:23, 321:23 | |
| 321:25, 322:1 | |
| 322:1, 322:2 | |
| 322:3, 322:6 | |
| 322:6, 322:8 | |
| 322:9, 322:12 | |
| 322:12, 323:22 | |
| 323:23, 324:15 | |
| 324:15, 325:5 | |
| 325:5, 325:12 | |
| 325:12, 326:21 | |
| 326:21, 327:15 | |
| 327:15, 329:22 | |
| 329:22, 336:20 | |
| 336:20, 337:14 | |
| 337:14, 338:5 | |
| 338:6, 340:12 | |
| 340:12, 344:5 | |
| 344:5, 347:7 | |
| 347:7, 349:9 | |
| 349:9 | |
| **Johnson's** | |
| 230:18, 245:6 | |
| 245:10, 261:2 | |
| 263:1, 263:21 | |
| 265:8, 268:13 | |
| 269:20, 270:8 | |
| 271:1, 272:2 | |
| 294:12, 295:5 | |
| 301:10, 302:11 | |
| 302:19, 304:21 | |
| 306:12, 312:25 | |
| 313:16, 316:10 | |
| 316:14, 317:3 | |
| 318:15, 319:22 | |
| 320:8, 325:6 | |
| 325:13, 336:2 | |
| **Johnston** 310:4 | |
| 356:8 | |
| **joined** 211:8 | |
| 211:14 | |

**July** 223:10
  236:12, 237:20
  238:13, 238:14
  259:1, 301:19
  301:23, 356:3
**jump** 329:10
  331:9, 332:1
  333:6, 334:11
**jumping** 333:7
**June** 227:13
  228:2, 237:6
  246:23, 256:18
  273:17, 340:3
**jury** 234:3
  320:5

**K**

**Kathy** 215:5
  215:25, 216:1
**keep** 241:11
  251:11, 252:20
  254:16, 258:21
  294:22
**kept** 328:23
  329:23
**key** 298:23
  299:1
**kind** 248:20
  304:6, 329:17
**Kingdom** 287:8
  287:16, 287:19
  288:1, 288:5
  288:13, 288:21
  288:22, 289:3
**KLUGER**
  204:13
**knew** 227:22
  228:20, 281:8
  317:15, 319:24
  320:7, 323:23
  325:6, 325:13
  330:14, 330:16
**know** 207:14
  211:10, 211:11
  211:22, 211:23

212:6, 216:2
221:13, 225:1
226:1, 226:14
226:23, 228:24
231:21, 233:20
238:12, 250:21
251:5, 251:9
252:7, 280:6
281:16, 282:18
288:25, 289:7
290:15, 290:15
292:3, 292:7
292:21, 294:14
294:24, 299:23
300:3, 300:11
304:5, 304:6
306:24, 307:2
308:4, 310:8
312:8, 312:16
313:18, 314:14
317:11, 317:12
320:11, 322:11
322:12, 322:17
323:1, 323:13
324:23, 326:9
326:17, 329:2
329:2, 329:10
329:15, 329:20
330:1, 330:1
331:22, 332:11
335:2, 335:3
335:15, 335:20
335:21, 338:24
339:3, 339:20
340:1, 342:22
344:20, 347:4
347:6, 349:13
349:14, 349:21
350:20, 351:11
352:10, 353:13
**knowledge**
  219:12, 220:9
  223:20, 256:6
  344:25, 346:8
  353:22
**Korea** 251:25

285:20, 287:12
**Kretchmer**
  307:10

**L**

**lab** 315:25
  332:2, 334:21
**labeled** 309:23
**labor** 352:21
**laboratory**
  260:14, 300:22
  338:16
**labs** 301:10
**lack** 279:2
  344:25
**Langer** 221:11
  221:13, 229:25
  290:8, 290:9
  290:16, 290:17
  291:1, 291:8
  291:10, 291:14
  291:16, 291:20
  292:21, 292:22
  301:19, 301:23
  303:9, 303:25
  304:1, 304:5
  304:11, 304:13
  304:17, 305:8
  305:21, 305:24
  306:14, 306:18
  307:15, 307:15
  308:7, 308:16
  356:3, 356:5
  356:7
**Langer's** 302:11
  305:18
**language** 217:7
  217:12, 218:3
  220:16
**large** 211:11
  229:25, 337:19
  337:22
**largely** 222:4
**lastly** 276:11
**late** 216:21

218:8
**LAW** 203:1
**lawyer** 301:15
**lawyers** 253:5
**lays** 216:18
  217:4
**leading** 311:13
**learned** 219:17
  227:8
**learning** 292:24
**leave** 275:12
  281:20
**led** 212:13
  212:15, 213:12
**left** 214:12
  216:3, 223:19
  249:5, 328:15
  345:16
**Lemmo** 216:12
**letter** 214:10
  218:16, 218:18
  239:5, 244:21
  245:16, 246:7
  246:13, 247:12
  249:11, 250:6
  253:4, 253:7
  253:9, 264:5
  264:11, 271:6
  277:9, 277:12
  280:16, 281:24
  282:17, 283:16
  284:5, 284:19
  284:20, 286:18
  288:7, 308:6
  308:19, 340:5
  340:8, 356:5
  356:7, 356:19
  357:3
**letterhead** 310:3
**letters** 218:4
  218:7
**level** 269:21
  279:7, 284:25
  318:19
**levels** 247:25
  319:11

**Lewin** 221:11
  221:22, 222:2
  240:24, 241:24
  242:16, 273:13
  277:18, 278:25
  279:8, 311:24
  312:10, 312:22
  313:7, 313:15
  315:23, 316:5
  321:25, 322:7
  322:15, 323:4
  323:6, 323:15
  323:22, 324:16
  324:25, 326:6
  326:24, 330:21
  337:5, 338:2
  338:5, 338:15
  342:11, 342:19
  342:22, 343:16
  343:19, 343:24
  344:4, 344:10
  344:15, 345:5
**Lewin's** 212:14
  222:3, 247:8
  273:2, 277:12
  315:7, 315:14
**Lexington** 204:8
**lie** 270:20
**LIEU** 205:3
  205:5
**life** 221:7
**lifetime** 221:1
**light** 267:16
  267:18, 274:19
  304:20, 319:16
  356:15
**limit** 238:2
  270:22, 271:2
**limitations**
  220:24
**limited** 308:24
**limits** 248:12
**line** 216:17
  231:11, 271:1
  328:19
**lines** 279:5

**list** 248:13
282:23, 285:23
286:12, 288:20
293:17, 311:16
**listed** 206:11
244:22, 250:1
253:11, 286:2
343:15
**listing** 253:23
**lists** 260:14
285:19, 287:11
**literature**
295:11
**litigation** 226:21
**litigations** 212:4
**little** 207:19
207:23, 271:22
277:8, 283:4
**LLC** 203:6
**LLP** 204:8
204:18, 205:7
**locate** 234:24
**located** 311:14
**Logan** 204:18
**long** 210:25
216:2, 246:2
**look** 213:5
214:5, 215:10
223:18, 225:17
245:21, 247:19
251:9, 257:20
260:25, 265:3
271:5, 293:8
293:12, 293:16
294:5, 297:25
299:21, 300:1
300:23, 311:4
313:20, 313:24
315:15, 315:22
315:25, 317:17
320:24, 328:3
331:25, 332:5
336:9, 336:11
339:7, 345:17
348:15, 349:2
350:10, 352:6

352:11, 353:8
**looked** 208:24
220:6, 221:15
222:7, 237:12
247:11, 248:5
257:9, 257:11
259:9, 276:15
288:12, 294:20
296:4, 296:7
301:2, 307:20
327:5, 337:19
**looking** 215:2
219:12, 225:14
229:6, 237:3
237:21, 238:21
239:2, 241:4
244:2, 246:2
248:11, 253:6
263:4, 264:11
267:3, 272:2
276:1, 280:14
281:12, 288:23
290:13, 296:23
303:25, 304:21
337:5, 338:4
340:9, 344:2
349:6
**lookout** 225:15
**looks** 243:3
245:21, 251:20
333:2, 334:16
339:4, 341:23
**lot** 217:7, 219:7
268:14, 300:13
301:11, 305:16
320:16, 326:10
344:24
**lots** 240:24
255:2, 267:3
269:10, 323:5
323:8, 323:15
324:25
**low** 247:24
290:2
**lower** 327:11
**lunch** 273:8

279:18
**Luncheon**
279:23
**Lynne** 228:14
228:15, 228:18
229:8

**M**

**Ma'am** 260:2
264:9, 305:20
308:13, 316:20
317:9, 320:3
324:4, 332:4
334:5, 335:23
339:15, 342:17
342:24, 344:15
345:2, 345:10
349:13, 349:25
351:11
**machine** 213:11
**Maggiano**
205:15
**magnification**
303:2, 303:5
303:17, 305:10
306:7, 306:11
**magnitude**
266:22
**mailed** 300:10
**making** 236:9
242:4, 258:22
314:21, 344:24
**man** 284:20
**manage** 342:16
**Management**
219:23
**Manipulation**
357:4
**MANUEL**
204:10
**manufacture**
219:6, 261:2
**manufacturers**
314:6
**Maple** 204:3

**MARC** 203:13
355:3
**March** 203:14
207:3, 253:7
289:13, 357:7
**mark** 226:12
236:1, 236:4
258:12, 353:11
353:15
**marked** 209:18
234:10, 347:4
347:10, 353:16
**marketed** 255:4
**marks** 350:14
**Martin** 246:17
**material** 218:9
218:13, 219:2
219:8, 224:1
252:3, 252:5
268:1, 268:4
305:11, 308:17
316:10, 316:12
330:20, 331:15
337:20, 338:1
338:2, 338:5
338:5, 339:7
345:24
**materials**
208:10, 214:20
222:14, 263:13
268:2, 304:6
337:6, 346:20
**matter** 203:12
224:23, 289:5
**matters** 311:21
**McCARTER**
205:7
**McCarthy**
227:7
**McCrone** 218:3
218:8, 218:11
218:15, 222:6
239:4, 239:7
239:12, 240:5
240:14, 241:20
241:23, 242:2

242:15, 244:3
244:8, 245:6
246:22, 253:4
262:23, 263:18
267:11, 273:17
274:5, 316:6
316:9, 316:13
316:25, 317:1
317:2, 317:21
318:9, 320:23
320:25, 321:17
326:22, 327:4
327:10, 328:12
328:15, 328:23
329:14, 329:20
330:4, 331:5
333:9, 334:6
335:10, 336:21
339:21, 340:3
340:8, 340:11
348:16, 356:11
356:13, 356:19
357:3, 357:4
**McCrone's**
327:5
**McGIVNEY**
204:13
**MCNEILL-GE...**
203:6
**McNelis** 205:14
**MD** 203:9
206:3, 207:8
**mean** 211:4
211:9, 212:22
214:24, 215:9
215:17, 216:4
216:19, 217:4
219:20, 222:24
223:11, 224:7
225:3, 227:5
225:1, 228:16
229:4, 248:4
248:4, 264:6
284:11, 289:3
313:18, 314:14
316:16

**meaning** 217:17
291:5, 341:5
**means** 212:23
214:1, 217:24
220:13, 221:12
229:20, 231:22
250:21
**medical** 220:3
295:11
**medicated**
327:16
**Medicine** 295:7
**meet** 244:13
**meeting** 216:13
224:13, 224:17
225:3, 225:8
225:11, 225:19
225:22, 225:24
226:1, 226:2
226:8, 226:9
226:15, 226:16
227:8, 227:15
227:18, 228:2
238:13, 238:15
241:13, 297:9
297:11, 297:22
298:23, 301:18
356:3
**meetings** 239:1
**Mellon** 247:6
277:9, 277:15
**member** 313:8
**members**
213:23, 312:11
**memo** 236:9
236:12, 243:14
244:1, 244:7
253:10, 278:23
289:14, 289:14
297:7, 297:8
298:8, 298:22
303:20, 304:7
304:8, 305:2
305:14, 305:16
305:17, 305:23
310:3, 310:14

314:25, 322:23
324:17, 324:19
324:20, 356:8
356:17, 356:18
357:6
**memoir** 225:13
**memorandum**
241:13, 304:9
**memorialize**
298:22
**memory** 225:13
225:17
**mention** 210:9
237:10, 240:22
241:12, 241:23
**mentioned**
210:11, 228:17
241:22
**met** 227:12
**method** 257:24
264:24, 277:3
279:11, 283:1
285:14, 302:19
303:12, 332:9
346:16, 346:19
**methodologies**
224:14
**methodology**
248:1, 280:21
345:1
**methods** 213:9
213:10, 221:4
222:3, 223:4
240:14, 240:16
248:12, 248:17
248:18, 274:8
278:20, 292:23
293:19, 308:20
308:20, 309:8
332:1, 332:16
333:5, 333:14
339:9, 346:12
**micrograph**
238:18
**micrographs**
244:4, 244:13

332:22, 333:10
333:14, 333:16
333:19, 333:23
338:9, 338:19
**microscope**
256:22, 260:22
261:23, 263:9
263:9, 263:19
263:19, 264:25
265:4, 265:14
267:16, 267:17
276:20, 302:3
302:23, 304:20
305:4, 305:7
306:6, 323:8
330:5, 336:24
337:11, 337:13
337:14
**microscopist**
343:17, 343:21
**microscopy**
224:4, 238:14
242:17, 274:19
274:19, 274:20
275:9, 304:20
306:11, 310:19
319:16, 332:9
339:5, 339:6
345:23, 356:15
**MID-L-2456-18**
203:5
**MID-L-3095-18**
203:3
**MID-L-4252-18**
203:4
**MID-L-4826-18**
203:5
**MID-L-5368-17**
203:6
**MID-L-598-18**
203:7
**MID-L-600-18**
203:3
**MID-L-6635-17**
203:7
**MID-L-6805-16**

203:4
**MID-L-7049-16**
203:6
**MIDDLESEX**
203:1, 203:13
**midst** 213:11
**Mike** 227:2
227:18
**Miller** 223:2
258:4
**millers** 222:11
222:16
**milling** 257:2
**Milstein** 215:8
215:12, 227:20
**mine** 240:20
244:17, 257:25
261:24, 265:8
284:12, 284:14
284:14, 285:23
**Miner** 223:2
**mineralogical**
287:18
**minerals** 203:5
253:4, 263:25
274:22, 357:6
**miners** 222:11
222:16
**mines** 237:20
239:5, 245:3
247:1, 259:1
259:19, 266:7
275:23, 284:12
285:10, 286:5
316:17, 316:19
**minimum**
215:24, 269:21
**Minnesota**
274:14, 275:7
275:12, 330:6
331:6, 335:16
336:1, 336:5
336:7, 344:17
345:4, 356:21
356:23
**minor** 259:14

259:21
**minute** 248:11
334:7, 334:15
336:9, 350:7
**minutes** 239:1
351:18, 352:4
**misclassification**
217:8
**misidentification**
274:25, 341:14
**misleading**
217:20, 217:25
**misreading**
222:4
**missed** 272:18
**missing** 280:6
280:13, 301:14
334:18, 350:16
350:16
**mistake** 221:20
343:20
**mistaken** 267:8
**mistakenly**
266:22, 321:12
343:17, 344:13
346:3
**mistakes** 344:24
**mistook** 343:18
**moderately**
305:9
**moment** 300:25
353:23
**morning** 207:12
207:13, 315:18
323:4, 326:20
353:10, 353:19
**MORSE** 203:6
**Mount** 221:13
296:21, 301:23
307:5
**move** 277:18
339:10, 345:2
345:10, 347:11
**Mt** 295:6
**Mulberry** 205:8
**multiple** 234:18

243:21, 244:16
352:17
**Musco** 347:4
347:16
**Musco-2** 347:4
347:10, 348:23
349:6, 349:8
349:14, 349:20
357:8
**Musgravite**
271:19
**music** 235:10
235:21, 238:9
256:8
**Myers** 281:24
282:2, 284:5
284:21

**N**

**name** 223:18
228:8, 321:13
321:14
**named** 227:18
**names** 226:23
228:7, 228:10
228:13, 228:21
282:23
**Nancy** 347:4
**Nashad** 321:1
321:2, 321:11
**Nashed** 356:17
**Natasha** 223:16
223:17
**necessarily**
212:6, 234:19
234:24, 287:25
299:1
**need** 208:6
240:19, 243:24
278:10, 279:19
336:9
**needed** 210:15
230:12, 230:14
**needs** 219:8
339:23

**negative** 269:3
269:6, 275:7
288:8
**neither** 355:15
355:18
**never** 218:12
232:5, 232:14
255:24, 280:12
294:1, 294:16
316:9, 316:13
317:15, 318:22
323:21, 324:16
326:18, 334:6
334:14, 344:16
344:19, 345:3
352:8, 353:1
**new** 203:1
203:13, 203:14
203:14, 203:23
204:4, 204:9
204:9, 204:14
205:4, 205:8
214:25, 251:6
273:3, 286:8
288:17, 311:15
311:25, 319:22
320:7, 321:20
343:1, 355:5
355:24
**Newark** 205:8
**news** 277:20
320:7
**Nicholson** 203:9
206:3, 207:4
207:12, 278:8
**nine** 335:3
**non** 249:15
260:6, 292:11
329:9
**normal** 221:6
296:7, 333:25
**NORTH** 203:3
203:4, 203:5
203:6, 203:7
**Notary** 203:13
355:3, 355:24

**notation** 213:2
**note** 210:18
215:4, 215:24
217:6, 222:11
223:9, 226:11
230:2, 230:10
236:10, 243:17
249:23
**noted** 207:4
**notes** 209:18
209:19, 209:22
209:24, 210:2
210:4, 210:5
210:5, 210:7
210:12, 210:23
212:20, 214:8
214:23, 215:16
216:8, 216:25
221:9, 222:17
222:20, 223:15
223:16, 223:23
224:25, 225:12
225:21, 226:4
226:7, 227:5
294:21, 295:4
327:9, 330:3
330:4, 330:8
331:5, 331:10
331:22, 332:4
332:7, 332:10
332:12, 332:16
333:13, 338:20
346:4, 356:21
**noticed** 280:12
**November**
225:20, 226:8
227:9, 245:17
245:18, 246:11
307:16, 310:2
**NTP** 213:8
**number** 209:25
211:12, 212:12
212:14, 227:6
227:17, 229:24
234:22, 236:25
237:12, 237:16

239:2, 250:9
252:22, 253:11
257:14, 257:22
257:23, 274:8
281:15, 284:4
287:6, 290:2
298:12, 298:23
315:14, 327:10
331:23, 337:19
337:22, 342:12
348:11, 350:15
**numbered**
334:22
**numbers** 260:14
280:6, 280:10
320:16, 334:22
350:16
**numerous**
213:20, 239:18
253:13, 253:17
284:24, 313:2
337:19, 344:2

**O**

**o'clock** 351:25
**O'TOOLE**
205:3
**object** 242:21
**objection**
219:19, 227:4
230:25, 231:7
232:3, 234:6
242:20, 252:12
255:12, 255:14
278:13, 288:19
291:4, 292:19
293:5, 294:3
294:25, 296:17
300:18, 305:25
307:8, 308:2
308:18, 309:6
309:25, 310:24
311:9, 311:17
312:13, 312:18
313:22, 314:13

319:25, 320:9
321:21, 322:4
322:10, 322:16
322:22, 324:18
325:2, 327:7
328:8, 329:1
329:7, 329:16
329:19, 329:25
330:18, 331:2
331:8, 331:20
332:15, 333:1
333:12, 333:17
333:24, 334:1
334:9, 335:8
335:13, 335:19
336:3, 337:7
339:25, 340:18
341:10, 341:22
342:21, 343:2
343:5, 343:11
343:13, 344:6
344:11, 345:14
345:20, 346:1
350:5, 350:25
**objective** 301:14
**observations**
308:23
**observe** 302:1
**observed** 237:18
257:15, 258:7
261:14, 263:14
267:21, 268:6
276:21, 302:15
302:15, 303:5
303:16, 303:22
305:1, 308:13
318:18
**observing** 302:7
303:13
**obtain** 299:17
**obtained** 295:24
299:8, 330:4
**obtaining** 300:4
**obviously** 303:4
320:11
**occupational**

222:14
**occurred** 210:1
210:6
**October** 244:20
245:2, 245:13
245:17, 246:18
249:12, 264:7
264:12, 266:6
267:11, 269:11
272:23, 280:15
317:19, 323:13
324:23
**offer** 251:14
254:11
**offering** 352:9
**official** 251:16
314:10, 314:20
315:2, 315:5
**oh** 332:14
**okay** 213:4
221:21, 235:10
235:12, 236:8
236:9, 237:2
237:8, 238:6
238:7, 238:9
238:10, 239:1
239:8, 239:22
242:25, 243:12
244:15, 246:5
246:8, 247:14
247:23, 252:20
253:8, 256:15
260:3, 260:4
264:14, 266:5
268:3, 270:24
272:13, 273:25
277:10, 278:16
281:20, 288:18
290:17, 296:8
307:12, 322:19
326:7, 335:7
350:8, 352:20
**once** 309:11
**ones** 250:16
273:24, 351:7
**open** 295:10

299:18
**opinion** 261:10
277:3, 351:9
**opportunity**
313:16, 344:21
**opposed** 298:7
**optical** 256:22
257:12, 257:16
263:9, 263:19
**Oral** 203:11
**order** 229:19
315:13, 336:24
**ore** 257:9
316:19, 316:22
**organizations**
312:15
**origin** 252:4
285:14, 285:19
**original** 286:18
315:11, 319:15
319:16, 341:12
342:4
**Original/Altered**
356:15
**originals** 242:20
**originated**
310:17
**outlined** 268:25
**outside** 254:4
305:17, 354:1
**ovarian** 214:1
**ovaries** 295:12
295:12
**ovary** 295:18
295:25, 356:9
**overload** 213:13
**oversee** 219:24

**P**

**P-2** 209:18
**P-3** 234:10
235:3
**P-6** 353:15
353:17, 353:18
357:18

**P.C** 204:3
204:13
**p.m** 280:1
354:6
**page** 206:2
211:3, 212:21
213:1, 216:7
221:10, 223:15
229:18, 229:18
230:1, 231:11
233:14, 237:14
237:23, 240:10
241:14, 241:23
242:5, 242:13
243:10, 243:23
243:23, 244:12
249:22, 249:24
250:8, 252:24
253:2, 253:9
254:1, 257:13
258:9, 258:25
259:23, 259:24
261:1, 264:2
265:3, 266:3
269:3, 269:17
274:11, 275:22
278:23, 282:6
287:15, 311:19
318:5, 318:12
319:7, 320:14
327:9, 332:19
335:3, 336:15
337:4, 337:9
338:8, 340:16
343:22, 351:12
352:18, 352:18
356:2, 357:2
357:17
**pages** 206:11
225:18, 334:22
334:23, 334:23
335:4, 353:7
**paid** 225:2
225:10, 225:21
225:23, 226:8
298:3, 309:16

309:17
**Pakistan** 285:21
287:13
**paper** 248:12
248:18, 278:9
295:16, 296:18
310:19, 310:25
311:1, 349:4
**paragraph**
242:14, 242:18
249:13, 251:17
290:5, 306:10
311:19
**Paralegal**
205:14
**parenthesis**
262:6
**Park** 204:14
205:3
**PARNELL**
204:8
**part** 208:19
212:1, 213:21
215:1, 219:16
220:6, 262:13
264:4, 265:11
282:4, 293:24
301:7, 304:23
311:7, 342:6
349:14
**partial** 333:13
334:12, 334:17
**participants**
228:6
**participate**
224:13
**participated**
213:23, 225:25
226:16
**particle** 236:23
239:6
**particles** 264:20
296:3, 303:3
330:24
**particular**
210:14, 228:10

280:24, 282:18
283:5
**particularly**
312:2
**parties** 355:17
**parts** 287:3
329:5, 334:17
341:20
**pass** 219:8
255:4
**Paterson** 203:14
**pathology**
213:14
**patients** 295:24
**pattern** 262:14
330:25
**patterns** 261:14
261:15, 287:21
328:4, 331:16
**pay** 226:15
**paying** 298:19
**PC** 205:14
**PCPC** 211:13
215:15, 215:22
**pedigree** 282:24
**Pennsylvania**
204:19
**people** 217:9
225:2, 225:10
225:21, 225:23
226:8, 226:17
227:17, 228:18
277:12, 281:7
298:14, 320:1
344:24
**percent** 220:11
259:14, 259:22
266:21, 267:7
279:7, 291:22
296:4, 318:12
318:19, 345:24
**perfect** 331:16
**performed**
306:15
**period** 215:6
215:11, 217:18

220:18, 287:21
**permission**
  299:21, 299:25
**person** 247:11
  281:9, 312:5
  320:10, 321:7
  334:25
**personal** 219:11
  322:24
**personalities**
  310:9, 310:13
**perspective**
  312:24
**peruse** 248:20
**petition** 212:18
  213:1, 213:25
  214:6, 214:7
  214:11, 214:21
  214:25, 216:16
  220:21
**Petterson**
  322:24, 356:18
**ph** 271:19
  271:20
**pharmaceutical**
  298:16
**PhD** 223:1
**Philadelphia**
  204:19
**Phone** 203:24
**photo** 338:19
**photographs**
  238:15
**physical** 243:12
  243:20, 252:15
  253:16
**pick** 352:12
**picked** 228:21
  323:15, 324:25
**picture** 241:8
  319:20
**pictures** 296:9
  338:19
**pieces** 339:22
  339:23
**pivot** 217:15

217:16, 217:23
**place** 218:15
  242:19, 255:2
  256:14, 355:13
**places** 288:17
**Placitella** 204:3
  204:5, 205:14
  206:4, 207:10
  232:6, 242:22
  242:25, 258:13
  258:17, 258:20
  279:17, 280:4
  325:16, 325:25
  347:14, 347:18
  351:17, 351:20
  352:1, 352:5
  352:13, 352:16
  353:14, 353:24
**Plaintiff** 204:6
**play** 231:11
  232:19
**played** 231:14
  232:21
**playing** 217:7
  218:2
**please** 231:1
  244:19, 261:18
  265:2, 265:20
  267:1, 267:24
  273:11, 275:3
  276:8, 276:24
  294:6, 313:19
  325:10, 336:10
  336:12
**PLM** 258:5
  274:8, 275:4
**point** 218:5
  218:6, 239:3
  251:8, 255:6
  265:2, 281:18
  292:15, 302:11
  350:4
**pointed** 207:17
  282:7
**points** 207:18
  217:25, 229:25

**polite** 207:19
**Pollack** 247:6
**Pooley** 221:11
  222:6, 239:4
  239:7, 239:9
  243:15, 245:14
  247:3, 250:12
  250:14, 250:17
  250:23, 250:24
  250:25, 251:3
  251:9, 251:13
  251:15, 251:17
  260:9, 261:5
  261:19, 269:10
  269:13, 269:24
  276:12, 276:17
  276:25, 277:16
  282:8, 283:16
  284:13, 286:16
  286:19, 286:25
  288:8, 288:20
  290:8, 290:18
  291:1, 291:8
  291:10, 291:17
  291:18, 291:19
  291:22, 292:22
  292:25, 302:20
**Pooley's** 251:18
  286:13, 286:22
  287:24
**PORTION**
  209:15
**posed** 231:25
**position** 309:2
  309:5, 326:23
**positive** 219:1
  276:18
**positively**
  265:15, 328:1
**possession**
  233:17
**possible** 228:6
  266:14, 309:3
  312:1, 327:24
  336:16, 336:25
  356:23

**possibly** 266:16
**post** 293:15
  352:25
**potentially**
  285:24, 308:23
**powder** 236:10
  245:7, 245:11
  245:15, 261:2
  262:22, 263:1
  263:6, 263:21
  267:3, 267:12
  268:14, 269:20
  270:8, 270:21
  271:1, 271:9
  272:2, 278:25
  279:7, 281:15
  281:16, 302:11
  304:21, 306:13
  307:22, 312:25
  316:11, 316:15
  316:18, 316:23
  317:1, 317:3
  317:20, 318:15
  319:22, 320:8
  321:25, 322:9
  322:14, 323:5
  323:24, 324:2
  325:7, 325:14
  327:16, 333:4
  333:22, 336:2
  343:10
**powdered**
  336:19
**powders** 287:19
**power** 300:13
**pp** 356:17
**Practice** 203:12
**Pre** 224:3
**precision**
  217:12
**prefer** 262:9
**preliminary**
  221:19
**preparation**
  219:17, 302:1
  318:4, 328:11

330:11, 332:10
  336:14
**prepare** 223:13
  229:15
**prepared**
  211:21, 229:16
  229:17, 298:2
  302:18, 303:2
  333:6, 333:20
**preparing**
  208:22, 209:1
  335:23
**presence** 231:9
  237:11, 249:14
  250:10, 255:10
  260:18, 276:5
  303:17, 305:8
**present** 205:13
  213:24, 224:1
  242:18, 263:5
  266:15, 266:17
  269:20, 271:18
  274:23, 306:12
  308:14, 321:17
**presented**
  252:24
**president** 310:6
  322:24, 323:1
**press** 306:19
  306:21, 307:1
  307:2, 307:6
**previous** 218:12
  218:22, 231:14
  232:21, 241:22
**previously**
  210:12, 214:14
  216:20, 225:5
**primary** 220:2
  240:17
**Princeton**
  268:13, 272:7
  273:19, 273:23
**printed** 258:22
**Prints** 332:22
**prior** 208:15
  218:15, 219:21

230:7, 323:9
355:5
**probable** 266:20
267:6
**probably** 209:4
210:15, 215:12
261:9, 261:11
269:1, 325:25
347:10
**problem** 347:15
**procedure**
203:12, 333:25
**procedures**
257:2
**proceed** 207:6
249:4, 280:2
325:23
**process** 299:23
300:3
**processes** 300:6
**produced** 257:2
323:7, 327:10
348:11
**product** 232:1
233:5, 239:19
248:2, 248:15
251:24, 252:10
254:2, 259:9
274:18, 274:21
280:25, 281:14
282:12, 314:6
326:24, 327:6
329:10
**production**
218:9, 218:13
219:8, 316:12
329:9
**products** 203:3
211:7, 219:7
219:23, 219:24
220:4, 222:13
231:18, 233:7
235:24, 250:9
250:10, 251:25
252:2, 254:20
255:19, 257:1

257:10, 257:16
258:5, 259:5
282:20, 290:7
298:15, 312:1
346:11, 353:3
**professionals**
299:5
**Professor**
240:24, 245:14
285:10, 285:10
343:24
**profile** 303:15
**program** 223:22
**promise** 238:4
240:18, 273:8
314:22, 314:24
315:3, 316:2
326:9, 350:12
**promised**
313:14, 314:18
326:1, 351:21
**proper** 329:4
**proposal** 351:16
**proposed** 279:7
289:18, 293:21
**Prosecco** 210:13
210:19
**Protection**
307:11
**prove** 218:5
**proved** 269:2
269:6
**provide** 217:24
349:11, 349:20
350:20, 350:21
351:4, 353:12
**provided** 209:24
211:15, 215:14
218:6, 233:2
233:11, 233:18
235:11, 235:17
235:22, 243:10
243:13, 243:19
293:13, 294:16
333:18, 334:4
334:5, 334:7

335:14, 339:1
339:13, 344:4
351:8, 351:10
353:1
**proving** 218:6
**public** 203:13
314:2, 355:3
355:24
**publically** 222:5
**publication**
295:10, 308:23
**publications**
297:19
**publish** 308:17
**published**
216:21, 229:2
243:4, 310:19
311:1
**pull** 222:21
224:1, 234:21
237:25
**pure** 303:14
**purity** 284:25
**purpose** 256:25
257:24, 260:17
261:20, 265:22
266:15, 339:4
346:15, 348:13
**purposely**
328:23
**pursuant**
203:12
**put** 211:2
214:20, 216:23
217:10, 226:10
226:12, 234:22
239:11, 255:2
258:3, 259:17
262:7, 262:11
263:21, 263:24
273:24, 277:14
277:17, 281:19
283:25, 288:16
289:6, 291:3
291:7, 292:4
292:5, 294:6

302:22, 306:25
319:14, 342:2
343:22, 345:17
348:11, 348:17
351:3
**puts** 217:2
**putting** 229:6
229:13, 286:8

**Q**

**quality** 220:8
223:18
**quantification**
306:15
**quantifying**
346:10
**quantities**
321:17
**quartz** 271:20
**Quebec** 265:8
**question** 212:7
216:10, 219:15
219:21, 226:12
231:1, 231:9
231:23, 232:9
239:15, 255:6
255:7, 263:7
281:3, 283:20
288:24, 305:18
305:24, 309:7
314:17, 320:3
323:3, 323:25
325:10, 339:11
339:14, 350:19
351:2, 353:4
**questions**
207:24, 223:23
298:13
**quick** 253:5
**quickly** 350:2
**quite** 275:8
299:18, 323:25
**quota** 274:25
**quotations**
226:10

**quote** 262:3
267:4, 272:3
274:12, 275:6
275:11, 275:16
278:10, 278:11
291:12, 292:4
293:3, 340:17
340:23
**quotes** 263:24
265:23
**quoting** 340:25
345:12

**R**

**Rachel** 222:23
222:25
**raise** 296:14
**raised** 214:7
230:23, 231:4
231:19, 231:21
255:6, 298:13
**ran** 248:6
259:12
**random** 223:9
**rat** 213:8
213:16
**Raw** 238:17
**re-reviewed**
273:2
**reached** 228:18
229:1
**reacted** 308:3
**read** 210:10
211:3, 212:9
215:16, 220:7
222:23, 306:8
324:20
**reading** 223:6
278:9, 343:22
**realize** 243:20
**really** 216:25
217:21, 219:14
292:20, 329:10
330:2, 346:23
351:22, 353:8

reason 325:9
reasons 297:16
recall 226:6
  226:22, 228:12
  230:19, 232:7
  232:10, 232:13
  233:8, 234:9
  280:19, 295:7
  310:1, 312:15
  312:19, 314:12
  319:2, 326:19
  331:23, 336:4
  346:9, 346:22
received 287:10
  300:11, 302:2
  313:6, 320:15
  320:20, 321:8
  336:20
recess 248:25
  279:23, 325:19
recipient 257:24
  348:12
recognition
  311:23
recollection
  210:6, 223:22
  227:1
recommendati...
  228:3, 228:8
record 207:2
  207:5, 235:16
  236:5, 248:24
  249:3, 279:21
  280:1, 280:9
  319:15, 324:20
  325:18, 325:23
  346:25, 347:24
  351:23, 352:14
  352:24, 353:25
  354:5
records 293:25
  294:4, 294:18
  327:4, 327:5
recreate 227:13
Red 204:4
redundancy

224:3
redundant
  229:21
refer 239:2
  252:4, 331:22
reference 213:3
  229:23, 230:5
  230:6, 238:13
  239:3, 239:18
  239:24, 241:20
  242:4, 243:15
  243:16, 243:22
  245:24, 245:25
  249:13, 249:16
  250:8, 250:12
  252:21, 252:22
  289:12, 342:13
  345:13, 350:11
referenced
  244:2, 338:20
  339:8
references
  295:5
referencing
  241:14, 277:13
referred 264:20
  281:13, 286:12
  286:19
referring
  233:20, 244:6
  244:11, 253:22
  284:15, 288:6
  308:11, 317:18
  322:11, 342:2
  342:3, 342:7
  342:18, 344:23
refers 251:5
  251:12, 280:24
  282:17, 338:24
  341:11
reflect 276:9
  277:1
reflects 315:21
  332:2
refresh 326:21
refute 316:5

regarded 211:6
regarding 243:6
regular 287:7
regulation
  289:18
Regulatory
  228:19
relate 323:4
related 210:12
  211:24, 212:2
  212:12, 214:11
  214:19, 215:11
  216:23, 217:14
  219:6, 223:23
  224:18, 226:18
  227:22, 228:25
  229:8, 230:8
  230:12, 238:22
  239:13, 246:15
  248:2, 249:7
  252:1, 254:19
  255:25, 257:13
  281:23, 326:6
  327:5, 330:19
  331:5, 340:3
relates 226:7
  327:16, 327:19
relating 250:23
relation 324:3
relationship
  314:10, 314:15
relative 332:23
  355:16, 355:18
release 219:4
  313:15, 313:20
released 219:7
  314:11, 314:19
  315:1
relevance
  213:17
relevant 220:3
  289:3
relied 218:4
remainder
  326:5
remember

221:12, 228:13
255:1, 286:18
321:6, 346:17
repeat 231:1
  262:17
repeated 239:22
repeatedly
  230:24, 231:4
  231:19
Replaced
  317:24
reply 283:19
report 211:12
  211:15, 211:17
  211:20, 211:23
  229:22, 237:4
  237:5, 237:15
  237:22, 239:4
  239:5, 239:6
  239:6, 239:9
  239:11, 239:17
  240:5, 240:25
  243:13, 243:16
  243:18, 243:19
  243:21, 243:22
  244:5, 244:14
  244:23, 245:2
  245:5, 245:5
  245:9, 245:9
  245:13, 245:14
  245:17, 245:18
  245:19, 245:24
  245:25, 246:3
  246:7, 246:8
  246:17, 246:20
  246:22, 246:25
  247:3, 247:8
  247:13, 247:14
  247:20, 247:24
  249:6, 249:14
  249:16, 249:17
  249:18, 249:25
  250:12, 250:13
  250:17, 250:18
  250:22, 250:24
  251:3, 251:6

251:6, 251:9
251:16, 251:18
252:16, 253:14
253:16, 253:19
254:2, 254:3
254:9, 254:11
254:11, 254:15
254:18, 257:7
259:19, 260:9
260:12, 261:20
262:4, 262:21
264:16, 266:6
267:10, 268:12
269:10, 271:9
272:1, 272:7
272:22, 273:16
273:17, 274:5
274:11, 274:12
274:22, 281:13
286:13, 286:23
287:24, 288:2
288:2, 304:10
304:25, 313:7
313:11, 313:15
313:16, 313:20
313:24, 314:11
314:19, 316:24
317:1, 317:2
317:6, 317:9
317:10, 317:11
317:13, 317:14
317:16, 317:19
317:23, 318:2
318:5, 318:23
319:1, 319:17
319:17, 320:15
320:20, 320:23
328:16, 335:17
335:22, 336:1
336:4, 336:6
339:1, 339:4
339:13, 339:16
339:21, 339:23
340:2, 340:6
340:8, 340:11
340:16, 340:17

340:22, 341:1
341:4, 341:15
341:19, 342:11
342:25, 343:8
344:2, 345:11
345:16, 356:11
356:11, 356:13
356:15
**reported** 242:7
251:1, 251:4
252:13, 252:14
290:6, 290:18
291:2, 291:16
305:22, 306:18
306:21, 312:24
313:2, 324:13
341:2
**reporter** 203:13
207:5, 355:4
**reporting**
250:19, 254:13
**reports** 236:10
238:21, 238:24
238:25, 239:4
239:7, 239:13
243:5, 243:7
243:9, 244:16
244:22, 245:22
246:15, 247:17
249:19, 252:25
253:12, 253:17
254:6, 268:19
318:8, 329:5
340:10, 341:13
**represent** 348:4
**representations**
230:16, 233:13
**representative**
234:16, 237:1
322:2
**reputation**
296:22
**request** 254:10
326:3
**requested**
336:24

**research** 262:22
266:7, 275:24
295:19, 299:4
309:17, 310:18
321:2
**respectfully**
339:10, 345:2
**respond** 315:13
**response** 212:25
214:20, 215:1
220:20
**responsive**
207:24
**rest** 335:7
**result** 238:19
248:7, 251:21
275:23, 277:2
277:7, 293:14
333:21
**results** 218:19
220:8, 221:15
221:18, 222:5
223:8, 235:22
236:5, 236:18
236:19, 236:21
236:22, 237:9
237:16, 238:16
238:17, 238:22
239:20, 240:13
240:15, 241:15
241:16, 242:1
242:2, 242:5
242:7, 243:4
243:4, 243:17
247:7, 247:9
247:11, 247:17
248:3, 248:14
248:16, 250:19
251:1, 251:3
251:10, 251:13
251:15, 252:9
252:13, 252:14
253:17, 253:23
254:8, 254:9
254:14, 254:14
254:19, 254:22

254:24, 255:5
255:10, 255:24
272:25, 273:20
273:23, 276:18
277:12, 277:16
278:18, 280:17
286:19, 292:3
293:12, 294:1
294:17, 296:2
306:20, 313:3
313:7, 314:5
314:7, 315:9
315:14, 316:5
317:13, 319:7
324:5, 337:9
341:12, 341:24
349:1, 349:8
349:15, 349:18
349:19, 349:22
349:23, 350:1
350:3, 353:5
357:4
**retained** 311:24
**retested** 222:9
**retracted**
221:18, 222:5
313:3, 315:8
**retrieved** 246:4
**returned** 309:9
**Reuter's** 216:18
**Reuters** 210:9
216:21, 217:15
229:1
**revealed** 258:1
258:5
**review** 208:10
210:4, 210:7
273:4, 293:23
312:20, 313:16
336:13, 341:25
**reviewed** 211:5
220:8, 230:16
242:15, 349:22
**reviewing**
209:23, 230:13
233:11

**Revised** 320:15
320:20
**Revlon** 204:10
**Reynolds** 257:5
258:4
**right** 209:9
225:1, 240:2
241:9, 242:2
245:1, 245:3
247:8, 248:13
249:19, 251:2
261:16, 261:17
262:18, 266:1
267:25, 268:4
269:16, 272:21
275:5, 275:8
275:15, 276:18
277:21, 280:12
280:17, 281:19
282:4, 282:8
282:13, 283:9
283:10, 284:2
286:3, 286:9
286:16, 288:1
288:13, 291:13
292:8, 292:17
292:18, 297:9
298:3, 298:20
299:16, 300:13
307:12, 308:7
309:12, 309:16
310:19, 311:5
311:8, 314:7
319:23, 320:23
321:1, 321:9
321:10, 322:14
323:9, 324:16
327:11, 330:16
332:14, 335:18
335:20, 339:24
340:14, 340:17
341:2, 341:4
341:8, 341:20
342:11, 343:1
344:5, 346:10
349:5, 349:10

351:4, 353:11
**Risk** 219:22
**Road** 205:3
**Robert** 250:7
**robin** 280:17
280:19, 281:5
**rods** 267:21
268:6, 318:18
**role** 216:2
219:21, 223:20
241:21
**rolled** 221:17
263:15
**ROME** 204:18
**Roth** 204:3
205:14
**round** 280:17
280:19, 281:5
**routinely** 290:1
**Rubin** 222:23
**Rubino** 222:25
223:2
**rude** 234:9
**Rules** 203:12
**run** 270:7
**running** 323:22

## S

**safe** 211:6
**safety** 211:24
216:23, 217:14
219:22, 219:24
226:18, 229:6
**sample** 237:1
240:6, 241:24
241:25, 242:4
242:16, 269:10
273:13, 274:23
282:23, 304:24
304:24, 306:4
309:9, 332:9
342:12, 342:23
343:19, 343:23
344:16
**sampled** 260:25

| | | | | |
|---|---|---|---|---|
| **samples** 212:15 | **sampling** 224:5 | 334:3, 336:19 | **screen** 237:25 | 311:18, 312:3 |
| 221:24, 221:25 | **Sandlin** 250:6 | 337:18, 338:8 | 240:9, 244:11 | 312:4, 314:2 |
| 222:7, 222:9 | **satisfy** 262:8 | 340:15, 341:1 | 257:20, 294:13 | 317:17, 317:21 |
| 240:1, 240:23 | **save** 333:22 | 341:12, 342:4 | 297:8, 306:25 | 317:24, 319:3 |
| 240:23, 241:1 | **saw** 353:5 | 343:25, 344:13 | **se** 225:16 | 319:5, 319:9 |
| 242:17, 243:3 | **saying** 221:18 | **scanning** 244:3 | **search** 269:5 | 319:17, 319:19 |
| 249:25, 251:14 | 233:21, 234:1 | 265:4, 265:14 | **second** 234:8 | 320:14, 322:20 |
| 257:12, 260:13 | 252:9, 275:9 | 266:24, 270:14 | 242:14, 251:8 | 323:10, 324:2 |
| 261:6, 262:4 | 279:3, 292:1 | 270:23, 271:3 | 251:17, 259:8 | 327:11, 327:17 |
| 266:21, 267:7 | **says** 217:6 | 274:19, 275:9 | 265:3, 273:19 | 327:20, 328:7 |
| 267:21, 268:6 | 217:15, 218:16 | 336:24, 339:5 | 282:6, 320:14 | 328:20, 330:6 |
| 269:20, 270:20 | 225:2, 227:24 | **scans** 278:17 | 327:9 | 330:21, 331:1 |
| 271:1, 274:17 | 240:1, 240:21 | 278:24 | **secondly** 301:8 | 331:11, 331:14 |
| 275:17, 281:6 | 242:8, 250:14 | **Schaefer** 244:20 | **section** 216:25 | 331:16, 332:5 |
| 281:9, 282:8 | 257:11, 257:14 | 246:14 | 327:20, 330:21 | 332:8, 332:25 |
| 282:24, 284:2 | 264:19, 265:1 | **Schaffner** 246:1 | 331:11 | 334:19, 336:17 |
| 287:2, 287:6 | 265:7, 266:20 | 249:24, 250:7 | **see** 212:20 | 336:21, 337:2 |
| 287:10, 287:20 | 267:25, 268:5 | 340:5 | 212:24, 237:10 | 337:4, 337:9 |
| 288:7, 288:11 | 268:5, 269:2 | **Schelz** 249:12 | 238:12, 239:12 | 337:11, 337:12 |
| 290:9, 290:10 | 269:19, 271:22 | 270:11, 270:24 | 239:21, 244:9 | 338:12, 339:3 |
| 290:14, 290:22 | 272:14, 274:16 | 280:16 | 245:5, 245:9 | 339:7, 340:19 |
| 291:6, 291:14 | 276:18, 278:14 | **School** 237:20 | 245:13, 245:18 | 342:10, 345:19 |
| 291:14, 291:20 | 278:21, 278:23 | 239:5, 245:2 | 245:22, 245:25 | 346:10, 347:12 |
| 291:23, 291:25 | 279:5, 279:15 | 246:25, 259:1 | 246:6, 247:7 | 348:2, 348:9 |
| 292:1, 293:9 | 283:9, 283:19 | 259:18, 266:7 | 248:20, 256:18 | 348:13, 348:17 |
| 302:16, 302:18 | 283:25, 284:23 | 275:23, 285:9 | 257:19, 258:1 | 349:4, 352:19 |
| 304:1, 304:2 | 285:13, 287:6 | 295:7 | 259:1, 259:5 | **seeing** 336:4 |
| 307:21, 308:7 | 288:4, 289:25 | **Schultz** 280:16 | 261:2, 261:20 | **seeking** 311:23 |
| 309:11, 309:14 | 290:4, 290:5 | **Science** 336:7 | 262:24, 264:22 | **seen** 218:12 |
| 313:2, 315:15 | 290:17, 291:13 | 356:23 | 265:1, 265:5 | 221:14, 221:17 |
| 315:23, 316:1 | 291:18, 291:25 | **scientific** 222:1 | 265:6, 265:11 | 221:25, 292:2 |
| 318:18, 321:25 | 298:2, 302:10 | 229:7, 229:13 | 265:21, 266:7 | 295:21, 318:1 |
| 321:25, 322:2 | 303:1, 303:8 | 298:7, 298:12 | 267:5, 273:1 | 318:3, 319:1 |
| 322:7, 327:23 | 303:8, 303:12 | 300:20, 308:24 | 274:14, 274:25 | 328:13, 330:8 |
| 331:15, 331:23 | 304:13, 304:16 | 309:8 | 275:17, 281:15 | 333:13, 335:21 |
| 331:24, 332:9 | 306:16, 309:1 | **scientist** 241:22 | 282:10, 284:21 | 336:8, 336:13 |
| 332:17, 333:6 | 310:15, 310:20 | 253:15, 253:20 | 285:2, 285:6 | 339:17, 346:5 |
| 333:23, 334:3 | 311:11, 311:13 | 254:3, 312:11 | 285:15, 286:12 | 348:7 |
| 336:17, 336:23 | 317:23, 318:17 | **scientists** 217:21 | 287:22, 289:20 | **select** 281:6 |
| 337:1, 340:13 | 320:15, 320:20 | 241:21, 284:24 | 294:13, 295:19 | **selected** 227:25 |
| 342:19, 343:16 | 320:24, 323:12 | 299:3, 299:4 | 296:21, 297:1 | 228:9, 339:23 |
| 343:23, 344:3 | 323:17, 324:17 | **scope** 306:6 | 297:17, 300:14 | **Selikoff** 295:6 |
| 344:9, 344:10 | 324:19, 324:22 | 330:12, 330:14 | 302:12, 303:6 | 296:21, 297:2 |
| 344:18, 344:22 | 325:1, 325:3 | **scratch** 235:18 | 303:10, 303:18 | 297:9, 297:12 |
| 345:4, 345:5 | 327:22, 328:14 | 266:13, 296:12 | 303:23, 305:13 | 297:17, 297:22 |
| 356:24 | 330:23, 332:20 | 346:4 | 308:15, 310:5 | 298:2, 298:19 |

299:14, 300:9
300:11, 301:11
302:7, 306:18
307:6, 309:19
309:22, 310:14
311:4, 311:16
**Selikoff's** 297:4
**SELVAGGIO**
203:7
**SEM** 264:25
265:22, 274:9
275:5
**send** 254:11
313:10, 349:12
**sending** 227:17
**sense** 210:24
288:21
**sensitivity**
331:25
**sent** 227:20
234:11, 249:19
254:9, 254:12
254:13, 276:12
281:6, 282:16
288:17, 307:18
308:7, 314:7
318:23, 322:7
327:3, 345:11
349:11
**sentence** 269:4
291:25
**separate** 209:16
251:3, 252:16
253:16, 307:9
**September**
243:14, 244:24
247:1, 247:4
247:15, 247:18
249:24, 264:16
270:9, 272:19
275:22, 276:13
281:24
**sequence** 312:8
**series** 239:3
**serious** 298:10
**serpentine**

266:14, 266:16
331:15
**served** 309:20
**SERVICES**
203:22
**Sesquicitrate**
321:15
**set** 220:14
220:17, 220:22
220:24, 221:4
237:19, 355:14
**setting** 298:9
**shape** 323:14
324:15, 324:24
**share** 254:8
299:13, 313:25
**shared** 238:14
243:15, 253:23
255:16, 328:10
330:10, 334:14
348:20
**sharing** 255:4
299:19
**sheet** 235:10
235:21, 238:9
256:8
**shelves** 224:2
**shift** 326:5
**shipment** 290:1
**shipments**
287:22, 323:8
**shipped** 288:22
**shortcut** 346:25
**Shorthand**
355:4
**show** 244:10
338:10, 347:9
347:13
**showed** 216:12
241:1, 268:1
323:8, 345:9
**Shower** 241:24
241:24, 242:16
242:16, 244:17
244:17, 246:15
246:15, 271:10

271:10, 272:8
272:8, 273:12
273:12, 273:17
273:18, 274:5
274:5, 274:18
274:18, 275:5
275:5, 276:2
276:2, 276:15
276:15, 277:23
277:24, 278:5
278:6, 278:15
278:15, 278:18
278:18, 278:24
278:25, 279:6
279:6, 312:25
313:1, 326:6
326:7, 326:12
326:12, 326:24
326:24, 327:6
327:6, 327:16
327:16, 327:19
327:19, 327:22
327:22, 328:5
328:5, 328:24
328:24, 329:13
329:14, 331:7
331:7, 331:11
331:12, 331:21
331:21, 332:6
332:6, 332:20
332:20, 332:21
332:21, 337:5
337:6, 338:1
338:1, 338:6
338:6, 338:15
338:15, 340:3
340:4, 344:3
344:4, 344:17
344:18, 345:4
345:4, 348:16
348:16
**showing** 323:12
324:22, 345:23
**showings** 323:5
**shown** 257:25
268:3, 274:21

275:17
**shows** 306:12
319:15
**side** 216:8
321:16, 345:17
345:18
**signature** 335:1
**signed** 323:18
334:20, 334:25
**significant**
234:4
**similar** 218:25
229:14, 303:14
**similarity**
321:13
**similarly** 221:22
**Sinai** 221:13
295:7, 296:21
301:23, 307:6
**single** 216:17
284:12, 287:20
**sit** 255:8, 325:4
325:11, 335:23
338:25, 339:12
**sites** 286:6
**sitting** 305:21
**situation** 213:12
**size** 236:23
239:6
**skip** 277:20
**skipped** 265:25
277:8, 277:9
**small** 261:8
262:5
**smaller** 212:23
212:25
**Smith** 204:20
219:19, 227:4
230:25, 231:7
232:3, 234:6
242:19, 242:24
252:12, 255:12
255:14, 258:11
258:15, 258:19
268:15, 278:13
288:19, 291:4

292:19, 293:5
294:3, 294:25
296:17, 300:18
305:25, 307:8
308:2, 308:18
309:6, 309:25
310:24, 311:9
311:17, 312:13
312:18, 313:22
314:13, 319:25
320:9, 321:21
322:4, 322:10
322:16, 322:22
324:18, 325:2
326:4, 327:7
328:8, 329:1
329:7, 329:16
329:19, 329:25
330:18, 331:2
331:8, 331:20
332:15, 333:1
333:12, 333:17
333:24, 334:1
334:9, 335:8
335:13, 335:19
336:3, 337:7
339:25, 340:18
341:10, 341:22
342:21, 343:2
343:5, 343:11
343:13, 344:6
344:11, 345:14
345:20, 346:1
347:12, 347:16
350:5, 350:25
351:15, 351:18
351:24, 352:3
352:9, 352:15
356:5, 356:7
356:8
**Society** 297:19
**sold** 236:7
286:8
**solely** 210:7
**solid** 238:25
**somebody**

250:23, 293:4
324:21, 332:13
347:6
**somebody's**
300:14
**soon** 294:7
**sorry** 219:14
236:3, 241:6
244:10, 250:4
263:7, 271:10
272:21, 281:2
286:3, 320:19
**sort** 218:10
**sounds** 322:18
**source** 211:22
252:5, 253:21
281:8, 281:16
289:8, 291:3
291:5, 291:5
316:14, 316:16
323:23, 335:10
335:12
**sourced** 252:3
288:25, 289:1
**sources** 283:23
284:9, 284:11
285:1
**South** 251:25
287:12
**Space** 336:7
356:23
**speak** 208:12
230:4
**special** 326:15
**specific** 243:22
248:15, 252:1
342:18
**specifically**
228:4, 239:14
292:22, 299:24
317:17
**specifications**
219:5, 220:3
**specifics** 346:9
**specified** 282:12
**specimens**

**283:20, 336:19**
338:15
**spend** 208:21
209:2, 210:24
221:8, 233:10
**Sperry-Rand**
240:21, 244:23
264:17, 265:21
274:13, 275:6
275:11
**spoke** 230:1
349:16
**spoken** 215:5
349:17
**spread** 209:6
**SPS** 274:1
**square** 204:18
332:24
**Squibb** 284:5
**stack** 349:4
**Stadlin** 282:1
**standard** 212:16
220:24, 255:1
255:3, 255:4
293:20, 293:21
337:15
**standards** 219:4
219:9, 219:9
220:6, 220:7
220:10, 220:14
220:17, 220:22
**standing** 303:22
303:24, 304:10
305:5
**Stanley** 215:8
215:11, 227:19
**star** 227:24
**start** 209:15
236:1, 256:16
310:16, 340:25
**started** 223:19
295:9, 297:2
310:25, 311:6
**starting** 211:16
223:15, 244:12
**starts** 223:11

229:20
**state** 203:13
304:19, 306:3
306:11, 308:22
310:16, 338:13
355:4, 355:24
**stated** 242:16
278:8
**statement** 242:6
342:24
**statements**
225:16, 307:5
**states** 267:20
284:8, 285:25
286:1, 286:25
287:17, 287:25
288:17, 289:9
299:9, 300:8
300:16, 305:3
323:3
**stenographic**
207:5
**stenographically**
355:12
**step** 266:24
270:13, 270:23
271:3
**steps** 298:11
**Stewart** 242:14
244:7, 274:7
**stimulate**
225:13, 225:16
**stop** 210:17
210:19
**story** 301:11
301:13, 310:10
335:10
**straight** 261:20
**stranded** 338:10
**Street** 203:14
203:22, 205:8
**stress** 213:12
**strike** 233:1
339:10, 345:2
345:10
**structures** 303:5

**studied** 295:23
304:2
**studies** 223:2
246:3, 253:18
257:12, 257:16
258:4, 284:25
**study** 213:8
213:8, 213:10
213:11, 213:16
213:20, 222:19
222:22, 245:10
251:14, 256:25
287:2, 290:7
290:8, 291:13
301:7, 309:9
346:15, 346:25
**studying** 312:1
**stuff** 265:25
288:3, 324:16
341:5, 341:7
**subcommittee**
250:7, 282:3
**subject** 213:14
233:22, 235:18
242:17, 253:10
289:17, 292:17
302:10, 310:9
**submit** 228:7
**submitted**
339:21
**subpoenas**
327:4
**subsequent**
283:11
**substance**
208:14, 235:4
**substances**
237:12
**substantially**
268:1, 268:4
268:5
**Substantive**
234:18
**sudden** 300:15
**suggestion**
352:21

**suggests** 308:22
**suit** 339:23
**Suite** 203:22
**summaries**
282:16
**summarized**
254:9
**summarizes**
253:12
**summary**
229:22, 242:6
251:18, 282:14
286:13, 306:2
318:6, 319:3
**Superior** 203:1
203:12
**supplied** 210:8
255:9, 255:24
260:13, 312:17
338:15, 349:9
349:23
**supplier** 285:24
328:17, 328:17
329:12
**support** 233:12
274:11, 326:22
**supported** 225:7
226:1
**supporting**
252:15
**supposed** 274:2
**sure** 217:25
231:2, 235:10
235:16, 235:21
236:22, 238:8
240:9, 241:2
241:8, 242:3
243:23, 248:22
249:21, 253:25
256:5, 256:7
256:10, 257:18
265:3, 273:21
275:8, 278:7
278:11, 278:21
279:9, 280:14
281:4, 290:15

300:4, 300:9
329:8, 352:15
**Surveillance**
219:22
**survey** 214:16
254:23, 284:13
**Susan** 203:9
206:3, 207:4
**suspect** 328:5
**swear** 207:5
**sworn** 207:8
355:7
**symposium**
212:12
**Szczepaniak**
228:15, 228:19

**T**

**tab** 211:10
211:12, 229:25
234:21, 236:9
238:11, 239:11
239:17, 240:13
240:20, 240:22
241:3, 241:4
241:16, 241:20
242:11, 242:12
244:1, 244:7
244:9, 244:10
244:16, 244:18
244:23, 245:1
245:1, 245:23
245:25, 246:9
247:20, 247:22
249:11, 249:23
250:2, 251:12
251:21, 251:22
252:21, 253:6
253:21, 254:1
256:17, 257:22
259:18, 260:8
264:8, 268:12
268:15, 271:5
272:6, 272:20
273:7, 273:10

275:4, 277:6
280:5, 280:15
281:22, 281:23
284:18, 285:19
289:12, 340:2
340:2, 340:5
352:17, 352:18
**tabbed** 293:10
**table** 213:2
294:5, 349:23
**tabs** 211:11
244:18, 280:13
283:11, 283:12
350:13, 350:16
**take** 212:2
248:19, 293:1
293:2, 325:16
332:5, 336:10
336:12, 340:22
349:7, 350:6
352:20
**taken** 203:12
208:4, 217:1
217:19, 218:14
248:25, 279:23
325:19, 341:5
355:12
**takes** 217:1
305:15
**talc** 203:4, 203:7
211:5, 211:21
211:24, 212:12
212:14, 214:15
214:19, 216:23
217:14, 218:9
218:10, 218:13
218:17, 221:5
221:13, 221:17
221:23, 222:12
222:16, 224:15
226:18, 229:6
230:18, 230:23
231:4, 231:18
232:1, 232:5
232:16, 233:23
234:12, 235:24

236:7, 238:23
239:19, 246:2
248:2, 248:6
248:13, 248:13
248:14, 249:8
249:15, 250:7
252:4, 252:5
252:8, 252:25
253:1, 253:10
254:20, 255:2
255:10, 255:19
255:22, 255:25
257:1, 257:9
257:9, 259:9
259:20, 260:13
261:1, 262:1
266:21, 267:7
278:19, 279:1
279:14, 282:3
283:20, 284:7
284:25, 285:24
286:4, 286:7
286:8, 287:2
287:19, 287:24
288:1, 288:12
288:16, 288:25
289:1, 289:7
289:17, 290:1
290:7, 290:16
291:25, 292:1
292:18, 293:14
294:2, 294:17
295:11, 295:17
296:3, 296:9
298:13, 300:14
301:20, 303:4
306:5, 307:21
308:5, 310:10
310:17, 311:11
311:14, 312:1
312:3, 312:17
312:23, 316:14
316:16, 320:2
320:12, 322:3
322:13, 323:7
323:24, 326:16

330:20, 332:23
336:17, 336:19
337:1, 337:15
346:11, 346:20
353:3, 356:4
356:9, 356:24
**talcs** 287:16
288:22, 298:15
**talcum** 236:10
281:15
**talk** 223:14
225:19, 236:21
237:15, 238:4
240:19, 294:23
294:24, 311:19
332:19, 337:5
344:3
**talked** 230:9
297:16
**talking** 218:18
218:21, 226:5
227:6, 236:12
242:11, 248:9
248:16, 251:13
274:4, 288:11
294:22, 297:12
316:25, 342:10
342:11
**talks** 237:11
254:1, 259:4
260:12, 260:17
265:4, 266:10
266:13, 282:6
283:5, 283:6
283:22, 285:4
285:5, 287:15
288:7, 289:19
297:11, 298:19
301:22, 302:14
318:11, 318:12
330:23, 331:14
342:7, 342:18
344:2, 346:15
**Task** 214:10
**team** 220:1
**TEC** 203:6

**technician**
310:18
**technique** 271:3
**tell** 210:20
211:3, 212:9
213:5, 215:16
219:3, 221:11
222:19, 229:19
244:6, 256:13
264:8, 281:12
290:13, 301:15
325:9, 326:10
333:10, 335:7
346:14, 349:6
351:7
**telling** 232:13
**TEM** 274:8
275:4, 289:23
330:23, 340:14
**temporary**
211:16
**ten** 290:9
291:14, 334:23
335:3
**tend** 328:18
**Tenovus** 295:10
295:15, 295:18
297:13, 297:25
299:12, 300:5
300:12, 301:7
302:2, 302:16
304:3, 306:4
310:17
**term** 217:10
246:3
**terms** 235:1
235:11, 288:15
332:2
**test** 219:1, 219:7
220:8, 221:23
224:2, 235:18
238:11, 238:16
238:19, 238:22
241:1, 242:5
242:7, 243:17
247:17, 248:3

248:6, 248:7
248:14, 248:15
252:1, 252:9
254:22, 254:24
255:5, 255:10
255:24, 256:16
256:18, 256:21
257:19, 257:23
257:24, 258:1
258:5, 258:24
266:5, 267:15
270:6, 270:6
275:7, 275:10
275:23, 276:12
277:2, 277:11
280:17, 280:21
281:4, 281:13
285:5, 291:7
293:12, 293:14
294:1, 294:17
307:15, 330:23
333:21, 334:25
335:1, 349:3
349:8, 349:19
352:24, 353:5
**tested** 214:12
221:24, 240:24
249:25, 250:9
255:3, 257:25
263:1, 301:10
312:23
**testified** 230:21
231:2, 256:9
316:8, 347:7
**testify** 355:8
**testimony**
208:15, 208:19
230:7, 231:10
231:12, 231:15
232:7, 232:11
232:19, 232:22
233:8, 343:20
352:8, 355:12
**testing** 212:14
214:15, 215:21
217:22, 218:9

218:15, 218:18
218:19, 218:22
220:24, 221:3
221:13, 222:3
223:20, 223:22
223:25, 224:14
228:4, 230:10
230:12, 231:8
233:22, 234:12
235:22, 236:5
239:14, 239:21
239:25, 240:17
240:23, 241:15
241:24, 247:9
248:1, 249:6
252:21, 252:25
254:19, 257:23
264:24, 270:1
270:16, 271:14
272:25, 273:3
277:6, 281:7
282:13, 287:16
288:15, 292:16
294:11, 321:24
327:6, 329:21
330:19, 331:25
332:3, 348:12
349:1, 353:2
**tests** 237:19
239:2, 242:1
254:1, 254:8
280:19, 280:20
281:1, 282:15
282:19, 289:7
289:20, 290:21
294:23, 305:21
321:8, 322:15
323:22, 326:6
326:21, 348:10
349:15, 349:18
**thank** 207:13
237:18, 237:24
238:1, 264:13
265:6, 274:1
**theme** 216:18
216:19, 217:5

**theoretically**
220:23
**thermal** 248:1
269:14, 278:2
278:3
**thing** 211:1
212:8, 218:25
229:3, 256:2
268:16, 275:6
292:5, 352:6
**things** 214:13
219:15, 225:13
225:15, 230:16
240:19, 295:14
323:14, 324:3
324:24, 342:14
346:18
**think** 220:25
237:23, 239:22
242:21, 244:4
244:13, 250:23
253:2, 262:16
264:12, 270:1
273:2, 275:8
277:11, 277:16
278:10, 281:22
283:4, 284:16
291:24, 292:3
292:5, 295:2
295:4, 298:6
301:14, 304:14
304:15, 308:17
309:7, 312:20
313:5, 313:23
313:23, 314:9
314:22, 314:24
316:3, 316:8
317:16, 326:20
327:24, 329:4
329:6, 331:9
332:1, 334:3
334:11, 346:20
347:2, 350:1
**third** 237:5
270:20
**Thomas** 356:21

**thought** 210:15
221:14, 221:24
223:8, 242:8
274:2, 277:21
277:22, 292:2
321:11, 344:13
351:24
**three** 214:13
227:25, 228:8
228:21, 236:10
268:19, 279:5
337:23, 348:6
**Tim** 227:7
227:7, 227:16
227:19, 227:21
**time** 207:1
208:9, 208:17
208:21, 209:2
209:18, 209:25
214:18, 215:6
215:11, 217:3
217:20, 220:11
221:8, 230:3
230:15, 231:2
231:11, 232:13
232:20, 233:10
236:2, 240:18
248:19, 248:23
249:2, 252:17
255:22, 255:22
279:20, 279:25
287:22, 293:17
295:14, 300:25
310:7, 310:13
312:12, 312:21
313:5, 314:9
316:8, 318:1
322:15, 323:2
323:9, 325:17
325:21, 328:22
331:4, 335:6
336:10, 336:12
344:23, 346:16
346:22, 347:21
347:23, 349:7
350:4, 354:3

355:13
**times** 207:23
211:16, 213:21
230:9
**timing** 323:4
**tissue** 295:23
296:7, 296:23
299:8, 299:19
299:20, 299:21
300:8, 300:11
300:14, 300:14
300:23, 301:1
301:2, 301:3
301:6, 301:9
301:12, 302:2
302:23, 303:25
304:2, 304:11
307:17, 308:14
308:24, 309:4
311:4
**tissues** 297:25
298:14, 298:17
299:13
**title** 209:11
**today** 208:18
208:22, 215:3
233:10, 255:8
256:9, 285:9
325:5, 325:11
326:6, 335:23
336:14, 339:1
339:12, 348:5
348:13, 348:21
350:9, 350:24
351:14, 352:14
352:24, 353:6
353:25
**today's** 207:2
335:24, 354:4
**told** 207:24
223:12, 309:12
312:21, 314:9
315:1, 316:9
323:21, 325:12
340:12, 344:15
344:16, 344:19

| | | | | |
|---|---|---|---|---|
| 345:3, 345:18 | 290:18, 291:16 | 346:18, 346:20 | 289:2, 289:8 | 349:5, 349:25 |
| **tools** 265:17 | 318:9, 318:11 | 350:22 | 299:9, 300:8 | 350:21 |
| **top** 225:1 | 318:18, 319:8 | **type** 298:16 | 300:16 | **Vermont** 237:1 |
| 278:23, 345:18 | 319:21, 320:1 | 338:10 | **Univ** 356:21 | 259:5, 259:9 |
| 349:10 | 320:2, 320:4 | **types** 239:18 | 356:23 | 259:20, 284:14 |
| **topic** 211:24 | 320:7, 320:11 | 260:19, 264:20 | **University** | **version** 317:24 |
| 215:2, 215:18 | 321:12 | **typical** 305:11 | 274:13, 275:7 | 318:25, 319:1 |
| 224:19, 227:10 | **tries** 311:20 | 338:10 | 275:12, 311:25 | 319:3 |
| 229:5, 229:8 | **true** 217:12 | **typing** 294:7 | 330:6, 331:6 | **versions** 317:13 |
| 234:19, 255:21 | 226:3, 226:12 | | 335:15, 336:1 | **versus** 246:2 |
| 307:10 | 252:7, 256:1 | **U** | 336:5, 336:6 | 339:5, 339:6 |
| **topics** 214:6 | 256:2, 289:11 | | 344:17, 345:4 | 342:15, 346:13 |
| 230:2 | 292:9, 292:10 | **ultimately** 234:2 | **unmistakably** | 346:19 |
| **total** 318:11 | 344:20, 353:21 | 266:19 | 330:25 | **Vice-President** |
| 319:8, 332:20 | 355:11 | **umbrella** 353:2 | **Unrelated** 229:5 | 209:12, 219:22 |
| **touch** 222:18 | **truth** 341:18 | **unable** 303:3 | **unusual** 300:21 | **video** 207:2 |
| **trace** 321:17 | 355:8, 355:8 | **unclear** 292:3 | **upset** 307:25 | 248:24, 249:3 |
| **track** 242:3 | 355:9 | 293:6 | **USA** 285:20 | 279:21, 280:1 |
| **trade** 215:22 | **try** 207:25 | **undergoes** | 311:13 | 325:22, 347:19 |
| 312:11 | 207:25, 289:6 | 317:16 | **use** 211:6, 217:9 | 347:22, 347:24 |
| **transcript** | 311:2 | **underneath** | 220:4, 224:4 | 349:7, 350:6 |
| 203:11, 209:16 | **trying** 219:20 | 214:23, 215:15 | 267:2, 284:8 | 354:4, 354:5 |
| 355:11 | 227:7, 227:13 | 216:15, 220:13 | 317:23, 326:12 | **Videographer** |
| **transmission** | 228:9, 228:17 | 224:10, 227:24 | 356:11 | 205:15, 207:1 |
| 274:20, 276:20 | 243:9, 308:21 | 283:9 | **usually** 210:20 | 248:23, 249:2 |
| 330:5, 332:8 | 322:19, 342:13 | **understand** | **uterus** 306:4 | 279:20, 279:25 |
| 337:10, 337:13 | 342:23, 351:12 | 208:7, 216:24 | | 325:17, 325:21 |
| 338:10, 339:6 | **tubular** 303:18 | 219:14, 219:21 | **V** | 347:21, 347:23 |
| 345:22 | 305:11, 306:7 | 221:9, 223:5 | | 354:3 |
| **transmitted** | **tumor** 309:9 | 227:8, 232:17 | **validated** 219:1 | **Videotape** 203:9 |
| 236:5, 236:11 | **tumors** 295:12 | 243:11, 281:2 | **value** 275:13 | 231:14, 232:21 |
| 331:18, 339:17 | 296:4, 296:9 | 281:5, 292:20 | 308:25 | **videotaped** |
| 347:1 | **turn** 320:18 | 295:3, 308:21 | **VAN** 205:3 | 207:3 |
| **travel** 223:10 | 352:18 | 311:3, 314:16 | 205:5 | **view** 302:12 |
| 225:7, 226:2 | **turned** 335:17 | **understanding** | **varied** 304:24 | 321:12 |
| **tremolite** | **Turnpike** | 217:13, 220:5 | **varieties** 249:15 | **Viewing** 303:1 |
| 217:10, 217:11 | 204:13 | 223:3, 223:8 | **various** 243:3 | **Village** 205:3 |
| 248:8, 248:9 | **two** 218:7 | **understood** | 246:14, 257:2 | **Vincent** 205:15 |
| 255:11, 256:1 | 219:15, 222:6 | 225:4 | 281:6, 283:6 | **Viscomi** 208:5 |
| 259:14, 259:22 | 230:11, 241:22 | **United** 284:8 | 287:3, 342:13 | **visiting** 301:23 |
| 259:25, 267:21 | 267:7, 274:2 | 285:25, 286:1 | **verifies** 249:14 | **volume** 234:9 |
| 268:6, 268:24 | 276:11, 278:20 | 287:7, 287:16 | **verify** 215:13 | 234:10, 234:15 |
| 269:2, 269:6 | 279:7, 287:1 | 287:19, 287:25 | 225:1, 226:3 | 234:16, 235:2 |
| 270:8, 270:21 | 323:15, 324:3 | 288:1, 288:5 | 226:11, 245:23 | 346:13 |
| 271:2, 271:19 | 324:25, 327:23 | 288:13, 288:17 | 246:9, 247:19 | |
| 272:15, 273:13 | 328:1, 334:23 | 288:21, 288:22 | 252:23, 349:3 | |

**W**

**W.J** 356:9
**Wales** 297:14
**walk** 210:23
236:2
**Walter** 244:7
**want** 221:8
233:10, 233:16
234:8, 235:9
235:9, 236:3
236:4, 238:4
238:8, 238:24
241:2, 242:10
242:19, 249:21
253:25, 262:11
273:7, 275:14
278:11, 278:12
279:10, 279:14
279:18, 286:22
289:4, 289:6
291:2, 291:2
293:2, 294:13
294:20, 294:21
294:22, 294:24
328:16, 342:2
346:23, 349:2
349:8, 349:13
349:14, 349:21
349:25, 350:21
351:9, 351:11
351:13, 352:11
353:14, 353:15
354:1
**wanted** 223:21
223:24, 280:14
309:11, 326:5
351:25, 352:1
**watched** 307:15
**watching**
302:24, 305:21
**way** 207:20
210:17, 216:19
217:11, 259:25
260:2, 277:17
280:6, 292:13

333:9, 339:8
351:3
**Wednesday**
203:14
**weeks** 306:18
**WEINER** 205:3
**Weinstein**
222:25
**Weisler** 311:22
312:2, 312:5
**WENDOWSKI**
203:7
**went** 250:13
259:19, 262:18
264:5, 265:23
267:4, 275:15
276:9, 277:1
297:1, 297:17
298:5, 315:18
316:3, 324:16
326:20, 338:20
346:17, 348:10
349:15, 349:18
**Westfield**
203:23
**Whittaker**
204:15, 312:16
**Wiley** 215:5
215:25, 216:1
228:11
**William** 323:18
**Windsor** 253:4
261:1, 261:24
262:1, 357:6
**witness** 203:11
206:2, 207:6
219:18, 347:13
355:7
**witness's** 326:2
**witnesses**
208:12, 210:19
212:9, 212:10
**woman** 296:24
**women** 299:8
300:1, 300:4
301:3, 301:6
304:2, 304:12

**women's** 209:12
295:11, 299:21
300:8
**word** 229:10
326:18
**work** 207:25
226:20, 227:19
265:7, 297:13
297:18, 297:23
298:5, 298:6
298:7
**worked** 225:6
226:17, 226:22
226:24, 226:25
227:2, 230:8
254:3, 312:15
335:11
**working** 230:3
310:22, 312:5
**workshop**
213:22
**world** 287:3
**world's** 300:22
300:24
**worldwide**
223:22, 223:25
285:1, 286:4
**write** 214:4
217:16, 225:10
225:22, 262:9
293:3, 296:18
319:4
**writes** 306:3
321:11, 321:16
**written** 218:8
235:2, 304:9
**wrong** 277:18
277:21, 277:22
**wrote** 209:22
211:15, 211:23
214:10, 215:12
227:2, 275:6
284:20, 307:16
314:25, 321:4

**X**

**x-ray** 236:25
238:1, 245:10
256:22, 257:11
259:4, 259:12
259:20, 260:22
261:23, 264:25
265:5, 265:14
265:15, 267:2
267:15, 267:18
268:20, 268:24
269:13, 270:13
270:23, 271:3
271:13, 272:1
272:8, 273:12
274:18, 276:1
278:1, 278:17
278:24, 279:4
279:15, 339:5
**XRD** 258:5
265:23, 274:2
274:8, 275:4
278:21, 279:11
279:16, 289:21

**Y**

**year** 224:1
224:12
**years** 218:12
218:15, 218:23
220:9, 222:13
230:24, 231:5
255:22, 283:21
287:1
**York** 204:9
204:9, 311:15
311:25
**YOUNG** 204:8

**Z**

**Zambia** 287:12

**X**

**07009** 205:4
**07090** 203:23
**07102** 205:8
**07701** 204:4
**07932** 204:14

**1**

**1** 203:22, 230:1
234:9, 234:10
234:16, 235:2
236:9, 240:1
260:15, 261:6
280:10
**1:32** 280:1
**10** 231:11
237:16, 240:2
260:15, 261:6
307:16
**10/12/71** 356:19
**10/27/72** 356:11
356:13
**10:00** 203:15
**10:08** 207:1
**100** 205:8
220:11, 221:24
**1000** 309:16
**10022** 204:9
**10-27** 267:2
**10-27-1972**
317:2
**10-27-72** 245:6
317:1
**10-31-72** 269:24
**108** 267:4
**108T** 268:14
270:16, 271:23
272:2, 318:13
320:21, 323:5
**109T** 267:4
270:17, 271:23
272:3, 318:13
320:21, 323:5
**11** 271:1

**11/10/71** 356:5
**11/29/72** 356:8
**11/5/18** 357:9
**11:20** 248:23
**11:34** 249:2
**1-10** 262:4
**11-11-71** 327:14
**11-9-73** 273:11
**12** 249:24
  281:24
**12/14/71** 356:7
**12:30** 279:17
**12:35** 279:20
**127** 204:3
**14** 205:3, 240:22
  241:4, 241:16
  246:1
**15** 218:15
  218:22, 241:13
**150** 282:7, 284:1
**1501Z** 274:24
  342:12, 342:19
  343:15, 343:23
**15th** 223:10
**16** 241:20
  242:11, 242:12
  250:2
**17** 244:20, 264:7
  264:12, 301:18
  323:7, 338:9
**18** 204:13
  289:13, 323:7
  338:9
**19** 240:7, 253:7
  262:23, 290:9
  291:13
**19103** 204:19
**1938** 224:6
  224:9
**1960s** 211:1
  211:3, 211:5
**1968** 211:8
  211:14
**1970s** 212:8
  231:24
**1971** 212:11

217:18, 220:18
236:13, 237:6
237:20, 238:13
240:7, 240:16
256:18, 259:1
262:24, 297:7
299:23, 300:3
307:16
**1972** 241:5
  241:6, 244:20
  244:24, 245:2
  245:14, 245:19
  246:18, 247:1
  247:4, 247:15
  247:18, 264:7
  264:12, 266:6
  267:11, 269:11
  270:9, 272:19
  272:23, 275:22
  276:13, 285:5
  289:20, 310:2
  317:8, 317:20
  323:7, 323:13
  324:23
**1973** 246:2
  246:7, 246:12
  246:23, 271:7
  273:17, 289:20
  290:22, 291:10
  293:15, 294:2
  294:18, 322:23
  340:3, 351:4
  351:7, 352:7
  352:25
**1974** 249:12
  280:15, 357:7
**1975** 249:24
  250:3, 252:3
  252:9, 281:24
  283:16, 284:19
**1976** 214:15
  217:18, 220:18
  240:16, 253:3
  253:7, 254:21
  255:1, 255:11
  255:17, 255:23

256:1, 289:13
**1980s** 212:17
**1984** 212:18
  214:21
**1986** 212:19
  212:25, 214:17
  218:11, 220:20
**1990s** 213:7
**1994** 213:22
  213:25
**1995** 214:8
  214:8
**1A** 256:17
  258:24, 259:18

**2**

**2** 203:9, 236:25
  241:23, 242:5
  242:13, 249:13
  249:24, 250:8
  252:24, 253:9
  278:23, 306:5
  318:5, 318:13
  356:17
**2.1** 212:21
**2.2** 213:2
**2:48** 325:17
**20** 283:16
**2000** 224:1
  224:3
**2008** 214:25
**2009** 214:16
  214:23, 215:21
  216:8, 216:14
  254:23
**2010** 214:16
  215:21, 254:23
**2014** 215:1
  216:16
**2018** 216:21
**2019** 203:14
  207:3
**207** 206:4
**21** 272:19
**215-569-5397**

204:19
**22** 246:23
  273:17, 340:3
**235** 203:22
**24** 253:3
**25** 246:7, 267:10
  271:6, 308:6
**25C** 241:3
  266:5, 267:2
  268:16, 268:17
  268:18, 270:25
  317:2, 317:2
**26** 244:1, 244:7
  244:9, 244:10
  244:10, 320:13
  320:14
**27** 240:20
  244:16, 244:18
  245:2, 264:10
  264:12, 266:6
  267:11, 317:19
**27A** 240:21
  264:4, 264:4
**27b** 264:9
**28** 237:6, 247:15
  247:18, 256:18
**28th** 227:9
**29** 247:4, 276:13
  284:19, 310:2

**3**

**3** 221:10, 241:14
  244:12, 266:21
  267:7, 281:15
  318:13, 337:9
  343:22
**3/6/18** 357:18
**3/71** 356:9
**3:02** 325:22
**3:41** 347:21
**3:45** 347:23
**3:54** 354:4
  354:6
**30** 245:25
  283:23, 284:8

297:7
**30,000** 303:6
**301** 356:4
**307** 356:5
**308** 356:7
**31** 245:14
  245:17, 245:23
  269:11, 271:6
  272:17
**310** 356:8
**311** 356:9
**317** 356:11
**318** 356:13
**3-18-1976** 291:1
**319** 356:15
**320** 356:17
**322** 356:18
**327** 356:19
**33** 336:6, 340:23
**330** 356:21
**336** 356:24
**34** 318:25
**342** 357:3
**344** 259:9
**344L** 236:25
  240:5, 263:2
  263:22
**345** 357:4
**346** 357:7
**347** 357:8
**348** 357:9
**353** 357:18
**356-357** 206:11
**36** 246:9, 272:6
  272:21, 273:7
  273:10, 273:11
  273:16, 275:4
  317:19, 340:2
  340:2, 340:5
**368** 322:23
  322:23
**370** 350:9
  350:12, 350:13
**376** 327:9
**3-9-71** 348:16
**3rd** 204:13

| | | |
|---|---|---|
| **4** | **66** 261:1, 262:1 | **973-822-1110** 204:14 |
| **4** 249:12, 280:15 | **7** | **9A** 238:12 239:8, 260:9 261:19 |
| **4:14** 351:21 | | |
| **41** 247:20 247:22 | **7** 237:20, 246:18 247:1, 259:1 | **9C** 239:21 239:23, 262:17 |
| **414** 348:2, 348:4 | 272:23, 275:22 | |
| **45** 249:11, 280:5 280:15 | **70s** 218:7 221:14, 221:23 | **9D** 239:12 262:17, 262:21 263:18 |
| **478** 345:17 | 231:20, 234:23 295:8 | |
| **479** 319:14 | **732-747-9003** 204:4 | **9th** 301:19 301:23 |
| **485** 330:3 | **75** 222:19, 296:4 | |
| **49** 342:2 | **76** 222:19 | |
| **5** | **7A** 266:22 | |
| **5** 212:21, 213:1 229:18, 237:14 257:13, 257:14 291:21, 318:12 318:19 | **8** | |
| **5/8/73** 356:18 | **8** 236:12, 241:4 241:6, 244:24 245:18, 264:16 270:9, 322:23 | |
| **50** 249:23, 250:2 | **80s** 218:8 | |
| **51** 280:9 | **8-19-1971** 263:18 | |
| **52** 250:4, 250:5 281:23, 288:6 | **87** 231:11 | |
| **5-25-73** 271:25 | **8th** 204:8 238:14 | |
| **52J** 251:12 | | |
| **56** 203:14 252:21, 253:3 253:6, 254:1 289:13 | **9** | |
| **58** 346:5, 346:6 346:8, 346:14 | **9** 238:11, 238:13 239:2, 246:11 352:17, 356:3 | |
| **6** | **908-789-2000** 203:24 | |
| **6** 203:14, 207:3 274:11, 311:19 340:16 | **908-789-2007** 203:24 | |
| **6/21/73** 357:3 | **9-28-72** 277:6 277:23 | |
| **600** 204:8 | **9-29-72** 276:25 | |
| **60s** 229:20 229:21 | **973-239-5700** 205:4 | |
| **646-589-7678** 204:9 | **973-622-4444** 205:9 | |

Exhibit 130

FDA–J&J Meeting
7/20/71

Protected Document--Subject to Protective Order

JNJMX68_000003965

July 21, 1971

Special Talc Project No. 503
FDA Meeting, July 20, 1971

Dr. R. A. Fuller

Attendance:

FDA:   Dr. R. Schaffner, Director, Office of Product Technology
       Dr. L. Beacham, Dep. Dir., Office of Product Technology
       Dr. A. Weissler, Director, Div. of Colors and Cosmetics
          Technology
       Dr. J. Gowdy (M. D.), Div. of Colors and Cosmetics
          Technology
       Dr. Eisenberg (microscopist)

J&J:   Dr. G. Hildick-Smith, Dr. W. Nashed.

We reviewed briefly our official submission of July 20, 1971 (see attached letter). Dr. Schaffner signed our house copy acknowledging receipt.

We informed the group that, in addition to the work done by Colorado School of Mines Research Institute which showed that Baby Powder contains no asbestos, we have had Professor Pooley and the McCrone Associates and Johnson & Johnson laboratories do extensive examination of our talc and Baby Powder by electron microscopy. The results show that we have no asbestos in our product.

Dr. Weissler wanted to know if tremolite or fibrous talc was found. We stated that our information is that no asbestos was found and that we will have full detailed reports on the findings in about a week.

Dr. Hildick-Smith pointed out that Dr. William Smith's extensive work (10 years) under a PHS grant showed that tremolite talc did not produce tumors in animals while asbestos did. The information was included in our Exhibit 4.

Dr. Schaffner asked if we had been in touch with Dr. Selikoff to resolve the difference between his findings and ours. We said we plan to do so as soon as the reports of completed work is available.

Protected Document--Subject to Protective Order

JNJMX68_000003966

Dr. R. A. Fuller                    - 2 -                    July 21, 1971

Dr. Schaffner said that his main mission at this time is to determine optimum methodology for examining talc samples.  He asked Dr. Weissler to review his progress in this area.  Dr. Weissler said that he had called Dr. Selikoff's office but that Dr. Selikoff was unavailable.  He had also had the same experience in trying to contact Dr. Cralley (PHS Service, Cincinnati).

Dr. Gowdy raised the question of inhalation of fine particles of talc below 5 µ.  He also said that there are cosmetic aerosol body powders and Dr. Schaffner asked for our particle size analysis of Baby Powder. We pointed out that our previous submission included particle size (by volume) analysis done by Colorado School of Mines and that we are currently preparing another report on particle size (in microns) of Baby Powder which would be submitted next week.

With regard to inhalation of fine inorganic particles, I pointed out that a farmer inhales a great deal of clay dust in his field throughout his life with no apparent danger and commented that if somebody was marketing clay Mr. Kretchmer would be asking FDA to ban it.  This elicited amused smiles.

Dr. Eisenberg reviewed quickly the method supplied by Colorado School of Mines (Exhibit 2).  He commented that he felt that the standard method followed by Colorado School of Mines using area % is a more valid procedure than electron microscopy.

Dr. Schaffner asked Dr. Weissler to set up a meeting, possibly Thursday of next week, with Dr. Selikoff and Dr. Cralley; also with our experts (Dr. Pooley, if available; Dr. McCrone; Mr. Caneer; and Dr. Rolle).  He indicated that he has to give Dr. Edwards some recommendations in two weeks.

I told Dr. Schaffner that according to our previous discussion, we are supplying all our information to him and that he will coordinate dissemination of the information within the FDA.  He agreed and said that they will also invite people from the Bureaus of Drugs and Product Safety to the discussion meeting to be set up by Dr. Weissler.

Finally, I stated that we have been doing a great deal of work without knowing precisely what Mr. Kretchmer's objections to talc were and that we can better direct our efforts if we know his specific objections.  After some hesitation, Dr. Schaffner gave me a copy of Mr. Kretchmer's letter to the Secretary and a copy of the Kretchmer press release (see attached) and obtained my signature as a receipt on his copy.

Protected Document--Subject to Protective Order

Dr. R. A. Fuller                    - 3 -                    July 21, 1971

<u>Actions:</u>

We will provide FDA with:

1.  Reports by Dr. Pooley, Dr. McCrone, and Johnson & Johnson on the results of electron microscopy examination of Baby Powder.

2.  Report on particle size in microns of Baby Powder.

3.  Convene our experts to meet with FDA at a date to be conveyed to us by Dr. Weissler.

                                        W. Nashed

WN/cw

Attach.

cc: Mr. J. E. Burke
    Mr. L. Foster
    Dr. G. Hildick-Smith
    Dr. T. H. Shelley
    Mr. S. C. Smoyer
    Mr. H. G. Stolzer to Mr. D. Clare
    Mr. J. C. Walcott

Protected Document--Subject to Protective Order

Exhibit 131

J&J - FDA
9/21/71



EXHIBIT
231

Protected Document--Subject to Protective Order

JNJMX68_000005215

**239**

## Johnson&Johnson

NEW BRUNSWICK. N. J.

September 21, 1971

R. Schaffner, Ph.D.
Director, Office of Product Technology
Bureau of Foods
Food and Drug Administration
Department of Health, Education, and Welfare
200 "C" Street
Washington, D.C.

Subject: JOHNSON'S Baby Powder

Dear Dr. Schaffner:

My colleagues and I wish to express our thanks for your providing us
the opportunity on August 3, 1971 to present our data and methods of
testing of JOHNSON'S Baby Powder and the talc used in its manufacture.

As we discussed, we are submitting herewith full reports of our in-
vestigations as follows:

| | |
|---|---|
| Identification of Samples used in the Pooley report and McCrone report. | Exhibit 1 [Vol. 1] |
| Letter from Colorado School of Mines Research Institute. | Exhibit 2 [Vol. 1] |
| Report by Johnson & Johnson Pharmaceutical Research Section: "Particle Size of JOHNSON'S Baby Powder." | Exhibit 3 [Vol. 1] |
| Report by Dr. F. D. Pooley, University College, Cardiff, Wales: "Report of Investigations of Talc Samples supplied by Johnson & Johnson." | Exhibit 4 [Vol. 1] |
| Reports by Walter C. McCrone Associates, Inc.: | Exhibit 5 [Vol. 2 - Vol. 3] |
| (a) "Methodology for the Determination of Asbestos in Talc." | |
| (b) "Examination of Baby Powder for Johnson & Johnson." | |

Protected Document--Subject to Protective Order

JNJMX68_000005216

240

R. Schaffner, Ph. D.          - 2 -          September 21, 1971

It is seen that the data conclusively proves that JOHNSON'S Baby Powder is free of asbestos.

It is suggested in the interest of future references to this data that our filings of July 8 and July 20, 1971 as well as this filing be incorporated in a master file with a reference number which can be utilized in future communications on this matter.

Should you have any questions regarding the data submitted, we will be very pleased to answer them.

Thanks for your consideration.

                                    Very truly yours,
                                    JOHNSON & JOHNSON

                                    W. Nashed

                              by:   W. Nashed, Ph. D.
                                    Director of Science Information

WN/cw

Attach:  Vols. 1, 2, and 3

bcc:  Mr. J. E. Burke
      Mr. D. Clare
      Dr. R. A. Fuller
      Mr. L. Foster
      Dr. G. Hildick-Smith
      Dr. T. H. Shelley
      Mr. S. C. Smoyer
      Mr. J. C. Walcott

Protected Document--Subject to Protective Order

241

The information and data submitted herein contains trade secrets, commercial or financial information or privileged or confidential information, and the Food and Drug Administration is not authorized to make them public without written permission from the company.

Protected Document--Subject to Protective Order

JNJMX68_000005218

Exhibit 132

*Johnson&Johnson*

BABY PRODUCTS COMPANY                    NEW BRUNSWICK, N. J. 08903

March 15, 1976

Dr. Norman F. Estrin
Vice President - Science
Cosmetic, Toiletries, and
   Fragrance Association
1133 15th Street, N.W.
Washington, D.C. 20005

Re: Examination for Asbestos In Talc

Dear Dr. Estrin:

The talc which is used by Johnson & Johnson is solely derived from
its own mine in Vermont, where the ore is mined selectively and
then beneficiated by the process of flotation.

Shipments of this highly purified talc are routinely examined by
our own laboratory to verify the absence of asbestos minerals.

Historically, Johnson & Johnson has always been concerned about the
mineralogical integrity of its talcs and even its earliest speci-
fications have required the examination for acicular particulates.
When it was erroneously reported in 1971 that our powder contained
asbestos, we sponsored a scientific seminar of mineralogical and
analytical experts for the FDA to prove that our talc is not con-
taminated with asbestos. At that time numerous samples were
analyzed by experienced consultants such as McCrone Associates,
Colorado School of Mines, Professor F. D. Pooley (of the University
College, Cardiff), Professor G. Brown (of Princeton), and Professor
M. Buerger (of M.I.T.). These examinations included X-ray diffrac-
tion analysis, differential thermal analysis, and transmission electron
microscopy.

During the period December 1972 to October 1973, 93 lots were indi-
vidually sampled and examined by X-ray diffractometry for the presence
of asbestos minerals. No amphiboles or serpentine minerals were
detected in any sample.

Dr. N. F. Estrin                       -2-            March 15, 1976
C.T.F.A.

Beginning in October 1973, differential thermal analysis was added
to our specified requirement. Both, differential thermal analysis
and X-ray diffractometry were instituted for the routine examination
of sequential lots. A further 100 lots have since been examined,
applying both methods to each sample. Again, no amphibole or ser-
pentine minerals have been detected.

I would like to advise that we are continuing to employ differential
thermal analysis and X-ray diffractometry in the examination of
sequential lots for the detection of amphibole and serpentine min-
erals.

It should be pointed out that we also maintain a worldwide monitoring
of talcs used by our Johnson & Johnson affiliates, employing these
same techniques.

Finally, let me add that periodically, we also submit sub-samples
for Transmission Electron Microscope examination and these have
always verified the absence of asbestiform minerals.

It is our understanding that you would wish to submit this information
to the FDA. Please regard this letter as non-confidential.

Sincerely yours,

George Lee
Director of Applied Research

GL/mm

WCD000009.

Exhibit 133

## JNJ000268964

## Metadata

| Confidentiality | Y | ORIGINAL |
|---|---|---|
| **Custodian** | Legacy 1 | ORIGINAL |
| **DocumentType** | Physical | ORIGINAL |

Dr. W. Nashed
Dr. T. H. Shelley
Dr. G. Hildick-Smith

*Johnson & Johnson*

*New Brunswick, N.J.*
December 13, 1972

**Subject:** Meeting November 1, 1972
with Dr. Schaffner - F. D. A.

Talc File:

    I met with Dr. Schaffner on November 1 and we had a frank, friendly talk for approximately an hour. I explained my mission and the necessity to make clear the concern of Johnson & Johnson management with respect to Dr. Lewin's report. I explained that from the beginning our company's attitude and actions had been to share information with the FDA in order to prevent unnecessary panic and irrational actions due to any ill-informed consumer pressures. We had, I pointed out, provided information and offered our complete background files to the administration prior to the public disclosures in this country of any concerns about talc per se or the potential contamination of talc with asbestos.

    I pointed out that having listened to Dr. Lewin and to the presentations of the world authorities we had assembled as consultants, I was convinced that there wasn't a shred of evidence to support the idea that either our Johnson* Baby Powder or Shower to Shower* contained any chrysotile asbestos. I said it was therefore difficult for me to explain to my colleagues in Johnson & Johnson management why it had not been decided not to publish Dr. Lewin's report. I then concluded that unless he could assure me that the report would not be issued I was instructed to make an appointment with Commissioner Edwards and make our viewpoint known to him. We felt this was necessary to be assured that the seriousness with which we view this situation and its potential effect on our business was known at all levels of the administration so that it could be viewed in the light of any consumer pressures.

    Dr. Schaffner did not disagree with me and repeated that he had not seen the report on our Baby Powder samples which had obviously irritated him. He agreed that we had indeed assembled competent people and appeared sympathetic to our views. He asked how much we had spent and I gave him a reasonable estimate. He told me confidentially and asked that I not publicize it, that he had received a comment from an optical microscopist on the FDA staff in a discussion of another problem, that Dr. Lewin was wrong and that he was "outside his field of competence". I confirmed that that was our view and that of our consultants. He went on to say that he had asked the Bureau of Mines "as suggested

Protected Document--Subject to Protective Order

JNJ 000268964

Pltf_JNJ_00041169

- 2 -

Meeting November 1, 1972
with Dr. Schaffner - FDA                        December 13, 1972

by Dr. Nashed" to review this report, but so far he had not heard
from them. He said "I have no control over the Bureau of Mines,
I cannot guarantee when they will report", but he hoped that it
would be completed within two weeks.

He went on to say that he was not happy that Lewin's work
had now turned into a research project on a new theory of structure
and not a program for the definition of analytical procedures as we
had all envisioned it to be. We agreed that we had both expected
the McCrone and Lewin conference to settle the problem.

When I pressed for an assurance that the report would not
be issued he said "it would be issued only over my dead body".
He then discussed with me what he said was his problem of what
to do with the report with respect to other manufacturers' products
if our products were cleared on the basis of our work and presenta-
tion. He was afraid of being accused of favoritism to the large
corporation, as they apparently were in the case of Bon Vivant
Soup Company in relation to Campbell Soup. While he emphasized
that this was his problem and not mine, he was interested in any
comment that I would care to make. I suggested that since the
controversy over Dr. Lewin's report centered around the analy-
tical procedures used, that if our work (as I was confident it did)
showed this to be invalid for our products, it obviously had to be
invalid for the products of other manufacturers as well. I sug-
gested that I thought it would be necessary to reanalyze the talcs
by the accepted procedure that was worked out in our meeting.

Dr. Schaffner asked what I thought about tremolite and I
responded that there was no evidence to implicate it as a carcinogen.
He said he agreed with me and that they had searched the literature
without success to find any report on the toxicity of tremolite. I
said that I believed we had an article or two when tremolite had
been used and found free of toxic effects (including carcinogenicity).
I said that I would forward any references we had to him and he
said that would be very helpful.

Dr. Schaffner then switched the subject to that of toxicity of
talc per se. He said that there was pressure on the F. D. A. with
respect to banning talc. When I asked if these pressures were
generalized or if he could give specific samples he quoted from a

Protected Document--Subject to Protective Order

- 3 -

Meeting November 1, 1972
with Dr. Schaffner - FDA                          December 13, 1972

letter from a Mr. Fred C. Hart of the Department of Air Resources
in New York City.  The letter dealt with the use of talc containing
asbestos in packaging materials and food additives and recommended
its banning.  The reasons given were some that we have heard be-
fore, mainly inuendo without any real facts to back them up.  The
letter further suggested that cosmetics probably should be included
in the ban as well.  (Dr. Nashed would you please check to see if
we can get a copy of Mr. Hart's letter the one dated September 18,
1972).  Dr. Schaffner indicated that he believed it was on file with the
Hearing Clerk.  I told Dr. Schaffner we had a good deal of information
on the freedom from toxicity on talc both from the literature and from
some in house studies.  He wanted to know if we would discuss this
subject with some members of his staff and I agreed to do so.  I
told him that while much of this information was already organized
into a report it would be better if we could postpone such a meeting
until our work was completed and I guessed that this might be as
early as two weeks but I couldn't be positive.  I told him that should
any emergency arise due to some incident or consumer pressure
before our meeting with him, not to hesitate to call us.  I said that
Dr. Hildick-Smith would be prepared to discuss this subject with
with them on a few hours notice.

Dr. Schaffner then concluded our meeting by suggesting that
he call me in two weeks when he hoped to have his decision on
Lewin's report finalized.  If he did not have the necessary informa-
tion from the Bureau of Mines and therefore could not give us the
answer he would make an appointment for Mr. Smoyer and I to see
Commissioner Edwards.  I suggested that when he called we could
perhaps set the date for our meeting to discuss the toxicity of talc.
I thanked him for his providing the time for our meeting and we
parted in a very friendly way.

R. A. Fuller

Protected Document--Subject to Protective Order

JNJ 000268966

Pltf_JNJ_00041169

Exhibit 134



### RESEARCH AND DEVELOPMENT

## WALTER C. McCRONE ASSOCIATES, INC.

- SMALL PARTICLE PROBLEMS
- SOLID STATE CHEMISTRY
- ULTRAMICRO ANALYSIS
- CRYSTALLOGRAPHY
- MICROSCOPY

GENERAL OFFICE: 493 EAST 31st STREET • LABORATORIES: 449-493 EAST 31st STREET

CHICAGO, ILLINOIS  60616

PHONE: (312) 842-7100
CABLE: CHEMICRONE

12 October 1971

Dr. A. Goudie
Johnson & Johnson
Research Center
501 George Street
New Brunswick, New Jersey 08901

Dear Dr. Goudie:

This letter will cover the final reports on several groups of samples, namely, 228-P, the Feminine Spray, Medicated Powder and Shower to Shower group, and the two Italian talc samples which we have investigated with electron microscopy and electron diffraction.

If you have any further questions or comments please call us.  It has been a pleasure working for you through these past few months and looking at the problems of talc and asbestos minerals.  Thank you again for all of your courtesies and kindness.

Very truly yours,

*Gene Grieger*

Gene Grieger
Research Physicist

GG:aw
Ref:  MA 2330

*Billed monthly –
several – (many several) – pictures
sent without captions or mounting*

JOJO-MA2546-00805

11-11-71  aw  MA 2347 and 2330

Dr. A. Goudie
Johnson & Johnson

Dear Dr. Goudie:

      This letter will cover the final reports on several groups of samples, namely, 228-P, the Feminine Spray, Medicated Powder and Shower to Shower group, and the two Italian talc samples which we have investigated with electron microscopy and electron diffraction.

      The 228-P appears to be very clean and very similar to the 344-L which we previously investigated. I believe that we can use all the data that we found on 344-L and apply it to 228-P as a general guide. The Femine Spray, Medicated Powder, and Shower to Shower were also very clean. The Shower to Shower appeared to have a few more ~~particles and~~ fibers than the other two samples, however I think that might be due to possible contamination from the G-11. In the G-11 we did find two positively identified chrysotile fibers and some other fibers which at first glance appeared to be chrysotile, when you look at the electron diffraction pattern. I believe that most of the fibers in Shower to Shower which are suspect may come from the G-11. The Italian talc is probably some of the best talc that I have looked at to date. I think it is at least as good as the commercial product, 344-L and 228-P. There is one possible problem which I believe to be very slight and that is that there is a large mineral fiber in there which may tend to confust the issue of fiber content. We did identify this with electron diffraction as not being tremolite but I do believe that it may cause some anxiety in some circles.

      In conclusion, with the exception of the G-11, I think all of these samples were quite clean with very low fiber content. I left out the comments on G-11

JOJO-MA2546-00806

JOJO-MA2546-00807

from the report because I felt you might want to change your supplier or investigate

your supplier, and this would only tend to confuse the issue perhaps with the FDA,

should you later decide to use these reports with the FDA. If you have

any further questions or comments please call us. It has been a pleasure

working for you through these past few months and looking at the problems of talc

and asbestos minerals. Thank you again for all of your courtesies and

kindness.

VTY:GG

JOJO-MA2546-00808

JOJO-MA2546-00809

We have, however, found chrysotile in 6-11, one of the
traces of
additives to Shower-to-Shower, and this might be a possible
source of these contaminant fibers.

Adele — paste master — this
cut & paste the above sentence
add the # is on sheet # 4
where the #

JOJO-MA2546-00810

JOJO-MA2546-00811

# FINAL REPORT ON SHOWER TO SHOWER, MEDICATED POWDER

## AND FEMININE SPRAY

Summary

We have examined samples of three Johnson & Johnson talc products, Shower to Shower, Medicated Powder and Feminine Aerosol Spray.  These products all seem to be quite clean, and we did not find any fibers of the asbestiform minerals in any of them: in particular, there are no bundles of chrysotile fibers and only in rare cases did we find any fibers suspect on the basis of morphology.  The maximum number of suspect fibers which we found in any sample was two, in the Shower to Shower.  There is a possibility of contamination by approximately one fiber in our lab and probably some contamination in the processing just from airborne fibers which get into the product during the grinding and mixing procedures.

**Walter C. McCrone Associates, Inc.**

JOJO-MA2546-00812

## Introduction

McCrone Associates has examined the appearance and fiber content of samples of Johnson & Johnson Shower to Shower, Medicated Talc Powder and Feminine Aerosol Spray.   The electron microscopy and electron diffraction methods used are described in a previous report to Johnson & Johnson, MA2330-1.

## Final Results of Examination

### Feminine Spray

The Feminine Spray sample showed talc plate sizes which are considerably smaller than those particle sizes in the other talc products.

The fiber content in this sample of Feminine Spray seems to be quite low, and we found very few examples of rolled talc or other fibers.  We found one unknown mineral fiber which we considered at first to be chrysotile, but, after a careful comparison of our standard chrysotile electron diffraction patterns and the unknown mineral pattern, we decided that it was not chrysotile.  This fiber has a central coring similar to chrysotile but shows a diffraction pattern different from chrysotile. This strong morphological similarity might have led to confusion without the use of electron diffraction and chrysotile standards.

A few talc fibers and some other small mineral fibers were identified with electron diffraction.  In addition, we found a fiber from which we could not get an electron diffraction pattern.  It did not appear to have a chrysotile structure but might possibly be calcium phosphate or sodium sesquicitrate.

-2-
**Walter C. McCrone Associates, Inc.**

JOJO-MA2546-00813

### Medicated Powder

The Medicated Powder is very similar in cleanliness to the Feminine Spray Powder. The additive "Microcell" appears to be a fine web-like structure, in some cases platy which appears very similar to crinkled newspaper when viewed from the top.

None of the several chemical additives which we found appeared to be fibrous: several orthorhombic, cubic, or perhaps tetraginal crystals might be calcium silicate.

We found few examples of fibrous talc and only one fiber which could be considered suspect because of its central coring. This suspect fiber gave an excellent electron diffraction pattern which, in our opinion, differs from chrysotile both in $\underline{d}$ values and intensity relationships. It could be hydromagnesite, halloysite or a rolled silicate. In addition to the suspect fiber we found examples of what appeared to be sodium sesquisitrate or a chemical very similar to it: the coring was not quite as obvious and it did give a slight electron diffraction pattern; there is a strong possibility that this is calcium phosphate or one of the ingredients added to the powder to give its medicated quality.

### Shower to Shower

The fiber content of Shower to Shower is quite low in comparison to previous samples which we have investigated and is predominantly rolled talc, I estimate it to be on the order of 0.001% and definitely no greater than 0.005%. We found three suspect fibers. Of these, two were found in one field and probably have the same source, very possibly contamination. Because they were covered by a talc plate, it was impossible to get electron diffraction

-3-

**Walter C. McCrone Associates, Inc.**

JOJO-MA2546-00814

the same general characteristics, but it still is questionable whether they are chrysotile. We have, however, found traces of chrysotile in G-11, one of the additives to Shower to Shower, and this might be a possible source of these contaminant fibers. The third fiber is quite small and in a field surrounded by small plates of talc. We have compared its electron diffraction pattern with those of talc and chrysotile and it does not appear to be either of the two. It is similar to chrysotile only insofar as it has an apparent coring of the sample.

In the remainder of the sample, we found few talc shards, i.e., small fragments of talc broken from larger plates which give talc patterns in most cases but which appear as fibers. There is some rolled talc and some other mineral fibers which we have not been able to identify with electron diffraction but which do not have any of the characteristics of amphiboles or chrysotile. As in the other two Johnson & Johnson products, we found several examples of fibers which have all of the general characteristics of sodium sesquicitrate, although they do not produce electron diffraction patterns. They generally occur in bundles and are not limited to single fibers as is chrysotile. The bundles of fibers, however, are quite random in orientation and seem to be almost a woven or intertwined structure.

Observation

In regard to the suspect fibers, many types of mineral fibers have a core similar to chrysotile, but their electron diffraction patterns identify them as other minerals. However, we cannot always obtain electron diffraction patterns from suspect fibers because they may have slightly different mineralogical structures which do not lead to strong electron diffraction patterns and/or their pattern may be masked by the major mineral species present in the sample.

-4-

**Walter C. McCrone Associates, Inc.**

JOJO-MA2546-00815

Exhibit 135

Exhibit 73



**mccrone environmental services, inc.**
200 OAKBROOK BUSINESS CENTER
5500 OAKBROOK PARKWAY
NORCROSS, GA 30093 • 404-449-8461

29 April 1986

Windsor Minerals, Inc.
P. O. Box 680
Windsor, Vermont 05089

RECEIVED

MAY 2 1986

W. M. I.

Attention: Mr. Roger N. Miller, President

Re: McCrone Project No. ME-2275

Dear Mr. Miller:

Under your Purchase Order WS-0503 we received eleven (11) talc samples for asbestos analysis. The samples were identified as follows:

| | | | |
|---|---|---|---|
| WMI 85-50 | WMI 85-54 | WMI 85-59 | WMI 85-62 |
| WMI 85-51 | WMI 85-56 | WMI 85-60 | WMI 85-63 |
| WMI 85-52 | WMI 85-58 | WMI 85-61 | |

Examinations by transmission electron microscopy resulted in no quantifiable amounts of asbestiform minerals in the samples. Thank you for consulting McCrone Environmental Services, Inc.

Sincerely,

Thomas Kremer
Electron Microscopist

James R. Millette, Ph.D.
Manager, Laboratory Services

TK/JRM/mts

cc: 1) Windsor Minerals, Inc.
       Windsor VT
    1) Mr. Roger N. Miller, President

a subsidiary of **walter c. mccrone associates, inc.**
2820 SOUTH MICHIGAN AVENUE • CHICAGO, ILLINOIS 60616 • 312-842-7100

EXHIBIT
PENGAD 800-631-6989
93
2-9-18

J&J-0044937

Protected Document--Subject to Protective Order

JNJS71R_00000954

Exhibit 136

SAMPLE NO. 137.          X-RAY DIFFRACTION PATTERN  *Li? No*
                                                    *0709 XY*



Analytical Results:   TALC 89%;   CHLORITE 4%;   α-QUARTZ 3%;   DOLOMITE 2%;
                      CHRYSOTILE 2%

Below:   PHOTOMICROGRAPHS OF DRY POWDER NO. 137





JOJO-MA2546-00138



DRY POWDER, SAMPLE NO. 137

0.1 MM.

CHRYSOTILE

TALC

EXAMPLES OF
TALC ALTERING
TO CHRYSOTILE

SAMPLE NO. 137 IN IMMERSION LIQUID OF n = 1.580

TALC

CHRYSOTILE

CHRYSOTILE FIBERS
EMBEDDED IN
TALC PARTICLES

OBJECTIVE DOWN
FROM BEST FOCUS

BEST FOCUS

OBJECTIVE UP
FROM BEST FOCUS

JOJO-MA2546-00139

SAMPLE NO. 137 IN IMMERSION LIQUID OF n = 1.580



α—QUARTZ

DOLOMITE

TALC

CHRYSOTILE

CHRYSOTILE

EXAMPLE OF CHRYSOTILE
FIBER EMBEDDED
IN TALC PARTICLE

0.1 MM.

CHRYSOTILE

EXAMPLE OF LARGEST
CHRYSOTILE PARTICLES
ENCOUNTERED IN
COMMERCIAL TALCS

OBJECTIVE DOWN
FROM BEST FOCUS

BEST FOCUS

OBJECTIVE UP
FROM BEST FOCUS

JOJO-MA2546-00140

SAMPLE NO. 136.        X-RAY DIFFRACTION PATTERN



Analytical Results:   TALC 87%;   CHLORITE 4%;   PHLOGOPITE 3%;
α-QUARTZ 2%;   DOLOMITE 2%;   CHRYSOTILE 2%

PHOTOMICROGRAPHS OF DRY POWDER NO. 136



0.1 mm.

JOJO-MA2546-00141

DRY POWDER, SAMPLE NO. 136



IN IMMERSION LIQUID OF n = 1.580

OBJECTIVE DOWN
FROM BEST FOCUS

BEST FOCUS

OBJECTIVE UP
FROM BEST FOCUS

TALC

TALC
ALTERING
TO
CHRYSOTILE

STAGE AT 0°

WITH CROSSED POLARS,

STAGE AT 45°

STAGE AT 90°

CHRYSOTILE

TALC

JOJO-MA2546-00142

DOWN



CHRYSOTILE
FIBERS
AND TALC
ALTERING
TO
CHLORITE

SAMPLE NO. 136

CHRYSOTILE
FIBERS
WITHIN
TALC
PARTICLES

ORGANIC
FIBER

JOJO-MA2546-00143

Transmission Electron Microscope

Thos. Hutchinson, Univ. of Minn.

Particle settling in a swirl tube was used for obtaining the dispersion of "talc" on 200 mesh microscope grids. Lewin and Shower to shower were collected.

Lewin

Roughly  900 grid squares were scanned in the T.E.M at moderate magnification. Five fiberous particles were found which gave electron diffraction patterns unmistakably crysotile asbestos. One highly suspect particle gave an noncrysotile diffraction pattern. The particles were generally less than 30 microns in length and had the typical fiber structure. No bundle branch and join was however seen.

Shower to shower.

Approximately 2100 grid squares were examined. Numerous examples of fiberous structures were seen. Electron diffraction of these fibers showed no resemblance to crysotile asbestos patterns. Three clear examples were found of serpentine material and which gave perfect crysotile patterns.

JOJO-MA2546-00144

JOJO-MA2546-00145

Two long fibers were found singly and two others were in the same grid square and apparently in close association with a talc structure. These fibers showed clear ~~fibrous~~ filamented structure at high magnification.

Total Concentration Calculation (Shower to Shower)

Prints of the micrographs were cut to estimate the relative ~~are~~ area of asbestos and ~~non~~ talc ~~areas~~. One fifth of one square contained in convertable asbestos, while approximately 1550 squares were covered with talc. This yeild an area percentage of one part in 7500 or roughly one one hundredth of one percent.

The total concentration of all "fibers" was near .one percent.

Summary: Neither scanning microscopy alone or aided by X-ray energy dispersive element detection can unequivocbly identify crysotile asbestos in concentration of a few percent. No elemental tag exists to descriminate asbestos from other fibrous minerals present. T.E.M. with electron diffraction shows less than ~~.01%~~ .01%

Thos. E. Hutchinson, Univ. of Minnesota

JOJO-MA2546-00146



Figure 20   Full diffractometer trace of Sample No. 16



JOJO-MA2546-00148